# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### SOUTHERN DIVISION

MARYLAND CHAPTER OF THE SIERRA
CLUB, part of Sierra Club, Inc.,
2101 Webster Street, Suite 1300
Oakland, CA 94612,

FRIENDS OF MOSES HALL,
7550 Seven Locks Road
Cabin John, MD 20818 (Montgomery
County),

NATIONAL TRUST FOR HISTORIC
PRESERVATION IN THE UNITED
STATES,
2600 Virginia Avenue NW, Suite 1100
Washington, DC 20037,

NATURAL RESOURCES DEFENSE
COUNCIL, INC.,
40 West 20th Street, 11th Floor
New York, NY 10011,

      *Plaintiffs*,

  v.

FEDERAL HIGHWAY ADMINISTRATION,
1200 New Jersey Avenue SE
Washington, DC 20590,

STEPHANIE POLLACK, in her official
capacity as Acting Administrator of the
Federal Highway Administration,
1200 New Jersey Avenue SE
Washington, DC 20590,

GREGORY MURRILL, in his official
capacity as Maryland Division
Administrator of the Federal Highway
Administration,
31 Hopkins Plaza, Ste. 1520

No. 22-cv-2597_____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

Baltimore, MD 21201,

MARYLAND DEPARTMENT OF
TRANSPORTATION,
7201 Corporate Center Drive
Hanover, MD 21076 (Anne Arundel
County),

JAMES F. PORTS, JR., in his official capacity
as Secretary of the Maryland Department of
Transportation,
7201 Corporate Center Drive
Hanover, MD 21076 (Anne Arundel County)

**INTRODUCTION**

1.      Defendants Federal Highway Administration (FHWA) and the Maryland Department of Transportation (MDOT) plan to widen and add toll lanes to a 15-mile stretch of I-495 (the Beltway) and I-270, between McLean, Virginia, and Gaithersburg, Maryland.

2.      Defendants ended their environmental review and approved the toll lanes project without disclosing crucial information about their conclusion that the project would reduce traffic congestion. They also refused to examine key threats to public health and historic sites. Defendants' deficient analysis of the toll lanes project violated the National Environmental Policy Act (NEPA), the Department of Transportation Act (Transportation Act), and the National Historic Preservation Act (NHPA).

3.      Defendants relied on traffic modeling performed by MDOT to predict that adding toll lanes will reduce traffic congestion on the Beltway and I-270. MDOT's model, however, counterfactually assumes that drivers will continue to pile onto these highways no matter how far the backup and no matter how long the delay. In reality, drivers often re-route when faced with extreme congestion. Defendants did not explain how they could reasonably rely upon the model's outputs given this serious limitation. MDOT also refused to release its underlying modeling files, further thwarting public scrutiny of Defendants' justification for the toll lanes project.

4.      Then, in the Final Environmental Impact Statement (FEIS) and the Record of Decision (ROD), Defendants revealed that MDOT had manually reduced the traffic volumes projected by its model on one set of ramps, erasing a predicted backup on the

1

Beltway. Modeling experts at the U.S. Department of Transportation tasked with reviewing this aspect of MDOT's modeling could not determine its "plausibility" or "reliability." Neither could the public.

5.     Defendants not only withheld important information about MDOT's traffic modeling, but they also refused to investigate important aspects of the project's harms to health and historic sites.

6.     By widening the highways to carry more cars and creating traffic bottlenecks where the toll lanes end, the toll lanes project would likely increase concentrations of fine particulate matter, which damages heart and lung health, in some communities near the Beltway and I-270. But Defendants refused to conduct *any* analysis of this harmful air pollution. They compounded this error by asserting, incorrectly, that air pollution from the toll lanes project would be evenly distributed along the project corridor. In fact, the record shows that air pollution would increase more in neighborhoods in Gaithersburg, Maryland that have a high proportion of minority and low-income residents—environmental justice communities which are already burdened with some of the highest levels of air pollution in the state.

7.     Defendants admit that the toll lanes project may disturb graves at the Morningstar Tabernacle No. 88 Moses Hall and Cemetery (Morningstar Moses Cemetery or Cemetery). The Cemetery is a nationally significant African American burial ground that is over 125 years old, and it abuts the Beltway. Widening the Beltway would disturb land that Defendants acknowledge may contain graves. Defendants nonetheless approved the toll lanes project without investigating this piece of land in

2

the project's path where people may be buried. Their disregard for this National Historic Register-eligible African American cemetery and the descendants of those buried there exacerbates the harm from the initial construction of the Beltway through the heart of the historic African American community of Gibson Grove, which is home to the Cemetery. Defendants concede that the Beltway's current alignment is a legacy of racial discrimination; yet, they remain unwilling to take simple, feasible steps to prevent further desecration of the Morningstar Moses Cemetery.

8.      The toll lanes project also threatens Plummers Island, another National Historic Register-eligible site whose biology has been the subject of over a century's worth of scientific research. A modest adjustment to Defendants' chosen alignment for the American Legion Bridge (which would be rebuilt and widened as part of the project) would have avoided the Island; its rare, threatened, and endangered plants; and its active research plots. Defendants, however, summarily dismissed that alternative without conducting the detailed inquiry prescribed by Defendant FHWA's own regulations. As at Morningstar Moses Cemetery, Defendants neglected the rigorous review mandated by Section 4(f) of the Transportation Act—a law passed shortly after the Beltway's construction and meant to ensure that federally sponsored highway projects would never again cause the thoughtless destruction of unique and prized natural and historic sites.

9.      Now that Defendants have issued an FEIS, final Transportation Act Section 4(f) determination, and ROD for the toll lanes project, Defendant MDOT and the project's private developer, with whom MDOT has partnered, are moving to complete

design and financing work, obtain final permits under other laws, and start construction.

10.     Defendants' actions threaten to advance the toll lanes project to a point beyond which they could no longer reasonably consider project alternatives if the Court were to order them to revise their NEPA, Transportation Act, or NHPA analyses to comply with those laws. To prevent that outcome, the Court should vacate the FEIS, Section 4(f) determination, and ROD and enjoin Defendants from taking further steps to finance, build, and operate the project until they fully comply with NEPA, the Transportation Act, NHPA, and the Administrative Procedure Act (APA).

## JURISDICTION AND VENUE

11.     This case arises under NEPA, 42 U.S.C. §§ 4321 et seq.; NHPA, 54 U.S.C. §§ 300101 et seq.; the Transportation Act, 49 U.S.C. §§ 101 et seq.; and the APA, 5 U.S.C. §§ 701-706. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (mandamus against U.S. agency officers), 28 U.S.C. § 1367 (supplemental jurisdiction), 28 U.S.C. §§ 2201-2202 (declaratory judgment and further necessary or proper relief), and 5 U.S.C. §§ 701-706 (APA).

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the toll lanes project would be built on land and over waters in this judicial district. Therefore, a substantial part of the property that is the subject of the action is situated in this district.

13.     Assignment to the Southern Division of this Court is appropriate because the Plaintiffs include a non-governmental entity residing in this division, and the

Defendants are a federal agency and federal and Maryland officials. L.R. 501.4(a)(ii).

**PARTIES**

**I.      Plaintiffs**

14.      Plaintiff Maryland Chapter of the Sierra Club (Sierra Club) is part of Sierra Club, the nation's largest and most enduring grassroots environmental organization and a not-for-profit 501(c)(4) corporation organized under California law. Sierra Club's mission is to explore, enjoy, and protect the earth's wild places; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. In furtherance of that mission, Sierra Club Maryland Chapter works to educate the public about the climate emergency and to advocate for bold systemic changes at the local and Maryland state level to promote a just and equitable transition away from fossil fuels and to protect air, water, land, and wildlife for future generations. The Sierra Club has more than 740,000 members nationwide, including more than 15,000 in Maryland.

15.      Sierra Club Maryland Chapter members have health, recreational, aesthetic, and other interests in areas harmed by the toll lanes project. For instance, Dr. Ivan Zama is a Sierra Club member and Bethesda resident whose backyard borders the Beltway's right-of-way. Two of Dr. Zama's children have trouble sleeping at night because of noise from the highway, despite his investment in triple-pane windows to dampen the sound. The toll lanes project would bring more cars closer to his home, exposing him and his family to more noise and air pollution, and reducing the value of

5

his property.

16.     Plaintiff Friends of Moses Hall is a not-for-profit membership organization that was organized for the purpose of protecting and preserving Maryland's Morningstar Tabernacle No. 88 Moses Hall and Cemetery, including protecting it from destruction and further desecration by expanding the Beltway. Among its objectives, Friends of Moses Hall aims to protect and preserve the site as an important African American historic site and as a hallowed final resting place for the ancestors of its members and other members of the local African American community. It is currently in the process of filing as a Maryland 501(c)(3) non-profit corporation.

17.     Plaintiff National Trust for Historic Preservation (National Trust) is a private charitable, educational, non-profit corporation chartered by Congress in 1949 to protect and defend America's historic resources; to further the historic preservation policy of the United States; and to "facilitate public participation" in the preservation of our nation's heritage. 54 U.S.C. § 312102(a). On behalf of its more than one million members and supporters around the country, the National Trust works to protect significant historic sites and to advocate historic preservation as a fundamental value in programs and policies at all levels of government. The National Trust is headquartered in Washington, D.C., and is authorized by Congress to sue in its corporate name. *Id*. §§ 312103, 312105(a). The National Trust's Chairman is designated by Congress as a member of the Advisory Council on Historic Preservation, an independent federal agency whose duties include implementation and enforcement of NHPA Section 106. *Id*. §§ 304101(a)(9), 304108(a). The National Trust participated in the Section 106

consultation and NEPA review processes for the toll lanes project, and in 2021 included Morningstar Tabernacle No. 88 Moses Hall and Cemetery on its annual list of *America's 11 Most Endangered Historic Places*.

18.     Members of Friends of Moses Hall, the National Trust, and Sierra Club have familial, conservation, and/or aesthetic interests in Morningstar Tabernacle No. 88 Hall and Cemetery, and surrounding areas threatened by the project. For example, Diane Baxter is a member of Friends of Moses Hall, National Trust, and Sierra Club. Two of Ms. Baxter's great grandparents are buried in the Morningstar Moses Cemetery. The exact location of their graves is unknown. Ms. Baxter has spent considerable time and effort working to study, protect, and preserve the site, in cooperation with other descendants of individuals interred there, archaeological experts, and members of the Cabin John community. The project's construction and the operation of the expanded lanes would encroach on burials and other cultural and historic features of the site Ms. Baxter values, studies, and works to protect for future generations, and it may cause the destruction of burials and other features. Further, the toll lanes project would expose her to additional noise and air pollution during her visits to the Cemetery.

19.     Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a not-for-profit, tax-exempt membership organization organized under New York law. NRDC's mission is to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends.

20.     NRDC members have health, recreational, aesthetic, and other interests in areas threatened by the project. For example, NRDC member Chris Ecker lives in

Rockville, Maryland, about a quarter mile from a segment of I-270 that would be widened by the project. Mr. Ecker has a severe lung condition that requires him to carry oxygen with him when he travels outside his home and is on the waiting list for a lung transplant. He often has to keep his windows closed to reduce his exposure to noise and other pollution from the highway. He worries that construction of the project and operation of the expanded highway will worsen the noise and air pollution he is exposed to, further threatening his health and interfering with his enjoyment of his home and neighborhood.

21.     NRDC, Sierra Club, and National Trust members have research and aesthetic interests in Plummers Island that would be harmed by the expansion of the American Legion Bridge as part of the toll lanes project. For example, NRDC, Sierra Club, and National Trust member Dr. Robert Soreng is a research associate botanist with the Smithsonian and the president of the Washington Biologists' Field Club—an organization of naturalists that undertakes research into the ecology and biology of Plummers Island. He regularly visits Plummers Island and intends to continue to do so. Construction of the toll lanes project would destroy biological research plots on Plummers Island that Dr. Soreng has studied in the past and intends to study again in the future. Project construction would also destroy rare, threatened, and endangered plants and plant communities on the Island that Dr. Soreng and other members of the Washington Biologists' Field Club enjoy observing and monitoring in their natural states.

## II.    Defendants

### A.    Federal Defendants

22.    Defendant Federal Highway Administration (FHWA) is a federal agency and a subdivision (or "administration") of the federal Department of Transportation. FHWA co-published the June 17, 2022 combined FEIS and Transportation Act Section 4(f) evaluation for the toll lanes project. FHWA also issued the August 25, 2022 ROD approving the project. The ROD incorporates and relies on the findings in the FEIS and associated review documents. FHWA is also the lead federal agency for purposes of the NHPA Section 106 review of the toll lanes project.

23.    Defendant Stephanie Pollack is FHWA's Acting Administrator, its highest ranking official. In that capacity, Defendant Pollack is responsible for the administration, operations, and activities of the FHWA, and for the agency's compliance with federal laws, including NEPA and Transportation Act Section 4(f). Ms. Pollack is sued in her official capacity.

24.    Defendant Gregory Murrill is the Division Administrator for the FHWA's Maryland Division and the ROD's signatory. He also signed a NHPA Section 106 Programmatic Agreement for this project on behalf of FHWA. Mr. Murrill is sued in his official capacity.

### B.    Maryland Defendants

25.    Defendant Maryland Department of Transportation (MDOT) is the state agency charged with planning, designing, building, and maintaining Maryland's highway system.

9

26.     MDOT owns and maintains Maryland highway segments that would be expanded and/or rebuilt as part of the project, including the Beltway from the American Legion Bridge over the Potomac River to the I-270 spur and I-270 from the Beltway to I-370.

27.     MDOT co-published the FEIS with FHWA and served as co-lead agency for its development. MDOT is responsible for the commitments and mitigation listed in Appendix A to the ROD, under FHWA's oversight. MDOT also exercised delegated authority from FHWA to lead aspects of the NHPA Section 106 process for reviewing the toll lanes project's effects on historic properties. MDOT has primary responsibility for ensuring implementation of the mitigation measures set out in the Programmatic Agreement executed as part of the Section 106 process.

28.     MDOT and the Maryland Transportation Authority have entered a Phase 1 Public-Private Partnership Agreement (P3 Agreement) with a private developer, Accelerate Maryland Partners LLC, to govern the toll lanes project's development. The P3 Agreement acknowledges that FHWA and MDOT share "control and responsibility" for the NEPA process and had the discretion to choose not to pursue the project.

29.     Defendant James F. Ports, Jr. is MDOT's Secretary and is responsible for its operations. He is also Chairman of the Maryland Transportation Authority. His predecessor, Gregory Slater, signed the P3 agreement for MDOT. Mr. Ports is sued in his official capacity.

## STATUTORY AND REGULATORY BACKGROUND

### I.    National Environmental Policy Act (NEPA)

30.    Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment," and by extension promote human health and welfare. 42 U.S.C. § 4321. NEPA makes it "the continuing policy of the Federal Government, in cooperation with State and local governments, . . . to create and maintain conditions under which man and nature can exist in productive harmony." *Id.* § 4331(a). It places responsibility on the federal government "to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources" to "preserve important historic, cultural, and natural aspects of our natural heritage"; "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings"; and "fulfill the responsibilities of each generation as trustee of the environment" for future generations. *Id.* § 4331(b)(1), (2), (4).

31.    To further these purposes, NEPA requires federal agencies to prepare a "detailed statement" on environmental effects, or Environmental Impact Statement (EIS), before pursuing "major Federal actions significantly affecting the quality of the human environment." *Id.* § 4332(2)(C). This requirement ensures that agencies "take a 'hard look' at the environmental effects" of those actions before approving them. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989).

32.    NEPA established a Council on Environmental Quality within the Executive Office of the President. 42 U.S.C. §§ 4321, 4342. The Council has issued

regulations implementing NEPA. 40 C.F.R. pts. 1500-08. FHWA has supplemented these regulations with its own implementing regulations, codified at 23 C.F.R. part 771.

33.     The Council's and FHWA's regulations provide for an EIS on a proposed federal action to be accompanied or followed by a public record of decision (ROD). 40 C.F.R. § 1505.2 (2019)[1]; 23 C.F.R. §§ 771.124(a), 771.127(a). Until a lawful EIS and ROD have been issued, "no action concerning the proposal shall be taken which would" either (1) "[h]ave an adverse environmental impact," or (2) "[l]imit the choice of reasonable alternatives" to the proposal. 40 C.F.R. § 1506.1(a). For highway projects requiring an EIS, with limited exceptions, this means that final design activities, property acquisition, construction materials purchases, and construction "must not proceed" until a lawful EIS and ROD have issued. 23 C.F.R. § 771.113(a).

34.     State highway agencies may co-lead the preparation of an EIS for proposed highway projects within their jurisdictions, alongside FHWA. 42 U.S.C. § 4332(D); 40 C.F.R. §§ 1501.5(b), 1506.2(c); 23 C.F.R. § 771.109(c)(2)-(5). State highway agency co-leads and project sponsors are responsible for implementing mitigation measures specified as commitments in the NEPA approval documents, under FHWA's supervision, unless the FHWA agrees to delete or change those measures. 23 C.F.R. § 771.109(b), (d).

---

[1] The Council issued revised NEPA regulations in 2020 that apply to "any NEPA process begun after September 14, 2020." 40 C.F.R. § 1506.13 (2021). The NEPA process challenged here began earlier. 83 Fed. Reg. 11,812 (Mar. 16, 2018). Accordingly, the complaint cites the regulations then in force, as codified in 2019.

## II.    Transportation Act Section 4(f)

35.    The Department of Transportation Act established the FHWA and governs its activities. *See* 49 U.S.C. § 104(a).

36.    Section 4(f) of the Transportation Act makes it "the policy of the United States government that special effort should be made to preserve the natural beauty of . . . public park and recreation lands," as well as "historic sites." *Id*. § 303(a), 303(f)(1) (explaining that "[t]he requirements of this section are commonly referred to as section 4(f) requirements"). FHWA has adopted Section 4(f) implementing regulations, codified at 23 C.F.R. part 774.

37.    Section 4(f) requires FHWA to determine whether proposed transportation projects will "requir[e] the use of publicly owned land of a public park . . . of national, State, or local significance, or land of an historic site of national, State or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park . . . or site)." 49 U.S.C. § 303(c); *see also* 23 C.F.R. §§ 774.3(a), 774.17. If so, FHWA may approve the project only if (1) "there is no prudent and feasible alternative to using that land," and (2) the "project includes all possible planning to minimize harm to the park . . . or historic site resulting from the use." 49 U.S.C. § 303(c); *see also* 23 C.F.R. § 774.3(a). If there is no prudent and feasible alternative that avoids the use of all Section 4(f) property, then FHWA must choose the alternative that "[c]auses the least overall harm in light of the statute's preservation purpose." 23 C.F.R. § 774.3(c)(1). FHWA's Section 4(f) regulations specify a series of factors the agency must consider and balance in determining least overall harm. *Id*.

13

38.     For transportation projects that require preparation of an EIS, Section 4(f)

requires FHWA to make these determinations before issuing a ROD. 23 C.F.R.

§ 774.9(b). That is because the potential use of parks or historic sites for such projects

"shall be evaluated as early as practicable in the development of the action when

alternatives to the proposed action are under study." *Id.* § 774.9(a).

### III.     National Historic Preservation Act (NHPA) Section 106

39.     NHPA makes it "the policy of the Federal Government . . . in partnership

with States," to "contribute to the preservation of nonfederally owned historic property

and give maximum encouragement to organizations and individuals undertaking

preservation by private means"; to "administer federally owned, administered, or

controlled historic property in a spirit of stewardship for the inspiration and benefit of

present and future generations"; and to help states and the National Trust for Historic

Preservation "expand and accelerate their historic preservation programs and

activities." 54 U.S.C. §§ 300101(3)-(4), (6), 300312.

40.     In furtherance of this policy, Section 106 of NHPA requires the heads of

federal agencies, prior to carrying out, funding, or licensing proposed projects, to "take

into account" the projects' effects on properties that are included or eligible for

inclusion on the National Register of Historic Places. 54 U.S.C. §§ 306108, 300320,

300308, 300311; *see also* 49 U.S.C. § 303(f)(2) (explaining that "[t]he requirements of

section 306108 of title 54 are commonly referred to as section 106 requirements," based

on an earlier codification of NHPA).

41.     NHPA established an Advisory Council on Historic Preservation

(Advisory Council) and authorized it to adopt regulations implementing Section 106. 54

U.S.C. §§ 304101, 304108(a). Those implementing regulations are codified at 36 C.F.R.

part 800, and are binding on all federal agencies, including FHWA. FHWA has not

issued any supplemental regulations implementing Section 106.

## IV.   Administrative Procedure Act (APA)

42.    The APA gives any "person suffering legal wrong because of agency

action, or adversely affected or aggrieved by agency action," the right to federal judicial

review. 5 U.S.C. § 702. Reviewing courts "shall . . . hold unlawful and set aside agency

action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of

discretion, or otherwise not accordance with law." *Id*. § 706(2)(A).

FACTUAL BACKGROUND

43.    In the ROD, FHWA approved MDOT's plan to add approximately 15

miles of toll lanes to the Beltway and I-270. Two toll lanes in each direction would run

from the Beltway's interchange with the George Washington Memorial Parkway in

McLean, Virginia, across the American Legion Bridge to west of Old Georgetown Road

in Bethesda, Maryland. On I-270, the toll lanes would extend from the Beltway to I-370

in Gaithersburg, Maryland. The following figure from the ROD depicts the toll lanes

project in dark blue:

15



44.     To add four toll lanes, MDOT would widen the Beltway and I-270, taking property from hundreds of homes and businesses. The toll lanes project would pave over 100 acres and harm 455 acres of forest; nearly eight linear miles of streams; portions of 13 national, county, and city parks; six archaeological sites; and at least four historic sites.

45.     MDOT anticipates the project would cost $3.75 to $4.25 billion and that construction would last at least five years.

46.     MDOT plans to deliver the toll lanes project through a public-private partnership, or "P3," with Accelerate Maryland Partners. A private subsidiary of Accelerate Maryland Partners would be responsible for final design, construction, operation, and maintenance of the project for a 50-year term. MDOT anticipates that the project's construction would be financed through private debt and equity, as well as through state bonds and the federal Department of Transportation's Infrastructure and Innovation Act credit assistance program. The private subsidiary would seek to recoup

16

its costs through tolls collected from drivers who use the new lanes.

47.     MDOT's P3 Agreement with Accelerate Maryland Partners, entered in August 2021, provides that if the project receives NEPA approval, MDOT will seek Maryland Board of Public Works approval to enter into a 50-year contract with the subsidiary—or "Section Developer"—to govern final design, construction, operation, and maintenance. This anticipated 50-year contract is generally referred to as the Section Contract.

48.     The P3 Agreement provides that if MDOT unilaterally declines to proceed with construction after financial close on the Section Contract, MDOT "shall pay compensation to the Section Developer in an amount equal to the MDOT Termination Sum." The MDOT Termination Sum is calculated by reference to the project's commercial value to the Section Developer and, on information and belief based on MDOT's estimated $3.75 to $4.25 billion project budget, would be a substantial amount.

49.     Tolls on the expanded sections of the Beltway and I-270 would vary based on traffic. As the remaining general purpose (or free) lanes became more congested, toll rates would rise to limit traffic in the toll lanes and keep vehicles in the toll lanes moving at least 45 miles per hour.

**I.      Deficiencies in Defendants' NEPA Review**

50.     The toll lanes project is a major federal action significantly affecting the environment for which NEPA requires an environmental impact statement. *See* 42 U.S.C. § 4332(2)(C).

51.     On July 10, 2020, Defendants issued a Draft Environmental Impact

17

Statement (DEIS) for the project.

52.     On October 1, 2021, Defendants issued a Supplemental Draft Environmental Impact Statement (SDEIS).

53.     On June 17, 2022, Defendants issued the FEIS.

54.     On August 25, 2022, federal Defendants approved the toll lanes project in the ROD.

55.     Defendants' NEPA review failed to disclose crucial information about traffic modeling, failed to take a hard look at project emissions of $PM_{2.5}$, and failed to take a hard look at project impacts to environmental justice communities.

**A.    Defendants' failures to disclose and explain MDOT's traffic modeling**

56.     Defendants used and relied on traffic modeling conducted by MDOT to predict the extent to which the toll lanes project would reduce traffic congestion on the Beltway, I-270, and local roads.

57.     MDOT's modeling projected the volume of traffic on the region's roads in 2045. MDOT forecast that, over the next two decades, population and job growth would increase traffic on the Beltway and I-270. MDOT's model assigned projected traffic volumes to individual segments of the regional road network. MDOT assigned many road segments a higher volume of traffic than those segments have capacity to handle. In some cases, volumes were more than double the segment's capacity.

58.     MDOT's "microsimulation" model then used assumptions about driver behavior (such as following distance between cars) to translate the estimated volumes on the roads into predictions about congestion. MDOT's modeling forecast extreme

congestion on road segments where traffic volumes exceeded capacity. MDOT's model then purported to show that adding capacity to the Beltway and I-270 in the form of new toll lanes would reduce traffic congestion.

59.     MDOT's model overestimates congestion on the Beltway and I-270 without the new toll lanes in part because the model does not account for a basic aspect of driver behavior: Many drivers faced with extreme congestion will take a different route, travel at a different time, use public transportation, or opt not to travel at all. Drivers would not all, as MDOT's model assumes, continue to pile onto gridlocked roads, then sit in traffic for hours on end.

60.     Sierra Club identified this shortcoming in MDOT's model in public comments submitted on the DEIS, SDEIS, and FEIS.

61.     This shortcoming was also described in an analysis of MDOT's model conducted by traffic modeling experts at the U.S. Department of Transportation's Volpe Center. In the ROD, FHWA described the Volpe Center as "a resource providing world-renowned multidisciplinary, multimodal transportation expertise on behalf of DOT, other federal agencies, and external organizations." The Volpe Center also noted that traffic models are capable of accounting for drivers re-routing to avoid congestion, but that MDOT did not take these steps to increase the reliability of its predictions.

62.     FHWA and MDOT did not respond to comments on this issue. In the ROD, FHWA acknowledged "inherent limitations" in MDOT's model but did not explain why it still relied on questionable model outputs.

63.     The agencies also did not respond to Sierra Club comments questioning

whether MDOT had complied with key provisions of MDOT and FHWA traffic modeling guidance. Nor did the agencies disclose the specific assumptions MDOT's model made about driver behavior. MDOT guidance indicates that different sets of assumptions can lead to significantly different model outputs.

64.     The FEIS did, however, reveal that MDOT had made changes to its traffic model between the SDEIS and FEIS. The nature and extent of those changes, however, were unclear from the FEIS.

65.     To attempt to better understand MDOT's traffic modeling, in June 2022, Sierra Club asked MDOT to release the electronic files containing MDOT's model inputs and outputs. In August 2022, the City of Rockville made a similar request.

66.     MDOT processed both requests under Maryland's Public Information Act. MDOT denied Sierra Club's and the City of Rockville's requests for fee waivers and refused to produce records without a substantial up-front payment to cover estimated search costs. FHWA and MDOT did not make modeling files public before releasing the ROD.

67.     Faced with questions about changes made to the model between the SDEIS and FEIS, FHWA referred one set of comments to modeling experts at the Volpe Center.

68.     The Volpe Center reviewed portions of the SDEIS and FEIS, a public comment letter from the Maryland Transit Opportunities Coalition, and MDOT's proposed response to that letter. The Volpe Center did not review public comments from Sierra Club's traffic modeling expert and did not review the modeling files

20

requested by Sierra Club and the City of Rockville.

69.     Although the ROD does not fully explain the changes that MDOT made to its model between the SDEIS and FEIS, the ROD does indicate that those changes included manually reducing the initially projected traffic volumes on ramps connecting the Beltway to the Greenbelt Metro Station.

70.     MDOT claimed that it reduced traffic volumes on these ramps by hand because the initially projected volumes exceeded the ramps' capacities and generated extensive backups on the Beltway.

71.     By manually reducing the volumes on the ramps, MDOT cleared the forecast backups. This change improved the projected performance of the toll lanes project by increasing the predicted number of cars per hour the expanded Beltway would carry relative to taking no action to expand the highway.

72.     The Volpe Center stated that it lacked the information necessary to evaluate the "plausibility" or "validity" of MDOT's manual adjustments to traffic volumes at these ramps.

73.     Defendants did not explain in the ROD or elsewhere why MDOT's manual adjustments to traffic volumes were plausible or valid.

74.     Defendants also never explained why MDOT changed traffic volumes *only* at the Greenbelt Metro ramps. In multiple rounds of public comments, Sierra Club's traffic modeling expert pointed out that traffic volumes exceeded capacity on numerous road segments, producing unrealistic levels of congestion. Defendants never acknowledged, let alone justified, this internal inconsistency.

21

**B.      Defendants' refusal to analyze harmful fine particulate ($PM_{2.5}$) air pollution from the toll lanes project**

75.      $PM_{2.5}$ is a type of fine particulate matter and a harmful air pollutant. Exposure to $PM_{2.5}$ is linked to premature death, heart attack, asthma exacerbation, and decreased lung function.

76.      Motor vehicles emit $PM_{2.5}$ from their tailpipes and through wear and tear on brakes and tires.

77.      Heavily traveled highways can generate unsafe levels of $PM_{2.5}$ in nearby communities.

78.      FHWA and MDOT refused to conduct any analysis of the toll lanes project's impact on $PM_{2.5}$ pollution.

79.      In their review of the toll lanes project, FHWA and MDOT neither measured nor estimated concentrations of $PM_{2.5}$ in the air in communities near the Beltway or I-270.

80.      FHWA and MDOT have not analyzed how building or operating the toll lanes project will affect $PM_{2.5}$ concentrations in communities near the Beltway or I-270.

81.      FHWA and MDOT claimed that the agencies did not need to analyze $PM_{2.5}$ pollution from the toll lanes project because the D.C. region is in attainment for the National Ambient Air Quality Standards (NAAQS) for $PM_{2.5}$.

82.      The $PM_{2.5}$ NAAQS are binding regulatory caps on the concentration of $PM_{2.5}$ that can lawfully exist in the ambient air, established by the U.S. Environmental

Protection Agency (EPA) under the Clean Air Act.[2] 42 U.S.C. §§ 7409, 7410(a); 40 C.F.R. § 50.7. After establishing a NAAQS, EPA designates air quality regions that meet the NAAQS as being in "attainment," and those that do not as being in "nonattainment." 42 U.S.C. § 7407(d)(1). EPA determines attainment and nonattainment based on measurements of pollution in the ambient air taken at approved monitors in a region. *See* 40 C.F.R. pt. 50, app. N. States must submit for EPA approval a state implementation plan that describes how the state will implement, maintain, and enforce the NAAQS. 42 U.S.C. §§ 7407(a), 7410(a)(1). State implementation plans for nonattainment areas must contain more stringent pollution control measures than those required for attainment areas. *Id.* § 7502(c).

83.     If a region is in nonattainment, a federal agency cannot approve a transportation project unless the project "conform[s] to [a state] implementation plan" approved by EPA. *Id.* § 7506(c)(1)-(2). A project conforms if, among other requirements, it will not "cause or contribute to any new violation" of the NAAQS or "increase the frequency or severity of any existing violation." *Id.* § 7506(c)(1)(B)(i)-(ii). Conformity determinations are not required for transportation projects in regions that are in attainment. *See id.* § 7506(c)(5).

84.     No $PM_{2.5}$ conformity determination was made for this project.

85.     Notwithstanding the D.C. region's attainment status for the $PM_{2.5}$

---

[2] EPA has set a "primary" (health-based) NAAQS annual average standard for $PM_{2.5}$ of 12 micrograms per cubic meter ($\mu g/m^3$), and a daily average standard of 65 $\mu g/m^3$. 40 C.F.R. § 50.7(a).

NAAQS, the toll lanes project may cause serious harm to people living and working near the Beltway and I-270 by increasing their exposure to $PM_{2.5}$.

86.     There is scientific consensus that exposure to concentrations of $PM_{2.5}$ below the NAAQS can cause serious health harms. "[A]ny amount of $PM_{2.5}$ in the system is harmful." *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 92 (4th Cir. 2020).

87.     The regional monitors used to determine attainment are too far away from the Beltway and I-270 to fully capture those highways' effects on $PM_{2.5}$ concentrations in near-highway communities. Concentrations of $PM_{2.5}$ emitted from vehicles traveling on highways are highest within several hundred feet of the highway and decrease with additional distance. The closest monitor to the proposed toll lanes is about three miles from I-270, in a public park.

88.     In 2015, MDOT conducted $PM_{2.5}$ monitoring near the Beltway. That monitoring detected $PM_{2.5}$ concentrations above the NAAQS. Defendants did not address this monitoring in their NEPA review, even though Sierra Club raised it in comments.

### C.     Defendants' arbitrary conclusion that the toll lanes project would not disproportionately harm environmental justice communities

89.     In part because of past discriminatory highway routing decisions, several low-income communities and communities of color are clustered near the Beltway and I-270. In the FEIS, FHWA and MDOT purported to evaluate whether pollution and other harms from the toll lanes project would fall disproportionately upon these

environmental justice communities.

90.     FHWA and MDOT identified environmental justice communities as census blocks within 0.25-mile of the project ("Community Effects Assessment Analysis Area") with either (1) a percentage of minority residents above the state average of 49 percent, or (2) median household income below a low-income threshold.

91.     The agencies concluded that the toll lanes project's air quality impacts would not disproportionately harm environmental justice communities because exposure to the project's air pollution would be distributed along the project corridor. Evidence before the agencies contradicts this conclusion.

92.     The toll lanes project would exacerbate already severe traffic congestion in Gaithersburg, where eight out of nine of the census blocks within the Community Effects Assessment Analysis Area are environmental justice communities. Traffic would get worse in these communities because the northbound toll lanes on I-270 would end in Gaithersburg, and significant backups would form where the toll lanes merge with general purpose lanes.

93.     Idling cars generate excess air pollution, and increased congestion on the Gaithersburg section of I-270 would disproportionately increase air pollution in environmental justice communities.

94.     Thus, contrary to FHWA and MDOT's conclusion, environmental justice communities bordering the highway in Gaithersburg would suffer a burden that is "appreciably more severe or greater in magnitude than the adverse effect that [would] be suffered by" non-environmental justice communities. *See* USDOT Order 5610.2C;

FHWA Order 6640.23A.

95.     FHWA and MDOT's environmental justice analysis was also deficient because they failed to take a hard look at the toll lanes project's cumulative impacts on environmental justice communities, as required by NEPA. *See* 40 C.F.R. § 1508.27(b)(7).

96.     "Cumulative impact" refers to the proposed federal action's incremental impact "when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7.

97.     Consideration of cumulative impacts is an essential component of an environmental justice analysis. Many minority communities and low-income communities are already overburdened by environmental, public health, and socioeconomic stressors. These existing burdens often render environmental justice communities more susceptible to environmental harms that may affect other populations less severely.

98.     FHWA and MDOT considered *only* the incremental harms from the toll lanes project. The agencies did not take a hard look at whether and how the project would exacerbate existing pollution burdens and health vulnerabilities faced by environmental justice communities.

99.     For example, environmental justice communities in Gaithersburg already face some of the worst air quality in Maryland and significantly higher exposure to air toxics and respiratory hazards than the state's general population in part because of these communities' proximity to heavy traffic on I-270 and I-370. Even though the

26

record before FHWA and MDOT showed that the toll lanes project would worsen traffic congestion and air pollution in Gaithersburg, the agencies did not examine the cumulative effect that this additional pollution would have on these already overburdened communities.

## II.  Deficiencies in Defendants' Reviews Under Transportation Act Section 4(f) and NHPA Section 106

100.   Transportation Act Section 4(f) and NHPA Section 106 obligated FHWA to evaluate the toll lanes project's effects on historic sites and to avoid and mitigate harms wherever possible. 49 U.S.C. § 303(c); 54 U.S.C. § 306108; 36 C.F.R. § 800.6(a)-(b). FHWA incorporated its Section 4(f) and Section 106 reviews into the NEPA process it co-led with MDOT, which culminated with Defendants' issuance of the FEIS and ROD.

101.   FHWA and MDOT concluded that the toll lanes project would "use" Section 4(f)-protected land at 20 historic sites and public parks.

102.   The ROD declares that there were no prudent and feasible alternatives to avoid the use of these historic sites and parks and that the FEIS and earlier NEPA documents "presented measures that had been identified to ensure all possible planning to minimize harm and mitigate for adverse impacts and effects."

103.   Under Section 106 of NHPA, FHWA and MDOT found that the toll lanes project would have an "adverse effect" on four historic sites. *See* 36 C.F.R. § 800.5(a), (d). The Section 106 process concluded with a Programmatic Agreement, setting out MDOT and FHWA's obligations for consultation and mitigation related to historic properties that the agencies identified as being harmed by the project. *See id.* § 800.14(b).

104.    Defendants' evaluation of how the toll lanes project would harm historic sites and public parks was deficient with respect to two sites eligible for listing on the National Register of Historic Places: Morningstar Tabernacle No. 88 Moses Hall and Cemetery and Plummers Island.

A.    **Defendants' refusal to determine, prior to issuing the ROD, how the toll lanes project would use and harm Morningstar Moses Cemetery**

105.    In the 1880s, Black residents of the Gibson Grove community in Cabin John, Maryland, established Morningstar Tabernacle No. 88, a chapter of the African American benevolent society, the Ancient United Order of the Sons and Daughters, Brothers and Sisters of Moses. They built Moses Hall, a fellowship lodge for community meetings and social gatherings. Next to the Hall, they established the Morningstar Moses Cemetery for society members and families.

106.    Burials in Morningstar Moses Cemetery date back to at least 1894 and continued into the 1970s. Hundreds of people are buried in Morningstar Moses Cemetery, most in graves that are no longer marked. The exact boundaries of the cemetery are not known.

107.    Morningstar Tabernacle No. 88 Moses Hall and Cemetery has been determined eligible for inclusion in the National Register of Historic Places. The Cemetery is a nationally significant African American burial ground.

108.    In the 1960s, Maryland and the federal government constructed the Beltway through the middle of the African American community of Gibson Grove. Records from eminent domain proceedings indicate that, in acquiring the right-of-way

for the Beltway, Maryland paid Black property owners significantly less per acre than white property owners in the area. FHWA and MDOT now acknowledge that the decision to route the Beltway through this Black community resulted from racial discrimination.

109.    One result of this discrimination and destruction is that, although Morningstar Moses Cemetery for nearly a century was on a quiet wooded slope in the protective community of Gibson Grove, the Cemetery now sits just feet from the Beltway and is subject to its significant environmental impacts.

110.    Through the Section 106 process, MDOT identified Morningstar Moses Cemetery as a historic site that could be adversely affected by the toll lanes project. In 2021, MDOT commissioned an archaeologist to search for graves in the Morningstar Moses Cemetery using ground-penetrating radar.

111.    The survey revealed 377 probable and possible burials. Dozens of the probable and possible burials are located in the state right-of-way, which is set off from the rest of the Cemetery by a chain-link fence installed by MDOT.

112.    The survey did not investigate the entire Cemetery or determine the Cemetery's boundaries. The survey did not extend to portions of the state right-of-way that would be disturbed by construction of the toll lanes project. FHWA and MDOT admit that individuals may be buried in this portion of the right-of-way and that construction of the toll lanes project may disturb burials. Such disturbance could include disinterring people buried in Morningstar Moses Cemetery and reburying them elsewhere.

113.     Even though FHWA and MDOT knew that individuals may be buried in the path of the new toll lanes, the agencies did not fully investigate the site. Instead, Federal Defendants issued the ROD without determining whether the toll lanes project would "use" or have an "adverse effect" on Morningstar Moses Cemetery under Transportation Act Section 4(f) and NHPA Section 106. 49 U.S.C. § 303(c); 54 U.S.C. § 306108; 36 C.F.R. § 800.5(a).

114.     FHWA and MDOT have deferred the use and adverse-effect determinations until the construction phase of the toll lanes project. During this phase, MDOT plans to commission a ground-penetrating radar survey to search for burials in the portions of the site that will be disturbed by construction.

115.     Despite Defendants' deferral of the use and adverse-effect determinations for this site, the FEIS and ROD repeatedly and inaccurately state that "impacts to Morningstar Tabernacle No. 88 Moses Hall and Cemetery are avoided."

116.     FHWA and MDOT refused to address or even acknowledge the cumulative impacts to Morningstar Tabernacle No. 88 Moses Hall and Cemetery from expanding the same highway that has already so degraded both the site and the community of Gibson Grove. In response to comments from Friends of Moses Hall urging them to consider these cumulative effects, MDOT and FHWA contended that the toll lanes project would have no adverse effects on the Cemetery and therefore no cumulative effects. This conclusion was inconsistent with Defendants' admission that they had not determined whether the toll lanes project would have adverse effects on the Cemetery by disturbing graves. Such disturbance would exacerbate the devastating

harms from the initial construction of the Beltway and constitute a cumulative impact to the Cemetery.

**B.   Defendants' failure to minimize harm to Plummers Island**

117.   Plummers Island is a 12.2-acre island in the Potomac River, located entirely within the Chesapeake and Ohio Canal National Historical Park. Plummers Island lies just east and downstream of the American Legion Bridge, which carries the Beltway across the Potomac River between Maryland and Virginia.

118.   Plummers Island, a unique natural area that hosts a number of rare, threatened, and endangered species, has been the subject of ecological, natural history, and geological research for over a century.

119.   The research on Plummers Island has been stewarded since 1901 by the Washington Biologists' Field Club (Field Club), a non-profit organization dedicated to studying long-term trends in biodiversity and ecology on Plummers Island.

120.   In the late 1950s, the Field Club deeded Plummers Island to the United States. As part of that agreement, the Field Club retained the right to maintain Plummers Island as a natural area and to use it for scientific research and meetings.

121.   Plummers Island is considered "the most thoroughly studied island in North America." The extensive research into Plummers Island includes nearly 400 scientific publications about the Island's biology, and research on the Island continues today.

122.   Plummers Island is eligible for inclusion in the National Register of Historic Places for, among other things, its contributions to science and conservation as

the site of long-term scientific studies, and it qualifies as a "historic site" under Section 4(f) of the Department of Transportation Act. 49 U.S.C. § 303(c); 23 C.F.R. § 774.17.

123.    The toll lanes project would reconstruct and widen the American Legion Bridge. The project would "use" Plummers Island under Section 4(f). 49 U.S.C. § 303(c); 23 C.F.R. § 774.17.

124.    The toll lanes project would require construction on Plummers Island, including excavation and access for demolition of the existing bridge foundation and piers adjacent to the Island.

125.    Three approximately 10-foot diameter pier foundations would be built on the Island.

126.    The widened American Legion Bridge would also overshadow and harm vegetation on the Island, including rare, threatened, and endangered plant species.

127.    The widened American Legion Bridge would adversely affect and in some cases destroy Field Club research plots on Plummers Island.

128.    The new bridge piers would change the way the river flows around Plummers Island, increasing the potential for logjams that can cause catastrophic flooding and erosion of the Island. In addition, the widening of the bridge will increase noise on the Island, which could disturb wildlife, as well as increase polluted runoff from the bridge into the Potomac and the channel separating Plummers Island from the riverbank, which could harm freshwater ecosystems around the Island.

129.    In spite of these many expected harms to Plummers Island, Defendants rejected alternative options for expanding the American Legion Bridge that would

avoid or minimize the harms. They did so without adequately documenting or explaining how the chosen design causes the least overall harm, in violation of Section 4(f).

130.    Under Section 4(f), if there is "no feasible and prudent" alternative that avoids the use of 4(f) property, then FHWA "may approve, from among the remaining alternatives that use Section 4(f) property, only the alternative that . . . [c]auses the least overall harm in light of the statute's preservation purpose." 23 C.F.R. § 774.3(c)(1); *see also* 49 U.S.C. § 303(c).

131.    Section 4(f) required FHWA to balance the following factors to identify the alternative that caused the least overall harm: "(i) The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property); (ii) The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection; (iii) The relative significance of each Section 4(f) property; (iv) The views of the official(s) with jurisdiction over each Section 4(f) property; (v) The degree to which each alternative meets the purpose and need for the project; (vi) After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and (vii) Substantial differences in costs among the alternatives." 23 C.F.R. § 774.3(c)(1).

132.    FHWA was also required to document in the FEIS or ROD its analysis of how the preferred alternative causes the least overall harm in accordance with the multifactor balancing test laid out above. *Id.* §§ 774.7(c), 774.9(b).

33

133.    MDOT and FHWA concluded that there was no "feasible and prudent" alternative to reconstructing and widening the American Legion Bridge that would avoid use of all Section 4(f) property. That conclusion obliged them to identify and select from among the design alternatives that would use Section 4(f) property the one that "[c]auses the least overall harm." *Id.* § 774.3(c)(1).

134.    MDOT and FHWA chose a design that would center the widened bridge on its current alignment, rather than one in which all new lanes would be added to the west of the current lanes—an alternative MDOT and FHWA referred to as the "west shift" alignment.

135.    The west shift alignment would have entirely avoided impacts to Plummers Island and was considered a "viable" option by a team of experts assembled by MDOT to evaluate alternative designs for the expanded bridge.

136.    MDOT and FHWA nonetheless rejected the west shift alignment because it would impact a residential community in Virginia, require reconfiguration of the Clara Barton Parkway interchange, and impact a larger acreage of National Park Service lands.

137.    This explanation was inadequate. The agencies' cursory analysis made no mention of the factors found in 23 C.F.R. § 774.3(c)(1). Nor did the agencies consider most of them. For example, the agencies never weighed "the relative significance" of Plummers Island—a site of scientific and historical value—against that of the parkland used by the west shift alignment. *See id.* § 774.3(c)(1)(iii). They also failed to sufficiently describe the nature of the impacts to the other parkland that would be used by the west

34

shift alignment or explain how the severity of those harms rivals the severity of harms

to Plummers Island, including destruction of long-term research plots. *See id.*

§ 774.3(c)(1)(ii). Nor did they describe any possible mitigation that could be undertaken

to minimize any impacts to the other parkland at issue, or discuss the relative cost of the

west shift and their chosen alignment. *See id.* § 774.3(c)(1)(i), (vii). This deficient analysis

of the west shift alignment stands in stark contrast to the detailed, factor-by-factor

analysis undertaken by the agencies with respect to other location-specific alternatives

that would have avoided the use of individual Section 4(f) properties.

138.    By failing to document and explain how, under the multifactor balancing

test required by regulation, their chosen design for the toll lanes project would cause

the "least overall harm" when compared to the west shift alignment, Defendants

violated Section 4(f). 49 U.S.C. § 303(c); 23 C.F.R. §§ 774.3(c)(1), 774.7(c), 774.9(b).

### FIRST CLAIM FOR RELIEF

**Violation of NEPA—Failure to Disclose and Explain Traffic Modeling
(All Plaintiffs, Against All Defendants)**

139.    Plaintiffs incorporate Paragraphs 1 through 138.

140.    NEPA required Defendants to disclose relevant information about their

methods and assumptions to enable the public to evaluate the conclusions presented in

the FEIS. 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1500.1(b), 1502.24. NEPA also required

Defendants to respond to substantive comments on their work. 40 C.F.R. §§ 1502.9(a)-

(b), 1503.4; 23 C.F.R. § 771.125(a)(1).

141.    The FEIS incorporates and the ROD relies on traffic modeling conducted

by MDOT to justify approval of the toll lanes project and explain Defendants'
conclusion that it meets the project's traffic-relief purposes.

142.    Defendants did not adequately explain MDOT's decision, between the
SDEIS and FEIS, to reduce traffic volumes manually and selectively at ramps
connecting the Beltway to the Greenbelt Metro Station.

143.    Defendants did not respond to Sierra Club comments seeking more
information about the assumptions undergirding MDOT's traffic modeling, including
MDOT's justification for relying upon traffic volume assignments in excess of road
capacity; the assumptions made about driver behavior; and the extent to which MDOT
complied with its own modeling guidance and that of FHWA.

144.    Defendants' failure to disclose relevant traffic modeling information
impedes the public's understanding of how the project would affect traffic congestion
and violates NEPA. 40 C.F.R. §§ 1500.1(b), 1502.24. So does their failure to respond to
Sierra Club's substantive comments on MDOT's traffic modeling. 40 C.F.R. §§ 1502.9(a)-
(b), 1503.4; 23 C.F.R. § 771.125(a)(1).

## SECOND CLAIM FOR RELIEF:

### Violation of NEPA—Failure to Analyze $PM_{2.5}$ Pollution
### (All Plaintiffs, Against All Defendants)

145.    Plaintiffs incorporate Paragraphs 1 through 144.

146.    NEPA required Defendants to take a hard look at the environmental
impacts of the toll lanes project before issuing an FEIS and ROD. *Nat'l Audubon Soc'y v.
Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005). A hard look involves a thorough

investigation of the action's significant effects and a candid acknowledgement of its risks. *Id.* at 185.

147.    By increasing traffic volume on parts of the Beltway and I-270 and worsening congestion in some areas, the toll lanes project is very likely to increase concentrations of $PM_{2.5}$, an air pollutant that harms respiratory and cardiovascular health, in some communities near the Beltway and I-270. Defendants nonetheless refused to conduct any analysis of how the project would affect $PM_{2.5}$ pollution.

148.    Defendants' refusal to analyze $PM_{2.5}$ pollution, a significant effect of the toll lanes project, was arbitrary and violated NEPA.

### THIRD CLAIM FOR RELIEF:

### Violation of NEPA—Failure to Analyze Cumulative and Disproportionate Harms to Environmental Justice Communities

### (All Plaintiffs, Against All Defendants)

149.    Plaintiffs incorporate Paragraphs 1 through 148.

150.    FHWA and MDOT violated NEPA by failing to take a hard look at the project's air quality harms to environmental justice communities.

151.    FHWA and MDOT's conclusion that environmental justice communities would not be disproportionately burdened by air pollution from the toll lanes project was arbitrary and contradicted by record evidence, which showed that the project would increase traffic congestion and air pollution in environmental justice communities in Gaithersburg.

152.    NEPA also required FHWA and MDOT to take a hard look at the cumulative effects of the toll lanes project on environmental justice communities. 40

37

C.F.R. §§ 1508.7, 1508.27(b)(7); *cf.* Exec. Order No. 12,898, 3 C.F.R. § 859 (1995), *reprinted*

*as amended in* 42 U.S.C. § 4321 (1998); USDOT Order 5610.2C; FHWA Order 6640.23A.

153.     The agencies failed to analyze the project's cumulative effects on

environmental justice communities in violation of NEPA.

### FOURTH CLAIM FOR RELIEF

### Violation of Transportation Act Section 4(f) and NHPA Section 106—Unlawful Deferral of Use and Adverse-Effect Determinations for Morningstar Tabernacle No. 88 Moses Hall and Cemetery

### (Plaintiffs Friends of Moses Hall, National Trust for Historic Preservation, and Sierra Club, Against All Defendants)

154.     Plaintiffs Friends of Moses Hall, National Trust, and Sierra Club

incorporate Paragraphs 1 through 153.

155.     Transportation Act Section 4(f) required Defendants, *before issuance of the*

*ROD*, (1) to determine whether the toll lanes project would "use" historic and other

property protected by Section 4(f), and (2) if so, to undertake "all possible planning to

minimize harm" to the affected sites. 49 U.S.C. § 303(c); 23 C.F.R. §§ 774.3(a), 774.9(a)-

(b).

156.     Morningstar Tabernacle No. 88 Moses Hall and Cemetery is a historic site

protected by Section 4(f).

157.     Defendants issued the FEIS and ROD without first determining whether

the toll lanes project would disturb graves in Morningstar Moses Cemetery and thereby

use and harm the site under Section 4(f).

158.     FHWA may not defer its 4(f) determination for Morningstar Moses

Cemetery past issuance of the ROD. FHWA and MDOT's execution of a NHPA Section

106 Programmatic Agreement does not relieve them of their obligation under Section 4(f) to assess *before issuing the ROD* whether the project would use the Cemetery, determine whether the use can be avoided, and, if not, engage in all possible planning to minimize harm to the Cemetery. *See* 23 C.F.R. § 774.9(a)-(b); 36 C.F.R. § 800.14(b).

159.    Even assuming that Defendants could rely on a Section 106 Programmatic Agreement to defer Section 4(f) use determinations in some circumstances, Section 106 did not allow Defendants to defer their Section 4(f) determination for Morningstar Moses Cemetery.

160.    Morningstar Tabernacle No. 88 Moses Hall and Cemetery is a historic site protected by Section 106.

161.    The toll lanes project is a federal undertaking subject to Section 106.

162.    Section 106 required Defendants to make "a reasonable and good faith effort" to identify historic sites that may be adversely affected by federal undertakings prior to approving them. 36 C.F.R. §§ 800.4(b)(1), 800.1(c).

163.    Defendants did not engage in reasonable and good faith efforts to identify the boundaries of Morningstar Moses Cemetery or to determine whether the toll lanes project would disturb burials in the Cemetery prior to issuance of the FEIS and ROD. Defendants did not search for burials in a portion of the state-owned right-of-way that would be disturbed by construction of the toll lanes project, and offered no reasonable justification for failing to conduct this search. This violated Transportation Act Section 4(f) and NHPA Section 106.

## FIFTH CLAIM FOR RELIEF

### Violation of NHPA Section 106—Failure to Analyze Harmful Cumulative Effects to Morningstar Tabernacle No. 88 Moses Hall and Cemetery

### (Plaintiffs Friends of Moses Hall, National Trust for Historic Preservation, and Sierra Club, Against All Defendants)

164.     Plaintiffs Friends of Moses Hall, National Trust, and Sierra Club incorporate Paragraphs 1 through 163.

165.     NHPA Section 106 required Defendants to consider the cumulative effects to Morningstar Moses Cemetery in deciding whether the toll lanes project would adversely affect the site. 36 C.F.R. § 800.5(a)(1).

166.     The cumulative effect to a historic site from an undertaking like the toll lanes project includes effects from past actions that have degraded the historic character of the site.

167.     The initial construction of the Beltway through Gibson Grove in the 1960s degraded the historic character of Morningstar Moses Cemetery.

168.     If the toll lanes project moves forward and disturbs burials in Morningstar Moses Cemetery, that disturbance would add to and exacerbate the harm caused by the Beltway's initial construction and be a cumulative effect of the project.

169.     Defendants issued the FEIS and ROD without determining whether the toll lanes project would disturb burials and thereby adversely affect Morningstar Moses Cemetery. Defendants nonetheless declared that the toll lanes project would have no cumulative effect on the Cemetery.

170.     Defendants' conclusion that the toll lanes project would have no

40

cumulative effect on Morningstar Tabernacle No. 88 Moses Hall and Cemetery was arbitrary and violated NHPA Section 106.

## SIXTH CLAIM FOR RELIEF

### Violation of Transportation Act Section 4(f) — Arbitrary Determination of Least Overall Harm

### (Plaintiffs Sierra Club, National Trust for Historic Preservation, and NRDC, Against All Defendants)

171.    Plaintiffs incorporate Paragraphs 1 through 170.

172.    Plummers Island is a historic site protected under Section 4(f) of the Transportation Act.

173.    The toll lanes project would "use" Plummers Island by placing piers for the reconstructed American Legion Bridge on the Island; causing other construction activity on the Island, which will disturb vegetation research plots; and shading vegetation research plots and unique plant communities on the Island.

174.    Because the toll lanes project would use Plummers Island, Section 4(f) allowed Defendants to approve it only if (1) they determined "there [was] no prudent and feasible alternative" and (2) they "include[d] all possible planning to minimize harm to [the Island] resulting from the use." 49 U.S.C. § 303(c). Assuming there was "no feasible and prudent avoidance alternative" to using the Island, Section 4(f) required Defendants to choose the alternative that would "[c]ause[] the least overall harm." 23 C.F.R. § 774.3(c)(1).

175.    Defendants approved the toll lanes project without conducting the analysis required to determine whether the on-center alignment they chose for the

American Legion Bridge would cause the least overall harm. In rejecting the west shift alignment alternative, they neglected to assess several elements of the least overall harm inquiry set out in FHWA's own regulations. *See* 23 C.F.R. § 774.3(c)(1).

176.    Defendants' failure to lawfully determine that the toll lanes project would cause the least overall harm and adequately explain their decision was arbitrary and violated Section 4(f). *See* 49 U.S.C. § 303(c); 23 C.F.R. §§ 774.3(c)(1), 774.7(c), 774.9(b).

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

A.    Declare that Defendants have violated NEPA;

B.    Declare that Defendants have violated Transportation Act Section 4(f);

C.    Vacate the June 17, 2022 FEIS and Section 4(f) determination and August 25, 2022 ROD;

D.    Enjoin Defendants from taking additional steps in furtherance of the project's financing, construction or operation until they fully comply with NEPA, NHPA, the Transportation Act, and the APA;

E.    Award Plaintiffs their litigation costs, including attorneys' fees and any expert witness fees; and

F.    Grant such other and further relief as the Court deems just and proper.


Dated:        October 11, 2022


 /s/ Peter J. DeMarco
Peter J. DeMarco (D. Md. Bar No. 19639)

Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Telephone: (202) 513-6267
Facsimile: (415) 795-4799
Email: pdemarco@nrdc.org

 /s/
Atid Kimelman (DC Bar No. 1673740)
*Pro hac vice motion forthcoming*
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
Telephone: (202) 469-8230
Facsimile: (415) 795-4799
Email: akimelman@nrdc.org
(signed by Peter J. DeMarco with
permission from Atid Kimelman)

 /s/
Nanding Chen (DC Bar No. 1736538)*
*Pro hac vice motion forthcoming*
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
Telephone: (484) 362-8970
Facsimile: (415) 795-4799
Email: nchen@nrdc.org
* Not admitted to the California Bar
(signed by Peter J. DeMarco with
permission from Nanding Chen)


*Counsel for Plaintiffs Maryland Sierra Club,
Friends of Moses Hall, National Trust for
Historic Preservation in the United States,
and Natural Resources Defense Council*


 /s/
Andrea Ferster (NY Bar No. 5920293)
*Pro hac vice motion forthcoming*
2121 Ward Court NW, 5th Floor

Washington, DC 20037
Telephone: (202) 974-5142
Facsimile: (202) 223-9257
Email: aferster@railstotrails.org
(signed by Peter J. DeMarco with
permission from Andrea Ferster)

*Counsel for Plaintiff Maryland Sierra Club*


/s/_____
Elizabeth S. Merritt (DC Bar No. 337261)
*Pro hac vice motion forthcoming*
Deputy General Counsel
National Trust for Historic Preservation
2600 Virginia Ave. NW, Suite 1100
Washington, DC 20037
Telephone: (202) 297-4133
Facsimile: (202) 588-6272
Email: emerritt@savingplaces.org
(signed by Peter J. DeMarco with
permission from Elizabeth S. Merritt)


*Counsel for Plaintiff National Trust for
Historic Preservation in the United States*