**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| NORTHERN VIRGINIA CITIZENS ASSOCIATION<br>P.O. Box 302<br>McLean, VA 22101,<br><br>      *Plaintiff*,<br> v.<br><br>FEDERAL HIGHWAY ADMINISTRATION,<br>1200 New Jersey Avenue, SE<br>Washington, DC 20590,<br><br>STEPHANIE POLLACK, in her official capacity as Acting Administrator of the Federal Highway Administration,<br>1200 New Jersey Avenue, SE<br>Washington, DC 20590,<br><br>GREGORY MURRILL, in his official capacity as Maryland Division Administrator of the Federal Highway Administration,<br>31 Hopkins Plaza, Ste. 1520<br>Baltimore, MD 21201,<br><br>MARYLAND DEPARTMENT OF TRANSPORTATION,<br>7201 Corporate Center Drive,<br>Hanover, MD 21076, and<br><br>JAMES F. PORTS JR., in his official capacity as Secretary of the Maryland Department of Transportation,<br>7201 Corporate Center Drive<br>Hanover, MD 21076,<br><br>      *Defendants*. | No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

# INTRODUCTION

1. Defendants Federal Highway Administration (FHWA) and the Maryland Department of Transportation State Highway Administration (MDOT) plan to widen and add toll lanes to a 15-mile stretch of I-495 (the Beltway) and I-270, between McLean, Virginia, and Gaithersburg, Maryland, including the addition of toll lanes over the American Legion Bridge crossing the Potomac River into the Commonwealth of Virginia ("Toll Lanes Project" or "HOT Lanes").  The Toll Lanes Project includes the construction by MDOT of flyover ramps in Virginia connecting the Toll Lanes Project at the terminus of the American Legion Bridge to the I-495 Express Lanes Northern Extension ("I-495 NEXT") project in Virginia.

2. The I-495 NEXT project is an extension of the I-495 Express Lanes along approximately three miles of the Beltway from their current northern terminus in the vicinity of the Old Dominion Drive overpass to the George Washington Memorial Parkway (GWMP) in the McLean area of Fairfax County, Virginia.

3. Defendants ended their environmental review for and approved the Toll Lanes Project without disclosing critical environmental information about the flyover ramps to be constructed by MDOT in Virginia, as required by the National Environmental Policy Act ("NEPA").

4. Defendants not only failed to adequately evaluate the impacts of these new ramps in Virginia, they also failed to consider measures that would have mitigated some of the water quality, air quality, noise, and visual impacts of the new ramps.

5. Adding toll lanes is likely to increase concentrations of fine particulate matter, which harms heart and lung health, in some communities near the Beltway and I-270. But Defendants failed to conduct *any* analysis of this harmful air pollution.

They compounded this error by asserting, incorrectly, that any air pollution from the toll lanes project would be evenly distributed along the project corridor.

6. Now that Defendants have issued a final environmental impact statement (FEIS), and ROD for the Toll Lanes Project, defendant MDOT and the project's private developer, with whom MDOT has partnered, are moving to complete design and financing work; obtain final permits under other laws; and start construction.

7. Defendants' actions will advance the Toll Lanes Project to a point beyond which they could no longer reasonably consider project alternatives if the Court were to order them to revise their NEPA analyses to comply with those laws. To prevent that outcome, the Court should vacate the FEIS and ROD and enjoin Defendants from taking further steps to finance, build, and operate the project until they fully comply with NEPA and the Administrative Procedure Act (APA).

## JURISDICTION AND VENUE

8. This case arises under NEPA, 42 U.S.C. §§ 4231 et seq.; and the APA, 5 U.S.C. §§ 701-706. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1361 (mandamus against U.S. agency officers), 28 U.S.C. §§ 2201-2202 (declaratory judgment and further necessary or proper relief), and 5 U.S.C. §§ 701-706 (APA).

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the Toll Lanes Project would be built on land and over waters in this judicial district. Therefore, a substantial part of the property that is the subject of the action is situated in this district.

10. Assignment to the Southern Division of this Court is appropriate because the Defendants are a federal agency and federal and Maryland officials. L.R. 501.4(a)(ii).

## PARTIES

**I.    Plaintiff**

11.    Plaintiff Northern Virginia Citizens Association, Inc. ("NOVA Citizens Association") is a nonprofit membership corporation formed under the laws of Virginia in December 2020, to educate citizens about truth and transparency in Virginia government, and for other charitable and educational purposes. Its mission is to promote the interests and further the common good and general welfare of the citizens of Northern Virginia and to perform all things incidental to, or appropriate in, the foregoing specific and primary purpose. NOVA Citizens Association has approximately 200 members in Northern Virginia, including more than 100 residing on Live Oak Drive, Green Oak Drive, and Rivercrest Drive in the vicinity of the planned flyover ramps connecting the I-495 NEXT project to the HOT Lane Project near the American Legion Bridge. NOVA Citizens Association submitted and signed on to letters submitted to VDOT, MDOT and the FHWA expressing concerns about the new information disclosed late in the NEPA process that MDOT would be constructing a part of the HOT Lane Project in Virginia.

12.    NOVA Citizens Association members live in close proximity to the flyover ramps. The flyover lanes proposed to be constructed by MDOT from the southbound toll lanes to the GWMP will move traffic closer to Live Oak Drive, creating potential safety hazards for pedestrians, particularly children. Proposed noise barriers would be located between 10 to 40 feet from the edge of the existing Live Oak Drive. These members have health, recreational, aesthetic, and other interests in areas harmed by the Toll Lanes Project. The direct impacts of MDOT and VDOT's joint project will be born most directly by the Live Oak Drive Community, by other adjacent residential communities, and on sensitive environmental resources. These members will experience both noise sound and light pollution associated with the ramps, which

will be located more than 70 feet above their properties, and increased exposure to harmful air pollutants.  The ramps will also increase surface water run-off into the Scotts Run/Live Oaks community and will exacerbate storm water management issues.

13.     For instance, Siva and Kalyani Vemuri are members of NOVA Citizens Association who reside at 714 Live Oak Drive adjacent to the I-495 Next flyover ramps and the realigned Live Oak Drive proposed by the HOT Lane Project.  303 yards of the Vemuri's land will be taken as temporary construction easement, including land critical to absorbing current Live Oak Drive local road flooding and will experience unmitigated storm water problems in a residential area that relies on aging septic tanks in very close proximity to the Potomac River.  The Toll Lanes project would bring more cars closer to the Vemuri home, exposing the family to more noise and air pollution, and reducing the value of their property.  Extensive tree removal, decreased grasses, and increased impervious surface will flood the property with storm water.  Additionally, a neighboring home will experience the same unmitigated storm water problem, and the water from the adjacent property will flow to their property.  The Vemuri family septic system will be greatly impacted. Remediation will cost the family thousands of dollars to revegetate their property. Flyover ramps will rise between 40 to 70 feet above the neighborhood and Live Oak Drive and will create noise from vehicles as well as from the heavy trucks up/down shifting during the mandated exit off of HOT lanes in Virginia.  Ramps towering above Live Oak Drive will create light pollution, impact visual privacy, and quality of life and home valuation will be drastically harmed.  Dangerous particulates, carbon emissions, and air pollution from this closer proximity will expose the family to health hazards, especially children.

## II. Defendants

### A. Federal Defendants

14. Defendant Federal Highway Administration (FHWA) is a federal agency and a subdivision (or "administration") of the federal Department of Transportation. FHWA co-published the June 17, 2022 FEIS for the Toll Lanes Project. FHWA also issued the August 25, 2022 ROD approving the project. The ROD incorporates and relies on the findings in the FEIS and associated review documents.

15. Defendant Stephanie Pollack is FWHA's Acting Administrator, its highest ranking official. In that capacity, Defendant Pollack is responsible for the administration, operations, and activities of the FHWA, and for the agency's compliance with federal laws, including NEPA. Ms. Pollack is sued in her official capacity.

16. Defendant Gregory Murrill is the Division Administrator for the FHWA's Maryland Division and the ROD's signatory. Mr. Murrill is sued in his official capacity.

### B. Maryland Defendants

17. Defendant Maryland Department of Transportation (MDOT) is the state agency charged with planning, designing, building, and maintaining Maryland's highway system.

18. MDOT owns and maintains the American Legion Bridge that carries the Beltway across the Potomac River, which then connects to the Beltway in Virginia.  MDOT will be constructing the flyover ramps that are needed to connect the HOT Lanes to the I-495 NEXT toll lane project in Virginia, due to the need for trucks to exit from the ramps Maryland highway segments that would be expanded and/or rebuilt as part of the project.

19. MDOT co-published the FEIS with FHWA and served as co-lead agency for its development.  MDOT is responsible for the commitments and mitigation listed in Appendix A to the ROD, under FWHA's oversight.

20. MDOT and the Maryland Transportation Authority have entered a Phase 1 Public-Private Partnership Agreement ("P3 Agreement") with a private developer, Accelerate Maryland Partners LLC, to govern the development of the Toll Lanes Project. The P3 Agreement acknowledges that FHWA and MDOT share "control and responsibility" for the NEPA process and had the discretion to choose not to pursue the project.

21. Defendant James F. Ports, Jr. is MDOT's Secretary and responsible for its operations. He is also Chairman of the Maryland Transportation Authority. His predecessor, Gregory Slater, signed the P3 agreement for MDOT. Mr. Ports is sued in his official capacity.

## STATUTORY AND REGULATORY BACKGROUND

### I. National Environmental Policy Act (NEPA)

22. Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment," and by extension human health and welfare. 42 U.S.C. § 4321. NEPA makes it "the continuing policy of the Federal Government, in cooperation with States," "to create and maintain conditions under which man and nature can exist in productive harmony." *Id*. § 4331(a). It directs the federal government "to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs and resources" to "preserve important historic, cultural, and natural aspects of our natural heritage"; "assure for all Americans safe, healthful, productive and esthetically and culturally pleasing surroundings"; and to "fulfill the responsibilities of each generation as trustee of the environment" for future ones. *Id*. § 4331(b)(1), (2), (4).

23. To further these purposes, NEPA requires federal agencies to prepare a "detailed statement" on environmental effects, or Environmental Impact Statement (EIS), before pursuing "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This requirement ensures that agencies "take a 'hard look' at the environmental

effects" of those actions before approving them. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989).

24.     NEPA established a Council on Environmental Quality within the Executive Office of the President and empowered the Council to issue regulations implementing NEPA. 42 U.S.C. §§ 4321, 4342. FHWA has supplemented these regulations with its own implementing regulations, codified at 23 Code of Federal Regulations part 771. 23 C.F.R. § 771.109(a)(1).

25.     The Council's and FHWA's regulations provide for an EIS on a proposed federal action to be followed by a public record of decision (ROD). 40 C.F.R. § 1505.2 (2019)[1]; 23 C.F.R. § 771.127(a). Until a lawful EIS and ROD have been issued, "no action concerning the proposal shall be taken which would" either (1) "[h]ave an adverse environmental impact," or "(2) [l]imit the choice of reasonable alternatives" to the proposal. *Id*. § 1506.1(a). In the context of highway projects, with limited exceptions, this means that final design activities, property acquisition, construction materials purchases, and construction "must not proceed" until a lawful EIS and ROD have issued. 23 U.S.C. § 711.113(a).

26.     State highway agencies may co-lead the preparation of an EIS for proposed highway projects within their jurisdictions, alongside FHWA. 42 U.S.C. § 4332(D)(i); 40 C.F.R. §§ 1501.5(b), 1506.2(c); 23 C.F.R. §§ 771.109(c)(2)-(5). State highway agency co-leads and project sponsors are responsible for implementing mitigation measures specified as commitments in the NEPA approval documents, under FHWA's supervision, unless the FHWA agrees to delete or change those measures. 23 C.F.R. § 771.109(b), (d).

---

[1] The Council issued revised NEPA regulations in 2020 that apply to "any NEPA process begun after September 14, 2020." 40 C.F.R. § 1506.13 (2021). The NEPA process challenged here began earlier. 83 Fed. Reg. 11,812 (Mar. 16, 2018). Accordingly, the complaint cites the regulations then in force, as codified in 2019.

## II. Administrative Procedure Act (APA)

27. The APA gives any person "suffering legal wrong because of agency action, or adversely affected by agency action," the right to federal judicial review. 5 U.S.C. § 702. Reviewing courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not accordance with law." *Id*. § 706(2)(A).

## FACTUAL BACKGROUND

28. In May 2021, the FHWA, Virginia Division and the Virginia Department of Transportation (VDOT) issued a Revised Environmental Assessment (EA) to study the environmental impacts of and alternatives to the I-495 NEXT project.

29. On June 29, 2021, the FHWA Virginia Division approved a Finding of No Significant Impact (FONSI) for the I-495 NEXT project, concluded that no environmental Impact Statement (EIS) for the project was required by NEPA. Neither the Revised EA nor the FONSI for the I-495 NEXT project addressed the new ramps and flyover bridges that would be needed to connect to the American Legion Bridge after the Maryland Toll Lanes Project was built. Instead, the FONSI specifically stated that "the HOT [Lanes] proposal for the American Legion Bridge and connections at each end were "outside of the limits of the project." I-495 NEXT FONSI. at 17-18.

30. Neither the Revised EA, FONSI or any technical reports associated with the I-495 NEXT project included detailed renderings of the proposed "interchange" between the I-495 NEXT project and the GWMP.

31. The Toll Lanes Project in Maryland was advanced in the NEPA process through the preparation of a Draft EIS in June 2020 and a Supplemental Draft EIS in October 2021.

8

These draft NEPA documents described the Toll Lanes Project as including an interchange with the GWMP, including "slip ramps" south of American Legion Bridge, but did not disclose or evaluate any environmental impacts to the Live Oak Drive community in McLean, Virginia.

32. At public information sessions held by VDOT on June 1 and 2, 2022, VDOT disclosed proposed design changes to the interchange at the George Washington Memorial Parkway ("GWMP"), to include a total of four flyover ramps in the vicinity of Live Oak Drive in McLean, Virginia, including 2 new ramps which will provide connections to and from the GWMP and the I-495 NEXT Express Lanes (Ramp 2 and Ramp 3), as well as the two realigned existing ramps to and from the Beltway general-purpose lanes to the GWMP.  This new design shifted the location of one of the ramps proposed as part of the I-495 Express Lanes (Ramp 3) closer to Live Oak Drive and included a new fifth ramp (Ramp 4 on the graphic below) under study by MDOT under the Toll Lane Project that would connect the southbound Express Lane to eastbound GWMP.  Additionally, MDOT will build Ramp 4B on the Live Oak Drive side of the Beltway as well as Ramp 6A and 6B on the opposite side of the Beltway through its P3 contract with Accelerate Maryland Partners.  This new design was depicted by VDOT as follows:

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 2 of 18

For the purposes of the responses, please reference the George Washington Memorial Parkway & I-495 Interchange (GWMP) graphic:

*Figure 1: Proposed GWMP associated with Virginia's I-495 NEXT project.*



Figure 1 clarifies the design elements associated with the I-495 NEXT project. These elements, shaded in purple, include a realignment and construction of 2 existing at-grade ramps (Ramp 1 and Ramp 5), and the construction of 2 new ramps which will provide connections to and from the GWMP and the I-495 NEXT Express Lanes (Ramp 2 and Ramp 3). A new fifth ramp (Ramp 4) is being studied by MDOT under the MLS that will connect the southbound Express Lane to eastbound George Washington Memorial Parkway.

33. On June 17, 2022, MDOT and the FHWA, Maryland Division published a FEIS for public review. The FEIS disclosed that "exchange" ramps connecting the HOT Lanes had changed for the project since the publication of the SDEIS in order to allow for ingress and egress between the HOT managed lanes and the general-purpose lanes, resulting in changes to the Limits of Disturbance previously evaluated in the NEPA process for the I-495 NEXT extension.

34. In the August 25, 2022 ROD for the Toll Lanes Project in Maryland, FHWA approved MDOT's plan to add approximately 15 miles of toll lanes to the Beltway and I-270. Two toll lanes in each direction would run from the Beltway's interchange with the GWMP in McLean, Virginia, across the American Legion Bridge to the I-270 spur in Bethesda, Maryland. On I-270, the toll lanes would extend from the Beltway to I-370 in Gaithersburg, Maryland. The

following drawing depicts the revised interchange, with the ramps to be constructed by VDOT as part of the I-495 NEXT project depicted in green, and the ramps that will be built by MDOT as part of the Toll Lanes project depicted in red:



35.    MDOT anticipates the Toll Lanes Project would cost 3.75 to 4.25 billion dollars and that construction would last for at least five years.

36.    MDOT plans to deliver the Toll Lanes Project through a public-private

11

partnership, or "P3," with Accelerate Maryland Partners. A private subsidiary of Accelerate Maryland Partners would be responsible for final design, construction, operation, and maintenance of the project for a 50-year term. MDOT anticipates that the project's construction would be financed through private debt and equity, as well as through state bonds and the federal Department of Transportation's Infrastructure and Innovation Act credit assistance program. The private subsidiary would seek to recoup its costs through tolls collected from drivers who use the new lanes.

37.  MDOT's P3 Agreement with Accelerate Maryland Partners, entered in August 2021, provides that if the project receives NEPA approval, MDOT will seek Maryland Board of Public Works approval to enter a 50-year contract with the subsidiary—or "Section Developer"—to govern final design, construction, operation, and maintenance

38.  The P3 Agreement provides that if MDOT unilaterally declines to proceed with construction after financial close on the Section Contract, MDOT "shall pay compensation to the Section Developer in an amount equal to the MDOT Termination Sum." The MDOT Termination Sum is calculated by reference to the project's commercial value to the Section Developer and, on information and belief, is based on MDOT's estimated 3.75 to 4.25 billion dollar project budget.

**CLAIM**

**Defendants Failed To Take a Hard Look at the Environmental Impacts of and Alternatives to Flyover Ramps To Be Constructed in Virginia in Violation of NEPA.**

39.  The Toll Lanes Project is a major federal action significantly affecting the environment for which NEPA requires an environmental impact statement. 42 U.S.C. § 4332(C).

40.  On July 10, 2020, Defendants issued a Draft Environmental Impact Statement (DEIS) for the Toll Lanes project.

41. On October 1, 2021, Defendants issued a Supplemental Draft Environmental Impact Statement (SDEIS) for the Toll Lanes project.

42. On June 17, 2022, Defendants issued the FEIS for the Toll Lanes project.

43. On August 25, 2022, federal Defendants approved the Toll Lanes project in the ROD.

44. Defendants' NEPA review failed to take a hard look at environmental impacts of the new flyover ramps in Virginia, including increased noise and visual impacts, removal of mature trees that served as a buffer between Live Oak and the existing I-495 and GWMP ramps, harm to water quality due to increased salt from run-off, petroleum and petroleum by-products, and increased exposure to harmful air pollutants.

45. Neither the DEIS nor the SDEIS for the Toll Lanes Project in Maryland included any evaluation of the specific impacts of the flyover ramps to be constructed by MDOT in Virginia to allow for ingress and egress from the HOT Lanes to the general-purpose lanes from the American Legion Bridge to the GWMP in Virginia.

46. The FEIS disclosed the planned construction by MDOT of new ramps in Virginia extending beyond the previously evaluated Limits of Disturbance but did not take a hard look at the visual, noise, water quality, and air quality impacts associated with moving these ramps closer to Live Oak Drive.  he FEIS failed to consider measures that would reduce or mitigate harm to the residents of Live Oak Drive from the increased noise, light, and water quality impacts on the west of the new ramps, such as noise walls on the ramps, re-vegetation of the forested area that has been cleared, mitigation to address flooding of septic fields and run off into Potomac watershed, and alignment shifts to reduce light and noise impacts on Live Oak Drive. The FEIS failed to consider an alternative design that would move the interchange toward

Tysons Corner by allowing commercial trucks to exit the I-495 Express Lanes in Tysons instead of McLean, eliminating the need for and reducing the footprint of some flyover ramps,

47. These new ramps would exacerbate already severe noise and water quality impacts experienced by the homes located near the GWMP and the American Legion Bridge in Northern Virginia.

48. "Cumulative impact" refers to the proposed federal action's incremental impact "when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or nonfederal) or person undertakes such other actions." *Id.* at § 1508.7.

49. FHWA and MDOT considered *only* the incremental harms from the Toll Lanes Project for the Live Oak Drive and surrounding communities. The agencies did not take a hard look at whether and how the project would exacerbate existing pollution burdens faced by the Northern Viriginia communities as a result of the I-495 NEXT Project, which has already destroyed hundreds of trees in the McLean community that will be further harmed by construction of these flyover ramps, in violation of NEPA.

50. The Defendants' failure to fully consider the impacts of the flyover ramps resulted in their failure to fully consider alternative designs or mitigation measures that would have reduced the environmental impacts of these ramps, in violation of NEPA.

**REQUEST FOR RELIEF**

Plaintiff respectfully requests that this Court:

    A.    Declare that Defendants have violated NEPA;

    B.    Vacate the June 17, 2022 FEIS and August 25, 2022 ROD;

    C.    Enjoin Defendants from taking additional steps in furtherance of the project's financing, construction or operation until they fully comply with NEPA and the APA;

    D.    Award Plaintiff its litigation costs, including attorneys' fees and any expert witness fees; and

    E.    Grant such other and further relief as the Court deems just and proper.

Dated: December 23, 2022

Respectfully submitted,

TOBIN, O'CONNOR & EWING

/s/ David C. Tobin
David C. Tobin, Esq., D. Md. Bar No. 03727
dctobin@tobinoconnor.com
Larry E. Tanenbaum, Esq., D. Md. Bar No. 17988
letanenbaum@tobinoconnor.com
5335 Wisconsin Avenue, N.W., Suite 700
Washington, D.C. 20015
Tel: (202) 362-5900
Fax: (202) 362-6579

/s/     Andrea Ferster
Andrea Ferster (DC Bar No. 384648)
(movant *pro hac vice*)
Attorney at Law
2121 Ward Court, N.W. 5th Fl.
Washington, D.C. 20037
Telephone: (202) 974-5142
 Email: aferster@railstotrails.org