**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| MARYLAND CHAPTER OF THE SIERRA CLUB, *et al.*, | |
| *Plaintiffs,* | |
| v. | Civil Action No. DKC 22-2597 |
| FEDERAL HIGHWAY ADMINISTRATION, *et al.*, | |
| *Defendants.* | |
| NORTHERN VIRGINIA CITIZENS' ASSOCIATION, | |
| *Plaintiff,* | Civil Action No. DKC 22-3336 |
| v. | |
| FEDERAL HIGHWAY ADMINISTRATION, *et al.*, | |
| *Defendants.* | |

**DECLARTION OF DEBRA BUTLER**

I, Debra Butler, declare as follows:

1.      I am a resident of the Live Oak Drive community, having lived at Green Oak Drive for nearly 20 years.  I am a member and President of the Northern Virginia Citizens Association ("NOVA Citizens Association").  I have personal knowledge of the facts asserted herein, and if called, would so testify.

2.      NOVA Citizens Association is a nonprofit membership corporation formed under the laws of Virginia in December 2020, to educate citizens about truth and transparency in Virginia government, and for other charitable and educational purposes.  Its mission is to promote the interests and further the common good and general welfare of the citizens of

1

Northern Virginia and to perform all things incidental to, or appropriate in, the foregoing specific and primary purpose. NOVA Citizens Association has approximately 200 members in Northern Virginia, including more than 100 residing on Live Oak Drive, Green Oak Drive, and Rivercrest Drive in the vicinity of the planned flyover ramps connecting the I-495 NEXT project to the Toll Lane Project in Maryland proposed by Maryland Department of Transportation ("MDOT") near the American Legion Bridge. NOVA Citizens Association submitted and signed on to letters submitted to VDOT, MDOT and the Federal Highway Administration ("FHWA") expressing concerns about the new information disclosed late in the National Environmental Policy Act ("NEPA") process that MDOT would be constructing a part of the Toll Lane Project in Virginia, including additional elevated flyover ramps from I-495's southbound toll lanes to the George Washington Memorial Parkway ("GWMP").

3.     NOVA Citizens Association members live in close proximity to the flyover ramps. The flyover ramps will move traffic closer to Live Oak Drive, creating potential safety hazards for pedestrians, particularly children.   These members have health, recreational, aesthetic, and other interests in areas harmed by the Toll Lanes Project. The direct and cumulative impacts of MDOT's project along with the belated design changes to the GWMP/I-495 interchange made by the Virginia Department of Transportation ("VDOT") as part of Virginia's I-495 NEXT project will be born most directly by the Live Oak Drive community, by other adjacent residential communities, and on sensitive environmental resources. These members will experience both noise sound and light pollution associated with the ramps, which will be located more than 70 feet above their properties, and increased exposure to harmful air pollutants. The ramps will also increase surface water run-off into the Scotts Run/Live Oaks community and will exacerbate storm water management issues.

4.      Members of the NOVA Citizens Association citizens were aware of the I-495 NEXT project proposed by VDOT and reviewed the NEPA documents associated with that project. At that point, the project did not encroach directly within the Live Oak community and members of the NOVA Citizens Association were assured by VDOT officials that their community would not be directly impacted by the project.

5.      At a public meeting in June 2022, VDOT unveiled a radically changed design at the GWMP cloverleaf interchange near the American Legion Bridge and the Live Oak Drive community. That redesign took the wooded area bordering GWMP, which provided a substantial treed barrier between our neighborhood and the light, noise, and air pollution of the Beltway, and turned it into a massive stormwater pit that likely will become a breeding ground for mosquitoes. The redesign adds and raises the flyover ramps, such that instead of a 15-foot-high sound and light barrier would be ineffective and that an almost 50-foot-high retaining wall/sound barrier would be required, effectively creating a Berlin Wall on Live Oak Drive. And where VDOT had promised greenscaping between a sound and light barrier, the revised design will now consist of only a low traffic barrier on Live Oak Drive, eliminate all greenscaping, and shift the Beltway closer to our community.   As a result, the impacts of these changes were not evaluated as part of the I-495 NEXT project, and they were also not evaluated in the NEPA documents for the Maryland Toll Lanes Project.

6.      These design changes included the following changes that impacted the Live Oak Drive community:

    a. Eliminating 16 small stormwater basins scattered throughout the Project to create one giant stormwater pit in the cloverleaf interchange between I-495 and the GWMP, exacerbating the run-off under Live Oak Drive, overloading the local streams with run off, destabilizing the soils and affecting mature trees, creating erosion in my backyard and increasing the load on my septic system and those of other residents of the Live Oak Drive community.

    b. Increasing the number and height of flyover ramps at the GWMP interchange, which will

increase light pollution and noise and affect our air quality.

c.  Moving the outermost ramp 10 to 20 feet closer to Live Oak Drive, such that the Beltway directly abuts the street, which also increases noise, light pollution, and adversely affects our air quality and quality of life.

d.  Narrowing Live Oak Drive to 22 feet in width and moving it closer to our members' homes, which affects the safety of pedestrians who previously used the grassy buffer to walk in the neighborhood, now gone, and eliminates the portion of the Potomac Heritage Trail that Live Oak Drive residents previously used.

e.  Installing a four-foot safety wall directly on Live Oak Drive in the place of the forested buffer area surrounding Live Oak Drive, eliminating the potential for meaningful greenscaping and exposing residents to the huge stormwater basin and interchange ramps, without any meaningful protection from highway noise, light pollution, and adverse visual impacts.

f.  Eliminating over ten acres of mature trees that VDOT previously assured the community would be retained.

7.  The Final Environmental Impact Statement ("FEIS") for the Maryland Toll Lanes Project, issued in June 2022, disclosed the new flyovers at essentially at the same time, but did not include any assessment of the impacts of these design changes.

8.  Faced with these impactful changes that had not been disclosed as part of the public I-495 NEXT NEPA documents, and without any evaluation of their environmental impacts apparently being done, NOVA Citizens Association filed a lawsuit against VDOT and the FHWA challenging the significant design changes made by VDOT post-dating the completion of the NEPA review of the I-495 NEXT project. *Virginia Citizens Ass'nv v. FHWA,* No. 1:23-cv-356 (LMB/IDD) (E.D. Va 2023).  In response, FHWA conceded that design changes relating to the GWMP/I-495 interchange had been approved in September 2021, following the completion of the NEPA process for the I-495 NEXT project, were not publicly disclosed and no environmental "reevaluation" had been prepared.  *See* Declaration of Thomas Nelson, ¶ 18 (attached as Exhibit A).  Instead, FHWA vaguely asserted that these impacts "can be addressed at one time in a

4

future NEPA reevaluation." *Id.*

9.    This litigation further disclosed that, on January 14, 2022, the FHWA approved an addendum to an Interchange justification report approving further changes in the vicinity of Live Oak Drive, described as "Relocation of the ramp from northbound I-495 Express to GWMP from the location proposed in the Approved IJR Conceptual Plan: this ramp would now fly over the southbound I-495 general purpose and Express Lanes and tie into GWMP on the west side of I-495. Nelson Declaration, ¶ 20 and Exhibit 11. No environmental review of these design modifications was conducted based on the assumption that the original I-495 NEXT NEPA studies included this area as part of the baseline conditions (what they call "Limits of Disturbance") even though the design changes occurring after completion of those studies obviously were not, and could not possibly have been, evaluated in the original NEPA studies.

10.    The additional changes belatedly proposed in the Maryland Toll Lanes Project, particularly when considered cumulatively with the design modifications to the GWMP/I-495 interchange approved, without public notice, in January 2022, will result in a significant impact on the Live Oak Drive community, including impacts on my home, my health, and the quality of my life. Air pollution has been insufficiently evaluated in the Toll Lane project NEPA documents, and design modifications now move the flyover ramps closer to Live Oak Drive. The Live Oak community already experiences significant stream erosion from I-495 runoff, which in turn has caused substantial tree loss. The changes made by VDOT in early 2022 have now eliminated *all trees* from the border between Live Oak Drive and I-495, trees that VDOT had previously committed to preserving. The new design will result in the bulk of the project's increased stormwater loadings channeling into and through the community. The Toll Lanes Project will significantly exacerbate the erosion that already contributes significant total

suspended sediment loadings to the Potomac River. Many of these concerns are outlined in my letter, to the Maryland Department of the Environment and U.S. Army Corps of Engineers dated September 22, 2022, attached hereto as Exhibit B.

11.   Because these design changes were internally approved by VDOT and the FHWA and only publicly announced after the commenting period had expired for the I-495 NEXT project, and then further information about the design modification was mentioned only vaguely and with no substantive detail in the final EIS for the Maryland Toll Lanes Project, NOVA Citizens Association was deprived of having any meaningful role in commenting on or understanding a major change to the project that will have a devastating environmental impact on our community. Moreover, both VDOT and MDOT have played a shell game, each disclaiming any significant impact from their portion of the project, while never considering the impact these design changes in totality despite their undeniably profound impacts on the Live Oak Drive community.

12.   A specific concern expressed by the NOVA Citizens Association has been the impact of increased impervious surface and the stormwater run-off on the Live Oak Community. Live Oak Drive sits along, and in, the Potomac Watershed. Small streams created by stormwater run-off run throughout neighboring properties and flow directly into the Potomac River. The Live Oak Drive community relies on in-ground Septic, many aging.

13.   Green Oak Drive runs perpendicular to Live Oak Drive. Storm water runs from Live Oak Drive down Green Oak Drive on both sides in gutters that cumulate and run into a drainage tunnel at 7012 Green Oak Drive, the front of my property. This water in turn funnels under our property and into the back and down to the Potomac River. Since the clear cutting of trees the run-off, and digging of a 8+ foot trench along Live Oak Drive at the cross road of Green Oak Drive, stormwater runoff has significantly increased in volume and flow rate, seriously exacerbating and

accelerating the erosion, cracking aging infrastructure, exposing tree roots that has uprooted trees, and exposing waste systems, and electrical power lines.

14.    The cumulative effects of the increased stormwater runoff, clear cutting, lack of permanent mitigation, and failure of any of the involved highway agencies to study downstream effects is an immediate threat to our family, neighbors, and pets: falling trees, ditches, flooded septics, and electrocution.

15.    NOVA Citizens Association believes that these impacts are unnecessary, and that a true NEPA process would have resulted in the consideration of more efficient and cost-effective ways to address the project needs without exposing the Live Oak Drive community to devastating impacts, including moving (at least) one of the flyover lanes to the opposite side of I-495, where it was originally designed to be located, to mitigate storm water impacts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 7, 2023.

_Debra A. Butler_
Debra Butler    6/7/23

Declaration of Deb Butler, Exhibit A

(Declaration of Thomas Nelson, PE and interchange justification report)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

NORTHERN VIRGINIA CITIZENS
ASSOCIATION, INC.,

     *Plaintiff*,

  v.

FEDERAL HIGHWAY
ADMINISTRATION, *et al*.,

     *Defendants*.

No. 1:23-cv-356 (LMB/IDD)

<u>**DECLARATION OF THOMAS L. NELSON, JR, P.E.**</u>

I, Thomas L. Nelson, Jr., P.E., declare as follows:

  1.  I am the Division Administrator for the U.S. Department of Transportation, Federal

Highway Administration ("FHWA"), Virginia Division and have served in that capacity since June

2019.  I have over 30 years of experience in leading large, complex projects at the federal and state

levels, as well as in the private sector.  Previously, I served as the Division Administrator for

FHWA's Kentucky Division Office.  During my tenure with FHWA, I have participated in

numerous multi-disciplinary reviews of environmental documents for highway projects.  This

includes, Categorical Exclusions ("CE"), Environmental Assessments ("EA"), and Environmental

Impact Statements ("EIS").  I have also served as Major Projects Engineer for major design and

construction projects that exceeded $500 million in construction cost.

  2.  I graduated from Michigan State University with a Bachelor of Science in Civil

Engineering in 1992 and am a licensed Professional Engineer.  As part of my current duties with

FHWA, I approve the Draft EIS, the Final EIS, and related actions. I also approve the

Environmental Record of Decision for EISs and Findings of No Significant Impacts ("FONSI") in

Virginia.  I have delegated the approval of EAs to the FHWA Virginia Division Office's Planning,

Environmental, Reality, and Freight Team Leader.

3.      As the Division Administrator for FHWA's Virginia Division Office, I was

responsible for approving the FONSI, the Interchange Justification Report ("IJR") and IJR

Addendum for the I-495 Express Lanes Northern Extension Project.

**A.  The Project.**

4.      The Interstate 495 Express Lanes Northern Extension Project, also known as the I-

495 NEXT Project (or "the Project"), will extend the I-495 Express Lanes along approximately

three miles of I-495, also referred to as the Capital Beltway, from their current northern terminus

in the vicinity of the Old Dominion Drive overpass to the George Washington Memorial Parkway

("GW Parkway") in the McLean area of Fairfax County, Virginia.  Ex. 1 at 1-1.  The Project

provides new and improved express lane connections at the Dulles Corridor and GW Parkway

interchanges, includes four miles of new bicycle and pedestrian connections including a shared-

use path parallel to I-495 from Lewinsville Road to near Live Oak Drive, replaces or rehabilitates

seven bridges with pedestrian accommodations, and replaces existing noise barriers.  The purpose

of the project is to reduce congestion, provide additional travel choices, and improve travel

reliability.

5.      The project extends from approximately south of the Dulles Toll Road and Route

267 interchange to the GW Parkway in the vicinity of the American Legion Memorial Bridge

("ALMB").   Although  the  proposed  lanes  would  terminate  at  the  GW  Parkway,  and  the

interchange provides a logical northern terminus for this study, additional improvements are

anticipated to extend approximately 0.3 miles north of the GW Parkway to provide a tie-in to the existing road. Ex. 1 at 1-1.

6.      The Project also includes access ramp improvements and lane reconfigurations along portions of the Dulles Toll Road and the Dulles International Airport Access Highway, on either side of the Capital Beltway, from the Spring Hill Road Interchange to the Route 123 interchange. The proposed improvements entail new and reconfigured express lane ramps and general purpose lane ramps at the Dulles Interchange and tie-in connections to the Route 123/I-495 interchange. The project has independent utility since it would provide a usable facility and be a reasonable expenditure of funds even if no additional transportation improvements are made in the area, including to the ALMB. Ex. 1 at 1-1; *see also* Ex. 5 at 18–19.

7.      The Project has three purposes: (1) reduce congestion; (2) provide additional travel choices; and (3) improve travel reliability.  As demonstrated in the I-495 Traffic and Transportation Technical Report, I-495 within the study area is severely congested during the weekday AM and PM peak periods in both directions, especially along I-495 northbound approaching the ALMB. *See* Ex. 1 at 1-11. The AM peak period occurs between 6:45 AM and 9:45 AM. *Id.* The PM peak period occurs between 2:45 PM and 5:45 PM. *Id.* Congestion is increasingly spreading beyond these peak periods as motorists either change their departure times to avoid delay or travel during the periods of highest congestion resulting in trips taking substantially longer, especially in the PM peak period. *Id.* From 2002 to 2017, the average annual daily traffic for I-495 at the ALMB has grown from 197,000 to 233,000, an 18 percent increase. *Id.* Projected growth in population and employment, particularly in Tysons, is forecasted to substantially increase in future years and additionally strain highway capacity. *Id.*

3

8.      In order to assess and document relevant resources that may be affected by the proposed project, the study area for the EA and the Revised EA extended beyond the immediate area of the proposed project described above.  The study area included approximately four miles along I-495 between the Route 123 interchange and the ALMB at the Maryland state line.  The study area also extended approximately 2,500 feet east along the GW Parkway.  Intersecting roadways and interchanges were also included in the study area, as well as adjacent areas within 600 feet of the existing edge of pavement.  The study area is a buffer around the road corridor that includes all natural, cultural, and physical resources that are analyzed in the EA and the Revised EA.  It does not represent the limits of disturbance ("LOD")[1] of the project nor imply right-of-way acquisition or construction impact, but rather extends beyond the project footprint to tie into the surrounding network, including tying into future network improvements.  Ex. 1 at 1-2.  The following figure depicts the project termini, study area, and LOD.

---

[1] Potential impacts to resources have been calculated based on the footprint of the conceptual level design of the Build Alternative, referred to as LOD. The LOD includes all major aspects of the planned construction, including roadway improvements, drainage, stormwater management facilities, utilities, erosion and sediment control, noise control measures, construction methods, and temporary construction easements.

4



**I-495 Express Lanes Northern Extension Project Limits**

**B.  The Environmental Assessment and Finding of No Significant Impact.**

9.      On April 18, 2018, FHWA concurred with the Virginia Department of
Transportation's ("VDOT") proposal to study the I-495 NEXT Project with an Environmental
Assessment.  Ex. 3.  FHWA chose to study the Project with an EA because while the project did
not clearly qualify for classification as a CE, neither did it appear on its face that it would likely
result in significant impacts to the environment, which would warrant study with an EIS.  Highway
actions that normally require preparation of an EIS include a new controlled access freeway, a
highway project of four or more lanes on a new location, or other projects of a similar magnitude.
*See* 23 C.F.R. § 771.115.  In this case, the I-495 NEXT Project would add lanes to an existing
facility for approximately three miles and modify ramps connecting to the existing I-495 Capital
Beltway, and the Project was expected to occur largely within existing operational right-of-way.
Ex. 3.  FHWA regulations provide that "[a]ll actions that are not EISs or CEs are EAs.  All actions
in this class require the preparation of an EA to determine the appropriate environmental document
required."  23 C.F.R. § 771.115(c).

10.      The EA prepared for the project considered potential environmental impacts the
project could have on a host of natural and human environmental resources including but not
limited to air quality, water quality, noise, environmental justice, population and housing, land use,
historic sites, and park and other properties protected under Section 4(f) of the Department of
Transportation Act.  Ex. 4 at 3-4–3-12.  The study also considered the impacts a no-build
alternative would have as a baseline of comparison to the impacts of the build alternative.  *Id.*

11.      Potential environmental impacts of the Build Alternative were estimated based on
the conceptual level of design LOD as shown in the above figure, *see supra* at 5, which was used

for decision-making purposes during the National Environmental Policy Act ("NEPA") process. Ex. 1 at 3-3.

12.     The EA published for public comment in February 2020 made clear that anything within the LOD could be impacted by construction.  The EA explicitly stated that the "[i]mpact values presented for the evaluated resources represent the worst-case scenarios and assume complete direct impact to the resource occurring in the LOD."  Ex. 4 at 3-1.  The Revised EA also noted that at the time of publication, it was not possible to anticipate the exact locations of each proposed activity, and final impacts would be reviewed and documented during detailed design and permitting activities which can occur following a FHWA NEPA decision: "As design progresses, measures may be taken to avoid and minimize impacts to environmental resources to the maximum extent practicable.  Avoidance and minimization measures which may be considered include, but are not limited to, increasing proposed slopes, addition of retaining walls, refinement of the proposed alignments, and revisions to the typical sections in specific places to avoid or minimize impacts."  Ex. 1 at 3-1.

13.     FHWA coordinated and solicited comments on the EA from approximately 24 Federal, State, and local government entities.  VDOT met four times with the Stakeholder Advisory Group on June 7 and October 22, 2018, May 9, 2019, and February 10, 2020.  Public information hearings were held on June 11, 2018 (76 attended) and May 20, 2019 (225 attended). Finally, Location and Design Public Hearings were held on October 5, 2020 (virtually) and October 18, 2020.  Even though FHWA regulations do not require public hearings for an EA, FHWA and VDOT solicited public comments on the EA prepared for the I-495 NEXT Project. Prior to these meetings, the  EA, along with technical reports, were made available for public review.  Comments on the  EA were accepted from the public until December 20, 2020, which is

beyond the ordinary 30-day comment period and 60 days after the last public hearing was held in October. All told, 986 comments were submitted and considered. VDOT prepared a Revised EA reflecting these comments and FHWA recommendations in May 2022. *See* Ex. 1.

14. After reviewing the environmental analyses conducted as part of the Environmental Assessment process, and considering public and agency comments, I approved a FONSI on June 29, 2021, because the analysis revealed the project would not have significant environmental impacts. *See* Ex. 5. Specifically, the FONSI documented the basis for concluding there would be no significant impact in terms of a range of human and environmental resources, including: (1) communities and community facilities; (2) economic resources; (3) land use; (4) environmental justice; (5) historic properties; (6) Section 4(f) (including parks and recreational areas); (7) Section 6(f); (8) air quality; (8) noise; (9) waters of the U.S.; (10) water quality; (11) flood plains; (12) wildlife habitat; (13) endangered species; (14) hazardous materials; (15) indirect effects; and (16) cumulative effects. *See id.* at 2–15.

15. The FONSI also addresses comments regarding the EA, including comments that question whether the project will function on its own, if the State of Maryland does not make roadway improvements to the ALMB and implement express lanes connecting to the I-495 NEXT Project. *See id.* at 18–19. Citing the I-495 Revised Traffic and Transportation Technical Report, the FONSI documents that even without roadway improvements in Maryland, the project would result in an overall increase in person throughput resulting from additional capacity. *Id.* at 18; *see also* Ex. 2. In addition, by increasing the person-carrying capacity of I-495 and by providing a reliable travel option using express lanes, drivers would have less incentive to use local cut-through routes. Ex 5 at 18–19. Traffic models with the project in place forecast a reduction in traffic volume and travel delay on the local street network, most notably along Georgetown Pike. *Id.*

Traffic volume demands and corresponding delays on Georgetown Pike are projected to decrease at five intersections along the corridor, including at: (1) Swinks Mill Road, (2) southbound I-495 ramps, (3) northbound I-495 ramps, (4) Balls Hill Road, and (5) Dead Run Drive. *Id.* In short, the Project has independent utility because it would provide a usable facility and is a reasonable expenditure of funds even if no additional improvements in the area are made, including from the I-495 & I-270 Managed Lanes Study in Maryland. *Id.* at 19. The FONSI thus documents the basis for concluding the project has independent utility in accordance with FHWA regulations. *See* 23 C.F.R. § 771.111(f)(2); Ex. 5 at 18–19.

16.     The FONSI also notes that potential environmental impacts will be considered as design work and construction proceeds. Ex. 5 at 19; *see also* Ex. 6 at 1–2. The FONSI states that "[t]he Build Alternative selected in this Finding of No Significant Impact provides flexibility for different designs to be considered when the project advances to more detailed phases of design and permitting. Ex. 5 at 16. The FONSI further notes that "[t]he project is planned to be delivered as part of a design-build contract," and that "[d]uring the permitting process, the U.S. Army Corps of Engineers and/or the U.S. Environmental Protection Agency may request an alternatives analysis pursuant to their authority under Section 404 of the Clean Water Act. If the Build Alternative is modified during the design or permitting process, then [VDOT] would need to address the change(s) via a reevaluation and submit it to FHWA for consideration." *Id.* at 16 n. 9 & 10. Finally, the FONSI states that "[t]he Finding of No Significant Impact will be reevaluated pursuant to 23 CFR 771.129(c) prior to FHWA granting any major approvals, and the reevaluation will take into account the conditions at that time." *Id.* at 19. As anticipated with the design-build method of project delivery, minor changes to the project within the LOD did occur after the FONSI

was issued, and those changes were addressed via reevaluations at the right-of-way acquisition stage and the pre-construction stages as described below.

17.     In a memorandum dated May 5, 2021, VDOT requested FHWA's approval to modify access to I-495 based on the Interchange Justification Report ("IJR"). Ex. 6 at 3.  An IJR includes an operational and safety analysis to determine whether the proposed change in access has a significant adverse impact on the safety and operation of the Interstate highway.  *See* 23 U.S.C. § 111.  On June 11, 2021, I approved VDOT's request to modify access to I-495.  Ex. 6 at 1.

**C.  Post FONSI Actions.**

18.     On September 2, 2021, VDOT staff contacted the FHWA Virginia Division to say that they were proposing changes to the ramps at the I-495/GW Parkway interchange.  Ex. 7. VDOT staff indicated that the changes were still within the LOD that was established for the Revised EA and asked if the changes needed to be reevaluated at that point in time.  *Id.*  My staff indicated that there is no requirement to conduct a NEPA reevaluation at that point in time and that the minor changes—as well as any other changes—can be addressed at one time in a future NEPA reevaluation.  *Id.*  The approach of adding up all of the changes and addressing them in one NEPA reevaluation is how our office typically handle changes since our standard process is to reevaluate NEPA documents at two points: (1) prior to FHWA's authorization to acquire right-of-way, and (2) just prior to construction at the PS&E stage, and the project had not yet advanced to those points.  Ex. 8.  Moreover, in a follow up email to VDOT, attached as Exhibit 9, FHWA noted regarding the changes to the ramp that, "the minor changes to the ramps are within the LOD that was evaluated in the EA and FONSI, so from a NEPA standpoint, the changes are not an issue since everything within the LOD is already assumed to be impacted."

**D.  150-day Statute of Limitations Notice.**

19.     On October 1, 2021, FHWA filed a "Notice of Final Federal Agency Actions on the Interstate 495 Express Lanes Northern Extension Project in Fairfax County, Virginia" in the Federal Register.  Subsequently, on October 4, 2021, the "Notice of Final Federal Agency Actions on the Interstate 495 Express Lanes Northern Extension Project in Fairfax County, Virginia" was published in the Federal Register, thus barring claims filed after March 3, 2022.  Ex. 10.  FHWA statute of limitations notices published in the Federal Register are subject to 23 U.S.C. § 139(l), which informs the public of the 150-day statute of limitations on claims under Federal law seeking judicial review of an approval issued by FHWA for a highway or public transportation capital project.  The actions taken by FHWA are described in the EA approved on February 24, 2020, the Revised EA completed on May 19, 2021, and the FONSI issued on June 29, 2021, among other documents.

**E.  Interchange Justification Report Addendum.**

20.     On January 14, 2022, I approved a IJR Addendum, which addressed proposed changes to project ramps, along with update traffic and safety analysis.  Ex. 11.  The IJR Addendum updates the I-495 NEXT Project and evaluates further modifications to the Proposed Action from the IJR at the I-495 interchange with the GW Parkway and Route 193.  *See id* at 1.  The IJR Addendum describes the change at the I-495/GW Parkway interchange as follows: "Relocation of the ramp from northbound I-495 Express to GWMP from the location proposed in the Approved IJR Conceptual Plan: this ramp would now fly over the southbound I-495 GP and Express Lanes and tie into GWMP on the west side of I-495 in order to reduce impacts on the east side of the I-495/GWMP interchange."  *Id.*  The IJR Addendum also updated traffic analysis based on the proposed changes to project ramps.  *Id.* at 14–43.  The updated traffic analysis compared

traffic operations across the Year 2025 and Year 2045 AM and PM peak periods between No Build, the Build (Approved IJR), and the IJR Addendum Build (Modified). *Id.* at 42–43. The Build (Modified) conditions generally showed improvements in travel times compared to the No Build conditions, and consistent or slight improvements in travel times compared to the Build (Approved IJR) conditions. *Id.* at 43. Further, the updated safety and crash analysis is as follows: "Overall, the Build (Modified) condition is projected to result in an approximately 4 percent increase in crashes as compared to the Build (Approved IJR) condition. However, the Build (Modified) condition still results in a nearly 19 percent decrease in total crashes in the IJR Addendum study area as compared to No Build conditions. Furthermore, it is important to note that the Build (Modified) condition provides additional access to and from the Express Lanes, resulting in increased travel choices for drivers, as well as a projected decrease in GP lanes traffic across the ALMB." *Id* at 4, 44–45.

**F.  Re-evaluation Forms.**

21.    The FHWA Virginia's Division NEPA Guidance calls for a reevaluation of the NEPA document to be conducted at two points: (1) prior to FHWA's authorization to acquire right-of-way, and (2) just prior to construction at the PS&E stage. *See* Ex. 15 at 3; *see also* Ex. 8 at 17. The reevaluations are conducted pursuant to 23 C.F.R. § 771.129(c), which states that "[a]fter the Administration issues a combined final EIS/[Record of Decision ("ROD")], ROD, FONSI, or CE designation, the applicant must consult with the Administration prior to requesting any major approvals or grants to establish whether or not the approved environmental document or CE designation remains valid for the requested Administration action. These consultations will be documented when determined necessary by the Administration." FHWA guidance further states that "[t]he purpose of a reevaluation is to determine whether an environmental document or

decision remains valid for Agency decisionmaking." Ex. 15 at 1. While the regulations and guidance do not require EA reevaluations to be documented, the FHWA does so anyway via the use of two standard forms that are submitted by VDOT: the Document Reevaluation for Right-of-Way Authorization form ("the EQ201"), and the Document Reevaluation for Plans, Specifications, and Estimate ("PSE") Authorization form ("the EQ200"). VDOT also submits an Environmental Certification/Commitments Checklist ("the EQ103") that addresses other (non-NEPA) environmental laws. Per the agency's guidance and standard operating procedure, FHWA reviews the reevaluation forms and has seven days to provide any comments to VDOT. Ex. 15 at 17; *see also* Ex. 8 at 17. However, FHWA's policies do not require the FHWA "to respond to the receipt of the reevaluation forms." Ex. 15 at 17; *see also* Ex. 8 at 17.

22.    Under a design build project such as the Project, the contractor is responsible for designing and constructing a project. States generally complete the NEPA document that includes 15% to 20% design before procuring a design builder who will be responsible for completing the final design and construction. A design build procurement method is recommended for complex project so that design builder can use innovation in design and the design builder is responsible for most of the design and construction risks. Virginia has used design build procurement method for all its major projects including Transform 66 P3 project, 95 Express Lanes, 395 Express lanes, and 495 HOT Lanes. 23 C.F.R. § 636.109 addresses how the NEPA process relates to the design-build procurement process.

23.    On March 1, 2022, VDOT issued a notice to proceed on the Project, providing the green light for construction to begin.

24.    On July 29, 2022, VDOT sent FHWA a Document Reevaluation for PSE Authorization form and an Environmental Certification/Commitments Checklist for early

maintenance of traffic work as well as early Intelligent Transportation Systems work within VDOT's right-of-way.  *See* Ex. 12.

25.     On August 12, 2022, VDOT sent FHWA a Document Reevaluation for Right-of-Way Authorization form for the entire project with the exception of two parcels.  Ex. 13.  The form states, "No design or scope changes outside the original project limits have been added or removed from the project." *Id.* at 3.

26.     On October 5, 2022, VDOT emailed FHWA a second Document Reevaluation for PS&E form that states "This PSE Reevaluation is based upon the Final Plans for each Project Area dated July 2022. The overall project design, right of way limits and scope are within the study area evaluated in the approved environmental document." Ex. 14 at 3.  VDOT also emailed FHWA an Environmental Certification/Commitments checklist.  *Id.*

27.     FHWA Virginia Division staff followed FHWA Virginia Division Standard Operating Procedures for NEPA and Section 4(f) Review and Approval in disposition of the re-evaluation forms for the project.  This disposition is consistent with other agency guidance, such as the NEPA Re-Evaluation Joint Guidance.  *See* Ex. 15.

28.     The NEPA Re-Evaluation Joint Guidance states that the purpose of a re-evaluation is to determine whether an environmental document or decision remains valid for agency decision-making.  *Id.* at 1.  Each of the three re-evaluation forms VDOT has submitted to date to take into account minor design changes that have not exceeded the LOD described in the Revised EA.  Consequently, none of the changes reflected in any of the three re-evaluation forms have warranted a supplemental EA or an EIS.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 6, 2023,

THOMAS L
NELSON JR

Digitally signed by THOMAS
L NELSON JR
Date: 2023.04.06 09:48:25
-04'00'

Thomas L. Nelson, Jr., P.E.
Division Administrator
U.S. Department of Transportation
Federal Highway Administration
Virginia Division

# Exhibit 11

# I-495 Express Lanes Northern Extension Interchange Justification Report Addendum

December 2021

Case 1:23-cv-00356-LMB-IDD   Document 35-2   Filed 04/06/23   Page 130 of 216 PageID# 609
Case 8:22-cv-02597-DKC      Document 46-3    Filed 06/16/23    Page 26 of 94

*I-495 Express Lanes Northern Extension*                    Interchange Justification Report Addendum

The findings of this document have been agreed upon between the Virginia Department of Transportation and Federal Highway Administration. The recommendations in this document will be carried forward in support of the Addendum to the I-495 NEXT Interchange Justification Report, originally approved June 11, 2021.

Abraham Lerner W.

Digitally signed by Abraham Lerner
DN: C=US,
E=abraham.lerner@vdot.virginia.gov,
O=VDOT, OU=Virginia MegaProjects,
CN=Abraham Lerner
Date: 2021.12.17 20:12:09-05'00'

12/17/2021

_____                    _____
Abraham Lerner, P.E.                         Date
I-495 NEXT Project Manager
Associate Manager Special Projects
Virginia Department of Transportation

Stephen L Bates
2021.12.20 11:14:01-05'00'

_____                    _____
Stephen L. Bates, P.E.                       Date
NOVA District Location and Design Engineer
Virginia Department of Transportation

Chlewicki Gilbert ztd49944
I am approving this document
2021.12.21 10:50:53-05'00'

_____                    _____
Gilbert Chlewicki, P.E.                      Date
Northern Virginia District Traffic Engineer
Virginia Department of Transportation

Emmett R. Heltzel          2021.12.28
                           17:40:55 -05'00'

_____                    _____
Emmett R. Heltzel, P.E.                      Date
State Location and Design Engineer
Location and Design Division
Virginia Department of Transportation

THOMAS L           Digitally signed by
                   THOMAS L NELSON JR
NELSON JR          Date: 2022.01.14 09:15:10
                   -05'00'

_____                    _____
Thomas L. Nelson, Jr., P.E.                  Date
Division Administrator
Federal Highway Administration, Virginia Division

# EXECUTIVE SUMMARY

This Interchange Justification Report Addendum provides an update to the I-495 Express Lanes Northern Extension (NEXT) Interchange Justification Report (IJR), which was approved by FHWA on June 11, 2021. This Addendum evaluates further modifications to the Proposed Action from the Approved IJR at the I-495 interchanges with the George Washington Memorial Parkway (GWMP) and Route 193 (Georgetown Pike). **Figure ES-1** shows the original project Study Area for the entire I-495 NEXT project and the IJR Addendum Study Area.

The improvements proposed through this Addendum include the following:

- Modified Conceptual Plan for GWMP interchange (see **Figure ES-2**)
    - Relocation of the ramp from northbound I-495 Express to GWMP from the location proposed in the Approved IJR Conceptual Plan: this ramp would now fly over the southbound I-495 GP and Express Lanes and tie into GWMP on the west side of I-495 in order to reduce impacts on the east side of the I-495/GWMP interchange.
- Modified Conceptual Plan for Route 193 (Georgetown Pike) interchange (see **Figure ES-2**)
    - Channelized free-flow right-turn from westbound Route 193 to northbound I-495.
    - Northbound I-495 on-ramp refinements, including a longer acceleration and an additional merge lane on the ramp beyond the merge gore point with I-495.
    - Revised Route 193 overpass typical section, including a wider bridge with a six-foot-wide sidewalk on the north side of the bridge and a trail connection to Scotts Run Nature Preserve.

Note these modifications for the I-495 NEXT project are not anticipated to require any additional Design Exceptions or Design Waivers.

**Figure ES-3** shows the additional improvements that will be constructed with the Maryland project, which were analyzed for the purposes of traffic and safety:

- Addition of a proposed exchange ramp from northbound I-495 GP to northbound I-495 Express: this new ramp would provide northbound ingress to the I-495 Express Lanes. The corresponding movement from northbound I-495 Express to northbound I-495 GP would be accommodated within Maryland in the vicinity of the River Road interchange, or at a location further to the north, consistent with the approved CLRP.
- Addition of a proposed exchange ramp from southbound I-495 Express to southbound I-495 GP: this new ramp would provide southbound egress from the I-495 Express Lanes. The corresponding movement from southbound I-495 GP to southbound I-495 Express would be accommodated at various points upstream in Maryland, consistent with approved CLRP.

Note that these modifications are assumed to be provided as part of the Maryland project and as such will be subject to VDOT's review process as that project moves forward on a parallel but independent track.

These improvements continue to satisfy FHWA's IJR Policy Points that must be addressed for all requests for new or modified access points to the existing Interstate Highway System

Case 1:23-cv-00356-LMB-IDD   Document 35-2   Filed 04/06/23   Page 132 of 216 PageID# 611
Case 8:22-cv-02597-DKC        Document 46-3    Filed 06/16/23    Page 28 of 94

Interchange Justification Report Addendum          *I-495 Express Lanes Northern Extension*



**Figure ES-1. Project Traffic Operations Analysis Study Area and IJR Addendum Study Area**

*I-495 Express Lanes Northern Extension*            Interchange Justification Report Addendum

**Table ES-1** provides a comparison summary of traffic operations results across the AM and PM peak periods for both 2025 and 2045, with results being compared for the Build (Modified) condition against both the Build (Approved IJR) and No Build condition.

- **2025 AM:** Freeway operations are consistent between Build (Modified) and Build (Approved IJR) conditions. GP lane operations improve as compared to No Build conditions in both directions. Consistent traffic operations are observed along Route 193 between Build (Modified) and Build (Approved IJR) conditions.
- **2025 PM:** Freeway operations are generally consistent between Build (Modified) and Build (Approved IJR) conditions, with the Build (Modified) conditions showing a slight improvement in travel times in the southbound GP lanes. GP lane operations improve as compared to No Build conditions in both directions. Improved traffic operations are observed along Route 193 in the Build (Modified) condition as compared to the Build (Approved IJR) condition due to the increased capacity provided at the Route 193 interchange. Both Build scenarios show improved operations on Route 193 as compared to the No Build condition.
- **2045 AM:** Freeway operations are generally consistent between Build (Modified) and Build (Approved IJR) conditions, with the Build (Modified) conditions showing slight improvements in travel times in both directions in the GP lanes due to reduced congestion over the ALMB. GP lane operations improve as compared to No Build conditions in both directions. Improved traffic operations are observed along Route 193 in the Build (Modified) condition as compared to the Build (Approved IJR) condition due to the increased capacity provided at the Route 193 interchange. Both Build scenarios show improved operations on Route 193 as compared to the No Build condition.
- **2045 PM:** Freeway operations are generally consistent between Build (Modified) and Build (Approved IJR) conditions, with the Build (Modified) conditions showing a slight increase in travel times (approximately 1.5 minutes) in the southbound GP lanes due to increased traffic demand south of Route 193 (south of the exchange ramp from the southbound Express Lanes). GP lane operations improve as compared to No Build conditions in both directions. Consistent traffic operations are observed along Route 193 between Build (Modified) and Build (Approved IJR) conditions.

**Table ES-1. Comparison of Traffic Operational MOEs for Build (Modified) Condition**

| Measure of Effectiveness | Build (Modified) - 2025 AM | | Build (Modified) - 2025 PM | | Build (Modified) - 2045 AM | | Build (Modified) - 2045 PM | |
|---|---|---|---|---|---|---|---|---|
| | vs. Build (Approved IJR) | vs. No Build | vs. Build (Approved IJR) | vs. No Build | vs. Build (Approved IJR) | vs. No Build | vs. Build (Approved IJR) | vs. No Build |
| Northbound GP Lanes Operations | Consistent | Improved | Consistent | Improved | Slightly Improved | Improved | Consistent | Improved |
| Southbound GP Lanes Operations | Consistent | Improved | Slightly Improved | Improved | Slightly Improved | Improved | Slightly Worse | Improved |
| Express Lanes Operations (Both Directions) | Consistent | - | Consistent | - | Consistent | - | Consistent | - |
| Route 193 Operations | Consistent | Consistent | Improved | Improved | Improved | Improved | Consistent | Improved |

December 2021

Overall, the Build (Modified) condition is projected to result in an approximately 4 percent increase in crashes as compared to the Build (Approved IJR) condition. This is attributable to the increase in traffic demand in the GP lanes for both directions south of the GWMP in the Build (Modified) condition. However, the Build (Modified) condition still results in a nearly 19 percent decrease in total crashes in the IJR Addendum study area as compared to No Build conditions. Furthermore, it is important to note that the Build (Modified) condition provides additional access to and from the Express Lanes, resulting in increased travel choices for drivers, as well as a projected decrease in GP lanes traffic across the ALMB.

An updated Conceptual Signing Plan is provided in **Appendix A** of the attached IJR Addendum**.**



Figure ES-2: Modified Conceptual Plan for the Route 193 (Georgetown Pike) Interchange and George Washington Memorial Parkway Interchange: I-495 NEXT Project Only

Interchange Justification Report Addendum

I-495 Express Lanes Northern Extension

December 2021

5



Figure ES-3. Modified Conceptual Plan for the Route 193 (Georgetown Pike) Interchange and George Washington Memorial Parkway Interchange I-495: NEXT + Maryland Managed Lanes Project

Case 1:23-cv-00356-LMB-IDD   Document 35-2   Filed 04/06/23   Page 137 of 216 PageID# 616
Case 8:22-cv-02597-DKC      Document 46-3    Filed 06/16/23    Page 33 of 94

*I-495 Express Lanes Northern Extension*                    Interchange Justification Report Addendum

# 1. INTRODUCTION

This Interchange Justification Report Addendum provides an update to the I-495 Express Lanes Northern Extension (NEXT) Interchange Justification Report (IJR), which was approved by FHWA on June 11, 2021. This Addendum evaluates further modifications to the Proposed Action from the Approved IJR at the I-495 interchanges with the George Washington Memorial Parkway (GWMP) and Route 193 (Georgetown Pike).

This document has been prepared to satisfy the requirements set forth by Federal and State Policy for changes in interstate access. It is consistent with the Virginia Department of Transportation's (VDOT's) Location and Design Division Instructional and Informational Memorandum LD-200.9, and in accordance with FHWA's policy on *Access to the Interstate System* dated August 27, 2009, and updated May 22, 2017.

## 1.1   PROPOSED ACTION FROM APPROVED IJR

VDOT, in cooperation with the FHWA and Fairfax County, evaluated improvement alternatives for an extension of the I-495 Express Lanes along approximately three miles of I-495, also referred to as the Capital Beltway, from their current northern terminus in the vicinity of the Old Dominion Drive overpass to the GWMP in the McLean area of Fairfax County. The development of improvements in this corridor followed the National Environmental Policy Act (NEPA) process, and in accordance with FHWA regulations, an Environmental Assessment (EA) was prepared. A Finding of No Significant Impact (FONSI) was issued on October 4, 2021, and a Finding of Engineering and Operational Acceptability was issued by FHWA on June 11, 2021.

Under this project, I-495 would be improved to provide the following:

- Extension of the existing I-495 Express Lanes, with two Express Lanes provided in each direction from their current terminus between the I-495/Route 267 interchange and the Old Dominion Drive overpass north approximately 1.6 miles to the GWMP interchange.
- Additional general purpose (GP) auxiliary lanes between the Route 267 and Route 193 interchanges to supplement the existing four GP through lanes in each direction.
- Additional access to and from the Express Lanes network
- Improvements to I-495 interchanges between Route 123 and GWMP
- Reconstruction of I-495 overpasses in the study area at Old Dominion Drive and Live Oak Drive

The improvements described in this Addendum are consistent with the Proposed Action from the Approved IJR and include further improvements to I-495 interchanges and additional access to and from the Express Lanes network. The further improvements are described in detail in **Section 3**.

These items satisfy the project Purpose and Need, described in Chapter 2 of the Approved IJR.

## 1.2   IJR ADDENDUM STUDY AREA

**Figure 1-1** shows the original project Study Area for the entire I-495 NEXT project and the IJR Addendum Study Area. The project Traffic Operational Analysis Study Area is consistent with the Study Area shown in the Approved IJR. Note that the improvements in this Addendum are focused at the I-495 interchanges with GWMP and Route 193; as such, the IJR Addendum Study Area focuses on operations along I-495 from south of Route 193 to Clara Barton Parkway, including operations along Route 193 and the GWMP.

Case 1:23-cv-00356-LMB-IDD   Document 35-2   Filed 04/06/23   Page 138 of 216 PageID# 617
Case 8:22-cv-02597-DKC   Document 46-3   Filed 06/16/23   Page 34 of 94

Interchange Justification Report Addendum          *I-495 Express Lanes Northern Extension*



**Figure 1-1. Project Traffic Operations Analysis Study Area and IJR Addendum Study Area**

Case 1:23-cv-00356-LMB-IDD   Document 35-2   Filed 04/06/23   Page 139 of 216 PageID# 618
Case 8:22-cv-02597-DKC   Document 46-3   Filed 06/16/23   Page 35 of 94

*I-495 Express Lanes Northern Extension*                    Interchange Justification Report Addendum

## 2. NO BUILD ALTERNATIVE

This section provides a brief update on the project No Build Alternative, which is described in Chapter 6 of the Approved IJR. The No Build Alternative assumes the construction of the adjacent managed lanes system in Maryland across the ALMB, around the I-495 Beltway in Maryland, and along I-270 in Maryland north to I-370 (see Section 6.2.1 of the Approved IJR).

Upon coordination with Maryland DOT – State Highway Administration (MDOT-SHA) in Summer 2021, MDOT-SHA staff shared updated conceptual plans for the I-495 interchanges with Cabin John Parkway, River Road, I-270, and points north along I-270. These conceptual plans result in changes in access into and out of the managed lanes system within Maryland but do not impact the I-495 NEXT No Build Alternative within the Study Area, which assumes that the Maryland managed lanes system would terminate near the GWMP interchange in Virginia. Northbound ingress and southbound egress from the system would be provided via left-side slip ramps at this location, similar to how the existing I-495 Express Lanes network terminus exists north of the Dulles Toll Road.

Given the changes in the network in Maryland beyond the I-495 NEXT Study Area, VDOT re-ran the I-495 NEXT travel demand model (a modified version of the MWCOG model described in Chapter 8 of the Approved IJR) with those changes in place to determine the impact, if any, on forecasted traffic volumes in Virginia within the Study Area. The results of these model runs showed a slight decrease in traffic in the Maryland managed lanes (statistically insignificant due to being within the margin of error), and essentially no change in the GP lanes. Therefore, VDOT conservatively assumed the same traffic forecasts and traffic analysis results for the No Build scenarios from the approved I-495 NEXT IJR. The assumptions for the network in Maryland are consistent with the regional Constrained Long-Range Plan (CLRP) Documentation summarizing the results of these model runs is included in **Appendix B**.

## 3. UPDATE TO PROPOSED ACTION (VDOT / TRANSURBAN 495 NEXT CHANGES)

The improvements proposed through this Addendum include the following:

- Modified Conceptual Plan for GWMP interchange (see **Exhibit 3-1**)
  - Relocation of the ramp from northbound I-495 Express to GWMP from the location proposed in the Approved IJR Conceptual Plan: this ramp would now fly over the southbound I-495 GP and Express Lanes and tie into GWMP on the west side of I-495 in order to reduce impacts on the east side of the I-495/GWMP interchange.
- Modified Conceptual Plan for Route 193 (Georgetown Pike) interchange (see **Exhibit 3-1**)
  - Channelized free-flow right-turn from westbound Route 193 to northbound I-495
  - Northbound I-495 on-ramp refinements, including a longer acceleration and an additional merge lane on the ramp beyond the merge gore point with I-495.
  - Revised Route 193 overpass typical section, including a wider bridge with a six-foot-wide sidewalk on the north side of the bridge and a trail connection to Scotts Run Nature Preserve

Note these modifications for the I-495 NEXT project are not anticipated to require any additional Design Exceptions or Design Waivers.

**Exhibit 3-2** shows the additional improvements that will be constructed with the Maryland project, which were analyzed for the purposes of traffic and safety:

- Addition of a proposed exchange ramp from northbound I-495 GP to northbound I-495 Express: this new ramp would provide northbound ingress to the I-495 Express Lanes. The corresponding movement from northbound I-495 Express to northbound I-495 GP would be accommodated within Maryland in the vicinity of the River Road interchange, or at a location further to the north, consistent with the approved CLRP.
- Addition of a proposed exchange ramp from southbound I-495 Express to southbound I-495 GP: this new ramp would provide southbound egress from the I-495 Express Lanes. The corresponding movement from southbound I-495 GP to southbound I-495 Express would be accommodated at various points upstream in Maryland, consistent with approved CLRP.

Note that these modifications are assumed to be provided as part of the Maryland project and as such will be subject to VDOT's review process as that project moves forward on a parallel but independent track.

# 4. FHWA AND VDOT INTERSTATE ACCESS POLICY COMPLIANCE

FHWA requires the preparation of an IJR for every proposed highway system modification that affects Interstate Highway access to facilitate the agency's independent evaluation of the request and to ensure that alternatives and pertinent factors have been appropriately considered. As the United States Department of Transportation's final reviewing agency and authority for all Interstate Highway access requests, FHWA has specified two justification policy points that must be addressed for all requests for new or modified access points to the existing Interstate Highway System. This report addresses both policy points for the proposed new and modified access points on the I-495 corridor between Route 267 and the ALMB. Additional factors beyond the operation, safety, and engineering acceptability of the requested change will be addressed as part of a separate of related NEPA process.

## 4.1.1   Policy Point 1

*Policy Point 1*
*An operational and safety analysis has concluded that the proposed change in access does not have a significant adverse impact on the safety and operation of the Interstate facility (which includes mainline lanes, existing, new, or modified ramps, ramp intersections with crossroad) or on the local street network based on both the current and the planned future traffic projections. The analysis should, particularly in urbanized areas, include at least the first adjacent existing or proposed interchange on either side of the proposed change in access (23 CFR 625.2(a), 655.603(d) and 771.111(f)).*

*The crossroads and the local street network, to at least the first major intersection on either side of the proposed change in access, should be included in this analysis to the extent necessary to fully evaluate the safety and operational impacts that the proposed change in access and other transportation improvements may have on the local street network (23 CFR 625.2(a) and 655.603(d)). Requests for a proposed change in access should include a description and assessment of the impacts and ability of the proposed changes to safely and efficiently collect, distribute, and accommodate traffic on the Interstate facility, ramps, intersection of ramps with crossroad, and local street network (23 CFR 625.2(a) and 655.603(d)). Each*

Case 1:23-cv-00356-LMB-IDD   Document 35-2   Filed 04/06/23   Page 141 of 216 PageID# 620
Case 8:22-cv-02597-DKC   Document 46-3   Filed 06/16/23   Page 37 of 94

*I-495 Express Lanes Northern Extension*                     Interchange Justification Report Addendum

*request should also include a conceptual plan of the type and location of the signs proposed to support each design alternative (23 U.S.C. 109(d) and 23 CFR 655.603(d)).*

**Response to Policy Point 1**

Study Area

The study area for operational analyses and safety performed as a part of this IJR, described in Chapter 4 of the Approved IJR, satisfies the FHWA requirements for roadway network analysis.

Operational and Safety Analyses

The traffic operations and safety analyses were performed for three analysis years: existing conditions (2018), 2025, and 2045. This analysis includes No Build and Build conditions in both 2025 and 2045. The traffic operational analyses and quantitative safety studies consistent with FHWA policy were documented in Chapters 9 and 10 of the Approved IJR, respectively. This IJR Addendum document confirms that traffic operations and safety conditions for the Modified 2025 and 2045 Build scenarios, henceforth referred to as "Build (Modified)" scenarios, remain generally consistent with the operations and safety conditions from the Build (Approved IJR) scenarios and show an improvement over No Build conditions.

Chapter 8 of the Approved IJR details the forecast traffic volumes for 2025 and 2045 and the methodology used to develop them. The modified forecast traffic volumes for 2025 Build (Modified) and 2045 Build (Modified) conditions are described in **Section 5** of this document.

The proposed plan for I-495 will result in marked operational improvements to the overall system by increasing capacity and improving access on the GP lanes by transferring some of the traffic currently using the over-saturated GP lanes to the proposed Express Lanes. The Express Lanes, which are physically separated from the GP lanes, operate at desirable travel speeds. In addition, adjacent crossroad intersections to the interchanges and local network also benefit from the proposed plan as indicated by less queue spillback from the I-495 mainline and less cut-through traffic within the influence area as a result of oversaturated conditions under the No Build scenarios. A detailed assessment of traffic operations using microsimulation (VISSIM) is presented in Chapter 9 of the Approved IJR and in **Section 6** of this document for the Build (Modified) scenarios.

From a safety perspective, detailed qualitative and quantitative safety analyses were conducted for the corridor on the general purpose lanes, ramps, arterials, and intersections and are detailed in Chapter 10 of the Approved IJR. Highway safety and design professionals used the *Highway Safety Manual* (HSM) as a resource to inform project development, design, and decision making in determining design features with the greatest potential to benefit safety. The crash prediction methods identified in the HSM use key elements for roadway design and traffic data that are fundamental to project development. Three safety analysis tools were employed:

- Enhanced Interchange Safety Analysis Tool (ISATe) for assessing general purpose freeway segments and interchanges
- Project-Developed Express Lane Safety Performance Function (SPF) for estimating future-year crashes in Express Lanes segments
- Extended Highway Safety Manual (HSM) Spreadsheets for estimating future-year crashes at arterial intersections

*Interchange Justification Report Addendum*       *I-495 Express Lanes Northern Extension*

These tools were used to estimate the number of future-year crashes for the No Build and Build Alternatives to allow for comparison and estimate potential safety benefits.

Planning level crash analysis was performed using industry standard practice and highway safety analysis tools. This analysis evaluated the safety performance of existing conditions and assessed the differences between the 2045 No Build and Build alternatives. The safety analyses focused on the network as a system, including mainline segments, ramps, C-D roads, intersections, and arterials. The quantitative safety evaluation of I-495 operations revealed an overall improvement in safety in 2045 under the Build Alternative compared to the No Build by efficiently moving a greater volume of traffic with significantly reduced congestion in both directions of the I-495 corridor. With the full Express Lanes network extended into Maryland, it is anticipated that the corridor will operate at a much-improved level of safety as compared to No Build conditions. Comprehensively, the project is a significant improvement in overall safety. The detailed results of these analysis are described in Chapter 9 of the Approved IJR and in **Section 7** of this document for the Build (Modified) condition. This document shows that the Build (Modified) condition results in generally consistent crash predictions with the Build (Approved IJR) condition, with both showing a significant reduction in crashes as compared to the No Build condition.

Conceptual Signing Plan
A conceptual signing plan for the Build Alternative was developed to demonstrate that the improvements could be signed in accordance with the Manual on Uniform Traffic Control Devices (MUTCD). The original conceptual signing plan for the Build Alternative was provided as Appendix C to the Approved IJR. The conceptual signing plan for the Modified Build Alternative was developed in coordination with VDOT, Fairfax County, and NPS and is included in **Appendix A** for reference.

### 4.1.2   Policy Point 2

*Policy Point 2*
*The proposed access connects to a public road only and will provide for all traffic movements. Less than "full interchanges" may be considered on a case-by-case basis for applications requiring special access, such as managed lanes (e.g., transit, HOVs, HOT lanes) or park and ride lots. The proposed access will be designed to meet or exceed current standards (23 CFR 625.2(a), 625.4(a)(2), and 655.603(d)). In rare instances where all basic movements are not provided by the proposed design, the report should include a full-interchange option with a comparison of the operational and safety analyses to the partial-interchange option. The report should also include the mitigation proposed to compensate for the missing movements, including wayfinding signage, impacts on local intersections, mitigation of driver expectation leading to wrong-way movements on ramps, etc. The report should describe whether future provision of a full interchange is precluded by the proposed design.*

*Response to Policy Point 2*
The proposed plan provides access to public roads for all the interchange improvements. A few partial interchanges were proposed or retained and incorporated into the access configuration to connect to the I-495 GP lanes and/or Express Lanes in the Build Alternative and Phase 1 concept because of special access conditions associated with Express Lanes and existing configuration at the I-495/Route 267 interchange.

The improvements associated with this IJR Addendum create an additional partial interchange at the GWMP interchange, as access is provided from the northbound GP lanes to the northbound Express Lanes

Case 1:23-cv-00356-LMB-IDD   Document 35-2   Filed 04/06/23   Page 143 of 216 PageID# 622
Case 8:22-cv-02597-DKC      Document 46-3      Filed 06/16/23      Page 39 of 94

*I-495 Express Lanes Northern Extension*                    Interchange Justification Report Addendum

and from the southbound Express Lanes to the southbound GP lanes. The reverse movements – northbound Express to northbound GP and southbound GP to southbound Express – were assumed to be provided north of the study area in Maryland given ongoing coordination with MDOT.

At the GWMP interchange, the I-495 NEXT Project provides access from the northbound Express Lanes to GWMP and from GWMP to the southbound Express Lanes (south-facing movements). The north-facing Express Lanes connection movements (southbound Express Lanes to GWMP and GWMP to northbound Express Lanes) are planned to be provided by the Maryland managed lanes project, as the I-495 Express Lanes in Virginia will transition into the Maryland system north of GWMP.

# 5. UPDATED TRAFFIC FORECASTS

Consistent with the Approved IJR, forecasts for future traffic demand were developed using the MWCOG travel demand model (version 2.3.75 using Route 9.1 Cooperative Forecasts for socioeconomic data). Outputs from the model were used to estimate growth on Study Area roadway links using National Cooperative Highway Research Program (NCHRP) 765 industry-standard practices. The development and validation of the travel demand model, as well as more detail on the traffic forecasting process, is described in Chapter 8 of the Approved IJR.

The I-495 NEXT travel demand models were modified for the 2025 Build (Modified) and 2045 Build (Modified) conditions to include the modifications described in **Section 3** as well as the network changes in Maryland just north of the Study Area described in **Section 2**, resulting in revised traffic forecasts for the Build (Modified) scenarios as compared to the Build (Approved IJR) scenarios.

**Exhibits 5-1a** though **5-1c** show the 2025 Build (Modified) forecast traffic volumes at the daily, AM peak hour, and PM peak hour level, respectively. **Exhibits 5-2a** through **5-2c** show these volumes for the 2045 Build (Modified) condition. All of these figures provide a comparison showing the change in volume against the Build (Approved IJR) condition. The forecast traffic volumes for the 2025 and 2045 Build (Approved IJR) and No Build conditions can be found within the Approved IJR; a discussion of traffic volumes is contained in Chapter 8 and the volume diagrams are provided in the *Traffic and Transportation Technical Report (TATTR)*, which is attached by reference to the Approved IJR.

As shown in these figures, in the Build (Modified) condition, traffic volumes show a slight increase in the GP lanes south of the GWMP and a decrease in the GP lanes north of the GWMP due to the proposed exchange ramps at the GWMP interchange. These exchange ramps result in additional demand for the Express Lanes across the ALMB, providing some relief to the GP lanes across the bridge.

Separately, **Exhibits 5-1d** and **5-1e** show the 2025 Build (Approved IJR) side-by-side against the 2025 Build (Modified) forecast traffic volumes along Route 193 for the AM and PM peak hours, respectively. **Exhibits 5-2d** and **5-2e** show these same comparisons for the 2045 Build (Approved IJR) and Build (Modified) conditions. Similar to the freeway forecast volumes, the forecasts for 2025 and 2045 Build (Approved IJR) and No Build conditions can be found within the Approved IJR, including volume figures in the TATTR (Attachment 1 to the IJR).

Interchange Justification Report Addendum           *I-495 Express Lanes Northern Extension*

# 6. UPDATED TRAFFIC ANALYSIS

This section compares the traffic operational performance of the Build (Modified) condition for the I-495 NEXT project for the 2025 and 2045 analysis years. Comparisons are provided against the Build (Approved IJR) condition and against the No Build condition, results of which are consistent with those in Chapter 9 of the Approved IJR. Chapter 9 of the Approved IJR also provides details on the traffic operational analysis methodology, including analysis tools and software (Vissim Version 9.0 and Synchro 10).

Measures of effectiveness (MOEs) are consistent with the Approved IJR and the VDOT *Traffic Operations and Safety Analysis Manual* (TOSAM). The following MOEs were compared in this IJR Addendum:

- Freeway Performance
    - Simulated Average Density (simulated vehicles per lane per mile but not reported as LOS), focusing on segments in the IJR Addendum study area in which congestion was observed under Build (Approved IJR) or Build (Modified) conditions.
    - Simulated Average Speed (mph) and Congestion *Heat Maps*: incremental speeds reported for aggregated lanes, by time interval (mph)
    - Simulated Travel Time (seconds): reported for travel paths along northbound and southbound I-495 for both the GP lanes and Express Lanes
    - Simulated Ramp Queue Length: reported average and 95th percentile queue lengths (feet), focusing on locations in the IJR Addendum study area in which queue spillback was observed to exceed storage.
    - Person Throughput (persons per peak period): number of persons moved along the I-495 corridor between each interchange in the IJR Addendum study area
- Arterial Performance
    - Microsimulation Delay and HCM-Analogous Level of Service, focused on intersection locations in the IJR Addendum study area (Route 193)
    - Intersection Queue Length, again focused on intersection locations in the IJR Addendum study area

In 2025, the Build conditions are analyzed using the Phase 1 design concept; in 2045, the Build conditions are analyzed using the Ultimate configuration concept as described in Chapter 6 of the Approved IJR.

The traffic models for the IJR Addendum are provided as **Appendix C.**

## 6.1   2025 CONDITIONS: NO BUILD VS. BUILD (APPROVED IJR) VS. BUILD (MODIFIED)

### 6.1.1   2025 AM Peak Freeway Operation

2025 AM Densities

**Table 6-1** provides a list of all freeway mainline segments (in the IJR Addendum study area) classified as "congested" (density greater than 35 vehicles per mile per lane) or "severely congested" (density greater than 45 vpmpl) from the Build (Approved IJR) condition. Average speed and density results in the 2025 Build (Modified) condition remain consistent with 2025 Build (Approved IJR) conditions; for both freeway segments that show congested conditions, a slight reduction in density is observed. Tables showing the densities of all freeway segments in the IJR Addendum study area, including those under No Build conditions, can be found in **Appendix D.**

*I-495 Express Lanes Northern Extension*                    Interchange Justification Report Addendum

**Table 6-1. 2025 Build AM Peak Hour Congested Freeway Segments**

| Facility | Segment | Type | 2025 Build (Approved IJR) | | | 2025 Build (Modified) | | |
|---|---|---|---|---|---|---|---|---|
| | | | Average Speed (mph) | Average Density (vpmpl) | Congestion Level | Average Speed (mph) | Average Density (vpmpl) | Congestion Level |
| SB I-495 (GP) | Between ramp to GWMP and ramp to Route 193 | Basic | 50 | 36.2 | Congested | 50 | 35.5 | Congested |

<u>2025 AM Speeds</u>

**Figure 6-1** and **Figure 6-2** provide a "heat map" comparison of AM peak period average speeds among 2025 No Build, 2025 Build (Approved IJR), and 2025 Build (Modified) conditions along the I-495 GP lanes and the I-495 Express Lanes, respectively. Time of day during the peak period is provided on the horizontal axis while location along the corridor is provided along the vertical axis; the colors signify average speeds for each scenario. The "heat maps" reflect reduced congestion between Clara Barton Parkway and Dulles Toll Road in both Build conditions. The I-495 GP lanes in the 2025 Build (Modified) condition show speeds that remain consistent with the 2025 Build (Approved IJR) condition. The Express Lanes in the 2025 Build (Modified) condition operate consistently with the 2025 Build (Approved IJR) condition, showing average speeds at or near the posted speed limit throughout the peak period.

December 2021

Interchange Justification Report Addendum          *I-495 Express Lanes Northern Extension*



**Figure 6-1. AM Peak Period Average Speeds along I-495 GP Lanes for 2025 No Build, 2025 Build (Approved IJR), and 2025 Build (Modified) Conditions**

*I-495 Express Lanes Northern Extension*                    Interchange Justification Report Addendum



**Figure 6-2. AM Peak Period Average Speeds along I-495 Express Lanes for 2025 No Build, 2025 Build (Approved IJR), and 2025 Build (Modified) Conditions**

Interchange Justification Report Addendum          *I-495 Express Lanes Northern Extension*

2025 AM Travel Times

A comparison of AM peak period travel times for 2025 No Build, 2025 Build (Approved IJR), and 2025 Build (Modified) conditions is shown in **Table 6-2.** Travel time measurements have been aggregated by direction of travel and facility type.

**Table 6-2. 2025 AM Peak Period Travel Time Comparison**

| Route | GP Travel Times (Minutes: Seconds) | | | Express Lanes Travel Times (Minutes: Seconds) | | |
|---|---|---|---|---|---|---|
| | **2025 No Build** | **2025 Build (Approved IJR)** | **2025 Build (Modified)** | **2025 No Build** | **2025 Build (Approved IJR)** | **2025 Build (Modified)** |
| Northbound I-495 (Route 123 to River Road) | 9:37 | 6:53 | 6:50 | 7:43 | 6:12 | 6:09 |
| Southbound I-495 (River Road to Route 123) | 7:49 | 6:56 | 6:56 | 7:00 | 6:07 | 6:06 |

Travel time improvements in the 2025 Build (Modified) condition remain consistent with improvements shown in the 2025 Build (Approved IJR) condition when comparing to the 2025 No Build condition.

- The northbound GP lanes show a consistent improvement of approximately 3 minutes in 2025 Build (Modified) and 2025 Build (Approved IJR) conditions.
- The northbound Express Lanes show a consistent improvement of approximately 1.5 minutes in 2025 Build (Modified) and 2025 Build (Approved IJR) conditions.
- The southbound GP lanes show a consistent improvement of approximately 1 minute in 2025 Build (Modified) and 2025 Build (Approved IJR) conditions.
- The southbound Express Lanes show a consistent improvement of approximately 1 minute in 2025 Build (Modified) and 2025 Build (Approved IJR) conditions.

2025 AM Ramp Queues

There are no locations in the IJR Addendum study area in which ramp queues are exceeding storage in any of the 2025 No Build, Build (Approved IJR), or Build (Modified) conditions. **Appendix E** summarizes queueing for all ramps in the IJR Addendum study area.

Case 1:23-cv-00356-LMB-IDD   Document 35-2   Filed 04/06/23   Page 149 of 216 PageID# 628
Case 8:22-cv-02597-DKC   Document 46-3   Filed 06/16/23   Page 45 of 94

*I-495 Express Lanes Northern Extension*                     Interchange Justification Report Addendum

<u>2025 AM Person Throughput</u>
**Figure 6-3** and **Figure 6-4** display 2025 AM peak period person throughput along I-495 northbound and southbound, respectively (GP and Express combined). These figures show the estimated number of persons moved across a three-hour period based on simulated vehicle throughput and assumed vehicle occupancies for GP and Express Lanes. Person throughput generally remains consistent between Build (Modified) and Build (Approved IJR) conditions and represents an increase over person throughput from the No Build condition in the 2025 AM peak period.



**Figure 6-3. 2025 AM Peak Period Person Throughput, I-495 Northbound**



**Figure 6-4. 2025 AM Peak Period Person Throughput, I-495 Southbound**

Interchange Justification Report Addendum                     *I-495 Express Lanes Northern Extension*

**6.1.2    2025 AM Peak Intersection Operations**

2025 AM Intersection Delay and Level of Service
**Table 6-3** compares the overall intersection HCM-analogous LOS among No Build, Build (Approved IJR), and Build (Modified) conditions for each intersection along Route 193 for the 2025 AM peak hour. The unsignalized intersection of Route 193 and Helga Place/Linganore Drive shows an improvement of approximately 120 s/veh and 20 s/veh in comparison to No Build and Build (Approved IJR) conditions, respectively. This is due to the capacity improvements along eastbound and westbound Route 193 within the interchange with I-495. All other Route 193 intersections show delay results that are generally consistent through all three scenarios.

**Table 6-3. VISSIM Intersection Microsimulation Delay and HCM-Analogous LOS – 2025 No Build vs. 2025 Build (Approved IJR) vs. 2025 Build (Modified), AM Peak Hour**

| Intersection Control | Intersection | 2025 No Build | | 2025 Build (Approved IJR) | | 2025 Build (Modified) | |
|---|---|---|---|---|---|---|---|
| | | Intersection Microsimulation Delay (s/veh) | Intersection HCM-Analogous LOS | Intersection Microsimulation Delay (s/veh) | Intersection HCM-Analogous LOS | Intersection Microsimulation Delay (s/veh) | Intersection HCM-Analogous LOS |
| Unsignalized | Route 193 and Helga Place/ Linganore Drive | 139.6 | F | 39.5 | E | 19.9 | C |
| Signalized | Route 193 and I-495 Southbound Ramps | 25.4 | C | 23.9 | C | 23.5 | C |
| Signalized | Route 193 and I-495 Northbound Ramps | 20.5 | C | 20.7 | C | 20.4 | C |
| Signalized | Route 193 and Balls Hill Road | 21.1 | C | 23.0 | C | 23.0 | C |
| Unsignalized | Route 193 and Dead Run Drive | 9.6 | A | 9.5 | A | 10.1 | B |

*I-495 Express Lanes Northern Extension*　　　　　Interchange Justification Report Addendum

2025 AM Intersection Queues

Within the IJR Addendum study area, while the 2025 AM Build (Modified) condition has intersection movement queues that exceed storage, there are no locations where this is not also the case under No Build conditions. Consistent with the Build (Approved IJR) condition, there are no locations in which intersection queues degrade as compared to No Build conditions. A full comparison of queuing at all intersection approach locations is provided in **Appendix E.**

### 6.1.3　2025 PM Peak Freeway Operations

2025 PM Densities

**Table 6-4** provides a list of all freeway mainline segments (in the IJR Addendum study area) classified as "congested" (density greater than 35 vehicles per mile per lane) or "severely congested" (density greater than 45 vpmpl) from the Build (Approved IJR) condition. Average speed and density results in the 2025 Build (Modified) condition remain consistent with 2025 Build (Approved IJR) conditions; for the single freeway segment that shows congested conditions, a slight reduction in density is observed. Tables showing the densities of all freeway segments in the IJR Addendum study area, including those under No Build conditions, can be found in **Appendix D**.

<span style="color:#d2691e"><b>Table 6-4. 2025 Build PM Peak Hour Congested Freeway Segments</b></span>

| Facility | Segment | Type | 2025 Build (Approved IJR) | | | 2025 Build (Modified) | | |
|---|---|---|---|---|---|---|---|---|
| | | | Average Speed | Average Density (vpmpl) | Congestion Level | Average Speed | Average Density (vpmpl) | Congestion Level |
| SB I-495 (GP) | North of ramp to WB DTR (between Route 193 and DTR) | Diverge | 37 | 40.9 | Congested | 34 | 36.5 | Congested |

2025 PM Speeds

**Figure 6-5** and **Figure 6-6** provide a "heat map" comparison of PM peak period average speeds among 2025 No Build, 2025 Build (Approved IJR), and 2025 Build (Modified) conditions along the I-495 GP lanes and the I-495 Express Lanes, respectively. Time of day during the peak period is provided on the horizontal axis while location along the corridor is provided along the vertical axis; the colors signify average speeds for each scenario. The "heat maps" reflect reduced congestion between Clara Barton Parkway and Route 123 on the I-495 GP lanes in both Build conditions. The I-495 GP lanes in the 2025 Build (Modified) condition show speeds that remain consistent with the 2025 Build (Approved IJR) condition. The Express Lanes in 2025 Build (Modified) condition operate consistently with 2025 Build (Approved IJR) condition, showing average speeds at or near the posted speed limit throughout the peak period.

Interchange Justification Report Addendum                *I-495 Express Lanes Northern Extension*



**Figure 6-5. PM Peak Period Average Speeds along I-495 GP Lanes for 2025 No Build, 2025 Build (Approved IJR), and 2025 Build (Modified) Conditions**

*I-495 Express Lanes Northern Extension*                    Interchange Justification Report Addendum



**Figure 6-6. PM Peak Period Average Speeds along I-495 Express Lanes for 2025 No Build, 2025 Build (Approved IJR), and 2025 Build (Modified) Conditions**

2025 PM Travel Times

A comparison of PM peak period travel times for 2025 No Build, 2025 Build (Approved IJR), and 2025 Build (Modified) conditions is shown in **Table 6-5.** Travel time measurements have been aggregated by direction of travel and facility type.

**Table 6-5. 2025 PM Peak Period Travel Time Comparison**

| Route | GP Travel Times (Minutes: Seconds) | | | Express Lanes Travel Times (Minutes: Seconds) | | |
|---|---|---|---|---|---|---|
| | 2025 No Build | 2025 Build (Approved IJR) | 2025 Build (Modified) | 2025 No Build | 2025 Build (Approved IJR) | 2025 Build (Modified) |
| Northbound I-495 (Route 123 to River Road) | 10:36 | 6:45 | 6:39 | 8:02 | 6:05 | 6:04 |
| Southbound I-495 (River Road to Route 123) | 15:59 | 8:05 | 6:56 | 8:11 | 6:09 | 6:05 |

Travel times improvements in the 2025 Build (Modified) condition remain generally consistent with improvements shown in the 2025 Build (Approved IJR) condition when comparing to the 2025 No Build condition.

- The northbound GP lanes show a consistent improvement of approximately 4 minutes in 2025 Build (Modified) and 2025 Build (Approved IJR) conditions.
- The northbound Express Lanes show a consistent improvement of approximately 2 minutes in 2025 Build (Modified) and 2025 Build (Approved IJR) conditions.
- The southbound GP lanes show a travel time improvement of approximately 9 minutes in the 2025 Build (Modified) condition in comparison to 2025 No Build, which actually represents a travel time savings of an additional 1 minute from 2025 Build (Approved IJR) conditions.
- The southbound Express Lanes show a consistent improvement of approximately 2 minutes in 2025 Build (Modified) and 2025 Build (Approved IJR) conditions.

2025 PM Ramp Queues

**Table 6-6** provides a summary of freeway ramp queues exceeding available storage under 2025 No Build, 2025 Build (Approved IJR), or 2025 Build (Modified) conditions during the PM peak period in the IJR Addendum study area. The ramp from westbound Clara Barton Parkway to the southbound I-495 GP lanes, which sees significant queue spillback under both No Build and Build (Approved IJR) conditions, no longer sees queue spillback under Build (Modified) conditions due to congestion relief on the ALMB, as some GP lanes demand is projected to shift to utilize the Express Lanes due to the new exchange ramp provided just downstream of this location.

**Appendix E** summarizes queueing for all ramps in the IJR Addendum study area.

*I-495 Express Lanes Northern Extension*                    Interchange Justification Report Addendum

### Table 6-6. 2025 PM Ramp Queues Exceeding Storage

| Ramp Name | 2025 No Build | | | 2025 Build (Approved IJR) | | | 2025 Build (Modified) | | |
|---|---|---|---|---|---|---|---|---|---|
| | 95th % Average Ramp Queue (feet) | Ramp Storage (feet) | Storage Exceeded? | 95th % Average Ramp Queue (feet) | Ramp Storage (feet) | Storage Exceeded? | 95th % Average Ramp Queue (feet) | Ramp Storage | Storage Exceeded? |
| Clara Barton WB to I-495 SB GP | 7,122 | 2,095 | Yes | 6,887 | 2,095 | Yes | 0 | 2,095 | No |

<u>2025 PM Person Throughput</u>

**Figure 6-7** and **Figure 6-8** display 2025 PM peak period person throughput along I-495 northbound and southbound, respectively (GP and Express combined). These figures show the estimated number of persons moved across a three-hour period based on simulated vehicle throughput and assumed vehicle occupancies for GP and Express Lanes. Person throughput generally remains consistent between Build (Modified) and Build (Approved IJR) conditions and represents an increase over person throughput from the No Build condition in the 2025 PM peak period.



**Figure 6-7. 2025 PM Peak Period Person Throughput, I-495 Northbound**

Interchange Justification Report Addendum                    *I-495 Express Lanes Northern Extension*



**Figure 6-8. 2025 PM Peak Period Person Throughput, I-495 Southbound**

### 6.1.4    2025 PM Peak Intersection Operations

<u>2025 PM Intersection Delay and Level of Service</u>
**Table 6-7** compares the overall intersection HCM-analogous LOS among No Build, Build (Approved IJR), and Build (Modified) conditions for each intersection along Route 193 for the 2025 PM peak hour. Due to capacity improvements along eastbound and westbound Route 193, operations are improved at all intersections when comparing 2025 Build (Modified) conditions to both scenarios.

*I-495 Express Lanes Northern Extension*                    Interchange Justification Report Addendum

**Table 6-7. VISSIM Intersection Microsimulation Delay and HCM-Analogous LOS – 2025 No Build vs. 2025 Build (Approved IJR) vs. 2025 Build (Modified) PM Peak Hour**

| Intersection Control | Intersection | 2025 No Build | | 2025 Build (Approved IJR) | | 2025 Build (Modified) | |
|---|---|---|---|---|---|---|---|
| | | Intersection Microsimulation Delay (s/veh) | Intersection HCM-Analogous LOS | Intersection Microsimulation Delay (s/veh) | Intersection HCM-Analogous LOS | Intersection Microsimulation Delay (s/veh) | Intersection HCM-Analogous LOS |
| Unsignalized | Route 193 and Helga Place/ Linganore Drive | 157.9 | F | 28.0 | D | 12.9 | B |
| Signalized | Route 193 and I-495 Southbound Ramps | 61.7 | E | 42.5 | D | 24.8 | C |
| Signalized | Route 193 and I-495 Northbound Ramps | 19.9 | B | 21.5 | C | 16.6 | B |
| Signalized | Route 193 and Balls Hill Road | 65.0 | E | 35.5 | D | 20.3 | C |
| Unsignalized | Route 193 and Dead Run Drive | 58.6 | F | 71.5 | F | 11.9 | B |

2025 PM Intersection Queues

Within the IJR Addendum study area, while the 2025 PM Build (Modified) condition has intersection movement queues that exceed storage, there are no locations where this is not also the case under No Build conditions. Consistent with the Build (Approved IJR) condition, there are no locations in which intersection queues degrade as compared to No Build conditions. A full comparison of queuing at all intersection approach locations is provided in **Appendix E.**

## 6.2   2045 CONDITIONS: NO BUILD VS. BUILD (APPROVED IJR) VS. BUILD (MODIFIED)

### 6.2.1   2045 AM Peak Freeway Operations

2045 AM Densities

**Table 6-8** provides a list of all freeway mainline segments (in the IJR Addendum study area) classified as "congested" (density greater than 35 vehicles per mile per lane) or "severely congested" (density greater than 45 vpmpl) from the Build (Approved IJR) condition.  Average speed and density results in the 2045 Build (Modified) condition generally remain consistent with or improve upon the 2045 Build (Approved

*Interchange Justification Report Addendum*　　　　　　　*I-495 Express Lanes Northern Extension*

IJR) condition, with 12 of the 13 freeway segments showing an improvement in density. Tables showing the densities of all freeway segments in the IJR Addendum study area, including those under No Build conditions, can be found in **Appendix D**.

**Table 6-8. 2045 Build AM Peak Hour Congested Freeway Segments**

| Facility | Segment | Type | 2045 Build (Approved IJR) | | | 2045 Build (Modified) | | |
|---|---|---|---|---|---|---|---|---|
| | | | Average Speed (mph) | Average Density (vpmpl) | Congestion Level | Average Speed (mph) | Average Density (vpmpl) | Congestion Level |
| NB I-495 (GP) | Between DTR and Route 193 | Weave | 35 | 50.4 | Severely Congested | 43 | 43.3 | Congested |
| NB I-495 (GP) | Between ramps to/from Route 193 | Basic | 41 | 48.1 | Severely Congested | 42 | 51.6 | Severely Congested |
| NB I-495 (GP) | Between Route 193 and GWMP | Weave | 32 | 54.4 | Severely Congested | 37 | 52.3 | Severely Congested |
| NB I-495 (GP) | Between ramps to/from GWMP | Basic | 30 | 65.0 | Severely Congested | 49 | 37.7 | Congested |
| NB I-495 (GP) | Between GWMP and Clara Barton Parkway | Weave | 27 | 66.9 | Severely Congested | 48 | 36.1 | Congested |
| SB I-495 (GP) | Between Clara Barton Parkway and GWMP | Weave | 26 | 72.5 | Severely Congested | 38 | 51.8 | Severely Congested |
| SB I-495 (GP) | Between ramp to GWMP and ramp to Route 193 | Diverge | 50 | 41.2 | Congested | 50 | 40.9 | Congested |
| SB I-495 (GP) | Between ramps to Route 193 and from SB I-495 C-D Road | Basic | 53 | 37.8 | Congested | 53 | 37.0 | Congested |

*I-495 Express Lanes Northern Extension*          Interchange Justification Report Addendum

2045 AM Speeds

**Figure 6-9** and **Figure 6-10** provide a "heat map" comparison of AM peak period average speeds among 2045 No Build, 2045 Build (Approved IJR), and 2045 Build (Modified) along the I-495 GP lanes and the I-495 Express Lanes, respectively. Time of day during the peak period is provided on the horizontal axis while location along the corridor is provided along the vertical axis; the colors signify average speeds for each scenario.

The northbound GP lanes "heat maps" reflect reduced congestion between the Dulles Toll Road and Clara Barton Parkway in both Build conditions. The southbound GP lanes "heat maps" reflect reduced congestion between River Road and Route 193 in both Build conditions. In both directions of the GP lanes, speeds in the 2045 Build (Modified) condition show slight improvements as compared with the 2045 Build (Approved IJR) condition. This is due to congestion relief provided across the ALMB in both directions due to a projected shift in demand for some GP lanes trips to the Express Lanes via the new exchange ramps proposed just south of the bridge in the Build (Modified) condition.

The Express Lanes in the 2025 Build (Modified) condition operate consistently with the 2025 Build (Approved IJR) condition, showing average speeds at or near the posted speed limit throughout the peak period.

Case 1:23-cv-00356-LMB-IDD   Document 35-2   Filed 04/06/23   Page 160 of 216 PageID# 639
Case 8:22-cv-02597-DKC   Document 46-3   Filed 06/16/23   Page 56 of 94

Interchange Justification Report Addendum                    *I-495 Express Lanes Northern Extension*



**Figure 6-9. AM Peak Period Average Speeds along I-495 GP Lanes for 2045 No Build, 2045 Build (Approved IJR), and 2045 Build (Modified) Condition**

*I-495 Express Lanes Northern Extension*          Interchange Justification Report Addendum



**Figure 6-10. AM Peak Period Average Speeds along I-495 Express Lanes for 2045 No Build, 2045 Build (Approved IJR), and 2045 Build (Modified) Conditions**

2045 AM Travel Times

A comparison of AM peak period travel times for 2045 No Build, 2045 Build (Approved IJR), and 2045 Build (Modified) conditions is shown in **Table 6-9.** Travel time measurements have been aggregated by direction of travel and facility type.

**Table 6-9. 2045 AM Peak Period Travel Time Comparison**

| Route | GP Travel Times (Minutes: Seconds) | | | Express Lanes Travel Times (Minutes: Seconds) | | |
|---|---|---|---|---|---|---|
| | 2045 No Build | 2045 Build (Approved IJR) | 2045 Build (Modified) | 2045 No Build | 2045 Build (Approved IJR) | 2045 Build (Modified) |
| Northbound I-495 (Route 123 to River Road) | 11:59 | 8:03 | 7:27 | 9:37 | 5:43 | 5:40 |
| Southbound I-495 (River Road to Route 123) | 16:15 | 7:32 | 7:05 | 8:04 | 5:41 | 5:40 |

Travel times improvements in the 2045 Build (Modified) condition remain generally consistent with improvements shown in the 2045 Build (Approved IJR) condition when comparing to the 2045 No Build condition.

- The northbound GP lanes show a travel time improvement of approximately 4.5 minutes in the 2045 Build (Modified) condition in comparison to 2045 No Build, which actually represents a travel time savings of an additional 30 seconds from 2045 Build (Approved IJR) conditions.
- The northbound Express Lanes show a consistent improvement of approximately 4 minutes in 2045 Build (Modified) and 2045 Build (Approved IJR) conditions.
- The southbound GP lanes show a travel time improvement of approximately 9 minutes in the 2045 Build (Modified) condition in comparison to 2045 No Build, which actually represents a travel time savings of an additional 30 seconds from 2045 Build (Approved IJR) conditions.
- The southbound Express Lanes show a consistent improvement of approximately 2.5 minutes in 2045 Build (Modified) and 2045 Build (Approved IJR) conditions.

2045 AM Ramp Queues

**Table 6-10** provides a summary of freeway ramp queues exceeding available storage under 2045 No Build, 2045 Build (Approved IJR), or 2045 Build (Modified) conditions during the AM peak period in the IJR Addendum study area. In the 2045 (Approved IJR) condition, the only ramp that continued to exceed storage was the ramp from westbound Clara Barton Parkway to the southbound I-495 GP lanes. However, this queue is eliminated in the 2045 Build (Modified) condition due to congestion relief on the ALMB, as some GP lanes demand is projected to shift to utilize the Express Lanes due to the new exchange ramp provided just downstream of this location.

**Appendix E** summarizes queueing for all ramps in the IJR Addendum study area.

*I-495 Express Lanes Northern Extension*　　　　　　Interchange Justification Report Addendum

**Table 6-10. 2045 AM Ramp Queues Exceeding Storage**

| Ramp Name | 2045 No Build | | | 2045 Build (Approved IJR) | | | 2045 Build (Modified) | | |
|---|---|---|---|---|---|---|---|---|---|
| | 95th % Average Ramp Queues (feet) | Ramp Storage (feet) | Storage Exceeded? | 95th % Average Ramp Queues (feet) | Ramp Storage (feet) | Storage Exceeded? | 95th % Average Ramp Queues (feet) | Ramp Storage (feet) | Storage Exceeded? |
| I-495 NB GP to Route 193 | 4,995 | 1,225 | Yes | 152 | 1,225 | No | 80 | 1,225 | No |
| Route 193 to I-495 NB GP | 1,106 | 930 | Yes | 0 | 930 | No | 0 | 930 | No |
| Clara Barton EB to I-495 SB GP | 3,142 | 1,100 | Yes | 237 | 1,100 | No | 0 | 1,100 | No |
| Clara Barton WB to I-495 SB GP | 7,123 | 2,095 | Yes | 2,821 | 2,095 | Yes | 0 | 2,095 | No |

2045 AM Person Throughput

**Figure 6-11** and **Figure 6-12** display 2045 AM peak period person throughput along I-495 northbound and southbound, respectively (GP and Express combined). These figures show the estimated number of persons moved across a three-hour period based on simulated vehicle throughput and assumed vehicle occupancies for GP and Express Lanes. Person throughput generally remains consistent between Build (Modified) and Build (Approved IJR) conditions and represents an increase over person throughput from the No Build condition in the 2045 AM peak period.

Interchange Justification Report Addendum          *I-495 Express Lanes Northern Extension*



**Figure 6-11. 2045 AM Peak Period Person Throughput, I-495 Northbound**



**Figure 6-12. 2045 AM Peak Period Person Throughput, I-495 Southbound**

### 6.2.2    2045 AM Peak Intersection Operations

<u>2045 AM Intersection Delay and Level of Service</u>

**Table 6-11** compares the overall intersection HCM-analogous LOS among No Build, Build (Approved IJR), and Build (Modified) conditions for each intersection along Route 193 for the 2045 AM peak hour. Due to capacity improvements along eastbound and westbound Route 193 within the interchange with I-495, all intersections perform at LOS E or better under Build (Modified) conditions, and the two signalized intersections with the I-495 ramps show an improvement as compared to Build (Approved IJR) conditions.

*I-495 Express Lanes Northern Extension*          Interchange Justification Report Addendum

**Table 6-11. VISSIM Intersection Microsimulation Delay and HCM-Analogous LOS – 2045 No Build vs. 2045 Build (Approved IJR) vs. 2045 Build (Modified) AM Peak Hour**

| Intersection Control | Intersection | 2045 No Build | | 2045 Build (Approved IJR) | | 2045 Build (Modified) | |
|---|---|---|---|---|---|---|---|
| | | Intersection Microsimulation Delay (s/veh) | Intersection HCM-Analogous LOS | Intersection Microsimulation Delay (s/veh) | Intersection HCM-Analogous LOS | Intersection Microsimulation Delay (s/veh) | Intersection HCM-Analogous LOS |
| Unsignalized | Route 193 and Helga Place/ Linganore Drive | 231.7 | F | 72.7 | F | 41.6 | E |
| Signalized | Route 193 and I-495 Southbound Ramps | 40.2 | D | 39.1 | D | 33.6 | C |
| Signalized | Route 193 and I-495 Northbound Ramps | 69.1 | E | 54.8 | D | 33.7 | C |
| Signalized | Route 193 and Balls Hill Road | 59.7 | E | 25.1 | C | 21.1 | C |
| Unsignalized | Route 193 and Dead Run Drive | 14.3 | B | 14.3 | B | 14.7 | B |

2045 AM Intersection Queues

Within the IJR Addendum study area, while the 2045 AM Build (Modified) condition has intersection movement queues that exceed storage, there are no locations where this is not also the case under No Build conditions. Consistent with the Build (Approved IJR) condition, there are no locations in which intersection queues degrade as compared to No Build conditions. A full comparison of queuing at all intersection approach locations is provided in **Appendix E.**

### 6.2.3   2045 PM Peak Freeway Operations

2045 PM Densities

**Table 6-12** provides a list of all freeway mainline segments (in the IJR Addendum study area) classified as "congested" (density greater than 35 vehicles per mile per lane) or "severely congested" (density greater than 45 vpmpl).  Average speed and density results in the 2045 Build (Modified) condition generally remain consistent with the 2045 Build (Approved IJR) condition. Tables showing the densities of all freeway segments in the IJR Addendum study area, including those under No Build conditions, can be found in **Appendix D**.

*Interchange Justification Report Addendum*          *I-495 Express Lanes Northern Extension*

**Table 6-12. 2045 Build PM Peak Hour Congested Freeway Segments**

| Facility | Segment | Type | 2045 Build (Approved IJR) | | | 2045 Build (Modified) | | |
|---|---|---|---|---|---|---|---|---|
| | | | Average Speed (mph) | Average Density (vpmpl) | Congestion Level | Average Speed (mph) | Average Density (vpmpl) | Congestion Level |
| NB I-495 (GP) | Between DTR and Route 193 | Weave | 10 | 122.3 | Severely Congested | 10 | 121.2 | Severely Congested |
| NB I-495 (GP) | Between ramps to/from Route 193 | Basic | 15 | 95.0 | Severely Congested | 15 | 94.5 | Severely Congested |
| NB I-495 (GP) | Between Route 193 and GWMP | Weave | 15 | 84.2 | Severely Congested | 14 | 84.5 | Severely Congested |
| NB I-495 (GP) | Between ramps to/from GWMP | Basic | 16 | 97.4 | Severely Congested | 16 | 96.8 | Severely Congested |
| NB I-495 (GP) | Between GWMP and Clara Barton Parkway | Weave | 21 | 73.3 | Severely Congested | 21 | 72.8 | Severely Congested |

<u>2045 PM Speeds</u>

**Figure 6-13** and **Figure 6-14** provide a "heat map" comparison of PM peak period average speeds among 2045 No Build, 2045 Build (Approved IJR), and 2045 Build (Modified) conditions along the I-495 GP lanes and the I-495 Express Lanes. Time of day during the peak period is provided on the horizontal axis while location along the corridor is provided along the vertical axis; the colors signify average speeds for each scenario.

The northbound GP lanes "heat maps" are consistent between both Build conditions and reflect a reduction in congestion south of Route 193 as compared to No Build conditions. The southbound GP "heat maps" reflect reduced congestion between River Road and Clara Barton Parkway in the Build conditions as compared to No Build conditions. Note that the Build (Modified) condition is observed to have more occasional slowdowns south of Route 193 as compared to the Build (Approved IJR) condition due to increased traffic demand in the GP lanes in this area from the upstream Express-to-GP exchange ramp. Overall speeds and travel times, described in the following section, still represent a substantial improvement over No Build conditions.

The Express Lanes in the 2045 Build (Modified) condition operate consistently with the 2045 Build (Approved IJR) condition, showing average speeds at or near the posted speed limit throughout the peak period.

*I-495 Express Lanes Northern Extension*                     Interchange Justification Report Addendum



**Figure 6-13. PM Peak Period Average Speeds along I-495 GP Lanes for 2045 No Build, 2045 Build (Approved IJR), and 2045 Build (Modified) Conditions**

Interchange Justification Report Addendum          *I-495 Express Lanes Northern Extension*



**Figure 6-14. PM Peak Period Average Speeds along I-495 Express Lanes for 2045 No Build, 2045 Build (Approved IJR), and 2045 Build (Modified) Conditions**

*I-495 Express Lanes Northern Extension*  　　　　　Interchange Justification Report Addendum

2045 PM Travel Times

A comparison of PM peak period travel times for 2045 No Build, 2045 Build (Approved IJR), and 2045 Build (Modified) conditions is shown in **Table 6-13.** Travel time measurements have been aggregated by direction of travel and facility type.

**Table 6-13. 2045 PM Peak Period Travel Time Comparison**

| Route | GP Travel Times (Minutes: Seconds) | | | Express Lanes Travel Times (Minutes: Seconds) | | |
|---|---|---|---|---|---|---|
| | 2045 No Build | 2045 Build (Approved IJR) | 2045 Build (Modified) | 2045 No Build | 2045 Build (Approved IJR) | 2045 Build (Modified) |
| Northbound I-495 (Route 123 to River Road) | 28:18 | 23:42 | 23:25 | 15:59 | 5:39 | 5:40 |
| Southbound I-495 (River Road to Route 123) | 15:16 | 7:46 | 9:12 | 6:42 | 5:49 | 5:40 |

Travel times improvements in 2045 Build (Modified) remain consistent with improvements shown 2045 Build (Approved IJR) when comparing to 2045 No Build.

- The northbound GP lanes show a consistent improvement of approximately 5 minutes in 2045 Build (Modified) and 2045 Build (Approved IJR) conditions.
- The northbound Express Lanes show a consistent improvement of approximately 10 minutes in 2045 Build (Modified) and 2045 Build (Approved IJR) conditions.
- The southbound GP lanes show a travel time improvement of approximately 6 minutes in the 2045 Build (Modified) condition in comparison to 2045 No Build. Note that this represents a travel time increase of approximately 1.5 minutes from 2045 Build (Approved IJR) conditions, due to increased traffic demand in the GP lanes in this area from the upstream Express-to-GP exchange ramp.
- The southbound Express Lanes show a consistent improvement of approximately 1 minute in 2045 Build (Modified) and 2045 Build (Approved IJR) conditions.

2045 PM Ramp Queues

**Table 6-14** provides a summary of freeway ramp queues exceeding available storage under 2045 No Build, 2045 Build (Approved IJR), or 2045 Build (Modified) during the PM peak period in the IJR Addendum study area. The only ramp that exceeded storage in No Build conditions was the ramp from westbound Clara Barton Parkway to the southbound I-495 GP lanes. However, this queue is eliminated in the 2045 Build (Approved IJR) condition and remains consistent in the 2045 Build (Modified) condition.

**Appendix E** summarizes queueing for all ramps in the IJR Addendum study area.

Interchange Justification Report Addendum          *I-495 Express Lanes Northern Extension*

### Table 6-14. 2045 PM Ramp Queues Exceeding Storage

| Ramp Name | 2045 No Build | | | 2045 Build (Approved IJR) | | | 2045 Build (Modified) | | |
|---|---|---|---|---|---|---|---|---|---|
| | 95th % Average Ramp Queues (feet) | Ramp Storage (feet) | Storage Exceeded? | 95th % Average Ramp Queues (feet) | Ramp Storage (feet) | Storage Exceeded? | 95th % Average Ramp Queues (feet) | Ramp Storage (feet) | Storage Exceeded? |
| Clara Barton WB to I-495 SB GP | 7,124 | 2,095 | Yes | 68 | 2,095 | No | 68 | 2,095 | No |

**2045 PM Person Throughput**

**Figure 6-15** and **Figure 6-16** display 2045 PM peak period person throughput along I-495 northbound and southbound, respectively (GP and Express combined). These figures show the estimated number of persons moved across a three-hour period based on simulated vehicle throughput and assumed vehicle occupancies for GP and Express Lanes. Person throughput generally remains consistent between Build (Modified) and Build (Approved IJR) conditions and represents an increase over person throughput from the No Build condition in the 2045 PM peak period.



**Figure 6-15. 2045 PM Peak Period Person Throughput, I-495 Northbound**

*I-495 Express Lanes Northern Extension*                    Interchange Justification Report Addendum



**Figure 6-16. 2045 PM Peak Period Person Throughput, I-495 Southbound**

### 6.2.4    2045 PM Peak Intersection Operations

2045 PM Intersection Delay and Level of Service

**Table 6-15** compares the overall intersection HCM-analogous LOS among No Build, Build (Approved IJR), and Build (Modified) for each intersection along Route 193 for the 2045 PM peak hour. Consistent intersection operations are observed under Build (Approved IJR) and Build (Modified) conditions, with three of the five intersections showing a substantial reduction in delay and improvement in LOS as compared to No Build conditions.

**Table 6-15. VISSIM Intersection Microsimulation Delay and HCM-Analogous LOS – 2045 No Build vs. 2045 Build (Approved IJR) vs. 2045 Build (Modified) PM Peak Hour**

| Intersection | 2045 No Build | | 2045 Build (Approved IJR) | | 2045 Build (Modified) | |
|---|---|---|---|---|---|---|
| | Intersection Microsimulation Delay (s/veh) | Intersection HCM-Analogous LOS | Intersection Microsimulation Delay (s/veh) | Intersection HCM-Analogous LOS | Intersection Microsimulation Delay (s/veh) | Intersection HCM-Analogous LOS |
| Route 193 and Helga Place/ Linganore Drive | 125.6 | F | 15.9 | C | 15.7 | C |
| Route 193 and I-495 Southbound Ramps | 24.5 | C | 21.6 | C | 27.9 | C |
| Route 193 and I-495 Northbound Ramps | 60.3 | E | 63.6 | E | 63.5 | E |
| Route 193 and Balls Hill Road | 40.7 | D | 18.4 | B | 16.7 | B |
| Route 193 and Dead Run Drive | 40.6 | E | 13.8 | B | 13.5 | B |

<u>2045 PM Intersection Queues</u>

Within the IJR Addendum study area, while the 2045 PM Build (Modified) condition has intersection movement queues that exceed storage, there are no locations where this is not also the case under No Build conditions. Consistent with the Build (Approved IJR) condition, there are no locations in which intersection queues degrade as compared to No Build conditions. A full comparison of queuing at all intersection approach locations is provided in **Appendix E.**

## 6.3   UPDATED TRAFFIC ANALYSIS CONCLUSIONS

**Table 6-16** provides a comparison summary of traffic operations results across the 2025 and 2045 AM and PM peak periods, with results being compared for the Build (Modified) condition against both the Build (Approved IJR) and No Build condition.

- **2025 AM:** Freeway operations are consistent between Build (Modified) and Build (Approved IJR) conditions. GP lane operations improve as compared to No Build conditions in both directions. Consistent traffic operations are observed along Route 193 between Build (Modified) and Build (Approved IJR) conditions.

Case 1:23-cv-00356-LMB-IDD  Document 35-2  Filed 04/06/23  Page 173 of 216 PageID# 652
Case 8:22-cv-02597-DKC  Document 46-3  Filed 06/16/23  Page 69 of 94

*I-495 Express Lanes Northern Extension*                    Interchange Justification Report Addendum

- **2025 PM:** Freeway operations are generally consistent between Build (Modified) and Build (Approved IJR) conditions, with the Build (Modified) conditions showing a slight improvement in travel times in the southbound GP lanes. GP lane operations improve as compared to No Build conditions in both directions. Improved traffic operations are observed along Route 193 in the Build (Modified) condition as compared to the Build (Approved IJR) condition due to the increased capacity provided at the Route 193 interchange. Both Build scenarios show improved operations on Route 193 as compared to the No Build condition.

- **2045 AM:** Freeway operations are generally consistent between Build (Modified) and Build (Approved IJR) conditions, with the Build (Modified) conditions showing slight improvements in travel times in both directions in the GP lanes due to reduced congestion over the ALMB. GP lane operations improve as compared to No Build conditions in both directions. Improved traffic operations are observed along Route 193 in the Build (Modified) condition as compared to the Build (Approved IJR) condition due to the increased capacity provided at the Route 193 interchange. Both Build scenarios show improved operations on Route 193 as compared to the No Build condition.

- **2045 PM:** Freeway operations are generally consistent between Build (Modified) and Build (Approved IJR) conditions, with the Build (Modified) conditions showing a slight increase in travel times (approximately 1.5 minutes) in the southbound GP lanes due to increased traffic demand south of Route 193 (south of the exchange ramp from the southbound Express Lanes). GP lane operations improve as compared to No Build conditions in both directions. Consistent traffic operations are observed along Route 193 between Build (Modified) and Build (Approved IJR) conditions.

**Table 6-16. Comparison of Traffic Operational MOEs for Build (Modified) Condition**

| Measure of Effectiveness | Build (Modified) - 2025 AM | | Build (Modified) - 2025 PM | | Build (Modified) - 2045 AM | | Build (Modified) - 2045 PM | |
|---|---|---|---|---|---|---|---|---|
| | vs. Build (Approved IJR) | vs. No Build | vs. Build (Approved IJR) | vs. No Build | vs. Build (Approved IJR) | vs. No Build | vs. Build (Approved IJR) | vs. No Build |
| Northbound GP Lanes Operations | Consistent | Improved | Consistent | Improved | Slightly Improved | Improved | Consistent | Improved |
| Southbound GP Lanes Operations | Consistent | Improved | Slightly Improved | Improved | Slightly Improved | Improved | Slightly Worse | Improved |
| Express Lanes Operations (Both Directions) | Consistent | - | Consistent | - | Consistent | - | Consistent | - |
| Route 193 Operations | Consistent | Consistent | Improved | Improved | Improved | Improved | Consistent | Improved |

# 7. UPDATED SAFETY AND CRASH ANALYSIS

A safety analysis for the Build (Modified) condition was conducted consistent with the Approved IJR and with VDOT IIM-LD-200.9. The analysis for this IJR Addendum is focused on the predicted number of crashes for the 2045 design year in the IJR Addendum study area. The crash prediction methodology is consistent with the methodology described in Chapter 10 of the Approved IJR:

- **Enhanced Interchange Safety Analysis Tool (ISATe):** ISATe is a safety analysis tool used to evaluate freeway and interchange systems. ISATe predicts crashes by crash location, i.e., mainline freeway segments, ramp segments, and ramp terminals. Inputs to the tool include both geometric and operational characteristics of roadway and ramp facilities. ISATe also analyzes ramp terminal crossroad intersections based on the number of lanes and arrangement of lanes and type of traffic control. For the purposes of mainline and interchange safety analysis and conditions on the I-495 corridor, ISATe was used to evaluate the GP lanes and all study area ramps.

- **Developed Express Lane Safety Performance Function (SPF):** this I-495 Express Lanes-specific SPF was used to evaluate the Express Lanes mainline segments, as the HSM (First Edition) does not have a crash prediction methodology for estimating the safety performance of separated/managed lanes.

## 7.1 FUTURE CONDITIONS SAFETY ANALYSIS: 2045 NO BUILD VS. BUILD (APPROVED IJR) VS. BUILD (MODIFIED)

**Table 7-1** shows the predicted number of crashes along the I-495 GP lanes and all interchange ramps, as well as the I-495 Express Lanes and the three signalized intersections along Route 193, for the 2045 analysis year. Comparisons are provided across No Build, Build (Approved IJR), and Build (Modified) conditions and for Fatal and Injury crashes, Property Damage Only (PDO) crashes, and Total crashes.

In both the northbound and southbound GP lanes, the Build (Modified) condition would result in a slight increase in the predicted number of crashes as compared to the Build (IJR) condition. This is attributable to the increase in traffic demand in the GP lanes for both directions south of the GWMP in the Build (Modified) condition, as described previously in Section 5 and shown in **Exhibits 5-1** and **5-2**. In the northbound direction, the new access provided in this alternative is projected to result in some traffic demand utilizing the GP lanes south of GWMP and switching over to the Express Lanes at the new exchange ramp; the reverse direction is projected to see a similar shift in travel demand, with some southbound traffic using the Express Lanes across the ALMB and then switching over to the GP lanes at the exchange ramp. This increase in AADT is directly correlated with an increase in crashes.

Most of the increase in crashes in the GP lanes in the Build (Modified) condition would be in the PDO crash category. However, in the northbound GP lanes, there would be a projected increase in Fatal and Injury crashes as well. The northbound direction, unlike the southbound direction, does not feature a C-D road between Route 193 and GWMP interchanges to mitigate lane-change conflicts. The projected increase in crashes in the northbound direction, including the increase in fatal and injury crashes, would not be concentrated in any one segment but would generally apply to all freeway mainline segments south of GWMP, with the longer segments showing higher crash projections.

**Table 7-2** and **Table 7-3** provide a more detailed breakdown of total crashes along the mainline segments along the I-495 GP lanes between the Build (Approved IJR) and Build (Modified) conditions, showing the

segments that have the largest differences in predicted crashes. As shown, the increases in crashes south of Route 193 are forecasted across all segments and correlated with increases in AADT and segment lengths.

Overall, the Build (Modified) condition is projected to result in an approximately 4 percent increase in crashes as compared to the Build (Approved IJR) condition. However, the Build (Modified) condition still results in a nearly 19 percent decrease in total crashes in the IJR Addendum study area as compared to No Build conditions. Furthermore, it is important to note that the Build (Modified) condition provides additional access to and from the Express Lanes, resulting in increased travel choices for drivers, as well as a projected decrease in GP lanes traffic across the ALMB.

Declaration of Deb Butler, Exhibit B

(NOVA Citizens Association letter re Army Corps permit)



September 28, 2022

U.S. Army Corps of Engineers Baltimore District
Attn: Mr. Nicholas Ozburn
2 Hopkins Plaza
Baltimore, MD 21201

Maryland Department of the Environment
Attn: Mr. Steve Hurt
Wetlands and Waterways Program
1800 Washington Blvd.
Suite 430
Baltimore, MD 21230-1708

> Re: MDOT I-495/I-270 Managed Lane Study : USACE Application Number NAB-2018-02152 and MDE Tracking Numbers 20-NT-0114/202060649

Dear Mr. Ozburn and Mr. Hurt,

I write on behalf of the Northern Virginia Citizens Association to object to the proposed Clean Water Act ("CWA") §401 Water Quality Certification and the Joint Federal/State Application for the Alteration of any Floodplain, Waterway, Tidal or Nontidal Wetland in Maryland (JPA).

In brief, development of the I-495/I-270 Managed Lane Study ("MLSO"O by Maryland and Virginia together has been a giant "BAIT-AND-SWITCH" scheme whereby extreme adverse effects on the Live Oak Drive community in Northern Virginia are hidden, with both Virginia and Maryland using each other as cover so that the environmental impacts to this community need never be considered or addressed.

1

In so doing, the agencies have violated multiple federal laws including, but not limited to, the Clean Water Act, the National Environmental Policy Act, the Bald and Golden Eagle Protection Act[1], the National Historic Preservation Act and the Administrative Procedure Act. We urge you to deny the JPA and the CWA §401 Water Quality Certification Applications unless and until Maryland thoroughly analyzes *and mitigates* the impacts of its planned construction in Northern Virginia.

For example, the specific regulatory action at issue here illustrates the problem – and how the residents of Live Oak Drive have been prevented any opportunity to have our concerns addressed. *The JPA and the CWA §401 certification address only impacts in Maryland. But Maryland is building the portion of the MLS I <u>in Virginia</u> that will impact the Live Oak Drive community in Virginia*, as evidenced by documentation in the JPA permit file.[2]

**Virginia claims no responsibility for this construction because it will be done by Maryland. But because the activity is occurring in Virginia, and not Maryland, MDOT too neglects to consider the impacts.**

The problem facing our neighborhood is amply illustrated by a review of Appendix A to the CWA §401 Certification Request: "Names and Addresses of Adjacent Property Owners."[3] That 16-page list includes hundreds (perhaps thousands) of properties that may be impacted by the project – *but not a single address in Virginia, even though Maryland will be constructing giant flyover ramps in Virginia that will impact the Live Oaks community.*

We have previously endeavored to persuade MDOT and VDOT to meet with our community and to address our concerns, to no avail. Accordingly, we reiterate our concerns here and again request mitigation to address clear Clean Water Act violations, as well as other environmental issues. We offer specific recommendations that would address these concerns. And we welcome the opportunity to meet with you to discuss these issues.

---

[1] With respect to the Bald and Golden Eagle Protection Act, we note that the statute authorizes both civil and *criminal* penalties, *including* for employees of state agencies or their contractors. *See* 50 C.F.R. §22.6 (definition of "person").

[2] *See, e.g.,* JPA Appendix A at pp. 3-7 (showing wetlands impacts in the Live Oak Drive community of Northern Virginia) (*Available at* ArcGIS (oplanesmd.com)).

[3] *Available at* Appendix-A_Names-and-Addresses-of-Adjacent-Property-Owners_20220711.pdf (oplanesmd.com).

Below, we provide a more detailed discussion of our concerns, and the reasons why the JPA and the CWA §401 Water Quality Certification should be denied.

_Clean Water Act_. We assume that both VDOT and MDOT are fully aware of – and will be in compliance with – all of their obligations to mitigate stormwater pollution from major construction projects.  _See, e.g._, 33 U.S.C. §1342(p) (requiring permits for certain types of stormwater discharges); 40 C.F.R. §122.26(a)(1)(ii) (requiring permits to discharge stormwater "associated with industrial activity"); 40 C.F.R. §122.26(b)(14)(x) (_defining_ "storm water discharge associated with industrial activity" to include construction projects that will disturb more than five acres of land); EPA, 2022 Nationwide Construction General Permit for Stormwater Discharges from Construction Activities (_requiring_, among other things, a Stormwater Pollution Prevention Plan (SWPPP); erosion and sediment controls and pollution prevention practices throughout the entire construction project; and regular inspections by a "qualified person" to verify compliance with permit) (_available at_ https://www.epa.gov/npdes/2022-construction-general-permit-cgp).

Those requirements for construction activities, however, are not the only Clean Water Act (CWA) requirements applicable here. As MDOT and VDOT should know, the waterbodies near and over which the I-495 expansion project will occur are on the Maryland CWA "Section 303(d)" list of impaired water bodies that do not meet applicable Water Quality Standards (WQS).[4]  _See_ 33 U.S.C. §1313(d) ("identification of areas with insufficient controls").  Maryland has identified the region of the Potomac River by the American Legion Bridge as being "water quality-impaired" for Total Suspended Solids (sediments or "TSS", which come primarily from erosion), nutrients (nitrogen and phosphorus, which come primarily from fertilizers and wastewater treatment systems, including septic systems), chlorides and sulfates (which can come from road de-icing and roadway runoff). _See_ Maryland Department of the Environment, Maryland Water Quality Assessment Interactive Map (_available at_ Water Quality Assessments (IR) and TMDLs (state.md.us)). Although Maryland in 2012 issued Total Maximum Daily Loads (TMDLs, regulations limiting the amount of pollutant loadings allowed in a specific area) for sediments and nutrients for this segment of the Potomac, this area still has not come into compliance with the applicable WQS.  _See_ Maryland Department of the Environment, TMDLs and Water Quality Plans for the Potomac River Montgomery County (_available at_ Potomac River Montgomery County (maryland.gov)); Maryland Department of the Environment, Maryland Water Quality Assessment

---

[4] As you are aware, jurisdictionally, the Potomac River belongs to Maryland. The Maryland-Virginia State border is at the Virginia side of the banks of the Potomac.

Interactive Map (showing that, in 2022, this area of the Potomac is still listed as "303(d)-impaired" for sediments and nutrients). Moreover, Maryland has not yet developed TMDLs for chlorides and sulfates.

The Potomac River drains directly to the Chesapeake Bay, which is itself severely water quality-impaired and subject to its own TMDLs – which in turn reach upstream to where the I-495 expansion will take place, and beyond.  Indeed, the CWA itself established the Chesapeake Bay Program, based in part upon the "diminished" water quality of the Bay that resulted from "pollution" and "excessive sedimentation."  *See* 33 U.S.C. §1267. Both Maryland and Virginia are members of the Chesapeake Bay Program partnership, and are subject to its Accountability Framework should they fail to meet the pollutant loadings mandated in their jurisdictions. By 2025, that framework requires, among other things, a 25% reduction in nitrogen loadings and a 20% reduction in sediment loadings, as compared to 2009.  *See, e.g.,* Chesapeake Bay TMDL Fact Sheet (*available at* https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-tmdl-fact-sheet);  EPA, Chesapeake Bay TMDL (*available at* https://www.epa.gov/chesapeake-bay-tmdl/chesapeake-bay-tmdl-document*).*

Unfortunately, the current VDOT-MDOT plan for the Live Oak Drive community portion of the I-495 expansion project will only exacerbate the water quality issues in the area – as well as making it highly unlikely that either state can achieve its obligations under the Chesapeake Bay Program partnership.

***The Project will more than double the current square footage of impervious surface as compared to the existing eight-lane Beltway***.  Yet VDOT has exempted the existing Beltway from its stormwater mitigation requirements and traded 80% of the credits for the new surface mitigation – using credits from elsewhere in the Commonwealth that will provide *no actual pollutant mitigation in the area actually affected* – notwithstanding the fact that surface water in the area of the American Legion Bridge is already impaired.  To be clear, what VDOT has done is to trade away most of the mitigation for water quality in this area, such that mitigation will only be required for 20% of the volume flowing from the doubling of the impervious area around the American Legion Bridge.  And the addition of ramps at the interchange will only increase surface water runoff.  Moreover, the current preliminary figures indicate that Virginia has already exceeded its allowable pollutant loadings on the 20% of the roadway they are required to address.  Indeed, Fairfax County is already recording a 2% increase in salinity annually in streams and watershed adjacent to the project – *before project construction has even begun*. Nor have we located anything in the administrative record for this action to demonstrate that MDOT has done ***anything***

4

beyond what VDOT has done (*i.e.,* virtually nothing) to address these stormwater impacts.

VDOT and MDOT further exacerbate the water quality issues in the Scotts Run/Live Oak Drive community by consolidating the stormwater infrastructure down to a mere three pond locations, ponds which are indisputably inadequate to handle the increased runoff from the doubling of impervious surfaces. The net result is that all of this additional stormwater runoff will drain directly into the Scotts Run/Live Oak Drive community. Yet Live Oak Drive is one of the few remaining areas of McLean that still relies on septic systems for wastewater treatment. Indeed, much of the non-wooded area in the community is comprised of the septic fields needed to treat the residential sewage. These additional stormwater loadings, to the extent that they do not simply runoff and contaminate nearby streams and the Potomac, will infiltrate in and around the septic fields, shortening the life of those systems (at a bare minimum) and, more significantly, risking system failure with accompanying heightened nutrient loadings to nearby streams and the Potomac itself. Of course, any such heightened nutrient loadings will also reach the Chesapeake Bay, further hindering the restoration of the Bay.[5] Nowhere in the administrative record does MDOT acknowledge or propose to mitigate these impacts.

The Live Oak Drive community already experiences significant stream erosion from I-495 runoff, which in turn has caused substantial tree loss. *Moving* Live Oak Drive, *eliminating all trees* from the border between Live Oak Drive and I-495, and *moving the flyover ramps closer to Live Oak Drive*, will result in the bulk of the project's increased stormwater loadings channeling into and through the community. In so doing, VDOT and MDOT will significantly exacerbate the erosion that already contributes significant TSS loadings to the Potomac. It is undisputed that, "The majority of runoff from the new lanes will be piped directly to Scotts Run stream or the Potomac River with no detention, worsening downstream flooding and erosion along Scott's Run." Letter from Leanna H. O'Donnell, Fairfax County Department of Planning and Development to Martha Coello, Fairfax County Department of Transportation, "I-495 Express Lanes Northern Extension Project Environmental Assessment), p. 2 (February 12, 2021).

VDOT responds with the unsupported – and illogical – assertion that "The proposed drainage features will result in a reduction in water quantity as water leaves the 495

---

[5] We acknowledge that VDOT has purchased mitigation credits which may partially offset the nutrient impacts to the Chesapeake Bay. These offsets, however, come from a different part of the state and thus will do *nothing* to mitigate the water quality impacts of this project on the Potomac, which also fails to meet WQS and is subject to TMDLs.

roadway, as well as improvement in water quality, when compared with conditions that exist today." *Id.* That is absurd. As noted above, the addition of *four* new express lanes along with five new flyover ramps will double the amount of impervious surface in the area as compared to existing conditions. The addition of the new stormwater retention basins cannot begin to hold the new influx of water. The only way VDOT could reach such a conclusion – particularly with respect to Scotts Run and the Live Oak Drive community – was by <u>completely ignoring the impact that *MDOT's* construction will have in *Virginia*</u> – or perhaps by pretending, notwithstanding all factual evidence to the contrary, that buying mitigation credits elsewhere in Virginia will somehow improve water quality here. But VDOT cannot simply wish away its obligations under the CWA by pretending that they are solely MDOT's responsibility (and, for the reasons discussed above and in Appendix B, ignoring these cumulative impacts was a blatant violation of NEPA).

Absurd though their response is, at least VDOT responded. ***MDOT has offered no response at all.*** We are not surprised. MDOT's constituents do not live in Virginia, and MDOT has made it abundantly clear that it cares not one bit about the impacts its actions will impose on Virginia residents.

Indeed, when the County pointed out that the project will generate ***3,000*** feet of stream impacts, much of it in the Scotts Run area, and requested mitigation, VDOT cavalierly and dismissively responded that "Scotts Run is already significantly degraded." *Id.* And MDOT, of course, did not respond at all. The CWA, however, requires that states take measures to ensure the "***restoration*** and maintenance of the 'chemical, physical, and biological integrity of the Nation's waters.'" 33 U.S.C. §1251 (emphasis added).  The entire structure and requirements of the CWA make clear that states may not simply claim that a waterbody is degraded and use that as an excuse not to take measures to improve water quality – let alone use existing degradation as an excuse to make water quality worse.  *See, e.g.,* 33 U.S.C. §1313(d)(4) (antidegradation requirement);  40 C.F.R. §131.12(a)(1) (implementing the CWA antidegradation requirement by mandating that "the level of water quality necessary to protect the existing uses shall be *maintained* and protected") (emphasis added); EPA, *Water Quality Standards Handbook,* Chapter 4, p. 1) (*available at* <u>eCFR :: 40 CFR 131.12 -- Antidegradation policy and implementation methods.</u>) (<u>***the maintenance and protection of existing uses is  the "absolute floor" or "minimum level of protection to all waters"***</u>).

Finally, we note that the project lies six miles upstream from the Little Falls pumping plant that flows to the Dalecarlia Reservoir in the District, providing drinking water for much of McLean.  Excess loadings of pollutant from this stormwater contamination may

well result in exceedances of Maximum Contaminant Levels (MCLs) in McLean residents' drinking water – and thus cause the County and the Commonwealth to be in violation of the Safe Drinking Water Act. *See* 42 U.S.C. §300f *et seq.*

For the foregoing reasons, we believe that if MDOT and VDOT move forward with the current system design, absent significant additional stormwater mitigation measures, the agencies will be in violation of their obligations under the Clean Water Act – and potentially the Safe Drinking Water Act as well. Accordingly, we believe that the JPA and the §401 Water Quality Certification application should be denied.

While perhaps not directly relevant to the administrative actions at issue here, below we outline additional illegalities with MDOT and VDOT's actions.  We also discuss certain mitigation measures that would help to mitigate the unaddressed water quality impacts being imposed on the Live Oak Drive community, the Potomac River and the Chesapeake Bay by MDOT and VDOT's actions.

*National Environmental Policy Act.*  As outlined in the document provided to MDOT and VDOT on June 7, 2022 entitled "Questions for VDOT and MDOT: Concerned Citizens Following the June 6, 20222 Public Meeting at Langley High School (attached as Appendix A), we believe that MDOT and VDOT have violated the National Environmental Policy Act (NEPA, 42 U.S.C. §§4321 *et seq.*) in multiple respects.  To the extent that the Army Corps and MDE rely on these flawed environmental assessments, they compound and amplify the errors, and result in your agencies being complicit in these NEPA violations. These flaws include the following:

- Failure to discuss in VDOT's Environmental Assessment, as a "connected action," the MDOT construction that will occur in Virginia;

- Failure to discuss in VDOT's Environmental Assessment, as a "cumulative action," the MDOT construction that will occur in Virginia;

- Failure to discuss in VDOT's Environmental Assessment, as "cumulative effects," the environmental impacts of the MDOT construction that will occur in Virginia;

- Unlawful segmentation by both VDOT and MDOT in separately analyzing clearly connected and cumulative actions;

- Failure by MDOT to provide adequate notice to Virginia residents that it – a state agency in an entirely different state – would be taking actions with a Significant Environmental Impact in Virginia;

7

- Failure by VDOT to provide adequate public notice to its affected residents that an entirely different state (Maryland) would be taking actions with a Significant Environmental Impact in their neighborhood; and

- VDOT making an illegal "irretrievable commitment of resources" in closing on the contract with Transurban before completing the required environmental analyses under NEPA.

In addition, however, and as detailed further below, we believe that in developing their "coordinated but separate" projects for expanding I-495, VDOT and MDOT have also failed to ensure compliance with the Bald and Golden Eagle Protection Act (16 U.S.C. §§668-668c), the Clean Water Act (CWA, 33 U.S.C. §§1251 *et seq.*), the National Historic Preservation Act (54 U.S.C. §§100101 *et seq.*) and the Administrative Procedure Act (5 U.S.C. §§500 *et seq.*).

*__Bald and Golden Eagle Protection Act.__* Members of the community have personally seen – and taken photographs and videos – of bald eagles (and potentially nests) in and around Scott's Run Nature Preserve, including in the vicinity of the Langley Swim Club.[6]  The proposed I-495 expansion Project, as currently designed, will include significant land disturbance in and around the Langley Swim Club, including removal of trees, moving Live Oak Drive, and significant encroachment onto the property of the Langley Swim Club, and Scott's Run Nature Preserve. Yet we are aware of *no* efforts by VDOT or MDOT to catalogue the presence of bald eagles or their nests, nor to undertake mitigation to ensure compliance with the Bald and Golden Eagle Protection Act.

Accordingly, we believe that the current project design may result in VDOT, MDOT and/or their contractors violating the Bald and Golden Eagle Protection Act.

For reference, the Bald and Golden Eagle Protection Act imposes civil *or criminal* penalties on persons (*including* employees of state agencies or their contractors) who "take, possess, sell, purchase, barter, offer to sell, purchase or barter, transport, export or import, at any time or any manner, any bald eagle ... [or any golden eagle], alive or dead, or any part (including feathers), nest, or egg thereof." 16 U.S.C. §668(a), (b).[7] The

---

[6] We would be happy to provide these photographs and videos upon request.
[7] Under the regulations, "*Person* means an individual, corporation, partnership, trust, association, or any other private entity, or any officer, employee, agent, department, or instrumentality of any State or political subdivision of a State." 50 C.F.R. § 22.6.

Act defines "take" as "pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, *molest or disturb*." 16 U.S.C. §668c (emphasis added). The United States Fish and Wildlife Service has clarified in regulations that "disturb" includes "to agitate or bother a bald or golden eagle to a degree that causes, or is likely to cause, based on the best scientific information available, 1) injury to an eagle, 2) a decrease in its productivity, by substantially interfering with normal breeding, feeding, or sheltering behavior, or 3) nest abandonment, by substantially interfering with normal breeding, feeding, or sheltering behavior." *See* 50 C.F.R. § 22.6.

Of particular relevance here, the Fish and Wildlife Service has interpreted its definition of "disturb" to include "human-induced alterations initiated around a previously used nest site during a time when eagles are not present, if, upon the eagle's return, such alterations agitate or bother an eagle to a degree that interferes with or interrupts normal breeding, feeding, or sheltering habits, and causes injury, death or nest abandonment."  U.S. Fish and Wildlife Service, *National Bald Eagle Management Guidelines,* pp. 2, 17 (2007) (*available at* [https://www.fws.gov/sites/default/files/documents/national-bald-eagle-management-guidelines.pdf](https://www.fws.gov/sites/default/files/documents/national-bald-eagle-management-guidelines.pdf)).

**<u>*The National Historic Preservation Act.*</u>**  We understand that as part of its Cultural Resources Survey, VDOT identified a Civil War encampment that could be impacted by the I-495 expansion project.[8] Subsequently, however, we were unable to locate any reference to that Civil War encampment in subsequent documentation, nor can we locate any references or documentation to support a conclusion that VDOT complied with its consultation obligations under the National Historic Preservation Act (NHPA). Accordingly, it appears that VDOT (and DOT) may have violated the NHPA.

For reference, Section 106 of the NHPA requires identification and assessment of the potential effects on historic buildings and structures before initiation of a "federal undertaking." *See* 54 U.S.C. § 306108. A "federal undertaking" is defined as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a federal agency, including: (1) those carried out by or on behalf of a federal agency; (2) those carried out with federal financial assistance; (3) those requiring a federal permit, license or approval; and (4) those subject to state or local regulation

---

[8] *Compare* Commonwealth Heritage Group, *Cultural Resources Survey for the Interstate 495 Express Lanes Northern Extension Project*, (June 2019); *with* VDOT, *Final Environmental Assessment for the Interstate 495 Express Lanes Northern Extension Project* (February 2020).

administered pursuant to a delegation or approval by a federal agency." 30 C.F.R. §800.16(y). Where potentially historic properties have been identified and could be impacted by the project, the project proponents must initiate consultation with the Advisory Council on Historic Preservation (ACHP), State Historic Preservation Officer (SHPO) or Tribal Historic Preservation Officer (THPO), and other consulting parties.  *See* 54 U.S.C. § 306108.

*The Administrative Procedure Act*. Members of our community have been closely following the I-495 expansion project for many years, regularly visiting the VDOT website and attending both virtual and in-person public meetings.  Yet it was only in May of 2022 that we discovered that MDOT would be constructing major portions of the expansion project in Virginia – and that five large flyover ramps would be built adjacent to the Live Oak Drive neighborhood. While we have requested responses from both VDOT and MDOT as to what specific steps it has taken to inform the affected communities that MDOT would be undertaking major construction in and around our Virginia neighborhood, it appears obvious that neither agency provided anywhere near the level of public notice that is required to satisfy their obligations under the Administrative Procedure Act (APA).

For reference, the APA requires federal agencies to provide adequate public notice and an opportunity for affected persons to comment on many types of agency actions. *See, e.g.*, 5 U.S.C. §§552, 553. NEPA expressly provides that those notice and comment obligations apply to issuance Environmental Assessments and Environmental Impact Statements. 42 U.S.C. §4332(c) (*referencing* 5 U.S.C. §552). Although VDOT and MDOT are not federal agencies, the NEPA (and APA) requirements apply to them here.  *See* 42 U.S.C. §4332(D) (an Environmental Assessment or Environmental Impact Statement "for any major federal action funded under a program of grants to the States shall not be deemed legally insufficient solely by reason of having been prepared by a State agency or official if (i) the State agency or official has statewide jurisdiction and has the responsibility for such action, [and] (ii) the responsible Federal official furnishes guidance and participates in such preparation."). As a cooperating agency, the Army Corps may also be legally liable for MDOT's and VDOT's respective failures to provide adequate notice and comment (as well as for the substantive inadequacies of the NEPA documentation, as outlined above and in the attachment).

*    *    *

We have previously identified for MDOT and VDOT the two key mitigation measures that are necessary for our community. To date, neither MDOT nor VDOT has had the courtesy even to respond to us.  While we believe that the Least Environmental Damaging Practicable Alternative ("LEDPA") is to deny the JPA as others have noted in their comment letters, any permit issued by the Army Corps must include these necessary measures to mitigate the impacts of the new flyover ramps on the Live Oak community:

1. *First,* the community needs ***adequate sound and light mitigation.***

    a. Specifically, we need high quality sound and light barriers between Live Oak Drive and *all* I-495 and George Washington Parkway ramps.

    b. These ramps must be high enough to block truck light from the community (*i.e.*, at least ten feet higher than the highest ramp).

    c. The barriers must be of sufficient quality to block at least 80% of the sound from I-495 and George Washington Parkway traffic, and they should be as compatible with residential aesthetic as possible (*e.g.*, accommodating "green walls"). We understand that Whisper Walls would meet these criteria (as well as being partially made from recycled used tires, thereby providing an additional environmental benefit). There may be other alternatives that would provide sufficient sound and light protection that would work in lieu of, or in combination with, Whispers Walls.

    d. The community strongly prefers that the highest flyover ramp or ramps have the barriers installed on the ramps themselves.

2. *Second,* the community needs ***adequate stormwater mitigation.*** We note that, separate and apart from our request, VDOT and MDOT have an independent legal obligation to mitigate stormwater pollution to comply with the Clean Water Act, including provisions relating to protection of the Chesapeake Bay. As discussed above, this obligation arises not just in the construction phase of the project, but also subsequently, when the expanded lanes are operational.

    a. The community believes that the most efficient and cost-effective way to address the stormwater issues would be to move (at least) one of the

flyover lanes to the opposite side of I-495, where it was originally designed to be located. Specifically, the flyover lane designed to move traffic from the northbound toll lanes to the George Washington Parkway should not veer over towards Live Oak Drive, but instead should take the more direct route to the Parkway (*See* Appendix B. Prior design dated October 2020 versus current design dated June 2022).

i.   Because this original design requires fewer feet of elevated roadway, we anticipate that it is a less expensive design than the current design.

ii.  This approach would sufficiently mitigate the stormwater issues. Rather than channeling the bulk of the project's increased stormwater loadings into and through Scott's Run and the Live Oak Drive community, a portion of the stormwater will channel to the other side of the Beltway, thus increasing opportunities for stormwater infiltration and reducing overall stormwater pollution and erosion. Further, not moving Live Oak Drive, and not eliminating the trees buffering the community from I-495 will also promote stormwater infiltration and improve water quality. Finally, even a moderate reduction in stormwater flow through the Live Oak Drive community will reduce erosion and improve water quality.

iii. This approach has the added benefit of not requiring the relocation of portions of Live Oak Drive, thereby further reducing costs. We anticipate that the cost savings from partially reverting to the earlier design would more than amply cover any cost of for the sound and noise barriers discussed above, to the extent that the cost of those barriers might exceed what has already been budgeted by VDOT and MDOT.

iv.  This approach similarly resolves concerns regarding violation of the Bald and Golden Eagle Protection Act, as it dramatically reduces disturbances to the Langley Swim Club and nearby areas of Scotts Run Nature Preserve.

12

     v.   Moreover, this approach provides significant benefits to the Langley Swim Club and to the numerous users of Scotts Run Nature Preserve by not eliminating much of the Swim Club/Nature Preserve parking. We understand, for example, the Langley Swim Club is in discussions with Fairfax County to purchase a portion of the Nature Preserve to compensate for parking that will be lost as a result of the I-495 expansion project.

     vi.   This approach similarly offers significant safety benefits, as the proposed narrowing of Live Oak Drive, coupled with the elimination of much of the parking at Langley Swim Club, poses significant risks for the many walkers, hikers and bikers who use this area for recreation – not to mention all of the children who use the Langley Swim Club throughout the summer months.

     vii.   Finally, this approach preserves much of the tree canopy that VDOT would otherwise remove, providing addition stormwater mitigation – and aesthetic – benefits.

b.   Should VDOT and MDOT not be willing to accommodate this partial reversion to the earlier design, then the VDOT and MDOT engineers will need to develop a stormwater engineering solution that sufficiently reduces the runoff such that polluted runoff (beyond the limited amounts that will be captured in the retention basins): (1) receives sufficient treatment to meet applicable water quality standards and Total Maximum Daily Loads; (2) does not cause significant stream erosion in the Live Oak Drive neighborhood (thereby increasing Total Suspended Solids loadings in the Potomac, as well as the damaging benthic communities and reducing Total Dissolved Oxygen in the Potomac); and (3) does not damage neighborhood septic systems such that the Potomac receives even higher loadings of nitrogen and fecal coliform. (Needless to say, VDOT and MDOT would also have an independent obligation to ensure that their actions do not impact any eagle nests in the area, should the agencies choose not to revert to the earlier design.) We are not certain what these mitigation measures might look like (or cost) but we would welcome further discussions if VDOT and MDOT are not interested in our preferred solution.

We appreciate your consideration of our concerns. You can reach me at
novacitizensassociation@gmail.com.

Regards,


Debra Butler
President
Northern Virginia Citizens Association

cc:

Ms. Samantha Beers
Director
Office of Community, Tribes & Environmental Assessment
U.S. Environmental Protection Agency Region 3
1600 John F. Kennedy Blvd
Philadelphia, PA 19103-2852

Mr. Lawrence Starfield
Acting Assistant Administrator
Office of Enforcement and Compliance Assurance
Mail code 2201A
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Ms. Martha Williams
Director
U.S. Fish and Wildlife Service
1849 C Street, NW
Washington, DC 20240

Ms. Carin Bisland
Chief, Partnerships and Accountability Branch
Chesapeake Bay Program
410 Severn Avenue
Annapolis, Maryland  21403

The Honorable Barbara Favola
Virginia State Senator
2319 18th Street, N
Arlington, VA 22201

The Honorable Kathleen Murphy
Delegate, Virginia's 34th House District
P.O. Box 146
McLean, VA 22101

The Honorable John Foust
Fairfax County, Virginia Board of Supervisors
Dranesville District
McLean Government Center
1437 Ball Hill Road
McLean, VA 22101

Appendix

Appendix A.   Email to Office of Senator Barbara Favola, Virginia Delegate Kathleen Murphy, John Foust, Virginia Board of Supervisors, "495NEXT Construction - Press Coverage VDOT/MDOT bait & switch", dated June 7, 2022

Questions for VDOT and MDOT
Concerned Citizens Following the June 6, 2022 Public Meeting at Langley High School

1. Exactly how high are the five flyover lanes that are proposed for near Live Oak Drive?

2. Will the extended toll lanes be the same height as the existing highway, or will they be higher?

3. Exactly how high are the visual and sound barriers that are proposed to shield Live Oak Drive from the flyover lanes and the extended toll lanes?

   a. Where VDOT proposes to replace the existing barriers, will the replacement barriers be sound barriers or merely visual barriers?

   b. Where VDOT proposes to replace the existing barriers, will the barriers be the same height as the existing barriers or will they be higher?

   c. Where VDOT proposes to replace the existing barriers, will the barriers be high enough to shield both the sound and the visual impacts from the highway expansion?

   d. Please provide details on the materials proposed for the barriers shielding Live Oak Drive.

      i. For example, will VDOT use "Whisper Walls" or will some other type of wall be used?

      ii. Exactly how much sound protection will these barriers provide?

         1. Please provide the response both in terms of percentage reduction in sound impacts and in actual decibels with and without the barriers.

16

    2. Please include in the response impacts for the MDOT and the VDOT portions of the project, both separately and combined.

4. When, exactly (month and year), was **VDOT first** informed that MDOT would be building five flyover lanes near Live Oak Drive?

    a. Please explain what specific measures were taken, and when, to inform the affected communities that MDOT would be building five flyover lanes near Live Oak Drive.

5. Please identify exactly where in the public documentation **VDOT** explains to the public that MDOT will be building five flyover ramps (and taking other actions) in Virginia. Please also identify specifically **when** (month and year) that documentation was made available to the public.

6. What specific actions did **MDOT** take to inform the affected **Virginia** communities that it would be taking actions with Significant Environmental Impacts in those Virginia communities?

    a. What specific actions did MDOT take to ensure that affected Virginia communities received notice that its Draft Environmental Impact Statement was available for public review and comment?

    b. What specific actions did MDOT take to ensure that affected Virginia communities received notice that it would be holding public hearings on its Draft Environmental Impact Statement?

7. What specific measures did **VDOT** take to inform the affected **Virginia** communities that MDOT would be taking actions with Significant Environmental Impacts in those Virginia communities?

    a. What specific actions did VDOT take to ensure that affected Virginia communities received notice that MDOT's Draft Environmental Impact Statement was available for public review and comment, and that that document would discuss specific and significant impacts in Virginia?

    b. What specific actions did VDOT take to ensure that affected Virginia communities received notice that MDOT would be holding public

hearings on its Draft Environmental Impact Statement, and that MDOT construction would have specific and significant impacts in Virginia?

8. Please explain VDOT's rationale for **not** discussing in its Environmental Assessment, **as a "connected action,"** the MDOT construction that will occur in Virginia.  For reference, "connected actions" are "closely related *and therefore should be discussed in the same impact statement*. Actions are connected if they … are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1) (emphasis added).

9. Please explain VDOT's rationale for **not** discussing in its Environmental Assessment, **as a "cumulative action,"** the MDOT construction that will occur in Virginia.  For reference, "cumulative actions" are "Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts *and should therefore be discussed in the same impact statemen*t." 40 C.F.R. § 1508.25(a)(2) (emphasis added).

10. Please explain VDOT's rationale for **not** discussing in its Environmental Assessment, **as "cumulative effects,"** the environmental impacts of the MDOT construction that will occur in Virginia. For reference, "cumulative effects" are "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and *reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions*. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.1(g) (emphasis added).

11. Please explain the rationale for VDOT and MDOT not preparing a single, integrated Environmental Impact Statement, given that the regulations clearly mandate a single EIS for "connected" and "cumulative" actions.

12. Please explain why VDOT and MDOT believe that separately analyzing clearly connected and cumulative actions does not constitute **unlawful "segmentation"** under the National Environmental Policy Act (NEPA).  For reference, unlawful segmentation occurs when agency artificially divides a major federal action into smaller components to avoid application of NEPA to some of its segments.  *See, e.g., Coalition on Sensible Transportation, Inc. v. Dole,* 826 F.2d 60, 68 (D.C.

Cir. 1987) ("Agencies may not evade their responsibilities under NEPA by artificially dividing a major federal action into smaller components.").

13. Please explain the basis for your belief that Virginia residents should have been on notice that the "Significant Environmental Impacts" to the Northern Virginia community would be undertaken by MDOT and thus would be addressed only in MDOT's Draft Environmental Impact Statement, and neither identified nor discussed in VDOT's Environmental Assessment.

14. We understand from the meeting on June 6, 2022 that VDOT and Transurban have reached financial close on the 495-NEXT expansion project. We also understand that VDOT has not yet completed its noise analyses as well as various other environmental impact studies. Please explain how financial close does not constitute an **illegal "irretrievable commitment of resources"** under NEPA. For reference, NEPA analyses *must* be prepared at the "feasibility analysis (go-no go) stage." *Andrus v. Sierra Club,* 442 U.S. 347, 351 n. 3 (1979). As such, NEPA requires that the environmental analyses be conducted and completed "before any irreversible and irretrievable commitment of resources" occurs. *Metcalf v. Daley,* 214 F.3d 1135, 1142 (9th Cir, 2000); *see also Native Ecosystems Council v. Dombeck*, 304 F. 3d 886 (9th Cir. 2002).

15. Please explain VDOT's legal rationale for not addressing the noise impacts of **both** its portion of the project and MDOT's five flyover ramps, including why failure to do so does not violate NEPA's prescriptions regarding connected actions, cumulative actions, cumulative impacts and unlawful segmentation.

   a. Does VDOT's **Analysis of Noise Abatement** include the noise impacts from the five flyover ramps being constructed by VDOT?

   b. Does VDOT's estimate of a 10 decibel increase in traffic noise in the Live Oak Drive neighborhood include the noise impacts of the flyover ramps or exclude those impacts?

   c. If VDOT's estimate of a 10 decibel increase in traffic noise in the Live Oak Drive neighborhood excludes the noise impacts of the flyover ramps, please explain how the MDOT and VDOT projects together meet the US Department of Transportation's requirements for noise levels in

residential neighborhoods.  *See* 23 C.F.R. §§ 772.11(c), 772.13 and Table 1 to Part 772.

16. Where in the public record can we find the following analyses:

    a. **Alternatives assessment** for the expanded project scope?

        i. What other options were considered besides the new, expanded and elevated flyover ramps, and were those options discussed in the Environmental Assessment prepared by VDOT or only in the documents prepared by MDOT?

        ii. On what basis did VDOT and MDOT conclude that these massive new ramps are the least environmentally-impactful alternative, and was that rationale discussed in the Environmental Assessment prepared by VDOT or only in the documents prepared by MDOT?

    b. **Assessment of mitigation measures** to address the impacts on the Live Oak Drive community and Scotts Run Nature Preserve that will result from the expanded project scope?

        i. What specific mitigation measures were considered, and were those measures discussed in the Environmental Assessment prepared by VDOT or only in the documents prepared by MDOT?

        ii. On what basis were those mitigation measures rejected and was that rationale discussed in the Environmental Assessment prepared by VDOT or only in the documents prepared by MDOT?

    c. **Noise impacts** that will result from the new project scope, including:

        i. Traffic noise predictions in conformance with the **FHWA Traffic Noise Model (TNM),** as required under 23 C.F.R. §§772.9 and 772.11?

        ii. Analysis of Noise Abatement for Live Oak Drive, as required under 23 C.F.R. § 772.3?

    d. **Light pollution impacts** on the Live Oak Drive community that will result from the new project scope?

    e. **Air dispersion modeling analysis** that assesses both the criteria and the hazardous air pollutant emission impacts from the new project scope?

f.  **Visibility and noise impacts** on Scotts Run Nature Preserve that will result from the new project scope?

g.  Impacts on **water quality** from the increased traffic that will result from the new project scope?

h.  **Wetlands impacts** that will result from the new project scope?

i.  **Biological resources impacts** that will result from the new project scope?

j.  In light of the documented **health impacts to communities near major traffic sites, air quality impacts** on the Live Oak Drive community that will result from the new project scope?

k.  Calculated **climate change impacts** resulting from increased traffic resulting from the new project scope? (We assume that, in accordance with federal regulations and guidance, VDOT used the most current Social Cost of Carbon to calculate the monetary climate change impacts from the new project scope.  What was the result of that analysis?)

ACTION:  We request that VDOT and MDOT formally respond to these questions by June 30th.

Appendix B.  Prior design dated October 2020 versus current design dated June 2022

