**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| MARYLAND CHAPTER OF THE SIERRA CLUB, *et al.*,<br><br>*Plaintiffs*,<br>v.<br><br>FEDERAL HIGHWAY ADMINISTRATION, *et al.*,<br><br>*Defendants*. | Civil Action No. DKC 22-2597 |
| NORTHERN VIRGINIA CITIZENS ASSOCIATION,<br><br>*Plaintiff*,<br>v.<br><br>FEDERAL HIGHWAY ADMINISTRATION, *et al.*,<br><br>*Defendants*. | Civil Action No. DKC 22-3336 |

**ADDENDUM OF CITED STATUTES AND REGULATIONS**

**TABLE OF CONTENTS**


| Cited Statutes | Page |
|---|---|
| 5 U.S.C. § 706 | ADD__002 |
| 23 U.S.C. § 138 | ADD__004 |
| 42 U.S.C. § 4332 | ADD__009 |
| 42 U.S.C. § 4344 | ADD__013 |
| 42 U.S.C. § 7407 | ADD__016 |
| 42 U.S.C. § 7410 | ADD__023 |
| 42 U.S.C. § 7506 | ADD__033 |
| 49 U.S.C. § 303 | ADD__039 |
| 54 U.S.C. §§ 300308, 300311 | ADD__043 |
| 54 U.S.C. § 300320 | ADD__045 |
| 54 U.S.C. § 306108 | ADD__047 |
| Va. Code Ann. § 10.1-1307 | ADD__049 |
| **Cited Regulations** | **Page** |
| 23 C.F.R. § 771.125 | ADD__053 |
| 23 C.F.R. § 774.17 | ADD__055 |
| 23 C.F.R. § 774.3 | ADD__060 |
| 23 C.F.R. § 774.7 | ADD__063 |
| 23 C.F.R. § 774.9 | ADD__066 |
| 36 C.F.R. § 800.1 | ADD__069 |
| 36 C.F.R. § 800.4 | ADD__071 |
| 36 C.F.R. § 800.5 | ADD__075 |
| 36 C.F.R. § 800.6 | ADD__079 |

| | |
|---|---|
| 36 C.F.R. § 800.16 | ADD__084 |
| 40 C.F.R. § 50.13 | ADD__088 |
| 40 C.F.R. § 50.18 | ADD__090 |
| 40 C.F.R. § 1502.9 (2019) | ADD__092 |
| 40 C.F.R. § 1502.16 (2019) | ADD__095 |
| 40 C.F.R. § 1502.21 (2019) | ADD__098 |
| 40 C.F.R. § 1502.24 (2019) | ADD__101 |
| 40 C.F.R. § 1503.4 (2019) | ADD__103 |
| 40 C.F.R. § 1508.7 (2019) | ADD__105 |
| 40 C.F.R. § 1506.13 (2022) | ADD__107 |
| 40 C.F.R. § 1508.27 (2019) | ADD__110 |

# STATUTES

**5 U.S.C. § 706**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO





vides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| *Derivation* | *U.S. Code* | *Revised Statutes and Statutes at Large* |
|---|---|---|
| .................. | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| *Derivation* | *U.S. Code* | *Revised Statutes and Statutes at Large* |
|---|---|---|
| .................. | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

### § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| *Derivation* | *U.S. Code* | *Revised Statutes and Statutes at Large* |
|---|---|---|
| .................. | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, §10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

**Statutory Notes and Related Subsidiaries**

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: ‘‘This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title].’’

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801. Congressional review.
802. Congressional disapproval procedure.
803. Special rule on statutory, regulatory, and judicial deadlines.
804. Definitions.
805. Judicial review.
806. Applicability; severability.
807. Exemption for monetary policy.
808. Effective date of certain rules.

### § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of

**23 U.S.C. § 138**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



pealed by Pub. L. 112–141, div. A, title I, §1519(b)(2), July 6, 2012, 126 Stat. 575.

### § 138. Preservation of parklands

(a) DECLARATION OF POLICY.—

(1) IN GENERAL.—It is the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.

(2) COOPERATION AND CONSULTATION.—

(A) IN GENERAL.—The Secretary shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of the lands traversed.

(B) TIMELINE FOR APPROVALS.—

(i) IN GENERAL.—The Secretary shall—

(I) provide an evaluation under this section to the Secretaries described in subparagraph (A); and

(II) provide a period of 30 days for receipt of comments.

(ii) ASSUMED ACCEPTANCE.—If the Secretary does not receive comments by 15 days after the deadline under clause (i)(II), the Secretary shall assume a lack of objection and proceed with the action.

(C) EFFECT.—Nothing in subparagraph (B) affects—

(i) the requirements under—

(I) subsections (b) through (f); or

(II) the consultation process under section 306108 of title 54; or

(ii) programmatic section 4(f) evaluations, as described in regulations issued by the Secretary.

(3) REQUIREMENT.—After the effective date of the Federal-Aid Highway Act of 1968, the Secretary shall not approve any program or project (other than any project for a Federal lands transportation facility) which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof, or any land from an historic site of national, State, or local significance as so determined by such officials unless—

(A) there is no feasible and prudent alternative to the use of the land; and

(B) the program includes all possible planning to minimize harm to such park, recreational area, wildlife and waterfowl refuge, or historic site resulting from such use.

(4) STUDIES.—In carrying out the national policy declared in this section the Secretary, in cooperation with the Secretary of the Interior and appropriate State and local officials, is authorized to conduct studies as to the most feasible Federal-aid routes for the movement of motor vehicular traffic through or around national parks so as to best serve the needs of the traveling public while preserving the natural beauty of these areas.

(b) DE MINIMIS IMPACTS.—

(1) REQUIREMENTS.—

(A) REQUIREMENTS FOR HISTORIC SITES.—The requirements of this section shall be considered to be satisfied with respect to an area described in paragraph (2) if the Secretary determines, in accordance with this subsection, that a transportation program or project will have a de minimis impact on the area.

(B) REQUIREMENTS FOR PARKS, RECREATION AREAS, AND WILDLIFE OR WATERFOWL REFUGES.—The requirements of subsection (a)(1) shall be considered to be satisfied with respect to an area described in paragraph (3) if the Secretary determines, in accordance with this subsection, that a transportation program or project will have a de minimis impact on the area. The requirements of subsection (a)(2) with respect to an area described in paragraph (3) shall not include an alternatives analysis.

(C) CRITERIA.—In making any determination under this subsection, the Secretary shall consider to be part of a transportation program or project any avoidance, minimization, mitigation, or enhancement measures that are required to be implemented as a condition of approval of the transportation program or project.

(2) HISTORIC SITES.—With respect to historic sites, the Secretary may make a finding of de minimis impact only if—

(A) the Secretary has determined, in accordance with the consultation process required under section 306108 of title 54, that—

(i) the transportation program or project will have no adverse effect on the historic site; or

(ii) there will be no historic properties affected by the transportation program or project;

(B) the finding of the Secretary has received written concurrence from the applicable State historic preservation officer or tribal historic preservation officer (and from the Advisory Council on Historic Preservation if the Council is participating in the consultation process); and

(C) the finding of the Secretary has been developed in consultation with parties consulting as part of the process referred to in subparagraph (A).

(3) PARKS, RECREATION AREAS, AND WILDLIFE OR WATERFOWL REFUGES.—With respect to parks, recreation areas, or wildlife or waterfowl refuges, the Secretary may make a finding of de minimis impact only if—

(A) the Secretary has determined, after public notice and opportunity for public review and comment, that the transportation program or project will not adversely affect the activities, features, and attributes of the park, recreation area, or wildlife or waterfowl refuge eligible for protection under this section; and

(B) the finding of the Secretary has received concurrence from the officials with jurisdiction over the park, recreation area, or wildlife or waterfowl refuge.

(c) SATISFACTION OF REQUIREMENTS FOR CERTAIN HISTORIC SITES.—

(1) IN GENERAL.—The Secretary shall—

(A) align, to the maximum extent practicable, with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) and section 306108 of title 54, including implementing regulations; and

(B) not later than 90 days after the date of enactment of this subsection, coordinate with the Secretary of the Interior and the Executive Director of the Advisory Council on Historic Preservation (referred to in this subsection as the ''Council'') to establish procedures to satisfy the requirements described in subparagraph (A) (including regulations).

(2) AVOIDANCE ALTERNATIVE ANALYSIS.—

(A) IN GENERAL.—If, in an analysis required under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), the Secretary determines that there is no feasible or prudent alternative to avoid use of a historic site, the Secretary may—

(i) include the determination of the Secretary in the analysis required under that Act;

(ii) provide a notice of the determination to—

(I) each applicable State historic preservation officer and tribal historic preservation officer;

(II) the Council, if the Council is participating in the consultation process under section 306108 of title 54; and

(III) the Secretary of the Interior; and

(iii) request from the applicable preservation officer, the Council, and the Secretary of the Interior a concurrence that the determination is sufficient to satisfy subsection (a)(1).

(B) CONCURRENCE.—If the applicable preservation officer, the Council, and the Secretary of the Interior each provide a concurrence requested under subparagraph (A)(iii), no further analysis under subsection (a)(1) shall be required.

(C) PUBLICATION.—A notice of a determination, together with each relevant concurrence to that determination, under subparagraph (A) shall—

(i) be included in the record of decision or finding of no significant impact of the Secretary; and

(ii) be posted on an appropriate Federal website by not later than 3 days after the date of receipt by the Secretary of all concurrences requested under subparagraph (A)(iii).

(3) ALIGNING HISTORICAL REVIEWS.—

(A) IN GENERAL.—If the Secretary, the applicable preservation officer, the Council, and the Secretary of the Interior concur that no feasible and prudent alternative exists as described in paragraph (2), the Secretary may provide to the applicable preservation officer, the Council, and the Secretary of the Interior notice of the intent of the Secretary to satisfy subsection (a)(2) through the consultation requirements of section 306108 of title 54.

(B) SATISFACTION OF CONDITIONS.—To satisfy subsection (a)(2), each individual described in paragraph (2)(A)(ii) shall concur in the treatment of the applicable historic site described in the memorandum of agreement or programmatic agreement developed under section 306108 of title 54.

(d) REFERENCES TO PAST TRANSPORTATION ENVIRONMENTAL AUTHORITIES.—

(1) SECTION 4(F) REQUIREMENTS.—The requirements of this section are commonly referred to as section 4(f) requirements (see section 4(f) of the Department of Transportation Act (Public Law 89–670; 80 Stat. 934) as in effect before the repeal of that section).

(2) SECTION 106 REQUIREMENTS.—The requirements of section 306108 of title 54 are commonly referred to as section 106 requirements (see section 106 of the National Historic Preservation Act of 1966 (Public Law 89–665; 80 Stat. 917) as in effect before the repeal of that section).

(e) BRIDGE EXEMPTION FROM CONSIDERATION.—A common post-1945 concrete or steel bridge or culvert (as described in 77 Fed. Reg. 68790) that is exempt from individual review under section 306108 of title 54 shall be exempt from consideration under this section.

(f) RAIL AND TRANSIT.—

(1) IN GENERAL.—Improvements to, or the maintenance, rehabilitation, or operation of, railroad or rail transit lines or elements thereof that are in use or were historically used for the transportation of goods or passengers shall not be considered a use of a historic site under subsection (a), regardless of whether the railroad or rail transit line or element thereof is listed on, or eligible for listing on, the National Register of Historic Places.

(2) EXCEPTIONS.—

(A) IN GENERAL.—Paragraph (1) shall not apply to—

(i) stations; or

(ii) bridges or tunnels located on—

(I) railroad lines that have been abandoned; or

(II) transit lines that are not in use.

(B) CLARIFICATION WITH RESPECT TO CERTAIN BRIDGES AND TUNNELS.—The bridges and tunnels referred to in subparagraph (A)(ii) do not include bridges or tunnels located on railroad or transit lines—

(i) over which service has been discontinued; or

(ii) that have been railbanked or otherwise reserved for the transportation of goods or passengers.

(Added Pub. L. 89–574, § 15(a), Sept. 13, 1966, 80 Stat. 771; amended Pub. L. 90–495, § 18(a), Aug. 23, 1968, 82 Stat. 823; Pub. L. 94–280, title I, § 124, May 5, 1976, 90 Stat. 440; Pub. L. 100–17, title I, § 133(b)(10), Apr. 2, 1987, 101 Stat. 171; Pub. L. 109–59, title VI, § 6009(a)(1), Aug. 10, 2005, 119 Stat. 1874; Pub. L. 112–141, div. A, title I, § 1119(c)(2), July 6, 2012, 126 Stat. 492; Pub. L. 113–287, § 5(f)(2), Dec. 19, 2014, 128 Stat. 3268; Pub. L. 114–94, div. A, title I, §§ 1301(a), 1302(a), 1303(a), title XI,

§11502(a), Dec. 4, 2015, 129 Stat. 1375, 1377, 1378, 1690; Pub. L. 117–58, div. A, title I, §11316, Nov. 15, 2021, 135 Stat. 543.)

### Editorial Notes

#### References in Text

For the effective date of the Federal-Aid Highway Act of 1968, referred to in subsec. (a)(3), see section 37 of Pub. L. 90–495, as amended, set out as an Effective Date of 1968 Amendment note under section 101 of this title.

The National Environmental Policy Act of 1969, referred to in subsec. (c)(1)(A), (2)(A), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, which is classified generally to chapter 55 (§4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

The date of enactment of this subsection, referred to in subsec. (c)(1)(B), is the date of enactment of Pub. L. 114–94, which was approved Dec. 4, 2015.

#### Amendments

2021—Subsec. (a)(1). Pub. L. 117–58, §11316(4), designated first sentence of subsec. (a) as par. (1), inserted heading, and substituted ''It is'' for ''It is declared to be''.

Subsec. (a)(2). Pub. L. 117–58, §11316(3), designated second sentence of subsec. (a) as par. (2)(A), inserted par. and subpar. headings, substituted ''The Secretary'' for ''The Secretary of Transportation'', and added subpars. (B) and (C).

Subsec. (a)(3). Pub. L. 117–58, §11316(2), designated third sentence of subsec. (a) as par. (3) and inserted heading, inserted dash after ''unless'', redesignated cls. (1) and (2) within text as subpars. (A) and (B), respectively, and inserted line breaks before each subpar., and substituted ''use of the land; and'' for ''use of such land, and'' and ''the program includes'' for ''such program includes''.

Subsec. (a)(4). Pub. L. 117–58, §11316(1), designated fourth sentence of subsec. (a) as par. (4) and inserted heading.

2015—Subsec. (c). Pub. L. 114–94, §1301(a), added subsec. (c).

Subsec. (d). Pub. L. 114–94, §1302(a), added subsec. (d).

Subsec. (e). Pub. L. 114–94, §1303(a), added subsec. (e).

Subsec. (f). Pub. L. 114–94, §11502(a), added subsec. (f).

2014—Subsec. (b)(2)(A). Pub. L. 113–287 substituted ''section 306108 of title 54'' for ''section 106 of the National Historic Preservation Act (16 U.S.C. 470f)'' in introductory provisions.

2012—Subsec. (a). Pub. L. 112–141 substituted ''Federal lands transportation facility'' for ''park road or parkway under section 204 of this title''.

2005—Pub. L. 109–59, §6009(a)(1)(A), which directed substitution of ''(a) Declaration of Policy.—It is'' for ''it is hereby'', was executed by making the substitution for ''It is hereby'' to reflect the probable intent of Congress.

Subsec. (b). Pub. L. 109–59, §6009(a)(1)(B), added subsec. (b).

1987—Pub. L. 100–17 inserted ''(other than any project for a park road or parkway under section 204 of this title)'' before ''which requires'' in third sentence.

1976—Pub. L. 94–280 authorized the Secretary, in cooperation with the Secretary of the Interior and appropriate State and local officials, to conduct studies as to the most feasible Federal-aid routes for the movement of motor vehicular traffic through or around national parks so as to best serve the needs of the traveling public while preserving the natural beauty of these areas.

1968—Pub. L. 90–495 amended section generally so as to render it identical to section 1653(f) of Title 49, Transportation, governing all programs and projects subject to the jurisdiction of the Secretary of Transportation.

### Statutory Notes and Related Subsidiaries

#### Effective Date of 2021 Amendment

Amendment by Pub. L. 117–58 effective Oct. 1, 2021, see section 10003 of Pub. L. 117–58, set out as a note under section 101 of this title.

#### Effective Date of 2015 Amendment

Amendment by Pub. L. 114–94 effective Oct. 1, 2015, see section 1003 of Pub. L. 114–94, set out as a note under section 5313 of Title 5, Government Organization and Employees.

#### Effective Date of 2012 Amendment

Amendment by Pub. L. 112–141 effective Oct. 1, 2012, see section 3(a) of Pub. L. 112–141, set out as an Effective and Termination Dates of 2012 Amendment note under section 101 of this title.

#### Effective Date of 1968 Amendment

Amendment by Pub. L. 90–495 effective Aug. 23, 1968, see section 37 of Pub. L. 90–495, set out as a note under section 101 of this title.

#### Clarification of Existing Standards

Pub. L. 109–59, title VI, §6009(b), Aug. 10, 2005, 119 Stat. 1876, provided that:

''(1) In general.—Not later than 1 year after the date of enactment of this Act [Aug. 10, 2005], the Secretary [of Transportation] shall (in consultation with affected agencies and interested parties) promulgate regulations that clarify the factors to be considered and the standards to be applied in determining the prudence and feasibility of alternatives under section 138 of title 23 and section 303 of title 49, United States Code.

''(2) Requirements.—The regulations—

''(A) shall clarify the application of the legal standards to a variety of different types of transportation programs and projects depending on the circumstances of each case; and

''(B) may include, as appropriate, examples to facilitate clear and consistent interpretation by agency decisionmakers.''

#### Study of Transit Needs in National Parks and Related Public Lands

Pub. L. 105–178, title III, §3039, June 9, 1998, 112 Stat. 393, as amended by Pub. L. 105–206, title IX, §9009(y), July 22, 1998, 112 Stat. 862, provided that:

''(a) Purposes.—The purposes of this section are to encourage and promote the development of transportation systems for the betterment of the national parks and other units of the National Park System, national wildlife refuges, recreational areas, and other public lands in order to conserve natural, historical, and cultural resources and prevent adverse impact, relieve congestion, minimize transportation fuel consumption, reduce pollution (including noise and visual pollution), and enhance visitor mobility and accessibility and the visitor experience.

''(b) Study.—

''(1) In general.—The Secretary, in coordination with the Secretary of the Interior, shall undertake a comprehensive study of alternative transportation needs in national parks and related public lands managed by Federal land management agencies [to] assist in carrying out the purposes described in subsection (a). The study shall be submitted to the Committee on Transportation and Infrastructure of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate not later than January 1, 2000.

''(2) Study elements.—The study required by paragraph (1) shall—

''(A) identify transportation strategies that improve the management of the national parks and related public lands;

''(B) identify national parks and related public lands with existing and potential problems of ad-

verse impact, high congestion, and pollution, or which can benefit from alternative transportation modes;

"(C) assess the feasibility of alternative transportation modes; and

"(D) identify and estimate the costs of alternative transportation modes for each of the national parks and related public lands referred to in paragraph (1).

"(3) DEFINITION.—For purposes of this subsection, the term 'Federal land management agencies' means the National Park Service, the United States Fish and Wildlife Service, and the Bureau of Land Management."

STUDY OF ALTERNATIVE TRANSPORTATION MODES IN NATIONAL PARK SYSTEM

Pub. L. 102–240, title I, §1050, Dec. 18, 1991, 105 Stat. 2000, provided that:

"(a) IN GENERAL.—Not later than 12 months after the date of the enactment of this Act [Dec. 18, 1991], the Secretary, in consultation with the Secretary of the Interior, shall conduct and transmit to Congress a study of alternative transportation modes for use in the National Park System. In conducting such study, the Secretary shall consider (1) the economic and technical feasibility, environmental effects, projected costs and benefits as compared to the costs and benefits of existing transportation systems, and general suitability of transportation modes that would provide efficient and environmentally sound ingress to and egress from National Park lands; and (2) methods to obtain private capital for the construction of such transportation modes and related infrastructure.

"(b) FUNDING.—From sums authorized to be appropriated for park roads and parkways for fiscal year 1992, $300,000 shall be available to carry out this section."

### § 139. Efficient environmental reviews for project decisionmaking and One Federal Decision

(a) DEFINITIONS.—In this section, the following definitions apply:

(1) AGENCY.—The term "agency" means any agency, department, or other unit of Federal, State, local, or Indian tribal government.

(2) AUTHORIZATION.—The term "authorization" means any environmental license, permit, approval, finding, or other administrative decision related to the environmental review process that is required under Federal law to site, construct, or reconstruct a project.

(3) ENVIRONMENTAL DOCUMENT.—The term "environmental document" includes an environmental assessment, finding of no significant impact, notice of intent, environmental impact statement, or record of decision under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(4) ENVIRONMENTAL IMPACT STATEMENT.—The term "environmental impact statement" means the detailed statement of environmental impacts required to be prepared under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(5) ENVIRONMENTAL REVIEW PROCESS.—

(A) IN GENERAL.—The term "environmental review process" means the process for preparing for a project an environmental impact statement, environmental assessment, categorical exclusion, or other document prepared under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(B) INCLUSIONS.—The term "environmental review process" includes the process and schedule, including a timetable for and completion of any environmental permit, approval, review, or study required for a project under any Federal law other than the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

(6) LEAD AGENCY.—The term "lead agency" means the Department of Transportation and, if applicable, any State or local governmental entity serving as a joint lead agency pursuant to this section.

(7) MAJOR PROJECT.—

(A) IN GENERAL.—The term "major project" means a project for which—

(i) multiple permits, approvals, reviews, or studies are required under a Federal law other than the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.);

(ii) the project sponsor has identified the reasonable availability of funds sufficient to complete the project;

(iii) the project is not a covered project (as defined in section 41001 of the FAST Act (42 U.S.C. 4370m)); and

(iv)(I) the head of the lead agency has determined that an environmental impact statement is required; or

(II) the head of the lead agency has determined that an environmental assessment is required, and the project sponsor requests that the project be treated as a major project.

(B) CLARIFICATION.—In this section, the term "major project" does not have the same meaning as the term "major project" as described in section 106(h).

(8) MULTIMODAL PROJECT.—The term "multimodal project" means a project that requires the approval of more than 1 Department of Transportation operating administration or secretarial office.

(9) PROJECT.—

(A) IN GENERAL.—The term "project" means any highway project, public transportation capital project, or multimodal project that, if implemented as proposed by the project sponsor, would require approval by any operating administration or secretarial office within the Department of Transportation.

(B) CONSIDERATIONS.—In determining whether a project is a project under subparagraph (A), the Secretary shall take into account, if known, any sources of Federal funding or financing identified by the project sponsor, including any discretionary grant, loan, and loan guarantee programs administered by the Department of Transportation.

(10) PROJECT SPONSOR.—The term "project sponsor" means the agency or other entity, including any private or public-private entity, that seeks approval of the Secretary for a project.

(11) STATE TRANSPORTATION DEPARTMENT.—The term "State transportation department" means any statewide agency of a State with responsibility for one or more modes of transportation.

**42 U.S.C. § 4332**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



able at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

J.R. BIDEN, JR.

## SUBCHAPTER I—POLICIES AND GOALS

### § 4331. Congressional declaration of national environmental policy

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

(Pub. L. 91–190, title I, § 101, Jan. 1, 1970, 83 Stat. 852.)

#### Statutory Notes and Related Subsidiaries

COMMISSION ON POPULATION GROWTH AND THE AMERICAN FUTURE

Pub. L. 91–213, §§ 1–9, Mar. 16, 1970, 84 Stat. 67–69, established the Commission on Population Growth and the American Future to conduct and sponsor such studies and research and make such recommendations as might be necessary to provide information and education to all levels of government in the United States, and to our people regarding a broad range of problems associated with population growth and their implications for America's future; prescribed the composition of the Commission; provided for the appointment of its members, and the designation of a Chairman and Vice Chairman; required a majority of the members of the Commission to constitute a quorum, but allowed a lesser number to conduct hearings; prescribed the compensation of members of the Commission; required the Commission to conduct an inquiry into certain prescribed aspects of population growth in the United States and its foreseeable social consequences; provided for the appointment of an Executive Director and other personnel and prescribed their compensation; authorized the Commission to enter into contracts with public agencies, private firms, institutions, and individuals for the conduct of research and surveys, the preparation of reports, and other activities necessary to the discharge of its duties, and to request from any Federal department or agency any information and assistance it deems necessary to carry out its functions; required the General Services Administration to provide administrative services for the Commission on a reimbursable basis; required the Commission to submit an interim report to the President and the Congress one year after it was established and to submit its final report two years after Mar. 16, 1970; terminated the Commission sixty days after the date of the submission of its final report; and authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such amounts as might be necessary to carry out the provisions of Pub. L. 91–213.

#### Executive Documents

EXECUTIVE ORDER NO. 11507

Ex. Ord. No. 11507, eff. Feb. 4, 1970, 35 F.R. 2573, which related to prevention, control, and abatement of air and water pollution at federal facilities was superseded by Ex. Ord. No. 11752, eff. Dec. 17, 1973, 38 F.R. 34793, formerly set out below.

EXECUTIVE ORDER NO. 11752

Ex. Ord. No. 11752, Dec. 17, 1973, 38 F.R. 34793, which related to the prevention, control, and abatement of environmental pollution at Federal facilities, was revoked by Ex. Ord. No. 12088, Oct. 13, 1978, 43 F.R. 47707, set out as a note under section 4321 of this title.

### § 4332. Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.[1]

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by subchapter II of this chapter.

(Pub. L. 91–190, title I, §102, Jan. 1, 1970, 83 Stat. 853; Pub. L. 94–83, Aug. 9, 1975, 89 Stat. 424.)

**Editorial Notes**

AMENDMENTS

1975—Par. (2)(D) to (I). Pub. L. 94–83 added subpar. (D) and redesignated former subpars. (D) to (H) as (E) to (I), respectively.

**Statutory Notes and Related Subsidiaries**

CERTAIN COMMERCIAL SPACE LAUNCH ACTIVITIES

Pub. L. 104–88, title IV, §401, Dec. 29, 1995, 109 Stat. 955, provided that: ''The licensing of a launch vehicle or launch site operator (including any amendment, extension, or renewal of the license) under [former] chapter 701 of title 49, United States Code [now chapter 509 (§50901 et seq.) of Title 51, National and Commercial Space Programs], shall not be considered a major Federal action for purposes of section 102(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(C)) if—

''(1) the Department of the Army has issued a permit for the activity; and

''(2) the Army Corps of Engineers has found that the activity has no significant impact.''

**Executive Documents**

EX. ORD. NO. 13352. FACILITATION OF COOPERATIVE CONSERVATION

Ex. Ord. No. 13352, Aug. 26, 2004, 69 F.R. 52989, provided:

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

SECTION 1. *Purpose.* The purpose of this order is to ensure that the Departments of the Interior, Agriculture, Commerce, and Defense and the Environmental Protection Agency implement laws relating to the environ-

[1] So in original. The period probably should be a semicolon.

ment and natural resources in a manner that promotes cooperative conservation, with an emphasis on appropriate inclusion of local participation in Federal decisionmaking, in accordance with their respective agency missions, policies, and regulations.

SEC. 2. *Definition*. As used in this order, the term ''cooperative conservation'' means actions that relate to use, enhancement, and enjoyment of natural resources, protection of the environment, or both, and that involve collaborative activity among Federal, State, local, and tribal governments, private for-profit and nonprofit institutions, other nongovernmental entities and individuals.

SEC. 3. *Federal Activities*. To carry out the purpose of this order, the Secretaries of the Interior, Agriculture, Commerce, and Defense and the Administrator of the Environmental Protection Agency shall, to the extent permitted by law and subject to the availability of appropriations and in coordination with each other as appropriate:

(a) carry out the programs, projects, and activities of the agency that they respectively head that implement laws relating to the environment and natural resources in a manner that:

(i) facilitates cooperative conservation;

(ii) takes appropriate account of and respects the interests of persons with ownership or other legally recognized interests in land and other natural resources;

(iii) properly accommodates local participation in Federal decisionmaking; and

(iv) provides that the programs, projects, and activities are consistent with protecting public health and safety;

(b) report annually to the Chairman of the Council on Environmental Quality on actions taken to implement this order; and

(c) provide funding to the Office of Environmental Quality Management Fund (42 U.S.C. 4375) for the Conference for which section 4 of this order provides.

SEC. 4. *White House Conference on Cooperative Conservation*. The Chairman of the Council on Environmental Quality shall, to the extent permitted by law and subject to the availability of appropriations:

(a) convene not later than 1 year after the date of this order, and thereafter at such times as the Chairman deems appropriate, a White House Conference on Cooperative Conservation (Conference) to facilitate the exchange of information and advice relating to (i) cooperative conservation and (ii) means for achievement of the purpose of this order; and

(b) ensure that the Conference obtains information in a manner that seeks from Conference participants their individual advice and does not involve collective judgment or consensus advice or deliberation.

SEC. 5. *General Provision*. This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities or entities, its officers, employees or agents, or any other person.

GEORGE W. BUSH.

### § 4332a. Repealed. Pub. L. 114–94, div. A, title I, § 1304(j)(2), Dec. 4, 2015, 129 Stat. 1386

Section, Pub. L. 112–141, div. A, title I, § 1319, July 6, 2012, 126 Stat. 551, related to accelerated decisionmaking in environmental reviews.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF REPEAL

Repeal effective Oct. 1, 2015, see section 1003 of Pub. L. 114–94, set out as an Effective Date of 2015 Amendment note under section 5313 of Title 5, Government Organization and Employees.

### § 4333. Conformity of administrative procedures to national environmental policy

All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter.

(Pub. L. 91–190, title I, § 103, Jan. 1, 1970, 83 Stat. 854.)

### § 4334. Other statutory obligations of agencies

Nothing in section 4332 or 4333 of this title shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

(Pub. L. 91–190, title I, § 104, Jan. 1, 1970, 83 Stat. 854.)

### § 4335. Efforts supplemental to existing authorizations

The policies and goals set forth in this chapter are supplementary to those set forth in existing authorizations of Federal agencies.

(Pub. L. 91–190, title I, § 105, Jan. 1, 1970, 83 Stat. 854.)

## SUBCHAPTER II—COUNCIL ON ENVIRONMENTAL QUALITY

### § 4341. Omitted

**Editorial Notes**

CODIFICATION

Section, Pub. L. 91–190, title II, § 201, Jan. 1, 1970, 83 Stat. 854, which required the President to transmit to Congress annually an Environmental Quality Report, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, item 1 on page 41 of House Document No. 103–7.

### § 4342. Establishment; membership; Chairman; appointments

There is created in the Executive Office of the President a Council on Environmental Quality (hereinafter referred to as the ''Council''). The Council shall be composed of three members who shall be appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate. The President shall designate one of the members of the Council to serve as Chairman. Each member shall be a person who, as a result of his training, experience, and attainments, is exceptionally well qualified to analyze and interpret environmental trends and information of all kinds; to appraise programs and

**42 U.S.C. § 4344**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



activities of the Federal Government in the light of the policy set forth in subchapter I of this chapter; to be conscious of and responsive to the scientific, economic, social, esthetic, and cultural needs and interests of the Nation; and to formulate and recommend national policies to promote the improvement of the quality of the environment.

(Pub. L. 91–190, title II, § 202, Jan. 1, 1970, 83 Stat. 854.)

**Statutory Notes and Related Subsidiaries**

COUNCIL ON ENVIRONMENTAL QUALITY; REDUCTION OF MEMBERS

Provisions stating that notwithstanding this section, the Council was to consist of one member, appointed by the President, by and with the advice and consent of the Senate, serving as chairman and exercising all powers, functions, and duties of the Council, were contained in the Department of the Interior, Environment, and Related Agencies Appropriations Act, 2006, Pub. L. 109–54, title III, Aug. 2, 2005, 119 Stat. 543, and were repeated in provisions of subsequent appropriations acts which are not set out in the Code. Similar provisions were also contained in the following prior appropriations acts:

Pub. L. 108–447, div. I, title III, Dec. 8, 2004, 118 Stat. 3332.

Pub. L. 108–199, div. G, title III, Jan. 23, 2004, 118 Stat. 408.

Pub. L. 108–7, div. K, title III, Feb. 20, 2003, 117 Stat. 514.

Pub. L. 107–73, title III, Nov. 26, 2001, 115 Stat. 686.

Pub. L. 106–377, § 1(a)(1) [title III], Oct. 27, 2000, 114 Stat. 1441, 1441A–45.

Pub. L. 106–74, title III, Oct. 20, 1999, 113 Stat. 1084.

Pub. L. 105–276, title III, Oct. 21, 1998, 112 Stat. 2500.

Pub. L. 105–65, title III, Oct. 27, 1997, 111 Stat. 1375.

## § 4343. Employment of personnel, experts and consultants

(a) The Council may employ such officers and employees as may be necessary to carry out its functions under this chapter. In addition, the Council may employ and fix the compensation of such experts and consultants as may be necessary for the carrying out of its functions under this chapter, in accordance with section 3109 of title 5 (but without regard to the last sentence thereof).

(b) Notwithstanding section 1342 of title 31, the Council may accept and employ voluntary and uncompensated services in furtherance of the purposes of the Council.

(Pub. L. 91–190, title II, § 203, Jan. 1, 1970, 83 Stat. 855; Pub. L. 94–52, § 2, July 3, 1975, 89 Stat. 258.)

**Editorial Notes**

REFERENCES IN TEXT

The last sentence of section 3109 of title 5, referred to in subsec. (a), probably means the last sentence of section 3109(b) of title 5, which was the last sentence of that section when the reference was enacted. Since then, section 3109 of title 5 has been amended to add subsecs. (c) to (e) at the end.

CODIFICATION

In subsec. (b), ''section 1342 of title 31'' substituted for ''section 3679(b) of the Revised Statutes (31 U.S.C. 665(b))'' on authority of Pub. L. 97–258, § 4(b), Sept. 13, 1982, 96 Stat. 1067, the first section of which enacted Title 31, Money and Finance.

AMENDMENTS

1975—Pub. L. 94–52 designated existing provisions as subsec. (a) and added subsec. (b).

## § 4344. Duties and functions

It shall be the duty and function of the Council—

(1) to assist and advise the President in the preparation of the Environmental Quality Report required by section 4341[1] of this title;

(2) to gather timely and authoritative information concerning the conditions and trends in the quality of the environment both current and prospective, to analyze and interpret such information for the purpose of determining whether such conditions and trends are interfering, or are likely to interfere, with the achievement of the policy set forth in subchapter I of this chapter, and to compile and submit to the President studies relating to such conditions and trends;

(3) to review and appraise the various programs and activities of the Federal Government in the light of the policy set forth in subchapter I of this chapter for the purpose of determining the extent to which such programs and activities are contributing to the achievement of such policy, and to make recommendations to the President with respect thereto;

(4) to develop and recommend to the President national policies to foster and promote the improvement of environmental quality to meet the conservation, social, economic, health, and other requirements and goals of the Nation;

(5) to conduct investigations, studies, surveys, research, and analyses relating to ecological systems and environmental quality;

(6) to document and define changes in the natural environment, including the plant and animal systems, and to accumulate necessary data and other information for a continuing analysis of these changes or trends and an interpretation of their underlying causes;

(7) to report at least once each year to the President on the state and condition of the environment; and

(8) to make and furnish such studies, reports thereon, and recommendations with respect to matters of policy and legislation as the President may request.

(Pub. L. 91–190, title II, § 204, Jan. 1, 1970, 83 Stat. 855.)

**Editorial Notes**

REFERENCES IN TEXT

Section 4341 of this title, referred to in par. (1), was omitted from the Code.

**Executive Documents**

TRANSFER OF FUNCTIONS

So much of functions of Council on Environmental Quality under par. (5) of this section as pertains to ecological systems transferred to Administrator of Environmental Protection Agency by Reorg. Plan No. 3 of 1970, § 2(a)(5), eff. Dec. 2, 1970, 35 F.R. 15623, 84 Stat. 2086, set out under section 4321 of this title.

[1] See References in Text note below.

**§ 4345. Consultation with Citizens' Advisory Committee on Environmental Quality and other representatives**

In exercising its powers, functions, and duties under this chapter, the Council shall—

(1) consult with the Citizens' Advisory Committee on Environmental Quality established by Executive Order numbered 11472, dated May 29, 1969, and with such representatives of science, industry, agriculture, labor, conservation organizations, State and local governments and other groups, as it deems advisable; and

(2) utilize, to the fullest extent possible, the services, facilities, and information (including statistical information) of public and private agencies and organizations, and individuals, in order that duplication of effort and expense may be avoided, thus assuring that the Council's activities will not unnecessarily overlap or conflict with similar activities authorized by law and performed by established agencies.

(Pub. L. 91–190, title II, § 205, Jan. 1, 1970, 83 Stat. 855.)

**Editorial Notes**

REFERENCES IN TEXT

Executive Order numbered 11472, dated May 29, 1969, referred to in par. (1), is set out as a note under section 4321 of this title.

**Executive Documents**

CITIZENS' ADVISORY COMMITTEE ON ENVIRONMENTAL QUALITY

For provisions relating to termination of Citizens' Advisory Committee on Environmental Quality, see Ex. Ord. No. 12007, Aug. 22, 1977, 42 F.R. 42839, formerly set out as a note under section 14 of the Federal Advisory Committee Act in the Appendix to Title 5, Government Organization and Employees.

**§ 4346. Tenure and compensation of members**

Members of the Council shall serve full time and the Chairman of the Council shall be compensated at the rate provided for Level II of the Executive Schedule Pay Rates (5 U.S.C. 5313). The other members of the Council shall be compensated at the rate provided for Level IV or[1] the Executive Schedule Pay Rates (5 U.S.C. 5315).

(Pub. L. 91–190, title II, § 206, Jan. 1, 1970, 83 Stat. 856.)

**§ 4346a. Travel reimbursement by private organizations and Federal, State, and local governments**

The Council may accept reimbursements from any private nonprofit organization or from any department, agency, or instrumentality of the Federal Government, any State, or local government, for the reasonable travel expenses incurred by an officer or employee of the Council in connection with his attendance at any conference, seminar, or similar meeting conducted for the benefit of the Council.

(Pub. L. 91–190, title II, § 207, as added Pub. L. 94–52, § 3, July 3, 1975, 89 Stat. 258.)

[1] So in original. Probably should be ''of''.

**§ 4346b. Expenditures in support of international activities**

The Council may make expenditures in support of its international activities, including expenditures for: (1) international travel; (2) activities in implementation of international agreements; and (3) the support of international exchange programs in the United States and in foreign countries.

(Pub. L. 91–190, title II, § 208, as added Pub. L. 94–52, § 3, July 3, 1975, 89 Stat. 258.)

**§ 4347. Authorization of appropriations**

There are authorized to be appropriated to carry out the provisions of this chapter not to exceed $300,000 for fiscal year 1970, $700,000 for fiscal year 1971, and $1,000,000 for each fiscal year thereafter.

(Pub. L. 91–190, title II, § 209, formerly § 207, Jan. 1, 1970, 83 Stat. 856, renumbered § 209, Pub. L. 94–52, § 3, July 3, 1975, 89 Stat. 258.)

SUBCHAPTER III—MISCELLANEOUS PROVISIONS

**§§ 4361, 4361a. Repealed. Pub. L. 104–66, title II, § 2021(k)(1), (2), Dec. 21, 1995, 109 Stat. 728**

Section 4361, Pub. L. 94–475, § 5, Oct. 11, 1976, 90 Stat. 2071, related to 5-year plan for research, development, and demonstration.

Section 4361a, Pub. L. 95–155, § 4, Nov. 8, 1977, 91 Stat. 1258, related to budget projections in annual revisions of the plan for research, development, and demonstration.

**§ 4361b. Implementation by Administrator of Environmental Protection Agency of recommendations of "CHESS" Investigative Report; waiver; inclusion of status of implementation requirements in annual revisions of plan for research, development, and demonstration**

The Administrator of the Environmental Protection Agency shall implement the recommendations of the report prepared for the House Committee on Science and Technology entitled ''The Environmental Protection Agency Research Program with primary emphasis on the Community Health and Environmental Surveillance System (CHESS): An Investigative Report'', unless for any specific recommendation he determines (1) that such recommendation has been implemented, (2) that implementation of such recommendation would not enhance the quality of the research, or (3) that implementation of such recommendation will require funding which is not available. Where such funding is not available, the Administrator shall request the required authorization or appropriation for such implementation. The Administrator shall report the status of such implementation in each annual revision of the five-year plan transmitted to the Congress under section 4361[1] of this title.

(Pub. L. 95–155, § 10, Nov. 8, 1977, 91 Stat. 1262.)

[1] See References in Text note below.

**42 U.S.C. § 7407**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO





until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7406. Interstate air quality agencies; program cost limitations

For the purpose of developing implementation plans for any interstate air quality control region designated pursuant to section 7407 of this title or of implementing section 7506a of this title (relating to control of interstate air pollution) or section 7511c of this title (relating to control of interstate ozone pollution), the Administrator is authorized to pay, for two years, up to 100 per centum of the air quality planning program costs of any commission established under section 7506a of this title (relating to control of interstate air pollution) or section 7511c of this title (relating to control of interstate ozone pollution) or any agency designated by the Governors of the affected States, which agency shall be capable of recommending to the Governors plans for implementation of national primary and secondary ambient air quality standards and shall include representation from the States and appropriate political subdivisions within the air quality control region. After the initial two-year period the Administrator is authorized to make grants to such agency or such commission in an amount up to three-fifths of the air quality implementation program costs of such agency or commission.

(July 14, 1955, ch. 360, title I, § 106, as added Pub. L. 90–148, § 2, Nov. 21, 1967, 81 Stat. 490; amended Pub. L. 91–604, § 3(c), Dec. 31, 1970, 84 Stat. 1677; Pub. L. 101–549, title I, § 102(f)(2), title VIII, § 802(f), Nov. 15, 1990, 104 Stat. 2420, 2688.)

### Editorial Notes

#### Codification

Section was formerly classified to section 1857c–1 of this title.

#### Prior Provisions

A prior section 106 of act July 14, 1955, was renumbered section 117 by Pub. L. 91–604 and is classified to section 7417 of this title.

#### Amendments

1990—Pub. L. 101–549, § 102(f)(2)(A), inserted ''or of implementing section 7506a of this title (relating to control of interstate air pollution) or section 7511c of this title (relating to control of interstate ozone pollution)'' after ''section 7407 of this title''.

Pub. L. 101–549, § 102(f)(2)(B), which directed insertion of ''any commission established under section 7506a of this title (relating to control of interstate air pollution) or section 7511c of this title (relating to control of interstate ozone pollution) or'' after ''program costs of'', was executed by making the insertion after that phrase the first place it appeared to reflect the probable intent of Congress.

Pub. L. 101–549, § 102(f)(2)(C), which directed insertion of ''or such commission'' after ''such agency'' in last sentence, was executed by making insertion after ''such agency'' the first place it appeared in the last sentence to reflect the probable intent of Congress.

Pub. L. 101–549, §§ 102(f)(2)(D), 802(f), substituted ''three-fifths of the air quality implementation program costs of such agency or commission'' for ''three-fourths of the air quality planning program costs of such agency''.

1970—Pub. L. 91–604 struck out designation ''(a)'', substituted provisions authorizing Federal grants for the purpose of developing implementation plans and provisions requiring the designated State agency to be capable of recommending plans for implementation of national primary and secondary ambient air quality standards, for provisions authorizing Federal grants for the purpose of expediting the establishment of air quality standards and provisions requiring the designated State agency to be capable of recommending standards of air quality and plans for implementation thereof, respectively, and struck out subsec. (b) which authorized establishment of air quality planning commissions.

## § 7407. Air quality control regions

### (a) Responsibility of each State for air quality; submission of implementation plan

Each State shall have the primary responsibility for assuring air quality within the entire geographic area comprising such State by submitting an implementation plan for such State which will specify the manner in which national primary and secondary ambient air quality standards will be achieved and maintained within each air quality control region in such State.

### (b) Designated regions

For purposes of developing and carrying out implementation plans under section 7410 of this title—

(1) an air quality control region designated under this section before December 31, 1970, or a region designated after such date under subsection (c), shall be an air quality control region; and

(2) the portion of such State which is not part of any such designated region shall be an air quality control region, but such portion may be subdivided by the State into two or more air quality control regions with the approval of the Administrator.

### (c) Authority of Administrator to designate regions; notification of Governors of affected States

The Administrator shall, within 90 days after December 31, 1970, after consultation with appropriate State and local authorities, designate as an air quality control region any interstate area or major intrastate area which he deems necessary or appropriate for the attainment and maintenance of ambient air quality standards. The Administrator shall immediately notify the Governors of the affected States of any designation made under this subsection.

### (d) Designations

#### (1) Designations generally

##### (A) Submission by Governors of initial designations following promulgation of new or revised standards

By such date as the Administrator may reasonably require, but not later than 1 year after promulgation of a new or revised national ambient air quality standard for any pollutant under section 7409 of this title, the Governor of each State shall (and at any other time the Governor of a State deems appropriate the Governor may) submit to the Administrator a list of all areas (or portions thereof) in the State, designating as—

(i) nonattainment, any area that does not meet (or that contributes to ambient

air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant,

(ii) attainment, any area (other than an area identified in clause (i)) that meets the national primary or secondary ambient air quality standard for the pollutant, or

(iii) unclassifiable, any area that cannot be classified on the basis of available information as meeting or not meeting the national primary or secondary ambient air quality standard for the pollutant.

The Administrator may not require the Governor to submit the required list sooner than 120 days after promulgating a new or revised national ambient air quality standard.

**(B) Promulgation by EPA of designations**

(i) Upon promulgation or revision of a national ambient air quality standard, the Administrator shall promulgate the designations of all areas (or portions thereof) submitted under subparagraph (A) as expeditiously as practicable, but in no case later than 2 years from the date of promulgation of the new or revised national ambient air quality standard. Such period may be extended for up to one year in the event the Administrator has insufficient information to promulgate the designations.

(ii) In making the promulgations required under clause (i), the Administrator may make such modifications as the Administrator deems necessary to the designations of the areas (or portions thereof) submitted under subparagraph (A) (including to the boundaries of such areas or portions thereof). Whenever the Administrator intends to make a modification, the Administrator shall notify the State and provide such State with an opportunity to demonstrate why any proposed modification is inappropriate. The Administrator shall give such notification no later than 120 days before the date the Administrator promulgates the designation, including any modification thereto. If the Governor fails to submit the list in whole or in part, as required under subparagraph (A), the Administrator shall promulgate the designation that the Administrator deems appropriate for any area (or portion thereof) not designated by the State.

(iii) If the Governor of any State, on the Governor's own motion, under subparagraph (A), submits a list of areas (or portions thereof) in the State designated as nonattainment, attainment, or unclassifiable, the Administrator shall act on such designations in accordance with the procedures under paragraph (3) (relating to redesignation).

(iv) A designation for an area (or portion thereof) made pursuant to this subsection shall remain in effect until the area (or portion thereof) is redesignated pursuant to paragraph (3) or (4).

**(C) Designations by operation of law**

(i) Any area designated with respect to any air pollutant under the provisions of paragraph (1)(A), (B), or (C) of this subsection (as in effect immediately before November 15, 1990) is designated, by operation of law, as a nonattainment area for such pollutant within the meaning of subparagraph (A)(i).

(ii) Any area designated with respect to any air pollutant under the provisions of paragraph (1)(E) (as in effect immediately before November 15, 1990) is designated by operation of law, as an attainment area for such pollutant within the meaning of subparagraph (A)(ii).

(iii) Any area designated with respect to any air pollutant under the provisions of paragraph (1)(D) (as in effect immediately before November 15, 1990) is designated, by operation of law, as an unclassifiable area for such pollutant within the meaning of subparagraph (A)(iii).

**(2) Publication of designations and redesignations**

(A) The Administrator shall publish a notice in the Federal Register promulgating any designation under paragraph (1) or (5), or announcing any designation under paragraph (4), or promulgating any redesignation under paragraph (3).

(B) Promulgation or announcement of a designation under paragraph (1), (4) or (5) shall not be subject to the provisions of sections 553 through 557 of title 5 (relating to notice and comment), except nothing herein shall be construed as precluding such public notice and comment whenever possible.

**(3) Redesignation**

(A) Subject to the requirements of subparagraph (E), and on the basis of air quality data, planning and control considerations, or any other air quality-related considerations the Administrator deems appropriate, the Administrator may at any time notify the Governor of any State that available information indicates that the designation of any area or portion of an area within the State or interstate area should be revised. In issuing such notification, which shall be public, to the Governor, the Administrator shall provide such information as the Administrator may have available explaining the basis for the notice.

(B) No later than 120 days after receiving a notification under subparagraph (A), the Governor shall submit to the Administrator such redesignation, if any, of the appropriate area (or areas) or portion thereof within the State or interstate area, as the Governor considers appropriate.

(C) No later than 120 days after the date described in subparagraph (B) (or paragraph (1)(B)(iii)), the Administrator shall promulgate the redesignation, if any, of the area or portion thereof, submitted by the Governor in accordance with subparagraph (B), making such modifications as the Administrator may deem necessary, in the same manner and under the same procedure as is applicable under clause (ii) of paragraph (1)(B), except that the phrase ''60 days'' shall be substituted for the phrase ''120 days'' in that clause. If the Governor does not submit, in accordance with subparagraph (B), a redesignation for an area

(or portion thereof) identified by the Administrator under subparagraph (A), the Administrator shall promulgate such redesignation, if any, that the Administrator deems appropriate.

(D) The Governor of any State may, on the Governor's own motion, submit to the Administrator a revised designation of any area or portion thereof within the State. Within 18 months of receipt of a complete State redesignation submittal, the Administrator shall approve or deny such redesignation. The submission of a redesignation by a Governor shall not affect the effectiveness or enforceability of the applicable implementation plan for the State.

(E) The Administrator may not promulgate a redesignation of a nonattainment area (or portion thereof) to attainment unless—

(i) the Administrator determines that the area has attained the national ambient air quality standard;

(ii) the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of this title;

(iii) the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;

(iv) the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 7505a of this title; and

(v) the State containing such area has met all requirements applicable to the area under section 7410 of this title and part D.

(F) The Administrator shall not promulgate any redesignation of any area (or portion thereof) from nonattainment to unclassifiable.

**(4) Nonattainment designations for ozone, carbon monoxide and particulate matter (PM–10)**

**(A) Ozone and carbon monoxide**

(i) Within 120 days after November 15, 1990, each Governor of each State shall submit to the Administrator a list that designates, affirms or reaffirms the designation of, or redesignates (as the case may be), all areas (or portions thereof) of the Governor's State as attainment, nonattainment, or unclassifiable with respect to the national ambient air quality standards for ozone and carbon monoxide.

(ii) No later than 120 days after the date the Governor is required to submit the list of areas (or portions thereof) required under clause (i) of this subparagraph, the Administrator shall promulgate such designations, making such modifications as the Administrator may deem necessary, in the same manner, and under the same procedure, as is applicable under clause (ii) of paragraph (1)(B), except that the phrase "60 days" shall be substituted for the phrase "120 days" in that clause. If the Governor does not submit, in accordance with clause (i) of this subparagraph, a designation for an area (or portion thereof), the Administrator shall promulgate the designation that the Administrator deems appropriate.

(iii) No nonattainment area may be redesignated as an attainment area under this subparagraph.

(iv) Notwithstanding paragraph (1)(C)(ii) of this subsection, if an ozone or carbon monoxide nonattainment area located within a metropolitan statistical area or consolidated metropolitan statistical area (as established by the Bureau of the Census) is classified under part D of this subchapter as a Serious, Severe, or Extreme Area, the boundaries of such area are hereby revised (on the date 45 days after such classification) by operation of law to include the entire metropolitan statistical area or consolidated metropolitan statistical area, as the case may be, unless within such 45-day period the Governor (in consultation with State and local air pollution control agencies) notifies the Administrator that additional time is necessary to evaluate the application of clause (v). Whenever a Governor has submitted such a notice to the Administrator, such boundary revision shall occur on the later of the date 8 months after such classification or 14 months after November 15, 1990, unless the Governor makes the finding referred to in clause (v), and the Administrator concurs in such finding, within such period. Except as otherwise provided in this paragraph, a boundary revision under this clause or clause (v) shall apply for purposes of any State implementation plan revision required to be submitted after November 15, 1990.

(v) Whenever the Governor of a State has submitted a notice under clause (iv), the Governor, in consultation with State and local air pollution control agencies, shall undertake a study to evaluate whether the entire metropolitan statistical area or consolidated metropolitan statistical area should be included within the nonattainment area. Whenever a Governor finds and demonstrates to the satisfaction of the Administrator, and the Administrator concurs in such finding, that with respect to a portion of a metropolitan statistical area or consolidated metropolitan statistical area, sources in the portion do not contribute significantly to violation of the national ambient air quality standard, the Administrator shall approve the Governor's request to exclude such portion from the nonattainment area. In making such finding, the Governor and the Administrator shall consider factors such as population density, traffic congestion, commercial development, industrial development, meteorological conditions, and pollution transport.

**(B) PM–10 designations**

By operation of law, until redesignation by the Administrator pursuant to paragraph (3)—

(i) each area identified in 52 Federal Register 29383 (Aug. 7, 1987) as a Group I area (except to the extent that such identification was modified by the Administrator

before November 15, 1990) is designated nonattainment for PM–10;

(ii) any area containing a site for which air quality monitoring data show a violation of the national ambient air quality standard for PM–10 before January 1, 1989 (as determined under part 50, appendix K of title 40 of the Code of Federal Regulations) is hereby designated nonattainment for PM–10; and

(iii) each area not described in clause (i) or (ii) is hereby designated unclassifiable for PM–10.

Any designation for particulate matter (measured in terms of total suspended particulates) that the Administrator promulgated pursuant to this subsection (as in effect immediately before November 15, 1990) shall remain in effect for purposes of implementing the maximum allowable increases in concentrations of particulate matter (measured in terms of total suspended particulates) pursuant to section 7473(b) of this title, until the Administrator determines that such designation is no longer necessary for that purpose.

**(5) Designations for lead**

The Administrator may, in the Administrator's discretion at any time the Administrator deems appropriate, require a State to designate areas (or portions thereof) with respect to the national ambient air quality standard for lead in effect as of November 15, 1990, in accordance with the procedures under subparagraphs (A) and (B) of paragraph (1), except that in applying subparagraph (B)(i) of paragraph (1) the phrase ''2 years from the date of promulgation of the new or revised national ambient air quality standard'' shall be replaced by the phrase ''1 year from the date the Administrator notifies the State of the requirement to designate areas with respect to the standard for lead''.

**(6) Designations**

**(A) Submission**

Notwithstanding any other provision of law, not later than February 15, 2004, the Governor of each State shall submit designations referred to in paragraph (1) for the July 1997 $PM_{2.5}$ national ambient air quality standards for each area within the State, based on air quality monitoring data collected in accordance with any applicable Federal reference methods for the relevant areas.

**(B) Promulgation**

Notwithstanding any other provision of law, not later than December 31, 2004, the Administrator shall, consistent with paragraph (1), promulgate the designations referred to in subparagraph (A) for each area of each State for the July 1997 $PM_{2.5}$ national ambient air quality standards.

**(7) Implementation plan for regional haze**

**(A) In general**

Notwithstanding any other provision of law, not later than 3 years after the date on which the Administrator promulgates the designations referred to in paragraph (6)(B) for a State, the State shall submit, for the entire State, the State implementation plan revisions to meet the requirements promulgated by the Administrator under section 7492(e)(1) of this title (referred to in this paragraph as ''regional haze requirements'').

**(B) No preclusion of other provisions**

Nothing in this paragraph precludes the implementation of the agreements and recommendations stemming from the Grand Canyon Visibility Transport Commission Report dated June 1996, including the submission of State implementation plan revisions by the States of Arizona, California, Colorado, Idaho, Nevada, New Mexico, Oregon, Utah, or Wyoming by December 31, 2003, for implementation of regional haze requirements applicable to those States.

**(e) Redesignation of air quality control regions**

(1) Except as otherwise provided in paragraph (2), the Governor of each State is authorized, with the approval of the Administrator, to redesignate from time to time the air quality control regions within such State for purposes of efficient and effective air quality management. Upon such redesignation, the list under subsection (d) shall be modified accordingly.

(2) In the case of an air quality control region in a State, or part of such region, which the Administrator finds may significantly affect air pollution concentrations in another State, the Governor of the State in which such region, or part of a region, is located may redesignate from time to time the boundaries of so much of such air quality control region as is located within such State only with the approval of the Administrator and with the consent of all Governors of all States which the Administrator determines may be significantly affected.

(3) No compliance date extension granted under section 7413(d)(5)[1] of this title (relating to coal conversion) shall cease to be effective by reason of the regional limitation provided in section 7413(d)(5)[1] of this title if the violation of such limitation is due solely to a redesignation of a region under this subsection.

(July 14, 1955, ch. 360, title I, § 107, as added Pub. L. 91–604, § 4(a), Dec. 31, 1970, 84 Stat. 1678; amended Pub. L. 95–95, title I, § 103, Aug. 7, 1977, 91 Stat. 687; Pub. L. 101–549, title I, § 101(a), Nov. 15, 1990, 104 Stat. 2399; Pub. L. 108–199, div. G, title IV, § 425(a), Jan. 23, 2004, 118 Stat. 417.)

**Editorial Notes**

REFERENCES IN TEXT

Section 7413 of this title, referred to in subsec. (e)(3), was amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsec. (d) of section 7413 no longer relates to final compliance orders.

CODIFICATION

Section was formerly classified to section 1857c–2 of this title.

[1] See References in Text note below.

PRIOR PROVISIONS

A prior section 107 of act July 14, 1955, as added Nov. 21, 1967, Pub. L. 90–148, §2, 81 Stat. 490, related to air quality control regions and was classified to section 1857c–2 of this title, prior to repeal by Pub. L. 91–604.

Another prior section 107 of act July 14, 1955, as added Dec. 17, 1963, Pub. L. 88–206, §1, 77 Stat. 399, was renumbered section 111 by Pub. L. 90–148 and is classified to section 7411 of this title.

AMENDMENTS

2004—Subsec. (d)(6), (7). Pub. L. 108–199 added pars. (6) and (7).

1990—Subsec. (d). Pub. L. 101–549 amended subsec. (d) generally, substituting present provisions for provisions which required States to submit lists of regions not in compliance on Aug. 7, 1977, with certain air quality standards to be submitted to the Administrator, and which authorized States to revise and resubmit such lists from time to time.

1977—Subsecs. (d), (e). Pub. L. 95–95 added subsecs. (d) and (e).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

OZONE AND PARTICULATE MATTER STANDARDS

Pub. L. 108–199, div. G, title IV, §425(b), Jan. 23, 2004, 118 Stat. 417, provided that: ''Except as provided in paragraphs (6) and (7) of section 107(d) of the Clean Air Act [subsec. (d)(6), (7) of this section] (as added by subsection (a)), section 6101, subsections (a) and (b) of section 6102, and section 6103 of the Transportation Equity Act for the 21st Century [Pub. L. 105–178] (42 U.S.C. 7407 note; 112 Stat. 463), as in effect on the day before the date of enactment of this Act [Jan. 23, 2004], shall remain in effect.''

Pub. L. 105–178, title VI, June 9, 1998, 112 Stat. 463, as amended by Pub. L. 109–59, title VI, §6012(a), Aug. 10, 2005, 119 Stat. 1882, provided that:

''SEC. 6101. FINDINGS AND PURPOSE.

''(a) The Congress finds that—

''(1) there is a lack of air quality monitoring data for fine particle levels, measured as $PM_{2.5}$, in the United States and the States should receive full funding for the monitoring efforts;

''(2) such data would provide a basis for designating areas as attainment or nonattainment for any $PM_{2.5}$ national ambient air quality standards pursuant to the standards promulgated in July 1997;

''(3) the President of the United States directed the Administrator of the Environmental Protection Agency (referred to in this title as the 'Administrator') in a memorandum dated July 16, 1997, to complete the next periodic review of the particulate matter national ambient air quality standards by July 2002 in order to determine 'whether to revise or maintain the standards';

''(4) the Administrator has stated that 3 years of air quality monitoring data for fine particle levels, measured as $PM_{2.5}$ and performed in accordance with any applicable Federal reference methods, is appropriate for designating areas as attainment or nonattainment pursuant to the July 1997 promulgated standards; and

''(5) the Administrator has acknowledged that in drawing boundaries for attainment and nonattainment areas for the July 1997 ozone national air quality standards, Governors would benefit from considering implementation guidance from EPA on drawing area boundaries.

''(b) The purposes of this title are—

''(1) to ensure that 3 years of air quality monitoring data regarding fine particle levels are gathered for use in the determination of area attainment or nonattainment designations respecting any $PM_{2.5}$ national ambient air quality standards;

''(2) to ensure that the Governors have adequate time to consider implementation guidance from EPA on drawing area boundaries prior to submitting area designations respecting the July 1997 ozone national ambient air quality standards;

''(3) to ensure that the schedule for implementation of the July 1997 revisions of the ambient air quality standards for particulate matter and the schedule for the Environmental Protection Agency's visibility regulations related to regional haze are consistent with the timetable for implementation of such particulate matter standards as set forth in the President's Implementation Memorandum dated July 16, 1997.

''SEC. 6102. PARTICULATE MATTER MONITORING PROGRAM.

''(a) Through grants under section 103 of the Clean Air Act [42 U.S.C. 7403] the Administrator of the Environmental Protection Agency shall use appropriated funds no later than fiscal year 2000 to fund 100 percent of the cost of the establishment, purchase, operation and maintenance of a $PM_{2.5}$ monitoring network necessary to implement the national ambient air quality standards for $PM_{2.5}$ under section 109 of the Clean Air Act [42 U.S.C. 7409]. This implementation shall not result in a diversion or reprogramming of funds from other Federal, State or local Clean Air Act activities. Any funds previously diverted or reprogrammed from section 105 Clean Air Act [42 U.S.C. 7405] grants for $PM_{2.5}$ monitors must be restored to State or local air programs in fiscal year 1999.

''(b) EPA and the States, consistent with their respective authorities under the Clean Air Act [42 U.S.C. 7401 et seq.], shall ensure that the national network (designated in subsection (a)) which consists of the $PM_{2.5}$ monitors necessary to implement the national ambient air quality standards is established by December 31, 1999.

''(c)(1) The Governors shall be required to submit designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] for each area following promulgation of the July 1997 $PM_{2.5}$ national ambient air quality standard within 1 year after receipt of 3 years of air quality monitoring data performed in accordance with any applicable Federal reference methods for the relevant areas. Only data from the monitoring network designated in subsection (a) and other Federal reference method $PM_{2.5}$ monitors shall be considered for such designations. Nothing in the previous sentence shall be construed as affecting the Governor's authority to designate an area initially as nonattainment, and the Administrator's authority to promulgate the designation of an area as nonattainment, under section 107(d)(1) of the Clean Air Act, based on its contribution to ambient air quality in a nearby nonattainment area.

''(2) For any area designated as nonattainment for the July 1997 $PM_{2.5}$ national ambient air quality standard in accordance with the schedule set forth in this section, notwithstanding the time limit prescribed in paragraph (2) of section 169B(e) of the Clean Air Act [42 U.S.C. 7492(e)(2)], the Administrator shall require State implementation plan revisions referred to in such paragraph (2) to be submitted at the same time as State implementation plan revisions referred to in section 172 of the Clean Air Act [42 U.S.C. 7502] implementing the revised national ambient air quality standard for fine particulate matter are required to be submitted. For any area designated as attainment or unclassifiable for such standard, the Administrator shall require the State implementation plan revisions referred to in such paragraph (2) to be submitted 1 year after the area has been so designated. The preceding provisions of this paragraph shall not preclude the implementation of the agreements and recommendations set forth in the Grand Canyon Visibility Transport Commission Report dated June 1996.

''(d) The Administrator shall promulgate the designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] for each area following promulgation of the July 1997 $PM_{2.5}$ national ambient air quality standard by the earlier of 1 year after the initial designations required under subsection (c)(1) are required to be submitted or December 31, 2005.

''(e) FIELD STUDY.—Not later than 2 years after the date of enactment of the SAFETEA–LU [Aug. 10, 2005], the Administrator shall—

''(1) conduct a field study of the ability of the $PM_{2.5}$ Federal Reference Method to differentiate those particles that are larger than 2.5 micrometers in diameter;

''(2) develop a Federal reference method to measure directly particles that are larger than 2.5 micrometers in diameter without reliance on subtracting from coarse particle measurements those particles that are equal to or smaller than 2.5 micrometers in diameter;

''(3) develop a method of measuring the composition of coarse particles; and

''(4) submit a report on the study and responsibilities of the Administrator under paragraphs (1) through (3) to—

''(A) the Committee on Energy and Commerce of the House of Representatives; and

''(B) the Committee on Environment and Public Works of the Senate.

''SEC. 6103. OZONE DESIGNATION REQUIREMENTS.

''(a) The Governors shall be required to submit the designations referred to in section 107(d)(1) of the Clean Air Act [42 U.S.C. 7407(d)(1)] within 2 years following the promulgation of the July 1997 ozone national ambient air quality standards.

''(b) The Administrator shall promulgate final designations no later than 1 year after the designations required under subsection (a) are required to be submitted.

''SEC. 6104. ADDITIONAL PROVISIONS.

''Nothing in sections 6101 through 6103 shall be construed by the Administrator of Environmental Protection Agency or any court, State, or person to affect any pending litigation or to be a ratification of the ozone or $PM_{2.5}$ standards.''

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

### § 7408. Air quality criteria and control techniques

**(a) Air pollutant list; publication and revision by Administrator; issuance of air quality criteria for air pollutants**

(1) For the purpose of establishing national primary and secondary ambient air quality standards, the Administrator shall within 30 days after December 31, 1970, publish, and shall from time to time thereafter revise, a list which includes each air pollutant—

(A) emissions of which, in his judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare;

(B) the presence of which in the ambient air results from numerous or diverse mobile or stationary sources; and

(C) for which air quality criteria had not been issued before December 31, 1970 but for which he plans to issue air quality criteria under this section.

(2) The Administrator shall issue air quality criteria for an air pollutant within 12 months after he has included such pollutant in a list under paragraph (1). Air quality criteria for an air pollutant shall accurately reflect the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on public health or welfare which may be expected from the presence of such pollutant in the ambient air, in varying quantities. The criteria for an air pollutant, to the extent practicable, shall include information on—

(A) those variable factors (including atmospheric conditions) which of themselves or in combination with other factors may alter the effects on public health or welfare of such air pollutant;

(B) the types of air pollutants which, when present in the atmosphere, may interact with such pollutant to produce an adverse effect on public health or welfare; and

(C) any known or anticipated adverse effects on welfare.

**(b) Issuance by Administrator of information on air pollution control techniques; standing consulting committees for air pollutants; establishment; membership**

(1) Simultaneously with the issuance of criteria under subsection (a), the Administrator shall, after consultation with appropriate advisory committees and Federal departments and agencies, issue to the States and appropriate air pollution control agencies information on air pollution control techniques, which information shall include data relating to the cost of installation and operation, energy requirements, emission reduction benefits, and environmental impact of the emission control technology. Such information shall include such data as are available on available technology and alternative methods of prevention and control of air pollution. Such information shall also include data on alternative fuels, processes, and operating methods which will result in elimination or significant reduction of emissions.

(2) In order to assist in the development of information on pollution control techniques, the

**42 U.S.C. § 7410**

other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

TERMINATION OF ADVISORY COMMITTEES

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

ROLE OF SECONDARY STANDARDS

Pub. L. 101–549, title VIII, § 817, Nov. 15, 1990, 104 Stat. 2697, provided that:

''(a) REPORT.—The Administrator shall request the National Academy of Sciences to prepare a report to the Congress on the role of national secondary ambient air quality standards in protecting welfare and the environment. The report shall:

''(1) include information on the effects on welfare and the environment which are caused by ambient concentrations of pollutants listed pursuant to section 108 [42 U.S.C. 7408] and other pollutants which may be listed;

''(2) estimate welfare and environmental costs incurred as a result of such effects;

''(3) examine the role of secondary standards and the State implementation planning process in preventing such effects;

''(4) determine ambient concentrations of each such pollutant which would be adequate to protect welfare and the environment from such effects;

''(5) estimate the costs and other impacts of meeting secondary standards; and

''(6) consider other means consistent with the goals and objectives of the Clean Air Act [42 U.S.C. 7401 et seq.] which may be more effective than secondary standards in preventing or mitigating such effects.

''(b) SUBMISSION TO CONGRESS; COMMENTS; AUTHORIZATION.—(1) The report shall be transmitted to the Congress not later than 3 years after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990].

''(2) At least 90 days before issuing a report the Administrator shall provide an opportunity for public comment on the proposed report. The Administrator shall include in the final report a summary of the comments received on the proposed report.

''(3) There are authorized to be appropriated such sums as are necessary to carry out this section.''

## § 7410. State implementation plans for national primary and secondary ambient air quality standards

### (a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems

(1) Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

(2) Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall—

(A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

(B) provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to—

(i) monitor, compile, and analyze data on ambient air quality, and

(ii) upon request, make such data available to the Administrator;

(C) include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D;

(D) contain adequate provisions—

(i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—

(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

(II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility,

(ii) insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

(E) provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional

agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

(F) require, as may be prescribed by the Administrator—

(i) the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

(ii) periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

(iii) correlation of such reports by the State agency with any emission limitations or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

(G) provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

(H) provide for revision of such plan—

(i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

(ii) except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to otherwise comply with any additional requirements established under this chapter;

(I) in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D (relating to nonattainment areas);

(J) meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C (relating to prevention of significant deterioration of air quality and visibility protection);

(K) provide for—

(i) the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

(ii) the submission, upon request, of data related to such air quality modeling to the Administrator;

(L) require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover—

(i) the reasonable costs of reviewing and acting upon any application for such a permit, and

(ii) if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V; and

(M) provide for consultation and participation by local political subdivisions affected by the plan.

(3)(A) Repealed. Pub. L. 101–549, title I, §101(d)(1), Nov. 15, 1990, 104 Stat. 2409.

(B) As soon as practicable, the Administrator shall, consistent with the purposes of this chapter and the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 791 et seq.], review each State's applicable implementation plans and report to the State on whether such plans can be revised in relation to fuel burning stationary sources (or persons supplying fuel to such sources) without interfering with the attainment and maintenance of any national ambient air quality standard within the period permitted in this section. If the Administrator determines that any such plan can be revised, he shall notify the State that a plan revision may be submitted by the State. Any plan revision which is submitted by the State shall, after public notice and opportunity for public hearing, be approved by the Administrator if the revision relates only to fuel burning stationary sources (or persons supplying fuel to such sources), and the plan as revised complies with paragraph (2) of this subsection. The Administrator shall approve or disapprove any revision no later than three months after its submission.

(C) Neither the State, in the case of a plan (or portion thereof) approved under this subsection, nor the Administrator, in the case of a plan (or portion thereof) promulgated under subsection (c), shall be required to revise an applicable implementation plan because one or more exemptions under section 7418 of this title (relating to Federal facilities), enforcement orders under section 7413(d)[1] of this title, suspensions under subsection (f) or (g) (relating to temporary energy or economic authority), orders under section 7419 of this title (relating to primary nonferrous smelters), or extensions of compliance in decrees entered under section 7413(e)[1] of this title (relating to iron- and steel-producing operations) have been granted, if such plan would have met the requirements of this section if no such exemptions, orders, or extensions had been granted.

(4) Repealed. Pub. L. 101–549, title I, §101(d)(2), Nov. 15, 1990, 104 Stat. 2409.

[1] See References in Text note below.

(5)(A)(i) Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

(ii) Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

(iii) Any State may revise an applicable implementation plan approved under this subsection to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section.

(B) The Administrator shall have the authority to promulgate, implement and enforce regulations under subsection (c) respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.

(C) For purposes of this paragraph, the term ''indirect source'' means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii)), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.

(D) For purposes of this paragraph the term ''indirect source review program'' means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations—

(i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

(ii) preventing maintenance of any such standard after such date.

(E) For purposes of this paragraph and paragraph (2)(B), the term ''transportation control measure'' does not include any measure which is an ''indirect source review program''.

(6) No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 7413(d)[1] of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

**(b) Extension of period for submission of plans**

The Administrator may, wherever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

**(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation**

(1) The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator—

(A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A), or

(B) disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

(2)(A) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409.

(B) No parking surcharge regulation may be required by the Administrator under paragraph (1) of this subsection as a part of an applicable implementation plan. All parking surcharge regulations previously required by the Administrator shall be void upon June 22, 1974. This subparagraph shall not prevent the Administrator from approving parking surcharges if they are adopted and submitted by a State as part of an applicable implementation plan. The Administrator may not condition approval of any implementation plan submitted by a State on such plan's including a parking surcharge regulation.

(C) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(B), Nov. 15, 1990, 104 Stat. 2409.

(D) For purposes of this paragraph—

(i) The term ''parking surcharge regulation'' means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles.

(ii) The term ''management of parking supply'' shall include any requirement providing that any new facility containing a given number of parking spaces shall receive a permit or other prior approval, issuance of which is to be conditioned on air quality considerations.

(iii) The term ''preferential bus/carpool lane'' shall include any requirement for the setting aside of one or more lanes of a street or highway on a permanent or temporary basis for the exclusive use of buses or carpools, or both.

(E) No standard, plan, or requirement, relating to management of parking supply or preferential bus/carpool lanes shall be promulgated after June 22, 1974, by the Administrator pursuant to this section, unless such promulgation has been subjected to at least one public hearing

which has been held in the area affected and for which reasonable notice has been given in such area. If substantial changes are made following public hearings, one or more additional hearings shall be held in such area after such notice.

(3) Upon application of the chief executive officer of any general purpose unit of local government, if the Administrator determines that such unit has adequate authority under State or local law, the Administrator may delegate to such unit the authority to implement and enforce within the jurisdiction of such unit any part of a plan promulgated under this subsection. Nothing in this paragraph shall prevent the Administrator from implementing or enforcing any applicable provision of a plan promulgated under this subsection.

(4) Repealed. Pub. L. 101–549, title I, § 101(d)(3)(C), Nov. 15, 1990, 104 Stat. 2409.

(5)(A) Any measure in an applicable implementation plan which requires a toll or other charge for the use of a bridge located entirely within one city shall be eliminated from such plan by the Administrator upon application by the Governor of the State, which application shall include a certification by the Governor that he will revise such plan in accordance with subparagraph (B).

(B) In the case of any applicable implementation plan with respect to which a measure has been eliminated under subparagraph (A), such plan shall, not later than one year after August 7, 1977, be revised to include comprehensive measures to:

(i) establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and

(ii) implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds. Such measures shall, as a substitute for the tolls or charges eliminated under subparagraph (A), provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

(C) Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D.

**(d), (e) Repealed. Pub. L. 101–549, title I, § 101(d)(4), (5), Nov. 15, 1990, 104 Stat. 2409**

**(f) National or regional energy emergencies; determination by President**

(1) Upon application by the owner or operator of a fuel burning stationary source, and after notice and opportunity for public hearing, the Governor of the State in which such source is located may petition the President to determine that a national or regional energy emergency exists of such severity that—

(A) a temporary suspension of any part of the applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) may be necessary, and

(B) other means of responding to the energy emergency may be inadequate.

Such determination shall not be delegable by the President to any other person. If the President determines that a national or regional energy emergency of such severity exists, a temporary emergency suspension of any part of an applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) adopted by the State may be issued by the Governor of any State covered by the President's determination under the condition specified in paragraph (2) and may take effect immediately.

(2) A temporary emergency suspension under this subsection shall be issued to a source only if the Governor of such State finds that—

(A) there exists in the vicinity of such source a temporary energy emergency involving high levels of unemployment or loss of necessary energy supplies for residential dwellings; and

(B) such unemployment or loss can be totally or partially alleviated by such emergency suspension.

Not more than one such suspension may be issued for any source on the basis of the same set of circumstances or on the basis of the same emergency.

(3) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator, if any. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of paragraph (2).

(4) This subsection shall not apply in the case of a plan provision or requirement promulgated by the Administrator under subsection (c) of this section, but in any such case the President may grant a temporary emergency suspension for a four month period of any such provision or requirement if he makes the determinations and findings specified in paragraphs (1) and (2).

(5) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10[1] of this title, as in effect before August 7, 1977, or section 7413(d)[1] of this title, upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(g) Governor's authority to issue temporary emergency suspensions**

(1) In the case of any State which has adopted and submitted to the Administrator a proposed plan revision which the State determines—

(A) meets the requirements of this section, and

(B) is necessary (i) to prevent the closing for one year or more of any source of air pollution, and (ii) to prevent substantial increases in unemployment which would result from such closing, and

which the Administrator has not approved or disapproved under this section within 12 months of submission of the proposed plan revision, the Governor may issue a temporary emergency suspension of the part of the applicable implementation plan for such State which is proposed to be revised with respect to such source. The determination under subparagraph (B) may not be made with respect to a source which would close without regard to whether or not the proposed plan revision is approved.

(2) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of this subsection.

(3) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10[1] of this title as in effect before August 7, 1977, or under section 7413(d)[1] of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(h) Publication of comprehensive document for each State setting forth requirements of applicable implementation plan**

(1) Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Administrator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

(2) The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

**(i) Modification of requirements prohibited**

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d)[1] of this title (relating to compliance orders), a plan promulgation under subsection (c), or a plan revision under subsection (a)(3); no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

**(j) Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards**

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

**(k) Environmental Protection Agency action on plan submissions**

**(1) Completeness of plan submissions**

**(A) Completeness criteria**

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must meet before the Administrator is required to act on such submission under this subsection. The criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

**(B) Completeness finding**

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria established pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator, and that has not been determined by the Administrator (by the date 6 months after receipt of the submission) to have failed to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

**(C) Effect of finding of incompleteness**

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

**(2) Deadline for action**

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

**(3) Full and partial approval and disapproval**

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

**(4) Conditional approval**

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

**(5) Calls for plan revisions**

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D, unless such date has elapsed).

**(6) Corrections**

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

**(*l*) Plan revisions**

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

**(m) Sanctions**

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title in relation to any plan or plan item (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

**(n) Savings clauses**

**(1) Existing plan provisions**

Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

**(2) Attainment dates**

For any area not designated nonattainment, any plan or plan revision submitted or required to be submitted by a State—

(A) in response to the promulgation or revision of a national primary ambient air quality standard in effect on November 15, 1990, or

(B) in response to a finding of substantial inadequacy under subsection (a)(2) (as in effect immediately before November 15, 1990),

shall provide for attainment of the national primary ambient air quality standards within 3 years of November 15, 1990, or within 5 years of issuance of such finding of substantial inadequacy, whichever is later.

**(3) Retention of construction moratorium in certain areas**

In the case of an area to which, immediately before November 15, 1990, the prohibition on construction or modification of major stationary sources prescribed in subsection (a)(2)(I) (as in effect immediately before November 15, 1990) applied by virtue of a finding

of the Administrator that the State containing such area had not submitted an implementation plan meeting the requirements of section 7502(b)(6) of this title (relating to establishment of a permit program) (as in effect immediately before November 15, 1990) or 7502(a)(1) of this title (to the extent such requirements relate to provision for attainment of the primary national ambient air quality standard for sulfur oxides by December 31, 1982) as in effect immediately before November 15, 1990, no major stationary source of the relevant air pollutant or pollutants shall be constructed or modified in such area until the Administrator finds that the plan for such area meets the applicable requirements of section 7502(c)(5) of this title (relating to permit programs) or subpart 5 of part D (relating to attainment of the primary national ambient air quality standard for sulfur dioxide), respectively.

**(*o*) Indian tribes**

If an Indian tribe submits an implementation plan to the Administrator pursuant to section 7601(d) of this title, the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section 7601(d)(2) of this title. When such plan becomes effective in accordance with the regulations promulgated under section 7601(d) of this title, the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.

**(p) Reports**

Any State shall submit, according to such schedule as the Administrator may prescribe, such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development[2] effectiveness, need for revision, or implementation of any plan or plan revision required under this chapter.

(July 14, 1955, ch. 360, title I, § 110, as added Pub. L. 91–604, § 4(a), Dec. 31, 1970, 84 Stat. 1680; amended Pub. L. 93–319, § 4, June 22, 1974, 88 Stat. 256; Pub. L. 95–95, title I, §§ 107, 108, Aug. 7, 1977, 91 Stat. 691, 693; Pub. L. 95–190, § 14(a)(1)–(6), Nov. 16, 1977, 91 Stat. 1399; Pub. L. 97–23, § 3, July 17, 1981, 95 Stat. 142; Pub. L. 101–549, title I, §§ 101(b)–(d), 102(h), 107(c), 108(d), title IV, § 412, Nov. 15, 1990, 104 Stat. 2404–2408, 2422, 2464, 2466, 2634.)

**Editorial Notes**

References in Text

The Energy Supply and Environmental Coordination Act of 1974, referred to in subsec. (a)(3)(B), is Pub. L. 93–319, June 22, 1974, 88 Stat. 246, as amended, which is classified principally to chapter 16C (§ 791 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 791 of Title 15 and Tables.

Section 7413 of this title, referred to in subsecs. (a)(3)(C), (6), (f)(5), (g)(3), and (i), was amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsecs. (d) and (e) of section 7413 no longer relates to final compliance orders and steel industry compliance extension, respectively.

Section 1857c–10 of this title, as in effect before August 7, 1977, referred to in subsecs. (f)(5) and (g)(3), was in the original ''section 119, as in effect before the date of the enactment of this paragraph'', meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, § 3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of subsecs. (f)(5) and (g)(3) of this section by Pub. L. 95–95, § 107, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to section 7413(d)(5) of this title. Section 7413 of this title was subsequently amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, see note above. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

Codification

Section was formerly classified to section 1857c–5 of this title.

Prior Provisions

A prior section 110 of act July 14, 1955, was renumbered section 117 by Pub. L. 91–604 and is classified to section 7417 of this title.

Amendments

1990—Subsec. (a)(1). Pub. L. 101–549, § 101(d)(8), substituted ''3 years (or such shorter period as the Administrator may prescribe)'' for ''nine months'' in two places.

Subsec. (a)(2). Pub. L. 101–549, § 101(b), amended par. (2) generally, substituting present provisions for provisions setting the time within which the Administrator was to approve or disapprove a plan or portion thereof and listing the conditions under which the plan or portion thereof was to be approved after reasonable notice and hearing.

Subsec. (a)(3)(A). Pub. L. 101–549, § 101(d)(1), struck out subpar. (A) which directed Administrator to approve any revision of an implementation plan if it met certain requirements and had been adopted by the State after reasonable notice and public hearings.

Subsec. (a)(3)(D). Pub. L. 101–549, § 101(d)(1), struck out subpar. (D) which directed that certain implementation plans be revised to include comprehensive measures and requirements.

Subsec. (a)(4). Pub. L. 101–549, § 101(d)(2), struck out par. (4) which set forth requirements for review procedure.

Subsec. (c)(1). Pub. L. 101–549, § 102(h), amended par. (1) generally, substituting present provisions for provisions relating to preparation and publication of regulations setting forth an implementation plan, after opportunity for a hearing, upon failure of a State to make required submission or revision.

Subsec. (c)(2)(A). Pub. L. 101–549, § 101(d)(3)(A), struck out subpar. (A) which required a study and report on necessity of parking surcharge, management of parking supply, and preferential bus/carpool lane regulations to achieve and maintain national primary ambient air quality standards.

Subsec. (c)(2)(C). Pub. L. 101–549, § 101(d)(3)(B), struck out subpar. (C) which authorized suspension of certain regulations and requirements relating to management of parking supply.

[2] So in original. Probably should be followed by a comma.

Subsec. (c)(4). Pub. L. 101–549, § 101(d)(3)(C), struck out par. (4) which permitted Governors to temporarily suspend measures in implementation plans relating to retrofits, gas rationing, and reduction of on-street parking.

Subsec. (c)(5)(B). Pub. L. 101–549, § 101(d)(3)(D), struck out "(including the written evidence required by part D)," after "include comprehensive measures".

Subsec. (d). Pub. L. 101–549, § 101(d)(4), struck out subsec. (d) which defined an applicable implementation plan for purposes of this chapter.

Subsec. (e). Pub. L. 101–549, § 101(d)(5), struck out subsec. (e) which permitted an extension of time for attainment of a national primary ambient air quality standard.

Subsec. (f)(1). Pub. L. 101–549, § 412, inserted "or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets)" in subpar. (A) and in last sentence.

Subsec. (g)(1). Pub. L. 101–549, § 101(d)(6), substituted "12 months of submission of the proposed plan revision" for "the required four month period" in closing provisions.

Subsec. (h)(1). Pub. L. 101–549, § 101(d)(7), substituted "5 years after November 15, 1990, and every three years thereafter" for "one year after August 7, 1977, and annually thereafter" and struck out at end "Each such document shall be revised as frequently as practicable but not less often than annually."

Subsecs. (k) to (n). Pub. L. 101–549, § 101(c), added subsecs. (k) to (n).

Subsec. (*o*). Pub. L. 101–549, § 107(c), added subsec. (*o*).

Subsec. (p). Pub. L. 101–549, § 108(d), added subsec. (p).

1981—Subsec. (a)(3)(C). Pub. L. 97–23 inserted reference to extensions of compliance in decrees entered under section 7413(e) of this title (relating to iron- and steel-producing operations).

1977—Subsec. (a)(2)(A). Pub. L. 95–95, § 108(a)(1), substituted "(A) except as may be provided in subparagraph (I)(i) in the case of a plan" for "(A)(i) in the case of a plan".

Subsec. (a)(2)(B). Pub. L. 95–95, § 108(a)(2), substituted "transportation controls, air quality maintenance plans, and preconstruction review of direct sources of air pollution as provided in subparagraph (D)" for "land use and transportation controls".

Subsec. (a)(2)(D). Pub. L. 95–95, § 108(a)(3), substituted "it includes a program to provide for the enforcement of emission limitations and regulation of the modification, construction, and operation of any stationary source, including a permit program as required in parts C and D and a permit or equivalent program for any major emitting facility, within such region as necessary to assure (i) that national ambient air quality standards are achieved and maintained, and (ii) a procedure" for "it includes a procedure".

Subsec. (a)(2)(E). Pub. L. 95–95, § 108(a)(4), substituted "it contains adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility, and (ii) insuring compliance with the requirements of section 7426 of this title, relating to interstate pollution abatement" for "it contains adequate provisions for intergovernmental cooperation, including measures necessary to insure that emissions of air pollutants from sources located in any air quality control region will not interfere with the attainment or maintenance of such primary or secondary standard in any portion of such region outside of such State or in any other air quality control region".

Subsec. (a)(2)(F). Pub. L. 95–95, § 108(a)(5), added cl. (vi).

Subsec. (a)(2)(H). Pub. L. 95–190, § 14(a)(1), substituted "1977;" for "1977".

Pub. L. 95–95, § 108(a)(6), inserted "except as provided in paragraph (3)(C)," after "or (ii)" and "or to otherwise comply with any additional requirements established under the Clean Air Act Amendments of 1977" after "to achieve the national ambient air quality primary or secondary standard which it implements".

Subsec. (a)(2)(I). Pub. L. 95–95, § 108(b), added subpar. (I).

Subsec. (a)(2)(J). Pub. L. 95–190, § 14(a)(2), substituted "; and" for ", and".

Pub. L. 95–95, § 108(b), added subpar. (J).

Subsec. (a)(2)(K). Pub. L. 95–95, § 108(b) added subpar. (K).

Subsec. (a)(3)(C). Pub. L. 95–95, § 108(c), added subpar. (C).

Subsec. (a)(3)(D). Pub. L. 95–190, § 14(a)(4), added subpar. (D).

Subsec. (a)(5). Pub. L. 95–95, § 108(e), added par. (5).

Subsec. (a)(5)(D). Pub. L. 95–190, § 14(a)(3), struck out "preconstruction or premodification" before "review".

Subsec. (a)(6). Pub. L. 95–95, § 108(e), added par. (6).

Subsec. (c)(1). Pub. L. 95–95, § 108(d)(1), (2), substituted "plan which meets the requirements of this section" for "plan for any national ambient air quality primary or secondary standard within the time prescribed" in subpar. (A) and, in provisions following subpar. (C), directed that any portion of a plan relating to any measure described in first sentence of 7421 of this title (relating to consultation) or the consultation process required under such section 7421 of this title not be required to be promulgated before the date eight months after such date required for submission.

Subsec. (c)(3) to (5). Pub. L. 95–95, § 108(d)(3), added pars. (3) to (5).

Subsec. (d). Pub. L. 95–95, § 108(f), substituted "and which implements the requirements of this section" for "and which implements a national primary or secondary ambient air quality standard in a State".

Subsec. (f). Pub. L. 95–95, § 107(a), substituted provisions relating to the handling of national or regional energy emergencies for provisions relating to the postponement of compliance by stationary sources or classes of moving sources with any requirement of applicable implementation plans.

Subsec. (g). Pub. L. 95–95, § 108(g), added subsec. (g) relating to publication of comprehensive document.

Pub. L. 95–95, § 107(b), added subsec. (g) relating to Governor's authority to issue temporary emergency suspensions.

Subsec. (h). Pub. L. 95–190, § 14(a)(5), redesignated subsec. (g), added by Pub. L. 95–95, § 108(g), as (h). Former subsec. (h) redesignated (i).

Subsec. (i). Pub. L. 95–190, § 14(a)(5), redesignated subsec. (h), added by Pub. L. 95–95, § 108(g), as (i). Former subsec. (i) redesignated (j) and amended.

Subsec. (j). Pub. L. 95–190 § 14(a)(5), (6), redesignated subsec. (i), added by Pub. L. 95–95, § 108(g), as (j) and in subsec. (j) as so redesignated, substituted "will enable such source" for "at such source will enable it".

1974—Subsec. (a)(3). Pub. L. 93–319, § 4(a), designated existing provisions as subpar. (A) and added subpar. (B).

Subsec. (c). Pub. L. 93–319, § 4(b), designated existing provisions as par. (1) and existing pars. (1), (2), and (3) as subpars. (A), (B), and (C), respectively, of such redesignated par. (1), and added par. (2).

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1977 Amendment

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

#### Pending Actions and Proceedings

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official

duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF IMPLEMENTATION PLANS APPROVED AND IN EFFECT PRIOR TO AUG. 7, 1977

Nothing in the Clean Air Act Amendments of 1977 [Pub. L. 95–95] to affect any requirement of an approved implementation plan under this section or any other provision in effect under this chapter before Aug. 7, 1977, until modified or rescinded in accordance with this chapter as amended by the Clean Air Act Amendments of 1977, see section 406(c) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

SAVINGS PROVISION

Pub. L. 91–604, §16, Dec. 31, 1970, 84 Stat. 1713, provided that:

''(a)(1) Any implementation plan adopted by any State and submitted to the Secretary of Health, Education, and Welfare, or to the Administrator pursuant to the Clean Air Act [this chapter] prior to enactment of this Act [Dec. 31, 1970] may be approved under section 110 of the Clean Air Act [this section] (as amended by this Act) [Pub. L. 91–604] and shall remain in effect, unless the Administrator determines that such implementation plan, or any portion thereof, is not consistent with applicable requirements of the Clean Air Act [this chapter] (as amended by this Act) and will not provide for the attainment of national primary ambient air quality standards in the time required by such Act. If the Administrator so determines, he shall, within 90 days after promulgation of any national ambient air quality standards pursuant to section 109(a) of the Clean Air Act [section 7409(a) of this title], notify the State and specify in what respects changes are needed to meet the additional requirements of such Act, including requirements to implement national secondary ambient air quality standards. If such changes are not adopted by the State after public hearings and within six months after such notification, the Administrator shall promulgate such changes pursuant to section 110(c) of such Act [subsec. (c) of this section].

''(2) The amendments made by section 4(b) [amending sections 7403 and 7415 of this title] shall not be construed as repealing or modifying the powers of the Administrator with respect to any conference convened under section 108(d) of the Clean Air Act [section 7415 of this title] before the date of enactment of this Act [Dec. 31, 1970].

''(b) Regulations or standards issued under this title II of the Clean Air Act [subchapter II of this chapter] prior to the enactment of this Act [Dec. 31, 1970] shall continue in effect until revised by the Administrator consistent with the purposes of such Act [this chapter].''

FEDERAL ENERGY ADMINISTRATOR

''Federal Energy Administrator'', for purposes of this chapter, to mean Administrator of Federal Energy Administration established by Pub. L. 93–275, May 7, 1974, 88 Stat. 97, which is classified to section 761 et seq. of Title 15, Commerce and Trade, but with the term to mean any officer of the United States designated as such by the President until Federal Energy Administrator takes office and after Federal Energy Administration ceases to exist, see section 798 of Title 15, Commerce and Trade.

Federal Energy Administration terminated and functions vested by law in Administrator thereof transferred to Secretary of Energy (unless otherwise specifically provided) by sections 7151(a) and 7293 of this title.

## § 7411. Standards of performance for new stationary sources

### (a) Definitions

For purposes of this section:

(1) The term ''standard of performance'' means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

(2) The term ''new source'' means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source.

(3) The term ''stationary source'' means any building, structure, facility, or installation which emits or may emit any air pollutant. Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines.

(4) The term ''modification'' means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

(5) The term ''owner or operator'' means any person who owns, leases, operates, controls, or supervises a stationary source.

(6) The term ''existing source'' means any stationary source other than a new source.

(7) The term ''technological system of continuous emission reduction'' means—

(A) a technological process for production or operation by any source which is inherently low-polluting or nonpolluting, or

(B) a technological system for continuous reduction of the pollution generated by a source before such pollution is emitted into the ambient air, including precombustion cleaning or treatment of fuels.

(8) A conversion to coal (A) by reason of an order under section 2(a) of the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 792(a)] or any amendment thereto, or any subsequent enactment which supersedes such Act [15 U.S.C. 791 et seq.], or (B) which qualifies under section 7413(d)(5)(A)(ii)[1]

[1] See References in Text note below.

**42 U.S.C. § 7506**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



23, and such planning processes shall take into account the requirements of this part.

**(c) Joint planning**

In the case of a nonattainment area that is included within more than one State, the affected States may jointly, through interstate compact or otherwise, undertake and implement all or part of the planning procedures described in this section.

(July 14, 1955, ch. 360, title I, § 174, as added Pub. L. 95–95, title I, § 129(b), Aug. 7, 1977, 91 Stat. 748; amended Pub. L. 101–549, title I, § 102(d), Nov. 15, 1990, 104 Stat. 2417.)

**Editorial Notes**

AMENDMENTS

1990—Pub. L. 101–549 amended section generally, substituting present provisions for provisions which related to: in subsec. (a), preparation of implementation plan by designated organization; and in subsec. (b), coordination of plan preparation.

### § 7505. Environmental Protection Agency grants

**(a) Plan revision development costs**

The Administrator shall make grants to any organization of local elected officials with transportation or air quality maintenance planning responsibilities recognized by the State under section 7504(a) of this title for payment of the reasonable costs of developing a plan revision under this part.

**(b) Uses of grant funds**

The amount granted to any organization under subsection (a) shall be 100 percent of any additional costs of developing a plan revision under this part for the first two fiscal years following receipt of the grant under this paragraph, and shall supplement any funds available under Federal law to such organization for transportation or air quality maintenance planning. Grants under this section shall not be used for construction.

(July 14, 1955, ch. 360, title I, § 175, as added Pub. L. 95–95, title I, § 129(b), Aug. 7, 1977, 91 Stat. 749.)

### § 7505a. Maintenance plans

**(a) Plan revision**

Each State which submits a request under section 7407(d) of this title for redesignation of a nonattainment area for any air pollutant as an area which has attained the national primary ambient air quality standard for that air pollutant shall also submit a revision of the applicable State implementation plan to provide for the maintenance of the national primary ambient air quality standard for such air pollutant in the area concerned for at least 10 years after the redesignation. The plan shall contain such additional measures, if any, as may be necessary to ensure such maintenance.

**(b) Subsequent plan revisions**

8 years after redesignation of any area as an attainment area under section 7407(d) of this title, the State shall submit to the Administrator an additional revision of the applicable State implementation plan for maintaining the national primary ambient air quality standard for 10 years after the expiration of the 10-year period referred to in subsection (a).

**(c) Nonattainment requirements applicable pending plan approval**

Until such plan revision is approved and an area is redesignated as attainment for any area designated as a nonattainment area, the requirements of this part shall continue in force and effect with respect to such area.

**(d) Contingency provisions**

Each plan revision submitted under this section shall contain such contingency provisions as the Administrator deems necessary to assure that the State will promptly correct any violation of the standard which occurs after the redesignation of the area as an attainment area. Such provisions shall include a requirement that the State will implement all measures with respect to the control of the air pollutant concerned which were contained in the State implementation plan for the area before redesignation of the area as an attainment area. The failure of any area redesignated as an attainment area to maintain the national ambient air quality standard concerned shall not result in a requirement that the State revise its State implementation plan unless the Administrator, in the Administrator's discretion, requires the State to submit a revised State implementation plan.

(July 14, 1955, ch. 360, title I, § 175A, as added Pub. L. 101–549, title I, § 102(e), Nov. 15, 1990, 104 Stat. 2418.)

### § 7506. Limitations on certain Federal assistance

**(a), (b) Repealed. Pub. L. 101–549, title I, § 110(4), Nov. 15, 1990, 104 Stat. 2470**

**(c) Activities not conforming to approved or promulgated plans**

(1) No department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title. No metropolitan planning organization designated under section 134 of title 23, shall give its approval to any project, program, or plan which does not conform to an implementation plan approved or promulgated under section 7410 of this title. The assurance of conformity to such an implementation plan shall be an affirmative responsibility of the head of such department, agency, or instrumentality. Conformity to an implementation plan means—

(A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and

(B) that such activities will not—

(i) cause or contribute to any new violation of any standard in any area;

(ii) increase the frequency or severity of any existing violation of any standard in any area; or

(iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

The determination of conformity shall be based on the most recent estimates of emissions, and such estimates shall be determined from the most recent population, employment, travel and congestion estimates as determined by the metropolitan planning organization or other agency authorized to make such estimates.

(2) Any transportation plan or program developed pursuant to title 23 or chapter 53 of title 49 shall implement the transportation provisions of any applicable implementation plan approved under this chapter applicable to all or part of the area covered by such transportation plan or program. No Federal agency may approve, accept or fund any transportation plan, program or project unless such plan, program or project has been found to conform to any applicable implementation plan in effect under this chapter. In particular—

(A) no transportation plan or transportation improvement program may be adopted by a metropolitan planning organization designated under title 23 or chapter 53 of title 49, or be found to be in conformity by a metropolitan planning organization until a final determination has been made that emissions expected from implementation of such plans and programs are consistent with estimates of emissions from motor vehicles and necessary emissions reductions contained in the applicable implementation plan, and that the plan or program will conform to the requirements of paragraph (1)(B);

(B) no metropolitan planning organization or other recipient of funds under title 23 or chapter 53 of title 49 shall adopt or approve a transportation improvement program of projects until it determines that such program provides for timely implementation of transportation control measures consistent with schedules included in the applicable implementation plan;

(C) a transportation project may be adopted or approved by a metropolitan planning organization or any recipient of funds designated under title 23 or chapter 53 of title 49, or found in conformity by a metropolitan planning organization or approved, accepted, or funded by the Department of Transportation only if it meets either the requirements of subparagraph (D) or the following requirements—

(i) such a project comes from a conforming plan and program;

(ii) the design concept and scope of such project have not changed significantly since the conformity finding regarding the plan and program from which the project derived; and

(iii) the design concept and scope of such project at the time of the conformity determination for the program was adequate to determine emissions.

(D) Any project not referred to in subparagraph (C) shall be treated as conforming to the applicable implementation plan only if it is demonstrated that the projected emissions from such project, when considered together with emissions projected for the conforming transportation plans and programs within the nonattainment area, do not cause such plans and programs to exceed the emission reduction projections and schedules assigned to such plans and programs in the applicable implementation plan.

(E) The appropriate metropolitan planning organization shall redetermine conformity of existing transportation plans and programs not later than 2 years after the date on which the Administrator—

(i) finds a motor vehicle emissions budget to be adequate in accordance with section 93.118(e)(4) of title 40, Code of Federal Regulations (as in effect on October 1, 2004);

(ii) approves an implementation plan that establishes a motor vehicle emissions budget if that budget has not yet been determined to be adequate in accordance with clause (i); or

(iii) promulgates an implementation plan that establishes or revises a motor vehicle emissions budget.

(3) Until such time as the implementation plan revision referred to in paragraph (4)(C)[1] is approved, conformity of such plans, programs, and projects will be demonstrated if—

(A) the transportation plans and programs—

(i) are consistent with the most recent estimates of mobile source emissions;

(ii) provide for the expeditious implementation of transportation control measures in the applicable implementation plan; and

(iii) with respect to ozone and carbon monoxide nonattainment areas, contribute to annual emissions reductions consistent with sections 7511a(b)(1) and 7512a(a)(7) of this title; and

(B) the transportation projects—

(i) come from a conforming transportation plan and program as defined in subparagraph (A) or for 12 months after November 15, 1990, from a transportation program found to conform within 3 years prior to November 15, 1990; and

(ii) in carbon monoxide nonattainment areas, eliminate or reduce the severity and number of violations of the carbon monoxide standards in the area substantially affected by the project.

With regard to subparagraph (B)(ii), such determination may be made as part of either the conformity determination for the transportation program or for the individual project taken as a whole during the environmental review phase of project development.

(4) CRITERIA AND PROCEDURES FOR DETERMINING CONFORMITY.—

(A) IN GENERAL.—The Administrator shall promulgate, and periodically update, criteria and procedures for determining conformity (except in the case of transportation plans, programs, and projects) of, and for keeping the Administrator informed about, the activities referred to in paragraph (1).

(B) TRANSPORTATION PLANS, PROGRAMS, AND PROJECTS.—The Administrator, with the concurrence of the Secretary of Transportation, shall promulgate, and periodically update, criteria and procedures for demonstrating and as-

[1] See References in Text note below.

suring conformity in the case of transportation plans, programs, and projects.

(C) CIVIL ACTION TO COMPEL PROMULGATION.—A civil action may be brought against the Administrator and the Secretary of Transportation under section 7604 of this title to compel promulgation of such criteria and procedures and the Federal district court shall have jurisdiction to order such promulgation.

(D) The procedures and criteria shall, at a minimum—

(i) address the consultation procedures to be undertaken by metropolitan planning organizations and the Secretary of Transportation with State and local air quality agencies and State departments of transportation before such organizations and the Secretary make conformity determinations;

(ii) address the appropriate frequency for making conformity determinations, but the frequency for making conformity determinations on updated transportation plans and programs shall be every 4 years, except in a case in which—

(I) the metropolitan planning organization elects to update a transportation plan or program more frequently; or

(II) the metropolitan planning organization is required to determine conformity in accordance with paragraph (2)(E); and

(iii) address how conformity determinations will be made with respect to maintenance plans.

(E) INCLUSION OF CRITERIA AND PROCEDURES IN SIP.—Not later than 2 years after August 10, 2005, the procedures under subparagraph (A) shall include a requirement that each State include in the State implementation plan criteria and procedures for consultation required by subparagraph (D)(i), and enforcement and enforceability (pursuant to sections 93.125(c) and 93.122(a)(4)(ii) of title 40, Code of Federal Regulations) in accordance with the Administrator's criteria and procedures for consultation, enforcement and enforceability.

(F) Compliance with the rules of the Administrator for determining the conformity of transportation plans, programs, and projects funded or approved under title 23 or chapter 53 of title 49 to State or Federal implementation plans shall not be required for traffic signal synchronization projects prior to the funding, approval or implementation of such projects. The supporting regional emissions analysis for any conformity determination made with respect to a transportation plan, program, or project shall consider the effect on emissions of any such project funded, approved, or implemented prior to the conformity determination.

(5) APPLICABILITY.—This subsection shall apply only with respect to—

(A) a nonattainment area and each pollutant for which the area is designated as a nonattainment area; and

(B) an area that was designated as a nonattainment area but that was later redesignated by the Administrator as an attainment area and that is required to develop a maintenance plan under section 7505a of this title with respect to the specific pollutant for which the area was designated nonattainment.

(6) Notwithstanding paragraph 5,[2] this subsection shall not apply with respect to an area designated nonattainment under section 7407(d)(1) of this title until 1 year after that area is first designated nonattainment for a specific national ambient air quality standard. This paragraph only applies with respect to the national ambient air quality standard for which an area is newly designated nonattainment and does not affect the area's requirements with respect to all other national ambient air quality standards for which the area is designated nonattainment or has been redesignated from nonattainment to attainment with a maintenance plan pursuant to section 7505a[1] of this title (including any pre-existing national ambient air quality standard for a pollutant for which a new or revised standard has been issued).

(7) CONFORMITY HORIZON FOR TRANSPORTATION PLANS.—

(A) IN GENERAL.—Each conformity determination required under this section for a transportation plan under section 134(i) of title 23 or section 5303(i) of title 49 shall require a demonstration of conformity for the period ending on either the final year of the transportation plan, or at the election of the metropolitan planning organization, after consultation with the air pollution control agency and solicitation of public comments and consideration of such comments, the longest of the following periods:

(i) The first 10-year period of any such transportation plan.

(ii) The latest year in the implementation plan applicable to the area that contains a motor vehicle emission budget.

(iii) The year after the completion date of a regionally significant project if the project is included in the transportation improvement program or the project requires approval before the subsequent conformity determination.

(B) REGIONAL EMISSIONS ANALYSIS.—The conformity determination shall be accompanied by a regional emissions analysis for the last year of the transportation plan and for any year shown to exceed emission budgets by a prior analysis, if such year extends beyond the applicable period as determined under subparagraph (A).

(C) EXCEPTION.—In any case in which an area has a revision to an implementation plan under section 7505a(b) of this title and the Administrator has found the motor vehicles emissions budgets from that revision to be adequate in accordance with section 93.118(e)(4) of title 40, Code of Federal Regulations (as in effect on October 1, 2004), or has approved the revision, the demonstration of conformity at the election of the metropolitan planning organization, after consultation with the air pollution control agency and solicitation of public comments and consideration of such comments, shall be required to extend only through the last year of the implementa-

[2] So in original. Probably should be "paragraph (5),".

tion plan required under section 7505a(b) of this title.

(D) EFFECT OF ELECTION.—Any election by a metropolitan planning organization under this paragraph shall continue in effect until the metropolitan planning organization elects otherwise.

(E) AIR POLLUTION CONTROL AGENCY DEFINED.—In this paragraph, the term ''air pollution control agency'' means an air pollution control agency (as defined in section 7602(b) of this title) that is responsible for developing plans or controlling air pollution within the area covered by a transportation plan.

(8) SUBSTITUTION OF TRANSPORTATION CONTROL MEASURES.—

(A) IN GENERAL.—Transportation control measures that are specified in an implementation plan may be replaced or added to the implementation plan with alternate or additional transportation control measures—

(i) if the substitute measures achieve equivalent or greater emissions reductions than the control measure to be replaced, as demonstrated with an emissions impact analysis that is consistent with the current methodology used for evaluating the replaced control measure in the implementation plan;

(ii) if the substitute control measures are implemented—

(I) in accordance with a schedule that is consistent with the schedule provided for control measures in the implementation plan; or

(II) if the implementation plan date for implementation of the control measure to be replaced has passed, as soon as practicable after the implementation plan date but not later than the date on which emission reductions are necessary to achieve the purpose of the implementation plan;

(iii) if the substitute and additional control measures are accompanied with evidence of adequate personnel and funding and authority under State or local law to implement, monitor, and enforce the control measures;

(iv) if the substitute and additional control measures were developed through a collaborative process that included—

(I) participation by representatives of all affected jurisdictions (including local air pollution control agencies, the State air pollution control agency, and State and local transportation agencies);

(II) consultation with the Administrator; and

(III) reasonable public notice and opportunity for comment; and

(v) if the metropolitan planning organization, State air pollution control agency, and the Administrator concur with the equivalency of the substitute or additional control measures.

(B) ADOPTION.—(i) Concurrence by the metropolitan planning organization, State air pollution control agency and the Administrator as required by subparagraph (A)(v) shall constitute adoption of the substitute or additional control measures so long as the requirements of subparagraphs (A)(i), (A)(ii), (A)(iii) and (A)(iv) are met.

(ii) Once adopted, the substitute or additional control measures become, by operation of law, part of the State implementation plan and become federally enforceable.

(iii) Within 90 days of its concurrence under subparagraph (A)(v), the State air pollution control agency shall submit the substitute or additional control measure to the Administrator for incorporation in the codification of the applicable implementation plan. Nothwithstanding[3] any other provision of this chapter, no additional State process shall be necessary to support such revision to the applicable plan.

(C) NO REQUIREMENT FOR EXPRESS PERMISSION.—The substitution or addition of a transportation control measure in accordance with this paragraph and the funding or approval of such a control measure shall not be contingent on the existence of any provision in the applicable implementation plan that expressly permits such a substitution or addition.

(D) NO REQUIREMENT FOR NEW CONFORMITY DETERMINATION.—The substitution or addition of a transportation control measure in accordance with this paragraph shall not require—

(i) a new conformity determination for the transportation plan; or

(ii) a revision of the implementation plan.

(E) CONTINUATION OF CONTROL MEASURE BEING REPLACED.—A control measure that is being replaced by a substitute control measure under this paragraph shall remain in effect until the substitute control measure is adopted by the State pursuant to subparagraph (B).

(F) EFFECT OF ADOPTION.—Adoption of a substitute control measure shall constitute rescission of the previously applicable control measure.

(9) LAPSE OF CONFORMITY.—If a conformity determination required under this subsection for a transportation plan under section 134(i) of title 23 or section 5303(i) of title 49 or a transportation improvement program under section 134(j) of such title 23 or under section 5303(j) of such title 49 is not made by the applicable deadline and such failure is not corrected by additional measures to either reduce motor vehicle emissions sufficient to demonstrate compliance with the requirements of this subsection within 12 months after such deadline or other measures sufficient to correct such failures, the transportation plan shall lapse.

(10) LAPSE.—In this subsection, the term ''lapse'' means that the conformity determination for a transportation plan or transportation improvement program has expired, and thus there is no currently conforming transportation plan or transportation improvement program.

**(d) Priority of achieving and maintaining national primary ambient air quality standards**

Each department, agency, or instrumentality of the Federal Government having authority to

[3] So in original. Probably should be ''Notwithstanding''.

conduct or support any program with air-quality related transportation consequences shall give priority in the exercise of such authority, consistent with statutory requirements for allocation among States or other jurisdictions, to the implementation of those portions of plans prepared under this section to achieve and maintain the national primary ambient air-quality standard. This paragraph extends to, but is not limited to, authority exercised under chapter 53 of title 49, title 23, and the Housing and Urban Development Act.

(July 14, 1955, ch. 360, title I, §176, as added Pub. L. 95–95, title I, §129(b), Aug. 7, 1977, 91 Stat. 749; amended Pub. L. 95–190, §14(a)(59), Nov. 16, 1977, 91 Stat. 1403; Pub. L. 101–549, title I, §§101(f), 110(4), Nov. 15, 1990, 104 Stat. 2409, 2470; Pub. L. 104–59, title III, §305(b), Nov. 28, 1995, 109 Stat. 580; Pub. L. 104–260, §1, Oct. 9, 1996, 110 Stat. 3175; Pub. L. 106–377, §1(a)(1) [title III], Oct. 27, 2000, 114 Stat. 1441, 1441A–44; Pub. L. 109–59, title VI, §6011(a)–(f), Aug. 10, 2005, 119 Stat. 1878–1881.)

**Editorial Notes**

References in Text

Paragraph (4) of subsec. (c), referred to in subsec. (c)(3), was amended by Pub. L. 109–59, title VI, §6011(f), Aug. 10, 2005, 119 Stat. 1881, to redesignate subpar. (C) as (E), strike it out, and add new subpars. (C) and (E). See 2005 Amendment notes below.

Section 7505a of this title, referred to in subsec. (c)(6), was in the original ''section 175(A)'' and was translated as reading ''section 175A'', meaning section 175A of act July 14, 1955, which is classified to section 7505a of this title, to reflect the probable intent of Congress.

The Housing and Urban Development Act, referred to in subsec. (d), may be the name for a series of acts sharing the same name but enacted in different years by Pub. L. 89–117, Aug. 10, 1965, 79 Stat. 451; Pub. L. 90–448, Aug. 1, 1968, 82 Stat. 476; Pub. L. 91–152, Dec. 24, 1969, 83 Stat. 379; and Pub. L. 91–609, Dec. 31, 1970, 84 Stat. 1770, respectively. For complete classification of these Acts to the Code, see Short Title notes set out under section 1701 of Title 12, Banks and Banking, and Tables.

Codification

In subsecs. (c)(2) and (d), ''chapter 53 of title 49'' substituted for ''the Urban Mass Transportation Act [49 App. U.S.C. 1601 et seq.]'' and in subsec. (c)(4)(F) substituted for ''Federal Transit Act'' on authority of Pub. L. 103–272, §6(b), July 5, 1994, 108 Stat. 1378 (the first section of which enacted subtitles II, III, and V to X of Title 49, Transportation), and of Pub. L. 102–240, title III, §3003(b), Dec. 18, 1991, 105 Stat. 2088, which provided that references in laws to the Urban Mass Transportation Act of 1964 be deemed to be references to the Federal Transit Act.

Amendments

2005—Subsec. (c)(2)(E). Pub. L. 109–59, §6011(a), added subpar. (E).

Subsec. (c)(4). Pub. L. 109–59, §6011(f)(1)–(3), inserted par. (4) and subpar. (A) headings, in first sentence substituted ''The Administrator shall promulgate, and periodically update,'' for ''No later than one year after November 15, 1990, the Administrator shall promulgate'', designated second sentence as subpar. (B), inserted heading, substituted ''The Administrator, with the concurrence of the Secretary of Transportation, shall promulgate, and periodically update,'' for ''No later than one year after November 15, 1990, the Administrator, with the concurrence of the Secretary of Transportation, shall promulgate'', designated third sentence as subpar. (C), inserted heading, substituted ''A civil action'' for ''A suit'', and redesignated former subpars. (B) to (D) as (D) to (F), respectively.

Subsec. (c)(4)(B)(ii). Pub. L. 109–59, §6011(b), amended cl. (ii) generally. Prior to amendment, cl. (ii) read as follows: ''address the appropriate frequency for making conformity determinations, but in no case shall such determinations for transportation plans and programs be less frequent than every three years; and''.

Subsec. (c)(4)(E). Pub. L. 109–59, §6011(f)(4), added subpar. (E) and struck out former subpar. (E) which read as follows: ''Such procedures shall also include a requirement that each State shall submit to the Administrator and the Secretary of Transportation within 24 months of November 15, 1990, a revision to its implementation plan that includes criteria and procedures for assessing the conformity of any plan, program, or project subject to the conformity requirements of this subsection.''

Subsec. (c)(7) to (10). Pub. L. 109–59, §6011(c)–(e), added pars. (7) to (10).

2000—Subsec. (c)(6). Pub. L. 106–377 added par. (6).

1996—Subsec. (c)(4)(D). Pub. L. 104–260 added subpar. (D).

1995—Subsec. (c)(5). Pub. L. 104–59 added par. (5).

1990—Subsecs. (a), (b). Pub. L. 101–549, §110(4), struck out subsec. (a) which related to approval of projects or award of grants, and subsec. (b) which related to implementation of approved or promulgated plans.

Subsec. (c). Pub. L. 101–549, §101(f), designated existing provisions as par. (1), struck out ''(1)'', ''(2)'', ''(3)'', and ''(4)'' before ''engage in'', ''support in'', ''license or'', and ''approve, any'', respectively, substituted ''conform to an implementation plan after it'' for ''conform to a plan after it'', ''conform to an implementation plan approved'' for ''conform to a plan approved'', and ''conformity to such an implementation plan shall'' for ''conformity to such a plan shall'', inserted ''Conformity to an implementation plan means—'' followed immediately by subpars. (A) and (B) and closing provisions relating to determination of conformity being based on recent estimates of emissions and the determination of such estimates, and added pars. (2) to (4).

1977—Subsec. (a)(1). Pub. L. 95–190 inserted ''national'' before ''primary''.

**Statutory Notes and Related Subsidiaries**

Regulations

Pub. L. 109–59, title VI, §6011(g), Aug. 10, 2005, 119 Stat. 1882, provided that: ''Not later than 2 years after the date of enactment of this Act [Aug. 10, 2005], the Administrator of the Environmental Protection Agency shall promulgate revised regulations to implement the changes made by this section [amending this section].''

### § 7506a. Interstate transport commissions

#### (a) Authority to establish interstate transport regions

Whenever, on the Administrator's own motion or by petition from the Governor of any State, the Administrator has reason to believe that the interstate transport of air pollutants from one or more States contributes significantly to a violation of a national ambient air quality standard in one or more other States, the Administrator may establish, by rule, a transport region for such pollutant that includes such States. The Administrator, on the Administrator's own motion or upon petition from the Governor of any State, or upon the recommendation of a transport commission established under subsection (b), may—

(1) add any State or portion of a State to any region established under this subsection whenever the Administrator has reason to believe that the interstate transport of air pol-

**49 U.S.C. § 303**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



**§ 303. Policy on lands, wildlife and waterfowl refuges, and historic sites**

(a) It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites.

(b) The Secretary of Transportation shall cooperate and consult with the Secretaries of the Interior, Housing and Urban Development, and Agriculture, and with the States, in developing transportation plans and programs that include measures to maintain or enhance the natural beauty of lands crossed by transportation activities or facilities.

(c) APPROVAL OF PROGRAMS AND PROJECTS.—Subject to subsections (d) and (h), the Secretary may approve a transportation program or project (other than any project for a park road or parkway under section 204[1] of title 23) requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if—

(1) there is no prudent and feasible alternative to using that land; and

(2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

(d) DE MINIMIS IMPACTS.—

(1) REQUIREMENTS.—

(A) REQUIREMENTS FOR HISTORIC SITES.—The requirements of this section shall be considered to be satisfied with respect to an area described in paragraph (2) if the Secretary determines, in accordance with this subsection, that a transportation program or project will have a de minimis impact on the area.

(B) REQUIREMENTS FOR PARKS, RECREATION AREAS, AND WILDLIFE OR WATERFOWL REFUGES.—The requirements of subsection (c)(1) shall be considered to be satisfied with respect to an area described in paragraph (3) if the Secretary determines, in accordance with this subsection, that a transportation program or project will have a de minimis impact on the area. The requirements of subsection (c)(2) with respect to an area described in paragraph (3) shall not include an alternatives analysis.

(C) CRITERIA.—In making any determination under this subsection, the Secretary shall consider to be part of a transportation program or project any avoidance, minimization, mitigation, or enhancement measures that are required to be implemented as a condition of approval of the transportation program or project.

(2) HISTORIC SITES.—With respect to historic sites, the Secretary may make a finding of de minimis impact only if—

(A) the Secretary has determined, in accordance with the consultation process required under section 306108 of title 54, United States Code,[2] that—

(i) the transportation program or project will have no adverse effect on the historic site; or

(ii) there will be no historic properties affected by the transportation program or project;

(B) the finding of the Secretary has received written concurrence from the applicable State historic preservation officer or tribal historic preservation officer (and from the Advisory Council on Historic Preservation if the Council is participating in the consultation process); and

(C) the finding of the Secretary has been developed in consultation with parties consulting as part of the process referred to in subparagraph (A).

(3) PARKS, RECREATION AREAS, AND WILDLIFE OR WATERFOWL REFUGES.—With respect to parks, recreation areas, or wildlife or waterfowl refuges, the Secretary may make a finding of de minimis impact only if—

(A) the Secretary has determined, after public notice and opportunity for public review and comment, that the transportation program or project will not adversely affect the activities, features, and attributes of the park, recreation area, or wildlife or waterfowl refuge eligible for protection under this section; and

(B) the finding of the Secretary has received concurrence from the officials with jurisdiction over the park, recreation area, or wildlife or waterfowl refuge.

(e) SATISFACTION OF REQUIREMENTS FOR CERTAIN HISTORIC SITES.—

(1) IN GENERAL.—The Secretary shall—

(A) align, to the maximum extent practicable, the requirements of this section with the requirements of the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.) and section 306108 of title 54, including implementing regulations; and

(B) not later than 90 days after the date of enactment of this subsection, coordinate with the Secretary of the Interior and the Executive Director of the Advisory Council on Historic Preservation (referred to in this subsection as the ''Council'') to establish procedures to satisfy the requirements described in subparagraph (A) (including regulations).

(2) AVOIDANCE ALTERNATIVE ANALYSIS.—

(A) IN GENERAL.—If, in an analysis required under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.), the Secretary determines that there is no feasible or prudent alternative to avoid use of a historic site, the Secretary may—

(i) include the determination of the Secretary in the analysis required under that Act;

(ii) provide a notice of the determination to—

[1] See References in Text note below.

[2] So in original. The words '', United States Code'' probably should not appear.

(I) each applicable State historic preservation officer and tribal historic preservation officer;

(II) the Council, if the Council is participating in the consultation process under section 306108 of title 54; and

(III) the Secretary of the Interior; and

(iii) request from the applicable preservation officer, the Council, and the Secretary of the Interior a concurrence that the determination is sufficient to satisfy subsection (c)(1).

(B) CONCURRENCE.—If the applicable preservation officer, the Council, and the Secretary of the Interior each provide a concurrence requested under subparagraph (A)(iii), no further analysis under subsection (c)(1) shall be required.

(C) PUBLICATION.—A notice of a determination, together with each relevant concurrence to that determination, under subparagraph (A) shall—

(i) be included in the record of decision or finding of no significant impact of the Secretary; and

(ii) be posted on an appropriate Federal website by not later than 3 days after the date of receipt by the Secretary of all concurrences requested under subparagraph (A)(iii).

(3) ALIGNING HISTORICAL REVIEWS.—

(A) IN GENERAL.—If the Secretary, the applicable preservation officer, the Council, and the Secretary of the Interior concur that no feasible and prudent alternative exists as described in paragraph (2), the Secretary may provide to the applicable preservation officer, the Council, and the Secretary of the Interior notice of the intent of the Secretary to satisfy subsection (c)(2) through the consultation requirements of section 306108 of title 54.

(B) SATISFACTION OF CONDITIONS.—To satisfy subsection (c)(2), the applicable preservation officer, the Council, and the Secretary of the Interior shall concur in the treatment of the applicable historic site described in the memorandum of agreement or programmatic agreement developed under section 306108 of title 54.

(f) REFERENCES TO PAST TRANSPORTATION ENVIRONMENTAL AUTHORITIES.—

(1) SECTION 4(F) REQUIREMENTS.—The requirements of this section are commonly referred to as section 4(f) requirements (see section 4(f) of the Department of Transportation Act (Public Law 89–670; 80 Stat. 934) as in effect before the repeal of that section).

(2) SECTION 106 REQUIREMENTS.—The requirements of section 306108 of title 54 are commonly referred to as section 106 requirements (see section 106 of the National Historic Preservation Act of 1966 (Public Law 89–665; 80 Stat. 917) as in effect before the repeal of that section).

(g) BRIDGE EXEMPTION FROM CONSIDERATION.—A common post-1945 concrete or steel bridge or culvert (as described in 77 Fed. Reg. 68790) that is exempt from individual review under section 306108 of title 54 shall be exempt from consideration under this section.

(h) RAIL AND TRANSIT.—

(1) IN GENERAL.—Improvements to, or the maintenance, rehabilitation, or operation of, railroad or rail transit lines or elements thereof that are in use or were historically used for the transportation of goods or passengers shall not be considered a use of a historic site under subsection (c), regardless of whether the railroad or rail transit line or element thereof is listed on, or eligible for listing on, the National Register of Historic Places.

(2) EXCEPTIONS.—

(A) IN GENERAL.—Paragraph (1) shall not apply to—

(i) stations; or

(ii) bridges or tunnels located on—

(I) railroad lines that have been abandoned; or

(II) transit lines that are not in use.

(B) CLARIFICATION WITH RESPECT TO CERTAIN BRIDGES AND TUNNELS.—The bridges and tunnels referred to in subparagraph (A)(ii) do not include bridges or tunnels located on railroad or transit lines—

(i) over which service has been discontinued; or

(ii) that have been railbanked or otherwise reserved for the transportation of goods or passengers.

(Pub. L. 97–449, §1(b), Jan. 12, 1983, 96 Stat. 2419; Pub. L. 100–17, title I, §133(d), Apr. 2, 1987, 101 Stat. 173; Pub. L. 109–59, title VI, §6009(a)(2), Aug. 10, 2005, 119 Stat. 1875; Pub. L. 113–287, §5(p), Dec. 19, 2014, 128 Stat. 3272; Pub. L. 114–94, div. A, title I, §§1301(b), 1302(b), 1303(b), title XI, §11502(b), Dec. 4, 2015, 129 Stat. 1376, 1378, 1690.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 303(a) ......... | 49:1651(b)(2). | Oct. 15, 1966, Pub. L. 89–670, §2(b)(2), 80 Stat. 931. |
| | 49:1653(f) (1st sentence). | Oct. 15, 1966, Pub. L. 89–670, §4(f), 80 Stat. 934; restated Aug. 23, 1968, Pub. L. 90–495, §18(b), 82 Stat. 824. |
| 303(b) ......... | 49:1653(f) (2d sentence). | |
| 303(c) ......... | 49:1653(f) (less 1st, 2d sentences). | |

In subsection (a), the words "hereby declared to be" before "the policy" are omitted as surplus. The words "of the United States Government" are substituted for "national" for clarity and consistency.

In subsection (b), the words "crossed by transportation activities or facilities" are substituted for "traversed" for clarity.

In subsection (c), before clause (1), the words "After August 23, 1968" after "Secretary" are omitted as executed. The word "transportation" is inserted before "program" for clarity. In clause (2), the words "or project" are added for consistency.

**Editorial Notes**

REFERENCES IN TEXT

Section 204 of title 23, referred to in subsec. (c), was repealed and a new section 204 enacted by Pub. L. 112–141, div. A, title I, §1119(a), July 6, 2012, 126 Stat. 473, 489.

The National Environmental Policy Act of 1969, referred to in subsec. (e)(1)(A), (2)(A), is Pub. L. 91–190,

Jan. 1, 1970, 83 Stat. 852, which is classified generally to chapter 55 (§ 4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

The date of enactment of this subsection, referred to in subsec. (e)(1)(B), is the date of enactment of Pub. L. 114–94, which was approved Dec. 4, 2015.

AMENDMENTS

2015—Subsec. (c). Pub. L. 114–94, § 11502(b)(1), substituted ''subsections (d) and (h)'' for ''subsection (d)''.

Subsec. (e). Pub. L. 114–94, § 1301(b), added subsec. (e).

Subsec. (f). Pub. L. 114–94, § 1302(b), added subsec. (f).

Subsec. (g). Pub. L. 114–94, § 1303(b), added subsec. (g).

Subsec. (h). Pub. L. 114–94, § 11502(b)(2), added subsec. (h).

2014—Subsec. (d)(2)(A). Pub. L. 113–287 substituted ''section 306108 of title 54, United States Code'' for ''section 106 of the National Historic Preservation Act (16 U.S.C. 470f)'' in introductory provisions.

2005—Subsec. (c). Pub. L. 109–59, § 6009(a)(2)(A), inserted heading and substituted ''Subject to subsection (d), the Secretary'' for ''The Secretary'' in introductory provisions.

Subsec. (d). Pub. L. 109–59, § 6009(a)(2)(B), added subsec. (d).

1987—Subsec. (c). Pub. L. 100–17 inserted ''(other than any project for a park road or parkway under section 204 of title 23)'' after ''program or project''.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2015 AMENDMENT

Amendment by Pub. L. 114–94 effective Oct. 1, 2015, see section 1003 of Pub. L. 114–94, set out as a note under section 5313 of Title 5, Government Organization and Employees.

TREATMENT OF MILITARY FLIGHT OPERATIONS

Pub. L. 105–85, div. A, title X, § 1079, Nov. 18, 1997, 111 Stat. 1916, provided that: ''No military flight operation (including a military training flight), or designation of airspace for such an operation, may be treated as a transportation program or project for purposes of section 303(c) of title 49, United States Code.''

### § 303a. Development of water transportation

(a) POLICY.—It is the policy of Congress—

(1) to promote, encourage, and develop water transportation, service, and facilities for the commerce of the United States; and

(2) to foster and preserve rail and water transportation.

(b) DEFINITION.—In this section, ''inland waterway'' includes the Great Lakes.

(c) REQUIREMENTS.—The Secretary of Transportation shall—

(1) investigate the types of vessels suitable for different classes of inland waterways to promote, encourage, and develop inland waterway transportation facilities for the commerce of the United States;

(2) investigate water terminals, both for inland waterway traffic and for through traffic by water and rail, including the necessary docks, warehouses, and equipment, and investigate railroad spurs and switches connecting with those water terminals, to develop the types most appropriate for different locations and for transferring passengers or property between water carriers and rail carriers more expeditiously and economically;

(3) consult with communities, cities, and towns about the location of water terminals, and cooperate with them in preparing plans for terminal facilities;

(4) investigate the existing status of water transportation on the different inland waterways of the United States to learn the extent to which—

(A) the waterways are being used to their capacity and are meeting the demands of traffic; and

(B) water carriers using those waterways are interchanging traffic with rail carriers;

(5) investigate other matters that may promote and encourage inland water transportation; and

(6) compile, publish, and distribute information about transportation on inland waterways that the Secretary considers useful to the commercial interests of the United States.

(Pub. L. 103–272, § 4(j)(6)(A), July 5, 1994, 108 Stat. 1366.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 303a ........... | 49 App.:142. | Feb. 28, 1920, ch. 91, § 500, 41 Stat. 499; Aug. 6, 1981, Pub. L. 97–31, § 12(9), 95 Stat. 154. |

Section 4(j)(6)(A) amends 49:ch. 3 by restating 49 App.:142 as section 303a because the provision more appropriately belongs in chapter 3.

In subsection (a)(2), the words ''in full vigor both'' are omitted as surplus.

In subsection (b), the words ''be construed to'' are omitted as surplus.

In subsection (c)(1), the word ''appropriate'' is omitted as surplus. The word ''vessels'' is substituted for ''boats'' for consistency in the revised title and with other titles of the United States Code.

In subsection (c)(2), the words ''the subject of'', ''apparatus'', ''appliances in connection therewith'', and ''or interchange'' are omitted as surplus.

In subsection (c)(3), the words ''appropriate'' and ''suitable'' are omitted as surplus.

In subsection (c)(6), the words ''province and'', ''from time to time'', and ''useful statistics, data, and'' are omitted as surplus.

**Statutory Notes and Related Subsidiaries**

ARCTIC SHIPPING FEDERAL ADVISORY COMMITTEE

Pub. L. 116–283, div. G, title LVXXXIV [LXXXIV], § 8426, Jan. 1, 2021, 134 Stat. 4730, provided that:

''(a) PURPOSE.—The purpose of this section is to establish a Federal advisory committee to provide policy recommendations to the Secretary of Transportation on positioning the United States to take advantage of emerging opportunities for Arctic maritime transportation.

''(b) DEFINITIONS.—In this section:

''(1) ADVISORY COMMITTEE.—The term 'Advisory Committee' means the Arctic Shipping Federal Advisory Committee established under subsection (c)(1).

''(2) ARCTIC.—The term 'Arctic' has the meaning given the term in section 112 of the Arctic Research and Policy Act of 1984 (15 U.S.C. 4111).

''(3) Arctic sea routes.—The term 'Arctic Sea Routes' means the international Northern Sea Route, the Transpolar Sea Route, and the Northwest Passage.

''(c) ESTABLISHMENT OF THE ARCTIC SHIPPING FEDERAL ADVISORY COMMITTEE.—

''(1) ESTABLISHMENT OF ADVISORY COMMITTEE.—

''(A) IN GENERAL.—The Secretary of Transportation, in coordination with the Secretary of State,

**54 U.S.C. §§ 300308, 300311**

### § 300307. Historic preservation review commission

In this division, the term ''historic preservation review commission'' means a board, council, commission, or other similar collegial body—

(1) that is established by State or local legislation as provided in section 302503(a)(2) of this title; and

(2) the members of which are appointed by the chief elected official of a jurisdiction (unless State or local law provides for appointment by another official) from among—

(A) professionals in the disciplines of architecture, history, architectural history, planning, prehistoric and historic archeology, folklore, cultural anthropology, curation, conservation, and landscape architecture, or related disciplines, to the extent that those professionals are available in the community; and

(B) other individuals who have demonstrated special interest, experience, or knowledge in history, architecture, or related disciplines and will provide for an adequate and qualified commission.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3189.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 300307 ......... | 16 U.S.C. 470w(13). | Pub. L. 89–665, title III, § 301(13), as added Pub. L. 96–515, title V, § 501, Dec. 12, 1980, 94 Stat. 3002; Pub. L. 102–575, title XL, § 4019(a)(11), Oct. 30, 1992, 106 Stat. 4764. |

### § 300308. Historic property

In this division, the term ''historic property'' means any prehistoric or historic district, site, building, structure, or object included on, or eligible for inclusion on, the National Register, including artifacts, records, and material remains relating to the district, site, building, structure, or object.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3189.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 300308 ......... | 16 U.S.C. 470w(5). | Pub. L. 89–665, title III, § 301(5), as added Pub. L. 96–515, title V, § 501, Dec. 12, 1980, 94 Stat. 3001; Pub. L. 102–575, title XL, § 4019(a)(4), Oct. 30, 1992, 106 Stat. 4764. |

The words ''historic resource'' are omitted so that a uniform term is used throughout this division.

### § 300309. Indian tribe

In this division, the term ''Indian tribe'' means an Indian tribe, band, nation, or other organized group or community, including a Native village, Regional Corporation or Village Corporation (as those terms are defined in section 3 of the Alaska Native Claims Settlement Act (43 U.S.C. 1602)), that is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3189.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 300309 ......... | 16 U.S.C. 470w(4). | Pub. L. 89–665, title III, § 301(4), as added Pub. L. 96–515, title V, § 501, Dec. 12, 1980, 94 Stat. 3001; Pub. L. 102–575, title XL, § 4019(a)(3), Oct. 30, 1992, 106 Stat. 4763. |

### § 300310. Local government

In this division, the term ''local government'' means a city, county, township, municipality, or borough, or any other general purpose political subdivision of any State.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3189.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 300310 ......... | 16 U.S.C. 470w(3). | Pub. L. 89–665, title III, § 301(3), as added Pub. L. 96–515, title V, § 501, Dec. 12, 1980, 94 Stat. 3001. |

The word ''parish'' is omitted as unnecessary because of 1 U.S.C. 2.

### § 300311. National Register

In this division, the term ''National Register'' means the National Register of Historic Places maintained under chapter 3021 of this title.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3189.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 300311 ......... | 16 U.S.C. 470w(6). | Pub. L. 89–665, title III, § 301(6), as added Pub. L. 96–515, title V, § 501, Dec. 12, 1980, 94 Stat. 3001. |

### § 300312. National Trust

In this division, the term ''National Trust'' means the National Trust for Historic Preservation in the United States established under section 312102 of this title.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3189.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 300312 ......... | no source. | |

### § 300313. Native Hawaiian

In this division, the term ''Native Hawaiian'' means any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes Hawaii.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3190.)

**54 U.S.C. §§ 300320**

### § 300319. Tribal land

In this division, the term "tribal land" means—

(1) all land within the exterior boundaries of any Indian reservation; and

(2) all dependent Indian communities.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3191.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 300319 ......... | 16 U.S.C. 470w(14). | Pub. L. 89–665, title III, § 301(14), as added Pub. L. 102–575, title XL, § 4019(a)(12), Oct. 30, 1992, 106 Stat. 4764. |

### § 300320. Undertaking

In this division, the term "undertaking" means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including—

(1) those carried out by or on behalf of the Federal agency;

(2) those carried out with Federal financial assistance;

(3) those requiring a Federal permit, license, or approval; and

(4) those subject to State or local regulation administered pursuant to a delegation or approval by a Federal agency.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3191.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 300320 ......... | 16 U.S.C. 470w(7). | Pub. L. 89–665, title III, § 301(7), as added Pub. L. 96–515, title V, § 501, Dec. 12, 1980, 94 Stat. 3001; Pub. L. 102–575, title XL, § 4019(a)(5), Oct. 30, 1992, 106 Stat. 4764. |

### § 300321. World Heritage Convention

In this division, the term "World Heritage Convention" means the Convention concerning the Protection of the World Cultural and Natural Heritage, done at Paris November 23, 1972 (27 UST 37).

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3191.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 300321 ......... | no source. | |

The words "the Trust Territory of the Pacific Islands . . . and, upon termination of the Trusteeship Agreement for the Trust Territories of the Pacific Islands" are omitted as obsolete. See note at 48 U.S.C. prec. 1681. For continued application of certain laws of the United States in certain cases, see the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (48 U.S.C. 1801 note), the Compact of Free Association between the Government of the United States of America and the Governments of the Marshall Islands and the Federated States of Micronesia (48 U.S.C. 1901 note), and the Compact of Free Association between the Government of the United States of America and the Government of Palau (48 U.S.C. 1931 note).

SUBDIVISION 2—HISTORIC PRESERVATION PROGRAM

## CHAPTER 3021—NATIONAL REGISTER OF HISTORIC PLACES

Sec.
302101. Maintenance by Secretary.
302102. Inclusion of properties on National Register.
302103. Criteria and regulations relating to National Register, National Historic Landmarks, and World Heritage List.
302104. Nominations for inclusion on National Register.
302105. Owner participation in nomination process.
302106. Retention of name.
302107. Regulations.
302108. Review of threats to historic property.

### § 302101. Maintenance by Secretary

The Secretary may expand and maintain a National Register of Historic Places composed of districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3191.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 302101 ......... | 16 U.S.C. 470a(a)(1)(A) (1st sentence). | Pub. L. 89–665, title I, § 101(a)(1)(A) (1st sentence), Oct. 15, 1966, 80 Stat. 915; Pub. L. 91–383, § 11, as added Pub. L. 94–458, § 2, Oct. 7, 1976, 90 Stat. 1942; Pub. L. 93–54, § 1(d), July 1, 1973, 87 Stat. 139; Pub. L. 96–205, title VI, § 608(a)(1), (2), Mar. 12, 1980, 94 Stat. 92; Pub. L. 96–515, title II, § 201(a), Dec. 12, 1980, 94 Stat. 2988. |

**Statutory Notes and Related Subsidiaries**

RECOVERY OF FEES FOR REVIEW SERVICES FOR HISTORIC PRESERVATION TAX CERTIFICATION

Pub. L. 106–113, div. B, § 1000(a)(3) [title I], Nov. 29, 1999, 113 Stat. 1535, 1501A–142, provided in part: "That notwithstanding any other provision of law, the National Park Service may hereafter recover all fees derived from providing necessary review services associated with historic preservation tax certification, and such funds shall be available until expended without further appropriation for the costs of such review services".

HISTORICALLY BLACK COLLEGES AND UNIVERSITIES HISTORIC BUILDING RESTORATION AND PRESERVATION

Pub. L. 104–333, div. I, title V, § 507, Nov. 12, 1996, 110 Stat. 4156, as amended by Pub. L. 108–7, div. F, title I, § 150, Feb. 20, 2003, 117 Stat. 245; Pub. L. 116–9, title II, § 2402, Mar. 12, 2019, 133 Stat. 747, provided that:

"(a) AUTHORITY TO MAKE GRANTS.—From the amounts made available to carry out the National Historic Preservation Act [see 54 U.S.C. 300101 et seq.], the Secretary of the Interior shall make grants in accordance with this section to eligible historically black colleges and universities for the preservation and restoration of historic buildings and structures on the campus of these institutions.

"(b) GRANT CONDITIONS.—Grants made under subsection (a) shall be subject to the condition that the grantee covenants, for the period of time specified by the Secretary, that—

"(1) no alteration will be made in the property with respect to which the grant is made without the concurrence of the Secretary; and

**54 U.S.C. § 306108**

### § 306108. Effect of undertaking on historic property

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property. The head of the Federal agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3227.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 306108 ......... | 16 U.S.C. 470f. | Pub. L. 89–665, title I, § 106, Oct. 15, 1966, 80 Stat. 917; Pub. L. 94–422, title II, § 201(3), Sept. 28, 1976, 90 Stat. 1320. |

The words ''historic property'' are substituted for ''district, site, building, structure, or object that is included in or eligible for inclusion in the National Register'' because of the definition of ''historic property'' in section 300308 of the new title.

### § 306109. Costs of preservation as eligible project costs

A Federal agency may include the costs of preservation activities of the agency under this division as eligible project costs in all undertakings of the agency or assisted by the agency. The eligible project costs may include amounts paid by a Federal agency to a State to be used in carrying out the preservation responsibilities of the Federal agency under this division, and reasonable costs may be charged to Federal licensees and permittees as a condition to the issuance of the license or permit.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3227.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 306109 ......... | 16 U.S.C. 470h–2(g). | Pub. L. 89–665, title I, § 110(g), as added Pub. L. 96–515, title II, § 206, Dec. 12, 1980, 94 Stat. 2996. |

### § 306110. Annual preservation awards program

The Secretary shall establish an annual preservation awards program under which the Secretary may make monetary awards in amounts of not to exceed $1,000 and provide citations for special achievement to officers and employees of Federal, State, and certified local governments in recognition of their outstanding contributions to the preservation of historic property. The program may include the issuance of annual awards by the President to any citizen of the United States recommended for the award by the Secretary.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3227.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 306110 ......... | 16 U.S.C. 470h–2(h). | Pub. L. 89–665, title I, § 110(h), as added Pub. L. 96–515, title II, § 206, Dec. 12, 1980, 94 Stat. 2997. |

The words ''historic property'' are substituted for ''historic resources'' for consistency because the defined term in the new division is ''historic property''.

### § 306111. Environmental impact statement

Nothing in this division shall be construed to—

(1) require the preparation of an environmental impact statement where the statement would not otherwise be required under the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.); or

(2) provide any exemption from any requirement respecting the preparation of an environmental impact statement under that Act.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3227.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 306111 ......... | 16 U.S.C. 470h–2(i). | Pub. L. 89–665, title I, § 110(i), as added Pub. L. 96–515, title II, § 206, Dec. 12, 1980, 94 Stat. 2997. |

**Editorial Notes**

REFERENCES IN TEXT

The National Environmental Policy Act of 1969, referred to in text, is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, which is classified generally to chapter 55 (§ 4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

### § 306112. Waiver of provisions in event of natural disaster or imminent threat to national security

The Secretary shall promulgate regulations under which the requirements of this subchapter (except section 306108) may be waived in whole or in part in the event of a major natural disaster or an imminent threat to national security.

(Pub. L. 113–287, § 3, Dec. 19, 2014, 128 Stat. 3227.)

HISTORICAL AND REVISION NOTES

| *Revised Section* | *Source (U.S. Code)* | *Source (Statutes at Large)* |
|---|---|---|
| 306112 ......... | 16 U.S.C. 470h–2(j). | Pub. L. 89–665, title I, § 110(j), as added Pub. L. 96–515, title II, § 206, Dec. 12, 1980, 94 Stat. 2997. |

### § 306113. Anticipatory demolition

Each Federal agency shall ensure that the agency will not grant a loan, loan guarantee, permit, license, or other assistance to an applicant that, with intent to avoid the requirements of section 306108 of this title, has intentionally significantly adversely affected a historic property to which the grant would relate, or having legal power to prevent it, has allowed the sig-

**VA. CODE ANN. § 10.1-1307**

Code of Virginia
Title 10.1. Conservation
Subtitle II. Activities Administered by Other Entities
Chapter 13. Air Pollution Control Board
Article 1. General Provisions

# § 10.1-1307. Further powers and duties of Board and Department

A. The Board shall have the power to control and regulate its internal affairs. The Department shall have the power to initiate and supervise research programs to determine the causes, effects, and hazards of air pollution; initiate and supervise statewide programs of air pollution control education; cooperate with and receive money from the federal government or any county or municipal government, and receive money from any other source, whether public or private; develop a comprehensive program for the study, abatement, and control of all sources of air pollution in the Commonwealth; and advise, consult, and cooperate with agencies of the United States and all agencies of the Commonwealth, political subdivisions, private industries, and any other affected groups in furtherance of the purposes of this chapter.

B. The Board may adopt by regulation emissions standards controlling the release into the atmosphere of air pollutants from motor vehicles, only as provided in § 10.1-1307.05 and Article 22 (§ 46.2-1176 et seq.) of Chapter 10 of Title 46.2.

C. After any regulation has been adopted by the Board pursuant to § 10.1-1308, the Department may grant local variances therefrom, if it finds after an investigation and hearing that local conditions warrant; except that no local variances shall be granted from regulations adopted by the Board pursuant to § 10.1-1308 related to the requirements of subsection E of § 10.1-1308 or Article 4 (§ 10.1-1329 et seq.). If local variances are permitted, the Department shall issue an order to this effect. Such order shall be subject to revocation or amendment at any time if the Department, after a hearing, determines that the amendment or revocation is warranted. Variances and amendments to variances shall be adopted only after a public hearing has been conducted pursuant to the public advertisement of the subject, date, time, and place of the hearing at least 30 days prior to the scheduled hearing. The hearing shall be conducted to give the public an opportunity to comment on the variance.

D. After the Board has adopted the regulations provided for in § 10.1-1308, the Department shall have the power to (i) initiate and receive complaints as to air pollution; (ii) hold or cause to be held hearings and enter orders diminishing or abating the causes of air pollution and orders to enforce the Board's regulations pursuant to § 10.1-1309;and (iii) institute legal proceedings, including suits for injunctions for the enforcement of orders, regulations, and the abatement and control of air pollution and for the enforcement of penalties.

E. The Board in making regulations; the Department in approving variances, control programs, or permits; and the courts in granting injunctive relief under the provisions of this chapter, shall consider facts and circumstances relevant to the reasonableness of the activity involved and the regulations proposed to control it, including:

1. The character and degree of injury to, or interference with, safety, health, or the reasonable use of property which is caused or threatened to be caused;

2. The social and economic value of the activity involved;

3. The suitability of the activity to the area in which it is located, except that consideration of this factor shall be satisfied if the local governing body of a locality in which a facility or activity is proposed has resolved that the location and operation of the proposed facility or activity is suitable to the area in which it is located; and

4. The scientific and economic practicality of reducing or eliminating the discharge resulting from such activity.

F. The Department shall conduct the hearings provided for in this chapter.

G. The Board shall not:

1. Adopt any regulation limiting emissions from wood heaters; or

2. Enforce against a manufacturer, distributor, or consumer any federal regulation limiting emissions from wood heaters adopted after May 1, 2014.

H. The Department shall submit an annual report to the Governor and General Assembly on or before October 1 of each year on matters relating to the Commonwealth's air pollution control policies and on the status of the Commonwealth's air quality.

I. In granting a permit pursuant to this section, the Department shall provide in writing a clear and concise statement of the legal basis, scientific rationale, and justification for the decision reached. When the decision of the Department is to deny a permit, pursuant to this section, the Department shall, in consultation with legal counsel, provide a clear and concise statement explaining the reason for the denial, the scientific justification for the same, and how the Department's decision is in compliance with applicable laws and regulations. Copies of the decision, certified by the Director, shall be mailed by certified mail to the permittee or applicant.

1966, c. 497, §§ 10-17.16, 10-17.18; 1968, c. 311; 1969, Ex. Sess., c. 8; 1970, c. 469; 1972, c. 781; 1973, c. 251; 1977, c. 31; 1980, c. 469; 1984, c. 734; 1988, cc. 26, 891; 1990, c. 231; 2004, c. 650; 2015, c. 471;2021, Sp. Sess. I, c. 263;2022, c. 356.

The chapters of the acts of assembly referenced in the historical citation at the end of this section(s) may not constitute a comprehensive list of such chapters and may exclude chapters whose provisions have expired.

# REGULATIONS

**23 C.F.R. § 771.125**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO





**§771.125 Final environmental impact statements.**

(a)(1) After circulation of a draft EIS and consideration of comments received, a final EIS must be prepared by the lead agencies, in cooperation with the applicant (if not a lead agency). The final EIS must identify the preferred alternative and evaluate all reasonable alternatives considered. It must also discuss substantive comments received on the draft EIS and responses thereto, summarize public involvement, and describe the mitigation measures that are to be incorporated into the proposed action. Mitigation measures presented as commitments in the final EIS will be incorporated into the project as specified in paragraphs (b) and (d) of §771.109. The final EIS should also document compliance, to the extent possible, with all applicable environmental laws and executive orders, or provide reasonable assurance that their requirements can be met.

(2) Every reasonable effort must be made to resolve interagency disagreements on actions before processing the final EIS. If significant issues remain unresolved, the final EIS must identify those issues and the consultations and other efforts made to resolve them.

(b) The final EIS will be reviewed for legal sufficiency prior to Administration approval.

(c) The Administration will indicate approval of the EIS for an action by signing and dating the cover page. Final EISs prepared for actions in the following categories will be submitted to the Administration's Headquarters for prior concurrence:

(1) Any action for which the Administration determines that the final EIS should be reviewed at the Headquarters office. This would typically occur when the Headquarters office determines that:

(i) Additional coordination with other Federal, State or local governmental agencies is needed;

(ii) The social, economic, or environmental impacts of the action may need to be more fully explored;

(iii) The impacts of the proposed action are unusually great; (iv) major issues remain unresolved; or

(iv) The action involves national policy issues.

(2) Any action to which a Federal, State or local government agency has indicated opposition on environmental grounds (which has not been resolved to the written satisfaction of the objecting agency).

(d) Approval of the final EIS is not an Administration action as defined in §771.107 and does not commit the Administration to approve any future request for financial assistance to fund the preferred alternative.

(e) The initial publication of the final EIS must be in sufficient quantity to meet the request for copies that can be reasonably expected from agencies, organizations, and individuals. Normally, copies will be furnished free of charge. However, with Administration concurrence, the party requesting the final EIS may be charged a fee that is not more than the actual cost of reproducing the copy or may be directed to the nearest location where the statement may be reviewed.

(f) The final EIS must be transmitted to any persons, organizations, or agencies that made substantive comments on the draft EIS or requested a copy, no later than the time the document is filed with EPA. In the case of lengthy documents, the agency may provide alternative circulation processes in accordance with 40 CFR 1502.19. The applicant must also publish a notice of availability in local newspapers and make the final EIS available through the mechanism established pursuant to DOT Order 4600.13, which implements Executive Order 12372. When filed with EPA, the final EIS must be available for public review at the applicant's offices and at appropriate Administration offices. A copy should also be made available for public review at institutions such as local government offices, libraries, and schools, as appropriate. To minimize hardcopy requests and printing costs, the Administration encourages the use of project websites or other publicly accessible electronic means to make the final EIS available.

(g) The final EIS may take the form of an errata sheet pursuant to 23 U.S.C. 139(n)(1) and 40 CFR 1503.4(c).

**23 C.F.R. § 774.17**

project, substantially interferes with the access to a wildlife and waterfowl refuge when such access is necessary for established wildlife migration or critical life cycle processes, or substantially reduces the wildlife use of a wildlife and waterfowl refuge.

(f) The Administration has reviewed the following situations and determined that a constructive use does not occur when:

(1) Compliance with the requirements of 36 CFR 800.5 for proximity impacts of the proposed action, on a site listed on or eligible for the National Register, results in an agreement of ''no historic properties affected'' or ''no adverse effect;''

(2) For projected noise levels:

(i) The impact of projected traffic noise levels of the proposed highway project on a noise-sensitive activity do not exceed the FHWA noise abatement criteria as contained in Table 1 in part 772 of this chapter; or

(ii) The projected operational noise levels of the proposed transit or railroad project do not exceed the noise impact criteria for a Section 4(f) activity in the FTA guidelines for transit noise and vibration impact assessment or the moderate impact criteria in the FRA guidelines for high-speed transportation noise and vibration impact assessment;

(3) The projected noise levels exceed the relevant threshold in paragraph (f)(2) of this section because of high existing noise, but the increase in the projected noise levels if the proposed project is constructed, when compared with the projected noise levels if the project is not built, is barely perceptible (3 dBA or less);

(4) There are proximity impacts to a Section 4(f) property, but a governmental agency's right-of-way acquisition or adoption of project location, or the Administration's approval of a final environmental document, established the location for the proposed transportation project before the designation, establishment, or change in the significance of the property. However, if it is reasonably foreseeable that a property would qualify as eligible for the National Register prior to the start of construction, then the property should be treated as a historic site for the purposes of this section; or

(5) Overall (combined) proximity impacts caused by a proposed project do not substantially impair the activities, features, or attributes that qualify a property for protection under Section 4(f);

(6) Proximity impacts will be mitigated to a condition equivalent to, or better than, that which would occur if the project were not built, as determined after consultation with the official(s) with jurisdiction;

(7) Change in accessibility will not substantially diminish the utilization of the Section 4(f) property; or

(8) Vibration levels from project construction activities are mitigated, through advance planning and monitoring of the activities, to levels that do not cause a substantial impairment of protected activities, features, or attributes of the Section 4(f) property.

[73 FR 13395, Mar. 12, 2008, as amended at 83 FR 54507, Oct. 29, 2018]

### § 774.17 Definitions.

The definitions contained in 23 U.S.C. 101(a) are applicable to this part. In addition, the following definitions apply:

*Administration.* The FHWA, FRA, or FTA, whichever is approving the transportation program or project at issue. A reference herein to the Administration means the State when the State is functioning as the FHWA, FRA, or FTA in carrying out responsibilities delegated or assigned to the State in accordance with 23 U.S.C. 325, 326, 327, or other applicable law.

*All possible planning.* All possible planning means that all reasonable measures identified in the Section 4(f) evaluation to minimize harm or mitigate for adverse impacts and effects must be included in the project.

(1) With regard to public parks, recreation areas, and wildlife and waterfowl refuges, the measures may include (but are not limited to): design modifications or design goals; replacement of land or facilities of comparable value and function; or monetary compensation to enhance the remaining property or to mitigate the adverse impacts of the project in other ways.

(2) With regard to historic sites, the measures normally serve to preserve

the historic activities, features, or attributes of the site as agreed by the Administration and the official(s) with jurisdiction over the Section 4(f) resource in accordance with the consultation process under 36 CFR part 800.

(3) In evaluating the reasonableness of measures to minimize harm under §774.3(a)(2), the Administration will consider the preservation purpose of the statute and:

(i) The views of the official(s) with jurisdiction over the Section 4(f) property;

(ii) Whether the cost of the measures is a reasonable public expenditure in light of the adverse impacts of the project on the Section 4(f) property and the benefits of the measure to the property, in accordance with §771.105(d) of this chapter; and

(iii) Any impacts or benefits of the measures to communities or environmental resources outside of the Section 4(f) property.

(4) All possible planning does not require analysis of feasible and prudent avoidance alternatives, since such analysis will have already occurred in the context of searching for feasible and prudent alternatives that avoid Section 4(f) properties altogether under §774.3(a)(1), or is not necessary in the case of a *de minimis* impact determination under §774.3(b).

(5) A *de minimis* impact determination under §774.3(b) subsumes the requirement for all possible planning to minimize harm by reducing the impacts on the Section 4(f) property to a *de minimis* level.

*Applicant*. The Federal, State, or local government authority, proposing a transportation project, that the Administration works with to conduct environmental studies and prepare environmental documents. For transportation actions implemented by the Federal government on Federal lands, the Administration or the Federal land management agency may take on the responsibilities of the applicant described herein.

*CE*. Refers to a categorical exclusion, which is an action with no individual or cumulative significant environmental effect pursuant to 40 CFR 1508.4 and §771.116, §771.117, or §771.118 of this chapter; unusual circumstances are taken into account in making categorical exclusion determinations.

*De minimis impact*. (1) For historic sites, *de minimis* impact means that the Administration has determined, in accordance with 36 CFR part 800 that no historic property is affected by the project or that the project will have "no adverse effect" on the historic property in question.

(2) For parks, recreation areas, and wildlife and waterfowl refuges, a *de minimis* impact is one that will not adversely affect the features, attributes, or activities qualifying the property for protection under Section 4(f).

*EA*. Refers to an Environmental Assessment, which is a document prepared pursuant to 40 CFR parts 1500–1508 and §771.119 of this title for a proposed project that is not categorically excluded but for which an EIS is not clearly required.

*EIS*. Refers to an Environmental Impact Statement, which is a document prepared pursuant to NEPA, 40 CFR parts 1500–1508, and §§771.123 and 771.125 of this chapter for a proposed project that is likely to cause significant impacts on the environment.

*Feasible and prudent avoidance alternative*. (1) A feasible and prudent avoidance alternative avoids using Section 4(f) property and does not cause other severe problems of a magnitude that substantially outweighs the importance of protecting the Section 4(f) property. In assessing the importance of protecting the Section 4(f) property, it is appropriate to consider the relative value of the resource to the preservation purpose of the statute.

(2) An alternative is not feasible if it cannot be built as a matter of sound engineering judgment.

(3) An alternative is not prudent if:

(i) It compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need;

(ii) It results in unacceptable safety or operational problems;

(iii) After reasonable mitigation, it still causes:

(A) Severe social, economic, or environmental impacts;

(B) Severe disruption to established communities;

(C) Severe disproportionate impacts to minority or low income populations; or

(D) Severe impacts to environmental resources protected under other Federal statutes;

(iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude;

(v) It causes other unique problems or unusual factors; or

(vi) It involves multiple factors in paragraphs (3)(i) through (3)(v) of this definition, that while individually minor, cumulatively cause unique problems or impacts of extraordinary magnitude.

*FONSI.* Refers to a Finding of No Significant Impact prepared pursuant to 40 CFR 1508.13 and § 771.121 of this chapter.

*Historic site.* For purposes of this part, the term ''historic site'' includes any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register. The term includes properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization that are included in, or are eligible for inclusion in, the National Register.

*Official(s) with jurisdiction.* (1) In the case of historic properties, the official with jurisdiction is the SHPO for the State wherein the property is located or, if the property is located on tribal land, the THPO. If the property is located on tribal land but the Indian tribe has not assumed the responsibilities of the SHPO as provided for in the National Historic Preservation Act, then a representative designated by such Indian tribe shall be recognized as an official with jurisdiction in addition to the SHPO. When the ACHP is involved in a consultation concerning a property under Section 106 of the NHPA, the ACHP is also an official with jurisdiction over that resource for purposes of this part. When the Section 4(f) property is a National Historic Landmark, the National Park Service is also an official with jurisdiction over that resource for purposes of this part.

(2) In the case of public parks, recreation areas, and wildlife and waterfowl refuges, the official(s) with jurisdiction are the official(s) of the agency or agencies that own or administer the property in question and who are empowered to represent the agency on matters related to the property.

(3) In the case of portions of Wild and Scenic Rivers to which Section 4(f) applies, the official(s) with jurisdiction are the official(s) of the Federal agency or agencies that own or administer the affected portion of the river corridor in question. For State administered, federally designated rivers (section 2(a)(ii) of the Wild and Scenic Rivers Act, 16 U.S.C. 1273(a)(ii)), the officials with jurisdiction include both the State agency designated by the respective Governor and the Secretary of the Interior.

*Railroad or rail transit line elements.* Railroad or rail transit line elements include the elements related to the operation of the railroad or rail transit line, such as the railbed, rails, and track; tunnels; elevated support structures and bridges; substations; signal and communication devices; maintenance facilities; and railway-highway crossings.

*ROD.* Refers to a record of decision prepared pursuant to 40 CFR 1505.2 and §§ 771.124 or 771.127 of this chapter.

*Section 4(f) evaluation.* Refers to the documentation prepared to support the granting of a Section 4(f) approval under § 774.3(a), unless preceded by the word ''programmatic.'' A ''programmatic Section 4(f) evaluation'' is the documentation prepared pursuant to § 774.3(d) that authorizes subsequent project-level Section 4(f) approvals as described therein.

*Section 4(f) Property.* Section 4(f) property means publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance.

*Station.* A station is a platform and the associated building or structure such as a depot, shelter, or canopy used by intercity or commuter rail transportation passengers for the purpose of boarding and alighting a train. A station does not include tracks, railyards, or electrification, communications or signal systems, or equipment. A platform alone is not considered a station.

*Use*. Except as set forth in §§ 774.11 and 774.13, a ''use'' of Section 4(f) property occurs:

(1) When land is permanently incorporated into a transportation facility;

(2) When there is a temporary occupancy of land that is adverse in terms of the statute's preservation purpose as determined by the criteria in § 774.13(d); or

(3) When there is a constructive use of a Section 4(f) property as determined by the criteria in § 774.15.

[73 FR 13395, Mar. 12, 2008, as amended at 83 FR 54507, Oct. 29, 2018]

## PART 777—MITIGATION OF IMPACTS TO WETLANDS AND NATURAL HABITAT

Sec.
777.1 Purpose.
777.2 Definitions.
777.3 Background.
777.5 Federal participation.
777.7 Evaluation of impacts.
777.9 Mitigation of impacts.
777.11 Other considerations.

AUTHORITY: 42 U.S.C. 4321 *et seq.;* 49 U.S.C. 303; 23 U.S.C. 101(a), 103, 109(h), 133(b)(1), (b)(11), and (d)(2), 138, 315; E.O. 11990; DOT Order 5660.1A; 49 CFR 1.48(b).

SOURCE: 65 FR 82924, Dec. 29, 2000, unless otherwise noted.

### § 777.1 Purpose.

To provide policy and procedures for the evaluation and mitigation of adverse environmental impacts to wetlands and natural habitat resulting from Federal-aid projects funded pursuant to provisions of title 23, U.S. Code. These policies and procedures shall be applied by the Federal Highway Administration (FHWA) to projects under the Federal Lands Highway Program to the extent such application is deemed appropriate by the FHWA.

### § 777.2 Definitions.

In addition to those contained in 23 U.S.C. 101(a), the following definitions shall apply as used in this part:

*Biogeochemical transformations* means those changes in chemical compounds and substances which naturally occur in ecosystems. Examples are the carbon, nitrogen, and phosphorus cycles in nature, in which these elements are incorporated from inorganic substances into organic matter and recycled on a continuing basis.

*Compensatory mitigation* means restoration, enhancement, creation, and under exceptional circumstances, preservation, of wetlands, wetland buffer areas, and other natural habitats, carried out to replace or compensate for the loss of wetlands or natural habitat area or functional capacity resulting from Federal-aid projects funded pursuant to provisions of title 23, U.S. Code. Compensatory mitigation usually occurs in advance of or concurrent with the impacts to be mitigated, but may occur after such impacts in special circumstances.

*Mitigation bank* means a site where wetlands and/or other aquatic resources or natural habitats are restored, created, enhanced, or in exceptional circumstances, preserved, expressly for the purpose of providing compensatory mitigation in advance of authorized impacts to similar resources. For purposes of the Clean Water Act, Section 404 (33 U.S.C. 1344), use of a mitigation bank can only be authorized when impacts are unavoidable.

*Natural habitat* means a complex of natural, primarily native or indigenous vegetation, not currently subject to cultivation or artificial landscaping, a primary purpose of which is to provide habitat for wildlife, either terrestrial or aquatic. For purposes of this part, habitat has the same meaning as natural habitat. This definition excludes rights-of-way that are acquired with Federal transportation funds specifically for highway purposes.

*Net gain of wetlands* means a wetland resource conservation and management principle under which, over the long term, unavoidable losses of wetlands area or functional capacity due to highway projects are offset by gains at a ratio greater than 1:1, through restoration, enhancement, preservation, or creation of wetlands or associated areas critical to the protection or conservation of wetland functions. This definition specifically excludes natural habitat, as defined in this section, other than wetlands.

**23 C.F.R. § 774.3**

774.15 Constructive use determinations.
774.17 Definitions.

AUTHORITY: 23 U.S.C. 103(c), 109(h), 138, 325, 326, 327 and 204(h)(2); 49 U.S.C. 303; Section 6009 of the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (Pub. L. 109–59, Aug. 10, 2005, 119 Stat. 1144); 49 CFR 1.81 and 1.91; and, Pub. L. 114–94, 129 Stat. 1312, Sections 1303 and 11502.

SOURCE: 73 FR 13395, Mar. 12, 2008, unless otherwise noted.

### § 774.1 Purpose.

The purpose of this part is to implement 23 U.S.C. 138 and 49 U.S.C. 303, which were originally enacted as Section 4(f) of the Department of Transportation Act of 1966 and are still commonly referred to as ''Section 4(f).''

### § 774.3 Section 4(f) approvals.

The Administration may not approve the use, as defined in § 774.17, of Section 4(f) property unless a determination is made under paragraph (a) or (b) of this section.

(a) The Administration determines that:

(1) There is no feasible and prudent avoidance alternative, as defined in § 774.17, to the use of land from the property; and

(2) The action includes all possible planning, as defined in § 774.17, to minimize harm to the property resulting from such use; or

(b) The Administration determines that the use of the property, including any measure(s) to minimize harm (such as any avoidance, minimization, mitigation, or enhancement measures) committed to by the applicant, will have a *de minimis* impact, as defined in § 774.17, on the property.

(c) If the analysis in paragraph (a)(1) of this section concludes that there is no feasible and prudent avoidance alternative, then the Administration may approve, from among the remaining alternatives that use Section 4(f) property, only the alternative that:

(1) Causes the least overall harm in light of the statute's preservation purpose. The least overall harm is determined by balancing the following factors:

(i) The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);

(ii) The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;

(iii) The relative significance of each Section 4(f) property;

(iv) The views of the official(s) with jurisdiction over each Section 4(f) property;

(v) The degree to which each alternative meets the purpose and need for the project;

(vi) After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

(vii) Substantial differences in costs among the alternatives.

(2) The alternative selected must include all possible planning, as defined in § 774.17, to minimize harm to Section 4(f) property.

(d) Programmatic Section 4(f) evaluations are a time-saving procedural alternative to preparing individual Section 4(f) evaluations under paragraph (a) of this section for certain minor uses of Section 4(f) property. Programmatic Section 4(f) evaluations are developed by the Administration based on experience with a specific set of conditions that includes project type, degree of use and impact, and evaluation of avoidance alternatives.[1] An approved programmatic Section 4(f) evaluation may be relied upon to cover a particular project only if the specific conditions in the programmatic evaluation are met

(1) The determination whether a programmatic Section 4(f) evaluation applies to the use of a specific Section 4(f) property shall be documented as specified in the applicable programmatic Section 4(f) evaluation.

(2) The Administration may develop additional programmatic Section 4(f) evaluations. Proposed new or revised programmatic Section 4(f) evaluations will be coordinated with the Department of Interior, Department of Agriculture, and Department of Housing

[1] FHWA Section 4(f) Programmatic Evaluations can be found at *www.environment.fhwa.dot.gov/4f/4fnationwideevals.asp.*

and Urban Development, and published in the FEDERAL REGISTER for comment prior to being finalized. New or revised programmatic Section 4(f) evaluations shall be reviewed for legal sufficiency and approved by the Headquarters Office of the Administration.

(e) The coordination requirements in § 774.5 must be completed before the Administration may make Section 4(f) approvals under this section. Requirements for the documentation and timing of Section 4(f) approvals are located in §§ 774.7 and 774.9, respectively.

[73 FR 13395, Mar. 12, 2008, as amended at 73 FR 31610, June 3, 2008; 83 FR 54506, Oct. 29, 2018]

### § 774.5 Coordination.

(a) Prior to making Section 4(f) approvals under § 774.3(a), the Section 4(f) evaluation shall be provided for coordination and comment to the official(s) with jurisdiction over the Section 4(f) resource and to the Department of the Interior, and as appropriate to the Department of Agriculture and the Department of Housing and Urban Development. The Administration shall provide a minimum of 45 days for receipt of comments. If comments are not received within 15 days after the comment deadline, the Administration may assume a lack of objection and proceed with the action.

(b) Prior to making *de minimis* impact determinations under § 774.3(b), the following coordination shall be undertaken:

(1) For historic properties:

(i) The consulting parties identified in accordance with 36 CFR part 800 must be consulted; and

(ii) The Administration must receive written concurrence from the pertinent State Historic Preservation Officer (SHPO) or Tribal Historic Preservation Officer (THPO), and from the Advisory Council on Historic Preservation (ACHP) if participating in the consultation process, in a finding of ''no adverse effect'' or ''no historic properties affected'' in accordance with 36 CFR part 800. The Administration shall inform these officials of its intent to make a *de minimis* impact determination based on their concurrence in the finding of ''no adverse effect'' or ''no historic properties affected.''

(iii) Public notice and comment, beyond that required by 36 CFR part 800, is not required.

(2) For parks, recreation areas, and wildlife and waterfowl refuges:

(i) Public notice and an opportunity for public review and comment concerning the effects on the protected activities, features, or attributes of the property must be provided. This requirement can be satisfied in conjunction with other public involvement procedures, such as a comment period provided on a NEPA document.

(ii) The Administration shall inform the official(s) with jurisdiction of its intent to make a *de minimis* impact finding. Following an opportunity for public review and comment as described in paragraph (b)(2)(i) of this section, the official(s) with jurisdiction over the Section 4(f) resource must concur in writing that the project will not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection. This concurrence may be combined with other comments on the project provided by the official(s).

(c) The application of a programmatic Section 4(f) evaluation to the use of a specific Section 4(f) property under § 774.3(d)(1) shall be coordinated as specified in the applicable programmatic Section 4(f) evaluation.

(d) When Federal encumbrances on Section 4(f) property are identified, coordination with the appropriate Federal agency is required to ascertain the agency's position on the proposed impact, as well as to determine if any other Federal requirements may apply to converting the Section 4(f) land to a different function. Any such requirements must be satisfied, independent of the Section 4(f) approval.

### § 774.7 Documentation.

(a) A Section 4(f) evaluation prepared under § 774.3(a) shall include sufficient supporting documentation to demonstrate why there is no feasible and prudent avoidance alternative and shall summarize the results of all possible planning to minimize harm to the Section 4(f) property.

(b) A *de minimis* impact determination under § 774.3(b) shall include sufficient supporting documentation to

**23 C.F.R. § 774.7**

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO




and Urban Development, and published in the FEDERAL REGISTER for comment prior to being finalized. New or revised programmatic Section 4(f) evaluations shall be reviewed for legal sufficiency and approved by the Headquarters Office of the Administration.

(e) The coordination requirements in §774.5 must be completed before the Administration may make Section 4(f) approvals under this section. Requirements for the documentation and timing of Section 4(f) approvals are located in §§774.7 and 774.9, respectively.

[73 FR 13395, Mar. 12, 2008, as amended at 73 FR 31610, June 3, 2008; 83 FR 54506, Oct. 29, 2018]

**§ 774.5 Coordination.**

(a) Prior to making Section 4(f) approvals under §774.3(a), the Section 4(f) evaluation shall be provided for coordination and comment to the official(s) with jurisdiction over the Section 4(f) resource and to the Department of the Interior, and as appropriate to the Department of Agriculture and the Department of Housing and Urban Development. The Administration shall provide a minimum of 45 days for receipt of comments. If comments are not received within 15 days after the comment deadline, the Administration may assume a lack of objection and proceed with the action.

(b) Prior to making *de minimis* impact determinations under §774.3(b), the following coordination shall be undertaken:

(1) For historic properties:

(i) The consulting parties identified in accordance with 36 CFR part 800 must be consulted; and

(ii) The Administration must receive written concurrence from the pertinent State Historic Preservation Officer (SHPO) or Tribal Historic Preservation Officer (THPO), and from the Advisory Council on Historic Preservation (ACHP) if participating in the consultation process, in a finding of ‘‘no adverse effect’’ or ‘‘no historic properties affected’’ in accordance with 36 CFR part 800. The Administration shall inform these officials of its intent to make a *de minimis* impact determination based on their concurrence in the finding of ‘‘no adverse effect’’ or ‘‘no historic properties affected.’’

(iii) Public notice and comment, beyond that required by 36 CFR part 800, is not required.

(2) For parks, recreation areas, and wildlife and waterfowl refuges:

(i) Public notice and an opportunity for public review and comment concerning the effects on the protected activities, features, or attributes of the property must be provided. This requirement can be satisfied in conjunction with other public involvement procedures, such as a comment period provided on a NEPA document.

(ii) The Administration shall inform the official(s) with jurisdiction of its intent to make a *de minimis* impact finding. Following an opportunity for public review and comment as described in paragraph (b)(2)(i) of this section, the official(s) with jurisdiction over the Section 4(f) resource must concur in writing that the project will not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection. This concurrence may be combined with other comments on the project provided by the official(s).

(c) The application of a programmatic Section 4(f) evaluation to the use of a specific Section 4(f) property under §774.3(d)(1) shall be coordinated as specified in the applicable programmatic Section 4(f) evaluation.

(d) When Federal encumbrances on Section 4(f) property are identified, coordination with the appropriate Federal agency is required to ascertain the agency's position on the proposed impact, as well as to determine if any other Federal requirements may apply to converting the Section 4(f) land to a different function. Any such requirements must be satisfied, independent of the Section 4(f) approval.

**§ 774.7 Documentation.**

(a) A Section 4(f) evaluation prepared under §774.3(a) shall include sufficient supporting documentation to demonstrate why there is no feasible and prudent avoidance alternative and shall summarize the results of all possible planning to minimize harm to the Section 4(f) property.

(b) A *de minimis* impact determination under §774.3(b) shall include sufficient supporting documentation to

demonstrate that the impacts, after avoidance, minimization, mitigation, or enhancement measures are taken into account, are *de minimis* as defined in § 774.17; and that the coordination required in § 774.5(b) has been completed.

(c) If there is no feasible and prudent avoidance alternative the Administration may approve only the alternative that causes the least overall harm in accordance with § 774.3(c). This analysis must be documented in the Section 4(f) evaluation.

(d) The Administration shall review all Section 4(f) approvals under §§ 774.3(a) and 774.3(c) for legal sufficiency.

(e) A Section 4(f) approval may involve different levels of detail where the Section 4(f) involvement is addressed in a tiered EIS under § 771.111(g) of this chapter.

(1) When the first-tier, broad-scale EIS is prepared, the detailed information necessary to complete the Section 4(f) approval may not be available at that stage in the development of the action. In such cases, the documentation should address the potential impacts that a proposed action will have on Section 4(f) property and whether those impacts could have a bearing on the decision to be made. A preliminary Section 4(f) approval may be made at this time as to whether the impacts resulting from the use of a Section 4(f) property are *de minimis* or whether there are feasible and prudent avoidance alternatives. This preliminary approval shall include all possible planning to minimize harm to the extent that the level of detail available at the first-tier EIS stage allows. It is recognized that such planning at this stage may be limited to ensuring that opportunities to minimize harm at subsequent stages in the development process have not been precluded by decisions made at the first-tier stage. This preliminary Section 4(f) approval is then incorporated into the first-tier EIS.

(2) The Section 4(f) approval will be finalized in the second-tier study. If no new Section 4(f) use, other than a *de minimis* impact, is identified in the second-tier study and if all possible planning to minimize harm has occurred, then the second-tier Section 4(f) approval may finalize the preliminary approval by reference to the first-tier documentation. Re-evaluation of the preliminary Section 4(f) approval is only needed to the extent that new or more detailed information available at the second-tier stage raises new Section 4(f) concerns not already considered.

(3) The final Section 4(f) approval may be made in the second-tier CE, EA, final EIS, ROD or FONSI.

(f) In accordance with §§ 771.105(a) and 771.133 of this chapter, the documentation supporting a Section 4(f) approval should be included in the EIS, EA, or for a project classified as a CE, in a separate document. If the Section 4(f) documentation cannot be included in the NEPA document, then it shall be presented in a separate document. The Section 4(f) documentation shall be developed by the applicant in cooperation with the Administration.

### § 774.9 Timing.

(a) The potential use of land from a Section 4(f) property shall be evaluated as early as practicable in the development of the action when alternatives to the proposed action are under study.

(b) Except as provided in paragraph (c) of this section, for actions processed with EISs the Administration will make the Section 4(f) approval either in the final EIS or in the ROD. Where the Section 4(f) approval is documented in the final EIS, the Administration will summarize the basis for its Section 4(f) approval in the ROD. Actions requiring the use of Section 4(f) property, and proposed to be processed with a FONSI or classified as a CE, shall not proceed until notification by the Administration of Section 4(f) approval.

(c) After the CE, FONSI, or ROD has been processed, a separate Section 4(f) approval will be required, except as provided in § 774.13, if:

(1) A proposed modification of the alignment or design would require the use of Section 4(f) property; or

(2) The Administration determines that Section 4(f) applies to the use of a property; or

(3) A proposed modification of the alignment, design, or measures to minimize harm (after the original Section

**23 C.F.R. § 774.9**

demonstrate that the impacts, after avoidance, minimization, mitigation, or enhancement measures are taken into account, are *de minimis* as defined in § 774.17; and that the coordination required in § 774.5(b) has been completed.

(c) If there is no feasible and prudent avoidance alternative the Administration may approve only the alternative that causes the least overall harm in accordance with § 774.3(c). This analysis must be documented in the Section 4(f) evaluation.

(d) The Administration shall review all Section 4(f) approvals under §§ 774.3(a) and 774.3(c) for legal sufficiency.

(e) A Section 4(f) approval may involve different levels of detail where the Section 4(f) involvement is addressed in a tiered EIS under § 771.111(g) of this chapter.

(1) When the first-tier, broad-scale EIS is prepared, the detailed information necessary to complete the Section 4(f) approval may not be available at that stage in the development of the action. In such cases, the documentation should address the potential impacts that a proposed action will have on Section 4(f) property and whether those impacts could have a bearing on the decision to be made. A preliminary Section 4(f) approval may be made at this time as to whether the impacts resulting from the use of a Section 4(f) property are *de minimis* or whether there are feasible and prudent avoidance alternatives. This preliminary approval shall include all possible planning to minimize harm to the extent that the level of detail available at the first-tier EIS stage allows. It is recognized that such planning at this stage may be limited to ensuring that opportunities to minimize harm at subsequent stages in the development process have not been precluded by decisions made at the first-tier stage. This preliminary Section 4(f) approval is then incorporated into the first-tier EIS.

(2) The Section 4(f) approval will be finalized in the second-tier study. If no new Section 4(f) use, other than a *de minimis* impact, is identified in the second-tier study and if all possible planning to minimize harm has occurred, then the second-tier Section 4(f) approval may finalize the preliminary approval by reference to the first-tier documentation. Re-evaluation of the preliminary Section 4(f) approval is only needed to the extent that new or more detailed information available at the second-tier stage raises new Section 4(f) concerns not already considered.

(3) The final Section 4(f) approval may be made in the second-tier CE, EA, final EIS, ROD or FONSI.

(f) In accordance with §§ 771.105(a) and 771.133 of this chapter, the documentation supporting a Section 4(f) approval should be included in the EIS, EA, or for a project classified as a CE, in a separate document. If the Section 4(f) documentation cannot be included in the NEPA document, then it shall be presented in a separate document. The Section 4(f) documentation shall be developed by the applicant in cooperation with the Administration.

**§ 774.9 Timing.**

(a) The potential use of land from a Section 4(f) property shall be evaluated as early as practicable in the development of the action when alternatives to the proposed action are under study.

(b) Except as provided in paragraph (c) of this section, for actions processed with EISs the Administration will make the Section 4(f) approval either in the final EIS or in the ROD. Where the Section 4(f) approval is documented in the final EIS, the Administration will summarize the basis for its Section 4(f) approval in the ROD. Actions requiring the use of Section 4(f) property, and proposed to be processed with a FONSI or classified as a CE, shall not proceed until notification by the Administration of Section 4(f) approval.

(c) After the CE, FONSI, or ROD has been processed, a separate Section 4(f) approval will be required, except as provided in § 774.13, if:

(1) A proposed modification of the alignment or design would require the use of Section 4(f) property; or

(2) The Administration determines that Section 4(f) applies to the use of a property; or

(3) A proposed modification of the alignment, design, or measures to minimize harm (after the original Section

4(f) approval) would result in a substantial increase in the amount of Section 4(f) property used, a substantial increase in the adverse impacts to Section 4(f) property, or a substantial reduction in the measures to minimize harm.

(d) A separate Section 4(f) approval required under paragraph (c) of this section will not necessarily require the preparation of a new or supplemental NEPA document. If a new or supplemental NEPA document is also required under § 771.130 of this chapter, then it should include the documentation supporting the separate Section 4(f) approval. Where a separate Section 4(f) approval is required, any activity not directly affected by the separate Section 4(f) approval can proceed during the analysis, consistent with § 771.130(f) of this chapter.

(e) Section 4(f) may apply to archeological sites discovered during construction, as set forth in § 774.11(f). In such cases, the Section 4(f) process will be expedited and any required evaluation of feasible and prudent avoidance alternatives will take account of the level of investment already made. The review process, including the consultation with other agencies, will be shortened as appropriate.

### § 774.11 Applicability.

(a) The Administration will determine the applicability of Section 4(f) in accordance with this part.

(b) When another Federal agency is the Federal lead agency for the NEPA process, the Administration shall make any required Section 4(f) approvals unless the Federal lead agency is another U.S. DOT agency.

(c) Consideration under Section 4(f) is not required when the official(s) with jurisdiction over a park, recreation area, or wildlife and waterfowl refuge determine that the property, considered in its entirety, is not significant. In the absence of such a determination, the Section 4(f) property will be presumed to be significant. The Administration will review a determination that a park, recreation area, or wildlife and waterfowl refuge is not significant to assure its reasonableness.

(d) Where Federal lands or other public land holdings (e.g., State forests) are administered under statutes permitting management for multiple uses, and, in fact, are managed for multiple uses, Section 4(f) applies only to those portions of such lands which function for, or are designated in the plans of the administering agency as being for, significant park, recreation, or wildlife and waterfowl refuge purposes. The determination of which lands so function or are so designated, and the significance of those lands, shall be made by the official(s) with jurisdiction over the Section 4(f) resource. The Administration will review this determination to assure its reasonableness.

(e) In determining the applicability of Section 4(f) to historic sites, the Administration, in cooperation with the applicant, will consult with the official(s) with jurisdiction to identify all properties on or eligible for the National Register of Historic Places (National Register). The Section 4(f) requirements apply to historic sites on or eligible for the National Register unless the Administration determines that an exception under § 774.13 applies.

(1) The Section 4(f) requirements apply only to historic sites on or eligible for the National Register unless the Administration determines that the application of Section 4(f) is otherwise appropriate.

(2) The Interstate System is not considered to be a historic site subject to Section 4(f), with the exception of those individual elements of the Interstate System formally identified by FHWA for Section 4(f) protection on the basis of national or exceptional historic significance.

(f) Section 4(f) applies to all archeological sites on or eligible for inclusion on the National Register, including those discovered during construction, except as set forth in § 774.13(b).

(g) Section 4(f) applies to those portions of federally designated Wild and Scenic Rivers that are otherwise eligible as historic sites, or that are publicly owned and function as, or are designated in a management plan as, a significant park, recreation area, or wildlife and waterfowl refuge. All other applicable requirements of the Wild and Scenic Rivers Act, 16 U.S.C. 1271–1287, must be satisfied, independent of the Section 4(f) approval.

**36 C.F.R. § 800.1**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO


# PART 800—PROTECTION OF HISTORIC PROPERTIES

## Subpart A—Purposes and Participants

Sec.
800.1 Purposes.
800.2 Participants in the Section 106 process.

## Subpart B—The Section 106 Process

800.3 Initiation of the section 106 process.
800.4 Identification of historic properties.
800.5 Assessment of adverse effects.
800.6 Resolution of adverse effects.
800.7 Failure to resolve adverse effects.
800.8 Coordination with the National Environmental Policy Act.
800.9 Council review of Section 106 compliance.
800.10 Special requirements for protecting National Historic Landmarks.
800.11 Documentation standards.
800.12 Emergency situations.
800.13 Post-review discoveries.

## Subpart C—Program Alternatives

800.14 Federal agency program alternatives.
800.15 Tribal, State, and local program alternatives. [Reserved]
800.16 Definitions.
APPENDIX A TO PART 800—CRITERIA FOR COUNCIL INVOLVEMENT IN REVIEWING INDIVIDUAL SECTION 106 CASES

AUTHORITY: 16 U.S.C. 470s.

SOURCE: 65 FR 77725, Dec. 12, 2000, unless otherwise noted.

## Subpart A—Purposes and Participants

### § 800.1 Purposes.

(a) *Purposes of the section 106 process.* Section 106 of the National Historic Preservation Act requires Federal agencies to take into account the effects of their undertakings on historic properties and afford the Council a reasonable opportunity to comment on such undertakings. The procedures in this part define how Federal agencies meet these statutory responsibilities. The section 106 process seeks to accommodate historic preservation concerns with the needs of Federal undertakings through consultation among the agency official and other parties with an interest in the effects of the undertaking on historic properties, commencing at the early stages of project planning. The goal of consultation is to identify historic properties potentially affected by the undertaking, assess its effects and seek ways to avoid, minimize or mitigate any adverse effects on historic properties.

(b) *Relation to other provisions of the act.* Section 106 is related to other provisions of the act designed to further the national policy of historic preservation. References to those provisions are included in this part to identify circumstances where they may affect actions taken to meet section 106 requirements. Such provisions may have their own implementing regulations or guidelines and are not intended to be implemented by the procedures in this part except insofar as they relate to the section 106 process. Guidelines, policies, and procedures issued by other agencies, including the Secretary, have been cited in this part for ease of access and are not incorporated by reference.

(c) *Timing.* The agency official must complete the section 106 process ''prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license.'' This does not prohibit agency official from conducting or authorizing nondestructive project planning activities before completing compliance with section 106, provided that such actions do not restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties. The agency official shall ensure that the section 106 process is initiated early in the undertaking's planning, so that a broad range of alternatives may be considered during the planning process for the undertaking.

### § 800.2 Participants in the Section 106 process.

(a) *Agency official.* It is the statutory obligation of the Federal agency to fulfill the requirements of section 106 and to ensure that an agency official with jurisdiction over an undertaking takes legal and financial responsibility for section 106 compliance in accordance with subpart B of this part. The agency official has approval authority for the undertaking and can commit the Federal agency to take appropriate action

**36 C.F.R. § 800.4**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO




with the Indian tribe and the Council, as appropriate. An Indian tribe may enter into an agreement with a SHPO or SHPOs specifying the SHPO's participation in the section 106 process for undertakings occurring on or affecting historic properties on tribal lands.

(e) *Plan to involve the public.* In consultation with the SHPO/THPO, the agency official shall plan for involving the public in the section 106 process. The agency official shall identify the appropriate points for seeking public input and for notifying the public of proposed actions, consistent with § 800.2(d).

(f) *Identify other consulting parties.* In consultation with the SHPO/THPO, the agency official shall identify any other parties entitled to be consulting parties and invite them to participate as such in the section 106 process. The agency official may invite others to participate as consulting parties as the section 106 process moves forward.

(1) *Involving local governments and applicants.* The agency official shall invite any local governments or applicants that are entitled to be consulting parties under § 800.2(c).

(2) *Involving Indian tribes and Native Hawaiian organizations.* The agency official shall make a reasonable and good faith effort to identify any Indian tribes or Native Hawaiian organizations that might attach religious and cultural significance to historic properties in the area of potential effects and invite them to be consulting parties. Such Indian tribe or Native Hawaiian organization that requests in writing to be a consulting party shall be one.

(3) *Requests to be consulting parties.* The agency official shall consider all written requests of individuals and organizations to participate as consulting parties and, in consultation with the SHPO/THPO and any Indian tribe upon whose tribal lands an undertaking occurs or affects historic properties, determine which should be consulting parties.

(g) *Expediting consultation.* A consultation by the agency official with the SHPO/THPO and other consulting parties may address multiple steps in §§ 800.3 through 800.6 where the agency official and the SHPO/THPO agree it is appropriate as long as the consulting parties and the public have an adequate opportunity to express their views as provided in § 800.2(d).

### § 800.4 Identification of historic properties.

(a) *Determine scope of identification efforts.* In consultation with the SHPO/THPO, the agency official shall:

(1) Determine and document the area of potential effects, as defined in § 800.16(d);

(2) Review existing information on historic properties within the area of potential effects, including any data concerning possible historic properties not yet identified;

(3) Seek information, as appropriate, from consulting parties, and other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area, and identify issues relating to the undertaking's potential effects on historic properties; and

(4) Gather information from any Indian tribe or Native Hawaiian organization identified pursuant to § 800.3(f) to assist in identifying properties, including those located off tribal lands, which may be of religious and cultural significance to them and may be eligible for the National Register, recognizing that an Indian tribe or Native Hawaiian organization may be reluctant to divulge specific information regarding the location, nature, and activities associated with such sites. The agency official should address concerns raised about confidentiality pursuant to § 800.11(c).

(b) *Identify historic properties.* Based on the information gathered under paragraph (a) of this section, and in consultation with the SHPO/THPO and any Indian tribe or Native Hawaiian organization that might attach religious and cultural significance to properties within the area of potential effects, the agency official shall take the steps necessary to identify historic properties within the area of potential effects.

(1) *Level of effort.* The agency official shall make a reasonable and good faith effort to carry out appropriate identification efforts, which may include background research, consultation,

oral history interviews, sample field investigation, and field survey. The agency official shall take into account past planning, research and studies, the magnitude and nature of the undertaking and the degree of Federal involvement, the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the area of potential effects. The Secretary's standards and guidelines for identification provide guidance on this subject. The agency official should also consider other applicable professional, State, tribal, and local laws, standards, and guidelines. The agency official shall take into account any confidentiality concerns raised by Indian tribes or Native Hawaiian organizations during the identification process.

(2) *Phased identification and evaluation.* Where alternatives under consideration consist of corridors or large land areas, or where access to properties is restricted, the agency official may use a phased process to conduct identification and evaluation efforts. The agency official may also defer final identification and evaluation of historic properties if it is specifically provided for in a memorandum of agreement executed pursuant to § 800.6, a programmatic agreement executed pursuant to § 800.14(b), or the documents used by an agency official to comply with the National Environmental Policy Act pursuant to § 800.8. The process should establish the likely presence of historic properties within the area of potential effects for each alternative or inaccessible area through background research, consultation and an appropriate level of field investigation, taking into account the number of alternatives under consideration, the magnitude of the undertaking and its likely effects, and the views of the SHPO/THPO and any other consulting parties. As specific aspects or locations of an alternative are refined or access is gained, the agency official shall proceed with the identification and evaluation of historic properties in accordance with paragraphs (b)(1) and (c) of this section.

(c) *Evaluate historic significance*—(1) *Apply National Register criteria.* In consultation with the SHPO/THPO and any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to identified properties and guided by the Secretary's standards and guidelines for evaluation, the agency official shall apply the National Register criteria (36 CFR part 63) to properties identified within the area of potential effects that have not been previously evaluated for National Register eligibility. The passage of time, changing perceptions of significance, or incomplete prior evaluations may require the agency official to reevaluate properties previously determined eligible or ineligible. The agency official shall acknowledge that Indian tribes and Native Hawaiian organizations possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them.

(2) *Determine whether a property is eligible.* If the agency official determines any of the National Register criteria are met and the SHPO/THPO agrees, the property shall be considered eligible for the National Register for section 106 purposes. If the agency official determines the criteria are not met and the SHPO/THPO agrees, the property shall be considered not eligible. If the agency official and the SHPO/THPO do not agree, or if the Council or the Secretary so request, the agency official shall obtain a determination of eligibility from the Secretary pursuant to 36 CFR part 63. If an Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to a property off tribal lands does not agree, it may ask the Council to request the agency official to obtain a determination of eligibility.

(d) *Results of identification and evaluation*—(1) *No historic properties affected.* If the agency official finds that either there are no historic properties present or there are historic properties present but the undertaking will have no effect upon them as defined in § 800.16(i), the agency official shall provide documentation of this finding, as set forth in § 800.11(d), to the SHPO/THPO. The agency official shall notify all consulting parties, including Indian tribes and Native Hawaiian organizations, and make the documentation available

for public inspection prior to approving the undertaking.

(i) If the SHPO/THPO, or the Council if it has entered the section 106 process, does not object within 30 days of receipt of an adequately documented finding, the agency official's responsibilities under section 106 are fulfilled.

(ii) If the SHPO/THPO objects within 30 days of receipt of an adequately documented finding, the agency official shall either consult with the objecting party to resolve the disagreement, or forward the finding and supporting documentation to the Council and request that the Council review the finding pursuant to paragraphs (d)(1)(iv)(A) through (d)(1)(iv)(C) of this section. When an agency official forwards such requests for review to the Council, the agency official shall concurrently notify all consulting parties that such a request has been made and make the request documentation available to the public.

(iii) During the SHPO/THPO 30 day review period, the Council may object to the finding and provide its opinion regarding the finding to the agency official and, if the Council determines the issue warrants it, the head of the agency. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part. The agency shall then proceed according to paragraphs (d)(1)(iv)(B) and (d)(1)(iv)(C) of this section.

(iv) (A) Upon receipt of the request under paragraph (d)(1)(ii) of this section, the Council will have 30 days in which to review the finding and provide the agency official and, if the Council determines the issue warrants it, the head of the agency with the Council's opinion regarding the finding. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part. If the Council does not respond within 30 days of receipt of the request, the agency official's responsibilities under section 106 are fulfilled.

(B) The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall take into account the Council's opinion before the agency reaches a final decision on the finding.

(C) The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall then prepare a summary of the decision that contains the rationale for the decision and evidence of consideration of the Council's opinion, and provide it to the Council, the SHPO/THPO, and the consulting parties. The head of the agency may delegate his or her duties under this paragraph to the agency's senior policy official. If the agency official's initial finding will be revised, the agency official shall proceed in accordance with the revised finding. If the final decision of the agency is to affirm the initial agency finding of no historic properties affected, once the summary of the decision has been sent to the Council, the SHPO/THPO, and the consulting parties, the agency official's responsibilities under section 106 are fulfilled.

(D) The Council shall retain a record of agency responses to Council opinions on their findings of no historic properties affected. The Council shall make this information available to the public.

(2) *Historic properties affected.* If the agency official finds that there are historic properties which may be affected by the undertaking, the agency official shall notify all consulting parties, including Indian tribes or Native Hawaiian organizations, invite their views on the effects and assess adverse effects, if any, in accordance with § 800.5.

[65 FR 77725, Dec. 12, 2000, as amended at 69 FR 40553, July 6, 2004]

### § 800.5 Assessment of adverse effects.

(a) *Apply criteria of adverse effect.* In consultation with the SHPO/THPO and any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to identified historic properties, the agency official shall apply the criteria of adverse effect to historic properties within the area of potential effects. The agency official shall consider any views concerning such effects which have been provided by consulting parties and the public.

(1) *Criteria of adverse effect.* An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a

**36 C.F.R. § 800.5**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



for public inspection prior to approving the undertaking.

(i) If the SHPO/THPO, or the Council if it has entered the section 106 process, does not object within 30 days of receipt of an adequately documented finding, the agency official's responsibilities under section 106 are fulfilled.

(ii) If the SHPO/THPO objects within 30 days of receipt of an adequately documented finding, the agency official shall either consult with the objecting party to resolve the disagreement, or forward the finding and supporting documentation to the Council and request that the Council review the finding pursuant to paragraphs (d)(1)(iv)(A) through (d)(1)(iv)(C) of this section. When an agency official forwards such requests for review to the Council, the agency official shall concurrently notify all consulting parties that such a request has been made and make the request documentation available to the public.

(iii) During the SHPO/THPO 30 day review period, the Council may object to the finding and provide its opinion regarding the finding to the agency official and, if the Council determines the issue warrants it, the head of the agency. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part. The agency shall then proceed according to paragraphs (d)(1)(iv)(B) and (d)(1)(iv)(C) of this section.

(iv) (A) Upon receipt of the request under paragraph (d)(1)(ii) of this section, the Council will have 30 days in which to review the finding and provide the agency official and, if the Council determines the issue warrants it, the head of the agency with the Council's opinion regarding the finding. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part. If the Council does not respond within 30 days of receipt of the request, the agency official's responsibilities under section 106 are fulfilled.

(B) The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall take into account the Council's opinion before the agency reaches a final decision on the finding.

(C) The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall then prepare a summary of the decision that contains the rationale for the decision and evidence of consideration of the Council's opinion, and provide it to the Council, the SHPO/THPO, and the consulting parties. The head of the agency may delegate his or her duties under this paragraph to the agency's senior policy official. If the agency official's initial finding will be revised, the agency official shall proceed in accordance with the revised finding. If the final decision of the agency is to affirm the initial agency finding of no historic properties affected, once the summary of the decision has been sent to the Council, the SHPO/THPO, and the consulting parties, the agency official's responsibilities under section 106 are fulfilled.

(D) The Council shall retain a record of agency responses to Council opinions on their findings of no historic properties affected. The Council shall make this information available to the public.

(2) *Historic properties affected.* If the agency official finds that there are historic properties which may be affected by the undertaking, the agency official shall notify all consulting parties, including Indian tribes or Native Hawaiian organizations, invite their views on the effects and assess adverse effects, if any, in accordance with § 800.5.

[65 FR 77725, Dec. 12, 2000, as amended at 69 FR 40553, July 6, 2004]

### § 800.5 Assessment of adverse effects.

(a) *Apply criteria of adverse effect.* In consultation with the SHPO/THPO and any Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to identified historic properties, the agency official shall apply the criteria of adverse effect to historic properties within the area of potential effects. The agency official shall consider any views concerning such effects which have been provided by consulting parties and the public.

(1) *Criteria of adverse effect.* An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a

historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association. Consideration shall be given to all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the National Register. Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative.

(2) *Examples of adverse effects.* Adverse effects on historic properties include, but are not limited to:

(i) Physical destruction of or damage to all or part of the property;

(ii) Alteration of a property, including restoration, rehabilitation, repair, maintenance, stabilization, hazardous material remediation, and provision of handicapped access, that is not consistent with the Secretary's standards for the treatment of historic properties (36 CFR part 68) and applicable guidelines;

(iii) Removal of the property from its historic location;

(iv) Change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance;

(v) Introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features;

(vi) Neglect of a property which causes its deterioration, except where such neglect and deterioration are recognized qualities of a property of religious and cultural significance to an Indian tribe or Native Hawaiian organization; and

(vii) Transfer, lease, or sale of property out of Federal ownership or control without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance.

(3) *Phased application of criteria.* Where alternatives under consideration consist of corridors or large land areas, or where access to properties is restricted, the agency official may use a phased process in applying the criteria of adverse effect consistent with phased identification and evaluation efforts conducted pursuant to § 800.4(b)(2).

(b) *Finding of no adverse effect.* The agency official, in consultation with the SHPO/THPO, may propose a finding of no adverse effect when the undertaking's effects do not meet the criteria of paragraph (a)(1) of this section or the undertaking is modified or conditions are imposed, such as the subsequent review of plans for rehabilitation by the SHPO/THPO to ensure consistency with the Secretary's standards for the treatment of historic properties (36 CFR part 68) and applicable guidelines, to avoid adverse effects.

(c) *Consulting party review.* If the agency official proposes a finding of no adverse effect, the agency official shall notify all consulting parties of the finding and provide them with the documentation specified in § 800.11(e). The SHPO/THPO shall have 30 days from receipt to review the finding.

(1) *Agreement with, or no objection to, finding.* Unless the Council is reviewing the finding pursuant to papagraph (c)(3) of this section, the agency official may proceed after the close of the 30 day review period if the SHPO/THPO has agreed with the finding or has not provided a response, and no consulting party has objected. The agency official shall then carry out the undertaking in accordance with paragraph (d)(1) of this section.

(2) *Disagreement with finding.* (i) If within the 30 day review period the SHPO/THPO or any consulting party notifies the agency official in writing that it disagrees with the finding and specifies the reasons for the disagreement in the notification, the agency official shall either consult with the party to resolve the disagreement, or request the Council to review the finding pursuant to paragraphs (c)(3)(i) and (c)(3)(ii) of this section. The agency official shall include with such request the documentation specified in § 800.11(e). The agency official shall also concurrently notify all consulting parties that such a submission has been made and make the submission documentation available to the public.

(ii) If within the 30 day review period the Council provides the agency official and, if the Council determines the issue warrants it, the head of the agency, with a written opinion objecting to the finding, the agency shall then proceed according to paragraph (c)(3)(ii) of this section. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part.

(iii) The agency official should seek the concurrence of any Indian tribe or Native Hawaiian organization that has made known to the agency official that it attaches religious and cultural significance to a historic property subject to the finding. If such Indian tribe or Native Hawaiian organization disagrees with the finding, it may within the 30 day review period specify the reasons for disagreeing with the finding and request the Council to review and object to the finding pursuant to paragraph (c)(2)(ii) of this section.

(3) *Council review of findings.* (i) When a finding is submitted to the Council pursuant to paragraph (c)(2)(i) of this section, the Council shall review the finding and provide the agency official and, if the Council determines the issue warrants it, the head of the agency with its opinion as to whether the adverse effect criteria have been correctly applied. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part. The Council will provide its opinion within 15 days of receiving the documented finding from the agency official. The Council at its discretion may extend that time period for 15 days, in which case it shall notify the agency of such extension prior to the end of the initial 15 day period. If the Council does not respond within the applicable time period, the agency official's responsibilities under section 106 are fulfilled.

(ii)(A) The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall take into account the Council's opinion in reaching a final decision on the finding.

(B) The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall prepare a summary of the decision that contains the rationale for the decision and evidence of consideration of the Council's opinion, and provide it to the Council, the SHPO/THPO, and the consulting parties. The head of the agency may delegate his or her duties under this paragraph to the agency's senior policy official. If the agency official's initial finding will be revised, the agency official shall proceed in accordance with the revised finding. If the final decision of the agency is to affirm the initial finding of no adverse effect, once the summary of the decision has been sent to the Council, the SHPO/THPO, and the consulting parties, the agency official's responsibilities under section 106 are fulfilled.

(C) The Council shall retain a record of agency responses to Council opinions on their findings of no adverse effects. The Council shall make this information available to the public.

(d) *Results of assessment*—(1) *No adverse effect.* The agency official shall maintain a record of the finding and provide information on the finding to the public on request, consistent with the confidentiality provisions of § 800.11(c). Implementation of the undertaking in accordance with the finding as documented fulfills the agency official's responsibilities under section 106 and this part. If the agency official will not conduct the undertaking as proposed in the finding, the agency official shall reopen consultation under paragraph (a) of this section.

(2) *Adverse effect.* If an adverse effect is found, the agency official shall consult further to resolve the adverse effect pursuant to § 800.6.

[65 FR 77725, Dec. 12, 2000, as amended at 69 FR 40553, July 6, 2004]

### § 800.6 Resolution of adverse effects.

(a) *Continue consultation.* The agency official shall consult with the SHPO/THPO and other consulting parties, including Indian tribes and Native Hawaiian organizations, to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties.

**36 C.F.R. § 800.6**

(ii) If within the 30 day review period the Council provides the agency official and, if the Council determines the issue warrants it, the head of the agency, with a written opinion objecting to the finding, the agency shall then proceed according to paragraph (c)(3)(ii) of this section. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part.

(iii) The agency official should seek the concurrence of any Indian tribe or Native Hawaiian organization that has made known to the agency official that it attaches religious and cultural significance to a historic property subject to the finding. If such Indian tribe or Native Hawaiian organization disagrees with the finding, it may within the 30 day review period specify the reasons for disagreeing with the finding and request the Council to review and object to the finding pursuant to paragraph (c)(2)(ii) of this section.

(3) *Council review of findings.* (i) When a finding is submitted to the Council pursuant to paragraph (c)(2)(i) of this section, the Council shall review the finding and provide the agency official and, if the Council determines the issue warrants it, the head of the agency with its opinion as to whether the adverse effect criteria have been correctly applied. A Council decision to provide its opinion to the head of an agency shall be guided by the criteria in appendix A to this part. The Council will provide its opinion within 15 days of receiving the documented finding from the agency official. The Council at its discretion may extend that time period for 15 days, in which case it shall notify the agency of such extension prior to the end of the initial 15 day period. If the Council does not respond within the applicable time period, the agency official's responsibilities under section 106 are fulfilled.

(ii)(A) The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall take into account the Council's opinion in reaching a final decision on the finding.

(B) The person to whom the Council addresses its opinion (the agency official or the head of the agency) shall prepare a summary of the decision that contains the rationale for the decision and evidence of consideration of the Council's opinion, and provide it to the Council, the SHPO/THPO, and the consulting parties. The head of the agency may delegate his or her duties under this paragraph to the agency's senior policy official. If the agency official's initial finding will be revised, the agency official shall proceed in accordance with the revised finding. If the final decision of the agency is to affirm the initial finding of no adverse effect, once the summary of the decision has been sent to the Council, the SHPO/THPO, and the consulting parties, the agency official's responsibilities under section 106 are fulfilled.

(C) The Council shall retain a record of agency responses to Council opinions on their findings of no adverse effects. The Council shall make this information available to the public.

(d) *Results of assessment*—(1) *No adverse effect.* The agency official shall maintain a record of the finding and provide information on the finding to the public on request, consistent with the confidentiality provisions of § 800.11(c). Implementation of the undertaking in accordance with the finding as documented fulfills the agency official's responsibilities under section 106 and this part. If the agency official will not conduct the undertaking as proposed in the finding, the agency official shall reopen consultation under paragraph (a) of this section.

(2) *Adverse effect.* If an adverse effect is found, the agency official shall consult further to resolve the adverse effect pursuant to § 800.6.

[65 FR 77725, Dec. 12, 2000, as amended at 69 FR 40553, July 6, 2004]

**§ 800.6 Resolution of adverse effects.**

(a) *Continue consultation.* The agency official shall consult with the SHPO/THPO and other consulting parties, including Indian tribes and Native Hawaiian organizations, to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties.

(1) *Notify the Council and determine Council participation.* The agency official shall notify the Council of the adverse effect finding by providing the documentation specified in § 800.11(e).

(i) The notice shall invite the Council to participate in the consultation when:

(A) The agency official wants the Council to participate;

(B) The undertaking has an adverse effect upon a National Historic Landmark; or

(C) A programmatic agreement under § 800.14(b) will be prepared;

(ii) The SHPO/THPO, an Indian tribe or Native Hawaiian organization, or any other consulting party may at any time independently request the Council to participate in the consultation.

(iii) The Council shall advise the agency official and all consulting parties whether it will participate within 15 days of receipt of notice or other request. Prior to entering the process, the Council shall provide written notice to the agency official and the consulting parties that its decision to participate meets the criteria set forth in appendix A to this part. The Council shall also advise the head of the agency of its decision to enter the process. Consultation with Council participation is conducted in accordance with paragraph (b)(2) of this section.

(iv) If the Council does not join the consultation, the agency official shall proceed with consultation in accordance with paragraph (b)(1) of this section.

(2) *Involve consulting parties.* In addition to the consulting parties identified under § 800.3(f), the agency official, the SHPO/THPO and the Council, if participating, may agree to invite other individuals or organizations to become consulting parties. The agency official shall invite any individual or organization that will assume a specific role or responsibility in a memorandum of agreement to participate as a consulting party.

(3) *Provide documentation.* The agency official shall provide to all consulting parties the documentation specified in § 800.11(e), subject to the confidentiality provisions of § 800.11(c), and such other documentation as may be developed during the consultation to resolve adverse effects.

(4) *Involve the public.* The agency official shall make information available to the public, including the documentation specified in § 800.11(e), subject to the confidentiality provisions of § 800.11(c). The agency official shall provide an opportunity for members of the public to express their views on resolving adverse effects of the undertaking. The agency official should use appropriate mechanisms, taking into account the magnitude of the undertaking and the nature of its effects upon historic properties, the likely effects on historic properties, and the relationship of the Federal involvement to the undertaking to ensure that the public's views are considered in the consultation. The agency official should also consider the extent of notice and information concerning historic preservation issues afforded the public at earlier steps in the section 106 process to determine the appropriate level of public involvement when resolving adverse effects so that the standards of § 800.2(d) are met.

(5) *Restrictions on disclosure of information.* Section 304 of the act and other authorities may limit the disclosure of information under paragraphs (a)(3) and (a)(4) of this section. If an Indian tribe or Native Hawaiian organization objects to the disclosure of information or if the agency official believes that there are other reasons to withhold information, the agency official shall comply with § 800.11(c) regarding the disclosure of such information.

(b) *Resolve adverse effects*—(1) *Resolution without the Council.* (i) The agency official shall consult with the SHPO/THPO and other consulting parties to seek ways to avoid, minimize or mitigate the adverse effects.

(ii) The agency official may use standard treatments established by the Council under § 800.14(d) as a basis for a memorandum of agreement.

(iii) If the Council decides to join the consultation, the agency official shall follow paragraph (b)(2) of this section.

(iv) If the agency official and the SHPO/THPO agree on how the adverse effects will be resolved, they shall execute a memorandum of agreement. The agency official must submit a copy of

the executed memorandum of agreement, along with the documentation specified in § 800.11(f), to the Council prior to approving the undertaking in order to meet the requirements of section 106 and this subpart.

(v) If the agency official, and the SHPO/THPO fail to agree on the terms of a memorandum of agreement, the agency official shall request the Council to join the consultation and provide the Council with the documentation set forth in § 800.11(g). If the Council decides to join the consultation, the agency official shall proceed in accordance with paragraph (b)(2) of this section. If the Council decides not to join the consultation, the Council will notify the agency and proceed to comment in accordance with § 800.7(c).

(2) *Resolution with Council participation.* If the Council decides to participate in the consultation, the agency official shall consult with the SHPO/THPO, the Council, and other consulting parties, including Indian tribes and Native Hawaiian organizations under § 800.2(c)(3), to seek ways to avoid, minimize or mitigate the adverse effects. If the agency official, the SHPO/THPO, and the Council agree on how the adverse effects will be resolved, they shall execute a memorandum of agreement.

(c) *Memorandum of agreement.* A memorandum of agreement executed and implemented pursuant to this section evidences the agency official's compliance with section 106 and this part and shall govern the undertaking and all of its parts. The agency official shall ensure that the undertaking is carried out in accordance with the memorandum of agreement.

(1) *Signatories.* The signatories have sole authority to execute, amend or terminate the agreement in accordance with this subpart.

(i) The agency official and the SHPO/THPO are the signatories to a memorandum of agreement executed pursuant to paragraph (b)(1) of this section.

(ii) The agency official, the SHPO/THPO, and the Council are the signatories to a memorandum of agreement executed pursuant to paragraph (b)(2) of this section.

(iii) The agency official and the Council are signatories to a memorandum of agreement executed pursuant to § 800.7(a)(2).

(2) *Invited signatories.* (i) The agency official may invite additional parties to be signatories to a memorandum of agreement. Any such party that signs the memorandum of agreement shall have the same rights with regard to seeking amendment or termination of the memorandum of agreement as other signatories.

(ii) The agency official may invite an Indian tribe or Native Hawaiian organization that attaches religious and cultural significance to historic properties located off tribal lands to be a signatory to a memorandum of agreement concerning such properties.

(iii) The agency official should invite any party that assumes a responsibility under a memorandum of agreement to be a signatory.

(iv) The refusal of any party invited to become a signatory to a memorandum of agreement pursuant to paragraph (c)(2) of this section does not invalidate the memorandum of agreement.

(3) *Concurrence by others.* The agency official may invite all consulting parties to concur in the memorandum of agreement. The signatories may agree to invite others to concur. The refusal of any party invited to concur in the memorandum of agreement does not invalidate the memorandum of agreement.

(4) *Reports on implementation.* Where the signatories agree it is appropriate, a memorandum of agreement shall include a provision for monitoring and reporting on its implementation.

(5) *Duration.* A memorandum of agreement shall include provisions for termination and for reconsideration of terms if the undertaking has not been implemented within a specified time.

(6) *Discoveries.* Where the signatories agree it is appropriate, a memorandum of agreement shall include provisions to deal with the subsequent discovery or identification of additional historic properties affected by the undertaking.

(7) *Amendments.* The signatories to a memorandum of agreement may amend it. If the Council was not a signatory

to the original agreement and the signatories execute an amended agreement, the agency official shall file it with the Council.

(8) *Termination.* If any signatory determines that the terms of a memorandum of agreement cannot be or are not being carried out, the signatories shall consult to seek amendment of the agreement. If the agreement is not amended, any signatory may terminate it. The agency official shall either execute a memorandum of agreement with signatories under paragraph (c)(1) of this section or request the comments of the Council under § 800.7(a).

(9) *Copies.* The agency official shall provide each consulting party with a copy of any memorandum of agreement executed pursuant to this subpart.

### § 800.7 Failure to resolve adverse effects.

(a) *Termination of consultation.* After consulting to resolve adverse effects pursuant to § 800.6(b)(2), the agency official, the SHPO/THPO, or the Council may determine that further consultation will not be productive and terminate consultation. Any party that terminates consultation shall notify the other consulting parties and provide them the reasons for terminating in writing.

(1) If the agency official terminates consultation, the head of the agency or an Assistant Secretary or other officer with major department-wide or agency-wide responsibilities shall request that the Council comment pursuant to paragraph (c) of this section and shall notify all consulting parties of the request.

(2) If the SHPO terminates consultation, the agency official and the Council may execute a memorandum of agreement without the SHPO's involvement.

(3) If a THPO terminates consultation regarding an undertaking occurring on or affecting historic properties on its tribal lands, the Council shall comment pursuant to paragraph (c) of this section.

(4) If the Council terminates consultation, the Council shall notify the agency official, the agency's Federal preservation officer and all consulting parties of the termination and comment under paragraph (c) of this section. The Council may consult with the agency's Federal preservation officer prior to terminating consultation to seek to resolve issues concerning the undertaking and its effects on historic properties.

(b) *Comments without termination.* The Council may determine that it is appropriate to provide additional advisory comments upon an undertaking for which a memorandum of agreement will be executed. The Council shall provide them to the agency official when it executes the memorandum of agreement.

(c) *Comments by the Council*—(1) *Preparation.* The Council shall provide an opportunity for the agency official, all consulting parties, and the public to provide their views within the time frame for developing its comments. Upon request of the Council, the agency official shall provide additional existing information concerning the undertaking and assist the Council in arranging an onsite inspection and an opportunity for public participation.

(2) *Timing.* The Council shall transmit its comments within 45 days of receipt of a request under paragraph (a)(1) or (a)(3) of this section or § 800.8(c)(3), or termination by the Council under § 800.6(b)(1)(v) or paragraph (a)(4) of this section, unless otherwise agreed to by the agency official.

(3) *Transmittal.* The Council shall provide its comments to the head of the agency requesting comment with copies to the agency official, the agency's Federal preservation officer, all consulting parties, and others as appropriate.

(4) *Response to Council comment.* The head of the agency shall take into account the Council's comments in reaching a final decision on the undertaking. Section 110(l) of the act directs that the head of the agency shall document this decision and may not delegate his or her responsibilities pursuant to section 106. Documenting the agency head's decision shall include:

(i) Preparing a summary of the decision that contains the rationale for the decision and evidence of consideration of the Council's comments and providing it to the Council prior to approval of the undertaking;

**36 C.F.R. § 800.16**

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO



carried out in a manner consistent with the program comment, the Council may withdraw the comment and the agency official shall comply with the requirements of §§ 800.3 through 800.6 for the individual undertakings.

(f) *Consultation with Indian tribes and Native Hawaiian organizations when developing program alternatives.* Whenever an agency official proposes a program alternative pursuant to paragraphs (a) through (e) of this section, the agency official shall ensure that development of the program alternative includes appropriate government-to-government consultation with affected Indian tribes and consultation with affected Native Hawaiian organizations.

(1) *Identifying affected Indian tribes and Native Hawaiian organizations.* If any undertaking covered by a proposed program alternative has the potential to affect historic properties on tribal lands, the agency official shall identify and consult with the Indian tribes having jurisdiction over such lands. If a proposed program alternative has the potential to affect historic properties of religious and cultural significance to an Indian tribe or a Native Hawaiian organization which are located off tribal lands, the agency official shall identify those Indian tribes and Native Hawaiian organizations that might attach religious and cultural significance to such properties and consult with them. When a proposed program alternative has nationwide applicability, the agency official shall identify an appropriate government to government consultation with Indian tribes and consult with Native Hawaiian organizations in accordance with existing Executive orders, Presidential memoranda, and applicable provisions of law.

(2) *Results of consultation.* The agency official shall provide summaries of the views, along with copies of any written comments, provided by affected Indian tribes and Native Hawaiian organizations to the Council as part of the documentation for the proposed program alternative. The agency official and the Council shall take those views into account in reaching a final decision on the proposed program alternative.

[65 FR 77725, Dec. 12, 2000, as amended at 69 FR 40554, July 6, 2004]

## § 800.15 Tribal, State, and local program alternatives. [Reserved]

## § 800.16 Definitions.

(a) *Act* means the National Historic Preservation Act of 1966, as amended, 16 U.S.C. 470–470w-6.

(b) *Agency* means agency as defined in 5 U.S.C. 551.

(c) *Approval of the expenditure of funds* means any final agency decision authorizing or permitting the expenditure of Federal funds or financial assistance on an undertaking, including any agency decision that may be subject to an administrative appeal.

(d) *Area of potential effects* means the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties, if any such properties exist. The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking.

(e) *Comment* means the findings and recommendations of the Council formally provided in writing to the head of a Federal agency under section 106.

(f) *Consultation* means the process of seeking, discussing, and considering the views of other participants, and, where feasible, seeking agreement with them regarding matters arising in the section 106 process. The Secretary's ''Standards and Guidelines for Federal Agency Preservation Programs pursuant to the National Historic Preservation Act'' provide further guidance on consultation.

(g) *Council* means the Advisory Council on Historic Preservation or a Council member or employee designated to act for the Council.

(h) *Day* or *days* means calendar days.

(i) *Effect* means alteration to the characteristics of a historic property qualifying it for inclusion in or eligibility for the National Register.

(j) *Foreclosure* means an action taken by an agency official that effectively precludes the Council from providing comments which the agency official can meaningfully consider prior to the approval of the undertaking.

(k) *Head of the agency* means the chief official of the Federal agency responsible for all aspects of the agency's

actions. If a State, local, or tribal government has assumed or has been delegated responsibility for section 106 compliance, the head of that unit of government shall be considered the head of the agency.

(l)(1) *Historic property* means any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places maintained by the Secretary of the Interior. This term includes artifacts, records, and remains that are related to and located within such properties. The term includes properties of traditional religious and cultural importance to an Indian tribe or Native Hawaiian organization and that meet the National Register criteria.

(2) The term *eligible for inclusion in the National Register* includes both properties formally determined as such in accordance with regulations of the Secretary of the Interior and all other properties that meet the National Register criteria.

(m) *Indian tribe* means an Indian tribe, band, nation, or other organized group or community, including a native village, regional corporation, or village corporation, as those terms are defined in section 3 of the Alaska Native Claims Settlement Act (43 U.S.C. 1602), which is recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

(n) *Local government* means a city, county, parish, township, municipality, borough, or other general purpose political subdivision of a State.

(o) *Memorandum of agreement* means the document that records the terms and conditions agreed upon to resolve the adverse effects of an undertaking upon historic properties.

(p) *National Historic Landmark* means a historic property that the Secretary of the Interior has designated a National Historic Landmark.

(q) *National Register* means the National Register of Historic Places maintained by the Secretary of the Interior.

(r) *National Register criteria* means the criteria established by the Secretary of the Interior for use in evaluating the eligibility of properties for the National Register (36 CFR part 60).

(s)(1) *Native Hawaiian organization* means any organization which serves and represents the interests of Native Hawaiians; has as a primary and stated purpose the provision of services to Native Hawaiians; and has demonstrated expertise in aspects of historic preservation that are significant to Native Hawaiians.

(2) *Native Hawaiian* means any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii.

(t) *Programmatic agreement* means a document that records the terms and conditions agreed upon to resolve the potential adverse effects of a Federal agency program, complex undertaking or other situations in accordance with § 800.14(b).

(u) *Secretary* means the Secretary of the Interior acting through the Director of the National Park Service except where otherwise specified.

(v) *State Historic Preservation Officer (SHPO)* means the official appointed or designated pursuant to section 101(b)(1) of the act to administer the State historic preservation program or a representative designated to act for the State historic preservation officer.

(w) *Tribal Historic Preservation Officer (THPO)* means the tribal official appointed by the tribe's chief governing authority or designated by a tribal ordinance or preservation program who has assumed the responsibilities of the SHPO for purposes of section 106 compliance on tribal lands in accordance with section 101(d)(2) of the act.

(x) *Tribal lands* means all lands within the exterior boundaries of any Indian reservation and all dependent Indian communities.

(y) *Undertaking* means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including those carried out by or on behalf of a Federal agency; those carried out with Federal financial assistance; and those requiring a Federal permit, license or approval.

(z) *Senior policy official* means the senior policy level official designated

by the head of the agency pursuant to section 3(e) of Executive Order 13287.

[65 FR 77725, Dec. 12, 2000, as amended at 69 FR 40555, July 6, 2004]

APPENDIX A TO PART 800—CRITERIA FOR COUNCIL INVOLVEMENT IN REVIEWING INDIVIDUAL SECTION 106 CASES

(a) *Introduction.* This appendix sets forth the criteria that will be used by the Council to determine whether to enter an individual section 106 review that it normally would not be involved in.

(b) *General policy.* The Council may choose to exercise its authorities under the section 106 regulations to participate in an individual project pursuant to the following criteria. However, the Council will not always elect to participate even though one or more of the criteria may be met.

(c) *Specific criteria.* The Council is likely to enter the section 106 process at the steps specified in the regulations in this part when an undertaking:

(1) *Has substantial impacts on important historic properties.* This may include adverse effects on properties that possess a national level of significance or on properties that are of unusual or noteworthy importance or are a rare property type; or adverse effects to large numbers of historic properties, such as impacts to multiple properties within a historic district.

(2) *Presents important questions of policy or interpretation.* This may include questions about how the Council's regulations are being applied or interpreted, including possible foreclosure or anticipatory demolition situations; situations where the outcome will set a precedent affecting Council policies or program goals; or the development of programmatic agreements that alter the way the section 106 process is applied to a group or type of undertakings.

(3) *Has the potential for presenting procedural problems.* This may include cases with substantial public controversy that is related to historic preservation issues; with disputes among or about consulting parties which the Council's involvement could help resolve; that are involved or likely to be involved in litigation on the basis of section 106; or carried out by a Federal agency, in a State or locality, or on tribal lands where the Council has previously identified problems with section 106 compliance pursuant to §800.9(d)(2).

(4) *Presents issues of concern to Indian tribes or Native Hawaiian organizations.* This may include cases where there have been concerns raised about the identification of, evaluation of or assessment of effects on historic properties to which an Indian tribe or Native Hawaiian organization attaches religious and cultural significance; where an Indian tribe or Native Hawaiian organization has requested Council involvement to assist in the resolution of adverse effects; or where there are questions relating to policy, interpretation or precedent under section 106 or its relation to other authorities, such as the Native American Graves Protection and Repatriation Act.

# PART 801—HISTORIC PRESERVATION REQUIREMENTS OF THE URBAN DEVELOPMENT ACTION GRANT PROGRAM

Sec.
801.1 Purpose and authorities.
801.2 Definitions.
801.3 Applicant responsibilities.
801.4 Council comments.
801.5 State Historic Preservation Officer responsibilities.
801.6 Coordination with requirements under the National Environmental Policy Act (42 U.S.C. 4321 *et seq.*).
801.7 Information requirements.
801.8 Public participation.
APPENDIX 1 TO PART 801—IDENTIFICATION OF PROPERTIES: GENERAL
APPENDIX 2 TO PART 801—SPECIAL PROCEDURES FOR IDENTIFICATION AND CONSIDERATION OF ARCHEOLOGICAL PROPERTIES IN AN URBAN CONTEXT

AUTHORITY: Pub. L. 89–665, 80 Stat. 915 (16 U.S.C. 470); Pub. L. 94–422, 90 Stat. 1320 (16 U.S.C. 470(i)); Pub. L. 96–399, 94 Stat. 1619 (42 U.S.C. 5320).

SOURCE: 46 FR 42428, Aug. 20, 1981, unless otherwise noted.

### §801.1 Purpose and authorities.

(a) These regulations are required by section 110(c) of the Housing and Community Development Act of 1980 (HCDA) (42 U.S.C. 5320) and apply only to projects proposed to be funded by the Department of Housing and Urban Development (HUD) under the Urban Development Action Grant (UDAG) Program authorized by title I of the Housing and Community Development Act of 1974, as amended (42 U.S.C. 5301). These regulations establish an expedited process for obtaining the comments of the Council specifically for the UDAG program and, except as specifically provided, substitute for the Council's regulations for the ''Protection of Historic and Cultural Properties'' (36 CFR part 800).

**40 C.F.R. § 50.13**

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO




year after the effective date of the designation of that area, pursuant to section 107 of the Clean Air Act, for the lead NAAQS set forth in §50.16; except that for areas designated nonattainment for the lead NAAQS set forth in this section as of the effective date of §50.16, the lead NAAQS set forth in this section will apply until that area submits, pursuant to section 191 of the Clean Air Act, and EPA approves, an implementation plan providing for attainment and/or maintenance of the lead NAAQS set forth in §50.16.

(Secs. 109, 301(a) Clean Air Act as amended (42 U.S.C. 7409, 7601(a)))

[43 FR 46258, Oct. 5, 1978, as amended at 73 FR 67051, Nov. 12, 2008]

**§50.13 National primary and secondary ambient air quality standards for $PM_{2.5}$.**

(a) The national primary and secondary ambient air quality standards for particulate matter are 15.0 micrograms per cubic meter (µg/m$^3$) annual arithmetic mean concentration, and 35 µg/m$^3$ 24-hour average concentration measured in the ambient air as $PM_{2.5}$ (particles with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers) by either:

(1) A reference method based on appendix L of this part and designated in accordance with part 53 of this chapter; or

(2) An equivalent method designated in accordance with part 53 of this chapter.

(b) The annual primary and secondary $PM_{2.5}$ standards are met when the annual arithmetic mean concentration, as determined in accordance with appendix N of this part, is less than or equal to 15.0 µg/m$^3$.

(c) The 24-hour primary and secondary $PM_{2.5}$ standards are met when the 98th percentile 24-hour concentration, as determined in accordance with appendix N of this part, is less than or equal to 35 µg/m$^3$.

(d) Until the effective date of the final Fine Particulate Matter National Ambient Air Quality Standards: State Implementation Plan Requirements rule to be codified at 40 CFR 51.1000 through 51.1016, the 1997 annual $PM_{2.5}$ NAAQS set forth in this section will continue in effect, notwithstanding the promulgation of the 2012 primary annual $PM_{2.5}$ NAAQS under §50.18. The 1997 primary annual $PM_{2.5}$ NAAQS set forth in this section will no longer apply upon the effective date of the final Fine Particulate Matter National Ambient Air Quality Standards: State Implementation Plan Requirements rule; except that for areas designated nonattainment for the 1997 annual $PM_{2.5}$ NAAQS set forth in this section as of the effective date of the final Fine Particulate Matter National Ambient Air Quality Standards: State Implementation Plan Requirements rule, the requirements applicable to the 1997 primary annual $PM_{2.5}$ NAAQS set forth in this section will apply until the effective date of an area's redesignation to attainment for the 1997 annual $PM_{2.5}$ NAAQS pursuant to the requirements of section 107 of the Clean Air Act. The 1997 secondary annual $PM_{2.5}$ NAAQS and the 1997 24-hour $PM_{2.5}$ NAAQS shall remain in effect. The area designations and classifications with respect to the 1997 annual and 24-hour $PM_{2.5}$ NAAQS remain codified in 40 CFR part 81 in order to provide information on where the 1997 primary annual $PM_{2.5}$ NAAQS has been revoked and to facilitate the implementation of the 1997 secondary annual $PM_{2.5}$ NAAQS and the 1997 24-hour $PM_{2.5}$ NAAQS.

[71 FR 61224, Oct. 17, 2006, as amended at 81 FR 58149, Aug. 24, 2016]

**§50.14 Treatment of air quality monitoring data influenced by exceptional events.**

(a) *Requirements*—(1) *Scope*. (i) This section applies to the treatment of data showing exceedances or violations of any national ambient air quality standard for purposes of the following types of regulatory determinations by the Administrator:

(A) An action to designate an area, pursuant to Clean Air Act section 107(d)(1), or redesignate an area, pursuant to Clean Air Act section 107(d)(3), for a particular national ambient air quality standard;

(B) The assignment or re-assignment of a classification category to a nonattainment area where such classification is based on a comparison of pollutant design values, calculated according

**40 C.F.R. § 50.18**

(c) The level of the standard shall be measured by a reference method based on appendix A or A–1 of this part, or by a Federal Equivalent Method (FEM) designated in accordance with part 53 of this chapter.

[75 FR 35592, June 22, 2010]

**§ 50.18 National primary ambient air quality standards for $PM_{2.5}$.**

(a) The national primary ambient air quality standards for $PM_{2.5}$ are 12.0 micrograms per cubic meter ($\mu g/m^3$) annual arithmetic mean concentration and 35 $\mu g/m^3$ 24-hour average concentration measured in the ambient air as $PM_{2.5}$ (particles with an aerodynamic diameter less than or equal to a nominal 2.5 micrometers) by either:

(1) A reference method based on appendix L to this part and designated in accordance with part 53 of this chapter; or

(2) An equivalent method designated in accordance with part 53 of this chapter.

(b) The primary annual $PM_{2.5}$ standard is met when the annual arithmetic mean concentration, as determined in accordance with appendix N of this part, is less than or equal to 12.0 $\mu g/m^3$.

(c) The primary 24-hour $PM_{2.5}$ standard is met when the 98th percentile 24-hour concentration, as determined in accordance with appendix N of this part, is less than or equal to 35 $\mu g/m^3$.

[78 FR 3277, Jan. 15, 2013]

**§ 50.19 National primary and secondary ambient air quality standards for ozone.**

(a) The level of the national 8-hour primary ambient air quality standard for ozone ($O_3$) is 0.070 parts per million (ppm), daily maximum 8-hour average, measured by a reference method based on appendix D to this part and designated in accordance with part 53 of this chapter or an equivalent method designated in accordance with part 53 of this chapter.

(b) The 8-hour primary $O_3$ ambient air quality standard is met at an ambient air quality monitoring site when the 3-year average of the annual fourth-highest daily maximum 8-hour average $O_3$ concentration is less than or equal to 0.070 ppm, as determined in accordance with appendix U to this part.

(c) The level of the national secondary ambient air quality standard for $O_3$ is 0.070 ppm, daily maximum 8-hour average, measured by a reference method based on appendix D to this part and designated in accordance with part 53 of this chapter or an equivalent method designated in accordance with part 53 of this chapter.

(d) The 8-hour secondary $O_3$ ambient air quality standard is met at an ambient air quality monitoring site when the 3-year average of the annual fourth-highest daily maximum 8-hour average $O_3$ concentration is less than or equal to 0.070 ppm, as determined in accordance with appendix U to this part.

[80 FR 65452, Oct. 26, 2015]

APPENDIX A–1 TO PART 50—REFERENCE MEASUREMENT PRINCIPLE AND CALIBRATION PROCEDURE FOR THE MEASUREMENT OF SULFUR DIOXIDE IN THE ATMOSPHERE (ULTRAVIOLET FLUORESCENCE METHOD)

1.0 APPLICABILITY

1.1 This ultraviolet fluorescence (UVF) method provides a measurement of the concentration of sulfur dioxide ($SO_2$) in ambient air for determining compliance with the national primary and secondary ambient air quality standards for sulfur oxides (sulfur dioxide) as specified in § 50.4, § 50.5, and § 50.17 of this chapter. The method is applicable to the measurement of ambient $SO_2$ concentrations using continuous (real-time) sampling. Additional quality assurance procedures and guidance are provided in part 58, appendix A, of this chapter and in Reference 3.

2.0 PRINCIPLE

2.1 This reference method is based on automated measurement of the intensity of the characteristic fluorescence released by $SO_2$ in an ambient air sample contained in a measurement cell of an analyzer when the air sample is irradiated by ultraviolet (UV) light passed through the cell. The fluorescent light released by the $SO_2$ is also in the ultraviolet region, but at longer wavelengths than the excitation light. Typically, optimum instrumental measurement of $SO_2$ concentrations is obtained with an excitation wavelength in a band between approximately 190 to 230 nm, and measurement of the $SO_2$ fluorescence in a broad band around 320 nm, but these wavelengths are not necessarily

**40 C.F.R. § 1502.9 (2019)**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO




as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(3) By stage of technological development including federal or federally assisted research, development or demonstration programs for new technologies which, if applied, could significantly affect the quality of the human environment. Statements shall be prepared on such programs and shall be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(d) Agencies shall as appropriate employ scoping (§ 1501.7), tiering (§ 1502.20), and other methods listed in §§ 1500.4 and 1500.5 to relate broad and narrow actions and to avoid duplication and delay.

### § 1502.5 Timing.

An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (§ 1508.23) so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made (§§ 1500.2(c), 1501.2, and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary.

(b) For applications to the agency appropriate environmental assessments or statements shall be commenced no later than immediately after the application is received. Federal agencies are encouraged to begin preparation of such assessments or statements earlier, preferably jointly with applicable State or local agencies.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.

### § 1502.6 Interdisciplinary preparation.

Environmental impact statements shall be prepared using an inter-disciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of the Act). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§ 1501.7).

### § 1502.7 Page limits.

The text of final environmental impact statements (e.g., paragraphs (d) through (g) of § 1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages.

### § 1502.8 Writing.

Environmental impact statements shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which will be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

### § 1502.9 Draft, final, and supplemental statements.

Except for proposals for legislation as provided in § 1506.8 environmental impact statements shall be prepared in two stages and may be supplemented.

(a) Draft environmental impact statements shall be prepared in accordance with the scope decided upon in the scoping process. The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements

in section 102(2)(C) of the Act. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion. The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action.

(b) Final environmental impact statements shall respond to comments as required in part 1503 of this chapter. The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(c) Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall adopt procedures for introducing a supplement into its formal administrative record, if such a record exists.

(4) Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

**§ 1502.10 Recommended format.**

Agencies shall use a format for environmental impact statements which will encourage good analysis and clear presentation of the alternatives including the proposed action. The following standard format for environmental impact statements should be followed unless the agency determines that there is a compelling reason to do otherwise:

(a) Cover sheet.

(b) Summary.

(c) Table of contents.

(d) Purpose of and need for action.

(e) Alternatives including proposed action (sections 102(2)(C)(iii) and 102(2)(E) of the Act).

(f) Affected environment.

(g) Environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of the Act).

(h) List of preparers.

(i) List of Agencies, Organizations, and persons to whom copies of the statement are sent.

(j) Index.

(k) Appendices (if any).

If a different format is used, it shall include paragraphs (a), (b), (c), (h), (i), and (j), of this section and shall include the substance of paragraphs (d), (e), (f), (g), and (k) of this section, as further described in §§ 1502.11 through 1502.18, in any appropriate format.

**§ 1502.11 Cover sheet.**

The cover sheet shall not exceed one page. It shall include:

(a) A list of the responsible agencies including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and if appropriate the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one paragraph abstract of the statement.

(f) The date by which comments must be received (computed in cooperation with EPA under § 1506.10).

The information required by this section may be entered on Standard Form 424 (in items 4, 6, 7, 10, and 18).

**§ 1502.12 Summary.**

Each environmental impact statement shall contain a summary which adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice

**40 C.F.R. § 1502.16 (2019)**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO




among alternatives). The summary will normally not exceed 15 pages.

**§ 1502.13 Purpose and need.**

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

**§ 1502.14 Alternatives including the proposed action.**

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

**§ 1502.15 Affected environment.**

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The descriptions shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

**§ 1502.16 Environmental consequences.**

This section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in § 1502.14. It shall include discussions of:

(a) Direct effects and their significance (§ 1508.8).

(b) Indirect effects and their significance (§ 1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See § 1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under § 1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

**§ 1502.17 List of preparers.**

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§ 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

**§ 1502.18 Appendix.**

If an agency prepares an appendix to an environmental impact statement the appendix shall:

(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

**§ 1502.19 Circulation of the environmental impact statement.**

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in § 1502.18(d) and unchanged statements as provided in § 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

**§ 1502.20 Tiering.**

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

**§ 1502.21 Incorporation by reference.**

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material

**40 C.F.R. § 1502.21 (2019)**

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

**§ 1502.17 List of preparers.**

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§ 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

**§ 1502.18 Appendix.**

If an agency prepares an appendix to an environmental impact statement the appendix shall:

(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

**§ 1502.19 Circulation of the environmental impact statement.**

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in § 1502.18(d) and unchanged statements as provided in § 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

**§ 1502.20 Tiering.**

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

**§ 1502.21 Incorporation by reference.**

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material

may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

### § 1502.22 Incomplete or unavailable information.

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, ''reasonably foreseeable'' includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the FEDERAL REGISTER on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

[51 FR 15625, Apr. 25, 1986]

### § 1502.23 Cost-benefit analysis.

If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with section 102(2)(B) of the Act the statement shall, when a cost-benefit analysis is prepared, discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations. In any event, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision.

### § 1502.24 Methodology and scientific accuracy.

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

**40 C.F.R. § 1502.24 (2019)**

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO




may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

**§ 1502.22 Incomplete or unavailable information.**

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, ''reasonably foreseeable'' includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the FEDERAL REGISTER on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

[51 FR 15625, Apr. 25, 1986]

**§ 1502.23 Cost-benefit analysis.**

If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with section 102(2)(B) of the Act the statement shall, when a cost-benefit analysis is prepared, discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations. In any event, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision.

**§ 1502.24 Methodology and scientific accuracy.**

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

**40 C.F.R. § 1503.4 (2019)**

(c) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental reviews or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant site-specific effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or entitlements.

(d) When a cooperating agency with jurisdiction by law objects to or expresses reservations about the proposal on grounds of environmental impacts, the agency expressing the objection or reservation shall specify the mitigation measures it considers necessary to allow the agency to grant or approve applicable permit, license, or related requirements or concurrences.

**§ 1503.4 Response to comments.**

(a) An agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, and shall respond by one or more of the means listed below, stating its response in the final statement. Possible responses are to:

(1) Modify alternatives including the proposed action.

(2) Develop and evaluate alternatives not previously given serious consideration by the agency.

(3) Supplement, improve, or modify its analyses.

(4) Make factual corrections.

(5) Explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response.

(b) All substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous), should be attached to the final statement whether or not the comment is thought to merit individual discussion by the agency in the text of the statement.

(c) If changes in response to comments are minor and are confined to the responses described in paragraphs (a)(4) and (5) of this section, agencies may write them on errata sheets and attach them to the statement instead of rewriting the draft statement. In such cases only the comments, the responses, and the changes and not the final statement need be circulated (§ 1502.19). The entire document with a new cover sheet shall be filed as the final statement (§ 1506.9).

## PART 1504—PREDECISION REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

Sec.
1504.1 Purpose.
1504.2 Criteria for referral.
1504.3 Procedure for referrals and response.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

**§ 1504.1 Purpose.**

(a) This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements.

(b) Under section 309 of the Clean Air Act (42 U.S.C. 7609), the Administrator of the Environmental Protection Agency is directed to review and comment publicly on the environmental impacts of Federal activities, including actions for which environmental impact statements are prepared. If after this review the Administrator determines that the matter is ''unsatisfactory from the standpoint of public health or welfare or environmental quality,'' section 309 directs that the matter be referred to the Council (hereafter ''environmental referrals'').

(c) Under section 102(2)(C) of the Act other Federal agencies may make similar reviews of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These reviews

**40 C.F.R. § 1508.7 (2019)**

**§ 1508.6 Council.**

*Council* means the Council on Environmental Quality established by title II of the Act.

**§ 1508.7 Cumulative impact.**

*Cumulative impact* is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**§ 1508.8 Effects.**

*Effects* include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

**§ 1508.9 Environmental assessment.**

*Environmental assessment:*

(a) Means a concise public document for which a Federal agency is responsible that serves to:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

(2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

(3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

**§ 1508.10 Environmental document.**

*Environmental document* includes the documents specified in § 1508.9 (environmental assessment), § 1508.11 (environmental impact statement), § 1508.13 (finding of no significant impact), and § 1508.22 (notice of intent).

**§ 1508.11 Environmental impact statement.**

*Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of the Act.

**§ 1508.12 Federal agency.**

*Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations States and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

**§ 1508.13 Finding of no significant impact.**

*Finding of no significant impact* means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§ 1501.7(a)(5)). If the assessment is included, the finding need not

**40 C.F.R. § 1506.13 (2022)**

AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO




FEDERAL REGISTER each week of the environmental impact statements filed since its prior notice. The minimum time periods set forth in this section are calculated from the date of publication of this notice.

(b) Unless otherwise provided by law, including statutory provisions for combining a final environmental impact statement and record of decision, Federal agencies may not make or issue a record of decision under § 1505.2 of this chapter for the proposed action until the later of the following dates:

(1) 90 days after publication of the notice described in paragraph (a) of this section for a draft environmental impact statement.

(2) 30 days after publication of the notice described in paragraph (a) of this section for a final environmental impact statement.

(c) An agency may make an exception to the rule on timing set forth in paragraph (b) of this section for a proposed action in the following circumstances:

(1) Some agencies have a formally established appeal process after publication of the final environmental impact statement that allows other agencies or the public to take appeals on a decision and make their views known. In such cases where a real opportunity exists to alter the decision, the agency may make and record the decision at the same time it publishes the environmental impact statement. This means that the period for appeal of the decision and the 30-day period set forth in paragraph (b)(2) of this section may run concurrently. In such cases, the environmental impact statement shall explain the timing and the public's right of appeal and provide notification consistent with § 1506.10; or

(2) An agency engaged in rulemaking under the Administrative Procedure Act or other statute for the purpose of protecting the public health or safety may waive the time period in paragraph (b)(2) of this section, publish a decision on the final rule simultaneously with publication of the notice of the availability of the final environmental impact statement, and provide notification consistent with § 1506.10, as described in paragraph (a) of this section.

(d) If an agency files the final environmental impact statement within 90 days of the filing of the draft environmental impact statement with the Environmental Protection Agency, the decision-making period and the 90-day period may run concurrently. However, subject to paragraph (e) of this section, agencies shall allow at least 45 days for comments on draft statements.

(e) The lead agency may extend the minimum periods in paragraph (b) of this section and provide notification consistent with § 1506.10. Upon a showing by the lead agency of compelling reasons of national policy, the Environmental Protection Agency may reduce the minimum periods and, upon a showing by any other Federal agency of compelling reasons of national policy, also may extend the minimum periods, but only after consultation with the lead agency. The lead agency may modify the minimum periods when necessary to comply with other specific statutory requirements. (§ 1507.3(f)(2) of this chapter) Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, EPA may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period of time it shall notify the Council.

### § 1506.12 Emergencies.

Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of the regulations in this subchapter, the Federal agency taking the action should consult with the Council about alternative arrangements for compliance with section 102(2)(C) of NEPA. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

### § 1506.13 Effective date.

The regulations in this subchapter apply to any NEPA process begun after September 14, 2020. An agency may

apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020.

## PART 1507—AGENCY COMPLIANCE

Sec.

1507.1 Compliance.
1507.2 Agency capability to comply.
1507.3 Agency NEPA procedures.
1507.4 Agency NEPA program information.

AUTHORITY: 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123.

SOURCE: 85 FR 43373, July 16, 2020, unless otherwise noted.

### § 1507.1 Compliance.

All agencies of the Federal Government shall comply with the regulations in this subchapter.

### § 1507.2 Agency capability to comply.

Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements of NEPA and the regulations in this subchapter. Such compliance may include use of the resources of other agencies, applicants, and other participants in the NEPA process, but the agency using the resources shall itself have sufficient capability to evaluate what others do for it and account for the contributions of others. Agencies shall:

(a) Fulfill the requirements of section 102(2)(A) of NEPA to utilize a systematic, interdisciplinary approach that will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making that may have an impact on the human environment. Agencies shall designate a senior agency official to be responsible for overall review of agency NEPA compliance, including resolving implementation issues.

(b) Identify methods and procedures required by section 102(2)(B) of NEPA to ensure that presently unquantified environmental amenities and values may be given appropriate consideration.

(c) Prepare adequate environmental impact statements pursuant to section 102(2)(C) of NEPA and cooperate on the development of statements in the areas where the agency has jurisdiction by law or special expertise or is authorized to develop and enforce environmental standards.

(d) Study, develop, and describe alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources, consistent with section 102(2)(E) of NEPA.

(e) Comply with the requirements of section 102(2)(H) of NEPA that the agency initiate and utilize ecological information in the planning and development of resource-oriented projects.

(f) Fulfill the requirements of sections 102(2)(F), 102(2)(G), and 102(2)(I), of NEPA, Executive Order 11514, Protection and Enhancement of Environmental Quality, section 2, as amended by Executive Order 11991, Relating to Protection and Enhancement of Environmental Quality, and Executive Order 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting for Infrastructure Projects.

### § 1507.3 Agency NEPA procedures.

(a) The Council has determined that the categorical exclusions contained in agency NEPA procedures as of September 14, 2020, are consistent with this subchapter.

(b) No more than 36 months after September 14, 2020, or 9 months after the establishment of an agency, whichever comes later, each agency shall develop or revise, as necessary, proposed procedures to implement the regulations in this subchapter. When the agency is a department, it may be efficient for major subunits (with the consent of the department) to adopt their own procedures.

(1) Each agency shall consult with the Council while developing or revising its proposed procedures and before publishing them in the FEDERAL REGISTER for comment. Agencies with similar programs should consult with each other and the Council to coordinate their procedures, especially for programs requesting similar information from applicants.

**40 C.F.R. § 1508.27 (2019)**

consequencies together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct; (2) indirect; (3) cumulative.

**§ 1508.26 Special expertise.**

*Special expertise* means statutory responsibility, agency mission, or related program experience.

**§ 1508.27 Significantly.**

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a) *Context*. This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity*. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

[43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

**§ 1508.28 Tiering.**

*Tiering* refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement