**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MARYLAND CHAPTER OF THE SIERRA CLUB, et al.,<br><br>　　　　　　*Plaintiffs*,<br><br>　v.<br><br>FEDERAL HIGHWAY ADMINISTRATION, et al.,<br><br>　　　　　　*Defendants*. | Civil Action No. DKC 22-2597 |
| NORTHERN VIRGINIA CITIZENS' ASSOCIATION,<br><br>　　　　　　*Plaintiff*,<br><br>　v.<br><br>FEDERAL HIGHWAY ADMINISTRATION, et al.,<br><br>　　　　　　*Defendants*. | Civil Action No. DKC 22-3336 |

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

INTRODUCTION ........................................................................................................1

LEGAL BACKGROUND..........................................................................................4

    I.    The National Environmental Policy Act .......................................................4

    II.    Section 4(f) Of The Department Of Transportation Act ...............................5

    III.    Section 106 Of The National Historic Preservation Act ...............................6

FACTUAL BACKGROUND.....................................................................................6

    I.    The I-495 & I-270 Managed Lanes Study....................................................6

    II.    The 2020 Draft Environmental Impact Statement........................................7

    III.    The Preferred Alternative ..............................................................................8

    IV.    The 2021 Supplemental Draft Environmental Impact Statement...................9

    V.    The 2022 Final Environmental Impact Statement........................................10

        A.    FHWA Gathered Extensive Input From Federal, State, And Local Agencies, And The Public...........................................................11

        B.    FHWA Took A Hard Look At Air Quality ........................................11

        C.    FHWA Thoroughly Evaluated Environmental Justice Impacts........................13

        D.    FHWA Took Concerns About Traffic Modeling Seriously .............................15

        E.    Through Extensive Research And Planning, FHWA Avoided Impacts To The Morningstar Cemetery.......................................17

        F.    FHWA Conducted Extensive Studies To Avoid And Minimize Impacts To Resources Near The American Legion Bridge ................................18

    VI.    The 2022 Record Of Decision ..................................................................19

STANDARD OF REVIEW.......................................................................................19

ARGUMENT............................................................................................................20

    I.    The Court Lacks Jurisdiction Over Northern Virginia Citizens Association's Claims ......................................................................................20

        A.    NVCA's Alleged Injuries Are Not Traceable To FHWA's NEPA Analysis For The Managed Lanes Project ....................................22

        B.    NVCA's Alleged Injuries Cannot Be Redressed In This Case.........................24

II.    The Agencies Complied With NEPA .......................................................................25

       A.    FHWA Took The Required Hard Look At Air Quality Impacts, Including
             PM$_{2.5}$ ...........................................................................................................25

             1.    FHWA Adhered to the Relevant Air Quality Regulations and
                   Conducted the Required Analyses....................................................26

             2.    Reliance on NAAQS Compliance for Analyzing Criteria
                   Pollutants is not Arbitrary or Capricious..............................................27

       B.    FHWA Took A Hard Look At Environmental Justice Impacts.........................31

             1.    FHWA Thoroughly Considered the Effects of Air Pollution on
                   Environmental Justice Communities Within the Project Area .............32

             2.    The Agency Took a Hard Look at the Project's Cumulative
                   Impacts on Environmental Justice Communities .................................34

       C.    FHWA Ensured The Traffic Modeling Met All Required Standards,
             Provided Enough Information To Allow Informed Participation, And
             Responded To All Reasoned Comments......................................................37

             1.    The Agencies Responded to the Comments Submitted ......................38

             2.    The Changes Made to the Model Were Minor and Adequately
                   Explained.........................................................................................40

             3.    The Underlying Data was Reasonably Available................................41

III.   FHWA Has Not Violated Section 4(f) Or Section 106................................................43

       A.    The Agencies' Section 4(F) And Section 106 Findings For The
             Morningstar Cemetery Are Supported By The Record And The Law .............43

             1.    Plaintiffs Confuse the Section 4(f) "Use" Determination and the
                   Section 106 "Effects" Determination...................................................44

             2.    The Record Supports FHWA's Section 4(f) and Section 106
                   Conclusions ....................................................................................45

       B.    FHWA's Least Overall Harm Analysis For The American Legion Bridge Is
             Reasonable And Supported By The Record ..................................................47

CONCLUSION ........................................................................................................51

## Table of Authorities

**Cases**

*Adler v. Lewis*,
   675 F.2d 1085 (9th Cir. 1982) ............................................................................ 48, 49

*Am. Trucking Ass'ns v. EPA*,
   283 F.3d 355 (D.C. Cir. 2002) .................................................................................. 28

*Audubon Naturalist Soc'y of The Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*,
   524 F. Supp. 2d 642 (D. Md. 2007) ................................................................... 27, 49

*Baehr v. Creig Northrop Team, P.C.*,
   953 F.3d 244 (4th Cir. 2020) .................................................................................... 20

*Border Power Plant Working Grp. v. Dep't of Energy*,
   260 F. Supp. 2d 997 (S.D. Cal. 2003) ...................................................................... 28

*Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Comm'n*,
   449 F.2d 1109 (D.C. Cir. 1971) ................................................................................ 29

*Citizens Against Burlington, Inc. v. Busey*,
   938 F.2d 190 (D.C. Cir. 1991) .................................................................................. 50

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ...................................................................................... 6, 20, 48

*City of Alexandria v. Slater*,
   198 F.3d 862 (D.C. Cir. 1999) .................................................................................. 47

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .................................................................................................. 20

*Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*,
   576 F. App'x 477 (6th Cir. 2014) ............................................................................. 27

*Coal. for Healthy Ports v. U.S. Coast Guard*,
   No.13-5347, 2015 WL 7460018 (S.D.N.Y. 2015) ............................................. 42, 43

*Coal. On Sensible Transp. Inc. v. Dole*,
   642 F. Supp. 573 (D.D.C. 1986) ............................................................................... 50

*Coal. on Sensible Transp. Inc. v. Dole*,
   826 F.2d 60 (D.C. Cir. 1987) ............................................................................... 5, 50

*Conservation Nw. v. Rey*,
   674 F. Supp. 2d 1232 (W.D. Wash. 2009) ............................................................... 37

*Dine Citizens Against Ruining Our Env't v. Haaland*,
   59 F.4th 1016 (10th Cir. 2023) ........................................................................... 28, 33

*Doe v. Va. Dep't of State Police*,
   713 F.3d 745 (4th Cir. 2013) ........................................................................ 21, 22, 24

*Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.*,
   772 F.2d 700 (11th Cir. 1985) ............................................................. 40

*Earth Island Inst. v. Carlton*,
   626 F.3d 462 (9th Cir. 2010) ............................................................... 39

*Earth Island Inst. v. U.S. Forest Serv.*,
   697 F.3d 1010 (9th Cir. 2012) ............................................................. 40

*Ecology Ctr. v. Castaneda*,
   574 F.3d 652 (9th Cir. 2009) ............................................................... 43

*Environmental Defense Center v. Bureau of Ocean Energy Management*,
   36 F.4th 850 (9th Cir. 2022) ............................................................... 29

*Friends for Ferrell Parkway, LLC v. Stasko*,
   282 F.3d 315 (4th Cir. 2002) ............................................................... 21

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*,
   681 F.3d 581 (4th Cir. 2012) ................................................................. 4

*Friends of Buckingham v. State Air Pollution Control Bd.*,
   947 F.3d 68 (4th Cir. 2020) ................................................................. 30

*Friends of Cap. Crescent Trail v. Fed. Transit Admin.*,
   255 F. Supp. 3d 60 (D.D.C. 2017) ....................................................... 42

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
   204 F.3d 149 (4th Cir. 2000) ............................................................... 21

*Ground Zero Ctr. for Non-Violent Action v. United States Dep't of Navy*,
   860 F.3d 1244 (9th Cir. 2017) ............................................................. 41

*Gunpowder Riverkeeper v. FERC*,
   807 F.3d 267 (D.C. Cir. 2015) ............................................................. 29

*Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*,
   673 F.3d 518 (7th Cir. 2012) ............................................................... 25

*Hickory Neighborhood Def. League v. Skinner*,
   731 F. Supp. 207 (W.D.N.C. 1990) ..................................................... 48

*Hickory Neighborhood Def. League v. Skinner*,
   893 F.2d 58 (4th Cir. 1990) ................................................................... 6

*Holly Hill Farm Corp. v. United States*,
   447 F.3d 258 (4th Cir. 2006) ............................................................... 20

*HonoluluTraffic.com v. Federal Transit Administration*,
   742 F.3d 1222 (9th Cir. 2014) ................................................. 44, 45, 46

*Hughes River Watershed Conservancy v. Johnson*,
   165 F.3d 283 (4th Cir. 1999) ......................................................... 36, 38

*Idaho Sporting Cong. v. Thomas*,
   137 F.3d 1146 (9th Cir. 1998) .............................................. 42

*Lands Council v. McNair*,
   537 F.3d 981 (9th Cir. 2008) ................................................ 42

*Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed Highway Admin.*,
   756 F.3d 447 (6th Cir. 2014) ................................................ 31

*League of Wilderness Defenders—Blue Mountains v. U.S. Forest Serv.*,
   549 F.3d 1211 (9th Cir. 2008) .............................................. 43

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ....................................................... 20, 22

*Marsh v. Or. Nat. Res. Council*,
   490 U.S. 360 (1989) ................................................. 19, 36, 40

*Mirant Potomac River, LLC v. State Air Pollution Control Bd.*,
   No. CL07–2933, 2008 WL 6745388 (Va. Cir. Mar. 13, 2008) .............. 30

*Mississippi v. EPA*,
   744 F.3d 1334 (D.C. Cir. 2013) ........................................... 28

*Monroe Cnty. Conservation Council, Inc. v. Volpe*,
   472 F.2d 693 (2d Cir. 1972) .............................................. 6

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
   783 F.3d 1301 (D.C. Cir. 2015) ........................................... 37

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*,
   677 F.3d 596 (4th Cir. 2012) ............................................. 34

*Nat'l Audubon Soc'y v. Dep't of Navy*,
   422 F.3d 174 (4th Cir. 2005) ........................................ 4, 5, 37

*Nat'l Ctr. for Pres. L. v. Landrieu*,
   496 F. Supp. 716 (D.S.C. 1980) .......................................... 4

*Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Eng'rs*,
   716 F.3d 119 (4th Cir. 2013) ............................................. 36

*Ohio Valley Env't. Coal. v. Aracoma Coal Co.*,
   556 F.3d 177 (4th Cir. 2009) .......................................... 20, 40

*Ohio Valley Envtl. Coal., Inc. v. U.S. Army Corps of Eng'rs*,
   828 F.3d 316 (4th Cir. 2016) ............................................. 19

*Robertson v. Methow Valley Citizens*,
   490 U.S. 332 (1989) ...................................................... 4, 5

*Sierra Club v. Adams*,
   578 F.2d 389 (D.C. Cir. 1978) ........................................... 40

*Sierra Club v. Fed. Highway Admin.*,
    No. 17-CV-1661-WJM-MEH, 2018 WL 1610304 (D. Colo. Apr. 3, 2018) ........................... 27

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017) ........................................................................... 31, 32, 33

*Sierra Club v. FHWA*,
    715 F. Supp. 2d 721 (S.D. Tex. 2010) ........................................................................... 27

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
    554 U.S. 269 (2008) ........................................................................... 22

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ........................................................................... 24

*Tinicum Twp., Pa. v. U.S. Dep't of Transp.*,
    685 F.3d 288 (3d Cir. 2012) ........................................................................... 4, 27

*TOMAC, Taxpayers of Mich. Against Casinos v. Norton*,
    433 F.3d 852 (D.C. Cir. 2006) ........................................................................... 26, 27

*Town of Weymouth, Mass. v. Mass. Dep't of Env't Prot.*,
    961 F.3d 34 (1st Cir. 2020) ........................................................................... 30, 47

*Valley Cmty. Pres. Comm'n v. Mineta*,
    373 F.3d 1078 (10th Cir. 2004) ........................................................................... 6

*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013) ........................................................................... 5

*Wildlife v. N.C. Dep't of Transp.*,
    762 F.3d 374 (4th Cir. 2014) ........................................................................... 4, 6, 47

**Statutes**

5 U.S.C. § 701 ........................................................................... 19

16 U.S.C. § 470f ........................................................................... 1

23 U.S.C. § 138(a) ........................................................................... 5

42 U.S.C. § 4332(C) ........................................................................... 1

42 U.S.C. § 7409(b)(1) ........................................................................... 27, 28

42 U.S.C. §§ 4321 ........................................................................... 4

49 U.S.C. § 303(c) ........................................................................... 1, 5

54 U.S.C. § 306108 ........................................................................... 6

Va. Code Ann. § 10.1-1307(E) ........................................................................... 30

**Regulations**

23 C.F.R. § 774.3(c)(1) ............................................................................... 5, 47

36 C.F.R. § 800.14(b) ...................................................................................... 47

36 C.F.R. § 800.4(b)(1) ...................................................................................... 6

36 C.F.R. § 800.4(b)(2) ............................................................................... 44, 47

40 C.F.R. § 1502.16(b) ........................................................................ 34, 35, 36

40 C.F.R. § 1502.23 ...................................................................................... 16, 19

40 C.F.R. § 1503.4 ............................................................................................ 40

40 C.F.R. §§ 1502.16(a)-(b) ............................................................................ 34

88 Fed. Reg. 5558 ............................................................................................ 28

**Other Authorities**

Executive Order 12,898 ........................................ 8, 9, 11, 13, 14, 15, 31, 34

Executive Order 12,988 .................................................................................... 31

Executive Order 14,096 .................................................................................... 31

**Table of Acronyms**

| | |
|---|---|
| **AADT** | Average Annual Daily Traffic |
| **CAA** | Clean Air Act |
| **CO** | Carbon Monoxide |
| **DEIS** | Draft Environmental Impact Statement |
| **EIS** | Environmental Impact Statement |
| **EJ** | Environmental Justice |
| **FEIS** | Final Environmental Impact Statement |
| **FHWA** | Federal High Administration |
| **GHG** | Greenhouse Gas |
| **HOT** | High-Occupancy Toll |
| **MDOT SHA** | Maryland Department of Transportation, State Highway Administration |
| **MSAT** | Mobile Source Air Toxics |
| **NAAQS** | National Ambient Air Quality Standards |
| **NEPA** | National Environmental Policy Act |
| **NPDES Permit** | National Pollution Discharge Elimination System General Permit |
| **NVCA** | Northern Virginia Citizens Association |
| **PM$_{2.5}$** | Particulate Matter 2.5 |
| **P3** | Public-Private Partnership Program |
| **ROD** | Record of Decision |
| **SDEIS** | Supplemental Draft Environmental Impact Statement |
| **VDOT** | Virginia Department of Transportation |

**INTRODUCTION**

By almost any metric, traffic on the Capital Beltway and I-270 is some of the worst in the country. In fact, the National Capital Region is the most congested region in the nation based on delay and congestion data per auto commuter. To alleviate some of that traffic burden, the Federal High Administration ("FHWA") and the Maryland Department of Transportation, State Highway Administration ("MDOT SHA") (together, the "agencies") initiated the Managed Lanes Study ("the Study" or "Project") over five years ago.

The need of the Project is clear: with forecasts showing continued population growth, employment, and travel demand increases throughout the area, these problems will not go away without action. On top of those traffic needs is required infrastructure replacement, including the sixty-year-old American Legion Bridge which will likely need replacement in the near future. And so, the agencies conducted the study to address congestion, improve trip reliability on I-495 and I-270, and enhance existing and planned multimodal mobility and connectivity. By addressing those concerns, the Project would improve the movement of people and goods throughout the area and ensure homeland security needs are met.

Because the Managed Lanes Study is federally funded, the Project must comply with federal environmental protection and historic preservation laws, including: the National Environmental Policy Act, 42 U.S.C. § 4332(C) ("NEPA"); Section 4(f) of the Department of Transportation Act of 1966, 49 U.S.C. § 303(c); and Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f. To fulfil their obligations with those laws, FHWA, as the Lead Federal Agency, and MDOT SHA, as the co-lead agency and Local Project Sponsor, studied the community, natural, cultural, and other environmental impacts of the Project. They strove to avoid and minimize the impacts wherever possible and mitigate for these unavoidable

1

impacts at an equal or greater value. Throughout the process, the agencies worked with federal, state, and local resource agency partners to meet all regulatory requirements and ensure the protection of significant environmental resources. And to ensure the local communities' viewpoints were heard and incorporated into the Project, the agencies conducted extensive public outreach. The culmination of those efforts was the Final Environmental Impact Statement ("FEIS") and FHWA's approval of the Project in the Record of Decision ("ROD").

Plaintiffs now challenge the adequacy of the agencies' years-long environmental review. They allege that FHWA violated NEPA by failing to adequately review air pollution and environmental justice ("EJ") impacts and ignoring traffic model concerns. And a single Plaintiffs' group—the Northern Virginia Citizens Association ("NVCA")—alleges a violation of NEPA for failing to re-study impacts of a separate project following minor design changes. Various Plaintiffs also challenge the agencies' compliance with Section 4(f) of the Department of Transportation Act and Section 106 of the National Historic Preservation Act. They allege the agencies improperly deferred their study of potential impacts to the Morningstar Tabernacle 88 Moses Hall and Cemetery ("Morningstar Cemetery"), and improperly dismissed an alternative alignment of the American Legion Bridge that would have avoided Plummers Island in the Potomac.

Plaintiffs' NEPA challenges all fail. First, NVCA lacks standing to bring its claims. The injuries it alleges are all traceable to a separate project already under construction in another state, for which its members already sought redress in the Eastern District of Virginia. This Court cannot grant them the relief they seek.

Second, Plaintiffs' challenges to FHWA's air quality analysis are not legally sound. FHWA reasonably relied on the public health standards for pollutants set by the Environmental

Protection Agency when it considered the potential air quality impacts from the Project. Contrary to Plaintiffs' contentions, NEPA does not require the hyper-localized modeling for areas that are well within attainment of the EPA standards.

Third, FHWA took the required hard look at EJ concerns, and Plaintiffs cannot show otherwise. FHWA followed its guidance on EJ reviews, and ensured all potential EJ communities were identified and impacts were considered. The record supports FHWA's findings that impacts would be felt equally along the entire Project corridor, and therefore no "disproportionately high and adverse" effects on minority and low-income communities resulted from the Project.

Fourth, Plaintiffs' technical criticism of the traffic model amounts only to a disagreement between experts. FHWA and MDOT SHA possess expertise in the area of traffic modeling, and the agencies relied on those experts in ensuring the models' accuracy and in responding to criticism. And while Plaintiffs complain that they did not have every piece of data in their preferred format, the agencies made sure that the data necessary for the public to check their work was reasonably available.

Finally, Plaintiffs' Section 4(f) and Section 106 claims miss the mark. As to the Morningstar Cemetery, Plaintiffs confuse and conflate the statutory requirements and fail to show any deficiency in the process. And as to Plummers Island, they merely nitpick the agencies' well supported decision to choose a bridge alignment that would avoid more parkland—and a residential property—rather than their preferred alternative.

In sum, Plaintiffs' allegations do not undermine the agencies good work. As supported by the record, FHWA and MDOT SHA thoroughly considered the Project's impacts, allowed for full public participation, considered and responded to opposing viewpoints, and followed the

statutory and regulatory mandates. The result was a well-supported FEIS. The Court should therefore grant summary judgment for Federal Defendants.

## LEGAL BACKGROUND

### I.      The National Environmental Policy Act

NEPA requires federal agencies to consider the impacts of, and alternatives to, federal actions significantly affecting the environment. 42 U.S.C. §§ 4321, 4331. The goal of NEPA is "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. Its specific purpose "is to sensitize all federal agencies to the environment in order to foster precious resource preservation." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 184 (4th Cir. 2005). To promote that purpose, "NEPA mandates a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences." *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 393 (4th Cir. 2014) (quoting *Robertson v. Methow Valley Citizens*, 490 U.S. 332, 350-51 (1989)) (cleaned up). It also "requires an agency to disseminate widely its findings on the environmental impacts of its actions." *Nat'l Audubon Soc'y*, 422 F.3d at 184.

For any "major Federal actions significantly affecting the quality of the human environment," the agency must prepare an Environmental Impact Statement ("EIS"). *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 584 (4th Cir. 2012). An EIS is legally sufficient if it "provide[s] the decision-makers with sufficient information of the environmental consequences of their action so that they can make a reasoned decision." *Nat'l Ctr. for Pres. L. v. Landrieu*, 496 F. Supp. 716, 737 (D.S.C.), *aff'd*, 635 F.2d 324 (4th Cir. 1980). But "NEPA does not require maximum detail. Rather, it requires agencies to make a series of line-drawing decisions based on the significance and usefulness of additional information." *Tinicum Twp., Pa.*

*v. U.S. Dep't of Transp.*, 685 F.3d 288, 296 (3d Cir. 2012) (citing *Coal. on Sensible Transp. Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987)).

Although NEPA establishes the procedures by which agencies must consider environmental impacts, it does not dictate substantive results. *Robertson*, 490 U.S. at 350. "If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.* (citations omitted). For this reason, "[c]ourts should not second-guess agency decisions, so long as the agency has given a hard look at the environmental impacts of its proposed action." *Nat'l Audubon Soc'y*, 422 F.3d at 199. This is true even if the court disagrees with the "necessity or wisdom of the proposed action." *Id.* The court's "role is not to flyspeck an agency's environmental analysis, looking for any deficiency no matter how minor." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 319 (D.C. Cir. 2013) (quotations omitted).

## II.     Section 4(f) Of The Department Of Transportation Act

Department of Transportation Act Section 4(f) applies to highway projects that "requir[e] the use of publicly owned land of a public park . . . or land of an historic site of national, State, or local significance . . ." 49 U.S.C. § 303(c); *accord* 23 U.S.C. § 138(a). FHWA may approve projects that make more than a *de minimis* "use" of those resources only where "(1) there is no prudent and feasible alternative" and (2) "the program or project includes all possible planning to minimize harm to the . . . [resource] resulting from the use." 49 U.S.C. § 303(c).

If there are no feasible and prudent alternatives to using Section 4(f) property, the Secretary may select only the alternative that "[c]auses the least overall harm in light of [Section 4(f)'s] preservation purpose." 23 C.F.R. § 774.3(c)(1).

When reviewing Section 4(f) approvals, courts take a "hard look" at whether the facts supported the Secretary's decision. *Hickory Neighborhood Def. League v. Skinner*, 893 F.2d 58, 61 (4th Cir. 1990). Although courts "must conduct a 'thorough, probing, in depth review' to ensure that the Secretary's determination complies with Section 4(f)'s requirements," *Defs. of Wildlife*, 762 F.3d at 401 (quoting *Monroe Cnty. Conservation Council, Inc. v. Volpe*, 472 F.2d 693, 700 (2d Cir. 1972)), the agency's Section 4(f) determination "is entitled to a presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

### III.    Section 106 Of The National Historic Preservation Act

Under Section 106 of the National Historic Preservation Act ("NHPA"), before a federal agency approves federal funding or issues a license, the agency must "take into account the effect of the undertaking on any historic property." 54 U.S.C. § 306108. "Unlike Section 4(f), Section 106 is essentially a procedural statute and does not impose a substantive mandate on the FHWA." *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1085 (10th Cir. 2004).

To comply with Section 106, the agency must first "make a reasonable and good faith effort" to identify historic proprieties. 36 C.F.R. § 800.4(b)(1). Once the properties are identified, the agencies must determine whether there will be any "adverse effects" to those properties, *id.* § 800.5(a), and consider alternatives or modifications to avoid, minimize, or mitigate any adverse effects identified, *id.* § 800.6(a). A Programmatic Agreement may be used "to govern . . . the resolution of adverse effects from certain complex project situations." *Id.* § 800.14(b).

### FACTUAL BACKGROUND

### I.    The I-495 & I-270 Managed Lanes Study

In an effort to reduce severe congestion within the National Capital Region, FHWA and the MDOT SHA started the Study over five years ago. AR 242; AR 267. The agencies started the

review process when they issued a notice to advise the public of their intention to prepare an EIS. AR 55593-94.

The Project is part of the broader Public-Private Partnership Program ("P3 Program"), a partnership between the government sector and private entities. AR 35751. The P3 Program is an "innovative finance method" that taps into private expertise to improve all phases of the Project, including the "design, build, finance, operate, and maintain the proposed infrastructure." AR 35767. The P3 Program makes large-scale improvements, such as those in this Project, financially viable. AR 35767.

The scope of the Study travels I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, ending just west of MD 5 in Prince George's County, Maryland. Along that stretch spanning the Potomac River is the American Legion Bridge, a 60-year-old bridge badly needing replacement. The Study also moves along I-270, from the I-495 interchanges, including the east and west I-270 spurs, to north of I-370 in Montgomery County, Maryland. AR 4. I-495 and I-270 are the two most heavily traveled freeways in Maryland, each with an Average Annual Daily Traffic (AADT) volume up to 260,000 vehicles per day in 2018. AR 4. The Study looks at alternatives that would address road congestion and improve trip reliability along that forty-eight-mile corridor. *See* AR 35732.

## II.    The 2020 Draft Environmental Impact Statement

FHWA and the MDOT SHA published the Draft Environmental Impact Statement ("DEIS") on July 10, 2020. Fifteen preliminary alternatives were initially identified and seven alternatives, including a No Build Alternative, were retained for detailed study. *See* AR 35768-69.

The DEIS included a thorough examination of the alternatives and the potential impacts to resources: historic, architectural, and archeological resources as required by Section 106 of the NHPA, *see* AR 35872; air quality impacts, including the Project's effects on criteria pollutants per National Ambient Air Quality Standards ("NAAQS"), *see* AR 35895; and impacts to EJ communities as outlined Executive Order 12898, *see* AR 35957. Nineteen technical reports (including reports on community effects and air quality impacts) accompanied the DEIS, documenting "existing conditions, methodologies, assessments of effects, and conceptual mitigation." AR 35735.

All the build alternatives included full replacement of the American Legion Bridge with a new, wider bridge. AR 35743. "The existing bridge is nearly 60 years old and would need to be replaced sometime over the next few decades regardless of the Study. The new bridge would be constructed in phases to maintain the same number of existing lanes at all times, and therefore the new bridge will be replaced in the same existing location." AR 35743.

After publication, FHWA and MDOT SHA provided 90 days for public comment—twice the minimum required by FHWA, which the agencies extended an additional 30 days. AR 35. During this four-month comment period, the agencies received close to 3,000 comments from the public, community partners, stakeholders, and local and federal officials. AR 35-36; 613.

III.    **The Preferred Alternative**

In May 2021, after publishing the DEIS, the agencies identified Alternative 9 – Phase 1 South, as the "Preferred Alternative" for the Study. *See* AR 248. The Preferred Alternative is a fifteen-mile stretch of I-495 and I-270 between McLean, Virginia, and Gaithersburg, Maryland. The Preferred Alternative adds two high-occupancy toll ("HOT") managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to east of MD

187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from east

of MD 187 to I-270. AR 27377.



MLS Preferred Alternative – AR 266

The Preferred Alternative includes not only road improvements, but also transit investment and new pedestrian and bicycle facilities. AR 296-98; 299; 312-13. The transit opportunities will include "free bus transit usage of the HOT managed lanes" which will increase the travel speed and trip reliability. AR 296. There also will be direct and indirect connections to other transit stations. *Id.* Existing bike and pedestrian routes that will be impacted by the Project will be replaced in kind or upgraded. *Id.* The agencies have also committed to constructing a new pedestrian and bicycle lane across the America Legion Bridge and constructing a new sidewalk to reestablish the historic connection between First Agape AME Zion Church ("Gibson Grove Church") and Morningstar Cemetery. AR 313.

IV.     **The 2021 Supplemental Draft Environmental Impact Statement**

The agencies published the Supplemental Draft Environmental Impact Statement ("SDEIS") on October 1, 2021. AR 27360. The SDEIS was prepared to consider new information developed after the DEIS was published. *Id.* That new information was primarily the selection of the Project's Preferred Alternative, and the Study's focus was correspondingly reduced to the Preferred Alternative. In addition, the SDEIS updated "measures to avoid, minimize, and mitigate potential environmental effects, where applicable." AR 27365. Those measures included the following: avoiding and significantly reducing property, community,

historic, natural resources and parkland impacts; avoiding impacts to Morningstar Cemetery; and avoiding all residential and business displacements. *See* AR 27362.

The initial comment period for the SDEIS lasted for 60 days, and the agencies extended the comment period by fifteen days based on public and stakeholder requests. AR 242.

## V.    The 2022 Final Environmental Impact Statement

The FEIS was published on June 17, 2022. AR 243. It presented final, updated analyses for environmental impacts related to the Preferred Alternative. AR 246. Twenty-one final technical reports support the FEIS, including a Final Traffic Analysis Technical Report, Final Community Effects Assessment & Environmental Justice Technical Report, Final Air Quality Technical Report, and Final Avoidance, Minimization, and Impacts Report. *See* AR 246.

The Final Section 4(f) Evaluation accompanied the FEIS and included a final determination that the Project addressed "all possible planning to minimize harm to the Section 4(f) properties." AR 532. As part of the analysis, the Section 4(f) Evaluation highlights a comparison of DEIS, SDEIS, and FEIS Section 4(f) impacts. *See* AR 535. As a result of design refinements after feedback received from the Draft Section 4(f) Evaluation and the SDEIS, the Preferred Alternative resulted in a "net reduction of approximately 113.6 acres of impact to Section 4(f) properties." AR 534. That included a reduction from 1.9 acres of permanent impact to 0.2 acres at the Washington Biologists' Field Club on Plummers Island, and complete avoidance of the Morningstar Cemetery. *See* AR 534-36.

The FEIS and Final 4(f) Evaluation analyzed air quality impacts, traffic impacts, impacts on EJ populations, potential impacts to Morningstar Cemetery, and impacts to resources near the American Legion Bridge, including Plummers Island. Those analyses confirm the hard look taken by FHWA.

### A. FHWA Gathered Extensive Input From Federal, State, And Local Agencies, And The Public.

FHWA and MDOT SHA "met with and considered input from federal, state, and local agencies as well as the public." AR 7. The four-year process included reading, reviewing, and responding to "more than 5,000 comments formally submitted via email, phone, online and hard copy comment forms," as well as holding seven virtual and in-person hearings for the Draft and SDEIS. AR 244. The extensive effort also involved over 16 public workshops and over 200 individual stakeholder, community, elected official, and business meetings. AR 242. Those meetings included three meetings with the Washington Biologist Field Club, a group dedicated to studying Plummers Island. AR 598-99. In response to the public input process, FHWA and MDOT SHA "modified analysis methodologies, conducted new analyses, studied new or modified existing alternatives, refined design to avoid or minimize environmental and community impacts, and identified meaningful mitigation to address unavoidable impacts." *Id.*

### B. FHWA Took A Hard Look At Air Quality

Throughout the environmental review process, the agencies identified and considered the air quality impacts from the project. The FEIS includes assessments that build on the DEIS and SDEIS analyses of impacts to air quality, including discussions regarding NAAQS, and analyses of Mobile Source Air Toxics ("MSAT") emissions and Greenhouse Gas ("GHG") emissions. AR 407-12. To support the FEIS, the agencies prepared the Final Air Quality Technical Report, which focuses on the Preferred Alternative. AR 14326. Its purpose is to "present the existing conditions, an assessment of potential direct impacts of the Preferred Alternative to air quality and final mitigation, if applicable, for unavoidable impacts." AR 14326. That analysis builds on the previous documents, including the Draft Air Quality Technical Report.

11

Visualize 2045, the long-range transportation plan for metropolitan Washington, includes the Project's scope and design. The Visualize 2045 Air Quality Conformity Analysis is based on the most current planning assumptions available for the Washington region, as well as the latest emissions factor model specified by EPA for use in these types of conformity assessments. AR 520. That analysis demonstrates that the Project "will not cause or contribute to a new violation . . . of the NAAQS established by USEPA." AR 520; *see also* AR 408.

The primary NAAQS pollutants are discussed throughout the Study. A detailed description of both the source and the health and environmental effects of the criteria pollutants—including Particulate Matter 2.5 ("$PM_{2.5}$")—are described in the Draft Air Quality Technical Report. AR 44930. Because the Project study area is in attainment for $PM_{2.5}$ and Carbon Monoxide ("CO"), the Clean Air Act transportation conformity requirements pertaining to those pollutants do not apply for this Project. AR 408. For that reason, no further $PM_{2.5}$ or CO analysis was required. AR 408. But MDOT SHA analyzed CO emissions from affected intersections and interchanges "for informational purposes since CO is a proxy for transportation emissions . . . ."  AR 656. "The result of that analysis demonstrates that the worst-case interchanges and intersections for each Build Alternative . . . , using very conservative assumptions, would not cause or contribute to a violation of the CO NAAQS within the study area." AR 656.

Finally, FHWA considered the air quality impacts from construction. "The primary air quality concerns during construction would be a potential short-term localized increase in the concentration of fugitive dust (including airborne $PM_{2.5}$ and $PM_{10}$)." AR 522. To mitigate and minimize these short-term localized impacts to air quality, FHWA put forward nine dust control measures for use by the contractor. AR 522.

C.      **FHWA Thoroughly Evaluated Environmental Justice Impacts**

In compliance with Executive Order 12898, USDOT Order 5610.2C, FHWA Order

6640.23A, and FHWA memorandum Guidance on Environmental Justice and NEPA (2011),

FHWA followed an eight-step process for identifying EJ communities and analyzing whether the

Project would cause any disproportionately high and adverse effects on those communities. *See*

AR 473.

The first step was identification of minority race and ethnicity populations, and low-

income populations along the forty-eight-mile corridor. *See* AR 473. The agencies conducted an

EJ analysis of the 66 Census block groups along the impacted area, considering both

race/ethnicity and income factors to identify impacted EJ populations. AR 471-78. The agencies

then used supplemental data such as various mapping tools, English-speaking status, subsidized

housing locations, distribution of Supplemental Nutrition Assistance Program benefits, and

students receiving free/reduced-price lunches to identify additional EJ populations in the

impacted area. *See* AR 480. To properly identify low-income populations, the agencies used the

HUD Income Limits Survey, which has a lower-threshold methodology for determining low-

income populations in the impacted area than is required for an EJ analysis. AR 475-76. The

agencies also used analytical tools such as US EPA EJSCREEN[1] to enhance their EJ analysis.

AR 480-81. This confirmed that the methodology and identification of potential EJ populations

aligned with similar assessments completed by outside expert institutions. AR 649. In total, the

agencies identified 16 of the 66 census block groups were considered EJ populations for the

Study. AR 477.

---

[1] EJSCREEN is "an online EJ screening and mapping tool that combines environmental and
demographic data for various geographies and presents them in maps and reports." AR 480.

The second step consisted of a review of demographic data to determine existing environmental and community conditions of EJ populations. *See* AR 473. The agencies conducted a robust analysis looking at the 66 census population block areas within the study corridor. AR 474. This included further identification of minority race and ethnicity populations and low-income populations. *Id.* Among the factors looked at, the agencies used EJSCREEN to analyze several environmental indicators, including $PM_{2.5}$, for the identified EJ populations to compare the EJ concerns to the rest of the State of Maryland. AR 480.

The third step included thorough documentation of outreach as planned and refined throughout the Project, in full consideration of demographic and community data to ensure "meaningful involvement in EJ populations." *See* AR 473. Outreach efforts during the DEIS hearing and comment period included:

- Flyers in English, Spanish, Amharic, and French to around 200 affordable housing complexes, schools, and places of worship along the study corridors.
- Spanish, Amharic, and French translations of the DEIS Executive Summary on the Project website and hard copies at viewing locations.
- Spanish language ads in *El Tiempo Latino, Washington Hispanic,* and on *eltiempo.com.*

Outreach efforts during the SDEIS hearing and comment period included:

- Newspaper print advertisements.
- Online digital ads three weeks before the public hearing, including ads targeting black and African American and Hispanic adults likely to own a home and commute over 20 miles daily using I-270 or I-495 using geofencing.
- Spanish-language radio ads two weeks before the virtual public hearing.
- Flyer outreach to various housing complexes, advisory boards, and other community groups.

*See* AR 487-89.

Finally, the Study involved identification of adverse or beneficial effects to EJ populations under the No Build and Preferred Alternative. *See* AR 473. The No Build Alternative "could result in increased overflow congestion on local roads which could result in

increased response times for emergency services and increased travel times to community facilities." AR 493. And this alternative would not address the existing congestion and related emissions. *See id.* The Preferred Alternative, by contrast, "would address existing and long-term traffic growth including improvement to the local roadway network, increased trip reliability, enhanced multimodal connectivity and mobility and additional travel options." AR 493.

FHWA compared the effects on EJ communities and made its final conclusions. The FEIS considered impacts on EJ vs. non-EJ communities and found that most quantifiable impacts would fall on non-EJ communities, including:

- 91% of impacted properties and 85% of impacted property acreage.
- 100% of impacted community facility properties and acreage.
- 90% of impacted Section 4(f) properties and 98% of impacted Section 4(f) property acreage.
- 58% of the low-risk, 93% of the moderate-risk and 82% of the high-risk sites of hazardous materials concerns.
- 95% of impact to wetlands, 83% impact to wetland buffers 84-91% impact to waters, 77% impact to tree canopy and 89% impact to floodplains.

AR 502.

Based this information, FHWA and MDOT SHA determined that "a disproportionately high and adverse impact would not occur to the EJ Analysis Area populations under the Preferred Alternative." AR 503.

### D. FHWA Took Concerns About Traffic Modeling Seriously

The traffic impacts analysis "used state-of-the-practice models that were validated and calibrated specifically for the Study." AR 636. Those same models are "regularly used by MDOT SHA and other transportation agencies to evaluate projects in the Washington, DC metro area." AR 318. FHWA "reviewed and approved" the models "when this NEPA process was initiated." AR 636. And "[a]s typical practice . . . information was updated during the course of the Study." AR 636

As they did with every substantive comment received, FHWA and MDOT SHA responded to the comments about traffic modeling and discussed the opposing points of view. *See* AR 636. The agencies summarized the "many comments" about traffic modeling and addressed general topics raised, including methodology and inputs used. *See* AR 636. It also specifically responded to Plaintiff Sierra Club's comments, including their comments on traffic modeling. *See* AR 171-75.

During the comment period for the FEIS, FHWA received a comment letter from Maryland Transit Opportunities Coalition ("Coalition"). The Coalition alleged that differences between the modeling results in the SDEIS and the FEIS revealed "possible scientific fraud." AR 130. FHWA took its responsibility to ensure scientific integrity seriously. 40 C.F.R. § 1502.23 ("Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents."). In response to those comments, FHWA engaged the DOT Volpe Center—a resource that provides "world-renowned multidisciplinary, multimodal transportation expertise on behalf of DOT, other federal agencies, and external organizations"—to conduct an independent review of the issues raised in the Coalition's letter. AR 137. After completing the review of the SDEIS and FEIS traffic modeling, the Volpe Center "did not find scientific integrity fraud." AR 137. Instead, it attributed the differences to "minor changes in the analyses conducted for those two documents and inherent limitations of the modeling process used by [MDOT] to analyze the project's impacts on traffic volumes and travel times." AR 137; *accord* AR 138-39.

The Volpe Center determined that two points raised by the Coalition deserved a more detailed response. AR 179750-53. MDOT SHA addressed those issues, as well as all the allegations in the Coalition's letter; FHWA included that response in the ROD. AR 140.

**E.     Through Extensive Research And Planning, FHWA Avoided Impacts To The Morningstar Cemetery**

A focus area of the Study was the Morningstar Cemetery, the site of a late nineteenth-century African American benevolent society. The Morningstar Cemetery is near the I-495 inner loop just south of Cabin John Parkway and next to a MDOT SHA-owned right of way. AR 27541. Through all the decision making, FHWA and MDOT SHA consulted the leadership of the First Agape African American Methodist Episcopal Zion Church, the Friends of Moses Hall, the Maryland Historical Trust, and others. Through that consultation, the agencies were able to learn more about the property and how to preserve it.

An important step toward preservation occurred on July 23, 2020, when MDOT SHA found that Morningstar Cemetery was eligible for listing in the National Register of Historic Places. The Maryland Historic Trust concurred with the eligibility determination on September 4, 2020. AR 27455.

Another step was the identification of both marked graves and potential graves. Invasive bamboo had made it nearly impossible to determine what lay underneath various parts of the Morningstar Cemetery property and along the MDOT SHA right-of-way. In early 2021, to help the documentation of Morningstar Cemetery, MDOT SHA removed invasive bamboo. AR 27590. An archaeological monitor was present during all clearing activities, making it possible to document marked graves and the archaeological site of Moses Hall. AR 13914.

MDOT SHA also conducted ground penetrating radar surveys of the cemetery property and portions of the state-owned right-of-way. The surveys revealed possible burials that extended into the MDOT SHA right-of-way. AR 6021. MDOT SHA adjusted the limits of disturbance near the cemetery to avoid the areas where radar revealed potential for grave features

and included additional buffer around this area within the right-of-way to avoid possible impacts. AR 27428.

After assisting and reviewing this work, FHWA agreed that "[b]ased on the current historic boundary, the Preferred Alternative would avoid direct impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery." AR 5687.

Despite avoiding the Morningstar Cemetery, MDOT SHA has committed to improvements within the historically African American community of Gibson Grove where the Morningstar Cemetery is located. In the ROD, MDOT SHA committed to: (1) construct a new sidewalk to re-establish a connection between the Morningstar Cemetery and First Agape Zion Church ("Gibson Grove Church"); (2) fund or construct a new parking lot for the Gibson Grove Church; (3) provide stormwater improvements for the Church property; and (4) convey to the trustees of the Morningstar Cemetery a portion of the existing state-owned right-of-way located next to the boundary of Morningstar Cemetery where surveys identified potential burials. AR 31.

### F.     FHWA Conducted Extensive Studies To Avoid And Minimize Impacts To Resources Near The American Legion Bridge

A focus of the Study was avoidance of resources near the American Legion Bridge. One of those resources was Plummers Island, which is part of the Ohio Canal National Historic Park, owned by the National Park Service. AR 369. Plummers Island is "a recognized ecologically sensitive and [National Register of Historic Places]-eligible historic property." AR 369.

After extensive coordination with the National Park Service, FHWA and MDOT SHA assembled an "Strike Team" of national and local experts in design, structures, and constructability. AR 307; AR 534. The Team was asked to investigate "alternative bridge designs and construction techniques that could be employed to reduce, minimize, and avoid impacts to natural, cultural, and parkland resources around the [American Legion Bridge]." AR

307. The Strike Team looked at a range of options, including different bridge types, construction methods, and bridge alignments. *Id.* As a result of the Strike Teams efforts, impacts to Plummers Island were reduced from 1.9 acres of permanent impact in the DEIS to 0.2 acres in the FEIS. AR 536.

## VI.   The 2022 Record Of Decision

FHWA and MDOT SHA announced approval of the Record of Decision ("ROD") on August 25, 2022. *See* AR 57. Relying on information and analyses presented in the DEIS, SDEIS, FEIS, technical reports, and on comments throughout the review process, the ROD identified selection of the Preferred Alternative as the selected alternative. The decision "balances the need for safe, fast and efficient transportation and public services with the goal of avoiding, minimizing, or mitigating adverse environmental and community effects." *Id.* FHWA and MDOT SHA considered comments issued during a thirty-day review period between the publication of the FEIS and the ROD. AR 7. These totaled roughly 33 individual comments and 514 form letter comments from individuals. *See* AR 51. The ROD includes all substantive comments received during the period, which amounts to eight comments. *See id.*

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, provides for judicial review of agency decisions under NEPA, Section 4(f), and Section 106. Under the APA, "a court will set aside an agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ohio Valley Envtl. Coal., Inc. v. U.S. Army Corps of Eng'rs*, 828 F.3d 316, 321 (4th Cir. 2016) (quoting 5 U.S.C. § 706(2)(A)). Though a court's review under the APA should be "searching and careful," it is not de novo. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (citation omitted). The court's review is "highly deferential, with a

presumption in favor of finding the agency action valid." *Ohio Valley Env't. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). "Deference is due where the agency has examined the relevant data and provided an explanation of its decision that includes a rational connection between the facts found and the choice made." *Id.* (internal quotation marks and citation omitted). That "narrow" standard does not empower a court "to substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 416. The court reviews only "whether the agency conformed with controlling statutes, and whether the agency has committed a clear error of judgment." *Holly Hill Farm Corp. v. United States*, 447 F.3d 258, 263 (4th Cir. 2006) (internal quotations and citations omitted)).

## ARGUMENT

### I.     The Court Lacks Jurisdiction Over Northern Virginia Citizens Association's Claims

Northern Virginia Citizens Association ("NVCA") fails to establish standing to bring its NEPA claims. "Article III standing is part and parcel of the constitutional mandate that the judicial power of the United States extend[s] only to cases and controversies." *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (internal quotation marks omitted). To establish Article III standing, a plaintiff must allege an injury that is (1) "concrete, particularized, and actual or imminent"; (2) "fairly traceable to the challenged action"; and (3) "redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (noting these elements are "the irreducible constitutional minimum of standing").

Even if NVCA sufficiently demonstrates injury-in-fact, it has not—and cannot—demonstrate the other two elements required for standing. "The second and third prongs of [the] standing inquiry require [the court] to determine whether [plaintiff]'s alleged injuries are fairly

traceable to a defendant's conduct, and whether a favorable decision would be likely to redress these injuries." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013). As to the second prong, known as "traceability," it "means it must be likely that the injury was caused by the conduct complained of and not by the independent action of some third party not before the court." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000). NVCA does not plausibly allege that its members' injuries are traceable to Federal Defendant's actions being challenged *in this case*—i.e., FHWA's analysis of environmental impacts associated with the Managed Lanes Study under NEPA. Rather, NVCA's alleged injuries are tied directly to the 495-NEXT Project, which as NVCA notes, is "a separate toll lane project underway in Virginia." Pls.' Mem. 10 n.7. NVCA is fully aware of the separate nature of the 495-NEXT Project, having already filed (and subsequently dismissing) a challenge to FHWA's and the Virginia Department of Transportation's ("VDOT")'s environmental analysis in the Eastern District of Virginia.[2]

Traceability and redressability are interrelated, and "they rise or fall together in this case." *Va. Dep't of State Police*, 713 F.3d at 755 n.6 (quoting *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 323 n.1 (4th Cir. 2002)). Thus, for the same reason NVCA cannot demonstrate traceability—NVCA is challenging the wrong project—it does not meet the third prong of standing, redressability. "[T]he redressability prong entails that it must be likely, and not merely speculative, that a favorable decision will remedy the injury." *Gaston Copper Recycling*, 204 F.3d at 154; *Va. Dep't of State Police*, 713 F.3d at 755. "That inquiry focuses, as

---

[2] *N. Va. Citizens Ass'n v. FHWA*, No. 1:23-cv-356 (E.D. Va.) (motion for preliminary injunction denied April 7, 2023, *see* ECF No. 40; voluntarily dismissed May 11, 2023, ECF No. 42).

it should, on whether the *injury* that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008).

Importantly, "the traceability and redressability prongs become problematic when third persons not party to the litigation must act in order for an injury to arise or be cured." *Va. Dep't of State Police*, 713 F.3d at 755. Because the action causing NVCA's alleged injury is not the subject of the challenge in this case, there is no relief this Court could accord. *See Lujan*, 504 U.S. at 568, 571 (finding lack of redressability where redress of complained-of injury required action from agency not party to the case). Accordingly, this Court lacks subject matter jurisdiction and NVCA's claims must be dismissed.

### A. NVCA's Alleged Injuries Are Not Traceable To FHWA's NEPA Analysis For The Managed Lanes Project

NVCA alleges that FHWA's NEPA analysis failed to assess impacts from "belated design changes" to the interchange surrounding the George Washington Memorial Parkway near Live Oak Drive. Pls.' Mem. 10. Specifically, NVCA alleges that the "redesigned" interchange includes additional and raised ramps that eliminate green scaping between Live Oak Drive and I-495, thereby requiring a taller barrier to block sound and light. *Id.* at 11; Butler Decl. ¶¶ 5-6. At the outset, NVCA acknowledges that the Virginia Department of Transportation is responsible for the revised interchange. Pls.' Mem. 11 (alleging that "the Virginia Department of Transportation (VDOT) unveiled a radically changed design," and that "work by VDOT" has eliminated the treed buffer between Live Oak Drive and I-495). And NVCA admits VDOT made these changes to the interchange "as part of Virginia's 495-NEXT project."[3] Butler Decl. ¶ 3.

_____

[3] As explained in the litigation challenging the 495-NEXT Project, where NVCA raised the same arguments as they do in this case, these "changes" were not "radical," but refined the project design within the Limits of Disturbance already considered to be impacted. *See* Butler Decl., Ex. A ¶ 18.

The Managed Lanes Project FEIS confirms what NVCA already knows—which ramps are being constructed as part of the Managed Lanes Project versus the 495 NEXT Project. Appendix E, Maps 1 and 2, depict the "exchange ramps" proposed as part of the Managed Lanes Project. AR 5098-99. These exchange ramps were contemplated in the Project SDEIS and would provide ingress and egress to the I-495 Express Lanes. *See* AR 27674. Importantly—these "exchange" ramps are not the ramps causing NVCA's alleged injuries. *See* Butler Decl. ¶¶ 5-6 (describing height and proximity of 495-NEXT Project ramps to Live Oak Drive).[4] The other ramps next to Live Oak Drive are all denoted as part of the 495 NEXT Project. *Id.*; *see also* AR 178599, Fig. 1 (denoting five separate ramps near Live Oak Drive, only one of which ("Ramp 4") is part of the Managed Lanes Project).

NVCA is incorrect that the design revisions were made by VDOT to "facilitate the additional flyover ramps to be built by MDOT." Pls.' Mem. 12 (citing Butler Decl., Ex. A, att. 11 at 1) (VDOT Interchange Justification Report Addendum ("IJR Addendum")). The IJR Addendum explains the relocation of a ramp as part of the 495-NEXT Project "in order to reduce impacts on the east side of the I-495/GWMP interchange." Butler Decl., Ex. A, att. 11 at 1. The IJR Addendum shows the revised VDOT ramp design with the Managed Lanes Project components layered on top, which "were analyzed for the purposes of traffic and safety." *Id.* Indeed, even without the Managed Lanes Project, the 495-NEXT Project would still move forward (and currently is moving forward), because it has independent utility. AR 178607 (noting that each project has independent utility).

---

[4] The Managed Lanes Project included Live Oak Drive within the Limits of Disturbance to be consistent with *VDOT's right-of-way*. The Managed Lanes Project does not actually impact Live Oak Drive. AR 159972-73.

NVCA's alleged injuries are not caused by the action being challenged in this case—FHWA's environmental analysis of the Managed Lanes Project. Because NVCA's alleged injuries are not traceable to the Managed Lanes Project, NVCA lacks standing.

**B.      NVCA's Alleged Injuries Cannot Be Redressed In This Case**

For similar reasons, NVCA's alleged injuries cannot be redressed in this case. A plaintiff faces a related obstacle to establishing traceability and redressability when there is an unchallenged, independent rule, policy, or decision that would prevent relief even if the court were to render a favorable decision. *Va. Dep't of State Police*, 713 F.3d at 756. This Court cannot afford relief that would redress NVCA's alleged injuries, as the environmental analysis here relates to the Managed Lanes Project—a project that is independent from the 495-NEXT Project and the genesis of NVCA's alleged harm.[5] Simply put, the cause of NVCA's alleged harm is not before this Court, and therefore this Court cannot afford any relief.

And NVCA's argument that FHWA is required, as part of its analysis of the Managed Lanes Project, to conduct supplemental NEPA analysis of the revisions to the 495-NEXT Project, has no merit. Supplemental NEPA analysis of cumulative impacts from the 495-NEXT Project neither would redress NVCA's alleged harm,[6] nor is that even available to begin with. FHWA considered the Managed Lanes Project's cumulative impacts, combined with past, present, and reasonably-foreseeable future actions, which are summarized in the FEIS and provided in detail in Appendix Q. AR 517-520; AR 21152, Table 3-10 (listing Virginia's

---

[5] A project that NVCA already challenged, and voluntarily dismissed after being denied a preliminary injunction.

[6] Even if NVCA alleged "procedural" harm under NEPA, this does not provide NVCA with standing, as any procedural harm cannot be tied to a "concrete interest" as would be required to demonstrate standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

expansion of I-495 HOT lanes in list of transportation projects included in indirect and cumulative effects analysis). FHWA need not prepare supplemental NEPA analysis for the Managed Lanes Project because of minor design changes to the 495-NEXT Project (especially because supplemental NEPA analysis was not required *for the 495-NEXT Project itself*). *See Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 673 F.3d 518, 522-23 (7th Cir. 2012) (finding an agency need not conduct cumulative impacts analysis for projects proposed after the agency has issued its draft NEPA analysis). In other words, "NEPA does not require an agency to generate paperwork bearing no meaningful effect on the substance of pending proposals." *Id.*

Because NVCA's alleged injuries cannot be redressed in this case, it lacks standing, and the Court lacks jurisdiction over its claims.

## II.     The Agencies Complied With NEPA

Plaintiffs allege that FHWA and MDOT SHA violated NEPA by failing to take the required hard look at the Project's $PM_{2.5}$ emissions, the adverse impacts on EJ communities, the impacts from changes to the George Washington Memorial Parkway interchange design, and by failing to disclose and explain important aspects of the studies traffic modeling.

Neither the record nor the law supports any of Plaintiffs' challenges. The record shows that the agencies took the required hard look at the environmental impacts, provided extensive public involvement, disclosed and responded to all opposing viewpoints, and continued to assess and refine the Project throughout the Study. The Court should therefore grant FHWA's motion for summary judgment as to NEPA.

### A.     FHWA Took The Required Hard Look At Air Quality Impacts, Including $PM_{2.5}$

Plaintiffs argue that FHWA's air quality analysis fell short because it ignored the public health harms from the Project's $PM_{2.5}$ emissions. Pls.' Mem. 20-23. And they contend that

FHWA's reliance on NAAQS compliance for its air quality analysis is arbitrary and capricious. Pls.' Mem. 23-27. Plaintiffs are wrong. FHWA looked at the right information, followed the applicable regulations, and relied on the air quality standards set by EPA. Such an analysis does not violate NEPA.

### 1.    FHWA Adhered to the Relevant Air Quality Regulations and Conducted the Required Analyses

At every step, FHWA followed the required regulations and ensured a hard look was taken at air quality impacts. To start, FHWA ensured the Study area complied with the NAAQS. As required by EPA, the Metropolitan Washington Council of Governments' Transportation Planning Board conducted a regional conformity analysis to assess whether the area met the current NAAQS standards. AR 408. That study included the Project in its long-range outlook for NAAQS compliance, and FHWA ensured that the correct design concept and scope of the Project were analyzed as required by the applicable regulations. AR 145782-84; AR 146294-95; AR 189890. The result of the conformity analysis showed that the Project "will not cause or contribute to a new violation . . . of the NAAQS established by USEPA." AR 520; AR 408.

As to the primary NAAQS pollutants, FHWA continued its hard look. In the Air Quality Technical Report accompanying the DEIS, both the source and the health and environmental effects of the criteria pollutants are described. AR 44930. Because the area is in attainment for both $PM_{2.5}$ and CO, as confirmed in the long-range transportation plan, no further modeling or analysis was required. But FHWA still analyzed CO "for transparency under NEPA for affected intersections and interchanges impacted by the Study." AR 14330-31. FHWA's "choice to model primarily for carbon monoxide was reasonable, given that carbon monoxide is the most likely priority pollutant to have a significant impact on air quality," *TOMAC, Taxpayers of Mich.*

*Against Casinos v. Norton*, 433 F.3d 852, 863 (D.C. Cir. 2006), and because it is a "proxy for

transportation emissions." AR 656.

And the agencies included $PM_{2.5}$ in its analysis. On top of describing the specific health

effects from particulate matter, AR 44930, and confirming the Project area's attainment status

for $PM_{2.5}$, AR 44995, the agencies also considered the short-term air quality impacts from

construction. AR 45037-38. They identified the "short-term localized increase" in airborne $PM_{2.5}$

as one of its "primary air quality concerns," and provided measures to mitigate that concern. *Id.*

While that analysis is "focused on the construction phase," it nevertheless "address[es] . . . air

pollution for the entire project." *Audubon Naturalist Soc'y of The Cent. Atl. States, Inc. v. U.S.*

*Dep't of Transp.*, 524 F. Supp. 2d 642, 708 (D. Md. 2007).

Throughout this process, FHWA consulted EPA regarding the various impact analyses,

including air quality. At no time did EPA suggest that FHWA should separately model $PM_{2.5}$.

### 2. Reliance on NAAQS Compliance for Analyzing Criteria Pollutants is not Arbitrary or Capricious

Contrary to Plaintiffs' assertions, "the case law is nearly unanimous that federal agencies

may rely on NAAQS compliance to conclude that human health will not be seriously affected by

a transportation project." *Sierra Club v. Fed. Highway Admin.*, No. 17-CV-1661-WJM-MEH,

2018 WL 1610304, at *7 (D. Colo. Apr. 3, 2018) (collecting cases from Fifth, Sixth, and Ninth

Circuits).[7] And for good reason. The Clean Air Act ("CAA") requires that the Environmental

Protection Agency set the primary NAAQS at levels "to protect the public health." 42 U.S.C. §

7409(b)(1). Given the CAA's requirements, the "logic" of FHWA's reliance on the NAAQS "is

---

[7] "Notably, at least two courts have recognized that NEPA's requirements are per se satisfied by demonstrating conformity with NAAQS." *Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 576 F. App'x 477, 492 n.6 (6th Cir. 2014) (citing *Tinicum*, 685 F.3d at 296–98; *Sierra Club v. FHWA*, 715 F. Supp. 2d 721, 741 (S.D. Tex. 2010)).

indeed well-reasoned: If ambient air quality standards are designed, as they are, to protect human health, then a finding that the projects do not violate those standards logically indicates that they will not significantly impact public health." *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1020–21 (S.D. Cal. 2003).

It is true that "EPA isn't required to set NAAQS at levels below which [a pollutant] is known to be harmless." Pls.' Mem. 22 (citing *Am. Trucking Associations, Inc. v. E.P.A.*, 283 F.3d 355, 360, 369-70 (D.C. Cir. 2002)). And the Clean Air Act does not require the EPA administrator to set the NAAQS at a zero-risk level. *See Mississippi v. EPA*, 744 F.3d 1334, 1351 (D.C. Cir. 2013). But EPA *must* set the standards "at a level that reduces risk sufficiently so as to protect public health with an adequate margin of safety." 88 Fed. Reg. 5558, 5564 (Jan. 27, 2023); 42 U.S.C. § 7409(b)(1). While Plaintiffs may disagree with the current NAAQS level for $PM_{2.5}$, that is not at issue in this litigation. As to NEPA, Plaintiffs cite to no case, statute, or regulation that requires the hyper-localized findings they demand for $PM_{2.5}$ levels below the NAAQS.

The reasonableness of FHWA's reliance on the NAAQS standards is highlighted by the EPA's consideration of the health effects of $PM_{2.5}$. EPA has long known and understood the effects of $PM_{2.5}$ on public health. Pls.' Mem. 20-21. Indeed, in Sierra Club's comments, they note that EPA considered all the health effects from $PM_{2.5}$ when EPA established the NAAQS standards for particulate matter. AR 136988. For that reason, FHWA did not act arbitrarily or capriciously by relying on those same standards when it considered the air quality impacts— including impacts to public health—of $PM_{2.5}$. *See Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1046 (10th Cir. 2023) ("Comparison to standards set by administrative

bodies to determine whether healthy levels of pollutants would be exceeded constitutes a hard

look at the health impacts of the drilling.").

The cases Plaintiffs rely on to argue that reliance on the NAAQS violates NEPA are

inapt. In *Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Comm'n*, 449

F.2d 1109 (D.C. Cir. 1971), the D.C. Circuit rejected a proposed regulation that would have

"prohibited" the agency "from conducting an independent evaluation and balancing of certain

environmental factors" if the applicant agreed to comply with another agencies' environmental

standards. 449 F.2d at 1117, 1122. But an agency's reliance on another entity's environmental

analyses should be rejected only when "the agency had failed to undertake *any* analysis of its

own. That is not the case here." *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 281 (D.C. Cir.

2015) (Rogers, J., concurring) (citing *Calvert Cliffs*, 449 F.2d 1109). FHWA prepared a detailed

air quality analysis that included discussion of the NAAQS pollutants, the relevant regulations,

and why further analysis was not required. And the agencies disclosed the comment letters with

the studies on $PM_{2.5}$ Plaintiffs point to, and the agencies acknowledged that information. Thus,

Plaintiffs have not identified "the fatal type of abdication that the court disapproved in . . .

*Calvert Cliffs*." *Id.*

And *Environmental Defense Center v. Bureau of Ocean Energy Management*, 36 F.4th

850, 874 (9th Cir. 2022), does not support Plaintiffs' claims. There, the Ninth Circuit did not

review an agency's reliance on the NAAQS for an EIS—it considered a finding of no significant

impact based on a National Pollution Discharge Elimination System General Permit ("NPDES

permit") issued under the Clean Water Act for offshore oil well stimulations treatments. *Id.* at

874. The court found that "the NPDES permit was not created or intended to be used for the

offshore well stimulation treatments at issue in that case" because "the NPDES permit does not

require monitoring for the most common well stimulation treatment fluids." *Id.* at 875. By contrast, the NAAQS attainment levels include the pollutant at issue here— $PM_{2.5}$—and are set at a level determined by EPA to be necessary to protect public health.

Plaintiffs' reliance on *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68 (4th Cir. 2020), fares no better. The Fourth Circuit vacated Virginia's approval of a compressor station in that case because the state agency failed to comply with Virginia's EJ requirements. 947 F.3d at 87-93. While *Friends of Buckingham* discusses $PM_{2.5}$ and NAAQS conformity, it is "easily distinguishable." *Town of Weymouth, Mass. v. Mass. Dep't of Env't Prot.*, 961 F.3d 34, 55 (1st Cir.), *on reh'g*, 973 F.3d 143 (1st Cir. 2020) (rejecting comparison to *Friends of Buckingham* in determining compliance with Massachusetts EJ requirements). The statute at issue there outlines the powers and duties of the Virginia Air Pollution Control Board, and grants "the Board with broad authority 'to control . . . all sources of air pollution in the Commonwealth.'" *Mirant Potomac River, LLC v. State Air Pollution Control Bd.*, No. CL07–2933, 2008 WL 6745388, at * 3 (Va. Cir. Mar. 13, 2008). When exercising that broad authority, Virginia law mandates specific findings the Board must make, Va. Code Ann. § 10.1-1307(E), which includes consideration of environmental justice. *Friends of Buckingham*, 947 F.3d at 87.

The Fourth Circuit found the Board failed to give "any explanation" as to the specific, localized findings required under Virginia law, and reliance on the NAAQS could not overcome those failings. *Id.* at 89. Even so, "Virginia's EJ requirements are not [NEPA]'s . . . requirements. A violation of the former, even on similar facts, would not necessarily be a violation of the latter." *Town of Weymouth*, 961 F.3d at 55. The mandates Virginia state law imposes on its agencies should have no bearing on a federal agency's actions in the state of

Maryland. Under NEPA, there is no requirement for the hyper-localized findings Plaintiffs demand, and agencies are allowed to rely on the careful work of other entities.

On this record, Plaintiffs have not shown a violation of NEPA. The agencies analyzed the projects impacts to air quality, and reasonably relied on the NAAQS standards when considering the Project's health impacts from $PM_{2.5}$.

### B.    FHWA Took A Hard Look At Environmental Justice Impacts

FHWA complied with the requirements of E.O. 12898. This Executive Order instructs federal agencies to "identif[y] and address[], as appropriate disproportionately high and adverse human health or environmental effects . . . on minority populations and low-income populations in the United States." Exec. Ord. No. 12898, 59 Fed. Reg. 7629, 7629 (Feb. 11, 1994).[8] FHWA Order 6640.23A establishes the agency's policies and procedures for E.O. 12898. AR 472.

NEPA requires that an agency consider the environmental impacts of its projects in making its decisions. *Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed Highway Admin.*, 756 F.3d 447, 476-77 (6th Cir. 2014). While EJ issues are a consideration in decision making, they are not controlling. *Id.*; *see also Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017) ("As always with NEPA, an agency is not required to select the course of action that best serves environmental justice, only to take a 'hard look' at environmental justice issues.") (citations omitted). FHWA considered environmental justice impacts throughout its NEPA environmental review process—in the 2020 DEIS, 2021 SDEIS and 2022 FEIS. AR 38406; AR 27430; AR 471.

Plaintiffs argue that FHWA's EJ analysis fails in two ways: (1) FHWA failed to take a hard look at the evidence that the Project would disproportionately increase air pollution in EJ

---

[8] Executive Order 14,096, Revitalizing Our Nation's Commitment to Environmental Justice for All, issued April 21, 2023, supplements E.O. 12,988. This new E.O., however, does not apply to FHWA's analysis here.

communities, Pls.' Mem. 30; and (2) FHWA failed to take a hard look at cumulative impacts to environmental justice communities because it did not factor into its analysis the relevant communities' preexisting pollution burdens and health vulnerabilities. *Id.* at 33. As explained below, neither argument is supported by the record.

### 1. FHWA Thoroughly Considered the Effects of Air Pollution on Environmental Justice Communities Within the Project Area

Plaintiffs assert that the agencies ignored the impacts of traffic, and by extension, air pollution, on environmental justice communities near the managed lanes northern end point on I-270 and the I-270 spurs. *See* Pls.' Mem. 30-32. But FHWA specifically considered traffic impacts to EJ communities, including communities at the Project's northern endpoint in Gaithersburg. AR 5230-32. In fact, FHWA prepared a more than 100-page technical report (not including additional appendices) analyzing community and socioeconomic effects, including identification and analysis of effects on EJ communities. AR 5136-5261 Appendix F, Final Community Effects Assessment & EJ Analysis Technical Report ("EJ Report").

As for traffic, although FHWA acknowledged that drivers would still experience congestion on I-270 northbound during PM peak periods because of bottlenecks, it specifically explained that this *preexisting* congestion "would not get worse due to implementing the Preferred Alternative." AR 259. FHWA also determined that both the managed lanes and the general-purpose lanes would "experience traffic *improvements* under the Preferred Alternative in 2045 along the corridor segments near EJ populations. AR 5231 (emphasis added). And the agencies found that drivers from EJ populations would likely *benefit* from the increased access to transit options. *Id.*

Along with analyzing traffic impacts (including benefits), multiple air quality studies demonstrate that FHWA took the requisite hard look at air pollution impacts to EJ communities.

FHWA conducted a quantitative assessment of MSAT emissions, and analyses for GHG and CO emissions. AR 5233. CO analysis demonstrated that "the worst-case interchanges and intersections for each build and the No Build Alternative, using very conservative assumptions, would not cause or contribute to a violation of the CO NAAQS within the study corridor." AR 5232-33; AR 44992 (showing localized carbon monoxide impacts below NAAQS standards). And for the interchange where I-270 meets I-370, the modeling showed concentrations *lower* than what exists today. AR 44993.

Plaintiffs disagree with FHWA's conclusion that air pollution would not disproportionately impact EJ communities because traffic related air pollution would be distributed along the entire

FHWA also considered health effects on EJ communities. In the EJ Report's analysis, FHWA noted that FHWA guidance shows that "air toxics emissions from mobile sources have the potential to impact human health." AR 5234. Those health effects include "a causal relationship between traffic-related air pollution and exacerbation of asthma" and "suggested evidence of a causal relationship between childhood asthma, non-asthma respiratory symptoms, impaired lung function, total and cardiovascular mortality, and cardiovascular morbidity." *Id.* After noting these potential health impacts, FHWA acknowledged that "EJ populations who live in areas with high USEPA and MD EJSCREEN EJ Index scores may experience air quality and/or public health impacts from construction activities and highway operations more acutely than populations with lower EJ Index scores." *Id.*; *see also* AR 496. Contrary to Plaintiffs' assertion, FHWA did not ignore air pollution impacts to EJ communities—it considered these impacts consistent with the hard look standard. *See Dine Citizens*, 59 F.4th at 1046 (finding agency's admission of health impacts on sensitive groups is proof that the agency did not ignore the issue and met the requisite "hard look" standard).

Plaintiffs disagree with FHWA's conclusion that air pollution would not disproportionately impact EJ communities because traffic related air pollution would be distributed along the entire

length of the Project corridor, "regardless of EJ status." AR 496. But Plaintiffs provide no record evidence to the contrary, and no support for their assertion that FHWA provided the public with erroneous information and reached an arbitrary and capricious conclusion. *See contra N.C. Wildlife Fed'n v. N.C. Dep't of Transp.,* 677 F.3d 596, 602-03 (4th Cir. 2012) (finding agency made fundamental errors in the data they relied on in the "no-build" scenario, knew of the error, but did not divulge the error to the public). FHWA's nearly 250-page Air Quality Technical Report (Appendix K to the FEIS) includes the data from the MSAT analysis and the CO emissions analysis. AR 14330-14347. There is no support for the assertion that FHWA's data and conclusions are wrong. Rather, as noted above, FHWA acknowledged that EJ communities "may experience air quality and/or public health impacts . . . more acutely" than other communities. AR 496. The robust technical reports, combined with the analysis in the FEIS itself, demonstrate the consideration the agency gave to the impacts from traffic-related air pollution, including on EJ communities. FHWA met NEPA's hard look requirement and E.O. 12898's mandate to identify, address, and consider the project impacts on environmental justice communities.

**2.      The Agency Took a Hard Look at the Project's Cumulative Impacts on Environmental Justice Communities**

Under NEPA, an agency must consider the cumulative impacts of a proposed project to meet the 'hard look' standard. 40 C.F.R. §§ 1502.16(a)-(b), 1508.27(b)(7) (2019). Cumulative impacts are those that "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions," no matter who is responsible for those other actions. *Id*. § 1508.7. If the agency has "discuss[ed] and give[n] appropriate consideration" to a project's effects on the human environment, the agency's burden under NEPA has been met. 40 C.F.R. § 1502.16(b). FHWA met this standard by thoroughly considering cumulative impacts, including on EJ communities.

Plaintiffs assert that the agency did not factor in the preexisting pollution burdens and health vulnerabilities of EJ communities. Pls.' Mem. 34. This claim ignores the fact that the EJ communities' preexisting pollution burden was built into the framework of how the agency identified EJ populations in the first place. AR 5207-08; *see also* Appendix F: EJScreen Data and Mapping, AR 5350. And the entire purpose of the EJ Report was to "present the existing conditions, an assessment of potential direct impacts of the [Project] to socioeconomic resources and final mitigation and community enhancements." AR 5141. The EJ report disclosed both the adverse impacts and benefits of the Project on the identified EJ communities. AR 5227. For air quality specifically, FHWA noted that the study area for the Project is within the EPA's attainment area for CO and PM2.5, and thus analysis of these pollutants was not required. Nevertheless, a CO analysis was conducted "for transparency and informational purposes." AR 5232-33. FHWA concluded, using "very conservative assumptions," that the worst-case interchanges and intersections for each alternative analyzed "would not cause or contribute to a violation of the CO NAAQS within the study corridor." AR 5233. No further Project-level air quality analysis was required, and thus any more granular level of analysis on a local level was not required. *Id.* FHWA also explained that "due to industry-wide limitations in tools/techniques for measuring project-specific health outcomes, detailed air quality effects on public health cannot be projected for any specific location." *Id.* FHWA did disclose, as noted above, that EJ communities with high EJ Index scores may experience air quality impacts "more acutely" than populations with lower scores. AR 5234.

Together with the technical report specifically addressing environmental justice communities discussed above, FHWA also prepared a more than 80-page technical report addressing both indirect and cumulative effects of the Project. AR 21108-21193 (Appendix Q,

Final Indirect and Cumulative Effects Technical Report ("Cumulative Effects Report")). The

Cumulative Effects Report specifically analyzes cumulative impacts to EJ communities,

concluding that "the overall impact to environmental justice populations has been greatly

reduced" with the Preferred Alternative. AR 21159. FHWA also concluded that "effects to

human health and safety, *air quality*" and other impacts "would be distributed consistently

throughout the study corridor and would be mitigated to the greatest extent applicable." AR

21160. As a result, "physical impacts and effects to other environmental characteristics would

not be considered disproportionately high or adverse in potential EJ populations." *Id.* Although

FHWA acknowledged that "past, present, and future projects would likely have impacts to

potential EJ populations," the project "is not expected to contribute substantially to the

incremental impact on these populations.[9] *Id.*

> Plaintiffs suggest that qualitative analysis is insufficient under NEPA. Pls.' Mem. 35. But

there is no hard and fast rule requiring quantitative analysis. *See Ohio Valley Env't Coal., Inc. v.*

*U.S. Army Corps of Eng'rs*, 716 F.3d 119, 129 (4th Cir. 2013); *see also Hughes River Watershed*

*Conservancy v. Johnson*, 165 F.3d 283, 288 (4th Cir. 1999) (("[A]n agency takes a sufficient

'hard look' when it obtains opinions from its own experts, obtains opinions from experts outside

the agency, gives careful scientific scrutiny and responds to all legitimate concerns that are

raised.") (citing *Marsh*, 490 U.S. at 378-85). FHWA's 86-page ICE Technical report (FEIS App.

Q), more than 100-page report addressing environmental justice communities (FEIS App. K), its

coordinating meetings with EPA, FTA, MDOT SHA, and others, as well as multiple public

meetings and comment periods through the DEIS, SDEIS, and FEIS process demonstrate that the

---

[9] FHWA also concluded that the Project would benefit Environmental Justice communities through increased mobility and improved bicycle and pedestrian access, toll-free travel for transit vehicles, and enhanced connections to transit centers. AR 651.

agency sufficiently discussed and gave appropriate consideration to the cumulative impacts of the Project, including to EJ communities.

Although Plaintiffs may not agree with FHWA's conclusions about potential impacts, their disagreement does not mean that FHWA failed to take a hard look or that their decision was in any way arbitrary or capricious. *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1325 (D.C. Cir. 2015); *see also Conservation Nw. v. Rey*, 674 F. Supp. 2d 1232, 1249 (W.D. Wash. 2009) (finding "court need not decided whether" the agency considered the "best scientific methodology available, nor does NEPA require a court to resolve disagreements among various scientists as to methodology" and "mere difference of opinion or disagreement with a conclusion is insufficient, under NEPA, to overturn agency action") (citations omitted). Plaintiffs cannot use the NEPA hard look standard to resolve a substantive disagreement with the agency's decision and the court should reject their efforts to "use review of an agency's environmental analysis as a guise for second-guessing substantive decisions committed to the discretion of the agency." *Nat'l Audubon Soc'y*, 422 F.3d at 185; *see also Friends of Pine Street v. Everett*, No. 5:19-cv-95-GWC, slip op. at 55-56 (D. Vt. May 16, 2023) ("It is not the court's place in a NEPA review to substitute its own judgment about whether the benefits [of a project] outweigh the projected increase in traffic . . . . What matters to the court is whether the agencies have adequately considered the impact of these decisions."). Having thoroughly considered impacts to environmental justice communities, FHWA satisfied its obligations under NEPA.

### C.   FHWA Ensured The Traffic Modeling Met All Required Standards, Provided Enough Information To Allow Informed Participation, And Responded To All Reasoned Comments

At every step of the NEPA process, FHWA ensured that the traffic modeling met industry and scientific standards. The agencies responded to and disclosed all substantive

comments Sierra Club and others made on traffic models—indeed, MDOT SHA even adjusted some inputs to the models as a result. And when commenters questioned the scientific integrity of the modeling, FHWA took those allegations seriously. It sent the modeling outside of FHWA to experts at the Department of Transportation's Volpe Center to investigate the claims. The Volpe Center found no evidence of fraud. FHWA then ensured MDOT SHA provided satisfactory explanations to specific issues the Volpe Center raised before approving the ROD.

Plaintiffs assert that FHWA's actions nevertheless did not satisfy its NEPA duties by failing to adequately respond to comments, failing to adequately explain alterations it made to the traffic models, and failing to provide the modeling files for the project. Pls.' Mem. 36-41. The record does not support Plaintiffs' arguments.

### 1.    The Agencies Responded to the Comments Submitted

Plaintiffs first argue that the agencies failed to adequately respond to their comments about traffic modeling. Pls.' Mem. 37-39. Sierra Club submitted comments on each of the DEIS, SDEIS, and FEIS. The agencies responded to Sierra Club's hundreds of pages of comments individually and produced the comments in full. AR 22945-23041; AR 164-212. All three rounds of comments included sections on traffic modeling, and the agencies addressed those issues.

In response to Sierra Club's 174-page SDEIS comment letter, the agencies "carefully reviewed" Sierra Club and its consultant's comments about "traffic modeling, theories, and data," which are topics within FHWA's and MDOT SHA's "traditional expertise." AR 23037. Although Sierra Club and its consultants rejected all of the metrics in the Project analysis as "invalid," AR 158586, the agencies' experts "remain[ed] confident in the state-of-the-art traffic impacts methodology employed for the MLS [Project]" after their review. AR 23037. By obtaining "opinions from its own experts" and responding to the commenters' "concerns," the agencies took the required "hard look." *Hughes River*, 165 F.3d at 288.

All the comments Plaintiffs raise in their brief focus on specific metrics: capacity, throughput, and demand.[10] In response to comments on demand, the agencies rejected Sierra Clubs' critique because it would have required that the Project "analysis assume[] zero growth for the No Build Alternative as a result of likely gridlock conditions." AR 23037. Explaining why that assumption was unreasonable, the agencies pointed to "clear projected increases in regional population and employment that can certainly increase demand for mobility, even if congestion conditions worsen under the No Build scenario." AR 23037. As to capacity, the agencies pointed to the portions of the documents that discuss latent and induced demand, AR 23038, because in Appendix B of Sierra Club's comments, Sierra Club disagreed with the agency's determination that "over-capacity MWCOG model forecasts can be used to quantify latent demand."[11] AR 158618; AR 22975. Finally, for throughput, MDOT SHA agreed that certain critiques had "merit." AR 23038. As a result, MDOT SHA reevaluated and updated throughput tables to "address[] the concerns identified." AR 23038.

Plaintiffs acknowledge these responses but disagree with their conclusions. Pls.' Mem. 37-39. But "that disagreement does not render [FHWA]'s review and comment process improper." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 473 (9th Cir. 2010). As the agencies explained, "while the comments' mischaracterization of the analysis, conclusion and its rejection

---

[10] "Throughput represents the number of vehicles . . . that pass by a given point in the roadway network in a set amount of time." AR 768. Demand refers to either latent demand—"people who want to use I-495 or I-270 during the peak hours, but do not because of the congestion,"—or induced demand—people who take trips that they otherwise would not have "without capacity improvements." Capacity is how many cars can fit on a road. AR 778.

[11] Contrary to Plaintiffs' assertions, the Volpe Center's findings do not support their claims that MDOT's model "defies common sense" as to traffic volumes. Pls.' Mem. at 38. The Volpe Center found that the changes to the FEIS model resulted in "more realistic levels" of delays as compared to the SDEIS results. AR 138.

of the long-standing practice of federal, regional and state expertise is not accepted, each of their comments were seriously considered." AR 23037. After that serious consideration, the agencies modified certain analyses, made factual corrections, and explained why the comments did not warrant further agency response. *See* 40 C.F.R. § 1503.4. "Though [FHWA] did not perform the point-by-point type of counterargument to experts that Plaintiffs appear to desire," that was not required under NEPA. *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1021 (9th Cir. 2012); *see also Marsh*, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

Because courts are not in a position to decide the "propriety of competing methodologies" in the transportation analysis context, they instead should "simply determin[e] whether the [agency]'s choice of methodology had a rational basis, consistently applied, taking relevant considerations into account." *Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.*, 772 F.2d 700, 711 (11th Cir. 1985). That is "especially" true "in matters involving not just simple findings of fact but complex predictions based on special expertise," which is when "a reviewing court must generally be at its most deferential." *Aracoma Coal*, 556 F.3d at 192 (quotations omitted). Here, the agencies ensured that opposing viewpoints were considered, accepted suggested changes that had merits, and rejected those that its experts disagreed with. There is "no doubt that [FHWA] gave full and fair consideration to each comment received." *Sierra Club v. Adams*, 578 F.2d 389, 394 (D.C. Cir. 1978).

### 2. The Changes Made to the Model Were Minor and Adequately Explained

Plaintiffs next argue that the agencies failed to explain changes that were made to the model between the SDEIS and the FEIS. Pls.' Mem. 39-40. In the FEIS, the agencies noted the

updates to the traffic analysis, including "forecast refinements to address comments received on the SDEIS." AR 317. In response to these changes, several organizations, including Sierra Club, commented on the FEIS, and those comments were responded to and included in the ROD. In response, MDOT SHA noted those comments were "not based in fact and appear to be based on a misunderstanding of how data was updated and refined" between the SDEIS and the FEIS. AR 171; AR 130.

The change in modeling inputs is the same issue raised by the Maryland Transit Opportunities Coalition. The Volpe Center attributed the differences in the SDEIS and FEIS models to "minor changes in the analyses conducted for those two documents and inherent limitations of the modeling process used by [MDOT] to analyze the project's impacts on traffic volumes and travel times." AR 137; *accord* AR 138-39. And although the Volpe Center suggested that two issues deserved a more detailed response, AR 139, MDOT SHA—at the request of FHWA—addressed those issues and provided a full explanation in the ROD. AR 140. Thus, before finalizing the ROD, FHWA ensured the commenters' "opposing viewpoint was fully considered in the internal decisionmaking process." *Ground Zero Ctr. for Non-Violent Action v. United States Dep't of Navy*, 860 F.3d 1244, 1256 (9th Cir. 2017) (holding failure to disclose agency risk assessment harmless where record showed agency internalized opposing viewpoints into the decisionmaking process). FHWA therefore satisfied NEPA.

### 3.    The Necessary Data was Reasonably Available

Finally, Plaintiffs contend that the agencies refused to provide data necessary for their review. Pls.' Mem. 41. They argue that NEPA's public participation requirements demand the agency make public all underlying data, including the modeling files for the traffic analysis. *Id.*

Sierra Club submitted multiple requests for modeling files,[12] asking not only for the computer files, but also emails, reports, and memorandums. AR 175918-19. They made those requests even though much of the data underlying the traffic models was publicly available. AR 189588. Because of the "massive request," MDOT SHA charged for the "time incurred to prepare, search, and review documents after the first two hours of work" as allowed under Maryland Public Information Act. AR 189589. But Sierra Club insisted that was not enough. AR 178712.

NEPA requires that the public receive underlying "environmental data" from which the agency's expert derives their opinion about the impacts of the proposed project. *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998) (overruled on other grounds by *The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008)). But that obligation is only "to make information *reasonably* available to the public." *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 255 F. Supp. 3d 60, 67 (D.D.C.), *aff'd*, 877 F.3d 1051 (D.C. Cir. 2017). NEPA does not require the agencies to provide every file and data point used for its complex modeling. Providing detail about the models used and the ultimate quantitative findings "is the 'underlying environmental data' that NEPA requires." *Coal. for Healthy Ports v. U.S. Coast Guard*, No. 13-5347, 2015 WL 7460018, at *16 (S.D.N.Y. 2015) (quoting *Idaho Sporting Cong.*, 137 F.3d at 1150).

Based on the information provided in the environmental documents, the public had adequate information to check the agency's work. Indeed, multiple groups submitted comments challenging the traffic models and the inputs, all without the modeling files. "They only needed

---

[12] Early on, Sierra Club sought the computer files from FHWA. Because FHWA did not have the files requested in its record, FHWA directed their request to MDOT SHA and told them where they could find the publicly available data. AR 136264.

the . . . findings . . . on which [FHWA's] conclusion actually turned. The law does not require more." *Coal. for Healthy Ports*, 2015 WL 7460018, at *16.

And while that information alone satisfied the agencies' obligations, much of the data requested was publicly available in the draft and final environmental documents. *See* AR 702-1501 (FEIS); AR 27919-28126 (SDEIS); AR 36588-38113 (DEIS). That the publicly available data was not in Sierra Club's preferred format does not mean they were unavailable. AR 135914. Indeed, the choice of format for publicly available data is left to agency discretion. *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 667–68 (9th Cir. 2009) ("We defer to an agency's choice of format for scientific data."); *see also League of Wilderness Defenders—Blue Mountains v. U.S. Forest Serv.*, 549 F.3d 1211, 1218 (9th Cir. 2008) ("It is not for this court to tell the Forest Service what specific evidence to include, nor how specifically to present it."). "[T]he format of the data has not apparently impaired [Plaintiffs]' ability to bring legal challenges." *Castaneda*, 574 F.3d at 667–68. Plaintiffs therefore cannot show they were precluded from meaningful participation, and thus no NEPA violation occurred.

## III.    FHWA Has Not Violated Section 4(f) Or Section 106

Plaintiffs contend that FHWA violated Section 4(f) and Section 106 as to two of the properties eligible for study and protection under those statutes: Morningstar Cemetery and Plummers Island. Because the record shows FHWA followed the statutory requirements and made the required findings, the Court should reject Plaintiffs' claims.

### A.    The Agencies' Section 4(F) And Section 106 Findings For The Morningstar Cemetery Are Supported By The Record And The Law

Plaintiffs Friends of Moses Hall, Sierra Club, and National Trust for Historic Preservation contend that, as to the Morningstar Cemetery, the agencies improperly deferred the Section 4(f) determination and failed to make the required assessments under Section 106. Pls.'

43

Mem. 48-52. But in making that argument, Plaintiffs confuse and conflate the separate Section 4(f) and Section 106 conclusions and overlook the reasonable and good-faith efforts by the agencies.

### 1. Plaintiffs Confuse the Section 4(f) "Use" Determination and the Section 106 "Effects" Determination

In arguing that the agencies "deferred" the Section 4(f) determination for the Morningstar Cemetery, *see* Pls.' Mem. 48-52, Plaintiffs confuse the separate conclusions made for Section 4(f) and Section 106. Contrary to Plaintiffs' assertions, FHWA did not defer the Section 4(f) determination of whether the Project would "use" the Morningstar Cemetery property. As stated in the Final Section 4(f) Evaluation and described in the ROD, FHWA determined that the preferred alternative avoids impacts to Morningstar Cemetery. AR 31; *see also* AR 5637.

The Section 106 process, on the other hand, was adhered to through a Programmatic Agreement ("PA"). AR 45. FHWA and MDOT SHA initially determined that, under Section 106, there would be no adverse effects to the Morningstar Cemetery from the Project. But after the Maryland Historical Trust did not concur with that finding, the agencies agreed that a final Section 106 determination of the effects, if any, to the Morningstar Cemetery would be deferred through the PA until further investigations were completed. AR 396; *see* 36 C.F.R. § 800.4(b)(2) ("The agency official may also defer final identification and evaluation of historic properties if it is specifically provided for in . . . a programmatic agreement."). The agreement details how those investigations will occur and what steps the agencies must take if additional burials are discovered. AR 14298-99.

The same Section 4(f) and Section 106 approach was taken in *HonoluluTraffic.com v. Federal Transit Administration*, 742 F.3d 1222 (9th Cir. 2014). There, a proposed transit service project in Oahu's corridor passed near several historic sites, including potential Native Hawaiian

burial sites. *Id.* 1225-27. The court found that, although the defendants did not conduct surveys to identify and evaluate the undiscovered Native Hawaiian burial sites along the entire length of the Project before its approval—even though construction was likely to disturb some of those sites— the defendants had not violated Section 4(f). *Id.* at 1233-34. No violation occurred because "[b]urial sites are eligible for Section 4(f) protection only insofar as they are identified under the Section 106 process for identifying historic sites." *Id.* at 1234. The defendants "made a good faith and reasonable effort to identify known archaeological sites along the proposed Project route and . . . developed an appropriate plan for dealing with sites that may be discovered during construction" under Section 106 and therefore complied with Section 4(f). *Id.*

### 2.     The Record Supports FHWA's Section 4(f) and Section 106 Conclusions

The agencies' Section 4(f) and Section 106 conclusions are supported by the record. As in *HonoluluTraffic.com*, the agencies made a "good faith and reasonable effort" to identify potential burials. The agencies removed vegetation that impeded investigations, conducted radar surveys, and researched historical records. Through that process, they were able to determine the historic boundary of the Morningstar Cemetery and make design changes to avoid impacts to that property under Section 4(f).

The historic boundary of the Morningstar Cemetery is well supported. MDOT SHA used a combination of field work, AR 13913, GPR surveys, AR 27458, and historic research, final 4(f) eval, to discover its contours. As shown in the picture below, MDOT SHA created an overlay of the Project's limits of disturbance (green line), ground-penetrating radar data (yellow overlay), and a historic 1957 aerial of the property (shortly before Beltway construction). The picture shows the location of Moses Hall (marked in red) and the historic road that pre-dated the Beltway (north of Moses Hall). From that information, the agencies determined "that the burials are likely bounded by the historic . . . road running to the west and curving north on the western

45

portion of the property." AR 6021. The historic boundary includes the possible burials in the state-owned right-of-way. Following that work, FHWA and the relevant agencies agreed with MDOT SHA's conclusion on the historic property boundaries. AR 396.



1957 Aerial, GPR, and LOD Overlay, AR 6029

Although the agencies did not conduct surveys over every area in the state-owned right-of-way, "there was a good reason for [their] reluctance to conduct the surveys." *HonoluluTraffic.com*, 742 F.3d at 1234. The cemetery's soil type can affect the quality of data from the radar survey, so the existence and location of burials "can only be confirmed through subsurface investigations." AR 13915-16. And because the Project limits of disturbance "is within or North of [the] historic road bounding feature, potential is low for additional burials." AR 6021. Given that information, the agencies made the reasoned choice to defer any disturbance of the remaining areas until after Project approval.

And the PA resolves the Section 106 process. Before entering into the PA, the agencies determined that there would be no adverse effects—including any cumulative effects. The agencies ultimately decided to defer a final effects determination, however, and the PA was entered into to resolve the process. 36 C.F.R. § 800.4(b)(2); 36 C.F.R. § 800.14(b) ("[A]gency official may negotiate a programmatic agreement to govern . . . the resolution of adverse effects."); *see also City of Alexandria v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999) (noting the "usual product" of the Section 106 process is an "agreement upon how the detrimental effects will be 'taken into account.'"). The PA includes a treatment plan that specifies the methods, limits, and consultation procedures for further investigation of areas with the potential for additional burials outside the current historic boundary. AR 14288, 14296, 14298-99. Following completion of the other investigations specified in the PA and treatment plan, a final identification and determination of the effects to Morningstar Cemetery will be made in compliance with the Section 106 process. AR 399.

## B.     FHWA's Least Overall Harm Analysis For The American Legion Bridge Is Reasonable And Supported By The Record

Plaintiffs NRDC, Sierra Club, and National Trust for Historic Preservation do not challenge FHWA's determination that there was no prudent or feasible alternative that would avoid the use of all Section 4(f) property. Pls.' Mem. at 55. They instead argue that the agencies disregarded a bridge alignment that would have avoided Plummers Island altogether. *Id.* at 55-59.

"If there are no feasible and prudent alternatives to using Section 4(f) property, the Secretary may select only the alternative that 'causes the least overall harm in light of Section 4(f)'s preservation purpose.'" *Defs. of Wildlife*, 762 F.3d at 400–01 (quoting 23 C.F.R. § 774.3(c)(1)) (alternations omitted).

47

> This determination involves balancing several factors, including: (1) the "ability to mitigate adverse impacts"; (2) the relative severity of the harm after mitigation; (3) the relative significance of the Section 4(f) property; (4) the "views of the official(s) with jurisdiction over each Section 4(f) property"; (5) the "degree to which each alternative meets the purpose and need for the project"; (6) "[a]fter reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f)"; and  (7) "[s]ubstantial differences in costs among the alternatives."

*Id.* at 401 (quoting 23 C.F.R. § 774.3(c)(1)(i)-(vii)). Plaintiffs assert that the agencies failed to make specific findings on each individual factor it considered when they rejected the west alignment for the American Legion Bridge. That argument, however, is not supported by the record and is based on an overly formulistic reading of Section 4(f)'s requirements.

Section 4(f) does not require "formal findings." *Overton Park*, 401 U.S. at 409. And "regardless of whether the reports and studies use the 'magic' terminology'" or explicit findings, "a court reviewing the Secretary's decision fulfills its duty if it determines that the Secretary considered all relevant factors and standards and it reasonably and thoroughly reviews the voluminous record accumulated over a long period of time." *Hickory Neighborhood Def. League v. Skinner*, 731 F. Supp. 207, 214 (W.D.N.C.), *aff'd,* 910 F.2d 159 (4th Cir. 1990); *accord Adler v. Lewis*, 675 F.2d 1085, 1095 (9th Cir. 1982) ("[E]ven under the exacting § 4(f) requirements, the judicial branch may not 'fly speck,' if it appears, in its review, that all factors and standards were considered."). The record here supports FHWA's thorough review of the relevant factors and the reasonableness of FHWA's decision.

After publishing the DEIS, the agencies undertook "considerable avoidance and minimization . . . to the NPS properties around the [American Legion Bridge]." AR 369. The agencies consulted NPS and heeded its request to reassess the bridge design and limits of disturbance "to limit impacts to NPS land and its natural and cultural resources." *Id.* The agencies then created a "Strike Team," composed of national and local experts on bridge design,

natural resources, and cultural resources. Their stated goal was to find the alignment that would avoid the most parkland in the area:

> To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the Chesapeake and Ohio Canal National Historical Park (Chesapeake and Ohio Canal NHP) and George Washington Memorial Parkway units of the NPS.

*Id.* "An additional goal of the Strike Team was to develop and evaluate alternatives for the avoidance and minimization of Plummers Island." *Id.* The Strike Team looked at several different bridge alignments and construction methods in its attempts to avoid resources. Among the options considered were the on-center alignment that was ultimately chosen, and Plaintiffs preferred "west shift alignment."

Based on the results of the Strike Team investigations, the agencies selected the on-center alignment. The agencies quantified the impacts to NPS properties, AR 17692, and found that "the on-center alignment would impact the least amount of total NPS Land." AR 17702. The on-center alignment would impact less total NPS parkland and result in fewer impacts to trees, wetlands, and forest canopy. AR 17692. The west shift alignment would have also required "residential displacement" and a "re-configuration of the Clara Barton Parkway interchange." AR 17702.[13] In all, the on-center alignment "will result in approximately 0.28 acres of impacts to the Island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact." AR 644. Looking at all these factors, the agencies determined the west shift alignment would not minimize harm to these important resources. "If the route does not minimize harm, it need not be selected." *Audubon Naturalist Soc'y*, 524 F. Supp. 2d at 683-84.

---

[13] The agencies created a visual impact map depicting the comparison of impacts between the base and west shift options. *See* AR 17695.

Contrary to Plaintiffs' assertions, FHWA acknowledged the scientific and historical significance of Plummers Island and the Washington Biologists' Field Club. FHWA recognized the Washington Biologists' Field Club's "significant . . . contributions to science and conservation as the site of long-term scientific studies conducted by the club." AR 403. And they internalized the impacts that would occur to Plummers Island: "proposed construction activities at the western edge of Plummers Island will alter the natural landscape of the island, a character-defining feature of the Washington Biologists' Field Club, resulting in diminishment of the property's integrity of setting." AR 403. And the Strike Team considered the costs. The Strike Team noted that although the west-shift alignment could save cost and time for construction, the "added expense for shifting the roadway approaches and adjacent Clara Barton Parkway interchange . . . could quickly negate these cost and schedule benefits." AR 198378; *see also* AR 198391.

In sum, the agencies engaged "in a broad consideration of the relative harm" arising from the various alignments and selected the alignment they determined, after consulting NPS, that caused the least total harm. *See Coal. On Sensible Transp. Inc. v. Dole*, 642 F. Supp. 573, 603 (D.D.C. 1986), *aff'd,* 826 F.2d 60 (D.C. Cir. 1987) (discussing Section 4(f)(2) balancing process). Plaintiffs would have this Court disregard that record and vacate the agencies' reasoned and supported decision because they did not include the west alignment in its formal least harm analysis. "But federal courts are neither empowered nor competent to micromanage strategies for saving the nation's parklands." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 204 (D.C. Cir. 1991). The agencies made a reasoned choice to select the alternative that did the least overall harm to parkland—and

residential property—in the area. The Court should therefore uphold that decision and grant

the Federal Defendants' motion as to Section 4(f).

## CONCLUSION

For all these reasons, the Court should enter summary judgment for the Federal

Defendants.


Dated: August 7, 2023

<div style="margin-left: 40%;">

Respectfully submitted,

TODD KIM
Assistant Attorney General

By: */s/ Samuel R. Vice*
SAMUEL R. VICE
FRANCES B. MORRIS
Trial Attorneys
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 353-5540
Email: samuel.vice@usdoj.gov
Email: frances.morris@usdoj.gov

*Counsel for Federal Defendants*

</div>