UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| Maryland Chapter of the Sierra Club, *et al.*, | |
| *Plaintiffs*, | |
| v. | |
| Federal Highway Administration, *et al.*, | Case No.: 8:22-cv-2597-DKC |
| *Defendants*. | |
| Northern Virginia Citizens Association, | |
| *Plaintiff*, | |
| v. | |
| Federal Highway Administration, *et al.*, | Case No.: 8:22-cv-03336-DKC |
| *Defendants*. | |

**STATE DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 5

    A. Regional transportation agencies have long studied the impact of traffic congestion and recognized managed lanes as part of the regional plan. ............... 5

    B. MDOT evaluated alternative managed lanes, transit, and other transportation tools to address the existing and growing congestion on I-495 and I-270 ...................... 7

    C. The agencies used every available tool to gather public input on the draft environmental impact statement before recommending a preferred alternative..... 8

    D. Based on public input, MDOT changed the preferred alternative to reduce impacts and encouraged additional input. ............................................................. 9

    E. FHWA independently evaluated the project and reached its own conclusions. ... 12

ARGUMENT ................................................................................................... 13

I.  The agencies' comprehensive environmental review complied with the law and entitles them to summary judgment. ............................................................. 13

    A. To prevail, Plaintiffs must show that the decision approving the managed lanes project was arbitrary and capricious. ............................................................. 14

    B. The record shows that the agencies' decision was reasoned and that they are entitled to summary judgment. ............................................................. 15

II. Plaintiffs' traffic claims fail because MDOT's traffic analysis considered substantive comments and provided relevant information to the public. ...................................... 16

    A. MDOT used industry-accepted modeling techniques to make long-term traffic projections.................................................................................................... 17

    B. MDOT took a hard look at Plaintiffs' criticisms of its traffic model but was not persuaded. ........................................................................................... 19

        1. Multiple levels of expert review support MDOT's traffic analysis. .............. 19

        2. MDOT considered and responded to Plaintiffs traffic comments ................. 20

    C. MDOT did not improperly withhold its modeling files....................................... 22

III. MDOT's approach to air pollutants was not arbitrary and capricious....................... 24

    A. The regional analysis established that Montgomery County and Fairfax County would remain within the EPA health standard for $PM_{2.5}$...................................... 24

    B. Relying on EPA's air quality standards for $PM_{2.5}$ complied with NEPA's rule of reason. ................................................................................................... 25

    C. Neither Fourth Circuit nor out-of-circuit cases alter NEPA's rule of reason. ...... 28

i

D.  MDOT's localized carbon monoxide modeling confirms its $PM_{2.5}$ conclusions.  30

IV. MDOT and FHWA studied potential effects on environmental justice communities and avoided disproportionate impacts to them. .......................................................... 31

A.  The record reflects that MDOT recognized and accounted for past harms to environmental justice communities. .................................................................... 31

B.  MDOT did not miss any disproportionately high and adverse air quality impacts to environmental justice communities. .................................................................. 33

V.  The Virginia Department of Transportation and MDOT appropriately considered the impacts of flyover ramps in Virginia. ........................................................................ 35

A.  Because Plaintiffs fail to show that harms from flyover ramps in Virginia are traceable to this project, they lack standing. ......................................................... 36

B.  The final EIS addresses impacts from the Virginia flyover ramps. ..................... 37

VI. MDOT carefully avoided or minimized impacts to parks and historic properties under Section 4(f) and Section 106. ................................................................................... 38

A.  MDOT investigated and avoided impacts to Morningstar Tabernacle No. 88 Moses Hall and Cemetery under Section 4(f). .................................................... 39

B.  Using a programmatic agreement complied with Section 106. ............................ 41

C.  MDOT's planning minimized effects to Plummers Island from the necessary replacement of a bridge. ....................................................................................... 42

CONCLUSION ................................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Whitewater v. Tidwell,*
    770 F.3d 1108 (4th Cir. 2014) ...............................................................14, 19

*American Trucking Associations, Inc. v. EPA,*
    283 F.3d 355 (D.C. Cir. 2002) ....................................................................28

*Blaustein & Reich, Inc. v. Buckles,*
    365 F.3d 281 (4th Cir. 2004) .......................................................................14

*Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy
    Commission,*
    449 F.2d 1109 (D.C. Cir. 1971) ..................................................................29

*Citizens for Scenic Severn River Bridge, Inc. v. Skinner,*
    802 F. Supp. 1325 (D. Md. 1991), *aff'd per curiam,* 972 F.2d 338 (4th
    Cir. 1992) ...................................................................................................38

*City of Alexandria v. Slater,*
    198 F.3d 862 (D.C. Cir. 1999) ....................................................................41

*CTIA-Wireless Ass'n v. FCC,*
    466 F.3d 105 (D.C. Cir. 2006) ....................................................................42

*Defenders of Wildlife v. North Carolina Dep't of Transp.,*
    762 F.3d 374 (4th Cir. 2014) .................................................................13, 14

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004).................................................................................23, 26

*Dubois v. Dep't of Agric.,*
    102 F.3d 1273 (1st Cir. 1996)......................................................................26

*el Bienestar de la Comunidad Costera v. FERC,*
    6 F.4th 1321 (D.C. Cir. 2021)......................................................................31

*Environmental Defense Center v. Bureau of Ocean Energy Management,*
    36 F.4th 850 (9th Cir. 2022).   ....................................................................29

*Friends of Buckingham v. State Air Pollution Control Board,*
    947 F.3d 68 (4th Cir. 2020) ........................................................................29

*GBA Assocs. v. Gen. Servs. Admin.*,
  32 F.3d 898 (4th Cir. 1994) ............................................................36

*Hughes River Watershed Conserv. v. Johnson*,
  165 F.3d 283 (4th Cir. 1999) ....................................................16, 19

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ......................................................................26

*N. Va. Citizens Ass'n v. Fed. Hwy. Admin.*,
  Case No. 1:23-cv-356 ....................................................................35

*No Mid-Currituck Bridge-Concerned Citizens v. North Carolina Dep't of
  Transp.*,
  60 F.4th 794 (4th Cir. 2023) .........................................................17

*Overbey v. Mayor of Baltimore*,
  930 F.3d 215 (4th Cir. 2019) ........................................................36

*Presidio Hist. Ass'n v. Presidio Trust*,
  811 F.3d 1154 (9th Cir. 2016) ......................................................38

*Save Our Sound OBX, Inc. v. North Carolina Dep't of Transp.*,
  914 F.3d 213 (4th Cir. 2019) ........................................................37

*Sierra Club v. U.S. Dep't of Interior*,
  899 F.3d 260 (4th Cir. 2018) ........................................................36

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ......................................................................37

*Webster v. U.S. Dep't of Agric.*,
  685 F.3d 411 (4th Cir. 2012) ...........................................14, 26, 28, 29

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ................................................................26, 28

**Statutes**

5 U.S.C. § 706(a)(2) ...........................................................................14

42 U.S.C. § 7409(b)(1) ...........................................................26, 28, 29

49 U.S.C. § 303(c)(1) ..........................................................................38

49 U.S.C. § 303(c)(2) ..........................................................................39

**Rules and Regulations**

23 C.F.R. § 774 ...................................................................................................44

23 C.F.R. § 774.3 ...............................................................................................41

23 C.F.R. § 774.3(a)(2) .......................................................................................43

23 C.F.R. § 774.3(c) ...........................................................................................43

23 C.F.R. § 774.3(c)(1) ...................................................................................43, 44

36 C.F.R. § 800.2(c) ...........................................................................................40

36 C.F.R. § 800.4(b)(2) .......................................................................................41

36 C.F.R. § 800.14(b)(2)(iii) ...............................................................................42

40 C.F.R. § 1500.1(a) .........................................................................................27

85 Fed. Reg.43304 (July 16, 2020) .....................................................................23

Exec. Order No. 12898, 59 Fed. Reg. 7629 (Feb. 16, 1994) ................................31

Exec. Order No. 12898, 59 Fed. Reg. 7630 (Feb. 16, 1994) ................................26

Exec. Order No. 14096, 88 Fed. Reg. 25251 (April 26, 2023) .............................31

Exec. Order No. 14096, 88 Fed. Reg. 25253 (April 26, 2023) .............................26

**State Regulations**

Md. Code, Gen. Provisions § 4-2 ........................................................................23

Md. Code, Gen. Provisions § 4-206 .....................................................................23

# INTRODUCTION

Traffic congestion on I-495 (the Capital Beltway) and I-270 is a frustrating reality for citizens across the Greater Washington Metropolitan region.  Even with the recent exponential growth in teleworking, the longstanding concept of a rush "hour" is no longer valid.  Traffic along I-495 and I-270 is now experienced eight-to-twelve hours a day. See AR.4378 (FEIS, Appendix C Final Covid-19 Travel Analysis & Monitoring Plan, Attachment 1E - 2021 data).  With regional population expected to grow by nearly 1.2 million people by 2045, Maryland travelers using these highways and adjacent roads will continue to confront worsening traffic congestion, which negatively impacts their quality of life. AR.268 (FEIS at 1-4)

Recognizing these serious challenges, the State of Maryland embarked on the environmental study at issue in this case in order to engage residents and experts in identifying and balancing the impacts associated with potential transportation solutions with impacts on Maryland's diverse communities and our rich cultural and natural resources.

Years of planning studies across our region show that no one solution will resolve all traffic problems in and around these two highway facilities, among the most congested in the entire state.  Instead, a layered solution is needed.  Improved transit and increased telework are part of the overall plan.  Even recognizing potential impacts to community and environmental resources, reasonable traffic management tools sometimes involve building additional capacity.  This project study is about a traffic management tool: new toll lanes (called "managed lanes") along I-495 and I-270. In addition to maintaining all free general-purpose lanes on these highways, two tolled and high occupancy managed lanes will be designed from just south of the American Legion Bridge to the I-370 intersection on I-270

1

to assure travelers a fast, reliable trip and enhanced connections to other transit and transportation facilities.

Between 2018 and 2022, the Maryland Department of Transportation State Highway Administration (MDOT) and the Federal Highway Administration (FHWA) carefully studied the proposed managed lanes' benefits and impacts, as well as potential project alternatives. In so doing, MDOT reached out to other agencies, technical experts, and the public. The transparent and comprehensive dissemination of information regarding the effects and benefits of the proposed managed lanes, and the encouragement of input from the general public and key stakeholders, led MDOT to select a narrower project than had been originally recommended.

From the full spectrum of issues studied by MDOT during the course of its environmental review, Plaintiffs raise several narrow claims. While they acknowledge that a reviewing court should not "flyspeck" an agency's environmental impact statement, Plaintiffs' summary judgment brief does just that. Their flawed narrative, replete with selective and misleading citations to the record, fails to reveal inadequacies in either MDOT's analysis or in the process used to prepare the environmental impact statement.

A review of the project administrative record in this case reflects that MDOT took great care to consider, avoid, and minimize project impacts.[1] When not all adverse impacts could be avoided, MDOT committed to a broad range of mitigation to address impacts to parkland, and to sensitive cultural and environmental resources. MDOT's outreach to all interested parties, especially environmental justice communities, was robust and fair. The administrative record shows that MDOT listened and responded to public input on the project

---

[1] Many of the most important documents in the record are available on the project's website, oplanesmd.com/environmental.

proposal. MDOT substantially reconsidered its original preferred alternative, and in so doing drastically reduced the project's scope and impacts.

Plaintiffs' objections to MDOT's analysis or process find no support in applicable law and are contradicted by the contents of the thorough project record. First, the administrative record reflects a careful and reasonable analysis of potential traffic benefits. Plaintiffs offer a consultant to poke holes in MDOT's traffic modeling, but the agency's methodology properly relied on and implemented regionally approved and industry-accepted models. Plaintiffs' narrow claims concerning the traffic analysis fail to undermine the overall conclusion that managed lanes will reduce congestion. Second, with respect to air quality concerns, Plaintiffs do not challenge the agency's conclusion that the proposed action complies with current air quality standards. Instead, they argue that the environmental review should have applied different standards for one air pollutant and conducted additional analyses that have not yet been required by federal regulators. Plaintiffs are entitled to advocate that the federal government adopt new air quality standards, but an environmental impact statement is not the appropriate venue for such advocacy. Plaintiffs' policy dispute does not undermine MDOT's analysis in this case.

Third, MDOT's robust outreach to minority and economically disadvantaged communities, and the agency's detailed assessment of project impacts to those communities defeats Plaintiffs' claims regarding environmental justice. Using accepted data from the federal and state governments, MDOT reasonably concluded that the managed lane project would not result in disproportionate, high, and adverse impacts to environmental justice communities. Fourth, Plaintiffs lack standing to assert claims related to alleged impacts of this project to Virginia communities on the other side of the American Legion Bridge. Even if they could demonstrate standing, Plaintiffs fail to connect this project's impacts to the property interests across the Potomac River. They have already tried and failed to stop

3

an unrelated Virginia Department of Transportation project that is the true basis for their concerns.

Fifth, Plaintiffs' allegations concerning parkland and historic resources also fail. There is no evidence that the managed lanes project will infringe upon the historic Morningstar Tabernacle No. 88 Moses Cemetery property or on those burials outside the previous understood cemetery area. In order to address even the unlikely identification of additional burials within the limits of disturbance, an approved programmatic agreement, concurred to by experts and the State Historic Preservation Officer, was executed under the National Historic Preservation Act.  And finally, Plaintiffs ignore MDOT's intensive efforts to evaluate and minimize potential impacts to parkland in the study areas, including to Plummers Island, a portion of the C&O Canal National Historic Park.

In sum, the claims set forth in Plaintiffs' Complaint and detailed in their Motion for Summary Judgment, fail to present a genuine issue of material fact or establish any claim as a matter of law.  Their arguments reflect, instead, a policy disagreement with the decision to build managed lanes on I-495 and I-270.  However sincere, a policy disagreement is insufficient to overturn an agency's decision under the Administrative Procedure Act. Plaintiffs cannot establish that MDOT's review and analysis of this important transportation improvement project, and FHWA's final decision approving the project, was arbitrary or capricious or otherwise violated any applicable law.

## BACKGROUND

As noted above, Plaintiffs do not challenge that the National Capital Region is the most congested in the country as measured by annual delay and congestion per commuter. AR.5 (ROD at 2). They do not challenge that traffic congestion in the region impacts Marylanders' quality of life and it is only getting worse.[2] They do not challenge that MDOT and FHWA have spent years identifying these needs and developing an overall plan which includes a variety of solutions. Instead, they argue narrow points that neither undermine the need for the managed lanes project nor challenge the reasonableness of the agencies' environmental review.

### A.    Regional transportation agencies have long studied the impact of traffic congestion and recognized managed lanes as part of the regional plan.

Maryland roads hit an all-time high in vehicle miles traveled in 2019. AR.268 (FEIS at 1-4). The intense demand for travel in the region leads to more vehicles on the road. AR.269 (FEIS at 1-5). That means slower speeds, more crashes, standstill traffic, and slower emergency response times. AR.269 (FEIS at 1-5, 1-8). All of this hurts trip reliability, leaving travelers, whether in cars or buses, unable to predict how long it will take to get to work, daycare or schools. AR.270 (FEIS at 1-6). It makes bus lines and connection to other transit uncertain. AR.270 (FEIS 1-5 through 8) And the same problems spill over into the movement of goods and services, a critical part of the region's economy AR.273 (FEIS at 1-9). The FHWA concurred with these critical impacts on Maryland's travelers. AR. 5-6 (ROD at 4–5).

---

[2] Montgomery County, Maryland saw its population increase by more than 20% from 2000 to 2020. AR.267 (FEIS at 1-3). Experts foresee another 16% leap between 2020 and 2045. AR.267 (FEIS at 1-3).

The federal, state, and local agencies responsible for relieving these traffic congestion problems have been studying ways to do so for nearly two decades.  AR.266–69 (FEIS at 1-2–1-5); AR.6 (ROD at 3).  Appendix A to the draft environmental impact statement catalogues those studies.  AR.36073–78 (DEIS App. A at 4–9).  As Appendix A explains, every study agrees that no single project—highway or transit—can untangle the region's traffic snarls.  AR.36083 (DEIS App. A at 12); *see* AR.6 (ROD at 3).  What the region needs instead is a "synergistic system of transportation solutions."  AR.6 (ROD at 3).

Considering the collective judgment of these studies, the Metropolitan Washington Council of Governments' Transportation Planning Board in 2017 approved ten regional traffic relief concepts for further study.  AR.6 (ROD at 3).  Those concepts included both transit projects like the Purple Line light rail and traffic management projects like managed lanes on I-495 and I-270.  AR.6 (ROD at 3).

Managed lanes are special highway lanes that are separated from the rest of the traffic.  AR.249 (FEIS at ES-8).  Access to them is regulated by requiring a toll for most vehicles.  AR.21 (ROD at 18).  When traffic in general-purpose lanes increases, so does the cost of using the managed lanes.  AR.21 (ROD at 18).  That way, the managed lanes maintain a free flow of traffic.  AR.21 (ROD at 18).  Such managed lanes already exist—and have proven helpful—around most of I-495 in Virginia.  AR.316 (FEIS at 3-32).

The I-495 and I-270 managed lanes will give travelers choices.  If they ride the bus or join a carpool, they can use the managed lanes for free.  AR.272 (FEIS at 1-8).  If they are alone and running late, they can pay to use the managed lanes.  AR.272 (FEIS at 1-8).  And if they prefer to use transit, like Metrorail, they will have an easier time reaching a station.  AR.272 (FEIS at 1-8).  Meanwhile, drivers who choose to stay in the unchanged, free, general-purpose lanes will also face less traffic.  AR.272 (FEIS at 1-8).

**B.      MDOT evaluated alternative managed lanes, transit, and other trans-portation tools to address the existing and growing congestion on I-495 and I-270**

Following the Transportation Planning Board's suggestion, MDOT and FHWA began preparation of an environmental impact statement for managed lanes on I-495 and I-270, publishing a notice of intent in early 2018.  AR.55593–94 (Notice of Intent).  Working with other federal, state, and local agencies, and gathering input from the public, MDOT and FHWA established that the purpose of any project targeting traffic problems should be "to address congestion, improve trip reliability on I-495 and I-270 . . . and enhance existing and planned multimodal mobility and connectivity."  AR.266 (FEIS at 1-2).  That purpose, the agencies found, would address the region's needs to:

- accommodate existing traffic and long-term traffic growth;

- enhance trip reliability;

- provide more roadway travel choices;

- improve movement of goods and services; and

- accommodate homeland security.

AR.266 (FEIS at 1-2); *see* AR.36084 (Purpose and Need Report at 13-14).

With this purpose and need in mind, MDOT developed 15 preliminary alternatives for further review.  AR.278–79 (FEIS at 2-1–2-2).  Those alternatives ran the gamut from no action, to building more general-purpose lanes or managed lanes, to creating stand-alone transit.  AR.279 (FEIS at 2-2).  From there, MDOT and FHWA applied screening criteria tied to the project's purpose and need, while at the same time considering the alternatives in the context of other projects already included in long-range regional planning.  AR.281 (FEIS at 2-4).  With participation of federal and state agencies, this screening process trimmed the list of alternatives to seven.  AR.282 (FEIS at 2-5).  Each of those seven

alternatives received more detailed analysis in a draft environmental impact statement. AR.282–83 (FEIS at 2-5–2-6); *see* AR.35791–98 (DEIS at 2-24–2-31).

**C.    The agencies used every available tool to gather public input on the draft environmental impact statement before recommending a preferred alternative.**

The draft environmental impact statement (EIS), published in July 2020, was available for four months of public comment.  AR.242 (FEIS at ES-1).  During that comment period, MDOT confronted the challenge of the covid-19 pandemic.  It used every tool available— and some tools that it had to innovate—to ensure effective public engagement.  For example, MDOT advertised widely on news and social media outlets, held both in-person and virtual meetings, and put modular libraries around the study area that allowed safe review of project documents.  AR.586–99 (FEIS at 8-2–8-15).  These new, creative ways of reaching the public have since found a permanent place in MDOT's toolbox, as many people found it easier to see and comment on the draft EIS.  AR.29 (FEIS at 26).

In January 2021, after reviewing all comments on the draft EIS, MDOT announced its recommended preferred alternative.  AR.25 (ROD at 22).  That alternative—known as Alternative 9—would have created two managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia all the way to Maryland Route 5 in Prince George's County, as well as on I-270 from I-495 to I-370.  AR.282 (FEIS at 2-5); AR.25 (ROD at 22).  As encouraged in the NEPA process, this announcement spurred even more debate.  After several more months of evaluating public and agency input on Alternative 9, MDOT and FHWA announced a modified preferred alternative: Alternative 9 – Phase 1 South.  AR.25 (ROD at 22); AR.284 (FEIS at 2-7).

8

**D.      Based on public input, MDOT changed the preferred alternative to re-
duce impacts and encouraged additional input.**

The agencies' modified preferred alternative still included two managed lanes in each

direction, but those lanes extended only from the GW Parkway to Maryland Route 187 on

I-495 and from I-495 to I-370 on I-270.  AR.284 (FEIS at 2-7).  The total length of managed

lanes went from 48 miles to 15 miles.  AR.284 (FEIS at 2-7).  The final preferred alternative

appears below (in dark blue):



AR.4 (ROD at 2).

A supplemental draft EIS documented the new preferred alternative's benefits and im-

pacts.  AR.27343–630 (SDEIS).  It would still replace the American Legion Bridge—a

major traffic bottleneck—and use managed lanes to reduce congestion.  AR.284 (FEIS at

2-7); AR.26–27 (ROD at 23–24).  It would improve traffic conditions both for local drivers

and for people traveling longer distances on I-95, the key highway linking Florida and

Maine.  AR.28 (ROD at 25).  Beyond that, the new preferred alternative addressed the

public's questions about the impacts of a 48-mile route.  AR.26 (ROD at 23).

The supplemental draft EIS explained how the new preferred alternative would avoid or minimize effects on parks and historic properties.  AR.242 (FEIS at ES-1); AR.27435–43 (SDEIS at 4-9–4-18).  It documented 20 parks and historic properties that stood to be affected by the managed lanes project—down from 38 such properties in the draft EIS.  AR.533 (Final EIS at 6-3–6-4).  The agencies also worked to reduce impacts on properties within the new preferred alternative. Those properties included part of Plummers Island in the Potomac River, which under the preferred alternative will experience less than one-tenth an acre of permanent impacts from the expansion of the American Legion Bridge.  AR.539 (FEIS at 6-9).  At the same time, an MDOT redesign moved the construction limits of disturbance beyond the boundary for Morningstar Tabernacle No. 88 Moses Hall and Cemetery.  MDOT's investigation allowed it to better define the cemetery's boundaries and avoid all impacts within them.  AR.31 (ROD at 28); AR.13954 (FEIS App. I, vol. 9 at 63).  To be clear, through its careful efforts, MDOT identified that Morningstar burials had likely occurred outside the Cemetery's previously understood property boundary.  However, since no construction had previously occurred in the areas identified and the redesign would also be outside these areas, a small portion of these areas owned by MDOT would be gifted to the Cemetery. AR.580 (FEIS at 7-18).

After a longer-than-normal 60-day comment period for the supplemental draft EIS, MDOT incorporated additional ways to improve the project by reducing impacts and increasing transportation benefits based on public input and coordination with other federal, state and local agencies.  For instance, the final environmental impact statement includes a new trail connection from the American Legion Bridge to the Chesapeake and Ohio Canal towpath, new noise barrier locations, better stormwater management, and reduced impacts to sensitive resources from careful engineering design reviews.  AR.243 (FEIS at ES-2).

10

The final EIS preferred alternative has reduced impact on parks, wetlands, waterways, floodplains, and forest canopies.  AR.31 (ROD at 28).

MDOT's consultation efforts with key stakeholders and the public also focused on its comprehensive mitigation plan and commitment to more project improvements.  These conversations led to important benefits, including:

- a commitment to build a shared-used bicycle-pedestrian path on the American Legion Bridge;

- continued reduction of property, community, historic, natural resource, and park impacts;

- a commitment to improve pedestrian and bicyclist safety at key locations in the study area; and

- toll-free travel for high-occupancy vehicles, transit buses, and motorcycles in the managed lanes.  AR.244–45 (FEIS at ES-3–ES-4).

The 450-page final EIS summarizes both the benefits and the potential impacts of the managed lanes project.  But that analysis went far beyond the final EIS itself.  MDOT's staff and consultants prepared more than a dozen technical reports, spanning thousands of pages, which were updated and appended to each iteration of the EIS.  Those reports offer technical detail on the agencies' traffic, environmental justice, cultural resources, and air quality analyses.  *See, e.g.*, AR.702 (FEIS App. A, traffic technical report); AR.1502 (FEIS App. B, draft application for interstate access point approval); AR.5136 (FEIS App. F, environmental justice technical report); AR.5777 (FEIS App. I, cultural resources technical report); AR.14323 (FEIS App. K, air quality technical report).  Consideration of the agencies' decision in this matter must also take account of the comprehensive information in the technical reports and the internal analyses that supports them.

E.    **FHWA independently evaluated the project and reached its own con-clusions.**

FHWA was involved at each step of this process as the lead federal agency.  In that role, FHWA coordinated with MDOT in regular meetings and with other agencies in larger working group meetings.[3]  Before making its final decision, FHWA called on its own expertise and conducted an independent assessment of the environmental review, including its underlying technical analyses.  AR.4 (ROD at 1).  And when Plaintiffs challenged a small part of MDOT's traffic modeling, FHWA's experts carefully evaluated those comments and even solicited independent expert review.  AR.189812–60 (FHWA comments and MDOT responses on DEIS); AR.137 (ROD App. D, FHWA Memo describing Volpe Center review).

FHWA's Record of Decision sums up years of agency review: MDOT and FHWA "considered all the alternatives, information, analyses, and objections" to the project.  AR.56 (ROD at 53).  After "a balanced consideration of the need for safe and efficient transportation," as well as the project's "social, economic, and environmental effects," FHWA found that MDOT had properly documented all potential project impacts, and considered design changes to avoid and minimize those impacts.  AR.56 (ROD at 53).  It accordingly approved the project on August 25, 2022.  AR.57 (ROD at 54).  Plaintiffs did not like FHWA's decision, each for different reasons, and filed these now-consolidated complaints.

---

[3] *See, e.g.*, AR.55855, AR.55930, AR.56093, AR.56563, AR.57883, AR.58440, AR.117460, AR.119296 (select agendas and meeting notes from FHWA meetings); AR.55844, AR.55881, AR.56583, AR.59935, AR.61422, AR.64813, AR.141810 (select interagency working group notes and presentations); AR.57903 (agency coordination plan).

## ARGUMENT

The administrative record supporting the agency decisions in this case is comprehensive and detailed.  This record demonstrates MDOT's compliance with all the key environmental statutes and regulations related to the proposed managed lanes project.  Plaintiffs' accusations rely on selective and sometimes inaccurate representations concerning the agencies' environmental review process.  As required by NEPA, MDOT engaged the public, as well as federal, state, and local experts, to collect and analyze input regarding the benefits and impacts of the proposed infrastructure project.  MDOT actively listened and responded to this input, and redesigned the project to reduce and mitigate impacts at each stage in their thorough process.  AR.56 (ROD at 53).  Plaintiffs, for their part, do not dispute that the project's environmental review correctly identified a reasonable range of project alternatives or was conducted with a full range of public participation.  Their claims are narrower.  But at each narrow point where Plaintiffs accuse the agencies of not doing enough, the record proves why their claims are unsupported.  Thus, the agencies' discretionary decision to approve the managed lanes project should be upheld.

## I.      The agencies' comprehensive environmental review complied with the law and entitles them to summary judgment.

Plaintiffs' complaint and motion set out narrow claims that MDOT and FHWA violated three statutes: the National Environmental Policy Act, Section 106 of the National Historic Preservation Act, and Section 4(f) of the U.S. Department of Transportation Act.  Pltfs.' Br. at 1–2.  As those statutes do not provide their own causes of action, Plaintiffs seek review under the Administrative Procedure Act (APA).  *See* Pltfs.' Br. at 17–18; *Defenders of Wildlife v. North Carolina Dep't of Transp.*, 762 F.3d 374, 393 (4th Cir. 2014) (holding

that the APA governs review under both NEPA and Section 4(f)).  As shown below, these challenges are factually and legally unsupported.

>    **A.    To prevail, Plaintiffs must show that the decision approving the managed lanes project was arbitrary and capricious.**

Under the APA, courts may "hold unlawful and set aside agency action" that is shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(a)(2).  That is a difficult standard to meet.  It is not enough for Plaintiffs to say that the facts in the record could be viewed differently.   Rather, they must prove that the agency's decision lacks "a rational connection between the facts" the agency found and "the choice" the agency made.  *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014) (brackets omitted).  Plaintiffs cannot win by "flyspeck[ing] the agency's environmental analysis, looking for any deficiency, no matter how minor."  *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 421 (4th Cir. 2012) (brackets and internal quotation marks omitted).  Judicial review instead demands "a holistic view" of the agency's environmental study.  *Id*. at 422.

When faced with cross-motions for summary judgment, courts consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law."  *Defenders of Wildlife*, 762 F.3d at 392.  But especially when the case "involves primarily issues of fact that implicate substantial agency expertise," the APA's standard of review is "ultimately narrow and highly deferential" to the agency.  *Id*.  Because of this "highly deferential standard of review," a court facing cross-motions for summary judgment in an APA case "presumes the validity of the agency action."  *Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 291 (4th Cir. 2004).  So if a plaintiff cannot meet its heavy burden under the APA, the agency is entitled to summary judgment.

Here, Plaintiffs do not dispute that the summary judgment standard of review in an APA case is "ultimately narrow and highly deferential" to the agency. *Id.*; *see* Pltfs.' Br. at 18.  But it is a standard they cannot meet.  Their motion for summary judgment should be denied, and MDOT's and FHWA's motions should be granted.

   **B.**   **The record shows that the agencies' decision was reasoned and that they are entitled to summary judgment.**

   The record that supports the agencies' decision in this case is formidable.  It starts with a detailed environmental review, summarized in a draft environmental impact statement, supplemental draft environmental impact statement, and final environmental impact statement.  Each of those EISs draws on thousands of pages of technical appendices, which address the agencies' methodology for reviewing all key resource impacts and the results of their analyses in fine detail.  Behind that stands tens of thousands of pages in the administrative record reflecting interagency communications regarding the NEPA review.  The record explains in detail how MDOT and FHWA reached their conclusions.

   Before the agencies even started their review, they "committed to a transparent process" as the basis of their decision-making.  AR.37 (ROD at 34).  That commitment led to an unprecedented amount of agency outreach to the public—including targeted outreach to vulnerable communities—even in the midst of the covid-19 pandemic.  AR.37–39 (ROD at 34–36).  The result was a proposed project that accounted for community concerns through changes to the preferred alternative and targeted mitigation designed to minimize environmental and community effects.  AR.38–39 (ROD at 35–36).

   This massive public and community outreach effort was just one aspect of the agencies' hard look at environmental effects under the National Environmental Policy Act.  The agencies' thorough consideration of those effects is summarized in the final EIS and detailed in its appendices.   AR.221–701 (FEIS); AR.702–27125 (FEIS appendices).

Separately, the agencies affirmed that the managed lanes project will comply with other applicable laws, including the Clean Air Act, Section 4(f) of the U.S. Department of Transportation Act, and Section 106 of the National Historic Preservation Act. AR39–45 (ROD at 36–42). And the agencies paid special attention to the project's potential impacts on low-income and minority communities, ultimately concluding that those communities would not be disproportionately affected. AR.45–46 (ROD at 42–43).

Taken together, the agencies' work shows a level of care that makes it impossible for Plaintiffs to claim that the environmental review ignored key issues. Instead, their summary judgment brief focuses on narrow, technical issues. But none of those issues is enough to show that, in light of the agencies' thorough review of environmental effects, the agencies' decision was arbitrary and capricious.

## II.   Plaintiffs' traffic claims fail because MDOT's traffic analysis considered substantive comments and provided relevant information to the public.

Plaintiffs' attack on MDOT's traffic modeling is just the sort of flyspecking that cannot support a challenge to agency expertise. They do not question the overall reasonableness of MDOT's and FHWA's conclusions regarding the purpose and need for the project and the overall transportation analysis and effects in the project area. Instead, they claim that the National Environmental Policy Act required a different response to their specialized critique of the transportation forecasting models, and that they should have been given more access to one of the model's inner workings. Pltfs.' Br. at 36-42. NEPA requires none of that. NEPA requires that an agency take a "hard look" at a project's potential environmental effects. *Hughes River Watershed Conserv. v. Johnson*, 165 F.3d 283, 288 (4th Cir. 1999). That means the agency must listen to experts, engage in "careful scientific scrutiny," and address any "legitimate concerns." *Id*. In so doing, the agency remains "entitled to rely on the view of [its] own experts." *Id*. A reviewing court may not "second-

guess agency decisions" as long as the agency has taken the requisite "hard look."  *No Mid-Currituck Bridge-Concerned Citizens v. North Carolina Dep't of Transp.*, 60 F.4th 794, 800 (4th Cir. 2023).

### A.    MDOT used industry-accepted modeling techniques to make long-term traffic projections.

MDOT used two different models to ensure that its traffic estimates were reasonable. One, a regional traffic forecast developed by the Metropolitan Washington Council of Governments, is used by transportation agencies throughout the area to predict daily and peak traffic volumes.  AR.636 (FEIS at 9-25).  In making these predictions, the Council's model draws on a range of information, including population, household, employment, and local land-use data.  AR.744 (FEIS App. A at 38).  The Council's model also accounts for all major roadways and transportation services in the region, including Metrorail, commuter rail, and buses.  AR.744 (FEIS App. A at 38).  MDOT used the model's results to develop hourly volume forecasts to the year 2045.  AR.637 (FEIS at 9-26).

The forecast volumes were fed into a separate traffic simulation model known in the traffic modeling industry as VISSIM.  AR.636 (FEIS at 9-25); *see* AR.748–54 (FEIS App. A at 42–48 (discussing model validation)).  The VISSIM model is a microsimulation. AR.755 (FEIS App. A at 49).  It goes beyond traffic volumes to estimate, at a local trip level, things like traffic speed, delays, travel time, and the total number of vehicles moving on the roads—in short, the level of service on the road network.  AR.319 (FEIS at 4-3). Using the VISSIM model, MDOT could calculate impacts by comparing future traffic on I-495 and I-270—and on local roads—with and without managed lanes.  AR.327–33 (FEIS at 4-11–4-17).

MDOT made sure that these models accounted for other proposed projects that could affect traffic volumes.  Those projects included roadway improvements like the I-270

innovative congestion management plan[4] and the addition of managed lanes on I-495 in Virginia, as well as transit improvements like the Purple Line light rail and bus rapid transit. AR.321–22 (FEIS at 4-5–4-6) (describing all the roadway and transit improvements included in the model). Even with all other transportation projects assumed in place, the model predicted that traffic on I-495 and I-270 would continue to grow. AR.325 (FEIS at 4-9). Without the managed lanes project, congestion would keep getting worse, leading to "slow travel speeds, significant delays, long travel times, and an unreliable network." AR.333 (FEIS at 4-17).

Adding managed lanes on I-495 from the American Legion Bridge to I-270, and on I-270 from I-495 to I-370, would improve traffic conditions. Those improvements include:

- lowering system-wide traffic delays by 13% during the morning peak and by 38% during the evening peak, AR.9 (ROD at 6);

- improving travel speeds in the general-purpose (non-toll) lanes, while providing an option for a free-flow trip in the managed lanes, AR.9 (ROD at 6), AR.794–99 (FEIS App. A at 88–93); and

- reducing overall delay on surrounding local roads, AR.9 (ROD at 6).

In short, the agencies evaluated the facts and reasonably concluded that travelers on I-495, I-270, and the surrounding local roads "would experience significantly faster, more reliable trips." AR.10 (ROD at 7).

---

[4] The I-270 innovative congestion management plan uses on-ramp traffic signals to control the flow of traffic onto I-270, thereby easing congestion. AR.321 (FEIS at 4-5).

**B.** **MDOT took a hard look at Plaintiffs' criticisms of its traffic model but was not persuaded.**

Plaintiffs do not directly dispute MDOT's modeling.[5] Instead, Plaintiffs focus on MDOT's *response* to their hired expert's claim that the models' assumptions led to "unrealistically high traffic volumes." Pltfs.' Br. at 37. Plaintiffs' finite procedural focus on MDOT's response to comments, as opposed to the model's substantive conclusions, is a tacit recognition of unfavorable law. The law says that when a "dispute involves primarily issues of fact that implicate substantial agency expertise," as a traffic modeling dispute does, the agency's view should receive deference. *Am. Whitewater*, 770 F.3d at 1115. NEPA similarly lets an agency "rely on the view of [its] own experts." *Hughes River*, 165 F.3d at 288. What Plaintiffs miss is that this deference to agency expertise also colors their procedural claims about responding to comments.

**1. Multiple levels of expert review support MDOT's traffic analysis.**

Multiple levels of expert review support MDOT's traffic findings. To start, MDOT used the same traffic models and methods that experts around the region have tested and accepted. AR.318 (FEIS at 4-2). Beyond that, traffic experts analyzed and agreed with the models' outputs. AR.1200–1316 (FEIS App. A, MWCOG validation memos); AR.1317–1413 (FEIS App. A, VISSIM calibration report). Finally, FHWA experts independently reviewed MDOT's work, giving special attention to Plaintiffs' concerns. AR.138 (ROD App. D, FHWA Aug. 15, 2022 memo). The final EIS includes detailed tables explaining how traffic on I-495 and I-270 will keep getting worse. *See, e.g.,*

---

[5] In their background discussion—though not in their legal argument—Plaintiffs seem to question the premise of the managed lanes project. They say that adding lanes will increase demand, "negating any congestion relief" from the managed lanes. Pltfs.' Br. at 6. But MDOT's modeling disproved this "induced demand" theory, and Plaintiffs do not rely on it as a reason to reverse the agencies' decision. AR.637 (FEIS at 9-26) (explaining that less than 1% of vehicles miles traveled in the model result from induced demand).

AR.794–99 (FEIS App. A at 88-93) (tables showing changes on I-495 and I-270).  Traffic on local roads also will worsen.  AR.800 (FEIS App. A at 94) (tables showing changes on local roads).  And adding managed lanes will provide relief.  AR.788–800 (FEIS App. A at 82–94) (discussing improvements from managed lanes project).  Indeed, MDOT's sensitivity analysis showed that even if future volumes are lower than forecast, the project would still help.  AR.4327 (FEIS App. C at 7).  The data supports the decision: Managed lanes are needed now.

Plaintiffs know that the Court owes deference to MDOT's experts on these points.  "No model is perfect," they say in their brief, "and the agencies are entitled to deference for the reasonable methodological choices they make."  Pltfs.' Br. at 42.  That is presumably why they try to claim that the independent experts at the U.S. Department of Transportation's Volpe Center's "found that MDOT's model failed to account for" drivers' tendency to reroute when faced with impenetrable traffic.  Pltfs.' Br. at 38.  But they mischaracterize the Volpe Center's findings in at least two ways.  First, Plaintiffs imply that the Center was talking about routing around traffic on I-495and I-270, Pltfs.' Br. at 37-38.  In fact, it was talking about "individual links near the project area" on the adjacent arterial roads and intersections, not I-495 and I-270 themselves.  AR.138 (ROD App. D at 38).  Second, the Volpe Center did not find that MDOT's model "failed"—it found that such a model "cannot by itself" predict drivers' "real world" rerouting; that is the purpose of expert interpretation.  AR.138 (ROD App. D at 38).  The model did what it was supposed to do, and the Volpe Center's findings do not suggest otherwise.

### 2.  MDOT considered and responded to Plaintiffs traffic comments

Plaintiffs' claim that MDOT did not respond to their traffic expert's criticisms also fails.  Pltfs.' Br. at 37-39 The record shows the careful consideration of Plaintiffs comments

by MDOT experts.  For one, MDOT explained that the traffic volumes in its model came from the Metropolitan Washington Council of Governments' model—a model accepted by every relevant transportation agency in the region.  AR.636 (FEIS at 9-25).  MDOT also explained, contrary to Plaintiffs' view, that "projected increases in regional population and employment" had the potential to increase traffic on I-495and I-270, "even if congestion conditions worsen."  AR.23037 (FEIS App. T at CO-827).  As for Plaintiffs' more specific bottleneck concerns, MDOT responded by pointing to its detailed analysis in the final EIS. AR.23037 (FEIS App. T at CO-827); *see* AR.317–41 (FEIS ch. 4); AR.135084 (letter and attachments addressing travel time). MDOT adjusted its traffic model after careful review.

Plaintiffs argue on one hand that MDOT failed to consider their comments regarding potential shortcomings of the modeling but on the other hand complain that MDOT made manual adjustments (for both build and no-build scenarios) when checking its modeling results and responding to comments.  Pltfs.' Br. at 39-40.  MDOT was transparent that it discovered an anomaly on ramps connecting to I-495 at the Greenbelt Metrorail station.[6] MDOT reported that the microsimulation model's traffic volumes near Greenbelt "showed significantly higher growth" than the trends in the underlying traffic volume model. AR.132 (ROD App. D at 12).  It explained that the anomaly was due to double-counting trips in different models.  AR.132 (ROD App. D at 12).  This analysis demonstrates that MDOT took a hard look at its work.

Opponents alleged in a letter to the U.S. Department of Transportation that this Greenbelt adjustment amounted to "scientific fraud" in MDOT's traffic model.  AR.137 (ROD App. D at 17).  The U.S. Department of Transportation passed on the opponents' letter to traffic experts at Volpe Center, who independently reviewed it and found no fraud.  AR.137

---

[6] The Greenbelt Metrorail station ramps do not connect to a part of I-495 that would receive managed lanes.

(ROD App. D at 17); AR.139 (ROD App. D at 19).  FHWA's responses to opponents' letter also concluded that the manually adjusted model met "a professional standard of care."  AR.130 (ROD App. D at 10).

Nor is the model's anomalous congestion near the Greenbelt metro "one example of the precise problem" raised by Plaintiffs' expert.  Pltfs.' Br. at 40.  The anomaly was a one-off mismatch between the traffic model forecasts used in the final EIS and the Metropolitan Council of Governments' model trends, caught because MDOT performed a "review" of the two models to make sure the models were working in alignment.  AR.132 (ROD App. D at 12).  That review involved "trend-check spreadsheets" that compared many locations. AR.132 (ROD App. D at 12).  The area near the Greenbelt Metrorail station was the only place where the review found a mismatch that warranted manual adjustment.  AR.132 (ROD App. D at 12).  That MDOT's review did not find more locations like Greenbelt actually disproves Plaintiffs' claim that "unrealistically high traffic volumes . . . pervade[] the model."  Pltfs.' Br. at 40.  Even more so, MDOT's process showed transparent careful review of its work to assure that its predictions were reasonable, not capricious.

**C.    MDOT did not improperly withhold its modeling files.**

Plaintiffs conclude their critique of MDOT's traffic modeling by alleging that MDOT "refuse[ed] to disclose" the "computer files" related to its model.  Pltfs.' Br. at 41.  Or, as Plaintiffs clarify, MDOT declined to share those files unless Plaintiffs "paid more than $21,000."  Pltfs.' Br. at 41.  Nothing in NEPA requires an agency to disclose every detail of its models, software, and data at no cost.

The vast majority of documents that Plaintiffs asked for was already available for free on MDOT's project website.[7]  That free information included the initial traffic data

---

[7]  *See*  https://oplanesmd.com/wp-content/uploads/2020/07/APP-C_MLS_Traffic-Tech-

prepared for the purpose and need review, as well as the data in the project's alternatives report, draft EIS, supplemental draft EIS, final EIS, and three traffic technical reports. *See* AR.702–1501 (FEIS traffic technical report); AR.27919–28126 (SDEIS traffic technical report); AR.36588–38113 (DEIS traffic technical report). Additionally, as Plaintiffs reluctantly admit, MDOT offered the data that Plaintiffs requested pursuant to Maryland's public disclosure law and at costs allowed thereunder. Despite specific disclosure of its right to appeal under the Maryland Public Information Act, Plaintiffs did not appeal either the costs or the disclosures. What is more, another entity that filed a similar request for records and data paid for and received the records. AR.189584–55 (MDOT response to City of Rockville). Plaintiffs chose neither to pay nor to use any of the various avenues of appeal under the Maryland Public Information Act. *See* Md. Code, Gen. Provisions §§ 4-1A-05; 4-1B-04; 4-362.

Releasing the additional traffic data to Plaintiffs would not have added to the public's understanding and is not required under NEPA's "rule of reason." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004); *see* 85 Fed. Reg.43304, 43363 (July 16, 2020) (setting a 300-page limit for an EIS of "unusual scope or complexity"). The data at issue comprise complex inputs and algorithms understandable only to a traffic modeling professional. And, as Plaintiffs knew, the complex inputs and algorithms are part of proprietary software. It was not free for the agency, and Maryland law did not require the agency to release it for free. *See* Md. Code, Gen. Provisions § 4-206 (allowing a reasonable fee for the costs of producing public records).[8]

---

Report-Appendices.pdf (DEIS traffic technical report); https://oplanesmd.com/wp-content/uploads/2021/09/SDEIS_AppA_Traffic-Evaluation-Memo_web.pdf (SDEIS traffic technical report); and https://oplanesmd.com/wp-content/uploads/2022/06/01_MLS_FEIS_AppA_Traffic-Tech-Report_June-2022p.pdf (FEIS traffic technical report).

[8] Sierra Club Foundation revenues for 2021 exceeded $118 million, and its net assets

**III.     MDOT's approach to air pollutants was not arbitrary and capricious.**

Plaintiffs do not even allege, much less establish, that the evaluation of potential effects on air quality from the managed lanes was arbitrary and capricious or otherwise failed the requirements of NEPA.  The agencies disclosed that $PM_{2.5}$—a name for particulate matter that is no larger than 2.5 microns in diameter—was among the series of air borne pollutants produced from mobile sources, like the highways at issue, and that $PM_{2.5}$ could increase with the project and that $PM_{2.5}$ has adverse effects on human health.  AR.655 (FEIS at 6-44).  The environmental review materials also discuss the relationship of more vehicles and the impacts on air quality.  *See, e.g.*, AR.14356–57 (FEIS App. K at 31–32) (noting that increased vehicle miles traveled "can increase emissions").  Here, Plaintiffs' real argument is that the EPA's localized health standard for one classification of pollutants, $PM_{2.5}$, is not sufficient and that it should have been modeled at a microscale level for various points throughout the alignment, despite EPA standards.  That argument fails both because the record shows that the project will not violate EPA's standards for $PM_{2.5}$ and because MDOT's localized analysis of carbon monoxide—a proxy for this type of emission—shows no threat of localized harm.

**A.     The regional analysis established that Montgomery County and Fairfax County would remain within the EPA health standard for $PM_{2.5}$.**

Plaintiffs argue that the agencies failed NEPA's "hard look" at the "localized health impacts" of $PM_{2.5}$.  Pltfs.' Br. at 23-27.  No one doubts that, in sufficient concentrations, $PM_{2.5}$ can have adverse health effects.  AR.655 (FEIS at 9-44).  That is why the Environmental Protection Agency has set air quality standards for $PM_{2.5}$.  Plaintiffs admit that $PM_{2.5}$ was evaluated under standards set by EPA and that EPA has found those standards

---

exceeded     $233     million.     *See*     https://vault.sierraclub.org/foundation-annual-report-2021/download/scf-scfar-2021-financials%20(1).pdf.

are being met in Montgomery County, Maryland, and Fairfax County, Virginia. Pltfs.' Br. at 21.

To test whether EPA's air quality standards will continue to be met in the future, the Transportation Planning Board conducted a regional conformity analysis—a complex analysis of air pollutant sources and emissions that assesses whether the region is at risk of violating EPA air quality standards. As relevant here, that analysis studied air emissions from all projects planned for the region, including the managed lanes project, through the year 2045. The results showed that the cumulative projected $PM_{2.5}$ emissions from all projects would not violate EPA's air quality standards. EPA confirmed that the Transportation Planning Board had properly conducted this analysis. AR.131349 (EPA May 2020 memo). And FHWA agreed that no new analysis was needed for the managed lanes project. AR131392 (FHWA June 2020 email).

Unable to deny these conclusions endorsing the managed lanes project's continued compliance with EPA's $PM_{2.5}$ air quality standards, Plaintiffs argue instead that NEPA required more. Even though the EIS informed the public that $PM_{2.5}$ is an airborne pollutant which can have adverse health effects and which in part derives from motor vehicles, and even though the managed lanes project is being built in counties where $PM_{2.5}$ meets EPA standards, Plaintiffs say FHWA should require more than the EPA requirements, that it must estimate and model how $PM_{2.5}$ emissions from the project would affect each separate area within and adjacent to the project, that it should require predictions at numerous microlevel points. But neither NEPA nor EPA requires any such thing.

### B.    Relying on EPA's air quality standards for $PM_{2.5}$ complied with NEPA's rule of reason.

Plaintiffs do not say that discussion of $PM_{2.5}$ is absent from the project's environmental review; MDOT disclosed that $PM_{2.5}$ can harm human health. AR.655 (FEIS at 9-44).

MDOT also explained that, even including project-related $PM_{2.5}$ emissions, Montgomery and Fairfax Counties would meet the Environmental Protection Agency's air quality standards for $PM_{2.5}$. AR.35897–99 (DEIS at 4-60–4-62); Pltfs.' Br. at 21. Plaintiffs argue that NEPA required MDOT to model and estimate $PM_{2.5}$ at a microscale level and how it "would affect the health of people living closest to the toll lanes." Pltfs.' Br. at 23.

Compliance with NEPA is judged by a "rule of reason" that anchors the scope of agency review to "the usefulness of any new potential information to the decisionmaking process." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004). An environmental impact statement need not flag every possible, incremental change in environmental conditions, as long as its review is reasonable—i.e., a "hard look" at potential effects (*Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). The idea is for courts to make a "pragmatic judgment" about an EIS, taking a "holistic view of what the agency has done" to review impacts. *Webster*, 685 F.3d at 421-22. As the First Circuit put it, a "discussion of environmental effects . . . need not be exhaustive" so long as the agency has "information sufficient to permit a reasoned choice . . . ." *Dubois v. Dep't of Agric.*, 102 F.3d 1273, 1287 (1st Cir. 1996) (citation omitted).

Here, Plaintiffs concede that both Montgomery and Fairfax Counties comply with EPA's national ambient air quality standards for $PM_{2.5}$. Pltfs.' Br. at 21. When EPA sets those standards, it is saying that their "attainment and maintenance" will "protect the public health"—indeed, it is saying that meeting the air quality standards will protect public health with "an adequate margin of safety." 42 U.S.C. § 7409(b)(1); *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472–73 (2001) (explaining how EPA's air quality standards work). What is more, EPA established its air quality standards by evaluating the varied sources and dispersion characteristics of pollutants like $PM_{2.5}$.[9] In EPA's judgment, its standards

---

[9] EPA's thorough process for setting $PM_{2.5}$ air quality standards is described on its website.

establish that the levels of $PM_{2.5}$ for both Montgomery and Fairfax Counties will "protect the public health" with "an adequate margin of safety." The regional analysis was sufficient to protect the public health with an adequate margin of safety and no additional analysis is required by MDOT. AR.408 (FEIS at 5-67) (explaining that because the counties are "in an attainment area for $PM_{2.5}$ . . . no further analysis of $PM_{2.5}$ was required"). The point of NEPA review, after all, is to consider "the quality of the human environment." 40 C.F.R. § 1500.1(a).

FHWA guidance confirms MDOT's approach. That guidance says that "microscale" carbon monoxide analysis is "unnecessary" when combined project and background concentrations are "well below" EPA's standards. FHWA, Guidance for Preparing and Processing Environmental and Section 4(f) Documents, Technical Advisory T 6640.8A (Oct. 30, 1987) at 10.[10] The same logic applies here. Because the air quality monitoring stations nearest the study area showed that $PM_{2.5}$ concentrations are now "well below" EPA air quality standards, and the project is "not predicted to increase emissions burdens," microscale $PM_{2.5}$ analysis is not required. AR.35897–99 (DEIS at 4-60–4-62).

Despite all this, Plaintiffs say that MDOT should have performed such a microscale analysis for "those closest" to the highway. Pltfs.' Br. at 23. But if agencies could not rely on compliance with federal and state standards when preparing an EIS, it would make the NEPA process even more complicated than it already is. If Plaintiffs were right, for example, an agency could not rely on the fact that a project's water discharges met federal and state water quality standards. An EIS would instead have to model, track, and somehow assess the effects of discharges far below those standards. That degree of study is more like a doctoral dissertation than a reasonable, hard look at effects on the human

---

*See* https://www.epa.gov/naaqs/particulate-matter-pm-air-quality-standards.

[10]    *See*    https://www.environment.fhwa.dot.gov/legislation/nepa/guidance_preparing_env_documents.aspx.

environment.  Plaintiffs' arguments are without merit and the record reflects that the review of potential impacts to air quality were reasonable.

### C.   Neither Fourth Circuit nor out-of-circuit cases alter NEPA's rule of reason.

Plaintiffs' argument that the EIS should have considered $PM_{2.5}$ at a local level rests on their reading of the D.C. Circuit's decision in *American Trucking Associations, Inc. v. EPA*, 283 F.3d 355 (D.C. Cir. 2002).  That case, they say, establishes that EPA need not set air quality standards at a level "below which [a pollutant] is known to be harmless."  Pltfs.' Br. at 22 (quoting *Am. Trucking*, 283 F.3d at 360) (brackets in Plaintiffs' brief).  From there, they reason that compliance with EPA's air quality standards may not "protect the public health"—despite what the Clean Air Act requires.  Pltfs.' Br. at 22, 24.  And if compliance with the $PM_{2.5}$ air quality standards does not protect the public health, Plaintiffs say, MDOT should have studied $PM_{2.5}$ more carefully.  Pltfs.' Br. at 24.

Plaintiffs' argument misreads both the D.C. Circuit's opinion in *American Trucking* and NEPA's requirements.  *American Trucking* does not excuse EPA from setting air quality standards that will "protect the public health" with "an adequate margin of safety."  42 U.S.C. § 7409(b)(1).  It explains that when science does not offer "a threshold concentration below which" pollutants "are known to be harmless," EPA faces a "difficult" task. *Am. Trucking*, 283 F.3d at 360.  But, as the D.C. Circuit held, EPA still must set an air quality standard that will "reduce risks sufficiently to protect public health."  *Id.* (citation omitted).  Against that backdrop, NEPA allows agencies to make a "pragmatic judgment." *Webster*, 685 F.3d at 421–22.  If EPA has set a standard that protects public health—as it has for $PM_{2.5}$—an agency can reasonably rely on that standard when preparing an environmental review under NEPA.

28

Plaintiffs try to bolster their argument by citing two more cases from other circuits. Pltfs.' Br. at 24-26. But neither case is persuasive here. *Calvert Cliffs' Coordinating Committee, Inc. v. U.S. Atomic Energy Commission*, decided more than half a century ago, speaks to an agency's "balancing the overall costs and benefits" of a project, not its use of EPA standards as a reasonable proxy for potential environmental effects. 449 F.2d 1109, 1125 (D.C. Cir. 1971). The Ninth Circuit's decision in *Environmental Defense Center v. Bureau of Ocean Energy Management* similarly rejects reliance on a permit that "was not created or intended to be used for" the project at issue. 36 F.4th 850, 874 (9th Cir. 2022). EPA's air quality standards, by contrast, are specifically meant to "protect the public health" against harm from $PM_{2.5}$. 42 U.S.C. § 7409(b)(1). MDOT thus reasonably relied on those standards and the Transportation Planning Board's conclusion that the project will not cause a violation of EPA air quality standards.

Nor does the Fourth Circuit's decision in *Friends of Buckingham v. State Air Pollution Control Board*, 947 F.3d 68 (4th Cir. 2020), change the $PM_{2.5}$ calculus. Plaintiffs say that case "rejects a less extreme version of the rationale" that MDOT used here. Pltfs.' Br. at 26. But *Friends of Buckingham* is not a NEPA case. It instead involved an environmental justice analysis, under Virginia state law, of emissions from a stationary source. *Id.* at 87. When the state performed that analysis, it failed even to make findings about the environmental justice characteristics of the local community.[11] *Id*. at 88–90. *Friends of Buckingham* thus does not speak to the reasonableness under NEPA of relying on EPA's $PM_{2.5}$ air quality standards when preparing an EIS. Under NEPA, which calls for "pragmatic judgment" and a "holistic" view of impacts, the $PM_{2.5}$ analysis in MDOT's EIS was reasonable. *See Webster*, 685 F.3d at 421–22.

---

[11] *See infra* at 31–35 (discussing MDOT's environmental justice efforts).

**D.    MDOT's localized carbon monoxide modeling confirms its PM$_{2.5}$ conclusions.**

Even though the managed lanes project complies with EPA air quality standards, and even though EPA set those standards to protect public health, MDOT went one step further. To check localized air emissions, MDOT modeled carbon monoxide emissions at project intersections and interchanges—including the I-270 interchange with I-370 that most concerns Plaintiffs.  MDOT did this work, it explained, "for transparency and informational purposes," not because NEPA required it.  AR.44929 (DEIS App. I at 12); *see* AR.14330 (FEIS App. K at 5–6) (referencing DEIS technical report).  And it chose to model carbon monoxide, rather than all six criteria pollutants, because carbon monoxide is a good "proxy for transportation emissions."  AR.44929 (DEIS App. I at 12).

MDOT's carbon monoxide modeling "conservatively assumed worst-case conditions," thereby "overestimating the emissions results."  AR.44992 (DEIS App. I at 74).  These conservative estimates still showed that localized carbon monoxide impacts would be well below EPA's air quality standards during peak one-hour and eight-hour timeframes. AR.44992 (DEIS App. I at 74).  For the specific interchange that Plaintiffs are most worried about, the modeling showed concentrations lower than what exists today.  AR.44993 (DEIS App. I at 74) (showing concentrations at interchange IC.36, where I-270 and I-370 meet).

MDOT did not have to study localized carbon monoxide emissions, but it did anyway. What it found confirms two things.  First, even the busiest intersections and interchanges will not see the sort of increased air pollution that would violate EPA's air quality standards.  Second, and as a result, it was reasonable for MDOT to rely on regional compliance with PM$_{2.5}$ standards.

IV.     **MDOT and FHWA studied potential effects on environmental justice communities and avoided disproportionate impacts to them.**

Plaintiffs' next cluster of claims involve the Executive Order on environmental justice. On that front, MDOT's efforts were extraordinary.  The goal of environmental justice review, as White House guidance explains, is to assess whether a proposed action could result in "disproportionately high and adverse" effects on minority and low-income communities. Exec. Order No. 12898, 59 Fed. Reg. 7629, 7630 (Feb. 16, 1994).[12]  To do that, agencies must first find communities that are vulnerable because of past race- or income-based discrimination. *See Vecino para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021) (holding that an agency's delineation of an environmental justice community must be "reasonable and adequately explained").  MDOT went well beyond that requirement, consistently reaching out to vulnerable communities and documenting impacts on those communities.  AR.487–93 (FEIS at 5-146–5-152).  Using what it learned during these outreach efforts, MDOT's experts prepared a separate technical report to assess potential impacts to environmental justice communities.  AR.5136–5617 (FEIS App. F).  MDOT reasonably concluded, based on that work, that the managed lanes project will not cause disproportionate, high, and adverse effects to minority or low-income communities.  AR.5257–58 (FEIS App. F at 109–10).  FHWA agreed.  AR.45 (ROD at 42).

A.     **The record reflects that MDOT recognized and accounted for past harms to environmental justice communities.**

Plaintiffs claim that the agencies did not account for "pre-existing burdens and health vulnerabilities" in environmental justice communities.  Pltfs.' Br. at 34.  Plaintiffs are wrong.  The EIS describes the historic practices that caused minority communities to

---

[12] New environmental justice guidance, issued after the decision in this case, drops the word "high" from this formulation. *See* Exec. Order No. 14096, 88 Fed. Reg. 25251, 25253 (April 26, 2023). That new order does not apply here.

experience "the most adverse impacts and the fewest benefits" from interstate highways. AR.476 (FEIS at 5-135). Because of these practices, the final EIS explains, construction of interstate highways "further concentrate[ed] poverty and expos[ed] remaining residents to the environmental and public health effects associated with traffic proximity." AR.477 (FEIS at 5-136). The final EIS discloses that the Gibson Grove community was "physically split" by the construction of I-495. AR.477 (FEIS at 5-136 & n.46). The discussion in the Cultural Resources Technical report provides a detailed discussion of the Gibson Grove community and prior impacts. When the final EIS studies the environmental justice communities along the length of the project, it does so with these "pre-existing burdens" in view. AR.471–505 (FEIS at 5-130–5-164); *see* AR.5136–617 (FEIS App. F) (technical report on environmental justice issues).

MDOT recognized that environmental justice communities have suffered in the past from government's failure to consider the disparate impacts of infrastructure. That is why MDOT worked so hard to both engage with environmental justice communities and evaluate impacts on them. *See* AR.476–77 (FEIS at 5-135–5-136); AR.5198 (FEIS App. F at 50). It not only offered more time, and more ways, for the public to comment, it made special efforts to "ensur[e] minority and low-income communities" had information about impacts. AR.35–36 (ROD at 32–33); *see* AR.487–93 (FEIS at 5-146–5-152) (describing special outreach efforts to environmental justice communities). In addition to outreach to the general public by way of public meetings, on line and in person, newsletters to all adjacent property owners, a frequently updated website, and public hearings, those "more concentrated" efforts included: mailing flyers in five languages to affordable housing complexes, schools, and places of worship; translating and providing hard copies of the EIS executive summary; and an online survey and "community 'pop-up' events" where it could hear concerns in person. AR.647–48 (FEIS at 9-37–9-38); *see* AR.36 (ROD at 33).

32

Because of what MDOT learned through these efforts, it incorporated into the final project decision items that were prioritized by environmental justice communities such as "improved sidewalks and bicycle facilities, better lighting, and traffic calming measures" adjacent to the highway facilities.  When the project is developed, MDOT will work with local governments to implement these measures.   AR.36 (ROD at 33); AR.73–74 (ROD App. A at 16–17).[13]

Despite MDOT's outreach to environmental justice communities, Plaintiffs argue that MDOT failed to account for vulnerable communities' "elevated susceptibility" to environmental harms.  Pltfs.' Br. at 34–35.  But MDOT and FHWA did just that, evaluating environmental justice issues in a special technical report that accounted for air toxin cancer risks, the air toxics respiratory hazard index, and increased risks associated with proximity to traffic.  AR.5207–08 (FEIS App. F at 59–60).  That analysis showed that non-environmental justice communities "would bear the majority of quantifiable impacts" from the project, including 91% of impacted properties, 100% of impacted community facilities, and 95% of wetlands impacts.  AR.502 (FEIS at 5-162).

### B.     MDOT did not miss any disproportionately high and adverse air quality impacts to environmental justice communities.

Plaintiffs incorrectly claim that for one community the air quality analysis was insufficient for environmental justice purposes.  Focusing on Gaithersburg, Maryland, they argue that a new "chokepoint" where the managed lanes merge into general lanes could

---

[13] Contrary to Plaintiffs' assertion, MDOT considered and incorporated input from the University of Maryland School of Health Community Engagement, Environmental Justice & Health Lab.  The Lab helped MDOT review its environmental justice methodology, in addition to input MDOT received from an Environmental Justice Working Group.  AR.5224–48 (FEIS Appendix F at 76–100); AR.186887.  Ideas offered by the Lab and the Working Group regarding environmental justice impact assessment, outreach, and project mitigation were incorporated into the study and final agency decision.

exacerbate air quality impacts to nearby environmental justice communities.  Pltfs.' Br. at 31–33.  In making this argument, Plaintiffs acknowledge the final EIS's finding that all parts of the project study area will receive "an equal share of air pollution."  Pltfs.' Br. at 32–33.  As they see it, though, MDOT's traffic data contradicts that finding.  Plaintiffs say that northbound speeds near the end of the managed lanes on I-270 "would drop by 30 mph" during evening rush hour.  Pltfs.' Br. at 32.  They foresee a similar problem where I-270 merges into I-495.  Pltfs.' Br. at 32.  And because both these places are close to environmental justice communities, Plaintiffs claim that MDOT should have done more analysis.  Pltfs.' Br. at 32–33.

Contrary to those claims, MDOT reasonably assessed air quality impacts in the Gaithersburg area in the context of existing conditions in that community.  Plaintiffs' argument on this point has three main problems.  First, they lack record support for their assertion that—contrary to MDOT's findings—"[a]ir pollution would not be distributed evenly along the project's path."  Pltfs.' Br. at 30.  The record shows the opposite: traffic operations from the project will affect all areas equally, "regardless of [environmental justice] status."  AR.496 (FEIS at 5-155).  And while the EIS candidly acknowledges that "[c]ongestion would still exist" on I-270 because of "downstream bottlenecks," it "would not get worse" when the managed lanes are built.  AR.259 (FEIS at ES-18).  Second, the record shows that MDOT specially screened for "primary risk factors"—including "known pollutants"—that "have a tendency to disproportionately affect" environmental justice communities.  AR.649 (FEIS at 9-38).  Third, even if air pollution would not disperse evenly, but be worse at each end of I-270, the record shows that those areas will not be disproportionately affected by the project.  AR.496 (FEIS at 5-155); AR.44993 (DEIS App. I at 74).

\*       \*       \*

34

MDOT concluded that environmental justice communities will benefit from the managed lanes project. To reach that conclusion, MDOT relied on actual user data showing that people "of all incomes" will benefit from managed lanes, in part because the most common use of managed lanes is for critical trips to appointments or school events. AR.650 (FEIS at 9-39). Environmental justice communities will also benefit from the managed lanes project because it will increase mobility through improved bicycle and pedestrian access, allow toll-free travel for transit vehicles, and enhance connections to transit centers. AR.651 (FEIS at 9-40); AR.257-58 (FEIS at ES16–17). For all these reasons, and given all the analysis in the final EIS, MDOT's and FHWA's conclusion that the managed lane project will not have disproportionately high and adverse effects on environmental justice communities was not arbitrary and capricious.

## V.   The Virginia Department of Transportation and MDOT appropriately considered the impacts of flyover ramps in Virginia.

Plaintiffs' final NEPA argument involves ramps that have already been approved and are now being built by the Commonwealth of Virginia. The Virginia plan, called "495 NEXT," would extend Virginia's existing managed lanes along I-495 toward the American Legion Bridge. AR.288 (FEIS at 3-4). Plaintiffs claim harm from "new flyover ramps" that are part of 495 NEXT.[14] Pltfs.' Br. at 43; ECF 46-3, Decl. of Debra Butler ¶¶ 2, 3. But because those elevated ramps are part of the separate Virginia project, any harm from them is not fairly traceable to the project here. And in any event, MDOT's environmental review addressed the Maryland managed lanes project's impact on the relevant neighborhood.

---

[14] Indeed, some of the plaintiffs in this case sued the Virginia Department of Transportation over the impact of the Virginia flyover ramps. Those claims were voluntarily dismissed. *See N. Va. Citizens Ass'n v. Fed. Hwy. Admin.*, Case No. 1:23-cv-356.

**A.** **Because Plaintiffs fail to show that harms from flyover ramps in Virginia are traceable to this project, they lack standing.**

As Plaintiffs admit, their ability to sue over the Virginia flyover ramps depends on their having standing under Article III of the U.S. Constitution.  Pltfs.' Br. at 19.  To show standing, they must have suffered an injury-in-fact that is caused by the agency action they are challenging.  *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 283 (4th Cir. 2018).  And they must show such a causal link between their alleged injury and the challenged action for each of their claims.  *Overbey v. Mayor of Baltimore*, 930 F.3d 215, 230 (4th Cir. 2019).

Plaintiffs cannot pass the standing test for their Virginia flyover ramp claim because their alleged injuries for that claim are not fairly traceable to the Maryland managed lanes project.  Plaintiffs' standing declaration is clear about how they think their injuries will happen: "The flyover ramps will move traffic closer to" their declarant's neighborhood and cause her to "experience" both sound and light pollution "associated with the ramps."  Butler Decl. ¶ 3.  "The ramps," the declarant says, "will also increase surface water run-off" and "exacerbate storm water management issues."  Butler Decl. ¶ 3.

The elevated "flyover" ramps at the center of Plaintiffs' injury claim are depicted on the first page of final EIS Appendix E.  The problem for Plaintiffs is that this map shows the flyover ramps as part of the Virginia 495 NEXT project, not the Maryland managed lanes project.  AR.5098 (FEIS App. E at 1) (orange crosshatching).  Thus, Plaintiffs who claim harm from the Virginia flyover ramps are not claiming harm from this project.[15] And if Plaintiffs are not harmed by this project, they lack standing to challenge the Virginia flyover ramps in this case.  *See GBA Assocs. v. Gen. Servs. Admin.*, 32 F.3d 898, 901 (4th Cir. 1994) (finding no standing where the "chain of causation" is broken).

---

[15] The 495 NEXT project has independent utility—it would be built even if the Maryland managed lanes project was not.

Even if Plaintiffs argue that they will suffer procedural harm under NEPA from an alleged failure to include the Virginia flyover ramps in the Maryland environmental review, they would still lack standing.  The failure to comply with NEPA is a procedural harm, but it does not create standing unless it relates to "a concrete interest."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  Since the only concrete interests that Plaintiffs' point to are harms from the Virginia flyover ramps, they lack standing to challenge the Maryland managed lanes project.

### B.     The final EIS addresses impacts from the Virginia flyover ramps.

On the merits, Plaintiffs argue that MDOT's final EIS "failed to take a hard look at the environmental impacts of the new flyover ramps in Virginia."  Pltfs.' Br. at 43.  They admit, however, that the final ramp design remains within the limits of disturbance.  Pltfs.' Br. at 44.  Their argument is that the final ramp design's "unique impacts" require supplemental environmental review.  Pltfs.' Br. at 44–45.

Project changes do not require supplemental review unless they "present a seriously different picture of the environmental impact of the proposed project."  *Save Our Sound OBX, Inc. v. North Carolina Dep't of Transp.*, 914 F.3d 213, 221–22 (4th Cir. 2019) (internal quotation marks omitted).  Here, the final EIS defined the project's limits of disturbance as the area within which all project activities—including construction, grading, clearing, stormwater management, and noise barrier replacement—would occur.  AR.346 (FEIS at 5-5); AR.634–35 (FEIS at 9-23–9-24).  The final EIS then calculated the project's environmental impacts within those limits of disturbance.  AR.5099 (FEIS App. E at 2) (map showing limits of disturbance near Live Oak Drive).  Because nothing about those calculations has changed, the supplemental review that Plaintiffs advocate would be pointless.

Plaintiffs are also wrong to claim that they had no way to know about the changes to the design of the Virginia flyover ramps. MDOT and the Virginia Department of Transportation kept Virginians informed through regular meetings from the earliest days of the project. Options for the ramps connecting the Maryland managed lanes to the GW Parkway were shown in several of these meetings, including an October 2020 virtual public meeting, September 2021 presentations to the Fairfax County Board of Supervisors, a 495 NEXT virtual public information meeting, and a February 2022 presentation to the McLean Citizens Association. *See* AR.21204, 21206, 21218 (FEIS App. R at 8, 10, 22). The Virginia flyover ramps were shown as early as September 2021. *See* AR.155115 (slide from 495 NEXT meeting in September 2021 showing final ramp locations). Plaintiffs cannot legitimately claim surprise in the face of this record.

## VI.   MDOT carefully avoided or minimized impacts to parks and historic properties under Section 4(f) and Section 106.

Like their other claims, Plaintiffs' claims under Section 106 of the National Historic Preservation Act and Section 4(f) of the U.S. Department of Transportation Act fail as a matter of law. The final EIS reviewed potential impacts to 20 historic properties and parks. Plaintiffs focus on two: Morningstar Tabernacle No. 88 Moses Hall and Cemetery (Morningstar Cemetery, for short) and the Washington Biologists Field Club on Plummers Island. Pltfs.' Br. at 47-59. Section 106 requires agencies to consider the effects of their actions on historic properties but does not substantively limit those effects. *See Citizens for Scenic Severn River Bridge, Inc. v. Skinner*, 802 F. Supp. 1325, 1338 (D. Md. 1991), *aff'd per curiam*, 972 F.2d 338 (4th Cir. 1992). Section 106, like NEPA, is a procedural statute. *Presidio Hist. Ass'n v. Presidio Trust*, 811 F.3d 1154, 1169 (9th Cir. 2016). Section 4(f), by contrast, prohibits a transportation agency from affecting covered parks and historic properties if there is a "prudent and feasible alternative." 49 U.S.C. § 303(c)(1). If no such

alternative exists, the agency must "minimize harm" to the affected parks and historic properties.  49 U.S.C. § 303(c)(2).  The record shows that MDOT complied with both these laws.

### A.     MDOT investigated and avoided impacts to Morningstar Tabernacle No. 88 Moses Hall and Cemetery under Section 4(f).

In compliance with Section 4(f), MDOT engaged experts to perform historic research, met with the local descendant community, and performed detailed investigations of this important historic resource and sacred resting place for the surrounding Black community. AR.476 (FEIS at 5-135–5-136).  A detailed report attached to the final EIS explains how the property's boundaries were established.  *See* AR.13883 (FEIS App. I, vol. 9).  What follows is a short summary.

The initial phase of investigation included discussions with the descendants of people whose remains are interred in the cemetery, allowing MDOT to both collect information and understand their concerns. *See, e.g.*, AR.6161–63 (letter from descendants).  MDOT went into the field to map the cemetery's surface features, including burial markers, depressions, and other cemetery remnants.  AR.13913 (FEIS App. I, vol. 9 at 22).  After that, MDOT's experts used ground-penetrating radar to survey places that were accessible inside the property boundaries and outside those boundaries but within property owned by MDOT, also referred to as the MDOT right-of-way.  AR.13915 (FEIS App. I, vol. 9 at 24).

Investigation was made more difficult due to overgrown foliage and bamboo. AR.13917–23 (FEIS App. I, vol. 9 at 26–32).  After consulting Morningstar Cemetery stakeholders and the Maryland State Historic Preservation Officer, MDOT helped the Morningstar Cemetery clear some bamboo on the property.  AR.13986 (FEIS App. I, vol. 9 at 95).  By using ground-penetrating radar, MDOT's experts were able to learn about subsurface features without the risks of excavation.  The full scope of the investigation is

shown in yellow on the map below.  *See also* AR.14241 (FEIS App. I, vol. 9, app. G at 26).

MDOT did all this work to ensure, first, that the cemetery was accurately mapped and, second, that the managed lanes project could avoid it.  And MDOT followed the Section 106 rules by consulting with the Advisory Council on Historic Preservation, the Maryland Historic Trust (the State Historic Preservation Officer), and a wide range of other parties that had a demonstrated interest in historic resources.  AR.395 (FEIS at 5-54); *see* 36 C.F.R. § 800.2(c).  That consultation—and the ground-penetrating radar work—led the relevant officials to concur with MDOT on the cemetery's historic property boundaries.  AR.396 (FEIS at 5-55).

All this work, performed as part of the Section 4(f) analysis supports the conclusion that the old access road—seen on map below as a white roadway—is the northern boundary of the cemetery.



AR.6029 (map in cultural resources technical report). With the cemetery's boundaries thus established, MDOT altered the project design to avoid any impact on it. AR.393 (FEIS at 5-52). By avoiding impacts in this way, MDOT satisfied Section 4(f). *See* 23 C.F.R. § 774.3 (requiring avoidance of Section 4(f) properties if feasible and prudent).

Plaintiffs cannot genuinely dispute the material facts. The work by MDOT reasonably defined the cemetery's boundaries. That finding, as explained above, stemmed from a thorough investigation using accepted techniques that included both archival research and discussions with relevant parties. AR.399, 645 (FEIS at 5-58, 9-34). The northern boundary of the Cemetery was reasonably understood to not cross the old access road depicted on the map.

### B.      Using a programmatic agreement complied with Section 106.

MDOT also acted reasonably in using a programmatic agreement to manage unanticipated effects and to avoid unnecessary and potentially invasive disturbance of historic resources prior to NEPA approval. Plaintiffs argue that a programmatic agreement can be used "only" for "corridors or large land areas." Pltfs.' Br. at 52. Even setting aside that the managed lanes project is exactly the kind of "corridor" project that is ideal for a programmatic agreement, the Section 106 rules do not restrict programmatic agreements to "corridors and large land areas," as Plaintiffs claim. To the contrary, agencies enjoy flexibility in their use of programmatic agreements. 36 C.F.R. § 800.4(b)(2) (allowing agencies to "defer final identification and evaluation of historic properties if it is specifically provided for in a . . . programmatic agreement"); *see City of Alexandria v. Slater*, 198 F.3d 862, 873-74 (D.C. Cir. 1999) (upholding phased investigation work because Section 106 rules encourage flexible, staged planning). Indeed, the Advisory Council on Historic

Preservation says that "[p]rogrammatic agreements are the most commonly used program alternative."[16]

Using a programmatic agreement here was both reasonable and procedurally proper because it avoided unnecessary, potentially damaging ground disturbance before a decision was made.  The agreement details how more investigation will occur and how MDOT will work with the consulting parties.  AR.14288 (FEIS App. J at 6).  It also describes ongoing consultation with the Friends of Moses Hall over a protective noise barrier that would face the cemetery.  AR.14296 (FEIS App. J at 14).  And because the agreement was reviewed, finalized, and executed by all required parties, it is part of the final EIS and agency decision.  AR.14283 (FEIS App. J).  For all these reasons, MDOT's programmatic agreement complied with Section 106.  *See CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 107 (D.C. Cir. 2006) ("A programmatic agreement binds the agency and 'satisfies the agency's section 106 responsibilities . . . .'") (quoting 36 C.F.R. § 800.14(b)(2)(iii)).

## C.    MDOT's planning minimized effects to Plummers Island from the necessary replacement of a bridge.

Plaintiffs' final objection to the managed lanes project involves Plummers Island—a small, ecologically diverse place in the Potomac River near the American Legion Bridge. Plummers Island is within the C&O Canal National Historical Park.  Part of the island— the Washington Biologists Field Club on Plummers Island—is individually eligible for listing on the National Register of Historic Places.  AR.369 (FEIS at 5-28).

Plaintiffs concede that there is no feasible and prudent way to replace the American Legion Bridge that would avoid all parkland impacts.  Pltfs.' Br. at 55.  Absent such harmless alternatives, FHWA's rules for applying Section 4(f) required MDOT to take two

---

[16] https://www.achp.gov/program_alternatives/pa.

steps.  First, MDOT had to include "all possible planning" to minimize harm from the project.  23 C.F.R. § 774.3(a)(2).  Then, MDOT had to decide which feasible and prudent option caused the "least overall harm."  23 C.F.R. § 774.3(c).

To satisfy the "all possible planning" step, MDOT collaborated with the National Park Service, which owns the C&O Canal Park, including Plummers Island.  AR.548 (FEIS at 6-18).  During the environmental review process, the Park Service asked MDOT to consider how it might minimize acreage impacts to the C&O Canal Park, including Plummers Island, when it replaced the American Legion Bridge.  AR.369 (FEIS at 5-28).  That request led MDOT to form a "strike team" dedicated to reducing the limits of disturbance for the bridge replacement via engineering plans, construction techniques, and bridge alignments.  AR.370 (FEIS at 5-29).

MDOT's strike team succeeded.  The final EIS bridge design reduced impacts to Plummers Island by 80 percent.  FHWA's final decision commitments and Programmatic Agreement encourage additional minimization during the final design stage.  AR.50 (ROD at 47).  Based upon the NEPA design, when the bridge is replaced and widened as part of the project, its new piers will permanently affect about one-tenth an acre on Plummers Island.  AR.43 (ROD at 40).  Temporary construction impacts will be just 0.27 acres.  AR.43 (ROD at 40).  Not satisfied, Plaintiffs now argue that Section 4(f) prohibited these effects because MDOT and FHWA improperly rejected their preferred bridge alignment—the "west shift alignment."  Pltfs.' Br. at 55.

The record shows that in rejecting the west shift alignment, MDOT and FHWA reasonably applied the "least overall harm" balancing factors.  *See* 23 C.F.R. § 774.3(c)(1).  Compared to the current bridge alignment, the west shift alignment would permanently impact six times more protected park acreage.  AR.556 (FEIS at 6-26).  It would also require major reconfigurations of another parkland road interchange.  AR.557 (FEIS at 6-

43

27). By themselves, these factors support MDOT's reasonable conclusion that the west shift alignment was not a feasible and prudent alternative. *See* 23 C.F.R. § 774.3(c)(1) (describing "least overall harm" analysis). But there was more: The west shift alignment would also have required MDOT to take homes and affect the Naval Surface Warfare Center Carderock Division property, while the approved bridge replacement would do neither. AR.174844 (Draft Avoidance, Minimization, and Impacts for American Legion Bridge and Plummers Island); AR.370 (FEIS at 5-29); AR.17681 (FEIS App. N). Because the Section 4(f) rules require agencies to balance the "magnitude of any adverse impacts to resources not protected by Section 4(f)," 23 C.F.R. § 774.3(c)(1), those harms to community resources were again enough to conclude that the west shift alignment was not the alternative that caused the least overall harm. AR.557 (FEIS at 6-27); *see* Pltfs.' Br. at 56.

Plaintiffs' counterarguments focus on MDOT's finding that the west shift was "viable." Pltfs.' Br. at 55–57. But that viability finding meant only that the alternate alignment could be built using a "conventional construction approach." AR.369 (FEIS at 5-30). Constructability is just one aspect of the Section 4(f) analysis. *See* 23 C.F.R. § 774. Seen in its entirety, MDOT's Section 4(f) analysis was reasonable.[17]

Finally, Plaintiffs claim that Plummers Island deserves more protection than other parkland protected by Section 4(f). Pltfs.' Br. at 57. It is true, of course, that Plummers Island is an important place. But so is the entire C&O Canal Park, of which Plummers Island is only one attribute. AR.535 (FEIS at 6-5). MDOT found that it would not be feasible and

---

[17] Plaintiffs' arguments also ignore extensive mitigation that further reduces impacts to parkland, including Plummers Island. AR.548–51 (FEIS at 6-18–6-21). After consulting the Park Service and the Washington Biologists' Field Club, MDOT committed to "slope armoring" to mitigate any future erosion that might result from tree clearing. AR.551 (FEIS at 6-21). MDOT will also keep evaluating mitigation options during final design that could reduce or even eliminate physical impacts to Plummers Island. *See* AR.50 (ROD at 47) (noting that the project developer "will continue to further avoid and minimize impacts throughout the remainder of the design process to the greatest extent practicable").

prudent to trade a tenth of an acre of permanent impacts to Plummers Island for far more harm to other parts of the C&O Canal Park.  AR.557 (FEIS at.6-27).  The Park Service, after coordinating with MDOT, agreed.  AR.558–59 (FEIS at 6-28–6-29).  Because MDOT followed the right Section 4(f) steps, and its conclusions were not arbitrary and capricious, its decision should be affirmed.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment and instead grant summary judgment to MDOT and FHWA.

Respectfully submitted,

Anthony G. Brown
Attorney General of Maryland

Linda M. DeVuono (Fed. Bar No. 08667)
Office of the Attorney General of Maryland
707 N. Calvert St., 4th Floor
Baltimore, MD 21202
Tel: (410) 530-9783
ldevuono@mdot.maryland.gov

*Counsel for Defendants Maryland Department of Transportation and Secretary Paul J. Wiedefeld*

_____/s/_____
Fred R. Wagner (Fed. Bar No. 15806)
Jay C. Johnson
Venable LLP
600 Massachusetts Ave., NW
Washington, DC 20001
Tel: (202) 344-4000
Fax: (202) 344-8300
Email: fwagner@venable.com
Email: jcjohnson@venable.com

45

*Special Counsel to the Attorney General of Maryland for Defendants Maryland Department of Transportation and Secretary Paul J. Wiedefeld*

**CERTIFICTE OF SERVICE**

I hereby certify that on this 7th day of August, 2023, a copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

_____/s/_____
Jay C. Johnson