**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| MARYLAND CHAPTER OF THE SIERRA CLUB, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. DKC 22-2597 |
| FEDERAL HIGHWAY ADMINISTRATION, *et al.*, | |
| *Defendants*. | |
| NORTHERN VIRGINIA CITIZENS ASSOCIATION, | |
| *Plaintiff*, | Civil Action No. DKC 22-3336 |
| v. | |
| FEDERAL HIGHWAY ADMINISTRATION, *et al.*, | |
| *Defendants*. | |

**PLAINTIFFS' JOINT REPLY IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO DEFENDANTS'
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

GLOSSARY ....................................................................................................... ix

INTRODUCTION ................................................................................................ 1

ARGUMENT ....................................................................................................... 1

I.    The Agencies cannot escape this Court's searching review ................................. 1

II.   The Agencies failed to take the required hard look at public health
      harms from the project's PM$_{2.5}$ emissions ................................................. 3

      A.  The Agencies' reliance on current regional NAAQS
          compliance did not constitute a hard look at localized PM$_{2.5}$
          impacts ............................................................................................. 4

      B.  The Agencies' analyses for different pollutants did not
          constitute a hard look at localized PM$_{2.5}$ impacts ........................ 8

      C.  The Agencies' other references to PM$_{2.5}$ in their NEPA
          documents did not constitute a hard look at localized PM$_{2.5}$
          impacts ........................................................................................... 10

      D.  Plaintiffs do not demand nearly as much as the Agencies
          suggest ........................................................................................... 11

III.  The Agencies failed to take a hard look at the project's impacts to
      environmental justice communities ................................................................ 12

      A.  The Agencies continue to ignore record evidence that shows
          increased air pollution in environmental justice communities
          near the toll lanes' endpoints ........................................................ 13

      B.  The Agencies' general statements about existing burdens and
          possible harms do not constitute a hard look at the project's
          cumulative impacts to environmental justice communities ............ 15

IV.   The Agencies did not provide a reasonable explanation of their
      traffic modeling ............................................................................................... 19

      A.  The Agencies did not seriously consider and respond to
          Marshall's comments ...................................................................... 20

B. Manually reducing forecasted traffic on some overcapacity roads but not others was inconsistent with the Agencies' dismissal of Marshall's comments .......................................................... 21

C. The Agencies unlawfully withheld data underlying their conclusions about traffic ................................................................ 22

V. The Agencies failed to take the required hard look at impacts from belated changes to the George Washington Memorial Parkway interchange design ........................................................................ 23

A. NVCA has standing ........................................................................ 23

B. The Agencies cannot point to anywhere in the record where they evaluated the impacts of the radical and belated interchange re-design .......................................................................... 28

VI. The Agencies' inadequate investigation of the Morningstar Moses Cemetery violated Section 4(f) and Section 106 .............................. 32

A. The Agencies violated Section 4(f) by concluding that the toll lanes project would not use the Cemetery ...................................... 32

B. The record does not support the Agencies' refusal to search the remainder of the Limits of Disturbance for burials before issuing the ROD ................................................................................ 36

C. The Programmatic Agreement does not cure the Agencies' violations of Section 4(f) or Section 106 ........................................ 38

D. The Agencies arbitrarily ignored cumulative effects to the Cemetery ............................................................................................ 39

VII. The Agencies violated Section 4(f) by rejecting an alternative that would have avoided Plummers Island without weighing multiple regulatory factors in FHWA's least overall harm test ...................... 40

VIII. The Court should vacate the Agencies' unlawful actions ................ 45

CONCLUSION ........................................................................................ 45

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Evans*,
   371 F.3d 475 (9th Cir. 2004) ......................................................................18

*ASARCO, Inc. v Kadish,*
   490 U.S. 605 (1989)...................................................................................28

*Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*,
   524 F. Supp. 2d 642 (D. Md. 2007).......................................................11, 44

*Balt. Gas & Elec. Co. v. NRDC*,
   462 U.S. 87 (1983).....................................................................................16

*Barnes v. FAA*,
   865 F.3d 1266 (9th Cir. 2017) .....................................................................6

*Beard v. Banks*,
   548 U.S. 521 (2006)...................................................................................24

*Border Power Plant Working Grp. v. Dep't of Energy*,
   260 F. Supp. 2d 997 (S.D. Cal. 2003) ..........................................................6

*California v. Bernhardt*,
   472 F. Supp. 3d 573 (N.D. Cal. 2020) .......................................................11

*Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*,
   449 F.2d 1109 (D.C. Cir. 1971).................................................................4, 5

*Church of Scientology of Cal. v. United States*,
   506 U.S. 9 (1992).......................................................................................26

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971)...................................................................................41

*City of Alexandria v. Slater*,
   198 F.3d 862 (D.C. Cir. 1999)....................................................................34

*Ctr. for Biological Diversity v. U.S. Forest Serv.*,
   349 F.3d 1157 (9th Cir. 2003) ...............................................................20, 21

*Defs. of Wildlife v. N.C. Dep't of Transp.*,
   762 F.3d 374 (4th Cir. 2014) ...............................................33, 38, 40, 41, 45

*Diné Citizens Against Ruining Our Env't v. Haaland*,
   59 F.4th 1016 (10th Cir. 2023) ..........................................6, 11, 17, 18

*Druid Hills Civic Ass'n v. FHWA,*
    772 F.2d 700 (11th Cir. 1985) ...........................................................34, 44, 45

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.,*
    36 F.4th 850 (9th Cir. 2022) ...................................................................4, 5

*Friends of Buckingham v. State Air Pollution Control Bd.,*
    947 F.3d 68 (4th Cir. 2020) ............................................................6, 7, 12, 15

*Friends of Cap. Crescent Trail v. U.S. Army Corps of Eng'rs,*
    453 F. Supp. 3d 804 (D. Md. 2020) ................................................................26

*Great Basin Res. Watch v. Bureau of Land Mgmt.,*
    844 F.3d 1095 (9th Cir. 2016) ........................................................................4

*Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.,*
    673 F.3d 518 (7th Cir. 2012) ...................................................................28, 30

*A Helping Hand, LLC v. Baltimore Cnty.,*
    515 F.3d 356 (4th Cir. 2008) .........................................................................45

*HonoluluTraffic.com v. Fed. Transit Admin.,*
    No. 11-cv-0307, 2014 WL 692891 (D. Haw. Feb. 18, 2014)............................44

*HonoluluTraffic.com v. Fed. Transit Admin.,*
    742 F.3d 1222 (9th Cir. 2014) ......................................................................34

*Hughes River Watershed Conservancy v. Glickman,*
    81 F.3d 437 (4th Cir. 1996) ......................................................................2, 21

*Hughes River Watershed Conservancy v. Johnson,*
    165 F.3d 283 (4th Cir. 1999) ........................................................................18

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.,*
    387 F.3d 989 (9th Cir. 2004) .........................................................................17

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)...............................................................................24, 26

*Mayor of Balt. v. Azar,*
    973 F.3d 258, 276 (4th Cir. 2020) .................................................................13

*Meister v. U.S. Dep't of Agric.,*
    623 F.3d 363 (6th Cir. 2010) ..........................................................................2

*Muckleshoot Indian Tribe v. U.S. Forest Serv.,*
    177 F.3d 800 (9th Cir. 1999) ...................................................................16, 17

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*,
677 F.3d 596 (4th Cir. 2012) ............................................................8, 15, 19, 23, 29, 31

*N.M. ex rel. Richardson v. Bureau of Land Mgmt.*,
565 F.3d 683 (10th Cir. 2009) ........................................................................30

*Nat'l Audubon Soc'y v. Dep't of Navy*,
422 F.3d 174 (4th Cir. 2005) ............................................2-4, 7, 10-13, 15, 16

*Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014) ........................................................................41

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
137 F.3d 1372 (9th Cir. 1998) .......................................................10, 17, 18

*NRDC v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988) ........................................................................31

*NRDC v. U.S. Dep't of Transp.*,
770 F.3d 1260 (9th Cir. 2014) ........................................................................12

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*,
716 F.3d 119 (4th Cir. 2013) ........................................................................18

*Or. Nat. Res. Council Fund v. Goodman*,
505 F.3d 884 (9th Cir. 2007) ........................................................................13

*Pitt Cnty. v. Hotels.com, L.P.*,
553 F.3d 308 (4th Cir. 2009) ........................................................................28

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
588 F.3d 718 (9th Cir. 2009) ...................................................................6, 10, 11

*S.C. Wildlife Fed'n v. Limehouse*,
549 F.3d 324 (4th Cir. 2008) ........................................................................27

*Se. Alaska Conservation Council v. U.S. Forest Serv.*,
443 F. Supp. 3d 995 (D. Alaska 2020) .....................................................14, 15

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) ..........................................................................2

*Sierra Club v. FHWA*,
715 F. Supp. 2d 721 (S.D. Tex. 2010) ............................................................6

*Sierra Club v. FHWA*,
No. 17-cv-1661, 2018 WL 1610304 (D. Colo. Apr. 3, 2018) ..........................5, 6

*Stenlund v. Marriott Int'l, Inc.*,
    172 F. Supp. 3d 874 (D. Md. 2016) ...................................................................39, 45

*Stop H-3 Ass'n v. Dole*,
    740 F.2d 1442 (9th Cir. 1984) .......................................................................................33

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ........................................................................................................27

*Tanners' Council of Am., Inc. v. Train*,
    540 F.2d 1188 (4th Cir. 1976) ..................................................................................2, 37

*TOMAC v. Norton*,
    433 F.3d 852 (D.C. Cir. 2006) .........................................................................................9

*Town of Weymouth v. Mass. Dep't of Envtl. Prot.*,
    961 F.3d 34 (1st Cir. 2020) ..............................................................................................7

*United States v. Westvaco Corp.*,
    No. 00-cv-2602, 2015 WL 10323214, (D. Md. Feb. 26, 2015) ......................................6

*United States v. Ameren Mo.*,
    421 F. Supp. 3d 729 (E.D. Mo. 2019) ............................................................................6

*Uzuegbunam v. Preczewski*,
    141 S. Ct. 792 (2021) .....................................................................................................26

*Webster v. U.S. Dep't of Agric.*,
    685 F.3d 411 (4th Cir. 2012) ...........................................................................................3

*Wild Va. v. U.S. Forest Serv.*,
    24 F.4th 915 (4th Cir. 2022) ....................................................................................2, 3, 5

**Statutes**

5 U.S.C. § 706(2)(A) .............................................................................................................45

49 U.S.C. § 303(c) ................................................................................................................35

Va. Code Ann. § 10.1-1307(E)(1) ..........................................................................................7

Va. Code Ann. § 10.1-1307(E)(3) ..........................................................................................7

**Regulations and Rulemakings**

23 C.F.R. § 771.125(a)(1) .....................................................................................................20

23 C.F.R. § 774.3(c)(1) ....................................................................................................40, 41

23 C.F.R. § 774.3(c)(1)(i) ................................................................................42

23 C.F.R. § 774.3(c)(1)(ii) ..........................................................................43, 44

23 C.F.R. § 774.3(c)(1)(iii) .........................................................................42, 44

23 C.F.R. § 774.3(c)(1)(vi) ..............................................................................42

23 C.F.R. § 774.3(c)(1)(vii) ..............................................................................44

23 C.F.R. § 774.17 ......................................................................................33, 41

23 C.F.R. § 774.7(c) .........................................................................................41

23 C.F.R. § 774.9(a) .........................................................................................35

23 C.F.R. § 774.9(b) .........................................................................................32

36 C.F.R. § 800.4(b)(2) ....................................................................................39

36 C.F.R. § 800.5(a)(1) ....................................................................................33

36 C.F.R. § 800.5(a)(2) ....................................................................................33

36 C.F.R. § 800.5(a)(3) ....................................................................................38

40 C.F.R. § 50.8 .................................................................................................9

40 C.F.R. § 50.18 ...........................................................................................9, 14

40 C.F.R. § 1502.9(b) (2019) ...........................................................................20

40 C.F.R. § 1502.21 (2019) ..............................................................................22

40 C.F.R. § 1503.4 (2019) ................................................................................20

40 C.F.R. § 1508.27(a) (2019) ...........................................................................7

40 C.F.R. § 1508.27(b)(2) (2019) ......................................................................7

40 C.F.R. § 1508.27(b)(10) (2019) .................................................................4, 7

65 Fed. Reg. 77,698 (Dec. 12, 2000) ..........................................................38, 39

73 Fed. Reg. 13,368 (Mar. 12, 2008) ...............................................................41

77 Fed. Reg. 42,802 (July 20, 2012) ................................................................42

**Other Authorities**

EPA, *Learn About the Impacts of Diesel Exhaust*, https://tinyurl.com/2tr6bdd4.........................25

EPA, *MOVES2014, MOVES2014a, and MOVES2014b Technical Guidance* 27 (2018), https://tinyurl.com/3amahwc3 ............................................................................................9

Council on Envtl. Quality, *Environmental Justice: Guidance Under the National Environmental Policy Act* 9 (1997), https://tinyurl.com/49bfcp4z.......................................................16, 19

FHWA Tech. Advisory T 6640.8A ¶ 8.b (1987) .........................................................................10

**GLOSSARY**

| | |
|---|---|
| Agencies | MDOT and FHWA |
| APA | Administrative Procedure Act |
| DEIS | June 2020 Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| EPA | U.S. Environmental Protection Agency |
| SDEIS | September 2021 Supplemental Draft Environmental Impact Statement |
| FEIS | June 2022 Final Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| MDOT | Maryland Department of Transportation |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| $PM_{2.5}$ | Fine particulate matter |
| ROD | August 2022 Record of Decision |
| VDOT | Virginia Department of Transportation |

**INTRODUCTION**

Environmental impact statements are not marketing materials. They must unflinchingly disclose a project's damage to health, ecosystems, and historic sites. The Agencies failed that basic requirement. They shrugged off evidence that their final environmental impact statement (FEIS) understated the toll lanes project's air pollution (particularly in environmental justice communities), overpromised its traffic relief, and inadequately evaluated its damage to the Morningstar Moses Cemetery, Plummers Island, and a neighborhood in McLean.

The Agencies' briefs continue to ignore facts that undercut their pitch for the project. They attempt to wave away fundamental problems with their analyses as policy disagreements or flyspecks, and thereby fall short of the reasoned explanation required by the Administrative Procedure Act (APA). The Agencies' violations of the National Environmental Policy Act (NEPA), Section 4(f) of the Department of Transportation Act, and Section 106 of the National Historic Preservation Act obscured the project's harms from decisionmakers and the public alike, and deprived two significant historic sites of congressionally mandated protections. The Court should vacate the project's unlawful approvals, so the Agencies can reconsider their decision after a full evaluation of the project's impacts.

**ARGUMENT[1]**

**I.     The Agencies cannot escape this Court's searching review**

Throughout their briefs, the Agencies argue that their findings are beyond question and that the NEPA violations Plaintiffs allege amount to flyspecking. The Agencies are mistaken. Their view of the Court's role is so constrained as to render judicial review meaningless.

---

[1] All Plaintiffs join the arguments in Parts I and VIII. All Plaintiffs except Northern Virginia Citizens Association (NVCA) join the arguments in Parts II, III, and IV. Only NVCA joins the arguments in Part V. Friends of Moses Hall, Sierra Club, and National Trust for Historic

The Court's review of NEPA claims is "searching and careful," not a "rubber stamp." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 185 (4th Cir. 2005) (cleaned up). Just because agency conclusions touch upon scientific or technical matters doesn't entitle them to deference. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). Agencies must earn deference by rationally explaining how they applied their expertise to the facts before them. *See Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 374 (6th Cir. 2010); *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 444-46 (4th Cir. 1996); *Tanners' Council of Am., Inc. v. Train*, 540 F.2d 1188, 1191, 1193-94 (4th Cir. 1976).

The Agencies have not earned the deference they demand here. Rather than rationally engage with Plaintiffs' arguments, they deflect to page counts and public outreach. MDOT Br. 11, 15, 32; FHWA Br. 14, 32, 34, 35, 36.[2]  Rather than squarely address adverse record evidence, they claim Plaintiffs never provided it, FHWA Br. 34; *infra* 13; they "acknowledge[]" it without analyzing it, FHWA Br. 29; *infra* 10 n.11; and, in at least two important instances, they outright mischaracterize it, *infra* 8, 20. The Agencies get no deference when they duck difficult questions. *See Wild Va. v. U.S. Forest Serv.*, 24 F.4th 915, 927-28 (4th Cir. 2022) (holding that agency violated NEPA by "fail[ing] to account for real-world data" that called modeling results into question).

Nor can the Agencies paper over their violations by dismissing Plaintiffs' NEPA claims as "narrow," "technical," or "flyspecking." MDOT Br. 2, 3, 5, 13, 16; FHWA Br. 3. Flyspecks

---

Preservation join the arguments in Part VI. Sierra Club, National Trust for Historic Preservation, and the Natural Resources Defense Council (NRDC) join the arguments in Part VII. Because the Agencies challenge standing only as to NVCA's claims addressed in Part V, for all other claims Plaintiffs rest on their demonstration of standing in their opening brief.

[2] Plaintiffs cite to their opening brief, ECF No. 46-1, as "Pls. Br."; to FHWA's opening brief, ECF No. 47-1, as "FHWA Br."; and to MDOT's opening brief, ECF No. 48-1, as "MDOT Br."

are "minor" deficiencies or "trivial inadequac[ies]" in an FEIS that do not "defeat the goals of informed decision making and informed public comment." *Nat'l Audubon Soc'y*, 422 F.3d at 186 (cleaned up); *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 425 (4th Cir. 2012).

But Plaintiffs challenge gaping holes in the Agencies' evaluation of air pollution, environmental justice, and traffic. The Agencies' refusal to conduct any analysis of the project's increased fine particulate matter ($PM_{2.5}$) pollution—which exacerbates asthma and causes heart attacks and early death—is not a trivial inadequacy. Pls. Br. 20-29. Just ask people who breathe the air near the Beltway and I-270. Ecker Decl. ¶¶ 3-8, ECF No. 46-4; Zama Decl. ¶¶ 9-10, ECF No. 46-10. Erroneously informing environmental justice communities that the project would not increase air pollution in their neighborhoods more than others, when the Agencies' modeling shows otherwise, is not a minor deficiency. Pls. Br. 30-33. And the Agencies' failure to explain why they relied upon traffic modeling that forecast impossibly high numbers of cars on the road did in fact defeat the goals of informed decision making and public comment. *Id.* at 36-42.

Added to their inadequate investigation of the Morningstar Moses Cemetery and their cursory dismissal of an alternative that would have avoided Plummers Island, these fundamental defects in core aspects of the FEIS establish a pattern of the Agencies waving off valid concerns. Any one of the Agencies' serious legal violations merits vacatur. *See Wild Va.*, 24 F.4th at 923, 927-30, 932 (vacating an EIS that addressed a wide range of environmental and social impacts because of deficiencies in its analyses of the project's harms to streams).

## II.    The Agencies failed to take the required hard look at public health harms from the project's $PM_{2.5}$ emissions

Plaintiffs explained in their opening brief why NEPA required the Agencies to assess and disclose localized health impacts from the project's $PM_{2.5}$ emissions. Pls. Br. 20-29. In response, the Agencies don't dispute the key facts: (1) $PM_{2.5}$ is a dangerous pollutant that causes serious

harms, including heart attacks and early deaths, even at low levels, *id.* at 22; (2) the toll lanes

project would increase $PM_{2.5}$ pollution, *id.* at 7-8; and (3) this pollution would harm the

communities closest to the toll lanes the most, *id.* at 21-22.

The Agencies nonetheless stand by their claim that current county-level compliance with

the National Ambient Air Quality Standards (NAAQS) for $PM_{2.5}$ meant no analysis of $PM_{2.5}$

impacts was needed. *See* FHWA Br. 26-31; MDOT Br. 25-29. But existing compliance, based on

air monitoring miles from the Beltway and I-270, doesn't address *this project's* $PM_{2.5}$ pollution,

much less any related health impacts. Pls. Br. 24-25. The Agencies thus failed to provide the

"thorough investigation" and "forthright acknowledgement" of impacts that NEPA's hard look

review required. *See Nat'l Audubon Soc'y*, 422 F.3d at 187.

### A.    The Agencies' reliance on current regional NAAQS compliance did not constitute a hard look at localized $PM_{2.5}$ impacts

The Agencies' defense rests, at bottom, on a "misunderstanding of the nature of NEPA

and its relationship to 'substantive' environmental laws." *Great Basin Res. Watch v. Bureau of

Land Mgmt.*, 844 F.3d 1095, 1103 (9th Cir. 2016). The Agencies are right that compliance with a

substantive law—including a NAAQS—can *inform* a NEPA analysis. *See* FHWA Br. 28-29;

MDOT Br. 30. But there are limits to when such compliance can *satisfy* an agency's hard look

obligations. The substantive law must "specifically address the impacts of the project at issue."

*Envtl. Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 874 (9th Cir. 2022) (cleaned

up). And, even then, compliance doesn't necessarily mean related impacts are insignificant.

*Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1123 (D.C.

Cir. 1971); *Great Basin Res. Watch*, 844 F.3d at 1103; *see also* 40 C.F.R. § 1508.27(b)(10)

(2019)[3] (listing threatened violation of environmental laws as one of ten factors relevant to an impact's "severity").

The Agencies failed at the first step: current regional NAAQS compliance doesn't "specifically address" the project's localized $PM_{2.5}$ impacts. *Envtl. Def. Ctr.*, 36 F.4th at 874. That NAAQS "are specifically meant" to protect people, MDOT Br. 29, and "include the pollutant at issue," FHWA Br. 30, isn't enough.[4] Current county-level NAAQS compliance doesn't reflect $PM_{2.5}$ levels near the Beltway and I-270, which may *already* exceed the NAAQS.[5] *See* Pls. Br. 21-22, 24-25. And—more importantly—it doesn't account for how much the project would increase those localized $PM_{2.5}$ levels going forward. *Id.* Because of this mismatch, the Agencies' conclusion that current regional NAAQS compliance meant "no further analysis of $PM_{2.5}$ was required," AR_000408, is precisely the type of "abdication of NEPA authority to the standards of other agencies" that *Calvert Cliffs* rejected. *See* 449 F.2d at 1122-23.

The "nearly unanimous" out-of-Circuit cases the Agencies draw upon, *see* FHWA Br. 27 (quoting *Sierra Club v. FHWA*, No. 17-cv-1661, 2018 WL 1610304, at *7 (D. Colo. Apr. 3, 2018)), help underscore the Agencies' failures here. In all but one of these cases, the agency did

---

[3] As in their opening brief, Plaintiffs cite to the 2019 NEPA regulations. *See* Pls. Br. 33 n.29.

[4] Whether the current $PM_{2.5}$ NAAQS meet Clean Air Act standards is also irrelevant here. Plaintiffs believe the current annual $PM_{2.5}$ NAAQS isn't as protective as the Clean Air Act requires. EPA and Maryland agree. *See* Pls. Br. 22, 25 n.17. But Plaintiffs concur with FHWA that this question "is not at issue in this litigation." FHWA Br. 28.

[5] Thus, FHWA's suggestion that this case is *only* about impacts "below the NAAQS" is wrong. FHWA Br. 28. The Agencies continue to ignore a study that shows—*using MDOT data*—that communities along the toll lanes' path may already experience $PM_{2.5}$ levels above the NAAQS. Pls. Br. 21-22 (citing AR_193539, 193545). The Agencies' failure to account for this "real-world data" alone violated NEPA. *See Wild Va.*, 24 F.4th at 928.

more than rely solely on current regional NAAQS compliance.[6] Instead, the agency modeled the project's emissions, added them to ambient pollution levels, and found the cumulative levels wouldn't exceed the NAAQS. *See Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1045-46 (10th Cir. 2023) (agency modeled increase in pollution levels from oil wells and compared to NAAQS); *Sierra Club*, 2018 WL 1610304, at *4 (same for highway); *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F. Supp. 2d 997, 1020-21 (S.D. Cal. 2003) (same for power plant); *Barnes v. FAA*, 865 F.3d 1266, 1271-72 (9th Cir. 2017) (same for airport expansion). Thus, the "logic" behind those decisions, *see* FHWA Br. 27-28, doesn't fit here.[7] The Agencies didn't model *future* pollution levels near the project and compare those levels to the NAAQS; they relied on existing $PM_{2.5}$ levels miles from the highways, ignored the project's $PM_{2.5}$ pollution, and called it a day. Because current regional NAAQS compliance "sheds no light on the specific effect at issue—the environmental impact of [$PM_{2.5}$ pollution] *from this project*"—it cannot satisfy NEPA's hard look requirement. *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009) (emphasis added).

---

[6] The one case where the agency appears to have relied solely on regional NAAQS compliance, *see Sierra Club v. FHWA*, 715 F. Supp. 2d 721, 741 (S.D. Tex. 2010), is unpersuasive for the reasons explained above, *supra* 4-7; *see also* Pls. Br. 26 & n.19.

[7] Even if it did fit, the "logic" of those decisions wouldn't be "well-reasoned," *see* FHWA Br. 27-28 (cleaned up), because the record here shows that serious health harms still occur at $PM_{2.5}$ levels below the NAAQS. *See* Pls. Br. 22, 25; *accord Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68, 92 (4th Cir. 2020) (recognizing that "any amount of $PM_{2.5}$ in the system is harmful" and "even when NAAQS are not violated as to [$PM_{2.5}$], the record reflects that exposure to $PM_{2.5}$ will increase the risk of asthma, heart attacks, and death"). The Agencies do not dispute that fact. *See* FHWA Br. 28; MDOT Br. 28. Nor could they, given the "majority scientific consensus" on that point. *United States v. Westvaco Corp.*, No. 00-cv-2602, 2015 WL 10323214, at *9 (D. Md. Feb. 26, 2015); *see also United States v. Ameren Mo.*, 421 F. Supp. 3d 729, 817 (E.D. Mo. 2019); AR_193222. The Agencies fail to explain how a standard that doesn't protect against those undisputed harms could justify ignoring those harms under NEPA.

The Agencies' attempts to distinguish the Fourth Circuit's decision in *Friends of Buckingham* fare no better. FHWA Br. 30-31; MDOT Br. 29. To be sure, *Friends of Buckingham* "is not a NEPA case." MDOT Br. 29. But that distinction is illusory. Both NEPA and the Virginia statute at issue in *Friends of Buckingham* require an agency to consider health impacts and the characteristics of the local community before approving a project.[8] *Compare* Va. Code Ann. § 10.1-1307(E)(1), (3) (requiring agency to "consider" the "character and degree" of health harms and the activity's "suitability" to its location), *with* 40 C.F.R. § 1508.27(a), (b)(2) (requiring agency to consider the local "context" for "site-specific actions" as well as "[t]he degree to which the proposed action affects public health"). And both statutes are procedural: they do not affect the agency's "broad authority" to approve or reject a project. FHWA Br. 30; *see Nat'l Audubon Soc'y*, 422 F.3d at 184. Applying the Virginia statute, the Fourth Circuit held—given modeling showing the project would increase local $PM_{2.5}$ levels and record evidence of serious health harms associated with $PM_{2.5}$ exposure, even below the NAAQS—that the state agency's decision to "fall[] back on [the] NAAQS" rather than confront the project's local health impacts was arbitrary and capricious. *Friends of Buckingham*, 947 F.3d at 92.

The Agencies committed the same error, on similar facts, here. *See* Pls. Br. 27. They provide no persuasive reason the rationale in *Friends of Buckingham* shouldn't apply to them as well. That the Agencies compounded the errors in *Friends of Buckingham* by refusing to even determine how much the project would increase local $PM_{2.5}$ levels, *id.*, only further confirms that

---

[8] *Town of Weymouth v. Massachusetts Department of Environmental Protection*, on the other hand, is "easily distinguishable" precisely because the policy it considered was so different. 961 F.3d 34, 55 (1st Cir.), *amended on other grounds,* 973 F.3d 143 (1st Cir. 2020). Unlike NEPA or the Virginia statute, the Massachusetts policy was triggered only if certain conditions were met, and not all conditions were met in that case. *Id.* at 54-55.

their analysis fell short of NEPA's hard look requirements and the APA's standards for reasoned

decision making.

## B.    The Agencies' analyses for different pollutants did not constitute a hard look at localized PM$_{2.5}$ impacts

Several of the Agencies' arguments hinge on the theory that their assessment of other air

pollutants somehow cured their refusal to assess the project's PM$_{2.5}$ impacts. It did not.

First, the Agencies' conformity finding for ozone is irrelevant. Despite admitting in the

FEIS that the Clean Air Act's conformity process didn't apply to the project's PM$_{2.5}$ pollution,

*see* AR_014329, the Agencies now cite conformity as justification for their approach, FHWA Br.

26; MDOT Br 25. The Agencies, however, do not explain how a process that doesn't apply to the

project's PM$_{2.5}$ impacts somehow excused them from taking a hard look at those impacts. *See*

Pls. Br. 27-28. MDOT's new assertion that PM$_{2.5}$ *was* addressed in the conformity determination,

*see* MDOT Br. 25, is false. The determination evaluated only ozone, AR_131349, and mentioned

PM$_{2.5}$ only to reiterate that it wasn't subject to conformity here, AR_131351. At bottom, the

Agencies' reliance on conformity is another way of arguing that current regional NAAQS

compliance justifies ignoring future localized impacts. But that's wrong. *Supra* 4-7.

The Agencies' insistence that their carbon monoxide analysis excused addressing PM$_{2.5}$,

*see* MDOT Br. 30; FHWA Br. 26, is also misplaced. This post-hoc rationale is absent from the

administrative record, *see, e.g.*, AR_000408; AR_022746, and therefore cannot support the

decision. *See N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 604 (4th Cir. 2012). In

any event, the new explanation also fails on the merits. While carbon monoxide can be a "proxy"

for tailpipe emissions, *see* AR_044929, it's not a replacement for assessing PM$_{2.5}$ impacts here.

Unlike carbon monoxide, a substantial portion of PM$_{2.5}$ traffic emissions come from non-exhaust

sources like tire and brake wear.[9] *See* AR_177626. Carbon monoxide and $PM_{2.5}$, moreover, are subject to different standards, covering different time frames. *Compare* 40 C.F.R. § 50.8 (carbon monoxide one- and eight-hour standards), *with id.* § 50.18 ($PM_{2.5}$ daily and annual standards). And they have different health impacts, with $PM_{2.5}$ exposure "about 50 times more damaging to public health." AR_136988-89. An assessment of tailpipe carbon monoxide emissions doesn't account for these important differences. And, unlike *TOMAC v. Norton*, the Agencies never concluded—and there's no record evidence to suggest—that, for this project, "carbon monoxide is more likely than [$PM_{2.5}$] to impact air quality." *Contra* 433 F.3d 852, 863 (D.C. Cir. 2006).

Nor do the Agencies' carbon monoxide findings show localized $PM_{2.5}$ impacts would be insignificant. *Contra* MDOT Br. 30. Indeed, the analysis—if relevant at all—suggests the opposite. It shows that carbon monoxide levels would be substantially higher under the project than under the "no-build" scenario. *See* AR_044993. For some areas, including one of the Beltway/I-270 interchanges, carbon monoxide levels would more than double. *Id.* (showing, for example, a 2025 no-build 1-hour level of 4 parts per million and a build level of 8.6 parts per million). The Agencies' projections that localized carbon monoxide levels would significantly increase only underscores why they needed to take a hard look at localized $PM_{2.5}$ impacts.

Finally, MDOT's new spin on FHWA's 1987 Advisory lacks record support. *See* MDOT Br. 27. MDOT ignores Plaintiffs' arguments showing that the Advisory is irrelevant to—and cannot supplant—its NEPA obligations as to $PM_{2.5}$. *See* Pls. Br. 28. But even if the Advisory applied, it wouldn't support disregarding localized $PM_{2.5}$ impacts. The Advisory allows agencies

---

[9] A proper $PM_{2.5}$ analysis therefore considers $PM_{2.5}$ emissions from exhaust as well as tire and brake wear. *See* EPA, *MOVES2014, MOVES2014a, and MOVES2014b Technical Guidance* 27 (2018), https://tinyurl.com/3amahwc3 (EPA guidance for MOVES2014b, the traffic pollution model the Agencies used, *see* AR_044959). The Agencies, on the other hand, considered only exhaust ("running" and "crankcase") emissions for carbon monoxide. AR_044960.

to skip a localized carbon monoxide analysis only if they conclude "microscale" carbon monoxide levels—that is, "project [] contribution plus background"—are "well below" the NAAQS. FHWA Tech. Advisory T 6640.8A ¶ 8.b (1987), https://tinyurl.com/ycym59da. The Agencies never made that finding for local *PM₂.₅* levels.[10] *Contra* MDOT Br. 27. Nor could they: they neither assessed the existing $PM_{2.5}$ levels near the Beltway and I-270 (which record evidence suggests may already exceed the NAAQS), nor determined how much the project would increase those levels. *See* Pls. Br. 24-25.

### C. The Agencies' other references to PM₂.₅ in their NEPA documents did not constitute a hard look at localized PM₂.₅ impacts

The Agencies' attempt to cobble together other references to $PM_{2.5}$ in the NEPA documents, *see* FHWA Br. 27, cannot save their refusal to analyze localized $PM_{2.5}$ impacts.[11] The mere disclosure that $PM_{2.5}$ can harm human health, *see* AR_044930, is a "[g]eneral statement[] about 'possible effects' and 'some risk'" that does not alone "constitute a hard look" under NEPA, *see Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998). Such information, while relevant, doesn't answer the specific question NEPA asks: what are the $PM_{2.5}$ impacts "from this project"? *S. Fork Band Council*, 588 F.3d at 726. Answering that question requires assessing how the project will affect local $PM_{2.5}$ levels and what that means for public health—exactly what the Agencies refused to do here.

The Agencies' treatment of fugitive dust (which includes $PM_{2.5}$) during the toll lanes'

---

[10] The Agencies' observation that *current* levels miles away from the project are "well below" the NAAQS, *see* AR_035897, is not the same as finding *future* levels close to the new toll lanes would be "well below" the NAAQS. *Cf.* Pls. Br. 24-25; *supra* 4-6.

[11] Nor can the Agencies' mere "disclos[ure]" and one-sentence "acknowledg[ment]" of Plaintiffs' comments on PM₂.₅ impacts. *See* FHWA Br. 29; *see also* AR_022746 (the "acknowledgment"). NEPA required the Agencies to respond to Plaintiffs' critical comments, not "sweep[] the negative evidence under the rug." *Nat'l Audubon Soc'y*, 422 F.3d at 194.

construction doesn't help them either. *Contra* FHWA Br. 27. The Agencies were right to identify "short-term localized increases" in fugitive dust from construction as an air-quality issue. AR_045037. But acknowledging short-term impacts from construction didn't satisfy their separate obligation to assess long-term impacts from decades of the toll lanes' operation. *See S. Fork Band Council*, 588 F.3d at 726 (agency violated NEPA by failing to consider "ten years of environmental impacts that would not be present in the no-action scenario").[12]

### D.     Plaintiffs do not demand nearly as much as the Agencies suggest

Contrary to MDOT's hyperbole, Plaintiffs don't demand a "doctoral dissertation." MDOT Br. 27. NEPA required the Agencies to, "[a]t the least," conduct a "thorough investigation" into the project's $PM_{2.5}$ pollution and provide a "candid acknowledgment of the risks" that pollution would pose to people living closest to the toll lanes. *See Nat'l Audubon Soc'y*, 422 F.3d at 185. On this record, simply relying on current regional NAAQS compliance wasn't enough. *Supra* 4-7. NEPA doesn't mandate "any particular methodologies." *Diné Citizens*, 59 F.4th at 1043. But it also doesn't allow agencies "to ignore" impacts "when there are methods for analyzing those impacts." *Id.* Instead, it requires an "accurate and defensible" methodology that can support "sound scientific decisions." *California v. Bernhardt*, 472 F. Supp. 3d 573, 624 (N.D. Cal. 2020). The Agencies may be able to come up with a method that satisfies their hard look obligations short of conducting the "hyper-localized" analysis they clearly wish to avoid. *See* FHWA Br. 28. If they cannot, they must use the established methods available to model the project's $PM_{2.5}$ pollution and to assess localized health risks for surrounding

---

[12] *Audubon Naturalist Society of the Central Atlantic States, Inc. v. U.S. Department of Transportation*, 524 F. Supp. 2d 642 (D. Md. 2007), is inapposite. The court there did not conclude that acknowledging a highway's construction-related air pollution negated the need to assess air pollution impacts from the highway's operation. Indeed, in that case FHWA evaluated the highway's long-term impacts on local $PM_{2.5}$ levels. *Id.* at 693-94, 696.

communities. *See, e.g.*, *NRDC v. U.S. Dep't of Transp.*, 770 F.3d 1260, 1272 (9th Cir. 2014) (upholding an FHWA health risk assessment under NEPA's hard look standard). Either way, in the first instance, it will be up to the Agencies to determine—based on the facts they find once they finally start considering the project's localized $PM_{2.5}$ impacts—how best to satisfy the hard look standard. *See Nat'l Audubon Soc'y*, 422 F.3d at 195-96 (explaining that, on remand, the agency needed to "supply enough background information to establish a rational basis for its conclusions"). What matters here is that they haven't taken the required hard look yet.

## III. The Agencies failed to take a hard look at the project's impacts to environmental justice communities

Plaintiffs' opening brief outlined two critical flaws in the Agencies' environmental justice analysis. First, the Agencies' conclusion that the project's air pollution would be distributed evenly along the toll lanes contradicted the record. Pls. Br. 30-33. Second, the Agencies failed to take a hard look at the project's cumulative harms to some of Maryland's most overburdened environmental justice communities. *Id.* at 33-36.

The Agencies repeat these errors in their briefs. They again disregard negative evidence on traffic-related air pollution. And they still offer no evaluation of cumulative impacts, emphasizing instead their community outreach efforts, acknowledgement of past harms, and vague conclusion that "past, present, and future projects would likely have impacts to potential [environmental justice] populations." FHWA Br. 35-36; MDOT Br. 32-33. The Agencies' inaccurate and conclusory assertions disclose little about the project's actual effects on the health of already overburdened environmental justice communities. By glossing over key questions of equity and public health, the Agencies reduced environmental justice to a "box to be checked." *See Friends of Buckingham*, 947 F.3d at 92. This violated NEPA.

A.    **The Agencies continue to ignore record evidence that shows increased air pollution in environmental justice communities near the toll lanes' endpoints**

The Agencies try to support their inaccurate claim that the project would not worsen traffic near environmental justice communities by making another inaccurate one: that Plaintiffs have not provided evidence to the contrary. *See* FHWA Br. 34; MDOT Br. 34. But Plaintiffs' opening brief detailed extensive record evidence showing that the project—compared with the no-build alternative—would disproportionately increase congestion around the toll lanes' end points in Gaithersburg and North Bethesda, where environmental justice communities are clustered. Pls. Br. 31-32.[13] The Agencies continue to "sweep[] negative evidence under the rug" by denying its existence. *Nat'l Audubon Soc'y*, 422 F.3d at 194.

Statements from NEPA documents that traffic "would not get worse" at the toll lanes' end points and would affect "all areas equally," FHWA Br. 32; MDOT Br. 34, cannot justify the Agencies' claim because they are not supported by any data or analysis. *See Mayor of Balt. v. Azar*, 973 F.3d 258, 276 (4th Cir. 2020) (explaining that agency say-so is inadequate under the APA). Indeed, they are contradicted by the Agencies' own modeling data and statements from FHWA's own staff. *See* Pls. Br. 31-32. NEPA requires an agency to explain how "underlying data" support such "generalized, conclusory assertions." *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 893 (9th Cir. 2007). The Agencies still have not done so.

---

[13] While the Agencies' model forecasts faster travel speeds systemwide and significant congestion relief north of the American Legion Bridge under the project, it predicts a dramatic drop in speeds for some stretches of highway near Gaithersburg and North Bethesda. *Compare* AR_001719 (20-40 mph decreases in speed on I-270 northbound general purpose lanes between the MD-28 and I-370 interchange from 6 pm to 7 pm), *and* AR_001708 (decrease in speed, sometimes by close to 50 mph, on Beltway Inner Loop general purpose lanes between I-270 west spur and I-270 east spur from 8 am to 10 am), *with* AR_000328 (claiming project will increase general purpose lane speeds systemwide by 4 mph), *and* AR_001708 (increase in speed, sometimes by close to 40 mph, on Beltway Inner Loop general purpose lanes between Clara Barton Parkway and MD-190 from 9 am to 10 am).

Nor does the Agencies' carbon monoxide analysis support their conclusion that air pollution would be distributed evenly. Although the Agencies cite their carbon monoxide analysis repeatedly, *e.g.*, FHWA Br. 32-33; MDOT Br. 30, they never claim it addresses the actual distribution of the project's air pollution. Nor could they. Their carbon monoxide analysis wasn't designed to evaluate whether environmental justice communities would receive a disproportionate share of the project's air pollution. Instead, the point of that analysis was to see if, in a worst-case scenario, "any location throughout the [project] corridor" would violate the carbon monoxide NAAQS. AR_044946. So rather than using their traffic model's congestion forecasts to project carbon monoxide levels, the Agencies assumed, contrary to those forecasts, that all stretches of road considered would have the *same* "theoretical" level of "worst-case" congestion for one hour. AR_044968.

But the Agencies' counterfactual assumption of uniform congestion renders their carbon monoxide analysis useless for assessing whether the project would pollute some communities more than others.[14] Answering that question would have required grappling with the traffic model's prediction that the project would worsen congestion in some environmental justice communities while easing it elsewhere. Pls. Br. 30-32. The carbon monoxide analysis ignores these data and therefore provides no support for the Agencies' claim that air pollution would be evenly distributed along the project's route.[15] *See Se. Alaska Conservation Council v. U.S.*

---

[14] Similarly, even if a carbon monoxide analysis could shed light on the project's $PM_{2.5}$ pollution—which it cannot, *supra* 8-10—the Agencies' focus on one-hour, worst-case emissions renders their analysis useless for understanding the longer-term (daily and annual) $PM_{2.5}$ levels that would drive the project's contributions to asthma, heart attacks, and early deaths in nearby communities. *See* AR_196544-55 (causality findings for short-term and long-term $PM_{2.5}$ exposures); *see also* 40 C.F.R. § 50.18 (setting 24-hour and annual $PM_{2.5}$ standards).

[15] The Agencies' mobile source air toxics (MSAT) analysis is also inapposite. *Contra* FHWA Br. 32-33. While the Agencies used their traffic modeling data for that analysis, *see* AR_014338, the

*Forest Serv.*, 443 F. Supp. 3d 995, 1013 (D. Alaska 2020) (rejecting agency's assessment of "maximum potential impacts" for project alternatives, rather than the "probable environmental consequences" as NEPA required).

The Agencies' observation that carbon monoxide levels at the I-270/I-370 interchange in Gaithersburg are higher now than they would be with the project, *see* FHWA Br. 33; MDOT Br. 30, is disingenuous. In fact, the Agencies' carbon monoxide analysis shows the project would significantly increase carbon monoxide levels near Gaithersburg (and North Bethesda) environmental justice communities compared to the no-build alternative. AR_044993-94; *see N.C. Wildlife Fed'n*, 677 F.3d at 603 (describing NEPA's requirement to compare project impacts to those of the no-build alternative). Thus, nothing in the Agencies' inapt carbon monoxide analysis calls into question the story told by their traffic modeling: environmental justice communities at the toll lanes' endpoints would shoulder a disproportionate share of project-induced congestion, and therefore bear a disproportionate share of project-induced pollution, *see* Pls. Br. 30-33.

**B.    The Agencies' general statements about existing burdens and possible harms do not constitute a hard look at the project's cumulative impacts to environmental justice communities**

NEPA requires a hard look at the "combined impact[s]" of the project's incremental harms and environmental justice communities' existing burdens. *Nat'l Audubon Soc'y*, 422 F.3d at 197. The Agencies obfuscate their failure to meet this requirement by emphasizing their

---

analysis predicted total air toxics emissions for the entire project rather than for specific locations along the project, *see* AR_014339-40. That analysis therefore sheds no light on whether the project would cause "disproportionately adverse effect[s] on minority and low-income populations" along its path. *Friends of Buckingham*, 947 F.3d at 87 (cleaned up).

analysis of the project's *incremental* impacts and by dressing up general assertions about existing burdens and possible risks as a "thorough investigation." *Id.*

The Agencies' mere tally of certain quantifiable impacts—such as "impacted properties," MDOT Br. 33—did not dispense with their obligation to take a hard look at the cumulative effects of the project's air pollution and other harms on environmental justice communities. That non-environmental justice communities would "bear the majority" of those tallied impacts, *see* FHWA Br. 15, 35; MDOT Br. 33, doesn't answer a key question posed by a cumulative effects analysis for environmental justice communities: how the project might harm these communities given their "historical patterns of exposure to environmental hazards."[16]

The Agencies' recognition of past harms, while important, is also insufficient under NEPA. *Contra* FHWA Br. 35; MDOT Br. 33. Using existing environmental burdens to merely decide which communities should be classified as environmental justice communities is not the same as meaningfully assessing the project's impacts on those communities in light of those burdens. *See* Pls. Br. 33-34, *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 96 (1983) (explaining that NEPA requires agencies to "consider and disclose the actual environmental effects"). And the acknowledgement of environmental justice communities' past sufferings, *see* MDOT Br. 31-32, rings hollow without a "candid acknowledgement" of how the project would exacerbate that suffering, *see Nat'l Audubon Soc'y*, 422 F.3d at 185.

Nor does the FEIS's appendix on cumulative effects show that the Agencies "specifically analyze[d] cumulative impacts to [environmental justice] communities." *Contra* FHWA Br. 36. Despite being "entitled 'cumulative effects,'" *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177

---

[16] Council on Envtl. Quality, *Environmental Justice: Guidance Under the National Environmental Policy Act* 9 (1997), https://tinyurl.com/49bfcp4z.

F.3d 800, 811 (9th Cir. 1999), the appendix contains no independent analysis. It simply refers to

the Agencies' inadequate environmental justice analysis elsewhere and concludes, without

support, that "effects to human health and safety, air quality" and other impacts "would be

distributed consistently throughout the study corridor," AR_021159-60; FHWA Br. 36. These

"broad and general statements devoid of specific, reasoned conclusions" do not constitute a hard

look. *Muckleshoot*, 117 F.3d at 811.

      The Agencies' general description of air pollutants' possible effects and their conclusory

statement that environmental justice populations "may experience air quality impacts more

acutely" are also inadequate. Pls. Br. 35-36; *supra* 10. The Agencies' briefs ignore a line of cases

explaining that NEPA requires a "more than perfunctory" analysis of cumulative effects that

goes beyond the generic disclosure of potential harms. *Klamath-Siskiyou Wildlands Ctr. v.*

*Bureau of Land Mgmt.*, 387 F.3d 989, 993-94 (9th Cir. 2004). These cases show that, in the

environmental justice context, a cumulative impacts analysis must examine *how* the project

would impact environmental justice communities, taking into account their heightened

susceptibilities to risk factors and higher exposure to pollutants. Pls. Br. 35-36; *see also*

*Klamath-Siskiyou*, 387 F.3d at 993 ("A proper consideration" of cumulative impacts requires

"some quantified or detailed information." (cleaned up)). While the Agencies were entitled to

choose a reasonable methodology to meet that requirement, *Diné Citizens*, 59 F.4th at 1043,[17]

---

[17] Plaintiffs do not "suggest that qualitative analysis" can never be sufficient under NEPA.
*Contra* FHWA Br. 36. Rather, the Agencies' failure is having no "detailed information"—
qualitative or quantitative—about the project's cumulative health impacts on environmental
justice communities, especially impacts concerning air pollution. *See* Pls. Br. 35-36; *Klamath-
Siskiyou*, 387 F.3d at 993. And given record evidence on the serious health impacts of air
pollution, *e.g.*, AR_136988-89, 136993-94; AR_177622-26, even assuming the Agencies lack
the tools to measure location-specific health outcomes for some pollutants, *contra* AR_136996-
97, 137002-03, they have failed to justify why "more definitive" information than their cursory
statements "could not be provided," *see Cuddy Mountain*, 137 F.3d at 1380.

they could not rely solely on "[g]eneral statements about 'possible' effects and 'some risk,'"

*Cuddy Mountain*, 137 F.3d at 1380. The Agencies here did that and nothing more. *See* FHWA

Br. 36 ("FHWA acknowledged that 'past, present, and future projects would likely have impacts

to potential EJ populations . . . .'").

    *Diné Citizens* confirms, rather than excuses, the insufficiency of the Agencies' analysis.

While that case upheld an agency's analysis of one pollutant's impacts to "sensitive groups," that

analysis consisted of more than a mere "admission of health impacts." *Contra* FHWA Br. 33.

There, the agency predicted the project's air emissions and then found that cumulative pollution

levels wouldn't pose significant health risks. *Diné Citizens*, 59 F.4th at 1045-46. In contrast, the

Agencies here failed to conduct a reasonable study that would allow them to reach an informed

conclusion about cumulative environmental justice impacts. Pls. Br. 34-35. In fact, their

approach is more like the greenhouse gas analysis that *Diné Citizens* rejected—both "[s]imply

state[]" the possibility of risks without "meaningfully inform[ing] the public" about the project's

impacts. 59 F.4th at 1043.[18]

    The Agencies' page counts and outreach efforts cannot make up for the critical gaps in

their analysis. *Contra* FHWA Br. 32; MDOT Br. 31. "[G]irth is not a measure of the analytical

soundness" of a NEPA analysis. *Anderson v. Evans*, 371 F.3d 475, 494 (9th Cir. 2004). Nor is

the amount of outreach conducted. Community engagement is an important aspect of achieving

---

[18] FHWA's reliance on *Ohio Valley Environmental Coalition v. U.S. Army Corps of Engineers*, 716 F.3d 119 (4th Cir. 2013), and *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283 (4th Cir. 1999), is also misplaced. FHWA Br. 36-37. While the agencies in those cases performed extensive technical analyses of the relevant impacts, the Agencies here did not "obtain [expert] opinions" about or give "careful scientific scrutiny" to how the project would exacerbate environmental justice communities' existing environmental and public health burdens. *Hughes River*, 165 F.3d at 288; *see Ohio Valley*, 716 F.3d 128-29.

environmental justice.[19] But outreach is only as good as the information disseminated. And providing affected communities with conclusory statements about the project's cumulative impacts gives short shrift to environmental justice as well as NEPA's goal to ensure public disclosure and informed decisionmaking. *N.C. Wildlife Fed'n*, 677 F.3d at 601-02.

\* \* \*

The Agencies failed to confront negative evidence about traffic-related air pollution and sought to replace the required hard look at the project's cumulative effects on the health of environmental justice communities with generic assertions. The Court should reject the Agencies' attempt to turn NEPA's project-specific approach into a generic box-checking exercise.

## IV.    The Agencies did not provide a reasonable explanation of their traffic modeling

Comments from Sierra Club's traffic modeling expert Norman Marshall laid out a fundamental problem with the Agencies' traffic projections: they were premised on impossibly high estimates of traffic volumes. Pls. Br. 37-38. MDOT's modeling predicted future traffic volumes far above many roads' "capacity," AR_158590, 158593-95, i.e., the number of cars that can fit on a road, FHWA Br. 39 n.10. That sharp break between the model and reality infected MDOT's forecasts, leading it to overestimate congestion relief from adding toll lanes.

NEPA required the Agencies to disclose the "relevant shortcomings" of their modeling so that the public could meaningfully evaluate the Agencies' claims. *N.C. Wildlife Fed'n*, 677 F.3d at 603 (cleaned up). In three key ways, the Agencies failed to explain their model, warts and all. Their lack of transparency violated NEPA.

---

[19] *See Environmental Justice: Guidance Under the National Environmental Policy Act*, *supra* note 16, at 13.

**A.      The Agencies did not seriously consider and respond to Marshall's comments**

Marshall offered detailed comments based on expert analysis of MDOT's modeling data, technical literature, and his thirty-plus years of experience. *See, e.g.*, AR_158583-625. Rather than providing a considered response as NEPA required, the Agencies mischaracterized, demeaned, and ignored Marshall's "responsible opposing view." 40 C.F.R. §§ 1502.9(b), 1503.4; 23 C.F.R. § 771.125(a)(1). They claimed Marshall called for them to assume "zero growth" in traffic congestion, AR_023037, an absurd position that Marshall never espoused. They charged that his analysis was "not based in fact," without addressing the litany of evidence he offered documenting how MDOT had overestimated traffic volumes. AR_000171. Their "response" to his maps, graphs, and number crunching was a bare citation back to the same sections of the DEIS and FEIS he was criticizing. AR_023038. The Agencies did make "minor" corrections to some of the errors Marshall flagged, *id.*; FHWA Br. 39, but they did not address or even acknowledge the fundamental flaws that gave rise to those errors.

The Volpe Center, despite never reviewing Marshall's comments, bolstered his argument by describing "limitation[s]" of MDOT's "traffic simulation modeling" (VISSIM). AR_000138; Pls. Br. 38. VISSIM cannot account for drivers rerouting onto local roads to avoid congestion on I-270 or the Beltway. *Contra* MDOT Br. 20. VISSIM doesn't even include local roads in its network. AR_000320. The Volpe Center described microsimulation models' general inability to account for "rerouting of trip flows," before discussing "extremely high localized delays" in MDOT's modeling caused by this limitation. AR_000138. MDOT chose not to employ more accurate methods. AR_000138-39. It now implies that it used "expert interpretation" to address its model's shortcomings. MDOT Br. 20. If it did, the record contains no evidence of that effort.

In sum, the Agencies failed "to address or refute the concern presented" by Sierra Club's traffic modeling comments. *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157,

20

1167-68 (9th Cir. 2003); *Hughes River*, 81 F.3d at 445 (rejecting agency's reliance on its own experts' opinion where "the record provide[d] no basis for determining whether the opinions" of those experts "were reasonable," and the agency did "not address the [conflicting] expert evidence furnished" to it).

### B. Manually reducing forecasted traffic on some overcapacity roads but not others was inconsistent with the Agencies' dismissal of Marshall's comments

Between the SDEIS and FEIS, MDOT adjusted certain model outputs by hand. AR_000173. The Agencies didn't adequately explain these changes. Pls. Br. 39-40. Asked to review the changes, the Volpe Center concluded that it lacked the information necessary to "assess their plausibility or validity." AR_000139. The Agencies never responded. Their briefs don't even acknowledge the statement.

Instead, the Agencies trumpet the Volpe Center's conclusion (or, more precisely, FHWA's gloss on the Volpe Center report) that it "did not find scientific integrity fraud." AR_000137; FHWA Br. 38; MDOT Br. 21. Not only is this faint praise, it is also inapposite. Agencies don't satisfy NEPA's public disclosure mandate simply by not fraudulently manipulating data.

Moreover, Marshall did not allege scientific fraud. He argued that MDOT's modeling systemically overestimated future traffic volumes. MDOT counters that its "trend-check spreadsheets" detected only one instance where estimated traffic volumes anomalously exceeded those predicted by the MWCOG model. MDOT Br. 22; AR_000132. Again, MDOT misses the point. MDOT's analysis assumed the validity of the MWCOG model's volume predictions. Marshall's comments questioned that assumption, and the Agencies never answered that question. Their silence became even more unjustifiable when MDOT manually adjusted

forecasted traffic volumes on the overcapacity Greenbelt Metro ramps, but left untouched the other overcapacity road segments gumming up its modeling. Pls. Br. 40.

**C.    The Agencies unlawfully withheld data underlying their conclusions about traffic**

As FHWA acknowledges, "NEPA requires that the public receive underlying environmental data from which the agency's expert derives their opinion about the impacts of the proposed project." FHWA Br. 42 (cleaned up); *accord* 40 C.F.R. § 1502.21. But the data underlying the Agencies' modeling include more than the Agencies' description of the model and its "ultimate quantitative findings." FHWA Br. 42. The computer files requested by Sierra Club and withheld by the Agencies contained the model's raw inputs and outputs, and constituted the foundation for the Agencies' traffic projections.

Sierra Club asked the Agencies for these modeling files (excluding proprietary models), because information necessary to understand key aspects of the Agencies' traffic predictions was not publicly available, in any format. AR_175918-20; AR_178649-64, 178669-70. *Contra* FHWA Br. 43; MDOT Br. 22-23. Sierra Club requested these files in part so Marshall could evaluate MDOT's choice of modeling parameters, which could alter traffic volumes ("throughput") by as much as 30 percent. AR_178651-54; FHWA Br. 39 n.10. The Agencies might have satisfied their NEPA obligations on this matter by releasing the computer files or otherwise revealing their choice of parameters. They did neither.

MDOT's willingness to release the computer files after review, redaction, and receipt of $21,796 did not cure the Agencies' NEPA violation. AR_189588-89. NEPA required the Agencies to make underlying data available to the public, not lock it behind a paywall or a time-consuming appeals process. And even had Sierra Club paid up, it still wouldn't have gotten the data in time to comment on the FEIS. *See* AR_000051; AR_175918; AR_189586.

* * *

The aggregate effect of refusing to respond to Marshall's comments, to adequately explain changes to the model, and to release modeling files was to deny the public information necessary to evaluate and timely comment upon the Agencies' claims about the project's benefits. *See N.C. Wildlife Fed'n*, 677 F.3d at 603. The Agencies thereby violated NEPA.

## V.    The Agencies failed to take the required hard look at impacts from belated changes to the George Washington Memorial Parkway interchange design

### A.    NVCA has standing

The Agencies do not dispute that NVCA's members and the Live Oak Drive Community are harmed by the changed design to the George Washington Memorial Parkway interchange. The Agencies instead argue that NVCA lacks standing to bring their claim "because their alleged injuries . . . are not fairly traceable to the Maryland managed lanes project" since NVCA's "alleged injuries are tied directly to" the Virginia Department of Transportation (VDOT)'s 495 NEXT project. MDOT Br. 36; FHWA Br. 21. In contrast to FHWA, which acknowledges that Ramp #4 *is* part of the toll lanes project, *id.* at 23, MDOT falsely alleges that the flyover ramps are "part of the Virginia 495 NEXT project, not the Maryland [toll] lanes project," MDOT Br. 36. FHWA also claims that NVCA's injuries are not "redressable" because the 495 NEXT project is "the genesis of NVCA's alleged harm." FHWA Br. 24. These defenses are without merit.

#### 1.    NVCA's injury is fairly traceable to the Agencies' failure to comply with their ongoing obligation under NEPA to take a hard look at the impacts of the belated interchange re-design

NVCA has established an injury that is fairly traceable to the toll lanes project's changes to the George Washington Memorial Parkway interchange. As stated in the Declaration of Debra Butler, the "additional changes belatedly proposed in the Maryland Toll Lanes Project,

particularly when considered cumulatively with the design modifications to the [George

Washington Memorial Parkway] interchange . . . in January 2022, will result in a significant

impact on the Live Oak Drive community, including impacts on my home, my health, and the

quality of my life." Butler Decl. ¶ 10, ECF No. 46-3. The Agencies' contrary arguments fail to

accept the facts alleged in Ms. Butler's sworn testimony as true, *see Lujan v. Defs. of Wildlife*,

504 U.S. 555, 561 (1992), and to draw all disputed factual inferences in favor of NVCA, *see*

*Beard v. Banks*, 548 U.S. 521, 529-30 (2006).

As FHWA acknowledges, one of the flyover ramps impacting NVCA—Ramp #4— is

part of the Maryland toll lanes project. FHWA Br. 23 (citing AR_178599). In fact, the record

shows that MDOT has responsibility for significant portions of the project in Virginia beyond

Ramp #4, including sound walls, construction of multiple new "flyover" ramps, and a bridge

reconstruction. AR_005098-99 (distinguishing, for instance, "Aerial Structure" and "Aerial

Structure VDOT 495 Next"). The maps included in the FEIS depict the work being done by

MDOT versus VDOT and indicate that MDOT's work is far more extensive than the Agencies'

narrative description of MDOT's work as being merely "Ramp #4." AR_005099 (June 17,

2022); *see also* AR_177868.

Thus, it is apparent that, while VDOT has started clearing the area as part of the 495

NEXT project to prepare for the connection with the toll lanes project, MDOT is planning

significant construction in Virginia well beyond a single ramp. The FEIS confirms that the toll

lanes project "would include adjustment of the existing ramps connecting George Washington

Memorial Parkway with I-495 inner and outer loops as well as new flyover ramps providing

direct access to the [toll] lanes from George Washington Memorial Parkway . . . [and] a new

exchange ramp . . . constructed from Maryland [toll] lanes to Virginia general purpose (GP) lanes." AR_005717.

As Ms. Butler further notes in her declaration, "both VDOT and MDOT have played a shell game, each disclaiming any significant impact from their portion of the project, while never considering the impact of these design changes in totality despite their undeniably profound impacts on the Live Oak Drive community." Butler Decl. ¶ 11. The shell game is highlighted by how closely one has to scrutinize maps, buried deep in the administrative record, to understand the full scope of MDOT's work on the interchange. The Agencies' efforts to employ this same shell game to evade any judicial review of NVCA's challenge should be rejected.

Even assuming the toll lanes project's work on the interchange is limited to Ramp #4, it is apparent from the map depicting the new flyover ramps that the addition of Ramp #4 will have significant detrimental impacts on the Live Oak Drive Community, and will contribute significantly to the overall cumulative impacts on the Live Oak Drive Community. Ramp #4 will be located within 200 feet of Live Oak Drive. AR_178599; AR_179974. Ramp #4 will bring more cars and, most notably, trucks, in close proximity to the Live Oak Drive Community since the purpose of Ramp #4 is to allow commercial trucks with more than two axles to exit from the Maryland toll lanes into Virginia's general purpose lanes, since such commercial trucks are prohibited in Virginia's toll lanes. *See* AR_167482. Diesel truck emissions are especially dangerous to human health.[20]

The portions of the interchange MDOT will construct as part of the toll lanes project also contributed to the loss of trees, *see* AR_163494, and the construction of noise barriers much

---

[20] *See* EPA, *Learn About the Impacts of Diesel Exhaust*, https://tinyurl.com/2tr6bdd4 ("Exposure to diesel exhaust can lead to serious health conditions like asthma and respiratory illnesses and can worsen existing heart and lung disease, especially in children and the elderly.").

closer to Live Oak Drive, *see* AR_163493. Indeed, the FEIS acknowledges visual impacts associated with the "new flyover ramps providing direct access to the HOT managed lanes." AR_005717. The toll lanes project now requires the construction of a single massive stormwater management pit, *see* AR_163484, that has exacerbated run off under Live Oak Drive and into local streams creating erosion and increasing the load on septic systems of the Live Oak Drive Community, Butler Decl. ¶ 6. Accordingly, FHWA is wrong in asserting, without any support, that the interchange modifications do not cause "NVCA's alleged injuries." FHWA Br. 23

**2. NVCA's injuries are redressable by a court order vacating the FEIS and ROD until a supplemental environmental review is prepared**

The Agencies also argue that the injury to NVCA members from the toll lanes project is not redressable by this Court because "even without the Managed Lanes Project, the 495-NEXT Project would still move forward (and currently is moving forward)." FHWA Br. 23. But that is not the standard for redressability. The harms to NVCA's members are redressable because a court order halting the toll lanes project could also lead to the incorporation of measures to minimize and mitigate those harms, notwithstanding the partial completion of the 495 NEXT project. *See Lujan*, 504 U.S. at 572 n.7. The potential availability of even partial mitigation or relief satisfies the redressability prong of standing. *See Friends of Cap. Crescent Trail v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 3d 804, 815 (D. Md. 2020) (finding redressability even though a court order vacating a wetlands permit for the Purple Line transit project "could only lead to the restoration of a small amount of wetlands and linear streams and would not lead to the restoration of the Trail," because it would redress the injury identified relating to "the waters affected by the Purple Line project"); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) ("[T]he ability 'to effectuate a partial remedy' satisfies the redressability requirement." (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)).

26

A true NEPA process that fully discloses impacts and evaluates mitigation measures would have resulted in the consideration of more efficient and cost-effective ways to address the project needs without exposing the Live Oak Drive community to devastating impacts, such as, for example, "moving (at least) one of the flyover lanes to the opposite side of I-495, where it was originally designed to be located, to mitigate storm water impacts." Butler Decl. ¶ 15; *see* AR_189314. NVCA's injuries would also be partially redressed by the adoption of measures to address erosion resulting from the extreme loss of trees, replacement greenscaping, and improved stormwater management design. Butler Decl. ¶¶ 6, 13. All of these mitigation measures would be within the Agencies' power after vacatur of the toll lanes project. NVCA's injuries are therefore redressable.

A supplemental environmental evaluation that fully discloses the individual and cumulative impacts on the Live Oak Drive Community will also allow the public to understand those impacts and propose and develop measures to minimize and mitigate the identified environmental impacts. This procedural remedy, because it is tied to a concrete injury to NVCA's members (see above), would redress this injury. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("[Plaintiff's] interests in viewing the flora and fauna of the area would be harmed if the Burnt Ridge Project went forward without incorporation of the ideas he would have suggested if the Forest Service had provided him an opportunity to comment."); *see also S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 330 (4th Cir. 2008) ("The party seeking an injunction need not show that injunction of the state defendant would lead directly to redress of the asserted injury, but only that relief will preserve the federal procedural remedy.").

The FHWA also asserts, without any support, that "[s]upplemental NEPA analysis of cumulative impacts from the 495-NEXT Project neither would redress NVCA's alleged harm,

nor is that even available to begin with," because "FHWA considered the Managed Lanes Project's cumulative impacts, combined with past, present, and reasonably-foreseeable future actions." FHWA Br. 23 (footnote omitted). However, this argument improperly confuses the threshold question of standing with the merits of NVCA's cumulative effects claim. Standing "in no way depends on the merits of the claim." *ASARCO, Inc. v Kadish,* 490 U.S. 605, 624 (1989) (cleaned up); *accord Pitt Cnty. v. Hotels.com, L.P.*, 553 F.3d 308, 312 (4th Cir. 2009). When NVCA's evidence is accepted, NVCA has shown concrete injury that is redressable by the Court.[21]

### B.    The Agencies cannot point to anywhere in the record where they evaluated the impacts of the radical and belated interchange re-design

Apart from their vigorous efforts to challenge NVCA's standing, the Agencies give scant attention to the merits of NVCA's claims. Indeed, FHWA's brief makes no merits argument outside its standing defense. The Agencies have failed to justify the lawfulness of their failure to take the hard look NEPA required at the impacts of the radically re-designed interchange.

#### 1.    The Agencies' post hoc rationalization that the ramp will not result in any direct or cumulative impacts on the Live Oak Drive Community has no support in the record

There is no question that the construction of the toll lanes project in Virginia will have direct and cumulative impacts on Live Oak Drive. *Supra* 24-26. The initial proposed interchange design, including what was presented in the SDEIS, would not have had such significant impacts on the Live Oak Drive Community. Pls. Br. 10; *see also* Butler Decl. ¶ 6; AR_156196-97. The belated addition of multiple flyover ramps now results in significantly more impacts, including

---

[21] The decision cited by FHWA, *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.,* 673 F.3d 518 (7th Cir. 2012), doesn't address standing. NVCA therefore addresses this case in the discussion of the merits. *Infra* 30.

the deforestation of the treed buffer between the Beltway and Live Oak Drive, and will expose the Live Oak Drive Community to increased noise, air, visual, and light pollution. Butler Decl. ¶ 6; AR_179974, 179978-80 (cross-sections depicting elevation of ramps in relation to homes on Live Oak Drive). The Agencies point to no place in the record where they assessed the full range of the cumulative environmental impacts of the toll lanes project work in Virginia. FHWA's assertion in its brief that the belated addition of Ramp #4 as part of the toll lanes project will have no incremental or cumulative impacts on the Live Oak Drive Community is therefore a post hoc rationalization that cannot support the Agencies' decision. *See N.C. Wildlife Fed'n*, 677 F.3d at 604.

> ### 2. The Agencies' mere inclusion of MDOT's interchange work within the project's "Limits of Disturbance" does not provide the required hard look under NEPA

MDOT argues that the FEIS considered the impacts of the toll lanes project's portion of the interchange modifications because the modifications would be constructed within the "limits of disturbance" delineated for the project, and the FEIS "calculated the project's environmental impacts within those limits of disturbance." MDOT Br. 37. In support of that claim, MDOT cites a map that depicts certain existing resources within the Limits of Disturbance. AR_005099. But a map of existing conditions is not an analysis of the project's impacts. To the contrary, internal communications in October 2021—well before the radical five-ramp loop and multiple-flyover re-design of the interchange was proposed—show that Live Oak Drive was included in the toll lanes project's Limits of Disturbance even though the interchange design at that time contemplated "no surface disturbance or construction on Live Oak." AR_156196. MDOT points to nothing in either the FEIS or other NEPA documents that actually evaluated the specific impacts of the interchange modifications.

The Agencies provide no case law supporting their position that they need not evaluate the specific impacts of any change to the project so long as it is within the designated "Limits of Disturbance." Nor do they make any attempt to distinguish or respond to the contrary case law cited by NVCA. *See N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 707 (10th Cir. 2009) ("We would not say that analyzing the likely impacts of building a dirt road along the edge of an ecosystem excuses an agency from analyzing the impacts of building a four-lane highway straight down the middle, simply because the type of impact—habitat disturbance—is the same under either scenario."). In short, MDOT's argument that within the designated Limits of Disturbance, anything goes, is not the law.

### 3. The Agencies failed to take a hard look at the cumulative impacts of the interchange modifications from both the 495 NEXT and the toll lanes projects

MDOT makes no response to NVCA's challenge to the Agencies' failure to consider the cumulative impacts from both VDOT and MDOT's belated changes to the interchange design. FHWA, as part of its standing argument, cites *Habitat Education Center* for the proposition that a final EIS need not consider the cumulative impacts of a project that was proposed after a draft EIS was issued. FHWA Br. 25. However, the Seventh Circuit in that case also made clear that "this does not mean that the agency is free to ignore any new information that comes to light in the interval between the draft and final EIS. Instead, the agency must take a hard look at the new information and determine if supplementation is necessary." *Habitat Educ. Ctr.,* 673 F.3d at 528.

In this case, unlike *Habitat Education Center,* there is no evidence that the Agencies took a hard look at the cumulative impacts of the belated modifications to the 495 NEXT project, which were disclosed just prior to the SDEIS for the toll lanes project being issued, and the additional changes added by the toll lanes project. Rather, the Agencies simply continue to play a shell game to try to evade any obligation to evaluate cumulative impacts of both projects based

30

on their conclusory assertion, without any supporting NEPA evaluation, that none of the belated interchange modifications had significant individual impacts that required supplementation and therefore must not require any cumulative supplementation. But even individually insignificant impacts—which these are not—can cause cumulatively significant harms. *See NRDC v. Hodel*, 865 F.2d 288, 297-98 (D.C. Cir. 1988). NEPA does not permit the Agencies' approach.

### 4. The radical interchange re-design was not publicly revealed until after the SDEIS comment period for the toll lanes project had expired

Finally, MDOT asserts that NVCA was not blindsided by the belated interchange modifications because "MDOT and [VDOT] kept Virginians informed through regular meetings from the earliest days of the project." MDOT Br. 38. However, the record does not support, and indeed contradicts, this assertion.[22] Internal MDOT and VDOT communications in October 2021—when the SDEIS was out for public comment, *see* AR_027632—show that the interchange design at that time contemplated "no surface disturbance or construction along Live Oak." AR_156196. In any event, NEPA requires more than public disclosure of designs at a meeting. It requires written disclosure of impacts, subject to public notice and comment, in a NEPA document. *See N.C. Wildlife Fed'n*, 677 F.3d at 604-05.

---

[22] MDOT points to a table in the FEIS listing various "stakeholder" meetings in Virginia in 2020 and 2021. MDOT Br. 38 (citing AR_21204, 21206, 21218). However, this table merely indicates that discussions about the interchange were held in 2020 and 2021 and February 2022. Nothing in the list of meetings on this table states the topic of those meetings, let alone suggests that the radical five-ramp loop and multiple-flyover ramp interchange design now contemplated was disclosed at those early meetings. Likewise, the interchange depiction referenced by MDOT, *see id.* (citing AR_155115), which was included in a VDOT presentation to the Fairfax County Board of Supervisors on September 28, 2021, is a low-resolution schematic of the interchange that appears to show only four of the five ramps in the loop by Live Oak Drive and does not depict the multiple additional elevated "flyover" ramps. *Compare* AR_155115, *with* AR_005099. A clearer representation of this map is available at AR_189314.

31

Accordingly, MDOT provides no evidence to contradict NVCA's assertion that it was not until June 6, 2022, that the radical re-design of the interchange, including MDOT's role in building Ramp #4, was made public. At that point, the NEPA review for the 495 NEXT project was long completed, and the comment period for the toll lanes project SDEIS, issued in October 2021, had long closed, thus depriving NVCA of any meaningful opportunity to comment on this radical change and its profound impacts on the Live Oak Drive Community.

## VI.    The Agencies' inadequate investigation of the Morningstar Moses Cemetery violated Section 4(f) and Section 106

The Agencies do not know whether the toll lanes project would "avoid all impacts" to the Morningstar Moses Cemetery. *Contra* MDOT Br. 10; FHWA Br. 41. Nor have they "determine[d] the historic boundary" of the Cemetery. FHWA Br. 45; *see* MDOT Br. 41. And they do not yet know whether construction would disinter or otherwise disturb human remains because they approved the project without completing their search of the portion of the project's Limits of Disturbance that might contain burials, opting instead to defer the necessary investigations. AR_000399; AR_014298-99. Rather than confront the consequences of their unfinished search, the Agencies' briefs pretend the matter is settled and proclaim their success in sparing the Cemetery from the Beltway's expansion. But the Agencies' self-imposed ignorance regarding the project's true effects on an historic cemetery violates Section 4(f) and Section 106.

### A.    The Agencies violated Section 4(f) by concluding that the toll lanes project would not use the Cemetery

The Agencies do not dispute that FHWA regulations required them to include in the FEIS or ROD their final decision as to whether the project would "use" the historic Cemetery under Section 4(f). 23 C.F.R. § 774.9(b); Pls. Br. 48-49. The Section 4(f) evaluation in the FEIS, however, admits that the Agencies' assessment of project impacts to the Cemetery is still ongoing. AR_005686-87; *see also* ECF No. 28 ¶ 114. Nevertheless, FHWA now insists that it

has not unlawfully deferred its Section 4(f) use determination, but rather finalized it, concluding that the project would not use the Morningstar Moses Cemetery. FHWA Br. 44.

That conclusion is irrational. The Agencies admit that project construction might disturb burials in the Cemetery. AR_000399; AR_014298. And they do not dispute that disinterring or otherwise disturbing people buried in the Cemetery to widen the highway would be a "use" of the Cemetery. *See* 23 C.F.R. § 774.17; Pls. Br. 49. The Agencies, therefore, could not reasonably conclude, once and for all, that the project would not use the Cemetery.[23] Yet, according to FHWA, that is exactly what they did. This arbitrary use determination violates Section 4(f). *See Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1455 (9th Cir. 1984).

The Agencies argue that Section 106 somehow authorized them to make their deliberately uninformed use determination under Section 4(f). FHWA Br. 44-45; MDOT Br. 41-42. But they point to no language in Section 106 nor any provision of its implementing regulations that purports to modify the "substantive restraints" that Section 4(f) imposed upon the Agencies. *See Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 398 (4th Cir. 2014). None exists. *See* Pls. Br. 50-52. Disturbing burials within the historic Cemetery would constitute both an "adverse effect" under Section 106 and a "use" under Section 4(f). *See* 36 C.F.R. § 800.5(a)(1)-(2); 23 C.F.R. § 774.17. Consequently, the Agencies' concession that they cannot yet determine whether the project would adversely affect the Cemetery under Section 106

---

[23] The Agencies claim they have avoided land within the Cemetery's "current historic boundary," FHWA Br. 47; AR_005687, an oxymoronic phrase that implicitly concedes the Agencies have yet to establish the *actual* historic boundary. Semantic contortions aside, if there are people buried within the Limits of Disturbance, then the Cemetery extends into the Limits of Disturbance. The Cemetery's National Register boundary would need to be expanded to include the area in which the newly discovered burials were found. *See* AR_006008. Permanent incorporation of any part of this area into the project (or any temporary occupation inconsistent with the preservation purpose of Section 4(f)) would "use" the Cemetery. *See* 23 C.F.R. § 774.17.

demonstrates that they could not reasonably conclude that the project would not use the Cemetery under Section 4(f).

The Agencies did not take the "same Section 4(f) and Section 106 approach" as in *HonoluluTraffic.com v. Federal Transit Administration*. FHWA Br. 44; *see* Pls. Br. 52 n.38. When the agencies issued the ROD in that case, they had no practicable way to determine whether the project would disturb burials: its 20-mile route remained uncertain, and they lacked non-invasive methods to search for burials. 742 F.3d 1222, 1234 (9th Cir. 2014). Here, by contrast, the Agencies have demarcated the project's precise Limits of Disturbance and have already identified the unevaluated portion of the Limits of Disturbance as possibly containing burials. AR_198511 (fig. 2.3); AR_014298. The unevaluated patch of land that might contain burials is measured in feet, not miles. AR_198511 (fig. 2.3). And the Agencies have found that non-invasive ground penetrating radar is an effective way to identify burials within the Cemetery. AR_027746. Therefore, unlike *HonoluluTraffic.com*, there was no "good reason for Defendants' reluctance to conduct the survey[]" and confirm whether the toll lanes project would harm the Cemetery. 742 F.3d at 1234.[24]

MDOT is wrong that further investigation would risk disturbing burials. MDOT Br. 42. Before issuing the ROD, the Agencies agreed that the next step to search for burials in the Cemetery was to perform a non-invasive ground penetrating radar survey of the unevaluated

---

[24] *City of Alexandria v. Slater*, 198 F.3d 862 (D.C. Cir. 1999), is distinguishable for similar reasons. There, the agencies deferred their identification of historic sites that would be harmed by the project's construction staging yards because the agencies had not yet decided the location of these "ancillary activities," and "substantial engineering work" would have been required to do so. *Id.* at 871-73.

portion of the Limits of Disturbance.[25] AR_198506; AR_014222-23, 14238. Technically, that ground penetrating radar survey cannot locate burials conclusively; only excavation can provide certainty. AR_014237; FHWA Br. 46. But ground penetrating radar has already identified "probable burials" in portions of the Cemetery previously within the Limits of Disturbance. AR_014229. These "probable burials" are so likely to be actual burials that the Agencies have treated them as such, redesigning the project to avoid them. AR_027746.[26] Thus, the Agencies had a proven, non-invasive method that they could have used to search the Limits of Disturbance for the probable location of additional human remains.

Putting off this necessary investigation until after the ROD did not safeguard the Cemetery. Quite the opposite. Now that the project is already greenlit and design is significantly advanced, the Agencies' options for avoiding or minimizing harm to any burials discovered within the Limits of Disturbance will be severely limited. *See* 23 C.F.R. § 774.9(a) ("The potential use of land from a Section 4(f) property shall be evaluated as early as practicable in the development of the action when alternatives to the proposed action are under study."). The Agencies' unnecessary delay in searching for burials denied this historic site the substantive protections afforded by Section 4(f). *See* 49 U.S.C. § 303(c).

---

[25] The Agencies performed that ground penetrating radar survey about four months ago. Pls. Br. 16. MDOT recently informed Friends of Moses Hall that the agency will share the survey's results on the day after Plaintiffs file this brief.

[26] The archaeologist who surveyed the Cemetery defined "probable burials" as rectangular subsurface anomalies, oriented east-west, and arranged in orderly rows. AR_014227. This classification reflects the archaeologist's highest level of confidence that these are actual burials, short of verification through intrusive means. *Id.*

**B.    The record does not support the Agencies' refusal to search the remainder of the Limits of Disturbance for burials before issuing the ROD**

The Agencies hypothesize that a dirt access road destroyed by the Beltway's construction marked the northern border of the Cemetery. Because the project's Limits of Disturbance near the Cemetery roughly track the access road as it appeared in an aerial photograph from 1957, the Agencies surmise that the project would avoid the Cemetery. FHWA Br. 45-46; MDOT Br. 40. Three problems dog their speculation.

First, the Maryland Historical Trust refused to abide it. When MDOT claimed that the project would steer clear of the Cemetery, AR_006007-08, 6021, the Maryland Historical Trust countered that the potential for burials in the unevaluated portion of the Limits of Disturbance precluded a finding that the project would have no adverse effects on the Cemetery. AR_161430. The Agencies were forced to admit that they could not yet determine whether the project would disturb human remains. AR_006040.

Second, the location of a dirt access road in 1957 is not a reliable indicator of the boundaries of a "vernacular African American cemetery" established at least two generations earlier.[27] *See* AR_013987. The Cemetery was not fenced in; the graves were dispersed "among woods and underbrush." AR_013961. Many were marked with "uninscribed fieldstone" or wood, AR_013975-76, which could be overlooked, displaced, or degraded over the decades. Perhaps the people who built this access road, like the people who built the Beltway through Gibson Grove in the 1960s, were not aware of the exact location of burials in the Morningstar Moses Cemetery. *See* AR_153089 ("Early, unmarked graves from the late 19th century may not have been visible, marked, or remembered by the 1960s."). Archaeological investigations suggest that

---

[27] The earliest verified burial in the Cemetery dates to 1894. AR_013954. Given the large number of burials in the Cemetery that are unmarked and not yet dated, the Cemetery might be even older. AR_173463.

the Cemetery's oldest burials are closest to the road. AR_014229-30. The only way to determine whether the road bounded the Cemetery would be to look beyond it. But the Agencies, despite finding burials right up to the edge of the former road, looked no farther. *Compare* FHWA Br. 46, *with* AR_013998-99.

Third, the State has been wrong about the Cemetery's boundaries many times before. The State Roads Commission in 1961 claimed that the Cemetery was "far away from" the Beltway's proposed right-of-way, even as it took land containing more than a dozen burials. AR_013961; AR_014229. During the course of reviewing the toll lanes project, MDOT twice opined— incorrectly—that there were unlikely to be burials within the right-of-way. Pls. Br. 14. The Agencies are simply wagering that this time they got it right. But their speculation does not amount to the reasoned conclusion required by Section 4(f) and Section 106. *See Tanners' Council of Am.*, 540 F.2d at 1193 (refusing to defer to agency conclusions that were "the product of guesswork").

The record also includes no rational explanation for the Agencies' decision to delay finishing their search of the Limits of Disturbance until after approving the project. At least a year before issuing the ROD, the Agencies learned that a section of right-of-way in the project's path might contain burials. AR_014216, 14228; AR_000057; *see also* AR_156115-16 (Friends of Moses Hall comments imploring MDOT to complete the investigation of the Cemetery); AR_006021 (MDOT's acknowledgment of the potential for burials within the Limits of Disturbance). They initially claimed this state-owned land wasn't "accessible," AR_014298—an implausible excuse they do not defend in their briefs. *See* Pls. Br. 50. They now contend that they postponed further investigation because it was unlikely to identify burials. FHWA Br. 46; MDOT Br. 42. But the Agencies admitted that the ground penetrating radar survey was

necessary before construction, AR_014296; AR_198506; their guess about whether the survey would find human remains was not a legitimate reason to delay it.

Consequently, the Agencies' explanation of their decision not to finish searching for burials before approving the project "runs counter to the evidence before" them, *Defs. of Wildlife*, 762 F.3d at 396 (cleaned up), and thereby violates Section 4(f) and Section 106.

### C. The Programmatic Agreement does not cure the Agencies' violations of Section 4(f) or Section 106

Plaintiffs have not challenged the Agencies' decision to choose a Programmatic Agreement to carry out their Section 106 responsibilities. But the regulations governing Programmatic Agreements do not grant them carte blanche to defer searching the Cemetery for burials or to avoid compliance with Section 4(f). *Contra* MDOT Br. 41-42.

The Agencies have deferred their assessment of the project's adverse effects on the Cemetery. Pls. Br. 51. The regulation that governs deferrals of assessments, 36 C.F.R. § 800.5(a)(3), does not include programmatic agreements as a basis for deferring Section 106 obligations. Instead, it provides that agencies may use a "phased process" for assessments "[w]here alternatives under consideration consist of corridors or large land areas, or where access to properties is restricted." 36 C.F.R. § 800.5(a)(3). Neither circumstance is present here. Pl. Br. 52. MDOT could access its own land to look for burials. Pls. Br. 50. And, according to the Advisory Council on Historic Preservation, the "corridors or large land areas" provision applies when agencies must assess effects along "major corridors" *before* making "specific route alignment decisions." 65 Fed. Reg. 77,698, 77,720 (Dec. 12, 2000). The Agencies, however, demarcated the Limits of Disturbance, including in the area near the Cemetery, long before issuing the ROD. *See* AR_032160.

The Agencies invoke 36 C.F.R. § 800.4(b)(2), a Section 106 regulation that allows agencies to "defer final identification and evaluation of historic properties if it is specifically provided for in . . . a programmatic agreement." FHWA Br. 47; MDOT Br. 41. But that regulation does not authorize the Agencies' deferral either. It states that, "[a]s specific aspects or locations of an alternative are refined or access is gained, the agency official shall proceed with the identification and evaluation of historic properties." 36 C.F.R. § 800.4(b)(2). At that point, "[a]ny further deferral of final identification would complicate the process and jeopardize an adequate assessment of effects and resolution of adverse effects." 65 Fed. Reg. at 77,719. Because the Agencies had "refined" their Preferred Alternative and had access to the unevaluated portion of the Limits of Disturbance long before issuing the ROD, this provision does not excuse the Agencies' deferral of their Section 106 obligations or their unsubstantiated Section 4(f) use determination. Indeed, because of Section 4(f)'s substantive prohibitions, deferring the practicable identification of historic properties renders the Agencies' decision inherently arbitrary under Section 4(f).

### D.    The Agencies arbitrarily ignored cumulative effects to the Cemetery

The Agencies violated Section 106 by arbitrarily concluding that the project would not have any cumulative effects on the Cemetery. Pls. Br. 52-55. Neither Agency responded to Plaintiffs' cumulative effects claim in their opposition brief.[28] They have thereby conceded the argument. *Stenlund v. Marriott Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016).

* * *

Section 4(f) and Section 106 barred the Agencies from approving the toll lanes project without determining the full extent of the historic Morningstar Moses Cemetery and whether the

---

[28] FHWA implies that the Agencies deferred their cumulative effects determination for the Cemetery. FHWA Br. 47. The record belies that assertion. AR_174970; AR_000182.

project would use or have an adverse effect upon the Cemetery. The Agencies claimed to have answered those questions when, in fact, they had only kicked the can down the road. Their misleading statements, unfinished investigation, and inexcusable delay violated the law and did a particular disservice to the descendants of those at rest in the Morningstar Moses Cemetery.

**VII.    The Agencies violated Section 4(f) by rejecting an alternative that would have avoided Plummers Island without weighing multiple regulatory factors in FHWA's least overall harm test**

The Agencies' post-hoc rationalization for rejecting the west shift alignment of the American Legion Bridge—the only option that would preserve the unique ecology and long-term scientific research on Plummers Island—is too little too late. The Agencies admit that the west shift alignment is a viable option. MDOT Br. 44. And they do not contest that they had to evaluate whether the west shift alignment would cause the "least overall harm," 23 C.F.R. § 774.3(c)(1), or that they failed to include that evaluation in the FEIS's least overall harm analysis. Pls. Br. 56. Instead, the Agencies attempt to defend their rejection of the west shift alignment based on a cursory, post-hoc analysis cobbled together from disparate parts of the record, none of which address least overall harm. FHWA Br. 48-51; MDOT Br. 43-44. But even that belated analysis skipped several of the seven factors in FHWA's regulatory balancing test. 23 C.F.R. § 774.3(c)(1); Pls. Br. 56-59. By violating FHWA's own "procedural requirements" and ignoring relevant factors, *see Defs. of Wildlife*, 762 F.3d at 401, the Agencies' dismissal of the west shift alignment violated Section 4(f), Pls. Br. 58-59.

The Agencies' briefs illustrate that they misunderstood the least overall harm test. They claim that their incomplete analysis of two factors *alone*—impacts to Section 4(f) resources (additional acreage of parkland, wetlands, and trees) and to non-Section 4(f) resources (an interchange realignment and residential displacement)—establishes that the west shift alignment would not cause the least overall harm. MDOT Br. 43-44; FHWA Br. 49. But FHWA's

regulations impose a *seven*-factor test, 23 C.F.R. § 774.3(c)(1), "a comprehensive inquiry that balances the net harm to Section 4(f) properties caused by each alternative with all other relevant concerns," 73 Fed. Reg. 13,368, 13,372 (Mar. 12, 2008).

The Agencies' confusion about the legal standard[29] and even some of the basic facts[30] demonstrates the pitfalls of foregoing the documentation of the least overall harm analysis mandated by FHWA regulations. Section 4(f) itself does not require formal findings. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 417 (1971); FHWA Br. 48. But FHWA's regulations, which post-date *Overton Park*, do. *See* 23 C.F.R. § 774.7(c). The Agencies' failure to document their weighing of the least overall harm factors—or even mention the west shift alignment in their least overall harm analysis—violates FHWA's regulations. *See Defs. of Wildlife*, 762 F.3d at 401 (explaining that an agency must "follow[] all procedural requirements" (citing *Overton Park*, 401 U.S. at 417)); *Nat'l Envtl. Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("It is axiomatic . . . that an agency is bound by its own regulations," and "an agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations." (cleaned up)). And cutting

---

[29] MDOT further muddies the water by asserting that the Agencies concluded the west shift alignment was not a "feasible and prudent alternative." MDOT Br. 44-45. Yet that supposed finding appears nowhere in the record. And it would have required application of a set of regulatory factors separate from the least overall harm factors. *See* 23 C.F.R. § 774.17 (defining "feasible" and "not prudent"). MDOT, however, makes no attempt to argue that the west shift alignment—a concededly "constructab[le]" and therefore "feasible" alternative— presents the kinds of "[s]evere" impacts or "extraordinary" costs necessary to render it "not prudent." MDOT Br. 44; 23 C.F.R. § 774.17.

[30] MDOT is wrong that only part of Plummers Island is National Register-eligible. *See* AR_177566, 177569-71 (evaluating entirety of Plummers Island for National Register listing); *contra* MDOT Br. 42. MDOT also mistakenly claims that the west shift alignment would take "homes." MDOT Br. 44. Only one residence would be taken. *See* AR_017691, 17693. And the "minimally offset" west shift alignment at issue here would *not* affect the Naval Surface Warfare Center Carderock Division property. *See* AR_017690-91; *contra* MDOT Br. 44.

procedural corners contributed to their substantive error of not evaluating each regulatory factor to ensure that the chosen alternative causes the least overall harm.

Most strikingly, the Agencies did not weigh the "relative significance" of Plummers Island against that of the Section 4(f) property that would be used by the west shift alignment. 23 C.F.R. § 774.3(c)(1)(iii); *see* Pls. Br. 57. It is not enough that the FEIS recognized Plummers Island's significance as a general matter. *Contra* FHWA Br. 50. Rather, the Agencies must compare the scientific, historical, and ecological significance of Plummers Island—"the most scientifically studied island in North America"—with the relative importance of the parkland that would be impacted by the west shift alignment. Pls. Br. 57. But all the Agencies say about that other parkland—a significant portion of which appears to be median strips and paved road—is that it contains trees and wetlands. FHWA Br. 49; AR_017692; AR_017694 (depicting the "LOD Impact – West Shift" as including five parcels adjacent to, and in some cases covering, the Clara Barton Parkway, MacArthur Boulevard, and Beltway ramps). What of its ecological, historical, or recreational significance, if any? On those key factors, the record is silent. With nothing specific to point to, MDOT throws up its hands, claiming "the entire C&O Canal Park" is important. MDOT Br. 44. But this factor is about *relative* significance. As FHWA has recognized, some Section 4(f) properties "are worthy of a greater degree of protection than others." 77 Fed. Reg. 42,802, 42,809 (July 20, 2012); Pls. Br. 57. MDOT's argument is a tacit admission that it never determined which parkland here has greater significance —a critical failing, particularly given the unique importance of Plummers Island.

Next, the Agencies fail to rebut Plaintiffs' argument that the Agencies did not address "whether the west shift alignment's impacts to Section 4(f) and non-Section 4(f) property could be mitigated." Pls. Br. 58; *see* 23 C.F.R. § 774.3(c)(1)(i), (vi). The Agencies explored mitigation

for the on-center alignment, MDOT Br. 44 n.17, but they evidently did not search for similar mitigation for the west shift alignment. Pls. Br. 58. The result was an apples-to-oranges comparison: the Agencies pitted the impacts of a mitigated on-center alignment against those of an unmitigated west shift alignment.

That lopsided analysis exacerbates the Agencies' failure to consider the "relative severity of the remaining harm, *after mitigation*, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection." 23 C.F.R. § 774.3(c)(1)(ii) (emphasis added); *see* Pls. Br. 57-58. The Agencies try to dismiss the harms to Plummers Island as insignificant, MDOT Br. 43; FHWA Br. 49, but the on-center alignment would threaten the "sensitive" ecology of Plummers Island, AR_000369 n.5, which has "evolve[d] naturally and organically for over a century." AR_0177565. Heavy machinery, tree cutting, and construction would damage the Island's protected features, including rare plants, long-term research plots, and its natural landscape. AR_000403, 466, 468, 551; AR_0022926; AR_0177564-65 (noting "long-term scientific studies" contribute to Plummers Island's National Register eligibility and that the Island's natural landscape is a character-defining feature); Pls. Br. 57-58. The expanded American Legion Bridge would also cast an extended shadow over rare, threatened, and endangered plants on Plummers Island, AR_000468; Pls. Br. 17,[31] and its piers could worsen flooding and erosion on the Island, Pls. Br. 17. By comparison, would the loss of a few acres from the thousands that comprise the extensive Chesapeake and Ohio Canal National Historical Park meaningfully impair the ecological, historical, or recreational value of the land or the protected attributes that qualify the park for protection?

---

[31] The Agencies seem to have ignored shading when calculating the acreage of impacts to Plummers Island, AR_017692-95, despite elsewhere acknowledging that the shading impacts would likely be permanent, AR_000468.

Rather than answer this question, MDOT reduces this factor to a numerical comparison of how much land the west shift alignment would impact compared to the on-center alignment. MDOT Br. 44-45. But this simplistic approach fails to grapple with how those impacts would harm "the protected activities, attributes, or features that qualify each Section 4(f) property for protection," 23 C.F.R. § 774.3(c)(1)(ii), and ignores the significance of Plummers Island, *id.* § 774.3(c)(1)(iii); *cf. HonoluluTraffic.com v. Fed. Transit Admin.*, No. 11-cv-0307, 2014 WL 692891, at *5 (D. Haw. Feb. 18, 2014) (agency could choose alternative that "would use a greater number of § 4(f) properties" because it would "physically affect only non-contributing elements of those properties and would not substantially impair the properties' settings"); *Audubon Naturalist Soc'y*, 524 F. Supp. 2d at 681-82 (agency could choose alternative that impacted more acreage of Section 4(f) property because it would avoid a "particularly sensitive" and "significan[t]" Section 4(f) property).

Finally, the Agencies could not have weighed any "[s]ubstantial differences in cost," 23 C.F.R. § 774.3(c)(1)(vii); *contra* FHWA Br. 50, because the Strike Team tasked with studying alternatives for the American Legion Bridge never even determined which alternative would cost more. The Strike Team found the west shift alignment would be cheaper to build than the on-center alignment, but it did not evaluate whether those savings would outweigh the expense of reconfiguring the Clara Barton Parkway interchange. AR_0198378. In contrast, the Agencies gave specific cost comparisons for other alternatives considered in their least overall harm analysis. Pls. Br. 58; *see, e.g.*, AR_038784 (alternative would have cost $27 million more).

In sum, the Agencies failed to adequately consider multiple regulatory factors before rejecting the west shift alignment, violating Section 4(f)'s "stringent requirements" to "carefully examine[]" options for avoiding harm to protected land. *Druid Hills Civic Ass'n v. FHWA*, 772

F.2d 700, 718-19 (11th Cir. 1985). Because the Agencies failed to "follow[] all procedural requirements" or consider the "relevant factors," *Defs. of Wildlife*, 762 F.3d at 401, the Agencies arbitrarily rejected an alternative that could have spared Plummers Island, and thereby violated Section 4(f).

## VIII.   The Court should vacate the Agencies' unlawful actions

As Plaintiffs explained in their opening brief, vacatur of unlawful agency actions is the default remedy under the APA, *see* 5 U.S.C. § 706(2)(A), and the Fourth Circuit doesn't hesitate to apply that remedy, Pls. Br. 59 (collecting cases). Plaintiffs thus urged the Court to vacate the unlawful ROD, FEIS, and Section 4(f) determination. *Id.*

The Agencies fail to justify a departure from the default remedy of vacatur. Indeed, the Agencies don't address remedy in their opening briefs at all. Nor do they explain why they've skipped over this important issue. It's not for lack of notice: briefing in this case hasn't been bifurcated, and Plaintiffs squarely raised the issue in their opening brief. And it's not for lack of space: the Agencies' briefs were well under the page limit. Given the Agencies' apparent calculated silence, the Court should find they have conceded the issue, *see A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 369 (4th Cir. 2008); *Stenlund*, 172 F. Supp. 3d at 887, and grant the default remedy of vacatur.

## CONCLUSION

The Court should grant summary judgment for Plaintiffs, deny summary judgment for the Agencies, and vacate the FEIS, Section 4(f) determination, and ROD for the toll lanes project.


Respectfully Submitted,

/s/ Peter J. DeMarco
Peter J. DeMarco (D. Md. Bar No. 19639)

Jared E. Knicley (D. Md. Bar No. 18607)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Telephone: (202) 513-6267
Facsimile: (415) 795-4799
Email: pdemarco@nrdc.org
Email: jknicley@nrdc.org

Atid Kimelman (CA Bar No. 344993)
(admitted *pro hac vice*)
Nanding Chen (CA Bar No. 348808)
(admitted *pro hac vice*)
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
Telephone: (202) 469-8230
Facsimile: (415) 795-4799
Email: akimelman@nrdc.org
Email: nchen@nrdc.org

*Counsel for Plaintiffs Maryland Sierra Club,
Friends of Moses Hall, National Trust for
Historic Preservation in the United States,
and Natural Resources Defense Council*

/s/Andrea Ferster
Andrea Ferster (DC Bar No. 384648)
(admitted *pro hac vice*)
Attorney at Law
68 Beebe Pond Road
Canaan, NY 12029
Telephone: (202) 974-5142
Email: aferster@railstotrails.org
(signed by Peter J. DeMarco with
permission from Andrea Ferster)

*Counsel for Plaintiffs Maryland Sierra Club and
Northern Virginia Citizens Association*

/s/ Elizabeth S. Merritt
Elizabeth S. Merritt (DC Bar No. 337261)
(admitted *pro hac vice*)
Deputy General Counsel
National Trust for Historic Preservation
600 14th Street NW, Suite 500
Washington, DC 20005

Telephone: (202) 297-4133
Facsimile: (202) 588-6272
Email: emerritt@savingplaces.org
(signed by Peter J. DeMarco with
permission from Elizabeth S. Merritt)

*Counsel for Plaintiff National Trust for
Historic Preservation in the United States*

47