**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARYLAND CHAPTER OF THE SIERRA
CLUB, et al.,

                              *Plaintiffs*,

      v.

FEDERAL HIGHWAY
ADMINISTRATION, et al.,

                        *Defendants*.

Civil Action No. DKC 22-2597

NORTHERN VIRGINIA CITIZENS'
ASSOCIATION,

                          *Plaintiff*,

      v.

FEDERAL HIGHWAY
ADMINISTRATION, et al.,

                        *Defendants*.

Civil Action No. DKC 22-3336

**FEDERAL DEFENDANTS' REPLY IN SUPPORT**
**OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

ARGUMENT .............................................................................................. 1

I.      Northern Virginia Citizens Association Lacks Standing ....................... 1

II.     The Agencies Complied With NEPA .................................................. 6

    A.      The Agencies Took A Hard Look At Air Quality Impacts...................... 6

        1.      Plaintiffs fail to show the agencies' reliance on NAAQS compliance for $PM_{2.5}$ was improper ................................. 6

        2.      Plaintiffs demand more than any federal law requires................... 9

    B.      The Agencies Took A Hard Look At Impacts To Environmental Justice Communities, Consistent With FHWA Environmental Justice Policies ........................................................................ 10

        1.      The agencies considered adverse and beneficial traffic-related impacts on EJ communities ................................. 12

        2.      The agencies properly considered the Project's cumulative impacts on EJ communities ........................................ 15

    C.      Plaintiffs' Disagreements With The Methodology Of The Traffic Models Used And Their Resulting Projections Do Not Amount To A Violation Of NEPA ................................................................ 17

        1.      The agencies used industry standard models and explained those models adequately ............................................... 17

        2.      The agencies did not improperly withhold any required data....... 18

III.    The Agencies Complied With Section 4(f) And Section 106............................. 19

    A.      The Agencies Section 4(F) Analysis For The Morningstar Cemetery Is Well Supported By The Record And The Law..................................... 19

        1.      The agencies made a reasonable and good faith effort to identify burial sites........................................................ 20

        2.      The defined cemetery boundary is well supported ..................... 22

        3.      Plaintiffs cannot plausibly challenge the agencies' use determination ........................................................... 23

i

B.    The Agencies' Decision To Defer The Final Section 106 Effects Assessment For The Cemetery Was Proper ............................................. 23

C.    FHWA Reasonably Rejected A Proposal To Minimize Harm To Plummers Island That Would Have Re-Aligned The American Legion Bridge Onto Other Portions Of National Park Service Property ..................................................................................................... 24

CONCLUSION .................................................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ................................................................................ 27

*Citizens Against Ruining Our Environment v. Haaland*,
  59 F.4th 1016 (10th Cir. 2023) ............................................................................... 16

*Citizens for Smart Growth v. Sec'y of Dep't of Transp.*,
  669 F.3d 1203 (11th Cir. 2012) .............................................................................. 26

*City of Alexandria v. Slater*,
  198 F.3d 862 (D.C. Cir. 1999) ................................................................................ 20

*Coal. for Healthy Ports v. United States Coast Guard*,
  No.13-CV-5347 (RA), 2015 WL 7460018 (S.D.N.Y. Nov. 24, 2015) ................... 18

*Communities Against Runway Expansion, Inc. v. F.A.A.*,
  355 F.3d 678 (D.C. Cir. 2004) ................................................................................ 10

*Corridor H Alternatives, Inc. v. Slater*,
  166 F.3d 368 (D.C. Cir. 1999) ................................................................................ 20

*Ecology Ctr. v. Castaneda*,
  574 F.3d 652 (9th Cir. 2009) .................................................................................. 19

*Friends of Buckingham v. State Air Pollution Control Bd.*,
  947 F.3d 68 (4th Cir. 2020) ...................................................................................... 9

*Friends of Cap. Crescent Trail v. Fed. Transit Admin.*,
  255 F. Supp. 3d 60 (D.D.C. 2017) .......................................................................... 18

*Honeywell Intern., Inc. v. EPA*,
  374 F.3d 1363 (D.C. Cir. 2004) .............................................................................. 27

*HonoluluTraffic.com v. Fed. Transit Admin.*,
  742 F.3d 1222 (9th Cir. 2014) .......................................................................... 20, 22

*HonoluluTraffic.com v. Fed. Transit Admin.*,
  No. CIV. 11-00307, 2012 WL 5386595 (D. Haw. Nov. 1, 2012) ..................... 20, 22

*Hughes River Watershed Conservancy v. Johnson*,
  165 F.3d 283 (4th Cir. 1999) .................................................................................. 18

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*,
  677 F.3d 596 (4th Cir. 2012) .................................................................................. 26

*Nat'l Parks Conservation Ass'n v. Semonite*,
  422 F. Supp. 3d 92 (D.D.C. 2019) .......................................................................... 27

*Nat'l Wildlife Fed'n v. EPA,*
    286 F.3d 554 (D.C. Cir. 2002) ................................................................. 18

*Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ................................................................................ 26

*Sierra Club v. FERC,*
    867 F.3d 1357 (D.C. Cir. 2017) ............................................................. 10

*Valley Cmty. Pres. Comm'n. v. Mineta,*
    373 F.3d 1078 (10th Cir. 2004) ............................................................. 23

*WildEarth Guardians v. Jewell,*
    738 F.3d 298 (D.C. Cir. 2013) ................................................................. 7

**Statutes**

23 U.S.C. § 138(a)(3) ..................................................................................... 25

23 U.S.C. § 109(h) ......................................................................................... 25

42 U.S.C. § 7409(b)(1) .................................................................................... 6

42 U.S.C. § 7506(c)(1) ............................................................................... 7, 9

**Regulations**

23 C.F.R. § 771.113 ....................................................................................... 21

23 C.F.R. § 774.3 .......................................................................................... 25

23 C.F.R. § 774.11 ........................................................................................ 20

36 C.F.R. § 800.4 .................................................................................... 20, 23

36 C.F.R. § 800.5 .......................................................................................... 24

40 C.F.R. § 1502.14 (2019) .......................................................................... 26

40 C.F.R. § 1503.4 (2019) ............................................................................ 17

40 C.F.R. § 93.123 .......................................................................................... 9

71 Fed. Reg. 12,468 ........................................................................................ 9

77 Fed. Reg. 42,802 .......................................................................... 22, 23, 25

**Other Authorities**

Executive Order 12898 ................................................................................. 11

*Not A Box to Be Checked: Env't Justice and Friends of Buckingham v. State Air Pollution Control Bd. (4th Cir. 2020),*
    45 HARV. ENVTL. L. REV. 219 (2021) ............................................... 9, 10

**TABLE OF ACRONYMS**

| | |
|---|---|
| CO | Carbon Monoxide |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| EJ | Environmental Justice |
| FEIS | Final Environmental Impact Statement |
| FHWA | Federal Highway Administration |
| HOT | High-Occupancy Toll |
| MDOT SHA | Maryland Department of Transportation, State Highway Administration |
| MHT | Maryland Historical Trust |
| MSAT | Mobile Source Air Toxics |
| NAAQS | National Ambient Air Quality Standards |
| NEPA | National Environmental Policy Act |
| NPS | National Park Service |
| NVCA | Northern Virginia Citizens Association |
| $PM_{2.5}$ | Particulate Matter 2.5 |
| ROD | Record of Decision |
| SDEIS | Supplemental Draft Environmental Impact Statement |
| VDOT | Virginia Department of Transportation |

**INTRODUCTION**

As detailed in the Federal Defendants' opening brief, the fundamental requirements of the National Environmental Policy Act ("NEPA")—disclosing relevant information about environmental impacts to the public and gathering enough information so that agency officials can make an informed decision—were met through the Federal Highway Administration's ("FHWA") and the Maryland Department of Transportation, State Highway Administration's ("MDOT SHA") (together, the "agencies") study and authorization of the Managed Lanes Study ("Project"). Likewise, the Federal Defendants explained why Plaintiffs' interpretations of the requirements under Section 4(f) of the Department of Transportation Act of 1966, and Section 106 of the National Historic Preservation Act are wrong, and how potential impacts to the historic properties within the Project area had been minimized and avoided. In their Reply, Plaintiffs continue to misinterpret the relevant law and misconstrue the record. In truth, Plaintiffs' opposition to the Project is more substantive than procedural. The agencies followed the appropriate procedures and made the requisite findings, and Plaintiffs have not shown otherwise. Plaintiffs therefore fail to meet their burden and summary judgment should be granted for Defendants.

**ARGUMENT**

**I.    Northern Virginia Citizens Association Lacks Standing**

This Court lacks subject matter jurisdiction over Plaintiff Northern Virginia Citizens Association's ("NVCA") NEPA claims because NVCA lacks Article III standing. Federal Defendants explained that NVCA's alleged injuries are not fairly traceable to the agencies' analysis of environmental impacts associated with the Managed Lanes Project. Fed. Defs.' Mem. at 21, ECF No. 47-1. Instead, NVCA's alleged injuries relate to the separate, independent I-495

NEXT Project being developed and constructed by the Virginia Department of Transportation ("VDOT"), which NVCA already challenged (and subsequently dismissed) in the Eastern District of Virginia. *Id.* And because NVCA's claims lack traceability, NVCA also cannot demonstrate redressability. Simply put, this Court cannot redress alleged injuries[1] that result from an action that is not the subject of this case. As a result, NVCA's claims must be dismissed for lack of subject matter jurisdiction.

NVCA asserts that it has satisfied traceability because Ms. Butler, who submitted a declaration in support of NVCA's standing, stated that the "additional changes belatedly proposed in the Maryland Toll Lanes Project . . . will result in a significant impact on the Live Oak Drive Community." Pls.' Reply at 23-24, ECF No. 49 (citing Butler Decl. ¶ 10, ECF No. 46-3). This single sentence referring to "changes" proposed in the Managed Lanes Study directly contradicts multiple other instances in Ms. Butler's declaration (and Plaintiffs' briefing in this case) where NVCA recognizes that the design changes about which it complains were made by VDOT as part of the 495 NEXT Project. *See, e.g.*, Pls.' Mem. at 11, ECF No. 46-1 ("the Virginia Department of Transportation (VDOT) unveiled a radically changed design"); Butler Decl. ¶ 3 ("The direct and cumulative impacts of MDOT's project along with the belated design changes to the GWMP/I-495 interchange *made by the Virginia Department of Transportation (VDOT) as part of Virginia's I-495 NEXT project* will be born most directly by the Live Oak Drive

---

[1] NVCA asserts that FHWA does "not dispute that NVCA's members and the Live Oak Drive Community are harmed by the changed design to the George Washington Memorial Parkway Interchange." Pls.' Reply at 23. Although FHWA focused on the traceability and redressability prongs of Article III standing, in the litigation challenging the 495 NEXT Project in the Eastern District of Virginia, FHWA argued the injuries complained of—which are the same injuries complained of in this case—did not result from the "design changes," but resulted from construction that would have occurred regardless of any design changes. *See* Defendant Federal Highway Administration's Opposition to Plaintiff's Motion for a Preliminary Injunction, Docket No. 1:23-cv-356, ECF No. 35 at 14 (Apr. 6, 2023).

community . . . .") (emphasis added); *id.* ¶ 5 ("VDOT unveiled a radically changed design"); *id.* ¶ 8 (NVCA "filed a lawsuit against VDOT and the FHWA challenging the significant design changes made by VDOT . . . ."); *id.* ¶ 10 ("The changes made by VDOT in early 2022 . . . ."); *id.* ¶ 11 ("Because these design changes were internally approved by VDOT . . . ."). Thus, multiple statements in the Butler declaration contradict NVCA's assertion that it has established its alleged injuries are fairly traceable to the Managed Lanes Study. Instead, NVCA's own statements admit that its alleged injuries are traceable to the 495 NEXT Project, which is not the subject of this lawsuit.

Seizing on FHWA's explanation that only one ramp—Ramp #4—is contemplated as part of the Managed Lanes Study, NVCA now asserts that this Ramp #4 alone is the cause of its alleged injuries. Pls.' Reply at 24 (citing Fed. Defs.' Mem. at 23). Ramp #4 is depicted in the image below:

*Figure 1: Proposed GWMP associated with Virginia's I-495 NEXT project.*



Source: AR 178599. Ramp #4 is also depicted below as nested inside Ramps 1, 2 and 3.



Source: AR 177868. Federal Defendants explained that the Project's Supplemental Draft Environmental Impact Statement ("SDEIS") contemplated "exchange ramps" that would provide ingress and egress to the I-495 Express Lanes. Fed. Defs.' Mem. at 23 (citing AR 27674); *see also* AR 5098-99 (depicting two portions of ramps in solid purple that will provide access between managed lanes in Maryland and general purpose lanes in Virginia and at GWMP interchange). Ramp #4 is not the genesis of NVCA's alleged injuries as described in Ms. Butler's declaration. *See* Butler Decl. ¶¶ 5-6 (complaining of proximity of flyover ramps to Live Oak Drive and height of flyover ramps). Indeed, Ramp #4 is separated from the Live Oak Drive community by three other ramps—all of which are part of the 495 NEXT Project (and some of which are existing at-grade ramps that will be realigned and reconstructed at a higher elevation). *See* AR 178599-60. NVCA does not (and cannot) explain why Ramp #4—the only ramp that is associated with the Managed Lanes Study—is the cause of their alleged injuries.

NVCA now alleges that "MDOT is planning significant construction in Virginia well beyond a single ramp." Pls.' Reply at 24. NVCA cites the Environmental Resource Mapping, Appendix E, to demonstrate that MDOT will perform work in Virginia other than Ramp #4. *Id.* Although there may be additional work to tie-in the ramps being constructed by VDOT as part of the 495 NEXT Project to the new bridge over I-495 (marked as "GWMP" in the first figure above), the ramps themselves will still be constructed as part of the 495 NEXT Project, regardless of the Managed Lanes Study. *See* AR 178599-60 (explaining that ramps will be either constructed or reconstructed as part of the 495 NEXT Project, "after which MDOT will perform work to tie into the new GWMP bridge over I-495").

Importantly, NVCA notes that "VDOT has started clearing the area as part of the 495 NEXT project." Pls.' Reply at 24. NVCA is correct that the 495 NEXT Project is moving forward—this is because each project has independent utility with its own "respective purpose and need." AR 178607. In other words, each project is distinct from the other and includes "proposed improvements to address their respective purpose and need that could function regardless of the other." *Id.* Documents cited by NVCA confirm the two projects' functional independence. The VDOT Interchange Justification Report Addendum, included as an attachment to Ms. Butler's declaration, depicts the 495 NEXT project configuration near Live Oak Drive and the GWMP. Butler Decl., Ex. A, att. 11 at 5. This configuration does not include Ramp #4 or additional tie-in work associated with the Managed Lanes Study, which is overlaid on the I-495 NEXT Project on the next page. Butler Decl., Ex. A, att. 11 at 6. The footprint of the ramps near Live Oak Drive *is not changed* by adding the Managed Lanes Study work. NVCA's alleged injuries—the realignment of Ramp #1 closer to Live Oak Drive, higher elevation ramps, and one larger stormwater drainage basin, *see* Butler Decl. ¶ 6—are attributable

to the 495 NEXT Project. Indeed, NVCA sought a preliminary injunction of the 495 NEXT

Project in the Eastern District of Virginia, which the court denied because the court found that

NVCA's complained-of injuries (the same now asserted before this Court) had already occurred

and were thus not redressable. *See* Transcript of Preliminary Injunction Hearing, Docket No.

1:23-cv-356, ECF No. 41 at 47:19-48:8 (Apr. 7, 2023). NVCA's claimed injuries are not fairly

traceable to the Managed Lanes Study and cannot be redressed in this case. The Court should

find NVCA lacks standing to bring their claims.

## II.    The Agencies Complied With NEPA

### A.    The Agencies Took A Hard Look At Air Quality Impacts

In their Reply, Plaintiffs concede that compliance with a substantive law like the National

Ambient Air Quality Standards ("NAAQS") can inform and, in some cases, even satisfy an

agency's hard look obligations. Pls.' Reply at 4. To satisfy the hard look requirement here,

though, Plaintiffs say the agencies needed to do more. They demand analysis of "localized

health impacts," yet refuse to say what type of analysis would satisfy their demand. *See* Pls.'

Mem. at 11-12. Even so, the record shows the agencies not only confirmed compliance with the

Particulate Matter 2.5 ("$PM_{2.5}$") NAAQS—which was all that was required—but also that

localized project emissions for Carbon Monoxide ("CO"), a proxy for transportation emissions,

would not exceed the NAAQS, and that regional attainment is expected continue long after the

Project is built. Plaintiffs try to discount or simply ignore this added analysis. But the record and

the law confirms the agencies took the requisite hard look at $PM_{2.5}$ emissions.

### 1.    Plaintiffs fail to show the agencies' reliance on NAAQS compliance for $PM_{2.5}$ was improper

The EPA sets the NAAQS for criteria pollutants, including $PM_{2.5}$, at levels to protect

public health. 42 U.S.C. § 7409(b)(1). For that reason, agencies may rely on NAAQS compliance

when assessing whether a transportation project will affect human health. *See* Fed. Defs.' Mem. at 27-31. Plaintiffs have not shown a single case that has rejected an agency's reliance on the NAAQS under NEPA. Plaintiffs, however, say that in all the cases in which courts approved reliance on the NAAQS, that approval came only after the agency did additional analyses. Pls.' Reply at 5-6. While Plaintiffs fail to show that the approval of NAAQS reliance hinged on anything more, the agencies here did that extra work too.

First, Plaintiffs say that the Project's localized emissions had to be analyzed and compared to the NAAQS. Pls.' Reply. at 4-6. Even though the Washington DC area, including nearby Montgomery County in Maryland and Fairfax County in Virginia, is designated in attainment for meeting the health based $PM_{2.5}$ and CO NAAQS,[2] the agencies conducted localized CO modeling as a "proxy for transportation emissions," including $PM_{2.5}$. AR 656. That analysis showed that, "using very conservative assumptions," "the worst-case interchanges and intersections for each Build Alternative . . . would not cause or contribute to a violation of the CO NAAQS within the study area." AR 656. By conducting localized modeling for CO as a proxy for $PM_{2.5}$, and then comparing that modeling to the NAAQS, the agencies satisfied their obligations under NEPA. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 312 (D.C. Cir. 2013) (finding hard look satisfied where agency used $NO_2$ emissions modeling from "a regional technical study" as a proxy for ozone emissions).

Second, Plaintiffs demand that the agencies' analysis include a comparison of "*future* pollution levels" of the Project to the NAAQS. Pls.' Reply at 6. Despite Plaintiffs' assertions otherwise, the agencies confirmed that NAAQS compliance is expected to continue. The

---

[2] Under the Clean Air Act, when an area is in attainment, no localized "hot-spot" analysis is required. 42 U.S.C. § 7506(c)(1), (5).

Metropolitan Washington Council of Governments' Transportation Planning Board regional conformity analysis confirmed the long-range outlook for NAAQS compliance of all planned projects in the area, including the Project through the year 2045. AR 408. And FHWA ensured that the correct design concept and scope of the Project were in the analysis. AR 145782-84; AR 146294-95; AR 189890. The result of the conformity analysis showed that all planned projects "will not cause or contribute to a new violation . . . of the NAAQS established by USEPA." AR 520; *see also* AR 33, 39, 408. Because the Project "is included in the conforming long-range plan, it is not anticipated that the Selected Alternative, which is included in the updated Air Quality Conformity analysis, would cause new air quality violation, worsen existing violations, delay timely attainment of the relevant NAAQS." AR 40. Plaintiffs do not even try to grapple with this study; indeed, it is not cited anywhere in their briefs. But Plaintiffs cannot create a NEPA violation simply by ignoring the evidence that supports the agencies' hard look.

Finally, Plaintiffs' assertion that a 2015 study shows "that communities along the toll lanes path may already experience $PM_{2.5}$ levels above the NAAQS" is misleading and flawed. Pls.' Reply at 5 n.5. That study, which used data from over ten years ago (and therefore does not reflect current emissions control technology), AR 193543, was not conducted along the Preferred Alternate path—the monitors studied were in Largo, Maryland, "miles away from the project" studied here. AR 193537; Pls.' Mem. at 25. And that study's conclusions, in fact, undermine Plaintiffs' arguments. The study concluded that no direct correlation between $PM_{2.5}$ concentrations and "traffic volumes . . . or speeds was found in the collected data." AR 193545. Thus, Plaintiffs' assertions that increased traffic volumes will cause greater $PM_{2.5}$ emissions finds no support even in their own record citations.

### 2.    Plaintiffs demand more than any federal law requires

Plaintiffs demand far more than NEPA—or any other federal statute—requires. Under the Clean Air Act, localized "hot-spot" analyses for $PM_{2.5}$ are only required for projects in areas that are currently in nonattainment for the $PM_{2.5}$ NAAQS. 42 U.S.C. § 7506(c)(1), (5). And even then, only projects that are "considered to have the potential to impact the air quality standards (i.e., 'projects of air quality concern')" are required to do the localized analysis. 71 Fed. Reg. 12,468. As defined by 40 C.F.R. § 93.123(b)(1), projects that are not a local air quality concern include "[a]ny new or expanded highway project that primarily services gasoline vehicle traffic (i.e., does not involve a significant number or increase in the number of diesel vehicles)."[3] If Plaintiffs are correct (and they are not) that an additional quantitative hotspot analysis of $PM_{2.5}$ is required for a project located in a NAAQS attainment area, that would lead to the untenable position that NEPA requires more for projects in attainment areas than would be required for a project in a non-attainment area under the Clean Air Act.

Plaintiffs continued reliance on *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68 (4th Cir. 2020) is misplaced. Contrary to Plaintiffs' arguments, Pls.' Reply at 7, the Virginia Department of Environmental Quality's statutory permitting duties to approve a compressor station under Virginia law are not relevant to the NEPA study here. The requirements of the Virgina law are "more stringent than agency requirements under federal environmental law." Paparo, Regina, *Not A Box to Be Checked: Env't Justice and Friends of Buckingham v. State Air Pollution Control Bd. (4th Cir. 2020)*, 45 HARV. ENVTL. L. REV. 219,

---

[3] EPA has recognized that new HOV lanes projects that do not involve a "a significant number of diesel vehicles" or "a significant increase in the number of diesel vehicles" typically would not need a $PM_{2.5}$ hot-spot analysis. EPA, *Near Roadway Air Pollution and Health: Frequently Asked Questions* 2 (2018), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100UKQS.pdf.

235 (2021). Indeed, the localized site suitability findings mandated by Virgina law are not found in NEPA. As correctly observed in one recent article on this issue, "[i]f *Friends of Buckingham* had turned on obligations under NEPA and the CEQ guidance, the Fourth Circuit may have reasoned that the Board had sufficiently examined the environmental justice issues implicated by the administrative record." *Id.* at 234 (comparing holding from *Friends of Buckingham* to *Communities Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678 (D.C. Cir. 2004) and *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017)).

Because the agencies conducted the required analyses and reasonably relied on EPA's health-based standards, the Court should find the agencies took the required hard look at air quality impacts.

### B.    The Agencies Took a Hard Look at Impacts to Environmental Justice Communities, Consistent with FHWA Environmental Justice Policies

Plaintiffs maintain that the agencies failed to take a hard look at the Project's impacts on environmental justice communities. Pls.' Reply at 12. According to Plaintiffs, the agencies "gloss[ed] over" "key questions of equity and public health," thereby reducing their environmental justice analysis to a "box to be checked." *Id.* Plaintiffs' argument cannot be squared with the Final Environmental Impact Statement's ("FEIS") 30-page summary of FHWA's EJ analysis, which is supported by the more than 100-page technical report dedicated to community and socioeconomic effects, analyzing the Project's effects on identified EJ communities. *See* AR 5136-61 (Appendix F, Final Community Effects Assessment & EJ Analysis Technical Report ("EJ Report")).[4] Contrary to Plaintiffs' assertion, the agencies took a

---

[4] Environmental justice was also considered in the DEIS, AR 35957-35980, and the SDEIS, AR 27806-18.

hard look at the Project's environmental justice impacts consistent with their obligations under E.O. 12898 and FHWA Order 6640.23A.

The agencies conducted the EJ analysis in accordance with FHWA Order 6640.23A: FHWA Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (2012) ("FHWA EJ Order"),[5] and United States Department of Transportation Order 5610.2(c), Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (2021).[6] AR 5193. The FHWA EJ Order defines a "disproportionately high and adverse effect on minority and low-income populations" as an impact that:

- Would be predominantly borne by a minority and/or low-income population, or
- Will be suffered by the minority population and/or low-income population and is appreciably more severe or greater in magnitude than the adverse effect that will be suffered by the nonminority population and/or non-low-income population.

*Id.* Plaintiffs do not criticize the agencies' identification of EJ communities and their existing conditions, or the agencies' public outreach and meaningful engagement with the identified EJ communities. Plaintiffs focus solely on the agencies' identification and disclosure of adverse impacts to EJ communities. Consistent with the FHWA EJ Order, the agencies considered impacts (both adverse and beneficial) on a wide range of characteristics, including demographics; traffic; human health and safety; air and water quality; noise; hazardous materials; natural resources; visual landscape and aesthetic values; economy and employment; access and mobility; community cohesion/isolation and quality of life; and tolling considerations.

---

[5] FHWA Order 6640.23A (June 14, 2012), available at https://www.fhwa.dot.gov/legsregs/ directives/orders/664023a.cfm (last accessed Oct. 4, 2023).
[6] UDOT Order 5610.2(c) (May 16, 2021), available at https://www.transportation.gov/sites/ dot.gov/files/Final-for-OST-C-210312-003-signed.pdf (last accessed Oct. 4, 2023).

AR 5227. Nothing more was required, and the Court should find that the agencies took the required hard look at the Project's impacts on environmental justice communities.

### 1. The agencies considered adverse and beneficial traffic-related impacts on EJ communities

Plaintiffs myopically focus on one metric in the agencies' identification of both beneficial and adverse impacts to EJ communities—traffic. Pls.' Reply at 13. Plaintiffs assert that the agencies ignore "extensive record evidence" demonstrating that the Project, compared to the no-build alternative, would disproportionately increase congestion around the Project's northern endpoint in Gaithersburg. *Id.* And, by extension, Plaintiffs assert that this disproportionate increase in congestion would result in a "disproportionate share of project-induced pollution." *Id.* at 15.[7]

But the agencies do not ignore this alleged evidence. In fact, Appendix B to the FEIS, Application for Interstate Access Point Approval, discloses the traffic data that Plaintiffs argue the agencies "swept under the rug." *See* AR 1502. The agencies explained that the Project would result in *traffic improvements* "along the corridor segments adjacent to EJ populations." AR 5231. This is true for both the HOT lanes and the general purpose lanes. *Id.* Plaintiffs assert that a projected decrease in speed for *one hour* of the PM peak near the identified EJ communities means that the agencies not only overlooked increased congestion, but outright ignored evidence of such. Pls.' Reply at 13 n.13 (citing a projected decrease in speed in the general purpose lanes

---

[7] Despite Plaintiffs' assertion that the agencies ignored data connecting the alleged increased congestion with increased air pollution near the identified EJ communities, even Plaintiffs "evidence" is far from exact: "All else equal, increased traffic congestion increases air pollution nearby," Pls.' Mem. at 30; "So, in general, the more cars on the road, and the worse the congestion, the higher the $PM_{2.5}$ emissions." Pls.' Mem. at 7; *Contra* AR 193545. Plaintiffs' support for this general assertion are their own comments submitted on the SDEIS, Pls.' Mem. at 7 (citing AR 158672-73), and is contradicted by the 2015 study they cite to elsewhere. AR 193545.

on I-270 northbound between MD-28 and I-370 from 6pm-7pm).[8] But the agencies not only considered this evidence, they explained that "[c]ongestion would still be present during the PM peak period on I-270 northbound and the I-495 inner loop . . . due to downstream bottlenecks outside of the [Project] limits." AR 259. Importantly, the agencies concluded that preexisting congestion because of these bottlenecks "would not get worse due to implementing the [Project]." *Id.* Plaintiffs themselves ignore that "increased traffic congestion under the No Build Alternative would contribute to increased overflow congestion on the local road network." AR 5227. Thus, along with increased local road congestion, without the Project there could be "increased response times for emergency services and increased travel times to community facilities, especially during peak travel periods." *Id.*

FHWA's EJ Order directs the agency to compare adverse effects on EJ populations against adverse effects on non-EJ populations. AR 5195. The agencies did just that with respect to traffic-related air pollution, concluding that it would be distributed along the entire length of the Project corridor, "regardless of EJ status." AR 496; *see also* Air Quality Technical Report, Appendix K to FEIS, AR 14330-47. The agencies explained that because the Project area is in attainment for criteria pollutants' NAAQS, no further project-level air quality analysis was required. AR 5233 (concluding that "the worst-case interchanges and intersections for each build and the No Build Alternative, using very conservative assumptions, would not cause or contribute to a violation of the CO NAAQS within the study corridor."); *see also* Section II(A), *supra*. Even so, the agencies recognized that "air toxic emissions from mobile sources have the potential to impact human health," AR 5234, and that EJ populations "may experience air quality

---

[8] Plaintiffs also cite traffic modeling which predicts a decrease in speed on the Beltway Inner Loop general purpose lanes between the I-270 west spur and I-270 east spur from 8am-10am. Pls.' Reply at 13 n.13 (citing AR 1708).

and/or public health impacts from construction activities and highway operations more acutely"
than non-EJ populations. AR 496.

Evaluating whether the Project would disproportionately impact EJ communities includes
not only an analysis of adverse effects, but also benefits to those same communities. FHWA's EJ
Order instructs that in "determining whether a particular program, policy, or activity will have
disproportionately high and adverse effects on [EJ] populations," the agency "should take into
account mitigation and enhancement measures and potential offsetting benefits to the affected
minority and/or low-income populations." FHWA EJ Order ¶ 8(e) (noting that other factors that
may be considered include "design" and "comparative impacts"); *see also* USDOT Order
5610.2(C) ¶ 9(b); AR 5257. Plaintiffs' singular focus on a subset of one metric in the agencies'
overall analysis of adverse impacts completely disregards the Project's beneficial impacts on EJ
populations. For traffic specifically, the agencies concluded that drivers from EJ populations
would likely *benefit* from the increased access to transit options. AR 5231; *see also* AR 651
(noting that Project would benefit EJ communities through increased mobility and improved
bicycle and pedestrian access, toll-free travel for transit vehicles, and enhanced connections to
transit centers); AR 5235 ("Opportunities for active transportation will be provided," including
"enhanced pedestrian and bicycle connections," which have been shown to "reduce human
health risks and improve overall wellbeing"); AR 5243 ("An enhancement to mobility may occur
due to reduced congestion on local routes, free bus transit usage of HOT lanes, and toll-free use
of HOT lanes for eligible High Occupancy Vehicles. . . .").

The agencies thoroughly considered both adverse impacts and benefits associated with
the Project for multiple resources, including, among others, traffic, and air pollution, and then
compared the effects to EJ populations with effects to non-EJ populations. *See* AR 5249-56. The

agencies explained that the "types of impacts caused by the [Project] would not differ between EJ populations and non-EJ populations," and that non-EJ populations "would bear the majority of quantifiable impacts for various resources." AR 5257. Consistent with the FHWA EJ Order and USDOT Order 5610.2C, the agencies reasonably concluded that the Project would not result in a disproportionately high and adverse impact to EJ populations. AR 5258. The agencies' thorough analysis and comparison of both adverse impacts and benefits to EJ and non-EJ communities satisfied NEPA's hard look standard.

> ### 2.    The agencies properly considered the Project's cumulative impacts on EJ communities

The FHWA EJ Order defines "adverse effects" as the "totality of significant individual or cumulative human health or environmental effects." FHWA EJ Order at ¶ 5(f). Plaintiffs maintain that the agencies failed to take a hard look at "the cumulative effects of the [P]roject's air pollution and other harms on environmental justice communities." Pls.' Reply at 16. Plaintiffs again singularly focus on air quality impacts, arguing that the agencies "must examine how the [P]roject would impact environmental justice communities, taking into account their heightened susceptibilities to risk factors and higher exposure to pollutants." *Id.* at 17. Plaintiffs' argument about cumulative impacts to EJ communities is much the same as their general argument that the agencies did not adequately consider adverse impacts of traffic-related air pollution. Plaintiffs assert that the agencies should have produced location-specific health data, and without that, the agencies cannot satisfy NEPA's hard look standard. *Id.*

The agencies took the required hard look at those impacts. The agencies explained that the Project area—including EJ populations—are in attainment for criteria pollutants' NAAQS, and as a result no Project-level air quality analysis was required. AR 496. Still, as explained above, the agencies completed a CO analysis using "very conservative assumptions" and

concluded that the worst-case interchanges and intersections for each alternative analyzed

"would not cause or contribute to a violation of the CO NAAQS within the study corridor." AR

5233.

That analysis is consistent with the analysis the Tenth Circuit upheld in *Diné Citizens*

*Against Ruining Our Environment v. Haaland*, 59 F.4th 1016 (10th Cir. 2023). In *Diné Citizens*,

the Bureau of Land Management estimated direct emissions from oil and gas wells and

concluded that approval of drilling permits "would not be expected to result in any exceedances

of the NAAQS or NMAAQS for any criteria pollutants in the analysis area." *Diné Citizens*, 59

F.4th at 1046. The court held that "[c]omparison to standards set by administrative bodies to

determine whether healthy levels of pollutants would be exceeded constitutes a hard look at the

health impacts of drilling." *Id.* So too here. The agencies' conservative estimate and conclusion

that the Project would not cause or contribute to a violation of the NAAQS constitutes a hard

look in accordance with NEPA.

The plaintiffs in *Diné Citizens* also challenged the lack of evidence in the record of

health-impacts, especially for sensitive groups. In BLM's environmental analysis, it "conceded

there were health impacts of ozone pollutants, especially for sensitive groups." 59 F.4th at 1046.

The court found that BLM "did not ignore" health impacts, but that it had concluded that

"elevated ozone levels . . . would not reach unhealthy levels as defined by NAAQS and

NMAAQS." *Id.* The court held that where the project would not result in unhealthy levels as

defined by NAAQS (as in this case), the agency took the requisite hard look at criteria pollutant

emissions. *Id.* The agencies have acknowledged that EJ populations "may experience air quality

and/or public health impacts from construction activities and highway operations more acutely"

than non-EJ populations. AR 496. Plaintiffs insist the agencies must go further and produce

16

location-specific data on health outcomes or justify why this information is not provided. Pls.'
Reply at 17 n.17. But the agencies explained that "due to industry-wide limitations in
tools/techniques for measuring project-specific health outcomes, detailed air quality effects on
public health cannot be projected for any specific location along the [Project] limits." AR 5233;
*see also* AR 667-68 (explaining limitations in assessing project-specific health outcomes
associated with MSAT exposure and listing measures to minimize impacts to air quality). This
acknowledgment, while explaining limitations of more granular, hyper-localized analysis,
satisfies NEPA's hard look standard.

    **C.    Plaintiffs' Disagreements With The Methodology Of The Traffic Models
    Used And Their Resulting Projections Do Not Amount To A Violation Of
    NEPA**

    **1.    The agencies used industry standard models and explained those
    models adequately**

Throughout their briefing, Plaintiffs have continued to assert that the agencies failed to
adequately address the alleged deficiencies in the traffic modeling that Plaintiffs identified. Pls.'
Reply at 19-22. As detailed in MDOT's and FHWA's opening briefs, the agencies considered
Plaintiffs' comments and adequately responded. Fed. Defs.' Mem. at 38-41; MDOT Mem. at
19-22. As required by CEQ regulations, the agencies "modif[ied] its analyses" and made "factual
corrections" in response to comments that had merit. 40 C.F.R. § 1503.4(a)(3)-(4) (2019); AR
23038. And for those comments that lacked merit, the agencies "explain[ed] why the comments
[did] not warrant further agency response" and the "reasons which support the agency's
position," 40 C.F.R. § 1503.4(a)(5) (2019).

What is clear, however, is that there is no response by the agencies that would have
satisfied Plaintiffs. That is because Plaintiffs do not believe the model could be fixed by some
agency action; according to them, the only solution was to use a different model altogether. AR

158591 (stating that the "the only solution" to the alleged flaws in MWCOG model "is to replace [MWCOG's algorithm] with a more modern . . . algorithm."). But "[a]gencies are entitled to select their own methodology as long as that methodology is reasonable. The reviewing court must give deference" to that decision. *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289 (4th Cir.1999); *see also Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 565 (D.C. Cir. 2002) (noting courts "may reject an agency's choice of a scientific model only when the model bears no rational relationship to the characteristics of the data to which it is applied") (quotations omitted).

It was reasonable for MDOT to use "state-of-the-practice models," AR 636, that are "regularly used" and accepted by experts at transportation agencies throughout the DC metro area. AR 318. And despite Plaintiffs' comments, the agencies showed that the traffic modeling was well supported—and correct. The Court should defer to the agencies' decision to use industry standard models and reject Plaintiffs' erroneous contentions.

### 2.    The agencies did not improperly withhold any required data

Plaintiffs also continue to argue that the agencies improperly withheld the computer modeling files for the traffic modeling. NEPA requires only that agencies make underlying environmental data "*reasonably* available to the public." *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 255 F. Supp. 3d 60, 67 (D.D.C.), *aff'd*, 877 F.3d 1051 (D.C. Cir. 2017). Reasonably available, in this context, does not mean every data file used for modeling; rather, it requires only that the agencies provide detail about the model and its "quantitative findings on which the [FHWA]'s conclusion actually turned." *Coal. for Healthy Ports v. United States Coast Guard*, No. 13-CV-5347 (RA), 2015 WL 7460018, at *16 (S.D.N.Y. Nov. 24, 2015). Plaintiffs do not contest that the agencies provided that information. "The law does not require more." *Id.*

18

In their Reply, the only issue Plaintiffs identify as potentially providing even more information than was available is the actual parameters used for the modeling, which in turn could have altered throughput. Pls.' Reply at 22. But as FHWA identified, Fed. Defs.' Mem. at 39, throughput is one of the central issues on which Sierra Club has focused its attention, both in its comments and now in their summary judgment briefs. *See, e.g.*, AR 158586-90. Plaintiffs do not contend that they lack information necessary to contest the modeling or bring their legal challenge. *See Ecology Ctr. v. Castaneda*, 574 F.3d 652, 667 (9th Cir. 2009). And without showing that meaningful participation was precluded, Plaintiffs cannot show any violation of NEPA occurred.

Plaintiffs attempt to make their position reasonable, asserting that the agencies could have satisfied their NEPA obligation by merely "revealing their choice of parameters." Pls.' Reply at 22. But Plaintiffs never asked for just the parameters—their "massive request" included all emails, reports, and memorandums, on top of the computer modeling files. AR 175918-19; 189589. And while Plaintiffs assert that MDOT's charge for the costs incurred in processing their request rendered the data unavailable, they fail to acknowledge that the data was, in fact, released to the City of Rockville after it paid those costs. MDOT Mem. at 23; AR 189584-55.

## III.     The Agencies Complied With Section 4(f) And Section 106

### A.     The Agencies Section 4(f) Analysis For The Morningstar Cemetery Is Well Supported By the Record and the Law

In their opening brief, Plaintiffs asserted that the agencies violated Section 4(f) by failing to determine whether the Project will use the Morningstar Cemetery before approving the Record of Decision ("ROD"). Pls.' Mem. at 48-55. Now, after FHWA showed that the agencies did, in fact, determine that impacts to the Cemetery were avoided, Plaintiffs have abandoned that

argument and contend that the agencies' conclusions are arbitrary. Pls.' Reply at 32-35. Plaintiffs' repackaged argument, like their first, fails. Plaintiffs continue to confuse the Section 4(f) and Section 106 requirements, present no record evidence that undermines the agencies' "use" conclusions, and provide no support for their insistence that more was required. Indeed, Plaintiffs' Reply shows that their arguments are founded on a misunderstanding of the Section 4(f) analysis altogether. The Section 4(f) analysis required the agencies to identify the Section 4(f) historic properties, define the property's boundary, and conclude whether the Project would use the historic site. The agencies did that and more.

### 1.     The agencies made a reasonable and good faith effort to identify burial sites

The first step of a Section 4(f) analysis is to identify Section 4(f) properties. Section 4(f) historic sites are defined as properties that are on or eligible for listing on the National Register of Historic Places. 23 C.F.R. §§ 774.11(f), 774.17; *see also City of Alexandria v. Slater*, 198 F.3d 862, 871 (D.C. Cir. 1999); *Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 370-71 (D.C. Cir. 1999). Identification of historic sites for the National Register is outlined in Section 106, which requires only that the agencies to "make a reasonable and good faith effort to carry out appropriate identification efforts." 36 C.F.R. § 800.4(b)(1); *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1233 (9th Cir. 2014). "Consequently, because Section 4(f) compliance is predicated on identification of historic sites via the § 106 process, if an agency makes a 'reasonable and good faith effort' to identify historic sites, the agency's Section 4(f) responsibility should also be satisfied." *HonoluluTraffic.com v. Fed. Transit Admin.*, No. CIV. 11-00307, 2012 WL 5386595, at *6 (D. Haw. Nov. 1, 2012), *aff'd*, 742 F.3d 1222 (9th Cir. 2014).

The agencies made reasonable and good-faith efforts to identify the likely burial sites. Those efforts included historic research, AR 476, discussions with descendants, AR 6161-63, field work to map the surface features, AR 13913, identification of soil types, AR 14241, and ground penetrating radar to learn about subsurface features and possible burials. AR 13915. And because of the "limited potential" that burials could be located outside the cemetery boundary, the agencies committed in the Programmatic Agreement to investigate areas impacted by construction.[9] Plaintiffs do not contest the reasonableness of any of these measures.

The only measure Plaintiffs assert was lacking was the ground penetrating radar ("GPR") survey for one portion of land next to the cemetery boundary and within the State's right-of-way. Pls.' Reply at 37. The record includes a detailed explanation of why that survey was completed later: when MDOT conducted the initial GPR survey, it was not feasible to extend beyond the area that was examined. AR 14230. Soil type, vegetation, and terrain made it "impossible to confidently identify potential graves" using GPR in the areas north and east of the cemetery boundary, so further surveys would "very likely provide limited information." AR 14231.

Plaintiffs' attempts to distinguish this case from *HonoluluTraffic.com* are not persuasive. Plaintiffs do not even try to grapple with the Section 4(f) identification analysis approved by the Ninth Circuit, the same process the agencies followed here. Instead, they point to immaterial factual differences. It is true that the project in *HonoluluTraffic.com* was 20 miles long and that the agencies had not completed the final design of the project when they issued the ROD, making identification of every site difficult. But final design of all FHWA transportation projects—including this one—is not finalized until after a ROD. S*ee* 23 C.F.R. § 771.113(a)(iii).

---

[9] As Plaintiffs acknowledge, MDOT completed the evaluation of the state-owned right-of-way in May 2023, under the Programmatic Agreement. Pls.' Reply at 35 n.25.

And the agencies' Section 4(f) analysis did not begin and end with the Morningstar Cemetery—it spanned the entire 15-mile project corridor and analyzed dozens of properties, including a different historic cemetery. And while a non-invasive way to definitively identify burials was unavailable for *HonoluluTraffic.com* rail project, even with GPR the location of burials "can only be confirmed through subsurface investigations." AR 13915-16. In fact, the methods to identify burial sites and predict the likelihood of finding burials that the court found reasonable in *HonoluluTraffic.com* are some of the same techniques used by the agencies here. *HonoluluTraffic.com v. Fed. Transit Admin.*, No. CIV. 11-00307 AWT, 2012 WL 5386595, at *4-*6 (D. Haw. Nov. 1, 2012), *aff'd*, 742 F.3d 1222 (9th Cir. 2014) (noting agencies conducted "soil survey data, archaeological records, land survey maps, and field observations").[10]

### 2.    The defined cemetery boundary is well supported

Once reasonable measures were taken to identify the location of the possible burials, the next necessary step in the Section 4(f) analysis was to define the Cemetery's boundary. Indeed, before any finding of use involving Section 4(f) properties is made, "it is necessary to have . . . clearly defined property boundaries for the Section 4(f) properties." Section 4(f) Policy Paper, 77 Fed. Reg. 42,802. Using the historic aerial photos showing the road that bounded the historic cemetery on top of the extensive burial site identification work, Fed. Defs.' Mem. at 46 (citing AR 6029), the agencies were able to determine the boundary of the Section 4(f) property and that burials outside the Cemetery's boundaries were unlikely.

---

[10] Plaintiffs fail to acknowledge that the court approved the agencies' Section 4(f) analysis even though they found "that it is possible, and even likely in some areas, that the construction of the stations and columns of the elevated guideway may disturb such sites." *HonoluluTraffic.com*, 2012 WL 5386595, at *3. By contrast, the agencies here acknowledged that, although it is possible further burials are within the limits of disturbance, based on the extensive research done it is unlikely.

Plaintiffs dismiss these efforts as "speculation." Pls.' Reply at 36-37. But the agencies relied on help from qualified archaeologists and historians who detailed their work in the FEIS Cultural Technical Report for the Morningstar Cemetery. AR 13883-14282. And the agencies considered all the information available and determined the boundary using their informed judgment. Section 4(f) Policy Paper, 77 Fed. Reg. 42,802.

### 3.    Plaintiffs cannot plausibly challenge the agencies' use determination

The final step of the Section 4(f) analysis was to determine whether the Project would use the Cemetery. Through identifying burials and defining the Cemetery boundary, the agencies were able to make design changes to avoid impacts to that property under Section 4(f).

Rather than engage with the actual determination, Plaintiffs again fall back to their erroneous interpretation that Section 106 deferral of effects renders the Section 4(f) analysis void. Nothing supports their contention. And even if further burials are found in the limits of disturbance during construction, the Programmatic Agreement includes a treatment plan that specifies the methods, limits, and consultation procedures for additional burials. AR 14288, 14296, 14298-99. Because that process meets Section 4(f)'s requirements, Plaintiffs' arguments should be rejected. *See Valley Cmty. Pres. Comm'n. v. Mineta*, 373 F.3d 1078, 1089 (10th Cir. 2004) (holding that the FHWA had met its Section 4(f) obligations where a Programmatic Agreement was adopted to deal with any impacts to previously unidentified cultural resources discovered during construction).

### B.    The Agencies' Decision To Defer The Final Section 106 Effects Assessment For The Cemetery Was Proper

As in their opening brief, Plaintiffs continue to push their incorrect reading of Section 106 and FHWA's regulations. Section 106 allows for the process to be completed through a Programmatic Agreement. And under Section 106, agencies may defer the identification,

evaluation, and the effects assessment of all or portions of the historic properties for a project. 36 C.F.R. § 800.4(b)(2); 36 C.F.R. § 800.5(a)(3). That is exactly what the agencies elected to do here. AR 83.

Like the rest of the adverse effects determination under Section 106, the agencies deferred any cumulative effects determination of the cemetery. AR 396. Cumulative effects are one of the potential adverse effects listed in 36 C.F.R. § 800.5(a)(1). Section 800.5 does not separate the cumulative effects determination from the rest of the Section 106 adverse effects that must be assessed. 36 C.F.R. § 800.5(a)(1). The agencies made a well-supported adverse effects determination for all the Section 106 properties identified, but deferred the Section 106 effects assessment—including the cumulative effects—for the Morningstar Cemetery until after consultation with Maryland Historical Trust ("MHT").

Contrary to Plaintiffs' assertion, the record does not "belie[]" the fact that the cumulative effects analysis was deferred. Pls.' Reply. at 39 n.28. The agencies provided the MHT with consultation materials, including an effects finding for the Morningstar Cemetery. The agencies determined that the Preferred Alternative would avoid direct impacts to the Morningstar Cemetery. Despite that well supported determination, after consultation with MHT, the agencies deferred the final effects assessment until after they completed further investigations outlined in the Programmatic Agreement. That the agencies completed a full effects analysis, including a cumulative effects analysis, does not change that fact.

### C.    FHWA Reasonably Rejected A Proposal To Minimize Harm To Plummers Island That Would Have Re-Aligned The American Legion Bridge Onto Other Portions Of National Park Service Property

After the agencies put forward the record evidence showing their well-supported decision to reject the "west shift" of the American Legion Bridge that Plaintiffs prefer, Plaintiffs claim

24

that the agencies' compilation of evidence is "post-hoc rationalization." And they continue to argue that a factor by factor least overall harm analysis was required for the west shift alignment. But Plaintiffs' post-hoc rationalization claim is simply inaccurate, and the regulations do not require the formulistic review Plaintiffs demand.

Plaintiffs' first error is their erroneous interpretation of what is required for the least overall harm analysis under FHWA's regulations. Neither Section 4(f) nor FHWA's implementing regulations require the agency to make additional formal factor-by-factor findings when the agency conducts additional preliminary engineering to try to minimize harm. *See* 23 U.S.C. § 138(a)(3) (requiring (1) no feasible and prudent alternative and (2) all possible planning to minimize harm); 23 C.F.R. § 774.3(c). The least overall harm analysis is a balancing of impacts for complex projects with multiple Section 4(f) properties that cannot all be avoided, allowing FHWA to fulfill its statutory mandate to make project decisions in the best overall public interest, required by 23 U.S.C. § 109(h). It is not, as Plaintiffs seem to argue, an additional one-size-fits-all analysis applied to every Section 4(f) resource no matter the project's details.

And the least overall harm analysis is required only for the alternatives that use Section 4(f) property and "remain under consideration." Section 4(f) Policy Paper, 77 Fed. Reg 42,802. Plaintiffs have not—and cannot—point to any authority requiring that the agencies treat every viable structural engineering shift considered when attempting to minimize harm to Section 4(f) properties as an "alternative" requiring a line-by-line application of the least overall harm considerations. If Plaintiffs were correct, every viable alignment adjustment that shifted potential impacts from one property to another—for dozens of Section 4(f) properties along the entire 15-mile corridor—would have to be fully analyzed under Plaintiffs' formulaic standard. Rather than a thoughtful comparison of the alternatives by agency experts, the least overall harm

analysis would devolve into endless box checking of countless design and engineering options. But when conducting a Section 4(f) analysis, like NEPA, the agencies need only consider a reasonable range of project alternatives, *cf. N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 602 (4th Cir. 2012), not every project option "conceivable by the mind of man." *Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978).

Whether it was required or not, the agencies completed the analysis when they rejected the west shift. The west shift was one of several engineering alignment proposals considered to minimize impacts within the limits of disturbance of the Preferred Alternative at the American Legion Bridge. After determining what shifts were viable, the agencies selected the on-center alignment because it "would impact the least amount of total NPS Land," and avoid "residential displacement" and a "re-configuration of the Clara Barton Parkway[11] interchange." AR 17702. The agencies then incorporated the on-center shift into the Preferred Alternative design for the final least overall harm analysis. In finding the west shift bridge alignment would not minimize harm to the same level of the on-center alignment, the agencies focused on harm to the NPS' properties, considered the impacts to both Section 4(f) and non-Section 4(4) appropriately, and provided its reasoning for eliminating the west shift from further study. AR 19812. Contrary to Plaintiffs' arguments, nothing more was required. *Cf.* 40 C.F.R. § 1502.14(a) (2019) (noting under NEPA agencies need only "briefly discuss the reasons for [alternatives] having been eliminated"); *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1213 (11th Cir. 2012) ("When alternatives are rejected from consideration in an EIS, there is no duty to perform in-depth analyses of these alternatives.").

---

[11] The Clara Barton Parkway is a public park under the jurisdiction of the NPS and is also on the National Register of Historic Properties. AR 5645.

And the National Park Service agreed with those conclusions. After the American Legion Bridge Strike Team presented its results to NPS on February 8, 2021, AR 369, the Department of Interior, on behalf of NPS, concurred that the Preferred Alternative was the alternative with the least overall harm. NPS did not object to the agencies' rejection of the west shift option. AR 80. And the relative significance of Plummers Island was not lost on NPS; indeed, the Department of Interior's letter confirms that minimization of harm to Plummers Island was, and would continue to be, a focal point of the agencies' efforts during the final engineering design of the bridge *Id.*; *see also* AR 60-62 (listing mitigation and commitments for American Legion Bridge design and Plummers Island).

## CONCLUSION[12]

For any project as complex and large as the Managed Lanes Study, agencies face countless line drawing decisions about what methodologies and analyses to include. The agencies are tasked with using their expertise to make those calls and explain why they made them. Plaintiffs have made clear that they disagree with the decisions made for this Project and, at bottom, the Project itself. But they failed to meet their heavy burden of showing any of the decisions made were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. And NVCA failed to show they have standing to bring any of their claims at all. For each of Plaintiffs' claims, the record and the law supports the agencies' significant work. That work, viewed through the highly deferential standard owed, shows that the agencies

---

[12] Plaintiffs contend that the agencies "conceded the issue" of whether vacatur is appropriate. But "the merits of a case and the appropriate remedy are different issues that should be treated separately." *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 95 (D.D.C. 2019) (citing *Honeywell Intern., Inc. v. EPA*, 374 F.3d 1363, 1375 (D.C. Cir. 2004) (Randolph, J., concurring)). If the Court grants Plaintiffs' motion, the Federal Defendants requests that the Court allow the parties to brief whether remand without vacatur is appropriate. *See Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

complied with NEPA, Section 4(f), and Section 106. The Court should deny Plaintiffs' motion and grant the Federal Defendants' and MDOT's motions.

Dated: October 4, 2023

Respectfully submitted,

TODD KIM
Assistant Attorney General

By: */s/ Samuel R. Vice*
SAMUEL R. VICE
FRANCES B. MORRIS
Trial Attorneys
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 353-5540
Email: samuel.vice@usdoj.gov
Email: frances.morris@usdoj.gov

*Counsel for Federal Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 4th day of October 2023 a copy of this Reply in Support of Federal Defendants' Cross-Motion for Summary Judgment has been electronically filed with the Clerk of Court and served on all registered parties via CM/ECF.

By: */s/ Samuel R. Vice*
SAMUEL R. VICE