UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| Maryland Chapter of the Sierra Club, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>Federal Highway Administration, *et al.*,<br><br>*Defendants*. | Case No.: 8:22-cv-2597-DKC |
| Northern Virginia Citizens Association,<br><br>*Plaintiff*,<br><br>v.<br><br>Federal Highway Administration, *et al.*,<br><br>*Defendants*. | Case No.: 8:22-cv-03336-DKC |

**REPLY BRIEF IN SUPPORT OF STATE DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ........................................................................................................ 1

ARGUMENT ............................................................................................................... 3

I.    Judicial review involves a holistic review of the environmental studies, not a re-weighing of the evidence. ................................................................................ 3

II.   Plaintiffs' flyspecking critique of MDOT's industry-standard traffic models casts no doubt on the reasonableness of the analysis or the conclusions supporting the need for managed lanes. ......................................................................................... 6

    A.  MDOT's exhaustive traffic technical reports explain how models were properly applied. ..................................................................................... 6

    B.  Plaintiffs had everything they needed to comment on the traffic models......... 9

III.  Agencies may reasonably rely on EPA's air quality standards, which are specifically designed to protect human health. ............................................... 10

    A.  Because this region is in compliance with EPA's public health air quality standard for $PM_{2.5}$, the agencies reasonably assessed air quality impacts, and microscale analysis was unnecessary............................................................. 11

    B.  Plaintiffs' demand for microscale air quality analysis is not reasonable under NEPA. ....................................................................................................... 13

    C.  Neither *Friends of Buckingham* nor the other cases Plaintiffs cite require microscale analysis. ................................................................................. 14

IV.  MDOT reasonably concluded that the managed lanes project will not result in disproportionate, high and adverse effects on environmental justice communities. ..................................................................................................... 16

    A.  MDOT's traffic models do not show disproportionate high and adverse impact. .................................................................................................... 17

    B.  The agencies' environmental justice analysis properly considered the project's potential for cumulative impacts............................................................... 20

V.   Plaintiffs' meritless claims about impacts in northern Virginia should be dismissed for lack of standing................................................................................. 22

VI.  The agencies met Section 4(f)'s and Section 106's separate requirements for Morningstar Tabernacle No. 88 Moses Hall and Cemetery. ............................... 24

    A.  The agencies satisfied Section 4(f) by defining the cemetery's boundaries and avoiding any use of it. ............................................................................... 25

i

B.  The agencies' programmatic agreement satisfies Section 106. ...................... 27

VII.    MDOT complied with Section 4(f) by minimizing harm to Plummers Island. ..... 29

VIII.   The agencies' decision should not be vacated for a minor violation—if the Court finds one. ......................................................................................................... 31

CONCLUSION ............................................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*,
    988 F.3d 146 (D.C. Cir. 1993) ...................................................................31

*Am. Whitewater v. Tidwell*,
    770 F.3d 1108 (4th Cir. 2014) ...................................................................5

*Audubon Naturalist Soc. of the Cent. Atl. States, Inc. v. U.S. Dep't of
Transp.*,
    524 F.Supp.2d 642 (D. Md. 2007) .................................................15, 16, 21

*City of Columbus v. Cochran*,
    523 F.Supp.3d 731 (D. Md. 2021) (Chasanow, J.) ....................................31

*In re Consolidated Salmonid Cases*,
    791 F.Supp.2d 802 (E.D. Cal. 2011)...........................................................5

*CTIA-Wireless Ass'n. v. FCC*,
    466 F.3d 105 (D.C. Cir. 2006) ..................................................................27

*Defenders of Wildlife v. N.C. Dep't of Transp.*,
    762 F.3d 374 (4th Cir. 2014) .....................................................................5

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004)....................................................................................9

*Diné Citizens Against Ruining Our Env't v. Haaland*,
    59 F.4th 1016 (10th Cir. 2023) .................................................................15

*Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
    36 F.4th 850 (9th Cir. 2022) .....................................................................13

*Friends of Buckingham v. State Air Pollution Control Board*,
    947 F.3d 68 (4th Cir. 2020) ......................................................................14

*Hughes River Watershed Conserv. v. Johnson*,
    165 F.3d 283 (4th Cir. 1999) .....................................................................4

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989)....................................................................................5

*Meister v. U.S. Department of Agriculture,*
  623 F.3d 363 (6th Cir. 2010) ...................................................4

*Miccosukee Tribe of Indians of Fla. v. U.S.,*
  566 F.3d 1257 (11th Cir. 2009) ................................................5

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,*
  463 U.S. 29 (1983)....................................................................4

*Muckleshoot Indian Tribe v. U.S. Forest Serv.,*
  177 F.3d 800 (9th Cir. 1999) ..................................................20

*No Mid-Currituck Bridge-Concerned Citizens v. N.C. Dep't of Transp.,*
  60 F.4th 794 (4th Cir. 2023) ....................................................3

*NRDC v. U.S. Dept. of Transp.,* 770 F.3d 1260, 1264 (9th Cir. 2014)..............................15

*San Luis & Delta-Mendota Water Authority v. Locke,*
  776 F.3d 971 (9th Cir. 2014) ....................................................4

*Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.,*
  914 F.3d 213 (4th Cir. 2019) ..................................................24

*Sierra Club v. Fed. Energy Reg. Comm'n,*
  867 F.3d 1357 (D.C. Cir. 2017) ..............................................20

*Sierra Club v. U.S. Dep't of Transp.,*
  753 F.2d 120 (D.C. Cir. 1985) ................................................21

*U.S. Air Tour Ass'n v. FAA,*
  298 F.3d 997 (D.C. Cir. 2002) ..................................................9

*Webster v. U.S. Dep't of Agric.,*
  685 F.3d 411 (4th Cir. 2012) ...............................................3, 4

*Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.,*
  427 F.Supp.3d 582 (D. Md. 2019) ..........................................23

**Statutes**

42 U.S.C. § 7407(d)(1)(A) .........................................................11

42 U.S.C. § 7409(b)(1) .........................................................10, 13

42 U.S.C. § 7502.......................................................................15

**State Regulations**

Va. Code Ann. § 10.1-1307(E)(3) ......................................................................14

**Rules and Regulations**

23 C.F.R. § 774.3 ......................................................................................26

23 C.F.R. § 774.3(a)(2) ..............................................................................29

23 C.F.R. § 774.3(c)(1) ..............................................................................29

23 C.F.R. § 774.7(c) ..................................................................................30

36 C.F.R. 800.4(b)(1) ................................................................................25

36 C.F.R. 800.14(b)(1)(v) ..........................................................................28

36 C.F.R. § 800.4(b)(2) ..............................................................................27

36 C.F.R. § 800.14(b)(2)(iii) ......................................................................27

40 C.F.R. § 58.10 ......................................................................................11

40 C.F.R. §§ 93.101, 93.116 ......................................................................11

40 C.F.R. § 1508.7 ....................................................................................20

# INTRODUCTION

Every National Environmental Policy Act review starts with establishing a project's purpose and need.  The purpose and need for the proposed managed lanes project is undisputed.  Travelers living in the greater Washington region need a solution that will relieve current and future traffic jams, make their commutes more reliable and predictable, and give them more choices when they move around the region.  Adding managed lanes to I-495 and I-270 will do all of that, both for drivers and those who wish to use public transportation.  This one project is not intended to be a panacea for all the region's transportation woes.  It is part of the region's overall transportation plan, and it will drastically improve the lives of commuters daily.

Plaintiffs do not challenge whether completed managed lanes on I-495 and I-270 will help people to avoid the well-known and persistent traffic jams on those roads.  Indeed, managed lane projects like this have succeeded elsewhere in Maryland and in the Greater Washington area.   This case is not about whether managed lanes can achieve their goals.  Rather, this case is about whether the decisionmaking agencies—the Maryland Department of Transportation State Highway Administration and the Federal Highway Administration—took a hard look at the environmental effects of the managed lanes project.  Like most NEPA challenges, this case presents a practical question about agency process as reflected in a comprehensive administrative record.  Despite Plaintiffs' desire, it is not an invitation to re-weigh that record evidence.

When MDOT and FHWA studied the environmental effects of the managed lanes project, they used a transparent process with reasonable and industry-accepted technical methodologies.  Over the course of four and a half years, they performed a wide range of research, analysis and considered input from the public, key stakeholders, and governmental

entities.  Their analyses applied accepted models to show the traffic nightmare that the region is facing and the project's potential benefits.  They followed United States Environmental Protection Agency standards and FHWA guidance to assess the project's air quality impacts.  They reached out to minority and low-income communities in the study area to contribute to the analysis of potential environmental justice concerns, and to consider whether the project would have disproportionate, high, and adverse effects on those communities.  And they took extraordinary steps to minimize the project's effects on the public, the states' environmental resources, parkland, and historic properties.

MDOT and its federal partners have demonstrated, and the record shows, that the agencies took the required hard look.

**ARGUMENT**

Relying mostly on a blend of citations to their opening brief and comments that they submitted to the agencies during the NEPA process, Plaintiffs' reply brief distorts the truth of what happened during the environmental review of the managed lanes project. They urge the Court to dismiss the agencies' public outreach efforts and comprehensive technical studies of all natural and socio-economic resources in the study area. They mistakenly assert that page counts have nothing to say about the agencies' work, when in fact they are not blank; they are filled with substantive data and are indicative of the agencies' in-depth analysis. Nor was MDOT's community outreach an empty gesture. To the contrary, the record reflects that the public input was seriously considered and fundamentally altered the proposed action. Plaintiffs' even take credit for input recognized by the agencies but incongruently argue they were ignored when the agencies considered but reasonably rejected some of their other comments.[1] Pltfs.' Reply at 20.

**I.      Judicial review involves a holistic review of the environmental studies, not a re-weighing of the evidence.**

Plaintiffs admit that a reviewing court may not "second-guess agency decisions" when the agency has taken a "hard look" at environmental effects under NEPA. *No Mid-Currituck Bridge-Concerned Citizens v. N.C. Dep't of Transp.*, 60 F.4th 794, 800 (4th Cir. 2023). But they want this Court to do just that: revisit the evidence that was before the agencies and reach a different conclusion. They also admit a "hard look" cannot be diminished by flyspecking an agency's environmental review, that is "looking for any deficiency, no matter how minor." *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 421 (4th Cir. 2012).

---

[1] MDOT acknowledges that different Plaintiffs join different parts of their arguments. Pltfs.' Reply at 1 n.1. It uses the term Plaintiffs throughout for convenience, recognizing that it applies only to those Plaintiffs who join a given argument.

Instead, judicial review involves "a holistic view" of the agency's work, *id*., recognizing, as plaintiffs also admit, that agencies are "entitled to rely on the view of their own experts," *Hughes River Watershed Conserv. v. Johnson*, 165 F.3d 283, 288 (4th Cir. 1999) ("Although our inquiry into the facts is to be searching and careful, this court is not empowered to substitute its judgment for that of the agency.").

Plaintiffs' own citations agree. A court's review should ensure that an agency has not "*entirely failed* to consider an important aspect of the problem" or "is *so implausible* that it could not be ascribed to a difference in view or the product of agency expertise." *San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 975 (9th Cir. 2014) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983)) (emphases added). This authority underscores the substantial burden facing Plaintiffs if they want to overturn the agencies' environmental review process—a burden they fail to meet.

Plaintiffs try to sidestep these authorities by premising their whole argument on the notion that agencies must earn deference. Pltfs.' Reply at 2. They incorrectly draw that notion from a throwaway phrase in a Sixth Circuit case, *Meister v. U.S. Department of Agriculture*, 623 F.3d 363 (6th Cir. 2010). *Meister*—which is not a NEPA case—fails to support their argument. Indeed, the Sixth Circuit agrees that "agencies are more specialized than courts are" and that courts should "defer to them" when they "actually use" their expertise as a "comparative advantage." *Id*. at 367. The problem in *Meister* was that the "entire basis" of the agency's conclusions was "three sentences" in an expert's email that amounted to nothing more than "a hypothetical." *Id*. at 373. The agency did not receive deference because it gave the court nothing to defer to. *See id*. at 374 (calling the agency's estimates "entirely arbitrary").

By contrast, the agencies here engaged numerous experts, peer reviewed that analysis, and published multiple technical reports for public and other agency comment. See e.g.,

AR.702–1501 (FEIS App. A, Final Traffic Analysis Technical Report).  The agencies responded to Plaintiffs' complaints about MDOT's air quality analysis.  They are rebutted in the Agencies responses to comments and in the final EIS technical report.  AR.14323–14573 (FEIS App. K, Final Air Quality Technical Report).  Detailed technical reports similarly support MDOT's analysis of environmental justice issues and potential impacts on historic and cultural resources.  AR.5136–5617 (FEIS App. F, Final Community Effects Assessment and Environmental Justice Analysis Technical Report); AR.5618–5702 (FEIS App. G, Final Section 4(f) Evaluation); AR.13883–14282 (FEIS App. I, Cultural Resources Technical Report Volume 9).  This is simply not a case in which the agencies have somehow lost the presumption of deference.  Rather, the sole question before the Court is whether Plaintiffs can prove the absence of a "rational connection" between the agencies' factual findings and their decision.  *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014).  And since this case "involves primarily issues of fact that implicate substantial agency expertise," the Court's review is "ultimately narrow and highly deferential" to the agencies.  *Defenders of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014).[2]

---

[2] Other cases cited by Plaintiffs similarly support this deference to agency expertise.  Even the consideration of what constitutes the best scientific and commercial data available is a scientific determination deserving deference.  *See Miccosukee Tribe of Indians of Fla. v. U.S.*, 566 F.3d 1257, 1265 (11th Cir. 2009) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377-78 (1989).  A court should be "especially wary of overturning such a determination on review."  *In re Consolidated Salmonid Cases*, 791 F.Supp.2d 802, 821 (E.D. Cal. 2011).  This will be particularly relevant in supporting MDOT's expert traffic analysis.  See *infra* at 5–10.

**II.    Plaintiffs' flyspecking critique of MDOT's industry-standard traffic models casts no doubt on the reasonableness of the analysis or the conclusions supporting the need for managed lanes.**

Plaintiffs never question the obvious fact that the greater Washington region has a serious traffic problem.  MDOT's modeling predicted future traffic volumes far above many roads' "capacity," i.e., the number of cars that can fit on a road.  Pltfs.' Reply at 19.  That much is true: MDOT's models do show traffic volumes above road capacity.  AR.2 (ROD at 2 & n.2).  These volumes reflect traffic demand.  MDOT's models also show volume throughput—which is limited by the number of cars that can fit on the road—and documents the relationship between demand and throughput.  AR.792 (FEIS App. A, Final Traffic Analysis Technical Report at 86).  Where Plaintiffs go wrong is the idea that showing traffic volumes above capacity is a "sharp break" from "reality."  Pltfs.' Reply at 19.  Traffic demand exceeds road capacity all the time—that is what causes traffic jams.  AR.1527 (FEIS App. B, MDOT SHA's Draft Application for Interstate Access Point Approval (IAPA) at 18).  MDOT's models reasonably demonstrate that those existing traffic jams are going to get much worse, and Plaintiffs do not challenge that.  AR.5–8 (ROD at 2–5).

**A.    MDOT's exhaustive traffic technical reports explain how models were properly applied.**

MDOT has explained how its traffic modeling worked, including the fact that it was relying on an industry-accepted, widely used forecast developed by the Metropolitan Washington Council of Governments and a similarly industry-accepted microsimulation known as VISSIM.  MDOT Br. at 17–18.  In their reply brief, Plaintiffs repeat their arguments but now incorrectly state that MDOT "assumed the validity" of the Council's data.  In fact, the record reflects the data validation process performed by MDOT.  *See* AR.723–

724 (FEIS App. A, Final Traffic Analysis Technical Report at 17–18; FEIS App. B, IAPA
Application, App. A at 38–50) (describing how the model is validated to existing condi-
tions in the study area). MDOT compared the Council's model results across different
scenarios and utilized the National Cooperative Highway Research Program procedures to
post-process all data from the Council's model results. See AR.987 (FEIS App. A, Final
Traffic Analysis Technical Report, MWCOG User Guide at 21).[3]

Plaintiffs also continue to cherry-pick figures from MDOT's system-wide traffic anal-
yses. In so doing, they mischaracterize the pertinent conclusions in the EIS and technical
reports. For instance, Plaintiffs identify one segment of the project area predicted to expe-
rience lower speeds with the managed lanes than without them. FHWA comprehensively
addressed this same concern in the Record of Decision, explaining that traffic would get
so bad if the managed lanes are *not built* that it would be like experiencing a travel incident
on the bridge every day. AR.55 (ROD at 52). Because of this, far fewer vehicles could
cross the American Legion Bridge during peak hours. Due to the inability of vehicles to
move on the bridge in the no build scenario, traffic downstream of the bridge might move
a little faster, but that is because far fewer people would be moving through those points
and therefore fewer people will be getting where they want to go on time.

This data point does not show a shortcoming of building managed lanes; it demon-
strates the cost of doing nothing. AR.55 (ROD at 52). When looking at the entire system,
MDOT's traffic analysis showed that 76% of the trips people frequently make—known as

---

[3] The NCHRP is a research program established by the National Academies of Sciences
Transportation Research Board. The NCHRP "conducts evidence-based research that ad-
heres          to          the          highest          standards          of          integrity."
https://onlinepubs.trb.org/onlinepubs/nchrp/newsite/whynchrpworks.pdf    A similar post-
processing review was conducted for the hourly forecasted traffic volumes obtained from
the VISSIM model. AR.36588 (DEIS App. C, Traffic Technical Report at 21); AR.724
(FEIS App. A, Final Traffic Analysis Technical Report at 18).

"trip pairs"—would benefit from traveling in the general-purpose lanes if the managed lanes are built, and that the average PM travel time would decrease across the entire system. AR.56 (ROD at 53); AR.174 (ROD App. D at 54). This is the key point from a traffic modeling perspective: while the agency considers potential effects across several specific portions of the study area, the overall assessment of a project must be made on a system-wide basis. Adding managed lanes would lower system-wide traffic delays by 13% during the morning rush and by 38% during the evening rush, in addition to improving travel speeds and reducing delays on local roads. AR.9 (ROD at 6). Plaintiffs ignore all these facts and do not challenge the overall conclusions.

Plaintiffs' next return to their claim that the Volpe Center's review of MDOT's work somehow "bolstered" their traffic argument by acknowledging VISSIM's "limitations." Pltfs.' Reply at 20. But they are still wrong. The Volpe Center was engaged to evaluate a limited claim and it vindicated both FHWA and MDOT, finding that the model met "a professional standard of care." AR.130 (ROD App. D at 10). This finding was not "faint praise," as Plaintiffs allege. Pltfs.' Reply at 21. The FHWA had already reviewed Plaintiffs' claims but Volpe Center was engaged to solely to evaluate whether MDOT's models showed scientific integrity, and it found that they did. AR.130 (ROD App. D at 10); AR.137 (ROD App. D at 17).

Finally, Plaintiffs argue that they were owed a more detailed response to their attack on "the validity of the MWCOG model's volume predictions." Pltfs.' Reply at 21–22. In making this point, though, Plaintiffs gloss over MDOT's detailed review of the model outputs, which is described in the record. AR.36610 (DEIS, App. C, Traffic Technical Report at 18). That review itself responds to Plaintiffs' critique of the model. That MDOT's review found only one anomaly disproves Plaintiffs' claim that the model, and the agency's careful implementation of the model, should not be trusted. Indeed, only a careful review

of the model's outputs could have caught the anomaly, which is about 17 miles outside the nearest part of the project's limits.

Plaintiffs' larger grievance, it seems, is that MDOT did not respond to Plaintiffs' expert point-by-point. Pltfs.' Reply at 20. Here too, Plaintiffs are incorrect. MDOT did respond directly to Plaintiffs' expert. AR.173–174 (ROD App. D at 53–54) (detailed explanation of the Greenbelt issue). But it was not obliged to answer him at every turn, especially when he was asking the agency to reject a traffic model that virtually every other study in the region uses. AR.36587 (DEIS App. C, Traffic Technical Report at 20); AR.722 (FEIS Appendix A, Final Traffic Analysis Technical Report at 16.). Nor did MDOT have to address in detail the faulty premise beneath Plaintiffs' argument. All credible traffic experts know that it is reasonable for traffic volume *demand* to exceed roadway capacity. On that point, the models themselves are all the response needed.

### B. Plaintiffs had everything they needed to comment on the traffic models.

On top of their claim that the agencies did not adequately respond to their comments about the traffic model, Plaintiffs argue that MDOT should have turned over the model's "raw inputs and outputs." Pltfs.' Reply at 22. Admitting that they could have obtained this data by paying the fees allowed under Maryland's public disclosure law, Plaintiffs argue that it was NEPA, not the public disclosure law, that entitled them to the data. Pltfs.' Reply at 22. But they do not address MDOT's point that disclosure of such data would violate NEPA's "rule of reason" by putting a large burden on the agency with no corresponding benefit to the public. *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004).

Agencies regularly use sophisticated models to assess environmental effects. When they do, NEPA requires only that "the agencies' explanation of the model's assumptions and methodologies is reasonable." *U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1008 (D.C.

9

Cir. 2002).  MDOT is aware of no cases, and Plaintiffs cite none, that require the agency to turn over all its underlying data so that the public can recreate the model.

Here, MDOT published three traffic technical reports, each with hundreds of pages of information about the models.  AR.702–1501 (FEIS, App. A, Final Traffic Analysis Technical Report); AR.27919–28126 (SDEIS App. A, Traffic Evaluation Memorandum: Alternative 9-Phase 1 South); AR.36588–38113 (DEIS App. C, Traffic Analysis Technical Report).  Its draft application for an interstate access point approval, also appended to the final EIS, contains even more details, including descriptions of modeling parameters like vehicle inputs, routing decisions, seeding time, and number of runs.  AR.1555 (FEIS App. B, MDOT SHA's Draft Application for Interstate Access Point Approval (IAPA) at 46).

## III.    Agencies may reasonably rely on EPA's air quality standards, which are specifically designed to protect human health.

Plaintiffs do not challenge that the air in both Montgomery County, Maryland and Fairfax County, Virginia meets the Environmental Protection Agency's air quality standards for $PM_{2.5}$.  Plaintiffs also do not dispute that EPA sets those air quality standards—including the standard for $PM_{2.5}$—at a level that will "protect the public health" with "an adequate margin of safety."  42 U.S.C. § 7409(b)(1).  Nor do Plaintiffs argue that building the managed lanes project will cause a violation of EPA's $PM_{2.5}$ standard.  Their only argument, instead, is that regardless of EPA's air quality standard, NEPA required the agencies to perform a microscale analysis of $PM_{2.5}$'s health effects.  Pltfs.' Reply at 4.  That argument lacks support in both caselaw and common sense.

10

A.    **Because this region is in compliance with EPA's public health air qual-ity standard for PM$_{2.5}$, the agencies reasonably assessed air quality im-pacts, and microscale analysis was unnecessary.**

In arguing for a microscale PM$_{2.5}$ analysis, Plaintiffs ask the Court to require more than the Clean Air Act does. Indeed, they obscure the Clean Air Act's requirements by framing their arguments as NEPA arguments. Pltfs.' Reply at 3–4. But when set against the back-drop of the Clean Air Act's regulatory process, the unreasonableness of what Plaintiffs want under NEPA becomes clear.

Under the Clean Air Act, air quality is measured on a regional level using monitors placed throughout the region. *See* 40 C.F.R. § 58.10. When those monitors show that a given region meets EPA's public health air quality standards for a particular pollutant, it is in "attainment." 42 U.S.C. § 7407(d)(1)(A). When the monitors show that a region does not meet EPA's standards, it is in "non-attainment." *Id*.

Whether a region is in attainment or not affects how the region studies the effects of new air emission sources, such as the managed lanes project. Agencies within a region that is *not* in attainment with the relevant public health air quality standard may be required to prepare a "hot-spot" analysis—essentially, a microscale analysis of air pollutants—for certain transportation projects. *See* 40 C.F.R. §§ 93.101, 93.116. For a region that is in attainment, by contrast, agencies need not prepare such a hot-spot analysis. *See id*.

Here, Plaintiffs do not dispute that the region is in attainment of EPA's air quality re-quirements for PM$_{2.5}$. Monitors set up throughout the region confirm it. AR.44935–37 (DEIS App. I, Air Quality Technical Report at 18–20) (showing existing regional moni-tors). No additional analysis is required because attainment of EPA's air quality standards protects human health with a sufficient margin of safety.

The Clean Air Act and EPA's standards are not good enough for Plaintiffs. Even though the region is in attainment, they demand a microscale analysis of PM$_{2.5}$. Pltfs'

11

Reply at 4. This demand is unreasonable at a basic level because it would thwart the entire regulatory regime created by the Clean Air Act. Agencies like MDOT that regulate in a Clean Air Act attainment region would be treated as if they were in a non-attainment region. NEPA does not supersede the Clean Air Act in this way.

In any case, MDOT modeled carbon monoxide emissions at project intersections and interchanges to provide a broad "proxy for transportation emissions."[4] AR.44929, AR.44992 (DEIS App. I, Air Quality Technical Report at 29, 74). This analysis showed concentrations below EPA's air quality standards, thus supporting the claim that all transportation emissions, including $PM_{2.5}$, would remain below those standards. AR.44929 (DEIS App. I, Air Quality Technical Report at 12).

Plaintiffs' counterargument that carbon monoxide emissions will double in "some areas" fails to note that even in this case, it is far less than the established public health air quality standard. Pltfs.' Reply at 9. For example, the data for the intersection of I-495, I-270, and MD 355 show that in 2025, one-hour emissions would be 8.60 parts per million if the managed lanes are built and 4.00 if they are not. AR.44993 (DEIS App. I, Air Quality Technical Report at 75). In 2040, the numbers are 4.90 with the project and 2.80 without it. *Id*. But those numbers are still far below the one-hour air quality standard of *35* parts per million, and also down from 2016's 11.90 parts per million. *Id*. So even in places where the increased throughput allowed by the managed lanes increases emissions when compared to no change, those emissions do not threaten to violate EPA's public health air quality standards and still represent a significant reduction from current concentrations.

---

[4] Plaintiffs wrongly characterize MDOT's use of the carbon monoxide analysis as a "post-hoc rationale." Pltfs.' Reply at 8. As the record shows, the analysis was in fact performed because carbon monoxide is a good proxy. AR.44929 (DEIS App. I, Air Quality Technical Report at 12).

In sum, Plaintiffs' concerns about microscale $PM_{2.5}$ emissions must be understood against the regulatory and factual background of this case. For $PM_{2.5}$, county-level standards *are* local standards. Because this region is "in attainment" of those standards, the Clean Air Act did not require a hot spot analysis, much less the microscale analysis of pollutants that Plaintiffs want. What is more, the evidence from modeling carbon monoxide emissions in the final EIS shows that the managed lanes project will not exceed EPA's public health air quality standards on a hyper-local level. And because carbon monoxide is a proxy for other air emissions, including $PM_{2.5}$, the agencies reasonably concluded that those emissions will also continue to comply with EPA standards.

### B.    Plaintiffs' demand for microscale air quality analysis is not reasonable under NEPA.

In searching for support from caselaw, Plaintiffs lose track of NEPA's overarching rule of reason. They concede that compliance with EPA's air quality standards "can inform a NEPA analysis," but they insist on more. Pltfs.' Reply at 4. In support of their view, they cite a Ninth Circuit decision that they say limits the use of a substantive law like the Clean Air Act to situations in which that law "specifically address[es] the impacts of the project at issue." Pltfs.' Reply at 4 (quoting *Envt'l Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 874 (9th Cir. 2022)). But the agencies here are not relying on future compliance with a tangentially relevant state permit to reach a finding of no significant impact, as were the agencies in the Ninth Circuit case. *Envt'l Def. Ctr.*, 36 F.4th at 874–75. The agencies here are relying on this project's undisputed compliance with EPA's air quality standards for $PM_{2.5}$ to find that $PM_{2.5}$ from this project does not threaten human health. AR.408 (FEIS at 5-67). That finding is exactly in line with the purpose of EPA's air quality standards, which exist to "protect public health" with an "adequate margin of safety." 42 U.S.C. § 7409(b)(1).

13

Underscoring its reasonableness, the agencies' use of EPA's air quality standards for the managed lanes environmental review follows FHWA guidance, which says that "microscale" carbon monoxide analysis is "unnecessary" when combined project and background concentrations are "well below" EPA's standards.  FHWA, Guidance for Preparing and Processing Environmental and Section 4(f) Documents, Technical Advisory T 6640.8A (Oct. 30, 1987).[5] This is not a "new spin" on the guidance, as Plaintiffs claim.  Pltfs.' Reply at 9.  The guidance was specifically created to encourage "uniformity and consistency in the format, content, and processing of . . . documents pursuant to [NEPA]."  FHWA Guidance, *supra* n.5.

Plaintiffs also misread the FHWA guidance.  In their telling, the guidance allows agencies to "skip a localized carbon monoxide analysis only if they conclude '*microscale*' carbon monoxide levels" are "well below" EPA's standards.  Pltfs.' Reply at 10 (emphasis added).  In other words, Plaintiffs say that the agencies have to draw a conclusion about "microscale" levels before they know whether to conduct a microscale analysis.  That process would make little sense, and it is not what the guidance says.  The point of the guidance is that no microscale analysis is needed at all if EPA's air quality standards are met, and those standards are judged on a regional scale, not a microscale.  FHWA Guidance, *supra* n.5.

### C.    Neither *Friends of Buckingham* nor the other cases Plaintiffs cite require microscale analysis.

Plaintiffs' legal argument for microscale analysis of $PM_{2.5}$ emissions rests largely on their reading of the Fourth Circuit's decision in *Friends of Buckingham v. State Air Pollution Control Board*, 947 F.3d 68 (4th Cir. 2020).  They concede, as they must, that *Friends*

---

[5] *Available at* https://www.environment.fhwa.dot.gov/legislation/nepa/guidance_preparing_env_documents.aspx

*of Buckingham* "is not a NEPA case."  Pltfs.' Reply at 7.  But they are wrong that the Virginia environmental justice statute there at issue is like NEPA.  Indeed, as Plaintiffs acknowledge in a parenthetical, the Virginia statute focuses on an "activity's 'suitability' to its location."  Pltfs.' Reply at 7 (quoting Va. Code Ann. § 10.1-1307(E)(3)).  NEPA does not.  Under NEPA's rule of reason, agencies can use their expertise to decide when localized analysis is needed.  Because the managed lanes project involves mobile sources in a region where EPA's air quality standards are already being met and which have been set to provide a sufficient margin of safety for human health, no such localized analysis was needed here.

The other cases that Plaintiffs cite are either further afield or support the agencies position.[6]  One, from the Tenth Circuit, flatly holds that "[c]omparison to standards set by administrative bodies to determine whether healthy levels of pollutants would be exceeded constitutes a hard look" at health impacts.  *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1046 (10th Cir. 2023).  The agencies made just such a comparison here.  In Plaintiffs' other cases, unlike here, the region being studied was not in compliance with EPA's air quality standards, also known as in an area of "nonattainment."  *See* NRDC v. U.S. Dept. of Transp., 770 F.3d 1260, 1264 (9th Cir. 2014); *Audubon Naturalist Soc. of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F.Supp.2d 642 (D. Md. 2007).  When a region is out of compliance, completely different rules for reviewing air quality impacts apply.  *See* 42 U.S.C. § 7502 (describing nonattainment plans).  By relying on these nonattainment cases, Plaintiffs make clear that they want the agencies to go beyond EPA's requirements.  But NEPA does not require such additional review, and the agencies' decision to rely on EPA's public health air quality standards was reasonable.

---

[6] Several of the cases that Plaintiffs cite are general NEPA cases, not $PM_{2.5}$ cases, though their brief does not make that clear.  *See* Pltfs.' Reply at 5.

Plaintiffs' reliance on *Audubon Naturalist* illustrates their category mistake. Plaintiffs claim that the court in *Audubon Naturalist* rejected the idea that "acknowledging a highway's construction-related air pollution negated the need to assess air pollution impacts from the highway's operation." Pltfs.' Reply at 11 n.12. But they never mention that, when that case was heard, the counties were *not* in compliance with EPA's air quality standards. *Audubon Naturalist*, 524 F.Supp.2d at 692. Thus, different rules for considering air quality effects applied. There, as here, MDOT followed those rules. In both cases, its actions were reasonable.

## IV.    MDOT reasonably concluded that the managed lanes project will not result in disproportionate, high and adverse effects on environmental justice communities.

Plaintiffs' environmental justice claims ignore all the work that MDOT did to ensure that the voices of underserved communities were heard and considered in the NEPA process for the managed lanes project. Worse, Plaintiffs say that MDOT and FHWA "reduced environmental justice to a 'box to be checked.'" Pltfs.' Reply at 12. Nothing could be further from the truth. MDOT's outreach efforts went well beyond what the law requires. AR.35–36 (ROD at 32–33); AR.487–93 (FEIS at 5-146–5-152); AR.647–48 (FEIS at 9-37–9-38). Those efforts to ensure that the potential impacts to environmental justice communities were adequately considered included an aggressive outreach plan focused on underserved and overburdened communities. In addition to this effective communication, MDOT followed FHWA guidance to collect accurate data and analyze potential project impacts. These efforts are summarized in a final EIS appendix. AR.5136–5617 (FEIS App. F, Final Community Effects Assessment and Environmental Justice Analysis Technical Report). Nothing in Plaintiffs' reply casts doubt on the agencies' process, analysis, or conclusions.

**A.    MDOT's traffic models do not show disproportionate high and adverse impact.**

Plaintiffs' substantive environmental justice argument hinges on their interpretation of MDOT's traffic models.  They say that the managed lanes project "would disproportionately increase congestion" at the project's endpoints, which include both environmental justice communities and those communities that are not so defined.

MDOT considered Plaintiffs comments regarding congestion impacts and reasonably reached the opposite conclusion: traffic from the project would affect all areas equally, "regardless of [environmental justice] status."  AR.496 (FEIS at 5-155).  Plaintiffs misinterpret both agency guidance on how to assess environmental justice effects and relevant record evidence.

First, FHWA/USDOT guidance supports the fundamental premise that understanding potential "disproportionate" effects requires comparing a project's adverse and beneficial impacts.  Specifically, FHWA 2012 EJ Order 6640.23A outlines how an agency should decide whether a particular program, policy, or activity would have disproportionately high and adverse impacts on minority and low-income populations.  This EJ Order and guidance states that FHWA (and project proponents) should account for "mitigation and enhancement measures and potential offsetting benefits to the affected minority and/or low-income populations" as well as "design, comparative impacts, and the relevant number of similar existing system elements in nonminority and low incomes areas."[7]

_____

[7] The FHWA Order defines a "disproportionate high and adverse" effect as an impact that: "would be _predominately_ borne by a minority and/or low-income population, or will be suffered by the minority population and/or low-income population and _is appreciably more severe or greater in magnitude than the adverse effect that will be suffered by the nonminority population_…" (Emphasis added.)  This definition's plain language supports the comparative approach taken by the agencies.  See AR.5193 (FEIS App. F, Final Community Effects Assessment and Environmental Justice Analysis Technical Report at 45).

Plaintiffs' argument fails to recognize how the managed lanes project will benefit environmental justice communities. The project includes many "enhancement measures" and other benefits, such as increased availability of the managed lanes for transit and vanpools without tolls, better connections to multi-modal mobility to promote transit usage, improvements to local street networks to promote pedestrian safety, and new bicycle paths. AR.16–17 (ROD at 13–14). Those benefits are on top of the basic traffic relief on I-495 and I-270. Under FHWA guidance, these project benefits were properly part of the agencies' environmental justice analysis.

Plaintiffs also incorrectly fault the agencies for comparing the project's overall effects across the study area, even though that is precisely what is called for.[8] Air quality impacts associated with project construction and operations will be experienced throughout the study area, in both majority and minority communities, in places with higher incomes and with lower incomes. These "comparative impacts" are fully described in the FEIS and Appendix F. If one community is anticipated to experience one type of impact, that does not necessarily mean that such an impact would be "disproportionate, high or adverse." Air quality effects from the project, for example, are not expected to be "high," as emissions from project construction and operation will comply with all relevant standards.

Second, Plaintiffs misinterpret one narrow set of traffic metrics to allege a disproportionate impact on environmental justice communities. As summarized above, the drop in speed along northbound I-270 in the evening peak hour and along the inner loop of I-495 in the morning peak hour stem from downstream bottlenecks located *outside* the limits of the project—bottlenecks that themselves are caused by the terrible traffic that will exist if

---

[8] Plaintiffs do not contest the agencies' basic environmental justice methodologies, including the identification of minority and low-income populations, the standard for what qualified as low-income in this area, the collection of relevant demographic data, and application of the federal and state environmental justice screening tools.

the managed lanes are not built.  Plaintiffs' focus on speed also ignores other metrics show-ing how the managed lanes will cause overall traffic to improve.  *See surpa* at 8.  For example, MDOT's analysis showed that the same segments on which they focus will in-crease throughput by over 20 percent along the I-495 inner loop in the morning and by 4 percent on northbound I-270 in the evening.  AR.1671–74 (FEIS App. B, MDOT SHA's Draft Application for Interstate Access Point Approval (IAPA) at 162–65).  Increased throughput means that more vehicles—and thus more people—will pass by a given point on the roadway in a set amount of time.  AR.1670 (FEIS App. B, Draft Application for Interstate Access Point Approval (IAPA) at 161).  When more vehicles can use I-495 and I-270, it reduces the burden on the surrounding local roadway network.  AR.1670 (FEIS App. B, Draft Application for Interstate Access Point Approval (IAPA) at 161).  That is, vehicles will be taken off local roads which are often closer to homes when travel is more attractive on the highway; and overall congestion will be reduced which has both transpor-tation and air quality benefits.  More broadly, 76 percent of the trip pairs analyzed by MDOT show that the managed lanes project will improve travel times for drivers using the general-purpose lanes.  AR.56 (ROD at 53).  These improvements will benefit environ-mental justice communities.

In short, MDOT's traffic analysis transparently summarized expected transportation performance across the study area, including environmental justice communities.  The agency fairly discussed both anticipated benefits and areas where traffic challenges would remain.  And the agency explained that "downstream bottlenecks" will "not get worse" because of the managed lanes project.  AR.259 (FEIS at ES-18).  The record supports the agencies' conclusion that the managed lanes project will have beneficial and detrimental environmental effects across the adjacent communities and did not have a disproportion-ately high or adverse impact on environmental justice communities.

B. **The agencies' environmental justice analysis properly considered the project's potential for cumulative impacts.**

Plaintiffs also challenge the agencies' environmental justice review by questioning the scope and sufficiency of the cumulative impacts analysis for specific resources. NEPA regulations define a cumulative impact as "[t]he impact on the environment which results from *the incremental impact of the action* when added to other past, present, and reasonably foreseeable actions…" 40 C.F.R. § 1508.7 (emphasis added.) The project administrative record proves that the agencies took the requisite "hard look" at these potential impacts and properly applied those findings in the context of environmental justice. *See Sierra Club v. Fed. Energy Reg. Comm'n*, 867 F.3d 1357, 1368 (D.C. Cir. 2017).[9]

Plaintiffs' main objection is that absent a public health assessment, impacts cannot be adequately reviewed. Plaintiffs are also wrong that the agencies did not properly disclose impacts. The agencies considered and disclosed the potential short-term (construction) and long-term (operational) air quality impacts in the context of past and present conditions. They presented the very data cited by Plaintiffs regarding the EJ Index categories; and appropriately acknowledged that certain environmental justice communities could experience air quality or public health impacts "more acutely than populations with lower EJ Index scores." AR.5251 (FEIS App. F, Final Community Effects Assessment and Environmental Justice Analysis Technical Report at 103). These conclusions were based on a detailed analysis that compared expected mobile source air toxic emissions from the project's build-out years to existing conditions. Even beyond the project's operation, with advances in emissions technology, and more electric and hybrid vehicles, these pollutants

---

[9] The Ninth Circuit cases cited by Plaintiffs do not set forth different procedural expectations. Indeed, the final EIS and Record of Decision lay out how the detailed information about environmental justice was "useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts." *See, e.g.*, *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 810 (9th Cir. 1999).

are expected to decline compared to existing conditions.  AR.14338–14340 (FEIS App. K, Final Air Quality Technical Report at 13–15).

This analysis performed a major scientific literature review addressing the relationship between public health and traffic-related air pollution.  The review found a relationship with certain asthma conditions, but also pointed out that "data are not sufficient to fully support causality."  For other health outcomes, the literature survey revealed that "data were either inadequate or insufficient data to draw firmer conclusions."  AR.5234 (FEIS App. F, Final Community Effects Assessment and Environmental Justice Analysis Technical Report at 86).

The scope and methodology of this air quality cumulative effects analysis mirrors the EIS that was upheld in the *Audubon* case involving the Intercounty Connector.  Like this project, MDOT there found that harmful emissions would decline dramatically between current and built conditions and that the project would make a "negligible" difference in emissions in the study area.  *Audubon Naturalist*, 524 F.Supp.2d at 695.  Also as was upheld in *Audubon*, MDOT did not perform a public health assessment, pointing out the uncertainties in such an analysis's ability to predict the health impact of emissions on people living near the roadway.  *Id.*  The court upheld this process.  *Id.* at 674–75; *see also Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 129 (D.C. Cir. 1985) (agency has "responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances").

Finally, Plaintiffs ignore how information presented to the decisionmaker (and the public) concerning cumulative effects expressly informed how the managed lane project would be built and what environmental justice mitigation commitments would be implemented.  The final EIS summarizes wide-ranging measures to address construction dust air impacts,

AR.5244–46 (FEIS App. F, Final Community Effects Assessment and Environmental Justice Analysis Technical Report at 96–98), as well as project elements added to respond directly to concerns raised through the EJ outreach process, AR.5252–59 (FEIS App. F, Final Community Effects Assessment and Environmental Justice Analysis Technical Report at 110–111).  And because the project incorporates increased opportunities for "active transportation" (e.g., the several pedestrian and bicycle improvements), the agencies also reasonably concluded these mitigation measures can reduce health risks and improve overall wellbeing in environmental justice communities.  AR.5250–51 (FEIS App. F, Final Community Effects Assessment and Environmental Justice Analysis Technical Report at 102–103).[10]

In sum, the agencies' review of cumulative effects impacting environmental justice communities meets all applicable regulatory standards and should be upheld.

## V.    Plaintiffs' meritless claims about impacts in northern Virginia should be dismissed for lack of standing.

In its opening brief, MDOT argued that Plaintiffs lacked standing to sue if they could not show that alleged harms to residents in northern Virginia's Live Oak Drive community were fairly traceable to the managed lanes project, and those claims should be dismissed. MDOT Br. at 36–37.

---

[10] The Environmental Justice Working Group, an important part of MDOT's community outreach efforts, conducted a survey asking respondents to identify the top environmental concerns in their community.  The results indicated that water, noise, and housing were the top three issues.  Survey results also reflected community requests for improved lighting and enhanced safety on local streets and sidewalks as key priorities.  MDOT incorporated these project elements into the final action, further demonstrating its responsiveness to environmental justice issues.  See AR.5224 (FEIS App. F, Final Community Effects Assessment and Environmental Justice Analysis Technical Report at 76).

Plaintiffs now assert that one of the ramps to be built in northern Virginia—Ramp #4—is part of the managed lanes project.  Pltfs.' Reply at 23–25.  Ramp #4, they say, "will have significant detrimental effects on the Live Oak Drive Community."  Pltfs.' Reply at 25.  Because these injuries are caused by part of the managed lanes project, Plaintiffs conclude that they have standing to sue.

The declaration in support of Plaintiffs' standing to sue over the managed lanes project's work in northern Virginia does not mention Ramp #4.  *See* ECF 46-3, Declaration of Debra Butler.  Instead, that declaration argues that harm to Plaintiffs and their members stems from "elevated flyover ramps" that "will move traffic closer to Live Oak Drive."  Butler Decl. ¶¶ 2–3.  The problem is that Ramp #4 is not an "elevated flyover ramp."  Comparing the record document cited by Plaintiffs that labels the ramps with numbers (AR.178599 (letter from FHWA at 2)) with the maps from the EIS showing which ramps are elevated (AR.5098–99) makes clear that only Ramps #2 and #3 are elevated because those are the only ramps shown in orange—the map's code for aerial structures.  Since Plaintiffs have alleged harm only from "elevated flyover ramps," they cannot have standing based on Ramp #4, which is not elevated.

If Plaintiffs are trying to claim harm from Ramp #4 despite it not being elevated, or to suggest that other aspects of MDOT's work in northern Virginia would harm them, it is too late.  Pltfs.' Reply at 24.  The facts of standing must be established through a declaration or other admissible evidence, *see Wikimedia Found. v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 427 F.Supp.3d 582, 600 (D. Md. 2019), and the only declaration Plaintiffs submitted on this issue does not mention harm from anything other than "flyover ramps."  *See* Butler Decl. ¶¶ 2–3.  Their claims about northern Virginia construction should thus be dismissed for lack of standing.

On the merits, Plaintiffs claim that only a "supplemental environmental evaluation" would "fully disclose[]" impacts to the Live Oak Drive community. Pltfs.' Reply at 27. But they ignore Fourth Circuit precedent holding that supplemental environmental review is not required unless project changes "present a seriously different picture of the environmental impact of the proposed project." *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 221–22 (4th Cir. 2019) (internal quotation marks omitted). And they do not dispute that the alleged ramp changes are within the project's limits of disturbance. Pltfs.' Reply at 29. They do not allege at all how Ramp #4 differs from that presented in the FEIS/ROD. All ramp changes by VDOT and Ramp #4 are within the limits of disturbance described in the FEIS. None are significant enough to warrant a supplemental environmental review, especially when the final EIS already shows the actual footprint of the ramps that MDOT would build, and the potential environmental effects are so included. AR.5098–99 (FEIS App. E, Maps 1–2). Thus, even if Plaintiffs had standing, they should not prevail on these claims.

## VI.    The agencies met Section 4(f)'s and Section 106's separate requirements for Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

Plaintiffs' arguments about historic resources, like their NEPA arguments, suffer from two problems. First, they minimize or ignore substantial administrative record evidence about the agencies' analysis of key resources. Second, and more fundamentally, they try to alter or avoid the well-established judicial standard of reasonableness concerning the method and scope of investigation and put in its place a new standard of absolute certainty. On that front, they claim that the agencies' thorough analysis of potential impacts to historic resources and detailed agreement to manage those resources during project development fall short without a guarantee that the project will avoid those resources. Pltfs.' Reply at 32. But this is not the correct standards under either Section 4(f) of the U.S. Department

24

of Transportation Act or Section 106 of the National Historic Preservation Act. Neither those laws nor their implementing regulations require certainty. They require only that the agencies act reasonably, coordinate with the appropriate stakeholders, and exercise an adequate level of effort to reach their conclusions. See e.g., 36 C.F.R. 800.4(b)(1), *supra* at 3–5. And the record here shows that the agencies were both thorough and reasonable.

### A.    The agencies satisfied Section 4(f) by defining the cemetery's boundaries and avoiding any use of it.

The most significant historic resource in dispute is the Morningstar Tabernacle No. 88 Moses Hall and Cemetery.[11] According to Plaintiffs, MDOT's extensive evaluation of that cemetery still fell short because the agencies defined the cemetery's boundaries to determine the potential "use" of property before they conducted a full survey using ground-penetrating radar. Pltfs.' Reply at 34–35. That survey, it seems, was the only way to satisfy Plaintiffs. Pltfs.' Reply at 36.

Plaintiffs' focus on ground-penetrating radar is wrong in several ways. To start, it ignores the extensive work MDOT did to define the cemetery's boundaries. MDOT first performed extensive research for and review of historical documents, discussions with the descendants of people who are buried in the cemetery, and field review of the cemetery's surface features and identified artifacts. This analysis included review of records produced by the historic trustees of the Cemetery. AR.6161–63 (letter from descendants); AR.13913 (FEIS App. I, vol. 9, Cultural Resources Technical Report for Morningstar Cemetery at 22); AR.6029 (historical aerial photo showing road as a northern boundary).

---

[11] The study's review of historic and cultural resources covers a wide array of places and things in the study area, even though Plaintiffs' claims focus solely on the Morningstar Tabernacle.

As Plaintiffs are aware, because they were directly and regularly informed of the agencies' investigation, MDOT conducted ground-penetrating radar analysis of accessible areas of the property prior to the ROD.  Working closely with stakeholders, MDOT identified portions of the property that presented a higher likelihood of readable data and lower risk of disturbing sensitive resources.  AR.145 (ROD App. D at 25).  MDOT was sensitive to the varied concerns of the descendant community, listened to its independent experts and explained to Plaintiffs, in real time, why moving in heavy equipment and workmen so close to highway in order to clear thick brush and trees outside the reasonably assumed cemetery boundary would not be conducted prior to approval of the development activities.  *See* AR.145 (ROD App. D at 25).  In addition to its analysis of the historic boundary, MDOT opted to perform engineering analysis to move as far as possible the highway construction from the reasonably assumed cemetery boundary.  AR.13885 (FEIS App. I, vol. 9, Cultural Resources Technical Report for Morningstar Cemetery at ii) (recommending a change to project limits of disturbance).  As MDOT explained, and FHWA agreed, the FEIS limits of disturbance presented no Section 4(f) "use" of the cemetery.

All of this work is compiled in an appendix to the FEIS that details how the agencies identified the cemetery's boundaries.  AR.13883–14282 (FEIS App. I, vol. 9, Cultural Resources Technical Report for Morningstar Cemetery).   The conclusion that the project will not use the cemetery for purposes of Section 4(f) was reasonable and satisfies the statute. AR.393 (FEIS at 5-52); *see* 23 C.F.R. § 774.3.[12]

---

[12] This conclusion was later affirmed by the work done under the programmatic agreement. *See infra* at 28.

### B.    The agencies' programmatic agreement satisfies Section 106.

The requirements of Section 4(f) and Section 106 are separate.  MDOT and FHWA

satisfied Section 4(f) by reasonably defining the cemetery's boundaries and concluding

that the project would avoid any use of property within those boundaries.  Section 106, by

contrast, requires participation of agencies and other interested parties (called "consulting

parties" under the applicable regulations) to satisfy the statute's procedural requirements.

Here, the agencies correctly identified all potential resources and the possibility of "adverse

effects" to those resources.  As is often the case with large linear projects like highways,

transmission lines, and pipelines, the agencies signed a programmatic agreement with other

consulting parties to conclude the process.  AR.81–106 (signed programmatic agreement).

The Section 106 rules explicitly authorize this approach.  36 C.F.R. § 800.4(b)(2).

Plaintiffs admit in their reply that they "have not challenged the Agencies' decision to

choose a Programmatic Agreement to carry out their Section 106 responsibilities."  Pltfs.'

Reply at 38.  Because the very act of signing a programmatic agreement fulfills those re-

sponsibilities, this admission should end the dispute over Section 106.  *CTIA-Wireless*

*Ass'n. v. FCC*, 466 F.3d 105, 107 (D.C. Cir. 2006) ("A programmatic agreement binds the

agency and 'satisfies the agency's section 106 responsibilities . . . .'" (quoting 36 C.F.R.

§ 800.14(b)(2)(iii)).  Still, Plaintiffs continue to suggest that signing a programmatic agree-

ment does not let the agencies "defer" their assessment of the cemetery unless certain con-

ditions are met.  Pltfs.' Reply at 38.  As the Section 106 rules explain, however, that is far

too narrow a view of programmatic agreements.  Programmatic agreements are the most

appropriate method in a variety of situations—specifically including linear projects like

this one.  Programmatic agreements are specifically intended to "defer final identification

and evaluation of historic properties" under a set of conditions set out in the agreement.  40

C.F.R. § 800.4(b)(2).[13]  The agencies have met the programmatic agreement's require-
ments here.

"Section 4(f)'s substantive prohibitions" do not prevent the agencies from signing a
programmatic agreement which provides additional conditions under Section 106, as Plain-
tiffs suggest.  Pltfs.' Reply at 39.

Finally, Plaintiffs point out that, following the Record of Decision, MDOT performed
the ground-penetrating radar adjacent to the Morningstar Cemetery site as set out in the
programmatic agreement.  Pltfs.' Reply at 35 n.25.  First, as set out in the Programmatic
Agreement, the agencies consulted with the Maryland Historical Trust, Friends of Moses
Hall (a plaintiff in this case), and the Trustees of the Morningstar Tabernacle No. 88 Moses
Hall and Cemetery to develop a Cemetery Treatment Plan.  AR.94 (Final Programmatic
Agreement).  Then, this past spring, in careful coordination with the same consulting par-
ties, MDOT conducted the substantial site preparation work as agreed in the March 2023
Cemetery Treatment Plan. Soon after, the additional ground-penetrating radar work that
Plaintiffs wanted was performed.  That work shows no evidence of burials within the Pro-
ject's Limits of Disturbance.  *See* Declaration of Steve Archer ¶¶ 5–7 & Ex. 1.  Thus,
ground-penetrating radar work done under the programmatic agreement supports the cem-
etery boundary determination set forth in the ROD and the no use determination of the
Section 4(f) analysis.

---

[13] The Section 106 regulations support the use of programmatic agreements in many situ-
ations, including "where other circumstances warrant a departure from the normal Section
106 process."  36 C.F.R. 800.14(b)(1)(v).  Taking care to avoid the unnecessary disturb-
ance of sensitive resources qualifies as one of those circumstances.

**VII.    MDOT complied with Section 4(f) by minimizing harm to Plummers Island.**

Plaintiffs also allege that the agencies failed to comply with Section 4(f) in their review of potential impacts to Plummers Island, a small, ecologically diverse part of the C&O Canal National Historical Park.  Plaintiffs allege that the agencies' failed to adequately consider the possibility of shifting the American Legion Bridge to the west, which they say would avoid harms to Plummers Island.  Pltfs.' Reply at 40.

Under the Section 4(f) regulations, an agency must include in the project "all reasonable measures . . . to minimize harm or mitigate for adverse impacts and effects . . . ."  This process is called "all possible planning."  *See* 23 C.F.R. § 774.3(a)(2); 774.17.  The careful coordination between MDOT, FHWA, and the National Park Service more than satisfied these obligations.  These agencies recognized that a replacement American Legion Bridge would result in unavoidable impacts to National Park Service protected resources, the C&O Canal Park, of which Plummers Island is a part, and the Clara Barton Parkway.  They created the American Legion Bridge Strike Team, which was tasked with comparing multiple engineering design and construction options aimed at minimizing harm to those resources. The agencies properly incorporated their design and construction options deemed best at minimizing harm into the project preferred alternative.

Plaintiffs agree that both the agencies' chosen option and their preferred "west-shift" bridge alignment would harm protected Section 4(f) properties.  Pltfs.' Reply at 42.  Despite the planning efforts that reduced permanent impacts to Plummer Island to 0.1 acre, Plaintiffs assert that the agencies misapplied the balancing factors in the Section 4(f) rules, and that they should have concluded that the west-shift alignment causes less overall harm. Pltfs. Reply at 40–42; 23 C.F.R. § 774.3(c)(1).  That claim fails on its face.

Plaintiffs' west-shift alignment would permanently impact *six* times more protected park acreage than the agencies' preferred alignment.  AR.17692 (FEIS App. N, Final

Avoidance, Minimization, and Impacts Report at 7). The Plaintiffs' also admit that their preferred west shift would result in the loss of at least one residence. Pltfs.' Reply at 41 n.30.[14] The National Park Service emphasized the importance of minimizing acreage impacts to its impacted resources. AR.17698 (FEIS App. N, Final Avoidance, Minimization, and Impacts Report at 13); AR.8142 (ALB Strike Team Briefing, February 2, 2021). These factors alone are sufficient basis for the MDOT and FHWA to reasonably conclude that the preferred ALB alignment is the least harmful. AR.43 (ROD at 40).[15]

Setting aside the merits of the agencies' least overall harm conclusion, Plaintiffs argue that the agencies should have shown their work by engaging in a point-by-point balancing analysis. Pltfs.' Reply at 41. Here, however, Plaintiffs admit that Section 4(f) "does not require" any such "formal findings." Pltfs.' Reply at 41. The applicable regulation says only that a least overall harm analysis "must be documented." 23 C.F.R. § 774.7(c). FHWA's Section 4(f) Policy Paper reinforces that the regulations do not mandate a formulaic, factor-by-factor analysis. *See* https://www.environment.fhwa.dot.gov/legislation/section4f/4fpolicy.aspx. Instead, the agency must balance the potential harm to 4(f) resources against non-parkland impacts and practical concerns. That is what happened here. MDOT balanced the relative harms to the C&O Canal and Clara Barton resources, including all planned mitigation efforts, as well as the National Park Service's views concerning those potential effects.

In sum, the agencies complied with all Section 4(f) requirements concerning Plummers Island by incorporating all possible planning to minimize harms into the final action, and

---

[14] The record also shows how the west shift and associated changes to Clara Barton Parkway would affect the Naval Warfare Center. AR.17694 (FEIS App. N, Avoidance and Minimization Technical Report at 9).

[15] Plaintiffs also ignore MDOT's mitigation commitments to further consider refinements to the project's final design to potentially avoid even the 0.1 acre of anticipated permanent impacts to Plummers Island. AR.62 (ROD App. A at 5).

by explaining in detail the impacts of the west shift alignment, including both maps and a table that compared the west shift alignment to the agencies' preferred alignment. AR.17690–17695 (FEIS App. N, Final Avoidance, Minimization, and Impacts Report at 5–10). Again, the record proves both the agencies' reasonableness and their compliance with Section 4(f)'s requirements.

## VIII.  The agencies' decision should not be vacated for a minor violation—if the Court finds one.

At the end of their reply brief, Plaintiffs argue that the Court should vacate FHWA's decision authorizing the managed lanes project if they prevail. Pltfs.' Br. at 45. This Court has held, however, that "in instances where agency action is deemed arbitrary and capricious rather than contrary to law, courts will, at times, remand the agency's decision without vacating it." *City of Columbus v. Cochran*, 523 F.Supp.3d 731, 772 (D. Md. 2021) (Chasanow, J.). Which path the Court chooses depends on the "seriousness of the order's deficiencies" and "the disruptive consequences of an interim change that may itself be changed." *Id*. (quoting *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.3d 146, 150–51 (D.C. Cir. 1993)). Here, because the Court has not yet decided the merits, and because any decision favoring Plaintiffs could take various forms, no one knows how serious a finding of arbitrary and capricious action would be, much less what disruptive consequences it might have. Thus, MDOT asks that the Court order separate briefing on the proper remedy if it rules in Plaintiffs' favor on any issue.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment and grant summary judgment for MDOT and FHWA.

Respectfully submitted,

Anthony G. Brown
Attorney General of Maryland

Linda M. DeVuono (Fed. Bar No. 08667)
Office of the Attorney General of Maryland
707 N. Calvert St., 4th Floor
Baltimore, MD 21202
Tel: (410) 530-9783
ldevuono@mdot.maryland.gov

*Counsel for Defendants Maryland
Department of Transportation and Secretary
Paul J. Wiedefeld*

_____/s/_____
Fred R. Wagner (Fed. Bar No. 15806)
Jay C. Johnson
Venable LLP
600 Massachusetts Ave., NW
Washington, DC 20001
Tel: (202) 344-4000
Fax: (202) 344-8300
Email: fwagner@venable.com
Email: jcjohnson@venable.com

*Special Counsel to the Attorney General of
Maryland for Defendants Maryland
Department of Transportation and Secretary
Paul J. Wiedefeld*

32

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of October, 2023, a copy of the foregoing was served on all counsel of record via the Court's CM/ECF system, and a courtesy copy was sent to the Clerk in accordance with local rules.

/s/
_____
Fred R. Wagner
