**U.S. Department of Transportation**

**Federal Highway Administration**

**Maryland Division**

### RECORD OF DECISION

**I-495 & I-270 Managed Lanes Study**
**Montgomery and Prince George's Counties, Maryland**
**and Fairfax County, Virginia**

**Federal Highway Administration, Maryland Division**

**10 South Howard Street, Suite 2450**
**Baltimore, MD 21201**

# TABLE OF CONTENTS

I.    Decision...................................................................................................................... 1

II.   Project Location ........................................................................................................... 1

III.  Project Background ...................................................................................................... 2

IV.   Purpose and Need ........................................................................................................ 4

V.    Alternatives Considered .............................................................................................. 6

   A.   No Build Alternative ................................................................................................. 6

   B.   Alternative 9 – Phase 1 South (Selected Alternative)............................................... 6

   C.   Alternatives Considered and Dismissed.................................................................. 19

VI.   Factors in the Decision-Making Process, Including Measures to Minimize Harm ......... 23

   A.   Planning Process .................................................................................................... 24

   B.   NEPA Process ........................................................................................................ 26

   C.   Environmental Impacts and Measures to Avoid and Minimize ................................ 27

   D.   Public Outreach and Opportunities for Comment ................................................... 32

   E.   Consideration of Agency and Public Comments ..................................................... 34

VII.  Determination of Findings Regarding Other Laws ...................................................... 36

   A.   Air Quality Conformity ............................................................................................ 36

   B.   Section 4(f) Determination ..................................................................................... 37

   C.   Section 106 Determination ..................................................................................... 42

   D.   Environmental Justice ............................................................................................ 42

   E.   Wetlands and Waterways Finding ........................................................................... 43

   F.   Floodplain Finding.................................................................................................. 44

   G.   Section 7 of the Endangered Species Act ................................................................ 44

VIII. Mitigation and Commitments .................................................................................... 45

IX.   Permits, Approvals and Next Steps ............................................................................ 46

X.    Comments on FEIS .................................................................................................... 48

   A.   Overview ................................................................................................................ 48

   B.   Common Themes .................................................................................................... 49

XI.   Statute of Limitations ................................................................................................ 53

XII.  Conclusion ............................................................................................................... 53

## List of Figures

Figure 1: I-495 & I-270 Managed Lanes Study Corridors – Selected Alternative........................................... 2

Figure 2: Alternative 9 - Phase 1 South Typical Sections (HOT Managed Lanes Shown in Yellow) .............. 7

Figure 3: Selected Alternative HOT Managed Lanes Access Locations........................................................ 11

Figure 4: Bicycle and Pedestrian Improvements ................................................................. 15
Figure 5: Alternatives Screening Process ........................................................................... 19

**List of Tables**

Table 1: Interchange Improvements/HOT Managed Lane Access Locations under Selected Alternative ......... 9
Table 2: Stormwater Management Requirements for the Selected Alternative ..................................... 16
Table 3: Approved Toll Rate Ranges, Soft Rate Caps, and Discounts ........................................... 19
Table 4: Example Environmental Resource Impact Avoidance and Minimization Efforts ......................... 28
Table 5: Summary of Impacts and Findings of the Selected Alternative ...................................... 29
Table 6: Use of Section 4(f) Property for the Selected Alternative ........................................ 40

**List of Appendices**
**Appendix A: Mitigation and Commitments**
**Appendix B: US Department of Interior FEIS and Section 4(f) Evaluation Letter**
**Appendix C: Section 106 Programmatic Agreement**
**Appendix D: FEIS Substantive Comments and Responses**

00000003

1    **National Environmental Policy Act**
2    **Record of Decision**
3    **Federal Highway Administration**
4
5    **I-495 & I-270 Managed Lanes Study**
6    **Montgomery and Prince George's Counties, Maryland**
7    **and Fairfax County, Virginia**

8

9    **I.    Decision**

10   This Record of Decision (ROD) was prepared in accordance with National Environmental Policy Act (NEPA)
11   (42 USC § 4321 et seq.), the Council on Environmental Quality (CEQ) regulations for implementing the
12   procedural provisions of NEPA (40 CFR Parts 1500 to 1508), and the Federal Highway Administration
13   (FHWA) Environmental Impact and Related Procedures (23 CFR Part 771).This ROD announces selection
14   of the Preferred Alternative, Alternative 9 – Phase 1 South, as the Selected Alternative for the I-495 and
15   I-270 Managed Lanes Study (Study) located in Montgomery and Prince George's Counties, Maryland, and
16   Fairfax County, Virginia. The FHWA hereby approves the Selected Alternative which includes adding two
17   high-occupancy toll (HOT) managed lanes in each direction along I-495 and the conversion of the existing
18   high-occupancy vehicle (HOV) lane to a HOT managed lane and adding one, new HOT managed lane in
19   each direction on I-270 within the Phase 1 South limits (hereafter "the Project"). The Selected Alternative
20   is fully described in **Section V.2** of this ROD and in the Final Environmental Impact Statement (FEIS),
21   Chapter 3[1].

22   This decision relies on the Project administrative record, including information and analysis described in
23   the Draft Environmental Impact Statement (DEIS), Supplemental DEIS (SDEIS), FEIS, all supporting
24   technical reports, public and agency comments received during official review periods, and input received
25   throughout the review process from the public and interested local, state, and federal agencies. In making
26   this decision, the FHWA considered the Project's potential impacts and a reasonable range of alternatives
27   under the National Environmental Policy Act (NEPA), Section 4(f) of the US Department of Transportation
28   Act of 1966, 49 USC 303 (c), and many other laws.  The final decision balances the need for safe, fast and
29   efficient transportation and public services with the goal of avoiding, minimizing, or mitigating adverse
30   environmental and community effects.

31   **II.    Project Location**

32   The 48-mile study corridor or study area limits have remained unchanged throughout the Study: I-495
33   from south of the George Washington Memorial Parkway in Fairfax County, Virginia, to west of MD 5 and
34   along I-270 from I-495 to north of I-370, including the east and west I-270 spurs in Montgomery and Prince
35   George's Counties, Maryland. The Selected Alternative, Alternative 9 - Phase 1 South (shown in **dark blue**
36   in **Figure 1**), includes build improvements within the limits of Phase 1 South only totaling approximately
37   15 miles of proposed improvements. The Phase 1 South limits extend from I-495 from the George
38   Washington Memorial Parkway in Virginia to west of MD 187 and along I-270 from I-495 to north of I-370

---

[1] https://oplanesmd.com/wp-content/uploads/2022/06/MLS_FEIS_03_Preferred-Alternative_June-2022p-1.pdf

1

1  and on the I-270 east and west spurs as shown in **dark blue** in **Figure 1**. There is no action, or no
2  improvements, included at this time on I-495 east of the I-270 east spur to MD 5 (shown in light blue in
3  **Figure 1**).

4              **Figure 1: I-495 & I-270 Managed Lanes Study Corridors – Selected Alternative**



5

6  **III.    Project Background**

7  Congestion has plagued the National Capital Region for decades. The National Capital Region is the most
8  congested region in the nation based on annual delay and congestion per auto commuter. I-495 and I-
9  270 in Maryland are the two most heavily traveled freeways in the National Capital Region and the state
10 of Maryland experiences the second longest commuting times in the nation[2]. Concerns with congestion
11 on I-495 and I-270 and planning to accommodate anticipated future growth have been the subject of
12 numerous studies conducted by the Maryland Department of Transportation State Highway
13 Administration (MDOT SHA), Virginia Department of Transportation (VDOT), and regional planning
14 agencies for many years. (https://oplanesmd.com/environmental/resources/). These studies reflect how
15 the Washington metropolitan area has continued to experience considerable growth, including a
16 population increase of 20.1 percent in Montgomery County and 14.6 percent in Prince George's County
17 between 2000 and 2020. Continued growth is anticipated as the Metropolitan Washington Council of
18 Governments (MWCOG) estimates that between 2020 and 2045, the population of these counties will
19 further increase approximately 16.3 percent and 7.9 percent, respectively.

---

[2] Specifically, I-495 west of I-270 had an Average Annual Daily Traffic (AADT) of 255,000 vehicles per day and I-270
had an AADT volume over 265,000 vehicles per day in 2019 (MDOT SHA, 2020), FEIS, Chapter 1
(https://oplanesmd.com/wp-content/uploads/2022/06/MLS_FEIS_01_PurposeNeed_June-2022p-1.pdf)

00000005

1   The area adjacent to the study corridors is one of the most intensive employment, residential and
2   transportation corridors in the State. A series of past planning studies[3] (dating back almost 20 years)
3   considered a wide breath of congestion relief solutions within the study corridors. As detailed in the
4   Purpose and Need statement, these studies demonstrated the need in the National Capital Region for a
5   synergistic system of transportation solutions. None of the various analyses supported the principle that
6   any individual highway or transit option could alleviate traffic congestion or accommodate anticipated
7   future demand and is best summarized in the conclusion of the 2002 Capital Beltway/Purple Line Study[4]
8   (2002 Study) which analyzed circumferential rail corridors (approximately 42 miles) along the Capital
9   Beltway Corridor. This analysis concluded: "Congestion on the Beltway itself as well as demand on the
10  other transportation facilities is so great that no single highway or transit improvement will provide
11  significant relief to the long-term demand" (2002 Study, page S-17). It was also recommended that studies
12  of the highway and transit alternatives be conducted separately because transit operates more efficiently
13  if it serves areas where people live and work.

14  Importantly, these studies considered various transit, highway, and traffic management improvements.
15  For example, the Purple Line was identified as the major transit option. The State opted to move forward
16  with the Purple Line which is currently under construction. These studies evaluated various options of
17  building managed lanes along these highways and means to connect to other regional transportation
18  facilities.

19  At the same time as Maryland, VDOT proceeded with its own studies and the 495 Express Lanes Northern
20  Extension (495 NEXT[5]) project, which would extend the existing Express Lanes on I-495 in Virginia by
21  approximately three miles from the I-495 and Dulles Toll Road interchange to the vicinity of the ALB. (Refer
22  to **Section V.2** for additional information on this project and MDOT SHA and VDOT's coordination.)

23  In 2017, the MWCOG's Transportation Planning Board (TPB) evaluated and approved a set of 10 regional
24  initiatives[6] for further study. MWCOG, is an independent, nonprofit association where area leaders
25  address regional issues affecting the District of Columbia, suburban Maryland, and northern Virginia. This
26  group analyzed managed lanes on the portions of I-495 and I-270 included in the Study. For example,
27  Initiative 1. Regional Express Transit Network: Express toll lanes network (free to HOV and transit) with
28  added lanes where feasible on existing limited access highways (including remaining portion of Capital
29  Beltway, I-270, Dulles Toll Road, US 50); includes expanded American Legion Bridge (page 8,
30  https://www.mwcog.org/assets/1/28/07192017_-_Item_8_-_LRPTF_Resolution_R1-
31  2018_and_Memo.pdf). Then, in October 2018, the TPB approved the "Visualize 2045" plan which included
32  a variety of financially constrained projects related to potential toll lanes on I-495 and I-270. The National
33  Capital Region Transportation Planning Board (NCRTPB) updated the Visualize 2045 Long Range
34  Transportation Plan Update and Transportation Sector Greenhouse Gas reduction Goals and Strategies in
35  June of this year.

---

[3] https://oplanesmd.com/wp-content/uploads/2020/07/DEIS_AppA_PN_web.pdf and
https://oplanesmd.com/environmental/resources/
[4] https://oplanesmd.com/wp-content/uploads/2019/07/Capital_Beltway_Purple_Line_Study_2002.pdf
[5] http://www.495northernextension.org/
[6] https://www.mwcog.org/assets/1/28/07192017_-_Item_8_-_LRPTF_Resolution_R1-2018_and_Memo.pdf

00000006

1  In March of 2018, FHWA issued a Notice of Intent to prepare an EIS followed by Scoping Public Workshops
2  in April 2018. The alternatives development phase, described in greater detail in **Section VI** of this ROD
3  and **DEIS, Chapter 2** and **DEIS, Appendix B**, included coordination with and input from federal, state, and
4  local agencies and public outreach. Public input included presentations of the current thinking at relevant
5  times: Preliminary Alternatives in July 2018 and Alternatives Retained for Detailed Study (ARDS) in April
6  to May 2019.

7  Throughout the Study, the FHWA and MDOT SHA met with and considered input from federal, state, and
8  local agencies as well as the public. The DEIS was published in July 2020 and was made available for formal
9  public and agency review and comment for a 123-day comment period. The SDEIS was published on
10  October 1, 2021 and was prepared to consider new information relative to the Preferred Alternative,
11  Alternative 9 - Phase 1 South. The SDEIS was available for review to the public and agencies for a 60-day
12  comment period.

13  The FEIS was published on June 17, 2022, and presented the final analyses completed for the Preferred
14  Alternative, design refinements since the SDEIS, as well as responses to comments on the DEIS and SDEIS.
15  The FEIS responds to the over 5,000 public and agency comments received on the DEIS and SDEIS. The
16  FEIS was available for a 30-day review period between the publication of the FEIS and the ROD. During
17  this 30-day period, public comments were received and considered by FHWA and MDOT SHA. New and
18  substantive comments received during the FEIS review period are summarized in **Section XI** and **Appendix
19  D** of this ROD.

20  The advancement of conceptual mitigation for unavoidable effects to environmental resources from the
21  Selected Alternative has occurred during each of the NEPA Document milestones for the Study: the DEIS,
22  SDEIS and FEIS. The final mitigation was based on priorities identified by the Officials with Jurisdiction
23  (OWJ) and regulatory agencies over the resource to achieve no net loss, with a goal of net benefit. FHWA
24  will require the MDOT SHA, as part of this approval, to implement the extensive mitigation and
25  commitments planned for this Project and described in **Appendix A** of this ROD, and stipulations
26  negotiated as part of an approved Programmatic Agreement concerning adverse effects to cultural and
27  historic resources, **Appendix C** of this ROD. The mitigation and commitments address the full range of
28  resources discussed in the EIS documents: water resources (wetlands, floodplains, groundwater
29  hydrology, watershed and surface waters); forests (including vegetation and terrestrial habitat); rare,
30  threatened, and endangered species; terrestrial wildlife; aquatic biota; parks and recreational facilities;
31  unique and sensitive areas; historical, architectural, and archaeological resources; noise; air quality;
32  property acquisitions; hazardous materials; topography, geology, and soils; community facilities;
33  environmental justice; and visual/aesthetic resources.

34  The website for Op Lanes Maryland Program and the Project (https://oplanesmd.com/) has been and will
35  continue to be maintained to provide updates, announcements and access to project documents
36  following the ROD.

37  ## IV.    Purpose and Need

38  As described above in **Section III**, improvements to address the severe congestion on I-495 and I-270 have
39  been evaluated for decades, with similar consensus regarding the need for highway, transit and other
40  transportation management measures. The congestion on these corridors also has negative effects on

00000007

1   access to and usage of other transportation modes. Besides enhanced performance on I-495 and I-270
2   themselves, improvements to provide congestion relief on these facilities will also enhance existing and
3   proposed multimodal transportation services by improving connectivity and mobility through enhancing
4   trip reliability and providing additional travel choices for efficient travel during times of extensive
5   congestion. Improved direct and indirect connections to park and ride lots, Metrorail, bus and other
6   transit facilities are anticipated to occur as a result of addressing congestion on these regional roadways,
7   thus providing a system of systems approach to addressing overall transportation needs in the National
8   Capital Region.

9   The Study Purpose and Need Statement was developed through a collaborative process with other
10  federal, state and local agencies and the public during the NEPA scoping process that included
11  examination of multiple transportation and regional planning studies that had been conducted over the
12  past 20+ years, and an analysis of the environmental and socioeconomic conditions of the region. Refer
13  to **DEIS, Appendix A** for the Purpose and Need Statement (https://oplanesmd.com/wp-
14  content/uploads/2020/07/DEIS_AppA_PN_web.pdf).

15  This Study analyzed travel demand management solution(s) and reasonable alternatives that address
16  these identified needs of the study area. The Project purpose is to address congestion, improve trip
17  reliability on I-495 and I-270 within the study limits and enhance existing and planned multimodal mobility
18  and connectivity.

19  The needs for the Study are:

20  • Accommodate Existing Traffic and Long-Term Traffic Growth
21  • Enhance Trip Reliability
22  • Provide Additional Roadway Travel Choices
23  • Improve Movement of Goods and Services
24  • Accommodate Homeland Security.

25  Two goals for the Study were identified in addition to the needs: 1) the use of alternative funding
26  approaches for financial viability and 2) environmental responsibility.

27  For additional details on the Study's Purpose and Need refer to:

28  • DEIS, Chapter 1: Purpose and Need (https://oplanesmd.com/wp-
29    content/uploads/2020/11/2020-06-02_DEIS_01_Purpose_and_Need.pdf)
30  • DEIS, Appendix A: Purpose and Need Statement (https://oplanesmd.com/wp-
31    content/uploads/2020/07/DEIS_AppA_PN_web.pdf)
32  • SDEIS, Chapter 1: Purpose and Need (https://oplanesmd.com/wp-
33    content/uploads/2021/09/SDEIS_01_PurposeNeed.pdf)
34  • FEIS, Chapter 1: Purpose and Need (https://oplanesmd.com/wp-
35    content/uploads/2022/06/MLS_FEIS_01_PurposeNeed_June-2022p-1.pdf)

00000008

1  ## V.    Alternatives Considered

2  ### A.    No Build Alternative

3  The No Build Alternative, often called the base case, includes all other projects in Visualize 2045 adopted
4  by the MWCOG, TPB in 2018, except improvements considered under this Study. Specifically, the Visualize
5  2045 reflects the extension of the I-495 express lanes in Virginia from the Dulles Toll Road interchange to
6  the George Washington Memorial Parkway. The No Build Alternative also includes the I-270 Innovative
7  Congestion Management (ICM) project, which is providing a series of improvements to address mobility
8  and safety at key points along I-270 targeted to reduce congestion at key bottlenecks along the corridor.
9  All ICM improvements are anticipated to be completed by the end of 2022. While the ICM improvements
10  will improve mobility and safety, they will not address the long-term capacity need for the I-270 corridor.

11  The No Build Alternative also includes the Visualize 2045 transit improvement projects including the
12  Purple Line, improvements to MARC, and the construction of a BRT network. The MDOT Maryland Transit
13  Administration (MTA) and Montgomery County have Bus Rapid Transit (BRT) studies underway to provide
14  additional travel choices and relieve congestion on the adjacent roadway networks.

15  Routine maintenance and safety improvements along I-495 and I-270 are included in the No Build
16  Alternative. However, it does not include new capacity improvements to I-495 and I-270. The No Build
17  Alternative does not meet the Study's Purpose and Need and is only retained for the purposes of
18  comparison with the Build Alternatives in accordance with the regulations for implementing NEPA (40 CFR
19  §1502.14(d)).

20  ### B.    Alternative 9 – Phase 1 South (Selected Alternative)

21  As outlined in the FEIS, the Selected Alternative is anticipated to address the Study's Purpose and Need
22  concerning existing and future congestion in at least the following ways.

23  Reduce system-wide delay for the entire study area by 13% during the AM peak period and by 38% during
24  the PM peak period compared to 2045 No Build conditions. [FEIS, page 4-10]

25  Improve travel speeds and provide the option for a free flow trip in the HOT managed lanes with an
26  average speed of 60 mph, see Table 4-6 [FEIS, page 4-12], and provide benefits to the existing lanes by
27  improving average speeds in the general purpose lanes by four mph on average throughout the study
28  corridors during peak periods compared to the No Build condition. Detailed corridor travel speed results
29  by peak hour and direction for the general purpose lanes and the managed lanes are provided in Table 4-
30  7. [FEIS, page 4-13]

31  Provide increased throughput by 2,000 vehicles per hour compared to the No Build Alternative, from an
32  average of 15,700 vehicles per hour to an average of 17,700 vehicles across the ALB and on I-270 north to
33  I-370 while reducing congestion. [FEIS, page 4-15]

34  Reduce delay on surrounding local roadways, including a 4.8% reduction in daily delay on the arterials in
35  Montgomery County, with some localized increases in arterial traffic near the managed lane access
36  interchanges. [FEIS, page 4-17]

00000009

1  Some congestion would still be present during the PM peak period on I-270 northbound and the I-495
2  inner loop in the design year of 2045 due to downstream bottlenecks outside of the Selected Alternative
3  limits, but travelers on most corridors would experience significantly faster, more reliable trips.

4  The Selected Alternative reflects no action or improvements on I-495 east of the I-270 east spur to MD 5
5  (Figure 1). The elements of the Selected Alternative are described in the following sections and include:
6  alignment and cost, interchanges and HOT managed lanes, transit-related elements, pedestrian and
7  bicycle facilities, stormwater management, cross culverts, and tolling.

8  **Alignment and Cost**

9  On I-495, the Selected Alternative consists of adding two new, HOT managed lanes in each direction from
10 the George Washington Memorial Parkway to west of MD 187. The extent of work along I-495 between
11 the I-270 west and east spurs is limited to west of MD 187. On I-270, the Selected Alternative consists of
12 converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT
13 managed lane in each direction from I-495 to just north of I-370 and on the I-270 east and west spurs. The
14 proposed typical sections for the Selected Alternative along I-495 and I-270 are shown in **Figure 2**. The
15 HOT managed lanes will be separated from the general purpose lanes using flexible delineators placed
16 within a buffer, as shown in **Figure 2**. Transit buses and HOV 3+ vehicles will be allowed free passage in
17 the HOT managed lanes.

18   **Figure 2: Alternative 9 - Phase 1 South Typical Sections (HOT Managed Lanes Shown in Yellow)**



**I-495 from the George Washington Memorial Parkway to west of MD 187**

Approx. 194' - 198'

**I-495: American Legion Bridge (Looking north towards Maryland)**

Exit and entrance lanes provide access to the High-Occupancy Toll Lanes from the George Washington Memorial Parkway

Location for shared-use path on ALB

**I-495 west of MD 187 to west of MD 5 - NO ACTION AT THIS TIME**



Approx. 138' - 146'

**I-270 from I-495 to I-370**



Approx. 218' - 222'

19

00000010

1    Along I-270, the existing collector-distributor (C-D) lane separation from Montrose Road to I-370 will be
2    removed as part of the proposed improvements. MDOT SHA included this proposed lane reconfiguration
3    and repurposing of pavement on I-270 for the Build Alternatives in the DEIS to address the current
4    imbalanced traffic utilization along the C-D Road segment and in response to public comments to keep
5    the improvements within the existing pavement footprint. The proposed improvements will tie into the
6    existing C-D road segment that would remain along northbound I-270 north of I-370. As a result, the
7    amount of roadway widening along I-270 needed for the Selected Alternative is minimized.

8    Virginia's 495 Express Lanes Northern Extension (495 NEXT) project would extend the existing Express
9    Lanes on I-495 in Virginia by approximately three miles from the I-495 and Dulles Toll Road interchange
10   to the vicinity of the ALB. The project needs[7] are reduce congestion and improve roadway safety, provide
11   additional travel choices, and improve travel reliability. The 495 NEXT will provide new and improved
12   express lanes connections at the Dulles Corridor and George Washington Memorial Parkway interchanges.
13   The Selected Alternative will overlap and tie-in with the 495 NEXT improvements on I-495 at the George
14   Washington Memorial Parkway interchange. MDOT has coordinated closely with the Virginia Department
15   of Transportation (VDOT), a Cooperating Agency on the Study, to refine the preliminary design concept to
16   consolidate and provide compatible movements at the interchange.  Specifically, design concepts at the
17   George Washington Memorial Parkway interchange, along I-495 in Virginia south of the ALB, consolidates
18   movements and provides coordinated movements with the recently approved 495 NEXT in Virginia. Other
19   than buses, vehicles with greater than two axles are not currently permitted to use the Express Lanes in
20   Virginia.  The HOT lanes in Maryland will not prohibit vehicles that are permitted to use the HOT
21   lanes.  The interchange at the George Washington Memorial Parkway has been designed to accommodate
22   this difference in the Virginia Express Lanes and Maryland HOT lanes.   The Selected Alternative also adds
23   a pair of exchange ramps to provide vehicles the opportunity to exit the managed lanes along the I-270
24   west spur north of I-495 in Maryland.

25   Additionally, MDOT SHA's ongoing I-270 ICM project is providing a series of improvements to address
26   mobility and safety at key points along I-270 targeted to reduce congestion at bottlenecks along the
27   corridor in the short-term. Elements of the ICM that will be maintained within the Selected Alternative
28   limits include ramp metering; the additional auxiliary lane added in both directions along the I-270 west
29   spur and I-270 mainline up to Montrose Road; and auxiliary lanes in both directions along I-270 between
30   the MD 189 and MD 28 interchanges.

31   The limit of disturbance (LOD) is the proposed boundary within which all mainline construction,
32   construction access, staging, materials storage, grading, clearing, erosion and sediment control,
33   landscaping, drainage, stormwater management, noise barrier replacement/construction, and related
34   activities would occur. The LOD for the Selected Alternative was determined from the proposed roadway
35   typical section, interchange configuration, and roadside design elements and is shown on the
36   *Environmental Resource Mapping* (**FEIS, Appendix E**).

37   The preliminary, estimated capital cost for the Selected Alternative in 2022 dollars ranges between $3.75
38   and $4.25 billion. The cost range in year or expenditure (YOE) dollars, which accounts for inflation
39   between now and when the project is anticipated to be constructed (2026), is between $4.5 and $5.0
40   billion. The methodology, assumptions, and components of the cost estimate have been refined since the

[7] http://www.495northernextension.org/about_the_study/default.asp

00000011

1   SDEIS based on the level of information available and the preliminary design concept presented in the
2   FEIS. This estimate includes costs for preliminary and final design, construction, property acquisition, and
3   environmental mitigation commitments. The cost estimate was prepared using major quantities in
4   accordance with the MDOT SHA Highway Construction Cost Estimating Manual with additional
5   construction elements quantified and appropriate contingencies added based on past construction
6   experience and engineering judgment to reflect the increased level of detail available at this time. The
7   cost estimate also includes costs for design and construction risks determined through a cost and schedule
8   risk assessment (CSRA) workshop completed with FHWA in spring 2022.

9   **Interchanges and HOT Managed Lanes**

10  There are a total of 34 existing interchanges within the study limits, with 14 existing interchanges within
11  the limits of Phase 1 South of the Selected Alternative. All 14 interchanges within Phase 1 South will be
12  modified as needed to accommodate the managed lanes. The HOT managed lanes traveling in the same
13  direction as the general purpose lanes would be separated from the general purpose lanes by a buffer
14  and flexible delineators as shown in the typical sections (**Figure 2**). Access to and from the HOT managed
15  lanes would be provided via direct access ramps at select existing interchanges; direct access ramps at
16  two new interchanges; exchange ramps between Virginia and Maryland where ingress to the Maryland
17  HOT managed lanes from the general purpose lanes along the inner loop and egress from the Maryland
18  HOT managed lanes to the general purpose lanes along the outer loop would be provided; exchange
19  ramps providing ingress to and egress from the HOT managed lanes in both directions along the I-270
20  West Spur; and at the limits of the build improvements for the Selected Alternative.

21  In total, access to and from the HOT managed lanes is proposed at nine locations (five existing
22  interchanges, two new interchanges, and two exchange ramp locations), as well as at the termini of the
23  HOT managed lanes along I-495 west of MD 187, along the I-270 east spur south of MD 187, and along I-
24  270 north of I-370. The interchanges that will be modified as part of the Selected Alternative are listed in
25  **Table 1**.

26  **Table 1: Interchange Improvements/HOT Managed Lane Access Locations under Selected Alternative**

| Location | Modification |
|---|---|
| Interface with Virginia I-495 HOT Lanes south of the ALB (see location 'F' on Figure 3) | • Exchange ramp from Maryland HOT managed lanes to Virginia general purpose lanes (outer loop only) <br> • Exchange ramp from the Virginia general purpose lanes to Maryland HOT managed lanes (inner loop only) |
| I-495/George Washington Memorial Parkway Interchange (see location 'G' on Figure 3) | • Direct access to HOT managed lanes in Maryland <br> • Adjusted interchange ramps to accommodate widened mainline |
| I-495/Clara Barton Parkway Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| I-495/MD 190/Cabin John Parkway Interchange (see location 'H' on Figure 3) | • HOT managed lanes direct access interchange <br> • Adjusted interchange ramps to accommodate widened mainline |
| I-495/I-270 west spur Interchange (see location 'I' on Figure 3) | • HOT managed lanes direct access interchange <br> • Reconstructed interchange to accommodate HOT managed lanes |
| I-495/MD 187 Interchange | • No proposed interchange improvements |

9

| Location | Modification |
|---|---|
| I-495/I-270 east spur/MD 355 Interchange | • No proposed interchange improvements |
| I-495/MD 185 Interchange | • No proposed interchange improvements |
| I-495/MD 97 Interchange | • No proposed interchange improvements |
| I-495/US 29 Interchange | • No proposed interchange improvements |
| I-495/MD 193 Interchange | • No proposed interchange improvements |
| I-495/MD 650 Interchange | • No proposed interchange improvements |
| I-495/ I-95 Interchange | • No proposed interchange improvements |
| I-495/US 1 Interchange | • No proposed interchange improvements |
| I-495/Greenbelt Metro Interchange | • No proposed interchange improvements |
| I-495/MD 201 Interchange | • No proposed interchange improvements |
| I-495/Baltimore-Washington Parkway Interchange | • No proposed interchange improvements |
| I-495/MD 450 Interchange | • No proposed interchange improvements |
| I-495/US 50 Interchange | • No proposed interchange improvements |
| I-495/MD 202 Interchange | • No proposed interchange improvements |
| I-495/Arena Drive Interchange | • No proposed interchange improvements |
| I-495/MD 214 Interchange | • No proposed interchange improvements |
| I-495/Ritchie Marlboro Interchange | • No proposed interchange improvements |
| I-495/MD 4 Interchange | • No proposed interchange improvements |
| I-495/MD 337/Suitland Road Interchange | • No proposed interchange improvements |
| I-495/MD 5 Interchange | • No proposed interchange improvements |
| I-270 west spur north of I-495 (see location 'E' on Figure 3) | • Exchange ramps allowing ingress to and egress from the HOT managed lanes to general purpose lanes |
| I-270 west spur/Democracy Boulevard Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| I-270 west spur/Westlake Terrace Interchange (see location 'D' on Figure 3) | • Repurposed existing HOV only ramps to/from north to HOT managed lanes direct access ramps<br>• Added HOT managed lanes direct access ramps to/from south |
| I-270 Y-Split Interchange | • Reconstructed interchange to accommodate HOT managed lanes |
| I-270/Montrose Road Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| I-270/Wootton Parkway Interchange *(new interchange)* (see location 'C' on Figure 3) | • New interchange for HOT managed lanes direct access only |
| I-270/MD 189 Interchange | • Reconfigured interchange ramps to accommodate widened mainline |
| I-270/MD 28 Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| I-270/Gude Drive Interchange *(new interchange)* (see location 'B' on Figure 3) | • New interchange for HOT managed lanes direct access only |
| I-270/Shady Grove Road Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| I-270/I-370 Interchange (see location 'A' on Figure 3) | • HOT managed lanes direct access interchange (to/from south only)<br>• Adjusted ramps to accommodate widened mainline |
| I-270 east spur/MD 187/Rockledge Drive Interchange | • Adjusted interchange ramps to accommodate widened mainline |

1   Note: The rows shaded in blue indicate HOT managed lanes access locations.

00000013

Record of Decision

1                                    **Figure 3: Selected Alternative HOT Managed Lanes Access Locations**



2

11

**Transit-Related Elements**

Severe congestion on I-495 and I-270 adversely affects the regional and local roadway network, especially in and around the interchanges and arterial roads in the study area. The congestion on these corridors also has negative effects on access to and usage of other transportation modes. Besides enhanced performance on I-495 and I-270 themselves, improvements to provide congestion relief on these facilities will also enhance existing and proposed multimodal transportation services by improving connectivity and mobility through enhancing trip reliability and providing additional travel choices for efficient travel during times of extensive congestion.  Improved direct and indirect connections to park and ride lots, Metrorail, bus and other transit facilities are anticipated to occur as a result of addressing congestion on these regional roadways, thus providing a system of systems approach to addressing overall transportation needs in the National Capital Region.

The Selected Alternative includes transit-related elements that provide access/connectivity and enhance mobility for transit vehicles and passengers to support the Study's purpose of enhancing existing and planned multimodal mobility and connectivity.  Additionally, MDOT SHA has prepared the Transit Service Coordination Report as the initial product from the I-495 & I-270 Managed Lanes Transit Work Group to assist affected counties and transit providers in prioritizing capital and operating investments(https://oplanesmd.com/transit-service-coordination-report/).

MDOT SHA has identified opportunities to enhance transit mobility and connectivity as part of the Selected Alternative. These include the following elements, which were documented in the SDEIS and FEIS:

- Free bus transit usage of the HOT managed lanes to provide an increase in speed of travel, assurance of a reliable trip, and connection to local bus service/systems on arterials that directly connect to activity and economic centers.
- Access from the proposed HOT managed lanes to existing transit stations and planned Transit Oriented Development via direct and indirect connections. A direct connection is where the HOT managed lanes ramps connect to an arterial at or near the location of a transit facility like at the Westfield Montgomery Mall Transit Center on Westlake Terrace. A connection is considered indirect where the transit facility is not adjacent, but in relatively close proximity to the HOT managed lanes access point, like at the Shady Grove Metro Station on I-370, and the Twinbrook and Rockville Metro Stations near Wootton Parkway. New or existing bus routes can take advantage of the relative proximity to the HOT managed lanes for express bus service or other direct connections.
- Construct new bus bays at Washington Metropolitan Area Transit Authority's Shady Grove Metrorail Station and increase parking capacity at the Westfield Montgomery Mall Transit Center.

MDOT SHA and the Public-Private Partnership (P3) Developer have committed to additional regional transit improvements and investments in transit services and projects as part of the P3 Agreement. Refer to **FEIS, Chapter 7, Section 7.3 and ROD, Appendix A, Table 2**. While these commitments are not required as part of the Project, the Study efforts identified these additional means to enhance existing and planned transit and support new opportunities for regional transit service, including:

00000015

1     •   Construct and equip the Metropolitan Grove Operations and Maintenance Facility including the
2        necessary bus fleet.

3     •   After financial close of the Phase 1 South Section P3 Agreement, fund not less than $60 million
4        from the Development Rights Fee provided by the P3 Developer for the design and permitting of
5        high priority transit investments in Montgomery County

6     •   Provide not less than $300 million of additional transit investment funding inclusive of the P3
7        Developer's proposed transit investment to implement high priority transit projects in
8        Montgomery County over the operating term of Phase 1 South.

9     •   Working with Montgomery, Frederick, and Prince George's Counties to expand transit fare
10       subsidies for eligible low-income riders.

11     •   Design and construct the ALB such that a future capital improvement project will have one or
12       more feasible options to achieve the full design and implementation of a transit line across the
13       ALB.  These options will be enabled by designing the northbound and southbound structures to
14       not preclude a possible future transit line including the addition of foundation and substructure
15       elements.

**Pedestrian and Bicycle Facilities**

The Selected Alternative reflects a commitment to provide pedestrian and bicycle connectivity and
mobility in the study area consistent with comments received throughout the NEPA process. Existing
pedestrian and bicycle facilities impacted by the Selected Alternative would be replaced in kind or
upgraded to meet the current master plan[8] recommended facilities. Provision of these upgraded facilities
would be subject to maintenance agreements between MDOT SHA and the local jurisdictions in
compliance with Maryland law. The design approach for facilities along crossroads where the crossroad
bridge would be reconstructed is to replace, upgrade, or provide new pedestrian/bicycle facilities (that
are consistent with the current master plan), where adjacent connections on either side of the bridge
currently exist. Where the I-495 and I-270 mainline or ramps cross over a roadway or pedestrian/bicycle
facility and the bridge would be replaced, the mainline and ramp bridges would be lengthened to
accommodate the footprint for the master plan facility under the structure. The two locations where
lengthening of the mainline bridges is included in the Selected Alternative are described below and
included in **Section 3.2.2** in **Chapter 3** of the **FEIS**:

    •   Lengthen the I-495 bridge over Seven Locks Road to accommodate pedestrian/bicycle facilities
      along Seven Locks Road. MDOT has committed to constructing the master plan recommended
      facilities along Seven Locks Road

    •   Lengthen the I-270 bridge over Tuckerman Lane to accommodate future pedestrian/bicycle
      facilities along Tuckerman Lane. Montgomery County would construct the master plan
      recommended facilities along Tuckerman Lane in the future.

In response to public comments supporting a direct connection of the shared use path from the ALB to
the Chesapeake and Ohio Canal towpath, a direct connection to the Chesapeake and Ohio Canal towpath
has been incorporated into the Selected Alternative's preliminary design and final impact analysis. The

---

[8] MDOT SHA Bicycle Policy & Design Guidelines (January 2015), Montgomery County Planning Department's Bicycle
Facility Design Toolkit (May 2018), and City of Rockville's Bikeway Master Plan (April 2017)

00000016

1   direct connection to the Chesapeake and Ohio Canal towpath results in fewer NPS property and natural
2   resource impacts. MDOT SHA and the Developer will continue to coordinate with NPS to review the
3   condition of the existing connection(s) to the east and west of the ALB between the Chesapeake and Ohio
4   Canal towpath and the MacArthur Boulevard sidepath outside of the study area to ensure the existing
5   connection(s) can handle any increased usage from the new shared use path connection to the
6   Chesapeake and Ohio Canal towpath. The alignment of the proposed shared use path connection to the
7   Chesapeake and Ohio Canal towpath is shown in the **FEIS, Appendix E**.

8   The proposed pedestrian and bicycle facilities that would be constructed as part of the Selected
9   Alternative are listed in **Table 3-2** in **Chapter 3** of the **FEIS** and shown in **Figure 4** of this ROD. Identification
10  of the proposed pedestrian and bicycle facilities was conducted during the NEPA process in coordination
11  with the Maryland-National Capital Park and Planning Commission (M-NCPPC), the Montgomery County
12  Department of Transportation (MCDOT), and the City of Rockville. Coordination with these key agency
13  stakeholders will continue through final design. The new facilities or upgrades included in the Selected
14  Alternative were designed at a planning level in accordance with MDOT SHA, Montgomery County, or City
15  of Rockville design requirements, including consideration of the recent Montgomery County Complete
16  Streets Design Guide.

00000017

1                      **Figure 4: Bicycle and Pedestrian Improvements**



2

00000018

1  **Stormwater Management**

2  The *Maryland Stormwater Management Act of 2007* emphasizes environmental site design (ESD) and
3  consideration of SWM early in the planning stage of a project to better balance transportation needs,
4  right-of-way considerations, and requirements of the Act, which include both water quality (i.e., ESD) and
5  water quantity management. Water quality management treats the first flush of rainfall to remove
6  pollutants and improve downstream conditions. Water quantity management stores and slowly releases
7  water to reduce downstream flooding.

8  The Selected Alternative will be required to meet all SWM permitting requirements for Maryland and
9  Virginia, which includes both water quality treatment and water quantity control. In Maryland, water
10  quality treatment must be provided onsite to the maximum extent practicable for all new impervious area
11  and a minimum of 50 percent of reconstructed existing impervious area to mimic the runoff characteristics
12  of woods in good conditions.

13  MDOT SHA reevaluated stormwater needs and locations for the overall Project management approach
14  during the NEPA process using a more detailed volume-based analysis and developing a SWM Concept.
15  The SWM Concept applies standard Maryland Department of the Environment (MDE) approved hydrology
16  and hydraulic procedures, which includes a volumetric approach for calculating stormwater credit. A total
17  of 167 Points of Investigation (POI) or Lines of Investigation (LOI), defined as locations where project-
18  related stormwater runoff leaves the MDOT SHA right-of-way, were identified for Phase 1 South.
19  Required and provided stormwater needs were then tabulated for each POI/LOI. A planning-level,
20  conceptual identification of stormwater management (SWM) needs was considered throughout the Phase
21  1 South limits when establishing the LOD for the Selected Alternative.

22  The total impervious area requiring treatment (IART) was determined for the Selected Alternative and is
23  presented in **Table 2** below. A total of approximately 116 acres of new impervious area is anticipated for
24  Phase 1 South.  All new impervious area will need to be treated for both water quality and water quantity.
25  In addition, approximately 72 acres of existing impervious area will require water quality treatment and
26  approximately 22 acres of existing water quality treatment is expected to be impacted by the Project and
27  must be replaced.

28  **Table 2: Stormwater Management Requirements for the Selected Alternative**

| IART from Loss of Water Quality (ac) | IART from Redevelopment (ac) | IART from New Development (ac) | Total IART (ac) |
|---|---|---|---|
| 21.75 | 72.03 | 116.20 | 209.98 |

29  Note: Stormwater requirements are for work in Maryland only.

30  Proposed SWM facilities for the FEIS include wet ponds, extended detention ponds, underground quantity
31  facilities, submerged gravel wetlands, grass swales, bioswales, micro-bioretentions, bioretentions,
32  underground sand filters, etc. The proposed, large surface SWM features are shown on the *Environmental
33  Resource Mapping* (**FEIS, Appendix E**). Due to existing site constraints, the estimated impervious area
34  treated (IAT) onsite for the Selected Alternative is 207.59 acres and the estimated remaining IART must
35  be treated off-site using compensatory SWM is 2.39 acres.

00000019

The Compensatory SWM Mitigation Plan, **FEIS, Appendix D** provides compensatory SWM sites to meet the target IART for the Selected Alternative through use of mainly environmental site design SWM facilities within the same MDE 12-digit and/or 8-digit watershed Washington Metropolitan (No. 021402). The amount of compensatory IAT identified, 27.39 acres, exceeds the need of 2.39 acres. The plan includes an excess of potential compensatory SWM sites to allow for the more detailed analysis performed during final design. Detailed design will include avoidance and minimization of impacts that may result from SWM sites. In addition, the use of alternate sites which could have fewer, or no impacts, will be considered in final design.

The Selected Alternative will also include work in Virginia, located between the George Washington Memorial Parkway and the southern bank of the Potomac River. Coordination with VDOT on the 495 NEXT project is ongoing and will continue through final design. The preliminary stormwater analysis identified a pond retrofit and expansion to meet both the water quantity and quality requirements. Preliminary calculations indicated that the retrofit would provide both two-year and ten-year management.  In addition, the retrofit is estimated to provide between 75 and 90 percent of the required nutrient load reduction. Credits for the remaining required nutrient load reduction can be purchased from a Nutrient Credit Bank. The exact nutrient load credits to be purchased will be determined during final design.

**Cross Culverts**

All major cross culverts, defined as culverts 36 inches in diameter or greater with a drainage area greater than 25 acres, were identified and analyzed to determine if they would need additional capacity in the proposed conditions. Major culverts were identified by desktop analysis using the MDOT SHA large and small structure database; LiDAR (light detection and ranging) topographic data with one-foot contours; the MDOT SHA NPDES database; and field observations.

If an existing culvert crossing is predicted to need additional capacity in the proposed conditions, then an auxiliary culvert has been proposed to meet the need. It was assumed that the auxiliary culverts could be installed using trenchless technologies (installing the culvert underground without disturbing the existing road) so as not to disrupt traffic traveling on the existing road. The LOD of the Selected Alternative includes all areas identified for culvert augmentation and shown in the mapping in **FEIS, Appendix E**.

Detailed hydrologic and hydraulic analysis will be completed during final design to confirm that augmentation is required. The detailed design will utilize additional data, including roadway and stream topographic survey, to analyze each culvert crossing location more thoroughly and will assess the hydraulic impacts associated with augmentation to confirm that the proposed design will meet the regulatory requirements. The increased capacity from culvert augmentation can lead to increased downstream discharges and velocities, which may result in increased downstream flooding.  The addition of a culvert barrel can also lead to redistribution of channel flows and sediment transport, leading to aquatic organism passage barriers. Culvert augmentations will be designed with these considerations in mind. During final design, it is possible that culvert augmentation will not be needed at some previously identified locations or will be needed at other additional locations based on the detailed design.

MDOT SHA also refined the approach to relocate, pipe, or maintain the existing alignment of Thomas Branch located along the I-270 west spur. The Selected Alternative design concept proposes to eliminate

00000020

1    the existing culvert crossing of the I-270 west spur north of Democracy Boulevard to reduce the total
2    length of culvert along Thomas Branch and maintain portions in an open channel.

3    **Tolling**

4    The Selected Alternative includes tolling of the HOT managed lanes as a variably priced facility that will
5    utilize dynamic pricing. The toll rates and toll rate ranges were determined through a multi-step process
6    that is codified in Maryland law and regulation [Transportation Article §4-312 of the Annotated Code of
7    Maryland and COMAR Title 11 Department of Transportation, Subtitle 07 Maryland Transportation
8    Authority DTA, Chapter 05 Public Notice of Toll Schedule Revisions (11.07.05)], which provides for public
9    input through public hearings.

10   Maryland law requires the establishment of toll rate ranges for variably priced facilities, including those
11   utilizing dynamic pricing, which is a method of calculating the toll where the pricing mileage rate varies
12   within the approved toll rate range in real time. A dynamic facility uses operational metrics to adjust the
13   toll in real time to maintain free-flowing traffic by using pricing factors to influence the traffic flow—when
14   lanes become more congested, the toll increases, and when the lanes become less congested, the toll
15   decreases. The toll rates within each tolling segment could change as often as every five minutes based
16   on real-time traffic volumes or speed in the HOT lanes to provide customers who choose to use the HOT
17   lanes and pay a toll, a faster and more reliable trip. Customers will pay the toll rate in effect when they
18   enter the managed lanes, regardless of toll rate changes that occur in any tolling segment during their
19   trip.

20   The toll rate ranges were approved by the Maryland Transportation Authority (MDTA) Board in Fall 2021
21   and include minimum and maximum toll rate ranges, soft rate caps, a process for annual toll escalation,
22   and toll discounts for certain types of vehicles. Refer to **Table 3**. The toll rate ranges are limited to only
23   Phase 1 South. Any action to set, revise and fix tolls outside of Phase 1 South limits would require a
24   separate toll setting process in accordance with State law.

25   The goal of the HOT managed lanes is to maintain free-flowing traffic by using pricing factors to influence
26   traffic flow. The Selected Alternative was designed to maintain speeds of 45 mph or greater in the HOT
27   managed lanes, in compliance with Title 23 United States Codes (U.S.C.) 129 and 166.

28   MDTA spent more than two years conducting due diligence activities on the toll rate range proposal which
29   included traffic and revenue studies, post-model processing, and feedback from potential developers. The
30   approved toll rate ranges are provided below in cost per mile ($/mile) for a passenger vehicle. The rate
31   ranges    for    other    vehicle    classifications    can    be    found    on    the    MDTA    webpage    at
32   https://mdta.maryland.gov/ALB270TollSetting/TollRateRangeSettingProcessAndApprovedTollRateRange
33   s. The toll rate ranges will only apply to the HOT managed lanes; the existing free general purpose lanes
34   will not be tolled. Customers will pay the toll rate in effect when they enter the managed lanes, regardless
35   of toll rate changes that occur in any tolling segment during their trip. In addition, the approved rates
36   include discounts for qualifying vehicles—including HOV 3+ (including carpools and vanpools), buses and
37   motorcycles.[9]

---

[9] Other exemptions, such as emergency vehicles during emergency response, have been agreed upon as part of the toll operations
between MDTA, MDOT SHA and the Developer.

00000021

1    Table 3: Approved Toll Rate Ranges, Soft Rate Caps, and Discounts[1]
2    for Passenger Vehicle (2-axle) by Payment Type for the I-495 & I-270 Managed Lanes Study

| General Purpose Lanes | HOT Managed Lanes | | | | | |
|---|---|---|---|---|---|---|
| | Payment Type | Approved Toll Rate Ranges for Passenger Vehicle (2-axle) (2021 $/mile) | | | HOV 3+ Vanpools Carpools | Buses / Motorcycles |
| | | Minimum Toll Rate[2] | Soft Rate Cap | Maximum Toll Rate | | |
| Free | Electronic Toll Collection (ETC) (*E-ZPass*) | $0.17 | $1.50 | $3.76 | Free | Free |
| | Pay-By-Plate (Registered Video) (1.25x ETC) | $0.21 | $1.88 | $4.70 | | |
| | Video Tolling (Unregistered Video) (1.5x ETC) | $0.26 | $2.25 | $5.64 | | |

3    [1] MDTA uses the term discount to refer to all vehicles that could have a toll that is lower than the standard toll rate.
4    [2] The minimum trip toll (not per mile) by payment type for all vehicle types would be $0.50 for customers using E-ZPass®, $0.63
5    for customers using Pay-By-Plate (Registered Video), and $0.75 for customers using Video Tolling (Unregistered Video).
6
7    **C.    Alternatives Considered and Dismissed**

8    The alternatives development and screening process for the Study followed five steps to narrow the
9    Preliminary Range of Alternatives under consideration to the Preferred Alternative, refer to **Figure 5**. The
10   results and documentation of the first four steps were presented in the Study's **DEIS, Chapter 2** and the
11   last step, identification of the Preferred Alternative, was documented in the **SDEIS, Chapter 2**.

12    **Figure 5: Alternatives Screening Process**



13

00000022

## 1.    Preliminary Alternatives

Fifteen Preliminary Alternatives were identified from previous studies and planning documents, and input from the public, and federal, state, and local agencies during the NEPA scoping process. The Preliminary Alternatives included the No Build Alternative as well as alternatives that included elements such as Transportation Systems Management (TSM)[10]/ Transportation Demand Management (TDM),[11] additional general purpose lanes, High-Occupancy Vehicle (HOV) lanes, priced managed lanes, collector-distributor lanes, contraflow lanes, reversible lanes, and transit. Stand-alone transit alternatives considered three transit modes: heavy rail, light rail, and bus. Additionally, options were identified for alternatives that could be applied to either I-495 or I-270 as well as different transit modes. Some of the alternatives included lettered options which reflect whether the options were exclusively applicable to I-495 or I-270 or were related to a specific transit mode. The Preliminary Alternatives were:

- Alternative 1: No Build
- Alternative 2: Transportation Systems Management/Transportation Demand Management (TSM/TDM)
- Alternative 3: Add one general purpose lane in each direction on I-495 and I-270
- Alternative 4: Add one HOV lane in each direction on I-495 and retain existing HOV lane in each direction on I-270
- Alternative 5: Add one priced managed lane in each direction on I-495 and convert one existing HOV lane in each direction to a priced managed lane on I-270
- Alternative 6: Add two general purpose lanes in each direction on I-495 and I-270
- Alternative 7: Add two HOV lanes in each direction on I-495 and retain one existing HOV lane and add one HOV lane in each direction on I-270
- Alternative 8: Add two priced managed lanes in each direction on I-495 and add one priced managed lane in each direction and retain one existing HOV lane in each direction on I-270
- Alternative 9: Add two priced managed lanes in each direction on I-495 and convert one existing HOV lane to a priced managed lane and add one priced managed lane in each direction on I-270
- Alternative 10: Add two priced managed lanes in each direction on I-495 and on I-270 and retain one existing HOV lane in each direction on I-270 only
- Alternative 11: Physically separate traffic using collector-distributor lanes, adding two general purpose lanes in each direction on I-495
- Alternative 12A: Convert existing general purpose lane on I-495 to contraflow lane during peak periods
- Alternative 12B: Convert existing HOV lane on I-270 to contraflow lane during peak periods
- Alternative 13A: Add two priced managed reversible lanes on I-495
- Alternative 13B: Convert existing HOV lanes to two priced managed reversible lanes on I-270

---

[10] TSM are actions that improve the operation and coordination of transportation services and facilities.

[11] TDM is a variety of strategies, techniques, or incentives aimed at providing the most efficient and effective use of existing transportation services and facilities (e.g., rideshare and telecommuting promotion, managed lanes, preferential parking, road pricing, etc.)

00000023

1    • Alternative 13C: Add two priced managed reversible lanes and retain one existing HOV lane in
2       each direction on I-270
3    • Alternative 14A: Heavy Rail[12] transit
4    • Alternative 14B: Light Rail[13] transit
5    • Alternative 14C: Fixed guideway BRT[14] off alignment of existing roadway
6    • Alternative 15: Add one dedicated bus lane on I-495 and I-270

## 2.    Screened Alternatives

The Preliminary Alternatives were evaluated by applying the screening criteria established from the Study's Purpose and Need (as described in the **FEIS, Chapter 2, Section 2.2 and in greater detail in DEIS, Appendix B**), performing assessments of readily available information. An alternative was dropped from further consideration only if the available information demonstrated it clearly did not meet the Study's Purpose and Need. Screened Alternatives were identified as those that met the screening criteria or required additional analysis to determine their ability to meet the Purpose and Need.

As a result of the initial screening, seven alternatives were recommended to be advanced for further detailed analysis and 13 alternatives were dropped from further consideration. Alternatives 1, 5, 8, 9, 10, 13B, and 13C were recommended for further analysis and environmental evaluation as the Screened Alternatives. In February 2019, the Screened Alternatives were presented to the public through the Study website via written documentation and a video.

## 3.    Alternatives Retained for Detailed Study and Evaluated in the DEIS

Additional engineering, traffic, financial, and environmental analyses were completed for the Screened Alternatives which all were then carried forward as alternatives retained for detailed study (ARDS) and all were presented at eight, in person, Spring 2019 Public Workshops and were then further analyzed.

FHWA and MDOT SHA determined that Alternative 5 was deficient in addressing both existing traffic and long-term traffic growth and trip reliability, while only minimally less costly and impactful to property and environmental impacts and with these concerns and reduced anticipated usage it also raised concerns with the alternative's financial viability. Consequently, it was determined that Alternative 5 was not reasonable. However, the analysis of Alternative 5 was included in in **DEIS, Chapter 3** and **DEIS, Chapter 4** for comparison purposes.

Following the Spring 2019 Public Workshops and agency meetings, several Cooperating and Participating Agencies requested that MDOT SHA evaluate an alternative that would provide an alternate route for travelers to use MD 200 (Intercounty Connector) instead of the top side of I-495 between I-270 and I-95

---

[12] Heavy Rail is a mode of transit service (also called metro, subway, rapid transit, or rapid rail) operating on an electric railway with the capacity for a heavy volume of traffic. It is characterized by high speed and rapid acceleration passenger rail cars operating singly or in multi-car trains on fixed rails.

[13] Light Rail is a mode of transit service (also called streetcar, tramway, or trolley) operating passenger rail cars singly (or in short trains) on fixed rails. Light rail vehicles are typically driven electrically with power being drawn from an overhead electric line via a trolley or a pantograph and driven by an operator on board the vehicle.

[14] Bus Rapid Transit is a high-quality bus-based transit system that delivers fast and efficient service that may include dedicated lanes, busways, traffic signal priority, off-board fare collection, elevated platforms, and enhanced stations.

00000024

1   to avoid or reduce impacts to significant, regulated resources and residential relocations. This new
2   alternative, the MD 200 Diversion Alternative, was developed and analyzed with input from the agencies.
3   After evaluation, it was determined that the MD 200 Diversion Alternative would not address the Study's
4   Purpose and Need of accommodating long-term traffic growth, enhancing trip reliability, or improving the
5   movement of goods and services. A summary of the MD 200 Diversion Alternative analysis was included
6   in the **DEIS, Chapter 2** and **DEIS, Appendix B**, *Alternatives Technical Report*.

7   In response to public and agency input, MDOT SHA and FHWA evaluated another alternative, called
8   Alternative 9 Modified (Alternative 9M). Alternative 9M consisted of a blend of Alternatives 5 and 9 with
9   the primary difference on the top side of I-495 between I-270 and I-95 being the addition of one managed
10  lane per direction instead of two managed lanes. Alternative 9M was evaluated and determined to be a
11  reasonable alternative, and thus was included as a Build Alternative in the DEIS.

12  The following Cooperating Agencies provided concurrence[15] on the ARDS: US Environmental Protection
13  Agency (USEPA), US Army of Engineers (USACE), NPS, MDE, Maryland Department of Natural Resources,
14  and VDOT.

15  The **DEIS, Chapter 3**, **DEIS, Chapter 4**, and **DEIS, Appendix B**, *Alternatives Technical Report* presented the
16  additional analysis and comparison of impacts between the Build Alternatives (Alternatives 8, 9, 9M, 10,
17  13B, 13C) and the No Build Alternative, plus Alternative 5 for comparison purposes.

18      **4.      Identification of the Preferred Alternative**

19  In January 2021, Alternative 9 was announced as the MDOT SHA Recommended Preferred Alternative
20  based on the results of traffic, engineering, financial, and environmental analyses, as well as public
21  comment. However, after several months of further coordinating with and listening to agencies and
22  stakeholders and reviewing public comments FHWA and MDOT SHA identified a new Preferred Alternative
23  in the SDEIS: Alternative 9 – Phase 1 South and a No-Build for the balance of Alternative 9.

24  The FHWA and MDOT SHA's selection of the Preferred Alternative was based on currently available
25  information and consideration of comments received on the DEIS. The agencies received many comments
26  supporting the need to address improvements to the ALB, a major regional traffic bottleneck; to avoid
27  property displacements, avoid and minimize public parkland impacts to the maximum extent practicable
28  in compliance with Section 4(f) regulations; to coordinate with planned managed lane projects in Northern
29  Virginia to provide a seamless regional managed lanes system; and to increase multi-modal transportation
30  options in the study area.

31  Many of these key concerns and comments raised by the agencies and public through review of the DEIS
32  were common among the Build Alternatives retained including, but not limited to, stormwater
33  management, direct managed lanes access, transit elements, noise, property impacts, and proposed
34  relocations. The efforts to further address comments, avoid and minimize impacts, and determine
35  mitigation for unavoidable impacts continued through the development of the FEIS. The specific elements
36  of the Selected Alternative are described in **Section V.2** of this document and **FEIS, Chapter 3**.

---

[15] NCPC abstained from concurring on the ARDS; M-NCPPC did not concur on the ARDS.

00000025

1      **5.      Environmentally Preferred Alternative**

2   According to CEQ regulations implementing NEPA (40 CFR 1502.2(2)), the agency shall "identify all
3   alternatives considered by the agency in reaching its decision, specifically the alternative or alternatives
4   which were considered to be environmentally preferable." The environmentally preferred alternative is
5   one that meets the project purpose and need and causes the least harm to natural and physical
6   environment. Based on the analyses and evaluations conducted during the EIS process, specifically
7   **Section VII.C** of this ROD and **FEIS, Chapter 5**, the Selected Alternative, as described in **Section V.2**, is
8   deemed the environmentally preferred alternative.

9   **VI.    Factors in the Decision-Making Process, Including Measures to Minimize Harm**

10  The DEIS, SDEIS, and FEIS detailed the extensive alternatives analysis conducted for this Study during the
11  NEPA process. Consideration of input from partner agencies, stakeholders, and the public was an integral
12  part of the alternatives development process and was a major factor in the identification of the Selected
13  Alternative. Many comments received on the DEIS centered around the need to find an alternative that
14  would avoid residential and business displacements and impacts to significant parkland on the topside
15  and eastside of I-495. While other comments focused on providing support for alternatives that would
16  include replacement of the aging and severely congested ALB. FHWA weighed the benefits and impacts
17  and also considered a No Build Alternative in the decision of the Selected Alternative in this ROD.

18  The notable benefits of the Selected Alternative are that it will:

19  • Further align with the phased delivery and permitting approach
20  • Focus improvements on Phase 1 South, including the ALB, the biggest traffic chokepoint in the
21    region. Replacement of the bridge is part of a bi-state effort to improve mobility and would
22    provide a seamless regional system of managed lanes by connecting to Virginia over the ALB.
23  • Expedite replacement of the ALB with a private funding source.
24  • Provide options for travel by keeping all existing general purpose lanes free.
25  • Reduce reliance on single occupancy vehicles and permitting buses, carpool, vanpool, and
26    personal vehicles with three or more people to travel faster and more reliably in the new HOT
27    lanes free of charge any time of the day.
28  • Avoid all residential and commercial displacements.
29  • Minimize impacts by over 50% to National Parks near the ALB (George Washington Memorial
30    Parkway, Clara Barton Parkway, and Chesapeake & Ohio Canal National Historical Park) and
31    completely avoid three other National Parks: Baltimore Washington Parkway, Greenbelt Park, and
32    Suitland Parkway.
33  • Avoid approximately 22 acres of Maryland-National Capital Park and Planning Commission
34    parkland including Rock Creek, Sligo Creek, and Northwest Branch Stream Valley Parks.

35  As described in greater detail in **SDEIS, Chapter 3** and **FEIS, Chapter 4**, the Selected Alternative is projected
36  to provide meaningful operational benefits to the regional system even though it includes no action for a
37  large portion of the study area in an effort to avoid and minimize impacts. The Selected Alternative will
38  significantly increase throughput across the ALB and on the southern section of I-270 while reducing
39  congestion. It will also increase speeds, improve reliability, and reduce travel times and delays along I-

00000026

1  495, I-270, and the surrounding roadway network compared to the No Build Alternative, albeit to a lesser
2  degree than the Build Alternatives presented in the DEIS that provided managed lanes throughout the full
3  study area limits. Projected daily traffic volumes served would increase with development of the Selected
4  Alternative when compared to the No Build Alternative because the freeways would be able to
5  accommodate latent demand that would otherwise use the local roadway network to avoid congestion.
6  Congestion would be present in the general purpose lanes during the PM peak period on I-270
7  northbound and the I-495 inner loop in the design year of 2045 due to downstream bottlenecks outside
8  of the Selected Alternative limits, but overall operations would be significantly better than the No Build.

9  The key factors considered in deciding to approve the Preferred Alternative as the Selected Alternative
10  are discussed below and include a summary of the planning process, NEPA process, Purpose and Need,
11  alternatives considered, environmental impacts and measures to avoid and minimize impacts, and lastly
12  a summary of the public outreach opportunities.

13  ### A.  Planning Process

14  As noted in **Section III** of this ROD, MDOT SHA, MDOT MTA VDOT have performed numerous studies[16] to
15  evaluate a myriad of transportation solutions to address the regional congestion. Those solutions have
16  demonstrated the need in this region to make use of all the tools in the transportation toolbox. MDOT
17  SHA and other regional transportation partners have studied and, in many cases, already constructed and
18  improved elements of the transportation system of systems needed to serve this important region. The
19  various transportation facilities consist of interstate, circumferential and arterial highways, bus rapid
20  transit, local bus services, commuter and freight rail, one of the world's most extensive metro rail, and
21  light rail systems that move people and goods throughout the region.

22  Historically improvements to the severe congestion have been evaluated, with similar consensus
23  regarding the need for all tools in the transportation toolbox. That is, they include the need for highway,
24  transit and other transportation management measures. For example, in 2002, a combined highway and
25  transit study, the Capital Beltway/Purple Line Study[16], was initiated by MDOT SHA and MDOT MTA, which
26  identified adding HOV lanes to I-495 and constructing the Purple Line, a transit alignment inside the
27  Beltway. This combined study concluded that fixed guideway transit was not recommended wholly along
28  the Capital Beltway itself. In 2003, the transit and highway portions of the Capital Beltway/Purple Line
29  Study were separated into two independent studies, the Purple Line Project and the Capital Beltway Study
30  (MDOT SHA et al., 2013), with the justification that both projects were needed to meet the demands of
31  the corridor. The Purple Line Project Final Environmental Impact Statement (FEIS) and Draft Section 4(f)
32  Evaluation was signed in 2013 and a Record of Decision (ROD) was issued in 2014. This transit solution is
33  currently under construction on a 16-mile, two-track light rail system from Bethesda to New Carrollton.

34  To promote effective transportation system connectivity, the role of each specific transportation project
35  to the larger transportation network, is critical. One of the objectives of any major investment study is to
36  identify facility improvements that also improve the linkage of the regional transportation system. As
37  noted, I-495 and I-270 are critical elements of the National Highway System and the local transportation
38  network. These highways have interregional connections to many radial routes in Maryland and Virginia
39  that provide access to and from Washington, DC. Residential and employment activity centers and

---

[16] https://oplanesmd.com/environmental/resources/

00000027

1   recreational facilities are located along I-495 and I-270. I-270 provides the highway link from I-495 to I-
2   370/ MD 200 and to I-70. For long distance travelers, a portion of I-495 is also I-95 which serves as a
3   critical link in the Maine to Florida interstate route. I-95 is designated as a portion of the National Highway
4   System, a key element of the multimodal National Transportation System.

5   Given the highly constrained area surrounding the interstates in the study area, the natural, cultural,
6   historical, and recreational amenities that exist along this alignment are finite resources that cannot be
7   easily replaced or replenished. From the initiation of this Study, MDOT SHA committed to avoid and
8   minimize community, cultural, environmental, and parkland impacts, and mitigate for unavoidable
9   impacts at an equal or greater value. MDOT SHA has worked with FHWA and with federal, state, and local
10  resource agencies in a collaborative process to address all regulatory requirements and to ensure the
11  protection of significant environmental and community resources.

12  In planning mitigation, MDOT SHA, worked with FHWA, federal, state and local agencies and the public to
13  provide meaningful benefits to adjacent resources and improve the values, services, attributes, and
14  functions which may be compromised. Innovative, creative solutions, including modern urban stormwater
15  management and environmentally sensitive design techniques, will be utilized to mitigate for unavoidable
16  impacts resulting from the project. Mitigation commitments are identified and included in this Record of
17  Decision, refer to **Appendix A** of this document.

18  The Study's alternatives development process[17] was informed by numerous previous studies and planning
19  documents[18]. The initial screening of the Preliminary Alternatives considered initiatives and projects
20  outlined in Visualize 2045, the latest financially Constrained Long-Range Plan (CLRP) that was approved
21  by the National Capital Region Transportation Planning Board on October 17, 2018. An update to this plan
22  was approved by the National Capital Region Transportation Planning Board on June 15, 2022. Visualize
23  2045 identified Seven Aspirational Initiatives for a Better Future. One of the seven initiatives is "Expand
24  Express Highway Network," which includes congestion-free toll roads, building on an emerging toll road
25  network to encourage carpooling and new opportunities for transit and express buses to travel in the toll
26  lanes. For more information on this initiative refer to:

27  http://mwcog.maps.arcgis.com/apps/Cascade/index.html?appid=debc2550777b4cc2bae2364c7712a151

28  Three specific, financially constrained projects in the approved 2018 *Visualize2045* Plan that relate to this
29  Study are:

30      •   CLRP-constrained element ID-1182: I-95/I-495 component of Traffic Relief Plan to include two
31          managed lanes in each direction, between the Baltimore Washington Parkway and the Virginia
32          State Line/Potomac River at the Woodrow Wilson Bridge.

33      •   CLRP-constrained element ID-3281: I-95/I-495 component of Traffic Relief Plan to include two
34          managed lanes in each direction, between the Baltimore Washington Parkway and the Virginia
35          State Line/Potomac River at the ALB.

36      •   CLRP-constrained element ID-1186: I-270 component of Traffic Relief Plan, to include two
37          managed lanes in each direction, between I-495 and I-70/US 40.

---

[17] Refer to DEIS, Appendix B (https://oplanesmd.com/wp-content/uploads/2020/07/DEIS_AppB_Alts_web.pdf\).

[18] https://oplanesmd.com/environmental/resources/

1    For more information about these three projects, refer to *Appendix B – Summary of Projects in the*
2    *Financially Constrained Element*: https://www.mwcog.org/documents/2018/10/17/visualize-2045-a-
3    long-range-transportation-plan-for-the-national-capital-region-featured-publications-tpb-visualize-
4    2045/.

5    ## B.    NEPA Process

6    The Study was initiated in early 2018 with the publication of a Notice of Intent to develop an EIS followed
7    by a formal scoping period to determine the range of issues to be addressed by the Study. During the
8    Scoping process, potential Cooperating, Participating, and Notified Agencies at the federal, state, local,
9    and regional levels were initially identified by FHWA and MDOT SHA, in accordance with 40 CFR 1501.6
10   and 23 U.S.C. § 139. The list of two Lead (Federal Agency and Local Project Sponsor), eight Cooperating,
11   18 Participating, and seven Notified agencies is provided in **DEIS, Chapter 7, Table 7-1**.

12   The entire NEPA process has been dedicated to obtaining, considering and responding to public and
13   agency input. Along with FHWA, the MDOT SHA in evaluating the need for congestion relief along the 48-
14   mile corridor, listened to public and agency input regarding alternative solutions, delayed the Study to
15   add and consider new alternatives along through the process, carefully evaluated alternatives, screened
16   a wide range into a set of 15 preliminary alternatives that were then studied in detail and presented in
17   the DEIS. In an innovative manner, FHWA and MDOT SHA presented the DEIS to the public during the
18   COVID-19 Pandemic with in-person and virtual opportunities that may have reached even more people
19   than even traditional methods. FHWA and MDOT SHA also embarked on an evaluation of the long term
20   and short term potential impacts of the pandemic on the region's traffic. MDOT SHA heard the concerns
21   of the public, community and interest groups, and environmental resource agencies and developed a
22   Preferred Alternative with shorter limits, Phase 1 South, which would satisfy the need for congestion relief
23   set forth in the Study's Purpose and Need. The Preferred Alternative, with build improvements only within
24   the limits of Phase 1 South, avoids over 100 acres of parkland and hundreds of wetland and stream
25   features. The impacts associated with the Preferred Alternative were avoided and minimized to the
26   greatest extent practicable in all areas at this preliminary stage of the Study, and avoidance and
27   minimization techniques were specifically refined in some areas of sensitive or recreationally valuable
28   resources, such as the NPS park properties around the ALB. The results were published in the SDEIS in
29   October 2021.

30   As preliminary design advanced on the Preferred Alternative in coordination with the Developer, minor
31   modifications occurred, which resulted in further avoidance and minimization of environmental resources
32   and documented in the FEIS. In addition, coordination with the resource agencies on avoidance,
33   minimization, and conceptual mitigation continued. The FEIS was published in June 2022 and included a
34   comprehensive list of the mitigation and commitments to be carried forward into final design.

35   As summarized below, the NEPA Process for the Study documented in the DEIS, SDEIS, and FEIS, the
36   substantial traffic, engineering, and environmental analyses for public review and comment.

37   The DEIS was published on July 10, 2020 and was made available for public and agency review for a 123-
38   day comment period. The DEIS and supporting documents summarized the entire alternatives
39   development process, including the analysis and screening of 15 Preliminary Alternatives, full
40   consideration of two additional alternatives raised during the comment process, and a detailed

00000029

1    comparison of six Build Alternatives. The DEIS presented the results of draft analyses and the comparison
2    of potential effects to social, cultural and natural environmental resources between the No Build and the
3    six Build Alternatives.

4    The SDEIS was published on October 1, 2021 and was prepared to consider new information relative to
5    the Preferred Alternative, Alternative 9 - Phase 1 South.  Building on the analysis in the existing DEIS, the
6    SDEIS disclosed information relevant to the Preferred Alternative focusing on new information, while
7    referencing the DEIS for information that remained valid. The SDEIS also described the background and
8    context in which the Preferred Alternative was identified. The SDEIS presented updated information on
9    draft analyses that were presented in the DEIS. The SDEIS was available for review to the public and
10   agencies for a 60-day comment period, including an extension of 15 days based on public and stakeholder
11   requests.

12   The FEIS was published on June 17, 2022, and presented the final analyses completed for the Preferred
13   Alternative, design refinements since the SDEIS, as well as responses to comments on the DEIS and SDEIS.
14   The FEIS responds to the over 5,000 public and agency comments received on the DEIS and SDEIS. The
15   FEIS includes the results of the final analyses of environmental impacts based on extensive avoidance and
16   minimization efforts and presents final mitigation and commitments for unavoidable impacts. The FEIS
17   was available for a 30-day review through the Project website (https://oplanesmd.com/feis/), the USEPA
18   EIS Database and at 17 public libraries along or near the study corridors.

19   ## C.    Environmental Impacts and Measures to Avoid and Minimize

20   The Selected Alternative is a resource avoidance and minimization alternative based in part on extensive
21   coordination with and input from agencies and stakeholders, including the Officials with Jurisdiction
22   (OWJs) for Section 4(f) properties. Comments received on the DEIS and Draft Section 4(f) Evaluation from
23   agencies and stakeholders specifically requested avoidance of significant parkland and historic resources
24   within the study area. The Selected Alternative is responsive to comments received and aligns the Study
25   to be consistent with the previously determined phased delivery and permitting approach by limiting the
26   build improvements to the area of Phase 1 South only while avoiding improvements on I-495 east of the
27   I-270 East Spur. The result is complete avoidance of significant stream valley parks, including Rock Creek,
28   Northwest Branch, Sligo Creek, Southwest Branch, and Henson Creek Stream Valley Parks, as well as
29   historic parks of national significance including the Baltimore-Washington Parkway, Greenbelt Park and
30   Suitland Parkway.

31   The impacts associated with the Selected Alternative were avoided and minimized to the greatest extent
32   practicable in all areas at this preliminary stage of the Study, and avoidance and minimization techniques
33   were specifically refined in some areas of sensitive or recreationally valuable resources. **Table 4** illustrates
34   the avoidance and minimization that has occurred at each NEPA document milestone.

27

1    Table 4: Example Environmental Resource Impact Avoidance and Minimization Efforts
2                           at each NEPA Document Milestone

| Resource | DEIS (Alt 9) | SDEIS (Pref Alt) | FEIS (Pref Alt) |
|---|---|---|---|
| Residential Displacements | 34 | 0 | 0 |
| Business Displacements | 4 | 0 | 0 |
| Park impacts (total acres) | 133.1 | 36.1 | 30.2 |
| NPS Park Property impacts (total acres) | 29.4 | 17.0 | 16.2 |
| M-NCPPC Park Property impacts (total acres) | 29.0 | 9.2 | 8.2 |
| Wetlands (total acres) | 16.3 | 4.3 | 3.9 |
| Waterways (total linear feet) | 155,922 | 46,553 | 42,286 |
| 100-Year Floodplain (total acres) | 119.5 | 48.8 | 31.6 |
| Forest Canopy (total acres) | 1,497.0 | 500.1 | 455.0 |

3   Under the Selected Alternative, impacts to Morningstar Tabernacle No. 88 Moses Hall and Cemetery
4   boundary are avoided. In the DEIS, Alternative 9 would have impacted 0.3 acre of the Morningstar
5   Cemetery. Based on further investigations of the property since the DEIS, the Preferred Alternative as
6   presented in the SDEIS and FEIS avoids impacts to the historic Morningstar Tabernacle No. 88 Moses Hall
7   and Cemetery boundary. Despite the avoidance efforts, MDOT SHA has committed in the ROD to the
8   following (refer to **Appendix A, Table 1**):

9   • Construct a new sidewalk along the west side of Seven Locks Road under I-495 to re-establish a
10      connection between Morningstar Tabernacle No. 88 Moses Hall and Cemetery and First Agape
11      AME Zion Church (Gibson Grove Church) in the historically African American community of Gibson
12      Grove.

13  • Convey a portion of existing MDOT SHA owned right-of-way located adjacent to the boundary of
14      Morningstar Tabernacle No. 88 Moses Hall and Cemetery with an identified potential for
15      unmarked graves to the Trustees of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

16  As noted in **Table 4**, the minimization efforts to NPS park properties resulted in 12 acres avoided under
17  the Selected Alternative. However, the Selected Alternative still impacts 16.2 acres to three NPS park
18  properties: George Washington Memorial Parkway, Chesapeake and Ohio Canal National Historical Park
19  and Clara Barton Parkway. In addition, impacts to Plummers Island, part of the Chesapeake and Ohio Canal
20  National Historical Park, could not be avoided completely, but impacts have been reduced by 1.7 acres.
21  In the DEIS, the Build Alternatives had 1.9 acres of impacts to Plummers Island. Under the Selected
22  Alternative, there would be approximately 0.28 acres of impact, of which less than 0.1 acres would be
23  permanent impact and 0.27 acres would be temporary impact. Impacts to Plummers Island are required
24  for the ALB substructure, including permanent use for three, discrete, approximately 10-foot diameter
25  pier foundations and temporary, construction activities. Temporary construction activities may include
26  efforts such as excavation, access for demolition of existing bridge foundation and piers adjacent to the
27  island, and slope protection. Access to the existing and proposed piers is required for these activities. In
28  addition, MDOT SHA has made a commitment to evaluate additional options for the ALB during final
29  design that would further minimize or avoid physical impact to Plummers Island, refer to **Appendix A,**
30  **Table 1**.

00000031

1  A summary of the permanent and temporary effects associated with the Selected Alternative are shown
2  in **Table 5.** The impacts presented are associated with the build improvements of the Selected Alternative.
3  For additional details on the environmental impacts and efforts to avoid and minimize impact by resource
4  refer to **FEIS, Chapter 5**. Specific mitigation and commitments are presented in **Appendix A** of this
5  document.

6                     **Table 5: Summary of Impacts and Findings of the Selected Alternative**

| Summary of Selected Alternative Permanent and Temporary Impacts |
|---|
| **Land Use and Zoning** |
| • Conversion of 78.2 acres of existing land uses to transportation right-of-way |
| • Located entirely within Priority Funding Areas and is consistent with the Maryland Smart Growth Priority Funding Areas Act |
| **Communities and Community Facilities** |
| • No residential or business displacements |
| • Partial property impacts are dispersed throughout seven communities adjacent to I-495 and I-270 in the Phase 1- South area only. |
| • Divisions or isolation of properties, persons, or groups would not occur due to the generally parallel nature of the LOD along I-495 and I-270 and the fact that no properties would be displaced. |
| • Reduction in total traffic on all network local roads by 3.5%, which would lead to better access to facilities and improved emergency response times along local roadways |
| • Benefits to the quality of life due to reduced congestion along the study corridors and improved trip reliability and travel choices to destination points within the region |
| • Partial property acquisitions from: 1 correctional facility, 2 healthcare facilities, 4 places of worship, 1 recreation center, 2 schools, and 1 historic cemetery (refer to FEIS, Table 5-4) |
| **Parks and Recreation Facilities** |
| • 30.2 acres of right-of-way needed from park properties (refer to FEIS, Table 5-5) |
| ○ 16.2 acres of impacts at 3 NPS properties: 2.7 acres of permanent and 13.5 acres of temporary impacts |
| ○ 8.2 acres of impacts at 5 M-NCPPC properties: 7.5 acres of permanent and 0.7 acres of temporary impacts |
| ○ 5.4 acres of impacts at 4 City of Rockville park properties: 5.2 acres of permanent and 0.2 acres of temporary impacts |
| ○ 0.5 acres of impacts at 1 City of Gaithersburg park property: 0.4 acres of permanent and <0.1 acres of temporary impacts |
| **Property Acquisitions** |
| • No residential of business displacements |
| • 92.8 acres of total property outside of the existing highway right-of-way is needed: 78.2 acres for permanent use and 14.7 acres for temporary use |
| • 361 properties impacted: 255 residential and 106 business/other properties |
| **Visual and Aesthetic Resources** |
| • Construction of the Selected Alternative would not introduce new elements incompatible with the existing visual character or qualities along the study corridors or that experienced by neighbors |
| • Vegetation removal will be mitigated based on state and local agency requirements and standards to maintain the visual quality of the key locations |
| • Aesthetic and landscaping guidelines of all highway elements will be established in consultation with local jurisdiction, private interest groups, local community and business associations, and local, state, and federal agencies |

00000032

- Construction will result in the removal of vegetation along the study corridors and the addition of construction equipment into existing viewsheds

**Historic Architectural and Archeological Resources**

- Adverse effects to 4 historical architectural properties and 6 archeological properties
- Additional archaeological delineation and treatment at the Poor Farm Cemetery is needed and is a commitment documented in the Programmatic Agreement
- Avoids impacts to the historic Morningstar Tabernacle No. 88 Moses Hall and Cemetery boundary; determination of effects deferred until further investigations are completed as documented in the Programmatic Agreement
- The signed Section 106 Programmatic Agreement is included in **Appendix B** of this document.

**Air Quality**

- In an attainment area for particulate matter (PM2.5)
- Project would not be an exceedance of the carbon monoxide (CO) National Ambient Air Quality Standards (NAAQS)
- Mobile Source Air Toxics (MSATs) pollutant emissions are expected to increase slightly with the Selected Alternative when compared to the No Build condition for 2025 and 2045, but all MSAT pollutant emissions are expected to significantly decline in the Opening (2025) and Design years (2045) when compared to existing conditions (2016)
- Greenhouse gases (GHG) emissions with the Selected Alternative are expected to decline in the Opening (2025) and Design (2045) years for all GHG pollutants when compared to existing conditions.
- Temporary air quality impacts are expected during construction, but measures will be implemented during construction to minimize emissions from construction vehicles

**Noise**

- 3 noise sensitive areas (NSA) in Virginia are predicted to have noise impacts
- 45 NSAs in Maryland are predicted to have noise impacts
- Noise impacts during construction are anticipated
- Noise abatement for impacts is included in the Selected Alternative

**Hazardous Materials**

- 255 sites of concern were assigned a risk classification based on potential environmental impacts and proximity to the Selected Alternative LOD
  - o 11 sites of high risk concern
  - o 41 sites of moderate risk concern
  - o 83 sites of low risk concern
  - o 120 de minimis sites - unlikely for potential contamination

**Topography, Geology and Soils**

- Topography would be altered from construction of the Selected Alternative by surficial excavation and grading, thereby changing the relative ground elevation, but this work is not anticipated to have a substantial effect on underlying sediments
- Soil removal or alterations to the soil profile and structure due to construction activities is expected
- Measures to protect soils from erosion would be implemented based on approved Erosion and Sediment Control Plans (E&S Plans) prepared in accordance with Maryland and Virginia regulations.

**Waters of the US and Waters of the State, Including Wetlands**

- 3.9 acres of wetland impacts
- 6.5 acres to impacts to wetland buffers
- 42,286 linear feet of impacts to waterways

00000033

- Concurrent with the NEPA process, MDOT SHA has prepared a Joint Federal/State Permit Application for the Alteration of Any Floodplain, Waterway, Tidal or Non-Tidal Wetland (refer to **FEIS, Appendix P**)

**Watersheds and Surface Water Quality**

- Surface waters, surface water quality, and watershed characteristics within the Selected Alternative LOD are directly and indirectly impacted to intermittent and perennial stream channels and increases in impervious surface in their watersheds
- The impacts to jurisdictional surface waters by USGS HUC8, Maryland 8-digit, and Maryland 12-digit watersheds are provided in *Appendix A* of the *Final Natural Resources Technical Report* (**FEIS, Appendix M**) and in **Table 5-29 to 5-33 in Chapter 5 of the FEIS**.

**Groundwater Hydrology**

- Selected Alternative may affect groundwater and hydrology, mainly due to highway runoff impacts from stormwater infiltration
- Impacts to drinking water from groundwater resources are not anticipated

**Floodplain**

- 31.6 acres of impacts to FEMA 100-year floodplains
- USACE determined that the Washington Aqueduct, the one Section 408 in the study limits, would not result in an adverse effect to this resource and further coordination is not needed
- Detailed hydrologic and hydraulic (H&H) study will be prepared during final design to identify the existing storm discharge and floodplain extent
- All construction occurring within the FEMA designated floodplains will comply with FEMA-approved local floodplain construction requirements

**Vegetation and Terrestrial Habitat**

- Removal and disturbance of vegetated areas, including forests, within the LOD due to clearing and grading of land needed for construction
- 455 acres of forest canopy impacts
  - 11.1 acres of Forest Conservation Easements
  - 0.9 acres TMDL Reforestation Sites
  - 2.8 ICC Reforestation Sites
- Approximately 1.0 acre of impacts to forest areas and seven specimen trees would be impacted by the off-site compensatory stormwater quality treatment sites

**Terrestrial Wildlife**

- No bald eagle nests have been identified by USFWS within the study corridor boundary
- The Selected Alternative is not within the Critical Area
- 11.2 acres of potential impacts to Forest Interior Dwelling Species (FIDS) habitat

**Aquatic Biota**

- May affect aquatic biota due to direct and indirect impacts to perennial and intermittent stream channels
- Impacts to aquatic biota may include mortality of aquatic organisms during construction of culvert extensions and loss of natural habitat from the placement of culvert pipes and other in-stream structures, or from more gradual changes in stream conditions

**Rare, Threatened and Endangered (RTE) Species**

- Extensive surveys in the corridor study boundary did not detect any federally listed bat species of the Northern Long-eared Bat or the Indiana Bat.
- 6 RTE plant species would be impacted near the Potomac River
- No Virginia state-listed wood turtle were found during field surveys

00000034

| Unique and Sensitive Areas |
| --- |
| • No impacts to special protection areas or Virginia Natural Area Preserves and Conservation Sites |
| • 163.1 acres of impacts to Unique and Sensitive Areas |
|    o 55.9 acres of impact to Targeted Ecological Areas<br>   o 23.8 acres of impacts to Green Infrastructure Hubs<br>   o 83.4 acres of impacts to Green Infrastructure Corridors |
| **Environmental Justice** |
| • The Selected Alternative will not cause disproportionately high and adverse effects on any minority and/or low-income populations in accordance with the provisions of E.O. 12898 and FHWA Order 6640.23A. |

### D. Public Outreach and Opportunities for Comment

From the outset of the Study's NEPA process, FHWA and MDOT SHA developed a comprehensive public involvement and engagement strategy designed to obtain input from stakeholders around the entire study area. This strategy combined traditional opportunities for commenting on the DEIS and SDEIS in addition to wide-ranging outreach to community organizations (e.g., church groups, homeowners' associations, public interest groups, and governmental entities), with particular sensitivity and outreach to identified environmental justice (EJ) communities. The public involvement and engagement process, starting in early 2018 and continuing to the present, considered the vast diversity of community resources. The lead agencies strategy also changed over time to reflect the realities of conducting the NEPA process in part during the COVID-19 Pandemic. Prior to and after pandemic restrictions were eased, there were both in person and virtual public and community meetings, presentations at community events and in public spaces. The efforts during the Study to engage with the public in a safe manner during the pandemic became nationally recognized based on its strategy of ensuring safety while still providing similar opportunities for meaningful participation by the public in the NEPA process. MDOT SHA and FHWA were able to make the DEIS available and accessible both in person and virtually and by holding public hearings in recognition of evolving social gathering and public health restrictions. The public involvement conducted throughout the Study has gone above and beyond and has been documented in the following reports: **DEIS, Chapter 7 and Appendix P; SDEIS, Chapter 7;** and **FEIS Chapter 8 and Appendix R**.

The Study's public involvement efforts began immediately after the publication of the Notice of Intent (NOI) in the *Federal Register* on March 16, 2018, to announce the initiation of the Study. Following the NOI, public involvement efforts were organized by subsequent engagement stages: Scoping, Preliminary Alternatives, and Alternatives Retained for Detailed Study (ARDS). Since publication of the NOI, 16 Public Workshops with over 2,100 attendees were held along the study corridors in Montgomery and Prince George's Counties.

The DEIS was published on July 10, 2020 and was made available on the I-495 & I-270 P3 Program webpage (https://oplanesmd.com/deis/), on the USEPA EIS Database webpage and at multiple public locations in hard copy in Montgomery and Prince George's Counties, Maryland; Fairfax County, Virginia; and Washington, DC. Following publication of the DEIS, FHWA and MDOT SHA provided a 90-day comment period, which is twice the minimum time required by the CEQ regulations. Based on input from the general public, community partners, stakeholders, and local and federal officials, however, MDOT SHA supported extending the DEIS comment period and made a formal request to FHWA, which has authority to grant any extension. FHWA approved this request and granted a 30-day extension of the public comment period

00000035

1    for the DEIS. All in all, the DEIS was made available for comment and review from July 10, 2020, through
2    and including November 9, 2020, a total of four months. During this extended comment period, the
3    agencies received close to 3,000 comments.

4    The SDEIS published on October 1, 2021, was prepared to consider new information relative to the
5    Preferred Alternative, Alternative 9 - Phase 1 South. Building off the analysis in the existing DEIS, the SDEIS
6    disclosed new information relevant to the Preferred Alternative while referencing the DEIS for information
7    that remained valid. The SDEIS also described the background and context in which the Preferred
8    Alternative, Alternative 9 – Phase 1 South was identified. The SDEIS was available for the public to review
9    and comment on the Preferred Alternative during a 45-day comment period, which was later extended
10   an additional 15 days in response to public comments and requests. The SDEIS was also made available
11   on the I-495 & I-270 P3 Program webpage (https://oplanesmd.com/sdeis/), on the USEPA EIS Database
12   webpage and at multiple public locations in hard copy in Montgomery and Prince George's counties;
13   Maryland, Fairfax County, Virginia; and Washington, D.C.

14   The FEIS was published on June 17, 2022 and was made available for a 30-day review on the I-495 & I-270
15   P3 Program webpage (https://oplanesmd.com/feis/ ), on the US EPA EIS Database webpage and at
16   multiple public locations in hard copy in Montgomery and Prince George's Counties, Maryland; Fairfax
17   County, Virginia; and Washington, DC.

18   Involvement by the public has been a critical part of a NEPA study. To-date, 16 public workshops and 7
19   public hearings were held, with distinct public comment periods.  Additionally, over 200 individual
20   stakeholder, community, elected official and business meetings were held to present Study information
21   and hear concerns and feedback on a variety of topics.

22   The public participation elements of the NEPA process were an opportunity to promote equity and EJ
23   concerns by ensuring minority and low-income communities (EJ populations) have access to and receive
24   information concerning the proposed action and the potential impacts on those communities.  With even
25   more concentrated outreach, project efforts effectively identified community concerns and informed
26   agency decision-makers regarding project elements and potential enhancements specifically geared to
27   protected communities.  In this regard, MDOT SHA implemented a robust plan to meet and exceed federal
28   policies and best practices for outreach to and engagement with EJ populations within and adjacent to
29   the study area.

30   In addition, in the Fall of 2021, MDOT SHA developed an online survey to seek additional feedback from
31   EJ populations on existing community concerns and strategies that could be implemented to address
32   those concerns. The survey was distributed in a variety of ways including through multiple community
33   "pop-up" events hosted by MDOT SHA at local specialty markets in areas noted as having high percentages
34   of low-income and/or minority populations. These events allowed MDOT SHA to answer Study-related
35   questions and to engage face-to-face to hear community concerns and potential solutions. The results of
36   this survey helped identify priorities of these communities for improved sidewalks and bicycle facilities,
37   better lighting, and traffic calming measures.  These elements have been incorporated into the Selected
38   Alternative or as mitigation for potential impacts and commitments; refer to **Appendix A** of this document
39   for the comprehensive list of mitigation and commitments.

00000036

1    ### E.    Consideration of Agency and Public Comments

2    From the outset of the NEPA review, the project proponent, MDOT SHA, and FHWA committed to a
3    transparent process that would inform all aspects of the agencies' decision-making. As described in detail
4    in this ROD, the Project reflects substantial engineering modifications (refer to **FEIS, Chapter 3, Section**
5    **3.1**) that directly responded to over 5,000 comments from a wide spectrum of stakeholders, community
6    groups, and governmental entities. MDOT SHA and FHWA have modified analysis methodologies,
7    conducted revised analyses, studied new or modified existing alternatives, refined design to avoid and
8    minimize environmental and community impacts, and identified meaningful mitigation to address
9    unavoidable impacts.

10   MDOT SHA incorporated public input into every phase of the NEPA process, including development of the
11   Study's Purpose and Need. Community input obtained during the scoping phase reflected a concern that
12   any proposed highway improvements should complement the region's broader mobility and
13   transportation objectives. As a result, the agencies amended its Purpose and Need to include
14   enhancements to multi-modal mobility connectivity and transit accessibility (refer to DEIS, Chapter 1 and
15   FEIS, Chapter 1). The agencies also expanded the range of alternatives considered during the NEPA
16   analysis to include suggestions received from Cooperating and Participating agencies and the public (refer
17   to DEIS Chapter 2, and DEIS Appendix B, Alternatives Technical Report). These additional alternatives
18   assisted with the public's ability to compare potential Project impacts and transportation benefits.

19   Most importantly, following publication of the DEIS, MDOT SHA and FHWA considered concerns raised
20   from a variety of stakeholders that the originally proposed Preferred Alternative, that recommended
21   improvements across almost the entire span of the Capital Beltway in Maryland, would have resulted in a
22   numerous adverse environmental and community impacts. Public and agency comments focused in
23   particular on the number of potential residential and/or business displacements, the use of public
24   parkland (owned by local, state, and federal agencies), water resources impacts, and community impacts,
25   including environmental justice issues.

26   In response to this input, and traffic operational concerns across the ALB and southern section of I-270,
27   MDOT SHA and FHWA published a SDEIS which announced changes to the Preferred Alternative that
28   substantially reduced Project impacts, while also providing relief from existing and future traffic issues
29   along some of the most congested sections of the Beltway and I-270 and reconstructing of one of the
30   region's most severe bottlenecks, the ALB. Among other highlights, this revised Preferred Alternative
31   eliminated all residential and business displacements, reduced permanent parkland impacts by almost 70
32   percent, avoided all impacts to the boundary of the Morningstar Tabernacle No. 88 Moses Hall and
33   Cemetery, significantly reduced impacts to sensitive lands around the ALB, and substantially reduced the
34   amount of potential water and stream impacts.

35   The process by which the agencies sought and obtained public input was also extraordinary in its scope
36   and intensity. The mandatory official public comment periods were extended to more than a total of six
37   months. As the NEPA process was conducted during the COVID Pandemic, the agencies employed
38   numerous public participation methods to ensure the broadest opportunities to provide input, and to do
39   so in a safe environment. MDOT SHA conducted 16 public workshops and 7 public hearings, all with
40   separate public comment periods. For a summary of the individual stakeholder, community, elected
41   official and business meetings held during the course of the Study refer to FEIS, Chapter 8.

00000037

1   MDOT SHA also engaged in rigorous coordination with local, state, and federal agency Cooperating and
2   Participating agencies.  For instance, the agencies created an "American Legion Bridge Strike Team" aimed
3   specifically at reducing impacts to federally-owned parkland adjacent to the existing and proposed
4   reconstructed bridge.  The engineering changes as a result of those efforts resulted in modifications to
5   the constructability plan for the ALB by removing construction vehicle access in three of the four
6   quadrants to avoid and minimize impacts to sensitive NPS property. Another example of additional public
7   outreach was formation of the EJ Working Group and EJ Outreach and Engagement Plan implementation
8   in the Fall of 2021 to provide opportunities for meaningful engagement with underserved communities
9   directly or indirectly affected (refer to **FEIS, Chapter 8, Section 8.2.3** for additional details).

10  Demonstrating the agencies' commitment to all aspects of the Study's Purpose and Need, the Selected
11  Alternative described in this ROD includes a wide range of non-highway elements reflective of the public's
12  recommendations.  These include the ability for bus transit and car/vanpools to use the new managed
13  lanes free of charge, the construction of new or improved bicycle and pedestrian paths, and
14  enhancements to public transit facilities that will provide improved access to Washington Metropolitan
15  Area Transit Authority (WMATA) bus and rail service.  Other projects commitments that are part of MDOT
16  SHA's agreement with the Public-Private Partnership (P3) Developer ("Developer"), further expand the
17  commitment to multi-modal transportation investments in the study area.  These commitments are
18  documented in the **FEIS, Chapter 7, Section 7.3**.  The MDOT SHA P3 Agreement is available on the program
19  website here: https://oplanesmd.com/p3-information/phase-1-agreement/.

20  Among the many other highlights of how the agencies' incorporated community and agency concerns into
21  the Selected Alternative include:

22  • Aligning the Selected Alternative and environmental permitting process with the phased project
23    delivery/construction approach focusing on addressing the severe congestion at the ALB as
24    priority.

25  • Committing to constructing a shared use path on the east side of the ALB to support regional
26    pedestrian and bicycle connectivity.

27  • Identifying appropriate on-site and off-site SWM to meet regulatory requirements and removed
28    or relocated SWM facilities from sensitive resources including parks, where feasible, and NPS
29    property.

30  • Monitoring and analyzing traffic impacts associated with the COVID-19 Pandemic to understand
31    any impacts on existing and future travel and to the Study.

32  • Including toll-free travel under the Selected Alternative for high-occupancy vehicles (HOV) with
33    three (3) or more occupants, transit buses, carpool/vanpool and motorcyclists to reduce the
34    reliance on single occupancy vehicles and provide equitable travel options.

35  • Avoiding and minimizing environmental and property impacts by eliminating the concrete barrier
36    separation and repurposing the pavement on I-270 between the Collector-Distributor system and
37    the general purpose lanes to provide a new lane and largely stay within the existing roadway
38    footprint on I-270.

00000038

1  • Modifying direct access ramps to the managed lanes in consideration of local land use and the
2    potential for community, property, and environmental impacts. For example, the preliminary
3    direct access interchange at Montrose Road was relocated to Wootton Parkway to minimize
4    stream, park and property impacts.

5  • Establishing a Transit Work Group to further explore opportunities for new or expanded transit
6    service on managed lanes.

7  • Establishing an Economic Work Group to determine the economic impacts of the project to the
8    National Capital Region.

9  • Establishing an Environmental Justice (EJ) Working Group to support the EJ analysis and
10   engagement efforts.

11 • Incorporating closed roadway sections with retaining walls where feasible to avoid and minimize
12   environmental and property impacts.

13 • Including underground SWM vaults to avoid and minimize environmental and property impacts.

14 • Eliminating all ramps crossing over the general purpose lanes of I-495 at the MD 190/River Road
15   interchange by adjusting the location of the high-occupancy toll (HOT) lane direct access ramps
16   between I-495 and MD 190. All HOT lanes direct access ramps within this interchange are now
17   proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of
18   ramps crossing over the general purpose lanes of I-495.

19  In sum, Selected Alternative in this ROD reflects the wide breadth of changes made to the Preferred
20  Alternative and the no action or improvements on a portion of the proposed action contemplated at the
21  beginning of the NEPA process, as well as the range of permitting mitigation and other related P3
22  commitments. The details presented as part of the Selected Alternative represent the culmination of over
23  four years of coordination with the public, stakeholders, and government agencies.

24  **VII.  Determination of Findings Regarding Other Laws**

25      **A.  Air Quality Conformity**

26  The Study is currently included in the National Capital Region Transportation Planning Board (TPB) Fiscal
27  Year (FY) 2019 – 2024 Transportation Improvement Program (TIP) [TIP ID 6432 and Agency ID AW0731
28  (planning activities)] and the TPB Visualize 2045 Long Range Plan (CEID 1182, CEID 3281, and Appendix B
29  page 56). This Study is included in the Air Quality Conformity Determination that accompanies the
30  Visualize 2045 Plan. The Visualize2045 Air Quality Analysis is based upon the latest planning assumptions
31  available for the Washington region. The analysis used MOVES2014a, the latest emission factor model
32  specified by USEPA for use in preparation of state implementation plans and conformity assessments at
33  the time of analysis.

34  As part of the conformity requirements, consultation with affected agencies such as the USEPA, FHWA,
35  Federal Transit Administration (FTA), and the Metropolitan Washington Air Quality Committee (MWAQC),
36  as well as with the public was completed. 23 CFR 450.324(c) requires that the Metropolitan Planning
37  Organization (MPO) review and update the transportation plan at least every four years in air quality

00000039

nonattainment and maintenance areas to confirm the transportation plan's validity and consistency with current and forecasted transportation and land use conditions and trends and to extend the forecast period to at least a 20-year planning horizon. The TPB approved an update to Visualize 2045 on June 15, 2022. The design concept and scope for the Preferred Alternative is included in the Air Quality Conformity analysis accompanying the update to Visualize 2045. As the Study is included in the conforming long-range plan, it is not anticipated that the Selected Alternative, which is included in the updated Air Quality Conformity analysis, would cause new air quality violations, worsen existing violations, or delay timely attainment of the relevant NAAQS.

The Air Quality Analysis study area (i.e., Montgomery County and Fairfax County) is in an attainment area for $PM_{2.5}$, therefore, transportation conformity requirements pertaining to $PM_{2.5}$ do not apply for this Project and no further analysis of $PM_{2.5}$ was required. The Maryland counties were redesignated from a nonattainment area to attainment and entered a 20-year maintenance period for CO in March 1996. The area was considered a maintenance area for the 20 years following until March 2016 when the counties completed the maintenance period. Since the Maryland counties have completed the maintenance period, transportation conformity no longer applies for CO. Similarly, Fairfax County is designated attainment for CO, and is also considered attainment for the 1997 $PM_{2.5}$ NAAQS per the USEPA 2016 ruling.

## B. Section 4(f) Determination

Section 4(f) of the US Department of Transportation Act of 1966 as amended (49 U.S.C. 303(c) and 23 U.S.C. 138) is a federal law that protects properties defined in 23 CFR 774.17 as "publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, state, or local significance, or land of an historic site of national, state, or local significance." Section 4(f) applies to all transportation projects that require funding or other approvals by the USDOT. As a USDOT agency, FHWA must comply with Section 4(f) and its implementing regulations at 23 CFR 774.

Regulations at 23 CFR 774.11(c) state Section 4(f) applies to a park, recreation area, or wildlife and waterfowl refuge determined to be significant. For properties where no determination exists, "the Section 4(f) property will be presumed to be significant." 23 CFR 774.17 further defines "Historic site" to include any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places (NRHP).

FHWA will not approve a transportation project that uses any Section 4(f) property, unless:

- FHWA determines that there is no feasible and prudent avoidance alternative to the use of land from the property, and the action includes all possible planning to minimize harm to the property resulting from such use (23 CFR 774.3(a)); or

- FHWA determines that the use of Section 4(f) property, including any measures to minimize harm (such as avoidance, minimization, mitigation, or enhancements measures) committed to by the applicant, will have a de minimis impact on the property (23 CFR 774.3(b)).

An impact to a public park, recreation area, or wildlife and waterfowl refuge may be determined to be *de minimis* if the transportation use of the Section 4(f) property, including incorporation of any measure(s) to minimize harm (such as any avoidance, minimization, mitigation, or enhancement measures), does not

00000040

1  adversely affect the activities, features, or attributes that qualify the resource for protection under Section
2  4(f) (23 CFR 774.17). For historic sites, a *de minimis* impact means that FHWA has determined (in
3  accordance with 36 CFR 800) that either no historic property is affected by the project or that the project
4  will have "no adverse effect" on the historic property. A *de minimis* impact determination does not require
5  analysis to determine if avoidance alternatives are feasible and prudent, but consideration of avoidance,
6  minimization, mitigation or enhancement measures should occur.

7  The Selected Alternative considered significant coordination with and listening to agencies and
8  stakeholders, including the OWJs for Section 4(f) properties. The Selected Alternative would avoid the use
9  of 40 Section 4(f) properties with a net reduction of approximately 113.6 acres of Section 4(f) properties,
10  including both parks and historic resources, compared to the DEIS Alternative 9. The Selected Alternative
11  would require use of a total of 33.2 acres from 20 Section 4(f) properties (including temporary and
12  permanent use), compared to a total of 146.8 acres for the DEIS Alternative 9. Refer to **Table 6** for a
13  summary of the Use of Section 4(f) Property from the Selected Alternative.

14  A *de minimis* impact finding has been made on 13 of the 20 impacted properties listed in **Table 6**. The
15  public was afforded the opportunity to comment on the *de minimis* impact finding during the SDEIS
16  comment period as well as a separate notice on the Project website and the respective OWJ websites.
17  Written concurrence from the OWJs and FHWA is included in the appendices in the FEIS. For letters from
18  M-NCPPC, City of Gaithersburg and City of Rockville, refer to **FEIS, Appendix S**. For the concurrence from
19  the Maryland Historical Trust (MHT) refer to **FEIS, Appendix I**. A full description and analysis of the 13
20  Section 4(f) properties that would experience a *de minimis* impact is found in **FEIS, Appendix G, Section**
21  **2.**

22  In addition to OWJs, the Section 4(f) Evaluation must be made available to the US Department of the
23  Interior (USDOI) and as needed, to the US Department of Agriculture (USDA) and the Department of
24  Housing and Urban Development (HUD) (23 CFR §774.5). In accordance with 23 CFR §774.5, USDOI has
25  been provided an opportunity to review and comment on the Draft Section 4(f) and Updated Section 4(f),
26  and Final Section 4(f) Evaluation in coordination with the FEIS. In a letter dated July 12, 2022, USDOI
27  responded with no further comments on the FEIS and agreed that there is no feasible and prudent use of
28  Section 4(f) properties in the study area, the proposed action includes all possible planning to minimize
29  harm to resources and that the Preferred Alternative is the alternative with the lease overall harm. (Refer
30  to Appendix B of this ROD for a copy of this letter.) The Selected Alternative would not affect resources
31  requiring coordination with USDA and HUD and, therefore, consultation with these agencies is not
32  necessary.

33  The DEIS, SDEIS, and FEIS presented measures that had been identified to ensure all possible planning to
34  minimize harm and mitigate for adverse impacts and effects. These measures are presented in **Section 4**
35  **of the Draft Section 4(f) Evaluation** (**DEIS, Appendix F**), **Chapter 5 of the SDEIS, Chapter 6 of the FEIS,**
36  **and Section 4 of FEIS, Appendix G**.

37  Pursuant to Section 106, MDOT SHA has prepared a Programmatic Agreement to resolve adverse effects
38  to historic properties (**FEIS, Appendix J and Appendix C of the ROD**). In general, mitigation measures
39  agreed upon as part of the Section 106 process satisfy the requirement to include all possible planning to
40  minimize harm for historic properties under Section 4(f) (refer to **Appendix A** of this document).

00000041

1  With regard to public parks, all possible planning involves the minimization activities described herein as
2  well as mitigation coordinated with the OWJs over public parks and recreation areas, as described in
3  **Chapters 6 and 7** of the FEIS, and **FEIS, Appendix G.** All possible planning to minimize harm will additionally
4  involve an agreement document that outlines the process to continue coordination with the OWJs over
5  Section 4(f) properties through the design phase of the Project.

6  Based on the information presented in the Draft Section 4(f) Evaluation, Updated Draft Section 4(f)
7  Evaluation, and the Final Section 4(f) Evaluation, FHWA has concluded that there is no feasible and
8  prudent alternative to the use of land from the Section 4(f) properties identified in **Table 6**, and the
9  proposed action includes all possible planning to minimize harm, and the Selected Alternative is the
10  alternative with the least overall harm.

00000042

1

## Table 6: Use of Section 4(f) Property for the Selected Alternative

| Section 4(f) Property | Official(s) with Jurisdiction[1] | Property Type | Section 4(f) Approval | Permanent (acres)[2] | Temporary (acres)[2] | Total (acres)[2] |
|---|---|---|---|---|---|---|
| George Washington Memorial Parkway | Advisory Council on Historic Preservation (ACHP), NPS, Virginia Department of Historic Resources (VDHR) | Public Park and Historic Property | Individual Evaluation | 0.6 | 3.8 | 4.4 |
| Chesapeake and Ohio Canal National Historical Park[3] | ACHP, MHT, NPS | Public Park and Historic Property | Individual Evaluation | 1.0 | 9.1 | 10.1 |
| Clara Barton Parkway[3] | ACHP, MHT, NPS | Public Park and Historic Property | Individual Evaluation | 1.1 | 0.6 | 1.7 |
| Washington Biologists' Field Club on Plummers Island | MHT, NPS | Historic Property | Individual Evaluation | <0.1 | 0.27 | 0.28 |
| Carderock Springs Historic District | MHT | Historic Property | De minimis | < 0.1 | < 0.1 | < 0.1 |
| Gibson Grove AME Church | MHT | Historic Property | Individual Evaluation | 0.6 | 0.0 | 0.6 |
| Cabin John Stream Valley Park Unit 2 | Maryland-National Capital Park and Planning Commission (M-NCPPC) Montgomery County | Public Park | De minimis | 0.6 | < 0.1 | 0.6 |
| Burning Tree Club | MHT | Historic Property | De minimis | 1.3 | 0.0 | 1.3 |
| Academy Woods | MHT | Historic Property | De minimis | 0.2 | 0.0 | 0.2 |
| Cabin John Regional Park | M-NCPPC Montgomery County | Public Park | Individual Evaluation | 5.7 | 0.6 | 6.3 |
| Tilden Woods Stream Valley Park | M-NCPPC Montgomery County | Public Park | De minimis | 0.3 | 0.1 | 0.4 |
| Old Farm Neighborhood Conservation Area | M-NCPPC Montgomery County | Public Park | De minimis | 0.1 | 0.0 | 0.1 |
| Cabin John Stream Valley Park Unit 6 | M-NCPPC Montgomery County | Public Park | De minimis | 0.8 | <0.1 | 0.8 |
| Bullards Park and Rose Hill Stream Valley Park | City of Rockville Department of Recreation and Parks | Public Park | Individual Evaluation | 3.3 | 0.0 | 3.3 |
| Rockmead Park | City of Rockville Department of Recreation and Parks | Public Park | De minimis | 0.2 | 0.1 | 0.3 |
| Woottons Mill Park | City of Rockville Department of Recreation and Parks | Public Park | De minimis | 0.7 | 0.0 | 0.7 |

| Section 4(f) Property | Official(s) with Jurisdiction[1] | Property Type | Section 4(f) Approval | Permanent (acres)[2] | Temporary (acres)[2] | Total (acres)[2] |
|---|---|---|---|---|---|---|
| Woodley Gardens | MHT | Historic Property | De minimis | 1.2 | 0.1 | 1.3 |
| Rockville Senior Center and Park | City of Rockville Department of Recreation and Parks, MHT | Public Park and Historic Property | De minimis | 1.0 | 0.1 | 1.1 |
| Ward Building | MHT | Historic Property | De minimis | 0.2 | 0.0 | 0.2 |
| Malcolm King Park | City of Gaithersburg Department of Parks, Recreation and Culture | Public Park | De minimis | 0.4 | <0.1 | 0.5 |

1    Note: 1. Virginia Department of Historic Resources (VDHR) serves as the Virginia State Historic Preservation Office; Maryland Historical Trust (MHT) serves as the Maryland
2    State Historic Preservation Office.
3    2. All impacts quantities rounded to the tenths of an acre. For purposes of determining Section 4(f) use, temporary impacts are considered short-term, construction related
4    activities that do not require permanent incorporation of a Section 4(f) resource into a transportation facility. Short-term, construction related work includes but is not limited
5    to construction staging, material and equipment storage, construction access easements, and other areas needed to support the construction, but not part of the long-term
6    improvement.
7    3. Section 4(f) impacts to Chesapeake and Ohio Canal National Historical Park and Clara Barton Parkway as currently noted in Chapter 5 exclude the area that currently has an
8    existing transportation use. The area within NPS property defined as transportation use includes existing I-495 at-grade roadway sections to the toe of slope, Clara Barton
9    Parkway Interchange ramp sections to the toe of slope, existing pier locations for the structure over the Chesapeake and Ohio Canal and eastbound Clara Barton Parkway, and
10   existing pier locations for the ALB.

00000044

C.    **Section 106 Determination**

Due to the complexity and wide scope of the Study, the Section 106 process has concluded through a Programmatic Agreement (PA), as described at 36 CFR Part 800.14[b]. (Refer to **Appendix C**.) FHWA notified the Advisory Council on Historic Preservation (ACHP) of this anticipated PA in March 2018, and ACHP notified MDOT SHA and FHWA in May 2018 of their participation in consultation for this undertaking (36 CFR Part 800.6[a][1][iii]). The PA provides protocols for additional consultation, historic properties identification, effects assessment, and adverse effects resolution as design advances. MDOT SHA will oversee implementation of the PA as the Project continues following the ROD.

Subsequent to the SDEIS, MDOT SHA completed its review of consulting parties' comments on the first draft of the PA and provided a second draft to consulting parties on December 6, 2021. MDOT SHA received consulting parties' comments on the second draft on January 3, 2022. MDOT SHA provided a third draft to consulting parties for comment on March 31, 2022 and received consulting parties' comment on the third draft to consulting parties for comment on April 14, 2022. MDOT SHA provided a final PA to consulting parties for signature on May 17, 2022. The PA has been signed and was executed prior to the issuance of the ROD. (Refer to **Appendix C** of this document.)

D.    **Environmental Justice**

All federal agencies have certain obligations under EO 12898: Federal Actions to Address Environmental Justice (EJ) in Minority Populations and Low-Income Populations (EJ Order). EO 12898 states that "...each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."

The Study completed an EJ analysis as part of the NEPA process and has been documented in the following reports: **DEIS, Chapter 4 and Appendix E; SDEIS, Chapter 4;** and **FEIS Chapter 5 and Appendix F**. As a result of this analysis, the Selected Alternative will not cause disproportionately high and adverse effects on any minority and/or low-income populations in accordance with the provisions of E.O. 12898 and FHWA Order 6640.23A.

During the outreach and engagement efforts, community priorities were identified for improved sidewalks and bicycle facilities, better lighting, and traffic calming measures. MDOT SHA commits to working with the City of Rockville, the City of Gaithersburg, and Montgomery County to:

- Identify locations where safer pedestrian crossings on major state roadways are needed.

- Identify locations where additional pedestrian improvements including adding or upgrading sidewalk, restriping for bicycle lanes, adding or upgrading ADA ramps are needed.

- Identify locations along state roads with existing pedestrian facilities where more or improved lighting is needed.

MDOT SHA has also committed to certain improvements within the historically African American community of Gibson Grove either as mitigation for direct impacts or as commitments for further enhancement. MDOT SHA will construct or fund a new parking lot for the Gibson Grove Church in coordination with their restoration plans, provide stormwater improvements to the property, and provide

00000045

1    a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection
2    between Gibson Grove Church and Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Refer to
3    **Chapter 5, Section 5.7** and **FEIS, Appendix J** for details.  MDOT SHA has also committed to convey a portion
4    of existing MDOT SHA owned right-of-way located adjacent to the boundary of Morningstar Tabernacle
5    No. 88 Moses Hall and Cemetery with an identified potential for unmarked graves to the Trustees of the
6    Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

7    Additionally, the Developer is committed to community and transit enhancements as referenced in the
8    **FEIS, Chapter 7, Section 7.3**.

9    ### E.    Wetlands and Waterways Finding

10   The Selected Alternative impacts wetlands and waterways located entirely within the Middle Potomac-
11   Catoctin HUC-8 watershed. Impacts were analyzed and quantified within the LOD for each regulatory
12   jurisdiction and were documented in **Chapter 5 of the FEIS, and FEIS Appendices M, N, O and P**. In
13   Maryland, MDE impacts include 152,934 square feet (3.51 acres) of permanent wetland impacts and
14   28,594 linear feet of non-culverted stream impacts; and USACE impacts include 148,598 square feet (3.41
15   acres) of permanent wetland impacts and 29,769 linear feet of non-culverted stream impacts. In Virginia,
16   VDEQ and USACE impacts include 944 linear feet of non-culverted streams.

17   Based on the direct and indirect impacts of the Selected Alternative, the nontidal wetlands and waterways
18   mitigation requirement estimate in Maryland includes 4.38 acres of wetland mitigation credits and 7,511
19   functional feet (FF) of stream credits. No mitigation bank credits within an appropriate service area, or in-
20   lieu fee programs were identified in Maryland; therefore, MDOT SHA committed to meeting the USACE
21   and MDE nontidal wetlands and waterways mitigation requirement through the permittee-responsible
22   mitigation. Off-site compensatory nontidal wetlands and waterways mitigation in Maryland consists of
23   two permittee-provided mitigation sites, including a total of 4.61 acres of potential wetland mitigation
24   credits and 6,304 FF of potential stream mitigation credits. The remaining required stream mitigation
25   credits will be provided by purchasing credits from a mitigation bank that will have an initial credit release
26   in the fall of 2022. Further details on the Selected Alternative impacts, mitigation requirements, proposed
27   mitigation sites, and Phase II Mitigation Plans is included in the *Final Compensatory Wetlands and
28   Waterways Mitigation Plan (CMP)* (**FEIS, Appendix O**).

29   In Virginia, wetland mitigation requirements were determined based on replacement ratios in the Virginia
30   Administrative Code (9VAC25-680-70), and stream mitigation requirements were developed based on the
31   USACE's Unified Stream Methodology for use in Virginia, January 2007. MDOT SHA commits to meeting
32   Virginia stream mitigation requirements through purchase of privately-owned mitigation bank credits.
33   These credits will fulfill the current mitigation requirement estimate of 472 riverine mitigation credits in
34   the Fairfax County Middle Potomac-Catoctin watershed. MDOT SHA has identified specific mitigation
35   bankers and confirmed credit availability in the Final CMP (**FEIS, Appendix O**).

36   Concurrent with the NEPA process, MDOT SHA has prepared a Joint Federal/State Permit Application for
37   the Alteration of Any Floodplain, Waterway, Tidal or Non-Tidal Wetland (refer to **FEIS, Appendix P**). The
38   USACE plans to issue a Clean Water Act, Section 404 and Section 10 Permit.  The MDE and VDEQ plan to
39   issue Section 401 Water Quality Certifications, and MDE will also issue a Maryland Nontidal Wetlands and
40   Waterways Permit.

00000046

### F.    Floodplain Finding

The Selected Alternative will result in 31.6 acres of impacts to FEMA 100-Year Floodplain, which represent the estimated footprint of fill areas associated with construction of the Selected Alternative. Actual analysis of potential study related changes to hydraulic function and elevation of floodplains would be determined using hydraulic and hydrologic (H&H) floodplain modeling as part of the engineering process for each structure in final design. Roadway expansion and augmented culverts associated with the Selected Alternative may increase the size of existing floodplain encroachments but would not result in new significant encroachments into the floodplain as defined in CFR §650.105(q). The proposed expansion of the roadway would increase the size of existing floodplain encroachments but would not result in new significant floodplain encroachments.

If H&H studies find that the flood elevation would change, mitigation or other actions will be required in accordance with floodplain regulations. MDOT SHA will submit project plans to MDE for approval of structural evaluations, fill volumes, proposed grading evaluations, structural flood-proofing, and flood protection measures in compliance with FEMA requirements, US Department of Transportation (USDOT) Order 5650.2, *Floodplain Management and Protection*, and EO 11988. Improvements at existing culverts are required to maintain existing 100-year flood high water elevations. Culvert improvements and new culvert design will ensure that flood risk to adjacent properties is not increased, a requirement of COMAR 26.17.04.11. 23 CFR § 650.115(a) will be consulted when determining design standards for flood control measures. In addition, per FHWA memorandum HIBT-20 every effort will be made during final design to avoid classification of the roadway embankment as a flood control structure. The requirement set forth in 23 CFR § 650.111 to complete location hydraulic studies for floodplain encroachment areas will be complied with at later stages of design.

### G.    Section 7 of the Endangered Species Act

Section 7 of the Endangered Species Act (ESA) of 1973 (16 U.S.C. Sections 1531-1544) requires all federal agencies to use their authorities to conserve endangered and threatened species in consultation with the USFWS and/or National Oceanic and Atmospheric Administration (NOAA) National Marine Fisheries Service (NMFS). Section 7(a)(2) (16 U.S.C. § 1536) establishes substantive requirements for federal agencies to insure, in consultation with the USFWS, any action authorized, funded, or carried out is not likely to jeopardize the continued existence of any endangered or threatened species or destroy or adversely modify designated critical habitat. The Section 7 implementing regulations (50 CFR Part 402) specify how federal agencies must fulfill their Section 7(a)(2) consultation requirements. Section 9 of the ESA (16 U.S.C. § 1538) prohibits any action that causes a "take" of species listed as endangered or threatened. "Take" is further defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt any of these.

The USFWS administers the ESA for all terrestrial and nontidal freshwater species, while the NMFS administers the ESA for marine and anadromous species or critical habitat. While there are no tidal areas within the limits of the Selected Alternative, the NMFS also regulates effects to other trust resources such as anadromous fish species, estuaries, and EFH. A response was received on August 9, 2018, from NMFS, included in *Appendix N* of the *Final Natural Resources Technical Report* (**FEIS, Appendix M**), stating the corridor study boundary lies outside the limits of potential direct or indirect effects to federally-listed or proposed threatened or endangered species under the jurisdiction of NMFS.

00000047

1   The USFWS also indicated that the Project is covered by the January 5, 2016, Programmatic Biological
2   Opinion on Final 4(d) Rule for the NLEB and Activities Excepted from Take Prohibitions since the area
3   where forest clearing would occur does not have known maternity roost trees or hibernacula. In their
4   letter, the USFWS stated that the Project was "not likely to adversely affect" the NLEB. MDOT SHA
5   coordinated closely with USFWS and MDNR regarding NLEB and Indiana bat, and ESA Section 7
6   consultation has concluded.

7   **VIII.    Mitigation and Commitments**

8   The Selected Alternative, with build improvements only within the limits of Phase 1 South, avoids over
9   100 acres of parkland and hundreds of wetland and stream features. The Selected Alternative was
10  developed as a resource avoidance and minimization alternative based in part on extensive coordination
11  with and input from agencies and stakeholders, including the OWJs for Section 4(f) properties. Comments
12  received on the DEIS and Draft Section 4(f) Evaluation from agencies and stakeholders specifically
13  requested avoidance of significant parkland and historic resources within the study area. The Selected
14  Alternative is responsive to comments received and aligns the Study to be consistent with the previously
15  determined phased delivery and permitting approach by limiting the build improvements to the area of
16  Phase 1 South only. The final decision results in complete avoidance of significant stream valley parks,
17  including Rock Creek, Northwest Branch, Sligo Creek, Southwest Branch, and Henson Creek Stream Valley
18  Parks, as well as historic parks of national significance including the Baltimore-Washington Parkway,
19  Greenbelt Park and Suitland Parkway.

20  Mitigation developed for this Study was identified to reduce and offset resource impacts resulting from
21  the Selected Alternative. In planning for mitigation, MDOT SHA has strived to provide meaningful benefits
22  to resources and improve their values, services, attributes, and functions that may be compromised. The
23  lead agencies have worked in good faith to plan worthwhile mitigation based on identified priorities that
24  would, at a minimum, result in no net loss with a goal of a net benefit. The detailed comprehensive
25  mitigation package is included in **Appendix A** of this document.

26  A comprehensive mitigation package was developed in close coordination with local, state and federal
27  agency partners for the Study and includes:

28  • Acquisition of parkland replacement property totaling approximately 94.50 acres

29  • Parkland amenities, such as improved access to parks

30  • Stream restoration totaling approximately 6,300 functional feet

31  • Wetland creation/restoration totaling approximately 6.10 acres

32  • Forest and terrestrial vegetation restoration

33  • Rare, threatened and endangered species restoration

34  • Cultural landscape report; historic resource condition assessments and restoration; and Phase III
35    data recovery

36  • Noise barriers

37  Beyond mitigation for unavoidable impacts identified in the EIS documents, additional transit, bicycle and
38  pedestrian and/or environmental priorities have been committed to by MDOT SHA. These priorities,

00000048

1  identified through stakeholder coordination, have been included as part of the Selected Alternative and
2  are summarized in **Appendix A, Table 1**.

3  Additional commitments have been made by the Developer (Accelerate Maryland Partners) or MDOT SHA
4  if the project is delivered as a P3 with a Section Developer controlled by AMP using private funding. These
5  commitments are captured separately throughout the FEIS including in **Appendix A, Table 2** of this ROD.
6  These commitments are included to disclose the efforts the Developer and MDOT SHA have made to
7  advance the project in an environmentally responsible manner taking into account input received from
8  the public, stakeholders and local governments related to transit, community enhancements, water
9  quality, and equity. These commitments are not mitigation for direct environmental impacts, are in
10  addition to the NEPA-related commitments captured in **Appendix A, Table 1**, and are tied to project
11  delivery under a P3 contractual agreement.

12  Commitments listed in **Appendix A, Table 2** are the responsibility of MDOT SHA and the P3 Developer to
13  implement as part of the Phase 1 South Section P3 Agreement, which will be the contractual agreement
14  outlining the terms and conditions for final design, construction, financing, operations, and maintenance
15  and/or Memoranda of Understanding with applicable third parties such as local governments.  MDOT SHA
16  will provide quarterly status update reports for items listed in **Appendix A, Table 1** to FHWA following
17  issuing a notice to proceed for final design and construction.

18  ## IX.    Permits, Approvals and Next Steps

19  In addition to NEPA compliance, several permits and approvals are being coordinated concurrently with
20  the NEPA Process. **Table 7** summarizes the federal, state, and local permits, authorizations and
21  approvals that are required for the Selected Alternative based on the current Study design
22  assumptions  and associated impacts.

23  **Table 7: Permits and Approvals**

| Permit/ Approval | Responsible/Permitting Agency | Anticipated Timeframe |
|---|---|---|
| Interstate Access Point Approval | Federal Highway Administration | Fall 2022 |
| Mandatory Referral | Maryland-National Capital Park and Planning Commission | Fall 2022/Early 2023 |
| Record of Decision | National Park Service | Fall 2022 |
| Archaeological Resource Protection Act (ARPA) permit for Maryland and Virginia resources | National Park Service | Early 2023 |
| Least Environmentally Damaging and Practicable Alternative (LEDPA) | US Army Corps of Engineers | Spring 2023 |
| Clean Water Act Section 404 and Section 10 | US Army Corps of Engineers | Spring 2023 |
| Maryland/Virginia State Waters (Section 401) | Maryland Department of Environment / Virginia Department of Environmental Quality | Spring 2023 |
| Maryland Nontidal Wetlands and Waterways Permit | Maryland Department of Environment | Spring 2023 |

00000049

| Permit/ Approval | Responsible/Permitting Agency | Anticipated Timeframe |
|---|---|---|
| Virginia Wetland Protection Permit | Virginia Department of Environmental Quality | Spring 2023 |
| Special Use Permit - Construction in Maryland | National Park Service | Early 2023 |
| Special Use Permit - Construction in Virginia | National Park Service | Early 2023 |
| Highway Deed Easement in Maryland | National Park Service/FHWA | Spring 2023 |
| Park Construction Permit | Maryland-National Capital Park and Planning Commission | Early 2023 |
| Maryland Reforestation Law Approval | Maryland Department of Natural Resources | Early 2023 |
| State and County Forest Conservation Easement Revision Approvals | Maryland Department of Natural Resources / Maryland-National Capital Park and Planning Commission | Summer 2023 |
| General Permit for Stormwater Associated with Construction Activity - Maryland | US Environmental Protection Agency / Maryland Department of the Environment | Spring 2023 |
| General Permit for Stormwater Associated with Construction Activity - Virginia | US Environmental Protection Agency / Virginia Department of Environmental Quality | Late 2023 |
| Stormwater Management/Erosion and Sediment Control | Maryland Department of Transportation - State Highway Administration Plan Review Division / Maryland Department of the Environment | Late 2023 |
| Stormwater Management/Erosion and Sediment Control | US Environmental Protection Agency / Maryland Department of the Environment / Virginia Department of Environmental Quality | Late 2023 |
| Clean Water Act Section 402 (MS4) | Maryland Department of the Environment | Spring 2023 |
| Water Appropriation and Use Permit | Maryland Department of the Environment | Spring 2023 |

Following the ROD, MDOT SHA anticipates proceeding with the remaining steps of project development using the Progressive P3 approach. The Developer is working collaboratively with MDOT SHA, MDTA, and the stakeholders on predevelopment work for Phase 1 South. This effort focuses on advancing the preliminary design and due-diligence activities by involving all stakeholders – including Montgomery County, VDOT, municipalities, property owners, utility owners, and citizens.

As part of the predevelopment work, the Developer has advanced a procurement process to select the Design-Build contractors that will subcontract with them to perform final design and construction of Phase 1 South. The Developer will be responsible to MDOT SHA for the final design, construction, financing, operations, and maintenance of Phase 1 South.

The Developer will continue to further avoid and minimize impacts throughout the remainder of the design process to the greatest extent practicable. Monetary incentives have been added to the Developer's Technical Provisions to encourage further avoidance and minimization of impacts to wetlands, waterways, forest, and parkland. MDOT SHA and the Developer will develop an Environmental Management Plan and an Environmental Compliance Plan to track the mitigation and commitment documented in the FEIS and ROD, as included in **Appendix A** of this document. MDOT SHA and the Developer will coordinate closely on any future design changes and will consult with FHWA to consider if

1  such changes trigger the need to reevaluate the NEPA analysis and to determine if the NEPA decision
2  remains valid.  Any additional environmental studies beyond a reevaluation would be coordinated with
3  the appropriate stakeholders and agencies.

4  **X.    Comments on FEIS**

5        **A.    Overview**

6  As described in Section VII, the FEIS was available for a 30-day review through the Project website
7  (https://oplanesmd.com/feis/), the USEPA EIS Database and at 17 public libraries along the study corridors
8  including in Montgomery and Prince George's Counties, Maryland, Washington DC and Fairfax County,
9  Virginia. During the FEIS availability period, from June 17, 2022 through July 18, 2022, a total of 33
10 comments were received via email or letter transmitted via email. The breakdown of comments received
11 by commenting entity is:

12      • Cooperating Agencies: 3
13      • Other Agencies/ Stakeholders: 3
14      • Elected Officials: 2
15      • Community Organizations: 9
16      • Businesses: 0
17      • Individuals: 16

18 In addition to the 33 comments, form letter comments were also received via email from 514 individuals;
19 in many cases an individual submitted multiple entries of the same email/letter to different government
20 officials, but they were only counted once. Form letter comments are comments that were submitted by
21 individuals containing mostly the same language or content. There were two form letter comments
22 received on the FEIS.  However, all of the form letter comments submitted included a request to extend
23 the FEIS comment period.

24 As with comments received on the DEIS and SDEIS, the FEIS comments were reviewed, considered, and
25 uploaded into a database used as a repository for all comments received. MDOT SHA and FHWA reviewed
26 and considered each comment and substantive comments requiring a technical review were assigned to
27 the appropriate technical staff.

28 All substantive comments received during the FEIS availability period have been responded to in **Appendix
29 D** of the ROD. Comments received, before or after the availability period, were considered in the decision-
30 making process and reflected in the project record but are not included in this Appendix.  The responses
31 to substantive comments in **ROD, Appendix D** include responses to:

32      • Montgomery County Department of Transportation
33      • Maryland Transit Opportunities Coalition
34      • Peter James (2 comments)
35      • Friends of Moses Hall
36      • Office of the County Executive, Montgomery County
37      • Sierra Club (2 comments)
38      • The Maryland General Assembly
39      • National Capital Region Transportation Planning Board

00000051

**B.    Common Themes**

A few common themes emerged during review of the comments received.  Request for an extension of the FEIS availability period and request for a formal FEIS comment period were noted as a top common theme mainly through the form comment letters. Other common themes included opposition to the program or project and concerns over environmental impact including environmental justice and analysis of greenhouse gas emissions. There were also several comments questioning the results and validity of the final traffic analysis and the need to consider teleworking. Responses to these common themes follow.

**1.    Extend FEIS Availability Period and Formal FEIS Comment Period**

FEIS comments questioned whether a 30-day availability period was adequate to meaningfully review and comment on the material in the FEIS including supporting appendices. Based on the Council on Environmental Quality (CEQ) regulations, no formal comment period on a FEIS is required and no final decision can be made sooner than 30 days after the FEIS is published in the Federal Register. An extension of the FEIS availability period was not granted by FHWA as there has been extensive opportunity for the public to review and comment on the Project documents including the DEIS and SDEIS over a four-year period. The FEIS was prepared in support of the normal progress of a NEPA Study.  That is, after reviewing and considering the many comments received on the DEIS and SDEIS the agencies took another hard look at its prior analyses, evaluated accumulated data, refined design to further address operational considerations and most notably to further efforts to avoid and minimize impacts. The FEIS outlined the changes made since the SDEIS to aid in review of new or updated information.  Supporting technical reports appended to the FEIS were analyses presented with the DEIS, updated with the SDEIS and finalized for the FEIS.

From the outset of the Study's NEPA process, the FHWA and MDOT SHA, developed a comprehensive public involvement and engagement strategy designed to obtain input from stakeholders around the entire MLS study area. The public involvement and engagement process, starting in early 2018 and continuing for over four years, considered the vast diversity of community resources.  The MDOT SHA's public involvement strategy ensured the safety of the public during the pandemic, while still providing the same opportunities for meaningful participation by the public in the NEPA process and even expanding opportunities using new technologies and alternative methods.

In addition to a combined six-month public comment review period for the DEIS and SDEIS, MDOT SHA held 16 large public workshops, 7 public hearings including virtual and in-person, and over 200 citizen, elected official, community, stakeholder, and business owner meetings.  Refer to **DEIS, Chapter 7 and Appendix P; SDEIS, Chapter 7; FEIS Chapter 8; and FEIS, Appendix R** for detailed information on public involvement.

As a result of this continued public involvement and engagement effort, and with input from federal, state, and local agencies, the lead agencies refined and presented the following in the FEIS: the Preferred Alternative, potential impacts of the Preferred Alternative, and responses to more than 5,000 comments received on the DEIS and SDEIS.  Importantly, this Preferred Alternative reflected project refinements that address many comments, including design modifications and adjustments, finalizing technical analyses,

00000052

1  continued application of avoidance and minimization efforts, and finalizing mitigation for unavoidable
2  impacts.  This is precisely what the NEPA process envisions.  Refer to **FEIS, Executive Summary** for more
3  detailed explanation.

4  The FEIS was made available for a 30-day Notice of Availability through various and widely accessible
5  means.  Public involvement and engagement will continue as the Project advances to final design and
6  construction.  The MDOT SHA will be responsible for implementing strategies, such as public meetings
7  and community events, with the goal of maintaining an open dialogue with stakeholders. For the more
8  detailed response to comments related to the request to extend the FEIS availability period, refer to
9  Montgomery County Executive, Marc Erich and Sierra Club comment letters and response in **ROD,**
10 **Appendix D**.

11        **2.        Environmental Justice (EJ) Analysis**

12 FEIS comments stated that the EJ analysis had not been previously released to the public for review and
13 comment.  This is not accurate.  The DEIS, SDEIS, and FEIS all documented the EJ analysis completed for
14 the Project; refer to **DEIS, Chapter 4, Section 4.21; DEIS Appendix E; SDEIS, Chapter 4, Section 4.21; FEIS,**
15 **Chapter 5, Section 5.21; and FEIS, Appendix F**.  The EJ analysis and methodology is discussed in **DEIS,**
16 **Chapter 4, Section 4.21.2** and **FEIS, Chapter 5, Section 5.21.2**.

17 As stated in the DEIS, SDEIS, and FEIS, the strategies developed under EO 12898, USDOT Order 5610.2C,
18 FHWA Order 6640.23A, and FHWA memorandum Guidance on Environmental Justice and NEPA (2011)
19 set forth the appropriate and necessary steps to identify and address disproportionately high and adverse
20 effects of federal transportation projects on minority and low-income populations. Based on these
21 strategies, the first four steps, below, were documented in the DEIS EJ analysis, updated in the SDEIS EJ
22 analysis and updated and enhanced where necessary for the FEIS EJ analysis:

23   1.  The identification of minority race and ethnicity populations and low-income populations (EJ
24       populations) along the 48-mile study corridor for the **DEIS, Chapter 4, Sections 4.21.2.A-B** and
25       then an update on the identification of EJ populations for the Preferred Alternative, Alternative 9
26       - Phase 1 South limits in the **SDEIS, Chapter 4, Section 4.21.2.B**;

27   2.  The review of demographic data to determine the existing environmental and community
28       conditions of the EJ populations, documented in the **DEIS, Chapter 4, Section 4.21.3** and
29       enhanced in the **SDEIS, Chapter 4, Section 4.21.2.C**;

30   3.  The documentation of public outreach as planned, conducted and refined throughout the study
31       in consideration of the demographic and community data to ensure meaningful involvement in EJ
32       populations, documented in the **DEIS, Chapter 4, 4.Section 21.4** and updated in the **SDEIS,**
33       **Chapter 4, Section 4.21.2.D**; and

34   4.  The identification of potential beneficial and/or adverse impacts to EJ populations under the No
35       Build and Screened Alternatives in the **DEIS, Chapter 4, Section 4.21.5**, and the identification of
36       potential beneficial and/or adverse impacts to EJ populations under the No Build and Preferred
37       Alternative, Alternative 9 - Phase 1 South updated in the **SDEIS, Chapter 4, Section 4.21.3**.

00000053

1   Steps #2, 3, and 4 are updated and Steps #5 through #8, below, are documented in this FEIS EJ Analysis
2   in consideration of the Preferred Alternative[19]:

3       5.  The consideration of mitigation or community enhancement measures if unavoidable adverse
4           effects are expected to occur under the Preferred Alternative **(throughout FEIS, Section 5.21.5)**;

5       6.  A comparison of adverse effects to all EJ populations under the Preferred Alternative versus
6           adverse effects to a non-EJ population reference community **(FEIS, Chapter 5, Table 5-51)**;

7       7.  A determination of whether disproportionately high and adverse impacts would occur to EJ
8           populations under the Preferred Alternative **(FEIS, Chapter 5, Table 5-51)**; and

9       8.  A final conclusion of whether disproportionately high and adverse effects would occur to EJ
10          populations, based on unmitigated adverse effects and whether public feedback has been
11          addressed **(FEIS, Chapter 5, Section 5.21.7)**.

12  The public had sufficient opportunity to review and comment on the EJ analysis conducted for the Project.
13  As previously described in **Section VIII.D** of this document, MDOT SHA also implemented additional EJ
14  outreach efforts before the FEIS to engage meaningfully and directly with underserved communities to
15  identify improvements needed in their communities. These commitments are described in **Section VII.D**
16  and documented in the **ROD, Appendix A, Table 1, numbers 114-117.**

17          **3.      Greenhouse Gas Analysis**

18  FEIS comments stated that the greenhouse gas (GHG) analysis was not previously released to the public
19  for review and comment. This is not accurate. The DEIS, SDEIS, and FEIS all documented the GHG analysis
20  as part of the air quality analysis for the Project; refer to **DEIS, Chapter 4, Section 4.8; DEIS Appendix I;**
21  **SDEIS, Chapter 4, Section 4.8; FEIS, Chapter 5, Section 5.8.B; and FEIS, Appendix K**.

22  As documented in the FEIS, to date, no national standards for GHG emissions have been established by
23  the USEPA under the Clean Air Act and there is no regulatory requirement that has been established to
24  analyze these emissions at a project level for transportation projects. Consistent with the 2016 CEQ Final
25  GHG NEPA guidance,[20] a quantitative GHG analysis was conducted on the six Build Alternatives and the
26  Preferred Alternatives as documented in the DEIS and FEIS, respectively. Since there is no approved
27  methodology for conducting a project-level quantitative GHG emissions analysis, there are numerous
28  parameters that could be applied to conduct such a review. Consistent with FHWA guidance on developing
29  an affected network to analyze project-related pollutants, such as MSATs, MDOT SHA analyzed GHG
30  emissions using the same affected network as the MSAT analysis. Refer to **FEIS, Appendix K, Section 3.4.1**
31  for the GHG results. While no significant increase in GHG emissions from the Preferred Alternative was
32  noted, MDOT SHA has committed to implementing a Greenhouse Gas Reduction Program to reduce
33  emissions during construction. Refer to **ROD, Appendix A, Table 1, number 130**.

34          **4.      Consideration of Teleworking**

35  FEIS comments noted that more workers are teleworking or telecommuting than pre-pandemic times.
36  The Project considered the effects to the COVID-19 pandemic and the impacts on teleworking or remote

---

[19]Steps #4 and 5 plus Steps #6 and 7 are combined in this FEIS EJ Analysis.
[20] https://www.federalregister.gov/documents/2016/08/05/2016-18620/final-guidance-for-federal-departments-and-agencies-on-consideration-of-greenhouse-gas-emissions-and

00000054

1 working on the region.  Refer to **FEIS, Chapter 4, Section 4.5** and **FEIS, Appendix C** for the COVID-19 Travel
2 Analysis and Monitoring Plan.

3 As documented in the FEIS, the traffic results show statewide traffic volumes are back to pre-pandemic
4 levels, while transit ridership has remained down.  In addition, the sensitivity analysis of the Preferred
5 Alternative in the FEIS concluded that: "the results of the MWCOG and VISSIM sensitivity analyses confirm
6 that the capacity improvements proposed under the Preferred Alternative would be needed and effective
7 even if future demand changes from the pre-pandemic forecasts based on potential long-term impacts to
8 teleworking, e-commerce, and transit use that are not formally accounted for in the current regional
9 forecasting models", **FEIS, page 4-25**. MDOT SHA also responded to teleworking comments in the **FEIS,**
10 **Chapter 9, pages 9-7 and 9-8**.

11      **5.      Traffic Forecasts and Modeling Results**

12 FEIS comments questioned the Study's final traffic forecasts and modeling results.  These comments are
13 not based in fact and appear to be based on a misunderstanding of how data was updated and refined
14 between publication of the SDEIS and publication of the FEIS and its supporting documents.  FHWA and
15 MDOT followed accepted practice and processes for considering how or if project design refinements or
16 other relevant new information would impact traffic forecasts.  As explained below, the analysis reflected
17 in the FEIS is sound.  Any changes to the traffic forecast results in the FEIS properly reflect appropriate
18 and relatively minor updates to modeling inputs based on information available to MDOT SHA following
19 completion of the SDEIS.

20 The FEIS document acknowledges several changes that were made to the traffic forecasts and analysis
21 between the time the SDEIS and FEIS were published.  Refer to **FEIS, Chapter 4, Section 4.1** and **4.2** and
22 **FEIS Appendix A, Section 2**. The changes that were made are typical of the standard process of updating
23 the information presented in a draft environmental document (DEIS and SDEIS) in response to comments
24 received following public review of the document, and also to reflect refinements to the design that
25 occurred after the SDEIS was published. This is a typical process which occurs as the lead agencies meet
26 with affected agencies and stakeholders throughout the NEPA process and make refinements to the
27 design, as needed, to avoid or minimize impacts and/or costs.  For the more detailed response to
28 comments related to the results of the traffic analysis, refer to the Maryland Transit Opportunities
29 Coalition comment and response in **ROD, Appendix D**.

30      **6.      Traffic Results in General Purpose Lanes**

31 FEIS comments stated that the general purpose lanes in the future build conditions would be worse than
32 the No Build condition.  As noted earlier in the ROD, on page 6, the Selected Alternative provides benefits
33 to the existing lanes by improving average speeds in the general purpose lanes by four mph on average
34 throughout the study corridors during peak periods compared to the No Build condition.  However, the
35 results in the FEIS do show that the travel times for some inner loop trips are "longer" in the Build general
36 purpose lanes than No Build (for example, the trip from River Road to I-370 takes 26.6 minutes under
37 Build conditions versus 17.0 minutes in the No Build).  The reason is that the backups would be so bad in
38 Virginia under the No Build condition that fewer vehicles would actually get across the ALB during the
39 peak hour.  This makes some trips in Maryland under the No Build look better than they are.  A similar
40 analogy is that the No Build condition is like having an incident on the ALB every day.  The Build condition

00000055

1  serves much more throughput during the peak hour and there is naturally some increase in travel time
2  during the peak when looking at that segment.  While this affects some trip pairs, 76% of the trip pairs
3  show a benefit from traveling in the general purpose lanes under Build versus No Build, and the average
4  PM travel time change between No Build and Build is 8 minutes of savings.

5  **XI.    Statute of Limitations**

6  Pursuant to 23 USC Section 139(l), FHWA will publish a statute of limitation (SOL) notice in the Federal
7  Register upon issuance of this ROD.  A claim arising under federal law seeking judicial review of the Federal
8  agency actions on the I-495 and I-270 Managed Lanes Study will be barred unless the claim is filed within
9  150 days of publication of the SOL notice in the Federal Register.

10  **XII.    Conclusion**

11  FHWA has considered all of the alternatives, information, analyses, and objections submitted by federal,
12  state, tribal, and local governments and public commenters for consideration by the lead and cooperating
13  agencies in developing this ROD.  Having considered this information, FHWA has determined that:

14  1. Adequate opportunity was afforded for the presentation of views by all parties with a substantive
15  economic, social, and or environmental interest;

16  2. Fair consideration has been given to the preservation and enhancement of the environment and to the
17  interests of the communities in which the Selected Alternative is located; and

18  3. All practicable measures to avoid or minimize environmental harm have been incorporated into this
19  decision, and where adverse effects remain, there exists no reasonable alternative to avoid and further
20  mitigate such effects.

21  Based on a balanced consideration of the need for safe and efficient transportation, the social, economic
22  and environmental effects of the proposed transportation improvements, and national, state, and local
23  environmental protection goals, as well as the FEIS and comments submitted by the public and agencies,
24  FHWA has determined in accordance with 23 CFR 771 that:

25  • The requirements of 23 CFR 771 have been met;

26  • Consistent with social, economic and other essential consideration, to the maximum extent
27    practicable, adverse environmental effects revealed in the environmental impact statement
28    process will be minimized or avoided;

29  • Consistent with social, economic, or other essential considerations, from among reasonable
30    alternatives, thereto, the action to be directly undertaken by MDOT SHA, is an alternative that
31    minimizes or avoids adverse environmental effects to the maximum extent practicable, including
32    the effects disclosed in the environmental impact statement;

33  • The action to the fullest extent practicable, incorporates the environmental investigations,
34    reviews, and consultations in a single coordinated process;

00000056

1　　• Compliance with all applicable environmental requirements is reflected in the environmental
2　　　document required under NEPA; and

3　　• Public involvement and a systematic interdisciplinary approach were essential parts of the
4　　　development process for the action.

5　Approved:

6

7　Gregory Murrill
8　Division Administrator
9　Maryland Division
10　Federal Highway Administration

8/25/2022
Date

00000057

**OP·LANES**
MARYLAND

I-495 & I-270 Managed Lanes Study

Record of Decision

## Appendix A: Mitigation and Commitments by MDOT SHA and P3 Developer

The advancement of conceptual mitigation for unavoidable direct impacts to environmental resources throughout the NEPA process for the Study continued and has been documented in the DEIS, SDEIS and FEIS. Mitigation developed for this Study was identified to reduce and offset environmental impacts resulting from the Selected Alternative. In planning for mitigation, MDOT SHA has strived to provide meaningful benefits to resources and improve their values, services, attributes, and functions that may be compromised. Lastly, the lead agencies have worked in good faith to plan worthwhile mitigation based on identified priorities that would, at a minimum, result in no net loss with a goal of a net benefit.

Beyond mitigation for unavoidable impacts, additional commitments, such as those for transit, priority bicycle and pedestrian improvements, and environmental enhancements have been identified through extensive coordination with agencies and stakeholders. These commitments have been identified in consideration of comments received over the course of the Study and to further support elements of the Study's Purpose and Need. **Table 1** presents these commitments that have been made beyond mitigation for direct impacts. MDOT SHA is responsible for implementing all commitments and mitigation listed in Table 1. FHWA, through its stewardship and oversight responsibility will ensure that MDOT SHA implements all commitments and mitigations listed in Table 1. MDOT SHA will provide quarterly status update reports to FHWA following issuing a notice to proceed for final design and construction.

### Table 1: MDOT SHA Mitigation and Commitments

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| | **WETLANDS/WATERWAYS** | | |
| 1. | Stream restoration (721 functional feet) along unnamed tributary to Great Seneca Creek south of Bradbury Drive in Quince Orchard Valley Neighborhood Park (Site CA-5). | M | Final Design & Construction |
| 2. | Stream restoration (5,583 functional feet) and wetland creation/restoration (4.61 acres of credit) along Cabin Branch east and west of Montgomery Village Avenue at Montgomery Village Golf Club (Site RFP-2). | M | Final Design & Construction |
| 3. | Purchase of 1,207 functional feet of riverine mitigation credit from approved Maryland mitigation banks. | M | Final Design & Construction |
| 4. | Purchase of 506 linear feet of riverine mitigation credit from approved Virginia mitigation banks. | M | Final Design & Construction |
| 5. | Design of stream stabilization and restoration to provide ecological uplift, where practicable, when relocating streams within the Preferred Alternative limits of disturbance (LOD). | C | Final Design & Construction |



I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| **FOREST** | | | |
| 6. | Mitigate for unavoidable impacts to forests in Maryland (414.7 acres) on an acre-for-acre basis in accordance with the mitigation hierarchy described in the Maryland Reforestation Law (MD Natural Resources Code § 5-103) including:<br>• Onsite mitigation (within the project LOD).<br>• Off-site mitigation [at 68 sites identified in the Maryland Reforestation Law Mitigation Site Search Report prepared for the MLS, refer to Appendix T of the Natural Resources Technical Report, (**FEIS, Appendix M**).<br>• Purchase of forest mitigation bank credits from approved forest mitigation banks in affected county and/or watershed.<br>• Any remaining mitigation required may be fulfilled through payment into the Reforestation Fund, as approved by MDNR.<br>• Final forest mitigation plan will be developed and implemented by the Developer in conjunction with MDOT SHA and the affected jurisdictions and landowners, including M-NCPPC and NPS, during the final design phase of the project. The Developer will track changes to the impacts and mitigation credits. | M | Final Design |
| 7. | Commit to planting of any approved reforestation sites on MDNR property within five years of the initial Maryland Reforestation Law approval for the project. MDOT SHA has committed to providing a minimum of five years of maintenance and monitoring at reforestation mitigation plantings. All reforestation sites will need approval/concurrence from DNR, and may include up to 210.54 acres on MDNR property at the sites identified in the Maryland Reforestation Law Mitigation Site Search Report prepared for the MLS. (Refer to Appendix T of the Natural Resources Technical Report, **FEIS, Appendix M**). Coordination and determination of final mitigation sites will be conducted by the Developer in conjunction with MDOT SHA and MDNR. | M | Final Design, Construction & Post-construction |
| 8. | Forest impacts in Virginia that require mitigation are within NPS property. Therefore, forest mitigation will follow the comprehensive ecological restoration plan outlined in #9 below. Although tree impacts occur in Virginia outside of NPS property, there is no statewide forest regulation that requires mitigation off county or state parkland. No tree impacts occur on county or state parkland in Virginia. | M | Final Design & Construction |

00000059



I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| | **PARKLAND** | | |
| | **NATIONAL PARK SERVICE** | | |
| 9. | Develop and implement a Comprehensive Ecological Restoration Plan and Cost Estimate for Restoring Limits of Disturbance to Preexisting Conditions for the impacted area. The plan shall include the following components:<br>• *Forest and terrestrial vegetation restoration including:*<br>   o Avoiding and minimizing impacts to trees within and surrounding the LOD through a robust tree protection plan.<br>   o Survey impacted vegetation community prior to construction to determine existing community composition and develop replanting plan based on survey results.<br>   o Replanting forest (including shrub and herbaceous layers) inch-for-inch within LOD in temporary impact areas and providing non-native invasive (NNI) species control and maintenance and monitoring for 5 years within reforestation area.<br>   o Softening edge effects associated with disturbance by treating and removing non-native invasive species within a 50-foot buffer of the LOD and replanting native trees and shrubs in any gaps resulting from the removal of mature trees or non-native invasive species. In coordination with NPS during design, sensitive areas, such as areas of known archeological resources, within the 50-foot buffer will be excluded if ground disturbance is required.<br>   o Providing monetary compensation for remaining tree impacts, based on inch for inch replacement of DBH impacted.<br>• *Rare, Threatened and Endangered plant species restoration including:*<br>   o Conducting a final pre-construction of rare, threatened or endangered (RTE) plant inspection.<br>   o Collecting seeds and/or individual RTE plant species from impact area prior to construction.<br>   o Cultivating plants and storing seeds/propagating plants from seed in an off-site nursery.<br>   o Reestablishing RTE species from stored seed and cultivated and propagated plants following construction and topsoil restoration. | M | Final Design & Construction |

00000060



I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| | • Topsoil salvage and restoration including:<br>    ○ Salvaging topsoil from impact area and storing in nearest possible stockpile location.<br>    ○ Restoring subsoils and reduce compaction via ripping, discing, plowing or double-digging following construction.<br>    ○ Placing salvaged topsoil in impact area following construction.<br>• Herpetofauna translocation including:<br>    ○ Conducting Herpetofauna relocation effort immediately prior to construction activities<br>        ▪ Conducting a sweep through a portion of the impact area with approximately 10 biologists searching for and capturing reptiles and amphibians and logging all captures.<br>        ▪ Relocating captured individuals safely away from the impact area.<br>        ▪ Conducting a second sweep through the same portion of impact area, logging all captures and relocating captured individuals.<br>        ▪ Conducting a third sweep and relocate effort, if the number of captured individuals is not dramatically reduced and continue sweeping the portion of the work area until the number of captured individuals is minimal.<br>        ▪ Continuing the multiple sweep process until the entire work area is cleared.<br>• Downed woody debris salvage and restoration including:<br>    ○ Moving all downed woody debris from the impact area to the edge of the impact area just outside of the E&S measures as part of the clearing operation.<br>    ○ Restoring downed woody debris, if appropriate, to the impact area following construction and topsoil restoration. | | |
| 10. | Create/restore 1.53 acres of wetland northwest of American Legion Bridge (Site ID CHOH-13) per the Wetland Statement of Findings. | M | Construction |
| 11. | Install new white legend and border on brown background guide signs along I-495 for the George Washington Memorial Parkway exit. | M | Construction |
| 12. | Shift bridge piers north of Lock 13 to the maximum extent possible while maintaining adequate vertical clearance of 12 feet, 6 inches between towpath and bottom of bridge steel to accommodate NPS equipment. Design new ALB to capture all drainage outfall using downspouts. The downspouts will be located so the water does not drop onto areas with frequent pedestrian use. | C | Final Design |
| 13. | Complete a pre-construction condition assessment of locks, masonry walls, towpath, and canal prism throughout entire LOD and develop and implement a plan for repairs identified during condition assessment subject to NPS approval. | M | Final Design |

00000061



I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| 14. | Develop Interpretive product on archeological sites; Create web-based Story Map, waysides, and/or brochures. | M | Final Design & Construction |
| 15. | Complete a pre-construction condition assessment of Potomac Heritage Trail within the LOD and develop and implement a plan to restore and improve the trail within the LOD, in consultation and agreement with NPS. | M | Final Design |
| 16. | Prepare Visitor and Ecological Impact Study. | C | Completed |
| 17. | Acquire James Audia property (two parcels totaling 1.4 acres) as replacement parkland for impacts to George Washington Memorial Parkway. If unavailable, acquire or convey property for replacement parkland of similar size and/or function in coordination with NPS. | M | Final Design |
| 18. | Convey a portion of the MDOT SHA owned former Ridenour property (38.7 acres) to NPS as replacement parkland for impacts to Chesapeake and Ohio Canal National Historical Park and Clara Barton Parkway. | M | Final Design |
| 19. | Provide monetary compensation up to $60,000 to NPS to update and refine the George Washington Memorial Parkway Climate Action Plan. | M | Final Design & Construction |
| 20. | The Preferred Alternative will result in temporary closure of the Potomac Heritage National Scenic Trail within the LOD during construction. A detour route, if determined to be necessary, will continue to be developed by MDOT SHA and the Developer in coordination with NPS, Fairfax County, and VDOT. The segment of the trail within the LOD would be restored on a new alignment after construction is completed. | M | Final Design, Construction & Post-construction |
| 21. | Evaluate drainage and sight distance considerations at the intersection of the shared use path and Chesapeake and Ohio Canal towpath during final design in coordination with NPS, within the LOD. | C | Final Design |
| 22. | Design and construct, in coordination with NPS and the Washington Biologists' Field Club, slope armoring along the upstream side of Plummers Island within the LOD to mitigate for future slope erosion as a result of tree clearing with the LOD. The slope armoring could include, but is not limited to, a rip-rap slope, live staking, and brush layering or any combination of armoring that will provide a blended natural aesthetic with the topography and historic nature of the island. | C | Final Design & Construction |
| 23. | Develop and evaluate additional options for the American Legion Bridge during final design that would further minimize or avoid physical impact to Plummers Island, in consultation with the National Park Service. | C | Final Design |

00000062

 I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| **MARYLAND-NATIONAL CAPITAL PARK & PLANNING COMMISSION** | | | |
| **General** | | | |
| 24. | Acquire the 24.14-acre Bardon, Inc. property (Acct. no. 00402385) and convey to M-NCPPC. If unavailable, acquire or convey property as replacement parkland of similar size and/or function in coordination with M-NCPPC. | M | Final Design |
| 25. | Acquire the 0.57-acre Bardon, Inc. property (Acct. no. 02620882) and convey to M-NCPPC. If unavailable, acquire or convey property as replacement parkland of similar size and/or function in coordination with M-NCPPC. | M | Final Design |
| 26. | Evaluate the ability to re-convey unused property, previously owned by M-NCPPC, back to that agency post construction. | C | Post-construction |
| 27. | Convey the MDOT SHA owned 3.15-acre right-of-way located at MD 97 and 16th Street. | M | Final Design |
| 28. | Convey two MDOT SHA owned 15.35-acre parcels (Acct. no. 161300980570 and 161300980626) located between Northwood High School and Northwest Stream Valley Park. | M | Final Design |
| **Cabin John Stream Valley Park Unit 2** | | | |
| 29. | Plan, design, and construct improvements to formalize the Cabin John Trail trailhead parking area along Seven Locks Road including:<br>• Reconstruct the existing driveway per MD Standard No. 630.02 or applicable County standard.<br>• Pave the existing gravel lot with full depth asphalt. Paved area measures approximately 60' x 100'. Assume open section lot.<br>• Optimize parking lot design to provide maximum number of spaces, including Americans with Disabilities Act (ADA)-compliant spaces (with signage) per the ADA Guidelines. Stripe new parking spaces.<br>• Provide drainage and stormwater management (SWM) facilities as required to treat impervious area per County requirements.<br>• Install signage prohibiting littering/dumping, replace existing trash can, and remove existing illicitly dumped material.<br>• Relocate existing sign kiosk. Location to be determined in consultation with M-NCPPC.<br>• Construct bicycle repair stand, with tools and pump at Cabin John Trail trailhead, in consultation with M-NCPPC. | M | Final Design & Construction |

00000063



I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| 30. | Stream stabilization (~1,000 linear feet) along Cabin John Creek including:<br>• Remove all concrete structures within stream along both along existing banks and failed pieces in the stream.<br>• Rebuild banks with rock and vegetative stabilization techniques that promote environmental functions.<br>• Replant riparian buffer with native seed, herbaceous plugs, and native shrubs and trees.<br>• Install instream grade control structures (such as rock sill, crossvane, riffles, etc.) to transition stream into, through, and out of the underpass area in a stable and ecologically sound way.<br>• Protect sewer manhole and restore I-495 on-ramp outfall to Cabin John Creek with environmentally sensitive channel techniques. | M | Final Design & Construction |
| 31. | Plan, design, and implement forest and terrestrial vegetation mitigation including:<br>• NNI control for 7 years within 50' buffer of LOD.<br>• Infill plantings, on park property, consisting of shrubs, understory/canopy trees and herbaceous seeding within NNI control areas (50 ft buffer from LOD). | M | Final Design & Construction |
| 32. | Plan and design wildlife passage area under I-495 overpass of Cabin John Creek and Cabin John Parkway by lengthening new bridge structures. This will allow wildlife passage on the west side bank of Cabin John Creek while minimizing wildlife-vehicular conflicts along Cabin John Parkway by constructing wildlife exclusion fencing along the east side of the creek next to the Parkway, in coordination with M-NCPPC. | M | Final Design & Construction |
| **Cabin John Regional Park** | | | |
| 33. | Plan, design, and construct a fiberglass pedestrian bridge over the outfall/tributary to Cabin John Creek at STA 3640+00 for the natural surface connector trail including:<br>• Performing hydraulic study and determining feasibility of new crossing.<br>• Constructing fiberglass bridge per M-NCPPC-provided Fiberglass Bridge specification or per equal to or better alternative approved by M-NCPPC. | M | Final Design & Construction |
| 34. | Plan, design, and construct improvements for pedestrian and cycling access to the Robert C. McDonell campground access road by:<br>• Reconstruction of existing bridge over Old Farm Creek in same location per M-NCPPC-provided specifications for Prefabricated Steel Truss Bridge (Section 401) and Helical Piles (Section 403) (hydraulically in-kind replacement).<br>• Provide temporary crossing for pedestrians and cyclists during bridge reconstruction.<br>• Provide stream stabilization work immediately upstream, underneath, and immediately downstream of the bridge.<br>• Limit time of year of bridge reconstruction to window when campground access is closed. | M | Final Design & Construction |

00000064



I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| | • Bridge design shall provide for ADA compliance, pedestrian access, and passage of cyclists without dismounting while incorporating a gate to prevent unauthorized access by vehicles. | | |
| 35. | Plan, design, and construct improvements to the existing parking area on Tuckerman Lane near the Robert C. McDonell Campground access road including:<br>• Resurface the existing paved lot. (Paved area measures approximately 2500 SF. (25' x 100')).<br>• Optimize parking lot design to provide maximum number of spaces. Stripe new parking spaces. Incorporating ADA parking, as applicable.<br>• Provide additional landscaping in vicinity of lot, in consultation with M-NCPPC. | M | Final Design & Construction |
| 36. | Plan, design, and construct a fiberglass pedestrian bridge over Cabin John Creek to connect the Cabin John Trail to the Kidney Bean Loop Trail, in the vicinity of Goya Drive including:<br>• Constructing fiberglass bridge per provided Fiberglass Bridge specification or per equal to or better alternative approved by M-NCPPC.<br>• Design and construct in-stream grade control and bank protection structures to stabilize stream in the vicinity of the new bridge. | M | Final Design & Construction |
| 37. | Plan, design, and construct improvements for the stabilization of the Gainsborough Road stormwater outfall to Cabin John Creek *(approximately 255 linear feet)* with environmentally sensitive channel techniques.<br>• Include a planting plan to compensate for forest impacts related to this work.<br>• Provide treatment of invasive bamboo surrounding the channel.<br>• Construct pedestrian trail bridge replacement over Gainsborough outfall channel. | M | Final Design & Construction |
| 38. | Plan, design, and implement forest and terrestrial vegetation mitigation including:<br>• Conducting forest stand delineation within 100 ft buffer of LOD and develop a 7-year non-native invasive control management plan within M-NCPPC property.<br>• Implementing a 7-year non-native invasive control management plan within 100 feet of the LOD, on park property and within in the biodiversity area. Specific target areas and species to be determined by M-NCPPC Montgomery Parks.<br>• Infill plantings consisting of shrubs, understory/canopy trees and herbaceous seeding within NNI control areas (100 ft buffer from LOD on park property). | M | Final Design & Construction |
| | **Tilden Woods Stream Valley Park, Old Farm Neighborhood Conservation Area, and Cabin John Stream Valley Park Unit 6** | | |
| 39. | Plan, design, and construct improvements for the stabilization of the Greentree Road stormwater outfall from the pipe to a natural surface trail just south of Cabin John Creek *(approximately 310 linear feet)* with environmentally sensitive channel techniques. Include a planting plan to compensate for forest impacts related to this work. | M | Final Design & Construction |

00000065



I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| 40. | Plan, design, and implement forest and terrestrial vegetation mitigation including:<br>• NNI control for 7 years within 50' buffer of LOD on park property.<br>• Infill plantings consisting of shrubs, understory/canopy trees and herbaceous seeding within NNI control areas (50 ft buffer from LOD) on park property. | M | Final Design & Construction |
| 41. | Plan, design, and construct a single bridge structure with a clear span of Tuckerman Lane (including the associated pedestrian and bicycle facilities) and a clear span over Old Farm Creek (including the restored floodplain and a wildlife passage):<br>• Provide wildlife passage area on northern bank per M-NCPPC specifications<br>• Provide fish passage under Old Farm Creek overpass by restoring the stream to a natural channel and tie into the existing stream restoration immediately upstream<br>• Stream span must maximize floodplain cross-sectional area | M | Final Design & Construction |
| | **CITY OF GAITHERSBURG** | | |
| 42. | Convey the 4.03-acre MDOT SHA-owned, property (Acct. no. 09-02213932) to City of Gaithersburg. | M | Final Design |
| | **CITY OF ROCKVILLE** | | |
| 43. | Convey the 1.25-acre MDOT SHA-owned Millennium Garden Park (former Vernie Smith properties (Acct. nos. 16-0400205281 and 16-0400205270)) to City of Rockville. | M | Final Design |
| 44. | Acquire the 1.32-acre Betty B. Casey Property (on Fleet Street) (Acct. no 160400144125) and convey to the City of Rockville | M | Final Design |
| 45. | Acquire the 0.42-acre Lodging Partners LLC Property (41 Maryland Avenue) (Acct. no. 160403198603) and convey to the City of Rockville | M | Final Design |
| 46. | Acquire the 4.23-acre Cynthia Robertson Property (Potomac Woods) (Acct. no. 160401523951) and convey to the City of Rockville | M | Final Design |
| 47. | Continue to consult on context sensitive solutions, during the design phase, to the four existing parks (Bullards Park and Rose Hill Stream valley Park, Rockmead, Woottons Mill, and Rockville Senior Center). The consultation will be constrained to context sensitive solutions that are both compensatory to the impacts to Section 4(f) resources and a justifiable expenditure of public funds. For example, plantings and context sensitive stormwater management facility design. | C | Final Design |
| 48. | Design the improvements along Gude Drive to accommodate the proposed new entrance to the Rockville Senior Center at Piccard Drive proposed by the City of Rockville. Coordination will occur with the City of Rockville in final design to ensure compatibility with the City's planned improvements. | C | Final Design |

00000066



I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| **CULTURAL RESOURCES (SECTION 106)** | | | |
| 49. | Provide monetary compensation not to exceed $250,000 for a Cultural Landscape Report for Clara Barton Parkway (historical narrative; updated existing conditions, analysis, and evaluation; and treatment guidelines for management of character defining features). | M | Final Design |
| 50. | Prepare National Register Nomination for Dead Run Ridges Archaeological District in coordination with NPS and submit to Virginia SHPO. | M | Final Design |
| 51. | Complete Phase III Archaeological Data Recovery at 44FX0374, 44FX0379 and 44FX0389 (George Washington Memorial Parkway) and develop associated public interpretation materials. | M | Final Design |
| 52. | Complete Phase III Archaeological Data Recovery at 18MO749 and 18MO751 (Chesapeake and Ohio Canal) and develop associated public interpretation materials. | M | Final Design |
| 53. | Prepare a draft National Register Nomination for the Washington Biologists' Field Club on Plummers Island to NPS and WBFC for their review and comment prior to formal submission of the nomination to MD SHPO. | M | Final Design |
| 54. | Place temporary fencing along the LOD within Plummers Island to delimit construction activities. | C | Construction |
| 55. | Fund or implement a photographic survey documenting conditions before, during and post-construction on Plummers Island within the area of potential effects (APE) boundary and provide the results to Washington Biologists' Field Club and NPS. | M | Post-construction |
| 56. | Fund or develop Graphic Information System maps to document known current and historical study locations and key natural resource features within the APE on Plummers Island to assist in documenting change over time and provide these files to Washington Biologists' Field Club and NPS. | M | Final Design |
| 57. | Procure a sub-meter accurate GPS unit for Washington Biologists' Field Club to use in long-term monitoring of plant locations, collection sites, and other historical research features on Plummers Island. | M | Final Design |
| 58. | Provide for digitization and cataloging of historical records, subject to any availability or rights restrictions, related to Plummers Island and the Washington Biologists' Field Club that are housed at the Smithsonian Institution that are not currently available in electronic format, and provide the files to Washington Biologists' Field Club and NPS. | M | Final Design |
| 59. | Provide Washington Biologists' Field Club historical content related to Plummers Island as part of the above digitization effort to incorporate into their website. | M | Final Design |
| 60. | Complete additional archaeological investigations of LOD surrounding Morningstar Tabernacle No. 88 Moses Hall and Cemetery and monitor for potential archaeological findings during construction. | C | Construction |

00000067



I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| 61. | Design context-sensitive treatment of noise barrier facing the Morningstar Tabernacle No. 88 Moses Hall and Cemetery which may include decorative elements appropriate to the historic property and/or such elements as memorial plaques or signage. MDOT SHA will provide consulting parties and MD SHPO comment opportunity for project elements, specifically noise barrier, within the APE adjacent to the cemetery at a draft level of design and a second opportunity prior to finalization of design; for each review there will be a minimum 30-day review period. | C | Final Design & Construction |
| 62. | Complete additional archaeological investigations of the LOD in the general vicinity of the Montgomery County Poor Farm adjacent to I-270 near Wootton Parkway. | C | Final Design |
| 63. | Improve the stormwater drainage on the First Agape African Methodist Episcopal (AME) Zion Church (Gibson Grove Church) by routing drainage into a new underground culvert to be installed as part of the project. MDOT SHA will ensure a parking lot identified as part of the church's restoration plan, is constructed on church property following installation of the culvert drainage design. MDOT SHA will work with the church on schedule and timing of the culvert and parking lot work to be compatible with ongoing church restoration efforts to the maximum extent practicable. | M | Final Design |
| **NOISE[1]** | | | |
| 64. | Extended noise barrier (Barrier System VA-1/2) from STA 86+29 to STA 98+85 LT. | M | Final Design & Construction |
| 65. | Construct new noise barrier (Barrier System MD-1) from STA 131+13 to STA 145+18 LT. | M | Final Design & Construction |
| 66. | Construct new noise barrier (Barrier System MD-2) from STA 130+62 to STA 198+51 RT. | M | Final Design & Construction |
| 67. | Relocate and extend existing noise barrier (Barrier System MD-3) from STA 158+10 to STA 211+97 LT. | M | Final Design & Construction |
| 68. | Construct new noise barrier (Barrier System MD-4) from STA 198+13 to STA 221+68 RT. | M | Final Design & Construction |
| 69. | Relocate and extend existing noise barrier (Barrier System MD-5) from STA 227+21 to STA 293+76 LT. | M | Final Design & Construction |
| 70. | Relocate and extend existing noise barrier (Barrier System MD-6/6A/7) from STA 221+56to STA 293+24 RT. | M | Final Design & Construction |
| 71. | Relocate existing noise barrier (Barrier System MD-8) from STA 294+12 to STA 319+61 RT. | M | Final Design & Construction |
| 72. | Relocate existing noise barrier (Barrier System MD-10) from STA 337+75 to STA 355+06 LT. | M | Final Design & Construction |

---

[1] A preliminary determination of the location and horizontal and vertical alignment for the noise barriers was made based on the latest design concept (FEIS Table 5-20); however, final determination of noise barrier feasibility, reasonableness, dimensions and locations will be made in final design.

00000068

 I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| 73. | Relocate and extend existing noise barrier (Barrier System MD-11) from STA 320+42 to STA 354+78 RT. | M | Final Design & Construction |
| 74. | Partially relocate and extend existing noise barrier (Barrier System 270-05) from STA 3432+67 to STA 3490+25 LT. | M | Final Design & Construction |
| 75. | Construct new noise barrier (Barrier System 270-06) from STA 3493+65 to STA 3538+71 LT. | M | Final Design & Construction |
| 76. | Relocate existing noise barrier (Barrier System 270-07A) from STA 3685+15 to STA 4710+91 LT. | M | Final Design & Construction |
| 77. | Partially relocate existing noise barrier (Barrier System 270-07B) from STA 4710+91 to STA 4748+02 LT. | M | Final Design & Construction |
| 78. | Construct new noise barrier (Barrier System 270-08) from STA 4750+11 to STA 4804+26 LT. | M | Final Design & Construction |
| 79. | Extended existing noise barrier (Barrier System 270-09) from STA 4751+67 to STA 4801+90 RT. | M | Final Design & Construction |
| 80. | Extended existing noise barrier (Barrier System 270-11 (270 west spur portion)) from STA 3743+50 to STA 3778+34 LT. | M | Final Design & Construction |
| 81. | Partially relocate and extend existing noise barrier (Barrier System 270-12) from STA 3749+46 RT to STA 294+47 LT. | M | Final Design & Construction |
| 82. | Partially relocate and extend existing noise barrier (Barrier System 270-14) from STA 3492+05 to STA 3540+07 RT. | M | Final Design & Construction |
| 83. | Relocate and extend existing noise barrier (Barrier System 270-15) from STA 3624+55 to STA 3684+02 LT. | M | Final Design & Construction |
| 84. | Construct new noise barrier (Barrier System 270-18) from STA 3722+12 to STA 3727+46 RT. | M | Final Design & Construction |
| 85. | These noise abatement commitments will not be removed from the Project as a result of value engineering and/or similar studies/activities. Any changes to these commitments will be subject to re-evaluation under NEPA and must be approved by MDOT SHA and FHWA. | C | Final Design |
| | **AQUATIC AND TERRESTRIAL MITIGATION COMMITMENTS** | | |
| 86. | Implement additional water quality protection measures to prevent soil erosion and subsequent sediment influx into nearby waterways. Construction contractors are designated as co-permittees on the National Pollutant Discharge Elimination System permit to ensure compliance. This permit is issued under Maryland's General Permit for construction activities and is implemented with a regular inspection program for construction site sediment control devices that includes penalties for inadequate maintenance. To ensure compliance, onsite evaluations by a certified erosion and sediment control (E&S) inspector would occur throughout the duration of construction. | C | Construction |



I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| 87. | Potential water quality impacts from construction would be minimized through strict adherence to mandated E&S and SWM requirements. In particularly sensitive areas, other impact minimization activities may be considered and could include: more specialized SWM options; redundant E&S measures; monitoring of aquatic biota above and below sensitive stream crossings before and after construction to quantify any inadvertent impacts that occur at the crossing; fish relocation from dewatered work areas during construction to reduce fish mortality; and use of a qualified environmental monitor on-site to enhance E&S compliance. | C | Construction |
| 88. | Continue coordination with MDNR and the Scenic and Wild River Advisory Board in final design. | C | Final Design |
| 89. | Account for post-construction SWM and compliance with total maximum daily loads in the stormwater design and water quality monitoring to comply with required permits. | C | Post-Construction |
| 90. | Develop environmental site design SWM features to maintain current infiltration rates to the greatest extent practicable. | C | Final Design |
| 91. | Design all hydraulic structures to accommodate flood flows without causing substantial impact. | C | Final Design |
| 92. | Design culverts and bridges to limit the increase of the regulatory flood elevation to protect structures from flooding risks and use standard hydraulic design techniques for all waterway openings where feasible to maintain current flow regimes and limit adjacent flood risk (COMAR 26.17.04). | C | Final Design |
| 93. | Remove the existing peregrine falcon nest box on the ALB just prior to the nesting season when construction is scheduled to begin to minimize potential impacts to the currently nesting peregrine falcons as recommended by the US Fish and Wildlife Service (USFWS). Disruption for one or more nesting seasons due to long-term construction activities is anticipated. Once construction activities are nearly complete near the former nest site, USFWS recommends that the nest box be reinstalled. MDOT SHA will follow the USFWS recommended protection measures for the peregrine falcon nesting on the ALB. | C | Construction |
| 94. | Adopt and implement construction best management practices (BMPs) to minimize incidental take of migratory birds. MDOT SHA commits to consulting with the USFWS immediately prior to construction to determine the presence/absence of bald eagle nests in the vicinity of the Preferred Alternative LOD. | C | Construction |
| 95. | Use of bridges and depressed culverts wherever possible to maintain natural stream substrate in areas where new or replaced culverts are necessary. Channel morphology would be evaluated, and culvert extensions designed to maintain aquatic life passage by avoiding downstream scour and channel degradation. Preliminary designs do not include culvert replacements but do include | C | Final Design |

OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| | augmentations resulting from installing new pipes adjacent to existing culverts to provide additional area for flow. | | |
| 96. | Comply with the stream closure period for the designated use class of the stream for all in-stream work in Maryland, including that for culvert extensions, and any potential waiver requests would require agency approval(s). In-stream work is prohibited in Use I streams from March 1 through June 15. | C | Construction |
| 97. | Conduct a mussel survey in the Potomac River surrounding the ALB, 10-meters upstream and 25-meters downstream of the temporary project LOD, for all Maryland State-listed mussel species that are short-term and long-term brooders prior to construction and relocation of Maryland State-listed rare species, if necessary. | C | Final Design |
| 98. | Design causeways and trestles proposed adjacent to the existing ALB to avoid impacting fish passage by maintaining river velocities below approximately 3 feet per second at commonly observed discharges (e.g., below 90 percentile) during the period in which anadromous fish are spawning (February 15 – June 15). Trestles or other non-fill accessways will be used in areas of deeper water (e.g., extending from the southern bank) to the extent practicable to minimize fill and associated flow restrictions. | C | Final Design |
| 99. | Maintain access to Plummers Island for construction purposes by bridging over the oxbow of the Potomac River without placing any materials or fill within the stream channel. | C | Construction |
| 100. | Voluntarily commit to a time of year restriction for tree clearing from May 1 through July 31 of any year within a 3-mile buffer around each of the three positive Northern Long-Eared Bat (NLEB) detection locations within the study corridors to go above and beyond what is required to protect this bat species. Note, the Study was determined to have "no effect" on the Indiana Bat and "not likely to adversely affect" the NLEB. | C | Construction |
| 101. | Commit to a time of year restriction for tree clearing within the Virginia portion of the Preferred Alternative LOD from April 1 – October 31 of any year to avoid impact to tri-colored bat roost trees during roosting season. | C | Construction |
| 102. | Continue coordinating with NPS and MDNR to determine a mitigation plan for RTE plant species prior to construction. This will include the use of matting along access roads to minimize soil compaction during construction, replanting of appropriate RTE plants within temporarily disturbed areas following construction, and monitoring of replanted RTE plant populations to ensure successful reestablishment. | M | Construction & Post-Construction |



I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| 103. | Commit to avoidance and minimization measures for the wood turtle as recommended by the Virginia Department of Wildlife Resources (VDWR): <br> • Prior to the commencement of work all contractors associated with work at this site must be made aware of the possibility of encountering wood turtles on site and become familiar with their appearance, status and life history. <br> • If any wood turtles are encountered and are in jeopardy during the development or construction of this project, remove them from immediate harm and call VDWR. Any relocations should be reported to VDWR, and the wood turtle observation form should be completed and faxed to VDWR. <br> • Minimize potential wildlife entanglements, resulting from use of synthetic/plastic E&S matting, by use matting made from natural/organic materials such as coir fiber, jute, and/or burlap. | C | Construction |
| 104. | Continue coordination with National Marine Fisheries Service to determine appropriate mitigation for potential impacts to anadromous fish during construction. | C | Final Design |
| 105. | Maintain existing or improved aquatic life passage in the culverts conveying Watts Branch and Old Farm Creek under I-270. | C | Final Design & Construction |
| 106. | Consult 23 CFR § 650.115(a) when determining design standards for flood control measures. | C | Final Design |
| 107. | Comply with the requirement set forth in 23 CFR § 650.111 to complete location hydraulic studies for floodplain encroachment areas during later stages of design. | C | Final Design |
| 108. | Avoid and minimize impact to aquatic species by: <br> • Maintaining existing or improving aquatic life passage in the primary (not overflow) culverts that are being replaced or extended and continuing to coordinate with MDNR, USFWS, the National Marine Fisheries Service (NMFS), and the Maryland Department of the Environment (MDE) regarding aquatic life passage. <br> • Designing completely replaced culverts designated as "major stream crossing" to meet the passage criteria described by USFWS (USFWS, 2019b). <br> • Evaluating areas where culverts are being extended or augmented for the feasibility of a natural or nature-like stream bottom, in design. <br> • Implementing BMPs during the replacement of the ALB crossing the Potomac River such as extensive in-stream work and using coffer dams and temporary construction trestles to avoid and minimize impacts to the river and its aquatic biota. | C | Final Design & Construction |

00000072

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| 109. | Consult with NMFS and MDNR when construction plans are developed for roadway crossings of the Potomac River and Cabin John Creek, the two known anadromous fish use areas, to ensure that impacts due to construction and permanent fill are minimized to the extent practicable. | C | Construction |
| 110. | Comply with COMAR 26.17.04.11 by ensuring culvert improvements and new culvert design will not increase flood risk to adjacent properties. | C | Final Design |
| 111. | Submit final plans to MDE for approval of structural evaluations, fill volumes, proposed grading evaluations, structural flood-proofing, and flood protection measures in compliance with FEMA requirements, US Department of Transportation Order 5650.2, Floodplain Management and Protection, and Executive Order 11988. | C | Final Design |
| 112. | Employ BMPs within the 100-year floodplain as required by MDE permits. | C | Final Design & Construction |
| 113. | Ensure water quantity treatment be met onsite or through waiver requests in specific areas. Every effort to meet water quality treatment requirements onsite, where practicable will be made. Where not practicable, water quality requirements would be met offsite in accordance with MDE regulations. | C | Final Design |
| **ENVIRONMENTAL JUSTICE/EQUITY** | | | |
| 114. | MDOT SHA and the Developer will continue coordination with local and regional advisory groups to determine additional methods for engaging with underserved communities. This will be an ongoing effort that continues post-NEPA, through final design and construction. Local and regional advisory groups may include but are not limited to the Montgomery County Advisory Groups, City of Rockville and City of Gaithersburg. | C | Final Design & Construction |
| 115. | Construct a new sidewalk along the west side of Seven Locks Road under I-495 to re-establish a connection between Morningstar Tabernacle No. 88 Moses Hall and Cemetery and First Agape AME Zion Church (Gibson Grove Church) in the historically African American community of Gibson Grove, see commitment ID No. 125. | C | Construction |
| 116. | Convey a portion of existing MDOT SHA owned right-of-way located adjacent to the boundary of Morningstar Tabernacle No. 88 Moses Hall and Cemetery with an identified potential for unmarked graves to the Trustees of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. | C | Post-Construction |
| 117. | Continue coordination with the City of Rockville, City of Gaithersburg, and Montgomery County to advance the identified priorities that were noted during EJ engagement efforts including more or improved sidewalks and bicycle facilities; better lighting on streets and sidewalks; and traffic calming | C | Final Design & Construction |

00000073



I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| | measures to make streets safer. Through this continued coordination, MDOT SHA with the Developer will: Identify locations where safer pedestrian crossings on major state roadways are needed. <br>• Identify locations where additional pedestrian improvements including adding or upgrading sidewalk, restriping for bicycle lanes, adding or upgrading ADA ramps are needed. <br>• Identify locations along state roads with existing pedestrian facilities where more or better lighting is needed. | | |
| | **TOLLING** | | |
| 118. | The toll rate ranges will only apply to the high-occupancy toll (HOT) lanes; the existing free general-purpose lanes will not be tolled. In addition, the proposal will include discounts for qualifying vehicles—including HOV 3+ (including carpools and vanpools), buses and motorcycles. | C | Operations |
| | **TRANSIT** | | |
| 119. | Enhance transit mobility and connectivity within the Preferred Alternative including the following elements: <br>• Free bus transit usage of the HOT managed lanes to provide an increase in speed of travel, assurance of a reliable trip, and connection to local bus service/systems on arterials that directly connect to activity and economic centers. <br>• Direct and indirect connections from the proposed HOT managed lanes to existing transit stations and planned Transit Oriented Development at the Shady Grove Metro (I-370), Twinbrook Metro and Rockville Metro (Wootton Parkway), and Westfield Montgomery Mall Transit Center (Westlake Terrace). | C | Operations |
| 120. | Construct new bus bays at Washington Metropolitan Area Transit Authority's Shady Grove Metrorail Station. | C | Final Design and Construction |
| 121. | Increase parking capacity at the Westfield Montgomery Mall Transit Center. | C | Final Design and Construction |
| 122. | Design and construct the ALB such that a future capital improvement project will have one or more feasible options to achieve the full design and implementation of a transit line across the ALB. These options will be enabled by designing the northbound and southbound structures to not preclude a possible future transit line including the addition of foundation and substructure elements. | C | Final Design and Construction |
| | **PEDESTRIAN AND BICYCLE FACILITIES** | | |

00000074

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| 123. | Replace in kind or upgrade to meet the current master plan recommended facilities for existing pedestrian and bicycle facilities impacted by the Preferred Alternative, through coordination with the local agencies having jurisdiction over and/or maintenance responsibility for these facilities. | C | Final Design & Construction |
| 124. | Replace, upgrade, or provide new pedestrian/bicycle facilities consistent with the current master plan, where adjacent connections on either side of the bridge currently exist for facilities along crossroads where the crossroad bridge would be reconstructed. Where the I-495 and I-270 mainline or ramps cross over a roadway or pedestrian/bicycle facility and the bridge would be replaced, the mainline and ramp bridges would be lengthened to accommodate the footprint for the master plan facility under the structure. | C | Final Design & Construction |
| 125. | Reconstruct the ALB with a new pedestrian and bicycle shared use path to provide multimodal connectivity across the Potomac River, to be located along the east side of the ALB. A direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative LOD and impact analyses. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection(s) to the east and west of the American Legion Bridge between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the study area to ensure the existing connection(s) can handle any increased usage from the new shared use path connection to the Chesapeake and Ohio Canal towpath. | C | Final Design & Construction |
| 126. | Widen the existing variable-width sidepath along the east side of Seven Locks Road under I-495 (Cabin John Trail), consistent with the county master plan. | C | Final Design & Construction |
| 127. | Construct a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection between First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall and Cemetery. | C | Final Design & Construction |
| **AIR QUALITY** | | | |
| 128. | Implement a Diesel Emissions Reduction Program that exceeds pertinent Federal and state regulations to minimize air pollution including MSAT emissions during construction consisting of initiatives such as:<br>• Ensuring diesel powered construction equipment to meet minimum emissions reduction requirements by engine manufacturer, or by being properly retrofitted with emissions control devices, or that clean fuels be used if necessary to meet the emissions reduction requirements.<br>• Retrofitting equipment that is used to be on the EPA Verified Retrofit Technology List. | C | Construction |

00000075



I-495 & I-270 Managed Lanes Study

Record of Decision

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| | • Requiring the use of ultra-low sulfur diesel fuel in construction equipment.<br>• Implementing a Driver Training program to provide incremental savings by more efficiently operating mobile and stationary machinery. | | |
| 129. | Implement a Truck Staging Area Plan for all construction vehicles waiting to load or unload material where emissions will have the least impact on sensitive areas and the public. These include but not limited to hospitals, schools, residences, motels, hotels, daycare facilities, elderly housing and convalescent facilities. All sources of emissions shall be located as far away as possible from fresh air intakes, air conditioners and windows. | C | Construction |
| 130. | Implement a Greenhouse Gas Reduction Program to reduce emissions during construction including initiatives such as:<br>• Use of alternative fuels and vehicle hybridization of construction vehicles, to the maximum extent practicable.<br>• Maintaining existing vegetation, where possible.<br>• Use of recycled and reclaimed materials, including use of recycled asphalt, use of industrial byproducts as cement substitutes, and recycled concrete, to the maximum extent practicable. | C | Construction |
| 131. | Implement an Anti-Idling Policy to avoid unnecessary idling of construction equipment in order to reduce engine emissions and to provide air quality benefits to those who live and work in or adjacent to the construction sites. The plan may include, but is not limited to, limiting idling of all mobile construction equipment, including delivery trucks, to three minutes, except under certain conditions. | C | Construction |
| 132. | Manage fugitive dust emissions during construction, by use some or all of the following dust control measures, to minimize and mitigate, to the greatest extent practicable, impacts to air quality:<br>• Minimize land disturbance<br>• Cover trucks when hauling soil, stone, and debris (MDE Law)<br>• Use water trucks to minimize dust<br>• Use dust suppressants if environmentally acceptable<br>• Stabilize or cover stockpiles<br>• Construct stabilized construction entrances per construction standard specifications<br>• Regularly sweep all paved areas including public roads<br>• Stabilize onsite haul roads using stone | M | Construction |

00000076

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | Timeframe |
|---|---|---|---|
| | • Temporarily stabilize disturbed areas per MDE erosion and sediment standards and approved plans | | |
| **VISUAL** | | | |
| 133. | Install new white legend and border on brown background guide signs along I-495 for the George Washington Memorial Parkways exit. | M | Construction |
| 134. | Establish and follow aesthetic and landscaping guidelines of all highway elements in consultation with the local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state, and Federal agencies. The Developer will be responsible for establishing the aesthetic and landscaping guidelines. | C | Final Design |

Additional commitments have been made by the Developer (Accelerate Maryland Partners) or MDOT SHA if the project is delivered as a P3 with a Section Developer controlled by AMP using private funding. These commitments are captured separately throughout the FEIS including in **Table 2** below. These commitments are included to disclose the efforts the Developer and MDOT SHA have made to advance the project in an environmentally responsible manner taking into account input received from the public, stakeholders and local governments related to transit, community enhancements, water quality, and equity. These commitments are not mitigation for direct environmental impacts, are in addition to the NEPA-related commitments captured in **Table 1** and are tied to project delivery under a P3 contractual agreement.

Commitments listed in **Table 2** are the responsibility of MDOT SHA and the P3 Developer to implement as part of the Phase 1 South Section P3 Agreement, which will be the contractual agreement outlining the terms and conditions for the final design, construction, financing, operations, and maintenance and/or Memoranda of Understanding with applicable third parties such as local governments.  MDOT SHA will provide quarterly status update reports to FHWA following financial close of a Section P3 Agreement with the Section Developer controlled by AMP.

## Table 2: P3 Developer Agreement Commitments

| ID No. | Commitments | Timeframe |
|---|---|---|
| 1. | Continue to further avoid and minimize impacts to the greatest extent practicable after the NEPA Process throughout the remainder of the design process. Utilize the monetary incentives that have been added to the Developer's Technical Provisions to encourage further avoidance and minimization of impacts to wetlands, waterways, forest, and parkland. | Final Design |
| 2. | Develop and implement an Environmental Management Plan in coordination with MDOT SHA. | Final Design |
| 3. | Develop and implement an Environmental Compliance Plan in coordination with MDOT SHA. | Final Design |
| 4. | Develop and implement a Sustainability Plan for the project to support community, environmental, and sustainability goals. The Sustainability Plan will include actions related to the following:<br>• The quality of life surrounding the infrastructure asset;<br>• Stakeholder and community engagement;<br>• Natural resource management;<br>• Ecosystems and biodiversity health;<br>• Climate resilience and carbon emissions. | Final Design |
| 5. | Make good faith efforts to achieve a Platinum Award rating or, at minimum, a Gold Award rating as recognized by the Envision™ Sustainable Infrastructure Rating System of the Institute for Sustainable Infrastructure. | Final Design |
| 6. | Exceed the stormwater quality protection enhancements for the project by providing additional stormwater quality mitigation beyond the regulatory requirements. | Final Design |
| 7. | Construct and equip the Metropolitan Grove Operations and Maintenance Facility including the necessary bus fleet. | Final Design through Operations |
| 8. | After financial close of the Phase 1 South Section P3 Agreement, fund not less than $60 million from the Development Rights Fee for design and permitting of high priority transit investments in Montgomery County. | Final Design through Operations |
| 9. | Provide not less than $300 million of additional transit investment funding inclusive of the phase developer's proposed transit investment to implement high priority transit projects in Montgomery County over the operating term of Phase 1 South. | Final Design through Operations |
| 10. | Work with Montgomery, Frederick, & Prince George's Counties to expand transit fare subsidies for eligible low-income riders. | Final Design |
| 11. | Fund priority bicycle and pedestrian connections to remove barriers and provide connectivity for bicyclists and pedestrians as part of the commitment to support Vision Zero, and beyond commitments identified in **Table 1** by:<br>• Defining a neighborhood walk and cycle connectivity zone to enhance multi-model connectivity.<br>• Facilitating the development of a facility improvement program for the installation or replacement of sidewalks, crossings, or signal modifications and formalizing trail development that has pedestrian demand, then rank projects according to safety significance (considering predictive safety analyses completed by M-NCPPC), readiness, and landowner consensus, as part of its commitment to support Vision Zero.<br>Determine the exact investments as part of the Section P3 Agreement for Phase 1 South. | Construction through Operations |



# United States Department of the Interior

Office of the Secretary
Washington, D.C. 20240

July 12, 2022

IN REPLY REFER TO:                                                                                           4111
ER 21/0425

*Via Electronic Mail Only*

Ms. Caryn J. G. Brookman
Environmental Program Manager
707 North Calvert Street, P-601
Baltimore, MD 21202

>        RE:    I-495 and I-270 Managed Lanes Study Final Environmental Impact Statement (FEIS) and
>               Section 4(f) Evaluation

Dear Ms. Brookman:

The U.S. Department of the Interior (Department) has reviewed the Federal Highway Administration's
(FHWA) and Maryland Department of Transportation State Highway Administration's (MDOT SHA)
I-495 and I-270 Managed Lanes Study Final Environmental Impact Statement (FEIS) and Section 4(f)
Evaluation. The Department submits the following comments on behalf of the National Park Service
(NPS).

The Department submitted formal comments during the public scoping period on May 1, 2018, on the
Draft Environmental Impact Statement/Section 4(f) Evaluation on November 9, 2020, and on the
Supplemental Draft Environmental Impact Statement/Section 4(f) Evaluation on November 10, 2021.
In addition to monthly Cooperating Agency meetings, the NPS has extensively coordinated with MDOT
SHA separately to further minimize any impacts to NPS parklands and resources. The Department
understands that the FHWA and MDOT SHA have worked closely with the NPS in preparing both the
Supplemental Draft Environmental Impact Statement as well as the FEIS and final Section 4(f)
Evaluation. Resulting from this coordination, impacts to national park land have been reduced from
approximately 99 acres to 16.48 acres (2.8 acres permanent, 13.77 acres temporary) for the proposed
replacement of the American Legion Bridge and the installation of infrastructure for a shared use
pedestrian path to the C&O Canal towpath. Most of these impacts will be mitigated through measures
implemented as part of the Section 106 Programmatic Agreement, the Wetlands Statement of Findings,
and the Mitigation Agreement that the NPS and MDOT SHA are developing, which will include the
measures listed on pages 6-18 through 6-21 of the FEIS. The FEIS was developed in coordination with
the NPS and meets NPS requirements; therefore, the Department has no further comments on the FEIS
but would like to note that the NPS and MDOT SHA will need to coordinate on design development and
construction methodology to continue effort to reduce impacts.

**SECTION 4(f) EVALUATION**

Upon review of the Final Section 4(f) Evaluation, the Department agrees that there is no feasible and prudent alternative to use of Section 4(f) properties in the project study area, the proposed action includes all possible planning to minimize harm to lands and resources, and that the Preferred Alternative, Alternative 9, Phase 1 South, is the alternative with least overall harm.

The Department notes that continued coordination between the NPS and MDOT SHA is required as the study moves into developing designs and prepares construction methodology to further minimize and avoid impacts to NPS resources. In particular, the NPS has specific concerns regarding the sensitive resources found on Plummers Island, located beneath the American Legion Bridge, and requests input in the continuing refinement of the designs and construction methodology in order to ensure impacts are kept at a minimum, or to avoid impacts to the island all together. In addition, as referenced in the Section 4(f) Evaluation, the MDOT SHA and the developer will continue to coordinate with the NPS to review the condition of the existing connection between the C&O towpath and MacArthur Boulevard side path outside this project study area.

Thank you for the opportunity to provide comments and for your consideration of our important resources. We also appreciate the close coordination that the FHWA and MDOT SHA have had with the NPS on this project, and we look forward to future continued collaboration in these planning efforts. Any further coordination should be handled through Tammy Stidham, Deputy Associate Regional Director, Lands and Planning, National Capital Region, National Park Service, 1100 Ohio Drive SW, Washington, D.C. 20242, (202) 619-7474 or tammy_stidham@nps.gov.

                    Sincerely,




                    Stephen G. Tryon
                    Director, Office of Environmental
                     Policy and Compliance

cbrookman@mdot.maryland.gov

**PROGRAMMATIC AGREEMENT**
Among the
**FEDERAL HIGHWAY ADMINISTRATION,**
**MARYLAND DEPARTMENT OF TRANSPORTATION STATE HIGHWAY**
**ADMINISTRATION,**
**NATIONAL PARK SERVICE,**
**MARYLAND STATE HISTORIC PRESERVATION OFFICER,**
**VIRGINIA STATE HISTORIC PRESERVATION OFFICER**
**AND**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**

**Implementing Section 106 of the National Historic Preservation Act for the**
**I-495 and I-270 Managed Lanes Study**
**Anne Arundel, Frederick, Montgomery and Prince George's Counties, Maryland, and**
**Fairfax County, Virginia**

**WHEREAS**, the U.S. Department of Transportation, Federal Highway Administration (FHWA), plans to approve the I-495 and I-270 Managed Lanes Study (MLS), a proposed Public-Private Partnership (P3) administered by the Maryland Department of Transportation State Highway Administration (MDOT SHA); and

**WHEREAS**, the MLS Preferred Alternative, "Alternative 9 Phase I South" (Project) consists of construction of Priced Managed Lanes along Interstates 495 and 270, beginning in Fairfax County, Virginia, and extending north to approximately Interstate 370, and east along the separated portions of I-495 ("spurs") to approximately Maryland Route 187, as described in detail via documentation linked in Attachment 4; and

**WHEREAS,** FHWA has determined that the Project is an undertaking, as defined in 36 C.F.R. §800.16(y), and thus is subject to review under Section 106 of the National Historic Preservation Act (NHPA), 54 U.S.C. § 306108, and its implementing regulations, 36 C.F.R. Part 800 as amended; and

**WHEREAS,** MDOT SHA, with the approval of FHWA, intends to deliver the Project as a P3 using the services of a private sector developer or multiple developers who will advance the Project and be responsible for design, construction, operation and maintenance, subject to approvals by MDOT SHA and/or FHWA; and

**WHEREAS,** the Project may be implemented in construction phases, yet to be fully defined, and although this Programmatic Agreement (PA) reflects evaluation of the entire defined Project, certain commitments may require phased implementation; and

**WHEREAS**, FHWA is the lead agency for purposes of ensuring that the Project complies with Section 106 of the NHPA, as amended, and codified in its implementing regulations, 36 C.F.R. Part 800, as amended (August 5, 2004); and

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement -- FINAL
MAY 17, 2022

**WHEREAS,** MDOT SHA, on behalf of FHWA, has established and updated the Area of Potential Effects (APE) for the project in consultation with the Maryland State Historic Preservation Office (MD SHPO) and Virginia State Historic Preservation Office (VA SHPO), encompassing the corridor project limits as described above, including areas of direct limits of disturbance, inclusive of all project elements with the potential to affect historic properties, such as identified natural resource and park mitigation sites, and a sufficient buffer for audible and visual effects where they may be likely to occur; a link to the detailed map of the APE is provided in Attachment 4; and

**WHEREAS,** the National Park Service (NPS) agrees FHWA is the lead federal agency for purposes of ensuring that the Project complies with Section 106 of the NHPA, as amended, and codified in its implementing regulations, 36 C.F.R. Part 800, as amended (August 5, 2004) and has agreed to participate in this PA as an Invited Signatory; and

**WHEREAS,** federal agencies which, at FHWA's invitation, designate FHWA as the lead federal agency for the Project may use this PA to fulfill their obligations under Section 106 of the NHPA according to 36 C.F.R. 800.2(a)(2), without the need for amendment of this PA, provided that FHWA follows the requirements of this PA; and

**WHEREAS,** NPS would authorize permanent use of the affected federal park property for the Project through coordination with FHWA for a Highway Deed Easement and would issue a permit for temporary use of land under its administration for construction-related activities. NPS intends to use this PA to comply with 36 C.F.R. Part 800, 54 U.S.C. § 100902, 36 C.F.R. Part 14; and

**WHEREAS,** the Project will involve the use of lands managed by the NPS within the Chesapeake and Ohio Canal National Historical Park, a unit of the National Park System, and the George Washington Memorial Parkway (GWMP), a unit of the National Park System, that includes the Clara Barton Parkway; and

**WHEREAS,** NPS is charged in its administration of the units of the National Park System to meet the directives of other laws, regulations, and policies including the NPS Organic Act as codified in Title 54 U.S.C. § 100101(a) to "conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such a manner and by such means as will leave them unimpaired for the enjoyment of future generations"; and

**WHEREAS,** the GWMP, a unit of the National Park System, with portions located in Montgomery County, Maryland; and Fairfax and Arlington Counties and the City of Alexandria in Virginia, was established following the authorization of the parkway pursuant to what is known as the Capper-Cramton Act, Public Law 71-284, 46 Statute 482 (1930), and came to be administered by NPS pursuant to Executive Order 6166 of June 10, 1933. The GWMP is on the National Register of Historic Places (NRHP) for its association with twentieth century parkway design, engineering, landscape architecture, park planning and conservation, commemoration, and an association with George Washington; and

**WHEREAS,** the Clara Barton Parkway is the portion of the GWMP that runs along the Maryland side of the Potomac River and which also became part of the National Park System through the

Capper-Cramton Act (originally as the Maryland portion of the GWMP). The Clara Barton Parkway, as a portion of the GWMP, is also on the NRHP; and

**WHEREAS**, the Chesapeake and Ohio Canal National Historical Park, a unit of the National Park System, stretches along the Potomac River from Rock Creek at Georgetown in Washington, D.C., to Cumberland, Maryland, for 184.5 miles, was established as a national monument in 1961 and was then established as a national historical park by Congress in 1971, through Public Law 91-664 for the purpose of preserving and interpreting the 19th century transportation canal and its associated scenic, natural, and cultural resources; and providing opportunities for education and appropriate outdoor recreation. The Chesapeake and Ohio Canal National Historical Park is listed on the NRHP and contains more than 1,300 historic structures, including one of the largest collections of 19th century canal features and buildings in the national park system. The towpath and canal cross underneath I-495 at the American Legion Bridge, in Bethesda, Maryland; and

**WHEREAS,** FHWA has elected to phase the identification, evaluation, and effects assessment of certain portions of the APE and historic properties where unavailability of access or design information precluded such identification, evaluation and assessment, as provided in 36 C.F.R. 800.4(b)(2), and 36 C.F.R. 800.5(a)(3); and

**WHEREAS**, FHWA will ensure additional identification, evaluation, and assessment is completed in a timely manner prior to final design and construction, to allow for meaningful consultation and practical opportunities to avoid, minimize, or mitigate for any potential adverse effects to historic properties; and

**WHEREAS**, FHWA has initiated consultation pursuant to 36 C.F.R. 800.3(c) with the MD SHPO by letter on April 12, 2018 and the VA SHPO by letter on May 14, 2019, and the term "SHPO" is used to refer to both state offices when one is not specified; MDOT SHA on behalf of FHWA will continue to consult with the appropriate SHPO and consulting parties under the terms of this PA in order to identify historic properties, assess the effects of the Project on historic properties, and, if necessary, resolve adverse effects to historic properties; and

**WHEREAS,** FHWA, pursuant to 36 C.F.R. 800.6(a)(1)(i)(C), on March 26, 2018, initiated Section 106 consultation with the Advisory Council on Historic Preservation (ACHP), and the ACHP has chosen to participate in the consultation pursuant to 36 C.F.R. 800.6(a)(1)(iii); and

**WHEREAS**, FHWA, pursuant to 36 C.F.R. § 800.10(c), invited the Secretary of the Interior (Secretary) to participate in consultation by letter dated March 16, 2020, as the Project includes National Historic Landmarks (NHL) within the APE, and the National Park Service, National Capital Area NHL Program (NPS-NHL) has represented the Secretary concerning the NHLs within the Project throughout consultation and will continue to participate in future consultations involving the NHLs, and

**WHEREAS**, FHWA, ACHP, MDOT SHA, and the MD SHPO, under the *Amended Programmatic Agreement Among the Federal Highway Administration, the Maryland Department of Transportation State Highway Administration, the Advisory Council on Historic Preservation, the Maryland State Historic Preservation Officer, Implementing Section 106 of the National*

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement -- FINAL
MAY 17, 2022

*Historic Preservation Act for the Federal-aid Highway Program in Maryland* ("Statewide PA", linked in Attachment 4), have agreed to delegate certain authorities relating to Section 106 of the NHPA to MDOT SHA for Federal-aid Highway Projects in Maryland; and

**WHEREAS,** MDOT SHA, pursuant to the Statewide PA, employs professionals meeting the Secretary of the Interior's Professional Qualifications Standards (48 Fed. Reg. 44738-39, September 29, 1983) with experience and background in the fields of archaeology, architectural history and/or history who will oversee implementation of stipulations in this PA; and

**WHEREAS,** MDOT SHA, on behalf of FHWA, pursuant to 36 C.F.R. 800.4(a)(1), has established and updated the APE for the Project in consultation with the MD and VA SHPO, has identified historic properties within the APE, and has identified adversely affected properties, as described in the *Draft Section 106 Technical Report* of January 2020 and subsequent documentation (linked in Attachment 4); and

**WHEREAS,** MDOT SHA and FHWA, pursuant to 36 C.F.R 800.2(d) have sought and considered the views of the public regarding the Project's effects on historic properties by providing notice and information in following its public involvement procedures under the National Environmental Policy Act (NEPA); and

**WHEREAS,** MDOT SHA, during the course of consultation, has invited the parties listed in Attachment 2 to participate in consultation on the Project; and

**WHEREAS,** the parties listed in Attachment 3, based on their relationship to specific actions as specified in this PA, or interest in historic properties affected by the project, have been invited to be consulting parties and concur by signing this PA; and

**WHEREAS,** MDOT SHA and FHWA have initiated consultation with Federally recognized Native American tribal nations (Tribes) listed in Attachment 2 and provided the Tribes with information about the Project. MDOT SHA, on behalf of FHWA, has invited the same Tribes to be consulting parties, as shown in Attachment 3, and concur by signing this PA; and

**WHEREAS,** FHWA has invited MDOT SHA and NPS to be invited Signatories to this PA, based on their responsibilities for implementation of its terms, and all Signatories, required and invited, are referred to as "Signatories" to this document; and.

**WHEREAS,** FHWA has determined that the Project will have an adverse effect on NRHP-listed or eligible properties ("historic properties") including the George Washington Memorial Parkway (Clara Barton Parkway), the Chesapeake and Ohio Canal National Historical Park, the Washington Biologists' Field Club on Plummers Island, Gibson Grove African Methodist Episcopal Zion Church, archaeological sites 44FX3922 (Dead Run Ridges Archaeological District), 44FX0374, 44FX0379, 44FX0389, 18MO749 and 18MO751; that additional effects may not be completely known; and that FHWA intends to use this PA to comply with 36 C.F.R. Part 800, 54 U.S.C. § 100902, 36 C.F.R. Part 14 and to govern the implementation of the Project and the resolution of adverse effects.

**NOW, THEREFORE**, FHWA, NPS, ACHP, MDOT SHA, MD SHPO, and VA SHPO, (hereinafter "Signatories") agree that the Project will be implemented in accordance with the following Stipulations in order to take into account the effect of the Project on historic properties and that these Stipulations will govern compliance of the Project with Section 106 of the NHPA until this PA expires or is terminated.

**Stipulations**

I.    **Roles and Responsibilities**

  A.    **FHWA** is the lead federal agency and is responsible for ensuring the terms of this PA are carried out.

  B.    **MDOT SHA** is delegated authority by FHWA under this PA and the Statewide PA to continue defined aspects of consultation, Project compliance review, and mitigation implementation.  MDOT SHA will be primarily responsible for implementation of this PA excepting where otherwise specified.  Additionally:

    1.    MDOT SHA will enter into agreements with one or more developers to design, build, and operate the Project.  MDOT SHA will ensure the work of the developer or developers conforms to the requirements of this PA and may task the developer(s) with assistance with certain commitments (such as context-sensitive design); however, MDOT SHA may not delegate consultation obligations or other responsibilities specified in this PA to the developer(s).

    2.    MDOT SHA will require the developer(s) to retain professionals meeting the Secretary of the Interior's Professional Qualifications Standards (48 Fed. Reg. 44738-39, September 29, 1983) with experience and background in the fields of archaeology, architectural history and/or history for the duration of design and construction to assist with design commitments, liaise with MDOT SHA cultural resources staff and facilitate compliance with this PA.

    3.    MDOT SHA, on behalf of FHWA, will consult with the relevant SHPO(s) for actions under this PA and 36 C.F.R. 800.

  C.    **NPS** is charged in its administration of the units of the National Park System to meet the directives of other laws, regulations, and policies including the NPS Organic Act as codified in Title 54 U.S.C. § 100101(a).

  D.    **SHPO**: The Maryland Historical Trust (MD SHPO) has jurisdiction as established in the NHPA for historic properties in Maryland.  The Virginia Department of Historic Resources (VA SHPO) has jurisdiction as established in the NHPA for historic properties in Virginia. The SHPOs will:

    1.    Respond to requests from MDOT SHA for concurrence on eligibility determinations, effect determinations, and technical documents within a 30-day review period unless otherwise specified in this PA, or MDOT SHA specifically

provides for an extended review period at the time of submittal. MDOT SHA and FHWA may assume concurrence or no objection to determinations and submittals if no response is received within 30 days, if no extended timeline is specifically established in the review request or if no timeline is specified in 36 C.F.R. 800. All durations referenced in this PA refer to calendar days.

2.      Provide written comments, share general technical assistance/guidance, and make available to MDOT SHA or its designates survey records or other documents necessary to fulfill the requirements of this PA.

**E.**      **ACHP** will provide policy guidance, provide comment on issues that may arise as requested by parties to this PA, and participate in dispute resolution as specified in Stipulation XIII.

**F.**      **Consulting Parties/Public**

1.      MDOT SHA has consulted with or provided the opportunity to consult to the parties listed in Attachment 2 prior to finalizing this PA.  Because the Preferred Alternative no longer affects numerous historic properties identified in earlier alternatives considered, several parties listed in Attachment 2 no longer have a demonstrable interest in historic properties affected by the Project. Parties listed in Attachment 3 continue to have a defined relationship to the Project and have been invited to concur in this PA.

2.      MDOT SHA will provide all consulting parties in Attachment 3, regardless of concurring status, with opportunities to consult on Project changes or new elements with the potential to affect historic properties.  MDOT SHA will offer other appropriate consulting parties the opportunity to rejoin or newly join consultation in the event of new or revised Project elements.  Consulting parties may sign this PA as concurring parties at any time after execution of the PA with the invitation of MDOT SHA or FHWA. Additional consulting parties may be included in Attachment 3 without the need to amend this PA.

3.      Concurrence with the PA by a party does not necessarily indicate that the party supports the Project, the Preferred Alternative, or endorses all stipulations of this PA, but rather indicates the desire of such parties to acknowledge consultation and/or remain involved in implementation of specific terms of this PA.

4.      MDOT SHA will provide for notification of the public for substantial changes to the Project that would result in an expanded APE or new effects to historic properties consistent with 36 CFR 800.8(c)(1)(iv) and procedures under NEPA to ensure ongoing opportunities for public input.  As appropriate, this process may identify new consulting or concurring parties who may wish to join the PA at a later time in response to Project refinement.

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement -- FINAL
MAY 17, 2022

## II.    Professional Standards

**A.**    Guidelines, standards and regulations relevant to this PA and its purposes are listed below, and links to these documents are found in Attachment 4.  Additionally, it is the intention of the Signatories to interpret this PA to incorporate any subsequent standards, revisions of standards, or applicable guidance issued by the Secretary, ACHP, or MD SHPO or VA SHPO as then in force during this PA.

1.    36 C.F.R. Part 800: Protection of Historic Properties, as amended (2004);

2.    *Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation* (1983);

3.    Secretary of the Interior's Professional Qualifications Standards (48 Fed. Reg. 44738-39, September 29, 1983)

4.    *Standards and Guidelines for Archeological Investigations in Maryland* (Shaffer and Cole 1994), including *Technical Update No. 1 of the Standards and Guidelines for Archaeological Investigations in Maryland: Collections and Conservation Standards* (2018);

5.    *Standards and Guidelines for Architectural and Historical Investigations in Maryland* (Maryland Historical Trust, Revised 2019);

6.    *Guidelines for Conducting Historic Resources Survey in Virginia* (Virginia Department of Historic Resources, revised September 2017)

7.    36 C.F.R Part 79: Curation of Federally-Owned and Administered Archaeological Collections

8.    *NPS Museum Handbook,* National Park Service, revised 2019

9.    Program Comment for Actions Affecting Post-1945 Concrete Steel Bridges (77 FR 68790);

10.    *Exemption Regarding Historic Preservation Review Process for Effects to the Interstate Highway System* (ACHP Program Comment, 2005)

11.    *Section 106 Archaeology Guidance* (ACHP, 2009)

12.    Policy Statement Regarding Treatment of Burial Sites, Human Remains and Funerary Objects (ACHP February 2007);

13.    National Register of Historic Places Bulletin 15, *How to Apply the National Register Criteria for Evaluation* (National Park Service revised 1997), National Register of Historic Places Bulletin 16A, *How to Complete the National Register Registration Form* (National Park Service revised 1997), and other National Register Bulletins as applicable

14.    NPS Management Policies – Section 5, Cultural Resource Management (2006)

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement -- FINAL
MAY 17, 2022

15.     Secretary of the Interior's Standards for the Treatment of Historic Properties (1995, Revised 2017); and accompanying guidelines for Treatment of Historic Properties (1995, Revised 2017) and Cultural Landscapes (1996)

## III.     General Project Section 106 Commitments

**A.**     MDOT SHA will implement mitigation concurrent with construction phasing where impacts will occur; in the event that the Project is modified or certain elements causing adverse effects are not constructed, MDOT SHA will notify Signatories and consulting parties of the change at such time as a final decision is made to remove such elements and amend the PA as necessary.

**B.**     MDOT SHA cultural resources staff who meet Secretary of the Interior's Professional Qualifications Standards will oversee implementation of all mitigation commitments and other terms of this PA.

**C.**     Consultation on Reforestation and other Mitigation Sites

1.     MDOT SHA is obligated to provide reforestation mitigation for the Project pursuant to the Maryland Reforestation Law (MD Nat Res Code § 5-103).  Reforestation must occur within 2 years or 3 growing seasons of completion of construction. MDOT SHA is also coordinating with the NPS to identify reforestation sites to account for impacted NPS-managed lands.  The locations to be used for reforestation are not yet fully identified.  Reforestation activities may take the form of conservation easements or other noninvasive activities which would not affect historic properties.  MDOT SHA will not consult on easements or conservation actions where no ground disturbance is involved.  If areas outside the APE are identified for reforestation where new plantings or other activities with the potential to affect historic properties are identified, MDOT SHA will consult in accordance with Stipulation IV to add such areas to the APE, identify historic properties, and evaluate effects to historic properties.  MDOT SHA will avoid adverse effects to historic properties to the maximum extent practicable in selecting reforestation planting sites.  If adverse effects are unavoidable, MDOT SHA will amend this PA in accordance with Stipulation XII to resolve any such adverse effects.

2.     As Project development proceeds, additional and revised mitigation or enhancement locations for impacts to resources other than historic properties may be identified.  These resources include, but are not limited to wetlands, stormwater, and parks.  To account for effects to historic properties at these locations, when actions are proposed at such locations that may affect historic properties, MDOT SHA will amend the APE and follow the procedure described in Stipulation IV below.

## IV.     Consultation Regarding Project Development

A.      Further consultation requirements regarding specific historic properties affected by the Project are described in Stipulation V. As project design advances or ancillary activities not currently known are identified, MDOT SHA will initiate consultation with SHPOs and other consulting parties (as described below) using the following process.

 1.      MDOT SHA cultural resources staff will review proposed changes that affect project location, design, methods of construction, materials, or limits of disturbance (LOD), for potential new effects to historic properties.  Should these changes necessitate an expansion of the APE, or if the changes would affect known or potential historic properties differently than described in this PA, MDOT SHA will consult on behalf of FHWA as described in Stipulation IV.B below.

 2.      If MDOT SHA, working with the developer(s), finds design or construction solutions that avoid or further minimize adverse effects to historic properties, MDOT SHA will consult in accordance with the procedures in Stipulation IV.B to seek concurrence with any updated determinations of effect, and amend this PA in accordance with Stipulation XII.

 3.      MDOT SHA, on behalf of FHWA, will consult upon changes to the LOD within the existing APE where additional archaeological investigation is recommended in the Cultural Resources Technical Report or where such recommendations are identified in subsequent consultation documentation, including the treatment plans described in Stipulations VI and VII.

 4.      MDOT SHA, on behalf of FHWA, will consult as specified elsewhere in this PA regarding specific stipulations, including Monitoring of Performance (Stipulation VIII).

B.      MDOT SHA, on behalf of FHWA, consistent with the principles described in 36 C.F.R. §§ 800.3 – 6, will consult with the appropriate SHPO(s), Signatories, concurring parties to this PA, Tribes who may ascribe religious and cultural significance to properties pursuant to 36 C.F.R. § 800.3(f)(2), local public agencies with jurisdiction and other consulting parties identified for this undertaking as appropriate on:

 1.      Amendments to the APE, consistent with 36 C.F.R. § 800.16(d), including identification and documentation of any new historic properties within the amended APE consistent with 36 C.F.R § 800.4(a) and (b).

 2.      New or revised determinations of eligibility for historic properties within the APE as described above, consistent with 36 C.F.R § 800.4(c).

 3.      New or revised assessment of effects to historic properties within the APE as described above, consistent with 36 C.F.R § 800.5.

4.     If MDOT SHA determines there are any new adverse effects to historic properties, it will notify FHWA. MDOT SHA and FHWA will consult with the SHPO and identified consulting parties to resolve the adverse effects consistent with 36 C.F.R § 800.6, including alternatives to avoid, minimize or mitigate such adverse effects; MDOT SHA and FHWA will follow the procedures in Appendix 3 and/or amend this PA as necessary to document such resolution of any new adverse effects.

C.     MDOT SHA will consult with the relevant SHPO(s), Signatories, Tribes, and appropriate consulting parties on archaeology inventory, archaeological evaluations for NRHP eligibility, and effect determinations for archaeological historic properties.

D.     MDOT SHA will provide consultation materials in written or electronic form, and follow timelines for comment opportunity as specified in Stipulation I. D.

## V.     Property-Specific Commitments

MDOT SHA will be responsible for ensuring the following mitigation and commitments are carried out, under the oversight of FHWA. MDOT SHA will either complete mitigation itself or enter into legally binding agreements with partner agencies to ensure the following stipulations are fulfilled, subject to the requirements of each stipulation below. Mitigation and commitments will be implemented by authorized construction phase, unless there is opportunity to provide advanced mitigation that is mutually agreeable to all parties, is feasible to advance, and is identified by MDOT SHA as a priority. All commitments regarding design-review with consulting parties will be conducted in a timely manner prior to final design and construction, to allow for meaningful consultation and practical opportunities to influence design to avoid impacts or ensure compatibility to the extent practicable with historic properties. Preliminary engineering activities to support design of future phases, such as geotechnical studies or other similar, minimally invasive activities with limited potential to affect historic properties may proceed within the APE prior to construction authorization and will not require consultation or advance mitigation.

### A.     George Washington Memorial Parkway (including Clara Barton Parkway)

1.     MDOT SHA will continue property-specific Design-Review consultation with NPS and SHPOs to ensure a context-sensitive design for new facilities, and, through the ongoing design process, minimize, to the extent practicable, impacts to character-defining features and resources that contribute to the George Washington Memorial Parkway/Clara Barton Parkway as a historic property. Key elements for NPS review include the bridge design, trail connections, retaining walls, ramp improvements, signage plans and barrier.  MDOT SHA will provide NPS and SHPOs a comment opportunity on plans at a draft level of design and a second opportunity prior to finalization of design for elements on

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement -- FINAL
MAY 17, 2022

NPS property or within the APE adjacent to NPS property; for each review there will be minimum 30-day review period.  In the event of objections relating to the final design from NPS or SHPOs that cannot be resolved, MDOT SHA and FHWA will follow Stipulation XIII of this PA.

2.      MDOT SHA will provide NPS funding in an amount not to exceed $250,000 for a Cultural Landscape Report (CLR) for Clara Barton Parkway.  The CLR will include historical narrative, updated existing conditions and analysis and evaluation, and treatment guidelines for management of character-defining features. NPS will complete the CLR within five (5) years of receipt of funds from MDOT SHA and provide a copy of the completed CLR, along with a summary of implementation of any treatment measures in a timely manner following their implementation, to MD SHPO and MDOT SHA.

**B.      Dead Run Ridges Archaeological District (44FX3922) and individual sites 44FX0374, 44FX0379 and 44FX0389**

1.      In consultation with VA SHPO, NPS, and other appropriate consulting parties including consulting Tribes, MDOT SHA will develop and implement Phase III data recovery on sites 44FX0374, 44FX0379, 44FX0389 and the Dead Run Ridges Archaeological District (44FX3922) as specified in Stipulation VI. Technical reporting, as well as interpretive materials suitable for the general public will be requirements of this effort.

2.      MDOT SHA will prepare a NRHP nomination form for the Dead Run Ridges Archaeological District, no later than 12 months following finalization of the report documenting the Phase III data recovery in Stipulation V. B. 1 above, basing the nomination on the report findings.  MDOT SHA will provide a copy of the draft nomination to NPS staff for review and comment prior to formal submission of the draft nomination to VA SHPO.  MDOT SHA will work with VA SHPO's Register Program to develop a final draft nomination for the Dead Run Ridges Archaeological District, and VA SHPO's Register Program will process the final draft for listing in the NRHP pursuant to its established policies and procedures.  The Department of Historic Resources State Review Board is under no obligation to approve the nomination for listing in the NRHP. Should the nomination be unsuccessful, or additional information be requested beyond the scope of the completed data recovery efforts, MDOT SHA will not be required to complete further fieldwork or analysis beyond what is agreed to in the treatment plan specified in Stipulation VI, or otherwise pursue nomination of the district.

**C.      Chesapeake and Ohio Canal National Historical Park**

1.      MDOT SHA will continue property-specific Design-Review consultation with NPS to ensure a context-sensitive design for new facilities constructed as

part of the Project, and, through the ongoing design process, minimize to the extent practicable impacts to character-defining features and resources that contribute to the Chesapeake and Ohio Canal National Historical Park as a historic property. MDOT SHA will provide NPS and MD SHPO a comment opportunity on design plans at a draft level of design, and a second opportunity prior to finalization of design for elements within the APE on or adjacent to NPS property; for each review there will be a minimum 30-day review period.  In the event of objections from NPS or MD SHPO that cannot be resolved relating to the final design, MDOT SHA and FHWA will follow Stipulation XIII of this PA.

2.      MDOT SHA will locate new bridge piers away from Lock 13 as part of the new Clara Barton Parkway Bridge and will avoid placing piers for the new structure closer to Lock 13 than the current bridge piers, as shown in the Preferred Alternative.

3.      MDOT SHA will protect Lock 13 in place during construction, by limiting LOD around the lock structure and providing an appropriate buffer to prevent damage.  MDOT SHA will rehabilitate or restore the structure if needed following construction, with treatment determined by or in consultation with NPS and MD SHPO as described below in Stipulation V.C.4 and VC.5. As part of the Archaeological Treatment Plan in Stipulation VI, MDOT SHA will include archaeological monitoring or other treatment approaches during construction in the area around Lock 13.

4.      MDOT SHA will conduct a condition assessment of lock structures, the Canal and the Towpath within the Project LOD prior to construction and provide copies of the assessment to MD SHPO and NPS.  MDOT SHA will provide for rehabilitation of lock structures, the Canal, and Towpath within the Project LOD following completion of substantial construction within the affected area. MDOT SHA will provide NPS and MD SHPO with a draft rehabilitation plan for review and comment prior to implementing the plan

5.      MDOT SHA will provide for vibration damage monitoring of other susceptible historic structures at Chesapeake and Ohio Canal National Historical Park within the APE during construction, specifically, Lock 12 and Lock 14. Additional vulnerable structures or features (such as masonry walls) to be monitored may be identified in consultation with NPS during the preparation and review of the condition assessment identified in Stipulation V.C.4.

       a. Should notable acute or incremental damage directly resulting from construction means or methods be identified as a result of the vibration monitoring, MDOT SHA will follow Section A of the Inadvertent Discovery Plan (Attachment 1).

        b. General wear or degradation of the historic fabric during construction that is not attributable to specific construction practices or incidents will be remediated by the rehabilitation plan in Stipulation V.C.4.

**D.**    **18MO749 Archaeological Site (C&O Canal)**
In consultation with MD SHPO, NPS, and other appropriate consulting parties, including Tribes, MDOT SHA will develop and implement a Phase III Data Recovery as specified in Stipulation VI. Technical reporting, as well as interpretive materials suitable for the general public will be requirements of this effort.

**E.**    **18MO751 Archaeological Site (C&O Canal)**
In consultation with MD SHPO, NPS, and other appropriate consulting parties, including Tribes, MDOT SHA will develop and implement a Phase III Data Recovery as specified in Stipulation VI. Technical reporting, as well as interpretive materials suitable for the general public will be requirements of this effort.

**F.**    **Washington Biologists' Field Club on Plummers Island**

    1.    MDOT SHA will prepare a NRHP nomination for the Washington Biologists' Field Club on Plummers Island.  MDOT SHA will provide a copy of the draft nomination to NPS staff and the Washington Biologists' Field Club (WBFC) for review prior to submittal to MD SHPO and address any comments prior to formal submission of the nomination. Should the nomination be unsuccessful, MDOT SHA will not be required to resubmit the nomination or otherwise complete additional studies or research after addressing comments by NPS staff.

    2.    MDOT SHA will place temporary fencing along the LOD within Plummers Island to delimit construction activities.

    3.    MDOT SHA will fund or implement a photographic survey documenting conditions before, during and after construction is completed adjoining Plummers Island, within the APE boundary, and provide the results to WBFC and NPS.

    4.    MDOT SHA will fund or develop GIS maps to document known current and historical study locations and key natural resource features within the APE to assist in documenting change over time and provide these files to WBFC and NPS.

    5.    MDOT SHA will procure a sub-meter accurate GPS unit for WBFC to use in long-term monitoring of plant locations, collection sites, and other historical research features.

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement -- FINAL
MAY 17, 2022

6.     MDOT SHA, subject to any availability or rights restrictions, will provide for digitization and cataloging of historical records related to the WBFC that are under the control of WBFC but housed at the Smithsonian Museum of Natural History, specifically the collection, "SIA RU102005, Smithsonian Institution, Washington Biologists' Field Club, circa 1900-1966 Records" that are not currently available in electronic format, and provide the files to WBFC and NPS.

7.     MDOT SHA will provide WBFC historical content, such as a synthesis of the digitized materials in Stipulation V.F.6, to incorporate into their website.

8.     MDOT SHA will complete stipulations V.F.1-7., other than those requiring longer timeframes (such as photographic survey after construction), unless continued consultation should necessitate a longer timeframe, within two (2) years of commencement of construction activities on Plummers Island.

**G.     Morningstar Tabernacle No. 88 Moses Hall and Cemetery**

1.     As part of context-sensitive design, MDOT SHA will consult with the Trustees of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery, Friends of Moses Hall, First Agape A.M.E. Zion Church, Cabin John Citizens Association, and other consulting parties with a demonstrated interest in the cemetery on context-sensitive treatment of noise barrier facing the cemetery; MDOT will work with the above-listed consulting parties on a context-sensitive treatment of noise barrier facing the cemetery, which may include decorative elements appropriate to the historic property and/or such elements as memorial plaques or signage. MDOT SHA will provide these consulting parties and MD SHPO comment opportunity for Project elements, specifically noise barrier, within the APE adjacent to the cemetery at a draft level of design and a second opportunity prior to finalization of design; for each review there will be a minimum 30-day review period. In the event MD SHPO does not agree with the final design, MDOT SHA and FHWA will follow Stipulation XIII of this PA.

2.     MDOT SHA will conduct further studies prior to final design and construction adjacent to the cemetery as part of the treatment plan specified in Stipulation VII.  Following completion of the studies in the treatment plan, MDOT SHA and FHWA will provide the results of the studies to MD SHPO and relevant consulting parties and determine project effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery in consideration of the results of the studies and the views of the MD SHPO and relevant consulting parties. Should interments be identified outside the identified boundary of the cemetery, and no additional project avoidance options are practicable, MDOT SHA and FHWA will consult on the likely adverse effect, identify mitigation options, and amend this PA as necessary following the procedures in Stipulations IV and XIII of this PA.

**H.    Gibson Grove A.M.E. Zion Church**

    1.    MDOT SHA will provide First Agape A.M.E. Zion Church at Gibson Grove and MD SHPO a comment opportunity at a draft level of design and a second opportunity prior to finalization of design for Project elements on church property or within the APE adjacent to the church property, with a minimum 30-day review period.

    2.    MDOT SHA will improve the stormwater drainage on the church property by routing drainage into a new underground culvert to be installed as part of the Project.

    3.    MDOT SHA will ensure that a parking lot identified in the church's restoration plan is constructed on church property following installation of the culvert drainage design. MDOT SHA will work with First Agape A.M.E. Zion Church on schedule and timing of the culvert and parking lot work to be compatible with ongoing church restoration efforts to the extent practicable.

    4.    MDOT SHA will ensure Project noise- or vibration- causing construction activities are restricted adjacent to the church during scheduled worship services or key events.

    5.    MDOT SHA, in coordination with Montgomery County, will install sidewalk on the west side of Seven Locks Road to more accessibly connect Gibson Grove A.M.E. Zion Church and Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

**VI.    Archaeological Treatment Plan (ATP)**

MDOT SHA's goal is to have a comprehensive but flexible ATP that addresses the LOD but can be revised and updated in response to Project design advancement. Prior to construction within affected areas, MDOT SHA will develop an ATP in consultation with SHPOs and appropriate consulting parties.  MDOT SHA will provide for a minimum 30-day review of the initial draft of the ATP.  MDOT SHA will be responsible for implementing the provisions of the ATP.  The ATP will include:

**A.**    Archaeological monitoring requirements during construction.

**B.**    Phase I Survey in areas where property access could not be obtained (as identified in the 2019 Technical Report, Volume 4, Chapter 5): RS-1; RS-2; S-4, SWM S-4, S-5, SWM S-5, S-6, SWM S-6; S-27; SWM S-27, S-8; S-10; S-53, and the vicinity of S-28.

**C.**    Phase I Survey in the vicinity of two sites, 18MO457 and18MO190, to define site boundaries and evaluate NRHP eligibility and potential impacts.

**D.**    Phase II Evaluation of Sites 18MO191 and 18MO752.

**E.**    Phase III Data Recovery investigations at 18MO749 and 18MO751 within the Chesapeake and Ohio Canal National Historical Park and the Dead Run Ridges Archaeological District within the GWMP (44FX3922), and individually eligible sites

within the district 44FX0374, 44FX0379 and 44FX0389.  MDOT SHA will prepare a draft NRHP Nomination form for the Dead Run Ridges archaeological district based on the results of Phase III Data Recovery investigation as described in Stipulation V. B. MDOT SHA, in consultation with other parties, will ensure the results of the data recovery are documented in technical reporting consistent with the requirements of Stipulation II, and will define and produce products or other efforts interpreting the data recovery reports to the general public.

**F.**　　　Provisions in the treatment plan required for work on NPS federal property, including cataloging and curation to NPS standards of artifacts and associated records, permitting under the Archaeological Resources Protection Act and compliance with the Native American Graves Protection and Repatriation Act (NAGPRA).

**G.**　　　If sites or areas proposed for archaeological treatment in the ATP are avoided by revising the Project LOD or other actions, MDOT SHA will document the revision, including updating effect determinations and seeking SHPO concurrence where required. MDOT SHA will provide such information to appropriate consulting parties and will thereby not need to complete treatment or investigation at such locations.

**H.**　　　MDOT SHA will ensure required consultation with the appropriate SHPO and appropriate consulting parties occurs on eligibility, effects, and treatment for any newly identified archaeological historic properties prior to final design and construction in areas identified for further archaeological treatment.  Reports or similar deliverables will be provided to Signatories and appropriate consulting parties with a minimum 30-day review opportunity.

**I.**　　　MDOT SHA will consult with SHPO and appropriate consulting parties on the ATP and any revisions or modifications to the ATP.  If SHPO concurs with the ATP or future revisions, no amendment of this PA is needed to implement or update the ATP.  If SHPO does not agree with the ATP or future proposed changes to the ATP, MDOT SHA will seek to resolve the disagreement or follow the provisions of Stipulation XIII.

**VII.**　**Cemeteries and Human Remains Treatment Plan**

**A.**　　　MDOT SHA acknowledges there is some potential for human remains associated with historic properties to be present in at least two areas of the LOD (adjacent to Morningstar Tabernacle No. 88 Moses Hall and Cemetery and in the general location of the Montgomery County Poor Farm) which are not currently accessible for the types of thorough archaeological investigation necessary to definitively identify interments. MDOT SHA will work with the developer(s) to minimize LOD to the maximum extent practicable in these areas

**B.** The treatment plan will include proposed investigations to identify and evaluate potential graves or human remains in specified sensitive areas to the maximum extent practicable to ensure avoidance or treatment prior to final design and construction.

**C**. MDOT SHA will consult with SHPO and, where identified, descendants, descendant communities and other appropriate consulting parties to fully identify, recover, and respectfully treat any human remains identified within LOD that cannot be avoided.

**D**. MDOT SHA will consult with SHPO and, where identified, descendants, descendant communities and other appropriate consulting parties on archaeological monitoring requirements for locations within LOD where potential for human remains is likely during construction, including unverified but reported locations of the Ball Family Cemetery.

**E.** MDOT SHA will seek input from affected consulting parties and concurrence from SHPO on the treatment plan prior to its implementation. MDOT SHA will be responsible for implementing the treatment plan. If SHPO does not agree with the treatment plan, MDOT SHA will seek to resolve the disagreement or follow the provisions of Stipulation XIII.

**F.** Activities on Federal Lands, including NPS-managed property, require adherence to NAGPRA. The treatment plan will include provisions for NAGPRA compliance in the event of human remains or funerary objects discovery.

**G.** MDOT SHA will ensure that at all times human remains are treated with dignity and respect in a manner consistent with ACHP's policy statement on the Treatment of Human Remains, Burial Sites and Funerary Objects.

**H.** MDOT SHA will ensure no photographs of human remains or associated funerary objects are released to the press or general public.

**I.** MDOT SHA will be responsible for all expenses for any removal, treatment and relocation/disposition of any human remains or funerary objects impacted by the Project.

**J.** MDOT SHA will fully implement all relevant provisions of the treatment plan prior to final design and any construction impacts within specified cemetery investigation locations.

**VIII. Monitoring of Performance**

**A.** Specific points for continued consultation are defined in Stipulations IV and V.

**B.** MDOT SHA will, for the duration of the Project, provide Signatories and consulting parties listed in Attachment 3 with a written progress report twice per calendar year describing status of implementation of this PA.

**C.** MDOT SHA will provide for a meeting opportunity for Signatories and consulting parties listed in Attachment 3 following issuance of each progress report.

**D.**    MDOT SHA will convene additional consulting party meetings as necessary or when requested by any Signatory;

**E.**    MDOT SHA may cancel individual meetings if there are no significant issues for discussion and no Signatory objects to the cancellation.

**IX.    Post-Review Discovery of Human Remains**

MDOT SHA will develop human remains treatment provisions as part of the archaeological and cemetery and human remains treatment plans in Stipulations VI and VII.  MDOT SHA will follow the attached Inadvertent Discovery Plan (Attachment 1) should human remains be identified in any areas or situations not covered by the archaeological or cemetery and human remains treatment plans**.**

**X.    Other Post-Review Discoveries**

MDOT SHA will follow the procedures in Attachment 1 of this PA for any inadvertent archaeological discoveries or inadvertent effects to historic properties during construction. MDOT SHA will provide training for the developer(s) in the Inadvertent Discovery Plan requirements.

**XI.    Confidentiality**

The Signatories agree to provide by the provisions of Section 304 of the NHPA, and other applicable requirements, to withhold information concerning the location, character, or ownership of resources where release of such information may endanger the integrity of the resource.

**XII.    Amendment**

Any Signatory to this PA may request that it be amended, whereupon the Signatories will consult in accordance with 36 C.F.R. § 800.14 to consider such an amendment. Amendments will be effective upon the date of the last signature from the Signatories.

**XIII.    Dispute Resolution**

**A.**    Should any Signatory or consulting party object at any time to the manner in which the terms of this PA are implemented, within 30 days of information being provided relating to the issue forming the basis of the objection, or within 30 days where the objector can otherwise be reasonably assumed to be aware of the issue forming the basis of objection, FHWA shall consult with such party to resolve the objection. If FHWA determines that such objection cannot be resolved, FHWA will take the following steps:

1.    Forward all documentation relevant to the dispute, including FHWA's proposed resolution, to ACHP. ACHP shall provide FHWA with its comment on the resolution of the objection within 30 days of receiving adequate documentation. Prior to reaching a final decision on the dispute, FHWA shall

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement -- FINAL
MAY 17, 2022

prepare a written response that takes into account any timely advice or comments regarding the dispute from ACHP, Signatories and consulting parties and provide them with a copy of this written response. FHWA will then proceed according to its final decision.

2.    If ACHP does not provide its advice regarding the dispute within the 30-day period, FHWA may make a final decision on the dispute and proceed accordingly. Prior to reaching such a final decision, FHWA shall prepare a written response that takes into account any timely comments regarding the dispute from the Signatories and consulting parties to the PA and provide them and ACHP with a copy of such written response.

3.    In the case of objections related to NRHP eligibility, any Signatory may object in writing within 30 days to an MDOT SHA or FHWA determination of eligibility. If MDOT SHA and FHWA are unwilling to revise the determination in response to the objection or other relevant information, FHWA (or MDOT SHA on its behalf) will submit the determination to the Keeper of the National Register of Historic Places for a determination pursuant to 36 C.F.R. Part 63.

**B.**    Objections from the Public: Should a member of the public object to an action taken under this PA, or compliance with the PA, within 30 days of information being provided relating to the issue forming the basis of the objection, or within 30 days where the objector can otherwise be reasonably assumed to be aware of the issue forming the basis of objection, FHWA will ensure that MDOT SHA consults with the objecting party to respond to the objection in coordination with FHWA where relevant, provided the objection is made in writing to the FHWA or MDOT SHA contacts identified in Attachment 5 or any subsequent updates to Attachment 5. MDOT SHA and FHWA will inform other Signatories of the objection and proposed resolution. Should a Signatory disagree with the proposed resolution, the Signatories will follow Stipulation XIII.A.

**C.**    FHWA's responsibility to carry out all other actions subject to the terms of this PA that are not the subject of the dispute remain unchanged.

**XIV.    Termination**

**A.**    Any Signatory to this PA may terminate it by providing 30 days' notice in writing to the other Signatories, provided that the Signatories will consult during the period prior to termination to seek agreement on amendments or other actions that would avoid termination.

**B.**    If any Signatory to this PA determines that a term will not or cannot be carried out, that party shall immediately consult with the other Signatories to attempt to develop an amendment per Stipulation XII, above. If within 30 days (or another time period

agreed to by all Signatories) an amendment cannot be reached, any signatory may terminate the PA upon written notification to the other Signatories.

**C.**     In the event of termination, FHWA will comply with 36 C.F.R. § 800 for all remaining actions, or until a new agreement is reached fulfilling such requirements.

This PA will continue in full force and effect until 20 years from the date of execution of the PA, or such time of final acceptance of the Project and when all terms of this PA have been met, should the terms be met prior to the 20-year expiration.  The PA will be invalid if the Project is terminated or authorization for the Project is rescinded.  At any time in the six-month period prior to its expiration, the Signatories will consult to consider an extension or amendment of the PA.  At such time, the Signatories may consider an amendment to extend the PA unmodified for an additional specified duration or consult to amend the PA in accordance with Stipulation XII. No extension or amendment will be effective until all Signatories have signed the amendment or amendment to extend.

In witness thereof, the Signatories to this PA, through their duly authorized representatives, have executed this PA on the days and dates set out on the following pages and certify that they have read, understood, and agreed to the terms and conditions of this PA as set forth herein.

The effective date of this PA is the date of the last signatory page.

This PA may be executed in counterparts, each of which shall constitute an original, and all of which shall constitute one and the same agreement.

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement -- FINAL
MAY 17, 2022

**PROGRAMMATIC AGREEMENT AMONG THE FEDERAL HIGHWAY ADMINISTRATION, MARYLAND DEPARTMENT OF TRANSPORTATION STATE HIGHWAY ADMINISTRATION, NATIONAL PARK SERVICE, MARYLAND STATE HISTORIC PRESERVATION OFFICER, VIRGINIA STATE HISTORIC PRESERVATION OFFICER AND ADVISORY COUNCIL ON HISTORIC PRESERVATION**

**IMPLEMENTING SECTION 106 OF THE NATIONAL HISTORIC PRESERVATION ACT FOR THE I-495 AND I-270 MANAGED LANES STUDY, ANNE ARUNDEL, FREDERICK, MONTGOMERY AND PRINCE GEORGE'S COUNTIES, MARYLAND AND FAIRFAX COUNTY, VIRGINIA**

**May 17, 2022**

Signatory:

FEDERAL HIGHWAY ADMINISTRATION

Date    6/06/2022

Gregory Murrill
Division Administrator
FHWA Maryland Division

**PROGRAMMATIC AGREEMENT AMONG THE FEDERAL HIGHWAY ADMINISTRATION, MARYLAND DEPARTMENT OF TRANSPORTATION STATE HIGHWAY ADMINISTRATION, NATIONAL PARK SERVICE, MARYLAND STATE HISTORIC PRESERVATION OFFICER, VIRGINIA STATE HISTORIC PRESERVATION OFFICER AND ADVISORY COUNCIL ON HISTORIC PRESERVATION**

**IMPLEMENTING SECTION 106 OF THE NATIONAL HISTORIC PRESERVATION ACT FOR THE I-495 AND I-270 MANAGED LANES STUDY, ANNE ARUNDEL, FREDERICK, MONTGOMERY AND PRINCE GEORGE'S COUNTIES, MARYLAND AND FAIRFAX COUNTY, VIRGINIA**

**May 17, 2022**

ADVISORY COUNCIL ON HISTORIC PRESERVATION

Date  6.14.2022

Reid J. Nelson
Executive Director (Acting)

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement -- FINAL
MAY 17, 2022

**PROGRAMMATIC AGREEMENT AMONG THE FEDERAL HIGHWAY ADMINISTRATION, MARYLAND DEPARTMENT OF TRANSPORTATION STATE HIGHWAY ADMINISTRATION, NATIONAL PARK SERVICE, MARYLAND STATE HISTORIC PRESERVATION OFFICER, VIRGINIA STATE HISTORIC PRESERVATION OFFICER AND ADVISORY COUNCIL ON HISTORIC PRESERVATION**

**IMPLEMENTING SECTION 106 OF THE NATIONAL HISTORIC PRESERVATION ACT FOR THE I-495 AND I-270 MANAGED LANES STUDY, ANNE ARUNDEL, FREDERICK, MONTGOMERY AND PRINCE GEORGE'S COUNTIES, MARYLAND AND FAIRFAX COUNTY, VIRGINIA**

**May 17, 2022**

Signatory:

MARYLAND STATE HISTORIC PRESERVATION OFFICER

_____     Date  ___May 19, 2022___
Elizabeth Hughes
Director
Maryland Historical Trust

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement - FINAL
MAY 17, 2022

**PROGRAMMATIC AGREEMENT AMONG THE FEDERAL HIGHWAY ADMINISTRATION, MARYLAND DEPARTMENT OF TRANSPORTATION STATE HIGHWAY ADMINISTRATION, NATIONAL PARK SERVICE, MARYLAND STATE HISTORIC PRESERVATION OFFICER, VIRGINIA STATE HISTORIC PRESERVATION OFFICER AND ADVISORY COUNCIL ON HISTORIC PRESERVATION**

**IMPLEMENTING SECTION 106 OF THE NATIONAL HISTORIC PRESERVATION ACT FOR THE I-495 AND I-270 MANAGED LANES STUDY, ANNE ARUNDEL, FREDERICK, MONTGOMERY AND PRINCE GEORGE'S COUNTIES, MARYLAND AND FAIRFAX COUNTY, VIRGINIA**

**May 17, 2022**

Signatory:

VIRGINIA STATE HISTORIC PRESERVATION OFFICER


Date 5/19/2022

Julie Langan
Director
Virginia Department of Historic Resources

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement - FINAL
MAY 17, 2022

## PROGRAMMATIC AGREEMENT AMONG THE FEDERAL HIGHWAY ADMINISTRATION, MARYLAND DEPARTMENT OF TRANSPORTATION STATE HIGHWAY ADMINISTRATION, NATIONAL PARK SERVICE, MARYLAND STATE HISTORIC PRESERVATION OFFICER, VIRGINIA STATE HISTORIC PRESERVATION OFFICER AND ADVISORY COUNCIL ON HISTORIC PRESERVATION

## IMPLEMENTING SECTION 106 OF THE NATIONAL HISTORIC PRESERVATION ACT FOR THE I-495 AND I-270 MANAGED LANES STUDY, ANNE ARUNDEL, FREDERICK, MONTGOMERY AND PRINCE GEORGE'S COUNTIES, MARYLAND AND FAIRFAX COUNTY, VIRGINIA

### May 17, 2022

Signatory:

NATIONAL PARK SERVICE

TINA CAPPETTA
Digitally signed by TINA CAPPETTA
Date: 2022.06.06 12:40:09 -04'00'

Date    6/6/2022

Tina Capetta
Superintendent
Chesapeake and Ohio National Historical Park

Charles
Cuvelier
Date: 2022.06.06
12:35:53 -04'00'

Date    6/6/2022

Charles J. Cuvelier
Superintendent
George Washington Memorial Parkway

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement - FINAL
MAY 17, 2022

**PROGRAMMATIC AGREEMENT AMONG THE FEDERAL HIGHWAY ADMINISTRATION, MARYLAND DEPARTMENT OF TRANSPORTATION STATE HIGHWAY ADMINISTRATION, NATIONAL PARK SERVICE, MARYLAND STATE HISTORIC PRESERVATION OFFICER, VIRGINIA STATE HISTORIC PRESERVATION OFFICER AND ADVISORY COUNCIL ON HISTORIC PRESERVATION**

**IMPLEMENTING SECTION 106 OF THE NATIONAL HISTORIC PRESERVATION ACT FOR THE I-495 AND I-270 MANAGED LANES STUDY, ANNE ARUNDEL, FREDERICK, MONTGOMERY AND PRINCE GEORGE'S COUNTIES, MARYLAND AND FAIRFAX COUNTY, VIRGINIA**

**May 17, 2022**

Signatory:

MARYLAND STATE HIGHWAY ADMINISTRATION

_____          Date  05/27/2022
                                                        _____
Tim Smith, P.E.
Administrator

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement - FINAL
MAY 17, 2022

**Attachments**

1. Inadvertent Discovery Plan
2. All Parties Invited to Consult on the Project
3. Consulting Parties invited to Concur
4. Links to Documentation Referenced
5. Contact Information for FHWA and MDOT SHA staff responsible for PA implementation (to be updated as necessary)

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement -- FINAL
MAY 17, 2022

## Attachment 1
## Inadvertent Discovery Plan

**A.    Unanticipated Impacts to Architectural Historic Properties:** if the Project causes unanticipated impacts to any National Register of Historic Places (NRHP) eligible, listed, or contributing buildings, sites, structures, or objects of the built environment, the contractor must notify the engineer and immediately cease any activity causing ongoing damage until consultation occurs.  MDOT SHA shall, in consultation with the appropriate SHPO (VA or MD), determine if adverse effects have occurred to the property/properties and develop a plan for the protection of the historic property, and minimization or mitigation of impacts.  If mitigation is identified, FHWA, MDOT SHA, SHPO, and other Signatories as necessary will execute a Memorandum of Agreement or amend this PA to record the identified mitigation.  MDOT SHA may hold the developer(s) liable for any or all costs resulting from this process following appropriate processes identified in its contract instruments.

**B.    Unanticipated Damage to Known Archaeological Resources:** if unauthorized excavation occurs outside the approved limits of disturbance (LOD) or other approved boundaries designed to protect archaeological resources or cemeteries and thereby causes impacts to known, NRHP-eligible properties, MDOT SHA will ensure any activity causing ongoing damage is stopped until consultation occurs.  MDOT SHA will conduct a damage assessment consistent with the model used for such assessments under the Archaeological Resources Protection Act (https://www.nps.gov/archeology/pubs/techbr/tchBrf20.pdf). MDOT SHA will use the results of the assessment in consultation with the relevant SHPO to determine if the resource has been adversely affected and determine appropriate mitigation.  If the resource is of known or suspected Native American affiliation, FHWA, with assistance from MDOT SHA shall consult with federally recognized Indian Tribes as appropriate.  If the resource is affiliated with other known descendant groups or consulting parties, MDOT SHA will consult with such parties as well.  Should damage occur on NPS land, MDOT SHA will consult with the NPS staff and regional archaeologist regarding the damage assessment report and any identified mitigation. If mitigation is identified, FHWA, MDOT SHA, SHPO, and other Signatories as necessary will execute a Memorandum of Agreement or amend this PA to record the identified mitigation.  MDOT SHA may hold the developer(s) liable for any or all costs resulting from this process following appropriate processes identified in its contract instruments.

00000108

**C.    Unanticipated Discovery of Human Remains:** Should any burials, interments, or human remains (hereafter, "remains") be encountered during construction, MDOT SHA will ensure all applicable construction work in the vicinity of the remains is immediately stopped to prevent damage to the remains, or to any additional remains that might be present in the vicinity.  A minimum 100-foot buffer around identified remains will be established by MDOT SHA free of disturbance, to be adjusted as appropriate for the site conditions. Construction may occur outside the buffer unless evidence of additional remains is found.  If remains are suspected to be human but not confirmed, MDOT SHA will ensure that such confirmation is made by a qualified professional.  Human remains will at all times be treated respectfully and access and visibility limited to the site of discovery to authorized personnel only.  Within Maryland, pursuant to State of Maryland Criminal Code § 10-402, the State's Attorney must authorize movement or removal of any remains until determined to be archaeological.  If the remains are determined to be archaeological, MDOT SHA and the relevant SHPO will consult to determine treatment of the remains and any other necessary treatment such as work needed to define extent of remains in the most expeditious manner feasible.  Within Virginia, human remains and associated funerary objects encountered during the course of actions taken as a result of this PA shall be treated in a manner consistent with the Virginia Antiquities Act (Code of Virginia 10.1-2305) and its implementing regulation (17VAC5-20), adopted by the Virginia Board of Historic Resources and published in the Virginia Register on July 15, 1991.

If the remains are determined archaeological and suspected to be of Native American origin, MDOT SHA, in coordination with FHWA, shall provide notification to tribal governments in accordance with any expressed tribal consultation preferences within 24 hours or as soon as practicable.  MDOT SHA and/or FHWA will consult with affected federally recognized Indian Tribes, the Maryland Commission on Indian Affairs and appropriate Maryland Indian groups as appropriate regarding treatment of the remains. MDOT SHA will accommodate tribal cultural preferences to the extent practicable during such an event.  If remains can be associated with other known descendant communities or organizations, including the cemetery-affiliated consulting or concurring parties to this PA, such parties shall also be consulted.

If the human remains are likely to be of Native American origin and are located on lands controlled or owned by the U.S. Government, including National Park Service Property within the APE, the Federal land managing agency will assume responsibility for compliance with the Native American Graves Protection and Repatriation Act (NAGPRA; 25 USC 3001), with MDOT SHA assistance.

In consultation with the relevant SHPO, Federally Recognized Indian Tribes, and FHWA as appropriate, and other identified descendant/affiliated consulting parties, the MDOT SHA shall develop a plan for the treatment or disposition of the remains or follow provisions of an existing treatment plan developed per this PA. MDOT SHA shall implement the provisions of the agreed treatment plan.

Should the remains be associated with, or constitute an intact archaeological resource, provision **D** below is also applicable.

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement – FINAL

**D.**　　Unanticipated Discovery of Archaeological Resources: If previously unidentified archaeological features, artifacts, or other materials (hereafter, "resource") are discovered during construction, all ground-disturbing work in the vicinity of the resource shall be temporarily suspended or modified to prevent further damage to the resource, and MDOT SHA will provide a reasonable buffer where ground disturbance is prohibited to cover the extent of the resource that may not be exposed.

　　　　The MDOT SHA archaeologist shall perform a preliminary inspection to identify the resource and evaluate its likelihood of NRHP eligibility. Following this inspection, construction may resume in the vicinity of but outside the boundary of the archaeological resource as defined by the MDOT SHA archaeologist. If the resource is potentially eligible for the NRHP, MDOT SHA will consult with the relevant SHPO on an eligibility determination and, if determined eligible for the NRHP, every effort shall be made to minimize impacts through redesign or modification of construction methods. If the resource is of known or suspected Native American affiliation, FHWA, with assistance from MDOT SHA shall consult with federally recognized Indian Tribes as appropriate. If the resource can be reasonably identified with other descendant or affiliated communities, MDOT SHA shall also attempt to consult with such parties.

　　　　In consultation with the relevant SHPO, MDOT SHA shall develop a plan for the treatment of any resource determined eligible. MDOT SHA shall describe actions proposed to avoid, minimize, or mitigate adverse effects, and request SHPO, tribal, and any other consulting party comments within 5 working days, unless there is a life or safety hazard requiring immediate interim action. MDOT SHA will disclose any interim action affecting the eligible resource taken in the event of a life or safety hazard. MDOT SHA, at its discretion, may establish a longer comment period if practicable in consideration of potential safety, cost, public travel disruption, and other factors. MDOT SHA shall then implement the provisions of the agreed-upon plan and/or amend this PA to document the resolution, should the resource be determined eligible and should the Project adversely affect the resource.

# Attachment 2
## All Parties Invited to Consult on the Project

**Federally Recognized Tribal Nations**
- **Absentee-Shawnee Tribe of Oklahoma**
- **Delaware Nation**
- **Delaware Tribe of Indians**
- **Chickahominy Indian Tribe**
- **Chickahominy Indians Eastern Division**
- **Eastern Shawnee Tribe of Oklahoma**
- **Monacan Indian Nation**
- **Nansemond Indian Tribe**
- **Oneida Indian Nation**
- **Onondaga Nation**
- **Pamunkey Indian Tribe**
- **Rappahannock Tribe, Inc.**
- **Saint Regis Mohawk Tribe**
- **Seneca-Cayuga Nation**
- **Shawnee Tribe**
- **Tuscarora Nation**
- **Upper Mattaponi Indian Tribe**

**State Recognized and Other Tribes**
- **Piscataway Conoy Tribe of Maryland (PCT)**
- **PCT - Cedarville Band of Piscataway**
- **PCT - Choptico Band of Piscataway**
- **Piscataway Indian Nation**

**Federal Agencies**
- **Department of Defense**
- **General Services Administration**
- **Federal Railroad Administration**
- **Federal Transit Administration**
- **National Capital Planning Commission**
- **National Institute of Standards and Technology**
- **National Park Service**
- **U.S. Army Corps of Engineers**
- **U.S. Department of Agriculture**
- **U.S. Postal Service**

**State Agencies and Organizations**
- **Maryland Commission on Indian Affairs**
- **MDOT Maryland Transit Administration**

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement – FINAL

- **MDOT Maryland Transportation Authority**
- **Maryland Historical Trust**
- **Preservation Maryland**
- **Virginia Department of Historic Resources**
- **Virginia Department of Transportation**
- **Washington Metropolitan Area Transit Authority**

**County Agencies and Organizations**

- **Charles County Department of Planning**
- **Frederick County**
- **Frederick County Preservation Trust**
- **Maryland Milestones/Anacostia Trails Heritage Area, Inc.**
- **Montgomery County Department of Correction and Rehabilitation**
- **Montgomery County Department of General Services**
- **Montgomery County Department of Transportation**
- **Montgomery County Heritage Area, Heritage Tourism Alliance of Montgomery County**
- **Maryland Milestones**
- **Maryland-National Capital Parks and Planning Commission – Montgomery County Planning – Historic Preservation**
- **Maryland-National Capital Parks and Planning Commission – Montgomery Parks**
- **Maryland-National Capital Parks and Planning Commission – Prince George's County Planning – Historic Preservation**
- **Maryland-National Capital Parks and Planning Commission – Prince George's County Department of Parks and Recreation**
- **Montgomery Preservation, Inc.**
- **Prince George's County Historic Preservation Commission**
- **Prince George's County Historical and Cultural Trust**
- **Prince George's Heritage, Inc.**

**Municipal and Other Organizations**
- **Cabin John Citizens Association**
- **Canoe Cruisers Association**
- **C&O Canal Association**
- **C&O Canal Trust**
- **Carderock Springs Citizens' Association**
- **City of Gaithersburg**
- **City of College Park**
- **City of Glenarden**
- **City of Greenbelt**
- **City of Rockville**
- **First Agape A.M.E. Zion Church at Gibson Grove**

- **Frederick County Landmarks Foundation**
- **Heart of the Civil War Heritage Area**
- **Indian Spring Community Association**
- **National Park Seminary Master Association**
- **National Trust for Historic Preservation**
- **Peerless Rockville**
- **Rock Creek Conservancy**
- **Save Our Seminary at Forest Glen**
- **Sierra Club Maryland Chapter**
- **Silver Spring YMCA**
- **Trustees of Morningstar Tabernacle No. 88, Inc. (Friends of Moses Hall)**
- **Washington Biologists' Field Club**
- **Village of North Chevy Chase**

# Attachment 3
## Consulting Parties Invited to Concur

**Federally Recognized Tribes**
- **Absentee-Shawnee Tribe of Oklahoma**
- **Delaware Nation**
- **Delaware Tribe of Indians**
- **Chickahominy Indian Tribe**
- **Chickahominy Indians Eastern Division**
- **Eastern Shawnee Tribe of Oklahoma**
- **Monacan Indian Nation**
- **Nansemond Indian Tribe**
- **Oneida Indian Nation**
- **Onondaga Nation**
- **Pamunkey Indian Tribe**
- **Rappahannock Tribe, Inc.**
- **Saint Regis Mohawk Tribe**
- **Seneca-Cayuga Nation**
- **Shawnee Tribe**
- **Tuscarora Nation**
- **Upper Mattaponi Indian Tribe**

**State Recognized and Other Tribes**
- **Piscataway Conoy Tribe of Maryland (PCT)**
- **PCT - Cedarville Band of Piscataway**
- **PCT - Choptico Band of Piscataway**
- **Piscataway Indian Nation**

**Federal Agencies**

- **Department of Defense**
- **Federal Railroad Administration**
- **Federal Transit Administration**
- **National Capital Planning Commission**
- **National Institute of Standards and Technology**
- **U.S. Army Corps of Engineers**
- **U.S. Department of Agriculture**

**State Agencies**
- **Maryland Commission on Indian Affairs**
- **Maryland Department of Transportation – Maryland Transit Administration**
- **Maryland Transportation Authority**
- **Virginia Department of Transportation**

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement – FINAL

**Local and Other Agencies and Groups**
- **Cabin John Citizens Association**
- **Canoe Cruisers Association**
- **Carderock Springs Citizens Association**
- **City of Gaithersburg**
- **City of Rockville**
- **C&O Canal Association**
- **C&O Canal Trust**
- **First Agape A.M.E. Zion Church at Gibson Grove**
- **Maryland Milestones**
- **Maryland-National Capital Park and Planning Commission**
- **Montgomery County Heritage Area**
- **Montgomery Preservation, Inc.**
- **National Institute for Standards and Technology**
- **National Trust for Historic Preservation**
- **Peerless Rockville**
- **Preservation Maryland**
- **Trustees of Morningstar Tabernacle No. 88, Incorporated (Friends of Moses Hall)**
- **Virginia Department of Transportation**
- **Washington Biologists' Field Club**

## Attachment 4
## Links to Documentation Referenced In the I-495 & I-270 Managed Lanes Study PA

**Federal Codes and Regulations**

16 U.S.C. 470aa-470mm
Archaeological Resources Protection Act (ARPA)
https://uscode.house.gov/view.xhtml?path=/prelim@title16/chapter1B&edition=prelim

25 U.S.C. Ch. 32 § 3001
Native American Graves Protection and Repatriation Act (NAGPRA)
https://uscode.house.gov/view.xhtml?path=/prelim@title25/chapter32&edition=prelim

36 C.F.R. Part 14 and 54 U.S.C. § 100902
Rights-of-Way
https://www.ecfr.gov/current/title-36/chapter-I/part-14
https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title54-section100902&num=0&edition=prelim

36 C.F.R. Part 63
Dispute Resolution of Determinations of Eligibility for Inclusion in the NRHP
https://www.ecfr.gov/current/title-36/chapter-I/part-63

36 C.F.R. Part 79
Curation of Federally Owned and Administered Archaeological Collections
https://www.ecfr.gov/current/title-36/chapter-I/part-79

36 C.F.R. Part 800
Implementing Regulations of Section 106 of the National Historic Preservation Act
https://www.ecfr.gov/current/title-36/chapter-VIII/part-800?toc=1

40 C.F.R. 1506.6(a)
Public involvement – National Environmental Policy Act
https://www.ecfr.gov/current/title-40/chapter-V/subchapter-A/part-1506#1506.6

54 U.S.C.
- National Park Service and Related Programs
    § 100101(a) Promotion and Regulation of the National Park Service (NPS Organic Act)
    o https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title54-section100101&num=0&edition=prelim
- National Historic Preservation Act
    § 306108 Effect of Undertaking on Historic Property

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement – FINAL

- o https://uscode.house.gov/view.xhtml?req=(title:54%20section:306108%20edition:prelim)
- § 307103 Access to Information (Section 304)
- o https://www.achp.gov/digital-library-section-106-landing/frequently-asked-questions-protecting-sensitive-information

Public Law 71-284, 46 Statute 482 (1930); Executive Order 6166 of June 10, 1933
Capper-Cramton Act and Administration by the National Park Service
https://www.ncpc.gov/about/authorities/cca/
https://www.nps.gov/parkhistory/online_books/anps/anps_3b.htm

## State Codes and Regulations

Maryland Criminal Code § 0-402
Courts and Judicial Proceedings
https://law.justia.com/codes/maryland/2013/article-gcr/section-10-402

Maryland Natural Resources Code § 5-103
Reforestation
https://roads.maryland.gov/mdotsha/pages/index.aspx?PageId=158

Virginia Antiquities Act § 10.1-2305
Human Remains
https://law.lis.virginia.gov/vacode/title10.1/chapter23/section10.1-2305/
Implementation - Virginia Administrative Code 17VAC5-20
https://law.lis.virginia.gov/admincode/title17/agency5/chapter20/

## Guidelines and Standards

### *Advisory Council on Historic Preservation*
- *Exemption Regarding Historic Preservation Review Process for Effects to the Interstate Highway System* (ACHP Program Comment, 2005)
https://www.achp.gov/sites/default/files/exemptions/2017-01/final_interstate_exemption_notice.pdf

- *Policy Statement Regarding Treatment of Burial Sites, Human Remains, and Funerary Objects* (ACHP February 2007)
https://www.achp.gov/sites/default/files/policies/2018-06/ACHPPolicyStatementRegardingTreatmentofBurialSitesHumanRemainsandFuneraryObjects0207.pdf

- *Program Comment Issued for Streamlining Section 106 Review for Actions Affecting Post-1945 Concrete and Steel Bridges* (77 FR 68790)
https://www.federalregister.gov/documents/2012/11/16/2012-27866/program-comment-issued-for-streamlining-section-106-review-for-actions-affecting-post-1945-concrete

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement – FINAL

- *Section 106 Archaeology Guidance* (ACHP, 2009)
  https://www.achp.gov/sites/default/files/guidance/2017-02/ACHP%20ARCHAEOLOGY%20GUIDANCE.pdf

### The Maryland Historical Trust
- Standards and Guidelines for Archaeological Investigations in Maryland (Shaffer and Cole 1994)
  https://mht.maryland.gov/documents/PDF/archeology/Archeology_standards_investigations.pdf

- *Technical Update No. 1 of the Standards and Guidelines for Archaeological Investigations in Maryland: Collections and Conservation Standards* (2018)
  https://mht.maryland.gov/documents/PDF/archeology/Archeology_standards_curation.pdf

- Standards and Guidelines for Architectural and Historical Investigations in Maryland (Maryland Historical Trust, Revised 2019)
  https://mht.maryland.gov/documents/PDF/research/Survey_standards_architecture_web.pdf

### The National Park Service
- Management Policies – Section 5, Cultural Resource Management (2006)
  https://www.nps.gov/subjects/policy/upload/MP_2006.pdf

- NPS Museum Handbook, National Park Service, revised 2019
  https://www.nps.gov/museum/publications/handbook.html

- NRHP Bulletin 15 – How to Apply the National Register Criteria for Evaluation (National Park Service revised 1997)
  https://www.nps.gov/subjects/nationalregister/upload/NRB-15_web508.pdf

- Other NRHP Bulletins
  https://www.nps.gov/subjects/nationalregister/publications.htm#:~:text=national%20register%20of%20historic%20places%20bulletins

- The Secretary of the Interior's Guidelines for the Treatment of Cultural Landscapes (1996)
  https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/index.htm

- The Secretary of the Interior's Guidelines for the Treatment of Historic Properties (1995, Revised 2017)
  https://www.nps.gov/tps/standards/treatment-guidelines-2017.pdf

- The Secretary of the Interior's Professional Qualifications Standards
  https://www.nps.gov/articles/sec-standards-prof-quals.htm
  **OR** see 48 FR 44738
  https://www.nps.gov/subjects/historicpreservation/upload/standards-guidelines-archeology-historic-preservation.pdf

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement – FINAL

- The Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation (1983) https://www.nps.gov/subjects/historicpreservation/upload/standards-guidelines-archeology-historic-preservation.pdf

- The Secretary of the Interior's Standards for the Treatment of Historic Properties (1995, Revised 2017) https://www.nps.gov/tps/standards/four-treatments.htm OR https://www.ecfr.gov/current/title-36/chapter-I/part-68

### *The Virginia Department of Historic Resources*
- Guidelines for Conducting Historic Resources Survey in Virginia (Virginia Department of Historic Resources, revised September 2017) https://www.dhr.virginia.gov/wp-content/uploads/2018/06/SurveyManual_2017.pdf

### **Other Referenced Information**
- Area of Potential Effects, May 2022 https://oplanesmd.com/wp-content/uploads/2022/05/MLS_APE_Mapping.pdf

- Alternative 9 Phase 1 South project description (currently available here: https://oplanesmd.com/environmental/alternatives/pa/)

- First Agape A.M.E. Zion Church at Gibson Grove parking lot restoration plan (https://oplanesmd.com/wp-content/uploads/2022/04/P3-Gibson-Grove-Church-Parking-Layout.pdf)

- I-495 and I-270 Managed Lanes Study Draft Section 106 Technical Report: https://oplanesmd.com/deis/#:~:text=4(f)%20Evaluation-,appendix%20g,-Cultural%20Resources%20Technical

- MDOT SHA Statewide PA: https://www.roads.maryland.gov/OPPEN/2021_PA_Amendment.pdf

00000119

**Attachment 5**
FHWA and MDOT SHA Staff Contact Information:

**For FHWA:**

Ms. Jeanette Mar
Environmental Program Manager
FHWA - Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore, MD 21201
phone (410) 779-7152
fax     (410) 962-4054
jeanette.mar@dot.gov

**For MDOT SHA:**

Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
707 N. Calvert Street
Baltimore, MD 21202
phone (410) 545-8508
sarcher@mdot.maryland.gov



I-495 & I-270 Managed Lanes Study

**RECORD OF DECISION**

**MONTGOMERY COUNTY DEPARTMENT OF TRANSPORTATION – CHRISTOPHER CONKLIN**



Marc Elrich
*County Executive*

Christopher R. Conklin
*Director*

DEPARTMENT OF TRANSPORTATION

June 30, 2022

Hon Peter Buttigieg, Secretary
U.S. Department of Transportation
1200 New Jersey Avenue, S.E.
Washington D.C. 20590

RE:  MDOT Opportunity Lanes FEIS/Phase 1 South Transit Commitments

Dear Secretary Buttigieg:

The United States Department of Transportation (USDOT), through its Federal Highway Administration (FHWA) is conducting a National Environmental Policy Act (NEPA) review of the Opportunity Lanes (OpLanes) project being advanced by the Maryland Department of Transportation (MDOT).  A Final Environmental Impact Statement (FEIS) for the project was made available on June 17, 2022, with a Record of Decision (ROD) potentially being issued soon.  Our review of the FEIS has uncovered errors and omissions regarding the transit commitments for Phase 1 South of the project.  Commitments for future phases are not detailed in the FEIS.

The transit commitments for Phase 1 South of the project were made by MDOT through public correspondence and confirmed by official action (Resolution R2-2022) of the Transportation Planning Board (TPB), which is the Metropolitan Planning Organization for the Washington, D.C. region. MDOT was a party to the actions by TBP firmly establishing the transit mitigation commitments for this project, was directly involved in the drafting of the commitments, and voted in support of the language describing the commitments in July 2021. MDOT also confirmed its intention to provide transit investments itself, without contingency on additional concessionaire participation, in correspondence to the Montgomery County Council President in January 2022.

MDOT reaffirmed its commitment to providing these transit elements in the June 2022 meeting of the TPB when it voted to approve an update to the Long-Range Transportation Plan (LRTP), known as Visualize 2045 (Resolution R15-2022).  The two relevant TPB resolutions and correspondence with the Montgomery County Council President are attached to this letter for your reference.

**Office of the Director**

101 Monroe Street, 10ᵗʰ Floor, Rockville, MD 20850 · 240-777-7170 · 240-777-7178 Fax
www.montgomerycountymd.gov/mcdot

montgomerycountymd.gov/311    301-251-4850 TTY

**Response:**
As your letter correctly notes, MDOT has made financial commitments to certain transit improvements or investments as part of Phase 1 of the P3 Program.  MDOT stands firm on its commitment to advance certain transit improvements as part of Phase 1 of the P3 Program to further address the significant congestion on the study corridors and to enhance multimodal connectivity and mobility within the study area.  Each of the listed transit improvements or investments were identified as priorities in consultation and coordination with local jurisdictions, including Montgomery County.

Additionally, these commitments are related to part of the National Capital Region Transportation Planning Board's (TPB) regional planning efforts and were captured in the TPB Resolution R2-2022.  The construction of the New American Legion Bridge I-270 to I-70 Traffic Relief Plan (Project) was restored to the air quality conformity analysis as part of this resolution.  As noted in the "**WHEREAS**" or the basic facts and reasons for the resolution:

- TPB's action on June 21, 2021 to exclude the Project removed the private sector revenues that supported the Project thus disrupting the fiscal constraint of the projects submitted by MDOT and, as a result, additional projects (transit and/or highway) would have needed to be removed to reestablish the fiscal constraint;

- Many TPB member jurisdictions in Maryland and Virginia expressed an interest to amend the project input list by restoring the Project and the private sector revenues associated with the Project; and

- It was noted and understood that MDOT was proposing to deliver the Project fully with private funding through a public-private partnership (P3).

While MDOT committed to the improvements at the Shady Grove Metrorail Station and the Westfield Montgomery Mall Transit Center as part of the Preferred Alternative for the MLS, the other transit commitments in Resolution R2-2022 were clearly based on an understanding that the Project would be delivered with private funding and as a P3.  Characterization of these other transit commitments as public funding would be contrary to TPB Resolution R2-2022 and disrupt the fiscal constraint of the projects in the approved plan.

Through correspondence with the Montgomery County Council President on January 10, 2022 and with TPB on June 8, 2022, MDOT clearly articulated that these transit commitments were part of a P3 delivery and all funding and future agreements for these transit commitments were contingent upon the financial close of a P3 agreement with the Developer.

A Record of Decision (ROD) issued by the Federal Highway Administration (FHWA) does not mandate a particular project delivery method or form of project financing.  Rather, an FHWA ROD ensures that the mitigation and commitments related to regulatory actions and permit decisions for the project, not its financing or delivery method, are captured in the project approval.  Because MDOT has been clear that it intends to deliver Phase 1 South as a P3 fully with private funding, it would not be appropriate to include the other transit commitments from TPB Resolution R2-2022 as MDOT SHA commitments for the MLS in the ROD.

00000121



**OP·LANES** MARYLAND — I-495 & I-270 Managed Lanes Study · Case 8:22-cv-02597-DKC   Document 56-1   Filed 10/30/23   Page 122 of 144 · RECORD OF DECISION

*This page is intentionally left blank.*

Hon Peter Buttigieg, Secretary
June 30, 2022
Page 2

**Requested Corrective Action in the ROD**

I respectfully request that the ROD for this project correctly reflect the transit commitments for Phase 1 South of the project. For your convenience, we have provided proposed corrections to Section 7.2 of the FEIS, items 122 and 123, and ask that these corrections be carried through to all other instances where these commitments are described in the FEIS through appropriate language in the ROD.

**Table 1**
**Transit Commitment Corrections for FEIS Section 7.2**

| Item | Requested Action | FEIS Description | Corrected Description |
|---|---|---|---|
| Combine 122 & 123 and revise | Combine items 122 and 123 and replace the FEIS phrasing with the phrasing from the TPB Resolution R2-2022 Item 1.d. See also the January 10, 2022 letter Page 1, Paragraph 3.<br><br>This correction will reinstate MDOT's commitment to provide a bus maintenance facility equipment and fleet, and will reflect the agreed upon timing of the investments and the usage of the facilities. | 122. Increase the number of bus bays at Washington Metropolitan Area Transit Authority's Shady Grove Metrorail Station.<br><br>123. Increase parking capacity at the Westfield Montgomery Mall Transit Center | **REVISED 122.**<br>MDOT will construct new bus bays at Shady Grove Station; increase parking capacity at the Westfield Montgomery Park and Ride; provide the necessary bus fleet; and construct and equip the Metropolitan Grove Bus Operations and Maintenance Facility. These resources should be provided for use early in the construction period to support expanded local transit operations for the long term. |
| Replace 123. | Incorporate MDOT commitment to provide financial support to high priority transit projects to Montgomery County from TPB Resolution R2-2022 Items 1.b. and 1.c. See also the January 10, 2022 letter Page 2, Paragraph 1.<br><br>These commitments are missing from FEIS Section 7.2 and inappropriately characterized elsewhere | N/A | **REVISED 123.**<br>After financial close of the Phase 1 South Section P3 Agreement, MDOT will commit to fund not less than $60 million from the Development Rights Fee for design and permitting of high priority transit investments in Montgomery County.<br><br>As Part of Phase 1 South, MDOT will commit to provide not less than $300 million of additional transit investment funding inclusive of the phase developer's proposed transit investment to implement high priority transit projects in Montgomery County. |


This page is intentionally left blank.

Hon Peter Buttigieg, Secretary
June 30, 2022
Page 3

**Justification for the Corrections**

The highway capacity provided by this project is demonstrated to lead to increased traffic (FEIS Table 4-2, 4-9, 4-10), increased greenhouse gas emissions (FEIS Appendix K, Table 3-4) and is likely to reduce Non Auto Driver Mode Share (NADMS), which is contrary to local transportation policies. MDOT has made transit commitments that are essential mitigation actions required to partially offset the negative transportation and environmental consequences of the project. Further, as noted in the FEIS, the transit commitments are a component of the project's attempt to address equity. Unfortunately, the transit mitigation commitments contain omissions and are inaccurately and insufficiently described in various sections of the FEIS (Sections 3.2.1, 7.2 and 7.3).

The bifurcated description of the transit mitigation commitments in the FEIS between project actions and uncertain concessionaire actions is inconsistent with the principles of impact mitigation. Additionally, it does not comport with MDOT's representations to Montgomery County in its correspondence and does not satisfy the stipulations within the TPB resolution for this project. Furthermore, a commitment intended to mitigate an adverse impact cannot be conditioned on a third-party's willingness to honor it.

Before the TPB and in correspondence to the County, MDOT has committed to provide these transit mitigation elements, should the project proceed, without additional contingency related to the level of third-party financial participation. While it is possible that the concessionaire participation may offset MDOT's obligations, which is acknowledged in the reference documents, the commitments are those of MDOT, the public agency advancing this project. Montgomery County is not party to any agreements between MDOT and its potential concessionaire for the OpLanes project and it is the duty of the MDOT to ensure that the project's mitigation is provided. The Record of Decision (ROD) for this project must clearly state that fulfillment of these commitments is unambiguously the responsibility of the project sponsor, MDOT, independent of possible actions by other parties and how MDOT chooses to contract with third parties to fulfill them.

To highlight the discrepancy, compare the statement from page 2 of the January 2022 MDOT letter to the Montgomery County Council President regarding a portion of the transit commitments, which states (emphasis added),

> "**MDOT will commit** $300 million of transit service investment inclusive of the Phase Developer's transit commitment. The total transit investment **by MDOT** for Phase 1 South is estimated between $560 and $610 million, not including any additional funding committed by MDOT or VDOT for interstate transit in the American Legion Bridge Corridor"

with the language in the FEIS Section 7.3 on page 7-22, which states,



Hon Peter Buttigieg, Secretary
June 30, 2022
Page 4

> "*As part of its proposal, the Developer has proposed an estimated $300 million over the operating term for Phase 1 South. The exact investments would be determined as part of the Section P3 Agreement for Phase 1 South.*"

The FEIS clearly falls short of MDOT's commitments by using non-specific and non-committal language that is inconsistent with the clear and committal statements MDOT made in July 2021, January 2022 and reaffirmed in June 2022, just days before the FEIS was released for public review.

Further, the transit commitments are an issue of significant public interest covered in extensive correspondence throughout the NEPA review. It is inappropriate to change the characterization of the commitments in the FEIS and then refer final resolution of the mitigation to private negotiation that is not subject to public scrutiny and is opaque to the affected communities.

We respectfully request that the ROD accurately and completely reflect the full scope of MDOT's transit commitments. We thank you very much for your consideration of this issue and for your action to correct these errors. We believe that appropriate characterization of the transit mitigation commitments in the ROD is essential to serve the public interest in this matter as the presentation in the FEIS is erroneous and misleading. Should you wish to talk about this matter further, please feel free to contact me by phone at 240-777-7777 or by email at christopher.conklin@montgomerycountymd.gov.

Sincerely,

Christopher Conklin, P.E., Director
Montgomery County Department of Transportation

Enclosures
    A. Resolution R2-2022 (Air Quality Inputs Table Omitted)
    B. Resolution R15-2022
    C. January 10, 2022 Letter from MDOT to Montgomery County

cc:    Stephanie Pollak, FHWA
       Gregory Murrill, FHWA
       Jitesh Parikh, FHWA
       Jim Ports, MDOT
       Tim Smith, Administrator MDOT/SHA
       Jeffrey Folden, MDOT/SHA
       Kanti Srikanth, MWCOG
       Hon. Jamie Raskin, US House of Representatives, Maryland 8th District

*The attachments included with this FEIS comment letter are included on the following pages.*



**TPB R2-2022**
**July 21, 2021**

**NATIONAL CAPITAL REGION TRANSPORTATION PLANNING BOARD**
**777 North Capitol Street, N.E.**
**Washington, D.C. 20002**

**RESOLUTION ON INCLUSION OF PROJECT SUBMISSIONS IN THE**
**AIR QUALITY CONFORMITY ANALYSIS FOR THE**
**CONSTRAINED ELEMENT FOR THE MARYLAND PORTION OF THE UPDATE TO VISUALIZE**
**2045 AND THE FY 2023-2026 TRANSPORTATION IMPROVEMENT PROGRAM (TIP)**

**WHEREAS,** the National Capital Region Transportation Planning Board (TPB), as the federally designated metropolitan planning organization (MPO) for the Washington metropolitan area, has the responsibility under the provisions of Fixing America's Surface Transportation (FAST) Act for developing and carrying out a continuing, cooperative and comprehensive transportation planning process for the metropolitan area; and

**WHEREAS,** the federal metropolitan planning regulations (23 CFR.450) assign TPB the responsibility to cooperatively develop the long-range metropolitan transportation plan (LRTP) and transportation improvement program (TIP) specified in Sections 450.324 and 450.326; and

**WHEREAS,** the TIP is required by the Federal Transit Administration (FTA) and the Federal Highway Administration (FHWA) as a basis and condition for all federal funding assistance to state, local and regional agencies for transportation improvements within the metropolitan Washington, D.C. planning area; and

**WHEREAS,** the Statewide and Metropolitan Transportation Planning rule as published in the May 27, 2016 Federal Register by the FTA and FHWA requires that the LRTP and the TIP be reviewed and updated at least every four years; and

**WHEREAS,** federal conformity regulations, originally published by the Environmental Protection Agency in the November 24, 1993 Federal Register and with latest amendments published in April 2012, based on the federal Clean Air Act (CAA Section 176(c)), require that the metropolitan transportation plan, program and projects in metropolitan areas not in attainment of national ambient air quality standards, demonstrate conformity to the area's state implementation plan; and

**WHEREAS,** federal conformity regulations require that the conformity analysis of the plan, program and projects be reviewed and updated at least every four years; and

**WHEREAS,** on October 17, 2018, the TPB adopted resolution R4-2019 determining that the Visualize 2045 Plan and FY 2019-2024 TIP conform with the requirements of the Clean Air Act Amendments of 1990, resolution R5-2019 approving the Visualize 2045 Plan, and resolution R6-2019 approving the FY 2019-2024 TIP, and the Visualize 2045 Plan and FY 2019-2024 TIP were approved by the FTA and FHWA on December 13, 2018; and

reduction of greenhouse gas emissions, and will be based on the concept of 'zero-based budgeting' where all projects, including those currently included in the Plan, must be resubmitted for consideration in such Plan, provided that projects currently under construction or currently funded with federal, state, regional, local or private funds shall be exempt from such requirement; and

**WHEREAS,** the project submissions approved on June 16, 2021 by the TPB excluded the Maryland I-270/I-495 HOT Lanes project while approving the remaining Maryland transit and highway projects listed in Attachment A; and

**WHEREAS,** on June 21, 2021, the Maryland Department of Transportation (MDOT) notified the TPB that the package of projects submitted was supported by a financial plan, and the TPB's June 16, 2021 action to exclude the I-270/I-495 HOT Lanes project removed the private revenues that supported that project, thus disrupting the fiscal constraint for the projects MDOT has submitted and as a result, MDOT would need to remove additional projects (transit and/or highway) projects to reestablish the fiscal constraint for its project submission; and

**WHEREAS,** since the June 21, 2021 MDOT notification of the unintended consequences of the June 16, 2021 action to exclude the I-270/I-495 HOT Lanes project from conformity inputs, which also affected other projects that MDOT was funding on account of the receipt of private funding, many TPB member jurisdictions form Maryland have expressed an interest to amend the Maryland project input list by restoring the I-270/I-495 HOT Lanes project and the private sector revenues associated with the project; and

**WHEREAS,** since the June 16, 2021 TPB action to exclude the I-270/I-495 HOT Lanes project from the conformity inputs, a number TPB member jurisdictions from Virginia have articulated the significant adverse impact this action will have on the performance outcomes from Virginia projects and the mobility/accessibility improvements it anticipated from the I-270/I-495 HOT lanes project, and have expressed an interest to amend the Maryland project input list by restoring the I-270/I-495 HOT Lanes project and the private sector revenues associated with the project; and

**WHEREAS,** MDOT notes that it substantially changed the scope of the I-270/I-495 HOT Lanes project as part of this round of conformity analysis by downgrading the proposed construction of HOT lanes on I-495 from the I-270 Spur to Woodrow Wilson Bridge so as to better coordinate this proposal with the local jurisdictions and notes that MDOT remains committed to work with all TPB member jurisdictions to better understand and address any outstanding concerns they may have with the current recommended preferred alternative (Phase 1 North and South); and

**WHEREAS,** MDOT is proposing to deliver Phase 1 of the I-270/I-495 HOT Lanes project fully with private funding through a public-private partnership (P3); and

**WHEREAS,** MDOT and Montgomery County are committed to deliver transit improvements through establishing and maintaining a collaborative, coordinated effort for developing the transit improvements during the predevelopment work of the Phase 1 P3 Agreement.

00000125


reduction of greenhouse gas emissions, and will be based on the concept of 'zero-based budgeting' where all projects, including those currently included in the Plan, must be resubmitted for consideration in such Plan, provided that projects currently under construction or currently funded with federal, state, regional, local or private funds shall be exempt from such requirement; and

**WHEREAS,** the project submissions approved on June 16, 2021 by the TPB excluded the Maryland I-270/I-495 HOT Lanes project while approving the remaining Maryland transit and highway projects listed in Attachment A; and

**WHEREAS,** on June 21, 2021, the Maryland Department of Transportation (MDOT) notified the TPB that the package of projects submitted was supported by a financial plan, and the TPB's June 16, 2021 action to exclude the I-270/I-495 HOT Lanes project removed the private revenues that supported that project, thus disrupting the fiscal constraint for the projects MDOT has submitted and as a result, MDOT would need to remove additional projects (transit and/or highway) projects to reestablish the fiscal constraint for its project submission; and

**WHEREAS,** since the June 21, 2021 MDOT notification of the unintended consequences of the June 16, 2021 action to exclude the I-270/I-495 HOT Lanes project from conformity inputs, which also affected other projects that MDOT was funding on account of the receipt of private funding, many TPB member jurisdictions form Maryland have expressed an interest to amend the Maryland project input list by restoring the I-270/I-495 HOT Lanes project and the private sector revenues associated with the project; and

**WHEREAS,** since the June 16, 2021 TPB action to exclude the I-270/I-495 HOT Lanes project from the conformity inputs, a number TPB member jurisdictions from Virginia have articulated the significant adverse impact this action will have on the performance outcomes from Virginia projects and the mobility/accessibility improvements it anticipated from the I-270/I-495 HOT lanes project, and have expressed an interest to amend the Maryland project input list by restoring the I-270/I-495 HOT Lanes project and the private sector revenues associated with the project; and

**WHEREAS,** MDOT notes that it substantially changed the scope of the I-270/I-495 HOT Lanes project as part of this round of conformity analysis by downgrading the proposed construction of HOT lanes on I-495 from the I-270 Spur to Woodrow Wilson Bridge so as to better coordinate this proposal with the local jurisdictions and notes that MDOT remains committed to work with all TPB member jurisdictions to better understand and address any outstanding concerns they may have with the current recommended preferred alternative (Phase 1 North and South); and

**WHEREAS,** MDOT is proposing to deliver Phase 1 of the I-270/I-495 HOT Lanes project fully with private funding through a public-private partnership (P3); and

**WHEREAS,** MDOT and Montgomery County are committed to deliver transit improvements through establishing and maintaining a collaborative, coordinated effort for developing the transit improvements during the predevelopment work of the Phase 1 P3 Agreement.

**NOW, THEREFORE, BE IT RESOLVED THAT:** the National Capital Region Transportation Planning Board amends the projects to be included in the air quality conformity analysis for the proposed 2022 Update to Visualize 2045 by adding Maryland's construction of the American Legion Bridge I-270 To I-70 Relief Plan - Phase 1 of the Traffic Relief Plan:

- Phase 1 South, starting in the vicinity of the George Washington Parkway in Virginia including the American Legion Bridge, provides two HOT lanes in each direction from I-495 to I-270 and then I-270 from I-495 to I-370, with an anticipated completion by 2025;

- Phase 1 North, a related part of the project that is in Pre-NEPA, constructs two HOT Lanes in each direction on I-270 from I-370 to I-70, with an anticipated completion by 2030; and

**NOW, THEREFORE, BE IT FURTHER RESOLVED THAT:**

1. MDOT, in accordance with commitments made at the Maryland Board of Public Works (BPW), will:

   a. Identify additional transit investments that will be fully developed through ongoing coordination with the affected counties;

   b. After financial close of the Phase 1 South Section P3 Agreement, MDOT will commit to fund not less than $60 million from the Development Rights Fee for design and permitting of high priority transit investments in the Montgomery County, such as Phase I of the Corridor Cities Transitway, Bus Rapid Transit in the MD 355 Corridor, or other high priority projects. MDOT will work collaboratively with Montgomery County to develop plans for construction, final delivery, and operation, funded through ongoing toll revenue;

   c. As Part of Phase 1 South, MDOT will commit to provide not less than $300 million of additional transit investment funding inclusive of the phase developer's proposed transit investment to implement high priority transit projects in Montgomery County. The funds will be provided over the operating term of Phase 1 South within a schedule developed through collaboration on a plan for the construction, final delivery, and operations of the project(s) in conjunction with the managed lane development and financing;

   d. Additionally, as mitigation and as part of Phase 1 South highway improvements, MDOT will construct new bus bays at Shady Grove Station; increase parking capacity at the Westfield Montgomery Park and Ride; provide the necessary bus fleet; and construct and equip the Metropolitan Grove Bus Operations and Maintenance Facility. These resources should be provided for use early in the construction period to support expanded local transit operations for the long term. MDOT will brief the TPB on these plans prior to TPB adoption of the updated Visualize 2045 Plan in 2022; and


e.  Additional and appropriately scaled transit investments will be made by MDOT for Phase 1 North to fulfill its commitment to complete major transit improvements concurrent with all sections of Phase 1. MDOT shall seek concurrence with the affected counties on these transit investments and will report to and brief TPB on these investments prior to TBP adoption of the inputs for the next Long Range Transportation Plan and air quality conformity analysis update expected in 2024.

2.  Only after this collaboration and completion of a Final Environmental Impact Statement and Record of Decision for a build alternative, would MDOT seek BPW approval of the Section Agreement for Phase 1 South or Phase 1 North.

**As revised and adopted by the Transportation Planning Board at its regular meeting on July 21, 2021**

TPB R15-2022
June 15, 2022

**NATIONAL CAPITAL REGION TRANSPORTATION PLANNING BOARD**
777 North Capitol Street, N.E.
Washington, D.C. 20002

**RESOLUTION APPROVING THE 2022 UPDATE TO THE VISUALIZE 2045 LONG-RANGE TRANSPORTATION PLAN FOR THE NATIONAL CAPITAL REGION AND THE FY 2023–2026 TRANSPORTATION IMPROVEMENT PROGRAM (TIP)**

**WHEREAS,** the National Capital Region Transportation Planning Board (TPB), as the federally designated metropolitan planning organization (MPO) for the Washington region, has the responsibility under the provisions of the Fixing America's Surface Transportation (FAST) Act, reauthorized November 15, 2021 when the Infrastructure Investment and Jobs Act (IIJA) was signed into law, for developing and carrying out a continuing, cooperative and comprehensive transportation planning process for the metropolitan area; and

**WHEREAS,** the Federal Planning Regulations of the Federal Transit Administration (FTA) and the Federal Highway Administration (FHWA) implementing the FAST Act, which became effective June 27, 2016, specify the development and content of the long-range transportation plan and of the transportation improvement program and require that it be reviewed and updated at least every four years; and

**WHEREAS**, on October 17, 2018, the TPB approved a new long-range transportation plan, called "Visualize 2045," that meets federal planning requirements, addresses the federal planning factors and goals in the TPB Vision and the Regional Transportation Priorities Plan, and included a new "Aspirational Element" as specified by TPB Resolution R8-2018; and

**WHEREAS,** the TIP is required by FHWA and FTA as a basis and condition for all federal funding assistance to state, local and regional agencies for transportation improvements within the Washington planning area and the TPB approved the FY 2021-2024 Transportation Improvement Program (TIP) on March 20, 2020, which was developed as specified in the Federal Planning Regulations; and

**WHEREAS,** on December 16, 2020, TPB staff issued a Technical Inputs Solicitation Submission Guide, which is a formal call for area transportation implementing agencies to submit technical details, including information necessary to perform the required air quality analysis of the 2022 Update to the Visualize 2045 long-range transportation plan, and for projects and programs to be included in the FY 2023-2026 TIP that will meet federal planning requirements, and will address the federal planning factors and goals in the TPB Vision and the Regional Transportation Priorities Plan; and

**WHEREAS,** the transportation implementing agencies in the region provided project submissions for the 2022 Update to Visualize 2045 and the FY 2023-2026 TIP, and the TPB Technical Committee and the TPB reviewed the project submissions at meetings in April, May, June and July 2021 meetings; and

1


**WHEREAS,** at its June and July 2021 meetings, the TPB approved the projects submitted for inclusion in the Air Quality Conformity Analysis of the 2022 Update to Visualize 2045 and the FY 2023-2026 TIP; and

**WHEREAS,** MDOT made certain transit commitments associated with the I-270/I-495 Traffic Relief Plan in Resolution R2-2022 and is required to brief the TPB on the transit commitments related to Phase 1 South of the I-270/I-495 Traffic Relief Plan; and the TPB will provide a formal statement for inclusion in the public docket of the FEIS for the I-270/I-495 Traffic Relief Plan referencing TPB's requirement that the transit commitments be met; and MDOT will report to TPB on the status of the transit commitments to Montgomery County bimonthly until a transit commitments agreement is reached with Montgomery County for Phase 1 South of the project; and

**WHEREAS,** on June 15, 2022, upon adopting on-road greenhouse gas reduction goals and strategies, to be appended to the 2022 Update to Visualize 2045; and

**WHEREAS,** on April 1, 2022, the draft FY 2023–2026 TIP was released for a 30-day public comment and inter-agency review period along with the draft 2022 Update to Visualize 2045, and the Air Quality Conformity Analysis; and

**WHEREAS,** the FY 2023-2026 TIP has been developed to meet the financial requirements in the Federal Planning Regulations; and

**WHEREAS,** during the development of the 2022 Update to Visualize 2045, the FY 2023-2026 TIP, and the Air Quality Conformity Analysis, the TPB Participation Plan was followed, and several opportunities were provided for public comment: (1) a 30-day public comment period on project submissions for the air quality conformity analysis of the 2022 Update to Visualize 2045 and the FY 2023-2026 TIP and the air quality conformity analysis scope of work was provided from April 2 to May 3, 2021; (2) the TPB Community Advisory Committee (CAC) was briefed on the project submissions at its April 15, 2021 meeting, (3) an opportunity for public comment on these submissions was provided at the beginning of the April, May, June and July 2021 TPB meetings; (4) on April 1, 2022 the draft 2022 Update to Visualize 2045, the FY 2023-2026 TIP, and the draft Air Quality Conformity Analysis were released for a 30-day public comment period which closed on May 1, 2022; (5) on April 6 and 7, 2022, a virtual open house was held where staff shared results of the plan analysis and provided an opportunity for questions and answers; (6) on April 14, 2022, a Public Forum was held on the development of the FY 2023-2026 TIP; (7) an opportunity for public comment on these documents was provided on the TPB website and on the Visualize 2045 website, and at the beginning of the April, May and June 2022 TPB meetings; and (8) the documentation of the 2022 Update to Visualize 2045, the FY 2023-2026 TIP, the Air Quality Conformity Analysis includes summaries of all comments and responses; and

**WHEREAS,** the TPB Technical Committee has recommended favorable action on the 2022 Update to Visualize 2045, the FY 2023-2026 TIP, and the Air Quality Conformity Analysis by the Board; and

2

**WHEREAS,** on June 15, 2022, the TPB passed Resolution R16-2022, determining that the 2022 Update to Visualize 2045, the FY 2023-2026 TIP conform with the requirements of the Clean Air Act Amendments of 1990; and

**WHEREAS,** the FY 2023-2026 TIP projects are consistent with the 2022 Update to Visualize 2045, and are selected in accordance with the Federal Planning Regulations; and

**NOW, THEREFORE, BE IT RESOLVED THAT** the National Capital Region Transportation Planning Board approves the 2022 Update to Visualize 2045 and the FY 2023-2026 Transportation Improvement Program.

Adopted by the Transportation Planning Board at its regular meeting on June 15, 2022

3

00000128



**MARYLAND DEPARTMENT OF TRANSPORTATION**

Office of the Secretary

Larry Hogan
Governor

Boyd K. Rutherford
Lt. Governor

Gregory Slater
Secretary

January 10, 2022

The Honorable Gabriel Albornoz
Council President
Montgomery County Council
100 Maryland Avenue
Rockville MD 20850

Dear President Gabriel Albornoz:

Thank you for your letter regarding the priority transit project related to the New American Legion Bridge I-270 to I-70 Traffic Relief Plan and moving forward with identification of the transit project. I appreciate the opportunity to respond.

The Maryland Department of Transportation (MDOT) is committed to advancing this project in collaboration with Montgomery County, ensuring the solutions are multi-modal and advancing transit systems as part of it that help achieve the regional land use goals. As part of the project and the public-private partnership (P3) delivery model, MDOT has committed to provide significant transit improvements and investment as part of the Phase 1 South of the project from vicinity of the George Washington Memorial Parkway in Virginia to I-370. The project itself will include a high-occupancy toll (HOT) lane network for the corridor that will provide new opportunities for reliable transit travel in the corridor that does not currently exist. Connections will be provided between the HOT lanes and roads South of I-370 near transit centers and local activity centers such as I-370, Wootton Parkway, and Westlake Terrace to improve access to transit and jobs.

In just the early project development, MDOT has committed to provide capital improvements for transit by providing new bus bays at the Shady Grove Metrorail Station, expanding parking capacity at the Westfield Montgomery Mall Transit Center, and constructing and equipping the Metropolitan Grove Bus Operation and Maintenance Facility including providing the necessary bus fleet. While these capital improvements need to be further developed with Montgomery County and other stakeholders, our current estimate for these improvements is $200 to $250 million. Additionally, we are currently working with the Virginia Department of Transportation (VDOT) on additional transit funding commitments for the American Legion Bridge corridor to support interstate transit operations.

7201 Corporate Center Drive, Hanover, Maryland 21076  ·  410.865.1000  |  888.713.1414  |  Maryland Relay TTY 410.859.7227  ·  mdot.maryland.gov

---

The Honorable Gabriel Albornoz
Page Two

As part of the P3 delivery, MDOT is also committed to funding not less than $60 million from the upfront payment for Phase 1 South to support the design and permitting of Montgomery County's high priority transit projects, such as the Corridor Cities Transitway, bus rapid transit in the MD 355 corridor, or other high priority projects. The MDOT is also committed to continuing to work collaboratively with Montgomery County and other stakeholders to develop plans for construction, operation, and final delivery of this transit project in conjunction with the managed lane development and financing. During the operating term of Phase 1 South, MDOT will commit $300 million of transit service investment inclusive of the Phase Developer's transit commitment. The total transit investment by MDOT for Phase 1 South is estimated between $560 and $610 million, not including any additional funding committed by MDOT and VDOT for interstate transit in the American Legion Bridge corridor.

We agree it is important that we have collaboration between MDOT, Montgomery County, the City of Rockville, and the City of Gaithersburg. The MDOT will move forward with establishing a work group with these parties. We will reach to each stakeholder to identify its representative and request that you provide the Montgomery County Council's designee for this work group. Additionally, an investment to support these coordination activities will be included in MDOT's Final Fiscal Year 2022 to 2027 Consolidated Transportation Program (CTP) to be released later this month.

Thank you again for contacting me. We look forward to partnering with Montgomery County to advance new travel options and opportunities for our citizens. If you have any additional questions or concerns, please feel free to contact Jeffrey T. Folden, P.E., DBIA, MDOT State Highway Administration (MDOT SHA) I-495 and I-270 P3 Office Deputy Director, at 410-637-3321 or jfolden1@mdot.maryland.gov. Mr. Folden will be happy to assist you.

Sincerely,

Gregory Slater
Secretary

cc:    The Honorable Jud Ashman, Mayor, City of Gaithersburg
        The Honorable Marc Elrich, County Executive, Montgomery County
        Montgomery County Councilmembers
        The Honorable Bridget Donnell Newton, Mayor,l City of Rockville
        Ms. Holly Arnold, Administrator and CEO, MDOT Maryland Transit Administration
           (MDOT MTA)
        Jeffrey T. Folden, P.E., DBIA, Director, I-495 and I-270 P3 Office, MDOT SHA
        Tim Smith, P.E., Administrator, MDOT SHA  Ms. Kate Sylvester, Acting Deputy
           Administrator and Chief Planning, Programming, and Engineering Officer, MDOT MTA

00000129

**MARYLAND TRANSIT OPPORTUNITIES COALITION (BENJAMIN ROSS)**



**Maryland Transit Opportunities Coalition**

5 Lochness Court, Rockville MD 20850
TransitForMaryland@gmail.com

July 11, 2022

Ms. Polly Trottenberg, Deputy Secretary
U.S. Dept. of Transportation
1200 New Jersey Ave. SW
Washington, DC 20590

Subject: I-495 & I-270 Managed Lanes Study
    Evidence of scientific fraud in FEIS traffic model

Dear Ms. Trottenberg:

As you know, on June 17 FHWA and the Maryland DOT issued a Final Environmental Impact Statement for the I-495 & I-270 Managed Lanes Study. This project now awaits a Record of Decision.

Last October 18, we wrote to FHWA Administrator Pollack pointing out errors in the traffic model presented in the SDEIS. The FEIS acknowledges that our criticisms "have merit," and in response the FEIS presents new traffic forecasts that are substantially different.

However, the FEIS offers no explanation of what was wrong with the SDEIS model or how the errors were corrected. Moreover, when input and output data and documentation were requested from MDOT, the agency replied that the inquiry would be treated as a Public Information Act request (Maryland's version of FOIA) and no data would be provided in time to review the FEIS.

Examination of the FEIS traffic modeling technical appendix raises even greater concerns. Anomalies in the FEIS traffic forecasts create serious doubt whether the new traffic forecasts could have been generated by correcting previous errors and suggest possible falsification of model outputs.

The clearest evidence we have found of possible scientific fraud is in the modeling of the 2045 No-Build alternative. Changes occur from the SDEIS to the FEIS in patterns that are inconsistent with correction of errors in model inputs, coding, or numerical methods, but would be consistent with arbitrary adjustment of intermediate or final outputs.

**Response:**
The concerns and claims raised in your letter regarding MLS final traffic forecasts and modeling results are not based in fact and appear to be based on a misunderstanding of how data was updated and refined between publication of the Supplemental Draft Environmental Impact Statement (SDEIS) and publication of the FEIS and its supporting documents. The Federal Highway Administration (FHWA) and the Maryland Department of Transportation State Highway Administration (MDOT SHA) followed accepted practices and processes for considering how project design refinements or other relevant new information would impact traffic forecasts. FHWA and independent experts from the USDOT Volpe Center have reviewed the traffic analyses and indicated the modifications between the SDEIS and the FEIS meet a professional standard of care and did not find scientific integrity fraud. FHWA's concluding memorandum, the Volpe Center's Information Memorandum, and MDOT SHA's response memo to questions in the Volpe Information Memorandum are attached at the end of this response.

As explained below, the analysis reflected in the FEIS is sound. The FEIS discloses the changes that were made to the traffic forecasts and analysis between the time the SDEIS and FEIS were published. Refer to FEIS, Chapter 4, and FEIS Appendix A. The differences highlighted in your letter focus on the detailed support materials included in the FEIS appendices. The changes that caused some of the detailed results to differ between the SDEIS and FEIS are the consequence of several different factors, which are generally performed in the ordinary course of NEPA reviews by technical traffic forecasting professionals between the availability of a draft and final document. These factors include: (1) responding to public comments/questions; (2) updating modeling based on refinements to the alternatives analysis and/or identification of the preferred alternative; (3) reviewing or "validating" previous modeling results prior to publication of an FEIS.

MDOT SHA team carefully reviewed comments from the public and stakeholders and we appreciated the input provided. Some comments requested MDOT SHA review the data from the SDEIS to ensure its reliability and others requested refinements to the Preferred Alternative. It is best practice to review and double-check data outputs based on those changes and to refine modeling to reflect the most recent facts available to the agency. As described below, MDOT SHA determined that certain details within the overall results needed to be refined as a result of the refinements to the Preferred Alternative.

Finally, routine reviews and checking of the modeling results was performed following publication of the SDEIS. That process is designed to further validate modeling results and to resolve any perceived anomalies in traffic forecasting data. As described below, MDOT SHA pinpointed some very narrow concerns and modified a small number of data inputs to be as accurate as possible.

As described, MDOT SHA updated its analysis as a result of these factors. It would have been inconsistent with best practice if traffic modeling results from the SDEIS did NOT change in some ways. Ultimately, the issues identified and then resolved by MDOT SHA in the FEIS did not fundamentally alter the results within the six key metrics or the overall conclusions of the study related to the performance of the Preferred Alternative.

Ms. Polly Trottenberg, July 11, 2022                                    Page 2

For example, the predicted evening rush-hour travel time from Connecticut Avenue to I-95 on the Beltway Inner Loop is 15 minutes faster in the FEIS than in the SDEIS. The travel time from Rock Spring Park to I-95 is half an hour faster. Yet, in the two reports, the number of vehicles exiting the Inner Loop onto I-95 is *exactly identical* in each of the four pm peak hours, 3:00 to 4:00, 4:00 to 5:00, 5:00 to 6:00, and 6:00 to 7:00.

A basic principle of traffic modeling is that drivers tend to choose the fastest route from trip origin to destination. In a model, as in real life, large changes in travel times from southwestern Montgomery County's two major job centers would induce some drivers to change their travel routes. Traffic volumes on the ramp from the Inner Loop to I-95 cannot stay the same, yet that is what the FEIS says.

We have found numerous other anomalies of similar nature. These are described in the attachment to this letter.

President Biden's January 27, 2021 Memorandum on Restoring Trust in Government Through Scientific Integrity and Evidence-Based Policymaking states that:

> It is the policy of my Administration to make evidence-based decisions guided by the best available science and data..... Scientific findings should never be distorted or influenced by political considerations.

The memorandum instructs agencies to "prevent the suppression or distortion of scientific or technological findings, data, information, conclusions, or technical results."

In accordance with this policy, USDOT should take steps to ensure that the Record of Decision for the I-495/I-270 Managed Lane Study is not based on data manipulated to achieve a pre-determined outcome. We request an independent examination to ensure the veracity of the traffic modeling data that undergird this major policy decision. At a minimum, the modeling report should receive an independent peer review.

The Task Force established to implement the President's Memorandum, in its January 2022 report, called for "Increasing Transparency to Support Scientific Integrity." It explained that transparency can "help deter violations of scientific integrity policies and detect them when they occur by making sure relevant information is readily available to all who can use it."

We thus request the release of the data files and documentation of the FEIS model so that outside experts can examine them and comment prior to issuance of the ROD. We also request that MDOT identify the errors in the SDEIS and explain how the model was altered to correct them in the FEIS.

---

**Traffic Metrics:**

The major findings reported in Chapter 4 of the FEIS related to the six key traffic metrics identified at the beginning of the NEPA process, with input from stakeholders and the public. These metrics were used in evaluating the alternatives and they did not change throughout the Study:

1. Average Speed in General Purpose Lanes
2. Average Delay per Vehicle (System-wide)
3. Travel Time Index (TTI)
4. Level of Service (LOS)
5. Throughput
6. Local Network Delay

The table below shows a comparison of the results for each of these six key metrics for the Preferred (Selected) Alternative presented in the SDEIS and the FEIS.

| Key Traffic Metric | | Results Presented in SDEIS | Results Presented in FEIS |
|---|---|---|---|
| Average Speed (GP Lanes) | No Build | 24 mph | 24 mph |
| | Build | 29 mph | 28 mph |
| Average Delay Savings | AM Peak | 18% | 13% |
| | PM Peak | 32% | 38% |
| TTI (GP Lanes Average) | No Build | 2.36 | 2.0 |
| | Build | 2.01 | 1.8 |
| Percent of Segments Failing (LOS F) | No Build | 41% | 40% |
| | Build | 29% | 28% |
| Throughput (veh/hr) | No Build | 15,600 | 15,700 |
| | Build | 17,600 | 17,700 |
| Local Network Delay | Build Savings | 3.5% | 3.5% |

As shown in the table, the results presented in the FEIS for all key metrics were **either the same as reported in the SDEIS or very similar.** In all cases, the Preferred Alternative performed better than the No Build Alternative in the SDEIS and FEIS with a similar magnitude of benefits. This demonstrates that the changes made between the SDEIS and FEIS did not fundamentally alter the overall findings of the traffic study.

00000131


Ms. Polly Trottenberg, July 11, 2022                                                                            Page 3

Key aspects of the environmental analysis – among them whether the Preferred Alternative satisfies the Purpose and Need, air and noise pollution, and whether the project will help or harm Environmental Justice populations – are dependent on the traffic model. An independent inquiry into the scientific integrity of that model is needed before a Record of Decision is issued.

Sincerely,

Benjamin Ross, Chair
Maryland Transit Opportunities Coalition

cc:    Stephanie Pollack, FHWA Acting Administrator
       Dr. Faris Ibrahim, USDOT member of Scientific Integrity Fast-Track Committee
       Senator Ben Cardin
       Senator Chris Van Hollen
       Rep. Jamie Raskin
       Rep. Anthony Brown
       Peter Shapiro, Chair, Prince George's County Planning Board
       Casey Anderson, Chair, Montgomery County Planning Board

The following addresses your specific concerns:

**Travel Forecasting Response:**

The traffic volume forecast was refined between the SDEIS and FEIS based on a review of the post-processed model forecasts to confirm that the no build and build travel trends were in alignment with the Metropolitan Washington Council of Governments (MWCOG) model trends, identified post-pandemic and post-SDEIS. The following bullets explain the refinements:

- Some roadway design changes were made to the Preferred Alternative between the SDEIS and FEIS that were incorporated into the MWCOG model. These changes included the addition of at-grade exchange ramps for ingress and egress between the high-occupancy toll (HOT) lanes and general purpose lanes in both directions along the I-270 west spur and consolidation of the exchange ramps along I-495 between Virginia and Maryland in the vicinity of the George Washington Memorial Parkway, as noted on page 3-7 of the FEIS.

Trend-check spreadsheets were developed, which are a series of comparisons between MWCOG model volumes and the post-processed/balanced forecasted volumes for the daily and peak hour scenarios. The trend reviews/comparisons included the following: (1) growth rates between existing versus future year scenarios and no build versus build scenarios for all mainline and arterial roadway segments within the study area, and (2) comparing the proportions of average daily traffic that occurs during the peak periods. The trend-checks spreadsheets were also used to help identify locations that were showing growth rates that are either higher or lower than typical levels of growth, so that those locations could be reviewed to determine if the growth rates in the post-processed forecasted volumes were reasonable and explainable (e.g., development growth, diversions to parallel routes, shifts between general purpose versus managed lanes, etc.). The forecasting process incorporated assumptions and volume projections from prior studies as noted in FEIS Appendix A (e.g., Greenbelt Metro station), which were further refined in the FEIS forecasts, as discussed in the next bullet.

- In the SDEIS model, the traffic volumes in the Greenbelt area were showing significantly higher growth between existing and future compared to the MWCOG model trends. This increase was likely due to the process which was based on MWCOG trip tables being assigned to the VISUM model network, with additional trips from the Greenbelt Metro Station added on top. While this is not an uncommon practice, it resulted in forecasted volumes that well exceeded the capacity of the roadway. Therefore, in the FEIS, both the no build and build forecasts in the Greenbelt Metro Station area were reduced to better align with MWCOG model trends along both the interstate and the crossroads.

  As part of post processing efforts, traffic adjustments related to the Greenbelt area were made based on the appropriate origins and destinations – and therefore only impacted certain ramps and movements. After post-processing, additional trend checks were used to ensure growth trends aligned with the regional travel demand model. After the forecasting adjustments were completed, and validated against MWCOG model trends for the FEIS, the VISSIM model was updated and rerun. MDOT SHA did not add traffic on specific ramps in the forecast without rerunning the model to obtain updated results. The adjustments impacted the AM and PM forecasts on the I-495 Inner Loop, including through movements from Virginia and major ramp volumes.

### Evidence of Possible Scientific Fraud in Toll Lane Traffic Model

On October 18, 2021, MTOC, CABE, and DontWiden270 wrote to FHWA Administrator Stephanie Pollack regarding errors in Maryland DOT's traffic model for the I-270/I-495 toll lane project. This letter was also submitted as a formal comment on the SDEIS.

The FEIS, issued June 17, concedes (buried on page 828 of Appendix T) that the letter's criticisms of the model "have merit" and that changes were made in response:

> Finally, comments questioning certain throughput figures presented in the SDEIS, Appendix A have been determined to have merit. While that Appendix presents over 1,500 figures (in Attachment G), these comments identified minor anomalies in that data that we re-evaluated in the course of preparation of the FEIS and supporting technical reports. Updated throughput tables are presented in the FEIS (Appendix A, sub-appendix G) and have addressed the concerns identified. Overall, the throughput results summarized in Section 3.3.5 of the SDEIS which were used to evaluate the Preferred Alternative to the No Build Alternative follow expected trends, and the minor data corrections do not impact the overall conclusions presented.

However, the FEIS fails to identify the cause of the errors in the SDEIS model or describe the changes that were made. In addition, MDOT refuses to let expert outside reviewers see the input and output data files while the Record of Decision is pending. Consequently, there can be no confidence that the model has been fixed correctly, and the results in the FEIS continue to lack demonstrated validity.

Moreover, comparison of model results from the SDEIS and FEIS technical appendices reveal new anomalies. The changes in the reported results for the 2045 No-Build model are inconsistent with correction of errors in model inputs, coding, or numerical methods and consistent with arbitrary adjustments of intermediate or final outputs made to obtain a desired result.

A basic concept of traffic modeling is that drivers tend to choose the fastest route from the origin of each trip to its destination. In the models as in real life, if traffic on a highway moves faster, drivers will switch to it from other routes. The FEIS model results violate this principle.

Connecticut Avenue (Beltway exit 33) and Rockledge Drive (I-270 exit 1B) are the main access points to the Beltway for eastbound traffic from the two major employment centers in southwest Montgomery County, Bethesda/NIH/Walter Reed Medical Center and Rock Spring Park. Predicted evening rush-hour travel times from these interchanges to the

-1-

**Location Specific Response:**

- As noted in the responses above, trend-checks were completed to confirm that the FEIS forecast trends matched the MWCOG model trends. The SDEIS Build forecasts were updated and refined at the noted 9 interchanges to better reflect the differences that were shown in the MWCOG model for the Build and No-Build scenarios. For example, at the noted US 29, MD 193, MD 650, I-95, US 1, MD 201, MD 295, and MD 450 interchanges MWCOG showed less than 1% difference between the No-Build and Build scenarios, and the MWCOG showed approximately 1.5% decrease at the US 50 interchange. The FEIS forecast was updated to reflect these trends.

- The travel time results are reflective of less congestion on the Inner Loop through the Greenbelt area, which no longer spilled back into the west side of the Beltway, as discussed above. The demand volume for the I-495 Inner Loop to Northbound I-95 ramp in the PM peak was not impacted by the Greenbelt Metro Station area reductions. As a result, the no build volumes did stay the same between the SDEIS and FEIS for this movement. However, the SDEIS to FEIS build ramp volumes increased to better reflect the MWCOG trends between the no build and build. Overall, mainline I-95 volumes decreased between the no build and build, which is a trend that is consistent with the MWCOG model results.

- The crossroad forecasts discussed starting on page 2 of your letter were refined to better align with MWCOG trends between the no build and build in response to SDEIS comments. The volume differences between the SDEIS and FEIS shown on page 3 of the letter are small – generally less than 100 vehicles per hour difference and will not have any significant impact on the overall results and conclusions. Generally, volumes were adjusted at spot locations to better reflect MWCOG trends in the FEIS forecasts. This was done to more closely align with existing to No-Build trends and No-Build to Preferred Alternative trends from the travel demand models. These adjustments were made outside of the travel demand model runs – this is considered post-processing, a common industry-wide practice used to develop traffic volume forecasts. As volume adjustments at one location may impact an upstream or downstream location in the system, additional forecast refinements were needed at select locations to result in a balanced system that still aligned with MWCOG model trends.

For example, the FEIS forecasts were updated at the MD 295 interchange:

- Traffic reductions for Ramp 5, Ramp 8, and MD 295 (Northbound outside the Beltway and Southbound inside the Beltway) were directly related to the Greenbelt area adjustments.

- Traffic increases for Ramp 7 and MD 295 (Southbound outside the Beltway) were indirectly related to the Greenbelt area adjustments. This was necessary to maintain target trends between existing and future year scenarios based on MWCOG results.

The MD 295 SB volume changed from 4080 in the SDEIS to 4015 in the FEIS, a decrease of 65 vehicles, not 75 as shown on page 4 of the letter. Rather than the 15 vehicles stated on page 5, the discrepancy between this volume and the change at Ramp 8 is only 5 vehicles, which can be attributed to rounding. Volume imbalances were noted in the diagrams for the MD 201 interchange. Upon review, it was discovered that the Ramp 2 intersection volumes for the northbound through movement are shown incorrectly on the diagram due to a referencing error in the Excel spreadsheet. The 1275, 1415, 1515, and 1120 values should be 1195, 1340, 1440, and 1040. Note that the imbalance was a mistake/typo on the diagrams only and the imbalance does not exist in the actual model files or results.

Beltway junction with I-95 dropped drastically from SDEIS to FEIS – from 38 to 23 minutes from Connecticut Avenue and 67 minutes to 37 minutes, a full half-hour, from Rockledge Drive. Yet, as the first table shows, the traffic volume on the ramp from the eastbound Beltway to I-95 is *exactly identical* in each of the four evening peak hours.

With such large differences between the two models in predicted travel time, the algorithm *must* reassign some trips took other routes in the SDEIS model to the eastbound Beltway (the Inner Loop) in the FEIS model. Some commuting trips will switch from the I-270-ICC route to the Beltway-I-95 route; some long-distance trips headed north from Virginia will switch between the east and west sides of the Beltway, etc. These reassignments may well be counteracted by other changes in the model, but it is next to impossible that the changes would exactly cancel out in each of four different hours.

Predicted No-Build pm traffic volumes exiting eastbound I-495 onto I-95

| Time | SDEIS | FEIS |
|------|-------|------|
| 3:00-4:00 | 3655 | 3655 |
| 4:00-5:00 | 3605 | 3605 |
| 5:00-6:00 | 3600 | 3600 |
| 6:00-7:00 | 3865 | 3865 |

This is only one of many such anomalies that emerge when the SDEIS and FEIS are compared.

One clearly erroneous prediction by the SDEIS traffic model was a pattern of "widespread decline in traffic headed out of Washington toward the northeast during the evening rush hour... if the Preferred Alternative is built, compared to no-build." This was obviously wrong; widening I-270 and the American Legion Bridge will not reduce traffic toward Annapolis on US 50. The same error appeared on 7 other interchanges between US 50 and US 29.

The second table, copied from our October 18 letter, lists the SDEIS-model-predicted differences between the Build and No-Build alternatives in traffic headed outbound from the 9 interchanges in this sector. Traffic on each highway is measured on the segment immediately past the ramps on the outside of the Beltway.

SDEIS model-predicted change in outbound rush hour traffic

| Highway | No. of Vehicles | Percentage Change |
|---------|-----------------|-------------------|
| US 29 | −340 | −2.9% |
| MD 193 | −190 | −2.6% |
| MD 650 | −395 | −3.8% |
| I-95 | +530 | 1.6% |
| US 1 | −950 | −12.8% |
| MD 201 | −1,090 | −15.9% |
| MD 295 | −1,395 | −9.9% |
| MD 450 | −35 | −0.3% |
| US 50 | −1,230 | −4.1% |

In the FEIS model, the 8 interchanges that formerly showed a decrease in outbound traffic volume now show essentially unchanged traffic volumes (within 1%) between the Build and No-Build alternatives. (I-95 now shows a decline of 550 vehicles, or −1.7%, rather than an increase.)

-2-

**Traffic Analysis Simulation Model response:**

The same base VISSIM simulation models from the SDEIS were used in the FEIS. The FEIS models had the same limits, used the same version of VISSIM software, evaluated the same time periods, and included the same driver behavior inputs as the models developed for the SDEIS. The results presented in the FEIS differ because of the following refinements made to the simulation models between the SDEIS and FEIS.

- The demand volumes were updated to match the refined forecasts described in the previous section. This applied to both the no build and build models. The forecast adjustments in the Greenbelt area impacted the travel time results reported in the FEIS because there was less congestion on the Inner Loop through the Greenbelt area, which no longer spilled back into the west side of the Beltway. Because this change was related to background development, it affected both the No Build results and the Build results. While both the No Build and Build travel times reduced in the FEIS, the net difference between No Build and Build remained approximately the same and therefore this change did not fundamentally alter the overall benefits of the Preferred Alternative reported originally in SDEIS Chapter 3 and updated in FEIS Chapter 4.

- The geometry of the Preferred Alternative was updated in the build model to reflect the latest roadway alternative designs summarized in Chapter 3 of the FEIS.

- Coding changes were made to address discrepancies in the results at a few locations identified during review of SDEIS public and agency comments. The following changes made were:

  o Fixing signal timing on MD 121 in the no build model,

  o Updating the vehicle routing through the collector-distributer roads within the Arena Drive interchange to be consistent between the no build and build models,

  o Updating the vehicle routing of HOVs using the Outer Loop in the PM no build model to provide a congestion pattern more consistent with the calibrated existing conditions model, and

  o Updating the vehicle routing through the express and local lanes within the I-295 interchange approaching the Woodrow Wilson Bridge to provide more consistent results between the no build and build for AM Inner Loop speeds between US 50 and MD 337.

- Travel times for the PM Outer Loop trip towards the American Legion Bridge (ALB) increases in the FEIS, compared to the SDEIS. This change is due to the correction of a coding error in the SDEIS No Build VISSIM PM peak model that was identified and corrected during development of the FEIS. The issue was related to the routing of HOVs traveling from the top side Outer Loop to I-270 northbound, which caused severe congestion on the Outer Loop approaching the east spur to I-270 by sending too many vehicles north towards I-270 and not enough along the Outer Loop towards the ALB. This change did not significantly alter the overall network-wide results for the No Build Alternative, but rather shifted some of the congestion from one area to another. Therefore, the coding issue was not initially apparent when reviewing the overall findings presented in the SDEIS. Upon closer review of the SDEIS models following the comment period, this issue was identified and corrected. This change affected the travel times in the No Build PM model in a couple of locations. Travel times on the top side Outer Loop approaching Connecticut Avenue decreased between the SDEIS and the FEIS, while travel times on the west side Outer Loop approaching the ALB increased between the SDEIS and the

Let us examine in more detail how the predicted outbound traffic changed in and around these 8 interchanges from the SDEIS No-Build model to the FEIS No-Build model.

On US 29, MD 193, MD 650, and US 1, the two reports predict exactly identical traffic volumes outside the Beltway for each of the four hours, while the traffic volumes on the same road inside the Beltway are smaller in the FEIS than in the SDEIS. (The difference is less than 1% on US 29, MD 193, and MD 650, and 2% to 3% on US 1.) On I-95, which only exists outside the Beltway, predicted traffic volumes are identical.

On MD 201, MD 295, MD 450, and US 50, this pattern is reversed. The two reports predict exactly identical traffic volumes inside the Beltway for each of the four hours, and the traffic volumes outside the Beltway are smaller in the FEIS than in the SDEIS. The decreases are 6% or 7% at MD 201 and much smaller at the other three interchanges. To illustrate these patterns, the SDEIS- and FEIS-predicted traffic volumes on US 1 and MD 201 for the four pm rush-hour intervals are shown in the adjoining table.

This is not how the model should behave. Under conditions of pervasive traffic congestion – a safe assumption near the Beltway during the pm rush hour – an increase in traffic volumes on any stretch of highway will cause additional delay. This, in turn, will cause some drivers to switch to alternative routes.

Thus, if the FEIS model run puts fewer drivers on northbound MD 201 north of the Beltway, it will predict that some drivers switch to MD 201 from other highways. In other words, removing northbound vehicles from MD 201 north of the Beltway will induce an increase in predicted northbound traffic on that road south of the Beltway. Changes elsewhere in the model might counteract that effect, but it is extremely unlikely that independently determined changes in traffic volume would add up exactly to zero in each of four hours. And essentially impossible for that to occur at each of eight interchanges.

This pattern could, however, arise from ad hoc alteration of model outputs for the purpose of generating a desired conclusion. For example, the Greenbelt Metro Interchange,

**Predicted No-Build pm traffic volumes**

| Time | Inside Beltway | | Outside Beltway | |
|------|------|------|------|------|
| | SDEIS | FEIS | SDEIS | FEIS |
| **MD 201 - Northbound** | | | | |
| 3:00-4:00 | 2160 | 2160 | 1700 | 1595 |
| 4:00-5:00 | 2410 | 2410 | 1755 | 1645 |
| 5:00-6:00 | 2490 | 2490 | 1905 | 1795 |
| 6:00-7:00 | 2185 | 2185 | 1515 | 1405 |
| **MD 201 - Southbound** | | | | |
| 3:00-4:00 | 2330 | 2255 | 2065 | 2065 |
| 4:00-5:00 | 2660 | 2575 | 2370 | 2370 |
| 5:00-6:00 | 2820 | 2520 | 2640 | 2640 |
| 6:00-7:00 | 2325 | 2220 | 2330 | 2330 |
| **US 1 - Northbound** | | | | |
| 3:00-4:00 | 1790 | 1760 | 1775 | 1775 |
| 4:00-5:00 | 1935 | 1895 | 1900 | 1900 |
| 5:00-6:00 | 2280 | 2235 | 2115 | 2115 |
| 6:00-7:00 | 1850 | 1795 | 1625 | 1625 |
| **US 1 - Southbound** | | | | |
| 3:00-4:00 | 1845 | 1845 | 1645 | 1640 |
| 4:00-5:00 | 1805 | 1805 | 1690 | 1675 |
| 5:00-6:00 | 1890 | 1890 | 1870 | 1850 |
| 6:00-7:00 | 1795 | 1795 | 1755 | 1725 |

FEIS.  But as noted above, the overall No Build travel times and delays were not significantly affected by the change.  This coding change was applied to the No Build model only, and therefore did not affect the Build results.

The changes refined the analysis in response to public, stakeholder, and agency comments and did not fundamentally alter the overall findings of the MLS.

It should be noted that the No-Build MWCOG models were not changed – the only changes in the No-Build forecast were done in the post-processing steps for the Greenbelt interchange area (as discussed previously). In reference to comments made in the MTOC letter for MD 201 as an example, the demand volumes along MD 201 Northbound (outside the Beltway) were adjusted as part of the Greenbelt area reductions, which were done in the post-processing step. However, demand volumes along MD 201 Northbound (inside the Beltway) were not impacted by the Greenbelt area reductions. The movements directly impacted by the Greenbelt area reductions are movements with origins/destinations to the Greenbelt area, based on the trip tables within the MWCOG model.

Your letter questions how the results for the no build and build could be different on the east side of I-495, including at the US 50 and Baltimore-Washington (B/W) Parkway interchanges, if no capacity improvements are proposed in this section as part of the Preferred Alternative.  The following two bullets address the question:

- A review of the VISSIM simulation model results presented in the FEIS for the I-495 Outer Loop PM peak shows a slight improvement in operations between MD 5 and I-95 under build conditions.  The reason for this improvement is due to the reduced traffic demand in this section (approximately 2 percent reduction) related to changes in regional traffic patterns that are affected by the Preferred Alternative.

- Under no build conditions, through traffic between Virginia and Maryland is more likely to use the east side of I-495, US 50, and B/W Parkway to avoid the severe congestion at the American Legion Bridge.  Under build conditions, some of these regional trips would be expected to shift to the west side of I-495, as shown in the MWCOG model outputs and reflected in the FEIS forecasts.

-3-

00000135


mentioned briefly on page 4-1 of the FEIS, might have been incorporated into the FEIS No-Build alternative results by adding traffic on some but not all Beltway ramps, without rerunning the model. We have not identified any other reasonable explanation of this pattern of changes in predicted traffic volumes from SDEIS to FEIS, and MDOT certainly has not offered any.

Predicted vehicle movements within the interchanges exhibit anomalous patterns as well. Not only do the northhbound and southbound traffic volumes on each cross highway change between SDEIS and FEIS on only one side of the Beltway, but the hourly changes in traffic on the highway typically are equal to the changes on a single ramp. Traffic volumes on the other ramps of the interchange are mostly unchanged, with a few small changes of 5, 10, or at most 15 vehicles per hour.

The Baltimore-Washington Parkway (MD 295) interchange provides a clear example of this. The figure shows evening rush-hour traffic volumes from the SDEIS modeling[1] with changes from SDEIS to FEIS listed beneath in red. Where there are no red numbers, the SDEIS and FEIS numbers are identical.



The change in traffic on northbound MD 295 outside the Beltway exactly matches the change in traffic entering from Ramp 3; there is no change in through traffic or on the other three connecting ramps. The change in southbound traffic approaching the Beltway exactly matches the change in traffic on ramp 7 onto the eastbound Beltway. The change

in southbound traffic beyond the interchange matches the change in traffic on Ramp 8 from the eastbound Beltway in 3 of 4 one-hour intervals; there is a 15-vehicle discrepancy in the 3:00-4:00 hour.

A column of erroneous numbers in the FEIS chart for the MD 201 interchange gives further support to the hypothesis that numbers were generated by ad-hoc adjustments. The northbound traffic volume exiting the interchange (the column labeled NB) should equal the traffic turning right off Ramp 2 (WBR) plus the northbound through traffic at the Ramp 2 intersection (NBT). The numbers do not add up because the numbers shown for the through traffic are incorrect.[2] The discrepancies for the four hours are 80, 80, 80, and 75. An error of this nature could easily be made by someone adjusting previously obtained results by hand, but would be unlikely to arise in the output of a regional traffic model.

These anomalies come on top of MDOT's failure to explain the changes made to correct admitted errors in the modeling and its resistance to release of input and output data files. It is impossible to rely on the FEIS traffic modeling report for any purpose, pending a thorough inquiry that rules out the possibility of scientific fraud, identifies the errors in the SDEIS model, and demonstrates that the modeling errors have been corrected.

---

[1] The times of the four hourly intervals are incorrectly labeled as 6-7A, 7-8A, 8-9A, and 9-10A in numerous evening peak figures for the No-Build Alternative in both SDEIS and FEIS.

-4-

---

[2] That the error is in the through traffic, and not the turning traffic or the sum, can be verified by adding up traffic volumes on the other legs of the interchange, which are shown in the FEIS figure from which this detail was taken.

-5-


*MTOC Response Attachment 1: FHWA Memorandum*



U.S. Department
of Transportation

**Federal Highway
Administration**

# Memorandum

| | |
|---|---|
| Subject: **ACTION:** Maryland Transit Opportunities Coalition July 1, 2022 Evidence of Scientific Fraud in the FEIS Traffic Model Letter | Date: August 22, 2022 |
| From: Gregory Murrill Division Administrator Baltimore, Maryland | In Reply Refer To: HAD-MD |
| To: File | |

  Consistent with the National Environmental Policy Act (NEPA) 40 CFR §1500 et seq., as implemented by Federal Highway Administration (FHWA) at 23 CFR §771 et seq., FHWA considered all substantive comments received between publication of the Final Environmental Impact Statement (FEIS) and Record of Decision (ROD).  Thus, on July 11, 2022, Maryland Transit Opportunities Coalition (MTOC) transmitted a letter to the Department of Transportation (DOT) with an attachment entitled "Evidence of Possible Scientific Fraud in Toll Lane Traffic Model."  As a result of MTOC's comments, FHWA, as the lead federal agency, engaged DOT/Volpe Center (Volpe) to conduct an independent review of the issues raised in MTOC's comments.  Volpe is a resource providing world-renowned multidisciplinary, multimodal transportation expertise on behalf of DOT, other federal agencies, and external organizations.  In completing the independent review, DOT/Volpe Center reviewed the Supplemental Draft Environmental Impact Statement Chapter 3 Traffic, (SDEIS), SDEIS Appendix A (Traffic Evaluation Memorandum: Alternative 9 - Phase 1 South), FEIS Chapter 4 Traffic and FEIS Appendix A Traffic Analysis Tech Report regarding traffic modeling.  In addition, Volpe reviewed all the other comments in the letter from MTOC. Volpe did not find scientific integrity fraud in the Toll Lane Traffic Model.  Volpe attributed most of the differences between the traffic modeling results for the project reported in the SDEIS and FEIS in minor changes in the analyses conducted for those two documents and inherent limitations of the modeling process used by Maryland Department of Transportation (MDOT) (the project sponsor) to analyze the project's impacts on traffic volumes and travel times.  Attached are the results of the independent review conducted by Volpe.

2

FHWA provided the MDOT the opportunity to respond to the both the MTOC letter and the results of the independent review by Volpe.  Also attached is additional information from the MDOT providing clarification of the information contained in the SDEIS and the FEIS.

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study | Case 8:22-cv-02597-DKC    Document 56-1    Filed 10/30/23    Page 138 of 144

RECORD OF DECISION

*MTOC Response Attachment 2: USDOT Volpe Center Memorandum*



# Memorandum

**Subject:** **INFORMATION: I-495 & I-270 Managed Lanes Study, review of MTOC comments and proposed response**

**Date:** August 15, 2022

**From:** Don Pickrell and Scott Smith

**Reply to Attn. of:** V-320

**To:** Gloria Shepherd
Associate Administrator for Planning, Environment and Realty, FHWA

**Thru:** Gregg Fleming
Director,
Policy, Planning, and Environment Technical Center

The following documents were reviewed:
1. Letter from Benjamin Ross, Chair, Maryland Transit Opportunities Coalition to Polly Trottenberg, July 11, 2022, including attachment entitled "Evidence of Possible Scientific Fraud in Toll Lane Traffic Model"
2. Proposed response to MTOC ("MTOC Letter Follow-Up," August 9, 2022)

Our focus was on differences between the traffic modeling results reported for 2045 under the No-Build and Preferred ("Build") alternatives in the SDEIS and FEIS. We do not have an opinion on the merits of the project.

As part of this review, we consulted the following publicly available documents:
1. Sections of the Supplemental Draft Environmental Impact Statement (SDEIS), dated October 2021 and downloaded on 11 August 2022
   a. Chapter 3, Traffic
   b. Appendix A, Traffic Evaluation Memo
2. Sections of the Final Environmental Impact Statement (FEIS), dated June 2022 and downloaded on 11 August 2022
   a. Chapter 4, Traffic
   b. Appendix A, Traffic Evaluation Memo

Findings:

1. Differences in projected traffic volumes and travel times on selected roadway segments between the SDEIS and FEIS appear to result from three main sources:
   a. Minor changes in the modeled representation of the road and highway network mostly outside the immediate area of the project, which affect the baseline VISSIM calibration of link-level traffic volumes under the No-Build alternative (see p. 6 of proposed response to MTOC)
   b. Minor changes in the representation of the Preferred or Build Alternative in the MWCOG[1] regional travel demand model network (pp. 4-5 of the proposed response to MTOC, referring to FEIS p. 3-7)

_____
1 Metropolitan Washington Council of Governments

---

I-495 & I-270 Managed Lanes Study, review of MTOC comments and proposed response

   i. Addition of at-grade ramps for ingress and egress between the high-occupancy toll (HOT) lanes and general-purpose lanes in both directions along the west spur of I-270
   ii. Consolidation of exchange ramps along I-495 between Virginia and Maryland in the vicinity of the George Washington Memorial Parkway
   c. Reconciliation process of forecast travel volumes from the MWCOG regional travel demand model with those used in localized VISSIM modeling of traffic volumes, particularly in area approaching the METRO Greenbelt Station. This process, which inherently entails manual adjustment of forecast volumes, presumably affects the traffic simulation results for both the no-Build and Build alternatives.

2. These adjustments to the modeled representation of the highway network and to forecast travel volumes produced different results in the traffic modeling conducted for the SDEIS and FEIS, as follows:
   a. Overall differences in average daily traffic volumes under the No-Build alternative reported in the SDEIS and FEIS, which are a proxy for regional travel demand patterns, are generally minor (see Differences in demand section, below)
   b. In some locations, overall trip volumes were identical in the SDEIS and FEIS, which could explain the identical volumes on many individual network links in the detailed traffic simulations conducted for the two documents
   c. Although differences in modeled overall travel demand and simulated link-level traffic volumes are generally minor, these could nevertheless lead to significant differences in modeled travel times on specific links, as the area is highly congested during peak travel periods and delay increases non-linearly as traffic volumes grow.

3. Detailed simulations of traffic volumes on individual network links are generally conducted using fixed traffic volumes produced as part of the traffic assignment stage of a larger-scale, less detailed regional travel demand model as inputs. Because these detailed simulations generally do not entail rerouting of trip flows assigned by the regional demand model, they can sometimes predict changes in delay without accompanying changes in traffic volumes. This is a limitation of detailed traffic simulation modeling that can be addressed by repeated "iterative" solution of a regional travel demand model and the traffic simulation models used for more detailed analysis of localized traffic patterns and travel times, but this process is time-consuming, resource-intensive, and it may be difficult to reconcile the differing temporal and spatial resolutions of the two models.
   a. Some traffic simulation results reported in the SDEIS showed extremely high localized delays on individual links near the project area, under both the No-Build and Build alternatives. While in practice some traffic would be expected to re-route around these areas to avoid encountering extreme delays, the traffic simulation model cannot by itself produce this expected result, and the modeled delays were not adjusted manually in an effort to replicate such "real world" behavior.
   b. In response to the changes described in item 1 above, traffic simulation reported in the FEIS show significantly lower delays on these same facilities. Conspicuously, the changes incorporated in the FEIS modeling reduce delays to seemingly more realistic levels under both the No-Build and Build alternatives (see Congestion results section, below), so avoiding the extreme delays evident in the SDEIS modeling is *not* claimed to result from implementing the Build alternative.

4. Major road improvement projects can often affect the performance of other area roads outside their immediate area. While these are often beneficial – for example, moving traffic from a congested arterial to a freeway where the project indirectly improves performance – adverse impacts are also possible, such as worsening bottlenecks on roads carrying additional traffic toward the freeway.

15 August 2022          2

**I-495 & I-270 Managed Lanes Study, review of MTOC comments and proposed response**

    a. The SDEIS modeling apparently provided an example of worsening bottlenecks, where failing to adjust signal timing at intersections on a roadway carrying increased traffic to the major route the project would affect resulted in extreme queueing and delays.

    b. To identify these impacts and understand their sources, it is often necessary to feed the traffic volumes and travel times estimated by the more detailed traffic simulation model back to a model that offers the capability to change trip routings in response to resulting changes in the travel times used as the basis for the initial route assignments, such as the VISUM routing model or the MWCOG model.

    c. As indicated above, the process described in 4b is often a complex and time-consuming effort, given the differences in these models' temporal resolution of daily travel demand and in the detail with which they represent the road network. It appears that this feedback step was not part of the analysis conducted for the FEIS (See FEIS Appendix A, Figure 2-11: Modeling Methodology).

    d. Both the SDEIS and the FEIS presented detailed traffic volume and delay modeling for the local network in the project area (see SDEIS Table 3-13 and FEIS Table 4-11), which consistently showed the preferred alternative leading to a reduction in delay on arterial streets in the surrounding area. While this result seems plausible, it is unclear how it was obtained – was it the product of feeding travel times initially estimated by the traffic simulation model into a routing-type model (or even into the larger MWCOG regional model) and using the adjusted routings it produced to revise the traffic simulation results, or of some other process? Furthermore, the reported changes in local network delays are identical in the SDEIS and FEIS, suggesting that whatever process generated this result in the SDEIS analysis was not revised as part of the more recent FEIS modeling.

5. We could not find a detailed explanation of the adjustments to projected future travel demands that were made between the SDEIS and FEIS (see 1.c. above), so we cannot assess their plausibility or validity.

6. MTOC makes two major points in its letter that MD SHA should probably address in detail as part of its response letter.

    a. Predicted evening rush-hour travel times on the Beltway from Connecticut Avenue (exit 33) and Rockledge Drive (exit 1B) eastbound to its junction with I-95 dropped by 15 and 30 minutes from the SDEIS to the FEIS, but traffic volumes on the ramp from the eastbound Beltway to I-95 during each of the four evening peak hours are identical in the SDEIS and FEIS. Some re-routing of both evening commute and through trips would have been expected to occur in response to such large changes in travel time, and while it's possible that such responses did occur, it's unlikely that they would have left travel volumes unaffected.

    b. Differences between the No-Build and Build alternative in outbound traffic volumes on some (4 out of 8) routes carrying traffic from DC toward the northeast during the evening rush hour changed from the SDEIS to the FEIS in ways that are difficult to reconcile with the changes in travel speeds the project is expected to produce. In addition, the Build vs. No-Build differences in traffic volumes on ramps connecting these routes with the Beltway changed between the SDEIS and FEIS in ways that seem inconsistent with the expected impact of the project on through and connecting traffic at those interchanges.

**I-495 & I-270 Managed Lanes Study, review of MTOC comments and proposed response**

Differences in demand

*Table 1 ADT: differences between the SDEIS (Table 3-2 and 3-3) and FEIS (Table 4-2)*

| Corridor | Segment | Existing (2017) | SDEIS (2045 Projected) | | FEIS (2045 Projected) | |
|---|---|---|---|---|---|---|
| | | | No-Build | Build | No-Build | Build |
| I-270 | I-370 to MD 28 | 226,000 | 274,000 | 277,000 | 270,000 | 284,000 |
| | MD 28 to I-270 Spur | 259,000 | 308,000 | 311,000 | 299,000 | 320,000 |
| I-495 | American Legion Bridge | 243,000 | 285,000 | 309,000 | 280,000 | 306,000 |
| | MD 190 to I-270 Spur | 253,000 | 289,000 | 317,000 | 283,000 | 318,000 |
| | Between I-270 Spurs | 119,000 | 129,000 | 135,000 | 126,000 | 136,000 |
| | MD 355 to I-95 | 235,000 | 256,000 | 267,000 | 250,000 | 253,000 |
| | I-95 to US 50 | 230,000 | 248,000 | 250,000 | 248,000 | 250,000 |
| | US 50 to MD 214 | 235,000 | 256,000 | 258,000 | 256,000 | 258,000 |
| | MD 214 to MD 4 | 221,000 | 249,000 | 251,000 | 249,000 | 251,000 |
| | MD 4 to MD 5 | 198,000 | 223,000 | 224,000 | 223,000 | 224,000 |

The detailed no-build travel demands SDEIS (Appendix A, page 118) and FEIS (Appendix A, page 737) are similar, but not identical, consistent with the summarized comparison in Table 1.

Congestion results

There are some extremely high travel time indices (calculated as the ratio of peak-period to off-peak travel time) in the SDEIS, with significant differences in the PM Peak.

*Table 2 Selected travel time indices, from SDEIS (Table 3-8) and FEIS (Table 4-5)*

| PM Peak Hour | SDEIS (2045 Projected) | | FEIS (2045 Projected) | |
|---|---|---|---|---|
| Segment | No-Build | Build | No-Build | Build |
| Inner loop VA193 to I-270 | 6.6 | 6.9 | 3.8 | 4.0 |
| Inner loop I-270 to I-95 | 4.8 | 3.0 | 2.8 | 2.4 |

Modeled travel times are contained in Table 2 (p 10) in SDEIS appendix A, and Table 5-2A in FEIS Appendix A.

00000139



I-495 & I-270 Managed Lanes Study

**RECORD OF DECISION**

---

*MTOC Response Attachment 3: MDOT SHA Response to USDOT Volpe Center*

**MEMORANDUM**



Options & Opportunities for All

---

**DATE:** August 18, 2022

**TO:** FHWA

**FROM:** Jeffrey Folden
Director, I-495 & I-270 P3 Office
MDOT SHA

I understand you would like a response to "Findings" 6. a. and 6. b. from memorandum dated August 15, 2022, from the Volpe Center to the Federal Highway Administration with the subject "INFORMATION: I-495 & I-270 Managed Lanes Study, review of MTOC comments and proposed response":

**Section 6a:**

Memorandum Comment

Predicted evening rush-hour travel times on the Beltway from Connecticut Avenue (exit 33) and Rockledge Drive (exit 1B) eastbound to its junction with I-95 dropped by 15 and 30 minutes from the SDEIS to the FEIS, but traffic volumes on the ramp from the eastbound Beltway to I-95 during each of the four evening peak hours are identical in the SDEIS and FEIS. Some re-routing of both evening commute and through trips would have been expected to occur in response to such large changes in travel time, and while it's possible that such responses did occur, it's unlikely that they would have left travel volumes unaffected.

Response

The concern regarding predicted evening rush-hour travel times was addressed on page 7 of the MTOC Letter Follow-Up dated August 9, 2022, but additional detail/clarification is provided below:

The changes to the travel time results between the SDEIS and FEIS for evening rush hour travel times on the Beltway from Connecticut Avenue and Rockledge Drive eastbound to its junction with I-95 are the result of less congestion on the entire Inner Loop approaching the Greenbelt area during the evening rush hour in both the no build and build models in the FEIS. Upon review of the SDEIS models following the comment period, it was determined that the Greenbelt forecast projections were not consistent with the MWCOG model trends and therefore needed to be adjusted. The volumes serving the background development at the Greenbelt Metro Interchange were reduced accordingly for both the no build and build condition during development of the FEIS.

These changes did not affect the project traffic demand for vehicles traveling from the eastbound Beltway to I-95 because only trips with origins and destinations within the Greenbelt Metro Interchange (located approximately 2.5 mile east of the I-95 exit) were adjusted (see below graphic). However, it did affect the travel times for trips between Connecticut Avenue and Rockledge Drive eastbound to I-95 because congestion on the Inner Loop through the Greenbelt area no longer spilled back as far into the top side of the Beltway once the forecasting changes were applied for the FEIS. While both the No Build and Build travel times reduced in the FEIS, the net difference between

1

---

**MEMORANDUM**



Options & Opportunities for All

---

no build and build remained approximately the same and therefore this change did not fundamentally alter the overall benefits of the Preferred Alternative reported originally in SDEIS Chapter 3.



**Section 6b:**

Memorandum Comment

Differences between the No-Build and Build alternative in outbound traffic volumes on some (4 out of 8) routes carrying traffic from DC toward the northeast during the evening rush hour changed from the SDEIS to the FEIS in ways that are difficult to reconcile with the changes in travel speeds the project is expected to produce. In addition, the Build vs. No-Build differences in traffic volumes on ramps connecting these routes with the Beltway changed between the SDEIS and FEIS in ways that seem inconsistent with the expected impact of the project on through and connecting traffic at those interchanges.

Response

Trend-checks were completed to confirm that the FEIS forecast trends matched the MWCOG model trends. The Build forecasts were updated for the FEIS and reconciled to better reflect the differences that were shown in the MWCOG model for the Build and No-Build scenarios. However, the volume differences between Build and No Build are small – generally less than 100 vehicles per hour difference and will not have any significant impact on the overall results/conclusions. For example, at the noted US 29, MD 193, MD 650, I-95, US 1, MD 201, MD 295, and MD 450 interchanges, the MWCOG model showed less than 1% difference between the No-Build and Build scenarios, and the MWCOG model showed approximately 1.5% decrease at the US 50 interchange. The FEIS forecast was updated to reflect these trends. Related to changes in travel speeds, there was no feedback between the VISSIM traffic speeds and the MWCOG model which generates the forecasted demand volumes inputted into the VISSIM model.

2

---

00000140

**PETER JAMES**



To whom do I make a formal request for a new supplimental EIS statement for the OP Lnaes project

Peter <peter@ccaway.net>
To  SHA OPLANESP3                          ↩ Reply   ↩ Reply All   → Forward   •••
                                                    Tue 6/21/2022 1:19 AM
ⓘ We removed extra line breaks from this message.

Op Lanes Project Manager,

To my knowledge MDOT has not studied personal rapid transit (PRT) as an alternative.

My request to meet with Secretary Potts to discuss this alternative was recently denied.

Peter James

301 916-5722

**Response:**

While a personal rapid transit (PRT) alternative, which uses automated vehicles on a network of fixed guideways, was not specifically considered, it is similar in concept to other standalone transit alternatives that were considered during the Study. These standalone transit alternatives which also included fixed guideways such as separated lanes or rail, were found to not meet the Study's Purpose and Need.

During the alternatives development process, several standalone transit alternatives were considered but were dismissed from further consideration based on a number of factors, the most significant of which was the inability of standalone transit to address long-term traffic growth along only I-495 and I-270. No standalone transit alternative would be able to attract and carry sufficient ridership to address the severe congestion on I-495 and I-270, and would not accommodate Homeland Security. It would be anticipated that a PRT alternative with limited capacity of three to six passengers per automated pod, would also be unable to carry sufficient ridership to address long-term traffic needs. A PRT alternative would likely have very limited ability to improve the movement of goods and services as movement of freight or services that require vehicular movement (i.e., truck freight carriers, mechanical, electrical, services, etc.) would not be addressed with a PRT alternative.

Although standalone transit alternatives were found to not meet the Study's Purpose and Need, multiple transit elements have been incorporated into the Study to address the multimodal and connectivity needs in the study area as a complement to the congestion relief offered by the proposed highway improvements. These include allowing toll-free bus transit use of the high-occupancy toll managed lanes to provide an increase in speed of travel, assurance of a reliable trip, and connection to local bus service/systems on arterials that directly connect to urban and suburban activity centers. For a discussion of the standalone transit alternatives considered in the Study refer to DEIS, Appendix B, as well as FEIS, Chapter 7, Section 9.3.2.B.

A PRT vehicle is also similar to a connected and automated vehicle, which was considered in the traffic analysis for the Study. MDOT SHA participates in a statewide CAV working group (https://mva.maryland.gov/safety/Pages/MarylandCAV.aspx) to stay up to date on the latest research and industry projections. The analysis found that at this time, there are too many unknowns regarding how CAVs could affect demand and capacity to include CAVs directly in the traffic forecasts. Capacity will likely increase as vehicle spacing decreases, but the magnitude of the capacity increase is difficult to quantify based on the current research. Also, the benefits of more vehicles per lane may be offset by a potential increase in demand on the transportation network for some types of auto trips, including "mobility as a service" trips (people that could call an autonomous vehicle for a solo trip, rather than owning their own car) and "deadhead" trips (trips where the autonomous vehicle is empty, traveling to a parking lot or to the next pickup point). For a discussion on connected and automated vehicles refer to FEIS, Chapter 4, 4.1.3.G and FEIS, Appendix A.

Regarding the Section 4(f) Evaluation, due to the presence of linear, mostly north-south oriented, Section 4(f) properties adjacent to I-495 and I-270 it is unlikely that the implementation of a PRT alternative would avoid all Section 4(f) property impacts, as the PRT alternative would still require physical space for a fixed guideway. In consideration of a feasible and prudent alternative, as stated on page 149 of the Draft Section 4(f) Evaluation, DEIS Appendix F: A *feasible and prudent avoidance alternative* is one that avoids using any Section 4(f) property and does not cause other severe problems of a magnitude that substantially outweigh the importance of protecting the Section 4(f) property (23 CFR 774.17). In assessing the importance of protecting Section 4(f) properties, it is appropriate to consider the relative value of the resource to the preservation purpose of the statute. The preservation purpose of Section 4(f) is described in 49 U.S.C. § 303(a), which states: "It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites."

An alternative is not *feasible* if it cannot be built as a matter of sound engineering judgement.

An alternative is not *prudent* if:

00000141



July 16, 2022

Mr. Jeff Folden, I-495 & I-270 P3 Program Deputy Director
I-495 & I-270 P3 Office
707 North Calvert Street, Mail Stop P-60
Baltimore Maryland, 21202
MLS-NEPA-P3@mdot.maryland.gov

Mr. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
jitesh.parikh@dot.gov

**Re: Request for new supplemental environmental impact study and Comments on I-495 & I-270 Managed Lane Study Final Environmental Impact Statement and Updated Draft Section 4(f) Evaluation**

On June 17, 2022, the Federal Highway Administration and the Maryland Department of Transportation State Highway Administration (the "Agencies") issued a final environmental impact statement ("DEIS") for the I-495 and I-270 Expansion Project ("Project").

Section 4(f), now codified at 23 U.S.C. § 138 and 49 U.S.C. § 303, prohibit FWHA from approving the use of any parkland and other lands if a feasible and prudent avoidance alternative is available.

Dynamic Personal Rapid Transit, also known as Personal Rapid Transit(PRT) is such a feasible and prudent avoidance alternative.

Per U.S.C. § 771.130 Supplemental environmental impact statements.

"(a) A draft EIS, final EIS, or supplemental EIS may be supplemented at any time. An EIS must be supplemented whenever the Administration determines that:

(1) Changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or

(2) **New information or circumstances relevant to environmental concerns and bearing on the proposed action** or its impacts would result in significant environmental impacts not evaluated in the EIS."

In 2021, The California cities of Pittsburg, Brentwood, Oakley, and Antioch, along with East Contra Costa Transit Authority (ECCTA), Contra Costa Transportation Authority (CCTA), and Contra Costa County approved the "**East Contra Costa Dynamic Personal Micro Transit Feasibility study report**".

It compromises the project to a degree that is unreasonable to proceed with the project in light of its stated Purpose and Need;

It results in unacceptable safety or operational problems;

It causes severe social, economic, or environmental impacts even after reasonable mitigation; severe disruption to established communities; severe disproportionate impacts to minority or low income populations; or severe impacts to environmental resources protected under other Federal statutes;

It results in additional construction, maintenance, or operational costs of an extraordinary magnitude;

It causes other unique problems or unusual factors; or

It involves multiple factors above that while individually minor, cumulatively cause unique problems; or impacts of extraordinary magnitude.

As a PRT alternative would likely not meet the Study's Purpose and Need, mainly addressing existing and long-term traffic growth, it would not be considered a feasible and prudent alternative for the Managed Lanes Study.

00000142


Because some portion of PRT guideway vehicles can also been driven on surface roads, PRTs support both the travel demand most automobile occupants while supplying the best benefits of transit.

It is assumed that MCDOT and FHWA have concluded that:

- no "feasible and prudent avoidance alternative exists as the mode of conventional transit alternatives to do not provide adequate access to the travelers in the study area.
- The 2045 project traffic flow was significantly improved by the preferred alternative virus the no build alternative(see comment).

I found no evidence that personal rapid transit was included in any the the previous studies.

Elevated autonomous PRT guideways would use 1% of the land area of the preferred alternative.

A PRT alternative would not only eliminate the 82.8 acrea right of way requirement but could so reduce traffic on the existing lanes, two to four lanes could be removed and reclaimed for park or recreation and other public uses.

As PRTs use electric vehicles and can be powered by solar roofs, air qualify and impacts on Forest Canopy are eliminated.

These factors substantiate that PRTs are a "feasible and prudent avoidance alternative" and that therefore FHWA is prohibited from providing a Record f Decision without first conducting a supplimental

Comments:

The FEIS claims the prefered alternative will support 2000 more vehicles per hour than the no-build alternative in 2045.

This projection ignores the impact of emerge autonomous vehicles. San Francisco and Pheonix have approve fully autonmus taxi service in their cities. It is more likely than not that, autonomous vehicles will be fully deployed by 2045.

With 23 years of improvements like quantum computing, self driving vehicles provide optimal a near mix of shared and private use and traffic flow.

The advance of "de-materialzation" and the fact that cars no longer crash will reduce the weight and size of passenger vehicles from several thousand pounds to a few hundred pounds.

Together with the reduced vehicle footprints and headways, passenger throughout can be 15 times that current traffic on the same 12 foot highway lane.

Previous a stated goal of the Managed Lanes project was to enhance public saftey by providing fast mass evacuation in the case of public emergence. With a potential of 15 times the capacity on the existing I-270 footprint, large scale evacuation become possible.

*This page is intentionally left blank.*

One of the first PRTs built in 1975 in Morgantown, WV has nt had a single crash in 47 years.

Maryland has a Vision Zero law professing to design its highways to eliminate deaths and serious injuries by 2030 on its higheays. PRTs are the nly proven transportation mode that has achieved this goal.

Respectfully submitted,

Peter James

19204 Gatlin Dr

Gaithersburg, MD 20879

301 916-5722

*This page is intentionally left blank.*