**FRIENDS OF MOSES HALL**



Friends of Moses Hall
7550 Seven Locks Road
Cabin John, Maryland 20818
morningstarmosescj@gmail.com
www.friendsofmoseshall.org

July 15, 2022

Mr. Jeffrey T. Folden, P.E., DBIA
Maryland Department of Transportation
State Highway Administration, I-495 & I-270 P3 Office
707 North Calvert Street, Mail Stop P-601
Baltimore, MD 21202

Mr. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza, Suite 1520
Baltimore, MD 21201

Re:  Final Environmental Impact Statement and
     Final Section 4(f) Evaluation for the I-495 & I-270 Managed Lanes Study
     Morningstar Moses No. 88 Cemetery and Hall Site, Cabin John, Montgomery County, Maryland

Dear Messrs. Folden and Parikh:

Friends of Moses Hall has reviewed the I-495 & I-270 Managed Lanes Study Final Environmental Impact Statement (FEIS) and Final Section 4(f) Evaluation that was released June 17, 2022. We understand that there is no formal public comment period following release of the FEIS; however, during our June 13 consulting party meeting with the Federal Highway Administration (FHWA) and Department of Transportation State Highway Administration (MDOT SHA), we were told that comments on the FEIS would be accepted and considered. This letter is to share our ongoing concerns that the FEIS fails to meet the requirements of the National Environmental Policy Act (NEPA).

As emphasized in our previous letters to Secretary Buttigieg and to the Advisory Council on Historic Preservation (provided as attachments), MDOT SHA's failure to look for burials in the project's Limits of Disturbance (LOD) before issuing the FEIS and the upcoming Record of Decision (ROD) is an egregious and potentially very harmful violation of the agency's Section 106 and 4(f) obligations.

We state for the record that we are not in agreement with MDOT SHA's or the Maryland Historical Trust's deferral of the determination of effects to Morningstar Moses Cemetery and Hall site. We also state our non-concurrence with the Final Programmatic Agreement (PA), a governing document that greatly impacts the descendants of those buried at the Morningstar Moses Cemetery and other community stakeholders. Further, we have no idea at this point whether our comments and proposed revisions to the Cemetery Treatment Plan, a document required by the PA and of utmost importance to Morningstar Moses' descendant family members, will be adequately addressed.

Saved t

**Response:**

In accordance with the National Environmental Policy Act (NEPA), the Federal Highway Administration (FHWA) as the lead federal agency and the Maryland Department of Transportation State Highway Administration (MDOT SHA) as the co-lead agency, prepared the updated analyses in the FEIS after considering input from many stakeholders.  The Preferred Alternative was identified after reviewing all comments on the Draft Environmental Impact Statement (DEIS) and further refined after publication of the Supplemental DEIS (SDEIS) and review of additional stakeholder input, including input from the Friends of Moses Hall and those with interest in this community and its resources.  The analyses presented in the FEIS, including those addressing environmental justice and visual impacts, were *final* evaluations and determinations that were made in consideration of the comments received on the *draft* analyses presented in both the DEIS and SDEIS.  Your comments in the July 15, 2022 letter were carefully considered prior to issuance of the Record of Decision (ROD).

Concurrently, FHWA and MDOT SHA, along with the Maryland Historical Trust and Advisory Council on Historic Preservation, finalized the Programmatic Agreement (PA) in compliance with Section 106 of the National Historic Preservation Act (NHPA) of 1966, for which the Friends of Moses Hall was a consulting party.  Development and finalization of the DEIS, SDEIS, FEIS and the Section 106 PA were done in close coordination and consultation with numerous stakeholders, the public, and multiple local, state, and federal agencies over a four-year period.  During that time, FHWA and MDOT SHA provided extensive opportunity for public and stakeholder review and input into all aspects of the National Environmental Policy Act (NEPA) and Section 106 processes.  This input led to identification of the Preferred Alternative that significantly minimized and avoided impacts to sensitive resources, including the Morningstar Tabernacle No. 88 Moses Hall and Cemetery.  Based on additional investigations and consultation with the Friends of Moses Hall, agencies, and other stakeholders, MDOT SHA was able to avoid all direct impacts to the current historic Morningstar Tabernacle No. 88 Moses Hall and Cemetery boundary, including all known or suspected burials as identified through field investigation.  We remain committed to the additional investigation and evaluation of the cemetery as described in the PA.

To date, MDOT SHA has conducted a reasonable and good faith effort to identify interments using noninvasive methods of surface survey and ground penetrating radar (GPR) within the known cemetery as well as adjacent right-of-way.  Regarding your request for additional GPR, in the final report for the Morningstar property attached to the FEIS, Dr. Tim Horsley determined the remaining areas along the current highway and adjacent to the cemetery have significant impediments for conducting further meaningful GPR work and have a limited potential for identifying further possible burials **(FEIS Cultural Resources Technical Report Vol. 9, Appendix G, p 15-16).**  Nonetheless, in the draft treatment plan shared with the Friends of Moses Hall, MDOT SHA has committed to attempt additional GPR work in this area and share the results with appropriate consulting parties including the Friends of Moses Hall, before using any invasive methods to identify potential burials in these low-probability areas adjacent to, but outside the known cemetery boundary.  As affirmed by the Advisory Council on Historic Preservation per their letter rejecting your request for a pre-decisional referral to the Council on Environmental Quality (CEQ) and consistent with 36 CFR 800.14(b), the PA provides an ongoing, legally binding mechanism to continue consultation, continue evaluating effects to historic properties as additional evaluation and design information is developed, as well as provides a mechanism to resolve adverse effects and disputes.

The principal legal flaw in the FEIS as it relates to our concerns is the treatment of cumulative impacts in a way that is contrary to regulation or reason. Moreover, the behavior of MDOT SHA in relation to mitigation at the Morningstar Moses site belies an arbitrary and capricious approach to engaging with the policy issues that are present.

MDOT SHA and FHWA's stated intention is to maintain its unprecedented argument that the consideration of cumulative impacts does not include adverse impacts prior to 1970 or 1966, regardless of whether those earlier adverse impacts were caused by the same agency and the same infrastructure.[1] As we have previously indicated, NEPA requires consideration of cumulative impacts where repeated actions, over time, have accreted to impacts for resources. MDOT SHA's lack of familiarity with the fact that there is no pre-1970 cut-off and that cumulative impacts relate to both past and present action indicates a severely flawed analysis.

The record on the issue of cumulative impacts is clear. MDOT SHA's predecessor agency, in a time of racial discrimination and mass eviction for the benefit of urban renewal and highway construction, improperly incorporated a Black burial site into its highway project. In 1992, it widened the highway without appropriate consideration of the impacts to this site, which NEPA would have required.

We note that the potential for impacts to burials from the Preferred Alternative has not been ruled out due to insufficient ground penetrating radar (GPR) survey that has conducted. We submitted comments to MDOT SHA's proposed Cemetery Treatment Plan on May 2, 2022. Since we have not yet received a response to these comments, we wish to share for the record our Cemetery Treatment Plan comment letter attached hereto.

We once again emphasize that the area of the current MDOT SHA right-of-way where graves are indicated has already been subjected to significant ground disturbance from construction and earth-moving when I-495 was original constructed and again when the highway was widened in the 1990s. Additionally, decades of stormwater runoff, as well as highway use and maintenance, have further impacted burials. The new potential impact to burials is a very serious additional cumulative impact, which is on top of the other cumulative impacts including visual effects, noise, air pollution, stormwater runoff, and the environmental injustice of the original Beltway construction through this community resulting in decades of subsequent harm.

MDOT SHA and FHWA have formally acknowledged in the FEIS that the original construction of I-495 negatively impacted the historic African American community of Gibson Grove in Cabin John; however, our stakeholder community takes issue with the agencies' lack of transparency and inadequate community engagement as to equitable mitigation of cumulative effects. The mitigation commitments to the First Agape AME Zion Church appear to have been made before either Morningstar Moses descendants or the Cabin John community was included in Section 106 stakeholder discussions, and we are confused by the agencies' last-minute attempt in the FEIS to put duct tape on cumulative effects considerations and environmental justice by suggesting, in their responses to Draft Environmental Impact Statement (DEIS) and Supplemental Draft Environmental Impact Statement (SDEIS) comments, that the Section 106 mitigation commitments to the First Agape AME Zion Church property adequately address cumulative impacts to the Morningstar Moses site or the historic Gibson Grove community. This is the first time that Friends of Moses Hall or the community of Cabin John is hearing that mitigation of direct impacts to the church property is how MDOT SHA intends to mitigate cumulative impacts to the Morningstar Moses Cemetery site and is inappropriate given that these are two separate resources that are not co-located. And none of the proposed commitments address the Moses Hall site itself, but only features around it.

MDOT SHA and FHWA's arbitrary and capricious approach to impacts has been a common theme through this process. As we have previously noted, MDOT SHA has taken a different public and private face in relation to appropriate mitigations. On September 9, 2021, *The Washington Post* ran a story covering MDOT SHA's efforts

---

[1] MDOT SHA expressed this position in a January 4, 2021 presentation on Section 106 effects and in the May 2022 Draft #3 Section 106 comment responses.

The MDOT SHA and FHWA properly evaluated the Preferred Alternative's potential for cumulative effects, including at the Morningstar Cemetery. In conducting this analysis, MDOT SHA has acknowledged that the early 1960s construction of I-495 and other aspects of the Eisenhower Interstate System caused disruption to the Gibson Grove community and other communities, particularly communities of color. Indeed, these types of community impacts formed the historical context and impetus for passage of NEPA and NHPA. The MDOT SHA, during years of extensive research (discussed in more detail below), has not identified any evidence that I-495 construction in the 1960s impacted burials at Morningstar Cemetery. That research assisted MDOT SHA in determining whether the MLS proposed action would contribute to cumulative effects to the Morningstar properties and related resources in the context of past, present, and reasonably foreseeable actions as required by the NEPA CEQ regulations.

To provide further detail supporting the FEIS conclusions, MDOT SHA confirmed that in 1992, construction work was performed on I-495. This work was done within the median of I-495 near this area and avoided impact to the cemetery property. As documented in the SDEIS and FEIS, and as concluded in the ROD, the Selected Alternative avoids impacts to the cemetery property as well as to the area of the MDOT SHA owned right-of-way adjacent to the cemetery property where there could be the potential for unmarked graves. Lastly, our review did not identify any reasonably foreseeable future projects in the vicinity of the cemetery. We also note that based on commitments included in the ROD and PA, established in part based on coordination with stakeholders with interest in the Morningstar resource, the Selected Alternative will provide several benefits to the property by reducing stormwater and noise effects over existing conditions.

The MDOT SHA and FHWA also evaluated the potential for indirect effects including visual, noise, and vibration. This information was presented to and discussed with Friends of Moses Hall in January 2022. A noise barrier is proposed along the cemetery boundary that will reduce the current noise level by half. The MDOT SHA has also committed to designing the barrier in a context sensitive manner with options including vegetation screening, artistic form liner panels, and/or memorial plaques commemorating the names of known and unmarked interments. No aspects of the property were determined to be at risk from vibration.

Regarding drainage concerns on the cemetery, MDOT SHA has completed drainage investigations and various assessments of other complaints regarding current damage or disrepair to the cemetery. It was determined that these concerns were not caused by MDOT SHA's current highway operations.

At this time, MDOT SHA and FHWA have taken significant measures to avoid all known impacts to the property for the MLS and have not identified impacts that require mitigation. The MDOT SHA and FHWA are committed to developing and implementing the cemetery treatment plan identified in the Section 106 PA and implementing additional investigations, out of an abundance of caution, to identify any human remains and archaeological potential near the cemetery within the ROD limits of disturbance. The MDOT SHA will continue to offer the Friends of Moses Hall opportunities to consult and accommodate reasonable requests as the treatment plan is developed and implemented. Under the terms of the PA, if the results of the investigations provide additional information suggesting impacts are possible, then MDOT SHA will continue efforts to avoid such impacts and mitigate if impacts are unavoidable.

00000146


to avoid impacts/effects to the Morningstar site.[2] In that story, Julie M. Schablitsky, chief archaeologist for the Maryland Department of Transportation, stated, "'We own the faults of the Maryland Roads Commission impacting the community 60 years ago...It's our responsibility to repair the damage and come in and do the right thing.'" Yet on January 4, 2022, MDOT SHA concluded that it did not have to consider cumulative effects to the site because "impacts to the Gibson Grove community occurred with original I-495 construction, prior to the passage of NEPA and NHPA (Section 106)."[3] We note our strong concern that a press event was developed, without Friends of Moses Hall's (FMH) involvement, that may have misled stakeholders about the true level of commitment of MDOT SHA to address potential impacts to the site.

We also note that two additional issues raised by FMH were not appropriately resolved through the NEPA process. In both the DEIS and the SDEIS, MDOT SHA and FHWA failed to appropriately evaluate environmental justice and visual impact issues. Regarding environmental justice, MDOT SHA did not complete a disproportionate impact analysis in either draft document. The disproportionate impact analysis is the fundamental heart of an Environmental Justice analysis. To not provide it is to not adequately evaluate Environmental Justice under EO 12898. Providing this analysis only in the FEIS is to have deprived the public of the ability to evaluate the Environmental Justice impacts of the project and is therefore contrary to NEPA. Similarly, the visual impacts analysis was deferred to the FEIS. The visual impact analysis is fundamental to an understanding of actual visual impacts. To only provide in the FEIS is again to deprive the public of the ability to evaluate one form of impacts of the project. Again, doing so was also contrary to NEPA.

We also take issue with unequivocal statements in the FEIS that "all direct and indirect impacts to Moses Hall Cemetery completely [sic] avoided" while simultaneously deferring an effects determination. We take offense to MDOT SHA's statement that the agency is "gifting [emphasis ours] land owned by MDOT SHA with potential graves back to Trustees of Moses Hall Cemetery." We maintain that where there are currently identified "probable" – not just "potential" – graves should never have been taken for the I-495 highway right-of-way in the first place. Returning them to their descendants is not a "gift" but an obligation.

The approach to the Morningstar site through the NEPA/Section 106 process is contrary to NEPA and its implementing regulations and has deprived the site from receiving appropriate and reasonable mitigation that it deserves after decades of mistreatment from Maryland's highway agencies. We remind FHWA of Secretary Buttigieg's insightful remark – that "there is racism physically built into some of our highways." That is certainly true of I-495. The FEIS (Chapter 5, page 5-136) acknowledges this explicitly: I-495 through the former Gibson Grove community in Cabin John was "routed through low-income, majority-minority neighborhoods, disproportionately displacing black and African American residents in particular, further concentrating poverty and exposing remaining residents to the environmental and public health effects associated with traffic proximity."[4] We lament that FHWA has not followed the Secretary's direction to address such past wrongs more affirmatively and that has resulted in an environmental process that is procedurally, and morally, flawed.

**The undersigned descendants and their families feel strongly that this process has not taken into consideration the humanistic, emotional damage and heartache suffered by the African American descendant community as a direct result of past and future highway impacts to this site. Morningstar Tabernacle No. 88 Moses Cemetery and Hall is hallowed and sacred ground and requires the utmost respect by all individuals.**

We appreciate your consideration of these comments.

---

[2] Katherine Shaver, "African American gravesites detected near Capital Beltway will be spared in road-widening plans." *The Washington Post* September 9, 2021.
[3] MDOT. "Morningstar/Moses Hall Cemetery Update." January 4, 2022.
[4] FEIS Chapter 5 on pages 5-135 to 5-136: "Today's racially and economically segregated conditions in urban and metropolitan areas can be traced directly to decades of neighborhood destruction and residential displacements caused by highway projects plus housing policy and other racially marginalizing actions undertaken by local, state, and the federal government throughout the 20th century...Highways, such as the Southeast-Southwest Freeway (I-695) in D.C. and I-495 through the former Gibson Grove community in Cabin John, were frequently routed through low-income, majority-minority neighborhoods, disproportionately displacing black and African American residents in particular, further concentrating poverty and exposing remaining residents to the environmental and public health effects associated with traffic proximity."

---

It was also noted that MDOT SHA has committed to "gifting" certain land to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. The term "gifting" is used to indicate that the MDOT SHA will convey this land without seeking anything in return.

Regarding your comments on the environmental justice (EJ) analysis, we note that the initial analysis of potential EJ impacts were included in the DEIS. At this stage of the study, the analysis focused on the entire study area, reflecting a broad geographic area surrounding the 48-mile study limits for the Build Alternatives assessed in the DEIS. The DEIS study area included I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including the American Legion Bridge (ALB) across the Potomac River, to west of MD 5 in Prince George's County, Maryland; and I-270 from I-495 to I-370 in Montgomery County, including the east and west I-270 spurs north of I-495.

As a result of comments on the potential impacts, especially to those disclosed in the DEIS to EJ populations, MDOT SHA and FHWA took a fresh look at the alternatives and presented a revised alternative in the SDEIS, Alternative 9 – Phase 1 South, which substantially reduced the number and location of potentially impacted EJ populations. The Selected Alternative Phase 1 South has identified No Action for some 34 miles and with build improvements now 14 miles long focusing on the west side of I-495, including the ALB and I-270 from I-495 to I-370.

The SDEIS disclosed impacts to the EJ populations in comparison to non-EJ populations. The FEIS summarized the final technical analyses on impacts to both EJ and non-EJ populations and considered mitigation and community enhancements. Both beneficial and/or adverse impacts to EJ populations were considered in the EJ analysis. Based on the reasoning documented in the SDEIS and FEIS, FHWA and MDOT SHA have determined that no disproportionately high and adverse impacts to EJ populations would occur as a result of the I-495 and I-270 Managed Lanes Study Preferred Alternative. As intended by NEPA/Section 106 and Executive Order on EJ, a review of the entire record shows that impacts to EJ populations were presented, identified by the public as a result of the public outreach process, and were not only considered but resulted in a change to the Selected Alternative.


Sincerely,

**The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated and
Friends of Moses Hall**

**Diane E. Baxter**
President, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Descendant

**Dr. Charles W. Harris**
Vice President, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Descendant

**Eileen McGuckian**
Secretary, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Historian and President, Montgomery Preservation, Inc.
.

**Montgomery Crawford**
Treasurer, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Descendant

**Alexandra Jones, PhD, RPA**
Trustee, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Executive Director and Founder, Archaeology in the Community

**Austin E. White**
Trustee, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Descendant

**Charlotte Troup Leighton**
Chair, Friends of Moses Hall Committee
Trustee, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Vice President of Advocacy, Cabin John Citizens Association

**L. Paige Whitley**
Trustee and Chair, Research Committee, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Independent Researcher

**Sondra Raspberry**
Descendant

**Shannon S. Steward**
Descendant

**Christopher Waynes**
Descendant

**Austin White II**
Descendant

**Nathan White II**
Descendant

**Pandora White**
Descendant

*The attachments included with this FEIS comment letter are included on the following pages.*

00000148

I-495 & I-270 Managed Lanes Study | Case 8:22-cv-02597-DKC    Document 56-2    Filed 10/30/23    Page 5 of 76 | RECORD OF DECISION

This letter was included as an attachment with the FEIS Comment Letter and therefore the copy of the letter is included here. However, MDOT SHA acknowledges receipt of this letter is related to the Section 106 process and has addressed the comments raised through the Section 106 Consulting Parties process.



**FRIENDS OF MOSES HALL**
**MORNINGSTAR TABERNACLE NUMBER 88**
**ANCIENT UNITED ORDER OF SONS AND DAUGHTERS, BROTHERS AND SISTERS OF MOSES**
**7550 Seven Locks Road**
**Cabin John, MD 20818**
**morningstarmosescj@gmail.com**
**https://www.friendsofmoseshall.org/**

May 2, 2022

By Email to: sarcher@mdot.maryland.gov

Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation
State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

Re: I-495 and I-270 MLS Section 106 Materials, PA Third Draft - Archaeological Treatment Plan (Attachment 5) and Cultural Resources Treatment Plan (Attachment 4)

Dear Mr. Archer:

Thank you for the opportunity to review the additional Section 106 materials released on March 31, 2022. Our comments below are intended to supplement our comments that we submitted on April 14, 2022, but will specifically focus on the Cultural Resources Treatment Plan ("Cemetery Treatment Plan" - Attachment 4) and the Archaeological Treatment Plan (Attachment 5). Our comments to these documents are limited to their pertinence to Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M: 35-212 - hereafter "Morningstar Moses").

To put our comments and concerns into visual perspective, we have included a graphic map (*See Attachment 1*) based on the Report of Geophysical Survey (GPR) conducted July, 2021 by esteemed archaeologist Dr. Tim Horsley. As previously stated, Dr. Horsley's GPR survey covered only a portion of the Morningstar Moses property and a limited area of the state's I-495 Right-of-Way. Dr. Horsley's Report Summary stated that the total of 377 probable and possible burials "is likely lower than the actual total number of graves present." Dr. Horsley went on to state:

> "Importantly, these results reveal that subsurface anomalies interpreted as graves continue into the Maryland Department of Transportation State Highway Administration Right-of-Way (MDOT SHA ROW) to the north of the enclosed cemetery. While the exact number is difficult to define from these data, some 14 probable unmarked burials are indicated in this area. As many as 34 burials are suggested in total; however, most of the anomalies suggesting these likely have alternative, natural explanations."

The area of the MDOT SHA ROW where graves are indicated has already been subjected to significant ground

Friends of Moses Hall - 05.02.22 | Page 1 of 9

APPENDIX D – FEIS COMMENTS & RESPONSES | AUGUST 2022 | PAGE 29

00000149



disturbance from construction and earth-moving when I-495 was originally constructed and again when the highway was widened in the 1990s. Additionally, decades of stormwater runoff, as well as highway use and maintenance, have further impacted burials.

It is therefore reasonable to conclude that human remains have been disturbed and dislocated, and that it is likely that human remains will be discovered within the LOD area adjacent to Morningstar Moses. Any treatment plan and mitigation commitment must require the reinterment of human remains on the Morningstar Moses site. Prior to any such reinterment, a thorough archaeological survey of the Morningstar Moses property would be required to identify locations for reinterment. We emphasize that Order of Moses Tabernacle No. 88 members paid to bury their family members at Morningstar Moses and it is vital that this community of dead remain together.

We restate our rejection of SHA's convenient definition of the cemetery boundary. SHA is, in fact, now basing the cemetery boundary on a 1957 aerial map that was shared in consulting party meetings. The 1957 aerial was used as a graphic underlay during a Consulting Party meeting with SHA on January 4, 2022, for the depiction of grave shafts revealed in the limited area where GPR was conducted. We reject SHA's assumptions and interpretation of the 1957 aerial as sufficient to evaluate the extent of the boundaries of the Morningstar Moses Cemetery. Historical research and the absence of burial records for most of the 377 GPR-indicated probable and possible graves in the limited survey areas point to the distinct possibility that the cemetery is older and larger than originally thought. The historical evidence suggests that this could be a Reconstruction-era cemetery. Most graves were marked by stones and not inscribed markers, and it is likely that landowners and descendants present in 1957 would not have been able to identify the specific boundaries of the cemetery.

**Archaeological and Cultural Monitoring**

We reiterate our previous requirement that the monitoring of ground-disturbing and archaeological activities at the Morningstar Moses site, including areas of the adjacent LOD, must be carried out by an appropriate, qualified professional. Morningstar Moses' cultural and historic importance requires that a professional supervising ground-disturbing and archaeological investigations at the site have extensive experience in African American cemetery archaeology. The Archaeological and Cemetery Treatment Plans should include the following provision:

> The archaeological studies of Morningstar Moses cemetery required under the terms of the PA shall be carried out by a cultural resources management (CRM) firm with extensive experience in African American archaeology, community archaeology, and oral history selected by The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated (MT88) and Friends of Moses Hall (FMH), and under the direct supervision of a qualified professional approved by MT88 and FMH. The cultural monitor approved by MT88 and FMH is required to be on site at the Morningstar Moses project location at all times to monitor archaeological project activity. MDOT SHA shall cover the cost of the archaeologist and cultural monitor.

_Archaeological Treatment Plan_

The Morningstar Moses site is NRHP eligible under Criteria A and C, but the Maryland Historical Trust (MHT) has recommended that this site also be considered eligible under Criterion D. As previously stated, we concur with MHT that this site be deemed eligible under Criteria A, C and D. Accordingly, the Archaeological Treatment Plan should be updated to include the Morningstar Moses site.

The Cemetery Treatment Plan limits archaeological investigations to the presence of human remains and funerary objects, and does not consider that there is a potential for significant archaeological remains at the edge of the LOD and the northern cemetery boundary, including areas of the cemetery within the existing I-495 Right-of-Way, and along the access footpath that have not been subject to archaeological investigations.

Additionally, the Morningstar Moses site holds the only remaining extant foundation of a once thriving Order of Moses Hall building in Montgomery County. The close proximity of the Hall to the LOD and the history of significant past disturbance of the Morningstar Moses site from the original I-495 construction and subsequent widening — and highway traffic impacts in general — further supports that the site should be included in the Archaeological Treatment Plan.

Turning our attention to the Archaeological Treatment Plan document, we have the following preliminary comments, but reserve the right to review and comment further on this document once the Morningstar Moses site is included.

**Human Remains Protocols During Archaeological Investigations (Appendix 1)**

We take issue with the following language:

> "Within Maryland, pursuant to State of Maryland Criminal Code § 10-402, the State's Attorney must authorize movement or removal of any remains until determined to be archaeological."

It is our understanding of the statute that unless the removal is temporary, the authorization of the State's Attorney is required for the removal of any remains for any reason, regardless of whether they are considered archaeological or for any other consideration. The section also requires publication of "a notice of the proposed relocation in a newspaper of general circulation in the county where the burial site is located." There is no exception to this requirement for archaeology. The statute does allow for remains to be reinterred in the presence of "a trained anthropologist or archaeologist" rather than a "a mortician, professional cemeterian, or other individual qualified in the interment of human remains" or "a minister, priest, or other religious leader." This language should be corrected to accurately reflect State of Maryland Criminal Code § 10-402.

_Cemetery Treatment Plan_

**Site Treatment Plan Research Methods - Previously Conducted Research**

MDOT SHA appears to have carefully crafted its language in this section to support its assumptions and/or downplay findings — in some cases deceptively so. For example, we point to the mischaracterization of Dr. Tim Horsley's GPR survey findings at the top of Page 5:

> "The study identified 14 subsurface anomalies interpreted as possible graves within the MDOT SHA ROW to the north of the enclosed cemetery; an additional 20 anomalies in this area were thought more likely to be related to natural soil variations (Falchetta et al. 2021). Although the GPR reflections in this area are weaker than other parts of the survey area, as a result of this study, the area of possible burials features within the MDOT SHA ROW has been included within the NRHP eligible boundary of the property."

**We repeat for emphasis the precise language from Dr. Tim Horsley's Report Summary:**

> "Importantly, these results reveal that subsurface anomalies **interpreted as graves** continue into the Maryland Department of Transportation State Highway Administration Right-of-Way (MDOT SHA ROW) to the north of the enclosed cemetery. While the exact number is difficult to define from these data, **some 14 probable unmarked burials are indicated in this area**. As many as 34 burials are suggested in total; however, most of the anomalies suggesting these likely have alternative, natural explanations."

MDOT SHA's characterizations in this document and elsewhere appear aimed to convince consulting parties and the public to trust its version of a "revised cemetery boundary" and that "MDOT SHA developed an alternative design and LOD configuration that eliminates all Project impacts within the revised property boundary and avoids associated potential burial features within the MDOT SHA ROW adjacent to the cemetery boundary". We reject and take offense to MDOT SHA's characterizations and attempts to downplay

Friends of Moses Hall - 05.02.22                    Page 2 of 9

Friends of Moses Hall - 05.02.22                    Page 3 of 9



impacts to the Morningstar Moses site.

With reference to Page 5, Paragraph 2, we have twice submitted corrections to the MHT Determination of Eligibility (DOE) form submitted by MDOT SHA and again state that errors and omissions still exist. We also reemphasize that this site should be deemed eligible under Criteria A, C and D.

**Site Treatment Plan Research Methods - Defining Areas that Require Archaeological Investigation**

We believe that MDOT SHA again mischaracterizes Dr. Tim Horsley's GPR Report in stating that "Given the weak nature of feature signals identified on the nearby high ground, it may be impossible to confidently identify potential graves in this area." We also object to MDOT SHA's use of the word "potential graves" as misleading in certain places in the document. We look to Dr. Tim Horsley's GPR report for his interpretations of "probable" and "possible" burials as follows:

"For ease of interpretation, burials are divided into *probable burials* and *possible burials* depending on the confidence that such an interpretation can be made. This distinction is based on several characteristics of the geophysical anomaly (i.e., strength, dimensions, depth, and orientation), as well as its associated grave marker or other similar anomalies. In the case of possible burials, other explanations are possible and cannot be ruled out, although it is more likely that the anomaly is burial related."

We again point to Dr. Horsley's GPR report for his findings related to burials within the MDOT SHA ROW and, more specifically, to the cause of "weak signals" in this area:

"While the absolute number of burials within the ROW is impossible to determine with confidence, there is strong evidence that graves continue into this area. 14 probable burials are identified in Figure 21, with an additional 13 possible burials highlighted. A further 7 other features/ disturbance are shown, either fully or partially within this area. Together, this suggests as many as 27-34 unmarked graves with the ROW; however, this may be an over-estimate. In general, the GPR reflections in this area are weaker than other parts of the survey area; given the sensitivity of the ROW, great care has been taken to identify all potentially significant anomalies. It is quite possible that many of the possible burials are caused by other subsurface disturbances or natural soil variations, as well as the other feature/disturbance anomalies; however, it is impossible to rule out the presence of an unmarked burial in each case.

The difficulty in confidently identifying burials in this area might in part be related to a change in soil type. As described in Section and 1.5 and Figure 2, Brinklow-Blocktown channery silt loams are present in this corner of the cemetery (although it should be cautioned that the soil maps may not be accurate at the scale shown). Channery soils produce increased noise levels due to the greater concentration of stony material; however, the GPR data from this area are not discernibly noisier than the rest of the cemetery. The weaker reflections here indicate a lower physical contrast (primarily conductivity) between the causative features and the surrounding soil. Several factors could cause such a reduction in contrast, including (i) a change in soil type; (ii) variations in soil moisture (that can be related to soil type and/or topography); (iii) the nature of the burial (i.e., casket vs. shroud); and (iv) the state of preservation of the inhumation. While identifying which factors are the most significant is not usually possible solely based on the geophysical data in this instance it is likely a combination of at least (i), (iii) and (iv). As Falchetta et al. note, the top of the hill may have been the site of the earliest burials, and consequently their associated anomalies would be expected to be weaker due to more advanced decomposition.

The GPR reflections suggesting probable and possible burials in this area begin at a depth of around 1' (0.3m) and extend to at least 4-5' (1.2-1.5m). While the remains of any inhumations are likely below at least 3', distinct soil variations associated with the grave shafts can be expected at a depth of 1' (0.3m)."

**Environmental Context - Land Use History and Current Conditions**

We wish to clarify the following sentence: "The central portion of the path runs along a gully and was constructed on top of fill piles; railroad tie steps placed along that portion of the path by Boy Scouts working on an Eagle Scout project in 2008 were still in place." The source of the "fill piles" (shown as "Artificial Berm" on the map in *Attachment 1*) is undetermined, but the presence of large chunks of thick concrete indicate that this fill may have been associated with highway construction. We wish to clarify that the Boy Scouts did not create the fill piles, but simply created steps in the artificial berm to allow pedestrian access to the cemetery. It should be noted that MDOT SHA's perpetual stormwater easement is also located in this area and the fill piles could have been associated with construction of the stormwater drain. MDOT SHA's lack of maintenance of their stormwater easement on the property has contributed to soil erosion and physical degradation of the site.

**Treatment Goals - Additional Remote Sensing Survey/Archaeological Fieldwork**

The document states that "No further ground disturbing investigations will be conducted within the identified cemetery boundary at this time. A series of further steps, including additional GPR and examination of the LOD to identify burials outside the understood boundary of the cemetery will be conducted to evaluate avoidance of impacts to the Morningstar Cemetery as a result of MLS Project activities."

We point out that only non-invasive field investigations have been conducted at the site so far. GPR was conducted on a portion of the Morningstar Moses cemetery property and a portion of the MDOT SHA ROW. The areas where the GPR survey was conducted are shown on *Attachment 1*. In the likely event that human remains are present in the LOD, they must be reinterred within the Morningstar Moses cemetery. Prior to any such reinterment, a proper archaeological survey of the Morningstar Moses property, at the sole cost and expense of MDOT SHA, would be required to identify locations for reinterment.

MDOT SHA further states that, "The primary goal of the archaeological investigations in the MDOT SHA right-of-way is to confirm that no interments are located within the MLS Project LOD that would be impacted by the proposed construction in this area."

MDOT SHA's proposed areas within the LOD for additional GPR study seem to presume the end results of the investigations before they are carried out and do not demonstrate to us that the MDOT SHA is proactively seeking to avoid impacting all Morningstar Moses burials. MDOT SHA seems committed to their arbitrary definition of the boundary of the cemetery and does not consider that graves and artifacts could be present along the entire length of the LOD adjacent to the Morningstar Moses site.

**Machine and Hand Stripping of the LOD (P-10)**

This paragraph should be revised to read:

Following the GPR study, LOD will have been reduced to the maximum extent feasible while still accomplishing the purpose and need of the Project if the GPR has indicated a potential for additional burials within the LOD. At this time, substantial remaining vegetation will have been removed from the LOD in the vicinity of the Morningstar Cemetery as depicted in Figure 2.3 with an **appropriate, qualified archaeologist and cultural monitor present** for all ground disturbance. The area to be cleared encompasses the area between the roadway and the staked LOD. The mechanical removal of the topsoil in these areas will be accomplished with a Gradall, trackhoe, or similar with a bucket fitted with a smooth (not toothed) blade, and the soil removal will proceed, directed by the archaeologist **and cultural monitor, in a slow and careful manner removing only a few inches at a time** — as noted in the GPR study, "distinct soil variations associated with the grave shafts can be expected at a depth of 1 ft." The topsoil **will be sampled by screening for artifacts** and will be removed under the direction of the archaeologist **and cultural monitor**, and the interface between

00000151



the topsoil and subsoil will be cleaned by shovel, trowel, or a combination thereof to evaluate any features or artifacts indicative of interments **and/or archaeological remains.**

**Summary of Expected Steps of Coordination and Fieldwork**

As the document states, "The community has expressed a preference for re-interment of remains within Morningstar Cemetery, and the MDOT SHA will accommodate this to the extent practicable and permissible by law." We repeat that any treatment plan and mitigation commitment must require the reinterment of human remains on the Morningstar Moses site, in order to keep the community together. We restate that prior to any such reinterment, a thorough archaeological survey of the Morningstar Moses property, at the sole cost and expense of MDOT SHA, would be required to identify locations available within the Morningstar Moses site for reinterment.

**Respectful Treatment of Human Remains**

The following paragraph should be revised to read:

The MDOT SHA archaeologists and archaeological consultants will treat any human remains encountered during the Project in a manner guided by the relevant federal and state laws and guidelines. In addition, human remains will be treated with the utmost dignity and respect at all times. Human remains and/or associated artifacts (including grave markers, casket/coffin materials, or funerary objects) will be left in place where possible and not disturbed unless necessary, and no personal or media photographs **or filming** will be allowed of human remains other than what is needed for technical documentation, and consultant Project and MDOT SHA personnel will be restricted from posting or disclosing information, **videos,** or photographs on social media or other venues. The MDOT SHA and FHWA will be the only authorized sources to disseminate information to consulting parties or media. **However, in no event shall photographs or video of skeletal remains or funerary objects be released to the media or press without the express written consent of The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated.** No skeletal remains or materials associated with the remains will be collected or removed until appropriate consultation has taken place. All personnel involved with the discovery will maintain confidentiality concerning the remains, and any press contacts will be referred to the MDOT SHA.

We appreciate your consideration of these comments.

Sincerely,

**Friends of Moses Hall and**
**The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated**

**Diane E. Baxter**
President, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Dr. Charles W. Harris**
Vice President, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Eileen McGuckian**
Secretary, Morningstar Tabernacle Number 88, Incorporated
Historian and President, Montgomery Preservation. Inc.

**Montgomery Crawford**
Treasurer, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Alexandra Jones, PhD, RPA**
Trustee, Morningstar Tabernacle Number 88, Incorporated
Executive Director and Founder, Archaeology in the Community

**Austin E. White**
Trustee, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Charlotte Troup Leighton**
Trustee and Chair, Friends of Moses Hall Committee,
Morningstar Tabernacle Number 88, Incorporated
Vice President of Advocacy, Cabin John Citizens Association

**L. Paige Whitley**
Chair, Research Committee, Morningstar Tabernacle Number 88, Incorporated
Independent Researcher

**Sondra Raspberry**
Descendant

**Shannon S. Steward**
Descendant

**Christopher Waynes**
Descendant

**Austin White II**
Descendant

**Nathan White II**
Descendant

**Pandora White**
Descendant


**ATTACHMENT 1**
**Morningstar Tabernacle No. 88 Moses Hall and Cemetery**
**Cabin John, Montgomery County, Maryland**



cc:
Governor Lawrence J. Hogan – governor.mail@maryland.gov
Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
Treasurer Derek E. Davis – treasurer@treasurer.state.md.us
Jeffrey T. Folden, MDOT SHA – mls-nepa-P3@mdot.maryland.gov
Kendra Parzen, National Trust for Historic Preservation - KParzen@savingplaces.org
Elizabeth S. Merritt, National Trust for Historic Preservation - emerritt@savingplaces.org
Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
Julie Langan, Virginia DHR - julie.langan@dhr.virginia.gov
Steve Archer, MDOT SHA – sarcher@mdot.maryland.gov
Julie Schablitsky, MDOT SHA – jschablitsky@mdot.maryland.gov
Richard Ervin, MDOT SHA – rervin@mdot.maryland.gov
David Clarke, USDOT – david.clarke@dot.gov
April Marchese, USDOT – april.marchese@dot.gov
Colleen Vaughn, USDOT – colleen.vaughn@dot.gov
Brenda Mallory, Chair, White House Council on Environmental Quality – brenda_mallory@ceq.eop.gov
Vivian Lee, National Capital Planning Commission – vivian.lee@ncpc.gov
Samantha Beers, US EPA - beers.samantha@epa.gov
Emily Biondi, Federal Highway Administration – emily.biondi@dot.gov
James Gavin, Federal Highway Administration – james.gavin@dot.gov
Jitesh Parikh, Federal Highway Administration – jitesh.parikh@dot.gov
Jeanette Mar, FHWA Maryland Division – jeanette.mar@dot.gov
Reid Nelson, ACHP – rnelson@achp.gov
Mandy Ranslow, ACHP - mranslow@achp.gov
Jaime Loichinger, ACHP - jloichinger@achp.gov
Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
John Simkins, FHWA Virginia Division - john.simkins@dot.gov
Rebeccah Ballo, Montgomery County Planning Department – rebecccah.ballo@montgomeryplanning.org
Debra Borden, M-NCPPC – debra.borden@mncppc.org
Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
Eddie Bankhead, First Agape AME Zion Church - esbj@pobox.com
Rev. Edgar Bankhead, First Agape AME Zion Church - ebankjs@verizon.net
Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
Sara Love, Maryland State Delegate – sara.love@house.state.md.us
Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Carol Rubin, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Gerald Cichy, Commissioner, Montgomery County Planning Board –MCP-Chair@mncppc-mc.org
Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
Gabe Albornoz, Montgomery County Councilmember-councilmember.albornoz@montgomerycountymd.gov
Andrew Friedson, Montgomery County Councilmember- councilmember.friedson@montgomerycountymd.gov
Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

00000153



*A letter dated July 13, 2022 from ACHP was sent to the Friends of Moses Hall in response to this comment.*



**Friends of Moses Hall**
**7550 Seven Locks Road**
**Cabin John, Maryland 20818**
morningstarmosescj@gmail.com
www.friendsofmoseshall.org

June 15, 2022

Ms. Jaime Loichinger
Assistant Director
Advisory Council on Historic Preservation
400 F Street, NW, Suite 308
Washington, DC 20001

By email to: jloichinger@achp.gov

Re:  **Maryland I-495/I-270 Managed Lanes Study – Request for Pre-Decisional Referral to CEQ**
      Morningstar Tabernacle No. 88 Moses Hall and Cemetery (MIHP: 35-212)

Dear Ms. Loichinger:

Thank you for participating in Monday's consulting party meeting led by the Federal Highway Administration (FHWA) in response to our June 8 letter to Transportation Secretary Buttigieg (attached for reference). We especially appreciated your acknowledgement that federal agencies have an obligation to consider cumulative impacts and environmental justice.

During the meeting you indicated that the Programmatic Agreement (PA) was already in your office for execution. We learned yesterday that the ACHP has since executed the PA. This is unfortunate in our view, because it undermines FHWA's repeated assurances on Monday that there would still be a comment opportunity on both the PA and the Final Environmental Impact Statement (FEIS).

We continue to have great concerns that the I-495/I-270 Managed Lanes Study FEIS will soon be released by the FHWA and Maryland Department of Transportation (MDOT SHA) as a deeply flawed environmental review document that fails to meet the requirements of the National Environmental Policy Act. Further, as emphasized in our letter to Secretary Buttigieg, MDOT SHA's failure to look for burials in the LOD before the FEIS is an egregious and potentially very harmful violation of the agency's Section 106 and 4(f) obligations.

One of the primary legal flaws in the FEIS is an issue that has significant implications for the Section 106 regulations as well – the FHWA's stated intention to maintain its unprecedented argument that the consideration of cumulative impacts does not include adverse impacts prior to 1970 or 1966, regardless of whether those earlier adverse impacts were caused by the same agency and the same infrastructure. **The purpose of this letter is to urge the Advisory Council on Historic Preservation (ACHP) to initiate a**

Friends of Moses Hall                    June 15, 2022                    Page 1 of 3



pre-decisional referral to the Council on Environmental Quality (CEQ), pursuant to 40 C.F.R. Part 1504, to address the FHWA's attempt to revise the definition of cumulative effects in a manner inconsistent with prior precedent. Since the Section 106 regulations themselves rely on the consideration of cumulative effects, 36 C.F.R. § 800.5(a)(1), this issue has enormous importance for the ACHP. Unless the FHWA changes its position, this issue is expected to be one of the central challenges raised in litigation opposing the project. We urge the federal agencies to involve CEQ in reviewing this issue *before* it goes to the courts.

The ACHP's execution of the PA (although disappointing, and inconsistent with FHWA's assurances) does not preclude the ACHP from initiating this pre-decisional referral. The PA essentially kicks the can down the road, and *defers* any determination regarding adverse effects -- cumulative or otherwise. Therefore, resolving the inconsistent definitions of cumulative effects will be helpful, if not essential, to successful implementation of the PA.

In our view, the transportation agencies' refusal to consider the cumulative impacts of building the highway back in the 1960s is one of the most egregious compliance deficiencies and has dangerous implications for both Section 106 and NEPA as a matter of precedent. Therefore, we urge the ACHP to refer the matter to CEQ. The window for submitting a CEQ referral is a mere 25 days after the FEIS has been issued. If the FEIS is released as scheduled on June 17, the deadline for CEQ referral would be July 12. It is critical for the FEIS (or a Supplemental EIS) to reopen the consideration of cumulative impacts, so that a meaningful evaluation and resolution of those impacts can be achieved, without the artificial wall being imposed by the FHWA.

Thank you for considering our comments and our plea for your support and intervention.

Sincerely,
Friends of Moses Hall
and The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated

Diane E. Baxter
President, Morningstar Tabernacle Number 88, Incorporated
Descendant

Dr. Charles W. Harris
Vice President, Morningstar Tabernacle Number 88, Incorporated
Descendant

Eileen McGuckian
Secretary, Morningstar Tabernacle Number 88, Incorporated
Historian and President, Montgomery Preservation, Inc.

Montgomery Crawford
Treasurer, Morningstar Tabernacle Number 88, Incorporated
Descendant

Alexandra Jones, PhD, RPA
Trustee, Morningstar Tabernacle Number 88, Incorporated
Executive Director and Founder, Archaeology in the Community

Austin E. White
Trustee, Morningstar Tabernacle Number 88, Incorporated
Descendant

Charlotte Troup Leighton
Trustee and Chair, Friends of Moses Hall Committee,
Morningstar Tabernacle Number 88, Incorporated
Vice President of Advocacy, Cabin John Citizens Association

L. Paige Whitley
Chair, Research Committee, Morningstar Tabernacle Number 88, Incorporated
Independent Researcher

Sondra Raspberry
Descendant

Shannon S. Steward
Descendant

Christopher Waynes
Descendant

Austin White II
Descendant

Nathan White II
Descendant

Pandora White
Descendant

Enclosure :
Friends of Moses Hall letter to Secretary Buttigieg, June 8, 2022

cc:   David Clarke, Federal Preservation Officer, FHWA
Reid Nelson, Mandy Ranslow, Javier Marques, and Kelly Fanizzo, ACHP
Elizabeth S. Merritt, Deputy General Counsel, National Trust for Historic Preservation
Brenda Mallory, Chair, White House Council on Environmental Quality
Stephan Nevshehirlian, NEPA Program Manager, Region 3, US-EPA
Samantha Beers, Director, NEPA-Region 3, Office of Communities, Tribes, and Environmental Assessment, US-EPA

Friends of Moses Hall    June 15, 2022    Page 2 of 3

Friends of Moses Hall    June 15, 2022    Page 3 of 3

00000155



*For a response to the cumulative effects comments raised in this letter refer to the response to the July 15 FEIS comment, on pages 27-29 above.*



**Friends of Moses Hall**
**7550 Seven Locks Road**
**Cabin John, Maryland 20818**
morningstarmosescj@gmail.com
www.friendsofmoseshall.org

June 8, 2022

The Honorable Pete Buttigieg
Secretary of Transportation
U.S. Department of Transportation
1200 New Jersey Ave. SE
Washington, DC 20590

Re:  Maryland I-495/I-270 Managed Lanes Study
     Morningstar Tabernacle No. 88 Moses Hall and Cemetery (MIHP: 35-212)

Dear Mr. Secretary:

We write to you with great concern that the I-495/I-270 Managed Lanes Study Final Environmental Impact Statement (FEIS) will soon be released by the Maryland Department of Transportation (MDOT SHA) as a deeply flawed environmental review document that fails to meet the requirements of the National Environmental Policy Act, and most notably, the policies and priorities placed by the Biden administration on protecting and remediating historic wrongs to disadvantaged communities.

<u>Failure to Assess Cumulative Effects or to Substantively Address Racial Equity and Environmental Justice</u>

Friends of Moses Hall (FMH) has copied your office on our detailed comment letters related to this project and we encourage you to consider these communications carefully. Most pressingly, we believe that MDOT SHA and the Federal Highway Administration (FHWA) have erred in concluding that there are no clear cumulative effects at the historic Morningstar Moses site. The history of this site shows that MDOT SHA (formerly the Maryland State Roads Commission) has repeatedly engaged in activities that have both cumulatively and negatively affected conditions at this historic African American cemetery.

The FHWA and MDOT SHA have taken a position in this case that is absolutely unprecedented: When evaluating the cumulative impacts of the beltway widening project on this historic African American community, they argue that they do not have to consider the cumulative impacts of originally bulldozing the beltway through this site in the first place, because the Beltway was built prior to the enactment of the National Environmental Policy Act (NEPA) and the National Historic Preservation Act (NHPA). There is absolutely no legal basis for excluding the original construction of I-495 from the analysis of cumulative impacts to this site — especially since the original highway construction was funded and carried out by the same agencies as those proposing the current project.

Friends of Moses Hall                June 8, 2022                Page 1 of 4

In addition, there has been a dramatic contradiction between the unlawfully restricted scope of the agencies' environmental review and some of the agencies' public statements. For example, on September 9, 2021, *The Washington Post* ran a story covering SHA's efforts to avoid impacts to the Morningstar site.[1] In that story, Julie M. Schablitsky, chief archaeologist for the Maryland Department of Transportation, stated, "We own the faults of the Maryland Roads Commission impacting the community 60 years ago... It's our responsibility now to repair the damage and come in and do the right thing." Of course, we were encouraged to hear this important statement. By contrast, however, on January 4, 2022, SHA concluded that it did not have to consider cumulative effects to the site because "Impacts to the Gibson Grove community occurred with original I-495 construction, prior to the passage of NEPA and NHPA (Section 106)."[2]

FMH stresses that the original I-495 construction had significant and lasting economic, physical, and social impacts on this historic community through land takings and the splitting of this once vibrant African American community in Cabin John. Evidencing the cumulative effects of racial inequity inherent in the original land takings, FMH drafted a report of findings following our examination of Maryland State Roads Commission (MD SRC) records pertaining to the construction of I-495 from the late 1950s through the early 1960s. This document can be found on our website: https://www.friendsofmoseshall.org/press-releases.

Additionally, MDOT has admitted, based on an incomplete site investigation, that there may be burials in the project's Limits of Disturbance (LOD). Evidence of up to 34 burials has been found by ground penetrating radar (GPR) in the current I-495 right-of-way and it should be noted that only a small portion of the adjacent site right-of-way was surveyed prior to the FEIS. While MDOT has committed to additional GPR investigation of the project's adjacent LOD, the agency has refused to conduct these investigations prior to the FEIS and has instead elected to do so just prior to construction, when design changes may not be possible. MDOT has disregarded our reasonable concern regarding the location of the project's LOD in relation to the known burial sites, which raises substantial questions about physical avoidance. The updated LOD still appears to be immediately adjacent to graves.

FMH greatly appreciates the Biden administration's promise —and your personal commitment — to usher in a new era of racial equity in transportation projects. While FMH has not taken a position on the viability of the I-495/I-270 Managed Lanes project as a whole, we are committed to advocating for this historic African American resource, which was named one of *America's 11 Most Endangered Historic Places* in 2021 by the National Trust for Historic Preservation.

This site is important to descendants and others who consider it a sacred place and one whose role matters in an accurate history of the area. FMH hopes that someday the site will not only be a place of interment and reflection honoring those who passed on but will also be a site used to educate students and citizens of the role African American benevolent societies placed during a period of legal and social segregation in Maryland.

---

[1] Katherine Shaver, "African American gravesites detected near Capital Beltway will be spared in road-widening plans." *The Washington Post* September 9, 2021.
[2] MDOT. "Morningstar/Moses Hall Cemetery Update." January 4, 2022. (Addressed to Maryland SHPO and Virginia SHPO). Link to full document: https://drive.google.com/file/d/14StbqDBrn3nrKs_ABiUFPniiGNA2f6K1lL/view?usp=sharing

We note that the federal permitting dashboard calls for the Final EIS for this project to be issued on June 17, 2022, and for the Record of Decision to be issued seven weeks later on August 5. We assume you know that a number of environmental and conservation advocacy groups are deeply troubled by FHWA and MDOT's inadequate review of the project's significant harms. In our view, the agencies' refusal to consider the cumulative impacts of building the highway back in the 1960s is one of the most egregious compliance deficiencies and leaves the project highly vulnerable to potential legal challenge. **Therefore, we urge you to suspend the timeline for issuing a final decision to allow time for MDOT to fully investigate the LOD adjacent the site to determine if burials would be disturbed, and to reopen the consideration of cumulative impacts, under both NEPA and Section 106 of the NHPA, so that a meaningful evaluation and resolution of those impacts can be achieved.**

Thank you for considering our comments and our plea for your support and intervention.

Sincerely,
**Friends of Moses Hall**
and **The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated**

**Diane E. Baxter**
President, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Dr. Charles W. Harris**
Vice President, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Eileen McGuckian**
Secretary, Morningstar Tabernacle Number 88, Incorporated
Historian and President, Montgomery Preservation, Inc.

**Montgomery Crawford**
Treasurer, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Alexandra Jones, PhD, RPA**
Trustee, Morningstar Tabernacle Number 88, Incorporated
Executive Director and Founder, Archaeology in the Community

**Austin E. White**
Trustee, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Charlotte Troup Leighton**
Trustee and Chair, Friends of Moses Hall Committee,
Morningstar Tabernacle Number 88, Incorporated
Vice President of Advocacy, Cabin John Citizens Association

This page is intentionally left blank.

**L. Paige Whitley**
Chair, Research Committee, Morningstar Tabernacle Number 88, Incorporated
Independent Researcher

**Sondra Raspberry**
Descendant

**Shannon S. Steward**
Descendant

**Christopher Waynes**
Descendant

**Austin White II**
Descendant

**Nathan White II**
Descendant

**Pandora White**
Descendant

cc:    Stephanie Pollack, FHWA Administrator
Colleen Vaughn, Federal Preservation Officer, US-DOT
David Clarke, Federal Preservation Officer, FHWA
Mandy Ranslow, Jaime Loichinger, Javier Marques, and Kelly Fanizzo, ACHP
Elizabeth S. Merritt, Deputy General Counsel, National Trust for Historic Preservation

Friends of Moses Hall          June 8, 2022          Page 4 of 4



**OFFICE OF THE COUNTY EXECUTIVE, MONTGOMERY COUNTY**



OFFICE OF THE COUNTY EXECUTIVE

Marc Elrich
*County Executive*

July 18, 2022

The Honorable Pete Buttigieg
Secretary of Transportation
US Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

DOTExecSec@dot.gov

Via email

Dear Secretary Buttigieg,

As County Executive for Montgomery County, the most populous jurisdiction in Maryland and home to much of I-495 and I-270, I am writing in regard to the I-495 & I-270 Managed Lanes Final Environmental Impact Statement (FEIS). I ask that you delay the issuance of a Record of Decision for at least an additional 60 days to allow the public to review the document and identify issues that require resolution. I also ask that you require the Maryland Department of Transportation to respond to all substantive issues in a meaningful and constructive way before finalizing the National Environmental Policy Act process for this project.

The FEIS and appendices total 26,500 pages in 74 separate files, and it was released on June 17 for 30-day review. This is an enormous amount of information to review in a short time period. These same concerns about the timeline have been raised by many members of our legislative State delegation, the Maryland chapter of the Sierra Club, and other organizations. As noted in the letter from our state legislators, the extension is needed at least partly because the Maryland Department of Transportation (MDOT) did not release the federally mandated analyses and other missing information until issuance of the FEIS. This has meant that the public and reviewing agencies could only now review the environmental justice and greenhouse gas emissions analyses, mitigations plans, the recently changed traffic model, and MDOT's response to the 5,000 comments it received during the public comment periods for the Draft Environmental Impact Statement (DEIS) and Supplemental DEIS.

101 Monroe Street • Rockville, Maryland 20850
240-777-2500 • 240-777-2544 TTY • 240-777-2518 FAX
www.montgomerycountymd.gov

OST-S10-220718-008

**Response:**

On June 17, 2022, the FEIS was published in the federal register and made available for a 30-day period on the US Environmental Protection Agency's (USEPA) EIS Database website, on the Op Lanes Maryland webpage and at 17 public library locations in Maryland, Virginia and Washington D.C. The FEIS was prepared to present the final analyses completed for the Preferred Alternative, design refinements to address public comments, operational considerations and to further avoid and minimize impacts, and to respond over 5,000 comments received on the DEIS and SDEIS.

From the outset of the Study's NEPA process, the Federal Highway Administration (FHWA) as the lead federal agency, and the Maryland Department of Transportation (MDOT SHA) as the co-lead agency, developed a comprehensive public involvement and engagement strategy designed to obtain input from stakeholders around the entire MLS study area. This strategy combined traditional opportunities for commenting on the Draft Environmental Impact Statement (DEIS) and Supplemental DEIS (SDEIS) in addition to wide-ranging outreach to community organizations (e.g., church groups, homeowners' associations, public interest groups, and governmental entities), with particular sensitivity and outreach to identified Environmental Justice communities. Refer to FEIS, Chapter 8. The public involvement and engagement process, starting in early 2018 and continuing for over four years, considered the vast diversity of community resources. Despite a global pandemic, MDOT SHA's public involvement strategy ensured the safety of the public while still providing the same opportunities for meaningful participation by the public in the NEPA process.

The DEIS was published on July 10, 2020 and was made available on the I-495 & I-270 P3 Program webpage (https://oplanesmd.com/deis/), on the USEPA EIS Database webpage and at multiple public locations in hard copy in Montgomery and Prince George's counties, Maryland, Fairfax County, Virginia and Washington DC. Following publication of the DEIS, FHWA and MDOT SHA provided a 90-day comment period, which is twice the minimum time required by the CEQ regulations. Based on input from the general public, community partners, stakeholders, and local and federal officials, however, MDOT SHA supported extending the DEIS comment period and made a formal request to FHWA, which has authority to grant any extension. FHWA approved this request and granted a 30-day extension of the public comment period for the DEIS. All in all, the DEIS was made available for comment and review from July 10, 2020 through and including November 9, 2020, a total of four months. During this extended comment period, the agencies received close to 3,000 comments.

The SDEIS published on October 1, 2021 was prepared to consider new information relative to the Preferred Alternative, Alternative 9 - Phase 1 South. Building off the analysis in the existing DEIS, the SDEIS disclosed new information relevant to the Preferred Alternative while referencing the DEIS for information that remained valid. The SDEIS also described the background and context in which the Preferred Alternative, Alternative 9 - Phase 1 South was identified. The SDEIS was available for the public to review and comment on the Preferred Alternative during a 45-day comment period, which was later extended an addition 15 days. The SDEIS was also made available on the I-495 & I-270 P3 Program webpage (https://oplanesmd.com/sdeis/), on the USEPA EIS Database webpage and at multiple public locations in hard copy in Montgomery and Prince George's Counties, Maryland, Fairfax County, Virginia and Washington DC.

The Honorable Pete Buttigieg
July 18, 2022
Page 2 of 2

For your information, I have attached the memo I sent in March to the Federal Highway Administration outlining many of our concerns with this enormous project.

I sincerely appreciate your consideration of this request.

Enclosure

cc:   The Honorable Polly E. Trottenberg, Deputy Secretary, USDOT
      The Honorable Stephanie Pollack, Acting Administrator, FHWA
      Gregory Murrill, Division Administrator, FHWA
      Adam Ortiz, Regional Administrator, EPA
      The Honorable Gabe Albornoz, President, Montgomery County Council

Sincerely,

Marc Elrich
Montgomery County Executive

OST-S10-220718-008

In addition to a combined six-month EIS public comment review period, MDOT SHA has held 16 large public workshops, 7 public hearings including virtual and in-person, and over 200 individual, elected official, community, stakeholder, and business owner meetings. Refer to DEIS, Chapter 7 and Appendix P; SDEIS, Chapter 7; and FEIS Chapter 8 and Appendix R for detailed information on public involvement.

As a result of this continued public involvement and engagement effort, the Preferred Alternative, as described in the FEIS, reflected changes made since the SDEIS. Consistent with the NEPA process, a FEIS should include responses to substantive comments that can take place in the form of changes from what was presented in the DEIS such as factual corrections and/or new or modified analyses or alternatives. This is precisely what was done and clearly reflected in the FEIS. Refer to FEIS, Executive Summary. The MLS FEIS includes responses to more than 5,000 comments received on the DEIS and SDEIS and the Preferred Alternative reflects changes to address many of the comments including design modifications and adjustments, finalizing technical analyses, continued application of avoidance and minimization efforts and finalizing mitigation for unavoidable impacts.

As mentioned above, the FEIS was made available for a 30-day Notice of Availability through various and widely accessible means before the Record of Decision (ROD) was approved. Public involvement and engagement will continue as the project advances to final design and construction. As a requirement in the P3 Agreement, the Developer must provide a public outreach and engagement plan. The Developer will coordinate with MDOT SHA to facilitate an early and ongoing collaborative dialogue to engage stakeholders, local communities, and property owners though final design and construction. MDOT SHA, jointly with the Developer, would be responsible for implementing strategies, such as public meetings and community events, with the goal of maintaining an open dialogue with stakeholders.

*The attachment included with the FEIS comment letter is included on the following pages.*

OP·LANES™
M A R Y L A N D    I-495 & I-270 Managed Lanes Study



OFFICE OF THE COUNTY EXECUTIVE

Marc Elrich
County Executive

MEMORANDUM

March 10, 2022

TO:     Gregory Murrill, Division Administrator
        Federal Highway Administration, Maryland Division

        James F. Ports, Jr., Secretary of Transportation
        Maryland Department of Transportation

FROM:   Marc Elrich, County Executive

SUBJECT: I-495 and I-270 Opportunity Lanes / Managed Lanes Study Supplemental Draft
         Environmental Impact Statement (SDEIS)

This communication is in follow-up to Montgomery County's November 29, 2021, comments to
the Maryland Department of Transportation (MDOT) on the SDEIS for the I-495 and I-270
Opportunity Lanes / Managed Lanes Study ("the Project") prepared by MDOT.

I continue to have substantial concerns with the process that the Project appears to be following,
particularly regarding traffic and environmental impacts, and I urge that these concerns be
addressed through the issuance of an additional SDEIS prior to the Final Environmental Impact
Statement (FEIS). To achieve its intended purpose, this additional SDEIS should have, at
minimum, a 90-day public review period.

The comments provided last November are consistent with input we have provided throughout
the development of the Project since its initiation in early 2018, including comments dated
November 9, 2020, in response to the initial Draft Environmental Impact Statement (DEIS).
Below is a list of Montgomery County's most pressing ongoing and unaddressed concerns:

101 Monroe Street  •  Rockville, Maryland  20850
240-777-2500 •  240-777-2544 TTY •  240-777-2518 FAX
www.montgomerycountymd.gov

OST-S10-220718-008

---

I-495 and I-270 Opportunity Lanes / Managed Lanes Study
Supplemental Draft Environmental Impact Statement (SDEIS)
March 10, 2022
Page 2 of 5

**Local Road Impacts**

The SDEIS should, but does not, carefully consider traffic conditions at interchange
ramps, cross-streets, nor along local roadways. The analysis of local roadways groups all
roadways together, which averages those that may benefit (such as MD 355 outside the
Beltway) with those that may worsen (such as the radial arterials within the Beltway).
The analysis also uses daily values, which overlooks issues associated with peak hours
and peak directions. Averages and generalities hide potentially important information
with potential to have meaningful impact on the public.

Delays, speeds, and travel time information for the local network is extremely important
information that needs to be known at this stage of the SDEIS. Delaying availability of
and consideration of this specific level of information until the FEIS does not allow the
public the opportunity to review and comment on this fundamental information that could
have substantial impacts on these other roadways.

**Transportation Analysis Inconsistencies**

Based on the State's analysis, multiple core components of the Purpose and Need do not
appear to be achieved by the proposed project. The Purpose and Need references
efficiently moving "*goods, services, and people*" but the SDEIS does not appear to
address freight movement and the State has expressly refused to evaluate person
throughput.

There are multiple segments where the General Purpose Lanes worsen significantly,
particularly due to the shifting of bottlenecks on segments of I-270 and I-495 beyond the
Project limits. Legal precedents have been established that the National Environmental
Policy Act (NEPA) requires mitigation measures to be considered for these adverse
impacts. The SDEIS appendices contain numerous examples of significant traffic impacts
that are not mentioned in the main document, which means that these impacts are
unlikely to be noticed or understood by the public in a review of the SDEIS.

Several performance metrics combine the General Purpose Lanes and Opportunity Lanes
together or are missing metrics for the Opportunity Lanes entirely, again limiting the
capabilities of public review. A review of Appendix A revealed multiple other apparent
errors and inconsistencies that were detailed in the County's November 2021 comments.

**Transportation Alternatives**

The absence of an analysis of Project alternatives in the SDEIS fails to meet the
requirements of NEPA and prevents consideration of alternatives that could better reduce
congestion and greenhouse gas emissions. The Project prematurely eliminated transit
alternatives and alternatives focused on Transportation System Management and Travel
Demand Management. The County has consistently contested that these alternatives were

OST-S10-220718-008

I-495 and I-270 Opportunity Lanes / Managed Lanes Study
Supplemental Draft Environmental Impact Statement (SDEIS)
March 10, 2022
Page 3 of 5

eliminated based on flawed reasoning, as noted also in our November 2020 comments on the DEIS.

A 2017 report by the National Capital Region Transportation Planning Board found that the most effective measure to reduce congestion would be traffic demand management, including substantial telework. While the SDEIS reported on levels of traffic during the pandemic, it did not explore how public policies encouraging telework could be an alternative to constructing toll lanes. The Project did not give any consideration of the federal government's decision to permanently increase telework and flexible work schedules. As the largest single employer in the metropolitan region, this policy change could have significant effects on the region. Employer incentives and other policies that encourage telework in the private sector could also reduce congestion and should be considered more seriously in the consideration of potential alternatives.

**Environmental Justice; Equity**

This corridor has a highly diverse population, with 23% of census tracts (9 of 39 tracts) immediately adjacent to the corridor designated as Equity Emphasis Areas or Equity Focus Areas by the Metropolitan Washington Council of Governments and the Montgomery County Planning Department. Many additional Equity Emphasis/Focus Areas are located a short distance away from the corridor.

Department of Transportation Order 5610.2(a) states that environmental justice principles shall be fully considered throughout the planning and decision-making processes. Guidance issued by FHWA in December 2021 as well as Executive Order 13985 both similarly reiterate the importance of environmental justice analysis and considerations of equity impacts. The worsened General Purpose lanes as well as the physical impacts of the Project's construction prompt environmental justice considerations that do not appear to be considered in the SDEIS. Deferring these analyses to the FEIS does not comply with Federal requirements as it deprives the public the opportunity to review and provide feedback on these impacts or any proposed mitigation measures. An environmental justice analysis needs to be included in the SDEIS.

**Environmental Impacts**

The consideration of many other environmental impacts and associated mitigation resulting from the construction and operation of the Project are similarly deferred until the FEIS. The analysis is therefore missing substantial information on emissions and other air & water quality metrics, despite the policy under Executive Order 13990 to "reduce greenhouse gas emissions" and a requirement to achieve the Order's policies by including " input from the public and stakeholders, including State local, Tribal, and territorial officials, scientists, labor unions, environmental advocates, and environmental justice organizations." This requirement was reiterated by the Council on Environmental Quality (CEQ) when it published in the February 19, 2021, Federal Register its notice of

I-495 and I-270 Opportunity Lanes / Managed Lanes Study
Supplemental Draft Environmental Impact Statement (SDEIS)
March 10, 2022
Page 4 of 5

actions taken to follow-up on Executive Order 13990, stating that "*[NEPA] requires Federal agencies to consider the environmental effects of its proposed actions and involve the public in its decision-making processes. ... Federal courts consistently have held that NEPA requires agencies to disclose and consider climate impacts in their reviews.*"

Environmental metrics will be affected by other elements that have not been considered and reviewed by the public, including the aforementioned impacts to local roadways, increases in Vehicle-Miles Traveled, increased congestion in multiple segments, and how this Project will affect mode share targets included in our County Code and area master plans.

Withholding this information until the FEIS prevents an assessment of the project's consistency with the County's Climate Action Plan, as required by NEPA under 40 CFR § 1502.16(a)(5) and 1506.2(d)(2020). Greenhouse gas emissions are a key concern of the County, and the Climate Action Plan sets a goal of cutting greenhouse gas emissions 80% by 2027 and 100% by 2035. Reducing travel by automobiles and increasing the use of transit and greater use of transportation demand management to achieve trip reductions are key strategies of the County's plan for achieving our ambitious goals.

The Project also appears to treat environmental impacts included in the DEIS and proposed by the SDEIS to be shifted to future phases of work as Project savings and benefits. Deferring this analysis until the FEIS prevents the County from understanding the project's full impacts for its residents and providing meaningful comments about the project, including design and mitigation measures. However, these negative impacts still exist in the long term and should be associated with the Project. This approach of using future negative impacts in a way to advantage today's project is a highly concerning contorting of the intent and spirit of the NEPA process that does not reflect any actual environmental benefits.

**Financial Analysis**

The SDEIS fails to include financial information, including an estimate of public subsidies, that could be necessary to support this project. Our concern has been heightened by a lawsuit challenging the award of the predevelopment work to Accelerate Maryland Partners (AMP) This lawsuit generated by another bidder, Capital Express Mobility Partners (CEMP) has been allowed to move forward by the Montgomery County Circuit Court. CEMP argues that AMP assumed unrealistic construction costs in its bid. If CEMP is correct, Montgomery County residents could be forced to fund substantial subsidies for the selected concessionaire.

Higher costs could lead the State to reduce funding for future County transportation priorities. We have also continued to express concern, including in our comments on the DEIS, with the risk of potentially competing projects being given lower funding priority

OST-S10-220718-008

OST-S10-220718-008

00000162

I-495 and I-270 Opportunity Lanes / Managed Lanes Study
Supplemental Draft Environmental Impact Statement (SDEIS)
March 10, 2022
Page 5 of 5

from the State. Projects that are high priority for the County and risk negative funding
impacts may include improving transit services within the Opportunity Lanes,
constructing our master planned Bus Rapid Transit network, or operational improvements
to the General Purpose lanes.

Ultimately, based on the lack of appropriate analysis as well as other remaining inconsistencies
and shortcomings detailed in our November 2020 and November 2021 comments, the County
feels that the information in the DEIS and SDEIS does not comply with NEPA. The lack of
opportunity for public input and agency consideration of the FEIS warrants requiring an
additional SDEIS. The SDEIS we are requesting should address these substantive issues relating
to local road impacts and other issues with the transportation analyses, environmental justice and
equity impacts, other environmental impacts including those relating to air and water quality, and
financial and contracting considerations.

Should you have any questions regarding these comments and requests, please feel free to
contact me or Mr. Chris Conklin, P.E., Director of Transportation, at
christopher.conklin@montgomerycountymd.gov.

cc:     Stephanie Pollack, Acting Administrator, Federal Highway Administration
        Jeanette Mar, Environmental Program Manager, Federal Highway Administration
        Jeffrey T. Folden, Director, I-495 and I-270 Project Office, Maryland Department of
        Transportation
        Meredith Wellington, Land Use Planning Policy Analyst, Office of County Executive
        Chris Conklin, Director, Maryland Department of Transportation
        Glenn Orlin, Senior Analyst, Montgomery County Council
        Debra Borden, Principal Counsel, Legal Department, Maryland-National Capital Park
        and Planning Commission

OST-S10-220718-008

*This page is intentionally left blank.*

**SIERRA CLUB MARYLAND CHAPTER (JUNE 30, 2022)**



Sierra Club Maryland Chapter
P.O. Box 278
Riverdale, MD 20738
(301) 277-7111

June 30, 2022

The Honorable Pete Buttigieg
Secretary of Transportation
U.S. Department of Transportation
1200 New Jersey Avenue, SE
Washington, DC 20590

Dear Secretary Buttigieg,

On Friday June 17, the Maryland Department of Transportation (MDOT) and the Federal Highway Administration (FHWA) released with a 30-day availability period the I-495 & I-270 Managed Lanes Final Environmental Impact Statement (FEIS) and appendices, totaling 26,500 pages in 74 separate files.[1] The undersigned organizations request an additional formal 60-day review period be provided, up to and including September 17, 2022, to allow the public and commenting agencies a meaningful opportunity to review this new document – which most notably includes a revised traffic model that was used to evaluate key alternatives and estimate various impacts – that have not previously been released to the public.

The FEIS, when added to the over 19,000-page draft environmental impact statement (DEIS) and over 8,000-page supplemental draft environmental impact statement (SDEIS) that it incorporates by reference, represents 53,500 pages, which is roughly equal to almost four full 2022 sets of the *World Book Encyclopedia*. It is simply not possible to meaningfully review much less comment on four encyclopedia sets worth of information over 18 work days in a 30-day availability period. We therefore ask that you reconsider the early decision by the FHWA division office not to provide a longer review period. More time is necessary to carry out NEPA's core goal of ensuring meaningful public participation.

---

[1] After years-long review process, final report on I-495/I-270 widening project is released Nearly 500-page 'environmental impact statement' has more than 26,000 pages of appendices, Louis Peck, June 18, 2022, https://bethesdamagazine.com/bethesda-beat/transportation/after-years-long-review-process-final-report-on-i-495-i-270-widening-project-is-released/

1

**Response:**

On June 17, 2022, the FEIS was published in the federal register and made available for a 30-day period on the US Environmental Protection Agency's (USEPA) EIS Database website, on the Op Lanes Maryland website, and at 17 public library locations in Maryland, Virginia and Washington D.C. The FEIS was prepared in support of the normal progress of a National Environmental Policy Act (NEPA) Study. After reviewing and considering the many comments received on the Draft Environmental Impact Statement (DEIS) and Supplemental DEIS (SDEIS), the agencies took another hard look at its prior analyses, evaluated accumulated data, refined design to further address operational considerations and, most notably, to further efforts to avoid and minimize impacts.

From the outset of the Study's NEPA process, the Federal Highway Administration (FHWA) as the lead federal agency, and the Maryland Department of Transportation State Highway Administration (MDOT SHA) as the co-lead agency, developed a comprehensive public involvement and engagement strategy designed to obtain input from stakeholders around the entire MLS study area. This strategy combined traditional opportunities for commenting on the DEIS and SDEIS in addition to wide-ranging outreach to community organizations (e.g., church groups, homeowners' associations, public interest groups, and governmental entities), with particular sensitivity and outreach to identified Environmental Justice communities. Refer to FEIS, Chapter 8. The public involvement and engagement process, starting in early 2018 and continuing for over four years, considered the vast diversity of community resources. The MDOT SHA's public involvement strategy ensured the safety of the public during the pandemic while still providing the same opportunities for meaningful participation by the public in the NEPA process and even expanding opportunities using new technologies available.

The DEIS was published on July 10, 2020, and was made available on the I-495 and I-270 Public-Private Partnership (P3) Program webpage (https://oplanesmd.com/deis/), on the USEPA EIS Database webpage and at multiple public locations in hard copy in Montgomery and Prince George's counties, Maryland, Fairfax County, Virginia and Washington D.C. Following publication of the DEIS, FHWA and MDOT SHA provided a 90-day comment period, which is twice the minimum time required by the Council on Environmental Quality (CEQ) regulations. Based on input from the public, community partners, stakeholders, and local and federal officials, MDOT SHA supported extending the DEIS comment period and made a formal request to FHWA, which has authority to grant any extension. The FHWA approved this request and granted a 30-day extension of the public comment period for the DEIS. In summary, the DEIS was made available for comment and review from July 10, 2020 through and including November 9, 2020, a total of four months. During this extended comment period, the agencies received close to 3,000 comments.

Based primarily upon consideration of the large body of comments on the DEIS, the Preferred Alternative was revised to identify Alternative 9 - Phase 1 South. Building off the analysis in the existing DEIS, the SDEIS, published on October 1, 2021, disclosed new information relevant to the Alternative 9 - Phase 1 South as well as additional information accumulated since the DEIS. The majority of the information and analysis in the DEIS remained valid and was referenced accordingly.

According to MDOT's own FEIS press release, it has "modified analysis methodologies, conducted new analyses, studied new or modified existing alternatives, refined design ... , and identified ... mitigation ... [and] unavoidable impacts." The FEIS also includes a new environmental justice analysis never before released to the public. This is not the subject matter of a final EIS but of a supplemental DEIS, which must have a meaningful and proportional public comment period. Finally, with 5,000 comments submitted on the project and MDOT's responses to those comments of varying length and complexity, it is a substantial effort to review those responses for sufficiency and technical accuracy and merit.

With those kinds of significant changes entailing voluminous new material, with new questions about Maryland constructing toll lanes in Virginia,[2] and with a contentious two-state project that will open up Maryland to 70+ miles of privatization of public transportation infrastructure, it is imperative that the FHWA exercise its oversight role to require that this document receive no less than an additional 60-day review period as was provided for the SDEIS.

As is underscored by the MDOT press release, federally required analyses were not presented to the public with a formal comment period.[3] Some key analyses previously presented were incorrect,[4] and the current versions presented as correct do not explain how the previous errors occurred or how they were fixed. So, the public has no basis on which to verify their accuracy.

The National Environmental Policy Act (NEPA) and relevant DOT and FHWA Orders require accurate environmental analyses and meaningful public participation throughout the NEPA process. These requirements can only be met if

---

[2] MDOT's Plan to Build Toll Lanes in Fairfax is an Unwelcome Surprise to Some Virginians, Bruce DePuyt, June 16, 2022, https://www.marylandmatters.org/2022/06/16/mdots-plan-to-build-toll-lanes-in-fairfax-is-an-unwelcome-surprise-to-some-virginians/

[3] In a notice of actions following the issuance of President Biden's Executive Order 13990 on January 20, 2021, the Council on Environmental Quality made clear that decisions must consider environmental effects of proposed actions, including greenhouse gas emissions, and must involve the public in the decision-making process. The SDEIS for this project did not include a GHG emissions analysis, deferring it to the FEIS, seven months after the close of the formal public comment process.

[4] The significant critiques of flawed traffic modeling were admitted to "have merit" in the 69th file of the FEIS. T.2.B, Volume 2_SDEIS Community Organization Comments and Responses at CO-828, https://oplanesmd.com/wp-content/uploads/2022/06/68_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.B_Volume-2_June-2022p.pdf

2

The SDEIS was available for the public to review and comment during a 45-day comment period, which was later extended an additional 15 days, for a total of 60 days. During this period, all comments received on the totality of information available were accepted and considered. The SDEIS was officially made available on the I-495 and I-270 P3 Program webpage (https://oplanesmd.com/sdeis/), on the USEPA EIS Database webpage, and at multiple public locations in hard copy in Montgomery and Prince George's Counties, Maryland, Fairfax County, Virginia, and Washington DC.

In addition to a combined six-month public comment review period for the DEIS and SDEIS, MDOT SHA has held 16 large public workshops, 7 public hearings including virtual and in-person, and over 200 citizen, elected official, community, stakeholder, and business owner meetings. Refer to DEIS, Chapter 7 and Appendix P; SDEIS, Chapter 7; and FEIS Chapter 8 and Appendix R for detailed information on public involvement.

As a result of this continued public involvement and engagement effort, in addition to input from federal, state, and local agencies, the lead agencies refined and presented the Preferred Alternative and potential impacts of the Preferred Alternative. The MLS FEIS included responses to more than 5,000 comments received on the DEIS and SDEIS. The Preferred Alternative reflects changes to address many of the comments including design modifications and adjustments, finalizing technical analyses, continued application of avoidance and minimization efforts, and finalizing mitigation for unavoidable impacts. This is precisely what the NEPA process envisions. Refer to FEIS, Executive Summary for more detailed explanation.

As mentioned above, the FEIS was made available for a 30-day Notice of Availability through various and widely accessible means before the Record of Decision (ROD) was approved. Public involvement and engagement will continue as the project advances to final design and construction. The MDOT SHA will be responsible for implementing strategies, such as public meetings and community events, with the goal of maintaining an open dialogue with stakeholders.

00000165


the document issued on June 17 is re-designated to be an interim rather than final document and allotted a meaningful and proportional comment period. As noted before, an FEIS for this project should also have a public comment period of at least 60-90 days.[5] Adequate formal public review periods are needed for both an interim document and for an FEIS to ensure that the public has adequate time for meaningful review of the project's impacts.

The undersigned urge you to uphold federal regulations and provide a meaningful review period that will afford the public an adequate opportunity to review and comment on the new information prior to the issuance of a Record of Decision. This issue has been flagged for FHWA and MDOT repeatedly since January 2022 in letters from Sierra Club Maryland Chapter,[6] the Mayor and Council of Rockville,[7] 82 legislators in the Maryland General Assembly,[8] 10 Prince George's County mayors,[9] the Montgomery County Executive,[10] 32 civic and environmental groups,[11] multiple members of Congress,[12] and now dozens more groups.

We look forward to your prompt action on this critical, time-sensitive issue.

Sincerely,

---

[5] Sixty and 75-day FEIS review periods have been provided for other recent highway projects, such as the I-26 Connector in Asheville, NC and the I-45 in Houston, TX.

[6] Sierra Club Maryland Chapter letter to FHWA and MDOT, January 4, 2022, https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/SC-Letter-495270MLS-SDEIS-FEISReviewPd-2022Jan4.pdf

[7] Mayor and Council of Rockville letter to FHWA and MDOT, January 26, 2022, https://static1.squarespace.com/static/5b72c6a8da02bc640472bf8c/t/61fee871b03f68283366 29d3/1644095602555/FHA+Letter+FINAL+012622%281%29.pdf

[8] Maryland General Assembly letter to FHWA and MDOT, February 22, 2022, https://mcusercontent.com/6cdc39da7c0238a0521e24885/files/932d6527-1fc6-5b38-81ac-cba0cf057ae1/FWHA_Letter.pdf

[9] 10 Prince George's County mayors letter to FHWA and MDOT, February 26, 2022, https://9cb12f8b-0595-4233-98ce-142d43d80a5c.usrfiles.com/ugd/9cb12f_feceda725e324136bb9f7cd6f54b9f33.pdf

[10] Montgomery County Executive letter to FHWA and MDOT, March 10, 2022, https://9cb12f8b-0595-4233-98ce-142d43d80a5c.usrfiles.com/ugd/9cb12f_5ea4194f64224e46b8a04706f543f59.pdf

[11] 32 civic and environmental groups letter to Secretary Buttigieg, June 3, 2022, https://www.cabe495.com/_files/ugd/9cb12f_3ea64a8478ba48438955d198aefc629f.pdf

[12] Letter addressed to Secretary Buttigieg.

3

This side is intentionally left blank.

*This side is intentionally left blank.*

Sierra Club Maryland Chapter

Anacostia Watershed Community Advisory Committee

Audubon Mid-Atlantic

Audubon Naturalist Society

Beaverdam Creek Watershed Watch Group

Biodiversity for a Livable Climate

Brandywine TB Southern Region Neighborhood Coalition

Cabin John Citizens Association

Canoe Cruisers Association

Carderock Springs Citizens Association

Cedar Lane Ecosystems Study Group

Central Maryland Transportation Alliance

Chesapeake Climate Action Network

Citizens Against Beltway Expansion

Clean Water Action

Climate Xchange

Coalition for Smarter Growth

Defensores de la Cuenca

Delegate Lorig Charkoudian, Maryland General Assembly

DontWiden270.org

DoTheMostGood

Downtown Residents Advocacy Network (Baltimore)

Environmental Justice Ministry Cedar Lane Unitarian Universalist Church

Friends of Moses Hall and The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated

Friends of Sligo Creek

Greenbelt Climate Action Network

Glen Echo Heights Mobilization

4

*This side is intentionally left blank.*

Greater Farmland Civic Association

HoCo Climate Action

Indivisible Howard County

ISCA – Do Not Expand 495

Maryland Coalition for Responsible Transit

Maryland Conservation Council

Maryland League of Conservation Voters

Maryland Legislative Coalition

Maryland Native Plant Society

Maui Wowi

Mayor Bridget Donnell Newton, City of Rockville

Mayor Patrick Wojahn, City of College Park

National Parks Conservation Association

Neighbors of the Northwest Branch

North Hills of Sligo Creek Civic Association

Our Revolution Maryland

Prince George's County Peace and Justice Coalition

Promenade Towers Mutual Housing Corporation

Rock Creek Conservancy

Rock Creek Hills Citizens' Association

Rogue Tulips LLC

Save BARC

Strong Future Maryland

Takoma Park Mobilization Environment Committee

The Climate Mobilization, Montgomery County Chapter

The Ocean Foundation

Transform Maryland Transportation Coalition

5

Transit Choices

Union of Concerned Scientists

Unitarian Universalist Legislative Ministry of Maryland

Urban Breezes

Washington Area Bicyclist Association

Washington Biologists' Field Club

Well Mind Association of Greater Washington

Woodside Forest Civic Association


Cc:

Ms. Polly Trottenberg, Deputy Secretary, U.S. Department of Transportation

Ms. Stephanie Pollack, Acting Administrator, Federal Highway Administration

Mr. Gregory Murrill, Division Administrator, Federal Highway Administration

Mr. James Ports, Maryland Secretary of Transportation

Mr. Adam Ortiz, Division Administrator, U.S. Environmental Protection Agency

Ms. Tammy Stidham, Deputy Associate Area Director – Lands and Planning, National Park Service

U.S. Congressman Anthony Brown

U.S. Congressman Jamie Raskin

U.S. Senator Ben Cardin

U.S. Senator Chris Van Hollen

6

*This side is intentionally left blank.*

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 56-2    Filed 10/30/23    Page 26 of 76

RECORD OF DECISION

**SIERRA CLUB MARYLAND CHAPTER (JULY 18, 2022)**

July 18, 2022

Ms. Jeanette Mar and Mr. Jitesh Parikh
Environmental Program Manager
Federal Highway Administration, Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore, MD 21201
jitesh.parikh@dot.gov
jeanette.mar@dot.gov

Mr. Jeffrey Folden, P.E., DBIA
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Program Deputy Director
707 North Calvert Street, Mail Stop P-601
Baltimore, MD 21202
MLS-NEPA-P3@mdot.maryland.gov
oplanesMLS@mdot.maryland.gov

Re: Comments on I-495 & I-270 Managed Lane Study Final Environmental Impact Statement
and Final Section 4(f) Evaluation

The National Environmental Policy Act ("NEPA") mandates environmental impact statements for projects of the type and scale of the I-495 & I-270 Managed Lanes Study ("Project"). In an environmental impact statement, NEPA requires that the relevant agencies disclose significant impacts and that the public have a meaningful opportunity to review and comment on those impacts before major decisions are made. On June 17, 2022, the Federal Highway Administration ("FHWA") and the Maryland Department of Transportation State Highway Administration (the "Agencies") issued a final environmental impact statement ("FEIS") for the Project and opened a 30-day review period for the FEIS.

The FEIS describes the Agencies' preferred alternative and appears to formally conclude the NEPA and Transportation Act 4(f) portions of the Agencies' environmental review process. Despite its length, and despite two rounds of public comments identifying flaws in the prior drafts, the FEIS and its appendices present incomplete and inadequate analyses of environmental impacts and fail to achieve the fundamental objectives of NEPA. The undersigned Organizations oppose the preferred alternative put forth in the FEIS and support the no build alternative.

We provide the comments below to address issues raised by the FEIS. Where new information has become available since the supplemental draft environmental impact statement ("SDEIS"), it has been included and discussed. The comments provided below refer specifically to the FEIS and supplement the comments on the draft environmental impact statement ("DEIS") and SDEIS that were provided to the Agencies on November 9, 2020, and November 30, 2021, respectively, by the Maryland Chapter of the Sierra Club and other organizations. Unfortunately, the FEIS largely disregards the technical and procedural issues raised in the previous comments. Collectively, our comments present failures of the Agencies' environmental review process that, if not addressed, constitute violations of NEPA and other governing statutes that will render any record of decision invalid.

The comments identify the Organizations' key concerns regarding the FEIS, including the FEIS's failure to:

i

**Response:**

The following is a response to the Sierra Club, et al. (hereafter "Sierra Club") comments on the I-495 & I-270 Managed Lanes Study (Study) Final Environmental Impact Statement (FEIS), dated July 18, 2022. The cover letter and executive summary portion of the comment letter summarizes specific comments offered in the rest of the comment. Because all topics summarized in the introductory statement are covered separately below, as well as in responses to common themes raised by other parties, this portion of the comment letter does not require a specific response. The Federal Highway Administration (FHWA) and Maryland Department of Transportation State Highway Administration (MDOT SHA), co-lead agencies for this Study, have also reviewed Exhibits A-M that were included with the comment letter, but are addressed in the topics below and do not require a specific response either.

Throughout these comments, the Sierra Club cites to and/or summarizes various statutes, regulations, federal agency guidance, and case law regarding the National Environmental Policy Act (NEPA) process or other substantive areas of law. These comments generally reflect commenters' interpretations and legal conclusions. The Lead agencies have considered these commented but this response does not require the Lead agencies to specifically address the commenters' interpretation of the law and its application. The following responses focus on the contents of the environmental data and analysis reflected in the FEIS. It follows the table of contents and main issues listed in the comment letter.

Responses to the Sierra Club's comments on the Draft Environmental Impact Statement (DEIS) can be found in **FEIS, Appendix T, Section T.2.A, Volume 3** and responses to the Supplemental DEIS (SDEIS) comments can be found in **FEIS, Appendix T, Section T.2.B, Volume 2.**

**I. The Sierra Club's letter stated that the Agencies' Environmental Review Process Fails to Satisfy Public Participation Requirements**

FHWA and MDOT SHA responded to the Sierra Club's letter dated June 30, 2022; refer to **page 39** of this **ROD, Appendix D**. The June 30th letter raised the same issues as the July 18, 2022 Sierra Club letter. These comments questioned whether a 30-day availability period was adequate to meaningfully review and comment on the material in the FEIS including supporting appendices. Based on the Council on Environmental Quality (CEQ) regulations, no formal comment period on a FEIS is required and no final decision can be made sooner than 30 days after the FEIS is published in the Federal Register. An extension of the FEIS availability period was not granted by FHWA as there has been extensive opportunity for the public to review and comment on the Project documents including the DEIS and SDEIS over a four-year period. The FEIS was prepared in support of the normal progress of a NEPA Study. That is, after reviewing and considering the many comments received on DEIS and SDEIS the agencies took another hard look at its prior analyses, evaluated accumulated data, refined the Preferred Alternative design to further address operational considerations and most notably to further minimize impacts. The FEIS outlined the changes made since the SDEIS to aid in review of new or updated information. Supporting technical reports appended to the FEIS were analyses presented in the DEIS, updated in the SDEIS, and finalized for the FEIS. For the more detailed response to comments related to the request to extend the FEIS availability period, refer to the FHWA and MDOT's response to the June 30, 2022 Sierra Club comment in **page 39** of this **ROD, Appendix D**.

- Allow meaningful public comment throughout the NEPA review process, in part by failing to provide key documents and analyses that underpin the FEIS
- Address previous flaws and new, serious flaws in the traffic analysis
- Adequately assess impacts to public health from the construction and operation of the Project
- Adequately address significant adverse effects on sensitive historic and cultural resources
- Take the required hard look at environmental justice issues.

As we have consistently noted in our comments, the environmental review process for the Project seemed designed to reach a pre-determined result, namely, to expand I-495 and I-270 with toll lanes, without meaningfully involving the public, considering viable alternatives, or considering the preferred alternative's environmental impacts.

The Agencies must not move forward with the preferred alternative or any of the fundamentally flawed build alternatives without full and proper consideration of additional, less harmful and costly alternatives that address the real needs for transportation improvements in the region and providing the public with a new environmental review document that addresses the failures identified and accords the public a meaningful opportunity to review and comment.

Sincerely,

Sierra Club Maryland Chapter[1]

Aloha Enterprises, Inc.

ArchPlan Inc.

Audubon Naturalist Society

Bikemore

Carderock Springs Citizens Association

Central Maryland Transportation Alliance

Chesapeake Climate Action Network

Citizens Against Beltway Expansion

---

[1] The Organizations would like to acknowledge Jill Grant & Associates, LLC, Norm Marshall (Smart Mobility, Inc.), John Zamurs, PhD (ZAMURS AND ASSOCIATES, LLC), Ronald Bialek, MPP, Byron Bloch, Roselie Bright, Sc.D., Shannon Browne, PhD, Arthur Katz, and Dr. Benjamin Ross, for assisting the groups in drafting these comments. We would also like to thank the many organizations and volunteers who dedicated their time and expertise to these comments, including: David Cottingham, Barbara Coufal, Co-Chair, Citizens Against Beltway Expansion; Andrea Ferster; Andrew Gallant, Janet Gallant, Co-coordinator, DontWiden270.org; National Parks Conservation Association; Paula Posas; Robert Soreng, PhD, President of the Washington Biologists' Field Club; Sally Stolz, Co-coordinator, DontWiden270.org; Peter Yarrington, Audubon Naturalist Society Volunteer.

ii

The July 18, 2022 letter also claims the Agencies ignored opposing viewpoints, declined to tally the number of comments opposing the project in the FEIS, responded to public comments after the public could formally reply, and responded to similar comments in an inconsistent manor. In total, over 5,000 comments were received during the study comment periods for the DEIS and SDEIS. These comments were organized into relevant comment themes and summarized in respective reports. To be fully transparent and to ensure all comments were able to reach other citizens, the comment summary reports, including the individual submissions, were made publicly available on the Program website. The **FEIS, Appendix T** includes a response to every comment received on the DEIS and SDEIS. There is no requirement to tabulate the comments because every comment and response is available. **FEIS, Appendix T** includes a table of contents and an index to aid readers in finding both a response to their DEIS and SDEIS comments as well as the copy of their comments received. The index is organized first by the commenting entity (i.e. community organization, business, etc.) or individual, then alphabetical by the commenter's last name or organization. The DEIS Comment and Response Index can be found on **Page 2 of Appendix T, Index** and the SDEIS Comment and Response Index on **Page 67 of Appendix T, Index**.

Refer to **Appendix T, Section T.1** for agency comment responses, **T.2** for community organization comment responses, **T.3** for elected official comment responses, **T.4** for business comment responses, **T.5** for form letter comment responses, and **T.6** for individual comment responses. For thematic comment responses, refer to **Chapter 9** of the FEIS.

All Study documents posted on the website are compliant with Section 508 of the Rehabilitation Act of 1973 and follow federal and state accessibility requirements. The files can be read by a computer program to someone who is visually impaired. As included in Exhibit C, MDOT SHA sent a response to Mr. Gallant regarding the protection of files on the website. The files can be printed, they are accessible to the visual impaired in a manner which fully complies with 508 but content is produced in pdf format in an effort to maintain the integrity of the content.

## II. The Sierra Club's letter states that Traffic Models Used in the FEIS Are Deeply Flawed

FEIS comments questioned the Study's final traffic forecasts and modeling results. These comments are not based in fact and appear to be based on a misunderstanding of how data was updated and refined between publication of the SDEIS and publication of the FEIS and its supporting documents. FHWA and MDOT followed accepted practice and processes for considering how or if the Preferred Alternative design refinements or other relevant new information would impact traffic forecasts. Any changes to the traffic forecast results in the FEIS properly reflect appropriate and relatively minor updates to modeling inputs based on information available to MDOT SHA following completion of the SDEIS.

The Sierra Club has indicated that the FEIS's traffic model appears to be inconsistent with the traffic model used to predict revenue. Both modeling efforts are based on the Metropolitan Washington Council of Governments (MWCOG) regional travel demand model. However, updates and enhancements to the MWCOG models vary by use and purpose associated with the particular modeling exercise. Per AASHTO's Practitioners' Handbook, Managing the NEPA Process for Toll Lanes and Toll Roads (August 2016): "The NEPA traffic forecasts are intended to provide the basis for an informed Federal decision about the project. For projects involving a PPP or bond financing, it also will be necessary at some point to prepare investment-grade traffic and revenue (T&R) forecasts. The T&R forecasts serve a different purpose from the NEPA forecasts: they provide assurances to investors that traffic levels will be sufficient to support the toll revenues

00000171

OP·LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study

RECORD OF DECISION

City of Rockville

Climate Reality Montgomery County

Coalition for Smarter Growth

Conservation Montgomery

DontWiden270.org

Downtown Residents Advocacy Network (Baltimore)

Elders Climate Action Maryland Chapter

Environmental Justice Ministry, Cedar Lane Unitarian Universalist Church

Friends of Moses Hall/The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated

Friends of Sligo Creek

Howard County Climate Action

Indivisible Howard County Maryland

Job Opportunities Task Force

Maryland Conservation Council

Maryland League of Conservation Voters

Maryland Legislative Coalition

Maryland Nonprofits

MLC Climate Justice Wing

National Parks Conservation Association

Neighbors of the Northwest Branch

North Hills of Sligo Creek Civic Association

Northern Virginia Citizens Association

Our Revolution Maryland

Policy Foundation of Maryland

iii

anticipated for the project. These two sets of traffic forecasts generally are conducted separately and involve different methodologies. In many cases investment-grade T&R forecasts are prepared after the NEPA process is completed."

In general, Toll and Revenue modeling is performed for financial planning. It is used in part to generate traffic forecasts that can help identify and evaluate any potential financial risks or uncertainties associated with the project over time. CDM Smith is a company that performs Toll and Revenue studies using proprietary algorithms, data, and analysis, which they performed for the financial planning efforts for this project and to support toll setting. As noted in their report, their work included refinements to the MWCOG model – including adjustments to the population and employment projections, among other things. In addition, the Developer, as MDOT's P3 partner, will perform their own independent Traffic and Revenue studies to support their project financing. Neither Toll and Revenue models are used to evaluate the traffic operations of freeway segments, ramp segments, and intersections within the study area and they do not provide traffic performance measures needed to support NEPA and IAPA evaluations and documentation. When using information from the Toll and Revenue studies, it is also important to keep in mind that, "CDM Smith made qualitative judgments related to several key variables in the development and analysis of the traffic and revenue estimates that must be considered as a whole; therefore, selecting portions of any individual result without consideration of the intent of the whole may create a misleading or incomplete view of the results and the underlying methodologies used to obtain the results," as stated in the Final Toll Rate Setting Report.

The traffic modeling and analysis used to support traffic analysis for NEPA and IAPA, as well as engineering design, is also based on traffic forecasts developed from use of the MWCOG travel demand model, but the refinements and post-processing assumptions and methodologies differ from those used in Toll and Revenue model. Based on the MWCOG model and refinements completed as part of the NEPA process, the traffic forecast can then be used to develop VISSIM microsimulation models, the results of which are evaluated to identify the project's traffic impacts and potential areas for design refinements. More specifically, the traffic forecasts in the FEIS were not used to determine when the soft cap would potentially be exceeded; that information would come from the Toll and Revenue studies. Rather, as part of the forecasting assumptions for the NEPA efforts, it was assumed that the maximum throughput in the managed lanes would be capped (by use of toll rates) in order to maintain the minimum operating speed requirement. As stated in FEIS Appendix A, "It should be noted that toll rates are unknown at this point, but they will be dynamic to manage traffic demand in the HOT lanes. For the purposes of this analysis, volumes in the managed lanes were assigned to provide the maximum throughput while maintaining speeds of at least 45 mph in the managed lanes (the federal requirement). This threshold occurs at 1,600 to 1,700 vehicles per hour per lane in the highest demand segment, which equates to a maximum of 3,200 to 3,400 vehicles per hour in the two-lane managed lane network."

The description above helps explain why specific numbers from the Toll and Revenue studies should not be compared to specific numbers from the FEIS forecasts. Nonetheless, it should be noted that despite the differences in modeling purposes, assumptions and methodologies, MDOT's traffic modeling team did coordinate with the ongoing CDM Smith and P3 Developer modeling efforts to compare traffic volume forecasts to confirm relative consistency.

00000172



Rogue Tulips LLC

Strong Future MD

Takoma Park Mobilization Environment Committee

The Climate Mobilization, Montgomery County Chapter

Transform Maryland Transportation Coalition

Transit Choices

Voices Maryland

Washington Area Bicyclist Association

Washington Biologists' Field Club

Waterkeepers Chesapeake

Woodside Forest Civic Association

iv

In addition, the FEIS comment questioned the number of traffic model runs used in the analysis reported in the NEPA documentation. As part of MDOT SHA's Draft Application for Interstate Access Point Approval (IAPA), the IAPA Framework Document notes that "Five (5) runs will be performed for each model scenario," (page 24). This approach was approved by FHWA and is consistent with MDOT SHA Guidelines. Refer to **FEIS, Appendix B** for additional details on MDOT SHA's Draft Application for IAPA Approval.

The FEIS comment highlights specific travel time values, noting differences between the SDEIS and FEIS in a series of tables starting on page 18. The concerns are similar to those raised by the Maryland Transit Opportunities Coalition (MTOC) in a letter to FHWA dated July 11, 2022. MDOT's response to the MTOC comments is included in **ROD, Appendix D**. That response includes a list of specific forecasting and coding changes that were made by MDOT between the SDEIS and FEIS in light of the new recommended Preferred Alternative, and as part of the normal course of action for a NEPA study. The changes refined the analysis in response to public, stakeholder, and agency comments concerning the scope of the proposed action, as well as other issues. The updated analysis did not fundamentally alter the overall findings of the MLS. The following explains in greater detail how these refined analyses affected the specific travel time numbers cited by the Sierra Club.

Table 1 on page 18 shows travel time results for three northbound trips on the west side of the study area. The table correctly notes that the travel time results for all three of these trips decreased between the SDEIS and FEIS in both the No Build condition and in the Build condition. The reason that these travel times decreased is due to residual impacts from forecasting changes that were made in the Greenbelt area on the northeast side of the study area related to planned background development at the Greenbelt Metro interchange. The forecasts used in the SDEIS were overly conservative and projected peak period volumes that far exceeded the capacity along the Inner Loop and the ramps serving the Greenbelt Metro interchange. In the 2045 SDEIS models, severe congestion formed on the Inner Loop during the PM peak period approaching Greenbelt. The congestion was so severe that it backed up through the top side of the Beltway and into the west side of the Beltway, which increased travel times for northbound trips, including those shown in Table 1.

Upon review of the SDEIS models following the comment period, it was determined that the Greenbelt forecast projections were not consistent with the MWCOG model trends and therefore needed to be adjusted. The volumes serving the background development were reduced accordingly during development of the FEIS. This change impacted the travel time results reported in the FEIS because there was less congestion on the Inner Loop through the Greenbelt area, which no longer spilled back into the west side of the Beltway. Therefore, travel times improved in the FEIS for the northbound trips listed in Table 1. Because this change was related to background development, it affected both the No Build results and the Build results. While both the No Build and Build travel times reduced in the FEIS, the net difference between No Build and Build remained approximately the same and therefore this change did not fundamentally alter the overall benefits of the Preferred Alternative reported originally in SDEIS Chapter 3 and updated in FEIS Chapter 4, and the general conclusions are the same.

Table 2 reprints some of the values from Table 1, while Tables 3 and 4 highlight the travel time results for some additional trips on the west side of the study area. The explanation for why the travel times decreased between the SDEIS and the FEIS is the same as described above. The letter also highlights these specific

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................................... 1

I.   The Agencies' Environmental Review Process Fails to Satisfy Public Participation Requirements. ............................................................................................................. 3

    A.   The 30-day Availability Period on the FEIS Is Insufficient and Must Be Extended. ......... 3

    B.   The Agencies Have Not Tabulated the Public Comments on the FEIS, Contrary to Their Prior Practice, Thereby Dismissing and Erasing the Public's Voice ...................... 6

II.   The Traffic Models Used in the FEIS Are Deeply Flawed. ...................................... 11

    A.   The Traffic Modeling in the FEIS Fails to Address Critical Errors Identified by Commenters and Introduces New Errors. ................................................................. 11

    B.   The U.S. DOT Must Re-Examine the Traffic Modeling in the FEIS To Ensure Its Integrity and the Agencies Must Address Possible Inconsistencies Between the FEIS's Traffic Model and the Traffic Modelling Used to Support Revenue Models for the Project. ............................................................................................................ 14

    C.   There Are Serious Problems with the Current FEIS that Indicate the Traffic Models and How They Are Applied Should Be Reviewed Independently Before Final Decisions Are Made. .............................................................................................. 18

III.   The FEIS Fails To Address Impacts to Public Health. ........................................... 20

    A.   Respirable Crystalline Silica Construction Dust Remains a Major Unaddressed Public Health Hazard of this Project that the Agencies Are Ignoring. ......................... 22

    B.   The FEIS Fails To Address the Health Impacts of Traffic Safety Issues from the Preferred Alternative. ............................................................................................. 23

IV.   The FEIS's Discussion and Evaluation of Plummers Island, Certain NPS Lands, the Potomac River, and Impacts to the Northern Lon-Eared Bats and Other Bats Is Incomplete and Contrary to Applicable Legal Requirements. ...................................................... 25

    A.   Throughout the Environmental Review Processes, the Agencies Have Failed to Consider the Full Scope of Impacts to Plummers Island. ........................................... 25

    B.   The FEIS Fails to Address Several Outstanding Issues Pertaining to National Park Service Land Around the American Legion Bridge, Including on Both the Maryland and Virginia Sides of the Potomac River. ................................................ 33

    C.   The FEIS Does Not Adequately Identify and Analyze Impacts to the Potomac River. .................................................................................................................... 36

    D.   The FEIS's Analysis of Impacts to the Northern Long-Eared Bat and Other Bats Is Inadequate and Even More Outdated than Before, Given Recent Regulatory Developments and New Revelations About the Scope of Construction. .......................... 38

V.   The FEIS Fails to Meet the Agencies' Environmental Justice Obligations Despite Numerous Commenters' Efforts in Identifying Deficiencies in the Agencies' Analysis. ........... 41

    A.   Delaying the EJ Analysis Until the FEIS Precluded Meaningful Public Review Including, Most Importantly, Review and Comment by EJ Populations. ......................... 41

    B.   Cumulative Impacts to the African American Morningstar Moses Hall and Cemetery Site Have Been Disregarded and Dismissed by the Agencies, Unlawfully

v

trips because they are examples of trip pairs in which the projected travel time in the general purpose lanes under Build conditions is higher than for the same trip under No Build conditions. This topic has been brought up before and is addressed in **Section XI.B.6** of the **ROD**. The FEIS shows that the travel times for some Inner Loop trips are "longer" in the Build general purpose lanes than No Build. The reason is that the backups would be so bad in Virginia under the No Build condition that fewer vehicles would actually get across the American Legion Bridge (ALB) during the peak hour. This makes some trips in Maryland under the No Build look better than they are. The Build condition serves much more throughput during the peak hour and there is naturally some increase in travel time during the peak when looking at certain segments. While this affects some trip pairs, including the ones highlighted in the Sierra Club letter, most (76%) of the trip pairs show a benefit from traveling in the general purpose lanes under Build versus No Build, and the average PM travel time change between No Build and Build is a net improvement of 8 minutes of savings when looking at the entire system.

Table 5 and Table 6 show the travel time results for two trips that start on the top side of I-495 and follow the Outer Loop towards the ALB during the PM peak period. The tables highlight a large change in projected travel times for these three trips between the SDEIS and FEIS in the No Build model. These travel time increases detailed in the FEIS resulted from correction of a coding error in the SDEIS No Build VISSIM PM peak model that was identified and corrected during development of the FEIS. The issue was related to the routing of HOVs traveling from the top side Outer Loop to I-270 northbound, which caused severe congestion on the Outer Loop approaching the east spur to I-270 by sending too many vehicles north towards I-270 and not enough along the Outer Loop towards the ALB. This change did not significantly alter the overall network-wide results for the No Build Alternative, but rather shifted some of the congestion from one area to another. Therefore, the coding issue was not initially apparent when reviewing the overall findings presented in the SDEIS. Upon closer review of the SDEIS models following the comment period, this issue was identified and corrected. This change affected the travel times in the No Build PM model in a couple of locations. Travel times on the top side Outer Loop approaching Connecticut Avenue decreased between the SDEIS and the FEIS, while travel times on the west side Outer Loop approaching the ALB (such as those highlighted in Table 5 and Table 6) increased between the SDEIS and the FEIS. But as noted above, the overall No Build travel times and delays were not significantly affected by the change. This coding change was applied to the No Build model only, and therefore did not affect the Build results for these trips.

As shown in Table 5, the Build travel times are similar between the SDEIS and the FEIS. However, Table 5 and Table 6 show the incorrect values for the general purpose lane travel times for the Build condition. The values for the SDEIS and FEIS appear to be transposed in the Sierra Club letter – for the trip from Connecticut to GWP (Table 5), the reported travel time in the SDEIS is 9.8 minutes (not 10.1 minutes), while the reported travel time in the FEIS is 10.1 minutes (not 9.8 minutes). A similar error was made in the Sierra Club letter in Table 6 for the trip from Connecticut to River Road. The reported travel time in the SDEIS is 6.6 minutes (not 7 minutes) and the reported travel time in the FEIS is 7 minutes (not 6.6 minutes). This error is carried over into the "Difference" row, and therefore the "Increase Time" values shown in the yellow box in Table 5 and Table 6 are incorrect. If the proper values were used, the calculated increase time would be 440% (not 470%) in Table 5 and 586% (not 656%) in Table 6. As with the other changes described above, the coding change made by MDOT between the SDEIS and FEIS did not fundamentally alter the overall benefits of the Preferred Alternative reported originally in SDEIS Chapter 3 and updated in FEIS Chapter 4, and the general conclusions are the same.

Preventing an "Adverse Effects" Determination for a Nationally-Recognized 4(f) Protected Resource..........................................................................42

C. In Violation of Title VI, the Agencies Failed to Provide Meaningful Opportunities for Review and Comment on Agency Plans by Non-English Speaking Populations by Directing Limited English Proficiency Commenters to an Inaccurate SDEIS Executive Summary............................................................................52

D. The Agencies' EJ Analysis Suffers from Serious Deficiencies by Failing to Analyze Cumulative Impacts to EJ Populations...........................................53

E. The FEIS Fails to Take a "Hard Look" at Air Quality Impacts to EJ Populations...........55

F. The FEIS Fails to Quantify Impacts to the Gaithersburg EJ Area..........................56

G. The EJ Analysis Ignores Impacts to EJ Populations East of the I-270 Spur. .................56

H. The FEIS Fails to Fully Assess Construction and Post-Construction Impacts to the Julius West Middle School and Other Sensitive Sites Next to the Highway..................57

I. The FEIS Fails to Consider Impacts to Environmental Justice Communities from New Bottlenecks and Increased Traffic Created by the Preferred Alternative. ...............57

J. The FEIS Does Not Adequately Address the Environmental Justice Impacts of Adding Toll Lanes. ....................................................................58

VI. The FEIS Fails To Disclose the Socioeconomic and Societal Impacts of Private Concessionaire Contracts and Their Influence on Future Land Use Policies......................59

VII. Conclusion ...............................................................................62

EXHIBIT LIST ...............................................................................64

vi

The July 18, 2022 comment letter also suggested that MDOT SHA should be using empirical data from other projects in Virginia and Maryland. MDOT SHA did look at similar projects in Virginia, Maryland, and around the country, and that those projects showed system wide benefits to constructing managed lane facilities. FHWA has been promoting the use the managed lanes for many years, as noted in the example from 2004: https://highways.dot.gov/public-roads/novemberdecember-2004/managed-lanes.

For additional information refer to the following documents: **FEIS Chapter 4; FEIS, Appendix A, Final Traffic Analysis Technical Report; FEIS Appendix B, and MDOT SHA's Draft Application for Interstate Access Point Approval.** Responses to the Sierra Club's comments on the DEIS can be found in **FEIS, Appendix T, Section T.2.A, Volume 3, page CO-535** and responses to the SDEIS comments can be found in **FEIS, Appendix T, Section T.2.B, Volume 2, page CO-826.**

### III. The Sierra Club's letter states the FEIS Fails To Address Impacts to Public Health

The FEIS comment claims that public health was not addressed and ties it to a need for air quality and traffic safety analyses. This is not accurate as these analyses have been conducted for the Study. Specifically, the FEIS addresses comments received on public health in a response found on **page 9-56 of the FEIS, Chapter 9**. In addition, air quality and traffic safety analyses have been completed and documented.

While safety was not identified as a need for the Study, a safety analysis was conducted as part of MDOT SHA's Draft Application for IAPA Approval; refer to **FEIS, Appendix B** for additional details. That safety evaluation included a thorough review of existing crash data; an evaluation of crash rates and the identification of high crash locations; a qualitative assessment of how key design elements would be expected to influence safety; and a quantitative analysis that provides relative comparison results of predictive crash analysis for the No Build and Preferred Alternative. The safety results demonstrate that the Preferred Alternative should not have a significant adverse impact on the safety of the study corridors.

The air quality analysis is thoroughly documented in the DEIS, SDEIS, and FEIS; refer to **DEIS, Chapter 4, Section 4.8; DEIS Appendix I; SDEIS, Chapter 4, Section 4.8; FEIS, Chapter 5, Section 5.8; FEIS, Appendix K, and FEIS, Chapter 9, Section 9.3.4.F**. As stated in the FEIS, the Study is located in an attainment area, as defined by US Environmental Protection Agency (USEPA), for carbon dioxide (CO), and particulate matter ($PM_{10}$ and $PM_{2.5}$); therefore, transportation conformity requirements pertaining to these criteria pollutants do not apply to this project and no further emissions analysis were evaluated. Montgomery County, Maryland and Fairfax County, Virginia are listed by USEPA as non-attainment for the 2015 8-hour ozone standard. However, the National Capital Region Transportation Planning Board updated the Visualize 2045 plan in 2022 and the design concept and scope for the Selected Alternative is included in the Air Quality Conformity analysis accompanying the update. As the Study is included in the conforming long-range plan and the Air Quality Conformity analysis, the Selected Alternative would not cause new air quality violations, worsen existing violations, or delay timely attainment of the relevant national ambient air quality standards including ozone.

**EXECUTIVE SUMMARY**

Despite its length, and despite two rounds of public comments identifying serious flaws in the prior drafts, the FEIS and its appendices present incomplete and inadequate analyses of environmental impacts and fail to achieve the fundamental objectives of NEPA. The signatory Organizations to this comment oppose the preferred alternative put forth in the FEIS and support the no build alternative.

Viewed through the lens of NEPA's twin goals—disclosure of significant impacts and public participation—the Project's environmental review process has been operationally and legally insufficient. The FHWA- and MDOT-approved NEPA-documents have failed in numerous required areas to disclose significant impacts. The NEPA process led by these two agencies failed to allow for meaningful public participation by assigning inadequate comment periods for voluminous documents and by failing to respond to comments provided by the public and elected officials until after the public comment periods closed, precluding a productive back-and-forth discussion between the public, their elected officials, and the agencies.

These comments identify the Organizations' key concerns regarding the FEIS, including but not limited to the following:

- The FEIS process itself was flawed. Public comment periods were too short to allow meaningful comments on the voluminous documents and attachments that comprised the FEIS, SDEIS, and DEIS. The Agencies provided only an availability period rather than a public comment period on the FEIS and did not even provide an email address for submission of comments. The FEIS, like the DEIS and SDEIS, relies on documents and data that the Agencies have unlawfully withheld from the public. The FEIS also fails to meaningfully respond to public comments.

- There are serious flaws in the traffic analysis. Based on changes between the model outputs in the FEIS and SDEIS, it appears that manipulation of the models may have occurred. Like others, we call on the U.S. DOT to review the traffic model in the FEIS to ensure that the ROD is based on valid and credible traffic modeling. Moreover, the information presented in the FEIS shows that the preferred alternative will create new and larger traffic problems at key interchanges and merge areas by creating bottlenecks. The limited benefits of the toll lanes, available when most needed only to those who can afford them, cannot justify the magnitude of harm they will cause.

- The FEIS ignores the negative impacts of the preferred alternative on safety on the toll lanes, general purpose lanes, and arterial roads. These human health impacts must be evaluated and presented for public review and comment. The preferred alternative will increase vehicle travel and those extra miles will lead to more (preventable) deaths on the highway. In addition, the air pollution and, specifically, the extra particulate matter pollution caused by those extra miles will cause innumerable health impacts to the people living along the highway.

1

As documented in the FEIS and in accordance with the latest mobile source air toxics (MSAT) guidance, the Study is best characterized as one with "higher potential MSAT effects" since the projected Design Year traffic is expected to reach the 140,000 to 150,000 average annual daily traffic (AADT) criteria.[1] Therefore, a quantitative MSAT emissions analysis was conducted. The results of the MSAT analysis show that all of the MSAT pollutant emissions are expected to increase slightly for the Preferred Alternative when compared to the No Build condition for 2025 and 2045. All MSAT pollutant emissions are expected to significantly decline in the Opening (2025) and Design years (2045) when compared to existing conditions (2016). These long-term reductions occur despite projected increase in vehicle miles traveled (VMT) from 2016 to the 2025 and 2045 Build scenarios. Refer to **FEIS, Chapter 5, Section 5.8** and **FEIS, Appendix K, Section 3.3.3** for additional detail on the MSAT results.

As documented in the FEIS, to date, no national standards for greenhouse gas (GHG) emissions have been established by the USEPA under the Clean Air Act and there is no regulatory requirement that has been established to analyze these emissions at a project level for transportation projects. Consistent with the 2016 CEQ Final GHG NEPA guidance,[2] a quantitative GHG analysis was conducted on the six Build Alternatives and the Preferred Alternatives as documented in the DEIS and FEIS, respectively. Since there is no approved methodology for conducting a project-level quantitative GHG emissions analysis, there are numerous parameters that could be applied to conduct such a review. Consistent with FHWA guidance on developing an affected network to analyze project-related pollutants, such as MSATs, MDOT SHA analyzed GHG emissions using the same affected network as the MSAT analysis. Refer to **FEIS, Appendix K, Section 3.4.1** for the GHG results.

Air quality considerations during construction are documented in **FEIS, Chapter 5, Section 5.23.3** and **FEIS, Appendix K.** The results of the analysis of operational emissions of GHGs during construction using FHWA's Instructure Carbon Estimator can be found in **Appendix B of the Final Air Quality Technical Report (FEIS, Appendix K).**

While no significant increase in GHG emissions from the Preferred Alternative was noted, MDOT SHA has committed to implementing a Greenhouse Gas Reduction Program to reduce emissions during construction. Refer to **ROD, Appendix A, Table 1.**

**IV. The FEIS's Discussion and Evaluation of Plummers Island, Certain NPS Lands, the Potomac River, and Impacts to the Northern Long-Eared Bats and Other Bats Is Incomplete and Contrary to Applicable Legal Requirements**

The FEIS comments stated that the FEIS failed to acknowledge the full scope of impacts to Plummers Island, including the long-term research plots and sensitive research sites that will be destroyed by the project. This is not accurate. **FEIS Appendix T, Section T.2.A Volume 2, page CO-347** includes MDOT SHA's responses to comments from the Washington Biologist Field Club (WBFC) including specific responses that address these impacts to Plummers Island and the research plots. In addition, Plummers Island is discussed in the **FEIS, Chapter 5, Sections 5.4, 5.7, 5.12, 5.17, and 5.19; FEIS, Appendix G, Final Section 4(f) Evaluation; FEIS, Appendix M, Natural Resources Technical Report;** and **FEIS, Appendix N Final Avoidance, Minimization and Impacts Report.**

---

[1] Updated Interim Guidance on Mobile Source Air Toxic Analysis in NEPA Documents. October 18, 2016. https://www.fhwa.dot.gov/environMent/air_quality/air_toxics/policy_and_guidance/msat/page03.cfm

[2] https://www.federalregister.gov/documents/2016/08/05/2016-18620/final-guidance-for-federal-departments-and-agencies-on-consideration-of-greenhouse-gas-emissions-and

- The FEIS still does not adequately analyze air emissions, including the increase the Project will cause in harmful particulate matter and greenhouse gas emissions. Like the air quality analyses presented in the DEIS and SDEIS, the limited and error-filled air quality analysis presented in the FEIS does not support the general statements in that document downplaying air quality impacts, and in fact shows the Project will impair the health of communities around the Project, including environmental justice communities. Shockingly, the FEIS fails to meaningfully acknowledge or propose to mitigate the harmful air quality impacts and other pollution caused by construction of the preferred alternative, including from silica dust, a carcinogenic air pollutant generated by highway construction.

- The FEIS fails to adequately acknowledge or address the Project's adverse effects on historic and cultural resources, including the Morningstar Tabernacle No. 88 Hall and Cemetery in the historic Black community of Gibson Grove in Cabin John, Maryland, and Plummers Island, a globally unique biodiversity hotspot and site of over 120 years of long-term research in the D.C.-metro area. The Agencies have also failed to comply with their duties under the Section 4(f) of the Department of Transportation Act (Section 4(f)) with respect to these resources in numerous ways. Throughout the process, the Agencies rejected reasonable, prudent, and feasible alternatives that would minimize harm or avoid the use and destruction of significant features and attributes of these important historic resources and, ultimately, made arbitrary determinations about the adverse effects from the Project by failing to consider many important cumulative impacts from highway construction and operation. In the case of Morningstar Tabernacle No. 88 Hall and Cemetery, FHWA came to its conclusion of no adverse effects by wrongly ignoring the historic injustices caused by the highway construction in the 1960s.

- The FEIS fails to take the required hard look at environmental justice issues. The FEIS overlooks many of the harms that EJ communities will suffer during construction and operation of the preferred alternative, including localized air quality impacts from newly created bottlenecks and impacts from the loss of an otherwise free lane on I-270. In its belated analysis of adverse impacts to EJ communities, the Agencies use a flawed methodology and fail to grapple with historic inequities facing those communities from the initial construction of the highway system and the greater susceptibility of EJ populations to the impacts of environmental pollution.

- The FEIS does not adequately analyze impacts on federally threatened or endangered species and state rare, threatened, or endangered species.

As we have consistently noted in our comments, the environmental review process for the Project seemed designed to reach a pre-determined result, namely, to expand I-495 and I-270 with costly toll lanes, without meaningfully involving the public, considering viable alternatives, or

2

The FEIS comments stated that MDOT SHA failed to respect WBFC's role on Plummers Island throughout the planning process and provide appropriate advanced notice for disturbances to the island. FHWA and MDOT SHA have met with the WBFC representatives directly 3 times during the NEPA process for the Study. For access to Plummers Island, MDOT SHA secured permits with the National Park Service (NPS), the property owner, for all work done on NPS land and coordinated as agreed upon with NPS for all access to the properties. In addition, NPS has coordinated directly with WBFC several times.

Plummers Island is part of the Chesapeake and Ohio Canal National Historical Park and is owned by the NPS. As part of the Section 106 coordination for the Study, MDOT SHA completed the National Register of Historic Places (NRHP) determination of eligibility (DOE) form, included in **FEIS, Appendix I** and as Exhibit J in the Sierra Club FEIS comment letter. Plummers Island is a recognized ecologically sensitive and an NRHP-eligible historic property in addition to being part of the larger Chesapeake and Ohio Canal National Historical Park. The WBFC is a Section 106 Consulting Party for the Study and in this role they have had opportunities to comment on the project, the adverse effects and mitigation for impacts to Plummers Island. The specific comments from the WBFC on the Programmatic Agreement (PA), which were included as Exhibit M in your comment letter, were responded to by MDOT SHA. All of the consulting party comments on drafts of the PA were responded to and distributed to the consulting parties.

The FEIS comments state that the FEIS does not sufficiently explain why the west shift option for the American Legion Bridge (ALB) was rejected. This is not accurate. The FEIS includes this explanation in **FEIS Appendix N, pages 6 through 10 and 17**.

The FEIS comments states that mitigation for impacts to Plummers Island should have been evaluated in the NEPA process from the beginning and not just the Section 106 Process that will conclude after the comment period is over and the ROD is signed. The DEIS, SDEIS and FEIS document the mitigation that has evolved through the NEPA process in consultation with the regulatory agencies and with feedback from stakeholders and public comments. The public had an opportunity to review the final mitigation and commitments during the FEIS availability period. **FEIS, Chapter 7** and **Appendix A** of the ROD, document the mitigation and commitments developed during the NEPA process. Specifically, there is a commitment with the NPS to evaluate additional options for the ALB during final design that would further minimize or avoid physical impacts to Plummers Island.

The FEIS comments stated that the natural resource mapping is inaccurate. MDOT SHA does not agree with this assertion and believe the mapping to be complete. **FEIS Appendix T DEIS and SDEIS Comments and Responses Section T.2A Volume 2, page CO-351** includes comment responses that describe what is included in the project mapping.

The FEIS comments stated that the FEIS fails to accurately describe the likely impacts of the Preferred Alternative due to risks of catastrophic flooding to Plummers Island, and further states that the flooding issues from the planned caisson and pier emplacements of the ALB and leveling or trimming of the Plummers Island rock ridge were not fully addressed in the FEIS. This is not accurate. **FEIS Appendix T, DEIS & SDEIS Comments and Responses, Section T.2.B, Volume 1, page CO-717** addresses these concerns and indicate that full



considering the full range of the preferred alternative's environmental impacts. The Agencies should have aimed to provide a model process here that not only met but exceeded the legal baseline for proper review in recognition that there is a wider scope of impacts—including societal impacts relating to loss of governmental control and accountability—that need to be discussed for projects proceeding under a public-private partnership. The I-495 & I-270 Managed Lanes Study project and future projects being attempted as public-private partnerships have different long-term impacts than projects using a conventional design-build procurement process, which has been the norm since the interstate system developed over a half century ago.

**I.     The Agencies' Environmental Review Process Fails to Satisfy Public Participation Requirements.**

An EIS has "twin functions": preparation of the EIS is designed to require agencies to take a hard look at the consequences of their proposed actions, and distribution of the EIS is designed to provide important information about the proposed action to the public for notice and comment. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 356 (1989). The NEPA process relies on public scrutiny. *See* 40 C.F.R. § 1500.1(b) (2019). Public scrutiny is meaningful only if the agencies involved provide the public with sufficient information and time to craft their comments.

Here the Agencies have instead thwarted public participation by limiting comment periods, declining to provide *any* public comment period on the FEIS, let alone one of sufficient length, and issuing their responses to comments in unwieldy PDFs that are hard to open and navigate and inaccessible to people with certain disabilities. For these reasons, as well as those detailed further below, the Agencies have failed to satisfy their public participation requirements.

**A.     The 30-day Availability Period on the FEIS Is Insufficient and Must Be Extended.**

The 26,500-page FEIS includes new studies, a revised traffic model, and a new environmental justice analysis that the public has not had any opportunity to review. A 30-day availability period without even an email address listed for submitting comments[2] does not provide meaningful opportunity to review and comment on this FEIS. According to MDOT's own press release, the FEIS contains "modified analysis methodologies, conducted new analyses, studied new or modified existing alternatives, refined design ... , and identified ... mitigation ... [and] unavoidable impacts." We therefore reiterate our letter-request to Secretary Pete Buttigieg, of June 30, 2022, for a comment period of at least 60 days.[3]

---

[2] Op Lanes Maryland, Environmental I-495 & I-270 Managed Lanes Study Final Environmental Impact Statement (FEIS), last accessed on July 9, 2022 at https://web.archive.org/web/20220709150006/https://oplanesmd.com/feis/.
[3] Letter from the Sierra Club Maryland Chapter, et al. to Secretary Buttigieg (June 30, 2022), *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/62groups_495-270FEIS_letter_SecButtigieg_30Jun2022.pdf and attached as Exhibit A. We will be providing other materials referenced in these comments under separate cover.

3

hydrologic and hydraulic analysis (H&H) will be completed during final design to ensure that adverse flooding impacts due to the ALB construction are reduced to the maximum extent practicable. The rock ridge will not be trimmed or leveled as part of the project. The issue of potential flooding impacts were minimized to the extent possible during preliminary design of the Preferred Alternative.

In addition, the FEIS comments stated that the data being used to evaluate construction impacts from 100-year floods is outdated and understates the risks to Plummers Island. The current regulatory requirement for flood consideration is to use the rainfall intensity associated with a 100-year flood event. **FEIS Appendix T, DEIS & SDEIS Comments and Responses, Section T.2.B, Volume 1, page CO-717** discusses the 100-year storm and how the project will address flooding. Should the 100-year event volumes be updated during final design, the project will use the revised regulatory volumes for H&H analysis.

MDOT SHA has made a commitment to maintain access to Plummers Island for construction purposes by bridging over the oxbow of the Potomac River without placing any materials or fill within the stream channel. An additional commitment to implement best management practices during the replacement of the ALB crossing the Potomac River such as extensive in-stream work and using coffer dams and temporary construction trestles to avoid and minimize impacts to the river and its aquatic biota. Refer to **FEIS, Chapter 7** and **ROD, Appendix A, Table 1**.

FEIS comments stated that that the Potomac River and the drinking water drawn from the Potomac River would be negatively impacted by runoff from the ALB. The primary drinking water intake in the Potomac River is located above Great Falls and outside the project. The water intake at Little Falls Dam is only used intermittently. The NRTR does acknowledge the potential to increase contaminants to the raw water drawn from the Potomac River prior to being treated and distributed as drinking water.

The FEIS comment states there is no stormwater management planned for the ALB, and claims this may run afoul of Clean Water Act requirements. As explained in **FEIS, Chapter 3, Section 3.1.6**, direct discharge at the ALB qualifies for a waiver from quantity management because the runoff from a bridge will enter the major waterway significantly before the peak in the waterway elevation and therefore will not affect downstream flooding. Additionally, the NPS has jurisdiction over the land on both sides of the river and has determined that no SWM will be permitted in the circumstances presented.

The FEIS comments stated that the level of tree impacts on NPS lands is unacceptable and that there is no mitigation proposed. This is inaccurate. MDOT SHA has worked closely with NPS to avoid and minimize impacts to forests and trees on NPS property to the greatest extent practicable. FHWA and MDOT SHA have coordinated closely to develop acceptable levels of mitigation for impacts to NPS property and resources on their property. Separately, the Department of Interior and NPS have concurred with the FEIS and its proposed level of impacts and mitigation. **FEIS, Chapter 5, Section 5.16.4 page 5-110** summarizes the forest and terrestrial vegetation components of the comprehensive ecological restoration plan for mitigation of impacts to NPS property.

00000178

Our request for an adequate comment period is not new. In the SDEIS, the Agencies announced that they would defer critical analyses until the FEIS. We reiterate our SDEIS comments that this delay of critical analyses contravenes the NEPA process. SDEIS Comments at iii, 2-3, 74, 98, 100-03, 110-12, 122-23, 128, 136-37, 151, 154, 171, 173.[4] Given this improper delay, since January 2022, we and others have explained to FHWA and MDOT the need for an extended comment period on the FEIS. We hereby incorporate by reference the letters from the Sierra Club Maryland Chapter,[5] the Mayor and Council of Rockville,[6] 82 legislators in the Maryland General Assembly,[7] ten Prince George's County mayors,[8] the Montgomery County Executive,[9] 31 civic and environmental groups, and multiple members of Congress.[10] As many Maryland legislators explained in their request, without providing a meaningful opportunity for public comment on the FEIS that includes the ability to comment on "critical analyses needed for the public and policymakers to provide input" the public is unable to "shape final decisions about the 495/I-270 toll lanes," as required by law.

After the FEIS was released, letter-requests to FHWA for a 60-day review and comment period were made by 62 local and national groups, several Maryland jurisdiction representatives,[11]

[4] Sierra Club, et al., Comments on I-495 & I-270 Managed Lane Study Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation (Nov. 30, 2021) (hereinafter "SDEIS Comments"), available at, https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/2021-12-27%20-%20Sierra%20Club%20et%20al.%20SDEIS%20comments%20.pdf.
[5] Letter from Josh Tulkin to Jeanette Mar et al. (Jan. 4, 2022), attached as Exhibit A, available at https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/SC-Letter-495270MLS-SDEIS-FEISReviewPd-2022Jan4.pdf.
[6] Letter from Bridget Donnell Newton, Mayor, et al. to Jeanette Mar et al. (Jan. 26, 2022), attached as Exhibit A, available at https://static1.squarespace.com/static/5b72c6a8da02bc640472bf8c/t/61fee871b03f5828336629d3/1644095602555/FHA+Letter+FINAL+012622%281%29.pdf.
[7] Letter from Senator Pamela Beidle et al. to Gregory Murrill, Div. Admin., FHWA, Maryland Division (Feb. 22, 2022), attached as Exhibit A, available at https://mcusercontent.com/6cdc39da7c0238a0521e24885/files/932d6527-1fc6-5b38-81ac-cba0cef957ae1/FWHA_Letter.pdf.
[8] Letter from Mayor Sadara Barrow, et al. to Gregory Murrill, et al. (Feb. 26, 2022), attached as Exhibit A, available at https://9cb12f8b-0595-4233-98ce-142d43d80a5c.usrfiles.com/ugd/9cb12f_feceda725e324136bb9f7cd6f54b9f33.pdf.
[9] Letter from Marc Elrich, Montgomery County Executive Gregory Murrill, et al. (Mar. 10, 2022), attached as Exhibit A, available at https://9cb12f8b-0595-4233-98ce-142d43d80a5c.usrfiles.com/ugd/9cb12f_5ea4194f64224e46b8a0a4706f543f59.pdf.
[10] Letter from Rep. Anthony Brown & Rep. Raskin to Secretary Buttigieg (June 13, 2022), attached as Exhibit A.
[11] Letter from 62 local and national civic and environmental groups and several Maryland jurisdiction representatives to Secretary Pete Buttigieg (June 30, 2022) attached as Exhibit A, available at https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/62groups_495-270FEIS_letter_SecButtigieg_30Jun2022.pdf

4

The FEIS comment states further investigation and justification required into whether it is legal without Congress's review and approval to de-federalize Capper-Crampton lands and transfer to states for transportation use. FHWA and MDOT SHA have coordinated with the NPS and National Capital Planning Commission throughout the NEPA process on potential impacts to park property acquired with Capper-Cramton funding. This coordination and impacts are described on **page 5-29 and 5-30** of the **FEIS, Chapter 5**. As stated, after the conclusion of the NEPA process and if NPS agrees to the use of the impacted lands, FHWA would officially request the land for the highway purposes via execution of a highway deed easement, which does not require Congressional review.

The FEIS comment claims information on recreational use of the Potomac River during construction was not addressed and that the Canoe Cruisers Association comments were dismissed. A response to the Canoe Cruisers Association SDEIS Comment letter can be found in **FEIS, Appendix T, Section T.2.B, Volume 1**, which includes a response on river access during construction.

Furthermore, the Sierra Club letter states, the EIS lacks identification and Section 4(f) analysis on impacts to Potomac River. This a false statement. The Potomac River is a natural feature, rivers are not subject to Section 4(f) requirements, and it is not a district, site, structure, building, or object and not considered a historic property under Section 106 of NHPA. While the river was not evaluated under Section 4(f) or Section 106, it was considered as a drainage basin, watershed and for surface water quality in **FEIS, Section 5.13** and **FEIS, Appendix M**. In addition, MDOT SHA has committed to consult with NMFS and MDNR when construction plans are developed for roadway crossings of the Potomac River and Cabin John Creek, the two known anadromous fish use areas, to ensure that impacts due to construction and permanent fill are minimized to the extent practicable. Refer to **FEIS, Chapter 7** and **ROD, Appendix A, Table 1**.

FEIS comments state that the project failed to properly survey for rare, threatened, and endangered bat species and that the methodology used was not sufficient. Refer to the **FEIS, Chapter 5, Section 5.19.2.A** for a summary of the survey information conducted for the Study on the Northern Long-eared Bat (NLEB); additional details are documented in **FEIS, Appendix M**. The bat survey methodology used for the Managed Lanes Study is in keeping with the US Fish and Wildlife Service (USFWS) survey protocol, *Range-wide Indiana Bat Summer Survey Guidelines, 2020*. USFWS requested that MDOT SHA not conduct mist netting due to the risk of listed bats contracting COVID. The Study's bat survey plan was approved by USFWS prior to the commencement of the acoustic survey. Acoustic surveys were conducted in the vicinity of the ALB on both sides of the Potomac River. The results of bridge surveys for the presence of roosting bats and evening emergence surveys for bats potentially roosting on the ALB and Northwest Branch Bridge in 2019 were also provided in **Appendix P** of the **Final Natural Resources Technical Report (FEIS, Appendix M)** and the Bridge Survey Report for the Northern Long-eared Bat (Myotis septentrionalis) and Indiana Bat (Myotis sodalis), of the **Final Natural Resources Technical Report (Appendix P** of **FEIS, Appendix M)**.

The FEIS comments indicated that the FEIS should have considered and addressed the effects of the U.S. District Court for the District of Columbia determination that the designation of the NLEB as threatened, rather than endangered, was arbitrary and capricious and the project should not have relied upon the 4(d) Rule to determine adequate species protection. FHWA and MDOT SHA have coordinated closely with the

00000179


24 members of the Montgomery County Delegation of the Maryland General Assembly,[12] and, recently, from the Rockville City Council.[13]

The letter from the Maryland Delegates and Senators stated:

[T]he public, its representatives, and reviewing agencies can only now begin examining long-requested environmental justice and greenhouse gas emissions analyses, mitigation plans, the project's recently changed traffic model, and MDOT's responses to the 5,000 comments it received during the comment periods for the Draft EIS and Supplemental Draft EIS. ... In a February 22, 2022, letter to the FHWA and MDOT, over 80 members of the Maryland General Assembly called for a redo of the project's Supplemental Draft EIS to include the key missing analyses.

In spite of that February 22, 2022, letter, the Agencies did not redo the SDEIS and instead proceeded to release the 26,500 page FEIS. The FEIS includes many new analyses, but the public was provided no formal public comment period to meaningfully review and address the flaws in these late-breaking analyses. Like these legislators, we call on you to open a formal public comment period of sufficient time to meet your statutory obligations under NEPA.

In addition, as noted above, the FEIS incorporates new traffic data and analysis, and these inputs were not released as part of the FEIS—contrary to NEPA's requirements that the underlying data requested must be disclosed publicly with the FEIS. 40 C.F.R. § 1500.1(b) (2019) ("NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA"); *id.* § 1502.21 (2019) (underlying data may be incorporated by reference only if "it is reasonably available for inspection by potentially interested persons within the time allowed for comment"); *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015) ("To fulfill NEPA's public disclosure requirements, the agency must provide to the public 'the underlying environmental data' from which the [agency] develops its opinions and arrives at its decisions."). The Agencies' failure to provide this data before *and after* releasing the FEIS violates NEPA.

On June 29, 2022, MD Sierra Club requested the underlying data for the revised traffic model.[14] Rather than comply with NEPA's mandates and release these traffic data and analyses, we had to request them from MDOT and, as of the submission of these comments, MDOT has not yet released them. MDOT stated that it is processing our request not under NEPA but, rather, as a Maryland Public Information Act request and could not commit to providing the data in time for us to analyze and address them in these comments. MDOT's information officer explained:

---

[12] Letter from 24 Delegates and Senators in the Montgomery County Delegation of the Maryland General Assembly to Gregory Murrill, et al. (July 8, 2022), attached as Exhibit A.

[13] Robert Dyer, Rockville Mayor & Council Ask for More Time To Study New I-495/I-270 Managed Lanes Material, Rockville Nights (July 12, 2022), *available at* http://www.rockvillenights.com/2022/07/rockville-mayor-council-ask-for-more.html?m=1.

[14] *See* Smart Mobility, Inc. Report, attached as Exhibit B, App'x A.

5

---

USFWS throughout the NEPA process regarding the NLEB. MDOT SHA went above and beyond federal requirements and agreed to a voluntary time of year restriction for tree clearing from May 1 to July 31 of any year within a 3-mile buffer of the positive acoustic detection of the NLEB to protect the NLEB. USFWS provided a SDEIS comment indicating that the project would need to reinitiate Section 7 consultation if the NLEB listing status changes. Until the NLEB status is changed by USFWS, the current Section 7 coordination stands and is complete.

The FEIS comments stated that the proposed construction in Fairfax County, Virginia associated with the Preferred Alternative was not presented to the public until the FEIS was released in June 2022. This is not accurate. Throughout the NEPA process, MDOT SHA has coordinated closely with Virginia Department of Transportation (VDOT) and Fairfax County. Public outreach to Fairfax County residents has included direct meetings as well as multiple indirect notifications, including newspaper advertisement, radio spots, and email blasts. The DEIS, SDEIS and FEIS have been publicly available online and in a Fairfax County Public Library. All alternatives considered throughout the NEPA process have included proposed construction in Fairfax County, Virginia.

The FEIS comments stated that the public did not learn about the potential impact to Virginia state-endangered Little Brown Bat and Tri-colored Bat until the FEIS was released in June 2022. MDOT SHA requested a list of potentially affected species from Virginia Department of Wildlife Resources (DWR) prior to the DEIS publication. DWR provided a response after the DEIS was published that these two bat species could potentially occur within the Virginia portion of the study corridor. MDOT SHA completed bat survey data analysis and included its results in the FEIS. Presence of the tri-colored bat was confirmed, but no Little Brown Bats were identified. Virginia DWR agreed to the time of year restriction for tree clearing within the Virginia portion of the Preferred Alternative from April 1 – October 31 of any year to avoid impact to tri-colored bat roost trees during roosting season.

**V. The Sierra Club's letter states the FEIS Fails to Meet the Agencies' Environmental Justice Obligations Despite Numerous Commenters' Efforts in Identifying Deficiencies in the Agencies' Analysis**

The comments stated that the environmental justice (EJ) analysis had not been previously released to the public for review and comment. This is not accurate. The DEIS, SDEIS, and FEIS all documented the EJ analysis completed for the Project; refer to **DEIS, Chapter 4, Section 4.21; DEIS Appendix E; SDEIS, Chapter 4, Section 4.21; FEIS, Chapter 5, Section 5.21; and FEIS, Appendix F.** The EJ analysis and methodology is discussed in **DEIS, Chapter 4, Section 4.21.2 and FEIS, Chapter 5, Section 5.21.2.**

As stated in the DEIS, SDEIS, and FEIS, the strategies developed under EO 12898, USDOT Order 5610.2C, FHWA Order 6640.23A, and FHWA memorandum Guidance on Environmental Justice and NEPA (2011) set forth the appropriate and necessary steps to identify and address disproportionately high and adverse effects of federal transportation projects on minority and low-income populations. Based on these strategies, the first four steps, below, were documented in the DEIS EJ analysis, updated in the SDEIS EJ analysis and updated and enhanced where necessary for the FEIS EJ analysis:

00000180

As this is a request for records, this falls under the Maryland Public Information Act (PIA) and is being handled accordingly. We are in the initial stages of this request and are preparing the legally required 10-day letter which is due July 14, 2022. We are advising you that we do not anticipate providing these records to you within the first 10 business days.[15]

As the attached statement by Norm Marshall, our traffic expert, makes clear, his ability to meaningfully comment on the traffic model is therefore limited because "I do not have access to this underlying data." Given these delays and for all the foregoing reasons, our request for a 60-day review period is not only reasonable, it is essential to carrying out NEPA's core purpose of providing a "springboard for public comment." *Robertson*, 490 U.S. at 351–352. The review period for other recent, large highway projects has been 60 or 75 days and the Maryland (and Virginia) public deserves a similar review period.[16] The FEIS, when added to the over 19,000-page draft EIS and over 8,000-page supplemental DEIS that it incorporates by reference, consists of 53,500 pages. Adequate formal public review periods are needed to ensure that the public has sufficient time for meaningful review of the Project's impacts. For these reasons and those expressed in our June 2022 letter and in letters from many others, the Agencies must provide a comment period of at least 60 days to comply with NEPA's public disclosure obligations.

**B. The Agencies Have Not Tabulated the Public Comments on the FEIS, Contrary to Their Prior Practice, Thereby Dismissing and Erasing the Public's Voice[17]**

As part of the public comment process, NEPA requires agencies to respond to all substantive comments, including those with opposing viewpoints. *See* 40 C.F.R. § 1503.4 (the final EIS "shall consider substantive comments timely submitted during the public comment."); *id.* § 1502.9(c) ("At appropriate points in the final statement, the agency shall discuss any responsible opposing view that was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised."). This mandate requires agencies to disclose opposing viewpoints so that the agencies can "internalize opposing viewpoints into the final decisionmaking process." *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167–68 (9th Cir. 2003) ("The [Forest] Service's failure to disclose and analyze these opposing

[15] Email from MDOT to Jill Grant & Associates (July 1, 2022), attached as Exhibit B, App'x B.
[16] Sixty and 75-day FEIS review periods have been provided for other recent highway projects, such as the I-26 Connector in Asheville, N.C. and the I-45 in Houston, TX, respectively. *See* John Boyle, *I-26 Connector Environmental Impact Statement released, major hurdle for project passed*, Asheville Citizen Times (Feb. 5, 2020), *available at* https://www.citizen-times.com/story/news/local/2020/02/05/asheville-i-26-connector-environmental-impact-statement-released-nc-dot/4664937002/ (describing 60-day comment period); Texas DOT, Notice Final Environmental Impact Statement Available for Public Review - North Houston Highway Improvement Project, *available at* https://www.txdot.gov/inside-txdot/get-involved/about/hearings-meetings/houston/092520.html (explaining that the comment period on the FEIS was extended by 30 days, for a total of 75 days).
[17] This section incorporates by reference DEIS and SDEIS comments describing how the Agencies' systematically downplayed and miscounted public comments opposing the Project.

6

1. The identification of minority race and ethnicity populations and low-income populations (EJ populations) along the 48-mile study corridor for the **DEIS, Chapter 4, Sections 4.21.2.A-B** and then an update on the identification of EJ populations for the Preferred Alternative, Alternative 9 - Phase 1 South limits in the **SDEIS, Chapter 4, Section 4.21.2.B**;

2. The review of demographic data to determine the existing environmental and community conditions of the EJ populations, documented in the **DEIS, Chapter 4, Section 4.21.3** and enhanced in the **SDEIS, Chapter 4, Section 4.21.2.C**;

3. The documentation of public outreach as planned, conducted and refined throughout the study in consideration of the demographic and community data to ensure meaningful involvement in EJ populations, documented in the **DEIS, Chapter 4, Section 4.21.4** and updated in the **SDEIS, Chapter 4, Section 4.21.2.D**; and

4. The identification of potential beneficial and/or adverse impacts to EJ populations under the No Build and Screened Alternatives in the **DEIS, Chapter 4, Section 4.21.5**, and the identification of potential beneficial and/or adverse impacts to EJ populations under the No Build and Preferred Alternative, Alternative 9 - Phase 1 South updated in the **SDEIS, Chapter 4, Section 4.21.3**.

Steps #2, 3, and 4 are updated and Steps #5 through #8, below, are documented in this FEIS EJ Analysis in consideration of the Preferred Alternative[3]:

5. The consideration of mitigation or community enhancement measures if unavoidable adverse effects are expected to occur under the Preferred Alternative **(throughout FEIS, Section 5.21.5)**;

6. A comparison of adverse effects to all EJ populations under the Preferred Alternative versus adverse effects to a non-EJ population reference community **(FEIS, Chapter 5, Table 5-51)**;

7. A determination of whether disproportionately high and adverse impacts would occur to EJ populations under the Preferred Alternative **(FEIS, Chapter 5, Table 5-51)**; and

8. A final conclusion of whether disproportionately high and adverse effects would occur to EJ populations, based on unmitigated adverse effects and whether public feedback has been addressed **(FEIS, Chapter 5, Section 5.21.7)**.

The public had sufficient opportunity to review and comment on the EJ analysis conducted for the Project. The public participation elements of the NEPA process were an opportunity to promote equity and EJ concerns by ensuring minority and low-income communities (EJ populations) have access to and receive information concerning the proposed action and the potential impacts on those communities. With even more concentrated outreach, project efforts effectively identified community concerns and informed

[3] Steps #4 and 5 plus Steps #6 and 7 are combined in this FEIS EJ Analysis.

viewpoints violates NEPA and 40 C.F.R. § 1502.9(b) of the implementing regulations.") (citing *Cal. v. Block*, 690 F.2d 753, 770–71 (9th Cir. 1982)) (stating that NEPA's requirement that responsible opposing viewpoints are included in the final impact statement "reflects the paramount Congressional desire to internalize opposing viewpoints into the decisionmaking process to ensure that an agency is cognizant of all the environmental trade-offs that are implicit in a decision")).

Instead of following these legal requirements, the Agencies ignored opposing viewpoints; declined to tally the number of comments opposing the Project in the FEIS, contrary to their prior practice; responded to all public comments after the public could formally reply; and, in several cases, responded to similar comments in an inconsistent manner.

1.   **The Agencies Have Failed To Provide Any Analysis or Tabulation of the Contents of the 5,000+ DEIS and SDEIS Comments, Hindering the Ability of Decisionmakers To Determine the Level and Nature of Public Opinion and Opposition to the Plan or To Take the Comments into Account.**

In the FEIS, the Agencies do more than downplay and miscount public comments opposing the Project, as they did in the DEIS. In the FEIS, the Agencies fail to provide *any* analysis or tabulation of the contents of the comments, making it virtually impossible, due to the sheer number of comments, for decisionmakers to determine the level and nature of public opinion and opposition to the Project.

The only way reviewing agencies, elected officials, decision-makers at all levels, and the public can determine public sentiment as expressed in the comments is to read and tally the contents of 5,000+ raw comments reprinted in the FEIS, Appendix T.

This is an impossibly burdensome task for reviewers and the public.

The Agencies make even limited comment review onerous in light of the laborious processes the public must go through to access the comments and associated replies and references. Among the barriers to accessing and reading the FEIS Appendix T's 13 files and 5,732 pages containing the public comments: some of the text cannot be searched; the text cannot be copied and pasted from the pdf files; printouts are difficult to read, even for those with unimpaired vision; and three screens must be open at once in order to see an original comment, its associated response page, and the referenced material.

The protected PDF format that does not allow for copying of text presents extreme difficulties for the visually impaired and renders it virtually impossible to read the FEIS responses to comments. The printouts are too small to read even assuming ready access to a printer. The visually impaired need to copy the text and enlarge it to read it. The audio text reading function is not possible or practical for many people who have visual impairments (much less who speak a language other than English and need to have text copied to translate it) and is highly inefficient for meaningful review.

A frustrated FEIS reviewer submitted this comment to the Hogan Administration: "I cannot even copy/paste text from MLS FEIS PDF files. The MLS FEIS .pdf files are password protected.

7

agency decision-makers regarding project elements and potential enhancements specifically geared to protected communities. In this regard, MDOT SHA implemented a robust plan to meet and exceed federal policies and best practices for outreach to and engagement with EJ populations within and adjacent to the study area to engage meaningfully and directly with underserved communities to identify improvements needed in their communities. These commitments are documented in the **ROD, Appendix A, Table 1**.

The FEIS comment states the FEIS fails to quantify impacts to the Gaithersburg EJ Area. This statement is false. Census block groups in the Gaithersburg area were identified and included in the EJ analysis for the study and documented in the **DEIS, SDEIS, FEIS, DEIS, Appendix E** and **FEIS, Appendix F**. As noted in **Chapter 5, Section 5.21.4, Table 5-49**, eight block groups met the EJ population criteria of minority race/ethnicity and/or low income. In addition, MDOT SHA had targeted outreach to underserved communities in the Gaithersburg area in the Fall of 2021. The consideration of air quality impacts from the Preferred Alternative on EJ Populations in the study area is documented on **page 5-155** of the **FEIS, Chapter 5** and in **FEIS, Appendix F**.

The FEIS comments claim that cumulative impacts to Morningstar Moses Hall and Cemetery site have been disregarded and dismissed, unlawfully preventing an "adverse effects" determination for a nationally-recognized 4(f) protected resource. The MDOT SHA and FHWA properly evaluated the Preferred Alternative's potential for cumulative effects, including at the Morningstar Cemetery. In conducting this analysis, MDOT SHA has acknowledged that the early 1960s construction of I-495 and other aspects of the Eisenhower Interstate System caused disruption to the Gibson Grove community and other communities, particularly communities of color. Indeed, these types of community impacts formed the historical context and impetus for passage of NEPA and NHPA. The MDOT SHA, during years of extensive research (discussed in more detail below), has not identified any evidence that I-495 construction in the 1960s impacted burials at Morningstar Cemetery. That research assisted MDOT SHA in determining whether the MLS proposed action would contribute to cumulative effects to the Morningstar properties and related resources in the context of past, present, and reasonably foreseeable actions as required by the NEPA CEQ regulations.

To further detail supporting the FEIS conclusions, MDOT SHA confirmed that in 1992, construction work was performed on I-495. This work was done within the median of I-495 near this area and avoided impact to the cemetery property. As documented in the SDEIS and FEIS, and as concluded in the ROD, the Selected Alternative also avoids impacts to the cemetery property as well as to the area of the MDOT SHA owned right-of-way adjacent to the cemetery property where there could be the potential for unmarked graves. Lastly, our review did not identify any reasonably foreseeable future projects in the vicinity of the cemetery. In addition, based on commitments included in the ROD and Programmatic Agreement, established in part based on coordination with stakeholders with interest in the Morningstar resource, the Selected Alternative will improve existing stormwater and noise effects over the existing conditions. Refer to **FEIS, Chapter 7** and **ROD, Appendix A** for the commitments and mitigation details.

A formal response to the Friends of Moses Hall FEIS comment letter was prepared and included on **page 20** of this **ROD, Appendix D**. Refer to this response for additional details.

00000182

I can't even copy text to paste into an email. What am I able to do? Nothing but look and don't touch? This is terrible customer service. <Survey Comments>." The July 13, 2022, reply on behalf of the Hogan Administration from Jeffrey T. Folden, Director of the I-495 & I-270 P3 Office included this sentence:

> Each document was released as a secured PDF to ensure the document would not be manipulated. The customer-friendly PDF format also offers graphic integrity and preserves intended content and layout regardless of the operating system, device, or software application it is viewed on. All content in the FEIS can be read, printed, referenced, and shared."

*See* Exhibit C. This response confirms that the document text is not copy-and-pasteable and that this limitation was intentional. The inability to copy text presents an enormous barrier to providing meaningful comments on the FEIS (as was the case for the DEIS and SDEIS), as well as excludes people with visual limitations from the opportunity for meaningful review in the short review periods afforded. The use of a protected PDF format with uncopiable text in NEPA documents should be seriously reexamined—and ideally discontinued—at the federal and state agency level as a barrier to meaningful public participation and as a discrimination issue for people with visual impairments.[18]

None of these burdens and barriers was necessary. MDOT created a DEIS/SDEIS comments database that MDOT could have used (or shared) for comment tabulation and analysis. "As comments were received, they were reviewed, considered, and uploaded to a database used as a repository for comments received" (FEIS Appendix T Introduction, p. 3). Of note, in all 26,500+ pages of the FEIS, this is the only mention of the comments database.

> 2.    The Agencies' Extended Delay in Responding to 5,047 Comments and Providing a Response Outside of Any Formal Comment Opportunity Prevented the Public and Their Elected Officials from Having Meaningful Interaction with the Agencies During the Decisionmaking Process.

According to the FEIS, MDOT SHA received 2,909 public comments by the DEIS deadline of November 9, 2020, and 2,138 public comments by the SDEIS deadline of November 30, 2021 (FEIS 9-2).

The public, including officials from 22 cooperating agencies and "other agencies," FEIS App'x T Introduction at 4, who submitted comments by the DEIS deadline, waited *1 year and 7 months, or 585 days*, to have access to the comments and receive some sort of response (in many cases, just a list of cross references) from the Agencies via the FEIS. Commenters to the SDEIS waited *6.5 months, or 199 days*.

---

[18] In the public hearings held in 2021, the hearing officer showed a slide entitled "Title VI of the Civil Rights Act of 1964" that states: "MDOT SHA prohibits discrimination on grounds of … disability." Source: I-495 & I-270 MLS Virtual Public Hearing, November 1, 2021 at minute 10:20, https://youtu.be/4g0L9nk-L60.

8

## VI. The Sierra Club's letter state the FEIS Fails To Disclose the Socioeconomic and Societal Impacts of Private Concessionaire Contracts and Their Influence on Future Land Use Policies

Comments and concerns raised on the State's plans to develop the Project through a public-private partnership (P3) have been addressed in **FEIS, Chapter 9, Section 9.5.3**. As stated, MDOT has determined it is financially infeasible to construct improvements of the magnitude associated with the Selected Alternative. Additionally, MDOT does not have enough bonding capacity to take out loans to pay for the improvements, even with the promise of tolls to pay them back. Therefore, MDOT elected to use a P3 approach to fund the project. MDOT SHA has adequately evaluated its funding and delivery method.



These massive delays even in responding to elected officials and the public prevented them from having needed information, meaningful constituent-elected interactions about issues, opportunities for advocacy, and input into the decisionmaking process.

> **3.** **In the FEIS, the Agencies Erase the Public Voice by Failing to Make Any Analysis of the 5,000+ Public Comments.**

As noted above, nowhere in the FEIS documents covering 74 files and 26,500 pages is there an attempt at analysis, tabulation, or quantifying of the contents of the 5,000+ public comments.

The lack of tabulation and analysis is a marked change from the Agencies' treatment of public comments for the first three public comment periods[19] (see details of previous comment treatment, as described in our DEIS comments at 173-178[20] and DontWiden270.org's DEIS comments, FEIS App. T.2.A at 75-82).

The Agencies, for the Project's first three comment periods, differentiated between the number of discrete submissions and the number of separate points made within the submissions. The cumulative totals for the three periods: 3,937 individual submissions containing 16,129 points. The FEIS, in contrast, tallies only the number of submissions, with no numerical indication of the scope or complexity of their contents.

In the DEIS, the Agencies published a tally (albeit based on flawed label assignments and other biases) of the numbers of comments reflecting support or opposition to the Project during the previous comment periods. After observing the Agencies' biased processes for tallying comments, advocacy organizations suggested a compensatory strategy. We suggested that commenters make their opposition clear by beginning each DEIS and SDEIS comment submission with a version of, "I oppose the toll lane plan and support the no-build option."

Given such clear, consistent messages, the Agencies could easily have published an FEIS tally of submissions expressing opposition. Instead, the Agencies got around our "fix" by tallying *none* of the opinions expressed in the submissions. This effectively removed public opinion from the FEIS except on a submission-by-submission basis, repeated 5,000+ times.

---

[19] The "first three comment periods" referenced and incorporated in MDOT's DEIS and SDEIS were originally detailed in MDOT's Scoping Report (June 2018); the Alternatives Public Workshops Summary (January 2019); and the Summary of Public and Stakeholder Engagement for the Recommended Alternatives Retained for Detailed Study (September 2019).
[20] Sierra Club, et al., Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA) (Nov. 6, 2020) (hereinafter "DEIS comments"), *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u18365/2020-11-09-Comments%20on%20DEIS%2C%204%28f%29%2C%20and%20JPA%20%281%29%20%281%29.pdf

In reply to comments that started with, "I oppose the toll lane plan and support the no-build option," the Agencies ignored the opinion and "replied" with an unasked-for explanation of what the no-build option is. *See, e.g.*, FEIS App'x. T.2.A Vol. 1 at CO-76.

> **4.** **The Agencies Give Nonsensical, False, and Inconsistent Responses to Nearly Identical Comments from the Sierra Club and DontWiden270.org Regarding the Agencies' Previous, Biased Treatment of Public Comments.**

The FEIS gives nonsensical, false, and inconsistent responses to nearly identical comments from the Sierra Club and DontWiden270.org regarding the Agencies' previous, biased treatment of public comments.[21]

From the Agencies' response to the Sierra Club:

> The letter states incorrectly that the lead agencies improperly summarized or 'miscounted' the public input on these preliminary NEPA documents. The lead agencies reviewed all comments received and properly summarized the content of those comments during the preliminary scoping stages of the NEPA review in order to inform production of the DEIS.

FEIS App'x T.2.A Vol. 3 at CO-538. The Agencies provide no evidence or documentation to support their response.

In contrast, the Agencies' response to DontWiden270.org does *not* dispute or respond to evidence of MDOT's previous biased treatment of opposition comments, simply accepting, for instance, this documented example: MDOT established a policy to label a comment as being in opposition to the Project only if the submitter used exactly the right words. No comparable policy was established for pro-Project comments. *See* Sierra Club DEIS Comments at 166.

The Agencies' response to the Sierra Club, but not to DontWiden270.org, says, "Once the EIS documents were made available for formal comment periods, MDOT SHA reprinted and made available all comments on the DEIS and SDEIS and responded to all substantive comments in the FEIS." FEIS App'x. T.2.A Vol. 3 at CO-538.

If this were true, the publication of those DEIS and SDEIS comments would have happened *before* issuance of the FEIS, since the FEIS does not allow for a "formal comment period." Where, when, and to whom were those reprints made available?

---

[21] For references to the points in this section, see responses to Dontwiden270.org's DEIS submission, FEIS App'x. T.2.A Vol. 1 at CO-76-82, *available at* https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p.9.pdf and the responses to Sierra Club's DEIS submission. FEIS App'x. T.2.A Vol. 3 at CO-538, *available at* https://oplanesmd.com/wp-content/uploads/2022/06/MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-3_June-2022p.pdf

9

10

The Agencies' response to the Sierra Club's comments says: "Support for or opposition to the project and/or the Preferred Alternative as stated in all public comment is accurately reflected in the NEPA record and available for review." *Id.*

Since the FEIS does not tabulate support or opposition, how and where are "support for or opposition to the project and/or the Preferred Alternative" accurately reflected in the NEPA record? Does the Agencies' reply assume the reviewing federal agencies are creating their own tabulations from the raw public comments?

The Agencies' response to DontWiden270.org's comment makes a different point about support and opposition: "…a comment stating support or opposition is not a yes/no vote for the project."[22]

Yet the Agencies' treatment of comments from the first three public comment periods indicates the opposite: the Agencies clearly tabulated support and opposition to the Project, albeit in a biased and misleading manner.

## II. The Traffic Models Used in the FEIS Are Deeply Flawed.

### A. The Traffic Modeling in the FEIS Fails to Address Critical Errors Identified by Commenters and Introduces New Errors.

In our comments on the SDEIS, we explained that the traffic modeling supporting the SDEIS had serious errors. The SDEIS's traffic model presents a simplistic traffic story that, if the preferred alternative is not constructed, corridor traffic volumes will grow significantly and delays will grow exponentially. Based on this model, the SDEIS claims that the preferred alternative will reduce congestion on the general-purpose lanes and alleviate congestion on other roads relative to traffic conditions today. But that simple story relied on flawed modeling. *See* SDEIS Comments at 18-38; *see generally id.* at 39-96.

As described more fully in the attached expert report by Norman Marshall, President of Smart Mobility, Inc., (July 2022) (hereinafter "Marshall Report"),[23] the revised traffic modeling used in the FEIS does not remedy the acknowledged errors with the previous traffic model used in the SDEIS. To the contrary, the new model results are, instead, rife with evidence that the Agencies "have failed to comply with their own Agency guidance concerning traffic modeling" such that "the output is seriously compromised as a result of these modeling errors." *See* Marshall Report at 2.

Mr. Marshall's ability to thoroughly critique the traffic model was hampered because MDOT has refused to release the underlying data and model files, in violation of NEPA's public disclosure requirements. *See* Marshall Report at 4-5; *id.* App'x A-B; *see also* Section I.A of these comments. Even so, Mr. Marshall and others identified serious deficiencies in the FEIS traffic models. The Marshall Report details several categories of errors, some of which persist from the

---

[22] FEIS App'x T.2.A Vol. 1, p. CO-80, https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p-9.pdf
[23] The Smart Mobility, Inc., Report is attached as Exhibit B.

11

flawed modeling from the SDEIS and some of which are new. These errors undermine the simplistic story the Agencies continue to tell that the preferred alternative is necessary to address traffic congestion and reduce travel times. Instead, the models "appear to overstate travel time savings and inadequately capture congestion, gridlock conditions, and bottlenecks," Marshall Report at 23, based on the following errors:

- Given dramatic changes in predicted speed/travel time and vehicle throughput[24] between the SDEIS and FEIS, it appears that the modelers made parameter changes after they validated the traffic model, even though "it is only possible to have confidence in traffic microsimulation model outputs if the model is well calibrated to real-world base year data and [] these validated parameters are maintained in all alternatives analyses." As explained further in the Marshall Report, changing model parameters can have dramatic impacts on speed/travel time and throughput metrics. Marshall Report at 5-8.

- There are unexplained differences between the traffic "count" data in the FEIS and DEIS. The better model fit in the FEIS "appears to be achieved by changing the data rather than by changing the simulated volumes." But, changing the data inputs "at this point in the process after the calibration step [needs] to be disclosed and justified." That justification is not provided in the FEIS. It is possible that the FEIS modelers may be "fitting one model to another model rather than to actual data," which MDOT guidance strongly cautions against doing. *Id.* at 8-10.

- Even though input demand and the highway networks are described as "almost identical" in the SDEIS and FEIS, the FEIS shows much higher throughput under the 2045 no build alternative and also unexplained improvements in performance of the preferred alternative over the no build alternative. The only plausible explanations is that the model parameters have been changed since the model validation. If that is correct "the [p]referred alternative modeling is invalid." *Id.* at 10-15.

- To achieve reliable results from a traffic model, a modeler must reach convergence by running multiple simulations to receive comparable results. The FEIS states that only five simulations were run, the minimum required by MDOT. But, "[i]n heavily congested simulations, it generally is necessary to average more than 5 simulations. The report does not demonstrate that 5 simulations is sufficient for convergence." Again, without the underlying traffic files it is impossible to verify if the model was run enough times to achieve convergence. *Id.* at 15-16.

---

[24] Throughput is defined as "the number of vehicles that pass by a given point in the roadway network in a set amount of time." SDEIS at 3-13.

12



- As in the SDEIS, the FEIS traffic modeling invalidly shows future throughput to be much lower than existing throughput. This error was not addressed in the FEIS responses to comments. *Id.* at 17-18.

- As in the SDEIS, the FEIS continues to falsely insist that there is some increasing "demand" that exists independently from actual traffic volumes. Inputting unrealistic "demand" into the traffic model causes gridlock in the model and produces unrealistically low throughput. *Id.* at 18-20.

- Unlike the SDEIS, the FEIS adds a third model to its sequenced modeling approach, but this newly introduced model suffers from the same inherent problems as the other models. *Id.* at 20-22.

As we explained in our SDEIS comments, *see* SDEIS Comments at 19-20, rather than relying on flawed models, the Agencies should examine empirical data from Virginia and Maryland to understand the reasonably foreseeable impacts of constructing managed lanes on I-495 and I-270, which include the following:

1) Expanding I-495 and I-270 will shift traffic from the shoulder hours into the peak hours and create and/or exacerbate bottlenecks. As bottlenecks are most likely at the terminus of the managed lanes, phasing is critically important as well as the final extent of the Project.

2) An improvement in general-purpose lane speed is unlikely because constructing the managed lanes will shift traffic from the shoulder hours into the peak hours, and the general-purpose lanes will be just as congested during the peak hours as they would have been otherwise. The foundational premise of this Project is that extreme congestion in the general-purpose lanes is needed to justify the high tolls that will be required to fund the preferred alternative.

3) Constructing the I-495 and I-270 managed lanes is likely to make arterial congestion worse. No trip begins or ends on a limited access highway, and traffic does not magically switch between limited access highways and arterials despite what is presented in the SDEIS. Any shifts between these roadway classes causes traffic increases on some arterials and traffic decreases on others. As managed lanes concentrate traffic in the peak hour, arterial roads at I-495 and I-270 interchanges will be severely impacted, and these impacts are likely to outweigh the congestion benefits of traffic diversion from other arterials. The SDEIS models are incapable of calculating these tradeoffs.

4) If the managed lanes are constructed, it is likely that there will be significant traffic growth (induced travel) and induced land use impacts.

5) Managed lane proponents stress "choice." In fact, the choice is between two bad options: extreme congestion vs. extremely high tolls. Only about 1/6 of the daily traffic is carried by the Virginia I-495 Express Lanes despite the Express Lanes

13

having 1/3 of the roadway capacity. This is an inefficient use of infrastructure. The other 5/6 of traffic is carried by the general-purpose lanes. The toll lanes are "chosen" primarily by high-income travelers and/or travelers who are having the tolls reimbursed. This elite group will remain small because increases in demand by other users will prompt the tolls to increase further, becoming even less affordable.

6) The managed lanes will benefit only the few who are able to outbid the majority of travelers. There will be no benefits for non-users of the toll lanes. Non-users of the toll lanes (most travelers) will face continued high congestion in the general-purpose lanes and increased congestion on arterial roadways accessing I-495 and I-270 interchanges. Nevertheless, a portion of their taxes likely will go toward subsidizing the private toll lanes as has occurred in Virginia.

7) The MDTA toll-setting exercise was theater to mollify a skeptical public. The rates are set so high that the private operator will be able to maximize revenue through algorithms that cynically have been labeled "jam and harvest." These algorithms intentionally increase congestion in the general-purpose lanes prior to traffic peaking to justify charging higher tolls during the traffic peak. It's the public that gets "jammed" as their money gets "harvested."

The flawed traffic models used in the FEIS, like those in the SDEIS, continue to overestimate future congestion to justify the preferred alternative. The proposed managed lanes in Maryland will make congestion worse for most peak period drivers and push drivers to choose between extreme congestion and extremely high tolls that are set to make the lanes profitable.

As a result of these flawed models, the evaluation of numerous impacts that rely on traffic modeling, including air quality and environmental justice, is likewise flawed, and the consideration of reasonable, prudent, and feasible alternatives under NEPA and Section 4(f) is tainted. As one court observed, "In the area of the need for the subject [highway] segment, . . . predictions of traffic volumes in various target years of the several alternative transportation systems studied *are crucial*. Errors in traffic volume projections most likely would result in errors in conclusions based on traffic volume projections." *Movement Against Destruction v. Trainor*, 400 F. Supp. 533, 548 (D. Md. 1975) (emphasis added). *See also* 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."). Accordingly, a new draft NEPA document must be issued based on a revised and corrected traffic model.

**B.    The U.S. DOT Must Re-Examine the Traffic Modeling in the FEIS To Ensure Its Integrity and the Agencies Must Address Possible Inconsistencies Between the FEIS's Traffic Model and the Traffic Modelling Used to Support Revenue Models for the Project.**

**1.    MTOC Has Identified Inconsistencies in the Traffic Model that Warrant an Investigation into the Integrity of the Model.**

After the FEIS was released, Dr. Benjamin Ross, President of Maryland Transit Opportunities Coalition ("MTOC"), asked U.S. DOT Deputy Secretary Polly Trottenberg

14



to examine evidence of possible scientific fraud in the FEIS traffic model. We incorporate by reference MTOC's letter to U.S. DOT[25] and additional information revealed in the subsequent articles.[26]

Dr. Ross found that "[t]he numbers [from the traffic model] simply do not look like what a computer model would produce."[27] Further, the FEIS modeling for the 2045 no build alternative appears inconsistent "with correction of errors in model inputs, coding, or numerical methods, but would be consistent with arbitrary adjustment of intermediate or final outputs."[28]

In MTOC's letter, Ross explains that the FEIS's traffic model predicted that certain evening rush-hour travel times for the 2045 no build alternative would be less than predicted by the SDEIS models, even though the traffic counts in many spots are the same in both models. For example:

> the predicted evening rush-hour travel time from Connecticut Avenue to I-95 on the Beltway Inner Loop is 15 minutes faster in the FEIS than in the SDEIS. The travel time from Rock Spring Park to I-95 is half an hour faster. Yet, in the two reports, the number of vehicles exiting the Inner Loop onto I-95 is exactly identical in each of the four pm peak hours, 3:00 to 4:00, 4:00 to 5:00, 5:00 to 6:00, and 6:00 to 7:00.[29]

Based on these predicted results, the FEIS model outputs do not appear to be consistent with traffic modeling principles that, as commuting times decrease on a particular route, vehicles will switch from other routes to save time:

---

[25] Letter from MTOC to Deputy Sec'y Polly Trottenberg, USDOT (July 11, 2022) (hereinafter "MTOC Letter"), *available at* https://transitformaryland.org/sites/default/files/scientificintegrityletter.pdf, and attached as Exhibit D.
[26] Bruce DePuyt, Toll Lanes Critic Accuses MDOT of "Scientific Fraud" in Key Report, Maryland Matters (July 12, 2022), *available at* https://www.marylandmatters.org/2022/07/12/toll-lanes-critic-accuses-mdot-of-scientific-fraud-in-key-report/; Katherine Shaver, Maryland Toll Lane Critics Cite 'Possible Scientific Fraud' in Traffic Study, Washington Post (July 12, 2022), *available at* https://www.washingtonpost.com/transportation/2022/07/12/maryland-toll-lanes-traffic-study/; Andrew Gelman, Don't Go Back to Rockville: Possible Scientific Fraud in the Traffic Model for a Highway Project?, Statistical Modeling, Causal Inference, and Social Science Blog (July 12, 2022), *available at* https://statmodeling.stat.columbia.edu/2022/07/12/dont-go-back-to-rockville-possible-scientific-fraud-in-the-traffic-model-for-a-highway-project/; Alex Daugherty, Weekly Transportation post, Politico (July 12, 2022).
[27] Shaver, Maryland Toll Lane Critics Cite 'Possible Scientific Fraud' in Traffic Study, Washington Post.
[28] *See* MTOC Letter.
[29] Letter from MTOC to Deputy Sec'y Polly Trottenberg, at 2.

15

---

With such large differences between the two models in predicted travel time, the [model] algorithm must assign some trips that took other routes in the SDEIS model to the eastbound Beltway [] in the FEIS model... and it is next to impossible that the changes would exactly cancel out in each of the four hours [so that the traffic volumes between the FEIS and SEIS are exactly identical].[30]

In his letter, Dr. Ross identifies FEIS traffic model outputs that appear inconsistent with traffic model runs but "could … arise from ad hoc alteration of model outputs for the purposes of generating a desired conclusion."[31]

Based on these potential issues with the FEIS's traffic model, Dr. Ross asks U.S. DOT to complete an independent examination of the FEIS traffic model used for the Record of Decision for the I-495/I-270 Managed Lane Study to ensure the veracity of the traffic modeling data or, at a minimum, conduct a peer review of the modeling report.

After the new traffic model was released as part of the FEIS, Maryland Sierra Club requested that MDOT provide the underlying data files associated with the traffic model. As explained in the comments of Norm Marshall, these underlying data files were necessary in order to fully assess the accuracy of this model. Not only did MDOT refuse to supply these underlying data files in response to Sierra Club's timely request, MDOT subsequently asserts that these files may be provided only upon payment of over $21,000, and may not be provided even then, thus ensuring that the accuracy of this traffic model will not be questioned. MDOT's refusal to disclose this underlying data, in clear violation of NEPA, strongly suggests that MDOT is trying to hide something and that Mr. Ross's concerns about fraud are well-founded. We join this request for U.S. DOT to conduct a thorough examination of the traffic model. Failure to do so violates NEPA, which requires that the conclusions reached in environmental documents be supported by accurate data. *See* 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.").

### 2. The FEIS Traffic Model Appears to be Inconsistent with the Traffic Model Used To Predict Revenue.

The FEIS used different traffic models to predict environmental impacts and to predict toll revenue. According to the FEIS, FEIS at 10-2, the environmental impact traffic model was done by RK&K. The March 12, 2021, Preliminary Toll Rate Due Diligence Report, submitted to the Maryland Transportation Authority ("MDTA") by CDM Smith, states on page 3 that the model used for traffic and revenue estimates "was originally based on the Metropolitan Washington Council of Governments (MWCOG) regional travel demand model but with updates and enhancements incorporated by CDM Smith." It also states on page 2 that "[t]he developer [MDOT's partner in the Public-Private Partnership] will perform their own T&R [Traffic and Revenue] studies to support project financing." Because the Project may be funded using

---

[30] *Id.* Ex. 1 at 2.
[31] *Id.* Ex. 1 at 3.

16

00000187



Transportation Infrastructure Finance and Innovation Act funding, this model, like the FEIS model, will be submitted to U.S. DOT.

The FEIS fails to acknowledge or discuss an apparent inconsistency between its traffic model and the traffic models used to predict revenue. Using one traffic model to predict environmental impacts and an inconsistent traffic model to predict revenue is unacceptable. It is as dishonest as keeping two sets of financial records and showing numbers to lenders that are inconsistent with the numbers shown to tax collectors. Both the environmental impact traffic model and MDTA's revenue traffic model were used to project 2045 traffic conditions for the preferred alternative. However, the Preliminary Toll Rate Due Diligence Report that was made public by MDTA includes only 2025 numbers, and only a very limited number of those. Thus, we are not able to directly compare results of the two models. No results whatsoever of the developer's traffic model have been publicly released, so the public is unable to comment on any possible inconsistencies between that model and the FEIS model.

Nonetheless, the very sparse information in the Preliminary Toll Rate Due Diligence Report suggests a possible inconsistency between its model and the FEIS model. Table 7 of the toll rate report predicts that in 2025, average traffic in the two-lane tollway reaches the soft cap threshold (variously given in MDOT documents as 3200 or 3300 cars per hour) only in one roadway segment: northbound immediately north of River Road (MD 190). That segment forks between I-270 and the Beltway; the threshold is exceeded on the I-270 fork from 4:00 to 7:00 pm and on the Beltway fork between 6:00 and 7:00 pm. In the northbound segment immediately south of Montrose Road, it predicts that the soft cap will be hit frequently despite falling short of it under average conditions.

The FEIS forecast for 2045, twenty years later, shows the toll lane traffic volume exceeding 3300 cars per hour only in the northbound segment between River Road and the I-270 fork, between 3:00 and 6:00 pm. It predicts toll lane traffic volumes between 3200 and 3300 cars per hour only in one other segment, the segment immediately south of Montrose Road.

The forecasts in the Preliminary Toll Rate Due Diligence Report assume a steadily increasing demand for automobile travel due to population and job growth, and a more rapidly growing demand for toll lane travel due to increasing income levels. The growth in travel demand should be reflected in rising traffic volumes and increasing toll rates. Thus, one would expect the report to predict tolls reaching the soft cap more frequently in 2045 than in 2025. However, the FEIS traffic model does not predict traffic volumes sufficient to activate the soft cap. The FEIS failed to grapple with this issue and explain or correct the inconsistencies between the two models.

The reliance on inaccurate data—even in the face of explicit warnings about its inaccuracies—tainted the required consideration of alternatives and therefore violates NEPA.

17

C.   **There Are Serious Problems with the Current FEIS that Indicate the Traffic Models and How They Are Applied Should Be Reviewed Independently Before Final Decisions Are Made.**

Table 1 shows a comparison of the SDEIS and FEIS PM trip travel times. The difference between the no build ("NB") and general purpose ("GP") travel times both increase and decrease, but all GP and NB travel times in the FEIS are reduced. GP lanes are the non-toll lane part of the toll road.

Table 1. Comparison of FEIS to SDEIS Numbers

| PM Trips | SDEIS | | | FEIS | | |
|---|---|---|---|---|---|---|
| | NB | GP | Difference | NB | GP | Difference |
| GW Parkway to I-370 | 42 | 52.1 | 10.1 | 27.9 | 36.8 | 8.9 |
| Clara Barton to I-370 | 37.3 | 48.6 | 11.3 | 25.1 | 35.8 | 10.7 |
| River Road to I-370 | 24.4 | 30.8 | 6.4 | 17 | 26.6 | 9.6 |

Table 2 shows the difference projected between the FEIS and the SDEIS projected travel times for identical GP trips. The trips are the PM trips from the George Washington (GW) Parkway, Clara Barton Parkway, and River Road to the end of the toll lanes on I-270 at I-370.

Table 2. Travel Time Different Between SDEIS and FEIS for GP Lanes - PM

| | SDEIS | FEIS | Difference | % Reduction |
|---|---|---|---|---|
| GW Parkway to I-370 | 52.1 | 36.8 | 15.3 | 30 |
| Clara Barton to I-370 | 48.6 | 35.8 | 12.8 | 26 |
| River Road to I-370 | 30.8 | 26.6 | 4.2 | 15 |

What Table 2 shows is that there is a substantial reduction of travel times for the FEIS compared to the SDEIS. We are talking about a 30 to 15% reduction from 15 to 4 minutes. The result of these changes is to provide MDOT with the ability to claim higher average speeds for the general purpose (GP) part of the toll lanes in the newest analysis, despite the fact that the MDOT's own analysis projects on average a 10-minute advantage (faster trips) from the GW, Clara Barton, and River Road PM trips to I-370 for the no build alternative.

In fact, when you examine the key trips from River Road along the Beltway to Old Georgetown Road exit or to the Democracy exit on the I-270 West Spur, the comparative slowdown between trips in the GP lanes vs. the No Build has grown enormously – 137% (Table 3) for the Beltway trip and 33% (Table 4) for the I-270 West Spur trip.

Table 3. Trip times from River Road to Old Georgetown Road – PM

| SDEIS | | FEIS | | % Difference |
|---|---|---|---|---|
| NB | GP | NB | GP | |

18

| | 37.3 | 41.9 | 18.3 | 29 | |
|---|---|---|---|---|---|
| Difference GP-NB | 4.6 | | 10.9 | | 137% |

Table 4. Trip times from River Road to Democracy - PM

| SDEIS | | FEIS | | % Difference |
|---|---|---|---|---|
| NB | GP | NB | GP | |
| 10.4 | 16.7 | 4.9 | 13.3 | |
| Difference GP-NB | 6.3 | | 8.4 | 33% |

While there is a clear advantage for the no build in the PM trips, reducing the travel times of the GP portion of the toll road minimizes the devastating effects of the PM Beltway Chokepoint by giving the appearance that the speeds will be acceptable.

Figure 1. Map of project area with labeled interchanges and chokepoint



*Maryland Department of Transportation State Highway Administration I-495 & I-270 P3 Office map.*
Interchanges and chokepoint labeled by author.

Table 5 and 6 illustrate another inexplicable change between the SDEIS and FEIS. For trips from Connecticut Ave to the GW Parkway (Table 5) and Connecticut to River Road (Table 6) there is a 470% and 656% increase in the projected travel time advantage for the FEIS versus

the SDEIS for GP lanes over the no build lanes in the PM travel time. The Connecticut to GW Parkway and Connecticut to River Road No Build travel time changes between the SDEIS and the FEIS are 240% and 295%. It is puzzling that such a mismatch could occur and not explained.

Table 5. Trip from Connecticut to GWP - PM Minutes

| SDEIS | | FEIS | | Increase Time |
|---|---|---|---|---|
| NB | GP | NB | GP | |
| 16.4 | 10.1 | 39.4 | 9.8 | |
| Difference GP-NB | 6.3 | | 29.6 | 470% |

Table 5a. % Change Between SDEIS and FEIS for Connecticut to GWP - PM Minutes

| NB-SDEIS | NB -FEIS | % Difference | |
|---|---|---|---|
| 16.4 | 39.3 | 240% | |

Table 6. Trip from Connecticut to River Road - PM minutes

| SDEIS | | FEIS | | Increase Time |
|---|---|---|---|---|
| NB | GP | NB | GP | |
| 10.9 | 7 | 32.2 | 6.6 | |
| Difference GP-NB | 3.9 | | 25.6 | 656% |

6a. % Change Between SDEIS and FEIS from Connecticut to River Road - PM minutes

| NB-SDEIS | NB-FEIS | % Difference | |
|---|---|---|---|
| 10.9 | 32.2 | 295% | |

As explained more fully in the attached report, taken together these types of changes that clearly favor the Agencies' desired outcome require detailed and independent analysis that cannot be produced in 30 days for 26,000 pages with limited resources of outside groups.[32] Changes of this magnitude should not happen after two rounds of analysis before the FEIS, and they certainly should not completely favor MDOT's desired outcome.

**III.    The FEIS Fails To Address Impacts to Public Health.**

The FEIS fails to disclose serious public health risks and impacts and suffers from deficiencies in its analysis of the public health impacts of the evaluated alternatives. Throughout the NEPA process for this Project, we have requested that the Agencies conduct a full analysis of

---

[32] *See* Katz Report, attached as Exhibit H.

19

20

00000189


public health impacts, including, for example, an analysis of localized air quality impacts or health impacts from traffic safety issues. The Agencies have declined to do so.

Based on their close review of the FEIS and its appendices, several health experts—including a public health expert, air quality expert, traffic safety and crash analysis expert, and an epidemiologist—have provided letters and reports explaining where the FEIS has failed to disclose or analyze serious public health impacts of the Project...

Roselie Bright, Sc.D., and Ronald Bialek, MPP, explain that the FEIS suffers from a deficient analysis of impacts including a failure to address traffic-related injuries and deaths from an increase in vehicle miles traveled, adverse health impacts and deaths from increased mobile source air toxics and other sources of air pollution, and adverse health impacts from construction- and traffic-related noise. As Bright notes, the FEIS fails to acknowledge or discuss the links between, for example, increased air pollution from traffic and high rates of asthma or heart disease.[33] As Bialek highlights, these health impacts are likely to be disproportionately higher in EJ populations, given historic inequities. [34]

The report by ZAMURS AND ASSOCIATES, LLC, explains that the FEIS's air quality discussion lacks a discussion of the preferred alternative's impacts on criteria pollutants and other pollutant emissions and also fails to address air quality concerns in environmental justice communities, despite previous comments identifying these missing analyses.[35] Further, the FEIS fails to fully evaluate the effects of bottlenecks that will be created under the preferred alternative and, importantly, the air quality impacts from the bottlenecks that may concentrate around the end points of the preferred alternative, in areas where EJ populations live. *See* ZAMURS AND ASSOCIATES Report at 5-6.

Further, as discussed below, Byron Bloch, a longtime expert in traffic safety, discusses failures to address the public health impacts of traffic safety issues from the preferred alternative and from respirable silica dust caused by highway construction.[36]

Impacts to public health are an important part of any "hard look" analysis required by NEPA. Many of the proposed actions under the preferred alternative will cause significant, adverse public health impacts, whether directly, indirectly, or cumulatively. For all the reasons explained in the experts' letters and reports as well as those explained in our prior comments, this FEIS fails to take that hard look. As a result, the preferred alternative is likely to cause significant, adverse health impacts, unexamined in the FEIS.

---

[33] *See* Letter of Roselie Bright to Sierra Club, attached as Exhibit E.
[34] *See* Letter from Ronald Bialek to Sierra Club, attached as Exhibit F.
[35] *See* ZAMURS AND ASSOCIATES, LLC Report, attached as Exhibit G.
[36] *See* Bloch Report, attached as Exhibit I.

21

## A.    Respirable Crystalline Silica Construction Dust Remains a Major Unaddressed Public Health Hazard of this Project that the Agencies Are Ignoring.

MDOT and FHWA have failed to disclose or address critical health risks raised by safety experts regarding large volumes of toxic crystalline silica dust that will be released as the Project carries out demolitions of soundwalls, bridges, and highways to reconstruct and enlarge them for this Project. Their disregard and dismissal of this health risk flies in the face of recent, more stringent U.S. Occupational Safety and Health Administration ("OSHA") regulations for silica dust and known risks explored in articles with titles like, "Highway Repair: A New Silicosis Threat."[37]

OSHA explains that "[r]espirable crystalline silica . . . is created when cutting, sawing, grinding, drilling, and crushing stone, rock, concrete, brick, block, and mortar."

Research has shown silica dust to be a known carcinogen and one of the most harmful components of particulate matter, which is a mixture of small airborne particles of organic chemicals, metals, minerals and soil.

The Agencies do not address any of the construction-related risks of silica dust. The FEIS instead minimizes all construction-related air pollution: "Because the project's construction duration is not anticipated to exceed six years in any single location, most air emissions associated with construction are considered temporary in nature."[38]

That statement raises even more profound questions and concerns. Construction is not anticipated to exceed six years in any single location. Therefore, they consider it temporary. Six years in a single location is the entire elementary school education of a student at Carderock Springs Elementary School, which is already badly affected by its proximity to I-495. Six years is one less year than all of middle and high school, and surely will not provide comfort to the staff, students, and parents of students at Julius West Middle School, already adversely impacted by proximity to I-270. It is doubtful that another vulnerable population, the seniors at Rockville Senior Center, feel that six years is temporary.

The issue with air pollution from highway construction cannot be swept under the rug by a generic reference to "most emissions." A major issue facing all populations living, working, and going to school along the proposed construction route is the respirable crystalline silica dust. As one website correctly observes, "There are no regulations for bystanders or enforced protections for surrounding civilians. Unfortunately, the nature of respirable dust particles can put bystanders at risk of inhalation exposure far beyond the confines of the construction site."[39]

---

[37] David J. Valiante, et al, Highway Repair: A New Silicosis Threat, Am. J. Public Health 94(5): 876-880 (May 2004), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1448352/.
[38] FEIS at 9-50.
[39] How Far Can Respirable Dust Actually Travel? Sep 24, 2019, available at https://www.nosilicadust.com/how-far-can-respirable-dust-actually-travel/.

22

00000190

Toxic crystalline silica dust is a known carcinogen, it is very light and can drift hundreds of feet and even miles, and it causes multiple lung and breathing ailments and even death. Bryon Bloch, a longtime expert in traffic safety, states that the Project's FEIS is "evasive and fraught with omissions on such critical areas as: The generation of toxic silica construction dust that will assuredly cause asthma, silicosis, and lung cancer to many residents."[40]

He continues:

It is outrageous that this FEIS does NOT adequately address concerns for the toxic and carcinogenic crystalline silica construction dust that will be generated daily during at least the six years of road demolition and re- construction... including the multiple bridges and soundwalls. The FEIS ignores any concerns that thousands of our children through seniors will be sickened with asthma, silicosis, COPD, and lung cancer. In their response, MDOT simply refers to "fugitive dust" and then mentions that they "may" use some measures to minimize or mitigate.[41]

Contrast this evasive smoke-and-mirrors response with the evidence presented by the National Cancer Institute about silica construction dust being toxic and carcinogenic, and by the American Public Health Association about road re-construction projects causing silicosis. Yes, there are OSHA requirements to help protect the on-site workers from breathing respirable silica dust, but what about the nearby citizens and neighborhoods and schools? One of the MDOT measures is that they "*may use*" water trucks... but that means a fleet of daily tanker trucks and spraying huge amounts of water to hopefully capture enough of the silica dust, etc., and then how and where is it safely dispersed (without adversely affecting our public water supply ala Flint, Michigan)? Mitigation techniques are only mentioned in broad brush terms, and that they "*may*" be used... and that these measures are only partially effective at best.

For these reasons and those Mr. Bloch presents more fully in his report, the Agencies' failure to disclose and meaningfully grapple with the impacts of silica dust in their FEIS denies the public and decisionmakers the needed understanding of this Project's health impacts for populations living, working, and going to school near the highways.

**B.    The FEIS Fails To Address the Health Impacts of Traffic Safety Issues from the Preferred Alternative.**

The FEIS fails to address how the preferred alternative road design will lead to more vehicle crashes, including the lethal truck-vs.-car crashes. It also fails to address the safety impacts

---

[40] *See* Bloch Report, attached as Exhibit I.
[41] Full quote in FEIS at 5-181 "To manage fugitive dust emissions during construction, the contractor may use some or all of the following dust control measures, to minimize and mitigate, to the greatest extent practicable, impacts to air quality:"

23

---

of the severe bottleneck the Project creates where seven lanes will funnel down to two north of Gaithersburg.

Traffic collisions on the widened highways are likely to increase under the preferred alternative. The FEIS does not, however, fully evaluate these impacts. As the FEIS explains, "safety was not one of the specific elements identified in the Study's Purpose and Need." FEIS at 60.

If the preferred alternative is built, there will be seven northbound and seven southbound lanes on I-270, with two central toll lanes. This proposed road design is likely to create multiple safety problem. Vehicles will be required to shift to and from the central toll lanes to the outer lanes to exit. According to Bryon Bloch, a longtime expert in traffic safety, this configuration "will lead to many severe collisions."[42]

Further, the road configuration proposed under the preferred alternative will cause more frequent truck versus car crashes. For example, the proposed design does not address the need for safety shoulder or break-down lanes. FHWA recommends at least 12-foot shoulders adjacent to the outer travel lanes on roads, like I-270, with heavy truck traffic. Instead, the road designs for the preferred alternative:

look like an artist's concept, and [do] not include any technical details to describe such necessary features as entry and exit ramps, how the traffic will enter and exit the toll lanes, how the traffic on the central toll lanes will transition to the exits, and other details.[43]

Shoulders less than 12 feet adjacent to outer travel lanes carry safety risks. The FEIS talks about "typical sections" of highway but is not clear about where and how frequently a 12-foot shoulder for the general purpose lanes will be maintained. For example, it was disclosed in the final 4(f) evaluation that next to the Morningstar Moses Cemetery:

The width of the right shoulder is reduced from 12 feet to 6 feet wide (measured between the edge of travel lane and face of concrete barrier) for a total length of approximately 400 feet including tapers. The total length of the narrow right shoulder excluding the tapers is approximately 235 feet.[44]

This FEIS does not disclose how the risk is managed between toll lanes and general purpose lanes and whether when the general purpose lane shoulder is less than 12 feet, the toll lane shoulder is also proportionally narrower or if the general purpose lanes bear the entirety of the safety risks associated with a narrower shoulder adjacent to the outer lane.

In addition, Mr. Bloch opines, the preferred alternative will exacerbate the traffic backup bottlenecks as the seven lanes heading north on I-270 will funnel to two lanes just north of

---

[42] *See* Report of Byron Bloch at 1, attached as Exhibit I.
[43] *Id.* at 4.
[44] FEIS App'x G Final 4(f) Evaluation at 65, *available at* https://oplanesmd.com/wp-content/uploads/2022/06/11_MLS_FEIS_AppG_Final-Section-4f-Evaluation_-June-2022p.pdf

24

00000191

Gaithersburg. There are already bottlenecks in the Gaithersburg area from a less severe funneling from five lanes to two. As addressed more fully elsewhere in this Section, bottlenecks cause localized air pollution. Gaithersburg hosts several EJ populations who should not be asked to bear this additional environmental burden.

Based on his review of the FEIS, Mr. Bloch concludes:

The FEIS fails to address how the Alternative 9 road design will lead to more vehicle crashes, including the lethal truck-vs.-car crashes (which I have analyzed for many years as a national auto safety expert analyzing many such actual collision accidents). The lane shifting and cross-overs to and from the toll lanes to entry and exit locations will exacerbate such collisions with severe to fatal consequences for the occupants of passenger vehicles.

The FEIS should have, but did not, thoroughly evaluate these safety issues and corresponding impacts to public health while analyzing the effects of the alternatives. Instead, it includes a proposed alternative that is likely to cause significant health impacts from unsafe road conditions.

IV.    **The FEIS's Discussion and Evaluation of Plummers Island, Certain NPS Lands, the Potomac River, and Impacts to the Northern Lon-Eared Bats and Other Bats Is Incomplete and Contrary to Applicable Legal Requirements.**

A.    **Throughout the Environmental Review Processes, the Agencies Have Failed to Consider the Full Scope of Impacts to Plummers Island.**

Plummers Island is a unique natural research area that hosts many rare plant species while at the same time being close to a heavily populated urban area. It is the site of important, long-term scientific studies conducted by the Washington Biologists' Field Club ("WBFC" or "Club"), a non-profit organization comprised of influential and accomplished scientists and charged by the National Park Service with the care and maintenance of the Island. The Island also serves as the meeting place for the Club's members. WBFC has documented the rich ecosystems and biodiversity on Plummers Island through over 120 years of research. Plummers Island is entitled to protection under Section 4(f), both as part of the C & O Canal Historical Park and as a significant historic resource that is individually eligible for listing in the National Register of Historic Places as the Washington Biologists' Field Club on Plummers Island.

In the preferred alternative, the Agencies plan to take part of Plummers Island, place piers for the highway on the Island, undertake construction of the Project from the Island, destroy important research plots of rare plant species and habitat, and overshadow the Island and its significant research areas by as much as 30 feet with noisy new bridge lanes. All of these impacts constitute a use of Plummers Island that must be evaluated under Section 4(f).

WBFC was a consulting party in the Agencies' Section 106 process, but in spite of WBFC's attempts to protect the Island through its consulting role, the Agencies have failed to do so. Nonetheless, the Agencies appropriately recognized the Island's historic significant and have

agreed to nominate Plummers Island to the National Register of Historic Places. Yet, the Agencies have failed to protect the whole of the property, including the riparian areas outside the ordinary high water mark, or evaluate feasible and prudent alternatives that would avoid or minimize harm to the protected features of Plummers Island.

Under the binding 1959 agreement between WBFC and the National Park Service,[45] the parties memorialized their intent to "preserve this natural wild area as a sanctuary and scientific research preserve," and WBFC gave the Island to the federal government, who agreed to ensure that any improvements on the island "shall not be inconsistent with the uses to which the island has been dedicated by the [WBFC]" in exchange for WBFC's continued maintenance and research on the Island as a wild natural area, so long as WBFC existed and complied with certain obligations. WBFC's extensive studies of the Island make it a rare and precious part of the cultural and scientific natural heritage of the National Park system.

As we now discuss, the failure to acknowledge the full scope of the impact of the Project on Plummers Island, including the long-term research and sensitive research sites that will be destroyed by the Project, and the failure to evaluate feasible and prudent alternatives that would avoid or minimize harm to the protected features of Plummers Island, violates Section 4(f).

1.    **The Agencies Violated Section 4(f) of the Transportation Act by Failing To Mitigate all Proposed Impacts to the Island.**

The Agencies' failures to avoid or minimize impacts to Plummers Island violate Section 4(f) of the Department of Transportation Act. The Act bars the FHWA from approving any transportation project that "requires the use of . . . any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such . . . historic site resulting from such use." 23 U.S.C. § 138(a); 49 U.S.C. § 303(c). *See* SDEIS Comments at 136. FHWA determinations under Section 4(f) must be made in the ROD and cannot lawfully be deferred. 23 C.F.R. § 774.7(e)(3). *See generally* Sierra Club, Section 106 Comment Letter (Apr. 12, 2021).

The Agencies have now missed their opportunity to adopt an alternative to using Plummers Island as part of the Project or to adopt mitigation in compliance with Section 4(f). Understanding that the Agencies were unlikely to select an alternative that avoided the Island entirely, WBFC proposed mitigation efforts on many different topics in the Section 106 process. *See supra.* The Agencies rejected some of those proposals. They also failed to treat effects to wetlands and waterways as Section 4(f) issues. Now the FHWA has run out of time to formally agree to any meaningful mitigation to comply with its Section 4(f) responsibilities in the ROD because they deferred a final determination on Section 106 mitigation until the execution of the programmatic agreement after the NEPA process. The FEIS does not propose to include reasonable alternatives

---

[45] *See* WBFC, Section 106 Comments on the MLS Programmatic Agreement, App'x A (Feb. 3, 2022) (attaching 1959 Agreement between WBFC and NPS).



that would avoid or mitigate harm to the Island in the preferred alternative, suggesting that it is very unlikely that the full mitigation required by Section 4(f) will be approved in the ROD.

The preferred alternative will cause irreparable harm to Plummers Island. Environmental damage to Plummers Island cannot be fixed by any form of post-hoc mitigation, as is apparently contemplated by the programmatic agreement. Plummers Island is a research site that hosts a multigenerational study of long-term ecological processes. Destruction of, or serious damage to, the habitat stops the ecological processes whose progress WBFC has been studying for over a century and ends the long-term study. The Agencies' proposed "comprehensive ecological restoration plan" on NPS land to address impacts from the preferred alternative, FEIS at 5-110, is not a solution.[46] Instead, it disrupts long-term research begun in 1901 and forces the WBFC to start a new study from scratch. The deferral of consideration of these long-term impacts violates Section 4(f). *See Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 371 (D.C. Cir. 1999) (because the historic properties protected by Section 106 and Section 4(f) are similarly defined, "it follows that the [Federal Highway Administration] must complete its Section 106 determinations before it can comply with section 4(f)").

### 2. Areas Within the Riparian Zones of the Island Must be Considered When Evaluating Impacts to the Island.

In the FEIS and the Section 106 process, the Agencies improperly ignored impacts to Plummers Island beyond the Island's ordinary high water mark. For over 120 years, as part of its overall research, WBFC has studied the wider, riparian margins of Plummers Island. This ecosystem-wide approach to the Island is part of the legacy of WBFC on Plummers Island. However, MDOT continues to say the Island ends at the ordinary high water mark because it failed to recognize the character-defining features of the historic property that justify a different boundary. The Agencies also arbitrarily declined to treat Plummers Island as a separate historic site of national significance worthy of special protections within the larger Chesapeake & Ohio Canal National Historical Park, despite the clear determination of eligibility for the WBFC at Plummers Island made by the Maryland Historical Trust during the course of the Section 106 process.[47]

The FHWA's failure to recognize this use of WBFC at Plummer's Island for purposes of Section 4(f) is contrary to the historic record and inconsistent with the purpose of the proposed designation of Plummers Island on the National Register of Historic Places. Because of the legacy of the WBFC and its research, the federal government determined Plummers Island to be eligible for the Maryland Historical Trust and the National Register of Historical Places, and historic designation requires protecting the Island as a whole.

---

[46] At a minimum, however, as required by the Section 106 process, MDOT and NPS should consult with WBFC before and during any proceeding "restorations."

[47] *See* Maryland Historical Trust, Determination of Eligibility Form for Washington Biologists' Field Club on Plummers Island (Aug. 20, 2021), attached as Exhibit J.

27

### 3. WBFC Was not Properly Included in the Planning Process and the Agencies Improperly Rejected its Recommendations To Minimize Impacts to Plummers Island.

WBFC, despite its historic relationship with Plummers Island, was not originally included in the National Historic Preservation Act Section 106 process. Once WBFC was included as a consulting party to the Section 106 process, the Agencies met with WBFC and agreed to a five-year study of impacts from the Project with photographic documentation. Despite the fact that WBFC at Plummers Island will be used and its research sites will be irreparably damaged the by the Project, the Agencies have not agreed to WBFC's mitigation requests, including proposals for long-term monitoring of invasive species and the effects of the shadow from the bridge or WBFC's request for NPS funding for research using NPS standard plots emplaced and followed for 20 years to capture impacts more fully.[48] WBFC's suggestions were either ignored or dispensed with on engineering and cost grounds. For example, under the preferred alternative, the Agencies plan to build a shared use path on the bridge in a manner that would overhang Plummers Island, despite WBFC's objections and suggestions of where else to place it.

Moreover, WBFC was not given notice of MDOT's field visits to Plummers Island so that WBFC could oversee the work to avoid damage to certain plots and rare species. MDOT's contracted crews have already hacked down seven fringe trees (NPS was notified and fined the company, but that doesn't change the fact that the trees had already been cut down). MDOT has failed to respect WBFC's role on the Island throughout the planning process and provide appropriate advance notice for disturbances to Plummers Island.

WBFC should have been included in the Section 106 process from the beginning, and its reasonable mitigation requests should have been honored. Instead, the Agencies have pushed forward with a plan that will contravene WBFC's goals and permanently damage this important resource. More importantly, in doing so, the FHWA has violated its responsibilities under Section 4(f) to avoid or minimize harm to WBFC at Plummers Island as a stand-alone Section 4(f)-protected historic site.

### 4. Mitigation for Impacts to Plummers Island Should Have Been Evaluated in the NEPA Process from the Beginning Instead of Being Channeled into a Section 106 Process that Will Conclude after the Comment Period Is over and the ROD Is Signed.

The Agencies' failures to fully consider impacts to Plummers Island as part of the NEPA and Section 4(f) reviews is an artifact of their decision to address impacts to the Island in a Section

---

[48] Proposed mitigation included the following: Nomination of WBFC on Plummers Island to the National Register of Historical Places; bike & pedestrian lane emplacement; flooding potential; pier and caisson emplacements; ALB construction platforms; channel impacts from construction and vegetation removal; researching disturbance; invasive species; abatement of toxic runoff; abatement of noise pollution; vistas; expanded online content; financial support for inventories of understudied groups on the island; access during construction; and long-term research. *See* WBFC, Section 106 Comments on the MLS Programmatic Agreement at 14-18 (Feb. 3, 2022).

28



106 programmatic agreement that will not be executed until after the NEPA and Section 4(f) processes have concluded. The decision to rely on a programmatic agreement for Plummers Island was in error. Section 106 regulations provide that a programmatic agreement is appropriate in certain limited situations, including "[w]hen effects on historic properties cannot be fully determined prior to approval of an undertaking." 36 C.F.R. §800.14(b)(1)(iii). Here, however, there was no reason to defer all identification of historic properties within the area of potential effects or the assessment of adverse effects and any measures to avoid and mitigate. WFBC and other commenters provided fulsome comments about possible adverse effects to the Island and numerous suggestions for proposed mitigation.

Because of the decision to proceed with a programmatic agreement, the Agencies claimed that they could not fully consider impacts to Plummers Island in the NEPA and Section 4(f) processes and declined to consider reasonable alternatives to avoid impacts (such as project scope, number of new lanes, and road alignment). But delaying consideration of the impacts to the site during alternative selection under NEPA and Section 4(f) undermined discussion of potential mitigation measures for any adverse effects. *See* Sierra Club Section 106 Comments of October 8, 2021.[49]

For example, in the FEIS, the Agencies essentially state that disrupting the continuity of WFBC's research is unavoidable, by ignoring reasonable alternatives that avoid impacts to Plummers Island. The no build option was dismissed without sufficient consideration. In addition, the ALB Strike Team considered a construction approach with a "west shift" of the LOD to entirely avoid impacts to Plummers Island, FEIS at 5-28, and determined it a viable option. The FEIS does not sufficiently explain why this west shift was rejected, particularly because "[a]n additional goal of the ALB Strike Team was to develop and evaluate alternatives for the avoidance and minimization of [impacts to] Plummers Island as it is a recognized ecologically sensitive and an NRHP-eligible historic property in addition to being part of the larger Chesapeake and Ohio Canal National Historical Park." FEIS at 5-28.

Damage to the Island was not inevitable. Allowing construction of the Project to impact the Island demonstrates the Agencies' error in failing to explore reasonable, prudent, and feasible alternatives under NEPA and directly violates the FHWA's substantive obligations under Section 4(f)

### 5. The Agencies Violated NEPA by Failing To Fully Account for Toxic Runoff, Water Quality Impacts, and Other Likely Impacts to the Island.

Despite WFBC's and other comments explaining the likely impacts of the Project on Plummers Island, the FEIS does not provide NEPA's required "hard look" with respect to the Island.

[49] Sierra Club Maryland Chapter Section 106 Comments on the I-495 & I-270 MLS (Oct. 8, 2021), *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u18365/MDSierraClub-Section106Comments-10-08-2021.pdf.

29

First, by limiting their consideration to areas landward of the ordinary high water mark on the Island, the Agencies claim that the preferred alternative will impact less of the Island than would have been indicated if those areas had been properly included.[50] The area that was considered is partly under the expanded ALB and the extended shadow will shade it out. Additional rare communities within the area of potential effects and bordering on the LOD include the Potomac River Bedrock Terrace Hardpan Forest; Floodplain Terrace Forest (with wetland bedrock pools); and the Central Appalachian / Piedmont Basic Mesic Forest with many sensitive species that are restricted to these habitats on the Island, including several that are rare. Plants cannot move out of the way and natural habitat is already being lost throughout the region. The rocky headland of the Island preserves a bit of the Potomac Gorge Riverside Outcrop Barren plant community (globally and state rare) and possibly the easternmost extent of this vegetation unit in the Gorge.[51]

Second, the FEIS includes incomplete maps of the Island, which adds to the Agencies' failure to consider the full extent of the impacts from the preferred alternative. In previous MDOT slides, the positions of piers from the post-construction ALB appears to be wider and overhang Plummers Island more than illustrated in the FEIS. The Agencies have not explained this discrepancy between MDOT's slides and information in the FEIS. WBFC remains concerned that the FEIS understates anticipated impacts to Plummers Island. Further, the destruction and disturbance of Chesapeake & Ohio Canal National Historical Parklands and riparian and pond wetlands is not likely to be contained within the LOD. In addition, in the maps of Plummers Island, the FEIS fails to completely catalogue the Island's water resources. For example, in the maps of Plummers Island, the FEIS did not fully map the frog water pools in the area of potential effects. There is a pool northwest of the mapped pools not drawn on the map. And there is further pooling northeast of the mapped pools that should be mapped as wetlands. The Agencies cannot fully evaluate impacts to the Island if they cannot even accurately describe its current state.

Third, the FEIS fails to consider toxic runoff onto the Island or reasonable mitigation to address it. Most bridges studied for toxic runoff rise up from the surrounding lead-in roads (convex). The ALB is concave, draining as much as a half mile in either direction from Maryland and Virginia lead-in highways. The low point in the curve is between the bend in Plummers Channel and the adjacent mainland. Currently drainage runs onto the NPS mainland, the channel, and the land edge under the bridge on both sides. The expanded I-495 and ALB would substantially increase surface runoff from the ALB, including toxic pollutants onto NPS land and into Plummers Channel. In addition, the lowest point on the ALB drains through scuppers and culverts onto NPS land, cutting an erosional gully and then draining into Plummers channel. *See* WBFC Comments on Section 106 at 16.T (Feb. 3, 2022). The Potomac River water may show little increase in pollutants due to its disproportionately large volumes. In contrast, Plummers Channel does not flow much of the time, and runoff accumulates in the water there until the surface flow threshold

[50] WBFC emphasized this point in its virtual and written SDEIS comments in 2021. WBFC's prior comments on the Section 106 process and comments on the DEIS and SDEIS are available at https://wbfc.science/plummers-island-threatened/.

[51] *See* WBFC, Section 106 Comments on the MLS Programmatic Agreement, App'x C map B (Feb. 3, 2022), attached as Exhibit M.

30

significantly breaches the channel head (level at or above 4.3 ft at Littlefalls Gauging Station). Between 3.4 and 4.2 ft Plummers Channel currently back fills from the bottom. Below 3.5 ft it is mostly stagnant.[52] Yet, the FEIS fails to discuss drainage directly onto Plummers Island or into Plummers Channel.[53] The Agencies plan to address ALB storm water management by relying on compensatory sites. FEIS at 3-20. Sierra Club criticized this approach in its SDEIS comments, *see* SDEIS Comments at 97-101, and continues to object to it. By relying on compensatory stormwater management, the FEIS seems to say that nothing can be done about contaminated runoff.[54] The Agencies also state that meeting stormwater quantity management goals on the shorelines adjacent to the ALB is infeasible. *See* FEIS at 3-18. The FEIS demonstrates that the Agencies are still planning an unlawful game of "wait-and-see" when it comes to how stormwater will affect this precious resource.

Fourth, the Agencies have failed to properly survey and analyze the occurrences of rare, threatened, and endangered species on Plummers Island and in the vicinity. As Dr. Browne explains more fully in her attached letter, the Agencies have failed to properly survey for certain rare species on the Island and in the vicinity, including bats.[55] For example, they only performed bat surveys for two nights per site, even though bats frequently change roosts in the summer, so surveys should be performed for multiple nights to address presence or absence. Without mist netting and acoustic monitoring, more surveying is needed to determine the presence of threatened and endangered species on Plummers Island and in the vicinity of the American Legion Bridge on both sides of the Potomac River.

Fifth, the FEIS asserts that certain permanent impacts to Plummers Island will be temporary. The FEIS states that impacts to Plummers Island will be "permanent use for three, discrete, approximately 10-foot diameter pier foundations and temporary, construction activities," affecting "approximately 0.28 acres of impacts to the island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact." FEIS at 5-29. The FEIS notes, "[t]emporary construction activities may include efforts such as excavation, access for construction of existing bridge foundation and piers adjacent to the island, and slope protection. Access to the existing and proposed piers is required for these embankments." *Id.* These "temporary" construction activities have permanent effects. Armoring embankments, cutting down trees, destroying vegetation in the LOD, and creating a dead zone under the bridge and an extended shadow over the Island will irreparably damage the Island.

---

[52] The measures above are based on WBFC member Robert J. Soreng's estimates from having crossed to the Island many times. Dr. Soreng notes that even with the recent big rains the river level has been well below 4.3 ft.

[53] Plummers Channel is identified in the DEIS and SDEIS as "Rock Run Culvert," although it is neither Rock Run nor a culvert, and in the FEIS as a Potomac River "oxbow," although it is now officially named Plummers Channel by the USGS Board of Geographic Names.

[54] MDOT did not respond to comments about runoff from spills onto the Island from accidents. Several recent accidents have caused spills.

[55] *See* Letter from Shannon P. Brown, PhD to Sierra Club Maryland Chapter (July 18, 2022), attached as Exhibit K.

31

---

Even the FEIS recognizes that the "temporary" construction impacts may cause permanent damage to certain important plant species that are being studied on Plummers Island:[56]

Some impacts to RTE [or rare, threatened, and endangered] plants will occur on Plummers Island, though most will occur in areas that will be temporarily disturbed during construction of the new ALB. RTE plants potentially affected within the areas of temporary disturbance on Plummers Island include thousands of horse-tail crown grass plants, about a dozen pale dock plants, 30-50 halberd-leaf rose-mallow plants, and 10-50 Rand's goldenrod plants. All of these plants occur either along the Plummers Island shoreline of the oxbow of the Potomac River or along the Plummers Island shoreline of the Potomac River. As noted above, because of the duration of construction of the new ALB and potential shading effects from the expanded ALB, the plant impacts are likely more permanent than temporary, even though they occur outside of the permanent footprint of the bridge. The RTE plant impacts resulting from the bridge pier footprint on Plummers Island would be to a few dozen horse-tail crown grass plants along the edge of the oxbow of the Potomac River.

FEIS at 5-127. The FEIS does not, however, acknowledge that many other "temporary" impacts are permanent disruptions to the integrity of the Island. Plummers Island is currently managed for scientific research to study long-term trends with no disturbance. The preferred alternative is antithetical to that purpose and the FEIS fails to acknowledge the full impacts to Plummers Island and to WBFC's mission. These acknowledged impacts also increase the severity of the use of Plummers Island under Section 4(f), and the FHWA's violation of its substantive obligation under Section 4(f) to consider prudent and feasible alternatives that would avoid or minimize harm to the important research sites that will be destroyed by the Project.

**6. The Agencies also Do Not Address Concerns to Plummers Island from Flooding.**

The FEIS fails to accurately describe the likely impacts of the preferred alternative due to the risks of catastrophic flooding to the Island. As noted above, the Agencies improperly limited consideration of impacts to Plummers Island to those that occur within the Island's ordinary high-water mark.

The FEIS's evaluation of construction and long-term impacts to the Island from flooding is also inadequate. In the FEIS, the Agencies state that hydrologic analysis will not be completed until final design, but without full hydrologic analysis the FEIS is incomplete. *See* FEIS 5-84 (explaining that a general assessment of hydrologic effects for the Project will be completed "once final limits of cut and fill are determined the final phase of engineering design"). Flow in the

---

[56] The FEIS explains "the proposed construction activities at the western edge of Plummers Island will alter the natural landscape of the Island, a character-defining feature of the WFBC, resulting in diminishment of property's integrity of setting." FEIS at 9-33. It does not, however, fully describe the impacts from the Project or attempt to avoid or fully mitigate them, as discussed *supra*.

32

OP·LANES

MARYLAND    I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 56-2    Filed 10/30/23    Page 52 of 76    RECORD OF DECISION

channel will be affected simply by removing the old piers at the river's edge, let alone by flooding adding to this impact, but the FEIS does not address these impacts.

The flooding issues from planned caisson and pier emplacements (creating perfect conditions for logjams) and leveling or trimming the rock ridge that constrains the channel overflow from flooding the island are major and reasonably foreseeable adverse issues that require prompt attention and avoidance, minimization, or mitigation and were not fully addressed in the FEIS.

Similarly, the Agencies indicate that the construction process will be designed to address 100-year floods, but those floods now come more frequently than historic 100-year floods. The FEIS must acknowledge that the data it is using to evaluate construction impacts is outdated and understates the risks to the Island. Given the increasing frequency of more extreme rains, there is a potential for catastrophic flooding at the ALB in Mather Gorge narrows.

In sum, throughout this process, the Agencies have continued to undervalue both Plummers Island and WBFC's important role in protecting it. As a result, they have recommended an alternative that will, among other things, permanently alter RTE plants, destroy WBFC long-term research, denude, overshadow, and armor the upper end of the Island, and increase the risk that stormwater runoff or catastrophic flooding will cause large-scale damage to the Island. The Agencies still lack smart-growth-forward thinking to address climate change, and instead of coming up with smart-growth solutions they plan to permanently damage the irreplaceable natural resource that Plummers Island represents.

B. **The FEIS Fails to Address Several Outstanding Issues Pertaining to National Park Service Land Around the American Legion Bridge, Including on Both the Maryland and Virginia Sides of the Potomac River.**

1. **There Is No Stormwater Management Planned for the American Legion Bridge, Which May Run Afoul of Clean Water Act Requirements.**

With no plan for stormwater from the ALB, water will drain directly from the Bridge into the Potomac River. While original plans included stormwater management on National Park Service ("NPS") properties to address runoff from the Bridge, this control measure has been eliminated because, the Agencies claim, the NPS will not allow stormwater management facilities on their properties except in narrow circumstances not applicable here. *See* FEIS at 3-18.[57]

However, according to the FEIS at ES-10, Maryland Water Quality Standards, and likely Virginia Water Quality Standards as well, require onsite treatment of all new impervious areas and

---

[57] The Agencies must clearly explain why stormwater management to address Bridge runoff is not appropriate on Plummers Island because it is not clear that restriction applies given that Plummers Island is NPS-owned land.

33

for stormwater to leave a site in equal or better condition that it arrived. That requirement applies to most if not all of the ALB, yet nothing is being done to comply with it.

Observers of the Project involved in the Section 106 process have suggested that several of the scuppers on the American Legion Bridge will drain directly onto Plummers Island (National Park Service property), which would seem counter to the Agency's interpretation of NPS's policy regarding stormwater management on their property. This proposed stormwater drainage exacerbates the harm to this Section 4(f)-protected property discussed above.

Even beyond the legal requirements, it is highly concerning that no stormwater management is planned for an area that is concave and receives stormwater from large amounts of impervious surface in both Maryland and Virginia. Moreover, that stormwater flows directly into the Potomac River, a source of drinking water for 6 million people.

The Potomac River Keeper Network states:

The Potomac River provides clean, safe drinking water to almost 6 million people within the river basin. Close to 100 million gallons of water are taken from the river and transported to homes, schools, restaurants, hospitals, and dozens of other businesses and amenities daily. This water is used for drinking, cooking, cleaning, showering, and removing waste.[58]

According to the Potomac River Basin Drinking Water Source Protection Partnership,[59] pollution in the Potomac River from de-icing materials, hazardous spills, and stormwater are challenges to providing a reliable and safe supply of drinking water. Those challenges will significantly increase if the Agencies proceed with the preferred alternative of widen I-495 and the ALB by adding toll lanes without addressing increased stormwater runoff or spills into the Potomac. The FEIS should have addressed these stormwater issues given their extensive health and safety ramifications. No project should be cleared to move forward with such poor planning.

2. **Over 1,000 Trees Will Be Removed from National Park Service Land, Which Remains an Unacceptable Number from the Perspectives of the National Park Conservation Association, National Capital Planning Commission, and Most Likely the National Park Service As Well.**

According to the FEIS, in July 2021, the National Park Service objected to the removal of 858 trees on NPS property, including along the C&O Canal. FEIS App'x S at 14. Under the preferred alternative, 815 trees would be removed from the C&O Canal, 270 removed along the Clara

---

[58] Potomac River Keeper Network, https://www.potomacriverkeepernetwork.org/imagine-a-day-without-water-october-21st/#:~:text=The%20Potomac%20River%20provides%20clean,people%20within%20the%20river%20basin.
[59] Potomac River Basin Drinking Water Source Protection Partnership, *available at* https://www.potomacdwspp.org/about-us/.

34

Barton Parkway, and 76 from the George Washington Memorial Parkway, resulting in a total of 1,161 trees to be removed on NPS property. *Id.* at Tbl. 5-9. This is an unacceptable level of impact for which no apparent mitigation has been proposed. Given that these resources are protected under Section 4(f), the FHWA is obligated to consider whether there are prudent and feasible alternatives that avoid or minimize the harm resulting from the destruction of so many trees.

### 3. Further Investigation Is Required into Whether it Is Legal Without Congress's Review and Approval to De-Federalize Capper Crampton Lands and Transfer Them to the States for Transportation Use.

A November 19, 2021, letter from the National Capital Planning Commission to MDOT SHA[60] stated:

Regarding the two federal parkway lands, NPS has advised NCPC of its intent to "transfer" project-related George Washington Memorial Parkway land to the State of Virginia and project-related Clara Barton Parkway and Chesapeake & Ohio National Historic Park land to the State of Maryland. These resulting changes would negate NCPC's Capper-Crampton jurisdiction over Clara Barton Parkway land and our Planning Act jurisdiction over George Washington Memorial Parkway and C&O Canal National Historic Park lands. Given these facts, NCPC has no formal review authority over any aspect of the Alternative 9 - Phase I South Alternative; however, please note that NCPC would still be legally obligated to comply with the CCA requirements and 1941 and 1951 Agreements until such as time the land transfers are complete. This includes ensuring that M-NCPPC consents to the transfers and obtains compensation for its contribution to the land purchase.

Yet, two years earlier, there were concerns about the legality and optics of taking this course of action. Meeting notes obtained by FOIA state:

There was a discussion on de-federalizing CC lands. NCPC was not sure if that is allowed but were concerned with optics and risks associated with it even if it [sic] allowed. NCPC talked about [sic] 1963 perpetual easement agreement between the State and M-NCPPC due to the widening and construction of the Capital Beltway."[61]

---

[60] November 19, 2021, Letter to MDOT SHA's Jeffrey T. Folden from Marcel Acosta, Executive Director of National Capital Planning Commission, Re: I-495/270 Managed Lanes Study Draft Supplemental Environmental Impact Statement Comments.
[61] Meeting notes from Federal Highway Administration (FHWA) and National Capital Planning Commission (NCPC) Meeting, Location: NCPC Headquarters, November 1, 2019, attached as Exhibit L.

35

---

In another bullet, the meeting notes stated: "NCPC informed FHWA that NPS reached out to them know about the 1941 agreement on George Washington (GW) Parkway which stipulates NCPC's role."

The Agencies must justify these proposed land transfers, including identifying the "risks" noted by NCPC, explaining the decision-making process, and describing why the transfers are consistent with the applicable law, including all relevant agreements.

### C. The FEIS Does Not Adequately Identify and Analyze Impacts to the Potomac River.

#### 1. Information Is Lacking and Still Needed Regarding Recreational Use of the Potomac River During Construction.

The Potomac River flows under the American Legion Bridge (ALB), which will be replaced under the preferred alternative. Recreational users of the Potomac River are deeply concerned about the impact of construction of the new bridge on the River.

The Canoe Cruisers Association, one of these concerned groups, submitted comments on the EIS documents, FEIS App'x T.2.B. Vol. 1 at CO-566 – CO-569, and summarized their concerns in an opinion piece in Maryland's *Bay Journal*:

It is anticipated that the construction of the [American Legion] bridge will take five years and double the size of the current one. This will inevitably harm natural and recreational experiences and the river itself. Increased noise, restriction of the channel with barges, riprap and heavy equipment are certainties, and intermittent closures of the river to recreational boating are very likely. . . . The Potomac River is nationally recognized as an important historic, scenic and recreational waterway . . . . Two of the 11 nationally designated scenic land and water trails in the U.S. run under the American Legion Bridge: The Park Service's Potomac Heritage National Scenic Trail [and the] Captain John Smith Chesapeake National Historic Trail. . . . MDOT's environmental documentation fails to even mention the impact of bridge construction on these monumental historic and recreational sites. . . . . The department must describe how it can and will avoid adverse impacts. [62]

In their comments and article, the Canoe Cruisers Association raised concerns about boating access, safety, and environmental impacts to the Potomac River during construction of the new ALB. Unfortunately, the boating concerns raised by Canoe Cruisers Association have been generally dismissed.

---

[62] David Cottingham, Maryland Silent on Recreational Impacts of Potomac Bridge Project, Bay Journal (Apr. 13, 2022), *available at* https://www.bayjournal.com/opinion/forum/maryland-silent-on-recreational-impacts-of-potomac-bridge-project/article_40e00ae8-af71-11ec-9558-b35466700206.html.

36

00000197

For example, the Maryland Historic Preservation Office concluded that the Potomac River under the ALB is not an historic resource covered by the National Historic Preservation Act. Even though the National Park Service has designated the Potomac beneath the ALB as part of the Potomac Heritage Trail and the Captain John Smith Chesapeake Bay National Historic Trail, NPS did not echo the Canoe Cruisers Association's concern about adverse impacts to those waterway trails in its comments during the EIS or historic preservation reviews.

In their response to comments on the FEIS, the Agencies stated that, during construction, no dikes or large stones will be placed in the Potomac except around the new piers supporting the ALB. Further, they expect to construct the new bridge using "trestles" for the heavy equipment:

During construction, it is anticipated that causeways, trestles and barges will be utilized to access the ALB corridor for demolition and construction. It is not anticipated that rocks will be placed across the Potomac due to it's [sic] depth and that off the banks, the contractor will utilize steel trestles supported on temporary pilings that will be removed at the completion of construction as well as barges to obtain access. During the heavy construction operation, it is anticipated that *water users will have temporary disembarkment and reentry [sic] requirements to detour around the construction* (emphasis added). These are anticipated to be intermittent during construction. Permanent riprap for scour protection is anticipated to be placed around the pier footings but not across the entire channel between piers.

FEIS App'x T.2.B.Vol.1 at CO-567. Construction is expected to take up to 5 years and the proposed construction zone across the Potomac is about 600 feet long. The Agencies provide no information about where the "disembarkment and re-entry" points will be and no details on how frequently these "intermittent" disruptions will occur.

The Agencies further conclude that, "[w]hile the Potomac River has a recreational use, it is not a park as defined under Section 4(f) or the US Department of Transportation (USDOT) Act of 1996 as amended. Construction of the new ALB should *not prohibit the navigability* of the main channel of the Potomac River and construction will be limited to the shorelines." FEIS App'x T.2.A.Vol.1 at CO-568 (emphasis added).

Construction will certainly *interfere with or impede the navigability* of the Potomac for several years, even though it may not "prohibit" it, except intermittently.

More still needs to be disclosed to the recreational users of the Potomac and the public about how the Potomac will be impacted by the proposed demolition of the current American Legion Bridge and by its rebuilding and approximate doubling in size.

37

2. **The Agencies Should Have Considered Whether the Potomac River Is a Section 4(f) Resource Due to its Inclusion Within the C & O Canal Historical Park.**

The Agencies should have considered whether the Potomac River is a Section 4(f) recreational resource due to its location within the C & O Canal National Historical Park, the fact that it is part of the Potomac Heritage Trail and the Captain John Smith Chesapeake Bay National Historic Trail, and possibly due to its designation as a state wild and scenic river.

FHWA's Section 4(f) policy paper states:

Those portions of publicly owned rivers, which are designated as recreational trails are subject to the requirements of Section 4(f). Of course, Section 4(f) would also apply to lakes and rivers, or portions thereof, which are contained within the boundaries of a park, recreation area, refuge, or historic site to which Section 4(f) otherwise applies.[63]

Based on these criteria, the Potomac River should qualify as a Section 4(f) recreational resource. The River passes through the 4(f)-protected C & O Canal National Historical Park, passes around the 4(f)-protected resource Plummers Island within the C & O National Historical Park, and is part of the Potomac River Heritage Trail and the Captain John Smith Chesapeake Bay National Historic Trail, both of which are recreational resources.

Additionally, the Potomac River is designated by the state of Maryland as a "scenic waterway" under the state Department of Natural Resources' Scenic and Wild Rivers System, which underscores its importance as a recreational resource within Maryland. Given this designation, the FHWA should have consulted the state's Wild Rivers Advisory Council as it weighed whether the state's management plan designates the river as a "significant park, recreation area, or wildlife and waterfowl refuge" and is therefore protected under Section 4(f).

D. **The FEIS's Analysis of Impacts to the Northern Long-Eared Bat and Other Bats Is Inadequate and Even More Outdated than Before, Given Recent Regulatory Developments and New Revelations About the Scope of Construction.**

Throughout the NEPA process, we have emphasized that the Agencies' analysis of potential impacts to the Northern Long-Eared Bat relies on an outdated, 2016 Endangered Species Act ("ESA") Section 4(d) Rule, *see, e.g.*, SDEIS Comments at 118, and fails to sufficiently analyze the threat to bats, *see* DEIS comments at 74. We incorporate by reference the points we made in those comments in their entirety and note that the Agencies never responded to them in the FEIS.

The Agencies' assessment is now even more outdated in light of the U.S. Fish and Wildlife Service's proposed classification of the Northern Long-Eared Bat as endangered and the fact that, with construction extending into Virginia, even more bats, and potentially more bat species, will be impacted. These impacts were not properly evaluated by the Agencies' bat surveys.

---

[63] Section 4(f) Policy Paper, Question 21A, *available at* https://www.environment.fhwa.dot.gov/legislation/section4f/4fpolicy.aspx#addex21.

38

1.    **The FEIS Fails To Consider a Court Decision Invalidating the Fish and Wildlife Service's Listing of the Northern Long-Eared Bat as Threatened and the Agency's New Proposal To List it as Endangered.**

As we noted in our SDEIS comments, the U.S. District Court for the District of Columbia held that the designation of the Northern Long-Eared Bat as threatened, rather than endangered, was arbitrary and capricious. That opinion was issued before the DEIS was released for comment, *Center for Biological Diversity v. Everson*, 435 F. Supp. 3d 69 (D.D.C. 2020), giving the Agencies ample time to consider and address its effects. The FEIS does not, however, even acknowledge this decision. Instead, like the SDEIS and DEIS, the FEIS states—without caveat—that the Project is "covered" by the Programmatic Biological Opinion on the 4(d) Rule for the bat. FEIS at 5-126; FEIS App'x M, Sub-App'x N at 176-77; see also FEIS at 9-53; FEIS App'x M at 134 (explaining that the ESA consultation process has been "completed"); see also FEIS App'x M, Sub-App'x N at 84-85.

Correspondence from the Fish and Wildlife Service indicates that the decision to rely on the 4(d) Rule was made in 2019, before the D.C. District Court determined that the reasoning for the threatened status was arbitrary and capricious. FEIS App'x M, Sub-App'x N at 37. This letter also indicates that, in 2019, the Fish and Wildlife Service understood that a change in the Northern Long-Eared Bat's status would limit the Project's flexibility and even indicated a willingness to consider exemptions from the ESA's prohibition on "taking" endangered species, including potentially "exempt[ing] taking associated with tree removal during the active season, but outside of the pup season, in known occupied habitat." FEIS App'x M, Sub-App'x N at 37. MDOT SHA and FHWA were also aware of the impacts of a change in the ESA listing status: in a letter to MDOT, the Fish and Wildlife Service wrote that, because the Indiana Bat, a species found near the corridor study boundary, was endangered, there was "not as much flexibility" as there was when constructing around the Northern Long-Eared Bat's habitat when that bat species was listed as only threatened. FEIS App'x M, Sub-App'x P at 35. Further, the Agencies knew early on that forest clearing "may affect" the Northern Long-Eared Bat. FEIS App'x M, Sub-App'x P at 33. Despite that knowledge, the Agencies have not changed or even discussed possible changes to the Project in response to the changing status of the Northern Long-Eared Bat.

Importantly, the FEIS does not consider the Fish and Wildlife Service's recent proposal to list the Northern Long-Eared Bat as an endangered species under the ESA which, if finalized, will nullify the 2016 4(d) Rule. U.S. Fish and Wildlife Service, Proposed Listing, 87 Fed. Reg. 16442 (Mar. 23, 2022). None of the Agencies' correspondence even acknowledges this proposal or its implications and the Agencies have failed to undertake any conferencing procedures to address how the Project will be modified if the bat is ultimately listed as endangered.[64]

---

[64] On July 5, a federal district court in California vacated several ESA rules issued in 2019, returning the ESA consultation process to the regulatory regime that governed before 2019. The Agencies should ensure that its consultation is consistent with that applicable law and acknowledge that any consultation conducted under the now-vacated rules is invalid.

39

The Agencies must conduct a proper ESA Section 7 consultation and NEPA process that addresses the Northern Long-Eared Bat's likely change in status.

2.    **Because of Newly Disclosed Construction in Virginia, There Are More Species that Will Be Affected and Impacts to These Species Should Have Been Assessed Throughout the Process, Rather than Included Only in the FEIS.**

Under the proposed alternative, construction will take place in Fairfax County, Virginia. Virginia constituents were not informed of this proposed construction until the FEIS was released in June 2022.[65] Among other things, in the FEIS, the public learned that the Virginia Department of Wildlife Resources specifically identified Virginia's state-endangered Little Brown Bat and state-endangered Tri-colored Bat as species that could be impacted. FEIS App'x M, Sub-App'x N at 131. The Agencies have determined that there are 14.4 acres of suitable bat habitat and 18.2 acres of somewhat suitable bat habitat, FEIS App'x M at 118, and that there is a "high likelihood" that construction will impact these species. FEIS at 5-126. These impacts should have been discussed in the DEIS and SDEIS rather than sprung on Virginians in the FEIS, especially since Virginia's state government flagged these species as among those that could be impacted before the SDEIS was issued, FEIS App'x M, Sub-App'x N at 131, yet these additional species impacts were not discussed in the SDEIS, leaving the public without a sufficient opportunity to comment on them.

3.    **Surveys of Northern Long-Eared Bat Habitat Continue To Be Inadequate, and the FEIS Fails To Address this Inadequacy.**

To determine the impacts of the Project on the Northern Long-Eared Bat, the Agencies conducted surveys and sought to identify "known" maternity roost trees and hibernacula. These surveys were incomplete, however, for reasons outlined in our SDEIS comments, see SDEIS Comments at 118, meaning that the EIS process did not consider the full range of the bats' potential habitat.[66]

The Agencies have acknowledged possible impacts to Northern Long-Eared Bat and the potential of the preferred alternative to cause adverse impacts to bat habitat. SDEIS Comment at

---

[65] Bruce DePuyt, *MDOT's Plan to Build Toll Lanes in Fairfax is an Unwelcome Surprise to Some Virginians*, Maryland Matters (Jun. 16, 2022), https://www.marylandmatters.org/2022/06/16/mdots-plan-to-build-toll-lanes-in-fairfax-is-an-unwelcome-surprise-to-some-virginians/.

[66] The Fish and Wildlife Service recently recognized that its determination of a species' habitat must not be artificially constrained. It therefore rescinded a 2020 regulatory definition of "habitat," in the definition of "critical habitat," as too restrictive because it did not include areas that "'currently or periodically' contain something deemed a necessary 'resource of condition'" or which could serve in that manner "after restoration activities or other changes occur." U.S. Fish & Wildlife Service, Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 87 Fed. Reg. 37757, 37758 (June 24, 2022).

40



118. For bridges in particular, the Agencies have now determined that the project area has several areas that "support or could support roosting bats," including the Northern Long-Eared Bat: the American Legion Bridge, Clara Barton Parkway Eastbound bridge (which was *not surveyed*), the McArthur Boulevard/Clara Barton Parkway Westbound bridge, and Seven Locks Road Bridge. FEIS App'x M at 117.

Yet, nowhere does the 26,500-page FEIS respond to our concerns with the incomplete bat surveys. FEIS App'x T at 826-31 (FEIS response to comments). Because the habitat surveys were inadequate, the FEIS's assertion that there are no Northern Long-Eared Bats within the LOD, FEIS App'x M at 118, is inadequate for the same reasons that assertion fell short in the SDEIS. *See* SDEIS Comments at 118-19.

The Agencies' failure to consider and address new information, in this case regarding the likely endangered status of the Northern Long-Eared Bat; failure to consider impacts to Virginia bats; and reliance on incomplete habitat studies all resulted in a deficient analysis, in violation of NEPA and the ESA. 40 C.F.R. §§ 1500.1(b); 1502.1. The FEIS also should have analyzed reasonably foreseeable future actions like the likely listing of the Northern Long-Eared Bat as endangered, but it did not, in violation of NEPA regulations. 40 C.F.R. §§ 1508.7, 1508.25.

## V. The FEIS Fails to Meet the Agencies' Environmental Justice Obligations Despite Numerous Commenters' Efforts in Identifying Deficiencies in the Agencies' Analysis.

### A. Delaying the EJ Analysis Until the FEIS Precluded Meaningful Public Review Including, Most Importantly, Review and Comment by EJ Populations.

As we explained in our previous comments, by delaying an analysis of EJ impacts until the FEIS, the Agencies prevented full and fair participation by all potentially affected communities. *See* SDEIS Comments at 122-23. These procedural missteps violate NEPA, Title VI, Executive Order 12,898, USDOT Order 5610.2(a), and FHWA Order 6640.23A, among others. USDOT Order 5610.2(a) in particular requires the Department of Transportation to "fully consider[] environmental justice principles throughout planning and decision-making processes." Waiting until the FEIS to disclose key analyses violates this order and fundamental environmental justice principles. As the Maryland-National Capital Park and Planning Commission wrote, waiting to analyze certain EJ issues in the FEIS:

is far from a best practice since it obstructs public comment and community input. Waiting until after the selection of a preferred alternative to evaluate impacts to minority communities means that disproportionate impacts will not be considered in the formulation of the preferred alternative and thus do not receive the attention NEPA and Title VI of the Civil Rights Act of 1964 [] demand from the Lead Agencies.

M-NCPPC Comments on the SDEIS at 7 (Nov. 30, 2021). Similarly, by waiting until the FEIS to disclose these impacts and present the proposed mitigation for the preferred alternative, the Agencies impair the ability of the public—and EJ populations—to have meaningful input into ways to reduce impacts to EJ communities from the preferred alternative.

41

### B. Cumulative Impacts to the African American Morningstar Moses Hall and Cemetery Site Have Been Disregarded and Dismissed by the Agencies, Unlawfully Preventing an "Adverse Effects" Determination for a Nationally-Recognized 4(f) Protected Resource.

Friends of Moses Hall, the National Trust for Historic Preservation, Cabin John Citizens Association, Maryland-National Capital Park and Planning Commission, and Sierra Club Maryland Chapter have long raised the issue of cumulative effects and environmental injustice from the Project in relation to the cemetery and hall site of the Morningstar Tabernacle No. 88 of the Ancient United Order of Sons & Daughters, Brothers & Sisters of Moses in Cabin John, Maryland. These organizations, Section 106 consulting parties or signatories, have offered comments about Morningstar Moses Cemetery and Hall on the NEPA documents and in comment letters to MDOT SHA, FHWA, and other agencies as part of the Section 106 process. Their NEPA and Section 106 comments and all Section 106 agency communications are incorporated by reference in these comments.

The Morningstar Tabernacle No. 88 site abuts Interstate 495 in Cabin John, Maryland, because, as the FEIS recognizes:

Highways, such as the Southeast-Southwest Freeway (I-695) in D.C. and I-495 through the former Gibson Grove community in Cabin John, were frequently routed through low- income, majority-minority neighborhoods, disproportionately displacing black and African American residents in particular, further concentrating poverty and exposing remaining residents to the environmental and public health effects associated with traffic proximity.
The historic Gibson Grove A.M.E. Zion Church was physically split from the Morningstar Tabernacle No. 88 Moses Hall and Cemetery by construction of I-495 in Cabin John in the 1960s. Gibson Grove was a settlement founded and developed by formerly enslaved families, and the Church, Hall, and Cemetery are important features of this historic settlement. (See https://www.friendsofmoseshall.org/history.)

FEIS at 5-135-5-136. The Morningstar Tabernacle No. 88 is a National Register-eligible historic site located in what was a thriving African American community before it was split apart by the construction of the Beltway, which caused the decline of the community. Descendants of this once thriving community still live down the road and in the area. They, with community members and advocates, visit multiple times a year to provide upkeep for the cemetery site they regard as sacred and hallowed. Right next to this cemetery, I-495 was built in the 1960s, widened in the 1990s for increased traffic, and a subdivision was also built around the edges of the cemetery. Now the highway will be widened with four more lanes. Despite this, the Agencies maintain that cumulative impacts to the site do not have to be considered because the harms of the original highway construction occurred prior to the enactment of the National Environmental Policy Act (1970) and the National Historic Preservation Act (1966).

42

00000200



According to 32 C.F.R. § 651.16 (cumulative impacts), "(a) NEPA analyses must assess cumulative effects, which are the impact on the environment resulting from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."

All aspects of this definition apply to the Morningstar site. The past impacts are listed above, the current impact is four proposed new lanes of highway to be added right next to it, and the future impacts are the rest of the phases of this toll lane project, which will result in the highway becoming saturated with more and more car and tractor trailer traffic and resulting noise, dust, and air pollution with each new toll lane expansion in the overall plan. MDOT SHA's March 31, 2022, Section 106 letter explains the future impacts:

> The [I-495 & I-270 Managed Lanes Study] is the first element of the broader Op Lanes Maryland program which considers improvements along the entire length of I-495 (Capital Beltway) in Maryland, connecting into Virginia's portion of I-495, as well as the entire length of I-270 (Dwight D. Eisenhower Memorial Highway) up to I-70 in Frederick County, Maryland.[67]

The cumulative impacts to this site are clearly an adverse effect to Moses Hall that should have been acknowledged for this important Section 4(f)-protected historic resource. Morningstar Tabernacle No. 88 Moses Cemetery and Hall was named by the National Trust for Historic Preservation as one of America's "11 Most Endangered Historic Places" in 2021. Failure to acknowledge this adverse effect has deprived Moses Hall of the protections that it is entitled to under Section 4(f) that would have allowed it to have a say in determining the mitigation measures for the adverse, cumulative impacts still accumulating to it from this highway expansion and reasonably foreseeable future actions.

The cumulative impacts on Moses Hall from past actions are undeniable and have been fully acknowledged by the Agencies. In a *Washington Post* article entitled "Maryland will avoid Moses Morningstar Cemetery when widening Beltway," Julie Schablitsky, the Chief, Cultural Resources Section and Chief Archaeologist at MDOT, is quoted as follows:

> "We own the faults of the Maryland Roads Commission impacting this community 60 years ago," Schablitsky said during a recent visit to the cemetery. "It's our responsibility now to repair that damage and come in and do the right thing."[68]

---

[67] Section 106 Letter from Steve Archer to Elizabeth Hughes and Julie Langan, March 31, 2022 at 1. Notably, the FEIS itself never mentions this fact, that this is just one small part of a larger plan for putting toll lanes along the entire Beltway and beyond. Similarly, the FEIS does not consider cumulative impacts of the clearly reasonably foreseeable much larger overall toll lane expansion plan.
[68] Katherine Shaver, African American Gravesites Detected Near the Capital Beltway Will Be Spared in Road-Widening Plans, The Washington Post (Sept. 9, 2021). https://www.washingtonpost.com/transportation/2021/09/09/maryland-beltway-moses-morningstar-cemetery/.

43

MDOT's public position took a sharp turn on January 4, 2022, when the Agencies asserted, "[b]ecause the 1960s impacts [of the original Beltway construction] occurred prior to laws that required consideration of effects, . . . . there is not an adverse effect to the historic property based on 'cumulative' impacts."[69]

This conclusion is wrong as a matter of law. There is absolutely no support in the Section 106 regulations for this arbitrary cut-off date for consideration of cumulative impacts. On the contrary, they unconditionally state that: "[a]dverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." 36 C.F.R. § 800.5(a)(1). Nor is there any authority for this arbitrary cut-off date in the Council on Environmental Quality's cumulative impact regulations or in related regulatory guidance on cumulative impact analyses.

Furthermore, not only were those past cumulative impacts significant, they had a significant disproportionate impact on an environmental justice community and its most central community feature, the benevolent society hall and cemetery that bonded the community. As even the Agencies appear to acknowledge, a grave injustice was done when the Beltway was constructed. The imperative to consider past wrongs to environmental justice communities is confirmed by Executive Order 13990 (Jan. 20, 2021),[70] which applies to projects such as this one, that would utilize federal funding. The Executive Order cites the nation's commitment to "conserve our national treasures and monuments, places that secure our national memory. *Where the Federal Government has failed to meet that commitment in the past, it must advance environmental justice.*" (emphasis added). The Agencies' acknowledgement of this past wrong but refusal to consider these past impacts in the FEIS clearly violates NEPA and has the effect of depriving these historic resources of the protections to which they are entitled under Section 4(f). In other words, rather than remediate these past wrongs, the Agencies have doubled-down on them and compounded the harm.

While the FEIS acknowledges the past harm resulting from the Beltway's original construction, MDOT's January 4, 2022, letter asserted, without any substantiation, that no impacts to the cemetery occurred from the 1992 Beltway widening. That position is not credible. Basic math indicates that when a highway is widened, it increases throughput (which translates to more noise, dust, and pollution) and impervious surface, causing greater stormwater runoff, to which this site is particularly vulnerable by the state's own admission.

---

[69] MDOT SHA Section 106 letter from Julie M. Schablitsky to Elizabeth Hughes and Julie Langan dated Jan. 4, 2022 at 3.
[70] Exec. Order 13990, 86 C.F.R 7037 (Jan. 20, 2021). https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-public-health-and-environment-and-restoring-science-to-tackle-climate-crisis/

44

00000201

The response from consulting parties to the Agencies' flawed argument that they could apply a cutoff date to their analysis of cumulative effects was swift and scathing. The National Trust for Historic Preservation, Friends of Moses Hall, Sierra Club and other consulting parties raised legal objections to the Agencies' arbitrary and incorrect argument that no cumulative effects prior to 1966 and 1970 could be considered.

Still set on avoiding an adverse effects determination, the Agencies deflected and reframed the argument to focus on direct impacts to burials, claiming that an adverse effects determination depends on whether there are direct impacts to burials. And instead of taking a closer look to determine if there were grave shafts beyond the area surveyed, they asked for the determination of effect to be deferred until after the Project's Record of Decision.

The reframing went thus:

In [Maryland Historical Trust's ("MHT")] letter of February 4, 2022, the rationale for not concurring with the specific effect finding for Morningstar Cemetery was due to potential for additional burials outside the defined boundaries of the property that may exist or be impacted.

MDOT SHA and FHWA note that based on the specific issues raised by MHT, in the absence of other project changes not anticipated at this time, the potential for adverse effects is narrowly limited to the issue of the possibility of extant, unverified burials outside the defined boundary of the property that cannot be further avoided. FHWA finds that the issues related to atmospheric, audible, visual, and cumulative effects to the property, have been addressed. No diminishment of location, design, setting, materials, workmanship, feeling or association has been found in these areas, and there has been no specific disagreement expressed by MHT on these assessments.[71]

In this statement, not only do they deny any adverse effects, they misrepresent the comment of MHT[72] to justify their commitment to a position of "no adverse effect."

Despite the Agencies firmly maintained commitment to that unsupported legal argument, the Agencies themselves provide information within the FEIS that undercuts the argument. MDOT acknowledges cumulative adverse effects to the property. Examples include (emphasis added):

---

[71] Section 106 Letter from Steve Archer to Elizabeth Hughes and Julie Langan, March 31, 2022.
[72] The MHT February 4, 2022 letter states regarding the Morningstar site that:
"Given the sensitivity of the resource, the potential for the presence of additional burials that may be impacted, and the overwhelming expression of concern for this resource expressed by multiple consulting parties, it is our opinion that the finding of adverse effect remains valid for this historic property."

45

---

"*Understanding that the Beltway was constructed adjacent to these sensitive resources*, MDOT SHA has committed to construct the following pedestrian connections between the Gibson Grove A.M.E. Zion Church and the Morningstar[sic] Tabernalce[sic] No. 88 Moses Hall Cemetery to restore the historic connection along Sevel[sic] Locks Road: . . ."[73]

Commitment to "Constructing a new sidewalk along the west side of Seven Lock Road under I-495 to *reestablish the historic connection* between Gibson Grove Church and the Moses Hall Cemetery.[74]

Commitment to "*Gifting land owned by MDOT SHA with potential graves* back to Trustees of Moses Hall Cemetery." [75]

EJ mapping data provided by USEPA and University of Maryland (UMD) indicates that the concentration of communities with the greatest levels of EJ concern are *located along the study corridors*. Today's concentration of *communities with the greatest levels of EJ concern along the highway is directly related to the history of highway construction* before national environmental policy.

Today's *racially and economically segregated conditions* in urban and metropolitan areas can be *traced directly to decades of neighborhood destruction and residential displacements caused by highway projects plus housing policy and other racially marginalizing actions* undertaken by local, state, and the federal government *throughout the 20th century.*[76]

But then, remarkably, the FEIS fails to acknowledge that these impacts will be adverse. The FEIS sums up the Agencies' position:

Based on the current historic boundary, the Preferred Alternative will avoid direct impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Additionally, no atmospheric, audible, or visual effects to the property have been identified from the Preferred Alternative. No diminishment of location,

---

[73] FEIS App'x T.2.A.Vol.1 at CO-119 *available at* https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p-9.pdf.
[74] FEIS App'x T.2.A.Vol.1 at CO-119 *available at* https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p-9.pdf.
[75] This statement provides an acknowledgment of having taken cemetery land in 1962. That taking causes cumulative impacts to the community in the present day. FEIS App'x T.2.A.Vol.1 at CO-119 *available at* https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p-9.pdf.
[76] FEIS at 5-135.

46

---

00000202

design, setting, materials, workmanship, feeling or association has been found in these areas.[77]

Cumulative impacts from past Beltway construction are indisputably adverse; this site has been subject to longstanding, historic race-based discrimination in transportation planning in the state. The conclusion that there will be no use of Moses Hall for purposes of Section 4(f) is premature given that the serious legal issues regarding cumulative effects have been ignored.

The Agencies' wrongful dismissal and disregard of cumulative effects and other adverse effects to this site, as described above, is exacerbated by their deferral of the determination of impacts for the site through their decision to proceed with a Section 106 Programmatic Agreement.[78]

After walking back their initial determination of adverse effects and then making a contested determination of no adverse effect, the Agencies are postponing effects determination for the Morningstar Tabernacle No. 88 Hall and Cemetery in the historic Black community of Gibson Grove in Cabin John, Maryland. This approach violates FHWA's obligations to avoid and minimize harm to these historic resources under Section 4(f). *See Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 371 (D.C. Cir. 1999) (Because the historic properties protected by Section 106 and Section 4(f) are similarly defined, "it follows that the [Federal Highway Administration] must complete its Section 106 determinations before it can comply with section 4(f)").

The contentious issue surrounding the adverse effect determination for Morningstar Tabernacle No. 88 site cannot be deferred. In a letter to Dr. Julie M. Schablitsky of MDOT, the MHT clearly stated on February 4, 2022, that: "it is our opinion that the finding of adverse effect remains valid for this historic property."

Sierra Club objects to MDOT's deferral of the adverse effect determination for several additional specific reasons:

1. MDOT's new proposed plan to defer a determination of adverse effect for Morningstar Tabernacle No. 88 site until after issuance of the Record of Decision will foreclose major options for alternatives and mitigation.

2. Adverse effects can be determined now since, *inter alia*, there are over two dozen probable or possible grave shafts in the right-of-way abutting the land where the highway will be widened and heavy construction equipment will be used. The probable and possible grave shafts conform to the same patterns observed in the rest of the cemetery.

3. These effects, when added to the noise, vibration, and other proximity impacts of the Project and the cumulative impacts from past Beltway construction, are indisputably adverse and will substantially interfere with the use and enjoyment of this site; hence, even assuming some degree of post-ROD mitigation, there is no basis for arguing that there will be no adverse cumulative effects to this important historical site, which has been subject to longstanding, historic race-based discrimination in transportation planning in this state.

4. The FHWA's obligations to avoid or minimize harm to this site under Section 4(f) is clear, and the FHWA's failure to recognize the full scope of the significant use and harm to the site violates Section 4(f).

In summary, while the full extent of the adverse effect can be addressed as part of the programmatic agreement, the adverse effect determination must be made now. The Agencies' failure to consider the cumulative impacts associated with discriminatory and destructive past actions perpetuates and exacerbates a gross injustice, and violates both NEPA and Section 4(f).

---

[77] Appendix T.2.B. Vol. 2 at CO-831.
[78] See more detail on this in Sierra Club's April 14, 2022 Section 106 comment letter, available at: https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u25361/MDSierraClub-Section106Comments-14April2022final.pdf.

47

48


2. **Possible and Probable Burials in the State Right of Way Adjoining the Morningstar Cemetery and Hall Site Are at Risk from the Project and Have Not Been Sufficiently Investigated to Instill Confidence in the Cemetery Boundaries Determined by the Agencies.**

Next to what is known as the "current historic boundary" of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery are potential burials extending into the state highway right of way. No ground-penetrating radar was done around the currently known area of graves to determine how much further they extend. MDOT SHA and FHWA were unable to gain concurrence from Maryland Historical Trust for a "no adverse effects determination" in large part due to these potential graves, and thus the Agencies requested that the effects determination be deferred, depriving the Friends of Moses Hall and other descendants and supporters from a Section 4(f) adverse effects determination during the decision-making window that would have allowed the site to have further avoidance and mitigation measures.

MDOT SHA owns land from the original Beltway construction with potential graves. The graves in a parcel of MDOT right of way are not just potential but, based on ground-penetrating radar, are "possible" and "probable" and number several dozen. This indicates that the "current historic boundary" that MDOT SHA uses today is inaccurate and smaller than the true historic boundary of the cemetery.

The Agencies have claimed that there is no adverse effect to the Morningstar cemetery based on their "current historic boundary," even in the face of evidence that this boundary is likely not the site's accurate historic boundary. Of interest in this regard, a Maryland Public Information Act request for documents from the time of the original construction of the Beltway revealed a state payout to a McGuire Funeral Services, Inc. for a burial site located in the true historic boundary (but outside of MDOT's "current historic boundary").[79] *See* figure at right. The most likely reason for this payout was for reburials from the cemetery due to

State Rds Comm vs. Andrew Mickens and Jones' heirs



[79] See scan of original receipt in Report of Findings from Historical I-495 Right-of-Way Records Research prepared by Friends of Moses Hall, February 2022, at Attachment 1 *available at* https://static1.squarespace.com/static/600c2298f983552f0a55148b/t/61fe8ed7e0e2b44d94c5861c/1644072672567/FMH+-+ROW+RESEARCH+REPORT+-+FINAL.pdf.

49

Beltway construction.

Further reinforcing the issues with the boundary of the cemetery are the ground-penetrating radar data reported on by the Washington Post. Says the article: "The outer edges of the construction site will be about five feet from the closest area where radar found a possible burial, a project spokesman said. Previous plans had showed the Beltway expanding into the grassy area and about one-fifth of the 1.5-acre cemetery."[80]

In the same article, Illinois archaeologist Tim Horsley, who undertook the ground penetrating radar, expressed that "most of the anomalies appeared in adjacent rows. The total of 377 probable or possible burials in the cemetery is probably artificially low, he wrote, because his equipment couldn't reach the entire cemetery."[81]

Given this likely location of burials, a five-foot buffer from the edge of where graves were found in a ground-penetrating radar study that failed to reach the entire cemetery is insufficient to ensure that additional graves will not be disturbed.
The FEIS states:

- Through additional investigation and survey including ground penetrating radar (GPR), MDOT SHA identified potential unmarked graves within state-owned right-of-way adjacent to I-495.[82]

- MDOT SHA acknowledges there is some potential for human remains associated with historic properties to be present adjacent to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery . . . , which are not currently accessible for the types of thorough archaeological investigation necessary to definitively identify interments.[83]

Yet the Agencies still maintain:

1. Based on the current historic boundary, the preferred alternative will avoid direct impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Additionally, no atmospheric, audible, or visual effects to the property have been identified from the preferred alternative. No diminishment of location,

[80] Katherine Shaver, African American Gravesites Detected Near the Capital Beltway Will Be Spared in Road-Widening Plans, The Washington Post (Sept. 9, 2021), *available at* https://www.washingtonpost.com/transportation/2021/09/09/maryland-beltway-moses-morningstar-cemetery/.
[81] *Id.*
[82] FEIS T.2.A. Vol. 2 -at CO-326.
[83] *Id.* at CO-244.

50

00000204

design, setting, materials, workmanship, feeling or association has been found in these areas.[84]

2. The Project will be governed by a programmatic agreement, including a treatment plan that specifies the methods, limits and consultation procedures for further investigation of areas with the potential for additional burials outside of the current historic boundary, no specific determination of effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery will be made at this time, and will be made following completion of the additional investigations specified in the programmatic agreement and treatment plan.[85]

Given the implicit acknowledgement that subsequent studies under the programmatic agreement may reveal adverse effects on Moses Hall and Cemetery, the following conclusions in the FEIS are both unsubstantiated and premature:

"[T]here are no indirect or cumulative adverse effects to historic properties specifically caused by the undertaking."[86]

"The Preferred Alternative avoids ground disturbance of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery."[87]

"MDOT SHA has completed extensive . . . archaeological research that thoroughly documents the Morningstar Tabernacle No. 88 Moses Hall Cemetery and its significant features . . ."[88]

"[T]he lead agencies have far exceeded the obligation to consider and address potential project EJ concerns."[89]

For further information in support of these points, please see relevant additional information and arguments in Sierra Club Section 106 comments dated February 3, 2022, and

---

[84] Appendix T.2.B. Vol. 2 at CO-831, *available at* https://oplanesmd.com/wp-content/uploads/2022/06/68_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.B_Volume-2_June-2022p.pdf.
[85] *Id.*
[86] FEIS App'x I: CRTR Volume 1: Cultural Resources Tech Report at 21 *available at* https://oplanesmd.com/wp-content/uploads/2022/06/13_MLS_FEIS_App-I_CR_Vol-1_Cover-Report_June-2022_REDACTED.pdf
[87] FEIS T.2.A.vol2 -at CO-244.
[88] FEIS T.2.A.vol2 -at CO-245.
[89] FEIS App'x T.2.B.Vol.2 at CO-829.

51

April 14, 2022.[90] We incorporate by reference the FEIS comment letter of Friends of Moses Hall dated July 15, 2022.[91]

**C.    In Violation of Title VI, the Agencies Failed to Provide Meaningful Opportunities for Review and Comment on Agency Plans by Non-English Speaking Populations by Directing Limited English Proficiency Commenters to an Inaccurate SDEIS Executive Summary.**

As we explained in our comments on the SDEIS, for weeks, the executive summary of the SDEIS incorrectly downplayed some of the environmental impacts of the preferred alternative. *See* SDEIS Comments at 17-18. The Agencies belatedly corrected these errors in the English version on November 20, 2021, less than three weeks before comment deadline (although many commenters had downloaded the SDEIS already, had already completed their review, and even had already submitted their comments). But the Agencies did not change the SDEIS Executive Summaries in Amharic, Chinese, French, Korean, and Spanish, leaving non-English speakers with inaccurate environmental impacts to review and comment on until November 17, 2021, fewer than 13 days before the comment period closed, when they revised those summaries without public notice.[92] This omission violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Executive Order 13166, "Improving Access to Services with Persons with Limited English Proficiency," 65 Fed. Reg. 50,121 (Aug. 16, 2000), which require that project sponsors be certain that Limited English Proficiency populations have meaningful access to review and comment on agency plans.

In the FEIS, the Agencies summarized their outreach to communities with limited English proficiency and explained that "translated versions of the SDEIS Executive Summary were posted to the project website," SDEIS at 5-149, without noting the errors in that summary. In their response to comments in the FEIS, the Agencies downplay the SDEIS errors as "minor" and do not mention the delay in addressing errors in the non-English versions:

---

[90] Available at the following links respectively:
https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/MDSierraClub-Section106Comments-3Feb2022.pdf;
https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u25361/MDSierraClub-Section106Comments-14April2022final.pdf.
[91] *See* FEIS comment letter of Friends of Moses Hall (July 15, 2022).
[92] Some time on or after November 17, 2021, fewer than 13 days from the public comment deadline, MDOT and/or FHWA silently posted new Amharic, Chinese, French, Korean, and Spanish Executive Summaries that corrected the inaccuracies. Members of the public who relied on those translated versions and somehow became aware of the corrections therefore had a very limited time in which to comment. *Compare* https://web.archive.org/web/20211117155334/https://oplanesmd.com/sdeis (capture of SDEIS website from 3:35 PM on November 17 with links to old and incorrect Executive Summaries), *with* https://oplanesmd.com/sdeis/ (current SDEIS website with links to new Executive Summaries that include "FINAL_UPDATED-11_16_2021" in file name titles).

52



MDOT SHA promptly corrected a minor error in the environmental impacts summary chart, Table ES-1 of the SDEIS, upon notification by the Sierra Club Maryland Chapter. The document was updated on the project website and a replacement chart was provided at all locations where the document was publicly accessible. ... The minor error in the summary chart, Table ES-1 of the SDEIS does not require withdrawal and republication of the SDEIS.

Further, the Agencies undermined their own outreach efforts to populations with limited English proficiency populations because the flyers distributed at groceries and notices in newspapers targeting non-English populations, *see* FEIS at 5-147-5-149, unfortunately directed people to the online versions of the SDEIS at OpLanesMD.com/SDEIS, and the SDEIS had errors for most of the comment period. This failure to correct the website for weeks more for non-English speakers violates the Agencies' Title VI obligations.

**D.    The Agencies' EJ Analysis Suffers from Serious Deficiencies by Failing to Analyze Cumulative Impacts to EJ Populations.**

In the FEIS, the Agencies have finally produced a determination of whether the preferred alternative has disproportionately high and adverse effects to environmental justice populations. The conclusion that the preferred alternative will not have disproportionate adverse effects on EJ populations is wrong and the analysis suffers from serious deficiencies.

For example, the Agencies do not apply the appropriate definition of "adverse effects" as that term is used in the relevant USDOT EJ orders. "Adverse effects" is defined in USDOT Order 5610.2(a) as requiring a cumulative analysis of a list of possible effects on EJ populations:

the totality of significant *individual or cumulative* human health or environmental effects, including interrelated social and economic effects, which may include, but are not limited to: bodily impairment, infirmity, illness or death; air, noise, and water pollution and soil contamination; destruction or disruption of man-made or natural resources; destruction or diminution of aesthetic values; destruction or disruption of community cohesion or a community's economic vitality; destruction or disruption of the availability of public and private facilities and services; vibration; adverse employment effects; displacement of persons, businesses, farms, or nonprofit organizations; increased traffic congestion, isolation, exclusion or separation of minority or low-income individuals within a given community or from the broader community; and the denial of, reduction in, or significant delay in the receipt of, benefits of DOT programs, policies, or activities.

USDOT Order 5610.2(a), App'x. A.

This Order requires the Agencies to analyze the "totality of individual or cumulative" effects. NEPA also requires a cumulative analysis of impacts to EJ populations. Rather than evaluating the effects cumulatively, however, in the FEIS, the Agencies evaluate each environmental stressor to EJ populations (i.e., noise, displacement, air quality, etc.) in isolation and conclude that, because the impacts from individual environmental stressors do not disproportionately impact EJ populations compared to non-EJ populations, there is no overall

disproportionate impact. *See* FEIS at 5-155-5-160. For example, as to hazardous materials sites of concern, the FEIS tallies the number of affected communities with hazardous materials sites for EJ versus non-EJ populations:

EJ populations contain 27 low, 4 moderate, and 2 high risk sites of hazardous materials sites of concern, while non-EJ populations contain 37 low, 56 moderate, and 9 high risk sites of hazardous materials sites of concern. ... As such hazardous material concerns would not be higher or more adverse to EJ populations under the Preferred Alternative.

FEIS at 5-157. The analysis does not address cumulative adverse effects to EJ populations by *aggregating* all impacts to each EJ population, *i.e.*, it does not examine whether each EJ and non-EJ population is affected by additional noise, hazardous waste impacts, and water pollution from the preferred alternative. The Agencies thus failed to evaluate whether, once cumulative impacts are considered, EJ populations are disproportionately affected as compared to non-EJ populations.

As EPA stated in its comments on the DEIS, a proper EJ analysis requires looking at multiple impacts at the same time:

In a preliminary review, the [EJSCREEN, EJ mapping-and-screening] tool demonstrates that the MLS alternative peripheries may now face various disproportionate environmental challenges in the context of EJ, including concerns with air toxics and hazardous waste (involving treatment storage disposal facilities and large quantity generators).

EPA, Technical Comments on I-495 & I-270 MLS, DEIS (Nov. 9, 2020), FEIS App'x T.1.A Vol 1 at AG-39.

In addition, the Agencies' analysis in the FEIS does not thoroughly evaluate the historical and existing environmental burdens borne by EJ populations together with the predicted impacts from the preferred alternative. EJ populations have already experienced high levels of air pollution as well as other harmful environmental stressors and a proper analysis must account for EJ populations' resulting increased susceptibility to environmental impacts. The EPA highlighted this point when reviewing the EJ analysis in the SDEIS:

Table 4-45 indicates that block groups which the project characterizes as EJ and Non-EJ may face similar environmental consequences from certain hazards (e.g. air pollution). EPA notes that certain populations (e.g., low-income and/or people of color populations) may face elevated susceptibility of impacts that may affect other populations less severely. Thus the EPA encourages the project to address the potential for adverse impacts in areas of potential EJ concern even if less vulnerable areas may face similar conditions.

EPA, Technical Comments on I-495 & I-270 MLS, SDEIS (Nov. 30, 2021).

Most importantly, the FEIS completely ignores the egregious cumulative impacts resulting from past actions by MDOT, namely the original construction of the beltway in the 1960s that intentionally targeted and discriminated against EJ populations. *See* discussion above. As this

53

54

*Page 55 was blank in the comment letter*

and has failed to address dozens of studies and journal articles finding causal links between, for example, increased air pollution from traffic and high rates of asthma or heart disease. As Bialek highlights, these health impacts are likely to be disproportionately higher in EJ populations, given historic inequities.

Likewise, the FEIS fails to fully evaluate the effects of bottlenecks that will be created under the preferred alternative and, importantly, the air quality impacts from the bottlenecks that may concentrate around the end points of the preferred alternative, in areas where EJ populations live. *See* ZAMURS AND ASSOCIATES Report at 5-6; *see also* SDEIS Comments at 124-25. As also noted in the attached report by Norm Marshall, the serious flaws in the traffic model affect the assessment of air quality impacts in general, and therefore the evaluation of air quality impacts on EJ populations is also flawed. As discussed below, these air quality impacts result in significant public health impacts across the board that were also ignored in the FEIS, and these public health impacts will disproportionately affect EJ populations, particularly children.

In short, the Agencies have failed to appropriately describe and, as a consequence, mitigate the disproportionate air quality impacts on minority and low-income communities, despite their obligation to do so—and to make the information available to the public for review and comment—under NEPA, USDOT Order 5610.2(a), and USDOT order 6640.23A, before moving forward with the preferred alternative.

F.    **The FEIS Fails to Quantify Impacts to the Gaithersburg EJ Area.**

In the FEIS, the Agencies finally recognize that several census blocks in the Gaithersburg area have EJ populations and impacts to those areas should be fully evaluated. However, even with the Agencies' new analysis, they have failed to acknowledge real air quality and other health impacts from the preferred alternative, impacts that will disproportionately affect EJ populations, including those in the Gaithersburg area.

In our comments on the SDEIS, we listed different health assessments and air quality and other environmental impact analyses that the Agencies should have performed to accurately and quantitatively describe the potential impacts of the Project on the environmental concerns most negatively affecting the Gaithersburg community, as shown by EPA's EJSCREEN tool. SDEIS Comments at 113-14. These analyses and health risk assessments were not performed. In their expert report, ZAMURS AND ASSOCIATES, LLC explain that the "the pollutants that cause the greater health impacts, $PM_{2.5}$, $PM_{10}$ and $NO_2$ remain unexamined and unconsidered, despite the legal obligation to assess these pollutants under NEPA." ZAMURS AND ASSOCIATES Report at 3. Thus, the true impacts to the EJ populations in the Gaithersburg community remain unquantified in the FEIS.

G.    **The EJ Analysis Ignores Impacts to EJ Populations East of the I-270 Spur.**

In our SDEIS comments, we explained that the Agencies were improperly segmenting the Project by limiting their environmental review to exclude the significant environmental impacts anticipated from later phases of the Project to expand I-495 east of the I-270 spur and the northern portions of I-270. *See* SDEIS Comments at 12 (comparing proposed environmental impacts).

56

Based on public statements by Project proponents, the Agencies will ultimately seek approval for lane widening and toll lanes on I-495 from the American Legion Bridge to the Woodrow Wilson Bridge in Virginia and the northern portions of I-270, exactly as originally proposed. *See* SDEIS Comments at 8-17.

This improper segmentation of the Project also affects the Agencies' EJ analysis. The Agencies cannot avoid their obligations to evaluate impacts to EJ populations throughout the area, including in majority-minority Prince Georges County, that will be impacted by the later phases of the Project. A proper EJ analysis requires an evaluation from the American Legion Bridge to the Woodrow Wilson Bridge in Virginia—the scope of the Project initially proposed.

By deferring a full EJ analysis until after the first phase of the Project is approved, the Agencies are attempting to bias approval of the Project by making the highway expansion east of the I-270 spur seem inevitable and essentially "shoving under the rug" the likely significant impacts to EJ populations anticipated in later phases of the Project. We remain concerned that the Agencies will also attempt to streamline the environmental review process for that next phase by relying on the (inadequate) analyses performed for the first phase of the Project and even further curtailing the public comment process, thus reducing opportunities for the community to engage in review of the Project.

### H.  The FEIS Fails to Fully Assess Construction and Post-Construction Impacts to the Julius West Middle School and Other Sensitive Sites Next to the Highway.

As described in Section IV of these comments and in the attached expert comment letter by Rosalie Bright, the generation of silica dust during road construction is a significant health hazard that the FEIS fails to adequately discuss. As the I-270 and I-495 road and bridge construction takes place, there will be continuous generation of harmful silica dust, and precautions (i.e., staying indoors, keeping all windows closed, and wearing facemasks to go outside) may be needed to protect sensitive populations at schools (Julius West Middle School, Farmland Elementary, Carderock Springs Elementary, and Walter Johnson High) and other sites close to the highways.

In general, the FEIS fails to adequately identify, describe, and quantify the health impacts to these sensitive populations that will be impacted by silica dust under the preferred alternative.

### I.  The FEIS Fails to Consider Impacts to Environmental Justice Communities from New Bottlenecks and Increased Traffic Created by the Preferred Alternative

As explained in our previous comments, the SDEIS recognizes that the preferred alternative would create bottlenecks outside the preferred alternative limits, SDEIS at ES-12, 2-6, but the SDEIS does not accurately analyze these bottlenecks nor the arterial congestion that the preferred alternative would cause at the terminus of the managed lanes. These bottlenecks and additional congestion will create additional air quality impacts in the areas where they occur and cause travel delays for EJ populations living beyond the ends of Project development and, as noted

below, for EJ populations who must continue to use the general purpose lanes due to the unaffordability of tolls in the managed lanes.

Travel delays cause disproportionate impacts to EJ populations who face long commutes and inflexible work environments where late arrivals can mean dismissal. By failing to acknowledge these real impacts of bottlenecks, the FEIS fails to sufficiently evaluate impacts to EJ populations.

### J.  The FEIS Does Not Adequately Address the Environmental Justice Impacts of Adding Toll Lanes

The SDEIS did not provide a full picture of the costs of toll lanes on EJ communities. As we noted in our SDEIS comments, an analysis of the dynamic toll pricing revealed that driving in toll lanes could cost up to $50 per passenger car in 2021 dollars, for certain routes. *See* SDEIS Comments at 86-87; 126-27. These high tolls are exclusive, inequitable, and discriminatory. Toll lanes will not be accessible to working families. Lower income environmental justice populations who cannot afford the toll lanes will disproportionately rely on the free general-purpose lanes. In addition, as discussed above, the Agencies' traffic models are still flawed and still fail to acknowledge the new and worsened bottlenecks around the end points of the toll lanes that will disproportionately harm EJ populations living beyond the limits of the proposed new toll lanes.

Yet, the FEIS retains misguided statements from the SDEIS that fail to address the regressive impacts of predicted high tolls and overstate the purported benefits of eliminating peak-commuting-time HOV lines in favor of HOV 3+ lanes. *See* SDEIS Comments at 126-128. The FEIS even echoes the claim from the SDEIS that "populations in both EJ block groups and non-EJ block groups would have the opportunity to experience the[] operational benefits," from the toll lanes and HOV3+ lanes in the preferred alternative. SDEIS at 4-102 & 4-104; *see, e.g.,* FEIS at 5-162 (describing the HOV 3+ lanes as part of "affordable multimodal travel options").

These statements mischaracterize the likely impacts of the preferred alternative on EJ populations. As we have explained, the predicted benefits of the preferred alternative in reducing traffic times overall are overstated. Further, the aforementioned "benefits" will not reach EJ populations, who will be will be priced out of the toll lanes and required to rely on limited general purpose travel lanes. As the M-NCPPC explained, "[t]o simply conclude that everyone is benefiting with travel time savings when the project design does not provide equitable access to the managed lanes creates another layer of inequity." M-NCPPC Briefing and Discussion for July 15, 2020, Full Commission Meeting I-495 & I-270 Managed Lanes Study – DEIS Comments at 8 (June 8, 2020).

Further, the general purpose lanes as configured after building toll lanes will become less safe relative to today due to: additional traffic and congestion; new and worsened bottlenecks with end-merge-point congestion; loss of the inside shoulder lane; a higher concentration of 18-wheelers that are kept off the toll lanes by unaffordable tolls and whose numbers are increasing following the COVID-19 pandemic; removal of an existing non-tolled lane in each direction of I-270, squeezing more traffic into fewer general purpose lanes; inferior maintenance of the free lanes compared to the toll lanes and poorer safety during emergencies and slower access to emergency

57

58



response owing to space constraints and loss of the inside shoulder lane. *See* SDEIS Comments at 71-85; *see also supra* Section II.

Although the Agencies have now proposed mitigation related to the toll lanes, the mitigation is not focused on making toll lanes more affordable for low income and EJ populations or making the general-purpose lanes safer, but rather focused on transit fare subsidies and toll-free buses, FEIS at 5-163-164, actions that do not remove the inequity of the two-tier system that would be created by the toll lanes.

That the preferred alternative is inequitable is not surprising. Transurban is on record saying its goal in our region is to "maximize the tolls" and admitted that: "[a]n increase in the number or improvement in quality of alternative roads, public transportation or mass transit options, . . . and their relative convenience, affordability and efficiency, could reduce traffic volumes on our toll roads and therefore reduce our earnings."[93]

That the Agencies have failed to grapple with the inequities of the preferred alternative in their FEIS is, however, disappointing and, more importantly, violates NEPA and Title VI.

## VI. The FEIS Fails To Disclose the Socioeconomic and Societal Impacts of Private Concessionaire Contracts and Their Influence on Future Land Use Policies.

Legal expert Ellen Dannin (2011) describes how infrastructure privatization of the type being proposed for the I-495 and I-270 project impacts socioeconomics and society,[94] even impacting future legislation and land use policies.

Provisions commonly found in infrastructure privatization contracts make the public the guarantor of private contractors' expected revenues. Indeed, were it not for provisions that protect contractors from diminution of their expected returns, the contracts would be far shorter and much less complex. An effect of those contract provisions is to give private contractors a quasi-governmental status with power over new laws, judicial decisions, propositions voted on by the public, and other government actions that a contractor claims will affect toll roads and revenues. Giving private contractors such a role may well violate the non-delegation doctrine that bars private entities from exercising power that is inherently governmental.[95]

These impacts result from provisions commonly found in infrastructure contracts, including compensation events, noncompetition provisions, and the contractor's right to object to and receive compensation for legislative, administrative, and judicial decisions.

"The operation of these provisions gives private contractors power over decisions that affect the public interest and are normally made by public officials and subject to oversight, disclosure, and accountability—none of which apply to private contractors."[96]

Such provisions are fundamental to the I-495 and I-270 project and written into the term sheet.[97] The project's 20 compensation events wherein the state monetarily compensates the developer include: "Discriminatory Change in Law," and "construction or expansion of a Competing Facility." These funds come from taxpayers. This has all been described in earlier comments.[98]

The P3 process ensures and protects that the developer's private interest in avoiding any competing facilities near its toll lanes, regardless of what would serve the public interest . As a September 2020 Transurban prospectus explains,

An increase in the number or improvement in quality of alternative roads, public transportation or mass transit options, ... and their relative convenience, affordability and efficiency, could reduce traffic volumes on our toll roads and therefore reduce our earnings.[99]

Greater mobility and transportation options that are good for Marylanders and for addressing the climate crisis are not in the developer or their shareholder's interest.

Maryland taxpayer funds are even required to compensate the developer for "physical damage to the Work caused by other MDOT capital works projects [or VDOT capital works projects] in the immediate vicinity of the Section (excluding work undertaken by a Section Developer Related Entity)." So Maryland taxpayers pay the developer Transurban if VDOT capital works projects damage the toll lanes.

The term sheet clarifies in relation to compensation and relief events:

[93] Transurban Prospectus at 13 (Sept. 16, 2020), https://links.sgx.com/FileOpen/Transurban%20Finance%20Company%20Pty%20Ltd_Secured%20Euro%20MTN%20Programme%20OC.ashx?App=Prospectus&FileID=46449.
[94] See more on societal impacts in "5 questions for Donald Cohen of In the Public Interest," The New Common Sense newsletter from the Hewlett Foundation's Economy and Society Initiative (April 7, 2022), *available* at https://hewlett.org/5-questions-for-donald-cohen-of-in-the-public-interest/.
[95] Dannin, 2011, Crumbling Infrastructure, Crumbling Democracy: Infrastructure Privatization Contracts and Their Effects on State and Local Governance

[96] Ellen Dannin, *Crumbling Infrastructure, Crumbling Democracy: Infrastructure Privatization Contracts and Their Effects on State and Local Governance*, 6 *NW. J. L. & SOC. POL'Y* 47 (2011)., https://elibrary.law.psu.edu/fac_works/10/
[97] Term sheet. Compensation Events. Relief Events at 13-17. https://www.oplanesmd.com/wp-content/uploads/2021/06/Phase-1-P3-Agreement-Exhibit-8-%E2%80%93-Section-P3-Agreement-Term-Sheet.pdf
[98] See Sierra Club et al. SDEIS comments.
[99] Transurban Prospectus, September 16, 2020, page 13, publicly available on the website of the Singapore Stock Exchange.

59

60

00000209

To the extent a Compensation Event or a Relief Event directly causes an adverse cost or schedule impact on the Section Developer, the Section Developer may claim an extension to applicable deadlines for performance or relief from compliance with its obligations. Notice of such claim must be provided within 30 days after the date the Section Developer first became aware (or should reasonably have become aware) that the relevant Compensation Event or Relief Event had occurred.

If such adverse impact is caused by a Compensation Event, the Section Developer may also claim compensation which places the Section Developer in a "no better/no worse" position, as compared to immediately prior to the occurrence of the Compensation Event.

The developer is protected from risks, it is the state that is taking the risk from 30 compensation and relief events.

The Dannin article says that study of a proposed toll highway made clear that "the 'free' money comes at the very high cost of eliminated highway capacity, increased congestion and degradation of highway safety."

[D]egraded roadway conditions and increased traffic congestion are] an essential part of the JPPHA's plan. Without these failing conditions, little traffic would be induced to use the expensive Jefferson Parkway. . . . By starving SH 93 and Arvada roadways of needed improvements, JPPHA would ensure congestion and push some traffic to its road. However, what is good for a road is not good for drivers. The goal of state highway access should be to promote mobility, not to impair mobility to promote the ability to toll a road . . . . (Dannin, 2011)

In this case, degraded roadway conditions will occur from the majority of the heavy truck traffic concentrated in the general-purpose lanes degrading the infrastructure more quickly. Roadway conditions will also worsen due to removal of the left lane shoulder from the general-purpose lanes and likely more accidents. Increased congestion will occur during rush hour due to developer toll algorithms, because of new bottlenecks created at the ends of the toll lanes, and because of I-270 having two of its existing lanes converted to toll lanes (reducing publicly available road and squeezing more traffic into fewer general-purpose lanes).

To avoid being taken advantage of and protect the public interest in an infrastructure privatization deal, six principles[100] are recommended, none of which appear to have been prioritized for this project.

1. protecting the public welfare;
2. ensuring value for money;
3. taking all contingencies into account
4. establishing principles to justify the inclusion of each contract term;
5. demonstrating the superiority of privatization over public provision; and

[100] Dannin, 2011, p. 82.

61

6. establishing a process that ensures all relevant information is presented and properly evaluated.[101]

Egregiously, alternatives other than toll lanes were not seriously considered and no value for money analysis was done.

Negative financial and societal impacts have not been adequately reflected in discussions and debate for at least two reasons. First, the state treasurer was not able to have the necessary – support to review the Phase P3 agreement contract[102] to understand its costs and risks. Second, the far-reaching negative impacts are inconvenient and not a desired part of the state or developer's narrative that toll roads will happen "at no net cost"[103] to the taxpayer. Far from no-net-cost, the private toll roads will subordinate the interests of taxpayers and the public to the private toll operator's interest in maximizing toll revenue. By failing to disclose the foreseeable negative impacts of an intended largescale privatization of state infrastructure, the FEIS tainted the consideration of alternatives for not only this project but future projects.[104]

### VII. Conclusion

Despite a review process where thousands of public commenters, elected officials, and state and federal agencies have tried to steer the Agencies onto the path of equity, justice, climate resilience, and smart growth, the preferred alternative as proposed in the FEIS will have significant, irreversible negative impacts on Maryland, its air, water, land, climate, residents and communities, historic resources, ecosystems, flora, and fauna.

As in the SDEIS and DEIS, these impacts are either ignored or underestimated in the FEIS, contrary to the Agencies' legal requirements. The limited benefits of the preferred alternative, meanwhile, are routinely overstated in the FEIS, and in some cases, like the traffic models, appear to be the result of improper manipulation rather than data and science.

When considering the cost of widening the American Legion Bridge and both the Maryland and Virginia I-495 projects, there is virtually no benefit provided to the traveling public except for

[101] Dannin, 2011.
[102] John Tulkin and Klaus Philipsen, August 9, 2021, available at https://www.baltimoresun.com/opinion/op-ed/bs-ed-op-0810-hogan-toll-lanes-20210809-qtety5ezcncdrkt4ewaqpuaz4q-story.html
[103] Katherine Shaver, Washington Post, July 1 2022.
[104] More on these issues can be read here: "Meta-monopoly," MacroBusiness, June 9, 2022, *available at* https://web.archive.org/web/20220611204818/https://www.macrobusiness.com.au/2022/06/meta-monopoly-transurban-gouges-subsidies-from-taxpayers/; Gary Hodge, Opinion: Plans to Privatize Maryland's Highways with Toll Lanes are Not in the Public Interest - Maryland Matters, July 14, 2022, available at https://www.marylandmatters.org/2022/07/14/opinion-plans-to-privatize-marylands-highways-with-toll-lanes-are-not-in-the-public-interest/; Transurban, APA Group 'ripe for takeout' in shrinking public market

62



marginal benefits for toll payers that evaporate when they too will be faced with heavy traffic congestion at the termini of the toll lanes. Virginia's toll lanes, now constructed, demonstrate the likely impacts of the Project on traffic patterns and congestion. As we have noted throughout this process, the tradeoffs and harms to the environment, climate, taxpayers, Section 4(f)-protected properties, and communities at large far outweigh the Project's benefits.

This $3-to-$7 billion-dollar first phase of a Project that will not relieve congestion and will worsen bottlenecks does not fulfill its purpose and need. If the Project is to go forward, it should be rethought entirely, constructed as a public project with public money, and scaled to the needs and constraints of the affected region of Maryland. It must avoid impacts to irreplaceable resources like Plummers Island and Morningstar Tabernacle No. 88 Hall and Cemetery in the historic Black community of Gibson Grove in Cabin John, Maryland, rather than cut a path with rippling impacts that signals disrespect to the communities that cherish them.

The Agencies must pause this process by withdrawing the FEIS and analyzing less costly multimodal options to improve mobility in the region that do not cause such significant harm to human health and the environment. The Agencies must also provide the public with a meaningful opportunity to review and comment on these options prior to undertaking a new FEIS.

At a minimum, the Agencies must not move forward with the preferred alternative or any of the fundamentally flawed build alternatives without considering additional new alternatives, the many analyses that have been ignored or improperly deferred, and a new review process that addresses the failures identified in these comments and prior comments.

63

## EXHIBIT LIST

| | |
|---|---|
| Exhibit A | Compiled Letters Regarding Extension of Comment Period |
| Exhibit B | Smart Mobility, Inc., Review of Maryland I-495 & I-270 Managed Lanes Final Environmental Impact Statement and Final Section 4(f) Evaluation, July 2022 |
| Exhibit C | Andrew Gallant Comment and Jeffrey T. Folden Response, July 2022 |
| Exhibit D | Benjamin Ross, Maryland Transit Opportunities Coalition, July 11, 2022 Letter to Deputy Sec. Polly Trottenberg  Mentioned on pg. 12 of Master Copy |
| Exhibit E | Roselie Ann Bright, Comments on FEIS Regarding Lack of Analysis of Health Impacts, July 14, 2022 |
| Exhibit F | Ron Bialek, Letter to MD Sierra Club Reviewing and Commenting on I-495 & I-270 MS FEIS, July 16, 2022 |
| Exhibit G | ZAMURS AND ASSOCIATES, LLC, Review and Comment I-495 and I-270 Managed Lanes Study Final Environmental Impact Study and Final Section 4(f) Evaluation, June 2022 |
| Exhibit H | Arthur Katz Comments on FEIS Traffic Concerns, July 2022 |
| Exhibit I | Byron Bloch Comments on FEIS Safety Concerns, July 2022 |
| Exhibit J | WBFC Determination of Eligibility, August 20, 2021 |
| Exhibit K | Shannon Browne Letter to MD Sierra Club on FEIS, July 18, 2022 |
| Exhibit L | Federal Highway Administration (FHWA) and National Capital Planning Commission (NCPC) Meeting Notes, November 1, 2019 |
| Exhibit M | Washington Biologists' Field Club (WBFC) Comments on MLS-106, February 3, 2022 |

64

*These exhibits generally reflect commenters' interpretations and legal conclusions. The Lead agencies have considered these exhibits but this response does not require the Lead agencies to specifically address the commenters' interpretation of the law and its application.*

*This page is intentionally left blank.*

## THE MARYLAND GENERAL ASSEMBLY



SENATOR BENJAMIN F. KRAMER
SENATE DELEGATION CHAIR

SENATOR SUSAN C. LEE
SENATE DELEGATION VICE CHAIR

301-858-3151 · 410-841-3151
800-492-7122 Ext. 3151

DELEGATE MARC KORMAN
HOUSE DELEGATION CHAIR

DELEGATE ALFRED C. CARR, JR.
HOUSE DELEGATION VICE CHAIR

301-858-3610 · 410-841-3610
800-492-7122 Ext. 3610

THE MARYLAND GENERAL ASSEMBLY
ANNAPOLIS, MARYLAND 21401
MONTGOMERY COUNTY DELEGATION

July 8, 2022

Mr. Gregory Murrill
Division Administrator
Federal Highway Administration
U.S. Department of Transportation
31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201

Dear Mr. Murrill:

As members of the Montgomery County Delegation to the Maryland General Assembly, we write to express our grave concerns over limitations imposed on the public by the June 17, 2022, release of the I-495 & I-270 Managed Lanes Final Environmental Impact Statement (FEIS). Montgomery County, the most populous jurisdiction in the state, contains the entire Maryland geographic footprint of the Preferred Alternative.

The FEIS and its appendices total 26,500 pages in 74 files. Much of the material is new and all of it is important, given the enormity of the 50-year project, its multi-billion-dollar cost, major environmental and human impacts, and controversial nature. Yet the public is permitted only 30 days to review and understand this massive documentation — an impossible task — with no formal opportunity permitted for comment.

We ask that the Federal Highway Administration (FHWA) require the Maryland Department of Transportation (MDOT) to add an additional review and public comment period of 60 days, up to and including September 17, 2022.

The need for extended review and formal comment is essential because of certain decisions made by MDOT. The Department chose to defer the release of federally mandated analyses and other missing information until issuance of the FEIS. As a result, the public, its representatives, and reviewing agencies can only now begin examining long-requested environmental justice and greenhouse gas emissions analyses, mitigation plans, the project's recently changed traffic model, and MDOT's responses to the 5,000 comments it received during the public comment periods for the Draft EIS and Supplemental Draft EIS.

In a February 22, 2022, letter to the FHWA and MDOT, over 80 members of the Maryland General Assembly called for a redo of the project's Supplemental Draft EIS to include the key

**Response:**

On June 17, 2022, the FEIS was published in the federal register and made available for a 30-day period on the US Environmental Protection Agency's (USEPA) EIS Database website, on the Op Lanes Maryland webpage and at 17 public library locations in Maryland, Virginia and Washington D.C. The FEIS was prepared to present the final analyses completed for the Preferred Alternative, design refinements to address public comments, operational considerations and to further avoid and minimize impacts, and to respond over 5,000 comments received on the DEIS and SDEIS.

From the outset of the Study's NEPA process, the Federal Highway Administration (FHWA) as the lead federal agency, and the Maryland Department of Transportation (MDOT SHA) as the co-lead agency, developed a comprehensive public involvement and engagement strategy designed to obtain input from stakeholders around the entire MLS study area. This strategy combined traditional opportunities for commenting on the Draft Environmental Impact Statement (DEIS) and Supplemental DEIS (SDEIS) in addition to wide-ranging outreach to community organizations (e.g., church groups, homeowners' associations, public interest groups, and governmental entities), with particular sensitivity and outreach to identified Environmental Justice communities. Refer to FEIS, Chapter 8. The public involvement and engagement process, starting in early 2018 and continuing for over four years, considered the vast diversity of community resources. Despite a global pandemic, MDOT SHA's public involvement strategy ensured the safety of the public while still providing the same opportunities for meaningful participation by the public in the NEPA process.

The DEIS was published on July 10, 2020 and was made available on the I-495 & I-270 P3 Program webpage (https://oplanesmd.com/deis/), on the USEPA EIS Database webpage and at multiple public locations in hard copy in Montgomery and Prince George's counties, Maryland, Fairfax County, Virginia and Washington DC. Following publication of the DEIS, FHWA and MDOT SHA provided a 90-day comment period, which is twice the minimum time required by the CEQ regulations. Based on input from the general public, community partners, stakeholders, and local and federal officials, however, MDOT SHA supported extending the DEIS comment period and made a formal request to FHWA, which has authority to grant an extension. FHWA approved this request and granted a 30-day extension of the public comment period for the DEIS. All in all, the DEIS was made available for comment and review from July 10, 2020 through and including November 9, 2020, a total of four months. During this extended comment period, the agencies received close to 3,000 comments.

The SDEIS published on October 1, 2021 was prepared to consider new information relative to the Preferred Alternative, Alternative 9 - Phase 1 South. Building off the analysis in the existing DEIS, the SDEIS disclosed new information relevant to the Preferred Alternative while referencing the DEIS for information that remained valid. The SDEIS also described the background and context in which the Preferred Alternative, Alternative 9 - Phase 1 South was identified. The SDEIS was available for the public to review and comment on the Preferred Alternative during a 45-day comment period, which was later extended an addition 15 days. The SDEIS was also made available on the I-495 & I-270 P3 Program webpage (https://oplanesmd.com/sdeis/), on the USEPA EIS Database webpage and at multiple public locations in hard copy in Montgomery and Prince George's Counties, Maryland, Fairfax County, Virginia and Washington DC.

In addition to a combined six-month EIS public comment review period, MDOT SHA has held 16 large public workshops, 7 public hearings including virtual and in-person, and over 200 individual, elected official, community, stakeholder, and business owner meetings. Refer to DEIS, Chapter 7 and Appendix P; SDEIS, Chapter 7; and FEIS Chapter 8 and Appendix R for detailed information on public involvement.

As a result of this continued public involvement and engagement effort, the Preferred Alternative, as described in the FEIS, reflected changes made since the SDEIS. Consistent with the NEPA process, a FEIS should include responses to substantive comments that can take place in the form of changes from what was presented in the DEIS such as factual corrections and/or new or modified analyses or alternatives. This is precisely what was done and clearly reflected in the FEIS. Refer to FEIS, Executive Summary. The MLS FEIS includes responses to more than 5,000 comments received on the DEIS and SDEIS and the Preferred Alternative reflects changes to address many of the comments including design



missing analyses. Now that the analyses seem to have been included in the FEIS, we ask that you allow the public sufficient time to meaningfully review and evaluate what has been provided, and the opportunity to react to the material through formal public comments.

Sincerely,

Delegate Marc Korman
Chair, Montgomery County
House Delegation

Delegate Kumar Barve
Chair, Environment & Transportation
Committee

Delegate Al Carr

Delegate Lorig Charkoudian

Delegate Bonnie Cullison

Delegate Linda Foley

Delegate Anne Kaiser

Delegate Ariana Kelly

Delegate Lesley Lopez

Delegate Sara Love

Delegate Eric Luedtke

Delegate David Moon

Delegate Julie Palakovich Carr

Delegate Kirill Reznik

Delegate Emily Shetty

Delegate Jared Solomon

Delegate Vaughn Stewart

Delegate Jheanelle Wilkins

Senator Ben Kramer
Chair, Montgomery County
Senate Delegation

Senator Brian Feldman

Senator Cheryl Kagan

Senator Susan Lee

Senator Will Smith

Senator Jeff Waldstreicher

modifications and adjustments, finalizing technical analyses, continued application of avoidance and minimization efforts and finalizing mitigation for unavoidable impacts.

As mentioned above, the FEIS was made available for a 30-day Notice of Availability through various and widely accessible means before the Record of Decision (ROD) was approved. Public involvement and engagement will continue as the project advances to final design and construction. As a requirement in the P3 Agreement, the Developer must provide a public outreach and engagement plan. The Developer will coordinate with MDOT SHA to facilitate an early and ongoing collaborative dialogue to engage stakeholders, local communities, and property owners though final design and construction. MDOT SHA, jointly with the Developer, would be responsible for implementing strategies, such as public meetings and community events, with the goal of maintaining an open dialogue with stakeholders.

00000214



cc:   Mr. Pete Buttigieg, Secretary, U.S. Department of Transportation
       Ms. Polly Trottenberg, Deputy Secretary, U.S. Department of Transportation
       Ms. Stephanie Pollack, Acting Administrator, Federal Highway Administration
       Mr. Adam Ortiz, Division Administrator, U.S. Environmental Protection Agency

*This page is intentionally left blank.*

**NATIONAL CAPITAL REGION, TRANSPORTATION PLANNING BOARD**


National Capital Region
**Transportation Planning Board**

July 5, 2022

Mr. Gregory Murrill,
Division Administrator, FHWA
George H. Fallon Federal Building
Federal Highway Administration
31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201

Re: Information Related to the Final Environmental Impact Statement (FEIS) and Final Section 4(f)
Evaluation for the I-495 & I-270 Managed Lanes Study (MLS)

Dear Mr. Murrill:

On behalf of the National Capital Region Transportation Planning Board (TPB), I am writing to provide
you with information related to the Maryland Department of Transportation State Highway
Administration (MDOT SHA) and Federal Highway Administration (FHWA) published Final
Environmental Impact Statement (FEIS) and Final Section 4(f) Evaluation for the I-495 & I-270
Managed Lanes Study. The TPB is the federally designated metropolitan planning organization (MPO)
for the National Capital Region and the proposed Managed Lanes project is entirely within the TPB's
planning area.

The TPB understands that the FEIS for the proposed project was published on June 17, 2022, and
the document will remain available to the public for review through July 18, 2022. The TPB also
understands that during this availability period, the FHWA is anticipated to issue a Record of
Decision (ROD), particularly on the Study's Selected Alternative - MLS Preferred Alternative –
Alternative 9 – Phase 1 South. MDOT SHA has noted that the FEIS reflects responses to comments
received on the Draft Environmental Impact Statement (DEIS) and the Supplemental Draft
Environmental Impact Statement (SDEIS).

Consistent with the National Environmental Policy Act (NEPA) requirements for EISs, the TPB, as the
MPO for the project area, was requested by MDOT to include the study project in its long-range
transportation plan (LRTP). I am writing to inform you that the TPB adopted the update to its LRTP,
called Visualize 2045, on June 15, 2022, upon demonstrating that the LRTP met the federal fiscal
constraint requirements and demonstrated conformity to regional air quality plans and the federally
approved motor vehicle emissions budget (for Ozone). The TPB's resolutions adopting the LRTP and
approving the regional air quality conformity analysis for this plan are attached (Attachments 1 and 2
respectively). The TPB has formally submitted the documents to the Federal Highway Administration
and Federal Transit Administration for their review and approval.

The TPB's most recently adopted LRTP does include MDOT SHA's I-495 & I-270 Managed Lanes
project. The project as included TPB's Visualize 2045 has three distinct segments, with varying
actions and schedules for each and is described below:

1. Phase 1 Southern segment: Construct two managed lanes, in each direction, of I-495 from
   the vicinity of George Washington Memorial Parkway (VA 193) in Virginia, goes across the

METROPOLITAN WASHINGTON COUNCIL OF GOVERNMENTS
777 NORTH CAPITOL STREET NE, SUITE 300, WASHINGTON, DC 20002    MWCOG.ORG/TPB    (202) 962-3200

**Response:**
Thank you for your letter regarding the Transportation Planning Board's action to update Visualize 2045. Refer to **ROD
Section VI, Air Conformity**, to see reference to TPB's approval.

Mr. Gregory Murrill, Division Administrator, FHWA
July 5, 2022

American Legion Bridge, along I-270 all the way up to Maryland I-370. This segment is listed for construction with an anticipated open to traffic date of 2025.
2. Phase 1 Northern segment: Construct two managed lanes, in each direction, of I-270 from I-370 to I-70 in Frederick. That segment is listed for construction with an anticipated open to traffic date of 2030.
3. Phase 2 Eastern segment: This is a study of building managed lanes on I-495 in Maryland, starting at the I-270 spur to the east and up to the vicinity of the Woodrow Wilson Bridge. This study segment is not included in the plan for construction.

The financial plan submitted by MDOT for all its transportation projects included in Visualize 2045 and its air quality conformity analysis indicates that funding is reasonably expected to be available for the above three activities. The TPB's regional air quality conformity analysis includes both Phase 1 segments of the project, above, with the Phase 2 segment excluded since no changes to the transportation system capacity has been proposed at this time.

Lastly, as part of the TPB's acceptance of the above project MDOT identified a complementary set of other transportation projects that MDOT intends to fund. These projects and the commitment to implement them are outlined in a letter received by the TPB from MDOT in June of 2022 and is included as Attachment 3.

I trust your office will find the above information and the attachments documents relevant and informs your review of the FEIS.

Should you have any questions on the TPB activities in this regard, please do not hesitate to contact me at KSrikanth@mwcog.org or 202-962-3257. Thank you for your consideration.

Sincerely,

Kanathur N. Srikanth
Director, Transportation Planning Board

cc:
Mr. Jitesh Parikh, P3/MLS Director, FHWA
Mr. R Earl Lewis, Jr., Deputy Secretary for Policy, Planning, & Enterprise Services
Mr. Tim Smith, Administrator, MDOT-State Highway Administration
Mr. Jeffrey T. Folden, I-495 & I-270 P3 Office Director, MDOT

## ATTACHMENT 1

TPB R15-2022
June 15, 2022

NATIONAL CAPITAL REGION TRANSPORTATION PLANNING BOARD
777 North Capitol Street, N.E.
Washington, D.C. 20002

RESOLUTION APPROVING THE 2022 UPDATE TO THE VISUALIZE 2045 LONG-RANGE TRANSPORTATION PLAN FOR THE NATIONAL CAPITAL REGION AND THE FY 2023–2026 TRANSPORTATION IMPROVEMENT PROGRAM (TIP)

WHEREAS, the National Capital Region Transportation Planning Board (TPB), as the federally designated metropolitan planning organization (MPO) for the Washington region, has the responsibility under the provisions of the Fixing America's Surface Transportation (FAST) Act, reauthorized November 15, 2021 when the Infrastructure Investment and Jobs Act (IIJA) was signed into law, for developing and carrying out a continuing, cooperative and comprehensive transportation planning process for the metropolitan area; and

WHEREAS, the Federal Planning Regulations of the Federal Transit Administration (FTA) and the Federal Highway Administration (FHWA) implementing the FAST Act, which became effective June 27, 2016, specify the development and content of the long-range transportation plan and of the transportation improvement program and require that it be reviewed and updated at least every four years; and

WHEREAS, on October 17, 2018, the TPB approved a new long-range transportation plan, called "Visualize 2045," that meets federal planning requirements, addresses the federal planning factors and goals in the TPB Vision and the Regional Transportation Priorities Plan, and included a new "Aspirational Element" as specified by TPB Resolution R8-2018; and

WHEREAS, the TIP is required by FHWA and FTA as a basis and condition for all federal funding assistance to state, local and regional agencies for transportation improvements within the Washington planning area and the TPB approved the FY 2021-2024 Transportation Improvement Program (TIP) on March 20, 2020, which was developed as specified in the Federal Planning Regulations; and

WHEREAS, on December 16, 2020, TPB staff issued a Technical Inputs Solicitation Submission Guide, which is a formal call for area transportation implementing agencies to submit technical details, including information necessary to perform the required air quality analysis of the 2022 Update to the Visualize 2045 long-range transportation plan, and for projects and programs to be included in the FY 2023-2026 TIP that will meet federal planning requirements, and will address the federal planning factors and goals in the TPB Vision and the Regional Transportation Priorities Plan; and

WHEREAS, the transportation implementing agencies in the region provided project submissions for the 2022 Update to Visualize 2045 and the FY 2023-2026 TIP, and the TPB Technical Committee and the TPB reviewed the project submissions at meetings in April, May, June and July 2021 meetings; and

1

**WHEREAS**, at its June and July 2021 meetings, the TPB approved the projects submitted for inclusion in the Air Quality Conformity Analysis of the 2022 Update to Visualize 2045 and the FY 2023-2026 TIP; and

**WHEREAS**, MDOT made certain transit commitments associated with the I-270/I-495 Traffic Relief Plan in Resolution R2-2022 and is required to brief TPB on the transit commitments related to Phase 1 South of the I-270/I-495 Traffic Relief Plan; and the TPB will provide a formal statement for inclusion in the public docket of the FEIS for the I-270/I-495 Traffic Relief Plan referencing TPB's requirement that the transit commitments be met; and MDOT will report to TPB on the status of the transit commitments to Montgomery County bimonthly until a transit commitments agreement is reached with Montgomery County for Phase 1 South of the project; and

**WHEREAS**, on June 15, 2022, upon adopting on-road greenhouse gas reduction goals and strategies, to be appended to the 2022 Update to Visualize 2045; and

**WHEREAS**, on April 1, 2022, the draft FY 2023–2026 TIP was released for a 30-day public comment and inter-agency review period along with the draft 2022 Update to Visualize 2045, and the Air Quality Conformity Analysis; and

**WHEREAS**, the FY 2023-2026 TIP has been developed to meet the financial requirements in the Federal Planning Regulations; and

**WHEREAS**, during the development of the 2022 Update to Visualize 2045, the FY 2023-2026 TIP, and the Air Quality Conformity Analysis, the TPB Participation Plan was followed, and several opportunities were provided for public comment: (1) a 30-day public comment period on project submissions for the air quality conformity analysis of the 2022 Update to Visualize 2045 and the FY 2023-2026 TIP and the air quality conformity analysis scope of work was provided from April 2 to May 3, 2021; (2) the TPB Community Advisory Committee (CAC) was briefed on the project submissions at its April 15, 2021 meeting, (3) an opportunity for public comment on these submissions was provided at the beginning of the April, May, June and July 2021 TPB meetings; (4) on April 1, 2022 the draft 2022 Update to Visualize 2045, the FY 2023-2026 TIP, and the draft Air Quality Conformity Analysis were released for a 30-day public comment period which closed on May 1, 2022; (5) on April 6 and 7, 2022, a virtual open house was held where staff shared results of the plan analysis and provided an opportunity for questions and answers; (6) on April 14, 2022, a Public Forum was held on the development of the FY 2023-2026 TIP; (7) an opportunity for public comment on these documents was provided on the TPB website and on the Visualize 2045 website, and at the beginning of the April, May and June 2022 TPB meetings; and (8) the documentation of the 2022 Update to Visualize 2045, the FY 2023-2026 TIP, the Air Quality Conformity Analysis includes summaries of all comments and responses; and

**WHEREAS**, the TPB Technical Committee has recommended favorable action on the 2022 Update to Visualize 2045, the FY 2023-2026 TIP, and the Air Quality Conformity Analysis by the Board; and

2

**WHEREAS**, on June 15, 2022, the TPB passed Resolution R16-2022, determining that the 2022 Update to Visualize 2045, the FY 2023-2026 TIP conform with the requirements of the Clean Air Act Amendments of 1990; and

**WHEREAS**, the FY 2023-2026 TIP projects are consistent with the 2022 Update to Visualize 2045, and are selected in accordance with the Federal Planning Regulations; and

**NOW, THEREFORE, BE IT RESOLVED THAT** the National Capital Region Transportation Planning Board approves the 2022 Update to Visualize 2045 and the FY 2023-2026 Transportation Improvement Program.

Adopted by the Transportation Planning Board at its regular meeting on June 15, 2022

3



## ATTACHMENT 2

TPB R16 -2022
June 15, 2022

### NATIONAL CAPITAL REGION TRANSPORTATION PLANNING BOARD
777 North Capitol Street, N.E.
Washington, D.C. 20002

**RESOLUTION FINDING THAT THE 2022 UPDATE TO THE VISUALIZE 2045
LONG-RANGE TRANSPORTATION PLAN AND THE FY 2023-2026 TRANSPORTATION
IMPROVEMENT PROGRAM CONFORM WITH THE REQUIREMENTS OF
THE CLEAN AIR ACT AMENDMENTS OF 1990**

**WHEREAS,** the National Capital Region Transportation Planning Board (TPB) has been designated by the Governors of Maryland and Virginia and the Mayor of the District of Columbia as the Metropolitan Planning Organization (MPO) for the Washington Metropolitan Area; and

**WHEREAS,** the U.S. Environmental Protection Agency (EPA), in conjunction with the U.S. Department of Transportation (DOT), under the Clean Air Act Amendments of 1990 (CAAA), issued on November 24, 1993 "Criteria and Procedures for Determining Conformity to State or Federal Implementation Plans of Transportation Plans, Programs, and Projects Funded or Approved Under Title 23 U.S.C. or the Federal Transit Act," and, over the years, subsequently amended these regulations and provided additional guidance, which taken together provide the specific criteria for the TPB to make a determination of conformity of its financially constrained long-range transportation plan and Transportation Improvement Program (TIP) with the State Implementation Plan (SIP) for air quality maintenance within the Metropolitan Washington non-attainment area; and

**WHEREAS,** on December 16, 2020, the TPB staff released the Technical Inputs Solicitation Submission Guide and asked for inputs to the 2022 Update to Visualize 2045 and the FY 2023-2026 TIP; and

**WHEREAS,** a scope of work was developed to address all procedures and requirements, including public and interagency consultation, and the scope was released for public comment on April 2, 2021, and approved by the TPB at its June 16, 2021 meeting; and

**WHEREAS,** highway and transit project inputs submitted for inclusion in the air quality conformity analysis of the 2022 Update to Visualize 2045 and the FY 2023-2026 TIP were released for public comment on April 2, 2021, and approved by the TPB at its June and July 2021 meetings; and

**WHEREAS,** on April 1, 2022, the draft results of the air quality conformity analysis of the 2022 Update to the Visualize 2045 transportation plan and FY 2023-2026 TIP were released for a 30-day public comment period with inter-agency consultation; and

1

**WHEREAS,** the analysis reported in the Summary Report: Air Quality Conformity Analysis of the 2022 Update to Visualize 2045, dated June 15, 2022, demonstrates adherence to all mobile source emissions budgets for ground level ozone precursors Volatile Organic Compounds (VOC) and Nitrogen Oxides (NOx), and meets all regulatory, planning and interagency consultation requirements, and therefore provides the basis for a finding of conformity of the 2022 Update to Visualize 2045 and the FY 2023-2026 TIP with the requirements of the CAAA; and

**WHEREAS,** as part of the TPB's interagency consultation process, the Metropolitan Washington Air Quality Committee (MWAQC) concurs with the regional air quality conformity determination of the 2022 Update to Visualize 2045 and the FY 2023-2026 TIP, and provided other comments relating to the region's air quality;

**NOW, THEREFORE, BE IT RESOLVED THAT** the National Capital Region Transportation Planning Board determines that the 2022 Update to Visualize 2045 and the FY 2023-2026 Transportation Improvement Program conform to all requirements of the Clean Air Act Amendments of 1990.

Adopted by the Transportation Planning Board at its regular meeting on June 15, 2022

2

00000219


**ATTACHMENT 3**



MARYLAND DEPARTMENT OF TRANSPORTATION

Larry Hogan
Governor

Boyd K. Rutherford
Lt. Governor

James F. Ports, Jr.
Secretary

June 8, 2022

The Honorable Pamela Sebesky
Chair
Mr. Kanathur Srikanth
Deputy Executive Director, Metropolitan Planning
National Capital Region Transportation Planning Board
Metropolitan Washington Council of Governments
777 North Capital Street, N.E., Suite 300
Washington DC 20002

Dear Chair Sebesky and Mr. Srikanth:

I am writing to provide an update to the National Capital Region Transportation Planning Board (TPB) on transit improvements being developed as part of Phase 1 South of Op Lanes Maryland. This update was requested as part of resolution TPB R2-2022.

As part of Phase 1 South, the Maryland Department of Transportation (MDOT) is committed to encouraging carpooling and providing regional transit benefits consistent with the Aspirational Initiatives incorporated in Visualize 2045. Vehicles with three or more occupants and buses will be able to use the proposed high-occupancy toll (HOT) lanes for free. This will provide new options for carpools and new opportunities for free-flow transit crossing the new American Legion Bridge, connecting people and jobs in Maryland and Virginia. A bicycle and pedestrian path will also be provided across the new American Legion Bridge connecting trails in Maryland and Virginia and providing the option of interstate bicycle travel.

In addition to the above carpooling and transit benefits, MDOT committed to provide mitigation as part of the Phase 1 South highway improvements including increasing the number of bus bays at the Shady Grove Metrorail Station, increasing parking capacity at the Westfield Montgomery Mall Transit Center, and delivering the Metropolitan Grove Operations and Maintenance Facility including the necessary bus fleet. Since the TPB resolution, MDOT has further defined the scope and developed conceptual design for each of these transit improvements in collaboration with Montgomery County and other stakeholders. We remain committed to furthering the development of these transit benefits with stakeholders and delivering these mitigation resources as part of Phase 1 South to support expanded transit operations for the long term.

The MDOT also remains committed to funding not less than $60 million for designing and permitting high priority transit investments in Montgomery County. The specific projects were recently identified by Montgomery County and MDOT has allocated funding in fiscal years 2023 and 2024 to facilitate coordination with stakeholders and develop plans for final delivery and operation. An estimated $300 million in transit investment from toll revenues is currently proposed by the Developer over the operating term of Phase 1 South.

7201 Corporate Center Drive, Hanover, Maryland 21076 | 410.865.1000 | Maryland Relay TTY 410.859.7227 | mdot.maryland.gov

The Honorable Pamela Sebesky
Mr. Kanathur Srikanth
Page Two

These transit commitments will be included in the Final Environmental Impact Statement for the I-495 and I-270 Managed Lanes Study (MLS), which is expected to be published on June 17, 2022. A Record of Decision (ROD) for the MLS is expected later this summer. All funding and future agreements are contingent upon a ROD and the financial close of a future public-private partnership (P3) agreement with the Developer. As this project advances, MDOT remains committed to updating the TPB at future milestones and approval stages of the project.

By connecting Phase 1 South to the Virginia Department of Transportation's 495 Express Lanes Northern Extension and complimenting these managed lanes network with transit investments, MDOT has implemented policies that align with several Aspirational Initiatives to address the region's toughest challenges. From providing opportunities for commuter bus routes that connect people and jobs, expanding the congestion-free managed lanes network to encourage carpooling, and removing barriers for walkers and bicyclists, Phase 1 South will dramatically improve people's lives over the next 20 plus years.

We look forward to working with the TPB and our partners to advance new travel options and opportunities for our citizens, and we will continue to update you as we move forward with this program. If you need further assistance, please contact Jeffrey T. Folden, P.E., DBIA, MDOT State Highway Administration (MDOT SHA) I-495 and I-270 P3 Office Director, at 410-637-3321 or jfolden1@mdot.maryland.gov. Mr. Folden will be happy to assist you.

Sincerely,

R. Earl Lewis, Jr.
Deputy Secretary

cc:   Mr. Jeffrey Folden, Director, Office of Public Private Partnership, MDOT SHA
      Mr. Jeff Hirsch, Assistant Secretary for Policy Analysis and Planning, MDOT
      Ms. Heather Murphy, Director, Office of Planning and Capital Programming, MDOT
      Ms. Kari Snyder, Regional Planner, Office of Planning and Capital Programming, MDOT