# I-495 & I-270 MANAGED LANES STUDY

FINAL ENVIRONMENTAL IMPACT STATEMENT AND
FINAL SECTION 4(f) EVALUATION

June 2022



MARYLAND DEPARTMENT OF TRANSPORTATION

**STATE HIGHWAY ADMINISTRATION**



U.S. Department of Transportation
**Federal Highway Administration**






# I-495 & I-270 MANAGED LANES STUDY

**Montgomery and Prince George's Counties, Maryland & Fairfax County, Virginia**

## FINAL ENVIRONMENTAL IMPACT STATEMENT
### and
## FINAL SECTION 4(f) EVALUATION

Submitted Pursuant to:
42 U.S.C. §4332(2)(C) and 49 U.S.C. §303

By:
U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
and
MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

In Cooperation with:
U.S. Army Corp of Engineers, National Park Service
U.S. Environmental Protection Agency, Maryland Department of Environment
Virginia Department of Transportation, and Maryland-National Capital Park and Planning Commission

06/07/2022
_____
Date of Approval

_____
Tim Smith, P.E., Administrator
Maryland Department of Transportation
State Highway Administration

6/7/2022
_____
Date of Approval

_____
Gregory Murrill, Division Administrator
Federal Highway Administration

The following persons may be contacted for additional information concerning this document:

Mr. Jeffrey T. Folden, P.E., DBIA
Maryland Department of Transportation,
State Highway Administration, I-495 & I-270 P3 Office
707 North Calvert Street, Mail Stop P-601
Baltimore, MD 21202
410-637-3320

Mr. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
410-962-4440

This Final Environmental Impact Statement (FEIS) has been prepared in accordance with 23 CFR 771.125 and presents the final analyses completed for the Preferred Alternative, design refinements since the Supplemental Draft Environmental Impact Statement (SDEIS), as well as responses to comments on the Draft Environmental Impact Statement (DEIS) and SDEIS. The Preferred Alternative focuses on constructing two high-occupancy toll (HOT) managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to west of MD 187 on I-495, including the American Legion Bridge, and on I-270 from I-495 to north of I-370 and on the I-270 east spur from east of MD 187 to I-270. No action or no improvements are proposed east of the I-270 East Spur as part of the Preferred Alternative. The FEIS responds to the over 5,000 public and agency comments received on the DEIS and SDEIS. The FEIS includes the results of the final analyses of environmental impacts based on extensive avoidance and minimization efforts and presents final mitigation and commitments for unavoidable impacts.



I-495 & I-270 Managed Lanes Study

# Final Environmental Impact Statement and Final Section 4(f) Evaluation

## June 2022



U.S. Department
of Transportation

**Federal Highway
Administration**



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00000223

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

## TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ................................................................................................ **ES-1**

**1    PURPOSE AND NEED** ................................................................................................ **1-1**

  1.1    Background and Context ...................................................................................... 1-1

  1.2    Purpose and Need ............................................................................................... 1-2

  1.3    Accommodate Existing Traffic and Long-Term Traffic Growth ........................... 1-3

    1.3.1    Population and Employment Growth .......................................................... 1-3

    1.3.2    Traffic Growth ............................................................................................. 1-4

  1.4    Enhance Trip Reliability ...................................................................................... 1-6

  1.5    Provide Additional Roadway Travel Choices ....................................................... 1-7

  1.6    Accommodate Homeland Security ...................................................................... 1-8

  1.7    Improve Movement of Goods and Services ......................................................... 1-9

    1.7.1    Movement of Freight Goods ........................................................................ 1-9

    1.7.2    Movement of Commuting Employees .......................................................... 1-11

  1.8    Other Goals and Objectives ................................................................................ 1-11

    1.8.1    Incorporate Alternative Funding Sources to Achieve Financial Viability ......... 1-11

    1.8.2    Environmental Responsibility ...................................................................... 1-13

**2    ALTERNATIVES DEVELOPMENT AND EVALUATION** .................................................. **2-1**

  2.1    Preliminary Alternatives ..................................................................................... 2-2

  2.2    Screening Criteria ............................................................................................... 2-4

  2.3    Screened Alternatives ......................................................................................... 2-5

  2.4    Alternatives Retained and Evaluated in DEIS ...................................................... 2-6

  2.5    Identification of Preferred Alternative ................................................................ 2-7

**3    PREFERRED ALTERNATIVE** ...................................................................................... **3-1**

  3.1    Elements of the Preferred Alternative ................................................................. 3-2

    3.1.1    Alignment and Cost ..................................................................................... 3-3

    3.1.2    Limit of Disturbance .................................................................................... 3-5

    3.1.3    Interchanges and HOT Managed Lanes Access ............................................ 3-7

    3.1.4    Transit-Related Elements ............................................................................. 3-12

    3.1.5    Pedestrian and Bicycle Facilities .................................................................. 3-13

    3.1.6    Stormwater Management Considerations .................................................... 3-14

    3.1.7    Cross Culverts .............................................................................................. 3-21

    3.1.8    Construction and Short-term Effects ........................................................... 3-22

00000224




I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

3.1.9    Tolling..................................................................................................................3-25

3.2    Transportation Commitments ................................................................................3-28

3.2.1    Transit ...............................................................................................................3-28

3.2.2    Pedestrian and Bicycle Facilities ....................................................................3-29

3.3    Phase 1 P3 Agreement and Predevelopment Work ...............................................3-30

3.3.1    Selection of the Phase Developer ...................................................................3-31

3.3.2    NEPA and the Developer Work Together .......................................................3-31

3.4    Economic Benefits of Managed Lanes and the Preferred Alternative.....................3-32

4    TRANSPORTATION AND TRAFFIC .......................................................................4-1

4.1    Introduction ...........................................................................................................4-1

4.1.1    Traffic Analysis Data Collection and Modeling Methodology...........................4-2

4.1.2    Traffic Analysis Area.........................................................................................4-3

4.1.3    Traffic Modeling Assumptions .........................................................................4-3

4.2    Forecasting.............................................................................................................4-8

4.2.1    Baseline Conditions..........................................................................................4-8

4.2.2    2045 Volumes ..................................................................................................4-9

4.3    Traffic Analysis for No Build and Preferred Alternatives ........................................4-9

4.3.1    Delay ...............................................................................................................4-10

4.3.2    Travel Time......................................................................................................4-10

4.3.3    Speed...............................................................................................................4-12

4.3.4    Level of Service ...............................................................................................4-14

4.3.5    Throughput .....................................................................................................4-15

4.3.6    Local Network .................................................................................................4-15

4.3.7    Summary .........................................................................................................4-17

4.4    MDOT SHA's Draft Application for Interstate Access Point Approval .....................4-18

4.4.1    Operations of Interchanges, Cross Streets and Termini .................................4-18

4.4.2    Safety Evaluation............................................................................................4-19

4.5    COVID-19 Considerations and Plan Results ..........................................................4-20

4.5.1    Monitoring ......................................................................................................4-20

4.5.2    Research..........................................................................................................4-22

4.5.3    Sensitivity Analysis .........................................................................................4-24

5    ENVIRONMENTAL RESOURCES, CONSEQUENCES & MITIGATION ..........................5-1

5.1    Land Use and Zoning, Planning and Development ..................................................5-5

00000225



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

5.1.1    Introduction .................................................................................................5-5

5.1.2    Affected Environment ..................................................................................5-6

5.1.3    Environmental Consequences.......................................................................5-9

5.2    Population and Demographics.................................................................................5-12

5.2.1    Introduction ...............................................................................................5-12

5.2.2    Affected Environment ................................................................................5-12

5.2.3    Environmental Consequences.....................................................................5-14

5.3    Communities & Community Facilities......................................................................5-14

5.3.1    Introduction ...............................................................................................5-14

5.3.2    Affected Environment ................................................................................5-15

5.3.3    Environmental Consequences.....................................................................5-17

5.3.4    Mitigation...................................................................................................5-21

5.4    Parks and Recreational Facilities............................................................................5-22

5.4.1    Introduction ...............................................................................................5-22

5.4.2    Affected Environment ................................................................................5-22

5.4.3    Environmental Consequences.....................................................................5-22

5.4.4    Mitigation...................................................................................................5-31

5.5    Property Acquisitions.............................................................................................5-36

5.5.1    Introduction ...............................................................................................5-36

5.5.2    Affected Environment ................................................................................5-36

5.5.3    Environmental Consequences.....................................................................5-36

5.5.4    Mitigation...................................................................................................5-39

5.6    Visual and Aesthetic Resources .............................................................................5-39

5.6.1    Introduction ...............................................................................................5-39

5.6.2    Affected Environment ................................................................................5-41

5.6.3    Environmental Consequences.....................................................................5-43

5.6.4    Mitigation...................................................................................................5-51

5.7    Historic Architectural and Archaeological Resources ..............................................5-54

5.7.1    Introduction ...............................................................................................5-54

5.7.2    Affected Environment ................................................................................5-55

5.7.3    Environmental Consequences.....................................................................5-59

5.7.4    Mitigation...................................................................................................5-65

5.8    Air Quality ............................................................................................................5-66

00000226


| 5.8.1 | Introduction | 5-66 |
|---|---|---|
| 5.8.2 | Affected Environment | 5-66 |
| 5.8.3 | Environmental Consequences | 5-67 |
| 5.8.4 | Mitigation | 5-71 |
| 5.9 | Noise | 5-72 |
| 5.9.1 | Introduction | 5-72 |
| 5.9.2 | Affected Environment | 5-73 |
| 5.9.3 | Environmental Consequences | 5-73 |
| 5.9.4 | Mitigation | 5-74 |
| 5.9.5 | Statement of Likelihood | 5-74 |
| 5.10 | Hazardous Materials | 5-77 |
| 5.10.1 | Introduction | 5-77 |
| 5.10.2 | Affected Environment | 5-78 |
| 5.10.3 | Environmental Consequences | 5-78 |
| 5.10.4 | Mitigation | 5-80 |
| 5.11 | Topography, Geology, and Soils | 5-80 |
| 5.11.1 | Introduction | 5-80 |
| 5.11.2 | Affected Environment | 5-80 |
| 5.11.3 | Environmental Consequences | 5-80 |
| 5.11.4 | Mitigation | 5-82 |
| 5.12 | Waters of the US and Waters of the State, Including Wetlands | 5-82 |
| 5.12.1 | Introduction | 5-82 |
| 5.12.2 | Affected Environment | 5-83 |
| 5.12.3 | Environmental Consequences | 5-83 |
| 5.12.4 | Mitigation | 5-85 |
| 5.13 | Watersheds and Surface Water Quality | 5-92 |
| 5.13.1 | Introduction | 5-92 |
| 5.13.2 | Affected Environment | 5-92 |
| 5.13.3 | Environmental Consequences | 5-93 |
| 5.13.4 | Mitigation | 5-100 |
| 5.14 | Groundwater Hydrology | 5-101 |
| 5.14.1 | Introduction | 5-101 |
| 5.14.2 | Affected Environment | 5-102 |

00000227

 I-495 & I-270 Managed Lanes Study

 Final Environmental Impact Statement

5.14.3    Environmental Consequences..........................................................................................5-102

5.14.4    Mitigation........................................................................................................................5-102

5.15    Floodplains.......................................................................................................................5-102

5.15.1    Introduction....................................................................................................................5-102

5.15.2    Affected Environment.....................................................................................................5-103

5.15.3    Environmental Consequences..........................................................................................5-103

5.15.4    Mitigation........................................................................................................................5-104

5.16    Vegetation and Terrestrial Habitat ...............................................................................5-105

5.16.1    Introduction....................................................................................................................5-105

5.16.2    Affected Environment.....................................................................................................5-106

5.16.3    Environmental Consequences..........................................................................................5-106

5.16.4    Mitigation........................................................................................................................5-108

5.17    Terrestrial Wildlife ..........................................................................................................5-111

5.17.1    Introduction....................................................................................................................5-111

5.17.2    Affected Environment.....................................................................................................5-112

5.17.3    Environmental Consequences..........................................................................................5-114

5.17.4    Mitigation........................................................................................................................5-115

5.18    Aquatic Biota...................................................................................................................5-115

5.18.1    Introduction....................................................................................................................5-115

5.18.2    Affected Environment.....................................................................................................5-116

5.18.3    Environmental Consequences..........................................................................................5-118

5.18.4    Mitigation........................................................................................................................5-119

5.19    Rare, Threatened, and Endangered Species ..................................................................5-120

5.19.1    Introduction....................................................................................................................5-120

5.19.2    Affected Environment.....................................................................................................5-121

5.19.3    Environmental Consequences..........................................................................................5-126

5.19.4    Mitigation........................................................................................................................5-128

5.20    Unique and Sensitive Areas ...........................................................................................5-129

5.20.1    Introduction....................................................................................................................5-129

5.20.2    Affected Environment.....................................................................................................5-129

5.20.3    Environmental Consequences..........................................................................................5-130

5.20.4    Mitigation........................................................................................................................5-130

5.21    Environmental Justice (EJ) Analysis ..............................................................................5-130

00000228


5.21.1    Environmental Justice Regulatory Context ....................................................................5-130

5.21.2    Environmental Justice Analysis Methodology ..............................................................5-132

5.21.3    Historical Context..........................................................................................................5-135

5.21.4    Existing Conditions of Environmental Justice Populations ...........................................5-136

5.21.5    Public Outreach with Environmental Justice Populations ............................................5-146

5.21.6    Identification of Beneficial and Adverse Effects to Environmental Justice Populations ........ ....................................................................................................................................5-152

5.21.7    Determination of whether Disproportionately High and Adverse Impacts would Occur to Environmental Justice Populations (Block Groups) under the Preferred Alternative ..................5-161

5.22    Indirect and Cumulative Effects.............................................................................................5-164

5.22.1    Introduction ................................................................................................................5-164

5.22.2    Affected Environment..................................................................................................5-167

5.22.3    Environmental Consequences......................................................................................5-171

5.23    Consequences of Construction ..............................................................................................5-179

5.23.1    Visual and Aesthetic Resources ..................................................................................5-180

5.23.2    Hazardous Materials ....................................................................................................5-180

5.23.3    Air Quality ...................................................................................................................5-181

5.23.4    Noise ...........................................................................................................................5-182

5.23.5    Natural Resources .......................................................................................................5-182

5.24    Commitment of Resources ....................................................................................................5-183

5.24.1    Irreversible and Irretrievable Commitment of Resources ...........................................5-183

5.24.2    Short-Term Effects/Long-Term Effects .......................................................................5-184

5.25    Permits, Approvals and Authorizations Required..................................................................5-185

5.25.1    Federal Cooperating Agency Authorizations ..............................................................5-185

5.25.2    Permits and Approvals ................................................................................................5-187

6    FINAL SECTION 4(f) EVALUATION ....................................................................................6-1

6.1    Introduction ............................................................................................................................6-1

6.1.1    Purpose and Background ..................................................................................................6-2

6.1.2    Description of Preferred Alternative.................................................................................6-2

6.1.3    Changes Since the Draft Section 4(f) Evaluation, DEIS and SDEIS....................................6-3

6.2    Use of Section 4(f) Properties ..................................................................................................6-7

6.2.1    De Minimis Impact ...........................................................................................................6-8

6.3    Officials with Jurisdiction .........................................................................................................6-8

6.4    Section 4(f) Inventory ...............................................................................................................6-9

00000229



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

6.4.1    Overview ........................................................................................................6-9

6.4.2    Section 4(f) Properties Avoided ...................................................................6-13

6.5    Avoidance Alternatives and Analysis .....................................................................6-14

6.6    All Possible Planning ..............................................................................................6-18

6.6.1    Mitigation ....................................................................................................6-18

6.7    Least Overall Harm.................................................................................................6-26

6.7.1    Draft Section 4(f) Least Overall Harm Evaluation ........................................6-26

6.7.2    Final Least Overall Harm Analysis ...............................................................6-27

6.8    Coordination ..........................................................................................................6-28

6.9    Conclusion..............................................................................................................6-29

7    MITIGATION AND COMMITMENTS ....................................................................7-1

7.1    Introduction ...........................................................................................................7-1

7.2    Mitigation and Commitments.................................................................................7-4

7.3    P3 Agreement Commitments .................................................................................7-22

8    PUBLIC INVOLVEMENT AND AGENCY COORDINATION .......................................8-1

8.1    Introduction ...........................................................................................................8-1

8.2    Public Involvement.................................................................................................8-2

8.2.1    DEIS Notice of Availability and Comment Period..........................................8-2

8.2.2    SDEIS Notice of Availability and Comment Period.........................................8-4

8.2.3    Public Outreach with Environmental Justice (EJ) Populations........................8-6

8.2.4    Other Community Meetings and Stakeholder Outreach Events ....................8-12

8.3    Agency and Stakeholder Coordination ...................................................................8-15

8.3.1    Natural Resource Agency Coordination..........................................................8-21

8.3.2    Section 106 Consultation ...............................................................................8-24

8.3.3    Section 4(f) Agency Coordination ..................................................................8-25

8.4    Incorporation of Public and Agency Input into the Study.......................................8-26

9    DEIS AND SDEIS COMMENTS AND RESPONSES...................................................9-1

9.1    Introduction ...........................................................................................................9-1

9.2    Formal DEIS and SDEIS Comment Periods ..............................................................9-1

9.2.1    DEIS Comments Received ...............................................................................9-1

9.2.2    SDEIS Comments Received .............................................................................9-2

9.3    Responses to Common Theme Comments Received on the DEIS and SDEIS............9-2

9.3.1    Purpose and Need...........................................................................................9-2

9.3.2    Screening of Preliminary Alternatives............................................................9-8

00000230


9.3.3    Analysis of Alternatives Retained for Detailed Study .......................................9-14

9.3.4    Resource Impacts Assessment Methodology and Level of Detail ...................9-21

9.3.5    P3 Program.................................................................................................9-63

9.3.6    Tolling.......................................................................................................9-64

9.3.7    Public Involvement....................................................................................9-68

9.3.8    Comments Concerning Resources Outside Phase 1 South Limits ..................9-71

**10    LIST OF PREPARERS .............................................................................................10-1**

**11    DISTRIBUTION LIST...............................................................................................11-1**

11.1    Federal Agencies ....................................................................................................11-1

11.2    Federally Recognized Tribes ...................................................................................11-1

11.3    State of Maryland Agencies ....................................................................................11-1

11.4    Commonwealth of Virginia Agencies......................................................................11-2

11.5    State Recognized and Other Tribal Groups..............................................................11-2

11.6    County and Local Agencies ....................................................................................11-2

**12    REFERENCES .......................................................................................................12-1**

## LIST OF TABLES

Table 1-1: Regional Population Growth..............................................................................1-4
Table 1-2: Regional Employment Growth...........................................................................1-4
Table 1-3: 2017 and Projected 2045 No Build TTI for Most Congested Segments in AM Peak................1-7
Table 1-4: 2017 and Projected 2045 No Build TTI for Most Congested Segments in PM Peak................1-7
Table 3-1: Interchange Improvements/HOT Managed Lane Access Locations under Preferred Alternative ..3-9
Table 3-2: Pedestrian and Bicycle Facilities in the Preferred Alternative...............................3-15
Table 3-3: Stormwater Management Requirements for the Preferred Alternative................................3-17
Table 3-4: Stormwater Management Provided Under the Preferred Alternative.................................3-19
Table 3-5: Preferred Alternative Compensatory SWM Potential ...........................................3-21
Table 3-6: Compensatory SWM Potential Environmental Impacts ........................................3-21
Table 3-7: Approved Toll Rate Ranges, Soft Rate Caps, and Discounts (Free Passage) for Passenger Vehicle (2-axle) by Payment Type ........................................................................................3-27
Table 4-1: Existing Average Daily Traffic (ADT).................................................................4-8
Table 4-2: 2045 Average Daily Traffic (ADT) ....................................................................4-9
Table 4-3: 2045 System-Wide Delay for Entire Study Area .................................................4-10
Table 4-4: 2045 Travel Time Index (TTI) for Entire Study Area ...........................................4-10
Table 4-5: 2045 Travel Time Index (TTI) Results for General Purpose Lanes from VISSIM Model .........4-11
Table 4-6: 2045 Average Speed – Entire Study Area .........................................................4-12
Table 4-7: 2045 Corridor Travel Speed (mph) Results from VISSIM Model.............................4-13
Table 4-8: 2045 Percent of Lane-Miles Operating at LOS F for Entire Study Area ................4-14
Table 4-9: 2045 Vehicle Throughput at Key Locations .......................................................4-15
Table 4-10: 2045 Vehicle Throughput Results from VISSIM Model.......................................4-16

00000231



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement



Table 4-11: 2045 Local Network Results from MWCOG Model ............................................................4-17

Table 4-12: TTI Monitoring Summary ...............................................................................................4-22

Table 4-13: 2045 Sensitivity Analysis - System-Wide Delay for Entire Study Area................................4-25

Table 5-1: Summary of Quantifiable Impacts for the Preferred Alternative .............................................5-4

Table 5-2: Land Use Permanently Converted to Transportation Right-of-Way for the Preferred Alternative within the CEA Analysis Area ..........................................................................................................5-11

Table 5-3: Property Impacts in CEA Analysis Area Communities...........................................................5-18

Table 5-4: Property Impacts to Community Facilities from the Preferred Alternative ...........................5-21

Table 5-5: Potential Public Park Impacts (Acres) ...............................................................................5-23

Table 5-6: Summary of NPS Wetland and Floodplain Impacts on NPS Properties  from the Preferred Alternative ....................................................................................................................................5-25

Table 5-7: NPS Historic Park Properties with Adverse Effect................................................................5-25

Table 5-8: RTE Plant Species Surveyed within the Potomac River Gorge Portion ...................................5-26

Table 5-9: Surveyed Trees on NPS Properties and Impacts from the Preferred Alternative....................5-27

Table 5-10: Summary of Impacts from the Preferred Alternative to Park Property Acquired................5-30

Table 5-11: M-NCPPC Parkland and Resource Impacts (Acres) ............................................................5-33

Table 5-12: City of Rockville Parkland and Resource Impacts (Acres)...................................................5-34

Table 5-13: City of Gaithersburg Parkland and Resource Impacts (Acres) ............................................5-35

Table 5-14: Summary of Property Acquisitions and Impacts from the Preferred Alternative ................5-37

Table 5-15: Property Impacts by Geographic Area ..............................................................................5-38

Table 5-16: Historic Architectural Properties within the APE for the Preferred Alternative....................5-56

Table 5-17: Known Eligible Archaeological Resources within the APE of the Preferred Alternative ......5-58

Table 5-18: Historic Architectural Properties with Adverse Effect .......................................................5-59

Table 5-19: Archaeological Resources with a Known Adverse Effect.....................................................5-63

Table 5-20: Summary of Noise Sensitive Area (NSA) Impacts and ........................................................5-75

Table 5-21: Sites of Potential Concern Summary ................................................................................5-78

Table 5-22: Impact to Soils by Type in Acres .....................................................................................5-81

Table 5-23: Impacts to Steep Slopes and Highly Erodible Soils in Acres................................................5-82

Table 5-24: Summary of Impacts to USACE/MDE Wetlands and Waterways  within the Preferred Alternative LOD..............................................................................................................................5-84

Table 5-25: Summary of Impacts to Wetland Buffers by Classification..................................................5-84

Table 5-26: Summary of Delineated NPS Wetland Features and Impacts on NPS Properties within the Preferred Alternative LOD ..............................................................................................................5-86

Table 5-27:  Maryland Wetland and Stream Mitigation Requirements .................................................5-89

Table 5-28: Preferred Alternative Mitigation Sites and Credits.............................................................5-90

Table 5-29: Summary of Impacts to Waterways by Classification within USGS HUC8 Watersheds........5-94

Table 5-30: Summary of Impacts to Wetlands and Waterways by Classification within MD 8-Digit Watersheds ....................................................................................................................................5-94

Table 5-31: Impacts to Wetland Buffers by Classification within MD 8-Digit Watersheds ....................5-95

Table 5-32: Summary of Impacts to Wetlands and Waterways by Classification ...................................5-95

Table 5-33: Summary of Impacts to Wetland Buffers by Classification within MD 12-Digit Watersheds...... ......................................................................................................................................................5-96

Table 5-34: Additional Impervious Surfaces by MD 12-Digit Watersheds..............................................5-99

Table 5-35: Additional Impervious Surface by MD 8-Digit Watersheds ................................................5-99

00000232

  I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

Table 5-36: Waterways and Associated Floodplains within the Preferred Alternative LOD ................5-103
Table 5-37: Impacts to FEMA 100-Year Floodplain in Acres ...............................................................5-104
Table 5-38: Impacts to Forests in Acres within the Preferred Alternative LOD....................................5-107
Table 5-39: NPS Tree Survey Results and Impacts on NPS Properties..................................................5-107
Table 5-40: M-NCPPC Tree Survey Results and Impacts on M-NCPPC Properties ...............................5-107
Table 5-41: Impacts to Potential FIDS Habitat Within the Preferred Alternative LOD in Acres ...........5-115
Table 5-42: Summary of Aquatic Habitat Ranking Results by Watershed.............................................5-117
Table 5-43: Summary of Benthic Macroinvertebrate Scores and Ranking Results by Watershed.........5-117
Table 5-44: Summary of Fish IBI Scores and Ranking Results by Watershed ........................................5-117
Table 5-45: RTE Plant Species Surveyed within the Potomac River Gorge Portion...............................5-123
Table 5-46: SSPRA Impact Acreage within the Preferred Alternative LOD...........................................5-128
Table 5-47: Impacts to Unique and Sensitive Areas (acres).................................................................5-130
Table 5-48: HUD 2019 Low-Income Limit for  the Washington-Arlington-Alexandria, DC-VA-MD FMR Area
...............................................................................................................................................................5-135
Table 5-49: Total Environmental Justice Populations (Block Groups) ..................................................5-137
Table 5-50: Environmental Justice Working Group Meetings and Coordination ..................................5-149
Table 5-51: Comparison of Effects to EJ Populations versus Non-EJ Populations.................................5-153
Table 5-52: ICE Analysis Data Sources and Methodology....................................................................5-167
Table 5-53: Indirect Effects in the ICE Analysis Area ..........................................................................5-175
Table 5-54: Cumulative Effects in the ICE Analysis Area.....................................................................5-178
Table 5-55: Permits and Approvals ....................................................................................................5-188
Table 6-1: Comparison of Total Section 4(f) Impacts for Study Milestones ...........................................6-4
Table 6-2: Comparison of DEIS, SDEIS and Final Section 4(f) Evaluation Impacts ...................................6-5
Table 6-3: Summary of Section 4(f) Property Use ...................................................................................6-9
Table 6-4: Avoided Section 4(f) Use by the Preferred Alternative ........................................................6-13
Table 6-5: Avoidance Alternatives ......................................................................................................6-15
Table 6-6: Least Overall Harm Analysis...............................................................................................6-30
Table 8-1: SDEIS Viewing Locations ......................................................................................................8-5
Table 8-2: EJ Working Group Meetings and Coordination ....................................................................8-10
Table 8-3: Additional EJ Engagement ..................................................................................................8-11
Table 8-4: Stakeholder and Community Meetings Since Publication of the DEIS ..................................8-13
Table 8-5: Agency & Stakeholder Coordination Meetings Post-DEIS Publication ..................................8-16
Table 8-6: IAWG Meetings Post-DEIS Publication.................................................................................8-20
Table 8-7: City of Rockville and City of Gaithersburg Meetings Post-DEIS Publication ..........................8-21
Table 8-8: Natural Resource Related Meetings Since Publication of the DEIS .......................................8-21
Table 8-9: Section 106 Consultation Meetings Post-DEIS Publication...................................................8-25
Table 9-1: Traffic Benefits of Preferred Alternative vs. No Build Alternative-Entire Study Area ...........9-28

# LIST OF FIGURES

Figure 1-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative.................................1-2
Figure 1-2: Average Annual Daily Truck Traffic......................................................................................1-10
Figure 1-3: Residents' Home and Employment Commute Destinations .................................................1-12
Figure 2-1: Alternatives Screening Process............................................................................................2-2

00000233



Figure 3-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative...................................3-2
Figure 3-2: Alternative 9 - Phase 1 South Typical Sections (HOT Managed Lanes Shown in Yellow)........3-3
Figure 3-3: Operations & Maintenance Facility Location Map .....................................................................3-6
Figure 3-4: Example At-Grade Exchange Ramp Configuration ....................................................................3-7
Figure 3-5: Example Direct Access Interchange ...........................................................................................3-8
Figure 3-6: Proposed Preferred Alternative HOT Managed Lanes Access Locations ...............................3-11
Figure 4-1: Limits of VISSIM Model Network and Interchange Locations Included along I-495 and I-270.4-4
Figure 4-2: Daily Traffic Volume Changes on I-495 and I-270 During COVID-19 Pandemic vs. 2019 ......4-21
Figure 4-3: VMT Growth Trends in Maryland (2007 – 2017).....................................................................4-23
Figure 5-1: Land Use within the CEA Analysis Area ....................................................................................5-7
Figure 5-2: CEA Analysis Area Land Use Composition .................................................................................5-8
Figure 5-3: CEA Analysis Area Communities .............................................................................................5-16
Figure 5-4: Proposed Rendering of the I-495 and George Washington Memorial Parkway Interchange......
................................................................................................................................................................5-45
Figure 5-5: Chesapeake and Ohio Canal National Historical Park & Clara Barton Parkway – Aerial View.....
................................................................................................................................................................5-46
Figure 5-6: Chesapeake and Ohio Canal Towpath Rendering...................................................................5-47
Figure 5-7: -495 Inner Loop Driver's View Rendering – Looking North .....................................................5-48
Figure 5-8: View from Existing Trail south of I-495 in Cabin John Stream Valley Park, Unit 2, ...............5-49
Figure 5-9: Cabin John Regional Park..........................................................................................................5-50
Figure 5-10: Existing and Proposed Views from Morningstar Tabernacle No.88 Moses Hall and Cemetery
................................................................................................................................................................5-53
Figure 5-11: Preferred Alternative Wetland and Stream Mitigation Sites ...............................................5-91
Figure 5-12: EJ Populations Adjacent to the Preferred Alternative LOD ................................................5-138
Figure 5-13: Maryland EJSCREEN EJScore for Census Tracts in the Analysis Area...................................5-143
Figure 5-14: Overall ICE Analysis Boundary ............................................................................................5-166
Figure 5-15: Maryland Smart Growth Priority Funding Areas .................................................................5-172
Figure 5-16: Projected Population Growth 2015-2045 by TAZ within the ICE Analysis Area .................5-173
Figure 5-17: Projected Employment Growth 2015-2045 by TAZ within the ICE Analysis Area .............5-174
Figure 6-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative..................................6-3
Figure 6-2: Inventory of Section 4(f) Properties (Map 1 of 2)...................................................................6-11
Figure 6-3: Inventory of Section 4(f) Properties (Map 2 of 2)...................................................................6-12
Figure 8-1: EJ Populations along the Study Corridors.................................................................................8-8

## LIST OF APPENDICES

A. FINAL TRAFFIC ANALYSIS TECHNICAL REPORT
B. MDOT SHA'S DRAFT APPLICATION FOR INTERSTATE ACCESS POINT APPROVAL
C. FINAL COVID-19 TRAVEL ANALYSIS & MONITORING PLAN
D. COMPENSATORY STORMWATER MITIGATION PLAN
E. ENVIRONMENTAL RESOURCES MAPPING
F. FINAL COMMUNITY EFFECTS ASSESSMENT & ENVIRONMENTAL JUSTICE ANALYSIS TECHNCIAL REPORT
G. FINAL SECTION 4(F) EVALUATION
H. FINAL VISUAL IMPACT ASSESSMENT

00000234



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

I.   FINAL CULTURAL RESOURCES TECHNICAL REPORT
J.   SECTION 106 PROGRAMMATIC AGREEMENT
K.   FINAL AIR QUALITY TECHNCIAL REPORT
L.   FINAL NOISE ANALYSIS TECHNICAL REPORT
M.  FINAL NATURAL RESOURCES TECHNICAL REPORT
N.   FINAL AVOIDANCE, MINIMIZATION AND IMPACTS REPORT (AMR)
O.   FINAL COMPENSATORY WETLANDS AND WATERWAYS MITIGATION PLAN
P.   JOINT PERMIT APPLICATION
Q.   FINAL INDIRECT AND CUMULATIVE EFFECTS TECHNCIAL REPORT
R.   FINAL PUBLIC INVOLVEMENT AND AGENCY COORDINATION TECHNCIAL REPORT
S.   SELECT AGENCY CORRESPONDENCE
T.   REPONSES TO DEIS AND SDEIS COMMENTS
U.   ENVIRONMENTAL ASSESSMENT FORM

## ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| 495 NEXT | Virginia Department of Transportation I-495 Express Lanes Northern Extension |
| AADT | Average Annual Daily Traffic |
| AASHTO | American Association of State Highway Transportation Officials |
| AC | Acres |
| ACHP | Advisory Council on Historic Preservation |
| ACS | American Community Survey |
| ADA | Americans with Disabilities Act |
| ADT | Annual Daily Traffic |
| ALB | American Legion Bridge |
| AME | African Methodist Episcopal |
| AMR | Avoidance, Minimization, and Impacts Report |
| APE | Area of Potential Effects |
| ARDS | Alternatives Retained for Detailed Study |
| ARPA | Archaeological Resource Protection Act |
| AST | Aboveground Storage Tank |
| AVE | Area of Visual Effect |
| BMP | Best Management Practice |
| BPW | Board of Public Works |
| BRT | Bus Rapid Transit |
| CAA | Clean Air Act |
| CAV | Connected and Automated Vehicle |
| CCA | Capper-Cramton Act |
| C-D | Collector-Distributer |
| CDP | Census Designated Place |
| CEA | Community Effects Assessment |
| CEEJH | Community Engagement, Environmental Justice, and Health |

00000235


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| | |
|---|---|
| CEQ | Council on Environmental Quality |
| CFPP | Chesapeake Fish Passage Prioritization |
| CFR | Code of Federal Regulations |
| CFPP | Chesapeake Fish Passage Prioritization |
| $CH_4$ | Methane |
| CLRP | Constrained Long-Range Plan |
| CMP | Compensatory Mitigation Plan |
| CNE | Common Noise Environment |
| CO | Carbon Monoxide |
| $CO_2$ | Carbon Dioxide |
| $CO_2e$ | Carbon Dioxide Equivalent |
| COMAR | Code of Maryland Regulations |
| $C_{pv}$ | Channel Protection Volume |
| CSC | Customer Service Center |
| CTB | Consolidated Transportation Bonds |
| CWA | Clean Water Act |
| dB | Decibel |
| dBA | A-weighted Decibel |
| DBE | Disadvantaged Business Enterprises |
| DBH | Diameter at Breast Height |
| DEIS | Draft Environmental Impact Statement |
| DOT | Department of Transportation |
| DPW&T | Department of Public Works & Transportation |
| DRPT | Department of Rail and Public |
| E&S | Erosion and Sediment Control |
| EA | Environmental Assessment |
| EDCs | Endocrine Disrupting Chemicals |
| EFH | Essential Fish Habitat |
| EIS | Environmental Impact Statement |
| EJ | Environmental Justice |
| EMS | Emergency Medical Services |
| EO | Executive Order |
| ESA | Environmental Site Assessment |
| ESD | Environmental Site Design |
| ETC | Electronic Toll Collection |
| ETL | Express Toll Lane |
| F&R | Free and Reduced-price |
| FCA | Forest Conservation Act |
| FCDPWES | Fairfax County Department of Public Works and Environmental Services |
| FEIS | Final Environmental Impact Statement |
| FEMA | Federal Emergency Management Agency |

00000236



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| | |
|---|---|
| FF | Functional Feet |
| FEMA | Federal Emergency Management Agency |
| FHWA | Federal Highway Administration |
| FIDS | Forest Interior Dwelling Bird Species |
| FMR | Fair Market Ret |
| FPPA | Farmland Protection Policy Act |
| FSD | Forest Stand Delineation |
| FTA | Federal Transit Administration |
| FWCA | Fish and Wildlife Coordination Act |
| FY | Fiscal Year |
| GHG | Greenhouse Gases |
| GI | Green Infrastructure |
| GIA | Green Infrastructure Assessment |
| GIS | Geographic Information System |
| GP | General Purpose |
| GPR | Ground-penetrating Radar |
| GPS | Global Positioning System |
| GWMP | George Washington Memorial Parkway |
| H&H | Hydrologic and Hydraulic |
| HB | House Bill |
| HHS | Health and Human Services |
| HOA | Homeowners' Association |
| HOT | High-occupancy Toll |
| HOV | High-occupancy Vehicle |
| HSM | Highway Safety Manual |
| HUC | Hydrologic Unit Code |
| HUD | Housing and Urban Development |
| IAPA | Interstate Access Point Approval |
| IART | Impervious Area Requiring Treatment |
| IAT | Impervious Area Treatment |
| IAWG | Interagency Working Group |
| IB | Indiana Bat |
| IBI | Indices of Biological Integrity |
| ICC | Intercounty Connector |
| ICE | Indirect and Cumulative Effects |
| ICE | Infrastructure Carbon Estimator |
| ICM | Innovative Congestion Management |
| IPM | Integrated Pest Management |
| ISATe | Interchange Safety Analysis Tool |
| ISI | Institute for Sustainable Infrastructure |
| IWG | Interagency Working Group |

00000237



| | |
|---|---|
| JBA | Joint Base Andrews |
| JD | Jurisdictional Determination |
| JPA | Joint Permit Application |
| KLC | Keyes, Lethbridge, and Condon |
| LEP | Limited English Proficiency |
| LF | Linear Feet |
| LiDAR | Light Detection and Ranging |
| LOD | Limits of Disturbance |
| LOI | Lines of Investigation |
| LOS | Level of Service |
| LRP/VCP | Land Restoration Program/Voluntary Cleanup Program |
| LULC | Land Use/Land Cover |
| LUST | Leaking Underground Storage Tank |
| MARC | Maryland Area Regional Commuter |
| MBSS | Maryland Biological Stream Survey |
| MBTA | Migratory Bird Treaty Act |
| MCCC | Maryland Commission on Climate Change |
| MCDEP | Montgomery County Department of Environmental Protection |
| MCDOT | Montgomery County Department of Transportation |
| MDE | Maryland Department of the Environment |
| MDNR | Maryland Department of Natural Resources |
| MDOT SHA | Maryland Department of Transportation State Highway Administration |
| MDP | Maryland Department of Planning |
| MDSE | Maryland State Department of Education |
| MDTA | Maryland Transportation Authority |
| MEP | Maximum Extent Practicable |
| MERLIN | Maryland's Environmental Resources and Land Information Network |
| MHT | Maryland Historical Trust |
| MIHP | Maryland Inventory of Historic Properties |
| MLS | Managed Lanes Study |
| M-NCPPC | Maryland-National Capital Park and Planning Commission |
| MOU | Memorandum of Understanding |
| MPH | Miles per Hour |
| MPO | Metropolitan Planning Organization |
| MSATs | Mobile Source Air Toxics |
| MSDE | Maryland State Department of Education |
| MSFCMA | Magnuson-Stevens Fishery Conservation and Management Act |
| MSMF | Maryland Stream Mitigation Framework Calculator |
| MTA | Maryland Transit Administration |
| MTCO$_2$e | Metric Tons per Carbon Dioxide Equivalent |
| MWAQC | Metropolitan Washington Air Quality Committee |

00000238

| MWCOG | Metropolitan Washington Council of Governments |
| MWG | Mitigation Working Group |
| $N_2O$ | Nitrous Oxide |
| NAAQS | National Air Quality Standards |
| NAC | Noise Abatement Criteria |
| NB | Northbound |
| NCA | Neighborhood Conservation Area |
| NCPC | National Capital Planning Commission |
| NCR | National Capital Region |
| NCRTPB | National Capital Region Transportation Planning Board |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NIST | National Institute of Standards and Technology |
| NLEB | Northern Long-eared Bat |
| NMFS | National Marine Fisheries Service |
| NNI | Non-native Invasive |
| $NO_2$ | Nitrogen Dioxide |
| NOAA | National Oceanic and Atmospheric Administration |
| NOI | Notice of Intent |
| NPDES | National Pollutant Discharge Elimination System |
| NPS | National Park Service |
| NRCS | Natural Resources Conservation Service |
| NRHP | National Register of Historic Places |
| NSA | Noise-sensitive Area |
| NTCHS | National Technical Committee for Hydric Soils |
| NWI | National Wetlands Inventory |
| NWPR | Navigable Waters Protection Rule |
| $O_3$ | Ozone |
| O&M | Operations and Maintenance |
| OFD | One Federal Decision |
| OWC | Organic Wastewater Contaminant |
| OWJ | Officials with Jurisdiction |
| P3 | Public-Private Partnership |
| PA | Programmatic Agreement |
| Pb | Lead |
| PCB | Polychlorinated Biphenyl |
| PCT | Piscataway Conoy Tribe of Maryland |
| PEM | Palustrine Emergent |
| PFA | Priority Funding Areas |
| PFO | Palustrine Forested |
| PM | Particulate Matter |

00000239



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| POI | Point of Investigation |
|-----|------------------------|
| POP | Persistent Organic Pollutant |
| PPCP | Pharmaceuticals and Personal Care Product |
| PPE | Personal Protective Equipment |
| PPM | Parts per Million |
| PSI | Preliminary Site Investigations |
| PSS | Palustrine Scrub-shrub |
| PTI | Planning Time Index |
| $Q_p$ | Quantity Management |
| RBP | Rapid Bioassessment Protocol |
| RCRA | Resource Conservation and Recovery Act |
| RFP | Request for Proposals |
| RITIS | Regional Integrated Transportation Information System |
| ROD | Record of Decision |
| RPA | Resource Protection Areas |
| RTE | Rare, Threatened, and Endangered |
| SB | Southbound |
| SDEIS | Supplemental Draft Environmental Impact Statement |
| SDWA | Safe Drinking Water Act |
| SF | Square Feet |
| SFB | Small-footed Bat |
| SGCN | Species of Greatest Conservation Need |
| $SO_2$ | Sulfur Dioxide |
| SOF | Statement of Findings |
| SPA | Special Protection Area |
| SSPRA | Sensitive Species Project Review Areas |
| SVP | Stream Valley Park |
| SWAP | State Wildlife Action Plan |
| SWDA | Safe Drinking Water Act |
| SWM | Stormwater Management |
| TAZ | Traffic Analysis Zone |
| TCLP | Toxicity Characteristic Leaching Procedure |
| TDM | Transportation Demand Management |
| TEA | Targeted Ecological Area |
| TFAD | Travel Forecasting and Analysis Division |
| TIP | Transportation Improvement Program |
| TMDL | Total Maximum Daily Loads |
| TNM | Traffic Noise Model |
| TPB | Transportation Planning Board |
| TPY | Tons per Year |
| TSM | Transportation System Management |

00000240


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| TTI | Travel Time Index |
|-----|-------------------|
| U.S.C. | United States Code |
| USACE | United States Army Corps of Engineers |
| UMD | University of Maryland |
| USDA | United States Department of Agriculture |
| USDOI | United States Department of the Interior |
| USDOT | United States Department of Transportation |
| USEPA | United States Environmental Protection Agency |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |
| USPS | United States Postal Service |
| UST | Underground Storage Tank |
| VAC | Virginia Administrative Code |
| VDCR | Virginia Department of Conservation and Recreation |
| VDEQ | Virginia Department of Environmental Quality |
| VDGIF | Virginia Department of Game and Inland Fisheries |
| VDHR | Virginia Department of Historic Resources |
| VDOE | Virginia Department of Education |
| VDOF | Virginia Department of Forestry |
| VDOT | Virginia Department of Transportation |
| VDWR | Virginia Department of Wildlife Resources |
| VMT | Vehicle Miles Traveled |
| VPDES | Virginia Pollutant Discharge Elimination System |
| WBFC | Washington Biologists' Field Club |
| WHS | Wildlife and Heritage Service |
| WMATA | Washington Metropolitan Area Transit Authority |
| WQ$_v$ | Water Quality Volume |
| WQC | Water Quality Certification |
| WRAP | Wetland Restoration Action Plan |
| WSSC | Washington Suburban Sanitary Commission |
| WUS | Waters of the United States |

00000241

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

# EXECUTIVE SUMMARY

## OVERVIEW

The I-495 & I-270 Managed Lanes Study (Study) is being conducted in compliance with the National Environmental Policy Act (NEPA) with the Federal Highway Administration (FHWA) as the lead federal agency and the Maryland Department of Transportation State Highway Administration (MDOT SHA) as the co-lead agency and local project sponsor.  The Study was initiated in early 2018 with the publication of a Notice of Intent to develop an Environmental Impact Statement (EIS) followed by a formal scoping period to determine the range of issues to be addressed by the Study. At the beginning of the NEPA process, MDOT SHA and FHWA invited eight (8) federal, state and local agencies to be Cooperating Agencies and twenty (20) to be Participating Agencies in the Study. While the formal status of some agencies has changed since 2018, MDOT SHA and FHWA have benefited from active participation and regular collaboration with numerous Federal, state, and local agencies from both Maryland and Virginia. This coordination included close to 300 office and field agency meetings from 2018 through early 2022.

Involvement by the public is also a critical part of a NEPA study. MDOT SHA conducted an extensive effort to involve and engage the public, stakeholders, elected officials, businesses, and communities over the course of the Study. To-date, 16 public workshops and 7 public hearings were held, with distinct public comment periods.  Additionally, over 200 individual stakeholder, community, elected official and business meetings were held to present Study information and hear concerns and feedback on a variety of topics. In response to public and agency comments received over the course of the Study, MDOT SHA and FHWA have modified analysis methodologies, conducted new analyses, studied new or modified existing alternatives, refined design to avoid and minimize environmental and community impacts, and identified meaningful mitigation to address unavoidable impacts.

To document the substantial traffic, engineering, and environmental analyses for public review and comment, a Draft Environmental Impact Statement (DEIS), a Supplemental DEIS (SDEIS) and now a Final EIS (FEIS) have been prepared for the Study.

**DEIS:** The DEIS was published on July 10, 2020 and was made available for public and agency review and comment for an initial period of 90 days, twice the minimum time required by FHWA. Based on public and stakeholder requests, the DEIS comment period was extended for another 30+ days totaling a 123-day comment period. The DEIS and supporting documents summarized the entire alternatives development process, including the analysis and screening of 15 Preliminary Alternatives, full consideration of two additional alternatives raised during the comment process, and a detailed comparison of six Build Alternatives. The DEIS presented the results of draft analyses and the comparison of potential effects to social, cultural and natural environmental resources between the No Build and the six Build Alternatives.

**SDEIS**: The SDEIS was published on October 1, 2021 and was prepared to consider new information relative to the Preferred Alternative, Alternative 9 - Phase 1 South.  Building on the analysis in the existing DEIS, the SDEIS disclosed information relevant to the Preferred Alternative focusing on new information, while referencing the DEIS for information that remained valid. The SDEIS also described the background and context in which the Preferred Alternative was identified. The SDEIS presented updated information on draft analyses that were presented in the DEIS. The SDEIS was available for review to the public and agencies for a 60-day comment period, including an extension of 15 days based on public and stakeholder requests.

00000242

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

**FEIS:** The FEIS has been prepared to present the final analyses completed for the Preferred Alternative, design refinements since the SDEIS, as well as responses to comments on the DEIS and SDEIS. The FEIS responds to the over 5,000 public and agency comments received on the DEIS and SDEIS. The FEIS includes the results of the final analyses of environmental impacts based on extensive avoidance and minimization efforts and presents final mitigation and commitments for unavoidable impacts.

Upon publication of the FEIS and after a 30-day availability period, a Record of Decision (ROD) would be issued that identifies the Selected Alternative as a result of the Study, after considering a range of reasonable alternatives, efforts to avoid and minimize impacts, as well as final mitigation measures designed to address potential environmental impacts.

## What has Changed Since the Supplemental Draft Environmental Impact Statement?

As preliminary design has advanced on the Preferred Alternative in coordination with the Developer, minor modifications have occurred. These modifications included roadway design adjustments based on traffic operations, a new trail connection option from the American Legion Bridge (ALB) to the Chesapeake and Ohio Canal towpath, revisions to noise barrier locations based on further analysis, revisions to stormwater management (SWM) and culvert augmentation sites, and continued application of avoidance and minimization efforts at sensitive resources. The specific design modifications to the Preferred Alternative that have occurred since the SDEIS are described below.

The design concept at the George Washington Memorial Parkway interchange, along I-495 in Virginia south of the ALB has been modified to consolidate movements and provide coordinated movements with the proposed improvements from the 495 NEXT Project completed by the Virginia Department of Transportation (VDOT). Additionally, a pair of exchange ramps has been added to provide vehicles the opportunity to exit the managed lanes along the I-270 west spur north of I-495 in Maryland.

Public comments supporting a direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath were received by MDOT SHA, FHWA and National Park Service (NPS) during the SDEIS public comment period. To be responsive, a direct connection to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative limits of disturbance (LOD) and impact analyses. The three shared use path options connecting to MacArthur Boulevard presented in the SDEIS are no longer under consideration in this FEIS. The direct connection to the Chesapeake and Ohio Canal towpath results in fewer NPS property and natural resource impacts. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the study area. The alignment of the proposed shared use path connection to the Chesapeake and Ohio Canal towpath is shown in **FEIS, Appendix E**.

Modifications to the SWM approach for the FEIS included reevaluation of stormwater needs and locations using a more detailed volume-based analysis and the development of a SWM Concept. The concept fits within the Preferred Alternative LOD developed for the SDEIS and refined for the FEIS.

Since the SDEIS, the approach to relocate, pipe, or maintain the existing alignment of Thomas Branch located along the I-270 west spur, has been refined. The current design concept proposes to eliminate the existing culvert crossing of the I-270 west spur north of Democracy Boulevard to reduce the total length of culvert along Thomas Branch and maintain portions in an open channel.

00000243

The above design refinements as well as continued coordination and consultation with local, state, and Federal resource agencies and stakeholders since the SDEIS have resulted in further reductions to environmental resource impacts (refer to **Table ES-1**). This continued coordination coupled with previous efforts over the course of the Study have resulted in a Preferred Alternative that significantly avoids and minimizes impacts to natural, cultural, and community resources compared to the DEIS Build Alternatives.

## Have the Lead Agencies Addressed the DEIS and SDEIS Comments?

The FEIS includes responses to all comments received on the DEIS and SDEIS from agencies, community organizations, elected officials, businesses, stakeholders, and individuals. **FEIS, Appendix T** includes responses to each comment received. An index has been developed to aid readers in finding both a response to their DEIS/SDEIS comments as well as the copy of the comments received. The index is organized first by the commenting entity (i.e., community organization, business, etc.) or individual, then alphabetical by the commenter's last name or organization name.

With over 5,000 comments received on the DEIS and SDEIS, common topics or themes emerged in the comments received. **Chapter 9** of this FEIS presents a compilation of responses to the common themes identified from both EIS documents and arranged by thematic topics. The main common themes include:

- Purpose and Need
- Screening of Preliminary Alternatives
- Analysis of Alternatives Retained for Detailed Study
- Resource Impacts Assessment Methodology and Level of Detail
- Public-Private Partnership (P3) Program
- Tolling
- Public Involvement
- Comments Concerning Resources Outside Phase 1 South Limits

## How Have Public and Agency Comments Been Taken into Consideration?

Over the last four years, MDOT SHA has listened to, read, reviewed, and considered comments received from all stakeholders. This effort included more than 5,000 comments formally submitted via email, phone, online and hard copy comment forms, and through public testimony received on the DEIS and SDEIS at seven virtual and in-person public hearings. As a result of this continued involvement and engagement effort with agencies, stakeholders, and members of the public, comments have been incorporated into the project the following ways (not an all-inclusive list):

- Aligned the Preferred Alternative and environmental permitting process with the phased project delivery/construction approach focusing on addressing the severe congestion at the ALB as priority.
- Committed to constructing a shared use path on the east side of the ALB to support regional pedestrian and bicycle connectivity.
- Avoided and significantly reduced property, community, historic, natural resource, and parkland impacts.
- Avoided all residential and business displacements.

00000244

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

- Avoided impacts at the historic Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

- Identified appropriate on-site and off-site SWM to meet regulatory requirements and removed or relocated SWM facilities from sensitive resources including parks, where feasible, and NPS property.

- Monitored and analyzed traffic impacts associated with the COVID-19 Pandemic to understand any impacts on existing and future travel and to the Study.

- Committed to priority bicycle, pedestrian, and transit improvements to increase affordable multimodal options for travel within the study corridors.

- Included toll-free travel under the Preferred Alternative for high-occupancy vehicles (HOV) with three (3) or more occupants, transit buses, carpool/vanpool and motorcyclists to reduce the reliance on single occupancy vehicles and provide equitable travel options.

- Avoided and minimized environmental and property impacts by eliminating the concrete barrier and repurposing the pavement on I-270 between the Collector-Distributor system and the general purpose lanes to provide a new lane and largely stay within the existing roadway footprint on I-270.

- Modified direct access ramps to the managed lanes in consideration of local land use and the potential for community, property, and environmental impacts.

- Established a Transit Work Group to further explore opportunities for new or expanded transit service on managed lanes.

- Established an Economic Work Group to determine the economic impacts of the project to the National Capital Region.

- Established an Environmental Justice (EJ) Working Group to support the EJ analysis and engagement efforts.

- Incorporated closed roadway sections with retaining walls where feasible to avoid and minimize environmental and property impacts.

- Included underground SWM vaults to avoid and minimize environmental and property impacts.

- Significantly revised the constructability plan for the ALB by removing construction vehicle access in three of the four quadrants to avoid and minimize impacts to NPS property.

- Eliminated all ramps crossing over the general purpose lanes of I-495 at the MD 190/River Road interchange by adjusting the location of the high-occupancy toll (HOT) lane direct access ramps between I-495 and MD 190. All HOT lanes direct access ramps within this interchange are now proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of ramps crossing over the general purpose lanes of I-495.

## FINAL ENVIRONMENTAL IMPACT STATEMENT

### What is Included in the Final Environmental Impact Statement?

The FEIS presents a description of the Preferred Alternative and specific elements or components, as well as the associated final traffic, engineering, and environmental analyses results with the identified permanent and temporary impacts.

00000245



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

The FEIS focuses on any additional analysis and refinements of the data since the DEIS and SDEIS. The final analysis of environmental impacts is included in **Chapter 5** of the FEIS and is supported by 21 Final Technical Reports, which are listed in the adjacent text box and appended to the FEIS.

Additional analyses or final analyses that are presented in this FEIS include:

- Final Visual Impacts Assessment for the Preferred Alternative, including renderings and final mitigation.

- Final Air Quality Analysis for the Preferred Alternative including carbon monoxide, Mobile Source Air Toxics, Greenhouse Gas Emissions and construction related air quality impacts.

- Final Section 4(f) Evaluation with the final Least Overall Harm Analysis.

- Final EJ Analysis including comparison of adverse effects from the Preferred Alternative within EJ populations to adverse effects within a non-EJ population reference community and final conclusion of whether disproportionately high and adverse effects would occur.

> **What are the Supporting Technical Reports to the FEIS?**
> A. Final Traffic Analysis Technical Report
> B. MDOT SHA's Draft Application for Interstate Access Point Approval
> C. Final COVID-19 Travel Analysis & Monitoring Plan
> D. Compensatory Stormwater Mitigation Plan
> E. Environmental Resource Mapping
> F. Final Community Effects Assessment & Environmental Justice Technical Report
> G. Final Section 4(f) Evaluation
> H. Final Visual Impact Assessment
> I. Final Cultural Resources Technical Report
> J. Section 106 Programmatic Agreement
> K. Final Air Quality Technical Report
> L. Final Noise Analysis Technical Report
> M. Final Natural Resources Technical Report
> N. Final Avoidance, Minimization and Impacts Report
> O. Final Compensatory Wetlands and Waterways Mitigation Plan
> P. Joint Federal/State Permit Application
> Q. Final Indirect and Cumulative Effects Technical Report
> R. Final Public Involvement and Agency Coordination Technical Report
> S. Select Agency Correspondence
> T. Responses to DEIS and SDEIS Comments
> U. Environmental Assessment Form

- Final Mitigation Package including all final measures to mitigate unavoidable impacts for all resources identified through coordination with jurisdictional agencies.

- Final Joint Federal/State Permit Application and supporting documentation for the Alteration of Any Floodplain, Waterway, Tidal or Nontidal Wetlands.

With the advancement of the Preferred Alternative, coordination with the resource agencies on avoidance, minimization, and conceptual mitigation has continued. **Chapter 7** of the FEIS includes a comprehensive list of the mitigation and commitments to be carried forward into final design. The final mitigation and commitments will be included with the ROD.

Lastly, the FEIS includes responses to the public comments received on the DEIS and SDEIS. **Chapter 9** presents a summary of common themed comments and responses to those comments. **FEIS, Appendix T** presents the responses to all individual, elected official, agency, community organizations, businesses, and stakeholder comments and copies of the comments received.

00000246

## What is the Format of the FEIS?

The format of this FEIS follows the same format as the July 10, 2020 DEIS and October 1, 2021 SDEIS and contains twelve chapters.

- **Chapter 1** presents the Study's Purpose and Need, which is unchanged from the DEIS, but repeated for ease of the reader. This chapter is supported by the *Purpose and Need Statement* (**DEIS, Appendix A)** (https://oplanesmd.com/wp-content/uploads/2020/07/DEIS_AppA_PN_web.pdf).

- **Chapter 2** presents a summary of the alternatives development and evaluation process for the Managed Lanes Study that led to the determination of the Preferred Alternative. This chapter is supported by the *Alternatives Technical Report* (**DEIS, Appendix B**) https://oplanesmd.com/wp-content/uploads/2020/07/DEIS_AppB_Alts_web.pdf).

- **Chapter 3** presents a description of the Preferred Alternative. It also describes other common elements of the Preferred Alternative such as, LOD,[1] managed lanes access, SWM, culverts, construction and short-term effects, transit elements, pedestrian and bicycle considerations, and tolling.

- **Chapter 4** presents results from the traffic operational analyses conducted for the 2045 No Build Alternative and Preferred Alternative. This analysis has been updated since the SDEIS. It also discusses how the effects of the pandemic are being considered in the traffic analysis, as well as the effects to local roadway networks. This chapter is supported by the *Final Traffic Analysis Report* in **FEIS, Appendix A.**

- **Chapter 5** presents the permanent and temporary impacts associated with the Preferred Alternative. It also provides an update on the final measures to avoid, minimize, and mitigate potential environmental effects, where applicable. This chapter is supported by numerous technical reports as appended to this FEIS including **Appendices D, E, F, H, I, K, L, M, O, P,** and **Q**.

- **Chapter 6** presents the Final Section 4(f) Evaluation, which updates the Section 4(f) uses and mitigation associated with the Preferred Alternative to significant public parks, recreational areas, and historic properties in compliance with Section 4(f) of the US Department of Transportation (USDOT) Act of 1966. This chapter is a summary of the *Final Section 4(f) Evaluation* in **FEIS, Appendix G**.

- **Chapter 7** presents a comprehensive summary table of the mitigation measures and commitments that will be carried through to final design and construction of the Preferred Alternative.

- **Chapter 8** presents a summary of the public outreach and agency coordination for the Study that has occurred since publication of the DEIS in July 2020. This chapter is supported by the *Public Involvement and Agency Coordination Reports* in **DEIS, Appendix P** and **FEIS, Appendix R**.

- **Chapter 9** presents a summary of the common themed comments received on the DEIS and SDEIS and responses to those comments.

- **Chapter 10** presents the List of Preparers of the FEIS.

- **Chapter 11** presents the Distribution List of agencies, organizations, and persons to whom the FEIS was made available as well as information on public availability of the FEIS.

- **Chapter 12** presents the references for the FEIS.

---

[1] The limits of disturbance (LOD) are the proposed boundary within which all construction, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, and related activities would occur.

00000247


# PREFERRED ALTERNATIVE

## What is the Preferred Alternative?

The Study considered alternatives that address significant roadway congestion within the specific study limits which remain unchanged from the DEIS: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including replacement of the ALB over the Potomac River, to west of MD 5 and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs, in Montgomery and Prince George's counties, Maryland. The Preferred Alternative, Alternative 9 - Phase 1 South (shown in **dark blue** in **Figure ES-1**), includes build improvements within the limits of Phase 1 South only. There is no action or no improvements included at this time on I-495 east of the I-270 east spur to MD 5 (shown in **light blue** in **Figure ES-1**). While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the scope of the Study, improvements on the remainder of the interstate system may still be needed in the future and would advance separately, subject to additional environmental studies, analysis and collaboration with the public, stakeholders, and local agencies. The rationale for the identification of the Preferred Alternative is discussed in this FEIS in **Chapter 2, Section 2.5** and the **SDEIS, Chapter 2, Section 2.2**. Potential roadway or transit improvements on I-270 from north of I-370 to I-70 were not included as part of this Study, because that project has a demonstrated need outside of the Study and, therefore, is advancing under a separate planning study (https://oplanesmd.com/i270-environmental/).

**Figure ES-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative**



The Preferred Alternative includes a two-lane, HOT managed lanes network on I-495 and I-270 within the limits of Phase 1 South only (**Figure ES-2**). On I-495, the Preferred Alternative consists of adding two, new HOT managed lanes in each direction from south of the George Washington Memorial Parkway to west of MD 187. On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5. Along I-270, the existing collector-distributor lanes from Montrose Road to I-370 would be removed as part of the proposed improvements.

00000248

The managed lanes would be separated from the general purpose lanes using flexible delineators placed within a buffer. Transit buses and HOV 3+ vehicles would be permitted to use the managed lanes toll-free.

This Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS, and to align the NEPA approval with the P3 Program's planned project phased delivery and permitting approach. FHWA and Cooperating Agencies[2] concurred on Alternative 9 – Phase 1 South as the Preferred Alternative in June 2021.

### Figure ES-2: Alternative 9 – Phase 1 South Typical Sections (HOT Managed Lanes Shown in Yellow)

**I-495 from the George Washington Memorial Parkway to west of MD 187**



**I-495: American Legion Bridge (Looking north towards Maryland)**



**I-495 west of MD 187 to west of MD 5 - NO ACTION AT THIS TIME**



**I-270 from I-495 to I-370**



The Preferred Alternative includes the full replacement of the ALB with a new, wider bridge (not widening of the existing bridge) to accommodate the two HOT lanes in each direction. The existing bridge is nearly 60 years old and would need to be replaced sometime over the next decade regardless of this Study. The

---

[2] National Capital Planning Commission (NCPC) and Maryland-National Capital Park and Planning Commission (M-NCPPC) did not concur on the Preferred Alternative.

00000249

new bridge would be constructed in stages to maintain the same number of existing lanes during peak periods. The new bridge will be replaced in the same existing location.

The reconstructed ALB will include a shared use path to provide bicycle and pedestrian connection between Virginia and Maryland. Public comments supporting a direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath were received by MDOT SHA, FHWA and NPS during the SDEIS public comment period. To be responsive, a direct connection to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative LOD and impact analyses. The three shared use path options connecting to MacArthur Boulevard presented in the SDEIS are no longer under consideration in this FEIS. The direct connection to the Chesapeake and Ohio Canal towpath results in fewer NPS property and natural resource impacts. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the study area. The alignment of the proposed shared use path connection to the Chesapeake and Ohio Canal towpath is shown in **FEIS, Appendix E.**

## What Multimodal Components Are Included in the Preferred Alternative?

**Transit Components:** MDOT SHA has identified opportunities to enhance transit mobility and connectivity within the Preferred Alternative to further support the Purpose and Need and to address public and agency comments received. These include the following elements:

- Allowing bus transit usage of the HOT managed lanes toll free to provide an increase in speed of travel, assurance of a reliable trip, and connection to local bus service/systems on arterials that directly connect to urban and suburban activity and economic centers.
- Accommodating direct and indirect connections from the proposed HOT managed lanes to existing transit stations and planned Transit Oriented Development at the Shady Grove Metro (I-370), Twinbrook Metro (Wootton Parkway), Rockville, and Westfield Montgomery Mall Transit Center (Westlake Terrace) (refer to **Chapter 3, Section 3.1.4**).

**Bicycle and Pedestrian Components:** MDOT SHA has made a commitment to priority bicycle and pedestrian connections that remove existing barriers and provide connectivity for bicyclists and pedestrians consistent with the Montgomery County and City of Rockville master plans and priorities, including but not limited to:

- Replacing, upgrading, or providing new pedestrian and bicycle facilities where existing facilities would be impacted by the Preferred Alternative to meet the master plan recommended facilities.
- Constructing a new pedestrian and bicycle shared use path across the ALB to connect facilities in Maryland and Virginia.
- Lengthening the I-270 bridge over Tuckerman Lane to accommodate future pedestrian and bicycle facilities along Tuckerman Lane.
- Constructing new sidepaths[3] across MD 190 over I-495.

---

[3] Sidepath or shared use path is a paved or unpaved bikeway outside the motor vehicle traveled way providing two-way travel for pedestrians and bicycles within the highway right-of-way. Refer to **SDEIS, Chapter 2, Section 2.3.8**.

00000250

- Widening the existing variable-width sidepath along the northside of Seven Locks Road under I-495 (Cabin John Trail).

- Constructing a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection between First Agape African Methodist Episcopal Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

## How is Stormwater Management Addressed under the Preferred Alternative?

In accordance with the *Maryland Stormwater Management Act of 2007*, MDOT SHA will ensure SWM water quantity and water quality requirements, and treatment will be provided to improve current conditions, as required under the Maryland Stormwater Management Act. The project intends to meet Maryland water quality standards to provide onsite treatment of all new impervious area and a minimum of 50 percent of reconstructed existing impervious area. The FEIS includes an updated preliminary, conceptual level SWM analysis for the Preferred Alternative since the SDEIS. Modifications to the SWM approach for the FEIS included reevaluation of stormwater needs and locations based on a more detailed volume-based analysis and the development of a SWM Concept to fit within the Preferred Alternative LOD developed for the SDEIS and refined for the FEIS. The update includes a reduction in off-site compensatory SWM needs compared to the SDEIS.

For water quality requirements, the Preferred Alternative will meet the environmental site design requirements to the maximum extent practicable on-site. SWM facilities that could be provided include wet ponds, extended detention ponds, underground quantity facilities, submerged gravel wetlands, grass swales, bio-swales, micro-bioretentions, bioretentions, underground sand filter, etc. However, due to the amount of impervious area requiring treatment and the existing site constraints, the full amount of required water quality could not be provided in all drainage segments. For those drainage segments where water quality could not be met on-site, the deficiency will be met using compensatory (off-site) SWM within the same watershed as defined by the MDOT SHA *Sediment and Stormwater Guidelines and Procedures[4], Section 5.5*. Based on the results of an updated off-site compensatory SWM analysis, numerous potential water quality sites were identified to meet and exceed the full impervious area treatment required for the Preferred Alternative. Refer to **Chapter 3, Section 3.1.6** for additional details on the onsite SWM concept and the compensatory SWM plan (**FEIS, Appendix D**). The final onsite and, if necessary, off-site SWM concept will be developed during final design.

## FINAL SUMMARY OF ENVIRONMENTAL RESOURCES, CONSEQUENCES, AND MITIGATION

### What Avoidance and Minimization Efforts Have Occurred Over the Course of the NEPA Study?

Since the publication of the DEIS and SDEIS, avoidance and minimization opportunities to historic properties, parklands, wetlands, wetland buffers, waterways, forests, and the Federal Emergency Management Agency's 100-year floodplain have advanced through extensive coordination with the regulatory and resource agencies.

The Preferred Alternative, with build improvements only within the limits of Phase 1 South, avoids over 100 acres of parkland and hundreds of wetland and stream features identified in the DEIS. The Preferred Alternative presented was developed as a resource avoidance and minimization alternative based in part

---

[4] https://www.roads.maryland.gov/OHD2/Part_A_Sediment_and_Stormwater_Guidelines.pdf

00000251

on extensive coordination with and input from agencies and stakeholders, including the Officials with Jurisdiction (OWJs) for Section 4(f) properties. Comments received on the DEIS and Draft Section 4(f) Evaluation from agencies and stakeholders specifically requested avoidance of significant parkland and historic resources within the study area. The Preferred Alternative is responsive to comments received and aligns the Study to be consistent with the previously determined phased delivery and permitting approach by limiting the build improvements to the area of Phase 1 South only while avoiding improvements on I-495 east of the I-270 East Spur. The result is complete avoidance of significant stream valley parks, including Rock Creek, Northwest Branch, Sligo Creek, Southwest Branch, and Henson Creek Stream Valley Parks, as well as historic parks of national significance including the Baltimore-Washington Parkway, Greenbelt Park, and Suitland Parkway.

The impacts associated with the Preferred Alternative were avoided and minimized to the greatest extent practicable in all areas at this preliminary stage of the Study. Avoidance and minimization techniques were specifically refined in some areas of sensitive or recreationally valuable resources. Examples of avoidance and minimization efforts that have occurred through the DEIS, SDEIS, and FEIS include the following.

- **Displacements Avoided**: In the DEIS, Alternative 9 had 34 residential and 4 business displacements; the Preferred Alternative in the SDEIS and FEIS avoids all residential and business displacements.

- **Right-of-Way Requirements Further Minimized**: In the DEIS, Alternative 9 had 313.4 acres of right-of-way impacts; the SDEIS Preferred Alternative design minimized the right-of-way impacts to 115.9 acres; and the FEIS Preferred Alternative impacts were further minimized to 92.8 acres, including both temporary and permanent impacts.

- **Park Impacts Further Minimized**: In the DEIS, Alternative 9 had 133.1 acres of park impacts; the SDEIS Preferred Alternative had 36.1 acres; and the FEIS Preferred Alternative further minimized impacts to 30.2 acres, including both temporary and permanent impacts.

- **NPS Park Properties Around the ALB Further Minimized**: The three NPS Park properties around the ALB impacted by the Study are the George Washington Memorial Parkway, Chesapeake and Ohio Canal National Historical Park, and Clara Barton Parkway. Efforts to minimize impacts to these park properties has been a focus of much attention by MDOT SHA. These efforts resulted in the development of a team of national and local experts in design, structures, and constructability to look for innovative ways to avoid and minimize impacts to these resources of national significance (refer to **Chapter 5, Section 5.4** for details). In the DEIS, Alternative 9 impacted 29.4 acres of these three park properties; the SDEIS Preferred Alternative minimized impacts to 17 acres; and the FEIS Preferred Alternative further minimized impacts to 16.2 acres of which 2.7 acres are considered permanent impacts.

- **Maryland-National Capital Park and Planning Commission (M-NCPPC) Park Properties Further Minimized**: In the DEIS, Alternative 9 impacted 26 M-NCPPC park properties totaling 29 acres of impacts; the SDEIS Preferred Alternative impacted 9.2 acres at five M-NCPPC park properties; the FEIS Preferred Alternative further minimized the impacts at the five park properties to 8.2 acres, including both temporary and permanent impacts.

- **Morningstar Tabernacle No. 88 Moses Hall and Cemetery Avoided**: In the DEIS, Alternative 9 impacted 0.3 acre of the Morningstar Cemetery. Based on further investigations of the property since the DEIS, the Preferred Alternative as presented in the SDEIS and FEIS avoids impacts to the historic Morningstar Tabernacle No. 88 Moses Hall and Cemetery boundary.

00000252

- **Wetland Impacts Further Minimized**: In the DEIS, Alternative 9 had 16.3 acres of wetland impacts; the SDEIS Preferred Alternative had 4.3 acres; and the FEIS Preferred Alternative further minimized impacts to 3.9 acres.

- **Waterway Impacts Further Minimized**: In the DEIS, Alternative 9 had 155,922 linear feet of waterway impacts; the SDEIS Preferred Alternative had 46,553 linear feet; and the FEIS Preferred Alternative further minimized impacts to 42,286 linear feet.

- **Floodplain Impacts Further Minimized**: In the DEIS, Alternative 9 had 119.5 acres of floodplain impacts; the SDEIS Preferred Alternative had 48.8 acres; and the FEIS Preferred Alternative further minimized impacts to 31.6 acres.

- **Forest Canopy Impacts Further Minimized**: In the DEIS, Alternative 9 had 1,497 acres of forest canopy impacts; the SDEIS Preferred Alternative had 500.1 acres; and the FEIS Preferred Alternative further minimized impacts to 455.0 acres.

Refer to **Chapters 3, 5, and 6** of this FEIS for additional details on the impacts and efforts to further avoid and minimize impacts to environmental resources.  For unavoidable impacts, a comprehensive mitigation package has been developed. Final mitigation is documented in this FEIS in **Chapters 5, 6, and 7** and will be documented in the ROD. Following the NEPA Process, the Developer will continue to further avoid and minimize impacts throughout the remainder of the design process to the greatest extent practicable. Monetary incentives have been added to the Developer's Technical Provisions to encourage further avoidance and minimization of impacts to wetlands, waterways, forest, and parkland.

## What Are the Effects of the Preferred Alternative on the Environmental Resources?

The environmental consequences presented in **Chapter 5** are described for the Preferred Alternative. Since the DEIS and SDEIS, design has advanced on the Preferred Alternative. The permanent or long-term and temporary or short-term, construction-related effects are quantified and presented in this FEIS. The summary of environmental effects of the Preferred Alternative are presented in **Table ES-1.**

00000253

#### Table ES-1: Summary of Quantifiable Impacts[1] from the Preferred Alternative

| Resource | Permanent[1] | Temporary[1] | Total[1] | Change in Total Impact since SDEIS |
|---|---|---|---|---|
| Total Potential Impacts to Public Park Properties (acres) | 15.7 | 14.5 | **30.2** | -5.9 |
| Total Right-of-Way or Easement Required[2] (acres) | 78.2 | 14.7 | **92.8** | -23.1 |
| Number of Properties Directly Affected (count) | - | - | **361** | - 140 |
| Number of Residential Relocations (count) | - | - | **0** | 0 |
| Number of Business Relocations (count) | - | - | **0** | 0 |
| Number of Historic Properties with Adverse Effect[3] | - | - | **10** | + 1 |
| Noise Sensitive Areas Impacted (count) | - | - | **48** | + 1 |
| Hazardous Materials Sites of Concern (count) | - | - | **255** | 0 |
| Wetlands of Special State Concern | 0 | 0 | **0** | 0 |
| Wetlands[4] (acres) | 3.5 | 0.4 | **3.9** | - 0.4 |
| Wetland 25-foot Buffer (acres) | 6.3 | 0.2 | **6.5** | - 0.6 |
| Waterways[4] (square feet) | 637,080 | 323,136 | **960,216** | -57,486 |
| Waterways[4] (linear feet) | 39,933 | 2,353 | **42,286** | -4,267 |
| Tier II Catchments (acres) | 0 | 0 | **0** | 0 |
| 100-Year Floodplain (acres) | 24.2 | 7.42 | **31.6** | -17.2 |
| Forest Canopy (acres) | 438.5 | 16.5[5] | **455.0** | - 45.1 |
| Rare, Threatened and Endangered Species Habitat (acres) | 33.0 | 21.8 | **54.8** | -1.6 |
| Sensitive Species Project Review Area (acres) | 24.2 | 19.3 | **43.5** | -1 |
| Unique and Sensitive Areas (acres) | 135.7 | 27.4 | **163.0** | - 5.5 |

Notes: The impacts in this table are for the mainline improvements for the Preferred Alternative. Any impacts associated with the compensatory SWM are preliminary and discussed in the applicable resources sections in this Chapter and summarized in **Chapter 3, Section 3.1.6**.

[1] All values are rounded to the tenths place.

[2] The right-of-way is based on State records research and supplemented with county right-of-way, as necessary.

[3] Refer to **Chapter 5, Section 5.7** for additional details on the effects to historic properties.

[4] Refer to **Chapter 5, Section 5.12** for additional details on the impacts to wetlands and waterways.

[5] Temporary forest canopy impacts are cleared forest in areas that will not be permanently acquired or altered by roadway construction. Replanting will occur in these areas. Impacts will be avoided and minimized, and replanting will be maximized within the corridor as determined in final design. Refer to **Chapter 5, Section 5.16** for additional details on forest canopy.

## What Mitigation Is Being Considered for Unavoidable Environmental Effects?

The advancement of conceptual mitigation for unavoidable effects to environmental resources from the Preferred Alternative has occurred since the DEIS and SDEIS. The final mitigation is discussed by applicable resource in **Chapter 5** for the following resources: waters of the United States (US), waters of the state, and wetlands; floodplains; watersheds and surface water; forests, including vegetation and terrestrial habitat; rare, threatened, and endangered species; parks and recreational facilities; terrestrial wildlife; aquatic biota; unique and sensitive areas; historical, architectural, and archaeological resources; noise; air; property acquisitions; hazardous materials; topography, geology, and soils; groundwater hydrology; communities and community facilities; EJ; and visual and aesthetic resources. **Chapter 7** presents a comprehensive summary table of final mitigation measures and commitments that will be carried forward through to final design and construction of the Preferred Alternative. The final mitigation was based on priorities identified by the OWJ and regulatory agencies over the resource to achieve no net loss, with a goal of net benefit.

00000254

## What Are the Results of the Final Section 4(f) Evaluation?

Section 4(f) of the USDOT Act of 1966, as amended (49 United States Code [U.S.C.] §303(c)) stipulates that the USDOT, including the FHWA, cannot approve the use of land from a publicly-owned park, recreation area, wildlife or waterfowl refuge, or public or private historic site unless the following conditions apply:

- FHWA determines that there is no feasible and prudent avoidance alternative to the use of land from the property, and the action includes all possible planning to minimize harm to the property resulting from such use (23 Code of Federal Regulations (CFR) §774.3(a)(1) and (2)); or

- FHWA determines that the use of the Section 4(f) properties, including any measures to minimize harm committed to by the applicant, will have a *de minimis* impact on the property (23 CFR §774.3(b)).

The Preferred Alternative considered further coordination with and listening to agencies and stakeholders, including the OWJs for Section 4(f) properties. The Preferred Alternative is responsive to comments received requesting avoidance of Section 4(f) resources and aligns the Study to be consistent with the previously determined phased delivery and permitting approach.

The Preferred Alternative would avoid the use of 40 Section 4(f) properties with a net reduction of approximately 113.6 acres of Section 4(f) properties, including both parks and historic resources, compared to the DEIS Alternative 9. The Preferred Alternative would require use of a total of 33.2 acres from 20 Section 4(f) properties (including temporary and permanent use), compared to a total of 146.8 acres for the DEIS Alternative 9.

**Chapter 6** of this FEIS and **FEIS, Appendix G** includes the Final Section 4(f) Evaluation. The information included in this Final Section 4(f) Evaluation informed FHWA's consideration of the use of Section 4(f) property by the Preferred Alternative. The Final Section 4(f) Evaluation reflects the coordination with OWJs to coordinate impacts and mitigation, and *de minimis* coordination with the OWJs. The Final Section 4(f) Evaluation also includes finalization of the analysis to demonstrate all possible planning to minimize harm, finalization of the Least Overall Harm Analysis, and final mitigation commitments. Based on the information presented in the Draft Section 4(f) Evaluation, Updated Draft Section 4(f) Evaluation, and this Final Section 4(f) Evaluation, FHWA and MDOT SHA have concluded that there is no feasible and prudent alternative to the use of land from the Section 4(f) properties identified in **Table 6-2**, and the proposed action includes all possible planning to minimize harm, and the Preferred Alternative is the alternative with the least overall harm. Final approval of the Final Section 4(f) Evaluation will be made during the ROD.

## How Has Environmental Justice Been Addressed Under the Preferred Alternative?

The DEIS, SDEIS, and FEIS summarize the comprehensive community outreach and engagement strategies and in-depth analyses developed by MDOT SHA to ensure equal access to relevant Study information and to identify and address potential impacts to minority and low-income communities pursuant to federal requirements.  These strategies reflected federal policy and guidance regarding EJ pursuant to Executive Order 12898, USDOT Order 5610.2(c), FHWA Order 6640.23A, and FHWA *Guidance on Environmental Justice and NEPA* (2011).

The public participation elements of the NEPA process were an opportunity to promote equity and EJ concerns by ensuring minority and low-income communities (EJ populations) have access to and receive information concerning the proposed action and the potential impacts on those communities.  However,

00000255



even more concentrated outreach efforts effectively identified community concerns and informed agency decision-makers regarding project elements and potential mitigation specifically geared to protected communities. In this regard, MDOT SHA implemented a robust plan to meet and exceed federal policies and best practices for outreach to and engagement with EJ populations within and adjacent to the study area.

In the Fall of 2021, MDOT SHA underwent an additional outreach effort with the purpose of providing opportunities for meaningful engagement with underserved communities directly or indirectly affected by the proposed improvements. In consideration of the pandemic and due to the large study area, MDOT SHA developed an online survey to seek feedback from EJ populations on existing community concerns and strategies that could be implemented to address those concerns. The survey was distributed in a variety of ways including through multiple community "pop-up" events hosted by MDOT SHA at local specialty markets in areas noted as having high percentages of low-income and/or minority populations. These events allowed MDOT SHA to answer Study-related questions and to engage face-to-face to hear community concerns and potential solutions.

The FEIS includes the final EJ analysis. Per FHWA Order 6640.23A, a *Disproportionately High and Adverse Effect on Minority and Low-Income Populations* is an adverse impact that:

(1) is predominately borne by a minority population and/or a low-income population; or

(2) will be suffered by the minority population and/or low-income population and is appreciably more severe or greater in magnitude than the adverse effect that will be suffered by the nonminority population and/or non-low-income population.

Due to the parallel nature of the Preferred Alternative to I-495 and I-270, plus the infrequent distribution of EJ and non-EJ populations along the Phase 1 South limits, impacts would occur consistently throughout the limits. Quantifiable impacts, including impacts to property, community facilities and services, natural resources, noise, and hazardous waste, would be borne primarily by non-EJ populations.

Impacts to demographics, traffic, air quality and its effect on public health, safety, visual and aesthetic resources, economy and employment, access and mobility, community cohesion/isolation and quality of life, and impacts resulting from construction would occur consistently along the Phase 1 South limits and more frequently in non-EJ populations. Given the reasoning documented in detail in the EJ Analysis (**Chapter 5, Section 21** and **FEIS, Appendix F**) and in accordance with Executive Order 12898, USDOT Order 5610.2(c), FHWA Order 6640.23A, and in FHWA *Guidance on Environmental Justice and NEPA* (2011), FHWA and MDOT SHA have determined that a disproportionately high and adverse impact would not occur to the EJ populations under the Preferred Alternative.

However, to be responsive to community concerns raised during the outreach and engagement efforts, which identified priorities for improved sidewalks and bicycle facilities, better lighting, and traffic calming measures, MDOT SHA commits to working with the City of Rockville, the City of Gaithersburg, and Montgomery County to:

• Identify locations where safer pedestrian crossings on major state roadways are needed.

• Identify locations where additional pedestrian improvements including adding or upgrading sidewalk, restriping for bicycle lanes, adding or upgrading ADA ramps are needed.

00000256

- Identify locations along state roads with existing pedestrian facilities where more or improved lighting is needed.

MDOT SHA has also committed to certain improvements within the historically African American community of Gibson Grove either as mitigation for direct impacts or as commitments for further enhancement. MDOT SHA will construct or fund a new parking lot for the Gibson Grove Church, provide stormwater improvements to the property, and provide a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection between Gibson Grove Church and Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Refer to **Chapter 5, Section 5.7** and **FEIS, Appendix J** for details.

Additionally, the Developer is committed to the following as part of the P3 Agreement:

- Working with Montgomery, Frederick and Prince George's Counties to expand transit fare subsidies for eligible low-income riders.

- Defining a neighborhood walk and cycle connectivity zone to enhance multi-modal connectivity.

- Facilitating the development of a facility improvement program for the installation or replacement of sidewalks, crossings, or signal modifications and formalizing trail development that has pedestrian demand, then rank projects according to safety significance (considering predictive safety analyses completed by M-NCPPC), readiness, and landowner consensus, as part of its commitment to support Montgomery County's Vision Zero Action Plan. The Vision Zero Action Plan identifies strategies to eliminate serious and fatal collisions on County roads for vehicle occupants, pedestrians, and bicyclists by the end of 2030.

- Generating a Sustainability Plan for the project and will make good faith efforts to achieve, at minimum, a Gold Award rating as recognized by the Envision™ Sustainable Infrastructure Rating System of the Institute for Sustainable Infrastructure (ISI) and target a Platinum Award. The Sustainability Plan will include actions related to the quality of life surrounding the infrastructure asset, stakeholder and community engagement, natural resource management, ecosystems and biodiversity health, climate resilience and carbon emissions.

## How Has Transportation Equity Been Considered?

In consideration of FHWA's policy priorities and MDOT's interest in having an equitable transportation solution for all users of the Study roadways, MDOT SHA has incorporated elements into the Preferred Alternative or has committed to additional improvements or the Developer has committed to certain enhancements as part of the P3 Agreement that support fair, accessible, and affordable transportation options for all users of the Study roadways, including traditionally underserved communities, including the following. The elements listed below that are not part of the base design of the Preferred Alternative will be documented in the ROD or, if Developer lead, documented in the P3 Agreement and/or Memoranda of Understanding to ensure they are carried through project development.

- Supporting additional affordable, multimodal travel options including:

  o  Toll-free travel for new bus transit on managed lanes for a faster, more reliable trip.

  o  Toll-free travel for carpools/vanpools with three or more (3+) occupants.

00000257

o  Working with the Montgomery, Frederick, and Prince George's Counties to expand transit fare subsidies for eligible low-income riders.

- Improving accessibility to work, school, and other modes of transportation via pedestrian and bicycle improvements:

  o  Upgrading existing pedestrian and bicycle facilities impacted by the Preferred Alternative by replacing in-kind or upgrading to meet the master plan recommended facilities.

  o  Where I-495 and I-270 or associated ramps cross over a roadway and the bridge would be replaced, the mainline and ramp bridges will be lengthened to accommodate the footprint of the master plan facility under the structure.

  o  New pedestrian and bicycle facilities including a shared use path on the ALB.

  o  New sidepaths across MD 190 over I-495.

  o  New sidewalk along Seven Locks Road to re-establish the historic connection in the historically African American community of Gibson Grove.

  o  Providing safer pedestrian and bicycle improvements and connecting with planned City of Rockville improvements at the MD 189 and I-270 interchange.

- Enhancing transit connectivity and mobility by:

  o  Direct and indirect access ramps from the managed lanes to existing transit stations including Shady Grove, Twinbrook, Rockville Metro Stations and Westfield Montgomery Mall Transit Center.

  o  Increasing the number of bus bays at Washington Metropolitan Area Transit Authority (WMATA) Shady Grove Metrorail Station.

  o  Increasing parking capacity at the Westfield Montgomery Mall Transit Center.

- Upgrading existing transportation facilities throughout Phase 1 South for all users of the Study roadways by:

  o  Replacing or rehabilitating all existing bridges on or over I-495 and I-270 within the Phase 1 South corridor.

  o  Rehabilitating and repaving the existing general purpose lanes for smoother and safer travel for all users.

## TRANSPORTATION AND TRAFFIC

### What Are the Results of the Final Traffic Analyses?

Since the SDEIS, updates to traffic forecasts and analysis results have occurred for the 2045 No Build Alternative based on new information related to background projects (i.e., other projects within the study area that are expected to be constructed by the design year) and forecast refinements to address comments received on the SDEIS. Traffic forecasts and analysis results have also been updated for the Preferred Alternative to reflect design changes made following coordination with various stakeholders to

00000258

further improve operations and minimize property and environmental impacts. The FEIS also provides a detailed evaluation of the operations along cross streets and adjacent intersections. Refer to **Chapter 4** of this FEIS and **FEIS, Appendix A** for additional details.

The design updates and the forecasting refinements to the Preferred Alternative since the SDEIS show additional operational improvements. For example, the HOT lanes are now projected to achieve the desired speeds of 45 miles per hour (mph) or better during the peak hours, as reported in **Chapter 4, Section 4.3.1**. The projected operations on the Inner Loop of I-495 show an improvement over the SDEIS analysis –the average speed in the general purpose lanes during the PM peak hour was 7 mph in the SDEIS, whereas the FEIS traffic analysis shows speeds are around 15 mph; the congestion does not extend as far back along the mainline; and the results are more consistent with what VDOT was reporting for the 495 NEXT project.

The design year 2045 traffic operational evaluation results for the No Build Alternative and the Preferred Alternative are summarized below and presented in **Chapter 4** of this FEIS and **FEIS, Appendix A**.

The **No Build Alternative** would not address any of the significant operational issues experienced under existing conditions, and it would not be able to accommodate long-term traffic growth, resulting in slow travel speeds, significant delays, long travel times, and an unreliable network. Compared to the 2040 No Build results presented in the DEIS, the 2045 No Build results show generally higher delays and travel times on I-495 and I-270 due to additional projected traffic growth between 2040 and 2045. This traffic growth is anticipated despite additional transit projects included in the 2045 forecast that will help to slightly reduce projected delays on the surrounding local roadway network.

The **Preferred Alternative** is projected to provide meaningful operational benefits to the system even though it includes no action or no improvements for a large portion of the study area to avoid and minimize environmental and property impacts (**Table ES-2**). This alternative would significantly increase throughput across the ALB and on the southern section of I-270 while reducing congestion. It would also increase speeds, improve reliability, and reduce travel times and delays along the majority of I-495, I-270, and the surrounding roadway network compared to the No Build Alternative. The Preferred Alternative shows a reduction in delay on the surrounding local roadways, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges. Although the Preferred Alternative provides less improvement to traffic operations when compared to the Build Alternatives that included the full 48-mile study limits evaluated in the DEIS (such as Alternatives 9 and 10), it was chosen based in part on feedback from the public and stakeholders who indicated a strong preference for eliminating property and environmental impacts on the top and east side of I-495. Congestion would still be present during the PM peak period on I-270 northbound and the I-495 inner loop in the design year of 2045 due to downstream bottlenecks outside of the Preferred Alternative limits, but it would not get worse due to implementing the Preferred Alternative.

00000259

**Table ES-2: Traffic Benefits of Preferred Alternative vs. No Build Alternative for the Entire Study Area**

| METRIC | TIME PERIOD | IMPROVEMENT |
|---|---|---|
| System-Wide Average Delay Reduction vs. No Build | AM PEAK | 13% |
| | PM PEAK | 38% |
| Total Local Network Delay Reduction vs. No Build | DAILY | 3.5% |
| American Legion Bridge Throughput Increase vs. No Build | AM PEAK | 25% |
| | PM PEAK | 30% |
| I-270 at Montrose Road Throughput Increase vs. No Build | AM PEAK | 10% |
| | PM PEAK | 15% |

The FEIS and MDOT SHA's Application for Interstate Access Point Approval include a more detailed assessment of the future mainline and localized operational impacts of the Preferred Alternative. Refer to **FEIS, Appendix B** for MDOT SHA's Application for Interstate Access Point Approval. Opportunities to further address safety and operations will be evaluated on the Selected Alternative after the conclusion of NEPA and during final design.

## Will Adding New Lanes Induce More Travel Demand?

MDOT SHA's goal was not to increase demand but to address current and predicted demand. Current and predicted demand could be met by adding many additional new lanes, however, the ultimate recommendation was to add capacity via managed lanes. This fundamental difference is crucial to understanding why the traffic analysis shows only a very modest increase in traffic through induced demand.

Managed lanes do a better job at regulating overall travel demand, including induced demand, due to dynamic pricing. Dynamic pricing means that as the demand for use of the managed lanes increases, the rate charged for access to the lanes also increases. This tends to regulate uses of the managed lanes in order to permit them to operate in a near free-flow condition and at a general speed of at least 45 mph.

The traffic analysis shows that there could be some induced demand as a result of this project, but the impact will be very small (*less than 1 percent increase* in vehicle miles traveled in the region) and those effects are fully accounted for in the regional traffic models used in the Study developed by the Metropolitan Washington Council of Governments (MWCOG). Even with a less than 1 percent increase, the proposed managed lanes would reduce regional congestion delays and significantly improve travel times along both I-495 and I-270 in the Phase 1 South limits and on local roads throughout the study area. Refer to **FEIS, Chapter 4** and **Chapter 9, Section 9.3.4B**.

00000260

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

## How Has the COVID-19 Pandemic Impacted the Study?

The COVID-19 global pandemic had a profound impact on the daily routines of people across the world, affecting the way Maryland residents and regional commuters work, travel, and spend their free time. In the short-term, these changes have altered travel demand, transit use, and traffic volumes throughout the years 2020 and 2021 on all roadways in Maryland, including I-495 and I-270. In the long-term, there is uncertainty surrounding forecasts for post-pandemic traffic levels and transit use and there is no definitive model to predict how or if changes to mobility patterns during the pandemic will affect long-term traffic projections. To adapt to the ongoing and potential long-term travel impacts associated with the pandemic, MDOT SHA has developed a *COVID-19 Travel Analysis and Monitoring Plan* (**FEIS, Appendix C**). This plan included three components: monitoring to track changes in roadway and transit demand during the pandemic; research of historical data and surveys/projections from the Transportation Research Board and National Capital Region Transportation Planning Board; and a sensitivity analysis evaluating several "what if" scenarios related to future traffic demand due to potential long-term changes to teleworking, ecommerce, and transit use.

The traffic data shows a severe drop in traffic volumes in April 2020 after stay-at-home orders were issued across Maryland, with daily traffic volumes on I-270 and I-495 reducing by more than 50 percent compared to April 2019. With the rollout of vaccines in early 2021, the corresponding drop in COVID-19 cases, and the gradual reopening of schools and businesses, traffic volumes have continued to recover and are back to over 90 percent of normal as of November 2021. Transit use has been slower to recover, with the use of Maryland Transit Administration services statewide down over 40 percent compared to pre-pandemic levels as of October 2021. In the DC region, use of WMATA facilities are also down significantly in October 2021 compared to October 2019. WMATA rail ridership is down 73 percent on weekdays, while WMATA bus ridership is down 40 percent on weekdays, and parking at Metro facilities is down 88 percent (https://www.wmata.com/initiatives/ridership-portal/upload/October-2021-Ridership-Snapshot.pdf).

While congestion decreased significantly on I-495 and I-270 at the onset of the pandemic in Spring 2020, significant congestion had returned to the study area by November 2021, approaching pre-pandemic levels.

The 2045 forecasts and results presented in **Chapter 4, Section 4.3** are based on models that were developed and calibrated prior to the onset of the COVID-19 pandemic and have been determined to be reasonable for use in evaluating projected 2045 conditions. However, MDOT SHA acknowledges that residual effects of some of the near-term changes in travel behavior could be carried forward into the future. Therefore, a sensitivity analysis was also conducted as part of the *COVID-19 Travel Analysis and Monitoring Plan*. The first part of the sensitivity analysis involved modifying input parameters in the MWCOG regional forecasting model based on observed changes in travel behavior during the pandemic to evaluate a range of potential long-term scenarios. This evaluation confirmed that the project would still be needed, even if long-term effects of the pandemic were in the high impact range resulting in less traffic demand than originally projected. The second part of the sensitivity analysis involved re-running the 2045 No Build and 2045 Build VISSIM models that were used to generate the operational results presented in **Chapter 4, Section 4.3** of this FEIS, but with reduced demand volumes to account for potential sustained impacts from the pandemic. The results indicated that the Preferred Alternative would also provide meaningful operational benefits to the system under a reduced-demand scenario.

These results confirm that the capacity improvements proposed under the Preferred Alternative would be needed and effective, even if future demand changes from the pre-pandemic forecasts based on

00000261

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

potential long-term impacts to teleworking, e-commerce, and transit use that are not formally accounted for in the current regional forecasting models.

Refer to **Chapter 4, Section 4.5** and **FEIS, Appendix C** for additional detail on the impact of the COVID-19 pandemic on the Study.

## TOLLING

### Why Do the New Lanes Need to Be Tolled and Why Does the State Need a Developer to Build Them?

MDOT does not have the funds to construct improvements of this magnitude with an estimated cost of approximately $3.75 to $4.25 billion as the estimated cost of the Phase 1 South improvements. Additionally, even with the tolls to pay back loans, MDOT does not have enough bonding capacity to take out loans to pay for the improvements. Therefore, MDOT has selected a Developer through a competitive process and has entered into a Phase P3 agreement whereby the Developer will design, build, finance, operate, and maintain the managed lanes for a period of time using the toll revenue, once the ROD is issued. MDOT SHA would continue to own all of the lanes on I-495 and I-270 and ensure the highway meets their intended transportation function. For information on the toll rate process refer to **Chapter 3, Section 3.1.9**.

### How Were the Toll Rates Established?

The Preferred Alternative will be designed to maintain speeds of 45 mph or greater[5] in the HOT lanes, in compliance with Title 23 U.S.C. § 129 and 166. The goal of the HOT lanes is to maintain free-flowing traffic and to use pricing factors to influence traffic flow. As such, the toll rate range has been set through a public process as specified in Transportation Article, §4-312, Annotated Code of Maryland, to ensure the HOT lanes operate to established operational metrics, which applies the economic principles of supply and demand to influence the utilization of the HOT lanes. The Developer will be responsible for setting toll rates within the established toll rate ranges. The Developer will not only be responsible to ensure the free-flowing traffic goals are met, but will also have to cover design, maintenance, finance, and operations costs from the generated toll revenue. The toll rate range proposal approved by the MDTA Board in November 2021 will only be used if a ROD is signed by FHWA at the end of this Study.

The toll rate ranges for Phase 1 South consist of minimum toll rates, soft toll rate caps, and maximum toll rates for the HOT lanes. The rates also include annual escalation factors to ensure the toll rate ranges are adequate to cover the full term of the P3 Program agreements. Toll rates, within the set toll rate range, will be set dynamically, meaning they could change up to every five minutes based on traffic volumes or speed in the HOT lanes to provide customers who choose to use the HOT lanes and pay a toll, a faster and more reliable trip. The actual toll rates will change based on real-time traffic within each tolling segment. Customers will pay the toll rate in effect when they enter the managed lanes, regardless of toll rate changes that occur in any tolling segment during their trip.

The toll rate ranges will only apply to the HOT lanes; the existing free general purpose lanes will not be tolled. In addition, the approved rates include discounts for qualifying vehicles—such as HOV 3+ (including carpools and vanpools), buses, and motorcycles. MDTA recognizes that designated HOV compliant

---

[5] If average speeds in managed lanes drop below 45 mph during weekday peak periods 90% of the time over a 180-day period, federal law requires that the public authority with jurisdiction over the facility develops a plan of action toward bringing the facility into compliance (23 U.S.C. § 166 (d)(2)(B)).

00000262



I-495 & I-270 Managed Lanes Study

*Final Environmental Impact Statement*

vehicles are required to be toll-free under the Title 23 United States Code 166; however, MDTA is using the term 'discount' to refer to all vehicles that would have a toll rate that is lower than the standard toll rate.

## NEXT STEPS

### What Are the Next Steps for the Study?

Following an availability period for the FEIS, it is anticipated that FHWA will issue a ROD. The ROD will document the commitments to be carried forth during final design and construction. The ROD will document FHWA's approval of the Selected Alternative and the Final Section 4(f) Evaluation. The ROD will conclude the NEPA process.

### Will Additional Environmental and Community Benefits be Considered in Design?

Following the NEPA Process, the Developer will continue to further avoid and minimize impacts throughout the remainder of the design process to the greatest extent practicable. Monetary incentives have been added to the Developer's Technical Provisions to encourage further avoidance and minimization of impacts to wetlands, waterways, forest, and parkland. MDOT SHA and the Developer will develop an Environmental Management Plan and an Environmental Compliance Plan.

To support community, environmental, and sustainability goals, the Developer will generate a Sustainability Plan for the project and will make good faith efforts to achieve, at minimum, a Gold Award rating as recognized by the Envision™ Sustainable Infrastructure Rating System of the ISI and target a Platinum Award. The Sustainability Plan will include actions related to the quality of life surrounding the infrastructure asset; stakeholder and community engagement; natural resource management; ecosystems and biodiversity health; climate resilience; and carbon emissions.

Additionally, as noted in prior sections, the Developer has committed to other community and environmental enhancements. Refer to **Chapter 7, Section 7.3** for a list of commitments made by the Developer as part of the P3 Agreement.

### What Federal, State and Local Permits Are Required?

In addition to NEPA compliance, several permits and approvals are being coordinated concurrently with preparation of this FEIS. **Table 5-56** in **Chapter 5, Section 5.25** summarizes the Federal, state, and local permits, authorizations, and approvals that will likely be required based on the current Study design assumptions and associated impacts.

## PUBLIC-PRIVATE PARTNERSHIP (P3)

### What is a P3?

A P3 is an alternative model for delivery of a capital project. A P3 is a partnership between the public or governmental sector with private entities. The P3 seeks to harness private sector expertise, innovation, and funding to deliver public infrastructure for the benefit of the public owner and users of the infrastructure. P3s seek to successfully leverage the respective strengths of the public and private sectors to deliver large, complex infrastructure projects in a cost effective and timely fashion. Functions under a P3 agreement may include designing, building, financing, operating, and maintaining a transportation facility.

00000263

The Maryland Board of Public Works (BPW) approved a P3 designation for the I-495 & I-270 P3 Program in June 2019 and provided a supplemental approval in January 2020. The approvals allowed MDOT SHA to use a Progressive P3 process to design, construct, finance, operate, and maintain Phase 1 of the P3 Program – I-495 from south of the ALB to I-270 and I-270 from I-495 to I-70.

The I-495 & I-270 Managed Lanes Study is part of the P3 Program, and the Preferred Alternative aligns with the Phase 1 South limits that extend from I-495 south of the ALB to I-270, and along I-270 from I-495 to I-370. In August 2021, in accordance with Maryland law, MDOT and MDTA received approval from the BPW to award the Phase 1 P3 Agreement to the Phase Developer. Within this FEIS, the Phase Developer is referred to as the Developer.

## What is the Role and Responsibility of the Phase Developer?

The Phase Developer is working collaboratively with MDOT, MDTA, and the stakeholders on predevelopment work for Phase 1 South including advancing the preliminary design and due-diligence activities to further minimize impacts and reduce project risks. During the predevelopment work leading up to the FEIS, the Phase Developer focused on further refining the preliminary design concept and further avoiding and minimizing impacts to environmental resources, communities, properties, utilities, and other features.

Concurrent with the predevelopment work, the Phase Developer has advanced a procurement process to select the Design-Build contractors who will subcontract with them to perform final design and construction of all of Phase 1 South, once the ROD is issued. The Phase 1 South Developer will be responsible for the overall final design, construction, financing, operations, and maintenance of all of Phase 1 South.

00000264



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

# 1 PURPOSE AND NEED

The Study Purpose and Need has not changed. Refer to the Draft Environmental Impact Statement **(DEIS), Chapter 1, DEIS, Appendix A,** and Supplemental Draft Environmental Impact Statement **(SDEIS), Chapter 1.** These materials can be viewed through the following links on the Program website:

- **DEIS, Chapter 1:** https://www.oplanesmd.com/wp-content/uploads/2020/11/2020-06-02_DEIS_01_Purpose_and_Need.pdf
- **DEIS, Appendix A:** https://www.oplanesmd.com/wp-content/uploads/2020/07/DEIS_AppA_PN_web.pdf
- **SDEIS, Chapter 1:** https://oplanesmd.com/wp-content/uploads/2021/09/SDEIS_01_PurposeNeed.pdf

This FEIS Chapter has been updated to reflect 2045 population, employment and traffic projections.

## 1.1 Background and Context

The Federal Highway Administration (FHWA), as the Lead Federal Agency, and the Maryland Department of Transportation State Highway Administration (MDOT SHA), as the Local Project Sponsor, have prepared a Final Environmental Impact Statement (FEIS) under the National Environmental Policy Act (NEPA) for the I-495 & I-270 Managed Lanes Study (Study). The I-495 & I-270 Managed Lanes Study (Study) is the first environmental study under the broader I-495 & I-270 Public-Private Partnership (P3) Program.

This chapter presents a summary of the Purpose and Need for the Study, which was developed by FHWA and MDOT SHA in coordination with Cooperating and Participating Agencies and the public during the NEPA scoping process. The full Purpose and Need Statement that was concurred upon by the Cooperating Agencies[1] in November 2018 is included with the **DEIS, Appendix A.**

The 48-mile study limits remain unchanged throughout the Study: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, to west of MD 5 and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs in Montgomery and Prince George's Counties, Maryland. The Preferred Alternative, Alternative 9 - Phase 1 South (shown in **dark blue** in **Figure 1-1**), includes build improvements within the limits of Phase 1 South only totaling approximately 15 miles of proposed improvements. While no improvements are included at this time on I-495 east of the I-270 east spur to MD 5 (shown in **light blue** in **Figure 1-1**), improvements to the remaining parts of I-495 within the Study limits may still be needed in the future. Any such improvements would advance separately and would be subject to additional environmental studies and analysis and collaboration with the public, stakeholders and agencies.

Potential roadway or transit improvements on I-270 from north of I-370 to I-70 were not included as part of this Study, as alternatives for that phase of I-270 will be developed as part of a separate NEPA process (https://oplanesmd.com/i270-environmental/).

---

[1] M-NCPPC did not concur on the Purpose and Need.

00000265

**Figure 1-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative**



## 1.2  Purpose and Need

The Study Purpose and Need Statement was developed through a collaborative process with other federal, state and local agencies and the public during the NEPA scoping process that included examination of multiple transportation and regional planning studies that had been conducted over the past 20+ years, and an analysis of the environmental and socioeconomic conditions of the region. Refer to **DEIS, Appendix A** for the Purpose and Need Statement (https://oplanesmd.com/wp-content/uploads/2020/07/DEIS_AppA_PN_web.pdf). This chapter includes a summary of the Purpose and Need Statement, as well as updated traffic and demographic data relevant to the Purpose and Need.

This Study analyzed travel demand management solution(s) and reasonable alternatives that address these identified needs of the study area. The Project purpose is to address congestion, improve trip reliability on I-495 and I-270 within the study limits and enhance existing and planned multimodal mobility and connectivity.

The needs for the Study are:

- Accommodate Existing Traffic and Long-Term Traffic Growth
- Enhance Trip Reliability
- Provide Additional Roadway Travel Choices
- Improve Movement of Goods and Services
- Accommodate Homeland Security.

00000266


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

## 1.3  Accommodate Existing Traffic and Long-Term Traffic Growth

The state of Maryland experiences the second longest commuting times in the nation, according to 2015 US Census American Community Survey data. The National Capital Region is the most congested region in the nation based on annual delay and congestion per auto commuter. Specifically, I-495 west of I-270 had an Average Annual Daily Traffic (AADT) of 255,000 vehicles per day and I-270 had an AADT volume over 265,000 vehicles per day in 2019 (MDOT SHA, 2020). Refer to **Chapter 4**, **Section 4.3** and **FEIS, Appendix A** for results of the final traffic analysis.

### 1.3.1  Population and Employment Growth

I-495 connects key employment centers within the study area, many of which are undergoing redevelopment as multi-use activity centers with mixed land uses, including residential and retail activity. Bethesda, Rock Spring Technology Park, Silver Spring, Wheaton, College Park, Greenbelt, New Carrollton, Largo, and Suitland are all points of origin and destinations for large numbers of travelers. This creates travel demand during a broad range of times during the day and throughout the week as demonstrated by the fairly even traffic directional splits on I-495 during the peak periods.

The I-270 corridor provides an essential connection between the National Capital Region, central and western Maryland, and longer-distance trips to the Midwestern US, through use of I-70 and I-68. It is an important corridor for both local and long-distance trips. The area up to I-370 includes residential, retail/commercial, and growing mixed-use development including Downtown Crown in Gaithersburg. Major government and corporate employment centers such as National Institute of Standards and Technology and pharmaceutical corporations are spread throughout Montgomery County generating travel in both directions of I-270 during peak travel periods. However, there is a clear directional split in traffic on I-270 during the morning and afternoon/evening weekday commutes. I-270 is the primary route from the population centers around the National Capital Region to many recreational and tourism points of interest to the northwest including Monocacy National Battlefield, Chesapeake and Ohio Canal National Historical Park, Harpers Ferry National Historical Park, and Antietam National Battlefield.

Traffic growth along I-495 and I-270 is related in part to increased regional population. A growing population results in the need for additional mobility to intended destinations such as work, school, sites of commerce, and recreational/tourism points of interest. The population in Montgomery and Prince George's counties have increased approximately 20.1 and 14.6 percent, respectively, between 2000 and 2020 (**Table 1-1**). The Metropolitan Washington Council of Governments (MWCOG) Round 9.1a forecasts, estimates that between 2020 and 2045 the population in Montgomery County and Prince George's County will increase approximately 16.3 percent and 7.9 percent, respectively (**Table 1-1**). According to MWCOG 2000 and 2020 data, employment in Montgomery and Prince George's Counties has increased between 14.5 percent and 3.3 percent, respectively (**Table 1-2**). The MWCOG forecasts that between 2020 and 2045, employment in Montgomery County and Prince George's County will increase approximately 24.9 percent and 15.2 percent, respectively (**Table 1-2**).

00000267

### Table 1-1: Regional Population Growth

| Geography | 2000 | 2020 | % Increase Since 2000 | 2045 Forecast | Forecasted % Increase 2020 to 2045 |
|---|---|---|---|---|---|
| Montgomery County | 875,672 | 1,052,000 | 20.1% | 1,223,300 | 16.3% |
| Prince George's County | 805,723 | 923,100 | 14.6% | 995,900 | 7.9% |
| Inner Washington, DC Suburbs[1] | 390,386 | 529,400 | 35.6% | 681,500 | 28.7% |
| Outer Washington, DC Suburbs[2] | 891,273 | 1,093,000 | 22.6% | 1,204,700 | 10.2% |
| MWCOG Planning Area Counties Total | 4,385,759 | 5,690,000 | 29.7% | 6,925,700 | 21.7% |

Sources: MWCOG (2006; 2020)

[1] As defined by MWCOG and includes Calvert, Charles, and Frederick counties.

[2] As defined by MWCOG and includes Anne Arundel, Carroll, and Howard counties.

### Table 1-2: Regional Employment Growth

| Geography | 2000 | 2020 | % Increase Since 2000 | 2045 Forecast | Forecasted % Increase 2020 to 2045 |
|---|---|---|---|---|---|
| Montgomery County | 474,602 | 543,500 | 14.5% | 678,800 | 24.9% |
| Prince George's County | 337,976 | 349,000 | 3.3% | 402,100 | 15.2% |
| Inner Washington, DC Suburbs[1] | 161,003 | 201,100 | 24.9% | 251,300 | 25.0% |
| Outer Washington, DC Suburbs[2] | 525,294 | 649,200 | 23.6% | 789,700 | 21.6% |
| MWCOG Planning Area Counties Total | 2,791,859 | 3,360,600 | 20.4% | 4,273,800 | 27.2% |

Sources: MWCOG (2006; 2020)

[1] Includes Calvert, Charles, and Frederick counties.

[2] Includes Anne Arundel, Carroll, and Howard counties.

## 1.3.2  Traffic Growth

The 2020 Maryland State Highway Mobility Report (MDOT SHA, 2020)[2] documents substantial traffic growth in the National Capital Region prior to the COVID-19 pandemic. The number of vehicle miles traveled (VMT) along Maryland roadways set an all-time record in 2019 with over 60 billion VMT. Also, Baltimore, Montgomery, and Prince George's Counties experienced the largest increase in VMT between 2018 and 2019, each growing by more than 80 million VMT. These statistics show the large movement of people into and around the National Capital Region at peak periods and the movement of goods throughout the day. This movement is focused around the major interstates. In addition, the top four highest volume roadway sections in Maryland based on average daily traffic (ADT) are contained within

---

[2] The Purpose and Need Statement in the **DEIS, Appendix A** was finalized in November 2018 based on the 2016 Mobility Report. The 2018 Mobility Report numbers were included in **DEIS, Chapter 1**. The **FEIS, Chapter 1** presents the updated numbers based on the 2020 Mobility Report.

00000268


the study limits. These locations include I-270 from the I-270 Split to MD 117, I-495 from the Virginia State Line to the I-270 West Spur, I-495 from the I-270 East Spur to I-95, and I-495 from MD 4 to I-95. Refer to **Chapter 4, Table 4-1** for existing ADTs in the study corridors.

The combined effect of changes in traffic volumes and changes in transit usage on speeds and congestion along I-495 and I-270 has also been monitored by MDOT SHA through a partnership with the Regional Integrated Transportation Information System. A review of this data indicated that congestion decreased significantly on I-495 and I-270 at the onset of the pandemic in Spring 2020, corresponding to the sharp decline in traffic volumes during that time. However, by November 2021, significant congestion had returned to the study area, approaching pre-pandemic levels. For example, average speeds on the I-495 Inner Loop crossing the American Legion Bridge during the PM peak in early November (non-holiday) of 2021 were 20 mph, reflecting significant congestion, and matching the speeds during the similar period in November 2019 (also 20 mph). Refer to **Chapter 4, Section 4.5** and **FEIS, Appendix C** for additional details and results of the COVID-19 traffic analysis.

The high demand for travel results from commuter, commercial, and recreational use of the study corridors and has created congestion along the roadways. Congestion occurs during peak travel periods when demand exceeds roadway capacity. Along I-495, these peak travel periods occur at various times throughout the day, not just during the typical AM and PM peak periods, for as long as 10 hours per day. This type of recurring congestion makes roadways in the study corridors susceptible to exponential increases in delay, as the systems have a fixed capacity base. This exponential increase in delay occurs after a traffic queue has formed and new vehicles arrive, thereby increasing the delay for those vehicles arriving behind them (Cambridge Systematics, Inc., 2005).

Additionally, as congestion increases, the speeds decrease and the roadways in the study corridors become more susceptible to traffic incidents, such as vehicle crashes which cause non-recurring congestion. Crashes are unpredictable and can result from decreased vehicle spacing (rear-end collisions) and weaving and merging maneuvers (sideswipes) to change lanes. Heavily trafficked areas and construction zones are especially prone to these types of incidents (National Capital Region Transportation Planning Board, 2016d). After a crash occurs, it produces stop-and-go traffic movements and can result in lane closures on these capacity-limited systems. These non-recurring delays make the highway systems unreliable, thus negatively affecting travel times and speeds. (This diminished reliability as a result of traffic growth is interrelated to the another need element, as described in **Section 1.4**.)

Long-term traffic management options are needed to address the existing and future recurring congestion along the study corridors. In the National Capital Region, as well as across the country, the addition of general purpose roadway capacity alone cannot keep up with the growing demand for mobility due to the expanding populations and growth in and around the cities. Options to address the growing traffic demand and congestion in the region have been the subject of many prior studies; refer to **DEIS, Appendix A, Section 2.2.1**. While some of those strategies are being implemented, for example Travel Demand Management under the I-270 Innovative Congestion Management project to address existing issues and short-term needs on I-270 and additional mass transit under the Purple Line Light Rail project, these project alone would not address any of the significant operational issues experienced under existing conditions, and it would not be able to accommodate long-term traffic growth, resulting in slow travel speeds, significant delays, long travel times, and an unreliable network. The 2045 No Build traffic

00000269



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

projections show severe congestion on I-495 and I-270 which will adversely affect the regional and local roadway network, especially in and around the interchanges and arterial roads in the study area.

Traffic management strategies are one option in the transportation "tool-kit" that have been identified to address the growing congestion. Managed lanes would maintain traffic operations at a relatively free-flow condition with little congestion because the number of vehicles entering the lanes is controlled. Management strategies, such as managed lanes, were evaluated in several prior studies for these corridors: Capital Beltway Study, I-270 Multi-Modal Corridor Study, and the West Side Mobility Study. The management strategies previously evaluated in these prior studies include high-occupancy vehicle (HOV), high-occupancy toll (HOT), or express toll lanes (ETL).

Congestion on these corridors also has negative effects on access to and usage of other transportation modes. Besides enhanced performance on I-495 and I-270 themselves, improvements to provide congestion relief on these facilities will also enhance existing and proposed multimodal transportation services by improving connectivity and mobility through enhancing trip reliability and providing additional travel choices for efficient travel during times of extensive congestion. Improved direct and indirect connections to park and ride lots, Metrorail, bus and other transit facilities are anticipated to occur as a result of addressing congestion on these regional roadways, thus providing a system of systems approach to addressing overall transportation needs in the National Capital Region.

## 1.4 Enhance Trip Reliability

Congestion on I-495 and I-270 results in unpredictable travel times. Travelers and freight carriers place a high value on reaching their destinations in a timely and safe manner, and in recent years, the study corridors have become so unreliable that uncertain travel times are experienced daily.  More dependable travel times are needed to ensure trip reliability.

MDOT SHA uses the Travel Time Index (TTI)[3] as one of the primary measures of congestion on freeways/expressways. The 2018 Mobility Report identifies the top 15 congested segments during the AM peak hour and the PM peak hour in Maryland based on TTI data from the year 2017, corresponding to the baseline year for traffic operational analyses in this FEIS. Five of the top 15 most congested segments in Maryland during the AM peak are located within the study corridors on I-495, as shown in **Table 1-3**. Nine of the most congested segments in Maryland during the PM peak are located within the study corridors, as shown in **Table 1-4**. In 2045, based on modeling completed for the Study, travel times along the study corridors are projected to increase and users would likely have to increase their planned travel time to reach their intended destinations. In addition, increased amounts of congestion will likely decrease vehicle spacing along the roadways, thereby increasing the potential for congestion-related crashes (rear-end and sideswipe collisions). When these occur, traffic incidents and non-recurring congestion will further degrade the performance and reliability of I-495 and I-270, potentially causing delay for over 300,000 commuters each weekday by the year 2045 and increasing travel costs.

---

[3] The TTI compares the 50th percentile travel time of a trip on a segment of freeway/expressway for a particular hour to the travel time of a trip during off peak (free-flow or uncongested) conditions. The higher the TTI, for a given hour of the day, the longer the travel times (MDOT SHA, 2018). Free Free-flow conditions equate to TTI 1.0, and a TTI of 2.0 indicates a trip takes twice as long as free-free-flow conditions, and greater than 2.0 indicated severe congestion.

00000270

**Table 1-3: 2017 and Projected 2045 No Build TTI for Most Congested Segments in AM Peak**

| Road | Location | Direction (Loop) | 2017 TTI (MD Rank) | Projected 2045 TTI | Forecasted % Increase |
|------|----------|------------------|--------------------|--------------------|-----------------------|
| I-495 | MD 650 to MD 193 | Outer | 5.1 (1) | 6.5 | 27% |
| I-495 | at MD 650 | Outer | 4.6 (2) | 6.0 | 30% |
| I-495 | MD 193 to US 29 | Outer | 4.1 (3) | 5.3 | 29% |
| I-495 | I-95 to Prince George's County Line | Outer | 3.6 (5) | 7.2 | 100% |
| I-495 | US 29 to MD 97 | Outer | 2.9 (9) | 4.0 | 38% |

Source: MDOT SHA (2018) Note: MDOT SHA defines the various levels of congestion in four categories[4] based on TTI.

**Table 1-4: 2017 and Projected 2045 No Build TTI for Most Congested Segments in PM Peak**

| Road | Location | Direction (Loop) | 2017 TTI (MD Rank) | Projected 2045 TTI | Forecasted % Increase |
|------|----------|------------------|--------------------|--------------------|-----------------------|
| I-495 | at Cabin John Pkwy | Inner | 4.5 (1) | 6.1 | 36% |
| I-495 | Clara Barton Pkwy to Cabin John Pkwy | Inner | 3.8 (6) | 4.9 | 29% |
| I-270 | I-270 Split to Democracy Blvd | South | 3.5 (7) | 3.5 | 0%[2] |
| I-495 | MD 355 to MD 185 | Inner | 3.4 (9) | 3.7 | 9% |
| I-495 | at MD 185 | Inner | 3.4 (10) | 4.7 | 38% |
| I-495 | at MD 355 | Inner | 3.3 (11) | 5.3 | 61% |
| I-495 | MD 190 to I-270 West Spur | Inner | 3.3 (12) | 5.1 | 55% |
| I-495 | at MD 190 | Outer | 3.2 (14) | 3.4 | 6% |
| I-495 | MD 190 to Clara Barton Pkwy | Outer | 3.1 (15) | 3.1 | 0%[2] |

Source: MDOT SHA (2018)

Notes: 1. MDOT SHA defines the various levels of congestion in four categories[4] based on TTI. 2. Future congestion is mitigated by background projects at these locations.

Overall, this TTI data shows that users in the study corridors need an option for a reliable trip when the general purpose lanes are congested due to recurring or non-recurring congestion (such as incidents, weather, and disabled vehicles). Managed lanes are an option to provide users with a more reliable travel time for their trip. Managed lanes are designed to operate at an acceptable level of service even when the adjacent general purpose lanes are congested. Because they are managed to control the number of vehicles using the lane to keep them flowing, managed lanes provide users with a more reliable option to reach their destination(s).

## 1.5 Provide Additional Roadway Travel Choices

Travelers on I-495 and I-270 do not have free-flowing travel options in the study corridors during peak periods or during the high incidents of vehicle breakdowns or accidents which exacerbate congestion and delays. Other than on I-270 where there are some HOV lanes, existing low-occupancy vehicles, buses, carpools, and vanpools, and trucks are limited to general purpose lanes along these roadways. Users needing to travel during peak periods, which experience recurring delays, utilize a variety of methods seeking a less congested option. Users attempt to bypass high volume ramps and locations by using arterial streets for all or a portion of their travel. Other users adjust their travel schedule to avoid those timeframes with typical delays. In addition, other than choosing alternate non-freeway routes (local and

---

[4] These four categories are: Uncongested (TTI < 1.15); Moderate Congestion (1.15 < TTI < 1.3); Heavy Congestion (1.3 < TTI < 2.0); or Severe Congestion (TTI greater than 2.0).

00000271

arterial roadways), no options exist to avoid non-recurring delays, such as during crashes, which close travel lanes or substantially slow travel. Additional roadway management options are needed to improve travel choice for time-sensitive trips, provide opportunities to bypass delays, and manage demand, while improving reliability and maintaining the existing number of general purpose lanes in the study corridors (**FEIS, Appendix A, Section 3.6**).

Managed lanes are an option to provide drivers with a choice to pay for a less congested trip or to carpool because they are managed to control the number of vehicles using the lanes. Drivers adjust their travel behavior in order to take advantage of the management tool for those managed lanes if their particular trip purpose warrants a relatively free-flow condition. When traffic shifts to the managed lanes, it also frees up space in the general purpose lanes to accommodate additional traffic that might otherwise use the local arterial network to avoid freeway congestion. The management strategies could include HOV, HOT, or ETLs. Under the Preferred Alternative, the management strategy is HOT where single occupancy vehicles pay a toll while bus transit, HOV 3+ including carpool and vanpool, travel toll-free.[5] Managed lanes can also encourage and support reliable, more efficient transit service such as express and commuter bus routes. Optimizing free-flow conditions has the potential to increase overall mobility by making transit usage on those lanes faster and more effective. Accommodating transit usage on the managed lanes, coupled with enhancing connectivity through reduced congestion on the study corridors, presents the opportunity to incorporate multimodal solutions to the identified transportation needs.

## 1.6 Accommodate Homeland Security[6]

The National Capital Region is the nation's main hub of government, military, and other facilities related to homeland security, such as US Customs and Border Patrol, Federal Emergency Management Agency, and Transportation Security Administration, refer to **Table 3-8** in **FEIS, Appendix A** for additional details. These agencies and facilities rely on quick, unobstructed roadway access during a homeland security event. During a homeland security event, the government facilities along the I-495 and I-270 study corridors, as well as beyond the limits of the study corridors into the Baltimore Metropolitan Area and Northern Virginia, may be required to utilize I-495 and I-270. Existing congestion would be exacerbated in the event of an emergency evacuation and/or homeland security event in the National Capital Region. Per the FHWA study, *Highway Evacuations in Selected Metropolitan Areas: Assessment of Impediments*, a primary impediment to effective large-scale evacuations in the National Capital Region is roadway capacity (FHWA, 2010).

I-495 and I-270 are primary connections to and from densely populated communities in the National Capital Region, and the daily high travel demand on these highways results in severe congestion. Mobility and access for emergency response vehicles are limited by the traffic conditions on these highways, where high vehicle volumes may reduce the ability for emergency response vehicles to navigate and pass through congestion. This may result in longer response times. A study based on surveys from Emergency Medical Services (EMS) first responders, *Emergency Medical Service Providers' Experiences with Traffic Congestion*,

---

[5] Other exemptions, such as emergency vehicles during emergency response, have been agreed upon as part of the toll operations between MDTA, MDOT SHA and the Developer.

[6] Homeland Security is defined by the National Strategy for Homeland Security as "a concerted national effort to prevent terrorist attacks within the United States, reduce America's vulnerability to terrorism, and minimize the damage and recover from attacks that do occur." 2017 Edition – Revision 2, issued October 16, 2017
https://www.dhs.gov/sites/default/files/publications/18_0116_MGMT_DHS-Lexicon.pdf

00000272

supports this idea. The EMS study results indicate that traffic congestion is more often experienced on interstates and national highways than city streets, and that traffic congestion, on average, contributes to an extra ten minutes in emergency response time (Griffin and McGwin, 2013).

Additional roadway capacity would assist in improving emergency response access and accommodating a population evacuation should an event related to homeland security occur.

## 1.7  Improve Movement of Goods and Services

The transportation connections that I-495 and I-270 provide are essential to the productivity of the National Capital Region's economy. The study corridors allow the movement of goods and services, including freight and commuting employees, throughout the region. Existing congestion along both corridors increases the cost of doing business due to longer travel times and unreliable trips. The effects of this congestion on the movement of goods and services is a detriment to the health of the local, regional, and national economy. Efficient and reliable highway movement is necessary to accommodate passenger and freight travel that move goods and services through the region.

### 1.7.1  Movement of Freight Goods

Freight-dependent industries, including goods transportation services, raw materials/intermediate products transportation services, and retail/consumer outlets, account for 19 percent of the National Capital Region's Gross Domestic Product, which totaled $464 billion in 2013 (National Capital Region Transportation Planning Board, 2016c). Among these industries within the National Capital Region, the truck transportation mode accounts for 86 percent of the total weight and 79 percent of the total value of freight moved (National Capital Region Transportation Planning Board, 2016c).[7] Reliable travel times are critical to the movement of freight trucks and, therefore, the economy of the National Capital Region.

Freight trucks contribute to daily traffic flow conditions along I-495 and I-270. As shown in **Figure 1-2**, the study corridors experience the highest AADT volumes of freight trucks and greater percentages of freight trucks relative to other vehicles in the Freight-Significant Network.[8,9] Based on annual average data, both the I-495 study corridor and I-270 study corridor serve over 20,000 trucks per day, respectively. The demand for freight increases with population size. Each person in the United States generates demand for more than 60 tons of freight per year (MWCOG, 2016a), and with each new resident added, the demand for consumer goods increases. Therefore, as the population increases in the region, so does a corresponding demand for freight transportation. Refer to **FEIS, Appendix A, Section 3.9** for additional details.

---

[7] The freight weight and value percentages presented here are based on the National Capital Region Transportation Planning Board's *National Capital Region Freight Plan* (July 2016). The most recently available freight demand analysis data used in the 2016 *Freight Plan* is from 2007. See page 45 of the 2016 *Freight Plan* for additional information.

[8] Based on the National Capital Region Transportation Planning Board's National Capital Region Freight Plan (July 2016). The most recently available freight demand analysis data used in the *2016 Freight Plan* is from 2007. See page 45 of the *2016 Freight Plan* for additional information.

[9] Commercial traffic is not allowed on the National Park Service Parkways.

00000273

OP•LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

## Figure 1-2: Average Annual Daily Truck Traffic



*Source: National Capital Region Freight Plan, page 31. National Capital Region Transportation Planning Board, 2016.*

00000274

## 1.7.2  Movement of Commuting Employees

Thousands of employers in the National Capital Region depend on the study corridors for employee commuting and delivery access. As illustrated in **Figure 1-3**, approximately 54 percent of residents in Montgomery County and 56 percent of residents in Prince George's County travel ten or more miles from their homes for work with employment destinations and workers' home destinations densely clustered along the I-495 and I-270 study corridors (MD Maryland Department of Labor, Licensing, & Regulation, 2018 https://www.dllr.state.md.us/lmi/wiacommuting/). The ability to move freight and commuting employees through the study corridors will increasingly depend on the performance of the existing travel lanes on I-495 and I-270. Travelers, commuting employees, and freight trucks are especially sensitive to non-recurring delays (unanticipated disruptions), which are indicative of poor reliability, as they disrupt scheduled activities and manufacturing/distribution activities (Transportation Planning Board, 2016d). Refer to **FEIS, Appendix A, Section 3.10** for additional details. For additional detail on the COVID-19 pandemic's impact on commuting and travel, refer to **Chapter 4, Section 4.5** and **FEIS, Appendix C**.

## 1.8  Other Goals and Objectives

### 1.8.1  Incorporate Alternative Funding Sources to Achieve Financial Viability

The State of Maryland is committed to provide timely transportation improvements that can accommodate existing and long-term traffic growth. Typical roadway infrastructure improvements are funded through use of Maryland's Transportation Trust Fund. The Transportation Trust Fund is primarily comprised of revenue from the gas tax and motor vehicle registration and titling fees. All funds dedicated to MDOT are deposited in the Transportation Trust Fund, and disbursements for all programs and projects are made from the Transportation Trust Fund. Revenues are not earmarked for specific programs.

However, the State's traditional funding sources, including the Maryland Transportation Trust Fund, are unable to effectively finance, construct, operate, and maintain highway improvements of the magnitude that are needed to address roadway congestion and enhance trip reliability in these study corridors, due to the fiscal constraints of the program and the state-wide transportation needs. These types of large projects must be financially viable and revenue sources, such as pricing options, that provide adequate funding are needed to support additional roadway capacity and improvements that address roadway congestion and enhance reliability.

Large-scale improvements, such as those being considered with the Study, would require decades to accumulate enough revenue in the State's Transportation Trust Fund to deliver the improvements with traditional funding. The use of alternative funding approaches, such as pricing options, provides needed large-scale improvements decades earlier than would otherwise be realized using traditional funding and allows the project to be fiscally-constrained in the metropolitan transportation plan. This is a critical step in the NEPA decision-making process, as current federal policy restricts issuance of a NEPA decision document unless the project is fiscally-constrained. For large-scale improvements such as those considered in this Study, MDOT SHA will use an innovative financing method through a P3 in order to design, build, finance, operate, and maintain the proposed infrastructure improvements.

00000275

## Figure 1-3: Residents' Home and Employment Commute Destinations



*Source: U.S. Census Bureau, Center for Economic Studies, OnTheMap (https://onthemap.ces.census.gov)*

## 1.8.2   Environmental Responsibility

The area surrounding the study corridors is highly constrained. MDOT SHA has worked extensively with agency partners and other stakeholders to avoid and minimize community, wetlands, waterways, cultural, noise, air quality, and parkland impacts, and mitigate for impacts when not avoidable. With respect to final project permitting, MDOT SHA will work with our federal, state, and local resource agency partners in a streamlined, collaborative, and cooperative way to meet all regulatory requirements to ensure the protection of significant environmental and community resources. In planning mitigation for a build alternative, MDOT SHA will strive to provide meaningful benefit to resources and improve their values, services, attributes, and functions that may be compromised by a build alternative. MDOT SHA has worked in good faith with our regulatory agency partners to plan worthwhile mitigation based on identified priorities that strive to achieve the goal, at a minimum, of no net loss to impacted resources with a goal of net benefit. Innovative, creative solutions, including modern environmental site design techniques to mitigate for unavoidable impacts are identified in this FEIS and will also be included in the Record of Decision (ROD). Commitments in the ROD will also be included in any contract documents.

00000277

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study
Final Environmental Impact Statement

## 2    ALTERNATIVES DEVELOPMENT AND EVALUATION

The analysis of the Build Alternatives was documented in the Draft Environmental Impact Statement (DEIS), Chapter 2 and DEIS, Appendix B, Alternatives Technical Report and can be viewed through the following links on the Program website:

DEIS, Chapter 2: https://www.oplanesmd.com/wp-content/uploads/2020/11/2020-06-02_DEIS_02_Alternatives_Development.pdf

Alternatives Technical Report (DEIS, Appendix B): https://www.oplanesmd.com/wp-content/uploads/2020/07/DEIS_AppB_Alts_web.pdf

The analysis of the Build Alternatives and identification of the Preferred Alternative was documented in the Supplemental DEIS (SDEIS), Chapter 2.

SDEIS, Chapter 2 Alternatives: https://oplanesmd.com/wp-content/uploads/2021/09/SDEIS_02_Alternatives.pdf

The purpose of this chapter is to summarize the alternatives development and evaluation process for the I-495 & I-270 Managed Lanes Study (Study) that led to the determination of the Preferred Alternative for this Final Environmental Impact Statement (FEIS).

Preparation of an Environmental Impact Statement (EIS) under the National Environmental Policy Act (NEPA) involves identification of a reasonable range of alternatives to carry out the proposed federal action. The Maryland Department of Transportation State Highway Administration (MDOT SHA) analyzed a broad scope of preliminary alternatives to create a list of alternatives being carried forward for more detailed analysis as documented in the **DEIS, Chapter 2**. A reasonable range of alternatives are those that meet the Study's Purpose and Need and include those that are practical or feasible from the technical and economic standpoints and using common sense (Council on Environmental Quality [CEQ], 40 Questions, Response to Question 2a).[1]

The alternatives development and screening process for the Study followed five steps to narrow the Preliminary Range of Alternatives under consideration to the Preferred Alternative as shown in **Figure 2-1**. The results and documentation of the first four steps were presented in the Study's **DEIS, Chapter 2** and the last step, identification of the Preferred Alternative, was documented in the **SDEIS, Chapter 2**.

---

[1] Council on Environmental Quality, Memorandum to Agencies: Forty Most Frequently Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Federal Register 18026 (March 23, 1981), as amended (1986); Question 2a.

00000278

**Figure 2-1: Alternatives Screening Process**



## 2.1   Preliminary Alternatives

Fifteen Preliminary Alternatives were identified from previous studies and planning documents, and input from the public, and federal, state, and local agencies during the NEPA scoping process. The Preliminary Alternatives included the No Build Alternative as well as alternatives that included elements such as Transportation Systems Management (TSM)[2]/ Transportation Demand Management (TDM),[3] additional general purpose lanes, High-Occupancy Vehicle (HOV) lanes, priced managed lanes, collector-distributor lanes, contraflow lanes, reversible lanes, and transit. Stand-alone transit alternatives considered three transit modes: heavy rail, light rail, and bus. Additionally, options were identified for alternatives that could be applied to either I-495 or I-270 as well as different transit modes. Some of the alternatives included lettered options which reflect whether the options were exclusively applicable to I-495 or I-270 or were related to a specific transit mode. The Preliminary Alternatives were:

- Alternative 1: No Build
- Alternative 2: Transportation Systems Management/Transportation Demand Management (TSM/TDM)
- Alternative 3: Add one general purpose lane in each direction on I-495 and I-270
- Alternative 4: Add one HOV lane in each direction on I-495 and retain existing HOV lane in each direction on I-270
- Alternative 5: Add one priced managed lane in each direction on I-495 and convert one existing HOV lane in each direction to a priced managed lane on I-270
- Alternative 6: Add two general purpose lanes in each direction on I-495 and I-270
- Alternative 7: Add two HOV lanes in each direction on I-495 and retain one existing HOV lane and add one HOV lane in each direction on I-270

---

[2] TSM are actions that improve the operation and coordination of transportation services and facilities.

[3] TDM is a variety of strategies, techniques, or incentives aimed at providing the most efficient and effective use of existing transportation services and facilities (e.g., rideshare and telecommuting promotion, managed lanes, preferential parking, road pricing, etc.)

00000279

- Alternative 8: Add two priced managed lanes in each direction on I-495 and add one priced managed lane in each direction and retain one existing HOV lane in each direction on I-270

- Alternative 9: Add two priced managed lanes in each direction on I-495 and convert one existing HOV lane to a priced managed lane and add one priced managed lane in each direction on I-270

- Alternative 10: Add two priced managed lanes in each direction on I-495 and on I-270 and retain one existing HOV lane in each direction on I-270 only

- Alternative 11: Physically separate traffic using collector-distributor lanes, adding two general purpose lanes in each direction on I-495

- Alternative 12A: Convert existing general purpose lane on I-495 to contraflow lane during peak periods

- Alternative 12B: Convert existing HOV lane on I-270 to contraflow lane during peak periods

- Alternative 13A: Add two priced managed reversible lanes on I-495

- Alternative 13B: Convert existing HOV lanes to two priced managed reversible lanes on I-270

- Alternative 13C: Add two priced managed reversible lanes and retain one existing HOV lane in each direction on I-270

- Alternative 14A: Heavy Rail[4] transit

- Alternative 14B: Light Rail[5] transit

- Alternative 14C: Fixed guideway Bus Rapid Transit (BRT)[6] off alignment of existing roadway

- Alternative 15: Add one dedicated bus lane on I-495 and I-270

Modifications to the Preliminary Alternatives were made in response to public and agency input received during and after the Alternatives Public Workshops held in July 2018. In response to public and agency comments to retain alternatives that maintained opportunities for HOV benefits on I-270, MDOT SHA further defined the term priced managed lanes as either High-Occupancy Toll (HOT) lanes or Express Toll Lanes (ETLs), and the descriptions of certain alternatives were modified accordingly. For alternatives that would retain the existing HOV lanes on I-270, the added priced managed lanes were defined as ETL, where all vehicles in the ETL would be tolled. For alternatives that would involve the conversion of the existing HOV lanes on I-270, the priced managed lanes were defined as HOT lanes. For purposes of the alternatives evaluated in this Study, the existing HOV 2+ lanes on I-270 would be converted to HOT lanes, which includes the following operational structure:

---

[4] Heavy Rail is a mode of transit service (also called metro, subway, rapid transit, or rapid rail) operating on an electric railway with the capacity for a heavy volume of traffic. It is characterized by high speed and rapid acceleration passenger rail cars operating singly or in multi-car trains on fixed rails.

[5] Light Rail is a mode of transit service (also called streetcar, tramway, or trolley) operating passenger rail cars singly (or in short trains) on fixed rails. Light rail vehicles are typically driven electrically with power being drawn from an overhead electric line via a trolley or a pantograph and driven by an operator on board the vehicle.

[6] Bus Rapid Transit is a high-quality bus-based transit system that delivers fast and efficient service that may include dedicated lanes, busways, traffic signal priority, off-board fare collection, elevated platforms, and enhanced stations.

00000280

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

1. Qualifying or eligible HOVs may use the managed lanes for free under Title 23 USC 166 authority. Vehicles with three or more occupants (HOV 3+) would be eligible for the HOV status.

2. All other lower-occupancy vehicles (two-occupant and single occupant vehicles [SOV]) would be tolled at the full toll rate.

## 2.2    Screening Criteria

The Screening of the Preliminary Alternatives was completed by applying screening criteria related to the Study's Purpose and Need to each alternative. This process involved application of 15 metrics using a "high, medium, low" or "yes and no" approach. The evaluation of the Screened Alternatives assessed each alternative under the six major elements related to the Study's Purpose and Need:

- Engineering considerations:
    - Accommodates existing traffic and long-term traffic growth
    - Improves trip reliability
    - Provides additional roadway travel choice
    - Provides ease of use for travelers
- Accommodates homeland security
- Improves the movement of goods and services
- Enhances multimodal mobility and connectivity
- Financial viability
- Environmental considerations

The screening criteria used to determine the Alternatives Retained for Detailed Study (ARDS) were the same used for the initial screening of the Preliminary Alternatives but were refined by additional data to further differentiate between an alternative's ability to meet the Study's Purpose and Need. A detailed summary of the screening criteria and process was presented in the **DEIS, Chapter 2** and **DEIS, Appendix B**, *Alternatives Technical Report*.

The initial screening of the Preliminary Alternatives also considered initiatives and projects outlined in the *Visualize2045* Plan, the latest financially Constrained Long-Range Plan (CLRP) that was approved by the National Capital Region Transportation Planning Board on October 17, 2018. (An update to this plan is currently underway and is anticipated to be finalized for approval in 2022[7].) The *Visualize2045* Plan identified Seven Aspirational Initiatives for a Better Future. One of the seven initiatives is "Expand Express Highway Network," which includes congestion-free toll roads, building on an emerging toll road network, and new opportunities for transit and express buses to travel in the toll lanes. For more information on this initiative refer to:
http://mwcog.maps.arcgis.com/apps/Cascade/index.html?appid=debc2550777b4cc2bae2364c7712a151

---

[7] The proposed 2022 update to *Visualize2045* includes the addition of Maryland's construction of the American Legion Bridge I-270 to I-70 Relief Plan - Phase 1 South, starting in the vicinity of the George Washington Memorial Parkway in Virginia, including the American Legion Bridge, and provides two HOT lanes in each direction from I-495 to I-270 and then along I-270 from I-495 to I-370.

00000281

Three specific, financially constrained projects in the approved 2018 *Visualize2045* Plan that relate to this Study are:

- CLRP-constrained element ID-1182: I-95/I-495 component of Traffic Relief Plan to include two managed lanes in each direction, between the Baltimore Washington Parkway and the Virginia State Line/Potomac River at the Woodrow Wilson Bridge.

- CLRP-constrained element ID-3281: I-95/I-495 component of Traffic Relief Plan to include two managed lanes in each direction, between the Baltimore Washington Parkway and the Virginia State Line/Potomac River at the American Legion Bridge.

- CLRP-constrained element ID-1186: I-270 component of Traffic Relief Plan, to include two managed lanes in each direction, between I-495 and I-70/US 40.

For more information about these three projects, refer to *Appendix B – Summary of Projects in the Financially Constrained Element*: https://www.mwcog.org/documents/2018/10/17/visualize-2045-a-long-range-transportation-plan-for-the-national-capital-region-featured-publications-tpb-visualize-2045/.

This Study considered whether an alternative was consistent with the *Visualize2045* Plan in the initial screening process, but no alternative was dismissed for this reason alone.

## 2.3   Screened Alternatives

The Preliminary Alternatives were evaluated by applying the screening criteria established from the Study's Purpose and Need (as described in **Section 2.2** of this Chapter), using a general, qualitative assessment of readily available information. An alternative was dropped from further consideration only if the available information demonstrated it clearly did not meet the Study's Purpose and Need. Screened Alternatives were identified as those that met the screening criteria or required additional analysis to determine their ability to meet the Purpose and Need.

As a result of the initial screening, seven alternatives were recommended to be advanced for further detailed analysis and 13 alternatives were dropped from further consideration. Alternatives 1, 5, 8, 9, 10, 13B, and 13C were recommended for further analysis and environmental evaluation as the Screened Alternatives:

- Alternative 1: No Build – Though this alternative does not meet the Study's Purpose and Need, consistent with NEPA requirements, it was carried forward for further evaluation to serve as a base case for comparing the other alternatives

- Alternative 5: Add one HOT lane in each direction on I-495 and convert one existing HOV lane in each direction to a HOT lane on I-270

- Alternative 8: Add two ETLs in each direction on I-495 and add one ETL in each direction and retain one existing HOV lane in each direction on I-270

- Alternative 9: Add two HOT lanes in each direction on I-495 and convert one existing HOV lane to a HOT lane and add one HOT lane in each direction on I-270

- Alternative 10: Add two ETLs in each direction on I-495 and on I-270 and retain one existing HOV lane in each direction on I-270 only

00000282

- Alternative 13B: Add two HOT lanes in each direction on I-495 and convert existing HOV lanes to two reversible HOT lanes on I-270

- Alternative 13C: Add two ETLs in each direction on I-495 and add two reversible ETLs and retain one existing HOV lane in each direction on I-270

Screened Alternatives 8, 10, and 13C would retain the existing HOV lanes on I-270 and Screened Alternatives 5, 9, and 13B would involve the conversion of the existing HOV lanes on I-270 to HOT lanes. Alternatives 2, 3, 4, 6, 7, 11, 12A, 12B, 13A, 14A, 14B, 14C, and 15 were dropped from further consideration during the initial alternatives screening because they did not meet the screening criteria established by the Study's Purpose and Need. Additional information about the screening of these alternatives was documented in the **DEIS, Chapter 2** and **DEIS, Appendix B**, *Alternatives Technical Report*.

## 2.4   Alternatives Retained and Evaluated in DEIS

In February 2019, the Screened Alternatives were presented to the public through the Study website via written documentation and a video. Additional engineering, traffic, financial, and environmental analyses were completed, and used to determine the reasonableness of the Screened Alternatives to be carried forward as the ARDS. The Recommended ARDS included all seven Screened Alternatives. They were presented at eight Spring 2019 Public Workshops and were then further analyzed.

At that point, the FHWA and MDOT SHA determined that Alternative 5 was not a reasonable alternative because of its deficiencies in addressing existing traffic and long-term traffic growth and trip reliability, as well as concerns with the alternative's financial viability. Consequently, it was determined that Alternative 5 did not meet the Study's Purpose and Need and would not be retained as one of the ARDS. Alternative 5 was included in the comparison of impacts in **DEIS, Chapter 3** and **DEIS, Chapter 4** but was not retained as one of the ARDS or Build Alternatives.

Following the Spring 2019 Public Workshops and agency meetings, several Cooperating and Participating Agencies requested that MDOT SHA evaluate an alternative that would provide an alternate route for travelers to use MD 200 (Intercounty Connector) instead of the top side of I-495 between I-270 and I-95 to avoid or reduce impacts to significant, regulated resources and residential relocations. This new alternative, the MD 200 Diversion Alternative, was developed and analyzed with input from the agencies. After evaluation, it was determined that the MD 200 Diversion Alternative would not address the Study's Purpose and Need of accommodating long-term traffic growth, enhancing trip reliability, or improving the movement of goods and services. A summary of the MD 200 Diversion Alternative analysis was included in the **DEIS, Chapter 2** and **DEIS, Appendix B**, *Alternatives Technical Report*.

Following the Cooperating Agencies' concurrence[8] on the ARDS, MDOT SHA and FHWA evaluated an additional alternative, called Alternative 9 Modified (Alternative 9M), in response to public and agency input. Alternative 9M consisted of a blend of Alternatives 5 and 9 with the primary difference on the top side of I-495 between I-270 and I-95 being the addition of one managed lane per direction instead of two managed lanes. Alternative 9M was evaluated and determined to be a reasonable alternative, and thus was included as a Build Alternative in the DEIS.

---

[8] NCPC abstained from concurring on the ARDS; M-NCPPC did not concur on the ARDS.

00000283

The **DEIS, Chapter 3**, **DEIS, Chapter 4**, and **DEIS, Appendix B**, *Alternatives Technical Report* presented the additional analysis and comparison of impacts between the Build Alternatives (Alternatives 8, 9, 9M, 10, 13B, 13C) and the No Build Alternative, plus Alternative 5 for comparison purposes.

## 2.5  Identification of Preferred Alternative

CEQ guidance describes an "agency's preferred alternative" as one that the agency believes would fulfill its statutory mission and responsibilities, considering economic, environmental, technical, and other factors.[9] During the NEPA process, and especially based on input from partner agencies, stakeholders, and the public following publication of the DEIS, the FHWA and MDOT SHA considered many common themes reflected in the comments. In January 2021, Alternative 9 was announced as the MDOT SHA Recommended Preferred Alternative based on the results of traffic, engineering, financial, and environmental analyses, as well as public comment. However, after several months of further coordinating with and listening to agencies and stakeholders and reviewing public comments FHWA and MDOT SHA identified a new Preferred Alternative in the SDEIS: Alternative 9 – Phase 1 South.

Alternative 9 – Phase 1 South includes the same improvements proposed as part of Alternative 9, two HOT managed lanes in each direction along I-495 and I-270, but within the Phase 1 South limits only. The limits of Phase 1 South are along I-495 from the George Washington Memorial Parkway in Virginia to west of MD 187 in Maryland and along I-270 from I-495 to just north of I-370 and on the I-270 east and west spurs. There is no action, or no improvements, included at this time on I-495 east of the I-270 east spur to MD 5. The specific elements of the Preferred Alternative are presented in **Chapter 3** and the detailed traffic analysis is presented in **Chapter 4** of this document. As described in greater detail in **Chapter 4**, the Preferred Alternative is projected to provide meaningful operational benefits to the regional system even though it includes no action for a large portion of the study area and avoids and minimizes impacts.

The FHWA and MDOT SHA's selection of the Preferred Alternative was based on currently available information and consideration of comments received on the DEIS. The agencies received many comments supporting the need to address improvements to the American Legion Bridge, a major regional traffic bottleneck as soon as possible; to avoid property displacements, avoid and minimize public parkland impacts to the maximum extent practicable in compliance with Section 4(f) regulations; to coordinate with planned managed lane projects in Northern Virginia to provide a seamless regional managed lanes system; and to increase multi-modal transportation options in the study area.

Many of these key concerns and comments raised by the agencies and public through review of the DEIS were common among the Build Alternatives retained including, but not limited to, stormwater management, direct access, transit elements, noise, property impacts, and proposed relocations. Identifying a Preferred Alternative allowed the lead agencies to continue the coordination, design, and analysis effort on a single alternative in the SDEIS and this FEIS. The efforts to further address comments, avoid and minimize impacts, and determine mitigation for unavoidable impacts continued through the development of this FEIS. A detailed description of the elements of the Preferred Alternative are presented in **Chapter 3** of this document.

---

[9] Council on Environmental Quality, Memorandum to Agencies: Forty Most Frequently Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Federal Register 18026 (March 23, 1981), as amended (1986); Question 4a.

00000284

# 3    PREFERRED ALTERNATIVE

The design elements of the Preferred Alternative were documented in the Supplemental DEIS **(SDEIS), Chapter 2**. Various elements have been updated or advanced and are described in this Final Environmental Impact Statement (FEIS).

Refer to **SDEIS, Chapter 2**: https://oplanesmd.com/wp-content/uploads/2021/09/SDEIS_02_Alternatives.pdf

This FEIS Chapter documents the following updates:

- Limits of work of the Preferred Alternative; **Section 3.1.1**

- Revisions to the Limits of Disturbance (LOD) for the Preferred Alternative; **Section 3.1.2**

- Preliminary design adjustments based on traffic operations and revisions proposed by the Developer; **Section 3.1.2**

- Modifications to the exchange ramp locations for high-occupancy toll (HOT) managed lane access; **Section 3.1.3**

- Transit considerations and connections with the Preferred Alternative; **Section 3.1.4**

- Pedestrian and bicycle facilities included with the Preferred Alternative; **Section 3.1.5**

- The on-site and off-site (compensatory) stormwater (SWM) management considerations; **Section 3.1.6**

- Review of existing culverts and potential culvert augmentation requirements; **Section 3.1.7**

- Continued constructability review of the Preferred Alternative; **Section 3.1.8**

- Maryland Transportation Authority (MDTA) Toll Rate Setting Process and Approval; **Section 3.1.9**

- Public-Private Partnership (P3) solicitation and Developer Agreement; **Section 3.3**

The Preferred Alternative: Alternative 9 – Phase 1 South improvements include two high-occupancy toll (HOT) managed lanes in each direction along I-495 and the conversion of the existing high-occupancy vehicle (HOV) lane to a HOT managed lane and one, new HOT managed lane in each direction on I-270 within the Phase 1 South limits. The limits of Phase 1 South are along I-495 from the George Washington Memorial Parkway in Virginia to west of MD 187 and along I-270 from I-495 to north of I-370 and on the I-270 east and west spurs as shown in **dark blue** in **Figure 3-1**. There is no action, or no improvements, included at this time on I-495 east of the I-270 east spur to MD 5 (shown in light blue in **Figure 3-1**).

The alternatives development process and identification of the Preferred Alternative is documented in the Final Environmental Impact Statement **(FEIS), Chapter 2**. This chapter presents the updates and advancements on the design elements of the Preferred Alternative, further considerations for transportation commitments and mitigation measures, and progress of the Phase 1 predevelopment process since publication of the SDEIS on October 1, 2021 (https://oplanesmd.com/sdeis/). A benefit of conducting a Public-Private Partnership (P3) process with predevelopment work concurrent with the National Environmental Policy Act (NEPA) process is to increase efficiency by receiving input from the

00000285

Developer on preliminary design and ancillary elements of the project. During the predevelopment work leading up to the FEIS, MDOT SHA and the Developer focused on refining the preliminary design concept and adjusting the limits of disturbance (LOD) to further avoid and minimize impacts to environmental resources, communities, properties, utilities, and other features. These design refinements and adjustments were done in consideration of comments received from the resource and regulatory agencies, public and other stakeholders. These results of this collaborative effort are reflected in this chapter and ensure that the design and associated LOD are appropriate and feasible ahead of final design.

**Figure 3-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative**



## 3.1    Elements of the Preferred Alternative

Updated design elements of the Preferred Alternative presented in this FEIS include details about the Alignment and Cost (**Section 3.1.1**); LOD (**Section 3.1.2**); Interchanges and HOT Managed Lanes Access (**Section 3.1.3**); Transit-Related Elements (**Section 3.1.4**); Pedestrian and Bicycle Facilities (**Section 3.1.5**); Stormwater Management (SWM) Considerations (**Section 3.1.6**); Cross Culverts (**Section 3.1.7**); Construction and Short-term Effects (**Section 3.1.8**); and Tolling (**Section 3.1.9**). These elements contributed to the refinement of the Preferred Alternative since the SDEIS and associated property and environmental impacts as presented in **FEIS, Chapter 5**. Specifically, modifications to the Preferred Alternative since the SDEIS included minor roadway design adjustments along the I-495 and I-270 mainlines and crossing roads, revisions to noise barrier locations based on further analysis, alterations to the SMW and culvert augmentation sites using the latest existing condition information, and continued application of avoidance and minimization efforts at sensitive resources. These targeted refinements were made in response to the public, stakeholder, and agency comments received on the DEIS and SDEIS related to concerns about resource and property impacts and in consideration of the Developer's proposed preliminary design concept.

00000286


### 3.1.1 Alignment and Cost

On I-495, the Preferred Alternative consists of adding two new, HOT managed lanes in each direction from the George Washington Memorial Parkway to west of MD 187. The extent of work along I-495 between the I-270 west and east spurs was refined since the SDEIS based on the Developer's proposed design concept and the physical improvements and the LOD have been limited to west of MD 187, as opposed to east of MD 187 as described in the SDEIS. As a result, potential property impacts along I-495 in the vicinity and east of the MD 187 interchange are avoided. On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction from I-495 to just north of I-370 and on the I-270 east and west spurs. The proposed typical sections for the Preferred Alternative along I-495 and I-270 are shown in **Figure 3-2**. The improvement limits along I-270 and the I-270 east and west spurs have not changed from those presented in the SDEIS. The HOT managed lanes would be separated from the general purpose lanes using flexible delineators placed within a buffer, as shown in **Figure 3-2**. Transit buses and HOV 3+ vehicles would be allowed free passage in the HOT managed lanes.

**Figure 3-2: Alternative 9 - Phase 1 South Typical Sections (HOT Managed Lanes Shown in Yellow)**



00000287

Along I-270, the existing collector-distributor (C-D) lane separation from Montrose Road to I-370 would be removed as part of the proposed improvements. MDOT SHA included this proposed lane reconfiguration and repurposing of pavement on I-270 for the Build Alternatives in the DEIS to address the current imbalanced traffic utilization along the C-D Road segment and in response to public comments to keep the improvements within the existing pavement footprint. As a result, the amount of roadway widening along I-270 needed for the Preferred Alternative is limited.

Virginia's 495 Express Lanes Northern Extension (495 NEXT) project would extend the existing Express Lanes on I-495 in Virginia by approximately three miles from the I-495 and Dulles Toll Road interchange to the vicinity of the American Legion Bridge (ALB). The Preferred Alternative will overlap and tie-in with the 495 NEXT improvements on I-495 at the George Washington Memorial Parkway interchange. MDOT has coordinated closely with the Virginia Department of Transportation (VDOT) to refine the preliminary design concept to consolidate and provide compatible movements at the interchange. Additionally, MDOT SHA's ongoing I-270 Innovative Congestion Management (ICM) project is providing a series of improvements to address mobility and safety at key points along I-270 targeted to reduce congestion at bottlenecks along the corridor in the short-term. Elements of the ICM that will be maintained within the Preferred Alternative limits include ramp metering; the additional auxiliary lane added in both directions along the I-270 west spur and I-270 mainline up to Montrose Road; and auxiliary lanes in both directions along I-270 between the MD 189 and MD 28 interchanges.

The preliminary estimated capital cost for the Preferred Alternative ranges between $3.75 and $4.25 billion. The methodology, assumptions, and components of the cost estimate have been refined since the SDEIS based on the level of information available and the preliminary design concept presented in the FEIS. This estimate includes costs for design, construction, property acquisition, and environmental mitigation. The cost estimate was prepared using major quantities in accordance with the MDOT SHA *Highway Construction Cost Estimating Manual* with additional construction elements quantified and appropriate contingencies added based on past construction experience and engineering judgment to reflect the increased level of detail available at this time. The cost estimate also includes costs for design and construction risks determined through a cost and schedule risk assessment (CSRA) workshop completed with FHWA in spring 2022. The cost range is in May 2022 dollars and escalations have not been applied.

Where available, quantities for earthwork; SWM facilities (including off-site SWM) and small drainage structures; bridges, retaining walls, noise barriers, and large drainage structures; new pavement and resurfacing; roadside barriers, sidewalks, and trails; landscaping; pavement markings, ITS equipment, signage, and lighting; tolling equipment; utility relocations; and environmental mitigation measures were obtained. The unit costs for these items account for labor, materials, and equipment and were determined based on recent bid prices and MDOT SHA standard costs. The added contingencies, applied as a markup or a percentage of certain cost categories, varied to account for items that could not be quantified at this level of detail and uncertainties in the accuracy of quantities estimated. Specific items that were added to the capital cost for the Preferred Alternative since the SDEIS included funding for various transit improvements and pedestrian safety initiatives as committed by the Developer (further described in **Section 3.2**). Additionally, costs for implementation of an Operations and Maintenance (O&M) Facility and Traffic and Tolling Operations Center (further described in **Section 3.1.2**) are included in the capital cost.

00000288

OP·LANES
MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

### 3.1.2    Limit of Disturbance

The LOD was refined in targeted locations for the Preferred Alternative since the SDEIS. The LOD is the proposed boundary within which all mainline construction-related activities would occur. The LOD for the Preferred Alternative was determined from the proposed roadway typical section, interchange configuration, and roadside design elements and is shown on the *Environmental Resource Mapping* (**FEIS, Appendix E**). The mapping in **FEIS, Appendix E** includes a display of the proposed Preferred Alternative preliminary design concept based on continued coordination with the Developer. Property impacts associated with the LOD continued to be broken into permanent (or long-term) and temporary (or short-term) areas and are reported in **Chapter 5, Section 5.5.3**. Examples of temporary impacts include

> **What changes were made to the Limit of Disturbance since the SDEIS?**
> Modifications to the LOD for the Preferred Alternative included:
> - Continued application of avoidance and minimization efforts at sensitive resources;
> - Design adjustments based on traffic operations and coordination with local stakeholders;
> - Preliminary design revisions proposed by the Developer;
> - Revisions to noise barrier locations based on further analysis; and
> - Alterations to the stormwater management features and culvert augmentation sites through additional detailed evaluation.

where a temporary construction easement would be acquired for the use of property for construction staging and/or storage that is not needed for the project after construction. The LOD for the Preferred Alternative assumed the potential area of disturbance for the following elements, with recent changes based on the Developer's preliminary design concept as noted:

- Profile adjustments and roadway shifts due to mainline widening, including isolated adjustments to the proposed design concept since the SDEIS based on traffic operations
- Crossroad shift to Persimmon Tree Road over I-495 based on Developer's preliminary design concept
- Inclusion of pedestrian and bicycle facilities for roads that cross over I-495 and I-270 with refinements based on continued coordination with Montgomery County and the City of Rockville since the SDEIS (refer to **Section 3.1.5**)
- Direct access ramps and exchange ramps for access to the HOT managed lanes, including specific adjustments to the exchange ramp locations based on the Developer's preliminary design concept (refer to **Section 3.1.3**)
- Interchange ramp relocation, reconfiguration, and tie-ins due to mainline widening
- Intersection modifications to improve safety and operations at Wootton Parkway at Seven Locks Road and Gude Drive at Research Boulevard (see **Chapter 4, Section 4.4.1**)
- Placement of toll gantries and ITS equipment, refined based on the Developer's preliminary concept
- On-site drainage and SWM, refined based on the Developer's preliminary concept and existing condition information, including swales, ponds, and large facilities along the roadside and within interchanges
- Relocation of existing streams, where determined to be feasible
- Culvert extensions, auxiliary pipes, and drainage outfall stabilization areas to accommodate roadway drainage, refined based on the Developer's preliminary concept

00000289



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

- Noise barrier extension/replacement/construction, refined based on further analysis since the SDEIS
- Reconstruction of I-495 and I-270 mainline and interchange ramp bridges over water and roadways
- Full replacement and widening of the ALB
- Utility relocations
- Avoidance and impact minimization of adjacent land uses such as: streams, wetlands, historic properties, parks, and private properties; including refinements resulting from comments received on the SDEIS and application of avoidance and minimization techniques to the Developer's preliminary design concept (**Chapter 5**)
- Construction access, staging, materials storage, grading, clearing, and erosion and sediment control, including targeted adjustments to these locations based on input from the Developer

For the compensatory or off-site SWM sites, an LOD for each potential site was developed. The number of potential sites has changed since the SDEIS. Refer to **Section 3.1.6 C** and **FEIS, Appendix D** for details.

Since the SDEIS, MDOT SHA identified and evaluated potential locations for an O&M Facility and a Traffic and Tolling Operations Center. The O&M Facility will consist of office trailers and maintenance equipment such as trucks, trailers, and equipment for performing highway maintenance. The O&M Facility is proposed to be located at the existing MDOT SHA Gaithersburg Shop at 502 Quince Orchard Road, just west of I-270 (refer to **Figure 3-3**). There will be no environmental or property impacts associated with implementation of the O&M Facility as the facility will be placed within the existing paved footprint within property owned by MDOT SHA. The Traffic and Tolling Operations Center will house staff, computers, phones, and back office systems for operating the HOT managed lanes and will be located in an existing facility or existing building near the study corridors. There will be no environmental or property impacts associated with implementation of the Traffic and Operations Center.

**Figure 3-3: Operations & Maintenance Facility Location Map**



00000290

### 3.1.3 Interchanges and HOT Managed Lanes Access

The HOT managed lane access locations within the Phase 1 South limits, except for the exchange ramps, did not change from those identified in the SDEIS for the Preferred Alternative, **Table 3-1**. In the SDEIS, exchange ramps between Virginia and Maryland were proposed along I-495 at the interface with the Virginia 495 Express Lanes south of the ALB (egress from the Maryland HOT managed lanes to the general purpose lanes along the outer loop only) and north of the Clara Barton Parkway (ingress to the Maryland HOT managed lanes from the general purpose lanes along the inner loop only). Since the SDEIS, the design concept has been modified to consolidate and provide these movements along I-495 in

> **Have the Managed Lanes access points changed since the SDEIS?**
> - Exchange ramps between Virginia and Maryland have been consolidated at I-495 in the vicinity of the George Washington Memorial Parkway; and
> - At-grade exchange ramps for ingress and egress between the HOT managed lanes and general purpose lanes are proposed in both directions along the I-270 west spur.

Virginia south of the ALB, in the vicinity of the interchange at the George Washington Memorial Parkway. Additionally, a pair of exchange ramps has been added as proposed by the Developer along the I-270 west spur north of I-495. These at-grade exchange ramps allow for ingress and egress between the HOT managed lanes and general purpose lanes in both directions along I-270 and would look like the configuration shown in **Figure 3-4**. The locations of these exchange ramps are shown in **FEIS, Appendix E**.

**Figure 3-4: Example At-Grade Exchange Ramp Configuration**



There are 34 existing interchanges within the study limits, and 14 existing interchanges within the limits of Phase 1 South of the Preferred Alternative. All 14 interchanges would be modified as needed to accommodate the mainline widening of I-495 and I-270. The HOT managed lanes traveling in the same direction as the general purpose lanes would be separated from the general purpose lanes by a buffer

00000291

and flexible delineators as shown in the typical sections (**Figure 3-2**). Access to and from the HOT managed lanes would be provided via direct access ramps at select existing interchanges; direct access ramps at two new interchanges; exchange ramps between Virginia and Maryland where ingress to the Maryland HOT managed lanes from the general purpose lanes along the inner loop and egress from the Maryland HOT managed lanes to the general purpose lanes along the outer loop would be provided; exchange ramps providing ingress to and egress from the HOT managed lanes in both directions along the I-270 West Spur; and at the limits of the build improvements for the Preferred Alternative. An example of the configuration for the direct access interchange ramps is shown in **Figure 3-5**.

**Figure 3-5: Example Direct Access Interchange**



The preliminary direct access locations were identified using the following considerations and have not changed since the SDEIS:

- Providing system-to-system connections between major interstates and freeways (e.g., I-495/I-270 west spur, I-270/I-370)

- Providing access at interchanges with high traffic demand (e.g., MD 190)

- Providing access throughout the study area (e.g., Gude Drive, Wootton Parkway)

- Providing access in consideration of land use and at major transit facilities (e.g., Westlake Terrace at Westfield Montgomery Mall Transit Center)

- Potential community, property, and environmental impacts resulting from providing access.

In total, access to and from the HOT managed lanes is proposed at nine locations (five existing interchanges, two new interchanges, and two exchange ramp locations), as well as at the termini of the HOT managed lanes along I-495 west of MD 187, along the I-270 east spur south of MD 187, and along I-270 north of I-370. The interchanges that will be modified as part of the Preferred Alternative to

00000292


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

accommodate the widened mainline and HOT managed lane access locations are listed in **Table 3-1** and shown in **Figure 3-6** and **FEIS, Appendix E**. **Table 3-1** also includes a list of the I-495 interchange locations within the study limits and outside of Phase 1 South limits that will not be improved for the Preferred Alternative. The blue shaded rows indicate the HOT managed lanes access locations.

The proposed configuration of the I-495 interchange at MD 190 (River Road) was modified since the SDEIS based on the Developer's preliminary design concept. In the SDEIS, direct access to and from the HOT managed lanes and MD 190 was provided via separate flyover ramps. The concept incorporated in the Preferred Alternative and this FEIS includes a set of ramps to and from the HOT managed lanes that connect to MD 190 at a new four-leg intersection, similar to the ramps shown in **Figure 3-5**. The proposed interchange improvements are shown in **FEIS, Appendix E.**

**Table 3-1: Interchange Improvements/HOT Managed Lane Access Locations under Preferred Alternative**

| Location | Modification |
|---|---|
| Interface with Virginia I-495 HOT Lanes south of the ALB (see location 'F' on **Figure 3-5**) | • Exchange ramp from Maryland HOT managed lanes to Virginia general purpose lanes (outer loop only)<br>• Exchange ramp from the Virginia general purpose lanes to Maryland HOT managed lanes (inner loop only) |
| I-495/George Washington Memorial Parkway Interchange (see location 'G' on **Figure 3-5**) | • Direct access to HOT managed lanes in Maryland<br>• Adjusted interchange ramps to accommodate widened mainline |
| I-495/Clara Barton Parkway Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| I-495/MD 190/Cabin John Parkway Interchange (see location 'H' on **Figure 3-5**) | • HOT managed lanes direct access interchange<br>• Adjusted interchange ramps to accommodate widened mainline |
| I-495/I-270 west spur Interchange (see location 'I' on **Figure 3-5**) | • HOT managed lanes direct access interchange<br>• Reconstructed interchange to accommodate HOT managed lanes |
| I-495/MD 187 Interchange | • No proposed interchange improvements |
| I-495/I-270 east spur/MD 355 Interchange | • No proposed interchange improvements |
| I-495/MD 185 Interchange | • No proposed interchange improvements |
| I-495/MD 97 Interchange | • No proposed interchange improvements |
| I-495/US 29 Interchange | • No proposed interchange improvements |
| I-495/MD 193 Interchange | • No proposed interchange improvements |
| I-495/MD 650 Interchange | • No proposed interchange improvements |
| I-495/ I-95 Interchange | • No proposed interchange improvements |
| I-495/US 1 Interchange | • No proposed interchange improvements |
| I-495/Greenbelt Metro Interchange | • No proposed interchange improvements |
| I-495/MD 201 Interchange | • No proposed interchange improvements |
| I-495/Baltimore-Washington Parkway Interchange | • No proposed interchange improvements |
| I-495/MD 450 Interchange | • No proposed interchange improvements |
| I-495/US 50 Interchange | • No proposed interchange improvements |
| I-495/MD 202 Interchange | • No proposed interchange improvements |
| I-495/Arena Drive Interchange | • No proposed interchange improvements |
| I-495/MD 214 Interchange | • No proposed interchange improvements |
| I-495/Ritchie Marlboro Interchange | • No proposed interchange improvements |

00000293

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Location | Modification |
|---|---|
| I-495/MD 4 Interchange | • No proposed interchange improvements |
| I-495/MD 337/Suitland Road Interchange | • No proposed interchange improvements |
| I-495/MD 5 Interchange | • No proposed interchange improvements |
| I-270 west spur north of I-495 (see location 'E' on **Figure 3-5**) | • Exchange ramps allowing ingress to and egress from the HOT managed lanes to general purpose lanes |
| I-270 west spur/Democracy Boulevard Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| I-270 west spur/Westlake Terrace Interchange (see location 'D' on **Figure 3-5**) | • Repurposed existing HOV only ramps to/from north to HOT managed lanes direct access ramps<br>• Added HOT managed lanes direct access ramps to/from south |
| I-270 Y-Split Interchange | • Reconstructed interchange to accommodate HOT managed lanes |
| I-270/Montrose Road Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| I-270/Wootton Parkway Interchange *(new interchange)* (see location 'C' on **Figure 3-5**) | • New interchange for HOT managed lanes direct access only |
| I-270/MD 189 Interchange | • Reconfigured interchange ramps to accommodate widened mainline |
| I-270/MD 28 Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| I-270/Gude Drive Interchange *(new interchange)* (see location 'B' on **Figure 3-5**) | • New interchange for HOT managed lanes direct access only |
| I-270/Shady Grove Road Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| I-270/I-370 Interchange (see location 'A' on **Figure 3-5**) | • HOT managed lanes direct access interchange (to/from south only)<br>• Adjusted ramps to accommodate widened mainline |
| I-270 east spur/MD 187/Rockledge Drive Interchange | • Adjusted interchange ramps to accommodate widened mainline |

Note: The rows shaded in blue indicate HOT managed lanes access locations.

00000294

**Figure 3-6: Proposed Preferred Alternative HOT Managed Lanes Access Locations**



00000295

## 3.1.4  Transit-Related Elements

To support the Study's purpose of enhancing existing and planned multimodal mobility and connectivity, the Preferred Alternative includes transit-related elements that provide access/connectivity and enhance mobility for transit vehicles and passengers. Additionally, MDOT SHA's I-495 & I-270 P3 Office has prepared the Transit Service Coordination Report as the initial product for the I-495 & I-270 Managed Lanes Transit Work Group to assist affected counties and transit providers in prioritizing capital and operating investments.

An update regarding the transit-related elements and connections for the Preferred Alternative was included in the **SDEIS, Chapter 2** and is repeated here. A joint study by the MDOT Maryland Transit Administration and the Virginia Department of Rail and Public Transportation (DRPT) has identified opportunities for transit enhancements related to multimodal connectivity across the ALB. The conclusions of the study report are repeated in **Section 3.1.4 B,** below.

> **Transit Riders Will Benefit from the HOT Managed Lanes**
> - Enhances transit mobility and connectivity to existing and planned transit facilities.
> - Provides less-congested and more reliable routes for bus service.
> - Provides opportunities for planned or modified bus service to connect to underserved suburban to suburban transit markets.
> - Provides opportunities for new express bus service in National Capital Region, such as between Bethesda and Tysons.

## A. Enhanced Transit Mobility and Connectivity

MDOT SHA has identified opportunities to enhance transit mobility and connectivity within the Preferred Alternative to address the Purpose and Need and public and agency comments received. These include the following elements, which have not changed since the SDEIS:

- Free bus transit usage of the HOT managed lanes to provide an increase in speed of travel, assurance of a reliable trip, and connection to local bus service/systems on arterials that directly connect to activity and economic centers.
- Access from the proposed HOT managed lanes to existing transit stations and planned Transit Oriented Development via direct and indirect connections as shown in **Figure 3-6**. A direct connection is where the HOT managed lanes ramps connect to an arterial at or near the location of a transit facility like at the Westfield Montgomery Mall Transit Center on Westlake Terrace. A connection is considered indirect where the transit facility is not adjacent to, but in relatively close proximity to the HOT managed lanes access point, like at the Shady Grove Metro Station on I-370, and the Twinbrook and Rockville Metro Stations near Wootton Parkway. New or existing bus routes can take advantage of the relative proximity to the HOT managed lanes for express bus service or other direct connections.

MDOT SHA and the Developer have committed to additional regional transit improvements and investments in transit services and projects that are outside of the Preferred Alternative mainline improvements as part of the P3 Agreement. While these commitments are not required as part of the project to address the Study's Purpose and Need, they will enhance existing and planned transit and support new opportunities for regional transit service and are described in **Section 3.2.1**.

00000296

**B. I-495/American Legion Bridge Transit and Transportation Demand Management Plan**

The *I-495/ALB Transit/Transportation Demand Management (TDM) Study*, a joint effort between the MDOT Maryland Transit Administration and the Virginia Department of Rail and Public Transportation (DRPT), was initiated to identify a range of current and future potential multimodal solutions that could be implemented to reduce congestion, improve trip reliability and regional connections, and enhance existing and planned multimodal mobility and connectivity for travel between Maryland and Virginia across the ALB.

A series of potential investment packages to provide new mobility choices to service bi-state travel was identified in the *I-495/ALB Transit/TDM Final Report and Plan.*[1] Each package outlined a combination of transit service elements, technology enhancements, Commuter Assistance Programs, and parking needs. The suggested next steps recommended in the Final Report included advancement of transit service before or during construction of the HOT managed lanes, consideration of a bus-on-shoulder approach based on the sequence and duration of construction of the HOT managed lanes, working with local entities and transit providers to facilitate first-last mile connections, and determining local service modifications. Additional next steps were related to commuter assistance programs and technology enhancements, and parking and facility needs. These potential investment packages and regional transit improvements by MDOT, the VDOT, and the DRPT will continue to be developed and considered by both states.

The ALB shall be designed and constructed such that a future capital improvement project will have one or more feasible options to achieve the full design and implementation of a transit line across the ALB. These options will be enabled by designing the northbound and southbound structures to not preclude a possible future transit line including the addition of foundation and substructure elements.

### 3.1.5 Pedestrian and Bicycle Facilities

The Preferred Alternative reflects a commitment to provide pedestrian and bicycle connectivity and mobility in the study area in response to comments received throughout the NEPA process. A determination of existing pedestrian and bicycle facilities that would need to be replaced as part of the Preferred Alternative was considered in the **SDEIS, Chapter 2**. The updates since the SDEIS consist of refinement of the design criteria based on the Montgomery County *Complete Streets Design Guide* (February 2021) in consultation with Montgomery County through multiple meetings and further coordination with the City of Rockville.

As stated in the SDEIS, existing pedestrian and bicycle facilities impacted by the Preferred Alternative would be replaced in kind or upgraded to meet the current master plan recommended facilities. Provision of these upgraded facilities would be subject to maintenance agreements between MDOT SHA and the local jurisdictions in compliance with Maryland law.

The design approach for facilities along crossroads where the crossroad bridge would be reconstructed is to replace, upgrade, or provide new pedestrian/bicycle facilities consistent with the current master plan, where adjacent connections on either side of the bridge currently exist. Where the I-495 and I-270 mainline or ramps cross over a roadway or pedestrian/bicycle facility and the bridge would be replaced, the mainline and ramp bridges would be lengthened to accommodate the footprint for the master plan

---

[1] http://www.drpt.virginia.gov/media/3375/i495_alb_transittdm_study_finalreport_030521_combined.pdf

00000297

facility under the structure. The two locations where lengthening of the mainline bridges is included in the Preferred Alternative are described below:

- Lengthen the I-495 bridge over Seven Locks Road to accommodate pedestrian/bicycle facilities along Seven Locks Road. MDOT has committed to constructing the master plan recommended facilities along Seven Locks Road (refer to **Section 3.2.2**).

- Lengthen the I-270 bridge over Tuckerman Lane to accommodate future pedestrian/bicycle facilities along Tuckerman Lane. Montgomery County would construct the master plan recommended facilities along Tuckerman Lane in the future.

These efforts respond directly to comments received from local agencies and stakeholders and support the Study's Purpose of enhancing multimodal mobility and connectivity by removing barriers to non-vehicular mobility.

The proposed pedestrian and bicycle facilities that would be constructed as part of the Preferred Alternative are listed in **Table 3-2** and shown in **FEIS, Appendix E**. Refer to **Section 3.2.2** for a list of pedestrian and bicycle facility commitments that are part of the Preferred Alternative and are additional improvements beyond this base design approach, including the shared use trail across the ALB.

Identification of the proposed pedestrian and bicycle facilities was conducted during the NEPA process in coordination with the Maryland-National Capital Park and Planning Commission (M-NCPPC), the Montgomery County Department of Transportation (MCDOT), and the City of Rockville. Coordination with these key agency stakeholders will continue through final design. The new facilities or upgrades included in the Preferred Alternative were designed at a planning level in accordance with MDOT SHA, Montgomery County, or City of Rockville design requirements, including consideration of the recent Montgomery County *Complete Streets Design Guide*.

### 3.1.6   Stormwater Management Considerations

As presented in the **SDEIS, Chapter 2**, a planning-level, conceptual identification of SWM needs was considered throughout the Phase 1 South limits when establishing the LOD for the Preferred Alternative. The Maryland *Stormwater Management Act of 2007* emphasizes environmental site design (ESD)[2] and consideration of SWM early in the planning stage of a project to better balance transportation needs, right-of-way considerations, and requirements of the Act, which include both water quality (i.e., ESD) and water quantity management. Water quality management treats the first flush of rainfall to remove pollutants and improve downstream conditions. Water quantity management stores and slowly releases water to reduce downstream flooding.

---

[2] Title 4, Subtitle 201.1(B) of the Stormwater Management Act of 2007 defines ESD as "...using small-scale stormwater management practices, nonstructural techniques, and better site planning to mimic natural hydrologic runoff characteristics and minimize the impact of land development on water resources." Under this definition, ESD includes optimizing conservation of natural features (e.g., drainage patterns, soil, vegetation); minimizing impervious surfaces (e.g., pavement, concrete channels, roofs); slowing down runoff to maintain discharge timing and to increase infiltration and evapotranspiration; or using other nonstructural practices or innovative technologies approved by the Maryland Department of Environment (MDE).

00000298

Modifications to the SWM approach for the FEIS included reevaluation of stormwater needs and locations based on a more detailed volume-based analysis and the development of a SWM concept to fit within the Preferred Alternative LOD developed for the SDEIS and refined for the FEIS. The methodology for the previous stormwater evaluation for LOD development is presented in the **DEIS, Chapter 2** and **SDEIS, Chapter 2**.

Table 3-2: Pedestrian and Bicycle Facilities in the Preferred Alternative

| Location | Proposed Improvement |
|---|---|
| Persimmon Tree Road over I-495 | • Construct a new sidepath on the west side of Persimmon Tree Road<br>• Construct a new sidewalk on the east side of Persimmon Tree Road |
| MD 190 (River Road) over I-495 | • Construct new bike lanes in both directions on MD 190<br>• Construct new sidepaths on both sides of MD 190 |
| MD 191 (Bradley Boulevard) over I-495 | • Construct new bike lanes in both directions on MD 191<br>• Construct a new sidewalk on the south side of MD 191<br>• Construct a new sidepath on the north side of MD 191 |
| Democracy Boulevard over I-270 west spur | • Reconstruct the existing sidewalk on the south side of Democracy Boulevard<br>• Reconstruct the existing sidepath on the north side of Democracy Boulevard |
| Westlake Terrace over I-270 west spur | • Construct new two-way separated bike lanes and reconstruct the existing sidewalk on the south side of Westlake Terrace<br>• Reconstruct the existing sidewalk on the north side of Westlake Terrace |
| Montrose Road over I-270 | • Construct a new Breezeway[3] on the south side of Montrose Road<br>• Reconstruct the existing sidewalk on the north side of Montrose Road |
| Wootton Parkway over I-270 | • Reconstruct the existing sidewalk on the south side of Wootton Parkway<br>• Reconstruct the existing shared use path on the north side of Wootton Parkway |
| MD 189 (Falls Road) over I-270 | • Construct new bike lanes in both directions of MD 189<br>• Construct new sidewalks on both sides of MD 189 |
| MD 28 (W. Montgomery Avenue) over I-270 | • Construct new bike lanes/bikeable shoulders in both directions of MD 28<br>• Reconstruct the existing shared use path on the south side of MD 28<br>• Construct a new sidewalk on the north side of MD 28 |
| Gude Drive over I-270 | • Construct new bike lanes in both directions of Gude Drive<br>• Reconstruct the existing shared use path (Millennium Trail) on the south side of Gude Drive<br>• Construct a new sidewalk on the north side of Gude Drive |
| Shady Grove Road over I-270 | • Construct a new Breezeway[3] on the south side of Shady Grove Road<br>• Construct a new sidepath on the north side of Shady Grove Road |

Note: In the SDEIS, the proposed sidepaths on MD 190 (River Road) were a separate transportation commitment; however, are now part of the Preferred Alternative design approach that is consistent with the current master plan.

---

[3] Breezeways are envisioned to carry a high percentage of through traffic and can include trails, sidepaths, and separated bike lanes.

00000299


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

The land adjacent to the study corridors is heavily developed with numerous natural, cultural, and socioeconomic resources. The existing roadways are a mix of open section (i.e., no curb or concrete barrier) and closed section (i.e., curb or retaining wall) with superelevated cross slopes through horizontal curves. The density of development adjacent to the study corridors, combined with numerous environmental sensitive areas, complicated the efforts of finding enough suitable SWM on-site storage and treatment locations. However, as the design continues to progress, MDOT SHA will ensure SWM water quality requirements and treatment will be provided to the maximum extent practicable (MEP) at on-site locations, as required under the Maryland SWM Act.

## A. Methodology and Assumptions

The Preferred Alternative will be required to meet all SWM permitting requirements for Maryland and Virginia, which includes both water quality treatment and water quantity control. Most of the project is located in Maryland and therefore the following sections will focus on the Maryland regulations.

In Maryland, water quality treatment must be provided onsite to the MEP for all new impervious area and a minimum of 50 percent of reconstructed existing impervious area to mimic the runoff characteristics of woods in good conditions. Reconstructed impervious area is defined as existing pavement that is removed, disturbing bare earth, before being repaved or repurposed. Maryland also requires that proposed stormwater runoff for this project be reduced to match existing runoff for the 10-year storm. Variances can be granted for minimal increases in stormwater runoff, but detailed calculations must be provided to show that the increased runoff will not result in downstream flooding or erosion. In addition, local jurisdictional concurrence for any runoff increases will be required. In locations where there is documented downstream flooding, control of the 100-year storm may also be required.

The 2017 National Climate Assessment indicates that future rainfall events will increase in both frequency and intensity, leading to more urban and riverine flooding unless steps are taken to mitigate the impacts. In order to increase resiliency and mitigate increased stormwater runoff, the State of Maryland is updating the stormwater quantity management standards for flood control. At this time, the new requirements have not been established but may include increasing precipitation amounts to account for future climate change and/or requiring management of larger storm events. Depending on when these new quantity management standards are adopted in Maryland, this project may be required to meet the updated standards for climate change stormwater resilience.

A stormwater concept was developed by the Developer for the Preferred Alternative using standard Maryland Department of the Environment (MDE) approved hydrology and hydraulic procedures, which includes a volumetric approach for calculating stormwater credit. A total of 167 Points of Investigation (POI) or Lines of Investigation (LOI), defined as locations where project-related stormwater runoff leaves the MDOT SHA right-of-way, were identified for Phase 1 South. Required and provided stormwater needs were then tabulated for each POI/LOI.

Existing stormwater runoff was calculated at each POI/LOI using existing land use and standard MDE approved methodology. Proposed stormwater runoff was calculated at each POI/LOI using proposed land use based on preliminary roadway engineering and MDE methodology. Stormwater runoff or discharge was calculated for the 1-year and 10-year storms. Management of the 100-year storm, which may be a

00000300


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

requirement if there are documented downstream flooding problems, will be coordinated with Montgomery County during final design.

Required water quality treatment was calculated using the guidelines for state and federal projects for water quality shading and an evaluation of water quality loss based on preliminary roadway design. Existing stormwater best management practices (BMPs) were identified using the MDOT SHA National Pollutant Discharge Elimination System (NPDES) database. If an existing BMP was impacted by the proposed work, then the loss of water quality was added to the water quality requirements.

For this analysis, the reconstructed impervious area was quantified by assuming all outside shoulders, bridge decks, and approaches to bridge decks that need profile adjustments would be reconstructed. In addition, inside shoulders were assumed to be reconstructed when being converted or partially converted to a travel lane.

The total impervious area requiring treatment (IART) was determined for the Preferred Alternative and is presented in **Table 3-3** below. A total of approximately 116 acres of new impervious area is anticipated for Phase 1 South. All the new impervious area will need to be treated for both water quality and water quantity. In addition, approximately 72 acres of existing impervious area will require water quality treatment and approximately 22 acres of existing water quality treatment is expected to be impacted by the project and must be replaced.

**Table 3-3: Stormwater Management Requirements for the Preferred Alternative**

| IART from Loss of Water Quality (ac) | IART from Redevelopment (ac) | IART from New Development (ac) | Total IART (ac) |
|---|---|---|---|
| 21.75 | 72.03 | 116.20 | 209.98 |

Note: Stormwater requirements are for work in Maryland only.

The Preferred Alternative will also include work in Virginia, located between the George Washington Memorial Parkway and the southern bank of the Potomac River. Coordination with VDOT on the 495 NEXT project is ongoing and will continue through final design. The Virginia Department of Environmental Quality (VDEQ) requires the two-year storm be managed for erosion control and requires the ten-year storm be managed to match existing conditions if there are documented downstream flooding concerns. For water quality treatment, VDEQ requires that nutrient loading based on land cover be calculated and that a minimum of 75 percent of the difference between existing and proposed nutrient loads be treated on-site. The remaining 25 percent can be purchased from a Nutrient Credit Bank. A preliminary SWM evaluation was completed for the Virginia section of the Preferred Alternative. Since the 495 NEXT project will be constructed first, the proposed conditions for the 495 NEXT project were used as the existing land cover for the Preferred Alternative. The SWM evaluation resulted in a required reduction of approximately 20 pounds of phosphorus to meet water quality requirements.

## B. On-site Stormwater Management Provided for the Preferred Alternative

On-site SWM was evaluated on a POI basis for both water quality and water quantity in Maryland. SWM locations were refined between the SDEIS and FEIS based on agency coordination and more detailed preliminary design efforts, which included an evaluation of proposed grading to maximize the provided SWM facility footprints within the LOD. In addition, more stormwater treatment was realized through the

00000301

use of innovative design to reduce facility footprints and SWM facilities that could provide both water quantity and quality treatment within the same footprint. Proposed SWM facilities for the FEIS include wet ponds, extended detention ponds, underground quantity facilities, submerged gravel wetlands, grass swales, bioswales, micro-bioretentions, bioretentions, underground sand filters, etc. The proposed, large surface SWM features are shown on the *Environmental Resource Mapping* (**FEIS, Appendix E**).

Proposed water quantity facilities to control the ten-year storm were evaluated first since quantity requirements must be met on-site at each POI, whereas water quality treatment must be maximized onsite but can be provided off-site, if needed.  Based on the preliminary stormwater concept completed, 153 of the 167 POIs would meet the water quantity requirements. Fourteen POIs would not meet the water quantity requirements and may require either a variance or waiver approval. Variance requests may be needed for 11 out of these 14 POIs. Variance requests are very common for roadway projects and are typically related to minimal increases in downstream discharges or where adherence to a particular regulation may have adverse impacts. As more detailed design advances, MDOT SHA and the Developer will work toward meeting the water quantity requirements at these POIs or justifying the use of a variance. Variance approval would occur at final design and would require both local jurisdictional approval and documentation that no adverse impact would occur.

Three out of the 167 POIs will qualify for a quantity waiver due to direct discharge to the Potomac River. In Maryland, direct discharge to a major water body qualifies for a waiver from quantity management because the runoff from a bridge will enter the major waterway significantly before the peak in the waterway elevation and therefore will not affect downstream flooding.  Meeting quantity requirements on the shorelines adjacent to the ALB is challenging because the National Park Service (NPS) has jurisdiction over the land on both sides of the river and does not allow SWM on their property unless the facilities are part of the management of NPS parkland.  Additionally, the water must be drained from the bridge deck quickly to prevent the safety concerns of vehicles hydroplaning and icing on the roadway and pipe systems.  Consequently, the deck runoff will drain through bridge scuppers to the river via downspouts at bridge piers.

Water quality facilities to provide the required IART identified in **Table 3-3** to the MEP were also evaluated. ESD facilities[4] were considered first.  At POIs where the total required water quality treatment could not be met using ESD facilities, structural facilities[5] and underground facilities were proposed to provide additional water quality treatment onsite. Once onsite water quality has been provided to the MEP, off-site SWM locations within the same 6-digit watershed can be used to provide the remaining water quality requirement.  Off-site SWM facilities, including an explanation of the prioritization/hierarchy for the off-site selection, are discussed in the Compensatory SWM Mitigation Plan (**Section 3.1.6 C**) and the full report is available in **FEIS, Appendix D**.

Due to the large amount of required IART for the Preferred Alternative and existing site constraints, the water quality need could not be fully met onsite for the Preferred Alternative. **Table 3-4** shows the

---

[4] Environmental Site Design (ESD) facilities, also known as Chapter 5 facilities, are small-scale treatment practices including alternative surfaces, non-structural practices, and micro-scale practices (swales, micro-bioretention facilities).

[5] A Chapter 3 facility is defined as a structural facility and includes all facilities listed in Chapter 3 of the 2000 Maryland Stormwater Design Manual.  Structural facilities tend to have larger footprints and treat more impervious area per facility. They also can provide both water quality and quantity treatment.  Examples include wet ponds, sand filters, infiltration trenches.

00000302


estimated impervious area treated (IAT) onsite for the Preferred Alternative and the estimated remaining IART that would need to be treated off-site using compensatory SWM.  The off-site IART was significantly reduced between the SDEIS and FEIS from approximately 114 acres to approximately 2.5 acres.  The significant reduction in required off-site IART is due to refinement of the preliminary design including grading, innovative design considerations, provision for both water quality and quantity in the same facility footprint, and the use of variances/waivers for quantity control that allows for use of areas within the LOD to provide more water quality treatment.

**Table 3-4: Stormwater Management Provided Under the Preferred Alternative**

| Provided IAT (ac) | Remaining IART (ac) |
|---|---|
| 207.59 | 2.39 |

Note: Provided SWM is for the work in Maryland only.

In Virginia, a preliminary stormwater analysis identified a pond retrofit and expansion to meet both the water quantity and quality requirements. Preliminary calculations indicated that the retrofit would provide both two-year and ten-year management.  In addition, the retrofit is estimated to provide between 75 and 90 percent of the required nutrient load reduction. Credits for the remaining required nutrient load reduction can be purchased from a Nutrient Credit Bank. The exact nutrient load credits to be purchased will be determined during final design.

## C. Compensatory (Off-Site) Stormwater Mitigation Plan Considerations

MDOT SHA evaluated alternative means for providing SWM due to the heavily urbanized areas and numerous resources along the study corridors that limited available area for on-site SWM. An extensive planning-level study was performed to identify compensatory, or off-site, SWM opportunities to ensure the SWM water quality requirements of the Preferred Alternative could be met. The results of this evaluation, as originally presented in the SDEIS, were modified for the FEIS based on further analysis that reduced the need for compensatory, or off-site, SWM, as documented above in **Section 3.1.6 B**.

The number of compensatory SWM sites were reduced for the FEIS by prioritizing sites closest to the corridor, within the impacted MDE 12-digit and 8-digit watersheds, and by eliminating sites that had impacts to private properties and environmental resources. The methodologies, assumptions, and evaluations documented below were used for this compensatory SWM analysis to support and inform the Joint Permit Application (JPA), the FEIS, and Record of Decision (ROD). The potential compensatory treatment identified for the FEIS exceeds the anticipated requirement; however, the intent is to provide an excess of potential compensatory SWM sites to be evaluated during final design. It is anticipated that sites may be dropped from consideration when they are deemed infeasible during final design and as a result of coordination with permitting agencies. With the excess of SWM sites provided, it is anticipated that there would still be an adequate amount of potential treatment to meet the SWM water quality needs.

All findings of the compensatory SWM efforts are documented in the *Compensatory Stormwater Mitigation Plan* (**FEIS, Appendix D**), the JPA, and **FEIS, Chapter 5** where impacts to environmental features would occur, and the ROD. This section summarizes the compensatory SWM requirements and potential water quality credit only.

00000303


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

### a. Methodology and Assumptions

According to the Code of Maryland Regulations (COMAR), "the management of stormwater runoff is necessary to reduce stream channel erosion, pollution, siltation and sedimentation, and local flooding..." The quantification of the SWM required, water quality, and water quantity for a project is determined by the amount of existing impervious area and proposed impervious area located within the study area or LOD. While the MDE and MDOT SHA Water Quality Banking Agreement indicates SWM water quantity requirements must be met on-site for any given project, the SWM water quality requirements, while desirable to be met on-site, can be met elsewhere within the same MDE 6-digit watershed when on-site treatment is not practicable, with a hierarchal preference to meeting SWM water quality requirements within the same MDE 12-digit watershed as the impacts are located, before moving to the MDE 8-digit watershed, and ultimately the MDE 6-digit watershed, if needed. Additional information regarding a hierarchical approach in selecting compensatory, or off-site, SWM locations can be found in the *Compensatory Stormwater Mitigation Plan* (**FEIS, Appendix D**).

Initially for the compensatory SWM analysis presented in the SDEIS, LODs were identified for three types of sites: (1) SWM facilities, (2) stream restoration sites, and (3) pavement removal sites. However, as the on-site and compensatory SWM analysis was refined for the FEIS, only SWM facility sites, mainly ESD facilities but also structural facilities, were selected for inclusion in the Compensatory SWM Mitigation Plan and JPA. In general, SWM facility sites were selected to maximize MDOT SHA impervious area draining to the site and are primarily within the MDOT SHA right-of-way, to minimize impacts to private properties and historic and environmental resources (trees, wetlands, waterways, 100-year floodplains, etc.). If a SWM facility meets a minimum of one-inch treatment credit, full IAT credit for MDOT SHA impervious area will be achieved, otherwise the IAT for MDOT SHA impervious area will be pro-rated based on the amount of runoff (in inches) treated. For all non-MDOT SHA impervious areas draining to a facility, half of the IAT or removed is the resultant IAT credit.

Stream restoration sites are not included in the Compensatory SWM Mitigation Plan at this time because the requirements are anticipated to be met by the selected SWM facilities. If the selected sites are determined not feasible during final design, the Developer will utilize the site search approach as indicated in the SDEIS and in the Compensatory SWM Mitigation Plan, with consideration to a hierarchical approach for compensatory SWM sites, to evaluate additional sites and, if needed, revise the JPA and re-evaluate impacts.

To ensure full compliance with environmental requirements, impacts to forests, wetlands, waterways, floodplains, and properties were determined using desktop evaluations of compensatory SWM sites by the following disciplines: water resources, cultural resources, forestry, hazardous materials, maintenance of traffic, wetlands and waterways, right-of-way, parks/Section 4(f), structures, utilities, and constructability. All desktop evaluations were completed using readily-available data and were used to inform the LOD for each site. In addition to the desktop evaluations performed, field assessments were performed by the water resources, forestry, wetlands, and stream disciplines to inform the environmental resource delineations and better determine SWM feasibility. Compensatory SWM sites were removed after the desktop and field evaluations were completed if they resulted in multiple impacts to these resources.  In general, sites were removed from further consideration if they impacted Section 4(f) properties, significant cultural resources (i.e., historic structures, archaeological sites), significant environmental features, or existing hazardous materials hot spots.

00000304

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

**b. Compensatory Stormwater Management Requirements and Compensatory Stormwater Management Potential**

The Compensatory SWM Mitigation Plan provides compensatory SWM sites to meet the target IART for the Preferred Alternative, through use of mainly ESD SWM facilities (**Table 3-5**) within the same MDE 12-digit and/or 8-digit watershed as the Preferred Alternative LOD. As stated above, the amount of compensatory IAT exceeds the need identified in **Table 3-4**; however, the intent of the plan is to provide an excess of potential compensatory SWM sites for more detailed analysis during final design.

**Table 3-5: Preferred Alternative Compensatory SWM Potential**

| MDE 6-Digit Watershed | Target Compensatory SWM IART Requirement (ac)[1] | Compensatory SWM IAT Potential (ac) |
|---|---|---|
| Washington Metropolitan (No. 021402) | 2.39 | 27.39 |

[1] Target SWM IART is approximate and for the work in Maryland only.

Further avoidance and minimization of impacts to resources that would be caused by the compensatory SWM sites will be investigated during final design. In addition, the use of alternate sites which could have fewer, or no impacts, will be considered in final design. Final environmental impacts associated with off-site treatment should not exceed those presented in the JPA, the Compensatory SWM Mitigation Plan, and those listed below in **Table 3-6**. While it may be possible that alternative compensatory SWM sites identified during final design could result in an increase in impacts, the full approval and permitting process would be required.

**Table 3-6: Compensatory SWM Potential Environmental Impacts**

| Potential LOD Area (ac) | Potential Property Impact (ac) | Wetland Impact (ac/sf) | | | Wetland Buffer Impact (ac/sf) | Waterway Impact (lf/sf) | | | | FEMA 100-Year Floodplain Impact (ac/sf) | Forest Impact (ac/sf) | Specimen Tree Impact (Count/DBH) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | PFO | PSS | PEM | | Perennial | Intermittent | Ephemeral | POW | | | |
| 34.52 | 1.08 | 0 / 0 | 0 / 0 | 0 / 0 | 0 / 0 | 156 / 1,680 | 29 / 79 | 0 / 0 | 0 / 0 | 0.08 / 3,485 | 0.96 / 42,090 | 7 / 227 |

Note: Abbreviations are as follows— palustrine forested wetlands (PFO); palustrine scrub-shrub wetlands (PSS); palustrine emergent wetlands (PEM); acres (ac); square feet (sf); Federal Emergency Management Agency (FEMA); diameter at breast height (DBH).

## 3.1.7 Cross Culverts

Modifications to cross culverts along the study corridors for the Preferred Alternative in this FEIS included a more detailed hydrologic and hydraulic investigation based on additional topographic survey and refinements to the preliminary roadway geometric design. The approach for identifying cross culverts and cross culvert augmentation remains the same as presented in the **SDEIS, Chapter 2** and is repeated below. All major cross culverts, defined as culverts 36 inches in diameter or greater with a drainage area greater than 25 acres, were identified and analyzed to determine if they would need additional capacity in the proposed conditions. Major culverts were identified by desktop analysis using the MDOT SHA large and small structure database; LiDAR (light detection and ranging) topographic data with one-foot contours; the MDOT SHA NPDES database; and field observations.

00000305


If an existing culvert crossing needed additional capacity in the proposed conditions, then an auxiliary culvert has been proposed to meet the need. It was assumed that the auxiliary culverts could be installed using trenchless technologies (installing the culvert underground without disturbing the existing road) so as not to disrupt traffic traveling on the existing road. LOD assessments for construction access at the upstream and downstream end of the culvert were completed and area is provided for the implementation of trenchless technologies within the LOD. Existing culverts are also proposed to be extended for a new outfall structure to tie into the proposed grading limits for the Preferred Alternative.

After the need for the culvert augmentation was identified, further investigations including site visits and additional hydrologic and hydraulic computations, were conducted to determine the LOD at each location. For all proposed culvert augmentation sites in the Preferred Alternative and in preparation of the SDEIS, site visits were conducted to assess the existing site condition, as well as the potential LOD requirements as they relate to the existing condition and the proposed crossing modification. Several agencies, including the Federal Highway Administration (FHWA), United States Army Corps of Engineers (USACE), and MDE Nontidal Wetlands and Waterways, attended specific site visits to provide general feedback on the LOD requirements related to culvert augmentation.

To prepare for the site visit, a desktop review of each location was conducted, and the following data was compiled into an assessment form: existing and proposed culvert geometry, drainage area parameters, and an estimate of the potential capacity increase via augmentation. Additional site-specific information, such as upstream and downstream channel conditions including any bank erosion, channel head cutting, or other instability; notation of any unusual site circumstances including potentially impacted built infrastructure; and a photo documentation log, were added to the assessment form during the field investigations. Based on the field findings, LODs were proposed for each augmentation site, and they are included in the Preferred Alternative LOD and shown in **FEIS, Appendix E**.

Detailed hydrologic and hydraulic analysis will be completed during final design to confirm that augmentation is required. The detailed design will utilize additional data, including roadway and stream topographic survey, to analyze each culvert crossing location more thoroughly and will assess the hydraulic impacts associated with augmentation to confirm that the proposed design will meet the regulatory requirements. The increased capacity from culvert augmentation can lead to increased downstream discharges and velocities, which may result in increased downstream flooding. The addition of a culvert barrel can also lead to redistribution of channel flows and sediment transport, leading to aquatic organism passage barriers. Culvert augmentations will be designed with these considerations in mind. During final design, it is possible that culvert augmentation will not be needed at some previously identified locations or will be needed at other additional locations based on the detailed design.

### 3.1.8   Construction and Short-term Effects

Construction of the Preferred Alternative will be conducted in a heavily developed area constrained by existing residential and commercial development and environmental resources. Continued, detailed analysis was completed since publication of the SDEIS in coordination with the Developer to further assess constructability requirements relative to the existing constraints and to identify additional appropriate adjustments to the LOD and cost estimate. An overview of the factors that were considered for this analysis was provided in the **DEIS, Chapter 2** and **SDEIS, Chapter 2** and is summarized below.

00000306


The constructability analysis was based on assumptions and conceptual ideas about construction phasing, methodology, and the general sequence of how the work may proceed. These include construction sequencing, maintenance of traffic, availability of regional suppliers and contractors, and access, staging, and storage of equipment and materials. The Developer refined these assumptions in advancement of the proposed design concept and collaborated with MDOT SHA to adjust the LOD as needed. The assumed areas for construction staging, materials storage, and access needs within the Preferred Alternative LOD at specific locations are identified on the *Environmental Resource Mapping* (**FEIS, Appendix E**).

The approaches to complete the proposed work for the Preferred Alternative include mainline widening along I-495 and I-270, interchange reconstruction, and bridge replacement or reconstruction. The constructability analysis included coordination with the regulatory agencies at the properties or resources under their jurisdiction including the NPS, M-NCPPC, USACE, MDE, and Maryland Department of Natural Resources (DNR). Consideration was given to construction methods in challenging locations such as the ALB and the I-495 bridges over the Chesapeake and Ohio Canal and Clara Barton Parkway and widening adjacent to Thomas Branch (see **Section 3.1.8 A** and **Section 3.1.8 B** below).

The minimization of impacts to community, residential and commercial properties, and regulated resources such as cemeteries, parks, historic and archeological resources, and at wetlands and streams, to the greatest extent practicable, was included in the preliminary plans for construction of the Preferred Alternative. Techniques such as retaining wall construction in cut and fill sections were employed to minimize impacts. Additionally, avoidance and minimization of utility impacts was prioritized where feasible or the LOD accounts for utility relocations where impacts may be unavoidable. The quantified property impacts presented in this FEIS (**Chapter 5, Section 5.5**) are separated by permanent (or long-term) effects and temporary (or short-term) effects. Short-term, construction related work includes construction staging, material and equipment storage, construction easements, and other areas needed to support the construction, but are not part of the long-term improvements.

### A. American Legion Bridge Construction Evaluation

The Preferred Alternative includes the full replacement of the ALB on I-495 spanning the Potomac River with a new, wider bridge on the existing centerline. The existing bridge is nearly 60 years old and would need to be replaced regardless of the outcome of this Study. The new bridge would also need to be constructed in a sequence to maintain the existing number of travel lanes during peak periods during construction. Comments on the Build Alternatives presented in the DEIS and the Preferred Alternative in the SDEIS reflected a common support for advancing replacement of the ALB.

As summarized in the **SDEIS, Chapter 2**, due to the location of the ALB over the Potomac River and adjacency to several federally-owned parks, MDOT SHA created a separate group – the ALB Strike Team – to investigate alternative bridge designs and construction techniques that could be employed to reduce, minimize, and avoid impacts to natural, cultural, and parkland resources around the ALB. The Strike Team coordinated with key agency and public stakeholders, including NPS, M-NCPPC, USACE, MDE, and Maryland DNR. The NPS properties that border the Potomac River at the ALB include the George Washington Memorial Parkway, the Chesapeake and Ohio Canal National Historical Park (including the Chesapeake and Ohio Canal Towpath and Plummers Island), and Clara Barton Parkway. The results of the effort were presented in the SDEIS and are still reflected in the Preferred Alternative in this FEIS.

00000307

Impacts to Plummers Island were significantly reduced compared to those presented for the Build Alternatives in the DEIS by strategically locating the proposed piers for the replacement bridge and eliminating construction access from the Island. Further, MDOT SHA commits to accessing Plummers Island for construction purposes by bridging over the oxbow of the Potomac River without placing any materials or fill within the stream channel. MDOT SHA and the Developer will work with NPS and the Washington Biologist Field Club to design for and construct slope armoring along the upstream side of Plummers Island to mitigate for future slope erosion as a result of tree clearing within the LOD. The slope armoring could include but is not limited to a rip-rap slope, live staking, and brush layering or any combination of armoring that will provide a blended natural aesthetic with the topography and historic nature of the island.

In addition, the total impacts at the bridge construction site were minimized as the Strike Team effort resulted in a reduction of the number of construction access locations from all four quadrants, as noted in the DEIS, to the northwest quadrant only, due to its grade and proximity to a nearby roadway. This change substantially minimized impacts to the surrounding land and resources. There are many construction challenges associated with replacement of the ALB, such as access constraints due to the natural areas along the river's edge. To limit the area of disturbance, MDOT SHA assumed that most construction activities at the ALB and Clara Barton Parkway interchange will be completed from below the existing bridges instead of from the existing roadway, due to the need to access elements such as the existing and proposed piers. The Preferred Alternative accounts for a proposed, temporary road within the Chesapeake and Ohio Canal National Historical Park to access the ALB construction area. The two-lane access road will be 40-feet wide to accommodate two-way construction traffic and queuing. The LOD for this access road is identified in **FEIS, Appendix E**.

In Virginia, the Preferred Alternative will result in temporary closure of the Potomac Heritage National Scenic Trail within the LOD during construction of the replacement ALB. A detour route, if determined to be necessary, will continue to be developed by MDOT SHA and the Developer in coordination with NPS, Fairfax County, and VDOT. The segment of the trail within the LOD would be restored on a new alignment after construction is completed. Refer to **Chapter 5, Section 5.4** for additional information on the minimization efforts around the ALB.

## B.  Thomas Branch Investigation

Thomas Branch runs parallel to I-495 and the I-270 west spur from the interchange of Democracy Boulevard and the I-270 west spur to the interchange of MD 190 (River Road) and I-495, for approximately three miles. The proposed Preferred Alternative roadway improvements along I-495 and I-270 would impact Thomas Branch for nearly the entire length where it runs parallel to and crosses under these roadways. An analysis of the impacts and minimization efforts along Thomas Branch were performed for the Build Alternatives for the DEIS. Further review efforts by the Developer continued after publication of the SDEIS and for this FEIS to review the scenarios considered by MDOT to limit impacts to the resource while refining the LOD for the Preferred Alternative.

Since the SDEIS, the Developer has refined the preliminary approach to relocate, pipe, or maintain the existing alignment of Thomas Branch. The current design concept proposes to eliminate the existing culvert crossing of the I-270 west spur north of Democracy Boulevard and instead, convey Thomas Branch along the east side of the I-270 west spur to a new culvert crossing south of Democracy Boulevard. This

00000308


change was incorporated to reduce the total culvert length along Thomas Branch and maintain portions of Thomas Branch as open channel. This design concept is shown in the JPA (**FEIS, Appendix P**). Refinements to the proposed construction methods and minimization techniques to limit impacts to Thomas Branch, including evaluation of hydraulic modeling, will continue through final design.

### 3.1.9  Tolling

As stated in the SDEIS, the Preferred Alternative includes tolling of the HOT managed lanes. The toll rates and the toll rate ranges were determined through a multi-step process that is codified in Maryland law, which provides for public input through public hearings and official public testimony. This process was outlined in the SDEIS and has advanced since the SDEIS was published. The toll rate ranges were approved by the Maryland Transportation Authority (MDTA) Board in Fall 2021, following the Notice of Availability for the SDEIS. This section provides a summary of the toll rate setting process and the approved toll rate ranges.

The toll-rate setting process was led by MDTA, the only State entity with the authority to set, revise, and fix toll rates in accordance with Transportation Article §4-312 of the Annotated Code of Maryland and COMAR Title 11 Department of Transportation, Subtitle 07 MDTA, Chapter 05 Public Notice of Toll Schedule Revisions (11.07.05). The MDTA is responsible for setting the toll rate ranges and, in collaboration with the Developer, conducting toll collection operations for the Phase 1 South limits.

The Preferred Alternative will be a variably priced facility that utilizes dynamic pricing. Maryland law requires the establishment of toll rate ranges for variably priced facilities, including those utilizing dynamic toll rate range in real time. A dynamic facility uses operational metrics to adjust the toll in real time to maintain free-flowing traffic by using pricing factors to influence the traffic flow—when lanes become more congested, the toll increases, and when the lanes become less congested, the toll decreases. The toll rates within each tolling segment could change as often as every five minutes based on real-time traffic volumes or speed in the HOT lanes to provide customers who choose to use the HOT lanes and pay a toll, a faster and more reliable trip. Customers will pay the toll rate in effect when they enter the managed lanes, regardless of toll rate changes that occur in any tolling segment during their trip.

The MDTA-approved toll rates include a minimum toll, maximum toll rate ranges, soft rate caps, a process for annual toll escalation, and toll discounts for certain types of vehicles. The minimum and maximum toll rates are the lowest and highest toll rate per mile that would be charged in any tolling segment. The soft rate cap is the toll rate per mile that can only be exceeded when certain thresholds are met.  More detailed explanations are provided below in **Section 3.1.9 B**. The toll rate ranges are limited to only Phase 1 South. Any action to set, revise and fix tolls outside of Phase 1 South limits would require a separate toll setting process in accordance with State law.

MDTA spent more than two years conducting due diligence activities on the toll rate range proposal which included traffic and revenue studies, post-model processing, and feedback from potential developers. The toll rate ranges approved by MDTA are available on their website at https://mdta.maryland.gov/ALB270TollSetting/TollRateRangeSettingProcessAndApprovedTollRateRanges. The following sections provide detail on the toll rate setting process and the approved MDTA toll rates.

00000309


## A. Toll Rate Setting Process

The toll rate range setting process was described in the **SDEIS, Chapter 2, Section 2.3.6** and centered on a proposal by MDTA staff to establish minimum toll rates, maximum toll rates, soft rate caps within the minimum and maximum toll rate ranges, a process for annual toll escalation, and toll discounts for certain types of vehicles.

As noted above, the process for conducting the public hearings, recording comments from the public, and approving and finalizing the toll rate ranges is specified in Transportation Article, §4-312, Annotated Code of Maryland. The initial proposal was presented to the MDTA Board in May 2021. Per the process, the Board voted to take the toll proposal to public hearings and a public comment period, thereby ensuring the public was engaged in the toll rate range setting process and complying with State law by providing opportunities for public review and comment.

This first comment period lasted from May 20 through August 12, 2021. Two public hearings were held in July 2021. The material presented included the background and justification for the toll rate ranges (minimum and maximum per-mile rates), soft rate caps within the ranges, and discounts, as well as the process required for completing the hearings.

After consideration of the public comments, the MDTA staff presented the final toll rate range proposal at the September 30, 2021, MDTA Board Meeting. This final toll rate range was the recommended action for the Board and opened another comment period. The MDTA accepted written comments on the recommended action/final toll rate range proposal from September 30 through October 28, 2021. At the November 18, 2021, MDTA Board Meeting, the MDTA staff presented a summary and analysis of public comments received during the second public comment period. The comment summary and analysis were posted to the MDTA webpage at https://mdta.maryland.gov/ALB270TollSetting/. During this meeting, the MDTA Board voted to approve the final toll rate range. Before the Board voted, the public was provided a third opportunity to comment on the final toll rate range recommendation live during the meeting.

## B. MDTA Approved Toll Rate Ranges

The goal of the HOT managed lanes is to maintain free-flowing traffic and to use pricing factors to influence traffic flow. The Preferred Alternative was designed to maintain speeds of 45 mph or greater in the HOT managed lanes, in compliance with Title 23 United States Codes (U.S.C.) 129 and 166. As such, the toll rate range was set to ensure the HOT managed lanes operate to established operational metrics, which applies the economic principles of supply and demand to influence the utilization of the HOT managed lanes. The Developer will be responsible for setting toll rates within the established toll rate ranges. The Developer will not only be responsible to ensure the free-flowing traffic goals but will also have to cover design, maintenance, finance, and operations costs from the generated toll revenue. The toll rate ranges will only be used if a ROD is signed by FHWA at the end of this Study and the HOT managed lanes are constructed.

The approved toll rate ranges are provided in **Table 3-7** in cost per mile ($/mile) for a passenger vehicle. The rate ranges for other vehicle classifications can be found on the MDTA webpage at https://mdta.maryland.gov/ALB270TollSetting/TollRateRangeSettingProcessAndApprovedTollRateRanges. The toll rate ranges will only apply to the HOT managed lanes; the existing free general purpose lanes will not be tolled. In addition, the approved rates include discounts for qualifying vehicles—including HOV

00000310

3+ (including carpools and vanpools), buses and motorcycles.[6] MDTA recognizes that designated HOV compliant vehicles are required to be toll-free under Title 23 U.S.C. 166; however, MDTA is using the term 'discount' to refer to all vehicles that would have a toll rate that is lower than the standard toll rate. The elements of the approved toll rate ranges are described in the following subsections.

**Table 3-7: Approved Toll Rate Ranges, Soft Rate Caps, and Discounts (Free Passage) for Passenger Vehicle (2-axle) by Payment Type**

| General Purpose Lanes | HOT Managed Lanes | | | | | |
|---|---|---|---|---|---|---|
| | Payment Type | Approved Toll Rate Ranges for Passenger Vehicle (2-axle) (year 2021 $/mile) | | | HOV 3+ Vanpools Carpools | Buses / Motorcycles |
| | | Minimum Toll Rate[1] | Soft Rate Cap | Maximum Toll Rate | | |
| Free | Electronic Toll Collection (ETC) (*E-ZPass*) | $0.17 | $1.50 | $3.76 | Free | Free |
| | Pay-By-Plate (Registered Video) (1.25x ETC) | $0.21 | $1.88 | $4.70 | | |
| | Video Tolling (Unregistered Video) (1.5x ETC) | $0.26 | $2.25 | $5.64 | | |

[1] The minimum trip toll (not per mile) by payment type for all vehicle types would be $0.50 for customers using E-ZPass®, $0.63 for customers using Pay-By-Plate (Registered Video), and $0.75 for customers using Video Tolling (Unregistered Video).

### a. Minimum Toll Rate

The minimum toll rate is the lowest toll rate per mile that will be charged at any tolling segment for the HOT managed lanes. The minimum toll rate is intended to cover toll capture, processing, and collection costs.

### b. Soft Rate Cap

The soft rate cap is the toll rate amount that can only be exceeded when at least one of the following thresholds are met within a given tolling segment during the preceding five-minute period: the average traffic volume exceeds 1,600 passenger car equivalent vehicles per hour per lane or the average speed in a tolling segment is below 50 mph. The soft rate cap will always be lower than the maximum toll rate and can be exceeded only temporarily to provide customers who choose to pay a toll a faster and more reliable trip. The toll rate will continue to decrease once throughput and speed performance targets are achieved until it is at or below the soft rate cap.

MDTA is proposing the soft rate cap as a protection for customers. The purpose of the soft rate cap is to constrain the toll rate charged to customers when throughput and speed performance targets are achieved. This provides customers protection from toll increases when traffic conditions do not justify higher rates. Although not standard practice in the tolling industry, the MDTA is choosing to be one of

---

[6] Other exemptions, such as emergency vehicles during emergency response, have been agreed upon as part of the toll operations between MDTA, MDOT SHA and the Developer.

00000311

only two states in the United States to set a soft rate cap to constrain the toll rate as a protective measure for customers.

### c. Maximum Toll Rate

The maximum toll rate is the highest per-mile toll rate that may be charged within any tolling segment for the HOT managed lanes. The actual per-mile rate paid by customers is responsive to real-time traffic. The maximum rates cannot be exceeded under any circumstance. The maximum rate will only be realized under conditions where the soft rate cap is exceeded, which would be during times of deteriorating performance. In extremely rare circumstances, when traffic demand is very high and customers are experiencing decreased speeds in a given tolling segment, the toll rate may reach the maximum toll rate for that given tolling segment. The toll rate is determined on a segment-by-segment basis. The maximum toll rate is required for the most congested tolling segments and likely would not come into effect for many segments.

### d. Escalation

The toll rate ranges provided in **Table 3-7** are in 2021 $/mile. The minimum and maximum toll rate ranges, and the soft rate cap within them, will be adjusted annually according to pre-determined escalation factor equations. The adjustments are necessary to ensure the toll rates will (1) keep up with the growing traffic demand for the HOT managed lanes, (2) account for annual inflation, and (3) achieve the goal of providing a faster and more reliable trip for customers who choose to pay the toll. For the toll rates to effectively manage demand and ensure reliability for users of the HOT managed lanes into the future, the maximum per mile rates, soft rate caps, and video surcharge rates will escalate over time to account for inflation, population employment, and income growth. The minimum per mile toll rate ranges and the minimum trip tolls are both subject to escalation for inflation only.

## 3.2    Transportation Commitments

Beyond the Preferred Alternative elements described in **Sections 3.1.4** and **3.1.5** of this Chapter, additional priority transit and bicycle and pedestrian improvements have been committed to in response to comments and input received through extensive coordination with agencies and stakeholders over the course of the Study. These commitments further support elements of the Study's Purpose and Need. The priority transit and bicycle and pedestrian improvement commitments are described below. These commitments along with the mitigation described in **Chapter 7, Section 7.2**, will be included in the ROD and the lead agencies will be responsible for ensuring implementation.

### 3.2.1    Transit

The commitment to certain regional transit improvements to enhance existing and planned transit and support new opportunities for regional transit service is outlined below:

- Increase the number of bus bays at WMATA Shady Grove Metrorail Station
- Increase parking capacity at Westfield Montgomery Mall Transit Center

Some commitments have been made by the Developer or MDOT SHA as part of the P3 Agreement and are captured separately in **Chapter 7, Section 7.3**. The commitments related to transit include the following:

00000312

- As part of its proposal, the Developer has proposed an estimated $300 million for transit services in Montgomery County over the operating term of Phase 1 South

- Upon financial close of the Section P3 Agreement for Phase 1 South, MDOT is committed to fund not less than $60 million for design and permitting of high priority transit investments in Montgomery County and MDOT committed to deliver the Metropolitan Grove Bus O&M Facility, including the necessary bus fleet

Refer to **Section 3.1.4** of this Chapter for a description of the opportunities to enhance transit mobility and connectivity within the Preferred Alternative.

### 3.2.2    Pedestrian and Bicycle Facilities

Pedestrian and bicycle improvements and new connections that are beyond the base design approach described in **Section 3.1.5**, include:

- Constructing a new pedestrian/bicycle shared use path across the ALB to connect facilities in Maryland and Virginia, as discussed further below. A direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the study area.

- Widening the existing variable-width sidepath along the east side of Seven Locks Road under I-495 (Cabin John Trail).

- Constructing a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection between First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

As presented in the **SDEIS, Chapter 2**, MDOT, with support from VDOT, proposes to reconstruct the ALB with a new pedestrian and bicycle shared use path to provide multimodal connectivity across the Potomac River. The shared use path is anticipated to be located along the east side of the ALB as shown in **FEIS, Appendix E**. The path would connect to the planned Fairfax County trail system in Virginia. An existing Fairfax County trail on the west side of I-495 will be extended by VDOT through the 495 NEXT project along the outer loop and inner loop of I-495 to the George Washington Memorial Parkway. The ALB shared use path along the inner loop will then extend along I-495 through the George Washington Memorial Parkway interchange as part of the Preferred Alternative to connect to the Fairfax County trail.

Three preliminary options for a proposed shared use path connection between the ALB and MacArthur Boulevard sidepath in Maryland were evaluated and were presented in the **SDEIS, Chapter 2**. The options were developed in coordination with the key agency stakeholders including the NPS, MCDOT, M-NCPPC, and the USACE.[7] Public comments supporting a direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath were received by MDOT SHA, FHWA, and NPS during the SDEIS public comment period. To be responsive to these comments, a direct connection to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the

---

[7] USACE was involved in this evaluation as some of the shared use path connection options would result in increased impacts to wetlands and waters.

00000313

Preferred Alternative LOD and impact analyses. The three shared use path options connecting to MacArthur Boulevard presented in the SDEIS are no longer under consideration in this FEIS. The direct connection to the Chesapeake and Ohio Canal towpath results in fewer impacts to NPS property and natural resources. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the study area. Additionally, MDOT SHA and the Developer, in coordination with NPS, will evaluate drainage and sight distance considerations at the intersection of the shared use path from the ALB and the Chesapeake and Ohio Canal towpath during final design. The alignment of the proposed shared use path connection to the Chesapeake and Ohio Canal towpath is shown in **FEIS, Appendix E**.

As noted in **Section 3.2.1**, some commitments have been made by the Developer as part of the P3 Agreement. The commitments related to improvements to fund priority bicycle and pedestrian connections to remove barriers and provide connectivity for bicyclists and pedestrians, as part of its commitment to support Vision Zero,[8] are outlined below:

- Defining a neighborhood walk and cycle connectivity zone to enhance multimodal connectivity.
- Facilitating the development of a facility improvement program for the installation or replacement of sidewalks, crossings, or signal modifications and formalizing trail development that has pedestrian demand, then rank projects according to safety significance (considering predictive safety analyses completed by M-NCPPC), readiness, and landowner consensus, as part of its commitment to support Vision Zero.

## 3.3    Phase 1 P3 Agreement and Predevelopment Work

The Phase 1 P3 agreement process, including selection of the Phase Developer, was summarized in the **SDEIS, Chapter 2**. Additional information provided in this FEIS includes details about the advancement of predevelopment work by the Phase Developer since the SDEIS and the selection process for the Design-Build contractor(s). Within this FEIS, outside of **Section 3.3**, the Phase Developer is referred to as the Developer. The following definitions of limits are provided to assist in understanding the phased solicitation process:

- Phase 1:  I-495 from south of the ALB to I-270 and I-270 from I-495 to I-70. These are also the limits of the Phase 1 P3 Agreement.
- Phase 1 South: I-495 from south of the ALB to I-270 and I-270 from I-495 to I-370. These are the limits of the NEPA Preferred Alternative.

> **How has the P3 process advanced since the SDEIS?**
> - The Phase Developer worked collaboratively with MDOT, MDTA, and stakeholders on predevelopment work for Phase 1 South to inform this FEIS.
> - The Phase Developer has advanced a competitive procurement process to short-list and select the Design-Build contractor(s) who will be responsible for the final design and construction of all of Phase 1 South.
> - The Developer will be responsible to MDOT for performing the entire scope, which also includes financing, operations, and maintenance for the first phase.

---

[8] Vision Zero is an initiative to eliminate all traffic fatalities and severe injuries.
https://www.montgomerycountymd.gov/visionzero/index.html

00000314


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

- Phase 1 North: I-270 from I-370 to I-70. This project is advancing under a separate planning study (https://oplanesmd.com/i270-environmental/).

The Preferred Alternative in this FEIS is aligned with Phase 1 South, which is the first section planned to be delivered under Phase 1: the New ALB I-270 Traffic Relief Plan. Under the Preferred Alternative, consideration of improvements to the remaining parts of I-495 would be required to advance separately, subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agency partners. Additional improvements would proceed through subsequent P3 solicitation(s) or a public project delivery model, such as Design-Build.

In accordance with the terms and conditions of the Phase 1 P3 Agreement, MDOT and the Phase Developer have initiated and will further advance predevelopment work on the first section, Phase 1 South.

### 3.3.1 Selection of the Phase Developer

The Board of Public Works (BPW) originally approved the P3 designation for the P3 Program in June 2019 and provided a supplemental approval in January 2020. These approvals allowed MDOT SHA to use a Progressive P3 process to design, construct, finance, operate, and maintain Phase 1 of the P3 Program, by seeking a phase developer for Phase 1. This progressive approach allowed the solicitation process to proceed without final commitment during the NEPA process. The Phase 1 P3 solicitation process was described in **SDEIS, Chapter 2**.

In August 2021, in accordance with Maryland law, MDOT and MDTA received approval from the BPW to award the Phase 1 P3 Predevelopment Agreement to the Phase Developer. Predevelopment work related to Phase 1 South of the P3 Program is being completed by the Phase Developer and they will also support the predevelopment work for Phase 1 North (under a separate planning study) to inform the NEPA process.

### 3.3.2 NEPA and the Developer Work Together

As noted, Phase 1 South will be delivered using a Progressive P3 approach, which is designed to minimize risks to the State, provide more-efficient pricing, better schedule certainty, and support a phased delivery approach of the Preferred Alternative identified in this FEIS.

The Phase Developer is working collaboratively with MDOT, MDTA, and the stakeholders on predevelopment work for Phase 1 South. This upfront effort focused on advancing the preliminary design and due-diligence activities by involving all stakeholders – including Montgomery County, municipalities, property owners, utility owners, and citizens. As stated at the beginning of this Chapter, during the predevelopment work leading up to the FEIS, the Phase Developer focused on refining the preliminary design concept and further avoidance and minimization of impacts to environmental resources, communities, properties, utilities, and other features.

Concurrent with the predevelopment work, the Phase Developer has advanced a procurement process to select the Design-Build contractors who will subcontract with them to perform final design and construction of all of Phase 1 South. The Phase 1 Developer will be responsible for the overall final design, construction, financing, operations, and maintenance of all of Phase 1 South.

00000315


## 3.4    Economic Benefits of Managed Lanes and the Preferred Alternative

<div style="border:1px solid red;">

**What are the benefits
of Managed Lanes?**

- All travelers on the highway system and the local area network benefit from managed lanes because managed lanes improve highway operations and provide the driving public, as well as transit riders, with reduced congestion and improved safety. Travelers who choose to pay a toll will experience reliable and reduced travel times.
- Travelers who continue to use the free (general purpose) lanes will also see reduced travel times as seen along the I-495 and I-95 HOT Lanes in Virginia and the I-95 Express Toll Lanes north of Baltimore. This will help reduce the cost of congestion to the average commuter in the region.

</div>

There will be significant economic benefit to the State of Maryland and the National Capital Region with the Preferred Alternative, Alternative 9 – Phase 1 South. The improvements will provide for faster and more reliable movement of goods and services and improved access to employment centers and housing. The delivery of these improvements will lead to more jobs. The preliminary, estimated capital cost for the Preferred Alternative is greater than $3 billion and will support thousands of jobs per year during construction. The Preferred Alternative will result in savings to the Transportation Trust Fund by providing more than one billion in infrastructure investment for state of good repair to the existing roads and bridges that needs to be completed, allowing public funds to be used for other necessary transit and highway improvements. Additionally, this project will boost Maryland's competitiveness in the region.

00000316

# 4    TRANSPORTATION AND TRAFFIC

The preliminary traffic forecasts and analysis results for the Preferred Alternative were documented in the Supplemental DEIS **(SDEIS), Chapter 3** and **SDEIS, Appendix A**. Results have been updated and finalized in this Final Environmental Impact Statement (FEIS).

**SDEIS, Chapter 3**: https://oplanesmd.com/wp-content/uploads/2021/09/SDEIS_03_Traffic.pdf

**SDEIS, Appendix A**: https://oplanesmd.com/wp-content/uploads/2021/09/SDEIS_AppA_Traffic-Evaluation-Memo_web.pdf

What is the same in this FEIS Chapter from the SDEIS:

- The Preferred Alternative is the same: Alternative 9 - Phase 1 South.
- The design year is the same: 2045.
- The same version of the Metropolitan Washington Council of Governments (MWCOG) model was used: Version 2.3.75.
- The same VISSIM model limits were used.
- Baseline conditions for the year 2017 are unchanged.

What is updated in this FEIS Chapter:

- Traffic forecasts and analysis results for the 2045 No Build Alternative have been updated based on new information related to background projects (including the VDOT 495 NEXT project and the Greenbelt Metro Interchange) and forecast refinements to address comments received on the SDEIS (**Section 4.2**)
- Traffic forecasts and analysis results for the Preferred Alternative have been updated to reflect design changes described in **FEIS, Chapter 3** that were made following coordination with various stakeholders to further improve operations and/or minimize property and environmental impacts (**Section 4.3**).
- The discussion regarding the impact of COVID-19 on traffic demand and forecasts and the State's ongoing monitoring plan has been updated per the latest data (**Section 4.5**).

What is new in this FEIS Chapter:

- A detailed evaluation of the operations along cross streets and adjacent intersections, summarized in **Section 4.4.1** and documented in **FEIS, Appendix B**.
- A detailed safety evaluation, including predictive crash modeling, summarized in **Section 4.4.2** and documented in **FEIS, Appendix B**.
- The results of a COVID-19 sensitivity analysis, summarized in **Section 4.5** and documented in **FEIS, Appendix C**.

## 4.1    Introduction

As noted in **Chapter 1**, one of the needs for the I-495 & I-270 Managed Lanes Study (Study) is to accommodate existing traffic and long-term traffic growth on I-270 and I-495. An understanding of current and projected traffic demands on the transportation network along the study corridors and the

00000317


surrounding area is essential to properly evaluate how each of the Build Alternatives would address these traffic challenges. The DEIS and its appendices presented results from the traffic operational analyses conducted for the 2040 No Build Alternative and eight (8) Build Alternatives (Alternative 5, Alternative 8, Alternative 9, Alternative 9M, Alternative 10, Alternative 13B, Alternative 13C, and the MD 200 Diversion Alternative). The SDEIS and its appendices presented the draft results from the traffic operational analyses conducted for the 2045 No Build condition and the Preferred Alternative: Alternative 9 - Phase 1 South. This chapter presents updated and finalized results for the 2045 No Build Alternative and Preferred Alternative, summarizes the results of a detailed safety evaluation, and presents the findings from a sensitivity analysis evaluating potential long-term travel impacts related to the ongoing COVID-19 pandemic. For additional details on each of these topics, refer to the *Final Traffic Analysis Technical Report* in **FEIS, Appendix A**, the *MDOT SHA's Draft Application for Interstate Access Point Approval (IAPA) Report* in **FEIS, Appendix B**, and the *Final COVID-19 Travel Analysis and Monitoring Plan* in **FEIS, Appendix C**.

### 4.1.1 Traffic Analysis Data Collection and Modeling Methodology

Baseline conditions were established at the beginning of the Study reflecting year 2017 conditions. The baseline traffic data and existing calibrated models are unchanged from the DEIS. The DEIS assumed a design year of 2040. In the SDEIS and this FEIS, an updated design year of 2045 was used. Refer to paragraph 1 below and **Section 4.1.3** for additional details regarding why the design year was updated, as planned. Detailed traffic operational analyses were performed to evaluate the Preferred Alternative's ability to meet the Study's Purpose and Need based on year 2045 conditions. Similar to the DEIS and SDEIS, the evaluation methodology for the FEIS included a three-step process:

1. First, a regional forecasting model was developed for the No Build Alternative and Preferred Alternative using the MWCOG model, which is the model regularly used by MDOT SHA and other transportation agencies to evaluate projects in the Washington, DC metro area. For the SDEIS, MDOT SHA used an updated version of the MWCOG model, Version 2.3.75, which was released in Fall 2018. The DEIS used an earlier version of the MWCOG model, Version 2.3.71. There are three primary differences between the model versions. First, land use data was updated as part of MWCOG's regularly updated population, household, and employment cooperative forecasts from Round 9.0 to Round 9.1. Second, the transportation network was updated with new projects per the latest Constrained Long-Range Plan (CLRP), approved in 2018. Finally, these forecasts were performed at five-year intervals out to the year 2045, which allowed MDOT SHA to extend the design year to 2045 for analysis in the SDEIS. The FEIS used the same MWCOG model version as the SDEIS (Version 2.3.75).

2. Next, the outputs from the MWCOG model were imported into a VISSIM model to develop traffic volume projections for the design year of 2045 for each roadway segment and ramp movement within the study limits during the peak periods for the No Build Alternative and Preferred Alternative. These peak hour forecasts were updated for the FEIS based on new information related to background projects and to account for design changes to the Preferred Alternative that were made following coordination with various stakeholders to further improve operations and/or minimize property and environmental impacts following the SDEIS. Forecasts were also refined in response to comments received from the public and agencies on the SDEIS.

00000318

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

3. Finally, traffic simulation models were developed for the 2045 No Build Alternative and 2045 Preferred Alternative using VISSIM software to determine the projected operational performance in several key metrics during the AM peak period (6AM to 10AM) and the PM peak period (3PM to 7PM). The metrics were selected to evaluate the effectiveness of each of the Build Alternatives to efficiently move people through the region and to provide benefits to the transportation system. The metrics used in this FEIS were the same used to evaluate the other Build Alternatives in the DEIS and the SDEIS: speed, delay, travel time, level of service (LOS), throughput, and local network impacts.

## 4.1.2 Traffic Analysis Area

The traffic analysis area for the FEIS extended beyond the study limits to capture upstream and downstream effects. Evaluation of the Preferred Alternative in the FEIS used the same limits for the VISSIM simulation models as in the DEIS and the SDEIS, as shown in **Figure 4-1** and listed below:

- I-495 from VA 193 in Virginia across the American Legion Bridge (ALB) and through the state of Maryland to the Woodrow Wilson Bridge
- I-270 from the I-70 ramp merges to I-495, including the East and West Spurs

Additionally, the updated version of the MWCOG model used to develop 2045 volume projections for the SDEIS and this FEIS covered the same area as the previous version for the DEIS: the entire National Capital Region of surrounding roadways in 22 jurisdictions, including Montgomery County, Prince George's County, and Frederick County in Maryland, as well as Arlington County and Fairfax County in Virginia, and the District of Columbia.

## 4.1.3 Traffic Modeling Assumptions

The following summarizes the assumptions applied to the traffic modeling results presented in this FEIS, including discussion of the design year, background projects, managed lane design elements, tolling, and new technologies, such as connected and autonomous vehicles (CAV).

## A. Design Year

The DEIS used a 2040 design year to evaluate the No Build and Build Alternatives. MDOT SHA assumed the design year 2040 for all traffic analysis in the DEIS because at the time the Study began, that was the latest approved regional forecasting model from MWCOG. The 2040 forecasts were used to compare alternatives and determine which alternatives would be expected to provide the best operational benefit to meet the Study's Purpose and Need. A new version of the MWCOG model was approved and released in October 2018 that projected traffic demand out to the year 2045. The DEIS included a sensitivity analysis comparing the 2040 forecasts to the 2045 forecasts (refer to *Appendix J* of the *Traffic Analysis Technical Report* in **DEIS, Appendix C,**) and a commitment to include updated 2045 operational analyses for the Preferred Alternative to evaluate how that alternative would meet the Purpose and Need based on the latest MWCOG model. Therefore, the SDEIS assumed a design year 2045 for the No Build Alternative and Preferred Alternative. That assumption (i.e., a design year of 2045) was carried forward in this FEIS.

00000319

OP•LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

**Figure 4-1: Limits of VISSIM Model Network and Interchange Locations Included along I-495 and I-270**



00000320


## B. Background Roadway Projects

The analysis for the 2045 design year assumed completion of several background projects included in the region's CLRP. The impacts of these background projects were assumed as part of the baseline conditions for the design year 2045 No Build Alternative and the 2045 Preferred Alternative. The following roadway projects of regional significance within the study limits were not in the baseline (year 2017) model but were assumed to be in place in the year 2040 in the DEIS and are also assumed to be in place in the year 2045 for the purposes of this FEIS, as described on the following page.

- I-270 Innovative Congestion Management (ICM) Improvements
- Virginia Department of Transportation (VDOT) I-495 Express Lanes Northern Extension (495 NEXT)
- I-270 at Watkins Mill Road Interchange (open to traffic in June 2020)
- Greenbelt Metro Station Access Improvements
- MD 97 Montgomery Hills Project
- MD 185 Salt Barn (completed in 2020)

The I-270 ICM Project involves a series of spot improvements and traffic management strategies to improve operations and safety along the I-270 corridor.  The goal of the ICM Project is to address existing and short-term needs along the I-270 corridor.  Construction of the ICM improvements is ongoing and is expected to be completed in 2022. The I-495 & I-270 Managed Lanes Study has been designed to be compatible with the improvements implemented under the I-270 ICM Project. Elements of the ICM improvements will be maintained following construction of the Preferred Alternative, including ramp metering, auxiliary lane improvements in multiple locations along both directions of I-270 south of I-370, and all improvements north of I-370. Elements that will not be maintained involve changes to the auxiliary lanes associated with the existing C-D Road, which will be removed as part of the Preferred Alternative.

The 495 NEXT project involves an extension of the existing I-495 Express Lanes system in Virginia to the ALB. MDOT SHA has been coordinating with VDOT throughout the project to ensure consistency and compatibility of both projects. The forecasts and designs of the 495 NEXT project have been updated in this FEIS to reflect the latest proposed design based on this coordination.

Construction of the Watkins Mill Interchange has been completed and the project was opened to traffic in June 2020.  The 2045 No Build and 2045 Preferred Alternative models both include this project.

The Greenbelt Metro Station Access Improvements project is an MDOT SHA proposed project to convert the existing partial interchange between I-495 and the Greenbelt Metro Station into a full movement interchange.  This project is currently in the planning stage.  Forecasts for this project have been updated in this FEIS to reflect the latest planning efforts.

The MD 97 Montgomery Hills project is an MDOT SHA proposed project to improve pedestrian and bicycle connectivity and mobility along MD 97 in the vicinity of the I-495 interchange, while balancing traffic operations.  This project is currently in the design stage.  The latest forecasts and designs of this project are reflected in this FEIS.

Construction of a Salt Barn along the ramp from the I-495 Outer Loop to MD 185 was completed in 2020. The 2045 No Build and 2045 Preferred Alternative models both include this project. For additional details regarding these background projects, refer to *Final Traffic Analysis Technical Report* in **FEIS, Appendix A**.

00000321

## C. Background Transit Projects

Additionally, the benefits of the following proposed transit projects on the traffic demands for the roadway network within the study corridors were accounted for in both the 2040 and 2045 modeling:

- Purple Line Light Rail
- Corridor Cities Transitway
- US 29 Bus Rapid Transit (BRT)
- Randolph Road BRT
- North Bethesda Transitway

The updated 2045 MWCOG model also includes the following additional transit projects that are part of Montgomery County's Rapid Transit System that were not included in the 2040 model:

- MD 355 BRT
- Veirs Mill Road BRT
- New Hampshire Avenue BRT

Potential roadway or transit improvements on I-270 from north of I-370 to I-70 were not included as part of this Study, as alternatives for that phase of I-270 will be developed as part of a separate National Environmental Policy Act (NEPA) process (https://oplanesmd.com/i270-environmental/).

## D. Managed Lanes Design

Each of the Build Alternatives evaluated as part of the traffic analysis for the DEIS, and the Preferred Alternative evaluated in the SDEIS and this FEIS, included managed lanes. The managed lanes were assumed to be buffer-separated with a physical delineation using flexible delineators from the adjacent general purpose lanes. Access would be provided via grade separated direct connections at interchanges or via at-grade exchange ramps at key locations, as described below.

## E. Direct Access Locations

The direct access locations have evolved throughout the Study based on input from the stakeholders and design modifications to avoid or minimize impacts to sensitive resources, while still meeting the Purpose and Need.  The operational analysis results presented in this FEIS assume direct access would be provided at the following locations, consistent with the latest design for the Preferred Alternative. For more information on direct access locations, see **Chapter 3, Section 3.1.3**, and **Figure 3-3**.

- Three (3) interchanges on I-495:
  - George Washington Memorial Parkway
  - Cabin John Parkway / MD 190
  - I-270 west spur
- A set of exchange ramps between Maryland and Virginia:
  - Outer loop exchange ramp from Maryland high-occupancy toll (HOT) managed lanes to Virginia general purpose lanes south of the ALB
  - Inner loop exchange ramp from Virginia general purpose lanes to Maryland HOT managed lanes south of ALB

00000322

- A set of exchange ramps on the West Spur of I-270 providing ingress/egress in both directions
- Five (5) interchanges on I-270:
  - I-495 and I-270 Y-split on the west spur
  - Westlake Terrace (expanded interchange serving all directions)
  - Wootton Parkway (new interchange)
  - Gude Drive (new interchange)
  - I-370 (to/from the south)

## F. Tolling

The Preferred Alternative will include tolling of the HOT managed lanes. The final toll policies and toll rate ranges for the proposed managed lanes have been approved and were defined following Maryland's regulatory requirements as described in **Chapter 3, Section 3.1.9**. The managed lanes would operate under a dynamic tolling approach where the toll rates would change in response to real-time variations in traffic conditions. For the purposes of the analysis in this FEIS, the volume in the managed lanes would be set to maintain a minimum average operating speed of at least 45 miles per hour (mph)[1] and not exceed 1,600 to 1,700 vehicles per hour per lane in the highest demand section of the managed lanes. The remaining portion of demand for each freeway section would be in the general purpose lanes.  For *planning purposes only*, the dynamically priced toll rates from the initial MWCOG model runs for use in evaluating the Build Alternatives in the DEIS were retained for use in this FEIS, as shown in the *Final Traffic Analysis Technical Report* in **FEIS, Appendix A**.  The dynamic toll rates used by MWCOG for travel demand modeling were developed as "per mile" rates based on an iterative process for each alternative and ranged from $0.20 to $1.36 per mile (in 2016 dollars). The iterative process was designed to estimate appropriate toll values to control the volume of traffic using the managed lanes through a combination of volume to capacity ratios and maintaining a minimum operating speed at or near free-flow conditions. The toll rates produced as part of this MWCOG modeling process were developed by MWCOG staff. MDOT SHA did not perform this step for traffic forecasting and traffic analysis purposes, because the estimated toll values for future-year networks were provided by MWCOG when the model was transmitted to MDOT SHA. In November 2021, MDTA approved toll rate ranges for use on the I-495 and I-270 HOT lanes in Maryland (https://mdta.maryland.gov/ALB270TollSetting/TollRateRangeSettingProcessAndApprovedTollRateRanges). While it was too late in the process to incorporate those values directly into the modeling and analysis for the FEIS, the assumed MWCOG values are similar and were sufficient for use in planning level activities. Projected volumes in the HOT lanes were refined for this FEIS through post processing efforts, as described in **FEIS, Appendix A**, but the base tolling assumptions from the MWCOG model did not change.

## G. Connected and Automated Vehicles

The expected influx of CAVs will impact future traffic operations on all roads in Maryland, including I-495 and I-270, as well as nationwide. MDOT SHA participates in a statewide CAV working group (https://mva.maryland.gov/safety/Pages/MarylandCAV.aspx) to stay up to date on the latest research and industry projections.  At this time, there are too many unknowns regarding how CAVs could affect

---

[1] If average speeds in managed lanes drop below 45 mph during weekday peak periods 90% of the time over a 180-day period, federal law requires that the public authority with jurisdiction over the facility develop a plan of action toward bringing the facility into compliance (23 USC. 166 (d)(2)(B)).

00000323



demand and capacity to include CAVs directly in the traffic forecasts. Capacity will likely increase as vehicle spacing decreases, but the magnitude of the capacity increase is difficult to quantify based on the current research.  Also, the benefits of more vehicles per lane may be offset by a potential increase in demand on the transportation network for some types of auto trips, including "mobility as a service" trips (people that could call an autonomous vehicle for a solo trip, rather than owning their own car) and "deadhead" trips (trips where the autonomous vehicle is empty, traveling to a parking lot or to the next pickup point).  Therefore, the traffic projections for this Study apply traditional forecasting techniques, while being cognizant of the potential future CAV impacts.

## 4.2   Forecasting

Forecasts for the Study were developed using the methodologies and assumptions described in Section 4.1 and the *Final Traffic Analysis Technical Report* in **FEIS, Appendix A**.  The results are summarized below.

### 4.2.1   Baseline Conditions

Baseline conditions were developed for the year 2017 and reflect conditions prior to the onset of the COVID-19 pandemic, which began affecting traffic demand and volumes in early 2020. COVID-19 considerations are described later in this chapter in **Section 4.5**. The study limits include many of the most heavily traveled, most congested, and most unreliable roadway segments in Maryland.[2] According to the *2020 Maryland State Highway Mobility Report*, the top four highest volume roadway sections in Maryland based on average daily traffic (ADT) are contained within the study limits. These locations include I-270 from the I-270 Split to MD 117; I-495 from the Virginia State Line to the I-270 West Spur; I-495 from MD 4 to I-95; and I-495 from the I-270 East Spur to I-95. **Table 4-1** shows the baseline existing (year 2017) ADT for each segment within the study area, which reflects total traffic in both directions.

**Table 4-1: Existing Average Daily Traffic (ADT)**

| Corridor | Segment | Existing Volumes (2017) |
|---|---|---|
| I-270 (both directions) | I-370 to MD 28 | 226,000 |
| | MD 28 to I-270 Spur | 259,000 |
| I-495 (both directions) | at American Legion Bridge | 243,000 |
| | MD 190 to I-270 Spur | 253,000 |
| | Between I-270 Spurs | 119,000 |
| | MD 355 to I-95 | 235,000 |
| | I-95 to US 50 | 230,000 |
| | US 50 to MD 214 | 235,000 |
| | MD 214 to MD 4 | 221,000 |
| | MD 4 to MD 5 | 198,000 |

---

[2] Segments as defined by *2020 Maryland State Highway Mobility Report*

00000324



## 4.2.2    2045 Volumes

Traffic volumes throughout the study corridors are projected to continue to grow over the next 20 to 25 years due to expected increases in population and employment in the Washington, DC metropolitan region. Refer to **Chapter 1, Section 1.3.1**, and **Tables 1-1** and **1-2** for additional details. **Table 4-2** below shows the projected design year 2045 ADT for each segment along I-495 and I-270 within the study limits for the No Build and Preferred Alternative. Despite many segments already operating at or near capacity, daily traffic volumes on I-270 and I-495 are projected to increase between now and the design year 2045 under the No Build condition. Locations that add capacity to I-270 and I-495 under the Preferred Alternative would be projected to see an increase in daily traffic volumes served compared to the No Build Alternative because the freeways would be able to accommodate latent demand that would otherwise use the local roadway network to avoid congestion.

While these forecasts were developed using models that do not specifically include potential long-term impacts of the COVID-19 pandemic on travel behavior, a sensitivity analysis was conducted evaluating several "what if" scenarios, including potential sustained changes in teleworking, eCommerce, and transit use on projected 2045 travel demand and operations, as described in **Section 4.5**.

**Table 4-2: 2045 Average Daily Traffic (ADT)**

| Corridor | Segment | No Build (2045) | Preferred Alternative (2045) |
|---|---|---|---|
| I-270 | I-370 to MD 28 | 270,000 | 284,000 |
| | MD 28 to I-270 Spur | 299,000 | 320,000 |
| I-495 | at American Legion Bridge | 280,000 | 306,000 |
| | MD 190 to I-270 Spur | 283,000 | 318,000 |
| | Between I-270 Spurs | 126,000 | 136,000 |
| | MD 355 to I-95 | 250,000 | 253,000 |
| | I-95 to US 50 | 248,000 | 250,000 |
| | US 50 to MD 214 | 256,000 | 258,000 |
| | MD 214 to MD 4 | 249,000 | 251,000 |
| | MD 4 to MD 5 | 223,000 | 224,000 |

## 4.3    Traffic Analysis for No Build and Preferred Alternatives

Using the forecast volumes described in **Section 4.2**, the Preferred Alternative was evaluated and compared to the No Build condition in the design year of 2045 for several key operational metrics, including delay, travel time, speed, LOS, throughput, and the effect on the local network. These metrics are the same metrics used in the DEIS and SDEIS to evaluate and compare the alternatives, but results have been updated for this FEIS to reflect the latest forecasts and design based on stakeholder input to further improve operations and/or minimize property and environmental impacts, as described in **Chapter 3**. The results were obtained from the MWCOG model and the VISSIM traffic simulation models and are summarized in the following sections. For additional details, refer to the **FEIS, Appendix A,** *Final Traffic Analysis Technical Report***.**

00000325

### 4.3.1 Delay

System-wide delay was calculated to determine the average amount of time each vehicle in the traffic simulation model would be delayed while trying to reach its destination. Delay can be caused by slow travel due to congestion or vehicles yielding the right-of-way at stop-controlled or signalized intersections. **Table 4-3** shows the projected average delay per vehicle in the entire network under the No Build Alternative and the Preferred Alternative during the 2045 AM peak period and the 2045 PM peak period. These results include all vehicles in the system for the full simulation period, which included four hours in the morning (6:00 AM to 10:00 AM) and four hours in the afternoon (3:00 PM to 7:00 PM).

**Table 4-3: 2045 System-Wide Delay for Entire Study Area**

| Alternative | Average Delay (min/vehicle) | | Percent Improvement vs. No Build | |
|---|---|---|---|---|
| | AM Peak (6-10AM) | PM Peak (3-7PM) | AM Peak (6-10AM) | PM Peak (3-7PM) |
| No Build | 12.2 | 11.3 | N/A | N/A |
| Preferred Alternative | 10.6 | 7.0 | 13% | 38% |

The results indicated that the Preferred Alternative would be projected to reduce system-wide delay by 13 percent during the AM peak period and by 38 percent during the PM peak period compared to 2045 No Build conditions. These results reflect all vehicles in the model, including those traveling on I-495 and I-270 for the entire length of the study area (including the no action areas) and those traveling through and within the cross-street interchanges.

### 4.3.2 Travel Time

Travel time index (TTI) was calculated for each segment of I-495 and I-270 based on the outputs from the traffic simulation model. TTI quantifies the average travel time and congestion levels during the peak periods and is defined as the ratio of the average (50th percentile) travel time during a particular hour to the travel time during free-flow or uncongested conditions. TTI also serves as a proxy for the Planning Time Index (PTI), which is used to estimate reliability, because there is a strong correlation between PTI and TTI. Roadways with a lower TTI have some reserve capacity to absorb the disruption caused by non-recurring congestion (and generally have a lower PTI), while roadways with high TTI values are more likely to be impacted by minor incidents (and generally have a higher PTI). **Table 4-4** shows the weighted average TTI values for the entire study area (including the no action areas) in the general purpose lanes for the Preferred Alternative and the No Build Alternative during the AM peak hour (7:00 AM to 8:00 AM) and the PM peak hour (4:00 PM to 5:00 PM) in the design year of 2045.

**Table 4-4: 2045 Travel Time Index (TTI) for Entire Study Area**

| Alternative | Weighted Average TTI[1] (General Purpose Lanes) |
|---|---|
| No Build | 2.0 |
| Preferred Alternative | 1.8 |

Note: [1] Reflects weighted average TTI on I-270 and I-495 during peak hours (7-8AM and 4-5PM)

00000326



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

MDOT SHA defines "congestion" as any roadway segment with a TTI value greater than 1.15, while "severe congestion" is reached at TTI values of 2.0. Under the 2045 No Build Alternative, the weighted average TTI along I-270 and I-495 during the peak hours is 2.0, which reflects severe congestion throughout the study area. The results indicated that the general purpose lanes under the Preferred Alternative would improve compared to No Build from a TTI of 2.0 to a TTI of 1.8 in the design year of 2045. This reflects an improvement from the severe congestion category to the "heavy congestion" category (defined as TTI between 1.3 and 2.0). TTI values broken down by segment are provided in **Table 4-5** and have been color coded based on MDOT SHA's definition of uncongested conditions, moderate congestion, heavy congestion, and severe congestion.

The results indicated that the Preferred Alternative would be projected to improve four general purpose segments from congested levels under the No Build Alternative (TTI over 1.15) to uncongested (TTI under 1.15) and also improve two general purpose segments from severe congestion (TTI over 2.0) to heavy congestion (TTI under 2.0) due to the capacity improvements under Build conditions. One general purpose segment would be projected to experience a slight increase in TTI (from 3.8 to 4.0) during the PM peak due to the higher volume served in the segment during the peak hour resulting from the Preferred Alternative releasing the bottleneck at the ALB. All HOT lanes would be projected to operate at uncongested levels (TTI < 1.15). Additional details are provided in the *Final Traffic Analysis Technical Report* in **FEIS, Appendix A.**

Table 4-5: 2045 Travel Time Index (TTI) Results for General Purpose Lanes from VISSIM Model

| Peak Period | Corridor | Alternative | |
|---|---|---|---|
| | | No Build | Preferred |
| AM Peak Hour (7-8AM) | I-270 Northbound from I-495 to I-370 | 1.1 | 1.0 |
| | I-270 Southbound from I-370 to I-495 | 1.3 | 1.2 |
| | I-495 Inner Loop from Virginia 193 to I-270 | 1.4 | 1.0 |
| | I-495 Outer Loop from I-270 to Virginia 193 | 1.5 | 1.1 |
| | I-495 Inner Loop from I-270 to I-95[3] | 1.0 | 1.1 |
| | I-495 Outer Loop from I-95 to I-270[3] | 2.9 | 2.7 |
| | I-495 Inner Loop from I-95 to MD 5[3] | 2.7 | 2.6 |
| | I-495 Outer Loop from MD 5 to I-95[3] | 2.5 | 2.5 |
| PM Peak Hour (4-5PM) | I-270 Northbound from I-495 to I-370 | 2.2 | 1.7 |
| | I-270 Southbound from I-370 to I-495 | 1.0 | 1.0 |
| | I-495 Inner Loop from Virginia 193 to I-270 | 3.8 | 4.0 |
| | I-495 Outer Loop from I-270 to Virginia 193 | 2.4 | 1.0 |
| | I-495 Inner Loop from I-270 to I-95[3] | 2.8 | 2.4 |
| | I-495 Outer Loop from I-95 to I-270[3] | 1.8 | 1.1 |
| | I-495 Inner Loop from I-95 to MD 5[3] | 1.4 | 1.5 |
| | I-495 Outer Loop from MD 5 to I-95[3] | 2.7 | 1.9 |

Notes: [1] MDOT SHA defines various levels of congestion based on TTI: Uncongested (green) – TTI ≤ 1.15; Moderate Congestion (yellow) – 1.15 < TTI ≤ 1.3; Heavy Congestion (orange) – 1.3 < TTI < 2.0; Severe Congestion (red) – TTI ≥ 2.0. [2] This table summarizes TTI in the general purpose lanes. All HOT/Express Toll Lanes would have TTI values in the uncongested range (TTI less than 1.15). [3] Gray shaded rows reflect segments outside Phase 1 South limits.

00000327

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

### 4.3.3   Speed

The metric of average speed was calculated from the traffic simulation model output. Speed data was compiled for all links in the system. **Table 4-6** shows the average speed for the Preferred Alternative in the general purpose lanes and the HOT lanes for the entire study limits of I-495 and I-270 during the AM peak hour (7:00 AM to 8:00 AM) and the PM peak hour (4:00 PM to 5:00 PM) compared to the No Build Alternative in the design year of 2045. The results are shown for the entire study limits to be consistent with the results presented in the DEIS and SDEIS, even though the Build improvements for the Preferred Alternative are only in the Phase 1 South limits.

**Table 4-6: 2045 Average Speed – Entire Study Area**

| Alternative | Average Speed[1] (General Purpose Lanes) | Average Speed[1] (HOT Lanes) |
|---|---|---|
| No Build | 24 mph | N/A |
| Preferred Alternative | 28 mph | 60 mph |

Note: [1] Reflects weighted average speed on I-270 and I-495 during peak hours (7-8AM and 4-5PM)

The results indicated that the additional capacity proposed under the Preferred Alternative would provide the option for a free flow trip in the HOT lanes (average speed of 60 mph) and would also provide benefits to the existing lanes by improving average speeds in the general purpose lanes by four mph on average throughout the study area during the peak periods compared to the No Build condition.

Detailed corridor travel speed results by peak hour and direction for the general purpose lanes and the managed lanes are provided in **Table 4-7**. During the 2045 AM peak, speeds in the I-495 general purpose lanes are projected to improve under the Preferred Alternative compared to No Build and all HOT lanes are projected to maintain speeds of at least 60 mph. On the I-495 outer loop, average speeds in the general purpose lanes are projected to improve from 35 mph to 50 mph between the I-270 west spur and the George Washington Memorial Parkway and improve slightly (from 20 mph to 22 mph) in the no action area between MD 5 and the I-270 West Spur.  On the I-495 inner loop, average speeds in the general purpose lanes are projected to improve from 38 mph to 55 mph between the George Washington Memorial Parkway and the I-270 west spur and remain unchanged (at 26 mph) in the no action area between MD 5 and the I-270 west spur. On I-270 southbound, average speeds in the general purpose lanes are projected to improve slightly (from 44 mph to 45 mph) between I-370 and I-495 compared to No Build conditions, and motorists would have the option of a free flow trip (62 mph) in the adjacent HOT lanes. On I-270 northbound, speeds are free flow during the AM peak period under both the No Build and the Preferred Alternative. The results show a slight improvement in average speed along I-270 northbound under the Preferred Alternative compared to No Build (from 55 mph to 61 mph) due to the removal of the Local Lanes system and the provision of the adjacent HOT lanes (which are projected to operate at 63 mph).

During the 2045 PM peak, the Preferred Alternative is projected to improve speeds significantly along the I-495 outer loop in the general purpose lanes throughout the study area. Average speeds in the general purpose lanes are projected to improve from 22 mph to 52 mph between the I-270 west spur and the George Washington Memorial Parkway and from 19 mph to 32 mph in the no action area between MD 5 and the I-270 west spur due to the Preferred Alternative relieving the downstream bottleneck. The HOT

00000328

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

lanes along the I-495 outer loop are projected to operate at free flow conditions (63 mph) during the PM peak.

**Table 4-7: 2045 Corridor Travel Speed (mph) Results from VISSIM Model**

| Peak Period | Corridor | Travel Lanes | Alternative | |
|---|---|---|---|---|
| | | | No Build | Preferred |
| AM Peak Hour[3] (7-8AM) | I-270 Northbound from I-495 to I-370 | General Purpose Lanes | 55[2] | 61 |
| | | HOT Lanes | - | 63 |
| | I-270 Southbound from I-370 to I-495 | General Purpose Lanes | 44[2] | 45 |
| | | HOT Lanes | - | 62 |
| | I-495 Outer Loop from I-270 West Spur to George Washington Memorial Parkway | General Purpose Lanes | 35 | 50 |
| | | HOT Lanes | - | 62 |
| | I-495 Inner Loop from George Washington Memorial Parkway to I-270 West Spur | General Purpose Lanes | 38 | 55 |
| | | HOT Lanes | - | 63 |
| | I-495 Outer Loop from MD 5 to I-270 West Spur[1] | General Purpose Lanes | 20 | 22 |
| | | HOT Lanes | - | - |
| | I-495 Inner Loop from I-270 West Spur to MD 5[1] | General Purpose Lanes | 26 | 26 |
| | | HOT Lanes | - | - |
| PM Peak Hour[3] (4-5PM) | I-270 Northbound from I-495 to I-370 | General Purpose Lanes | 27[2] | 27 |
| | | HOT Lanes | - | 45 |
| | I-270 Southbound from I-370 to I-495 | General Purpose Lanes | 57[2] | 58 |
| | | HOT Lanes | - | 63 |
| | I-495 Outer Loop from I-270 West Spur to George Washington Memorial Parkway | General Purpose Lanes | 22 | 52 |
| | | HOT Lanes | - | 63 |
| | I-495 Inner Loop from George Washington Memorial Parkway to I-270 West Spur | General Purpose Lanes | 14 | 15 |
| | | HOT Lanes | - | 62 |
| | I-495 Outer Loop from MD 5 to I-270 West Spur[1] | General Purpose Lanes | 19 | 32 |
| | | HOT Lanes | - | - |
| | I-495 Inner Loop from I-270 West Spur to MD 5[1] | General Purpose Lanes | 25 | 24 |
| | | HOT Lanes | - | - |

Notes: [1] Shaded rows reflect locations outside the Phase 1 South limits with no action proposed under the Preferred Alternative. [2] No Build results along I-270 are shown as an average of the Express Lanes and the adjacent Local Lanes. Under No Build conditions, vehicles enter and exit I-270 via a separated Local Lanes system, which will be eliminated under the Build alternatives to reduce the roadway footprint and minimize impacts. [3] Results reported here for the overall AM and PM peak hours, consistent with DEIS and SDEIS. For complete results covering entire study period (6-10AM, 3-7PM), refer to **FEIS, Appendix B.**

Speeds along the I-495 inner loop and I-270 northbound are limited by downstream congestion outside the limits of Phase 1 South during the PM peak under the Preferred Alternative (i.e., along the inner loop from the I-270 east spur toward I-95 and the B/W Parkway). On the I-495 inner loop, average speeds in the general purpose lanes are projected to improve slightly (increase from 14 mph to 15 mph) between the George Washington Memorial Parkway and the I-270 west spur under the Preferred Alternative during the 2045 PM peak hour compared to the No Build Alternative but speeds remain low because of severe congestion that will remain on the top side of I-495 in the no action area. Average speeds in the HOT lanes will maintain free flow operations (62 mph) until they merge back into the general purpose lanes

00000329

  I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

east of the I-270 west spur. In the no action area between the I-270 west spur and MD 5, I-495 inner loop speeds will drop slightly between the No Build and Preferred Alternative, from 25 mph to 24 mph, due to the additional demand served during the peak hour.

On I-270 northbound, average speeds in the general purpose lanes would be similar for the Preferred Alternative compared to the No Build Alternative (27 mph) in the 2045 PM peak without additional improvements on I-270 north of I-370 because of severe congestion where I-270 reduces to two lanes north of the Phase 1 South limits. Average speeds in the HOT lanes would be better and motorists would achieve the desired average speed of 45 mph until they merge back into the general purpose lanes north of I-370. As noted earlier in **Section 4.1.3**, potential improvements in the section of I-270 north of I-370 are being evaluated under a separate pre-NEPA study. On I-270 southbound, projected speeds are generally free flow during the PM peak period because this is the off-peak direction. Average speeds are projected to be similar for the Preferred Alternative compared to the No Build and Preferred Alternative (increase slightly from 57 mph to 58 mph), with higher average speeds (63 mph) in the adjacent HOT lanes.

### 4.3.4  Level of Service

Level of Service (LOS) is a letter grade assigned to a section of roadway that measures the quality of traffic flow, ranging from LOS A to LOS F. LOS A represents optimal, free-flow conditions, while LOS F represents failing conditions where demand exceeds capacity. For freeway segments, the *Highway Capacity Manual* assigns LOS grades based on density. Urban freeway segments reach failing (LOS F) conditions when the density exceeds 45 passenger cars per mile per lane. The percentage of lane-miles projected to operate at LOS F during the peak periods in the design year of 2045 was calculated from the traffic simulation model output for the Preferred Alternative and the No Build Alternative. The results include the entire study areas (including the no action areas) and are shown in **Table 4-8.** Detailed tables showing LOS by segment are provided in the **FEIS, Appendix A,** *Final Traffic Analysis Technical Report***.**

Table 4-8: 2045 Percent of Lane-Miles Operating at LOS F for Entire Study Area

| Alternative | Percent of Lane-Miles Operating at LOS F | | |
|---|---|---|---|
| | AM Peak Hour (7-8AM) | PM Peak Hour (4-5PM) | Average |
| No Build | 32% | 47% | 40% |
| Preferred Alternative | 26% | 30% | 28% |

The results indicated that the Preferred Alternative would be effective at reducing the number of failing segments within the study corridors during both the AM peak hour (7:00 AM to 8:00 AM) and the PM peak hour (4:00 PM to 5:00 PM). In the design year of 2045, the percentage of lane-miles projected to operate at LOS F would decrease by more than 10 percent because of the Preferred Alternative. However, it is projected that 28 percent of the lane miles would continue to operate at LOS F in the design year of 2045 under the Preferred Alternative, primarily in areas that would have no action (namely, I-495 east of the I-270 east spur).

00000330

### 4.3.5  Throughput

The metric of vehicle throughput was calculated from the traffic simulation model output to quantify how efficiently goods, services, and people could be moved through the study corridors under each alternative. Throughput represents the number of vehicles that pass by a given point in the roadway network in a set amount of time. Four key locations were chosen for evaluating throughput during the peak periods: I-495 crossing the ALB, I-495 west of I-95, I-495 at MD 5, and I-270 at Montrose Road. These locations cover the four main segments of the study area, separated by major freeway junctions (I-495 at I-95 and I-495 at I-270) and are considered representative of the entire study area. **Table 4-9** summarizes the average vehicle-throughput at the four key locations for the No Build Alternative and the Preferred Alternative in terms of vehicles per hour. The values include traffic traveling in both directions and account for vehicles traveling in both the general purpose lanes and the managed lanes. For consistency, the same four key locations used in the DEIS and SDEIS are reported in this FEIS even though the Preferred Alternative includes no action in two of the four locations. Under No Build conditions, the number of vehicles (and people) that can travel through the system during the peak period is constrained by congestion. The Preferred Alternative would result in approximately 13 percent increased throughput compared to the No Build Alternative at the key locations, from an average of 15,700 vehicles per hour to an average of 17,700 vehicles per hour. This translates into increased efficiency of the roadway network in getting people, goods, and services to their destinations. Additional benefits of increased throughput on the highway include reduced peak spreading (i.e., less congestion in the off-peak hours) and reduced burden on the surrounding roadway network.

**Table 4-9: 2045 Vehicle Throughput at Key Locations**

| Alternative | Average Vehicle Throughput at Four Key Locations[1] (vehicle/hour) |
|---|---|
| No Build | 15,700 |
| Preferred Alternative | 17,700 |

Note: [1] Evaluation locations include I-495 at ALB, I-495 west of I-95, I-495 at MD 5, I-270 at Montrose Road

**Table 4-10** provides additional detail by showing the vehicle throughput results generated from the VISSIM outputs at each key location during the AM peak hour (7:00 AM to 8:00 AM) and the PM peak hour (4:00 PM to 5:00 PM). Results are reported in terms of vehicles per hour and percent increase in vehicle-throughput for the Preferred Alternative compared to the No Build Alternative, rounded to the nearest five percent. As expected, the most significant increases under the Preferred Alternative occur at the locations where HOT lanes are proposed (I-495 at the ALB and I-270 at Montrose Road).

### 4.3.6  Local Network

While the focus of the Study is to provide benefits to travelers using I-495 and I-270, the proposed action would also have impacts on the surrounding local roadway network.[3] This impact was quantified by using the results of the MWCOG regional model output for the No Build Alternative and the Preferred Alternative to calculate the total vehicle hours of delay on all arterials in Montgomery County, Maryland,

---

[3] For the purposes of this Study, the local roadway network includes minor and principal arterials, but not roadways that are classified as expressways, freeways, or interstate.

00000331


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

Prince George's County, Maryland, and the District of Columbia. Other regions in Maryland and Virginia showed negligible changes in local delay because of the project.

Table 4-10: 2045 Vehicle Throughput Results from VISSIM Model

| Metric | Peak Period | Location | Alternative | |
|---|---|---|---|---|
| | | | No Build | Preferred |
| Vehicle-Throughput (vehicle/hour) | AM Peak Hour (7-8AM) | I-270 at Montrose Rd | 18,182 | 19,855 |
| | | I-495 at American Legion Bridge | 18,204 | 22,346 |
| | | I-495 west of I-95 | 14,381 | 14,525 |
| | | I-495 at MD 5 | 8,847 | 8,990 |
| | PM Peak Hour (4-5PM) | I-270 at Montrose Rd | 19,246 | 22,182 |
| | | I-495 at American Legion Bridge | 17,002 | 22,472 |
| | | I-495 west of I-95 | 15,881 | 16,639 |
| | | I-495 at MD 5 | 13,804 | 14,325 |
| Percent Change in Vehicle-Throughput vs. 2045 No Build | AM Peak Hour (7-8AM) | I-270 at Montrose Rd | N/A | 10% |
| | | I-495 at American Legion Bridge | N/A | 25% |
| | | I-495 west of I-95 | N/A | 0% |
| | | I-495 at MD 5 | N/A | 0% |
| | PM Peak Hour (4-5PM) | I-270 at Montrose Rd | N/A | 15% |
| | | I-495 at American Legion Bridge | N/A | 30% |
| | | I-495 west of I-95 | N/A | 5% |
| | | I-495 at MD 5 | N/A | 5% |

Note: Gray shaded rows indicate locations outside Phase 1 South limits.

**Table 4-11** shows the total vehicle hours of delay and percent reduction compared to the 2045 No Build Alternative for arterials in Montgomery County, Prince George's County, and the District of Columbia individually. The results indicated that the Preferred Alternative would be projected to result in a net reduction in daily delay on the surrounding arterials of 3.5 percent by drawing traffic off the local network, despite some localized increases in arterial traffic near the managed lane access interchanges. Montgomery County would be projected to experience the largest local network savings under the Preferred Alternative as a result of the proposed physical roadway widening along portions of I-495 and I-270 in Montgomery County to provide HOT lanes under this Alternative. Prince George's County and the strict of Columbia would also expect to experience some benefits to the local network despite no physical roadway improvements within these jurisdictions under the Preferred Alternative.

00000332

**Table 4-11: 2045 Local Network Results from MWCOG Model**

| Metric | Alternative | |
|---|---|---|
| | No Build | Preferred |
| Daily Delay (vehicle-hours) for All Arterials in Montgomery County | 242,408 | 230,882 |
| Percent Reduction vs. No Build (Montgomery County) | N/A | 4.8% |
| Daily Delay (vehicle-hours) for All Arterials in Prince George's County | 160,143 | 157,832 |
| Percent Reduction vs. No Build (Prince George's County) | N/A | 1.4% |
| Daily Delay (vehicle-hours) for All Arterials in District of Columbia (DC) | 176,612 | 169,859 |
| Percent Reduction vs. No Build (District of Columbia) | N/A | 3.8% |
| Total Daily Delay (vehicle-hours) for All Arterials in Montgomery County, Prince George's County, and the District of Columbia (DC) | 579,163 | 558,573 |
| Percent Reduction vs. No Build (Total) | N/A | 3.5% |

### 4.3.7 Summary

The following summarizes the results of the design year 2045 traffic operational evaluation for the No Build Alternative and the Preferred Alternative presented in this chapter of the FEIS.

1.  The **No Build Alternative** would not address any of the significant operational issues experienced under existing conditions, and it would not be able to accommodate long-term traffic growth, resulting in slow travel speeds, significant delays, long travel times, and an unreliable network. Compared to the 2040 No Build results presented in the DEIS, the 2045 No Build results show generally higher delays and travel times on I-495 and I-270 due to additional projected traffic growth between 2040 and 2045. This traffic growth is anticipated despite additional transit projects included in the 2045 forecast that will help to slightly reduce projected delays on the surrounding local roadway network.

2.  The **Preferred Alternative** is projected to provide meaningful operational benefits to the system even though it includes no action or no improvements for a large portion of the study area to avoid and minimize environmental and property impacts. This alternative would significantly increase throughput across the ALB and on the southern section of I-270 while reducing congestion. It would also increase speeds, improve reliability, and reduce travel times and delays along the majority of I-495, I-270, and the surrounding roadway network compared to the No Build Alternative. Although the Preferred Alternative provides less improvement to traffic operations when compared to the Build Alternatives that included the full 48-mile study limits evaluated in the DEIS (such as Alternatives 9 and 10), it was chosen based in part on feedback from the public and stakeholders who indicated a strong preference for eliminating property and environmental impacts on the top and east side of I-495. Congestion would still be present during the PM peak period on I-270 northbound and the I-495 inner loop in the design year of 2045 due to downstream bottlenecks outside of the Preferred Alternative limits but would not get worse due to implementing the Preferred Alternative.

00000333

## 4.4 MDOT SHA's Draft Application for Interstate Access Point Approval

Per the FHWA *Policy on Access to the Interstate System* (updated May 22, 2017), any project that would result in new or revised access points to interstate facilities requires development of an IAPA report to document that an operational and safety analysis has concluded that the proposed change in access would not have a significant adverse impact on the safety and operation of the interstate facility (including mainline lanes, existing and proposed ramps, and ramp intersections with the cross streets) or on the local street network based on both current and future traffic projections. Proposed access must also connect to public roads only and must provide for all traffic movements, except for special applications such as managed lanes that are considered on a case-by-case basis. Section 111(a) of Title 23, United States Code, provides that State departments of transportation (State DOTs) may not add any points of access to, or exit from, the interstate system without prior approval of the Secretary. The Secretary has delegated this authority to the Federal Highway Administrator pursuant to Title 23, Code of Federal Regulations, Paragraph 1.48(b)(10).

The Preferred Alternative includes many new and revised access points and therefore IAPA documentation will be required for this project before it is constructed. As part of this process, MDOT SHA has prepared a Draft Application for IAPA, which is included with in **FEIS, Appendix B**. The results of the operational and safety evaluations contained in that document are summarized below. While MDOT SHA and FHWA have coordinated throughout the project on elements to be included in MDOT SHA's Draft Application for IAPA, formal approval of the IAPA documentation cannot occur until after the Record of Decision (ROD). The information contained in MDOT SHA's Draft Application for IAPA and summarized below is considered draft until an affirmative determination by FHWA of safety, operational, and engineering acceptability is obtained.

### 4.4.1 Operations of Interchanges, Cross Streets and Termini

The operations of interchanges, cross streets, and project termini were evaluated as part of MDOT SHA's Draft Application for IAPA. Analysis was conducted using VISSIM simulation modeling software to evaluate interstate mainline segments, ramp merge, diverge, and weave segments, ramp junctions and ramp intersections. The analysis in MDOT SHA's Draft Application for IAPA includes all interchanges within the Phase 1 South limits affected by the Preferred Alternative, as well as one adjacent interchange on either side. A total of 19 interchanges were evaluated. Operational metrics included density and speed by lane, LOS, throughput, and queuing.

The evaluation ensured that the number of lanes provided and the auxiliary lane lengths for merge, diverge, and weave operations were sufficient to achieve acceptable operations in the design year 2045 at all interchanges impacted under the Preferred Alternative and at the project termini locations where the HOT lanes tie back into the general purpose lanes on I-270 and I-495 and where the proposed HOT lanes in Maryland tie into the proposed HOT lanes system in Virginia. The latest design for the Preferred Alternative presented in this FEIS reflects the modifications required to provide acceptable operations on the freeways and freeway junctions.

For analysis of the adjacent arterials, cross streets, and intersections, Synchro/SimTraffic simulation models were developed using Version 10.3. A total of 60 intersections were evaluated for the No Build Alternative and 67 intersections were evaluated under the Preferred Alternative, as the project will result

00000334

Case 8:22-cv-02597-DKC    Document 56-3    Filed 10/30/23    Page 115 of 125

OP·LANES
MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

in a net increase of seven signalized intersections. Operational metrics determined for each intersection included delay, LOS, and queues for all intersections, approaches, and movements.

Most of the intersections studied were projected to operate acceptably under the Preferred Alternative when comparing 2045 No Build and 2045 Build conditions. However, two locations were identified where intersection improvements are proposed to improve safety and/or operations.  These intersections are located near new managed lane access ramps and are projected to attract additional traffic that would degrade operations compared to the No Build Alternative if additional improvements were not provided. Therefore, additional turn lanes and signal timing adjustments were included at the following intersections:

- Wootton Parkway at Seven Locks Road
- Gude Drive at Research Boulevard

Preliminary designs at these two locations were coordinated with affected stakeholders. The proposed improvements have been incorporated into the overall Preferred Alternative design presented in this FEIS, and the limit of disturbance has been adjusted, as needed, to account for this operational mitigation when determining environmental and property impacts. Coordination with stakeholders will continue during final design (post ROD).  For complete details, refer to **FEIS, Appendix B**.

### 4.4.2   Safety Evaluation

The safety evaluation conducted as part of MDOT SHA's Draft Application for IAPA included a thorough review of existing crash data and crash patterns for all freeways, ramps, intersections, and crossroads; an evaluation of crash rates and the identification of high crash locations within the study area; a qualitative assessment of how key design elements from the Preferred Alternative would be expected to influence safety and affect high crash locations within the study area; and a quantitative analysis that focuses on the relative comparison results from predictive crash analysis under the No Build Alternative and the Preferred Alternative.

Over the three-year crash study period between 2016 and 2018, approximately 4,700 crashes occurred within the study area. Seventy-three percent of the crashes along the freeways were rear end and sideswipe collisions that occurred during congested roadway conditions. The Preferred Alternative reduces congestion levels during peak periods to address the needs of the system and accommodate existing traffic and long-term traffic growth on I-270 and I-495. By reducing the extent and duration that the freeways and local roadways operate under congestion, unstable flow, and stop-and-go conditions, it can be anticipated that the Preferred Alternative will reduce the potential for congestion-related crashes, such as rear-end and sideswipe crashes occurring during peak periods.

The Preferred Alternative will replace aging structures, provide new pavement, and include improved geometrics, which are also likely to result in safety improvements. While the project will include tighter cross sections through specific sections of roadway to avoid impacts to critical resources, introduce new signalized intersections along some crossroads, and include additional merge and diverge access points along the freeway at certain locations, safety improvement and mitigation considerations have been identified and will continue to be evaluated through the future design efforts. Overall, it can be concluded that the Preferred Alternative should not have a significant adverse impact on the safety of the study corridors.  For complete details of the safety evaluation, refer to **FEIS, Appendix B**.

00000335



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

## 4.5 COVID-19 Considerations and Plan Results

The COVID-19 global pandemic impacted the daily routines of people across the world, affecting the way Maryland residents and regional commuters work, travel, and spend their free time. In the short-term, these changes have altered travel demand, transit use, and traffic volumes throughout the years 2020 and 2021 on all roadways in Maryland, including I-495 and I-270. In the long-term, there is uncertainty surrounding forecasts for post-pandemic traffic levels and transit use and there is no definitive model to predict how or if changes to mobility patterns during the pandemic will affect long-term traffic projections. To adapt to the ongoing and potential long-term travel impacts associated with the pandemic, MDOT SHA developed a *COVID-19 Travel Analysis and Monitoring Plan* for the Study. The latest version of the plan is included in **FEIS, Appendix C**. The plan includes three components, with additional details on each in the following sections:

- **Monitoring**: tracking changes in roadway and transit demand during the pandemic, including daily and hourly volume data, i.e., how does travel change in response to the number of cases, vaccine distribution, unemployment rates, school closings, and policy changes;
- **Research:** reviewing historical data and surveys/projections from the Transportation Research Board and the National Capital Region Transportation Planning Board; and
- **Sensitivity Analyses**: evaluating "what if" scenarios, including potential changes in teleworking, eCommerce, and transit use on projected 2045 travel demand and operations.

### 4.5.1 Monitoring

As part of its ongoing mission, and in response to public comments on the DEIS, MDOT SHA has been closely monitoring the changes in traffic patterns throughout the pandemic. **Figure 4-2** shows how traffic volumes within the study corridors have fluctuated during the pandemic compared to pre-pandemic levels. The data shows a severe drop in traffic volumes in April 2020 after stay-at-home orders were issued across Maryland, with daily traffic volumes on I-270 and I-495 reducing by more than 50 percent compared to April 2019. After the stay-at-home order was replaced with a "safer at home" advisory in May 2020, traffic volumes gradually increased throughout the summer, stabilizing at approximately 15 percent less than typical conditions during fall 2020. As cases began to surge in November/December 2020, traffic volumes dipped again through the winter. With the rollout of vaccines in early 2021, the corresponding drop in COVID-19 cases, and the gradual reopening of schools and businesses, daily traffic volumes have continued to recover. Volumes were back to over 90 percent of normal as of November 2021 compared to expected 2021 levels, even when considering two years of projected growth since 2019.  MDOT SHA will continue to monitor volumes into winter/spring 2021-2022.

Statewide, weekly traffic volumes were within one percent of November 2019 values in November 2021, per MDOT's coronavirus tracking website, linked below. Volumes during the afternoon peak hour have recovered closer to pre-pandemic levels compared to morning hours and daily volumes, with some permanent count stations on I-270 and I-495 recording higher volumes between 5PM and 6PM in October 2021 than October 2019. Transit use has been slower to recover, with usage of Washington Metropolitan Area Transit Authority (WMATA) facilities down significantly in November 2021 compared to November 2019. WMATA rail ridership was down 73 percent on weekdays, while WMATA bus ridership was down 36 percent on weekdays, and parking at Metro facilities was down 88 percent in November 2021 (https://www.wmata.com/initiatives/ridership-portal/upload/November-2021-Ridership-Snapshot.pdf).

00000336

OP·LANES MARYLAND | I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

Similarly, Maryland Transit Administration (MTA) services statewide were down over 40 percent compared to pre-pandemic levels as of November 2021 per data presented on MDOT's coronavirus tracking website: (https://www.mdot.maryland.gov/tso/Pages/Index.aspx?PageId=141).

**Figure 4-2: Daily Traffic Volume Changes on I-495 and I-270 During COVID-19 Pandemic vs. 2019**



The combined effect of changes in traffic volumes and changes in transit usage on speeds and congestion along I-495 and I-270 has also been monitored by MDOT SHA through a partnership with the Regional Integrated Transportation Information System (RITIS). RITIS compiles transportation-related data from a variety of sources, including speed and congestion data from INRIX, which MDOT SHA can obtain for any day and facility through the RITIS web portal. A review of this data indicated that congestion decreased significantly on I-495 and I-270 at the onset of the pandemic in Spring 2020, corresponding to the sharp decline in traffic volumes during that time. However, by November 2021, significant congestion had returned to the study area, approaching pre-pandemic levels. For example, average speeds on the I-495 Inner Loop crossing the ALB during the PM peak in early November (non-holiday) of 2021 were 20 mph, reflecting significant congestion, and matching the speeds during the similar period in November 2019 (also 20 mph). In the AM peak, average speeds on the I-495 Outer Loop between MD 650 and US 29 in early November 2021 were even lower - below 15 mph. While these speeds are slightly higher than those observed in that same area during the AM peak in November 2019 (10 mph), the findings indicate that there is still substantial congestion along I-495 even though volumes have not fully rebounded to pre-pandemic levels along I-495 during the morning peak period. Along I-270, average speeds are generally 5 to 10 mph higher in November 2021 compared to November 2019 despite volumes exceeding 2019 levels at MDOT SHA's permanent count station located on I-270 South of MD 121. These increased speeds could

00000337



be attributed to recent improvements completed by MDOT SHA along I-270, including the opening of the Watkins Mill interchange in 2020 and the implementation of ramp metering along southbound I-270 on-ramps in September 2021 as part of the ICM project. Even so, some congestion remains along I-270, with average speeds on I-270 southbound of approximately 30 mph during the AM peak period in November 2021 and average speeds on I-270 northbound below 40 mph during the PM peak period in November 2021.

MDOT SHA has also monitored an additional metric of congestion and reliability, TTI. As noted in **Section 4.3.2**, TTI is defined as the ratio of the average (50th percentile) travel time during a particular hour to the travel time during free-flow or uncongested conditions. MDOT SHA defines "congestion" as any roadway segment with a TTI value greater than 1.15, while "severe congestion" is reached when TTI values reach 2.0. **Table 4-12** below shows the number of hours each day in which congestion was present on I-495 and I-270 in October 2021 based on observed TTI values compared to the baseline pre-pandemic condition (year 2017).

**Table 4-12: TTI Monitoring Summary**

| Roadway | Baseline 2017 | | October 2021 | |
|---|---|---|---|---|
| | # Of Hours Ave TTI > 1.15 | # Of Hours Max TTI > 2.0 | # Of Hours Ave TTI > 1.15 | # Of Hours Max TTI > 2.0 |
| I-495 | 10 | 10 | 9 | 11 |
| I-270 | 8 | 8 | 5 | 8 |

In October 2021, the average TTI along I-495 (in both directions) exceeded 1.15 for 9 hours of the day (6:00 AM to 10:00 AM and 2:00 PM to 7:00 PM), while severe congestion (TTI > 2.0) was experienced in at least one segment of I-495 for 11 hours of the day (6:00 AM to 11:00 AM and 1:00 PM to 7:00 PM). These results are similar to the baseline (year 2017) data, in which the average TTI along I-495 exceeded 1.15 and severe congestion was experienced in at least one segment of I-495 for 10 hours of the day (6:00 AM to 10:00 AM and 2:00 PM to 8:00 PM). On I-270, the average TTI (in both directions) exceeded 1.15 for 5 hours of the day in October 2021 (6:00 AM to 9:00 AM and 4:00 PM to 6:00 PM), while severe congestion (TTI > 2.0) was experienced in at least one segment of I-495 for 8 hours of the day (6:00 AM to 10:00 AM and 3:00 PM to 7:00 PM). These results are slightly better than the baseline (year 2017) data, in which the average TTI along I-270 exceeded 1.15 and severe congestion was experienced in at least one segment of I-495 for 8 hours of the day (6:00 AM to 10:00 AM and 3:00 PM to 7:00 PM).

### 4.5.2 Research

MDOT SHA conducted research related to the COVID-19 pandemic, which involved reviewing historical data and surveys/projections from the Transportation Research Board, the National Capital Region Transportation Planning Board, and other transportation agencies.

A review of past economic events and societal changes effects on travel was conducted. The most recent relevant event was the recession that occurred in 2007 and 2008. This recession had a prolonged effect on travel in Maryland, with impacts lasting for several years. The recession was compounded with a dramatic increase in fuel costs that further suppressed travel. However, a review of MDOT SHA Mobility

00000338

Reports indicated that annual vehicle miles traveled (VMT) in Maryland returned to 2007 levels by 2015 and continued to increase significantly after that through 2017, as shown in **Figure 4-3**. Despite the dip in traffic volumes during and immediately following the recession, overall traffic growth in the 10 year period between 2007 and 2017 was more than 5 percent. In fact, traffic growth continued through 2019, and Maryland set a record for VMT in 2019 with 60.1 billion VMT. This pattern is similar to other historical events that have caused a temporary dip in travel (such as the 1979 energy crisis), while the long-term trend line has continuously showed steady growth in VMT nationwide since 1970.

**Figure 4-3: VMT Growth Trends in Maryland (2007 – 2017)**



Source: Maryland State Highway Mobility Reports

Throughout the Study, MDOT SHA has stayed abreast of available information, research studies, and guidance within the larger transportation industry, including the following reports and presentations, which are included in **FEIS, Appendix C** for reference:

- Presentation: How Much Will COVID-19 Affect Travel Behavior? by the National Academies of Sciences Engineering and Medicine Transportation Research Board, 6/1/2020

- Presentation: COVID-19 Impacts on Managed Lanes by the National Academies of Sciences Engineering and Medicine Transportation Research Board, 6/25/2020

- Memorandum: Transportation Impacts of the COVID-19 Pandemic in the National Capital Region by the National Capital Region Transportation Planning Board Technical Committee, 9/3/2020

- Presentation: Commuter Connections 2020 Employer Telework Survey – Coronavirus Pandemic Survey Results by the National Capital Region Transportation Planning Board Technical Committee, 9/16/2020

- Report: Capital COVID-19 Snapshot: Safe Return to Work by the Greater Washington Partnership, summarizing results from a survey conducted in August 2020.

- Presentation: Visualizing Effects of COVID-19 on Transportation: A One-Year Retrospective by the National Academies of Sciences Engineering and Medicine Transportation Research Board, 3/8/2021

00000339


- Poster: <u>Observed and Expected Impacts of COVID-19 on Travel Behavior in the United States. A Panel Study Analysis</u> presented at the 2022 National Academies of Sciences Engineering and Medicine Transportation Research Board Annual Meeting, 1/11/2022

### 4.5.3   Sensitivity Analysis

As noted above, MDOT SHA has developed a *COVID-19 Travel Analysis and Monitoring Plan* to monitor and analyze the impacts of the COVID-19 pandemic on existing and future travel. MDOT SHA must ensure that transportation improvements are being developed to meet our State's needs not only for today, but for the next 25-plus years. Historically, vehicular travel has increased as the economy recovered following economic events and societal changes, such as the 2008 Great Recession. Traffic volumes within the study area have continued to increase as businesses and schools reopened throughout the year 2021.

Based upon historic research of other similar dramatic societal effects on travel and the most recent data suggesting that traffic is rebounding close to pre-pandemic levels, the 2045 forecasts and results presented in **Section 4.3** using models that were developed and calibrated prior to the onset of the COVID-19 pandemic have been determined to be reasonable for use in evaluating projected 2045 conditions. However, MDOT SHA acknowledges that residual effects of some of the near-term changes in travel behavior could be carried forward into the future. Therefore, a sensitivity analysis evaluating several "what if" scenarios related to future traffic demand due to potential long-term changes to teleworking, e-commerce, and transit use was also conducted as part of the *COVID-19 Travel Analysis and Monitoring Plan.* The results of the sensitivity analysis are summarized below.

The first part of the sensitivity analysis involved modifying input parameters in the MWCOG regional forecasting model based on observed changes in travel behavior during the pandemic to evaluate a range of potential long-term scenarios.  Potential long-term travel impacts associated with the pandemic that could be captured within the travel demand model included changes in household travel due to increased work from home, remote learning possibilities, and increased discretionary travel, a reduction in non-home-based trips, and a decrease in long distance travel via airports, and changes in long-distance automobile travel.  For additional details, refer to the *COVID-19 Scenario Analysis* report included as an Attachment within **FEIS, Appendix C**.

Three potential scenarios were modeled using the MWCOG model. The "high impact" scenario replicated observed travel conditions in late 2020/early 2021 before the rollout of vaccines when the economy was functioning with continued work from home and restrictions on long distance travel impacting visitor travel were still in place. During this period, there was approximately a 15% reduction in VMT in the region compared to typical conditions, but this scenario would be unlikely in the long term. Two other more-likely scenarios were designed to capture potential levels between the high scenario and the original forecasts. These included a "low impact" scenario that assumed a part-time work from home schedule (one to two days per week) for select industries along with limited remote learning opportunities (five percent) and a "medium impact" scenario that assumed parameters between the low and high values. For each scenario, several model outputs were generated, including total trips, VMT, total delay, and LOS. While each scenario resulted in fewer trips, less VMT, and less overall delay than the original forecasts, a large portion of the project corridors would be projected to experience poor levels of service (LOS E or F) under No Build conditions in all scenarios.  This evaluation confirmed that the project would still be

00000340

OP·LANES™ MARYLAND   I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

needed, even if long-term effects of the pandemic were in the high impact range resulting in less traffic demand than originally projected.

The second part of the sensitivity analysis involved re-running the 2045 No Build and 2045 Build VISSIM models that were used to generate the operational results presented in **Section 4.3**, but with reduced demand volumes to account for potential sustained impacts from the pandemic. For this analysis, traffic count data collected by MDOT SHA in the second week of November 2021 (when COVID-19 case counts were relatively low, vaccines and boosters were widely available, most schools were open for in-person learning, but many employers continued to offer flexible telework – a reasonable potential long-term scenario). Data was collected at five permanent count stations located along I-270 and I-495 was compared to count data at the same locations during the same time period on the same week in November 2019. The results indicated that volumes during the AM peak period (6:00 AM to 10:00 AM) were approximately five percent less than normal, while volumes during the PM peak period (3:00 PM to 7:00 PM) were approximately three percent less than normal. Therefore, the VISSIM sensitivity analysis was conducted with AM peak period volumes five percent less and PM peak period volumes three percent less than projected in the original design year 2045 forecasts, and operational metrics were evaluated to determine the relative benefit of the Preferred Alternative under that hypothetical scenario.

The results indicate that the Preferred Alternative would also provide meaningful operational benefits to the system under a reduced-demand scenario. As shown in **Table 4-13** below, the Preferred Alternative would be projected to reduce system-wide delay by nine percent during the AM peak period and by 48 percent during the PM peak period compared to 2045 No Build conditions. In the AM peak period, the relative benefits of the Preferred Alternative are slightly less than for the original forecasts (nine percent versus 13 percent savings) because morning travel is impacted more significantly by factors related to the pandemic, such as increased telework. However, during the PM peak period, the relative benefits of the Preferred Alternative are higher under a reduced-demand scenario than in the original forecasts (48 percent versus 38 percent savings). This is because any long-term reduction in traffic volumes would help improve operations in the no action areas that would otherwise constrain the overall benefits of the Preferred Alternative, particularly during the PM peak period. Additional results from this VISSIM sensitivity analysis for other operational metrics are provided in **FEIS, Appendix C**.

### Table 4-13: 2045 Sensitivity Analysis - System-Wide Delay for Entire Study Area

| Alternative | Average Delay (min/vehicle) | | Percent Improvement vs. No Build | |
|---|---|---|---|---|
| | AM Peak (6-10AM) | PM Peak (3-7PM) | AM Peak (6-10AM) | PM Peak (3-7PM) |
| No Build | 8.0 | 8.4 | N/A | N/A |
| Preferred Alternative | 7.3 | 4.4 | 9% | 48% |

Note: Sensitivity analysis assumes 5% less volume during AM peak and 3% less volume during PM peak

The results of the MWCOG and VISSIM sensitivity analyses confirm that the capacity improvements proposed under the Preferred Alternative would be needed and effective even if future demand changes from the pre-pandemic forecasts based on potential long-term impacts to teleworking, e-commerce, and transit use that are not formally accounted for in the current regional forecasting models.

00000341

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

# 5   ENVIRONMENTAL RESOURCES, CONSEQUENCES & MITIGATION

This chapter presents an overview of the socio-economic, cultural, natural, and other environmental resources along the study corridors, the anticipated permanent and temporary effects to those resources from the Preferred Alternative, and a preliminary assessment of measures to avoid, minimize, and mitigate unavoidable effects to those resources. This chapter follows the same format as the Draft Environmental Impact Statement (DEIS)and Supplemental DEIS (SDEIS).

This chapter builds upon the following Study documents:

DEIS, Chapter 4: https://www.oplanesmd.com/wp-content/uploads/2020/11/2020-06-02_DEIS_04_Environmental.pdf

The supporting DEIS and supporting Technical Reports are available on the Program website: https://oplanesmd.com/deis/#DEIS

SDEIS, Chapter 4: https://oplanesmd.com/wp-content/uploads/2021/09/SDEIS_04_Environmental.pdf

The supporting SDEIS and supporting Technical Reports are available on the Program website: https://oplanesmd.com/sdeis/#SDEIS

Updates to this chapter since the SDEIS include:

- The final impacts and effects, both permanent and temporary, from the Preferred Alternative.
- Updated agency coordination that has occurred since the SDEIS related to further avoidance, minimization and mitigation of resources.
- The final mitigation for the permanent and temporary impacts (also presented in Chapter 7 of this Final Environmental Impact Statement (FEIS)).
- A list of permits approvals and authorizations that will likely be required following the Record of Decision (ROD).

This chapter provides an updated summary of existing resources, anticipated final effects, and final mitigation related to the Preferred Alternative. All supporting documentation is cross-referenced throughout this chapter and available through the program website https://oplanesmd.com/.

Due to extensive coordination and consultation with local, state, and federal resource agencies and stakeholders throughout the National Environmental Policy Act (NEPA) process, the Maryland Department of Transportation State Highway Administration (MDOT SHA) was able to advance avoidance and minimization measures for regulated and sensitive resources and property displacements along I-495 and I-270 since the DEIS. Design has also advanced since the SDEIS, as discussed in **Chapters 2** and **3** of this document, resulting in further avoidance and minimization of the environmental resources as discussed throughout this chapter. Further avoidance and minimization since the SDEIS have been accomplished through a number of approaches including modification of stormwater management

00000342

location and design, relocation of managed lane access points, shifting the centerline alignment, reduction in lanes and shoulder widths near sensitive resources, changing interchange configurations and other design refinements. These measures have been incorporated into the Preferred Alternative, and as outlined in this Chapter, impacts associated with the Preferred Alternative have been significantly avoided and/or minimized compared to the DEIS Build Alternatives.

The Preferred Alternative, with build improvements only within the limits of Phase 1 South, avoids over 100 acres of parkland and hundreds of wetland and stream features identified in the DEIS. The Preferred Alternative presented was developed as a resource avoidance and minimization alternative based in part on extensive coordination with and input from agencies and stakeholders, including the Officials with Jurisdiction (OWJs) for Section 4(f) properties. Comments received on the DEIS and Draft Section 4(f) Evaluation from agencies and stakeholders specifically requested avoidance of significant parkland and historic resources within the study area. The Preferred Alternative is responsive to comments received and aligns the Study to be consistent with the previously determined phased delivery and permitting approach by limiting the build improvements to the area of Phase 1 South only while avoiding improvements on I-495 east of the I-270 East Spur. The result is complete avoidance of significant stream valley parks, including Rock Creek, Northwest Branch, Sligo Creek, Southwest Branch, and Henson Creek Stream Valley Parks, as well as historic parks of national significance including the Baltimore-Washington Parkway, Greenbelt Park and Suitland Parkway.

Examples of avoidance and minimization efforts that have occurred from the DEIS, SDEIS and FEIS include the following.

- **Displacements Avoided**: In the DEIS, Alternative 9 had 34 residential and 4 business displacements; the Preferred Alternative in the SDEIS and FEIS avoids all residential and business displacements.

- **Right-of-Way Requirements Further Minimized**: In the DEIS, Alternative 9 had 313.4 acres of right-of-way impacts; the SDEIS Preferred Alternative design minimized the right-of-way impacts to 115.9 acres; and the FEIS Preferred Alternative impacts were further minimized to 92.8 acres, including both temporary and permanent impacts.

- **Park Impacts Further Minimized**: In the DEIS, Alternative 9 had 133.1 acres of park impacts; the SDEIS Preferred Alternative had 36.1 acres; and the FEIS Preferred Alternative further minimized impacts to 30.2 acres, including both temporary and permanent impacts.

- **National Park Service Park (NPS) Properties Around the American Legion Bridge (ALB) Further Minimized**: The three NPS Park properties around the ALB impacted by the Study are: George Washington Memorial Parkway, Chesapeake and Ohio Canal National Historical Park, and Clara Barton Parkway. Efforts to minimize impacts to these park properties has been a focus of much attention by MDOT SHA. This resulted in development of a team of national and local experts in design, structures, and constructability to look for innovative ways to avoid and minimize impacts to these resources of national significance (refer to **Section 5.4** for details). In the DEIS, Alternative 9 impacted 29.4 acres of these three park properties; the SDEIS Preferred Alternative minimized impacts to 17 acres; and the FEIS Preferred Alternative further minimized impacts to 16.2 acres of which 2.7 acres are considered permanent impacts.

- **Maryland-National Capital Park and Planning Commission (M-NCPPC) Park Properties Further Minimized**: In the DEIS, Alternative 9 impacted 26 M-NCPPC park properties totaling 29 acres of impacts; the SDEIS Preferred Alternative impacted 9.2 acres at five M-NCPPC park properties; the

00000343


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

FEIS Preferred Alternative further minimized the impacts to the five park properties to 8.2 acres of impacts, including both temporary and permanent impacts.

- **Morningstar Tabernacle No. 88 Moses Hall and Cemetery Avoided**: In the DEIS, Alternative 9 impacted 0.3 acre of the Morningstar Cemetery. Based on further investigations of the property since the DEIS, the Preferred Alternative as presented in the SDEIS and FEIS avoids impacts to the historic Morningstar Tabernacle No. 88 Moses Hall and Cemetery boundary.

- **Wetland Impacts Further Minimized**: In the DEIS, Alternative 9 had 16.3 acres of wetland impacts; the SDEIS Preferred Alternative had 4.3 acres; and the FEIS Preferred Alternative further minimized impacts to 3.9 acres.

- **Waterway Impacts Further Minimized**: In the DEIS, Alternative 9 had 155,922 linear feet of waterway impacts; the SDEIS Preferred Alternative had 46,553 linear feet; and the FEIS Preferred Alternative further minimized impacts to 42,286 linear feet.

- **Floodplain Impacts Further Minimized**: In the DEIS, Alternative 9 had 119.5 acres of floodplain impacts; the SDEIS Preferred Alternative had 48.8 acres; and the FEIS Preferred Alternative further minimized impacts to 31.6 acres.

- **Forest Canopy Impacts Further Minimized**: In the DEIS, Alternative 9 had 1,497 acres of forest canopy impacts; the SDEIS Preferred Alternative had 500.1 acres; and the FEIS Preferred Alternative further minimized impacts to 455.0 acres.

The impacts associated with the Preferred Alternative were avoided and minimized to the greatest extent practicable in all areas at this preliminary stage of the Study, and avoidance and minimization techniques were specifically refined in some areas of sensitive or recreationally valuable resources. Permanent or long-term effects and temporary or short-term construction-related effects of the Preferred Alternative have been updated since the SDEIS. A summary of the permanent and temporary effects associated with the Preferred Alternative are shown in **Table 5-1**. The anticipated construction effects are discussed qualitatively throughout this chapter, in **Section 5.2.3** and in **Chapter 3, Section 3.1.8**. The impacts presented in this chapter are associated with the build improvements of the Preferred Alternative. If there are additional impacts to a resource associated with off-site compensatory stormwater quality treatment, those impacts are discussed where applicable throughout this chapter. A summary of the potential environmental impacts associated with off-site compensatory stormwater quality treatment are presented in **Chapter 3, Section 3.1.6**.

Final mitigation for unavoidable impacts is discussed throughout the chapter in the applicable resource discussions. **Chapter 7** of this document also presents a comprehensive list of the mitigation and commitments developed through extensive coordination with the resource and regulatory agencies. Following the ROD and assuming a build alternative is chosen, the Developer will continue to look for opportunities to avoid and minimize impacts throughout the remainder of the design process to the greatest extent practicable. Monetary incentives have been added to the Developer's Technical Provisions to encourage further avoidance and minimization of impacts to wetlands, waterways, forest, and parkland.

00000344

OP·LANES
MARYLAND     I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

Table 5-1: Summary of Quantifiable Impacts for the Preferred Alternative

| Resource | Permanent[1] | Temporary[1] | Total[1] | Change in Total Impact since SDEIS[1] | Section Reference in Chapter 5 |
|---|---|---|---|---|---|
| Total Potential Impacts to Public Park Properties (acres) | 15.7 | 14.5 | 30.2 | - 5.9 | 5.4 |
| Total Right-of-Way or Easement Required[2] (acres) | 78.2 | 14.7 | 92.8 | - 23.1 | 5.5 |
| Number of Properties Directly Affected (count) | - | - | 361 | -140 | 5.5 |
| Number of Residential Relocations (count) | - | - | 0 | 0 | 5.5 |
| Number of Business Relocations (count) | - | - | 0 | 0 | 5.5 |
| Number of Historic Properties with Adverse Effect[3] | - | - | 10 | + 1 | 5.7 |
| Noise Sensitive Areas Impacted (count) | - | - | 48 | + 1 | 5.9 |
| Hazardous Materials Sites of Concern (count) | - | - | 255 | 0 | 5.10 |
| Wetlands of Special State Concern | 0 | 0 | 0 | 0 | 5.12 |
| Wetlands[4] (acres) | 3.5 | 0.4 | 3.9 | - 0.4 | 5.12 |
| Wetland 25-foot Buffer (acres) | 6.3 | 0.2 | 6.5 | - 0.6 | 5.12 |
| Waterways[4] (square feet) | 637,080 | 323,136 | 960,216 | -57,486 | 5.12 |
| Waterways[4] (linear feet) | 39,933 | 2,353 | 42,286 | -4,267 | 5.12 |
| Tier II Catchments (acres) | 0 | 0 | 0 | 0 | 5.13 |
| 100-Year Floodplain (acres) | 24.2 | 7.42 | 31.6 | -17.2 | 5.15 |
| Forest Canopy (acres) | 438.5 | 16.5[5] | 455.0 | -45.1 | 5.16 |
| Rare, Threatened and Endangered Species Habitat (acres) | 33.0 | 21.8 | 54.8 | -1.6 | 5.19 |
| Sensitive Species Project Review Area (acres) | 24.2 | 19.3 | 43.5 | -1 | 5.20 |
| Unique and Sensitive Areas (acres) | 135.7 | 27.4 | 163.0 | - 5.5 | 5.20 |

Notes: The impacts in this table are for the mainline improvements for the Preferred Alternative. Any impacts associated with off-site compensatory stormwater quality treatment are preliminary and discussed in the applicable resources sections in this Chapter and summarized in **Chapter 3, Section 3.1.6**.

[1] All values are rounded to the tenths place.

[2] The right-of-way is based on State records research and supplemented with county right-of-way, as necessary.

[3] Refer to **Section 5.7** for additional details on the effects to historic properties.

[4] Refer to **Table 5-24, Section 5.12** for additional details on the impacts to wetlands and waterways.

[5] Temporary forest canopy impacts are cleared forest in areas that will not be permanently acquired or altered by roadway construction. Replanting will occur in these areas. Impacts will be avoided and minimized, and replanting will be maximized within the corridor as determined in final design. Refer to **Section 5.16** for additional details on forest canopy.

Common terms used throughout this chapter are defined below.

- **Study corridors:** Defined in the Study scope, includes I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including the American Legion Bridge (ALB) crossing over the Potomac River, to west of MD 5 in Prince George's County, Maryland; and I-270 from I-495 to I-370 in Montgomery County, including the east and west I-270 spurs north of I-495.

- **Phase 1 South Limits:** Defined as the limits of the build improvements associated with the Preferred Alternative, Alternative 9 – Phase 1 South and includes two, new high-occupancy toll (HOT) managed

00000345