corridor study boundary during summer 2020. MDOT SHA and FHWA agreed to conduct the acoustic surveys to satisfy Section 7(a)(1) of the ESA.

The survey resulted in the recording of 15,059 bat calls at 16 sites in the Preferred Alternative LOD. One NLEB presence was detected at a site within the Phase 1 South portion of the corridor study boundary along I-495 south of I-270 spur, but this site is not located within the Preferred Alternative LOD. No calls were recorded of either IB or SFB. Specific details of study methodology and results are provided within the *Final Natural Resources Technical Report* (**FEIS, Appendix M**) and within the *I-495 & I-270 Managed Lanes Study Threatened and Endangered Bat Habitat Assessment and Acoustic Survey Report* in *Appendix P* of the *Final Natural Resources Technical Report* (**FEIS, Appendix M**).

The tri-colored bat (*Perimyotis subflavus*) and little brown bat (*Myotis lucifugus*) are both state Endangered species in Virginia and both species statuses are Under Review federally. Biologists conducted acoustic data analysis for the tri-colored bat and little brown bat in the Virginia portion of the Preferred Alternative LOD using the data collected in 2020 for the NLEB and IB acoustic survey. Presence of the tri-colored bat was confirmed, but no little brown bats were identified. There are 14.4 acres of suitable bat habitat and 18.2 acres of somewhat suitable bat habitat in the Virginia portion of the Preferred Alternative LOD.

## B. Fisheries

A response was received on August 9, 2018, from NMFS, included in *Appendix N* of the *Final Natural Resources Technical Report* (**FEIS, Appendix M**), stating the corridor study boundary lies outside the limits of potential or indirect effects to federally-listed or proposed threatened or endangered species under the jurisdiction of NMFS. Therefore, further consultation with NMFS under Section 7 of the ESA is not needed unless the study changes substantially or new information becomes available.

The NMFS provided comments on the DEIS and SDEIS regarding upstream passage of diadromous fish in the Potomac River and Cabin John Creek, included in **FEIS, Appendix T**. Further discussion of diadromous fish is included in **Section 5.18**, since these species are not rare, threatened, or endangered.

## C. Sensitive Species Project Review Areas

Sensitive Species Project Review Areas (SSPRAs) are the general locations of documented Maryland state-listed RTE species and include nearly all state-regulated and designated areas involving sensitive and listed species. A discussion of mapped SSPRAs within the corridor study boundary is included in *Section 2.10.2.C* of the *Final Natural Resources Technical Report* (**FEIS, Appendix M**).

## D. State-Listed Species of Concern

### a. Plants

Project coordination with the MDNR, VDCR, Virginia Department of Game and Inland Fisheries (VDGIF), and NPS regarding the potential presence of RTE species within the corridor study boundary is documented in *Section 2.10.2.D* of the *Final Natural Resources Technical Report* (**FEIS, Appendix M**).

Further coordination with the NPS in late 2019 resulted in an expanded list of RTE plants from the Chesapeake and Ohio Canal National Historical Park that potentially occur or historically occurred within or near the Preferred Alternative LOD. The NPS requested that MDOT SHA conduct field surveys for these

00000463

 I-495 & I-270 Managed Lanes Study

*Final Environmental Impact Statement*

species within the corridor study boundary where suitable habitat exists. In 2020, MDOT SHA performed targeted plant surveys within portions of the Potomac Gorge located within the corridor study boundary, which encompasses the area inclusive of the Preferred Alternative LOD.

**Table 5-45** provides a list of the 41 species of RTE plants that were surveyed within the portion of the Potomac Gorge that is within the corridor study boundary. The RTE species that were found and would be impacted by the Preferred Alternative LOD are highlighted in green in **Table 5-45**. Field survey methodologies and results are described for the 2019 and 2020 surveys within the *Rare, Threatened, and Endangered Plant Survey Report I-495 & I-270 Managed Lanes Study* found within *Appendix R* of the *Final Natural Resources Technical Report* (**FEIS, Appendix M**).

**Table 5-45: RTE Plant Species Surveyed within the Potomac River Gorge Portion of the Preferred Alternative LOD**

| Scientific Name | Common Name | Status |
|---|---|---|
| **Maryland and Virginia** | | |
| *Arabis patens* | Spreading Rockcress | S3G3/S1G3 |
| *Carex careyana* | Carey's Sedge | S1G4G5 Endangered/ S3G4G5 |
| *Erigenia bulbosa* | Harbinger-of- Spring | S3G5/S3G5 |
| *Erythronium albidum* | Small White Fawn-Lily | S2G5 Threatened/ S2G5 |
| *Maianthemum stellatum* | Starry False Solomon's-Seal | S2G5 Endangered/ S2G5 |
| *Phacelia covillei* | Buttercup Scorpion-Weed | S2G3 Threatened/ S1 |
| *Sida hermaphrodita* | Virginia Fanpetals | S1G3 Endangered/ S1G3 |
| *Solidago simplex* ssp. *Randii* var. *racemosa* | Rand's Goldenrod | S1G3 Threatened/ S1G3? |
| *Valeriana pauciflora* | Large-flower Valerian | S1G4 Endangered/ S1G4 |
| **Maryland Only** | | |
| *Astragalus canadensis* | Canadian    Milk-Vetch | S1G5 Endangered |
| *Baptisia australis* | Blue Wild Indigo | S2G5 Threatened |
| *Bromus latiglumis* | Early-leaf Brome | S1G5 Endangered |
| *Carex hitchcockiana* | Hitchcock's Sedge | S1G5 Endangered |
| *Clematis viorna* | Vasevine | S3G5 |
| *Corallorhiza wisteriana* | Spring Coralroot | S1G5 Endangered |
| *Coreopsis tripteris* | Tall Tickseed | S1G5 Endangered |
| *Hybanthus concolor* | Eastern Green-Violet | S3G5 |
| *Cuscuta polygonorum* | Smartweed Dodder | S1G5 Endangered/ S1G5 |
| *Galactia volubilis* | Downy Milk-Pea | S5G3 |
| *Gentiana villosa* | Striped Gentian | S1G4 Endangered |
| *Geum aleppicum* | Yellow Avens | S1G5 Endangered/ SHG5 |
| *Helianthus occidentalis* | Few-leaf Sunflower | S1G5 Threatened/ S1G5T5 |
| *Hibiscus laevis* | Halberd-leaf Rose-Mallow | S3G5 |
| *Homalosorus pycnocarpos* | Glade Fern | S2G5 Threatened |

00000464

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Scientific Name | Common Name | Status |
|---|---|---|
| *Iresine rhizomatosa* | Juda's-Bush | S1 G5 Endangered |
| *Lipocarpha micrantha* | Small-flower Halfchaff Sedge | S1G5 Endangered/ S2G5 |
| *Matelea obliqua* | Climbing Milkvine | S1S2G4? Endangered |
| *Mecardonia acuminata* | Axil-Flower | S2G5 Endangered |
| *Monarda clinopodia* | White Bergamot | S3S4G5 |
| *Paspalum repens* var. *fluitans* | Horse-tail Crown Grass | S2G5 Threatened |
| *Phaseolus polystachios* | Thicket Bean | S3G5 |
| *Polygala polygama* | Racemed Milkwort | S1G5 Threatened |
| *Potamogeton foliosus* | Leafy Pondweed | S2G5 |
| *Pycnanthemum verticillatum* | Whorled Mountain-Mint | S2G5 Threatened |
| *Rumex latissimus* | Pale Dock | S1G5 Endangered |
| *Sagittaria rigida* | Sessile-fruit Arrowhead | S1G5 Endangered/ S1G5 |
| *Salix interior* | Sandbar Willow | S1G5 Endangered/ S1G5TNR |
| *Silene nivea* | Snowy Catchfly | S1G4? Endangered/ S1G4? |
| *Triphora trianthophoros* | Threebirds | S1G4? Endangered/ S1G3G4T3T4 |
| **Virginia Only** | | |
| *Borodinia dentata* | Short's False Rockcress | S3G5/S1G5 |
| *Senecio suaveolens* | False Indian-Plantain | S1G4 Endangered/ S2G4 |

Source: Townsend 2019, MDNR 2019, Weakley et al. 2012; Brown and Brown 1984; *Kartesz 2015*
State Rank: S1=Critically Imperiled/Highly State Rare; S2=Imperiled/State Rare; S3=Vulnerable/Watchlist; T=Subspecies/Variety Ranked Differently than Species
Global Rank: G3=Vulnerable; G4=Apparently Secure; G5=Secure; ?=Inexact Numeric Rank; NR=Not Ranked

Within the Preferred Alternative LOD in Virginia, two (2) RTE plant species were found, including Carey's sedge (*Carex careyana*) and buttercup scorpion-weed (*Phacelia covillei*). On the Maryland side, seven (7) RTE plant species were documented within the corridor study boundary. Documented RTE plants included:

- Buttercup Scorpion-Weed
- Carey's Sedge
- PaleDock
- Halberd-leaf Rose-Mallow
- White Bergamot
- Rand's Goldenrod
- Horse-tail Crown Grass

Further details of the plant survey results for Maryland are described within the 2019 and 2020 survey reports, both titled *Rare, Threatened, and Endangered Plant Survey Report I-495 & I-270 Managed Lanes Study,* found within *Appendix R* of the *Final Natural Resources Technical Report* (**FEIS, Appendix M**).

00000465

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

The NPS manages the Potomac Gorge Conservation Area, a 15-mile-long riparian corridor along the Potomac River running downstream from Great Falls. This biologically diverse area that crosses the Phase 1 South portion of the corridor study boundary contains at least 30 distinct natural vegetation communities that support numerous rare plant and animal species (The Nature Conservancy 2005). Plummers Island is a 12-acre island located in the Potomac River within the Potomac Gorge and the Chesapeake and Ohio Canal National Historical Park in Montgomery County, Maryland, adjacent to the American Legion Bridge. The island is separated from the mainland by an oxbow of the Potomac River. Plummers Island is considered the most scientifically studied island in North America, where biologists have documented a great diversity of flora and fauna. The island is the headquarters of the Washington Biologists Field Club, a group incorporated in 1901 to promote the study of biology in the Washington, DC area. The western end of Plummers Island is within the Phase 1 South portion of the corridor study boundary and includes several rock outcroppings, a vernal pool wetland, mature upland forest, terrace and riparian habitat, two Washington Biologists Field Club vegetation research plots, and several species of state listed plants identified during the I-495 & I-270 Managed Lanes Study RTE Plant Survey in 2020, including horse-tail crown grass (*Paspalum repens* var. *fluitans*), buttercup scorpion-weed, pale dock (*Rumex altissimus*), white bergamot (*Monarda clinopodia*), Rand's goldenrod (*Solidago simplex* ssp. *Randii* var. *racemosa*), and halberd-leaf rose-mallow (*Hibiscus laevis*). See the RTE Plant Species Survey mapping in *Appendix R* of the *Final Natural Resources Technical Report* (**FEIS, Appendix M**) for more specific locations of where these plant species were identified on the island.

### b. Wood Turtle

During MDOT SHA coordination with the VDEQ in October 2020 regarding its review of the DEIS, the VDEQ requested that a habitat evaluation of streams in the Virginia portion of the corridor study boundary be conducted for the presence of wood turtle (*Glyptemys insculpta*). The wood turtle is a state-threatened species in Virginia, and is known to occur in Turkey Run, a waterbody located east of the corridor study boundary. The evaluation was to include an assessment of potential upland and aquatic habitats, the results of which would be reported to the Virginia Department of Wildlife Resources (VDWR).

To assess the potential presence of wood turtles within the Virginia portion of the corridor study boundary, qualified biologists conducted field surveys of all delineated streams in February and March 2021. Survey methodology and study results are summarized in the *Wood Turtle Habitat Assessment and Survey Report – Virginia I-495 & I-270 Managed Lanes Study* found in *Appendix P* of the *Final Natural Resources Technical Report* (**FEIS, Appendix M**). Portions of eight streams, including the Virginia shoreline of the Potomac River, were assessed within the Virginia portion of the corridor study boundary. Four of the streams were either intermittent or ephemeral and, thus, were not suitable overwintering habitat for wood turtles. The perennial streams within the corridor study boundary provided only marginal habitat because of their relatively small size and shallow flow. Wood turtles generally do not prefer large rivers but will use smaller tributary streams that flow into larger rivers. Therefore, while some instream habitat features were observed within the Potomac River, no turtles were found, nor would they be expected to overwinter there. No suitable tributary streams flowing into the Potomac River occur within the corridor study boundary. Upland habitats within the corridor study boundary were also determined to be suboptimal, as the habitat is primarily forested with few suitable openings for basking and egg laying. No wood turtles were found during the field surveys.

00000466

### 5.19.3 Environmental Consequences

The No Build Alternative would not result in any Study-related construction and would therefore not directly impact RTE species.

Neither NLEB or IB species were confirmed within the corridor study boundary during visual bridge and emergence surveys in 2019 or 2020. However, temporary day roosting by big brown bats on the bridge over McArthur Boulevard/Clara Barton Parkway westbound and evidence of guano beneath the ALB and bridge over Seven Locks Road, suggest that bats do occasionally roost on suitable I-495 bridges. As noted above, based on the small amount of guano observed beneath the day roosting big brown bats and guano found on other bridges, none of the I-495 bridges appeared to serve as maternity roosting habitat, but were likely used as temporary day or night roosting sites. Therefore, potential impacts to bridge roosting bats within the Preferred Alternative LOD would be minimal and would likely cause a shift to other suitable roosting sites near the bridges rather than resulting in an impact to the bats.

The NLEB and IB acoustic surveys undertaken within the corridor study boundary during the 2020 active season (May 15 through August 15) were conducted to better determine the potential presence of these federally listed bat species within the corridor study boundary. Neither of the species was detected within the Preferred Alternative LOD by the surveys.

Informal consultation between the FHWA, MDOT SHA and the USFWS continued with submittal of the habitat assessment and acoustic study report to the USFWS and MDNR. In a letter to the FHWA dated January 13, 2021, the USFWS issued a "no effect" determination for the IB based on the absence of documented IB during bridge, emergence, and acoustic surveys. The USFWS also indicated that the project is covered by the January 5, 2016, Programmatic Biological Opinion on Final 4(d) Rule for the NLEB and Activities Excepted from Take Prohibitions since the area where forest clearing would occur does not have known maternity roost trees or hibernacula. In their letter, the USFWS stated that the project was "not likely to adversely affect" the NLEB. MDOT SHA coordinated closely with USFWS and MDNR regarding NLEB and Indiana bat, and ESA Section 7 consultation has concluded. There is a high likelihood of tricolored bat (*Perimyotis subflavus*) roost trees occurring in the Virginia portion of the Preferred Alternative LOD and tree removal during roosting season could negatively impact the tri-colored bat population in Virginia.

The MDNR identified several state-listed threatened or endangered plant species that may occur within scour bars or the adjacent floodplain of the Potomac River. Surveys for targeted RTE plant species were conducted in 2019 and 2020. While none of the targeted RTE plant species were found during limited 2019 surveys, the 2020 RTE plant survey determined that the following 6 species would be impacted by the Preferred Alternative (highlighted in green in **Table 5-46**): pale dock, Carey's sedge, buttercup scorpion-weed, horse-tail crown grass, Halberd-leaf Rose-Mallow, and Rand's Goldenrod. More details about these species can be found in the 2020 RTE survey results described in *the Rare, Threatened, and Endangered Plant Survey Report I-495 & I-270 Managed Lanes Study* in *Appendix R* of the *Final Natural Resources Technical Report* (**FEIS, Appendix M**). MDNR, VDCR, NPS, and USFWS have reviewed the plant survey results and did not have further comments.

00000467


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

As noted above, the Preferred Alternative would likely impact six of the seven RTE plant species of concern found within the Potomac River corridor near the ALB. Likely tens of thousands of buttercup scorpion-weed plants occur within the Preferred Alternative LOD where temporary construction activities are anticipated. While this represents a significant impact, it should be noted that this species was also widespread and abundant outside the limits of the project survey upstream and downstream of the ALB on both the Maryland and Virginia sides of the Potomac River. Impacts to other RTE plant species within the Preferred Alternative LOD where temporary construction activities are anticipated include 10-50 Carey's sedges, thousands of horse-tail crown grass, 10-15 pale dock, 10-50 Rand's goldenrod, and about 50 halberd-leaf rose-mallow. Horse-tail crown grass was also observed in abundance upstream of the ALB on the Maryland shoreline and both upstream and downstream of the ALB on the Virginia shoreline. While temporarily disturbed areas will be restored following construction of the replacement ALB, the duration of construction will be several years, likely resulting in permanent impacts to RTE plants within the temporary limits of disturbance.

Some impacts to RTE plants will occur on Plummers Island, though most will occur in areas that will be temporarily disturbed during construction of the new ALB. RTE plants potentially affected within the areas of temporary disturbance on Plummers Island include thousands of horse-tail crown grass plants, about a dozen pale dock plants, 30-50 halberd-leaf rose-mallow plants, and 10-50 Rand's goldenrod plants. All of these plants occur either along the Plummers Island shoreline of the oxbow of the Potomac River or along the Plummers Island shoreline of the Potomac River. As noted above, because of the duration of construction of the new ALB and potential shading effects from the expanded ALB, the plant impacts are likely more permanent than temporary, even though they occur outside of the permanent footprint of the bridge. The RTE plant impacts resulting from the bridge pier footprint on Plummers Island would be to a few dozen horse-tail crown grass plants along the edge of the oxbow of the Potomac River.

Buttercup scorpion-weed and horse-tail crown grass are the only two RTE plant species with individuals located within the permanent LOD. The greatest permanent impacts to buttercup scorpion-weed would occur at the northern end of the replacement ALB, affecting thousands of individual plants within an area of about an acre. Permanent impacts would also occur to perhaps a few hundred horse-tail crown grass plants along the Potomac River shoreline and edges of the oxbow of the Potomac River for the placement of bridge piers. As noted above, other permanent impacts to RTE plants may occur from shading by the wider ALB footprint, but the extent of those potential permanent impacts will need to be investigated post-construction.

MDNR indicated in an email on February 28, 2020, included in *Appendix N* of the *Final Natural Resources Technical Report* (**FEIS, Appendix M**), that MDNR no-longer tracks bald eagle nests and that although this species is no-longer listed by the state, it is protected under the federal Bald and Golden Eagle Protection Act (16 U.S.C. § 668-668c). As noted in their email, MDNR generally defers to the National Bald Eagle Management Guidelines. MDOT SHA has coordinated and will continue to coordinate with USFWS concerning bald eagles, in addition to peregrine falcons, as discussed in **Section 5.17**. USFWS determined that there are no bald eagle nests within the corridor study boundary. MDOT SHA commits to coordinating with USFWS just prior to construction to confirm that there are still no bald eagle nests within close proximity to the Preferred Alternative LOD. Impact acreage of SSPRAs located within the Preferred Alternative is included in **Table 5-46**.

00000468



Table 5-46: SSPRA Impact Acreage within the Preferred Alternative LOD

|  | Permanent | Temporary | Total |
|---|---|---|---|
| **Total SSPRA in Acres** | 24.2 | 19.3 | **43.5** |

Surveys for the state-listed wood turtle were conducted in the Virginia portion of the corridor study boundary; no wood turtles were found, and only marginally-suitable habitat was identified. Virginia Department of Wildlife Resources (VDWR) determined this project is not likely to result in significant adverse impacts upon this species. However, because they may be encountered on site during work, VDWR recommends the following as avoidance and minimization measures:

- Prior to the commencement of work all contractors associated with work at this site be made aware of the possibility of encountering wood turtles on site and become familiar with their appearance, status, and life history. An appropriate information sheet / field observation form to distribute to contractors and employees was provided.

- If any wood turtles are encountered and are in jeopardy during the development or construction of this project, remove them from immediate harm and call DWR. If staff on site hold an appropriate Threatened and Endangered Species Scientific Collection Permit, this staff member may relocate wood turtles out of harm's way and into suitable habitat, preferably within the nearest perennial stream. Any relocations should be reported to VDWR, and the wood turtle observation form should be completed and faxed to VDWR.

- To minimize potential wildlife entanglements, resulting from use of synthetic/plastic erosion and sediment control matting, use matting made from natural/organic materials such as coir fiber, jute, and/or burlap.

### 5.19.4 Mitigation

MDOT SHA and FHWA have worked closely with USFWS and MDNR to ensure protection of listed bat species. While the Study was determined to have "no effect" on the IB and "not likely to adversely affect" the NLEB, MDOT SHA voluntarily committed to a time of year restriction for tree clearing from May 1 through July 31 of any year within a 3-mile buffer around each positive NLEB detection location within the study corridor to go above and beyond what is required to protect this bat species. One of the three positive detection locations for NLEB is located within the Phase 1 South portion of the corridor study boundary. IB was not detected in the acoustic or bridge surveys.

MDOT SHA commits to a time of year restriction for tree clearing within the Virginia portion of the Preferred Alternative from April 1 – October 31 of any year to avoid impact to tri-colored bat roost trees during roosting season.

MDOT SHA commits to coordinating with NPS and MDNR to determine a comprehensive ecological restoration plan for NPS lands within the Preferred Alternative LOD prior to construction. This plan will include RTE plant species restoration components, such as: conducting a final pre-construction RTE plant inspection; topsoil salvage and restoration; collecting seeds and/or individual RTE plants from the impact area prior to construction; cultivating plants and storing seeds/propagating plants from seed in an offsite nursery; re-establishing RTE species from stored seed and cultivated and propagated plants following

00000469

construction and topsoil restoration; and monitoring replanted RTE plant populations to ensure successful reestablishment. MDOT SHA commits to accessing Plummers Island for construction purposes by bridging over the oxbow of the Potomac River without placing any materials or fill within the stream channel.

## 5.20 Unique and Sensitive Areas

### 5.20.1 Introduction

Unique and Sensitive Areas are ecological resources designated by state and local municipalities that do not fall within the regulations of other environmental resources such as waterways or forests. Maryland's 2001 GreenPrint Program was established to protect Maryland's most-ecologically-valuable natural lands and watersheds, which were designated as Targeted Ecological Areas (TEA). TEAs were created based on rankings of GI; RTE species; aquatic habitat and biota; water quality; coastal ecosystem; and climate change adaptation. GI areas were identified by the Maryland Greenways Commission and MDNR's Green Infrastructure Assessment (GIA), which considered land cover, wetlands, sensitive species, roads, streams, terrestrial and aquatic conditions, floodplains, soils, and developmental pressure to identify a network of "hubs" and "corridors" containing the most-ecologically-critical undeveloped lands remaining in Maryland. Montgomery County has designated certain watersheds as Special Protection Areas (SPA) due to the presence of high-quality water resources and related natural features that could be jeopardized by development activities without additional water quality protection measures. Environmental Overlay Zones were established within the limits of SPAs to impose additional land use regulations and impervious surface limits on the underlying areas (Montgomery Planning, 2012[41]; Blackwell, 1989[42]). Refer to the **DEIS, Chapter 4, Section 4.20** (https://oplanesmd.com/wp-content/uploads/2020/11/2020-06-02_DEIS_04_Environmental.pdf), *Section 2.11 of the Final Natural Resources Technical Report* **(FEIS, Appendix M)** for the applicable federal and state regulations and methodology.

### 5.20.2 Affected Environment

#### A. Targeted Ecological Areas and Green Infrastructure

Four (4) GI corridors and three (3) GI hubs overlap within the limits of the Preferred Alternative LOD. In addition, TEAs overlap with the Preferred Alternative LOD between Cabin John Creek and the Potomac River in Montgomery County.

#### B. Special Protection Area (SPA) and Environmental Overlay Zones

There are no SPAs or Environmental Overlay Zones within the limits of the Preferred Alternative LOD, but the Piney Branch SPA is located approximately 4,000 feet southwest of the I-270/Shady Grove Road interchange.

#### C. Natural Area Preserves and Conservation Sites

There are no VDCR National Heritage Natural Area Preserves within the limits of the Preferred Alternative LOD or within Fairfax County, Virginia. There are two VDCR Conservation Sites within a five-mile radius of the Preferred Alternative.

---

[41] Montgomery Planning. 2012. Special Protection Areas (SPA). Available at:
http://www.montgomeryplanning.org/environment/spa/index.shtm [Accessed 7 September 2018].
[42] Blackwell, Robert J. 1989. *Overlay Zoning, Performance Standards, and Environmental Protection After Nollan.* 16 B.C. Envtl.
Aff. L. Rev. 615. Available at: http://lawdigitalcommons.bc.edu/ealr/vol16/iss3/6 [Accessed 7 September 2018].

00000470

### 5.20.3 Environmental Consequences

The No Build Alternative would not result in any Study-related construction and would therefore not directly impact GI hubs and corridors, TEAs, or SPAs.

Impacts to unique and sensitive areas associated with the Preferred Alternative are summarized in **Table 5-47**. There would be no impacts to SPAs or VDCR Natural Area Preserves and Conservation Sites resulting from the Preferred Alternative.

Table 5-47: Impacts to Unique and Sensitive Areas (acres)

| Resource | Permanent Impacts[1] | Temporary Impacts[1] | Total Impacts[1] |
|---|---|---|---|
| Targeted Ecological Areas | 40.1 | 15.8 | 55.9 |
| Green Infrastructure Hubs | 12.9 | 10.9 | 23.8 |
| Green Infrastructure Corridors | 82.7 | 0.7 | 83.4 |
| Special Protection Areas | 0.00 | 0.00 | 0.00 |
| **TOTAL Unique and Sensitive Area Types** | **135.7** | **27.4** | **163.1** |

Note: [1] All values are rounded to the tenths place.

Construction of the Preferred Alternative would increase the man-made footprint within the TEAs and GI areas, but the GI hubs and corridors would remain intact. However, road widening would create larger gaps in GI corridors. New manmade structures and roadways impact contiguous forest blocks and wetland complexes in TEAs and GI areas, which are often habitats for FIDS, and contain biologically important rivers, streams, and other natural resources. Refer to **Sections 5.12.3, 5.13.3, 5.15.3, 5.16.3, 5.17.3, 5.18.3** for additional details on the potential impacts to habitats.

### 5.20.4 Mitigation

Avoidance and minimization efforts to reduce impacts to GI and TEAs involves a two-tiered approach. The first level occurred during the planning stage where every reasonable effort was made to avoid wetlands and waterways as well as parklands to the greatest extent practicable. Many GI, TEA, and wildlife corridors overlap with wetlands, waterways, and park land. The second level of avoidance and minimization will occur at the Public-Private Partnership (P3) design/build stage, with advancement of the design and further refinements to the LOD. Reducing construction cost by limiting vegetation removal, the need for endangered species assessment, and forest and wetland mitigation provide incentive to refine the LOD and reduce impacts to resources. However, opportunities for avoidance and minimization of impacts to roadside resources are limited due to the fixed nature of the highway corridor.

## 5.21 Environmental Justice (EJ) Analysis

### 5.21.1 Environmental Justice Regulatory Context

All federal agencies have certain obligations under Title VI of the 1964 Civil Rights Act and EO 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (EJ Order). Under Title VI and related statutes, each federal agency is required to ensure that no person is excluded from participation in, denied the benefit of, or subjected to discrimination under any program or activity receiving federal financial assistance on the basis of race, color, national origin,[43] age, sex, disability, or religion. EO 12898 states that "...each Federal agency shall make achieving Environmental Justice part of its mission by identifying and addressing, as appropriate, disproportionately high and

---

[43] Including individuals with Limited English Proficiency.

00000471

adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."

EO 12898 directs Federal agencies to identify and address the disproportionately high and adverse human health or environmental effects of their actions on minority and low-income populations, to the greatest extent practicable and permitted by law. A disproportionately high and adverse effect on minority and low-income populations is defined by the FHWA Order 6640.23A: *FHWA Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* (2012), as an impact that:

- Would be predominately borne by a minority and/or low-income population, or
- Will be suffered by the minority population and/or low-income population and is appreciably more severe or greater in magnitude than the adverse effect that will be suffered by the nonminority population and/or non-low-income population.

The EO is intended to promote nondiscrimination in federal programs that affect human health and the environment, as well as provide minority and low-income communities access to public information and public participation.

The strategies developed under EO 12898 and subsequent Environmental Justice (EJ) FHWA guidance set forth the appropriate and necessary steps to identify and address disproportionately high and adverse effects of federal transportation projects on the health or environment of minority and low-income populations to the greatest extent practicable and permitted by law. The guidance also addresses an important aspect of EJ: providing meaningful opportunities for public involvement by members of minority populations and low-income populations during the planning and development of programs, policies, and activities (including the identification of potential effects, alternatives, and mitigation measures, if required). The following policies and guidance documents provide assistance for addressing minority and low-income communities:

- USDOT Order 5610.2C *Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* (2021 revision);
- FHWA Order 6640.23A, *FHWA Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* (2012); and
- FHWA memorandum *Guidance on Environmental Justice and NEPA* (2011).

EO 12898 does not define the terms *minority* or *low-income*, but the terms have been defined in the USDOT and FHWA Orders on EJ. FHWA Order 6640.23A provides the following definitions, which have been used in this analysis:

- *Minority Individual* – A person who identifies as:
    1) Black: a person having origins in any of the black racial groups of Africa;
    2) Hispanic or Latino: a person of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race;
    3) Asian American: a person having origins in any of the original peoples of the Far East, Southeast Asia or the Indian subcontinent;

00000472

4) American Indian and Alaskan Native: a person having origins in any of the original people of North America, South America (including Central America), and who maintains cultural identification through tribal affiliation or community recognition; or

5) Native Hawaiian and Other Pacific Islander: a person having origins in any of the original peoples of Hawaii, Guam, Samoa or other Pacific Islands.

- *Low-Income Individual* – A person whose household income is at or below the US Department of Health and Human Services (HHS) poverty guidelines.

### 5.21.2 Environmental Justice Analysis Methodology

As stated previously, the strategies developed under EO 12898, USDOT Order 5610.2C, FHWA Order 6640.23A, and FHWA memorandum Guidance on Environmental Justice and NEPA (2011) set forth the appropriate and necessary steps to identify and address disproportionately high and adverse effects of federal transportation projects on minority and low-income populations. Based on these strategies, the first four steps, below, were documented and updated in the DEIS and SDEIS EJ Analyses and have been updated and enhanced where necessary for this FEIS EJ Analysis:

1. The identification of minority race and ethnicity populations and low-income populations (EJ populations) along the 48-mile study corridor for the **DEIS, Chapter 4, Sections 4.21.2.A-B** and then an update on the identification of EJ populations for the Preferred Alternative, Alternative 9 - Phase 1 South limits in the **SDEIS, Chapter 4, Section 4.21.2.B**;

2. The review of demographic data to determine the existing environmental and community conditions of the EJ populations, documented in the **DEIS, Chapter 4, Section 4.21.3** and enhanced in the **SDEIS, Chapter 4, Section 4.21.2.C**;

3. The documentation of public outreach as planned, conducted and refined throughout the study in consideration of the demographic and community data to ensure meaningful involvement in EJ populations, documented in the **DEIS, Chapter 4, 4.Section 21.4** and updated in the **SDEIS, Chapter 4, Section 4.21.2.D**; and

4. The identification of potential beneficial and/or adverse impacts to EJ populations under the No Build and Screened Alternatives in the **DEIS, Chapter 4, Section 4.21.5**, and the identification of potential beneficial and/or adverse impacts to EJ populations under the No Build and Preferred Alternative, Alternative 9 - Phase 1 South updated in the **SDEIS, Chapter 4, Section 4.21.3**.

Steps #2, 3, and 4 are updated and Steps #5 through #8, below, are documented in this FEIS EJ Analysis in consideration of the Preferred Alternative[44]:

5. The consideration of mitigation or community enhancement measures if unavoidable adverse effects are expected to occur under the Preferred Alternative **(throughout Section 5.21.5)**;

6. A comparison of adverse effects to all EJ populations under the Preferred Alternative versus adverse effects to a non-EJ population reference community **(Table 5-51)**;

7. A determination of whether disproportionately high and adverse impacts would occur to EJ populations under the Preferred Alternative **(Table 5-51)**; and

---

[44]Steps #4 and 5 plus Steps #6 and 7 are combined in this FEIS EJ Analysis.

00000473

8. A final conclusion of whether disproportionately high and adverse effects would occur to EJ populations, based on unmitigated adverse effects and whether public feedback has been addressed **(Section 5.21.7)**.

## A. Environmental Justice Analysis Area

This EJ Analysis describes the existing conditions of and potential impacts to minority race and ethnicity populations and low-income populations who live within the "EJ Analysis Area." The EJ Analysis Area is the same geographic analysis area used for the CEA in **Sections 5.1 to 5.3**. The EJ Analysis Area is composed of the same basic population units—Census block groups—as the CEA Analysis Area. Like the CEA Analysis Area, the EJ Analysis Area includes all 66 Census block groups that are located within 0.25-mile to either side of the Phase 1 South limits.[45] The 66 block groups can also be sorted into the same community designations as the CEA Analysis Area Communities that are defined in **FEIS, Appendix F, Table 2-1**. Like the CEA Analysis Area, the EJ Analysis Area is located almost entirely within Montgomery County, Maryland, and partially within Fairfax County, Virginia.

For the purposes of this EJ Analysis, a block group within the EJ Analysis Area that meets the minority race and ethnicity population and/or low-income population criteria defined in **Sections 5.21.2 B-C** below is referred to as an "EJ population." (While it is understood that a population of minority race and ethnicity persons or a population of low-income persons does not necessarily live within delineated geographies along the study corridor, this EJ Analysis must rely on a basic unit of population to collect and analyze data— in this case, the block group.)

## B. Identification of Minority Race and Ethnicity Populations

MDOT SHA, in coordination with FHWA, identified the methodology for the EJ Analysis for the Study. Using the methodology, the following definition applies to this Study:

- *Minority Populations* - Any readily identifiable groups of minority persons who live in geographic proximity, and if circumstances warrant, geographically dispersed/transient persons (such as migrant workers or Native Americans) who would be similarly affected by a proposed USDOT program, policy or activity. See USDOT Order 5610.2C and FHWA Order 6640.23A.

Per the CEQ Environmental Guidance Under NEPA (1997), a minority population is present when: (A) the minority race and ethnicity population of the affected area exceeds 50 percent or (B) the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographic analysis.

For the purposes of this EJ Analysis, the Census block group is used as the basic unit of population because it represents a "readily identifiable group of minority persons who live in geographic proximity" (FHWA Order 6640.23A). Additionally, this EJ Analysis uses a methodological approach based on Environmental Guidance Under NEPA (CEQ, 1997) approach, as approach (B) is slightly more conservative than approach (A). A block group within the EJ Analysis Area was considered an EJ population if its minority race and

---

[45] The 0.25-mile buffer on either side of the study corridors was established as a resource inventory boundary that would reasonably include areas that would potentially be subject to direct impacts from the Preferred Alternative. Expanding the CEA Analysis Area/EJ Analysis Area to include all Census block groups intersecting the 0.25-mile delineation provides a conservative spatial approximation of the neighborhoods surrounding the study corridors.

00000474

ethnicity population is equal to or exceeds 49 percent, which is the percent population of minority race and ethnicity individuals in Maryland. Maryland was chosen instead of Montgomery County as the appropriate unit of geographic analysis to compare the block groups within the EJ Analysis Area against because Maryland has a more conservative threshold for comparison, while Montgomery County has a relatively high level of multiracial diversity. If the block groups within the EJ Analysis Area were compared to the County, fewer of the block groups would have a "meaningfully greater" percent population of minority race and ethnicity individuals, resulting in fewer block groups given elevated EJ consideration. As such, the percent population of minority race and ethnicity individuals of each block group was compared to that of Maryland.

## C. Identification of Low-Income Populations

As stated previously, MDOT SHA, in coordination with FHWA, identified the methodology for the EJ Analysis for the Study. Using the methodology, the following definition applies to this Study:

- *Low-Income Population* – Any readily identifiable group of low-income persons who live in geographic proximity, and, if circumstances warrant, geographically dispersed/transient persons (such as migrant workers or Native Americans) who would be similarly affected by a proposed USDOT program, policy, or activity. See USDOT Order 5610.2C and FHWA Order 6640.23A.

For the purposes of this FEIS EJ Analysis, the Census block group is used as the basic unit of population because it represents a "readily identifiable group of low-income persons who live in geographic proximity" (FHWA Order 6640.23A). The ACS Five-Year Estimates (2015-2019) were also used to collect the median household income and average household size data for each of the 66 block groups within the EJ Analysis Area. The average household size within the block groups was three persons. The HHS Poverty Guidelines provide a threshold median income for low-income designation by size of household. Using the HHS 2019 Poverty Guidelines income threshold for a three-person household, an EJ Analysis Area block group would have a median income of $21,330 or less to be considered a low-income population. However, no block groups within the EJ Analysis Area had a median household income at or below $21,330. Under the HHS 2019 Poverty Guidelines, no low-income populations would be in the EJ Analysis Area.

Additional guidance provided in the EJ Federal Interagency Working Group (IWG) report, *Promising Practices for EJ Methodologies in NEPA Reviews* (2016) was used to evaluate low-income populations for the EJ Analysis Area. Guidelines for identifying low-income populations explain that it may be appropriate for agencies to select a threshold for identifying low-income populations that exceed the poverty level as defined by the HHS Poverty Guidelines (IWG EJ 2016). While HHS Poverty Guidelines are calculated based on a national average, the EJ Analysis Area is in a high-income area compared to the rest of the 48 contiguous states.  Because the cost of living in the EJ Analysis Area was determined to be greater than the national average and comparison with the HHS 2019 Poverty Guidelines did not yield any low-income populations, a more conservative methodology for determining low-income populations was adopted using the Department of Housing and Urban Development (HUD) 2019 Income Limits Survey. The HUD Income Limits Survey calculates the threshold for a low-income family/household designation at the Metropolitan Fair Market Rent (FMR)/Income Limits Area-level. The calculations are based on the number of persons in a family.

00000475


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

The HUD 2019 FMR/Income Limits, shown in **Table 5-48** provided a more appropriate comparison for determining low-income populations in the EJ Analysis Area. HUD defines low-income as a family earning 80 percent or less of an area's median family income. The EJ Analysis Area is in the Washington-Arlington-Alexandria, DC-VA-MD FMR Area. As previously stated, the average household size within the EJ Analysis Area was three persons. Therefore, for this EJ Analysis, a block group was considered an EJ population if its median household income was at or below $69,850, the HUD 2019 Low-Income Limit for a family of three in the Washington-Arlington-Alexandria, DC-VA-MD FMR Area.

**Table 5-48: HUD 2019 Low-Income Limit for
the Washington-Arlington-Alexandria, DC-VA-MD FMR Area**

| Persons in Family/Household | Guideline |
|---|---|
| 1 | $ 54,350 |
| 2 | $ 62,100 |
| 3 | $ 69,850 |
| 4 | $ 77,600 |
| 5 | $ 83,850 |
| 6 | $ 90,050 |
| 7 | $ 96,250 |
| 8 | $ 102,450 |

Source: Department of Housing and Urban Development, FY 2019 Income Limits Survey
(https://www.huduser.gov/portal/datasets/il/il2019/2019summary.odn).

### 5.21.3 Historical Context

Current disparate economic and environmental health conditions of racially segregated communities can be traced largely to policy (or the lack thereof) enacted by federal, state, and local governments during the United States' period of suburbanization from 1940 to 1980. Suburbanization was made possible in part by construction of America's interstate highway systems that allowed families with automobiles, to live, work, and travel more conveniently and more extensively. However, the benefits and adverse impacts from construction and operation of these interstate highway systems, plus other regional and local highway networks, were not distributed equitably. Instead, the benefits and adverse impacts were purposefully concentrated among different racial populations, with majority-minority race and ethnicity communities—primarily black and African American communities— experiencing the most adverse impacts and the fewest benefits. Predominately white communities were typically intentionally avoided during highway design and construction yet experienced the most benefits from highway implementation.

Today's racially and economically segregated conditions in urban and metropolitan areas can be traced directly to decades of neighborhood destruction and residential displacements caused by highway projects plus housing policy and other racially marginalizing actions undertaken by local, state, and the federal government throughout the 20th century. Prior to passage of NEPA in 1969, there were no regulatory requirements for a government agency to seek input from affected communities during the highway development process. Highways, such as the Southeast-Southwest Freeway (I-695) in D.C. and I-

00000476

495 through the former Gibson Grove community in Cabin John,[46] were frequently routed through low-income, majority-minority neighborhoods, disproportionately displacing black and African American residents in particular, further concentrating poverty and exposing remaining residents to the environmental and public health effects associated with traffic proximity. As shown in *Appendix F* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* in **FEIS, Appendix F** and described in **Section 5.21.4 D.a**, EJ mapping data provided by USEPA and University of Maryland (UMD) indicates that the concentration of communities with the greatest levels of EJ concern are located along the study corridors. Today's concentration of communities with the greatest levels of EJ concern along the highway is directly related to the history of highway construction before national environmental policy.

Grassroots organization and protests against these marginalizing practices led eventually to the adoption of civil rights and environmental legislation, including NEPA in 1969. NEPA requires consideration of a range of alternatives to a proposed action and opportunities for public engagement, including with EJ populations (defined in this regulatory context as minority race and ethnicity populations and low-income populations). The NEPA process works as intended through continual refinement of design based on public and agency input to avoid, minimize, and mitigate impacts to resources, including impacts that are disproportionately high and adverse to EJ populations.

### 5.21.4 Existing Conditions of Environmental Justice Populations

The existing conditions of minority race and ethnicity populations and low-income populations are identified for each block group within the EJ Analysis Area. Per the methodology set forth in **Section 5.21.2**, of a total 66 block groups within the EJ Analysis Area, 16 are considered EJ populations on the basis of minority race and ethnicity and/or low-income populations. The 66 block groups within the EJ Analysis Area have been sorted into seven EJ Analysis Area Communities using the same methodology as done for CEA Analysis Area Communities in the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**). The EJ populations and the Analysis Area Communities in which they are located are shown on **Figure 5-12**.

### A. Existing Minority Race and Ethnicity Populations

As described in **Section 5.21.2 A**, a block group within the EJ Analysis Area was identified as an EJ population if 49 percent or more of the block group population identified as a minority race and ethnicity. Of the 66 block groups within the EJ Analysis Area, 15 had minority race and ethnicity populations equal to or above 49 percent.

The EJ Analysis Area, where 42 percent of the population identifies as a minority race or ethnicity, is less diverse than both Montgomery County and the state, whose minority race or ethnicity populations are 56 percent and 49 percent, respectively. Minority race and ethnicity populations considered EJ populations

---

[46] The historic Gibson Grove A.M.E. Zion Church was physically split from the Morningstar Tabernacle No. 88 Moses Hall and Cemetery by construction of I-495 in Cabin John in the 1960s. Gibson Grove was a settlement founded and developed by formerly enslaved families, and the Church, Hall, and Cemetery are important features of this historic settlement. (See https://www.friendsofmoseshall.org/history.) Additional detail on Gibson Grove A.M.E. Zion Church and the Morningstar Tabernacle No. 88 Moses Hall and Cemetery is provided in **Section 5.7**.

00000477

OP·LANES™ MARYLAND I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

were present to varying degrees in the Gaithersburg, North Bethesda, Potomac, and Rockville EJ Analysis Area Communities. The minority populations are shown in blue in **Figure 5-12**.

Race and ethnicity data for each EJ Analysis Area block group is provided in the *Final Community Effects Assessment and Environmental Justice Technical Report* (**FEIS Appendix F, Section 5.4.1** and **Table 5-2**).

## B.  Existing Low-Income Populations

As described in **Section 5.21.2 B**, a block group was identified as low-income population if its median household income was at or below $69,850. Block groups within the EJ Analysis Area that qualified as low-income populations are highlighted in yellow in **Figure 5-12.** Of the block groups within the EJ Analysis Area, four had a median household income below $69,850. Low-income populations considered EJ populations were present to varying degrees in the Potomac, North Bethesda, and Gaithersburg EJ Analysis Area Communities. Household income data for block groups within the EJ Analysis Area is provided in the *Final Community Effects Assessment and Environmental Justice Technical Report* (**FEIS Appendix F, Section 5.4.2** and **Table 5-3**).

## C.  Summary: Total Environmental Justice Populations

In summary, 16 (or 24 percent) of the 66 block groups within the EJ Analysis Area meet the minority race and ethnicity population and/or low-income household population criteria to be considered EJ populations. The 16 EJ populations are shown in **Table 5-49**.

**Table 5-49: Total Environmental Justice Populations (Block Groups)**

| EJ Analysis Area Community | EJ Population | Meets EJ Population Criteria: | |
|---|---|---|---|
| | | **Minority Race/Ethnicity** | **Low-Income** |
| Gaithersburg | 7007.17 - 1 | ✓ | ✓ |
| | 7007.17 - 3 | ✓ | |
| | 7007.17 - 4 | ✓ | ✓ |
| | 7008.16 - 1 | ✓ | |
| | 7008.16 - 2 | ✓ | |
| | 7008.17 - 1 | ✓ | |
| | 7008.17 - 3 | ✓ | |
| | 7008.29 - 1 | ✓ | |
| **Rockville** | 7010.07 - 1 | ✓ | |
| North Bethesda | 7012.15 - 2 | | ✓ |
| | 7012.15 - 3 | ✓ | |
| | 7012.15 - 4 | ✓ | |
| | 7045.01 - 2 | ✓ | |
| | 7045.01 - 4 | ✓ | |
| Potomac | 7060.12 - 2 | ✓ | |
| | 7060.12 - 3 | ✓ | ✓ |

00000478

## Figure 5-12: EJ Populations Adjacent to the Preferred Alternative LOD



00000479

OP·LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

## D. Supplemental Community Data

Additional data reviewed to supplement the formal identification of EJ populations via the EJ Analysis methodology is summarized below, including: online EJ mapping tools, households' English-speaking status, the locations of low-income subsidized housing, the distribution of Food Stamps/Supplemental Nutrition Assistance Program (SNAP) benefits, the proportion of students receiving free and reduced-price lunch programs, and Equity Emphasis Areas.[47]

### a. Online Environmental Justice Mapping Tools

**USEPA EJSCREEN (2.0)**

The USEPA hosts an online EJ screening and mapping tool[48] that combines environmental and demographic data for various geographies and presents them in maps and reports. The USEPA uses publicly-available data and combines environmental and demographic characteristics (indicators) to produce an EJ Index for a specific geography. To remain consistent with the data collection used in this EJ Analysis, the USEPA EJSCREEN geography used here is the Census block group.

For a selected block group, an EJSCREEN Demographic Index[49] is formulaically applied to an Environmental Indicator. The resulting score is the EJ Index[50] for the selected block group for the corresponding Environmental Indicators. An EJ Index is a percentile comparing the environmental and demographic characteristics of a selected block group[51] to those of all block groups within the State of Maryland. For instance, if a block group has an EJ Index score of 86 for the Hazardous Waste Proximity Indicator, it means that 14 percent of block groups in Maryland have higher values. The higher the EJ Index, the greater the potential for EJ concern.

USEPA EJSCREEN generates EJ Indexes for the 12 Environmental Indicators listed below. Definitions of the USEPA EJSCREEN Demographic Indexes and Environmental Indicators can be found in *Appendix F, pages 1-2,* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* **(FEIS, Appendix F)**.

- Particulate Matter $_{2.5}$
- Ozone
- Diesel Particulate Matter

---

[47] The National Capital Region Transportation Planning Board (TPB) Methodology for Equity Emphasis Areas, referenced tract-level Census data to identify communities that have significant concentrations of low-income and/ or minority populations. Data from the American Community Survey for each of the following four population groups is used: Low-Income, African American, Asian, and Hispanic or Latino.

[48] See https://www.epa.gov/ejscreen.

[49] The Demographic Index is the combined average of percent minority race/ethnicity and percent low-income households.

[50] Per USEPA, an EJ Index ultimately measures disparity. Within USEPA EJSCREEN, disparity is the difference between the Environmental Indicator's average value among minority race and ethnicity persons and low-income households in the block group versus the average values in the state. A higher EJ Index identifies a block group as contributing more toward the state's disparity in the respective Environmental Indicator category.

[51] The EJ Analysis Area includes all block groups that are located within one-quarter mile to either side of the Preferred Alternative LOD. There are a total of 66 block groups within the EJ Analysis Area. The block groups are also grouped into individual EJ Analysis Area Communities for ease of reader understanding. The 66 block groups are matched with the municipality or Census-Designated Place in which they are primarily located to form the EJ Analysis Area Communities. Overall, the 66 block groups within the EJ Analysis Area can be sorted into seven Analysis Area Communities. Refer to **Chapter 5, Section 5.21.2 A** for additional detail and for how the EJ Analysis Area relates to the CEA Analysis Area.

00000480

- Air Toxics Cancer Risk
- Air Toxics Respiratory Hazard Index
- Traffic Proximity
- Lead Paint
- Superfund Proximity
- Risk Management Plan Facility Proximity
- Hazardous Waste Proximity
- Underground Storage Tanks and Leaking Underground Storage Tanks
- Wastewater Discharge

USEPA EJSCREEN EJ Indexes were generated per Environmental Indicator for each of the 66 block groups within the EJ Analysis Area and are listed in *Appendix F* of the *Final Community Effects Assessment and Environmental Justice Technical Report* (**FEIS, Appendix F**). The EJ Indexes for each of the 66 EJ Analysis Area block groups are also presented via a heat maps for each Environmental Indicator in *Appendix F* of the *Final Community Effects Assessment and Environmental Justice Technical Report* (**FEIS, Appendix F**). Additionally, a comparison and summary of USEPA EJSCREEN EJ Indexes for the 16 block groups specifically identified as EJ populations per the Study methodology described in **Chapter 5.21.2** is provided in *Appendix F* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**).

Results from the review of USEPA EJSCREEN data show that the EJ Indexes for seven of the Study's 16 EJ populations—all located in the Gaithersburg EJ Analysis Area Community— are at or above the 50th percentile in the state for all 12 Environmental Indicators. Another two of the Study's 16 EJ populations— both located in the Potomac EJ Analysis Area Community— are at or above the 50th percentile in the state for 11 of the 12 Environmental Indicators. For all of the USEPA EJ Indexes except the Wastewater Discharge and Hazardous Materials Proximity Indicators, there are at least one non-EJ population that falls at or above the 50th percentile.

**Maryland EJSCREEN**

Influenced by the USEPA EJSCREEN mapping tool, Maryland EJSCREEN, developed by the Community Engagement, Environmental Justice, and Health (CEEJH) Laboratory at the UMD School of Public Health, also assesses and maps EJ risks for Census tracts in Maryland.[52] Maryland EJSCREEN data is only available at the Census tract geographic level. As such, data was collected for the Census tracts in which the EJ populations are located. Note that a Census tract encompasses a larger population than a block group, which is the basic EJ population unit for the purposes of this Study.

For a selected tract, a value representing its Population Characteristics (an average value of the tract's sensitive populations and socioeconomic factors) is formulaically applied to a Pollution Burden indicator (an average value of a tract's exposures and environmental effects). The resulting values for each Pollution Burden Indicator are combined into a single overall MD EJSCREEN EJ Score[53] for the selected tract. The EJ Score is a percentile comparing the combination value of Pollution Burden Indicator and Population

---

[52] See https://p1.cgis.umd.edu/mdejscreen/.
[53] See https://p1.cgis.umd.edu/mdejscreen/help.html for definition details and explanations of methodology.

00000481

Characteristics of a selected tract to that of all tracts within the State of Maryland. For instance, a tract with an EJ Score of 90 is in the 90th percentile, meaning only 10 percent of tracts in Maryland have higher EJ Scores. The higher the EJ Score, the greater the potential for EJ concern.

Definitions of the MD EJSCREEN Population Characteristics and Pollution Burden Indicators can be found in *Appendix F* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* **(FEIS, Appendix F)**.

MD EJSCREEN EJ Scores were generated for each of the 32 tracts and are listed in *Appendix F* of the *Community Effects Assessment and Environmental Justice Analysis Technical Report* **(FEIS Appendix F)**. The EJ Score for each of the tracts is also presented via a heat map in **Figure 5-13**. Additionally, a comparison and summary of MD EJSCREEN EJ Scores for the eight tracts containing the block groups specifically identified as EJ populations per the Study methodology described in **Chapter 5.21.2** is provided in *Appendix F* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* **(FEIS Appendix F)**.

Results from the review of MD EJSCREEN data show that all eight of the Study's tracts containing EJ populations fall at or above the 50th percentile in the state for Exposure. The overall EJ Scores for five of the Study's eight tracts containing EJ populations fall at or above the 50th percentile in the state, while four tracts containing EJ populations fall at or above the 50th percentile for Sensitive Populations. Lastly, three of the Study's eight tracts containing EJ populations fall at or above the 50th percentile for both the Environmental Effects and Socioeconomic Factors. When looking at all 32 of the Analysis Area tracts, Gaithersburg, Rockville, North Bethesda, Bethesda, and Potomac all have some of the highest scores for various indicators. All of the indicators, except for Socioeconomic Factors, have tracts without EJ populations that fall at or above the 50th percentile.

**Summary of Online Environmental Justice Mapping Tools**

The review of the USEPA EJSCREEN and MD EJSCREEN data and mapping tools confirm that the methodology and identification of EJ populations completed to date for the Study is largely in line with similar assessments completed by outside expert institutions. The EJSCREEN tools also provide an additional layer of nuance by selecting specific, measurable, and common issues faced by EJ populations along the study corridors. Mapping is an easily digestible visual of where Analysis Area block groups and communities with higher concentrations of EJ populations are located.

The results of this review, in combination with the Study's formal EJ Analysis, will help inform and guide MDOT SHA and the Developer where EJ initiatives and outreach should be focused both prior to issuance of the ROD and implemented during final design and construction. Information on engagement, outreach, and community enhancements to EJ populations is provided in **Section 5.21.5**.

b. **Limited English-Speaking Households**

EO 13166 *Improving Access to Services for Persons with Limited English Proficiency* (2000) requires Federal agencies to examine the services they provide, identify any need for services to those with limited English proficiency (LEP), and develop and implement a system to provide those services so LEP persons can have meaningful access to them.  A person who does not speak English as their primary language and who has a limited ability to read, speak, write or understand English may be LEP.  In accordance with MDOT SHA's

00000482

*Title VI Program Implementation Plan* (2015), "MDOT SHA will provide translation services to individuals that have limited ability to read, write, speak or understand English. SHA will seek to communicate with LEP populations and provide LEP individuals meaningful access to SHA programs and activities."[54] Interpretation services, particularly Spanish and American Sign Language, have been available both proactively and by request at each Public Workshop, Public Hearing, and applicable outreach event held for the study.

ACS Five-Year Estimates (2015-2019) data on limited English-Speaking households was evaluated to identify potential LEP populations within the EJ Analysis Area where specific LEP supporting outreach could be targeted. The ACS allows respondents to identify one's household as English-speaking only, Spanish-speaking, other Indo-European language-speaking, Asian and Pacific Island language-speaking, or other language-speaking. Respondents who identify as part of a non- English-speaking only household further classify as either a "limited English-speaking household" or, "not a limited English-speaking household."

The average proportion of LEP households within EJ Analysis Area was 5.5 percent. In comparison, the proportion of LEP households was lower in Montgomery and Fairfax counties at 4.4 percent, and in Maryland at 1.8 percent. Of the 66 block groups within the EJ Analysis Area, 26 had an above-average percent of LEP households. Ten of the above-average block groups are block groups already identified as EJ populations; the remaining 16 above-average block groups are not considered EJ populations. The block groups shown in *Table 5-5* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**) have an above-average (5.5 percent and above) percent of LEP households.

### c. Free and Reduced-Price Lunch Programs

The Virginia Department of Education (VDOE 2019-2020) and Maryland State Department of Education (MSDE 2019-2020) provide annual data on public school student enrollment in the free and reduced-price (F&R) lunch program. Overall, 33.7 (33.68) percent of students enrolled in Montgomery County Public Schools receive F&R program benefits. Within the EJ Analysis Area, an average of 20.4 percent of students receive F&R program benefits. *Table 5-6* in the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS Appendix F, Section 5.4.4**) shows the six schools that have an above-average population of students who receive F&R program benefits. Four of the six of the schools with an above-average percentage of F&R program participation are in block groups already identified as EJ populations, with the exception of Beall Elementary School (located in block group 7010.05 - 1) and Julius West Middle School (located in block group 7010.05 – 1). No Fairfax County public schools in the EJ Analysis Area have above-average percentage of F&R program participation.

---

[54] MDOT SHA Title VI Program Implementation Plan accessed at https://www.roads.maryland.gov/OEO/TitleVI-Program-Implementation-Plan.pdf.

00000483

OP•LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

**Figure 5-13: Maryland EJSCREEN EJScore for Census Tracts in the Analysis Area**



00000484

### d. Places of Worship

Additionally, to support and facilitate outreach efforts places of worship located within EJ Analysis Area Communities that contain minority or low-income populations were identified. A list of the 61 places of worship is provided in the *Section 5.4.4* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**).

### e. Affordable Housing Complexes

The HUD Multifamily Assistance & Section 8 Database, Montgomery County Housing Opportunities Commission, and Fairfax County Redevelopment and Housing Authority were consulted to locate affordable housing complexes with subsidized units within the EJ Analysis Area. Affordable housing complexes are identified in their respective Community Profile in *Appendix D* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**). In the EJ Analysis Area, a total of 21 housing complexes rent units at affordable, below-market rates for qualifying households. A list of the housing complexes is provided in *Table 5-7* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**). Twelve of the 21 affordable housing complexes are located in EJ populations.

### f. Food Stamps/SNAP Benefits

American Community Survey Five-Year Estimates (2015-2019) were used to collect data on households utilizing Food Stamps/SNAP benefits. Thirty-one of the 66 block groups within the EJ Analysis Area contain households receiving Food Stamps/SNAP benefits; the remaining 35 block groups do not contain populations receiving Food Stamps/SNAP benefits. The average percent of households receiving Food Stamps/SNAP benefits for the 31 block groups is 4.8 percent. Of these 31 block groups, 11 have a proportion of households that receive Food Stamps/SNAP benefits at or above the five percent EJ Analysis Area average; these block groups are shown in *Table 5-8* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**).

### g. Equity Emphasis Areas

The NCRTPB has designated Census tracts with higher-than-average concentrations of minority, low-income populations, or both, as Equity Emphasis Areas (EEA). EEAs are used in regional transportation planning to identify areas to target transportation improvements.

The EEA were reviewed to determine any overlap with block groups identified in this Study methodology as EJ populations.[55] Of 66 total block groups within the EJ Analysis Area, 15 overlap with Equity Emphasis Areas, as shown in *Table 5-9 and Figure 5-3* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**).

### h. MDOT SHA Voluntary Demographic Survey

It is MDOT SHA policy to offer a demographic survey to voluntarily complete for attendees of MDOT SHA public meetings. Ten attendees of the November 1, 2021 Virtual Public Hearing completed the survey. Eight survey respondents identified as White, one respondent identified as Asian, and one respondent identified as "other" race; one respondent was in the 18 to 40 age bracket, four were in the 40 to 65 age

---

[55] Note that the TPB methodology uses Census tracts, which encompass a larger geographic area than the Census block groups used in this EJ Analysis. As such, the comparison of EEAs and EJ populations is not a one-to-one geographic comparison.

00000485

bracket, and five were in the 65 and over age bracket. Additionally, no survey respondents identified as having a disability to be accommodated at the Virtual Hearing, and no survey respondents identified any other language than English spoken at home. Note that, due to the voluntary nature of the survey and the small sample size, the results of the survey may not accurately represent the demographics of all the Virtual Public Hearing attendees.

## E.  Summary of the Existing Conditions of Environmental Justice Populations

Based on the methodology described in **Section 5.21.2**, 16 (or 24 percent) of the 66 block groups within the EJ Analysis Area meet the minority race and ethnicity population and/or low-income household population criteria to be considered EJ populations. The 16 EJ populations are shown in **Figure 5-12** and listed in the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**). The 16 EJ populations are located in the Analysis Area Communities of Gaithersburg, Rockville, Potomac, and North Bethesda.

As detailed in **Section 5.21.4 D** above, supplemental community data was reviewed to understand if there were any block group populations or Analysis Area Communities not identified through this Study's EJ Analysis methodology that could benefit from the additional engagement given the formally identified EJ populations. Synthesizing the EJ Index scores above the 50th percentile from the USEPA and MD EJSCREEN mapping tools, plus the data on above-average limited English-Speaking households, low-income subsidized housing, households receiving Food Stamps/SNAP benefits, student participation in F&R lunch programs, and EEAs, the non-EJ populations listed below may benefit from the additional EJ engagement. See **Table 5-10** of **Appendix F** for additional detail.

- Gaithersburg EJ Analysis Area Community
  - 7008.17 - 2
- Rockville EJ Analysis Area Community:
  - 7007.18 - 1
  - 7007.18 - 2
  - 7010.01 - 3
  - 7010.02 - 3
  - 7010.05 - 1
- North Bethesda EJ Analysis Area Community:
  - 7012.05 – 3
- Bethesda EJ Analysis Area Community:
  - 7044.04 – 4
- Potomac EJ Analysis Area Community:
  - 7060.12 – 1
- McLean EJ Analysis Area Community:
  - 4801.00 - 4

Refer to *Sections 5.4.5* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**) for additional detail.

00000486

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

### 5.21.5 Public Outreach with Environmental Justice Populations

Providing full and fair access to meaningful involvement by low-income and minority populations in project planning and development is an important aspect of EJ. Meaningful involvement means the Lead Agencies target participation from populations typically underrepresented, throughout all the project stages. It is important to engage and advise EJ populations of the project development steps and consider their feedback. Residents are an important source for local history, special sites, and unusual traffic, pedestrian or employment patterns relevant to the project. This information is used in the design and evaluation of alternatives, to avoid negative impacts to valued sites, and to support the development of safe, practical, and attractive transportation options that are responsive to the EJ population's needs. Due to the highly diverse demographics composing the population adjacent to and using the study corridors, much of the corridor-wide public involvement efforts conducted for the Study were aimed at reaching this socioeconomically diverse audience.

In addition to standard public notifications of the availability of the DEIS and SDEIS and announcement of the Public Hearings and associated comment periods, MDOT SHA implemented additional notification methods to encourage meaningful involvement by low-income and minority race/ethnicity populations, as well as other traditionally marginalized populations in review of the DEIS and SDEIS, and participation in the Public Hearings and comment periods. This section summarizes the public involvement efforts conducted in EJ populations, as well as additional efforts to notify traditionally underserved populations. Additional detail on the public involvement efforts presented here is provided in the *Final Public Involvement and Agency Coordination Technical Report* (**FEIS, Appendix R**).

### A. Publication of DEIS, Public Hearings, and Associated Comment Period

Environmental Justice outreach efforts for publication of the DEIS and notification of the Public Hearings and comment period include the following:

- Mailed and/or emailed flyers in English, Spanish, Amharic, and French[56] flyers to approximately 200 affordable housing complexes, schools, and places of worship[57] along the study corridors. Emailed PDFs of these flyers to the organizations that have email addresses listed online. A cover letter was sent with both forms of distribution.
- Uploaded to the project website the DEIS Executive Summary translated into Spanish, Amharic, and French.
- Provided hard copies of the translated DEIS Executive Summary at the DEIS viewing locations.
- Spanish language advertisements in *El Tiempo Latino*, *Washington Hispanic*, and on *eltiempo.com*.
- Additional County outreach:
    - Montgomery County News press release
    - Inclusion in Montgomery County Executive's weekly newsletter

---

[56] Spanish, French, and Amharic are the top primary languages of English for Speakers of Other Languages (ESOL) learners in both counties.
[57] Includes Environmental Justice (EJ)- area schools with above-average participation in the Free and Reduced-price Meals Program; places of worship in EJ areas; and all affordable-housing complexes within CEA Analysis Area, plus Prince George's County along the study corridors.

00000487

- o Inclusion in Montgomery County Department of Transportation (MCDOT) bi-weekly newsletter and social media posts
- o Distribution of flyer via M-NCPPC Prince George's County Planning email databases
  - ▪ Planning Department listserv with approximately 19,200 email addresses
  - ▪ Community Association listserv with approximately 700 email addresses
- o Inclusion in Prince George's County social media posts
- o Coordination with Prince George's County Faith-Based Advisory Board to distribute information to their ministry listserv with approximately 70 email addresses

- Additional translation of flyer to Simplified Chinese, Korean, Malayalam, Punjabi, Tagalog, and Yoruba, uploaded to the project website, and distribution of hard copies to groceries largely serving immigrant communities.
  - o ALDI (Beltsville, Lanham)
  - o Anarkali Bazar (Greenbelt)
  - o Giant Food (Greenbelt, Largo, Marlow Heights)
  - o Global International Grocery (Silver Spring)
  - o Great Wall Supermarket (Rockville)
  - o Jumbo Food International Supermarket (Temple Hills)
  - o La Colonia International Supermarket (Camp Springs)
  - o Las Americas Market (Rockville)
  - o Latino Market Grocery (Gaithersburg)
  - o Lidl (District Heights)
  - o Periyar Asian Grocery (Landover Hills)
  - o Safeway (Greenbelt)
  - o Save A Lot (Forestville)
  - o Shoppers (College Park, Forestville, Largo, New Carrollton)

The DEIS outreach materials are included for reference in *Appendix G* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* **(FEIS, Appendix F)**.

## B. Publication of SDEIS, Public Hearings, and Associated Comment Period

Environmental Justice outreach efforts for publication of the SDEIS and notification of the Public Hearing and comment period were similar to the DEIS outreach efforts and included the following:

- Newspaper print advertisements in *El Tiempo Latino*, *Washington Hispanic* and digital advertisements on *Afro.com*, and *Eltiempo.com,* and *Fairfaxtimes.com*.

00000488

- Ran additional online digital advertisements three weeks prior to the virtual public hearing, including digital advertisements targeted black and African American and Hispanic adults likely to own a home and commute over 20 miles daily using I-270 or I-495 via geofencing.[58]

- Ran Spanish-language radio advertisements two weeks prior to the virtual public hearing on WLZL-FM, a Spanish-language station that broadcasts to the Washington-Baltimore metropolitan area. The radio spot emphasized the virtual public hearing and project website.

- Developed a flyer to outreach to EJ populations that featured an emphasis on SDEIS availability, ways to comment, and the announcement of Virtual Public Hearing; the flyer included a QR code to link to SDEIS availability on the project website. The flyer was translated into in Spanish, Amharic, French, Chinese, and Korean based on the top languages spoken by LEP populations in Montgomery County as identified in the 2020 MCDOT *Language Assistance Plan*.

- Mailed flyer to approximately 200 affordable housing complexes, schools, and places of worship along the study corridors. PDFs of these flyers were emailed to the organizations that have email addresses listed online. A cover letter was sent with both forms of distribution.

- Mailed flyers to county advisory boards and community groups who serve minority race and ethnicity and other traditionally marginalized populations. PDFs of these flyers were emailed to the organizations that have email addresses listed online. A cover letter was sent with both forms of distribution. Advisory boards and community groups include, but are not limited to, the following:
  - Montgomery County
    - Faith Community Advisory Council
    - Gilchrest Immigrant Resource Center
    - Department of Housing and Community Affairs
    - Community Reach, Commission on People with Disabilities
    - Health and Human Services Latino Health Initiative
    - Literacy Council
    - DOT Division of Transit Services
    - Health and Human Services Office of Community Affairs
    - Office of Community Partnerships
    - Sidney Kramer Upcountry Regional Services Center
    - Health and Human Services Asian American Health Initiative
    - Office of Community Relations
    - Department of Social Services Internal and External Affairs
- Prince George's County:
  - Housing Authority
  - Community Outreach Promoting Empowerment Section (COPE)
  - Literacy Council

---

[58] Online digital advertisements were run through the Exchange Display Network, which specializes in digital buys with geographic and demographic programmatic targeting. Digital advertisements targeted African Americans or Hispanic adults using geofencing and behavioral data. The target area was in zip codes which index the highest to target a specified audience segment; and behavioral data indicating the likelihood for that adult to own a home and commute over 20 miles daily using I-270 or I-495. Of the total 5 million-plus potential impressions, 20 percent, or 1.2 million impressions, targeted this demographic.

00000489

OP·LANES™
M A R Y L A N D    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

    o  Aging and Disabilities Services Division
- Delivered hard copies of the English and translated flyers to 18 libraries and 33 specialty markets and/or grocery stores. [59]
- Coordinated with M-NCPPC, Prince George's County Planning Board to distribute the flyer via the Planning Department and Community Association listservs.

Additionally, translated versions of the SDEIS Executive Summary were posted to the project website, and all SDEIS documents were made Section 508-compliant on the project website. An online presentation was setup on the project website where users could view the informational display boards in a web-based format that could be translated into multiple languages using Google Translate.

SDEIS outreach materials are included for reference in *Appendix G* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**).

## C. Environmental Justice Working Group and Environmental Justice Engagement Initiatives

### a. Environmental Justice Working Group

In response to comments from the USEPA on the DEIS, a Working Group was established in Spring 2021 to support the EJ analysis and outreach efforts to be conducted for the Study moving forward. Agency members include FHWA, USEPA, MDOT SHA, MDP, MCDOT, M-NCPPC, and Prince George's County Department of Public Works and Transportation (DPW&T). The goals of the EJ Working Group are to:

- Develop potential mitigation measures should high and adverse disproportionate impacts occur and identify additional outreach opportunities using federal, state, and local experience;
- Identify potential commitments to EJ/public health community enhancement measures related to social/health vulnerability indicators; and
- Identify recommendations for additional engagement opportunities including FEIS notifications and post-NEPA outreach to communities.

EJ Working Group meetings have occurred on the dates listed in **Table 5-50**.

**Table 5-50: Environmental Justice Working Group Meetings and Coordination**

| DATE | AGENDA ITEMS |
|---|---|
| March 2, 2021 | Kick-off Meeting; Agency member introductions, and discussion of  goals |
| April 7, 2021 | Data collection to support existing conditions discussion in EJ Analysis; Discussion on EJ Public Outreach Plan and future opportunities; community enhancement considerations |
| September 15, 2021 | Review of draft EJ Public Outreach Plan: SDEIS/FEIS/ROD and future opportunities in consideration of the Preferred Alternative; community enhancement considerations |
| November 9, 2021 | Final EJ Outreach and Engagement Plan |

---

[59] Attempts to drop off flyers were made at 33 specialty markets and grocery stores. Note that several locations were either closed or did not accept the flyers for posting or distribution.

00000490

Based on ideas provided by MDOT SHA in the draft EJ Public Outreach Plan: SDEIS/FEIS/ROD and agreed upon by the EJ Working Group, MDOT SHA initiated contact with Montgomery County, local advisory group leads, the City of Rockville, the City of Gaithersburg, and regional organizations to leverage their local knowledge and experience with community engagement and to seek recommendations on potential community enhancements. Contact was made with the UMD CEEJH Laboratory, as well as the following Montgomery County Advisory Groups:

- African Affairs Advisory Group
- Asian Pacific Advisory Group
- Caribbean American Advisory Group
- Faith Community Advisory Council
- Latin American Advisory Group
- LGBTQ Advisory Group
- Middle Eastern American Advisory Group
- Senior Community

A meeting with MDOT SHA and the CEEJH Laboratory Director and faculty was held on October 20, 2021, to share EJ Analysis methodology and the targeted EJ outreach conducted to date, as well as seek additional suggestions for outreach and potential community enhancement efforts. Regarding the EJ Analysis methodology, general feedback received from the CEEJH suggested that data on environmental conditions should be used to supplement demographic data in the identification of populations of EJ concern, as living with overburdened environmental stressors is a key feature of EJ populations. Additionally, given the roadway-focused nature of the project, MDOT SHA was encouraged to focus on public health impacts from air quality impacts due to traffic proximity, as poor air quality contributes directly to many health concerns.

The discussion with CEEJH Laboratory underscored the importance of incorporating USEPA and MD EJSCREEN data in the EJ Analysis (see **Section 5.21.4 D.a**), which provides data on existing environmental conditions along the study corridors. Additional organizations were also added to ongoing EJ outreach efforts.

MDOT SHA initiated communication with Montgomery County Advisory Groups and planners from the City of Rockville and City of Gaithersburg in Fall 2021, also to share targeted EJ outreach conducted to date and seek additional suggestions for outreach and potential community enhancement efforts. MDOT SHA requested the advisory groups to respond to questions regarding the location of EJ populations, methods of communication, commonly spoken non-English languages, community enhancement priorities, and survey distribution options. The City of Rockville provided detailed information in response to the request including suggested methods for communication, languages and enhancement priorities within the City.

**b. Environmental Justice Engagement Initiatives**

Based on the results of the local, state and regional coordination conducted as part of the EJ Working Group's EJ Public Outreach Plan, MDOT SHA implemented additional public-facing EJ outreach efforts to

00000491

engage meaningfully and directly with underserved communities and identify strategies to minimize impacts and to identify community enhancements that could potentially be incorporated into the project.

In consideration of the pandemic and due to the large study area, MDOT SHA developed an online survey to seek feedback from EJ and other underserved populations on existing community concerns and strategies that could be implemented to address those concerns. The survey was distributed in a variety of ways including through multiple community "pop-up" events hosted by MDOT SHA at local specialty markets in areas noted as having high percentages of low-income and/or minority populations. These community events allowed for meaningful, direct face-to-face engagement. Community members were able to complete the survey on iPads and ask questions of the staff. Multi-lingual staff were present at each pop-up event.

The survey was open for approximately six weeks, allowing respondents to complete the questions at their own pace. In addition to English, the survey was provided in Spanish, French, Amharic, Chinese, and Korean— the same top five non-English spoken languages that DEIS and SDEIS materials were translated into based on Montgomery County's Department of Transportation 2020 *Language Assistance Plan*. The survey and results are provided in *Appendix H* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**).

In addition to the direct face-to-face engagement, postcards, flyers, yard signs, targeted social media, local agency and community organization coordination were used to promote the survey. Promotional materials included a QR code with a direct link to the survey online; the flyer also included the survey questions themselves. All materials were translated into the top five non-English languages identified above. Postcards and flyers were placed at local health clinics, specialty markets, grocery stores and places of worship. Yard signs with the QR code were placed at affordable housing complexes and near bus transit stations. In addition, an email with the survey was sent to 230 community email addresses informing people about the survey, inviting them to participate, and encouraging them to share the information with their community. Lastly, approximately 49 places of worship were contacted and, where allowed, postcards and yard signs with the QR code were distributed.

The survey included three multiple choice questions about potential community betterment and needs, and one open-ended question asking what other improvements are needed in the respondent's community. Sixty-one people completed the survey. The following are the most common responses to the multiple-choice questions in the survey.

Question #1: Transportation improvements needed:
1. Better lighting on streets and sidewalks (21%)
2. More or improved sidewalks (17%)
3. Traffic calming to make streets safer (15%)

Question #2: Neighborhood needs:
1. Recreation centers parks, and playgrounds (30%)
2. Sidewalks, trails, and bike lanes (26%)

Question #3: Environmental problems in your community:
1. Water quality (24%)
2. Noise (20%)

00000492

3.  Safe and healthy housing (20%)

The most common responses to the open-ended question on community improvements needed were:

- Lighting
- Community services
- Safety
- Road (more or better)

For additional detail on EJ Engagement Initiatives, refer to the *EJ Outreach Summary Report* in *Appendix H* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**).

## 5.21.6 Identification of Beneficial and Adverse Effects to Environmental Justice Populations

Both beneficial and/or adverse effects to the existing conditions of EJ populations are considered in this EJ Analysis. Effects described in this section include physical impacts to existing private property, including community facility property, as well as physical impacts to transportation right-of-way. Per FHWA EJ Order 6640.23A, consideration is also given to effects on the following environmental characteristics: demographics, traffic, human health and safety; air quality; noise/vibration; water quality; hazardous materials; natural resources; visual landscape and aesthetic values; economy and employment; access and mobility; community cohesion/isolation and quality of life; and tolling considerations. Also considered in this section are community enhancement measures for each resource, as applicable.

### A. No Build Alternative

The No Build Alternative would not result in any Study-related construction and therefore no land use conversions or property acquisitions are required; no direct impacts would occur in EJ populations. Increased traffic congestion under the No Build Alternative would contribute to increased overflow congestion on the local road network. As a result, the No Build Alternative could result in increased response times for emergency services and increased travel times to community facilities, especially during peak travel periods.

Existing congestion on I-495 and I-270 occur for periods of ten to seven hours per day, respectively. Re-occurring congestion results in vehicles idling for extended periods which can increase emissions and impact air quality. The No Build Alternative would not address the existing congestion experienced along the study corridors.

### B. The Preferred Alternative

The Preferred Alternative would address existing and long-term traffic growth, including improvement to the local roadway network, increased trip reliability, enhanced multimodal connectivity and mobility and additional travel options as described in **FEIS, Chapter 3** and as detailed in the traffic analysis in **FEIS, Chapter 4** and **FEIS, Appendix A**. The impacts of the Preferred Alternative on various characteristics of EJ populations are summarized and compared to the corresponding impacts on non-EJ populations in **Table 5-51**. Note that the nature of some of the following characteristics (aside from property) makes it difficult to precisely quantify effects at the block group-level. Therefore, the effects on these characteristics within EJ populations are described in a primarily qualitative manner.

00000493

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

Expanded detail on the impacts to various characteristics of EJ populations is provided in *Chapter 5, Section 6.2* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**).

Table 5-51: Comparison of Effects to EJ Populations versus Non-EJ Populations

| Resource | Comparison and Analysis and Analysis of Impacts to 16 EJ Populations versus Impacts to 50 Non-EJ Populations |
|---|---|
| Property | Permanent and temporary property acquisition in EJ populations would total 14.3 acres from 31 properties, compared to property acquisition in non-EJ populations, which would total 78.6 acres from 330 properties.<br><br>Impacted properties in EJ populations account for 9% of the total impacted properties and 15% of the total impacted acreage along the entire Phase 1 South limits.<br><br>Impacted properties in non-EJ populations account for 91% of the total impacted properties and 85% of the total impacted acreage along the entire Phase 1 South limits.<br><br>All affected private property owners would be compensated for the fair market value of the acquired portion of land and any damages to the remaining property and structures; this includes compensation for temporary use of land for the construction of the Preferred Alternative. Ongoing coordination with area businesses would occur to prevent or minimize both short- and long-term disruptions. *The Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally Assisted Programs* information and MDOT SHA "Your Land, Your Highways: Your Rights and Benefits Guide" are provided in *Appendix E* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**).<br><br>Given the proportion of impacts and compensation requirements described above, the frequency and type of property impacts would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| Community Facilities, incl. Section 4(f) Properties (Public Parks and Public Parks with Historic Properties) | No residential or business property relocations would occur under the Preferred Alternative. No permanent or temporary impacts to community facility properties would occur in EJ populations. Impacts to 11 community facility properties, totaling 8.0 acres of impacts, would occur in non-EJ populations. Impacts to two Section 4(f) properties (public parks, public parks with historic properties, and historic sites) —Malcolm King Park and Academy Woods historic site— totaling 0.6 acres of impact, would occur in EJ populations.* Impacts to 18 Section 4(f) properties**, totaling 32.6 acres of impact, would occur in non-EJ populations.***<br><br>Impacted community facility properties in non-EJ populations account for 100% of community facility property impacts. Impacted Section 4(f) properties in EJ populations account for 10% of the total impacted Section 4(f) properties and 2% of the impacted Section 4(f) property acreage. |

00000494

OP·LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Resource | Comparison and Analysis and Analysis of Impacts to 16 EJ Populations versus Impacts to 50 Non-EJ Populations |
|---|---|
| | All affected community facility property owners would be compensated for the fair market value of the acquired portion of land and any structures acquired for the construction of the Preferred Alternative. Ongoing coordination with area businesses would occur to prevent or minimize both short- and long-term disruptions. *The Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally Assisted Programs* information and MDOT SHA "Your Land, Your Highways: Your Rights and Benefits Guide" are provided in *Appendix E* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**).<br><br>Mitigation for impacts to Section 4(f) properties has been coordinated extensively with the Officials with Jurisdiction (OWJ) over the impacted park properties. Refer to **Chapter 6** for detail on Section 4(f) properties. Refer to **Chapter 7** for detail on mitigation related to impacted Section 4(f) properties.<br><br>Given the proportion of impacts and mitigation described above, the frequency and type of community facility and Section 4(f) property impacts would not be higher or more adverse to EJ populations under the Preferred Alternative.<br><br>*Since the SDEIS, Morris Park in block group 7007.17 – 4 is now avoided by the Preferred Alternative LOD.*<br>**Includes the Washington Biologists' Field Club on Plummers Island, identified as a Section 4(f) property after the SDEIS. The impacts are not double counted for this property, as it is entirely within the Chesapeake and Ohio Canal National Historical Park.*<br>***Minor differences in Section 4(f) impact calculations between the EJ Analysis and the Section 4(f) Evaluation are due to rounding.* |
| Demographics | No property relocations would occur under the Preferred Alternative. Implementation of the Preferred Alternative would not result in changes to the existing population size or demographic characteristics (age and sex, disability, household income, race and ethnicity, LEP, F&R Lunch program participation) of the EJ Analysis Area, including both EJ and non-EJ populations.<br><br>Because the existing population size or demographic characteristics of the EJ Analysis Area would not be impacted, no mitigation is required.<br><br>As such, the frequency and type of impacts to demographics would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| Traffic | The addition of direct access would occur at 4 locations in EJ populations and 5 locations in non-EJ populations.<br><br>The Preferred Alternative is projected to provide operational benefits to the proposed managed lanes as well as general purpose lanes on the I-495 and I-270 interstate system, |

00000495

 I-495 & I-270 Managed Lanes Study

*Final Environmental Impact Statement*

| Resource | Comparison and Analysis and Analysis of Impacts to 16 EJ Populations versus Impacts to 50 Non-EJ Populations |
|---|---|
| | plus operational benefits to the surrounding local arterial network. The Preferred Alternative would significantly increase vehicle throughput across the ALB and on the southern section of I-270 while reducing congestion. It would also increase speeds, improve reliability, and reduce travel times and delays along the majority of I-495, I-270, and the surrounding roadway network compared to the No Build Alternative. Populations in both EJ populations and non-EJ populations would have the opportunity to experience these operational benefits. As such, the frequency and type of traffic impacts would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| Air Quality | Because the Study is in attainment for criteria pollutants' NAAQS,[60] transportation conformity requirements do not apply for this Study, meaning no project-level air quality analysis was required. For this reason, air quality modeling at a localized level—the level at which this EJ Analyses are otherwise conducted— is not available. |
| | Exposure to traffic-related air pollution under the Preferred Alternative would result from short-term construction activities (approximately five years) and long-term highway operations. The exposure would be distributed along the Phase 1 South limits, regardless of EJ status. In general, all of the MSAT pollutant emissions are expected to increase slightly for the Preferred Alternative when compared to the No Build condition for 2025 and 2045, opening and design years, respectively. All MSAT pollutant emissions are expected to significantly decline in the opening and design years when compared to existing conditions (2016). These long-term reductions occur despite projected increase in VMT from 2016 to the 2025 and 2045 Build scenarios. However, EJ populations who live in areas with high USEPA and MD EJSCREEN EJ Index scores (*Appendix F* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**)) may experience air quality and/or public health impacts from construction activities and highway operations more acutely than populations with lower EJ Index scores. |
| | Construction-related air quality impacts of the project would be limited to short-term increased fugitive dust and mobile-source emissions, including carbon monoxide, during construction. Construction related air quality mitigation measures would be applied to minimize air quality and public health impacts to all populations along the Phase 1 South limits, particularly to EJ populations. Refer to **Section 5.8.4** of this Chapter for additional details. All required construction-related permits would be obtained from MDE prior to construction. Dust control measures to minimize and mitigate impacts to air quality would be used to the greatest extent practicable. To minimize the amount of emissions generated during construction, efforts would be made to limit traffic disruptions, especially during peak travel hours. Further, depending on the meteorological |

[60]These counties were redesignated to attainment of the 2008 ozone NAAQS, effective May 15, 2019 (See: https://www.federalregister.gov/documents/2019/04/15/2019-06128/air-plan-approval-district-of-columbia-maryland-and-virginia-maryland-and-virginia-redesignation).

00000496



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Resource | Comparison and Analysis and Analysis of Impacts to 16 EJ Populations versus Impacts to 50 Non-EJ Populations |
|---|---|
| | conditions, research has shown that noise barriers may deflect emissions and/or increase dispersion of emissions. Refer to **Chapter 7** for detail on mitigation related to air quality.<br><br>Further, "active transportation" modes such as walking and bicycling have been shown to reduce human health risks and improve overall wellbeing.[1] Opportunities for active transportation will be provided under the Preferred Alternative via new and enhanced pedestrian and bicycle connections. Refer to **Section 5.21.7**, below, and **Chapter 7** for detail on pedestrian and bicycle facilities.<br><br>As such, air quality would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Safety** | No impacts would occur to safety along the Phase 1 South limits, including both EJ populations and non-EJ populations.<br><br>The Preferred Alternative would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with federal and state regulation. During construction, safety maintenance measures to protect drivers, bicyclists, and pedestrians would also be implemented in accordance with federal, state, and local regulations. Further, additional capacity on the Phase 1 South limits would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur; this benefit would occur for both EJ populations and non-EJ populations.<br><br>As such, impacts to safety would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Noise** | Of a total of 60 NSAs, 11 are located in EJ populations and 49 are located in non-EJ populations. Two of the 11 NSAs in EJ populations would not experience a noise impact. Another 3 NSAs in EJ populations, while experiencing a noise impact, would not be protected by noise barrier systems as the systems are considered not reasonable and/or feasible. Ten of the 49 NSAs in non-EJ populations would not experience a noise impact. Another 7 NSAs in non-EJ populations, while experiencing a noise impact, would not be protected by noise barrier systems as the systems are considered not reasonable and/or feasible.<br><br>Overall, a greater percentage of the total NSAs are located in non-EJ populations (82%) than in EJ populations (18%). A slightly lower percentage of NSAs in EJ populations would not experience a noise impact (18%) as compared to the NSAs in non-EJ populations that would not experience a noise impact (20%). Between EJ populations and non-EJ populations, the percentage of NSAs experiencing an impact but whose noise barrier |

00000497

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Resource | Comparison and Analysis and Analysis of Impacts to 16 EJ Populations versus Impacts to 50 Non-EJ Populations |
|---|---|
| | systems would be considered not feasible and/or reasonable, is smaller in non-EJ populations (18%), as compared to the same type of NSAs in EJ populations (33%).<br><br>Noise barrier feasibility and reasonableness criteria are based on federal regulation (23 CFR 772), the MDOT SHA *Highway Noise Abatement Planning and Engineering Guidelines*, and *VDOT Highway Traffic Noise Impact Analysis Guidance Manual.* In general, noise abatement feasibility criteria focus on whether it is physically possible to build a noise barrier that achieves a minimally acceptable level of noise reduction, taking into consideration acoustics, safety, and access. Noise barrier reasonableness criteria focus on viewpoints, noise reduction design goal, and cost effectiveness. These criteria are applied equally wherever noise abatement was considered, regardless of NSA location. (Refer to **Section 5.9** for detail on noise abatement.)<br><br>While the percentage of NSAs who experience noise impacts and whose barrier systems are considered not feasible and/or reasonable is greater in EJ populations versus non-EJ populations, overall, a substantially greater percentage of NSAs are located in non-EJ populations rather than EJ populations. The feasible and/or reasonable criteria is based on federal and state regulations and are applied equally wherever noise abatement is considered. As such, noise impacts would not be considered higher or more adverse to EJ populations under the Preferred Alternative. |
| **Hazardous Materials** | EJ populations contain 27 low, 4 moderate, and 2 high risk sites of hazardous materials sites of concern, while non-EJ populations contain 37 low, 56 moderate, and 9 high risk sites of hazardous materials sites of concern.<br><br>EJ populations account for 42% of the low, 7% of the moderate, and 18% of the high-risk sites of hazardous materials sites of concern. Hazardous material mitigation would be conducted as necessary in accordance with federal, state, and local regulations.<br><br>As such, hazardous materials concerns would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Natural Resources** | Impacts would occur to natural resources in both EJ populations and non-EJ populations. Natural resource impacts would occur in 10 EJ populations and 32 non-EJ populations.<br><br>In comparison to non-EJ populations, EJ populations account for 5% of total impacts to wetlands, 17% of total impacts to wetland buffers, 16% of total impacts to waters (linear feet), 9% of total impacts to waters (square feet), 23% of total impacts to tree canopy, and 11% of total impacts to floodplains.<br><br>Impacts to natural resources will be mitigated in accordance with all applicable federal, state, and local regulations. Refer to **Chapter 7** for detail on mitigation related to natural resources. |

00000498

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Resource | Comparison and Analysis and Analysis of Impacts to 16 EJ Populations versus Impacts to 50 Non-EJ Populations |
|---|---|
| | As such, impacts to natural resources would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| Visual Landscape and Aesthetic Values | The Preferred Alternative would result in changes to viewsheds or visual impacts in both EJ populations and non-EJ populations. New highway lanes would be added to the existing I-495 or I-270 corridor regardless of adjacency to an EJ population. The addition of project elements associated with the highway widening would not introduce new elements incompatible with the existing visual character or qualities, again regardless of adjacency to an EJ population. |
| | During final design, MDOT SHA and the Developer would develop and follow aesthetic and landscaping guidelines of all highway elements in consultation with the local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state, and Federal agencies. The goal will be to design highway elements to be sensitive to the context of the surrounding land use, including historic and park resources. Refer to **Chapter 7** for detail on mitigation related to the visual landscape and aesthetic values. |
| | As such, impacts to the visual landscape and aesthetic values would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| Economy and Employment | The Preferred Alternative would not result in business relocations and would not impact access to area businesses or employers. There would be no overall impact to the distribution of worker occupation, or major employers within EJ or non-EJ populations within the Analysis Area. Proposed improvements would help address increasing congestion, thereby maintaining mobility throughout the region, including areas with EJ populations. |
| | Through the Opportunity MDOT Program, the agency will provide resources for job seekers and small, minority-, women-, and veteran-owned businesses and disadvantaged businesses to prepare for potential opportunities to work with MDOT and the I-495 & I-270 P3 Program. |
| | As such, impacts economy and employment would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| Access and Mobility | The Preferred Alternative would not permanently eliminate or impede access between residences and community facilities and businesses, including both those in EJ populations and non-EJ populations. An incremental enhancement to access may occur for both EJ populations and non-EJ populations due to reduced congestion on local routes. |
| | Impacts to access and mobility during construction would be minimized in compliance with MDOT SHA Work Zone Safety and Mobility requirements along the Phase 1 South |

00000499

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Resource | Comparison and Analysis and Analysis of Impacts to 16 EJ Populations versus Impacts to 50 Non-EJ Populations |
|---|---|
| | limits and would include maintenance of the same number of existing lanes. Under the Preferred Alternative, the same number of general purpose lanes will remain along with the addition of the 4 HOT managed lanes.  Also, under the Preferred Alternative the general purpose lanes will be rehabilitated including resurfacing, and all bridges including the ALB will be reconstructed. These improvements will benefit all drivers of the study corridors.<br><br>The Preferred Alternative includes toll-free travel for bus transit and HOVs with three or more passengers, new direct access to transit centers from the managed lanes, specific transit center improvements and new and enhanced bicycle/pedestrian connections. Refer to **Chapter 7** for detail on mitigation on transit and pedestrian and bicycle facilities, as they relate to access and mobility.<br><br>As such, impacts to access and mobility would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Community Cohesion and Quality of Life** | No changes would occur to the existing sense of community cohesion in EJ populations or non-EJ populations. Divisions or isolation of properties, persons, or groups would not occur due to the generally parallel nature of the Preferred Alternative LOD along I-495 and I-270 and the fact that no properties would be displaced. Property- and construction- related changes to a local resident's or employee's existing quality of life would be experienced by both EJ populations and non-EJ populations. At the same time, local residents and employees, regardless of EJ status, could experience a benefit to quality of life due to reduced congestion in general purpose lanes and HOT lanes<br><br>To further enhance community cohesion and quality of life in the EJ Analysis Area, MDOT SHA has committed to new and enhanced bicycle/pedestrian connections to support additional affordable travel options.   Specifically, MDOT SHA has committed to constructing a new sidewalk along the west side of Seven Lock Road under I-495 to *reestablish the historic connection* between First Agape A.M.E. Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall Cemetery, in the historically African American community of Gibson Grove. Refer to **Chapter 3, Section 3.1.5** for additional bicycle and pedestrian improvements.<br><br>As such, impacts to community cohesion and quality of life would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Construction** | Construction of project elements would occur along the Phase 1 South limits, including in EJ populations. Impacts from construction to visual and aesthetic resources, hazardous material sites of concern, air quality, and noise would also occur throughout the Preferred Alternative limits, including within EJ populations. It is anticipated that construction will last approximately five years. Mainline widening would occur throughout the Phase 1 South limits. |

00000500

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Resource | Comparison and Analysis and Analysis of Impacts to 16 EJ Populations versus Impacts to 50 Non-EJ Populations |
|---|---|
|  | Two (2.0) acres in EJ populations and 12.6 acres in non-EJ populations would be required temporarily for construction access, staging, and materials storage; EJ populations contain 16% percent of total temporary property acquisition for construction. Construction for new direct access and for modifications to existing interchanges to accommodate highway widening would occur at 10 locations in EJ populations and 8 locations in non-EJ populations. |
|  | All construction impacts would be mitigated in accordance with federal, state, and local regulations. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. MDOT SHA and the Developer will continue to coordinate with the neighboring communities through design and construction. |
|  | As such, impacts from construction would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| Tolling Considerations | Consistent with FHWA guidance, while the travel speed and trip reliability benefits offered by the tolled lanes under the Preferred Alternative could be a less feasible choice for EJ populations due to cost burden, all existing general purpose lanes would remain toll-free and would undergo some travel time improvements. Also, under the Preferred Alternative, the general purpose lanes will be rehabilitated including resurfacing, and all bridges including the ALB will be reconstructed. These improvements will benefit all drivers of the study corridors. Traffic analysis conducted in support of the Preferred Alternative indicates that travel times would improve, and congestion would decrease along general purpose lanes. Similarly, because HOVs with three or more passengers will also travel toll-free on the new managed lanes, the use and availability of car and vanpools should be enhanced. Proposed bicycle and pedestrian improvements also provide for enhanced connectivity and mobility to area transit. These affordable transportation options can particularly benefit potential users who may not have reasonable access to personal vehicles. |
|  | As such, impacts from tolling would not be higher or more adverse to EJ populations under the Preferred Alternative. |

[1]Raynault, Eloisa and Ed Christopher. "How Does Transportation Affect Public Health?" *Public Roads Magazine*, Vol. 76 No. 6. Federal Highway Administration. Accessed at https://highways.dot.gov/public-roads/mayjune-2013/how-does-transportation-affect-public-health.

00000501

## 5.21.7 Determination of whether Disproportionately High and Adverse Impacts would Occur to Environmental Justice Populations (Block Groups) under the Preferred Alternative

Per FHWA Order 6640.23A, a *Disproportionately High and Adverse Effect on Minority and Low-Income Populations* is an adverse impact that:

(1) is predominately borne by a minority population and/or a low-income population; or

(2) will be suffered by the minority population and/or low-income population and is appreciably more severe or greater in magnitude than the adverse effect that will be suffered by the nonminority population and/or non-low-income population.

In determining whether a particular program, policy, or activity would have disproportionately high and adverse impacts on minority and low-income populations, Order 6640.23A states that FHWA (and MDOT SHA) should take into account "mitigation and enhancement measures and potential offsetting benefits to the affected minority and/or low-income populations" as well as "design, comparative impacts, and the relevant number of similar existing system elements in nonminority and non-low-income areas" (FHWA 2012).

Due to the parallel nature of the Preferred Alternative LOD to I-495 and I-270, plus the infrequent distribution of EJ and non-EJ populations along the Phase 1 South limits, impacts would occur consistently throughout the limits. Quantifiable impacts, including impacts to property, community facilities and services, natural resources, noise, and hazardous waste, would be borne primarily by non-EJ populations. Non-EJ populations would bear the majority of quantifiable impacts for various resources, including the following:

- 91 percent of impacted properties and 85 percent of impacted property acreage;
- 100 percent of impacted community facility properties and acreage;
- 90 percent of impacted Section 4(f) properties and 98 percent of impacted Section 4(f) property acreage;
- 58 percent of the low-risk, 93 percent of the moderate-risk, and 82 percent of the high-risk sites of hazardous materials concern; and
- 95 percent of impacts to wetlands, 83 percent of impacts to wetland buffers, 84 to 91 percent of impacts to waters (linear feet and square feet, respectively), 77 percent of impacts to the tree canopy, and 89 percent of impacts to floodplains.

Impacts to demographics, traffic, air quality and its effect on public health, safety, visual and aesthetic resources, economy and employment, access and mobility, community cohesion/isolation and quality of life, and impacts resulting from construction would occur consistently along the Phase 1 South limits and more frequently in non-EJ populations.

The types of impacts caused by the Preferred Alternative would not differ between EJ populations and non-EJ populations. The Preferred Alternative includes construction of the following project elements that are distributed throughout the Phase 1 South limits: mainline widening, addition of new direct access and reconstruction of existing interchanges, reconstruction of mainline bridges and overpasses, relocation of utilities, and construction/reconstruction of stormwater management, retaining walls, and noise barriers.

00000502

Operation of the Preferred Alternative would also be consistent along the Phase 1 South limits. As such, the types of impacts caused by the Preferred Alternative would not be greater in magnitude in EJ populations versus non-EJ populations.

In response to public and agency input and concern about property impacts under the Build Alternatives analyzed in the DEIS, including considerable impacts to EJ populations, MDOT SHA selected the Preferred Alternative for Phase 1 South, which avoided all residential and business displacements and substantially reduced the number and location of potentially impacted EJ populations.

Given the reasoning summarized above and documented in detail in the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**) and in accordance with EO 12898, USDOT Order 5610.2C, FHWA Order 6640.23A, and FHWA Guidance on EJ and NEPA (2011), FHWA and MDOT SHA have determined that a disproportionately high and adverse impact would not occur to the EJ Analysis Area populations under the Preferred Alternative.

However, to be responsive to community concerns raised during the outreach and engagement efforts, which identified priorities for improved sidewalks and bicycle facilities, better lighting, and traffic calming measures, MDOT SHA commits to working with the City of Rockville, the City of Gaithersburg, and Montgomery County to:

- Identify locations where safer pedestrian crossings on major state roadways are needed.
- Identify locations where additional pedestrian improvements including adding or upgrading sidewalk, restriping for bicycle lanes, adding or upgrading ADA ramps are needed.
- Identify locations along state roads with existing pedestrian facilities where more or improved lighting is needed.

MDOT SHA has incorporated elements into the Preferred Alternative or has committed to additional improvements or the Developer has committed to certain enhancements as part of the P3 Agreement that support fair, accessible, and affordable transportation options for all users of the Study roadways, including traditionally underserved communities, including the following:[61]

- Supporting additional affordable, multimodal travel options including:
    - Toll-free travel for new bus transit on managed lanes for a faster, more reliable trip.
    - Toll-free travel for carpools/vanpools with three or more (3+) occupants.
    - Working with the local communities to expand transit fare subsidies for eligible low-income riders.
- Improving accessibility to work, school, and other modes of transportation via pedestrian and bicycle improvements:
    - Upgrading existing pedestrian and bicycle facilities impacted by the Preferred Alternative by replacing in-kind or upgrading to meet the master plan recommended facilities.

---

[61] The elements listed that are not part of the base design of the Preferred Alternative will be documented in the Record of Decision or, if Developer lead, documented in the P3 Agreement and/or Memoranda of Understanding to ensure they are carried through project development.

00000503

- o Where I-495 and I-270 or associated ramps cross over a roadway and the bridge would be replaced, the mainline and ramp bridges will be lengthened to accommodate the footprint of the master plan facility under the structure.

- o New pedestrian and bicycle facilities including a shared use path on the American Legion Bridge.

- o New sidepaths across MD 190 over I-495.

- o New sidewalk along Seven Locks Road to re-establish the historic connection in the historically African American community of Gibson Grove.

- o Providing safer pedestrian and bicycle improvements and connecting with planned City of Rockville improvements at the MD 189 and I-270 interchange.

- Enhancing transit connectivity and mobility by:

  - o Direct and indirect access ramps from the managed lanes to existing transit stations including Shady Grove, Twinbrook, Rockville Metro Stations and Westfield Montgomery Mall Transit Center.

  - o Increasing the number of bus bays at WMATA Shady Grove Metrorail Station.

  - o Increasing parking capacity at the Westfield Montgomery Mall Transit Center.

- Upgrading existing transportation facilities throughout Phase 1 South for all users of the Study roadways by:

  - o Replacing or rehabilitating all existing bridges on or over I-495 and I-270 within the Phase 1 South corridor.

  - o Rehabilitating and repaving the existing general purpose lanes for smoother and safer travel for all users.

MDOT SHA has also committed to certain improvements within the historically African American community of Gibson Grove either as mitigation for direct impacts or as commitments for further enhancement. MDOT SHA will construct or fund a new parking lot for the Gibson Grove Church, provide stormwater improvements to the property, and provide a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection between Gibson Grove Church and Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Refer to **Section 5.7** of this Chapter and **FEIS, Appendix J** for details.

Additionally, the Developer is committed to the following as part of the P3 Agreement:

- Working with Montgomery, Frederick and Prince George's Counties to expand transit fare subsidies for eligible low-income riders.

- Defining a neighborhood walk and cycle connectivity zone to enhance multi-modal connectivity.

- Facilitating the development of a facility improvement program for the installation or replacement of sidewalks, crossings, or signal modifications and formalizing trail development that has pedestrian demand, then rank projects according to safety significance, readiness, and landowner consensus, as part of its commitment to support Montgomery County's Vision Zero Action Plan. The Vision Zero Action Plan identifies strategies to eliminate serious and

00000504

fatal collisions on County roads for vehicle occupants, pedestrians, and bicyclists by the end of 2030.[62]

• Generating a Sustainability Plan for the project and will make good faith efforts to achieve, at minimum, a Gold Award rating as recognized by the Envision™ Sustainable Infrastructure Rating System of the Institute for Sustainable Infrastructure (ISI) and target a Platinum Award. The Sustainability Plan will include actions related to the quality of life surrounding the infrastructure asset, stakeholder and community engagement, natural resource management, ecosystems and biodiversity health, climate resilience and carbon emissions.

Refer to **Chapter 3, Sections 3.1.4** and **3.2** for detail on transit-related elements of the Preferred Alternative as well as transportation commitments. Refer to **Chapter 7, Section 7.2** for detail on all commitments.

MDOT SHA and the Developer will continue coordination with local and regional advisory groups to determine additional methods for engaging with underserved communities. This will be an ongoing effort that continues post-NEPA, through final design and construction.

## 5.22 Indirect and Cumulative Effects
### 5.22.1 Introduction

This indirect and cumulative effects (ICE) assessment was conducted in accordance with MDOT SHA's current ICE guidelines (MDOT SHA, 2012) and in accordance with NEPA's CEQ implementing regulations. The ICE analysis considers the effects of the proposed action in the context of general trends on population, employment, and general growth based on master plans, reports, census and geographic data, historic maps, and aerial imagery. It considers planning and forecasting documents concerning past, present, and future economic

> **Indirect effects** are caused by the action and are later in time or farther removed in distance but are still reasonably-foreseeable (40 CFR § 1508.8(b)).
>
> **Cumulative effects** are defined as impacts on the environment that result from the incremental impact of the action when added to past, present, and reasonably-foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such actions (40 CFR § 1508.7).

development; the history and origins of the proposed action and previous studies; and data reflected in previously completed NEPA documents for understanding of the potential for indirect and cumulative effects in the region.

The ICE Analysis methodology includes the following four general steps:

• Step 1: Collect data and identify resources
• Step 2: Define the ICE Analysis Boundary
• Step 3: Define the ICE time frame
• Step 4: Define the analysis approach and methodology

**Step 1:** This ICE analysis considers the resources, listed below, that could potentially experience direct or indirect impacts by the Preferred Alternative:

• Socioeconomic Resources (communities, residences, businesses, parks and recreation);

---

[62] See https://www.montgomerycountymd.gov/visionzero/.

00000505

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

- Cultural Resources (historic structures/districts and archeological sites);
- Natural Resources (surface water, wetlands, floodplains, forest, wildlife /wildlife habitat, and sensitive species); and
- Air Quality

**Step 2:** Since the DEIS, a new ICE Analysis Area boundary was defined to reflect the reduced Phase 1 South limits of the Preferred Alternative. Representative sub-boundaries were identified and reviewed, for example Area of Traffic Influence (ATI), Planning Areas, and watersheds. The geographic boundary used for the ICE analysis was developed by synthesizing sub-boundaries to create a single ICE Analysis Area boundary (**Figure 5-14**) to capture the full geographic area where potential indirect and/or cumulative effects would be reasonably foreseeable. The representative sub-boundary components can be found in **Section 2.2.2** of the *Final Indirect and Cumulative Effects Technical Report* (**FEIS, Appendix Q**).

**Step 3:** The temporal boundaries, or time frame, of the ICE analysis includes setting a past and future time frame. In general, the temporal boundary is identified based on factors including data availability, relevant historical events or trends, data availability and the design year for improvements being evaluated in the EIS.

A period of 75 years, from 1970 to 2045, is the ICE time frame (or temporal boundary). The first section of I-495 was opened in 1961, and the highway was completed in 1964. The first year for which decennial census data was available after the completion of I-495 was 1970. In addition, 1970 generally coincides with the opening of I-95 between Baltimore and Washington, DC. Washington National Pike was built from 1953 to 1960 and became known as I-270 in 1975.

The future time frame of 2045 was determined based on the Study's design year, as well as the availability of data. Population and employment projections are available through 2045 from MWCOG, allowing a more accurate depiction of future conditions within the ICE Analysis Area.

**Step 4:** The ICE analysis requires an understanding of past, current and potential future conditions in the ICE analysis area in order to assess the potential for impacts associated with the range of study alternatives. Consideration of past effects included research and review of published literature, census information, and historic aerial imagery. GIS mapping was obtained or created for the ICE Analysis Area and used to assess trends from the past to the present time frame. Resources identified within the ICE boundary are considered in light of past and present socioeconomic, cultural, and natural environmental conditions and trends. Future conditions are analyzed to compare build and no build scenarios and the resulting potential indirect and cumulative effects. The methodologies identified in the MDOT SHA ICE guidance were applied, including trends analysis and overlays.

- Trends analysis involves qualitative discussion of impacts to a resource over time. Past and current effects can allow for an informed projection of likely future effects.
- Overlays of present and future land use maps over the existing environmental resources allow for quantitative or qualitative description of the impacts to those resources.

00000506

OP·LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

**Figure 5-14: Overall ICE Analysis Boundary**



00000507

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

Based on these methods, the ICE Analysis is designed to identify impacts to resources from other actions (past, present, and future) including indirect impacts—if any—due to the Preferred Alternative. Then, the potential incremental effects of the Preferred Alternative are evaluated in light of the past, present, and future impacts identified. **Table 5-52** provides a brief summary of the resources, data, data sources, and analysis methodology used for identifying potential indirect and cumulative effects.

**Table 5-52: ICE Analysis Data Sources and Methodology**

| Resource | Data | Data Sources | Analysis Methodology |
|---|---|---|---|
| **Socioeconomic Resources** | | | |
| Communities (facilities, services, cohesion), residences, businesses, parks and recreation | Aerial photos, land use maps, census data, county comprehensive plans | M-NCPPC, MDP, Maryland iMap GIS, MWCOG, US Census Bureau, Montgomery County, Fairfax County, Alexandria, City of Fairfax | Overlay mapping and aerial photos, analyze trends in population and housing and availability of services, examine county comprehensive plans |
| **Cultural Resources** | | | |
| Historic structures/districts and archeological sites | Historic maps and photos, land use maps, historical site records | M-NCPPC, MHT, VDHR, National Register | Overlays of land use surrounding historical sites; trend analysis |
| **Natural Resources** | | | |
| Surface Water / Floodplains | Stream mapping, aerial imagery, land use data, watershed boundaries, floodplain mapping | M-NCPPC, MDNR, MDE, VDEQ, FEMA | Overlays of land use and historical imagery, trends analysis |
| Wetlands and Aquatic Habitat | Wetlands mapping, land use and historical imagery | M-NCPPC, MDNR, VDNR, NWI | Overlays of land use and historical imagery, trends analysis |
| Forests | Land use mapping and historical imagery | M-NCPPC, MDNR, MDP, VDNR | Overlays of land use and historical imagery, trends analysis |
| **Other** | | | |
| Air Quality | CLRP | NCRTPB | Regional conformity discussion |

## 5.22.2 Affected Environment

The ICE Analysis documented in **DEIS, Chapter 4, Section 4.22** (https://www.oplanesmd.com/wp-content/uploads/2020/11/2020-06-02_DEIS_04_Environmental.pdf) and **DEIS, Appendix O** (https://www.oplanesmd.com/wp-content/uploads/2020/07/DEIS_AppO_ICE-Tech-Report_May-2020_web.pdf) presumed potential development of managed lanes in the entire study area, including the shorter limits of the Preferred Alternative - Phase 1 South. The analytical assumptions underlying the indirect and cumulative effects based on the Build Alternatives documented in the DEIS have not changed and remain valid. Because of the reduced Phase 1 South limits for the Preferred Alternative, as described below, the anticipated indirect and cumulative effects are likely less than those described in the DEIS.

00000508

## A.  Past and Present Land Use

Substantial population growth and land development has occurred in the ICE Analysis Area during the analysis time frame. Most ICE Analysis Area jurisdictions have seen substantial population growth since 1970 and are projected to have an increase in population by 2045. Most populations in the ICE Analysis Area are estimated to rise at a somewhat more modest pace compared to the prior decades, as the land uses become older and available land becomes scarcer.

MWCOG member jurisdictions include all the ICE Analysis Area jurisdictions and more. According to the Financially Constrained Element of MWCOG's *Visualize2045* (NCRTPB, 2018), approximately 39 major roadway construction projects and 19 major transit projects are proposed in the ICE Analysis Area. According to MWCOG's Round 9.1a Cooperative Forecast, the Metropolitan Washington Region will add more than 648,000 households between 2015 and 2045, for a total of 2.66 million households. More than half of the expected household growth in the ICE Analysis Area will occur in Fairfax County, the District of Columbia, and Montgomery County. Commercial development in the MWCOG region declined by 29 percent in 2020 compared to 2019 (MWCOG, 2021a). Six of the ten largest development projects in the MWCOG region, by square footage, are located within the ICE Analysis Area.

The study corridor is located within the Potomac River drainage basin. The full ICE Analysis Area contains approximately 17,800 acres of wetlands according to National Wetlands Inventory (NWI) mapping and approximately 30,400 acres of FEMA's 100-year floodplains. A total of 66 nontidal wetlands and 238 stream segments were delineated within the corridor study boundary. More detailed descriptions of wetland resources and impacts are included in the *Final Natural Resources Technical Report* (**FEIS, Appendix M**).

The Chesapeake Bay Land Cover GIS dataset was used to identify land cover in the full ICE Analysis Area (367,500 acres total). Forest and shrub land cover accounts for approximately 49 percent (181,900 acres) of the ICE Analysis Area, with herbaceous and impervious land cover at 25 percent (93,200 acres) and 22 percent (82,500 acres), respectively. The remaining categories account for two percent (8,700 acres) water cover and less than one percent (1,200 acres) of barren land.

Existing land use in the ICE Analysis Area includes a mix of developed residential, commercial, and institutional land uses, along with open spaces, forested areas, and relatively small areas of farmland. For the Maryland portion of the ICE Analysis Area, Land Use/Land Cover (LULC) is available for 1973, 2002, and 2010 data years from the MDP. The data suggests an overall pattern of agricultural and forest land converted into residential use between 1973 and 2010. Institutional and industrial uses rose modestly in this time frame, and other land use categories were generally stable. Land use in the Maryland portion of the ICE Analysis Area is predominantly suburban, mid to low-density residential use, with more dense areas closer to Washington, DC and becoming less intense further from the city core. Commercial, industrial, and institutional uses are generally clustered around major transportation corridors, especially interstate highways. Green spaces are generally stream valley corridors and larger parks dispersed throughout the area.

The land use data for the District of Columbia from 2005, as presented in the District of Columbia Comprehensive Plan, and the 2017 existing land use map, note the expansive city core of about four-square miles centered around the open spaces of Federal Washington, DC. The core is surrounded by an

00000509

inner ring of moderate- to high-density residential and mixed-use neighborhoods. Beyond the inner ring is an outer ring of less dense development, characterized largely by single-family housing and garden apartments. As noted in the Comprehensive Plan, the District was almost fully developed by 1960.

The Virginia portion of the ICE Analysis Area is generally characterized by mature suburban residential land uses, with commercial and other uses focused in hubs along major transportation corridors. The land uses are denser in the areas closer to Washington, DC, becoming more suburban further away from the urban core. The Virginia portion of the ICE Analysis Area has seen a major growth in office buildings since 1970, particularly in areas close to highways, Metrorail stations, and near Washington, DC. Residential land use accounts for 63 percent of the land use in the Fairfax County portion of the ICE Analysis Area.

### B. Future Land Use

The availability and level of detail for future land use varies depending on the planning jurisdiction. Background information on future land use is summarized below based on available plans and data by jurisdiction. County and local master plans focus on protecting existing open space and residential communities by directing future development to designated areas. There are no planned developments in the ICE Analysis Area that are dependent upon the completion of the Preferred Alternative. For additional information, refer to the *Section 3.1.1C* of the *Final Indirect and Cumulative Effects Technical Report* (**FEIS, Appendix Q**)

- Montgomery County, Maryland: A review of the various land use plans in Montgomery County, indicates that the comprehensive planning documents aim to protect existing suburban residential areas along I-495, and maintain them in their current form. New growth is to be primarily focused into hubs around existing mass transit, and in more-densely-urbanized areas closer to Washington, DC.

- Frederick County, Maryland: The 2010 comprehensive plan policy is to direct future land use growth in the vicinity of existing population centers and highway infrastructure, particularly near Frederick and along I-270 in the ICE Analysis Area.

- Fairfax County, Virginia: The 2017 county plan calls for the creation of community-focused, mixed-use centers with a compatible mix of housing, commercial, institutional/public services, and recreation uses. These are encouraged within the established urban centers such as Tysons Corner, primarily located along major highways in the County, and focused mostly closer to Arlington and Washington, DC.

- Arlington County, Virginia: The 2016 comprehensive plan calls for retention of the predominant residential character of the County, and limitation of intense development to defined areas (Arlington County, 2016). In particular, it calls for concentrating high-density development within the Rosslyn-Ballston and Jefferson Davis Metrorail Transit Corridors.

- District of Columbia: The District of Columbia comprehensive plan notes that the City has been largely built-out since the 1960s, but demand for land, housing, and jobs has continued to fuel land use change (DC Office of Planning, 2021). The plan notes that as the urban core expands, reinvestment in established business districts, such as Golden Triangle, the Downtown Core, and

00000510

Near Southwest will continue, as these areas become modernized, better connected, and developed with new infill and public improvements.

## C. Smart Growth

Maryland's *Smart Growth Priority Funding Areas Act of 1997* (Smart Growth Act) directs Maryland state infrastructure funds to areas within or connecting with county-designated and state-certified PFAs. Growth-related projects include most State programs that encourage growth and development such as highways, sewer and water construction, economic development assistance, and State leases or construction of new office facilities. The Smart Growth Act legislatively designated certain areas as PFAs and established criteria for locally designated PFAs. Through the Smart Growth Act, Maryland is committed to limiting sprawl development by directing funds where they can help to revitalize older neighborhoods, and redirect growth to already developed areas, saving the state's farmland, open spaces, and natural resources (MDP, 2019). To evaluate the Study's growth implications, consistency with MDP's Planning Policy, and compliance with the PFA Law, Smart Growth Coordination Checklists were prepared by MDOT SHA and are included in *Appendix C* of the *Final Community Effects Assessment and Environmental Justice Analysis Technical Report* (**FEIS, Appendix F**). In an email dated January 12, 2022, MDP concurred with Planning Act Consistency and PFA Law compliance determinations for the Study.

As shown in **Figure 5-15**, the Preferred Alternative is located entirely within PFAs. PFAs cover much of the Montgomery County portion of the ICE Analysis Area, extending north from the Washington DC border and along the I-495 and I-270 corridors. While PFAs are not located where undeveloped farmland remains near the boundary between Montgomery and Frederick Counties, the Frederick County portion of the ICE Analysis Area contains PFAs that are located along I-270 and around the City of Frederick.

## D. Population, Housing and Employment Growth

Most ICE Analysis Area jurisdictions have seen substantial population growth since 1970. Montgomery County's population nearly doubled between 1970 and 2019, while Frederick County, the least populous of the two Maryland counties, nearly tripled with a growth of 196 percent. Fairfax County, the most populous of the ICE Analysis Area counties in Virginia, grew nearly 152 percent during that time. Arlington County grew by approximately 30 percent and the incorporated cities in Virginia of Alexandria, Fairfax City, and Falls Church have experienced growth of 42 percent, 7 percent, and 31 percent, respectively.

All of the ICE Analysis Area jurisdictions are projected to increase in population by 2045. Most are estimated to rise at a somewhat more modest pace compared to the prior decades, as the land uses become more mature and available land becomes scarcer. Washington, DC is estimated to continue rising in population, regaining the population lost since 1970 and exceeding it by 2030. **Figure 5-16** shows the estimated growth by Traffic Analysis Zone (TAZ) between 2015 and 2045. Areas with the greatest population growth (shown in darker shades) are generally clustered around I-270 and I-495, in Washington, DC, and along other major roadway corridors such as I-66. In the Maryland portion of the ICE Analysis Area, areas with the greatest projected population growth are generally consistent with the PFAs shown in **Figure 5-15**.

Much of the housing growth occurred as farmland in the jurisdictions surrounding Washington, DC were converted to suburban residential uses. The growth in housing has gradually tapered off as developable

00000511

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

land has been depleted in these areas; new housing growth primarily comes from infill, densification, and redevelopment of existing land uses.

Employment growth projections were obtained from MWCOG Round 9.1a Cooperative Forecasts and show that employment is projected to grow between 2015 and 2045 for all jurisdictions in the ICE Analysis Area. Washington, DC is the greatest concentration of employment in the ICE Analysis Area, followed by Fairfax County and Montgomery County.

**Figure 5-17** shows the total estimated change in employment by TAZ for the ICE Analysis Area between 2015 and 2045, with greater employment growth forecast for darker shaded areas. The forecasts predict growth clustered in central Washington, DC as well as other urban centers primarily located along major transportation infrastructure corridors such as I-495, I-270, and I-66. Similar to population growth, several growth areas are located along I-495 and I-270. These growth areas are generally consistent with the location of PFAs shown in **Figure 5-15.**

MWCOG member jurisdictions include all the ICE Analysis Area jurisdictions and more. According to MWCOG's Round 9.1a Cooperative Forecast, the Metropolitan Washington Region will add more than 648,000 households between 2015 and 2045, for a total of 2.66 million households. Fairfax County, the District of Columbia, and Montgomery County would have more than half of the expected household growth in the ICE Analysis Area. Commercial development in the MWCOG region declined by 29 percent in 2020 compared to 2019 (MWCOG, 2021a). Six of the ten largest development projects in the MWCOG region, by square footage, are located within the ICE Analysis Area. None of the future projects identified are known to be dependent upon the I-495 & I-270 Managed Lanes Study. Refer to the *Final Indirect and Cumulative Effects Technical Report* (**FEIS, Appendix Q**) for additional details.

### 5.22.3 Environmental Consequences

The reduced, Phase 1 South limits of the Preferred Alternative would result in a substantial reduction in the ICE analysis footprint, and as a result, a reduced potential for indirect and cumulative effects when compared to the DEIS ICE analysis area. The following summary provides a broad assessment of the indirect and cumulative effects that are likely to occur with the proposed development of the Preferred Alternative. Refer to **DEIS, Chapter 4, Section 22** and **DEIS, Appendix O, Section 3** for the indirect and cumulative effects analysis of the DEIS Build Alternatives. For additional details on the indirect and cumulative effects analysis for the Preferred Alternative, refer to **Section 3.2** of the *Final Indirect and Cumulative Effects Technical Report* (**FEIS, Appendix Q**).

### A. Indirect Effects

Indirect effects are caused by the action and are later in time or farther removed in distance but are still reasonably-foreseeable. Indirect effects may include growth-inducing effects and other effects related to induced changes in the patterns of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems (40 CFR § 1508.8).

00000512

OP·LANES
MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

**Figure 5-15: Maryland Smart Growth Priority Funding Areas**



Source: Maryland Department of Planning, http://mdpgis.mdp.state.md.us/pfa/

00000513

OP·LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

## Figure 5-16: Projected Population Growth 2015-2045 by TAZ within the ICE Analysis Area



Source: MWCOG Round 9.1a Cooperative Forecasting

00000514

OP·LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

## Figure 5-17: Projected Employment Growth 2015-2045 by TAZ within the ICE Analysis Area



Source: MWCOG Round 9.1a Cooperative Forecasting

00000515

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

The indirect effects of worsening traffic congestion under the No Build Alternative could include loss of economic productivity, changes in community cohesion resulting from reduced access and delays, effects on the desirability of communities, and potential changes to individual decisions about where to live and work. While no resources are anticipated to be directly impacted under a no build scenario, the No Build Alternative does include currently planned and programmed infrastructure projects that may affect the ICE Analysis Area. Moreover, under the No Build Alternative, motor vehicle volumes are forecasted to increase over time and with them are anticipated increases in travel times and delays related to growing traffic congestion. Worsening traffic congestion could have potential negative effects on motor vehicle-reliant activities, such as: emergency response services, supply chain/commercial trucking and deliveries, school bus schedules, and workforce commuters.

The indirect effects of the Preferred Alternative in the ICE Analysis Area are summarized in **Table 5-53**.

Table 5-53: Indirect Effects in the ICE Analysis Area

| Resource | Indirect Effects of the Build Alternatives |
|---|---|
| *Socioeconomic Resources* (communities, residences, businesses, parks and recreation) | Roadway improvements, such as those proposed under the Preferred Alternative, can be an attraction to commercial or real estate development. The possibility of induced growth in the ICE Analysis Area would be lessened by the reduced Phase 1 South limits of the Preferred Alternative, the long-term presence of the existing highway, and the mature land uses and developments that have occurred in the ICE Analysis Area. As a result, the likelihood of induced commercial or residential development is reduced substantially by the built-out environment that has been in existence for many years. Moreover, much of the undeveloped land within the ICE Analysis Area is designated by comprehensive plans for preservation. Indirect impacts would be minimized by adhering to existing master plans and zoning regulations pertaining to new development.<br><br>The Preferred Alternative could change travel patterns by providing increased capacity along existing facilities. More rural, less-developed portions of the ICE Analysis Area and other locations where undeveloped land exists would be most likely to experience pressure for new development from improved access along the I-270 and I-495 corridors. Noise impacts could occur to communities from greater traffic volumes on connecting roadways. Indirect impacts would be minimized by adherence to existing master plans and zoning regulations pertaining to new development. |
| *Cultural Resources* (historic structures /districts and archeological sites) | Potential indirect effects could occur to historic properties resulting from increased population growth and development in the APE. However, these areas are subject to many greater economic and demographic pressures producing increased population and development that are not caused by the Study. Development of new land uses or more intensive land uses could lead to destruction or altering the integrity of historically important characteristics of archeological and architectural historic properties. |
| *Natural Resources* — Surface Water | Indirect impacts of the Preferred Alternative would result from effects related to changes in facility-related run-off quality and quantity associated with the conversion of land from rural to urban and suburban uses as well as changes in drainage patterns and imperviousness. Indirect downstream impacts to surface water would be minimized through the development and application of approved erosion and sediment control plans and stormwater-related BMPs. In addition, detailed hydrologic and hydraulic analysis will be completed as required per MDE permitting/COMAR to ensure that proposed culvert augmentation/modification does not result in negative flood impacts to other property owners or negative impacts to channel stability. Coordination with federal, state and local agencies overseeing water resources in the ICE Analysis Area has continued throughout the Study to determine appropriate mitigation for impacts. |

00000516

OP·LANES™
M A R Y L A N D     I-495 & I-270 Managed Lanes Study

*Final Environmental Impact Statement*

| Resource | | Indirect Effects of the Build Alternatives |
|---|---|---|
| | Wetlands | Indirect impacts to wetlands and waterways from the Preferred Alternative could result from roadway runoff, sedimentation, and changes to hydrology. All indirect impacts would lead to a decrease in available wetland and waterway habitat within the ICE Analysis Area and ultimately a decrease in plant and animal species inhabiting these areas. Any wetlands impacts associated with proposed public or private development would require permitting by the USACE and state regulatory agencies, as well as review and approval by county governments to ensure consistency with environmental protection guidelines. |
| | Floodplains | Floodplain encroachment could alter the hydrology of the floodplain, which could indirectly result in more severe flooding in terms of flood height, duration, and erosion. Indirect impacts from the Preferred Alternative would be limited as they are confined to widening in existing corridors and impacts to floodplains would be minimized through adherence to existing regulatory requirements. |
| | Forest | Indirect impacts to forests from the Preferred Alternative could result from roadway runoff, sedimentation, and the introduction of non-native plant species within disturbed areas. Increased demand for land development resulting from greater access provided by the Preferred Alternative could result in pressure for conversion of forest land to residential or commercial use. |
| | Wildlife and Wildlife Habitat | The potential negative indirect effects to terrestrial and aquatic wildlife and wildlife habitat would be limited as the Preferred Alternative would improve existing roadways in highly urbanized areas which are already highly fragmented and affected by the existing transportation facilities |
| | Sensitive Species | Loss of protected species' habitat and fragmentation of such habitat related to an increased demand for land use changes could indirectly affect protected and other wildlife species. |
| Air Quality | | No substantial indirect effects to air quality are anticipated from the Preferred Alternative and would not cause or contribute to any violation of NAAQS. The quantitative assessments conducted for the project-specific CO and MSATs impacts were considered analyses of indirect effects because they address air quality impacts attributable to the project that occur at a later time in the future. Those assessments demonstrate that in the future: (1) air quality impacts from CO would not cause or contribute to violations of the CO NAAQS; (2) MSATs emissions from the affected network would be significantly lower than they are today when compared to the No Build condition for 2025 and 2045; and (3) the mobile source emissions budgets established for the region for purposes of meeting the ozone NAAQS would not be exceeded. |

## B.  Cumulative Effects

Cumulative effects are defined as impacts on the environment that result from the incremental impact of the action when added to past, present, and reasonably-foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such actions (40 CFR § 1508.7).

Past actions that have impacted resources include the numerous infrastructure and land development activities that occurred in the ICE Analysis Area throughout the ICE time frame. As described in the *Final Indirect and Cumulative Effects Technical Report* (**FEIS, Appendix Q**), jurisdictions in the ICE Analysis Area have experienced substantial growth of population, housing, and employment since 1970. For example, Montgomery County's population nearly doubled between 1970 and 2019. The decades of growth and development in the ICE Analysis Area has entailed continuous expansion and intensification of urban and suburban land uses into previously rural landscapes. Similarly, the network of transportation infrastructure has been continually expanded to accommodate the transportation needs of the growing regional economy and population.

00000517

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

Present and future actions impacting resources include noise, land development, and infrastructure improvements required to accommodate existing and future populations and economic activity. MWCOG estimates show ICE Analysis Area jurisdictions growing in population and employment through 2045. Demand from existing populations and economic activity has created substantial traffic congestion in the region, and many currently planned projects are intended to accommodate this existing demand. Future projects, as described in the **Section 3.1.3** of the *Final Indirect and Cumulative Effects Technical Report* (**FEIS**, **Appendix Q**) will continue to expand infrastructure capacity to meet the needs of the growing population.

The past, present and future actions have had both beneficial and adverse impacts. Past and present growth and development have improved local economies and led to provision of community facilities, transportation infrastructure, and recreational resources benefiting residences and businesses. Construction and expansion of transportation facilities has facilitated economic growth by providing access to employment and community facilities and allowing for more efficient movement of goods and services.

Increased population and employment in the ICE Analysis Area is expected to increase traffic volumes and create eventual need for more transportation improvement projects. The proposed action is one of many reasonably-foreseeable future transportation projects designed to address both existing volumes, as well as anticipated growth. The Preferred Alternative would provide improved access, mobility, and traffic conditions. Combined with the other projects identified in **Section 3.1.3B** in the *Final Indirect and Cumulative Effects Technical Report* (**FEIS**, **Appendix Q**), it is anticipated that there would be a greater overall benefit to local communities. The proposed action, along with other future transportation projects would cause noise impacts, with potential cumulative effects on communities in the vicinity of improved and new roadways.

The No Build Alternative, considered in the context of growth and development occurring throughout the ICE Analysis Area, would result in potentially negative socioeconomic impacts from increasing traffic congestion. The effects of worsening traffic congestion could include loss of economic productivity, changes in community cohesion resulting from reduced access and delays, effects on the desirability of communities, and potential changes to individual decisions about where to live and work.

The proposed action, along with other future transportation projects would cause noise impacts, with potential cumulative effects on communities in the vicinity of improved and new roadways. Cumulative impacts to water quality could occur from stream loss and the incremental increase of impervious surfaces that may increase runoff from past, present, and future development projects. These would be minimized through the use of BMPs during construction and use of SWM facilities. The incremental effect would be minimized by the required permitting process, which would identify avoidance, minimization, and mitigation as needed to offset wetland losses. The cumulative effects of the Preferred Alternative in the ICE Analysis Area are summarized in **Table 5-54**.

00000518

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

## Table 5-54: Cumulative Effects in the ICE Analysis Area

| Resource | Cumulative Effects of the Preferred Alternative |
|---|---|
| *Socioeconomic Resources* (communities, residences, businesses, parks and recreation) | • The continual expansion of transportation facilities in the region, while providing benefits of increased access and mobility, also has detrimental effects on communities adjacent to these facilities, including potential loss of community cohesion.<br>• The Preferred Alternative would add to the impacts from other past, present and future projects to parklands in communities adjacent to the I-495 and I-270 corridors, often in well-developed areas where replacement parkland could not be easily located. |
| *Cultural Resources* (historic structures /districts and archeological sites) | • Past actions in the ICE Analysis Area have already resulted in destruction or degradation of resources, including demolition for new construction or changes in land use context surrounding cultural resource areas, where proximal replacement of resources may not be possible.<br>• Present and future actions, including transportation projects and land development activity, would likely continue to impact cultural resources in similar ways. |
| *Natural Resources* — Surface Water | • Cumulative impacts to water quality could occur from stream loss and the incremental increase of impervious surfaces that may increase runoff from past, present, and future development projects.<br>• These would be minimized through the use of BMPs during construction and use of SWM facilities.<br>• The incremental effect would be minimized by the required permitting process, which would identify avoidance, minimization, and mitigation as needed to offset wetland losses. |
| *Natural Resources* — Wetlands | • Past land use development and transportation projects have had impacts on wetlands, particularly those that occurred prior to the passage of state and Federal laws that regulate wetland impacts.<br>• The incremental effect would be minimized by the required permitting process, which would identify avoidance, minimization, and mitigation as needed to offset wetland losses. |
| *Natural Resources* — Floodplains | • The incremental impact of the Preferred Alternative to floodplains, considered in light of past, present and future impacts, is expected to be relatively minimal due to existing regulatory controls and regulations. |
| *Natural Resources* — Forest | • While future development and transportation projects would be regulated in a manner that minimizes forest impacts, the past losses of forest in the ICE Analysis Area have been extensive. The incremental effect of the Preferred Alternative on forested land in the ICE analysis area would be potentially substantial.<br>• The required 1:1 mitigation would help offset the incremental effect of this impact; however, it may not be possible to find suitable replacement land within close proximity of the build corridors. Additionally, this may result in replacement of mature forest areas with new, smaller trees. |
| *Natural Resources* — Wildlife and Wildlife Habitat | • Overall, the cumulative effects of past transportation and development projects have been adverse to wildlife and wildlife habitat, but present and future impacts would be reduced by applicable Federal, state, and local laws and regulations requiring potential adverse effects to be avoided, minimized, or mitigated.<br>• The Preferred Alternative would contribute to the incremental effect on wildlife habitat in the ICE Analysis Area in light of other past, present and future projects. |
| *Natural Resources* — Sensitive Species | • The overall impacts of past actions in the ICE Analysis Area have had adverse effects on sensitive species due to the conversion of wildlife habitat to urbanized land.<br>• Present and future development could potentially impact protected species, though such effects would likely be minimized by adherence to Federal and state laws and regulations for protected species. |

00000519

OP·LANES™ I-495 & I-270 Managed Lanes Study
M A R Y L A N D

Final Environmental Impact Statement

| Resource | Cumulative Effects of the Preferred Alternative |
|---|---|
| Air Quality | • The Study is currently included in the NCRTPB FY 2019 – 2024 TIP [TIP ID 6432 and Agency ID AW0731 (planning activities)] and the NCRTPB Visualize 2045 Long-Range Plan (CEID 1182; CEID 3281; and Appendix B, page 56). This project (adding two managed lanes in each direction) is included in the Air Quality Conformity Analysis that accompanies the Visualize 2045 Plan. This analysis demonstrates that the incremental impact of the proposed project on mobile source emissions, when added to the emissions from other past, present, and reasonably-foreseeable future actions, as reflected in the transportation plan and TIP conformity determinations and will not cause or contribute to a new violation, increase the frequency or severity of any violation, or delay timely attainment of the NAAQS established by USEPA. Therefore, the cumulative impacts of the project to air quality are not expected to be significant. The NCRTPB is currently updating the Visualize 2045 plan, to be completed in 2022. The design concept and scope for the Preferred Alternative will be included in the Air Quality Conformity Determination accompanying the update to Visualize 2045 which will be approved in 2022. Regarding GHG emissions, statewide analyses indicate that the HOT lanes will not impede Maryland's ability to meet its GHG emission reduction goals. According to the Greenhouse Gas Reduction Act Plan, which includes this project, Maryland is expected to exceed its 40% reduction by 2030 goal and strive for a 50% reduction by 2030. (Refer to **Section 5.8** and **FEIS, Appendix K** for more information.) |

## 5.23 Consequences of Construction

The LOD of the Preferred Alternative accounts for areas needed for construction. The assumed areas for construction access, staging and materials storage are identified on the *Environmental Resource Mapping* (**FEIS, Appendix E**). Since the DEIS and SDEIS, design and LOD refinements have occurred. The long-term effects and short-term, construction-related effects of the Preferred Alternative have been quantified and documented in this FEIS. Impacts associated with construction that will be further evaluated for the Preferred Alternative in final design including, traffic congestion associated with construction maintenance of traffic, impacts to business and residential access, utility disruptions, vibrations, sediment erosion and stormwater management, and construction related noise.

It is anticipated that construction will last approximately five to six years. Details related to precisely when and where construction related activities will occur will be determined in final design, however, the project will likely require night work to occur when activities could not be completed safely during the day. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. Impacts associated with construction that will be further evaluated for the Selected Alternative in final design include traffic congestion associated with construction maintenance of traffic, utility disruptions, construction vibration, erosion and sediment and control, and construction related noise.

The management of construction impacts is addressed in an agreement between MDOT SHA and the Developer. Pursuant to that agreement, coordination with the neighboring communities will continue through final design and construction. The agreement includes requirements to minimize impacts to surrounding communities and the traveling public, while completing construction as soon as possible. Work hours and duration of construction will be identified to minimize impacts to traffic in an effort to reduce construction related congestion and in consideration of noise and vibration impacts to adjacent communities. Construction methods and materials will comply with contract, state and federal regulation, and environmental permits and mitigation requirements. Careful attention will be taken to assure that

00000520

  I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

material placement will occur when weather conforms to industry standards and regulation. In addition to required governmental inspections, the Developer is required by contract to provide independent environmental, quality, and safety oversight of its contractor's performance. Refer to the Final Phase 1 P3 Agreement, https://oplanesmd.com/p3-information/phase-1-agreement/. Once the Developer has selected a Design-Build Contractor(s), the schedule and duration for Phase 1 South construction will be made available to the public.

In addition, to support community, environmental and sustainability goals, the Developer will generate a Sustainability Plan for the project and will make good faith efforts to achieve, at minimum, a Gold Award rating as recognized by the Envision™ Sustainable Infrastructure Rating System of ISI and target a Platinum Award in collaboration with the Developer. The Sustainability Plan will include actions related to the quality of life surrounding the infrastructure asset, stakeholder and community engagement, natural resource management, ecosystems and biodiversity health, climate resilience and carbon emissions.

### 5.23.1 Visual and Aesthetic Resources

Construction would require the removal of vegetation to varying degrees throughout the study corridors. As a result of the vegetation removal, the wider interstates, added ramps, retaining walls, and noise barriers would become more visible and prominent from both the dynamic and static views. The static views from adjacent properties, including residential properties, commercial enterprises, parkland/ open space properties, and a number of community resources would experience an impact; however, impacts would generally be consistent with existing views of the study corridors as the surrounding area is adjacent to the existing interstate facilities and the surrounding area is urban in nature. Temporary visual impacts from both dynamic and static views will occur from the addition of construction equipment including cranes, heavy vehicles, trucks, borrow material and equipment stockpiling, safety signage, temporary barriers, etc. MDOT SHA has also been coordinating with NPS and M-NCPPC on visual impacts and mitigation at their park properties. Mitigation measures to lessen the visual impact of the improvements have been considered as appropriate. For example, MDOT SHA reduced the number of signs and considered the aesthetics of signage along the NPS and M-NCPPC parkways per NPS and M-NCPPC request. Vegetation removal will be minimized, and additional landscaping may be incorporated in other areas as well. Mitigation for tree removal will be done in accordance with the Maryland Reforestation Law and NPS and M-NCPPC agency requirements, such as on-site planting, when feasible.

### 5.23.2 Hazardous Materials

Prior to acquisition of right-of-way and construction, Preliminary Site Investigations (PSI) would be conducted to further investigate properties within and in the vicinity of the Preferred Alternative LOD that have a high potential for mitigation of contaminated materials exposed during construction activities (refer to **Section 5.10** for additional details). Proposed investigation for the high concern sites should adequately characterize surficial and subsurface soils, as well as groundwater, if anticipated to be encountered. Example locations would consider locations of previous releases, former/current/abandoned storage tanks, and inferred groundwater flow, as well as proposed soil/groundwater disturbance during construction. The Developer would be required to use best management practices to minimize the release of any hazardous materials during construction.

00000521

### 5.23.3 Air Quality

Because the project's construction duration is not anticipated to exceed five years in any single location, most air emissions associated with construction are considered temporary in nature. The primary air quality concerns during construction would be a potential short-term localized increase in the concentration of fugitive dust (including airborne $PM_{2.5}$ and $PM_{10}$), as well as mobile source emissions, including pollutants such as CO. To manage fugitive dust emissions during construction, the contractor may use some or all of the following dust control measures, to minimize and mitigate, to the greatest extent practicable, impacts to air quality:

- Minimize land disturbance
- Cover trucks when hauling soil, stone, and debris (MDE Law)
- Use water trucks to minimize dust
- Use dust suppressants if environmentally acceptable
- Stabilize or cover stockpiles
- Construct stabilized construction entrances per construction standard specifications
- Regularly sweep all paved areas including public roads
- Stabilize onsite haul roads using stone
- Temporarily stabilize disturbed areas per MDE erosion and sediment standards

Since CO emissions from motor vehicles generally increase with decreasing vehicle speed, disruption of traffic during construction (such as temporary reduction of roadway capacity and increased queue lengths) could result in short-term elevated concentrations of CO. To minimize the amount of emissions generated, efforts would be made during construction to limit traffic disruptions, especially during peak travel hours including keeping the same number of existing lanes open during construction.

Construction activities would also generate GHG emissions. Preparation of the roadway corridor (e.g., earth-moving activities) involves a considerable amount of energy consumption and resulting GHG emissions; manufacture of the materials used in construction and fuel used by construction equipment also contribute to GHG emissions; and on-road vehicle delay during construction would also increase fuel use, resulting in GHG emissions. In addition to an analysis of operational emissions of GHG, an analysis of construction GHG emissions associated with the Preferred Alternative using the FHWA Infrastructure Carbon Estimator is included in the FEIS. Refer to **FEIS, Chapter 5, Section 5.8** and **FEIS, Appendix K**. FHWA's Infrastructure Carbon Estimator analysis is a planning level analysis that uses high-level estimates of construction activity in terms of lane miles or track miles before refined estimates are available. It is appropriate to analyze decisions that are made in the long-range planning or project development processes, before details about specific facility dimensions, materials, and construction practices are known. The results of the Infrastructure Carbon Estimator analysis for the Preferred Alternative show that the construction and maintenance of the project would produce approximately 1.1 million metric tons per year of $CO_2$ equivalents. The majority of these emissions are associated with vehicles using the roadway during normal operations and delays associated with the construction of the project. Refer to *Appendix B* of the *Final Air Quality Technical Report* (**FEIS, Appendix K**) for the results of the Infrastructure Carbon Estimator. Other measures that will be implemented during construction to help minimize emissions are discussed in **Section 5.8.4** of this chapter.

00000522



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

### 5.23.4 Noise

Noise would be generated from the construction of the highway improvements and the noise barriers. (Refer to **Section 5.9** for additional details). The Developer would be responsible for developing a construction work sequence that minimizes the duration of time without a noise barrier in place.

Land uses that are sensitive to vehicular noise are also sensitive to construction noise. Despite highway construction being a short-term phenomenon, significant noise impacts can occur. The extent and severity of these impacts depend on the phase of construction and the noise characteristics of construction equipment being used. As with any major construction project, areas around the construction site are likely to experience varied periods and degrees of noise impact. This type of project will likely employ the following equipment, which could be a source of construction noise: bulldozers and earthmovers; front-end loaders; dumps and other diesel trucks; and compressors. Generally, sensitive land uses near construction zones may experience noise levels between 78 dB(A) and 83 dB(A). Maintenance and adjustments to equipment, temporary noise barriers, construction of permanent noise barriers first where possible, variation of construction activity areas, public involvement, and financial incentives to contractors are all mitigation procedures that can decrease temporary noise impacts. During final design, these mitigation measures will be considered to minimize public exposure to short-term noise impacts. Wherever possible, the Developer will be required to construct any proposed noise barrier prior to demolishing the existing sound barrier. This would reduce noise and screen neighborhoods from construction activities. Where a proposed noise barrier cannot be constructed prior to demolishing an existing noise barrier, the Developer will be required to begin construction of the new noise barrier within 60 days of beginning the existing sound barrier demolition; the Developer would also be required to continue construction operations of the proposed noise barrier until it is completed. Contract provisions will allow the Developer to salvage and reuse certain sound barrier materials to minimize construction duration. These provisions were added to reduce construction impacts to surrounding properties. Final determination of noise barrier feasibility, reasonableness, dimensions, and locations will be made during the Final Design Noise Analysis, which is discussed further in **DEIS, Appendix J,** *Noise Analysis Technical Report*, **SDEIS, Appendix E**, *Noise Technical Report Addendum*, and **FEIS Appendix L**, *Final Noise Technical Report*.

### 5.23.5 Natural Resources

Impacts to surface water quality during construction include physical disturbances or alterations, accidental spills, and sediment releases. These impacts can affect aquatic life through the potential to contaminate waterways in the vicinity of the Preferred Alternative LOD and could potentially increase contaminants in the raw water for the drinking water supply. Direct stream channel impacts associated with the Preferred Alternative are compared and quantified in *Appendix A* of the *Natural Resources Technical Report* (**FEIS, Appendix M**).

During construction, large areas of exposed soil can be severely eroded by wind and rain when the vegetation and naturally occurring soil stabilizers are removed. Erosion of these exposed soils can considerably increase the sediment load to receiving waters (Barrett et al., 1993). Sediment loads caused by construction could eventually enter the intermittent drinking water intake at Little Falls Dam if not controlled. These increased sediment loads can destroy or damage fish spawning areas and macroinvertebrate habitat and could increase maintenance and sediment removal cycles for the drinking

00000523

water supply system. An accidental sediment release in a stream can clog the respiratory organs of fish, macroinvertebrates, and the other members of their food web (Berry et al., 2003). Additional suspended sediment loads have also been shown to cause stream warming by reflecting radiant energy (CWP, 2003).

Construction of roadway improvements across drainageways and in floodplains may lead to increases in floodplain elevation and size, which must be addressed. Detailed analysis and design solutions will be required to accommodate increased flood volumes to eliminate impacts to insurable properties. MDOT SHA conducted an assessment to determine where culvert augmentations are likely necessary to limit upstream increases in floodplain elevation related to culvert extensions and included these in the Preferred Alternative LOD. Additional culvert pipes running alongside the existing culverts are proposed in those areas where flood risk potential was identified. Refer to **Chapter 3, Section 3.1.7** of this document for additional details on culverts.

Initial roadway construction would result in is the removal of trees and other riparian buffer vegetation. The removal of riparian vegetation, including forest and tree cover, greatly reduces the buffering of nutrients and other runoff materials and allows unfiltered water to directly enter a stream channel (Trombulak and Frissell, 2001). Tree removal during the construction process can reduce the amount of shade provided to a stream and raise the water temperature of the affected stream. In addition to tree removal, stormwater discharges also have the potential to increase surface water temperatures in nearby waterways. The effects of the temperature change depend on stream size, existing temperature regime, volume and temperature of stream baseflow, and the degree of shading.

## 5.24  Commitment of Resources
### 5.24.1  Irreversible and Irretrievable Commitment of Resources
NEPA requires that environmental analyses include identification of "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." An irreversible or irretrievable commitment of resources results in the permanent loss of a resource for future uses (or alternative purposes) as they cannot be replaced or recovered.

The No-Build Alternative would not require an irreversible and irretrievable commitment of resources.

The construction of the Preferred Alternative would result in the commitment of natural, physical, and financial resources that would be irreversible and irretrievable. The irreversible dedication of land to transportation use for the construction of the Preferred Alternative would render the land unusable for any other use. Approximately 92.8 acres of land converted to transportation use under the Preferred Alternative, 78.2 acres of permanent and 14.7 acres of temporary impacts (refer to **Section 5.1.3, Table 5-2**). Land used in the construction and operation of the proposed facility (right-of-way) is considered an irreversible commitment during the time period that the land is used for a transportation facility.

As part of this permanent land alteration, approximately 455.0 acres of forest canopy (refer to **Section 5.16.3, Table 5-38**), 3.9 acres of wetlands, and 42,286 linear feet of streams (refer to **Section 5.12.3, Table 5-24**) have the potential to be affected by the Preferred Alternative. While forest, stream and wetland mitigation would account for some of these losses, these individual distinct ecosystems could be irreversibly impacted.

00000524

Significant amounts of fossil fuels, electricity, labor, and highway construction materials would be irretrievably expended for the construction of the Preferred Alternative. Anticipated construction materials would include aggregates, asphalt, cement, gravel, and sand. Concrete and steel would be required for bridges and other structures such as retaining walls and noise barriers. Fuel, electricity, and labor required to manufacture, transport, and install these materials would be irretrievably lost. No long-term impacts to construction-related resources are anticipated for the Preferred Alternative.

Since the managed lanes would generate toll revenue, the anticipated construction costs could be recouped over time. Projects that include a future revenue source such as tolls may be constructed with no direct state and federal funding upfront. The P3 Program has a goal to implement the improvements at no net cost to the State. However, if a state subsidy is required, it would typically be paid to the Developer at the beginning of the contract, whereas if positive excess cashflows are anticipated, they could be paid to the State at the beginning of the contract and/or as revenue sharing payments to the State during the operation of the facility.

The commitment of these resources is based on the concept that residents in the immediate area, state, and region would benefit from the improved quality of the transportation system. These benefits would consist of reduced congestion, enhanced trip reliability, additional roadway choices, and improved movement of goods and services, as described in **Chapters 3 and 4**, which are expected to outweigh the commitment of the irreversible and irretrievable resources.

### 5.24.2 Short-Term Effects/Long-Term Effects

Short-term impacts to resources in relation to long-term productivity have been evaluated in accordance with (42 US Code [U.S.C.] § 4332(C)(iv)) and guidelines published by the CEQ on implementing NEPA (40 CFR 1502.16). This analysis qualitatively discusses the relationship between short-term impacts to and use of resources, and the long-term benefits and productivity of the environment. For this analysis, short-term refers to the estimated three-to-five-year period of construction, the time when the largest number of temporary environmental effects is most likely to occur. Long-term refers to the more than 100-year life span estimated for the proposed improvements. This section discusses whether the short-term uses of environmental resources by the proposed improvements would affect (either positively or negatively) the long-term productivity of the environment.

### A.  Short-Term Impacts

Construction of the Preferred Alternative would result in short-term impacts, as described in **Chapter 3**, **Section 3.1.8** and **Section 5.23** of this chapter.

An increase in employment and job opportunities for future permitting and design, construction workers, suppliers, and inspectors would result during construction of the Preferred Alternative. As of the time of this document, more than $3 billion in private infrastructure investment will support economic development and job growth in communities and the region with thousands of jobs per year during construction. This short-term employment, use of materials to construct the improvements, and purchases of goods and services generated by construction could create a short-term improvement in the local economy that would diminish once the construction is completed. Workers who live in the region may fill these new positions or it is possible that people may move to the area as a result of the job opportunities created by the project. The concentration of workers within the area would stimulate the

00000525

local economy by increasing business at area commercial and retail establishments. Increased sales tax would be derived from the commercial sales and from the sales of materials required for construction.

During construction, detours may be required rerouting travelers to other area roadways. Some travelers may choose to take alternate routes to avoid construction areas and further delays. The use of alternate routes may increase fossil fuel usage and could result in loss of business for commercial establishments thereby lowering sales tax revenues. Rerouting may lead to increased congestion and delays on the detour routes.

Expanding roadway alignments, materials storage areas, and movement of construction vehicles may result in the removal of existing vegetation. A temporary increase in air quality and noise impacts are expected. Water resources would also be needed for construction activities including mixing aggregate materials, road wetting, and landscaping.

## B. Long-Term Impacts

The long-term impacts and benefits of the implementation of the Preferred Alternative would remain for the duration of the facility's life. The increased capacity and reduced traffic congestion would result in more efficient use of fossil fuels.

Reduced congestion, enhanced trip reliability, and additional roadway choices would result in quicker trips and commutes for drivers. Improved movement of goods and services would benefit the local and regional economy. Generally, logistics costs decrease as trucks and commercial vehicles travel in less congested conditions, spending less time en route, thus improving supply chain fluidity for regional industries dependent on truck traffic.

Improving congestion and reducing the amount and duration of idle traffic would result in decreased air pollution. Together, these effects would result in an enhanced overall environment for the many communities in Maryland along I-495, I-270, and the greater National Capital area.

The implementation of the Preferred Alternative would require permanent conversion of property to transportation uses. Real estate taxes paid of those properties would be eliminated. These long-term loses may be offset by areas adjacent to the improvements that experience induced growth.

## 5.25 Permits, Approvals and Authorizations Required

### 5.25.1 Federal Cooperating Agency Authorizations

FHWA is the lead Federal agency for the Study. The Cooperating Agencies for this Study include those Federal and state agencies that would ultimately be responsible for Federal authorization decisions. In addition, other key agencies with regulatory or management jurisdiction over sensitive resources were invited to act as Cooperating Agencies. At the DEIS stage, there were eight Cooperating Agencies (four Federal, three state and one regional). Since that time and based on additional information on regulatory authority, two agencies requested a change in status from Cooperating Agency to Participating Agency. These two agencies include the MDNR and NCPC. FHWA did not disagree with these requests.

The following are the Federal Cooperating Agencies that have authorization decision responsibilities for the Study:

00000526

OP·LANES™    I-495 & I-270 Managed Lanes Study
MARYLAND                                        Final Environmental Impact Statement

- National Park Service (NPS)
- US Army Corps of Engineers (USACE) Baltimore District
- US Environmental Protection Agency (USEPA)

The state Cooperating Agencies for the Study are Maryland Department of Environment (MDE) and Virginia Department of Transportation (VDOT). The one regional Cooperating Agency is M-NCPPC covering both Montgomery and Prince George's counties.

## A. National Park Service Authorization

The NPS authorization decision relates to consideration and approval of a Special Use Permit for the temporary use of land under its administration for temporary construction related activities and consent to the request of a highway deed easement by FHWA, pursuant to the authority of 23 U.S.C. § 107(d) for the NPS land that will permanently become land for highway purposes.

Assuming selection of the Preferred Alternative, the NPS action would be taken in response to FHWA's request for land for highway purposes from the following NPS park properties: George Washington Memorial Parkway, Chesapeake and Ohio Canal National Historical Park, and Clara Barton Parkway, and their accompanying administered properties, as expressed in statute, regulation, and policies.

After conclusion of the NEPA process and if NPS agrees to the use of the impacted lands, FHWA would officially request land for highway purposes via execution of a highway deed easement. NPS authorization or consent of the request would be required to advance the transfer of land for permanent incorporation into transportation use. The execution of a highway deed easement would be done in compliance with 23 U.S.C. § 107(d) which authorizes the FHWA to arrange with Federal agencies to provide rights-of-way to state DOT's whenever such rights-of-way are required for the Interstate System and NPS Director's Order (DO) #87D: Non-NPS Roads, which sets forth NPS operational policies and procedures for responding to requests for use of national parks for non-NPS highway projects partially or fully funded under Title 23 of the United States Code. The project would also require NPS to issue a Special Use Permit for the temporary use of land under its administration for construction related purposes.

In addition, NPS authorization is to the Organic Act in 1916. 16 U.S.C. § 1, as amended and supplemented. The Organic Act established the National Park Service as an agency under the direction of the Secretary of the Interior with the stated purpose of promoting use of national park lands while protecting them from impairment. Specifically, the Act declares that the National Park Service has a dual mission, both to conserve park resources and provide for their use and enjoyment "in such a manner and by such means as will leave them unimpaired" for future generations. 16 U.S.C. §1 and prohibits it from authorizing any activities "in derogation of the values and purposes for which the System units have been established." 54 U.S.C. § 100101. NPS will not ultimately be able to provide the required authorizations unless the final Selected Alternative can be shown not to cause such impairment.

## B. US Army Corps of Engineers

The proposed transportation upgrades to the I-495 and I-270 corridors being evaluated in the Study will result in discharges of dredged/fill material into Waters of the US, including jurisdictional wetlands and structures built in/over navigable waters. Therefore, the project will require USACE authorization under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act. Concurrent with the

00000527

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

NEPA Process, MDOT SHA prepared a Joint Federal/State Permit Application (JPA) and supporting documentation for the Alteration of Any Floodplain, Waterway, Tidal or Non-Tidal Wetland within the LODs of the Build Alternatives of the Study. This application was prepared pursuant to the requirements of the Code of Maryland Regulations, Sections 26.17 and 26.23, and Section 404 of the Clean Water Act and supported by the DEIS. The application was amended and resubmitted to the USACE focusing on the impacts associated with the Preferred Alternative. The JPA is included in **FEIS, Appendix P**.

The JPA is further supported by the *Final* AMR (**FEIS, Appendix N**) and the *Final Compensatory Mitigation Plan* (**FEIS, Appendix O**). The AMR describes the process of avoiding and minimizing impacts to wetlands, their buffers, waterways, and the FEMA 100-year floodplain to the greatest extent practicable and presents justifications for impacts that were unavoidable. The *Final Compensatory Mitigation Plan* presents the approach to nontidal wetlands and waterways compensatory mitigation for the unavoidable impacts from Preferred Alternative and includes the Phase II Mitigation Design Plans (**FEIS, Appendix O**).

Section 14 of the Rivers and Harbors Act of 1899, as amended and codified in (33 U.S.C. § 408) regulates alteration of USACE civil work's projects, such as dams, levees, or flood channels. The Section 408 review process typically includes review of engineering, environmental, legal, and safety issues associated with the requested alteration(s). USACE Engineering Circular No. 1165-2-220 issued on September 10, 2018 provides procedural guidance for processing Section 408 requests. MDOT SHA coordinated with USACE to determine applicability of Section 408 to the proposed Study. USACE identified one Section 408 resource within the corridor study boundary, the Washington Aqueduct, located adjacent to Clara Barton Parkway near the Potomac River. This feature would not be impacted by the Preferred Alternative.

## C. US Environmental Protection Agency (USEPA)

Under Section 309 of the Clean Air Act, the USEPA is charged with reviewing EISs of all Federal agencies and to comment on the adequacy of the analysis, and identification and recommendation of appropriate measures to avoid and mitigate significant environmental impacts of the proposed action. The USEPA also serves as the repository (EIS database) for EISs prepared by Federal agencies and provides notice of its availability in the Federal Register. The USEPA also has veto power over the Section 404 permits issued by the USACE. It is anticipated that USEPA will provide comments on the EIS in fulfillment of their statutory duty under the Clean Air Act and coordinate with the lead Federal Agency and state proponents consistent with that authority.

## 5.25.2 Permits and Approvals

In addition to NEPA compliance, several permits and approvals are being coordinated concurrently with preparation of this FEIS. **Table 5-55** summarizes the Federal, state, and local permits, authorizations and approvals that will likely be required based on the current Study design assumptions and associated impacts.

00000528

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

**Table 5-55: Permits and Approvals**

| Permit/ Approval | Responsible/Permitting Agency | Anticipated Timeframe |
|---|---|---|
| National Environmental Policy Act (NEPA) Approval – Record of Decision[1] | Federal Highway Administration | Summer 2022 |
| Section 4(f) Approval | Federal Highway Administration | Summer 2022 |
| Interstate Access Point Approval | Federal Highway Administration | Summer 2022 |
| Section 106 Programmatic Agreement | Federal Highway Administration | Spring 2022 |
| Mandatory Referral #1 | Maryland-National Capital Park and Planning Commission | Summer 2022 |
| Archaeological Resource Protection Act (ARPA) permit for Maryland and Virginia resources. | National Park Service | Early 2023 |
| TPB- CLRP/Conformity Determination | Transportation Planning Board &Federal Highway Administration | Summer 2022 |
| Clean Water Act Section 404 and Section 10 | US Army Corps of Engineers | Spring 2023 |
| Maryland/Virginia State Waters (Section 401) | Maryland Department of Environment / Virginia Department of Environmental Quality | Spring 2023 |
| Maryland Nontidal Wetlands and Waterways Permit | Maryland Department of Environment | Spring 2023 |
| Virginia Wetland Protection Permit | Virginia Department of Environmental Quality | Spring 2023 |
| Special Use Permit - Construction in Maryland | National Park Service | Early 2023 |
| Special Use Permit - Construction in Virginia | National Park Service | Early 2023 |
| Highway Deed Easement in Maryland | National Park Service/FHWA | Spring 2023 |
| Mandatory Referral #2 (at least 35% design) | Maryland-National Capital Park and Planning Commission | Early 2023 |
| Park Construction Permit - M-NCPPC | Maryland-National Capital Park and Planning Commission | Early 2023 |
| Maryland Reforestation Law Approval | Maryland Department of Natural Resources | Early 2023 |
| State and County Forest Conservation Easement Revision Approvals | Maryland Department of Natural Resources / Maryland-National Capital Park and Planning Commission | Summer 2023 |
| General Permit for Stormwater Associated with Construction Activity - Maryland | US Environmental Protection Agency / Maryland Department of the Environment | Spring 2023 |
| General Permit for Stormwater Associated with Construction Activity - Virginia | US Environmental Protection Agency / Virginia Department of Environmental Quality | Spring 2023 |
| Stormwater Management/Erosion and Sediment Control | Maryland Department of Transportation - State Highway Administration Plan Review Division / Maryland Department of the Environment | Spring 2023 |

00000529



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Permit/ Approval | Responsible/Permitting Agency | Anticipated Timeframe |
|---|---|---|
| Stormwater Management/Erosion and Sediment Control | US Environmental Protection Agency / Maryland Department of the Environment / Virginia Department of Environmental Quality | Spring 2023 |
| Clean Water Act Section 402 (MS4) | Maryland Department of the Environment | Spring 2023 |
| Water Appropriation and Use Permit | Maryland Department of the Environment | Spring 2023 |
| Facility Memorandum of Understanding (MOU) for impacts on local facilities and other mitigation | Maryland-National Capital Park and Planning Commission | Summer 2022 |
| Facility Memorandum of Understanding (MOU) for impacts on local facilities and other mitigation | City of Rockville | Summer 2022 |
| Facility Memorandum of Understanding (MOU) for impacts on local facilities and other mitigation | Montgomery County | Summer 2022 |
| Facility Memorandum of Understanding (MOU) for impacts on local facilities and other mitigation | City of Gaithersburg | Summer 2022 |

00000530



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

# 6    FINAL SECTION 4(F) EVALUATION

The Final Section 4(f) Evaluation has been prepared with the Final Environmental Impact Statement (FEIS) and focuses on analysis of the Preferred Alternative. This Final Section 4(f) Evaluation builds upon the analysis in the Draft Section 4(f) Evaluation, DEIS and Supplemental DEIS (SDEIS), and has been prepared to support and inform the FEIS.

The DEIS and SDEIS documents can be viewed through the following links on the Program website:

DEIS, Chapter 5: https://oplanesmd.com/wp-content/uploads/2020/11/2020-06-02_DEIS_05_Section_4f.pdf

DEIS, Appendix F: https://oplanesmd.com/wp-content/uploads/2020/07/DEIS_AppF_Draft-Section-4f-Eval_web.pdf

SDEIS, Chapter 5: https://oplanesmd.com/wp-content/uploads/2021/09/SDEIS_05_Updated_DraftSection4f.pdf

The Preferred Alternative considered further coordination with and listening to agencies and stakeholders, including the Officials with Jurisdiction (OWJs) for Section 4(f) properties. The Preferred Alternative is responsive to comments received requesting avoidance of Section 4(f) resources and aligns the I-495 & I-270 Managed Lanes Study (Study) with the previously determined phased delivery and permitting approach.

The Preferred Alternative would avoid the use of 40 Section 4(f) properties totaling approximately 109 acres relative to the DEIS Build Alternatives. The Preferred Alternative would require use of a total of 33.2 acres from 20 Section 4(f) properties (including temporary and permanent use), compared to a total of 146.8 acres for the DEIS Alternative 9.

This FEIS Chapter includes the following updates:

- Revised impacts based on additional avoidance and minimization as a result of design refinements and reassessment of stormwater management
- Updates on all possible planning to avoid and minimize the use of Section 4(f) properties within the Preferred Alternatives limits
- Updated Least Overall Harm Analysis and Conclusion

## 6.1    Introduction

Section 4(f) of the US Department of Transportation (USDOT) Act of 1966 as amended (49 United States Code [U.S.C.] § 303(c)) is a Federal Law that protects significant publicly-owned parks, recreation areas, wildlife and/or waterfowl refuges, or any significant public or private historic sites. Section 4(f) applies to all transportation projects that require funding or other approvals by the USDOT. As a USDOT agency, the Federal Highway Administration (FHWA) must comply with Section 4(f) and its implementing regulations

00000531

at 23 CFR 774. The Final Section 4(f) Evaluation (**FEIS, Appendix G**) follows established USDOT regulations at 23 Code of Federal Regulations (CFR) 774, FHWA's *2012 Section 4(f) Policy Paper*, and 23 U.S.C. § 138 and 39 U.S.C. § 303.

Regulations at 23 CFR 774.17 define a Section 4(f) property as "publicly-owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, state, or local significance, or land of an historic site of national, state, or local significance." 23 CFR 774.17 further defines "historic site" to include any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places (NRHP).

Under Section 4(f), the USDOT, including the FHWA, cannot approve a transportation project that uses Section 4(f) property, unless it is determined that:

- There is no feasible and prudent avoidance alternative to the use of land from the property, and the action includes all possible planning to minimize harm to the property resulting from such use (23 CFR 774.3(a)(1) and (2)); or

- The use of the Section 4(f) properties, including any measures to minimize harm (such as avoidance, minimization, mitigation, or enhancements measures) committed to by the applicant, will have a *de minimis* impact on the property (23 CFR 774.3(b)).

The Final Section 4(f) Evaluation (**FEIS**, **Appendix G** and summarized below) describes Section 4(f) properties identified within the corridor study boundary; discusses potential impacts or use of the Section 4(f) properties; and evaluates potential avoidance alternatives to determine if any are feasible and prudent. It then presents measures to minimize harm and mitigate for the use of Section 4(f) properties and demonstrates that all possible planning to minimize harm to the Section 4(f) properties has been included in the project. Lastly, it presents an analysis to determine the least overall harm alternative.

### 6.1.1    Purpose and Background

In the SDEIS, published on October 1, 2021, FHWA and Maryland Department of Transportation State Highway Administration (MDOT SHA) identified the Preferred Alternative: Alternative 9 – Phase 1 South, which includes the same improvements proposed as part of Alternative 9 in the DEIS but focuses the build improvements within the Phase 1 South limits only. The Preferred Alternative is described in **Section 6.1.2** below. This decision to identify Alternative 9 – Phase 1 South as the Preferred Alternative was based in part on extensive coordination with and input from agencies and stakeholders, including the OWJs for Section 4(f) properties. Comments received on the DEIS and Draft Section 4(f) Evaluation from agencies and stakeholders specifically requested avoidance of significant parkland and historic resources within the study corridors. The Preferred Alternative is responsive to comments received and aligns the Study with the previously determined phased delivery and permitting approach by limiting the build improvements to Phase 1 South and avoiding improvements on I-495 east of the I-270 east spur. The result is complete avoidance of significant Section 4(f) properties within the study limits, which remain the same as the DEIS, on I-495 east of the I-270 east spur to MD 5 in Prince George's County.

### 6.1.2    Description of Preferred Alternative

The Preferred Alternative includes a two-lane High-Occupancy Toll (HOT) managed lanes network on I-495 and I-270 within the limits of Phase 1 South only (shown in **dark blue** in **Figure 6-1**). On I-495, the

00000532

Preferred Alternative consists of adding two new HOT managed lanes in each direction from the George Washington Memorial Parkway (GWMP) in Virginia to west of MD 187. On I-270, the Preferred Alternative consists of converting the one existing High-Occupancy Vehicle (HOV) lane in each direction to a HOT managed lane and adding one HOT managed lane in each direction from I-495 to I-370 and on the I-270 east and west spurs. There is no action, or no improvements, at this time on I-495 east of the I-270 east spur to MD 5 (shown in light blue in **Figure 6-1**). Along I-270, the existing collector-distributor lane designation from Montrose Road to I-370 would be removed as part of the proposed improvements. The managed lanes would be separated from the general purpose lanes using pylons placed within a four-foot wide buffer. Transit buses and HOV 3+ vehicles would be permitted to use the managed lanes toll-free.

**Figure 6-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative**



### 6.1.3   Changes Since the Draft Section 4(f) Evaluation, DEIS and SDEIS

**Table 6-1** provides a comparison of the total Section 4(f) impacts identified through the three major milestones of the Study (DEIS, SDEIS and FEIS). These totals reflect the extensive efforts of MDOT SHA to avoid and minimize impacts to Section 4(f) properties. The initial total of approximately 146.8 acres of Section 4(f) property impact (including permanent and temporary impacts) reported in the DEIS and Draft Section 4(f) Evaluation has been reduced to a total of approximately 33.2 acres for this Final Section 4(f) Evaluation and the corresponding FEIS. Of this impact, approximately 14.7 acres would be temporary[1], and approximately 18.5 acres would be permanent.

The total number of Section 4(f) properties impacted was reduced by 38 properties after the DEIS based on the revised limits of the Preferred Alternative and other minimization measures. This left 21 properties with Section 4(f) use reported in the SDEIS. Since the SDEIS, impacts to two additional parks were avoided

---

[1] Temporarily impacted property would not be permanently acquired by MDOT SHA as part of this project.

00000533

including Cabin John Stream Valley Park (Rockville) and Morris Park based on further design refinements. One additional Section 4(f) property was identified (the Washington Biologists' Field Club on Plummers Island) bringing the final total to 20 properties. The highest impact to any single Section 4(f) property is now 10.1 acres to the Chesapeake and Ohio Canal National Historical Park (9.1 acres of which would be temporary). The largest permanent impact to any single park is 5.7 acres of impact to Cabin John Regional Park.

Table 6-1: Comparison of Total Section 4(f) Impacts for Study Milestones

| Study Milestone | Total Section 4(f) Impacts (Acres) | Number of Section 4(f) Properties Impacted |
|---|---|---|
| DEIS and Draft Section 4(f) Evaluation (Alternative 9) | 146.8 | 59 |
| SDEIS (Preferred Alternative) | 39.1 | 21 |
| **FEIS and Final Section 4(f) Evaluation (Preferred Alternative)\*** | **33.2** | **20** |

Note: Impacts rounded to the closest 0.1 acres.

\*   Includes the Washington Biologists' Field Club, which is contained entirely within the Chesapeake and Ohio Canal National Historical Park and was not identified as a Section 4(f) property until after the SDEIS due to recent identification of the property's NRHP eligibility.

The Preferred Alternative has resulted in a net reduction of approximately 113.6 acres of impact to Section 4(f) properties, including both parks and historic resources, compared to the DEIS Alternative 9. (Refer to **Section 6.4** for more detailed information). Impacts were avoided by limiting the Build Alternative to within the Phase 1 South limits, and by minimizing impacts to several parks and historic resources following consideration of public and agency comments received during the DEIS and SDEIS public comment periods. MDOT SHA and FHWA coordinated closely with the OWJs in a series of office and field meetings to identify opportunities to further avoid and minimize impacts to historic resources and park land including contributing features within parks such as forested areas, wetlands, and waterways within the Preferred Alternative limits of disturbance (LOD).

Since the DEIS and Draft Section 4(f) Evaluation, MDOT SHA engaged in substantial efforts to avoid and minimize impacts to park and historic resources around the American Legion Bridge (ALB). These efforts resulted in the development of a team of national and local experts in design, structures, and constructability tasked with looking for innovative ways to avoid and minimize impacts to these resources of national significance (refer to **Chapter 5, Section 5.4 and FEIS, Appendix G** for details). In the DEIS, Alternative 9 impacted 29.4 acres of these three park properties; the SDEIS minimized impacts to 17 acres; and the FEIS Preferred Alternative further minimized impacts to 16.2 acres, of which 2.6 are considered permanent impacts and the rest temporary.

Another focus area for avoidance and minimization was at the Morningstar Tabernacle No. 88 Moses Hall and Cemetery (Morningstar Cemetery) located adjacent to the I-495 inner loop just south of Cabin John Parkway. Since the DEIS, additional investigations and design refinements of the LOD have led to complete avoidance of the Morningstar Cemetery property. Refer to **FEIS, Chapter 5, Section 5.7** and **FEIS, Appendices G and I**.

00000534

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

The Preferred Alternative LOD no longer impacts two City of Rockville Parks: the Millennium Garden Park and Cabin John Stream Valley Park. Regarding Millennium Garden Park, the property was initially identified as a Section 4(f) property in the DEIS; however, based on further research, it was determined that the property is owned by MDOT SHA and therefore, no longer considered a Section 4(f) resource in the SDEIS. No impacts would occur to the property under the Preferred Alternative due to design refinements. Since the SDEIS, further refinements of the stormwater management concept for the Preferred Alternative have resulted in avoidance of impacts to the City of Rockville Cabin John Stream Valley Park.

Design refinements have reduced impacts to two City of Gaithersburg parks including Morris Park and Malcolm King Park. Impacts to Morris Park in Gaithersburg have been eliminated completely, and permanent impacts to Malcolm King Park have been reduced by 0.8 acres compared to the SDEIS.

One newly identified Section 4(f) property, the Washington Biologists' Field Club on Plummers Island, is included in the Final Section 4(f) Evaluation. The property was surveyed for eligibility on the NRHP and determined eligible by MHT after the SDEIS was published. The property would incur an estimated permanent impact of 0.28 acres, which was reduced from the previous impact of 1.9 acres under DEIS Alternative 9. The property is located entirely within another Section 4(f) property, the Chesapeake and Ohio Canal National Historical Park. More information is included in **Section 2.6** of **FEIS, Appendix G**.

For the properties where a Section 4(f) use would occur under the Preferred Alternative, **Table 6-2** below provides a comparison of the impacts in the DEIS, the SDEIS, and this Final Section 4(f) Evaluation and FEIS. Note that the DEIS included only a total impact calculation and did not distinguish between permanent and temporary impacts as in the SDEIS and Final Section 4(f) Evaluation. The last column in **Table 6-2** summarizes, at a high-level, changes to impacts from the SDEIS related to design refinements of the Preferred Alternative LOD at each property. Additional details on changes to each property since the SDEIS are provided in the Final Section 4(f) Evaluation (**FEIS, Appendix G**).

**Table 6-2: Comparison of DEIS, SDEIS and Final Section 4(f) Evaluation Impacts**

| Section 4(f) Property | DEIS Impact (Alt 9) (acres) | SDEIS Impacts (acres) | Final Section 4(f) Impacts (acres) | Changes from SDEIS Impacts |
|---|---|---|---|---|
| George Washington Memorial Parkway | Total: 12.2 | Permanent: 0.7 Temporary: 3.7 Total: 4.4 | Permanent: 0.6 Temporary: 3.8 Total: 4.4 | Shift of 0.1 acres from permanent impact to temporary |
| Chesapeake & Ohio Canal National Historical Park[1] | Total: 15.4 | Permanent: 1.0 Temporary: 9.1 Total: 10.1 | Permanent: 1.0 Temporary: 9.1 Total: 10.1 | No change |
| Clara Barton Parkway[1] | Total: 1.8 | Permanent: 1.6 Temporary: 0.9 Total: 2.5 | Permanent: 1.1 Temporary: 0.6 Total: 1.7 | Impacts decreased by 0.8 acres, including a reduction of 0.5 acres of permanent and 0.2 acres of temporary impact. |

00000535

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Section 4(f) Property | DEIS Impact (Alt 9) (acres) | SDEIS Impacts (acres) | Final Section 4(f) Impacts (acres) | Changes from SDEIS Impacts |
|---|---|---|---|---|
| Washington Biologists' Field Club | N/A | N/A | Permanent: <0.1 Temporary: 0.27 Total: 0.28 | Property was not identified as NRHP-eligible in the DEIS or SDEIS. However, impacts were reduced from 1.9 acres of permanent impact to 0.2 acres from the DEIS. |
| Carderock Springs Historic District | No Impact | Permanent: < 0.1 Temporary: < 0.1 Total: < 0.1 | Permanent: < 0.1 Temporary: < 0.1 Total: < 0.1 | No change |
| Gibson Grove AME Church | No Impact | Permanent: 0.1 Temporary: 0.0 Total: 0.1 | Permanent: 0.1 Temporary: 0.0 Total: 0.1 | No Change |
| Cabin John Stream Valley Park Unit 2 | Total: 1.1 | Permanent: 0.8 Temporary: 0.6 Total: 1.4 | Permanent: 0.6 Temporary: <0.1 Total: 0.6 | Impacts decreased by 0.8 acres, including a reduction of 0.2 acres of permanent and 0.5 acres of temporary impact |
| Burning Tree Club | Total: 0.8 | Permanent: 1.3 Temporary: 0.0 Total: 1.3 | Permanent: 1.3 Temporary: 0.0 Total: 1.3 | No change |
| Academy Woods | Total: 0.2 | Permanent: 0.2 Temporary: 0.0 Total: 0.2 | Permanent: 0.2 Temporary: 0.0 Total: 0.2 | No change |
| Cabin John Regional Park | Total: 5.7 | Permanent: 5.7 Temporary: 0.6 Total: 6.3 | Permanent: 5.7 Temporary: 0.6 Total: 6.3 | No change |
| Tilden Woods Stream Valley Park | Total: 0.2 | Permanent: 0.6 Temporary: 0.1 Total: 0.7 | Permanent: 03 Temporary: 0.1 Total: 0.4 | Permanent impacts reduced by 0.3 acres |
| Old Farm Neighborhood Conservation Area | Total: 0.1 | Permanent: 0.1 Temporary: 0.0 Total: 0.1 | Permanent: 0.1 Temporary: 0.0 Total: 0.1 | No change |
| Cabin John Stream Valley Park Unit 6 | Total: 0.4 | Permanent: 0.8 Temporary: 0.0 Total: 0.8 | Permanent: 0.8 Temporary: <0.1 Total: 0.8 | Temporary impacts increased 0.02 |
| Cabin John Stream Valley Park (Rockville) | Total: 2.1 | Permanent: 2.1 Temporary: 0.0 Total: 2.1 | No impact | Impacts eliminated |
| Bullards Park and Rose Hill Stream Valley Park | Total: 0.3 | Permanent: 3.3 Temporary: 0.0 Total: 3.3 | Permanent: 3.3 Temporary: 0.0 Total: 3.3 | No change |

00000536

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Section 4(f) Property | DEIS Impact (Alt 9) (acres) | SDEIS Impacts (acres) | Final Section 4(f) Impacts (acres) | Changes from SDEIS Impacts |
|---|---|---|---|---|
| Rockmead Park | Total: 0.2 | Permanent: 0.2 Temporary: 0.1 Total: 0.3 | Permanent: 0.2 Temporary: 0.1 Total: 0.3 | No change |
| Woottons Mill Park | Total: 0.2 | Permanent: 0.7 Temporary: 0.0 Total: 0.7 | Permanent: 0.7 Temporary: 0.0 Total: 0.7 | No change |
| Woodley Gardens | Total: 0.7 | Permanent: 1.2 Temporary: 0.1 Total: 1.3 | Permanent: 1.2 Temporary: 0.1 Total: 1.3 | No change |
| Rockville Senior Center and Park | Total: 0.7 | Permanent: 1.0 Temporary: 0.0 Total: 1.0 | Permanent: 1.0 Temporary: 0.1 Total: 1.1 | Temporary impact has increased by 0.1 acres |
| Ward Building | Total: 0.1 | Permanent: 0.2 Temporary: 0.0 Total: 0.2 | Permanent: 0.2 Temporary: 0.0 Total: 0.2 | No change |
| Malcolm King Park | Total: 0.1 | Permanent: 1.3 Temporary: 0.0 Total: 1.3 | Permanent: 0.4 Temporary: <0.1 Total: 0.5 | Permanent impacts decreased by 0.8 acres |
| Morris Park | Total: 0.1 | Permanent: 1.1 Temporary: 0.0 Total: 1.1 | No impact | Impacts eliminated |

Note: all impacts rounded to the closest 0.1 acres.

[1] Section 4(f) impacts to Chesapeake and Ohio Canal National Historical Park and Clara Barton Parkway as currently noted in Chapter 5 exclude the area that currently has an existing transportation use. The area within NPS property defined as transportation use includes existing I-495 at-grade roadway sections to the toe of slope, Clara Barton Parkway Interchange ramp sections to the toe of slope, existing pier locations for the structure over the Chesapeake and Ohio Canal and eastbound Clara Barton Parkway, and existing pier locations for the American Legion Bridge.

## 6.2 Use of Section 4(f) Properties

Pursuant to 23 CFR 774.17, a "use" of Section 4(f) property occurs:

1. When land is **permanently incorporated** into a transportation facility;

2. When there is a **temporary occupancy** of land that is adverse in terms of the statute's preservation purpose as determined by the criteria in 23 CFR 774.13(d). A temporary occupancy of land does not constitute a "use" within the meaning of Section 4(f) if the following conditions are satisfied:

   - The duration of the occupancy must be less than the time needed for the construction of the project, and no change of ownership occurs;

   - Both the nature and magnitude of the changes to the Section 4(f) land are minimal;

   - No permanent adverse physical changes, nor interference with activities or purposes of the resources on a temporary or permanent basis, are anticipated;

   - The land must be returned to a condition that is at least as good as existed prior to the project; and

00000537



- There is documented agreement with the appropriate Federal, State, or local officials having jurisdiction over the land that the above conditions have been met.

3. When there is a **constructive use** of a Section 4(f) property. As defined in 23 CFR 774.15, a constructive use occurs when the transportation project does not incorporate land from a Section 4(f) property, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired. The degree of impact and impairment must be determined in consultation with the OWJs in accordance with 23 CFR 774.15(d)(3).

## 6.2.1  De Minimis Impact

An impact to a significant public park, recreation area, or wildlife and waterfowl refuge may be determined to be *de minimis* if the transportation use of the Section 4(f) property, including incorporation of any measure(s) to minimize harm (such as any avoidance, minimization, mitigation, or enhancement measures), does not adversely affect the activities, features, or attributes that qualify the resource for protection under Section 4(f) (23 CFR 774.17).

For historic sites, a *de minimis* impact means that FHWA has determined (in accordance with 36 CFR 800) that either no historic property is affected by the project or that the project will have "no adverse effect" on the historic property. A *de minimis* impact determination does not require analysis to determine if avoidance alternatives are feasible and prudent, but consideration of avoidance, minimization, mitigation, or enhancement measures should occur.

Following 23 CFR 774.5(b), the public should be afforded an opportunity to review and comment on the effects of the Proposed Action on the protected activities, features, or attributes of the Section 4(f) parks, recreation areas or wildlife and waterfowl refuges. Opportunity for public review applies to historic sites as well. This is accomplished during the Section 106 process. Documentation of consulting party involvement is required (23 CFR 774.5(b) and 774.7(b)). Moreover, the OWJs over the property, after being informed of the public comments and FHWA's intent to make the *de minimis* impact finding, must concur in writing that the project will not adversely affect the activities, features, or attributes that qualify the property for protection under Section 4(f).

Upon fulfilling the requirements set forth in 23 CFR 774.5(b), FHWA made a Section 4(f) *de minimis* impact findings for 13 of the 20 impacted properties listed in **Table 6-2**. A full description and analysis of the 13 Section 4(f) properties that would experience a *de minimis* impact is found in **FEIS, Appendix G, Section 2.**

## 6.3  Officials with Jurisdiction

In the case of public parks, recreation areas, and wildlife and waterfowl refuges, the OWJs are the officials of the agency or agencies that own or administer the property in question and who are empowered to represent the agency on matters related to the property. There are no wildlife and waterfowl refuges within the corridor study boundary. There are four OWJs over park properties that would incur a Section 4(f) use as a result of this project: National Park Service (NPS), Maryland-National Capital Park and Planning Commission (M-NCPPC), Montgomery County, City of Gaithersburg, and City of Rockville.

Some public parks, recreation areas, and wildlife and waterfowl refuges are also historic properties included in, or eligible for inclusion in the NRHP. In other cases, historic sites are located within the

00000538


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

property boundaries of public parks, recreation areas, and wildlife and waterfowl refuges. When either of those situations exists and a project alternative proposes use of land from the historic site, there will be more than one official with jurisdiction. The OWJs over historic sites are the Maryland Historical Trust (MHT) in Maryland and the Virginia Department of Historic Resources (VDHR) in Virginia. The Advisory Council on Historic Preservation (ACHP) is also an OWJ over historic sites when they are involved in Section 106 consultation.

## 6.4   Section 4(f) Inventory

### 6.4.1   Overview

The Draft Section 4(f) Evaluation included descriptions of all Section 4(f) properties identified within the corridor study boundary, the use of Section 4(f) properties for all previously evaluated alternatives, and discussion of minimization measures for each property. The SDEIS updated this information based on the Preferred Alternative (Alternative 9 – Phase 1 South), which avoids the use of Section 4(f) properties within the study limits outside of Phase 1 South where no improvements are proposed, resulting in lower overall impacts to Section 4(f) properties. **Figures 6-2** and **6-3** present an inventory of Section 4(f) properties that are adjacent to the Preferred Alternative LOD; properties not impacted by the Preferred Alternative are labeled in red. **Table 6-3** presents the Section 4(f) properties impacted by the Preferred Alternative. Each property with a potential Section 4(f) use is then described in **Sections 2.3 through 2.22** of the *Final Section 4(f) Evaluation* (**Appendix G**). **Table 6-3** notes the OWJ for each Section 4(f) property; the OWJ is designated in the Section 4(f) regulations and are for the purposes of Section 4(f) only.

**Table 6-3: Summary of Section 4(f) Property Use**

| Section 4(f) Property | Official(s) with Jurisdiction[1] | Property Type | Section 4(f) Approval | Final Section 4(f) Impacts[2] |
|---|---|---|---|---|
| George Washington Memorial Parkway | ACHP, NPS, VDHR | Public Park and Historic Property | Individual Evaluation | Permanent: 0.6 Temporary: 3.8 Total: 4.4 |
| Chesapeake and Ohio Canal National Historical Park[3] | ACHP, MHT, NPS | Public Park and Historic Property | Individual Evaluation | Permanent: 1.0 Temporary: 9.1 Total: 10.1 |
| Clara Barton Parkway[3] | ACHP, MHT, NPS | Public Park and Historic Property | Individual Evaluation | Permanent: 1.1 Temporary: 0.6 Total: 1.7 |
| Washington Biologists' Field Club on Plummers Island | MHT, NPS | Historic Property | Individual Evaluation | Permanent: <0.1 Temporary: 0.27 Total: 0.28 |
| Carderock Springs Historic District | MHT | Historic Property | *De minimis* | Permanent: <0.1 Temporary: <0.1 Total: <0.1 |
| Gibson Grove AME Church | MHT | Historic Property | Individual Evaluation | Permanent: 0.1 Temporary: 0.0 Total: 0.1 |
| Cabin John Stream Valley Park Unit 2 | M-NCPPC Montgomery County | Public Park | *De minimis* | Permanent: 0.6 Temporary: 0.0 Total: 0.6 |
| Burning Tree Club | MHT | Historic Property | *De minimis* | Permanent: 1.3 Temporary: 0.0 Total: 1.3 |

00000539

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study

*Final Environmental Impact Statement*

| Section 4(f) Property | Official(s) with Jurisdiction[1] | Property Type | Section 4(f) Approval | Final Section 4(f) Impacts[2] |
|---|---|---|---|---|
| Academy Woods | MHT | Historic Property | *De minimis* | Permanent: 0.2 Temporary: 0.0 Total: 0.2 |
| Cabin John Regional Park | M-NCPPC Montgomery County | Public Park | Individual Evaluation | Permanent: 5.7 Temporary: 0.6 Total: 6.3 |
| Tilden Woods Stream Valley Park | M-NCPPC Montgomery County | Public Park | *De minimis* | Permanent: 0.3 Temporary: 0.1 Total: 0.4 |
| Old Farm Neighborhood Conservation Area | M-NCPPC Montgomery County | Public Park | *De minimis* | Permanent: 0.1 Temporary: 0.0 Total: 0.1 |
| Cabin John Stream Valley Park Unit 6 | M-NCPPC Montgomery County | Public Park | *De minimis* | Permanent: 0.8 Temporary: <0.1 Total: 0.8 |
| Bullards Park and Rose Hill Stream Valley Park | City of Rockville Department of Recreation and Parks | Public Park | Individual Evaluation | Permanent: 3.3 Temporary: 0.0 Total: 3.3 |
| Rockmead Park | City of Rockville Department of Recreation and Parks | Public Park | *De minimis* | Permanent: 0.2 Temporary: 0.1 Total: 0.3 |
| Woottons Mill Park | City of Rockville Department of Recreation and Parks | Public Park | *De minimis* | Permanent: 0.7 Temporary: 0.0 Total: 0.7 |
| Woodley Gardens | MHT | Historic Property | *De minimis* | Permanent: 1.2 Temporary: 0.1 Total: 1.3 |
| Rockville Senior Center and Park | City of Rockville Department of Recreation and Parks, MHT | Public Park and Historic Property | *De minimis* | Permanent: 1.0 Temporary: 0.1 Total: 1.1 |
| Ward Building | MHT | Historic Property | *De minimis* | Permanent: 0.2 Temporary: 0.0 Total: 0.2 |
| Malcolm King Park | City of Gaithersburg Department of Parks, Recreation and Culture | Public Park | *De minimis* | Permanent: 0.4 Temporary: <0.1 Total: 0.5 |

Note: 1. VDHR serves as the Virginia State Historic Preservation Office; MHT serves as the Maryland State Historic Preservation Office.

2. All impacts quantities rounded to the tenths. For purposes of determining Section 4(f) use, temporary impacts are considered short-term, construction related activities that do not require permanent incorporation of a Section 4(f) resource into a transportation facility. Short-term, construction related work includes but is not limited to construction staging, material and equipment storage, construction access easements, and other areas needed to support the construction, but not part of the long-term improvement.

3. Section 4(f) impacts to Chesapeake and Ohio Canal National Historical Park and Clara Barton Parkway as currently noted in Chapter 5 exclude the area that currently has an existing transportation use. The area within NPS property defined as transportation use includes existing I-495 at-grade roadway sections to the toe of slope, Clara Barton Parkway Interchange ramp sections to the toe of slope, existing pier locations for the structure over the Chesapeake and Ohio Canal and eastbound Clara Barton Parkway, and existing pier locations for the American Legion Bridge.

00000540

OP·LANES
MARYLAND
I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

### Figure 6-2: Inventory of Section 4(f) Properties (Map 1 of 2)



Note: Properties labeled and numbered in red are included as part of the Section 4(f) inventory but are not impacted by the Preferred Alternative.

00000541

OP·LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

**Figure 6-3: Inventory of Section 4(f) Properties (Map 2 of 2)**



Note: Properties labeled and numbered in red are included as part of the Section 4(f) inventory but are not impacted by the Preferred Alternative.

00000542

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

As described in **Section 1.2.2.A** of the Draft Section 4(f) Evaluation (https://oplanesmd.com/wp-content/uploads/2020/07/DEIS_AppF_Draft-Section-4f-Eval_web.pdf), a constructive use analysis was conducted to evaluate whether the proposed action, while not directly incorporating land from a Section 4(f) property or properties, has proximity impacts that would substantially impair the use or value of the resource or resources. These analyses evaluate how the Proposed Action affects neighboring or nearby Section 4(f) properties and determines if impacts from the proposal would result in substantial impairment of the activities, features, or attributes that qualify the resource for protection under Section 4(f). The constructive use analysis determined that no constructive uses would occur from noise, visual intrusions, restrictions of access, or vibrations.

### 6.4.2    Section 4(f) Properties Avoided

While the study limits remain the same as noted in the DEIS, the limits of build improvements under the Preferred Alternative are limited to Phase 1 South only. There is no action or no improvements included at this time on I-495 east of the I-270 east spur to MD 5. Additionally, two park properties within the Phase 1 South area, Morris Park and Cabin John Stream Valley Park in Rockville, have been avoided based on design refinements since the SDEIS. As a result of these refinements, the Preferred Alternative would avoid the use of 40 Section 4(f) properties that were previously reported as Section 4(f) uses in the DEIS and Draft Section 4(f) Evaluation, reducing the total acreage of Section 4(f) use by approximately 108.8 acres. This avoidance comprises the vast majority of the net reduction in impacts to Section 4(f) properties of 113.6 acres compared to DEIS Alternative 9. The properties avoided and acreage of Section 4(f) use previously included in the DEIS and SDEIS are included in **Table 6-4**.

### Table 6-4: Avoided Section 4(f) Use by the Preferred Alternative

| Section 4(f) Properties No Longer Impacted by the Preferred Alternative | Acres of Avoided Section 4(f) Use |
|---|---|
| Andrews Manor Park | 2.6 |
| Baltimore Washington Parkway | 69.3 |
| Beckett Field | 0.2 |
| Beltsville Agricultural Research Center (BARC) | 0.5 |
| Blair Local Park | 0.4 |
| Buddy Attick Lake Park | 0.1 |
| Cabin John Stream Valley Park (Rockville) | 2.1 |
| Calvary Evangelical Lutheran Church | <0.1 |
| Carsondale | 0.1 |
| Cherry Hill Road Park | 1.8 |
| Douglas E. Patterson Park | 0.7 |
| Fleming Local Park | 0.1 |
| Forest Glen Historic District | 0.2 |
| Forest Glen Neighborhood Park | 0.3 |
| Glenarden Historic District | 0.8 |
| Greenbelt Historic District | 0.3 |
| Greenbelt Park | 0.6 |
| Grosvenor Estate (Wild Acres) | 0.1 |

00000543

| Section 4(f) Properties No Longer Impacted by the Preferred Alternative | Acres of Avoided Section 4(f) Use |
|---|---|
| Henry P. Johnson Park | <0.1 |
| Henson Creek Stream Valley Park | 0.1 |
| Heritage Glen Park | 0.5 |
| Hollywood Park | <0.1 |
| Indian Spring Club Estates and Indian Spring Country Club | 1.2 |
| Indian Springs Park (City of Greenbelt) | 0.1 |
| Indian Springs Terrace Local Park | 1.4 |
| Locust Hill Neighborhood Park | 0.3 |
| Manchester Estates Park | 0.5 |
| McDonald Field | <0.1 |
| Metropolitan Branch, Baltimore & Ohio Railroad | 8.8 |
| Montgomery Blair High School Athletic Fields | 1.4 |
| Morningstar Tabernacle No. 88 Moses Hall and Cemetery | 0.3 |
| Morris Park | 1.1 |
| National Park Seminary Historic District / Forest Glen | 1.2 |
| Northwest Branch Stream Valley Park, Unit 3 | 3.2 |
| Rock Creek Stream Valley Park, Unit 2 | 0.4 |
| Rock Creek Stream Valley Park, Unit 3 | 3.3 |
| Sligo Creek Parkway | 4.1 |
| South Four Corners Neighborhood Park | 0.1 |
| Southwest Branch Stream Valley Park | 0.3 |
| Suitland Parkway | 0.3 |
| **TOTAL ACRES AVOIDED** | **108.8** |

Note: all avoided impacts presented are relative to DEIS Alternative 9.

Properties that would experience a Section 4(f) use from the Preferred Alternative are detailed in **Sections 2.3 through 2.22** in the *Final Section 4(f) Evaluation* (**FEIS, Appendix G**). Within the Preferred Alternative LOD, there is one property subject to the Capper-Cramton Act, Clara Barton Parkway; one property, the Chesapeake and Ohio Canal National Historic Park, subject to Section 6(f). Refer to **Section 1.6.2** of the *Final Section 4(f) Evaluation* for additional information on other relevant authority including the Capper-Cramton Act of 1930 (**FEIS**, **Appendix G**).

## 6.5   Avoidance Alternatives and Analysis

A feasible and prudent avoidance alternative is one that avoids using any Section 4(f) property and does not cause other severe problems of a magnitude that substantially outweigh the importance of protecting the Section 4(f) property (23 CFR 774.17). In assessing the importance of protecting Section 4(f) properties, it is appropriate to consider the relative value of the resource to the preservation purpose of the statute. The preservation purpose of Section 4(f) is described in 49 U.S.C. § 303(a), which states: "It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites."

00000544

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

The presence of linear Section 4(f) properties such as Cabin John Stream Valley Park, GWMP, and Clara Barton Parkway, that extend perpendicular to the alignment of I-495 or I-270 limits the potential for feasible and prudent avoidance alternatives to exist in this corridor, which makes avoidance of all Section 4(f) properties difficult. Additionally, the corridor study boundary is characterized as a densely populated, urban area with large residential communities and business complexes, large governmental institutions, numerous community facilities, and hundreds of sensitive cultural and natural resources. Since I-495 and I-270 are existing interstate systems that serve local and regional traffic and connect to major arterials in each county, addressing the need on a system level is critical to achieving the overall purpose of the Study.

Six alternatives that would completely avoid the use of Section 4(f) properties have been developed and were discussed in detail in **Section 3** of the **Draft Section 4(f) Evaluation (DEIS, Appendix F)**. They are evaluated in accordance with the definition of a *feasible* and *prudent* avoidance alternative found in 23 CFR 774.17 and are summarized briefly in **Table 6-5** below.

The alternatives previously included in the DEIS least overall harm analysis are carried forward here, as they are still applicable to the current evaluation of least overall harm with revised Phase 1 South limits in this FEIS. The Preferred Alternative, a minimization alternative, is also included for evaluation in the revised discussion of least overall harm.

### Table 6-5: Avoidance Alternatives

| Avoidance Alternative | Description | Avoidance Analysis Findings [2] |
|---|---|---|
| **Alternative 1: No Build Alternative** | Alternative 1 would avoid all Section 4(f) property impacts. Under this alternative routine maintenance and safety improvements would occur but there would be no changes to the existing lane configuration on I-495 and I-270. There would be no operational improvements or increased capacity along I-495 and I-270. | Alternative 1 would avoid impacts to Section 4(f) properties but would be unreasonable to proceed with in light of the Study's stated Purpose and Need. Alternative 1 causes other severe problems of a magnitude that substantially outweigh the importance of protecting Section 4(f) properties.<br><br>Prudence factor failed per 23 CFR 774.17:<br>• (i) It compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need |
| **Increased Bus Transit** | This alternative would include expansion of existing bus transit services within the limits of the Study on both I-270 and I-495 and the additional surrounding roadway network. This could be in the form of an increase in bus service on existing I-495 and I-270 within the limits of the Study, or consideration of dedicated facilities such as bus rapid transit systems on existing infrastructure. | An extensive regionwide network of dedicated BRT facilities along I-495 and I-270 would not achieve the Study's Purpose and Need. It would be unreasonable to proceed with the Bus Transit Alternative in light of the stated Purpose and Need. This avoidance alternative causes other severe problems of a magnitude that substantially outweigh the importance of protecting the Section 4(f) properties.<br><br>Prudence factor failed per 23 CFR 774.17:<br>• (i) It compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need |

---

[2] Refer to the definition of *feasible and prudent avoidance alternative* in 23 CFR § 774.17.

00000545



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Avoidance Alternative | Description | Avoidance Analysis Findings[2] |
|---|---|---|
| Transportation System Management/ Transportation Demand Management (TSM/TDM) | Transportation System Management (TSM)/Transportation Demand Management (TDM) strategies are improvements to existing facilities that improve the operation and coordination of transportation services and facilities. | A TSM/TDM Alternative would not accommodate existing and future long-term traffic, nor would these measures enhance trip reliability. In addition, the TSM/TDM Alternative would not directly provide an additional travel choice, accommodate Homeland Security, improve the movement of goods and services, nor enhance multimodal connectivity; and it would not provide a revenue source. Based on these factors, the TSM/TDM Alternative is not a feasible and prudent alternative. This avoidance alternative causes other severe problems of a magnitude that substantially outweigh the importance of protecting the Section 4(f) properties.<br><br>Prudence factors failed per 23 CFR 774.17:<br>• (i) It compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need<br>• (ii) It results in unacceptable safety or operational problems |
| Section 4(f) Avoidance Alternative 1 | Section 4(f) Avoidance Alternative 1 would construct four new managed lanes off-alignment between George Washington Memorial Parkway and MD 4, outside of I-495. To avoid the use of any Section 4(f) property on I-270, four managed lanes would be constructed off alignment to the west of existing I-270. The alignment of Section 4(f) Avoidance Alternative 1 would rejoin existing I-270 at the MD 200 interchange, the limit of the Study. | Section 4(f) Avoidance Alternative 1 would result in additional construction, maintenance, and operational costs of an extraordinary magnitude. After reasonable mitigation, it would still cause severe social, economic, and environmental impacts; severe disruption to established communities; and severe impacts to environmental resources protected under other Federal statutes. Section 4(f) Avoidance Alternative 1 causes other severe problems of a magnitude that substantially outweighs the importance of protecting Section 4(f) properties.<br><br>Prudence factors failed per 23 CFR 774.17:<br>• (iii) After reasonable mitigation, it still causes:<br>  • (A) Severe social, economic, or environmental impacts;<br>  • (B) Severe disruption to established communities;<br>  • (D) Severe impacts to environmental resources protected under other Federal statutes;<br>• (iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude |
| Section 4(f) Avoidance Alternative 2 | Section 4(f) Avoidance Alternative 2 would construct four new managed lanes off-alignment between George Washington Memorial Parkway and MD 4. The managed lanes would be constructed inside the alignment of existing I-495 through nearly full the limits of the Study. To avoid the use of any Section 4(f) property on I-270, four managed lanes would also be | Avoidance Alternative 2 would result in additional construction, maintenance, and operational costs of an extraordinary magnitude. After reasonable mitigation, it would still cause severe social, economic, and environmental impacts; severe disruption to established communities; and severe impacts to environmental resources protected under other Federal statutes. Section |

00000546



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Avoidance Alternative | Description | Avoidance Analysis Findings[2] |
|---|---|---|
| | constructed off alignment to the east of existing I-270. | 4(f) Avoidance Alternative 2 causes other severe problems of a magnitude that substantially outweighs the importance of protecting Section 4(f) properties. <br><br> Prudence factors failed per 23 CFR 774.17: <br> • (iii) After reasonable mitigation, it still causes: <br>   • (A) Severe social, economic, or environmental impacts; <br>   • (B) Severe disruption to established communities; <br>   • (D) Severe impacts to environmental resources protected under other Federal statutes; <br> • (iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude |
| Section 4(f) Avoidance Alternative 3 | Section 4(f) Avoidance Alternative 3 would construct four managed lanes as proposed in the Preferred Alternative. However, where impacts to Section 4(f) properties would occur, the location specific options would be incorporated into the alignment of Section 4(f) Avoidance Alternative 3. | Although Section 4(f) Avoidance Alternative 3 would result in additional construction, maintenance, and operational costs of an extraordinary magnitude. After reasonable mitigation, it would still cause severe social, economic, and environmental impacts; severe disruption to established communities; and severe impacts to environmental resources protected under other Federal statutes. Section 4(f) Avoidance Alternative 3 causes other severe problems of a magnitude that substantially outweighs the importance of protecting Section 4(f) properties. <br><br> Prudence factors failed per 23 CFR 774.17: <br> • (iii) After reasonable mitigation, it still causes: <br>   • (A) Severe social, economic, or environmental impacts; <br>   • (B) Severe disruption to established communities; <br>   • (D) Severe impacts to environmental resources protected under other Federal statutes; <br> • (iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude |

The Preferred Alternative would not avoid the use of all Section 4(f) properties. It would, however, avoid the use of 40 Section 4(f) properties and reduce the total acreage of Section 4(f) use by approximately 108.8 acres compared to DEIS Build Alternative 9 (**Table 6-3**). This comprises the vast majority of the net reduction in impacts to Section 4(f) properties of 113.6 acres compared to DEIS Alternative 9.

00000547


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

## 6.6   All Possible Planning

Section 4(f) states FHWA may not approve the use of Section 4(f) property unless there is no feasible and prudent avoidance alternative, and the action includes all possible planning to minimize harm to the property resulting from such use. "All possible planning," as defined in 23 CFR 774.17, includes all reasonable measures to minimize harm or mitigate for adverse impacts and effects. The cost of mitigation should be a reasonable public expenditure in light of the severity of the impact on Section 4(f) property, in accordance with 23 CFR 771.105(e).

The DEIS and SDEIS presented measures that had been identified to ensure all possible planning to minimize harm and mitigate for adverse impacts and effects. These measures are summarized here and detailed in **Section 4 of the Draft Section 4(f) Evaluation** (**DEIS, Appendix F**) and **Chapter 5 of the SDEIS**. Additional minimization and mitigation efforts have been implemented in conjunction with the Preferred Alternative presented in this FEIS and the Final Section 4(f) Evaluation, which were summarized in section 6.1.3 of this chapter and provided in greater details in **Section 4 of FEIS, Appendix G**.

Since the publication of the SDEIS, MDOT SHA has coordinated with the OWJs for impacted Section 4(f) properties to identify specific mitigation commitments.

Pursuant to Section 106, MDOT SHA has prepared a Programmatic Agreement to resolve adverse effects to historic properties (**FEIS, Appendix J**). In general, mitigation measures agreed upon as part of the Section 106 process satisfy the requirement to include all possible planning to minimize harm for historic properties under Section 4(f).

With regard to public parks, all possible planning involves the minimization activities described herein as well as mitigation coordinated with the OWJs over public parks and recreation areas, as described in **Section 6.6.1** of this chapter, **Chapter 7** of the FEIS, and **FEIS, Appendix G**. All possible planning to minimize harm will additionally involve an agreement document that outlines the process to continue coordination with the OWJs over Section 4(f) properties through the design phase of the project.

### 6.6.1   Mitigation

MDOT SHA has coordinated extensively with the OWJs on Section 4(f) properties impacted by the Preferred Alternative to identify a comprehensive package of mitigation measures. Final mitigation commitments have been developed to include all possible planning to minimize harm in coordination with the OWJs. Mitigation measures in this section are organized by OWJ.

### A.   National Park Service

MDOT SHA has coordinated with NPS to identify a comprehensive package of mitigation measures to account for impacts to GWMP, Chesapeake and Ohio Canal National Historical Park, and Clara Barton Parkway. The measures identified are listed below.

- Develop and implement a Comprehensive Ecological Restoration Plan and Cost Estimate for Restoring LOD to Preexisting Conditions for the impacted area. The plan shall include the following components:
  - o   Forest and terrestrial vegetation restoration including:

00000548

- Avoiding and minimizing impacts to trees within and surrounding the LOD through a robust tree protection plan.
- Survey impacted vegetation community prior to construction to determine existing community composition and develop replanting plan based on survey results.
- Replanting forest (including shrub and herbaceous layers) inch-for-inch within LOD in temporary impact areas and providing non-native invasive (NNI) species control and maintenance and monitoring for 5 years within reforestation area.
- Softening edge effects associated with disturbance by treating and removing non-native invasive species within a 50-foot buffer of the LOD and replanting native trees and shrubs in any gaps resulting from the removal of mature trees or non-native invasive species. In coordination with NPS during design, sensitive areas, such as areas of known archeological resources, within the 50-foot buffer will be excluded if ground disturbance is required.
- Providing monetary compensation for remaining tree impacts, based on inch-for-inch replacement of DBH impacted.

o Rare, Threatened and Endangered plant species restoration including:
- Conducting a final pre-construction RTE plant inspection.
- Collecting seeds and/or individual RTE plant species from impact area prior to construction.
- Cultivating plants and storing seeds/propagating plants from seed in an off-site nursery.
- Reestablishing RTE species from stored seed and cultivated and propagated plants following construction and topsoil restoration.

o Topsoil salvage and restoration including:
- Salvaging topsoil from impact area and storing in nearest possible stockpile location.
- Restoring subsoils and reducing compaction via ripping, discing, plowing or double-digging following construction.
- Placing salvaged topsoil in impact area following construction.

o Herpetofauna translocation including:
- Conducting Herpetofauna relocation effort immediately prior to construction activities.
- Conducting a sweep through a portion of the impact area with approximately 10 biologists searching for and capturing reptiles and amphibians and logging all captures.
- Relocating captured individuals safely away from the impact area.
- Conducting a second sweep through the same portion of impact area, logging all captures and relocating captured individuals.

00000549



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

- Conducting a third sweep and relocate effort, if the number of captured individuals is not dramatically reduced and continue sweeping the portion of the work area until the number of captured individuals is minimal.
- Continuing the multiple sweep process until the entire work area is cleared.
  - o Downed woody debris salvage and restoration including:
    - Moving all downed woody debris from the impact area to the edge of the impact area just outside of the E&S measures as part of the clearing operation.
    - Restoring downed woody debris to the impact area, if appropriate, following construction and topsoil restoration.

- Create/restore 1.53 acres of wetland northwest of American Legion Bridge (Site ID CHOH-13) per the Wetland Statement of Findings.

- Install new white legend and border on brown background guide signs along I-495 for the GWMP exit.

- Shift bridge piers north of Lock 13 to the maximum extent possible while maintaining adequate vertical clearance of 12 feet, 6 inches between towpath and bottom of bridge steel to accommodate NPS equipment. Design new ALB to capture all drainage outfall using downspouts. The downspouts will be located so the water does not drop onto areas with frequent pedestrian use.

- Complete a pre-construction condition assessment of locks, masonry walls, towpath, and canal prism throughout entire LOD and develop and implement a plan for repairs identified during condition assessment.

- Complete Phase III Archaeological Data Recovery at 44FX0374, 44FX0379 and 44FX0389 (GWMP) and develop associated public interpretation materials (in Virginia).

- Complete Phase III Archaeological Data Recovery at 18MO749 and 18MO751 (Chesapeake and Ohio Canal) and develop associated public interpretation materials (In Maryland).

- Prepare National Register Nomination for Dead Run Ridges Archaeological District.

- Develop Interpretive product on archeological sites; Create web-based Story Map, waysides, and/or brochures.

- Provide monetary compensation for a Cultural Landscape Report for Clara Barton Parkway (historical narrative; updated existing conditions and analysis and evaluation; and treatment guidelines for management of character defining features).

- Complete a pre-construction condition assessment of Potomac Heritage Trail within the LOD and develop and implement a plan to improve the trail within the LOD.

- Prepare Visitor and Ecological Impact Study.

- Acquire James Audia property (two parcels totaling 1.4 acres) as replacement parkland for impacts to GWMP. If unavailable, acquire or convey property for replacement parkland of similar size and/or function in coordination with NPS.

- Convey a portion of the MDOT SHA owned former Ridenour property (38.7 acres) to NPS as replacement parkland for impacts to Chesapeake and Ohio Canal National Historical Park and Clara Barton Parkway.

00000550



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

- Provide monetary compensation up to $60,000 to update and refine the GWMP Climate Action Plan.

- The Preferred Alternative will result in temporary closure of the Potomac Heritage National Scenic Trail within the LOD during construction. A detour, if determined to be necessary, will continue to be developed by MDOT SHA and the Developer in coordination with NPS, Fairfax County, and the Virginia Department of Transportation. The segment of the trail within the LOD would be restored on a new alignment after construction is completed.

- Evaluate drainage and sight distance considerations at the intersection of the shared use path and Chesapeake and Ohio Canal towpath during final design in coordination with NPS, within the LOD.

- Design and construct, in coordination with NPS and the Washington Biologists' Field Club, slope armoring along the upstream side of Plummers Island to mitigate for future slope erosions as a result of tree clearing with the LOD. The slope armoring could include but is not limited to a rip-rap slope, live staking, and brush layering or any combination of armoring that will provide a blended natural aesthetic with the topography and historic nature of the island.

- Evaluate additional options for the American Legion Bridge during final design that would further minimize or avoid physical impact to Plummers Island.

## B. M-NCPPC

MDOT SHA has coordinated with M-NCPPC to identify a comprehensive package of mitigation measures to account for impacts to M-NCPPC park properties, including all possible planning to minimize harm to the Section 4(f) resources. Mitigation measures are grouped below based on general mitigation applicable to all park impacts, and mitigation measures specific to one or more M-NCPPC properties.

### a. General Mitigation

General measures applicable to all M-NCPPC park impacts include:

- Acquire the 24.14-acre Bardon, Inc. property (Acct. no. 00402385) and convey to M-NCPPC. If unavailable, acquire or convey property as replacement parkland of similar size and/or function in coordination with M-NCPPC.

- Acquire the 0.57-acre Bardon, Inc. property (Acct. no. 02620882) and convey to M-NCPPC. If unavailable, acquire or convey property as replacement parkland of similar size and/or function in coordination with M-NCPPC.

- Evaluate the ability to re-convey unused property previously owned by M-NCPPC back to that agency post construction.

- Convey the MDOT SHA owned 3.15-acre right-of-way located at MD 97 and 16th Street.

- Convey two MDOT SHA owned 15.35-acre parcels (Acct. no. 161300980570 and 161300980626) located between Northwood High School and Northwest Stream Valley Park.

00000551

OP·LANES
MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

**b. Cabin John Stream Valley Park Unit 2**

Mitigation measures specific to Cabin John Stream Valley Park Unit 2 include:

- Plan, design and construct improvements to formalize the Cabin John Trail trailhead parking area along Seven Locks Road including:
  - Reconstructing the existing driveway per MD Standard No. 630.02 or applicable County standard.
  - Pave the existing gravel lot with full depth asphalt. Paved area measures approximately 60' x 100'. Assume open section lot.
  - Optimizing parking lot design to provide maximum number of spaces, including Americans with Disabilities Act (ADA)-compliant spaces (with signage) per the ADA Guidelines. Stripe new parking spaces.
  - Providing drainage and stormwater management facilities as required to treat new impervious area per County requirements.
  - Install signage prohibiting littering/dumping, replace existing trash can, and remove existing illicitly dumped material.
  - Relocate existing sign kiosk.
  - Construct bicycle repair stand, with tools and pump at Cabin John trailhead.
- Stream stabilization (~1,000 linear feet) along Cabin John Creek including:
  - Remove all concrete structures within stream both along existing banks and failed pieces in the stream.
  - Rebuild banks with rock and vegetative stabilization techniques that promote environmental functions.
  - Replant riparian buffer with native seed, herbaceous plugs, and native shrubs and trees.
  - Install instream grade control structures (such as rock sill, crossvane, riffles, etc.) to transition stream into, through, and out of the underpass area in a stable and ecologically sound way.
  - Protect sewer manhole and restore I-495 on-ramp outfall to Cabin John Creek with environmentally sensitive channel techniques.
- Plan, design and implement forest and terrestrial vegetation mitigation including:
  - NNI control for 7 years within 50-foot buffer of LOD.
  - Infill plantings, on park property, consisting of shrubs, understory/canopy trees and herbaceous seeding within NNI control areas (50-foot buffer from LOD).
- Plan and design wildlife passage area under I-495 overpass of Cabin John Creek and Cabin John Parkway by lengthening new bridge structures. This will allow wildlife passage on the west side bank of Cabin John Creek while minimizing wildlife-vehicular conflicts along Cabin John Parkway by constructing wildlife exclusion fencing along the east side of the creek next to the Parkway, in coordination with M-NCPPC.

00000552

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

### c. Cabin John Regional Park

Mitigation measures specific to Cabin John Regional Park include:

- Plan, design, and construct a fiberglass pedestrian bridge over the outfall/tributary to Cabin John Creek at STA 3640+00 for the natural surface connector trail including:
    - Performing hydraulic study and determining feasibility of new crossing.
    - Constructing fiberglass bridge per M-NCPPC-provided Fiberglass Bridge specification or per equal to or better alternative approved by M-NCPPC.
- Plan, design and construct improvements for pedestrian and cycling access to the Robert C. McDonnell campground access road by:
    - Reconstruction of existing bridge over Old Farm Creek in same location per M-NCPPC-provided specifications for Prefabricated Steel Truss Bridge (Section 401) and Helical Piles (Section 403) (hydraulically in-kind replacement).
    - Provide temporary crossing for pedestrians and cyclists during bridge reconstruction.
    - Provide stream stabilization work immediately upstream, underneath, and immediately downstream of the bridge.
    - Limit time of year of bridge reconstruction to window when campground access is closed.
    - Bridge design shall provide for ADA compliance, pedestrian access, and passage of cyclists without dismounting while incorporating a gate to prevent unauthorized access by vehicles.
- Plan, design and construct improvements to the existing parking area on Tuckerman Lane near the Robert C. McDonnell Campground access road including:
    - Resurfacing the existing paved lot. (Paved area measures approximately 2500 square feet. (25 feet x 100 feet).
    - Optimize parking lot design to provide maximum number of spaces. Stripe new parking spaces. Incorporating ADA parking, as applicable.
    - Provide additional landscaping in vicinity of lot.
- Plan, design and construct a fiberglass pedestrian bridge over Cabin John Creek to connect the Cabin John Trail to the Kidney Bean Loop Trail, in the vicinity of Goya Drive including:
    - Constructing fiberglass bridge per M-NCPPC-provided Fiberglass Bridge specification or per equal to or better alternative approved by M-NCPPC.
    - Design and construct in-stream grade control and bank protection structures to stabilize stream in the vicinity of the new bridge.
- Plan, design and construct improvements for the stabilization of the Gainsborough Road stormwater outfall to Cabin John Creek (approximately 255 linear feet) with environmentally sensitive channel techniques.
    - Include a planting plan to compensate for forest impacts related to this work.
    - Provide treatment of invasive bamboo surrounding the channel.
    - Construct pedestrian trail bridge replacement over Gainsborough outfall channel.
- Plan, design and implement forest and terrestrial vegetation mitigation including:

00000553

- o  Conducting forest stand delineation within 100-foot buffer of LOD and develop a 7-year non-native invasive control management plan within M-NCPPC property.

- o  Implementing a 7-year non-native invasive control management plan within 100 feet of the LOD on park property and in the biodiversity area. Specific target areas and species to be determined by M-NCPPC Montgomery Parks.

- o  Infill plantings consisting of shrubs, understory/canopy trees and herbaceous seeding within NNI control areas (100-foot buffer from LOD on park property).

### d. Tilden Woods Stream Valley Park, Old Farm Neighborhood Conservation Area, and Cabin John Stream Valley Park Unit 6

Mitigation measures specific to Tilden Woods Stream Valley Park, Old Farm Neighborhood Conservation Area, and Cabin John Stream Valley Park Unit 6 include:

- Plan, design, and construct improvements for the stabilization of the Greentree Road stormwater outfall from the pipe to a natural surface trail just south of Cabin John Creek (approximately 310 linear feet) with environmentally sensitive channel techniques. Include a planting plan to compensate for forest impacts related to this work.

- Plan, design, and implement forest and terrestrial vegetation mitigation including:

  - o  NNI control for 7 years within 50-foot buffer of LOD within on park property.

  - o  Infill plantings consisting of shrubs, understory/canopy trees and herbaceous seeding within NNI control areas (50-foot buffer from LOD) on park property.

- Plan, design, and construct a single bridge structure with a clear span of Tuckerman Lane (including the associated pedestrian and bicycle facilities) and a clear span over Old Farm Creek (including the restored floodplain and a wildlife passage):

  - o  Provide wildlife passage area on northern bank per M-NCPPC specifications

  - o  Provide fish passage under Old Farm Creek overpass by restoring the stream to a natural channel and tie into the existing stream restoration immediately upstream

  - o  Stream span must maximize floodplain cross-sectional area

## C. City of Gaithersburg

Mitigation specific to the impacts to Malcolm King Park include the conveyance of a 4.03-acre MDOT SHA-owned property (Acct. no. 09-02213932) to City of Gaithersburg.

## D. City of Rockville

Mitigation measures for impacts to Bullards Park and Rose Hill Stream Valley Park, Rockmead Park, Woottons Mill Park, and the Rockville Senior Center and Park include:

- Convey the 1.25-acre MDOT SHA-owned Millennium Garden Park (former Vernie Smith properties (Acct. nos. 16-0400205281 and 16-0400205270)) to City of Rockville.

- Acquire the 1.32-acre Betty B. Casey Property (on Fleet Street) (Acct. no 160400144125) and convey to the City of Rockville

00000554


- Acquire the 0.42-acre Lodging Partners LLC Property (41 Maryland Avenue) (Acct. no. 160403198603) and convey to the City of Rockville

- Acquire the 4.23-acre Cynthia Robertson Property (Potomac Woods) (Acct. no. 160401523951) and convey to the City of Rockville

- Continue to consult on context sensitive solutions, during the design phase, to the four existing parks (Bullards Park and Rose Hill Stream valley Park, Rockmead, Woottons Mill, and Rockville Senior Center). The consultation will be constrained to context sensitive solutions that are both compensatory to the impacts to Section 4(f) resources and a justifiable expenditure of public funds. For example, plantings and context sensitive stormwater management facility design.

## E. Maryland Historical Trust

Mitigation for Section 4(f) impacts to historic properties were coordinated with MHT. Mitigation measures are listed below. Because some of the historic properties are also park properties, some mitigation measures are duplicated from the lists above under park OWJs.

- Prepare a Cultural Landscape Report for Clara Barton Parkway.
- Prepare National Register Nomination for Dead Run Ridges Archaeological District.
- Complete Phase III Archaeological Data Recovery at 44FX0374, 44FX0379 and 44FX0389 (GWMP) and develop associated public interpretation materials.
- Complete Phase III Archaeological Data Recovery at 18MO749 and 18MO751 (Chesapeake and Ohio Canal) and develop associated public interpretation materials.
- Complete National Register Nomination for Washington Biologists' Field Club on Plummers Island.
- Place temporary fencing along the LOD within Plummers Island to delimit construction activities.
- Fund or implement a photographic survey documenting conditions before, during and post-construction on Plummers Island within the APE boundary and provide the results to the Washington Biologists' Field Club and NPS.
- Fund or develop GIS maps to document known current and historical study locations and key natural resource features within the APE on Plummers Island to assist in documenting change over time and provide these files to Washington Biologists' Field Club and NPS.
- Procure a sub-meter accurate GPS unit for Washington Biologists' Field Club to use in long-term monitoring of plant locations, collection sites, and other historical research features on Plummers Island.
- Provide for digitization and cataloging of historical records, subject to any availability or rights restrictions, related to Plummers Island and the Washington Biologists' Field Club that are housed at the Smithsonian Institution that are not currently available in electronic format, and provide the files to Washington Biologists' Field Club and NPS.
- Provide Washington Biologists' Field Club historical content related to Plummers Island as part of the above digitization effort to incorporate into their website.
- Complete additional archaeological investigations of LOD surrounding Morningstar Tabernacle No. 88 Moses Hall and Cemetery and monitor for potential archaeological findings during construction.

00000555


- Design context-sensitive treatment of noise barrier facing the Morningstar Tabernacle No. 88 Moses Hall and Cemetery which may include decorative elements appropriate to the historic property and/or such elements as memorial plaques or signage. MDOT SHA will provide consulting parties and the MD State Historic Preservation Officer comment opportunity for project elements, specifically noise barrier, within the APE adjacent to the cemetery at a draft level of design and a second opportunity prior to finalization of design; for each review there will be a minimum 30-day review period.

- Complete additional archaeological investigations of the LOD in the general vicinity of the Montgomery County Poor Farm adjacent to I-270 near Wootton Parkway.

- Improve the stormwater drainage on the First Agape AME Zion Church (Gibson Grove Church) by routing drainage into a new underground culvert to be installed as part of the project. MDOT SHA will ensure a parking lot identified as part of the church's restoration plan, is constructed on church property following installation of the culvert drainage design. MDOT SHA will work with the church on schedule and timing of the culvert and parking lot work to be compatible with ongoing church restoration efforts to the maximum extent practicable.

## 6.7   Least Overall Harm

Pursuant to 23 CFR 774.3(c)(1), if the avoidance analysis determines that there is no feasible and prudent avoidance alternative, then only the alternative that causes the least overall harm may be approved. Because no feasible and prudent avoidance alternative has been identified, all remaining alternatives are evaluated to determine which would cause the least overall harm.

23 CFR 774.3(c)(1) identifies seven factors for identifying the alternative with the least overall harm.

- Factor 1: The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);

- Factor 2: The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;

- Factor 3: The relative significance of each Section 4(f) property;

- Factor 4: The views of the OWJs over each Section 4(f) property;

- Factor 5: The degree to which each alternative meets the Purpose and Need for the project;

- Factor 6: After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

- Factor 7: Substantial differences in costs among the alternatives.

### 6.7.1   Draft Section 4(f) Least Overall Harm Evaluation

The Draft Section 4(f) Evaluation included a preliminary assessment of least overall harm which compared location-specific avoidance options, other minimization alternatives, and Alternatives Retained for Detailed Study (ARDS) based on the least overall harm criteria. (Refer to **DEIS, Appendix F, Section 5**.)

The DEIS included discussion of 18 location-specific alternatives identified to avoid the use of individual Section 4(f) properties, developed to be incorporated into the DEIS Build Alternatives. Each alternative was evaluated using the seven factors of least overall harm. The alternatives consisted of alignment shifts,

00000556



tunnels, or bridges that were developed to avoid specific Section 4(f) properties for which the impacts were not anticipated to be *de minimis*.

In general, the evaluation determined that these location specific options would result in additional use of other Section 4(f) properties, adverse impacts of a severe magnitude to resources not subject to Section 4(f) protection, or a substantial increase in cost. Because the location-specific options modify relatively short portions of the end-to-end Build Alternatives, each would meet the Purpose and Need of the Study to some degree. However, the analysis determined that the location specific options that more substantially deviate from the existing alignments of I-495 and I-270 and result in a lengthier travel routes would be less effective in addressing the project needs.

The DEIS considered other minimization alternatives including Alternative 5: 1-Lane High-Occupancy Toll Managed Lane Network and the MD 200 Diversion Alternative. These were evaluated along with the six Build Alternatives that were retained for detailed study in the DEIS. These alternatives included managed lanes that differ in the manner in which the proposed travel lanes would be designated and configured. The six ARDS included Alternatives 8, 9, 9M, 10, 13B, and 13C. These are described in detail in the **DEIS, Chapter 2, Section 2.6**.

### 6.7.2 Final Least Overall Harm Analysis

The preliminary results of the Least Overall Harm Analysis were presented in the **DEIS, Appendix F, Section 5.4**, and are summarized below for each of the alternatives (**Table 6-6**). The table has been updated to include the Preferred Alternative and finalize the least overall harm analysis.

Based on the analysis detailed in **Table 6-6** below, MDOT SHA has identified the Preferred Alternative (Alternative 9 – Phase 1 South) as the alternative with least overall harm. The Preferred Alternative would have substantially equal ability to mitigate adverse impacts to each Section 4(f) property relative to the DEIS Build Alternatives (Alternatives 8, 9, 9 Modified, 10, 13B and 13C). However, due to the shorter limits and substantial number of properties avoided, the Preferred Alternative would have fewer property impacts to mitigate compared to the DEIS Build Alternatives. The Preferred Alternative would have substantially lower overall harm to Section 4(f) properties due to the shorter project limits and fewer Section 4(f) properties impacted. The lower overall harm applies in consideration of both the acreage and number of properties impacted relative to the DEIS Build Alternatives, as well as the relative significance of each Section 4(f) property.

MDOT SHA has provided multiple opportunities for the OWJ to provide their views on the least overall harm analysis, including the comment periods for the DEIS, Draft Section 4(f) Evaluation and SDEIS. Extensive coordination with the OWJs has been conducted to identify a comprehensive strategy of avoidance, minimization, and mitigation for unavoidable Section 4(f) impacts. Input from the OWJs has focused largely on avoidance, minimization, and mitigation measures. No OWJs have objected to the identification of the Preferred Alternative as the alternative with least overall harm in accordance with the regulations at 23 CFR 774.

The Preferred Alternative satisfies the Purpose and Need for the Project, though to a somewhat lesser extent than the DEIS Build Alternatives as noted in **Table 6-6**. The Preferred Alternative would also require substantially lower magnitude of overall impacts to properties not protected by Section 4(f) due to the

00000557


shorter project limits. The estimated cost of the Preferred Alternative ($3.75 to $4.25 billion) would be lower than other Build Alternatives.

While some of the other alternatives and location specific options would reduce harm to one or more Section 4(f) properties, each of these alternatives would have problems related to cost and/or the ability to meet Purpose and Need. The MD 200 Diversion Alternative and Alternative 5 would each fail to meet the Purpose and Need. Each of the Location Specific Options (LS-1 through LS-11) would meet the Purpose and Need but would have substantially greater cost compared to the Preferred Alternative. Furthermore, many of the Location Specific Options would create additional impacts to other Section 4(f) properties as noted in **Table 6-6**.

Based on the information presented in the Draft Section 4(f) Evaluation, the Updated Draft Section 4(f) Evaluation, and this Final Section 4(f) Evaluation, FHWA and MDOT SHA have reached a conclusion that the Preferred Alternative is the alternative with least overall harm. The Preferred Alternative meets the Purpose and Need for the Study and impacts far fewer Section 4(f) properties and total acreage relative to the other Build Alternatives that would meet the Purpose and Need. The Preferred Alternative would avoid the use of 40 Section 4(f) properties totaling approximately 108.8 acres relative to the DEIS Build Alternatives. The Preferred Alternative would require use of a total of 33.2 acres of Section 4(f) property (including temporary and permanent), compared to 146.8 acres for the DEIS Build Alternative 9. Coordination with the OWJs has continued since the DEIS and documented in the FEIS.

## 6.8   Coordination

Section 4(f) regulations require the Draft Section 4(f) Evaluation be made available for coordination and comment to OWJs over the Section 4(f) resource (23 CFR §774.5). Since publication of the DEIS in July 2020, MDOT SHA has conducted conference calls, meetings, and field reviews, or sent letters to the following agencies with jurisdiction over parkland along the Phase 1 South limits: NPS, M-NCPPC Montgomery County, National Capital Planning Commission (NCPC), City of Rockville, and the City of Gaithersburg. FHWA and MDOT SHA have also held meetings and coordinated with the agencies with jurisdiction over historic sites, including NPS, ACHP, NCPC, MHT, and the VDHR. MDOT SHA has worked closely with the OWJs over all Section 4(f) properties to identify minimization and mitigation measures necessary for Section 4(f) approval. **FEIS, Chapter 8, Section 8.3.3** details the meetings held and the topics covered.

In addition to OWJs, the Section 4(f) Evaluation must be made available to the US Department of the Interior (USDOI) and as needed, to the US Department of Agriculture (USDA) and the Department of Housing and Urban Development (HUD) (23 CFR §774.5). In accordance with 23 CFR §774.5, USDOI has been provided an opportunity to review and comment on the Draft Section 4(f) and Updated Section 4(f), which included a preliminary conclusion on the avoidance and least overall harm analysis. USDOI consultation will continue with review of the Final Section 4(f) Evaluation in coordination with the FEIS which will enable USDOI to provide comments on FHWA's conclusions regarding the existence of feasible and prudent avoidance alternatives, the inclusion of all possible planning to minimize harm to Section 4(f) properties (including mitigation), and the least overall harm alternative. The Preferred Alternative would not affect resources requiring coordination with USDA and HUD and, therefore, consultation with these agencies is not necessary.

00000558


The public was given notice and afforded an opportunity to comment on the Draft Section 4(f) Evaluation and Updated Draft Section 4(f) Evaluation per 23 CFR 774(b)(2). This public involvement has been conducted in conjunction with the overall NEPA document public involvement process, as outlined in **FEIS, Chapter 8**, **Section 8.2**.

Prior to making a Section 4(f) *de minimis* impact determination, public notice and opportunity for public review is required. For historic resources, MDOT SHA has notified MHT and consulting parties of the intent to make a *de minimis* impact determination via letters as part of the Section 106 process. For park resources, the opportunity for public notice and review occurred as part of the public review of the DEIS and SDEIS as the intent to make a *de minimis* impact determination has been documented in the Draft Section 4(f) Evaluation and the Updated Section 4(f) Evaluation. A supplemental opportunity for public review was also provided for one park property that was not identified as a potential *de minimis* impact in the Draft Section 4(f) Evaluation or the Updated Draft Section 4(f) Evaluation, but due to additional impact minimization, was identified as a *de minimis* impact in the Final Section 4(f) Evaluation. All public comments on the DEIS, SDEIS, and subsequent opportunity for public review related to the intent to make *de minimis* impact determinations were provided to the OWJs. In addition, the MDOT SHA sent a request for written agreement from each OWJ that the impacts to specific parks will not adversely affect the features, attributes, or activities qualifying those properties for protection under Section 4(f). The OWJs have concurred with multiple 4(f) *de minimis* applications, as required by regulation. This concurrence does not mean the OWJ supports the Preferred Alternative as defined in the FEIS. Section 4(f) compliance and a *de minimis* impact determination is separate and distinct from other federal requirements and should not be construed as the OWJ supporting the Preferred Alternative.  Refer to **FEIS**, **Appendices I and S** for copies of this correspondence.

## 6.9   Conclusion

Based on the information presented in the Draft Section 4(f) Evaluation, Updated Draft Section 4(f) Evaluation, and this Final Section 4(f) Evaluation, FHWA and MDOT SHA have concluded that there is no feasible and prudent alternative to the use of land from the Section 4(f) properties identified in **Table 6-2**, and the proposed action includes all possible planning to minimize harm, and the Preferred Alternative is the alternative with the least overall harm.

00000559

**Table 6-6: Least Overall Harm Analysis**

| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| **DEIS Build Alternatives** | | | | | | | | |
| Alternative 8 | Substantially equal ability to mitigate adverse impacts to each Section 4(f) property | Substantially equal relative harm given the physical footprint among the Build Alternatives. Harm would occur to properties as described in Section 2 | All DEIS build alternatives would impact the same number of Section 4(f) properties | OWJs provided views during the review period of the DEIS, Draft Section 4(f) Evaluation and SDEIS. No OWJs objected to the identification of the Preferred Alternative as the alternative with least overall harm | Meets Purpose and Need to a Lesser Degree | Substantially equal magnitude of adverse impacts to properties not protected by Section 4(f) | Total Cost of Alternative would be between $8.7 and $9.6 billion | Would meet the Purpose and Need to a lesser degree than other DEIS Build Alternatives. Would create traffic problems that would reduce trip demand in the managed lanes. |
| Alternative 9 | | | | | Meets Purpose and Need to Greater Degree | | Total Cost of Alternative would be between $8.7 and $9.6 billion | Would meet the Purpose and Need; impacts to properties protected by Section 4(f) are minimized; appropriate mitigation measures for use of Section 4(f) property to minimize harm. |
| Alternative 9 Modified | | | | | Meets Purpose and Need to a Lesser Degree | Lesser Magnitude of Adverse Impacts than Build Alternatives | Cost of Alternative would be between $8.5 and $9.3 billion. Not financially viable owing to lower revenue. | Would meet the Purpose and Need to a lesser degree than other DEIS Build Alternatives because it does not successfully address existing traffic and long-term traffic growth or enhance trip reliability, and it is not financially viable. |
| Alternative 10 | | | | | Meets Purpose and Need | Greater Magnitude of Adverse Impacts than other Build Alternatives | Total Cost of Alternative would be between $9.0 and $9.9 billion | Would have greater impacts to Section 4(f) Properties, natural resources, and property relocations as well as greater cost, but would provide no additional benefit in meeting Purpose and Need. |
| Alternative 13B | | | | | Meets Purpose and Need to a Lesser Degree | Substantially equal magnitude of adverse impacts to properties not protected by Section 4(f) | Total Cost of Alternative would be between $8.7 and $9.6 billion. Not financially viable owing to lower revenue | Would meet the Purpose and Need to a greater degree than the other DEIS Build Alternatives. Would only accommodate traffic growth in the peak direction during peak period. Would not be financially self-sufficient. |
| Alternative 13C | | | | | Meets Purpose and Need to a Lesser Degree | | Total Cost of Alternative would be between $8.8 and $9.7 billion. Not financially viable owing to lower revenue | Would meet the Purpose and Need to a lesser degree. Would have negative impacts to travel along I-495 during the AM peak period as reversible lanes can only be operated in one direction at a time. Would not be financially self-sufficient. |
| **Preferred Alternative** | | | | | | | | |
| **Preferred Alternative** **Alternative 9 – Phase 1 South** | Substantially equal ability to mitigate adverse impacts to each Section 4(f) property relative to the DEIS Build Alternatives, with fewer property impacts to mitigate. | Substantially lower overall harm due to shorter project limits and fewer Section 4(f) properties impacted. | Less harm than DEIS Build Alternatives | Modified project limits to avoid Section 4(f) properties, in response to feedback from OWJ. OWJs provided views during the review period of the SDEIS. No OWJs objected to the identification of the Preferred Alternative as the alternative with least overall harm | Meets Purpose and Need to a Lesser Degree | Substantially lower magnitude of overall impacts to properties not protected by Section 4(f) due to shorter project limits | Cost of Alternative would be between $3.75 and $4.25 billion. | Would meet the Purpose and Need. Would have substantially lower impacts to Section 4(f) properties and resources not protected by Section 4(f) due to shorter project limits. |

00000560



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| **Other Alternatives Considered** | | | | | | | | |
| **MD 200 Diversion Alternative** | Greater Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | OWJs provided views during the review period of the DEIS, Draft Section 4(f) Evaluation and SDEIS. No OWJs objected to the identification of the Preferred Alternative as the alternative with least overall harm | Does not meet Purpose and Need | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Cost of Alternative would be between $7.0 and $8.1 billion. Not financially viable owing to lower revenue. | The MD 200 Diversion Alternative would not address the Study's Purpose and Need of accommodating long-term traffic growth, enhancing trip reliability or improving the movement of goods and services. Would not be financially self-sufficient. |
| **Alternative 5** | Greater Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | OWJs provided views during the review period of the DEIS, Draft Section 4(f) Evaluation and SDEIS. No OWJs objected to the identification of the Preferred Alternative as the alternative with least overall harm | Does not meet Purpose and Need | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Cost of Alternative would be between $7.8 and $8.5 billion. Not financially viable owing to lower revenue. | Alternative 5 does not meet the Study's Purpose and Need because it does not address existing traffic and long-term traffic growth or enhance trip reliability, and it is not financially viable. |
| **Location Specific Options** | | | | | | | | |
| **LS-1** | Greater Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | OWJs provided views during the review period of the DEIS, Draft Section 4(f) Evaluation and SDEIS. No OWJs objected to the identification of the Preferred Alternative as the alternative with least overall harm | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-1 would meet the Purpose and Need of the project, it would cost $600 million more to construct than the DEIS Build Alternatives along this portion of the project. |
| **LS-2** | Greater Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative Not financially viable owing to lower revenue | Option LS-2 would adequately meet the Purpose and Need of the project, it would cost in excess of $1 billion more than the DEIS Build Alternatives along this portion of the project. |
| **LS-3** | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | | Meets Purpose and Need | Greater Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-3 would result in 10.4 acres of additional impacts to Section 4(f) properties, which would create additional mitigation along this portion of the project when compared to the DEIS Build Alternatives. Would cost in excess of $1.7 billion more than the DEIS Build Alternatives along this portion of the project. |
| **LS-4** | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | | | Greater Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives | When compared to the DEIS Build Alternatives, Option LS-4 would result in 11 acres of additional impacts to Section 4(f) properties and cost nearly $700 million more. |

00000561

OP LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| LS-5 | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-5 would result in 3.8 acres of additional impacts to Section 4(f) properties and cost $27 million more than the DEIS Build Alternatives along this portion of the Study. |
| LS-6 | Great Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-6 would cost $25 million more than the DEIS Build Alternatives along this portion of the Study. |
| LS-7 | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | OWJs provided views during the review period of the DEIS and Draft Section 4(f) Evaluation. No OWJs objected to the identification of the Preferred Alternative as the alternative with least overall harm. | Meets Purpose and Need | Greater Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-7 would result in an increase of 12 acres of impact to Section 4(f) properties, result in 547 additional relocations, and cost approximately $1.2 billion more than the DEIS Build Alternatives along this portion of the Study. |
| LS-8 | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-8 would result in 0.9 acres of additional impacts to Section 4(f) properties and cost $250 million more than the DEIS Build Alternatives along this portion of the Study. |
| LS-9 | Greater Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternative | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-9 would cost approximately $200 million more than the DEIS Build Alternatives along this portion of the Study. |
| LS-10 | Less Ability to Mitigate than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | Greater Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | When compared to the DEIS Build Alternatives, Option LS-10 would result in 6.1 acres of additional impacts to one Section 4(f) property: BARC. Option LS-10 would cost approximately $88 million more than the DEIS Build Alternatives along this portion of the project. |
| LS-11 | Greater Ability to Mitigate than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | Less Harm than DEIS Build Alternatives | | | Lesser Magnitude of Adverse Impacts than DEIS Build Alternatives | Greater Cost than DEIS Build Alternatives or Preferred Alternative | Option LS-11 would cost approximately $500 million more than the DEIS Build Alternatives along this portion of the project. |



# 7  MITIGATION AND COMMITMENTS

## 7.1  Introduction

Since the publication of the Draft Environmental Impact Statement (DEIS) and Supplemental DEIS (SDEIS), avoidance and minimization opportunities to historic properties, parklands, wetlands, wetland buffers, waterways, forests, and the Federal Emergency Management Agency's 100-year floodplain have advanced through extensive coordination with the regulatory and resource agencies.

The Preferred Alternative, with build improvements only within the limits of Phase 1 South, avoids over 100 acres of parkland and hundreds of wetland and stream features. The Preferred Alternative was developed as a resource avoidance and minimization alternative based in part on extensive coordination with and input from agencies and stakeholders, including the Officials with Jurisdiction for Section 4(f) properties. Comments received on the DEIS and Draft Section 4(f) Evaluation from agencies and stakeholders specifically requested avoidance of significant parkland and historic resources within the study area. The Preferred Alternative is responsive to comments received and aligns the Study to be consistent with the previously determined phased delivery and permitting approach by limiting the build improvements to the area of Phase 1 South only. The result is complete avoidance of significant stream valley parks, including Rock Creek, Northwest Branch, Sligo Creek, Southwest Branch, and Henson Creek Stream Valley Parks, as well as historic parks of national significance including the Baltimore-Washington Parkway, Greenbelt Park and Suitland Parkway.

The impacts associated with the Preferred Alternative were avoided and minimized to the greatest extent practicable in all areas based on available information, and avoidance and minimization techniques were specifically refined in some areas of sensitive or recreationally valuable resources. Examples of avoidance and minimization efforts that have occurred from the DEIS, SDEIS and Final Environmental Impact Statement (FEIS) include the following.

- **Displacements Avoided**: In the DEIS, Alternative 9 had 34 residential and 4 business displacements; the Preferred Alternative in the SDEIS and FEIS avoids all residential and business displacements.

- **Right-of-Way Requirements Further Minimized**: In the DEIS, Alternative 9 had 313.4 acres of right-of-way impacts; the SDEIS Preferred Alternative design minimized the right-of-way impacts to 115.9 acres; and the FEIS Preferred Alternative impacts were further minimized to 92.8 acres, including both temporary and permanent impacts.

- **Park Impacts Further Minimized**: In the DEIS, Alternative 9 had 133.1 acres of park impacts; the SDEIS Preferred Alternative had 36.1 acres; and the FEIS Preferred Alternative further minimized impacts to 30.2 acres, including both temporary and permanent impacts.

- **NPS Park Properties Around the ALB Further Minimized**: The three National Park Service (NPS) Park properties around the American Legion Bridge (ALB) impacted by the Study are: George Washington Memorial Parkway, Chesapeake and Ohio Canal National Historical Park, and Clara Barton Parkway. Efforts to minimize impacts to these park properties has been a focus of much attention by the Maryland Department of Transportation State Highway Administration (MDOT SHA). This resulted in development of team of national and local experts in design, structures, and

00000563

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

constructability to look for innovative ways to avoid and minimize impacts to these resources of national significance (refer to **Chapter 5, Section 5.4** for details). In the DEIS, Alternative 9 impacted 29.4 acres of these three park properties; the SDEIS Preferred Alternative minimized impacts to 17 acres; and the FEIS Preferred Alternative further minimized impacts to 16.2 acres of which 2.7 acres are considered permanent impacts.

- **M-NCPPC Park Properties Further Minimized**: In the DEIS, Alternative 9 impacted 26 Maryland-National Capital Park and Planning Commission (M-NCPPC) park properties totaling 29 acres of impacts; the SDEIS Preferred Alternative impacted 9.2 acres at five M-NCPPC park properties; the FEIS Preferred Alternative further minimized the impacts to the five park properties to 8.2 acres of impacts, including both temporary and permanent impacts.

- **Morningstar Tabernacle No. 88 Moses Hall and Cemetery Avoided**: In the DEIS, Alternative 9 impacted 0.3 acre of the Morningstar Cemetery. Based on further investigations of the property since the DEIS, the Preferred Alternative as presented in the SDEIS and FEIS avoids impacts to the historic Morningstar Tabernacle No. 88 Moses Hall and Cemetery boundary.

- **Wetland Impacts Further Minimized**: In the DEIS, Alternative 9 had 16.3 acres of wetland impacts; the SDEIS Preferred Alternative had 4.3 acres; and the FEIS Preferred Alternative further minimized impacts to 3.9 acres.

- **Waterway Impacts Further Minimized**: In the DEIS, Alternative 9 had 155,922 linear feet of waterway impacts; the SDEIS Preferred Alternative had 46,553 linear feet; and the FEIS Preferred Alternative further minimized impacts to 42,286 linear feet.

- **Floodplain Impacts Further Minimized**: In the DEIS, Alternative 9 had 119.5 acres of floodplain impacts; the SDEIS Preferred Alternative had 48.8 acres; and the FEIS Preferred Alternative further minimized impacts to 31.6 acres.

- **Forest Canopy Impacts Further Minimized**: In the DEIS, Alternative 9 had 1,497 acres of forest canopy impacts; the SDEIS Preferred Alternative had 500.1 acres; and the FEIS Preferred Alternative further minimized impacts to 455.0 acres.

The advancement of conceptual mitigation for unavoidable direct impacts to environmental resources from the Preferred Alternative has occurred since the DEIS and SDEIS. Mitigation developed for this Study was identified to reduce and offset environmental impacts resulting from the Preferred Alternative. In planning for mitigation, MDOT SHA has strived to provide meaningful benefits to resources and improve their values, services, attributes, and functions that may be compromised. Lastly, the lead agencies have worked in good faith to plan worthwhile mitigation based on identified priorities that would, at a minimum, result in no net loss with a goal of a net benefit.

This chapter presents the mitigation measures for impacts to environmental resources identified as a result of the Preferred Alternative, as discussed in this FEIS in Chapters 3, 5, and 6. **Section 7.2** includes a comprehensive summary table of final mitigation measures resulting from the National Environmental Policy Act (NEPA) process that will be included in the Record of Decision (ROD).

Beyond mitigation for unavoidable impacts, additional commitments, such as those for transit, priority bicycle and pedestrian improvements, and environmental enhancements have been identified through extensive coordination with agencies and stakeholders. These commitments have been identified in

00000564

response to comments received over the course of the Study and to further support elements of the Study's Purpose and Need. **Section 7.2** presents these commitments that have been made beyond mitigation for direct impacts. Both the mitigation and commitments identified in **Section 7.2** will be included in the ROD as commitments and will be the responsibility of the lead agencies to ensure implementation.

Some commitments have been made by the Developer or MDOT SHA as part of the Public-Private Partnership (P3) Agreement and are captured separately throughout the NEPA document including in **Section 7.3** this chapter. These commitments are included in the FEIS to disclose the efforts the State of Maryland and Developer have made to advance the project in an environmentally responsible manner taking into account input received from the public, stakeholders and local governments related to transit, community facilities, water quality and equity. These commitments will be the responsibility of the Developer and/or MDOT SHA and will not be included in the ROD. These commitments are captured in the P3 Agreement and/or Memoranda of Understanding with applicable third parties such as local governments.

00000565

OP·LANES™
MARYLAND   I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

## 7.2   Mitigation and Commitments

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | FEIS Section Reference |
|---|---|---|---|
| WETLANDS/WATERWAYS | | | |
| 1. | Stream restoration (721 functional feet) along unnamed tributary to Great Seneca Creek south of Bradbury Drive in Quince Orchard Valley Neighborhood Park (Site CA-5). | M | CH 5, 5.12.4 |
| 2. | Stream restoration (5,583 functional feet) and wetland creation/restoration (4.61 acres of credit) along Cabin Branch east and west of Montgomery Village Avenue at Montgomery Village Golf Club (Site RFP-2). | M | CH 5, 5.12.4 |
| 3. | Purchase of 1,207 functional feet of riverine mitigation credit from approved Maryland mitigation banks. | M | CH 5, 5.12.4 |
| 4. | Purchase of 506 linear feet of riverine mitigation credit from approved Virginia mitigation banks. | M | CH 5, 5.12.4 |
| 5. | Design of stream stabilization and restoration to provide ecological uplift, where practicable, when relocating streams within the Preferred Alternative limits of disturbance (LOD). | C | CH 5, 5.12.4 |
| FOREST | | | |
| 6. | Mitigate for unavoidable impacts to forests on an acre-for-acre basis in accordance with the mitigation hierarchy described in the Maryland Reforestation Law (MD Natural Resources Code § 5-103) including:<br>• Onsite mitigation (within the project LOD).<br>• Off-site mitigation [at 68 sites identified in the Maryland Reforestation Law Mitigation Site Search Report prepared for the MLS, refer to Appendix T of the Natural Resources Technical Report, (**FEIS, Appendix M**).<br>• Purchase of forest mitigation bank credits from approved forest mitigation banks in affected county and/or watershed.<br>• Any remaining mitigation required may be fulfilled through payment into the Reforestation Fund, as approved by MDNR.<br>• Final forest mitigation plan will be developed and implemented by the Developer in conjunction with MDOT SHA and the affected jurisdictions and landowners during the final design phase of the project. | M | CH 5, 5.16.4 |
| 7. | Commit to planting of any approved planting sites on MDNR property within five years of the initial Maryland Reforestation Law approval for the project. MDOT SHA has committed to providing a minimum of five years of maintenance and monitoring at reforestation mitigation plantings. | M | CH 5, 5.16.4 |
| 8. | Forest impacts in Virginia that require mitigation are within NPS property. Therefore, forest mitigation will follow the comprehensive ecological restoration plan outlined in #9 below. Although tree impacts occur in Virginia | M | CH 5, 5.16.4 |

00000566


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | FEIS Section Reference |
|---|---|---|---|
| | outside of NPS property, there is no statewide forest regulation that requires mitigation off county or state parkland. No tree impacts occur on county or state parkland in Virginia. | | |
| | **PARKLAND** | | |
| | **NATIONAL PARK SERVICE** | | |
| 9. | Develop and implement a Comprehensive Ecological Restoration Plan and Cost Estimate for Restoring Limits of Disturbance to Preexisting Conditions for the impacted area. The plan shall include the following components:<br>• *Forest and terrestrial vegetation restoration including:*<br>   ○ Avoiding and minimizing impacts to trees within and surrounding the LOD through a robust tree protection plan.<br>   ○ Survey impacted vegetation community prior to construction to determine existing community composition and develop replanting plan based on survey results.<br>   ○ Replanting forest (including shrub and herbaceous layers) inch-for-inch within LOD in temporary impact areas and providing non-native invasive (NNI) species control and maintenance and monitoring for 5 years within reforestation area.<br>   ○ Softening edge effects associated with disturbance by treating and removing non-native invasive species within a 50-foot buffer of the LOD and replanting native trees and shrubs in any gaps resulting from the removal of mature trees or non-native invasive species. In coordination with NPS during design, sensitive areas, such as areas of known archeological resources, within the 50-foot buffer will be excluded if ground disturbance is required.<br>   ○ Providing monetary compensation for remaining tree impacts, based on inch for inch replacement of DBH impacted.<br>• *Rare, Threatened and Endangered plant species restoration including:*<br>   ○ Conducting a final pre-construction of rare, threatened or endangered (RTE) plant inspection.<br>   ○ Collecting seeds and/or individual RTE plant species from impact area prior to construction.<br>   ○ Cultivating plants and storing seeds/propagating plants from seed in an off-site nursery.<br>   ○ Reestablishing RTE species from stored seed and cultivated and propagated plants following construction and topsoil restoration. | M | CH 5, 5.4.4 and CH 6, 6.6.1 |

00000567



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | FEIS Section Reference |
|---|---|---|---|
| | • *Topsoil salvage and restoration including:* <br> ○ Salvaging topsoil from impact area and storing in nearest possible stockpile location. <br> ○ Restoring subsoils and reduce compaction via ripping, discing, plowing or double-digging following construction. <br> ○ Placing salvaged topsoil in impact area following construction. <br> • *Herpetofauna translocation including:* <br> ○ Conducting Herpetofauna relocation effort immediately prior to construction activities <br> ▪ Conducting a sweep through a portion of the impact area with approximately 10 biologists searching for and capturing reptiles and amphibians and logging all captures. <br> ▪ Relocating captured individuals safely away from the impact area. <br> ▪ Conducting a second sweep through the same portion of impact area, logging all captures and relocating captured individuals. <br> ▪ Conducting a third sweep and relocate effort, if the number of captured individuals is not dramatically reduced and continue sweeping the portion of the work area until the number of captured individuals is minimal. <br> ▪ Continuing the multiple sweep process until the entire work area is cleared. <br> • *Downed woody debris salvage and restoration including:* <br> ○ Moving all downed woody debris from the impact area to the edge of the impact area just outside of the E&S measures as part of the clearing operation. <br> ○ Restoring downed woody debris, if appropriate, to the impact area following construction and topsoil restoration. | | |
| 10. | Create/restore 1.53 acres of wetland northwest of American Legion Bridge (Site ID CHOH-13) per the Wetland Statement of Findings. | M | CH 6, 6.6.1 |
| 11. | Install new white legend and border on brown background guide signs along I-495 for the George Washington Memorial Parkway exit. | M | CH 5, 5.6.4 and CH 6, 6.6.1 |
| 12. | Shift bridge piers north of Lock 13 to the maximum extent possible while maintaining adequate vertical clearance of 12 feet, 6 inches between towpath and bottom of bridge steel to accommodate NPS equipment. Design new ALB to capture all drainage outfall using downspouts. The downspouts will be located so the water does not drop onto areas with frequent pedestrian use. | C | CH 6, 6.6.1 |
| 13. | Complete a pre-construction condition assessment of locks, masonry walls, towpath, and canal prism throughout entire LOD and develop and implement a plan for repairs identified during condition assessment. | M | CH 6, 6.6.1 |

00000568



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | FEIS Section Reference |
|---|---|---|---|
| 14. | Complete Phase III Archaeological Data Recovery at 44FX0374, 44FX0379 and 44FX0389 (GWMP) and develop associated public interpretation materials (in Virginia). | M | CH 6, 6.6.1 |
| 15. | Complete Phase III Archaeological Data Recovery at 18MO749 and 18MO751 (Chesapeake and Ohio Canal) and develop associated public interpretation materials (In Maryland). | M | CH 6, 6.6.1 |
| 16. | Prepare National Register Nomination for Dead Run Ridges Archaeological District. | M | CH 6, 6.6.1 |
| 17. | Develop Interpretive product on archeological sites; Create web-based Story Map, waysides, and/or brochures. | M | CH 6, 6.6.1 |
| 18. | Provide monetary compensation for a Cultural Landscape Report for Clara Barton Parkway (historical narrative; updated existing conditions, analysis, and evaluation; and treatment guidelines for management of character defining features). | M | CH 6, 6.6.1 |
| 19. | Complete a pre-construction condition assessment of Potomac Heritage Trail within the LOD and develop and implement a plan to restore and improve the trail within the LOD. | M | CH 6, 6.6.1 |
| 20. | Prepare Visitor and Ecological Impact Study. | C | CH 6, 6.6.1 |
| 21. | Acquire James Audia property (two parcels totaling 1.4 acres) as replacement parkland for impacts to George Washington Memorial Parkway. If unavailable, acquire or convey property for replacement parkland of similar size and/or function in coordination with NPS. | M | CH 5, 5.4.4 and CH 6, 6.6.1 |
| 22. | Convey a portion of the MDOT SHA owned former Ridenour property (38.7 acres) to NPS as replacement parkland for impacts to Chesapeake and Ohio Canal National Historical Park and Clara Barton Parkway. | M | CH 5, 5.4.4 and CH 6, 6.6.1 |
| 23. | Provide monetary compensation up to $60,000 to NPS to update and refine the George Washington Memorial Parkway Climate Action Plan. | M | CH 6, 6.6.1 |
| 24. | The Preferred Alternative will result in temporary closure of the Potomac Heritage National Scenic Trail within the LOD during construction. A detour route, if determined to be necessary, will continue to be developed by MDOT SHA and the Developer in coordination with NPS, Fairfax County, and VDOT. The segment of the trail within the LOD would be restored on a new alignment after construction is completed. See ID No. 19. | M | CH 5, 5.4.3 and CH 6, 6.6.1 |
| 25. | Evaluate drainage and sight distance considerations at the intersection of the shared use path and Chesapeake and Ohio Canal towpath during final design in coordination with NPS, within the LOD. | C | CH 3, 3.2.2 and CH 5, 5.7.2 |

00000569

**OP·LANES** ™ MARYLAND | I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | FEIS Section Reference |
|---|---|---|---|
| 26. | Design and construct, in coordination with NPS and the Washington Biologists' Field Club, slope armoring along the upstream side of Plummers Island within the LOD to mitigate for future slope erosion as a result of tree clearing with the LOD. The slope armoring could include, but is not limited to, a rip-rap slope, live staking, and brush layering or any combination of armoring that will provide a blended natural aesthetic with the topography and historic nature of the island. | C | CH 3, 3.1.8 |
| 27. | Evaluate additional options for the American Legion Bridge during final design that would further minimize or avoid physical impact to Plummers Island. | C | N/A |
| **MARYLAND-NATIONAL CAPITAL PARK & PLANNING COMMISSION** |||||
| **General** |||||
| 28. | Acquire the 24.14-acre Bardon, Inc. property (Acct. no. 00402385) and convey to M-NCPPC. If unavailable, acquire or convey property as replacement parkland of similar size and/or function in coordination with M-NCPPC. | M | CH 5, 5.4.4 and CH 6, 6.6.1 |
| 29. | Acquire the 0.57-acre Bardon, Inc. property (Acct. no. 02620882) and convey to M-NCPPC. If unavailable, acquire or convey property as replacement parkland of similar size and/or function in coordination with M-NCPPC. | M | CH 5, 5.4.4 and CH 6, 6.6.1 |
| 30. | Evaluate the ability to re-convey unused property, previously owned by M-NCPPC, back to that agency post construction. | C | CH 6, 6.6.1 |
| 31. | Convey the MDOT SHA owned 3.15-acre right-of-way located at MD 97 and 16th Street. | M | CH 5, 5.4.4 and CH 6, 6.6.1 |
| 32. | Convey two MDOT SHA owned 15.35-acre parcels (Acct. no. 161300980570 and 161300980626) located between Northwood High School and Northwest Stream Valley Park. | M | CH 5, 5.4.4 and CH 6, 6.6.1 |

00000570



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | FEIS Section Reference |
|---|---|---|---|
| | **Cabin John Stream Valley Park Unit 2** | | |
| 33. | Plan, design, and construct improvements to formalize the Cabin John Trail trailhead parking area along Seven Locks Road including:<br>• Reconstruct the existing driveway per MD Standard No. 630.02 or applicable County standard.<br>• Pave the existing gravel lot with full depth asphalt. Paved area measures approximately 60' x 100'. Assume open section lot.<br>• Optimize parking lot design to provide maximum number of spaces, including Americans with Disabilities Act (ADA)-compliant spaces (with signage) per the ADA Guidelines. Stripe new parking spaces.<br>• Provide drainage and stormwater management (SWM) facilities as required to treat impervious area per County requirements.<br>• Install signage prohibiting littering/dumping, replace existing trash can, and remove existing illicitly dumped material.<br>• Relocate existing sign kiosk.<br>• Construct bicycle repair stand, with tools and pump at Cabin John Trail trailhead. | M | CH 6, 6.6.1 |
| 34. | Stream stabilization (~1,000 linear feet) along Cabin John Creek including:<br>• Remove all concrete structures within stream along both along existing banks and failed pieces in the stream.<br>• Rebuild banks with rock and vegetative stabilization techniques that promote environmental functions.<br>• Replant riparian buffer with native seed, herbaceous plugs, and native shrubs and trees.<br>• Install instream grade control structures (such as rock sill, crossvane, riffles, etc.) to transition stream into, through, and out of the underpass area in a stable and ecologically sound way.<br>• Protect sewer manhole and restore I-495 on-ramp outfall to Cabin John Creek with environmentally sensitive channel techniques. | M | CH 6, 6.6.1 |
| 35. | Plan, design, and implement forest and terrestrial vegetation mitigation including:<br>• NNI control for 7 years within 50' buffer of LOD.<br>• Infill plantings, on park property, consisting of shrubs, understory/canopy trees and herbaceous seeding within NNI control areas (50 ft buffer from LOD). | M | CH 6, 6.6.1 |
| 36. | Plan and design wildlife passage area under I-495 overpass of Cabin John Creek and Cabin John Parkway by lengthening new bridge structures. This will allow wildlife passage on the west side bank of Cabin John Creek while minimizing wildlife-vehicular conflicts along Cabin John Parkway by constructing wildlife exclusion fencing along the east side of the creek next to the Parkway, in coordination with M-NCPPC. | M | CH 5, 5.17.4 and CH 6, 6.6.1 |

00000571

**OP·LANES**™
M A R Y L A N D    I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | FEIS Section Reference |
|---|---|---|---|
| | **Cabin John Regional Park** | | |
| 37. | Plan, design, and construct a fiberglass pedestrian bridge over the outfall/tributary to Cabin John Creek at STA 3640+00 for the natural surface connector trail including: <br>• Performing hydraulic study and determining feasibility of new crossing. <br>• Constructing fiberglass bridge per M-NCPPC-provided Fiberglass Bridge specification or per equal to or better alternative approved by M-NCPPC. | M | CH 6, 6.6.1 |
| 38. | Plan, design, and construct improvements for pedestrian and cycling access to the Robert C. McDonell campground access road by: <br>• Reconstruction of existing bridge over Old Farm Creek in same location per M-NCPPC-provided specifications for Prefabricated Steel Truss Bridge (Section 401) and Helical Piles (Section 403) (hydraulically in-kind replacement). <br>• Provide temporary crossing for pedestrians and cyclists during bridge reconstruction. <br>• Provide stream stabilization work immediately upstream, underneath, and immediately downstream of the bridge. <br>• Limit time of year of bridge reconstruction to window when campground access is closed. <br>• Bridge design shall provide for ADA compliance, pedestrian access, and passage of cyclists without dismounting while incorporating a gate to prevent unauthorized access by vehicles. | M | CH 6, 6.6.1 |
| 39. | Plan, design, and construct improvements to the existing parking area on Tuckerman Lane near the Robert C. McDonell Campground access road including: <br>• Resurface the existing paved lot. (Paved area measures approximately 2500 SF. (25' x 100')). <br>• Optimize parking lot design to provide maximum number of spaces. Stripe new parking spaces. Incorporating ADA parking, as applicable. <br>• Provide additional landscaping in vicinity of lot. | M | CH 6, 6.6.1 |
| 40. | Plan, design, and construct a fiberglass pedestrian bridge over Cabin John Creek to connect the Cabin John Trail to the Kidney Bean Loop Trail, in the vicinity of Goya Drive including: <br>• Constructing fiberglass bridge per provided Fiberglass Bridge specification or per equal to or better alternative approved by M-NCPPC. <br>• Design and construct in-stream grade control and bank protection structures to stabilize stream in the vicinity of the new bridge. | M | CH 6, 6.6.1 |

00000572

| ID No. | Mitigation and Commitments | Mitigation (M) or Commitment (C) | FEIS Section Reference |
|---|---|---|---|
| 41. | Plan, design, and construct improvements for the stabilization of the Gainsborough Road stormwater outfall to Cabin John Creek *(approximately 255 linear feet)* with environmentally sensitive channel techniques. <br>• Include a planting plan to compensate for forest impacts related to this work. <br>• Provide treatment of invasive bamboo surrounding the channel. <br>• Construct pedestrian trail bridge replacement over Gainsborough outfall channel. | M | CH 6, 6.6.1 |
| 42. | Plan, design, and implement forest and terrestrial vegetation mitigation including: <br>• Conducting forest stand delineation within 100 ft buffer of LOD and develop a 7-year non-native invasive control management plan within M-NCPPC property. <br>• Implementing a 7-year non-native invasive control management plan within 100 feet of the LOD, on park property and within in the biodiversity area.  Specific target areas and species to be determined by M-NCPPC Montgomery Parks. <br>• Infill plantings consisting of shrubs, understory/canopy trees and herbaceous seeding within NNI control areas (100 ft buffer from LOD on park property). | M | CH 6, 6.6.1 |
| **Tilden Woods Stream Valley Park, Old Farm Neighborhood Conservation Area, and Cabin John Stream Valley Park Unit 6** | | | |
| 43. | Plan, design, and construct improvements for the stabilization of the Greentree Road stormwater outfall from the pipe to a natural surface trail just south of Cabin John Creek *(approximately 310 linear feet)* with environmentally sensitive channel techniques. Include a planting plan to compensate for forest impacts related to this work. | M | CH 6, 6.6.1 |
| 44. | Plan, design, and implement forest and terrestrial vegetation mitigation including: <br>• NNI control for 7 years within 50' buffer of LOD on park property. <br>• Infill plantings consisting of shrubs, understory/canopy trees and herbaceous seeding within NNI control areas (50 ft buffer from LOD) on park property. | M | CH 6, 6.6.1 |
| 45. | Plan, design, and construct a single bridge structure with a clear span of Tuckerman Lane (including the associated pedestrian and bicycle facilities) and a clear span over Old Farm Creek (including the restored floodplain and a wildlife passage): <br>• Provide wildlife passage area on northern bank per M-NCPPC specifications <br>• Provide fish passage under Old Farm Creek overpass by restoring the stream to a natural channel and tie into the existing stream restoration immediately upstream <br>• Stream span must maximize floodplain cross-sectional area | M | CH 6, 6.6.1 |

00000573



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| | CITY OF GAITHERSBURG | | |
|---|---|---|---|
| 46. | Convey the 4.03-acre MDOT SHA-owned, property (Acct. no. 09-02213932) to City of Gaithersburg. | M | CH 5, 5.4.4 and CH 6, 6.6.1 |
| | **CITY OF ROCKVILLE** | | |
| 47. | Convey the 1.25-acre MDOT SHA-owned Millennium Garden Park (former Vernie Smith properties (Acct. nos. 16-0400205281 and 16-0400205270)) to City of Rockville. | M | CH 5, 5.4.4 and CH 6, 6.6.1 |
| 48. | Acquire the 1.32-acre Betty B. Casey Property (on Fleet Street) (Acct. no 160400144125) and convey to the City of Rockville | M | CH 5, 5.4.4 and CH 6, 6.6.1 |
| 49. | Acquire the 0.42-acre Lodging Partners LLC Property (41 Maryland Avenue) (Acct. no. 160403198603) and convey to the City of Rockville | M | CH 5, 5.4.4 and CH 6, 6.6.1 |
| 50. | Acquire the 4.23-acre Cynthia Robertson Property (Potomac Woods) (Acct. no. 160401523951) and convey to the City of Rockville | M | CH 5, 5.4.4 and CH 6, 6.6.1 |
| 51. | Continue to consult on context sensitive solutions, during the design phase, to the four existing parks (Bullards Park and Rose Hill Stream valley Park, Rockmead, Woottons Mill, and Rockville Senior Center). The consultation will be constrained to context sensitive solutions that are both compensatory to the impacts to Section 4(f) resources and a justifiable expenditure of public funds. For example, plantings and context sensitive stormwater management facility design. | C | CH 5, 5.4.4 and CH 6, 6.6.1 |
| | **CULTURAL RESOURCES (SECTION 106)** | | |
| 52. | Prepare a Cultural Landscape Report for Clara Barton Parkway. | M | FEIS, App J |
| 53. | Prepare National Register Nomination for Dead Run Ridges Archaeological District. | M | FEIS, App J |
| 54. | Complete Phase III Archaeological Data Recovery at 44FX0374, 44FX0379 and 44FX0389 (George Washington Memorial Parkway) and develop associated public interpretation materials. | M | FEIS, App J |
| 55. | Complete Phase III Archaeological Data Recovery at 18MO749 and 18MO751 (Chesapeake and Ohio Canal) and develop associated public interpretation materials. | M | FEIS, App J |
| 56. | Complete National Register Nomination for the Washington Biologists' Field Club on Plummers Island. | M | FEIS, App J |
| 57. | Place temporary fencing along the LOD within Plummers Island to delimit construction activities. | C | FEIS, App J |

00000574



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| 58. | Fund or implement a photographic survey documenting conditions before, during and post-construction on Plummers Island within the area of potential effects (APE) boundary and provide the results to Washington Biologists' Field Club and NPS. | M | FEIS, App J |
|---|---|---|---|
| 59. | Fund or develop Graphic Information System maps to document known current and historical study locations and key natural resource features within the APE on Plummers Island to assist in documenting change over time and provide these files to Washington Biologists' Field Club and NPS. | M | FEIS, App J |
| 60. | Procure a sub-meter accurate GPS unit for Washington Biologists' Field Club to use in long-term monitoring of plant locations, collection sites, and other historical research features on Plummers Island. | M | FEIS, App J |
| 61. | Provide for digitization and cataloging of historical records, subject to any availability or rights restrictions, related to Plummers Island and the Washington Biologists' Field Club that are housed at the Smithsonian Institution that are not currently available in electronic format, and provide the files to Washington Biologists' Field Club and NPS. | M | FEIS, App J |
| 62. | Provide Washington Biologists' Field Club historical content related to Plummers Island as part of the above digitization effort to incorporate into their website. | M | FEIS, App J |
| 63. | Complete additional archaeological investigations of LOD surrounding Morningstar Tabernacle No. 88 Moses Hall and Cemetery and monitor for potential archaeological findings during construction. | C | FEIS, App J |
| 64. | Design context-sensitive treatment of noise barrier facing the Morningstar Tabernacle No. 88 Moses Hall and Cemetery which may include decorative elements appropriate to the historic property and/or such elements as memorial plaques or signage. MDOT SHA will provide consulting parties and MD SHPO comment opportunity for project elements, specifically noise barrier, within the APE adjacent to the cemetery at a draft level of design and a second opportunity prior to finalization of design; for each review there will be a minimum 30-day review period. | C | FEIS, App J |
| 65. | Complete additional archaeological investigations of the LOD in the general vicinity of the Montgomery County Poor Farm adjacent to I-270 near Wootton Parkway. | C | FEIS, App J |
| 66. | Improve the stormwater drainage on the First Agape African Methodist Episcopal (AME) Zion Church (Gibson Grove Church) by routing drainage into a new underground culvert to be installed as part of the project. MDOT SHA will ensure a parking lot identified as part of the church's restoration plan, is constructed on church property following installation of the culvert drainage design. MDOT SHA will work with the church on schedule and timing of the culvert and parking lot work to be compatible with ongoing church restoration efforts to the maximum extent practicable. | M | FEIS, App J |

00000575

| | NOISE[1] | | |
|---|---|---|---|
| 67. | Extended noise barrier (Barrier System VA-1/2) from STA 86+29 to STA 98+85 LT. | M | CH 5, 5.9.4 |
| 68. | Construct new noise barrier (Barrier System MD-1) from STA 131+13 to STA 145+18 LT. | M | CH 5, 5.9.4 |
| 69. | Construct new noise barrier (Barrier System MD-2) from STA 130+62 to STA 198+51 RT. | M | CH 5, 5.9.4 |
| 70. | Relocate and extend existing noise barrier (Barrier System MD-3) from STA 158+10 to STA 211+97 LT. | M | CH 5, 5.9.4 |
| 71. | Construct new noise barrier (Barrier System MD-4) from STA 198+13 to STA 221+68 RT. | M | CH 5, 5.9.4 |
| 72. | Relocate and extend existing noise barrier (Barrier System MD-5) from STA 227+21 to STA 293+76 LT. | M | CH 5, 5.9.4 |
| 73. | Relocate and extend existing noise barrier (Barrier System MD-6/6A/7) from STA 221+56to STA 293+24 RT. | M | CH 5, 5.9.4 |
| 74. | Relocate existing noise barrier (Barrier System MD-8) from STA 294+12 to STA 319+61 RT. | M | CH 5, 5.9.4 |
| 75. | Relocate existing noise barrier (Barrier System MD-10) from STA 337+75 to STA 355+06 LT. | M | CH 5, 5.9.4 |
| 76. | Relocate and extend existing noise barrier (Barrier System MD-11) from STA 320+42 to STA 354+78 RT. | M | CH 5, 5.9.4 |
| 77. | Partially relocate and extend existing noise barrier (Barrier System 270-05) from STA 3432+67 to STA 3490+25 LT. | M | CH 5, 5.9.4 |
| 78. | Construct new noise barrier (Barrier System 270-06) from STA 3493+65 to STA 3538+71 LT. | M | CH 5, 5.9.4 |
| 79. | Relocate existing noise barrier (Barrier System 270-07A) from STA 3685+15 to STA 4710+91 LT. | M | CH 5, 5.9.4 |
| 80. | Partially relocate existing noise barrier (Barrier System 270-07B) from STA 4710+91 to STA 4748+02 LT. | M | CH 5, 5.9.4 |
| 81. | Construct new noise barrier (Barrier System 270-08) from STA 4750+11 to STA 4804+26 LT. | M | CH 5, 5.9.4 |
| 82. | Extended existing noise barrier (Barrier System 270-09) from STA 4751+67 to STA 4801+90 RT. | M | CH 5, 5.9.4 |
| 83. | Extended existing noise barrier (Barrier System 270-11 (270 west spur portion)) from STA 3743+50 to STA 3778+34 LT. | M | CH 5, 5.9.4 |
| 84. | Partially relocate and extend existing noise barrier (Barrier System 270-12) from STA 3749+46 RT to STA 294+47 LT. | M | CH 5, 5.9.4 |
| 85. | Partially relocate and extend existing noise barrier (Barrier System 270-14) from STA 3492+05 to STA 3540+07 RT. | M | CH 5, 5.9.4 |
| 86. | Relocate and extend existing noise barrier (Barrier System 270-15) from STA 3624+55 to STA 3684+02 LT. | M | CH 5, 5.9.4 |
| 87. | Construct new noise barrier (Barrier System 270-18) from STA 3722+12 to STA 3727+46 RT. | M | CH 5, 5.9.4 |

---

[1] A preliminary determination of the location and horizontal and vertical alignment for the noise barriers was made based on the latest design concept (Table 5 20); however, final determination of noise barrier feasibility, reasonableness, dimensions and locations will be made in final design.

00000576


I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| | AQUATIC AND TERRESTRIAL MITIGATION COMMITMENTS | | |
|---|---|---|---|
| 88. | Implement additional water quality protection measures to prevent soil erosion and subsequent sediment influx into nearby waterways. Construction contractors are designated as co-permittees on the National Pollutant Discharge Elimination System permit to ensure compliance. This permit is issued under Maryland's General Permit for construction activities and is implemented with a regular inspection program for construction site sediment control devices that includes penalties for inadequate maintenance. To ensure compliance, onsite evaluations by a certified erosion and sediment control (E&S) inspector would occur throughout the duration of construction. | C | CH 5, 5.11.4 |
| 89. | Potential water quality impacts from construction would be minimized through strict adherence to mandated E&S and SWM requirements. In particularly sensitive areas, other impact minimization activities may be considered and could include: more specialized SWM options; redundant E&S measures; monitoring of aquatic biota above and below sensitive stream crossings before and after construction to quantify any inadvertent impacts that occur at the crossing; fish relocation from dewatered work areas during construction to reduce fish mortality; and use of a qualified environmental monitor on-site to enhance E&S compliance. | C | CH 5, 5.18.4 |
| 90. | Continue coordination with MDNR and the Scenic and Wild River Advisory Board in final design. | C | CH 5, 5.13.4 |
| 91. | Account for post-construction SWM and compliance with total maximum daily loads in the stormwater design and water quality monitoring to comply with required permits. | C | CH 5, 5.13.4 |
| 92. | Develop environmental site design SWM features to maintain current infiltration rates to the greatest extent practicable. | C | CH 5, 5.14.4 |
| 93. | Design all hydraulic structures to accommodate flood flows without causing substantial impact. | C | CH 5, 5.15.4 |
| 94. | Design culverts and bridges to limit the increase of the regulatory flood elevation to protect structures from flooding risks and use standard hydraulic design techniques for all waterway openings where feasible to maintain current flow regimes and limit adjacent flood risk (COMAR 26.17.04). | C | CH 5, 5.15.4 |
| 95. | Remove the existing peregrine falcon nest box on the ALB just prior to the nesting season when construction is scheduled to begin to minimize potential impacts to the currently nesting peregrine falcons as recommended by the US Fish and Wildlife Service (USFWS).  Disruption for one or more nesting seasons due to long-term construction activities is anticipated. Once construction activities are nearly complete near the former nest site, USFWS recommends that the nest box be reinstalled. MDOT SHA will follow the USFWS recommended protection measures for the peregrine falcon nesting on the ALB. | C | CH 5, 5.17.4 |
| 96. | Adopt and implement construction best management practices (BMPs) to minimize incidental take of migratory birds. MDOT SHA commits to consulting with the USFWS immediately prior to construction to determine the presence/absence of bald eagle nests in the vicinity of the Preferred Alternative LOD. | C | CH 5, 5.17.4 |
| 97. | Use of bridges and depressed culverts wherever possible to maintain natural stream substrate in areas where new or replaced culverts are necessary. Channel morphology would be evaluated, and culvert extensions | C | CH 5, 5.18.4 |

00000577



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

|  | | | |
|---|---|---|---|
|  | designed to maintain aquatic life passage by avoiding downstream scour and channel degradation. Preliminary designs do not include culvert replacements but do include augmentations resulting from installing new pipes adjacent to existing culverts to provide additional area for flow. | | |
| 98. | Comply with the stream closure period for the designated use class of the stream for all in-stream work in Maryland, including that for culvert extensions, and any potential waiver requests would require agency approval(s). In-stream work is prohibited in Use I streams from March 1 through June 15. | C | CH 5, 5.18.4 |
| 99. | Conduct a mussel survey in the Potomac River surrounding the ALB, 10-meters upstream and 25-meters downstream of the temporary project LOD, for all Maryland State-listed mussel species that are short-term and long-term brooders prior to construction and relocation of Maryland State-listed and rare species, if necessary. | C | CH 5, 5.18.4 |
| 100. | Design causeways and trestles proposed adjacent to the existing ALB to avoid impacting fish passage by maintaining river velocities below approximately 3 feet per second at commonly observed discharges (e.g., below 90 percentile) during the period in which anadromous fish are spawning (February 15 – June 15). Trestles or other non-fill accessways will be used in areas of deeper water (e.g., extending from the southern bank) to the extent practicable to minimize fill and associated flow restrictions. | C | CH 5, 5.18.4 |
| 101. | Maintain access to Plummers Island for construction purposes by bridging over the oxbow of the Potomac River without placing any materials or fill within the stream channel. | C | CH 5, 5.19.4 |
| 102. | Voluntarily commit to a time of year restriction for tree clearing from May 1 through July 31 of any year within a 3-mile buffer around each of the three positive Northern Long-Eared Bat (NLEB) detection locations within the study corridors to go above and beyond what is required to protect this bat species. Note, the Study was determined to have "no effect" on the Indiana Bat and "not likely to adversely affect" the NLEB. | C | CH 5, 5.19.4 |
| 103. | Commit to a time of year restriction for tree clearing within the Virginia portion of the Preferred Alternative LOD from April 1 – October 31 of any year to avoid impact to tri-colored bat roost trees during roosting season. | C | CH 5, 5.19.4 |
| 104. | Continue coordinating with NPS and MDNR to determine a mitigation plan for RTE plant species prior to construction. This will include the use of matting along access roads to minimize soil compaction during construction, replanting of appropriate RTE plants within temporarily disturbed areas following construction, and monitoring of replanted RTE plant populations to ensure successful reestablishment. | M | CH 5, 5.19.4 |

00000578

| | | | |
|---|---|---|---|
| 105. | Commit to avoidance and minimization measures for the wood turtle as recommended by the Virginia Department of Wildlife Resources (VDWR):<br>• Prior to the commencement of work all contractors associated with work at this site must be made aware of the possibility of encountering wood turtles on site and become familiar with their appearance, status and life history.<br>• If any wood turtles are encountered and are in jeopardy during the development or construction of this project, remove them from immediate harm and call VDWR. Any relocations should be reported to VDWR, and the wood turtle observation form should be completed and faxed to VDWR.<br>• Minimize potential wildlife entanglements, resulting from use of synthetic/plastic E&S matting, by use matting made from natural/organic materials such as coir fiber, jute, and/or burlap. | C | CH 5, 5.19.3 |
| 106. | Continue coordination with National Marine Fisheries Service to determine appropriate mitigation for potential impacts to anadromous fish during construction. | C | CH 5, 5.18.4 |
| 107. | Maintain existing or improved aquatic life passage in the culverts conveying Watts Branch and Old Farm Creek under I-270. | C | CH 5, 5.18.4 |
| 108. | Consult 23 CFR § 650.115(a) when determining design standards for flood control measures. | C | CH 5, 5.15.4 |
| 109. | Comply with the requirement set forth in 23 CFR § 650.111 to complete location hydraulic studies for floodplain encroachment areas during later stages of design. | C | CH 5, 5.15.4 |
| 110. | Avoid and minimize impact to aquatic species by:<br>• Maintaining existing or improving aquatic life passage in the primary (not overflow) culverts that are being replaced or extended and continuing to coordinate with MDNR, USFWS, the National Marine Fisheries Service (NMFS), and the Maryland Department of the Environment (MDE) regarding aquatic life passage.<br>• Designing completely replaced culverts designated as "major stream crossing" to meet the passage criteria described by USFWS (USFWS, 2019b).<br>• Evaluating areas where culverts are being extended or augmented for the feasibility of a natural or nature-like stream bottom, in design.<br>• Implementing BMPs during the replacement of the ALB crossing the Potomac River such as extensive in-stream work and using coffer dams and temporary construction trestles to avoid and minimize impacts to the river and its aquatic biota. | C | CH 5, 5.18.4 |
| 111. | Consult with NMFS and MDNR when construction plans are developed for roadway crossings of the Potomac River and Cabin John Creek, the two known anadromous fish use areas, to ensure that impacts due to construction and permanent fill are minimized to the extent practicable. | C | CH 5, 5.18.4 |
| 112. | Comply with COMAR 26.17.04.11 by ensuring culvert improvements and new culvert design will not increase flood risk to adjacent properties. | C | CH 5, 5.15.4 |

00000579



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| | | | |
|---|---|---|---|
| 113. | Submit final plans to MDE for approval of structural evaluations, fill volumes, proposed grading evaluations, structural flood-proofing, and flood protection measures in compliance with FEMA requirements, US Department of Transportation Order 5650.2, Floodplain Management and Protection, and Executive Order 11988. | C | CH 5, 5.15.4 |
| 114. | Employ BMPs within the 100-year floodplain as required by MDE permits. | C | CH 5, 5.15.4 |
| 115. | Ensure water quantity treatment be met onsite or through waiver requests in specific areas. Every effort to meet water quality treatment requirements onsite, where practicable will be made. Where not practicable, water quality requirements would be met offsite in accordance with MDE regulations. | C | CH 3, 3.1.6 and CH 5, 5.13.4 |
| **ENVIRONMENTAL JUSTICE/EQUITY** | | | |
| 116. | MDOT SHA and the Developer will continue coordination with local and regional advisory groups to determine additional methods for engaging with underserved communities. This will be an ongoing effort that continues post-NEPA, through final design and construction. | C | CH 5, 5.21.7 and CH 8, 8.2.3 |
| 117. | Construct a new sidewalk along the west side of Seven Locks Road under I-495 to re-establish a connection between Morningstar Tabernacle No. 88 Moses Hall and Cemetery and First Agape AME Zion Church (Gibson Grove Church) in the historically African American community of Gibson Grove, see commitment ID No. 125. | C | CH 5, 5.3.3, 5.21.6, and 5.21.7 |
| 118. | Convey a portion of existing MDOT SHA owned right-of-way located adjacent to the boundary of Morningstar Tabernacle No. 88 Moses Hall and Cemetery with an identified potential for unmarked graves to the Trustees of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. | C | N/A |
| 119. | Continue coordination with the City of Rockville, City of Gaithersburg, and Montgomery County to advance the identified priorities that were noted during EJ engagement efforts including more or improved sidewalks and bicycle facilities; better lighting on streets and sidewalks; and traffic calming measures to make streets safer. Through this continued coordination, MDOT SHA with the Developer will:<br>• Identify locations where safer pedestrian crossings on major state roadways are needed.<br>• Identify locations where additional pedestrian improvements including adding or upgrading sidewalk, restriping for bicycle lanes, adding or upgrading ADA ramps are needed.<br>• Identify locations along state roads with existing pedestrian facilities where more or better lighting is needed. | C | CH 5, 5.21.7 |
| **TOLLING** | | | |
| 120. | The toll rate ranges will only apply to the high-occupancy toll (HOT) lanes; the existing free general-purpose lanes will not be tolled. In addition, the proposal will include discounts for qualifying vehicles—including HOV 3+ (including carpools and vanpools), buses and motorcycles. | C | CH 3, 3.1.9 |

00000580

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| | TRANSIT | | |
|---|---|---|---|
| 121. | Enhance transit mobility and connectivity within the Preferred Alternative including the following elements:<br>• Free bus transit usage of the HOT managed lanes to provide an increase in speed of travel, assurance of a reliable trip, and connection to local bus service/systems on arterials that directly connect to activity and economic centers.<br>• Direct and indirect connections from the proposed HOT managed lanes to existing transit stations and planned Transit Oriented Development at the Shady Grove Metro (I-370), Twinbrook Metro and Rockville Metro (Wootton Parkway), and Westfield Montgomery Mall Transit Center (Westlake Terrace). | C | CH 3, 3.1.4 |
| 122. | Increase the number of bus bays at Washington Metropolitan Area Transit Authority's Shady Grove Metrorail Station. | C | CH 3, 3.2.1 |
| 123. | Increase parking capacity at the Westfield Montgomery Mall Transit Center. | C | CH 3, 3.2.1 |
| 124. | Design and construct the ALB such that a future capital improvement project will have one or more feasible options to achieve the full design and implementation of a transit line across the ALB. These options will be enabled by designing the northbound and southbound structures to not preclude a possible future transit line including the addition of foundation and substructure elements. | C | CH 3, 3.1.4 |
| | PEDESTRIAN AND BICYCLE FACILITIES | | |
| 125. | Replace in kind or upgrade to meet the current master plan recommended facilities for existing pedestrian and bicycle facilities impacted by the Preferred Alternative, through coordination with the local agencies having jurisdiction over and/or maintenance responsibility for these facilities. | C | CH 3, 3.1.5 |
| 126. | Replace, upgrade, or provide new pedestrian/bicycle facilities consistent with the current master plan, where adjacent connections on either side of the bridge currently exist for facilities along crossroads where the crossroad bridge would be reconstructed. Where the I-495 and I-270 mainline or ramps cross over a roadway or pedestrian/bicycle facility and the bridge would be replaced, the mainline and ramp bridges would be lengthened to accommodate the footprint for the master plan facility under the structure. | C | CH 3, 3.1.5 |
| 127. | Reconstruct the ALB with a new pedestrian and bicycle shared use path to provide multimodal connectivity across the Potomac River, to be located along the east side of the ALB. A direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative LOD and impact analyses. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the study area. | C | CH 3, 3.2.2 |
| 128. | Widen the existing variable-width sidepath along the east side of Seven Locks Road under I-495 (Cabin John Trail). | C | CH 3, 3.2.2 |

00000581



I-495 & I-270 Managed Lanes Study

*Final Environmental Impact Statement*

| 129. | Construct a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection between First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall and Cemetery. see commitment ID No. 114. | C | CH 3, 3.2.2 |
|---|---|---|---|
| | **AIR QUALITY** | | |
| 130. | Implement a Diesel Emissions Reduction Program that exceeds pertinent Federal and state regulations to minimize air pollution including MSAT emissions during construction consisting of initiatives such as:<br>• Ensuring diesel powered construction equipment to meet minimum emissions reduction requirements by engine manufacturer, or by being properly retrofitted with emissions control devices, or that clean fuels be used if necessary to meet the emissions reduction requirements.<br>• Retrofitting equipment that is used to be on the EPA Verified Retrofit Technology List.<br>• Requiring the use of ultra-low sulfur diesel fuel in construction equipment.<br>• Implementing a Driver Training program to provide incremental savings by more efficiently operating mobile and stationary machinery. | C | CH 5, 5.8.4 |
| 131. | Implement a Truck Staging Area Plan for all construction vehicles waiting to load or unload material where emissions will have the least impact on sensitive areas and the public. These include but not limited to hospitals, schools, residences, motels, hotels, daycare facilities, elderly housing and convalescent facilities. All sources of emissions shall be located as far away as possible from fresh air intakes, air conditioners and windows. | C | CH 5, 5.8.4 |
| 132. | Implement a Greenhouse Gas Reduction Program to reduce emissions during construction including initiatives such as:<br>• Use of alternative fuels and vehicle hybridization of construction vehicles, to the maximum extent practicable.<br>• Maintaining existing vegetation, where possible.<br>• Use of recycled and reclaimed materials, including use of recycled asphalt, use of industrial byproducts as cement substitutes, and recycled concrete, to the maximum extent practicable. | C | CH 5, 5.8.4 |
| 133. | Implement an Anti-Idling Policy to avoid unnecessary idling of construction equipment in order to reduce engine emissions and to provide air quality benefits to those who live and work in or adjacent to the construction sites. The plan may include, but is not limited to, limiting idling of all mobile construction equipment, including delivery trucks, to three minutes, except under certain conditions. | C | CH 5, 5.8.4 |
| 134. | Manage fugitive dust emissions during construction, by use some or all of the following dust control measures, to minimize and mitigate, to the greatest extent practicable, impacts to air quality:<br>• Minimize land disturbance<br>• Cover trucks when hauling soil, stone, and debris (MDE Law)<br>• Use water trucks to minimize dust | M | CH 5, 5.23.3 |

00000582



I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

| | | | |
|---|---|---|---|
| | • Use dust suppressants if environmentally acceptable<br>• Stabilize or cover stockpiles<br>• Construct stabilized construction entrances per construction standard specifications<br>• Regularly sweep all paved areas including public roads<br>• Stabilize onsite haul roads using stone<br>• Temporarily stabilize disturbed areas per MDE erosion and sediment standards and approved plans | | |
| **VISUAL** | | | |
| 135. | Install new white legend and border on brown background guide signs along I-495 for the George Washington Memorial Parkways exit. | M | CH 5, 5.6.4 |
| 136. | Establish and follow aesthetic and landscaping guidelines of all highway elements in consultation with the local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state, and Federal agencies. The Developer will be responsible for establishing the aesthetic and landscaping guidelines. | C | CH 5, 5.6.4 |

00000583



## 7.3   P3 Agreement Commitments

Following the NEPA Process, the Developer will continue to further avoid and minimize impacts throughout the remainder of the design process to the greatest extent practicable. Monetary incentives have been added to the Developer's Technical Provisions to encourage further avoidance and minimization of impacts to wetlands, waterways, forest, and parkland.  MDOT SHA and the Developer will develop an Environmental Management Plan and an Environmental Compliance Plan.

To support community, environmental, and sustainability goals, the Developer will generate a Sustainability Plan for the project and will make good faith efforts to achieve, at minimum, a Gold Award rating as recognized by the Envision™ Sustainable Infrastructure Rating System of the Institute for Sustainable Infrastructure and target a Platinum Award. The Sustainability Plan will include actions related to the quality of life surrounding the infrastructure asset, stakeholder and community engagement, natural resource management, ecosystems and biodiversity health, climate resilience and carbon emissions. The Developer also has a goal of exceeding the stormwater quality protection enhancements for the Project by providing additional stormwater quality mitigation beyond the regulatory requirements.

The Developer has proposed an estimated $300 million for transit services in Montgomery County over the operating term of Phase 1 South. The exact investments would be determined as part of the Section P3 Agreement for Phase 1 South.

The Developer has also committed to working with Montgomery, Frederick, and Prince George's Counties to expand transit fare subsidies for eligible low-income riders.  Additionally, upon financial close of the Section P3 Agreement for Phase 1 South, MDOT is committed to fund not less than $60 million from the Development Rights Fee provided by the Developer for the design and permitting of high priority transit investments in Montgomery County and MDOT is committed to deliver the Metropolitan Grove Operations and Maintenance Facility including the necessary bus fleet.

The Developer has also proposed to fund priority bicycle and pedestrian connections to remove barriers and provide connectivity for bicyclists and pedestrians as part of its commitment to support Vision Zero, and beyond commitments identified in **Section 7.2** by:

- Defining a neighborhood walk and cycle connectivity zone to enhance multi-model connectivity.
- Facilitating the development of a facility improvement program for the installation or replacement of sidewalks, crossings, or signal modifications and formalizing trail development that has pedestrian demand, then rank projects according to safety significance (considering predictive safety analyses completed by M-NCPPC), readiness, and landowner consensus, as part of its commitment to support Vision Zero.

The exact investments from the Developer would be determined as part of the Section P3 Agreement for Phase 1 South.

00000584

 I-495 & I-270 Managed Lanes Study

Final Environmental Impact Statement

# 8   PUBLIC INVOLVEMENT AND AGENCY COORDINATION

Outreach to and engagement with the public, stakeholders and agencies has continued since the publication of the Draft Environmental Impact Statement (DEIS) in July of 2020, including the outreach associated with the Supplemental DEIS (SDEIS). The following provides an overview of the extensive outreach and engagement that has occurred over the course of the I-495 & I-270 Managed Lanes Study (Study).

DEIS, Chapter 7:  https://www.oplanesmd.com/wp-content/uploads/2020/11/2020-06-02_DEIS_07_PIA_Coordination.pdf

DEIS, Appendix P:  https://www.oplanesmd.com/wp-content/uploads/2020/07/DEIS_AppP_PITR_web.pdf

SDEIS, Chapter 7: https://oplanesmd.com/wp-content/uploads/2021/09/SDEIS_07_PI-Agency-Coord.pdf

This Final Environmental Impact Statement (FEIS) chapter summarizes and updates coordination from July 2020 through April 2022, including:

- The public involvement efforts during the DEIS and SDEIS Comment Periods, including specific outreach to environmental justice populations,
- Stakeholder and community engagement,
- Agency coordination that has occurred related to the National Environmental Policy Act (NEPA), Permitting, Section 106 and Section 4(f) coordination; and
- Incorporation of public, agency and stakeholder comments into the study.

## 8.1   Introduction

A comprehensive public involvement and agency coordination program has been conducted throughout the Study. This chapter summarizes the outreach, engagement, and agency consultation that has occurred since publication of the DEIS on July 10, 2020, includes the outreach and engagement that occurred with the publication of the SDEIS on October 1, 2021, and includes an update since the SDEIS to publication of this FEIS. Detailed public involvement and agency coordination efforts that occurred from publication of the Notice of Intent in 2018 to publication of the DEIS in 2020 are included in **DEIS, Appendix P**, *Public Involvement and Agency Coordination Technical Report.*

This chapter also summarizes the key ways in which the lead agencies were responsive to public, stakeholder and agency comments including, but not limited to, identifying a Preferred Alternative that avoids all residential and business displacements and significantly avoids and minimizes impacts to natural, cultural and community resources, incorporating commitments to further enhance the environment and water quality, improve bicycle and pedestrian connectivity, and support transit connectivity and mobility. Refer to **Chapters 3** and **5** and **Section 8.4** of this Chapter for more details.

Additional details on the public involvement efforts, outreach materials, summaries from the public meetings, and agency coordination, summarized in the subsequent sections, is provided throughout the *Final Public Involvement and Agency Coordination Technical Report* (**FEIS, Appendix R**). Additional detail

00000585

on select agency correspondence received on the project is provided in the *Select Agency Correspondence Technical Report* (**FEIS, Appendix S)**.

## 8.2   Public Involvement

### 8.2.1   DEIS Notice of Availability and Comment Period

The DEIS was published on July 10, 2020 and was made available on the I-495 & I-270 Public-Private Partnership (P3) Program webpage (https://oplanesmd.com/DEIS/) and on the US Environmental Protection Agency (USEPA) Environmental Impact Statement (EIS) Database webpage. The DEIS comment period was 123-days, from July 10, 2020 to November 9, 2020.

Opportunities to comment on the DEIS were provided by the following ways:

- Oral testimony at the In-Person or Virtual Public Hearings
- Private oral testimony to a court reporter at an In-Person Public Hearing in a separate room
- Online DEIS comment form at https://oplanesmd.com/DEIS/
- Email to MLS-NEPA-P3@mdot.maryland.gov
- Written comments on a comment form at an In-Person Public Hearing
- Letters to Lisa B. Choplin, DBIA, I-495 & I-270 P3 Program Director, I-495 & I-270 P3 Office, 707 North Calvert Street, Mail Stop P-601, Baltimore MD 21202
- Call-in line to provide verbal comment through voicemail

Four virtual or online hearings were held during the DEIS Comment Period on the following days:

- Tuesday, August 18, 2020
- Thursday, August 20, 2020
- Tuesday, August 25, 2020
- Thursday, September 3, 2020

Two in-person hearings were held during the DEIS Comment Period on:

- Tuesday, September 1, 2020
- Thursday, September 10, 2020

To provide persons without electronic access to view the DEIS in hard copy, the Maryland Department of Transportation State Highway Administration (MDOT SHA) and the Federal Highway Administration (FHWA) employed innovative approaches due to widespread closures of many public facilities, including libraries, caused by the global COVID-19 pandemic. Due to the closures of public facilities, temporary facilities to house the DEIS for public review were provided at eight community-based public library parking lot locations along the study corridors, as well as one location in Washington, DC. Lobbies at six centrally-located post offices in Montgomery and Prince George's Counties were also used for DEIS viewing locations. Locations were available during the week and weekend days, with day and evening hours to provide adequate options for the public to view the documents. Lastly, six select MDOT SHA, Maryland Transportation Authority (MDTA), and Virginia Department of Transportation (VDOT) offices within or near the study area were also open to the public for viewing of the DEIS and Technical Reports. Each DEIS viewing location was compliant with the Americans with Disabilities Act (ADA) and equipped with required Personal Protective Equipment, including masks, hand sanitizers, and antibacterial cleaning solution. A strict safety protocol, in compliance with the State-mandated COVID-19 guidelines, was

00000586