

I-495 & I-270 Managed Lanes Study

# APPENDIX F
# FINAL COMMUNITY EFFECTS ASSESSMENT
# AND ENVIRONMENTAL JUSTICE ANALYSIS
# TECHNICAL REPORT
## June 2022



U.S. Department
of Transportation
**Federal Highway
Administration**



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION



## TABLE OF CONTENTS

1    INTRODUCTION ......................................................................................................... 1
  1.1    Overview ......................................................................................................... 1
  1.2    Study Corridors and the Preferred Alternative .............................................. 1
  1.3    Description of the Preferred Alternative ........................................................ 2
2    METHODOLOGY ...................................................................................................... 4
  2.1    CEA Analysis Area ........................................................................................... 4
  2.2    Data Collection ................................................................................................ 5
  2.3    Analysis of Environmental Consequences and Mitigation.............................. 8
3    EXISTING CONDITIONS AND ENVIRONMENTAL CONSEQUENCES ................................. 1
  3.1    Land Use and Zoning, Planning, and Development ......................................... 1
    3.1.1    Existing Conditions .............................................................................. 1
    3.1.2    Environmental Consequences............................................................. 10
  3.2    Population and Demographics ....................................................................... 13
    3.2.1    Existing Conditions ............................................................................ 13
    3.2.2    Environmental Consequences............................................................. 18
    3.2.3    Mitigation........................................................................................... 19
  3.3    Economic, Employment, and Commuting Characteristics.............................. 19
    3.3.1    Existing Conditions ............................................................................ 19
    3.3.2    Environmental Consequences............................................................. 27
    3.3.3    Mitigation........................................................................................... 28
  3.4    Housing ......................................................................................................... 29
    3.4.1    Existing Conditions ............................................................................ 29
    3.4.2    Environmental Consequences............................................................. 31
    3.4.3    Mitigation........................................................................................... 31
  3.5    Community Facilities ...................................................................................... 31
    3.5.1    Existing Conditions ............................................................................ 31
    3.5.2    Environmental Consequences............................................................. 36
    3.5.3    Mitigation........................................................................................... 37
  3.6    Property Acquisitions .................................................................................... 38
    3.6.1    Existing Conditions ............................................................................ 38

00005137

OP·LANES™
M A R Y L A N D    I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment & EJ Analysis Technical Report

| | | |
|---|---|---|
| 3.6.2 | Environmental Consequences | 38 |
| 3.6.3 | Mitigation | 41 |
| **4** | **COMMUNITY PROFILES AND CONSEQUENCES** | **42** |
| 4.1 | CEA Analysis Area Communities | 42 |
| 4.2 | What are the Community Profiles? | 42 |
| 4.3 | Summary of Environmental Consequences to Communities | 42 |
| **5** | **ENVIRONMENTAL JUSTICE ANALYSIS** | **45** |
| 5.1 | Environmental Justice Analysis Regulatory Context | 45 |
| 5.2 | Environmental Justice Analysis Methodology | 46 |
| 5.2.1 | Environmental Justice Analysis Area | 47 |
| 5.2.2 | Identification of Minority Race and Ethnicity Populations | 48 |
| 5.2.3 | Identification of Low-Income Populations | 48 |
| 5.3 | Historical Context | 50 |
| 5.4 | Existing Conditions of Environmental Justice Populations | 51 |
| 5.4.1 | Existing Minority Race and Ethnicity Populations | 51 |
| 5.4.2 | Existing Low-Income Populations | 55 |
| 5.4.3 | Summary: Total Environmental Justice Populations | 57 |
| 5.4.4 | Supplemental Community Data | 59 |
| 5.4.5 | Summary of the Existing Conditions of Environmental Justice Populations | 69 |
| 5.5 | Public Outreach with Environmental Justice Populations | 71 |
| 5.5.1 | Publication of DEIS, Public Hearings, and Associated Comment Period | 71 |
| 5.5.2 | Publication of SDEIS, Public Hearing, and Associated Comment Period | 72 |
| 5.5.3 | Environmental Justice Working Group and Environmental Justice Engagement Initiatives | 76 |
| 5.6 | Identification of Beneficial and/or Adverse Impacts to Environmental Justice Populations & Consideration of Mitigation or Community Enhancement Measures | 79 |
| 5.6.1 | No Build Alternative | 79 |
| 5.6.2 | Preferred Alternative | 80 |
| 5.7 | Comparison of Adverse Impacts to Environmental Justice Populations versus Non-Environmental Justice Populations | 101 |
| 5.8 | Determination of whether Disproportionately High and Adverse Impacts would Occur to Environmental Justice Populations under the Preferred Alternative | 108 |
| **6** | **REFERENCES** | **113** |

00005138



I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment & EJ Analysis Technical Report

## LIST OF TABLES

Table 2-1: CEA Analysis Area Communities and Included Census Block Groups .......................................... 7

Table 3-1: Comprehensive, Master, and Sector Plans ................................................................. 5

Table 3-2: Land Use Permanently Converted to Transportation Right-of-Way for the Preferred Alternative ................................................................................................................................. 11

Table 3-3: Historic and Projected Population in Fairfax County, Montgomery County, and Maryland ..... 14

Table 3-4: Major Montgomery County Employers in CEA Analysis Area .................................................. 20

Table 3-5: Means of Transportation to Work ............................................................................... 22

Table 3-6: Top 30 Employment Destinations for Workers Who Live in the CEA Analysis Area ................. 24

Table 3-7: Top 30 Home Destinations for Workers Employed in the CEA Analysis Area .......................... 26

Table 3-8: Local Property Tax Rates and Revenue .......................................................................... 27

Table 3-9: Impacts to Community Facility Properties from the Preferred Alternative .............................. 36

Table 3-10: Summary of Right-of-Way Acquisitions and Impacts from the Preferred Alternative ............ 39

Table 3-11: Property Impacts by Geographic Area ........................................................................ 40

Table 4-1: Property Impacts in Analysis Area Communities ............................................................... 43

Table 5-1: HUD 2019 Low-Income Limit for the Washington-Arlington-Alexandria, ................................. 49

Table 5-2: Race and Ethnicity Characteristics of Block Groups within the EJ Analysis Area ...................... 52

Table 5-3: EJ Analysis Area Household Income Characteristics .............................................................. 55

Table 5-4: Total Environmental Justice Populations ........................................................................ 57

Table 5-5: Block Groups within the EJ Analysis Area with Above-Average LEP Households ...................... 63

Table 5-6: EJ Analysis Area Schools with Above-Average Free and Reduced Lunch Program Participation ................................................................................................................................. 64

Table 5-7: Affordable Housing Complexes in the EJ Analysis Area .......................................................... 66

Table 5-8: EJ Analysis Area Populations with Above-Average Households Utilizing Food Stamps/SNAP .. 66

Table 5-9: Block Groups within EJ Analysis Area that Overlap with Equity Emphasis Areas ...................... 67

Table 5-10: Non-EJ Populations Identified for Additional EJ Engagement via Supplemental Data ........... 69

Table 5-11: Environmental Justice Working Group Meetings and Coordination ...................................... 76

Table 5-12: Property Impacts in Environmental Justice Populations ..................................................... 80

Table 5-13: Impacts to Public Parks, Public Parks with Historic Properties, and Historic Sites* (Section 4(f) Properties) in Environmental Justice Populations ................................................................................. 81

Table 5-14: HOT Lanes Direct Access Locations in EJ Populations ........................................................... 83

Table 5-15: Impacted NSAs and Corresponding Noise Barrier Systems in EJ Populations .......................... 88

Table 5-16: Natural Resource Impacts in EJ Populations .................................................................... 90

Table 5-17: Hazardous Materials Sites of Concern in EJ Populations ..................................................... 92

Table 5-18: HOT Lanes Access Construction Locations in EJ Populations .................................................. 97

Table 5-19: Comparison of Effects to EJ Populations versus Non-EJ Populations .................................... 101

## LIST OF FIGURES

Figure 1-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative ...................................... 2

Figure 1-2: Preferred Alternative Typical Sections (HOT Managed lanes Shown in Yellow) ......................... 3

Figure 2-1: CEA Analysis Area Communities ................................................................................... 6

00005139

 I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment & EJ Analysis Technical Report

Figure 3-1: CEA Analysis Area Land Use Distribution...................................................................................... 2
Figure 3-2: Land Use within the CEA Analysis Area ...................................................................................... 3
Figure 3-3: Smart Growth Priority Funding Areas......................................................................................... 9
Figure 3-4: Population Distribution Among CEA Analysis Area Communities  ........................................... 14
Figure 3-5: Population Density within the CEA Analysis Area .................................................................... 15
Figure 3-6: Age Distribution by Sex............................................................................................................ 16
Figure 3-7: Household Income .................................................................................................................... 17
Figure 3-8: Race and Ethnicity Characteristics of the CEA Analysis Area.................................................. 18
Figure 3-9: Occupations of Employed CEA Analysis Area Residents.......................................................... 20
Figure 3-10: CEA Analysis Area Residents' Top 100 Employment Destinations ........................................ 23
Figure 3-11: CEA Analysis Area Workers' Top 100 Home Destinations...................................................... 25
Figure 3-12: CEA Analysis Area Housing Unit Build Year ........................................................................... 29
Figure 3-13: CEA Analysis Area Housing Type by Tenure ........................................................................... 30
Figure 3-14: MARC and Metrorail Transit within the CEA Analysis Area................................................... 35
Figure 5-1: Environmental Justice Populations........................................................................................... 58
Figure 5-2: Maryland EJSCREEN EJScore for Census Tracts in the Analysis Area....................................... 62
Figure 5-3: Equity Emphasis Areas and Environmental Justice Populations ............................................. 68

## LIST OF APPENDICES

**Appendix A**   CEA Analysis Area Environmental Mapping
**Appendix B**   Zoning and Land Use Classification Table
**Appendix C**   Smart Growth Consistency Coordination Checklists
**Appendix D**   Community Profiles
**Appendix E**   Uniform Relocation Assistance Act
**Appendix F**   EJScreen Data and Mapping
**Appendix G**   EJ-Related Public Involvement Materials
**Appendix H**   EJ Engagement Initiatives Summary Report

00005140

# 1    INTRODUCTION

## 1.1    Overview

The Federal Highway Administration (FHWA), as the Lead Federal Agency, and the Maryland Department of Transportation State Highway Administration (MDOT SHA), as the Local Project Sponsor, are preparing a Final Environmental Impact Statement (FEIS) in accordance with the National Environmental Policy Act (NEPA) for the I-495 & I-270 Managed Lanes Study (Study).  The I-495 & I-270 Managed Lanes Study (Study) is the first environmental study under the broader I-495 & I-270 Public-Private Partnership (P3) Program.

This Final Community Effects Assessment and Environmental Justice Analysis Technical Report has been prepared to support the FEIS and focuses on the analysis of the Preferred Alternative. The Preferred Alternative, also referred to as Alternative 9 – Phase 1 South, includes building a new American Legion Bridge and delivering two high-occupancy toll (HOT) managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to west of MD 187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from east of MD 187 to I-270. Refer to **Figure 1-1**. This Preferred Alternative was identified after extensive coordination with agencies, the public and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach.

The purpose of the Final Community Effects Assessment and Environmental Justice Analysis Technical Report is to present the existing conditions, an assessment of potential direct impacts of the Preferred Alternative to socioeconomic resources and final mitigation and community enhancements, if applicable. This Final Community Effects Assessment and Environmental Justice Analysis Technical Report builds upon the analysis in the Draft Community Effects Assessment and Environmental Justice Analysis Technical Report, DEIS and Supplemental DEIS (SDEIS), and has been prepared to support and inform the FEIS.

## 1.2    Study Corridors and the Preferred Alternative

In the SDEIS, published on October 1, 2021, FHWA and MDOT SHA identified the Preferred Alternative: Alternative 9 – Phase 1 South to be consistent with the previously determined phased delivery and permitting approach, which focuses on Phase 1 South. As a result, Alternative 9 – Phase 1 South includes the same improvements proposed as part of Alternative 9 in the DEIS but focuses the build improvements within the Phase 1 South limits only. The limits of Phase 1 South are along I-495 from the George Washington Memorial Parkway to west of MD 187 and along I-270 from I-495 to north of I-370 and on the I-270 east and west spurs as shown in **dark blue** in **Figure 1-1**. The improvements include two new HOT managed lanes in each direction along I-495 and I-270 within the Phase 1 South limits.  There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5 (shown in light blue in **Figure 1-1**). While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately and would be subject to additional environmental studies and analysis and collaboration with the public, stakeholders and agencies.

00005141

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

The 48-mile corridor Study limits remain unchanged: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, to west of MD 5 and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs in Montgomery and Prince George's Counties, Maryland (shown in both dark and light blue in **Figure 1-1**).

**Figure 1-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative**



## 1.3    Description of the Preferred Alternative

The Preferred Alternative includes a two-lane HOT managed lanes network on I-495 and I-270 within the limits of Phase 1 South only (**Figure 1-2**). On I-495, the Preferred Alternative consists of adding two, new HOT managed lanes in each direction from the George Washington Memorial Parkway to west of MD 187. On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5. Along I-270, the existing collector-distributor (C-D) lanes from Montrose Road to I-370 would be removed as part of the proposed improvements. The managed lanes would be separated from the general purpose lanes using pylons placed within a four-foot wide buffer. Transit buses and HOV 3+ vehicles would be permitted to use the managed lanes toll-free.

00005142



OP·LANES™
MARYLAND | I-495 & I-270 Managed Lanes Study | Final Community Effects Assessment & EJ Analysis Technical Report

**Figure 1-2: Preferred Alternative Typical Sections (HOT Managed lanes Shown in Yellow)**

I-495 from the George Washington Memorial Parkway to west of MD 187



I-495: American Legion Bridge (Looking north towards Maryland)



I-495 west of MD 187 to west of MD 5 - NO ACTION AT THIS TIME



I-270 from I-495 to I-370



00005143

OP·LANES
MARYLAND | I-495 & I-270 Managed Lanes Study | Final Community Effects Assessment & EJ Analysis Technical Report

## 2   METHODOLOGY

### 2.1   CEA Analysis Area

This Community Effects Assessment and Environmental Justice Analysis Technical Report defines and describes various existing community and socioeconomic conditions within the **CEA Analysis Area** surrounding the Preferred Alternative, Alternative 9 - Phase 1 South limits (**Figure 2-1**). The CEA Analysis Area was delineated to include all 2010 Census block groups[1] that are located within 0.25-mile to either side of the Phase 1 South limits in portions of Fairfax County, Virginia and Montgomery County, Maryland.[2] These Census block groups were then matched with the municipality or Census Designated Place (CDP) in which they were primarily located to define individual CEA Analysis Area Communities. As identified in **Table 2-1**, the CEA Analysis Area is composed of 66 block groups sorted into seven CEA Analysis Area Communities. **Figure 2-1** highlights each of the seven CEA Analysis Area Communities and **Appendix A** depicts the CEA Analysis Area across multiple figures to show the location of each block group.[3] (Note that CEA Analysis Area Community boundaries do not specifically follow municipality or CDP boundaries because the CEA Analysis Area Community boundaries are drawn along block group boundaries.)

Within this *Community Effects Assessment and Environmental Justice Analysis Technical Report*, **Chapter 3** details existing conditions by resource for the entire CEA Analysis Area. The description of each resource's existing conditions is followed immediately by the presentation of environmental consequences of the Preferred Alternative, Alternative 9 - Phase 1 South to these resources within the context of the entire CEA Analysis Area.

To enhance public understanding of impacts and accessibility to this Technical Report's data, a community profile for each of the seven CEA Analysis Area Communities is provided in **Chapter 4** and **Appendix D**. Each profile includes an overview of:

- The community location;
- Planning and development;
- Community facilities; and
- Minority race/ethnicity populations and low-income populations, if present.

The profiles also include community-specific mapping and figures presenting the population's distribution of racial and ethnicity characteristics, zoning and land use, and housing characteristics. The profile for

---

[1] Block groups are statistical divisions of Census Tracts and are generally defined to contain between 600 and 3,000 people. A block group usually covers a contiguous area. Each Census Tract contains at least one block group, and block groups are uniquely numbered within the Census Tract. Block groups never cross state, county, or Census Tract boundaries but may cross the boundaries of any other geographic entity (e.g. municipality, or Census-Designated Place). (https://www.census.gov/geo/reference/gtc/gtc_bg.html). Note that 2020 Census block group boundaries were not yet available to the public at the time of this study's publication.

[2] Based on preliminary evaluation, 0.25-mile to either side of the study corridors was established as a resource inventory boundary that would reasonably include areas that would potentially be subject to direct impacts from Alternative 9 - Phase 1 South. Expanding the CEA Analysis Area to include all Census block groups intersecting the 0.25-mile delineation provides a conservative spatial approximation of the neighborhoods surrounding the study corridors; additionally, necessary data is available at the Census block group-level.

[3] Note that the term "EJ Analysis Area" is used instead of "CEA Analysis Area" in the Environmental Justice Analysis in **Chapter 5**. The EJ Analysis Area is identical to the CEA Analysis Area defined here.

00005144


each CEA Analysis Area Community is immediately followed by a description of the long-term impacts of the Preferred Alternative to resources within each community. Impacts, including changes to land use and development, right-of-way acquisitions and potential relocations of businesses and residences, and impacted community facility properties and services are quantified for each of the CEA Analysis Area Communities. Qualitative impacts, including potential changes to community aesthetics and character, as well as development patterns, are also described for each CEA Analysis Area Community. Presenting impacts in this manner will help community members better understand how the alternatives may impact and benefit specific communities.

## 2.2    Data Collection

Preparation of this Community Effects Assessment and Environmental Justice Analysis Technical Report includes a review of resource data for the CEA Analysis Area. Resources reviewed included:

- Land use and zoning, planning, and development;
- Population and demographic characteristics;
- Economic, employment, and commuting characteristics;
- Housing stock, age, and tenure;
- Community facilities and services; and
- Environmental Justice (EJ) populations.

This information is sourced from the following:

- Geographic Information Systems (GIS) data from Fairfax and Montgomery Counties;
- Comprehensive, master, sector, transportation and related planning publications, as well as zoning ordinances for Fairfax and Montgomery Counties;
- Pipeline of Approved Development Projects from Montgomery County;
- Maryland Department of Labor;
- US Census 2010 and 2015-2019 American Community Survey (ACS) Five-Year Estimates;
- US Census Longitudinal Employer-Household Dynamics data (2018);
- Google Earth and Google Maps- Street View; and
- Field reconnaissance where data gaps are identified.

00005145

**Figure 2-1: CEA Analysis Area Communities**



00005146

Table 2-1: CEA Analysis Area Communities and Included Census Block Groups

| CEA Analysis Area Community[4] | CEA Analysis Area Census Block Groups[5] | | |
|---|---|---|---|
| Fairfax County, Virginia | | | |
| McLean | • 4701.00 – 1 | • 4701.00 – 2 | • 4801.00 – 4 |
| Montgomery County, Maryland | | | |
| Potomac | • 7012.06 – 1<br>• 7012.06 – 2<br>• 7060.08 – 1<br>• 7060.08 – 2 | • 7060.09 – 2<br>• 7060.09 – 3<br>• 7060.12 – 1<br>• 7060.12 – 2 | • 7060.12 – 3<br>• 7060.13 – 1<br>• 7060.13 – 2 |
| Cabin John | • 7058.00 – 2 | • 7058.00 – 3 | |
| Bethesda | • 7044.03 – 1<br>• 7044.04 – 4<br>• 7045.02 – 1 | • 7045.02 – 2<br>• 7045.03 – 1 | • 7059.01 – 3<br>• 7059.02 – 3 |
| North Bethesda | • 7012.05 – 1<br>• 7012.05 – 2<br>• 7012.05 – 3<br>• 7012.05 – 4<br>• 7012.13 – 1<br>• 7012.13 – 2 | • 7012.13 – 3<br>• 7012.15 – 1<br>• 7012.15 – 2<br>• 7012.15 – 3<br>• 7012.15 – 4<br>• 7044.01 – 1 | • 7044.01 – 2<br>• 7045.01 – 1<br>• 7045.01 – 2<br>• 7045.01 – 3<br>• 7045.01 – 4 |
| Gaithersburg | • 7007.17 – 1<br>• 7007.17 – 3<br>• 7007.17 – 4<br>• 7008.16 – 1 | • 7008.16 – 2<br>• 7008.17 – 1<br>• 7008.17 – 2<br>• 7008.17 – 3 | • 7008.29 – 1 |
| Rockville | • 7007.18 – 1<br>• 7007.18 – 2<br>• 7010.01 – 2<br>• 7010.01 – 3<br>• 7010.02 – 1<br>• 7010.02 – 2 | • 7010.02 – 3<br>• 7010.04 – 2<br>• 7010.04 – 4<br>• 7010.05 – 1<br>• 7010.05 – 2<br>• 7010.06 – 1 | • 7010.06 – 2<br>• 7010.07 – 1<br>• 7010.07 – 2<br>• 7012.10 – 1<br>• 7012.11 – 3 |

[4] As used here, community refers to either a municipality or a Census-Designated Place (CDP), as delineated by the State of Maryland and the US Census Bureau, respectively. Many CEA Analysis Area block groups intersect and/or overlap with more than one community. For the purposes of this Technical Report, each of the CEA Analysis Area block groups has been assigned to the respective community in which most of their land area is located.

[5] Refer to **Appendix A** for the location of these block groups in relation to the corridors.

00005147

## 2.3    Analysis of Environmental Consequences and Mitigation

23 USC 109(h) requires that US DOT "assure that possible adverse economic, social, and environmental effects relating to any proposed project on any Federal-aid system have been fully considered in developing such project, and that the final decisions on the project are made in the best overall public interest, taking into consideration the need for fast, safe and efficient transportation, public services, and the costs of eliminating or minimizing such adverse effects and the following:

- Air, noise, and water pollution;
- Destruction or disruption of man-made and natural resources, aesthetic values, community cohesion and the availability of public facilities and services;
- Adverse employment effects, and tax and property value losses;
- Injurious displacement of people, businesses and farms; and
- Disruption of desirable community and regional growth."

In **Section 3**, the environmental consequences of the Preferred Alternative, which is described in **Section 1,** are presented immediately following the description of the existing conditions for each of the resource types. Mitigation or community enhancement measures, if required, are also included for each impacted resource type.

00005148

OP•LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

# 3    EXISTING CONDITIONS AND ENVIRONMENTAL CONSEQUENCES

## 3.1    Land Use and Zoning, Planning, and Development

### 3.1.1    Existing Conditions

### A.    Land Use and Zoning

Land use patterns and development goals are identified in long-term comprehensive plans that are implemented through zoning codes and maps adopted by local governments. Zoning codes regulate the type and density of development within delineated land areas to ensure compliance with the long-term comprehensive plans' land use and development goals. The CEA Analysis Area encompasses 27,006 acres of land; 3,337 acres of which are located just south of the American Legion Memorial Bridge in Fairfax County, Virginia and the remaining 23,628 acres are in Montgomery County (including the City of Gaithersburg and the City of Rockville), Maryland.

Land use conditions within the CEA Analysis Area were identified through the review of zoning designations. Zoning designations were used primarily because this data is consistently updated by municipalities, while the land use data provided by the Maryland Department of Planning dates from 2010. Fairfax County maintains current land use data (Fairfax, 2021). For the purposes of this Technical Report, existing conditions are generally referred to by their "land use." The land use types, described below, were summarized based on the primary land uses allowed under the counties' zoning codes. Some overlap in allowed land uses may occur. The distribution of each land use within the CEA Analysis Area is quantified in **Figure 3-1** and supporting mapping depicting land use within the CEA Analysis Area is provided as **Figure 3-2**. The table in **Appendix B** presents how local zoning/land use codes were categorized into high-level zoning/land use categories within the CEA Analysis Area.

- **Commercial/Employment:** includes, but is not limited to: retail, service, convenience, and lodging establishments; professional and medical offices; civic, cultural, and institutional establishments; public and private education and childcare facilities; public uses; places of worship; indoor entertainment.

- **Industrial:** includes but is not limited to: office and research parks; employment uses requiring larger tracts of land; production, manufacturing, assembly, and processing establishments; hospitals; retail and wholesale; automobile services; laundry services, warehouse, storage, and distribution.

- **Mixed-Use:** includes a mix of commercial/employment and residential uses.

- **Park/Open Space:** includes local, state, regional, and federal parks and recreational areas, including, but not limited to: stream valley parks, railroad trails, community centers, parkways, and National Historic Parks; smaller tracts of public and private undeveloped open space interspersed among developed areas; and agricultural lands.

- **Planned Unit/Planned Community:** includes land reserved for future development, primarily for residential communities.

- **Residential:** includes detached single-family dwelling units and duplex dwelling units, attached single-family row housing; garden apartments; high-rise apartments/condominiums; mobile homes; and trailer parks; plus, yards and associated areas.

00005149

**OP·LANES** MARYLAND | I-495 & I-270 Managed Lanes Study | Final Community Effects Assessment & EJ Analysis Technical Report

- **Transportation:** includes right-of-way reserved for road, rail, bicycle, pedestrian, and transit facilities, as well as supporting transportation infrastructure, such as park-and-ride facilities, maintenance areas, distribution warehouses, and open/forested areas adjacent to roadways.

Existing data reflect a highly-developed system of land use in the CEA Analysis Area. Most of the study area has been planned and built out based in large part on the presence of the existing I-495 and I-270 corridors. Sixty-nine percent of the CEA Analysis Area has been built out for either residential, industrial, mixed, commercial/employment, or planned community uses. Much of the area reflects dense land use patterns with little potential for additional development based on the lack of available space or on existing land use restrictions. As a whole, only 18 percent of the land in Montgomery County remains available for development as undeveloped land (Montgomery Planning, 2021). The relative composition of land use in the CEA Analysis Area is shown in **Figure 3-1**.

At 15,355 acres, residential zones account for 57 percent of the CEA Analysis Area. The second-most common land use is park/open space, which accounts for 4,697 acres, or 17 percent of the CEA Analysis Area. This is followed by transportation, which accounts for 3,686 acres, or 14 percent of the CEA Analysis Area. Mixed-use (1,518 acres), planned unit/planned community (1,114 acres), industrial (330 acres), and commercial/employment (306 acres) zones account for the remaining 12 percent of CEA Analysis Area land. Additional detail on land use for individual CEA Analysis Area Communities is provided in **Section 4** and **Appendix D**.



**Figure 3-1: CEA Analysis Area Land Use Distribution**

*Source: City of Gaithersburg GIS web map (https://maps.gaithersburgmd.gov/gallery/); City of Rockville GIS Open Data (http://data-rockvillemd.opendata.arcgis.com/); Montgomery County/MNCPPC MCATLAS (http://www.mcatlas.org/viewer/); Fairfax County Open Geospatial Data (https://www.fairfaxcounty.gov/maps/open-geospatial-data).*

00005150



I-495 & I-270 Managed Lanes Study          Final Community Effects Assessment & EJ Analysis Technical Report

**Figure 3-2: Land Use within the CEA Analysis Area**



00005151

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 17 of 121

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## B.    Farmland and Protected Lands

The *Farmland Protection Policy Act of 1981* (FPPA) strives to minimize the extent to which Federal programs contribute to the conversion of important farmlands to non-agricultural uses; lessen the adverse effects of federal actions on farmland; and assure that federal programs are operated in a manner that, to the extent practicable, will be compatible with state, local government, and private programs that protect farmland. According to federal regulations implementing the FPPA, *farmland* does not include land already in or committed to urban development, including lands identified as urbanized area on the 2010 Census urban area-based reference map[6].

The CEA Analysis Area is almost entirely within a Census urban area, except west of I-495 along the Potomac River in the Potomac and McLean CEA Analysis Area Communities, where the Chesapeake and Ohio Canal National Park and Clara Barton Parkway are located.

The CEA Analysis Area was reviewed for lands not covered by the FPPA, but protected under:

- Virginia state preservation programs;
- the Maryland Agricultural Land Preservation Foundation (MALPF);
- the Maryland Agricultural Easement Program;
- the Maryland Environmental Trust; and
- the Maryland Rural Legacy Program, including county Rural Legacy Programs (MCATLAS, 2018 and Montgomery County Rustic Roads Advisory Committee, 2015).

Per the Virginia Department of Conservation and Recreation's online Conservation Lands Database, there are a total of nine conservation easements spread throughout the McLean CEA Analysis Area Community. These easements are almost entirely privately owned, aside from one owned by the National Park Service, and are managed by a variety of entities including the Northern Virginia Conservation Trust, the Potomac Conservancy, and the Virginia Outdoors Foundation. The easements range from approximately one acre to approximately 63 acres (Virginia Department of Conservation and Recreation, 2021).

The McLean CEA Analysis Area Community also contains one non-profit fee simple holding owned by the Northern Virginia Conservation Trust that is approximately five acres. Additionally, Scott's Run Nature Preserve, owned by the Fairfax County Park Authority, is located on the banks of the Potomac River directly west of I-495 and is accessible from Georgetown Pike. Scott's Run encompasses approximately 384 acres (Virginia Department of Conservation and Recreation, 2021).

The CEA Analysis Area overlaps with a small portion of the Maryland Department of Natural Resources (DNR) designated Piney Branch Special Protection Area (SPA) in the Gaithersburg CEA Analysis Area

---

[6] *The Farmland Protection Policy Act* (7 CFR 658.2) states, "Farmland means prime or unique farmlands as defined in section 1540(c)(1) of the Act or farmland that is determined by the appropriate state or unit of local government agency or agencies with concurrence of the Secretary to be farmland of statewide or local importance.  "Farmland" does not include land already in or committed to urban development or water storage, Farmland "already in" urban development or water storage includes all such land with a density of 30 structures per 40-acre area. Farmland already in urban development also includes lands identified as "urbanized area" (UA) on the 2010 Census urban area-based reference map (https://www.census.gov/geographies/reference-maps/2010/geo/2010-census-urban-areas.html), or as urban area with a "tint overprint" on the USGS topographical maps, or as "urban-built-up" on the USDA Important Farmlands Maps."

00005152

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Community, north of Darnestown Road and south of Medical Center Way. Existing land uses at this location include roadways and adjacent strips of undeveloped land as well as development complexes and parking facilities associated with Shady Grove Adventist Hospital.

## C.    Review of Approved Comprehensive, Master, and Sector Plans

The *Maryland Economic Growth, Resource Protection and Planning Act* (1992), as amended, articulates the State's growth policy through visions centered on concentrating development in suitable areas, protecting sensitive areas, and establishing funding mechanisms to achieve the visions. The Act also requires local jurisdictions to address these same visions in their comprehensive plans. Under the Act, local governments are required to review, and if necessary, update their plans once every six years.

Maryland's *Smart and Sustainable Growth Act of 2009* clarifies the link between local comprehensive plans and local land use ordinances. The bill defines the current requirement of "consistency". Actions that are "consistent with" or have "consistency with" a comprehensive plan are actions that further, and are not contrary to, the following items in the plan: policies; timing of implementation of the plan; timing of development; timing of rezoning; development patterns; land uses; and densities or intensities.

Planning and development goals within CEA Analysis Area Communities are guided by a variety of comprehensive, master, and sector plans. Relevant plans that overlap portions of the CEA Analysis Area are listed in **Table 3-1.** These plans generally set goals that include enhancing transportation efficiency by promoting the use of major highways and arterials networks to limit traffic impacts on local and neighborhood streets. Roadway-related recommendations referencing the study corridors have been italicized.

### Table 3-1: Comprehensive, Master, and Sector Plans

| Planning Document | Roadway-Related Recommendations Referencing the Study Corridors |
|---|---|
| **Fairfax County, Virginia** ||
| Fairfax County Comprehensive Plan, 2017 Edition (Area II McLean Planning District (Amended February 20, 2018) | • *Identifies I-495 as a proposed high-occupancy toll lane facility from Old Dominion Drive north to Maryland*<br>• *I-495 south of Old Dominion Drive is an existing high-occupancy toll lane facility* |
| **Montgomery County, Maryland** ||
| Comprehensive Amendment to the Bethesda/Chevy Chase MP (1990) | • *Maximum six to eight-lane divided roadway system for I-495, from the Potomac River to Rock Creek Park*<br>• *Variable minimum right-of-way width for I-495* |
| North Bethesda Garrett Park MP (1992) | • *Maximum six-lane divided roadway for I-495*<br>• *Minimum 300-foot right-of-way width* |
| Gaithersburg Vicinity MP (1996) | • No recommendations specific to the study corridors |
| Potomac Subregion MP (2002) | • *Maximum eight-lane divided roadway system for I-495, 12-lane divided roadway for I-270 from the Rockville City line to the I-270 Spur, and six-lane divided highway for the I-270 spur from I-270 to I-495*<br>• *Minimum 300-foot right-of-way width for I-495 and I-270* |

00005153



I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Planning Document | Roadway-Related Recommendations Referencing the Study Corridors |
|---|---|
| Capital Beltway HOV Lane Project and Interchange at the Intersection of Randolph Road and Veirs Mill Road (Amendment to the MP of Highways within Montgomery County) (2004) | • *Revised the Potomac Subregion Master Plan (2002) recommending:* <br> ○ *Maximum eight-lane, plus two-High-Occupancy Vehicle (HOV) lanes, divided roadway system for I-495 from the American Legion Bridge to I-270 West Spur* <br> ○ *Minimum 300-foot right-of-way width for I-495* <br> • *Revised the Bethesda-Chevy Chase MP (1990) to recommend HOV lanes* <br> • *HOV, or High-Occupancy Toll (HOT), lanes on I-495 between the American Legion Bridge and the I-270 West Spur* <br> • *Managed lanes that do not give preference to high-occupancy vehicles were not considered* |
| Guiding the Future of the MD 355/I–270 Corridor (2008) | • *Use value pricing for express lanes on I-270, the Inter-County Connector, and I-495 to enhance mobility and improve access.* |
| City of Gaithersburg MP (2009) (currently being updated) | • *Express Toll Lane (ETL) direct access ramps for I-270 at the Metropolitan Grove Road extended site* |
| Gaithersburg West MP Transportation Appendix (Draft March 2009) | • *No recommendations specific to the study corridors* |
| Great Seneca Science Corridor MP (2010) | • *Maximum 12-lane divided roadway system for I-270 between Great Seneca Creek (proximal to Game Preserve Road) and Shady Grove Road* <br> • *Minimum 300-foot right-of-way width for I-270* <br> • *Provide off-ramp right-of-way for the proposed new interchange at I-270 and Watkins Mill Road and grade-separated interchanges at I-270 at Watkins Mill Road extended and I-270 at Gude Drive* <br> • *Construction of improvements at the Watkins Mill interchange by MDOT SHA are underway. Completion is expected Summer 2020.* <br> • *There are no current MDOT SHA plans to add an interchange at Gude Drive* |
| Countywide Transit Corridors Functional MP (2013) | • *Transportation System Management (TSM) improvements are in place to provide a more efficient use of ROW along HOV lanes on I-270* <br> • *At the Fernwood Road bridge, high-occupancy-vehicle (HOV) ramps connecting with the HOV lanes on the I-270 West Spur, both to and from the north and south.* |
| Rockville 2040 Comprehensive MP Transportation Report (2016) | • *No recommendations specific to the study corridors* |
| Bethesda Downtown Sector Plan (2017) | • *No recommendations specific to the study corridors* |
| Grosvenor-Strathmore Minor Area MP (2017) | • *No recommendations specific to the study corridors* |

00005154


| Planning Document | Roadway-Related Recommendations Referencing the Study Corridors |
|---|---|
| Rock Spring MP (2017) | • No recommendations specific to the study corridors |
| Technical Update to the MP of Highways and Transitways (2018) | • *Minimum 300-foot right-of-way width for I-270 except between West Gude Drive and the I-270 Spur*<br>• *Designates I-270 between I-495 and I-370 as a "Freeway with Existing HOV Lanes"*<br>• *Designates I-495 between the I-270 West Spur and the Maryland--Virginia line as a "Freeway with Planned HOV Lanes."* |
| Rockville 2040: Comprehensive Plan Update (2021)[1] | • *"Protect and enhance Rockville's property, neighborhoods, and environment while supporting solutions to regional traffic congestion on I-270 and I-495"*<br>• *"Monitor and coordinate with Maryland Department of Transportation State Highway Administration (MDOT SHA) regarding any projects to alter I-270 through Rockville. The City strongly supports mass transit, transportation demand management (TDM), and other alternative solutions to traffic congestion on I-270 as opposed to widening or the creation of toll lanes on I-270 as a remedy."* |
| **Regional** | |
| National Capital Region Transportation Planning Board FY 2019-2024 Transportation Improvement Program (2018) | • *Major Highway Projects within the study corridors include:*<br>○ *I-495 and I-270 Traffic Relief Plan – TIP ID 6432, Total $7.6 Billion, FY 2019-2024 Program $129 Million, Complete 2025* |
| National Capital Region Transportation Planning Board Visualize2045 Long-Range Plan (2022 Update) | • *I-95/I-495 component of Traffic Relief Plan in Montgomery and Prince George's Counties to include two managed lanes in each direction, between Baltimore Washington Parkway and Virginia Stateline/Potomac River (Woodrow Wilson Bridge) (CLRP 1182)*<br>• *I-270 component of Traffic Relief Plan in Montgomery County to include two managed lanes in each direction, between I-495 and I-70/US 40 (CLRP 1186)* |

*Source: Montgomery County Planning Department, Master Plan List, https://montgomeryplanning.org/planning/master-plan-list/ , accessed June 2021; Fairfax County Planning Division, Comprehensive Plan Documents, https://www.fairfaxcounty.gov/planning-development/fairfax-county-comprehensive-plan, accessed June 2021.*

Note: [1] The Rockville 2040 Comprehensive Plan Update also states, "A return to pre-pandemic traffic volumes on I-270 will continue to impact Rockville's local roads and the City supports actions and investments that reduce of mitigate impacts from I-270 that do not result in additional lanes, toll roads, or right-of-way expansion by the State."

Various residential, mixed-use, commercial, and retail development projects are proposed within the Montgomery County portion of the CEA Analysis Area. Development projects that have been approved by their respective County Planning Board but not yet constructed are considered "in the Pipeline" and are summarized below.

The most readily available GIS data from Montgomery County indicates that, as of October 2021, 53 Pipeline development projects are located in the Montgomery County portion of the CEA Analysis Area

00005155

(M-NCPPC, 2019). The projects include 11 mixed-use developments, 29 residential developments, and 13 office and retail developments. Combined, these Pipeline development projects would result in 6,535 new[7] residential units and 19,543 office, retail, and industrial jobs. Development projects in Montgomery County and elsewhere along the study corridor would further increase travel demand by the planning horizon year of 2040.

Maryland's *Smart Growth Priority Funding Areas Act of 1997* (Smart Growth Act) directs Maryland state infrastructure funds to areas within or connecting with county-designated and state-certified Priority Funding Areas (PFAs). Growth-related projects include most State programs that encourage growth and development such as highways, sewer and water construction, economic development assistance, and State leases or construction of new office facilities. The Smart Growth Act legislatively designated certain areas as PFAs and established criteria for locally designated PFAs. Through Smart Growth, Maryland is committed to limiting sprawl development by directing funds where they can help to revitalize older neighborhoods, and redirect growth to already developed areas, saving the state's farmland, open spaces, and natural resources. Smart growth makes efficient use of land, water, and air; creates a sense of community and place; expands transportation, employment, and housing choices; distributes the costs and benefits of development in an equitable manner; and promotes the public health (MD Department of Planning). To evaluate the Study's growth implications, consistency with the MD Department of Planning's Planning Policy, and compliance with the Priority Funding Area Law, Smart Growth Coordination Checklists were completed by MDOT SHA and are included with related correspondence in **Appendix C** of this technical report. In an email dated January 12, 2022, MDP concurred with Planning Act Consistency and PFA Law compliance determinations for the Study. It was determined that the Preferred Alternative is located entirely within PFAs.

As shown in **Figure 3-3**, the vast majority of the CEA Analysis Area is within a Maryland Department of Planning-designated PFA (a small portion of the CEA Analysis Area in Potomac falls outside of a PFA). As the I-495 and I-270 Managed Lanes Study proposed improvements would expand existing major regional corridors around which PFAs are designated, improvements within the CEA Analysis Area would be consistent with the Smart Growth Act.

---

[7] New residential units are the sum of approved, unbuilt residential units for each project.

00005156



I-495 & I-270 Managed Lanes Study          Final Community Effects Assessment & EJ Analysis Technical Report

**Figure 3-3: Smart Growth Priority Funding Areas**



*Source: Maryland Department of Planning, http://mdpgis.mdp.state.md.us/pfa/*

00005157

## 3.1.2    Environmental Consequences

Potential long-term impacts from the Preferred Alternative are described, herein, along with a description of the Preferred Alternative's consistency with Community Master Plans and other documents that guide land use, zoning, and development within the CEA Analysis Area. Any impacts to pending or approved developments are also identified.

Descriptions of existing land use conversion to transportation right-of-way refers to physical changes in land use and should not be interpreted as a change in the official Zoning Code designation, which is subject to county and municipal regulations and not an element of the I-495 & I-270 Managed Lanes Study. For indirect and cumulative impacts from the Preferred Alternative on land use and development in the region, see the *Final Indirect and Cumulative Effects Technical Report* **(FEIS, Appendix Q)**.

### A.    The No Build Alternative

The No Build Alternative requires no right-of-way acquisition or conversion of land to transportation use.

Because the No Build Alternative would not provide HOV or toll facilities on I-495 or I-270, it would not be consistent with the following Comprehensive, Master or Sector Plans that call for HOV or toll facilities on I-495 or I-270:

- Fairfax County Comprehensive Plan, 2017 Edition;
- Capital Beltway HOV Lane Project and Interchange at the Intersection of Randolph Road and Veirs Mill Road (Amendment to the MP of Highways in Montgomery County) (2004);
- Guiding the Future of the MD 355/I-270 Corridor (2008); and
- National Capital Region Transportation Planning Board FY 2019-2024 Transportation Program (2018); and
- National Capital Region Transportation Planning Board Vision 2045 (2022 Update).

### B.    Preferred Alternative

The Preferred Alternative would result in the permanent conversion of 78.2 acres of existing land uses to right-of-way for the new HOT lanes under the Preferred Alternative. This conversion includes the alteration of existing transportation land use for non-highway facilities (e.g. railway, county right-of-way, vegetated buffer zones etc.) outside of the existing I-495 and I-270 highway footprint, to right-of-way for the new HOT lanes (**Table 3-2**). The conversion of land from its present use would be the result of expanding the existing transportation right-of-way to adjacent properties and accommodating stormwater management facilities or drainage improvements, new or reconstructed noise barriers, and utility relocation that cannot be accommodated within existing highway right-of-way.

The Preferred Alternative would also use 14.7 acres of existing land uses for temporary use during construction.

00005158

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Table 3-2: Land Use Permanently Converted to Transportation Right-of-Way for the Preferred Alternative

| Land Use | Total Existing Land Use in the CEA Analysis Area (acres) | Temporary Land Use Impacts During Construction of the Preferred Alternative (acres) | Land Use Permanently Converted to Transportation ROW under the Preferred Alternative (acres) |
|---|---|---|---|
| Transportation[1] | 3,686 | <0.1 | <0.1 |
| (% of land use type permanently impacted) | -- | -- | <0.1% |
| Residential | 15,335 | 2.6 | 35.3 |
| (% of land use type permanently impacted) | -- | -- | 0.2% |
| Planned Unit/ Planned Community | 1,114 | 0.2 | 8.2 |
| (% of land use type permanently impacted) | -- | -- | 0.7% |
| Park/Open Space | 4,697 | 9.3 | 12.8 |
| (% of land use type permanently impacted) | -- | -- | 0.3% |
| Mixed-Use | 1,518 | 2.6 | 16.3 |
| (% of land use type permanently impacted) | -- | -- | 1.1% |
| Industrial | 330 | -- | 2.8 |
| (% of land use type permanently impacted) | -- | -- | 0.8% |
| Commercial/ Employment | 306 | -- | 2.7 |
| (% of land use type permanently impacted) | -- | -- | 0.9% |
| Total Permanent Change in Land Use[2] | 27,006 | 14.7 | 78.2 |
| (% of land use type permanently impacted) | -- | -- | 0.3% |

[1]Transportation Land Use is the land considered transportation use—such as railway facilities, county right-of-way, and vegetated buffer zones— by the owner jurisdictions that is located outside of the I-495 & I-270 highway footprint.

Under the Preferred Alternative, conversion to transportation right-of-way would most commonly occur to residential land uses (35.3 acres), followed by mixed-use land uses (16.3 acres). Conversion of residential land use within the LOD accounts for 0.2 percent of residential land use in the CEA Analysis Area; conversion of mixed-use land uses within the LOD accounts for 1.1 percent of mixed-use land uses in the CEA Analysis Area. Conversion of park/open space land uses within the LOD accounts for 0.3 percent of the park/open space land uses in the CEA Analysis Area. Overall, 78.2 acres of land use, or 0.3 percent of the CEA Analysis Area, along the Phase 1 South limits would be permanently converted to transportation right-of-way.

The land use conversions under the Preferred Alternative would primarily consist of acquiring strips of land, or strip takes, from undeveloped areas or areas of trees and landscaping in yards that back to I-495 or I-270. The Preferred Alternative would not substantially affect the overall land use within the CEA

00005159

Analysis Area. As shown in **Table 3-2**, 1.1 percent or less of each land use type would be impacted by the Preferred Alternative. The extent, pace, and location of development within the CEA Analysis Area would be influenced and controlled by the respective county land development policies and plans. Outside of PFAs, large lot development, or areas where sprawl is likely to occur, would be limited to low development capacity in the CEA Analysis Area. The Preferred Alternative would support opportunities for redevelopment and infill, with growth in the study area being directed to existing communities and along transportation corridors. Future planned growth is not impeded by the proposed improvements under the Preferred Alternative and is not dependent on the proposed improvements.

The vast majority of the Preferred Alternative LOD is located within the Washington DC-MD-VA Census Urbanized Area. The land use conversion would impact a small portion of undeveloped riparian buffer located immediately outside of the Census Urbanized Area where the Preferred Alternative is located in McLean, Virginia. This riparian buffer for the Potomac River is not active farm area, nor does it provide farm-oriented services. As with other areas along the LOD, impacts to this portion of McLean would be limited acquisitions of right-of-way along the existing I-495 roadway. Consultation with the US Department of Agricultural Natural Resource Conservation Service (NRCS) is required for FPPA review if a project has the potential to convert prime, statewide, unique, or locally important farmland to non-farm use. If required, NRCS review determines if a Farmland Conversion Impact Rating for Corridor Type Projects is obligatory for a project. However, the LOD outside of the Census urban area is excluded from FPPA regulation because the LOD will not impact Prime Farmland Soils, as the soils are located on parkland within the Potomac River. For additional discussion on farmland soils, refer to the *Final Natural Resources Technical Report* **(FEIS, Appendix M)**. Other than parkland discussed in the *Final Section 4(f) Evaluation* **(FEIS, Appendix G)** and historic properties discussed in the *Final Cultural Resources Technical Report* **(FEIS, Appendix I)**, areas subject to conservation or protection under state and local land use and zoning designations would not be impacted by the Preferred Alternative.

The Preferred Alternative would be compatible with planned and approved future development in Montgomery and Fairfax Counties, including those identified in **Section 3.1.1C**, by providing additional roadway capacity to accommodate existing traffic and long-term traffic growth as well as travel choices for enhanced trip reliability and the improved movement of goods and services, consistent with the Study's Purpose and Need. Improvements would continue to make the area desirable for business and residential development.

Further, the Preferred Alternative is generally consistent with Comprehensive, Master or Sector Plans that call for HOV or toll facilities on I-495, referenced in **Table 3-1.** The assumed right-of-way for the Preferred Alternative would be adjacent to the existing I-495 and I-270 alignments and within the 300-foot right-of-way of I-495 and I-270 as recommended in multiple planning documents referenced in **Table 3-1.** The Preferred Alternative is located entirely within PFAs and is consistent with the Smart Growth Act. The Preferred Alternative would not substantially affect the overall land use within the CEA Analysis Area as only 1.1 percent or less of each land use type would be impacted by the Preferred Alternative. Within the Phase 1 South limits, much of the land use has already been developed and there is a paucity of unoccupied land available for new development. Much of the unoccupied land is also designated by planning documents for preservation, further reinforcing the small likelihood of development pressure as a result of new or additional access to I4-95 and I-270 from the managed lanes.

00005160

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## C.    Mitigation or Community Enhancement Measures

All property owners affected by partial acquisition and its associated land use conversion to transportation right-of-way would be compensated for the fair market value of the acquired portion of land and any damages to the remaining property and structures; this includes compensation for temporary use of land for the construction of the Preferred Alternative.

During final design, the Developer would develop and follow aesthetic and landscaping guidelines of all highway elements in consultation with the local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state, and Federal agencies. The goal will be to design highway elements, including retaining walls, noise barriers, and other visual barriers, to be sensitive to the context of the surrounding land use.  Further, mitigation for resource impacts would be developed in accordance with jurisdictional agency requirements.

## 3.2    Population and Demographics

### 3.2.1    Existing Conditions

The CEA Analysis Area population presented is based on data from the US Census, ACS Five-Year Estimates, 2015-2019. At the time this technical report was written, the 2015-2019 ACS 5-Year Estimates were the most recently available data. Population data is presented per CEA Analysis Area block group within their representative community for comparison alongside state and county data. The CEA Analysis Area population is further described by demographic data to include: age, sex, households with disabilities, race, ethnicity, national origin, and household income distribution using data from the US Census, ACS Five-Year Estimates, 2015-2019. Like the population overview, demographic data is presented for comparison with state and county existing conditions. Where appropriate, maps are provided that illustrate relevant patterns and/or concentrations of demographic characteristics within the CEA Analysis Area. The text discussion references relevant patterns and/or concentrations by community, noting specific block groups with outlier data where appropriate. Demographic data is also presented for individual CEA Analysis Area Communities in **Section 4** and **Appendix D**.

00005161

**OP·LANES** ™
MARYLAND   I-495 & I-270 Managed Lanes Study   Final Community Effects Assessment & EJ Analysis Technical Report

## A.    Population

**Table 3-3** shows historic trends and projections for the population of Fairfax and Montgomery Counties and the State of Maryland. Over the twenty-year period between 1990 and 2010, Fairfax County saw the greatest increase in population growth, with its population increasing by 32 percent. During the same period, Montgomery County's population grew by 28 percent and Maryland's population grew by 21 percent. Through 2040 population growth in Fairfax County is projected to grow by 22 percent compared to projected growth in Montgomery County at 23 percent and Maryland at 17 percent.

**Table 3-3: Historic and Projected Population in Fairfax County, Montgomery County, and Maryland**

| Geography | 1990 | 2000 | 2010 | 2040 | Percent Change 1990–2010 | Percent Change 2010–2040 |
|---|---|---|---|---|---|---|
| Fairfax County | 818,600 | 969,700 | 1,081,700 | 1,317,300 | +32% | +22% |
| Montgomery County | 757,027 | 873,341 | 971,777 | 1,197,150 | +28% | +23% |
| Maryland | 4,780,753 | 5,296,486 | 5,773,552 | 6,739,410 | +21% | +17% |

*Source: Maryland Department of Planning, "Historical and Projected Total Population for Maryland's Jurisdictions," December 2020 and County of Fairfax, Virginia, "Demographic Reports 2020."*

Additionally, according to MWCOG Round 9.1a Cooperative Forecasting, between 2015 and 2045, the population of Montgomery County is expected to grow by 20.5 percent, while the population of Fairfax County is expected to grow by 25.9 percent.

The CEA Analysis Area is in the Washington-Arlington-Alexandria, DC-VA-MD-WV Metropolitan Statistical Area. The total population of the CEA Analysis Area is 103,614 people. Of this total, approximately 97 percent reside in Montgomery County and three percent in Fairfax County. Population distribution throughout the CEA Analysis Area Communities is shown in **Figure 3-4** and **Figure 3-5**. Population density within the CEA Analysis Area (**Figure 3-5**) mirrors the density of residential development.

**Figure 3-4: Population Distribution Among CEA Analysis Area Communities**



00005162

**Figure 3-5: Population Density within the CEA Analysis Area**



00005163



I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## B.    Age and Sex Characteristics

Section 162 (a) of the *Federal-Aid Highway Act of 1973* (23 USC 324) provides protection against gender-based discrimination while *The Age Discrimination Act of 1975* prohibits discrimination on the basis of age. The distribution of male and female individuals across age cohorts for the CEA Analysis Area is shown in **Figure 3-6**. The distribution of male and female[8] individuals is similar across all ages. At 15 percent of the population, the 50 to 59 cohort is the largest age group in the CEA Analysis Area, followed by the 40 to 49 cohort, which comprises 14 percent of the CEA Analysis Area population. Individuals aged 80 and over make up five percent, or the smallest portion of the CEA Analysis Area.

### Figure 3-6: Age Distribution by Sex



*Note: Age distribution is shown as a percentage.*
*Source: 2015–2019 American Community Survey 5–Year Estimates*

## C.    Disability Characteristics

Section 504 of the Rehabilitation Act of 1973/Americans with Disabilities Act of 1990 provides disabled individuals equal opportunities to participate in and have access to federal programs, benefits and services. Five (5.2) percent of the 60,402 households in the CEA Analysis Area include one or more persons with a disability. This proportion is equal to that of Fairfax County (5.2 percent); it is slightly less than that of Maryland (8.9 percent) and Montgomery County (5.7 percent).

---

[8] "Male" and "Female" are the only response options available in the 2015–2019 American Community Survey 5–Year Estimates.

00005164

OP•LANES
MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## D.    Household Income

The ACS Five-Year Estimates calculated the number of households in a geography that fall within an annual income range. **Figure 3-7** shows the number of households within the annual income range for the CEA Analysis Area, Montgomery County, and Fairfax County. Note that the income ranges provided by the ACS were not evenly divided for each range.

**Figure 3-7: Household Income**



*Source: 2015–2019 American Community Survey Five-Year Estimates*

Household income distribution in **Figure 3-7** indicates a generally affluent population within the CEA Analysis Area as a whole. Thirty-two percent of CEA Analysis Area households—the majority—earned $200,000 or more in annual income, followed by 13 percent of households earning $150,000 to $199,999 in annual income. The smallest proportion of the CEA Analysis Area households, five percent, earned $19,999 or less in annual income. In comparison, the State of Maryland had a lower percentage of households who earned an annual income of $200,000 or more, at 13 percent, and a lower percentage of households who earned an annual income of $150,000 to $199,999, at 11 percent. A higher percentage of households in Maryland, ten percent, earned an annual income of $19,999 or less. Additional information on low-income households as they relate to the identification of potential Environmental Justice populations is provided in **Section 5.2.3**.

## E.    Race and Ethnicity

The breakdown of race and ethnicity characteristics for the CEA Analysis Area population are shown in **Figure 3-8**. The detailed race and ethnicity characteristics for Fairfax and Montgomery Counties, as well as each block group within the CEA Analysis Area are provided in **Table 5-2** in **Section 5.4.1**. Montgomery

00005165

County, with a total minority race and ethnicity population[9] of 56 percent represents a more diverse population compared to Maryland, which has a minority race and ethnicity population of 49 percent. The CEA Analysis Area, where 42 percent of the population identifies as a minority race or ethnicity, is less diverse than both the county and the state.

**Figure 3-8: Race and Ethnicity Characteristics of the CEA Analysis Area**



Source: 2015–2019 American Community Survey Five-Year Estimates

Over half (58 percent) of the CEA Analysis Area identifies as White alone, followed by those who identify as Asian alone (17 percent), those who identify as Hispanic or Latino of any race (11 percent), and those who identify as Black or African American alone (10 percent). Those who identify as some other race alone plus two or more races, Native Hawaiian and other Pacific Islander alone, or American Indian and Alaska Native alone comprise less than 10 percent each of the CEA Analysis Area population.

Additional detail on race and ethnicity characteristics as they relate to the identification of potential Environmental Justice populations is found in **Section 5.2.2**.

### 3.2.2    Environmental Consequences

Impacts to the CEA Analysis Area population and demographics were assessed in terms of potential impact to the overall composition of these resources throughout the CEA Analysis Area. Potential impacts include increased or decreased development within the CEA Analysis Area that may result in change to population or demographic characteristics. The potential for impacts to population and demographics within specific communities are presented for the No Build and the Preferred Alternative by CEA Analysis Area

---

[9] Total Minority Race and/or Ethnicity Population is the sum of persons self-identifying as Black or African American Alone, Hispanic or Latino (regardless of race), Asian American Alone, American Indian and Alaskan Native Alone, Native Hawaiian or other Pacific Islander Alone, Some Other Race Alone, and two or more races.

00005166

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 32 of 121

OP•LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Community provided in **Section 4** and **Appendix D**. For indirect and cumulative impacts from the Preferred Alternative on the regional population, see the *Final Indirect and Cumulative Effects Technical Report* **(FEIS, Appendix Q)**.

### A.    The No Build Alternative

The No Build Alternative would have no impact on population or demographic characteristics, including age and sex, disability, household income, and race and ethnicity characteristics, within the CEA Analysis Area. However, regardless of improvements within the study corridors the regional population is projected to experience significant growth over the 30-year period between 2010 and 2040. The total population of Fairfax County is expected to increase by 22 percent; as shown in **Table 3-3**, the total population of Montgomery County is expected to increase by 23 percent. Additionally, according to MWCOG Round 9.1a Cooperative Forecasting, between 2015 and 2045, the population of Montgomery County is expected to grow by 20.5 percent, while the population of Fairfax County is expected to grow by 25.9 percent. The increase in population and lack of improvements to I-495 and I-270 under the No Build Alternative resulting in increased congestion may limit planned growth for the CEA Analysis Area.

### B.    The Preferred Alternative

The Preferred Alternative does not result in any full acquisitions or residential or business displacements. By providing additional roadway capacity through HOT managed lanes, the Preferred Alternative would accommodate increased traffic and congestion attributed to the projected regional population growth between 2010 and 2045. The increased capacity on I-495 and I-270, access to travel choices, and enhanced trip reliability would maintain the area's desirability for future economic activity. The Preferred Alternative would have minimal impact on the overall population of the CEA Analysis Area; no impacts would occur to demographic characteristics, including age and sex, disability, household income, and race and ethnicity characteristics, within the CEA Analysis Area. The minimal demographic changes would be consistent with approved master plans and population growth projections associated with those plans.

### 3.2.3    Mitigation

Because minimal impacts on the overall population of the CEA Analysis Area and no impacts on demographic characteristics, including age and sex, disability, household income, and race and ethnicity characteristics, would occur within the CEA Analysis Area, no mitigation is required.

## 3.3    Economic, Employment, and Commuting Characteristics

### 3.3.1    Existing Conditions

### A.    Employment and Economic Characteristics

The CEA Analysis Area is home to 57,022 persons over 16 years of age who are employed in the civilian sector, plus 453 persons employed in the Armed Forces. In the CEA Analysis Area, 96 percent of the labor force is employed. In comparison, Fairfax and Montgomery Counties have the same percent of the labor force employed, while Maryland has a slightly lower percentage at 95 percent. Consistent with US Census data, *workers,* as presented here, refers to the CEA Analysis Area population employed in the civilian sector only, unless otherwise specified.  Workers can be characterized by *occupation*, which refers to "the kind of work a person does to earn a living" (US Census Bureau, 2018). **Figure 3-9** reveals that 28 percent of CEA Analysis Area residents are employed in management, business and financial occupations. Sales and office occupations, as well as administrative support occupations, employ 14 percent of CEA Analysis

00005167



I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Area residents.  The remaining occupations each employ less than 11 percent of CEA Analysis Area residents.

**Figure 3-9: Occupations of Employed CEA Analysis Area Residents**

- Management + Business & Financial (28%)
- Sales, Office, & Administrative (14%)
- Computer & Mathematical + Architecture + Engineering (11%)
- Healthcare Practitioner, Technicians, & Support (9%)
- Education & Library (7%)
- Life, Physical, & Social Science (7%)
- Legal (5%)
- Arts, Design, Entertain... Sports, & Media (4%)
- Food Preparation & Serving + Personal Care Service (6%)
- Prod... Trans... & Mate... Movi... (3%)
- Natural Resources, Constructi...
- Com... & Social Servi...
- Building & Grounds...
- Eme...

*Source: American Community Survey Five-Year Estimates (2015-2019)*

In addition to employment characteristics of CEA Analysis Area residents, the CEA Analysis Area can be described by its contributions to the regional economy. The Maryland Department of Labor identifies "major" employers to be businesses or institutions with 100 or more employees. Employers in Montgomery County with more than 750 employees (excluding state and local governments and post offices) are listed in **Table 3-4**. No Fairfax County major employers were identified within the Fairfax County portion of the CEA Analysis Area.

**Table 3-4: Major Montgomery County Employers in CEA Analysis Area**

| Company | Number of Location(s) in CEA Analysis Area Communities | Total Number Employed at Company throughout Montgomery County |
|---|---|---|
| AstraZeneca (formerly MedImmune) | 1 location in Gaithersburg | 750 - 999 |
| BAE Systems | 1 location in Rockville | 750 - 999 |
| Bio Reliance Corp. | 1 location in Gaithersburg | 750 - 999 |
| CVS Pharmacy | 1 location in Potomac 1 location in North Bethesda 1 location in Rockville | 750 - 999 |
| Giant Food | 2 locations in Potomac | 1,000+ |
| Home Depot | 1 location in Potomac | 750 - 999 |

00005168

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 34 of 121

**OP·LANES** M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Company | Number of Location(s) in CEA Analysis Area Communities | Total Number Employed at Company throughout Montgomery County |
|---|---|---|
| Lockheed Martin Corp. | 1 location in Rockville | |
| | 2 locations in North Bethesda | |
| | 2 locations in Rockville | 1,000+ |
| | 1 location in Gaithersburg | |
| Macy's | 1 location in Potomac | 1,000+ |
| Marriott International, Inc. | 1 location in North Bethesda | |
| | 2 locations in Gaithersburg | 1,000+ |
| | 1 location in Rockville | |
| McDonald's | 2 locations in Potomac | 1,000+ |
| Montgomery College | 1 location in Gaithersburg | 750 - 999 |
| OpenText | 1 location in Gaithersburg | 750 - 999 |
| Safeway | 2 locations in Rockville | 1,000+ |
| Shady Grove Adventist Hospital | 1 location in Gaithersburg | 1,000+ |
| Silver Diner | 1 location in Gaithersburg | 1,000+ |
| Target | 1 location in Gaithersburg | 750 - 999 |
| USSI, Inc. | 1 location in Rockville | 1,000+ |

*Note: Excludes federal, state, and local governments.*
*Sources: Maryland Department of Labor, https://www.dllr.state.md.us/lmi/emplists/montgomery.shtml, accessed June 2021*

*Guiding the Future of the MD 355/I–270 Corridor* (2008), describes the I-270 corridor in Montgomery County as an internationally recognized biotechnology industry cluster. This industry cluster has key institutions in the CEA Analysis Area, including several major employers listed in **Table 3-4**. Per the Maryland Department of Commerce *Maryland BioHealth Directory*, at least 64 other biotechnology companies are located in the CEA Analysis Area.

The federal government industry cluster is also represented in the CEA Analysis Area by the following key institutions: National Institute of Standards and Technology (NIST); National Institutes of Health (NIH); Naval Surface Warfare Center; and the US Internal Revenue Service (IRS).

### B.    Commuting Characteristics[10]

American Community Survey (ACS) Five-Year Estimates (2015–2019) were reviewed to obtain information on the means of transportation to work. This data for the CEA Analysis Area is summarized in **Table 3-5**. Of the geographies displayed in **Table 3-5**, Maryland represents the largest proportion of commuters who drive alone (74 percent) to and from work, while the CEA Analysis Area and Montgomery County represent the smallest proportions of commuters who drive alone to and from work (66 and 65 percent, respectively).

---

[10] *Data collection for the American Community Survey Five-Year Estimates (2015-2019) precedes and therefore does not account for the effects of the COVID-19 global pandemic, including the increase in employees working from home. For MDOT SHA's statement on the COVID-19 global pandemic and the I-495 and I-270 Managed Lanes Study, see* **FEIS, Chapter 4**.

00005169



I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

**Table 3-5: Means of Transportation to Work**

| Geographic Unit | Car, Truck, Van, or Motorcycle: Drove Alone | Car, Truck, Van: Carpooled | Public Transportation* | Bicycle, Walked, or Other Means | Worked at Home |
|---|---|---|---|---|---|
| Fairfax County, Virginia | 71% | 10% | 10% | 3% | 7% |
| Montgomery County, Maryland | 65% | 10% | 15% | 4% | 6% |
| Maryland | 74% | 9% | 9% | 3% | 5% |
| **CEA Analysis Area** | **66%** | **8%** | **14%** | **4%** | **9%** |

*Includes bus, trolley bus, streetcar, trolley car, subway, railroad, ferryboat, and taxicab.*
*Source: American Community Survey Five-Year Estimates (2015-2019)*

Longitudinal Employer-Household Dynamics (LEHD) data from the US Census Bureau was collected to describe where CEA Analysis Area commuters traveled to and from for work. LEHD data is used to characterize workforce dynamics for specific geographic locations. One of these data products, LEHD Origin-Destination Employment Statistics (LODES), provides details on home and employment destinations for residents and workers at the block group-level (US Census Bureau Center for Economic Studies, 2018). LODES data from 2018, the most recent year available, was used to identify the home and employment destinations to which residents and workers in the CEA Analysis Area commute. The top 100 employment destinations for workers living in the CEA Analysis Area is shown in **Figure 3-10** and the associated top 30 employment destinations for workers living in the CEA Analysis Area are listed in **Table 3-6**. The top 100 home destinations for workers employed in the CEA Analysis Area is shown **Figure 3-11** and the associated top 30 home destinations for workers employed in the CEA Analysis Area are listed in **Table 3-7**.

00005170

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

**Figure 3-10: CEA Analysis Area Residents' Top 100 Employment Destinations**



*Source: US Census Bureau, Center for Economic Studies, OnTheMap (https://onthemap.ces.census.gov)*

00005171

**Table 3-6: Top 30 Employment Destinations for Workers Who Live in the CEA Analysis Area**

| Employment Destination | Number of Worker-Jobs | Share | Employment Destination | Number of Worker-Jobs | Share |
|---|---|---|---|---|---|
| Washington, DC | 8,250 | 17.9% | Wheaton CDP, MD | 289 | 0.6% |
| Rockville, MD | 4,638 | 10.1% | North Potomac CDP, MD | 282 | 0.6% |
| Bethesda CDP, MD | 4,399 | 9.5% | Beltsville CDP, MD | 258 | 0.6% |
| North Bethesda CDP, MD | 3,162 | 6.9% | Frederick, MD | 250 | 0.5% |
| Gaithersburg city, MD | 2,329 | 5.1% | Chantilly CDP, VA | 196 | 0.4% |
| Potomac CDP, MD | 2,172 | 4.7% | Aspen Hill CDP, MD | 184 | 0.4% |
| Tysons CDP, VA | 1,113 | 2.4% | Olney CDP, MD | 172 | 0.4% |
| Arlington CDP, VA | 1,058 | 2.3% | Greenbelt , MD | 168 | 0.4% |
| Germantown CDP, MD | 799 | 1.7% | McLean CDP, VA | 168 | 0.4% |
| Silver Spring CDP, MD | 790 | 1.7% | Montgomery Village CDP, MD | 163 | 0.4% |
| Baltimore , MD | 787 | 1.7% | Calverton CDP, MD | 161 | 0.3% |
| Columbia CDP, MD | 537 | 1.2% | Chillum CDP, MD | 161 | 0.3% |
| College Park, MD | 524 | 1.1% | Takoma Park, MD | 158 | 0.3% |
| Alexandria, VA | 463 | 1.0% | Towson CDP, MD | 156 | 0.3% |
| Reston CDP, VA | 462 | 1.0% | Friendship Heights Village CDP, MD | 155 | 0.3% |

Source: US Census Bureau, Center for Economic Studies, OnTheMap (https://onthemap.ces.census.gov)
Note: CDP stands for Census-Designated Place

As shown in **Figure 3-10** and summarized in **Table 3-6**, the primary employment destinations for workers living in the CEA Analysis Area are densely clustered around I-495 and I-270. Of the 46,114 employed residents living in the CEA Analysis Area[11], the largest share (18 percent) commute to work in Washington, DC. CDPs and municipalities within the CEA Analysis Area account for the next-largest shares of employment destinations after Washington, DC: approximately 37 percent of the employed residents commute to CDPs and municipalities within the CEA Analysis Area. The size of the shares associated with the employment destinations indicate that the dense urban core of Washington, DC and the communities outside of DC and along I-270 are the central location of employment opportunities for those living in the CEA Analysis Area and the Washington-Arlington-Alexandria, DC-VA-MD-WV Metropolitan Statistical Area.

---

[11] The number of employed residents in the CEA Analysis Area based on LEHD Origin-Destination Employment Statistics (LODES) data is different from the number of persons over 16 years-of-age who are employed in the civilian sector based on American Community Survey Five-Year Estimates (2015-2019) data.  Numbers from both ACS and LODES are derived from separate US Census Bureau programs and are valid in the various contexts of this Technical Report.

00005172

**Figure 3-11: CEA Analysis Area Workers' Top 100 Home Destinations**



Source: US Census Bureau, Center for Economic Studies, OnTheMap (https://onthemap.ces.census.gov)

00005173


Table 3-7: Top 30 Home Destinations for Workers Employed in the CEA Analysis Area

| Home Destination | Number of Worker-Jobs | Share | Home Destination | Number of Worker-Jobs | Share |
|---|---|---|---|---|---|
| Germantown CDP, MD | 6,932 | 6.0% | Columbia CDP, MD | 1,781 | 1.5% |
| Gaithersburg city, MD | 5,074 | 4.4% | Clarksburg CDP, MD | 1,455 | 1.3% |
| Washington city, DC | 4,997 | 4.3% | Arlington CDP, VA | 1,426 | 1.2% |
| Rockville city, MD | 4,532 | 3.9% | Redland CDP, MD | 1,268 | 1.1% |
| North Bethesda CDP, MD | 3,146 | 2.7% | Damascus CDP, MD | 1,099 | 0.9% |
| Potomac CDP, MD | 2,774 | 2.4% | Ellicott City CDP, MD | 1,085 | 0.9% |
| Bethesda CDP, MD | 2,623 | 2.3% | Fairland CDP, MD | 904 | 0.8% |
| Aspen Hill CDP, MD | 2,443 | 2.1% | Travilah CDP, MD | 856 | 0.7% |
| Silver Spring CDP, MD | 2,308 | 2.0% | Ballenger Creek CDP, MD | 805 | 0.7% |
| Montgomery Village CDP, MD | 2,165 | 1.9% | Urbana CDP, MD | 730 | 0.6% |
| Olney CDP, MD | 2,140 | 1.8% | Bowie city, MD | 705 | 0.6% |
| North Potomac CDP, MD | 2,073 | 1.8% | Glenmont CDP, MD | 615 | 0.5% |
| Wheaton CDP, MD | 1,902 | 1.6% | Cloverly CDP, MD | 599 | 0.5% |
| Frederick city, MD | 1,901 | 1.6% | Laurel city, MD | 590 | 0.5% |
| Baltimore city, MD | 1,879 | 1.6% | South Laurel CDP, MD | 582 | 0.5% |

*Source: US Census Bureau, Center for Economic Studies, OnTheMap (onthemap.ces.census.gov)*
*Note: CDP stands for Census-Designated Place*

As shown in **Figure 3-11** and summarized in **Table 3-7**, the primary home destinations for workers employed in the CEA Analysis Area are also clustered around I-495 and I-270, although less densely than the employment destinations. Each of these top destinations is located within or adjacent to the study corridors and are likely accessed using I-495 and I-270. Of the 115,841 workers employed in the CEA Analysis Area,[12] the largest share (six percent) commute home to Germantown. CDPs and municipalities within the CEA Analysis Area account for the next-largest shares of home destinations after Germantown: approximately 16 percent of the workers commute home to CDPs and municipalities within the CEA Analysis Area. The smaller shares associated with each home destination indicate that, in general, workers live in more decentralized locations throughout the Washington-Arlington-Alexandria, DC-VA-MD-WV Metropolitan Statistical Area.

## C.    Tax Base

Real and Personal Property Tax is the largest single source of revenue for county governments within the CEA Analysis Area. The tax rates for Fairfax and Montgomery Counties are summarized below in **Table 3-8**. Fairfax County acquires 79.2 percent of its revenue through real estate and personal property tax and Montgomery County acquires 46.3 percent of its revenue through property tax.

---

[12] See footnote #10.

00005174

**Table 3-8: Local Property Tax Rates and Revenue**

| CEA Analysis Area Locality | FY 2020 Real Property Tax Rates (per $100 assessed value) | FY 2020 County Property (Real and Personal) Tax Revenues ($ Million) |
|---|---|---|
| Fairfax County | $1.1500 | $3,531 |
| Montgomery County | $0.9786 | $1,836.8 |

*Source: Fairfax County, VA FY 2020 Fairfax County Adopted Budget Plan (Overview) and Maryland Association of Counties, FY 2020 Report of County Budgets, Tax Rates & Selected Statistics.*

### 3.3.2    Environmental Consequences

Potential economic, employment, and commuting characteristic impacts from the No Build and Preferred Alternative would include impacts to the local and regional economy and tax revenue impacts. Potential impacts from the No Build and Preferred Alternative to the CEA Analysis Area are described quantitatively and qualitatively. For indirect and cumulative impacts from the Preferred Alternative on employment and other socioeconomic resources, see the *Final Indirect and Cumulative Effects Technical Report* **(FEIS, Appendix Q)**.

### A.    The No Build Alternative

Routine roadway maintenance activities related to the No Build Alternative would not directly result in right-of-way acquisitions or relocations to businesses or employment centers or access to area businesses or employment.

However, the No Build Alternative would not address existing or future congestion issues. Future traffic projections identify increased congestion within the CEA Analysis Area. Increased traffic congestion would lead to longer commuting times for individuals who use the I-495 and I-270 corridors, as documented in the *Final Traffic Technical Report* **(FEIS, Appendix A)**. Travel demand will continue to increase, exceeding the current capacity of the roadways. This would result in longer peak travel periods and/or additional volume on nearby roads as drivers attempt to avoid congestion. Increased traffic congestion may also result in a slight increase in the number of people who choose alternative means to commute to work other than driving alone.

The ability to move freight, services and commuting employees through the study corridors will increasingly depend on the performance of the existing travel lanes on I-495 and I-270. According to MDOT SHA estimates, the total congestion cost to users in the National Capital Region has exceeded all other regions in the state of Maryland. The No Build Alternative would have a negative effect on the regional economy. Increased traffic congestion would inhibit inter-community travel, including access to local businesses. It could also delay the delivery of goods to and from these businesses. Decreased mobility within the regional network would not support the planned economic growth in the region; as a result, a decrease in the rate of new business development would be expected. This would also affect existing businesses, as increased traffic and congestion would inconvenience potential customers, limiting the geographic base of individual businesses. Congestion expected under the No Build Alternative would also make product and supply delivery less predictable. While the No Build Alternative would have no direct effect on the existing tax base over the short-term because there would be no right-of-way

00005175

acquisitions or relocations, the negative effect on commuting and the regional economy could result in a diminished tax base if such businesses relocated to areas outside of the CEA Analysis Area.

## B.    Preferred Alternative

The Preferred Alternative does not result in any full acquisitions or residential or business displacements. There would be no impact to the distribution of worker occupation, or major employers within the CEA Analysis Area as a result of the Preferred Alternative.

The improvements proposed under the Preferred Alternative would help address increasing congestion, thereby maintaining mobility throughout the region. By providing additional roadway capacity through managed lanes, I-495 and I-270 would accommodate increases in traffic that are expected to occur in the region. This added capacity would mitigate longer peak travel periods that would be expected under the No Build Alternative. The added mobility would help support economic growth by maintaining the ability for residents and through travelers to access and patronize local businesses. The maintained function of I-495 and I-270, option of travel choice, and enhanced trip reliability would support the planned economic growth in the region. Managed lanes would maintain congestion-free conditions, thereby increasing one- or two-lane traffic flow predictability. Reliable travel times create advantages for all users, including long-range fleets and commercial "just in time" freight delivery services.

The Preferred Alternative would not remove or relocate any access points to I-495 or I-270; therefore, commercial trip patterns would likely not be affected. However, by maintaining regional mobility, the Preferred Alternative would support planned residential, commercial, and industrial development in the CEA Analysis Area.

The drivers that use I-495 and I-270 within the Phase 1 South limits are important to the tax base for the CEA Analysis Area. Revenue is generated through sales and use tax, commercial property tax, and income tax on residents. There are areas available for development and redevelopment throughout the CEA Analysis Area. It is anticipated that increased capacity, enhanced trip reliability, additional roadway choices, and the improved movement of goods and services would foster infill development in designated growth areas, consistent with the master plans of the affected communities.

It is expected that future tax revenue generated from the projected development and redevelopment growth in the CEA Analysis Area would outweigh the minimal reduction in tax base by the assumed project-related relocations.

### 3.3.3    Mitigation

Because benefits to the economy, employment, regional commutes, and tax base would occur under the Preferred Alternative, no mitigation is required. Ongoing coordination with area businesses during construction would occur to prevent or minimize both short- and long-term disruptions.

A separate initiative under MDOT's I-495 & I-270 Public-Private Partnership (P3) Program, Opportunity MDOT[13] has developed a strategy for workforce development to ensure that P3 Program strengthens economic development and opportunities for small businesses and individuals.

---

[13] See https://oplanesmd.com/opportunity-mdot/.

00005176



I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## 3.4    Housing

### 3.4.1    Existing Conditions

The CEA Analysis Area contains 40,953 occupied housing units, plus an additional 1,791 unoccupied housing units (US Census, ACS Five-Year Estimates, 2015-2019). As shown in **Figure 3-12**, most of the housing stock in the CEA Analysis Area was between three to seven decades old.  Of the total 42,744 housing units, 27 percent were built from 1950 to 1969, and 34 percent were built from 1970 to 1989. Thirty-five percent of the housing units were built after 1990, and four percent of the housing units were built in 1949 or earlier. The proliferation of housing in the CEA Analysis Area built between 1950 and 1989 reflects the suburbanization of metropolitan areas that was occurring throughout the United States during this time.

**Figure 3-12: CEA Analysis Area Housing Unit Build Year**



*Source: 2015–2019 American Community Survey 5–Year Estimates*

The CEA Analysis Area contains various types of housing structures, the composition and tenure of which is shown in **Figure 3-13**. Occupied housing units in the CEA Analysis Area were 69 percent owner-occupied and 31 percent renter-occupied.

00005177

**Figure 3-13: CEA Analysis Area Housing Type by Tenure**



Source: *2015–2019 American Community Survey 5–Year Estimates*

Detached single-family houses make up 44 percent, the largest portion, of the housing structure types in the CEA Analysis Area. Small and medium-sized apartment and condominium complexes with between five and 19 housing units collectively make up 12 percent of the CEA Analysis Area housing structure types. Single-family attached housing structures, such as rowhouses or townhouses make up 19 percent, and large apartment and condominium complexes, with 20 to more than 50 individual housing units comprise 24 percent. Houses subdivided into two, three, and four individual housing units make up one percent of the CEA Analysis Area housing structure types. While not shown in **Figure 3-13**, there are also 28 owned and 17 rented mobile home, boat, RV, or van housing units in the CEA Analysis Area; these comprise less than one percent of the housing structures.

The HUD Multifamily Assistance & Section 8 Database, Montgomery County Housing Opportunities Commission, and Fairfax County Redevelopment and Housing Authority were consulted to locate housing complexes with subsidized units generally referred to as *low-income subsidized housing* within the CEA Analysis Area. With funding from federal, state, and local resources, 21 housing complexes in the CEA Analysis Area rent units at below-market rates for qualifying households. Low-income subsidized housing complexes primarily include multifamily apartment complexes. Additionally, Fairfax and Montgomery Counties administer rental housing vouchers for low-income households through various federal, state, and local affordable housing subsidy programs, including the federal Housing Choice Voucher (HCV) Program. Low-income households with housing vouchers live in market-rate and below-market-rate housing units throughout the CEA Analysis Area. Low-income subsidized housing complexes identified with the CEA Analysis Area are listed in **Section 5.4.4E**.

00005178


### 3.4.2    Environmental Consequences

Impacts to housing were assessed in terms of effects the quantity, age, type, or tenure of CEA Analysis Area housing stock. The potential for impacts to housing to affect accessibility, community character, sense of place, cohesion, and isolation on the seven CEA Analysis Area Communities are evaluated **Chapter 4** and **Appendix D**. For indirect and cumulative impacts from the Preferred Alternative on housing patterns, see the *Final Indirect and Cumulative Effects Technical Report* **(FEIS, Appendix Q)**.

#### A.    The No Build Alternative

The No Build Alternative would not require residential relocations or right-of-way acquisition and would not affect the quantity, age, type, or tenure of CEA Analysis Area housing stock.

#### B.    Preferred Alternative

Because the Preferred Alternative would not require residential relocations, no impacts to the quantity, age, type, or tenure of CEA Analysis Area housing stock would occur under the Preferred Alternative.

### 3.4.3    Mitigation

Because no impacts would occur to housing in the CEA Analysis Area, no mitigation is required.

## 3.5    Community Facilities[14]

### 3.5.1    Existing Conditions

Public and private community facilities within the CEA Analysis Area provide services to residents and businesses in the surrounding communities.   Community facilities documented here fall into eight categories[15]:

- Educational Facilities
- Places of Worship
- Cemeteries[16]
- Health Care Facilities
- Public Parks and Parks with Historic Properties (Section 4(f) Properties)
- Recreation Centers

- Emergency Services, Law Enforcement, and Correctional Facilities
- Transportation
- Public Utilities
- Other, including libraries and post offices

---

[14] Impacts to CEA Analysis Area Communities are described in **Section 4** and **Appendix D**.

[15] Public parks and public parks with historic properties referenced in this assessment of community facilities are impacted in the Preferred Alternative and are being evaluated in accordance with Section 4(f) of the US Department of Transportation Act of 1966. Details on Section 4(f) impacts can be found in **FEIS**, **Chapter 5.4** and **FEIS, Chapter 6**.

[16] Cemeteries referenced in this assessment of community facilities are considered historic properties impacted by the Preferred Alternative and are being evaluated in compliance with Section 106 of the National Historic Preservation Act of 1966 (NHPA). Details on historic cemeteries are found in **FEIS, Chapter 5.7**.

00005179

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 45 of 121

OP•LANES
M A R Y L A N D   | I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Community facilities within the CEA Analysis Area are briefly described below.  The names and locations of community facilities are shown on mapping for each CEA Analysis Area Community, included in **Section 4** and **Appendix D**.

## A.    Educational Facilities

Within the CEA Analysis Area, 59 pre-kindergarten, primary and secondary schools, and childcare facilities were identified.  Educational facilities are distributed across the CEA Analysis Area counties, with two schools in Fairfax County and 57 schools in Montgomery County.  Educational facilities included four alternative and special education schools, 36 private/parochial schools, 16 public elementary and middle schools, and three public high schools.

One higher education facility is located within the CEA Analysis Area: the Johns Hopkins University, Montgomery County Campus in the Gaithersburg CEA Analysis Area Community.

## B.    Places of Worship

Within the CEA Analysis Area, 43 places of worship were identified, including three places of worship within Fairfax County and 40 in Montgomery County. Gibson Grove A.M.E Zion Church is significant for its association with the African American settlement of Gibson Grove that was founded in the 1880s by formerly enslaved people; the only remaining building associated with the community of Gibson Grove is the existing original church building. Details on this historic property are found in **FEIS, Chapter 5.7**.

## C.    Cemeteries

Morningstar Tabernacle No. 88 Moses Hall and Cemetery, the site of a late nineteenth-century African American benevolent society, is located within the Cabin John CEA Analysis Area Community and is being evaluated under Section 106 of the National Historic Preservation Act of 1966 (NHPA). The cemetery was closely associated with the Gibson Grove A.M.E. Zion Church. The Montgomery County Poor Farm Cemetery, which was associated with the Montgomery County Almshouse, is located within the Rockville CEA Analysis Area and is also being evaluated under Section 106 of the NHPA. Details on these historic cemeteries are found in **FEIS, Chapter 5.7**.

## D.    Health Care

Six healthcare facilities were identified within the CEA Analysis Area: Adventist Healthcare Shady Grove Medical Center, Adventist Behavioral Health and Wellness, Adventist Rehabilitation Hospital of Maryland, Shady Grove Medical Center- Kaiser Permanente, Family Medicine Shady Grove, and Sterling Care Rockville Nursing.

## E.    Emergency Services, Law Enforcement, and Correctional Facilities

Within the CEA Analysis Area three fire stations and one police station were identified: Bethesda Fire Department Station 26, Cabin John Park Volunteer Fire Department Stations 10 and 30, Maryland State Police Barrack N- Rockville. These facilities serve the respective municipalities in which they're located. Additionally, the Montgomery County Detention Center is located within the CEA Analysis Area. All fire and police stations within Fairfax County are located outside of the CEA Analysis Area.

00005180

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## F.    Public Parks and Public Parks with Historic Properties (Section 4(f) Properties)

Public parks and public parks with historic properties within the LOD of the Preferred Alternative were reviewed in support of the FEIS and the Section 4(f) Evaluation in **FEIS, Chapter 6**. Detailed information regarding public parks and public parks with historic properties and potential impacts are addressed in the *Final Section 4(f) Evaluation* (**FEIS, Appendix G**). Refer to the Community Profiles in **Appendix D** for a list of 25 Section 4(f) parks and parks with historic properties within each CEA Analysis Area Community.

## G.    Recreation Centers

Existing recreation centers within the CEA Analysis Area include the following: Activity Center at Bohrer Park, Casey Community Center, Clara Barton Recreation Center, Gaithersburg Miniature Golf Course, Gaithersburg Skate Park, North Bethesda Community Center (Planned), Our Lady of Bethesda Retreat Center, Rockville Senior Center, and Thomas Farm Community Center.

## H.    Transportation Facilities

The CEA Analysis Area is served regionally by a network of freeways and major highways, primarily under the jurisdiction of MDOT SHA and VDOT.  A network of arterial and residential routes accommodates the movement of residents, goods, and services.  Most of these routes are under the jurisdiction of Fairfax County Department of Transportation (DOT) and Montgomery County DOT.  Additionally, some of the incorporated areas have jurisdiction over municipal routes within the CEA Analysis Area.

Regional and local public transportation and transit services, including railways and buses serve the CEA Analysis Area.  Regional transit service is provided by the Maryland Area Regional Commuter (MARC) and the Washington Metropolitan Area Transit Authority (WMATA) as shown in **Figure 3-14**.  MARC train service is an integral component of Maryland's transportation system, with nearly 190 miles of rail across three lines: Penn, Camden, and Brunswick.   None of these lines intersect the CEA Analysis Area. WMATA operates rapid transit Metrorail service in DC, northern Virginia, and Montgomery and Prince George's Counties in Maryland. The CEA Analysis Area is intersected by the Red line, which is one of six total Metrorail lines.  There are no MARC and Metrorail Stations within the CEA Analysis Area.  No Park & Ride facilities were identified within the CEA Analysis Area.

Local transportation is also provided by way of a network of interconnected bike lanes, paved and natural surface trails, sharrows[17], and on-road routes.  Local bus service within the CEA Analysis Area is provided by WMATA fixed-route bus service (Metrobus) and paratransit service (MetroAccess), as well as Montgomery County's Ride On service.  Currently no local bus service is provided within the Fairfax County portion of the CEA Analysis Area.  While many of these services have routes that cross either I-495 or I-270, only Ride On routes use either of these corridors. Ride On route 70 uses I-270 between I-370 and I-495 (at the I-270 eastern leg). The Maryland Transit Administration (MTA) operates four Commuter Bus Lines within the CEA Analysis Area.

---

[17] Shared roadways are open to both bicycle and vehicular travel, but do not contain assigned space for each, such as a dedicated bike lane.  Sharrows, or shared lane markings, are used to provide guidance for bicyclists and drivers, allowing them to share the same lane. Source: MDOT, "What is a Bikeway," https://www.mdot.maryland.gov/tso/pages/Index.aspx?PageId=89.

00005181



I-495 & I-270 Managed Lanes Study        Final Community Effects Assessment & EJ Analysis Technical Report

One heliport at Adventist Healthcare Shady Grove Medical Center (Rockville, MD) was identified in the CEA Analysis Area.

## I.    Public Utilities

Public water and sewer services in the Virginia portion of the CEA Analysis Area are supplied by the Fairfax County Water Authority. The Occoquan Reservoir and the Potomac River are the two major sources for all water processed by the Fairfax County Water Authority for the Virginia portion of the CEA Analysis Area, which is in the Blue Plains Treatment Area.

Within the Maryland portion of the CEA Analysis Area public water and sewer services are supplied by the Washington Suburban Sanitary Commission (WSSC). The Patuxent River and the Potomac River are the sources for all processed water supplied by the WSSC to Montgomery County. Water from the Patuxent River is held in two reservoirs, Tridelphia and Rocky Gorge, and is pumped to the Patuxent Water Filtration Plant (WFP) located in Laurel where it is treated. The Potomac WFP is in Potomac and extracts water from the Potomac River. No filtration plants are located within the CEA Analysis Area.

Two wastewater treatment plants serve the CEA Analysis Area. The Piscataway Plant, located in Accokeek, Maryland is operated by the WSSC. The Blue Plains Plant located in southwest DC is managed by the DC Water and Sewer Authority. Neither plant is located within the CEA Analysis Area.

Electricity service and natural gas services in the Virginia portion of the CEA Analysis Area are provided primarily by Dominion Virginia Power and Washington Gas, respectively. Phone and cable services are provided primarily by Comcast, Cox of Northern Virginia, and Verizon. In the Maryland portion of the CEA Analysis Area, electricity and natural gas services are provided primarily by Baltimore Gas & Electric (BGE), Potomac Electric Power Company (PEPCO), Washington Gas, and FirstEnergy/Potomac Edison. Phone and cable services are provided primarily by Comcast, Verizon, and RCN.

## J.    Public Libraries and Post Offices

Fairfax and Montgomery Counties operate separate public library systems with individual branch locations providing service and accessibility to communities throughout the CEA Analysis Area. Within the CEA Analysis Area there is one branch of the Montgomery County public library system, the Davis branch. No branch locations for the Fairfax County Public Library system were identified within the CEA Analysis Area.

The US Postal Service operates four post office locations within the Maryland portion of the CEA Analysis Area. No post offices were identified within the Fairfax County portion of the CEA Analysis Area.

00005182

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 48 of 121

**OP·LANES**
M A R Y L A N D   | I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

**Figure 3-14: MARC and Metrorail Transit within the CEA Analysis Area**



00005183

 I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

## 3.5.2    Environmental Consequences

Impacts to community facilities and services were assessed in terms of potential impact to the properties of individual facilities throughout the CEA Analysis Area. Potential impacts include partial property acquisitions for right-of-way, changes in access to the facilities, changes to viewsheds and visual impacts, and increased noise. Potential impacts also include changes in traffic volumes and patterns that could affect ease of access, the service provided by the facility, or response times.

### A.    The No Build Alternative

The No Build Alternative would not result in any study-related construction and would therefore not directly impact community facilities within the CEA Analysis Area. However, under the No Build condition traffic congestion is anticipated to increase within the CEA Analysis Area, which would result in increased travel times along the study corridors. The No Build Alternative would result in increased response times for emergency services and travel times to other community facilities, especially during peak travel periods. Additionally, the No Build Alternative would not draw traffic off the local network and would not result in reduced delay on the surrounding local roadways.

### B.    Preferred Alternative

The Preferred Alternative is projected to reduce traffic on local roads by three and a half percent. This could result in improved response times for emergency services and travel times to other community facilities, especially during peak travel periods.

The Preferred Alternative would require partial acquisitions from the properties of one correctional facility, two healthcare facilities, four places of worship, one recreation center, two schools, and one historic cemetery identified in **Table 3-9**. These partial acquisitions will not affect access; will not impact buildings, amenities, or facilities on the properties; and will not cause any permanent or temporary closures of the community facilities. The Preferred Alternative would also impact 20 Section 4(f) resources, including 13 public parks and public parks with historic properties on a permanent and temporary basis. No permanent impacts to access, recreational amenities, or facilities will occur. Impacts to Section 4(f) properties are detailed in **FEIS, Chapter 6** and **FEIS, Appendix G**. Because the boundaries of the Montgomery County Poor Farm Cemetery are poorly understood and no marked graves remain, quantifiable impacts were not calculated at this time. The existing building of Gibson Grove A.M.E. Zion Church will not be impacted, but the property would be adversely affected by the construction of the Preferred Alternative. Details on historic cemeteries and historic properties are found in **FEIS, Chapter 5.7**.

**Table 3-9: Impacts to Community Facility Properties from the Preferred Alternative**

| CEA Analysis Area Community | CEA Analysis Area Block Group | Community Facilities | Property Acquisition (acres) | | |
|---|---|---|---|---|---|
| | | | Total | *Perm.* | *Temp.* |
| **Rockville** | 7007.18 - 2 | Shady Grove Medical Center, Kaiser Permanente | **0.5** | *0.5* | — |
| | 7010.01 - 2 | Montgomery County Poor Farm Cemetery | Unknown | | |
| | 7010.02 - 1 | Montgomery County Detention Center | **3.7** | *3.7* | *0.1* |

00005184

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 50 of 121

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| | 7010.04 - 2 | Rockville Senior Center | **1.1** | *1.0* | *0.1* |
| | | First Baptist Church* | **0.4** | *0.4* | — |
| | | First Christ Church of Scientist | **<0.1** | *<0.1* | *<0.1* |
| | 7010.05 - 1 | Rockville Christian Church* | **0.5** | *0.5* | — |
| | | Sterling Care Rockville Nursing | **0.9** | *0.9* | — |
| | | Julius West Middle School* | **0.6** | *0.6* | — |
| **Potomac** | 7060.09 - 3 | Carderock Springs Elementary School | **0.2** | *0.2* | *0.1* |
| | | Gibson Grove A.M.E. Zion Church | **0.1** | *0.1* | — |

*Note: "—" indicates zero property impacts. All community facility property impacts are partial acquisitions. No property displacements would occur under the Preferred Alternative. The total acreage may not equal the sum of the permanent and temporary impacts due to rounding.*

*\* Community facility property impact extends into block group 7010.06 – 2, also in the Rockville CEA Analysis Area Community.*

The Preferred Alternative would not eliminate existing access or provide new access to impacted community facility properties, as none of these properties are currently accessed directly from I-495 or I-270.[18] No permanent impacts to the operation of community facilities would occur. Changes to viewsheds from and noise levels at community facility properties would occur due to the construction and operation of the Preferred Alternative.

Impacts to services that support the communities within the study area, including transit and utilities, will continue to be coordinated in final design. Impacts to these services are anticipated to be minor to negligible. Existing bus transit services that utilize I-495 and I-270 would be permitted to use managed lanes implemented under the Preferred Alternative; as a result of this use, transit services would benefit from reduced travel times and enhanced reliability.

Minor utility relocations will occur and would be coordinated with the appropriate service providers during construction to ensure there is minimal disruption to utility customers.

### 3.5.3    Mitigation

Mitigation measures to lessen the visual impact of the improvements have been considered as appropriate. The design of all highway elements would follow aesthetic and landscaping guidelines and would be visually consistent with the existing highway setting. The aesthetic and landscaping guidelines would be developed by the Developer in consultation with local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state, and federal agencies.

Full property acquisitions have been avoided and other property impacts minimized through a series of engineering and design refinement approaches. As design of the LOD progressed, property impacts have been minimized where feasible. All affected private property owners would be compensated for the fair market value of the acquired portion of land and any damages to the remaining property and structures; this includes compensation for temporary use of land for the construction of the Preferred Alternative.

---

[18] This discussion of impacts to community facilities excludes detailed impacts to public parks and public parks with historic properties, which are described in **FEIS, Chapter 5.4.3**.

00005185

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 51 of 121

**OP·LANES** | I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report
MARYLAND

Mitigation for impacts to Section 4(f) properties, including public parks and public parks with historic properties, has been coordinated extensively with the Officials with Jurisdiction (OWJ) over the impacted park properties. The final mitigation commitments have been developed to include all possible planning to minimize harm. Refer to **FEIS, Chapter 6** and **FEIS, Appendix G** for additional details.

Noise abatement would be provided in all Noise Sensitive Areas where abatement has been found to be reasonable and feasible. Detail on noise impacts and abatement is provided in **FEIS, Chapter 5.9** and **FEIS, Appendix L**.

## 3.6    Property Acquisitions

Property acquisitions within the Preferred Alternative LOD for conversion to transportation right-of-way include only partial acquisitions with no full acquisitions. A partial acquisition is considered one that does not cause a business or residential relocation and has been assumed where a principle building of a residence, business, or community facility is located more than 20 feet from the Preferred Alternative LOD. A full property acquisition resulting in a relocation would be assumed where a principle building is located within 20 feet of the LOD. This methodology to determine where a full property acquisition would be required was developed in coordination with the MDOT SHA Office of Real Estate based on similar project experience and engineering judgment.

The Preferred Alternative LOD was determined from the proposed roadway typical section, interchange configuration, and roadside design elements. The proposed roadway typical section, roadside design features, and topography and terrain were used to determine the cut and fill lines required to construct the Preferred Alternative. Generally, the cut and fill lines were offset by an additional ten feet to create the LOD. For further details on the establishment of the LOD refer to the **FEIS, Chapter 3.1.2**. For details on the applicable federal and state regulations and methodology related to property acquisition, refer to the **FEIS, Chapter 5.5**.

### 3.6.1    Existing Conditions

Within the highly developed CEA Analysis Area well-established communities, parklands and open space, commercial, and industrial areas are traversed by state and local transportation rights-of-way. The existing I-495 right-of-way within the study corridor ranges in width between 150 and 300 feet, to accommodate a six- to eight-lane freeway (three to four lanes in each direction) plus auxiliary lanes in some locations. The I-495 median width varies from closed to approximately 36 feet wide with shoulders up to 12 feet in width along most of the roadway. The existing I-270 right-of-way from the I-495 split, north to I-370 varies between 250 and 300 feet. Where the I-270 east and west spurs intersect with I-495, I-270 carries a total of six lanes with the left lane of both directions used as a HOV lane during peak periods. North of the spurs, I-270 is a twelve-lane freeway with one high-occupancy vehicle (HOV) lane and five general purpose (GP) lanes in each direction. The median of I-270 is barrier-separated with full-width shoulders. Existing conditions are depicted as the No Build Alternative in **Figure 1-2.**

### 3.6.2    Environmental Consequences

#### A.    The No Build Alternative

The No Build Alternative would not result in impacts to properties.

00005186

## B.    Preferred Alternative

The Preferred Alternative does not result in any full acquisitions or residential or business displacements.

The Preferred Alternative would impact 92.8 acres of right-of-way that is outside of the existing highway right-of-way (78.2 acres for permanent use and 14.7 acres for temporary use) primarily from properties adjacent to the existing I-495 and I-270 roadway alignments. This includes 30.2 acres of permanent and temporary impact to the 13 public parks and public parks with historic sites identified in **FEIS, Chapter 5, Table 5-5**. The number and types of properties impacted by the Preferred Alternative are shown in **Table 3-10**. The proposed right-of-way impacts would not eliminate existing access or provide new access to impacted properties, as none of these properties are currently accessed directly from I-495 or I-270.

Table 3-10: Summary of Right-of-Way Acquisitions and Impacts from the Preferred Alternative

| Property Types | Number of Properties[1] |
|---|---|
| Residential Relocations | 0 |
| Residential Properties Impacted | 255 |
| Business Relocations | 0 |
| Business/Other Properties Impacted[2,3] | 106 |
| Total Number of Properties Impacted | 361 |

[1] The number of properties relocated or impacted is not broken out by permanent and temporary to avoid double-counting a property that is impacted for both permanent and temporary use. Only the total count is provided.

[2] Business/Other Properties Impacted is equal to the sum of impacted properties with non-residential zoning designations, including Commercial/Employment, Industrial, Mixed-use, Park/Open Space, Planned Unit/Planned Community, and Transportation.

[3] Includes the 13 impacted public parks and public parks with historic sites identified in **FEIS Chapter 5, Table 5-5**.

The Preferred Alternative results in property impacts due to roadway widening to construct additional travel lanes, reconfiguration of interchange ramps, reconstruction of significant bridges and other structures, augmentation and extension of culverts, replacement or extension of existing noise barriers, construction of new noise barriers, and utility relocation that cannot be accommodated within existing highway right-of-way. Generally, the proposed property acquisition for right-of-way would include acquiring strips of land, or strip takes, from undeveloped areas or areas of trees and landscaping in yards that back to I-495 or I-270. Acquisition of larger areas would be needed for the accommodation of stormwater management (SWM) facilities or drainage improvements. The proposed SWM facilities are shown on the *Environmental Resource Mapping* **(FEIS, Appendix E)**.

A breakdown of partial property impacts along the study corridor is presented by areas between existing interchanges in **Table 3-11**. To provide localized context, property impacts are presented for 16 areas between existing interchanges; page references to the *Environmental Resource Mapping* **(FEIS, Appendix E)** are provided for each area. Each individual property acquisition identified will be evaluated further during final design.

00005187



I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## Table 3-11: Property Impacts by Geographic Area

| Geographic Area | Permanent | Temporary | Total[1,2] |
|---|---|---|---|
| **Area 1: I-495 west side, south of George Washington Parkway (FEIS Appendix E, Map 1-2)** | | | |
| Number of Existing Properties Impacted | — | — | 11 |
| Total Acreage of Partial Property Acquisitions | 0.7 | 0.1 | 0.8 |
| **Area 2: I-495 west side, between George Washington Parkway and Clara Barton Parkway (FEIS Appendix E, Maps 2-5)** | | | |
| Number of Existing Properties Impacted | — | — | 8 |
| Total Acreage of Partial Property Acquisitions | 0.9 | 8.3 | 9.3 |
| **Area 3: I-495 west side, between Clara Barton Parkway and MD 190 (River Road) (FEIS Appendix E, Maps 5-10)** | | | |
| Number of Existing Properties Impacted | — | — | 55 |
| Total Acreage of Partial Property Acquisitions | 6.4 | 0.7 | 7.1 |
| **Area 4: I-495 west side, between MD 190 (River Road) and I-270 west spur (FEIS Appendix E, Maps 10-12)** | | | |
| Number of Existing Properties Impacted | — | — | 68 |
| Total Acreage of Partial Property Acquisitions | 8.7 | 0.5 | 9.2 |
| **Area 5: I-495 top side, between I-270 west spur and MD 187 (Old Georgetown Road) (FEIS Appendix E, Maps 12-14)** | | | |
| Number of Existing Properties Impacted | — | — | 7 |
| Total Acreage of Partial Property Acquisitions | 0.2 | 0 | 0.2 |
| **Area 6: I-495 top side, between MD 187 (Old Georgetown Road) and I-270 east spur – OUTSIDE LIMITS OF PREFERRED ALTERNATIVE – NO IMPACTS** | | | |
| Number of Existing Properties Impacted | — | — | 0 |
| Total Acreage of Partial Property Acquisitions | 0 | 0 | 0 |
| **Area 7: I-270 west spur, between I-495 and Democracy Boulevard (FEIS Appendix E, Maps 7,9)** | | | |
| Number of Existing Properties Impacted | — | — | 4 |
| Total Acreage of Partial Property Acquisitions | 1.5 | 0.7 | 2.1 |
| **Area 8: I-270 west spur, between Democracy Boulevard and Westlake Terrace (FEIS Appendix E, Maps 17-18)** | | | |
| Number of Existing Properties Impacted | — | — | 3 |
| Total Acreage of Partial Property Acquisitions | 1.3 | <0.1 | 1.3 |
| **Area 9: I-270 east spur, between I-495 and MD 187 (Old Georgetown Road) (FEIS Appendix E, Maps 19-20)** | | | |
| Number of Existing Properties Impacted | — | — | 4 |
| Total Acreage of Partial Property Acquisitions | 1.2 | 0 | 1.2 |
| **Area 10: I-270 west and east spurs, between Y-split and Westlake Terrace and MD 187 (FEIS Appendix E, Maps 18, 20-22)** | | | |
| Number of Existing Properties Impacted | — | — | 14 |
| Total Acreage of Partial Property Acquisitions | 6.8 | 0.1 | 6.9 |
| **Area 11: I-270 mainline, between Y-split and Montrose Road (FEIS Appendix E, Maps 22-26)** | | | |
| Number of Existing Properties Impacted | — | — | 63 |
| Total Acreage of Partial Property Acquisitions | 15.7 | 1.2 | 16.8 |
| **Area 12: I-270 mainline, between Montrose Road and MD 189 (Falls Road) (FEIS Appendix E, Maps 25-29)** | | | |
| Number of Existing Properties Impacted | — | — | 23 |
| Total Acreage of Partial Property Acquisitions | 12.8 | 0.3 | 13.2 |
| **Area 13: I-270 mainline, between MD 189 (Falls Road) and MD 28 (W. Montgomery Ave.) (FEIS Appendix E, Maps 29-31)** | | | |
| Number of Existing Properties Impacted | — | — | 45 |
| Total Acreage of Partial Property Acquisitions | 7.8 | 0.3 | 8.1 |
| **Area 14: I-270 mainline, between MD 28 (W. Montgomery Ave.) and Shady Grove Road (FEIS Appendix E, Maps 31-34)** | | | |
| Number of Existing Properties Impacted | — | — | 40 |

00005188


| Geographic Area | Permanent | Temporary | Total[1,2] |
|---|---|---|---|
| Total Acreage of Partial Property Acquisitions | 8.8 | 2.4 | 11.2 |
| **Area 15: I-270 mainline, between Shady Grove Road and I-370 (FEIS Appendix E, Maps 34-38)** | | | |
| Number of Existing Properties Impacted | — | — | 13 |
| Total Acreage of Partial Property Acquisitions | 4.8 | <0.1 | 4.8 |
| **Area 16: I-270 mainline, north of I-370 (FEIS Appendix E, Maps 36, 39)** | | | |
| Number of Existing Properties Impacted | — | — | 3 |
| Total Acreage of Partial Property Acquisitions | 0.6 | <0.1 | 0.6 |
| **Phase 1 South - Total** | | | |
| Number of Existing Properties Impacted | — | — | 361 |
| **Total Right-of-way[3] (acres)** | 78.2 | 14.6 | 92.8 |

Note: [1] The number of properties impacted is not broken out by permanent and temporary to avoid double-counting a property that is impacted for both permanent and temporary use. Only the total count is provided.

[2] The total acreage may not equal the sum of the permanent and temporary impacts due to rounding.

The properties that would be impacted by the Preferred Alternative are dispersed throughout the seven CEA Analysis Area Communities along the study corridors within the CEA Analysis Area. The impacts of the partial property acquisitions on individual communities are evaluated in **Section 4** and **Appendix D**.

### 3.6.3    Mitigation

All affected private property owners would be compensated for the fair market value of the acquired portion of land and any damages to the remaining property and structures; this includes compensation for temporary use of land for the construction of the Preferred Alternative. Ongoing coordination with area businesses would occur to prevent or minimize both short- and long-term disruptions.

Property acquisition activities will be performed in accordance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Uniform Act), as amended and all applicable Maryland State laws that establish the process through which MDOT SHA may acquire real property through a negotiated purchase or through condemnation. The *Uniform Relocation Assistance and Real Property Acquisition Policies Act* is included in **Appendix E**.

Note that it is the policy of MDOT SHA to ensure compliance with the provisions of *Title VI of the Civil Rights Act of 1964,* and related civil rights laws and regulations which prohibit discrimination on the grounds of race, color, sex, national origin, age, religion, or physical or mental handicap in all MDOT SHA projects funded in whole or in part of FHWA. MDOT SHA will not discriminate in highway planning, highway design, highway construction, right-of-way acquisitions, or provision of relocation advisory assistance. This policy has been incorporated into all levels of the highway planning process to ensure that proper consideration may be given to the social, economic, and environmental effects of all highway projects.

00005189

Case 8:22-cv-02597-DKC     Document 58-2     Filed 10/30/23     Page 55 of 121

OP-LANES
M A R Y L A N D | I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

# 4   COMMUNITY PROFILES AND CONSEQUENCES

## 4.1   CEA Analysis Area Communities

**Section 3** of this technical report presents impacts to environmental resources for the entire CEA Analysis Area, which includes all 66 Census block groups within 0.25-mile of the LOD. To better localize the impacts, the 66 block groups were matched with the municipality or Census Designated Place (CDP) in which they were primarily located to define the individual CEA Analysis Area Communities. The Gaithersburg, Rockville, North Bethesda, Bethesda, Cabin John, Potomac, and McLean CEA Analysis Area Communities are shown in **Figure 2-1**. Detail on the delineation is also provided in **Section 2.1**.

## 4.2   What are the Community Profiles?

To enhance public understanding of impacts and accessibility to the data presented in **Sections 3 and 5**, a profile for each of the seven CEA Analysis Area Communities was prepared (**Appendix D**). The profiles feature an overview of the community location; planning and development; community facilities; socioeconomic characteristics,[19] including minority/race populations and low-income populations, if present; and resource impacts, including impacted community facilities and services. Impacts are presented in this manner to communicate how the Preferred Alternative may impact specific communities.

Each community profile includes **Map 1**, which depicts the community, as defined for this technical report; the limits of the CEA Analysis Area; any overlaying city, town, municipal or Census Designated Place (CDP) boundaries; and the CEA Analysis Area block groups within the subject community. **Map 2** identifies and maps community facilities within the CEA Analysis Area Community.

Potential impacts from the Preferred Alternative to each CEA Analysis Area Community[20] are also described, including the number of impacted properties, the number and type of community facilities impacted, changes to land use, and potential noise abatement. Qualitative impacts, including potential changes to viewsheds, and a community's sense of place, cohesion, and isolation, are also highlighted for each CEA Analysis Area Community.

## 4.3   Summary of Environmental Consequences to Communities

Under the Preferred Alternative, properties that would be impacted by the improvements are dispersed throughout the seven CEA Analysis Area Communities. Right-of-way acquisitions under the Preferred Alternative would generally occur to properties adjacent to the existing I-495 and I-270 roadway alignments, acquiring strips of land from undeveloped areas or areas of trees and landscaping directly adjacent to I-495 or I-270. As described in **Section 3.6.1**, a partial acquisition would be needed when the

---

[19] Note that no persons identifying as American Indian and Alaska Native alone are estimated to live within the Cabin John, McLean, and Potomac CEA Analysis Area Communities. Additionally, no persons identifying as Native Hawaiian or Other Pacific Islander alone are estimated to live within the Bethesda, Gaithersburg, McLean, North Bethesda, and Rockville CEA Analysis Area Communities. These populations are not included in the corresponding bar charts in these profiles.

[20] As described previously, the terms "CEA Analysis Area Community" and "EJ Analysis Area Community" are interchangeable. For instance, the Gaithersburg EJ Analysis Area Community has the same block groups and boundaries as the Gaithersburg CEA Analysis Area Community. As such, the profile for the Gaithersburg CEA Analysis Area Community serves as the profile for the Gaithersburg EJ Analysis Area Community. See **Chapter 2.1** for delineation detail.

00005190

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 56 of 121

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

limits of disturbance[21] encroach onto a portion of the property but is more than 20 feet from a principal building.

The construction of the Preferred Alternative would include the following Study elements: managed lanes, shoulders, traffic barrier, direct access at-grade auxiliary lanes or ramps, reconstructed bridges, cut and fill slopes, SWM facilities, retaining walls, and noise walls along the existing highway corridors. Construction of the Preferred Alternative would also require relocation of signage, guardrails, communications towers, and light poles due to the widening of the roadway. Similarly, where noise barriers already exist, they would be replaced; additional noise barriers may be constructed as detailed in **FEIS, Chapter 5.9** and in the *Final Noise Technical Report* **(FEIS, Appendix L)**.

There are no residential or business relocations or displacements with the Preferred Alternative. As shown in **Table 4-1**, partial property impacts under the Preferred Alternative are dispersed throughout the seven Analysis Area Communities within the LOD.

Table 4-1: Property Impacts in Analysis Area Communities

| CEA Analysis Area Community | Number of Impacted Properties[1] | Property Acquisition (acres) | | |
|---|---|---|---|---|
| | | *Perm.* | *Temp.* | **Total** |
| Gaithersburg | 10 | *2.7* | *<0.1* | **2.7** |
| Rockville | 114 | *32.2* | *3.0* | **35.2** |
| North Bethesda | 75 | *13.6* | *1.0* | **14.7** |
| Bethesda | 44 | *4.4* | *0.5* | **4.9** |
| Cabin John | 22 | *4.3* | *1.4* | **5.7** |
| Potomac | 81 | *19.7* | *4.9* | **24.6** |
| McLean[2] | 16 | *1.2* | *3.8* | **5.0** |
| Total | **361** | **78.2** | **14.7** | **92.8** |

Notes: [1] One impacted parcel falls in both the Cabin John and Potomac Analysis Area Communities and is counted twice for the purpose of this table; it is only counted once in the calculation of the total number of impacted parcels, which is equal to 361.

[2] Three of the parcels in the McLean Analysis Area Community are categorized as park/open space and are part of the George Washington Memorial Parkway.

Of the total 92.8 acres of property required under the Preferred Alternative, the Rockville Analysis Area Community would experience the greatest number and largest proportion (38 percent), by acreage, of the total property impacts, and the Potomac Analysis Area Community would experience the second greatest number and second greatest proportion (27 percent), by acreage, of the property impacts. At 10 properties and three percent of the total acreage of property impacts, the Gaithersburg Analysis Area Community would experience the smallest proportion of property impacts as it is located near the northern terminus of the Phase 1 South limits.

Property acquisitions under the Preferred Alternative would occur to properties adjacent to the existing I-495 and I-270 roadway alignments, acquiring strips of land from undeveloped areas or areas of trees and landscaping directly adjacent to I-495 or I-270. In addition, approximately 1.1 acres of right-of-way would be required for the compensatory or offsite stormwater management. (Offsite stormwater management

---

[21] Generally defined as the proposed boundary within which all construction, materials storage, grading, landscaping and related activities would occur.

00005191



locations are preliminary at this point in the Study and will be identified by the Developer in coordination with property owners during final design; refer to **FEIS, Chapter 3.1.6.E** for additional details on the compensatory stormwater management and potential impacts.)

Divisions or isolation of properties, persons, or groups would not occur due to the generally parallel nature of the LOD along I-495 and I-270 and the fact that no properties would be displaced. As such, the existing sense of community cohesion of communities along the study corridors would not be impacted. The Preferred Alternative also would not eliminate access or provide new access to properties, nor would it impede access between residences, community facilities, and businesses as no properties are accessed directly from I-495 or I-270. MDOT SHA has committed to constructing a new sidewalk along the west side of Seven Locks Road under I-495, which would reestablish the historic connection between First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall and Cemetery in the historically African American community of Gibson Grove.

00005192

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 58 of 121

OP·LANES
M A R Y L A N D | I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

# 5    ENVIRONMENTAL JUSTICE ANALYSIS

## 5.1    Environmental Justice Analysis Regulatory Context

All federal agencies must comply with Title VI of the 1964 Civil Rights Act and Executive Order (EO) 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations. Under Title VI and related statutes, each federal agency is required to ensure that no person is excluded from participation in, denied the benefit of, or subjected to discrimination under any program or activity receiving federal financial assistance on the basis of race, color, national origin,[22] age, sex, disability, or religion. EO 12898 states that "…each Federal agency shall make achieving Environmental Justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."

EO 12898 directs federal agencies to identify and address the disproportionately high and adverse human health or environmental effects of their actions on minority and low-income populations, to the greatest extent practicable and permitted by law. A disproportionately high and adverse effect on minority and low-income populations is defined by the FHWA Order 6640.23A: *FHWA Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* (2012), as an impact that:

- Would be predominately borne by a minority and/or low-income population, or
- Will be suffered by the minority population and/or low-income population and is appreciably more severe or greater in magnitude than the adverse effect that will be suffered by the nonminority population and/or non-low-income population.

The EO is intended to promote nondiscrimination in federal programs that affect human health and the environment, as well as provide minority and low-income communities access to public information and public participation.

The strategies developed under EO 12898 and subsequent Environmental Justice (EJ) FHWA guidance set forth the appropriate and necessary steps to identify and address disproportionately high and adverse effects of federal transportation projects on the health or environment of minority and low-income populations to the greatest extent practicable and permitted by law. The guidance also addresses an important aspect of EJ: providing meaningful opportunities for public involvement by members of minority populations and low-income populations during the planning and development of programs, policies, and activities (including the identification of potential effects, alternatives, and mitigation measures, if required). The following policies and guidance documents provide assistance for addressing minority and low-income communities:

- US Department of Transportation (USDOT) Order 5610.2(c) *Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* (2021 revision);

---

[22] Including individuals with Limited English Proficiency.

00005193

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

- FHWA Order 6640.23A, *FHWA Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* (2012); and

- FHWA memorandum *Guidance on Environmental Justice and NEPA* (2011).

EO 12898 does not define the terms *minority* or *low-income*, but the terms have been defined in the USDOT and FHWA Orders on EJ. FHWA Order 6640.23A provides the following definitions, which have been used in this analysis:

- *Minority Individual* – A person who identifies as:

    1) Black: a person having origins in any of the black racial groups of Africa;

    2) Hispanic or Latino: a person of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race;

    3) Asian American: a person having origins in any of the original peoples of the Far East, Southeast Asia or the Indian subcontinent;

    4) American Indian and Alaskan Native: a person having origins in any of the original people of North America, South America (including Central America), and who maintains cultural identification through tribal affiliation or community recognition; or

    5) Native Hawaiian and Other Pacific Islander: a person having origins in any of the original peoples of Hawaii, Guam, Samoa or other Pacific Islands.

- *Low-Income Individual* – A person whose household income is at or below the US Department of Health and Human Services (HHS) poverty guidelines.

## 5.2    Environmental Justice Analysis Methodology

As stated in **Section 5.1**, the strategies developed under EO 12898, USDOT Order 5610.2(c), FHWA Order 6640.23A, and FHWA memorandum Guidance on Environmental Justice and NEPA (2011) set forth the appropriate and necessary steps to identify and address disproportionately high and adverse effects of federal transportation projects on minority and low-income populations. Based on these strategies, the first four steps, below, were documented and updated in the DEIS and SDEIS EJ Analyses and have been updated and enhanced where necessary for this FEIS EJ Analysis:

1.  The identification of minority race and ethnicity populations and low-income populations (EJ populations) along the 48-mile study corridor for the **DEIS (DEIS, Chapter 4.21.2A** and **4.21.2B** and **DEIS, Appendix E**, **Chapter 4.2.1 and 4.2.2)** and then an update on the identification of EJ populations for the Preferred Alternative, Alternative 9 - Phase 1 South limits in the **SDEIS (SDEIS, Chapter 4.21.2)**;

2.  The review of demographic data to determine the existing environmental and community conditions of the EJ populations, documented in the **DEIS (DEIS, Chapter 4.21.3** and **DEIS, Appendix E, Chapter 4.3**) and enhanced in the **SDEIS (SDEIS, Chapter 4.21.2)**;

00005194

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 60 of 121

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

3. The documentation of public outreach as planned, conducted and refined throughout the study in consideration of the demographic and community data to ensure meaningful involvement in EJ populations, documented in the **DEIS (DEIS, Chapter 4.21.4** and **DEIS, Appendix E, Chapter 4.4)** and updated in the **SDEIS (SDEIS, Chapter 4.21.2)** and **FEIS (FEIS, Chapter 5.21.4)**; and

4. The identification of potential beneficial and/or adverse impacts to EJ populations under the No Build and Screened Alternatives in the **DEIS (DEIS, Chapter 4.21.5** and **DEIS, Appendix E, Chapter 4.5)**, and the identification of potential beneficial and/or adverse impacts to EJ populations under the No Build and Preferred Alternative, Alternative 9 - Phase 1 South updated in the **SDEIS (SDEIS, Chapter 4.21.3)** and **FEIS (FEIS, Chapter 5.21.6)**.

Steps #2, 3, and 4 are updated and Steps #5 through #8, below, are documented in this FEIS EJ Analysis in consideration of the Preferred Alternative, Alternative 9 - Phase 1 South:

5. The consideration of mitigation or community enhancement measures if unavoidable adverse effects are expected to occur under the Preferred Alternative (**Section 5.6**);[23]

6. A comparison of adverse effects to all EJ populations under the Preferred Alternative versus adverse effects to a non-EJ population reference community (**Section 5.7**);

7. A determination of whether disproportionately high and adverse impacts would occur to EJ populations under the Preferred Alternative (**Section 5.8**); and

8. A final conclusion of whether disproportionately high and adverse effects would occur to EJ populations, based on unmitigated adverse effects and whether public feedback has been addressed (**Section 5.8**).

### 5.2.1    Environmental Justice Analysis Area

This EJ Analysis describes the existing conditions of and potential impacts to minority race and ethnicity populations and low-income populations who live within the "EJ Analysis Area." The EJ Analysis Area is the same geographic analysis area used for the Community Effects Assessment (CEA) in **Section 3**. The EJ Analysis Area is composed of the same basic population units—Census block groups—as the CEA Analysis Area. Like the CEA Analysis Area, the EJ Analysis Area includes all 66 Census block groups that are located within 0.25-mile to either side of the Phase 1 South limits.[24] The 66 block groups can also be sorted into the same community designations as the CEA Analysis Area Communities that are defined in **Section 2.1**. Like the CEA Analysis Area, the EJ Analysis Area is located almost entirely within Montgomery County, Maryland, and partially within Fairfax County, Virginia.

For the purposes of this EJ Analysis, a block group within the EJ Analysis Area that meets the minority race and ethnicity population and/or low-income population criteria defined in **Sections 5.2.2** and **5.2.3** below is referred to as an "EJ population." (While it is understood that a population of minority race and ethnicity

---

[23] Steps #4 and 5 plus Steps #7 and 8 are combined in this FEIS EJ Analysis.

[24] The 0.25-mile buffer on either side of the study corridors was established as a resource inventory boundary that would reasonably include areas that would potentially be subject to direct impacts from the Preferred Alternative. Expanding the CEA Analysis Area/EJ Analysis Area to include all Census block groups intersecting the 0.25-mile delineation provides a conservative spatial approximation of the neighborhoods surrounding the study corridors.

00005195

persons or a population of low-income persons does not necessarily live within delineated geographies along the study corridor, this EJ Analysis must rely on a basic unit of population to collect and analyze data— in this case, the block group.)

## 5.2.2    Identification of Minority Race and Ethnicity Populations

MDOT SHA, in coordination with FHWA, identified the methodology for the Environmental Justice Analysis for the Study. Using the methodology, the following definition applies to this Study:

- *Minority Populations* - Any readily identifiable groups of minority persons who live in geographic proximity, and if circumstances warrant, geographically dispersed/transient persons (such as migrant workers or Native Americans) who would be similarly affected by a proposed USDOT program, policy or activity. See USDOT Order 5610.2C and FHWA Order 6640.23A.

Per the Council on Environmental Quality (CEQ) Environmental Guidance Under NEPA (1997), a minority population is present when: (A) the minority race and ethnicity population of the affected area exceeds 50 percent or (B) the minority population percentage of the affected area is meaningfully greater than the minority population percentage in the general population or other appropriate unit of geographic analysis.

For the purposes of this EJ Analysis, the Census block group is used as the basic unit of population because it represents a "readily identifiable group of minority persons who live in geographic proximity" (FHWA Order 6640.23A). Additionally, this EJ Analysis uses a methodological approach based on Environmental Guidance Under NEPA (CEQ, 1997) approach (B), as approach (B) is slightly more conservative than approach (A). A block group within the EJ Analysis Area was considered an EJ population if its minority race and ethnicity population is equal to or exceeds 49 percent, which is the percent population of minority race and ethnicity individuals in Maryland. Maryland was chosen instead of Montgomery County as the appropriate unit of geographic analysis to compare the block groups within the EJ Analysis Area against because Maryland has a more conservative threshold for comparison, while Montgomery County has a relatively high level of multiracial diversity. If the block groups were compared to the County, fewer of the block groups would have a "meaningfully greater" percent population of minority race and ethnicity individuals, resulting in fewer block groups given elevated EJ consideration. As such, the percent population of minority race and ethnicity individuals of each block group was compared to that of Maryland.

## 5.2.3    Identification of Low-Income Populations

As stated previously, MDOT SHA, in coordination with FHWA, identified the methodology for the EJ Analysis for the Study. Using the methodology, the following definition applies to this Study:

- *Low-Income Population* – Any readily identifiable group of low-income persons who live in geographic proximity, and, if circumstances warrant, geographically dispersed/transient persons (such as migrant workers or Native Americans) who would be similarly affected by a proposed USDOT program, policy, or activity. See USDOT Order 5610.2C and FHWA Order 6640.23A.

For the purposes of this FEIS EJ Analysis, the Census block group is used as the basic unit of population because it represents a "readily identifiable group of low-income persons who live in geographic proximity" (FHWA Order 6640.23A). The ACS Five-Year Estimates (2015-2019) were also used to collect

00005196



I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

the median household income and average household size data for each of the 66 block groups within the EJ Analysis Area. The average household size within the block groups was three persons. The HHS Poverty Guidelines provide a threshold median income for low-income designation by size of household. Using the HHS 2019 Poverty Guidelines income threshold for a three-person household, an EJ Analysis Area block group would have a median income of $21,330 or less to be considered a low-income population. However, no block groups within the EJ Analysis Area had a median household income at or below $21,330. Under the HHS 2019 Poverty Guidelines, no low-income populations would be in the EJ Analysis Area.

Additional guidance provided in the EJ Federal Interagency Working Group (IWG) report, *Promising Practices for EJ Methodologies in NEPA Reviews* (2016) was used to evaluate low-income populations for the EJ Analysis Area. Guidelines for identifying low-income populations explain that it may be appropriate for agencies to select a threshold for identifying low-income populations that exceed the poverty level as defined by the HHS Poverty Guidelines (IWG EJ 2016). While HHS Poverty Guidelines are calculated based on a national average, the EJ Analysis Area is in a high-income area compared to the rest of the 48 contiguous states. Because the cost of living in the EJ Analysis Area was determined to be greater than the national average and comparison with the HHS 2019 Poverty Guidelines did not yield any low-income populations, a more conservative methodology for determining low-income populations was adopted using the Department of Housing and Urban Development (HUD) 2019 Income Limits Survey. The HUD Income Limits Survey calculates the threshold for a low-income family/household designation at the Metropolitan Fair Market Rent (FMR)/Income Limits Area-level. The calculations are based on the number of persons in a family.

The HUD 2019 FMR/Income Limits, shown in **Table 5-1** provided a more appropriate comparison for determining low-income populations in the EJ Analysis Area. HUD defines low-income as a family earning 80 percent or less of an area's median family income. The EJ Analysis Area is in the Washington-Arlington-Alexandria, DC-VA-MD FMR Area. As previously stated, the average household size within the EJ Analysis Area was three persons. Therefore, for this EJ Analysis, a block group was considered an EJ population if its median household income was at or below $69,850, the HUD 2019 Low-Income Limit for a family of three in the Washington-Arlington-Alexandria, DC-VA-MD FMR Area.

#### Table 5-1: HUD 2019 Low-Income Limit for the Washington-Arlington-Alexandria, DC-VA-MD FMR Area

| Persons in Family/Household | Guideline |
|:---:|:---:|
| 1 | $ 54,350 |
| 2 | $ 62,100 |
| 3 | $ 69,850 |
| 4 | $ 77,600 |
| 5 | $ 83,850 |
| 6 | $ 90,050 |
| 7 | $ 96,250 |
| 8 | $ 102,450 |

*Source: Department of Housing and Urban Development, FY 2019 Income Limits Survey (https://www.huduser.gov/portal/datasets/il/il2019/2019summary.odn).*

00005197

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## 5.3    Historical Context

Current disparate economic and environmental health conditions of racially segregated communities can be traced largely to policy (or the lack thereof) enacted by federal, state, and local governments during the United States' period of suburbanization from 1940 to 1980. Suburbanization was made possible in part by construction of America's interstate highway systems that allowed families with automobiles, to live, work, and travel more conveniently and more extensively. However, the benefits and adverse impacts from construction and operation of these interstate highway systems, plus other regional and local highway networks, were not distributed equitably. Instead, the benefits and adverse impacts were purposefully concentrated among different racial populations, with majority-minority race and ethnicity communities—primarily black and African American communities— experiencing the most adverse impacts and the fewest benefits. Predominately white communities were typically intentionally avoided during highway design and construction yet experienced the most benefits from highway implementation.

Today's racially and economically segregated conditions in urban and metropolitan areas can be traced directly to decades of neighborhood destruction and residential displacements caused by highway projects plus housing policy and other racially marginalizing actions undertaken by local, state, and the federal government throughout the 20th century. Prior to passage of the National Environmental Policy Act (NEPA) in 1969, there were no regulatory requirements for a government agency to seek input from affected communities during the highway development process. Highways, such as the Southeast-Southwest Freeway (I-695) in DC and I-495 through the former Gibson Grove community in Cabin John,[25] were frequently routed through low-income, majority-minority neighborhoods, disproportionately displacing black and African American residents in particular, further concentrating poverty and exposing remaining residents to the environmental and public health effects associated with traffic proximity. As shown in **Appendix F** and described in **Section 5.4.4A**, EJ mapping data provided by EPA and University of Maryland indicates that the concentration of communities with the greatest levels of EJ concern are located along the study corridor. Today's concentration of communities with the greatest level of EJ concern along the highway is directly related to the history of highway construction before national environmental policy.

Other environmental, public health, and socioeconomic conditions of the EJ Analysis Area are described in **Section 5.4**.

Grassroots organization and protest against these marginalizing practices led eventually to the adoption of civil rights and environmental legislation, including NEPA in 1969. NEPA requires consideration of a range of alternatives to a proposed action and opportunities for public engagement, including with EJ populations (defined in this regulatory context as minority race and ethnicity populations and low-income populations). The NEPA process works as intended through continual refinement of design based on public and agency input to avoid, minimize, and mitigate impacts to resources, including impacts that are disproportionately high and adverse to EJ populations.

---

[25] The historic Gibson Grove AME Zion Church was physically split from the Morningstar Tabernacle No. 88 Moses Hall and Cemetery by construction of I-495 in Cabin John in the 1960s. Gibson Grove was a settlement founded and developed by formerly enslaved families, and the Church, Hall, and Cemetery are important features of this historic settlement. (See https://www.friendsofmoseshall.org/history.) Additional detail on the history and design avoidance of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery is provided in **FEIS, Chapter 5.7**.

00005198


## 5.4    Existing Conditions of Environmental Justice Populations

The existing conditions of minority race and ethnicity populations and low-income populations are identified for each block group in the EJ Analysis Area. Per the methodology set forth in **Section 5.2**, of a total 66 block groups within the EJ Analysis Area along the study corridors within the Phase 1 South limits, 16 are considered EJ populationsEJ populations on the basis of minority race and ethnicity and/or low-income populations. The EJ populations and the Analysis Area Communities in which they are located are shown on **Figure 5-1**.

### 5.4.1    Existing Minority Race and Ethnicity Populations

Race and ethnicity data for the block groups within the EJ Analysis Area is displayed in **Table 5-2**. As described in **Section 5.2**, a block group was identified as an EJ population if 49 percent or more of the block group population identified as a minority race and ethnicity. Of the 66 block groups within the EJ Analysis Area, 15 had minority race and ethnicity populations equal to or above 49 percent. In **Table 5-2** these block groups are highlighted in blue and identified as "yes" in the right-most column.

The EJ Analysis Area, where 42 percent of the population identifies as a minority race or ethnicity, is less diverse than both Montgomery County and the state, whose minority race or ethnicity populations are 56 percent and 49 percent, respectively. Minority race and ethnicity populations considered EJ populations were present to varying degrees in the Gaithersburg, North Bethesda, Potomac, and Rockville EJ Analysis Area Communities.

00005199


I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment & EJ Analysis Technical Report

**Table 5-2: Race and Ethnicity Characteristics of Block Groups within the EJ Analysis Area**

| EJ Analysis Area Community | Geographic Area/ Block Group | Total Population | American Indian and Alaska Native Alone | | Asian Alone | | Black or African American Alone | | Native Hawaiian and Other Pacific Islander Alone | | White Alone | | Some Other Race Alone and Two or More Races | | Hispanic or Latino, Regardless of Race | | Total Minority Population[1] | | Considered EJ Block Group Based on Minority Race and Ethnicity Population? |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | |
| | Fairfax County | 1,145,862 | 1,487 | <1% | 218,484 | 19% | 108,685 | 9% | 684 | <1% | 581,418 | 51% | 47,944 | 4% | 187,160 | 16% | 564,444 | 49% | n/a |
| | Montgomery County | 1,043,530 | 1,505 | <1% | 153,306 | 15% | 186,964 | 18% | 438 | <1% | 457,265 | 44% | 40,298 | 4% | 203,754 | 20% | 586,265 | 56% | n/a |
| | Prince George's County | 908,670 | 2,116 | <1% | 37,170 | 4% | 560,785 | 62% | 404 | <1% | 115,436 | 13% | 25,261 | 3% | 167,498 | 18% | 793,234 | 87% | n/a |
| | Maryland | 6,018,848 | 12,002 | <1% | 375,951 | 6% | 1,768,596 | 29% | 2,294 | <1% | 3,062,363 | 51% | 191,160 | 3% | 606,482 | 10% | 2,956,485 | 49% | n/a |
| | Total Block Groups within the EJ Analysis Area | 103,614 | 149 | <1% | 17,643 | 17% | 10,055 | 10% | 19 | <1% | 59,730 | 58% | 4,555 | 4% | 11,463 | 11% | 43,884 | 42% | n/a |
| **Fairfax County** | | | | | | | | | | | | | | | | | | | |
| McLean | 4701.00 - 1 | 664 | 0 | <1% | 119 | 18% | 0 | <1% | 0 | <1% | 510 | 77% | 31 | 5% | 4 | 1% | 154 | 23% | no |
| | 4701.00 - 2 | 1,896 | 0 | <1% | 433 | 23% | 23 | 1% | 0 | <1% | 1,312 | 69% | 31 | 2% | 97 | 5% | 584 | 31% | no |
| | 4801.00 - 4 | 464 | 0 | <1% | 155 | 33% | 0 | <1% | 0 | <1% | 298 | 64% | 0 | <1% | 11 | 2% | 166 | 36% | no |
| **Montgomery County** | | | | | | | | | | | | | | | | | | | |
| Potomac | 7012.06 - 1 | 1,481 | 0 | <1% | 254 | 17% | 12 | 1% | 0 | <1% | 1,074 | 73% | 59 | 4% | 82 | 6% | 407 | 27% | no |
| | 7012.06 - 2 | 1,920 | 0 | <1% | 218 | 11% | 0 | <1% | 0 | <1% | 1,374 | 72% | 0 | <1% | 328 | 17% | 546 | 28% | no |
| | 7060.08 - 1 | 1,849 | 0 | <1% | 393 | 21% | 27 | 1% | 0 | <1% | 1,336 | 72% | 85 | 5% | 8 | <1% | 513 | 28% | no |
| | 7060.08 - 2 | 862 | 0 | <1% | 176 | 20% | 41 | 5% | 8 | 1% | 569 | 66% | 38 | 4% | 30 | 3% | 293 | 34% | no |
| | 7060.09 - 2 | 1,725 | 0 | <1% | 267 | 15% | 45 | 3% | 0 | <1% | 1,235 | 72% | 9 | 1% | 169 | 10% | 490 | 28% | no |
| | 7060.09 - 3 | 1,456 | 0 | <1% | 125 | 9% | 20 | 1% | 0 | <1% | 1,075 | 74% | 19 | 1% | 217 | 15% | 381 | 26% | no |
| | 7060.12 - 1 | 892 | 0 | <1% | 144 | 16% | 121 | 14% | 0 | <1% | 465 | 52% | 48 | 5% | 114 | 13% | 427 | 48% | no |
| | 7060.12 - 2 | 1,335 | 0 | <1% | 292 | 22% | 235 | 18% | 0 | <1% | 424 | 32% | 68 | 5% | 316 | 24% | 911 | 68% | **yes** |
| | 7060.12 - 3 | 1,032 | 0 | <1% | 174 | 17% | 200 | 19% | 0 | <1% | 519 | 50% | 51 | 5% | 88 | 9% | 513 | 50% | **yes** |
| | 7060.13 - 1 | 1,411 | 0 | <1% | 156 | 11% | 12 | 1% | 0 | <1% | 1,024 | 73% | 37 | 3% | 182 | 13% | 387 | 27% | no |
| | 7060.13 - 2 | 1,478 | 0 | <1% | 340 | 23% | 0 | <1% | 0 | <1% | 912 | 62% | 118 | 8% | 108 | 7% | 566 | 38% | no |
| Cabin John | 7058.00 - 2 | 2,121 | 0 | <1% | 280 | 13% | 92 | 4% | 11 | 1% | 1,501 | 71% | 45 | 2% | 192 | 9% | 620 | 29% | no |
| | 7058 .00 - 3 | 1,141 | 0 | <1% | 1 | <1% | 16 | 1% | 0 | <1% | 987 | 87% | 14 | 1% | 123 | 11% | 154 | 13% | no |
| North Bethesda | 7012.05 - 1 | 2,425 | 0 | <1% | 52 | 2% | 189 | 8% | 0 | <1% | 1,736 | 72% | 233 | 10% | 215 | 9% | 689 | 28% | no |
| | 7012.05 - 2 | 3,100 | 0 | <1% | 412 | 13% | 188 | 6% | 0 | <1% | 2,166 | 70% | 235 | 8% | 99 | 3% | 934 | 30% | no |
| | 7012.05 - 3 | 762 | 0 | <1% | 143 | 19% | 33 | 4% | 0 | <1% | 455 | 60% | 0 | <1% | 131 | 17% | 307 | 40% | no |
| | 7012.05 - 4 | 815 | 0 | <1% | 41 | 5% | 144 | 18% | 0 | <1% | 547 | 67% | 35 | 4% | 48 | 6% | 268 | 33% | no |

00005200

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment & EJ Analysis Technical Report

| Location | ID | Total | | % | | % | | % | | % | | % | | % | | % | | % | Flag |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 7012.13 - 1 | 1,239 | 0 | <1% | 194 | 16% | 329 | 27% | 0 | <1% | 689 | 56% | 0 | <1% | 27 | 2% | 550 | 44% | no |
| | 7012.13 - 2 | 998 | 0 | <1% | 117 | 12% | 9 | 1% | 0 | <1% | 576 | 58% | 73 | 7% | 223 | 22% | 422 | 42% | no |
| | 7012.13 - 3 | 2,251 | 0 | <1% | 480 | 21% | 237 | 11% | 0 | <1% | 1,249 | 55% | 86 | 4% | 199 | 9% | 1,002 | 45% | no |
| | 7012.15 - 1 | 961 | 0 | <1% | 44 | 5% | 89 | 9% | 0 | <1% | 716 | 75% | 24 | 2% | 88 | 9% | 245 | 25% | no |
| | 7012.15 - 2 | 964 | 25 | 3% | 107 | 11% | 16 | 2% | 0 | <1% | 697 | 72% | 21 | 2% | 98 | 10% | 267 | 28% | no |
| | 7012.15 - 3 | 2,678 | 0 | <1% | 543 | 20% | 215 | 8% | 0 | <1% | 1,217 | 45% | 233 | 9% | 470 | 18% | 1,461 | 55% | yes |
| | 7012.15 - 4 | 1,100 | 20 | 2% | 128 | 12% | 148 | 13% | 0 | <1% | 564 | 51% | 53 | 5% | 187 | 17% | 536 | 49% | yes |
| | 7044.01 - 1 | 1,821 | 0 | <1% | 160 | 9% | 81 | 4% | 0 | <1% | 1,300 | 71% | 109 | 6% | 171 | 9% | 521 | 29% | no |
| | 7044.01 - 2 | 1,468 | 5 | <1% | 211 | 14% | 63 | 4% | 0 | <1% | 1,004 | 68% | 47 | 3% | 138 | 9% | 464 | 32% | no |
| | 7045.01 - 1 | 546 | 0 | <1% | 44 | 8% | 29 | 5% | 0 | <1% | 442 | 81% | 8 | 1% | 23 | 4% | 104 | 19% | no |
| | 7045.01 - 2 | 982 | 0 | <1% | 165 | 17% | 82 | 8% | 0 | <1% | 500 | 51% | 118 | 12% | 117 | 12% | 482 | 49% | yes |
| | 7045.01 - 3 | 929 | 0 | <1% | 186 | 20% | 39 | 3% | 0 | <1% | 498 | 54% | 57 | 6% | 149 | 16% | 431 | 46% | no |
| | 7045.01 - 4 | 1,018 | 0 | <1% | 206 | 20% | 223 | 22% | 0 | <1% | 409 | 40% | 34 | 3% | 146 | 14% | 609 | 60% | yes |
| Bethesda | 7044.03 - 1 | 1,559 | 0 | <1% | 175 | 11% | 24 | 2% | 0 | <1% | 1,139 | 73% | 55 | 4% | 166 | 11% | 420 | 27% | no |
| | 7044.04 - 4 | 1,433 | 0 | <1% | 136 | 9% | 165 | 12% | 0 | <1% | 1,006 | 70% | 15 | 1% | 111 | 8% | 427 | 30% | no |
| | 7045.02 - 1 | 746 | 0 | <1% | 52 | 7% | 0 | <1% | 0 | <1% | 659 | 88% | 11 | 1% | 24 | 3% | 87 | 12% | no |
| | 7045.02 - 2 | 1,800 | 0 | <1% | 242 | 13% | 10 | 1% | 0 | <1% | 1,331 | 74% | 66 | 4% | 151 | 8% | 469 | 26% | no |
| | 7045.03 - 1 | 1,572 | 0 | <1% | 154 | 10% | 0 | <1% | 0 | <1% | 1,250 | 80% | 15 | 1% | 153 | 10% | 322 | 20% | no |
| | 7059.01 - 3 | 1,461 | 0 | <1% | 159 | 11% | 45 | 3% | 0 | <1% | 1,104 | 76% | 10 | 1% | 143 | 10% | 357 | 24% | no |
| | 7059.02 - 3 | 1,277 | 3 | <1% | 237 | 19% | 42 | 3% | 0 | <1% | 885 | 69% | 34 | 3% | 76 | 6% | 392 | 31% | no |
| | 7007.17 - 1 | 2,419 | 0 | <1% | 218 | 9% | 1,084 | 45% | 0 | <1% | 350 | 14% | 149 | 6% | 618 | 26% | 2,069 | 86% | yes |
| | 7007.17 - 3 | 2,585 | 0 | <1% | 165 | 6% | 788 | 30% | 0 | <1% | 310 | 12% | 70 | 3% | 1,252 | 48% | 2,275 | 88% | yes |
| | 7007.17 - 4 | 869 | 0 | <1% | 171 | 20% | 132 | 15% | 0 | <1% | 252 | 29% | 32 | 4% | 282 | 32% | 617 | 71% | yes |
| | 7008.16 - 1 | 2,246 | 0 | <1% | 1,263 | 56% | 213 | 9% | 0 | <1% | 192 | 9% | 119 | 5% | 459 | 20% | 2,054 | 91% | yes |
| Gaithersburg | 7008.16 - 2 | 2,440 | 49 | 2% | 300 | 12% | 817 | 33% | 0 | <1% | 815 | 33% | 43 | 2% | 416 | 17% | 1,625 | 67% | yes |
| | 7008.17 - 1 | 1,521 | 0 | <1% | 367 | 24% | 249 | 16% | 0 | <1% | 551 | 36% | 126 | 8% | 228 | 15% | 970 | 64% | yes |
| | 7008.17 - 2 | 1,854 | 0 | <1% | 216 | 12% | 198 | 11% | 0 | <1% | 977 | 53% | 266 | 14% | 197 | 11% | 877 | 47% | no |
| | 7008.17 - 3 | 4,433 | 0 | <1% | 772 | 17% | 1,145 | 26% | 0 | <1% | 2,049 | 46% | 192 | 4% | 275 | 6% | 2,384 | 54% | yes |
| | 7008.29 - 1 | 1,500 | 0 | <1% | 686 | 46% | 58 | 4% | 0 | <1% | 576 | 38% | 99 | 7% | 81 | 5% | 924 | 62% | yes |
| | 7007.18 - 1 | 4,606 | 32 | 1% | 935 | 20% | 656 | 14% | 0 | <1% | 2,460 | 53% | 225 | 5% | 298 | 6% | 2,146 | 47% | no |
| | 7007.18 - 2 | 1,564 | 0 | <1% | 278 | 18% | 395 | 25% | 0 | <1% | 845 | 54% | 29 | 2% | 17 | 1% | 719 | 46% | no |
| | 7010.01 - 2 | 2,416 | 0 | <1% | 362 | 15% | 118 | 5% | 0 | <1% | 1,546 | 64% | 87 | 4% | 303 | 13% | 870 | 36% | no |
| | 7010.01 - 3 | 569 | 0 | <1% | 58 | 10% | 22 | 4% | 0 | <1% | 489 | 86% | 0 | <1% | 0 | <1% | 80 | 14% | no |
| | 7010.02 - 1 | 986 | 0 | <1% | 174 | 18% | 32 | 3% | 0 | <1% | 699 | 71% | 0 | <1% | 81 | 8% | 287 | 29% | no |
| Rockville | 7010.02 - 2 | 1,941 | 0 | <1% | 326 | 17% | 0 | <1% | 0 | <1% | 1,384 | 71% | 29 | 1% | 202 | 10% | 557 | 29% | no |
| | 7010.02 - 3 | 1,018 | 0 | <1% | 174 | 17% | 54 | 5% | 0 | <1% | 728 | 72% | 19 | 2% | 43 | 4% | 290 | 28% | no |
| | 7010.04 - 2 | 1,622 | 0 | <1% | 109 | 7% | 79 | 5% | 0 | <1% | 1,206 | 74% | 77 | 5% | 151 | 9% | 416 | 26% | no |
| | 7010.04 - 4 | 1,086 | 0 | <1% | 148 | 14% | 32 | 3% | 0 | <1% | 582 | 54% | 206 | 19% | 118 | 11% | 504 | 46% | no |
| | 7010.05 - 1 | 2,507 | 0 | <1% | 635 | 25% | 191 | 8% | 0 | <1% | 1,404 | 56% | 30 | 1% | 247 | 10% | 1,103 | 44% | no |

00005201

| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **7010.05 - 2** | 832 | 0 | <1% | 115 | 14% | 43 | 5% | 0 | <1% | 471 | 57% | 129 | 16% | 74 | 9% | 361 | 43% | no |
| **7010.06 - 1** | 1,626 | 0 | <1% | 604 | 37% | 71 | 4% | 0 | <1% | 868 | 53% | 16 | 1% | 67 | 4% | 758 | 47% | no |
| **7010.06 - 2** | 2,266 | 0 | <1% | 482 | 21% | 13 | 1% | 0 | <1% | 1,438 | 63% | 79 | 3% | 254 | 11% | 828 | 37% | no |
| **7010.07 - 1** | 2,564 | 0 | <1% | 842 | 33% | 256 | 10% | 0 | <1% | 1,179 | 46% | 40 | 2% | 247 | 10% | 1,385 | 54% | **yes** |
| **7010.07 - 2** | 763 | 15 | 2% | 125 | 16% | 113 | 15% | 0 | <1% | 447 | 59% | 46 | 6% | 17 | 2% | 316 | 41% | no |
| **7012.10 - 1** | 986 | 0 | <1% | 127 | 13% | 52 | 5% | 0 | <1% | 681 | 69% | 43 | 4% | 83 | 8% | 305 | 31% | no |
| **7012.11 - 3** | 763 | 0 | <1% | 76 | 10% | 0 | <1% | 0 | <1% | 477 | 63% | 179 | 23% | 31 | 4% | 286 | 37% | no |

*Note: Rows highlighted in blue and featuring a "yes" in the right-most column indicate that the block group is considered an Environmental Justice population.*

00005202

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 68 of 121

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## 5.4.2    Existing Low-Income Populations

Median household income data for the EJ Analysis Area is provided in **Table 5-3**. As described in **Section 5.2.3,** above, a block group was identified as low-income population if its median household income was at or below $69,850. Block groups within the EJ Analysis Area that qualified as low-income populations are highlighted in green and noted with a "yes" in the right-most column of the table.

### Table 5-3: EJ Analysis Area Household Income Characteristics

| EJ Analysis Area Community | Geography/ Block Group | Median Household Income | Considered EJ Block Group Based on Low-Income Population? |
|---|---|---|---|
| | Maryland | $84,805 | n/a |
| | Virginia | $74,222 | n/a |
| | Montgomery County | $108,820 | n/a |
| | Prince George's County | $84,920 | n/a |
| | Fairfax County | $124,831 | n/a |
| McLean | 4701.00 - 1 | $228,594 | no |
| | 4701.00 - 2 | $250,000+ | no |
| | 4801.00 - 4 | $250,000+ | no |
| Potomac | 7012.06 - 1 | $133,750 | no |
| | 7012.06 - 2 | $208,155 | no |
| | 7060.08 - 1 | $250,000+ | no |
| | 7060.08 - 2 | $250,000+ | no |
| | 7060.09 - 2 | $250,000+ | no |
| | 7060.09 - 3 | $196,250 | no |
| | 7060.12 - 1 | $73,295 | no |
| | 7060.12 - 2 | $74,286 | no |
| | 7060.12 - 3 | $51,641 | yes |
| | 7060.13 - 1 | $206,250 | no |
| | 7060.13 - 2 | $212,557 | no |
| Cabin John | 7058.00 - 2 | $182,279 | no |
| | 7058.00 - 3 | $231,250 | no |
| North Bethesda | 7012.05 - 1 | $218,438 | no |
| | 7012.05 - 2 | $232,371 | no |
| | 7012.05 - 3 | $113,750 | no |
| | 7012.05 - 4 | $250,000+ | no |
| | 7012.13 - 1 | $223,125 | no |
| | 7012.13 - 2 | $113,398 | no |
| | 7012.13 - 3 | $102,738 | no |
| | 7012.15 - 1 | $85,144 | no |
| | 7012.15 - 2 | $59,111 | yes |
| | 7012.15 - 3 | $122,763 | no |
| | 7012.15 - 4 | $75,781 | no |
| | 7044.01 - 1 | $180,556 | no |

00005203



I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| EJ Analysis Area Community | Geography/ Block Group | Median Household Income | Considered EJ Block Group Based on Low-Income Population? |
|---|---|---|---|
| | 7044.01 - 2 | $215,192 | no |
| | 7045.01 - 1 | $121,731 | no |
| | 7045.01 - 2 | $200,625 | no |
| | 7045.01 - 3 | $152,228 | no |
| | 7045.01 - 4 | $219,545 | no |
| Bethesda | 7044.03 - 1 | $85,994 | no |
| | 7044.04 - 4 | $141,250 | no |
| | 7045.02 - 1 | $250,000+ | no |
| | 7045.02 - 2 | $198,250 | no |
| | 7045.03 - 1 | $200,428 | no |
| | 7059.01 - 3 | $240,313 | no |
| | 7059.02 - 3 | $250,000+ | no |
| Gaithersburg | 7007.17 - 1 | $64,596 | yes |
| | 7007.17 - 3 | $73,920 | no |
| | 7007.17 - 4 | $64,635 | yes |
| | 7008.16 - 1 | $93,721 | no |
| | 7008.16 - 2 | $87,043 | no |
| | 7008.17 - 1 | $81,328 | no |
| | 7008.17 - 3 | $90,889 | no |
| | 7008.17 - 2 | $103,531 | no |
| | 7008.29 - 1 | $180,104 | no |
| Rockville | 7007.18 - 1 | $107,196 | no |
| | 7007.18 - 2 | $82,083 | no |
| | 7010.01 - 2 | $107,759 | no |
| | 7010.01 - 3 | $246,750 | no |
| | 7010.02 - 1 | $156,111 | no |
| | 7010.02 - 2 | $208,295 | no |
| | 7010.02 - 3 | $161,250 | no |
| | 7010.04 - 2 | $147,434 | no |
| | 7010.04 - 4 | $119,750 | no |
| | 7010.05 - 1 | $121,625 | no |
| | 7010.05 - 2 | $161,563 | no |
| | 7010.06 - 1 | $178,438 | no |
| | 7010.06 - 2 | $177,917 | no |
| | 7010.07 - 1 | $122,443 | no |
| | 7010.07 - 2 | $84,917 | no |
| | 7012.10 - 1 | $217,625 | no |
| | 7012.11 - 3 | $182,778 | no |

Note: Rows highlighted in green and featuring a "yes" in the right-most column indicate that the block group is considered an Environmental Justice population.

00005204

Of the 66 block groups within the EJ Analysis Area, four had a median household income below $69,850. Low-income populations considered EJ populations were present to varying degrees in the Potomac, North Bethesda, and Gaithersburg EJ Analysis Area Communities.

### 5.4.3    Summary: Total Environmental Justice Populations

In summary, 16 (or 24 percent) of the 66 block groups within the EJ Analysis Area meet the minority race and ethnicity population and/or low-income household population criteria to be considered EJ populations. The 16 EJ populations are shown in **Table 5-4**.

**Table 5-4: Total Environmental Justice Populations**

| EJ Analysis Area Community | EJ Population | Meets EJ Population Criteria: | |
| --- | --- | --- | --- |
| | | Minority Race/Ethnicity | Low-Income |
| Gaithersburg | 7007.17 - 1 | ✓ | ✓ |
| | 7007.17 - 3 | ✓ | |
| | 7007.17 - 4 | ✓ | ✓ |
| | 7008.16 - 1 | ✓ | |
| | 7008.16 - 2 | ✓ | |
| | 7008.17 - 1 | ✓ | |
| | 7008.17 - 3 | ✓ | |
| | 7008.29 - 1 | ✓ | |
| Rockville | 7010.07 - 1 | ✓ | |
| North Bethesda | 7012.15 - 2 | | ✓ |
| | 7012.15 - 3 | ✓ | |
| | 7012.15 - 4 | ✓ | |
| | 7045.01 - 2 | ✓ | |
| | 7045.01 - 4 | ✓ | |
| Potomac | 7060.12 - 2 | ✓ | |
| | 7060.12 - 3 | ✓ | ✓ |

Of the 16 block groups identified as EJ populations approximate to the Preferred Alternative, 12 met the criteria[26] based on only minority race and ethnicity population criteria. These 12 block groups were located in the Gaithersburg, Rockville, Potomac, and North Bethesda EJ Analysis Area Communities displayed in **Figure 5-1**. Of the 16 block groups identified as EJ populations, one block group, in the North Bethesda EJ Analysis Area Community, met the criteria based on only low-income population criteria.[27] Three of the 16 block groups identified as EJ populations met the criteria based on both minority race and ethnicity population criteria as well as low-income population criteria. These three block groups were identified in the Gaithersburg and Potomac EJ Analysis Area Communities.

---

[26] A block group was identified as an EJ population based on minority race and ethnicity population criteria if the block group's percent of minority race and ethnicity persons was equal to or exceeded that of Maryland's state-wide percent (49 percent).

[27] A block group was identified as an EJ population based on low-income population criteria if its median household income was at or below $69,850, the HUD 2019 Low-Income Limit for a family of three in the Washington-Arlington-Alexandria, DC-VA-MD FMR Area.

00005205

## Figure 5-1: Environmental Justice Populations



00005206

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 72 of 121

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

#### 5.4.4    Supplemental Community Data

Additional data reviewed to supplement the formal identification of EJ populations via the EJ Analysis methodology is summarized below, including: online EJ mapping tools, households' English-speaking status, the locations of low-income subsidized housing, the distribution of Food Stamps/Supplemental Nutrition Assistance Program (SNAP) benefits, the proportion of students receiving free and reduced-price lunch programs, and Equity Emphasis Areas.[28]

#### A.    Online Environmental Justice Mapping Tools

##### a.    EPA EJSCREEN (2.0)

The EPA hosts an online EJ screening and mapping tool[29] that combines environmental and demographic data for various geographies and presents them in maps and reports. The EPA uses publicly-available data and combines environmental and demographic characteristics (indicators) to produce an EJ Index for a specific geography. To remain consistent with the data collection used in this EJ Analysis, the EPA EJSCREEN geography used here is the Census block group.

For a selected block group, an EJSCREEN Demographic Index[30] is formulaically applied to an Environmental Indicator. The resulting score is the EJ Index[31] for the selected block group for the corresponding Environmental Indicator. An EJ Index is a percentile comparing the environmental and demographic characteristics of a selected block group[32] to those of all block groups within the State of Maryland. For instance, if a block group has an EJ Index score of 86 for the Hazardous Waste Proximity Indicator, it means that 14 percent of block groups in Maryland have higher values. The higher the EJ Index, the greater the potential for EJ concern.

EPA EJSCREEN generates EJ Indexes for the 12 Environmental Indicators listed below. Definitions of the EPA EJSCREEN Demographic Indexes and Environmental Indicators can be found in **Appendix F**.

- Particulate Matter $_{2.5}$
- Ozone
- Diesel Particulate Matter
- Air Toxics Cancer Risk

---

28 The National Capital Region Transportation Planning Board (TPB) Methodology for Equity Emphasis Areas references tract-level Census data to identify communities that have significant concentrations of low-income and/ or minority populations. Data from the American Community Survey for each of the following four population groups is used: Low-Income, African American, Asian, and Hispanic or Latino.

29 See https://www.epa.gov/ejscreen.

30 The demographic index is the combined average of percent minority race/ethnicity and percent low-income households.

31 Per EPA, an EJ Index ultimately measures disparity. Within EPA EJSCREEN, disparity is the difference between the Environmental Indicator's average value among minority race and ethnicity persons and low-income households in the block group versus the average values in the state. A higher EJ Index identifies a block group as contributing more toward the state's disparity in the respective Environmental Indicator category.

32 EJ Analysis Area block groups are all block groups that are located within one-quarter mile to either side of the Preferred Alternative LOD. There are a total of 66 EJ Analysis Area block groups. Additionally, EJ Analysis Area block groups are also grouped into EJ Analysis Area Communities for ease of reader understanding: the block groups are matched with the municipality or Census-Designated Place in which they are primarily located to form the EJ Analysis Area Community. Overall, the 66 EJ Analysis Area block groups can be sorted into seven EJ Analysis Area Communities. Refer to **Section 5.2.1** for additional detail and for how the EJ Analysis Area relates to the CEA Analysis Area.

00005207

OP·LANES
M A R Y L A N D     I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

- Air Toxics Respiratory Hazard Index
- Traffic Proximity
- Lead Paint
- Superfund Proximity
- Risk Management Plan Facility Proximity
- Hazardous Waste Proximity
- Underground Storage Tanks and Leaking Underground Storage Tanks
- Wastewater Discharge

EPA EJSCREEN EJ Indexes were generated per Environmental Indicator for each of the 66 block groups within the EJ Analysis Area and are listed in **Appendix F**. The EJ Indexes for each of the 66 block groups are also presented via a heat map for each Environmental Indicator in **Appendix F**. Additionally, a comparison and summary of EPA EJSCREEN EJ Indexes for the 16 block groups specifically identified as EJ populationsper the Study methodology described in **Section 5.2** is provided in **Appendix F**.

Results from the review of EPA EJSCREEN data show that the EJ Indexes for seven of the Study's 16 EJ populations—all located in the Gaithersburg EJ Analysis Area Community— are at or above the 50th percentile in the state for all 12 Environmental Indicators. Another two of the Study's 16 EJ populations— both located in the Potomac EJ Analysis Area Community— are at or above the 50th percentile in the state for 11 of the 12 Environmental Indicators. For all of the EPA EJ Indexes except the Wastewater Discharge and Hazardous Materials Proximity Indicators, there are at least one non-EJ population that falls at or above the 50th percentile.

### b. Maryland EJSCREEN

Influenced by the EPA EJSCREEN mapping tool, Maryland EJSCREEN, developed by the Community Engagement, Environmental Justice, and Health (CEEJH) Laboratory at the University of Maryland (UMD) School of Public Health, also assesses and maps EJ risks for Census tracts in Maryland.[33] Maryland EJSCREEN data is only available at the Census tract geographical level. As such, data was collected for the Census tracts in which the EJ populations are located. Note that a tract encompasses a larger population than a block group, which is the basic EJ population unit for the purposes of this Study.

For a selected tract, a value representing its Population Characteristics (which is based on an average value of the tract's sensitive populations and socioeconomic factors) is formulaically applied to a Pollution Burden Indicator (which is based on an average value of the tract's exposures and environmental effects). The resulting values for each Pollution Burden Indicator are combined into a single overall MD EJSCREEN EJ Score[34] for the selected tract. The EJ Score is a percentile of a selected tract to that of all tracts within the State of Maryland. For instance, a tract with an EJ Score of 90 is in the 90th percentile, meaning that only 10 percent of tracts in Maryland have higher EJ Scores. The higher the EJ Score, the greater the potential for EJ concern.

---

33 See https://p1.cgis.umd.edu/ejscreen/.
34 See https://p1.cgis.umd.edu/mdejscreen/help.html for definition details and explanations of methodology.

00005208

Definitions of the MD EJSCREEN Population Characteristics and Pollution Burden Indicators can be found in **Appendix F**.

MD EJSCREEN Scores were generated for each of the 32 tracts are listed in **Appendix F**. The EJ Score for each of the tracts is also presented via a heat map in **Figure 5-2**. Additionally, a comparison and summary of MD EJSCREEN EJ Scores for the eight tracts containing the block groups specifically identified as EJ populations EJ populations per the Study's methodology described in **Section 5.2** is provided in **Appendix F**.

Results from the review of MD EJSCREEN data show that all eight of the Study's tracts containing EJ populations fall at or above the 50th percentile in the state for Exposure. The overall EJ Scores for five of the Study's eight tracts containing EJ populations fall at or above the 50th percentile in the state, while four tracts containing EJ populations fall at or above the 50th percentile for Sensitive Populations. Lastly, three of the Study's eight tracts containing EJ populations fall at or above the 50th percentile for both the Environmental Effects and Socioeconomic Factors. When looking at all 32 of the Analysis Area tracts, Gaithersburg, Rockville, North Bethesda, Bethesda, and Potomac all have some of the highest scores for various indicators. All of the indicators, except for Socioeconomic Factors, have tracts without EJ populations that fall at or above the 50th percentile.

### c.    Summary of EJSCREEN Mapping Tools

The review of the EPA EJSCREEN and MD EJSCREEN data and mapping tools confirm that the methodology and identification of EJ populations completed to date for the Study is largely in line with similar assessments completed by outside expert institutions. The EJSCREEN tools also provide an additional layer of nuance by selecting specific, measurable, and common issues faced by EJ populations along the study corridors. Mapping is an easily digestible visual of where Analysis Area block groups and communities with higher concentrations of EJ populations are located.

The results of this review, in combination with the Study's formal EJ Analysis, will help inform and guide MDOT SHA and the Developer where EJ initiatives and outreach should be focused both prior to issuance of the ROD and implemented during final design and construction. Information on engagement outreach, and community enhancements to EJ populations is provided in **Section 5.5**.

00005209



**Figure 5-2: Maryland EJSCREEN EJScore for Census Tracts in the Analysis Area**



00005210

OP·LANES
MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## B.    Limited English-Speaking Households

Executive Order 13166 *Improving Access to Services for Persons with Limited English Proficiency* (2000) requires Federal agencies to examine the services they provide, identify any need for services to those with limited English proficiency (LEP), and develop and implement a system to provide those services so LEP persons can have meaningful access to them.  A person who does not speak English as their primary language and who has a limited ability to read, speak, write or understand English may be LEP.  In accordance with MDOT SHA's *Title VI Program Implementation Plan* (2015), "MDOT SHA will provide translation services to individuals that have limited ability to read, write, speak or understand English. SHA will seek to communicate with LEP populations and provide LEP individuals meaningful access to SHA programs and activities."[35] Interpretation services, particularly Spanish and American Sign Language (ASL), have been available both proactively and by request at each Public Workshop, Public Hearing, and applicable outreach event held for the study.

ACS Five-Year Estimates (2015-2019) data on limited English-Speaking households was evaluated to identify potential LEP populations within the EJ Analysis Area where specific LEP supporting outreach could be targeted.  The ACS allows respondents to identify one's household as English-speaking only, Spanish-speaking, other Indo-European language-speaking, Asian and Pacific Island language-speaking, or other language-speaking. Respondents who identify as part of a non- English-speaking only household further classify as either a "limited English-speaking household" or, "not a limited English-speaking household."

The average proportion of LEP households within EJ Analysis Area was 5.5 percent. In comparison, the proportion of LEP households was lower in Montgomery and Fairfax Counties at 4.4 percent, and in Maryland at 1.8 percent. Of the 66 block groups within the EJ Analysis Area, 26 had an above-average percent of LEP households. Ten of the above-average block groups are block groups already identified as EJ populations; the remaining 16 above-average block groups are not considered EJ populations. The block groups in **Table 5-5** have an above-average (5.5 percent and above) percent of LEP households.

Table 5-5: Block Groups within the EJ Analysis Area with Above-Average LEP Households

| EJ Analysis Area Community | Block Group | Percent LEP Households (Above-Average) | EJ Population? |
|---|---|---|---|
| Gaithersburg | 7007.17 - 1 | 9.4% | yes |
| | 7007.17 - 3 | 24.0% | yes |
| | 7007.17 - 4 | 12.4% | yes |
| | 7008.16 - 1 | 7.0% | yes |
| | 7008.16 - 2 | 9.6% | yes |
| | 7008.17 - 2 | 12.8% | no |
| | 7008.17 - 3 | 7.1% | yes |
| Rockville | 7007.18 - 1 | 6.1% | no |
| | 7007.18 - 2 | 6.1% | no |
| | 7010.01 - 3 | 12.8% | no |
| | 7010.02 - 3 | 5.5% | no |

---

[35] MDOT SHA Title VI Program Implementation Plan accessed at https://www.roads.maryland.gov/OEO/TitleVI-Program-Implementation-Plan.pdf.

00005211


| | 7010.04 - 2 | 7.5% | no |
|---|---|---|---|
| | 7010.06 - 1 | 17.8% | no |
| | 7010.06 - 2 | 7.2% | no |
| | 7010.07 - 1 | 7.4% | yes |
| | 7012.11 - 3 | 33.3% | no |
| North Bethesda | 7012.15 - 3 | 6.3% | yes |
| | 7045.01 - 1 | 15.2% | no |
| | 7045.01 - 3 | 15.2% | no |
| Bethesda | 7044.03 - 1 | 5.8% | no |
| | 7044.04 - 4 | 6.0% | no |
| | 7012.06 - 2 | 7.2% | no |
| | 7060.08 - 2 | 5.5% | no |
| Potomac | 7060.12 - 1 | 12.1% | no |
| | 7060.12 - 2 | 10.6% | yes |
| | 7060.12 - 3 | 32.4% | yes |

## C.    Free and Reduced-Price Lunch Programs

The Virginia Department of Education (VDOE 2019-2020) and Maryland State Department of Education (MSDE 2019-2020) provide annual data on public school student enrollment in the free and reduced-price lunch program. Overall, 33.7 (33.7) percent of students enrolled in Montgomery County Public Schools receive Free and Reduced-Price (F&R) program benefits. Within the EJ Analysis Area, an average of 20.4 percent of students receive F&R program benefits. The six schools in **Table 5-6** have an above-average population of students who receive F&R program benefits.

Table 5-6: EJ Analysis Area Schools with Above-Average Free and Reduced Lunch Program
Participation

| EJ Analysis Area Community | School | Percent F&R Program Participation (Above-Average) | Block Group | EJ Population? |
|---|---|---|---|---|
| Gaithersburg | Summit Hall Elementary School | 79.6% | 7007.17 - 3 | yes |
| | Rosemont Elementary School | 57.4% | 7007.17 - 4 | yes |
| | Gaithersburg High School | 42.1% | 7007.17 - 1 | yes |
| | Fields Road Elementary School | 37.5% | 7008.16 - 2 | yes |
| Rockville | Beall Elementary School | 29.9% | 7010.05 - 1 | no |
| | Julius West Middle School | 27.8% | 7010.05 – 1 | no |

Source: Maryland State Department of Education (2019-2020); Virginia Department of Education (2019-2020)

Four of the six of the schools with an above-average percentage of F&R program participation are in block groups already identified as EJ populations, with the exception of Beall Elementary School (located in block group 7010.05 - 1) and Julius West Middle School (located in block group 7010.05 – 1). No Fairfax County public schools in the EJ Analysis Area have above-average percentage of F&R program participation.

00005212

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 78 of 121

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## D.    Places of Worship

Additionally, to support and facilitate outreach efforts, places of worship located within EJ Analysis Area Communities that contain minority or low-income populations were identified. These include:

- Beth Sholom Congregation and Talmud Torah Synagogue
- Bethesda United Church of Christ
- Cabin John United Methodist Church
- Centro Cristiano Peniel
- Chinese Bible Church of Maryland
- Church of the Ascension
- Clinton AME Zion Church
- Concord Church
- Congressional Heights Baptist Church
- Cross Community
- Emmanuel Lutheran Church
- Epworth United Methodist Church
- Ezra Israel Congregation
- First Assembly of God Church
- First Baptist Church
- First Baptist Church of Rockville
- First Christ Church of Scientist
- Friends Meeting Church
- Gaithersburg Presbyterian Church
- Geneva United Presbyterian Church
- Good Shepherd Lutheran Church
- Greek Orthodox Church of Saint George
- Hermon Church
- Iglesia de Dios
- Iglesia Hispana Centro Cristiano de Rockville
- Immanuel Presbyterian Church
- Interfaith Works Community Ministry of Montgomery County
- Islamic Center of Maryland
- Islamic Community Center of Potomac
- Islamic Education Center
- Jerusalem - Mount Pleasant United Methodist Church
- Kingdom Hall of Jehovah's Witnesses
- Korean Presbyterian Church of Rockville
- Latvian Lutheran Church
- Living Faith Lutheran Church
- Magen David Sephardic Congregational Synagogue
- McLean Bible Church
- Mount Calvary Baptist Church
- Mount Zion Church (historical)
- National Korean United Methodist Church
- North Bethesda United Methodist Church
- Our Lady of China Pastoral Center
- Rockville Christian Church
- Rockville Church of Christ
- Rockville Church of God
- Rockville Presbyterian Church
- Rockville Seventh Day Adventist Church
- Saint Bartholemew Church
- Saint George Coptic Orthodox Church
- Saint James Episcopal Church
- Saint Jane DeChantel Church
- Saint Mark Orthodox Church
- Saint Mark United Presbyterian Church
- Saint Raphael Catholic Church
- Trinity Lutheran Church
- Ursuline Academy Convent
- Wildwood Baptist Church

## E.    Affordable Housing Complexes

The HUD Multifamily Assistance & Section 8 Database, Montgomery County Housing Opportunities Commission, and Fairfax County Redevelopment and Housing Authority were consulted to locate affordable housing complexes with subsidized units within the EJ Analysis Area. Affordable housing complexes are identified in their respective Community Profile in **Section 4** and **Appendix D** and in **Table 5-7**. In the EJ Analysis Area, a total of 21 housing complexes rent units at affordable, below-market rates for qualifying households. Twelve of the 21 affordable housing complexes are located in EJ populations.

00005213

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Table 5-7: Affordable Housing Complexes in the EJ Analysis Area

| EJ Analysis Area Community | Affordable Housing Complex | Block Group | Located in EJ Population? |
|---|---|---|---|
| Gaithersburg | 17 Barkley Apartments | 7007.17 - 1 | yes |
| | Amber Commons Apartments | 7007.17 - 1 | yes |
| | Montgomery Club VI | 7007.17 - 3 | yes |
| | Rosedale Apartments | 7007.17 - 4 | yes |
| | Montgomery Housing Inc | 7008.16 - 1 | yes |
| | Brighton Village Apartments | 7008.16 - 1 | yes |
| | Camden Washingtonian | 7008.16 - 2 | yes |
| | The Villages of Gaithersburg | 7008.16 - 2 | yes |
| | The Crossing at Washingtonian Center | 7008.17 - 2 | no |
| | Cadence at Crown | 7008.17 - 3 | yes |
| | The Flats at Shady Grove | 7012.11 - 3 | no |
| Rockville | Huntington at King Farm | 7007.18 - 1 | no |
| | Gables Upper Rock | 7007.18 - 2 | no |
| | Thomas Street Housing | 7010.05 - 1 | no |
| | Post at Falls Grove | 7010.07 - 1 | yes |
| | Camden at Falls Grove | 7010.07 - 2 | no |
| North Bethesda | Timberlawn Crescent | 7012.15 - 3 | yes |
| | St. Luke's Homes, Inc. | 7044.01 - 1 | no |
| Potomac | Chelsea Towers | 7060.12 - 1 | no |
| | Magruder's Discovery | 7060.12 - 1 | no |
| | Lakeview House Apartments | 7060.12 - 3 | yes |

## F.    Food Stamps/SNAP Benefits

American Community Survey Five-Year Estimates (2015-2019) were used to collect data on households utilizing Food Stamps/SNAP benefits.  Thirty-one of the 66 block groups within the EJ Analysis Area contain households receiving Food Stamps/SNAP benefits; the remaining 35 block groups do not contain populations receiving Food Stamps/SNAP benefits.  The average percent of households receiving Food Stamps/SNAP benefits for the 31 block groups is 4.8 percent.  Of these 31 block groups, 11 have a proportion of households that receive Food Stamps/SNAP benefits at or above the five percent EJ Analysis Area average; these block groups are shown in **Table 5-8**.

Table 5-8: EJ Analysis Area Populations with Above-Average Households Utilizing Food Stamps/SNAP

| EJ Analysis Area Community | Block Group | Percent Households Utilizing Food Stamps/SNAP (Above-Average) | EJ Population? |
|---|---|---|---|
| Potomac | 7060.12 - 1 | 12.9% | no |
| | 7060.12 - 3 | 19.4% | yes |
| North Bethesda | 7045.01 - 4 | 5.7% | yes |
| Bethesda | 7044.04 - 4 | 7.7% | no |
| Gaithersburg | 7007.17 - 1 | 7.6% | yes |
| | 7007.17 - 3 | 5.9% | yes |

00005214



I-495 & I-270 Managed Lanes Study        Final Community Effects Assessment & EJ Analysis Technical Report

|  | 7007.17 - 4 | 11.0% | yes |
|---|---|---|---|
|  | 7010.01 - 2 | 5.7% | no |
| Rockville | 7010.01 - 3 | 5.3% | no |
|  | 7010.02 - 3 | 10.2% | no |
| McLean | 4801.00 - 4 | 6.5% | no |

## G.    Equity Emphasis Areas

The National Capital Region Transportation Planning Board (TPB) has designated Census tracts with higher-than-average concentrations of minority, low-income populations, or both, as Equity Emphasis Areas (EEA). EEAs are used in regional transportation planning to identify areas to target transportation improvements.

The EEA were reviewed to determine any overlap with block groups identified in this Study methodology as EJ populations.[36] Of 66 total block groups within the EJ Analysis Area, 15 overlap with Equity Emphasis Areas, as shown in **Table 5-9** and **Figure 5-3**.

Table 5-9: Block Groups within EJ Analysis Area that Overlap with Equity Emphasis Areas

| EJ Analysis Area Community | Block Group | EJ Population? |
|---|---|---|
|  | 7007.17 - 1 | yes |
|  | 7007.17 - 3 | yes |
|  | 7007.17 - 4 | yes |
|  | 7008.16 - 1 | yes |
| Gaithersburg | 7008.16 - 2 | yes |
|  | 7008.17 - 1 | yes |
|  | 7008.17 - 2 | no |
|  | 7008.17 - 3 | yes |
|  | 7008.29 - 1 | yes |
|  | 7007.18 - 1 | yes |
|  | 7010.01 - 2 | no |
| Rockville | 7010.01 - 3 | no |
|  | 7010.04 - 4 | no |
|  | 7010.05 - 1 | no |
|  | 7010.05 - 2 | no |

---

36 Note that the TPB methodology uses Census tracts, which encompass a larger geographic area than the Census block groups used in this EJ Analysis. As such, the comparison of EEAs and EJ populations is not a one-to-one geographic comparison.

00005215

OP•LANES
MARYLAND    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

**Figure 5-3: Equity Emphasis Areas and Environmental Justice Populations**



00005216



## H.    MDOT SHA Voluntary Demographic Survey

It is MDOT SHA policy to offer a demographic survey to voluntarily complete for attendees of MDOT SHA public meetings. Ten attendees of the November 1, 2021 Virtual Public Hearing completed the survey. Eight survey respondents identified as White, one respondent identified as Asian, and one respondent identified as "other" race; one respondent was in the 18 to 40 age bracket, four were in the 40 to 65 age bracket, and five were in the 65 and over age bracket. Additionally, no survey respondents identified as having a disability to be accommodated at the Virtual Hearing, and no survey respondents identified any other language than English spoken at home. Note that, due to the voluntary nature of the survey and the small sample size, the results of the survey may not accurately represent the demographics of all the Virtual Public Hearing attendees.

### 5.4.5    Summary of the Existing Conditions of Environmental Justice Populations

EJ populations are highlighted and identified with "yes" in the Minority Population column of **Table 5-2** and "yes" in the Low-Income Population column of **Table 5-3**, as well as depicted in **Figure 5-1**. In total, 16 block groups within the EJ Analysis Area were identified as EJ populations. Block groups identified as EJ populations that have a minority population exceeding 49 percent of the total block group population are highlighted in blue, those with a median income less than $69,850 are highlighted in yellow, and those that were identified as both minority and low-income populations are highlighted in green in **Figure 5-1**; the identification methodology for EJ populations is described in **Section 5.2**. The 16 EJ populations are located in the Analysis Area Communities of Gaithersburg, Rockville, Potomac, and North Bethesda.

As detailed in **Section 5.4.4** above, supplemental community data was reviewed to understand if there were any block groups or Analysis Area Communities not identified through this Study's EJ Analysis methodology that could benefit from the additional engagement given the formally identified EJ populations. Synthesizing the EJ Index scores above the 50th percentile from the EPA and MD EJSCREEN mapping tools,[37] plus the data on above-average limited English-Speaking households, low-income subsidized housing, households receiving Food Stamps/SNAP benefits, student participation in free and reduced-price lunch programs, and Equity Emphasis Areas, the non-EJ populations identified in **Table 5-10** may benefit from the additional EJ engagement.

**Table 5-10**: **Non-EJ Populations Identified for Additional EJ Engagement via Supplemental Data**

| EJ Analysis Area Community | Non-EJ Block Group within the EJ Analysis Area | Supplemental Data Results |
|---|---|---|
| Gaithersburg | 7008.17 - 2 | • Above-Average Percent LEP Households<br>• One Affordable Housing Complex<br>• Overlap with Equity Emphasis Area<br>• Tract Above 50th percentile- MD EJSCREEN Index Score |
| Rockville | 7007.18 - 1 | • Above-Average Percent LEP Households<br>• Above 50th percentile- EPAEJSCREEN indicator: Lead Paint |

---

[37] Excludes EPA EJSCREEN EJ index score for Wastewater Discharge Indicator due to incomplete dataset.

00005217


I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| | | |
|---|---|---|
| | | • One Affordable Housing Complex |
| | 7007.18 - 2 | • Above-Average Percent LEP Households<br>• Above 50th percentile- EPAEJSCREEN- Lead Paint<br>• One Affordable Housing Complex |
| | 7010.01 - 3 | • Above-Average Percent:<br>  ○ LEP Households<br>  ○ Food Stamps/SNAP<br>• Above 50th percentile- EPAEJSCREEN- Lead Paint<br>• Overlap with Equity Emphasis Area |
| | 7010.02 - 3 | • Above-Average Percent<br>  ○ Food Stamps/SNAP<br>  ○ LEP Households<br>• Above 50th percentile- EPAEJSCREEN- Underground Storage Tanks |
| | 7010.05 - 1 | • One Affordable Housing Complex<br>• Overlap with Equity Emphasis Area<br>• Tract Above 50th percentile- MD EJSCREEN Index Score<br>• Two Schools with Above-Average Percent F&R Program Participation |
| **North Bethesda** | 7012.05 - 3 | • Above 50th percentile- EPAEJSCREEN indicators:<br>  ○ Lead Paint<br>  ○ RMP Proximity<br>  ○ Superfund Proximity |
| **Bethesda** | 7044.04 - 4 | • Above-Average Percent:<br>  ○ Food Stamps/SNAP<br>  ○ LEP Households<br>• Above 50th percentile- MD EJSCREEN EJ Score TRACT |
| **Potomac** | 7060.12 - 1 | • Above-Average Percent<br>  ○ Food Stamps/SNAP<br>  ○ LEP Households<br>• Above 50th percentile- EPAEJSCREEN indicators:<br>  ○ Air Toxics Cancer Risk<br>  ○ Diesel PM<br>  ○ Respiratory Hazard<br>  ○ Ozone<br>  ○ PM2.5<br>  ○ RMP Proximity<br>  ○ Superfund Proximity<br>  ○ Traffic Proximity/Volume<br>• Tract Above 50th percentile- MD EJSCREEN Index Score<br>• Two Affordable Housing Complexes |
| **McLean** | 4801.00 - 4 | • Above-Average Percent Food Stamps/SNAP<br>• Above 50th percentile- EPAEJSCREEN indicators:<br>  ○ Air Toxics Cancer Risk<br>  ○ Respiratory Hazard<br>  ○ Ozone<br>  ○ PM2.5 |

00005218

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 84 of 121

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| | | o  RMP Proximity |
| | | o  Superfund Proximity |
| | | o  Underground Storage Tanks |

## 5.5    Public Outreach with Environmental Justice Populations

In addition to standard public notifications of the availability of the DEIS and announcement of the Public Hearings and associated comment period (as documented in **FEIS, Chapter 8**), MDOT SHA implemented additional notification methods to encourage meaningful involvement by low-income and minority race/ethnicity populations, as well as other traditionally marginalized populations in review of the DEIS and SDEIS and participation in the Public Hearings and comment periods.

### 5.5.1    Publication of DEIS, Public Hearings, and Associated Comment Period

Environmental Justice outreach efforts for publication of the DEIS and notification of the Public Hearings and comment period include the following:

- Mailed and/or emailed flyers in English, Spanish, Amharic, and French[38] flyers to approximately 200 affordable housing complexes, schools, and places of worship[39] along the study corridors. Emailed PDFs of these flyers to the organizations that have email addresses listed online. A cover letter was sent with both forms of distribution.

- Uploaded to the project website the DEIS Executive Summary translated into Spanish, Amharic, and French.

- Provided hard copies of the translated DEIS Executive Summary at the DEIS viewing locations.

- Spanish language advertisements in *El Tiempo Latino*, *Washington Hispanic*, and on *eltiempo.com*.

- Additional County outreach:
    - Montgomery County News press release;
    - Inclusion in Montgomery County Executive's weekly newsletter;
    - Inclusion in Montgomery County Department of Transportation bi-weekly newsletter and social media posts;
    - Distribution of flyer via M-NCPPC Prince George's County Planning email databases:
        - Planning Department listserv with approximately 19,200 email addresses
        - Community Association listserv with approximately 700 email addresses
    - Inclusion in Prince George's County social media posts; and
    - Coordination with Prince George's County Faith-Based Advisory Board to distribute information to their ministry listserv with approximately 70 email addresses.

---

[38] Spanish, French, and Amharic are the top primary languages of English for Speakers of Other Languages (ESOL) learners in both counties.
[39] Includes Environmental Justice (EJ)- area schools with above-average participation in the Free and Reduced-price Meals Program; places of worship in EJ areas; and all affordable-housing complexes within CEA Analysis Area, plus Prince George's County along the study corridors.

00005219


- Additional translation of flyer to Simplified Chinese, Korean, Malayalam, Punjabi, Tagalog, and Yoruba, uploaded to the project website, and distribution of hard copies to groceries largely serving immigrant communities:
    - ALDI (Beltsville, Lanham);
    - Anarkali Bazar (Greenbelt);
    - Giant Food (Greenbelt, Largo, Marlow Heights);
    - Global International Grocery (Silver Spring);
    - Great Wall Supermarket (Rockville);
    - Jumbo Food International Supermarket (Temple Hills);
    - La Colonia International Supermarket (Camp Springs);
    - Las Americas Market (Rockville);
    - Latino Market Grocery (Gaithersburg);
    - Lidl (District Heights);
    - Periyar Asian Grocery (Landover Hills);
    - Safeway (Greenbelt);
    - Save A Lot (Forestville); and
    - Shoppers (College Park, Forestville, Largo, New Carrollton).

Refer to **Appendix G** for EJ outreach materials used for the notification and public comment period associated with the DEIS.

### 5.5.2    Publication of SDEIS, Public Hearing, and Associated Comment Period

Environmental Justice outreach efforts for publication of the SDEIS and notification of the Public Hearing and comment period were similar to the DEIS outreach efforts and included the following:

- Newspaper print advertisements in *El Tiempo Latino*, *Washington Hispanic* and digital advertisements on *Afro.com*, and *Eltiempo.com,* and *Fairfaxtimes.com*.
- Ran additional online digital advertisements three weeks prior to the virtual public hearing, including digital advertisements targeted black and African American and Hispanic adults likely to own a home and commute over 20 miles daily using I-270 or I-495 via geofencing.[40]
- Ran Spanish-language radio advertisements two weeks prior to the virtual public hearing on WLZL-FM, a Spanish-language station that broadcasts to the Washington-Baltimore metropolitan area.  The radio spot emphasized the virtual public hearing and project website.
- Developed a flyer to outreach to EJ populations that featured an emphasis on SDEIS availability, ways to comment, and the announcement of Virtual Public Hearing; the flyer included a QR code

---

[40] Online digital advertisements were run through the Exchange Display Network, which specializes in digital buys with geographic and demographic programmatic targeting.  Digital advertisements targeted African Americans or Hispanic adults using geofencing and behavioral data.  The target area was in zip codes which index the highest to target a specified audience segment; and behavioral data indicating the likelihood for that adult to own a home and commute over 20 miles daily using I-270 or I-495. Of the total 5 million-plus potential impressions, 20 percent, or 1.2 million impressions, targeted this demographic.

00005220

to link to SDEIS availability on the project website. The flyer was translated into in Spanish, Amharic, French, Chinese, and Korean based on the top languages spoken by LEP populations in Montgomery County as identified in the 2020 Montgomery County Department of Transportation *Language Assistance Plan*.

- Mailed flyer to approximately 200 affordable housing complexes, schools, and places of worship along the study corridors. PDFs of these flyers were emailed to the organizations that have email addresses listed online. A cover letter was sent with both forms of distribution.

- Mailed flyers to county advisory boards and community groups who serve minority race and ethnicity and other traditionally marginalized populations. PDFs of these flyers were emailed to the organizations that have email addresses listed online. A cover letter was sent with both forms of distribution. Advisory boards and community groups include, but are not limited to, the following:
  - o Montgomery County
    - Faith Community Advisory Council
    - Gilchrest Immigrant Resource Center
    - Department of Housing and Community Affairs
    - Community Reach, Commission on People with Disabilities
    - Health and Human Services Latino Health Initiative
    - Literacy Council
    - DOT Division of Transit Services
    - Health and Human Services Office of Community Affairs
    - Office of Community Partnerships
    - Sidney Kramer Upcountry Regional Services Center
    - Health and Human Services Asian American Health Initiative
    - Office of Community Relations
    - Department of Social Services Internal and External Affairs

- Prince George's County:
  - o Housing Authority
  - o Community Outreach Promoting Empowerment Section (COPE)
  - o Literacy Council
  - o Aging and Disabilities Services Division

- Distributed hard copies of the translated flyer to grocery stores largely serving immigrant communities and libraries in Montgomery, Prince George's, and Frederick Counties. [41]
  - o Admas International Market (Hyattsville)

[41] Attempts to drop off flyers were made at the listed specialty markets and grocery stores. Note that several locations were either closed or did not accept the flyers for posting or distribution.

00005221

OP•LANES
M A R Y L A N D | I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

- o ALDI (Beltsville and Lanham)
- o Anarkali Bazar (Greenbelt)
- o Asian Super Market (Frederick)
- o Brunswick Branch Library (Brunswick)
- o C. Burr Artz Public Library (Frederick)
- o Chevy Chase Library (Chevy Chase)
- o Davis (North Bethesda) Library (Bethesda)
- o Ebenezer International Market (Frederick)
- o Edward Fry Memorial Library at Point of Rocks
- o El Eden International Market 2 (Frederick)
- o Favor International Food (Silver Spring)
- o Frederick Bazaar-Indian-Pak Grocery Store (Frederick)
- o Giant Food (Greenbelt, Lanham, Upper Marlboro, and Marlow Heights)
- o Glenarden Branch Library, PGCMLS (Glendarden)
- o Global International Grocery (Silver Spring)
- o Great Wall Supermarket (Rockville)
- o Halal Market (Frederick)
- o Hampton Park Post Office (Capitol Heights)
- o Jumbo Food International Supermarket (Temple Hills)
- o Kenilworth Post Office (Riverdale Park)
- o Kensington Park Branch(Kensington)
- o La Chiquita Grocery (Frederick)
- o La Colonia International Supermarket (Camp Springs)
- o Lagos Market International (Forestville/District Heights)
- o Largo Post Office (Upper Marlboro)
- o Largo-Kettering Branch Library, PGCMLS (Largo/Upper Marlboro)

00005222

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 88 of 121

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

- o   Las Americas Market  (Rockville)

- o   Latino Market Grocery Inc (Gaithersburg)

- o   Lidl (District Heights)

- o   Megamart Gaithersburg (Gaithersburg)

- o   Mercado Latino (Beltsville)

- o   Mi Pueblo International Market (Frederick)

- o   Middletown Public Town (Middletown)

- o   Myersville Community Library (Myersville)

- o   New Carrollton Branch Library, PGCMLS (New Carrollton/Hyattsville)

- o   Orange Latin Market, Colombian & South American products (Gaithersburg)

- o   Periyar Asian Grocery (Landover Hills)

- o   Potomac Branch (Potomac)

- o   Rockville Post Office (Rockville)

- o   Safeway (Greenbelt)

- o   Savanna International Market Inc (Gaithersburg)

- o   Save A Lot (Forestville)

- o   Shoppers (Bowie, College Park, New Carrolton, Forestville, Largo/Upper Marlboro)

- o   Spauldings Branch Library (District Heights)

- o   Temple Hills Post Office (Temple Hills)

- o   Urbana Regional Library (Frederick/Urbana)

- o   Walkersville Public Library (Walkersville)

- o   Wegmans (Lanham)

- o   West Lake Post Office (Bethesda)

- ▪   Contact was made to distribute flyers via Maryland-National Capital Park and Planning Commission (M-NCPPC) Prince George's County Planning email databases.

Additionally, translated versions of the SDEIS Executive Summary were posted to the project website, and all SDEIS documents were made Section 508-compliant on the project website. An online presentation

00005223

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 89 of 121



OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

was setup on the project website where users could view the informational display boards in a web-based format that could be translated into multiple languages using Google Translate.

Refer to **Appendix G** for EJ outreach materials used for the notification and public comment period associated with the SDEIS.

### 5.5.3    Environmental Justice Working Group and Environmental Justice Engagement Initiatives

### A.    Environmental Justice Working Group

In response to comments from the US EPA on the DEIS, a Working Group was established in Spring 2021 to support the Environmental Justice analysis and outreach efforts to be conducted for the Study moving forward. Agency members include FHWA, US EPA, MDOT SHA, Maryland Department of Planning (MDP), Montgomery County Department of Transportation (MCDOT), Maryland-National Capital Park and Planning Commission (M-NCPPC), and Prince George's County Department of Public Works and Transportation (DPW&T). The goals of the EJ Working Group are to:

- Develop potential mitigation measures should high and adverse disproportionate impacts occur and identify additional outreach opportunities using federal, state, and local experience;
- Identify potential commitments to EJ/public health community enhancement measures related to social/health vulnerability indicators; and
- Identify recommendations for additional engagement opportunities including FEIS notifications and post-NEPA outreach to communities.

EJ Working Group meetings have occurred on the dates listed in **Table 5-11.**

**Table 5-11: Environmental Justice Working Group Meetings and Coordination**

| DATE | AGENDA ITEMS |
|---|---|
| March 2, 2021 | Kick-off Meeting; Agency member introductions and discussion of goals |
| April 7, 2021 | Data collection to support existing conditions discussion in EJ Analysis; Discussion on EJ Public Outreach Plan and future opportunities; community enhancement considerations |
| September 15, 2021 | Review of draft EJ Public Outreach Plan: SDEIS/FEIS/ROD and future opportunities in consideration of the Preferred Alternative; community enhancement considerations |
| November 9, 2021 | Final EJ Outreach and Engagement Plan |

Based on ideas provided by MDOT SHA in the draft EJ Public Outreach Plan: SDEIS/FEIS/ROD and agreed upon by the EJWG, MDOT SHA initiated contact with Montgomery County, local advisory group leads, the City of Rockville, the City of Gaithersburg, and regional organizations to leverage their local knowledge and experience with community engagement and to seek recommendations on potential community enhancements. Contact was made with the University of Maryland, Center for Community Engagement, Environmental Justice, and Health (CEEJH) Laboratory, as well as the following Montgomery County Advisory Groups:

00005224



I-495 & I-270 Managed Lanes Study        Final Community Effects Assessment & EJ Analysis Technical Report

- African Affairs Advisory Group

- Asian Pacific Advisory Group

- Caribbean American Advisory Group

- Faith Community Advisory Council

- Latin American Advisory Group

- LGBTQ Advisory Group

- Middle Eastern American Advisory Group

- Senior Community

A meeting with MDOT SHA and the CEEJH Laboratory Director and faculty was held on October 20, 2021 to share EJ Analysis methodology and the targeted EJ outreach conducted to date, as well as seek additional suggestions for outreach and potential community enhancement efforts. Regarding the EJ Analysis methodology, general feedback received from the CEEJH suggested that data on environmental conditions should be used to supplement demographic data in the identification of populations of EJ concern, as living with overburdened environmental stressors is a key feature of EJ populations. Additionally, given the roadway-focused nature of the project, MDOT SHA was encouraged to focus on public health impacts from air quality impacts due to traffic proximity, as poor air quality contributes directly to many health concerns.

The discussion with CEEJH Laboratory underscored the importance of incorporating EPA and MD EJSCREEN data in the EJ Analysis (see Section 59), which provides data on existing environmental conditions along the study corridors. Additional organizations were also added to ongoing EJ outreach efforts.

MDOT SHA initiated communication with Montgomery County Advisory Groups and planners from the City of Rockville and City of Gaithersburg in Fall 2021, also to share targeted EJ outreach conducted to date and seek additional suggestions for outreach and potential community enhancement efforts. MDOT SHA requested the advisory groups to response to questions regarding the location of EJ populations, methods of communication, commonly spoken non-English languages, community enhancement priorities, and survey distribution options. The City of Rockville provided detailed information in response to the request including suggested methods for communication, languages and enhancement priorities within the City.

## B.    Environmental Justice Engagement Initiatives

Based on the results of the local, state and regional coordination conducted as part of the EJWG's EJ Public Outreach Plan, MDOT SHA implemented additional public-facing EJ outreach efforts to engage meaningfully and directly with underserved communities and identify strategies to minimize impacts and to identify community enhancements that could potentially be incorporated into the project.

00005225



In consideration of the pandemic and due to the large study area, MDOT SHA developed an online survey to seek feedback from EJ and other underserved populations on existing community concerns and strategies that could be implemented to address those concerns. The survey was distributed in a variety of ways including through multiple community "pop up" events hosted by MDOT SHA at local specialty markets in areas noted as having high percentages of low-income and/or minority populations. These community events allowed for meaningful, direct face-to-face engagement. Community members were able to complete the survey on iPads and ask questions of the staff. Multi-lingual staff were present at each pop-up event.  Pop-up events were held at the following locations in November 2021:

- Great Wall Supermarket (Pop-up Event with informational booth)

- Lotte Plaza Market (Pop-up Event with informational booth)

- Megamart (Pop-up Event with informational booth)

- H Mart (Pop-up Event with informational booth)

- Adarash Market (Pop-up Event with informational booth)

- Lotte Plaza Market (Pop-up Event with informational booth)

- Patel Brothers Farms Market (Pop-up Event with informational booth)

The survey was open for approximately six weeks, allowing respondents to complete the questions at their own pace. In addition to English, the survey was provided in Spanish, French, Amharic, Chinese, and Korean— the same top five non-English spoken languages that DEIS and SDEIS materials were translated into based on Montgomery County's Department of Transportation 2020 *Language Assistance Plan*. The survey and results are provided in the *Environmental Justice Outreach and Engagement Initiative for the Preferred Alternative* in **Appendix H**.

In addition to the direct face-to-face engagement, postcards, flyers, yard signs, targeted social media, local agency and community organization coordination were used to promote the survey.  Promotional materials included a QR code with a direct link to the survey online; the flyer also included the survey questions themselves. All materials were translated into the top five non-English languages identified above. Postcards and flyers were placed at local health clinics, specialty markets, grocery stores and places of worship. Yard signs with the QR code were placed at affordable housing complexes and near bus transit stations. In addition, an email with the survey was sent to 230 community email addresses informing people about the survey, inviting them to participate, and encouraging them to share the information with their community. Lastly, approximately 49 places of worship were contacted and, where allowed postcards and yard signs with the QR code were distributed.

The survey included three multiple choice questions about potential community betterment and needs, and one open-ended question asking what other improvements are needed in the respondent's community. Sixty-one people completed the survey.  The following are the most common responses to the multiple-choice questions in the survey.

Question #1: Transportation improvements needed:

00005226



I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

1. Better lighting on streets and sidewalks (21%)
2. More or improved sidewalks (17%)
3. Traffic calming to make streets safer (15%)

Question #2: Neighborhood needs:

1. Recreation centers parks, and playgrounds (30%)
2. Sidewalks, trails, and bike lanes (26%)

Question #3: Environmental problems in your community:

1. Water quality (24%)
2. Noise (20%)
3. Safe and healthy housing (20%)

The most common responses to the open-ended question on community improvements needed were:

- Lighting
- Community services
- Safety
- Road (more or better)

For additional detail, refer to the *Environmental Justice Outreach and Engagement Initiative* for the Preferred Alternative in **Appendix H**.

## 5.6 Identification of Beneficial and/or Adverse Impacts to Environmental Justice Populations & Consideration of Mitigation or Community Enhancement Measures

Both beneficial and/or adverse effects to the existing conditions of EJ populations are considered in this EJ Analysis. Effects described in this section include physical impacts to existing private property, including community facility property, as well as physical impacts to transportation right-of-way. Per FHWA EJ Order 6640.23A, consideration is also given to effects on the following environmental characteristics: demographics, traffic, human health and safety; air quality; noise/vibration; water quality; hazardous materials; natural resources; visual landscape and aesthetic values; economy and employment; access and mobility; community cohesion/isolation and quality of life; and tolling considerations. Also considered in this section are mitigation and community enhancement measures for each resource, as applicable.

### 5.6.1 No Build Alternative

The No Build Alternative would not result in any Study-related construction and therefore no land use conversions or property acquisitions are required; no direct impacts would occur in EJ populations. Increased traffic congestion under the No Build Alternative would contribute to increased overflow congestion on the local road network. As a result, the No Build Alternative could result in increased response times for emergency services and increased travel times to community facilities, especially during peak travel periods.

Existing congestion on I-495 and I-270 occur for periods of ten to seven hours per day, respectively. Re-occurring congestion results in vehicles idling for extended periods which can increase emissions and impact air quality. The No Build Alternative would not address the existing congestion experienced along the study corridors.

00005227

OP·LANES
M A R Y L A N D | I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

### 5.6.2    Preferred Alternative

The Preferred Alternative would address existing and long-term traffic growth, including improvement to the local roadway network, increased trip reliability, enhanced multimodal connectivity and mobility, and additional travel options as described in **FEIS, Chapter 3** and as detailed in the traffic analysis in **FEIS, Chapter 4 and FEIS, Appendix A**. The impacts of the Preferred Alternative on various characteristics of EJ populations are presented in this section. Where quantifiable, the impacts are provided in a table for all EJ populations so the reader can better understand the distribution of impacts. A comparison of the impacts within EJ populations to the impacts within non-EJ populations is provided in **Section 5.7**.

Note that the nature of some of the following characteristics (aside from property) makes it difficult to precisely quantify effects at the block group-level. Therefore, the effects on these characteristics within EJ populations are described in a primarily qualitative manner.

### A.    Property

#### a.    Beneficial and/or Adverse Impacts

As shown in **Table 5-12**, partial property impacts would occur in six of the 16 EJ populations. Total partial property acquisition in EJ populations is 14.3 acres (12.3 acres permanently acquired and 2.0 acres temporarily acquired) from 31 property parcels. These permanent acquisitions are primarily strips of land, or strip takes, from undeveloped areas or areas of trees and landscaping in yards that back to I-495 or I-270 along the Phase 1 South limits. Note that permanent acquisitions may also occur to properties further away from I-495 or I-270 to accommodate offsite stormwater management facilities. (Offsite stormwater management locations are preliminary at this point in the Study and are being developed as part of the *Compensatory Plan* in **FEIS, Appendix D**.) No property displacements would occur under the Preferred Alternative.

All property impacts are included in the LOD and the calculations presented in **Table 5-12**. Impacted properties under the Preferred Alternative are shown on the Environmental Resource Mapping in **FEIS, Appendix E**.

Table 5-12: Property Impacts in Environmental Justice Populations

| EJ Analysis Area Community | EJ Population | Number of Impacted Properties* | Property Acquisition (acres) | | |
|---|---|---|---|---|---|
| | | | Total | Perm. | Temp. |
| Gaithersburg | 7007.17 - 1 | | — | | |
| | 7007.17 - 3 | | — | | |
| | 7007.17 - 4 | 1 | 0.2 | 0.2 | — |
| | 7008.16 - 1 | | — | | |
| | 7008.16 - 2 | 2 | 0.4 | 0.4 | <0.1 |
| | 7008.17 - 1 | 7 | 2.0 | 2.0 | <0.1 |
| | 7008.17 - 3 | | — | | |
| | 7008.29 - 1 | | — | | |
| Rockville | 7010.07 - 1 | 8 | 1.9 | 0.9 | 1.1 |
| North Bethesda | 7012.15 - 2 | | — | | |
| | 7012.15 - 3 | | — | | |
| | 7012.15 - 4 | | — | | |

00005228



I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| | | | | | |
|---|---|---|---|---|---|
| | 7045.01 - 2 | 7 | **2.2** | *1.5* | *0.7* |
| | 7045.01 - 4 | | — | | |
| Potomac | 7060.12 - 2 | | — | | |
| | 7060.12 - 3 | 6 | **7.5** | *7.2* | *0.3* |

*Note: "—" indicates zero property impacts.*

### b.    Mitigation

All affected private property owners would be compensated for the fair market value of the acquired portion of land and any damages to the remaining property and structures; this includes compensation for temporary use of land for the construction of the Preferred Alternative. Ongoing coordination with area businesses would occur to prevent or minimize both short- and long-term disruptions. *Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally Assisted Programs* information is provided in **Appendix E**.

## B.    Community Facilities and Services and Section 4(f) Properties

### a.    Beneficial and/or Adverse Impacts

No impacts would occur to community facility properties and services in EJ populations.

The Preferred Alternative would impact two Section 4(f) properties in EJ populations in the Gaithersburg and North Bethesda EJ Analysis Area Communities. The impacted public park and public park with historic properties (Section 4(f) properties) are shown in **Table 5-13**.

**Table 5-13: Impacts to Public Parks, Public Parks with Historic Properties, and Historic Sites\* (Section 4(f) Properties) in Environmental Justice Populations**

| EJ Analysis Area Community | EJ Population | Section 4(f) Property | Property Acquisition (acres) | | |
|---|---|---|---|---|---|
| | | | *Total* | *Perm.* | *Temp.* |
| Gaithersburg | 7007.17 - 1 | | — | | |
| | 7007.17 - 3 | | — | | |
| | 7007.17 - 4 | | — | | |
| | 7008.16 - 1 | | — | | |
| | 7008.16 - 2 | Malcolm King Park | **0.5** | *0.4* | *<0.1* |
| | 7008.17 - 1 | | — | | |
| | 7008.17 - 3 | | — | | |
| | 7008.29 - 1 | | — | | |
| Rockville | 7010.07 - 1 | | — | | |
| North Bethesda | 7012.15 - 2 | | — | | |
| | 7012.15 - 3 | | — | | |
| | 7012.15 - 4 | | — | | |
| | 7045.01 - 2 | Academy Woods | **0.2** | *0.2* | — |
| | 7045.01 - 4 | | — | | |
| Potomac | 7060.12 - 2 | | — | | |
| | 7060.12 - 3 | | — | | |

*Note(s): "—" indicates zero property impacts. Since the SDEIS, Morris Park in block group 7007.17 – 4 is now avoided by the Preferred Alternative LOD.*
*\*Historic sites analyzed as part of the Section 4(f) Evaluation.*

00005229



I-495 & I-270 Managed Lanes Study | Final Community Effects Assessment & EJ Analysis Technical Report

**b.    Mitigation**

Because no community facility properties and services within EJ populations are impacted, no mitigation is required.[42]

Mitigation for impacts to Section 4(f) properties has been coordinated extensively with the Officials with Jurisdiction (OWJ) over the impacted park properties. The final mitigation commitments have been developed to include all possible planning to minimize harm. These measures include, but are not limited to, the following: landscaping, replacement land, visual and noise barriers, ecological and stream restoration, and funding of park related buildings and amenities. Refer to **FEIS, Chapters 6 and 7** and **FEIS, Appendix G** for additional details.

## C.    Demographics

### a.    Beneficial and/or Adverse Impacts

Implementation of the Preferred Alternative would not result in changes to the existing population size or demographic characteristics (age and sex, disability, household income, race and ethnicity, Limited English Proficiency, Free and Reduced Lunch program of Food Stamps/SNAP program participation) of the EJ Analysis Area, including the existing population size or demographic characteristics of EJ populations. No property relocations would occur under the Preferred Alternative.

### b.    Mitigation

Because the existing population size or demographic characteristics of EJ populations would not be impacted, no mitigation is required.

## D.    Traffic

### a.    Beneficial and/or Adverse Impacts

Traffic projections were typically measured in segments along the study corridors. As shown in **Figure 5-1**, the 16 EJ populations are located primarily along the I-270 Y-Split and I-270 in the Potomac, North Bethesda, Gaithersburg, and Rockville EJ Analysis Area Communities.

To determine traffic impacts proximal to the EJ populations, this EJ Analysis considers travel time and speed data[43] for the HOT and general purpose (GP) lanes along the following segments:

- I-270 Northbound from I-495 to I-370

---

[42] Note that the Gibson Grove A.M.E. Zion Church community in the EJ population 7060.09 – 3 in the Potomac EJ Analysis Area Community is closely associated with Morningstar Tabernacle No. 88 Moses Hall and Cemetery, the site of a late nineteenth-century African American benevolent society building and cemetery and Section 106 property. Project activities at Morningstar Tabernacle No. 88 Moses Hall and Cemetery include the construction of noise barrier within the LOD. No permanent or temporary impacts or ground disturbance within the cemetery boundary would occur. Existing conditions of and effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery are being evaluated through the Section 106 process, which is documented in **FEIS Chapter 5, Section 5.7** and **FEIS Appendix I; FEIS Chapter 6** and **FEIS Appendix G**.

[43] Impacts to local roadway networks were modeled in terms of vehicle hours of delay at the county-level and are not broken down by corridor segments. Arterial roadways in Montgomery County, used by drivers from both EJ populations and non-EJ populations, are projected to experience an approximately five percent reduction in delay under the Preferred Alternative. Also note that vehicle delay and roadway Levels of Service (LOS) were measured for the length of the study corridors and are also not broken down by corridor segments. As such, no delay or LOS data is available for corridor segments proximal to EJ populations.

00005230



I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

- I-270 Southbound from I-370 to I-495

Under the Preferred Alternative in 2045, the average travel times for drivers in the HOT lanes on I-270 northbound between I-495 to I-370 is projected to be eight minutes with an average speed of 63 mph in the AM peak hours and 12 minutes with an average speed of 45 mph in the PM peak hours. In the reverse, southbound direction, the average travel times for drivers in the HOT lanes on this segment would be eight minutes with an average speed of 62 mph in the AM peak hours and eight minutes with an average speed of 63 mph in the PM peak hours. Travel time indexes (TTI)[44] projected for both northbound and southbound I-270 HOT lanes between I-495 and I-370 indicate that drivers would experience uncongested conditions in the AM and PM peak hours along all of I-495 and I-270 in the study corridors.

Should use of the HOT lanes not be a feasible economic choice for drivers from EJ populations, all existing GP lanes would remain free and would also experience traffic improvements under the Preferred Alternative in 2045 along the corridor segments adjacent to EJ populations identified above. The average travel times for drivers in the GP lanes on I-270 northbound between I-495 to I-370 is projected to be nine minutes with an average speed of 61 mph in the AM peak hours and 20 minutes with an average speed of 27 mph in the PM peak hours. In the reverse, southbound direction, the average travel times for drivers in the GP lanes on this segment would be 12 minutes with an average speed of 45 mph in the AM peak hours and 10 minutes with an average speed of 58 mph in the PM peak hours. Travel time indexes (TTI) projected for both northbound and southbound I-270 GP lanes between I-495 and I-370 indicate that drivers would experience uncongested conditions in the AM and PM peak hours, with the exception of drivers on the northbound I-270 during the PM peak, who may experience heavy congestion.

Drivers from EJ populations may benefit from direct access to HOT lanes and/or direct access for transit vehicles to transit stations, particularly at locations proximal to EJ populations. However, implementation of HOT lanes direct access ramps would include the effects of construction experienced by those who live and commute near the construction sites, including EJ populations. See **Section N** for a discussion of construction impacts on EJ populations.

The direct access locations shown in **Table 5-14** are proposed within or adjacent to EJ populations.

Table 5-14: HOT Lanes Direct Access Locations in EJ Populations

| EJ Analysis Area Community | EJ Population | Location/Description |
|---|---|---|
| Gaithersburg | 7007.17 - 1 | — |
| | 7007.17 - 3 | — |
| | 7007.17 - 4 | — |
| | 7008.16 - 1 | — |
| | 7008.16 - 2 | **I-270 at I-370**: a new interchange would be constructed for HOT lanes direct access to and from the south; the existing interchange ramps would be adjusted to accommodate widening of the mainline; direct access to Shady Grove Metro Station would also be provided |

---

[44] TTI quantifies the average travel time and congestion levels during the peak periods and is defined as the ratio of the average (50th percentile) travel time during a particular hour to the travel time during free-flow or uncongested conditions.

00005231

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 97 of 121

OP·LANES
M A R Y L A N D    | I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| | | |
|---|---|---|
| | 7008.17 - 1 | — |
| | 7008.17 - 3 | — |
| | 7008.29 - 1 | — |
| Rockville | 7010.07 - 1 | **I-270 at Gude Drive**: a new interchange would be constructed for HOT lanes direct access |
| North Bethesda | 7012.15 - 2 | — |
| | 7012.15 - 3 | — |
| | 7012.15 - 4 | — |
| | 7045.01 - 2 | **I-495 at I-270 west spur**: a new interchange would be constructed for HOT lanes direct access; the existing interchange would be reconstructed to accommodate HOT lanes |
| | 7045.01 - 4 | — |
| Potomac | 7060.12 - 2 | **I-270 west spur at Westlake Terrace**: existing HOV only ramps to and from the north would be repurposed to HOT lanes direct access ramps; new ramps would be constructed for HOT lanes direct access to and from the south; direct access to Montgomery Mall Transit Center would also be provided |
| | 7060.12 - 3 | |

*Note: "—" indicates no new direct access would be added in or adjacent to the corresponding EJ population.*

**b.  Mitigation**

Mitigation would not be required for traffic effects on EJ populations, because, at a minimum, all existing general purpose lanes would remain free and would experience a decrease in congestion conditions under the Preferred Alternative.

The Interstate Access Point Approval (IAPA) will evaluate potential ways to mitigate increases in traffic volumes to ensure safe and efficient operations at the project termini and at all interchanges within the Preferred Alternative. Potential mitigation strategies include signal timing adjustments, adding or extending turn lanes, changing lane assignments, pedestrian and bicycle improvements, modification to intersections such as new traffic signals, and TDM strategies such as dynamic signage.

See **Section O** for tolling considerations and EJ populations.

**E.  Air Quality**

**a.  Beneficial and/or Adverse Impacts**

Currently, Montgomery County, Maryland and Fairfax County, Virginia are in attainment for all National Ambient Air Quality Standards (NAAQS) for airborne pollutants that have adverse impacts on human health and the environment (referred to as "criteria pollutants") with the exception of the 2015 8-hour ozone standard,[45] for which the counties are nonattainment. Because the Managed Lanes Study is located in an Environmental Protection Agency (EPA) attainment area for Carbon Monoxide (CO) and fine particulate matter ($PM_{2.5}$), no analysis of these pollutants was required; however, a CO analysis of emissions from affected intersections and interchanges was conducted for the DEIS for transparency and

---

[45] These counties were redesignated to attainment of the 2008 ozone NAAQS, effective May 15, 2019 (See: https://www.federalregister.gov/documents/2019/04/15/2019-06128/air-plan-approval-district-of-columbia-maryland-and-virginia-maryland-and-virginia-redesignation).

00005232


informational purposes since CO is a proxy for transportation emissions. The results of that analysis demonstrate that the worst-case interchanges and intersections for each Build and the No Build Alternative, using very conservative assumptions, would not cause or contribute to a violation of the CO NAAQS within the study corridor. See **FEIS, Chapter 5.8** and **FEIS, Appendix K** for additional details.

Ozone emissions are addressed in the regional air quality conformity analysis and there is no requirement to complete a project level analysis of ozone. The I-495 and I270 Managed Lanes Study is included in the federally mandated Air Quality Conformity Analysis that accompanies the National Capital Region Transportation Planning Board (TPB) *Visualize 2045* long-range plan. The *Visualize 2045* Air Quality Conformity Analysis is based upon the most current planning assumptions available for the Washington region, as well as the latest emissions factor model specified by EPA for use in these types of conformity assessments. As part of the air quality conformity determination, consultation with affected agencies such as the EPA, FHWA, FTA, and the Metropolitan Washington Air Quality Committee (MWAQC), plus the public, was completed.

The EPA has identified nine compounds with significant contributions from mobile sources that are among the national and regional-scale cancer drivers from their 1999 National Air Toxics Assessment. The nine compounds identified were acetaldehyde; acrolein; benzene; 1, 3-butadiene; diesel particulate matter (PM) plus diesel exhaust organic gases; ethylbenzene; formaldehyde; naphthalene; and polycyclic organic matter (POM). While FHWA considers these the priority MSATs, the list is subject to change and may be adjusted in consideration of future EPA rules.  A quantitative assessment of MSAT emissions projections was conducted for the affected network for the Preferred Alternative.  In general, all of the MSAT pollutant emissions are expected to increase slightly for the Preferred Alternative when compared to the No Build condition for 2025 and 2045, opening and design years, respectively. All MSAT pollutant emissions are expected to significantly decline in the opening and design years when compared to existing conditions (2016). These long-term reductions occur despite projected increase in VMT from 2016 to the 2025 and 2045 Build scenarios.

Because the Study is in attainment for criteria pollutants' NAAQS,[46] transportation conformity requirements do not apply for this Study, meaning no further project-level air quality analysis was required. For this reason, air quality modeling at a localized level—the level at which this EJ Analyses are otherwise conducted— is not available. Furthermore, due to industry-wide limitations in tools/techniques for measuring project-specific health outcomes,[47] detailed air quality effects on public health cannot be projected for any specific location along the Phase 1 South limits.

---

[46]These counties were redesignated to attainment of the 2008 ozone NAAQS, effective May 15, 2019 (See: https://www.federalregister.gov/documents/2019/04/15/2019-06128/air-plan-approval-district-of-columbia-maryland-and-virginia-maryland-and-virginia-redesignation).

[47] While much work has been done to assess the overall public health risk from traffic proximity and MSATs exposure, it is a continuing area of research and the tools and techniques for assessing project-specific health outcomes as a result of lifetime MSAT exposure remain limited. These limitations impede the ability to evaluate how potential public health risks posed by MSAT exposure should be incorporated into project-level decision-making within the context of a NEPA Study such as the MLS.  The FHWA, Environmental Protection Agency (EPA), the Health Effects Institute, and others have funded and conducted research studies to more clearly define potential risks from MSAT emissions associated with highway projects. An overview of FHWA-sponsored MSAT research efforts is provided in *FHWA Guidance Appendix D- FHWA Sponsored Mobile Source Air Toxics Research Efforts* (Updated Interim Guidance on Mobile Source Air Toxic Analysis in NEPA Documents). Please see FHWA Guidance Appendix D,

00005233

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 99 of 121

OP•LANES
M A R Y L A N D™    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Generally speaking, however, it is understood that "[a]ir toxics emissions from mobile sources have the potential to impact human health" (FHWA, 2018). The Health Effects Institute (HEI), which has conducted several FHWA-funded studies as documented in *FHWA Guidance Appendix D- FHWA Sponsored Mobile Source Air Toxics Research Efforts* (see **FEIS, Appendix K**), published a literature review of 700 studies examining the public health effects of traffic-related air pollution. The HEI literature review concludes that

> *"[m]any aspects of the epidemiologic and toxicologic evidence relating adverse human health effects to exposure to primary traffic-generated air pollution remain incomplete. However, the Panel concluded that the evidence is sufficient to support a causal relationship between exposure to traffic-related air pollution and exacerbation of asthma. It also found suggestive evidence of a causal relationship with onset of childhood asthma, non-asthma respiratory symptoms, impaired lung function, total and cardiovascular mortality, and cardiovascular morbidity, although the data are not sufficient to fully support causality. For a number of other health outcomes, there was limited evidence of associations, but the data were either inadequate or insufficient to draw firmer conclusions. The Panel's conclusions have to be considered in the context of the progress made to reduce emissions from motor vehicles."* (HEI, 2010)

Exposure to traffic-related air pollution would result from short-term construction activities (approximately four to five years) and long-term highway operations. EJ populations who live in areas with high EPA and MD EJSCREEN EJ Index scores (see **Section 5.4.4A** and **Appendix F**) may experience air quality impacts from construction activities and highway operations more acutely than populations with lower EJ Index scores.

### b.    Mitigation or Community Enhancement Measures

Construction-related air quality impacts of the project would be limited to short-term increased fugitive dust and mobile-source emissions, including carbon monoxide, during construction, which is expected to last four to five years. All required construction-related permits would be obtained from Maryland Department of the Environment (MDE) prior to construction. During construction the contractor may use the following dust control measures, to minimize and mitigate, to the greatest extent practicable, impacts to air quality:

- Minimize land disturbance;

- Minimize traffic disruption to the extent possible, especially during peak travel hours;

- Cover trucks when hauling soil, stone, and debris (MDE Law);

- Use water trucks to minimize dust;

- Use dust suppressants if environmentally acceptable;

- Stabilize or cover stockpiles;

---

provided in **FEIS, Appendix K** for summaries of these studies and links to download the studies themselves. FHWA will continue to monitor the developing research in this field.

00005234

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 100 of 121

**OP·LANES**
M A R Y L A N D    | I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

- Construct stabilized construction entrances per construction standard specifications;

- Regularly sweep all paved areas including public roads;

- Stabilize onsite haul roads using stone; and

- Temporarily stabilize disturbed areas per MDE erosion and sediment standards.

Additionally, depending on the meteorological conditions, research has shown that noise barriers may deflect emissions and/or increase dispersion of emissions.

All state and local regulations regarding dust control and other air quality emission reduction controls would be followed. See **FEIS, Chapter 5.8** for additional detail.

Further, "active transportation" modes such as walking and bicycling have been shown to reduce human health risks and improve overall wellbeing.[48] Opportunities for active transportation will be provided under the Preferred Alternative via new and enhanced pedestrian and bicycle connections. Refer to **Section 5.8**, below, and **FEIS, Chapter 7** for detail on pedestrian and bicycle community enhancements.

### F.    Safety
#### a.    Beneficial and/or Adverse Impacts

The Preferred Alternative would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulation. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Existing pedestrian and bicycle facilities impacted by the Preferred Alternative would be replaced in-kind, at a minimum, and would be coordinated with the counties and local jurisdictions. Additional capacity on I-495 and I-270 would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. Further, by providing additional travel options, the Preferred Alternative is expected to reduce congestion on the mainline and local roadway networks, allowing for more reliable travel times for all users, including emergency responders. Refer to **FEIS, Appendix A**, *Final Traffic Analysis Report*.

#### b.    Mitigation

Safety mitigation considerations are described above.

### G.    Noise
#### a.    Beneficial and/or Adverse Impacts

The Noise Technical Report (**FEIS, Appendix L**) found that the Preferred Alternative would increase traffic noise in communities adjacent to the proposed limits of disturbance along the Phase 1 South limits. Noise

---

[48] Raynault, Eloisa and Ed Christopher. "How Does Transportation Affect Public Health?" *Public Roads Magazine*, Vol. 76 No. 6. Federal Highway Administration. Accessed at https://highways.dot.gov/public-roads/mayjune-2013/how-does-transportation-affect-public-health.

00005235



I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

sensitive areas (NSAs) are composed of areas that have different land use activity categories, with varying levels of noise sensitivity, which have been combined into a single NSA. There are 60 NSAs adjacent to the Preferred Alternative LOD.

As shown in **Table 5-15,** 11 of the 60 NSAs are located in EJ populations. Of the 11 NSAs in EJ populations, nine would experience noise impacts[49] under the Preferred Alternative.

**b.    Mitigation**

Federal regulation (23 CFR 772) and the MDOT SHA Highway Noise Policy require that noise abatement be investigated at all NSAs where the Build condition traffic noise levels approach or exceed the FHWA Noise Abatement Criteria (NAC) for the defined land use category. Where noise abatement was warranted for consideration, it was examined to determine if the abatement is feasible and reasonable.[50]

**Table 5-15** identifies the NSAs and their corresponding noise barrier systems within EJ populations.

Table 5-15: Impacted NSAs and Corresponding Noise Barrier Systems in EJ Populations

| EJ Analysis Area Community | EJ Population | NSAs and Noise Barrier System Scenario |
|---|---|---|
| Gaithersburg | 7007.17 - 1 | — |
| | 7007.17 - 3 | NSA 5-01 would experience a noise impact and the existing noise barrier system would remain in place |
| | 7007.17 - 4 | — |
| | 7008.16 - 1 | NSA 5-02 would experience a noise impact and the existing noise barrier system would remain in place |
| | 7008.16 - 2 | NSA 5-04 would not experience a noise impact |
| | 7008.17 - 1 | NSA 5-06 and NSA 5-07 would experience noise impacts, but the associated noise barrier system is considered not feasible/reasonable; NSA 5-05: N/A* |
| | 7008.17 - 3 | — |
| | 7008.29 - 1 | — |
| Rockville | 7010.07 - 1 | NSA 5-14 would experience a noise impact, but the associated noise barrier system is considered not feasible/reasonable |
| North Bethesda | 7012.15 - 2 | — |
| | 7012.15 - 3 | NSA 5-33A would experience a noise impact and a new noise barrier system is recommended for construction |
| | 7012.15 - 4 | — |
| | 7045.01 - 2 | NSA 5-36 would experience a noise impact and the existing noise barrier system is recommended to be extended; |

[49] According to MDOT SHA and Virginia Department of Transportation (VDOT) guidance, an impact is identified when design year noise levels are predicted to equal or exceed the appropriate MDOT SHA or VDOT criteria for each NSA land use, or when predicted noise levels are anticipated to increase over existing year noise. Additional detail is located in **FEIS, Chapter 5.9**.

[50] Note that, in several areas, NSAs are grouped together with a single barrier system; if one of the NSAs is protected by an existing barrier system, it is assumed that all NSAs in that group are protected by the existing barrier system. Additional detail is provided in **FEIS, Table 5-20** in the noise impact analysis.

00005236


| | | |
|---|---|---|
| | | NSA 2-03 would experience a noise impact and the existing noise barrier system would be replaced with a reconstructed system |
| | 7045.01 - 4 | — |
| Potomac | 7060.12 - 2 | — |
| | 7060.12 - 3 | NSA 5-32C: would experience a noise impact and a new noise barrier system recommended for construction |

*Note: "—" indicates no NSA is located within the EJ population.*
*\*Considered "no noise impact" for the purposes of this technical report.*

For additional detail on noise impacts and abatement, see **FEIS, Chapter 5.9** and the *Noise Technical Report* **(FEIS, Appendix L)**.

### H.    Natural Resources

#### a.    Beneficial and/or Adverse Impacts

As documented in the *Final Natural Resources Technical Report* in **FEIS, Appendix M**, the Preferred Alternative would impact various existing natural resources. Quantifiable impacts to wetlands, wetland buffers, waterways, floodplains, and tree canopy in EJ populations are provided in **Table 5-16**. Natural resource impacts would occur in ten EJ populations.

00005237

OP•LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment & EJ Analysis Technical

**Table 5-16: Natural Resource Impacts in EJ Populations**

| EJ Analysis Area Community | EJ Population | Wetlands (acres) | Wetland Buffers (acres) | Waters (linear feet) | Waters (square feet) | Tree Canopy Impacted (acres) | Floodplains (acres) |
|---|---|---|---|---|---|---|---|
| Gaithersburg | 7007.17 - 1 | — | — | — | — | — | — |
| | 7007.17 - 3 | — | — | 98.7 | 1,638.3 | 0.8 | 0.2 |
| | 7007.17 - 4 | — | — | 247.2 | 2,258.4 | 7.6 | 0.3 |
| | 7008.16 - 1 | — | — | 266.3 | 5,064.5 | 1.0 | 0.7 |
| | 7008.16 - 2 | — | — | 519.8 | 11,394.5 | 3.9** | 0.4 |
| | 7008.17 - 1 | — | — | 1,041.6 | 15,119.0 | 25.4** | — |
| | 7008.17 - 3 | — | — | — | — | — | — |
| | 7008.29 - 1 | — | — | — | — | — | — |
| Rockville | 7010.07 - 1 | <0.1 | 0.1 | 1,008.8 | 25,328.7 | 11.4** | 1.9 |
| North Bethesda | 7012.15 - 2 | — | — | — | — | — | — |
| | 7012.15 - 3 | — | — | 142.3 | 1,196.4 | — | — |
| | 7012.15 - 4 | — | — | — | — | — | — |
| | 7045.01 - 2 | <0.1 | 0.3 | 1,498.6 | 11,290.7 | 24.6** | — |
| | 7045.01 - 4 | — | — | — | — | — | — |
| Potomac | 7060.12 - 2 | — | — | — | — | <0.1 | — |
| | 7060.12 - 3 | 0.1 | 0.7 | 1,807.7* | 10,221.9*** | 19.6** | — |

Note: "—" indicates no impacts.
* Includes 27.0 linear feet of temporary waterline impacts.
**Includes <1.0 acre of temporary impact.
***Includes 171.6 square feet of temporary impacts.

00005238

 I-495 & I-270 Managed Lanes Study        Final Community Effects Assessment & EJ Analysis Technical Report

**b.    Mitigation**

Efforts to avoid and minimize impacts to natural resources have been developed throughout the Study. Efforts to mitigate these natural resource impacts along the Phase 1 South limits, including in EJ populations, are summarized as follows.

Based on the Preferred Alternative direct and indirect impacts, the current mitigation requirement estimate in Maryland includes 4.38 acres of wetland mitigation credits and 7,511 functional feet of stream credits that are detailed in **FEIS, Chapter 5.14.4**. No mitigation bank credits within an appropriate service area, or in-lieu fee programs were identified in Maryland when MDOT SHA initiated the project in 2018, and therefore MDOT SHA decided to pursue permittee-responsible mitigation for the requirements. The current proposed permittee-responsible, off-site mitigation in Maryland consists of two mitigation sites, including a total of 4.38 acres of potential wetland mitigation credits and 7,511 functional feet of potential stream mitigation credits. The remaining required stream mitigation credits will be provided by purchasing credits from a mitigation bank that will have an initial credit release in the fall of 2022.

The Study requires a Clean Water Act (CWA) Section 401 water quality certification from MDE and VDEQ indicating that anticipated discharges from the Study will comply with federally-mandated water quality standards. The submission of the request for water quality certification is anticipated in early 2022. Post-construction stormwater management and compliance with Total Maximum Daily Loads (TMDLs) requirements will be accounted for in the stormwater design and water quality monitoring to comply with required permits.

Erosion and sediment control, as well as stormwater management (SWM) techniques, are the most important minimization efforts in relation to water quality.  Impacts to water quality would be minimized through strict adherence to erosion and sediment control procedures and MDE storm water management regulations.  SWM would be developed in compliance with all applicable MDE regulations and guidance and designed in accordance with MDE's 2000 Maryland Stormwater Design Manual (MDE, 2009) and MDE's SWM Act of 2007.

Water quantity treatment would be met onsite or through waiver requests in specific areas. The project would attempt to meet water quality treatment requirements onsite, where practicable. Where this is not practicable, water quality requirements would be met offsite in accordance with MDE regulations. Other measures may also be considered in particularly sensitive watersheds after further coordination with resource agencies, such as redundant erosion and sediment control measures in especially sensitive watersheds and/or providing on-site environmental monitors during construction to provide extra assurance that erosion and sediment control measures are fully implemented and functioning as designed. These measures will also minimize potential impacts of contaminants on downstream drinking water supplies. Refer to **FEIS, Chapter 3.1.6** for details on the conceptual SWM analysis for the Preferred Alternative. Additionally, contaminants entering the Washington Aqueduct are also treated by the Dalecarlia and McMillan treatment plants, which must meet EPA's drinking water standards prescribed in the Aqueduct's National Pollution Discharge Elimination System (NPDES) Permit.

Unavoidable impacts to the tree canopy will be regulated by Maryland Department of Natural Resources (MDNR) under the Maryland Reforestation Law. Forest impacts must be replaced on an acre-for-acre or one-to-one basis on public lands. MDOT SHA would first be required to find available public land to be

00005239

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

reforested within the affected county and/or watershed. If this is not possible, MDOT SHA could purchase credits in a forest mitigation bank or pay into the MDNR Reforestation Fund that is used by MDNR to plant replacement trees. The site search results include 68 recommended off-site mitigation sites that could provide 39.96 acres of reforestation planting on public lands within the affected county and watershed of the Preferred Alternative. An additional 268.48 acres of potential reforestation could potentially be planted outside of the affected county and watershed but would require a variance from MDNR. In addition, forest impacts may be mitigated by purchasing credits from approved forest mitigation banks in the affected county and/or watershed. Any remaining mitigation required may be fulfilled through payment into the Reforestation Fund, as approved by MDNR.

All construction occurring within the FEMA designated floodplains must comply with Federal Emergency Management Agency (FEMA)-approved local floodplain construction requirements. Stormwater management would be provided, and all hydraulic structures would be designed to accommodate flood volumes without causing substantial impact. Culverts and bridges would be designed to limit the increase of the regulatory flood elevation to protect structures from flooding risks, and the use of standard hydraulic design techniques to maintain current flow and limit adjacent flood risk for all waterway openings would be applied where feasible. The use of state-of-the-art erosion and sediment control techniques and stormwater management controls would also minimize the risks or impacts to floodplains due to encroachments. MDOT SHA will submit project plans to MDE for approval of mitigation techniques in compliance with FEMA requirements, US Department of Transportation (USDOT) Order 5650.2, *Floodplain Management and Protection*, and Executive Order 11988, *Floodplain Management*.

Refer to **FEIS, Chapter 7** and the *Final Natural Resources Technical Report* **(FEIS, Appendix M)** for details on natural resource impacts and mitigation.

## I.    Hazardous Materials

### a.    Beneficial and/or Adverse Impacts

Construction of the Preferred Alternative would require disturbance of existing soil conditions, including identified hazardous materials sites of concern as documented in the *Hazardous Materials Technical Report* (**SDEIS, Appendix I**) and **FEIS, Chapter 5.10**. Within or adjacent to the Preferred Alternative limits of disturbance there are a total of 135 sites of concern assigned either a low, moderate, or high risk classification. EJ populations contain the 27 low risk, four moderate risk, and two high risk sites of concern identified in **Table 5-17**.

Table 5-17: Hazardous Materials Sites of Concern in EJ Populations

| EJ Analysis Area Community | EJ Population | Sites of Concern |
|---|---|---|
| Gaithersburg | 7007.17 - 1 | — |
| | 7007.17 - 3 | 1 low-risk |
| | 7007.17 - 4 | 1 low-risk |
| | 7008.16 - 1 | — |
| | 7008.16 - 2 | — |
| | 7008.17 - 1 | 6 low-risk, 1 moderate-risk |
| | 7008.17 - 3 | — |

00005240

Case 8:22-cv-02597-DKC     Document 58-2     Filed 10/30/23     Page 106 of 121

OP·LANES
M A R Y L A N D      I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

|  | 7008.29 - 1 | — |
| Rockville | 7010.07 - 1 | 9 low-risk |
| North Bethesda | 7012.15 - 2 | — |
|  | 7012.15 - 3 | 2 low-risk |
|  | 7012.15 - 4 | 1 low-risk |
|  | 7045.01 - 2 | 5 low-risk |
|  | 7045.01 - 4 | — |
| Potomac | 7060.12 - 2 | — |
|  | 7060.12 - 3 | 2 low-risk, 3 moderate-risk, 2 high-risk |

*Note: "—" indicates no low, moderate, or high sites of concern.*

### b.  Mitigation

Hazardous material mitigation would be conducted as necessary in accordance with federal, state, and local regulations. Prior to acquisition of right-of-way and construction, Preliminary Site Investigations (PSIs) would be conducted to further investigate properties within the final LOD and vicinity that have a high potential for mobilization of hazardous materials as a result of construction activities. The Developer would be required to use best management practices to minimize the release of any hazardous materials during construction.

See **FEIS, Chapter 5.10** for detail on hazardous materials impact mitigation measures.

## J.  Visual and Aesthetic Resources

### a.  Beneficial and/or Adverse Impacts

The construction of the Preferred Alternative would include managed lanes, shoulders, traffic barriers, cut and fill slopes, stormwater management (SWM) facilities, retaining walls, and noise barriers along the existing highway corridor. Additionally, the Preferred Alternative would require modifications at existing interchanges to accommodate the mainline widening and direct access at-grade auxiliary lanes or ramps. Locations of interchange modifications, including where HOT lanes direct access would be constructed, in EJ populations is provided in **Table 5-14** in **Section N**.  This may require the reconstruction of structures spanning the study corridors to lengthen or raise the elevation of these structures.

Construction of the Preferred Alternative would also require relocation of signage, guardrails, communications towers, and light poles due to the widening of the roadway. These ancillary features may be positioned closer to the adjacent land uses, including residential areas, commercial enterprises, and community facilities in EJ populations.

Construction would require the removal of vegetation to varying degrees throughout the study corridors. As a result of the vegetation removal, the wider interstates, added ramps, retaining walls, and noise barriers would become more visible and prominent. The views from adjacent properties, including residential properties, commercial enterprises, parkland/ open space properties in EJ populations would experience an impact.

However, impacts would generally be consistent with existing views along the majority of the Phase 1 South limits because of the dominant presence of the existing interstate facilities, including ancillary features, and the surrounding area's urbanized nature.

00005241

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Additional detail on impacts to visual and aesthetic resources is provided in the *Visual Impact Assessment* in **FEIS, Appendix H.**

### b. Mitigation

Mitigation measures to lessen the visual impact of the improvements in EJ populations would be considered as appropriate. Vegetation removal would be minimized, and additional landscaping may be incorporated in other areas as well. Mitigation for tree removal will be done in accordance with the Maryland Reforestation Law and National Park Service (NPS) and Maryland-National Capital Park and Planning Commission (M-NCPPC) agency requirements, such as on-site planting, when feasible. Details on tree removal mitigation is provided in **Section H.b**.

During final design, the Developer would develop and follow aesthetic and landscaping guidelines of all highway elements in consultation with the local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state, and Federal agencies. The goal will be to design highway elements, including retaining walls, noise barriers, and other visual barriers, to be sensitive to the context of the surrounding land use.  Further, mitigation for resource impacts would be developed in accordance with jurisdictional agency requirements.

## K.    Economy and Employment

### a. Beneficial and/or Adverse Impacts

No business displacements would occur under the Preferred Alternative.  There would be no overall impact to the distribution of worker occupation or major employers within EJ populations.

Proposed improvements would help address increasing congestion, thereby maintaining mobility throughout the region. Additionally, construction and expansion of transportation facilities has facilitated economic growth by providing access to employment and community facilities and allowing for more efficient movement of goods and services. These benefits would be inclusive of EJ populations.

Additionally, through Opportunity MDOT Program the agency will provide resources for job seekers as well as small, minority-, women- and veteran-owned businesses and disadvantaged businesses to access training, advisory services and advanced industry resources to prepare for potential opportunities to work with MDOT and the I-495 & I-270 P3 Program.

### b. Mitigation

MDOT SHA coordination with area businesses would occur to prevent or minimize both short- and long-term disruptions during construction. No other mitigation would be required for economy and employment characteristics within EJ populations.

## L.    Access and Mobility

### a. Beneficial and/or Adverse Impacts

Due to the generally parallel nature of the Preferred Alternative LOD along I-495 and I-270, the existing access between residences and community facilities and business, including those in EJ populations, would not be impacted. An increase in access may occur as a result of new and/or improved bicycle and pedestrian connections, as well as new direct connections between HOT lanes and major transit locations.

00005242

An enhancement to mobility may occur due to reduced congestion on local routes, free bus transit usage of HOT lanes, and toll-free use of HOT lanes for eligible High Occupancy Vehicles with three or more passengers.

The same number of general purpose lanes will remain along with the addition of the four HOT lanes. The general purpose lanes will also be rehabilitated and resurfaced, and all bridges, including the American Legion Bridge, will be reconstructed. These improvements would benefit all drivers of the study corridors.

### b. Mitigation or Community Enhancements

The project elements and potential community enhancement measures referenced above would further enhance access and mobility in the EJ Analysis Area. Specifically, MDOT SHA has committed to the following enhancements:

- Direct and indirect access to existing and proposed transit stations, including Shady Grove, Twinbrook, and Medical Center Metro stations and Montgomery Mall Transit centers, and transit-oriented development areas within the EJ Analysis Area;

- Construction of new bus bays at WMATA Shady Grove Metrorail Station and increased parking at the Westfield Montgomery Mall Park and Ride;

- Constructing a new pedestrian/bicycle shared use path across the ALB to connect facilities in Maryland and Virginia;

- Lengthening the I-270 bridge over Tuckerman Lane to accommodate future pedestrian/bicycle facilities along Tuckerman Lane;

- Constructing new sidepaths across MD 190 over I-495;

- Widening the existing variable-width sidepath along Seven Locks Road under I-495 (Cabin John Trail);

- Constructing a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection between First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall and Cemetery in the historically African American community of Gibson Grove.

Impacts to access and mobility during construction would be minimized in compliance with MDOT SHA Work Zone Safety and Mobility requirements along the Phase 1 South limits and would include maintenance of the same number of existing lanes. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Existing pedestrian and bicycle facilities impacted by the Preferred Alternative would be replaced in-kind, at a minimum, and would be coordinated with the counties and local jurisdictions.

### M. Community Cohesion and Quality of Life

### a. Beneficial and/or Adverse Impacts

Under the Preferred Alternative, partial property acquisition for right-of-way would occur throughout the Phase 1 South limits, including in EJ populations as identified in **Table 5-12** in **Section A**. The partial acquisitions are primarily strips of land, or strip takes, from undeveloped areas or areas of trees and

00005243

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 109 of 121

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

landscaping in yards that back to I-495 or I-270, resulting in a reduction of the overall property size. Divisions or isolation of properties, persons, or groups would not occur due to the generally parallel nature of the Preferred Alternative LOD along I-495 and I-270 and the fact that no properties would be displaced. As such, the existing sense of community cohesion of EJ populations along the Phase 1 South would not be impacted. The Preferred Alternative also would not eliminate access or provide new access to properties, nor would it impede access between residences, community facilities, and businesses as no properties are accessed directly from I-495 or I-270.

Residents and employees, including those in EJ populations, who live, work, and utilize services immediately adjacent to the study corridors may experience changes in current quality of life due to property acquisition and temporarily during construction activities. However, residents and employees could experience a benefit to quality of life due to reduced congestion in general purpose lanes and HOT lanes along the Phase 1 South limits, plus enhanced trip reliability and travel choices to destination points within the region.

### b. Mitigation

To further enhance community cohesion and quality of life in the EJ Analysis Area, MDOT SHA has committed to the community enhancements identified above in **Section 5.6.2L.b**.

## N. Construction

### a. Beneficial and/or Adverse Impacts

Construction of the Preferred Alternative includes the following: mainline widening, addition of new direct access and reconstruction of existing interchanges, reconstruction of mainline bridges and overpasses, relocation of utilities, and construction/reconstruction of stormwater management, retaining walls, and noise barriers. Construction of these elements would occur along the Phase 1 South limits, including in EJ populations. Additionally, impacts from construction to visual and aesthetic resources, hazardous material sites of concern, air quality, and noise would occur throughout the limits, including within EJ populations. Details related to when construction related activities will occur will be determined in final design. It is anticipated that construction will last approximately five years.

A total of 2.0 acres in EJ populations would be required temporarily for construction access, staging, and materials storage.[51] Mainline widening would occur throughout the Phase 1 South limits. Construction for new direct access and for modifications to existing interchanges to accommodate highway widening would occur at 10 locations along the nine EJ populations identified in **Table 5-18**.

---

[51] The limits of disturbance of the Preferred Alternative accounts for areas needed for construction.

00005244

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

Table 5-18: HOT Lanes Access Construction Locations in EJ Populations

| EJ Analysis Area Community | Total EJ Analysis Area Block Groups | HOT Lanes Access Construction Required |
|---|---|---|
| Gaithersburg | 7007.17 - 1 | — |
| | 7007.17 - 3 | — |
| | 7007.17 - 4 | New Direct Access (I-270 at I-370 and Shady Grove Metro Station) |
| | 7008.16 - 1 | — |
| | 7008.16 - 2 | New Direct Access (I-270 at I-370 and Shady Grove Metro Station) |
| | 7008.17 - 1 | Adjusted Interchange Ramps (I-270 at Shady Grove Rd. Interchange) New Direct Access (I-270 at I-370 and Shady Grove Metro Station) |
| | 7008.17 - 3 | — |
| | 7008.29 - 1 | — |
| Rockville | 7010.07 - 1 | Adjusted Interchange Ramps (I-270 at MD 28 Interchange) New Direct Access (I-270 at Gude Drive) |
| North Bethesda | 7012.15 - 2 | — |
| | 7012.15 - 3 | Adjusted Interchange Ramps (I-270 East Spur at MD 187/Rockledge Dr.) |
| | 7012.15 - 4 | — |
| | 7045.01 - 2 | Adjusted Interchange Ramps (I-270 West Spur at Democracy Blvd.) New Direct Access (I-495 at I-270 West Spur) |
| | 7045.01 - 4 | Adjusted Interchange Ramps (I-495 at MD 187) |
| Potomac | 7060.12 - 2 | Adjusted Interchange Ramps (I-270 West Spur at Democracy Blvd.) |
| | 7060.12 - 3 | Adjusted Interchange Ramps (I-270 West Spur at Democracy Blvd.) Reconstructed Interchange Ramps (I-270 Y-Split Interchange) New Direct Access (I-495 at I-270 West Spur) |

Note: "—" indicates no direct access construction would occur.

Construction would require the removal of vegetation to varying degrees throughout the study corridors. As a result of the vegetation removal, the wider interstates, added ramps, retaining walls, and noise barriers would become more visible and prominent to adjacent properties. Additional detail on visual and aesthetic impacts is provided in **FEIS Chapter 5.6** and **FEIS, Appendix H**.

Most emissions associated with construction are considered short-term or temporary in nature. The primary air quality concerns during construction would be a potential short-term localized increase in the concentration of fugitive dust, as well as mobile source pollutant emissions. In general, all of the mobile source air toxics (MSAT) pollutant emissions are expected to increase slightly for the Preferred Alternative when compared to the No Build condition for 2025 and 2045, opening and design years, respectively. All MSAT pollutant emissions are expected to significantly decline in the opening and design years when compared to existing conditions (2016). These long-term reductions occur despite projected increase in VMT from 2016 to the 2025 and 2045 Build scenarios. Additional detail on air quality impacts is provided in **FEIS, Chapter 5.8** and **FEIS, Appendix K**.

00005245

Areas around construction sites are likely to experience varied periods and degrees of noise impact. The extent and severity of these impacts depend on the phase of construction and the noise characteristics of construction equipment being used. Despite highway construction being a short-term phenomenon, significant noise impacts can occur. Additional detail on noise impacts is provided in **FEIS, Chapter 5.9** and **FEIS, Appendix L**.

### a.    Mitigation

Impacts associated with construction will be further evaluated for the Preferred Alternative in final design including, traffic congestion associated with construction maintenance of traffic, impacts to business and residential access, utility disruptions, vibrations, sediment erosion and stormwater management, and construction related noise.

All construction impacts would be mitigated in accordance with federal, state, and local regulations. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. MDOT SHA and the P3 Developer will continue to coordinate with the neighboring communities through design and construction. Construction will require maintenance of traffic throughout the duration of work to minimize the disruption to highway users.

Visual and aesthetic impacts would generally be consistent with existing views of the study corridors as the surrounding area is adjacent to the existing interstate facilities and the surrounding area is urban and suburban in nature. MDOT SHA has coordinated with NPS and M-NCPPC on visual impacts and mitigation at their park properties.  During final design, MDOT SHA and the Developer would develop and follow aesthetic and landscaping guidelines of all highway elements in consultation with the local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state, and Federal agencies.

Prior to acquisition of right-of-way and construction, Preliminary Site Investigations (PSIs) would be conducted to further investigate properties within and in the vicinity of the Preferred Alternative LOD that have a high potential for hazardous materials exposed during construction activities and require mitigation.

All required construction-related permits would be obtained from Maryland Department of the Environment (MDE) prior to construction. During construction the contractor may use the following dust control measures, to minimize and mitigate, to the greatest extent practicable, impacts to air quality:

- Minimize land disturbance;
- Cover trucks when hauling soil, stone, and debris (MDE Law);
- Use water trucks to minimize dust;
- Use dust suppressants if environmentally acceptable;
- Stabilize or cover stockpiles;
- Construct stabilized construction entrances per construction standard specifications;
- Regularly sweep all paved areas including public roads;
- Stabilize onsite haul roads using stone; and

00005246

Case 8:22-cv-02597-DKC   Document 58-2   Filed 10/30/23   Page 112 of 121

OP·LANES
M A R Y L A N D   | I-495 & I-270 Managed Lanes Study   Final Community Effects Assessment & EJ Analysis Technical Report

- Temporarily stabilize disturbed areas per MDE erosion and sediment standards.

## O.   Tolling Considerations

### a.   Beneficial and/or Adverse Impacts

The FHWA's *Impacts of Congestion Pricing on Low-Income Populations* (FHWA 2017), explains that the impacts of congestion pricing on low-income populations vary widely by context and type of project (i.e., full facility tolling or partial facility tolling).  In the tolled managed-lanes scenario, new travel choice becomes available for all users and additional network capacity is provided.  According to FHWA, well planned congestion pricing schemes:

- "Increase transportation options for all commuters, including low-income commuters, to achieve relatively congestion-free travel on specific occasions.

- Demonstrate wide acceptance and usage of priced-managed facilities by low-income commuters.

- Demonstrate that low-income commuters, many of whom are transit riders, particularly benefit from reduced congestion and transit investments made from pricing revenues (FHWA 2017)"

Consistent with FHWA guidance, while the travel speed and trip reliability benefits offered by the tolled lanes under the Preferred Alternative could be a less feasible choice for EJ populations due to cost burden, all existing general purpose (GP) lanes would remain toll-free and would undergo some travel time improvements. Also, under the Preferred Alternative, the general purpose lanes will be rehabilitated including resurfacing, and all bridges including the ALB will be reconstructed. These improvements will benefit all drivers of the study corridors. Traffic analysis conducted in support of the Preferred Alternative indicates that travel times would improve and congestion would decrease along GP lanes. Similarly, because High Occupancy Vehicles (HOVs) with three or more passengers will also travel toll-free on the new managed lanes, the use and availability of car and vanpools should be enhanced. Proposed bicycle and pedestrian improvements also provide for enhanced connectivity and mobility to area transit. These affordable transportation options can particularly benefit potential users who may not have reasonable access to personal vehicles.

All electronic tolling (AET) methods would be enlisted to collect tolls for the managed lanes under the Preferred Alternative.  Tolls would be set using dynamic pricing based on a tolling algorithm that would correlate the traffic volumes and demands with the toll rate. The advantage of using dynamic pricing is that it enables the HOT lanes to maintain a 45 miles per hour speed at all times and would reduce congestion in the GP lanes, which results in benefits for all users of the roadway facilities.

Toll rates were set through a public process by the Maryland Transportation Authority (MDTA) in accordance with COMAR 11.07.05. The MDTA toll rate proposal includes minimum toll and maximum toll rate ranges, soft rate caps, a process for annual toll escalation, and toll discounts for certain types of vehicles. The minimum and maximum toll rates are the lowest and highest toll rate per mile that would be charged for two-axle passenger vehicles in any tolling segment. The soft rate cap is the toll rate per mile that can only be exceeded when certain thresholds are met. The final toll rate range will be the recommended action for the MDTA Board and is available on the MDTA webpage at mdta.maryland.gov/ALB270TollSetting.

00005247



I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

The toll rate range proposal will be limited to only Phase 1 South. Any action to set, revise and fix tolls outside of Phase 1 South limits would require a separate toll setting process in accordance with State law. For additional detail on tolling, see **FEIS, Chapter 3.1.9**.

**b.    Mitigation or Community Enhancement Measures**

MDOT currently provides the following in managed lanes throughout the state:

- Free transponders for all customers;
- Prepaid cash/check payment options at MDTA walk-in centers, including four MVA's and six MDTA facilities;
- Allowing multiple payment methods, including credit card, cash, check or money order;
- Funding alternative modes of transportation through commuter programs such as Commuter Choice Maryland, Guaranteed Ride Home, and Maryland Rideshare;
- Providing more than 100 park-n-ride locations throughout the state; and
- Minimum prepaid balances sized to reduce the chance of users violating account minimums.

00005248

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 114 of 121

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

## 5.7 Comparison of Adverse Impacts to Environmental Justice Populations versus Non-Environmental Justice Populations

**Table 5-19: Comparison of Effects to EJ Populations versus Non-EJ Populations**

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
| **Property** | Property acquisition in EJ populations would total 14.3 acres from 31 properties, compared to property acquisition in non-EJ populations, which would total 78.6 acres from 330 properties.<br><br>Impacted properties in EJ populations account for 9% of the total impacted properties and 15% of the total impacted acreage along the entire Phase 1 South limits.<br><br>Impacted properties in non-EJ populations account for 91% of the total impacted properties and 85% of the total impacted acreage along the entire Phase 1 South limits.<br><br>All affected private property owners would be compensated for the fair market value of the acquired portion of land and any damages to the remaining property and structures; this includes compensation for temporary use of land for the construction of the Preferred Alternative. Ongoing coordination with area businesses would occur to prevent or minimize both short- and long-term disruptions. *The Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally Assisted Programs* information is provided in **Appendix E**.<br><br>Given the proportion of impacts and compensation requirements described above, the frequency and type of property impacts would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Community Facilities, incl. Section 4(f) Properties (Public Parks and Public Parks with Historic Properties)** | No residential or business property relocations would occur under the Preferred Alternative. No permanent or temporary impacts to community facility properties would occur in EJ populations. Impacts to 11 community facility properties, totaling 8.0 acres of impacts, would occur in non-EJ populations. Impacts to two Section 4(f) properties (public parks, public parks with historic properties, and historic sites) — Malcolm King Park and Academy Woods— totaling 0.6 acres of impact, would occur in EJ populations.* Impacts to 18 Section 4(f) properties**, totaling 32.6 acres of impact, would occur in non-EJ populations.***<br><br>Impacted community facility properties in non-EJ populations account for 100% of community facility property impacts. Impacted Section 4(f) properties in EJ populations account for 10% of the total impacted Section 4(f) properties and 2% of the impacted Section 4(f) property acreage.<br><br>All affected community facility property owners would be compensated for the fair market value of the acquired portion of land and any structures acquired for the construction of the Preferred Alternative. Ongoing coordination with area businesses would occur to prevent or minimize both short- and long-term disruptions. The |

00005249

OP·LANES
M A R Y L A N D | I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
| | *Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally Assisted Programs* is provided in **Appendix E**.<br><br>Mitigation for impacts to Section 4(f) properties has been coordinated extensively with the Officials with Jurisdiction (OWJ) over the impacted park properties. Refer to **FEIS, Chapter 5.4** and **FEIS, Chapter 6,** and **FEIS, Appendix G** for detail on Section 4(f) properties. Refer to Chapter 7 for detail on mitigation related to impacted Section 4(f) properties.<br><br>Given the proportion of impacts and mitigation described above, the frequency and type of community facility and Section 4(f) property impacts would not be higher or more adverse to EJ populations under the Preferred Alternative.<br><br>*\*Since the SDEIS, Morris Park in block group 7007.17 – 4 is now avoided by the Preferred Alternative LOD.*<br><br>*\*\*Includes the Washington Biologists' Field Club on Plummers Island, identified as a Section 4(f) property after the SDEIS. The impacts are not double counted for this property, as it is entirely within the Chesapeake and Ohio Canal National Historical Park.*<br><br>*\*\*\*Minor differences in Section 4(f) impact calculations between the EJ Analysis and the Section 4(f) Evaluation are due to rounding.* |
| **Demographics** | No property relocations would occur under the Preferred Alternative. Implementation of the Preferred Alternative would not result in changes to the existing population size or demographic characteristics (age and sex, disability, household income, race and ethnicity, Limited English Proficiency, Free and Reduced Lunch program participation) of the EJ Analysis Area, including both EJ and non-EJ populations.<br><br>Because the existing population size or demographic characteristics of the EJ Analysis Area would not be impacted, no mitigation is required.<br><br>As such, the frequency and type of impacts to demographics would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Traffic** | The addition of direct access would occur at 4 locations in EJ populations and 5 locations in non-EJ populations.<br><br>The Preferred Alternative is projected to provide operational benefits to the proposed managed lanes as well as general purpose lanes on the I-495 and I-270 interstate system, plus operational benefits to the surrounding local arterial network. The Preferred Alternative would significantly increase vehicle throughput across the American Legion Bridge and on the southern section of I-270 while reducing congestion. It would also increase speeds, improve reliability, and reduce travel times and delays along the majority of I-495, I-270, and the surrounding roadway network |

00005250

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
|  | compared to the No Build Alternative. Populations in both EJ populations and non-EJ populations would have the opportunity to experience these operational benefits. Refer to **FEIS**, **Chapter 7** for detail on mitigation related to traffic.<br><br>As such, the frequency and type of traffic impacts would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Air Quality** | Because the Study is in attainment for criteria pollutants' NAAQS,[52] transportation conformity requirements do not apply for this Study, meaning no project-level air quality analysis was required. For this reason, air quality modeling at a localized level—the level at which this EJ Analyses are otherwise conducted— is not available.<br><br>Exposure to traffic-related air pollution under the Preferred Alternative would result from short-term construction activities (approximately five years) and long-term highway operations. The exposure would be distributed along the Phase 1 South limits, regardless of EJ status.<br><br>In general, all of the MSAT pollutant emissions are expected to increase slightly for the Preferred Alternative when compared to the No Build condition for 2025 and 2045, opening and design years, respectively. All MSAT pollutant emissions are expected to significantly decline in the opening and design years when compared to existing conditions (2016). These long-term reductions occur despite projected increase in VMT from 2016 to the 2025 and 2045 Build scenarios.  However, EJ populations who live in areas with high EPA and MD EJSCREEN EJ Index scores **(Appendix F)** may experience air quality and/or public health impacts from construction activities and highway operations more acutely than populations with lower EJ Index scores.<br><br>Construction-related air quality impacts of the project would be limited to short-term increased fugitive dust and mobile-source emissions, including carbon monoxide, during construction.  Construction related air quality mitigation measures would be applied to minimize air quality and public health impacts to all populations along the Phase 1 South limits, particularly to EJ populations. Refer to **FEIS**, **Chapter 5.8.4** for additional details. All required construction-related permits would be obtained from Maryland Department of the Environment (MDE) prior to construction. Dust control measures to minimize and mitigate impacts to air quality would be used to the greatest extent practicable. To minimize the amount of emissions generated during construction, efforts would be made to limit traffic disruptions, especially during peak travel hours. Further, depending on the meteorological conditions, research has shown that noise barriers may deflect emissions and/or increase dispersion of emissions. Refer to FEIS, Chapter 7 for detail on mitigation related to air quality. |

---

[52] These counties were redesignated to attainment of the 2008 ozone NAAQS, effective May 15, 2019 (See: https://www.federalregister.gov/documents/2019/04/15/2019-06128/air-plan-approval-district-of-columbia-maryland-and-virginia-maryland-and-virginia-redesignation).

00005251

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 117 of 121

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
|  | Further, "active transportation" modes such as walking and bicycling have been shown to reduce human health risks and improve overall wellbeing.[1] Opportunities for active transportation will be provided under the Preferred Alternative via new and enhanced pedestrian and bicycle connections. Refer to **Section 5.8** below, and **FEIS, Chapter 7** for detail on pedestrian and bicycle community enhancements. As such, air quality impacts would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Safety** | No impacts would occur to safety along the Phase 1 South limits, including both EJ populations and non-EJ populations.<br><br>The Preferred Alternative would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with federal and state regulation. During construction, safety maintenance measures to protect drivers, bicyclists, and pedestrians would also be implemented in accordance with federal, state, and local regulations.<br><br>Further, additional capacity on the Phase 1 South limits would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur; this benefit would occur for both EJ populations and non-EJ populations. Refer to **FEIS**, **Chapter 7** for detail on mitigation related to safety.<br><br>As such, impacts to safety would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Noise** | Of a total of 60 NSAs, 11 are located in EJ populations and 49 are located in non-EJ populations. Two of the 11 NSAs in EJ populations would not experience a noise impact; Another 3 NSAs in EJ populations, while experiencing a noise impact, would not be protected by noise barrier systems as the systems are considered not reasonable and/or feasible. Ten of the 49 NSAs in non-EJ populations would not experience a noise impact. Another 7 NSAs in non-EJ populations, while experiencing a noise impact, would not be protected by noise barrier systems as the systems are considered not reasonable and/or feasible.<br><br>Overall, a greater percentage of the total NSAs are located in non-EJ populations (82%) than in EJ populations (18%). A slightly lower percentage of NSAs in EJ populations would not experience a noise impact (18%) as compared to the NSAs in non-EJ populations that would not experience a noise impact (20%). Between EJ populations and non-EJ populations, the percentage of NSAs experiencing an impact but whose noise barrier systems would be considered not feasible and/or reasonable, is smaller in non-EJ populations (18%), as compared to the same type of NSAs in EJ populations (33%).<br><br>Noise barrier feasibility and reasonableness criteria are based on federal regulation (23 CFR 772), the MDOT SHA *Highway Noise Abatement Planning and Engineering* |

00005252

OP·LANES™ I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
| | *Guidelines*, and *VDOT Highway Traffic Noise Impact Analysis Guidance Manual*. In general, noise abatement feasibility criteria focus on whether it is physically possible to build a noise barrier that achieves a minimally acceptable level of noise reduction, taking into consideration acoustics, safety, and access. Noise barrier reasonableness criteria focus on viewpoints, noise reduction design goal, and cost effectiveness. These criteria are applied equally wherever noise abatement was considered, regardless of NSA location. (Refer to **FEIS, Chapter 5.9** for detail on noise abatement.) |
| | While the percentage of NSAs who experience noise impacts and whose barrier systems are considered not feasible and/or reasonable is greater in EJ populations versus non-EJ populations, overall, a substantially greater percentage of NSAs are located in non-EJ populations rather than EJ populations. The feasible and/or reasonable criteria is based on federal and state regulations and are applied equally wherever noise abatement is considered. As such, noise impacts would not be considered higher or more adverse to EJ populations under the Preferred Alternative. |
| **Hazardous Materials** | EJ populations contain 27 low, 4 moderate, and 2 high risk sites of hazardous materials sites of concern, while non-EJ populations contain 37 low, 56 moderate, and 9 high risk sites of hazardous materials sites of concern. |
| | EJ populations account for 42% of the low, 7% of the moderate, and 18% of the high risk sites of hazardous materials sites of concern. Hazardous material mitigation would be conducted as necessary in accordance with federal, state, and local regulations. |
| | As such, hazardous materials concerns would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Natural Resources** | Impacts would occur to natural resources in both EJ populations and non-EJ populations. Natural resource impacts would occur in 10 EJ populations and 32 non-EJ populations. |
| | In comparison to non-EJ populations, EJ populations account for 5% of total impacts to wetlands, 17% of total impacts to wetland buffers, 16% of total impacts to waters (linear feet), 9% of total impacts to waters (square feet), 23% of total impacts to tree canopy, and 11% of total impacts to floodplains. |
| | Impacts to natural resources will be mitigated in accordance with all applicable federal, state, and local regulations. Refer to **FEIS, Chapter 7** for detail on mitigation related to natural resources. |
| | As such, impacts to natural resources would not be higher or more adverse to EJ populations under the Preferred Alternative. |

00005253

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
| Visual Landscape and Aesthetic Values | The Preferred Alternative would result in changes to viewsheds or visual impacts in both EJ populations and non-EJ populations. New highway lanes would be added to the existing I-495 or I-270 corridor regardless of adjacency to an EJ population. The addition of project elements associated with the highway widening would not introduce new elements incompatible with the existing visual character or qualities, again regardless of adjacency to an EJ population. During final design, MDOT SHA and the Developer would develop and follow aesthetic and landscaping guidelines of all highway elements in consultation with the local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state, and Federal agencies. The goal will be to design highway elements to be sensitive to the context of the surrounding land use, including historic and park resources. Refer to **FEIS**, **Chapter 7** for detail on mitigation related to the visual landscape and aesthetic values. As such, impacts to the visual landscape and aesthetic values would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| Economy and Employment | The Preferred Alternative would not result in business relocations and would not impact access to area businesses or employers. There would be no overall impact to the distribution of worker occupation, or major employers within EJ or non-EJ populations within the Analysis Area. Proposed improvements would help address increasing congestion, thereby maintaining mobility throughout the region, including areas with EJ populations. Through the Opportunity MDOT Program, the agency will provide resources for job seekers and small, minority-, women-, and veteran-owned businesses and disadvantaged businesses to prepare for potential opportunities to work with MDOT and the I-495 & I-270 P3 Program. As such, impacts economy and employment would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| Access and Mobility | The Preferred Alternative would not permanently eliminate or impede access between residences and community facilities and businesses, including both those in EJ populations and non-EJ populations. An incremental enhancement to access may occur for both EJ populations and non-EJ populations due to reduced congestion on local routes. Impacts to access and mobility during construction would be minimized in compliance with MDOT SHA Work Zone Safety and Mobility requirements along the Phase 1 South limits and would include maintenance of the same number of existing lanes. Under the Preferred Alternative, the same number of general purpose lanes will remain, along with the addition of the four HOT lanes. The general purpose lanes will also be rehabilitated and resurfaced, and all bridges, including the American Legion |

00005254

Case 8:22-cv-02597-DKC    Document 58-2    Filed 10/30/23    Page 120 of 121

OP·LANES
M A R Y L A N D    | I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
| | Bridge, will be reconstructed.  These improvements would benefit all drivers of the study corridors.<br><br>The Preferred Alternative includes toll-free travel for bus transit and High Occupancy Vehicles with three or more passengers (HOV3+), new, direct access to transit centers, and new and enhanced bicycle/pedestrian connections. Refer to **FEIS**, **Chapter 7** for detail on community enhancements related to access and mobility.<br><br>As such, impacts to access and mobility would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| Community Cohesion and Quality of Life | No changes would occur to the existing sense of community cohesion in EJ populations or non-EJ populations. Divisions or isolation of properties, persons, or groups would not occur due to the generally parallel nature of the Preferred Alternative LOD along I-495 and I-270 and the fact that no properties would be displaced. Property- and construction- related changes to a local resident's or employee's existing quality of life would be experienced by both EJ populations and non-EJ populations. At the same time, local residents and employees, regardless of EJ status, could experience a benefit to quality of life due to reduced congestion in general purpose lanes and HOT lanes<br><br>To further enhance community cohesion and quality of life in the EJ Analysis Area, MDOT SHA has committed to new and enhanced bicycle/pedestrian connections to support additional affordable travel options. Specifically, MDOT SHA has committed to constructing a new sidewalk along the west side of Seven Lock Road under I-495 to *reestablish the historic connection* between First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall Cemetery, in the historically African American community of Gibson Grove. Refer to **FEIS**, **Chapter 3.1.5** for additional bicycle and pedestrian improvements.<br><br>As such, impacts to community cohesion and quality of life would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| Construction | Construction of project elements would occur along the Phase 1 South limits, including in EJ populations. Impacts from construction to visual and aesthetic resources, hazardous material sites of concern, air quality, and noise would also occur throughout the Preferred Alternative limits, including within EJ populations.  It is anticipated that construction will last approximately five years. Mainline widening would occur throughout the Phase 1 South limits.<br><br>Two (2.0) acres in EJ populations and 12.6 acres in non-EJ populations would be required temporarily for construction access, staging, and materials storage; EJ populations contain 16% percent of total temporary property acquisition for construction.  Construction for new direct access and for modifications to existing |

00005255


I-495 & I-270 Managed Lanes Study     Final Community Effects Assessment & EJ Analysis Technical Report

| Resource | Comparison and Analysis of Effects to 16 EJ Populations versus Effects to 50 Non-EJ Populations |
|---|---|
|  | interchanges to accommodate highway widening would occur at 10 locations in EJ populations and 8 locations in non-EJ populations. |
|  | All construction impacts would be mitigated in accordance with federal, state, and local regulations. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. MDOT SHA and the Developer will continue to coordinate with the neighboring communities through design and construction. Refer to **FEIS, Chapter 7** for detail on mitigation related to construction. |
|  | As such, impacts from construction would not be higher or more adverse to EJ populations under the Preferred Alternative. |
| **Tolling Considerations** | Consistent with FHWA guidance, while the travel speed and trip reliability benefits offered by the tolled lanes under the Preferred Alternative could be a less feasible choice for EJ populations due to cost burden, all existing general purpose (GP) lanes would remain toll-free and would undergo some travel time improvements. Also, under the Preferred Alternative, the general purpose lanes will be rehabilitated including resurfacing, and all bridges including the ALB will be reconstructed. These improvements will benefit all drivers of the study corridors. Traffic analysis conducted in support of the Preferred Alternative indicates that travel times would improve and congestion would decrease along GP lanes. Similarly, because High Occupancy Vehicles (HOVs) with three or more passengers will also travel toll-free on the new managed lanes, the use and availability of car and vanpools should be enhanced. Proposed bicycle and pedestrian improvements also provide for enhanced connectivity and mobility to area transit. These affordable transportation options can particularly benefit potential users who may not have reasonable access to personal vehicles. |
|  | As such, impacts from tolling would not be higher or more adverse to EJ populations under the Preferred Alternative. |

*Includes permanent and temporary impacts.*

[1]Raynault, Eloisa and Ed Christopher. "How Does Transportation Affect Public Health?" *Public Roads Magazine*, Vol. 76 No. 6. Federal Highway Administration. Accessed at https://highways.dot.gov/public-roads/mayjune-2013/how-does-transportation-affect-public-health.

## 5.8   Determination of whether Disproportionately High and Adverse Impacts would Occur to Environmental Justice Populations under the Preferred Alternative

Per FHWA Order 6640.23A, a *Disproportionately High and Adverse Effect on Minority and Low-Income Populations* is an adverse impact that:

(1) is predominately borne by a minority population and/or a low-income population; or

00005256