

I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

(2) will be suffered by the minority population and/or low-income population and is appreciably more severe or greater in magnitude than the adverse effect that will be suffered by the nonminority population and/or non-low-income population.

In determining whether a particular program, policy, or activity would have disproportionately high and adverse impacts on minority and low-income populations, Order 6640.23A states that FHWA (and MDOT SHA) should take into account "mitigation and enhancement measures and potential offsetting benefits to the affected minority and/or low-income populations" as well as "design, comparative impacts, and the relevant number of similar existing system elements in nonminority and non-low-income areas" (FHWA 2012).

Due to the parallel nature of the Preferred Alternative limits of disturbance to I-495 and I-270, plus the infrequent distribution of EJ and non-EJ populations along the Phase 1 South limits, impacts would occur consistently throughout the limits. Non-EJ populations would bear the majority of quantifiable impacts for various resources, including the following:

- 91 percent of impacted properties and 85 percent of impacted property acreage;
- 100 percent of impacted community facility properties and acreage;
- 90 percent of impacted Section 4(f) properties and 98 percent of impacted Section 4(f) property acreage;
- 58 percent of the low-risk, 93 percent of the moderate-risk, and 82 percent of the high-risk sites of hazardous materials concern; and
- 95 percent of impacts to wetlands, 83 percent of impacts to wetland buffers, 84 to 91 percent of impacts to waters (linear feet and square feet, respectively), 77 percent of impacts to the tree canopy, and 89 percent of impacts to floodplains.

Impacts to demographics, traffic, air quality and its effect on public health, safety, visual and aesthetic resources, economy and employment, access and mobility, community cohesion/isolation and quality of life, and impacts resulting from construction would occur consistently along the Phase 1 South limits and more frequently in non-EJ populations.

The types of impacts caused by the Preferred Alternative would not differ between EJ populations and non-EJ populations. The Preferred Alternative includes construction of the following project elements that are distributed throughout the Phase 1 South limits: mainline widening, addition of new direct access and reconstruction of existing interchanges, reconstruction of mainline bridges and overpasses, relocation of utilities, and construction/reconstruction of stormwater management, retaining walls, and noise barriers. Operation of the Preferred Alternative would also be consistent along the Phase 1 South limits. As such, the types of impacts caused by the Preferred Alternative would not be greater in magnitude in EJ populations versus non-EJ populations.

In response to public and agency input and concern about property impacts under the Build Alternatives analyzed in the DEIS, including considerable impacts to EJ populations, MDOT SHA selected the Preferred Alternative for Phase 1 South, which avoided all residential and business displacements and substantially reduced the number and location of potentially impacted EJ populations.

Given the reasoning documented in this EJ Analysis and summarized above and in accordance with EO 12898, USDOT Order 5610.2C, FHWA Order 6640.23A, and an FHWA Guidance on Environmental Justice

00005257

(EJ) and NEPA (2011), FHWA and MDOT SHA have determined that a disproportionately high and adverse impact would not occur to the EJ Analysis Area population under the I-495 and I-270 Managed Lanes Study Preferred Alternative.

However, to be responsive to community concerns raised during the outreach and engagement efforts, which identified priorities for improved sidewalks and bicycle facilities, better lighting, and traffic calming measures, MDOT SHA commits to working with the City of Rockville, the City of Gaithersburg, and Montgomery County to:

- Identify locations where safer pedestrian crossings on major state roadways are needed.

- Identify locations where additional pedestrian improvements including adding or upgrading sidewalk, restriping for bicycle lanes, adding or upgrading ADA ramps are needed.

- Identify locations along state roads with existing pedestrian facilities where more or better lighting is needed.

MDOT SHA has incorporated elements into the Preferred Alternative or has committed to additional improvements or the Developer has committed to certain enhancements as part of the P3 Agreement that support fair, accessible, and affordable transportation options for all users of the Study roadways, including traditionally underserved communities, including the following:[53]

- Supporting additional affordable, multimodal travel options including:
    o Toll-free travel for new bus transit on managed lanes for a faster, more reliable trip.
    o Toll-free travel for carpools/vanpools with three or more (3+) occupants.
    o Working with the local communities to expand transit fare subsidies for eligible low-income riders.

- Improving accessibility to work, school, and other modes of transportation via pedestrian and bicycle improvements:
    o Upgrading existing pedestrian and bicycle facilities impacted by the Preferred Alternative by replacing in-kind or upgrading to meet the master plan recommended facilities.
    o Where I-495 and I-270 or associated ramps cross over a roadway and the bridge would be replaced, the mainline and ramp bridges will be lengthened to accommodate the footprint of the master plan facility under the structure.
    o New pedestrian and bicycle facilities including a shared use path on the American Legion Bridge.
    o New sidepaths across MD 190 over I-495.
    o New sidewalk along Seven Locks Road to re-establish the historic connection in the historically African American community of Gibson Grove.
    o Providing safer pedestrian and bicycle improvements and connecting with planned City of Rockville improvements at the MD 189 and I-270 interchange.

---

[53] The elements listed that are not part of the base design of the Preferred Alternative will be documented in the Record of Decision or, if Developer lead, documented in the P3 Agreement and/or Memoranda of Understanding to ensure they are carried through project development.

00005258

 I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

- Enhancing transit connectivity and mobility by:
  - Direct and indirect access ramps from the managed lanes to existing transit stations including Shady Grove, Twinbrook, Rockville Metro Stations and Westfield Montgomery Mall Transit Center.
  - Increasing the number of bus bays at WMATA Shady Grove Metrorail Station.
  - Increasing parking capacity at the Westfield Montgomery Mall Transit Center.

- Upgrading existing transportation facilities throughout Phase 1 South for all users of the Study roadways by:
  - Replacing or rehabilitating all existing bridges on or over I-495 and I-270 within the Phase 1 South corridor.
  - Rehabilitating and repaving the existing general purpose lanes for smoother and safer travel for all users.

MDOT SHA has also committed to certain improvements within the historically African American community of Gibson Grove either as mitigation for direct impacts or as commitments for further enhancement. MDOT SHA will construct or fund a new parking lot for the Gibson Grove Church, provide stormwater improvements to the property, and provide a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection between Gibson Grove Church and Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Refer to **FEIS**, **Chapter 5.7** and **FEIS**, **Appendix J** for details.

Additionally, the Developer is committed to the following as part of the P3 Agreement:

- Working with Montgomery, Frederick and Prince George's Counties to expand transit fare subsidies for eligible low-income riders.

- The Developer will facilitate the development of a facility improvement program for the installation or replacement of sidewalks, crossings, or signal modifications and formalizing trail development that has pedestrian demand, then rank projects according to safety significance, readiness, and landowner consensus, as part of its commitment to support Montgomery County's Vision Zero Action Plan, which identifies strategies to eliminate serious and fatal collisions on County roads for vehicle occupants, pedestrians, and bicyclists by the end of 2030.[54]

- In support of community, environmental, and sustainability goals, the Developer is requiring the development of a Sustainability Plan for the project to achieve, at minimum, a Gold Award rating as recognized by the EnvisionTM Sustainable Infrastructure Rating System of the Institute for Sustainable Infrastructure ("ISI") and target a Platinum Award in collaboration with the Section Developer. The Sustainability Plan will include actions related to the quality of life surrounding the infrastructure asset, stakeholder and community engagement, natural resource management, ecosystems and biodiversity health, climate resilience and carbon emissions.

---

[54] See https://www.montgomerycountymd.gov/visionzero/.

00005259


Refer to **Chapter 3, Sections 3.1.4** and **3.2** for detail on transit-related elements of the Preferred Alternative as well as transportation commitments. Refer to **Chapter 7, Section 7.2** for detail on all commitments.

MDOT SHA and the Developer will continue coordination with local and regional advisory groups to determine additional methods for engaging with underserved communities. This will be an ongoing effort that continues post-NEPA, through final design and construction.

00005260

Case 8:22-cv-02597-DKC    Document 58-3    Filed 10/30/23    Page 5 of 133

OP•LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Community Effects Assessment & EJ Analysis Technical Report

# 6    REFERENCES

**Fairfax County**

2020. *Demographic Reports*. Accessed at:
fairfaxcounty.gov/demographics/sites/demographics/files/assets/demographicreports/fullrpt.pdf

2021. *Agricultural & Forestal Map*. Accessed at:
fairfaxcountygis.maps.arcgis.com/apps/webappviewer/index.html?id=8703c68608b64c2890ddfed0
32f20d25.

2019. *Fairfax County Land Use Data: Existing Land use- Generalized*. Accessed at:
https://www.fairfaxcounty.gov/maps/open-geospatial-data.

2021. Fairfax County Zoning Administration Division. *The Fairfax County Zoning Ordinance*. Accessed
at: https://www.fairfaxcounty.gov/planning-development/zoning-ordinance.

2021. Fairfax County Department of Housing and Community Development. *Affordable Dwelling
Unit Rental Program*. Accessed at: https://www.fairfaxcounty.gov/housing/rentalhousing.

**Federal Highway Administration (FHWA)**

2013. Raynault, Eloisa and Ed Christopher. "How Does Transportation Affect Public Health?" Public
Roads Magazine, Vol. 76 No. 6. Accessed at https://highways.dot.gov/public-roads/mayjune-
2013/how-does-transportation-affect-public-health.

2017. *Impacts of Congestion Pricing on Low-Income Populations: Efforts to Measure and Response to
Income-Equity Concerns*. Accessed at: ops.fhwa.dot.gov/publications/fhwahop17019/index.htm.

2018. *Air Quality: Transportation & Toxic Air Pollutants—Research & Analysis*. Accessed at
https://www.fhwa.dot.gov/environment/air_quality/air_toxics/research_and_analysis/.

**City of Gaithersburg**

2021. *City of Gaithersburg GIS web map – Zoning*. Accessed at:
https://maps.gaithersburgmd.gov/gallery/.

**City of Rockville**

2021. *City of Rockville GIS Open Data – Zoning Districts*. Accessed at: https://data-
rockvillemd.opendata.arcgis.com/datasets/rockville-zoning-
districts/explore?location=39.086800%2C-77.154050%2C13.88.

**Health Effects Institute (HEI)**

2010. *Traffic-Related  Air Pollution: A Critical  Review of the Literature on  Emissions, Exposure,  and
Health Effects*. HEI Special Report 17. Accessed at:
https://www.healtheffects.org/system/files/SR17TrafficReview_Exec_Summary.pdf.

00005261

# APPENDIX A:
# CEA Analysis Area
# Environmental Mapping

00005262



Community Effects
Assessment Analysis Area

Census Block Groups
Limit of Disturbance
County Boundary
State Boundary

1:60,951
0    2,000  4,000
Feet

00005263


I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment and EJ Analysis Technical Report

# APPENDIX B:
## Zoning/Land Use
## Classification Table

00005264

| Land Use Classification for Purposes of DEIS/SDEIS/FEIS | Zoning Codes by Jurisdiction | | | |
|---|---|---|---|---|
| | Montgomery County | Fairfax County | City of Rockville | City of Gaithersburg |
| Commercial/ Employment | **EOF** – Employment Office, followed by maximum total FAR (0.5, 0.75, 1.0, 1.25, 1.5)<br>**EOFF-0.5** – Employment Office Floating, maximum allowed total density 0.5<br>**GR-1.5** – General Retail, maximum FAR 1.5<br>**NR-0.75** – Neighborhood Retail, maximum FAR 0.75 | **C-5** – Neighborhood Retail Commercial District | N/A | **C-2** – General Commercial<br>**E-1** – Urban Employment (office, churches, library, research, industry, agriculture?)<br>**E-2** – Moderate Intensity Industrial Park |
| Industrial | **IM 2.5** – moderate industrial, maximum FAR 2.5<br>**LSC** – Life Sciences Center, followed by total maximum FAR (1.0, 1.5, 2.0) | N/A | N/A | **I-1** – Light Industrial |
| Mixed Use | **CR** – Commercial Residential, followed by maximum total FAR (0.5, 0.75, 1.0, 1.25, 1.5, 2.0, 2.5)<br>**CRN-0.5** – Commercial Residential Neighborhood, maximum total FAR 0.5<br>**CRT** – Commercial Residential Town, followed by maximum total FAR (0.5, 0.75, 1.0, 1.25, 1.5, 2.25, 2.5) | N/A | **MXT** – Mixed-Use Transition<br>**MXC** – Mixed-Use Commercial<br>**MXE** – Mixed-Use Employment<br>**MXCD** – Mixed-Use Corridor District<br>**MXCT** – Mixed-Use Corridor Transition | **CD** – Corridor Development<br>**MXD** - Mixed Use Development |
| Residential | **R-10** – multi-family; minimum net lot area: 20,000 sq. ft.; 1,000 sq.ft./dwelling<br>**R-20** – multi-family; minimum net lot area: 16,000 sq. ft.; 2,000 sq.ft./dwelling<br>**R-30** – multi-family; minimum net lot area: 12,000 sq. ft.; 3,000 sq.ft./dwelling<br>**R-60** – single-family; minimum net lot area: 6,000 sq.ft.<br>**R-90** – single-family; minimum net lot area: 9,000 sq.ft.<br>**R-200** – single-family; minimum net lot area: 20,000 sq.ft.<br>**RE-1** – single-family; minimum net lot area: 40,000 sq.ft.<br>**RE-2** – single-family detached; minimum net lot area: 2 acres<br>**RE-2C** – single-family; minimum net lot area: 2 acres<br>**R-H** – Multiple-Family, High-Rise Planned Residential; minimum net lot area: 40,000 sq. ft. (1,000-1400 sq.ft./dwelling)<br>**RT-10** – Townhouse; minimum tract area: 20,000 sq.ft.; 10 dwellings units/acre<br>**RT-12.5** – Townhouse; minimum tract area: 20,000 sq.ft.; 12.5 dwellings units/acre<br>**RT-15** – Townhouse; minimum tract area: 40,000 sq.ft.; 15 dwellings units/acre<br>**RT-8** – Townhouse; minimum tract area: 20,000 sq.ft.; 8 dwellings units/acre<br>**THD** – townhouse high density | **R-1** – Residential District, 1 dwelling unit per acre<br>**R-2** – Residential District, 2 dwelling units per acre<br>**R-20** – Residential District, 20 dwelling units per acre<br>**R-E** – Residential Estate District | **R-150** – Low Density Residential<br>**R-200** – Suburban Residential<br>**R-75** – Single Unit Detached Dwelling, Residential<br>**R-90** – Single Unit Detached Dwelling, Restricted Residential<br>**RMD-15** – Residential Medium Density<br>**R-60** – Single Unit Detached Dwelling, Residential<br>**RMD-10** – Residential Medium Density<br>**R-400** – Residential Estate | **R-6** – Medium Density Residential<br>**R-20** – Medium Density Residential<br>**R-90** – Medium Density Residential<br>**R-90 C** – Medium Density Residential Cluster Development<br>**R-A** – Low Density Residential<br>**RP-T** – Medium Density Residential |

00005265

| Planned Unit/Planned Community | **PD-9** – Planned Development, Medium; minimum: 2 dwelling units/acre, maximum: 9 du/a<br>**PD-11** – Planned Development, Medium; minimum: 2 dwelling units/acre, maximum: 11 du/a<br>**PD-28** – Planned Development, High; minimum: 2 dwelling units/acre, maximum: 28 du/a | N/A | **PD** – Planned Development | **R-18** – Medium Density Planned Residential; maximum 18 dwelling units per acre |
| Park/Open Space* | | | **PARK** – Park Zone | |

*Municipal, stream valley, regional, neighborhood, and national parklands were identified on a property basis and are classified as Park/Open Space in the FEIS and CEAEJ Technical Report.

2

00005266



# APPENDIX C:
# Smart Growth Coordination
# Checklists

**From:** Bihui Xu -MDP- <bihui.xu@maryland.gov>
**Sent:** Wednesday, January 12, 2022 3:06 PM
**To:** Joseph Kresslein <JKresslein@mdot.maryland.gov>; Marty Baker <mbaker1@mdot.maryland.gov>; David Thomas (Consultant) <DThomas6.consultant@mdot.maryland.gov>; Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>
**Cc:** Chuck Boyd <chuck.boyd@maryland.gov>; Michael Bayer -MDP- <michael.bayer1@maryland.gov>; Scott Hansen -MDP- <scott.hansen@maryland.gov>; Donna Buscemi <DBuscemi@mdot.maryland.gov>; Dennis Atkins (Design) <DAtkins@mdot.maryland.gov>; Nicholas Baumann <NBaumann@mdot.maryland.gov>; Erron Ramsey <eramsey@rkk.com>; Tyler Ruth <tyler@blackwaterenvironmentalgroup.com>; Kirby Amoriello (Consultant) <KAmoriello.consultant@mdot.maryland.gov>; Karen Arnold <KArnold@mdot.maryland.gov>; Stacy Talmadge (Consultant) <STalmadge.consultant@mdot.maryland.gov>; Karen Kahl <kkahl@rkk.com>
**Subject:** Re: I-495 & I-270 Managed Lanes Study - Smart Growth Coordination

Joe, Marty, Caryn, David, and others,

After MDP's management reviewed the updated Checklist A and Checklist B, MDP added the language regarding the potential of induced growth effects in Checklist A (Planning Act Consistency Review) to recognize and address the potential indirect and cumulative growth impacts of the I-495 & I-270 MLS_Alternative 9 - Phase 1 South.  Please note that MDP made similar comments on induced growth effects in our DEIS review.  Despite the additional language regarding the induced growth issue, MDP still concurs with the Planning Act consistency determination for the I-495 & I-270 MLS_Alternative 9-Phase 1 South.

MDP concurs with the PFA Law compliance determination for the I-495 & I-270 MLS_Alternative 9-Phase 1 South.  We made a couple of minor edits in Checklist B (PFA Law Compliance Review).

Please review the revised Checklist A and Checklist B (see the attachments) and let us know if you have any questions or concerns.

Bihui

Bihui Xu, AICP
Lead Transportation Planner
Maryland Department of Planning
301 West Preston Street, RM 1101
Baltimore, MD 21201
(443)-854-6488 (Mobile)
(410) 767-4567 (Office)

bihui.xu@maryland.gov

Please take our customer service survey.
Planning.Maryland.gov

00005268

# Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

## Consistency Review pertaining to "Maryland's Economic Growth, Resource Protection, and Planning Policy (the Planning Policy)"

**Project Name:** I-495 & I-270 Managed Lanes Study

**Alternative No.:** Alternative 9 - Phase 1 South

**County:** Montgomery

## Tier 1 - Pre-CTP/Project Planning Screening

**The Tier 1 - Pre-CTP/Project Planning Screening should be completed prior to project scoping (prior to purpose and need).**

The Tier 1 review is the initial screening which provides a broad assessment on a project's growth implication and its likelihood of consistency with the 12 Visions of the Planning Policy as defined in §5-7A-01 of the State Finance and Procurement and the goals of the 2040 Maryland Transportation Plan.

This evaluation will be performed on a Major Capital Transportation Project prior to its inclusion in the Consolidated Transportation Program (CTP). It could also be used for projects at various stages of the development, e.g., in county priority letters and for the Highway Needs Inventory (HNI).

This screening provides the State with a general understanding of a project's potential growth and transportation impacts as well as assists State's project investment decision.

The following questions and review factors provide the guidance on the consistency review. The questions/criteria are not intended to be all-inclusive for all projects. **Professional judgment should be used along with the questions to assist in determining whether the project is likely to have growth implications based on local area conditions.**



1

00005269

## Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

# Increasing Capacity

| 1. Could the project likely add capacity to an existing facility or provide new capacity for an area not currently serviced by the facility? | Q1. Answer |
|---|---|
| | ⦿ **Yes**    ○ **No** |
| *Please provide a brief response to support your answer below.* | Reset Q1 |

The Managed Lanes Study (MLS) proposed action consists of adding two, new High Occupancy Toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to east of MD 187. On I-270, the proposed action consists of converting one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The proposed action adds capacity to the existing I-495 and I-270 highway facilities through the construction of new HOT managed lanes, new interchanges, and the modification of existing interchanges.

If the project meets one or more of the conditions provided in a. or b. below, the project is considered increasing transportation capacity. If the answer to Question 1 is "Yes," then the project is likely to affect land use and the reviewer should proceed to Question 2, 3 and 4. If the answer to Question 1 is "No," the project is unlikely to have significant growth impacts and the review is complete.

- a. Definition of Additional/Increased Capacity for Highways includes the following:
  1) New interchange construction;
  2) Conversion/reconstruction of an existing intersection or interchange to provide additional movements/access that may facilitate unintended development.*
  3) Any new construction or reconstruction of an existing roadway that would provide an additional through travel lane between two intersecting roadways that is equal or greater than one-lane mile of roadway.

  **\*Localized improvements intended to enhance traffic operations within these limits such as facilitating turning movements and/or functioning as an acceleration/deceleration or auxiliary lane would not be considered additional capacity.**

- b. Definition of Additional/Increased Capacity for Transit includes the following:
  1) A new rail line or dedicated service-lane transit line;
  2) An extension/expansion of existing rail or dedicated-service-lane transit line;
  3) An addition of a new transit station; and
  4) A transit project that requires major highway improvements for transit accommodation.



**MARYLAND DEPARTMENT OF TRANSPORTATION**

**STATE HIGHWAY ADMINISTRATION**

2

## Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

# Affecting Land Use

| 2. Could the project have potential to facilitate or accommodate planned and/or unplanned growth or transform current land use patterns? | Q2. Answer |
|---|---|
| | ⦿ Yes    ◯ No |
| | Reset Q2 |

*Please provide a brief response to support your answer:*

Within the MLS project area, the MLS proposed action will have potential to facilitate and accommodate planned or unplanned growth, and support opportunities primarily for redevelopment, as well as isolated opportunities for new growth, along the study limits. The proposed action is located entirely within PFAs. The areas in the study area consist primarily of established communities, as well as targeted growth and revitalization areas. Small areas of future growth, limited large lot development, and rural resources also exist in the study area. The study area have been transformed by the intensification of development in past decades and has shifted from rural to almost entirely developed suburban and urban land uses. Growth in the study area, through land use and growth policies and regulations, is directed to existing suburban and urban communities and mainly along transportation corridors. As much of the MLS project need derives from the need to accommodate existing traffic and long-term traffic growth in the study area, the proposed action would primarily accommodate existing and planned growth and would not change the existing land use patterns.

While the MLS proposed action with increased highway capacity occurs within PFAs, it could likely have indirectly and cumulatively induced growth impacts outside PFAs, especially considering the cumulative and indirect growth impacts that could be resulted from the potential and future I-270 project from I-370 to I-70, which is under a pre-NEPA study. However, in Montgomery County the potential large lot development in non-PFAs within the study area would be limited to low development capacity. The state and affected local jurisdictions should make concerted efforts to discourage induced development outside PFAs and locally designated growth areas, especially in Frederick County if the I-270 project from I-370 to I-70 would be carried forward in the future.

**When answering Question 2, consider the following factors where applicable:**

a. General location of the project: urban, rural, or suburban, Priority Funding Areas (PFAs), Local and State Growth & Conservation Areas.
b. Current general growth trend in the project area.
c. Current general development capacity and/or pressure in the project area.
d. Local development policies and regulations on growth.



3

## Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

Likelihood of the changes in growth rate and/or amount, or land use type/pattern (e.g., from agricultural/forest/barren land to residential, residential to commercial, and low density to high density) because of the potentially improved transportation capacity.

> **If the answer to Question 2 is "Yes", the project is likely to have growth implications and the reviewer should proceed to Questions 3 and 4.**
>
> **If the answer to Question 2 is "No," then the project is not likely to have growth implications, and the review is complete.**

## Consistency with Local Plans

| 3. Is the project consistent with the local comprehensive and/or transportation plans? | Q3. Answer |
|---|---|
| | ⦿ Yes   ◯ No |
| *If yes, list the plans, the dates the plans were adopted, and discuss a. and b. below in your response.* | Reset Q3 |

The MLS is included in the technical update of the Montgomery County Master Plan of Highways and Transitways (MPOHT), approved July 24, 2018. Additionally, the MLS is included in the Montgomery County MPOHT mapbook, amended May 20, 2020. In the MPOHT, the MLS is referred to as proposed high occupancy vehicle (HOV) lanes for I-495 between the I-270 West Spur and the American Legion Bridge. The MPOHT includes all existing and planned transportation facilities. Its vision is based on supporting the development of the County and its transportation infrastructure, including having a transportation system that builds and maintains livable communities and aids quality of life. These principles are in accordance with what is laid out in the Montgomery County General Plan, amended 1993, which aims to direct growth to the urban ring around Washington, DC, and development corridors, such as the I-270 corridor, that are along major roads. This growth strategy allows for the preservation of open space, farmland, and low-density residential uses. The MLS would provide for improvements to an existing transportation facility along almost entirely developed corridors and is needed to accommodate past and planned future growth. For those reasons, and the Purpose and Need's focus on enhancing existing and planned multimodal mobility and connectivity, the MLS would be consistent with the land use and transportation recommendations set out in the Montgomery County General Plan.

**When answering Question 3, consider the following factors where applicable:**

a. The project is in a local comprehensive or transportation plan.
b. The project addresses a local transportation recommendation or strategy.

> **To address Question 3, the project could be amended into the local comprehensive and/or transportation plans.**


MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

4

**Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)**

# Consistency with State Plans

| 4. Will the project likely be consistent with the 12 Visions of the Planning Policy and the goals of the 2040 Maryland Transportation Plan (MTP)?<br><br>*List the 12 visions and goals of the MTP that pertain to the project and discuss why they pertain.* | Q4. Answer<br><br>⊙ Yes    ○ No<br><br>Reset Q4 |
|---|---|

The MLS proposed action will likely be consistent with the 12 Visions of the Planning Policy and the goals of the 2040 Maryland Transportation Plan. Relating to the 12 visions, the MLS will enhance quality of life by addressing congestion, improving trip reliability, and providing multimodal roadway travel choice. The public involvement and engagement process, starting in early 2018 to the present, considered the vast diversity of community resources and included outreach, information sessions, open houses, public comment periods, and public hearings. The project occurs in areas designated for growth in existing population and business centers and is transportation infrastructure that will primarily accommodate redevelopment and growth in PFAs and locally designated growth areas. Although the proposed action could likely have induced growth effects, the state and affected local jurisdictions would make concerted efforts to discourage induced development outside PFAs. The MLS is part of a well-maintained and multimodal transportation system that facilitates convenient, affordable, and efficient movement of people, goods, and services. It also supports a state economic development goal of improving the movement of goods and services to support a strong and healthy economy. The MLS focuses on stewardship, environmental protection, and resource conservation through the incorporation of environmental responsibility, minimizing environmental impacts to the greatest extent practicable, and balancing efficient growth with resource protection. The strategies, policies, programs, and funding for the project are integrated across local, regional, state, and interstate levels.

For the 2040 Maryland Transportation Plan (MTP), the MLS proposed action is located entirely within PFAs and contains designated growth areas including Targeted Growth/Revitalization areas, Future Growth Areas, and Sustainable Communities. Opportunities for redevelopment and development would reflect smart and sustainable principles, following planning guidelines and regulations established by Montgomery County, the City of Rockville, and the City of Gaithersburg. There is no development capacity in environmentally sensitive areas, and the environmental impacts associated with the proposed action have been avoided and minimized to the greatest extent practicable, specifically in areas of sensitive or recreationally valuable resources, such as NPS and M-NCPPC park properties. An identified goal of the MLS is environmental responsibility, presenting opportunity for environmental stewardship. The proposed action includes multiple transit elements to address the identified needs of enhancing multi-modal mobility and connectivity while reducing reliance on single-occupant vehicle (SOV) trips. Transit improvements include:



5

# Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

- Allowing bus transit usage of the high occupancy toll (HOT) managed lanes toll free

- Accommodating direct and indirect connections from the HOT managed lanes to existing transit stations and planned Transit Oriented Development at the Shady Grove Metro, Twinbrook Metro, Montgomery Mall Transit Center, and Medical Center Metro

- Committing to regional transit improvements to enhance existing and planned transit and support new opportunities for regional transit service including constructing new bus bays at Washington Metropolitan Area Transit Authority's (WMATA) Shady Grove Metrorail Station and increased parking at the Westfield Montgomery Mall Park and Ride.

Bicycle and pedestrian improvements have also been incorporated into the proposed action. These improvements include replacing, upgrading, or providing new pedestrian/bicycle facilities consistent with local master plans where existing facilities exist or crossroad bridges would be reconstructed. Additional bicycle and pedestrian commitments include:

- Constructing a new shared use path across the American Legion Bridge to connect facilities in Maryland and Virginia to support regional multimodal travel

- Lengthening the I-270 bridge over Tuckerman Lane to accommodate future pedestrian/bicycle facilities along Tuckerman Lane

- Constructing new side paths across MD 190 over I-495

- Widening the existing variable-width side path along Seven Locks Road under I-495

- Constructing a new sidewalk along the west side of Seven Locks Road under I-495 to connect the First Agape AME Zion Church and Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

**When answering Question 4, consider the following factors where applicable:**

Please note that a thorough evaluation of consistency with the 12 Visions of the Planning Policy and the goals of the 2040 Maryland Transportation Plan are conducted in the Tier 2 Review (see below).

For the MTP consistency evaluation, please refer to "MDOT CTP Project Questionnaire: Annual Request to Maryland DOT for Project Funding."

a) Inside PFA, Sustainable Communities, Targeted Growth & Revitalization Area, or Future Growth Area.
b) Likely in support of smart and sustainable development & redevelopment in the areas indicated in the "4.a" factor above.
c) Unlikely or minimum potential direct and/or indirect impacts to environmentally sensitive and rural areas and resources;



MARYLAND DEPARTMENT
OF TRANSPORTATION

STATE HIGHWAY
ADMINISTRATION

00005274

# Planning Policy Consistency Checklist for Major Transportation Projects
## (Checklist A)

d) Likely potential for environmental stewardship;

e) Potential for supporting multi-modal transportation, particularly for transit, pedestrian and bicycle facilities and improvements that reduce reliance on single-occupant vehicle (SOV) travels;

f) Needed primarily for safety;

---

**To address Question 4, the project location and purpose could be revisited for consistency with the Planning Policy and/or Maryland Transportation Plan.**

**If the answer to both Questions 3 and 4 is "Yes," then the State is likely to consider including the project in the HNI and/or CTP. Tier 2 will be completed, 1) after the project is funded in the CTP for project planning, 2) at the Alternates Retained for Detailed Study stage, and 3) when prior to the Preferred Alternative approval.**

**If the answer to Question 3 or 4 is "No," then the project is not likely to be considered for inclusion in the HNI or CTP and the review is complete.**

---



00005275

# Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

## Tier 2 – CTP Project Planning Review

**The Tier 2 – CTP Project Planning Review should be conducted for the Alternates Retained for Detailed Study (ARDS) and for the Preferred/Selected Alternative.  A checklist may be needed for each alternative, if answers differ.**

After a project planning study is funded, MDOT and MDP in coordination with other state, local, federal, and regional agencies will determine if the project is consistent with the Planning Policy, which will help to guide the development of project alternatives and strategies. The following questions and criteria provide the guidance on the consistency review and are not intended to be all-inclusive for all projects. **Use professional judgment along with the questions to assist in determining if the project is likely to have growth implications based on local area conditions.**

| 1. Will the project add capacity to an existing facility or provide new capacity to a new area not currently accessed by the roadway or transit system? | Q1. Answer<br><br>⦿ Yes    ◯ No<br><br>Reset Q1 |
| --- | --- |

*Please provide a brief response to support your answer:*

The Managed Lanes Study (MLS) Preferred Alternative, Alternative 9 Phase 1 South, consists of adding two, new High Occupancy Toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to east of MD 187. On I-270, the Preferred Alternative consists of converting one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative proposes adding capacity to the existing I-495 and I-270 highway facilities through the construction of new HOT managed lanes, new interchanges, and the modification of existing interchanges.

Reevaluation of this question in the Tier 2 Review is needed. Once the project is added to the CTP for the NEPA project planning study, the scope and scale of the project may be changed as compared to the feasibility study or assessment conducted in the Tier 1 Review.  It is understood that not every transportation project will have growth impacts, but only those that will improve transportation accessibility by shortening travel times and lowering travel costs to certain extents that could cause land use or growth changes. This question addresses what types of transportation projects that may have growth or land use impacts. Please note that the growth or land use impacts from a project could be positive or negative in terms of its smart growth implications.

a)  Definition of Additional/Increased Capacity for Highways includes:
1)  New interchange construction;
2)  Conversion/reconstruction of an existing intersection or interchange to provide additional movements/access that may facilitate unintended development.*



00005276

# Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

3) Any new construction or reconstruction of an existing roadway that would provide an additional through travel lane between two intersecting roadways that is equal or greater than one-lane mile of roadway.

**\*Localized improvements intended to enhance traffic operations within these limits such as facilitating turning movements and/or functioning as an acceleration/deceleration or auxiliary lane are not considered additional capacity.**

b) Definition of Additional/Increased Capacity for Transit includes:

1) New rail or dedicate service-lane transit line;
2) Extension/expansion of existing rail or dedicated-service-lane transit line;
3) Addition of a new transit station; and
4) Transit project that requires major highway improvements for transit accommodation.

---

**Questions 2 through 6 guide the analysis of the project's growth and land use impacts.**

---

Question 2 considers the project location and how it relates to the defined geographic areas. Examining the project location and its relationship with various defined geographic areas helps to determine appropriate types of transportation improvements pertaining to different areas.

**2. In the project corridor, how is the project related to PFAs, Local and State Growth & Conservation Areas, and/or Sustainable Communities?**

*Please provide a brief response to support your answer based on the consideration of 2a through 2g below:*

The MLS Preferred Alternative proposes build improvements on I-495 from the George Washington Memorial Parkway to east of MD 187 and on I-270 from I-495 to north of I-370 including the I-270 east and west spurs. The Preferred Alternative is located entirely within PFAs. Local Municipal Growth Areas are located in the study limits. The areas in the study limits consist primarily of established communities, as well as targeted growth and revitalization areas. Small areas of future growth, large lot development, and rural resources also exist in the study limits. The study limits also contain Sustainable Communities.

The Preferred Alternative is located inside areas where growth and revitalization are targeted and includes a small area where land or resource preservation is targeted, along I-495 near Clara Barton Parkway and the C&O Canal Towpath. These areas are protected resources owned by the National Park Service and thus, sprawl is not likely to occurred. Additionally, the Preferred Alternative is located inside Established Community Areas, where the priority is to preserve the existing community characteristics.

**When answering Question 2, consider the following factors where applicable:**

a) Are there any PFAs in the study area?
b) Is the project located inside the PFA?



**9**

# Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

c) What are the Local and State Growth & Conservation Areas including Sustainable Communities in the project corridor?

d) Is the project inside the Local and State Growth & Conservation including Sustainable Communities Areas where growth or revitalization is targeted?

e) Is the project inside the Local and State Growth & Conservation Areas where land and/or resource preservation is targeted?

f) Is the project inside the Local and State Growth & Conservation Areas where sprawl[1] is likely to occur (e.g., Large Lot Development Area)?

g) Is the project in an Established Community Area where the priority is to preserve the existing community characteristics (e.g., a historic district)?

> The Local and State Growth & Conservation Area Guidelines provide the transportation objectives of each defined area, which help to define appropriate transportation improvements in each area.

A RIPD project reviewer should coordinate with related local jurisdictions to answer Question 7, which evaluates if and/or how the project would support smart and sustainable growth in designated growth areas. The evaluation helps to understand how transportation and land use could be better integrated to support smart growth.

**3. Based on coordination with the local jurisdictions, will the project support development or redevelopment in designated growth areas, e.g., Targeted Growth/Revitalization Area, Priority Funding Areas, or Sustainable Communities?**

**Q3. Answer**

◉ **Yes**    ○ **No**

**Reset Q3**

*Please provide a brief response to support your answer based on the consideration of 3a) through 3g) below:*

The MLS Preferred Alternative will support opportunities primarily for redevelopment, as well as isolated opportunities for new growth, along the study limits. The Preferred Alternative is located entirely within PFAs and contains designated growth areas including Targeted Growth/Revitalization areas, Future Growth Areas, and Sustainable Communities. These developments would reflect smart and sustainable principles, following planning guidelines and regulations established by Montgomery County, the City of Rockville, and the City of Gaithersburg. These developments would be supported by existing and planned infrastructure. The MLS could both directly or indirectly facilitate these developments and growth and will provide improvements to HOT lanes, transit, and pedestrian and bicycle facilities.

**When answering Question 3, consider the following factors where applicable:**

a) Are re-development or new growth opportunities proposed in the project area/corridor?

---

[1] Sprawl means the dispersed, low-density or low- intensity development outside of Priority Funding Areas.



00005278

# Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

b) Are these growth opportunities/developments in designated growth areas, e.g., PFAs, Targeted Growth/Revitalization Areas, Sustainable Communities, or Future Growth Areas?

c) Do these developments reflect smart and sustainable principles, e.g., compact and mixed-use where homes, stores, and offices, as well as schools, libraries, parks, recreation centers and other public facilities, are well connected, rather than isolated from one another; walkable and promoting transit and pedestrian/bicycle connections; encouraging infill; promoting affordable or workforce housing; promoting green energy and energy efficiency, etc.?

d) Are these developments supported by existing or planned infrastructure?

e) Will the project directly or indirectly facilitate these growth/developments?

f) Will the project support redevelopment/infill?

g) Does the project provide the types of transportation improvements including pedestrian and bicycle facilities that are suitable to the existing/new development areas?

---

The Local and State Growth & Conservation Area Guidelines provide the transportation objectives of each defined area, which help to define appropriate transportation improvements in each area.

---

Question 4 addresses how the project will minimize its direct environmental and natural resource impacts and provide opportunities for environmental stewardship and resource enhancement. Evaluation of the question helps us to understand what transportation, environmental, and/or other measures including land use policies, are in place to mitigate and/or help to enhance the resources affected by the project.

| 4. Will the project include sufficient measures to mitigate impacts and preserve and enhance natural resources and environmentally sensitive and rural lands? | Q4. Answer |
|---|---|
| *Please provide a brief response to support your answer based on the consideration of 4a) through 4c) below:* | ⊙ **Yes**   ○ **No**  <br> **Reset Q4** |

The MLS would have impacts to environmental and natural resources, including parkland; communities and properties; historic resources; wetlands and waterways; 100-year floodplains; forest canopy; rare, threatened, and endangered species habitat; and unique and sensitive areas. The impacts associated with the Preferred Alternative have been avoided and minimized to the greatest extent practicable and have specifically been refined in areas of sensitive or recreationally valuable resources, such as NPS and M-NCPPC park properties. Final avoidance and minimization efforts are ongoing. The FEIS and ROD will document these efforts and include a final mitigation package for any unavoidable impacts above and beyond what is required.

**When answering Question 4, consider the following factors where applicable:**

a) What are the environmental and natural resource impacts from the project?

b) Are the impacted resources in state or locally designated environmental sensitive or resource significant areas, e.g., Priority Preservation Areas, GreenPrint Areas, Historic and Cultural Areas, Water Resource Areas, and other resource/land conservation areas?



00005279

# Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

c) What are the federal, state, or local mitigation measures that would be provided by the projects?*

*Mitigation measures may include, but are not limited to, required regulatory mitigation, stewardship/enhancements that are above and beyond the mitigation requirements (if any), and project design/modification to avoid/minimize impacts. The appropriate NEPA/MEPA document prepared for the project includes an assessment of environmental impacts and recommendations for mitigation of these impacts resulting from the project. The permit review and compliance review processes for the project will ensure that the documented revisions will be implemented.

| | |
|---|---|
| **5.** **Will the project facilitate or accommodate planned or unplanned development that adversely affects environmentally sensitive resources and/or rural lands?**<br><br>**If yes, does the project include measures to address the adverse land use impacts?  Explain below.**<br><br>**If no, explain below.** |  |

*Please provide a brief response to support your answer based on the consideration of 5a) through 5k) below:*

The MLS proposed action would not be likely to have direct development impacts outside PFAs in the study area, but it would likely have some indirect and cumulatively induced growth outside PFAs.  The MLS project contains one small portion of environmentally sensitive/rural resource area, along I-495 near Clara Barton Parkway and the C&O Canal Towpath. The land uses within the study area has been transformed by the intensification of development in past decades and has shifted from rural to almost entirely developed suburban and urban land uses. There is no development capacity in the environmentally sensitive/rural resource area mentioned above, as these areas are protected resources owned by the National Park Service.

Growth in the study area, through land use and growth policies and regulations, is directed to existing suburban and urban communities and along transportation corridors. Pressure for growth would not be found in the small area near Clara Barton Parkway and the C&O Canal.  In Montgomery County, other areas outside PFAs could have limited and low-capacity large lot development.  However, Montgomery County does have programs in place, such as Transferable Development Rights (TDR) and land preservation programs, that would deter sprawl and minimize development in resource areas. The MLS would not change the existing land use patterns, especially in Montgomery County. Much of the project need derives from the need to accommodate existing traffic and long-term traffic growth in the study area. The state and local jurisdictions should make concerted efforts to discourage induced development outside PFAs and locally designated growth areas, especially in Frederick County if the I-270 project from I-370 to I-70 would be carried forward in the future.



12

00005280

# Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

A RIPD project reviewer should coordinate with related local jurisdictions to answer Question 5, which addresses potential indirect land use and resource impacts of the project and the measures that will minimize the indirect effects. Evaluation of the question helps us to understand if the project has indirect adverse land use/resource impacts and what transportation, environmental, and/or other measures including land uses are in place to minimize the indirect effects.

**When answering Question 5, consider the following factors where applicable:**

a) If the answer to Question 1 (i.e., adding capacity) is "yes," the project is likely to have growth implications, proceed to the following sub-questions.
b) Is the project located inside, or does it run through the environmentally sensitive and rural resource areas indicated in Question 2 factors d), e), and f) above?
c) What are the past and current growth trends in the project study area?
d) Is there development capacity[2] in the rural areas indicated in b) above?
e) Is there growth pressure in the project area, especially in the rural areas indicated in b) above?
f) Do local land use and growth policies, programs and regulations that would deter sprawl development in the rural areas indicated in b) above (e.g., only allowing 1 residential unit/20 acres in rural/agricultural areas, an effective Transfer of Development Rights (TDR) program, land preservation programs) exist?
g) Are there any state or local environmental and resource programs that will help prevent development in the resource areas indicated in b) above, (e.g., easement protection, public ownership, and programs of protecting wetlands and water resources)?
h) Will the project provide improved accessibility or new access to the resource areas indicated in b) above?
i) After analysis of the above sub-questions, will the project likely change the amount of growth or land use type/pattern?
j) Will the project provide access management and/or control measures to discourage development in the resource areas indicated in b) above?
k) Will the project consider other transportation, environmental, or land use measures that minimize or avoid adverse growth or land use impacts?

| 6. Will the project support environmental, economic, and social sustainability of Maryland communities? | Q6. Answer |
|---|---|
| |   ⦿ **Yes**  ◯ **No** |
| *Please provide a brief response to support your answer based on the consideration of 6a) through 6i) below:* | Reset Q6 |

The MLS Purpose and Need is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the Study limits, and enhances existing and planned multimodal mobility and connectivity. This includes accommodating existing

---

[2] Development capacity means additional residential and/or commercial development based on current or potential land use/zoning regulations and policies.



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00005281

# Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

traffic and long-term traffic growth, enhanced trip reliability, additional roadway travel choices accommodate homeland security and improve the movement of goods and services. Additionally, the MLS identified a goal of environmental responsibility. The Managed Lanes Study (MLS) incorporates principles from MDOT SHA's Complete Streets Policy such as, achieving equal opportunity and non-discrimination for all persons, upholding the American Disability Act (ADA), improving bicycle access, incorporating shared uses paths, transit elements, and informative signage, among others. Specifically, the Preferred Alternative includes multiple transit elements to address the identified needs of enhancing multi-modal mobility and connectivity while reducing reliance on single-occupant vehicle (SOV) trips. Transit improvements include:

- Allowing bus transit usage of the high occupancy toll (HOT) managed lanes toll free

- Accommodating direct and indirect connections from the HOT managed lanes to existing transit stations and planned Transit Oriented Development at the Shady Grove Metro, Twinbrook Metro, Montgomery Mall Transit Center, and Medical Center Metro

- Committing to regional transit improvements to enhance existing and planned transit and support new opportunities for regional transit service including constructing new bus bays at Washington Metropolitan Area Transit Authority's (WMATA) Shady Grove Metrorail Station and increased parking at the Westfield Montgomery Mall Park and Ride.

Bicycle and pedestrian improvements have also been incorporated into the Preferred Alternative. These improvements include replacing, upgrading, or providing new pedestrian/bicycle facilities consistent with local master plans where existing facilities exist or crossroad bridges would be reconstructed. Additional bicycle and pedestrian commitments include:

- Constructing a new shared use path across the American Legion Bridge to connect facilities in Maryland and Virginia to support regional multimodal travel

- Lengthening the I-270 bridge over Tuckerman Lane to accommodate future pedestrian/bicycle facilities along Tuckerman Lane

- Constructing new side paths across MD 190 over I-495

- Widening the existing variable-width side path along Seven Locks Road under I-495

- Constructing a new sidewalk along the west side of Seven Locks Road under I-495 to connect the First Agape AME Zion Church and Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

The MLS Preferred Alternative promotes communities in Montgomery County where smart and sustainable growth principles are kept and emphasized in planning documents. The MLS is a state priority that supports a significant industrial and business development in the state, with a focus



00005282

# Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

on improving the movement of goods and services within the National Capital Region to increase efficiency, reliable highway movement, and support a strong and healthy economy.

A RIPD project reviewer should coordinate with related local jurisdictions to answer Question 6, which provides an opportunity to assess the project's additional benefits or effects to sustainability (e.g., safety, healthy environment, climate change, energy efficiency, economic growth). **Please note that the analyses of Questions 3 through 5 also largely help to answer Question 6. When answering Question 6, consider the following factors as examples, where applicable:**

a) Does the purpose and need statement address these benefits?
b) Does the project incorporate Complete Streets principles? See SHA's Complete Streets Policy for guidance.
c) Does the project incorporate Transportation System Management (TSM) and/or Transportation Demand Management (TDM) measures, which will maximize the effectiveness of the existing facility?
d) Does the project incorporate green energy use or energy efficiency?
e) Does the project help to reduce greenhouse gas emissions by reducing reliance on single-occupancy-vehicle travels? See the Maryland Greenhouse Gas Reduction Act Plan Update 2015 for guidance.
f) Does the project minimize Climate Change impacts? See SHA's Climate Change policies/guidelines.
g) Does the project help to promote communities where smart and sustainable growth principles are kept? See the Smart Growth Network Online.
h) Is the project a state priority that supports a significant industrial or business development in the State, and is the project study streamlined to reflect its priority?
i) Does the project support resource-based industries/businesses, e.g., agricultural, forestry, mining, outdoor recreation and tourism, renewable energy, and at the same time minimize the intrusion of rural residential development on resource lands?

> **Based on the responses to questions 1 through 6, if the Smart Growth Transportation Working Group (SGTWG) determine the project is consistent with the Planning Policy, the review is complete.**
>
> **If it is determined that the project is "inconsistent" with the Planning Policy proceed to Tier 3.**
>
> **If the project is deemed "inconsistent" based on professional judgment of the SHA Reviewer and the MDP concurs that the project is "inconsistent" then the project will be reviewed by the Smart Growth Transportation Working Group (SGTWG).**



00005283

# Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

If the SGTWG concurs that the project is "inconsistent" the recommendation of the SGTWG would be considered by the SHA Administrator in the selection of a Preferred Alternative.



00005284

# Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

## Tier 3 – Exception Review

**Tier 3 – Exception Review (if applicable) should be completed prior to Preferred/Selected Alternative selection process, and again for the Preferred/Selected Alternative.**

The Tier 3 - Exception Review helps to determine whether the project should be funded by the State. **Professional judgment should be used along with the questions to assist in determining whether the project is likely to have growth implications based on local area conditions.**

| 1. Is there a reasonably feasible alternative? | Q1. Answer |
|---|---|
| | ○ **Yes**    ○ **No** |
| *Please provide a brief response to support your answer:* | **Reset Q1** |
| Click here to enter text. | |

Question 2 provides an opportunity to document the project benefits and assessment on whether the project's benefits would out weight the adverse impacts resulting from the inconsistency with the Planning Policy.

| 2. Do extraordinary circumstances³ exist which make the project necessary to construct despite a finding of inconsistency in Tier 2? | Q2. Answer |
|---|---|
| | ○ **Yes**    ○ **No** |
| *Please provide a brief response to support your answer:* | **Reset Q2** |
| Click here to enter text. | |

---

³ Based on in the PFA law, "extraordinary circumstances" could mean (1) the failure to fund the project creates an extreme inequity, hardship, or disadvantage and (2) there is no reasonable alternative for the project.



MARYLAND DEPARTMENT
OF TRANSPORTATION

STATE HIGHWAY
ADMINISTRATION

**17**

# Planning Policy Consistency Checklist for Major Transportation Projects (Checklist A)

## Reference Document Links

A. the 12 Visions of the Planning Policy as defined in §5-7A-01 of the State Finance and Procurement
http://mgaleg.maryland.gov/webmga/frmStatutesText.aspx?pid=&tab=subject5&stab=&ys=2015RS&article=gsf&section=5-7A-01&ext=html&session=2015RS

B. 2040 Maryland Transportation Plan
http://www.mdot.maryland.gov/newMDOT/Planning/Maryland_Transportation_Plan/Index.html

C. Priority Funding Areas (PFAs)
http://mdpgis.mdp.state.md.us/PFA/publicinfotemplate/index.html

D. Local and State Growth & Conservation Area Guidelines
http://maryland.maps.arcgis.com/apps/OnePane/basicviewer/index.html?appid=d27a6456c7024a508e95e2cc360c6ca3

E. MDOT CTP Project Questionnaire
http://www.mdot.maryland.gov/Office_of_Planning_and_Capital_Programming/County_Priority_Letters/Documents/Project_Questionnaire.docx

F. SHA's Complete Streets Policy
http://roads.maryland.gov/OPPEN/SHA_Complete_Street_Policy.pdf

G. Maryland Greenhouse Gas Reduction Act Plan Update 2015
http://www.mde.state.md.us/programs/Air/ClimateChange/Documents/ClimateUpdate2015.pdf

H. Smart Growth Network Online
http://www.smartgrowth.org/



18

00005286

# Priority Funding Area (PFA) Law Compliance Checklist for Major Transportation Projects (Checklist B)

## Compliance Review Pertaining to "Maryland's Smart Growth Legislation (the PFA Law)"

**Project Name:** I-495 & I-270 Managed Lanes Study

**Alternative No.:** Alternative 9 -Phase 1 South

**County:** Montgomery

### Tier 1 – "Growth Related" Determination & Location Evaluation

This evaluation is to be conducted early in the project development process, prior to project scoping and definition of purpose and need. Findings should then be reviewed at key points in the process, namely after developing the: a) preliminary alternatives b) Alternatives Retained for Detailed Study (ARDS); and selection of the Preferred/Selected Alternative. Where appropriate, the evaluation should be conducted for each alternative.

### Compliance – Statutory Requirements

The PFA law only applies to "growth-related" major capital projects, and the following types of projects are specifically excluded:

a) An existing MDTA transportation facilities project as defined in §4-101(h)
b) A project planning phase as defined in §8-610 (i)
c) An initial project planning phase as defined in §8-610 (e)

Although project planning phases noted above are excluded from the PFA statutory requirements (which pertain to the state's financial involvement), projects at this phase should nonetheless be evaluated in terms of these considerations to ensure that strategies are developed for addressing any such concerns when the project reaches this phase. A formal PFA law compliance evaluation/exception process will proceed when the preferred alternative is recommended, and prior to dedicating state financial support for a major project in the draft Comprehensive Transportation Program (CTP).



1

# Priority Funding Area (PFA) Law Compliance Checklist for Major Transportation Projects (Checklist B)

# <u>Growth-Related Major Capital Projects</u>

A first step in determining applicability of PFA law is to consider the definitions as outlined in section 2 of the Transportation article.  Consideration as to whether a project is "growth related" is implied as integral to the definition of a project as major or minor".

Major capital project" means "any new, expanded, or significantly improved facility or service that involves planning, environmental studies, design, right–of–way, construction," as defined in <u>§2-103.1 (a) (4) of the Transportation Article</u>.

"Minor capital project" means "any project for the preservation or rehabilitation of an existing facility or service, including the planning, design, right–of–way, construction, or purchase of equipment essential to the facility or service, and generally not requiring the preparation of an environmental impact assessment,"  as defined in <u>§2-103.1 (a) (5) of the Transportation Article</u>.

"Minor capital projects" also includes those in Statewide and Programmatic Initiatives in the Consolidated Transportation Program (CTP) and classified under the National Environmental Policy Act (NEPA) as Programmatic Categorical Exclusions (PCE) for federally funded projects and under the Maryland Environmental Policy Act (MEPA) as an Environmental Assessment Form (EAF) determinations for state funded projects.

The MD SHA and FHWA-Maryland Division utilized a Programmatic Agreement to efficiently process certain Categorical Exclusion Actions (3/27/12). The Programmatic Categorical Exclusion (PCE) is utilized for those project scopes that will not result in significant social, economic, and environmental impacts, and are, therefore, categorically excluded from the requirement to prepare an individual Categorical Exclusion, Environmental Assessment (EA) or Environmental Impact Statement (EIS).

| 1. | Is the project a major capital project or a minor capital project and funded by MDOT? | Q1. Answer  |
| --- | --- | --- |

*Please provide a brief response to support your answer:*

The Managed Lanes Study (MLS) is a major capital project, as it includes significant improvements to highway facilities and involves planning, environmental studies, design, right-of-way, and construction. The project will be funded through a Public-Private-Partnership (P3) with additional funding as needed provided by MDOT. Therefore, the MLS project is a growth-related project and is subject the PFA Law.

**If the project is determined as a major capital project, it may be a "growth related" project and subject to the PFA law and the reviewer should proceed to Question 2.**



2

# Priority Funding Area (PFA) Law Compliance Checklist for Major Transportation Projects (Checklist B)

> **If the project qualifies as a minor capital project it is not subject to the PFA law and the review is complete.**

## Location Evaluation

The PFA law specifically requires a major transportation project be located in PFAs to obtain state funding

| | |
|---|---|
| **2. Could any of the project limits be outside a PFA including those in a PFA Comment Area?** | **Q2. Answer** <br> ○ Yes   ● No <br><br> Reset Q2 |

The MLS Preferred Alternative proposes build improvements on I-495 from the George Washington Memorial Parkway to east of MD 187 and on I-270 from I-495 to north of I-370 including the I-270 east and west spurs. The Preferred Alternative is located entirely within PFAs.

The MLS project is a growth-related project; and the MLS Preferred Alternative, Alternative 9-Phase 1-South, is located entirely within PFAs. Therefore, the MLS Alternative 9 – Phase 1-South complies with the PFA law.

> **If the answer to Question 2 is "Yes," proceed to Question 3 below.**
>
> **If the answer to Question 2 is "No," the project complies with the PFA law and the review is complete.**

| | |
|---|---|
| **3. Do segments of the project outside PFAs meet the linear features criteria from §11.04.13.03 of COMAR below?** | **Q3. Answer** <br> ○ Yes   ○ No <br><br> Reset Q3 |

**A.** After consultation with the Maryland Department of Planning, SHA may deem a major capital project to be in a PFA, even if segments of the project are outside the PFA, if:

(1) Each segment:
    (a) Standing alone would be exempt under State Finance and Procurement Article, §5-7B-06, Annotated Code of Maryland;
    (b) Is necessary to eliminate or reduce the number of access points to a highway;
    (c) Is necessary to avoid denying access to a property owner with existing access;
    (d) Improves or maintains an existing roadway without significantly increasing capacity; or
    (e) Comprises less than 5 percent of the lane mileage of the total project length; and



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

**3**

00005289

# Priority Funding Area (PFA) Law Compliance Checklist for Major Transportation Projects (Checklist B)

**(2)** The total lane mileage of segments described in §A (1)(a), (b), (c), and (e) of this regulation, does not exceed 20 percent of the total lane mileage of the project.

**B.** If a highway or roadway serves as a boundary of a PFA, all portions of that highway or roadway immediately adjacent to the PFA, such as ramps, bridges, and overpasses, shall be deemed to be the priority funding area for purposes of State Finance and Procurement Article, §5-7B-04(a), Annotated Code of Maryland".

*Please provide a brief response to support your answer:*

As linear projects, portions of transportation projects can be located both within and outside of PFAs. A State regulation, (§11.04.13.03 of COMAR) addresses linear features pertaining to PFA locations. Please see the excerpt below from §11.04.13.03 of COMAR: Projects Located within a Priority Funding Area.

> **If the answer to Question 3 is "Yes," the project is considered to be inside a PFA and complies with the PFA law. Stop here until a decision is reviewed and concurred by the Smart Growth Working Group (SGTWG).**
>
> **If the answer to Question 3 is "No", the project is considered to be outside a PFA. Proceed to Tier 2 to seek an exception.**

> **For those preparing the Smart Growth Status for the CTP Project Information Forms (PIFs) please follow the instructions below:**
>
> If the project is inside a PFA, check "**Project Inside PFA.**"
>
> If the project is outside a PFA, check "**Project Outside PFA**" and check "**Exception Will Be Required**" or "**Exception Granted.**"
>
> If the project is outside the PFA, but received location approval prior to August 1, 1997, check "**Project Outside PFA**" and check "**Grandfathered.**"



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

4

# Priority Funding Area (PFA) Law Compliance Checklist for Major Transportation Projects (Checklist B)

## Tier 2 – Exception Evaluation

**Tier 2 – Exception Evaluation (if applicable) should be completed prior to Preferred/Selected Alternative selection process, and again for the Preferred/Selected Alternative.**

## Exceptions Not Requiring BPW Approval

In accordance with the PFA law, the exceptions listed in Question 1 for projects outside PFAs need approval from the Smart Growth Coordinating Committee and/or the Smart Growth Subcabinet, but not from the Maryland Board of Public Works (BPW) before being eligible for construction funding.

| | Q1. Answer |
|---|---|
| 1. **Does the project qualify as one of the following as defined in the Transportation Article** §5-7B-06 (a) of the State Finance and Procurement**?** <br> a) Where safety is the primary purpose of the project as defined by the Purpose and Need Statement. (§5-7B-06 (a) (1) of the State Finance and Procurement). <br> b) Where a project involves federal funds, to the extent compliance would conflict or be inconsistent with federal law as defined in §5-7B-06 (a) (2) of the State Finance and Procurement. <br> c) Where the project serves a commercial or industrial activity that due to its nature, must be located away from other development (e.g., mining, forestry, tourism) as defined in §5-7B-06 (a) (3) of the State Finance and Procurement. <br><br> *Please provide a brief response to support your answer* <br> Click here to enter text. | ○ <u>Yes</u>    ○ <u>No</u> <br><br> Reset Q1 |

**If the project meets any one of the conditions outlined in Question 1a), 1b) or 1c) above, it should be presented to the Smart Growth Coordinating Committee and/or the Smart Growth Subcabinet for review and approval. If an exception is approved, the review is complete.**

**Major bridge replacement projects that are outside PFAs and will not involve the addition of capacity: After the coordinated review with the Maryland Department of Planning, MDOT will document these projects in a memo as the approval of the safety exception under the PFA law.**



00005291

## Priority Funding Area (PFA) Law Compliance Checklist for Major Transportation Projects (Checklist B)

# Exceptions Requiring BPW Approval

In accordance with the PFA law, the exceptions listed in questions 2 through 6 below for projects outside PFAs require approval from the Maryland Board of Public Works before the projects are eligible for state funding for construction.

| | Q2. Answer |
|---|---|
| **2. Does the project maintain the existing transportation system and not significantly increase highway capacity (definition above) as determined by MDOT and MDP (§5-7B-05 (a) (3) (i) of the State Finance and Procurement)?** | ○ **Yes**    ○ **No**<br><br>**Reset Q2** |
| *Please provide a brief response to support your answer:* | |
| Click here to enter text. | |

For the purpose of addressing the PFA law compliance, MDOT and MDP agree to apply the following definition to help assist in determining if the project significantly increase highway capacity.

   a. Definition of Additional/Increased Capacity for Highways includes the following:
      1) New interchange construction;
      2) Conversion/reconstruction of an existing intersection or interchange to provide additional movements/access that may facilitate unintended development.*
      3) Any new construction or reconstruction of an existing roadway that would provide an additional through travel lane between two intersecting roadways that is equal or greater than one-lane mile of roadway.

      **\*Localized improvements intended to enhance traffic operations within these limits such as facilitating turning movements and/or functioning as an acceleration/deceleration or auxiliary lane would not be considered additional capacity.**

   b. Definition of Additional/Increased Capacity for Transit includes the following:
      1) A new rail line or dedicated service-lane transit line;
      2) An extension/expansion of existing rail or dedicated-service-lane transit line;
      3) An addition of a new transit station; and
      4) A transit project that requires major highway improvements for transit accommodation.



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

**6**

00005292

# Priority Funding Area (PFA) Law Compliance Checklist for Major Transportation Projects (Checklist B)

**3. Does the project have sole purpose of providing control of access along an existing corridor (§5-7B-05 (a) (3) (iii) of the State Finance and Procurement)?**

**Q3. Answer**

⃝ **Yes**     ⃝ **No**

Reset Q3

*Please provide a brief response to support your answer:*

Click here to enter text.

---

**4. Does the project have to be located away from other development due to its operational or physical nature (§5-7B-05 (a) (3) (iv) of the State Finance and Procurement)?**

**Q4. Answer**

⃝ **Yes**     ⃝ **No**

Reset Q4

*Please provide a brief response to support your answer:*

Click here to enter text.

---

**5. Does the project serve to connect two or more PFAs (§5-7B-05 (a) (3) (ii) of the State Finance and Procurement)?**
**Please note: "connecting PFAs" means the project touches PFAs and it mainly serves and benefits residents or workers in PFAs.**

5a) Are there adequate access controls or other measures in place as part of the project to:
1) Prevent development that is inconsistent with the State Planning Policy?, and
2) Constrain development that detracts from main street areas?, and

5b) Are there reasonable transportation alternatives to address the project purpose and need while not significantly increasing roadway capacity?

**Q5. Answer**

⃝ **Yes**     ⃝ **No**

Reset Q5

*Please provide a brief response to support your answer:*

Click here to enter text.



00005293

# Priority Funding Area (PFA) Law Compliance Checklist for Major Transportation Projects (Checklist B)

| | |
|---|---|
| **6. Are there extraordinary circumstances that warrant preceding the project, considering the following provisions (§5-7B-05 (a) (1) and (2) of the State Finance and Procurement)?** | **Q6. Answer** |
| | ○ **Yes**   ○ **No** |
| 6a) The failure to fund the project creates an extreme inequity, hardship, or disadvantage that clearly outweighs the benefits from locating the project in PFAs;<br>6b) There is no reasonable alternative for the project in PFAs in another location within the county or an adjacent county. | **Reset Q6** |
| *Please provide a brief response to support your answer:* | |
| Click here to enter text. | |

> **If the answer to any of Questions 2, 3, 4, 5, or 6 is "Yes," the project must be reviewed by the Smart Growth Coordinating Committee and the Smart Growth Subcabinet before proceeding to the Board of Public Works for approval.**
>
> **Recommendations from MDOT, the Smart Growth Subcabinet, or the locality where the project is located should be obtained before BPW presentation.**



MARYLAND DEPARTMENT
OF TRANSPORTATION
STATE HIGHWAY
ADMINISTRATION

00005294

# Priority Funding Area (PFA) Law Compliance Checklist for Major Transportation Projects (Checklist B)

## Legislative References

A. §2-103.1 (a) (4) of the Transportation Article and §2-103.1 (a) (5) of the Transportation Article
http://mgaleg.maryland.gov/webmga/frmStatutesText.aspx?article=gtr&section=2-103.1&ext=html&session=2019RS&tab=subject5

B. §4-101(h)
http://mgaleg.maryland.gov/webmga/frmStatutesText.aspx?article=gtr&section=4-101&ext=html&session=2019RS&tab=subject5

C. §8-610 (e) and §8-610 (i)
http://mgaleg.maryland.gov/webmga/frmStatutesText.aspx?article=gtr&section=8-610&ext=html&session=2019RS&tab=subject5

D. §11.04.13.03 of COMAR
http://www.dsd.state.md.us/comar/getfile.aspx?file=11.04.13.03.htm

E. State Finance and Procurement Article, §5-7B-04, Annotated Code of Maryland
http://mgaleg.maryland.gov/webmga/frmStatutesText.aspx?article=gsf&section=5-7B-04&ext=html&session=2019RS&tab=subject5

F. State Finance and Procurement Article, §5-7B-05, Annotated Code of Maryland
http://mgaleg.maryland.gov/webmga/frmStatutesText.aspx?article=gsf&section=5-7B-05&ext=html&session=2019RS&tab=subject5

G. State Finance and Procurement Article, §5-7B-06, Annotated Code of Maryland
http://mgaleg.maryland.gov/webmga/frmStatutesText.aspx?article=gsf&section=5-7B-06&ext=html&session=2019RS&tab=subject5



MARYLAND DEPARTMENT
OF TRANSPORTATION
STATE HIGHWAY
ADMINISTRATION

00005295

 I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment and EJ Analysis Technical Report



# APPENDIX D:
# Community Profiles

# McLean CEA Analysis Area Community



**Location:** The McLean CEA Analysis Area Community includes three Census block groups and covers 3,377 acres, overlapping the northern border of the McLean Census-Designated Place along I-495 in Fairfax County, Virginia (**Map 1**). The CEA Analysis Area Community is bordered roughly by: the Potomac River to the north; Chain Bridge and Chain Bridge Road to the east; Georgetown Pike (Route 193) and Dolley Madison Boulevard/Chain Bridge Road to the south; and Georgetown Pike and Difficult Run to the west. This is the southwestern-most community in the CEA Analysis Area and the only community located outside of Maryland.

**Planning & Development:** Planning is guided by the *Fairfax County Comprehensive Plan* (2017) and the *Fairfax County Transportation Policy Plan* (2017). Development patterns in the CEA Analysis Area Community include low-density, single-family houses and ample greenspace and parklands.

**Community Facilities:** Located within the CEA Analysis Area Community are: 2 schools (Langley High School, The Madeira School); 3 places of worship (Friends Meeting Church, Holy Trinity Church, Immanuel Presbyterian Church); and 2 parks/parkways (George Washington Memorial Parkway, Scott's Run Nature Preserve Park) (**Map 2**). No affordable housing developments were identified in this community.

**Environmental Justice Populations:** No EJ populations are identified in the McLean CEA Analysis Area Community. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 5**.



**McLean Map 1**

LEGEND
- ▬▬ Municipality/Census Designated Place
- ▢ Census Block Groups
- ▢ Limits of Disturbance



**McLean Map 2**

LEGEND
- ▬ Limits of Disturbance
- ▬ CEA Analysis Area Community
- ▮ Park Property
- ☆ K Thru 12 Education
- ▫ Place of Worship

## Race & Ethnicity

- Asian Alone — 23%
- Black or African American Alone — 1%
- White Alone — 70%
- Some Other Race Alone & Two or More Races — 2%
- Hispanic or Latino of Any Race — 4%

(additional slice: 4%)



## Land Use

| Land Use | Acres |
|---|---|
| Commercial/Employment | 0 |
| Industrial | 0 |
| Mixed-Use | 0 |
| Park/Open Space | 496 |
| Planned Unit/Planned Community | 0 |
| Residential | 2,781 |
| Transportation | 101 |

| | |
|---|---|
| **Total Population** | **3,024** |
| as percent of CEA Analysis Area | 3% |
| Median Age | 52.8 |
| Households with One + Persons with a Disability | 110 |
| Range of Median Household Income (Block Groups) | $228,594- |
| Low-Income Populations Identified? | No |
| Population Driving Car/Truck/Van to Work | 1,063 |



## Housing Characteristics

Owned / Rented

| Type | Value |
|---|---|
| Single-Family, Detached | 909 / 63 |
| Single-Family, Attached | 26 |
| 2& 3-4 Units in Structure | 15 |
| 5-9 & 10-19 Units in Structure | 0 / 0 |
| 20-49 & 50+ Units in Structure | 0 / 0 |
| Mobile Home, Boat, RV, Van, Etc. | 0 / 0 |



OP LANES™
MARYLAND

*Sources: ACS 5-Year Estimates (2015-2019); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Fairfax County Open Geospatial Data*

June 2022

00005297

# McLean CEA Analysis Area Community Impacts

| Alternative | Impacted Properties (#) | Impacted Community Facility Properties or Public Parks/ Public Parks with Historic Sites (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) |
|---|---|---|---|
| Alternative 1 (No Build) | None | None | None |
| Preferred Alternative | 16 | **Partial acquisition from:** 1 Park (George Washington Memorial Parkway) | **Park/Open Space:** 4.2 acres* **Residential:** 0.8 acres **Total Temporary and Permanent Land Required:** 5.0 acres |

## Summary of Impacts from the Preferred Alternative

The Preferred Alternative would require no relocations. It would require partial acquisition from multiple properties, including one park property. Impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities at the I-495 interchange with the George Washington Memorial Parkway. Generally, the Preferred Alternatives would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495.

The Preferred Alternative would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway networks would be mitigated by the inclusion of signage and the implementation of a temporary detour network. Emergency services would experience an incremental improvement in response times due to reduced congestion on I-495 that is anticipated under the Preferred Alternative. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The Preferred Alternative would not eliminate access or provide new access to properties, nor would it impede access between residences and community facilities and business, as no properties are accessed directly from I-495. However, an incremental enhancement to access may occur due to reduced congestion on the study corridors.

Changes to land use and development would be limited to those properties directly affected by partial acquisition. It is anticipated that the Preferred Alternative would have minimal impact on the overall population or demographic patterns within the CEA Analysis Area. Further, the Preferred Alternative would not change the sense of cohesion or interactions between persons or groups within the community as no relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to or within close proximity to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors. Noise abatement for noise sensitive land use/activity areas in McLean was evaluated in coordination with the Virginia Department of Transportation (VDOT) and in compliance with the VDOT Highway Traffic Noise Impact Analysis Guidance Manual. Based on updated analysis, this community contains two noise sensitive land use/activity areas (NSAs) where existing noise barriers would be reconstructed and extended; and one NSA where the existing noise barrier would be displaced by construction and replaced by a reconstructed barrier. Additional noise abatement information is available in **Chapter 5, Section 5.9** and the Final Noise Technical Report (**FEIS, Appendix L**). For specific noise barrier locations, refer to the Environmental Resource Mapping (**FEIS, Appendix E**).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Preferred Alternative would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in **Chapter 5, Section 5.6.**

*Park/Open Space land use impact may differ from specific park impact acreage. See Chapter 5.4.3 of the FEIS for specific park impact acreage.



*Sources: ACS 5-Year Estimates (2015-2019); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Fairfax County Open Geospatial Data*

# Potomac CEA Analysis Area Community



**Location**: The Potomac CEA Analysis Area Community includes 11 Census block groups and covers 8,971 acres, overlapping the western portion of the Potomac Census-Designated Place in a crescent shape along the I-270 split and I-495 (**Map 1**). The CEA Analysis Area Community extends roughly from the I-270 and Montrose Road interchange south along the west spur of I-270 to its intersection with I-495 and along I-495 to the Potomac River. The community then extends west along the Potomac River to Bealls Island.

**Planning & Development**: Planning within this analysis area community is guided by the *Potomac Subregion Master Plan* (2002). Development patterns are primarily rural suburban, with tree-lined residential developments of single-family houses as well as pockets of forested lands and parks located along local and arterial roadways.

**Community Facilities**: Within the CEA Analysis Area Community are 9 schools (Beverly Farms Elementary School, Carderock Springs Elementary School, Seven Locks Elementary School, St. James' Children's School, The Harbor School, Mater Dei School, Geneva Day School, Chabad Hebrew School of Potomac, Feynman School); 9 places of worship (Beth Sholom Congregational and Talmud Torah Synagogue, Congressional Heights Baptist Church, Emmanuel Lutheran Church, Geneva United Presbyterian Church, Gibson Grove Church, Greek Orthodox Church of Saint George, Hermon Church, Mount Glory Church, Saint James Episcopal Church); 1 cemetery (Saint Gabriel Cemetery); 5 parks/parkways (Cabin John Stream Valley Park Units 2 and 3, Cabin John Regional Park, Chesapeake and Ohio Canal National Historical Park, Clara Barton Parkway); 2 fire/rescue stations (Cabin John Park Volunteer Fire Department Stations 10 and 30); and 2 post offices (**Map 2**). Additionally, 3 affordable housing developments (Chelsea Towers, Magruder's Discovery, Lakeview House) were identified in this community.

**Environmental Justice Populations**: Two of the 11 Potomac CEA Analysis Area Community block groups (7060.12-2 and 7060.12-3) are identified as EJ populations. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 5**.



**Potomac Map 1**

LEGEND
- — Municipality/Census Designated Place
- Census Block Groups
- Limits of Disturbance



**Potomac Map 2**

LEGEND
- ▬ Limits of Disturbance
- CEA Analysis Area Community
- Park Property
- ☆ K Thru 12 Education
- ▢ Place of Worship
- ⬤ Cemetery
- ▲ Fire Station
- ▲ Post Office



**Race & Ethnicity**

- 16% Asian Alone
- 5% Black or African American Alone
- 65% White Alone
- 3% Some Other Race Alone & Two or More Races
- 11% Hispanic or Latino of Any Race



**Land Use**    ■ Acres

| Land Use | Acres |
|---|---|
| Commercial/Employment | 71 |
| Industrial | 0 |
| Mixed-Use | 65 |
| Park/Open Space | 2,547 |
| Planned Unit/Planned Community | 0 |
| Residential | 5,550 |
| Transportation | 739 |



**Housing Characteristics**    ■ Owned   ■ Rented

| | Single-Family, Detached | Single-Family, Attached | 2& 3-4 Units in Structure | 5-9 & 10-19 Units in Structure | 20-49 & 50+ Units in Structure | Mobile Home, Boat, RV, Van, Etc. |
|---|---|---|---|---|---|---|
| Owned | 3,267 | 793 | 0 | 100 | 599 | 0 |
| Rented | 180 | 210 | 45 | 88 | 492 | 0 |

| | |
|---|---|
| **Total Population** | **15,441** |
| *as percent of CEA Analysis Area* | 15% |
| Median Age | 47 |
| Households with One + Persons with a Disability | 1,078 |
| Range of Median Household Income (Block Groups) | $51,641-$250,000+ |
| Low-Income Populations Identified? | Yes |
| Population Driving Car/Truck/Van to Work | 5,176 |



**OP·LANES™ MARYLAND**

*Sources: ACS 5-Year Estimates (2015-2019); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Fairfax County Open Geospatial Data*

00005299

# Potomac CEA Analysis Area Community Impacts

| Alternative | Impacted Properties (#) | Impacted Community Facility Properties or Public Parks/ Public Parks with Historic Sites (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) | **Summary of Impacts from the Preferred Alternative** |
|---|---|---|---|---|
| Alternative 1 (No Build) | None | None | None | The Preferred Alternative would require no relocations. It would require partial acquisition from multiple properties, including: one school, one place of worship, and four park properties. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Generally, the Preferred Alternative would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495 or I-270.

The Preferred Alternative would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental improvement in response times due to reduced congestion on the study corridors that is anticipated under the Preferred Alternative. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The Preferred Alternative would not eliminate access or provide new access to properties, nor would it impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on the study corridors.

Changes to land use and development would be incremental and limited to those properties directly affected by partial acquisition. It is anticipated that the Preferred Alternative would have minimal impact on the overall population or demographic patterns within the CEA Analysis Area. Further, the Preferred Alternative would not change the sense of cohesion or interactions between persons or groups within the community as no relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway. |
| Preferred Alternative | 81 | **Partial acquisition from:**<br>**1 School** (Carderock Springs Elementary)<br>**1 Place of Worship** (Gibson Grove Church)<br>**4 Parks** (Cabin John Regional Park, Cabin John SVP- Unit 2, Chesapeake and Ohio Canal National Park, Clara Barton Memorial Parkway) | **Commercial/Employment**: 0.3 acres<br>**Mixed Use:** 0.2 acres<br>**Park/Open Space:** 9.7 acres*<br>**Residential**: 14.5 acres<br><br>**Total Temporary and Permanent Land Required**: 24.6 acres | Properties immediately adjacent to or within close proximity to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors. Based on updated analysis, this community contains six noise sensitive land use/activity areas (NSAs) where existing noise barriers would be reconstructed and extended; two NSAs where there are no existing noise barriers, but new barriers would be constructed; and one NSA that does not meet the feasible and reasonable criteria for noise abatement. Additional noise abatement information is available in **Chapter 5, Section 5.9** and the Final Noise Technical Report (**FEIS, Appendix L**). For specific noise barrier locations, refer to the Environmental Resource Mapping (**FEIS, Appendix E**).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Preferred Alternative would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in **Chapter 5, Section 5.6**.

Information on the potential beneficial and adverse effects to EJ populations is provided in the EJ Analysis in **Chapter 5**. Effects to the following resources within EJ populations are considered: human health and safety, air quality, noise, water quality, hazardous materials sites, natural resources, visual landscape and aesthetic values, economy and employment, access and mobility, community cohesion/isolation and quality of life, and tolling. |

*Park/Open Space land use impact may differ from specific park impact acreage. See Chapter 5.4.3 of the FEIS for specific park impact acreage.



Sources: ACS 5-Year Estimates (2015-2019); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Fairfax County Open Geospatial Data

# Cabin John CEA Analysis Area Community



**Location**: The Cabin John CEA Analysis Area Community includes two Census block groups and covers 1,886 acres, overlapping with much of the Cabin John Census-Designated Place (**Map 1**). This CEA Analysis Area Community is bordered roughly by: I-495 to the west and north; Cabin John Parkway to the north; MacArthur Boulevard to the east; and the Potomac River to the south.

**Planning & Development**: Planning and development within this CEA Analysis Area Community is guided by the *Comprehensive Amendment to the Bethesda/Chevy Chase Master Plan (1990)*. Development patterns generally include single-family houses as well as pockets of forested lands and parks located along local and arterial roadways.

**Community Facilities**: Located within the Cabin John CEA Analysis Area Community are 1 school (Brookmont Children's Program); 2 places of worship (Cabin John United Methodist Church, Saint George Coptic Orthodox Church); 4 parks/parkways and recreation centers (Clara Barton Parkway, Clara Barton Recreation Center, Cabin John Stream Valley Park Unit 2, Chesapeake and Ohio Canal National Historical Park); 2 post offices; and the potentially historic site of Moses Hall Cemetery. No affordable housing developments were identified in this community. (**Map 2**).

**Environmental Justice populations:** No EJ populations are identified in the Cabin John CEA Analysis Area Community. The EJ analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 5**.



**Cabin John Map 1**

LEGEND
- Municipality/Census Designated Place
- Census Block Groups
- Limits of Disturbance



**Cabin John Map 2**

LEGEND
- Limits of Disturbance
- CEA Analysis Area Community
- Park Property
- K Thru 12 Education
- Place of Worship
- Recreation Center
- Post Office

## Race & Ethnicity



- < 1%
- Asian Alone
- Black or African American Alone
- White Alone
- Some Other Race Alone & Two or More Races
- Hispanic or Latino of Any Race
- Native Hawaiian or Other Pacific Islander Alone

(2%, 10%, 9%, 3%, 76%)

## Land Use

| Land Use | Acres |
|---|---|
| Commercial/Employment | 0 |
| Industrial | 0 |
| Mixed-Use | 4 |
| Park/Open Space | 708 |
| Planned Unit/Planned Community | 0 |
| Residential | 1,025 |
| Transportation | 148 |

## Housing Characteristics

| | Owned | Rented |
|---|---|---|
| Single-Family, Detached | 931 | 87 |
| Single-Family, Attached | 83 | 16 |
| 2 & 3-4 Units in Structure | 2 | 14 |
| 5-9 & 10-19 Units in Structure | 0 | 110 |
| 20-49 & 50+ Units in Structure | 44 | 11 |
| Mobile Home, Boat, RV, Van, Etc. | 0 | 0 |

| Total Population | 3,262 |
|---|---|
| *as percent of CEA Analysis Area* | 3% |
| Median Age | 46.7 |
| Households with One + Persons with a Disability | 197 |
| Range of Median Household Income (Block Groups) | $182,279-$231,250 |
| Low-Income Populations Identified? | No |
| Population Driving Car/Truck/Van to Work | 1,195 |

*Sources: ACS 5-Year Estimates (2015-2019); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Fairfax County Open Geospatial Data*



00005301

# Cabin John CEA Analysis Area Community Impacts

| Alternative | Impacted Properties (#) | Impacted Community Facility Properties or Public Parks/Public Parks with Historic Sites (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) |
|---|---|---|---|
| **Alternative 1 (No Build)** | None | None | None |
| **Preferred Alternative** | 22 | **Partial acquisition from:**<br>**3 Parks** (Cabin John SVP-Unit 2, Chesapeake and Ohio Canal National Park, Clara Barton Memorial Parkway) | **Park/Open Space**: 2.3 acres*<br>**Residential**: 3.5 acres<br><br>**Total Temporary and Permanent Land Required:** 5.7 acres |

## Summary of Impacts from the Preferred Alternative

The Preferred Alternative would require no relocations. It would require partial acquisition from multiple properties, including three park properties. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Generally, the Preferred Alternative would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495.

The Preferred Alternative would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental improvement in response times due to reduced congestion on the study corridors that is anticipated under the Build Alternatives. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The Preferred Alternative would not eliminate access or provide new access to properties, nor would it impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on the study corridors.

Changes to land use and development would be incremental and limited to those properties directly affected by partial acquisition. It is anticipated that the Preferred Alternative would have minimal impact on the overall population or demographic patterns within the CEA Analysis Area. Further, the Preferred Alternative would not change the sense of cohesion or interactions between persons or groups within the community as no relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to or within close proximity to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors. Based on updated analysis, this community contains two noise sensitive land use/activity areas where there are no existing noise barriers, but new barriers would be constructed. Additional noise abatement information is available in **Chapter 5, Section 5.9** and the Final Noise Technical Report (**FEIS, Appendix L**). For specific noise barrier locations, refer to the Environmental Resource Mapping (**FEIS, Appendix E**).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Preferred Alternative would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in **Chapter 5, Section 5.6**.

The parcels containing the known location of the Moses Hall Cemetery would not be impacted by the Preferred Alternative LOD based on design refinements. MDOT SHA will continue consultation with the SHPOs and affected communities to determine additional investigations that may be appropriate near the cemetery following the avoidance measures. Further archaeological investigation and context-sensitive design near the cemetery will be commitments included in the Programmatic Agreement. Additional detail on historic cemeteries is provided in **Chapter 5, Section 5.7**.

*Park/Open Space land use impact may differ from specific park impact acreage. See Chapter 5.4.3 of the FEIS for specific park impact acreage.

OP•LANES™ MARYLAND

*Sources: ACS 5-Year Estimates (2015-2019); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Fairfax County Open Geospatial Data*

# Bethesda CEA Analysis Area Community



**Location:** The Bethesda CEA Analysis Area Community includes seven Census block groups and covers 1,946 acres, overlapping portions of the Bethesda Census-Designated Place in a crescent shape along I-495 (**Map 1**). The CEA Analysis Area Community is bordered roughly by: I-495 to the north, east, and west; and at the interchange of I-495 and Rockville Pike (MD 355), follows south along Beech Avenue, Greentree Road to Burning Tree Road, and Wilson Lane (Route 188) to Cabin John Parkway.

**Planning & Development:** Planning and development within this CEA Analysis Area Community is guided by the *Comprehensive Amendment to the Bethesda/Chevy Chase Master Plan* (1990). Development patterns and density generally include single-family houses as well as pockets of forested lands and parks located along local and arterial roadways such as Old Georgetown Road and Rockville Pike (MD 355).

**Community Facilities:** Within the CEA Analysis Area Community are 12 schools (Burning Tree Elementary School, Wyngate Elementary School, Holton-Arms School, St. Jane de Chantal School, Bethesda Country Day School, Rochambeau: the French International School and Lycee Rochambeau: the French International School, The Primary Day School, The Woods Academy, Apple Montessori School, Saint Bartholomew School, Ursuline Academy Convent); 4 places of worship (Concord Church, Saint Bartholomew Church, Saint Jane DeChantel Church, Saint Mark Orthodox Church); and 3 parks and recreation centers (Booze Creek Stream Valley Park, Rock Creek Stream Valley Park Unit 3, Our Lady of Bethesda Retreat Center) (**Map 2**). No affordable housing developments were identified in this community.

**Environmental Justice Populations:** No EJ populations are identified in the Bethesda CEA Analysis Area Community. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 5**.







Race & Ethnicity

- Asian Alone — 8%
- Black or African American Alone — 2%
- White Alone — 75%
- Some Other Race Alone & Two or More Races — 3%
- Hispanic or Latino of Any Race — 12%



Land Use — Acres

| Land Use | Acres |
|---|---|
| Commercial/Employment | 0 |
| Industrial | 0 |
| Mixed-Use | 17 |
| Park/Open Space | 85 |
| Planned Unit/Planned Community | 0 |
| Residential | 1,462 |
| Transportation | 382 |



Housing Characteristics — Owned / Rented

| | Owned | Rented |
|---|---|---|
| Single-Family, Detached | 2,079 | 206 |
| Single-Family, Attached | 257 | 87 |
| 2 & 3-4 Units in Structure | 0 | 15 |
| 5-9 & 10-19 Units in Structure | 15 | 10 |
| 20-49 & 50+ Units in Structure | 1,003 | 374 |
| Mobile Home, Boat, RV, Van, Etc. | 0 | 0 |

| | |
|---|---|
| Total Population | 9,848 |
| *as percent of CEA Analysis Area* | 10% |
| Median Age | 50.5 |
| Households with One + Persons with a Disability | 892 |
| Range of Median Household Income (Block Groups) | $85,994-$250,000+ |
| Low-Income Populations Identified? | No |
| Population Driving Car/Truck/Van to Work | 2,950 |



*Sources: ACS 5-Year Estimates (2015-2019); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Fairfax County Open Geospatial Data*

00005303

# Bethesda CEA Analysis Area Community Impacts

| Alternative | Impacted Properties (#) | Impacted Community Facility Properties or Public Parks/Public Parks with Historic Sites (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) |
|---|---|---|---|
| **Alternative 1 (No Build)** | None | None | None |
| **Preferred Alternative** | 44 | None | **Residential:** 4.9 acres<br>**Total Temporary and Permanent Land Required:** 4.9 acres |

## Summary of Impacts from the Preferred Alternative

The Preferred Alternative would require no relocations. It would require partial acquisition from multiple properties, but not from community facilities or parks in this community. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Generally, the Preferred Alternative would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495.

The Preferred Alternative would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental improvement in response times due to reduced congestion on the study corridors that is anticipated under the Preferred Alternative. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The Preferred Alternative would not eliminate access or provide new access to properties, nor would it impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on the study corridors.

Changes to land use and development would be incremental and limited to those properties directly affected by partial acquisition. It is anticipated that the Preferred Alternative would have minimal impact on the overall population or demographic patterns within the CEA Analysis Area. Further, the Preferred Alternative would not change the sense of cohesion or interactions between persons or groups within the community as no relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to or within close proximity to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors. Based on updated analysis, this community contains two noise sensitive land use/activity areas (NSAs) where existing noise barriers would be displaced by construction and replaced by reconstructed barriers; three NSAs where existing noise barriers would be reconstructed and extended; two NSAs where there are no existing noise barriers, but new barriers would be constructed; and one NSA where the existing noise barrier would remain in-place as currently constructed. Additional noise abatement information is available in **Chapter 5, Section 5.9** and the Final Noise Technical Report (**FEIS, Appendix L**). For specific noise barrier locations, refer to the Environmental Resource Mapping (**FEIS, Appendix E**).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, noise walls and other structures may be introduced; however, the Preferred Alternative would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in **Chapter 5, Section 5.6**.

OP•LANES™ MARYLAND

*Sources: ACS 5-Year Estimates (2015-2019); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Fairfax County Open Geospatial Data*

# North Bethesda CEA Analysis Area Community



**Location:** The North Bethesda CEA Analysis Area Community includes 17 Census block groups and covers 3,329 acres, overlapping the North Bethesda Census-Designated Place along the I-270 split (**Map 1**). The CEA Analysis Area Community is bordered roughly by: Montrose Road, Executive Boulevard, and Edson Lane to the north; Rock Creek Park and Rockville Pike (MD 355) to the east; I-495, through the I-270 split to the south; and I-270 to the west.

**Planning & Development:** Planning within this analysis area community is guided by the *North Bethesda/Garrett Park Master Plan (1992)*, the *Rock Spring Master Plan (2017)*, the *White Flint Sector Plan (2010)*, and the *White Flint 2 Sector Plan (2018)*. Development patterns and density include tree-lined single- and multi-family residential developments, pockets of forested lands and parks, and light industrial uses located along local and arterial roadways.

**Community Facilities:** Within the CEA Analysis Area Community are 13 schools (Grosvenor Center, Tilden Middle School, Ashburton Elementary School, Farmland Elementary School, Luxmanor Elementary School, Walter Johnson High School, The Manor Montessori School, Executive Child Development Center, Green Acres School, Georgetown Preparatory School, Alef Bet Montessori, Faith Methodist Church Preschool, Lone Oak Montessori School); 9 places of worship (Bethesda United Church of Christ, Faith United Methodist Church, Magen David Sephardic Congregational Synagogue, Mount Zion Church, North Bethesda United Methodist Church, Saint Luke's Episcopal Church, Saint Mark's United Presbyterian Church, Trinity Lutheran Church, Wildwood Baptist Church); 1 cemetery (Wildwood Baptist Cemetery); 7 parks and recreation centers (Cabin John Stream Valley Park Unit 6, Tilden Woods Stream Valley Park, Old Farm Neighborhood Conservation Area Park, Stratton Park, Fleming Local Park, Rock Creek Stream Valley Park Unit 3, North Bethesda Community Center—Planned); 1 fire/rescue station (Bethesda Fire Department Station 26); and 1 library (Davis Branch) (**Map 2**). Additionally, 2 affordable housing developments (Timberlawn Crescent, St. Luke's Homes, Inc.) were identified in this community.

**Environmental Justice populations:** Five of the 17 North Bethesda CEA Analysis Area Community block groups (7012.15-2, 7012.15-3, 7012.15-4, 7045.01-2, and 7045.01-4) are identified as EJ populations. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 5**.



**North Bethesda Map 1**

LEGEND
- Municipality/Census Designated Place
- Census Block Groups
- Limits of Disturbance



**Race & Ethnicity**
- American Indian and Alaska Native Alone
- Asian Alone
- Black or African American Alone
- White Alone
- Some Other Race Alone & Two or More Races
- Hispanic or Latino of Any Race

(< 1%, 11%, 13%, 9%, 61%, 6%)



**Land Use** — Acres

| Land Use | Acres |
|---|---|
| Commercial/Employment | 71 |
| Industrial | 0 |
| Mixed-Use | 250 |
| Park/Open Space | 198 |
| Planned Unit/Planned Community | 140 |
| Residential | 1,879 |
| Transportation | 792 |



**North Bethesda Map 2**

LEGEND
- Limits of Disturbance
- CEA Analysis Area Community
- Park Property
- K Thru 12 Education
- Place of Worship
- Cemetery
- Recreation Center
- Fire Station
- Library

| Total Population | 24,057 |
|---|---|
| *as percent of CEA Analysis Area* | 23% |
| Median Age | 44.4 |
| Households with One + Persons with a Disability | 1,688 |
| Range of Median Household Income (Block Groups) | $59,111-$250,000+ |
| Low-Income Populations Identified? | Yes |
| Population Driving Car/Truck/Van to Work | 7,876 |



**Housing Characteristics** — Owned ■ Rented

| | Single-Family, Detached | Single-Family, Attached | 2& 3-4 Units in Structure | 5-9 & 10-19 Units in Structure | 20-49 & 50+ Units in Structure | Mobile Home, Boat, RV, Van, Etc. |
|---|---|---|---|---|---|---|
| Owned | 3,840 | 1,083 | 79 | 428 | 990 | 8 |
| Rented | 439 | 383 | 161 | 492 | 2,081 | 17 |



*Sources: ACS 5-Year Estimates (2015-2019); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Fairfax County Open Geospatial Data*

# North Bethesda CEA Analysis Area Community Impacts

| Alternative | Impacted Properties (#) | Impacted Community Facility Properties or Public Parks/Public Parks with Historic Sites (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) | Summary of Impacts from the Preferred Alternative |
|---|---|---|---|---|
| Alternative 1 (No Build) | None | None | None | |
| Preferred Alternative | 75 | Partial acquisition from: 3 Parks (Cabin John SVP-Unit 6, Old Farm NCA, Tilden Woods SVP) | **Commercial/Employment**: 2.2 acres **Mixed-Use**: 1.1 acres **Park/Open Space**: 1.3 acres* **Residential**: 10.0 acres **Total Temporary and Permanent Land Required**: 14.7 acres | |

**Summary of Impacts from the Preferred Alternative**

The Preferred Alternative would require no relocations. It would require partial acquisition from multiple properties, including three park properties. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Generally, the Preferred Alternative would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495 or I-270.

The Preferred Alternative would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental improvement in response times due to reduced congestion on the study corridors that is anticipated under the Preferred Alternative. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The Preferred Alternative would not eliminate access or provide new access to properties, nor would it impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on the study corridors.

Changes to land use and development would be incremental and limited to those properties directly affected by partial acquisition. It is anticipated that the Preferred Alternative would have minimal impact on the overall population or demographic patterns within the CEA Analysis Area. Further, the Preferred Alternative would not change the sense of cohesion or interactions between persons or groups within the community as no relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to or within close proximity to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors. Based on updated analysis, this community contains three noise sensitive land use/activity areas (NSAs) where existing noise barriers would be displaced by construction and replaced by reconstructed barriers; one NSA where the existing noise barrier would be reconstructed and extended; two NSAs where the existing noise barriers would be extended; one NSA where there are no existing noise barriers, but a new barrier would be constructed; one NSA where the existing noise barrier would remain in place as currently constructed; and one NSA that does not meet the feasible and reasonable criteria for noise abatement. Additional noise abatement information is available in **Chapter 5, Section 5.9** and the Final Noise Technical Report (**FEIS, Appendix L**). For specific noise barrier locations, refer to the Environmental Resource Mapping (**FEIS, Appendix E**).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Preferred Alternative would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in **Chapter 5, Section 5.6**.

Information on the potential beneficial and adverse effects to EJ populations is provided in the EJ Analysis in **Chapter 5**. Effects to the following resources within EJ populations are considered: human health and safety, air quality, noise, water quality, hazardous materials sites, natural resources, visual landscape and aesthetic values, economy and employment, access and mobility, community cohesion/isolation and quality of life, and tolling.

*Park/Open Space land use impact may differ from specific park impact acreage. See Chapter 5.4.3 of the FEIS for specific park impact acreage.



*Sources: ACS 5-Year Estimates (2015-2019); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Fairfax County Open Geospatial Data*

# Gaithersburg CEA Analysis Area Community

**Location**: The Gaithersburg CEA Analysis Area Community includes nine Census block groups over 2,717 acres, including portions of the City of Gaithersburg and the National Institute of Standards and Technology (NIST) (**Map 1**). It is bordered roughly by: I-270 and West Diamond Avenue (Route 117) to the north; South Frederick Avenue (MD 355) to I-370 to the east; Shady Grove Road and Great Seneca Highway (Route 119) to the south; and NIST to the west. The Gaithersburg CEA is the northwesternmost community in the CEA Analysis Area.

**Planning & Development**: Planning is guided by the Great *Seneca Science Corridor Master Plan* (2010), *City of Gaithersburg Master Plan* (2009) (currently being updated), *Gaithersburg West Master Plan Transportation Appendix* (Draft March 2009), *Shady Grove Sector Plan* (2006), *Gaithersburg Vicinity Master Plan* (1996), and *Gaithersburg & Vicinity Master Plan* (1985, Amended 1988 and 1990). Development patterns blend older suburban design with new transit-oriented development including medium and high-density residential developments, tree-lined single-family developments, forested lands and parks, shopping centers, and light industrial uses.

**Community Facilities**: Within the community are 12 schools and higher education facilities (Fields Road Elementary School, Rosemont Elementary School, Summit Hall Elementary School, Gaithersburg High School, Gaithersburg Presbyterian Preschool and Kindergarten, Epworth Preschool and Kindergarten, NIST Child Care Center, John L. Gildner Regional Institute for Children and Adolescents School, The Katherine Thomas School, The Ridge School, Good Shepherd Lutheran Preschool, Johns Hopkins University Montgomery County Campus); 5 places of worship (Episcopal Church of the Ascension, Epworth United Methodist Church, First Assembly of God Church, Gaithersburg Presbyterian Church, Good Shepherd Lutheran Church); 6 parks and recreation centers (Morris Park, Malcolm King Park, Activity Center at Bohrer Park, Casey Community Center, Gaithersburg Miniature Golf Course, Gaithersburg Skate Park); 3 healthcare facilities (Adventist Healthcare's Behavioral Health and Wellness Services, Shady Grove Medical Center, and Rehabilitation Hospital of Maryland) (**Map 2**). There are 11 affordable housing developments (17 Barkley Apartments, Amber Commons Apartments, Montgomery Club VI, Rosedale Apartments, Montgomery Housing Inc., Brighton Village Apartments, Camden Washingtonian, The Villages of Gaithersburg, Cadence at Crown, The Crossing at Washingtonian Center, The Flats at Shady Grove) in this community.

**Environmental Justice populations**: Eight of the 9 Gaithersburg CEA Analysis Area Community block groups (7007.17-1, 7007.17-3, 7007.17-4, 7008.16-1, 7008.16-2, 7008.17-1, 7008.17-3, and 7008.29-1) are identified as EJ populations. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 5**.





**Gaithersburg Map 1**

LEGEND
- Municipality/Census Designated Place
- Census Block Groups
- Limits of Disturbance



**Gaithersburg Map 2**

LEGEND
- ☐ Limits of Disturbance
- ☐ CEA Analysis Area Community
- ☐ Park Property
- ☆ K Thru 12 Education
- ★ Higher Education
- ⬚ Place of Worship
- 🏥 Hospital
- ● Recreation Center



**Race & Ethnicity**

- Asian Alone — 19%
- Black or African American Alone — 21%
- White Alone — 5%
- Some Other Race Alone & Two or More Races — 24%
- Hispanic or Latino of Any Race — 31%

| Total Population | 19,867 |
|---|---|
| *as percent of CEA Analysis Area* | 19% |
| Median Age | 36.6 |
| Households with One + Persons with a Disability | 1,087 |
| Range of Median Household Income (Block Groups) | $64,596–$180,104 |
| Low-Income Populations Identified? | Yes |
| Population Driving Car/Truck/Van to Work | 7,664 |



**Land Use** — ■ Acres

| Land Use | Acres |
|---|---|
| Commercial/Employment | 101 |
| Industrial | 231 |
| Mixed-Use | 558 |
| Park/Open Space | 205 |
| Planned Unit/Planned Community | 74 |
| Residential | 1,048 |
| Transportation | 500 |



**Housing Characteristics** — ■ Owned ■ Rented

| | Single-Family, Detached | Single-Family, Attached | 2 & 3-4 Units in Structure | 5-9 & 10-19 Units in Structure | 20-49 & 50+ Units in Structure | Mobile Home, Boat, RV, Van, Etc. |
|---|---|---|---|---|---|---|
| Owned | 737 | 1,743 | 17 | 405 | 156 | 0 |
| Rented | 21 | 543 | 131 | 2,294 | 1,770 | 0 |



*Sources: ACS 5-Year Estimates (2015-2019); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Fairfax County Open Geospatial Data*

June 2022

00005307

# Gaithersburg CEA Analysis Area Community Impacts

| Alternative | Impacted Properties (#) | Impacted Community Facility Properties or Public Parks/Public Parks with Historic Sites (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) |
|---|---|---|---|
| Alternative 1 (No Build) | None | None | None |
| Preferred Alternative | 10 | Partial acquisition from: 1 Park (Malcom King Park) | **Industrial:** 0.2 acres<br>**Mixed-Use:** 2.0 acres<br>**Park/Open Space:** 0.4 acres<br><br>**Total Temporary and Permanent Land Required:** 2.7 acres |

## Summary of Impacts from the Preferred Alternative

The Preferred Alternative would require no relocations. It would require partial acquisition from multiple properties, including one park property. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Generally, the Preferred Alternative would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-270.

The Preferred Alternative would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour during construction. Emergency services would experience an incremental improvement in response times due to reduced congestion on the study corridors that is anticipated under the Preferred Alternative. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The Preferred Alternative would not eliminate access or provide new access to properties, nor would it impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on study corridors.

Changes to land use and development would be incremental and limited to those properties directly affected by partial acquisition. It is anticipated that the Preferred Alternative would have minimal impact on the overall population or demographic patterns within the CEA Analysis Area. Further, the Preferred Alternative would not change the sense of cohesion or interactions between persons or groups within the community as no relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to or within close proximity to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors. Based on updated analysis, this community contains two noise sensitive land use/activity areas (NSAs) with existing noise barriers that would remain in-place as currently constructed; and two NSAs that do not meet the feasible and reasonable criteria for noise abatement. Additional noise abatement information is available in **Chapter 5, Section 5.9** and the Final Noise Technical Report (**FEIS, Appendix L**). For specific noise barrier locations, refer to the Environmental Resource Mapping (**FEIS, Appendix E**).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Build Alternatives would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in **Chapter 5, Section 5.6**.

Information on the potential beneficial and adverse effects to EJ populations is provided in the EJ Analysis in **Chapter 5**. Effects to the following resources within EJ populations are considered: human health and safety, air quality, noise, water quality, hazardous materials sites, natural resources, visual landscape and aesthetic values, economy and employment, access and mobility, community cohesion/isolation and quality of life, and tolling.

*Park/Open Space land use impact may differ from specific park impact acreage. See Chapter 5.4.3 of the FEIS for specific park impact acreage.



*Sources: ACS 5-Year Estimates (2015-2019); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Fairfax County Open Geospatial Data*

# Rockville CEA Analysis Area Community



**Location:** The Rockville CEA Analysis Area Community includes 17 Census block groups and covers 4,779 acres, including portions of the City of Rockville (**Map 1**). The community is bounded roughly by: I-370 and North Frederick Road (MD 355) to the north; local roadways between I-270 and MD 355 to the east; the I-270 interchange with Montrose Road to the south; and the municipal boundary of the City of Rockville to the west.

**Planning & Development:** Planning within this CEA Analysis Area Community is guided by the *Rockville 2040 Comprehensive Plan* and its *Transportation Element* (2021). Development patterns are typical of an older suburb with shopping centers and light industrial uses clustered around arterial roadways. Tree-lined residential developments of single-family houses, larger apartments, and pockets of forested lands, open space, and parks are located along local and arterial roadways. There are growing areas of higher density, mixed-use developments that are a blend of urban and suburban land uses.

**Community Facilities:** Located within the CEA Analysis Area Community are: 11 schools (Beall Elementary School, Fallsmead Elementary School, Ritchie Park Elementary School, Julius West Middle School, The Alim Academy, Georgetown Hill Early School, Marcia D. Smith School, Children of the Cross Preschool, First Baptist Church WEE Center, Saint Raphael School; Rockville Nursery and Kindergarten); 11 places of worship (First Baptist Church and Pre-K, First Christ Church of Scientist, Kingdom Hall of Jehovah's Witnesses, Latvian Lutheran Church, Lutheran Church of the Cross, Rockville Christian Church and Pre-K, Rockville Church of Christ, Rockville Presbyterian Church, Rockville Seventh Day Adventist Church, Saint Raphael's Catholic Church, Unitarian of Rockville Church); 1 cemetery (Rockville Baptist Cemetery); 11 parks and recreation centers (Bullards Park and Rose Hill Stream Valley Park, Cabin John Stream Valley Park, Fallsgrove Stream Valley Park, Julius West Middle School Athletic Fields, Millennium Garden Park, Rockmead Park, Woodley Gardens Park, Woottons Mill Park, Rockville Senior Center and Park, Thomas Farm Community Center); 1 police station (Maryland State Police Barrack N - Rockville); one correctional facility; 2 healthcare facilities (Kaiser Permanente Shady Grove Medical Center, Family Medicine Shady Grove) (**Map 2**); and the potentially historic site of Montgomery County Poor Farm Cemetery. There are 5 affordable housing developments (Post at Falls Grove, Huntington at King Farm, Gables Upper Rock, Thomas Street Housing, Camden at Falls Grove) in the community.

**Environmental Justice populations:** One of the 17 Rockville CEA Analysis Area Community block groups (7010.07-1) is identified as an EJ population. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 5**.



**Rockville Map 1**

Legend:
- Municipality/Census Designated Place
- Census Block Groups
- Limits of Disturbance



**Rockville Map 2**

Legend:
- Limits of Disturbance
- CEA Analysis Area Community
- Park Property
- K Thru 12 Education
- Place of Worship
- Cemetery
- Hospital
- Recreation Center
- Police Station
- Correctional Facility



**Race & Ethnicity**

- American Indian and Alaska Native Alone — < 1%
- Asian Alone — 20%
- Black or African American Alone — 8%
- White Alone — 60%
- Some Other Race Alone & Two or More Races — 4%
- Hispanic or Latino of Any Race — 8%



**Land Use** (Acres)

| Land Use | Acres |
| --- | --- |
| Commercial/Employment | 63 |
| Industrial | 99 |
| Mixed-Use | 624 |
| Park/Open Space | 457 |
| Planned Unit/Planned Community | 901 |
| Residential | 1,611 |
| Transportation | 1,024 |



**Housing Characteristics** (Owned / Rented)

| | Owned | Rented |
| --- | --- | --- |
| Single-Family, Detached | 4,803 | 277 |
| Single-Family, Attached | 1,843 | 659 |
| 2 & 3-4 Units in Structure | 35 | 114 |
| 5-9 & 10-19 Units in Structure | 304 | 738 |
| 20-49 & 50+ Units in Structure | 443 | 1,788 |
| Mobile Home, Boat, RV, Van, Etc. | 0 | 0 |

| | |
| --- | --- |
| **Total Population** | **28,115** |
| *as percent of CEA Analysis Area* | 27% |
| Median Age | 45.2 |
| Households with One + Persons with a Disability | 1,645 |
| Range of Median Household Income (Block Groups) | $82,083-$246,750 |
| Low-Income Populations Identified? | No |
| Population Driving Car/Truck/Van to Work | 10,025 |



**OP LANES MARYLAND**

*Sources: ACS 5-Year Estimates (2015-2019); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Fairfax County Open Geospatial Data*

# Rockville CEA Analysis Area Community Impacts

| Alternative | Impacted Properties (#) | Impacted Community Facility Properties or Public Parks/ Public Parks with Historic Sites (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) |
|---|---|---|---|
| Alternative 1 (No Build) | None | None | None |
| Preferred Alternative | 114 | **Partial acquisition from**: 1 School (Julius West Middle) 3 Places of Worship (First Church-Christ Scientist, First Baptist Church, Rockville Christian Church) 2 Healthcare Facilities (Kaiser Permanente Shady Grove Medical Center, Sterling Care Rockville Nursing) 4 Parks (Bullards Park and Rose Hill SVP, Rockmead Park, Woottons Mill Park, Rockville Senior Center Park) 1 Correctional Facility (Montgomery County Detention Center) | **Commercial/Employment**: 0.2 acres **Industrial**: 2.6 acres **Mixed-Use**: 15.6 acres **Park/Open Space**: 4.2 acres* **Planned Unit/Planned Community**: 8.4 acres **Residential**: 4.3 acres **Transportation**: <0.1 acres  **Total Temporary and Permanent Land Required**: 35.2 acres |

## Summary of Impacts from the Preferred Alternative

The Preferred Alternative would require no relocations. It would require partial acquisition from multiple properties, including one school, three places of worship, two healthcare facilities, five park properties/recreation centers, and one correctional facility/detention center. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management techniques. Generally, the Preferred Alternative would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-270.

The Preferred Alternative would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental improvement in response times due to reduced congestion on the study corridors that is anticipated under the Preferred Alternative. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The Preferred Alternative would not eliminate access or provide new access to properties, nor would they impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on the study corridors.

Changes to land use and development would be incremental and limited to those properties directly affected by partial acquisition. It is anticipated that the Preferred Alternative would have minimal impact on the overall population or demographic patterns within the CEA Analysis Area. Further, the Preferred Alternative would not change the sense of cohesion or interactions between persons or groups within the community as no relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to or within close proximity to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors. Based on updated analysis, this community contains one noise sensitive land use/activity area (NSA) where the existing noise barrier would remain in-place as currently constructed; six NSAs where the existing noise barriers would be reconstructed and extended; three NSAs where there are no existing noise barriers, but new barriers would be constructed; and six NSAs that do not meet the feasible and reasonable criteria for noise abatement. Additional noise abatement information is available in **Chapter 5, Section 5.9** and the Final Noise Technical Report (**FEIS, Appendix L**). For specific noise barrier locations, refer to the Environmental Resource Mapping (**FEIS, Appendix E**).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Preferred Alternative would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in **Chapter 5, Section 5.6**.

Information on the potential beneficial and adverse effects to EJ populations is provided in the EJ Analysis in **Chapter 5**. Effects to the following resources within EJ populations are considered: human health and safety, air quality, noise, water quality, hazardous materials sites, natural resources, visual landscape and aesthetic values, economy and employment, access and mobility, community cohesion/isolation and quality of life, and tolling.

The parcels containing the likely location of the Montgomery County Poor Farm Cemetery would be impacted by the Preferred Alternative LOD. Further archeological investigation prior to construction will be included as a commitment in the Programmatic Agreement. MDOT SHA will continue to work to avoid and minimize impacts and will coordinate with affected communities on treatment of human remains should avoidance not be possible. Additional detail on historic cemeteries is provided in **Chapter 5, Section 5.7**.

*Park/Open Space land use impact may differ from specific park impact acreage. See Chapter 5.4.3 of the FEIS for specific park impact acreage.



Sources: ACS 5-Year Estimates (2015-2019); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Fairfax County Open Geospatial Data

I-495 & I-270 Managed Lanes Study

# APPENDIX E:
# MDOT SHA Relocation
# Assistance Program Summary

Revised: February 10, 2016
State Highway Administration - Office of Real Estate

## SUMMARY OF THE RELOCATION ASSISTANCE PROGRAM OF THE MARYLAND STATE HIGHWAY ADMINISTRATION

All State Highway Administration projects utilizing Federal funds must comply with the provisions of the Uniform Relocation and Real Property Acquisition Policies Act of 1970 (42 USC 4601) as amended by Title IV of the Surface Transportation and Uniform Relocation Assistance Act of 1987 (Public Law 100-17), Public Law 105-117 in 1997, MAP 21, and Title 49 CFR Part 24 in 2005. State-funded projects must comply with Sections 12-112 and Subtitle 2, Sections 12-201 to 12-212, of the Real Property Article of the Annotated Code of Maryland.

The State Highway Administration's Office of Real Estate administers the Relocation Assistance Program for the Maryland Department of Transportation.

The aforementioned Federal and State laws require that the State Highway Administration provide relocation assistance payments and advisory services to eligible persons who are displaced by a public project. There are two categories of residential occupants: 90-day owner-occupants and tenants and less than 90 day or short-term owner-occupants. Non-residential occupants may be businesses, farms or non-profit organizations.

A displaced person that has owned and occupied a subject dwelling for at least 180 days prior to the initiation of negotiations for the property may receive a replacement housing payment of up to $45,000. The replacement housing payment is composed of three parts: a purchase price differential; an increased mortgage interest differential; and reimbursement for incidental settlement expenses.

The purchase price differential is the difference between the value paid by the State Highway Administration for the existing dwelling and the cost to the displaced owner of a comparable replacement dwelling, as determined by the State's replacement housing study.

The increased mortgage interest differential is a payment made to the owner at the time of settlement on the replacement dwelling to negate the effects of less favorable financing in the new situation. The payment is calculated by use of the "buy-down" mortgage method.

Reimbursable incidental expenses are necessary and reasonable incidental costs that are incurred by the displaced person in purchasing a replacement dwelling, excluding pre-paid expenses such as real estate taxes and insurance. The maximum reimbursable amount for these incidental expenses is based upon the cost of the comparable selected in the replacement housing study.

A displaced person who has leased and occupied a subject dwelling for at least 90 days prior to the initiation of negotiations for the property may receive a replacement rental housing payment of up to $10,500. The replacement rental housing payment is the difference between

the monthly cost of housing for the subject dwelling, plus utilities, and the monthly cost of housing for a comparable replacement rental unit, plus utilities, over a period of 42 months. Owner-occupants of 90 or less days prior to the initiation of negotiations for the subject dwelling are eligible for the same replacement rental housing payments as tenants.

As an alternative to renting, a displaced tenant-occupant may elect to apply the rental replacement housing eligibility amount toward the down payment needed to purchase a replacement dwelling.

The comparable properties used in calculating any replacement housing payment eligibility must comply with all local standards for decent, safe and sanitary (DS&S) housing and be within the financial means of the displaced person.

If affordable, comparable DS&S replacement housing cannot be provided within the statutory maximums of $45,000 for 90-day owner-occupants or $10,500 for 90-day tenants or short-term owners, the maximums may be exceeded on a case-by-case basis. This may only be done after the completion and approval of a detailed study that documents the housing problem, explores the available replacement options and selects the most feasible and cost-effective alternative for implementation.

In addition, eligible displaced residential occupants may be reimbursed for the expense of moving personal property up to a maximum distance of fifty (50) miles, using either an actual cost or fixed schedule method.

Actual cost moves are based upon the lower of at least two commercial moving estimates and must be documented with receipted bills or invoices. Other incidental moving expenses, such as utility reconnection charges, may also be paid in the same manner.

As an alternative method, the fixed schedule move offers a lump sum, all-inclusive payment based upon the number of rooms to be moved. Other incidental costs are not separately reimbursable with this method.

Non-residential displaced persons such as businesses, farms or non-profit organizations may also receive reimbursement for the expense of relocating and re-establishing operations at a replacement site on either an actual cost or fixed payment basis.

Under the actual cost method, a non-residential displaced person may receive reimbursement for necessary and reasonable expenses for moving its personal property, the loss of tangible personal property that is not moved, the cost of searching for a replacement site and a re-establishment allowance of up to $60,000.

The actual reasonable moving expenses may be paid for a move by a commercial mover or for a self-move. Payments for the actual reasonable expenses are limited to a 50-mile radius unless the State determines a longer distance is necessary. The expenses claimed for actual cost moves must be supported by firm bids and receipted bills. An inventory of the items to be moved must be prepared in all cases. In self-moves, the State will negotiate an amount for

2

payment, usually lower than the lowest acceptable bid.  The allowable expenses of a self-move may include amounts paid for equipment hired, the cost of using the business vehicles or equipment, wages paid to persons who participate in the move, the cost of actual supervision of the move, replacement insurance for the personal property moved, costs of licenses or permits required and other related expenses.

In addition to the actual moving expenses mentioned above, the displaced business is entitled to receive a payment for the actual direct losses of tangible personal property that the business is entitled to relocate but elects not to move.  These payments may only be made after an effort by the owner to sell the personal property involved.  The costs of the sale are also reimbursable moving expenses.

If the business elects not to move or to discontinue the use of an item, the payment shall consist of the lesser of:  the fair market value of the item for continued use at the displacement site, less the proceeds from its sale; or the estimated cost of moving the item.

If an item of personal property which is used as part of a business or farm operation is not moved and is promptly replaced with a substitute item that performs a comparable function at the replacement site, payment shall be the lesser of:  the cost of the substitute item, including installation costs at the replacement site, minus any proceeds from the sale or trade-in of the replaced item; or the estimated cost of moving and reinstalling the replaced item.

In addition to the moving payments described above, a business may be eligible for a payment up to $60,000 for the actual reasonable and necessary expenses of re-establishing at the replacement site.  Generally, re-establishment expenses include certain repairs and improvements to the replacement site, increased operating costs, exterior signing, advertising the replacement location, and other fees paid to re-establish.  Receipted bills and other evidence of these expenses are required for payment.  The total maximum re-establishment payment eligibility is $60,000.

In lieu of all moving payments described above, a business may elect to receive a fixed payment equal to the average annual net earnings of the business.  This payment shall not be less than $1,000 nor more than $60,000.  In order to be entitled to this payment, the State must determine that the business cannot be relocated without a substantial loss of its existing patronage; the business is not part of a commercial enterprise having more than three other establishments in the same or similar business that are not being acquired; and the business contributes materially to the income of a displaced owner during the two taxable years prior to the year of the displacement.  A business operated at the displacement site solely for the purpose of renting to others is not eligible.  Considerations in the State's determination of loss of existing patronage are the type of business conducted by the displaced business and the nature of the clientele.  The relative importance of the present and proposed locations to the displaced business and the availability of suitable replacement sites are also factors.

In order to determine the amount of the "in lieu of" moving expense payment, the average annual net earnings of the business is to be one-half of the net earnings before taxes during the two taxable years immediately preceding the taxable year in which the business is relocated.  If the two taxable years are not representative, the State may use another two-year

3

period that would be more representative.  Average annual net earnings include any compensation paid by the business to the owner, owner's spouse, or dependents during the period.  Should a business be in operation less than two years, the owner of the business may still be eligible to receive the "in lieu of" payment.  In all cases, the owner of the business must provide information to support its net earnings, such as income tax returns, or certified financial statements, for the tax years in question.

Displaced farms and non-profit organizations are also eligible for actual reasonable moving costs up to 50 miles, actual direct losses of tangible personal property, search costs up to $2,500 and re-establishment expenses up to $60,000 or a fixed payment "in lieu of" actual moving expenses of $1,000 to $60,000.  The State may determine that a displaced farm may be paid a minimum of $1,000 to a maximum of $60,000 based upon the net income of the farm, provided that the farm has been relocated or the partial acquisition caused a substantial change in the nature of the farm.  In some cases, payments "in lieu of" actual moving costs may be made to farm operations that are affected by a partial acquisition.  A non-profit organization is eligible to receive a fixed payment or an "in lieu of" actual moving cost payment, in the amount of $1,000 to $60,000 based on gross annual revenues less administrative expenses.

A more detailed explanation of the benefits and payments available to displaced persons, businesses, farms and non-profit organizations is available in the brochure entitled, "Relocation Assistance – Your Rights and Benefits," that will be distributed at the public hearing for this project and be given to all displaced persons.

Federal and State laws require that the State Highway Administration shall not proceed with any phase of a project which will cause the relocation of any persons, or proceed with any construction project, until it has furnished satisfactory assurances that the above payments will be provided, and that all displaced persons will be satisfactorily relocated to comparable decent, safe and sanitary housing within their financial means, or that such housing is in place and has been made available to the displaced persons.

In addition, the requirements of Public Law 105-117 provides that a person who is an alien and is not lawfully present in the United States shall not be eligible for relocation payments or other assistance under the Uniform Act.  It also directed all State displacing agencies that utilize Federal funds in their projects to implement procedures for compliance with this law in order to safeguard that funding.  To this end, displaced persons will be asked to certify to their citizenship or alien status prior to receiving payments or other benefits under the Relocation Assistance Program.

4

00005315

**US Code**

*(Unofficial compilation from the Legal Information Institute)*

### TITLE 42 - THE PUBLIC HEALTH AND WELFARE

### CHAPTER 61—UNIFORM RELOCATION ASSISTANCE AND REAL PROPERTY ACQUISITION POLICIES FOR FEDERAL AND FEDERALLY ASSISTED PROGRAMS

*Please Note: This compilation of the US Code, current as of Jan. 4, 2012 , has been prepared by the Legal Information Institute using data from the U.S. House of Representatives, Office of the Law Revision Counsel. It is not an official U.S. government publication. For more details please see: http://www.law.cornell.edu/uscode/uscprint.html.*

*Notes on this document: The content in this document is taken directly from the US Code, with the following exceptions: page headers and footers, page numbering, and all formatting are artifacts of this presentation. Divider lines have been inserted between sections. The notes are set off by a vertical line and a larger left margin. The table of contents immediately following this title page is machine-generated from the headings in this portion of the Code. Commonly available fonts are used.*

*The Legal Information Institute promotes worldwide, free public access to law via the Internet. Founded in 1992, the LII created the first legal information website. It continues to be a pre-eminent "law-not-com" publisher of legal information and an important outreach activity of the Cornell Law School.*

**TITLE 42 - THE PUBLIC HEALTH AND WELFARE**   1

**CHAPTER 61 - UNIFORM RELOCATION ASSISTANCE AND REAL PROPERTY ACQUISITION POLICIES FOR FEDERAL AND FEDERALLY ASSISTED PROGRAMS**   5

**SUBCHAPTER I - GENERAL PROVISIONS**   6
§ 4601. Definitions   6
§ 4602. Effect upon property acquisition   9
§ 4603. Additional appropriations for moving costs, relocation benefits and other expenses incurred in acquisition of lands for National Park System; waiver of benefits   10
§ 4604. Certification   10
§ 4605. Displaced persons not eligible for assistance   11

**SUBCHAPTER II - UNIFORM RELOCATION ASSISTANCE**   13
§ 4621. Declaration of findings and policy   13
§ 4622. Moving and related expenses   14
§ 4623. Replacement housing for homeowner; mortgage insurance   16
§ 4624. Replacement housing for tenants and certain others   17
§ 4625. Relocation planning, assistance coordination, and advisory services   18
§ 4626. Housing replacement by Federal agency as last resort   20
§ 4627. State required to furnish real property incident to Federal assistance (local cooperation)   20
§ 4628. State acting as agent for Federal program   21
§ 4629. Public works programs and projects of District of Columbia government and Washington Metropolitan Area Transit Authority   21
§ 4630. Requirements for relocation payments and assistance of federally assisted program; assurances of availability of housing   22
§ 4631. Federal share of costs   22
§ 4632. Administration; relocation assistance in programs receiving Federal financial assistance   23
§ 4633. Duties of lead agency   24
§ 4634. Repealed. Pub. L. 100–17, title IV, § 415, Apr. 2, 1987, 100 Stat. 255   26
§ 4635. Planning and other preliminary expenses for additional housing   26
§ 4636. Payments not to be considered as income for revenue purposes or for eligibility for assistance under Social Security Act or other Federal law   27
§ 4637. Repealed. Pub. L. 100–17, title IV, § 415, Apr. 2, 1987, 101 Stat. 255   27
§ 4638. Transfers of surplus property   27

**SUBCHAPTER III - UNIFORM REAL PROPERTY ACQUISITION POLICY**   29
§ 4651. Uniform policy on real property acquisition practices   29
§ 4652. Buildings, structures, and improvements   30
§ 4653. Expenses incidental to transfer of title to United States   31
§ 4654. Litigation expenses   31
§ 4655. Requirements for uniform land acquisition policies; payments of expenses incidental to transfer of real property to State; payment of litigation expenses in certain cases   32

00005317

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

# TITLE 42—THE PUBLIC HEALTH AND WELFARE

Chap.  ...Sec.
1.  The Public Health Service [Mostly Repealed or Omitted, See Chapter 6A]  ...1
1A.  The Public Health Service; Supplemental Provisions [Transferred or Omitted]  ...71
2.  Sanitation and Quarantine  ...81
3.  Leprosy [Repealed]  ...121
3A.  Cancer [Repealed]  ...137
4.  Viruses, Serums, Toxins, Antitoxins, etc. [Repealed]  ...141
5.  Maternity and Infancy Welfare and Hygiene [Repealed]  ...161
6.  The Children's Bureau  ...191
6A.  Public Health Service  ...201
7.  Social Security  ...301
7A.  Temporary Unemployment Compensation Program [Omitted]  ...1400
8.  Low-Income Housing  ...1401
8A.  Slum Clearance, Urban Renewal, and Farm Housing  ...1441
8B.  Public Works or Facilities [Omitted]  ...1491
8C.  Open-Space Land [Omitted or Repealed]  ...1500
9.  Housing of Persons Engaged in National Defense  ...1501
10.  Federal Security Agency [Transferred or Omitted]  ...1601
11.  Compensation for Disability or Death to Persons Employed at Military, Air, and Naval Bases Outside United States  ...1651
12.  Compensation for Injury, Death, or Detention of Employees of Contractors with United States Outside United States  ...1701
13.  School Lunch Programs  ...1751
13A.  Child Nutrition  ...1771
14.  Development and Control of Atomic Energy [Transferred to Chapter 23]  ...1801
15.  Disaster Relief [Repealed]  ...1851
15A.  Reciprocal Fire Protection Agreements  ...1856
15B.  Air Pollution Control [Transferred or Repealed]  ...1857
16.  National Science Foundation  ...1861
16A.  Grants for Support of Scientific Research [Repealed]  ...1891
16B.  Contracts for Scientific and Technological Research  ...1900
17.  Federal Employment Service [Transferred]  ...1901
18.  Youth Medals  ...1921
19.  Saline and Salt Waters [Repealed, Omitted, or Transferred]  ...1951
19A.  Water Resources Research Program [Repealed]  ...1961
19B.  Water Resources Planning  ...1962
20.  Elective Franchise  ...1971
20A.  Civil Rights Commission  ...1975
21.  Civil Rights  ...1981
21A.  Privacy Protection  ...2000aa
21B.  Religious Freedom Restoration  ...2000bb
21C.  Protection of Religious Exercise in Land Use and by Institutionalized Persons  ...2000cc
21D.  Detainee Treatment  ...2000dd
21E.  Privacy and Civil Liberties Protection and Oversight  ...2000ee
21F.  Prohibiting Employment Discrimination on the Basis of Genetic Information  ...2000ff
22.  Indian Hospitals and Health Facilities  ...2001
23.  Development and Control of Atomic Energy  ...2011
24.  Disposal of Atomic Energy Communities  ...2301
25.  Federal Flood Insurance  ...2401
26.  National Space Program [Repealed, Omitted, or Transferred]  ...2451
26A.  National Space Grant College and Fellowship Program [Repealed or Transferred]  ...2486
26B.  Biomedical Research in Space [Repealed or Transferred]  ...2487
27.  Loan Service of Captioned Films and Educational Media for Handicapped  ...2491
28.  Area Redevelopment Program [Omitted or Repealed]  ...2501
29.  Juvenile Delinquency and Youth Offenses Control [Omitted]  ...2541
30.  Manpower Development and Training Program [Repealed]  ...2571
31.  Public Works Acceleration Program  ...2641
32.  Third Party Liability for Hospital and Medical Care  ...2651
33.  Community Mental Health Centers [Omitted, Transferred, or Repealed]  ...2661
34.  Economic Opportunity Program  ...2701

00005318

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

35.  Programs for Older Americans  ...3001
35A.  Community Service Employment for Older Americans [Repealed]  ...3061
36.  Compensation of Condemnees in Development Programs [Repealed]  ...3071
37.  Community Facilities and Advance Land Acquisition  ...3101
38.  Public Works and Economic Development  ...3121
39.  Solid Waste Disposal [Omitted or Repealed, See Chapter 82]  ...3251
40.  Soil Information Assistance for Community Planning and Resource Development  ...3271
41.  Demonstration Cities and Metropolitan Development Program  ...3301
42.  Narcotic Addict Rehabilitation  ...3401
43.  Department of Health and Human Services  ...3501
44.  Department of Housing and Urban Development  ...3531
45.  Fair Housing  ...3601
46.  Justice System Improvement  ...3701
47.  Juvenile Delinquency Prevention and Control [Omitted or Repealed]  ...3801
48.  Guarantees for Financing New Community Land Development [Repealed or Omitted]  ...3901
49.  National Housing Partnerships  ...3931
50.  National Flood Insurance  ...4001
51.  Design and Construction of Public Buildings To Accommodate Physically Handicapped  ...4151
52.  Intergovernmental Cooperation [Repealed, See Chapter 65 of Title 31]  ...4201
52A.  Joint Funding Simplification [Repealed]  ...4251
53.  Advisory Commission on Intergovernmental Relations  ...4271
54.  Cabinet Committee on Opportunities for Spanish-Speaking People [Omitted]  ...4301
55.  National Environmental Policy  ...4321
56.  Environmental Quality Improvement  ...4371
57.  Environmental Pollution Study  ...4391
58.  Disaster Relief [Repealed or Transferred]  ...4401
59.  National Urban Policy and New Community Development  ...4501
60.  Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Program  ...4541
61.  Uniform Relocation Assistance and Real Property Acquisition Policies for Federal and Federally Assisted Programs  ...4601
62.  Intergovernmental Personnel Program  ...4701
63.  Lead-Based Paint Poisoning Prevention  ...4801
63A.  Residential Lead-Based Paint Hazard Reduction  ...4851
64.  Public Service Employment Programs [Omitted]  ...4871
65.  Noise Control  ...4901
66.  Domestic Volunteer Services  ...4950
67.  Child Abuse Prevention and Treatment and Adoption Reform  ...5101
68.  Disaster Relief  ...5121
69.  Community Development  ...5301
70.  Manufactured Home Construction and Safety Standards  ...5401
71.  Solar Energy  ...5501
72.  Juvenile Justice and Delinquency Prevention  ...5601
73.  Development of Energy Sources  ...5801
74.  Nonnuclear Energy Research and Development  ...5901
75.  Programs for Individuals With Developmental Disabilities [Repealed]  ...6000
76.  Age Discrimination in Federally Assisted Programs  ...6101
77.  Energy Conservation  ...6201
78.  National Petroleum Reserve in Alaska  ...6501
79.  Science and Technology Policy, Organization and Priorities  ...6601
80.  Public Works Employment  ...6701
81.  Energy Conservation and Resource Renewal  ...6801
82.  Solid Waste Disposal  ...6901
83.  Energy Extension Service  ...7001
84.  Department of Energy  ...7101
85.  Air Pollution Prevention and Control  ...7401
86.  Earthquake Hazards Reduction  ...7701
87.  Water Research and Development [Repealed or Transferred]  ...7801
88.  Uranium Mill Tailings Radiation Control  ...7901
89.  Congregate Housing Services  ...8001
90.  Neighborhood and City Reinvestment, Self-Help and Revitalization  ...8101
91.  National Energy Conservation Policy  ...8201
92.  Powerplant and Industrial Fuel Use  ...8301

00005319

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

93.   Emergency Energy Conservation  ...8501
94.   Low-Income Energy Assistance  ...8601
95.   United States Synthetic Fuels Corporation [Omitted]  ...8701
96.   Biomass Energy and Alcohol Fuels  ...8801
97.   Acid Precipitation Program and Carbon Dioxide Study  ...8901
98.   Ocean Thermal Energy Conversion Research and Development  ...9001
99.   Ocean Thermal Energy Conversion  ...9101
100.  Wind Energy Systems  ...9201
101.  Magnetic Fusion Energy Engineering  ...9301
102.  Mental Health Systems  ...9401
103.  Comprehensive Environmental Response, Compensation, and Liability  ...9601
104.  Nuclear Safety Research, Development, and Demonstration  ...9701
105.  Community Services Programs  ...9801
106.  Community Services Block Grant Program  ...9901
107.  Consumer-Patient Radiation Health and Safety  ...10001
108.  Nuclear Waste Policy  ...10101
109.  Water Resources Research  ...10301
109A.  Membrane Processes Research  ...10341
109B.  Secure Water  ...10361
110.  Family Violence Prevention and Services  ...10401
111.  Emergency Federal Law Enforcement Assistance  ...10501
112.  Victim Compensation and Assistance  ...10601
113.  State Justice Institute  ...10701
114.  Protection and Advocacy for Individuals With Mental Illness  ...10801
115.  Child Development Associate Scholarship Assistance Program  ...10901
116.  Emergency Planning and Community Right-To-Know  ...11001
117.  Encouraging Good Faith Professional Review Activities  ...11101
118.  Alzheimer's Disease and Related Dementias Research  ...11201
119.  Homeless Assistance  ...11301
120.  Enterprise Zone Development  ...11501
121.  International Child Abduction Remedies  ...11601
122.  Native Hawaiian Health Care  ...11701
123.  Drug Abuse Education and Prevention  ...11801
124.  Public Housing Drug Elimination  ...11901
125.  Renewable Energy and Energy Efficiency Technology Competitiveness  ...12001
126.  Equal Opportunity for Individuals With Disabilities  ...12101
127.  Coordinated Services for Children, Youth, and Families  ...12301
128.  Hydrogen Research, Development, and Demonstration Program  ...12401
129.  National and Community Service  ...12501
130.  National Affordable Housing  ...12701
131.  Housing Opportunities for Persons With AIDS  ...12901
132.  Victims of Child Abuse  ...13001
133.  Pollution Prevention  ...13101
134.  Energy Policy  ...13201
135.  Residency and Service Requirements in Federally Assisted Housing  ...13601
136.  Violent Crime Control and Law Enforcement  ...13701
137.  Management of Rechargeable Batteries and Batteries Containing Mercury  ...14301
138.  Assisted Suicide Funding Restriction  ...14401
139.  Volunteer Protection  ...14501
140.  Criminal Justice Identification, Information, and Communication  ...14601
140A.  Jennifer's Law  ...14661
141.  Commercial Space Opportunities and Transportation Services [Repealed or Transferred]  ...14701
142.  Poison Control Center Enhancement and Awareness [Repealed]  ...14801
143.  Intercountry Adoptions  ...14901
144.  Developmental Disabilities Assistance and Bill of Rights  ...15001
145.  Public Safety Officer Medal of Valor and Tributes  ...15201
145A.  Law Enforcement Congressional Badge of Bravery  ...15231
146.  Election Administration Improvement  ...15301
147.  Prison Rape Elimination  ...15601
148.  Windstorm Impact Reduction  ...15701
149.  National Energy Policy and Programs  ...15801
150.  National Aeronautics and Space Programs, 2005 [Repealed, Omitted, or Transferred]  ...16601

00005320

*TITLE 42 - CHAPTER 61 UNIFORM RELOCATION*
*ASSISTANCE AND REAL PROPERTY ACQUISITION POLIC...*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

151.  Child Protection and Safety  ...16901
152.  Energy Independence and Security  ...17001
153.  Community Safety Through Recidivism Prevention  ...17501
154.  Combating Child Exploitation  ...17601
155.  Aeronautics and Space Activities [Repealed, Omitted, or Transferred]  ...17701
156.  Health Information Technology  ...17901
157.  Quality, Affordable Health Care for All Americans  ...18001
158.  Support for Pregnant and Parenting Teens and Women  ...18201
159.  Space Exploration, Technology, and Science  ...18301

00005321

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

# CHAPTER 61—UNIFORM RELOCATION ASSISTANCE AND REAL PROPERTY ACQUISITION POLICIES FOR FEDERAL AND FEDERALLY ASSISTED PROGRAMS

SUBCHAPTER I—GENERAL PROVISIONS

Sec.

4601.  Definitions.

4602.  Effect upon property acquisition.

4603.  Additional appropriations for moving costs, relocation benefits and other expenses incurred in acquisition of lands for National Park System; waiver of benefits.

4604.  Certification.

4605.  Displaced persons not eligible for assistance.

SUBCHAPTER II—UNIFORM RELOCATION ASSISTANCE

4621.  Declaration of findings and policy.

4622.  Moving and related expenses.

4623.  Replacement housing for homeowner; mortgage insurance.

4624.  Replacement housing for tenants and certain others.

4625.  Relocation planning, assistance coordination, and advisory services.

4626.  Housing replacement by Federal agency as last resort.

4627.  State required to furnish real property incident to Federal assistance (local cooperation).

4628.  State acting as agent for Federal program.

4629.  Public works programs and projects of District of Columbia government and Washington Metropolitan Area Transit Authority.

4630.  Requirements for relocation payments and assistance of federally assisted program; assurances of availability of housing.

4631.  Federal share of costs.

4632.  Administration; relocation assistance in programs receiving Federal financial assistance.

4633.  Duties of lead agency.

4634.  Repealed.

4635.  Planning and other preliminary expenses for additional housing.

4636.  Payments not to be considered as income for revenue purposes or for eligibility for assistance under Social Security Act or other Federal law.

4637.  Repealed.

4638.  Transfers of surplus property.

SUBCHAPTER III—UNIFORM REAL PROPERTY ACQUISITION POLICY

4651.  Uniform policy on real property acquisition practices.

4652.  Buildings, structures, and improvements.

4653.  Expenses incidental to transfer of title to United States.

4654.  Litigation expenses.

4655.  Requirements for uniform land acquisition policies; payments of expenses incidental to transfer of real property to State; payment of litigation expenses in certain cases.

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

## SUBCHAPTER I—GENERAL PROVISIONS

.....................................

### § 4601. Definitions

As used in this chapter—

**(1)** The term "Federal agency" means any department, agency, or instrumentality in the executive branch of the Government, any wholly owned Government corporation, the Architect of the Capitol, the Federal Reserve banks and branches thereof, and any person who has the authority to acquire property by eminent domain under Federal law.

**(2)** The term "State" means any of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, the Trust Territory of the Pacific Islands, and any political subdivision thereof.

**(3)** The term "State agency" means any department, agency, or instrumentality of a State or of a political subdivision of a State, any department, agency, or instrumentality of 2 or more States or of 2 or more political subdivisions of a State or States, and any person who has the authority to acquire property by eminent domain under State law.

**(4)** The term "Federal financial assistance" means a grant, loan, or contribution provided by the United States, except any Federal guarantee or insurance, any interest reduction payment to an individual in connection with the purchase and occupancy of a residence by that individual, and any annual payment or capital loan to the District of Columbia.

**(5)** The term "person" means any individual, partnership, corporation, or association.

**(6)** **(A)** The term "displaced person" means, except as provided in subparagraph (B)—

    **(i)** any person who moves from real property, or moves his personal property from real property—

        **(I)** as a direct result of a written notice of intent to acquire or the acquisition of such real property in whole or in part for a program or project undertaken by a Federal agency or with Federal financial assistance; or

        **(II)** on which such person is a residential tenant or conducts a small business, a farm operation, or a business defined in paragraph (7)(D), as a direct result of rehabilitation, demolition, or such other displacing activity as the lead agency may prescribe, under a program or project undertaken by a Federal agency or with Federal financial assistance in any case in which the head of the displacing agency determines that such displacement is permanent; and

    **(ii)** solely for the purposes of sections 4622 (a) and (b) and 4625 of this title, any person who moves from real property, or moves his personal property from real property—

        **(I)** as a direct result of a written notice of intent to acquire or the acquisition of other real property, in whole or in part, on which such person conducts a business or farm operation, for a program or project undertaken by a Federal agency or with Federal financial assistance; or

        **(II)** as a direct result of rehabilitation, demolition, or such other displacing activity as the lead agency may prescribe, of other real property on which such person conducts a business or a farm operation, under a program or project undertaken by a Federal agency or with Federal financial assistance where the head of the displacing agency determines that such displacement is permanent.

    **(B)** The term "displaced person" does not include—

        **(i)** a person who has been determined, according to criteria established by the head of the lead agency, to be either in unlawful occupancy of the displacement dwelling or to have occupied such dwelling for the purpose of obtaining assistance under this chapter;

00005323

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

    **(ii)** in any case in which the displacing agency acquires property for a program or project, any person (other than a person who was an occupant of such property at the time it was acquired) who occupies such property on a rental basis for a short term or a period subject to termination when the property is needed for the program or project.

**(7)** The term "business" means any lawful activity, excepting a farm operation, conducted primarily—

    **(A)** for the purchase, sale, lease and rental of personal and real property, and for the manufacture, processing, or marketing of products, commodities, or any other personal property;

    **(B)** for the sale of services to the public;

    **(C)** by a nonprofit organization; or

    **(D)** solely for the purposes of section 4622 of this title, for assisting in the purchase, sale, resale, manufacture, processing, or marketing of products, commodities, personal property, or services by the erection and maintenance of an outdoor advertising display or displays, whether or not such display or displays are located on the premises on which any of the above activities are conducted.

**(8)** The term "farm operation" means any activity conducted solely or primarily for the production of one or more agricultural products or commodities, including timber, for sale or home use, and customarily producing such products or commodities in sufficient quantity to be capable of contributing materially to the operator's support.

**(9)** The term "mortgage" means such classes of liens as are commonly given to secure advances on, or the unpaid purchase price of, real property, under the laws of the State in which the real property is located, together with the credit instruments, if any, secured thereby.

**(10)** The term "comparable replacement dwelling" means any dwelling that is

    **(A)** decent, safe, and sanitary;

    **(B)** adequate in size to accommodate the occupants;

    **(C)** within the financial means of the displaced person;

    **(D)** functionally equivalent;

    **(E)** in an area not subject to unreasonable adverse environmental conditions; and

    **(F)** in a location generally not less desirable than the location of the displaced person's dwelling with respect to public utilities, facilities, services, and the displaced person's place of employment.

**(11)** The term "displacing agency" means any Federal agency carrying out a program or project, and any State, State agency, or person carrying out a program or project with Federal financial assistance, which causes a person to be a displaced person.

**(12)** The term "lead agency" means the Department of Transportation.

**(13)** The term "appraisal" means a written statement independently and impartially prepared by a qualified appraiser setting forth an opinion of defined value of an adequately described property as of a specific date, supported by the presentation and analysis of relevant market information.

(Pub. L. 91–646, title I, § 101, Jan. 2, 1971, 84 Stat. 1894; Pub. L. 100–17, title IV, § 402, Apr. 2, 1987, 101 Stat. 246.)

### References in Text

This chapter, referred to in introductory provision and par. (6)(B)(i), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out below and Tables.

### Amendments

1987—Par. (1). Pub. L. 100–17, § 402(a), amended par. (1) generally. Prior to amendment, par. (1) read as follows: "The term 'Federal agency' means any department, agency, or instrumentality in the executive branch of the

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

Government (except the National Capital Housing Authority), any wholly owned Government corporation (except the District of Columbia Redevelopment Land Agency), and the Architect of the Capitol, the Federal Reserve banks and branches thereof."

Par. (3). Pub. L. 100–17, § 402(b), amended par. (3) generally. Prior to amendment, par. (3) read as follows: "The term 'State agency' means the National Capital Housing Authority, the District of Columbia Redevelopment Land Agency, and any department, agency, or instrumentality of a State or of a political subdivision of a State, or any department, agency, or instrumentality of two or more States or of two or more political subdivisions of a State or States."

Par. (4). Pub. L. 100–17, § 402(c), inserted ",  any interest reduction payment to an individual in connection with the purchase and occupancy of a residence by that individual," after "insurance".

Par. (6). Pub. L. 100–17, § 402(d), amended par. (6) generally. Prior to amendment, par. (6) read as follows: "The term 'displaced person' means any person who, on or after January 2, 1971, moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance; and solely for the purposes of sections 4622 (a) and (b) and 4625 of this title, as a result of the acquisition of or as the result of the written order of the acquiring agency to vacate other real property, on which such person conducts a business or farm operation, for such program or project."

Par. (7)(D). Pub. L. 100–17, § 402(f), substituted "section 4622" for "section 4622 (a)".

Pars. (10) to (13). Pub. L. 100–17, § 402(e), added pars. (10) to (13).

## Effective Date of 1987 Amendment

Section 418 of title IV of Pub. L. 100–17 provided that: "The amendment made by section 412 of this title [amending section 4633 of this title] (to the extent such amendment prescribes authority to develop, publish, and issue regulations) shall take effect on the date of the enactment of this title [Apr. 2, 1987]. This title and the amendments made by this title [enacting section 4604 of this title, amending this section and sections 4621 to 4626, 4630, 4631, 4633, 4636, 4638, 4651, and 4655 of this title, repealing sections 4634 and 4637 of this title, and enacting provisions set out as a note under this section] (other than the amendment made by section 412 to such extent) shall take effect on the effective date provided in such regulations but not later than 2 years after such date of enactment."

## Effective Date

Section 221 of Pub. L. 91–646 provided that:

"(a) Except as provided in subsections (b) and (c) of this section, this Act and the amendments made by this Act [see Short Title note below] shall take effect on the date of its enactment [Jan. 2, 1971].

"(b) Until July 1, 1972, sections 210 and 305 [sections 4630 and 4655 of this title] shall be applicable to a State only to the extent that such State is able under its laws to comply with such sections. After July 1, 1972, such sections [sections 4630 and 4655 of this title] shall be completely applicable to all States.

"(c) The repeals made by paragraphs (4) [repealing section 1606(b) of former Title 49, Transportation], (5) [repealing section 1465 of this title], (6) [repealing section 1415 (7)(b)(iii) and (8) second sentence of this title], (8) [repealing section 3074 of this title], (9) [repealing section 3307 (b), (c) of this title], (10) [repealing chapter 5 (sections 501–511) of Title 23, Highways], (11) [repealing provisions set out as notes under sections 501 and 510 of Title 23], and (12) of section 220 (a) of this title and section 306 of title III [repealing sections 3071 to 3073 of this title, section 141 of Title 23, and section 596 of Title 33, Navigation and Navigable Waters] shall not apply to any State so long as sections 210 and 305 [sections 4630 and 4655 of this title] are not applicable in such State."

## Short Title of 1987 Amendment

Section 401 of title IV of Pub. L. 100–17 provided that: "This title [enacting section 4604 of this title, amending this section and sections 4621 to 4626, 4630, 4631, 4633, 4636, 4638, 4651, and 4655 of this title, repealing sections 4634 and 4637 of this title, and enacting provisions set out as a note under this section] may be cited as the 'Uniform Relocation Act Amendments of 1987'."

## Short Title

Section 1 of Pub. L. 91–646 provided that: "That this Act [enacting this chapter, amending sections 1415, 2473, and 3307 of this title and section 1606 of former Title 49, Transportation, repealing sections 1465 and 3071 to 3074 of this title, section 2680 of Title 10, Armed Forces, sections 141 and 501 to 512 of Title 23, Highways, section 596 of Title 33, Navigation and Navigable Waters, sections 1231 to 1234 of Title 43, Public Lands, and enacting provisions set out as notes under this section and sections 4621 and 4651 of this title, and repealing provisions set out as notes under

00005325

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

sections 501 and 510 of Title 23] may be cited as the 'Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970'.' "

## Termination of Trust Territory of the Pacific Islands

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

## Willing Sellers Considered Displaced Persons

Pub. L. 111–8, div. E, title I, Mar. 11, 2009, 123 Stat. 710, provided that: "For fiscal year 2009 and hereafter, a willing seller from whom the Service acquires title to real property may be considered a 'displaced person' for purposes of the Uniform Relocation Assistance and Real Property Acquisition Policy Act [probably means the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. 4601 et seq.] and its implementing regulations, whether or not the Service has the authority to acquire such property by eminent domain."

## Treatment of Real Property Buyout Programs

Pub. L. 103–181, § 4, Dec. 3, 1993, 107 Stat. 2055, provided that:

"(a) Inapplicability of URA.—The purchase of any real property under a qualified buyout program shall not constitute the making of Federal financial assistance available to pay all or part of the cost of a program or project resulting in the acquisition of real property or in any owner of real property being a displaced person (within the meaning of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 [42 U.S.C. 4601 et seq.]).

"(b) Definition of 'Qualified Buyout Program'.—For purposes of this section, the term 'qualified buyout program' means any program that—

"(1) provides for the purchase of only property damaged by the major, widespread flooding in the Midwest during 1993;

"(2) provides for such purchase solely as a result of such flooding;

"(3) provides for such acquisition without the use of the power of eminent domain and notification to the seller that acquisition is without the use of such power;

"(4) is carried out by or through a State or unit of general local government; and

"(5) is being assisted with amounts made available for—

"(A) disaster relief by the Federal Emergency Management Agency; or

"(B) other Federal financial assistance programs."

[For transfer of all functions, personnel, assets, components, authorities, grant programs, and liabilities of the Federal Emergency Management Agency, including the functions of the Under Secretary for Federal Emergency Management relating thereto, to the Federal Emergency Management Agency, see section 315 (a)(1) of Title 6, Domestic Security.]

[For transfer of functions, personnel, assets, and liabilities of the Federal Emergency Management Agency, including the functions of the Director of the Federal Emergency Management Agency relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see former section 313 (1) and sections 551 (d), 552 (d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.]

....................................

## § 4602. Effect upon property acquisition

(a)  The provisions of section 4651 of this title create no rights or liabilities and shall not affect the validity of any property acquisitions by purchase or condemnation.

(b)  Nothing in this chapter shall be construed as creating in any condemnation proceedings brought under the power of eminent domain, any element of value or of damage not in existence immediately prior to January 2, 1971.

(Pub. L. 91–646, title I, § 102, Jan. 2, 1971, 84 Stat. 1895.)

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

### References in Text

This chapter, referred to in subsec. (b), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

....................................

## § 4603. Additional appropriations for moving costs, relocation benefits and other expenses incurred in acquisition of lands for National Park System; waiver of benefits

**(a)**  In all instances where authorizations of appropriations for the acquisition of lands for the National Park System enacted prior to January 9, 1971, do not include provisions therefor, there are authorized to be appropriated such additional sums as may be necessary to provide for moving costs, relocation benefits, and other expenses incurred pursuant to the applicable provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Public Law 91–646; 84 Stat. 1894). There are also authorized to be appropriated not to exceed $8,400,000 in addition to those authorized in Public Law 92–272 (86 Stat. 120) to provide for such moving costs, relocation benefits, and other related expenses in connection with the acquisition of lands authorized by Public Law 92–272.

**(b)**  Whenever an owner of property elects to retain a right of use and occupancy pursuant to any statute authorizing the acquisition of property for purposes of a unit of the National Park System, such owner shall be deemed to have waived any benefits under sections 4623, 4624, 4625, and 4626 of this title, and for the purposes of those sections such owner shall not be considered a displaced person as defined in section 4601 (6) of this title.

(Pub. L. 93–477, title IV, § 405, Oct. 26, 1974, 88 Stat. 1448.)

### References in Text

The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, referred to in subsec. (a), is Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

Public Law 92–272, referred to in subsec. (a), is Pub. L. 92–272, Apr. 11, 1972, 86 Stat. 120, which to the extent classified to the Code, amended sections 284b, 428m, 459f–10, 460m–1, 460m–7 and 460t–4 of Title 16, Conservation, and amended a provision set out as a note under section 450ll of Title 16. For complete classification of this Act to the Code, see Tables.

### Codification

Section was not enacted as part of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 which comprises this chapter.

....................................

## § 4604. Certification

**(a)  Acceptance of State agency certification**

Notwithstanding sections 4630 and 4655 of this title, the head of a Federal agency may discharge any of his responsibilities under this chapter by accepting a certification by a State agency that it will carry out such responsibility, if the head of the lead agency determines that such responsibility will be carried out in accordance with State laws which will accomplish the purpose and effect of this chapter.

**(b)  Promulgation of regulations; notice and comment; consultation with local governments**

**(1)**  The head of the lead agency shall issue regulations to carry out this section.

**(2)**  Repealed. Pub. L. 104–66, title I, § 1121(f), Dec. 21, 1995, 109 Stat. 724.

**(3)**  Before making a determination regarding any State law under subsection (a) of this section, the head of the lead agency shall provide interested parties with an opportunity for public review

00005327

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

and comment. In particular, the head of the lead agency shall consult with interested local general purpose governments within the State on the effects of such State law on the ability of local governments to carry out their responsibilities under this chapter.

**(c)  Effect of noncompliance with certification or with applicable law**

**(1)**  The head of a Federal agency may withhold his approval of any Federal financial assistance to or contract or cooperative agreement with any displacing agency found by the Federal agency to have failed to comply with the laws described in subsection (a) of this section.

**(2)**  After consultation with the head of the lead agency, the head of a Federal agency may rescind his acceptance of any certification under this section, in whole or in part, if the State agency fails to comply with such certification or with State law.

(Pub. L. 91–646, title I, § 103, as added Pub. L. 100–17, title IV, § 403, Apr. 2, 1987, 101 Stat. 248; amended Pub. L. 104–66, title I, § 1121(f), Dec. 21, 1995, 109 Stat. 724.)

### References in Text

This chapter, referred to in subsecs. (a) and (b)(3), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

### Amendments

1995—Subsec. (b)(2). Pub. L. 104–66 struck out par. (2) which read as follows: "The head of the lead agency shall, in coordination with other Federal agencies, monitor from time to time, and report biennially to the Congress on, State agency implementation of this section. A State agency shall make available any information required for such purpose."

### Effective Date

Section effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as an Effective Date of 1987 Amendment note under section 4601 of this title.

.....................................

## § 4605. Displaced persons not eligible for assistance

**(a)  In general**

Except as provided in subsection (c) of this section, a displaced person shall not be eligible to receive relocation payments or any other assistance under this chapter if the displaced person is an alien not lawfully present in the United States.

**(b)  Determinations of eligibility**

**(1)  Promulgation of regulations**

Not later than 1 year after November 21, 1997, after providing notice and an opportunity for public comment, the head of the lead agency shall promulgate regulations to carry out subsection (a) of this section.

**(2)  Contents of regulations**

Regulations promulgated under paragraph (1) shall—

**(A)**  prescribe the processes, procedures, and information that a displacing agency must use in determining whether a displaced person is an alien not lawfully present in the United States;

**(B)**  prohibit a displacing agency from discriminating against any displaced person;

**(C)**  ensure that each eligibility determination is fair and based on reliable information; and

**(D)**  prescribe standards for a displacing agency to apply in making determinations relating to exceptional and extremely unusual hardship under subsection (c) of this section.

00005328

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

**(c)  Exceptional and extremely unusual hardship**

If a displacing agency determines by clear and convincing evidence that a determination of the ineligibility of a displaced person under subsection (a) of this section would result in exceptional and extremely unusual hardship to an individual who is the displaced person's spouse, parent, or child and who is a citizen of the United States or an alien lawfully admitted for permanent residence in the United States, the displacing agency shall provide relocation payments and other assistance to the displaced person under this chapter if the displaced person would be eligible for the assistance but for subsection (a) of this section.

**(d)  Limitation on statutory construction**

Nothing in this section affects any right available to a displaced person under any other provision of Federal or State law.

(Pub. L. 91–646, title I, § 104, as added Pub. L. 105–117, § 1, Nov. 21, 1997, 111 Stat. 2384.)

### References in Text

This chapter, referred to in subsecs. (a) and (c), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscprint.html).*

## SUBCHAPTER II—UNIFORM RELOCATION ASSISTANCE

.....................................

### § 4621. Declaration of findings and policy

#### (a) Findings

The Congress finds and declares that—

(1) displacement as a direct result of programs or projects undertaken by a Federal agency or with Federal financial assistance is caused by a number of activities, including rehabilitation, demolition, code enforcement, and acquisition;

(2) relocation assistance policies must provide for fair, uniform, and equitable treatment of all affected persons;

(3) the displacement of businesses often results in their closure;

(4) minimizing the adverse impact of displacement is essential to maintaining the economic and social well-being of communities; and

(5) implementation of this chapter has resulted in burdensome, inefficient, and inconsistent compliance requirements and procedures which will be improved by establishing a lead agency and allowing for State certification and implementation.

#### (b) Policy

This subchapter establishes a uniform policy for the fair and equitable treatment of persons displaced as a direct result of programs or projects undertaken by a Federal agency or with Federal financial assistance. The primary purpose of this subchapter is to ensure that such persons shall not suffer disproportionate injuries as a result of programs and projects designed for the benefit of the public as a whole and to minimize the hardship of displacement on such persons.

#### (c) Congressional intent

It is the intent of Congress that—

(1) Federal agencies shall carry out this subchapter in a manner which minimizes waste, fraud, and mismanagement and reduces unnecessary administrative costs borne by States and State agencies in providing relocation assistance;

(2) uniform procedures for the administration of relocation assistance shall, to the maximum extent feasible, assure that the unique circumstances of any displaced person are taken into account and that persons in essentially similar circumstances are accorded equal treatment under this chapter;

(3) the improvement of housing conditions of economically disadvantaged persons under this subchapter shall be undertaken, to the maximum extent feasible, in coordination with existing Federal, State, and local governmental programs for accomplishing such goals; and

(4) the policies and procedures of this chapter will be administered in a manner which is consistent with fair housing requirements and which assures all persons their rights under title VIII of the Act of April 11, 1968 (Public Law 90–284), commonly known as the Civil Rights Act of 1968 [42 U.S.C. 3601 et seq.], and title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.].

(Pub. L. 91–646, title II, § 201, Jan. 2, 1971, 84 Stat. 1895; Pub. L. 100–17, title IV, § 404, Apr. 2, 1987, 101 Stat. 248.)

### References in Text

This chapter, referred to in subsecs. (a)(5) and (c)(2), (4), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

00005330

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

This subchapter, referred to in subsecs. (b) and (c)(1), (3), was in the original "this title", meaning title II of Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1895, which is classified principally to this subchapter. For complete classification of title II to the Code, see Tables.

Title VIII of the Act of April 11, 1968 (Public Law 90–284), commonly known as the Civil Rights Act of 1968, referred to in subsec. (c)(4), is title VIII of Pub. L. 90–284, Apr. 11, 1968, 82 Stat. 81, known as the Fair Housing Act, which is classified principally to subchapter I (§ 3601 et seq.) of chapter 45 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 3601 of this title and Tables.

The Civil Rights Act of 1964, referred to in subsec. (c)(4), is Pub. L. 88–352, July 2, 1964, 78 Stat. 241. Title VI of the Civil Rights Act of 1964 is classified generally to subchapter V (§ 2000d et seq.) of chapter 21 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2000a of this title and Tables.

## Amendments

1987—Pub. L. 100–17 substituted "Declaration of findings and policy" for "Declaration of policy" in section catchline and amended text generally. Prior to amendment, text read as follows: "The purpose of this subchapter is to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole."

## Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

## Savings Provision

Section 220(b) of Pub. L. 91–646 provided that: "Any rights or liabilities now existing under prior Acts or portions thereof shall not be affected by the repeal of such prior Acts or portions thereof under subsection (a) of this section [repealing sections 1415 (7)(b)(iii), (8) second sentence, 1465, 2473(b)(14), 3074, and 3307(b), (c) of this title, section 2680 of Title 10, Armed Forces, sections 501 to 512 of Title 23, Highways, sections 1231 to 1234 of Title 43, Public Lands, and section 1606(b) of former Title 49, Transportation, and provisions set out as notes under sections 501 and 511 of Title 23]."

...................................

## § 4622. Moving and related expenses

### (a)  General provision

Whenever a program or project to be undertaken by a displacing agency will result in the displacement of any person, the head of the displacing agency shall provide for the payment to the displaced person of—

> **(1)**  actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property;
>
> **(2)**  actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation, but not to exceed an amount equal to the reasonable expenses that would have been required to relocate such property, as determined by the head of the agency;
>
> **(3)**  actual reasonable expenses in searching for a replacement business or farm; and
>
> **(4)**  actual reasonable expenses necessary to reestablish a displaced farm, nonprofit organization, or small business at its new site, but not to exceed $10,000.

### (b)  Displacement from dwelling; election of payments: expense and dislocation allowance

Any displaced person eligible for payments under subsection (a) of this section who is displaced from a dwelling and who elects to accept the payments authorized by this subsection in lieu of the payments authorized by subsection (a) of this section may receive an expense and dislocation allowance, which shall be determined according to a schedule established by the head of the lead agency.

### (c)  Displacement from business or farm operation; election of payments; minimum and maximum amounts; eligibility

00005331

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

Any displaced person eligible for payments under subsection (a) of this section who is displaced from the person's place of business or farm operation and who is eligible under criteria established by the head of the lead agency may elect to accept the payment authorized by this subsection in lieu of the payment authorized by subsection (a) of this section. Such payment shall consist of a fixed payment in an amount to be determined according to criteria established by the head of the lead agency, except that such payment shall not be less than $1,000 nor more than $20,000. A person whose sole business at the displacement dwelling is the rental of such property to others shall not qualify for a payment under this subsection.

**(d)  Certain utility relocation expenses**

    **(1)**  Except as otherwise provided by Federal law—

        **(A)**  if a program or project

            **(i)**  which is undertaken by a displacing agency, and

            **(ii)**  the purpose of which is not to relocate or reconstruct any utility facility, results in the relocation of a utility facility;

        **(B)**  if the owner of the utility facility which is being relocated under such program or project has entered into, with the State or local government on whose property, easement, or right-of-way such facility is located, a franchise or similar agreement with respect to the use of such property, easement, or right-of-way; and

        **(C)**  if the relocation of such facility results in such owner incurring an extraordinary cost in connection with such relocation;

the displacing agency may, in accordance with such regulations as the head of the lead agency may issue, provide to such owner a relocation payment which may not exceed the amount of such extraordinary cost (less any increase in the value of the new utility facility above the value of the old utility facility and less any salvage value derived from the old utility facility).

    **(2)**  For purposes of this subsection, the term—

        **(A)**  "extraordinary cost in connection with a relocation" means any cost incurred by the owner of a utility facility in connection with relocation of such facility which is determined by the head of the displacing agency, under such regulations as the head of the lead agency shall issue—

            **(i)**  to be a non-routine relocation expense;

            **(ii)**  to be a cost such owner ordinarily does not include in its annual budget as an expense of operation; and

            **(iii)**  to meet such other requirements as the lead agency may prescribe in such regulations; and

        **(B)**  "utility facility" means—

            **(i)**  any electric, gas, water, steam power, or materials transmission or distribution system;

            **(ii)**  any transportation system;

            **(iii)**  any communications system (including cable television); and

            **(iv)**  any fixtures, equipment, or other property associated with the operation, maintenance, or repair of any such system;

located on property which is owned by a State or local government or over which a State or local government has an easement or right-of-way. A utility facility may be publicly, privately, or cooperatively owned.

(Pub. L. 91–646, title II, § 202, Jan. 2, 1971, 84 Stat. 1895; Pub. L. 100–17, title IV, § 405, Apr. 2, 1987, 101 Stat. 249.)

00005332

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

## Amendments

1987—Subsec. (a). Pub. L. 100–17, § 405(a)(1), inserted introductory provisions and struck out former introductory provisions which read as follows: "Whenever the acquisition of real property for a program or project undertaken by a Federal agency in any State will result in the displacement of any person on or after January 2, 1971, the head of such agency shall make a payment to any displaced person, upon proper application as approved by such agency head, for—".

Subsec. (a)(4). Pub. L. 100–17, § 405(a)(2)–(4), added par. (4).

Subsec. (b). Pub. L. 100–17, § 405(b), substituted "an expense and dislocation allowance, which shall be determined according to a schedule established by the head of the lead agency" for "a moving expense allowance, determined according to a schedule established by the head of the Federal agency, not to exceed $300; and a dislocation allowance of $200".

Subsec. (c). Pub. L. 100–17, § 405(c), amended subsec. (c) generally. Prior to amendment, subsec. (c) read as follows: "Any displaced person eligible for payments under subsection (a) of this section who is displaced from his place of business or from his farm operation and who elects to accept the payment authorized by this subsection in lieu of the payment authorized by subsection (a) of this section, may receive a fixed payment in an amount equal to the average annual net earnings of the business or farm operation, except that such payment shall be not less than $2,500 nor more than $10,000. In the case of a business no payment shall be made under this subsection unless the head of the Federal agency is satisfied that the business (1) cannot be relocated without a substantial loss of its existing patronage, and (2) is not a part of a commercial enterprise having at least one other establishment not being acquired by the United States, which is engaged in the same or similar business. For purposes of this subsection, the term 'average annual net earnings' means one-half of any net earnings of the business or farm operation, before Federal, State, and local income taxes, during the two taxable years immediately preceding the taxable year in which such business or farm operation moves from the real property acquired for such project, or during such other period as the head of such agency determines to be more equitable for establishing such earnings, and includes any compensation paid by the business or farm operation to the owner, his spouse, or his dependents during such period."

Subsec. (d). Pub. L. 100–17, § 405(d), added subsec. (d).

## Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

...................................

## § 4623. Replacement housing for homeowner; mortgage insurance

(a) **(1)** In addition to payments otherwise authorized by this subchapter, the head of the displacing agency shall make an additional payment not in excess of $22,500 to any displaced person who is displaced from a dwelling actually owned and occupied by such displaced person for not less than one hundred and eighty days prior to the initiation of negotiations for the acquisition of the property. Such additional payment shall include the following elements:

  **(A)** The amount, if any, which when added to the acquisition cost of the dwelling acquired by the displacing agency, equals the reasonable cost of a comparable replacement dwelling.

  **(B)** The amount, if any, which will compensate such displaced person for any increased interest costs and other debt service costs which such person is required to pay for financing the acquisition of any such comparable replacement dwelling. Such amount shall be paid only if the dwelling acquired by the displacing agency was encumbered by a bona fide mortgage which was a valid lien on such dwelling for not less than 180 days immediately prior to the initiation of negotiations for the acquisition of such dwelling.

  **(C)** Reasonable expenses incurred by such displaced person for evidence of title, recording fees, and other closing costs incident to the purchase of the replacement dwelling, but not including prepaid expenses.

**(2)** The additional payment authorized by this section shall be made only to a displaced person who purchases and occupies a decent, safe, and sanitary replacement dwelling within 1 year after

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

the date on which such person receives final payment from the displacing agency for the acquired dwelling or the date on which the displacing agency's obligation under section 4625 (c)(3) of this title is met, whichever is later, except that the displacing agency may extend such period for good cause. If such period is extended, the payment under this section shall be based on the costs of relocating the person to a comparable replacement dwelling within 1 year of such date.

**(b)**   The head of any Federal agency may, upon application by a mortgagee, insure any mortgage (including advances during construction) on a comparable replacement dwelling executed by a displaced person assisted under this section, which mortgage is eligible for insurance under any Federal law administered by such agency notwithstanding any requirements under such law relating to age, physical condition, or other personal characteristics of eligible mortgagors, and may make commitments for the insurance of such mortgage prior to the date of execution of the mortgage.

(Pub. L. 91–646, title II, § 203, Jan. 2, 1971, 84 Stat. 1896; Pub. L. 100–17, title IV, § 406, Apr. 2, 1987, 101 Stat. 251.)

### Amendments

1987—Subsec. (a)(1). Pub. L. 100–17, § 406(1)–(3), substituted "displacing agency" for "Federal agency" and "$22,500" for "$15,000" in introductory provisions, and in subpar. (A) "acquired by the displacing agency, equals the reasonable cost of a comparable replacement dwelling" for "acquired by the Federal agency, equals the reasonable cost of a comparable replacement dwelling which is a decent, safe, and sanitary dwelling adequate to accommodate such displaced person, reasonably accessible to public services and places of employment and available on the private market. All determinations required to carry out this subparagraph shall be made in accordance with standards established by the head of the Federal agency making the additional payment".

Subsec. (a)(1)(B). Pub. L. 100–17, § 406(4), added subpar. (B) and struck out former subpar. (B) which read as follows: "The amount, if any, which will compensate such displaced person for any increased interest costs which such person is required to pay for financing the acquisition of any such comparable replacement dwelling. Such amount shall be paid only if the dwelling acquired by the Federal agency was encumbered by a bona fide mortgage which was a valid lien on such dwelling for not less than one hundred and eighty days prior to the initiation of negotiations for the acquisition of such dwelling. Such amount shall be equal to the excess in the aggregate interest and other debt service costs of that amount of the principal of the mortgage on the replacement dwelling which is equal to the unpaid balance of the mortgage on the acquired dwelling, over the remainder term of the mortgage on the acquired dwelling, reduced to discounted present value. The discount rate shall be the prevailing interest rate paid on savings deposits by commercial banks in the general area in which the replacement dwelling is located."

Subsec. (a)(2). Pub. L. 100–17, § 406(5), added par. (2) and struck out former par. (2) which read as follows: "The additional payment authorized by this subsection shall be made only to such a displaced person who purchases and occupies a replacement dwelling which is decent, safe, and sanitary not later than the end of the one year period beginning on the date on which he receives from the Federal agency final payment of all costs of the acquired dwelling, or on the date on which he moves from the acquired dwelling, whichever is the later date."

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

.....................................

## § 4624. Replacement housing for tenants and certain others

**(a)**   In addition to amounts otherwise authorized by this subchapter, the head of a displacing agency shall make a payment to or for any displaced person displaced from any dwelling not eligible to receive a payment under section 4623 of this title which dwelling was actually and lawfully occupied by such displaced person for not less than 90 days immediately prior to

  **(1)**   the initiation of negotiations for acquisition of such dwelling, or

  **(2)**   in any case in which displacement is not a direct result of acquisition, such other event as the head of the lead agency shall prescribe. Such payment shall consist of the amount necessary to enable such person to lease or rent for a period not to exceed 42 months, a comparable replacement

00005334

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

dwelling, but not to exceed $5,250. At the discretion of the head of the displacing agency, a payment under this subsection may be made in periodic installments. Computation of a payment under this subsection to a low-income displaced person for a comparable replacement dwelling shall take into account such person's income.

**(b)** Any person eligible for a payment under subsection (a) of this section may elect to apply such payment to a down payment on, and other incidental expenses pursuant to, the purchase of a decent, safe, and sanitary replacement dwelling. Any such person may, at the discretion of the head of the displacing agency, be eligible under this subsection for the maximum payment allowed under subsection (a) of this section, except that, in the case of a displaced homeowner who has owned and occupied the displacement dwelling for at least 90 days but not more than 180 days immediately prior to the initiation of negotiations for the acquisition of such dwelling, such payment shall not exceed the payment such person would otherwise have received under section 4623 (a) of this title had the person owned and occupied the displacement dwelling 180 days immediately prior to the initiation of such negotiations.

(Pub. L. 91–646, title II, § 204, Jan. 2, 1971, 84 Stat. 1897; Pub. L. 100–17, title IV, § 407, Apr. 2, 1987, 101 Stat. 251.)

### Amendments

1987—Pub. L. 100–17 amended section generally, revising and restating as subsecs. (a) and (b) provisions formerly contained in introductory provisions and in pars. (1) and (2).

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

.....................................

## § 4625. Relocation planning, assistance coordination, and advisory services

**(a)  Planning of programs or projects undertaken by Federal agencies or with Federal financial assistance**

Programs or projects undertaken by a Federal agency or with Federal financial assistance shall be planned in a manner that

**(1)**   recognizes, at an early stage in the planning of such programs or projects and before the commencement of any actions which will cause displacements, the problems associated with the displacement of individuals, families, businesses, and farm operations, and

**(2)**   provides for the resolution of such problems in order to minimize adverse impacts on displaced persons and to expedite program or project advancement and completion.

**(b)  Availability of advisory services**

The head of any displacing agency shall ensure that the relocation assistance advisory services described in subsection (c) of this section are made available to all persons displaced by such agency. If such agency head determines that any person occupying property immediately adjacent to the property where the displacing activity occurs is caused substantial economic injury as a result thereof, the agency head may make available to such person such advisory services.

**(c)  Measures, facilities, or services; description**

Each relocation assistance advisory program required by subsection (b) of this section shall include such measures, facilities, or services as may be necessary or appropriate in order to—

**(1)**   determine, and make timely recommendations on, the needs and preferences, if any, of displaced persons for relocation assistance;

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

**(2)** provide current and continuing information on the availability, sales prices, and rental charges of comparable replacement dwellings for displaced homeowners and tenants and suitable locations for businesses and farm operations;

**(3)** assure that a person shall not be required to move from a dwelling unless the person has had a reasonable opportunity to relocate to a comparable replacement dwelling, except in the case of—

    **(A)** a major disaster as defined in section 5122 (2) of this title;

    **(B)** a national emergency declared by the President; or

    **(C)** any other emergency which requires the person to move immediately from the dwelling because continued occupancy of such dwelling by such person constitutes a substantial danger to the health or safety of such person;

**(4)** assist a person displaced from a business or farm operation in obtaining and becoming established in a suitable replacement location;

**(5)** supply

    **(A)** information concerning other Federal and State programs which may be of assistance to displaced persons, and

    **(B)** technical assistance to such persons in applying for assistance under such programs; and

**(6)** provide other advisory services to displaced persons in order to minimize hardships to such persons in adjusting to relocation.

**(d)  Coordination of relocation activities with other Federal, State, or local governmental actions**

The head of a displacing agency shall coordinate the relocation activities performed by such agency with other Federal, State, or local governmental actions in the community which could affect the efficient and effective delivery of relocation assistance and related services.

**(e)  Selection of implementation procedures**

Whenever two or more Federal agencies provide financial assistance to a displacing agency other than a Federal agency, to implement functionally or geographically related activities which will result in the displacement of a person, the heads of such Federal agencies may agree that the procedures of one of such agencies shall be utilized to implement this subchapter with respect to such activities. If such agreement cannot be reached, then the head of the lead agency shall designate one of such agencies as the agency whose procedures shall be utilized to implement this subchapter with respect to such activities. Such related activities shall constitute a single program or project for purposes of this chapter.

**(f)  Tenants occupying property acquired for programs or projects; eligibility for advisory services**

Notwithstanding section 4601 (1) of this title, in any case in which a displacing agency acquires property for a program or project, any person who occupies such property on a rental basis for a short term or a period subject to termination when the property is needed for the program or project shall be eligible for advisory services to the extent determined by the displacing agency.

(Pub. L. 91–646, title II, § 205, Jan. 2, 1971, 84 Stat. 1897; Pub. L. 100–17, title IV, § 408, Apr. 2, 1987, 101 Stat. 252.)

### References in Text

This chapter, referred to in subsec. (e), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

00005336

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

## Amendments

1987—Pub. L. 100–17, substituted "Relocation planning, assistance coordination, and advisory services" for "Relocation assistance advisory services" in catchline and amended text generally, revising and restating as subsecs. (a) to (f) provisions formerly contained in subsecs. (a) to (d).

## Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

....................................

# § 4626. Housing replacement by Federal agency as last resort

**(a)**  If a program or project undertaken by a Federal agency or with Federal financial assistance cannot proceed on a timely basis because comparable replacement dwellings are not available, and the head of the displacing agency determines that such dwellings cannot otherwise be made available, the head of the displacing agency may take such action as is necessary or appropriate to provide such dwellings by use of funds authorized for such project. The head of the displacing agency may use this section to exceed the maximum amounts which may be paid under sections 4623 and 4624 of this title on a case-by-case basis for good cause as determined in accordance with such regulations as the head of the lead agency shall issue.

**(b)**  No person shall be required to move from his dwelling on account of any program or project undertaken by a Federal agency or with Federal financial assistance, unless the head of the displacing agency is satisfied that comparable replacement housing is available to such person.

(Pub. L. 91–646, title II, § 206, Jan. 2, 1971, 84 Stat. 1898; Pub. L. 100–17, title IV, § 409, Apr. 2, 1987, 101 Stat. 253.)

## Amendments

1987—Subsec. (a). Pub. L. 100–17 amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: "If a Federal project cannot proceed to actual construction because comparable replacement sale or rental housing is not available, and the head of the Federal agency determines that such housing cannot otherwise be made available he may take such action as is necessary or appropriate to provide such housing by use of funds authorized for such project."

Subsec. (b). Pub. L. 100–17 amended subsec. (b) generally. Prior to amendment, subsec. (b) read as follows: "No person shall be required to move from his dwelling on or after January 2, 1971, on account of any Federal project, unless the Federal agency head is satisfied that replacement housing, in accordance with section 4625 (c)(3) of this title, is available to such person."

## Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

....................................

# § 4627. State required to furnish real property incident to Federal assistance (local cooperation)

Whenever real property is acquired by a State agency and furnished as a required contribution incident to a Federal program or project, the Federal agency having authority over the program or project may not accept such property unless such State agency has made all payments and provided all assistance and assurances, as are required of a State agency by sections 4630 and 4655 of this title. Such State agency shall pay the cost of such requirements in the same manner and to the same extent as the real property acquired for such project, except that in the case of any real property

Case 8:22-cv-02597-DKC   Document 58-3   Filed 10/30/23   Page 82 of 133
*TITLE 42 - Section 4628 - State acting as agent for Federal program*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

acquisition or displacement occurring prior to July 1, 1972, such Federal agency shall pay 100 per centum of the first $25,000 of the cost of providing such payments and assistance.

(Pub. L. 91–646, title II, § 207, Jan. 2, 1971, 84 Stat. 1898.)

......................................

## § 4628. State acting as agent for Federal program

Whenever real property is acquired by a State agency at the request of a Federal agency for a Federal program or project, such acquisition shall, for the purposes of this chapter, be deemed an acquisition by the Federal agency having authority over such program or project.

(Pub. L. 91–646, title II, § 208, Jan. 2, 1971, 84 Stat. 1899.)

### References in Text

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

......................................

## § 4629. Public works programs and projects of District of Columbia government and Washington Metropolitan Area Transit Authority

Whenever real property is acquired by the government of the District of Columbia or the Washington Metropolitan Area Transit Authority for a program or project which is not subject to sections 4630 and 4631 of this title, and such acquisition will result in the displacement of any person on or after January 2, 1971, the Mayor of the District of Columbia or the Washington Metropolitan Area Transit Authority, as the case may be, shall make all relocation payments and provide all assistance required of a Federal agency by this chapter. Whenever real property is acquired for such a program or project on or after such effective date, such Mayor or Authority, as the case may be, shall make all payments and meet all requirements prescribed for a Federal agency by subchapter III of this chapter.

(Pub. L. 91–646, title II, § 209, Jan. 2, 1971, 84 Stat. 1899; Pub. L. 93–198, title IV, § 421, Dec. 24, 1973, 87 Stat. 789.)

### References in Text

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

Subchapter III of this chapter, referred to in text, was in the original "title III of this Act", meaning title III of Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1904, which enacted subchapter III of this chapter, repealed sections 3071 to 3073 of this title, section 141 of Title 23, Highways, and section 596 of Title 33, Navigation and Navigable Waters, and enacted provisions set out as a note under section 4651 of this title. For complete classification of title III to the Code, see Tables.

### Transfer of Functions

"Mayor" substituted for "Commissioner" pursuant to section 421 of Pub. L. 93–198. Office of Commissioner of District of Columbia, as established by Reorg. Plan No. 3 of 1967, abolished as of noon Jan. 2, 1975, by Pub. L. 93–198, title VII, § 711, Dec. 24, 1973, 87 Stat. 818, and replaced by Office of Mayor of District of Columbia by section 421 of Pub. L. 93–198.

00005338

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

......................................

## § 4630. Requirements for relocation payments and assistance of federally assisted program; assurances of availability of housing

Notwithstanding any other law, the head of a Federal agency shall not approve any grant to, or contract or agreement with, a displacing agency (other than a Federal agency), under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the displacement of any person on or after January 2, 1971, unless he receives satisfactory assurances from such displacing agency that—

    **(1)** fair and reasonable relocation payments and assistance shall be provided to or for displaced persons, as are required to be provided by a Federal agency under sections 4622, 4623, and 4624 of this title;

    **(2)** relocation assistance programs offering the services described in section 4625 of this title shall be provided to such displaced persons;

    **(3)** within a reasonable period of time prior to displacement, comparable replacement dwellings will be available to displaced persons in accordance with section 4625 (c)(3) of this title.

(Pub. L. 91–646, title II, § 210, Jan. 2, 1971, 84 Stat. 1899; Pub. L. 100–17, title IV, § 410, Apr. 2, 1987, 101 Stat. 254.)

### Amendments

1987—Pub. L. 100–17 in introductory provisions substituted "displacing agency (other than a Federal agency)" for "State agency" and "assurances from such displacing agency" for "assurances from such State agency", and in par. (3) substituted "comparable replacement dwellings" for "decent, safe, and sanitary replacement dwellings".

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

### Effective Date

Section as completely applicable to all States after July 1, 1972, but until such date applicable to a State to extent the State is able under its laws to comply with this section, see section 221(b) of Pub. L. 91–646, set out as a note under section 4601 of this title.

......................................

## § 4631. Federal share of costs

    **(a)  Cost to displacing agency; eligibility**

The cost to a displacing agency of providing payments and assistance under this subchapter and subchapter III of this chapter shall be included as part of the cost of a program or project undertaken by a Federal agency or with Federal financial assistance. A displacing agency, other than a Federal agency, shall be eligible for Federal financial assistance with respect to such payments and assistance in the same manner and to the same extent as other program or project costs.

    **(b)  Comparable payments under other laws**

No payment or assistance under this subchapter or subchapter III of this chapter shall be required to be made to any person or included as a program or project cost under this section, if such person receives a payment required by Federal, State, or local law which is determined by the head of the Federal agency to have substantially the same purpose and effect as such payment under this section.

    **(c)  Agreements prior to January 2, 1971; advancements**

00005339

*TITLE 42 - Section 4632 - Administration; relocation assistance in programs receiving F...*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

Any grant to, or contract or agreement with, a State agency executed before January 2, 1971, under which Federal financial assistance is available to pay all or part of the cost of any program or project which will result in the displacement of any person on or after January 2, 1971, shall be amended to include the cost of providing payments and services under sections 4630 and 4655 of this title. If the head of a Federal agency determines that it is necessary for the expeditious completion of a program or project he may advance to the State agency the Federal share of the cost of any payments or assistance by such State agency pursuant to sections 4626, 4630, 4635, and 4655 of this title.

(Pub. L. 91–646, title II, § 211, Jan. 2, 1971, 84 Stat. 1900; Pub. L. 100–17, title IV, § 411, Apr. 2, 1987, 101 Stat. 254.)

### References in Text

Subchapter III of this chapter, referred to in subsecs. (a) and (b), was in the original "title III of this Act", meaning title III of Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1904, which is classified principally to subchapter III of this chapter. For complete classification of title III to the Code, see Tables.

### Amendments

1987—Subsec. (a). Pub. L. 100–17, § 411(a), amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: "The cost to a State agency of providing payments and assistance pursuant to sections 4626, 4630, 4635, and 4655 of this title, shall be included as part of the cost of a program or project for which Federal financial assistance is available to such State agency, and such State agency shall be eligible for Federal financial assistance with respect to such payments and assistance in the same manner and to the same extent as other program or project costs, except that, notwithstanding any other law in the case where the Federal financial assistance is by grant or contribution the Federal agency shall pay the full amount of the first $25,000 of the cost to a State agency of providing payments and assistance for a displaced person under sections 4626, 4630, 4635, and 4655 of this title, on account of any acquisition or displacement occurring prior to July 1, 1972, and in any case where such Federal financial assistance is by loan, the Federal agency shall loan such State agency the full amount of the first $25,000 of such cost."

Subsec. (b). Pub. L. 100–17, § 411(b), amended subsec. (b) generally. Prior to amendment, subsec. (b) read as follows: "No payment or assistance under section 4630 or 4655 of this title shall be required or included as a program or project cost under this section, if the displaced person receives a payment required by the State law of eminent domain which is determined by such Federal agency head to have substantially the same purpose and effect as such payment under this section, and to be part of the cost of the program or project for which Federal financial assistance is available."

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

......................................

## § 4632. Administration; relocation assistance in programs receiving Federal financial assistance

In order to prevent unnecessary expenses and duplications of functions, and to promote uniform and effective administration of relocation assistance programs for displaced persons under sections 4626, 4630, and 4635 of this title, a State agency may enter into contracts with any individual, firm, association, or corporation for services in connection with such programs, or may carry out its functions under this subchapter through any Federal or State governmental agency or instrumentality having an established organization for conducting relocation assistance programs. Such State agency shall, in carrying out the relocation assistance activities described in section 4626 of this title, whenever practicable, utilize the services of State or local housing agencies, or other agencies having experience in the administration or conduct of similar housing assistance activities.

(Pub. L. 91–646, title II, § 212, Jan. 2, 1971, 84 Stat. 1900.)

_____

00005340

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

.....................................

## § 4633. Duties of lead agency

### (a) General provisions

The head of the lead agency shall—

**(1)** develop, publish, and issue, with the active participation of the Secretary of Housing and Urban Development and the heads of other Federal agencies responsible for funding relocation and acquisition actions, and in coordination with State and local governments, such regulations as may be necessary to carry out this chapter;

**(2)** provide, in consultation with the Attorney General (acting through the Commissioner of the Immigration and Naturalization Service), through training and technical assistance activities for displacing agencies, information developed with the Attorney General (acting through the Commissioner) on proper implementation of section 4605 of this title;

**(3)** ensure that displacing agencies implement section 4605 of this title fairly and without discrimination in accordance with section 4605 (b)(2)(B) of this title;

**(4)** ensure that relocation assistance activities under this chapter are coordinated with low-income housing assistance programs or projects by a Federal agency or a State or State agency with Federal financial assistance;

**(5)** monitor, in coordination with other Federal agencies, the implementation and enforcement of this chapter and report to the Congress, as appropriate, on any major issues or problems with respect to any policy or other provision of this chapter; and

**(6)** perform such other duties as may be necessary to carry out this chapter.

### (b) Regulations and procedures

The head of the lead agency is authorized to issue such regulations and establish such procedures as he may determine to be necessary to assure—

**(1)** that the payments and assistance authorized by this chapter shall be administered in a manner which is fair and reasonable and as uniform as practicable;

**(2)** that a displaced person who makes proper application for a payment authorized for such person by this subchapter shall be paid promptly after a move or, in hardship cases, be paid in advance; and

**(3)** that any aggrieved person may have his application reviewed by the head of the Federal agency having authority over the applicable program or project or, in the case of a program or project receiving Federal financial assistance, by the State agency having authority over such program or project or the Federal agency having authority over such program or project if there is no such State agency.

### (c) Applicability to Tennessee Valley Authority and Rural Electrification Administration

The regulations and procedures issued pursuant to this section shall apply to the Tennessee Valley Authority and the Rural Electrification Administration only with respect to relocation assistance under this subchapter and subchapter I of this chapter.

(Pub. L. 91–646, title II, § 213, Jan. 2, 1971, 84 Stat. 1900; Pub. L. 100–17, title IV, § 412, Apr. 2, 1987, 101 Stat. 254; Pub. L. 102–240, title I, § 1055, Dec. 18, 1991, 105 Stat. 2002; Pub. L. 105–117, § 2, Nov. 21, 1997, 111 Stat. 2385.)

#### References in Text

This chapter, referred to in subsecs. (a)(1), (4) to (6) and (b)(1), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

00005341

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

## Amendments

1997—Subsec. (a)(2) to (6). Pub. L. 105–117 added pars. (2) and (3) and redesignated former pars. (2) to (4) as (4) to (6), respectively.

1991—Subsec. (c). Pub. L. 102–240 inserted "and the Rural Electrification Administration" after "Tennessee Valley Authority".

1987—Pub. L. 100–17 in amending section generally, substituted "Duties of lead agency" for "Regulations and procedures" in section catchline.

Subsec. (a). Pub. L. 100–17 amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: "In order to promote uniform and effective administration of relocation assistance and land acquisition of State or local housing agencies, or other agencies having programs or projects by Federal agencies or programs or projects by State agencies receiving Federal financial assistance, the heads of Federal agencies shall consult together on the establishment of regulations and procedures for the implementation of such programs."

Subsec. (b). Pub. L. 100–17 amended subsec. (b) generally. Prior to amendment, subsec. (b) read as follows: "The head of each Federal agency is authorized to establish such regulations and procedures as he may determine to be necessary to assure—

"(1) that the payments and assistance authorized by this chapter shall be administered in a manner which is fair and reasonable, and as uniform as practicable;

"(2) that a displaced person who makes proper application for a payment authorized for such person by this subchapter shall be paid promptly after a move or, in hardship cases, be paid in advance; and

"(3) that any person aggrieved by a determination as to eligibility for a payment authorized by this chapter, or the amount of a payment, may have his application reviewed by the head of the Federal agency having authority over the applicable program or project, or in the case of a program or project receiving Federal financial assistance, by the head of the State agency."

Subsec. (c). Pub. L. 100–17 amended subsec. (c) generally. Prior to amendment, subsec. (c) read as follows: "The head of each Federal agency may prescribe such other regulations and procedures, consistent with the provisions of this chapter, as he deems necessary or appropriate to carry out this chapter."

## Effective Date of 1991 Amendment

Amendment by Pub. L. 102–240 effective Dec. 18, 1991, and applicable to funds authorized to be appropriated or made available after Sept. 30, 1991, and, with certain exceptions, not applicable to funds appropriated or made available on or before Sept. 30, 1991, see section 1100 of Pub. L. 102–240, set out as a note under section 104 of Title 23, Highways.

## Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective Apr. 2, 1987, to the extent such amendment prescribes authority to develop, publish, and issue regulations, and otherwise to take effect on effective date provided in such regulations but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

## Abolition of Immigration and Naturalization Service and Transfer of Functions

For abolition of Immigration and Naturalization Service, transfer of functions, and treatment of related references, see note set out under section 1551 of Title 8, Aliens and Nationality.

## Improvement of Administration and Implementation of This Chapter

Memorandum of the President dated February 27, 1985, 50 F.R. 8953, provided:

The purpose of this Memorandum is to improve administration and implementation of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 [42 U.S.C. 4601 et seq.].

Specifically, I hereby direct the following actions:

1. The Presidential Memorandum of September 6, 1973 on this subject is superseded.

2. As with other Administration management improvement initiatives, a lead agency, the Department of Transportation (DOT), is designated to coordinate and monitor implementation of the Act, and consult periodically with State and local governments and other organizations and interest groups affected by administration of the Act.

3. DOT, jointly with the Department of Housing and Urban Development, shall interact with the principal executive departments and agencies affected by the Act in developing Administration policy.

00005342

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

4. Within 90 days of the date of this Memorandum, all affected executive departments and agencies shall propose common regulations under the Act. Within one year of the date of this Memorandum, such departments and agencies shall issue common regulations under the Act. Such regulations shall be consistent with the model policy promulgated by DOT, in consultation and coordination with other affected agencies, and published in final form in the Federal Register simultaneously with this Memorandum.

5. DOT shall report annually to the President's Council on Management Improvement, through the Office of Management and Budget, on implementation of the Act.

......................................

## § 4634. Repealed. Pub. L. 100–17, title IV, § 415, Apr. 2, 1987, 100 Stat. 255

Section, Pub. L. 91–646, title II, § 214, Jan. 2, 1971, 84 Stat. 1901, required head of each Federal agency to submit an annual report to the President respecting programs and policies established or authorized by this chapter, and the President to submit such reports to Congress.

### Effective Date of Repeal

Repeal effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as an Effective Date of 1987 Amendment note under section 4601 of this title.

......................................

## § 4635. Planning and other preliminary expenses for additional housing

In order to encourage and facilitate the construction or rehabilitation of housing to meet the needs of displaced persons who are displaced from dwellings because of any Federal or Federal financially assisted project, the head of the Federal agency administering such project is authorized to make loans as a part of the cost of any such project, or to approve loans as a part of the cost of any such project receiving Federal financial assistance, to nonprofit, limited dividend, or cooperative organizations or to public bodies, for necessary and reasonable expenses, prior to construction, for planning and obtaining federally insured mortgage financing for the rehabilitation or construction of housing for such displaced persons. Notwithstanding the preceding sentence, or any other law, such loans shall be available for not to exceed 80 per centum of the reasonable costs expected to be incurred in planning, and in obtaining financing for, such housing, prior to the availability of such financing, including, but not limited to, preliminary surveys and analyses of market needs, preliminary site engineering, preliminary architectural fees, site acquisition, application and mortgage commitment fees, and construction loan fees and discounts. Loans to an organization established for profit shall bear interest at a market rate established by the head of such Federal agency. All other loans shall be without interest. Such Federal agency head shall require repayment of loans made under this section, under such terms and conditions as he may require, upon completion of the project or sooner, and except in the case of a loan to an organization established for profit, may cancel any part or all of a loan if he determines that a permanent loan to finance the rehabilitation or the construction of such housing cannot be obtained in an amount adequate for repayment of such loan. Upon repayment of any such loan, the Federal share of the sum repaid shall be credited to the account from which such loan was made, unless the Secretary of the Treasury determines that such account is no longer in existence, in which case such sum shall be returned to the Treasury and credited to miscellaneous receipts.

(Pub. L. 91–646, title II, § 215, Jan. 2, 1971, 84 Stat. 1901.)

00005343

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

.....................................

## § 4636. Payments not to be considered as income for revenue purposes or for eligibility for assistance under Social Security Act or other Federal law

No payment received under this subchapter shall be considered as income for the purposes of title 26; or for the purposes of determining the eligibility or the extent of eligibility of any person for assistance under the Social Security Act [42 U.S.C. 301 et seq.] or any other Federal law (except for any Federal law providing low-income housing assistance).

(Pub. L. 91–646, title II, § 216, Jan. 2, 1971, 84 Stat. 1902; Pub. L. 99–514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub. L. 100–17, title IV, § 413, Apr. 2, 1987, 101 Stat. 255.)

### References in Text

The Social Security Act, referred to in text, is act Aug. 14, 1935, ch. 531, 49 Stat. 620, as amended, which is classified generally to chapter 7 (§ 301 et seq.) of this title. For complete classification of this Act to the Code, see section 1305 of this title and Tables.

### Amendments

1987—Pub. L. 100–17 inserted "(except for any Federal law providing low-income housing assistance)" before period at end.

1986—Pub. L. 99–514 substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954", which for purposes of codification was translated as "title 26" thus requiring no change in text.

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

.....................................

## § 4637. Repealed. Pub. L. 100–17, title IV, § 415, Apr. 2, 1987, 101 Stat. 255

Section, Pub. L. 91–646, title II, § 217, Jan. 2, 1971, 84 Stat. 1902, related to displacement by code enforcement, rehabilitation, and demolition programs receiving Federal assistance.

### Effective Date of Repeal

Repeal effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as an Effective Date of 1987 Amendment note under section 4601 of this title.

.....................................

## § 4638. Transfers of surplus property

The Administrator of General Services is authorized to transfer to a State agency for the purpose of providing replacement housing required by this subchapter, any real property surplus to the needs of the United States within the meaning of chapters 1 to 11 of title 40 and division C (except sections 3302, 3307 (e), 3501 (b), 3509, 3906, 4710, and 4711) of subtitle I of title 41. Such transfer shall be subject to such terms and conditions as the Administrator determines necessary to protect the interests of the United States and may be made without monetary consideration, except that such State agency shall pay to the United States all net amounts received by such agency from any sale, lease, or other disposition of such property for such housing.

(Pub. L. 91–646, title II, § 218, Jan. 2, 1971, 84 Stat. 1902; Pub. L. 100–17, title IV, § 414, Apr. 2, 1987, 101 Stat. 255.)

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

## Codification

In text, "chapters 1 to 11 of title 40 and division C (except sections 3302, 3307 (e), 3501 (b), 3509, 3906, 4710, and 4711) of subtitle I of title 41" substituted for "the Federal Property and Administrative Services Act of 1949, as amended" on authority of Pub. L. 107–217, § 5(c), Aug. 21, 2002, 116 Stat. 1303, which Act enacted Title 40, Public Buildings, Property, and Works, and Pub. L. 111–350, § 6(c), Jan. 4, 2011, 124 Stat. 3854, which Act enacted Title 41, Public Contracts.

## Amendments

1987—Pub. L. 100–17 inserted "net" after "all".

## Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

## SUBCHAPTER III—UNIFORM REAL PROPERTY ACQUISITION POLICY

.....................................

### § 4651. Uniform policy on real property acquisition practices

In order to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts, to assure consistent treatment for owners in the many Federal programs, and to promote public confidence in Federal land acquisition practices, heads of Federal agencies shall, to the greatest extent practicable, be guided by the following policies:

**(1)** The head of a Federal agency shall make every reasonable effort to acquire expeditiously real property by negotiation.

**(2)** Real property shall be appraised before the initiation of negotiations, and the owner or his designated representative shall be given an opportunity to accompany the appraiser during his inspection of the property, except that the head of the lead agency may prescribe a procedure to waive the appraisal in cases involving the acquisition by sale or donation of property with a low fair market value.

**(3)** Before the initiation of negotiations for real property, the head of the Federal agency concerned shall establish an amount which he believes to be just compensation therefor and shall make a prompt offer to acquire the property for the full amount so established. In no event shall such amount be less than the agency's approved appraisal of the fair market value of such property. Any decrease or increase in the fair market value of real property prior to the date of valuation caused by the public improvement for which such property is acquired, or by the likelihood that the property would be acquired for such improvement, other than that due to physical deterioration within the reasonable control of the owner, will be disregarded in determining the compensation for the property. The head of the Federal agency concerned shall provide the owner of real property to be acquired with a written statement of, and summary of the basis for, the amount he established as just compensation. Where appropriate the just compensation for the real property acquired and for damages to remaining real property shall be separately stated.

**(4)** No owner shall be required to surrender possession of real property before the head of the Federal agency concerned pays the agreed purchase price, or deposits with the court in accordance with section 3114 (a) to (d) of title 40, for the benefit of the owner, an amount not less than the agency's approved appraisal of the fair market value of such property, or the amount of the award of compensation in the condemnation proceeding for such property.

**(5)** The construction or development of a public improvement shall be so scheduled that, to the greatest extent practicable, no person lawfully occupying real property shall be required to move from a dwelling (assuming a replacement dwelling as required by subchapter II of this chapter will be available), or to move his business or farm operation, without at least ninety days' written notice from the head of the Federal agency concerned, of the date by which such move is required.

**(6)** If the head of a Federal agency permits an owner or tenant to occupy the real property acquired on a rental basis for a short term or for a period subject to termination by the Government on short notice, the amount of rent required shall not exceed the fair rental value of the property to a short-term occupier.

**(7)** In no event shall the head of a Federal agency either advance the time of condemnation, or defer negotiations or condemnation and the deposit of funds in court for the use of the owner, or take any other action coercive in nature, in order to compel an agreement on the price to be paid for the property.

**(8)** If any interest in real property is to be acquired by exercise of the power of eminent domain, the head of the Federal agency concerned shall institute formal condemnation proceedings. No Federal agency head shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property.

00005346

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

**(9)** If the acquisition of only a portion of a property would leave the owner with an uneconomic remnant, the head of the Federal agency concerned shall offer to acquire that remnant. For the purposes of this chapter, an uneconomic remnant is a parcel of real property in which the owner is left with an interest after the partial acquisition of the owner's property and which the head of the Federal agency concerned has determined has little or no value or utility to the owner.

**(10)** A person whose real property is being acquired in accordance with this subchapter may, after the person has been fully informed of his right to receive just compensation for such property, donate such property, and part thereof, any interest therein, or any compensation paid therefor to a Federal agency, as such person shall determine.

(Pub. L. 91–646, title III, § 301, Jan. 2, 1971, 84 Stat. 1904; Pub. L. 100–17, title IV, § 416, Apr. 2, 1987, 101 Stat. 255.)

### References in Text

Subchapter II of this chapter, referred to in par. (5), was in the original "title II of this Act", meaning title II of Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1895, which is classified principally to subchapter II of this chapter. For complete classification of title II to the Code, see Short Title note set out under section 4601 of this title and Tables.

This chapter, referred to in par. (9), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

This subchapter, referred to in par. (10), was in the original "this title", meaning title III of Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1904, which is classified principally to this subchapter. For complete classification of title III to the Code, see Tables.

### Codification

In par. (4), "section 3114 (a) to (d) of title 40" substituted for "section 1 of the Act of February 26, 1931 (46 Stat. 1421; 40 U.S.C. 258a)" on authority of Pub. L. 107–217, § 5(c), Aug. 21, 2002, 116 Stat. 1303, the first section of which enacted Title 40, Public Buildings, Property, and Works.

### Amendments

1987—Par. (2). Pub. L. 100–17, § 416(a), inserted provision respecting the waiver of appraisal in cases involving the acquisition of property with a low fair market value.

Par. (9). Pub. L. 100–17, § 416(b), amended par. (9) generally. Prior to amendment, par. (9) read as follows: "If the acquisition of only part of a property would leave its owner with an uneconomic remnant, the head of the Federal agency concerned shall offer to acquire the entire property."

Par. (10). Pub. L. 100–17, § 416(c), added par. (10).

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

### Savings Provision

Section 306 of Pub. L. 91–646 provided in part that: "Any rights or liabilities now existing under prior Acts or portions thereof shall not be affected by the repeal of such prior Act or portions thereof under this section [repealing sections 3071 to 3073 of this title, section 141 of Title 23, Highways, and section 596 of Title 33, Navigation and Navigable Waters]."

......................................

## § 4652. Buildings, structures, and improvements

**(a)** Notwithstanding any other provision of law, if the head of a Federal agency acquires any interest in real property in any State, he shall acquire at least an equal interest in all buildings, structures, or

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

other improvements located upon the real property so acquired and which he requires to be removed from such real property or which he determines will be adversely affected by the use to which such real property will be put.

**(b)** **(1)** For the purpose of determining the just compensation to be paid for any building, structure, or other improvement required to be acquired by subsection (a) of this section, such building, structure, or other improvement shall be deemed to be a part of the real property to be acquired notwithstanding the right or obligation of a tenant, as against the owner of any other interest in the real property, to remove such building, structure, or improvement at the expiration of his term, and the fair market value which such building, structure, or improvement contributes to the fair market value of the real property to be acquired, or the fair market value of such building, structure, or improvement for removal from the real property, whichever is the greater, shall be paid to the tenant therefor.

**(2)** Payment under this subsection shall not result in duplication of any payments otherwise authorized by law. No such payment shall be made unless the owner of the land involved disclaims all interest in the improvements of the tenant. In consideration for any such payment, the tenant shall assign, transfer, and release to the United States all his right, title, and interest in and to such improvements. Nothing in this subsection shall be construed to deprive the tenant of any rights to reject payment under this subsection and to obtain payment for such property interests in accordance with applicable law, other than this subsection.

(Pub. L. 91–646, title III, § 302, Jan. 2, 1971, 84 Stat. 1905.)

......................................

## § 4653. Expenses incidental to transfer of title to United States

The head of a Federal agency, as soon as practicable after the date of payment of the purchase price or the date of deposit in court of funds to satisfy the award of compensation in a condemnation proceeding to acquire real property, whichever is the earlier, shall reimburse the owner, to the extent the head of such agency deems fair and reasonable, for expenses he necessarily incurred for—

**(1)** recording fees, transfer taxes, and similar expenses incidental to conveying such real property to the United States;

**(2)** penalty costs for prepayment of any preexisting recorded mortgage entered into in good faith encumbering such real property; and

**(3)** the pro rata portion of real property taxes paid which are allocable to a period subsequent to the date of vesting title in the United States, or the effective date of possession of such real property by the United States, whichever is the earlier.

(Pub. L. 91–646, title III, § 303, Jan. 2, 1971, 84 Stat. 1906.)

......................................

## § 4654. Litigation expenses

### (a) Judgment for owner or abandonment of proceedings

The Federal court having jurisdiction of a proceeding instituted by a Federal agency to acquire real property by condemnation shall award the owner of any right, or title to, or interest in, such real property such sum as will in the opinion of the court reimburse such owner for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of the condemnation proceedings, if—

**(1)** the final judgment is that the Federal agency cannot acquire the real property by condemnation; or

**(2)** the proceeding is abandoned by the United States.

00005348

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(b)  Payment**

Any award made pursuant to subsection (a) of this section shall be paid by the head of the Federal agency for whose benefit the condemnation proceedings was instituted.

**(c)  Claims against United States**

The court rendering a judgment for the plaintiff in a proceeding brought under section 1346 (a)(2) or 1491 of title 28, awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

(Pub. L. 91–646, title III, § 304, Jan. 2, 1971, 84 Stat. 1906.)

....................................

## § 4655. Requirements for uniform land acquisition policies; payments of expenses incidental to transfer of real property to State; payment of litigation expenses in certain cases

**(a)**  Notwithstanding any other law, the head of a Federal agency shall not approve any program or project or any grant to, or contract or agreement with, an acquiring agency under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the acquisition of real property on and after January 2, 1971, unless he receives satisfactory assurances from such acquiring agency that—

**(1)**  in acquiring real property it will be guided, to the greatest extent practicable under State law, by the land acquisition policies in section 4651 of this title and the provisions of section 4652 of this title, and

**(2)**  property owners will be paid or reimbursed for necessary expenses as specified in sections 4653 and 4654 of this title.

**(b)**  For purposes of this section, the term "acquiring agency" means—

**(1)**  a State agency (as defined in section 4601 (3) of this title) which has the authority to acquire property by eminent domain under State law, and

**(2)**  a State agency or person which does not have such authority, to the extent provided by the head of the lead agency by regulation.

(Pub. L. 91–646, title III, § 305, Jan. 2, 1971, 84 Stat. 1906; Pub. L. 100–17, title IV, § 417, Apr. 2, 1987, 101 Stat. 256.)

### Amendments

1987—Pub. L. 100–17 designated existing provisions as subsec. (a), substituted "an acquiring agency" for "a State agency" and "such acquiring agency" for "such State agency", and added subsec. (b).

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

00005349

OP·LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study

Final Community Effects Assessment and EJ Analysis Technical Report

# APPENDIX F:
# EJScreen Data and Mapping

00005350

## Purpose of Appendix F

Data and maps included in this appendix, which are referenced in the text of **FEIS, Chapter 5** and **FEIS, Appendix F**, provide information on existing environmental conditions and were reviewed as additional resources to assist with the identification and consideration of EJ populations within the EJ Analysis Area.

The following is included in **Appendix F**:

- Definitions for the EPA EJSCREEN Environmental Indicators and Demographic Indexes, and the MD EJSCREEN Pollution Burden Indicators and Population Characteristics (**Pages 2-4**)

- Data tables showing EPA EJSCREEN EJ Indexes  and MD EJSCREEN EJ Scores for each block group within the EJ Analysis Area (or tract, for MD EJSCREEN). Note that the values are the percentiles in which each block group or tract falls (as compared to the State of Maryland) for each Environmental Indicator or Pollution Burden Indicator. (**Pages 5-8**)

- Summary tables with results from the review of EPA EJSCREEN and MD EJSCREEN data (**Pages 9-14**)

- Heat maps showing EPA EJSCREEN EJ Indexes for all 12 Environmental Indicators (**Pages 15-26**).

1

00005351

*I-495 and I-270 Managed Lanes Study*
*Final Community Effects Assessment and EJ Analysis Technical Report*
*Appendix F*

## EPA EJSCREEN Definitions

The following definitions, accessed from https://www.epa.gov/ejscreen/overview-environmental-indicators-ejscreen and https://www.epa.gov/ejscreen/overview-demographic-indicators-ejscreen, describe the Environmental Indicators and Demographic Indicators that are used by the EPA to calculate EJ Indexes at the block group level. Also included is a definition of the Demographic Index, which is used along with the Environmental Indicators to generate EJ Indexes.

| | | |
|---|---|---|
| **Environmental Indicator** | **Hazardous Waste Proximity Index** | Count of hazardous waste facilities (Treatment, Storage, and Disposal Facility and Large Quantity Generators) within 5 km (or nearest beyond 5 km), each divided by distance in kilometers |
| | **Lead Paint Indicator** | Percent of housing units built pre-1960, as indicator of potential lead paint exposure |
| | **Air Toxics Cancer Risk** | Lifetime cancer risk from inhalation of air toxics |
| | **Diesel Particulate Matter** | Diesel particulate matter level in air, $\mu g/m^3$ |
| | **Air Toxics Assessment Respiratory Hazard Index** | Ratio of exposure concentration to health-based reference concentration |
| | **Ozone** | Ozone summer seasonal avg. of daily maximum 8-hour concentration in air in parts per billion |
| | **Particulate Matter (PM 2.5)** | $PM_{2.5}$ levels in air, $\mu g/m^3$ annual avg. |
| | **Proximity to Risk Management Plan (RMP) Sites** | Count of RMP (potential chemical accident management plan) facilities within 5 km (or nearest one beyond 5 km), each divided by distance in kilometers |
| | **Superfund Proximity** | Count of proposed or listed NPL – also known as superfund – sites within 5 km (or nearest one beyond 5 km), each divided by distance in kilometers |
| | **Traffic Proximity and Volume** | Count of vehicles (AADT, avg. annual daily traffic) at major roads within 500 meters, divided by distance in meters (not kilometers) |
| | **Underground Storage Tanks (UST) and Leaking UST (LUST)** | Count of LUSTs (multiplied by a factor of 7.7) and the number of USTs within a 1,500-foot buffered block group |
| | **Wastewater Discharge Indicator** | Risk-Screening Environmental Indicators (RSEI) modeled toxic concentrations at stream segments within 500 meters, divided by distance in kilometers (km) |
| **Demographic Indicator** | **Demographic Index** | Based on the average of two demographic indicators: percent low-income and percent people of color |
| | **Low-Income** | The percent of a block group's population in households where the household income is less than or equal to twice the federal "poverty level" |
| | **People of Color** | The percent of individuals in a block group who list their racial status as a race other than white alone and/or list their ethnicity as Hispanic or Latino. That is, all people other than non-Hispanic white-alone individuals. The word "alone" in this case indicates that the person is of a single race, not multiracial |
| | **Less than High School Education** | Percent of people age 25 or older in a block group whose education is short of a high school diploma |
| | **Linguistic Isolation** | Percent of people in a block group living in linguistically isolated households. A household which all members age 14 years and over speak a non-English language and also speak English less than "very well" (have difficulty with English) is linguistically isolated |
| | **Individuals Under Age 5** | Percent of people in a block group under the age of 5 |
| | **Individuals Over Age 64** | Percent of people in a block group over the age of 64 |

2

Case 8:22-cv-02597-DKC    Document 58-3    Filed 10/30/23    Page 97 of 133

*I-495 and I-270 Managed Lanes Study*
*Final Community Effects Assessment and EJ Analysis Technical Report*
*Appendix F*

| | **Unemployment Rate** | The percent of a block group's population that did not have a job at all during the reporting period, made at least one specific active effort to find a job during the prior 4 weeks, and were available for work (unless temporarily ill) |
|---|---|---|

## MD EJSCREEN Definitions

The following definitions, accessed from https://p1.cgis.umd.edu/mdejscreen/help.html, describe the breakdown of Pollution Burden Indicators (Exposure Indicators, Environmental Effects Indicators) and Population Characteristics (Sensitive Populations, Socioeconomic Factors) that are used to calculate the MD EJSCREEN Overall EJScore for tracts.

<table>
<tr><td rowspan="18"><strong>Pollution Burden Indicator</strong></td><td colspan="2" align="center"><strong>Exposure Indicator</strong></td></tr>
<tr><td><strong>National-Scale Air Toxics Assessment (NATA) Cancer Risks</strong></td><td>Lifetime risk of developing cancer from inhalation of toxins. Reported as risk per lifetime per million people</td></tr>
<tr><td><strong>National-Scale Air Toxics Assessment (NATA) Respiratory Hazard Index</strong></td><td>Air toxics respiratory hazard index. This is the sum of hazard indices for those air toxics with reference concentrations based on respiratory endpoints, where each hazard index is the ratio of exposure concentration in the air to the health-based reference</td></tr>
<tr><td><strong>National-Scale Air Toxics Assessment (NATA) Diesel Particulate Matter</strong></td><td>Levels of diesel particulate matter in the air. Reported as micrograms per cubic meter ($\mu g/m^3$)</td></tr>
<tr><td><strong>Particulate Matter 2.5 (PM2.5)</strong></td><td>Levels of particulate matter with a diameter of 2.5 micrometers or smaller in air. Reported as micrograms per cubic meter ($\mu g/m^3$)</td></tr>
<tr><td><strong>Ozone</strong></td><td>Summer seasonal average of the maximum daily 8-hour concentration of ozone in air in parts per billion</td></tr>
<tr><td><strong>Traffic Proximity and Volume</strong></td><td>Count of vehicles (average annual daily traffic) at major roads within 500 meters or close to 500 meters, divided by distance in meters</td></tr>
<tr><td colspan="2" align="center"><strong>Environmental Effects Indicator</strong></td></tr>
<tr><td><strong>Lead Paint Indicator</strong></td><td>Percent of houses built before 1960, which likely contain lead paint</td></tr>
<tr><td><strong>Proximity to Risk Management Plan Sites</strong></td><td>Count of RMP (potential chemical accident management plan) facilities within 5 kilometers or close to 5 kilometers, divided by distance in kilometers</td></tr>
<tr><td><strong>Proximity to Treatment and Disposal Facilities</strong></td><td>Count of TSDF (hazardous waste management facilities) within 5 kilometers or closest to 5 kilometers, divided by distance in kilometers</td></tr>
<tr><td><strong>Proximity to National Proximity List Sites</strong></td><td>Count of NPL/Superfund sites (polluted sites that pose a risk to human health and/or the environment) within 5 kilometers or close to 5 kilometers, divided by distance in kilometers</td></tr>
<tr><td><strong>Proximity to Major Direct Water Discharges</strong></td><td>Toxic concentrations in stream segments within 500 meters, divided by distance in kilometers. Standards modeled after Risk-Screening Environmental Indicators (RSEI)</td></tr>
<tr><td><strong>Watershed Failure</strong></td><td>Percent of each census tract's watershed that exceeds levels of phosphorus and/or Nitrogen</td></tr>
</table>

3

| Population Characteristics | **Sensitive Populations** | |
|---|---|---|
| | **Asthma Emergency Room Discharges** | Count of patients released from the hospital after being admitted for asthma or asthma-related distress |
| | **Myocardial Infraction Discharges** | Patients released from the hospital after being admitted for a heart attack or heart attack symptoms |
| | **Low Birth Weight Infants** | Babies born weighing less than 5.5 pounds |
| | **Socioeconomic Factors** | |
| | **Percent Low Income** | Percentage of individuals whose household income in the past 12 months is less than two times below the federal poverty level |
| | **Percent Non-White** | Percentage of individuals who define themselves as any race/ethnicity besides non-Hispanic white |
| | **Less Than High School Education** | Percentage of individuals 25 and older who lack a high school diploma |
| | **Linguistic Isolation** | Percentage of households in which no one 14 years old and older speaks English "very well," or households which speak only English |
| | **Individuals Under 5 Years Old** | Percentage of people under the age of 5 |
| | **Individuals Over 64 Years Old** | Percentage of people over the age of 64 |
| | **Unemployment** | Percentage of the population over the age of 16 that is unemployed and eligible for the labor force. Excludes retirees, students, homemakers, institutionalized persons except prisoners, those not looking for work, and military personnel on active duty |

00005354

## EPA EJSCREEN Raw Data*

| Block Group within EJ Analysis Area | Analysis Area Community | Managed Lanes Study EJ Population? | EJ Index for Particulate Matter 2.5 (%ile in State) | EJ Index for Ozone (%ile in State) | EJ Index for 2017 Diesel Particulate Matter (%ile in State) | EJ Index for 2017 Air Toxics Cancer Risk (%ile in State) | EJ Index for 2017 Air Toxics Respiratory Hazard Index (%ile in State) | EJ Index for Traffic Proximity (%ile in State) | EJ Index for Lead Paint (%ile in State) | EJ Index for Superfund Proximity (%ile in State) | EJ Index for RMP Facility Proximity (%ile in State) | EJ Index for Hazardous Waste Proximity (%ile in State) | EJ Index for Underground Storage Tanks (%ile in State) | EJ Index for Wastewater Discharge (%ile in State) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4701.00 - 1 | McLean | no | 42 | 44 | 24 | 44 | 43 | 3 | 44 | 42 | 42 | 10 | 70 | 12 |
| 4701.00 - 2 | McLean | no | 16 | 18 | 3 | 20 | 16 | 9 | 21 | 22 | 14 | 3 | 25 | 5 |
| 4801.00 - 4 | McLean | no | 53 | 54 | 49 | 54 | 53 | 19 | 37 | 52 | 54 | 24 | 70 | 12 |
| 7007.17 - 1 | Gaithersburg | yes | 92 | 91 | 94 | 90 | 91 | 79 | 57 | 74 | 74 | 96 | 83 | 73 |
| 7007.17 - 3 | Gaithersburg | yes | 92 | 92 | 95 | 91 | 92 | 99 | 73 | 75 | 75 | 96 | 63 | 67 |
| 7007.17 - 4 | Gaithersburg | yes | 66 | 66 | 71 | 65 | 67 | 93 | 76 | 61 | 59 | 81 | 81 | 58 |
| 7007.18 - 1 | Rockville | no | 21 | 23 | 4 | 22 | 17 | 5 | 57 | 33 | 35 | 2 | 0 | 41 |
| 7007.18 - 2 | Rockville | no | 42 | 43 | 29 | 42 | 41 | 27 | 57 | 46 | 47 | 7 | 6 | 43 |
| 7008.16 - 1 | Gaithersburg | yes | 91 | 90 | 94 | 89 | 91 | 99 | 65 | 74 | 74 | 96 | 63 | 62 |
| 7008.16 - 2 | Gaithersburg | yes | 63 | 62 | 66 | 62 | 62 | 70 | 65 | 59 | 58 | 79 | 70 | 59 |
| 7008.17 - 1 | Gaithersburg | yes | 54 | 54 | 55 | 54 | 54 | 68 | 57 | 54 | 53 | 59 | 67 | 51 |
| 7008.17 - 2 | Gaithersburg | no | 47 | 48 | 41 | 48 | 47 | 21 | 46 | 49 | 49 | 14 | 18 | 41 |
| 7008.17 - 3 | Gaithersburg | yes | 55 | 54 | 55 | 54 | 55 | 59 | 57 | 54 | 54 | 62 | 67 | 54 |
| 7008.29 - 1 | Gaithersburg | yes | 50 | 50 | 48 | 50 | 50 | 24 | 48 | 51 | 50 | 24 | 24 | 39 |
| 7010.01 - 2 | Rockville | no | 33 | 35 | 17 | 33 | 31 | 4 | 40 | 41 | 41 | 8 | 14 | 39 |
| 7010.01 - 3 | Rockville | no | 38 | 39 | 23 | 38 | 37 | 10 | 57 | 44 | 45 | 12 | 16 | 45 |
| 7010.02 - 1 | Rockville | no | 36 | 38 | 23 | 37 | 35 | 0 | 46 | 43 | 42 | 14 | 20 | 40 |
| 7010.02 - 2 | Rockville | no | 16 | 19 | 3 | 17 | 13 | 3 | 41 | 30 | 28 | 6 | 20 | 37 |
| 7010.02 - 3 | Rockville | no | 33 | 34 | 18 | 33 | 30 | 20 | 28 | 40 | 37 | 15 | 63 | 38 |
| 7010.04 - 2 | Rockville | no | 22 | 24 | 8 | 23 | 18 | 0 | 32 | 33 | 35 | 2 | 13 | 27 |
| 7010.04 - 4 | Rockville | no | 43 | 44 | 36 | 44 | 43 | 11 | 36 | 47 | 47 | 15 | 63 | 33 |
| 7010.05 - 1 | Rockville | no | 25 | 27 | 9 | 26 | 22 | 0 | 13 | 36 | 36 | 5 | 18 | 30 |
| 7010.05 - 2 | Rockville | no | 45 | 46 | 38 | 45 | 44 | 16 | 28 | 48 | 48 | 16 | 14 | 36 |
| 7010.06 - 1 | Rockville | no | 37 | 38 | 30 | 38 | 36 | 10 | 37 | 42 | 42 | 8 | 21 | 23 |
| 7010.06 - 2 | Rockville | no | 14 | 17 | 6 | 16 | 11 | 0 | 57 | 28 | 28 | 4 | 16 | 25 |
| 7010.07 - 1 | Rockville | yes | 47 | 47 | 40 | 47 | 46 | 23 | 57 | 48 | 49 | 13 | 29 | 27 |
| 7010.07 - 2 | Rockville | no | 48 | 48 | 42 | 48 | 47 | 12 | 47 | 49 | 50 | 15 | 23 | 30 |
| 7012.05 - 1 | North Bethesda | no | 9 | 11 | 1 | 10 | 7 | 0 | 17 | 24 | 28 | 2 | 22 | 44 |
| 7012.05 - 2 | North Bethesda | no | 3 | 4 | 0 | 3 | 2 | 0 | 18 | 17 | 23 | 0 | 9 | 42 |
| 7012.05 - 3 | North Bethesda | no | 49 | 49 | 46 | 49 | 49 | 7 | 57 | 50 | 51 | 32 | 21 | N/A |
| 7012.05 - 4 | North Bethesda | no | 39 | 40 | 27 | 39 | 38 | 1 | 42 | 44 | 45 | 15 | 21 | 45 |
| 7012.06 - 1 | Potomac | no | 22 | 24 | 10 | 23 | 18 | 4 | 57 | 34 | 32 | 6 | 13 | 44 |
| 7012.06 - 2 | Potomac | no | 14 | 17 | 5 | 16 | 11 | 12 | 28 | 28 | 26 | 10 | 63 | 38 |
| 7012.10 - 1 | Rockville | no | 34 | 36 | 28 | 34 | 32 | 26 | 57 | 41 | 38 | 14 | 63 | 34 |
| 7012.11 - 3 | Rockville | no | 42 | 43 | 36 | 42 | 41 | 40 | 42 | 46 | 47 | 7 | 21 | 33 |
| 7012.13 - 1 | North Bethesda | no | 40 | 41 | 28 | 40 | 39 | 13 | 57 | 44 | 47 | 11 | 25 | 43 |
| 7012.13 - 2 | North Bethesda | no | 46 | 46 | 38 | 46 | 45 | 14 | 57 | 48 | 49 | 19 | 63 | 43 |

00005355

| Block Group within EJ Analysis Area | Analysis Area Community | Managed Lanes Study EJ Population? | EJ Index for Particulate Matter 2.5 (%ile in State) | EJ Index for Ozone (%ile in State) | EJ Index for 2017 Diesel Particulate Matter (%ile in State) | EJ Index for 2017 Air Toxics Cancer Risk (%ile in State) | EJ Index for 2017 Air Toxics Respiratory Hazard Index (%ile in State) | EJ Index for Traffic Proximity (%ile in State) | EJ Index for Lead Paint (%ile in State) | EJ Index for Superfund Proximity (%ile in State) | EJ Index for RMP Facility Proximity (%ile in State) | EJ Index for Hazardous Waste Proximity (%ile in State) | EJ Index for Underground Storage Tanks (%ile in State) | EJ Index for Wastewater Discharge (%ile in State) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7012.13 - 3 | North Bethesda | no | 35 | 36 | 20 | 35 | 33 | 6 | 46 | 40 | 44 | 8 | 20 | 40 |
| 7012.15 - 1 | North Bethesda | no | 42 | 43 | 31 | 39 | 41 | 4 | 40 | 45 | 47 | 15 | 26 | 39 |
| 7012.15 - 2 | North Bethesda | yes | 49 | 49 | 45 | 47 | 48 | 6 | 45 | 50 | 51 | 26 | 30 | 38 |
| 7012.15 - 3 | North Bethesda | yes | 46 | 46 | 38 | 43 | 45 | 5 | 57 | 48 | 49 | 20 | 34 | 43 |
| 7012.15 - 4 | North Bethesda | yes | 48 | 48 | 42 | 46 | 47 | 8 | 42 | 49 | 50 | 24 | 29 | 42 |
| 7044.01 - 1 | North Bethesda | no | 25 | 27 | 7 | 17 | 22 | 1 | 6 | 33 | 36 | 7 | 18 | 36 |
| 7044.01 - 2 | North Bethesda | no | 33 | 34 | 16 | 26 | 31 | 3 | 15 | 39 | 42 | 10 | 13 | 41 |
| 7044.03 - 1 | Bethesda | no | 26 | 28 | 8 | 18 | 23 | 0 | 32 | 33 | 36 | 7 | 20 | 37 |
| 7044.04 - 4 | Bethesda | no | 24 | 27 | 7 | 17 | 15 | 1 | 16 | 32 | 35 | 7 | 23 | 39 |
| 7045.01 - 1 | North Bethesda | no | 42 | 43 | 33 | 39 | 42 | 12 | 15 | 46 | 47 | 20 | 12 | 43 |
| 7045.01 - 2 | North Bethesda | yes | 44 | 44 | 35 | 40 | 43 | 4 | 41 | 47 | 47 | 27 | 26 | 46 |
| 7045.01 - 3 | North Bethesda | no | 43 | 44 | 34 | 40 | 42 | 7 | 15 | 46 | 47 | 23 | 27 | 43 |
| 7045.01 - 4 | North Bethesda | yes | 48 | 49 | 44 | 47 | 48 | 11 | 26 | 49 | 50 | 31 | 63 | 45 |
| 7045.02 - 1 | Bethesda | no | 33 | 34 | 19 | 26 | 30 | 1 | 18 | 39 | 40 | 18 | 63 | 43 |
| 7045.02 - 2 | Bethesda | no | 17 | 20 | 4 | 9 | 14 | 3 | 4 | 27 | 29 | 8 | 63 | 36 |
| 7045.03 - 1 | Bethesda | no | 15 | 18 | 3 | 8 | 12 | 1 | 1 | 25 | 29 | 6 | 63 | 39 |
| 7058.00 - 1 | Cabin John | no | 13 | 16 | 3 | 14 | 10 | 1 | 8 | 24 | 22 | 4 | 63 | 11 |
| 7058.00 - 3 | Cabin John | no | 23 | 26 | 9 | 24 | 20 | 6 | 4 | 25 | 6 | 9 | 16 | 7 |
| 7059.01 - 3 | Bethesda | no | 21 | 23 | 10 | 22 | 17 | 8 | 19 | 30 | 29 | 14 | 63 | 36 |
| 7059.02 - 3 | Bethesda | no | 33 | 35 | 22 | 33 | 31 | 1 | 33 | 38 | 34 | 19 | 63 | 34 |
| 7060.08 - 1 | Potomac | no | 28 | 30 | 26 | 29 | 25 | 40 | 27 | 33 | 20 | 45 | 29 | 10 |
| 7060.08 - 2 | Potomac | no | 38 | 39 | 37 | 38 | 36 | 27 | 36 | 43 | 42 | 26 | 32 | 24 |
| 7060.09 - 2 | Potomac | no | 21 | 24 | 12 | 22 | 18 | 9 | 41 | 32 | 31 | 20 | 28 | 23 |
| 7060.09 - 3 | Potomac | no | 25 | 28 | 16 | 26 | 23 | 2 | 37 | 34 | 33 | 17 | 63 | 30 |
| 7060.12 - 1 | Potomac | no | 52 | 52 | 51 | 52 | 52 | 50 | 47 | 52 | 52 | 44 | 29 | N/A |
| 7060.12 - 2 | Potomac | yes | 57 | 57 | 58 | 57 | 57 | 68 | 59 | 55 | 55 | 57 | 71 | N/A |
| 7060.12 - 3 | Potomac | yes | 57 | 57 | 58 | 57 | 57 | 58 | 58 | 55 | 55 | 58 | 74 | N/A |
| 7060.13 - 1 | Potomac | no | 24 | 27 | 12 | 25 | 21 | 9 | 30 | 34 | 34 | 20 | 63 | 38 |
| 7060.13 - 2 | Potomac | no | 35 | 36 | 25 | 36 | 33 | 1 | 27 | 41 | 42 | 24 | 17 | 41 |

*EPA EJSCREEN Indexes are reported in percentiles, comparing the indicators in the Analysis Area block groups to those of all block groups within the State of Maryland. For example, if a block group has an EJ index score of 86 for the hazardous waste proximity indicator, it means that only 14 percent of block groups in Maryland have higher values. The higher the EJ Index, the greater the potential for EJ concern. See https://www.epa.gov/EJSCREEN/overview-environmental-indicators-EJSCREEN for definitions and detailed information about the program methodology.

6

## Raw MD EJSCREEN Data*

| Tract within EJ Analysis Area | Analysis Area Community | Managed Lanes Study EJ Population? | EJScore (%ile in State) | Exposure (%ile in State) | Environmental Effect (%ile in State) | Sensitive Populations (%ile in State) | Socioeconomic Factors (%ile in State) |
|---|---|---|---|---|---|---|---|
| 4701.00 | McLean | no | n/a | n/a | n/a | n/a | n/a |
| 4801.00 | McLean | no | n/a | n/a | n/a | n/a | n/a |
| 7007.17 | Gaithersburg | yes | 0.72 | 0.96 | 0.52 | 0.60 | 0.78 |
| 7007.18 | Rockville | no | 0.45 | 0.89 | 0.09 | 0.47 | 0.35 |
| 7008.16 | Gaithersburg | yes | 0.52 | 0.84 | 0.33 | 0.18 | 0.72 |
| 7008.17 | Gaithersburg | yes | 0.58 | 0.92 | 0.36 | 0.54 | 0.49 |
| 7008.29 | Gaithersburg | yes | 0.46 | 0.56 | 0.19 | 0.64 | 0.45 |
| 7010.01 | Rockville | no | 0.37 | 0.86 | 0.40 | 0.05 | 0.17 |
| 7010.02 | Rockville | no | 0.35 | 0.88 | 0.37 | 0.09 | 0.06 |
| 7010.04 | Rockville | no | 0.36 | 0.72 | 0.33 | 0.10 | 0.29 |
| 7010.05 | Rockville | no | 0.53 | 0.95 | 0.60 | 0.29 | 0.28 |
| 7010.06 | Rockville | no | 0.39 | 0.88 | 0.34 | 0.11 | 0.23 |
| 7010.07 | Rockville | yes | 0.45 | 0.92 | 0.18 | 0.52 | 0.19 |
| 7012.05 | North Bethesda | no | 0.42 | 0.98 | 0.59 | 0.02 | 0.08 |
| 7012.06 | Potomac | no | 0.25 | 0.68 | 0.14 | 0.06 | 0.12 |
| 7012.10 | Rockville | no | 0.33 | 0.48 | 0.03 | 0.73 | 0.06 |
| 7012.11 | Rockville | no | 0.33 | 0.57 | 0.06 | 0.33 | 0.37 |
| 7012.13 | North Bethesda | no | 0.40 | 0.85 | 0.43 | 0.17 | 0.14 |
| 7012.15 | North Bethesda | yes | 0.48 | 0.99 | 0.70 | 0.06 | 0.17 |
| 7044.01 | North Bethesda | no | 0.52 | 0.99 | 0.81 | 0.08 | 0.20 |
| 7044.03 | Bethesda | no | 0.72 | 1.00 | 0.90 | 0.79 | 0.21 |
| 7044.04 | Bethesda | no | 0.57 | 0.98 | 0.95 | 0.28 | 0.09 |
| 7045.01 | North Bethesda | yes | 0.58 | 0.96 | 0.80 | 0.38 | 0.16 |
| 7045.02 | Bethesda | no | 0.41 | 0.93 | 0.71 | 0.00 | 0.01 |
| 7045.03 | Bethesda | no | 0.59 | 0.84 | 0.87 | 0.62 | 0.02 |
| 7058.00 | Cabin John | no | 0.45 | 0.62 | 0.63 | 0.55 | 0.00 |

7

00005357

| Tract within EJ Analysis Area | Analysis Area Community | Managed Lanes Study EJ Population? | EJScore (%ile in State) | Exposure (%ile in State) | Environmental Effect (%ile in State) | Sensitive Populations (%ile in State) | Socioeconomic Factors (%ile in State) |
|---|---|---|---|---|---|---|---|
| 7059.01 | Bethesda | no | 0.49 | 0.65 | 0.62 | 0.67 | 0.02 |
| 7059.02 | Bethesda | no | 0.42 | 0.79 | 0.67 | 0.16 | 0.05 |
| 7060.08 | Potomac | no | 0.12 | 0.31 | 0.13 | 0.01 | 0.02 |
| 7060.09 | Potomac | no | 0.26 | 0.51 | 0.30 | 0.23 | 0.01 |
| 7060.12 | Potomac | yes | 0.50 | 0.67 | 0.17 | 0.46 | 0.71 |
| 7060.13 | Potomac | no | 0.40 | 0.79 | 0.58 | 0.11 | 0.13 |

*MD EJSCREEN data is reported in percentiles as a decimal from 0-1, comparing the indicators in each Analysis Area tract to those of all tracts within the State of Maryland. For example, a tract with a score of 0.9 is in the 90th percentile, meaning only 10 percent of tracts in Maryland have higher values. The higher the value, the greater the potential for EJ concern. See https://p1.cgis.umd.edu/mdejscreen/help.html for definitions and detailed information about the program methodology.*

8

## EPA EJSCREEN Results*

| Summary | Percentile Range for the Study's EJ Populations | Study's Non-EJ Populations at/above 50th Percentile and Corresponding Analysis Area Community |
|---|---|---|
| **Hazardous Waste Proximity** | | |
| Nine of the Study's 16 EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Hazardous Waste Proximity.<br><br>The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Hazardous Waste Proximity in the EJ Analysis Area. | 13th – 96th | none |
| **Lead Paint** | | |
| Eleven of the Study's 16 EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Lead Paint.<br><br>The Gaithersburg and Potomac Analysis Area Communities contain the populations with the top 5 EJ Index percentiles for Lead Paint in the EJ Analysis Area. | 26th – 76th | Rockville<br>• 7007.18 – 1<br>• 7007.18 – 2<br>• 7010.01 – 3<br>• 7010.06 – 2<br>• 7012.10 – 1<br>North Bethesda<br>• 7012.05 – 3<br>• 7012.13 – 1<br>• 7012.13 – 2<br>Potomac<br>• 7012.06 – 1 |
| **Air Toxics Cancer Risk** | | |
| Ten of the Study's 16 EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Air Toxics Cancer Risk.<br><br>The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Air Toxics Cancer Risk in the EJ Analysis Area. | 47th – 65th | McLean<br>• 4801.00 - 4<br>Potomac<br>• 7060.12 - 1 |

9

| Summary | Percentile Range for the Study's EJ Populations | Study's Non-EJ Populations at/above 50th Percentile and Corresponding Analysis Area Community |
|---|---|---|
| **Diesel Particulate Matter** | | |
| Nine of the Study's 16 EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Diesel Particulate Matter.<br><br>The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Diesel Particulate Matter in the EJ Analysis Area. | 35th to 95th | McLean<br>• 4801.00 - 4<br>Potomac<br>• 7060.12 - 1 |
| **Air Toxics Respiratory Hazard Index** | | |
| Ten of the Study's 16 EJ populations have EJ Indexes that are at or above the 50th percentile in the state for the Air Toxics Respiratory Hazard Index.<br><br>The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Air Toxics Respiratory Hazard Index in the EJ Analysis Area. | 43rd to 92nd | McLean<br>• 4801.00 - 4<br>Potomac<br>• 7060.12 - 1 |
| **Ozone** | | |
| Ten of the Study's 16 populations have EJ Indexes that are at or above the 50th percentile in the state for Ozone.<br><br>The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Ozone in the EJ Analysis Area. | 44th to 92nd | McLean<br>• 4801.00 - 4<br>Potomac<br>• 7060.12 - 1 |
| **Particulate Matter (PM 2.5)** | | |
| Ten of the Study's 16 EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Particulate Matter.<br><br>The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Particulate Matter in the EJ Analysis Area. | 44th to 92nd | McLean<br>• 4801.00 - 4<br>Potomac<br>• 7060.12 - 1 |
| **Proximity to Risk Management Plan (RMP) Sites** | | |
| Thirteen of the Study's EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Proximity to Risk Management Sites. | 47th to 75th | McLean<br>• 4801.00 - 4 |

10

| Summary | Percentile Range for the Study's EJ Populations | Study's Non-EJ Populations at/above 50th Percentile and Corresponding Analysis Area Community |
|---|---|---|
| The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Proximity to RMP Sites in the EJ Analysis Area. | | Potomac<br>• 7060.12 – 1<br>North Bethesda<br>• 7012.05 – 3<br>Rockville<br>• 7010.07 - 2 |
| **Superfund Proximity** | | |
| Eleven of the Study's EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Superfund Proximity.<br><br>The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Superfund Proximity in the EJ Analysis Area. | 47th to 75th | McLean<br>• 4801.00 - 4<br>Potomac<br>• 7060.12 – 1<br>North Bethesda<br>• 7012.05 – 3 |
| **Traffic Proximity** | | |
| Nine of the Study's EJ populations have EJ Indexes that are at or above 50th percentile in the state for Traffic Proximity.<br><br>The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Traffic Proximity in the EJ Analysis Area. | 4th to 99th | Potomac<br>• 7060.12 – 1 |
| **Wastewater Discharge** | | |
| Seven of the Study's EJ populations have EJ Indexes that are at or above the 50th percentile in the state for Wastewater Discharge.<br><br>The Gaithersburg Analysis Area Community contains the populations with the top 5 EJ Index percentiles for Wastewater Discharge in the EJ Analysis Area. | 27th to 73rd | none |

**\*** See https://www.epa.gov/EJSCREEN/overview-environmental-indicators-EJSCREEN for definitions and detailed information about the program methodology.

Note: *PM* is particulate matter.

11

00005361

## MD EJ SCREEN Results*

| Summary | Percentile Range for the Tracts Containing EJ Populations | Study's Tracts without EJ Populations at/above 50th Percentile and Corresponding Analysis Area Community |
|---|---|---|
| **Overall EJScore** | | |
| Five of the Study's 8 EJ tracts are at or above the 50th percentile in the state for overall EJ Scores.<br><br>The Gaithersburg, North Bethesda, and Bethesda Analysis Area Communities contain the tracts with the top 5 Overall EJScore percentiles in the EJ Analysis Area. | 58th to 72nd | Rockville<br>• 7010.05<br>North Bethesda<br>• 7044.01<br>Bethesda<br>• 7044.03<br>• 7045.03<br>• 7044.04 |
| **Exposure** | | |
| All 8 of the Study's EJ tracts are at or above the 50th percentile in the state for Exposure.<br><br>The North Bethesda and Bethesda Analysis Area Communities contain the tracts with the top 5 Exposure percentiles in the EJ Analysis Area. | 56th – 99th | Rockville<br>• 7007.18<br>• 7010.01<br>• 7010.02<br>• 7010.04<br>• 7010.05<br>• 7010.06<br>• 7012.11<br>North Bethesda<br>• 7012.05<br>• 7012.13<br>• 7044.01<br>Bethesda<br>• 7044.03<br>• 7044.04 |

00005362

| Summary | Percentile Range for the Tracts Containing EJ Populations | Study's Tracts without EJ Populations at/above 50th Percentile and Corresponding Analysis Area Community |
|---|---|---|
| | | • 7045.02<br>• 7045.03<br>• 7059.01<br>• 7059.02<br>Cabin John<br>• 7058.00<br>Potomac<br>• 7012.06<br>• 7060.09<br>• 7060.13 |
| **Environmental Effects** | | |
| Three of the Study's 8 EJ tracts are at or above the 50th percentile in the state for Environmental Effects.<br><br>The North Bethesda and Bethesda Analysis Area Communities contain the tracts with the top 5 Environmental Effects percentiles in the EJ Analysis Area. | 17th – 80th | Rockville<br>• 7010.05<br>North Bethesda<br>• 7044.01<br>• 7012.05<br>Bethesda<br>• 7044.04<br>• 7044.03<br>• 7045.03<br>• 7045.02<br>• 7059.02<br>• 7059.01<br>Cabin John<br>• 7058.00 |
| **Sensitive Populations** | | |

00005363

*I-495 and I-270 Managed Lanes Study*
*Final Community Effects Assessment and EJ Analysis Technical Report*
*Appendix F*

| Summary | Percentile Range for the Tracts Containing EJ Populations | Study's Tracts without EJ Populations at/above 50th Percentile and Corresponding Analysis Area Community |
|---|---|---|
| Four of the Study's 8 EJ tracts are at or above the 50th percentile in the state for Sensitive Populations. <br><br> The Gaithersburg, Rockville, and Bethesda Analysis Area Communities contain the tracts with the top 5 Sensitive Populations percentiles in the EJ Analysis Area. | $6^{th} - 64^{th}$ | Rockville<br>• 7012.10<br>Bethesda<br>• 7044.03<br>• 7059.01<br>• 7045.03<br>Cabin John<br>• 7058.00 |
| **Socioeconomic Factors** | | |
| Three of the Study's 8 EJ tracts are at or above the 50th percentile in the state for Socioeconomic Factors. <br><br> The Gaithersburg and Potomac Analysis Area Communities contain the tracts with the top 5 Socioeconomic Factors percentiles in the EJ Analysis Area. | $16^{th} - 78^{th}$ | none |

**\*** See https://p1.cgis.umd.edu/mdejscreen/help.html for definitions and detailed information about the program methodology.

00005364



Legend

- Limit of Disturbance
- State Boundary
- Analysis Area Community
- Census Block Groups

Hazardous Waste Proximity Index
(Percentile as compared to State)

- 0 - 24th
- 25th - 49th
- 50th - 74th
- 75th - 100th

EPA EJ SCREEN:
Hazardous Waste
Proximity Index

0  0.5  1        2
Miles

OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

00005365



EPA EJ SCREEN:
Lead Paint Indicator
Index

Limit of Disturbance
State Boundary
Analysis Area
Census Block Groups

Lead Paint Indicator Index
(Percentile as compared to State)
0 - 24th
25th - 49th
50th - 74th
75th - 100th

0   0.5   1                    2
                            Miles

OP•LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

00005366



**EPA EJ SCREEN:**
**NATA Air Toxics Cancer**
**Risk Index**

Limit of Disturbance
State Boundary
Analysis Area
Census Block Groups

**NATA Air Toxics Cancer**
**Risk Index (Percentile as**
**compared to State)**

0 - 24th
25th - 49th
50th - 74th
75th - 100th

0  0.5  1    2
Miles

OP·LANES
M A R Y L A N D

I-495 & I-270 Managed Lanes Study

00005367





Limit of Disturbance
State Boundary
Analysis Area
Census Block Groups

**NATA Respiratory Hazard Index (Percentile as compared to State)**

0 - 24th
25th - 49th
50th - 74th
75th - 100th

**EPA EJ SCREEN:**
**NATA Respiratory**
**Hazard Index**

0    0.5    1    2
Miles

OP·LANES
MARYLAND

I-495 & I-270 Managed Lanes Study

00005369



Limit of Disturbance
State Boundary
Analysis Area
Census Block Groups

Ozone Index (Percentile as compared to State)
0 - 24th
25th - 49th
50th - 74th
75th - 100th

**EPA EJ SCREEN:**
**Ozone Index**

0   0.5   1        2
Miles

OP·LANES
MARYLAND

I-495 & I-270 Managed Lanes Study

00005370



Limit of Disturbance
State Boundary
Analysis Area
Census Block Groups

Particulate Matter (PM 2.5)
Index (Percentile as
compared to State)
0 - 24th
25th - 49th
50th - 74th
75th - 100th

EPA EJ SCREEN:
Particulate
Matter (PM 2.5) Index

0  0.5  1        2
Miles

OP·LANES
MARYLAND

I-495 & I-270 Managed Lanes Study

00005371



Maryland

Gaithersburg

Rockville

Montrose Road

North Bethesda

Bethesda

Potomac

Cabin John

McLean

George Washington Memorial Parkway

Virginia

District of Columbia

| Legend | Risk Management Plan Facilities Proximity Index (Percentile as compared to State) | | EPA EJ SCREEN: Risk Management Plan Facilities Proximity Index |
|---|---|---|---|
| Limit of Disturbance | | 50th - 74th | |
| State Boundary | | 75th - 100th | |
| Analysis Area | | | |
| Census Block Groups | 0 - 24th | | |
| | 25th - 49th | | |

0  0.5  1        2
Miles

N
W   E
S

OP·LANES
MARYLAND

I-495 & I-270 Managed Lanes Study

00005372



Limit of Disturbance
State Boundary
Analysis Area
Census Block Groups

Superfund Proximity Index
(Percentile as compared to State)

0- 24th
25th - 49th
50th- 74th
75th - 100th

EPA EJ SCREEN:
Superfund Proximity
Index

0   0.5   1   2
Miles

OP•LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

00005373



Maryland

Virginia

District
of Columbia

| Limit of Disturbance | Traffic Proximity and Volume | 50th - 74th | **EPA EJ SCREEN:** |
| State Boundary | Index (Percentile as compared to State) | 75th - 100th | **Traffic Proximity and** |
| Analysis Area | 0 - 24th | | **Volume Index** |
| Census Block Groups | 25th - 49th | | |

0    0.5    1    2 Miles

OP·LANES
MARYLAND

I-495 & I-270 Managed Lanes Study

00005374



Limit of Disturbance
State Boundary
Analysis Area
Census Block Groups

Underground Storage Tanks
Indicator Index (Percentile as
compared to State)

0 - 18
19 - 34
35 - 83

**EPA EJ SCREEN:**
**Underground Storage**
**Tank Indicator Index**

0  0.5  1        2
Miles

OP·LANES
MARYLAND

I-495 & I-270 Managed Lanes Study

00005375



Legend

Limit of Disturbance
State Boundary
Analysis Area Community
Census Block Groups

Wastewater Discharge Indicator Index
(Percentile as compared to State)
0 - 10th
11th - 20th
21th - 45th
46th - 96th

EPA EJ SCREEN:
Wastewater Discharge
Indicator Index

0   0.5   1        2
Miles

OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

00005376



# APPENDIX G:
# EJ Public Involvement
# Materials

00005377

# DEIS EJ Public Involvement Materials

00005378



**MARYLAND DEPARTMENT
OF TRANSPORTATION**

**STATE HIGHWAY
ADMINISTRATION**

Larry Hogan
*Governor*

Boyd K. Rutherford
*Lt. Governor*

Gregory Slater
*Secretary*

Tim Smith, P.E.
*Administrator*

July 17, 2020

Dear Community Member:

The National Capital Region is one of the most congested in the nation, and Marylanders face the second-highest commuting times in the country. With projected population growth in the region, we will continue to see those numbers increase. Multiple studies show that a comprehensive transportation network, including improvements to I-495 and I-270 coupled with investment in transit, is necessary to address congestion and move people, goods, and services throughout the region.

To address some of these challenges today and for the future, the Federal Highway Administration (FHWA) and the Maryland Department of Transportation State Highway Administration (MDOT SHA) are completing the I-495 & I-270 Managed Lanes Study in compliance with the National Environmental Policy Act (NEPA). The study seeks to identify a solution that addresses congestion, improves trip reliability, and enhances existing and planned mobility and connectivity for other modes of travel, including transit and ridesharing, along portions of I-495 and I-270.

As of summer 2020, FHWA and MDOT SHA have completed the Draft Environmental Impact Statement (DEIS) and Draft Section 4(f) Evaluation for the Managed Lanes Study. The DEIS provides an opportunity for the public, interest groups, and other agencies to review and provide comment on the proposed federal action and the adverse and beneficial environmental impacts and proposed mitigation for unavoidable impacts. FHWA, MDOT SHA, and the Maryland Department of the Environment (MDE) will conduct six Joint Public Hearings, four virtually and two in-person, to collect testimony on the DEIS and associated Joint Federal/State Application (JPA) for the Alteration of Any Floodplain, Waterway, Tidal or Nontidal Wetland in Maryland. The U.S. Army Corps of Engineers (USACE) will participate in one hearing on August 25 to meet the Department of the Army requirements. Public and agency comments on the DEIS and JPA will be accepted between July 10 and October 8, 2020.

**To help us with our outreach efforts, we ask that you please post the enclosed flyer announcing the I-495 and I-270 Managed Lanes Study Joint Public Hearings where you display your organization's community information. The flyer is provided in English, Spanish, and Amharic. A PDF version of the flyer will automatically be emailed to your organization's email address for listserv distribution if your organization's email address is readily available online. Please contact MDOT SHA if you have not received an email with the PDF flyer.** The Joint Public Hearings are also being publicized via the program website, e-blasts, mailings, newspaper advertisements, radio, digital outlets, and social media.

00005379

Page Two

Questions or comments on the study may be provided anytime via the I-495 and I-270 P3 Program email at MLS-NEPA-P3@mdot.maryland.gov For updated information on the study and public involvement opportunities, please visit the I-495 and I-270 P3 Program website at www.495-270-P3.com.

Thank you for your assistance.  If you have questions, please contact Ms. Caryn Brookman, Environmental    Program    Manager,    at    )410)    637-3335    or    via    email    at CBrookman@mdot.maryland.gov.  Ms. Brookman will be happy to assist you.

Sincerely,

Lisa B. Choplin, DBIA
Director, I-495 and I-270 P3 Office

cc:    Ms. Caryn J. G. Brookman, Environmental Program Manager, I-495 & I-270 P3 Office,
        MDOT SHA
        Jeffrey T. Folden, P.E., DBIA, Deputy Director, I-495 and I-270 P3 Office, MDOT SHA



Larry Hogan
Governor

Boyd K. Rutherford
Lt. Governor

Gregory Slater
Secretary

Tim Smith, P.E.
Administrator

**MARYLAND DEPARTMENT
OF TRANSPORTATION**

**STATE HIGHWAY
ADMINISTRATION**

July 17, 2020

Dear Community Member:

The National Capital Region is one of the most congested in the nation, and Marylanders face the second-highest commuting times in the country. With projected population growth in the region, we will continue to see those numbers increase. Multiple studies show that a comprehensive transportation network, including improvements to I-495 and I-270 coupled with investment in transit, is necessary to address congestion and move people, goods, and services throughout the region.

To address some of these challenges today and for the future, the Federal Highway Administration (FHWA) and the Maryland Department of Transportation State Highway Administration (MDOT SHA) are completing the I-495 & I-270 Managed Lanes Study in compliance with the National Environmental Policy Act (NEPA). The study seeks to identify a solution that addresses congestion, improves trip reliability, and enhances existing and planned mobility and connectivity for other modes of travel, including transit and ridesharing, along portions of I-495 and I-270.

As of summer 2020, FHWA and MDOT SHA have completed the Draft Environmental Impact Statement (DEIS) and Draft Section 4(f) Evaluation for the Managed Lanes Study. The DEIS provides an opportunity for the public, interest groups, and other agencies to review and provide comment on the proposed federal action and the adverse and beneficial environmental impacts and proposed mitigation for unavoidable impacts. FHWA, MDOT SHA, and the Maryland Department of the Environment (MDE) will conduct six Joint Public Hearings, four virtually and two in-person, to collect testimony on the DEIS and associated Joint Federal/State Application (JPA) for the Alteration of Any Floodplain, Waterway, Tidal or Nontidal Wetland in Maryland. The U.S. Army Corps of Engineers (USACE) will participate in one hearing on August 25 to meet the Department of the Army requirements.  Public and agency comments on the DEIS and JPA will be accepted between July 10 and October 8, 2020.

**To help us with our outreach efforts, we ask that you please post the enclosed flyer announcing the I-495 and I-270 Managed Lanes Study Joint Public Hearings where you display your organization's community information. The flyer is provided in English, Spanish, and French. A PDF version of the flyer will automatically be emailed to your organization's email address for listserv distribution if your organization's email address is readily available online.  Please contact MDOT SHA if you have not received an email with the PDF flyer.** The Joint Public Hearings are also being publicized via the program website, e-blasts, mailings, newspaper advertisements, radio, digital outlets, and social media.

Page Two

Questions or comments on the study may be provided anytime via the I-495 and I-270 P3 Program email at MLS-NEPA-P3@mdot.maryland.gov For updated information on the study and public involvement opportunities, please visit the I-495 and I-270 P3 Program website at www.495-270-P3.com.

Thank you for your assistance. If you have questions, please contact Ms. Caryn Brookman, Environmental Program Manager, at )410) 637-3335 or via email at CBrookman@mdot.maryland.gov. Ms. Brookman will be happy to assist you.

Sincerely,

Lisa B. Choplin, DBIA
Director, I-495 and I-270 P3 Office

cc:    Ms. Caryn J. G. Brookman, Environmental Program Manager, I-495 & I-270 P3 Office, MDOT SHA
       Jeffrey T. Folden, P.E., DBIA, Deputy Director, I-495 and I-270 P3 Office, MDOT SHA

**MARYLAND DEPARTMENT OF TRANSPORTATION**

**STATE HIGHWAY ADMINISTRATION**

Larry Hogan
Governor

Boyd K. Rutherford
Lt. Governor

Gregory Slater
Secretary

Tim Smith, P.E.
Administrator

July 20, 2020

Dear Community Member:

The National Capital Region is one of the most congested in the nation, and Marylanders face the second-highest commuting times in the country. With projected population growth in the region, we will continue to see those numbers increase. Multiple studies show that a comprehensive transportation network, including improvements to I-495 and I-270 coupled with investment in transit, is necessary to address congestion and move people, goods, and services throughout the region.

To address some of these challenges today and for the future, the Federal Highway Administration (FHWA) and the Maryland Department of Transportation State Highway Administration (MDOT SHA) are completing the I-495 & I-270 Managed Lanes Study in compliance with the National Environmental Policy Act (NEPA). The study seeks to identify a solution that addresses congestion, improves trip reliability, and enhances existing and planned mobility and connectivity for other modes of travel, including transit and ridesharing, along portions of I-495 and I-270.

As of summer 2020, FHWA and MDOT SHA have completed the Draft Environmental Impact Statement (DEIS) and Draft Section 4(f) Evaluation for the Managed Lanes Study. The DEIS provides an opportunity for the public, interest groups, and other agencies to review and provide comment on the proposed federal action and the adverse and beneficial environmental impacts and proposed mitigation for unavoidable impacts. FHWA, MDOT SHA, and the Maryland Department of the Environment (MDE) will conduct six Joint Public Hearings, four virtually and two in-person, to collect testimony on the DEIS and associated Joint Federal/State Application (JPA) for the Alteration of Any Floodplain, Waterway, Tidal or Nontidal Wetland in Maryland. The U.S. Army Corps of Engineers (USACE) will participate in one hearing on August 25 to meet the Department of the Army requirements.  Public and agency comments on the DEIS and JPA will be accepted between July 10 and October 8, 2020.

**To help us with our outreach efforts, we ask that you please distribute the attached flyer via your organization's email listserv for sharing community information. The flyer announces the I-495 and I-270 Managed Lanes Study Joint Public Hearings and is provided in English, Spanish, Amharic, and French. Print versions of the flyer have also been mailed to your organization.  Please contact MDOT SHA if you have not received print versions of the flyer.** The Joint Public Hearings are also being publicized via the program website, e-blasts, mailings, newspaper advertisements, radio, digital outlets, and social media.

Questions or comments on the study may be provided anytime via the I-495 and I-270 P3 Program email at MLS-NEPA-P3@mdot.maryland.gov For updated information on the study and public involvement opportunities, please visit the I-495 and I-270 P3 Program website at www.495-270-P3.com.

707 North Calvert St., Baltimore, MD  21202  |  410.637.3320  |  1.833.858.5960  |  Maryland Relay TTY 800.735.2258  |  roads.maryland.gov

00005383

Page Two

Thank you for your assistance.  If you have questions, please contact Ms. Caryn Brookman, Environmental Program Manager, at (410) 637-3335 or via email at CBrookman@mdot.maryland.gov.  Ms. Brookman will be happy to assist you.

Sincerely,

Lisa B. Choplin, DBIA
Director, I-495 and I-270 P3 Office

cc:   Ms. Caryn J. G. Brookman, Environmental Program Manager, I-495 & I-270 P3 Office,
      MDOT SHA
      Jeffrey T. Folden, P.E., DBIA, Deputy Director, I-495 and I-270 P3 Office, MDOT SHA

# 495 270 MANAGED LANES STUDY

## Introduction

The National Capital Region is one of the most congested in the nation, and Marylanders face the second-highest commuting times in the country. With projected population growth in the region, we will continue to see those numbers increase. Multiple studies show that a comprehensive transportation network, including improvements to I-495 and I-270 coupled with investment in transit, is necessary to address congestion and move people, goods and services throughout the region.

To address some of these challenges today and for the future, the Federal Highway Administration (FHWA) and the Maryland Department of Transportation State Highway Administration (MDOT SHA) are completing the I-495 & I-270 Managed Lanes Study in compliance with the National Environmental Policy Act (NEPA). The study seeks to identify a solution that addresses congestion, improves trip reliability, and enhances existing and planned mobility and connectivity for other modes of travel, including transit and ridesharing, along portions of I-495 and I-270.

Extensive public outreach has been completed for the Managed Lanes Study including four Scoping Open Houses in April 2018, four Public Workshops presenting the Preliminary Range of Alternatives in July 2018, eight Public Workshops presenting the Recommended Alternatives Retained for Detailed Study in April and May 2019, and numerous community meetings and stakeholder events.

FHWA and MDOT SHA have completed the Draft Environmental Impact Statement (DEIS) and Draft Section 4(f) Evaluation for the Managed Lanes Study, with the Notice of Availability published in the Federal Register on July 10, 2020. The DEIS includes traffic, environmental, engineering, and financial analyses of the Build Alternatives and the No Build Alternative. This DEIS provides an opportunity for the public, interest groups and other agencies to review and provide comment on the proposed federal action and the adverse and beneficial environmental impacts and proposed mitigation for unavoidable impacts.

FHWA, MDOT SHA, and the Maryland Department of the Environment (MDE) will conduct six Joint Public Hearings. The U.S. Army Corps of Engineers (USACE) will participate in one hearing on August 25 to meet the Department of the Army requirements. Comments will also be accepted on the Joint Federal/State Application (JPA) for the Alteration of Any Floodplain, Waterway, Tidal or Nontidal Wetland in Maryland. USACE is responsible for reviewing the JPA per the Clean Water Act, Section 404(b)(1) and MDE is responsible for reviewing the Application per Environment Article 65-503 and 65-906, Annotated Code of Maryland.

Public and agency comments on the DEIS and JPA will be accepted between July 10 and October 8, 2020.

### 495-270-P3.COM/DEIS

## Joint Public Hearings for the DEIS and JPA

The DEIS and JPA with supporting information is available on the Program website. Hearing materials, including a presentation, informational displays, and brochure can be viewed starting July 31 at the document availability locations or on the Program website. The public will have 3 minutes to provide their testimony during both virtual and in-person hearings.

### Virtual/Online Hearings

Due to the current COVID-19 health crisis and MDOT SHA's commitment to protect the public and agency members, **the public is encouraged to provide public testimony through virtual hearings.** Four virtual hearings are planned from 9 AM – 8 PM.

**PROVIDE PUBLIC TESTIMONY:**
- **TUESDAY, AUGUST 18, 2020**
- **THURSDAY, AUGUST 20, 2020**
- **TUESDAY, AUGUST 25, 2020 (Official USACE Hearing)**
- **THURSDAY, SEPTEMBER 3, 2020**

**PROVIDE PUBLIC TESTIMONY:**
- Register at 495-270-p3.com/DEIS
- Three sessions available for each hearing:
  - Morning (9 AM – 12 PM)
  - Afternoon (1 – 4 PM)
  - Evening (5 – 8 PM)
- Email instructions will be sent for approved session time

**WATCH THE VIRTUAL HEARING ONLINE:**
- Go to 495-270-p3.com/DEIS
- Closed captioning available

**IF YOU DO NOT HAVE INTERNET ACCESS:**
- Call 855-432-1483, press * to hear options
- Listen to the virtual hearing live
- Leave your testimony by voicemail on hearing dates from 9 AM - 8 PM

### In-Person Hearings

Two in-person hearings are planned from 12 – 9 PM.

- **TUESDAY, SEPTEMBER 1, 2020** – Prince George's County – Homewood Suites by Hilton, 9103 Basil Court, Largo, MD 20774
- **THURSDAY, SEPTEMBER 10, 2020** – Montgomery County – Hilton Executive Meeting Center, 1750 Rockville Pike, Rockville, MD 20852

**PROVIDE PUBLIC OR ONE-ON-ONE TESTIMONY BY APPOINTMENT ONLY:**
- Register by calling 833-858-5960
- Choose public testimony to panelists or one-on-one testimony to court reporter
- Registered participants will be placed in time slots and may listen to public testimony and limited staff will be available to answer questions
- Registered participants will receive the same brochure that is on the Program website
- Social distancing protocols will be strictly enforced, including required face coverings, hand sanitizing stations, and limited capacity in hearing room
- Call 855-432-1483 to listen live and/or leave your testimony by voicemail on hearing dates from 12 - 9 PM

Note: MDOT SHA will make the hearing transcript available on the Program website at a later date after the hearings have been concluded; hearings could be postponed if COVID-19 conditions change.

### REQUEST FOR ASSISTANCE:

The Maryland Relay Service can assist teletype users at 7-1-1. Persons requiring assistance to participate, such as an interpreter for hearing/speech difficulties or assistance with the English language, should contact the Program toll-free number at 833-858-5960 by August 3, 2020.

**Chinese:**
如需<中文版>的函件，请发电子邮件到 mls-nepa-p3@mdot.maryland.gov 。请在电子邮件主题行标出。

**Amharic:**
የአማርኛ ቅጂ በ ኢሜይል- mls-nepa-p3@mdot.maryland.gov እባክዎ በኢሜይል ላይ ይህንን ጉዳይ ያመልክቱ።

**Vietnamese:**
Để nhận được bản tin này bằng <tiếng Việt>, xin vui lòng gửi email đến: mls-nepa-p3@mdot.maryland.gov. Xin vui lòng biểu thị trong đúng tiêu đề email.

**Spanish:**
Para recibir este boletín en, por favor envíe un correo electrónico a: mls-nepa-p3@mdot.maryland.gov. Por favor indique en el asunto del correo electrónico.

## DEIS and JPA Document Availability

The DEIS and JPA with supporting information are available online at 495-270-P3.com/DEIS. Hard copies are available for review starting July 10, as follows:

**MARYLAND STATE OFFICES: Viewing hours include Monday to Friday 11 AM to 7 PM, Saturday and Sunday 12 to 5 PM**

**Montgomery County:** MDOT SHA Gaithersburg Shop, 502 Quince Orchard Road, Gaithersburg, MD 20878 | MDTA MD 200 West Operations, 16902 Crabbs Branch Way, Rockville, MD 20855 | MDOT SHA Fairland Shop, 12020 Plum Orchard Road, Silver Spring, MD 20904 | MDOT SHA Silver Spring Study Office, 8537 Georgia Avenue, Silver Spring, MD 20910

**Prince George's County:** MDOT SHA District 3 Office, 9300 Kenilworth Avenue, Greenbelt, MD 20770

**VIRGINIA STATE OFFICE: Viewing hours include Monday to Friday 9 AM to 4 PM**

**Fairfax County:** VDOT Northern Virginia District Office, 4975 Alliance Drive, Fairfax, VA 22030

**MARYLAND LIBRARIES:** Hard copies will be available in trailers in the library parking lots. **Viewing hours include Tuesday and Thursday 11 AM to 7 PM, and Sunday 12 to 5 PM.** Once libraries are open to the public, the hard copies will be available for review in the libraries during normal branch hours.

**Montgomery County:** Chevy Chase Library | Davis (North Bethesda) Library | Kensington Park Library | Potomac Library

**Prince George's County:** Glenarden Branch Library | Largo-Kettering Branch Library | New Carrollton Branch Library | Spauldings Branch Library

**WASHINGTON DC LIBRARY: Viewing hours include Monday through Friday from 11 AM to 2 PM and 3 to 7 PM.** Should library hours change, the document will be available during normal branch hours.

**Washington, DC:** Shepherd Park Neighborhood Library

**US POST OFFICES: Viewing hours include Monday to Friday 9 AM to 5 PM, Saturday 9 AM to Varies (see below)**

**Montgomery County:** West Lake PO (Saturday closes at 1 PM), 10421 Motor City Drive, Bethesda, MD 20817 | Rockville PO (Saturday closes at 4 PM), 500 N Washington Street, Rockville, MD 20850

**Prince George's County:** Kenilworth PO (Saturday closes at 12 PM ), 6270 Kenilworth Ave, Riverdale, MD 20737 | Hampton Park PO (Saturday closes at 4 PM), 9201 Edgeworth Drive, Capitol Heights, MD 20790 | Largo PO (Saturday closes at 3 PM), 9801 Apollo Drive, Upper Marlboro, MD 20774 | Temple Hills PO , 4806 Saint Barnabas Rd, Temple Hills, MD 20748

## Ways to Comment on the DEIS and JPA

- Oral testimony to panelists at in-person or virtual hearing
- Oral testimony to court reporter at in-person
- Oral testimony via voicemail (855-432-1483) during in-person or virtual hearing times
- Written comments in comment box at in-person hearing

**ALL COMMENTS** received, whether at the hearing through oral testimony OR through other methods (comment form, email, and letter), will be given EQUAL CONSIDERATION.

Comments must be received by 11:59 PM on October 8, 2020.

### Other Ways to Comment on the DEIS

- Comment Form on 495-270-P3.com/DEIS/
- Email at MLS-NEPA-P3@mdot.maryland.gov
- Send a written letter about **DEIS**:
  Lisa B. Choplin, DBIA
  Director, I-495 & I-270 P3 Office
  Maryland Department of Transportation
  State Highway Administration
  707 North Calvert Street
  Mail Stop P-601, Baltimore, MD 21202

### Other Ways to Comment on the JPA

- Email at
  john.j.dinne@usace.army.mil (USACE)
  MDE.SHAprojects@mdot.maryland.gov (MDE)
- Send a written letter about **JPA**:
  USACE
  Baltimore District
  Attn: Mr. Jack Dinne
  2 Hopkins Plaza
  Baltimore, MD 21201-2930

  MDE
  Wetlands and Waterways Program
  Attn: Mr. Steve Hurt
  1800 Washington Blvd., Suite 4300
  Baltimore, MD 21230









**495 270 MANAGED LANES STUDY**

## Introducción

La Región de la Capital Nacional es una de las más congestionadas de la nación y los residentes de Maryland tienen el tiempo de desplazamiento en segundo lugar más alto del país. Con el crecimiento demográfico proyectado de la región, seguiremos viendo cómo esas cifras aumentan. Múltiples estudios muestran que una red de transporte integral, que incluye mejoras a la I-495 e I-270, junto con la inversión en tránsito, es necesaria para abordar la congestión y mover personas, bienes y servicios a través de la región.

Para abordar algunos de estos desafíos presentes y futuros, la Administración Federal de Carreteras (FHWA) y la Administración Estatal de Carreteras del Departamento de Maryland (MDOT SHA) están realizando el Estudio de carriles administrados de la I-495 e I-270 en cumplimiento con la Ley de Política Ambiental Nacional (NEPA). El estudio busca identificar una solución que aborde la congestión, mejore la fiabilidad de los viajes y mejore la movilidad y conectividad existentes y planificadas para otros modos de viaje, incluso el tránsito y el uso compartido, a lo largo de partes de la I-495 e I-270.

Se ha realizado una amplia difusión pública del Estudio de carriles administrados, que incluye cuatro Puertas Abiertas de Estudio en abril de 2018, cuatro Talleres Públicos que presentaron la Gama Preliminar de Alternativas en julio de 2018, ocho Talleres Públicos que presentaron las Alternativas Recomendadas Retenidas para Estudio Detallado en abril y mayo de 2019 y numerosas reuniones comunitarias y eventos de partes interesadas.

La FHWA y la MDOT SHA han realizado el Proyecto de Declaración de Impacto Ambiental (DEIS) y el Proyecto de Evaluación de la Sección 4(f) para el Estudio de Carriles Administrados, con el Aviso de Disponibilidad publicado en el Registro Federal el 10 de julio de 2020. El DEIS incluye análisis de tránsito, medio ambiente, ingeniería y finanzas de las Alternativas de Construcción y la Alternativa de No Construcción. Este DEIS brinda una oportunidad para que el público, los grupos de interés y otras agencias revean y brinden comentarios sobre la acción propuesta y los impactos ambientales adversos y beneficiosos y la mitigación propuesta para impactos inevitables.

La FHWA, la MDOT SHA y el Departamento de Medio Ambiente de Maryland (MDE) llevarán a cabo seis Audiencias Públicas Conjuntas. El Cuerpo de Ingenieros del Ejército de los Estados Unidos (USACE) participará en una audiencia el 25 de agosto para cumplir con los requisitos del Departamento del Ejército. También se aceptarán comentarios en la Solicitud Conjunta Federal y Estatal (JPA) para la Alteración de Planicie Aluvial, Vía Fluvial, Humedales Aguas Arriba o Aguas Abajo de Maryland. USACE es responsable de revisar la JPA como lo indica la Ley de Aguas Limpias, Sección 404(b)(1) y el Departamento de Medio Ambiente de Maryland (MDE) es responsable de revisar la Solicitud como lo indican los Artículos No. 5-503 y No. 5-906 de Medio Ambiente del Código Anotado de Maryland.

Los comentarios públicos y de las agencias sobre el DEIS y la JPA serán aceptados entre el 10 de julio y el 8 de octubre de 2020.

### 495-270-P3.COM/DEIS

## Audiencias Públicas Conjuntas para el DEIS y la JPA

El DEIS y la JPA con información de apoyo están disponibles en el sitio web del programa. Los materiales de las audiencias, que incluye una presentación, exhibiciones informativas y folleto se pueden ver a partir del 31 de julio en los lugares donde los documentos están disponibles o en el sitio web del programa. El público tendrá 3 minutos para dar su testimonio durante las audiencias virtuales y presenciales.

### Audiencias virtuales o en línea

Debido a la actual crisis de salud del COVID-19 y al compromiso de MDOT SHA de proteger al público y a los miembros de la agencia, se alienta al público a dar testimonio público a través de audiencias virtuales. Habrá cuatro audiencias virtuales de 9 a.m. a 8 p.m.

- **MARTES, 18 DE AGOSTO DE 2020**
- **JUEVES, 20 DE AGOSTO DE 2020**
- **MARTES, 25 DE AGOSTO DE 2020** (AUDIENCIA OFICIAL DE USACE)
- **JUEVES, 3 DE SEPTIEMBRE DE 2020**

**PRESENTAR TESTIMONIO PÚBLICO:**
- Regístrese llamando al 495-270-p3.com/DEIS
- Tres sesiones disponibles para cada audiencia:
  - Mañana (de 9 a.m. a 12 p.m.)
  - Tarde (de 1 p.m. a 4 p.m.)
  - Noche (de 5 p.m. a 8 p.m.)
- Las instrucciones por correo electrónico se enviarán para la hora de la sesión aprobada.

**VEA EN LÍNEA LA AUDIENCIA VIRTUAL:**
- Llame al 495-270-p3.com/DEIS
  **SI NO TIENE ACCESO A INTERNET:**
- Llame al 855-432-1483, pulse * con las opciones.
- Escuchar la audiencia virtual en vivo.
- Deje su testimonio por correo de voz en fechas de audiencia en el sitio aprobado.

### Audiencias presenciales

Dos audiencias presenciales están previstas de 12 p.m. a 9 p.m.:

- **MARTES, 1 DE SEPTIEMBRE DE 2020** – Condado de Prince George – Homewood Suites by Hilton, 9103 Basil Court, Largo, MD 20774
- **JUEVES, 10 DE SEPTIEMBRE DE 2020** – Condado de Montgomery – Hilton Executive Meeting Center, 1750 Rockville Pike, Rockville, MD 20852

**PRESENTAR TESTIMONIO PÚBLICO O PERSONAL SOLO CON CITA PREVIA:**
- Regístrese llamando al 833-858-5960.
- Elija testimonio público a los panelistas o testimonio personal al escribano del Tribunal.
- Los participantes registrados serán ubicados en franjas horarias y podrán escuchar el testimonio público y personal limitado estará disponible para responder preguntas.
- Los participantes registrados recibirán el mismo folleto que se encuentra en el sitio web del programa.
- Los protocolos de distanciamiento social se aplicarán estrictamente, que incluye las mascarillas faciales obligatorias, las estaciones de desinfección de manos y una capacidad limitada en la sala de audiencias.
- Llame al 855-432-1483 para escuchar en vivo y/o deje su testimonio por correo de voz en las fechas de audiencia de 12 a 9 pm.

Nota: MDOT SHA hará disponible la transcripción de la audiencia en el sitio web del programa en una fecha posterior después de que las audiencias hayan concluido; las audiencias podrían posponerse si las condiciones del COVID-19 cambian.

### SOLICITE ASISTENCIA:

El Servicio de Retransmisión de Maryland puede ayudar a los usuarios de teléfonos en el 7-1-1. Las personas que requieran asistencia para participar, como un intérprete para dificultades auditivas o del habla o asistencia en otro idioma, deben comunicarse con el número gratuito del programa al 833-858-5960 antes del 3 de agosto de 2020.

*Chinese:*
如需小字及版小的資料，請及电子邮件至 mls-nepa-p3@mdot.maryland.gov，请在电子邮件主题栏标注

*Amharic:*
ይህንን ማስታወቂያ በአማርኛ መተርጐም እንዲሰጥዎ ከፈለጉ ኢሜል ያድርጉ mls-nepa-p3@mdot.maryland.gov የኢሜል የጉዳይ መስመር ውስጥ የጉዳዩ ማስታወቂያ በመግለጽ።

*Vietnamese:*
Nếu quý vị muốn bản tin này bằng tiếng Việt, xin vui lòng gửi email đến mls-nepa-p3@mdot.maryland.gov. Xin vui lòng biểu thị trong dòng chủ đề của email.

*Spanish:*
Si desea este boletín en español, por favor envíe un correo electrónico a mls-nepa-p3@mdot.maryland.gov. Por favor indique en el asunto del correo electrónico.

## Disponibilidad de documentos del DEIS y la JPA

El DEIS y la JPA con información de apoyo están disponibles en línea en **495-270-P3.COM/DEIS**. Las copias impresas están disponibles para su revisión a partir del 10 de julio, como se indica a continuación:

**OFICINAS DEL ESTADO DE MARYLAND: El horario de revisión es de lunes a viernes de 11 a.m. a 7 p.m., sábados y domingos de 12 p.m. a 5 p.m.**

**Condado de Montgomery:** MDOT SHA Gaithersburg Shop, 502 Quince Orchard Road, Gaithersburg, MD 20878 | MDTA MD 200 West Operations, 16902 Crabbs Branch Way, Rockville, MD 20855 | MDOT SHA Fairland Shop, 12020 Plum Orchard Road, Silver Spring, MD 20904 | MDOT SHA Silver Spring Study Office, 8537 Georgia Avenue, Silver Spring, MD 20910

**Condado de Prince George:** MDOT SHA District 3 Office, 9300 Kenilworth Avenue, Greenbelt, MD 20770

**OFICINA DEL ESTADO DE VIRGINIA: El horario de revisión es de lunes a viernes de 9 a.m. a 4 p.m.**

**Condado de Fairfax:** VDOT Northern Virginia District Office, 4975 Alliance Drive, Fairfax, VA 22030

**BIBLIOTECAS DE MARYLAND:** Las copias impresas estarán disponibles en las casas rodantes en los estacionamientos de la biblioteca. **El horario de revisión es de martes y jueves de 11 a.m. a 2 p.m. y domingos de 12 p.m. a 5 p.m.** Una vez que las bibliotecas estén abiertas al público, las copias impresas estarán disponibles para su revisión en las bibliotecas durante el horario normal de cada biblioteca.

**Condado de Montgomery:** Biblioteca de Chevy Chase | Biblioteca de Davis (North Bethesda) | Biblioteca de Kensington Park | Biblioteca de Potomac

**Condado de Prince George:** Biblioteca de Glenarden Biblioteca de Largo-Kettering | Nueva Biblioteca de Carrollton | Biblioteca de Spauldings

**BIBLIOTECA DE WASHINGTON DC: El horario de revisión es de lunes a viernes de 11 a.m. a 2 p.m. y de 3 p.m. a 7 p.m.** Si cambia el horario de la biblioteca, el documento estará disponible durante el horario normal de la biblioteca.

**Washington DC:** Biblioteca del barrio de Shepherd Park

**OFICINAS POSTALES DE EE. UU.: El horario de revisión es de lunes a viernes de 9 a.m. a 5 p.m., sábados de las 9 a.m. hasta una hora distinta (ver más abajo)**

**Condado de Montgomery:** West Lake PO (sábado cierra a la 1 p.m.), 10421 Motor City Drive, Bethesda, MD 20817 | Rockville PO (sábado cierra a las 4 p.m.), 500 N Washington Street, Rockville, MD 20850

**Condado de Prince George:** Kenilworth PO (sábado cierra a las 12 p.m.), 6270 Kenilworth Ave, Riverdale, MD 20737 | Hampton Park PO (sábado cierra a las 4 p.m.), 9201 Edgeworth Drive, Capitol Heights, MD 20790 | Largo PO (sábado cierra a las 3 p.m.), 9801 Apollo Drive, Upper Marlboro, MD 20774 | Temple Hills PO, 4806 Saint Barnabas Rd, Temple Hills, MD 20748

## Formas de comentar sobre el DEIS y la JPA

- Testimonio oral a panelistas en persona o audiencia virtual
- Testimonio oral al escribano del tribunal en persona
- Testimonio oral a través del correo de voz (855-432-1483) durante los horarios de audiencia presencial o virtual
- Comentarios escritos en el cuadro de comentarios en la audiencia presencial

**TODOS LOS COMENTARIOS** recibidos, ya sea en la audiencia a través de testimonio oral O a través de otros métodos (formulario de comentario, correo electrónico o carta), tendrán IGUAL CONSIDERACIÓN.

**Los comentarios deben ser recibidos antes de las 11:59 p.m. del 8 de octubre de 2020**

### Otras formas de comentar sobre el DEIS

- Formulario de comentarios en 495-270-P3.com/DEIS/
- Correo electrónico a MLS-NEPA-P3@mdot.maryland.gov
- Envíe una carta escrita sobre **DEIS:**
  Lisa B. Choplin, DBIA
  Director, I-495 & I-270 P3 Office
  Maryland Department of Transportation State Highway Administration 707 North Calvert Street Mail Stop P-601, Baltimore, MD 21202

### Otras formas de comentar sobre la JPA

- Correo electrónico a:
  john.j.dinne@usace.army.mil (USACE)
  MDE.SHAprojects@maryland.gov (MDE)
- Envíe una carta escrita sobre la **JPA** a:
  USACE
  Baltimore District
  Attn: Mr. Jack Dinne
  2 Hopkins Plaza
  Baltimore, MD 21201-2930

  MDE
  Wetlands and Waterways Program
  Attn: Mr. Steve Hurt
  1800 Washington Blvd., Suite 4300
  Baltimore, MD 21230




TRAFFIC RELIEF PLAN


MDOT
MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION


U.S. Department of Transportation
Federal Highway Administration

Maryland Department of the Environment


US Army Corps of Engineers

00005386



## Introduction

La région de la capitale nationale est l'une des plus encombrées du pays, et les habitants du Maryland doivent faire face à la deuxième plus grande durée des trajets domicile-travail au pays. Avec la croissance démographique prévue dans la région, nous allons continuer à voir ces chiffres augmenter. De nombreuses études montrent qu'un réseau de transport complet, comprenant des améliorations de l'I-495 et de l'I-270 associées à des investissements dans le transport en commun, est nécessaire pour remédier aux encombrements et déplacer les personnes, les biens et les services dans toute la région.

Pour relever certains de ces défis, aujourd'hui et à l'avenir, l'administration fédérale des routes (FHWA) et l'administration des routes d'État du ministère des transports du Maryland (MDOT SHA) sont en train d'achever l'étude sur les voies gérées des autoroutes I-495 et I-270, conformément à la loi sur la politique environnementale nationale (NEPA). L'étude cherche à identifier une solution qui permette de remédier aux encombrements, d'améliorer la fiabilité des déplacements et de renforcer la mobilité et la connectivité existantes et prévues pour d'autres modes de transport, y compris le transit et le covoiturage, le long de certaines portions des autoroutes I-495 et I-270.

Une vaste campagne de sensibilisation du public a été menée dans le cadre de l'étude sur les voies gérées, notamment quatre journées portes ouvertes en avril 2018, quatre ateliers publics présentant la gamme préliminaire de solutions de rechange en juillet 2018, huit ateliers publics présentant les solutions de rechange recommandées retenues pour l'étude détaillée en avril et mai 2019, ainsi que de nombreuses réunions communautaires et événements organisés par les parties prenantes.

La FHWA et le MDOT SHA ont achevé le projet d'étude d'impact environnemental (DEIS) et le projet d'évaluation de la section 4(f) sur les voies gérées. Avec l'avis de disponibilité publié dans le registre fédéral le 10 juillet 2020. La DEIS comprend des analyses de trafic, d'environnement, d'ingénierie et de finances des alternatives de construction et de non construction. Cette DEIS donne l'occasion au public, aux groupes d'intérêt et aux autres agences d'examiner et de commenter l'action fédérale proposée ainsi que les impacts environnementaux négatifs et bénéfiques et les mesures d'atténuation proposées pour les impacts inévitables.

La FHWA, le MDOT SHA et le ministère de l'environnement du Maryland (MDE) organiseront six audiences publiques conjointes. Le Corps des ingénieurs de l'armée américaine (USACE) participera à une audience le 25 août pour répondre aux exigences du ministère de l'armée. Des commentaires seront également acceptés sur la demande conjointe fédérale/État (JPA) pour la modification de toute plaine inondable, voie d'eau, zone humide avec ou sans marée dans le Maryland. L'USACE est responsable de l'examen du JPA conformément à la loi sur la propreté de l'eau, section 404(b)(1) et le MDE est responsable de l'examen de l'application de l'article §5-503 et §5-906 du code annoté du Maryland.

Les commentaires du public et des agences sur la DEIS et le JPA seront acceptés entre le 10 juillet et le 8 octobre 2020.

### 495-270-P3.COM/DEIS

## AUDIENCES PUBLIQUES CONJOINTES POUR LE DEIS ET LE JPA

Le DEIS et le JPA avec les informations à l'appui sont sur le site web du programme. Les documents d'audition, y compris une présentation, des présentoirs d'information et une brochure, peuvent être consultés à partir du 31 juillet dans les lieux de mise à disposition des documents ou sur le site web du programme. Le public disposera de 3 minutes pour apporter son témoignage lors des audiences virtuelles et en personne.

### Audiences virtuelles/en ligne

En raison de la crise sanitaire actuelle du COVID-19 et de l'engagement du MDOT SHA à protéger le public et les membres de l'agence, le public est encouragé à fournir des témoignages publics par le biais d'audiences virtuelles. Quatre audiences virtuelles sont prévues de 9h à 20h :

- **MARDI 18 AOÛT 2020**
- **JEUDI 20 AOÛT 2020**

**FOURNIR UN TÉMOIGNAGE PUBLIC :**
- S'inscrire au 495-270-p3.com/DEIS
- Trois séances sont disponibles pour chaque audition :
  - Matin (9h – 12h)
  - Après-midi (13 - 16h)
  - Soirée (17h - 20h)
- Des instructions par courriel seront envoyées pour le temps de session approuvé

- **MARDI 25 AOÛT 2020** (AUDIENCE OFFICIELLE DE L'USACE)

**REGARDEZ L'AUDITION VIRTUELLE EN LIGNE :**
- Allez à 495-270-p3.com/DEIS
- Sous-titrage code disponible

**SI VOUS N'AVEZ PAS ACCÈS À INTERNET :**
- Appelez le 855-432-1483, appuyez sur * pour connaître les options
- Écoutez l'audition virtuelle en direct
- Laissez votre témoignage par messagerie vocale aux dates d'audience de 9h à 20h

### Audiences en personne

Deux audiences en personne sont prévues de 12h à 21h :

- **MARDI 1ER SEPTEMBRE 2020** — PComté de Prince George - Homewood Suites by Hilton, 9100 Basil Court, Largo, MD 20774

- **JEUDI 10 SEPTEMBRE 2020** — Comté de Montgomery - Hilton Executive Meeting Center, 1750 Rockville Pike, Rockville, MD 20852

**FOURNIR DES TÉMOIGNAGES PUBLICS OU INDIVIDUELS SUR RENDEZ-VOUS UNIQUEMENT :**
- Inscrivez-vous en appelant le 833-858-5960
- Choisissez entre un témoignage public devant les panélistes ou un témoignage individuel devant un sténographe judiciaire
- Les participants inscrits seront placés dans des créneaux horaires et pourront écouter des témoignages publics et un personnel limité sera disponible pour répondre aux questions
- Les participants inscrits recevront la même brochure que celle qui se trouve sur le site web du programme
- Les protocoles de distanciation sociale seront strictement appliqués, notamment en ce qui concerne les couvre-visages obligatoires, les postes de désinfection des mains et la capacité limitée des salles d'audience
- Appelez le 855-432-1483 pour écouter en direct et/ou laisser votre témoignage par messagerie vocale aux dates d'audience de 12 à 21 heures

Remarque : Le MDOT SHA mettra la transcription des audiences à disposition sur le site web du Programme à une date ultérieure après la fin des audiences ; les audiences pourraient être reportées si les conditions de COVID-19 changent.

### DEMANDE D'ASSISTANCE

Le Maryland Relay Service peut aider les utilisateurs de téléyype au 7-1-1. Les personnes qui ont besoin d'une assistance pour participer, comme un interprète pour les difficultés d'audition ou de parole ou une assistance pour la langue anglaise, doivent contacter le numéro gratuit du programme au 833-858-5960 avant le 3 août 2020.

**Chinese:**
如需中文版の翻訳、请发电子邮件到 mls-nepa-p3@mdot.maryland.gov 、请在电子邮件主题栏位

**Vietnamese:**
Để nhận được bản tin này bằng tiếng Việt, xin vui lòng gửi email đến mls-nepa-p3@mdot.maryland.gov Xin vui lòng điền thị trong đầng chủ đề email

**Amharic:**
[Amharic text]
mls-nepa-p3@mdot.maryland.gov

**Spanish:**
Para recibir este boletín en, por favor envíe un correo electrónico a mls-nepa-p3@mdot.maryland.gov. Por favor indique en el asunto del correo electrónico.

## Disponibilité des documents de la DEIS et de JPA

Le DEIS et l'APP avec les informations à l'appui sont disponibles en ligne au **495-270-P3.com/DEIS**. Des copies papier sont disponibles pour examen à partir du 10 juillet, comme suit :

**BUREAUX DE L'ÉTAT DU MARYLAND : Les heures de consultation sont du lundi au vendredi de 11 h à 19 h, le samedi et le dimanche de 12 h à 17 h.**

Le comté de Montgomery : MDOT SHA Gaithersburg Shop, 502 Quince Orchard Road, Gaithersburg, MD 20878 | MDTA MD 200 West Operations, 16902 Crabbs Branch Way, Rockville, MD 20855 | MDOT SHA Fairland Shop, 12020 Plum Orchard Road, Silver Spring, MD 20904 | MDOT SHA Silver Spring Study Office, 8537 Georgia Avenue, Silver Spring, MD 20910

Le comté de Prince George : MDOT SHA District 3 Office, 9300 Kenilworth Avenue, Greenbelt, MD 20770

**VBUREAU DE L'ÉTAT DE VIRGINIE : Les heures de visionnage sont du lundi au vendredi de 9h à 16h**

Le comté de Fairfax : VDOT Northern Virginia District Office, 4975 Alliance Drive, Fairfax, VA 22030

**LES BIBLIOTHÈQUES DU MARYLAND :** Des copies papier seront disponibles dans des remorques sur les parkings des bibliothèques. **Les heures de consultation comprennent le mardi et le jeudi de 11 h à 19 h, et le samedi de 12 h à 17 h.** Une fois que les bibliothèques seront ouvertes au public, les copies papier seront disponibles pour consultation dans les bibliothèques pendant les heures d'ouverture normales de ses succursales.

Comté de Montgomery : Bibliothèque Chevy Chase | Bibliothèque Davis (North Bethesda) | Bibliothèque Kensington Park | Bibliothèque Potomac

Le comté de Prince George : Bibliothèque succ. Glenarden | Bibliothèque succ. Largo-Kettering | Bibliothèque succ. New Carrollton | Bibliothèque succ. Spauldings

**WASHINGTON DC LIBRARY :** Les heures de consultation sont du lundi au vendredi de 11 h à 14 h et de 15 h à 19h. Si les heures d'ouverture de la bibliothèque changent, le document sera disponible pendant les heures d'ouverture normales de l'agence.

Washington DC : SBibliothèque de quartier de Shepherd Park

**BUREAUX DE POSTE US : Les heures d'ouverture comprennent du lundi au vendredi de 9h à 17h, le samedi de 9h à 17h.**

Le comté de Montgomery : West Lake PO (fermeture le samedi à 13h), 10421 Motor City Drive, Bethesda, MD 20817 | Rockville PO (fermeture à 16h), 500 N Washington Street, Rockville, MD 20850

Le comté de Prince George : Kenilworth PO (fermeture le samedi à 12 h), 6270 Kenilworth Ave, Riverdale, MD 20737 | Hampton Park PO (fermeture le samedi à 16 h), 9201 Edgeworth Drive, Capitol Heights, MD 20790 | Largo PO (fermeture le samedi à 15 h), 9801 Apollo Drive, Upper Marlboro, MD 20774 | Temple Hills PO , 4806 Saint Barnabas Rd, Temple Hills, MD 20748

## Commenter sur DEIS et JPA

- Témoignage oral aux membres du panel lors d'une audition en personne ou virtuelle
- Témoignage oral au sténographe judiciaire en personne
- Témoignage oral via la messagerie vocale (855-432-1483) pendant les heures d'audition en personne ou virtuelles
- Commentaires écrits dans la boîte de commentaires lors de l'audition en personne

TOUS LES COMMENTAIRES reçus, que ce soit lors de l'audition par le biais d'un témoignage oral ou par d'autres méthodes (formulaire de commentaires, courriel et lettre), seront examinés de manière égale

**Les commentaires doivent être reçus avant 23h59 le 8 octobre 2020.**

### Autres façons de commenter l'étude d'impact sur le DEIS

- @ Formulaire de commentaires sur 495-270-P3.com/DEIS/
- Courriel : MLS-NEPA-P3@mdot.maryland.gov
- Envoyez une lettre écrite au sujet de la DEIS :

Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation
State Highway Administration
707 North Calvert Street
Mail Stop P-601, Baltimore, MD 21202

### Autres façons de commenter sur JPA

- Adresse électronique
  john.j.dinne@usace.army.mil (USACE)
  MDE.SHAprojects@maryland.gov (MDE)
- Envoyer une lettre écrite sur JPA :

USACE
Baltimore District
Attn: Mr. Jack Dinne
2 Hopkins Plaza
Baltimore, MD 21201-2930

MDE
Wetlands and Waterways Program
Attn: Mr. Steve Hurt
1800 Washington Blvd., Suite 4300
Baltimore, MD 21230





TRAFFIC RELIEF PLAN

MDOT MARYLAND DEPARTMENT OF TRANSPORTATION STATE HIGHWAY ADMINISTRATION

U.S. Department of Transportation Federal Highway Administration

Maryland Department of the Environment

US Army Corps of Engineers

00005387

    

**MANAGED LANES STUDY** 495 270

## መግቢያ

የሜሪላንድ ካፒታል ክፍለ በአካባቢ ቁጥሩ ጠባብ የሆኑ ከተሎናናቸው ውጤ አንዱ ሲሆን የሚጎዳው ደውየ ፈጣን መጎልባታ ጎበጎበ በውሎች ደርሰዋል ፡፡ በዚሁ ውጤ በዓመታ ውስጥ የሚከናወ የትራፊክ እንቅስቃሴዎሙ በ I-495 እና I-270 በመንገዱ ጥበትና በትራፊክ መጨናነቅ ምክንያት የሚጎዳ የዕለት ተዕለት ጎበበ ፡፡

የአካባቢ ትራታ ሻቸሙ የፌደራል መንገዶች አስተዳደር (FHWA) እና ሜሪላንድ የትራንስፖርት ግዛት ወይዘሮ አስተዳደር (MDOT SHA) በአካባ ፖል ልክ (NEPA) በሚስማማ መንገድ I-495 እና I-270 ለመንገ ዓ ሙሉ ፕሮግራም ነው ፡፡

## ለዲሃ መስመሮ/በእንላይን የሚኒኒሄ ችሎቶች

እነዛ ባዕለ የ COVID-19 ችግሩ ቀጥለ ለንፋሎ MDOT SHA የጣሙ ዛ ይይረሙ ዛ ለመቀዋል ኀም ፈቀልበሮች መሰረ በአካባቢ እና በመ መሰመሮ ፍሩንቤት ይዉዉ ፡፡

- የመደበ አላል 20 2020 ዓ.ም
- ሐመዝ አ 25 2020 ዓ.ም (ዛላ TUSACE ችሎ)
- ሐመዝ አ 20 2020 ዓ.ም

ለእነዝ የኮፒ የሚያስፈልጉ መከታፎ:
- **በዛ ላይ ይመጣበት**: 495-270-p3.com/DEIS
- **ኢንተርኔት ፍሩት**: ሳተ ከክል-ኀ98 ኀ5 -
  - ዋዋ (9 ከ10ም — 12 ከክፍ)
  - ከዎም በ08 (1 — 4 ከክፍ)
  - ዋዉሙ (5 — 8 ከክፍ)
  - ዉ.ዉ መመሃ ስተ/ቀጠኑ ከ65 ዛ ይላል
- **በ ዉ.ዉ መመሃ ስተ/ቀጠኑ ከ65 ዛ ይላል**
- **ፍርሙቶ ተ-ኀ83 ከክ ከላ**: 495-270-p3.com/DEIS
  - የ8.85-432-1483 ይዉዉ ኀ40-ዉዉ ለመገ ማ ይም
  - በ35 ዎ-83 ሳ ዉዉ ለ ዉጢ ዎ-ዉ ሳ ዉዉዉ
  - በ ዉ.ዉ ዎ-83 ሳ ዉ ነ ዉ ዉዉ ደ ዉዉ

## በእካል የሚኒኒሄ ችሎቶች

ሁለት በእካ የሚኒኒ ችሎቶች 12 – 9 ከክ ይዉ ፡፡

- **ማዉ ዎ-መሃ**12 20 ዓ.ም — የካ24 ጆርጅ ከ8 ፦ - በ9ማሉ ክክ 9ኀ-ውሮ ሃ 9103 Basil Court, Largo, MD 20774
- **ሐመዝ ማ-ዉ**10 2020 ዓ.ም — ሜቤ ፍል ፖ ፦ - ዜ64 የክ ዉ ማ 11750 Rockville Pike, Rockville, MD 20852

ቀ ም (መ-ማ ዉ የ9ኀ): የ ዉ ዎ ዎ-ዉ 83 ኀ-ዉ ዉ ዉ ፍ ፦
- በ 8.83-858-5960 በመዉዉ ዉዉ
- ሳ9 ዉ አ8 ዉ ዉ-ዉ ዉ ዉ ዉ ዉ ዉ ዉ ዉ ዉ ዉዉ
- የመ-ዉዉ ሳ ዉ-ዉ ዉ ዉ ዉ ዉ ዉ ዉ ዉ ዉ ዉ ዉ ዉዉ
- የመ-ዉ 83-ኀ8 ዉ ዉ ዉ ዉ-ዉ ዉ ዉ ዉ ዉ ዉ ዉ-ዉ ዉ ዉ ዉዉዉ ዉ 8.85-432-1483 ይዉዉ ፦

ዉ.ዉ ዉ ዉ ዉ ዉ-ዉ ዉ ዉ ዉ ዉ COVID-19 ዉ ዉ ዉ ዉ-ዉ ዉ ዉ ዉ ዉ ፦

ድ/ መየ የሚችሉ ህ ም:

የዉ ዉ ዉ 8.7 ኀ ኀኀ ዉ ዉ-ዉ 8 ዉ ዉ ፦ ዉ ዉ ዉ ዉ ዉ-ዉ ዉ ዉ-ዉ ዉዉ ዉ ኀ ኀ 8.83-858-5960 ኀ ኀ 3 ኀ 2020 ዉ ዉ ዉ ፦

Chinese:
如果<中文版>的需求，请在电话 mls-nepa-p3@mdot.maryland.gov 。请在电子邮件主题栏标注语言

Amharic:
ዛ4-8 ዉ ዉ 8 ኀ ዉ ፦ ኀ ኀ ዉ ዉ ኀ ዉ ኀ
mls-nepa-p3@mdot.maryland.gov ኀ ኀ ኀ
ኀ ኀ ዉ ፦

Vietnamese:
Để nhận được bản tin này bằng
<tiếng Việt>, xin vui lòng gửi email
đến: mls-nepa-p3@mdot.maryland.gov. Xin vui lòng biểu
thị trong dòng tiêu đề email.

Spanish:
Para recibir este boletín en, por favor envíe un correo
electrónico a: mls-nepa-p3@mdot.maryland.gov. Por favor indique en el
asunto del correo electrónico.

### 495-270-P3.COM/DEIS

## DEIS and JPA የሰነዶት ተገኝነት

DEIS እና JPA ሰነዶ መረጃዎች ዉ በ495-270-P3.com/DEIS ይገኛ ዉ ዉ ዉ ኀ ኀ 10 ጀምሮ ቀ ኀ ኀ 10 ጀምሮ ቀ ኀ ፦

*ፍዛዎ ጠፍ ብ8*: ዉ-ዉ ዉ ዉ ኀ ኀ ኀ 7 ከክ ፦ ዉ ኀ ዉ ኀ ኀ ኀ 12 ከክ ፦
- ዉዉ ዉ-ዉ ኀ MDOT SHA Gaithersburg Shop, 502 Quince Orchard Road, Gaithersburg, MD 20878 | MDTA MD 200 West Operations, 16902 Crabbs Branch Way, Rockville, MD 20855 | MDOT SHA Fairland Shop, 12020 Plum Orchard Road, Silver Spring, MD 20904 | MDOT SHA Silver Spring Study Office, 8537 Georgia Avenue, Silver Spring, MD 20910
- የካ24 ጆርጅ ከ8 2 ዉ ዉ ኀ 9300 Kenilworth Avenue, Greenbelt, MD 20770
- ፌ8ኀ ከ8 ዉ VDOT ኀ ኀ ኀ ኀ ኀ 4975 Alliance Drive, Fairfax, VA 22030

*ዉ ኀ ዉ-ዉ*: ዉ ዉ ዉ ኀ ኀ ኀ 7 ኀ ኀ ኀ ኀ ኀ 7 ኀ ኀ 5 ኀ ኀ ኀ ኀ ፦
- ዉዉ ኀ-ኀ ኀ ኀ ኀ ኀ | ኀ ኀ ኀ ኀ ኀ ኀ | ኀ ኀ ኀ | 2ኀ ኀ ኀ ኀ ኀ
- የካ24 ጆ ኀ ኀ8 *ዉ ኀ-ዉ* ኀ | ኀ ኀ ኀ ኀ | ኀ-ኀ ኀ ኀ ኀ | ኀ ኀ ኀ ኀ ኀ
- *ዉ ዉ ኀ ኀ ዉ-ዉ* ኀ: ዉ ኀ ኀ ኀ ኀ ኀ ኀ 2 ኀ ኀ 3 ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ
- ዉ ዉ ኀ ኀ-ኀ ኀ: ኀ ኀ ኀ ኀ ኀ ኀ
- *ዉ ኀ ኀ ኀ-ዉ*: ዉ ኀ ኀ ኀ ኀ ኀ ኀ 9 ኀ ኀ ኀ ኀ 9 ኀ ኀ (ኀ ኀ)
- ዉዉ ኀ-ዉ ኀ: West Lake PO (ኀ4 ኀ ኀ ኀ) 10421 Motor City Drive, Bethesda, MD 20817 | Rockville PO (ኀ4 ኀ ኀ ኀ) 500 N Washington Street, Rockville, MD 20850
- የካ24 ጆ ኀ8: Kenilworth PO (ኀ12 ኀ ኀ ኀ): 6270 Kenilworth Ave, Riverdale, MD 20737 | Hampton Park PO (ኀ4 ኀ ኀ ኀ) : 9201 Edgeworth Drive, Capitol Heights, MD 20790 | Largo PO (ኀ3 ኀ ኀ ኀ): 9801 Apollo Drive, Upper Marlboro, MD 20774 | Temple Hills PO, 4806 Saint Barnabas Rd, Temple Hills, MD 20748

## በ DEIS እና JPA ላይ አስተያየት የመስጠት መንገዶት

- የ9ኀ ማከከ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ
- ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ
- ኀ ኀ ኀ ኀ ኀ ኀ ኀ-ኀ ኀ (855-432-1483) ኀ ኀ ኀ ኀ ኀ ኀ
- ኀ ኀ ኀ-ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ

ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ (ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ

ኀ ኀ ኀ ኀ 8 ኀ 2020 ኀ:59 ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ፦

**DEIS ላይ አስተያየት ለመስጠት ለዶች መንገዶት**
- 🌐 ኀ ኀ ኀ ኀ: 495-270-P3.com/DEIS/
- ✉ ኀ ኀ ኀ ኀ: MLS-NEPA-P3@mdot.maryland.gov
- 📧 ለ DEIS ኀ ኀ ኀ ኀ:

**በJPA ላይ አስተያየት የሚሰጥበት ለዶች መንገዶት**
- 🌐 በዚህ ኀ ኀ ኀ: john.j.dinne@usace.army.mil (USACE) MDE.SHAprojects@maryland.gov (MDE)
- 📧 ለ JPA ኀ ኀ ኀ ኀ ኀ:
  USACE ዉ ኀ ኀ ኀ ኀ ኀ ኀ ኀ 2 Hopkins Plaza Baltimore, MD 21201-2930  |  AMDE ዎ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ ኀ-ኀ ኀ 1800 Washington Blvd, Suite 4300 Baltimore, MD 21230



# 495 270 MANAGED LANES STUDY

FHWA y MDOT SHA han completado el Borrador de la Declaración de Impacto Ambiental (DEIS, por sus siglas en inglés) y el Borrador de la Sección 4(f) Evaluación para el Estudio de Carriles de Acceso Controlado, con el Aviso de Disponibilidad publicado en el Registro Federal el 10 de julio de 2020. El DEIS incluye tráfico, ambiental, ingeniería y análisis financieros de las Alternativas de construcción y la Alternativa de no construcción. Este DEIS brinda una oportunidad para que el público, los grupos de interés y otras agencias revisen y brinden comentarios sobre la acción federal propuesta y los impactos ambientales adversos y beneficiosos y la mitigación propuesta para los impactos inevitables.

FHWA, MDOT SHA y el Departamento de Medio Ambiente de Maryland (MDE, por sus siglas en inglés) llevarán a cabo seis audiencias públicas conjuntas. El Cuerpo de Ingenieros del Ejército de los EE.UU. (USACE, por sus siglas en inglés) participará en una audiencia el 25 de agosto para cumplir con los requisitos del Departamento del Ejército. También se aceptarán comentarios sobre la Solicitud Conjunta Federal/Estatal (JPA) para la alteración de cualquier planicie de inundación, vía fluvial, humedales de mareas o sin marea en Maryland. USACE es responsable de revisar el JPA según la Ley de Agua Limpia, Sección 404 (b)(1) y MDE es responsable de revisar la Aplicación según el Artículo de Medio Ambiente §5-503 y §5-906, Código Anotado de Maryland.

Los comentarios públicos y de agencias sobre el DEIS y el JPA se aceptarán entre el 10 de julio y las 11:59 P. M. del 8 de octubre de 2020.

## Formas de comentar sobre el DEIS y la JPA

- Testimonio oral a panelistas en una audiencia en persona o virtual
- Testimonio oral al reportero de la corte en persona
- Testimonio oral por correo de voz (855-432-1483) durante el tiempo de audiencia en persona o virtual
- Comentarios escritos en el cuadro de comentarios en la audiencia en persona

### Otras formas de comentar sobre el DEIS

- A través del formulario de comentarios en 495-270-P3.com/DEIS/
- Por correo electrónico a MLS-NEPA-P3@mdot.maryland.gov
- Envíe una carta escrita sobre el DEIS a:
  Lisa B. Choplin, DBIA
  Director, Oficina I-495 e I-270 P3
  Maryland Department of Transportation
  State Highway Administration
  707 North Calvert Street
  Mail Stop P-601, Baltimore, MD 21202

### Otras formas de comentar sobre la JPA

- Por correo electrónico a:
  john.j.dinne@usace.army.mil (USACE)
  MDE.SHAprojects@maryland.gov (MDE)
- Envíe una carta escrita acerca de la JPA a:
  USACE
  Baltimore District
  Attn: Mr. Jack Dinne
  2 Hopkins Plaza
  Baltimore, MD 21201-2930

  MDE
  Wetlands and Waterways Program
  Attn: Mr. Steve Hurt
  1800 Washington Blvd., Suite 4300
  Baltimore, MD 21230

**TODOS LOS COMENTARIOS** recibidos, ya sea en la audiencia a través del testimonio oral O a través de otros métodos (formulario de comentarios, correo electrónico y carta), recibirán IGUALDAD DE CONSIDERACIÓN.

## Disponibilidad de documentos DEIS y JPA

El DEIS y la JPA con información de respaldo están disponibles en línea en **495-270-P3.com/DEIS**. Las copias impresas están disponibles para su revisión a partir del 10 de julio, de la siguiente manera:

**OFICINAS ESTATALES DE MARYLAND:** El horario de revisión es de lunes a viernes de 11 AM a 7 PM, sábados y domingos de 12 a 5 PM

**Condado de Montgomery:** MDOT SHA Gaithersburg Shop, 502 Quince Orchard Road, Gaithersburg, MD 20878 | MDTA MD 200 West Operations, 16902 Crabbs Branch Way, Rockville, MD 20855 | MDOT SHA Fairland Shop, 12020 Plum Orchard Road, Silver Spring, MD 20904 | MDOT SHA Silver Spring Study Office, 8537 Georgia Avenue, Silver Spring, MD 20910

**Condado de Prince George:** MDOT SHA District 3 Office, 9300 Kenilworth Avenue, Greenbelt, MD 20770

**OFICINAS ESTATALES DE VIRGINIA:** El horario de revisión es de lunes a viernes de 9 AM a 4 PM

**Condado de Fairfax:** VDOT Northern Virginia District Office, 4975 Alliance Drive, Fairfax, VA 22030

**BIBLIOTECAS DE MARYLAND:** Las copias impresas estarán disponibles en tráilers en los estacionamientos de la biblioteca. El horario de revisión es de martes a jueves de 11 AM a 7 PM, y los domingo de 12 a 5 PM. Una vez que las bibliotecas estén abiertas al público, las copias impresas estarán disponibles para su revisión en las bibliotecas locales durante el horario habitual.

**Condado de Montgomery:** Biblioteca Chevy Chase | Biblioteca Davis (North Bethesda) | Kensington Park Biblioteca | Biblioteca Potomac

**Condado de Prince George:** Biblioteca Local Glenarden | Biblioteca Local Largo-Kettering | Biblioteca Local New Carrollton | Biblioteca Local Spauldings

**BIBLIOTECA DE WASHINGTON, DC:** El horario de revisión es de lunes a viernes de 11 AM a 2 PM y de 3 a 7 PM. Si el horario de la biblioteca cambia, el documento estará disponible durante las horas habituales de la biblioteca.

**Washington, DC:** Biblioteca Shepherd Park Neighborhood Library

**OFICINA POSTAL DE LOS EE.UU:** El horario de revisión es de lunes a viernes de 9 AM a 5 PM, Sábado de 9 AM a el horario varía (revise más abajo)

**Condado de Montgomery:** West Lake PO (el sábado cierra a la 1 PM), 10421 Motor City Drive, Bethesda, MD 20817 | Rockville PO (el sábado cierra a las 4 PM), 500 N Washington Street, Rockville, MD 20850

**Condado de Prince George:** Kenilworth PO (el sábado cierra a las 12 PM), 6270 Kenilworth Ave, Riverdale, MD 20737 | Hampton Park PO (el sábado cierra a las 4 PM), 9201 Edgeworth Drive, Capitol Heights, MD 20790 | Largo PO (el sábado cierra a las 3 PM), 9801 Apollo Drive, Upper Marlboro, MD 20774 | Temple Hills PO, 4806 Saint Barnabas Rd, Temple Hills, MD 20748

## Audiencias públicas conjuntas para el DEIS y la JPA

El DEIS y la JPA junto con información de respaldo están disponibles en el sitio web del Programa. Los materiales para la audiencia, incluida una presentación, exhibiciones informativas y un folleto, se pueden ver a partir del 31 de julio en los lugares de disponibilidad de documentos o en el sitio web del Programa. El público tendrá 3 minutos para dar su testimonio durante las audiencias virtuales y en persona.

### Audiencias virtuales/en línea

Debido a la actual crisis de salud de COVID-19 y al compromiso de MDOT SHA de proteger al público y a los miembros de la agencia, se invita al público a brindar testimonio público a través de las audiencias virtuales. Se planean cuatro audiencias virtuales de 9 AM a 8 PM:

- **MARTES, 18 DE AGOSTO DE 2020**
- **JUEVES, 20 DE AGOSTO DE 2020**
- **MARTES, 25 DE AGOSTO DE 2020 (AUDIENCIA OFICIAL USACE)**
- **JUEVES, 3 DE SEPTIEMBRE DE 2020**

**PROPORCIONE TESTIMONIO PÚBLICO:**
- Regístrese en 495-270-p3.com/DEIS
- Tres sesiones disponibles para cada audiencia:
  - Mañana (9 AM – 12 PM)
  - Tarde (1 – 4 PM)
  - Noche (5 – 8 PM)
- Se enviarán instrucciones por correo electrónico para el tiempo de sesión aprobado

**VEA LA AUDIENCIA VIRTUAL EN LÍNEA:**
- Vaya a 495-270-p3.com/DEIS
- Habrá subtítulos disponibles

**SI UD. NO TIENE ACCESO A INTERNET:**
- Llame al 855-432-1483, presione * para escuchar las opciones
- Escuche la audiencia virtual en vivo
- Deje su testimonio con un mensaje de voz los días de la audiencia de 9 AM - 8 PM

### Audiencia en Persona

Dos audiencias en persona están planificadas de 12 – 9 PM:

- **MARTES, 1 DE SEPTEMBER DE 2020** – Condado de Prince George – Homewood Suites by Hilton, 9103 Basil Court, Largo, MD 20774
- **JUEVES, 10 DE SEPTIEMBRE DE 2020** – Montgomery County – Hilton Executive Meeting Center, 1750 Rockville Pike, Rockville, MD 20852

**PROPORCIONE TESTIMONIO PÚBLICO O INDIVIDUAL SOLO POR CITA:**
- Regístrese llamando al 833-858-5960.
- Elija testimonio público para panelistas o testimonio individual para reportero de la corte.
- Los participantes registrados recibirán el mismo folleto que se encuentra en el sitio web del Programa.
- Se aplicarán estrictamente los protocolos de distanciamiento social, incluidos el uso requerido de máscaras faciales, las estaciones para limpiarse las manos y la capacidad limitada en la sala de audición.
- Llame al 855-432-1483 para escuchar en vivo y/o dejar su testimonio por correo de voz en las fechas de audiencia de 12 a 9 PM.

Nota: MDOT SHA hará que la transcripción de la audiencia esté disponible en el sitio web del Programa en una fecha posterior una vez que se hayan concluido las audiencias; las audiencias podrían posponerse si las condiciones de COVID-19 cambian.

## 495-270-P3.COM/DEIS

### SOLICITUD DE ASISTENCIA:

El Servicio de Retransmisión de Maryland puede ayudar a los usuarios de teletipos por el 7-1-1. Las personas que requieran asistencia para participar, como un intérprete para dificultades auditivas/del habla o asistencia con el idioma inglés, deben comunicarse con el número gratuito del Programa al 833-858-5960 antes del 3 de agosto de 2020.



**MDOT** MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION



U.S. Department of Transportation
**Federal Highway Administration**



Maryland Department of the Environment



US Army Corps of Engineers

00005389