Larry Hogan, Governor
Boyd Rutherford, Lt. Governor



Robert S. McCord, Secretary
Sandy Schrader, Deputy Secretary

# Maryland
## DEPARTMENT OF PLANNING
### MARYLAND HISTORICAL TRUST

October 8, 2021

Dr. Julie M. Schablitsky
MDOT State Highway Administration
707 North Calvert Street
Baltimore, MD 21202

Re:     I-495 & I-270 Managed Lanes Study (MLS)
        Updated Identification and Effects
        Montgomery and Prince George's Counties, Maryland
        MDOT SHA Project No. AW073D12

Dear Dr. Schablitsky:

Thank you for providing the Maryland Historical Trust (Trust), the Maryland State Historic Preservation Office, with additional information regarding the above-referenced undertaking. The Maryland Department of Transportation State Highway Administration's (MDOT SHA) submittal represents ongoing consultation to assess the project's effects on historic properties, pursuant to Section 106 of the National Historic Preservation Act of 1966, as amended, and the Maryland Historical Trust Act of 1985, as amended, State Finance and Procurement Article §§ 5A-325 and 5A-326 of the Annotated Code of Maryland. Trust staff have conducted a thorough review of the materials and we are writing to provide our comments and concurrence.

**Revised Area of Potential Effects (APE):** Based on ongoing design development, MDOT SHA has revised the undertaking's APE to reflect the new Preferred Alternative and includes compensatory stormwater management sites as well as stream and wetland mitigation sites. The Trust agrees that the MDOT SHA's redefined APE encompasses the geographic area within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties.

**Architecture:** Trust staff reviewed the Determination of Eligibility (DOE) Forms prepared by the Maryland Department of Transportation State Highway Administration (MDOT SHA). MDOT SHA's submittal of 14 DOE forms represents ongoing historic structure investigations within the revised APE for the I-495 & I-270 Managed Lanes Study. Our comments regarding the eligibility of historic properties for listing in the National Register of Historic Places (National Register) are provided below.

The Trust concurs with MDOT SHA that the following properties are <u>eligible</u> for listing in the National Register:

- MIHP No. M: 12-46-2 Washington Biologists' Field Club on Plummers Island
- MIHP No. M: 26-89 Latvian Evangelical Lutheran Church of Washington DC
- MIHP No. M: 29-40 Magruder Blacksmith Shop

The Trust concurs that the following properties are <u>not eligible</u> for listing in the National Register:

- MIHP No. M: 26-88 Kelley House
- 14600 Springfield Road, Germantown
- 15025 Darnestown Road, Germantown

---

Maryland Historical Trust   •   100 Community Place   •   Crownsville   •   Maryland   •   21032

Tel: 410.697.9591   •   toll free 877.767.6272   •   TTY users: Maryland Relay   •   MHT.Maryland.gov

Dr. Julie M. Schablitsky
I-495 & I-270 Managed Lanes Study (MLS)
Page 2

- 17000 White Ground Road, Boyds
- 20600 Clarksburg Road, Boyds
- 20604 Clarksburg Road, Boyds
- 23320 Clarksburg Road, Boyds
- 23320 Ridge Road, Germantown
- 23330 Ridge Road, Germantown
- Gunners Branch Local Park, Germantown
- Heritage Farm Neighborhood Park, Potomac

**Archeology:** Thank you for providing the Maryland Historical Trust, and other relevant consulting parties, with a copy of the report on the recent geophysical survey conducted by Dr. Timothy Horsley of the Morningstar Tabernacle No. 88 Order of Moses Hall and Cemetery for the I-495 & I-270 Managed Lanes Study. MDOT SHA conducted additional investigations as part of its ongoing efforts to identify the presence of human remains within the limits of disturbance of the proposed undertaking. The report presents detailed documentation on the goals, methods, and results of the additional investigations. The study yielded important data that demonstrates the extent and likely locations of numerous burials situated within the cemetery property and adjacent MDOT SHA right of way. We appreciate MDOT SHA's ongoing efforts to identify and examine this significant historic property. The results of these studies will assist MDOT SHA in developing achievable alternatives to avoid, minimize, and mitigate any adverse effects. The Trust has accessioned this addendum report into our library and look forward to receiving the final Morningstar Cemetery archeological report, when available.

MDOT SHA's project submittal also includes the review of 275 compensatory stormwater management and stream restoration sites for the potential to impact significant cultural resources. We agree with MDOT SHA's recommendations for additional Phase I archeological investigations at several of the proposed sites as identified in Attachment 4 of MDOT SHA's letter. We understand that MDOT SHA will provide for the ongoing identification, evaluation, and treatment of archeological sites that may be adversely affected by the undertaking through the provisions of a Programmatic Agreement (PA), currently under negotiation pursuant to 36 CFR 800.14(b) for this undertaking.

**Revised Assessment of Effects:** The Trust continues to agree with MDOT SHA's determination that the overall proposed undertaking will have an adverse effect on historic properties in Maryland. Furthermore, the Trust agrees with the specific effect assessments stated in Attachment 3, Tables 2, 3 and 5 of MDOT SHA's letter dated 8 September 2021. We also acknowledge FHWA's intent to make a Section 4(f) de minimis finding for the properties listed in Attachment 3, Table 4.

We look forward to further consultation with MDOT SHA and the other consulting parties in the development of a comprehensive and achievable agreement document. If you have questions or need further assistance, please contact Tim Tamburrino (for historic structures) at tim.tamburrino@maryland.gov or Beth Cole (for archeology) at beth.cole@maryland.gov. Thank you for providing us this opportunity to comment.

Sincerely,

Elizabeth Hughes
Director/State Historic Preservation Officer
EH/BC/TJT/202100884

cc:     Caryn Brookman (SHA)

00005998

Dr. Julie M. Schablitsky
I-495 & I-270 Managed Lanes Study (MLS)
Page 3

Jeanette Mar (FHWA)
Mandy Ranslow (ACHP)
I-495 & I-270 MLS Section 106 Consulting Parties

00005999

U.S. Department
of Transportation
**Federal Highway
Administration**

**Maryland Division**

31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
(410) 962-4440
(410) 962-4054

December 15, 2021

In Reply Refer To:
HDA-MD

Ms. Julie Langan
State Historic Preservation Officer
Department of Historic Resources
2801 Kensington Avenue
Richmond, VA 23221

Dear Ms. Langan:

The Federal Highway Administration (FHWA) has considered comments received and requests for signatory status on the draft Section 106 Programmatic Agreement (PA) for the I-495 and I-270 Managed Lanes Study (MLS). In consultation with the Advisory Council on Historic Preservation (ACHP), FHWA has identified the following expected signatories to the agreement: FHWA (Maryland Division), ACHP, The Maryland Historical Trust (Maryland State Historic Preservation Office [SHPO]) and the Virginia Department of Historic Resources (Virginia SHPO). These signatories are specified and required by 36 CFR 800.6(b)(2) (as referenced also in 36 CFR 800.14(b)[3]).

36 CFR 800.6(c)(2) also provides for *invited* signatories to Section 106 agreements. For the MLS, The Maryland Department of Transportation State Highway Administration (MDOT SHA) and The National Park Service (NPS), will be invited signatories to the agreement. These agencies will have defined responsibilities for implementing the commitments in the agreement. The responsibilities (as pertains to Section 106 compliance) of other consulting parties are limited to providing input and views on commitments expected in the agreement. Therefore, consulting or concurring party status is appropriate for all other parties.

FHWA expects to offer concurring party status to tribal nations, local governments, consulting federal agencies, parties representing adversely affected properties, or properties that are otherwise subject to ongoing specific commitments or coordination. Concurring in the agreement is an acknowledgement that consultation has occurred and of participation in the agreement development.

If a consulting party invited to concur in the agreement does not concur in the agreement, it does not prevent the agreement from being executed, but neither does refusal to sign foreclose future consultation if the party has a demonstrated interest in historic properties affected by the action. FHWA, and MDOT SHA, on its behalf, will continue consultation with these parties with demonstrated interest in historic properties affected by the undertaking as appropriate, regardless of concurring status.

Other parties who wish to continue consultation but may have a more distant relationship to the project or effects, may wish to continue to be included as identified consulting parties as the project development proceeds.

Please feel free to contact Ms. Jeanette Mar, FHWA Environmental Program Manager, at Jeanette.Mar@dot.gov or at 410-779-7152 if you have any questions about the expected Section 106 Programmatic Agreement signatories.

Sincerely,

GREGORY KEITH MURRILL
Digitally signed by GREGORY KEITH MURRILL
Date: 2021.12.15 08:35:04 -05'00'

Gregory Murrill
Division Administrator

cc:  Ms. Mandy Ranslow, ACHP, FHWA Liaison/Program Analyst
     Mr. David Clarke, FHWA, Federal Preservation Officer
     Mr. John Simkins, FHWA, Virginia Division, Planning & Environmental, Realty & Freight
        Team Leader
     Mr. Tony Opperman, VDOT, Cultural Resources Program Manager
     Mr. Steve Archer, MDOT SHA, Cultural Resources Team Leader
     I-495/I-270 MLS Section 106 Consulting Parties

**U.S. Department of Transportation**

**Federal Highway Administration**

**Maryland Division**

31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
(410) 962-4440
(410) 962-4054

December 15, 2021

In Reply Refer To:
HDA-MD

Ms. Elizabeth Hughes
State Historic Preservation Officer
Maryland Historic Trust
100 Community Place
Crownsville, MD 21032-2023

Dear Ms. Hughes:

The Federal Highway Administration (FHWA) has considered comments received and requests for signatory status on the draft Section 106 Programmatic Agreement (PA) for the I-495 and I-270 Managed Lanes Study (MLS). In consultation with the Advisory Council on Historic Preservation (ACHP), FHWA has identified the following expected signatories to the agreement: FHWA (Maryland Division), ACHP, The Maryland Historical Trust (Maryland State Historic Preservation Office [SHPO]) and the Virginia Department of Historic Resources (Virginia SHPO). These signatories are specified and required by 36 CFR 800.6(b)(2) (as referenced also in 36 CFR 800.14(b)[3]).

36 CFR 800.6(c)(2) also provides for *invited* signatories to Section 106 agreements. For the MLS, The Maryland Department of Transportation State Highway Administration (MDOT SHA) and The National Park Service (NPS), will be invited signatories to the agreement. These agencies will have defined responsibilities for implementing the commitments in the agreement. The responsibilities (as pertains to Section 106 compliance) of other consulting parties are limited to providing input and views on commitments expected in the agreement. Therefore, consulting or concurring party status is appropriate for all other parties.

FHWA expects to offer concurring party status to tribal nations, local governments, consulting federal agencies, parties representing adversely affected properties, or properties that are otherwise subject to ongoing specific commitments or coordination. Concurring in the agreement is an acknowledgement that consultation has occurred and of participation in the agreement development.

If a consulting party invited to concur in the agreement does not concur in the agreement, it does not prevent the agreement from being executed, but neither does refusal to sign foreclose future consultation if the party has a demonstrated interest in historic properties affected by the action. FHWA, and MDOT SHA, on its behalf, will continue consultation with these parties with demonstrated interest in historic properties affected by the undertaking as appropriate, regardless of concurring status.

Other parties who wish to continue consultation but may have a more distant relationship to the project or effects, may wish to continue to be included as identified consulting parties as the project development proceeds.

Please feel free to contact Ms. Jeanette Mar, FHWA Environmental Program Manager, at Jeanette.Mar@dot.gov or at 410-779-7152 if you have any questions about the expected Section 106 Programmatic Agreement signatories.

Sincerely,

GREGORY
KEITH MURRILL
Digitally signed by GREGORY
KEITH MURRILL
Date: 2021.12.15 08:32:41
-05'00'

Gregory Murrill
Division Administrator

cc: Ms. Mandy Ranslow, ACHP, FHWA Liaison/Program Analyst
Mr. David Clarke, FHWA, Federal Preservation Officer
Ms. Beth Cole, MHT, Administrator, Review and Compliance
Mr. Steve Archer, MDOT SHA, Cultural Resources Team Leader
I-495/I-270 MLS Section 106 Consulting Parties



Larry Hogan
Governor

Boyd K. Rutherford
Lt. Governor

Gregory Slater
Secretary

Tim Smith, P.E.
Administrator

MARYLAND DEPARTMENT
OF TRANSPORTATION

STATE HIGHWAY
ADMINISTRATION

January 4, 2022


Ms. Elizabeth Hughes
State Historic Preservation Officer
Maryland Historical Trust
100 Community Place
Crownsville, MD  21032-2023

Ms. Julie Langan
State Historic Preservation Officer
Department of Historic Resources
2801 Kensington Avenue
Richmond, VA 23221

Dear Ms. Hughes and Ms. Langan:

This letter serves to continue consultation under Section 106 of the National Historic
Preservation Act with the Maryland Historical Trust (MHT) and the Virginia Department of
Historic Resources (DHR) for Project No. AW073A13, I-495 & I-270 Managed Lanes Study
(MLS).  The MLS is the first element of the broader Op Lanes Maryland (formerly P3) program
which considers improvements along the entire length of I-495 (Capital Beltway) in Maryland,
connecting into Virginia's portion of I-495, as well as the entire length of I-270 (Dwight D.
Eisenhower Memorial Highway) up to I-70 in Frederick County, Maryland.

MDOT SHA's most recent letter, dated September 8, 2021, transmitted the revised Area of
Potential Effects (APE) based on the Preferred Alternative, including an updated Limits of
Disturbance (LOD). Additionally, this letter included the results of MDOT SHA's archaeological
and architectural investigations within the revised APE and updated National Register of Historic
Places (NRHP) eligibility and effect findings, including revised effect findings for historic
properties outside the APE for the new Preferred Alternative. Finally, the letter provided the
results of ground-penetrating radar survey at Morningstar Tabernacle No. 88 Moses Hall and
Cemetery. MHT concurred with MDOT SHA's eligibility and effect findings in a letter dated
October 8, 2021. DHR agreed with the APE revisions and eligibility and effect findings within
Virginia on October 7, 2021. A Supplemental Draft Environmental Impact Statement (SDEIS)
was published October 1, 2021.

The first draft of the MLS Programmatic Agreement (PA), which identifies mitigation measures
and commits to consultation procedures as the project moves forward, was provided to
consulting parties for comment via letter dated March 10, 2021. MDOT SHA, working with
FHWA, has considered all comments received on the first draft, and incorporated this input

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Two

where possible.  The PA now accordingly reflects the Preferred Alternative, which was not identified at the time of the first draft.  Numerous properties included in the prior draft are no longer affected by the Preferred Alternative as documented in our earlier letter.

This letter also transmits a revised Area of Potential Effects within Maryland incorporating minor engineering adjustments along the corridor at roadway edges and intersection tie-ins. There are additional minor adjustments to the LOD throughout the corridor in Maryland and at the project limits in Virginia within the previously coordinated APE, but no changes that would affect historic properties differently or that would require additional archaeological evaluation. The revised APE also encompasses additional potential compensatory stormwater management (SWM) sites that may be selected for the MLS. These sites are being incorporated into a Compensatory Stormwater Management Plan for the Op Lanes Maryland program and submitted as part of a Joint Permit Application to the United States Army Corps of Engineers and the Maryland Department of the Environment. All identified compensatory SWM locations are in Maryland. This letter includes the results of MDOT SHA's archaeological and architectural investigations within the revised APE, including eligibility determinations for two previously unrecorded architectural resources and resulting effect findings. Finally, included is an updated Determination of Eligibility (DOE) form, archaeological site form, and an updated effect determination for Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

This update includes:

- A revised Area of Potential Effects (APE) in Maryland to encompass minor engineering adjustments along the corridor; additional compensatory SWM and wetland mitigation sites; pedestrian bridges in Cabin John Regional Park; and parking improvements at the Cabin John Trail trailhead in Cabin John Stream Valley Park (**Attachment 1**);
- New DOEs based on the revised APE and an updated DOE for Morningstar Tabernacle No. 88 Moses Hall and Cemetery (**Attachment 2**);
- Summaries of compensatory SWM and stream and wetland mitigation locations in Maryland and affected archaeological and architectural resources **(Attachments 3 and 4);**
- An updated effect determination for Morningstar Tabernacle No. 88 Moses Hall and Cemetery (**Attachment 5**);
- Updated Eligibility and Effects Tables (**Attachment 6**);
- The second draft of the MLS PA (**Attachment 7**), including proposed tables-of-contents for identified treatment plans;
- A Comment-response Matrix noting how comments received on Draft 1 of the PA were taken into consideration for Draft 2 (**Attachment 8**).

**Revised Area of Potential Effects**

The APE for this project was previously defined as a 250-foot buffer of consideration on either side the Preferred Alternative (Alternative 9: Phase 1 South) and included additional buffer areas

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Three

at the American Legion Bridge and elsewhere to capture setting, feeling, and viewshed effects. In addition, the APE included potential environmental mitigation sites where stream and wetland mitigation is proposed. As noted in prior correspondence, due to the large amount of impervious area requiring treatment for the Preferred Alternative and existing site constraints, all the required SWM could not be met on site for the Preferred Alternative. Consequently, compensatory, or offsite, SWM opportunities were investigated to ensure the SWM water quality requirements of the Preferred Alternative could be met. The APE in Virginia generally followed the APE for the VDOT NEXT Project that was previously coordinated with VDHR and has not changed since our previous letter.

Since the September 2021 submittal, the LOD in Maryland have been updated and include minor areas of expansion and reduction along the I-495 and I-270 corridor. The most significant reduction is located along I-495 west of I-270, where the LOD now terminate west of Georgetown Road. Elsewhere in Maryland, changes to the LOD consist of minor areas within or adjacent to the previously evaluated APE. The APE along the corridor in Maryland has been expanded to reflect the revised LOD and maintain a 250-foot buffer along the I-495 and I-270 corridor. Incorporation of additional compensatory SWM sites, as noted below, has further expanded the APE in Maryland.

The APE in Maryland has further been revised with the addition of 19 new compensatory SWM sites and 1 wetland mitigation site on National Park Service (NPS) property (CHOH-13) in Maryland. The APE is confined to the LOD for each compensatory SWM or wetland mitigation site, as no substantive visual elements are proposed that would be new or inconsistent with the existing character of these locations. The LOD of these sites have been added to the revised APE. The LOD for CHOH-13 extends partially outside the previous APE, and this area is also included in the revised APE (**Attachment 1**).

In addition, there are three locations in Cabin John Regional Park where MDOT SHA may add pedestrian bridges as parkland mitigation. An additional parkland mitigation location involves the improvement of an existing parking area at the Cabin John Trail within Cabin John Stream Valley Park. Specific LOD of these sites have not been defined but are expected to be smaller than the areas depicted on the revised APE maps. Two of the pedestrian bridge locations have been added to the revised APE; the other parkland mitigation sites fall within the previously defined APE (**Attachment 1d**).

The APE in Virginia is unchanged since our previous letter. Changes to the LOD in Virginia are confined to previously evaluated areas along the project limits, within the existing APE.

**Compensatory SWM Sites**

In the most recent letter, MDOT SHA included 275 compensatory SWM sites within the APE. Since that time, the number of SWM sites proposed for inclusion in the Joint Permit Application (JPA) has been reduced to 67, including 19 SWM sites that were not coordinated in prior project

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Four

correspondence. **Attachment 3** provides the list of the 67 SWM sites proposed in the JPA, inclusive of MDOT SHA's assessments for the 19 new SWM sites. The remaining, previously coordinated 227 sites remain in the APE as options for future consideration.

**Stream/Wetland and Parkland Mitigation**

As noted in the most recent letter, only 3 of the 14 previously coordinated stream and wetland sites remain under consideration for the Preferred Alternative, Phase 1 South: sites CA-5, CA-2/3, and RFP-2. The 11 remaining, previously coordinated stream and wetland sites remain in the APE as options for future consideration (**Attachment 1c**).

As part of proposed parkland mitigation opportunities under consideration for NPS property, MDOT SHA would restore a former wetland area within C&O Canal National Historical Park at site CHOH-13. This location includes existing and previous historical wetland that has been drained. Activities at mitigation site CHOH-13 would include invasive species removal and native plantings, along with bottom excavation to bring wetland hydrology back to the surface. A summary of the stream and wetland mitigation sites, including CHOH-13, is provided as **Attachment 4**.

As part of proposed parkland mitigation opportunities under consideration for Maryland-National Capital Park and Planning Commission (M-NCPPC) property, MDOT SHA is considering construction of three pedestrian trail bridges in Cabin John Regional Park. One would be located over a Cabin John Creek tributary east of Glackens Drive at a natural surface connection trail. The second would span Cabin John Creek to connect the Cabin John Trail to the Kidney Bean Loop Trail south of Goya Drive. The third would provide improved access to the Robert C. McDonnel Campground from the parking area along the north side of Tuckerman Lane. Also under consideration are improvements to a parking area along Seven Locks Road at the Cabin John Creek Trail in Cabin John Stream Valley Park. Improvements would include an improved access apron, paving, striping, SWM, debris/trash cleanup, and construction of a bicycle repair stand with tools and pump at the trailhead. There would be minimal ground disturbance for these mitigation activities, although specific LOD are not defined. The APE for the NPS and M-NCPPC mitigation sites is depicted on **Attachment 1d**.

**Updated Effect Determination for Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M: 35-212)**

In the previous letter, MDOT SHA described the extensive minimization efforts undertaken at Morningstar Tabernacle No. 88 Moses Hall and Cemetery, resulting in the elimination of all project impacts within the property and the avoidance of associated potentially indicated burial features within right-of-way adjacent to the cemetery. After careful consideration of the character of the historic property, issues raised by consulting parties, and with reference to the criteria of adverse effect at 36 CFR 800.5(a)(1), MDOT SHA and FHWA have determined that

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Five

the project will not adversely affect the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. A detailed statement supporting this determination is included as **Attachment 5**.

## Architecture

*Newly Identified Resources in the APE*

In the revised APE, MDOT SHA has identified an additional four previously recorded Maryland Inventory of Historic Properties (MIHP) resources; two unrecorded resources were identified within the expanded APE. Three of the MIHP resources are located within the LOD for the compensatory SWM sites. Two of these resources, 5511 Edson Lane (M: 30-26) and Leighton's Addition to Woodside (M: 36-78), were previously determined not eligible for the NRHP. The boundary of the third MIHP resource, the Norbeck Historic District (M: 23-113), falls within the LOD at a grass strip along the edge of an existing road west of MD 97. There are no impacts to associated historical features, and MDOT SHA did not evaluate the district. The fourth MIHP resource, the Granger Estate (Holton Arms School) (M: 35-17), is located along River Road (MD 190), outside the LOD for the I-495 and I-270 corridor. The MIHP boundary of this resource also falls outside the APE; however, the APE encompasses a small corner of the parcel boundary. The LOD at this location are confined to the existing MD 190 roadway, which is separated from the Granger Estate by a parallel access road and a wooded median. Because there are no impacts to associated historical features, MDOT SHA did not evaluate the Granger Estate.

The remaining two resources (7309 and 7311 River Road) were documented using MHT's Short Form for Ineligible Properties. Having extensive alterations, these resources are not associated with historic events (Criterion A) or significant persons (Criterion B), and they are not significant for their design or construction (Criterion C). The resources do not have historical or architectural significance and not eligible for the NRHP.

The new eligibility determinations are summarized in **Attachment 6, Table 1**. The MIHP resources are included in **Attachment 6, Table 3;** the eligibility status of the both the Norbeck Historic District and the Granger Estate is marked as "No Determination."

*Revised DOE for Morningstar Tabernacle No. 88 Moses Hall and Cemetery*

MDOT SHA has updated the May 2020 Determination of Eligibility form to include the latest information available about the property, based in part on archaeological surveys completed in May and September 2021. As a result of these surveys, the boundary of the property has been expanded to encompass an identified area of GPR-identified features possibly indicating human burials at the northwest corner of the property, within MDOT SHA right-of-way. As documented in our report of May 2021, additional research has led to the discovery of a photograph of the Moses Hall, and the building and its foundation are described in detail. Tables of documented burials and inscribed gravestones at the cemetery are included, along with additional photographs of the site following bamboo removal. The new information presented in the

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Six

updated DOE does not change the previous determination that the Morningstar Tabernacle No. 88 Moses Hall and Cemetery is eligible for listing in the National Register of Historic Places under Criteria A and C. The updated DOE is provided in **Attachment 2**.

*Updated Effect Assessments for Architectural Historic Properties*

The revised APE includes the location of two pedestrian trail bridges within Cabin John Regional Park (M: 29-78): one south of Goya Drive and another north of Tuckerman Lane. A third bridge location in Cabin John Regional Park, east of Glackens Drive, is within the previously coordinated APE, as is a location for improvements to a parking area along Seven Locks Road at the trailhead to the Cabin John Trail at Cabin John Stream Valley Park (M: 29-80). These mitigation areas are within forested areas of the parks or along roads similar existing park amenities are present and will not change the character of the surrounding areas. In letters dated August 8 and August 12, 2019, MHT concurred with MDOT SHA that the Cabin John Regional Park and the Cabin John Stream Valley Park are not eligible for listing in the National Register of Historic Places, and the parkland mitigation locations will not affect architectural historic properties.

The expanded APE also includes the CHOH-13 wetland mitigation site within the C&O Canal National Historical Park (M: 12-46), which is listed on the NRHP. MHT concurred with MDOT SHA in March 2020 that the project would adversely affect the park. The proposed wetland mitigation activities will increase the LOD for the purpose of restoring a historically compromised wetland and will not change the previous determination of adverse effect for the C&O Canal National Historical Park.

The LOD have been reduced along I-270 at Woodley Gardens (M: 26-71), where impacts to the contributing shopping center and associated parking lot have been minimized. This reduction does not change the prior no adverse effect determination for Woodley Gardens.

As noted earlier in the letter, MDOT SHA has updated the effect determination for Morningstar Tabernacle No. 88 Moses Hall and Cemetery with information that the property will not be adversely affected. A detailed explanation for this change is provided in **Attachment 5**. MDOT SHA continues to include commitments related to context-sensitive design for project elements adjacent to the cemetery, and further investigations of remaining LOD as appropriate through the proposed cemetery treatment plan, as described in **Attachment 7**, the second draft of the project PA.

MDOT SHA has determined that no additional architectural historic properties are present within the revised APE.

MDOT SHA's updated effect assessments for the project are summarized in **Attachment 6, Tables 4 - 5**. The updated effect assessments include overall findings of no adverse effect to 25 architectural historic properties and an adverse effect to 4 architectural historic properties. The

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Seven

revised APE has not changed MDOT SHA's intent to request that FHWA make a *de minimis*
impact finding for the minor Section 4(f) use of six historic properties, previously documented in
the September 8, 2021, letter and listed in **Attachment 6, Table 6** of this letter. MDOT SHA has
determined the project continues to have an adverse effect on architectural historic properties.

**Archaeology**

*Virginia*

There are no changes to the APE in Virginia. There are minor adjustments to the LOD in
Virginia confined to previously evaluated areas along the project limits, within the existing APE.
These changes would not impact significant archaeological resources, and do not require
additional archaeological evaluation.

*Maryland*

Archaeological investigations previously undertaken at Morningstar Tabernacle No. 88 Moses
Hall and Cemetery included detailed recordation of surface features, along with geophysical
investigations. However, no subsurface testing has been carried out, and MDOT SHA cannot
assess the integrity of archaeological deposits from the surface information. Due to avoidance
efforts, the LOD do not impact known features of the cemetery and no evaluation is made of
NRHP eligibility of the resource under criterion D, as indicated in the updated DOE form
included as **Attachment 2**.

At the C&O Canal National Historical Park, MDOT SHA has identified a circa 1.49 acres
potential wetland mitigation site, CHOH-13, located just west of the American Legion Bridge
(**Attachment 1d;** Park Mitigation, Map 1 of 4); the proposed work would provide wetland
mitigation for impacts of the project to park wetlands. The site is situated within a low area on a
terrace just north of the Potomac River and lies immediately north of NRHP eligible
archaeological site 18MO749, for which data recovery investigations are to be conducted. Only
the extreme easternmost portion of the mitigation site was tested by prior archaeological survey
for the project, with negative results.

The site may have been too poorly drained in the past to support human habitation, but this is not
known with certainty. Based on the proximity of the mitigation project to NRHP eligible
archaeological site 18MO749, full Phase I survey is warranted and MDOT SHA will include this
commitment as part of the treatment plan referenced in the **Attachment 7**, the second draft of the
PA.

MDOT SHA is also considering possible parkland mitigation opportunities for M-NCPPC.
MDOT SHA archaeologists assessed the potential of the survey area through consultation of the
SHA-GIS Cultural Resources Database, previous archaeological studies, historic mapping, soils,

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Eight

and prior disturbance.  First, MDOT SHA proposes to upgrade an existing M-NCPPC trailhead parking lot on the east side of Seven Locks Road at the Cabin John Creek Trail in Cabin John Stream Valley Park.  The area has been disturbed by construction of the existing parking area, and no archaeological investigations are warranted.

In addition, three locations in Montgomery County where MDOT SHA may provide fiberglass pedestrian bridges as parkland mitigation have been added to the APE.  No design plans are available at this time; their general locations are depicted in **Attachment 1d**.  Soil types at the bridge locations are indicative of active floodplains, settings where significant archaeological resources are not expected to occur.  Based on low archaeological potential, no further archaeological investigations are warranted at the proposed pedestrian bridge locations.

As indicated above, this letter provides our evaluations of 19 off-site SWM sites not previously coordinated with MHT that are under consideration, as part of 67 total that will be included with the JPA.  No additional archaeological investigations are warranted at the sites that were not previously coordinated with MHT in our prior correspondence, as indicated in **Attachment 3**.

Included for your review and comments are tables of contents for two treatment plans expected to be commitments of the project Programmatic Agreement; they are included with **Attachment 7**.  The first outlines further archaeological treatment and commitments for the project, and the second outlines procedures to be undertaken for potential human remains treatment and additional investigations at two cemeteries: the Morningstar Tabernacle No. 88 Moses Hall and Cemetery, and the Montgomery County Poor Farm.  MDOT SHA expects to provide drafts of both treatment plans with the next version of the PA, but welcomes comments on the structure, content, and organization as shown in the table of contents for incorporation into the drafts.

Finally, prior correspondence (the Gap Analysis and the first draft of the project Programmatic Agreement) indicated the need for further archaeological work at 18MO64 and 18MO510.  Those sites are located outside the LOD of the Preferred Alternative; as a result, no further work is warranted at 18MO64 and 18MO510 at this time.

*Responses Requested – Maryland:*

MDOT SHA respectfully requests from MHT any comments on the revised APE, review of the enclosed information supporting the analysis, comments on the proposed cultural resources investigations, and your comments/concurrence on the following determinations in Maryland:

- The revised APE, including compensatory SWM and wetland mitigation sites and proposed park pedestrian bridges.
- That no further work is required at 19 off-site SWM sites that have not been previously reviewed by MHT, as specified in **Attachment 3**; and no further work is required at sites 18MO64 and 18MO510 which are outside the APE, and no further work is required for minor ground disturbance expected at the identified parkland mitigation sites.

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Nine

- The updated DOE and revised boundary for Morningstar Tabernacle No. 88 Moses Hall and Cemetery
- The two architectural resources documented on Short Forms are not eligible for the NRHP (**Attachment 7, Table 1**)
- No historic properties will be affected within the revised APE at those locations specified in **Attachment 7, Table 3**
- Properties in **Attachment 6, Table 4** will experience an adverse effect
- There will be no adverse effect to the NRHP-eligible properties in **Attachment 6, Table 5**, should the Preferred Alternative be selected
- Your review and comments on the enclosed second draft of the project Programmatic Agreement including the treatment plan tables of contents

*Responses Requested – Virginia*:

MDOT SHA respectfully requests from DHR any comments on the second draft of the project Programmatic Agreement, including the tables of contents for the treatment plans. There are no changes to the APE or updated eligibility or effect determinations within Virginia in this submittal.

We request the above responses from MHT and DHR by **February 3, 2022**. We look forward to working with the respective State Historic Preservation Offices and additional consulting parties on continued development of the proposed Programmatic Agreement for the MLS undertaking. Please feel free to contact Steve Archer, MDOT SHA Cultural Resources Team Leader at 410-545-8508 or sarcher@mdot.maryland.gov with any questions or information needs on this project.

Sincerely,

Digitally signed by
Steve Archer
Adobe Acrobat
version:
2021.007.20102

Julie M. Schablitsky
*for* Chief Archaeologist/Assistant Division Chief
Environmental Planning Division

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Ten


Attachments:

*Attachment 1(a) – APE (Corridor)*
*Attachment 1(b) – APE (Stormwater Management)*
*Attachment 1(c) – APE (Stream and Wetland)*
*Attachment 1(d) – APE (Park Mitigation)*
*Attachment 2 – Updated DOE Form for Morningstar Cemetery*
*Attachment 3 – Compensatory SWM Sites Evaluation*
*Attachment 4 – Stream and Wetland Mitigation Site Summary*
*Attachment 5 – Updated Effect Determination, Morningstar Tabernacle No. 88 Moses Hall and
         Cemetery*
*Attachment 6 – Eligibility/Effects Table*
*Attachment 7 – Second Draft – Project Programmatic Agreement*
*Attachment 8 – Comment-response Matrix noting consideration of Comments received on First
         Draft of Programmatic Agreement*


cc:
        Mr. David Clarke, FHWA
        Mr. Marc Holma, Virginia DHR
        Ms. Jeanette Mar, Environmental Manager, FHWA Maryland Division
        Mr. Tony Opperman, VDOT
        Ms. Mandy Ranslow, ACHP
        Mr. John Simkins, FHWA Virginia Division
        Mr. Steve Archer, MDOT SHA-EPLD
        Mr. Richard Ervin, MDOT SHA-EPLD
        Mr. Jeffrey Folden, P.E., DBIA, Deputy Director, I-495 & I-270 P3 Office, MDOT SHA
        Mr. Matt Manning, MDOT SHA-EPLD
        Dr. Julie Schablitsky, MDOT SHA-EPLD
        I-495 & I-270 MLS Section 106 Consulting Parties

*-For Maryland Historical Trust Use Only-*

## Concurrence with the MDOT State Highway Administration's Determination(s) of Eligibility and/or Effects

**Project Number:** AW073A13                    **MHT Log No.**_____

**Project Name:** I-495 & I-270 Managed Lanes Study (MLS)

**County:** Montgomery and Prince George's

**Letter Date:** January 4, 2022

The Maryland Historical Trust has reviewed the documentation attached to the referenced letter and concurs with the MDOT State Highway Administration's determinations as follows:

**Eligibility** (as noted in the Eligibility Table [Attachment 3]:

    [ ]    Concur

    [ ]    Do Not Concur

**Effect** (as noted in the Effects Table [Attachment 3]:

    [ ]    No Properties Affected

    [ ]    No Adverse Effect

    [ ]    Conditioned upon the following action(s) (see comments below)

    [ ]    Adverse Effect

**Acknowledgment of FHWA's intent to make a *de minimis* impact finding** (as detailed in the referenced letter):

    [ ]    Acknowledge

Comments:

_____

_____

_____

_____

_____

_____

By: _____    _____

    MD State Historic Preservation Office/        Date

    Maryland Historical Trust

**Section 4(f) Criteria of Temporary Occupancy or *de minimis* Finding Approval:**

_____    _____    _____

**Federal Highway**            **Printed Name**            **Date**

**Administration**

Return by U.S. Mail or Facsimile to:
Dr. Julie M. Schablitsky, Assistant Division Chief, Environmental Planning Division,
MDOT State Highway Administration, P.O. Box 717, Baltimore, MD 21203-0717
Telephone: 410-545-8870 and Facsimile: 410-209-5046
A_Proj Number: 11729

**ATTACHMENT 3:**
**MLS Compensatory Stormwater Management Sites**
**Updated January 2022**

The MDOT SHA Cultural Resources section reviewed potential stormwater management (SWM) locations to identify and assess potential impacts to historic properties that may be present, and to recommend survey and evaluation measures as appropriate.  MDOT SHA archaeologists Richard Ervin, Kari Sprengeler, and Kristofer Beadenkopf assessed the archaeological potential of the water quality stream and SWM sites; MDOT SHA architectural historians Matt Manning and Rebecca Howell Crew evaluated the sites for impacts to architectural historic properties.

Avoidance, minimization and/or mitigation of effects to historic properties will be required as part of the MLS Project PA; the table below provides MDOT SHA findings for 67 off-site SWM locations. MDOT SHA will provide a process for SWM sites that may be added or modified in the future.

For the SWM locations, the Area of Potential Effects (APE) boundary at each location has been defined as the LOD.  Because of the nature of the proposed stormwater work, which does not introduce substantial visual elements, effects to historic properties are generally not expected outside the LOD.

The review of the potential SWM sites considered possible visual, audible, atmospheric and/or physical impacts that may occur to historic properties (both archaeological sites and architectural resources), which would diminish the integrity of any characteristics that would qualify a property for the National Register of Historic Places (NRHP).  No field visits have been made at this time, but individual sites have been flagged for future fieldwork.  MDOT SHA based its evaluations on the SHA-GIS Cultural Resources Database, including the Maryland Inventory of Historic Properties, NRHP, archaeological sites, previous archaeological studies, Maryland Property View and tax parcel data, historic aerial photographs and topographic maps, current aerial photography, LiDAR, and USDA soils data.

MDOT SHA is considering the following 67 sites as off-site stormwater management for the Preferred Alternative – Alternative 9, Phase 1 South; these sites will be included in the Joint Permit Application and identified in the FEIS.  MHT reviewed and concurred with MDOT SHA's evaluation of 48 of the below sites in October 2021.  The 19 sites where prior coordination has not occurred are noted in the table below.  Any changes to the proposed SWM sites would follow the process to be outlined in the project PA.

No architectural historic properties are affected by the proposed SWM sites, and no additional archaeological investigations are recommended at the 67 off-site locations.  MDOT SHA requests MHT's concurrence with our recommendations outlined below.

Attachment 3 – Cultural Resources Evaluations for Compensatory SWM Sites – January 2022
Page 2

Proposed Off-site SWM locations.  Note: shaded rows in **bold** designate SWM sites (19) that have not been reviewed as part of prior submittals

| Site Name | Comments | Historic Properties | Further Consultation Needed | SHPO Concurrence | Map Sheet |
|---|---|---|---|---|---|
| **WAS-1805** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **9** |
| **WAS-3305** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **62** |
| **WAS-3601** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **63** |
| WAS-3602 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 9 |
| **WAS-3603** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **64** |
| **WAS-3604** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **64** |
| **WAS-3612** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **64** |
| WAS-3613 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 9 |
| WAS-3614 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 9 |
| **WAS-3615** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **65** |
| **WAS-3616** | **Pending MHT concurrence that the unevaluated Norbeck Historic District (M: 23-113) is within the APE, but associated features are unaffected** | **None** | **No further work** | **Requested 2/2022** | **65** |
| WAS-3617 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 3 |
| WAS-3618 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 10 |
| WAS-3622 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 10 |
| **WAS-3625** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **66** |
| **WAS-3634** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **67** |
| **WAS-3635** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **67** |
| **WAS-3637** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **65** |
| **WAS-3638** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **65** |
| **WAS-3656** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **67** |
| **WAS-3658** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **67** |
| WAS-4058 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 28 |
| WAS-4059 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 28 |
| WAS-4067 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 28 |
| WAS-4068 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 28 |
| WAS-4072 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 32 |
| WAS-4091 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 13 |
| WAS-4098 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 13 |
| WAS-4099 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 13 |

Attachment 3 – Cultural Resources Evaluations for Compensatory SWM Sites – January 2022
Page 3

| Site Name | Comments | Historic Properties | Further Consultation Needed | SHPO Concurrence | Map Sheet |
|---|---|---|---|---|---|
| **WAS-4517** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **31** |
| **WAS-4518** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **31** |
| **WAS-4519** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **31** |
| **WAS-4521** | **No historic properties identified in the site APE boundary** | **None** | **No further work** | **Requested 2/2022** | **31** |
| WAS-4607 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 34 |
| WAS-4613 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 33 |
| WAS-4615 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 34 |
| WAS-4622 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 53 |
| WAS-4624 | No effect to contributing resources | Seneca Historic District (M: 17-63) | No further work | 10/2021 | 54 |
| WAS-4625 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 54 |
| WAS-4626 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 54 |
| WAS-4627 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 54 |
| WAS-4628 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 54 |
| WAS-4629 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 55 |
| WAS-4630 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 55 |
| WAS-4631 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 55 |
| WAS-4632 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 56 |
| WAS-4633 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 55 |
| WAS-4635 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 55 |
| WAS-4637 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 56 |
| WAS-4638 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 56 |
| WAS-4639 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 56 |
| WAS-4640 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 56 |
| WAS-4641 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 56 |
| WAS-4642 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 57 |
| WAS-4644 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 57 |
| WAS-4645 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 57 |
| WAS-4646 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 57 |
| WAS-4647 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 57 |
| WAS-4651 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 58 |
| WAS-4652 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 1 |

Attachment 3 – Cultural Resources Evaluations for Compensatory SWM Sites – January 2022
Page 4

| Site Name | Comments | Historic Properties | Further Consultation Needed | SHPO Concurrence | Map Sheet |
|-----------|----------|--------------------|-----------------------------|-------------------|-----------|
| WAS-4653 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 58 |
| WAS-4655 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 1 |
| WAS-4656 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 1 |
| WAS-4657 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 1 |
| WAS-4658 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 1 |
| WAS-4659 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 59 |
| WAS-4660 | No historic properties identified in the site APE boundary | None | No further work | 10/2021 | 59 |

Attachment 4 – Stream and Wetland Mitigation Site Summary – January 2022

**Note: Shaded rows in bold remain under consideration for the Preferred Alternative**

| Site Number | County | Architecture | Archaeology | Phase 1 South | Remarks |
|---|---|---|---|---|---|
| AN-1 | Montgomery | No architectural resources present | Low potential; no further work is warranted | N | |
| AN-3 | Montgomery | No architectural resources present | Low potential; no further work is warranted | N | |
| AN-6 | Prince George's | Beltsville Agricultural Research Center (BARC) (PG:62-14) | Phase I archaeology identified sites 18PR111, 18PR1191, and 18PR1192, no further work is warranted | N | BARC is NRHP eligible (2/2000); archaeological site 18PR111 is unevaluated for NRHP eligibility but no further work is warranted for the project as scoped; sites 18PR1191 and 18PR1192 are not NRHP eligible (MHT concurred 4/2021) |
| AN-7 | Prince George's | Beltsville Agricultural Research Center (BARC) (PG:62-14) | Phase I archaeology identified sites 18PR113 and 18PR1190, no further work is warranted | N | BARC is NRHP eligible (2/2000); archaeological sites 18PR113 and 18PR1190 warrant Phase II evaluation to determine their NRHP eligibility unless avoidance is feasible |
| **CA-2/3** | **Montgomery** | **No architectural resources present** | **Low potential; no further work is warranted** | **Y** | |
| **CA-5** | **Montgomery** | **No architectural resources present** | **Low potential; no further work is warranted** | **Y** | |
| PA-1 | Prince George's | Chesapeake Beach Railway Prism (AA-2559 and PG:72-81) | Phase I archaeology identified site 18PR605, no further work is warranted | N | Chesapeake Beach Railway Prism is not NRHP eligible; site 18PR605 is not NRHP eligible (MHT concurred 4/2021) |
| RFP-1 | Prince George's | No architectural resources present | Prior disturbance; no further work is warranted | N | |
| **RFP-2** | **Montgomery** | **Montgomery Village Golf Club (M: 20-52)** | **Prior disturbance and low potential; no further work is warranted** | **Y** | **Montgomery Village Golf Club is not NRHP eligible (MHT concurred 4/2021)** |
| RFP-3 | Frederick | Carrollton Manor Rural Historic District (F-1-134); Hebb-Kline Farmstead (F-1-202) | Phase I archaeology identified no archaeological sites and no further work is warranted | N | Hebb-Kline Farmstead is a contributing resource to the Carrollton Manor Rural HD and will not be adversely affected; no significant archaeological resources were identified |
| RFP-4 | Anne Arundel | No architectural resources present | Phase I archaeology identified site 18AN1696, no further work is warranted | N | Archaeological site 18AN1696 is unevaluated for NRHP eligibility but no further Investigation is warranted for the project as scoped (MHT concurred 4/2021) |
| RFP-5 | Prince George's | Fort Washington Golf Range | Prior disturbance; no further work is warranted | N | Fort Washington Golf Range is not NRHP eligible (MHT concurred 4/2021) |
| RFP-6 | Calvert | 6535 Ward Place | Phase I archaeology identified sites 18CH971 and 18CH972, no further work is warranted | N | 6535 Ward Place is not NRHP eligible; archaeological site 18CH971 is unevaluated for NRHP eligibility but no further work is warranted for the project as scoped; site 18CH972 is not NRHP eligible (MHT concurred 4/2021) |
| **CHOH-13** | **Montgomery** | **C&O Canal National Historical Park (M: 12-46)** | **Phase I archaeology is warranted** | **Y** | **Added as part of parkland mitigation; site location will not change the prior adverse effect determination for the C&O Canal National Historical Park** |

Attachment 5

00006020

**Morningstar Tabernacle No. 88 Moses Hall and Cemetery – Updated Finding - No Adverse Effect**

MDOT SHA and FHWA have been engaged in ongoing design minimization efforts in consultation with the Friends of Moses Hall and other relevant consulting parties to reduce and eliminate impacts to Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M: 35-212).

The Morningstar Tabernacle No. 88 Moses Hall and Cemetery, at I-495 and Seven Locks Road, was the site of a late nineteenth-century African American benevolent society, including a lodge building (Moses Hall) and cemetery. The property is eligible for listing in the NRHP under Criterion A for its association with the African American community in Cabin John and under Criterion C for its example of a vernacular African American cemetery. Construction of I-495 in the early 1960s acquired a portion of the property north of the then-extant building and a road that served as the apparent northern boundary of the cemetery. Although the property has lost historic features over time, including the Moses Hall building, and has experienced invasive vegetation overgrowth, the property retains integrity of location, design, materials, feeling, and association. Character-defining features include the former road trace leading to the hall and cemetery, the hall foundation, and the identified individual markers and grave depressions and their orientation and spacing.

**Design Avoidance**

The proposed design at this location has been revised and impacts eliminated since MDOT SHA made its initial adverse effect determination for the Morningstar property in July 2020. Further research and archaeological survey efforts have revealed new information about the property, including the discovery of possible burials indicated by ground-penetrating radar that may extend into MDOT SHA right-of-way. As a result of these investigations, MDOT SHA developed and presented in the SDEIS an alternative that eliminates all project impacts within the property boundary and avoids associated potential burial features within right-of-way adjacent to the modern cemetery boundary. No property is needed from the cemetery for either temporary construction or permanent acquisition. The area of possible burial features within right-of-way has now been included within the National Register eligible boundary of the property via an update in 2021. Because MDOT SHA right-of-way adjoining the cemetery where possible burials are indicated is no longer affected or needed for transportation use, MDOT SHA is pursuing transferring ownership of this portion of right-of-way to the cemetery trustees.

For the proposed design, the typical section has been modified to include a narrow right shoulder along the reconstructed I-495 inner loop general purpose lanes adjacent to the cemetery property. The width of the right shoulder is reduced from 12 feet to 6 feet wide (measured between the edge of travel lane and face of concrete barrier) for a total length of approximately 400 feet including tapers. The total length of the narrow right shoulder excluding the tapers is approximately 235 feet. The proposed noise barrier along the right shoulder and the cemetery is located two feet behind the concrete traffic barrier. The limits of disturbance (LOD) are offset behind the centerline of the noise barrier by 5.3 to 13.3 feet. This design avoids any right-of-way impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery historic property and provides a buffer to avoid performing earthwork at the nearest known GPR-indicated feature that may be a grave. **Morningstar Effect Attachment 3** provides an overlay of the project limits of disturbance, ground-penetrating radar data and a historic 1957 aerial of the property (shortly before Beltway construction). It is clear that the burials are likely bounded by the historic (no longer extant) road running to the west and curving north on the western portion of the property. Because the project LOD is within or North of this historic road bounding feature, potential is low for additional burials.

The proposed 24 foot-high noise barrier is provided to mitigate for noise and will have the additional benefit of screening the highway from view. 24 feet is an anticipated maximum height and may be somewhat reduced in final design to within the 16 to 24 foot height range. This segment of I-495 was completed in 1962, and the current view of the highway from the Morningstar Tabernacle No. 88 Moses Hall and Cemetery is not historically significant or character-defining feature of the historic property. The existing noise level at the cemetery is 70dBA, and MDOT SHA's noise analysis projects noise levels from the proposed highway to also be 70 dBA in 2045. The proposed noise barrier will reduce the projected perceived noise level by half, to 60 dBA. A comparison of typical outdoor and indoor noise levels is shown below:

| Common Outdoor and Indoor Noise Levels | | |
|---|---|---|
| **Common Outdoor Noise Example** | **Noise Level (decibels)** | **Common Indoor Noise Example** |
| | 110 | Rock Band |
| Jet Flyover at 1,000 feet | 100 | Inside Subway Train |
| Gas Lawn Mower at 3 feet | | |
| Diesel Truck at 50 feet | 90 | Food Blender at 3 feet |
| Noisy Urban Daytime | 80 | Garbage Disposal at 3 feet, Shouting at 3 feet |
| Gas Lawn Mower at 100 feet | 70 | Vacuum Cleaner at 10 feet |
| Commercial Area | | Normal Speech at 3 feet |
| | 60 | |
| | | Large Business Office |
| Quiet Urban Daytime | 50 | Dishwasher, Next Room |
| Quiet Urban Nighttime | 40 | Small Theater, Large Conference Room (background) |
| Quiet Suburban Nighttime | | Library |
| | 30 | |
| Quiet Rural Nighttime | | Bedroom at Night, Concert Hall (background) |
| | 20 | |
| | | Broadcast and Recording Studio |
| | 10 | Threshold of Hearing |
| | 0 | |

*Adapted from Guide on Evaluation and Attenuation of Traffic Noise. AASHTO. 1974*

Consistent with other historic properties adjoining I-495 and I-270, the placement of noise barrier is not considered a visual adverse effect because the view is not historically significant; the noise barrier provides benefit to the setting of the property by reducing highway noise from current conditions. Visualizations of the noise barrier, based on the maximum proposed height of 24 feet, are included as **Morningstar Effect Attachment 1**.

**Potential for Vibration Damage**

Contributing features of the property consist of the archaeological foundation of Moses Hall (largely underground and no longer supporting a structure) and multiple solid stone or concrete above-ground markers. These types of features are not typically susceptible to vibration damage from nearby traffic or ordinary construction methods.

No vibration-causing activities during construction or operation would be expected to pose a risk to the integrity of the property or its historic features.

Activities anticipated during construction within the LOD near the cemetery would include clearing and grubbing of vegetation, excavation, installation of noise wall, and new roadway subgrade and pavement installation. All typical equipment used for these activities either generates no discernible vibration, or limited vibration that is perceptible within a maximum of 50 feet from the equipment perimeter; all monuments within the property are outside this perceptibility range.

Nearby bridge piling installation, typically accomplished using a crane with pile hammer attachment, generates more substantial vibration, discernible up to approximately 250 feet from the equipment. However, the nearest piling will be approximately 400 feet from the Morningstar property, and no vibration perception or effects would be expected.

**Stormwater Management and Drainage**

The cemetery receives drainage from parts of the northbound lanes on I-495 and adjacent pervious (grass and vegetation) area along the roadway. Drainage concerns within the cemetery result from steep slopes, highly erodible soils, and sloughing of soils from around the gravestones and cemetery features.

The proposed design overall improves drainage functioning from the highway facility at the cemetery. However, the cemetery will likely continue to experience erosional issues due to its topography and susceptible soils independent of the current I-495 or proposed MLS improvements.

Detailed information on existing and proposed drainage is included as **Morningstar Effect Attachment 2**.

**Cumulative Effects**

The most recent highway impacts that diminished the larger Gibson Grove community in the past (including the cemetery and church) were associated with the original I-495 construction, prior to the passage of NEPA or the National Historic Preservation Act. In 1992, I-495 was widened from three to four lanes in each direction, however, the outside edge of I-495 was held and all widening occurred within the grassy median, which was replaced with travel lanes and concrete barrier. No impacts to the cemetery occurred from the 1992 improvements. Because the 1960s impacts occurred prior to laws that required consideration of effects, and there are no predicted or known future projects that would affect or diminish the property, there is not an adverse effect to the historic property based on "cumulative" impacts.

Following consulting party input and extensive minimization and avoidance efforts, MDOT SHA and FHWA have determined that the project will not adversely affect the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. The proposed design will entirely avoid the historic property boundary as defined in 2021 and will not affect the property's character-defining features, which are confined within the historic boundary. The project will not impact any markers, any known or suspected burials and will avoid all impacts to the archaeological foundation. The proposed noise barrier will further screen the property from visual and audible effects already present along I-495. No diminishment of location, design, materials, or association will occur, and feeling will remain the same or improved from the condition existing today. MDOT SHA's proposed activities will not alter the characteristics that qualify Morningstar Tabernacle No. 88 Moses Hall and Cemetery for the NRHP and do not constitute an adverse effect as defined at 36 CFR §800.5(1).

MDOT SHA will continue to commit to "context-sensitive design", "context-sensitive solutions" or "community enhancements" such as improved and/or new pedestrian connection between the cemetery and church, sympathetic design treatment of new noise barrier that faces the cemetery, and potentially other design elements of the project that are compatible and beneficial to the property but are not mitigation.

MDOT SHA will further commit to additional archaeological investigation and/or monitoring as part of treatment plans identified in the PA. Remaining uninvestigated areas of the LOD bordering the cemetery, which are currently impractical to investigate due to mature vegetation, slope, accessibility, and other issues, appear to have low potential for additional burials. They are either significantly removed from the historically understood boundaries of the property or are within disturbed cut/fill areas.

Regardless, MDOT SHA will continue to commit to further investigation to be developed in consultation with MHT and appropriate consulting parties as part of the proposed archaeological and human remains treatment plans. In the event of a late discovery indicating human remains or funerary objects where not currently expected, MDOT SHA would consult on such findings and amend the PA as appropriate, consistent with our established inadvertent discovery plan or the specific provisions of the PA.

**MORNINGSTAR EFFECT ATTACHMENT 1: SAMPLE VISUALIZATIONS**



1.  Existing View



2.  Proposed Condition



1.  Existing View



2.  Proposed Condition

**MORNINGSTAR EFFECT ATTACHMENT 2: EXISTING AND PROPOSED DRAINAGE**

The Historic Moses Hall Cemetery is located along the I-495 northbound lanes (inner loop) just west of where Seven Locks Road crosses under I-495 in Bethesda, Maryland. The cemetery receives drainage from parts of the northbound lanes on I-495 and adjacent pervious (grass and vegetation) area along the roadway. Drainage concerns in the area result from steep slopes, highly erodible soils, and sloughing of soils from around the gravestones. Drainage at the cemetery arises from three drainage areas: DA POI-SA118587; DA LOI-SA118371; and DA LOI-SA118810. One drainage area (DA POI-SA118587) is concentrated flow in a drainage ditch, while the other two (DA LOI-SA118371 and DA LOI-SA118810) contribute sheet flow to the parcel.

Stormwater flows from DA POI-SA118587 to the point of interest (POI-SA118587, which is the inlet to an existing 18-inch CMP culvert) are concentrated flow in a ditch that runs south and east between the roadway shoulder and cemetery boundary. The ditch drains to the 18-inch CMP culvert which drains south, discharging to another section of open channel ditch south of the cemetery. Flows then drain to the existing stormwater culvert system along Cypress Grove Lane. The drainage area to this POI includes a portion of the northbound lanes and adjacent pervious surface. Existing discharges to the POI are 0.7 CFS and 2.1 CFS for the 1-year and 10-year storm, respectively.

In proposed conditions, the drainage area to POI-SA118587 is decreased to remove all contributing impervious surface from the I-495 lanes. This impervious surface is routed to other stormwater management locations. The resulting decreased drainage area to the POI is all pervious surface in the SHA ROW. Flows to the POI in proposed condition are 0.1 CFS and 0.3 CFS for the 1-year and 10-year storm, respectively.

Other drainage at the cemetery property is in the form of sheet flow from two smaller, mostly pervious drainage areas. DA LOI-SA118371 drains an area south of the DA POI-SA118587. This sheet flow is over steep terrain along the embankment south and east of the roadway shoulder and is all pervious surface. This drainage area is unchanged from existing to proposed conditions, and flows are 0.1 CFS and 0.5 CFS for the 1- and 10-year discharge, respectively.

The other contributing sheet flow drainage area is DA LOI-SA118810. This sheet flow crosses the narrow cemetery access path off Seven Locks Road. In existing conditions, DA LOI-SA118810 drains a portion of the roadway shoulder of the I-495 northbound lanes. The proposed changes to this DA involve redirecting the roadway drainage off-site to reduce impacts to the cemetery parcel. Proposed drainage area to the LOI is all pervious surface from the SHA ROW and adjacent vegetated area. Existing discharges from this DA are 0.3 CFS and 1.4 CFS for the 1- and 10-year discharge, respectively and are reduced in proposed condition to 0.2 CFS and 1.0 CFS for the respective storms.



— Approximate Cemetery Boundary          Existing Conditions

DA POI-SA118587 - Drainage ditch between cemetery and I-495 NB receiving concentrated flows. Drains portion of northbound lanes and adjacent pervious area to POI at existing CMP culvert. Q1 EX - 0.7; Q1 PR - 0.1; Q10 EX - 2.1; Q10 PR - 0.3 (CFS)

DA LOI-SA118371 - Sheet flow from pervious SHA ROW draining south and east across cemetery property. Steep slopes and limited ROW in this area. No proposed improvements or changes in DA, Q. Q1 EX - 0.1; Q1 PR - 0.1; Q10 EX - 0.5; Q10 PR - 0.5 (CFS)

DA LOI-SA118810 - Sheet flow from SHA ROW draining south across cemetery access road. Portion of NB lanes and adjacent pervious surface. DA being reduced in PR conditions and impervious surface is being directed away from cemetery drive. Q1 EX - 0.3; Q1 PR - 0.2; Q10 EX - 1.4; Q10 PR - 1.0 (CFS)

**Existing Condition**



Proposed Conditions

———— Approximate Cemetery Boundary

DA POI-SA118587 - Drainage area significantly reduced. All impervious surface from expanded I-495 lanes redirected away from DA. Proposed drainage is pervious surface along roadway.
Q1 EX - 0.7; Q1 PR - 0.1; Q10 EX - 2.1; Q10 PR - 0.3 (CFS)

DA LOI-SA118371 - Sheet flow from pervious SHA ROW draining south and east across cemetery property. DA and Q unchanged from existing to proposed conditions.
Q1 EX - 0.1; Q1 PR - 0.1; Q10 EX - 0.5; Q10 PR - 0.5 (CFS)

DA LOI-SA118810 - DA reduced to remove all impervious surface contributing to sheet flow. Some pervious sheet flow remains and drains across cemetery access. Discharges reduced in proposed conditions.
Q1 EX - 0.3; Q1 PR - 0.2; Q10 EX - 1.4; Q10 PR - 1.0 (CFS)

Note: The sloughing being observed adjacent to the grave stones appears to be the result of vegetation clearing combined with poor (erodible) soils, not runoff from SHA ROW. Therefore, there will likely continue to be erosion issues at the cemetery.

**Proposed Condition**

## MORNINGSTAR EFFECT ATTACHMENT 3: 1957 Aerial, GPR, and LOD Overlay



00006029

Attachment 6 – Eligibility and Effect Tables – January 2022
Page 1

### Table 1: New Eligibility Determinations

| MIHP#/DHR# | Name | Type | SHA NR Det. | SHPO Concurrence | Remarks |
|---|---|---|---|---|---|
| - | 7309 River Road | Building | Not Eligible | Requested 2/2022 | Short Form – see Attachment 2 |
| - | 7311 River Road | District | Not Eligible | Requested 2/2022 | Short Form – see Attachment 2 |

### Table 2: New or Revised Historic Properties Experiencing No Adverse Effect

| MIHP#/DHR# | Name | Type | Impact | SHPO Concurrence | Period of Significance | NRHP Criteria | Remarks |
|---|---|---|---|---|---|---|---|
| M: 35-212 | Morningstar Tabernacle No. 88 Moses Hall and Cemetery | Landscape | No Adverse | Requested 9/2020 | 1887-1973 | A, C, Criteria Consideration D | Revised from Adverse Effect; see Attachment/Appendix XX |

### Table 3: New or Revised No Properties Affected

| MIHP#/DHR# | Name | Type | Impact | SHPO Concurrence | SHPO Eligibility | Remarks |
|---|---|---|---|---|---|---|
| M: 30-26 | 5511 Edson Lane | Building | NPA | Requested 2/2022 | Not Eligible 10/1992 | Demolished |
| M: 36-78 | Leighton's Addition to Woodside | District | NPA | Requested 2/2022 | Not Eligible 10/2012 | LOD on empty lot within not-eligible district |
| M: 23-113 | Norbeck Historic District | District | NPA | Requested 2/2022 | No Determination | MDOT SHA did not evaluate this resource. No historical features associated with district within LOD, which encompasses a grass strip within MDOT SHA ROW. MIHP form notes that as of 1985, the resource "no longer appears to have the characteristics of a historic district." |
| M: 35-17 | Granger Estate (Holton Arms School) | Building | NPA | Requested 2/2022 | No Determination | MDOT SHA did not evaluate this resource. The resource is within the APE, which encompasses a small corner of the 54.62-acre parcel boundary, screened by trees from MD 190; the MIHP boundary depicted on Medusa is outside the APE. |
| - | 7309 River Road | Building | NPA | Requested 2/2022 | Requested 2/2022 | |
| - | 7311 River Road | District | NPA | Requested 2/2022 | Requested 2/2022 | |

### Table 4: Summary of Historic Properties Experiencing an Adverse Effect

| MIHP#/DHR# | Name | Type | Impact | SHPO Concurrence | Period of Significance | NRHP Criteria | Remarks |
|---|---|---|---|---|---|---|---|
| M: 12-46 | Chesapeake and Ohio Canal National Historical Park | District | Adverse | 3/2020 | 1828-1924 | A, C, D | Listed |
| M: 35-61 and 029-0228 (Virginia) | George Washington Memorial Parkway/Clara Barton Memorial Parkway | Structure | Adverse | 3/2020 | 1930-1966 | B, C | Listed |
| M: 29-39 | Gibson Grove A.M.E. Zion Church | Building | Adverse | 10/2021 | Not established | A | Eligible |

Attachment 6 – Eligibility and Effect Tables – January 2022
Page 2

| MIHP#/DHR# | Name | Type | Impact | SHPO Concurrence | Period of Significance | NRHP Criteria | Remarks |
|---|---|---|---|---|---|---|---|
| M: 12-46-2 | Washington Biologists' Field Club on Plummers Island | Site | Adverse | 10/2021 | 1901-1971 | A | Eligible |

**Table 5: Summary of Historic Properties Experiencing No Adverse Effect**

| MIHP#/DHR# | Name | Type | Impact | SHPO Concurrence | Period of Significance | NRHP Criteria | Remarks |
|---|---|---|---|---|---|---|---|
| M: 30-38 | Academy Woods | District | No Adverse | 3/2020 | 1967-1974 | C | Eligible (Upon reaching 50 years) |
| M: 37-16 | B&O Railroad, Metropolitan Branch | Structure | No Adverse | 10/2021 | 1873-1945 | A, C | Eligible |
| M: 17-01 | Beallsville Historic District | District | No Adverse | 10/2021 | Not established | A, C | Eligible |
| PG:62-14 | Beltsville Agricultural Research Center (BARC) | District | No Adverse | 9/2020 | Not established | A, C | Eligible |
| M: 18-8-1 | Boyds-White Grounds Historic District | District | No Adverse | 10/2021 | Not established | A | Eligible |
| M: 35-121 | Burning Tree Club | District | No Adverse | 3/2020 | 1922-1923 | A, C | Eligible |
| M: 29-59 | Carderock Springs Historic District | District | No Adverse | 10/2021 | 1962-1967 | A, C | Listed |
| M: 35-194 | Carderock Springs South | District | No Adverse | 3/2020 | 1966-1971 | C | Eligible |
| F-1-134 | Carrollton Manor Rural Historic District (including Hebb-Kline Farmstead, F-1-202) | District | No Adverse | 4/2021 | 1855-1940 | A, C | Eligible |
| M: 14-27 | Cedar Grove Historic District | District | No Adverse | 10/2021 | Not established | A, C | Eligible |
| M: 29-79 | Congressional Country Club | District | No Adverse | 3/2020 | 1924-1978 | A, C | Eligible |
| M: 29-47 | David W. Taylor Model Basin | Building | No Adverse | 3/2020 | 1938-1970 | A, C | Listed |
| M: 18-15 | Friends Advice | Building | No Adverse | 10/2021 | c. 1806-1951 | A, B, Criteria Consideration G | Listed |
| M: 30-39 | Grosvenor Park | District | No Adverse | 3/2020 | 1963-1966 | A, C | Eligible |
| M: 26-89 | Latvian Evangelical Lutheran Church of Washington, DC | Building | No Adverse | 10/2021 | 1975-1979 | A | Eligible upon reaching 50 years of age |
| M: 29-40 | Magruder Blacksmith Shop | Building | No Adverse | 10/2021 | c. 1750-1850 | C | Eligible |
| M: 35-212 | Morningstar Tabernacle No. 88 Moses Hall and Cemetery | Landscape | No Adverse | Requested 2/2022 | 1887-1973 | A, C, Criteria Consideration D | |

Attachment 6 – Eligibility and Effect Tables – January 2022
Page 3

**Table 5: Summary of Historic Properties Experiencing No Adverse Effect**

| MIHP#/DHR# | Name | Type | Impact | SHPO Concurrence | Period of Significance | NRHP Criteria | Remarks |
|---|---|---|---|---|---|---|---|
| M: 20-47 | National Institute of Standards and Technology (NIST) Headquarters | District | No Adverse | 3/2020 | 1963-1969 | A, C | Listed |
| M: 29-52 | Naval Surface Warfare Center Carderock Division (NSWCCD) Historic District | District | No Adverse | 3/2020 | 1938-1958 | A, C | Eligible |
| M: 17-63 | Seneca Historic District | District | No Adverse | 10/2021 | late 17th-early 20th centuries | A | Listed |
| M: 12-44 | Sugarloaf Mountain Historic District | District | No Adverse | 10/2021 | Mid-18th century - 1939 | A, B, C, D | Eligible |
| M: 26-72-1 | Ward Building | Building | No Adverse | 3/2020 | 1978 | C | Eligible (Upon reaching 50 years) |
| M: 20-21 | Ward House | Building | No Adverse | 10/2021 | 1891-1969 | A, C | Eligible |
| M: 29-49 | Washington Aqueduct | Structure | No Adverse | 9/2020 | 1853-1939 | A, C | Listed (NHL) |
| M: 26-71 | Woodley Gardens | District | No Adverse | 10/2021 | 1960-1970 | A, C | Eligible; LOD within Woodley Gardens has been reduced since 10/2021 SHPO concurrence |

**Table 6: Summary of Section 4(f) *de minimis* Properties**

| MIHP#/DHR# | Name | Type | Impact | SHPO Concurrence | Period of Significance | NRHP Criteria | Remarks |
|---|---|---|---|---|---|---|---|
| M: 30-38 | Academy Woods | District | No Adverse; *de minimis* | 3/2020 | 1967-1974 | C | Eligible |
| PG:62-14 | Beltsville Agricultural Research Center (BARC) | District | No Adverse; *de minimis* | 3/2020 | Not Established | A, C | Eligible |
| M: 35-121 | Burning Tree Club | District | No Adverse; *de minimis* | 10/2021 | 1922-1923 | A, C | Eligible |
| M: 29-59 | Carderock Springs Historic District | District | No Adverse; *de minimis* | 10/2021 | 1962-1967 | A, C | Listed |
| M: 26-72-1 | Ward Building | Building | No Adverse; *de minimis* | 10/2021 | 1978 | C | Eligible (Upon reaching 50 years) |
| M: 26-71 | Woodley Gardens | District | No Adverse; *de minimis* | 10/2021 | 1960-1970 | A, C | Eligible |



Larry Hogan, Governor
Boyd Rutherford, Lt. Governor

Robert S. McCord, Secretary
Sandy Schrader, Deputy Secretary

# Maryland
## DEPARTMENT OF PLANNING
### MARYLAND HISTORICAL TRUST

February 4, 2022

Dr. Julie M. Schablitsky
MDOT State Highway Administration
707 North Calvert Street
Baltimore, MD 21202

Re:     I-495 & I-270 Managed Lanes Study (MLS)
        Montgomery and Prince George's Counties, Maryland
        MDOT SHA Project No. AW073C12

Dear Dr. Schablitsky:

Thank you for providing the Maryland Historical Trust (Trust), the Maryland State Historic Preservation
Office, with additional information regarding the above-referenced undertaking. The Maryland Department of
Transportation State Highway Administration's (MDOT SHA) submittal represents ongoing consultation to
assess the project's effects on historic properties, pursuant to Section 106 of the National Historic Preservation
Act of 1966, as amended, and the Maryland Historical Trust Act of 1985, as amended, State Finance and
Procurement Article §§ 5A-325 and 5A-326 of the Annotated Code of Maryland. MDOT SHA has revised
Area of Potential Effects (APE) to reflect engineering adjustments of the Preferred Alternative and the
consideration of additional potential compensatory stormwater management (SWM) sites. The letter includes
the results of MDOT SHA's architectural and archeological investigations within the revised APE, as well as
an updated Determination of Eligibility (DOE) Form and assessment of effects for the Morningstar Tabernacle
No. 88 Moses Hall & Cemetery. Trust staff have conducted a thorough review of the materials and we are
writing to provide our comments.

The Trust appreciates receiving copies of the detailed written comments prepared by multiple consulting
parties in response to this latest MDOT SHA submittal. We felt it was critical to defer our response until we
had the benefit of understanding and considering the comments of these parties. Consulting parties have an
essential role in the Section 106 consultation process in helping to inform project planning and resolve adverse
effects to historic properties. We value the input and advocacy of these parties from their varied perspectives
as representatives of local governments, non-profit organizations, and the stewards of the affected historic
properties. We look forward to their continued active participation as consultation proceeds for this
undertaking.

**Revised Area of Potential Effects (APE)**: Based on ongoing design development and the consideration of
additional compensatory SWM sites, MDOT SHA has revised the undertaking's APE. The Trust agrees that
the MDOT SHA's redefined APE encompasses the geographic area within which an undertaking may directly
or indirectly cause alterations in the character or use of historic properties.

**Compensatory Stormwater Management Sites**: MDOT SHA has assessed 19 new compensatory SWM sites
resulting in the identification of two previously unrecorded properties requiring National Register evaluations.
Trust staff reviewed the two Determination of Eligibility (DOE) Forms and concur that 7309 and 7311 River

---

Maryland Historical Trust   •   100 Community Place   •   Crownsville   •   Maryland   •   21032

Tel: 410.697.9591   •   toll free 877.767.6272   •   TTY users: Maryland Relay   •   MHT.Maryland.gov

Dr. Julie M. Schablitsky
I-495 & I-270 Managed Lanes Study (MLS)
Page 2

Road are not eligible for listing in the National Register of Historic Places (NRHP). The Trust also concurs with the findings presented in Attachment 3 of MDOT SHA's letter.

**Steam/Wetland and Parkland Mitigation**: The Trust concurs with the findings and recommended treatments presented in Attachment 4 of MDOT SHA's letter. A potential wetland mitigation site (CHOH-13) is under consideration within the C&O Canal National Historical Park. Based on the proximity of the mitigation site to archeological site 18MO749, MDOT SHA proposes full Phase I survey of the mitigation site. The Trust agrees with this assessment and looks forward to receiving the survey results in accordance with provisions of MDOT SHA's treatment plan for archeological sites within the Programmatic Agreement (PA) currently under negotiation pursuant to 36 CFR 800.14(b) for this undertaking.

**Revised DOE for Morningstar Tabernacle No. 88 Moses Hall & Cemetery**: The Trust previously concurred that the Morningstar Tabernacle No. 88 Moses Hall & Cemetery (Morningstar Hall and Cemetery) is eligible for listing in the NRHP under Criteria A and C in September 2020. The property remains NRHP-eligible, and we appreciate the completion of a revised DOE for this resource to reflect additional background research and the archeological surveys conducted in May and September 2021.

The Trust believes that sufficient information exists through research efforts and extensive remote sensing of the property to assess and demonstrate the information potential of this NRHP-eligible property under Criterion D. Throughout the cemetery site, ground-penetrating radar (GPR) revealed a significant number of burial shafts and facilitated the mapping of existing surface features. Furthermore, archeology investigations have led to conclusions about Moses Hall, including its construction date, expansion and repair campaigns, demolition, and how the space was used. Archeology will continue to inform the community and holds potential to provide information about African American benevolent societies and their burial practices. Therefore, it is the Trust's opinion that the Morningstar Hall and Cemetery is eligible under Criterion D. Any additional revisions to the DOE form by MDOT SHA should reconsider the application of Criterion D and incorporate the edits suggested by the Friends of Moses Hall in August 2020.

**Updated Effects Assessments**: The Trust continues to agree with MDOT SHA's determination that the overall proposed undertaking will have an <u>adverse effect</u> on historic properties in Maryland. With the exception of the Morningstar Hall and Cemetery, the Trust agrees with the specific effect assessments stated in Attachment 6, Tables 3, 4, and 5 of MDOT SHA's letter. We also acknowledge FHWA's intent to make a Section 4(f) de minimis finding for the properties listed in Attachment 6, Table 6.

The Trust would like to commend MDOT SHA for the robust outreach, research and minimization efforts at the Morningstar Hall and Cemetery that has led to the discovery of additional burial features and reduced the overall limits of disturbance (LOD) in the vicinity of the Morningstar Hall and Cemetery. However, we remain concerned about the potential for additional burials within the unevaluated portions of the LOD. As noted in MDOT SHA's correspondence, possible burials indicated by GPR may extend into MDOT SHA's right-of-way. Additionally, areas within the undertaking's LOD remain unevaluated due to mature vegetation, slope, accessibility and other issues. While MDOT SHA believes this area has low potential for burials since they are either significantly removed from historically understood boundaries for the cemetery or are disturbed by prior cut/fill activities, it is known that African American cemeteries often extend beyond contained boundaries. The potential for burials within the LOD cannot be ruled out. Given the sensitivity of the resource, the potential for the presence of additional burials that may be impacted, and the overwhelming expression of concern for this resource expressed by multiple consulting parties, it is our opinion that the finding of adverse effect remains valid for this historic property. The Trust recommends that the Federal Highway Administration (FHWA) request the Advisory Council on Historic Preservation (ACHP) review of this issue pursuant to 36 C.F.R. § 800.5(c)(2)(i).

Dr. Julie M. Schablitsky
I-495 & I-270 Managed Lanes Study (MLS)
Page 3

The PA currently requires the development of a cemetery treatment plan that provides for protective measures, ongoing investigations and excavation of the remaining LOD. The PA should identify measures that will be implemented to take into account any adverse effects identified during ongoing archeological investigations of the LOD as specified in the cemetery treatment plan. Additional property-specific measures pertaining to context-sensitive design, community enhancements and other elements of the project that are beneficial to the property and minimize potential for project effects should also be included in the PA.

**Comments on the Second Draft of the PA**: The Trust offers the follow comments on the draft PA.

Stipulation IV.B - Consultation Regarding Project Development: This section presents a very general statement regarding ongoing consultation with SHPOs and various parties. It should be expanded to include greater specificity and cite relevant sections of the regulations. For instance, how would adverse effects be resolved? See the following example from the statewide FHWA/MDOT SHA PA for MD (Stipulation II.B.II):

> *1. MDOT SHA will determine and document the Area of Potential Effect(s) (APE), as defined in 36 C.F.R. § 800.16(d); identify consulting parties for the specific undertaking (or "project"), including federally recognized Indian Tribes that may ascribe religious and cultural significance to properties in a project's APE pursuant to 36 C.F.R. § 800.3(f)(2), and local public agencies with jurisdiction; identify historic properties and prepare documentation; and assess effects to historic properties in consultation with MD SHPO, consulting parties for the project, and in accordance with the principles and processes described at 36 C.F.R. §§ 800.3 – 6.*

> *2. When MDOT SHA determines an undertaking will have an adverse effect on historic properties, it will notify the FHWA and initiate further consultation with MD SHPO and identified consulting parties for the project to resolve the adverse effects in accordance with 36 C.F.R. § 800.6, including alternatives to avoid, minimize, or mitigate adverse effects to historic properties resulting from the undertaking. Such alternatives or mitigation will be documented in a Section 106 Memorandum of Agreement or PA executed by FHWA, MD SHPO, and MDOT SHA or MDTA, and ACHP if participating in consultation.*

Stipulation V - Property Specific Commitments: This stipulation does not contain the level of specificity, timelines, etc. generally expected for treatment measures. While some of that may be a reflection of the lack of detailed design information to date, further clarity is needed for these commitments.

Stipulation V.A - George Washington Memorial Parkway (Including Clara Barton Parkway):
- Stipulation V.A.1 - What is the intent of the design review and how will MDOT SHA address and respond to comments provided by SHPOs and NPS as a result of the review. Does MDOT SHA propose to implement any protection measures during construction, or would those be developed as an outcome of the design review?
- Stipulation V.A.2 - The PA should provide a general timeline for completion of the Cultural Landscape Report, provision to provide copies of the document to SHPOs, and reporting on the implementation of treatment recommendations.

Stipulation V.C. - Chesapeake and Ohio Canal NHP:
- Stipulation V.C.1 - What is the intent of the design review and how will MDOT SHA address and respond to comments provided by SHPOs and NPS as a result of the review. Does MDOT SHA propose to implement any protection measures during construction, or would those be developed as an outcome of the design review?

Dr. Julie M. Schablitsky
I-495 & I-270 Managed Lanes Study (MLS)
Page 4

- Stipulation V.C.3 - The PA needs to include a review process for the reconstruction of Lock 13 - in consultation with NPS and SHPO.
- Stipulation V.C.4 - This section needs to specify that MDOT SHA will provide copies of the pre-construction condition assessment to NPS and SHPO and address the review process for rehabilitation of the lock structures, the Canal, and Towpath, within the LOD following construction and add a timeline for completion of that work following construction.
- Stipulation V.C.5 - The vibration monitoring provision needs to state how MDOT SHA will assess the vibration monitoring and address any potential damage as a result of vibration.

Stipulations V.D and V.E - Archeological Sites 18MO749 and 18MO751 (C&O Canal): These stipulations should follow the same language as V.B.1 - *In consultation with the MD SHPO, NPS, and other appropriate consulting parties, including Tribes, MDOT SHA will develop and implement a Phase III Data Recovery and associated public interpretation commitments as specified in Stipulation VI.*

Stipulation V.F - Washington Biologists' Field Club on Plummers Island:
- Stipulation V.F.1 - Greater specificity is needed on how the nomination will be submitted following NPS staff review - to SHPO, to NPS NR program?  Do we need to add the NR nomination standards to Stipulation II.A?
- Stipulation V.F.2 - Any additional protection measures needed for this resource?

Stipulation V.G - Morningstar Tabernacle No. 88 Moses Hall and Cemetery:
- Stipulation V.G.1 -The PA should state how MDOT SHA will address and respond to comments provided by consulting parties and SHPOs as a result of the review. Does MDOT SHA propose to implement any protection measures during construction, or would those be developed as an outcome of the design review?
- The PA should include additional stipulations that document MDOT SHA's commitment to oncoming coordination with the consulting parties for this resource - as discussed in the updated effect assessment (Attachment 5 to MDOT SHA's letter), including a possible property transfer: *MDOT SHA will continue to commit to "context-sensitive design", "context-sensitive solutions" or "community enhancements" such as improved and/or new pedestrian connection between the cemetery and church, sympathetic design treatment of new noise barrier that faces the cemetery, and potentially other design elements of the project that are compatible and beneficial to the property but are not mitigation.*
- The PA should identify measures that will be implemented to take into account any adverse effects identified during ongoing archeological investigations of the LOD as specified in the cemetery treatment plan.

Stipulation VI - Archaeological Treatment Plan (ATP):
- The preamble to this stipulation implies that there is only one ATP for the entire project, when it may make more sense to have multiple ATPs that address specific levels of investigation which will likely occur over differing time spans - such as the Phase I survey for areas were access could not be obtained, Phase II evaluations, Phase III data recovery plans. Having multiple ATPs will make the review and consultation process on the ATPs more manageable and targeted to the appropriate consulting parties for that plan.
- The PA needs to state the MDOT SHA will not only develop an ATP, but also *implement* the ATP.
- The PA should provide additional clarification on the timing for developing and implementing the plans to allow sufficient time to implement and complete the necessary investigations well in advance of construction. For Phase I or II work, MDOT SHA needs to build in contingency time for developing additional evaluation or mitigation work. For Phase III work, data recovery and related analyses may be lengthy and should be accomplished well in advance of construction.

Dr. Julie M. Schablitsky
I-495 & I-270 Managed Lanes Study (MLS)
Page 5

- This section should reference that the ATPs will be developed following the draft table of contents included in PA Attachment 5(a), including but not limited to the listed contents.

Stipulation - VII Cemeteries and Human Remains Treatment Plan:
- This section needs a brief preamble statement, see Stipulation VI as example. The PA needs to state the MDOT SHA will develop and *implement* the Cemeteries and Human Remains Treatment Plan.
- The PA should provide additional clarification on the timing for developing and implementing the plans to allow sufficient time to implement and complete the necessary investigations well in advance of construction and/or in conjunction with construction in the case of monitoring.
- This section should reference that the plans will be developed following the draft table of contents included in PA Attachment 5(b), including but not limited to the listed contents.

Attachments 5(a) and 5(b):  These attachments provide an informed framework for the development of Archaeological Treatment Plans and Cemeteries and Human Remains Treatment Plan with a suggested draft table of contents. Nevertheless, treatment plans are unique to a given resource/affected historic property. There may be additional items that need to be included in a plan for a specific resource, based on the nature of the resource and the results of consultation with the SHPOs and other consulting parties.

Thank you for the opportunity to comment. We look forward to further consultation with MDOT SHA and the other consulting parties to resolve adverse effects and develop of a comprehensive and achievable agreement document. If you have questions or need further assistance, please contact Tim Tamburrino (for historic structures) at tim.tamburrino@maryland.gov or Beth Cole (for archeology) at beth.cole@maryland.gov.

Sincerely,

Elizabeth Hughes
Director/State Historic Preservation Officer

EH/BC/TJT/20220050

cc:    Caryn Brookman (SHA)
       Jeanette Mar (FHWA)
       Mandy Ranslow (ACHP)
       I-495 & I-270 MLS Section 106 Consulting Parties



MARYLAND DEPARTMENT
OF TRANSPORTATION

STATE HIGHWAY
ADMINISTRATION

Larry Hogan
*Governor*

Boyd K. Rutherford
Lt. Governor

James F. Ports, Jr.
Secretary

Tim Smith, P.E.
Administrator

March 31, 2022

Ms. Elizabeth Hughes
State Historic Preservation Officer
Maryland Historical Trust
100 Community Place
Crownsville, MD 21032-2023

Ms. Julie Langan
State Historic Preservation Officer
Department of Historic Resources
2801 Kensington Avenue
Richmond, VA 23221

Dear Ms. Hughes and Ms. Langan:

This letter serves to continue consultation under Section 106 of the National Historic
Preservation Act with the Maryland Historical Trust (MHT) and the Virginia Department of
Historic Resources (DHR) for Project No. AW073A13, the I-495 & I-270 Managed Lanes Study
(MLS). The MLS is the first element of the broader Op Lanes Maryland program which
considers improvements along the entire length of I-495 (Capital Beltway) in Maryland,
connecting into Virginia's portion of I-495, as well as the entire length of I-270 (Dwight D.
Eisenhower Memorial Highway) up to I-70 in Frederick County, Maryland.

The Maryland Department of Transportation's (MDOT SHA) most recent letter on behalf of the
Federal Highway Administration (FHWA) dated January 4, 2022, transmitted the second draft of
the MLS Programmatic Agreement (PA), reflecting the Preferred Alternative and incorporating
input from consulting parties. Additionally, the letter included a revised Area of Potential Effects
(APE) within Maryland, incorporating minor engineering adjustments and additional
compensatory stormwater management (SWM) sites. Additional minor adjustments to the limits
of disturbance (LOD) within the previously coordinated APE were noted in Maryland and
Virginia. Finally, the January letter provided the results MDOT SHA's archaeological and
architectural investigations within the revised APE, including an updated determination of
eligibility (DOE) and effect determination for the Morningstar Tabernacle No. 88 Moses Hall
and Cemetery.

This letter transmits a revised APE in Maryland reflecting additional minor engineering
adjustments along the corridor at roadway edges and intersection tie-ins. The letter also includes
the third draft of the MLS PA. MDOT SHA, working with FHWA, has considered all comments
received on the second draft of the PA, and incorporated this input where possible. Finally, in

00006038

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Two

consideration of MHT and other consulting party comments and technical assistance with the
Advisory Council on Historic Preservation (ACHP), MDOT SHA and FHWA will make no
specific determination of effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery
at this time. Upon completion of the investigations to be developed through the PA and treatment
plan, MDOT SHA and FHWA will determine effects to the property based on those results, and
a process for consultation on the specific effects to the property will be identified in the PA.

This update includes:

- A revised Area of Potential Effects (APE) in Maryland to encompass minor engineering
  adjustments along the corridor (**Attachments 1a-1c**)
- Updated effect assessment for Morningstar Tabernacle No. 88 Moses Hall and Cemetery
- A comment-response matrix noting how comments received on Draft 2 of the PA were
  taken into consideration for Draft 3 (**Attachment 2**)
- The third draft of the MLS PA (**Attachment 3**)
- Draft Cemetery and Archaeological Treatment Plans (**Attachments 4 and 5**)
- Updated Effects Tables (**Attachment 6**)

**Revised Area of Potential Effects**

The APE for this project was previously defined as a 250-foot buffer of consideration on either
side the Preferred Alternative (Alternative 9: Phase 1 South) and included additional buffer areas
at the American Legion Bridge and elsewhere to capture setting, feeling, and viewshed effects.
In addition, the APE included potential environmental mitigation sites where stream and wetland
mitigation is proposed. As noted in prior correspondence, due to the large amount of impervious
area requiring treatment for the Preferred Alternative and existing site constraints, all the
required SWM could not be met on site for the Preferred Alternative. Consequently,
compensatory, or offsite, SWM opportunities were investigated to ensure the SWM water quality
requirements of the Preferred Alternative could be met. The APE in Virginia generally followed
the APE for the VDOT NEXT Project that was previously coordinated with DHR and has not
changed since our previous letter.

Since the January 2022 submittal, the LOD in Maryland have been updated and are limited to
three minor areas of expansion and reduction along the I-495 and I-270 corridor. These are:

- A 1.1-acre expansion of the LOD east of I-495, where the LOD have been widened
  within existing MDOT SHA right-of-way along MD 190 between I-495 and Burdette
  Road to accommodate proposed noise barriers and a shared use path (**Attachment 1a**);
- A 0.9-acre reduction to National Park Service (NPS) property on the east side of I-495 at
  the Clara Barton Parkway interchange. The reduction results from the removal of a
  shared use path connection to MacArthur Boulevard. The path will connect only to the
  C&O Canal towpath, providing  a reduction of 0.3 acres of LOD at the Clara Barton
  Parkway (**Attachment 1b**);

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Three

- A 4.6-acre reduction in the southeast quadrant of the I-270-Wootton Parkway intersection to minimize impacts around the reported location of the Montgomery County Poor Farm Cemetery (**Attachment 1c**).

The APE along the I-495 corridor in Maryland has been expanded at River Road to reflect the revised LOD and maintain a 250-foot buffer, and the two other reductions of LOD do not change the APE. The LOD and APE in Virginia are unchanged since our previous letter. The individual location maps for the LOD revisions noted above are provided with this letter. A complete mapbook showing the overall LOD and APE for the Preferred Alternative as expected to be included in the Final Environmental Impact Statement, including the I-495 and I-270 corridor, compensatory SWM locations, stream and wetland sites, and park mitigation, is available on MDOT SHA's FTP site.

**Updated Effect Determination for Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M: 35-212)**

In the previous letter, MDOT SHA and FHWA, after careful consideration of the character of the historic property, issues raised by consulting parties, and with reference to the criteria of adverse effect at 36 CFR 800.5(a)(1), determined that the project would not adversely affect the Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

MDOT SHA acknowledges MHT does not concur with the finding that the Morningstar Tabernacle No. 88 Moses Hall and Cemetery (Morningstar Cemetery) will not be adversely affected by the MLS undertaking.  FHWA has determined that the undertaking will have an adverse effect on historic properties, and this determination for the undertaking (project) as a whole has not changed.  In MHT's letter of February 4, 2022, the rationale for not concurring with the specific effect finding for Morningstar Cemetery was due to potential for additional burials outside the defined boundaries of the property that may exist or be impacted. Specific diminishment of the property per the criteria of adverse effect as defined at 36 CFR 800.5(a)(1) was not asserted. While MDOT SHA and FHWA believe that a reasonable and good faith effort has been made to evaluate the extent of Morningstar Cemetery, and we note that the historic boundary of the cemetery, inclusive of GPR-indicated potential burials in right-of-way, has been accepted by MHT, MDOT SHA has also consistently committed to further archaeological investigation in LOD still adjoining the cemetery. Accordingly, because the project will be governed by a PA, including a treatment plan that will specify the methods and limits of the investigation, and consultation procedures, MDOT SHA and FHWA will make no specific determination of effects to the Morningstar Cemetery at this time. Upon completion of the investigations to be developed through the PA and treatment plan, MDOT SHA and FHWA will determine effects to the property based on those results, and a process for consultation on the specific effects to the property will be identified in the PA.

MDOT SHA and FHWA note that based on the specific issues raised by MHT, in the absence of other project changes not anticipated at this time, the potential for adverse effects is narrowly

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Four

limited to the issue of the possibility of extant, unverified burials outside the defined boundary of
the property that cannot be further avoided. FHWA finds that the issues related to atmospheric,
audible, visual, and cumulative effects to the property, have been addressed. No diminishment of
location, design, setting, materials, workmanship, feeling or association has been found in these
areas, and there has been no specific disagreement expressed by MHT on these assessments.

Having requested technical assistance from the ACHP and discussed this approach an in an
informal meeting with MHT staff, further consultation under the PA following additional
investigations of limits-of-disturbance is appropriate. MDOT SHA and FHWA request MHT's
agreement that effects to Morningstar Cemetery are not determined at this time and will be
resolved through the PA.

**Draft Programmatic Agreement and Treatment Plans**

This third draft of the MLS PA incorporates consulting party input on Draft 2, outlined in the
included comment response matrix (**Attachment 2**). While additional comments were provided,
the matrix does not include responses to all comments provided related to other aspects of the
project, consultation issues that have been previously addressed, or have already received SHPO
concurrence. Upon receipt and incorporation of comments on Draft 3 of the PA, at this time
MDOT SHA anticipates a final draft for review by the signatories, provided consulting party
comments do not identify new substantive issues that must be addressed beforehand. Following
review by the signatories, MDOT SHA will finalize the PA and prepare it for signature. To
format the signature pages, MDOT SHA requests that consulting parties provide the names and
titles of the representatives who will be identified on concurring signature pages for the final PA,
should they wish to concur. Draft 3 of the PA is provided as **Attachment 3**.

Please note that comments on Draft 3 of the PA are requested by **April 14, 2022**.

MDOT SHA has taken consulting party comments into consideration on the Treatment Plan
tables of contents provided in January 2022 and is providing first substantive drafts for review
and comment of both the Cemeteries and Human Remains Treatment Plan, and Archaeological
Treatment Plan (**Attachments 4 and 5**). Some revision to the organization of the plans has been
made for ease of use and reference.

Please note that comments on the Treatment Plans are requested by **May 2, 2022**.

**Architecture**

*Expanded APE and Updated Effect Assessments for Architectural Historic Properties*

MDOT SHA's survey of the revised APE identified no previously unrecorded architectural
resources. The expanded APE along MD 190 east of I-495 extends farther into the southern
border of the National Register of Historic Places (NRHP)-eligible Burning Tree Club (M: 35-

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Five

121), but the LOD along MD 190 remain within MDOT SHA right-of-way. In October 2021, MHT concurred with MDOT SHA that the project would not adversely affect the Burning Tree Club, and the revised APE does not change the previous effect determination. MDOT SHA has determined that no additional architectural historic properties are present within the revised APE.

The reduction in LOD at the Clara Barton Parkway is a small portion of the overall LOD within the George Washington Memorial Parkway/Clara Barton Memorial Parkway (M: 35-61/029-0228) and does not change the prior adverse effect determination for the historic property, although impacts have been minimized by removing a proposed multi-use trail connection from MacArthur Boulevard and placing it at the C&O Canal Towpath, with the support of the National Park Service for this design option. This change in LOD also results in reduced impacts within the boundary of the NRHP-listed Washington Aqueduct (M:29-49) beneath MacArthur Boulevard; however, this historic property is underground, outside the vertical dimension of the APE, and will not be affected. The reduction in LOD does not change the prior no adverse effect determination.

The LOD have also been reduced along I-270 at Wootton Parkway to limit possible impacts to the vicinity of the Montgomery County Poor Farm cemetery. In our June 2019 letter, MDOT SHA provided documentation that there are no remaining above-ground structures associated with the Poor Farm, Site and Cemetery (M: 26-6). No architectural historic properties are present within the area of LOD reduction. As noted earlier in this letter, MDOT SHA has updated the specific effect determination for Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Effects to the property are not determined and a determination will be made through the PA as specified investigations are completed.

MDOT SHA's updated effect assessments for the project are summarized in **Attachment 6, Tables 1 - 3**. The updated effect assessments include overall findings of no adverse effect to 24 architectural historic properties and an adverse effect to 4 architectural historic properties. The revised APE has not changed MDOT SHA's intent to request that FHWA make a *de minimis* impact finding for the minor Section 4(f) use of six historic properties, previously documented in the January 2022 letter and listed in **Attachment 6, Table 4** of this letter. MDOT SHA has determined the project continues to have an adverse effect on architectural historic properties.

**Archaeology**

*Maryland*

Included for your review and comments are the draft treatment plans that will be included as commitments of the project Programmatic Agreement (**Attachment 3**). The first document outlines procedures to be undertaken for treatment of potential human remains and additional investigations at or near two cemeteries: the Morningstar Tabernacle No. 88 Moses Hall and Cemetery, and the Montgomery County Poor Farm (**Attachment 4**). The second document outlines further archaeological treatment and commitments for the project, including further

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Six

Phase I identification, Phase II evaluation, and Phase III data recovery investigations (**Attachment 5**). The treatment plans are being provided to the SHPOs, agencies, and qualified and appropriate consulting parties for review and comment.

Minor changes made to the MLS project LOD were reviewed for potential impacts to archaeological resources. The reductions of the LOD at the C&O Canal and in the southeast quadrant of the I-270-Wootton Parkway intersection reduce potential impacts to archaeological resources. The expansion of the LOD along MD 190 between I-495 and Burdette Road will occur mostly within areas previously disturbed by road construction and utility placement. The change is unlikely to impact significant archaeological resources and no further archaeological investigation is warranted.

*Virginia*

The LOD and APE in Virginia has not changed since our previous letter. MDOT SHA requests DHR review and comments on elements in Virginia contained in the draft archaeological treatment plan (**Attachment 5**) that is a commitment of the project draft Programmatic Agreement (**Attachment 3**). **Attachment 4** outlines procedures to be undertaken for treatment of potential human remains related to known additional investigations in Maryland. No known or suspected cemetery locations are proposed for investigation in Virginia, and should human remains in Virginia be identified during construction activities, the Inadvertent Discovery Plan attached to the PA would apply.

*Responses Requested – Maryland:*

MDOT SHA respectfully requests from MHT your comments or concurrence on the following materials as pertains to Maryland:

- The revised APE, consisting of an expansion along MD 190 west of I-495.
- Your agreement that effects to Morningstar Tabernacle No. 88 Moses Hall and Cemetery are not determined at this time as specified in **Attachment 6, Table 1**, and will be resolved through the PA.
- Properties in **Attachment 6, Table 2** will experience an adverse effect.
- There will be no adverse effect to the NRHP-eligible properties in **Attachment 6, Table 3**, should the Preferred Alternative be selected.
- Acknowledgement of FHWA's intent to make a *de minimis* impact finding at those properties listed in **Attachment 6, Table 4**.
- The enclosed third draft of the project PA
- The enclosed draft Treatment Plans.

00006043

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Seven

*Responses Requested – Virginia*:

MDOT SHA respectfully requests from DHR any comments on the third draft of the project Programmatic Agreement and the included archaeological treatment plan, as pertains to proposed elements in Virginia, although comments on other materials are welcome.  There are no changes to the APE or updated eligibility or effect determinations within Virginia in this submittal.

We request responses from MHT and DHR on Draft 3 of the PA, and the above-listed minor changes to the project by **April 14, 2022**. Comments on the two treatment plans are requested by **May 2, 2022**. We look forward to working with the respective State Historic Preservation Offices and additional consulting parties on continued development of the proposed Programmatic Agreement for the MLS undertaking.  Please feel free to contact me at 410-545-8508 or sarcher@mdot.maryland.gov with any questions or information needs on this project.

Sincerely,

Digitally signed by
Steve Archer
Adobe Acrobat
version:
2022.001.20085

Steve Archer
MDOT SHA Cultural Resources Team Leader
Environmental Planning Division

Attachments:

*Attachment 1(a) – LOD/APE (I-495 and MD 190)*
*Attachment 1(b) – LOD/APE (I-495 and Clara Barton Parkway)*
*Attachment 1(c) – LOD/APE (I-270 and Wootton Parkway)*
*Attachment 2 – Comment-response matrix noting consideration of comments received on Second*
*Draft of Programmatic Agreement*
*Attachment 3 – Third Draft – Project Programmatic Agreement*
*Attachment 4 – Draft Cemeteries and Human Remains Treatment Plan*
*Attachment 5 – Draft Archaeological Treatment Plan*
*Attachment 6 – Effects Tables*

cc:
　　　　Mr. David Clarke, FHWA
　　　　Mr. Marc Holma, Virginia DHR
　　　　Ms. Jeanette Mar, Environmental Manager, FHWA Maryland Division
　　　　Mr. Tony Opperman, VDOT

Ms. Elizabeth Hughes and Ms. Julie Langan
Page Eight

      Ms. Mandy Ranslow, ACHP
      Mr. John Simkins, FHWA Virginia Division
      Mr. Steve Archer, MDOT SHA-EPLD
      Mr. Richard Ervin, MDOT SHA-EPLD
      Mr. Jeffrey Folden, P.E., DBIA, Director, I-495 & I-270 P3 Office, MDOT SHA
      Mr. Matt Manning, MDOT SHA-EPLD
      I-495 & I-270 MLS Section 106 Consulting Parties

*-For Maryland Historical Trust Use Only-*
## Concurrence with the MDOT State Highway Administration's Determination(s) of Eligibility and/or Effects

**Project Number:** AW073A13                    **MHT Log No.**_____
**Project Name:** I-495 & I-270 Managed Lanes Study (MLS)
**County:**  Montgomery and Prince George's
**Letter Date:**  March 31, 2022

The Maryland Historical Trust has reviewed the documentation attached to the referenced letter and concurs with the MDOT State Highway Administration's determinations as follows:

**Eligibility** (as noted in the Eligibility Table [N/A]):

      [  ]    Concur
      [  ]    Do Not Concur

**Effect** (as noted in the Effects Table [Attachment 6]:

      [  ]    No Properties Affected
      [  ]    No Adverse Effect
      [  ]    Conditioned upon the following action(s) (see comments below)
      [  ]    Adverse Effect

**Acknowledgment of FHWA's intent to make a *de minimis* impact finding** (as detailed in the referenced letter):

      [  ]    Acknowledge

Comments:

_____
_____
_____
_____
_____
_____

By:    _____   _____
      MD State Historic Preservation Office/     Date
      Maryland Historical Trust

**Section 4(f) Criteria of Temporary Occupancy or *de minimis* Finding Approval:**

_____   _____   _____
**Federal Highway**          **Printed Name**          **Date**
**Administration**

Return by U.S. Mail or Facsimile to:
Dr. Julie M. Schablitsky, Assistant Division Chief, Environmental Planning Division,
MDOT State Highway Administration, P.O. Box 717, Baltimore, MD  21203-0717
Telephone: 410-545-8870 and Facsimile: 410-209-5046
A_Proj Number: 11729

00006046



Note: LOD is an engineered line and does not encroach on Burning Tree Club property; small discrepancies result from inaccurate SDAT property boundary layer.



LOD - March 21st, 2022

NRHP Eligible / Listed

LOD - December 17th, 2021

Area of Potential Effects

0    100    200 Feet

3/30/2022

**LOD**
**Location Change**

Clara Barton Parkway -1b

Note: The Washington Aqueduct is underground and will not be adversely affected.



LOD - March 21st, 2022 ☐    NRHP Eligible / Listed ☐

LOD - December 17th, 2021 ☐

Area of Potential Effects ☐

0    150    300 Feet    3/30/2022

**LOD
Location Change**

Wootton Parkway - 1c

**Table 1: Historic Properties where Effect Cannot Be Determined at this Time**

| MIHP#/DHR# | Name | Type | Impact | SHPO Concurrence | Period of Significance | NRHP Criteria | Remarks |
|---|---|---|---|---|---|---|---|
| M: 35-212 | Morningstar Tabernacle No. 88 Moses Hall and Cemetery | Landscape | Not Determined | Requested 4/2022 | 1887-1973 | A, C, Criteria Consideration D | Revised from No Adverse Effect |

**Table 2: Summary of Historic Properties Experiencing an Adverse Effect**

| MIHP#/DHR# | Name | Type | Impact | SHPO Concurrence | Period of Significance | NRHP Criteria | Remarks |
|---|---|---|---|---|---|---|---|
| M: 12-46 | Chesapeake and Ohio Canal National Historical Park | District | Adverse | 3/2020 | 1828-1924 | A, C, D | Listed |
| M: 35-61 and 029-0228 (Virginia) | George Washington Memorial Parkway/Clara Barton Memorial Parkway | Structure | Adverse | 3/2020 | 1930-1966 | B, C | Listed |
| M: 29-39 | Gibson Grove A.M.E. Zion Church | Building | Adverse | 10/2021 | Not established | A | Eligible |
| M: 12-46-2 | Washington Biologists' Field Club on Plummers Island | Site | Adverse | 10/2021 | 1901-1971 | A | Eligible |

**Table 3: Summary of Historic Properties Experiencing No Adverse Effect**

| MIHP#/DHR# | Name | Type | Impact | SHPO Concurrence | Period of Significance | NRHP Criteria | Remarks |
|---|---|---|---|---|---|---|---|
| M: 30-38 | Academy Woods | District | No Adverse | 3/2020 | 1967-1974 | C | Eligible (Upon reaching 50 years) |
| M: 37-16 | B&O Railroad, Metropolitan Branch | Structure | No Adverse | 10/2021 | 1873-1945 | A, C | Eligible |
| M: 17-01 | Bealisville Historic District | District | No Adverse | 10/2021 | Not established | A, C | Eligible |
| PG:62-14 | Beltsville Agricultural Research Center (BARC) | District | No Adverse | 9/2020 | Not established | A, C | Eligible |
| M: 18-8-1 | Boyds-White Grounds Historic District | District | No Adverse | 10/2021 | Not established | A | Eligible |
| M: 35-121 | Burning Tree Club | District | No Adverse | 3/2020 | 1922-1923 | A, C | Eligible |
| M: 29-59 | Carderock Springs Historic District | District | No Adverse | 10/2021 | 1962-1967 | A, C | Listed |
| M: 35-194 | Carderock Springs South | District | No Adverse | 3/2020 | 1966-1971 | C | Eligible |
| F-1-134 | Carrollton Manor Rural Historic District (Including Hebb-Kline Farmstead, F-1-202) | District | No Adverse | 4/2021 | 1855-1940 | A, C | Eligible |
| M: 14-27 | Cedar Grove Historic District | District | No Adverse | 10/2021 | Not established | A, C | Eligible |

00006050

Attachment 6 – Eligibility and Effect Tables – March 31, 2022
Page 2

**Table 3: Summary of Historic Properties Experiencing No Adverse Effect**

| MIHP#/DHR# | Name | Type | Impact | SHPO Concurrence | Period of Significance | NRHP Criteria | Remarks |
|---|---|---|---|---|---|---|---|
| M: 29-79 | Congressional Country Club | District | No Adverse | 3/2020 | 1924-1978 | A, C | Eligible |
| M: 29-47 | David W. Taylor Model Basin | Building | No Adverse | 3/2020 | 1938-1970 | A, C | Listed |
| M: 18-15 | Friends Advice | Building | No Adverse | 10/2021 | c. 1806-1951 | A, B, Criteria Consideration G | Listed |
| M: 30-39 | Grosvenor Park | District | No Adverse | 3/2020 | 1963-1966 | A, C | Eligible |
| M: 20-47 | National Institute of Standards and Technology (NIST) Headquarters | District | No Adverse | 3/2020 | 1963-1969 | A, C | Listed |
| M: 29-40 | Magruder Blacksmith Shop | Building | No Adverse | 10/2021 | c. 1750-1850 | C | Eligible |
| M: 26-89 | Latvian Evangelical Lutheran Church of Washington, DC | Building | No Adverse | 10/2021 | 1975-1979 | A | Eligible upon reaching 50 years of age |
| M: 29-52 | Naval Surface Warfare Center Carderock Division (NSWCCD) Historic District | District | No Adverse | 3/2020 | 1938-1958 | A, C | Eligible |
| M: 17-63 | Seneca Historic District | District | No Adverse | 10/2021 | late 17th-early 20th centuries | A | Listed |
| M: 12-44 | Sugarloaf Mountain Historic District | District | No Adverse | 10/2021 | Mid-18th century - 1939 | A, B, C, D | Eligible |
| M: 26-72-1 | Ward Building | Building | No Adverse | 3/2020 | 1978 | C | Eligible (Upon reaching 50 years) |
| M: 20-21 | Ward House | Building | No Adverse | 10/2021 | 1891-1969 | A, C | Eligible |
| M: 29-49 | Washington Aqueduct | Structure | No Adverse | 9/2020 | 1853-1939 | A, C | Listed (NHL) |
| M: 26-71 | Woodley Gardens | District | No Adverse | 10/2021 | 1960-1970 | A, C | Eligible; LOD within Woodley Gardens has been reduced since 10/2021 SHPO concurrence |

**Table 4: Summary of Section 4(f) de minimis Properties**

| MIHP#/DHR# | Name | Type | Impact | SHPO Concurrence | Period of Significance | NRHP Criteria | Remarks |
|---|---|---|---|---|---|---|---|
| M: 30-38 | Academy Woods | District | No Adverse; de minimis | 3/2020 | 1967-1974 | C | Eligible |
| PG:62-14 | Beltsville Agricultural Research Center (BARC) | District | No Adverse; de minimis | 3/2020 | Not Established | A, C | Eligible |
| M: 35-121 | Burning Tree Club | District | No Adverse; de minimis | 10/2021 | 1922-1923 | A, C | Eligible |

Attachment 6 – Eligibility and Effect Tables – March 31, 2022
Page 3

| MIHP#/DHR# | Name | Type | Impact | SHPO Concurrence | Period of Significance | NRHP Criteria | Remarks |
|---|---|---|---|---|---|---|---|
| M: 30-38 | Academy Woods | District | No Adverse; *de minimis* | 3/2020 | 1967-1974 | C | Eligible |
| PG:62-14 | Beltsville Agricultural Research Center (BARC) | District | No Adverse; *de minimis* | 3/2020 | Not Established | A, C | Eligible |
| M: 29-59 | Carderock Springs Historic District | District | No Adverse; *de minimis* | 10/2021 | 1962-1967 | A, C | Listed |
| M: 26-72-1 | Ward Building | Building | No Adverse; *de minimis* | 10/2021 | 1978 | C | Eligible (Upon reaching 50 years) |
| M: 26-71 | Woodley Gardens | District | No Adverse; *de minimis* | 10/2021 | 1960-1970 | A, C | Eligible |

00006052

DRAFT 3 – Deliberative and Pre-Decisional

**March 2022 – THIRD DRAFT**
**PROGRAMMATIC AGREEMENT**
**Among the**
**FEDERAL HIGHWAY ADMINISTRATION,**
**MARYLAND DEPARTMENT OF TRANSPORTATION STATE HIGHWAY**
**ADMINISTRATION,**
**NATIONAL PARK SERVICE,**
**MARYLAND STATE HISTORIC PRESERVATION OFFICER,**
**VIRGINIA STATE HISTORIC PRESERVATION OFFICER**
**AND**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**

**Implementing Section 106 of the National Historic Preservation Act for the**
**I-495 and I-270 Managed Lanes Study**
**Anne Arundel, Frederick, Montgomery and Prince George's Counties, Maryland and**
**Fairfax County, Virginia**

**WHEREAS**, the U.S. Department of Transportation, Federal Highway Administration (FHWA) plans to approve the I-495 and I-270 Managed Lanes Study (MLS), a proposed Public-Private Partnership (P3) administered by the Maryland Department of Transportation State Highway Administration (MDOT SHA); and

**WHEREAS**, the MLS Preferred Alternative, "Alternative 9 Phase I South" (Project) consists of construction of Priced Managed Lanes along Interstates 495 and 270, beginning in Fairfax County, Virginia, and extending north to approximately Interstate 370, and east along the separated portions of I-495 ("spurs") to approximately Maryland Route 187, as described in detail via documentation linked in Attachment 4; and

**WHEREAS,** FHWA has determined that the Project is an undertaking, as defined in 36 C.F.R. §800.16(y), and thus is subject to review under Section 106 of the National Historic Preservation Act (NHPA), 54 U.S.C. § 306108, and its implementing regulations, 36 C.F.R. Part 800 as amended; and

**WHEREAS,** the MDOT SHA, with the approval of FHWA, intends to deliver the Project as a P3 using the services of a private sector developer or multiple developers who will advance the Project and be responsible for design, construction, operation and maintenance, subject to approvals by MDOT SHA and/or FHWA; and

**WHEREAS,** the Project may be implemented in construction phases, yet to be fully defined, and although this Programmatic Agreement (PA) reflects evaluation of the entire defined Project, certain commitments may require phased implementation; and

**WHEREAS**, FHWA is the lead agency for purposes of ensuring that the Project complies with Section 106 of the NHPA, as amended, and codified in its implementing regulations, 36 C.F.R. Part 800, as amended (August 5, 2004); and

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

00006053

**WHEREAS**, the National Park Service (NPS) agrees FHWA is the lead federal agency for purposes of ensuring that the Project complies with Section 106 of the NHPA, as amended, and codified in its implementing regulations, 36 C.F.R. Part 800, as amended (August 5, 2004) and has agreed to participate in this PA as an Invited Signatory; and

**WHEREAS,** NPS would authorize permanent use of the affected Federal park property for the Project through coordination with FHWA for a Highway Deed Easement and would issue a permit for temporary use of land under its administration for construction-related activities. NPS intends to use this PA to comply with 36 C.F.R. Part 800, 54 U.S.C. § 100902, 36 C.F.R. Part 14; and

**WHEREAS,** the Project will involve the use of lands managed by the NPS within the Chesapeake and Ohio Canal National Historical Park, a unit of the National Park System, and the George Washington Memorial Parkway (GWMP), a unit of the National Park System, that includes the Clara Barton Parkway; and

**WHEREAS,** NPS is charged in its administration of the units of the National Park System to meet the directives of other laws, regulations, and policies including the NPS Organic Act as codified in Title 54 U.S.C. § 100101(a) to "conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such a manner and by such means as will leave them unimpaired for the enjoyment of future generations"; and

**WHEREAS**, the GWMP, a unit of the National Park System, with portions located in Montgomery County, Maryland; and Fairfax and Arlington Counties and the City of Alexandria in Virginia, was established following the authorization of the parkway pursuant to what is known as the Capper-Cramton Act, Public Law 71-284, 46 Statute 482 (1930), and came to be administered by NPS pursuant to Executive Order 6166 of June 10, 1933. The GWMP is on the National Register of Historic Places (NRHP); and for its association with twentieth century parkway design, engineering, landscape architecture, park planning and conservation, commemoration, and an association with George Washington; and

**WHEREAS**, the Clara Barton Parkway is the portion of the GWMP that runs along the Maryland side of the Potomac River and which also became part of the national park system through the Capper-Cramton Act (originally as the Maryland portion of the GWMP). The Clara Barton Parkway, as a portion of the GWMP, is also on the NRHP; and

**WHEREAS**, the Chesapeake and Ohio Canal National Historical Park, a unit of the national park system stretches along the Potomac River from Rock Creek at Georgetown in Washington, D.C., to Cumberland, Maryland, for 184.5 miles, was established as a national monument in 1961 and was then established as a national historical park by Congress in 1971, through Public Law 91-664 for the purpose of preserving and interpreting the 19th century transportation canal and its associated scenic, natural, and cultural resources; and providing opportunities for education and appropriate outdoor recreation. The Chesapeake and Ohio Canal National Historical Park is listed on the NRHP and contains more than 1,300 historic structures, including one of the largest

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

00006054

collections of 19th century canal features and buildings in the national park system. The towpath and canal cross underneath I-495 at the American Legion Bridge, in Bethesda, Maryland; and

**WHEREAS**, FHWA has elected to phase the identification, evaluation, and effects assessment of certain portions of the Area of Potential Effects (APE) and historic properties where unavailability of access or design information precluded such identification, evaluation and assessment, as provided in 36 C.F.R. 800.4(b)(2), and 36 C.F.R. 800.5(a)(3); and

**WHEREAS**, FHWA will ensure additional identification, evaluation, and assessment is completed in a timely manner prior to final design and construction, to allow for meaningful consultation and practical opportunities to avoid, minimize, or mitigate for any potential adverse effects to historic properties; and

**WHEREAS**, FHWA has initiated consultation pursuant to 36 C.F.R. 800.3(c) with the Maryland State Historic Preservation Office (MD SHPO) by letter on April 12, 2018 and the Virginia State Historic Preservation Office (VA SHPO) by letter on May 14, 2019, and the term "SHPO" is used to refer to both state offices when one is not specified; MDOT SHA on behalf of FHWA will continue to consult with the appropriate SHPO and consulting parties under the terms of this PA in order to identify historic properties, assess the effects of the Project on historic properties, and, if necessary, resolve adverse effects to historic properties; and

**WHEREAS,** FHWA, pursuant to 36 C.F.R. 800.6(a)(1)(i)(C), on March 26, 2018, initiated Section 106 consultation with the Advisory Council on Historic Preservation (ACHP), and the ACHP has chosen to participate in the consultation pursuant to 36 C.F.R. 800.6(a)(1)(iii); and

**WHEREAS**, FHWA, pursuant to 36 C.F.R. § 800.10(c), invited the Secretary of the Interior (Secretary) to participate in consultation by letter dated March 16, 2020, as the Project includes National Historic Landmarks (NHL) within the APE, and the National Park Service, National Capital Area NHL Program (NPS-NHL) has represented the Secretary concerning the NHLs within the Project throughout consultation and will continue to participate in future consultations involving the NHLs, and

**WHEREAS**, FHWA, ACHP, MDOT SHA, and the MD SHPO, under the *Amended Programmatic Agreement Among the Federal Highway Administration, the Maryland Department of Transportation State Highway Administration, the Advisory Council on Historic Preservation, the Maryland State Historic Preservation Officer, Implementing Section 106 of the National Historic Preservation Act for the Federal-aid Highway Program in Maryland* ("Statewide PA", linked in Attachment 4), have agreed to delegate certain authorities relating to Section 106 of the NHPA to MDOT SHA for Federal-aid Highway Projects in Maryland; and

**WHEREAS,** MDOT SHA, pursuant to the Statewide PA, employs professionals meeting the Secretary of the Interior's Professional Qualifications Standards (48 Fed. Reg. 44738-39, September 29, 1983) with experience and background in the fields of archaeology, architectural history and/or history who will oversee implementation of stipulations in this PA; and

**WHEREAS,** MDOT SHA, on behalf of FHWA, pursuant to 36 C.F.R. 800.4(a)(1), has established

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

and updated the APE for the Project in consultation with the MD and VA SHPO, has identified historic properties within the APE, and has identified adversely affected properties, as described in the *Draft Section 106 Technical Report* of January 2020 and subsequent documentation (linked in Attachment 4); and

**WHEREAS,** MDOT SHA and FHWA, pursuant to 36 C.F.R 800.2(d) have sought and considered the views of the public regarding the Project's effects on historic properties by providing notice and information in following its public involvement procedures under the National Environmental Policy Act (NEPA); and

**WHEREAS,** MDOT SHA, during the course of consultation, has invited the parties listed in Attachment 2 to participate in consultation on the Project; and

**WHEREAS,** the parties listed in Attachment 3, based on their relationship to specific actions as specified in this PA, or interest in historic properties affected by the project, have been invited to be consulting parties and concur by signing this PA; and

**WHEREAS,** MDOT SHA and FHWA, have initiated consultation with Federally-recognized Native American tribal nations (Tribes) listed in Attachment 2 and provided the Tribes with information about the Project.  MDOT SHA, on behalf of FHWA, has invited the same Tribes to be consulting parties, as shown in Attachment 3, and concur by signing this PA; and

**WHEREAS,** federal agencies which, at FHWA's invitation, designate FHWA as the lead federal agency for the Project may use this PA to fulfill their obligations under Section 106 of the NHPA according to 36 C.F.R. 800.2(a)(2), without the need for amendment of this PA, provided that FHWA follows the requirements of this PA; and

**WHEREAS,** FHWA has invited MDOT SHA and NPS to be invited Signatories to this PA, based on their responsibilities for implementation of its terms, and all Signatories, required and invited, are referred to as "Signatories" to this document; and.

**WHEREAS**, FHWA has determined that the Project will have an adverse effect on NRHP-listed or eligible properties ("historic properties") including the George Washington Memorial Parkway (Clara Barton Parkway), the Chesapeake and Ohio Canal National Historical Park, the Washington Biologists' Field Club on Plummers Island, Gibson Grove African Methodist Episcopal Zion Church, archaeological sites 44FX3922 (Dead Run Ridges Archaeological District), 44FX0374, 44FX0379, 44FX0389, 18MO749 and 18MO751; that additional effects may not be completely known; and that FHWA intends to use this PA to comply with 36 C.F.R. Part 800, 54 U.S.C. § 100902, 36 C.F.R. Part 14 and to govern the implementation of the Project and the resolution of adverse effects.

**NOW, THEREFORE**, FHWA, NPS, ACHP, MDOT SHA, MD SHPO, and VA SHPO, (hereinafter "Signatories") agree that the Project will be implemented in accordance with the following Stipulations in order to take into account the effect of the Project on historic properties and that these Stipulations will govern compliance of the Project with Section 106 of the NHPA until this PA expires or is terminated.

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3 March 2022

Commented [MEH1]: VA SHPO continues to believe 1) the definition of the APE needs to come higher in the WHEREAS clauses, 2) should be a stand-alone WHEREAS clause, and; 3) Should be clearly stated in the PA itself without having to reference other documents.

Commented [MEH2]: VA SHPO still believes this WHEREAS Clause should be moved up below the ones addressing NPS designating FHWA as lead federal agency. Thematically it makes more sense to have it there.

**Stipulations**

I.      **Roles and Responsibilities**

   A.      **FHWA** is the lead federal agency and is responsible for ensuring the terms of this PA are carried out.

   B.      **MDOT SHA** is delegated authority by FHWA under this PA and the Statewide PA to continue defined aspects of consultation, Project compliance review, and mitigation implementation. MDOT SHA will be primarily responsible for implementation of this PA excepting where otherwise specified. Additionally:

      1.      MDOT SHA will enter into agreements with one or more developers to design, build, and operate the Project. MDOT SHA will ensure the work of the developer or developers conforms to the requirements of this PA and may task the developer(s) with assistance with certain commitments (such as context-sensitive design); however, MDOT SHA may not delegate consultation obligations or other responsibilities specified in this PA to the developer(s).

      2.      MDOT SHA will require the developer(s) to retain professionals meeting the Secretary of the Interior's Professional Qualifications Standards (48 Fed. Reg. 44738-39, September 29, 1983) with experience and background in the fields of archaeology, architectural history and/or history for the duration of design and construction to assist with design commitments, liaise with MDOT SHA cultural resources staff and facilitate compliance with this PA.

      3.      MDOT SHA, on behalf of FHWA, will consult with the relevant SHPO(s) for actions under this PA and 36 C.F.R. 800.

   C.      **NPS** is charged in its administration of the units of the National Park System to meet the directives of other laws, regulations, and policies including the NPS Organic Act as codified in Title 54 U.S.C. § 100101(a).

   D.      **SHPO**: The Maryland Historical Trust (MD SHPO) has jurisdiction as established in the NHPA for historic properties in Maryland. The Virginia Department of Historic Resources (VA SHPO) has jurisdiction as established in the NHPA for historic properties in Virginia. The SHPOs will:

      1.      Respond to requests from MDOT SHA for concurrence on eligibility determinations, effect determinations, and technical documents within a 30-day review period unless otherwise specified in this PA, or MDOT SHA specifically provides for an extended review period at the time of submittal. MDOT SHA and FHWA may assume concurrence or no objection to determinations and submittals if no response is received within 30 days, if no extended timeline is specifically established in the review request or if no timeline is specified in 36 C.F.R. 800. All durations referenced in this PA refer to calendar days.

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

2.  Provide written comments, share general technical assistance/guidance, and make available to MDOT SHA or its designates survey records or other documents necessary to fulfill the requirements of this PA.

E.  **ACHP** will provide policy guidance, provide comment on issues that may arise as requested by parties to this PA, and participate in dispute resolution as specified in Stipulation XIII.

F.  **Consulting Parties/Public**

1.  MDOT SHA has consulted with or provided the opportunity to consult to the parties listed in Attachment 2 prior to finalizing this PA.  Because the Preferred Alternative no longer affects numerous historic properties identified in earlier alternatives considered, several parties listed in Attachment 2 no longer have a demonstrable interest in historic properties affected by the Project. Parties listed in Attachment 3 continue to have a defined relationship to the Project and have been invited to concur in this PA.

2.  MDOT SHA will provide all consulting parties in Attachment 3, regardless of concurring status, with opportunities to consult on Project changes or new elements with the potential to affect historic properties.  MDOT SHA will offer other appropriate consulting parties the opportunity to rejoin or newly join consultation in the event of new or revised Project elements.  Consulting parties may sign this PA as concurring parties at any time after execution of the PA with the invitation of MDOT SHA or FHWA. Additional consulting parties may be included in Attachment 3 without the need to amend this PA.

3.  Concurrence with the PA by a party does not necessarily indicate that the party supports the Project, the Preferred Alternative, or endorses all stipulations of this PA, but rather indicates the desire of such parties to acknowledge consultation and/or remain involved in implementation of specific terms of this PA.

4.  MDOT SHA will provide for notification of the public for substantial changes to the Project that would result in an expanded APE or new effects to historic properties consistent with 36 CFR 800.8(c)(1)(iv) and procedures under NEPA to ensure ongoing opportunities for public input.  As appropriate, this process may identify new consulting or concurring parties who may wish to join the PA at a later time in response to Project refinement.

II.  **Professional Standards**

A.  Guidelines, standards and regulations relevant to this PA and its purposes are listed below, and links to these documents are found in Attachment 4.  Additionally, it is the intention of the Signatories to interpret this PA to incorporate any subsequent

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

standards, revisions of standards, or applicable guidance issued by the Secretary, ACHP, or MD SHPO or VA SHPO as then in force during this PA.

    1.    36 C.F.R. Part 800: Protection of Historic Properties, as amended (2004);

    2.    *Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation* (1983);

    3.    Secretary of the Interior's Professional Qualifications Standards (48 Fed. Reg. 44738-39, September 29, 1983)

    4.    *Standards and Guidelines for Archeological Investigations in Maryland* (Shaffer and Cole 1994), including *Technical Update No. 1 of the Standards and Guidelines for Archaeological Investigations in Maryland: Collections and Conservation Standards* (2018);

    5.    *Standards and Guidelines for Architectural and Historical Investigations in Maryland* (Maryland Historical Trust, Revised 2019);

    6.    *Guidelines for Conducting Historic Resources Survey in Virginia* (Virginia Department of Historic Resources, revised September 2017)

    7.    36 CFR Part 79: Curation of Federally-Owned and Administered Archeological Collections

    8.    *NPS Museum Handbook,* National Park Service, revised 2019

    9.    Program Comment for Actions Affecting Post-1945 Concrete Steel Bridges (77 FR 68790);

    10.    *Exemption Regarding Historic Preservation Review Process for Effects to the Interstate Highway System* (ACHP Program Comment, 2005)

    11.    *Section 106 Archaeology Guidance* (ACHP, 2009)

    12.    Policy Statement Regarding Treatment of Burial Sites, Human Remains and Funerary Objects (ACHP February 2007);

    13.    National Register of Historic Places Bulletin 15, *How to Apply the National Register Criteria for Evaluation* (National Park Service revised 1997), National Register of Historic Places Bulletin 16A, *How to Complete the National Register Registration Form* (National Park Service revised 1997), and other National Register Bulletins as applicable

    14.    NPS Management Policies – Section 5, Cultural Resource Management (2006)

    15.    Secretary of the Interior's Standards for the Treatment of Historic Properties (1995, Revised 2017); and accompanying guidelines for Treatment of Historic Properties (1995, Revised 2017) and Cultural Landscapes (1996)

## III.    General Project Section 106 Commitments

00006059

**A.**     MDOT SHA will implement mitigation concurrent with construction phasing where impacts will occur; in the event that the Project is modified or certain elements causing adverse effects are not constructed, MDOT SHA will notify Signatories and consulting parties of the change at such time as a final decision is made to remove such elements and amend the PA as necessary.

**B.**     MDOT SHA cultural resources staff who meet Secretary of the Interior's Professional Qualifications Standards will oversee implementation of all mitigation commitments and other terms of this PA.

**C.**     Consultation on Reforestation and other Mitigation Sites

1.     MDOT SHA is obligated to provide reforestation mitigation for the Project pursuant to the Maryland Reforestation Law (MD Nat Res Code § 5-103). Reforestation must occur within 2 years or 3 growing seasons of completion of construction. MDOT SHA is also coordinating with the NPS to identify reforestation sites to account for impacted NPS-managed lands. The locations to be used for reforestation are not yet fully identified. Reforestation activities may take the form of conservation easements or other noninvasive activities which would not affect historic properties. MDOT SHA will not consult on easements or conservation actions where no ground disturbance is involved. If areas outside the APE are identified for reforestation where new plantings or other activities with the potential to affect historic properties are identified, MDOT SHA will consult in accordance with Stipulation IV to add such areas to the APE, identify historic properties, and evaluate effects to historic properties. MDOT SHA will avoid adverse effects to historic properties to the maximum extent practicable in selecting reforestation planting sites. If adverse effects are unavoidable, MDOT SHA will amend this PA in accordance with Stipulation XII to resolve any such adverse effects.

2.     As Project development proceeds, additional and revised mitigation or enhancement locations for impacts to resources other than historic properties may be identified. These resources include, but are not limited to wetlands, stormwater, and parks. To account for effects to historic properties at these locations, when actions are proposed at such locations that may affect historic properties, MDOT SHA will amend the APE and follow the procedure described in Stipulation IV below.

**IV.     Consultation Regarding Project Development**

**A.**     Further consultation requirements regarding specific historic properties affected by the Project are described in Stipulation V. As project design advances or ancillary activities not currently known are identified, MDOT SHA will initiate consultation with SHPOs and other consulting parties (as described below) using the following process.

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

1. MDOT SHA cultural resources staff will review proposed changes that affect project location, design, methods of construction, materials, or limits of disturbance (LOD), for potential new effects to historic properties. Should these changes necessitate an expansion of the APE, or if the changes would affect known or potential historic properties differently than described in this PA, MDOT SHA will consult on behalf of FHWA as described in Stipulation IV.B below.

2. If MDOT SHA, working with the developer(s), finds design or construction solutions that avoid or further minimize adverse effects to historic properties, MDOT SHA will consult in accordance with the procedures in Stipulation IV.B to seek concurrence with any updated determinations of effect, and amend this PA in accordance with Stipulation XII.

3. MDOT SHA, on behalf of FHWA, will consult upon changes to the LOD within the existing APE where additional archaeological investigation is recommended in the Cultural Resources Technical Report or where such recommendations are identified in subsequent consultation documentation, including the Treatment Plans described in Stipulations VI and VII.

4. MDOT SHA, on behalf of FHWA, will consult as specified elsewhere in this PA regarding specific stipulations, including Monitoring of Performance (Stipulation VIII).

**B.** MDOT SHA, on behalf of FHWA, consistent with the principles described in 36 C.F.R. §§ 800.3 – 6, will consult with the appropriate SHPO(s), Signatories, concurring parties to this PA, Tribes who may ascribe religious and cultural significance to properties pursuant to 36 C.F.R. § 800.3(f)(2), local public agencies with jurisdiction and other consulting parties identified for this undertaking as appropriate on:

1. Amendments to the APE, consistent with 36 C.F.R. § 800.16(d)

2. New or revised determinations of eligibility for historic properties within the APE as described above.

3. New or revised determinations of effect to historic properties within the APE as described above.

> Formatted: Normal

**C.** MDOT SHA will consult with the relevant SHPO(s), Signatories, Tribes, and appropriate consulting parties on archaeology inventory, archaeological evaluations for NRHP eligibility, and effect determinations for archaeological historic properties.

**D.** MDOT SHA will provide consultation materials in written or electronic form, and follow timelines for comment opportunity as specified in Stipulation I. D.

**V.    Property-Specific Commitments**

MDOT SHA will be responsible for ensuring the following mitigation and commitments are carried out, under the oversight of FHWA. MDOT SHA will either complete

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

mitigation itself or enter into legally binding agreements with partner agencies to ensure the following stipulations are fulfilled, subject to the requirements of each stipulation below. Mitigation and commitments will be implemented by authorized construction phase, unless there is opportunity to provide advanced mitigation that is mutually agreeable to all parties, is feasible to advance, and is identified by MDOT SHA as a priority. All commitments regarding design-review with consulting parties will be conducted in a timely manner prior to final design and construction, to allow for meaningful consultation and practical opportunities to influence design to avoid impacts or ensure compatibility to the extent practicable with historic properties.  Preliminary engineering activities to support design of future phases, such as geotechnical studies or other similar, minimally invasive activities with limited potential to affect historic properties may proceed within the APE prior to construction authorization and will not require consultation or advance mitigation.

A.    **George Washington Memorial Parkway (including Clara Barton Parkway)**

1.    MDOT SHA will continue property-specific Design-Review consultation with NPS and SHPOs to ensure a context-sensitive design for new facilities, and, through the ongoing design process, minimize, to the extent practicable, impacts to character-defining features and resources that contribute to the George Washington Memorial Parkway/Clara Barton Parkway as a historic property. Key elements for NPS review include the bridge design, trail connections, retaining walls, ramp improvements, signage plans and barrier.  MDOT SHA will provide NPS and SHPOs a comment opportunity on plans at a draft level of design and a second opportunity prior to finalization of design for elements on NPS property or within the APE adjacent to NPS property; for each review there will be minimum 30-day review period.  In the event of objections relating to the final design from NPS or SHPOs that cannot be resolved, MDOT SHA and FHWA will follow Stipulation XIII of this PA.

2.    MDOT SHA will provide NPS funding in an amount not to exceed $250,000 for a Cultural Landscape Report (CLR) for Clara Barton Parkway.  The CLR will include historical narrative, updated existing conditions and analysis and evaluation, and treatment guidelines for management of character defining features. NPS will complete the CLR within three (3) years of receipt of funds from MDOT SHA, provide a copy of the completed CLR to MD SHPO and MDOT SHA, along with a summary of implementation of any treatment measures in a timely manner following their implementation.

B.    **Dead Run Ridges Archaeological District (44FX3922) and individual sites 44FX0374, 44FX0379 and 44FX0389**

1.    In consultation with VA SHPO, NPS, and other appropriate consulting parties including consulting Tribes, MDOT SHA will develop and implement

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

Phase III data recovery and associated public interpretation commitments on sites 44FX0374, 44FX0379, 44FX0389 and the Dead Run Ridges Archaeological District (44FX3922) as specified in Stipulation VI.

2.    MDOT SHA will prepare a NRHP nomination form for the Dead Run Ridges Archaeological District, no later than 12 months following finalization of the report documenting the Phase III data recovery in Stipulation V. B. 1 above, basing the nomination on the report findings.  MDOT SHA will provide a copy of the draft nomination to NPS staff for review and comment prior to formal submission of the draft nomination to VA SHPO.  MDOT SHA will work with VA SHPO's Register Program to develop a final draft nomination for the Dead Run Ridges Archaeological District, and VA SHPO's Register Program will process the final draft for listing in the NRHP pursuant to its established policies and procedures.  The Department of Historic Resources State Review Board is under no obligation to approve the nomination for listing in the NRHP. Should the nomination be unsuccessful, or additional information be requested beyond the scope of the completed data recovery efforts, MDOT SHA will not be required to complete further fieldwork or analysis beyond what is agreed to in the treatment plan, or otherwise pursue nomination of the district.

**C.    Chesapeake and Ohio Canal National Historical Park**

1.    MDOT SHA will continue property-specific Design-Review consultation with NPS to ensure a context-sensitive design for new facilities constructed as part of the Project, and, through the ongoing design process, minimize to the extent practicable impacts to character-defining features and resources that contribute to the Chesapeake and Ohio Canal National Historical Park as a historic property. MDOT SHA will provide NPS and MD SHPO a comment opportunity on design plans at a draft level of design, and a second opportunity prior to finalization of design for elements within the APE on or adjacent to NPS property; for each review there will be a minimum 30-day review period.  In the event of objections from NPS or MD SHPO that cannot be resolved relating to the final design, MDOT SHA and FHWA will follow Stipulation XIII of this PA.

2.    MDOT SHA will locate new bridge piers away from Lock 13 as part of the new Clara Barton Parkway Bridge and will avoid placing piers for the new structure closer to Lock 13 than the current bridge piers, as shown in the Preferred Alternative.

3.    MDOT SHA will protect Lock 13 in place during construction, by limiting LOD around the Lock structure and providing an appropriate buffer to prevent damage.  MDOT SHA will rehabilitate or restore the structure if needed following construction, with treatment determined by or in consultation with NPS and MD SHPO as described below in Stipulation V.C.4 and VC.5. As part

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

of the Archaeological Treatment Plan in Stipulation VI, MDOT SHA will include archaeological monitoring or other treatment approaches during construction in the area around Lock 13.

4.      MDOT SHA will conduct a condition assessment of lock structures, the Canal and the Towpath within the Project LOD prior to construction and provide copies of the assessment to MD SHPO and NPS.  MDOT SHA will provide for rehabilitation of lock structures, the Canal, and Towpath within the Project LOD following completion of substantial construction within the affected area. MDOT SHA will provide NPS and MD SHPO with a draft rehabilitation plan for review and comment prior to implementing the plan

5.      MDOT SHA will provide for vibration damage monitoring of other susceptible historic structures at Chesapeake and Ohio Canal National Historical Park within the APE during construction, specifically, Lock 12 and Lock 14. Additional vulnerable structures or features (such as masonry walls) to be monitored may be identified in consultation with NPS during the preparation and review of the condition assessment identified in Stipulation V.C.4.

      a. Should notable acute or incremental damage directly resulting from construction means or methods be identified as a result of the vibration monitoring, MDOT SHA will follow Section A of the Inadvertent Discovery Plan (Attachment 1).

      b. General wear or degradation of the historic fabric during construction that is not attributable to specific construction practices or incidents will be remediated by the rehabilitation plan in Stipulation V.C.4.

**D.    18MO749 Archaeological Site (C&O Canal)**

In consultation with the MD SHPO, NPS, and other appropriate consulting parties, including Tribes, MDOT SHA will develop and implement a Phase III Data Recovery and associated public interpretation commitments as specified in Stipulation VI.

**E.    18MO751 Archaeological Site (C&O Canal)**

In consultation with the MD SHPO, NPS, and other appropriate consulting parties, including Tribes, MDOT SHA will develop and implement a Phase III Data Recovery and associated public interpretation commitments as specified in Stipulation VI.

**F.    Washington Biologists' Field Club on Plummers Island**

1.      MDOT SHA will prepare a NRHP Nomination for the Washington Biologists' Field Club on Plummers Island.  MDOT SHA will provide a copy of the draft nomination to NPS staff and the Washington Biologists' Field Club (WBFC) for review prior to submittal to MD SHPO and address any comments prior to formal submission of the nomination. Should the nomination be

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

unsuccessful, MDOT SHA will not be required to resubmit the nomination or otherwise complete additional studies or research after addressing comments by NPS staff.

2.      MDOT SHA will place temporary fencing along the LOD within Plummers Island to delimit construction activities.

3.      MDOT SHA will fund or implement a photographic survey documenting conditions before, during and after construction is completed adjoining Plummers Island, within the APE boundary, and provide the results to WBFC and NPS.

4.      MDOT SHA will fund or develop GIS maps to document known current and historical study locations and key natural resource features within the APE to assist in documenting change over time and provide these files to WBFC and NPS.

5.      MDOT SHA will procure a sub-meter accurate GPS unit for WBFC to use in long-term monitoring of plant locations, collection sites, and other historical research features.

6.      MDOT SHA, subject to any availability or rights restrictions, will provide for digitization and cataloging of historical records related to the WBFC that are housed at the Smithsonian Museum of Natural History, specifically the collection, "SIA RU102005, Smithsonian Institution, Washington Biologists' Field Club, circa 1900-1966 Records" that are not currently available in electronic format, and provide the files to WBFC and NPS.

7.      MDOT SHA will provide WBFC historical content, such as a synthesis of the digitized materials in Stipulation V.F.6, to incorporate into their website.

8.      MDOT SHA will complete stipulations V.F.1-7., other than those requiring longer timeframes (such as photographic survey after construction), unless continued consultation should necessitate a longer timeframe, within two (2) years of commencement of construction activities on Plummers Island.

G.      **Morningstar Tabernacle No. 88 Moses Hall and Cemetery**

1.      As part of context-sensitive design, MDOT SHA will consult with the Trustees of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery, Friends of Moses Hall, First Agape A.M.E. Zion Church, Cabin John Citizens Association, and other consulting parties with a demonstrated interest in the cemetery on context-sensitive treatment of noise barrier facing the cemetery; MDOT will work with the above-listed consulting parties on a context-sensitive treatment of noise barrier facing the cemetery, which may include decorative elements appropriate to the historic property and/or such elements as memorial plaques or signage. MDOT SHA will provide these consulting parties and MD SHPO comment opportunity for Project elements, specifically noise barrier,

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

within the APE adjacent to the cemetery at a draft level of design and a second opportunity prior to finalization of design; for each review there will be a minimum 30-day review period. In the event MD SHPO does not agree with the final design, MDOT SHA and FHWA will follow Stipulation XIII of this PA.

2.      MDOT SHA will conduct further studies prior to final design and construction adjacent to the cemetery as part of the treatment plan specified in Stipulation VII.  Following completion of the studies in the treatment plan, MDOT SHA and FHWA will provide the results of the studies to MD SHPO and relevant consulting parties and determine project effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery based on the results of the studies. If no interments are identified that would unavoidably be affected by the project, there will be no adverse effects to the cemetery from the Preferred Alternative. Should interments be identified outside the identified boundary of the cemetery, and no additional project avoidance options are feasible, MDOT SHA and FHWA will consult on the likely adverse effect, identify mitigation options, and amend this PA as necessary following the procedures in Stipulations IV and XIII of this PA.

**H.      Gibson Grove A.M.E. Zion Church**

1.      MDOT SHA will provide First Agape A.M.E. Zion Church at Gibson Grove and MD SHPO a comment opportunity at a draft level of design and a second opportunity prior to finalization of design for Project elements on church property or within the APE adjacent to the church property, with a minimum 30-day review period.

2.      MDOT SHA will improve the stormwater drainage on the church property by routing drainage into a new underground culvert to be installed as part of the Project.

3.      MDOT SHA will ensure that a parking lot identified in the church's restoration plan is constructed on church property following installation of the culvert drainage design. MDOT SHA will work with First Agape A.M.E. Zion Church on schedule and timing of the culvert and parking lot work to be compatible with ongoing church restoration efforts to the extent practicable.

4.      MDOT SHA will ensure Project noise- or vibration- causing construction activities are restricted adjacent to the church during scheduled worship services or key events.

5.      MDOT SHA, in coordination with Montgomery County, will install sidewalk on the west side of Seven Locks Road to more accessibly connect Gibson Grove A.M.E. Zion Church and Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

**VI.**    **Archaeological Treatment Plan (ATP)**

MDOT SHA's goal is to have a comprehensive but flexible ATP that addresses the LOD but can be revised and updated in response to Project design advancement. Prior to construction within affected areas, MDOT SHA will develop an ATP in consultation with SHPOs and appropriate consulting parties. MDOT SHA will provide for a minimum 30-day review of the initial draft of the ATP. MDOT SHA will be responsible for implementing the provisions of the ATP. The ATP will include:

**A.**    Archaeological monitoring requirements during construction.

**B.**    Phase I Survey in areas where property access could not be obtained (as identified in the 2019 Technical Report, Volume 4, Chapter 5): RS-1; RS-2; S-4, SWM S-4, S-5, SWM S-5, S-6, SWM S-6; S-27; SWM S-27, S-8; S-10; S-53, and the vicinity of S-28.

**C.**    Phase I Survey in the vicinity of two sites, 18MO457 and 18MO190, to define site boundaries and evaluate NRHP eligibility and potential impacts.

**D.**    Phase II Evaluation of sites 18MO191 and 18MO752.

**E.**    Phase III Data Recovery investigations, including public interpretation, at 18MO749 and 18MO751 within the Chesapeake and Ohio Canal National Historical Park and the Dead Run Ridges Archaeological District within the GWMP (44FX3922), and individually eligible sites within the district 44FX0374, 44FX0379 and 44FX0389. MDOT SHA will prepare a draft NRHP Nomination form for the Dead Run Ridges archaeological district based on the results of Phase III Data Recovery investigation as described in Stipulation V. B.

**F.**    Provisions in the treatment plan required for work on NPS federal property, including curation to NPS standards of artifacts and associated records, permitting under the Archaeological Resources Protection Act and compliance with the Native American Graves Protection and Repatriation Act (NAGPRA).

**G.**    If sites or areas proposed for archaeological treatment in the ATP are avoided by revising the Project LOD or other actions, MDOT SHA will document the revision, including updating effect determinations and seeking SHPO concurrence where required. MDOT SHA will provide such information to appropriate consulting parties and will thereby not need to complete treatment or investigation at such locations.

**H.**    MDOT SHA will ensure required consultation with the appropriate SHPO and appropriate consulting parties occurs on eligibility, effects, and treatment for any newly identified archaeological historic properties prior to final design and construction in areas identified for further archaeological treatment. Reports or similar deliverables will be provided to Signatories and appropriate consulting parties with a minimum 30-day review opportunity.

**I.**    MDOT SHA will consult with SHPO and appropriate consulting parties on the ATP and any revisions or modifications to the ATP. If SHPO concurs with the ATP or future revisions, no amendment of this PA is needed to implement or update the ATP. If

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

SHPO does not agree with the ATP or future proposed changes to the ATP, MDOT SHA
will seek to resolve the disagreement or follow the provisions of Stipulation XIII.

**VII.   Cemeteries and Human Remains Treatment Plan**

    **A.**    MDOT SHA acknowledges there is some potential for human remains associated
with historic properties to be present in at least two areas of the LOD (adjacent to
Morningstar Tabernacle No. 88 Moses Hall and Cemetery and in the general location of
the Montgomery County Poor Farm) which are not currently accessible for the types of
thorough archaeological investigation necessary to definitively identify interments.
MDOT SHA will work with the developer(s) to minimize LOD to the maximum extent
practicable in these areas.

    **B**.    The Treatment Plan will include proposed investigations to identify and evaluate
potential graves or human remains in specified sensitive areas to the maximum extent
practicable to ensure avoidance or treatment prior to final design and construction.

    **C**.    MDOT SHA will consult with SHPO and, where identified, descendants,
descendant communities and other appropriate consulting parties to fully identify,
recover, and respectfully treat any human remains identified within LOD that cannot be
avoided.

    **D**.    MDOT SHA will consult with SHPO and where identified, descendants,
descendant communities and other appropriate consulting parties on archaeological
monitoring requirements for locations within LOD where potential for human remains is
likely during construction, including unverified but reported locations of the Ball Family
Cemetery.

    **E.**    MDOT SHA will seek input from affected consulting parties and concurrence
from SHPO on the treatment plan prior to its implementation.  MDOT SHA will be
responsible for implementing the treatment plan.  If SHPO does not agree with the
treatment plan, MDOT SHA will seek to resolve the disagreement or follow the
provisions of Stipulation XIII.

    **F.**    Activities on Federal Lands, including NPS-managed property, require adherence
to NAGPRA.  The treatment plan will include provisions for NAGPRA compliance in the
event of human remains or funerary objects discovery.

    **G.**    MDOT SHA will ensure that at all times human remains are treated with dignity
and respect in a manner consistent with ACHP's policy statement on the Treatment of
Human Remains, Burial Sites and Funerary Objects.

    **H.**    MDOT SHA will ensure no photographs of human remains or associated funerary
objects are released to the press or general public.

    **I.**    MDOT SHA will be responsible for all expenses for any removal, treatment and
relocation/disposition of any human remains or funerary objects impacted by the Project.

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

**J.**      MDOT SHA will fully implement all relevant provisions of the cemetery treatment plan prior to final design and any construction impacts within specified cemetery investigation locations.

**VIII.   Monitoring of Performance**

**A.**      Specific points for continued consultation are defined in Stipulations IV and V.

**B.**      MDOT SHA will, for the duration of the Project, provide Signatories and consulting parties listed in Attachment 3 with a written progress report twice per calendar year describing status of implementation of this PA.

**C.**      MDOT SHA will provide for a meeting opportunity for Signatories and consulting parties listed in Attachment 3 following issuance of each progress report.

**D.**      MDOT SHA will convene additional consulting party meetings as necessary or when requested by any Signatory;

**E.**      MDOT SHA may cancel individual meetings if there are no significant issues for discussion and no Signatory objects to the cancellation.

**IX.     Post-Review Discovery of Human Remains**

MDOT SHA will develop human remains treatment provisions as part of the archaeological and cemetery and human remains treatment plans in Stipulations VI and VII.  MDOT SHA will follow the attached Inadvertent Discovery Plan (Attachment 1) should human remains be identified in any areas or situations not covered by the archaeological or cemetery treatment plans.

**X.      Other Post-Review Discoveries**

MDOT SHA will follow the procedures in Attachment 1 of this PA for any inadvertent archaeological discoveries or inadvertent effects to historic properties during construction. MDOT SHA will provide training for the developer(s) in the Inadvertent Discovery Plan requirements.

**XI.     Confidentiality**

The Signatories agree to provide by the provisions of Section 304 of the NHPA, and other applicable requirements, to withhold information concerning the location, character, or ownership of resources where release of such information may endanger the integrity of the resource.

**XII.    Amendment**

Any Signatory to this PA may request that it be amended, whereupon the Signatories will consult in accordance with 36 C.F.R. § 800.14 to consider such an amendment. Amendments will be effective upon the date of the last signature from the Signatories.

**XIII.   Dispute Resolution**

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

**A.**     Should any Signatory or consulting party object at any time to the manner in which the terms of this PA are implemented, within 30 days of information being provided relating to the issue forming the basis of the objection, or within 30 days where the objector can otherwise be reasonably assumed to be aware of the issue forming the basis of objection, FHWA shall consult with such party to resolve the objection. If FHWA determines that such objection cannot be resolved, FHWA will take the following steps:

1.     Forward all documentation relevant to the dispute, including FHWA's proposed resolution, to ACHP. ACHP shall provide FHWA with its comment on the resolution of the objection within 30 days of receiving adequate documentation. Prior to reaching a final decision on the dispute, FHWA shall prepare a written response that takes into account any timely advice or comments regarding the dispute from ACHP, Signatories and consulting parties and provide them with a copy of this written response. FHWA will then proceed according to its final decision.

2.     If ACHP does not provide its advice regarding the dispute within the 30-day period, FHWA may make a final decision on the dispute and proceed accordingly. Prior to reaching such a final decision, FHWA shall prepare a written response that takes into account any timely comments regarding the dispute from the Signatories and consulting parties to the PA and provide them and ACHP with a copy of such written response.

3.     In the case of objections related to NRHP eligibility, any Signatory may object in writing within 30 days to an MDOT SHA or FHWA determination of eligibility.  If MDOT SHA and FHWA are unwilling to revise the determination in response to the objection or other relevant information, FHWA (or MDOT SHA on its behalf) will submit the determination to the Keeper of the National Register of Historic Places for a determination pursuant to 36 C.F.R. Part 63.

**B.**     Objections from the Public: Should a member of the public object to an action taken under this PA, or compliance with the PA, within 30 days of information being provided relating to the issue forming the basis of the objection, or within 30 days where the objector can otherwise be reasonably assumed to be aware of the issue forming the basis of objection, FHWA will ensure that MDOT SHA consults with the objecting party to respond to the objection in coordination with FHWA where relevant, provided the objection is made in writing to the FHWA or MDOT SHA contacts identified in Attachment 5 or any subsequent updates to Attachment 5.  MDOT SHA and FHWA will inform other Signatories of the objection and proposed resolution.  Should a Signatory disagree with the proposed resolution, the Signatories will follow Stipulation XIII.A.

**C.**     FHWA's responsibility to carry out all other actions subject to the terms of this PA that are not the subject of the dispute remain unchanged.

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

**XIV.   Termination**

    **A.**    Any Signatory to this PA may terminate it by providing 30 days' notice in writing to the other Signatories, provided that the Signatories will consult during the period prior to termination to seek agreement on amendments or other actions that would avoid termination.

    **B.**    If any Signatory to this PA determines that a term will not or cannot be carried out, that party shall immediately consult with the other Signatories to attempt to develop an amendment per Stipulation XII, above. If within 30 days (or another time period agreed to by all Signatories) an amendment cannot be reached, any signatory may terminate the PA upon written notification to the other Signatories.

    **C.**    In the event of termination, FHWA will comply with 36 C.F.R. § 800 for all remaining actions, or until a new agreement is reached fulfilling such requirements.

This PA will continue in full force and effect until 20 years from the date of execution of the PA, or such time of final acceptance of the Project and when all terms of this PA have been met, should the terms be met prior to the 20-year expiration.  The PA will be invalid if the Project is terminated or authorization for the Project is rescinded.  At any time in the six-month period prior to its expiration, the Signatories will consult to consider an extension or amendment of the PA.  At such time, the Signatories may consider an amendment to extend the PA unmodified for an additional specified duration or consult to amend the PA in accordance with Stipulation XII. No extension or amendment will be effective until all Signatories have signed the amendment or amendment to extend.

<b>Signature Pages</b>

**Signatories: FHWA (Maryland Division), ACHP, MD SHPO, VA SHPO, NPS, MDOT SHA**

**Concurring Parties**

**Attachments**

        1.    Inadvertent Discovery Plan
        2.    All Parties Invited to Consult on the Project
        3.    Consulting Parties invited to Concur
        4.    Links to Documentation Referenced
        5.    Contact Information for FHWA and MDOT SHA staff responsible for PA implementation (to be updated as necessary)

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

**Attachment 1**
**Inadvertent Discovery Plan**

**A.    Unanticipated Impacts to Architectural Historic Properties:** if the Project causes unanticipated impacts to any National Register of Historic Places (NRHP) eligible, listed, or contributing buildings, sites, structures, or objects of the built environment, the contractor must notify the engineer and immediately cease any activity causing ongoing damage until consultation occurs.  MDOT SHA shall, in consultation with the appropriate SHPO (VA or MD), determine if adverse effects have occurred to the property/properties and develop a plan for the protection of the historic property, and minimization or mitigation of impacts.  If mitigation is identified, FHWA, MDOT SHA, SHPO, and other Signatories as necessary will execute a Memorandum of Agreement or amend this PA to record the identified mitigation.  MDOT SHA may hold the developer(s) liable for any or all costs resulting from this process following appropriate processes identified in its contract instruments.

**B.    Unanticipated Damage to Known Archaeological Resources:** if unauthorized excavation occurs outside the approved limits of disturbance (LOD) or other approved boundaries designed to protect archaeological resources or cemeteries and thereby causes impacts to known, NRHP-eligible properties, MDOT SHA will ensure any activity causing ongoing damage is stopped until consultation occurs.  MDOT SHA will conduct a damage assessment consistent with the model used for such assessments under the Archaeological Resources Protection Act (https://www.nps.gov/archeology/pubs/techbr/tchBrf20.pdf).  MDOT SHA will use the results of the assessment in consultation with the relevant SHPO to determine if the resource has been adversely affected and determine appropriate mitigation.  If the resource is of known or suspected Native American affiliation, FHWA, with assistance from MDOT SHA shall consult with federally recognized Indian Tribes as appropriate.  If the resource is affiliated with other known descendant groups or consulting parties, MDOT SHA will consult with such parties as well.  Should damage occur on NPS land, MDOT SHA will consult with the NPS staff and regional archaeologist regarding the damage assessment report and any identified mitigation. If mitigation is identified, FHWA, MDOT SHA, SHPO, and other Signatories as necessary will execute a Memorandum of Agreement or amend this PA to record the identified mitigation.  MDOT SHA may hold the developer(s) liable for any or all costs resulting from this process following appropriate processes identified in its contract instruments.

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

**C.      Unanticipated Discovery of Human Remains:** Should any burials, interments, or human remains (hereafter, "remains") be encountered during construction, MDOT SHA will ensure all applicable construction work in the vicinity of the remains is immediately stopped to prevent damage to the remains, or to any additional remains that might be present in the vicinity.  A minimum 100-foot buffer around identified remains will be established by MDOT SHA free of disturbance, to be adjusted as appropriate for the site conditions. Construction may occur outside the buffer unless evidence of additional remains is found.  If remains are suspected to be human but not confirmed, MDOT SHA will ensure that such confirmation is made by a qualified professional.  Human remains will at all times be treated respectfully and access and visibility limited to the site of discovery to authorized personnel only.  Within Maryland, pursuant to State of Maryland Criminal Code § 10-402, the State's Attorney must authorize movement or removal of any remains until determined to be archaeological.  If the remains are determined to be archaeological, MDOT SHA and the relevant SHPO will consult to determine treatment of the remains and any other necessary treatment such as work needed to define extent of remains in the most expeditious manner feasible.  Within Virginia, human remains and associated funerary objects encountered during the course of actions taken as a result of this PA shall be treated in a manner consistent with the Virginia Antiquities Act (Code of Virginia 10.1-2305) and its implementing regulation (17VAC5-20), adopted by the Virginia Board of Historic Resources and published in the Virginia Register on July 15, 1991.

If the remains are determined archaeological and suspected to be of Native American origin, MDOT SHA, in coordination with FHWA, shall provide notification to tribal governments in accordance with any expressed tribal consultation preferences within 24 hours or as soon as practicable.  MDOT SHA and/or FHWA will consult with affected federally recognized Indian Tribes, the Maryland Commission on Indian Affairs and appropriate Maryland Indian groups as appropriate regarding treatment of the remains. MDOT SHA will accommodate tribal cultural preferences to the extent practicable during such an event.  If remains can be associated with other known descendant communities or organizations, including the cemetery-affiliated consulting or concurring parties to this PA, such parties shall also be consulted.

If the human remains are likely to be of Native American origin and are located on lands controlled or owned by the U.S. Government, including National Park Service Property within the APE, the Federal land managing agency will assume responsibility for compliance with the Native American Graves Protection and Repatriation Act (NAGPRA; 25 USC 3001), with MDOT SHA assistance.

In consultation with the relevant SHPO, Federally Recognized Indian Tribes, and FHWA as appropriate, and other identified descendant/affiliated consulting parties, the MDOT SHA shall develop a plan for the treatment or disposition of the remains or follow provisions of an existing Treatment Plan developed per this PA. MDOT SHA shall implement the provisions of the agreed Treatment Plan.

Should the remains be associated with, or constitute an intact archaeological resource, provision **D** below is also applicable.

**D.      Unanticipated Discovery of Archaeological Resources:** If previously unidentified archaeological features, artifacts, or other materials (hereafter, "resource") are discovered during construction, all ground-disturbing work in the vicinity of the

00006073

resource shall be temporarily suspended or modified to prevent further damage to the resource, and MDOT SHA will provide a reasonable buffer where ground disturbance is prohibited to cover the extent of the resource that may not be exposed.

The MDOT SHA archaeologist shall perform a preliminary inspection to identify the resource and evaluate its likelihood of NRHP eligibility. Following this inspection, construction may resume in the vicinity of but outside the boundary of the archaeological resource as defined by the MDOT SHA archaeologist. If the resource is potentially eligible for the NRHP, MDOT SHA will consult with the relevant SHPO on an eligibility determination and, if determined eligible for the NRHP, every effort shall be made to minimize impacts through redesign or modification of construction methods. If the resource is of known or suspected Native American affiliation, FHWA, with assistance from MDOT SHA shall consult with federally recognized Indian Tribes as appropriate. If the resource can be reasonably identified with other descendant or affiliated communities, MDOT SHA shall also attempt to consult with such parties.

In consultation with the relevant SHPO, MDOT SHA shall develop a plan for the treatment of any resource determined eligible. MDOT SHA shall describe actions proposed to avoid, minimize, or mitigate adverse effects, and request SHPO, tribal, and any other consulting party comments within 5 working days, unless there is a life or safety hazard requiring immediate interim action. MDOT SHA will disclose any interim action affecting the eligible resource taken in the event of a life or safety hazard. MDOT SHA, at its discretion, may establish a longer comment period if practicable in consideration of potential safety, cost, public travel disruption, and other factors. MDOT SHA shall then implement the provisions of the agreed-upon plan and/or amend this PA to document the resolution, should the resource be determined eligible and should the Project adversely affect the resource.



I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

00006074

**Attachment 2**
**All Parties Invited to Consult on the Project**

**Federally Recognized Tribal Nations**
- Absentee-Shawnee Tribe of Oklahoma
- Delaware Nation
- Delaware Tribe of Indians
- Chickahominy Indian Tribe
- Chickahominy Indians Eastern Division
- Eastern Shawnee Tribe of Oklahoma
- Monacan Indian Nation
- Nansemond Indian Tribe
- Oneida Indian Nation
- Onondaga Nation
- Pamunkey Indian Tribe
- Rappahannock Tribe, Inc.
- Saint Regis Mohawk Tribe
- Seneca-Cayuga Nation
- Shawnee Tribe
- Tuscarora Nation
- Upper Mattaponi Indian Tribe

**State Recognized and Other Tribes**
- Piscataway Conoy Tribe of Maryland (PCT)
- PCT - Cedarville Band of Piscataway
- PCT - Choptico Band of Piscataway
- Piscataway Indian Nation

**Federal Agencies**
- Department of Defense
- General Services Administration
- Federal Railroad Administration
- Federal Transit Administration
- National Capital Planning Commission
- National Institute of Standards and Technology
- National Park Service
- U.S. Army Corps of Engineers
- U.S. Department of Agriculture
- U.S. Postal Service

**State Agencies and Organizations**
- Maryland Commission on Indian Affairs

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

- **MDOT Maryland Transit Administration**
- **MDOT Maryland Transportation Authority**
- **Maryland Historical Trust**
- **Preservation Maryland**
- **Virginia Department of Historic Resources**
- **Virginia Department of Transportation**
- **Washington Metropolitan Area Transit Authority**

**County Agencies and Organizations**

- **Charles County Department of Planning**
- **Frederick County**
- **Frederick County Preservation Trust**
- **Maryland Milestones/Anacostia Trails Heritage Area, Inc.**
- **Montgomery County Department of Correction and Rehabilitation**
- **Montgomery County Department of General Services**
- **Montgomery County Department of Transportation**
- **Montgomery County Heritage Area, Heritage Tourism Alliance of Montgomery County**
- **Maryland Milestones**
- **Maryland-National Capital Parks and Planning Commission – Montgomery County Planning – Historic Preservation**
- **Maryland-National Capital Parks and Planning Commission – Montgomery Parks**
- **Maryland-National Capital Parks and Planning Commission – Prince George's County Planning – Historic Preservation**
- **Maryland-National Capital Parks and Planning Commission – Prince George's County Department of Parks and Recreation**
- **Montgomery Preservation, Inc.**
- **Prince George's County Historic Preservation Commission**
- **Prince George's County Historical and Cultural Trust**
- **Prince George's Heritage, Inc.**

**Municipal and Other Organizations**
- **Canoe Cruisers Association**
- **C&O Canal Association**
- **C&O Canal Trust**
- **Carderock Springs Citizens' Association**
- **City of Gaithersburg**
- **City of College Park**
- **City of Glenarden**
- **City of Greenbelt**
- **City of Rockville**
- **First Agape A.M.E. Zion Church at Gibson Grove**

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

- **Frederick County Landmarks Foundation**
- **Heart of the Civil War Heritage Area**
- **Indian Spring Community Association**
- **National Park Seminary Master Association**
- **National Trust for Historic Preservation**
- **Peerless Rockville**
- **Rock Creek Conservancy**
- **Save Our Seminary at Forest Glen**
- **Sierra Club Maryland Chapter**
- **Silver Spring YMCA**
- **Trustees of Morningstar Tabernacle No. 88, Inc. (Friends of Moses Hall)**
- **Washington Biologists' Field Club**
- **Village of North Chevy Chase**



I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

**Attachment 3**
**Consulting Parties Invited to Concur**

**Federally Recognized Tribes**
- Absentee-Shawnee Tribe of Oklahoma
- Delaware Nation
- Delaware Tribe of Indians
- Chickahominy Indian Tribe
- Chickahominy Indians Eastern Division
- Eastern Shawnee Tribe of Oklahoma
- Monacan Indian Nation
- Nansemond Indian Tribe
- Oneida Indian Nation
- Onondaga Nation
- Pamunkey Indian Tribe
- Rappahannock Tribe, Inc.
- Saint Regis Mohawk Tribe
- Seneca-Cayuga Nation
- Shawnee Tribe
- Tuscarora Nation
- Upper Mattaponi Indian Tribe

**State Recognized and Other Tribes**
- Piscataway Conoy Tribe of Maryland (PCT)
- PCT - Cedarville Band of Piscataway
- PCT - Choptico Band of Piscataway
- Piscataway Indian Nation

**Federal Agencies**

- Department of Defense
- Federal Railroad Administration
- Federal Transit Administration
- National Capital Planning Commission
- National Institute of Standards and Technology
- U.S. Army Corps of Engineers
- U.S. Department of Agriculture

**State Agencies**
- Maryland Commission on Indian Affairs
- Maryland Department of Transportation – Maryland Transit Administration
- Maryland Transportation Authority
- Virginia Department of Transportation

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

**Local and Other Agencies and Groups**
- **Cabin John Citizens Association**
- **Canoe Cruisers Association**
- **Carderock Springs Citizens Association**
- **City of Gaithersburg**
- **City of Rockville**
- **C&O Canal Association**
- **C&O Canal Trust**
- **First Agape A.M.E. Zion Church at Gibson Grove**
- **Maryland Milestones**
- **Maryland-National Capital Park and Planning Commission**
- **Montgomery County Heritage Area**
- **Montgomery Preservation, Inc.**
- **National Institute for Standards and Technology**
- **National Trust for Historic Preservation**
- **Peerless Rockville**
- **Preservation Maryland**
- **Trustees of Morningstar Tabernacle No. 88, Incorporated (Friends of Moses Hall)**
- **Virginia Department of Transportation**
- **Washington Biologists' Field Club**



I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

00006079

**Attachment 4**
**Links to Documentation Referenced In the I–495 & I–270 Managed Lanes**
**Study PA**

**Federal Codes and Regulations**
16 U.S.C. 470aa-470mm
Archaeological Resources Protection Act (ARPA)
https://uscode.house.gov/view.xhtml?path=/prelim@title16/chapter1B&edition=prelim

25 U.S.C. Ch. 32 § 3001
Native American Graves Protection and Repatriation Act (NAGPRA)
https://uscode.house.gov/view.xhtml?path=/prelim@title25/chapter32&edition=prelim

36 C.F.R. Part 14 and 54 U.S.C. § 100902
Rights-of-Way
https://www.ecfr.gov/current/title-36/chapter-I/part-14
https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title54-
section100902&num=0&edition=prelim

36 C.F.R. Part 63
Dispute Resolution of Determinations of Eligibility for Inclusion in the NRHP
https://www.ecfr.gov/current/title-36/chapter-I/part-63

36 C.F.R. Part 79
Curation of Federally Owned and Administered Archaeological Collections
https://www.ecfr.gov/current/title-36/chapter-I/part-79

36 C.F.R. Part 800
Implementing Regulations of Section 106 of the National Historic Preservation Act
https://www.ecfr.gov/current/title-36/chapter-VIII/part-800?toc=1

40 C.F.R. 1506.6(a)
Public involvement – National Environmental Policy Act
https://www.ecfr.gov/current/title-40/chapter-V/subchapter-A/part-1506#1506.6

54 U.S.C.
- National Park Service and Related Programs
    § 100101(a) Promotion and Regulation of the National Park Service (NPS Organic Act)
    o https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title54-
       section100101&num=0&edition=prelim
- National Historic Preservation Act
    § 306108 Effect of Undertaking on Historic Property

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

- o https://uscode.house.gov/view.xhtml?req=(title:54%20section:306108%20edition:prelim)
- § 307103 Access to Information (Section 304)
- o https://www.achp.gov/digital-library-section-106-landing/frequently-asked-questions-protecting-sensitive-information

Public Law 71-284, 46 Statute 482 (1930); Executive Order 6166 of June 10, 1933
Capper-Cramton Act and Administration by the National Park Service
https://www.ncpc.gov/about/authorities/cca/
https://www.nps.gov/parkhistory/online_books/anps/anps_3b.htm


**State Codes and Regulations**
Maryland Criminal Code § 0-402
Courts and Judicial Proceedings
https://law.justia.com/codes/maryland/2013/article-gcr/section-10-402

Maryland Natural Resources Code § 5-103
Reforestation
https://roads.maryland.gov/mdotsha/pages/index.aspx?PageId=158

Virginia Antiquities Act § 10.1-2305
Human Remains
https://law.lis.virginia.gov/vacode/title10.1/chapter23/section10.1-2305/
Implementation - Virginia Administrative Code 17VAC5-20
https://law.lis.virginia.gov/admincode/title17/agency5/chapter20/


**Guidelines and Standards**

***Advisory Council on Historic Preservation***
- *Exemption Regarding Historic Preservation Review Process for Effects to the Interstate Highway System* (ACHP Program Comment, 2005)
  https://www.achp.gov/sites/default/files/exemptions/2017-01/final_interstate_exemption_notice.pdf

- *Policy Statement Regarding Treatment of Burial Sites, Human Remains, and Funerary Objects* (ACHP February 2007)
  https://www.achp.gov/sites/default/files/policies/2018-06/ACHPPolicyStatementRegardingTreatmentofBurialSitesHumanRemainsandFuneraryObjects0207.pdf

- *Program Comment Issued for Streamlining Section 106 Review for Actions Affecting Post-1945 Concrete and Steel Bridges* (77 FR 68790)
  https://www.federalregister.gov/documents/2012/11/16/2012-27866/program-comment-issued-for-streamlining-section-106-review-for-actions-affecting-post-1945-concrete

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

- *Section 106 Archaeology Guidance* (ACHP, 2009)
  https://www.achp.gov/sites/default/files/guidance/2017-02/ACHP%20ARCHAEOLOGY%20GUIDANCE.pdf

**The Maryland Historical Trust**
- Standards and Guidelines for Archaeological Investigations in Maryland (Shaffer and Cole 1994)
  https://mht.maryland.gov/documents/PDF/archeology/Archeology_standards_investigations.pdf

- *Technical Update No. 1 of the Standards and Guidelines for Archaeological Investigations in Maryland: Collections and Conservation Standards* (2018)
  https://mht.maryland.gov/documents/PDF/archeology/Archeology_standards_curation.pdf

- Standards and Guidelines for Architectural and Historical Investigations in Maryland (Maryland Historical Trust, Revised 2019)
  https://mht.maryland.gov/documents/PDF/research/Survey_standards_architecture_web.pdf

**The National Park Service**
- Management Policies – Section 5, Cultural Resource Management (2006)
  https://www.nps.gov/subjects/policy/upload/MP_2006.pdf

- NPS Museum Handbook, National Park Service, revised 2019
  https://www.nps.gov/museum/publications/handbook.html

- NRHP Bulletin 15 – How to Apply the National Register Criteria for Evaluation (National Park Service revised 1997)
  https://www.nps.gov/subjects/nationalregister/upload/NRB-15_web508.pdf

- Other NRHP Bulletins
  https://www.nps.gov/subjects/nationalregister/publications.htm#:~:text=national%20register%20of%20historic%20places%20bulletins

- The Secretary of the Interior's Guidelines for the Treatment of Cultural Landscapes (1996)
  https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/index.htm

- The Secretary of the Interior's Guidelines for the Treatment of Historic Properties (1995, Revised 2017)
  https://www.nps.gov/tps/standards/treatment-guidelines-2017.pdf

- The Secretary of the Interior's Professional Qualifications Standards
  https://www.nps.gov/articles/sec-standards-prof-quals.htm
  **OR** see 48 FR 44738
  https://www.nps.gov/subjects/historicpreservation/upload/standards-guidelines-archeology-historic-preservation.pdf

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

- The Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation (1983)
  https://www.nps.gov/subjects/historicpreservation/upload/standards-guidelines-archeology-historic-preservation.pdf

- The Secretary of the Interior's Standards for the Treatment of Historic Properties (1995, Revised 2017)
  https://www.nps.gov/tps/standards/four-treatments.htm
  OR https://www.ecfr.gov/current/title-36/chapter-I/part-68

*The Virginia Department of Historic Resources*
- Guidelines for Conducting Historic Resources Survey in Virginia (Virginia Department of Historic Resources, revised September 2017)
  https://www.dhr.virginia.gov/wp-content/uploads/2018/06/SurveyManual_2017.pdf

**Other Referenced Information**

- Alternative 9 Phase 1 South project description (currently available here: https://oplanesmd.com/environmental/alternatives/pa/)

- First Agape A.M.E. Zion Church at Gibson Grove parking lot restoration plan (link forthcoming)

- I-495 and I-270 Managed Lanes Study Draft Section 106 Technical Report: https://oplanesmd.com/deis/#:~:text=4(f)%20Evaluation-,appendix%20g,-Cultural%20Resources%20Technical

- MDOT SHA Statewide PA: https://www.roads.maryland.gov/OPPEN/2021_PA_Amendment.pdf

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

**Attachment 5**

FHWA and MDOT SHA Staff Contact Information:

**For FHWA:**

Ms. Jeanette Mar
Environmental Program Manager
FHWA - Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore, MD 21201
phone (410) 779-7152
fax     (410) 962-4054
jeanette.mar@dot.gov

**For MDOT SHA:**

Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
707 N. Calvert Street
Baltimore, MD 21202
phone (410) 545-8508
sarcher@mdot.maryland.gov

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

## Karen Hutchins-Keim

| | |
|---|---|
| **From:** | Steve Archer <SArcher@mdot.maryland.gov> |
| **Sent:** | Thursday, April 14, 2022 10:04 AM |
| **To:** | Matt Manning (Consultant); Richard Ervin; Caryn Brookman (Consultant); Karen Hutchins-Keim |
| **Subject:** | Fw: I-495 and I-270 MLS Section 106 Materials, PA Third Draft, Comments Requested by April 14, 2022 |

**EXTERNAL EMAIL:**  Do not click links or open attachments unless you trust the 'Sender' and know the content is safe.

FYI - MHT response on the PA.

---

**From:** Tim Tamburrino -MDP- <tim.tamburrino@maryland.gov>
**Sent:** Thursday, April 14, 2022 9:46 AM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Cc:** David Clarke, FHWA <david.clarke@dot.gov>; Mar, Jeanette (FHWA) <jeanette.mar@dot.gov>; Marc Holma, Virginia DHR <marc.holma@dhr.virginia.gov>; Mandy Ranslow, ACHP <mranslow@achp.gov>; John Simkins, FHWA Virginia Division <john.simkins@dot.gov>; Beth Cole, MHT <beth.cole@maryland.gov>; Eileen McGuckian <phileen3@verizon.net>; Alexandra Jones <ajones@archaeologyincommunity.com>; Diane Baxter <baxterd9@aol.com>; Charlotte Troup Leighton <troupleighton@gmail.com>; L. Paige Whitley <lpwhitley@me.com>; Ballo, Rebeccah <rebeccah.ballo@montgomeryplanning.org>; Crane, Brian <brian.crane@montgomeryplanning.org>; Betsy Merritt <emerritt@savingplaces.org>; Tammy_stidham@nps.gov <Tammy_stidham@nps.gov>; laurel_hammig@nps.gov <laurel_hammig@nps.gov>
**Subject:** Re: I-495 and I-270 MLS Section 106 Materials, PA Third Draft, Comments Requested by April 14, 2022

Hi Steve,

The Maryland Historical Trust (Trust) carefully reviewed the March 2022 - Third Draft of the PA provided with MDOT SHA's submittal. The revised PA largely incorporates the comments and suggested edits the Trust made on the Second Draft PA. We appreciate MDOT SHA's attention to addressing these issues in the Third Draft. We offer the following remaining comments for consideration in finalizing the document for signature.

1. Stipulation IV.B: We continue to assert that greater specificity is needed in Stipulation IV.B, particularly regarding the assessment of effects/updated determination of effects to historic properties as well as the process for resolution of adverse effect findings during implementation of the PA. Reference to 36 CFR 800.3-6 is a beneficial addition to the text. This stipulation IV.B should add an item 3 for assessment of effects and an item 4 for resolution of adverse effects - particularly since the determination of effects on Morningstar Tabernacle No. 88 Moses Hall and Cemetery remain undetermined. The Trust requests that MDOT SHA revise this section, consistent with the language proposed in our prior comments on the second draft PA.

2. Stipulation V.G.2 acknowledges that FHWA and MDOT SHA will utilize the results of the additional studies, in coordination with the final design plans, to determine the effects of the undertaking on this historic property, in consultation with the MD SHPO and consulting relevant parties. Until the study results and detailed plan information are available, an informed assessment of effects is not achievable. The sentence *If no interments are identified that would unavoidably be affected by the project, there will be no adverse effects to the cemetery from the Preferred Alternative* should be deleted from the PA as it makes assumptions that are not defensible until the information is available.

3. In finalizing the PA, FHWA and MDOT SHA should continue to address the comments provided by the other consulting parties (particularly the owners and stewards of historic properties) as it relates to the treatment of adversely affected or potentially affected historic properties.

1

00006085

The Trust will provide comments on the remaining project materials, including the revised APE and treatment plans, within the 30-day review period.
 Please feel free to contact me with any questions
Thanks, Tim

 Tim Tamburrino
Preservation Officer
Maryland Historical Trust
**Maryland Department of Planning**
MHT.Maryland.gov
(410)
697-9589

Please take our customer service survey.

**\*To check on the status of a project submittal, please use our online search:** https://mht.maryland.gov/compliancelog/ComplianceLogSearch.aspx.

On Thu, Mar 31, 2022 at 1:15 PM Steve Archer <SArcher@mdot.maryland.gov> wrote:

Greetings I-495 and I-270 MLS Section 106 Consulting Parties,

MDOT SHA is pleased to provide you with additional Section 106 documentation for your review and comment.  These materials include:

- ∞  MDOT SHA and FHWA's response to MHT regarding effects to the Morningstar Cemetery property, proposing to determine effects following completion of additional investigations under the PA.
- ∞  APE mapping with small updates to accommodate minor engineering adjustments, and two areas of LOD reduction that reduce potential impacts to historic resources.  Callout maps showing the changes are attached to the letter; the remainder of the APE and LOD has not changed.  However a full updated mapbook of the updated APE and LOD can be downloaded at the FTP site below.
- ∞  A Comment-Response Matrix noting how comments received on the second draft of the PA have been taken into consideration.
- ∞  The Third Draft of the Project Programmatic Agreement (PA), incorporating consulting party input.

**Drafts of the Archaeological Treatment Plan and Cemetery Treatment Plan (Attachments 4 and 5)  will be transmitted only to the appropriate/qualified consulting parties in a separate email.**

**As noted in the letter, we request all potential concurring parties (listed in Attachment 3 of the Draft PA) provide us with the name and title of the individual representative who may sign on behalf of your party.  We will use this information to prepare/offer concurring signature pages, but this does not obligate any party to provide signature.  If we do not receive this information we will assume your party does not wish to concur in the PA as we prepare the final document.  Please provide name and title to me via email by April 14, 2022.**

Further details are provided in the attached letter to the Maryland and Virginia State Historic Preservation Officers.  Attachments 1a-c and 6 are embedded within the attached letter.  Attachment 2 (Comment Responses) and Attachment 3 (Programmatic Agreement Third Draft) are provided as separate file attachments to this email.  The APE

mapbooks are larger files and may be downloaded at the following link, which also contains the same files attached to this email:

https://sftp1.mdot.state.md.us/
Username:  MLSResource
Password:  I495I270

MDOT SHA respectfully requests comments on these materials by no later than **Thursday, April 14, 2022**, close-of-business.  For the PA, *specific* comments or language suggestions, **keyed to stipulation number** are most helpful to the process.  Comments emailed directly to me are the most effective way to provide your input.

Thank you, we appreciate your ongoing consultation.  Feel free to contact me with any questions or concerns.

Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202
Phone 410-545-8508
sarcher@mdot.maryland.gov

Governor Hogan is committed to outstanding customer service. Tell us how we are doing. Click here.

  Maryland now features 511 traveler information!
Visit: www.md511.org

 Please consider the environment before printing this email

LEGAL DISCLAIMER - The information contained in this communication (including any attachments) may be confidential and legally privileged. This email may not serve as a contractual agreement unless explicit written agreement for this purpose has been made. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication or any of its contents is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender indicating that it was received in error and delete the original message and any copy of it from your computer system.

00006087

Larry Hogan, Governor
Boyd Rutherford, Lt. Governor



Robert S. McCord, Secretary
Sandy Schrader, Deputy Secretary

# Maryland
## DEPARTMENT OF PLANNING
### MARYLAND HISTORICAL TRUST

May 2, 2022

Mr. Steve Archer
MDOT State Highway Administration
707 North Calvert Street
Baltimore, MD 21202

Re:     I-495 & I-270 Managed Lanes Study (MLS)
        Montgomery and Prince George's Counties, Maryland
        MDOT SHA Project No. AW073A13

Dear Mr. Archer:

Thank you for providing the Maryland Historical Trust (Trust), the Maryland State Historic Preservation Office, with additional information regarding the above-referenced undertaking. The Maryland Department of Transportation State Highway Administration's (MDOT SHA) submittal represents ongoing consultation to assess the project's effects on historic properties, pursuant to Section 106 of the National Historic Preservation Act of 1966, as amended, and the Maryland Historical Trust Act of 1985, as amended, State Finance and Procurement Article §§ 5A-325 and 5A-326 of the Annotated Code of Maryland. MDOT SHA submittal contains the following materials: a revised Area of Potential Effects (APE) to reflect adjustments to the Preferred Alternative; an updated effects determination for the Morningstar Tabernacle No. 88 Moses Hall and Cemetery (Morningstar Moses Property, MIHP No. M: 35-212); draft Archeological Treatment Plan and the Cemetery and Human Remains Treatment Plan; and the third draft of the undertaking's Programmatic Agreement. Trust staff have conducted a thorough review of the materials and we are writing to provide our comments.

**Revised Area of Potential Effects (APE)**: Based on ongoing design development, MDOT SHA has revised the undertaking's APE. The Trust agrees that the MDOT SHA's redefined APE encompasses the geographic area within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties.

**Updated Effects Assessments**: The Trust continues to agree with MDOT SHA's determination that the overall proposed undertaking will have an <u>adverse effect</u> on historic properties in Maryland. We acknowledge that effects to the Morningstar Moses Property remain undetermined at this time and will be resolved upon the completion of additional investigations and consultation in accordance with the undertaking's PA and Treatment Plans. The Trust agrees with the specific effect assessments stated in Attachment 6, Tables 2 and 3 of MDOT SHA's letter. We also acknowledge FHWA's intent to make a Section 4(f) de minimis finding for the properties listed in Attachment 6, Table 4.

**Comments on the Draft Archeological Treatment Plan and the Cemetery and Human Remains Treatment Plan:** Thank you for providing the opportunity to comment on the following two draft treatment plans:

---

Maryland Historical Trust   •   100 Community Place   •   Crownsville   •   Maryland   •   21032

Tel: 410.697.9591   •   toll free 877.767.6272   •   TTY users: Maryland Relay   •   MHT.Maryland.gov

00006088

Mr. Steve Archer
I-495 & I-270 Managed Lanes Study (MLS)
Page 2

- *Archaeology Treatment Plan for the I-495/I-270 Managed Lanes Study* (March 2022); and
- *Cultural Resources Treatment Plan for the Morningstar Cemetery and Montgomery County Poor Farm Cemetery for the I-495/I-270 Managed Lanes Study, Montgomery County, Maryland* (March 2022).

The plans provide detailed information on the goals, methods, and ongoing consultation process for completing survey, evaluations of National Register eligibility, and data recovery for archeological resources as well as treatment plans for the Morningstar Cemetery and Montgomery County Poor Farm. The plans would be implemented during project design and construction actions under the project's pending Programmatic Agreement. In general, proposed methods meet the recommended approaches in the Trust's *Standards and Guidelines for Archeological Investigations in Maryland* and current best practices. We offer the following comments for consideration in finalizing the plans.

- The proposed Public Outreach Program for the Phase III Data Recovery of 18MO749 and 18MO751, both located within the C&O Canal NHP and NPS owned lands, needs to be more creative, robust, and incorporate measures to ensure accessibility to a diverse audience. Outreach efforts should be closely coordinated with NPS and integrated with their interpretive efforts for the park.

- MDOT SHA should address relevant comments on the treatment plans provided by the other consulting parties, particularly the owners of the involved properties.

**Comments on the Third Draft of the PA**: The Trust previously reviewed the third draft of the PA and provided comments to MDOT SHA via email on 14 April 2022. Those comments are included here for your reference.

The revised PA largely incorporates the comments and suggested edits the Trust made on the second draft PA. We appreciate MDOT SHA's attention to addressing these issues in the third draft. We offer the following remaining comments for consideration in finalizing the document for signature:

- **Stipulation IV.B**: We continue to assert that greater specificity is needed in Stipulation IV.B, particularly regarding the assessment of effects/updated determination of effects to historic properties as well as the process for resolution of adverse effect findings during implementation of the PA. Reference to 36 CFR 800.3-6 is a beneficial addition to the text. This stipulation IV.B should add an item 3 for assessment of effects and an item 4 for resolution of adverse effects - particularly since the determination of effects on Morningstar Tabernacle No. 88 Moses Hall and Cemetery remain undetermined. The Trust requests that MDOT SHA revise this section, consistent with the language proposed in our prior comments on the second draft PA.
- **Stipulation V.G.2** acknowledges that FHWA and MDOT SHA will utilize the results of the additional studies, in coordination with the final design plans, to determine the effects of the undertaking on this historic property, in consultation with the MD SHPO and consulting relevant parties. Until the study results and detailed plan information are available, an informed assessment of effects is not achievable. The sentence *If no interments are identified that would unavoidably be affected by the project, there will be no adverse effects to the cemetery from the Preferred Alternative* should be deleted from the PA as it makes assumptions that are not defensible until the information is available.

Mr. Steve Archer
I-495 & I-270 Managed Lanes Study (MLS)
Page 3

- In finalizing the PA, FHWA and MDOT SHA should continue to address the comments provided by the other consulting parties (particularly the owners and stewards of historic properties) as it relates to the treatment of adversely affected or potentially affected historic properties.

Thank you for the opportunity to comment. We look forward to further consultation with MDOT SHA and the other consulting parties to resolve adverse effects and develop of a comprehensive and achievable agreement document. If you have questions or need further assistance, please contact Tim Tamburrino (for historic structures) at tim.tamburrino@maryland.gov or Beth Cole (for archeology) at beth.cole@maryland.gov.

Sincerely,

Elizabeth Hughes
Director/State Historic Preservation Officer

EH/BC/TJT/202201434

cc:     Caryn Brookman (SHA)
        Jeanette Mar (FHWA)
        Mandy Ranslow (ACHP)
        I-495 & I-270 MLS Section 106 Consulting Parties

Tribes

00006091



**OFFICE OF PLANNING &
PRELIMINARY ENGINEERING**
environmental · social · economic responsibility

**Environmental Planning Division**

May 10, 2018

Good afternoon,

The Maryland Department of Transportation State Highway Administration (MDOT SHA) proposes improvements to I-495 (the Capital Beltway) and I-270 (Washington National Pike) in Montgomery and Prince George's Counties, Maryland, and Fairfax County, Virginia. The I-495 and I-270 Managed Lane Study (MLS) would add two lanes in each direction to both highways, and the study is being done as a Public-Private Partnership (P3).

On behalf of the Federal Highway Administration, we invite you to participate in consultation with MDOT SHA under Section 106 of the National Historic Preservation Act. A preliminary evaluation of the project corridor concluded that the project may impact significant historic properties, including archaeological sites and historic standing structures. Phase I archaeology is planned for the summer of 2018. The evaluation indicates that Phase II evaluation may be required for at least one prehistoric site along Paint Branch, a tributary of the Anacostia and Potomac Rivers, and for the Montgomery County Poor Farm and Cemetery near Rockville, MD, if they are impacted by the project.

Attached is our Section 106 Initiation Letter to the MD State Historic Preservation Officer (MD SHPO), along with the MDOT SHA Tribal Notification Form. We welcome any comments you may have, look forward to further consultation if you are interested.

Please feel free to contact me if you have questions about the project or the current status of planned field investigations.

Best Regards,
Rick

**Richard Ervin**
MDOT State Highway Administration
Senior Archaeologist
Cultural Resources Section
Environmental Planning Division
707 North Calvert Street, Mail Stop C-LL4
Baltimore, MD  21202
Telephone: (410) 545-2878
Rervin@sha.state.md.us

## MD SHA Tribal Consultation: Project Notification Form

**Project Name:** I-495 and I-270 Multi Lane Study          **Date:** May 2, 2018

**FMIS No:** AW073A11          **A-Proj No:** 11729          **Master No:** _____

**County:** Montgomery & Prince George's     **USGS Quadrangle:** _____

**Project Archeologist:** Richard Ervin

**Telephone:** 410-545-2878     **Email:** RErvin@sha.state.md.us     **FAX:** 410-209-5046

**Brief Project Description (attach a map and detailed project description to this form):**
Add two lanes in each direction to I-495 (the Capital Beltway) and I-270

| Project Type: | |
|---|---|
| __ Minor Transportation | __ Environmental Assessment |
| __ Other Categorical Exclusion | ✓ Environmental Impact Statement |
| | __ Other _____ |

| Archeological Potential (pre-Contact or Contact Period Sites) | |
|---|---|
| ✓ Known pre-Contact sites in project area | __ Unlikely to find pre-Contact sites in project area |
| __ Known Contact sites in project area | __ Unlikely to find Contact sites in project area |
| ✓ Likely to find pre-Contact sites in project area | __ No expected ground disturbance |
| __ Likely to find Contact sites in project area | __ Other _____ |

**Comments:**
_____
_____
_____

## Tribal Response *(tribal use only)*

**Tribe:** Absentee-Shawnee Tribe of Oklahoma

**Tribal Contact for this project:** Ms. Erin Thompson

**Title:** Tribal Historic Preservation Officer

**Address:** 2025 S. Gordon Cooper Drive

**City, State, Zip:** Shawnee, Oklahoma 74801

**Telephone:** 405-275-4030 Ext. 6340     **Fax:** _____

**Email:** ethompson@astribe.com

**Copies to:** _____

Please provide any corrections to:
Carol A. Ebright, Senior Archeologist
Maryland State Highway Administration
707 N. Calvert St.
Baltimore, MD 21202
cebright@sha.state.md.us

**Consulting Party Status**
Do you wish to be a consulting party on this project:     __Yes     __No     ✓Unsure
If not a consulting party, do you wish to continue to receive information about this project?     ✓Yes     __No     __Unsure
(Note:  If your answer is Unsure, SHA will continue to provide information.)

**Areas of Concern** (This information will be kept confidential)
Do you wish to inform SHA of any traditional religious and culturally important places in or near the project area?     __Yes  ✓No
If "Yes" please inform SHA how to proceed to address the tribe's concerns:
_____
_____
_____
_____

Name of person completing this form (please print): Erin Thompson

Signature: Erin Thompson    *Digitally signed by Erin Thompson DN: dc=local, dc=sha.sat, ou=Cultural Preservation, cn=Erin Thompson, email=ethompson@astribe.com Date: 2018.06.14 14:12:41 -05'00'*     Date: Jun 14, 2018

00006093

**From:** Kimberly Penrod <kpenrod@delawarenation.com>
**Sent:** Thursday, May 31, 2018 11:12 AM
**To:** Richard Ervin <RErvin@sha.state.md.us>
**Subject:** RE: MDOT SHA I-495 and I-270 Managed Lane Study (MLS) Public-Private Partnership (P3)

Richard,
The protection of our tribal cultural resources and tribal trust resources will take all of us working together.
We look forward to working with you and your agency.
With the information you have submitted <u>we can concur</u> at present with this proposed plan.
Our main concerns at the Delaware Nation on these types of projects are as follows:

1. Keeping a 50-100 ft (at least) area of protection around known sites.
2. Maintaining the buffer area and not allowing heavy equipment to impact these areas. Compression is an issue of concern for us. Be mindful of material staging/storage areas.
3. Protection of indigenous plants and/or re-introduction of the indigenous plants to the area is important to the Delaware Nation. Many of these are considered Traditional Cultural Properties for our people.
4. And if something is found, halting all work, contacting us within 48 hours and when work resumes discussion of a monitor if needed.

As with any new project, we never know what may come to light until work begins.
The Delaware Nation asks that you keep us up to date on the progress of this project and if any discoveries arise please contact us immediately.

Our department is trying to go as paper free as possible. If it is at all feasible for your office to send email correspondence we would greatly appreciate.

If you need anything additional from me please do not hesitate to contact me.

*Respectfully,*

*Kim Penrod*
*Delaware Nation*
*Director, Cultural Resources/106*
*Archives, Library and Museum*
*31064 State Highway 281*
*PO Box 825*
*Anadarko, OK 73005*
*(405)-247-2448 Ext. 1403 Office*
*(405)-924-9485  Cell*
*kpenrod@delawarenation.com*

*Unless someone like you cares a whole awful lot, nothing is going to get better. It's not.  ~Dr. Seuss*

**SHA**

## MD SHA Tribal Consultation: Project Notification Form

**Project Name:** I-495 and I-270 Multi Lane Study                    **Date:** May 2, 2018

**FMIS No:** AW073A11            **A-Proj No:** 11729            **Master No:** _____

**County:** Montgomery & Prince George's    **USGS Quadrangle:** _____

**Project Archeologist:** Richard Ervin

**Telephone:** 410-545-2878        **Email:** RErvin@sha.state.md.us        **FAX:** 410-209-5046

**Brief Project Description (attach a map and detailed project description to this form):**
Add two lanes in each direction to I-495 (the Capital Beltway) and I-270

| Project Type: | Environmental Assessment |
|---|---|
| ___ Minor Transportation | ✓ Environmental Impact Statement |
| ___ Other Categorical Exclusion | ___ Other _____ |

| Archeological Potential (pre-Contact or Contact Period Sites) | |
|---|---|
| ✓ Known pre-Contact sites in project area | ___ Unlikely to find pre-Contact sites in project area |
| ___ Known Contact sites in project area | ___ Unlikely to find Contact sites in project area |
| ✓ Likely to find pre-Contact sites in project area | ___ No expected ground disturbance |
| ___ Likely to find Contact sites in project area | ___ Other _____ |

**Comments:**
_____
_____
_____
_____

## Tribal Response *(tribal use only)*

**Tribe:** Delaware Nation

**Tribal Contact for this project:** Kimberly Penrod

**Title:** Director, Cultural Preservation Department

**Address:** P.O Box 825, 31064 State Highway 281

**City, State, Zip:** Anadarko, OK  73005

**Telephone:** 405-247-2448, ext. 1403        **Fax:** 405 247-8905

**Email:** kpenrod@delawarenation.com

**Copies to:** _____

Please provide any corrections to:
Carol A. Ebright, Senior Archeologist
Maryland State Highway Administration
707 N. Calvert St.
Baltimore, MD 21202
cebright@sha.state.md.us

**Consulting Party Status**
Do you wish to be a consulting party on this project:                    ✓ Yes    ___No    ___Unsure
If not a consulting party, do you wish to continue to receive information about this project?   ___Yes    ___No    ___Unsure
(Note:  If your answer is Unsure, SHA will continue to provide information.)

**Areas of Concern** (This information will be kept confidential)
Do you wish to inform SHA of any traditional religious and culturally important places in or near the project area?   ___Yes ___No
If "Yes" please inform SHA how to proceed to address the tribe's concerns:
_____
_____
_____
_____

Name of person completing this form (please print): Kim Penrod

Signature: *Kim Penrod*                        Date:  May 31, 2018

**From:** Jesse Bergevin <jbergevin@oneida-nation.org>
**Sent:** Thursday, May 31, 2018 12:36 PM
**To:** Richard Ervin <RErvin@sha.state.md.us>
**Subject:** RE: MDOT SHA I-495 and I-270 Managed Lane Study (MLS) Public-Private Partnership (P3)

Dear Mr. Ervin,

On May 10, 2018, Oneida Indian Nation (the " Nation") received and email and documentation from the Maryland Department of Transportation, State Highway Administration (MDOT), regarding the propose 1-495 and 1-270 Improvements project (the "Project") in Montgomery and Prince George's Counties, Maryland. The Nation asks to be apprised of the results of the archaeological studies for the Project.

Please let me know if there are any questions.

Thank you,

**Jesse Bergevin** | Historic Resources Specialist
**Oneida Indian Nation** | 2037 Dream Catcher Plaza, Oneida, NY 13421-0662
jbergevin@oneida-nation.org | www.oneidaindiannation.com
315.829.8463 Office | 315.829.8473 Fax

## SHA — MD SHA Tribal Consultation: Project Information Form

**Project Name:** I-495 and I-270 Multi Lane Study     **Date:** May 14, 2019

**FMIS No:** AW073A11     **A-Proj No:** 11729     **Master No:**

**County:** Montgomery & Prince George's     **USGS Quadrangle:**

**Project Archeologist:** Richard Ervin

**Telephone:** 410-545-2878     **Email:** rervin@sha.state.md.us     **FAX:** 410-209-5046

**Brief Project Description:** Add up to 2 lanes to I-495 (Capital Beltway) & I-270, replace American Legion Bridge over Potomac

| Project Status: | Determination of Effects |
|---|---|
| __ Initial Notification | __ Resolution of Adverse Effects |
| ✓ Definition of APE | __ Execution of MOA |
| __ Completion of Identification Studies (Phase 1) | __ Conducting Mitigation (Phase 3) |
| __ Determination of Eligibility (Phase 2) | __ Other |

**Enclosures:** May 14, 2019 letter to MD SHPO, with revised APE at the Potomac River Crossing, including Virginia
**Comments:** MDOT has identified additional potential impacts at the Potomac River, including Virginia

## Tribal Response (tribal use only)

**Tribe:** The Delaware Nation
**Tribal Contact for this project:** Erin Thompson
**Title:** Historic Preservation Director
**Address:** PO Box 825, 31064 State Highway 281
**City, State, Zip:** Anadarko, OK 73005
**Telephone:** 405-247-2448 ext 1403     **Fax:** 405-247-8905
**Email:** ethompson@delawarenation-nsn.gov
**Copies to:**

Please provide any corrections to:
Carol A. Ebright, Senior Archeologist
Maryland State Highway Administration
707 N. Calvert St.
Baltimore, MD 21202
cebright@sha.state.md.us

**Consulting Party Status**
Do you wish to be a consulting party on this project:     ✓Yes   __No   __Unsure
If not a consulting party, do you wish to continue to receive information about this project?   __Yes   __No   __Unsure
(Note: If your answer is Unsure, SHA will continue to provide information.)

**Comments on Enclosures if applicable** (please add additional pages if necessary):
Do you agree with the findings of eligibility or effect?     ✓ Yes     __ No
If "No" please comment:
Do you have comments on the report or MOA:     __ Yes     ✓ No
If "Yes" please comment:

**Areas of Concern** (This information will be kept confidential)
Do you wish to inform SHA of any traditional religious and culturally important places in or near the project area?   __Yes  ✓No
If "Yes" please inform SHA how to proceed to address the tribe's concerns (please add additional pages if necessary):

Do you have any other concerns?     __ Yes     ✓ No
If "Yes" please inform SHA how to proceed to address the tribe's concerns:

Name of person completing this form (please print): Erin Thompson
Signature: Erin Thompson     Digitally signed by Erin Thompson Date: 2019.07.02 12:35:54 -05'00'     Date: Jul 2, 2019

U.S. Department
of Transportation
**Federal Highway
Administration**

**Maryland Division**

31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
(410) 962-4440
(410) 962-4054

June 17, 2019

In Reply Refer To:
HDA-MD

Chief Stephen R. Adkins
7240 Adkins Road
King William, VA  23030

Dear Chief Adkins:

In May of 2018, the Maryland Division of the Federal Highway Administration contacted you
via letter to inquire if the Chickahominy Indian Tribe wished to consult on Federal-Aid Highway
Projects in Maryland under Section 106 of the National Historic Preservation Act (NHPA) and
its implementing regulations at 36 CFR 800.  We wish to re-extend that invitation, as we did not
receive a response on our earlier letter.

The letter sent in May 2018 also noted that FHWA was initiating consultation on the I-495 and I-
270 Managed lanes Study (MLS), a Federal-Aid project of the Maryland Department of
Transportation State Highway Administration (MDOT SHA).  At that time, it was anticipated
that all effects to historic properties and Section 106 consultation in Virginia for the MLS would
be resolved by FHWA's Virginia Division and the Virginia Department of Transportation
(VDOT), as VDOT's I-495 Northern Lanes Extension (NEXT) project footprint would account
for effects to all historic properties requiring inventory and evaluation in Virginia.

Since that time, both MDOT SHA and VDOT have refined project design concepts and MDOT
SHA will have proposed project elements in Fairfax County, Virginia, near the American Legion
Bridge and George Washington Memorial Parkway.

In coordination with the Virginia Department of Historic Resources (VDHR), MDOT SHA has
identified five additional pre-contact archaeological sites (44FX374, 44FX389, 44FX3160,
44FX381, and 44FX379) that are within the project's Area of Potential Effect.  MDOT SHA is
coordinating Phase II archaeological evaluation at these sites with the National Park Service, as
they are located within park service property.  This work is intended to determine if the sites are
eligible for the National Register of Historic Places.  Intensive Phase I archaeology will also be
done on a sixth site, 44FX373.  Additionally, MDOT SHA proposes to conduct Phase I survey
within the project limits along the George Washington Memorial Parkway in Virginia, to identify
any additional resources in this unsurveyed area.  Three known pre-contact archaeological sites
are recorded adjacent to the Phase I survey area.  A map of the survey area and archaeological
evaluation locations that MDOT SHA proposes in Virginia for the MLS is enclosed as part of the
Area of Potential Effects update sent to the Maryland and Virginia State Historic Preservation
Officers (Attachment 1).

2

Because the MLS project now has additional elements proposed in the Commonwealth of Virginia, the Federal Highway Administration Maryland Division respectfully requests your consultation on the project in accordance with 36 CFR 800.2(c)(2), regarding MDOT SHA's identification and evaluation of properties to which the tribe may attach religious or cultural significance.

FHWA respectfully requests your response by no later than **July 16, 2019** regarding consultation on MDOT SHA's I-495 and I-270 Managed Lanes Study, and any information needs or comments you may have at this time. Additionally, as noted in our letter of May 2018, FHWA's Maryland Division would like to confirm the tribe's interest and preferences regarding consultation on Federal-Aid projects in Maryland generally. If you would like additional information or to discuss these issues, please do not hesitate to contact Ms. Jeanette Mar, Environmental Program Manager, FHWA Maryland Division, by email to jeanette.mar@dot.gov or via phone at (410) 779-7152.

Sincerely,

Gregory Murrill
Division Administrator

Attachment

cc: Mr. John Simkins, FHWA Virginia Division, Planning and Environment Team Leader
    Mr. Steve Archer, MDOT SHA, Cultural Resources Team Leader
    Mr. Marc Holma, VA DHR, Architectural Historian
    Mr. Tony Opperman, VDOT, Cultural Resources Program Manager
    Ms. Sarah Clarke, VDOT, Environmental Program Planner, Cultural Resources

U.S. Department
of Transportation

**Federal Highway
Administration**

**Maryland Division**

31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
(410) 962-4440
(410) 962-4054

June 17, 2019

In Reply Refer To:
HDA-MD

Chief Gerald A. Stewart
1191 Indian Hill Lane
Providence Forge, VA  23140

Dear Chief Stewart:

In May of 2018, the Maryland Division of the Federal Highway Administration contacted you via letter to inquire if the Chickahominy Tribe Eastern Division wished to consult on Federal-Aid Highway Projects in Maryland under Section 106 of the National Historic Preservation Act (NHPA) and its implementing regulations at 36 CFR 800. We wish to re-extend that invitation, as we did not receive a response on our earlier letter.

The letter sent in May 2018 also noted that FHWA was initiating consultation on the I-495 and I-270 Managed lanes Study (MLS), a Federal-Aid project of the Maryland Department of Transportation State Highway Administration (MDOT SHA). At that time, it was anticipated that all effects to historic properties and Section 106 consultation in Virginia for the MLS would be resolved by FHWA's Virginia Division and the Virginia Department of Transportation (VDOT), as VDOT's I-495 Northern Lanes Extension (NEXT) project footprint would account for effects to all historic properties requiring inventory and evaluation in Virginia.

Since that time, both MDOT SHA and VDOT have refined project design concepts and MDOT SHA will have proposed project elements in Fairfax County, Virginia, near the American Legion Bridge and George Washington Memorial Parkway.

In coordination with the Virginia Department of Historic Resources (VDHR), MDOT SHA has identified five additional pre-contact archaeological sites (44FX374, 44FX389, 44FX3160, 44FX381, and 44FX379) that are within the project's Area of Potential Effect. MDOT SHA is coordinating Phase II archaeological evaluation at these sites with the National Park Service, as they are located within park service property. This work is intended to determine if the sites are eligible for the National Register of Historic Places. Intensive Phase I archaeology will also be done on a sixth site, 44FX373. Additionally, MDOT SHA proposes to conduct Phase I survey within the project limits along the George Washington Memorial Parkway in Virginia, to identify any additional resources in this unsurveyed area. Three known pre-contact archaeological sites are recorded adjacent to the Phase I survey area. A map of the survey area and archaeological evaluation locations that MDOT SHA proposes in Virginia for the MLS is enclosed as part of the Area of Potential Effects update sent to the Maryland and Virginia State Historic Preservation Officers (Attachment 1).

2

Because the MLS project now has additional elements proposed in the Commonwealth of Virginia, the Federal Highway Administration Maryland Division respectfully requests your consultation on the project in accordance with 36 CFR 800.2(c)(2), regarding MDOT SHA's identification and evaluation of properties to which the tribe may attach religious or cultural significance.

FHWA respectfully requests your response by no later than **July 16, 2019** regarding consultation on MDOT SHA's I-495 and I-270 Managed Lanes Study, and any information needs or comments you may have at this time. Additionally, as noted in our letter of May 2018, FHWA's Maryland Division would like to confirm the tribe's interest and preferences regarding consultation on Federal-Aid projects in Maryland generally. If you would like additional information or to discuss these issues, please do not hesitate to contact Ms. Jeanette Mar, Environmental Program Manager, FHWA Maryland Division, by email to jeanette.mar@dot.gov or via phone at (410) 779-7152.

Sincerely,

Gregory Murrill
Division Administrator

Attachment

cc: Mr. John Simkins, FHWA Virginia Division, Planning and Environment Team Leader
    Mr. Steve Archer, MDOT SHA, Cultural Resources Team Leader
    Mr. Marc Holma, VA DHR, Architectural Historian
    Mr. Tony Opperman, VDOT, Cultural Resources Program Manager
    Ms. Sarah Clarke, VDOT, Environmental Program Planner, Cultural Rsources



U.S.Department
of Transportation

**Federal Highway
Administration**

**Maryland Division**

31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
(410) 962-4440
(410) 962-4054

June 17, 2019

In Reply Refer To:
HDA-MD

Chief Dean Branham
P.O. Box 1136
Madison Heights, VA  24572

Dear Chief Branham:

In May of 2018, the Maryland Division of the Federal Highway Administration contacted you via letter to inquire if the Monacan Indian Nation wished to consult on Federal-Aid Highway Projects in Maryland under Section 106 of the National Historic Preservation Act (NHPA) and its implementing regulations at 36 CFR 800.  We wish to re-extend that invitation, as we did not receive a response on our earlier letter.

The letter sent in May 2018 also noted that FHWA was initiating consultation on the I-495 and I-270 Managed lanes Study (MLS), a Federal-Aid project of the Maryland Department of Transportation State Highway Administration (MDOT SHA).  At that time, it was anticipated that all effects to historic properties and Section 106 consultation in Virginia for the MLS would be resolved by FHWA's Virginia Division and the Virginia Department of Transportation (VDOT), as VDOT's I-495 Northern Lanes Extension (NEXT) project footprint would account for effects to all historic properties requiring inventory and evaluation in Virginia.

Since that time, both MDOT SHA and VDOT have refined project design concepts and MDOT SHA will have proposed project elements in Fairfax County, Virginia, near the American Legion Bridge and George Washington Memorial Parkway.

In coordination with the Virginia Department of Historic Resources (VDHR), MDOT SHA has identified five additional pre-contact archaeological sites (44FX374, 44FX389, 44FX3160, 44FX381, and 44FX379) that are within the project's Area of Potential Effect.  MDOT SHA is coordinating Phase II archaeological evaluation at these sites with the National Park Service, as they are located within park service property.  This work is intended to determine if the sites are eligible for the National Register of Historic Places.  Intensive Phase I archaeology will also be done on a sixth site, 44FX373.  Additionally, MDOT SHA proposes to conduct Phase I survey within the project limits along the George Washington Memorial Parkway in Virginia, to identify any additional resources in this unsurveyed area.  Three known pre-contact archaeological sites are recorded adjacent to the Phase I survey area.  A map of the survey area and archaeological evaluation locations that MDOT SHA proposes in Virginia for the MLS is enclosed as part of the Area of Potential Effects update sent to the Maryland and Virginia State Historic Preservation Officers (Attachment 1).

2

Because the MLS project now has additional elements proposed in the Commonwealth of Virginia, the Federal Highway Administration Maryland Division respectfully requests your consultation on the project in accordance with 36 CFR 800.2(c)(2), regarding MDOT SHA's identification and evaluation of properties to which the tribe may attach religious or cultural significance.

FHWA respectfully requests your response by no later than **July 16, 2019** regarding consultation on MDOT SHA's I-495 and I-270 Managed Lanes Study, and any information needs or comments you may have at this time. Additionally, as noted in our letter of May 2018, FHWA's Maryland Division would like to confirm the tribe's interest and preferences regarding consultation on Federal-Aid projects in Maryland generally. If you would like additional information or to discuss these issues, please do not hesitate to contact Ms. Jeanette Mar, Environmental Program Manager, FHWA Maryland Division, by email to jeanette.mar@dot.gov or via phone at (410) 779-7152.

Sincerely,

Gregory Murrill
Division Administrator

Attachment

cc: Mr. John Simkins, FHWA Virginia Division, Planning and Environment Team Leader
    Mr. Steve Archer, MDOT SHA, Cultural Resources Team Leader
    Mr. Marc Holma, VA DHR, Architectural Historian
    Mr. Tony Opperman, VDOT, Cultural Resources Program Manager
    Ms. Sarah Clarke, VDOT, Environmental Program Planner, Cultural Resources

**U.S. Department
of Transportation**

**Federal Highway
Administration**

**Maryland Division**

31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
(410) 962-4440
(410) 962-4054

June 17, 2019

In Reply Refer To:
HDA-MD

Chief Samuel Bass
1001 Pembroke Lane
Suffolk, VA  23434

Dear Chief Bass:

In May of 2018, the Maryland Division of the Federal Highway Administration contacted you
via letter to inquire if the Nansemond Indian Tribe wished to consult on Federal-Aid Highway
Projects in Maryland under Section 106 of the National Historic Preservation Act (NHPA) and
its implementing regulations at 36 CFR 800.  We wish to re-extend that invitation, as we did not
receive a response on our earlier letter.

The letter sent in May 2018 also noted that FHWA was initiating consultation on the I-495 and I-
270 Managed lanes Study (MLS), a Federal-Aid project of the Maryland Department of
Transportation State Highway Administration (MDOT SHA).  At that time, it was anticipated
that all effects to historic properties and Section 106 consultation in Virginia for the MLS would
be resolved by FHWA's Virginia Division and the Virginia Department of Transportation
(VDOT), as VDOT's I-495 Northern Lanes Extension (NEXT) project footprint would account
for effects to all historic properties requiring inventory and evaluation in Virginia.

Since that time, both MDOT SHA and VDOT have refined project design concepts and MDOT
SHA will have proposed project elements in Fairfax County, Virginia, near the American Legion
Bridge and George Washington Memorial Parkway.

In coordination with the Virginia Department of Historic Resources (VDHR), MDOT SHA has
identified five additional pre-contact archaeological sites (44FX374, 44FX389, 44FX3160,
44FX381, and 44FX379) that are within the project's Area of Potential Effect.  MDOT SHA is
coordinating Phase II archaeological evaluation at these sites with the National Park Service, as
they are located within park service property.  This work is intended to determine if the sites are
eligible for the National Register of Historic Places.  Intensive Phase I archaeology will also be
done on a sixth site, 44FX373.  Additionally, MDOT SHA proposes to conduct Phase I survey
within the project limits along the George Washington Memorial Parkway in Virginia, to identify
any additional resources in this unsurveyed area.  Three known pre-contact archaeological sites
are recorded adjacent to the Phase I survey area.  A map of the survey area and archaeological
evaluation locations that MDOT SHA proposes in Virginia for the MLS is enclosed as part of the
Area of Potential Effects update sent to the Maryland and Virginia State Historic Preservation
Officers (Attachment 1).

2

Because the MLS project now has additional elements proposed in the Commonwealth of Virginia, the Federal Highway Administration Maryland Division respectfully requests your consultation on the project in accordance with 36 CFR 800.2(c)(2), regarding MDOT SHA's identification and evaluation of properties to which the tribe may attach religious or cultural significance.

FHWA respectfully requests your response by no later than **July 16, 2019** regarding consultation on MDOT SHA's I-495 and I-270 Managed Lanes Study, and any information needs or comments you may have at this time. Additionally, as noted in our letter of May 2018, FHWA's Maryland Division would like to confirm the tribe's interest and preferences regarding consultation on Federal-Aid projects in Maryland generally. If you would like additional information or to discuss these issues, please do not hesitate to contact Ms. Jeanette Mar, Environmental Program Manager, FHWA Maryland Division, by email to jeanette.mar@dot.gov or via phone at (410) 779-7152.

Sincerely,

Gregory Murrill
Division Administrator

Attachment

cc: Mr. John Simkins, FHWA Virginia Division, Planning and Environment Team Leader
    Mr. Steve Archer, MDOT SHA, Cultural Resources Team Leader
    Mr. Marc Holma, VA DHR, Architectural Historian
    Mr. Tony Opperman, VDOT, Cultural Resources Program Manager
    Ms. Sarah Clarke, VDOT, Environmental Program Planner, Cultural Resources

**U.S. Department
of Transportation

Federal Highway
Administration**

**Maryland Division**

31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
(410) 962-4440
(410) 962-4054

June 17, 2019

In Reply Refer To:
HDA-MD

Chief Robert Gray
1054 Pocahontas Trail
King William, VA 23806

Dear Chief Gray:

In May of 2018, the Maryland Division of the Federal Highway Administration contacted you
via letter to inquire if the Pamunkey Indian Tribe wished to consult on Federal-Aid Highway
Projects in Maryland under Section 106 of the National Historic Preservation Act (NHPA) and
its implementing regulations at 36 CFR 800. We wish to re-extend that invitation, as we did not
receive a response on our earlier letter.

The letter sent in May 2018 also noted that FHWA was initiating consultation on the I-495 and I-
270 Managed lanes Study (MLS), a Federal-Aid project of the Maryland Department of
Transportation State Highway Administration (MDOT SHA). At that time, it was anticipated
that all effects to historic properties and Section 106 consultation in Virginia for the MLS would
be resolved by FHWA's Virginia Division and the Virginia Department of Transportation
(VDOT), as VDOT's I-495 Northern Lanes Extension (NEXT) project footprint would account
for effects to all historic properties requiring inventory and evaluation in Virginia.

Since that time, both MDOT SHA and VDOT have refined project design concepts and MDOT
SHA will have proposed project elements in Fairfax County, Virginia, near the American Legion
Bridge and George Washington Memorial Parkway.

In coordination with the Virginia Department of Historic Resources (VDHR), MDOT SHA has
identified five additional pre-contact archaeological sites (44FX374, 44FX389, 44FX3160,
44FX381, and 44FX379) that are within the project's Area of Potential Effect. MDOT SHA is
coordinating Phase II archaeological evaluation at these sites with the National Park Service, as
they are located within park service property. This work is intended to determine if the sites are
eligible for the National Register of Historic Places. Intensive Phase I archaeology will also be
done on a sixth site, 44FX373. Additionally, MDOT SHA proposes to conduct Phase I survey
within the project limits along the George Washington Memorial Parkway in Virginia, to identify
any additional resources in this unsurveyed area. Three known pre-contact archaeological sites
are recorded adjacent to the Phase I survey area. A map of the survey area and archaeological
evaluation locations that MDOT SHA proposes in Virginia for the MLS is enclosed as part of the
Area of Potential Effects update sent to the Maryland and Virginia State Historic Preservation
Officers (Attachment 1).

2

Because the MLS project now has additional elements proposed in the Commonwealth of Virginia, the Federal Highway Administration Maryland Division respectfully requests your consultation on the project in accordance with 36 CFR 800.2(c)(2), regarding MDOT SHA's identification and evaluation of properties to which the tribe may attach religious or cultural significance.

FHWA respectfully requests your response by no later than **July 16, 2019** regarding consultation on MDOT SHA's I-495 and I-270 Managed Lanes Study, and any information needs or comments you may have at this time. Additionally, as noted in our letter of May 2018, FHWA's Maryland Division would like to confirm the tribe's interest and preferences regarding consultation on Federal-Aid projects in Maryland generally. If you would like additional information or to discuss these issues, please do not hesitate to contact Ms. Jeanette Mar, Environmental Program Manager, FHWA Maryland Division, by email to jeanette.mar@dot.gov or via phone at (410) 779-7152.

Sincerely,

Gregory Murrill
Division Administrator

Attachment

cc: Mr. John Simkins, FHWA Virginia Division, Planning and Environment Team Leader
   Mr. Steve Archer, MDOT SHA, Cultural Resources Team Leader
   Mr. Marc Holma, VA DHR, Architectural Historian
   Mr. Tony Opperman, VDOT, Cultural Resources Program Manager
   Ms. Sarah Clarke, VDOT, Environmental Program Planner, Cultural Resources

**U.S. Department
of Transportation**

**Federal Highway
Administration**

**Maryland Division**

31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
(410) 962-4440
(410) 962-4054

June 17, 2019

In Reply Refer To:
HDA-MD

Chief Anne Richardson
5036 Indian Neck Road
Indian Neck, VA 23148

Dear Chief Richardson:

In May of 2018, the Maryland Division of the Federal Highway Administration contacted you via letter to inquire if the Rappahannock Tribe wished to consult on Federal-Aid Highway Projects in Maryland under Section 106 of the National Historic Preservation Act (NHPA) and its implementing regulations at 36 CFR 800. We wish to re-extend that invitation, as we did not receive a response on our earlier letter.

The letter sent in May 2018 also noted that FHWA was initiating consultation on the I-495 and I-270 Managed lanes Study (MLS), a Federal-Aid project of the Maryland Department of Transportation State Highway Administration (MDOT SHA). At that time, it was anticipated that all effects to historic properties and Section 106 consultation in Virginia for the MLS would be resolved by FHWA's Virginia Division and the Virginia Department of Transportation (VDOT), as VDOT's I-495 Northern Lanes Extension (NEXT) project footprint would account for effects to all historic properties requiring inventory and evaluation in Virginia.

Since that time, both MDOT SHA and VDOT have refined project design concepts and MDOT SHA will have proposed project elements in Fairfax County, Virginia, near the American Legion Bridge and George Washington Memorial Parkway.

In coordination with the Virginia Department of Historic Resources (VDHR), MDOT SHA has identified five additional pre-contact archaeological sites (44FX374, 44FX389, 44FX3160, 44FX381, and 44FX379) that are within the project's Area of Potential Effect. MDOT SHA is coordinating Phase II archaeological evaluation at these sites with the National Park Service, as they are located within park service property. This work is intended to determine if the sites are eligible for the National Register of Historic Places. Intensive Phase I archaeology will also be done on a sixth site, 44FX373. Additionally, MDOT SHA proposes to conduct Phase I survey within the project limits along the George Washington Memorial Parkway in Virginia, to identify any additional resources in this unsurveyed area. Three known pre-contact archaeological sites are recorded adjacent to the Phase I survey area. A map of the survey area and archaeological evaluation locations that MDOT SHA proposes in Virginia for the MLS is enclosed as part of the Area of Potential Effects update sent to the Maryland and Virginia State Historic Preservation Officers (Attachment 1).

Because the MLS project now has additional elements proposed in the Commonwealth of Virginia, the Federal Highway Administration Maryland Division respectfully requests your consultation on the project in accordance with 36 CFR 800.2(c)(2), regarding MDOT SHA's identification and evaluation of properties to which the tribe may attach religious or cultural significance.

FHWA respectfully requests your response by no later than **July 16, 2019** regarding consultation on MDOT SHA's I-495 and I-270 Managed Lanes Study, and any information needs or comments you may have at this time. Additionally, as noted in our letter of May 2018, FHWA's Maryland Division would like to confirm the tribe's interest and preferences regarding consultation on Federal-Aid projects in Maryland generally. If you would like additional information or to discuss these issues, please do not hesitate to contact Ms. Jeanette Mar, Environmental Program Manager, FHWA Maryland Division, by email to jeanette.mar@dot.gov or via phone at (410) 779-7152.

Sincerely,

Gregory Murrill
Division Administrator

Attachment

cc: Mr. John Simkins, FHWA Virginia Division, Planning and Environment Team Leader
   Mr. Steve Archer, MDOT SHA, Cultural Resources Team Leader
   Mr. Marc Holma, VA DHR, Architectural Historian
   Mr. Tony Opperman, VDOT, Cultural Resources Program Manager
   Ms. Sarah Clarke, VDOT, Environmental Program Planner, Cultural Resources



U.S. Department
of Transportation

**Federal Highway
Administration**

**Maryland Division**

31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
(410) 962-4440
(410) 962-4054

June 17, 2019

In Reply Refer To:
HDA-MD

Chief William F. Adams
5932 East River Road
King William, VA  23086

Dear Chief Adams:

In May of 2018, the Maryland Division of the Federal Highway Administration contacted you via letter to inquire if the Upper Mattaponi Indian Tribe wished to consult on Federal-Aid Highway Projects in Maryland under Section 106 of the National Historic Preservation Act (NHPA) and its implementing regulations at 36 CFR 800.  We wish to re-extend that invitation, as we did not receive a response on our earlier letter.

The letter sent in May 2018 also noted that FHWA was initiating consultation on the I-495 and I-270 Managed lanes Study (MLS), a Federal-Aid project of the Maryland Department of Transportation State Highway Administration (MDOT SHA).  At that time, it was anticipated that all effects to historic properties and Section 106 consultation in Virginia for the MLS would be resolved by FHWA's Virginia Division and the Virginia Department of Transportation (VDOT), as VDOT's I-495 Northern Lanes Extension (NEXT) project footprint would account for effects to all historic properties requiring inventory and evaluation in Virginia.

Since that time, both MDOT SHA and VDOT have refined project design concepts and MDOT SHA will have proposed project elements in Fairfax County, Virginia, near the American Legion Bridge and George Washington Memorial Parkway.

In coordination with the Virginia Department of Historic Resources (VDHR), MDOT SHA has identified five additional pre-contact archaeological sites (44FX374, 44FX389, 44FX3160, 44FX381, and 44FX379) that are within the project's Area of Potential Effect.  MDOT SHA is coordinating Phase II archaeological evaluation at these sites with the National Park Service, as they are located within park service property.  This work is intended to determine if the sites are eligible for the National Register of Historic Places.  Intensive Phase I archaeology will also be done on a sixth site, 44FX373.  Additionally, MDOT SHA proposes to conduct Phase I survey within the project limits along the George Washington Memorial Parkway in Virginia, to identify any additional resources in this unsurveyed area.  Three known pre-contact archaeological sites are recorded adjacent to the Phase I survey area.  A map of the survey area and archaeological evaluation locations that MDOT SHA proposes in Virginia for the MLS is enclosed as part of the Area of Potential Effects update sent to the Maryland and Virginia State Historic Preservation Officers (Attachment 1).



**EASTERN SHAWNEE**
**CULTURAL PRESERVATION DEPARTMENT**
70500 East 128 Road, Wyandotte, OK 74370

January 10, 2022
MDOT Maryland State Highway Administration
707 N Calvert St
Baltimore, MD 21202

RE: *I-495 and I-270 Managed Lanes Study (MLS)   HAD-MD  Master No. AW073A13, Montgomery County, MD*

Dear Mr. Archer,

The Eastern Shawnee Tribe has received your letter regarding the above referenced project(s) within Montgomery County, MD. The Eastern Shawnee Tribe is committed to protecting sites important to Tribal Heritage, Culture and Religion. Furthermore, the Tribe is particularly concerned with historical sites that may contain but not limited to the burial(s) of human remains and associated funerary objects.

As described in your correspondence, and upon research of our database(s) and files, we find our people occupied these areas historically and/or prehistorically. However, the project proposes **NO Adverse Effect** or endangerment to known sites of interest to the Eastern Shawnee Tribe. Please continue project as planned. However, should this project inadvertently discover an archeological site or object(s) we request that you immediately contact the Eastern Shawnee Tribe, as well as the appropriate state agencies (within 24 hours). We also ask that all ground disturbing activity stop until the Tribe and State agencies are consulted. Please note that any future changes to this project will require additional consultation.

In accordance with the NHPA of 1966 (16 U.S.C. § 470-470w-6), federally funded, licensed, or permitted undertakings that are subject to the Section 106 review process must determine effects to significant historic properties. As clarified in Section 101(d)(6)(A-B), historic properties may have religious and/or cultural significance to Indian Tribes. Section 106 of NHPA requires Federal agencies to consider the effects of their actions on all significant historic properties (36 CFR Part 800) as does the National Environmental Policy Act of 1969 (43 U.S.C. § 4321-4347 and 40 CFR § 1501.7(a). This letter evidences NHPA and NEPA historic properties compliance pertaining to consultation with this Tribe regarding the referenced proposed projects.

Thank you, for contacting the Eastern Shawnee Tribe, we appreciate your cooperation. Should you have any further questions or comments please contact our Office.

Sincerely,

*Paul B*

Paul Barton, Tribal Historic Preservation Officer (THPO)
Eastern Shawnee Tribe of Oklahoma
 (918) 666-5151 Ext:1833

00006112

Because the MLS project now has additional elements proposed in the Commonwealth of Virginia, the Federal Highway Administration Maryland Division respectfully requests your consultation on the project in accordance with 36 CFR 800.2(c)(2), regarding MDOT SHA's identification and evaluation of properties to which the tribe may attach religious or cultural significance.

FHWA respectfully requests your response by no later than **July 16, 2019** regarding consultation on MDOT SHA's I-495 and I-270 Managed Lanes Study, and any information needs or comments you may have at this time. Additionally, as noted in our letter of May 2018, FHWA's Maryland Division would like to confirm the tribe's interest and preferences regarding consultation on Federal-Aid projects in Maryland generally. If you would like additional information or to discuss these issues, please do not hesitate to contact Ms. Jeanette Mar, Environmental Program Manager, FHWA Maryland Division, by email to jeanette.mar@dot.gov or via phone at (410) 779-7152.

Sincerely,

Gregory Murrill
Division Administrator

Attachment

cc: Mr. John Simkins, FHWA Virginia Division, Planning and Environment Team Leader
   Mr. Steve Archer, MDOT SHA, Cultural Resources Team Leader
   Mr. Marc Holma, VA DHR, Architectural Historian
   Mr. Tony Opperman, VDOT, Cultural Resources Program Manager
   Ms. Sarah Clarke, VDOT, Environmental Program Planner, Cultural Resources

# Additional Consulting Parties

00006114

# CITY OF GREENBELT, MARYLAND

OFFICE OF THE CITY MANAGER

25 CRESCENT ROAD, GREENBELT, MD.  20770



May 11, 2018

**Nicole C. Ard**
City Manager

Ms. Julie M. Schablitsky
Assistant Division Chief
Environmental Planning Division
Maryland Department of Transportation, SHA
707 North Calvert Street
Baltimore, MD 21202

Re:    Study No. AW073A11
       I-495 & I-270 Managed Lane Study
       Section 106 Review

Dear Ms. Schablitsky:

The City of Greenbelt is in receipt of your letter dated, April 12, 2018, requesting comment on historic preservation issues as they relate to the I-495 & I-270 Managed Lane Study.  The City appreciates the opportunity to comment and looks forward to being an active partner in the Section 106 process.  This letter incorporates responses from the three consulting parties for the City of Greenbelt.

The Greenbelt City Council is on record in opposition to the proposed widening of I-495 and I-270 (letter attached).  While the City's opposition extends beyond the Section 106 process, for the purpose of responding to your request, this letter will focus on issues relevant to the identification and protection of historically and culturally significant resources.

The City is very concerned about the impact that the proposed widening project will have on the historic character and integrity of Historic Greenbelt.  Greenbelt is historically significant as one of three planned communities built through the Federal government's "Green Towns Program" during the Great Depression.  Greenbelt is significant for its status as a national model for community planning and design.  In November 1980, Greenbelt was listed as a Historic District in the National Register of Historic Places.  The boundaries of the District were drawn to include areas of the City directly related to the establishment and expansion of the planned community between 1935 and 1941.  In 1997, Historic Greenbelt was designated a National Historic Landmark.  Within the "Area of Potential Effects" lay portions of the Greenbelt National Register Historic District, National Historic Landmark designated areas, the historic Walker Family Cemetery, Buddy Attick Lake Park, segments of the Baltimore Washington Parkway, portions of the United States Department of Agriculture's Beltsville Agricultural Research Center and portions of Greenbelt National Park.

## A NATIONAL HISTORIC LANDMARK
PHONE: (301) 474-8000   www.greenbeltmd.gov

The proposed highway widening project's impact on Historic Greenbelt and significant historical resources is unacceptable.  The resources listed above have significant value to the history and character of Greenbelt, as well as the State.  These historic resources must be protected, as mandated under Federal Law.  The City continues to strongly urge the State of Maryland to use its resources to improve alternative existing multi-modal transportation options (i.e., MARC, Metro service, bus transit and bike routes).

The proposed plan to widen the Capital Beltway infringes on Greenbelt's parkland, open space and Forest Preserve.  These areas have been proven to be vitally important to a person's health and quality of life.  The City has actively invested in the creation of forested open space.  The City of Greenbelt's robust Recreation and Parks system is heavily used by Greenbelt residents, businesses and others from surrounding cities and counties.  These award-winning, multigenerational and inclusive recreation programs, facilities and parks are of vital importance in a densely populated urban area.  For these reasons, the Greenbelt Recreation Department opposes the proposed project.

Thank you for the opportunity to comment.  The City looks forward to continued participation in the Section 106 process, as well as future planning processes.  If you have any questions please contact Ms. Terri Hruby, Planning Director, at 240-542-2041 or by email at thruby@greenbeltmd.gov.

Sincerely,

Nicole Ard
City Manager

cc:    City Council
       Terri Hruby, Planning Director
       Julie McHale, Director of Recreation

# CITY OF GREENBELT

### 25 CRESCENT ROAD, GREENBELT, MD. 20770-1886



**THE CITY OF**
**GREENBELT**

October 23, 2017

The Honorable Lawrence Hogan, Jr.
Office of the Governor
100 State Circle
Annapolis, MD 21401

**CITY COUNCIL**
Emmett V. Jordan, Mayor
Judith F. Davis, Mayor Pro Tem
Konrad E. Herling
Leta M. Mach
Silke I. Pope
Edward V.J. Putens
Rodney M. Roberts

Re:  Proposed Highway Widening Projects

Dear Governor Hogan:

The Greenbelt City Council is opposed to the proposed widening of I-270, the Capital Beltway (I-495) and the Baltimore-Washington Parkway (MD 295) to accommodate managed and/or toll lanes.  These highway widening projects will not solve our region's road congestion problems.

Studies have shown that highway expansion projects ultimately do not relieve congestion. Instead research indicates that such projects encourage more driving, longer trips and increase suburban sprawl -which further stresses the environment, creates a greater maintenance burden to support an inefficient transportation network, and costs Maryland citizens time and money.  In fact, the deficiency of this proposal was published in the 2012 Baltimore-Washington Parkway Widening Feasibility Study which concluded that:

*"While a widened B-W Parkway will accommodate greater traffic volumes, the magnitude of increased travel demand on the facility generated by continuing anticipated regional population and employment growth will likely result in levels of traffic congestion similar to those experienced today."*

The impact that the proposed highway widening projects will have on the natural, socioeconomic, cultural and built environments is unacceptable.  Established neighborhoods adjacent to these highway corridors will be negatively impacted by a diminished quality of life, as will the users of the Parkway. Also, the natural and cultural significance of the Baltimore-Washington Parkway cannot be ignored.  The Parkway is listed on the National Register of Historic Places, an indication of its significant value to the history and character of Maryland.  This historic treasure deserves to be respected for its original function as a scenic byway.  The segment of the Parkway that is owned by the National Park Service should be retained by the National Park Service. To transfer ownership to the State will threaten its historic designation, and most likely result in the byway being transformed by State of Maryland Highway standards, destroying its scenic and parkway setting.

In a time when communities are wrestling with environmental and socioeconomic challenges, proceeding with highway widening projects that do little to address the region's congestion, but have high environmental, human and financial costs, raises questions and concerns that need to be carefully considered.  Before moving forward to construction of these projects, alternative congestion relief approaches should be studied and considered, including dedicating more funding to transit and other alternative modes of transportation.  We need to allocate our limited resources to supporting the live, work and play philosophy by investing in transit oriented development and the infrastructure necessary to attract and sustain it.

The City strongly urges your administration to consider utilizing resources to expand and improve the existing alternative transportation routes. The MARC Train serves the Baltimore-Washington Corridor. Resources dedicated to improving MARC Train service hours would do more to relieve congestion on the Corridor while maintaining the unique beauty, and relief that the Parkway provides to the regional road network. The new economy cannot support a

**A NATIONAL HISTORIC LANDMARK**
(301) 474-8000   FAX: (301) 441-8248
www.greenbeltmd.gov

00006117

continued disconnect between transportation projects and land use development patterns that do little to support a sustainable future.

The City requests that you withdraw your support for the I-495 and I-295 widening projects, and allow an opportunity for the state transportation agencies to pursue other congestion relief approaches. We can collectively work together towards developing a plan that will relieve traffic congestion on our highways while minimizing impacts to the natural and built environment.

Sincerely,

Emmett V. Jordan
Mayor

Judith F. Davis
Council Member

Konrad E. Herling
Council Member

Leta M. Mach
Council Member

Silke I. Pope
Council Member

Edward V.J. Putens
Council Member

Rodney M. Roberts
Council Member

Enclosure:  Baltimore-Washington Parkway Widening Feasibility Study (November 2012)

cc:     City Council
        Senator Ben Cardin
        Senator Chris Van Hollen
        Congressman Steny Hoyer
        Senator Paul Pinsky
        Delegate Anne Healey
        Council Member Derrick Davis
        Council Member Dannielle Glaros
        Council Member Andrea Harrison
        Council Member Mary Lehman
        Council Member Deni Taveras
        Council Member Obie Patterson
        Council Member Karen Toles
        Council Member Mel Franklin
        Four Cities Coalition
        Nicole Ard, City Manager
        Terri Hruby, Acting Director of Planning & Community Development

**MONTGOMERY COUNTY DEPARTMENT OF PARKS**
MARYLAND-NATIONAL CAPITAL PARK & PLANNING COMMISSION

May 18, 2018

Dr. Julie Shablitsky
Assistant Division Chief
Environmental Planning Division
Maryland Department of Transportation
State Highway Administration
707 North Calvert Street
Baltimore, MD  21202

Dear Dr. Shablitsky,

The Maryland-National Capital Park and Planning Commission, Montgomery Parks (Parks) has (by carbon copy) received your letter dated April 12, 2018 to Ms. Elizabeth Hughes, State Historic Preservation Officer, Maryland Historical Trust (MHT), concerning the proposed Study No. AW073A11, the I-495 & I-270 Managed Lanes Study (MLS), inviting MHT and local agencies to comment on MDOT's preliminary Area of Potential Effects (APE) and participate in the Section 106 process  As you know, M-NCPPC is a Cooperating Agency in the Interagency Working Group (IAWG). Representatives from Montgomery Parks' Cultural Resources Stewardship Section also participated in the May 3, 2018 meeting held at SHA's Baltimore office on the Section 106 process for this project. At that meeting, Parks was asked to submit comments to SHA on the preliminary APE and preliminary identification of cultural resources. We expect to refine and supplement these comments as the project progresses and the actual project impacts are defined more accurately.

As both Interstates 495 and 270 transect some of the most important cultural resources in the County, archaeological resources, historic objects and structures, and cultural landscapes will be adversely affected by the project. The heart of the County's park system, which originates in 1927, are its stream valley parks; these are all impacted by the proposed project. Due to concern for the loss of cultural resources, any alternatives considered must include a package of environmental and community stewardship mitigation projects that adequately offset the breadth of this major public works project.

The Preliminary Area of Potential Effects (APE)

The April 12, 2018 letter to MHT identifies two APE boundaries – one for direct impacts to National Register listed or eligible resources (the 300-foot from centerline Corridor Study Boundary), and a larger one for direct and indirect impacts (the Corridor Study Boundary plus an additional 250 feet to either side). Due to the lack of clarity on where the boundary for direct impacts lies at this time, Parks expects that MDOT/SHA will use the larger APE (which is

approximately 550' from the centerline) for *both* archaeology and standing structures assessments.

Identified Historic Resources on Parkland

There are two identified historic resources in the Project Area:

- Rock Creek Park Montgomery County Survey Area (M: 36-87)
- Sligo Creek Parkway (M: 32-15)

Within these linear stream valley park systems there are numerous contributing elements, some of which are strictly in the preliminary APE, others that are immediately outside but should be considered, and others that are yet to be identified. Joseph's Park Boundary Marker from 1817, for example, is an object within Rock Creek Park Stream Valley Unit 2. The Sligo Creek Golf Clubhouse is a building along the Sligo Creek Parkway in its Stream Valley Unit 3. There are other cultural resources in the preliminary APE that should be identified by SHA's consulting architectural historians.

Archaeology on Parkland

Currently, there are five recorded archaeological sites within the preliminary APE on parkland. These include:

18MO191 – Kavanagh XII site (Cabin John Regional Park)
18MO332 – Rock Creek Stream Valley site (Rock Creek Stream Valley Unit 2)
18MO457 – Booze Creek site (Cabin John Stream Valley Unit 2)
18MO510 – Rock Creek Hills #1 (Rock Creek Stream Valley Unit 2)
18MO602 – Fuster site (Northwest Branch Stream Valley Unit 3)

Based on preliminary research, none of these have been evaluated for their eligibility for inclusion on the National Register. In addition, large sections of the APE cross parkland in areas that have not been systematically surveyed for the presence of archaeological sites. As noted in the April 12, 2018 letter to MHT, SHA has identified 49 discrete areas in the overall project that appear to be undisturbed and will require additional testing. Parks requests a map identifying these areas so that we can contribute to them based on our knowledge of potential archaeological resources on parkland.

Additionally, Parks would like to inform SHA of a cemetery not currently noted on the maps provided in the April 12, 2018 letter to MHT. Gibson Grove Cemetery, which is not on parkland, lies within the preliminary APE on the west side of Seven Locks Road. The cemetery was divided from the Gibson Grove Church during the construction of I-495 years ago. It is listed as #105 on the Montgomery County Cemetery Inventory housed on the Planning Department website: http://montgomeryplanning.org/planning/historic/montgomery-county-cemetery-inventory/montgomery-county-cemetery-inventory-alphabetical/
Parks encourages MDOT/SHA to consult this inventory regularly so as not to miss burial sites.

M-NCPPC, Montgomery Parks appreciates the opportunity to be a Cooperating Agency in the IAWG and specifically to consult with SHA on the Section 106 aspects of this project, which will have a significant impact to the cultural landscape of the county. We look forward to continuing to work with SHA on identifying and protecting cultural resources on parkland as the project moves forward.

Sincerely,

Cassandra Michaud
Senior Archaeologist, RPA

Cc:    Beth Cole, Maryland Historical Trust
       Jeanette Mar, Federal Highway Administration
       Steve Archer, State Highway Administration
       Jai Cole, M-NCPPC, Montgomery Parks, Acting Chief, Park, Planning and Stewardship
       Matt Harper, M-NCPPC, Montgomery Parks, Natural Resources Manager
       Doug Stephens, M-NCPPC, Montgomery Parks, Natural Resources
       Joey Lampl, M-NCPPC, Montgomery Parks, Cultural Resources Stewardship
       Julie Mueller, M-NCPPC, Montgomery Parks, Cultural Resource Stewardship
       Rebeccah Ballo, M-NCPPC, Montgomery Planning, Historic Preservation

00006121



*Preserving Rockville's Heritage*

August 27, 2018

Department of Transportation
State Highway Administration
707 North Calvert Street, Mail Stop P-601
Baltimore, MD 21202

To Whom It May Concern:

I write to you today on behalf of Peerless Rockville Historic Preservation's
Board of Directors and members, concerning the proposed plans to expand
interstate 270 and the harmful effects of the physical widening of I-270 will
have on the historic resources and community fabric of the City of Rockville
and Montgomery County.

Peerless Rockville is a nonprofit, community-based organization founded in
1974 to preserve buildings, objects, and information important to Rockville's
heritage. We advance our goals through education, example, advocacy, and
community involvement. As a historic preservation advocacy organization, we
are deeply concerned about the potential impact of the I-270 expansion project
on Rockville's historic resources as well as the identity of its unique
neighborhoods that this project threatens.

The City of Rockville has many neighborhoods representing its development
over time. The post-war years featured a boom in housing and construction
that resulted in expansion and growth of the City and formed the modern
communities that thrive today. Development and consideration of historic
contexts should include a focus on the post-war, Mid-Century, and late 20th
century built environment. Although not currently listed as historic, many
communities within the area of potential effects meet National Register
eligibility criteria.

For example, the neighborhood of New Mark Commons was recently added to
the National Register of Historic Places as an exemplary illustration of
"Situated Modernism," combining clustered and free-standing houses within a
rolling, wooded landscape. Other neighborhoods like this exist all along the I-
270 corridor. Many of Rockville's neighborhoods were constructed during this
period to take advantage of the "new" highway infrastructure. We are gravely

00006122

concerned by any option for I-270 expansion that widens the footprint of the roadway in Rockville, threatening these long-standing communities, and we strongly urge you to choose alternate plans.

As a designated consulting partner to 106 Review, Peerless Rockville looks forward to working with SHA and other partners in protecting Rockville and Montgomery County's important historic resources throughout this study. As a community advocate, we stand strong in our desire to protect the rich heritage of our community.

Peerless Rockville Historic Preservation, Ltd. possesses an abundance of materials on Rockville's history, heritage, and historic homes and sites. We encourage all researchers and consultants documenting areas impacted by the I-270 expansion project to visit our office and utilize our archives and collections located in the historic Old Red Brick Courthouse in downtown Rockville.

Sincerely,

Nancy Pickard

Nancy Pickard

Executive Director


CC:

City of Rockville Mayor & Council

City of Rockville Historic District Commission

Elizabeth Hughes, State Historic Preservation Officer

**From:** Sarah Rogers <director@heritagemontgomery.org>
**Sent:** Monday, September 24, 2018 3:21 PM
**To:** Steve Archer <SArcher@sha.state.md.us>
**Subject:** Re: MDOT SHA I-495/I-270 Managed Lanes Study Section 106 Update

Replying to MDOT SHA Managed lanes study – keep us on the list.
Sarah L. Rogers
Heritage Montgomery

00006124

**From:** David, Gail <Gail.David@montgomerycountymd.gov>
**Sent:** Wednesday, November 7, 2018 2:31 PM
**To:** Steve Archer <SArcher@sha.state.md.us>
**Cc:** Jeanette Mar, FHWA <jeanette.mar@dot.gov>; David Clarke, FHWA <david.clarke@dot.gov>; Caryn Brookman <CBrookman@sha.state.md.us>; Beth Cole, MHT <beth.cole@maryland.gov>; Tim Tamburrino, MHT <tim.tamburrino@maryland.gov>
**Subject:** Re: I 495/I-270 Managed Lanes Study Agenda and online/call-in information for Section 106 Consulting Party Meeting Tuesday, November 13

Hi Steve,
I apologize but I will not be able to attend this meeting.  Please continue to keep me on the emails.  Thank you!

Gail David
Deputy Warden, Operations
Department of Correction and Rehabilitation
22880 Whelan Ln.
Boyds, Maryland 20841
240-773- 9928 (MCCF)
240-773-9975 (fax #)
240-777-9817 (MCDC)

gail.david@montgomerycountymd.gov

**From:** Jim Wasilak <jwasilak@rockvillemd.gov>
**Sent:** Monday, November 19, 2018 4:50 PM
**To:** Steve Archer <SArcher@sha.state.md.us>
**Cc:** Sheila Bashiri <sbashiri@rockvillemd.gov>; Ricky Barker <rbarker@rockvillemd.gov>
**Subject:** RE: I-495/I-270 MLS Section 106 Consultation: documents available and November 13 Consulting Party Meeting

Steve: The City of Rockville does not have comments on the Gap Analysis or Suburbanization Context Addendum at this time. However, the City does want to continue as a consulting party, so please keep Sheila Bashiri and myself on your list. I have let Matt Manning know that the City has development files on many of the properties listed in the Newly Identified Buildings and Districts chart within Rockville, and we will be forwarding that info to him over the coming weeks.

Thanks, Jim

--------------------------------------------------------------------------------------------

R. James Wasilak, AICP
Chief of Zoning
Department of Community Planning and Development Services
City of Rockville
111 Maryland Avenue
Rockville, Maryland  20850
240-314-8211 (direct)
240-314-8200 (CPDS main)
jwasilak@rockvillemd.gov



**MONTGOMERY COUNTY PLANNING DEPARTMENT**
THE MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION

November 19, 2018

Steve Archer
Cultural Resources Team Leader
Environmental Planning
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD  21202

**RE:  I-495/I- 270 Managed Lanes Study, Section 106 Comments**

Dear Mr. Archer:

Thank you for providing the opportunity to review and comment on the latest Section 106 review materials as part of the I-495/I-270 Managed Lanes Study. **These comments reflect the comprehensive comments from the Cultural Resources Sections of the M-NCPPC Montgomery County Parks and Planning Departments.**

**Gap Analysis**
The Gap Analysis and Suburban Context Addendum documents add significantly to the original context for this project and will be a useful tool in assessing the architectural and planning aspects of the sites that may be affected by the proposed project.  While clearly a great deal of effort went into researching and writing it, we nonetheless find that it lacks certain crucial information, and the consultant did not tap certain sources, and local context is underrepresented, both in the sections on the built environment and archaeology.  The Gap Analysis and Addendum lack substantive information on the social and cultural aspects of the potentially affected neighborhoods (Criterion A).   While providing a thorough study of the transportation and mainstream developer-generated housing, the analysis to date also omits a discussion of those who lived in Montgomery County outside of majority-white neighborhoods. For instance, were any of the possibly affected neighborhoods associated with Montgomery County's African American history, or the history of the large influx of Asian and Latino communities into the County?  Around 40% of Montgomery County's population was enslaved in the first half of the 19th century. After the Civil War, freedmen and women settled across Montgomery County, many in areas that are in proximity to the proposed project.  These settlements were regularly omitted from the historical documents most commonly used by researchers and alternative methods for their identification are often required.  Similarly, were any of the communities studied Jewish or representative of other excluded groups as a result of being shut out of communities due to restrictive covenants?  These important historical aspects are not taken into consideration in the document or as part of the survey strategy.

**Archaeological Context**
There are four known or potential cemetery locations within the APE for the project: Gibson Grove AME Church Cemetery; Ball Family Cemetery; St. John the Evangelist Catholic Church Cemetery (Forest Glen Cemetery); and The Poor Farm site and cemetery (18MO266). The Gap analysis lacks the Ball Family burial ground, which included at least two interments dating to 1855 and 1862. The stones were removed from the vicinity of I-270 and Montrose Road in the 1950s prior to the construction of the interstate

00006127

highway. The stones survive and are stored nearby. Montgomery County Cemetery Inventory files contain leads regarding the original burial site location within the project APE.

The St. John the Evangelist Cemetery is referenced in the gap analysis indirectly as part of the Forest Glen historic district. The discussion in the gap analysis makes no mention of the cemetery, but focuses exclusively on late 19th-century suburban development. The cemetery comprises nearly half the physical area of the district, and the first interment (the mother of John Carroll, first catholic bishop in the United States) dates to 1796. There are several notable early 19th-century headstones made of Seneca Sandstone, the same striking red stone used to build the church. The cemetery boundary is very close to, and possibly within the corridor boundary. Approximately half the cemetery, including the original location of the 1770s church, are within the architecture APE.

Generally, the archaeological context appears to be largely derived from research conducted in environmental settings of the Coastal Plain, with little focus on the Piedmont, which comprises most of Montgomery County. This context should be corrected.

**Requested Next Steps**

We welcome the offer of MDOT/SHA to have locality/consulting party specific meetings. Montgomery County would like to host such a meeting, and would work with SHA to invite County-specific stakeholders to the discussion. At this meeting we could work with MDOT/SHA to introduce the team and consultants to our extensive research files. This would also be an ideal opportunity to provide information from the Montgomery County Cemetery Inventory so that the potential effect to cemetery sites within the APE are adequately considered.

We also request that as Determination of Eligibility forms (DOEs) are sent to MHT for review, that these forms be concurrently transmitted to M-NCPPC (both Montgomery Planning and Montgomery Parks) so that we may also review and provide comments. Handling the property-specific reviews in smaller batches will enable us to provide feedback and analysis on a rolling basis, instead of having to review the entire set of DOEs at once near the end of the documentation phase of the project.

We also request that future Consulting Parties meetings provide initial assessments and analysis of impacts to Cultural Resources under 4F and NEPA. Some resources may have more stringent protection requirements under 4F and it would be helpful to understand and review any analysis that may have informed decisions on choosing a Preferred Alternative at the next and at all future meetings.

We would also like to thank the MDOT/SHA project team for providing the requested archaeological survey information and GIS maps after the last Consulting Parties meeting on November 13th. Given that it is standard practice to allow 30-days of review of new information, M-NCPPC requests until <u>COB Friday, December 14, 2018</u> to fully review this extensive material, including the archaeological survey areas that we have just received digitally. This is a large, complex project and, as such, requires adequate time to evaluate from the outset the framework for identifying and evaluating potential historic properties, as required under Section 106 of the National Historic Preservation Act. We also look forward to reviewing the final reports for the Phase I archaeological assessments currently underway.

Thank you again for the opportunity to comment. If you have any questions or need to discuss this matter, please feel free to contact us at 301-563-3404; <u>Rebeccah.Ballo@montgomeryplanning.org</u>, or 301-563-3414; <u>Joey.Lampl@montgomeryparks.org</u>.

Sincerely,

00006128



Rebeccah Ballo
Historic Preservation Supervisor, Montgomery County Planning

Joey Lampl,
Cultural Resources Manager, Montgomery County Parks

cc:    Jeannette Mar, FHWA
        Jason Shellenhammmer, RKK
        Tim Tamborino, Maryland Historical Trust
        Beth Cole, Maryland Historical Trust
        Carol Rubin, Montgomery Planning
        Matt Harper, Montgomery Parks
        Doug Stevens, Montgomery Parks
        Cassandra Michaud, Montgomery Parks

00006129

Post Office Box 4661
Rockville, MD 20849-4661
Web: www.montgomerypreservation.org
Email:  mpi@montgomerypreservation.org

# Montgomery Preservation Inc.

Promoting the Preservation, Protection and Enjoyment of Montgomery County's Rich Architectural Heritage and Historic Landscapes

November 19, 2018

Steve Archer, Cultural Resources Team Leader
Environmental Planning Division, State Highway Administration
Via email

Re: Section 106, 495/270 Managed Lanes Study

Dear Steve,

I write on behalf of Montgomery Preservation Inc. (MPI) to offer general comments about the referenced project.  We are impressed by the scope of the study and its identification of resources, districts, and parks from which to pare down historic places that may be affected. Please know that MPI has a strong interest in this wide-ranging project, and we pledge to work with all parties to facilitate the process.

Of the 160 Montgomery County properties identified in all of the categories, many fall into the suburbanization context.  We are pleased that the date was extended to 1978, as important planned communities are now included along with individually notable structures.  Others pre-date this late 19th to mid-20th century era.  Some are listed in the National Register and/or designated locally by Montgomery County or a municipality such as Rockville.

MPI is just completing its Montgomery County Cemetery Inventory Revisited project which, as it updated efforts from a decade ago, utilized advanced technology and additional data to better document 323 known burial sites throughout the County.  Four sites (Ball Cemetery ID# 279, Gibson Grove #105, MoCo Poor Farm #196, and St. John the Evangelist #131) are appropriately identified in your study.

If the APE is enlarged at any point in this process, and you want to broaden the study to include farther north sites such as Comsat or Moneysworth farm (both in Clarksburg) and other burial sites (such as Scotland in Rockville), we will help to provide additional information.

Lastly, MPI encourages you to meet in the near future with Montgomery County Historic Preservation and Parks staff, and include MPI, to more specifically discuss our County resources and to coordinate efforts.  There is no doubt that this highway project will have major effects on Montgomery County.

Sincerely yours,

/s/

Eileen McGuckian, president
Montgomery Preservation Inc.
Consulting Party

00006130

NPS Comments (November 19, 2018)

∞  General: The Gap Analysis only focuses on Maryland and does not look at Virginia, as it states: "Section 106 requirements for both archaeology and historic architecture in Virginia for this project are being addressed separately by the Virginia Department of Transportation for their ongoing project to extend the American Legion Memorial Bridge High Occupancy Toll (HOT) Lanes to the George Washington [Memorial] Parkway." Curious if this VDOT project covers the entirety of the MLS project area in Virginia. It would be helpful to see a graphic highlighting the two project areas to verify there will be complete coverage of the MLS project area within Virginia, as well as to ensure resources under the administration of the George Washington Memorial Parkway are properly identified (e.g., archeological sites).

∞  General: The Gap Analysis does not discuss underwater archeology or the potential for submerged cultural resources to exist within the project area. Given that a portion of the project area crosses the Potomac River at the American Legion Bridge, the potential for such resources to exist must be assessed. This includes expanding the historic context to include early maritime activities that took place within and adjacent to the project area and examine the potential for submerged cultural resources to be present.

∞  Section 1.1.1, p. 3: Please use the full, official name of the 'George Washington Memorial Parkway' in this report and subsequent project documentation (as opposed to the colloquial 'GW Parkway') - GLOBAL.

∞  Section 2.1 Background Research: There are other documentary sources related to CHOH that would be of use for a desktop survey of archaeological resources including Berger's 9-year study of the canal (Fiedel et al 2005). I realize that the survey did not include property within the MLS study area, but would provide a broader context. (Also applies to 4 Regional History).

∞  Section 2.3.2 Criteria for Archaeological Potential-- How are they determining "previous disturbance" in determining if an area has archaeological potential?

∞  Section 2.4.1 Previously Identified Historic Resources-- Text only references state data. Should include Federal (NPS) data from the parks.

∞  Section 4.1.1, p. 17. Recommend correcting the date in the section header from '1100 BC' to '11,000 BC.'

∞  Section 5.1.1 Previous Archaeological Surveys-- More survey needs to be done on the CHOH. Yes, agree. Fieldwork should be planned for the fall or winter when ground visibility is best. Nearby archaeological surveys have been unable to identify previously recorded sites due to vegetation (e.g. Kavanaugh 1981). Why did NPS deny survey applications for Diamanti et al. 2008? The reason should be stated.

∞  Section 5.1.2.B, p. 47. Recommend removing the underscore from the first paragraph.

∞  Section 6.2.1, p. 55. The text in the 'Significance' section for the Suitland Parkway appears gray, whereas the other text is black. Recommend correcting.

∞  Section 7.5.2, p. 104. There appears to be a random page break in the middle of the page.

∞  Section 7.6. I realize that the C&O Canal locks are mentioned several times and they appear in figures (e.g. Figure 19), but nowhere is there specific mention of Locks 12, 13, and 14, which are are directly under the ALB and within the APE and project corridor.

∞  Section 7.6. Good, yes, survey is recommended at CHOH.

∞  Section 8.1, p. 112. In the second paragraph, numbers less than ten are provided numerically and are also spelled out.

NPS Comments (November 19, 2018)

- ∞ Section 9.2. List the National Park units as well. In addition, C&O Canal is a historic district (NR listed)
- ∞ Appendix D, Map 2. Survey area S-12 partially overlaps with site 18MO22 (Potter site), so it would therefore be beneficial for the survey team to do limited fieldwork at the site to determine if any portion of it remains undisturbed, especially since they will already be in the area (see Section 7.4, p. 93 for details/recommendations).
- ∞ Page 51. Location: Change to "Cumberland, MD."
- ∞ Page 51, Period of Significance: The 2015 update to the C&O Canal NHP Historic District National Register nomination included an extended period of significance. Prehistoric and historic resources begins and continues the period from 9000 BCE through the original 1828 to 1924 period of significance (when the canal was built and operated). After the canal ceased commercial operation in 1924, a noncontiguous period of significance takes in the New Deal-era years of 1938 to 1942 for the district's association with Civilian Conservation Corps activity, and 1965 for the district's association with the NPS Mission 66 program.
- ∞ Page 51, NRHP: In 2015, the C&O Canal NHP Historic District National Register nomination was updated and the boundary was increased.

*Preserving Rockville's Heritage*

Steve Archer
Maryland Department of Transportation State Highway Administration
Cultural Resources Team Leader
Cultural Resources Section
Environmental Planning Division
707 North Calvert St
Baltimore, MD 21202

November 19, 2018

To Whom It May Concern,

Peerless Rockville writes to you today regarding the numerous properties potentially impacted by expansion of the I-270/495. The area in question contains hundreds if not thousands of homes and neighborhoods, businesses, and other developed properties that make up the fabric of the community of the City of Rockville. We thank you for the opportunity to participate in the review of the landscape representing Rockville's important and varied development during the modern period.

The 1950s in Rockville are defined by explosive population (over 200% growth) and doubling in land size. Early communities representing this growth include parts of the **West End**, and **Roxboro**. It should be noted that tiny Roxboro also has 1940s growth, predating the intensity of the post-war period.

Rockville's transportation infrastructure improvement and plans around this time, including I-270, led to the development of the neighborhoods of **Woodley Gardens**, **New Mark Commons**, and **Rockshire**.

**Woodley Gardens** is a "modern" neighborhood that bears the distinction of being one of Rockville's earliest pre-planned communities. At Woodley Gardens Colonial-inspired brick houses and apartments sit on streets with floral names such as Azalea, Crocus, Lily and Carnation. The neighborhood with its mix of homes, townhouses and co-operative apartments also boasts recreational and community amenities not found in most earlier housing developments. Monroe Warren Sr. and Monroe Warren Jr. developed Woodley Gardens using an innovative planning approach, which combined multiple housing types, with open space for natural features and recreation, and added a community shopping area.

In the early 1960s, veteran builder Monroe Warren Sr., known for earlier apartment and housing

00006133

developments in Washington D.C. as well as the Rockcrest neighborhood in Rockville, began construction on the western edge of Rockville. Here he and his son strove to create a community of high quality "prestige" homes. The conventional architectural style of the homes extended throughout the community and with the inclusion of tennis courts, baseball fields and an Olympic-sized swimming pool. The community amenities proved attractive to homebuyers, many of whom located to Rockville to work at government agencies that expanded to Montgomery County.

**New Mark Commons** has recently been added to the National Register of Historic places as a superior example of mid-century architecture and development patterns representing the physical, social and economic fabric of Montgomery County and Rockville during this period of growth and change.

A "situated modernism" community, New Mark Commons was designed by homebuilder Edmund J. Bennett and the modernist architecture firm Keyes, Lethbridge & Condon to harmoniously integrate the various housing types and community amenities with preserved natural features. The specific design of each home was selected based on which model best fit the natural topography and modern homes were clustered on courts and cul-de-sacs. New Mark Commons was the first PRU (Planned Residential Unit development) in Rockville and retained high integrity as a significant modernist community.

**Rockshire** is the largest of the Planned Residential Units (PRU) zoned in Rockville, which permitted greater flexibility in the layout of the subdivision so that other community goals, such as open space, could be achieved. Single family homes, townhouses, churches, and schools are located in this community. Within Rockshire and its neighboring Fallsmead are approximately 150 acres of city-owned parkland. Rockshire illustrates how a modern community and 19th century structures can co-exist and be integrated within the natural environment.

Rockshire's initial developers were Community Builders, led by Albert Small and Hermen Greenberg, whose *Southern Engineering* would eventually build more than 20,000 homes, condominiums, and office buildings throughout the DC metropolitan region. The planning for this neighborhood employed clustering, laying out smaller lots, conscious of the environmental features of the landscape.

The communities that developed alongside Watts Branch in the 1970s invited people to an environmentally sensitive watershed. Historically populated by farms near the early 19th century Wooton's Mill that utilized Watts Branch in its operations, construction here met the challenge of being environmentally sensitive while building coherent neighborhoods combining large modern homes and community amenities.

The environmental work of Luna Leopold (1915-2006), famed American geologist and hydrologist, influenced the management of Watts Branch Stream Valley Park. Leopold's ground-breaking 40-year study of Watts Branch revealed the effects of suburbanization on the environment.

These neighborhoods and the others that began in the 1960s and 1970s, including **Fallswood, Saddlebrook, Markwood, Briarglen, North Farm and Montrose Wood**, are intrinsically connected to the transit systems that enabled commuters to travel from to workplaces throughout the capitol region.

These residential developments were accompanied by an increasing need for schools, churches, shopping centers, office buildings, libraries, medical, health care, and recreation facilities. Virtually every aspect of life in suburbia – shopping, employment, education, recreation, religious worship – was geared to "Car Culture" and was designed to accommodate the family car and suburban mobility made possibly by transportation infrastructure.

New school construction followed patterns of residential development throughout the area as planners and public officials struggled to keep pace with suburban growth. In all, 23 new elementary, middle, and high schools opened in Rockville between 1950 and 1971. **Julius West Middle School** (1961) was part of this pattern.

Similarly, the growing population needed more and larger religious institutions. By 1960, the number of churches and religious institutions in Rockville had more than doubled. Rockville's established churches adapted to the population boom by enlarging existing church facilities or relocating and rebuilding on new sites, as did both the Rockville Christian Church and the First Baptist Church.

**First Baptist Church** (from Teresa Lachin's *Recent Rockville)*

Established in 1821, the First Baptist Church (1908) was located near the center of Rockville on Jefferson and Washington Streets. An Education Building (today the Garza Building) for Sunday school classes was built in 1958, and two years later the congregation purchased an adjacent property on Washington Street for a Colonial-style sanctuary to house its growing membership.

Fund-raising and parking space for the new million dollar facility proved difficult, and in 1968, the congregation sold their properties in town and purchased nine acres of undeveloped land one mile west of the downtown area at the intersection of 70-S (today I-270) and Route 28. The new site offered room for future expansion, ample parking space, convenient access to major roads and new neighborhoods, and visibility along a well-traveled interstate corridor. In making a fresh start at the new location, the congregation abandoned plans for a traditional Colonial-style church and directed their architect, Russell Jenkins of McClean, Virginia, to design "something modern-looking," a multi-purpose facility with a sanctuary, offices, meeting space, and classrooms.42 Jenkins' preliminary design for a 1,500-seat sanctuary was reduced in scale to meet site requirements and budget restraints. A revised design for a modernist two-story brick building with a dramatic folded plate roof and broad sheltering canopy over the main entryway was approved and built. A spacious foyer leads into the fan-shaped sanctuary, which is illuminated by clerestory windows under the roofline and exposed wooden beams.

Anticipating demolition of the 1908 Church on Washington Street, the congregation salvaged two large stained glass windows and installed them in the entry hall of the new facility. In 1973,

the Church transferred ownership of its historic Baptist Cemetery near the old Church to the protection of the Montgomery County Historical Society. Ten years later, ownership and care of the Cemetery was transferred to Peerless Rockville Historic Preservation, Ltd.

Healthcare & Technology

Nursing homes and retirement communities opened during the 1970s near the burgeoning communities of Fallsmead and Rockshire west of 70-S (today I-270). The Collingswood Nursing and Rehabilitation Center on Hurley Avenue was completed in 1972; the Rockville Nursing Home in Roxboro in 1976, and Potomac Valley Nursing and Wellness Center in 1964.

Proximity to federal research institutions, such as the National Institutes of Health and Naval Medical Center, and long range City planning initiatives helped foster Rockville's impressive postwar development as a prime location for scientific endeavor.

Population growth brought increasing numbers of science professionals and college-educated residents to the area, creating imperatives for modern health care and state-of-the-art medical facilities. Equally important to this development were the availability of affordable building sites and a pool of trained architects, builders, developers, and labor force to plan, design, and construct medical and scientific properties. Commercial buildings in area should be evaluated for involvement in the Human Genome Project, which occupied numerous large-scale buildings in and around the Rockville area in the later part of the 20th century.

Commercial Retail, Offices, & Industry

Development along Rockville Pike and other major roads followed on the heels of residential and commercial development, drawing customers away from downtown Rockville to new strip malls and shopping centers, such as Seven Locks Plaza.

By the late 1950s, unprecedented numbers of new office buildings were being planned, completed, or under construction. Like new schools and churches, Rockville's commercial and institutional architecture was predominantly modernist in design, affording curtain wall construction, versatile open interior spaces, and use of technologically innovative building materials. By contrast, legal office buildings of the 1960s and 1970s were more generally more traditionally styled with brick construction and Colonial-inspired details.

Decentralization of federal agencies (e.g., National Bureau of Standards, Atomic Energy Commission) to the suburbs fostered a generation of consulting firms offering professional expertise in science, industry, communications, and emerging technologies.

Other:

**Detention Center:**

Examples of Brutalist architecture in Rockville include the **Montgomery County Detention Center.** The architectural style known as Brutalism originated during the postwar era and takes its name from béton brut, a French term used by Swiss architect Le Corbusier for unfinished, sometimes raw, concrete used on exterior facades of large-scale buildings. Brutalism emerged in part as a reaction to the skeletal profile of the Miesian grid and purist geometry of the International Style. Le Corbusier's Unité d'Habitation (1948-1954) in Marseille, France, is considered a landmark example of the style. Brutalist buildings are blocky and starkly geometric with heavy surfaces of exposed concrete that express the mass and construction of design. Doorways are placed within cavernous entry plazas; windows are recessed and fenestration is frequently minimal (Definition description from Teresa Lachin's Recent Rockville).

**Poor Farm:**

Construction of roads and buildings during the past 60 years has almost obliterated all traces of the Montgomery County Poor Farm and the Poor Farm Cemetery. Despite construction, and the removal of burials, the site has historic significance. During a site visit in September 2018 a trash pit, likely associated with the Poor Farm, was located next to an office building at 1101 Wootton Parkway. While the cemetery site has been heavily disturbed by decades of construction, it may still contain burials, or other subsurface objects of historic significance. Even a systematic excavation of a cemetery will often miss burials, and given the nature of this cemetery, with many unmarked graves, and the haphazard way in which it has been excavated, there is a possibility that intact graves remain on the site.

Note: Burials impacted by construction earlier transportation infrastructure, I-270, the expansion of I-270, and the construction of 1101 Wootton Parkway were most often removed by workers from Snowden Funeral Homes and relocated to Parklawn Cemetery. Some burials were removed by an archaeological crew working for the National Park Service (1987-88) and were sent for study, but appear to have been returned and reinterred, likely at Parklawn. All burials which were removed have not been confirmed to be re-interred at Parklawn, although that is what has been verbally reported by Snowden representatives on several occasions. Snowden has not granted access to its records to researchers. Parklawn has graciously opened records to researchers and accompanied us to the burial plot, which is marked.

**11807 Dinwiddie Drive:**

This structure contains part of the original 1918 two-story frame house belonging to the O'Neale family of planters who made a land claim in 1769, and willed the property including 68 acre farm to descendants. The farmhouse is likely one of few surviving structures from this early 20th century agricultural period.

Research Library & Other Resources

Peerless Rockville, a non-profit historic preservation advocacy organization, possesses a research library that contains information on the history of many of these modern properties. We invite you to visit us to learn more about many of the listed addresses.

00006137

The City of Rockville has engaged consultants to produce a study of Rockville's historic contexts which will be relevant to your interests. We also recommend Teresa Lachin's publication "Rockville's Recent Past" (2012), from which much of the subject of this letter is sourced, for more information on this time period.

Sincerely,

Nancy Pickard

Executive Director

| From: | Smith, Kathryn |
|---|---|
| To: | Steve Archer |
| Subject: | Re: [EXTERNAL] I-495/I-270 MLS Section 106 Determination of Eligibility forms, Batch 4 Posted, comments requested by Feb. 28, and additional info |
| Date: | Tuesday, February 26, 2019 6:25:37 PM |

Steve,

The following are comments for your consideration as you prepare the documentation on historic properties within the APE:

First, I noticed that some of the DOE forms say they are just documenting earlier determinations done by MHT -- saying they are not eligible in 2000. Should these properties be re-evaluated in 2019 since nearly 20 years has passed? (examples: PG:73-24; PG:73-22; PG:73-23).

Also, I am wondering if the roadway and its alignment itself has been evaluated for NR eligibility? Records show that the Olmsted firm worked on the Beltway project, at least in the area where it crosses Rock Creek Park in Montgomery County (near Connecticutt Ave.). Apparently the planners wanted it to be parkway-like in this segment and so they hired Olmsted. According to my colleague, there's a job- number and associated records in the Olmsted records. You can search the records here: https://www.nps.gov/frla/olmstedarchives.htm#CP_JUMP_4037582

Best,
Kathryn

## Kathryn G. Smith
**National Historic Landmarks & National Register Coordinator**
**National Capital Region, National Park Service**

1100 Ohio Drive, SW
Washington, DC 20242
202.619.7180
202.401.0017 fax

kathryn_smith@nps.gov

**NCR Website**  https://www.nps.gov/RESSNCR

**NHL Website** http://www.nps.gov/nhl

**Facebook** National Historic Landmark Program - NPS

**Instagram** NationalHistoricLandmarkNPS  #NationalHistoricLandmark #FindYourPark

On Thu, Feb 7, 2019 at 2:56 PM Steve Archer <SArcher@sha.state.md.us> wrote:

Greetings Consulting Parties,

**From:** Eileen McGuckian <phileen3@verizon.net>
**Sent:** Tuesday, March 26, 2019 3:35 PM
**To:** Steve Archer <SArcher@sha.state.md.us>
**Subject:** comments for I-495/I-270 MLS Section 106 Consultation: comments on Batch 5

Hello Steve and all,

Thank you for posting Batch 5 of the determination-of-eligibility (DOE) forms for this project.

On behalf of Montgomery Preservation, I have a few comments.

In batch 5, 11807 Dinwiddie Drive in Rockville is listed as the John Henry O'Neale house and is briefly mentioned in the DOE form for Montrose Woods M 30-48.
However, although this individual property is in your batch list, there is no separate DOE form for it. Full disclosure:  This has been my home for 30+ years, and I did meet the surveyors when they visited one frosty day this winter, but have heard nothing further.
I have conducted research on this house, which I describe as the O'Neale-Prichard-Cantelon/McGuckian house for its three owners 1865-present, and would be happy to provide it to you in an appropriate format.

The other comment relates to the archaeological aspect of this consultation:
Shouldn't the identified burial sites be included with each batch?
Again, full disclosure:  Two grave markers from Ball Cemetery (ID#279 on the Montgomery County Cemetery Inventory) are on my property (address above).  They were moved from their original, nearby site by previous owner Ann Prichard in the late 1960s and are now safely indoors.
Again, I have conducted research on this burial site, including oral histories of individuals who recall the cemetery.  And again, I would be happy to provide information to you in an appropriate format; best would be the Cemetery Inventory-Revisited survey form.

Lastly, other burial sites within the APO should be identified in the DOE process:  Gibson Grove Cemetery ID#105, the Montgomery County Poor Farm Cemetery ID#196, and St. John the Evangelist Cemetery in Forest Glen ID#131.

Please confirm that you have received this communication.

Sincerely,

Eileen McGuckian, president
Montgomery Preservation Inc.



**MONTGOMERY COUNTY PLANNING DEPARTMENT**
THE MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION

March 28, 2019

Steve Archer
Cultural Resources Team Leader
Environmental Planning
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD 21202

**RE: I-495/I-270 Managed Lanes Study, Section 106 Determination of Eligibility Forms, Batch 5 Comments**

Dear Mr. Archer:

Thank you for providing the opportunity to review and comment on the latest Section 106 Determination of Eligibility (DOE) forms as part of the I-495/I-270 Managed Lanes Study. Please see the below comment(s) on the following DOEs:

1) Property Name: Holy Cross Hospital
   Address: 1500 Forest Glen Road, Silver Spring, 20910
   Batch: 5

   Holy Cross Hospital warrants a full DOE rather than a Short Form DOE for ineligible properties. The architecture firm of Faulkner, Kingsbury & Stenhouse, who specialized in modernist institutional buildings in the postwar era, designed the hospital. Architect Slocum Kingsbury, FAIA (1893-1987), graduated from Cornell University, served in World War I, and practiced architecture in New York City before moving to Washington, D.C. Kinsbury specialized in hospital design and the building received a Washington Board of Trade Award and AIA Potomac Valley Award in 1964.

   While Holy Cross Hospital has had alterations/additions to the main building and though the determination may remain static, the complex should be re-evaluated within a full historic context. Please refer to the following book for more information: Clare Lise Kelly, *Montgomery Modern* (Silver Spring, MD: M-NCPPC, 2015).

Thank you again for the opportunity to comment. If you have any questions or need to discuss this matter, please feel free to contact me at 301-563-3405 or John.Liebertz@montgomeryplanning.org.

Sincerely,

John Liebertz
Historic Preservation Specialist, Montgomery County Planning

cc:    Rebeccah Ballo, M-NCPPC, Planning HP Supervisor

00006141

Joey Lampl, M-NCPPC, Parks Cultural Resources Stewardship Manager
Julie Mueller, M-NCPPC, Parks Cultural Resources Stewardship Planner Coordinator
Cassandra Michaud, M-NCPPC, Parks Cultural Resources Archaeologist
Brian Crane, M-NCPPC, Planning Archaeologist
Jeannette Mar, FHWA
Tim Tamborino, MHT
Jason Shellenhammmer, RKK
Beth Cole, MHT
Eileen McGuckian, President, Montgomery Preservation, Inc.
Nancy Pickard, Executive Director, Peerless Rockville

00006142



*Preserving Rockville's Heritage*

Maryland Department of Transportation State Highway Administration
Cultural Resources Team Leader
Cultural Resources Section
Environmental Planning Division
707 North Calvert St
Baltimore, MD 21202

March 28, 2019

To Whom It May Concern:

Peerless Rockville writes to you today regarding the numerous properties listed in Batch 5 of the Determination of Eligibility that are potentially impacted by expansion of the I-270/495. The area in question contains hundreds if not thousands of homes and neighborhoods, businesses, places of worship and other developed properties that make up the fabric of the community of the City of Rockville. We thank you for the opportunity to participate in the review of the landscape representing Rockville's important and varied development during the modern period.

Overall, we assert that greater investigation of potential association with significant individuals and events is required for the neighborhoods in and near Rockville before determined ineligible, particularly given the size and period of history represented in the area.

For instance, **4 Choke Cherry Road** is a Mid-twentieth century Brutalist-influenced building constructed in 1974 which retains much of its original character. Current occupants include the Montgomery County Public School Center for Technology Innovation, Project Reboot (providing computer systems to low income families). We note that no data is provided on its architects, builders, or past occupants. This information should be obtained and evaluated before eligibility can be determined.

The **West End Park Section 2** was platted in 1890 as part of West End Park. The community reflects a broad range of single-family residential development patterns, beginning in the 1890s and continuing until the present, with the largest periods of growth in the early 1950s and the 1960s. A variety of firms and architects were responsible for creating the area, including initial development by Henry Copp and Reuben Detriech, also known for their work in Garret Park and Kensington respectively. In the 1960s, development was primarily by James E. Cafritz, also known for Aspen Hill Park and Laurel Grove.

**Rockshire Village** is functionally part of Rockshire, the largest of the Planned Residential Units (PRU) zoned in Rockville, which permitted greater flexibility in the layout of the subdivision so that other community goals, such as open space, could be achieved. Single family homes, townhouses, churches, and schools are located in this community. Within Rockshire and its

00006143

neighboring Fallsmead are approximately 150 acres of city-owned parkland. Rockshire illustrates how a modern community and 19th century structures can co-exist and be integrated within the natural environment.

The planning for this neighborhood employed clustering, laying out smaller lots, conscious of the environmental features of the landscape. The communities that developed alongside Watts Branch in the 1970s invited people to an environmentally sensitive watershed. Historically populated by farms near the early 19th century Wooton's Mill that utilized Watts Branch in its operations, construction here met the challenge of being environmentally sensitive while building coherent neighborhoods combining large modern homes and community amenities.

The environmental work of Luna Leopold (1915-2006), famed American geologist and hydrologist, influenced the management of Watts Branch Stream Valley Park. Leopold's ground-breaking 40-year study of Watts Branch revealed the effects of suburbanization on the environment.

These residential developments were accompanied by an increasing need for schools, churches, shopping centers, office buildings, libraries, medical, health care, and recreation facilities. Virtually every aspect of life in suburbia – shopping, employment, education, recreation, religious worship – was geared to "Car Culture" and was designed to accommodate the family car and suburban mobility made possibly by transportation infrastructure.

**The John Henry O'Neale House** is indeed on the few extant dwellings representing the early twentieth century agricultural history of Montgomery County that preceded the mid-20th century population explosion. The absence of farm-related outbuildings and fields is reflective of the late 20th century development that encroached upon the property, representing the suburban transformation of the area.


Research Library & Other Resources

Peerless Rockville, a non-profit historic preservation advocacy organization, possesses a research library that contains information on the history of many of these modern properties. We invite you to visit us to learn more about many of the communities.


Sincerely,

Nancy Pickard

Executive Director





**AT FOREST GLEN**

9615 Dewitt Drive #68
Silver Spring, MD 20910
301-589-1715
info@saveourseminary.org
www.saveourseminary.org

*Officers and Directors*
Don Hall, President
Eugene Rich, Vice President
Erin Mielke, Treasurer
Frank Riley, Secretary
Cassandra Ashman
Toni Bailey
Anne Brockett
Pat Crawford
Ann Hall
Patti Horrall
Linda Lyons
Chris Maines

*Executive Director*
Bonnie Rosenthal

June 11, 2019

The Honorable Pete K. Rahn, Secretary
Maryland Department of Transportation
State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21202

Re: I-495 and I-270 P3 Program

Dear Mr. Rahn:

We are writing to express our position on the I-495 and I-270 P3 Program, especially the seven currently recommended Alternatives Retained for Detailed Study (ARDS).

Many of the proposed I-495 expansion routes would harm a woodland area with a tributary of Rock Creek flowing through it. This area, known as "the Glen," is deemed a critical natural resource by the Maryland-National Capital Park and Planning Commission and is protected by a Category I Conservation Easement that prohibits altering the natural landscape.

The Glen borders the southern edge (the "inner loop") of I-495 for over 800 linear feet. Close to that edge are historic and possibly archaeological features that include a bridge abutment and stone retaining wall that were once part of the network of paths, bridges, and trails used by students of the former National Park Seminary (NPS) in Silver Spring, Maryland. We are concerned that expansion of the highway likely will adversely affect these features as well as the landscape into which they were deliberately designed, and which currently provides green space to both residents and the public.

NPS, once an elite girls' school (from the late 1800s until the 1940s), was transferred to the United States Army for a military convalescence hospital in 1942. Today, the historic campus is a residential community providing single- and multi-family housing for all income levels and includes the offices of a charitable organization supporting homeless adults. NPS is designated as a Historic District in the National Register of Historic Places and is listed on the Maryland Inventory of Historic Properties. The Maryland Historic Trust finds NPS's historic assets so valuable and significant that it has placed the property within a Preservation Easement.

Our organization, Save Our Seminary (SOS), knows this landscape well. SOS is a nonprofit organization incorporated in 1989 to combat the neglect of the unique and historic buildings and landscape of NPS. SOS's ongoing mission is to communicate the history of the National Park Seminary and promote preservation of its buildings, artifacts, and landscape.

At this time, we do not know where the proposed expansion, if it occurs, will be located, but NPS's location makes it highly vulnerable. We ask that the MDOT take the time to study fully the potential effects of this action and explore every feasible avenue other than road expansion into this historic greenspace. We strongly urge you to avoid claiming historic and natural features to reduce traffic congestion.

Sincerely,

*Bonnie Rosenthal*

Bonnie Rosenthal
Executive Director



# CARDEROCK SPRINGS
National Register of Historic Places

June 12, 2019

Governor Larry Hogan
100 State Circle
Annapolis, Maryland 21401-1925

Administrator Gregory Slater
Maryland State Highway Administration
707 North Calvert Street
Baltimore, Maryland 21202-36-01

**Subject: Comments about alternatives retained for detailed study & concerns about planned Beltway expansion**

I am the President of Carderock Springs Citizens' Association (CSCA) and write on behalf of the Carderock Springs community, a historic community located adjacent to the west side of Interstate 495 (the Beltway) and Carderock Springs South, a community located adjacent to the east side of the Beltway.

Our community was very disappointed to learn at the SHA public workshop on April 13, 2019 that despite our previous comments submitted to SHA on April 30, 2018 and October 1, 2018, SHA selected Alternatives that would add two lanes in each direction. As we have previously stated, adding 2 lanes in each direction would reduce the distance between the lanes of the Beltway where vehicles will travel and school and residences, resulting in increased noise and dangerous air pollution. That means, contrary to Governor Hogan's earlier promises to keep the Beltway expansion within the right-of-way (ROW), our community was shocked to learn on April 13 that:

1. Many homeowners might be losing parts of their yards (at least temporarily) should the alternatives that will be adding two lanes each direction be chosen. As previously noted in our comments, Carderock Springs has been designated a National Historic District that is listed in the National Register of Historic Places. A greater level of analysis and limitations on decision-making under Section 106 of the National Historic Preservation Act and Section 4 (f) of the Department of Transportation Act is warranted. Taking away these properties is not acceptable.

2. Traffic will be much closer to the Carderock Springs Elementary School (CSES), with a large area of the school and field exposed to noise of more than 66 dB and harmful pollution. In addition to previously cited research confirming the harmful effect of highway pollution on children's lung development, we also note that CSES has three classrooms for children with autism. Children on the autism spectrum are extremely sensitive to noise and we believe that their needs should be part of the on-going analysis of the ARDS and possible remediation if I-495 is expanded. Thus, not only will the effects of a beltway expansion be felt within a

Carderock Springs Citizens' Association
P.O. Box 237, Cabin John, MD 20818-0237

www.carderocksprings.net

**L&B 7550828v1/09999.0357

Governor Larry Hogan
Administrator Gregory Slater
June 12, 2019
Page 2

sensitive population, but such effects will be felt by a sensitive population *within a sensitive population*. Action must be taken to mitigate noise impacts at this location.

3. Elevated ramps over the Beltway linking managed lanes and River Road are also included as part of the ARDS, which will expand significantly the area negatively affected by noise and air pollution. Placing such elevated ramps in a residential area is, to our knowledge, an approach that has been rejected in all other jurisdictions as its negative effect is multiplied.

While our concerns are closely linked to the adverse effects that expanding the Beltway would have on our community, we share the views expressed by Montgomery County and others requesting the environmental, fiscal, and traffic impacts of proposed plans. Alternatives 8, 9, 10, 13B and 13C will, according to the very preliminary analysis provided in the Managed Lanes Study, have unacceptable impacts. We request that SHA assesses more carefully and comprehensively traffic patterns than it has up to now as it plans road expansion.

CSCA therefore requests that the SHA's environmental review and EIS specifically include the following:

- Conduct a new noise impact study to serve as the current baseline to measure the current level of Beltway noise in the vicinity of Carderock Springs given increased traffic over the last 17 years. If this study shows that current noise levels require a noise wall as abatement, any project alternative selected, even if limited only to traffic control measures, should include the building of a noise wall to specifications designed to ensure significant noise reduction.
- The traffic data used for the noise study to project future conditions should be conservative and be based on worst-case-scenarios in order to obtain true and correct traffic projections, both to determine the need for managed lanes, and to project actual traffic noise and emissions.
- In conducting the air pollution impact study to measure the current and projected levels of Beltway air pollutants in the vicinity of Carderock Springs, the health impacts of those current levels of pollutants, and the need for mitigation, the study must recognize and take into account the proximity of CSES and its athletic fields to the Beltway, and the potential for traffic to be even closer to these sensitive receptors if the ROW is expanded or if travel lanes are brought closer to the outside boundaries of the existing ROW.
- Evaluation of eligibility of Carderock Springs for Type I abatement under both existing conditions and future conditions.
- Include as a component of the alternatives (not as potential mitigation) a solid noise barrier along both sides of the Beltway in the vicinity of Carderock Springs
- Establish an I-495 & I-270 Community Working Group for community members, including Carderock Springs representation to actively participate in the development of the Draft Environmental Impact on I-495 & I-270 Managed Lanes Study and in any Section 106 Programmatic Agreement or

Carderock Springs Citizens' Association
P.O. Box 237, Cabin John, MD 20818-0237

www.carderocksprings.net

**L&B 7550828v1/09999.0357

00006147

Governor Larry Hogan
Administrator Gregory Slater
June 12, 2019
Page 3

Memorandum of Agreement, so the input and comments of these important stakeholders can shape SHA's further planning, review, design, and mitigation, rather than having these uniquely-situated stakeholders being relegated to participating only in the post-Draft Environmental Impact Statement public comment period.

We trust that you will seriously consider these comments.

John Orrick
President, Carderock Springs Citizens' Association

cc: Marc Korman, Delegate, District 16
    Sara Love, Delegate, District 16
    Susan Lee, Senator, District 16
    Andrew Friedson, Councilmember, Montgomery County
    Jack R. Smith, Superintendent, Montgomery County Public Schools

Carderock Springs Citizens' Association
P.O. Box 237, Cabin John, MD 20818-0237

www.carderocksprings.net

**L&B 7550828v1/09999.0357

# CITY OF GREENBELT, MARYLAND

DEPARTMENT OF PLANNING & COMMUNITY DEVELOPMENT

15 CRESCENT ROAD, SUITE 200, GREENBELT, MARYLAND 20770-1897



June 26, 2019

Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

RE: Preliminary List of Adversely and Potentially Adversely Affected Historic Properties

Dear Mr. Archer:

The City of Greenbelt has reviewed the preliminary list of adversely and potentially adversely affected historic properties as of June 17, 2019 and the City is concerned about the omission of certain properties from the list. The widening of the Capital Beltway (I-495) will have an impact on natural, socioeconomic, cultural, and built environment which would include Historic Greenbelt and its significant historical resources. These are resources that have significant value to the history and character of Greenbelt, as well as the State, and must be protected, as mandated by Federal law.

The City requests the following be added on the list:

- The Greenbelt Historic District, designated a National Historic Landmark (NHL) in 1997, whose boundaries encompass 756.8 acres in four discontiguous parcels. There are a large number of contributing resources which should be considered including the following ones.

    - The Turner Family Cemetery (now the Greenbelt City Cemetery) identified in 1937 government plans as the community's cemetery.

    - The Walker Family Cemetery/Indian Springs Park, a 1.3 acre site of springs, forest, and a burial ground is which was retained as an historical/recreational point of interest for the original community residents. This is a contributing resource.

In addition, the highway widening plans would include the Baltimore Washington Parkway, a scenic highway that was constructed to improve connectivity between Baltimore and



00006149

Washington DC, first envisioned by Pierre L'Enfant in his original plan for the United States Capital in 1791. The widening runs counter to the protection of the Parkway's aesthetic underpinnings.

The City continues to strongly oppose the proposed widening of the Capital Beltway to accommodate managed and/or toll lanes. The City is not in favor of alternatives that would require widening and believes that the project should limit its consideration to the alternatives that seek to manage transportation capacity and demand using only the existing paved right-of-way. In addition, the City advocates for study and identification of alternatives for congestion relief and dedication of more funding to transit.

The City is also concerned that this project will lead to more vehicles on the road, more congestion, more greenhouse gas emissions and air pollution – impacts that are not included in the screening criteria.

Thank you for the opportunity to comment. If you have any questions please contact Terri Hruby, Planning Director at 301-345-5417.

Sincerely,

Terry S. Hruby

cc:     City Council
        Nicole Ard, City Manager

**From:** Ballo, Rebeccah <rebeccah.ballo@montgomeryplanning.org>
**Sent:** Wednesday, July 3, 2019 3:47 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Cc:** Jeanette Mar, FHWA <jeanette.mar@dot.gov>; Beth Cole, MHT <beth.cole@maryland.gov>; Tim Tamburrino, MHT <tim.tamburrino@maryland.gov>; Caryn Brookman <CBrookman@mdot.maryland.gov>; Matt Manning <MManning@mdot.maryland.gov>; Lampl, Joey <joey.lampl@montgomeryparks.org>; Rubin, Carol <carol.rubin@montgomeryplanning.org>; Crane, Brian <Brian.Crane@montgomeryplanning.org>; Liebertz, John <John.Liebertz@montgomeryplanning.org>
**Subject:** RE: I-495/I-270 MLS Section 106 DOE forms, Batch 8, Consulting Party Meeting reminder 6/17 1pm

Good afternoon Steve,

The following are the compiled comments from Montgomery County Park & Planning on the Batch 8 DOEs. We have also included preliminary comments on other items.

∞ The Batch 8 Determinations of Eligibility included reference to Maryland Historical Trust Site M: 26-6, The Poor Farm, site and Cemetery. The corresponding mapped location for this resource in the Maryland Historical Trust archaeological site files (Site 18MO33) and in the Montgomery County Burial Sites Inventory is on the opposite side of I 270, on the north side of Wootton Parkway nearly half a mile away from the location investigated for Batch 8. Archaeological investigations for the Managed Lanes project must include the location and surroundings of Site 18MO33.

∞ Montgomery Parks concurs that Cabin John Regional Park is not eligible for the National Register of Historic Places *based on the current Determination of Eligibility (DOE) form*. Montgomery Parks concurs that Argyle Local Park is not eligible for the National Register of Historic Places *based on the current DOE form*. Montgomery Parks concurs that North Chevy Chase Local Park is not eligible for the National Register of Historic Places *based on the current DOE form*.

We do want to note that in the absence of any thorough archaeological information and technical reports, these concurring statements are premature and preclude us from making a truly informed decision on these DOEs or the project as a whole. Should archaeological features or sites be found in any of the above sites or in those released in previous batches, our response would change.

We continue to await technical reports, an expanded Area of Potential Effect (APE) map for Alternative 10, and the Determination of Effect (DOE) forms that would result.

Our response to the items distributed for review at the June 17, 2019 Section 106 Consulting Parties meeting (e.g., the List of Adverse Effects, the Draft Programmatic Agreement) and to other big-picture questions or discussion items are predicated on receiving the forthcoming technical reports and above items and to be given the time and tools to appropriately review a significant amount of new information. In addition, we point out that SHA's objection to supplying the M-NCPPC with GIS shape files for the project seriously undermines our ability to accurately correlate and respond to the impact of the project.

We look forward in the future to putting forth a formal recommendation that seeks an evaluation of the M-NCPPC's stream valley park system *as a whole* starting with formation and up to its mature years (before the M-NCPPC ventured into the establishment of regional parks). Montgomery County Parks and Planning recommend taking a holistic approach to determining the eligibility of the stream valley parks under Criterion A across both Montgomery and Prince George's Counties instead of reviewing the individual stream valley parks (or sections of the parks) as distinct entities. We believe that under Criterion A, there should be a way to take an *integrated* look at the regional and environmental planning import of this stream valley park system across the entirety of the M-NCPPC. Should we put forth this recommendation formally, and should it lead to a National Register Determination of Eligibility under Criterion A, the Department of Parks for both Montgomery and Prince George's Counties will require a signed Programmatic Agreement among the M-NCPPC, NCPC, and MHT to allow the land-owning Agencies to be able to continue to operate the stream valley park system as we do now, for the benefit of the residents of both counties, and without any undue regulatory hardship.

Lastly, at our June 17th meeting your team had offered to work with us to hold separate coordination meetings in addition to the larger CP meetings. We will work within our agency to identify some dates and communicate those with you soon. Thank you for the opportunity to comment.

Sincerely,

Rebeccah Ballo
Historic Preservation Program Supervisor | Montgomery County Planning Department
8787 Georgia Avenue | Silver Spring, Maryland 20910
Tel:  301-563-3404; Email: Rebeccah.Ballo@montgomeryplanning.org

Ms. Joey Lampl
Cultural Resources Manager
The Maryland-National Capital Park and Planning Commission
9500 Brunett Avenue
Silver Spring, MD  20901
301-563-3414

**From:** Lampl, Joey <joey.lampl@montgomeryparks.org>
**Sent:** Thursday, August 1, 2019 4:18 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Cc:** Ballo, Rebeccah <rebeccah.ballo@montgomeryplanning.org>; Mueller, Julie
<julie.mueller@montgomeryparks.org>; Michaud, Cassandra
<cassandra.michaud@montgomeryparks.org>; Rubin, Carol <carol.rubin@montgomeryplanning.org>;
Harper, Matthew <Matthew.Harper@montgomeryparks.org>; Stephens, Douglas
<Douglas.Stephens@montgomeryparks.org>; Cole, Jai <jai.cole@montgomeryparks.org>
**Subject:** Batch 9 Comments ML Study M-NCPPC, Montgomery Parks

Hello Steve,

Here is the response from M-NCPPC, Montgomery Parks on Batch 9 of the Managed Lane Study:

M-NCPPC, Montgomery Parks does *not* concur with the DOE finding that Cabin John SVP is ineligible for
the National Register. Parks believes Cabin John SVP is eligible under Criterion A as a natural stream
valley park within the broader park system that also includes Rock Creek Park and Sligo, which have
been found eligible. All are part of the same cultural landscape system that M-NCPPC created to
preserve the watersheds of the Anacostia and the Potomac. Even though Cabin John SVP was
implemented later than Rock Creek or Sligo, its implementation in the early 1960s would simply mean
that a period of significance might range from ca. 1929 to the early 1960s.

As I have mentioned in the past, these comments do not include anything we might add on the impact
to archaeological resources as we would need to review the full archaeological technical report.

In addition, as you have asked for the identification of additional consulting parties, please remind me if
the National Capital Planning Commission is a consulting party. As you know, many of the units in M-
NCPPC's stream valley park system were purchased with Capper-Crampton funds that tie our history
and ongoing park use to NCPC involvement.

Sincerely,
Joey

Ms. Joey Lampl
Cultural Resources Manager
The Maryland-National Capital Park and Planning Commission
9500 Brunett Avenue
Silver Spring, MD  20901
301-563-3414

**From:** Stabler, Jennifer <Jennifer.Stabler@ppd.mncppc.org>
**Sent:** Friday, August 2, 2019 2:40 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Subject:** RE: I-495/I-270 MLS Section 106 DOE forms, Batch 9

Hi Steve,
The Prince George's County Historic Preservation Section has reviewed the Batch 9 DOE forms and we concur with the eligibility evaluations recommendations provided.
Please let me know if you have any questions or need any additional information.
Thanks,

Jennifer

**Jennifer Stabler, Ph.D.**
**Archeology Planner Coordinator**
**Historic Preservation Section**
**The Maryland-National Capital Park & Planning Commission**
**14741 Governor Oden Bowie Drive**
**Upper Marlboro, MD 20772**
**301-952-5595 (Voice)**
**301-952-3799 (Fax)**

00006154



**CARDEROCK SPRINGS**
National Register of Historic Places

October 9, 2019

Lisa B. Choplin
Maryland State Highway Administration
707 North Calvert Street
Baltimore, Maryland 21202-36-01

Subject: Carderock point-of-contact for the Section 106 process, Draft EIS

Dear Mrs. Choplin,

Thank you for your response of July 10, 2019 to our June 12, 2019 comment letter regarding the proposed Beltway widening project. There were some points raised in your letter that I wanted to respond to.

Our historic community as well as the children that attend the Carderock Springs Elementary School face significant community integrity, quality of life and learning impacts from the Beltway expansion. As our comment letter stated, adding 2 lanes in each direction would reduce the distance between the lanes of the Beltway where vehicles will travel and school and residences, resulting in an increased noise and dangerous air pollution. This approach wouldn't be compatible with our designation as a National Historic District and with a learning environment for the children in our community and elementary school that includes students with autism.

Given our National Historic Designation, our community looks forward to participating and providing its input during the Section 106 process. John Tiernan (jtier@verizon.net) will be representing Carderock in this process. Konstantin Gartvig (kgartvig@yahoo.com) and Elena Kazakova (elenawiz@gmail.com) will be alternates.

Our community is strongly interested in SHA's evaluation of noise mitigation through sound barriers construction and how these can address our concerns on sound and air quality impacts. Once this analysis is completed, we would like to invite SHA representatives to come to our community to discuss the findings.

Also, if public reviews of the Draft EIS are still planned for December 2019, our community would like to participate in the public hearings on the Draft EIS. Please alert us when these are to take a place so we can organize a community meeting to discuss these findings directly with our residents. We hope that our community concerns will be heard and addressed in the Draft EIS.

00006155

Lisa B. Choplin
October 9, 2019
Page 2

Thank you for your attention to this matter.

John Orrick
President, Carderock Springs Citizens Association

cc: The Honorable Andrew Friedson, Councilmember, Montgomery County Council
    The Honorable Marc Korman, Maryland House of Delegates
    The Honorable Susan C. Lee, Senate of Maryland
    The Honorable Sara Love, Maryland House of Delegates
    Mr. Jack R. Smith, Superintendent, Montgomery County Public Schools
    Mr. Jeffrey T. Folden, P.E., DBIA, Deputy Director, I-495 and I-270 P3 Office, SHA
    Mr. Gregory Slater, Administrator, MDOT SHA
    John Tierman
    Konstantin Gartvig
    Elena Kazakova

**From:** Josh Tulkin <josh.tulkin@mdsierra.org>
**Sent:** Friday, October 25, 2019 5:37 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Subject:** Response to request for consulting party status

Oct 25, 2019

To Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202
Phone 410-545-8508
sarcher@mdot.maryland.gov

Re: Request for consulting party status on section 106 review of RCSVP Units #2,3

Dear Mr. Archer,

The Sierra Club is deeply concerned about proposed impact of the proposed expansion of highways 495 and 270 in Maryland, also known as the "Manager Lanes Project" and its potential effects on historic properties.

We understand that consultation has been initiated under Section 106 of the National Historic Preservation Act (NHPA) for the Manager Lanes Project, and that compliance with Section 4(f) of the Department of Transportation Act will/may also be required. Sierra Club would like to participate actively in the review process, both as a "consulting party" under Section 106 of the NHPA, pursuant to 36 C.F.R. § 800.2(c)(5), and by receiving and commenting on any documents prepared pursuant to Section 4(f).

Sierra Club's membership mission is to enjoy, explore, and protect the planet. Our outdoor programs bring people to hikes and outings across the country, from local parks, to areas of environmental and cultural significance. The Sierra Club has routinely over the years sought to protect areas for both their natural resource values and their cultural values.

For example, we recently supported national monument status for Stonewall Inn and the Ceasar Chavez homestead. We just commissioned a study of the history of the John Muir Trail and its construction. Links to our press releases on several of these issues is below. Locally Sierra Club was a vocal advocate for the creation of the Harriet Tubman Underground Railroad National Historic Park and Trail.

Locally, Sierra Club has thousands of members who live around the proposed route, and our members utilize the Rock Creek Stream Valley Park and other local parks that would be impacted by the project.  We are concerned about the potential impact on Rock Creek Stream Valley Park for both its ecological resources and cultural value. The creation and preservation of Rock Creek Stream Valley park was a key factor in the establishment of new institutions, such as the Maryland-National Capital Parks and Planning Commission, the establishment of the park marks a critical milestone in the land preservation movement of the time.

Because of Sierra Club's knowledge and concern about historic properties potentially affected by the project, we believe we can provide important information and a valuable perspective as a consulting party under Section 106 and in the review process under Section 4(f).

Please include Sierra Club in your distribution list for public notices of any meetings, and for the circulation of documents for comment.

We look forward to participating as the review and consultation process moves forward for the Manager Lanes process.


Sincerely,
Joshua Tulkin
Maryland Chapter Director

Links:
- Statement  on creation of Stonewall National Monument https://content.sierraclub.org/press-releases/2016/06/sierra-club-praises-stonewall-national-monument
- Statement  on creation of Birmingham Civil Rights National Monuments:  https://www.sierraclub.org/press-releases/2017/09/sierra-club-applauds-new-national-monuments-commitments-increase-diversity
- Blog on Pullman Historic Site: https://blogs.sierraclub.org/layoftheland/2014/09/labor-day-2014-preserving-labors-pullman-legacy.html#more
- Statement on César E. Chávez National Monument.: https://blogs.sierraclub.org/layoftheland/2012/10/monument-to-a-national-treasure.html



# Chesapeake & Ohio Canal Association Inc.

*A citizens' association concerned with the conservation of the natural and historical environment of the C&O Canal and the Potomac River Basin*

P.O. Box 366
Glen Echo, Maryland 20812
December 24, 2019

Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation
State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, Maryland 21202

Dear Mr. Archer:

Thank you for including the Chesapeake & Ohio Canal Association as a consulting party in the planning for proposed changes to I-495 and I-270.

As you know, the project's Area of Potential Effects includes National Parks on both sides of the Potomac River. As our name implies, however, our primary mission is to protect the C&O Canal National Historical Park. Our attention therefore focuses on the American Legion Memorial Bridge and its approaches in Maryland. We foresee potential harm to the natural and historical values of the canal park if the project proceeds.

During the construction phase, there would be inevitable disturbance to the Park's viewsheds, tranquility, wetlands, and perhaps to its structures. We are concerned that such disturbances would be kept to a minimum if the project moves forward. During the initial construction of the Capital Beltway in the 1960s, canal Lockhouse #13, a fine stone structure dating to 1830, was razed. We and the public are even more sensitive to historical concerns today. It is our hope that complete restoration would follow any damage to structures or to the wetlands in the Potomac Valley, and that the Park would be left in at least as fine a state as before the project began.

We note in particular that preliminary plans include space for pedestrians on the new bridge. We do not see how this would connect to the neighborhoods and to the parks at either end of the bridge. It would certainly be easier to connect with the C&O Canal on the Maryland end of the bridge than to the Potomac Heritage Trail, given the difference in the vertical distances to the ground on the two ends. We look forward to seeing how park visitors might take advantage of new access points.

We also have concerns for buried resources, such as the all-too-fragile Potomac Interceptor sewage line, and hope that damage to such assets will be avoided.

The C&O Canal Association is an all-volunteer citizen organization established in 1954 to help conserve the natural and historical environment of the C&O Canal and the Potomac River Basin. The Association thanks the Maryland Department of Transportation for the opportunity to comment on this project and looks forward to an outcome that is historically, culturally, and ecologically appropriate.

Yours truly,

William R. Holdsworth
President

**FRIENDS OF MOSES HALL**
**MORNINGSTAR TABERNACLE NUMBER 88**
**ANCIENT UNITED ORDER OF SONS AND DAUGHTERS,**
**BROTHERS AND SISTERS OF MOSES**
c/o Charlotte Troup Leighton
8005 Cypress Grove Lane
Cabin John, MD 20818
troupleighton@gmail.com

March 14, 2020

*By Email to:*
Mr. Steve Archer
Cultural Resources Team Leader
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD 21202

Re:    I-495/I-270 Managed Lanes Study
        Comments to Cultural Resources Technical Report

Dear Mr. Archer:

We sincerely appreciate your responsiveness and assistance in providing us with a copy of relevant portions of the Cultural Resources Technical Report compiled for the Managed Lanes Study in recent weeks. We also want to thank you for your engagement with our community during one of the recent CJCA volunteer clean-up events at the Moses Hall/Morningstar cemetery and lodge property. Another volunteer clean-up day is scheduled for March 28.

On behalf of a number of stakeholders, we have shared some comments and questions by email over the last several weeks. We will endeavor to summarize our comments and concerns in this letter; however, considering that we are a newly recognized consulting party, we can only comment on what we have seen and reviewed so far.

In email communication dated April 2019, you had indicated that the Moses Hall/Morningstar cemetery and lodge property would be included in a "gap analysis" that outlined cultural resources evaluation needs for the Managed Lanes Study. You also mentioned that cemeteries fall into a "gray area" as potential National Register of Historic Places (NRHP) identification, which left us very concerned.

As the first known Moses organization and burial ground in Montgomery County, this site is clearly of historical significance. Notwithstanding family connections to those interred at Moses Hall/ Morningstar cemetery, sites like this one offer descendants a sense of pride, belonging, and cultural heritage in our community — a place to point to when sharing family history with the next generation. The original beltway project displaced many members of the African American community in Cabin John. The community's remaining cultural resources are being threatened once again by the beltway expansion. This alarms many of us concerned about social and racial justice.

You have since assured us that the intent of MDOT SHA would be "first and foremost to avoid, but also to work with the community on respectful approaches to treatment if there are (or may possibly be) interments within the right-of-way, and we have definitely have some time on our side to work through the issue, including additional evaluation of archaeology related to Moses Hall outside the cemetery." While we appreciate these assurances, the Technical Report raises some concerns.

*Friends of Moses Hall*                                                                                    Page 1 of 3

00006161

Notwithstanding the many gravesites at the property that appear to fall within the Limits of Disturbance (LOD), the foundation of the former Moses Hall lodge building appears to us to be entirely within the LOD according to map exhibits to the Technical Report. MDOT SHA's consultants' apparently brief visit was performed without clearing the site first; therefore, the Report's observations about the relationship of graves or the Moses Hall foundation to the LOD are not reliable.

The Moses Hall/Morningstar cemetery property is mischaracterized in the Report, described incorrectly as the "Gibson Grove AME Church Cemetery" with "seven known burials within the cemetery dating form around 1921 to 1975. There are three concrete square markers with no writing and only two markers with visible writing." Volume 4 of the Report loosely refers to the property as "Moses Hall", with no identifying archaeological site number. The Report references the 2010 UC Berkeley doctoral thesis of Alexandra Jones, title "Gibson Grove A.M.E. Zion Church Gone But Not Forgotten: The Archaeology of an African American Church", as a primary research source for information related to the Moses Hall and Gibson Grove Church properties. However, the Report contradicts or paraphrases Dr. Jones' dissertation in places, particularly with reference to the Moses Hall cemetery and lodge site. The Report does not attempt to correct a number of obvious inconsistencies and inaccuracies.

We are concerned that MDOT SHA has put off studying the Moses Hall site, as it has been plainly mentioned in the gap analysis. We will not speculate as to why this has happened, but it raises a number of red flags in the community. While we appreciate that site ownership questions may have delayed intensive field investigations, more thorough historical research should have been done at this point in order to adequately design those field efforts.

In addition, we are concerned as to why it appears that NRHP identification of the Moses Hall site is being postponed until after a Programmatic Agreement (PA) is executed. While we recognize MDOT SHA's stated desire for "flexibility" in its approaches to mitigation of adverse effects, detailed investigations at the site should not wait until after the Programmatic Agreement is executed. The number and location of graves and other significant features needs to be identified in relationship to the LOD as soon as is practical. This knowledge needs to inform project design decisions and development of the PA rather than being addressed after the fact. Otherwise, we expect that the PA will be a document with incomplete stipulations that leave the site and the community vulnerable. We need to be able to review and consider the full impacts and expected diminishment of the property at a point in the process when we might have meaningful alternatives to resolving adverse effects.

MDOT SHA has ignored our community's stated concerns about the damaging effects of stormwater runoff, erosion, and traffic noise that have impacted both the Moses Hall and the Gibson Grove Church properties for many years. It is understandable that neglect of these cultural and historical resources has left us feeling skeptical that these sites can be protected without NRHP identification before the PA is executed.

Thank you for the opportunity to share comments and ongoing concerns of the **Friends of Moses Hall - Morningstar Tabernacle Number 88** related to the Managed Lanes project. Should you have any questions or require additional information, please feel free to contact me at troupleighton@gmail or 202.739.1751.

Sincerely,

**Charlotte Troup Leighton**
Moses Hall Neighbor and
Vice President, Advocacy for
Cabin John Citizens Association
troupleighton@gmail.com

*Friends of Moses Hall*                                                    Page 2 of 3

**Alexandra Jones, PhD, RPA**
Archaeologist, and Founder of Archaeology in the Community
ajones@archaeologyincommunity.com

**Austin White**
Descendant
gixxer1100@live.com

**Austin White II**
Descendant
gixxer1100@live.com

**Nathan White II**
Descendant
gixxer1100@live.com

**Shannon S. Steward**
Descendant
ShannonSteward1@gmail.com

**Pandora White**
Descendant
pdenniswhite12@yahoo.com

**Diane Baxter**
Descendant
baxterd9@aol.com

**Christopher Waynes**
Descendant
chrisw1330@hotmail.com

**Montgomery Crawford**
Descendant
mceye.photo@gmail.com

**Rev. Edgar S. Bankhead, Sr.**
Gibson Grove A.M.E. Zion Church
ebankjs@verizon.net

**Eddie Bankhead**
Gibson Grove A.M.E. Zion Church
esbj@pobox.com

**Judi Bankhead**
Gibson Grove A.M.E Zion Church
judibankhead@yahoo.com

**Eileen McGuckian**
Historian and President, Montgomery Preservation
phileen3@gmail.com

**L. Paige Whitley**
Historian and Author
lpwhitley@me.com

*Friends of Moses Hall*                                              Page 3 of 3





9615 Dewitt Drive #68
Silver Spring, MD 20910
301-589-1715
info@saveourseminary.org
www.saveourseminary.org

*Officers and Directors*
Donald Hall, President
Eugene Rich, Vice President
Erin Mielke, Treasurer
Frank Riley, Secretary
Cassandra Ashman
Toni Bailey
Anne Brockett
Pat Crawford
Ann Hall
Patti Horrall
Linda Lyons
Chris Maines

*Executive Director*
Bonnie Rosenthal

March 10, 2020

Steve Archer
Cultural Resources Team Leader
Maryland Dept. of Transportation State Highway Administration
Environmental Planning Division
707 N. Calvert Street
Baltimore, MD 21202

Dear Mr. Archer,

Thank you for providing Save Our Seminary at Forest Glen, Inc. the opportunity to comment on the *I-495 & I-270 Managed Lanes Study Historic Resources Technical Report*. We appreciate the thoroughness of the document given the enormous scope of the overall project. Save Our Seminary (SOS) is a nonprofit membership organization formed in 1989 to marshal public and private support to preserve the National Park Seminary Historic District. We have largely succeeded in our original goals and continue under our mission to communicate the history of the National Park Seminary property and promote preservation and public enjoyment of its buildings, artifacts, and landscape.

The National Register-listed National Park Seminary Historic District is an architecturally and historically significant site, the nucleus of which was constructed as a resort hotel in 1887. In 1894, it became National Park Seminary and was expanded over the years to include land to the north and south of its current boundaries. In 1942, the property was taken over for Army use to house soldiers recuperating from WWII injuries, a role it continued to serve through the Korean and Vietnam Wars. The historic district includes two dozen contributing buildings, nestled in and surrounded by a historic, designed landscape that includes walking paths, statuary, architectural follies, and a number of specimen trees.

While SOS has no ownership of the NPS buildings or grounds, our longtime involvement, deep knowledge of the history and development of the site, and our extensive archival collection confirm both our capability to comment on the proposed undertaking with authority and to express our concerns.

We concur with the SHA's overall finding of adverse effects for the proposed realignment of the Linden Lane bridge and the CSX railroad bridge. At the area adjacent to the CSX tracks, a 1907 contributing building known as the Italianate Villa, the statue of Minerva to its west, and the designed landscape will be adversely affected in design, setting, feeling, and association. The landscape at the Linden Lane bridge will be similarly affected and the aggregate of the bridge realignments will diminish the planned and natural landscape buffer that is part of the historic setting of the campus.

Within and just outside the LOD on the south side of the Beltway between the two bridges is the archaeology site 18MO514, which we agree must be evaluated for National Register eligibility. The site reveals valuable information about the history and development of the campus. Most important is the substantial stone and concrete abutment for the historic cast iron bridge that led from the Forest Glen railroad station to the hotel/school. This feature contributes to the understanding of the history of the National Park Seminary

Historic District. Historically, the hotel and school relied on the railroad to deliver not only its visitors and students, but nearly all of its goods -- its proximity is the singular reason the hotel's investors sought to build here and why the school selected this property. The iron bridge was known as the "walk bridge" because hotel guests and later students would walk across it to access the hotel/school, whereas any luggage would be loaded into carts or other vehicles for transport on the county road to the rear of the site. Accessing the property in this way was intentional as it afforded the most picturesque views of the hotel/school. The Francis Baldwin-designed Forest Glen station and most of the bridge itself are long gone. The bridge abutment is the remaining physical evidence of the link between school and railroad, which is seminally important to understanding the history and development of the Historic District. Its removal will adversely affect the Historic District's design, materials, setting, feeling, and association.

Additionally, site 18MO514 includes the ruins of a pump station, an industrial building with collapsed chimney, cisterns, several stone retaining walls, remnants of footpaths, and the former county road. Along with the historic landscape – which encompasses views from and to the historic buildings, and changes in topography – the resources identified as archaeological (which is debatable) at site 18MO514 contribute to our understanding of the history and development of the Historic District and would be adversely affected in their design, materials, setting, feeling, and association by the Beltway widening.

The effects of noise from the undertaking should also be considered. The hotel and school were founded in this location to be in a quiet, wooded setting, conducive to relaxing and learning, respectively. The school's administration specifically sought out a location where the students would be away from the distractions of a city and surrounded by nature. Moving the Beltway, Linden Lane, and the CSX tracks into the historic district will negatively affect the remains of the tranquility that contribute to the historic district's significance.

We anticipate that a Programmatic Agreement (or subsequent Memorandum of Agreement that takes into account effects to this particular historic district) will provide for phased archaeological investigation within all areas of the LOD, as well as National Register eligibility assessment of identified resources not only under Criterion D as archaeological sites, but under Criteria A and C as contributing resources to the National Park Seminary Historic District.

To offset anticipated adverse effects of the undertaking, we propose several items which would mitigate the loss of historic resources and character of the National Park Seminary Historic District:

- A Cultural Landscape Inventory for the historic district, which could be used at a future date to amend the National Register nomination
- Context-sensitive design for the new bridges and sound wall, taking into account the impact of those structures on views within the historic district
- Historically appropriate treatment of land disturbed by construction, with a focus on minimizing disturbance to the existing landscape, and appropriate restoration when that is unavoidable
- Protection of existing vegetation outside the LOD during construction.

We would welcome the opportunity to provide a site visit with SOS board members who are familiar with the history, terrain, built features, and natural landscape of the National Park Seminary Historic District at your earliest convenience. We thank you for the opportunity to comment and will continue to participate as a Consulting Party in this important review process.

Sincerely,

Bonnie Rosenthal

Bonnie Rosenthal
Executive Director



**Comments submitted by (Name):**     A Young          **On behalf of (Agency/Consulting party): NPS**

| Comment No. | Volume Page and Section | Priority* | Comment |
|---|---|---|---|
| Example | | | |
| 1 | Volume1 Page 18 Section3.1.1 | 3 | Numbers addition within paragraph is confusing. Clarify language around totals of eligible properties and totals experiencing adverse effects. |
| 2 | Volume1 Page Section Effects Assessment | 2 | Please include more detailed information and maps/LOD visualizations for adverse effects on NPS NR properties. |
| 3 | Volume1 Page22-23 Section E. | 2 | Greenbelt is also significant for the role it played in American Indian Movement protests in the 1970's. |
| 4 | Volume1 Page 28/29 Section NAE | 2 | Please include more detailed maps/LOD visualizations for NPS properties that have potential and no adverse effects. It's difficult to gage the accuracy of the designation. |
| 5 | Volume1 Page 37 Section | 2 | Is there a rough timeline in place for the consultation, drafting, and execution of the PA? |
| 6 | Volume Page Section | | |
| 7 | Volume Page Section | | |
| 8 | Volume Page Section | | |
| 9 | Volume Page Section | | |

*Priority: (**1**) Substantive comment regarding analysis or findings (**2**) supplementary information or technical comment not significantly affecting analysis (**3**) minor technical corrections (formatting, spelling, clarity, etc).

**Comments submitted by (Name):**                    **On behalf of (Agency/Consulting party): CHOH NPS**

| Comment No. | Volume Page and Section | Priority* | Comment |
|---|---|---|---|
| Example | Volume 1 Page 34 Section 2.1.1 | 2 | Please clarify relation of the text in the table to the numbering on Figure Z-99 |
| 1 | Volume 1-6 | 3 | Ensure that the title National Capital Region and the abbreviation is changed to Area throughout the reports. |
| 2 | Volume 4 Page 12 Section 3.3 Paragraph 3 | 3 | Please ensure that the NPS also receives copies of field forms, notes, photos, etc. for curation at MRCE. |
| 3 | Volume 1 Page 18 Section 3.1.1. | 2 | It is possible, however unlikely, that something may remain of the Lockhouse at Lock 13 that was demolished to make way for the Legion Bridge.  The report notes that due to the presence of stone riprap, STPs could not be excavated.  Should the bridge construction necessitate new extensive disturbance of the riprap covered area immediately north of Lock 13, it would probably be prudent to have the riprap removed and a limited Phase IB and/or GPR survey conducted to ascertain if the basement of the lockhouse survived. |
| 4 | Volume 4 Page 48 Section 4.8.1 1st Complete Paragraph Last Line | 2 | Please provide a citation for where the information that William Davis was the last recorded lockkeeper of Lock 12 and that he served until the canal closed in 1936.  Concerning the closure and the year 1936, the canal technically closed to navigation in 1923 with the onset of winter, which was standard practice.  It would have reopened in early 1924 had not a flood occurred.  This flood effectively ended all commercial navigation, but the Canal Company continued to exist as an entity.  It sold water rights where possible and, by court order, had to maintain the canal in such a state that it could be made navigable with a reasonable amount of effort.  That, of course, was laughable, but the company had to maintain that until it sold the canal to the federal government in 1938.  The 1936 flood certainly damaged the canal, but what could it close that hadn't already been by the 1924 event? |
| 5 | Volume 4 Page 48 Section 4.8.1 Second Paragraph Line 5 | 2 | The lockgates open towards the west, against the flow of water, not towards the east. |

*Priority: (**1**) Substantive comment regarding analysis or findings (**2**) supplementary information or technical comment not significantly affecting analysis (**3**) minor technical corrections (formatting, spelling, clarity, etc).

| 6 | Volume 4 Page 49 Section 4.8.1 Paragraph 2, Line 1 | 2 | Please rephrase the sentence to reflect the fact that the lockkeepers did not own the lockhouses. The buildings were the property of the Canal Company. Rather, it should read that the houses were occupied by the lockkeepers, whose names are indicated on the historic maps. |
|---|---|---|---|
| 7 | Volume 4 Page 49 Section 4.8.1 Paragraph 2 Line 8 | 3 | I agree that the construction of I-495 and the degree of ground disturbance probably did obliterate Lockhouse 13 in its entirety. However, as mentioned in Bullet #3 above, something may have survived. |
| 8 | Volume 4 Page 54 Section 4.8.2 Paragraph 2 Line 7 | 3 | Fix NHRP to read NRHP. |
| 9 | Volume 4 Page 58 Section 4.8.4 1st line of that section | 2 | Site 18MO751 contains a small prehistoric component that should be mentioned in the opening sentence. |
| 10 | Volume 4 Page 59 Section 4.8.4 Figure 39 | 2 | Please indicate on this figure the STPs that were positive for prehistoric artifacts. |
| 11 | Volume 4 Page 70 Section 4.9.1 Paragraph 1 Line 6 | 3 | The very last sentence ends with "it." Please correct this. |
| 12 | Volume 4 Page 70 Section 4.9.1 Paragraph 2 Last Sentence | 2 | The analysis of the Potter Site (18MO22) indicates the possibility the 40% of the site may be intact. Shouldn't this sentence state that no additional work is warranted unless the project APE changes in a way that could impact new areas of the site. This would also make the text consistent with the recommendation listed on Table 13, page 175 of the report. |

*Priority: (**1**) Substantive comment regarding analysis or findings (**2**) supplementary information or technical comment not significantly affecting analysis (**3**) minor technical corrections (formatting, spelling, clarity, etc.).

| 13 | Volume 4<br>Page 192<br>Section 5.2.3<br>Underwater Arch<br>Paragraph 1<br>Line 3 | 3 | It appears that the caption for Figure 115 is erroneously included in the body of the main text. |
|----|------|---|------|
| 14 | Volume 4<br>Page 194<br>Figures 116 and 117 | 3 | Please note that the black polygons indicating the approximate location of the American Legion Bridge on the historic maps is not consistently placed over the locks. |
| 15 | Volume 4<br>Page 195<br>Section 5.2.3<br>Underwater Arch<br>Paragraph 2 | 2 | The summary states that no commercial traffic occurred within the stretch of river within the section around the Legion Bridge. Given the Potomac Company works at Great Falls and at Little Falls, I think that there clearly were boats passing through this section. Commercial traffic may not have been extensive, but it was enough to encourage the early development of the skirting canals. Also, no mention is made at all of the possibility that prehistoric populations may have navigated this stretch despite the presence of sites up and down both sides of the Potomac here. I do concur that it is unlikely that there are any significant submerged resources at this location. |
| 16 | Volume 4<br>Page 212<br>References Cites | 3 | The date of the aerial of Montgomery County that was referenced in the main body of the report is 1962, not 1952. |
| 17 | Volume 4<br>Appendix C | 3 | It would be helpful if the header field for the artifact catalog is repeated on each page in the final report |
| 18 | Volume 5<br>Page 1<br>Section 1<br>Paragraph 4 | 3 | This section summarizing site 18MO751 fails to mention the prehistoric component. Please include this. |
| 19 | Volume 5<br>Page 8<br>Section 2 | 3 | Paragraph 3 mentions that a flotation sample was taken. I take it that the samples haven't actually been analyzed. Is there a plan to conduct the analysis? |
| 20 | Volume 5<br>Section 2 | 2 | I noted that some of the prehistoric ceramics exhibiting sooting on their interiors were dry brushed to preserve them for future analysis. Were any of the lithic tools left unclean for potential protein analyses? Were efforts made in the field to prevent contamination of artifacts and carbon samples that could be potentially tested in the future? Please indicate this in the methods section. |

*Priority: (**1**) Substantive comment regarding analysis or findings (**2**) supplementary information or technical comment not significantly affecting analysis (**3**) minor technical corrections (formatting, spelling, clarity, etc).

| 21 | Volume 5<br>Page 28<br>Figure 4.1 | 3 | As with the Volume 4 Phase I report, the STPs in site 18MO751 that were positive for prehistorics are not labeled correctly in the graphic. |
|----|----|----|----|
| 22 | Volume 5<br>Page 28 - 29<br>Section 4 | 3 | The bound volume erroneously includes pages 21/23 from the section on site 18PR750 intermingled between pages 28 and 29 of the discussion for 18MO749. |
| 23 | Volume 5<br>Page 32<br>Section 4<br>Top Paragraph | 3 | It would be nice if an image of the historic iron object were included at some point in the report given that it was intermingled with a significant prehistoric site. |
| 24 | Volume 5<br>Page 33<br>Figure 4.6 | 2 | The graphic does not include the location of the historic artifact.  Please include that at STP N500 E400.  Also, why not delineate the area around the STP with the positive historic find? |
| 25 | Volume 5<br>Page 36<br>Section 4<br>Test Units | 2 | It would be nice if the report included drawings of the TU wall profiles. |
| 26 | Volume 5<br>Page 40<br>Section 4<br>Top Paragraph<br>Line 5 | 3 | The sentence discussing the artifacts from the B2 horizon erroneously mentions historic finds twice, making the total count 5.  In reality, there were 4 historic objects in that horizon. |
| 27 | Volume 5<br>Page 41<br>Section 4<br>1st Full Paragraph<br>Line 9 | 3 | TU 3 produced four fragments of charcoal.  Is there enough for carbon dating?  Were the specimens collected and stored with that potential in mind? |
| 28 | Volume 5<br>Page 42<br>Section 4<br>Feature 1 | 3 | Was a soil sample collected from Feature 1 for future testing?  Would it be possible to include plan and profile drawings of the feature in this report? |

*Priority: (**1**) Substantive comment regarding analysis or findings (**2**) supplementary information or technical comment not significantly affecting analysis (**3**) minor technical corrections (formatting, spelling, clarity, etc).

| 29 | Volume 5<br>Page 53<br>Section 4<br>3rd line from top | 3 | Change "was" to were. |
|----|----|----|----|
| 30 | Volume 5<br>Page 56<br>Section 4<br>Artifact images | 3 | It would be nice to see an image of the metate/anvil/core included in this section on site 18MO749. Additionally, including an image of the historic artifacts from the site would be very useful. |
| 31 | Volume 5<br>Page 73<br>Section 5<br>Paragraph 3<br>Line 7 | 2 | The discussion of the new foundation located south of Lock 12 should not include the speculation that it was perhaps the original location of the lockhouse at Lock 12.  The Canal Company land records show that the structure lies outside of their original holdings.  I agree that it may have been constructed as a result of the concentration of canal locks and lockhouses there and supported some form of commercial activity. |
| 32 | Volume 5<br>Page 75<br>Section 5<br>Site History<br>1st paragraph<br>Line 7 | 3 | Insert that the construction of the canal ended in 1850 with Cumberland, MD as the ultimate terminus.  Dreams of reaching Pittsburg, PA were long gone. |
| 33 | Volume 5<br>Page 75<br>Section 5<br>Site History<br>1st paragraph<br>Lines 12 - 14 | 2 | Despite what past NPS and other documents have related concerning the B&O RR and control of the Canal Company, the fact stands in the Washington County Circuit Court Equity Cases No. 4191 and 4198 that the B&O did not legally own, nor could sell the canal to the Federal Government.  The Canal Company continued to legally exist by court order and was required to report to the court concerning its affairs.  It is true that B&O executives owned the majority of the canal company shares and, therefore, had a controlling interest, but their authority over the company has been greatly misconstrued.  The court appointed Receivers who were responsible for selling the canal after they gained the court's approval. |
| 34 | Volume 5<br>Page 75<br>Section 5<br>Paragraph 3<br>Line 13 | 3 | Please change *east* to west.  The lock gates swing open against the flow of water.  At Lock 12 the direction of opening is to the west. |

*Priority: (**1**) Substantive comment regarding analysis or findings (**2**) supplementary information or technical comment not significantly affecting analysis (**3**) minor technical corrections (formatting, spelling, clarity, etc).

| 35 | Volume 5<br>Page 81<br>Section 5<br>Figure 5.7 | 3 | The labels for the TUs are incredibly difficult to read in this graphic.  A larger size and color change is suggested. |
|---|---|---|---|
| 36 | Volume 5<br>Page 99<br>Section 5<br>Artifacts<br>Paragraph 1 | 3 | Colluvial processes are asserted as the likely cause of prehistoric artifact concentrations in TU 4.  I do not disagree with the notion of potentially attributing some of the material to those processes.  However, as the second sentence is written, it sounds as if the manmade I-495 bridge embankment is a major contributing factor to the accumulation of prehistoric artifacts in TU 4.  It also appears from Topo maps and LIDAR that the location of TU 4 is relatively level.  That, along with the accumulation of 56 prehistoric artifacts makes me less inclined to concur that colluvial processes alone caused this collection, even in spite of the geomorphological assessment. |
| 37 | Volume 5<br>Page 114<br>Section 5<br>Paragraph 2<br>Line 8 | 2 | Once again, the B&O was not legally able to sell the canal to the federal government.  Please revise to say that the court appointed Receivers sold the canal after gaining the approval of the court. |
| 38 | Volume 5<br>Page 114<br>Section 5<br>Paragraph 3 | 3 | Lockkeeper or Lock Tender are the preferred terms when talking about those who ran the locks.  I would avoid or limit the use of the term operator with respect to the canal. |
| 39 | Volume 5<br>Page 126<br>Section on<br>18MO750 | 2 | I was wondering if the analysis of the extended site boundary of 18MO750 accounted for the fact that the Lockhouse at Lock 14 was once located just south of the towpath in the vicinity of artifacts clustered around STP 1-15?  The house almost certainly abutted Feature 2, the towpath retaining wall.  Also, there is a quarry cut into the natural hillside just south of the N500 Transect and between approximately E650 and E700.  Knowledge of the existence of the lockhouse and quarry may change the interpretation of the artifact assemblage. |

*Priority: (**1**) Substantive comment regarding analysis or findings (**2**) supplementary information or technical comment not significantly affecting analysis (**3**) minor technical corrections (formatting, spelling, clarity, etc).

Larry Hogan, Governor
Boyd Rutherford, Lt. Governor



Robert S. McCord, Secretary
Sandy Schrader, Deputy Secretary

# Maryland
## DEPARTMENT OF PLANNING
### MARYLAND HISTORICAL TRUST

March 12, 2020

Dr. Julie M. Schablitsky
Assistant Division Chief
Environmental Planning Division
MDOT State Highway Administration
P.O. Box 717
Baltimore, MD 21203-0717

Re:    I-495 & I-270 Managed Lanes Study (MLS)
Montgomery and Prince George's Counties, Maryland
MDOT SHA Project No. AW073A11

Dear Dr. Schablitsky:

Thank you for providing the Maryland Historical Trust (Trust) with the six-volume *Cultural Resources Technical Report* for the above-referenced project. The Maryland Department of Transportation State Highway Administration's (MDOT SHA) submittal represents ongoing consultation to assess the project's effects on historic properties, pursuant to Section 106 of the National Historic Preservation Act of 1966, as amended, and the Maryland Historical Trust Act of 1985, as amended, State Finance and Procurement Article §§ 5A-325 and 5A-326 of the Annotated Code of Maryland. Trust staff have conducted a thorough review of the materials and we are writing to provide our comments and concurrence below and in an attachment to this letter.

**Architectural Historic Properties Comments for Maryland Sections of the Area of Potential Effects (APE):** MDOT SHA's extensive efforts to identify historic properties produced the well-written and effective *Suburbanization Historic Context Addendum (1961-1980), Montgomery and Prince George's Counties* (May 2019) and resulted in the survey and evaluation of 329 resources within the built environment. A total of 51 historic properties listed in or determined eligible for the National Register of Historic Properties were identified within the undertaking's APE, as noted in Table 2.2 of *Cultural Resources Technical Report Volume 3: Architectural Historic Properties Identification* (RK&K 2019). Our comments on the undertaking's effect on these historic properties are presented below.

**Archeology Comments for Maryland Sections of the APE:** Trust staff reviewed the following two draft reports included in the submittal:

1. *Cultural Resources Technical Report Volume 4: Phase I Archaeological Investigation for the I-495 & I-270 Managed Lanes Study, Montgomery and Prince George's County, Maryland and Fairfax County, Virginia* (Arnold et al. 2019) and
2. *Cultural Resources Technical Report Volume 5: Supplemental Phase I Archaeological Survey and Phase II Archaeological Evaluation of Sites 18PR750, 18MO749, and 18MO751 for the I-495/I-270 Managed Lanes Study Project, Prince George's County and Montgomery Counties, Maryland* (Millis et al. 2019).

Dr. Julie M. Schablitsky
I-495 & I-270 Managed Lanes Study (MLS)
Page 2 of 5

The reports present detailed documentation on the goals, methods, results and recommendations of Phase I initial and supplemental archeological survey conducted within accessible portions of the corridor study boundary and Phase II evaluations of three sites. The drafts generally meet the reporting requirements of the Trust's *Standards and Guidelines for Archeological Investigations in Maryland*. Attachment 1 lists the Trust's specific comments on the two reports. We ask SHA to have the consultants address these issues, in addition to applicable comments provided by the other consulting parties, in the preparation of the final documents. We await two hard copies and one electronic copy on disk of each final report for our Library, when available.

Based on the information presented in the report, the Trust agrees with MDOT SHA's findings as follows:

- We concur with MDOT SHA's evaluations that the following sites do not meet the criteria for eligibility in the National Register of Historic Places: 18MO22, 18MO750, 18MO753, 18MO754, 18MO755, 18MO756, 18PR425, 18PR750, 18PR1131 and 18PR1133.
- We concur with MDOT SHA's determination that sites 18MO749 and 18MO751 are **eligible** for inclusion in the National Register of Historic Places.
- We agree that further Phase I and II archeological investigations are warranted in specified areas to which access was denied, for indicated previously inventoried sites once more detailed project plans are developed, and in areas recommended for deep testing as stated in the draft reports.
- Based on the underwater archeological assessment of the American Legion Bridge crossing presented in the draft Phase I report, we agree that significant submerged cultural resources are unlikely to be located within the corridor study boundary and underwater archeological investigations are not warranted at this time.
- We agree that further consultation and coordination are needed to address the appropriate identification and treatment of cemeteries that may be impacted by the undertaking.

**Assessment of Effects on Historic Properties:** Trust staff carefully reviewed the information presented in MDOT SHA's *Cultural Resources Technical Report Volume 1: Overview and Effects Assessment* (December 2019) and other materials accompanying the submittal. Based on the supporting documentation, the Trust concurs with MDOT SHA's determination that the proposed undertaking will have an **adverse effect** on historic properties, including archeological properties, in Maryland. Furthermore, the Trust agrees with the following specific findings stated in MDOT SHA's submittal letter dated January 10, 2020 and accompanying attachments:

- We agree that the undertaking will adversely affect the historic properties listed in Table 1 (Attachment #2) and will also adversely affect archeological historic properties 18MO749 and 18MO751.
- We agree that the undertaking may adversely affect the historic properties listed in Table 2 (Attachment #2) and further consultation will be needed during design development to consider and address effects.
- We concur that the undertaking will have no adverse effect on the historic properties listed in Table 3 (Attachment #2).
- We acknowledge that MDOT SHA intends to request that the Federal Highway Administration make a de minimis finding for the minor Section 4(f) use of nine properties listed in Table 4 (Attachment #2). We are also including a signed concurrence sheet to facilitate the de minimis approval process.
- MDOT SHA was not able to fully complete its efforts to identify and evaluate archeological sites that may be impacted by the project given access denial issues and lack of construction

Dr. Julie M. Schablitsky
I-495 & I-270 Managed Lanes Study (MLS)
Page 3 of 5

     engineering details regarding the full limits of disturbance. Thus, we agree that further Phase I
     and II investigations may be warranted as planning develops for the following: five survey areas
     (Areas S-8, S-37, S-44, S-53, S-54), areas recommended for deep testing, the six sites listed in
     Attachment #3 to the submittal letter (18MO190, 18MO191, 18MO457, 18MO510, 18MO514,
     and 18MO752), plus the Moses Hall property.

- We agree that further consultation and coordination are needed to address the appropriate
  identification and treatment of cemeteries that may be impacted by the undertaking.

We understand that MDOT SHA intends to negotiate a Programmatic Agreement (PA), pursuant to 36
CFR 800.14(b) for this undertaking. The PA will not only stipulate mitigation measures to resolve the
undertaking's adverse effect on individual historic properties, but also establish a process for ongoing
identification of historic properties that may be affected, consideration and resolution of effects on
additional resources, and further coordination among the various parties involved in the Section 106
consultation for this complex undertaking. We look forward to a meeting of consulting parties to fully
discuss the anticipated effects and begin negotiation of appropriate mitigation measures.

Sincerely,

*Elizabeth Hughes*

Elizabeth Hughes
Director/State Historic Preservation Officer
EH/BC/TJT/202000116

cc:    Caryn Brookman (SHA)
       Jeanette Mar (FHWA)
       Julie Langan (VDHR)
       Rebeccah Ballo (Montgomery County Planning)
       Joey Lampl (Montgomery County Parks)
       Sarah Rogers (Heritage Tourism Alliance of Montgomery County, Inc.)
       Howard Berger (Prince George's County Planning Department)
       Aaron Marcavitch (Anacostia Trails Heritage Area, Inc.)

**Attachment 1**
**Trust Comments on Draft Archeological Reports**

**Phase I Archeological Survey Report**

1.  In the Field Results chapter, please include reference to the corresponding maps in Appendix E — Results and Recommendations of Archaeological Testing that illustrate the location of the various Survey Areas within the Corridor Study Boundary, so the reader may readily find the survey areas' positions within the larger study area. For instance, on page 15: *Area S-1 is a 0.99-acre limited survey area located within the cloverleaf off-ramp connecting the northbound lands of I-270 to West Montgomery Avenue (**Figure 4**) (**Appendix E, Page 27**)*.

2.  Several figures are missing from the draft report: Figures 17, 47, 75, 84.

3.  Add artifact tables to the results discussion for 18MO22, survey area S-13.

4.  The report recommends deep testing for multiple locales. The corresponding survey area figures in the text and those in Appendix E should map the areas where deep testing is recommended. For instance: S-16a (Figure 55, Appendix E map 5-6), S-16c (Figures 57, 58, 59 and Appendix E map 5-6), S-17 (Figure 70, Appendix E map 6), S-33 (Figure 91, Appendix E map 6).

5.  Double check all the Appendix E keys for archeological testing results to ensure that the color code matches the recommendations in the text and correct as needed. For instance: S-37 on page 9 is keyed in black (no further work recommended) yet the text recommends full Phase I survey; S-39 on page 12 is coded for Phase I survey, yet the text recommends no more work.

6.  In the Summary and Recommendations chapter, please include reference to the corresponding maps in Appendix E — Results and Recommendations of Archaeological Testing that illustrate the location of the various Survey Areas and inventoried archeological site locations within the Corridor Study Boundary, so the reader may readily find the various sites and survey areas' positions within the larger study area. (See example noted in item #1.) This applies to all sections of this chapter.

7.  On page 183, the report needs to include explicit recommendations in the discussion for Gibson Grove African Methodist Episcopal Zion Church and include an accompanying figure documenting the location of prior archeological testing on the parcel. Is additional archeological investigation warranted or only further consideration of the Moses Lodge Cemetery discussed in Section 5.2.5 D?

8.  Table 15 (page 184) should include add National Register eligibility recommendations to column six.

9.  Page 194, please check the accuracy of the overlaid mapping of the American Legion Bridge location on Figures 116 and 117 as it appears to be shown in different locations relative to the Rock Run drainage situated west of the study area.

10. Section 5.2.4 Additional Archaeological Studies Recommended needs to add figures and/or include reference to the corresponding maps in Appendix E — Results and Recommendations of Archaeological Testing. (See example noted in item #1.)

11. Section 5.2.4 should include a table with the recommendations for the sites discussed in this section or add these sites to Table 15.

12. Section 5.2.5 should include a table with the recommendations for the cemeteries discussed in this section or add them to Table 15.

13. Appendix C – Artifact Inventory needs careful editing for consistency and accuracy. Pages 10 – 27 have no provenience information for the artifacts listed. Pages 28 – 50 provide additional inventories for multiple sites and isolates distinctly grouped by site – likely these are the sites from federal NPS lands?

**Supplemental Phase I Archeological Survey and Phase II Archeological Evaluations**

1. The report's discussion of National Register eligibility for site 18MO751 in the Results and Conclusions and Recommendations chapters should solely reference Criterion D. The report does not present sufficient justification to support significance under Criteria A and C.

2. Please complete site update forms for 18MO22 and 18MO750 to reflect the results of the supplemental Phase I investigations, provide the original forms to Jennifer Cosham for entry in the Inventory records, and include a copy of the updates in Appendix 2.

3. The report needs to add an appendix that documents the professional qualifications of the principal investigator.

MHT Log #202000116

00006177

## Concurrence with the MDOT State Highway Administration's
## Determination(s) of Eligibility and/or Effects

**Project Number:** AW073A11                    **MHT Log No.** 2020 00116
**Project Name:** I-495 & I-270 Managed Lanes Study (MLS)
**County:** Montgomery and Prince George's
**Letter Date:** January 10, 2020

The Maryland Historical Trust has reviewed the documentation attached to the referenced letter and concurs with the MDOT State Highway Administration's determinations as follows:

**Eligibility** (as noted in the Eligibility Table [Attachments 2 & 3):
       ☒   Concur
       [ ]   Do Not Concur

**Effect** (as noted in the Effects Table [Attachments 2 &3):
       [ ]   No Properties Affected
       [ ]   No Adverse Effect
       [ ]   Conditioned upon the following action(s) (see comments below)
       ☒   Adverse Effect

**Acknowledgment of FHWA's intent to make a *de minimis* impact finding** (as detailed in the referenced letter, if applicable):
       ☒   Acknowledge

Comments:
   SEE LETTER DATED 12 MARCH 2020 FOR ADDITIONAL COMMENTS.

By: _Elizabeth Hughes_                    3·12·20
     MD State Historic Preservation Office/                    Date
     Maryland Historical Trust

**Section 4(f) Criteria of Temporary Occupancy or *de minimis* Finding Approval, if applicable:**

**Federal Highway**                    **Printed Name**                    **Date**
**Administration**

Return by U.S. Mail or Facsimile to:
Dr. Julie M. Schablitsky, Assistant Division Chief, Environmental Planning Division,
MDOT State Highway Administration, P.O. Box 717, Baltimore, MD 21203-0717
Telephone: 410-545-8870 and Facsimile: 410-209-5046
A_Proj Number: 11729

00006178


**Comments submitted by (Name):**     M. Joseph     **On behalf of (Agency/Consulting party): NPS**

| Comment No. | Volume Page and Section | Priority* | Comment |
|---|---|---|---|
| Example | Volume 1 Page 34 Section 2.1.1 | 2 | Please clarify relation of the text in the table to the numbering on Figure Z-99 |
| 1 | Volume 1 Page 18 Section 3.1 | | Explain why the effects can not be determined on 7 architectural properties. Elaborate |
| 2 | Volume 1 Page General Section | | Check sentence structure throughout the document. There are several awkwardly phrased sentences that would benefit from being two sentences. Also, do not start a sentence with the word "Because" as it is a connecting clause. Check grammar throughout. |
| 3 | Volume 1 Page 18 Section 3.1.1. | | The Period of Significance for each property should be explained as the narratives do not reflect how the value was determined. The reader should also have a brief introduction to each resources, no more than two sentences. |
| 4 | Volume 1 Page 19 Section 3.1.1. | | The "Unspecified" Criterion and Period of Significance really should be defined or at least attempted to be defined. |
| 5 | Volume 1 Page 20 Section 3.1.1 A | | The actions described will also impact the "design, workmanship, feeling, and materials" of the Baltimore- Washington Parkway. Address |
| 6 | Volume 1 Page 20 Section 3.1.1. C | | Divide the conversation of the impacts to the two parkways  to two separate sections. |
| 7 | Volume1 Page 23 Section 3.1.1. E | | The 'feeling" would be diminished after construction of the interchange. |
| 8 | Volume 1 Page 23 Section 3.1.1.G | | The realignment would effect the "location" of the railway as well. |
| 9 | Volume 1 Page 24 Section 3.1.1. H | | "Feeling" would also be effected. |

*Priority: (**1**) Substantive comment regarding analysis or findings (**2**) supplementary information or technical comment not significantly affecting analysis (**3**) minor technical corrections (formatting, spelling, clarity, etc).

| 10 | Volume 1<br>Page 26<br>Section 3.1.2. | | Again, explain why the effects cannot be determined at this time. See previous comments regarding Period of Significance. |
|----|----|----|----|
| 11 | Volume 1<br>Page 27<br>Section 3.1.2. B | | What is Carderock Springs Historic District? Where is it located? Managed by whom? Feeling would also be adversely effected by that removal of trees. |
| 12 | Volume 1<br>Page 28<br>Section 3.1.2. F | | The design of stormwater management facilities and features will have an adverse impact on the character of the parkway. |
| 13 | Volume3<br>Page 12<br>Section 2.5 | | Does the note "Eligible( for the purpose of Section 106)" have to be placed in the chart for Greenbelt Park? |
| 14 | Volume 3<br>Page<br>Section Appendix<br>C | | Was a form prepared for Greenbelt Park? If not- why? |
| 15 | Volume 1<br>Page 2<br>Section 1.1 | | Do we have idea where the three proposed stormwater management features will be located? One is mention for the ALB replacement within the Clara Barton Parkway vicinity (pg. 21) |
| 16 | Volume 1<br>Page 13<br>Section 2.3.1 | | Need to mention Clara Barton Parkway, a NPS property in Maryland, is also located with the APE for the ALB replacement project. |
| 17 | Volume 1<br>Page 19<br>Section 3.1.1 | | Table 3-1 – Update Period of Significance for the GWMP and Clara Barton Parkway from 1930-**1970** and the NRHP Criteria to include criteria **A**, in addition to B & C. |
| 18 | Volume 1<br>Page 20<br>Section C. | | GWMP and Clara Barton Parkway are eligible under criteria A, B, & C |
| 19 | Volume 1<br>Page 21<br>Section C. | | In the DEIS it indicated that the project is just new bridges but is widening the bridge as well. Update the text to reflect the nature of the project and its impacts. |
| 20 | Volume 1<br>Page 21<br>Section C. | | The NPS is trying to reduce the LOD because of the sensitive Potomac River Gorge ecological communities and sensitive archeological features within the vicinity of the American Legion Bridge (ALB). |

\*Priority: (**1**) Substantive comment regarding analysis or findings (**2**) supplementary information or technical comment not significantly affecting analysis (**3**) minor technical corrections (formatting, spelling, clarity, etc.).

| 21 | Volume 1 Page 21 Section C. | | Major impacts are projected for three of the quadrants for construction access to replace the ALB. Need to look at this location as a sensitive ecological and sensitive archeological zone related to the Potomac River Gorge. |
|---|---|---|---|
| 22 | Volume 1 Page 21 Section C. | | Stormwater Management Facility should not be located on NPS lands. Suggest trying to keep it on MDOT land with the Clara Barton Parkway interchange with the beltway. |
| 23 | Volume 1 Page 21 Section C. | | Need to state this differently – the expansion of the ALB within the NPS boundaries (effecting the following NR districts – C&O Canal, Clara Barton Parkway and George Washington Memorial Parkway). Adverse effect to the visual and physical quality of these NPS properties with the introduction of new structural features, removal of sensitive vegetation, possible regarding activities and possible destruction of archeological sites. |
| 24 | Volume 1 Page 25 Section K.c. | | Virginia DHR does not support defining the Dead Run Ridges area as an archeological district. |
| | Volume Page Section | | |
| | Volume Page Section | | |
| | Volume Page Section | | |
| | Volume Page Section | | |
| | Volume Page Section | | |
| | Volume Page Section | | |
| | Volume Page Section | | |

\*Priority: (**1**) Substantive comment regarding analysis or findings (**2**) supplementary information or technical comment not significantly affecting analysis (**3**) minor technical corrections (formatting, spelling, clarity, etc).

\*Priority: (**1**) Substantive comment regarding analysis or findings (**2**) supplementary information or technical comment not significantly affecting analysis (**3**) minor technical corrections (formatting, spelling, clarity, etc).

Cultural Resources Technical Report, Volume 4: Phase I Archaeological Survey, Intensive Phase I Archaeological Investigation For the I-495 & I 270 Managed Lanes Study, Montgomery and Prince George's County, Maryland and Fairfax County, Virginia Draft dated December 2019 and

Volume 5: Supplemental Phase I Archaeological Survey and Phase II Archaeological Evaluation of Sites 18PR750, 18MO749, and 18MO751, Prince George's and Montgomery Counties, Maryland. The I_495/I-270 Managed Lanes Study (Maryland Department of Transportation), Fairfax county, Virginia Draft dated December 2019
Reviewer: *Marian Creveling (MCC)*
March 2020

# Volume 4

| No. | Reviewer | Page | Line | Comment | Response |
|-----|----------|------|------|---------|----------|
|  | MCC | 30 |  | Figure is missing |  |
|  | MCC | 36 | ¶5 L1 & L4 | Line 1 says Grosvenor Place but line 4 says Grosvenor Lane is this a typo or are there two different street names. Could not confirm by looking at the map |  |
|  | MCC | 69 | Figure 47 | Figure is missing |  |
|  | MCC | 72 | ¶2 L1 | "..1 and 2 are were located…" Need to pick one and delete the other |  |
|  | MCC | 107 | Figure 75 | Figure is missing |  |
|  | MCC | 120 | Figure 84 | Figure is missing |  |
|  | MCC | 120 |  | General observation – 18PR1131 – located along BAWA and identified as a new site during this project – hopefully this was not also recorded by Berger during their recent survey |  |
|  | MCC | 149 | ¶2 | Only one Thomas et al.. in bibliography, 1992. Is the 1993 citation missing or is it a typo? |  |
|  | MCC | 176 | ¶1 | Refers to table 18 but the tables only go to 15 |  |
|  |  |  |  |  |  |
|  | MCC |  |  | General comments – The report is easy to read and follow. The text frequently referred to streets or other landmarks as site boundaries, but they were not always marked on the maps. I found the photo scale overwhelmed the artifacts in some of the images. Finally, my copy appeared to have two Appendix E, but the maps in the first appear to be the same as in Appendix D |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

00006183

**Cultural Resources Technical Report, Volume 4: Phase I Archaeological Survey, Intensive Phase I Archaeological Investigation For the I-495 & I 270 Managed Lanes Study, Montgomery and Prince George's County, Maryland and Fairfax County, Virginia Draft dated December 2019 and**
**Volume 5: Supplemental Phase I Archaeological Survey and Phase II Archaeological Evaluation of Sites 18PR750, 18MO749, and 18MO751, Prince George's and Montgomery Counties, Maryland. The I_495/I-270 Managed Lanes Study (Maryland Department of Transportation), Fairfax county, Virginia Draft dated December 2019**
**Reviewer: *Marian Creveling (MCC)***
**March 2020**

| No. | Reviewer | Page | Line | Comment | Response |
|---|---|---|---|---|---|
| | Volume 5 | | | | |
| | MCC | Viii | Figure 5.17 | Is it facing South or facing East? The list of figures does not match the figure caption | |
| | | | Figure 6.9 | Missing part of the site number | |
| | | 9 | ¶4 L4 | Sullivan & Rozen not in the bibliography | |
| | | 32 | Table 4.1 | Check counts across Horizons for Untyped PPK, Biface Med Stage and Metate/Anvil/Core then check the final count | |
| | | 40 | ¶2 L1 | Should be figure 4.6 not 4.7 | |
| | | 66 | Table 4.6 | Check total under B5 3.75-4.75 | |
| | | | ¶2 L1 | Total of artifacts in Ab horizon doesn't match that in the table | |
| | | 87 | Table 5.3 | Activities sub-total should be under feature 2 not feature 1 | |
| | | | | | |
| | | | | General comments – Well written easy to follow report. However, the format of my copy was off in that the abstracts, tables, chapters, etc.. all began on the left page instead of the right. In addition, I had an extra page 21/22 between pages 28 and 29. | |

2



**CARDEROCK SPRINGS**
National Register of Historic Places

March 16, 2020

Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

**Re: I-495 & I-270 Managed Lanes Study, comments from CSCA to the Draft Cultural Resources Technical Report, dated December 2019**

Dear Mr. Archer,

Thanks for the opportunity to provide you with our community comments (see below).

It is our understanding that the draft Cultural Resources Technical Report was prepared to comply with Section 106 of the National Historic Preservation Act (NHPA) of 1966, as amended, and its implementing regulations at 36 CFR Part 800, with the intent of considering the effects of the proposed I-495 & I-270 Managed Lanes project on adjacent historic properties. As part of this report, MDOT SHA and FHWA identified historic properties within the project's area of potential effects (APE); assessed effects to those properties; and is consulting with the Maryland Historic Trust (MHT) and additional consulting parties through the Section 106 process. The above-referenced report will also serve to inform the EIS.

In its role as a Consulting Party within the Section 106 process, the Carderock Springs Citizens Association (CSCA) has reviewed the Draft Cultural Resources Technical Report, particularly those parts relevant to our community, which includes the Carderock Springs Historic District and Carderock Springs South, both located at least partially within the APE and the CSB. We are also including comments regarding the neighboring Gibson Grove Church and Moses Hall Lodge and Cemetery properties, in coordination with the Cabin John Citizens Association.

## I.   BACKGROUND

A.   Carderock Springs is a historic district included in the National Register of Historic Places (NRHP). Developed by Edmund J. Bennett and designed by Keyes, Lethbridge, and Condon between 1962 and 1966, Carderock Springs is a subdivision of 275 modernist houses and a recreation center. Typical of Bennett / KLC subdivisions, Carderock Springs was planned to take full advantage of the existing landscape and topography, with curvilinear streets and cul-de-sacs serving wooded, sloping lots. Houses represent a range of models suited to varying site conditions, unified by a consistent design aesthetic to create Bennett's goal of a "visual community."

B.   Carderock Springs South is listed as an eligible historic district in the Cultural Resources Technical Report. Also designed by Keyes, Lethridge and Condon and developed by Bennett between 1967 and 1970, Carderock Springs South consists of 45 contemporary homes and is the last and final

**CARDEROCK SPRINGS**
National Register of Historic Places

section of the Carderock Springs community. In the Report, it is described as having "a naturalistic setting" with "some natural topographic features retained along with mature trees throughout the neighborhood."

C.   The Gibson Grove A.M.E. Zion Church derives its significance from its association with the African American settlement of Gibson Grove that was founded in the 1880s by former slaves. The original church was a log structure that was replaced with the current edifice in 1923. It is the only remaining structure associated with the African-American Gibson Grove community and is eligible for listing in the NRHP (filed in 2000).

D.   Moses Hall (Morningstar Tabernacle #88) and Moses Lodge Cemetery were established by the Grand United Order of Brothers and Sisters, Sons and Daughters of Moses (the Lodge). The Lodge was founded in 1868 as a fraternal organization for the maintenance of orphans, for burials, and for the care of the sick and destitute members. Moses Hall was destroyed by fire in the late 1960's and the Lodge organization is no longer extant; however, the membership of the Lodge was largely the same as the Gibson Grove AME Zion church congregation, whose family members are buried in the Moses Lodge cemetery. The cemetery was in use between 1912 and 1970, and it is thought that it contains at least 50 graves. The exact number is unknown and the site is currently overgrown, albeit in the process of being cleared of vegetation to facilitate a more complete survey of the graves and extant elements of the hall.

## II.   SUMMARIZED COMMENTS

Portions of the Carderock Springs Historic District, the Gibson Grove Church, and Moses Hall and Cemetery are all within the Corridor Study Boundary (CSB) and likely within the Limits of Disturbance (LOD), once they are determined. Carderock South is within the Area of Potential Effects (APE). Given this, it is clear that there will be adverse effects to these neighborhoods and properties if any alternative other than the "No Build" alternative is selected. These adverse effects would include property loss, loss of mature trees and landscape buffer, an increase in noise levels, changes to the historic settings and feeling due to tree loss and highway encroachment, potential increase of stormwater runoff and erosion, and, for the Moses Lodge Cemetery, potential loss / displacement of existing graves and of the remains of Moses Hall.

Section 106 promotes avoidance of adverse effects, which would require no encroachment on the Carderock Springs Historic District, Carderock Springs South, Gibson Grove Church, or Moses Hall and Cemetery or adverse impacts on its environmental qualities. However, this does not appear to be possible with many of the alternatives being considered. What steps will SHA take to avoid, minimize or mitigate adverse impacts? As the evaluation and design process continues, we request that periodic meetings be held to inform our communities of the status of the proposed project and any changes to the design. These meetings should also allow the community to voice concerns and ask questions. As part of the Programmatic Agreement (PA), we also request that we be a part of the design review process in our continuing role as a Consulting Party and be given the opportunity to provide formal comments in response to the proposed design once it is developed.

## III.   DETAILED COMMENTS

A.   Volume 1, Section 1.4: Alternatives Evaluated

Seven screened alternatives were identified in the report. These are summarized below for ease of reference, with focus on the proposed changes to I-495:

**CARDEROCK SPRINGS**
National Register of Historic Places

Alternative 1: No Build (Existing). Width of I-495 ranges from 138' to 146'.

Alternative 5: Add one High-Occupancy Toll (HOT) Managed Lane in each direction and convert one existing HOV lane to a HOT Managed Lane in each direction. Buses would be permitted on the HOT lanes. Resulting width of I-495 ranges from 170' to 174'.

Alternatives 8, 10 and 13C: Add two Express Toll Lanes (ETL) in each direction. Differences between these alternatives are in the I-270 component of the proposed work. Resulting width of I-495 ranges from 194' to 198'.

Alternatives 9 and 13B: Add two HOT lanes in each direction. Buses would be permitted on the HOT lanes. Differences between these alternatives are in the I-270 component of the proposed work. Resulting width of I-495 ranges from 194' to 198'.

*Comments:*

- *The Carderock Springs Historic District, Carderock Springs South, the Gibson Grove Church and the Moses Hall Lodge/Cemetery properties will all be affected by any alternative that results in expansion of the lanes on I-495. Our communities border the Beltway, and there are no sound barriers to mitigate and diffuse the heightened level of noise and air pollution that an increased number of cars and trucks traveling on a widened Beltway would generate. This includes all Alternatives listed above with the exception of Alternative 1, the No Build option. For this reason, the No Build Option is the preferred option for our communities.*

B. *Alternative 5, which adds one new lane in each direction, would be preferable to the options that add two lanes in each direction (Alternatives 8, 9, 10, 13B and 13C) in order to minimize the encroachment of roadway construction on our properties and keep the SHA and Montgomery County commitment to limit the Beltway expansion to the current SHA ROW in Carderock Springs. If more traffic needs to be accommodated, we would recommend that reversible lanes be reconsidered for the I-495 component. This solution would have a similar spatial impact to Alternative 5* Volume 1, Section 2.3.1: Area of Potential Effects

The APE is defined as the geographic area within which an undertaking may directly or indirectly cause alteration in the character or use of historic properties. For this proposed project, since the precise limits of disturbance (LOD) are currently still unknown, a corridor study boundary (CSB) has been defined as a line extending 300 feet from the centerline on either side of I-495 and I-270 within the study limits, expanding farther at certain interchanges. To capture anticipated visual, atmospheric, or audible effects, the APE generally encompassed an additional 250 feet on either side of the CSB. MHT accepted this APE without additional comments on May 17, 2018. The APE was updated in areas surrounding the American Legion Bridge, the C&O Canal, and the GW Parkway; however, these changes do not appear to pertain to the areas of the Carderock Springs Historic District, Gibson Grove Church or Moses Hall and Cemetery.

*Comments:*

- *The APE and CSB clearly include a section of the Carderock Springs Historic District running closest to the Beltway along Hamilton Springs Drive and Stone Trail Drive. It appears that the APE also extends to border of Carderock Springs South.*

**CARDEROCK SPRINGS**
National Register of Historic Places

- *The Gibson Grove Church, Moses Hall and the Moses Lodge Cemetery are also clearly located within the APE and the CSB. The remains of Moses Hall are directly adjacent to the existing I-495 and it seems likely that portions of the cemetery / interments are also located within the LOD. This needs to be investigated further.*

C.   Volume 1, Section 3: Effects Assessment and Section 3.1.2: Properties Where Effects Cannot be Fully Determined

Per the Draft Cultural Resources Technical Report, Carderock Springs Historic District is eligible for the NRHP under Criteria A and C and is currently listed, and Carderock Springs South is eligible under Criterion C. Gibson Grove A.M.E. Zion Church is eligible for the NRHP under Criterion A.

The following are definitions of Criteria A and C:

Criterion A - historic properties that are associated with events that have made a significant contribution to the broad patterns of our history.

Criterion C - historic properties that embody distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction.

Moses Hall and Cemetery are not currently listed on the NRHP.

*Comments:*

- *Gibson Grove Church is noted to meet only NRHP Criterion A. It seems that it should meet both NRHP Criteria A and C.*

- *While Moses Hall and Cemetery are not currently listed, we believe that they should be eligible for the NRHP. Clearing of vegetation from the site is underway to allow a more detailed archaeological and architectural survey and evaluation of the site, with likely application for listing on the NRHP.*

The Carderock Springs Historic District and the Gibson Grove Church have both been identified as "historic properties where effects cannot be fully determined," not as "properties experiencing adverse effect." Carderock Springs South is identified as "experiencing no adverse effect". Adverse effects on historic properties are found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify it for inclusion in the NRHP in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association. Specific examples of adverse effects include:

- Physical destruction of or damage to all or part of the property;

- Change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance;

- Introduction of visual, atmospheric, or audible elements that diminish the integrity of the property's significant historic features.

00006188



**CARDEROCK SPRINGS**
National Register of Historic Places

Per the Draft Cultural Resources Technical Report:

"Carderock Springs Historic District is eligible for the NRHP under Criteria A and C. The LOD avoids immediate physical impacts to contributing properties but may result in loss of tree and landscape buffer that could create a diminishment of the design and setting of contributing elements of the district. MDOT SHA proposed to include measures to avoid adverse effects in the PA, and if avoidance is not possible, a process to identify minimization and/or mitigation measures will be followed."

"Carderock Springs South is eligible for NRHP under Criterion C." We note that while outside the LOD, a portion of Carderock Springs South is within the APE, and like Carderock Springs Historic District is impacted by noise and air pollution from the Beltway currently.

"Gibson Grove A.M.E. Zion Church is eligible for the NRHP under Criterion A. The LOD at this location represent above-grade impacts, and no physical impacts to the historic property are anticipated. The south side of the parcel is within the LOD, but the church itself occupies the north side of the parcel, across a small gully. The nearby segment of I-495 forms an overpass crossing Seven Locks Road southeast of the church. The LOD at the overpass extends along Seven Locks Road in front of the church; dependent on design and construction needs, there may be diminishment of setting and feeling for the duration of construction. MDOT SHA proposed to include measured to avoid adverse effects in the PA, and if avoidance is not possible, a process to identify minimization and/or mitigation measured will be followed."

*Comments:*

- *It is not clear why Carderock Springs Historic District and Gibson Grove Church were deemed to be properties where effects cannot be fully determined. Similarly, we believe that there would be adverse impact on Carderock Springs South. We feel strongly that the effects can and should be evaluated and fully determined, as the specific examples of potential adverse effects listed above apply to these properties. These are discussed in more detail in the additional comments below.*

- *<u>Carderock Springs Historic District and Carderock Springs South:</u>*

*One of the important factors in Carderock Springs being named on the National Register of Historic Places was the environmental sensitivity of the builder in siting the homes. For example, the NRHP submission for Carderock Springs included the following statements:*

- *"The [subdivision] is respectful of its natural surroundings".*
- *"Tree preservation was a major concern for Bennett and his architects. In addition to moral and emotional benefits, there were also practical advantages to wooded home sites. Not only did they protect privacy, but they also attenuated the noise of vehicular traffic."*
- *"Mr. Bennett belonged to a small but significant category of mid-century builders who, for reasons that were not only ethical and aesthetic but also practical (they sought to provide privacy and shade, for instance), took the conscious decision to interfere minimally with natural site conditions."*
- *"Edmund Bennett believed that 'the difference between an average subdivision and an outstanding one is the way the land is planned.' Environmental friendliness is common to all KLC-designed and Bennett-built houses and subdivisions. The sales brochure for the third section of Carderock Springs claimed 'We agree with Frank Lloyd Wright that the house should be "of the site and not on it".'*



**CARDEROCK SPRINGS**
National Register of Historic Places

*The report of the Maryland Historic Trust on Carderock Springs South attached as an Exhibit to the Report states "Typical of Bennett's subdivisions during the period, Carderock Springs South reflects leading design concepts in its use of cluster development, landscape preservation techniques, buried power lines, community facilities and architectural covenants to create a picturesque and environmentally sensitive neighborhood that stood apart from the work of his contemporaries."*

*It seems clear that any Alternate other than the "No Build" Alternate will diminish the natural surroundings through removal of mature trees and landscape buffer. If mature trees, which cannot be easily or cheaply replaced, are cut down, this would significantly degrade the overall vision which resulted in Carderock Spring's inclusion on the NRHP. In addition, many mature trees cannot stand root cutting beyond their drip lines nor temporary or permanent soil piling around trunks or heavy equipment loads, so it is likely that an additional band of trees would be adversely affected beyond the immediate LOD. This degradation does not only affect the owners of these homes, but also the entire feel of the neighborhood's streets.*

- *The noise level from the Beltway currently exceeds the MD SHA's Noise Abatement Approach Criteria of 66 dBA for exterior residential noise levels. This is based on a study conducted by SHA in April of 2001 to monitor noise levels at 1988 impacted residences in Carderock Springs, with residences along the Beltway having maximum measured noise levels of 68 to 80 dBA. Sounds louder than 80 DBA are understood to harm the human ear. The noise levels will only increase with more lanes, with the affected number of residences also increasing due to closer proximity to the Beltway. SHA should perform a noise study to determine what the effects of the proposed Beltway expansion would have on surrounding properties, including Carderock Springs, Carderock Springs South, Gibson Grove Church, and the Moses Hall and Cemetery property. The construction of a noise barrier will need to be considered to mitigate increases in noise levels and air pollution, as well as any adverse visual impact on the historic character of the neighborhood. Those considerations should be shared with the Consulting Parties so they may provide comments on those considerations.*

D. Volume 1, Section 3.1.5: Indirect and Cumulative Effects

It is noted that "adverse effects 'may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance of be cumulative'" and that "past actions that have impacted historic properties include the numerous infrastructure and land development activities that have occurred in the APE." The report asserts that "the study is responding to other large-scale pressures resulting in increased population and development that result in depleted capacity and congestion on I-495 and I-270; it is not the case of generalized degradation of historic properties in the APE due to development. As a result, there are no indirect or cumulative adverse effects to historic properties specifically caused by the undertaking."

*Comments:*

- *Two specific issues related to the cumulative effects of the previous Beltway widening project and the proposed future undertaking have been identified and are of great concern to the affected communities:*

  • *As noted above, the first Beltway expansion (ca. 1988) diminished the distance from the Beltway to property lines. Most alternatives for this expansion propose to take property away from homeowners, bringing the community's homes essentially up to the very edge of the*



**CARDEROCK SPRINGS**
National Register of Historic Places

Beltway. What had been a bucolic setting worthy of listing on the National Register of Historic Places will become a louder and more polluted community if sound barrier walls are not built; or, if sound barrier walls are built, a neighborhood defined by walls rather than trees. In either scenario, for a community whose primary historic value is its modern architecture embedded in nature, the nearer encroachment of the Beltway is a grim prospect.

- A significant concern shared by both the Gibson Grove Church and Moses Hall Lodge/Cemetery property stakeholders relate to ongoing erosion. Dr. Alexandra Jones, in her 2010 UC Berkeley doctoral thesis titled "Gibson Grove A.M.E. Zion Church Gone But Not Forgotten: The Archaeology of an African American Church," stated: "The south side of the church has a slope of about 70% making it impossible to survey. The state had built Interstate 495 on the property adjacent to the church, under the claim of eminent domain. During the construction of the interstate the land to the south of the church was graded to create a drain ditch. The hill was graded so steep that over time the south side of the church property had eroded leaving very little area to walk." The state's insufficient approach to stormwater drainage during the Beltway construction continues to threaten adjacent properties and make restoration efforts for Gibson Grove Church and Moses Hall nearly impossible. We appreciate MDOT SHA's intention to determine appropriate measures to reverse damage to these properties from erosion and stormwater runoff and prevent any worsening of these conditions.

E.    Volume 1, Section 4: Next Steps

<u>Additional Archaeological Investigations</u>.

Moses Hall and Moses Lodge Cemetery were both identified during the Gap Analysis as archaeological resources within the LOD recommended for additional testing and evaluation to determine eligibility for the NHRP. "MDOT SHA would include commitments in the PA for phased evaluation of these sites, and provisions for avoidance, minimization, or mitigation of adverse effects should any of the resources be NRHP-eligible." In the case of cemeteries in this category, "should these cemeteries be located, found to have integrity, and also meet the criteria for the NRHP, MDOT SHA would make eligibility determinations after such investigations. Whether determines to be historic properties or not, MDOT SHA would first endeavor to avoid disturbance of human remains and remove and relocate any remains as a less preferred option."

*Comments:*

- *There is conflicting information in different sections of the report regarding the cemetery. In Volume 2 of the report, the Gap Analysis, Section 7.5.3 identifies Gibson Grove AME Church Cemetery as a location with potential for human burials and notes that there are seven known burials within the cemetery dating from around 1921 to 1975. In Volume 4, the Phase I Archaeological Investigation, there is additional reference to Dr. Alexandra Jones' dissertation (referenced above) and her finding approximately 50 graves that could not be identified (see pp. 183 and 205). The background information on the cemetery should be consistent within all sections of the report.*

- *As a first step, before potential adverse effects can be evaluated, it is imperative that a more detailed (non-invasive) survey and mapping exercise of any surface evidence of Moses Hall and graves such as field stones or depressions be performed, as has been indicated is the intent by SHA. This should include mapping of discernable surface features within the proposed limits of disturbance and the right-of-way-line, using effective approaches such as*



**CARDEROCK SPRINGS**
National Register of Historic Places

ground penetrating radar, photogrammetry, and any other available and appropriate tools. Efforts are underway to clear the site of vegetation to allow evaluation and survey of the site. Every effort should be made to identify remains at the property.

- Notwithstanding the many gravesites at the property that will fall within the LOD, the Moses Hall Lodge site looks to be entirely within the LOD on the map provided by SHA. For this reason, we feel compelled to work towards ensuring that the site is identified as "eligible" under Section 106. While the financial resources haven't been there to restore and protect this property over the last 50+ years since the building was destroyed by fire, the cultural and historical significance of Moses Hall Lodge is of great importance to the Cabin John community and descendants of Morningstar Tabernacle #88 members. Sites like Moses Hall offer descendants a sense of pride, belonging, and cultural heritage in our community - a place to point to when sharing family history with the next generation.

Programmatic Agreement.

Per the report, "Due to the complexity of the undertaking, the current state of design, and its uncertain effects to historic properties, MDOT SHA expects Section 106 review to be completed through the execution of a PA [Programmatic Agreement], documenting the assessment and resolution of effects to known historic properties and providing protocols for additional consultation, evaluations, and resolution of effects following advancement of design. Additionally, it is known the Study will have mitigation development needs for stream, wetland, and other environmental impacts. A preliminary list of sites under consideration has been identified in the Draft EIS, Appendix K. MDOT SHA will include procedures to evaluate and assess effects to cultural resources for these sites and other expansions or revisions to the APE in the PA. MDOT SHA has communicated the intent to complete Section 106 review via a PA to consulting parties since the inception of the PA. MDOT SHA shared a conceptual outline of the PA with consulting parties on June 17, 2019 (Appendix C of Volume 1). FHWA has notified ACHP of the proposed PA and ACHP has elected to participate in consultation, which will continue. MDOT SHA will oversee implementation of the stipulations of the PA as the program continues into design and construction."

Comments:

- We are very concerned about the PA being executed before a final design is known. Deferral of the real considerations of the impact on our communities has the potential to result in the design process becoming so far advanced that it will be impossible to avoid adverse impacts on our communities as promoted by Section 106.

Appendix C of Volume 1, the Conceptual Outline of the PA, indicates that:

- The PA "will describe process for effects of assessments to identified historic properties currently with 'unknown' effects upon further design, or should design within the APE evolve to change effect determinations."

- The PA "will describe the consultation process on substantial APE revisions where historic properties may be additionally or differently affected."

- "In addition to the above, there may be ongoing consultation required for properties where effects cannot yet be fully determined, design of certain elements in proximity to historic properties (such as elevated structures), where consultation may be requested to achieve context-sensitive design and minimize effects."


**CARDEROCK SPRINGS**
National Register of Historic Places

*Comments:*

- *As part of the PA, we request the following:*

    • *Section 106 promotes avoidance, which would require no encroachment on Carderock Springs Historic District, Carderock Springs South, Gibson Grove Church or Moses Hall and Cemetery, or adverse impacts on their environmental qualities. Given that the maps of certain alternatives published by SHA show the LOD to encroach on the yards of several properties in Carderock Springs, as well as onto the Gibson Grove Church and Moses Hall and Cemetery properties, and the destruction of the natural barrier of trees and plantings that now exists between the neighborhoods and the Beltway, however, this does not appear to be possible with many of the alternatives being considered. What steps will SHA take to avoid or mitigate adverse impacts? These need to be communicated to all parties concerned.*

    • *that periodic meetings be held to inform our communities of the status of the proposed project and any changes to the current design and to allow the community to voice concerns and ask questions; and*

    • *that we be a part of the design review process and given the opportunity to provide formal comments in response to the proposed design once it is developed.*

*Thank you for consideration of these comments.*

John Orrick
President, Carderock Springs Citizens Association

00006193

MLS Section 106 Technical Report Comments

**Comments submitted by (Name):** Jeanette Mar          **On behalf of (FHWA):** Federal Highway Administration

| Comment No. | Volume Page and Section | Priority* | Comment |
|---|---|---|---|
| 1 | Volume 1 Page 28 Section F | 1 | Determine/update whether contributing features of Suitland Parkway are transferred out of federal control to see if there is an adverse effect. |
| 2 | Volume 2 Page 6 Section 2.2 | 2 | Is the Shaffer and Cole 1994, the latest standards? |
| 3 | Volume 2 Page 41 Section 5.1 | 1 | Determine /update whether cemeteries are impacted. |
| 4 | Volume 2 Page 48 Section | 3 | 3rd paragraph "Built between 1987 and 1900", maybe 1897? |
| 5 | Volume 2 Page 93 Section 7.3 | 2 | Confusing terms "unevaluated and unsurveyed". Are they meant to be used interchangeably? |

*Priority: (**1**) Substantive comment regarding analysis or findings (**2**) supplementary information or technical comment not significantly affecting analysis (**3**) minor technical corrections (formatting, spelling, clarity, etc.).



# MONTGOMERY COUNTY PLANNING DEPARTMENT
THE MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION

March 16, 2020

Steve Archer
Cultural Resources Team Leader
Environmental Planning
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD  21202

**RE:  I-495/I- 270 Managed Lanes Study: Section 106 Comments, Vols.1-6**

Dear Mr. Archer:

Thank you for providing the opportunity to review and comment on the complete Section 106 Technical Reports and materials as part of the I-495/I-270 Managed Lanes Study. These comments reflect the comprehensive comments from the Cultural Resources Sections of the M-NCPPC Park and Planning Departments. Our comments are focused on Volumes 1-6, in particular the archaeological reports and National Register determinations.

We commend State Highways and the project consultants for compiling this information, and for allowing the consulting and cooperating parties ample time to review these reports. We have learned a great deal of new information through the survey work completed to date. We are offering the following comments on this phase of the project only; previous memos and letters submitted to SHA already contain our comments on the Gap Analysis and other technical documents. These comments are solely limited to the Section 106 review and do not yet contain our full comments on the NEPA/4F reviews or on the draft Programmatic Agreement. These comments, as well as comments that will be forthcoming regarding NEPA and 4F will be considered by the full Commission of the MNCPPC as they complete the agency's analysis at a later date this Spring.

In general, we concur with the recommendations where archaeological testing was completed but have concerns regarding areas where no archaeological testing was completed yet further work is not recommended. Specific instances are detailed in the table of comments that follows. We are also concerned about postponing basic identification and boundary delineation at the Poor Farm and Moses Hall Cemetery sites until after a Programmatic Agreement (PA) is executed. Delaying identification of the boundaries and evaluation of the NRHP eligibility of these sites prevents consideration of impacts to them during alternative selection under NEPA and undermines consideration of potential mitigation measures for any adverse effects during development of the PA.

MNCPPC Planning and Parks requests that the National Register determinations for the Moses Hall Cemetery and Poor Farm be completed as soon as possible and prior to continuing with finalizing the Draft Programmatic Agreement. We maintain that complete identification of known resources is an essential first step of the Section 106 review, and these determinations will help all parties complete detailed and complete stipulations in the Programmatic Agreement. Leaving this determination for subsequent phases is not necessary in our estimation. The cemetery's association with the NR-eligible Gibson Grove AME Zion Church would bolster its potential eligibility, though we believe based on documentation that the site merits further consideration in its own right. We offer to work closely with

00006195

SHA to provide additional information from our office and from the community to assist with these determinations so that they can be completed as soon as possible while we work on completing the draft agreement documents.

Thank you again for the opportunity to comment. If you have any questions or need to discuss this matter, please feel free to contact us at 301-563-3404; Rebeccah.Ballo@montgomeryplanning.org, or 301-563-3414; Joey.Lampl@montgomeryparks.org.

Please see additional technical comments in the tables on subsequent pages.

Sincerely,

Rebeccah Ballo
Historic Preservation Supervisor, Montgomery County Planning

Joey Lampl

Cultural Resources Manager, Montgomery County Parks

cc:    Jeannette Mar, FHWA
       Jason Shellenhammmer, RKK
       Tim Tamborino, Maryland Historical Trust
       Beth Cole, Maryland Historical Trust

00006196

| Volume 1 | | |
|---|---|---|
| **Page** | **Line** | **Comment** |
| 18 | Table 3-1 | Table seems premature given the number of areas/sites that require additional investigation and evaluation. |
| 27 | D. Gibson Grove A.M.E. Zion Church | What about the potential for noise effects? |
| 30 | Table 3-3 | Have noise impacts to the Forest Glen historic district been evaluated? |
| 35 | 4 Next Steps | Site 18MO189 is within the LOD, and identified as unevaluated in the Gap Analysis, but it is nowhere discussed in the Section 106 reports. |
| 35 | Para 2 Line 3 "possible location of Moses Hall" | Why possible? We know where it was and portions of the building foundation are visible on the surface. |
| 36 | Paragraph 1 | The location of the Moses Hall Cemetery is known, but the boundaries are not. |
| 36 | Table 4-2 | Most of these sites have had very little examination, and their boundaries are unknown. There is no evidence to support the assertion that these are outside the LOD. |
| 36 | Table 4-2: 18MO64 | Site form does not indicate any subsurface testing near this site. Notes read "Area unknown, due to light woods cover." There is no basis for concluding the site is outside LOD. |
| 36 | Table 4-2: 18MO66 | Site form notes read: "Tall grass prohibited survey." There is no basis for concluding the site is outside LOD. |
| 37 | Table 4-2: 18MO602 | Site form indicates no systematic survey or subsurface testing. There is no basis for concluding that the site is outside the LOD. |
| **Vol.3** | | |
| Appendix A | Map 7, page 8 | Please provide a reason why Sligo Creek Parkway is not listed as eligible for the NR. |
| | | |
| | | |
| **Vol 4** | | |
| **Page** | **Line** | **Comment** |
| ii | Paragraph 1: Area S-10, 11 | Text for S-10 on page i says deep testing may be needed and page 41 says that additional survey will be done. Survey appears to be warranted in untested portions of S-10. S-11 includes a Montgomery County Master Plan Historic Site (Wilde Acres 30/15). |
| ii | 4th paragraph: Ball Family Cemetery | Discussion in pages 199-205 suggests that the "alternate" location is more likely, outside the LOD but within the APE. |
| 15 | Table 3 | Why limited survey for S-11? This includes a Montgomery County Master Plan Historic Site. |
| 25 | 4.4 S-7 1st Paragraph | List which two archaeological sites were identified in this area. |
| 31 | 2nd paragraph | Need to confirm that the LOD has not changed since the report was written last year and this site 18MO752 will not be impacted. |
| 37 | Paragraph 2 line 1 | Delete redundant word "area" |
| 68 | Last paragraph | Including graphics with the referenced historic maps would be very helpful. |

| 70 | Last paragraph | Concurr that Site 18MO22 does not warrant additional work. |
|----|---------------|-----------------------------------------------------------|
| 132 | Section 4.26 Area S-32 | Why was the western portion of S-32 not tested? It appears to have a relatively low slope like the portion on M-NPPC land that was tested. Also, the portion of the study area within the "In the Woods" NRHP eligible and Montgomery County Master Plan Historic Site was not tested. Assessment of this part of the survey area was limited to the visual observation of paved areas. There is no evidence of any sort of cut-and-fill analysis or other historical analysis showing the area does not warrant testing. The conclusion that no further testing is needed in S-32 is not supported. |
| 141 | 1st paragraph | Need to confirm that the LOD has not changed since the report was written last year and this site 18MO756 will not be impacted. |
| 144 | 2nd paragraph | Table 11 reference error in text |
| 175 | Sites 18MO754-755 | Table says deep testing is recommended; elsewhere in the report the text says no further work is recommended. Please clarify. |
| 178 | Table 14 S-23 | No survey in Area S-23 is justified on the basis of similarity with S-36, an area over 7 miles away. This seems like a dubious comparison, and poor rationale for not completing survey in this area. |
|  | Table 14 S-24 | This appears to be a highway ROW. Why was permission for access not obtained? |
| 181 | S-11 | Most of the area in this study area has slopes of less than 15%, much of it less than 10% and should have been surveyed. This area also covers part of the 1928 Wild Acres Grosvenor Estate property. It is NRHP eligible, and not mentioned in the discussion. |
| 187 | Moses Hall | The level of effort expended on this site is not adequate to support management decisions. We realize that site ownership questions may complicate access for intensive survey, but why was background research so limited at this location? Those results will be needed to appropriately design intensive field survey. The report says that pedestrian survey was completed, but the site is entirely overgrown, and no effort was made to clear it. Why was no site number generated? Why are there no detailed maps, photographs, or graphics related to this site? |
| 196 | 5.2.4 | Leaving boundary delineation and NRHP evaluation investigations at the Moses Hall Site and Cemetery to a later date precludes potential impacts to this site from being considered during current project design and NEPA consultations, or discussions about the potential scope of mitigation efforts under Section 106.<br><br>At a minimum, a map that shows the location of significant site features to the proposed LOD is needed. Significant features would include any graves as well as the foundation and other features or artifact concentrations associated with Moses Hall. We recommend that grave locations be identified with a combination of close-interval (20cm or less) Ground Penetrating Radar and Magnetometer or Gradiometer survey along with limited shallow archaeological excavation to confirm grave shafts. Documentation should include time-slice plan and profile views of the GPR data to allow readers the ability to evaluate the results. Effective completion of such survey will likely require clearing the site of bamboo and other heavy growth obscuring the ground surface. |

00006198

| | | Montgomery County Guidelines for delineating cemetery boundaries are available as Appendix A at: https://montgomeryplanning.org/wp-content/uploads/2019/06/PB-Guidelines-for-Burial-Sites_final.pdf |
|---|---|---|
| 198 | Poor Farm Cemetery Site | Why are there no historical maps to bolster discussion of this site? Delaying identification of the location and boundaries of this site until after implementation of a Programmatic Agreement prevents consideration of the impacts to the site during alternative selection under NEPA and undermines discussion of potential mitigation measures for any adverse effects under Section 106. |
| 203 | 3rd Paragraph. | Updated information is available from M-NCPPC files to help resolve the location of the Ball Family Cemetery. |
| 203 | 4th Paragraph | The best available evidence is that the Ball Family Cemetery is not under I-270, but is inside the APE, but outside the LOD. |
| 205 | Moses Hall Cemetery | Why was no map analysis done of this location as was done with the Ball Family Cemetery? Why is there such a difference between the level of effort expended for archival research for the Ball Cemetery vs the Poor Farm and Moses Hall Cemeteries? These records are available and can be provided to SHA. |
| 206 | Paragraph 1 | The discrepancy between the results described in paragraph 1 and paragraph 2 on this page need to be explained. Does the first paragraph refer to pedestrian survey? What was the methodology? When was this done? Had vegetation died back? How many personnel on site? Were transects walked? How many? Any vegetation clearing? Maps drawn? The site is heavily overgrown obscuring known cemetery features making the observations about the number of markers unreliable. What is the statement "seven known burials" based on? The following paragraph citing Alexandra Jones' 2010 dissertation mentions 50 burials. |
| 206 | Paragraph 2 | Members of Gibson Grove and the local community, including descendants of the Moses Hall membership, have been conducting extensive historical research on this site. This knowledge should be incorporated into the report. |
| 206 | Paragraph 3 "Visible evidence of the cemetery ceases approximately 50 ft south of the MDOT SHA ROW. It is unlikely but still possible that additional burials extend farther north into the existing ROW, because a former | This statement is not supported by the methodology used on this heavily overgrown site. The level of effort and documentation provided in this report is insufficient to allow the reader to reach an informed opinion on the relationship of the LOD to graves on site. The part of the site closest to the ROW is covered by impenetrable bamboo. Why was the site not cleared? Why were none of the usual geophysical techniques for identifying graves used in this study? |

8787 Georgia Avenue, Silver Spring, Maryland 20910 | Historic Preservation | Tel: 301.563.3400 | Fax: 301.563.3412
www.MontgomeryPlanning.org

| | | |
|---|---|---|
| | structure, Moses Hall, once occupied the north boundary of the cemetery parcel." | |
| 206 | Last Paragraph "archaeological investigations are recommended if the Moses Lodge Cemetery remains within the LOD." | Delaying identification of the location and boundaries of this site until after implementation of a Programmatic Agreement prevents consideration of the impacts to the site during alternative selection under NEPA and undermines discussion of potential mitigation measures for any adverse effects under Section 106.<br><br>Archaeological investigations, including geophysical survey, should be completed as soon as practical so that discussions regarding alternative selection, design, and potential mitigation will include evaluation of the Moses Hall Site and cemetery extent. |
| App. F | MNCPPC site forms | Montgomery Parks address for these forms should be MNCPPC Montgomery Parks Archaeology Office, 6700 Needwood Road, Derwood, MD 20855. Main phone – 301-563-7530 |
| **Vol 5** | | |
| **Page** | **Line** | **Comment** |
| 71 | Summary | Concur with the eligibility recommendation for Site 18MO749. Some of the diagnostic prehistoric ceramics appear to be rare or uncommon in this part of Maryland. It would be useful to address that and how this compares to other sites along that stretch of the Potomac. That would help frame any potential mitigation/data recovery efforts that may be necessary here. |
| 114 | Summary | Concur that Site 18MO751 is eligible for the NRHP. |
| 122 | | Concur that Site 18MO22 is not eligible for the NRHP |
| 136 | | Concur that Site 18MO750 is not eligible for the NRHP |
| 142 | supplemental survey area east of I-495 and south of the Clara Barton Parkway | Concur with recommendations. |
| 146 | Paragraph 3 | "There is no indication that site 18MO749 may warrant preservation in place" is contradicted by "Avoidance and/or minimization measures should also be considered." We note that the Secretary of the Interior's Standards for Treatment state: "Archeological resources will be protected and preserved in place. If such resources must be disturbed, mitigation measures will be undertaken." |

00006200

**MONTGOMERY PRESERVATION**

Post Office Box 4661
Rockville, MD 20849-4661

Web: www.montgomerypreservation.org
Email: mpi@montgomerypreservation.org

To Promote the Preservation, Protection and Enjoyment of Montgomery County's Rich Architectural Heritage and Historic Landscapes

March 16, 2020

Mr. Steve Archer, Cultural Resources Team Leader
Environmental Planning, MDOT SHA
707 North Calvert Street
Baltimore, MD 21202

Re: I-495/I-270 Managed Lanes Study

Dear Mr. Archer,

Thank you for the opportunity to review materials that constitute the Capital Beltway/I-270 Managed Lanes Study thus far. As a consulting party, Montgomery Preservation (MPI) wishes to comment on four identified historic sites in Montgomery County, three cemeteries and one church.

In general, MPI is concerned about the lack of specific information about these historic properties and their treatment and recommends that all such treatments be included in the agreement document that is prepared for this project. As demonstrated in our comments below, MPI advises against SHA prematurely scheduling a Programmatic Agreement before more information is assembled and more decisions are made regarding final project design.

**MONTGOMERY COUNTY POOR FARM AND CEMETERY SITE:**
This site is ID#196 of the Montgomery County Cemetery Inventory-Revisited project. Now is the time to add new information (available from Montgomery Planning) and to properly define boundaries of the site on both sides of the interstate. This information is needed prior to discussing and executing the Programmatic Agreement and should assist with development of appropriate mitigation measures for any adverse effects under Section 106. In terms of treatment, archaeological investigation must be built into the SHA program. On a property that for two centuries was used for burials, it seems impossible that all human remains were removed in the hurried, scanty excavations that were conducted in the 1980s and 1990s.

**BALL FAMILY CEMETERY SITE:**
Location of Ball Family Cemetery is not in question. It was researched and described as ID#279 of the Montgomery County Cemetery Inventory-Revisited project in 2018. It seems that this site is outside of the LOD but inside the APE. Please include this complete research as part of the project.

**GIBSON GROVE AME ZION CHURCH:**
This site (MO 29/39) is designated on the Montgomery County Master Plan for Historic Preservation, and clearly would be negatively affected by any Beltway widening or improvements. Determination of the site's eligibility for the National Register of Historic Places should be expanded to include the Moses Hall Morningstar No. 88 Cemetery with which it was associated for most of its lifetime.

1

00006201

**MOSES HALL CEMETERY, CABIN JOHN:**

Morningstar No. 88 Moses Hall Cemetery was researched and described as ID#196 of the Montgomery County Cemetery Inventory-Revisited project. Reconnaissance of the property will confirm that this is a historic site with a fixed location and rich history. SHA's proposal to move ahead with planning before fully understanding the presence of this site is alarming. The extents of this African American cemetery and its National Register eligibility ought to be determined now, particularly given recent activities in Montgomery County and around our state. Any Beltway widening or improvements would directly, negatively impact this historic site, as well as other properties associated with the Cabin John black community.

Even before recent clean-up sessions at the cemetery, its location was well known and apparent. Now that most bamboo and felled trees have been removed, graves and the hall foundations are even more visible. In recent years, in-depth documentation has been conducted by community scholars, descendants, and a scholar doing research for her dissertation. Maps have been assembled, deeds and incorporation records consulted, and work sessions held to remove modern debris.

Below are preliminary significance and description summaries. We hope this research and identification of site boundaries will assist consideration of impacts to the site, development of a Programmatic Agreement, and discussion of mitigation measures for any adverse effects. MPI recommends that archaeological investigations be undertaken now to assist with evaluation of the site's history, significance and eligibility, and boundaries.

**Summary Statement of Significance:**
**Morningstar Tabernacle No. 88 Moses Hall and Cemetery**
With few options available in public cemeteries and the churchyards of largely white congregations, African Americans often turned to mutual beneficial societies for assistance with burials and funeral costs in the 19th and early 20th centuries.  One organization operating in Maryland -- the Ancient United Order of the Sons and Daughters, Brothers and Sisters of Moses -- was a vital support center for Cabin John's black community in the post-slavery era.

As the first known Order of Moses organization in Montgomery County, the Moses Hall and burial ground of Morningstar No. 88 are representative of this Mid-Atlantic area self-help movement. In the 1880s, free and formerly enslaved blacks purchased land from a local white landowner to begin a new community close to jobs, family, and friends. By the end of the 19th century, four important components of the settlement were operating – church, school, fraternal society hall, and burial ground. Morningstar No. 88 provided a safety net and economic security, increased civic participation, and promoted educational programs. The Moses Hall hosted dinners, funerals, business meetings, dances, and other community events. When needed, it also served as the local school.

Known burials range from 1894 to 1973.  About 51 burials thus far have been verified through engraved markers, death certificates, obituaries, oral histories of descendants, and a 1904-1914 minute book. One individual maintained a two-decades-long relationship with Clara Barton, whose home and Red Cross headquarters is nearby. Incorporating in 1933, Morningstar No. 88 served this community until its Hall was destroyed by arson in the late 1960s, a few years after the Capital Beltway separated its cemetery from nearby Gibson Grove AME Zion Church.

2

**Summary Description:**

**Morningstar Tabernacle No. 88 Moses Hall and Cemetery**

Morningstar No. 88 Moses Cemetery is situated on a steep hillside on the west side of and overlooking Seven Locks Road. There are two adjacent parcels of land, one a narrow entry from Seven Locks Road measuring 8' wide and containing .0488 acres, and the other a larger squared one-acre lot set between the highway and behind houses; together the lots look like a giant ladle. The cemetery holds the graves of the earliest African American settlers of Cabin John, including community founder Sarah Gibson, whose name gave rise to Gibson Grove. Descendants still reside in the community. Rows of graves are generally oriented North-South, and all markers face East. Known burials range from 1894 to 1973, with earlier burials presumed but not confirmed.

Approximately 70 grave markers can be observed today, 10 with inscriptions, 60 fieldstone markers, also numerous funeral home markers. Stones range from carved and inscribed headstones to fieldstones of all sizes and shapes. Many more graves on the site are unmarked, and 16 depressions were found without a fieldstone or headstone. Walking paths are woven in between rows of burials for access to graves and to the Moses Hall building site. Periwinkle is found throughout the site.

While none of the three known Moses Hall buildings (Gibson Grove, Emory Grove, and Mackalls) in Montgomery County are standing today, all were constructed with a standard template. The two-story rectangular frame building stood on a fieldstone foundation, with an entrance at one gable end and windows on the East and West facades. The Morningstar Moses Hall building was completely destroyed by arson in the 1960s; remaining on site are bricks, concrete, and other rubble from the original structure. These materials mark the structure's location, size, orientation, and access.

The present condition of the Morningstar Hall and cemetery is poor, with significant vegetation overgrowth, felled trees, and natural debris. Until recently bamboo, felled trees, and layers of leaves hampered visitation. Recent community work sessions have enabled improved access and on-site observation, and flags currently indicate grave markers of all kinds.

The context of both Morningstar Moses Hall and its cemetery continues to be their relationship to Gibson Grove AME Zion Church and the surrounding post-Emancipation African American community, and to its high position on a hill overlooking a two-lane road that dates to the early 19th century. Numerous homesites along (today's) Seven Locks Road still remain in black family hands.

Construction of the Capitol Beltway in the mid-1960s split the church and Moses Hall/cemetery properties, and some graves may have been moved at that time. A 2' x 3' interpretive sign erected with help from the Montgomery County Historic Preservation Commission at the foot of the cemetery hill in 2007 describes the historic close proximity of Gibson Grove Church, Moses Hall, and Morningstar Moses cemetery.

00006203