Marked and unmarked graves, as well as the Moses Hall site, are within the proposed limits of disturbance (LOD). So is the property of Gibson Grove AME Zion Church. The potential for archaeological investigation on this site is high, as is continued identification of individuals buried here. Potential for further documentation about Moses Hall, the cemetery, Gibson Grove Church, and this historic African American community is considerable. Research in primary source materials is ongoing. Morningstar Moses Cemetery and Hall meet multiple criteria for designation on the Montgomery County Master Plan for Historic Preservation.

In conclusion, MPI believes that additional historical and archaeological information about these four known historic resources must be obtained and included in the Section 106 review at this time, prior to development of the Programmatic Agreement. More thorough documentation will assist the Programmatic Agreement in accuracy and usefulness.

MPI appreciates the opportunity to participate as a consulting party and looks forward to continuing to work with all concerned.

Thank you very much,

Eileen McGuckian, president
Montgomery Preservation, Inc.

Cc:
Tim Tamburrino, Maryland Historical Trust
Rebeccah Ballo, Montgomery Planning
Cabin John Citizens Association
Peerless Rockville

4

Steve Archer
Cultural Resources Team Leader
Environmental Planning
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD   21202

March 16, 2020

**RE:  I-495/I- 270 Managed Lanes Study: Section 106 Comments, Vols.1-6**

Dear Mr. Archer:

Thank you for providing the opportunity to review and comment on the complete Section 106
Technical Reports and materials as part of the I-495/I-270 Managed Lanes Study. We commend
State Highways and the project consultants for compiling this information, and for making it
available to consulting and cooperating parties. Peerless Rockville Historic Preservation's
comments are focused on resources located in and near the City of Rockville, Maryland.

We note the identification of National Register eligible or designated properties in or near the
City of Rockville, and sites listed as within the Corridor Study Boundary and Area of Potential
Effect. The documents mark that most of these sites require great evaluation and we request that
that evaluation be prioritized before execution of the Programmatic Agreement.

We further note the presence of two established Rockville neighborhoods, Woodley Gardens and
New Mark Commons. We remain gravely concerned by any option for I-270 expansion that
widens the footprint of the roadway in Rockville, threatening these long-standing communities,
and we strongly urge you to choose alternate plans.

**MONTGOMERY COUNTY POOR FARM AND CEMETERY SITE:**
This site requires further research and work. Boundaries of the site on both sides of the interstate
must be identified prior to discussing and executing the Programmatic Agreement to assist with
development of appropriate mitigation measures for any adverse effects under Section 106.
Further excavations or non-invasive methods of identifying potential burials should be explored.
Current research suggests it is highly likely that human remains are present.

**ARCHAEOLOGICAL TESTING**

For the majority of the sites where archaeological testing was completed, the evaluations and
recommendations are sound. It is concerning that no mention is made of further testing for the 18
areas that remain untested because access could not be secured.   Peerless Rockville requests
that all sites be given a thorough evaluation before any other actions that will impact the sites are
considered. The complete identification of known resources needs to be completed as other
factors, such as National Historic Register designation status, are contingent on the findings.

Peerless Rockville looks forward to working with SHA and other partners in protecting Rockville and Montgomery County's important historic resources throughout this process. As a community advocate, we stand strong in our desire to protect the rich heritage of our community.

Peerless Rockville Historic Preservation, Ltd. possesses an abundance of materials on Rockville's history, heritage, and historic homes and sites. We encourage all researchers and consultants documenting areas impacted by the I-270 expansion project to visit our office and utilize our archives and collections located in the historic Old Red Brick Courthouse in downtown Rockville.

Sincerely,

Nancy Pickard
Executive Director
Peerless Rockville Historic Preservation

| | |
|---|---|
| **From:** | Steve Archer |
| **To:** | Jason Shellenhamer |
| **Subject:** | Fw: I-495 and I-270 Managed Lanes Study: Section 106 Technical Reports Updates, Comments Requested by March 16 |
| **Date:** | Monday, March 16, 2020 11:11:25 AM |

**From:** Moore, William <william.moore@vdot.virginia.gov>

**Sent:** Monday, March 16, 2020 11:03 AM

**To:** Steve Archer <SArcher@mdot.maryland.gov>; Opperman, Antony <a.opperman@vdot.virginia.gov>; Clarke, Sarah <sarah.clarke@vdot.virginia.gov>; Richard Ervin <RErvin@mdot.maryland.gov>

**Subject:** Fwd: I-495 and I-270 Managed Lanes Study: Section 106 Technical Reports Updates, Comments Requested by March 16

Steve,

I apologize for our delay in responding to your request for comments on Volume 6 of the I-495 & I-270 Managed Lanes Study Cultural Resources Technical Report.

We have finished reviewing the report and offer only the following comments:

In the abstract and subsequent sections of the report where recommendations are discussed consider addressing the individual NRHP eligibility of each site. As currently presented, it is unclear whether or not Sites 44FX0374 and 44FX0379 are being recommended eligible for the NRHP as individual resources or only as contributing resources to the proposed archaeological district.

Please let us now if you have any questions or need any clarification.

Respectfully,

Will Moore
Cultural Resources Statewide Archaeology Team Leader
Virginia Department of Transportation
1401 E. Broad Street
Richmond, VA 23219
804-786-2852

---------- Forwarded message ---------
From: **Stacy Talmadge** <STalmadge@mdot.maryland.gov>
Date: Fri, Jan 10, 2020 at 10:21 AM
Subject: I-495 and I-270 Managed Lanes Study: Section 106 Technical Reports Updates, Comments Requested by March 16
To: william.moore@vdot.virginia.gov <william.moore@vdot.virginia.gov>
Cc: Steve Archer <SArcher@mdot.maryland.gov>, Caryn Brookman <CBrookman@mdot.maryland.gov>, Jason Shellenhamer <jshellenhamer@rkk.com>

00006207

Section 106 Consulting Parties,

Per the email you should have received from Steve Archer on Thursday, January 9th, please see the details below for your use in downloading the I-495 & I-270 Managed Lanes Study Cultural Resources Technical Report for review and comment. As Steve mentioned, comments are requested by March 16, 2020.

https://sftp1.mdot.state.md.us/~
Username: WMoore
Password: threeuser1
[Please note, the FTP site works best using google chrome.]

As a reminder, your individual login/password information should <u>not</u> be shared or forwarded, nor should unredacted reports be distributed further. The download link will be available for **two weeks only** (files will be removed after <u>**January 24, 2020**</u>), to limit access. Even if you do not have time to review now, please download the files you wish to look at as soon as possible.

If you have any issues accessing or downloading the files, please feel free to contact me. Any other questions regarding the documents or content should be directed to Steve Archer.

Thank you,
Stacy.


**I-495 & I-270 P3 Office**
**601 North Calvert Street**
**Baltimore, MD 21202**

**<u>Mailing Address</u>**
**707 North Calvert Street P-601**
**Baltimore, MD 21202**

**Stacy Talmadge**
**Environmental Program Support**
**I-495 & I-270 P3 Office**

**Email: stalmadge@mdot.maryland.gov**
**Office: 410.637.3349**
**www.roads.maryland.gov**
**www.495-270-P3.com**


Governor Hogan is committed to outstanding customer service. Tell us how we are doing.
Click here.

 Maryland now features 511 traveler information!
Call 511 or visit: www.md511.org

 Please consider the environment before printing this email

LEGAL DISCLAIMER - The information contained in this communication (including any attachments) may be confidential and legally privileged. This email may not serve as a contractual agreement unless explicit written agreement for this purpose has been made. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication or any of its contents is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender indicating that it was received in error and delete the original message and any copy of it from your computer system.

# CABIN JOHN CITIZENS ASSOCIATION
## P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*

March 16, 2020

*By Email to:*
Mr. Steve Archer
Cultural Resources Team Leader
MDOT State Highways Administration
707 North Calvert Street Baltimore, MD 21202

Re: Comments from The Cabin John Citizens Association, Consulting Party
Regarding the I-495/I-270 Managed Lanes Study Draft Cultural Resources Technical Report

Dear Mr. Archer:

As you know, the Cabin John Citizens Association only recently became aware of your efforts and was granted consulting party status just a few weeks ago. Consequently, we have not had much time to review this report, nor have we been able to see the numerous redacted photos and figures pertaining to the various sites of historical significance within the geographic boundary of the community of Cabin John.

It is the CJCA's understanding that the Moses Hall/Morningstar cemetery and lodge property would be included in a "gap analysis" that outlined cultural resources evaluation needs for the Managed Lanes Study. As the first known Moses organization and burial ground in Montgomery County, this site is clearly of historical significance and of significance to current Cabin John families, who are descendants of Moses Hall and have family buried in its cemetery.

The original beltway project displaced many members of the African American community in Cabin John. The community's remaining cultural resources are being threatened once again by the beltway expansion. This alarms many of us concerned about social and racial justice. You have given assurances that the intent of MDOT SHA would be "first and foremost to avoid, but also to work with the community on respectful approaches to treatment if there are (or may possibly be) interments within the right-of-way, and we have definitely have some time on our side to work through the issue, including additional evaluation of archaeology related to Moses Hall outside the cemetery."

The assurances are encouraging, but they do not erase concerns raised by the Technical Report itself. Many gravesites at the property that appear to fall within the Limits of Disturbance (LOD), the foundation of the former Moses Hall lodge building appears to us to be entirely within the LOD according to map exhibits to the Technical Report. MDOT SHA's consultants' apparently brief visit was performed without clearing the site first; therefore, the Report's observations about the relationship of graves or the Moses Hall foundation to the LOD are not reliable. On page 208 in Volumne 4, the report describes the Moses Hall cemetery this way:

'Presently the cemetery is very overgrown and not tended. Two plots are fenced with low white garden fencing. There are seven known burials within the cemetery dating from around 1921 to 1975. There are three concrete square markers with no writing and only two markers with visible writing."

# CABIN JOHN CITIZENS ASSOCIATION
## P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*

As you know from your recent visit to the site to assist with its cleanup, there are more than 100 grave markers, depressions and other indicators of graves at the property.

Even without spending time at the site, one just has to read the 2010 UC Berkeley doctoral thesis of Alexandra Jones, title "Gibson Grove A.M.E. Zion Church Gone, But Not Forgotten: The Archaeology of an African American Church" which your technical report references, to know that she identified at least 50 gravesites.

It seems imperative that before potential adverse effects can be evaluated, more detailed survey and mapping of the property needs to be undertaken. This should include mapping of discernable surface features within the proposed limits of disturbance and the right-of-way-line, using effective approaches such as ground penetrating radar, photogrammetry, and any other available and appropriate tools. Every effort should be made to identify remains at the property. These detailed investigations at the site should not wait until after the Programmatic Agreement is executed. The number and location of graves and other significant features needs to be identified in relationship to the LOD as soon as is practical. This knowledge needs to inform project design decisions and development of the PA rather than being addressed after the fact.

MDOT SHA has ignored long-standing Cabin John community concerns about the damaging effects of stormwater runoff, erosion, and traffic noise that have impacted the Moses Hall and the Gibson Grove Church properties as well as the Cabin John creek parklands and the neighborhood in general. It is understandable that neglect of these cultural, historical and natural resources has left us feeling skeptical that these sites can be protected without NRHP identification before the PA is drafted.

The noise level from the Beltway currently exceeds the MD SHA's Noise Abatement Approach Criteria of 66 dBA for exterior residential noise levels in the Cabin John and Carderock Springs area, including the Gibson Grove and Moses Hall properties. The construction of a noise barrier will need to be considered to mitigate increases in noise levels, as well as any adverse visual impact on the historic character of these areas. Those considerations should be shared with the Consulting Parties so they may provide comments on those considerations.

As you know the C&O Canal also borders Cabin John and while I did not have a chance to understand what the draft technical report says in conjunction with those sites, I would urge the SHA  to ensure that the two sites identified for NRHP, 18MO749 (C&O Canal Site 1) and 18MO751 (C&O Canal Site 3), be adequately protected and that careful consideration be given to 18MO22 (The Potter Site/Clara Baron Parkway Site 1) as the initial Beltway construction forced the Potter home to be moved from its original site.

Thank you for your consideration on these matters and for the opportunity to work with you going forward to ensure that our cultural and historical landmarks in Cabin John are properly preserved.

Sincerely,

Susan Shipp
President of the Cabin John Citizens Association

**DRAFT 1 – Deliberative and Pre-Decisional**
**3/10/2021**
**PROGRAMMATIC AGREEMENT**
Among the
**FEDERAL HIGHWAY ADMINISTRATION,**
**MARYLAND DEPARTMENT OF TRANSPORTATION STATE HIGHWAY**
**ADMINISTRATION,**
**NATIONAL PARK SERVICE**
**MARYLAND STATE HISTORIC PRESERVATION OFFICER,**
**VIRGINIA STATE HISTORIC PRESERVATION OFFICER,**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION, and**
**MARYLAND-NATIONAL CAPITAL PARK & PLANNING**
**COMMISSION**

**Implementing Section 106 of the National Historic Preservation Act for the**
**I-495 and I-270 Managed Lanes Study**
**Anne Arundel, Frederick, Montgomery and Prince George's Counties, Maryland and**
**Fairfax County, Virginia**

**WHEREAS,** the U.S. Department of Transportation, Federal Highway Administration (FHWA) plans to approve The I-495 and I-270 Managed Lanes Study (MLS), a proposed Public-Private Partnership (P3) administered by the Maryland Department of Transportation State Highway Administration (MDOT SHA); and

**WHEREAS,** FHWA has determined that the Project is an undertaking, as defined in 36 C.F.R. §800.16(y), and thus is subject to review under Section 106 of the National Historic Preservation Act (NHPA), 54 U.S.C. § 306108 and its implementing regulations, 36 C.F.R. Part 800; and

**WHEREAS,** the MLS Preferred Alternative (Project) consists of construction of Priced Managed Lanes along Interstates 495 and 270, beginning in Fairfax County, Virginia, and extending North to Approximately Interstate 370, and East and Southward to Approximately Maryland Route 5 in Prince George's County, as described in detail in Attachment; and

**WHEREAS,** the MDOT SHA, with the approval of FHWA, intends to deliver the Project as a Public-Private Partnership ("P3") using the services of a private sector developer or multiple developers who will advance the project and be responsible for design, construction, operation and maintenance, subject to approvals by MDOT SHA and/or FHWA; and

**WHEREAS,** the MLS will be implemented in Phases, yet to be fully defined, and although this agreement reflects evaluation of the entire defined Preferred Alternative project, certain commitments may require phased implementation; and

**WHEREAS,** MDOT SHA has identified "Phase I South" (Attachment) extending approximately from the portion of the project in Virginia North to I-370 as the first phase of implementation; and

I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021

> **Commented [BR1]:** Please include a WHEREAS clause identifying Capper-Cramton Lands and the joint role of NCPC and MNCPPC in approving and managing projects in those land areas.

**WHEREAS**, FHWA has been designated the lead agency for purposes of ensuring that the Project complies with Section 106 of the National Historic Preservation Act (NHPA) (54 U.S.C.

00006213

§ 306108), as amended, and codified in its implementing regulations, 36 C.F.R. Part 800, as amended (August 5, 2004); and

**WHEREAS,** The National Park Service (NPS) agrees FHWA is the lead federal agency for purposes of ensuring that the Project complies with Section 106 of the NHPA, and has agreed to participate in this PA as an Invited Signatory. NPS will accommodate the project through land transfers via Highway Deed Easement and other permitting actions or accommodations that will result in an adverse effect to NRHP-listed or eligible properties including The Baltimore-Washington Parkway, Greenbelt Park, George Washington Memorial Parkway (Clara Barton Parkway), the Chesapeake and Ohio Canal National Historical Park, and intends to use this Programmatic Agreement (PA) to comply with 36 C.F.R. Part 800, 54 U.S.C. § 100902, 36 C.F.R. Part 14; and

**WHEREAS,** FHWA has elected to phase the identification, evaluation, and effects assessment of certain portions of the APE and historic properties where unavailability of access or design information precluded such identification, evaluation and assessment, as provided in 36 C.F.R. 800.4(b)(2), and 36 C.F.R. 800.5(a)(3); and

**WHEREAS,** FHWA will ensure additional identification, evaluation, assessment, is completed in a timely manner prior to construction, to allow practical opportunities to avoid, minimize, or mitigate for any potential adverse effects to historic properties, as stipulated under this PA; and

**WHEREAS,** FHWA has initiated consultation pursuant to 36 C.F.R. 800.3(c) with the Maryland State Historic Preservation Office (MD SHPO) and the Virginia State Historic Preservation Office (VA SHPO), (collectively referred to as SHPO where the specific office is not specified) by letter on DATE and MDOT SHA on behalf of FHWA will continue to consult with the appropriate SHPO(s) under the terms of this PA in order to identify historic properties, assess the effects of the Project on historic properties, and, if necessary, resolve adverse effects to historic properties; and

**WHEREAS,** in accordance with 36 C.F.R. 800.6(a)(1)(i)(C), the FHWA, on DATE, initiated Section 106 consultation with the Advisory Council on Historic Preservation (ACHP) and the ACHP has chosen to participate in the consultation pursuant to 36 C.F.R. 800.6(a)(1)(iii); and

**WHEREAS,** pursuant to 36 C.F.R. § 800.10(c) MDOT SHA invited the Secretary of the Interior (the "Secretary") to participate in consultation by letter dated [date], as the Undertaking includes National Historic Landmarks within the Area of Potential Effects (APE), and the National Park Service, National Capital Region NHL Program (NPS-NHL) has represented the Secretary concerning the NHLs within the project throughout consultation and will continue to participate in future consultations involving the National Historic Landmarks, and

**WHEREAS,** The Maryland-National Capital Park and Planning Commission (M-NCPPC) agrees FHWA is the lead federal agency for purposes of ensuring that the Project complies with Section 106 of the NHPA, and has agreed to participate in this PA as an Invited Signatory and in order for the project to move forward as proposed M-NCPPC would need to accommodate the project through land transfers via Highway Deed

I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021

Easement and/or other legal instruments and other permitting actions (including the requirement of a Park Construction Permit) that will result in an adverse effect to NRHP-listed or eligible properties including Rock Creek Park Units 2 & 3, Sligo Creek Parkway,  Part 14, and Baltimore-Washington Parkway; Greenbelt NHL Carsondale; and Glenarden and intends to use this Programmatic Agreement (PA) to comply with 36 C.F.R. Part 800, 54 U.S.C. § 100902, 36 C.F.R. Part 14, and

**WHEREAS**, under the *Amended Programmatic Agreement Among The Federal Highway Administration, the Maryland Department of Transportation State Highway Administration, the Advisory Council on Historic Preservation, the Maryland State Historic Preservation Officer,*

00006215

*Implementing Section 106 of the National Historic Preservation Act for the Federal-aid Highway Program in Maryland* ("Statewide PA" see Attachment), FHWA, the Advisory Council on Historic Preservation (ACHP), MDOT SHA, and the Maryland Historical Trust (MD SHPO) have agreed to delegate certain authorities relating to Section 106 of the NHPA to MDOT SHA for Federal-aid Highway projects in Maryland; and

**WHEREAS,** pursuant to the above agreement, MDOT SHA employs Secretary of Interior-qualified professionals in the fields of archaeology, architectural history and/or history who will oversee implementation of stipulations in this agreement; and

**WHEREAS,** Pursuant to 36 C.F.R. 800, MDOT SHA, on behalf of FHWA, has established and updated the APE for the project in consultation with SHPO, has identified historic properties within the APE, and identified adversely affected properties where feasible, as described in the *Draft Section 106 Technical Report* of January 2020, and subsequent documentation (Attachment/Link); and

**WHEREAS,** MDOT SHA, during the course of consultation, has invited the parties listed in Attachment to participate in consultation on the Project; and

**WHEREAS,** The following parties, based on their relationship to specific actions as specified in this agreement, have been invited to concur in the agreement (Placeholder); and

**WHEREAS**, during the course of consultation, MDOT SHA and FHWA have initiated consultation with the following Federally-recognized Native American tribes (Tribes) and provided the Tribes with information about the Project: (Placeholder List). The (Placeholder List) have been invited to become concurring parties to this agreement; and

**WHEREAS,** Federal Agencies who recognize FHWA as the lead federal agency for the Project may fulfill their obligations under Section 106 of the NHPA according to 36 C.F.R. 800.2(a)(2), provided that FHWA follows the requirements of this agreement.

**WHEREAS,** FHWA, ACHP, M-NCPPC, MD SHPO and VA SHPO, who are signatories to this agreement,, have invited MDOT SHA and NPS to be additional invited signatories to this agreement, and all signatories, required and invited, are referred to as "signatories" to this document; and

**WHEREAS**, FHWA has determined that historic properties will be adversely affected by the undertaking, and as described in 36 C.F.R. 800.14(b), a programmatic agreement is appropriate to to govern the implementation of the undertaking and the resolution of adverse effects from the complex project; and

**NOW, THEREFORE**, FHWA, NPS, M-NCPPC, ACHP, MDOT SHA, MD SHPO, VA SHPO,

I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021

**Commented [BR2]:** Consulting parties do not need to concur with the undertaking. Entities may sign but not concur and preserve their rights under 36 CFR 800. Perhaps reword?

**Commented [CB3]:** There are no federally recognized tribes in Maryland. Will MDOT SHA consult with tribes recognized by Maryland?

a(hereinafter
"Signatories") agree that the Project will be implemented in accordance with the following

00006217

Stipulations in order to take into account the effect of the undertaking on historic properties and that these Stipulations will govern compliance of the Project with Section 106 of the NHPA until this PA expires or is terminated.

**Stipulations**

**I.    Roles and Responsibilities**

> **Commented [BR4]:** Better define who is the 'public' versus the consulting parties under 36 CFR 800.

A.    **FHWA** is the lead federal agency and is responsible for ensuring the terms of this agreement are carried out.

B.    **MDOT SHA** is delegated authority under this PA and the Statewide PA to continue defined aspects of consultation, project compliance review, and mitigation implementation. MDOT SHA will be primarily responsible for implementation of this PA excepting where otherwise specified.

> **Commented [BR5]:** MNCPPC would also have a role with our actions defined as a permitting agency and landowner.

1.    Developer MDOT SHA will enter into agreements with one or more developers to design, build, and operate the project. MDOT SHA will ensure the work of the developer or developers conform to the requirements of this agreement and may task the developer with assistance with certain commitments (such as context-sensitive design); however MDOT SHA may not delegate consultation obligations or other responsibilities specified in this agreement to the developer.

(1)    MDOT SHA will require the developer or developers to retain qualified Secretary of Interior-qualified cultural resources staff for the duration of design and construction to assist with design commitments, liaise with MDOT SHA cultural resources staff and facilitate compliance with this PA.

> **Commented [BR6]:** Can this specifically reference the professional qualifications from the code?

(2)    MDOT SHA, on behalf of FHWA, will consult with the relevant SHPO(s) for actions under this PA and 36 C.F.R. 800.

(2)(3)    MDOT SHA will provide for notification to of the public of substantial changes to the Project that would result in expanded APE or new effects to historic properties consistent with the requirements of the National Environmental Policy Act (NEPA) to ensure ongoing opportunities for input. As appropriate, this process may identify new consulting or concurring parties who may wish to join the agreement at a later time in response to project refinement.

C.    **National Park Service** (*MDOT SHA requests proposed language from NPS*

I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021

*describing details of NPS action*)

**D.**  M-NCPPC:   Land owner with both permit approval authority for any work done on public park land, plus authority to grant or withhold land via various legal instruments for conveyance.

00006219

E.    ▨▨SHPOs The Maryland Historical Trust (MD SHPO) has jurisdiction as established in the National Historic Preservation Act for historic properties in Maryland. The Virginia Department of Historic Resources (VA SHPO) has jurisdiction as established in the National Historic Preservation Act for historic properties in Virginia. MDOT SHA, on behalf of FHWA, will consult with the relevant SHPO(s) for actions under this PA and 36 C.F.R. 800. Timelines for concurrence with or response for eligibility findings, effects determinations (generally 30 days unless otherwise specified) are established in 36 C.F.R. 800. MDOT SHA and FHWA may assume concurrence or no objection to findings and submittals if no response is received within the established timeline, or 30 days if no timeline is specifically established in 36 C.F.R. 800.

F.    ACHP will provide policy guidance, provide comment on issues that may arise as requested by parties to this agreement, and participate in dispute resolution as specified in Stipulation

G.    NCPC? Role in managing Capper-Cramton lands and our role with NCPC (we can bring up here again why NCPC should perhaps be a signatory or request language as to why they declined. Who is managing Capper Cramton lands/who is this delegated to?)

F.H.    **Concurring Parties/Public**

> 1.    Other consulting parties concurring in this agreement have ongoing opportunities to provide input, and participate in consultation where specified. Concurring parties may join this agreement at any time after execution of the agreement with the invitation of MDOT SHA or FHWA.
>
> 2.    Concurrence with the agreement by a party does not necessarily indicate that the party supports the project or the preferred alternative or endorses all stipulations of this Agreement, but rather indicates the desire of such parties to remain involved in implementation of the terms of this agreement.
>
> 3.    For substantial changes to the undertaking that would result in expanded APE or new effects to historic properties, MDOT SHA will provide for notification of the public consistent with the requirements of the National Environmental Policy Act (NEPA) to ensure ongoing opportunities for input. As appropriate, this process may identify new consulting or concurring parties who may wish to join the agreement at a later time in response to project refinement.

> **Commented [BR7]:** These are separate groups as defined by 36 CFR 800. The roles under NHPA for Consulting Parties should be pulled apart from the General public.

## II.    Professional Standards

A.    Guidelines, standards and regulations relevant to this agreement and its purposes are listed below. Additionally, it is the intention of the signatories to interpret this agreement to incorporate any subsequent standards, revisions of standards, or applicable guidance issued by the Secretary of Interior, ACHP, or MD SHPO or VA SHPO as then in force during this agreement.

> **Commented [CB8]:** This section should reference 36 CFR Part 61: Secretary of the Interior's Professional Qualifications Standards.

I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021

1.      36 C.F.R. Part 800: Protection of Historic Properties, as amended (2004);

2.      *Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation* (1983);

3.      *Standards and Guidelines for Archeological Investigations in Maryland* (Shaffer and Cole 1994);

4.      *Standards and Guidelines for Architectural and Historical Investigations in Maryland* (Maryland Historical Trust, Revised 2019);

5.      *Guidelines for Conducting Historic Resources Survey in Virginia* (Virginia Department of Historic Resources, revised September 2017)

6.      36 CFR Part 79: Curation of Federally-Owned and Administered Archeological Collections

7.      *Museum Handbook on Accessioning and Cataloging Museum Objects,* National Park Service, revised

8.      Program Comment for Actions Affecting Post-1945 Concrete Steel Bridges (77 FR 68790);

9.      Policy Statement Regarding Treatment of Burial Sites, Human Remains and Funerary Objects (ACHP February 2007);

10.     National Register of Historic Places Bulletin 15, *How to Apply the National Register Criteria for Evaluation* (National Park Service revised 1997), and other National Register Bulletins as applicable

**III.    Project-wide Mitigation and Commitments**

**A.**    MDOT SHA will implement mitigation concurrent with construction phasing where impacts will occur; in the event that the undertaking is modified or certain elements causing adverse effects are not constructed, MDOT SHA will notify signatories of the change at such time as a final decision is made removing such elements and amend the agreement as necessary.

**B.**    MDOT SHA cultural resources staff will oversee implementation of all mitigation commitments and other terms of this agreement.

**C.**    Reforestation

> **Commented [BR9]:** Note for Parks to make sure reforestation stipulations are in line with all other agreement documents.

00006221

MDOT SHA is obligated to provide reforestation mitigation for the project pursuant to the Maryland Reforestation Law (MD Nat Res Code § 5-103). Reforestation must occur within 2 years or 3 growing seasons of completion of construction. The locations for reforestation credit are not yet fully identified. Reforestation activities may take the form of conservation easements or other noninvasive activities which would not affect historic properties. MDOT SHA will not consult on easements or conservation actions where no ground disturbance is involved. If areas outside the APE are identified for reforestation where plantings or other activities with the potential to affect historic properties are identified, MDOT SHA will consult in accordance with Stipulation to add such areas to the APE, identify historic properties, and evaluate effects to historic properties. MDOT SHA will avoid adverse effects to historic properties to the maximum extent practicable. If adverse effects are unavoidable, MDOT SHA will amend this agreement in accordance with Stipulation to resolve any such adverse effects.

> **Commented [BR10]:** Add specific timing requirement. Add language that all consulting parties and signatories will be notified, given 30 days to review design documents and provide comments.

D.    ~~Compensatory Stormwater Mitigation Plan~~ *– locations to be included in Final LOD*

E.    ~~Culvert Augmentation~~ *– locations will be included in Final LOD*

F.    Stream and Wetland Mitigation on NPS lands *– locations to be included in Final LOD*

> **Commented [BR11]:** See below we suggest combining into one Stipulation instead of separate ones, or having them be landowner based—one for M-NCPPC, one for NPS, etc.

G.    Mitigation Measures on M-NCPPC Lands

H.    For impacted land and separate, non-contiguous mitigation sites that may become part of M-NCPPC parkland in the future, the transfer of land to M-NCPPC will be evaluated for adverse effect at such time prior to MNCPPC taking ownership, and that transfer may require additional Section 106 consultation including mitigation. additional consultations with other named Signatories to this undertaking, or others identified in subsequent agreement documents, for example on Capper Cramton lands, if required. Examples of types of activities and disturbances that this will apply to include the Compensatory Stormwater Mitigation Plan, culvert augmentation, stream and wetland mitigation on M-NCPPC and NPS land, park enhancement projects, parkland mitigation measures, environmental stewardship projects.

~~G.~~**I.**    Other Mitigation and Revisions to Mitigation Locations

As project development proceeds, additional mitigation or enhancement locations may be identified or proposed locations revised. MDOT SHA will follow the procedure described in Stipulation below for any changes to the APE resulting from new or revised mitigation or enhancement locations.

IV.    **Consultation Regarding Project Development**

A.    MDOT SHA will initiate consultation with SHPOs and other consulting parties (as described below) at the following points in project development:

> **Commented [BR12]:** Can this be in with Project Specific Mitigation section?

I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021

1.    Upon advancement of design wherein effects can be assessed to Gibson Grove A.M.E. Zion Church (*note effect determination for Gibson Grove may be made prior to next draft of PA*), Carderock Springs Historic District and Polychrome Historic District

2.    Upon changes proposed by MDOT SHA that would result in an expansion of the APE, or that would affect historic properties differently than described in this PA

**Commented [BR13]:** Adverse effects have already been determined. More language about consultation during development of construction design documents, re-assessment of the APE based on sound walls and location of new signage, etc. Gibson Grove to have a note about mitigation from improvements to stormwater management.

3.    If MDOT SHA, working with the Developer, finds design or construction solutions that avoid or further minimize adverse effects to historic properties, MDOT SHA shall consult in accordance with the procedures in Stipulation to seek concurrence with any revised findings of effect, and amend this PA in accordance with Stipulation

4.    Upon changes to the LOD within the existing APE where additional archaeological investigation is recommended in the Cultural Resources Technical Report or subsequent consultation documentation.

V.    **Consultation Process:**

MDOT SHA will consult with the relevant SHPO(s), concurring parties to this agreement, tribes, local governments and other consulting parties as appropriate on any amendments to the APE, new or revised determinations of National Register of Historic Places (NRHP) eligibility, new or revised determinations of effects to historic properties, or other findings and decisions to the relevant SHPO(s) and relevant consulting parties consistent with its Statewide PA and 36 C.F.R. 800.

> **Commented [BR14]:** Should go at the end?

> **Commented [BR15]:** Again, note that a revised APE may result in new consulting parties coming forward and being added to this agreement. See language from above.

VI.    **Property-Specific Mitigation and Commitments - Phase I South**

MDOT SHA will be responsible for ensuring the following mitigation is carried out, under the oversight of FHWA.  MDOT SHA will either complete mitigation itself, or enter into legally binding agreements with partner agencies to ensure the following stipulations are fulfilled, subject to the requirements of each stipulation below. Mitigation and commitments will be implemented by authorized construction phase, unless there is opportunity to provide advanced mitigation that is mutually agreeable to all parties, is feasible to advance, and is identified by MDOT SHA as a priority. Preliminary engineering activities to support design of future phases, such as geotechnical studies or other similar activities with limited potential to affect historic properties may proceed within the APE prior to construction authorization and will not require mitigation.

A.    George Washington Memorial Parkway/Clara Barton Parkway

1.    MDOT SHA will continue property-specific Design-Review consultation with NPS to ensure a context-sensitive design for new facilities, and, through the ongoing design process, minimize, to the extent practicable, impacts to character-defining features and resources that contribute to the George Washington Memorial Parkway/Clara Barton Parkway as a historic property.

2.    MDOT SHA will ensure revisions and updates are made to the Clara Barton National Historic Site National Historic Landmark Nomination.

> **Commented [BR16]:** Mirror this language for all M-NCPPC properties.

I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021

   3.     MDOT SHA will ensure completion of a Cultural Landscape report with
   treatment recommendations for the North Parkway, and provide funding for
   implementation of recommendations resulting from the cultural landscape report
   to be negotiated with NPS as part of a separate agreement or agreements.
   (MDOT SHA requests additional detail on scope of this proposed mitigation from
   NPS to include in the agreement)

**B.**     Dead Run Ridges Archaeological District
   (*This property may be avoided through ongoing minimization efforts; if avoidance
   is not confirmed, MDOT SHA will include provisions in the archaeological
   treatment plan as specified in* Stipulation)

**C.**     Chesapeake and Ohio Canal National Historical Park

   1.     MDOT SHA will continue property-specific Design-Review consultation
   with NPS to ensure a context-sensitive design for new facilities, and, through the
   ongoing design process, minimize to the extent practicable, impacts to character-
   defining features and resources that contribute to the Chesapeake and Ohio Canal
   National Historical Park as a historic property.

   2.     MDOT SHA will remove the bridge pier from Lock 13 as part of removal
   of the existing Clara Barton Parkway Bridge, and, subject to engineering and
   safety considerations, attempt to avoid new structure within Lock 13.

   3.     MDOT SHA will provide for reconstruction of Lock 13.

   4.     MDOT SHA will provide for rehabilitation of the Canal and Towpath at
   Widewater to Lock 5.(MDOT SHA requests additional detail on scope of this
   proposed mitigation from NPS to include in the agreement)

**D.**     18MO749 Archaeological Site (C&O Canal)
   MDOT SHA will develop a Data Recovery research design and interpretation
   commitments as part of the Archaeological Treatment Plan in Stipulation

**E.**     18MO751 Archaeological Site (C&O Canal)
   MDOT SHA will develop a Data Recovery research design and interpretation
   commitments as part of the Archaeological Treatment Plan in Stipulation

**F.**     Morningstar Tabernacle No. 88 Moses Hall and Cemetery
   *MDOT SHA continues to pursue avoidance and minimization efforts to the
   Morningstar Tabernacle No. 88 Moses Hall and Cemetery. If these efforts result in a
   revised finding of no adverse effect to the property, MDOT SHA will continue to include
   context-sensitive commitments adjacent to the cemetery including:*

   1.     Design-review of treatment of sound barrier facing the cemetery

   2.     Commitment to evaluate existing right-of-way adjacent to the cemetery toensure
   no undocumented burials or human remains would be affected, as part of the
   treatment plan specified in Stipulation

**Commented [BR17]:** How do we get specific without additional work to help us better determine appropriate mitigation. The stipulations can acknowledge now that it is known there are graves within the right of way. Perhaps more language about GPR, boundary delineation, all items related to more work to identify the resource, timing to review this work, pulling in the relevant consulting parties and SHPO at these stages, then mitigation to be further discussed during design stages with MDOT SHA and the contractor.

**Commented [CB18]:** Graves have already been identified within SHA's ROW.

3.    MDOT SHA will consult with descendants of those interred at Morningstar Tabernacle Cemetery as identified by the Friends of Moses Hall and the Trustees of Morningstar Tabernacle 88 regarding all phases of archaeological work in the cemetery including but not limited to:

    (1)    Development of methodologies for identifying graves (geophysical survey, testing of anomalies)

    (2)    Decisions to avoid or exhume remains

    (3)    Exhumation methodology

    (4)    Archaeological Excavation

    (5)    Grave documentation

    (6)    Transport of human remains and associated artifacts

    (7)    Storage of human remains and associated artifacts

    (8)    Analysis of human remains and associated artifacts

    (9)    Selecting reburial site

    (10)    Reburial

    (11)    Dissemination of imagery and archaeological results

4.    MDOT SHA shall provide for final disposition of remains and associated artifacts as directed by the Trustees of Morningside Tabernacle Number 88, Inc.

5.    Dissemination of information and imagery of human remains and associated artifacts by MDOT SHA shall be at the discretion of descendants of those interred at Morningstar Tabernacle Cemetery as identified by the Trustees of Morningside Tabernacle Number 88, Inc. and the Friends of Moses Hall.

> **Commented [CB19]:** This added text could be included in a treatment plan

00006226

**G.**    Gibson Grove A.M.E. Church

*MDOT SHA and FHWA have not identified an adverse effect to Gibson Grove A.M.E. church currently; however, based on design refinements to avoid and minimize effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery, the church may be subject to additional temporary construction related impacts causing an adverse effect to the property. In this event, MDOT SHA and Gibson Grove A.M.E. church will continue to explore preservation enhancements to the property suggested by Church leadership to be specified in subsequent drafts of this agreement. This consultation will include MNCPPC as this is a designated Master Plan Historic Site and the MD SHPO. Consultation to occur at 30, 60, and 95% design document stage for areas within the LOD adjacent to the Church property. All parties will have 30 days to review design documents and provide comments to MDOT SHA and FHWA. Additional stipulations to mitigate future adverse effects from direct or indirect impacts (auditory, visual, etc.) shall be discussed as part of the design. The design will explore ways to physically reconnect the Church with the Morningstar Tabernacle No. 88 Moses Hall and Cemetery to the extent possible within the LOD. Additional educational items including interpretive signage, brochures, web media, or other measures to tell the history of this historically African American community can be discussed during design consultation.*

**H.**    Carderock Springs Historic District

1.    MDOT SHA has found that effects to Carderock Springs Historic District cannot be determined based on the level of design at the time of the FEIS. MDOT SHA will work with the developer to advance design in a context-sensitive manner within and adjacent to the historic district in a manner that would avoid an adverse effect. These goals include such elements as: preservation of existing contours and limiting vegetation removal to the extent practicable, screening the highway from bordering houses by planting new trees of a similar type replacing those removed during construction, and placing noise walls incorporating design materials compatible with the houses and natural terrain.

2.    At such time as the design is sufficient to make a determination of effect, MDOT SHA will submit the finding of effect to MD SHPO and relevant consulting parties, including Carderock Springs Citizens Association, for review and comment, and request concurrence on the finding by MD SHPO.

3.    If MDOT SHA determines an adverse effect is unavoidable following this consultation, MDOT SHA will develop a treatment plan including mitigation for the Carderock Springs Historic District, in consultation with Carderock Springs Citizens Association and MD SHPO. The treatment plan will not require amendment of this agreement; if MD SHPO fails to concur on the proposed treatment plan, the parties will consult to revise the plan until concurrence is reached, or follow the dispute resolution provisions of Stipulation

**VII.    Mitigation and Commitments for Phases Subsequent to Phase I South**

A.    M-NCPPC Stream Valley Parks System~~Rock Creek Stream Valley Park Units 2 and 3~~

1.    MDOT SHA will ensure completion of a Multiple Property Nomination for the M-NCPPC Stream Valley Park system in Montgomery and Prince George's Counties before Park Construction Permit is granted for work in any of these parks. Such documentation will include historic context, description and significance, and registration requirements for listing of, at a minimum, Cabin John SV Park, Rock Creek Park, Sligo Creek Park, Northwest Branch SV Park, Paint Branch SV Park and any other stream valley parks of the early M-NCPPC Park system that protects the Anacostia and Potomac watersheds, IMDOT SHA will ensure completion of National Register of Historic Places Nomination Forms for Rock Creek Stream Valley Park Units 2 and 3 and Sligo Creek Parkway before a Park Construction Permit is granted for work in either of the two above parks. Such National Register nominations shall conform to the Registration Requirements laid out in the Multiple Property Nomination (referenced above) and also include a complete cultural landscapes inventory of all contributing and non-contributing features as well as defined Periods of Significance.

2.    MDOT SHA will ensure completion of a Cultural Landscape Report on the parkways of M-NCPPC, Montgomery Parks (Beach Drive in Rock Creek SV Park, Sligo Creek Parkway in Sligo Creek Park and Little Falls Parkway in Little Falls SV Park) with treatment recommendations for these parkways, and provide funding for implementation of recommendations resulting from the Cultural Landscape Report to be negotiated with M-NCPPC as part of a separate agreement or agreements.

~~1.~~3.    MD SHA will ensure completion of interpretive signage as part of a negotiated design package to be placed within the Montgomery County Parks stream valley park system covering the histories of indigenous peoples, people of color, immigrant communities, and other under-represented peoples. Such interpretive signage content must be approved by M-NCPPC, Montgomery County Department of Parks, Cultural Resources Stewardship Section and conform to the standard specifications and appearance of Parks interpretive signage with MDOT SHA logos added in addition to that of M-NCPPC, Montgomery Parks.

4.    MDOT SHA will provide for assistance with wayfinding/branding/signage for M-NCPPC historic properties (Such heritage tourism and/or cultural resources destinations to be negotiation in a future PA. MDOT SHA requests additional detail on scope of this proposed mitigation from M-NCPPC to include in the

I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021

**Commented [BR20]:** Combine M-NCPPC stream valley parks.

**Commented [LJ21]:** M-NCPPC will require a separate MOU with SHA/FHWA and MHT regarding the operations and maintenance of the stream valley park system such that M-NCPPC can fulfill its statutory obligations for park management.

agreement)

    5.    MDOT SHA will continue property-specific Design-Review consultation with Commission at 30%, 60%, 90% and 100% to develop Context-sensitive design for new facilities, including proposed new bridges and sound wall. 30 day-minimum comment review period by M-NCPPC, Montgomery Parks, MHT, and all consulting parties.

**VIII.**    7. MDOT SHA will ensure historically compatible restoration and revegetation of land disturbed by construction, with a focus on minimizing disturbance to the existing landscape, and appropriate restoration when such disturbance is unavoidable. Such plans to be made available to Commission for review at 30%, 60%, 90%, and 100% with 30-day minimum comment review period by M-NCPPC, Montgomery Parks, MHT, and all consulting parties.

**IX.**    MDOT SHA, through use of Best Management Practices during construction, will ensure protection of existing vegetation outside the LOD for the duration of construction.

        i.

00006229

B.A.    National Park Seminary Historic District (Forest Glen)

1.    MDOT SHA will continue property-specific Design-Review consultation with Save Our Seminary and National Park Seminary residents to develop Context-sensitive design for new facilities, including proposed new bridges and sound wall;

2.    MDOT SHA will ensure historically compatible restoration and revegetation of land disturbed by construction, with a focus on minimizing disturbance to the existing landscape, and appropriate restoration when such disturbance is unavoidable

3.    MDOT SHA, through use of Best Management Practices during construction, will ensure protection of existing vegetation outside the LOD for the duration of construction.

4.    MDOT SHA will ensure completion of a Cultural Landscape Inventory (or measured drawings) of key Seminary Resources *MDOT SHA requests additional detail from National Park Seminary Consulting parties on these requests*

5.    MDOT SHA will identify NRHP eligibility criteria for National Park Seminary Historic District and update National Register documentation accordingly.

C.B.    Sligo Creek Parkway

1.    MDOT SHA will develop historical information about the park and the golf course in collaboration with M-NCPPC, Friends of Sligo Creek and the Sligo Creek Golf Association and will offer to incorporate historical information on the sign for each hole, or at another location as appropriate. M-NCPPC shall have final approval for any interpretive materials developed that describe the history of their parkland.

2.    MDOT SHA will identify a period of significance for the Parkway and update National Register information to document the period of significance.

D.C.    Polychrome Historic District

1.    MDOT SHA has found that effects to the Polychrome Historic District cannot be determined based on the level of design at the time of the FEIS. MDOT SHA will work with M-NCPPC, the MD-SHPO, and the developer to advance design in a context- sensitive manner within and adjacent to the historic district, including such elements as preservation of the existing stairs and retaining wall at 9900 and 9904 Colesville Road. And avoidance of new above-grade elements along US 29 adjoining the historic district.

2.    At such time as the design is sufficient to make a determination, MDOT SHA will submit the finding of effect to MD SHPO and consulting parties, for review and comment, and request concurrence on the finding by MD SHPO

> **Commented [BR22]:** This is also a locally designated Master Plan Historic District with regulatory control directed by the Montgomery County Historic Preservation Commission and the CLG. Can develop a process in subsequent PA.

and M-NCPPC.

I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021

00006231

3.    If MDOT SHA determines an adverse effect is unavoidable following this consultation, MDOT SHA will develop a treatment plan including mitigation for the Polychrome Historic District, in consultation with relevant consulting parties, M-NCPPC, and MD SHPO. The treatment plan will not require amendment of this agreement; if MD SHPO fails to concur on the proposed treatment plan, the parties will consult to revise the plan until concurrence is reached, or follow the dispute resolution provisions of Stipulation

E.D.    Indian Springs Estates and Country Club

MDOT SHA, in consultation with the Silver Spring YMCA and other appropriate consulting parties, will prepare and fund interpretive materials describing developer Abraham Kay, the Jewish history of the club and development, and influential Jewish people in the DC suburbs during the 1940s and 50s, and seek a partnership with the Silver Spring YMCA or Montgomery County Parks to host and locate the materials where they are accessible to the public.

F.E.    Greenbelt Park

*(Adverse effects to this property may be avoided through ongoing minimization efforts including proposed removal of direct access ramps to the Baltimore-Washington Parkway interchange; in this event MDOT SHA will revise the effect determination and no mitigation would be required if concurrence is reached with a revised finding )*

> **Commented [BR23]:** What does NPS/NHL have to say about this?

1.    MDOT SHA will continue property-specific Design-Review consultation with NPS to ensure a context-sensitive design for new facilities, and, through the ongoing design process, minimize, to the extent practicable, impacts to character-defining features and resources that contribute to the Greenbelt Park as a historic property.

2.    MDOT SHA will provide funds to NPS for preparation of a Cultural Landscape Inventory of Greenbelt Park.

G.F.    Baltimore-Washington Parkway

> **Commented [BR24]:** Notes for Prince George's to beef up mitigation for this, Glenarden, and other communities.

> **Commented [SJ25R24]:** Other mitigation measures for the following properties could include oral histories, collection of historic photographs and other information for story maps, documentary videos, history modules for use in schools, displays in local libraries. Collect oral histories in the Glenarden and Carsondale communities; effects of Urban Renewal on Glenarden - collection of oral histories comparing what the community was like before and after Urban Renewal.

1.    MDOT SHA will continue property-specific Design-Review consultation with NPS to ensure a context-sensitive design for new facilities, and, through the ongoing design process, minimize, to the extent practicable, impacts to character-defining features and resources that contribute to the Baltimore-Washington Parkway as a historic property.

2.    *NPS has proposed general park mitigation for the Baltimore-Washington Parkway but not Section 106-specific items; MDOT SHA could complete a boundary survey as mitigation, we request NPS input here.*

H.G.    Carsondale

1.    MDOT SHA will complete a NRHP nomination of the district, identifying contributing and non-contributing resources.

00006232

2.    MDOT SHA will complete an NRHP multiple property documentation form for post- World War II African-American associated developments in Prince George's County, with particular emphasis on African-American Veterans and Veterans Administration-assisted housing for African-American Veterans in Prince George's County, as mitigation for effects to Carsondale as well as Glenarden as described in Stipulation below.

3.    MDOT SHA will ensure the results of this research are also accessible to the communities in a public format such as a web-accessible presentation; and to meet these goals, the work may be supplemented by oral histories, historic imagery or other appropriate content as practicable to obtain.

4.    Subject to community approval and the identification and approval of a suitable location, MDOT SHA will install a physical marker, plaque, or interpretive signage commemorating this history.

I.H.    Glenarden Historic District

1.    MDOT SHA will complete the documentation and interpretive effort described above in Stipulation above, which is also applicable to the history of Glenarden.

2.    Subject to community approval and the identification and approval of a suitable location, MDOT SHA will install a physical marker, plaque, or interpretive signage commemorating this history.

> **Commented [SJ26]:** Should the Greenbelt National Historic Landmark be added to this section?

VIII.X.    **Archaeological Treatment Plan (ATP)**

MDOT SHA's goal is to have a comprehensive but flexible archaeological treatment plan that addresses the project LOD but can be revised and updated in response to project design advancement. Prior to construction within affected areas, MDOT SHA will develop an archaeological treatment plan in consultation with relevant parties that includes:

> **Commented [BR27]:** Need to include specifics about process for review of draft ATP.

M-NCPPC, Montgomery Parks Archaeological Mitigation Requirements to be Inserted Here or Other Logical Places

> **Commented [MC28R27]:** I don't understand the point of the ATP as a separate layer. Aren't these just the stipulations for Archaeology? Is there more information that SHA plans to include in the ATP?

> **Commented [BR29]:** With the Signatories and consulting parties

A.    Requirements for site specific mitigation measures for impacts to Parks archaeological resources, once the scope of those impacts are identified. Impacts are not yet known for M-NCPPC archaeological resources and therefore mitigation requirements cannot be articulated at this time.

B.    Archaeological Monitoring Requirements during construction

A.C.    Additional Phase I Survey and deep testing as appropriate in areas partially surveyed (as identified in the 2020 Technical Report, Volume 4, Chapter 5): S-10, S-16c, S-17, S-27, SWM S-27, S-28, and S-33

> **Commented [CB30]:** These areas were recommended for further work, but not included in the draft ATP.

> **Commented [BR31]:** Go back to the table to include properties where more work had been recommended but these did not all make it into this agreement document. Put all of those and SHA can address specifically what should be taken out based on a revised LOD—they need to address this.

B.D.    Phase I Survey in areas where property access could not be obtained (as identified

00006233

in the 2020 Technical Report, Volume 4, Chapter 5): S-4, SWM S-4, S-5, SWM S-5, S-6, SWM S-6, RS-1, RS-2; S-8, S-37, S-44, S-53, and S-54

**E.**    Phase I Survey in the vicinity of three sites within the LOD to define site boundaries anddetermine potential impacts; to 18MO457, 18MO190, 18MO510.

~~C.~~**F.**    Phase I survey of sites within the APE but not currently identified as being within the LOD: 18MO63, 18MO64, 18MO65, 18MO332, 18MO556, 18MO602, as identified in Table 4-2 of the 2020 Cultural Resources Technical Report Volume 1 update., ~~, and 18MO64~~

~~D.~~**G.**    Phase II evaluation of 18MO191, which may represent the Ball family farmstead, 18MO752, 18MO514 (the Forest Glen site on the National Park Seminary property)

**H.**    Phase III Data Recovery investigations, including public interpretation at 18MO749 and 18MO751 within the C&O Canal NHP and the Dead Run Ridges Archaeological District within the GWMP.

~~E.~~**I.**    Archaeological work on M-NCPPC land will~~th~~ undergo additional review during the Montgomery Parks construction permit process.

~~F.~~**J.**

00006234

G.K.  If sites or areas proposed for treatment in the ATPATP are avoided by revising the project LOD or other actions, MDOT SHA will document the revision, including revisingeffect determinations and seeking SHPO concurrence and concurrence of affected land owners, including M-NCPPC and others, where required. MDOT SHA will provide such information to consulting parties, and will thereby not need to complete treatment or investigation at such locations.

H.L.  MDOT SHA will complete the archaeological treatment plan and implement required research and obtain concurrence from SHPO on eligibility, effects, and treatment approaches in accordance with ==Stipulation== for any newly identified archaeological resources found through implementation of the treatment plan prior to construction in areas identified for further archaeological treatment.

I.M.  MDOT SHA will consult with SHPO and relevant consulting parties on the treatment plan and any revisions or modifications to the archaeological treatment plan. If SHPO concurs with the treatment plan or future revisions, no amendment of this agreement is needed to implement or update the treatment plan. If SHPO does not agree with the treatment plan or future proposed changes to the treatment plan, MDOT SHA will seek to resolve the disagreement or follow the provisions of ==Stipulation==

## IX.XI. Cemeteries and Human Remains Treatment Plan

A.    MDOT SHA acknowledges there is potential for human remains associated with historic properties to be present in at least two areas of the LOD (adjacent to Morningstar Tabernacle No. 88 Moses Hall and Cemetery, and Montgomery County Poor Farm) which are not currently accessible for the types of thorough archaeological investigation necessary to definitively identify interments. MDOT SHA will work with the developer to minimize LOD to the maximum extent practicable in these areas.

A.B.    MDOT SHA shall complete geophysical survey (magnetometer and ground penetrating radar) within and adjacent to Morningstar Tabernacle cemetery to establish the relationship between the cemetery and MDOT SHA's ROW and the LOD.

B.C.    MDOT SHA will consult with SHPO, descendants, descendant communities and other relevant consulting parties on a treatment plan to fully identify, recover, and respectfully treat human remains withinLOD.

C.D.    MDOT SHA will consult with SHPO, descendants, descendant communities and other relevant consulting parties on archaeological monitoring requirements for locations within LOD where potential for human remains is likely during construction, including unverified but reported locationsof the Ball Family Cemetery.

D.E.    MDOT SHA will seek inputshall consult with descendants, descendant communities and other  from affected consulting parties and concurrence fromthe SHPO on the treatment plan prior to implementation of the cemetery treatment plan.If the SHPO, descendants or descendant community does not agree with the treatment plan, MDOT SHA will seek to resolve the disagreement or follow the provisions of ==Stipulation==

> **Commented [CB32]:** John Diggs-Dorsey and Sidney Randolph, two of three known victims of lynching in Montgomery County, were reportedly buried at the Poor Farm in unmarked graves in 1880 and 1896. MDOT SHA should consult with the Maryland Lynching Memorial Project about work at the Poor Farm site. And consult with Montgomery County Commission on Remembrance and Reconciliation on interpretation materials as mitigation.

> **Commented [CB33]:** This appears to be not up to date as MDOT SHA has conducted mapping and bamboo clearing at Morningstar Tabernacle Cemetery.

00006235

F.    MDOT SHA will fully implement all required provisions of the cemetery treatment plan prior to any construction impacts within specified cemetery investigation locations.

G.    MDOT SHA will assess and mitigate noise and vibration adverse effects to Morningstar Tabernacle No. 88 Moses Hall and Cemetery and Gibson Grove Church:

1.    Vibration Studies and Monitoring Plan

    (1)    Development of Vibration Monitoring Plan: MODT SHA's Geotechnical Engineering Unit, in consultation with MODT SHA Division 13, shall develop a vibration monitoring plan for the Undertaking, to include on-site research during final design as well as monitoring during construction. The recommendations of the plan shall be provided to SHPO and concurring parties for their comments prior to adoption.

    (2)    Baseline Studies: On-site research, done prior to construction, will measure existing vibration exposure, determine sensitivity of key funerary monuments, and assign thresholds accordingly.

    (3)    Vibration Monitoring: Vibration monitoring will be conducted on key funerary monuments within Morningstar Cemetery and Gibson Grove Church, recommended in the aforementioned vibration monitoring plan. When a reading exceeds the established threshold, an alarm will sound and the Contractor - or the cemetery manager – shall immediately contact {insert position title here}.

    (4)    Pre-construction Surveys: MODT SHA will conduct pre-construction surveys of all key funerary monuments within Morningstar Cemetery and Gibson Grove Church to record a "before" condition so that any construction-related damage can be accurately identified.

2.    Auditory Effects: Studies of predicted noise level increase attributable to the Undertaking within Morningstar Cemetery and Gibson Grove Church are three decibels (3 dB(A)) or less and are considered "barely perceptible" to normal human hearing. Therefore, the Undertaking will not substantially interfere with the use and enjoyment of the cemetery as currently planned. Changes to the plans after the execution of this MOA may require additional noise studies and if the levels increase above five decibels (5 dB(A)), additional consultation between the signatories and concurring parties to this MOA will be required.

3.    Noise Abatement: Upon satisfactory completion of the work, MODOT SHA will reimburse the property owner for the costs to install central heat/AC, storm windows, and insulation based on the lowest of 3 bids provided to MODT SHA by the property owner. If the property owner chooses, MODT SHA will make payment directly to a third-party contractor(s).

00006236

X.XII. **Monitoring of Performance**

00006237

A.     Specific points for continued consultation are defined in Stipulation

B.     MDOT SHA will, for the duration of the project, provide concurring parties with a written annual progress report describing status of implementation of this agreement.

C.     MDOT SHA will provide for a meeting of concurring parties following issuance of each annual progress report.

D.     MDOT SHA will convene additional consulting party meetings as necessary or requested by signatories;

E.     MDOT SHA may cancel individual annual meetings if there are no significant issues for discussion and no signatory or consulting party objects to the cancellation.

## XI.XIII.    Post-Review Discovery of Human Remains

In addition to the human remains treatment conditions developed as part of the archaeological and cemetery and human remains treatment plans in Stipulations , MDOT SHA will follow the standard procedure (Appendix 3) for inadvertent discovery of human remains for any areas or situations not covered by other specifications in the archaeological or cemetery treatment plans.

> **Commented [CB34]:** These stipulations and standard procedures must be developed in consultation with descendants and descendant communities and include descendants and descendant communities in the decision process for any exhumation, transport, storage, study, and reinterment of human remains.

## XII.XIV.    Other Post-Review Discoveries

MDOT SHA will follow its standard procedures (Appendix 3) described in the statewide Programmatic Agreement for any inadvertent discoveries or inadvertent effects to historic properties during construction.

## XIII.XV.    Confidentiality

MDOT SHA, FHWA, and all other signatories to this agreement agree to provide by the provisions of Section 304 of the NHPA, and other applicable requirements to withhold information concerning the location, character, or ownership of resources where release of such information may endanger the integrity of the resource.

## XIV.XVI.    Amendment

Any signatory to this Agreement may request that it be amended, whereupon the parties will consult in accordance with 36 C.F.R. § 800.14 to consider such an amendment. Amendments will be executed only upon signature by all signatories to this agreement.

## XV.XVII.    Dispute Resolution

A.     Should any signatory or consulting party to this Agreement or member of the public object at any time to any actions proposed or the manner in which the terms of this Agreement are implemented, FHWA shall consult with such party to resolve the objection. If FHWA determines that such objection cannot be resolved, FHWA will:

1.      Forward all documentation relevant to the dispute, including the FHWA's proposed resolution, to ACHP. ACHP shall provide FHWA with its comment on the resolution of the objection within thirty (30) calendar days of receiving adequate documentation. Prior to reaching a final decision on the dispute, FHWA shall prepare a written response that takes into account any timely advice or comments regarding the dispute from ACHP, signatories and consulting parties, and provide them with a copy of this written response. FHWA will then proceed according to its final decision.

2.      If ACHP does not provide its advice regarding the dispute within the thirty (30) day period, FHWA may make a final decision on the dispute and proceed accordingly. Prior to reaching such a final decision, FHWA shall prepare a written response that takes into account any timely comments regarding the dispute from the signatories and consulting parties to the Agreement and provide them and ACHP with a copy of such written response.

**B.**      FHWA's responsibility to carry out all other actions subject to the terms of this Agreement that are not the subject of the dispute remain unchanged.

## ~~XVI.~~XVIII.  Termination

**A.**      Any signatory to this Agreement may terminate it by providing 30 calendar days' notice in writing to the other signatories, provided that the signatories will consult during the period prior to termination to seek agreement on amendments or other actions that would avoid termination.

**B.**      If any signatory to this Agreement determines that a term will not or cannot be carried out, that party shall immediately consult with the other signatories to attempt to develop an amendment per Stipulation XIV, above. If within thirty (30) calendar days (or another time period agreed to by all signatories) an amendment cannot be reached, any signatory may terminate the Agreement upon written notification to the other signatories.

**C.**      In the event of termination, FHWA will comply with 36 C.F.R. § 800 for all remaining actions, or until a new agreement is reached fulfilling such requirements.

This PA shall continue in full force and effect until twenty (20) years from the date of execution of the PA, or such time of final acceptance of the Project and when all terms of this agreement have been met, unless the project is terminated or authorization for the project is rescinded. At any time in the six-month period prior to its expiration, the signatory parties will consult to consider an extension or amendment of the PA. At such time, the signatories may consider an amendment to extend the PA unmodified for an additional specified duration, or consult to amend the PA in accordance with Stipulation. No extension or amendment will be effective unless all parties to the PA have agreed to it in writing by amending the PA.

> **Commented [BR35]:** Can we have a note about Phasing? Is it 20 years from the final ROD, or 20 years for this PA that is for the first phase?

I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021

**Signature Pages**

**Signatory Parties: FHWA (Maryland Division), ACHP, MD SHPO, VA SHPO, NPS, MDOT SHA, <u>M-NCPPC</u>.**

**Concurring Parties: To Be Determined**

**Attachments/Appendices**

(**To be added to subsequent drafts**)



I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021



**FRIENDS OF MOSES HALL MORNINGSTAR TABERNACLE NUMBER 88**
**ANCIENT UNITED ORDER OF SONS AND DAUGHTERS, BROTHERS AND SISTERS OF MOSES**
**7550 Seven Locks Road**
**Cabin John, MD 20818**
**morningstarmosescj@gmail.com**
**https://www.friendsofmoseshall.org/**

April 12, 2021

*By Email to:* sarcher@mdot.maryland.gov

Mr. Steve Archer
Cultural Resources Team Leader
**Maryland Department of Transportation State Highway Administration Environmental**
**Planning Division**
707 North Calvert Street
Baltimore, MD 21202

**Re:     Draft PA – Comments from Friends of Moses Hall Consulting Party for**
**Morningstar Moses No. 88 Cemetery and Hall Site, Cabin John, MD**

Dear Mr. Archer:

Thank you for the opportunity to review and comment on the first draft of the Section 106 Programmatic Agreement ("PA") for the I-495/I-270 Managed Lanes Study ("Project"). Friends of Moses Hall enter the PA discussions recognizing the adverse cumulative impacts the Project will cause on the historic and culturally significant Morningstar Tabernacle No. 88 Moses Hall and Cemetery ("Moses Hall").

While we appreciate MDOT SHA's continued effort in evaluating and minimizing adverse impacts to Moses Hall, we have concerns regarding (1) the site design elements currently being considered and (2) certain provisions of the draft PA. Our comments on both are stated below.

I.      SITE DESIGN CONCERNS

Friends of Moses Hall is pleased that MDOT SHA has developed preliminary design avoidance and minimization concepts that may substantially reduce ground impacts at Moses

Hall. However, we have serious concerns with the potential impacts resulting from the proposed cantilevered roadway design as well as the ability of MDOT SHA to commit to a design that will minimize impacts to the Moses Hall site.

First, while we support revisions to the site design that minimize ground disturbance, we are concerned about impacts from a cantilevered roadway bed. Although the cantilevered design may reduce ground disturbance on the Moses Hall property, the roadway bed's encroachment over the Moses Hall property may render portions of the cemetery bordering the LOD inaccessible to descendants and could still result in ground disturbing impacts. For example, it is currently not clear how water running down the sound barrier or off the cantilevered roadway bed would be managed in order to avoid eroding the cemetery grounds below. Ultimately, the cantilevered roadway design will still impact burial sites. This is unacceptable.

Additionally, though we support site-design revisions that shift roadway alignment and move the fly-over ramp location away from the Moses Hall site, we disagree that a fly-over ramp is necessary to accomplish the Project's Purpose and Need. Such elevated ramps are out of character with Moses Hall and the Gibson Grove area. At-grade options, such as those proposed at Clara Barton Parkway, are the more appropriate choice.

Second, we are concerned about the uncertainty regarding a possible revision of MDOT SHA's adverse impact finding for the Moses Hall site. By the time the PA is executed, the project will only be at the 2-3% design stage. It is unclear to what degree MDOT SHA will be able to commit to one of the proposed designs that minimize effects. Further, there is strong evidence to suggest that there are a number of burials within the LOD, as well as within the current state right-of-way, and more may be identified as project planning continues. Given the uncertainty over whether the site-design changes will result in a revised adverse impact finding, Friends of Moses Hall have reviewed the draft Programmatic Agreement assuming that the Moses Hall site will be adversely impacted.

## II.    COMMENTS ON THE DRAFT PROGRAMMATIC AGREEMENT

Considering the longstanding impacts to Moses Hall caused by the construction of I-495 in the 1960s, a stronger commitment to minimizing and mitigating adverse impacts to the site is needed. The highway's original construction physically impacted the property and separated Moses Hall and the Gibson Grove community from significant community resources, including the Gibson Grove AME Zion Church. Those who remained saw their sense of community connectedness dwindle. The mitigation requested below should be honored in light of current and past environmental impacts to the site's physical, cultural, and historic characteristics.

We are also concerned about working through this and subsequent drafts of the PA without being provided copies of the archaeology reports needed to fully evaluate the Project's impacts on the cemetery. The following comments assume that MDOT SHA will timely provide copies of the relevant archeological reports to Friends of Moses Hall prior to reviewing and commenting on the next PA draft.

**1)  More specificity on the timing of activities throughout the PA is needed.**

Generally, the PA is lacking in identifiable and concrete timing commitments for the impact analyses, mitigation, monitoring, and reporting required by the PA. The PA should provide more nuance about the activities that occur during the pre-development construction and the operational period. Such clarity will better articulate to consulting parties MDOT SHA's obligations under the PA and allow for better accountability and performance monitoring throughout the PA's duration.

**2) The term "Secretary of the Interior-qualified professionals" needs clarification.**

The PA provides, in relevant part:

> **WHEREAS,** pursuant to the above agreement, MDOT SHA employs Secretary of the Interior- qualified professionals in the fields of archaeology, architectural history and/or history who will oversee implementation of stipulations in this agreement . . . .

As written, it is not clear which standards are being referred to in order to determine the qualifications of cultural resources professionals employed to oversee the PA's implementation. We recommend citing the Department of the Interior's guidance establishing qualification standards for cultural resources professionals. Suggested language is below:

> **WHEREAS,** pursuant to the above agreement, MDOT SHA employs professionals meeting *The Secretary of the Interior's Professional Qualification's Standards* (48 FR 44716) (hereinafter "qualified professionals") with experiences and background in the fields of archaeology, architectural history and/or history who will oversee implementation of the stipulations in this agreement . . . ."

Similarly, Stipulation I.B.1(1) should be revised to state the following:

> Archaeological studies required under the terms of this PA shall be carried out by, or under the direct supervision of, a qualified professional who, at a minimum, meets the Secretary of the Interior's Professional Qualification Standards (48 FR 44716, September 29, 1983) in archaeology or architectural history, as appropriate.

**3) MDOT SHA must ensure the project's developer conforms to the PA.**

We support Stipulation I.B. It reflects our belief that the government agencies involved in the Project, including MDOT SHA, should remain responsible for the obligations specified in the PA. We are encouraged by the degree of oversight the PA requires MDOT SHA to exercise to ensure the developer adheres to the requirements of this agreement.

However, we are concerned with the generality of MDOT SHA's responsibilities under Stipulation I.B. The duration and scope of the Project, the numerous stakeholders involved, and the number of potentially impacted historic properties necessitate requiring dedicated cultural resources staff to be assigned to oversee the implementation of this PA. We suggest MDOT SHA incorporate the following provisions to clarify its obligations in overseeing the PA's implementation:

00006243

- MDOT SHA will ensure Secretary of the Interior qualified professionals will be onsite where there is potential for historic properties to be affected by construction and will monitor all ground-disturbing activities that may affect historic and archeological resources when warranted and/or upon request of consulting parties.
- MDOT SHA will train the Developer and appropriate on-site contractor staff on the stipulations of this PA, including the Archeological Treatment Plan specified in Stipulation VIII and any human remains and cemetery treatment plan specified in Stipulation IX. A copy of the training will be provided to consulting parties for review and comment prior to implementation.
- A requirement to comply with the provisions of the PA in cooperation with MDOT SHA and the consulting parties will be included in all design and construction contracts.

MDOT SHA should also consider establishing a Cultural Resources Management Team (CRMT) to carry out the cultural resources work of the PA and undertake the responsibilities stated above. This approach is frequently taken in Section 106 compliance for large-scale infrastructure projects and would assure consulting parties of MDOT SHA's dedication to fulfilling its obligations agreed upon in the PA.

**4) MDOT SHA must confer with consulting parties regarding project developments that impact the consulting parties.**

We support Stipulations IV and V.  MDOT SHA is obligated to keep consulting parties appraised as to project developments, both expected and unforeseen, that affect historic properties. We support the need for MDOT SHA's continued engagement with consulting parties for new and revised determinations of effects on historic properties.

**5) The provision allowing preliminary engineering activities needs to be clarified.**

Stipulation VI provides:

 Preliminary engineering activities to support design of future phases, such as geotechnical technical studies or other similar activities with limited potential to affect historic properties may proceed within the APE prior to construction authorization and will not require mitigation.

We are concerned that this provision could potentially allow for ground-disturbing activities affecting burial sites adjacent to Moses Hall to be conducted within the APE. If the only "preliminary engineering activities" referred to are technical studies, the provision should be revised to better clarify which types of studies MDOT SHA anticipates may take place. Specific reference to more than one type of study narrows the scope of "other similar activities" and would better protect against the clause being used to justify more intrusive pre-construction activities.

Additionally, it is not clear whether "future phases" refers to project phases including Phase I or *after* Phase I. The latter reading permits certain preconstruction

activities to occur within Moses Hall without mitigation. If this is not the intended effect
of the provision, we suggest revising this section accordingly to clarify as such.

### 6) The "design-review" provision in Stipulation VI.F.1 is inadequate.

The likelihood that the project LOD will, at the very least, directly abut the Moses Hall
property line necessitates Friends of Moses Hall's continued consultation on the relevant site
design elements, including potential ground disturbances and impacts to the site's character.

The design-review provision should state that (1) "MDOT SHA will continue property-
specific Design-Review" consultation with FMH to ensure context-sensitive design for project
elements within, abutting, or facing the cemetery"; and (2) that MDOT SHA "through the
ongoing design process," shall "minimize to the extent practicable, impacts to the character-
defining features that contribute to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery
as a historic property."

### 7) The monitoring of ground-disturbing and archaeological activities on the Moses Hall site must be carried out by an *appropriate,* qualified professional.

Moses Hall's cultural and historic importance requires any professional supervising
ground-disturbing and archaeology-related activities to have extensive experience in African
American cemetery archaeology. Stipulation VI should include the following:

> The archaeological studies of Moses Hall cemetery required under the terms of
> this PA shall be carried out by a cultural resources management (CRM) firm
> with extensive experience in African American archaeology, African American
> cemetery archaeology, community archaeology, and oral history selected by
> Friends of Moses Hall and under the direct supervision of a qualified
> professional approved by Friends of Moses Hall.

Additionally, the following should be added to Stipulation VIII:

> A cultural monitor selected by Friends of Moses is required at the Morningstar
> Tabernacle No. 88 Moses Hall and Cemetery project location, at all times to monitor
> archaeology project activity. MDOT SHA shall cover the cost of the cultural monitor.

### 8) Any treatment plan and mitigation commitment must require the reinterment of human remains on the Moses Hall property.

There is strong evidence that burials likely took place beyond the currently estimated
property line for the Moses Hall cemetery. Thus, it is likely that human remains **will** be
discovered within the LOD area adjacent to Moses Hall. Any treatment plan and mitigation
commitment **must** require the reinterment of human remains on Moses Hall. Prior to any such
reinterment, a proper archaeological survey of the graveyard would be required to identify
locations for reinterment. While Friends of Moses Hall supports drafting a specific treatment
plan, Stipulation VI.F must ensure MDOT SHA commits to such a treatment plan, irrespective of
whether the adverse effect finding for Moses Hall is revised.

00006245

Stipulation VI.F.2 should be replaced with the following:

(1) "MDOT SHA will continue to evaluate the existing right-of-way adjacent to the cemetery to ensure no undocumented burials or human remains would be affected. Prior to any ground-disturbing activities, MDOT SHA will conduct a thorough investigation of the LOD adjacent to Moses Hall to identify undocumented burials or human remains, pursuant to the Cemetery and Human Remains treatment plan specified in Stipulation IX.

(2) If MDOT SHA determines an adverse impact to Moses Hall is unavoidable OR if human remains are discovered within the LOD adjacent to Moses Hall, MDOT SHA will conduct an archeological survey of the Moses Hall property pursuant to the agreements specified in Stipulations VIII and IX to identify plots for the reinterment of human remains.

**9) Any treatment and mitigation stipulations for Moses Hall must incorporate stronger vibration and noise impact analysis and monitoring requirements.**

The archaeological and impact monitoring commitments in the draft PA are insufficient. Given the sensitivity and historical significance of the Moses Hall site, a comprehensive cultural resources investigation is necessary to fully evaluate and understand **all** impacts on the site resulting from the Project's development and construction. In addition, further studies and monitoring of vibration and noise impacts are needed to properly mitigate adverse impacts from construction.

Stipulation VI.F should include the following:

"In order to lessen impacts on Moses Hall resulting from the Project, MDOT SHA shall:

(1) conduct pre-construction surveys on all key funerary headstones within Moses Hall record a "before" condition so that any construction-related damage can be accurately identified;

(2) conduct baseline studies to measure existing vibration exposure to determine the sensitivity of key funerary monuments and assign thresholds accordingly;

(3) develop a vibration monitoring plan that includes on-site research during final design and monitoring during construction; and

(4) conduct further studies of noise level impacts attributable to the Project within the Moses Hall site, with additional consultations between the signatories and the Friends of Moses Hall if the noise level increases attributable to the Project within the Moses Hall site exceed 5 dB(A))."

**10) Cumulative impacts to the character of the Moses Hall site caused by the Project warrant stronger mitigation commitments.**

We recognize that MDOT SHA's efforts to minimize direct impacts to the Moses Hall site may result in a revised adverse effect finding. Yet, in spite of these impact minimization

00006246

efforts, impacts from the Project will irreparably change the character of the Moses Hall site. In addition to construction-related impacts, decades of stormwater damage, increased noise, and visual impacts have irreparably damaged the cemetery's physical environment, quality, and character. Given the extent of these cumulative adverse impacts—both ongoing and projected—directly attributable to I-495 and the Project, Stipulation VI.F should include stronger mitigation commitments:

- MDOT SHA will develop a context-sensitive design for interpretive plaques, seating, fencing, and a memorial.
- MDOT SHA will ensure historically compatible restoration and re-vegetation of land disturbed by construction, with a focus on minimizing disturbance to the existing landscape, and appropriate restoration when such disturbance is unavoidable.
- MDOT SHA will seek an NRHP nomination for the property.
- MDOT SHA will identify Montgomery County Master Plan for Historic Preservation criteria and nominate Morningstar Tabernacle No. 88 Hall and Cemetery for designation.
- MDOT SHA will provide Friends of Moses Hall with a full topographical land title survey of the three property parcels (Parcel P528 - Account #07-00430703, Parcel P501 - Account #07-00430691, and Plat 12551 Outlot A - Account #07-01915930) that make up the Morningstar Tabernacle No. 88 Hall and Cemetery property.
- MDOT SHA will work with Friends of Moses Hall to improve ADA-compliant access to the site, including developing ADA compliant parking options.
- MDOT SHA will mitigate the soil erosion at the site that has been caused by stormwater runoff from the existing highway.
- MDOT SHA will remove the broken pipe culvert and clean up or repair the ravine area.
- MDOT SHA will assist in cleaning the trash and debris on the site.
- In collaboration with identified stakeholders, MDOT SHA will commit sufficient funds to the Board of Trustees of Morningstar Tabernacle Number 88, Incorporated, Montgomery Preservation, or other recognized preservation nonprofit, earmarked for restoration and maintenance of the cemetery grounds for long-term preservation.
- MDOT SHA shall reconstruct the Moses Hall foundation in situ using the original masonry.
- MDOT SHA will provide Friends of Moses Hall $20,000 for the purpose of producing a documentary and other educational materials about the Moses Hall site for use in Montgomery County Public Schools.

**11) The Archeological Treatment Plan (ATP) should be developed simultaneously to the PA and included as an appendix to the Final PA.**

Given the Project's impacts on the Moses Hall cemetery, we agree that a comprehensive archeological treatment plan is needed to ensure a proper accounting of the historic and cultural resources on the Moses Hall site. Any such treatment plan should ensure MDOT SHA fully

00006247

evaluates the archeological resources within the cemetery that may be impacted by the Project. However, we are concerned about developing the treatment plan separately from the PA. While we understand the need for flexibility, we do not support agreeing to a PA without reviewing and agreeing to the terms and conditions of the ATP.  The ATP should accordingly be developed simultaneously to the PA and circulated for review and approval prior to the signing of the final PA.

**12) Stipulation VIII must require a Phase I cultural resources investigation of Moses Hall.**

The 2020 Technical Report, Volume 4, Chapter 5 provides that "if the undertaking impacts [the Moses Hall] area, further archeological investigations at the site of Moses Hall will be identified during development of the project's anticipated Programmatic Agreement." The Technical Report further recommends Phase I identification at Moses Hall and that "MDOT SHA would include commitments in the PA for phased evaluation of the above archeological resources warranted."

MDOT SHA should ensure in the PA that a Phase I survey *will* be accomplished prior to any ground disturbing activities. Any such survey should be conducted within the cemetery utilizing various forms of geophysical techniques to identify cemetery features, i.e. graves, markers, grave depressions, and potential burial shafts.

Stipulation VIII should be revised to require a Phase I cultural resources investigation of the Moses Hall site by incorporating the following provision:

> "MDOT SHA will conduct a Phase I survey of the complete cultural property that is known as Morningstar Tabernacle No. 88 Moses Hall and Cemetery (including right of way and three identified parcels that comprise the Morningstar Tabernacle No. 88 Moses Hall and Cemetery property).  The cultural resources investigation will consist of an intensive geophysical survey (GPR and magnetometry, as appropriate) and LIDAR of the area sufficient to determine the number and extent of the resources present and their relationships to project features. It shall also produce a map delineating the boundaries of the cemetery and identify burials present.  If burials are identified within the LOD, the goal is for all parties to have a clear idea of where the human remains can be repatriated."

**13) Stipulation VIII must require a Phase II evaluation of the Moses Hall cemetery.**

In addition to the Phase II studies currently required in Stipulation VIII, Stipulation VIII should require a Phase II evaluation of the Moses Hall cemetery:

> "MDOT SHA will conduct a Phase II evaluation of Moses Hall for National Register eligibility that includes Traditional Cultural Place analysis and analysis of historic buildings and archaeological sites. Evaluation of the Moses Hall structure shall only include Shovel

00006248

Test Pits (within the structure area only) to obtain information for
use in National Register of Historic Places designation."

**14) Stipulation VIII should require Phase III data recovery conducted at the Moses Hall cemetery.**

The importance of Moses Hall as a cultural resource necessitates a Phase III Data Recovery investigation. Currently Phase III Data Recovery investigations are limited to "18MO749 and 18MO751 within the C&O Canal NHP and the Dead Run Ridges Archaeological District within the GWMP." Stipulation VIII should be revised to require Phase III data recovery for the Morningstar Tabernacle No. 88 Moses Hall and Cemetery as part of the Archeological Treatment Plan. Only hand excavations shall be permitted; mechanical excavations shall not be utilized.

**15) Stipulation VIII should require the Archeological Treatment Plan to include stronger commitments on reporting, artifacts curation, and site-specific treatment plans.**

The reporting and consultation provisions Stipulation VIII requires for the ATP are insufficient. Greater assurance is needed that (1) artifacts will be treated properly and respectfully, (2) that consulting parties will be timely informed of MDOT SHA's actions pursuant to the Stipulations of the PA, and (3) that consulting parties have the opportunity to review and provide critical feedback on MDOT SHA's archeological reports prior to publication.

The following provisions should be incorporated into Stipulation VIII:

- Upon completion of field testing/data gathering, and analysis, MDOT SHA shall submit a draft report describing the findings of the identification study to the SHPO and the relevant consulting party. All parties will have 30 days to review and comment on any draft reports furnished to them.
- MDOT SHA or its contractors shall ensure that all materials and records resulting from the survey, evaluation, and data recovery or mitigation conducted for the Project, or recovered during Project construction, will be curated in accordance with Standards and Guidelines for Archaeological Investigation in Maryland established by the Maryland Historic Trust at a facility within the state of Maryland, unless the relevant consulting party wishes to retain ownership of artifacts recovered from the cultural property.
- MDOT SHA shall ensure that draft and final reports resulting from actions pursuant to the Stipulations of this Programmatic Agreement will be provided to the SHPO and relevant consulting party upon request. All parties will have 30 days to review and comment on any draft reports furnished to them.
- MDOT SHA shall confer with consulting parties to identify appropriate measures that are in the public interest to avoid, minimize, or mitigate adverse effects to historic property and burials. When an agreement between MDOT SHA and consulting parties can be reached on how to resolve the adverse effects, MDOT SHA in consultation with consulting parties shall prepare a Treatment Plan describing the

measures to be carried out, the manner in which they will be carried out, and a schedule for their implementation.

**16) Stipulation VIII.F should specify that any treatments and investigations that have begun will be finished.**

Stipulation VIII.F provides:

> "If sites or areas proposed for treatment in the ATP are avoided by revising the project LOD or other actions, MDOT SHA will document the revision, including revising effect determinations and seeking SHPO concurrence where required. MDOT SHA will provide such information to consulting parties, and will thereby not need to complete treatment or investigation at such locations."

We suggest rephrasing to:

> "If sites or areas proposed for treatment in the ATP are avoided by revising the project LOD or other actions, MDOT SHA will document the revision, including revising effect determinations and seeking SHPO concurrence where required. MDOT SHA will provide such information to consulting parties *in a timely manner* and will thereby not need to complete *additional* treatment or investigation at such locations."

The changes added in italics denote that unreasonable delay in sharing information is not permitted and makes it clear that MDOT SHA will not be required to do any treatment or investigation beyond what they have already begun. This revised phrasing ensures that any treatment or investigation that has been initiated prior to a revised adverse effect determination will be completed.

**17) Stipulation IX should establish firmer guidelines for developing a cemetery and human remains treatment plan.**

As written, Stipulation IX is too general and vague to guarantee that human remains discovered during the LOD will be treated appropriately. More specific guidance is needed in the PA to ensure the sufficiency of any human remains treatment plan developed by MDOT SHA, SHPO, and the relevant consulting parties. The following provisions should be included in Stipulation IX:

- If any human remains are encountered during the cultural resources field work or Project construction, MDOT SHA and its contractors will adhere to the human remains treatment plan developed in consultation with SHPO and relevant consulting parties. If no human remains treatment plan has been developed, MDOT SHA will adhere to the Inadvertent Discovery Plan included as Appendix 3 to the statewide PA and, in consultation with the SHPO and the relevant consulting party, develop a site-specific treatment plan.

00006250

- Suspected human remains shall not be further disturbed or removed until guidance has been given from MDOT SHA and the relevant consulting party.
- At all times, human remains must be treated with the utmost dignity and respect and in a manner consistent with the ACHP's Policy Statement on the Treatment of Human Remains, Burial Sites and Funerary Objects.
- No photographs of any of the gravesites and/or associated funerary objects will be released to the press or to the general public.
- MDOT SHA shall cover all expenses associated with the removal, treatment and repatriation of the human remains into Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

**18) Stipulation IX.C should include Moses Hall.**

Stipulation IX.C provides:

MDOT SHA will consult with SHPO and relevant consulting parties on archaeological monitoring requirements for locations within the LOD where potential for human remains is likely during construction, including unverified but reported locations of the Ball Family Cemetery.

This stipulation should also include Moses Hall, as Moses Hall is in fact a location "within the LOD where potential for human remains is likely."

**19) The cross references in Stipulation IX.D and VIII.H should be clarified.**

Both Stipulation IX.D and Stipulation VIII.H conclude by stating: "If SHPO does not agree with the treatment plan, MDOT SHA will seek to resolve the disagreement or follow the provisions of Stipulation."

The stipulation referenced in this section is unclear. We assume this refers to the Dispute Resolution Stipulation, but as written, it is difficult to assess the effect of this provision without a clearly stipulated cross-reference.

**20) The provisions of the cemetery treatment plan must be implemented prior to *any* ground-disturbing activities.**

Stipulation IX.E provides that MDOT SHA will implement the "required provisions of the cemetery treatment plan prior to any *construction impacts*" (emphasis added). This is problematic, as it allows for any ground-disturbing activities not considered to be *construction impacts* to take place prior to a full evaluation of the potential for human remains within the ROW adjacent to Moses Hall. This provision should be revised by replacing "construction impacts" with the term "ground disturbing activities." This revision would ensure a proper treatment of areas with potential for human remains *before* any construction-related activities occur.

**21) Stipulation X must be more specific on how activities will be monitored beyond the construction period and into the operations period.**

00006251

As currently written, Stipulation X provides little guidance to consulting parties on how MDOT SHA will monitor performance of the PA and the duration over which the monitoring will take place. At minimum, MDOT SHA should clarify that performance monitoring will continue through the predevelopment/construction period and into Project's operational period.

**22) Annual progress reports are insufficient.**

Stipulation X.B states that MDOT SHA will provide concurring parties with written annual progress reports. Given the complexity of this project, this frequency is insufficient. Continued consulting party engagement is essential to ensure MDOT SHA and the Project Developer act in compliance with the entire PA. This provision should be revised to provide for quarterly progress reports during the pre-development and construction period, and semi-annual reports for the periods thereafter.

**23) The cross reference in Stipulation XI should be clarified.**

Stipulation XI provides, in relevant part, that "MDOT SHA will follow the standard procedure (Appendix 3) for inadvertent discovery of human remains for any areas or situations not covered by specifications in the archeological or cemetery treatment plans." It is our understanding that Appendix 3 refers to the Inadvertent Discovery Plan included as an appendix to the 2017 Amended Section 106 Programmatic Agreement between MDOT SHA and FHWA. This cross-reference needs to be clarified for FMH to properly assess this provision's effect.

**24) Stipulation XV.A.2 should be rephrased to ensure  FHWA to take comments into consideration.**

Stipulation XV.A.2 provides:

> "If ACHP does not provide its advice regarding the dispute within the thirty (30) day period, FHWA may make a final decision on the dispute and proceed accordingly. Prior to reaching such a final decision, FHWA shall prepare a written response that takes into account any timely comments regarding the dispute from the signatories and consulting parties to the Agreement and provide them and ACHP with a copy of such written response."

We suggest rephrasing to:

> "If ACHP does not provide its advice regarding the dispute within the thirty (30) day period, FHWA may make a final decision on the dispute, *taking into consideration any timely comments,* and proceed accordingly. Prior to reaching such a final decision, FHWA shall prepare a written response that takes into account any timely comments regarding the dispute from the signatories and consulting parties to the Agreement and provide them and ACHP with a copy of such written response."

The change added in italics makes it so that FHWA not only has to respond to comments via a written response, but must also take those comments into consideration in their final decision. As the provision is currently written, it seems as though FHWA does not have to contemplate the

comments in their decision and must only consider such comments when drafting its response regarding its final decision.

**25) The programmatic agreement must include a Design-Review provision**.

Though the PA refers to a "Design-Review" process several times, there are no provisions that identify and explain what that process entails. Design-Review provisions are frequently included in PAs for complex transit infrastructure projects and the absence of one is concerning. MDOT SHA must include a Design-Review provision that incorporates the following elements:

- When the phase of a project is ready for initial ground disturbing activities, MDOT SHA and the Developer will hold preconstruction review meetings for areas of the Project within the vicinity of historic properties (including site plan, elevation, and specifications) complete to 30%.
- MDOT SHA and the Developer shall submit drawings of the project in the vicinity of historic properties when the design is complete to 60% or equivalent and 90% or equivalent for review and comment from consulting parties with an interest in the affected property.
- MDOT SHA must carefully consider comments provided by other signatory parties and consulting parties and incorporate suggested modifications as appropriate.
- MDOT SHA shall also provide opportunity for public input on the design development process by soliciting comments through community meetings and ongoing outreach efforts.

**26) The 20-year duration of the PA is too long.**

We are concerned that the proposed duration of the PA is too long. A shorter time span, with the opportunity to renew, would better account for the concerns of the relevant consulting parties concurring in the agreement. The PA should be revised to state that the "PA shall continue in full force and effect until *seven (7) years* from the date of execution . . . ."

III.    CONCLUSION

The Morningstar Tabernacle No. 88 Moses Hall and Cemetery is a key and central feature of the historic African American community in the Cabin John area. MDOT SHA should ensure it accounts for the environmental injustices attributed to the original highway construction and appropriately addresses and mitigates any and all adverse impacts to this site, as well as to the First Agape A.M.E. Zion Church (a/k/a Gibson Grove Church) site, attributable to the Project.

We appreciate your consideration of these comments and their incorporation into the next PA draft. We are seeking Concurring Party status and look forward to engaging with MDOT SHA on the matter during review of subsequent PA drafts.

00006253

Sincerely,

**FRIENDS OF MOSES HALL**

**Alexandra Jones, PhD, RPA**
Executive Director and Founder, Archaeology in
the Community
Trustee, Morningstar Tabernacle Number 88,
Incorporated

**Austin E. White**
Descendant
Trustee, Morningstar Tabernacle Number 88,
Incorporated

**Eileen McGuckian**
Historian and President, Montgomery
Preservation
Trustee, Morningstar Tabernacle Number 88,
Incorporated

**Diane E. Baxter**
Descendant

**Montgomery Crawford**
Descendant

**Shannon S. Steward**
Descendant

**Christopher Waynes**
Descendant

**Charlotte Troup Leighton**
Vice President of Advocacy, CJCA

**Austin White II**
Descendant

**Nathan White II**
Descendant

**Pandora White**
Descendant

**Rev. Edgar S. Bankhead, Sr.**
First Agape A.M.E. Zion Church at Gibson
Grove

**Eddie Bankhead**
First Agape A.M.E. Zion Church at Gibson
Grove

**Judi Bankhead**
First Agape A.M.E. Zion Church at Gibson
Grove

**L. Paige Whitley**
Independent Researcher

cc:     Governor Lawrence J. Hogan – governor.mail@maryland.gov
        Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
        Treasurer Nancy Kopp – treasurer@treasurer.state.md.us
        Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
        Julie Langan, Virginia DHR - julie.langan@dhr.virginia.gov
        Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
        Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
        Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
        Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
        John Simkins, FHWA Virginia Division - john.simkins@dot.gov
        Rebeccah Ballo, Montgomery County Planning Department – rebeccah.ballo@montgomeryplanning.org
        Carol Rubin, M-NCPPC – carol.rubin@montgomeryplanning.org
        Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
        Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
        Greg Pawlson, Cabin John Citizens Association – gpawlson@gmail.com
        Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
        Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
        Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
        Sara Love, Maryland State Delegate – sara.love@house.state.md.us
        Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
        Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org

00006254

Natali Fani-Gonzalez, Vice-Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Gerald Cichy, Commissioner, Montgomery County Planning Board -MCP-Chair@mncppc-mc.org
Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
Gabe Albornoz, Montgomery County Councilmember - councilmember.albornoz@montgomerycountymd.gov
Andrew Friedson, Montgomery County Councilmember - councilmember.friedson@montgomerycountymd.gov
Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

00006255

**Karen Hutchins-Keim**

| | |
|---|---|
| **From:** | Eddie Bankhead <esbj@pobox.com> |
| **Sent:** | Monday, April 12, 2021 11:10 PM |
| **To:** | Steve Archer |
| **Subject:** | Draft PA - Comments from FIrst Agape AMEZ Church |

April 12, 2021

By Email to: sarcher@mdot.maryland.gov

Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

Good evening,

Thank you for your participation with us in protecting our church (First Agape AMEZ church at Gibson Grove) and other historic sites impacted by the beltway and its expansion for the I-495/I-270 Managed Lanes Study(Project).

We look forward to revisions of our church property's effect determination located at 7700 Sevel locks Road, as discussed during our April 6 meeting. We agree with Friends of Mosses Hall for the programmatic agreement to include a Design-Review provision[1].  As we work toward stabilizing and rebuilding our church, we wish to ensure our construction efforts do not conflict with the developer for the Managed Lanes project. We must have the means and mechanisms necessary to deconflict construction objectives and timing.  We will continue to share our planning (Site work, design, and construction) of our stabilization and rebuilding projects with the state and the future developer.  We seek to provide effective feedback to the developer as we continue to be stewards of our historic site.

Thank you for taking our comments. Your help in this matter is greatly appreciated.

In God We Trust,

--ES Bankhead jr.

Chair Trustee Board
First Agape AMEZ Church
7700 Seven Locks Road

Church web site :
https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.1stagape.com%2F&amp;data=04%7C01%7CSArcher%40mdot.maryland.gov%7Ce6cc4f89f1e241dfc81e08d8fe29bb07%7Cb38cd27c57ca4597be2822df43dd47f1%7C0%7C0%7C637538802480600624%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=Zx6bV7FRHFIeqQr5wVOIAT2ncwMQZPKZb42%2FJ2JMeOY%3D&amp;reserved=0

Correspondence Address:
First Agape AMEZ Church
PO BOX 1016

1

00006256

Burtonsville MD 20866

[1] Friend of Mosses Hall email 4-12-2021 Subject:Draft PA - Comments from Friends of Moses Hall Consulting Party for Morningstar Moses Cemetery and Hall Site
To: Steve Archer <SArcher@mdot.maryland.gov> Attached document Title: FMH PA Draft Comments_FINAL.pdd, page 13 Section 25.

00006257

# SIERRA CLUB
## MARYLAND CHAPTER

**Sierra Club Maryland Chapter**
P.O. Box 278
Riverdale, MD 20738
**(301) 277-7111**

April 12, 2021

Steve Archer
Cultural Resources Team Leader
Environmental Planning
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD 21202

Jeanette Mar
Environmental Program Manager
Federal Highway Administration, Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore MD 21201

**RE: SECTION 106 COMMENTS FOR THE I-495 & I-270 MANAGED LANES STUDY**

Dear Mr. Archer and Ms. Mar,

We appreciate the opportunity to participate in the I-495/I-270 Managed Lanes Study (MLS) Section 106 process as a consulting party. Founded in 1892, the Sierra Club is America's oldest and largest grassroots environmental organization, and nationwide it has approximately 800,000 members. The Maryland Chapter has over 70,000 members and supporters, a large number of whom reside in communities in Prince George's and Montgomery Counties that would be impacted, injured, and aggrieved by the planned I-495 & I-270 Managed Lanes Study project area, and who would be adversely affected. Many historic areas and sites of importance to these members and the counties at large are in the path of the project and will experience adverse effects that are not identified, assessed or resolved by the draft Programmatic Agreement circulated for public comment.

Our partners and the 50 groups that have signed on to our I-495 & I-270 MLS Draft Environmental Impact Assessment (DEIS) comments[1] have already expressed major concerns about the way the State of Maryland has conducted its environmental review and analysis of foreseeable adverse impacts on historic sites in the DEIS. Even in Phase 1A South of the project, there are at least four historic sites that have not been identified or accorded adequate assessment of adverse effects and avoidance, minimization, and mitigation measures. These include

---

[1] Sierra Club Maryland Chapter and Rock Creek Conservancy Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA), November 9, 2020. https://jillgrantlaw.com/wp-content/uploads/2020/11/2020-11-06-Comments-on-DEIS-4f-and-JPA.pdf

1

Plummers Island, Morningstar Tabernacle No. 88 Cemetery and Hall, Gibson Grove A.M.E. Zion Church, and Cedar Lane Unitarian Universalist Church.

Our comments are structured to address concerns with the programmatic agreement approach, the reasoning behind those concerns, site-specific comments for sites impacted by Phase IA South, and omitted or excluded alternatives whose lack of consideration limits opportunities for avoidance of impacts on historic sites. Lastly, we provide recommendations on the project's overall Section 106 approach.

We will not address historic sites in other potential phases of the project here but those sites' concerns need to be addressed fully as part of the Section 106 process, unless the I-495 & I-270 MLS is reduced to cover only Phase IA South while the remainder of the project is officially designated "no build."

## 1. ISSUES WITH THE PROGRAMMATIC AGREEMENT APPROACH

**The purely Programmatic Agreement approach for this project is inappropriate and inadequate as it impermissibly forecloses large measures to avoid impacts to historic properties (such as project scope, number of new lanes, and road alignment).**

**The Programmatic Agreement approach to the I-495 & I-270 MLS Section 106 process is not adequate to meet the requirements of federal law.** The Section 106 regulations provide that a Programmatic Agreement approach is appropriate in certain limited situations, including "[w]hen effects on historic properties cannot be fully determined prior to approval of an undertaking." 36 C.F.R. §800.14(b)(1)(iii). Here, however, there is no reason to defer all identification of historic properties within the area of potential effects or the assessment of adverse effects and any measures to avoid and mitigate until later. While there may be alignment refinements that will occur during the design-build process, there are no other circumstances to warrant a departure from the normal section 106 process.

To the contrary, deferral of the Section 106 process until after major decisions are made about alternatives during the NEPA process will foreclose many reasonable, feasible, and prudent measures for avoiding, minimizing, or mitigating adverse effects to historic properties. It is immediately apparent, for example, that the historic Plummers Island, which will be impacted by the widening of the American Legion Bridge, will experience major adverse impacts from the alternatives currently being considered during the NEPA process. Upstream bridge alternative won't be available to avoid major impacts to Plummers Island if Section 106 analysis is deferred until after the alignment is already selected. Impacts to Plummers Island and numerous other historic properties discussed in more detail below that will clearly be affected by the proposed project must be considered now before the Record of Decision (ROD) is approved.

This is particularly critical, as the assessment of adverse effects is directly relevant to determinations of whether the project will use Section 4(f)-protected historic properties. The Federal Highway Administration's (FHWA's) determinations under Section 4(f) must be made in the ROD, and cannot lawfully be deferred. 23 C.F.R. § 774.7(e)(3) The assessment of NHRP eligibility, identification of foreseeable impacts, and measures to avoid adverse effects can be determined with information currently available. This is important reason to do identification of

2

historic property, determination of impacts and possible avoidance and minimization/mitigation measures upfront or else such measures may be foreclosed later by subsequent project decision making.

## 2. MORE DETAILED PROGRAMMATIC AGREEMENT APPROACH COMMENTS

The approach to Section 106 taken here impermissibly defers full consideration of historic properties listed in or eligible for listing in the National Register of Historic Places by relying on a boilerplate Programmatic Agreement that the Agencies will not execute until after selecting a Preferred Alternative. Among other things, delaying full assessment of historic properties until a Programmatic Agreement is executed ignores the Agencies' present duty to comply with NEPA, which requires a "hard look" at all of the environmental consequences that will flow from the Project if the Agencies grant the permits needed for the Project to proceed. Selection of an Alternative in the ROD, including impacts on historic properties. For these reasons, relying on an unexecuted Programmatic Agreement to carry out the Section 106 review process precludes, rather than assists, the Agencies and the public from understanding how these effects might harm historic and cultural resources as required by NEPA.

Without a complete understanding of the Project's full range of environmental effects, including harm to historic properties, there is no way that the Agencies can reasonably select a preferred alternative as required by NEPA or identify an alternative that avoids use of historic properties, parks, and recreation areas unless no other feasible and prudent alternative is available as required by Section 4(f).

Deferring the full identification of historic properties may be acceptable where the nature and scope of the resources would allow them to be easily avoided, as in the case of archaeological sites that are significant under National Register Criterion D. However, resources such as historic properties require an entirely different approach, because preservation in-place is the preferred treatment, and options to avoid harm to these resources may be foreclosed once an alternative is selected. The identification of those historic properties and the Project's potential effects on them must be completed at a time when they can actually inform the selection of alternatives, rather than being deferred to a later date after alternatives have been foreclosed.

For the reasons discussed above, it is impossible to comment meaningfully on the Agencies' plans concerning historic and cultural resources because important baseline questions have not been decided. Outstanding issues that need to be resolved include the complete identification of historic properties affected and how the Project will affect them

Moreover, the Agencies' Draft Section 4(f) Evaluation is likewise insufficient because it does not have full information needed to understand the complete range of adverse effects of the Project and therefore cannot know how the Project will use historic properties. For these reasons, among others, the Agencies should undertake a thorough identification of historic properties and assessment of adverse effects immediately, so that any findings can be incorporated into the Final EIS. As Sierra Club noted in its comments on the DEIS, the assessment of impacts on cultural and historic sites was grossly inadequate and incomplete.

## 3. SITE-SPECIFC COMMENTS

**Plummers Island:** One of the first sites at risk from Phase 1 of the I-495/I-270 Managed Lanes Project (MLP) is Plummers Island, an NPS historic site of ongoing long-term research. Plummers Island has historic status as part of the Chesapeake and Ohio (C&O) Canal National Historical Park. In addition to being part of C&O Canal NHP, Plummers Island also has historic significance distinct from the C&O Canal NHP designation. Yet Plummers Island is not even mentioned in the March 10, 2021 draft of the Section 106 Programmatic Agreement. The importance of Plummers Island has not yet been adequately recognized in the NEPA DEIS and Section 106 process. See Washington Biologist Field Club Section 106 letter to Steve Archer dated April 9, 2021.

**There is a need to build in more specific avoidance, minimization, and mitigation measures for Plummers Island.** Context sensitive design option for Plummers Island need to be pursed for an area of unique concern that will experience serious adverse effects. The WBFC has proposed specific mitigation measures that should be considered in the Section 106 process. Avoidance measures should be identified now and not deferred to the design review consultations during the design-build process. Delaying identification of the location and boundaries of this site until after implementation of a Programmatic Agreement prevents consideration of the impacts to the site during alternative selection under NEPA and undermines discussion of potential mitigation measures for any adverse effects under Section 106.

**Morningstar Tabernacle No. 88 Moses Hall and Cemetery:** Leaving boundary delineation and NRHP evaluation investigations at the Moses Hall Site and Cemetery to a later date prevents potential impacts to this site from being considered during current project design and NEPA consultations. It also does not allow for discussion of potential scope of mitigation efforts under Section 106.

**In the draft Section 106 Programmatic Agreement no specific consideration appears to be given to protecting the Morningstar Tabernacle No. 88 Moses Hall foundation. The hall foundation needs to be evaluated as a contributing resource to the overall site.** This ruins is historically significant, and is a significant contributory element to Moses Hall. The destruction of the foundation of Moses Hall, the site of an important 19th century African American benevolent society is not a small thing, and any significant adverse effect to it could also be seen as an environmental justice impact.

**Gibson Grove A.M.E. Zion Church:** In DEIS Appendix F, page 26, Gibson Grove A.M.E. Zion Church is listed as one of the "Section 4(f) Properties where there is no Use or Impact." on the 0.4 acre site. Similarly, the most recent draft Programmatic Agreement states:

> "MDOT SHA and FHWA have not identified an adverse effect to Gibson Grove A.M.E. church currently, …MDOT SHA and FHWA have not identified an adverse effect to Gibson Grove A.M.E. church currently; however, based on design refinements to avoid and minimize effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery, the church may be subject to additional temporary construction related impacts causing an adverse effect to the property. In this event, MDOT SHA and Gibson Grove A.M.E. church will continue to explore preservation enhancements to the property suggested by

4

Church leadership to be specified in subsequent drafts of this agreement." (I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement, March 10, 2021)

**This is incorrect. The NRHP eligible Gibson Grove A.M.E. Zion Church will unquestionably be adversely impacted by the project.** The highway is next to the church as it is, and the Beltway runoff is likely why the church was damaged by treefall in the first place. Any parking, staging or construction on the church side of the road will adversely impact the church property. It will require infilling and have visual impacts detracting for the character and viewshed of the little white church on the hill. That no measures are being taken now to avoid, minimize, and mitigate adverse impacts to the church is a major omission, as the likely adverse impacts to the site are significant.

**Cedar Lane Unitarian Universalist Church**: Cedar Lane Unitarian Universalist Church, which predates the Beltway, has a unique architectural design meant to blend with the environment. Designed by renowned architect Pietro Belluschi who designed the Julliard School building, Cedar Lane Unitarian Universalist Church should be considered for potential NRHP eligibility. This church is listed in the same table as the Gibson Grove A.M.E. Church, the table entitled: "Section 4(f) Properties where there is no Use or Impact". This church will be impacted. As was pointed out in DEIS testimony:

> "Cedar Lane Unitarian Universalist Church would be greatly impacted by this project, although the DEIS chart lists it as "no impact". The natural habitats and walking trails of Rock Creek Park are part of Cedar Lane's appreciation of spirituality in nature. The creek, the estuaries and wildlife adjoining Beach Drive and our church grounds are a community gathering place. The noise level is already extremely high and would be higher with this project." (DEIS testimony of Montgomery County Faith Alliance for Climate Solutions, October 27, 2020)

**There are undoubtedly many other sites deserving of historic status and protections, including in Environmental Justice communities in Prince George's County who have not been invited to be a part of the Section 106 process. The I-270 expansion will disturb burial sites in the Poor Farm Cemetery in Rockville, and the descendants of those buried there and other concerned stakeholders also should have a voice in the Section 106 process.**

**Although not impacted by the first phase of the project, Sligo Creek Parkway and Indian Springs community (beyond the YMCA properties) in Silver Spring should be promptly screened for National Register of Historic Places eligibility, with special attention to their Native American history in addition to their more recent history connected to the early days of settlement in the area (the Blair family, etc.) and the 20th Century.**

**4. BRIDGE ALTERNATIVES NOT CONSIDERED**

**A one-lane addition per side alternative was not fully considered for the American Legion Bridge and should have been.** Over a decade of study by MDOT, VDOT, and FHWA conclude that: "

00006262

"Along the Capital Beltway, there were two proposed typical sections for the long-term alternatives: a one-lane and a two-lane managed system. However, the physical footprint for all of the alternatives was the same and it included widening for two lanes per direction in Virginia and widening for one lane per direction on the American Legion Bridge and in Maryland. The widening in Maryland was constrained by the right-of-way, proximity to sensitive environmental features, and proximity to adjacent residences" (West Side Mobility Study, 2009, p. 21).

**A one-lane addition per side, rather than two, would significantly reduce risks and adverse impacts to historical sites, among others.** Previous studies only considered it possible to widen the Capital Beltway by one lane per direction on the American Legion Bridge and in Maryland. Yet a one-lane addition per side alternative (Alternative 5) for the American Legion Bridge and most of the Maryland Beltway was rejected by MDOT and FHWA as "not a reasonable alternative" (DEIS Appendix D, p. 1) and excluded from the Joint Permit Application alternatives.). It is worth asking again in this context why a one-lane addition per direction alternative was not considered more fully, an alternative which would entail less harm to Plummers Island and would preserve the integrity and reduce the closure time of the C&O Canal NHP towpath. A one additional lane per side alternative would also be much less disruptive for the adjacent impacted historical sites all along the entire MD Beltway, including the two Gibson Grove historical sites.

**The DEIS failed to include any upstream alternative (adding new lanes and bike/pedestrian path only to the upstream side of the American Legion Bridge), so no one was able to comment on it. It should have been included and would significantly reduce harm to Plummers Island and the C&O Canal NHP.** In 2021, an MDOT "strike team" noted the possibility of an upstream bridge alternative in which new lanes would all be added to the upstream side of the American Legion Bridge. Yet, this option was not presented in the DEIS for public comment, which is a major omission. If more people had known about it through the DEIS process, they would have had a chance to comment. Bridge options deserve discussion and analysis. The same error should not be made as a part of the Section 106 process.

**The addition of lanes only to the upstream side of the bridge would better protect Plummers Island from the worst adverse impacts of bridge construction.**

**Bridge construction alternatives were not considered by Virginia in their I-495 Express Lanes Northern Extension (495 NEXT) Environmental Assessment (EA). Bridge construction alternatives could have avoided and minimized impacts to some historic properties.** Virginia owns 21% of the American Legion Bridge, while Maryland owns 79% of it and the Potomac River. Virginia's EA for the bridge analyzed only Build or No Build alternatives, assuming continuation of Virginia's pattern of adding two new toll lanes, which does not consider what might be in the best interests of Maryland. This means that Virginia did not pose any bridge alternatives and by doing so may have foreclosed options for other alternatives. It is unclear to what extent the Capital Beltway Accord (an "agreement on principles" announced November 12, 2020 by VA Governor Ralph Northam and MD Governor Larry Hogan) may have biased the process and foreclosed opportunities for other alternatives, including in the design and reconstruction of the bridge. The misalignment of the processes with an EA in Virginia and EIS in Maryland also raises questions about the appropriateness and

6

adequacy of the analysis of alternatives for the bridge. This inattention to bridge alternatives in a NEPA process contrasts starkly with the thorough process of review, analysis, and vetting that occurred for the Woodrow Wilson Bridge, which was ultimately built to accommodate heavy rail to support multimodal connectivity. It also begs the question why the Virginia side of the Beltway expansion project was not subjected to an equivalent level of review as the Maryland side if they are supposed to be coordinating the projects.

**The MDOT Recommended Preferred Alternative, announced on January 27, 2021, which includes four new tolled lanes on the American Legion Bridge, further seems to have foreclosed alternatives from consideration that could have been explored during the NEPA process and been informed by the Section 106 process. The MDOT Recommended Preferred Alternative is also premature given the inadequacy of the analysis presented in the DEIS and the early stage of the Section 106 process.**

**A serious study of bridge alternatives and bridge construction impacts has not been undertaken. Instead, the DEIS merely notes that "Other minimizations options were also considered and discussed with NPS such as a double deck bridge, top-down construction and reduced typical sections and pier locations (Appendix F, Section 2.1.2.C)." Given the scenic value of the river and the sensitivity of the historic sites and ecological significance of the sites under the American Legion Bridge, this is not acceptable. Further, the project will have adverse effects on the George Washington Memorial Parkway and the Clara Barton Parkway as a result of the American Legion Bridge and 495 Next project in Virginia.**

**5. RECOMMENDATIONS ON THE OVERALL SECTION 106 APPROACH**

**While it may be appropriate to provide a process for continuing to consider ways to reduce impacts on historic properties throughout the design-build process, wholesale deferral of the Section 106 process is not appropriate.** Other projects have instead used a hybrid approach, such as that used by the U.S. Coast Guard for a bridge project in Bismarck, ND, in which only some reviews were deferred to allow design flexibility.

**We recommend that the PA's dispute resolution mechanism include the two State Historic Preservation Offices (MD SHPO and VA SHPO) and also give both SHPOs an opportunity to comment.**

**The project's predevelopment contract documents should be immediately scrutinized for language that could be harmful to historic sites, and any such wording discovered should be flagged by those involved in the Section 106 process to MDOT to have it amended or removed.** The heavy involvement of the profit-driven private developer in the remainder of the NEPA process is concerning in its own right. The predevelopment contract expected to be signed within a month directs the developer team to: "eliminate the potential for Unknown Archaeological Remains and Unknown Endangered Species"[2] "Eliminate" is a very odd use of language to use when considering what that could mean in our historical areas and sites of

---

[2] Phase P3 Agreement RFP, Exhibit 6 Predevelopment Work Requirements, December 18, 2020, p. 15. https://495-270-p3.com/wp-content/uploads/2020/12/Phase-P3-Agreement-Exhibit-6-RFP-December-18-2020.pdf

00006264

concern, including Morningstar Tabernacle No. 88 Cemetery and Plummers Island. Contract language like that does not impart confidence about what future contracts may look like. Less extreme language such as "re-assess" and "document any" seems more appropriate.

**More information should be disclosed about the construction contractor to the project team and the Section 106 consulting parties.** It is concerning that developer team did not put forth a construction contractor as the bid process required. Omitting the name of a construction contractor from the bid upon contract submission introduces a further uncertainty for the public and Section 106 consulting parties as nothing is known about the construction contractor or its reputation and track record of handling adjacent or impacted cultural and historic properties.

**Although the DEIS mentioned a U.S. Coast Guard (USCG) letter stating that a bridge permit for the American Legion Bridge would not be required,[3] a bridge permit should be required.** The bridge permit process is a standard requirement that should be followed, and can further build awareness of and protection for sensitive historic and ecological sites that fall in the vicinity of the American Legion Bridge, including Plummers Island and the C&O Canal NHP.

**Dust minimization and specifically OSHA crystalline silica construction dust standards must be upheld and the users and visitors of historic parkland and sites adjacent to the widening must be protected.** Requirements for this should be included in the Programmatic Agreement. The roads and bridges deconstruction processes required for the Project will create massive amounts of toxic crystalline silica construction dust. This will occur on the American Legion Bridge and the toxic dust will drift downriver and impact Plummers Island and the C&O Canal National Historic Park (the eighth most visited national park during 2020), including its popular towpath. Plummers Island animal and plant life and the biologists studying it would be at risk from this dust. Visitors to the C&O Canal NHP and its towpath will be as well. Such toxic air pollution causes respiratory diseases including asthma, silicosis, chronic obstructive pulmonary disease (COPD), and lung cancer. This is an urgent public health issue. It is not addressed in the DEIS[4] nor in the Programmatic Agreement to date and it needs to be.

## CONCLUDING REMARKS

**In conclusion, deferral of federally required assessment of impacts impermissibly forecloses opportunities to avoid, minimize, and mitigate impacts to historic properties.** The purely Programmatic Agreement approach to Section 106 is inadequate to meet federal regulations, given the incomplete identification of historic properties and assessment of impacts to them in the I-495 & I-270 MLS DEIS.

---

[3] Sierra Club Maryland Chapter and Rock Creek Conservancy Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA), November 9, 2020, p. 64. https://jillgrantlaw.com/wp-content/uploads/2020/11/2020-11-06-Comments-on-DEIS-4f-and-JPA.pdf

[4] For further information, see Sierra Club Maryland Chapter and Rock Creek Conservancy Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA), November 9, 2020, pp. 108-109. https://jillgrantlaw.com/wp-content/uploads/2020/11/2020-11-06-Comments-on-DEIS-4f-and-JPA.pdf

00006265

**The project's planned deferral of assessment of impacts offers inadequate protection for historical and cultural sites, many of which are known now to face significant adverse effects.** Deferral of identification and assessment of impacts forecloses to these historical sites the opportunity of benefiting from important avoidance, minimization, and mitigation measures.

**A hybrid approach to the Section 106 process** which involves Programmatic Agreement for some sites and Memoranda of Agreement for sites that will experience known adverse impacts is appropriate for a project of this nature, magnitude, and complexity.

**With reference to historic properties, there remain issues with the lack of appropriate alternatives analysis for the American Legion Bridge.**

**Several specific sites impacted by Phase 1A South of the project deserve significantly greater attention and assessment of impacts**, including in some cases screening for a determination of National Register of Historic Places eligibility. This includes Plummers Island and the Cedar Lane Unitarian Universalist Church in Bethesda.

**Sligo Creek Parkway and Indian Springs community** in Silver Spring should be screened for National Register of Historic Places eligibility, with special attention to their Native American history in addition to their more recent history connected to the early days of settlement the area (the Blair family, etc.) and the 20th Century.

We look forward to your prompt attention to the issues raised in our comments.

Thank you.


Josh Tulkin, State Director
Sierra Club Maryland Chapter

**DRAFT 1 – Deliberative and Pre-Decisional**
**3/10/2021**
PROGRAMMATIC AGREEMENT
Among the
**FEDERAL HIGHWAY ADMINISTRATION,**
**MARYLAND DEPARTMENT OF TRANSPORTATION STATE HIGHWAY**
**ADMINISTRATION,**
**NATIONAL PARK SERVICE**

**NATIONAL CAPITAL PLANNING COMMISSION**
**MARYLAND STATE HISTORIC PRESERVATION OFFICER,**
**VIRGINIA STATE HISTORIC PRESERVATION OFFICER,**
**ADVISORY COUNCIL ON HISTORIC PRESERVATION**

**Implementing Section 106 of the National Historic Preservation Act for the**
**I-495 and I-270 Managed Lanes Study**
**Anne Arundel, Frederick, Montgomery and Prince George's Counties, Maryland and**
**Fairfax County, Virginia**

**WHEREAS**, the U.S. Department of Transportation, Federal Highway Administration (FHWA) plans to approve The I-495 and I-270 Managed Lanes Study (MLS), a proposed Public-Private Partnership (P3) administered by the Maryland Department of Transportation State Highway Administration (MDOT SHA); and

**WHEREAS,** FHWA has determined that the Project is an undertaking, as defined in 36 C.F.R. §800.16(y), and thus is subject to review under Section 106 of the National Historic Preservation Act (NHPA), 54 U.S.C. § 306108 and its implementing regulations, 36 C.F.R. Part 800; and

**WHEREAS**, the MLS Preferred Alternative (Project) consists of construction of Priced Managed Lanes along Interstates 495 and 270, beginning in Fairfax County, Virginia, and extending North to Approximately Interstate 370, and East and Southward to Approximately Maryland Route 5 in Prince George's County, as described in detail in Attachment; and

**WHEREAS,** the MDOT SHA, with the approval of FHWA, intends to deliver the Project as a Public-Private Partnership ("P3") using the services of a private sector developer or multiple developers who will advance the project and be responsible for design, construction, operation and maintenance, subject to approvals by MDOT SHA and/or FHWA; and

**WHEREAS,** the MLS will be implemented in Phases, yet to be fully defined, and although this agreement reflects evaluation of the entire defined Preferred Alternative project, certain commitments may require phased implementation; and

**WHEREAS,** MDOT SHA has identified "Phase I South" (Attachment) extending approximately from the portion of the project in Virginia North to I-370 as the first phase of implementation; and

**WHEREAS**, FHWA has been designated the lead agency for purposes of ensuring that the Project complies with Section 106 of the National Historic Preservation Act (NHPA) (54 U.S.C.

§ 306108), as amended, and codified in its implementing regulations, 36 C.F.R. Part 800, as amended (August 5, 2004); and

**WHEREAS**, The National Park Service (NPS) agrees FHWA is the lead federal agency for purposes of ensuring that the Project complies with Section 106 of the NHPA, and has agreed to participate in this PA as an Invited Signatory. NPS will accommodate the project through land transfers via Highway Deed Easement and other permitting actions or accommodations that will result in an adverse effect to NRHP-listed or eligible properties including The Baltimore-Washington Parkway, Greenbelt Park, George Washington Memorial Parkway (Clara Barton Parkway), the Chesapeake and Ohio Canal National Historical Park, and intends to use this Programmatic Agreement (PA) to comply with 36 C.F.R. Part 800, 54 U.S.C. § 100902, 36 C.F.R. Part 14; and

**WHEREAS,** FHWA has elected to phase the identification, evaluation, and effects assessment of certain portions of the APE and historic properties where unavailability of access or design information precluded such identification, evaluation and assessment, as provided in 36 C.F.R. 800.4(b)(2), and 36 C.F.R. 800.5(a)(3); and

**WHEREAS**, FHWA will ensure additional identification, evaluation, assessment, is completed in a timely manner prior to construction, to allow practical opportunities to avoid, minimize, or mitigate for any potential adverse effects to historic properties, as stipulated under this PA; and

**WHEREAS**, FHWA has initiated consultation pursuant to 36 C.F.R. 800.3(c) with the Maryland State Historic Preservation Office (MD SHPO) and the Virginia State Historic Preservation Office (VA SHPO), (collectively referred to as SHPO where the specific office is not specified) by letter on DATE  and MDOT SHA on behalf of FHWA will continue to consult with the appropriate SHPO(s) under the terms of this PA in order to identify historic properties, assess the effects of the Project on historic properties, and, if necessary, resolve adverse effects to historic properties; and

**WHEREAS,** in accordance with 36 C.F.R. 800.6(a)(1)(i)(C), the FHWA, on DATE, initiated Section 106 consultation with the Advisory Council on Historic Preservation (ACHP) and the ACHP has chosen to participate in the consultation pursuant to 36 C.F.R. 800.6(a)(1)(iii); and

**WHEREAS**, pursuant to 36 C.F.R. § 800.10(c) MDOT SHA  invited the Secretary of the Interior (the "Secretary") to participate in consultation by letter dated [date], as the Undertaking includes National Historic Landmarks within the Area of Potential Effects (APE), and the National Park Service, National Capital Region NHL Program (NPS-NHL) has represented the Secretary concerning the NHLs within the project throughout consultation and will continue to participate in future consultations involving the National Historic Landmarks, and

**WHEREAS**, under the *Amended Programmatic Agreement Among The Federal Highway Administration, the Maryland Department of Transportation State Highway Administration, the Advisory Council on Historic Preservation, the Maryland State Historic Preservation Officer,*

*Implementing Section 106 of the National Historic Preservation Act for the Federal-aid Highway Program in Maryland* ("Statewide PA" see Attachment), FHWA, the Advisory Council on Historic Preservation (ACHP), MDOT SHA, and the Maryland Historical Trust (MD SHPO) have agreed to delegate certain authorities relating to Section 106 of the NHPA to MDOT SHA for Federal-aid Highway projects in Maryland; and

**WHEREAS,** pursuant to the above agreement, MDOT SHA employs Secretary of Interior-qualified professionals in the fields of archaeology, architectural history and/or history who will oversee implementation of stipulations in this agreement; and

**WHEREAS,** Pursuant to 36 C.F.R. 800, MDOT SHA, on behalf of FHWA, has established and updated the APE for the project in consultation with SHPO, has identified historic properties within the APE, and identified adversely affected properties where feasible, as described in the *Draft Section 106 Technical Report* of January 2020, and subsequent documentation (Attachment/Link); and

**WHEREAS,** MDOT SHA, during the course of consultation, has invited the parties listed in Attachment to participate in consultation on the Project; and

WHEREAS, the National Capital Planning Commission (NCPC) is a Consulting Party in the Section 106 process pursuant to 36 CFR § 800.3(f)(1), and NCPC has advisory authority over Federal projects located in the Environs pursuant to the National Capital Planning Act 40 U.S.C. § 8722(b)(1); and

WHEREAS, NCPC has approval authority over projects on property acquired with Federal and state funding appropriated under the 1930 Capper-Cramton Act, 46 Stat. 482; and

WHEREAS, FHWA invited NCPC to sign this PA as an Invited Signatory; and NCPC has elected to fulfill its Section 106 responsibilities by participating in this consultation and signing this PA pursuant to 36 CFR § 800.6(c)(2); and

**WHEREAS,** The following parties, based on their relationship to specific actions as specified in this agreement, have been invited to concur in the agreement (Placeholder); and

**WHEREAS**, during the course of consultation, MDOT SHA and FHWA have initiated consultation with the following Federally-recognized Native American tribes (Tribes) and provided the Tribes with information about the Project: (Placeholder List). The (Placeholder List) have been invited to become concurring parties to this agreement; and

**WHEREAS,** Federal Agencies who recognize FHWA as the lead federal agency for the Project may fulfill their obligations under Section 106 of the NHPA according to 36 C.F.R. 800.2(a)(2), provided that FHWA follows the requirements of this agreement.

**WHEREAS,** FHWA, ACHP, MD SHPO and VA SHPO, who are signatories to this agreement,, have invited MDOT SHA and NPS to be additional invited signatories to this agreement, and all signatories, required and invited, are referred to as "signatories" to this document; and

Stipulations in order to take into account the effect of the undertaking on historic properties and that these Stipulations will govern compliance of the Project with Section 106 of the NHPA until this PA expires or is terminated.

**Stipulations**

**I.    Roles and Responsibilities**

   **A.    FHWA** is the lead federal agency and is responsible for ensuring the terms of this agreement are carried out.

   **B.    MDOT SHA** is delegated authority under this PA and the Statewide PA to continue defined aspects of consultation, project compliance review, and mitigation implementation.  MDOT SHA will be primarily responsible for implementation of this PA excepting where otherwise specified.

      1.    <u>Developer</u> MDOT SHA will enter into agreements with one or more developers to design, build, and operate the project.  MDOT SHA will ensure the work of the developer or developers conform to the requirements of this agreement and may task the developer with assistance with certain commitments (such as context-sensitive design); however MDOT SHA may not delegate consultation obligations or other responsibilities specified in this agreement to the developer.

         (1)    MDOT SHA will require the developer or developers to retain qualified Secretary of Interior-qualified cultural resources staff for the duration of design and construction to assist with design commitments, liaise with MDOT SHA cultural resources staff and facilitate compliance with this PA.

   **C.    National Park Service** (*MDOT SHA requests proposed language from NPS describing details of NPS action*)

   **D.    NCPC**
         **A.NCPC will review project submittals according to the timeframes defined within this PA and will participate in consultation, as requested by FHWA.**
         **B. These reviews do not supersede the statutory or regulatory obligations NCPC has, and its Commission will review and approve the project components as required based on its authorities, primarily under the Capper-Cramton Act.**

I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021

00006270

**D.    SHPO**s The Maryland Historical Trust (MD SHPO) has jurisdiction as established in the National Historic Preservation Act for historic properties in Maryland. The Virginia Department of Historic Resources (VA SHPO) has jurisdiction as established in the National Historic Preservation Act for historic properties in Virginia. MDOT SHA, on behalf of FHWA, will consult with the relevant SHPO(s) for actions under this PA and 36 C.F.R. 800.  Timelines for concurrence with or response for eligibility findings, effects determinations (generally 30 days unless otherwise specified) are established in 36 C.F.R. 800.  MDOT SHA and FHWA may assume concurrence or no objection to findings and submittals if no response is received within the established timeline, or 30 days if no timeline is specifically established in 36 C.F.R. 800.

**E.    ACHP** will provide policy guidance, provide comment on issues that may arise as requested by parties to this agreement, and participate in dispute resolution as specified in Stipulation

**F.    Concurring Parties/Public**

1.    Other consulting parties concurring in this agreement have ongoing opportunities to provide input, and participate in consultation where specified. Concurring parties may join this agreement at any time after execution of the agreement with the invitation of MDOT SHA or FHWA.

2.    Concurrence with the agreement by a party  does not necessarily indicate that the party supports the project or the preferred alternative or endorses all stipulations of this Agreement, but rather indicates the desire of such parties to remain involved in implementation of the terms of this agreement.

3.    For substantial changes to the undertaking that would result in expanded APE or new effects to historic properties, MDOT SHA will provide for notification of the public consistent with the requirements of the National Environmental Policy Act (NEPA) to ensure ongoing opportunities for input.  As appropriate, this process may identify new consulting or concurring parties who may wish to join the agreement at a later time in response to project refinement.

**II.    Professional Standards**

**A.**    Guidelines, standards and regulations relevant to this agreement and its purposes are listed below.  Additionally, it is the intention of the signatories to interpret this agreement to incorporate any subsequent standards, revisions of standards, or applicable guidance issued by the Secretary of Interior, ACHP, or MD SHPO or VA SHPO as then in force during this agreement.

1.      36 C.F.R. Part 800: Protection of Historic Properties, as amended (2004);

2.      *Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation* (1983);

3.      *Standards and Guidelines for Archeological Investigations in Maryland* (Shaffer and Cole 1994);

4.      *Standards and Guidelines for Architectural and Historical Investigations in Maryland* (Maryland Historical Trust, Revised 2019);

5.      *Guidelines for Conducting Historic Resources Survey in Virginia* (Virginia Department of Historic Resources, revised September 2017)

6.      36 CFR Part 79: Curation of Federally-Owned and Administered Archeological Collections

7.      *Museum Handbook on Accessioning and Cataloging Museum Objects,* National Park Service, revised

8.      Program Comment for Actions Affecting Post-1945 Concrete Steel Bridges (77 FR 68790);

9.      Policy Statement Regarding Treatment of Burial Sites, Human Remains and Funerary Objects (ACHP February 2007);

10.     National Register of Historic Places Bulletin 15, *How to Apply the National Register Criteria for Evaluation* (National Park Service revised 1997), and other National Register Bulletins as applicable

## III.    Project-wide Mitigation and Commitments

**A.**      MDOT SHA will implement mitigation concurrent with construction phasing where impacts will occur; in the event that the undertaking is modified or certain elements causing adverse effects are not constructed, MDOT SHA will notify signatories of the change at such time as a final decision is made removing such elements and amend the agreement as necessary.

**B.**      MDOT SHA cultural resources staff will oversee implementation of all mitigation commitments and other terms of this agreement.

**C.**      Reforestation

00006272

MDOT SHA is obligated to provide reforestation mitigation for the project pursuant to the Maryland Reforestation Law (MD Nat Res Code § 5-103). Reforestation must occur within 2 years or 3 growing seasons of completion of construction. The locations for reforestation credit are not yet fully identified. Reforestation activities may take the form of conservation easements or other noninvasive activities which would not affect historic properties. MDOT SHA will not consult on easements or conservation actions where no ground disturbance is involved. If areas outside the APE are identified for reforestation where plantings or other activities with the potential to affect historic properties are identified, MDOT SHA will consult in accordance with Stipulation to add such areas to the APE, identify historic properties, and evaluate effects to historic properties. MDOT SHA will avoid adverse effects to historic properties to the maximum extent practicable. If adverse effects are unavoidable, MDOT SHA will amend this agreement in accordance with Stipulation to resolve any such adverse effects.

**D.** Compensatory Stormwater Mitigation Plan – *locations to be included in Final LOD*

**E.** Culvert Augmentation – *locations will be included in Final LOD*

**F.** Stream and Wetland Mitigation on NPS lands – *locations to be included in Final LOD*

**G.** Other Mitigation and Revisions to Mitigation Locations

As project development proceeds, additional mitigation or enhancement locations may be identified or proposed locations revised. MDOT SHA will follow the procedure described in Stipulation below for any changes to the APE resulting from new or revised mitigation or enhancement locations.

**IV.    Consultation Regarding Project Development**

**A.** MDOT SHA will initiate consultation with SHPOs and other consulting parties (as described below) at the following points in project development:

1.    Upon advancement of design wherein effects can be assessed to Gibson Grove A.M.E. Zion Church (*note effect determination for Gibson Grove may be made prior to next draft of PA*), Carderock Springs Historic District and Polychrome Historic District

2.    Upon changes proposed by MDOT SHA that would result in an expansion of the APE, or that would affect historic properties differently than described in this PA

3.      If MDOT SHA, working with the Developer, finds design or construction solutions that avoid or further minimize adverse effects to historic properties, MDOT SHA shall consult in accordance with the procedures in <mark>Stipulation</mark> to seek concurrence with any revised findings of effect, and amend this PA in accordance with <mark>Stipulation</mark>

4.      Upon changes to the LOD within the existing APE where additional archaeological investigation is recommended in the Cultural Resources Technical Report or subsequent consultation documentation.

## V.    Consultation Process:

MDOT SHA will consult with the relevant SHPO(s), concurring parties to this agreement, tribes, local governments and other consulting parties as appropriate on any amendments to the APE, new or revised determinations of National Register of Historic Places (NRHP) eligibility, new or revised determinations of effects to historic properties, or other findings and decisions to the relevant SHPO(s) and relevant consulting parties consistent with its Statewide PA and 36 C.F.R. 800.

## VI.    Property-Specific Mitigation and Commitments - Phase I South

MDOT SHA will be responsible for ensuring the following mitigation is carried out, under the oversight of FHWA.  MDOT SHA will either complete mitigation itself, or enter into legally binding agreements with partner agencies to ensure the following stipulations are fulfilled, subject to the requirements of each stipulation below. Mitigation and commitments will be implemented by authorized construction phase, unless there is opportunity to provide advanced mitigation that is mutually agreeable to all parties, is feasible to advance, and is identified by MDOT SHA as a priority. Preliminary engineering activities to support design of future phases, such as geotechnical studies or other similar activities with limited potential to affect historic properties may proceed within the APE prior to construction authorization and will not require mitigation.

A.     George Washington Memorial Parkway/Clara Barton Parkway

1.      MDOT SHA will continue property-specific Design-Review consultation with NPS to ensure a context-sensitive design for new facilities, and, through the ongoing design process, minimize, to the extent practicable, impacts to character-defining features and resources that contribute to the George Washington Memorial Parkway/Clara Barton Parkway as a historic property.

2.      MDOT SHA will ensure revisions and updates are made to the Clara Barton National Historic Site National Historic Landmark Nomination.

3.    MDOT SHA will ensure completion of a Cultural Landscape report with treatment recommendations for the North Parkway, and provide funding for implementation of recommendations resulting from the cultural landscape report to be negotiated with NPS as part of a separate agreement or agreements. (MDOT SHA requests additional detail on scope of this proposed mitigation from NPS to include in the agreement)

**B.**    Dead Run Ridges Archaeological District

(*This property may be avoided through ongoing minimization efforts; if avoidance is not confirmed, MDOT SHA will include provisions in the archaeological treatment plan as specified in* Stipulation)

**C.**    Chesapeake and Ohio Canal National Historical Park

1.    MDOT SHA will continue property-specific Design-Review consultation with NPS to ensure a context-sensitive design for new facilities, and, through the ongoing design process, minimize to the extent practicable, impacts to character-defining features and resources that contribute to the Chesapeake and Ohio Canal National Historical Park as a historic property.

2.    MDOT SHA will remove the bridge pier from Lock 13 as part of removal of the existing Clara Barton Parkway Bridge, and, subject to engineering and safety considerations, attempt to avoid new structure within Lock 13.

3.    MDOT SHA will provide for reconstruction of Lock 13.

4.    MDOT SHA will provide for rehabilitation of the Canal and Towpath at Widewater to Lock 5.(MDOT SHA requests additional detail on scope of this proposed mitigation from NPS to include in the agreement)

**D.**    18MO749 Archaeological Site (C&O Canal)

MDOT SHA will develop a Data Recovery research design and interpretation commitments as part of the Archaeological Treatment Plan in Stipulation

**E.**    18MO751 Archaeological Site (C&O Canal)

MDOT SHA will develop a Data Recovery research design and interpretation commitments as part of the Archaeological Treatment Plan in Stipulation

**F.**    Morningstar Tabernacle No. 88 Moses Hall and Cemetery

*MDOT SHA continues to pursue avoidance and minimization efforts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. If these efforts result in a revised finding of no adverse effect to the property, MDOT SHA will continue to include context-sensitive commitments adjacent to the cemetery including:*

1.    Design-review of treatment of sound barrier facing the cemetery

2.    Commitment to evaluate existing right-of-way adjacent to the cemetery to ensure no undocumented burials or human remains would be affected, as part of the treatment plan specified in Stipulation

I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021

**G.**    Gibson Grove A.M.E. Church

*MDOT SHA and FHWA have not identified an adverse effect to Gibson Grove A.M.E. church currently; however, based on design refinements to avoid and minimize effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery, the church may be subject to additional temporary construction related impacts causing an adverse effect to the property.  In this event, MDOT SHA and Gibson Grove A.M.E. church will continue to explore preservation enhancements to the property suggested by Church leadership to be specified in subsequent drafts of this agreement.*

**H.**    Carderock Springs Historic District

1.    MDOT SHA has found that effects to Carderock Springs Historic District cannot be determined based on the level of design at the time of the FEIS. MDOT SHA will work with the developer to advance design in a context-sensitive manner within and adjacent to the historic district in a manner that would avoid an adverse effect.  These goals include such elements as: preservation of existing contours and limiting vegetation removal to the extent practicable, screening the highway from bordering houses by planting new trees of a similar type replacing those removed during construction, and placing noise walls incorporating design materials compatible with the houses and natural terrain.

2.    At such time as the design is sufficient to make a determination of effect, MDOT SHA will submit the finding of effect to MD SHPO and relevant consulting parties, including Carderock Springs Citizens Association, for review and comment, and request concurrence on the finding by MD SHPO.

3.    If MDOT SHA determines an adverse effect is unavoidable following this consultation, MDOT SHA will develop a treatment plan including mitigation for the Carderock Springs Historic District, in consultation with Carderock Springs Citizens Association and MD SHPO.  The treatment plan will not require amendment of this agreement; if MD SHPO fails to concur on the proposed treatment plan, the parties will consult to revise the plan until concurrence is reached, or follow the dispute resolution provisions of ==Stipulation==

**VII.    Mitigation and Commitments for Phases Subsequent to Phase I South**

**A.**    Rock Creek Stream Valley Park Units 2 and 3

1.    MDOT SHA will ensure completion of a Multiple Property Nomination for the M-NCPPC Stream Valley Park system in Montgomery and Prince George's Counties. **The effort will be undertaken in collaboration with MNCPPC and NCPC.**

2.    MDOT SHA will provide for assistance with wayfinding/branding/signage for M-NCPPC historic properties (MDOT SHA requests additional detail on scope of this proposed mitigation from M-NCPPC to include in the agreement) **The effort will be undertaken in collaboration with MNCPPC and NCPC.**

VIII.    495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021

**B.**     National Park Seminary Historic District (Forest Glen)

1.     MDOT SHA will continue property-specific Design-Review consultation with Save Our Seminary and National Park Seminary residents to develop Context-sensitive design for new facilities, including proposed new bridges and sound wall;

2.     MDOT SHA will ensure historically compatible restoration and revegetation of land disturbed by construction, with a focus on minimizing disturbance to the existing landscape, and appropriate restoration when such disturbance is unavoidable

3.     MDOT SHA, through use of Best Management Practices during construction, will ensure protection of existing vegetation outside the LOD for the duration of construction.

4.     MDOT SHA will ensure completion of a Cultural Landscape Inventory (or measured drawings) of key Seminary Resources *MDOT SHA requests additional detail from National Park Seminary Consulting parties on these requests*

5.     MDOT SHA will identify NRHP eligibility criteria for National Park Seminary Historic District and update National Register documentation accordingly.

**C.**     **Sligo Creek Parkway**

**1.     MDOT SHA will develop historical information about the park and the golf course in collaboration with M-NCPPC, NCPC, Friends of Sligo Creek and the Sligo Creek Golf Assocation and will offer to incorporate historical information on the sign for each hole, or at another location as appropriate.**

**2.     MDOT SHA will identify a period of significance for the Parkway and update National Register information to document the period of significance.**

**3.     MDOT SHA will reconstruct the I-495/Beltway Bridge over the Sligo Creek Parkway based on relevant M-NCPPC/Montgomery County design standards.**

**D.**     Polychrome Historic District

1.     MDOT SHA has found that effects to the Polychrome Historic District cannot be determined based on the level of design at the time of the FEIS. MDOT SHA will work with the developer to advance design in a context-sensitive manner within and adjacent to the historic district, including such elements as preservation of the existing stairs and retaining wall at 9900 and 9904 Colesville Road. and avoidance of new above-grade elements along US 29 adjoining the historic district.

2.     At such time as the design is sufficient to make a determination, MDOT SHA will submit the finding of effect to MD SHPO and consulting parties, for

concurrence in a revised DRAFT Section 106 Programmatic Agreement by MD SHPO.

3.    If MDOT SHA determines an adverse effect is unavoidable following this consultation, MDOT SHA will develop a treatment plan including mitigation for the Polychrome Historic District, in consultation with relevant consulting parties and MD SHPO. The treatment plan will not require amendment of this agreement; if MD SHPO fails to concur on the proposed treatment plan, the parties will consult to revise the plan until concurrence is reached, or follow the dispute resolution provisions of <mark>Stipulation</mark>

**E.**    Indian Springs Estates and Country Club

MDOT SHA, in consultation with the Silver Spring YMCA and other appropriate consulting parties, will prepare and fund interpretive materials describing developer Abraham Kay, the Jewish history of the club and development, and influential Jewish people in the DC suburbs during the 1940s and 50s, and seek a partnership with the Silver Spring YMCA or Montgomery County Parks to host and locate the materials where they are accessible to the public.

**F.**    Greenbelt Park

*(Adverse effects to this property may be avoided through ongoing minimization efforts including proposed removal of direct access ramps to the Baltimore-Washington Parkway interchange; in this event MDOT SHA will revise the effect determination and no mitigation would be required if concurrence is reached with a revised finding )*

1.    MDOT SHA will continue property-specific Design-Review consultation with NPS to ensure a context-sensitive design for new facilities, and, through the ongoing design process, minimize, to the extent practicable, impacts to character-defining features and resources that contribute to the Greenbelt Park as a historic property.

2.    MDOT SHA will provide funds to NPS for preparation of a Cultural Landscape Inventory of Greenbelt Park.

**G.**    Baltimore-Washington Parkway

1.    MDOT SHA will continue property-specific Design-Review consultation with NPS to ensure a context-sensitive design for new facilities, and, through the ongoing design process, minimize, to the extent practicable, impacts to character-defining features and resources that contribute to the Baltimore-Washington Parkway as a historic property.

2.    *NPS has proposed general park mitigation for the Baltimore-Washington Parkway but not Section 106-specific items; MDOT SHA could complete a boundary survey as mitigation, we request NPS input here.*

**H.**    Carsondale

1.    MDOT SHA will complete a NRHP nomination of the district, identifying contributing and non-contributing resources.

I-495 and I-270 Managed Lanes Study DRAFT Section 106 Programmatic Agreement
March 2021

2.     MDOT SHA will complete an NRHP multiple property documentation form for post- World War II African-American associated developments in Prince George's County, with particular emphasis on African-American Veterans and Veterans Administration-assisted housing for African-American Veterans in Prince George's County, as mitigation for effects to Carsondale as well as Glenarden as described in ==Stipulation== below.

3.     MDOT SHA will ensure the results of this research are also accessible to the communities in a public format such as a web-accessible presentation; and to meet these goals, the work may be supplemented by oral histories, historic imagery or other appropriate content as practicable to obtain.

4.     Subject to community approval and the identification and approval of a suitable location, MDOT SHA will install a physical marker, plaque, or interpretive signage commemorating this history.

**I.**     Glenarden Historic District

1.     MDOT SHA will complete the documentation and interpretive effort described above in ==Stipulation== above, which is also applicable to the history of Glenarden.

2.     Subject to community approval and the identification and approval of a suitable location, MDOT SHA will install a physical marker, plaque, or interpretive signage commemorating this history.

**VIII.   Archaeological Treatment Plan (ATP)**

MDOT SHA's goal is to have a comprehensive but flexible archaeological treatment plan that addresses the project LOD but can be revised and updated in response to project design advancement. Prior to construction within affected areas, MDOT SHA will develop an archaeological treatment plan in consultation with relevant parties that includes:

**A.**     Archaeological Monitoring Requirements during construction

**B.**     Phase I Survey in areas where property access could not be obtained (as identified in the 2020 Technical Report, Volume 4, Chapter 5): S-4, SWM S-4, S-5, SWM S-5, S-6, SWM S-6, RS-1, RS-2; S-8, S-37, S-44, S-53, and S-54

**C.**     Phase I Survey in the vicinity of three sites to define site boundaries and determine potential impacts to 18MO457, 18MO190, 18MO510, and 18MO64

**D.**     Phase II evaluation of 18MO191, which may represent the Ball family farmstead, 18MO752, 18MO514 (the Forest Glen site on the National Park Seminary property)

**E.**     Phase III Data Recovery investigations, including public interpretation at 18MO749 and 18MO751 within the C&O Canal NHP and the Dead Run Ridges Archaeological District within the GWMP.

**F.**      If sites or areas proposed for treatment in the ATP are avoided by revising the project LOD or other actions, MDOT SHA will document the revision, including revising effect determinations and seeking SHPO concurrence where required.  MDOT SHA will provide such information to consulting parties, and will thereby not need to complete treatment or investigation at such locations.

**G.**      MDOT SHA will complete the archaeological treatment plan and implement required research and obtain concurrence from SHPO on eligibility, effects, and treatment approaches in accordance with Stipulation for any newly identified archaeological resources found through implementation of the treatment plan prior to construction in areas identified for further archaeological treatment.

**H.**      MDOT SHA will consult with SHPO and relevant consulting parties on the treatment plan and any revisions or modifications to the archaeological treatment plan.  If SHPO concurs with the treatment plan or future revisions, no amendment of this agreement is needed to implement or update the treatment plan.  If SHPO does not agree with the treatment plan or future proposed changes to the treatment plan, MDOT SHA will seek to resolve the disagreement or follow the provisions of Stipulation

## IX.      Cemeteries and Human Remains Treatment Plan

**A.**      MDOT SHA acknowledges there is potential for human remains associated with historic properties to be present in at least two areas of the LOD (adjacent to Morningstar Tabernacle No. 88 Moses Hall and Cemetery, and Montgomery County Poor Farm) which are not currently accessible for the types of thorough archaeological investigation necessary to definitively identify interments.  MDOT SHA will work with the developer to minimize LOD to the maximum extent practicable in these areas.

**B.**      MDOT SHA will consult with SHPO and relevant consulting parties on a treatment plan to fully identify, recover, and respectfully treat human remains within LOD.

**C.**      MDOT SHA will consult with SHPO and relevant consulting parties on archaeological monitoring requirements for locations within LOD where potential for human remains is likely during construction, including unverified but reported locations of the Ball Family Cemetery.

**D.**      MDOT SHA will seek input from affected consulting parties and concurrence from SHPO on the treatment plan prior to implementation of the cemetery treatment plan. If SHPO does not agree with the treatment plan, MDOT SHA will seek to resolve the disagreement or follow the provisions of Stipulation

**E.**      MDOT SHA will fully implement all required provisions of the cemetery treatment plan prior to any construction impacts within specified cemetery investigation locations.

## X.      Monitoring of Performance

**A.**     Specific points for continued consultation are defined in Stipulation

**B.**     MDOT SHA will, for the duration of the project, provide concurring parties with a written annual progress report describing status of implementation of this agreement.

**C.**     MDOT SHA will provide for a meeting of concurring parties following issuance of each annual progress report.

**D.**     MDOT SHA will convene additional consulting party meetings as necessary or requested by signatories;

**E.**     MDOT SHA may cancel individual annual meetings if there are no significant issues for discussion and no signatory or consulting party objects to the cancellation.

**XI.     Post-Review Discovery of Human Remains**

In addition to the human remains treatment conditions developed as part of the archaeological and cemetery and human remains treatment plans in Stipulations , MDOT SHA will follow the standard procedure (Appendix 3) for inadvertent discovery of human remains for any areas or situations not covered by other specifications in the archaeological or cemetery treatment plans**.**

**XII.    Other Post-Review Discoveries**

MDOT SHA will follow its standard procedures (Appendix 3) described in the statewide Programmatic Agreement for any inadvertent discoveries or inadvertent effects to historic properties during construction.

**XIII.   Confidentiality**

MDOT SHA, FHWA, and all other signatories to this agreement agree to provide by the provisions of Section 304 of the NHPA, and other applicable requirements to withhold information concerning the location, character, or ownership of resources where release of such information may endanger the integrity of the resource.

**XIV.    Amendment**

Any signatory to this Agreement may request that it be amended, whereupon the parties will consult in accordance with 36 C.F.R. § 800.14 to consider such an amendment. Amendments will be executed only upon signature by all signatories to this agreement.

**XV.     Dispute Resolution**

**A.**     Should any signatory or consulting party to this Agreement or member of the public object at any time to any actions proposed or the manner in which the terms of this Agreement are implemented, FHWA shall consult with such party to resolve the objection. If FHWA determines that such objection cannot be resolved, FHWA will:

1.    Forward all documentation relevant to the dispute, including the FHWA's proposed resolution, to ACHP. ACHP shall provide FHWA with its comment on the resolution of the objection within thirty (30) calendar days of receiving adequate documentation. Prior to reaching a final decision on the dispute, FHWA shall prepare a written response that takes into account any timely advice or comments regarding the dispute from ACHP, signatories and consulting parties, and provide them with a copy of this written response. FHWA will then proceed according to its final decision.

2.    If ACHP does not provide its advice regarding the dispute within the thirty (30) day period, FHWA may make a final decision on the dispute and proceed accordingly. Prior to reaching such a final decision, FHWA shall prepare a written response that takes into account any timely comments regarding the dispute from the signatories and consulting parties to the Agreement and provide them and ACHP with a copy of such written response.

**B.**    FHWA's responsibility to carry out all other actions subject to the terms of this Agreement that are not the subject of the dispute remain unchanged.

## XVI.  Termination

**A.**    Any signatory to this Agreement may terminate it by providing 30 calendar days' notice in writing to the other signatories, provided that the signatories will consult during the period prior to termination to seek agreement on amendments or other actions that would avoid termination.

**B.**    If any signatory to this Agreement determines that a term will not or cannot be carried out, that party shall immediately consult with the other signatories to attempt to develop an amendment per Stipulation XIV, above. If within thirty (30) calendar days (or another time period agreed to by all signatories) an amendment cannot be reached, any signatory may terminate the Agreement upon written notification to the other signatories.

**C.**    In the event of termination, FHWA will comply with 36 C.F.R. § 800 for all remaining actions, or until a new agreement is reached fulfilling such requirements.

This PA shall continue in full force and effect until twenty (20) years from the date of execution of the PA, or such time of final acceptance of the Project and when all terms of this agreement have been met, unless the project is terminated or authorization for the project is rescinded.  At any time in the six-month period prior to its expiration, the signatory parties will consult to consider an extension or amendment of the PA.  At such time, the signatories may consider an amendment to extend the PA unmodified for an additional specified duration, or consult to amend the PA in accordance with Stipulation. No extension or amendment will be effective unless all parties to the PA have agreed to it in writing by amending the PA.

**Signature Pages**

**Signatory Parties: FHWA (Maryland Division), ACHP, NCPC?, MD SHPO, VA SHPO, NPS, MDOT SHA.**

**Concurring Parties: To Be Determined**

**Attachments/Appendices**

**(To be added to subsequent drafts)**





Christopher Oswald
Treasurer
National Park Seminary Master Association
9562 Ament St.
Silver Spring, MD  20910

April 12, 2021

Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202
Sent via e-mail to sarcher@mdot.maryland.gov

Dear Mr. Archer:

Thank you for the opportunity to comment on the Draft 1 of the "Programmatic Agreement regarding Implementing Section 106 of the National Historic Preservation Act for the I-495 and I-270 Managed Lanes Study dated March 10, 2021" (the Draft PA). These comments have been developed by National Park Seminary Master Association, a registered homeowners' association in the State of Maryland representing the National Park Seminary (NPS).

NPS is a unique and historic residential community of single-family homes, condominiums, townhouses, and apartments located in the Forest Glen section of Silver Spring, MD, with almost 900 linear feet abutting I-495. Our community encompasses 25 acres of land that includes 7 single-family homes; 90 townhomes; 76 condominiums; a county-managed facility currently used as office space for homeless housing assistance organizations; and 66 apartments. Six of the single-family homes, and all the condominiums and apartments, are situated in historic structures. Forty-four of the 66 apartments are Section 42 affordable housing units, reserved for those with incomes at or below 60% of our area's median income, creating a diverse neighborhood serving people of all incomes.

Although the comments that follow are our own, we have consulted with Save Our Seminary (SOS) during their development. SOS is a volunteer, nonprofit membership organization formed by preservationists and concerned citizens in 1989 to marshal public and private support and resources

Mr. Archer
April 12, 2021
Page 2

to preserve the historic buildings and grounds of the National Park Seminary. We also support the comments that SOS has submitted regarding the Draft PA.

We note that the NPSMA opposes the expansion of I-495 and I-270 (the Project). The reasons for our opposition to the Project    are articulated in the comments we submitted regarding the Draft Environmental Impact Statement (DEIS) for the Managed Lanes Study. This said, we appreciate the opportunity to work as a Consulting Party in the development of the Draft PA.

NPSMA respectfully requests that the following comments be incorporated into the PA.

- The Draft PA defines the term "Area of Potential Effects" (APE), but we are unfamiliar with how the APEs have been delineated for the Project.[1] Please clarify the source documentation in which the APEs for the Project have been defined. We also request that these source documents be shared with all consulting parties.

- Section II.A, "Professional Standards", should include applicable references to reforestation standards published by Montgomery County, Maryland, and the State of Maryland, National Park Service, or other relevant local, state, or federal agencies.

- In Section III.C, "Reforestation", please clarify that "ground disturbance" is inclusive of ground disturbance associated with construction activities as well as by the final expanded highway right of way and associated relocated bridges/rights of way.

- In Section III.C, we object to reforestation outside of the APE, particularly with respect to NPSMA property. Reforestation, particularly on the NPSMA property, should focus on preserving or enhancing the existing natural environment on-site, rather than off-site or via a mitigation bank. Also, many of the trees within the Delineation Limits defined in the Project's DEIS (and what we presume is the APE defined for the Section 106 mitigation effort) are large and mature specimens, providing a substantial overstory layer on our property. Any mitigation programs should focus on preserving these mature trees.

- Please note that natural setting of the National Park Seminary—inclusive of the forestation of the Glen area—is fundamental to the property's designation as a Historic District. As noted on the nomination form that led to the property's inclusion in the National Register, "[The] acres of wooded land create a rural vista in the midst of congested, suburban Washington. The Seminary grounds offer welcome open space and lend an air of bucolic dignity to homeowners in the vicinity."[2]

---

[1] If the APEs are synonymous with either the "Areas of Disturbance" or "Delineation Limits" defined in the DEIS, please specify.

[2] P. 7, *National Register of Historic Places Nomination Form—National Park Seminary Historic District,* September 14, 1972. (Available at https://catalog.archives.gov/id/106777846)

Mr. Archer
April 12, 2021
Page 3

- In Sections III.D and III.E we would like to reserve our opportunity to comment at a future date given that no details are currently provided. We do note that stormwater management facilities and culverts are present on NPSMA property and will likely be impacted by the Project.

- Section IV.A appears to set substantial limits on the consultation process during project development. This section needs to be rewritten to ensure that consultation processes take place at each stage of Project design refinement. We propose this should occur at 30% design, 60% design, and 90% design stages for Phase 1 and Phase 2 of the Project, followed by ongoing consultation during construction as conditions and Project progress warrant. These consultation milestones can be adjusted to reflect the actual design review process that the State Highway Administration and the P3 contractor establish.

- In Section VII.B.1, we request that all consultation processes involve both the MDOT SHA and the P3 developer so there is no break in communication or collaboration with the entities that will perform project design and construction. We also request that the NPSMA be explicitly mentioned as a consulting party (i.e., "MDOT SHA will continue property-specific Design-Review consultation with Save Our Seminary, *the National Park Seminary Master Association*, and National Park Seminary residents to develop Context-sensitive design for new facilities, including proposed new bridges and sound wall").

- In Section VII.B.2, we request addition of the following provision: "Restoration and revegetation plans will be developed in coordination with the NPSMA and SOS."

- We support and appreciate the provisions in Sections VII.B.4 and VII.B.5.

Thank you again for the opportunity to provide these comments. Please contact me at 301.980.7297 if you have questions or need additional information.

Sincerely,

Chris Oswald
Treasurer, NPSMA

cc:    National Park Seminary Board of Directors
       Bonnie Rosenthal, Save Our Seminary

00006286





AT FOREST GLEN

9615 Dewitt Drive #68
Silver Spring, MD 20910
301-589-1715
info@saveourseminary.org
www.saveourseminary.org

*Officers and Directors*
Donald Hall, President
Eugene Rich, Vice President
Ann Hall, Treasurer
Erin Mielke, Secretary
Toni Bailey
Anne Brockett
Pat Crawford
Patti Horrall
Linda Lyons
Chris Maines
Frank Riley

*Executive Director*
Bonnie Rosenthal

April 12, 2021

Steve Archer
Cultural Resources Team Leader
Maryland Dept. of Transportation State Highway Administration
Environmental Planning Division
707 N. Calvert Street
Baltimore, MD 21202

Dear Mr. Archer:

Thank you for providing Save Our Seminary at Forest Glen Inc.
(SOS) the opportunity to comment on the Draft 1 of the
"Programmatic Agreement regarding Implementing Section 106 of
the National Historic Preservation Act for the I-495 and I-270
Managed Lanes Study dated March 10, 2021" (the Draft PA). In
previous comments to the "I-495 and I-270 Managed Lanes Study
Historic Resources Technical Report" on March 10, 2020, SOS
established its standing to participate as a Consulting Party.

While preparing the following comments, SOS had the opportunity
to review the comments submitted by the National Park Seminary
Master Association (NPSMA) in its April 12, 2021 letter to you. Our
organization agrees with and supports the position of the NPSMA.
SOS respectfully requests that the following supplemental
comments be incorporated into the Draft PA:

- On the second page, the Draft PA states, "NPS will
  accommodate the project through land transfers via
  Highway Deed Easement and other permitting actions or
  accommodations that will result in an adverse effect to
  NRHP-listed or eligible properties..." However, the Draft PA
  does not explain how NRHP-listed properties, such as
  National Park Seminary, that are not managed by NPS
  might be transferred. We would appreciate an explanation
  of how transfers would be made for privately owned NRHP-
  listed properties.

- In Section II.A, SOS requests that the "Secretary of the
  Interior's Standards for the Treatment of Historic
  Properties, Guidelines for the Treatment of Cultural
  Landscapes" be added to the professional standards
  adhered to by MDOT.

00006287

- Regarding Section III, Project-wide Mitigation and Commitments:
  - SOS would like to participate in the reforestation contractor selection, with hiring contingent upon consensus among SOS and the property owners.
  - SOS would like to participate in reforestation planning, including approval of the final plan by SOS and property owners.
  - SOS strongly concurs with the stipulation by NPSMA that all reforestation mitigation be accomplished on site.
  - SOS requests details of any Stormwater Mitigation Plan, including stream impacts, recommended for National Park Seminary.
  - SOS requests design details of any recommended Culvert Augmentation at National Park Seminary.
  - SOS requests specific, detailed information on any WSSC infrastructure reconfiguration at National Park Seminary and the effects of such reconfiguration on the historic site.

- Regarding Section VII.B, Mitigation and Commitments for Phases Subsequent to Phase I South:
  - SOS requests that there be a Memorandum of Agreement (MOA) among MDOT, SOS, and NPSMA, and that the selected mitigation contractor also be a party to the MOA.
  - SOS strongly concurs with the provision that MDOT SHA will continue property-specific Design-Review consultation with Save Our Seminary and National Park Seminary residents to develop Context-sensitive design for new facilities, including proposed new bridges and sound wall.
  - Please provide additional details about sound barriers. SOS requests that sound barriers be extended parallel to the relocated railroad tracks because of the impact on historic resources and loss of green space.
  - SOS would like to participate in the selection of mitigation contractors.
  - Please confirm that mitigation measures will include repair of affected built features in addition to reforestation.
  - SOS requests that MDOT mark the location of the LOD for Alternative 9 so that it is clear on the ground where construction impacts will be, including impacts to the natural and built features affected, and that the marking occur as soon as possible, during the course of developing the Programmatic Agreement.
  - SOS concurs with the provision of an updated NRHP nomination that identifies criteria. SOS also asks that the NRHP nomination be expanded to include the significance of the landscape.
  - SOS appreciates the provision of an Archaeological Treatment Plan (ATP) and would like to know the physical extent of the Phase II evaluation.
  - SOS notes with appreciation the adoption of its suggestion that a Cultural Landscape Inventory (CLI) be provided. After further deliberation, SOS asks that

MDOT consider providing a Cultural Landscape Report (CLR) in addition to a CLI, for the following reasons:

* National Park Seminary is a publicly accessible site per the historic easement covering the property;
* A CLR will aid in preparation of an updated National Register nomination and assist with National Register criteria;
* A CLR will provide useful information for mitigation;
* A CLR will document existing conditions and features prior to project construction;
* A CLR guides the management and treatment decisions about a landscape's physical attributes, biotic systems, and use;
* A CLR is the basis for making sound decisions about cultural landscape preservation and treatment; and
* A CLR will inform the archaeological evaluation of the site.

○ SOS requests participation in the selection of the CLI and CLR consultant.
○ SOS asks that MDOT map APE and the historic and natural features within it, locating the proposed footprint, extent, and LOD of Build Alternative 9. This information is crucial to a full and complete understanding of the impacts of the construction project, and will aid SOS in its participation as a Consulting Party to the PA.

Finally, SOS wishes to point out that while it is pleased to participate as a Consulting Party to the PA, our organization nevertheless reiterates its position of opposition to the I-495 and I-270 expansion project. It is our conviction that the adverse effects on the National Park Seminary historic site, as well as the region, are too severe for the project to proceed.

Sincerely,

Bonnie Rosenthal

Bonnie Rosenthal
Executive Director

Cc: National Park Seminary Master Association

# Washington Biologists' Field Club

April 9, 2021

Dear Mr. Archer,

We write you on behalf of the Washington Biologists' Field Club (WBFC), which is a nonprofit organization charged by the National Park Service with the care and maintenance of Plummers Island. Plummers Island is part of the Chesapeake and Ohio (C&O) Canal National Historic Park, and is an historic site of unique and ongoing scientific research value. WBFC owned the land from 1908 to 1959, when it deeded Plummers Island to the United States Government while preserving the right to maintain the island as a natural wild area and use it for scientific research, as set forth in the attached Agreement (Appendix A).

We are concerned about the proposed I-495/I-270 and American Legion Bridge toll lane widening project and the significant, probable threats from bridge construction, operation, and maintenance to Plummers Island and its historic character, including its biota, and the century of intensive research activities that have taken place on the island. In order to ensure that project's impacts on Plummers Island receive adequate consideration, we request that you (1) designate WBFC as a consulting party to the National Historic Preservation Act Section 106 process immediately, (2) assess adverse effects from and consider alternatives to the project that will not impact Plummers Island, (3) consider Plummers Island for individual eligibility for the National Register of Historic Places, and (4) commit to undertaking the mitigation measures listed in this letter to minimize harm to Plummers Island resulting from the Maryland Department of Transportation's (MDOT's) current preferred alternative.

**1) We request WBFC be added as a consulting party to Section 106 immediately due to our special relationship to Plummers Island.**

We appreciate that an MDOT "strike team" came to learn more about Plummers Island on March 1, 2021. However, this was the first time anyone on this project communicated with us, and we continue to have major concerns with the proposed plan and the failure to acknowledge or assess its impacts on Plummers Island.

It came to our attention, not through the project team, that we were not invited to participate in the I-495/I-270 Managed Lanes Project Section 106 process, despite our unique relationship to Plummers Island. We learned just two weeks before the deadline that comments on the draft Section 106 Programmatic Agreement would be due on April 12, 2021.

This is an unfortunate oversight. WBFC has been responsible for the day-to-day maintenance of the island for almost 120 years, and is the entity most knowledgeable about the island, its historical status, and the long-term scientific studies ongoing on the island. Plummers Island is uniquely significant, independent of the historic

1

00006290

characteristics of the C&O Canal National Historical Park as a whole. Our organization, with its long relationship to the site, is uniquely suited to provide information that is directly relevant to the Section 106 process.

Any mitigation measures for the C&O Canal National Historical Park as a whole would not be sufficient to protect Plummers Island. The WBFC, as a discrete entity that has engaged in biological research on the Island since 1901, is best able to determine which impacts would or could result from American Legion Bridge construction and operation activities and which measures are needed to avoid, minimize, and mitigate these impacts.

Accordingly, WBFC should immediately be afforded consulting party status, and should be included in all communications in connection with the Section 106 process.

**2) We are dismayed that the cultural resource evaluations circulated as part of the DEIS fail to specifically identify or discuss the historic significance of Plummers Island.** The Section 106 identification process should include an evaluation of the significance of Plummers Island as an individually significant historic site independent of the C&O Canal National Historical Park, or at minimum, should include additional descriptions of its contributing significance to that site. The cultural resource evaluations undertaken to date have largely ignored Plummers Island and its unique historic characteristics.

**3) We are troubled by the approach taken by the draft Section 106 Programmatic Agreement, which does not contemplate identifying the adverse impacts on Plummers Island or looking at ways to resolve those impacts until after key decisions about the project are made and mitigation measures foreclosed.** It is not appropriate to defer the assessment of these impacts or any analysis of measures to mitigate adverse effects until after key decisions have been made about alternatives and the preferred alignment for the project, as avoiding or minimizing impacts to Plummers Island will require selecting appropriate bridge alignment and construction alternatives. There is sufficient information available now to undertake these evaluations, and this should be done now, before the widest range of options for mitigating and minimizing adverse effects to Plummers Island have been foreclosed.

The measures to protect the island and its biota (the subject of long-term ongoing research) need to be considered now and in detail. A memorandum of agreement, which would be executed before the Record of Decision, is a more appropriate vehicle for resolving adverse effects on Plummers Island than a programmatic agreement.

Due to the extraordinary sensitivity of the resources and the research that will be impacted by the Project, it is imperative that measures to avoid, reduce, and minimize impacts to Plummers Island be considered now, not deferred until after key project decisions have been made. We therefore request those protections be evaluated as part of the Section 106 process now, and specific commitments to resolve adverse effects be included in a memorandum of agreement and ultimately, in the Record of Decision for the project.

2

**4) The unique history and significance of Plummers Island must be assessed independently of its status as part of the Chesapeake & Ohio Canal National Historical Park.** A December 11, 2020 *Washington Post* article states: "Caryn Brookman, who oversees Maryland's environmental analysis of the highway expansion plan, said Plummers Island is protected as part of the 184-mile Chesapeake & Ohio Canal National Historical Park." However, the significance of Plummers Island goes beyond that. The significance of the island as a long-term research site should give it protection as a wildlife management area, and it is also a unique and significant historical site in its own right. The island's unique historic attributes include its value and history as an important research site (historic attributes are further reviewed in Appendix B).

The Federal Government acknowledged the importance of Plummers Island as a unique and special place in a unique management agreement with WBFC executed when Plummers Island was added to the C&O Canal National Historical Park in 1959 (see Appendix A). This agreement with the U.S. Government spared Plummers Island from destruction in the 1960 building of the American Legion Bridge, and the 1990s infilling of lanes in the middle of the bridge.

This 1959 agreement names some of the very unique and exceptional features of the island to the United States and to the world (full text below):

- The said Plummers Island has become among systematic biologists one of the world's most famous collecting spots and type localities, and
- The discoveries have indicated the probability of new knowledge in the field of biology and natural history, and
- The fame of this island is world-wide and many scientific organizations are interested in its preservation as a source of discovery, and
- The Washington Biologists' Field Club, Inc. and the United States Government desire to preserve this natural wild area as a sanctuary and scientific research preserve.

The current plan to build on the island or use it as a construction platform is in violation of the 1959 agreement. Any construction or other activity on the island scarring the landscape destroys the natural biota and opens up the island's habitats to invasive species. Any such activity would violate the vitality, integrity and continuity of the ecosystem WBFC is warded to conserve, protect, study and report on.

It is now 2021 and WBFC has invested in 120 years of research, producing over 400 scientific papers on the flora and fauna of Plummers Island, documenting over 4,000 species there. The integrity of the island's ecosystem is crucial to our long-term research, of following trends over many years. This is a unique biological reserve and resource. Plummers Island is a special place within the Mather Gorge of the Potomac River, one of the most biotically diverse areas in the United States given its small geographical area. There are many endangered, threatened, and rare species on Plummers Island, many known only from the gorge or the island.

00006292

Among the 19,000+ pages of the DEIS, the only mention of Plummers Island is buried in the DEIS technical reports. It is in the 18th Appendix of Appendix L (i.e. sub-Appendix R of Appendix L) that Plummers Island is mentioned. The entirety of the comments about Plummers Island in DEIS or appendices are: "The study area includes a portion of Plummers Island south of the American Legion Bridge and a small stream known as Rock Run Culvert. Exposed bedrock occurs on Plummers Island." (DEIS, Appendix R of Appendix L, p. 1) In this Appendix, RTE (Rare Threatened and Endangered) survey maps are shown as occurring on and around the Maryland side of the American Legion Bridge, including parts of Plummers Island. Yet, the DEIS erroneously states: "None of the targeted RTE plant species were found during the surveys" (Full DEIS, p. 4-115).

**5) There are significant, irreversible adverse effects that would accrue to Plummers Island and WBFC research projects under the MDOT American Legion Bridge expansion plan.** The ongoing and active research spaces on this island are contributing historic features of the island, in addition to the architectural resources (the cabin built in 1901). There are distinct adverse effects that impact a property of such high research value, these include destruction of areas of the island, noise pollutants that impair the quality of studies, and many more things listed below and described in greater detail in Appendix C.

In the *Washington Post* article on Plummers Island, it is said the bridge would nearly double in size due to the new lanes, shoulders, and bike path. This would increase the runoff from the road, most of which is currently piped off the bridge low-point, and drained into a gully feeding into the bend of the channel adjacent to Plummers Island. In the draft Programmatic Agreement (Appendix H on an unnumbered page, PDF page 7) in the project DEIS, it states:

> **Duration:** Because of the anticipated duration of this project, and that there may be additional elements that continue, a 15-year duration may be appropriate, or until all terms of the agreement are fulfilled or the project becomes inactive; can include provisions for extension of the agreement.

This is a very substantial amount of time to be impacted by construction. For a small federally protected island immediately downriver of the American Legion Bridge with unique biological, historical, and research value, the magnitude of these threats is extraordinary.

The adverse effects to the island's historic features and significance as a research site posed by the I-495/I-270 project are extensive and further detailed in Appendix C of this letter. They include:
1. Damage to waterways
2. Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of the island within the Zone of Destruction
3. Destruction of WBFC research plots
4. Destruction of past collection sites
5. Habitat destruction and disturbance lead to more invasive organisms

4

6. Potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction blow out
7. Sound from bridge construction and closer proximity of traffic in 2 new bridge lanes after they open on the bridge
8. Impacts on biota from salt and oil runoff from the bridge
9. Violation of long-term continuity of 120 years of research.

**6) Below are the minimum avoidance measures, design considerations, and mitigations to avoid or reduce impacts that should be made to avoid, minimize, and mitigate adverse effects to Plummers Island and the ongoing research there. These provisions should have been considered from the beginning of the MDOT-SHA project development and in the DEIS.**

As noted above, on March 1, 2021, an MDOT strike team for the project came to the island and spoke with the Washington Biologists' Field Club for the first time. It appeared the strike team had no idea of the significance of the island, and the information shared took them by surprise. Also, for the first time, we learned of the possibility of an upriver bridge alternative for addition of lanes only to the upriver side of the American Legion Bridge. No bridge alternatives were discussed in the Draft Environmental Impact Statement (DEIS), which is a major omission, and should have been presented there so that the public could have the same information to comment on. We would have certainly made DEIS comments on the bridge alternatives if any relevant information on bridge alternatives had been discussed in the DEIS. That information was lacking and clearly should have been included in the DEIS.

Clearly there needs to be a specific focus on design changes that will reduce and avoid impacts to Plummers Island. The first obvious choice for reducing and avoiding impacts is the "no build" option. Second is the upriver bridge alternative, which should have been evaluated in the DEIS and certainly must be now before the project is advanced.

Although WBFC is opposed to the American Legion Bridge expansion, particularly with toll lanes and lack of mass transit in the design (vans and buses from a few points are not an acceptable replacement for dedicated mass transit), the following types of mitigations are necessary and non-negotiable.

To protect Plummers Island, the minimum mitigations follow:

- Plan for major (not minor) flooding during the construction period.
- Avoid obstructing natural water flow into the Plummers Island channel.
- Build all the new lanes on the upriver side of the bridge.
- Build the access to and the construction platforms themselves only on the upriver side of the bridge and under the bridge.
- In any case, add sound barriers to the downstream side of the bridge.
- Use lane surfacing that is as quiet as possible.
- Place the outflow from bridge scuppers somewhere the runoff will not enter into Plummers Island waters.

00006294

- Avoid fugitive dust blowing onto the island by use of dust minimization measures including spraying.
- A waste and hazardous material disposal plan must ensure off-site disposal so as not to flow to or near Plummers Island.
- Provide prior notification informing WBFC of work schedules so notice can be given to researchers.
- Piping of road runoff (that contains oil and salt) is a major issue; currently the main scupper drainage flows into the channel separating the island from the mainland; future drainage should avoid the wetlands including the channel.
- For the duration of construction, any construction infrastructure should be designed to withstand major floods (over 14 feet) not minor (10-12 feet) floods; there have been 3 moderate (12-14 feet) and 2 major floods (17-19 feet) in the past 25 years. However, even minor floods recorded at Little Falls produce major flooding in the Plummers Island channel adjacent to the bridge (see Appendix D, point 6).
- Monitor during construction to ensure that construction work is not impacting the island and no construction workers or project personnel visit the island unless oriented and approved by the Washington Biologists' Field Club. These requirements should be included in bidding document and contractor's work plan as part of the environmental specifications that will be followed.
- Chance find or inadvertent discovery procedures should be followed and incorporated into bidding documents and contracts. Please provide a copy for our review to ensure they meet the requirements for protection of Plummers Island.

**7) To conclude, WBFC has had and continues to have a significant and primary responsibility to maintain this island as a long-term research site high in biodiversity with minimal disturbance. It must be protected.** We fund research studies each year. The island was already historically significant 60 years ago when the American Legion Bridge was built. It is only more significant and rarer today. It is nationally and globally significant, it is historically significant, and it is highly significant for ongoing research purposes. The research on the island is a historic feature.

We are not comfortable with the open-ended, non-committal attempts to reassure us that the strike team made. Under the Section 106 process, requests can be made for mitigations. There is a direct use of the island for purposes of Section 4(f) and a significant adverse effect under Section 106. Avoidance and mitigation measures cannot be deferred until later, after the Final Environmental Impact Statement, after the Record of Decision, or after predevelopment. That is already too late. We require assurances at an administrative level at all costs that the upriver bridge alternative (with all lanes added to the upriver side of the bridge) will be pursued and mitigation measures put in place to protect Plummers Island. Plummers Island is federally protected under legal agreements with the National Park Service and should become additionally protected with a determination of individual National Register of Historic Places eligibility or, at a minimum, assessment of contributing significance to the C&O Canal National Historic Park as soon as possible, with the biodiversity, engendered species, and research value of the island specifically identified as historical features of contributing importance.

00006295

**8) We reiterate our concerns with the nature of this process that does not allow the public to have adequate, timely information to advocate for their interests. We also reiterate that we support the no-build option.** Any proposals for redecking and rebuilding/refurbishment of the American Legion Bridge should fully assess potential alternatives and allow for public comment. Such proposals should also require, at a minimum, early focused attention on the high priority to avoid impacts on Plummers Island and to minimize and mitigate any potential adverse impacts to Plummers Island that may remain.

Respectfully,

Ralph Eckerlin, President

Robert Soreng, Vice President

Lowell Adams, Secretary

On behalf of the 85 members of the Washington Biologists' Field Club

00006296

**APPENDIX A: Full Text of Agreement with National Park Service**

AGREEMENT WITH NATIONAL PARK SERVICE

AGREEMENT AND STIPULATIONS BETWEEN THE WASHINGTON BIOLOGISTS' FIELD CLUB, INC. AND THE UNITED STATES OF AMERICA

This agreement made this 5th day of March, 1959, by and between the Washington Biologists' Field Club, Inc. and the United States of America.

WITNESSETH:

WHEREAS, The United States Government has by condemnation proceedings, in the United States District Court for the District of Maryland in Civil No. 10676 and by order of Court made the 24th day of June, taken possession of the defendant's Washington Biologists' Field Club, property designated in said proceedings as parcels "A" and "B" in tract no. 7, and

WHEREAS, This property was acquired by the Washington Biologists' Field Club, Inc. and has been used by the said Club as a natural wild area for scientific research for over 50 years and a great many scientific papers have been written in reference to biological and natural history discoveries made on said land and, more particularly, on that part of said land known as parcel "B" and more familiarly known as Plummers Island containing some 12.238 acres more or less, and

WHEREAS, The said Plummers Island has become among systematic biologists one of the world's most famous collecting spots and type localities, and

WHEREAS, The discoveries have indicated the probability of new knowledge in the field of biology and natural history, and

WHEREAS, The fame of this island is world-wide and many scientific organizations are interested in its preservation as a source of discovery, and

WHEREAS, The Washington Biologists' Field Club, Inc. and the United States Government desire to preserve this natural wild area as a sanctuary and scientific research preserve.

Therefore, The United States Government's petitioner in the United States District Court for the District of Maryland in Civil No. 10676 and the Washington Biologists' Field Club, Inc., defendant, and the owner of said parcel of land known as parcel "B" containing some 12.238 acres more or less which said land is an island in the Potomac River and is more familiarly known as Plummers Island, do hereby stipulate and agree that the said parcel "B" be withdrawn from these proceedings and that the said Washington Biologists' Field Club, Inc. does hereby agree to deed the said island to the United States Government without monetary consideration reserving in said deed to the Washington Biologists' Field Club, Inc., the right to

8

00006297

continue to maintain the island as a natural wild area and use it for scientific research and for meetings of the Club and to pursue its studies in the field of biology and natural history on the said island so long as the Washington Biologists' Field Club, Inc. exists and desires to continue to use the island for scientific research and so long as the further provisions and stipulations contained herein are complied with which are as follows:

1. The Washington Biologists' Field Club, Inc. agrees to supply the National Park Service with copies of scientific papers resulting from research conducted on said island when available.

2. The Washington Biologists' Field Club, Inc. will supply the National Park Service with an annual report and will include the names and addresses of the officers, list of the members, and a summarization of the scientific investigations carried on.

3. The Washington Biologists' Field Club, Inc. will indemnify the United States against any loss or damage or injury due to the Club's negligence or any of its members or guests in the use and occupancy permitted under this agreement.

4. The Washington Biologists' Field Club, Inc. shall maintain its building and facilities on the island or replace the same in orderly and safe condition without expense to the United States.

5. No additional buildings, structures, or other physical facilities shall be constructed on the island by the Washington Biologists' Field Club, Inc. without first obtaining written approval of the National Park Service.

6. It is further stipulated and agreed between the United States Government and the Washington Biologists' Field Club, Inc. that the membership of the Club as constituted on 1 August 1958,

Honorary Members:

Bartsch, Paul
Mann, William M.
Ricker, P. L.

Active Members:

Aldrich, John W.
Appel, William D.
Benedict, J. E.
Blake, S. F.
Brown, Edgar
Clarke, J. F. G.

Compton, Lawrence V.
Davis, Malcolm
Duvall, Allen J.
Erickson, Ray C.
Erlanson, C. O.
Fredine, C. Gordon
Fuller, Henry S
Gabrielson, Ira N.
Gardner, Marshall C.
Graham, Edward H.
Griffith, Richard E.
Handley, C. O., Jr.
Hotchkiss, Neil
Jackson, Hartley H. T.

Krombein, Karl V.
Leonard, Emery C.
Lincoln, Frederick C.
Linduska, Joseph P.
Meehean, O. Lloyd
Morrison, J. P. E.
Nelson, A. L.
Oehser, Paul H.
Parker, Kenneth W.
Presnall, Clifford C.
Reed, Theodore H.
Russell, Paul G.
Setzer, Henry W.
Smith, Albert C.

9

00006298

| | | |
|---|---|---|
| Smith, Lyman B. | Nonresident Members: | Eklund, Carl R. |
| Sohns, Ernest R. | | Fowler, James A. |
| Stevenson, James O. | Allan, Philip F. | Hamlet, John |
| Stewart, Robert E. | Allen, Durward L. | Holt, Ernest O. |
| Stickel, William H | Archino, Samuel | McAtee, W. L. |
| Swift, Ernest F. | Bartlett, H. H. | Myers, G. S. |
| Uhler, F. M. | Bryant, Harold C. | Peterson, Roger T. |
| Vogt, George B. | Cahalane, Victor H. | Wallis, William W. |
| Walker, Ernest P. | Cottam, Clarence | Wherry, Edgar T. |
| Wetmore, Alexander | Couch, Leo K. | |
| Zahniser, Howard | Dargan, Lucas M. | |

shall have the privilege of having their ashes placed on said island and a small bronze plaque in their memory placed on the stones of said island and that this privilege shall apply only to the membership as named above as it shall exist as of 1 August 1958.

7. It is further stipulated and agreed that the United States Government will allow the membership of the Washington Biologists' Field Club, Inc. to have access by foot over the land owned by the United States Government to the island at all times and whenever desired.

8. The Washington Biologists' Field Club, Inc. will be permitted to maintain and operate passenger-carrying ferry boats from and to the island which is to be for the exclusive use of the Club and its members and guests for access to the island.

9. The Washington Biologists' Field Club, Inc. will be permitted to erect and maintain a fence and gate at a suitable location to exclude the general public from the island, but the National Park Service is to be furnished keys to the lock or the National Park Service may provide its own lock if keys are delivered to the Washington Biologists' Field Club, Inc., and will also be permitted to clear the channel between the island and the Maryland shore to maintain a free flow of water therein.

10. It is further stipulated and agreed that authorized agents and personnel of the National Park Service shall have access to the island and the right to take scientists to the island, but, in that event, the Washington Biologists' Field Club, Inc. shall not be responsible for any injuries or damages resulting to said persons due to conditions upon said island provided said injuries or damages are not caused by negligence of the Club or by a failure on the part of said Washington Biologists' Field Club, Inc. to comply with the requirements of this stipulation.

11. It is further stipulated and agreed that all rights accruing to the Washington Biologists' Field Club, Inc, or to any member thereof by reason of the provisions of this stipulation or any amendment thereto may be terminated if said Washington Biologists' Field Club, Inc. no longer exists or in the event after due written notice

10

that the provisions of this stipulation and/or deed which will be executed following signing of this stipulation have been violated and continue to be violated by said Washington Biologists' Field Club, Inc. or its members, guests, employees, or servants for a period of time in excess of six months after receipt of said notice, and further in the event the island shall be no longer used for scientific research by the Washington Biologists' Field Club, Inc. for more than two years then this stipulation and any like provisions of the deed to be executed conveying the property to the United States shall terminate.

12. It is further stipulated and agreed that the United States may construct or permit the construction of needed nonrecreational public improvements upon the island or a portion thereof, which said improvements shall not be inconsistent with the uses to which the island has been dedicated by the Washington Biologists' Field Club, Inc.

13. It is further stipulated and agreed that this stipulation shall become effective after the filing and acceptance by the United States of a deed of conveyance containing the provisions outlined herein.


The United States of America

By: WILLIAM E. FINLEY

Director of the National Capital Planning Commission


Condemning Authority

The Washington Biologists' Field Club, Inc.

By: LLOYD W. SWIFT

President


I, Albert C. Smith, certify that I am the Secretary of the corporation named as party herein; that Lloyd W. Swift, who signed this contract on behalf of the party, was then President of said corporation; that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

ALBERT C. SMITH, *Secretary*

00006300

**APPENDIX B**: **Historical Importance of Plummers Island, Maryland (Feb 2021)**

**Background:**
The Washington Biologists' Field Club (WBFC) was established in 1901 by a group of prominent biologists for the purpose of acquiring a parcel of land and carrying out intensive studies of all groups of plants and animals living in the same area. For this purpose, WBFC bought Plummers Island and adjacent land on the Maryland shore of the Potomac (leased in 1901 and purchased 1908), and WBFC biologists and their colleagues have been carrying out intensive research into the biology of the area for the past 120 years. The island became part of C&O Canal National Historic Park in 1961, but WBFC has retained stewardship of Plummers Island and continues to manage it as a research area.

Under the stewardship of WBFC, Plummers Island and adjacent land on the Maryland shore of the Potomac have been the subject of continuous long-term ecological research stretching over more than a century, providing an unequalled depth for study of long-term ecological change. Almost 400 scientific publications have documented many aspects of the island's biology, and current scientific studies are extending a foundation that has been almost 120 years in the making. We live in a time of extreme environmental change, and research on long-term changes in populations of organisms is of vital importance for understanding how to manage human activities in our changing world. The century-long record of studies on Plummers Island makes it a unique and extremely valuable resource for such studies, and it is sometimes called "the most thoroughly studied island in North America."

WBFC has also served to promote communication and collaboration among biologists working on all groups of organisms, partly through meetings and joint projects on Plummers Island. WBFC membership has included many scientists with international reputations, who have carried out research whose importance extends far beyond their own specialties. In particular, WBFC membership has included several of the major figures in the twentieth-century environmental movement (see especially Bailey, Peterson, Pinchot, Swift, and Zahniser, below). Much information about WBFC and Plummers Island, including documentation for much of this information, is in its website (https://wbfc.science) and a published history:

Perry, M. C. 2007. The Washington Biologists' Field Club: Its Members and Its History. Washington DC.

Extensive records for WBFC are archived at the National Museum of Natural History.

**There are four categories that confer significance for the National Register of Historic Places.**

Plummers Island has important associations under three of them:

12

00006301

## 1. Is the property associated with events, activities, or developments that were important in the past?

Long-term studies of factors influencing lichen growth and mortality on Plummers Island allowed Mason Hale and Jim Lawrey to provide compelling evidence that lichen decline following the opening of the new American Legion Bridge was due to uptake of pollutants from automobile exhaust. This evidence that was important in driving antipollution legislation in the second half of the twentieth century, and especially in convincing Congress to ban the use of tetraethyl lead in gasoline (see Hale, below).

## 2. With the lives of people who were important in the past?

Many members were well known in their fields and made important scientific contributions. Members that are remembered outside the immediate biological community for their contributions include:

**Vernon Bailey** - Chief Field Naturalist for the Biological Survey (Dept. of Agriculture). He played a leading role in documenting the diversity of wildlife in the U. S., and he developed no harm live traps and catch-and-release sampling methods to replace the wasteful sampling with lethal traps that had long been the norm for studying populations of small animals.

**Frederick Vernon Coville** - a Dept. of Agriculture scientist, his research allowed blueberries and cranberries to be cultivated commercially; before this work, they could not be grown and could only be collected from wild shrubs. Coville was also important in developing conservation policy for arid lands, and served as the first Director of the U. S. National Arboretum. He was a life trustee of the National Geographic Society and longtime chair of its Committee on Research, and a longtime advisor to the Carnegie Institution of Washington.

**Mason Ellsworth Hale Jr.** - an expert on lichens at the Smithsonian Institution; his work on factors influencing lichen growth and mortality allowed him to provide detailed evidence of lichen decline caused by uptake of pollutants from auto exhaust following the opening of the American Legion Bridge, evidence that was important in convincing Congress to ban the use of tetraethyl lead in gasoline (see above).

**Henry Weatherbee Henshaw** - a zoologist and ethnologist with the Bureau of Ethnology, later the Biological Survey (Dept. of Agriculture), he did important work on native North American languages, and produced the first serious study classifying languages for the continent as a whole.

**Frederick Gustav Meyer** - a Dept. of Agriculture scientist, he was the first to make scientific observations and collections of wild Arabica coffee in its native range in southwestern Ethiopia; led a UN-FAO expedition to collect genetically diverse coffee in Ethiopia and establish international germplasm repositories for coffee, resulting in development of high-quality disease-resistant arabica coffee; also much work on ornamental and medicinal plants.

**Roger Tory Peterson** - credited as the inventor of the modern field guide, and a major figure in the twentieth-century environmental movement; his field guides have been used by many millions of people.

00006302

**Gifford Pinchot** - first Chief of the US Forest Service and founder of the Society of American Foresters, considered the "father" of modern forestry; his decisions on management of multiuse lands set the agenda for American conservation; later a 2-term governor of Pennsylvania.

**Charles Vancouver Piper** - a Dept. of Agriculture scientist, he played the central role in bringing the soybean to American agriculture (now our second most important crop, worth $40 billion/year), and he was the first to apply modern plant breeding techniques to grasses for golf course greens.

**Lloyd W. Swift** - Director, Division of Wildlife Management, U. S. Forest Service, where he was responsible for coordinating management of game, fish, non-game, and endangered species within multiple-use management programs on the 200-million acres of National Forest lands; after retiring, he served as Secretary and board member of the World Wildlife Fund.

**Alexander Wetmore** - an internationally known ornithologist, served for seven years as Secretary of the Smithsonian Institution and a longtime trustee of the National Geographic Society.

**Howard Clinton Zahniser** - Director of the Wilderness Society, he played a major role in formulating the 1964 Wilderness Act.

## 3. With significant architectural history, landscape history, or engineering achievements?

**Architectural history** - The WBFC cabin on Plummers Island was built in 1901. We have very good documentation of its construction, and it has been well maintained, substantially in its original condition.

**Landscape history** - We have 120 years' data documenting the history of the return of natural vegetation to a heavily disturbed site (logged and farmed), and of factors influencing the spread of invasive species. This historical data has been essential to important accomplishments of scientists on Plummers Island. For instance, detailed documentation of lichen decline following the opening of I-495, crucial in convincing Congress to ban lead in gasoline (see above), would not have been possible without long-term historical data and collections that allowed them to document the abundance, health, and lead content of lichens on Plummers Island before and after the freeway construction. Long-term monitoring of the plants on Plummers Island has also been crucial for documenting when various invasive species first appeared, and what environmental factors may have led to their introduction and establishment.

**Engineering achievements** - None.

## 4. Does it have the potential to yield information through archeological investigation about our past?

No archaeological work has been done on Plummers Island. There are remnants of old rock walls, and possible hides for guards (Civil War era?) facing the Potomac River. Several past members have done important linguistic and ethnological work on North American cultures (especially Henshaw, above).

00006303

**Appendix C: Endangered, Threatened, and Rare Species on Plummers Island**

The species on Plummers Island, including endangered, threatened, and rare species, have been studied since 1901. They are part of the island's historic and ongoing research value. Current awareness of and attention to their protection in the state's DEIS process has been inadequate.

Plummers Island has numerous state endangered, threatened, and rare species. Plummers Island has three extant endangered plants that have been considered endangered in Maryland for many years and were mentioned as endangered in the I-495/I-270 Managed Lanes DEIS, Appendix R of Appendix L, page 1. These state endangered plants are:

1. Coville's Phacelia *(Phacelia covellei)*
2. Horse-tail Paspalum *(Paspalum fluitans)*
3. Pale Dock *(Rumex altissimus)*

Curiously in March 2021, Maryland DNR downgraded two of those species (Coville's Phacelia and Horse-tail Paspalum) from endangered to threatened although their status, if anything, is more imperiled by the planned widening of the American Legion Bridge. On what basis could these species have been downgraded? The WBFC cannot agree with this change without compelling evidence.

The above list of three state RTE plant species is not complete or exhaustive (see Simmons et al. 2020); there are additional Maryland RTE plants on the island, such as Smooth Rose Mallow *(Hibiscus laevis)* which is a rare plant of concern; Pink Valerian *(Valeriana pauciflora)* which is endangered; Leatherwood *(Dirca palustris)* which is threatened; and Sticky Goldenrod *(Solidago racemosa)* which is threatened and part of a rare natural community. There are also several grass and sedge species including Flat-spiked Sedge *(Carex planispicata)* and Open-flower Panic Grass *(Dichanthelium laxiflorum)*. Other rare species include Ostrich Fern *(Matteuccia struthiopteris)* and Smooth Wild-petunia *(Ruellia strepens).*

RTE animals that live on or utilize the island include Eastern Small-footed Myotis (state endangered) and Northern Long Eared Bat (state threatened/US threatened). We can provide recent inventories of species on Plummers Island upon request.

The Endangered Species Act protects both federally listed endangered species and those species deemed endangered, threatened, or in need of conservation within the state, based on habitat and conservation factors. At the state level, threatened and endangered species are regulated under the Maryland Non-game and Endangered Species Act (Annotated Code of Maryland 10-2A-01).

Excerpts from a December 2020 *Washington Post* article by Katherine Shaver tell more of the story:

00006304

*Tucked below the American Legion Bridge on the Maryland side of the Potomac River … Plummers Island, … "the most thoroughly studied island in North America."*

*For nearly 120 years, the 12-acre patch of rock and woods has been home to the Washington Biologists' Field Club. Its 85 botanists, entomologists, ornithologists and other scientists have spent decades scrutinizing the island's thousands of species of plants, insects and wildlife.*

*Robert Soreng, the club's vice president and a botanist at the Smithsonian National Museum of Natural History, said Plummers Island provides a critical research site because of its remarkable biodiversity and protected status under the National Park Service. Studying the same wilderness since 1901, he said, has revealed how nature responds to human development, climate change, invasive species and other changes.*

*"This is incredibly valuable for studying long-term trends," Soreng said. "We know more about what's there than in any other place."*

*But Soreng and other scientists say the island's research value is in danger of being lost to a new, wider American Legion Bridge. Under a plan by Maryland Gov. Larry Hogan (R) to relieve traffic congestion on the Capital Beltway, an expanded bridge between Virginia and Maryland could require piers on the island's western edge. Trees would also have to be cut in that area to build a road for construction vehicles to access the bridge site over four to five years.*

***Plummers Island is in the Potomac Gorge, between Great Falls and Georgetown. The gorge is home to hundreds of rare species, including the highest concentration of rare plants in Maryland, according to the National Park Service.***

*Moreover, the biologists say, its protection from development has provided a rare chance to do fieldwork nine miles from downtown Washington.*

*"When you think about the Washington area, there aren't many places that haven't been disturbed by humans," said Matthew Perry, a club member and emeritus scientist with the Patuxent Wildlife Research Center in Laurel.*

*Soreng said more than 400 scientific papers have emerged from Plummers Island research. The most well-known study showed that many of the island's lichen species had died off and others had soaked up significantly more lead after the bridge was built, because of emissions from leaded gasoline used at the time.*

*… Club members have included legendary ornithologist Roger Tory Peterson; Gifford Pinchot, the first chief of the U.S. Forest Service; and Frederick Coville, who helped establish the National Arboretum.*

*"There's an extraordinary concentration of world-class biologists," said Bruce Stein, a club member and chief scientist for the National Wildlife Federation.*

*"Everything that's in there," Soreng said, "someone is recording."*

*Ralph Eckerlin, the club's president and a Northern Virginia Community College biology professor, said he worries about the birds, crickets, katydids and other species that rely on calling out to one another.*

*Pamela Goddard, a Mid-Atlantic specialist for the National Parks Conservation Association, said Plummers Island must be spared as precious urban green space.*

*"The promise for national parks is that they'll be protected," Goddard said. "They're not here as land to be developed for a highway."*

16

00006305

**APPENDIX D: WBFC Comments on American Legion Bridge Construction and Expansion Impacts to Plummers Island**

**Threats to Plummers Island from American Legion Bridge Construction and Expansion** (Submitted to the MDOT-SHA Strike Team, February 28, 2021 for the March 1 joint meeting with WBFC)

1. **Damage to waterways:**
   a. Potomac River shore: mud flats and sandbars are wetland features in the MDOT recalibrated (post the DEIS comments) Zone of Destruction.
   b. We don't know what the new and reconstructed bridge piers will do to flow along the river or channel, particularly if the point of rocks and Rock of Gibraltar (at the upper tip of the island) are destroyed or significantly altered. Sand bars and mud flat habitats could be substantially reduced for plants and animals that depend on these.
   c. The Island Channel (AKA "Rock Run Culvert"). The head of the channel down to the dog leg would not see daylight for years of construction. After which this part of the channel would be overshadowed by the 2 added lanes on the island side of the bridge. What are the consequences to waterways there and downstream?
   d. With the Channel covered by planking for the construction platform, high and mid-level floods will be redirected over those onto the island flood plain, potentially adversely affecting much of that flood plain.
   e. If sub-point d happens, all research plots in the flood plain could be substantially altered, (including vegetation plots 1, 3, 9, 10, 11, 12, and habitats for plants and animals)
   f. The "frog water" pools at the head of the island noted in the DEIS and circumscribed in subsequent documents are highly vulnerable to disturbance (vegetation plot 3 is in this zone).
   g. Zone of potential effects/disturbance uncertain, but estimated by DEIS to be 2/5 of the island. What is the MDOT plan for protecting this zone?
   h. Amphibians are in global and local decline due to pollution, diseases, ozone, and habitat destruction. Eleven species of amphibians are known from Plummers Island (Manville 1968 and https://collections.nmnh.si.edu/search/herps/): *Acris crepitans*, northern cricket frog; *Hyla  versicolor*, eastern gray treefrog; *Lithobates clamitans*, green tree frog; *Lithobates palustris*,  pickerel frog; *Lithobates sylvaticus*, wood frog; *Pseudacris crucifer*, spring peeper; *Pseudacris  feriarum*, upland chorus frog; *Ambystoma maculatum*, spotted salamander; *Eurycea longicauda  longicauda*, long-tailed salamander; *Hemidactylium scutatum*, four-toed salamander;  *Notophthalmus viridescens viridescens*, eastern newt; *Pseudotriton ruber*, northern red  salamander.

2. **Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of Plummers Island within the Zone of Destruction:**

17

00006306

    a. *Hibiscus laevis* (mud flats just below and above point of rocks)
    b. *Solidago racemosa* (point of rocks, below Rock of Gibraltar)
    c. *Hypericum prolificum* (point of rocks, below Rock of Gibraltar)
    d. *Paspalum fluitans* (mud flats just below and above point of rocks)
    e. other native plants rare on the island occurring only on west end in Zone of Destruction: e.g., *Sedum ternatum*. (on Rock of Gibraltar)
    f. Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): *Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus* Herbaceous Vegetation (USNVC: CEGL006483). Non-tidal mudflats. Global/State Ranks: G3/SNR (Simmons et al. 2016)
    g. Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (*Hypericum prolificum, Eubotrys racemosa) / Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia* Herbaceous Vegetation (USNVC: CEGL006491). Global/State Ranks: G2/S1.

**3. Destruction of WBFC research plots:**
    a. Vegetation research plots from 1997 and 2013-2015 will be destroyed (plots 4, 5, on the sandbar at the head of the island will be totally destroyed [see also sub-point 1e]), A historic National Park Service vegetation plot on the Potomac River sandbar could be destroyed.

**4. Destruction of past collection sites:**
    a. many plants and animals were vouchered or recorded from the west end of the island, some are only known on the island from there.

**5. Habitat destruction and disturbance lead to more invasive organisms:**
    a. the west end of the island is covered in a tangle of oriental bittersweet (first recorded from the island in 1982), and shrubs of amur honeysuckle (first recorded from the island in 1997), among many other invasive plants recorded there. Invasive species establishment and expansion will be sorely exacerbated by disturbance involved the construction process.

**6. Potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction blow out. Construction timbers potentially could rip out acres of trees and other vegetation in the island flood plain. Note 1**: 51 out of the 100 recorded historic Potomac River floods (over 9.4 ft at Little Falls Gauge, NOAA data) were recorded since the first bridge was built in 1962, 33 since the midsection of the bridge was filled in 1992, 1996 included 2 of the top 7 floods, and 2018 included 4 historic floods. In 2019 the island flood plain was inundated on and off for much of winter and spring. **Note 2**: Mather Gorge (Cohn 2004) is much narrower at the American Legion Bridge and Plummers Island than at Little Falls Gauge, so the high-water marks listed below substantially underestimate the peak flows at the

00006307

bridge and head of Island by as much as 7 ft (verified at the bridge side of the channel bend, March 25, 2021).

| rank | height | ft | date | rank | height | ft | date |
|---|---|---|---|---|---|---|---|
| 5 | 19.29 | ft | 1/21/1996 | 47 | 11.68 | ft | 4/18/2011 |
| 7 | 17.84 | ft | 9/8/1996 | 50 | 11.56 | ft | 12/17/2018 |
| 31 | 12.82 | ft | 3/15/2010 | 54 | 11.44 | ft | 9/21/2003 |
| 36 | 12.38 | ft | 6/5/2018 | 58 | 11.3 | ft | 5/20/2011 |
| 37 | 12.35 | ft | 3/6/1993 | 61 | 11.17 | ft | 1/27/2010 |
| 46 | 11.7 | ft | 5/18/2014 | 65 | 11.01 | ft | 9/29/2018 |
| 67 | 10.87 | ft | 12/12/2003 | 66 | 10.88 | ft | 3/12/2011 |
| 68 | 10.85 | ft | 9/11/2018 | 90 | 10.16 | ft | 3/25/1993 |
| 70 | 10.79 | ft | 3/22/1998 | 92 | 10.13 | ft | 1/29/1993 |
| 77 | 10.55 | ft | 4/18/1993 | 95 | 10.09 | ft | 11/29/1993 |
| 81 | 10.43 | ft | 1/10/1998 | 96 | 10.04 | ft | 5/13/2008 |
| 82 | 10.37 | ft | 3/30/1994 | 97 | 9.97 | ft | 9/23/2003 |
| 86 | 10.33 | ft | 10/31/2012 | 98 | 9.78 | ft | 9/9/2011 |
| 87 | 10.28 | ft | 3/30/2005 | 99 | 9.67 | ft | 5/6/2009 |
| | | | | 100 | 9.43 | ft | 4/17/2007 |

7. **Sound from bridge construction and closer proximity of traffic in 2 new bridge lanes after they open on the bridge:**
   a. The noise factor cannot be ignored by humans or wildlife. Already the sound of traffic is disturbing to human conversation at our meeting place the WBFC Cabin grounds.

8. **Salt and oil runoff impacts on biota from the bridge:**
   a. This depends on where the outflow is drained from the bridge drainage scuppers (particularly at the bridge's low-point)
   b. The unintended consequences of that volume of road salts on freshwater ecosystems can be severe. A colleague is working on this very subject on area highways, and the impacts he found were surprisingly devastating. One of the worst impacts was mobilizing (and making bioavailable) toxic metals in waterways.

9. **Violation of long-term continuity of 120 years of research (Perry 2007; Shetler et al. 2006):**
   a. Lichen study on Plummers Island validated essentiality of long-term research contributing to national and global removal of Lead from gasoline: A drop from 70 species to 20 species due to sensitivity to Lead pollution on the island (Lawrey & Hale 1979).
   b. The decline of forest breeding birds on Plummers Island is related to the American Legion Bridge (Johnston & Winings 1987).

19

00006308

c. Insects, like other organisms, are experiencing major declines globally (Borenstein 2018; Hallman et al. 2017; Jarvis 2018; Vogel 2017). Giant silk moths (Saturniidae) include Imperial, Cercropia, Luna, Polyphemus, Royal Walnut, Rosy maple etc. In New England, most of these are state endangered species because they have been hammered by an introduced biocontrol agent -- a non-native tachinid fly, *Compsilura concinna*, which was introduced to try and control gypsy moths in Massachusetts. That fly has wreaked havoc in New England because it is a generalist and the Saturniids have been heavily impacted. This pest has arrived in DC and vicinity but impacts here are not yet known (John Lil pers. comm. 2020). Thanks to the long history of research on insects of Plummers Island (***more than 3000*** species documented there; Brown & Bahr 2008a,b), the island is a key place to further document this aspect of "insect apocalypse" (Jarvis 2018) assuming the island remains intact. Erwin (1981) and Brown (2001) have documented long-term trends in beetles and moths, respectively, with shifts in species composition related mainly to vegetation succession. The AL Bridge project puts WBFC Plummers Island research on trends in biodiversity in jeopardy.

d. Bellwether issues of plagues, invasions and expansion of exotic species are expected to be exacerbated due to disturbance from construction – some examples of timing of introductions spread, and manifestations of infestations of plants animals, and diseases from around the region are recorded from Plummers Island (plant records from Shetler et al. 2006, WBFC Invasive Biota Committee reports 2015-2020), and https://collections.nmnh.si.edu/search/botany/)

   i. arrival and expansion of garlic mustard (1915), now rampant

   ii. arrival and expansion of tree of heaven (or hell) (1933), now 50+ trees

   iii. arrival and expansion of Japanese honeysuckle (1949), now dominant

   iv. arrival and expansion of Japanese stilt grass (1979), now locally dominant

   v. arrival and expansion of oriental bittersweet (1982), now all over and covering trees

   vi. arrival and expansion of amur honeysuckle (1997), now dominant on west end

   vii. arrival and expansion of winter creeper (1997), now patchily established but potentially widespread.

   viii. arrival and expansion of ivy (ca 2015), now patchily established but potentially widespread

   ix. Emerald Ash Borer (EAB) arrival and expansion in 2015 and death of ash trees (2016), mass die off of ash trees, a major shift in forest climax community (Simmons et al. 2016)

   x. fig buttercup arrival and expansion and expansion (3 plants 2017, 50 plants in 2019, 160 plants 2020), expanding exponentially

00006309

    xi.    arrival and expansion of European and Asian earthworms, which rapidly consume forest detritus and restructure soils, upending soil ecological processes and networks of indigenous species adapted to them, favoring colonization and replacement by invasive species, https://en.wikipedia.org/wiki/Invasive_earthworms_of_North_America

    xii.    arrival and expansion of Asian clams (*Corbicula fluminea*), shells now abundant in sandy soils across the island (arrived in Ohio River Valley ca 1959, established in the Potomac River by 1982)

    xiii.    Chestnut blight, was discovered in the USA in New York in 1904, arrived in Maryland by 1906, Chestnuts were historically on Plummers Island adjacent mainland, last documented in 1934, but considered extinct there by 1935. This once dominant species of the eastern deciduous forest was mostly wiped out within 50 years.

    xiv.    Beech blight is coming. Popkin (2019) documents a deadly beech disease is spreading in the northeast USA. There is a mature beech forest on the mainland side of Plummers Island, near Lock 12. We will be watching for the blight here, unless the forest is cut down for the bridge construction.

  e.  Research following climate change impacts to the ecosystems and organisms on Plummers Island will be conflated with issues involved with disturbance from bridge construction and emplacements.

## References

Borenstein, S. 2018. 'Windshield test' highlights big drop in flying bugs. *The Washington Post -HEALTH & SCIENCE* (2018-09-25).

Brown, J. W. 2001. Species turnover in the Leafrollers (Lepidoptera: Tortricicae) of Plummers Island, Maryland: Assessing a century of inventory data. *Proceedings of the Entomological Society of Washington* 103(3): 673-685. https://www.biodiversitylibrary.org/bibliography/2510

Brown, J. W., & S. M. Bahr II. 2008a. The Insect (Insecta) Fauna of Plummers Island, Maryland: Brief Collecting History and Status of the Inventory. *Bulletin of the Biological Society of Washington* 15: 54-64. http://dx.doi.org/10.2988/0097-0298(2008)15[54:TIIFOP]2.0.CO;2

Brown, J. W., & S. M. Bahr II. 2008b. Appendix List of the Invertebrates of Plummers Island, Maryland. *Bulletin of the Biological Society of Washington* 15: 192-226 http://dx.doi.org/10.2988/0097- 0298(2008)15[192:ALOTIO]2.0.CO;2

Brown, J. W., Epstein, M., Vann, K., Watkins, R., Bahr, S. M., Kolski, E. 2008. An overview of the Lepidoptera (Insecta) of Plummers Island, Maryland. *Bulletin of the Biological Society of Washington* 15: 65–74.

Cohn, J.P. 2004. The Wildest Urban River: Potomac River Gorge. *BioScience*, Volume 54(1): 8–14, https://doi.org/10.1641/0006-3568(2004)054[0008:TWURPR]2.0.CO;2

00006310

Erwin, T. L. 1981. Natural History of Plummers Island, Maryland. XXVI. The ground beetles of a temperate forest site (Coleoptera: Carabidae): an analysis of fauna in relation to size, habitat selection, vagility, seasonality, and extinction. *Bulletin of the Biological Society of Washington* 5: 105-224.

Hallmann, C. A., Sorg, M., Jongejans, E., Siepel, H., Hofland, N., Schwan, H., et al. 2017. More than 75 percent decline over 27 years in total flying insect biomass in protected areas. PLoS ONE 12 (10): e0185809. https://doi.org/10.1371/journal.pone.0185809

Jarvis, B. 2018. The insect apocalypse is here: What does it mean for the rest of life on Earth? *The New York Times Magazine*, 27 November 2018, pp. 41–48.

Johnston, W. H. & D.L. Winings. 1987. Natural History of Plummers Island, Maryland XXVII. The decline of forest breeding birds on Plummers Island, Maryland, and vicinity, by David W. Johnston and Daniel L. Winings. *Proceedings of the Biological Society of Washington* 100:762- 768. (December 31, 1987).

Lawrey, J. D., M. E. Hale Jr. 1979. Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution. *Science* Vol. 204, Issue 4391, pp. 423-424 https://dx.doi.org/10.1126/science.204.4391.423

Manville, R. H. 1968. Natural History of Plummers Island, Maryland XX. Annotated list of the vertebrates, by Richard H. Manville, except birds by Alexander Wetmore and Manville. Special Publication, Washington Biologists' Field Club, pp. 1-44. (January 1968.)

Perry, M. C. (ed.) 2007. THE WASHINGTON BIOLOGISTS' FIELD CLUB: ITS MEMBERS AND ITS HISTORY  (1900-2006). The Washington Biologists' Field Club, printed by The Maple Press Company, York  Pennsylvania. Pdf available under the About dropdown as WBFC Book at https://WBFC.science/wp-content/uploads/2019/09/wbfc_booksm.pdf

Popkin, G. 2019. A mysterious disease is striking American beech trees. *Science* Nov 14 2019 https://dx.doi.org/10.1126/science.aba2201

Shetler, S. G., S. S. Orli, E. F. Wells & M. Beyersdorfer. 2006 CHECKLIST OF THE VASCULAR PLANTS OF PLUMMERS ISLAND, MARYLAND. *Bulletin of the Biological Society of Washington*, 14(1): 1-57 https://wbfc.science/wp-content/uploads/2020/07/Checklist_Vasc_Plants_Plummers.pdf

Simmons, R.H, Fleming A.H., Soreng R.J. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Appendix 6, pdf. available at https://wbfc.science/wp-content/uploads/2019/09/plummer_island_nc_map_v1.3.pdf

Simmons R.H., Soreng R.J., Barrows E.M., Emmons L.H. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County. Maryland. Report prepared for the National Parks Conservation Association, July 2020. Appendix 5, pdf. available at https://WBFC.science

Vogel, G. 2017. Where have all the insects gone! *Science* 2 May 2017, Vol. 356, Issue 6338, pp. 576-579 https://science.sciencemag.org/content/356/6338/576.full

00006311



*Rock Creek Conservancy exists to restore Rock Creek and its parklands as a natural oasis for all people to appreciate and protect.*

Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202
Sent via electronic transmission: sarcher@mdot.maryland.gov

April 17, 2021

Mr. Archer:

Rock Creek Conservancy (the Conservancy) submits these comments on the I-495 and I-270 Managed Lanes Study - Draft Section 106 Programmatic Agreement (the Agreement) emphasizing the need for further analysis of runoff and downstream impacts in the Rock Creek watershed, and consideration for increased monitoring to mitigate impacts.

Rock Creek Conservancy is a non-profit organization based in Bethesda, Maryland, that restores Rock Creek and its parklands for all people to appreciate and protect, and annually engages more than 4,500 volunteers in people-powered restoration.

The Maryland Department of Transportation State Highway Administration (MDOT SHA) recently updated the Area of Potential Effects (APE) for the Managed Lane Study (the MLS) by letter dated July 23, 2020. The update was prompted by the identification of potential stream and water quality mitigation sites in Maryland, and Maryland Historical Trust agreed with the APE revision on September 4, 2020. MDOT SHA conducted an archeological survey to evaluate the status of historic sites within the APE and any potential impacts on those sites.

The archeological survey conducted in accordance with Section 106 of the National Historic Preservation Act included a historic site with direct relationships to Rock Creek: Rock Creek Stream Valley, Units 2 and 3. The conclusion of MDOT SHA's Section 106 assessment is that none of Rock Creek Park's historic properties will be significantly impacted by the MLS. However, the Draft Environmental Impact Statement (DEIS) for the MLS notes that, in addition to the negative effects of permanent conversion of Rock Creek Stream Valley, Units 2 and 3, from parkland to highway/use for transportation, "construction impacts MAY also temporarily diminish the integrity of the setting and feeling of the property."

The setting and feeling of the property are not only integral to the historic value of Units 2 and 3, but to the value of the Rock Creek Valley Park system as a whole. The Maryland Historic Trust published a report in 2012 on the eligibility of Unit 2 as a historic site, and recommended its eligibility for the National Register of Historic Places specifically for its "association with the maintenance of the larger Rock Creek Park system." Units 2 and 3 are maintained holistically by Maryland-National Capital Park and Planning Commission along with the rest of the Rock Creek Stream Valley Park. The impacts to the historic value of individual portions of the Stream Valley Park must be considered as impacts to the Park as a whole.

7200 Wisconsin Avenue, Suite 500 |Bethesda, MD 20814
(301) 579-3105 | info@rockcreekconservancy.org
rockcreekconservancy.org | #LoveRockCreek

00006312

Construction-related inputs into Rock Creek will ultimately impact the sites with historic value located along Rock Creek. The DEIS includes only rudimentary information about Rock Creek stream valley parks, Units 2 and 3, which are part of a National Register-eligible site, and does not consider the project's proximity impacts to parkland. These stream valley parks are part of the APE and were included in the Section 106 assessment, but were not deemed to be at risk for significant direct impacts from construction. The health of the land around Rock Creek is impacted by Rock Creek itself, so the impacts mentioned in the DEIS will have ramifications for historically designated areas that were not found to be at risk in the Section 106 assessment, due to the hydrology of Rock Creek. I urge MDOT SHA to give a more holistic review of the impacts on Rock Creek and how they will affect the proximally distant but nevertheless related historic value of the Stream Valley Parks.

Mitigation planning will help to avoid quantifiable and aesthetic impacts on downstream conditions in the Rock Creek watershed, such as environmental damage caused by increased impervious surface runoff and sedimentation from construction materials. Monitoring Rock Creek during and after construction to ensure there are no impacts to the creek, like siltation and erosion, which endanger infrastructure and historic buildings along Rock Creek both within the stream valley parks and further downstream, will be critical to identifying and responding to impacts. Considering the hydrologic factors of the area, I am asking MDOT SHA to consider the significance of heavy construction on the downstream portions of the Rock Creek watershed, and the historically significant sites located there, and include monitoring programs before, during, and after construction. Any impacts identified from monitoring will need to be mitigated to maintain the qualities of both the stream valley parks and the downstream historically designated places.

Preserving the health of Rock Creek and its historic sites is of utmost concern for the Conservancy and residents in Montgomery County who utilize the park space and activities offered by Rock Creek. There must be parallel studies of the impacts on Rock Creek and the impacts on historic sites located on Rock Creek, and how changes to one affects the other. Neglecting the nature of these relationships will cause further damage to the health of Rock Creek's environment.

Respectfully submitted,

Jeanne Braha, Executive Director

7200 Wisconsin Avenue, Suite 500 |Bethesda, MD 20814
(301) 579-3105  | info@rockcreekconservancy.org
rockcreekconservancy.org | #LoveRockCreek

00006313

Indian Spring Citizen Association comments on draft NHPA 106 Programmatic
Agreement dated 4/12/21

On behalf of the Indian Spring Citizen Association, we thank you for reaching out
to us as a consulting party and providing us an opportunity to play this role in this
NHPA process.  The following comments respond to your request for specific
suggestions to improve the NHPA 106 Programmatic Agreement.

In draft 1 of the PA, MDOT SHA suggests the following mitigation:

> E. Indian Springs Estates and Country Club
>
> MDOT SHA, in consultation with the Silver Spring YMCA and other
> appropriate consulting parties, will prepare and fund interpretive materials
> describing developer Abraham Kay, the Jewish history of the club and
> development, and influential Jewish people in the DC suburbs during the
> 1940s and 50s, and seek a partnership with the Silver Spring YMCA or
> Montgomery County Parks to host and locate the materials where they are
> accessible to the public.

Comment:  We appreciate your email confirming that ISCA is one of the
consulting parties and provide the follow specific suggested test for this paragraph:

> E. Indian Spring Estates and Country Club
>
> MDOT SHA, in consultation with the Silver Spring YMCA, the Indian
> Spring Citizens Association (ISCA) and other appropriate consulting parties,
> will prepare and fund interpretive materials describing developer Abraham
> Kay, the Jewish history of the club and development, and influential Jewish
> people in the DC suburbs during the 1940s and 50s, and seek a partnership
> with the Silver Spring YMCA or Montgomery County Parks to host and
> locate the materials where they are accessible to the public.
>
> MDOT SHA, in consultation with ISCA, will also cooperate with ISCA in
> adding interpretive materials describing this history of Indian Spring that
> preceded the development of the Indian Spring Estates and Country Club
> including the purchase of the land from the farmer on whose land there was
> an Indian Spring House as well as the prehistory or lore of visitation and use
> by Native Americans that inspired the name of the spring house, and the
> Indian Spring Estates and Country Club.  Consistent with the "Criteria for
> Archaeological Potential" DEIS Appendix G Cultural Resources Technical

Indian Spring Citizen Association comments on draft NHPA 106 Programmatic Agreement dated 4/12/21

> Report, Volume 2:  Archaeological and Historic Architectural Gap Analysis and Assessment (2 2.3.2 Criteria for Archaeological Potential) will conduct excavation surveys within 500 feet of the creek and surrounding wetlands in Indian Spring Terrace Park that appear associated with Indian Spring that is reported to have been used by Native Americans in order to avoid or mitigate adverse effects to prehistoric resources as part of the planning for any excavation and construction of the highway between Coleville Road and University Boulevard, including but not limited to the noise barrier and storm water work.

STIPULATIONS

> Under F.  Concurring Parties/Public, G. Other Mitigation and Revisions to Mitigation Locations or under IV Consultation Regarding Project Development

> [x] MDOT SHA shall consult with ISCA in the planning of any excavation, demolition, modification, building or rebuilding of the ramps and/or noise barriers for the Indian Spring community (south of the Beltway between Coleville Road and University Boulevard) this specifically includes the initial planning stage as well as consulting on design at the 30, 60, 90 and 100 percent design stages to develop context sensitive approaches.  ISCA shall have a minimum of 30 days to review and comment.  The scope of review shall include the avoidance or mitigation of adverse effects from direct and indirect impacts from proposed plans.  The audio and visual effects are also within this scope of review of potential adverse effects.

VIII.  Archaeological Treatment Plan

> [x] Phase I survey within 500 feet of the stream/creek and wetlands associated with planned demolition, excavation, construction and reconstruction of the Indian Spring Country Club and Estates and associated Indian Spring Terrace Park.

X. Monitoring of Performance

> A.  FHWA and MD-DOT commit to an archaeological construction monitoring in accordance with the Monitoring and Reporting Plan to be developed prior to any excavation, demolition or construction in consultation with the Signatories and consulting parties.

Indian Spring Citizen Association comments on draft NHPA 106 Programmatic Agreement dated 4/12/21

XII. Other Post-Review Discoveries

    A. If, during implementation of the Undertaking, monitors or other Project personnel discover archaeological resources that have not been previously identified and assessed or witness that a known historic property previously determined to be eligible for listing on the National Register are going to be effected in a manner not previously documented shall result in a work stoppage so that the Signatories and appropriate consulting parties consult in regard to next steps to avoid or mitigate the effects consistent with the NHPA.

Appendix 3 Inadvertent Discovery Plan

    A. [corresponding change]

# CABIN JOHN CITIZENS ASSOCIATION
## P.O. BOX 31, Cabin John MD 20818

*Organized 1919 -- Charter Member Montgomery County Civic Federation*

April 12, 2021

**_Via Email_**
Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation
State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

RE:    **Cabin John Citizens Association Comments Regarding the I-495/I-270 Managed
        Lane Study Draft Programmatic Agreement**

Dear Mr. Archer:

On behalf of the 2,100 residents of Cabin John, Maryland, the Cabin John Citizens Association
would like to provide the following comments on the Draft Programmatic Agreement (PA).

With our community borders defined by the Clara Barton Parkway and the C&O Canal on one
side, I-495 itself on another side and the Cabin John Parkway completing the triangle in which
we live, many of our concerns with respect to the PA mirror those of the National Park Service,
the Friends of Moses Hall and the Maryland-National Capital Parking and Planning
Commission.

**Moses Hall and Cemetery and the Reinternment of Human Remains**
The cemetery is the final resting place of a number of people who lived in Cabin John all their
lives. Descendants of those buried there still call Cabin John home. In the early 2000s members
of the community along with the Cabin John Citizens Association started a multi-year effort to
preserve the cemetery. We have worked with renewed effort in recent years.

There is now strong evidence to suggest that there are a number of burials within the LOD, as
well as within the current state right-of-way, and more may be identified as project planning
continues. The Cabin John Citizens Association concurs with the comments to the first draft of
the Section 106 Programmatic Agreement ("PA") from Friends of Moses Hall consulting party,
most especially when it comes to all of its stipulations regarding human remains.

Furthermore, we concur with the Friends of Moses Hall that MDOT SHA should ensure it
accounts for the environmental injustices attributed to the original highway construction and
appropriately addresses and mitigates any and all adverse impacts to this site, as well as to the
Gibson Grove (First Agape A.M.E. Zion Church) Church site, attributable to the Project.

1

**Noise Barriers, Stormwater Mitigation and Limit of Disturbance (LOD)**
As the current version of the MDOT I-495 and I-270 Managed Lane Study Interactive Map indicates the Limits of Disturbance to be -- at the very least -- to the border of the property lines of residential properties in Cabin John as well as the Moses Hall and Cemetery and the Gibson Grove Church sites.

Actual encroachment on to these two historic properties as well as the detrimental effects posed by stormwater runoff, loss of vegetation and other environmental impacts in conjunction with the Project are all adverse effects that are not adequately identified in the PA. This, in turn, makes the Design-Review process a critical component of collaborative mitigation.

We would like to see the stipulations for these two properties be rewritten to ensure there is ongoing consulting party collaboration regarding context-sensitive design of noise barriers as well as ongoing collaboration on minimizing and mitigating impacts to character-defining features and resources. Given the environmental vulnerability of the Moses Hall property in its current state and the reality that the Project will take years to complete, we would like the SHA to stipulate that stormwater runoff mitigations and noise barriers be put in place at the onset of the Project.

**River Rd. and Cabin John Parkway Interchange Design**
Elevated ramps in the vicinity of Moses Hall and Cemetery, the Gibson Grove Church and the Cabin John Valley Stream Park across Seven Locks Rd. from these two historic sites would be totally out of character with these historic sites, the parkland and the broader residential area of Cabin John.

We would like to see a stipulation that the SHA should require the pre-development contractor to reassess this interchange with the goal of developing new design alternatives that avoids a flyover or other aerial structures that cause adverse visual impacts affecting these historic properties.

**The Clara Barton Parkway and the C&O Canal National Historic Park**
When it comes to both of these historic entities, the draft PA is essentially in comprehensible as it filled with placeholders apparently awaiting input from the National Park Service.

Cabin John homes abut both sides of the parkway and a stretch of the C&O Canal. The access road to the Clara Barton Parkway in Cabin John is **the only way** some 100 CJ homes can enter or exit the neighborhood. It is extremely important that the final design, the construction period and the new Clara Barton Parkway interchange take into account that hundreds of homes are adjacent to these historic sites.

Given the lack of information, it is imperative that the Cabin John Citizens Association be designated a property-specific consulting party with regard to the design-review process for both of these entities.  With regard to the Clara Barton Parkway, we also ask the SHA stipulate that the contractor will protect trees and other vegetation outside the LOD, limit vegetation removal to the extent practicable and screen the parkway from bordering houses by planting new trees of a similar type replacing those removed during construction.

2

**Progress Reports**
The draft PA proposes written annual progress reports to concurring parties with a meeting to follow. This proposal is inadequate given the complexity of this project.  The PA should stipulate that the SHA and the developer should provide written updates and meet with consulting parties at least quarterly during the pre-development period with an understanding that a mutually agreeable frequency will be establish for information sharing during the construction period itself.

The Cabin John Citizens Association appreciates your consideration of our comments and proposed stipulations and we look forward to their incorporation into the next draft of the PA. WE are seeking Concurring Party status and look forward to continuing to provide input on subsequent PA drafts as well as throughout the design-review process.


Sincerely,

Susan Shipp
President, Cabin John Citizens Association


cc:
Governor Lawrence J. Hogan – governor.mail@maryland.gov
Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
Treasurer Nancy Kopp – treasurer@treasurer.state.md.us
State Sen. Susan Lee, Susan.lee@senate.state.md.us
Del. Ariana B. Kelly, Ariana.kelly@house.state.md.us
Del. Marc Korman, marc.korman@house.state.md.us
Del. Sara Love, Sara.love@house.state.md.us
Montgomery County Executive Marc Elrich, marc.elrich@montgomerycountymd.gov
Montgomery County Council President Tom Hucker,
Councilmember.Hucker@montgomerycountymd.gov
County Councilmembers:
Andrew Friedson, Councilmember.Friedson@montgomerycountymd.gov
Gabe Albornoz, Councilmember.Albornoz@montgomerycountymd.gov
Evan Glass, Councilmember.Glass@montgomerycountymd.gov
Will Jawando, Councilmember.Jawando@montgomerycountymd.gov
Hans Reimer, Councilmember.Reimer@montgomerycountymd.gov
Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
Rebeccah Ballo, Montgomery County Planning Department –
rebecccah.ballo@montgomeryplanning.org
Carol Rubin, M-NCPPC – carol.rubin@montgomeryplanning.org
Brian Crane, Montgomery County Planning Department –
brian.crane@montgomeryplanning.org

3



# CARDEROCK SPRINGS
National Register of Historic Places

April 12, 2021

Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation
State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

**RE: I-495/I-270 Managed Lane Study Draft Programmatic Agreement**

Dear Mr. Archer:

On behalf of the Carderock Springs Citizens Association, a community organization that represents Carderock Springs and Carderock Springs South, we appreciate the opportunity to provide comment on the Draft Programmatic Agreement (PA). Carderock Springs is designated as a National Historic District as a notable example of "situated modernism," and Carderock Springs South is designated as an eligible historic district.

We note and appreciate the stipulations identified for the Carderock Springs Historic District and recognize the attention that SHA has paid to the concerns that we raised in our previous comments. Based on our review of the initial draft of the Programmatic Agreement, we have identified eight substantive issues for the Carderock Springs Historic District that should be addressed in the next draft. We summarize these concerns below:

- **Effects Determination:** We disagree that a determination of effects cannot be made at this time. As we indicated in our comments last year, the *Cultural Resources Technical Report* acknowledged that the Project "may result in loss of tree and landscape buffer that could create a diminishment of the design and setting of contributing elements of the district" (Pg. 27). We believe that this loss, as well as any associated property impacts, *would* have an adverse effect on the Historic District. Trees are a character-defining feature of the Historic District. Their substantial removal would alter the visual character of the community, in addition to its bucolic setting. In the absence of any clear indication that tree loss or property impacts have been substantively avoided, we believe that a determination of adverse effect is appropriate.

- **Noise Barriers and Limit of Disturbance (LOD):** As the current version of the MDOT I-495 and I-270 Managed Lane Study Interactive Map indicates that the extent of the indicated Limits of Disturbance will be extended to the border of the property lines of many properties in Carderock Springs and Carderock Springs South, and that noise barriers are to be constructed at the edge of the indicated LOD, we are concerned about



whether the final design of the Project will maintain the actual LOD within the public right-of-way and still provide for tree preservation and placement of noise barriers along this right-of-way without encroachment onto private properties. Encroachment onto these properties would be further cause for a finding of an adverse effect. We note that there have been recent alternative proposals advanced on the location of the Project in order to mitigate the impacts on the Moses Hall Cemetery that appear to have the effect of shifting the roadway to the northwest from the location indicated on the interactive map published in June 2020. We believe that the Draft PA should be refined to better address the LOD and associated property impacts as potential mitigation.

- **Avoidance and Minimization:** We appreciate SHA's commitment to working with us to avoid any potential effect, as avoidance and minimization continue to remain the appropriate first steps and our priority. We would benefit from a clear understanding of the timeline of our work together to achieve such avoidance, given the upcoming pre-development work of the P3 Developer.

- **Treatment Plan:** As noted above, we believe that more work can and should be done to avoid and minimize potential effects. We do appreciate the inclusion of the Treatment Plan for potential mitigation, but we need greater clarity on the timing of the Treatment Plan in relation to the further development of the Project. When will the Plan be developed and what process will be available to work with SHA and the P3 Developer to refine and confirm approaches? This information should be included in the PA.

- **Addressing MD 190 and Cabin John Parkway Interchange Design:** We remain very concerned that the Project includes multiple flyover ramps connecting the proposed managed lanes with the MD 190/Cabin John Parkway interchange. These elevated ramps are out of character with the Carderock Springs Historic District and the broader residential (non-commercial) area and are a major driver of the effects to the historic resource. We continue to believe that these ramps are not needed to meet the Project's Purpose and Need as practicable alternatives to providing access exist that SHA is employing elsewhere on I-495. At-grade options, as proposed at Clara Barton Parkway, are most appropriate given the parkland and historic resource context of this area, as well. SHA should advance this modification as a meaningful way to avoid effects to the Historic District.

- **Operational Period Monitoring:** We note that, throughout the document, the Draft PA is largely silent on the operational period of the Project. While the construction period effects are meaningful, operational issues related to noise could have a meaningful long-term effect on Carderock Springs. While noise barriers should ameliorate this issue, ongoing noise monitoring near historic resources like Carderock Springs would be important to ensure that noise mitigation measures are effective and do not disrupt historic resources' bucolic setting.

- **Clarifying and Refining Timing:** As mentioned in part above, different dimensions of the timing of certain activities in the Draft PA should be clarified or refined:

00006321

**CARDEROCK SPRINGS**
National Register of Historic Places

- Meaningful coordination on avoidance, minimization, and potential treatment plans needs to occur during the Project design period, with a focus on the pre-development phase where Project elements can more easily be modified and refined. The Draft PA lacks any commitments related to timing for this coordination. Clear timelines should be provided.

- The frequency of meetings proposed in Section X is insufficient. Particularly during the upcoming pre-development period, SHA should meet with Consulting Parties far more frequently than annually. At a minimum, regular meetings with all Parties, perhaps monthly during the pre-development period and at least quarterly thereafter, in addition to the ad hoc meetings when required between individual Parties and SHA to resolve issues, should be the standard.

- The proposed duration of the PA is too long. While we appreciate SHA's effort to signal a commitment to long-term engagement, we believe that a shorter timeframe would force a focused consideration of the issues and an early evaluation of whether conditions have changed and how a renewed PA might be revised. We understand seven years to be a more traditional duration.

- **Dispute Resolution Procedures:** The Draft PA provides that in the event any disputes arise amongst the parties to the PA, the FHA will be the determining party to resolve such disputes. Given the role of the FHA as an advocate for this Project and the expertise that other parties to the agreement have in historic preservation, we believe that the party that is more appropriately situated to resolve such disputes is the Advisory Council on Historic Preservation. The model template programmatic agreement that the ACHP has posted on its website provides for the ACHP to be the determining party to resolve disputes.

Carderock Springs Citizens Association appreciates your consideration of these comments. We note that we are seeking Concurring Party status to remain an active and engaged participant through Project development. We will engage further with SHA on Concurring Party status during review of subsequent PA drafts.

We appreciate your consideration of these comments and look forward to their incorporation into the next draft of the PA.

Sincerely,

Jack Orrick
CSCA President

Carderock Springs Citizens' Association
P.O. Box 237, Cabin John, MD 20818-0237
www.carderocksprings.net

3



**CARDEROCK SPRINGS**
National Register of Historic Places

CC:

Governor Lawrence J. Hogan
Comptroller Peter V.R. Franchot
Treasurer Nancy Kopp
County Executive Marc Elrich
Councilmembers Andrew Friedson, Gabe Albornoz, Evan Glass, Will Jawando, and Hans Riemer
Senator Susan Lee and Delegates Ariana Kelly, Marc Korman, and Sara Love
Carol Rubin, Maryland National Capital Park and Planning Commission
Rebecca Ballo, Montgomery County Planning Department
Elizabeth Hughes, Maryland Historic Trust
Beth Cole, Maryland Historic Trust
Tim Tamburrino, Maryland Historic Trust

**Karen Hutchins-Keim**

| | |
|---|---|
| **From:** | Eddie Bankhead <esbj@pobox.com> |
| **Sent:** | Monday, April 12, 2021 11:10 PM |
| **To:** | Steve Archer |
| **Subject:** | Draft PA – Comments from FIrst Agape AMEZ Church |

April 12, 2021

By Email to: sarcher@mdot.maryland.gov

Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

Good evening,

Thank you for your participation with us in protecting our church (First Agape AMEZ church at Gibson Grove) and other historic sites impacted by the beltway and its expansion for the I-495/I-270 Managed Lanes Study(Project).

We look forward to revisions of our church property's effect determination located at 7700 Sevel locks Road, as discussed during our April 6 meeting. We agree with Friends of Mosses Hall for the programmatic agreement to include a Design-Review provision[1].  As we work toward stabilizing and rebuilding our church, we wish to ensure our construction efforts do not conflict with the developer for the Managed Lanes project. We must have the means and mechanisms necessary to deconflict construction objectives and timing.  We will continue to share our planning (Site work, design, and construction) of our stabilization and rebuilding projects with the state and the future developer.  We seek to provide effective feedback to the developer as we continue to be stewards of our historic site.

Thank you for taking our comments. Your help in this matter is greatly appreciated.

In God We Trust,

--ES Bankhead jr.

Chair Trustee Board
First Agape AMEZ Church
7700 Seven Locks Road

Church web site :
https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fwww.1stagape.com%2F&amp;data=04%7C01%7CSArcher%40mdot.maryland.gov%7Ce6cc4f89f1e241dfc81e08d8fe29bb07%7Cb38cd27c57ca4597be2822df43dd47f1%7C0%7C0%7C637538802480600624%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C1000&amp;sdata=Zx6bV7FRHFIeqQr5wVOIAT2ncwMQZPKZb42%2FJ2JMeOY%3D&amp;reserved=0

Correspondence Address:
First Agape AMEZ Church
PO BOX 1016

00006324

Burtonsville MD 20866

[1] Friend of Mosses Hall email 4-12-2021 Subject:Draft PA - Comments from Friends of Moses Hall Consulting Party for Morningstar Moses Cemetery and Hall Site
To: Steve Archer <SArcher@mdot.maryland.gov> Attached document Title: FMH PA Draft Comments_FINAL.pdd, page 13 Section 25.

00006325



CARDEROCK SPRINGS
National Register of Historic Places

October 8, 2021

Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

**Re:  I-495 and I-270 Managed Lanes Study, Comments from CSCA about Section 106 Materials, letter to MHT and VDHR from State Highway Administration dated September 8, 2021 ("SHA Letter")**

Dear Mr. Archer,

Thank you for the opportunity to provide you with our comments, as a Consulting Party to the NHPA Section 106 process, to the SHA letter referenced above, including the revision of the Area of Potential Effects (APE) and the updated Limits of Disturbance (LOD). It is our understanding that the Preferred Alternative represented in the current design is Alternative 9, which adds two HOT managed lanes in each direction to I-495 and I-270 in the current, reduced project area (Phase 1 South). This is consistent with the previous iteration of the design presented to us for the areas bordering the Carderock Springs Historic District (CSHD) and Carderock Springs South, although the APE and the LOD have shifted to minimize impacts on the Morningstar Tabernacle 88 Moses Hall and Cemetery and to incorporate changes due to the advancement of the design.

Consistent with our previous comments to the SHA, we request that the preferred alternative be modified so that only one lane be added to each side on I-495 to minimize negative impacts on our community and the adjacent Gibson Grove Church while continuing to minimize adverse effects on the Moses Hall Cemetery.

The currently introduced design includes an increase in impact on the CSHD from that indicated on the DEIS issued last fall due to the design refinements. These include design modifications at the Cabin John Parkway Interchange to minimize impacts to Morningstar Tabernacle No. 88 Moses Hall and Cemetery, resulting in shifting the centerline of I-495 towards the north (towards the CSHD) compared to existing conditions, as well as revisions to the locations of exchange ramps, construction of retaining and noise walls along the outer loop, and clearing and erosion and sediment control measures.

We disagree with SHA's determination that "the project will not adversely affect the Carderock Springs Historic District" and with SHA's statement that "these actions will not disturb the original topography and natural vegetation within Carderock Springs." Per SHA's letter, both physical effects and potential visual, atmospheric or audible effects within the APE were considered in this determination. SHA is also



requesting from the Maryland Historic Trust (MHT) that they concur with the "no adverse effects" determination for the Carderock Springs Historic District should the Preferred Alternative be selected and that they acknowledge FHWA's intent to make a *de minimis* impact finding for the district. It is our understanding that a *de minimis* impact finding signifies that, after taking into account avoidance, minimization, mitigation and enhancement measures, no adverse effect to the activities, attributes or features of our historic site under Section 4(f) protection is found.

Physical Effects: It is noted in the letter that the Preferred Alternative would result in impacts of less than 0.1 acre of the Carderock Springs Historic District, including permanent and temporary impacts. This represents an increase from the no impact reported in the DEIS. Furthermore, it is stated that the LOD adjoining Carderock Springs Historic District will impact approximately 3.2 square feet of the rear yard at 7610 Hamilton Spring Road, a contributing resource within the district. Based on our review of Map 7 in Appendix D of the SDEIS, which contains the Environmental Resource Mapping, it appears that this impact occurs at 7608 Hamilton Spring Road, not at the adjacent property at 7610 Hamilton Spring Road. This should be verified and amended as appropriate and as needed in the Final EIS. This LOD impact is in part due to the shifting of the centerline of I-495 noted above in combination with the construction of the new noise barrier walls and the 10-foot offset of the LOD behind the proposed walls. While we consider the noise barrier walls an important part of this project if the Preferred Alternative moves forward, we still consider this physical effect to have a negative impact on the CSHD and specifically on the property at 7608 Hamilton Spring Road.

Visual and Audible Effects: The SHA letter states that "the proposed noise wall will further screen the district from visual and audible effects already present along I-495." It is true that there are audible and visual effects already present at the properties bordering I-495, including numerous residences and the Carderock Springs Elementary School. There is a long history of noise levels that exceed the 66 dBA limits provided in the Noise Abatement Criteria (NAC) for Category B and Category C properties, resulting in letters to SHA and to our elected officials from affected residents, the Carderock Springs Citizens Association and the Carderock Springs Elementary School PTA Board requesting action to resolve these issues. These efforts date back to 1985 and have continued into the present with renewed energy every time the Beltway is widened and elevations are modified. Previous commitments to provide noise barriers following a 2001 SHA Sound Barrier Analysis fell through due to lack of funding. The results of that analysis showed noise levels reaching 80 dBA in properties adjoining the Beltway, and these noise levels still exist today. This is not an acceptable condition.

We have reviewed the proposed noise barrier information provided in the Supplemental Draft Environmental Impact Statement (SDEIS) Appendix E, the Noise Technical Report Addendum. Per this report, noise barriers that are typically 24 feet tall, but could reach 32 feet in some instances, are being proposed for the area that affects the CSHD and Carderock Springs South (NSA 1-03, NSA 1-04 and NSA 2-01). For the Preferred Alternative, estimated maximum noise levels were noted to be 78 dBA without noise barriers; these levels would be reduced to a maximum of 67 dBA with the proposed noise barriers. We agree that, should the Preferred Alternative, or any Alternative for that matter, move forward, that these noise barriers be included in the design to reduce the noise levels in the properties bordering the Beltway.

00006327



Regarding the visual effects of the Alternative 9, we do not agree that the proposed project does not have an adverse visual impact on the CSHD. As noted in the SHA letter, in addition to the CSHD's significance under Criterion A, it is also significant under Criterion C "for its distinctive examples of modernist houses in a carefully planned and landscaped development designed to have a 'natural' appearance by retaining most of the original vegetation and topography." This original vegetation includes large areas of mature trees, including in the areas bordering the Beltway. In addition to their contribution to the visual aesthetic and historic natural setting, the existing mature, tall trees also provide an additional measure of noise damping. The LOD includes a ten-foot offset behind the proposed noise wall, which will undoubtedly affect the mature trees that are either directly within the LOD or whose root systems extend into the LOD, and any other existing landscape buffer within the LOD.

We have not seen in any of the materials developed in connection the proposed I-495/I-270 Managed Lane Project, including the DEIS and the SDEIS, any specific information on the number and location of mature trees that are within the APE that will need to be removed. We believe that until a survey of the existing conditions of mature trees has been completed and an analysis of the number of trees that will need to be removed has been conducted the SHA cannot make a determination on the lack of visual impacts to the CSHD.

Our preferred course of action is to further limit the final width of the Beltway to minimize the impact on the historic landscape and mature trees in the CSHD. Where the landscape inevitably will be affected by the widening of the highway and the installation of the noise barriers, careful consideration should be given to the appropriate design for a noise barrier and the visual impact it will have on the area. Placing a tall barrier adjacent to our community's low-profile homes can impede the view and negatively impact the aesthetic dynamic. Additional discussions regarding potential mitigation of the visual impact of the noise barriers and the impact to the native vegetation will be an important part of the design process as it moves forward. This should include consideration of wall height, wall materials, and replacement of native vegetation and appropriate landscape elements to the foreground to reduce the barrier's visual impact. Please note that even replanting native trees adjacent to the noise walls will not immediately replace them due to the time it will take for their growth.

In addition to the visual effects from the noise barrier walls, we also understand that the current design incorporates fly-over ramps in several locations adjacent to the CSHD and Carderock South to allow traffic to access the managed lanes. While this design does not appear to have been presented in detail to date, we believe that these ramps will result in both a negative impact on the visual quality of our community due to their elevation and an increase in noise generated from the traffic utilizing these ramps, and recommend lowering the ramps, or allowing on-grade access to the managed lanes, to avoid both visual and audible negative impacts. It remains unknown what further impacts there may be from the placement of new signage for these entrance ramps, and their placement relative to the viewshed and property lines of the community and residential streets. Further information and consultation is requested as the project continues past the ROD so that CSHD will be consulted on these items to assess any as yet undefined visual impacts.



<u>Atmospheric Effects:</u> To date we have not seen a discussion of potential atmospheric effects, including air quality for the homes directly adjacent to the Beltway and at the Carderock Springs Elementary School. We request that air quality issued be addressed and discussed as part of the review process.

In summary, we contend that the project <u>will</u> adversely affect the Carderock Springs Historic District and disagree with SHA's statement that "these actions will not disturb the original topography and natural vegetation in Carderock Springs." In addition, we disagree with FHWA's intent to make a *de minimis* impact finding for the district for our historic site under Section 4(f) protection. We reiterate that the anticipated adverse effects will include property loss, loss of mature trees and landscape buffer, changes to the historic settings and feeling due to tree loss and highway encroachment, visual and sound impacts from the proposed fly-over ramps, and a potential increase in air pollution.

As part of the Programmatic Agreement, we request the following as a Consulting Party:

- to continue to search for creative design solutions that prioritize avoidance of adverse effects per Section 106, which would require no encroachment of the LOD on Carderock Springs Historic District, Carderock Springs South, Gibson Grove Church or Moses Hall and Cemetery, or adverse impacts on their visual and environmental qualities;

- that quarterly meetings be held to inform our communities of the status of the proposed project and any changes to the current design and to allow the community to voice concerns and ask questions;

- that we be a part of the design review process for the road, sound walls, and associated signage and lighting with the P3 partner, and be given the opportunity to provide formal comments in response to the proposed design at the 30% / 50% / 90% design phases; and

- that the Programmatic Agreement allow for continued consultation should any unexpected discoveries or changes to the design be found necessary within the portion of the APE adjacent to CSHD and Carderock South.

Thank you for consideration of these comments.

*John R. Orrick*

John Orrick
President, Carderock Springs Citizens Association

cc      Elizabeth Hughes, State Historic Preservation Officer, Maryland Historical Trust
        Julie Langan, State Historic Preservation Officer, Virginia Department of Historic Resources

00006329



**FRIENDS OF MOSES HALL**
The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
7550 Seven Locks Road
Cabin John, MD 20818
morningstarmosescj@gmail.com
https://www.friendsofmoseshall.org/

October 8, 2021

*By Email to:* sarcher@mdot.maryland.gov

Mr. Steve Archer
Cultural Resources Team Leader
**Maryland Department of Transportation State Highway Administration Environmental Planning Division**
707 North Calvert Street
Baltimore, MD 21202

**Re:    Report on Geophysical Surveys and GPR Presentation**

Dear Mr. Archer:

Thank you for the opportunity to review and comment on the Report on Geophysical Surveys and the GPR presentation developed by MDOT SHA. Friends of Moses Hall wish to again thank MDOT SHA for your reports and efforts to date.

Friends of Moses Hall particularly appreciates the GPR survey that was conducted, which sheds important light on the conditions at the cemetery. However, there are a number of concerns that we have with 1) the work completed and 2) SHA's resulting conclusion that burials have been "completely avoided." **We share the following comments:**

**The GPR effort conducted does not appear to be complete.** The tremendous volume of positive results should have resulted in a more thorough investigation of the area. We understand that incomplete bamboo removal and other physical obstacles prevented further GPR investigation in some locations; however, these problems can be undoubtedly addressed to allow for a more thorough investigation. It is appropriate practice in a GPR survey to cast a wider buffer than is apparent from this work. The investigation should have continued northward up to the edge of the highway, as well as extending further east and west. The fact that the investigation did not continue further northward precludes any determination that the graves have been "completely avoided." SHA simply did not give a hard or wide

00006330

enough look to prove that was the case. SHA's own study concludes that there is a notable possibility that graves were not captured by the GPR work thus far (pg. 13). These graves could be in highly sensitive areas quite close to the existing and potential future highway.

Therefore, on the basis of an incomplete GPR study, **it is imprudent for SHA to determine that the Preferred Alternative alignment completely avoids the cemetery**. In fact, the realization that SHA's understanding of this site has moved rapidly – from not incorporating it as a resource until Friends of Moses Hall's involvement, to identifying one potential burial in the ROW, to now identifying many – should give us substantial pause before declaring avoidance complete.

As a result, more GPR work should be done north, west, and east of the completed study limits, providing an appropriate buffer to what has been found to-date and deeply examining the most critical areas near the highway.

**Additionally, the location of the limits of disturbance (LOD) in relation to the *known* burial sites raises substantial questions about physical avoidance.** The updated LOD still appears to be immediately adjacent to a grave. As SHA's report acknowledges, GPR is imperfect. The entirely of the grave feature may not exactly correspond with the GPR findings. This risk is usually addressed by establishing a buffer, which does not appear to have been done for this LOD. Therefore, we remain concerned about physical impacts to burials.

To address this deficiency, **we strongly recommend that SHA establish both a buffer between graves and the LOD, as well as archaeological monitoring during construction**. In particular, we are extremely concerned about the impacts to graves that have already been affected by the establishment of ROW within the burial ground, and the Friends of Moses Hall needs to understand what will be done to protect these resources during construction.

As the previous point makes clear, the lack of any clear information about construction techniques also precludes any determination regarding physical avoidance. The sensitive nature of the site would require both an approach to construction itself and to monitoring that would ensure no physical impacts would occur. **SHA has not provided enough information about construction for the agency to claim physical avoidance nor for FMH to opine on the level of physical avoidance**.

With these comments, we request that SHA provide information on how they will address these meaningful limitations in the existing analysis. **This information is a prerequisite to any suggestion that physical effects to the site have been avoided.**

We appreciate your consideration of these comments.

Sincerely,

FRIENDS OF MOSES HALL
The Board of Trustees of
Morningstar Tabernacle Number 88, Incorporated

Diane E. Baxter
**President, Morningstar Tabernacle Number 88, Incorporated**
Descendant

00006331

**Dr. Charles W. Harris**
**Vice President, Morningstar Tabernacle Number 88, Incorporated**
Descendant

**Eileen McGuckian**
**Secretary, Morningstar Tabernacle Number 88, Incorporated**
Historian and President, Montgomery Preservation

**Montgomery Crawford**
**Treasurer, Morningstar Tabernacle Number 88, Incorporated**
Descendant

**Alexandra Jones, PhD, RPA**
**Trustee, Morningstar Tabernacle Number 88, Incorporated**
Executive Director and Founder, Archaeology in the Community

**Austin E. White**
**Trustee, Morningstar Tabernacle Number 88, Incorporated**
Descendant

**Charlotte Troup Leighton**
**Trustee and Chair, Friends of Moses Hall Committee, Morningstar Tabernacle Number 88, Incorporated**
Vice President of Advocacy, Cabin John Citizens Association

**L. Paige Whitley**
**Chair, Research Committee, Morningstar Tabernacle Number 88, Incorporated**
Independent Researcher

**Sondra Raspberry**
Descendant

**Shannon S. Steward**
Descendant

**Christopher Waynes**
Descendant

**Austin White II**
Descendant

**Nathan White II**
Descendant

**Pandora White**
Descendant

00006332

cc:    Governor Lawrence J. Hogan – governor.mail@maryland.gov
Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
Treasurer Nancy Kopp – treasurer@treasurer.state.md.us
Kendra Parzen, National Trust for Historic Preservation - KParzen@savingplaces.org
Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
Julie Langan, Virginia DHR - julie.langan@dhr.virginia.gov
Julie Schablitsky, MDOT SHA – jschablitsky@mdot.maryland.gov
Richard Ervin, MDOT SHA – rervin@mdot.marylnd.gov
Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
John Simkins, FHWA Virginia Division - john.simkins@dot.gov
Rebeccah Ballo, Montgomery County Planning Department – rebecccah.ballo@montgomeryplanning.org
Debra Borden, M-NCPPC – debra.borden@mncppc.org
Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
Eddie Bankhead, First Agape AME Zion Church - esbj@pobox.com
Rev. Edgar Bankhead, First Agape AME Zion Church - ebankjs@verizon.net
Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
Sara Love, Maryland State Delegate – sara.love@house.state.md.us
Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Gerald Cichy, Commissioner, Montgomery County Planning Board -MCP-Chair@mncppc-mc.org
Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
Gabe Albornoz, Montgomery County Councilmember - councilmember.albornoz@montgomerycountymd.gov
Andrew Friedson, Montgomery County Councilmember - councilmember.friedson@montgomerycountymd.gov
Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

00006333



**FRIENDS OF MOSES HALL**
**The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated**
**7550 Seven Locks Road**
**Cabin John, MD 20818**
**morningstarmosescj@gmail.com**
**https://www.friendsofmoseshall.org**

October 8, 2021

*By Email to:* sarcher@mdot.maryland.gov

Mr. Steve Archer
Cultural Resources Team Leader
**Maryland Department of Transportation State Highway Administration Environmental Planning**
**Division**
707 North Calvert Street
Baltimore, MD 21202

**Re:     I-495 and I-270 Managed Lanes Study, Comments on Section 106 Materials, letter to MHT and**
**VDHR dated September 8, 2021**

Dear Mr. Archer:

Thank you for the opportunity to review and comment on the latest Section 106 materials, including the revision of the Area of Potential Effects (APE) and updated Limits of Disturbance (LOD). As a Consulting Party to the NHPA Section 106 process, in addition to our concerns about the GPR survey report findings, we wish to express our concerns about project design advancements that impact not only the Morningstar Tabernacle 88 Moses Cemetery and Hall, but adjacent historic properties, such as First Agape AME Zion Church (formerly Gibson Grove AME Zion Church) and the Carderock Springs Historic District.

While we appreciate design modifications that minimize impacts to Morningstar Tabernacle 88 Moses Cemetery and Hall, we object to SHA's "no adverse effect" determination for Carderock Springs Historic District. Additionally, we are deeply disturbed by the increased impacts to the historic First Agape AME Zion Church (Gibson Grove Church), which resulted in an "adverse effect" finding. The Gibson Grove Church property has suffered cumulative impacts from stormwater damage over many years due to the original I-495 Beltway construction. Instead of piling on, SHA must right past wrongs by minimizing impacts to the Gibson Grove Church property and by mitigating damage caused by poor stormwater management.

00006334

Additionally, SHA must minimize impacts to these historic areas by preserving most of the tree canopy and topography, constructing context sensitive noise barriers, preserving air quality, and minimizing visual impacts. These are sensitive areas with residential homes and historic resources within close proximity to the highway – all of which are adversely affected by this project.

We appreciate your consideration of these comments.

Sincerely,

**FRIENDS OF MOSES HALL**
**The Board of Trustees of**
**Morningstar Tabernacle Number 88, Incorporated**

**Diane E. Baxter**
**President, Morningstar Tabernacle Number 88, Incorporated**
Descendant

**Dr. Charles W. Harris**
**Vice President, Morningstar Tabernacle Number 88, Incorporated**
Descendant

**Eileen McGuckian**
**Secretary, Morningstar Tabernacle Number 88, Incorporated**
Historian and President, Montgomery Preservation

**Montgomery Crawford**
**Treasurer, Morningstar Tabernacle Number 88, Incorporated**
Descendant

**Alexandra Jones, PhD, RPA**
**Trustee, Morningstar Tabernacle Number 88, Incorporated**
Executive Director and Founder, Archaeology in the Community

**Austin E. White**
**Trustee, Morningstar Tabernacle Number 88, Incorporated**
Descendant

**Charlotte Troup Leighton**
**Trustee and Chair, Friends of Moses Hall Committee, Morningstar Tabernacle Number 88,**
**Incorporated**
Vice President of Advocacy, Cabin John Citizens Association

**L. Paige Whitley**
**Chair, Research Committee, Morningstar Tabernacle Number 88, Incorporated**
Independent Researcher

**Sondra Raspberry**
Descendant

**Shannon S. Steward**
Descendant

00006335

**Christopher Waynes**
Descendant

**Austin White II**
Descendant

**Nathan White II**
Descendant

**Pandora White**
Descendant

cc:   Governor Lawrence J. Hogan – governor.mail@maryland.gov
      Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
      Treasurer Nancy Kopp – treasurer@treasurer.state.md.us
      Kendra Parzen, National Trust for Historic Preservation - KParzen@savingplaces.org
      Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
      Julie Langan, Virginia DHR - julie.langan@dhr.virginia.gov
      Julie Schablitsky, MDOT SHA – jschablitsky@mdot.maryland.gov
      Richard Ervin, MDOT SHA – rervin@mdot.maryalnd.gov
      Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
      Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
      Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
      Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
      John Simkins, FHWA Virginia Division - john.simkins@dot.gov
      Rebeccah Ballo, Montgomery County Planning Department – rebecccah.ballo@montgomeryplanning.org
      Debra Borden, M-NCPPC – debra.borden@mncppc.org
      Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
      Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
      Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
      Eddie Bankhead, First Agape AME Zion Church - esbj@pobox.com
      Rev. Edgar Bankhead, First Agape AME Zion Church - ebankjs@verizon.net
      Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
      Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
      Sara Love, Maryland State Delegate – sara.love@house.state.md.us
      Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
      Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
      Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
      Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
      Gerald Cichy, Commissioner, Montgomery County Planning Board -MCP-Chair@mncppc-mc.org
      Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
      Gabe Albornoz, Montgomery County Councilmember - councilmember.albornoz@montgomerycountymd.gov
      Andrew Friedson, Montgomery County Councilmember - councilmember.friedson@montgomerycountymd.gov
      Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
      Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
      Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
      Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
      Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
      Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
      Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

00006336

## I-495 & I-270 MLS Sept Materials Review- NPS

| ID | Reviewer | Document | Page #/Section | Comment |
|----|----------|----------|----------------|---------|
| | NPS-K.Smith (NHL Program | All | | I identified no potentially affected National Historic Landmarks in the revised APE. |
| | NPS-M.Joseph (GWMP) | Cover Letter | Page 4 | Although the impacts to GWMP lands on the Virginia side of the project, may have been reduced from 7.8 acres to 4.4 acres, the impacts to the GWMP-Clara Barton Parkway have increased increase to 2.5 acres and are not enumerated in the cover letter. Recommend having George Washington Memorial Parkway - Virginia and Clara Barton Parkway - Maryland, as two separate |
| | NPS-M.Joseph (GWMP) | Attachment 3 - Eligibility and Effect Tables | Table 6 | entries on the table. They are shown as separate locations in SDEIS, even though they are managed by the GWMP. |

00006337

Sierra Club Maryland Chapter
P.O. Box 278
Riverdale, MD 20738
(301) 277-7111

**SIERRA CLUB**
MARYLAND CHAPTER

October 8, 2021

Steve Archer
Cultural Resources Team Leader
Environmental Planning
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD 21202

Jeanette Mar
Environmental Program Manager
Federal Highway Administration, Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore MD 21201

**RE: SECTION 106 COMMENTS FOR THE I-495 & I-270 MANAGED LANES STUDY**

Dear Mr. Archer and Ms. Mar,

We appreciate the opportunity to once again participate in the I-495/I-270 Managed Lanes Study (MLS) Section 106 process as a consulting party. Founded in 1892, the Sierra Club is America's oldest and largest grassroots environmental organization, and nationwide it has approximately 800,000 members. The Maryland Chapter has over 70,000 members and supporters, a large number of whom reside in communities likely to be impacted by the planned I-495 & I-270 Managed Lanes. Many historic areas and sites of importance to these members are in the path of the project and will experience adverse from it.

Further to our April 2021 comments, we write to you today with new concerns and requests regarding the historic sites of Plummers Island, Morningstar Tabernacle No. 88 Cemetery and Hall, and Gibson Grove A.M.E. Zion Church, and Cedar Lane Unitarian Universalist Church.

We continue to see the Programmatic Agreement approach for this project as inappropriate and inadequate, as it impermissibly defers and forecloses large measures to avoid impacts (such as project scope, number of new lanes, and road alignment) to historic properties, including Section 4(f)-protected historic properties. Please see our April comments in this regard.

It is worth noting, detailed identification and impact assessments of historic sites for all of the I-495 & I-270 MLS are required because the part left off was not officially designated "no build."

Before going into specific site comments, it also needs to be said that short and overlapping timing of three different comment periods for the I-495/I-270 Managed Lanes Study during a pandemic is contrary to reason and the principles of Section 106, which emphasize the importance of meaningful public participation. This timing does not allow consulting parties sufficient opportunity to

00006338

comment meaningfully on any one process. The 8,000+ page Supplemental Draft Impact Statement was published on October 1 with a 45-day comment period and a four-week Toll Rate Range Setting comment period was begun on the same day.

Today's October 8 deadline for the Section 106 process does not give time to reflect information from the SDEIS in these Section 106 comments.

We therefore request that the comment period for the Section 106 process be extended by one month beyond the point when the SDEIS comment period has closed so that those closely engaged in this process with the most at stake can reflect the most up to date information.

Our comments about specific sites follow:

**Plummers Island:** We are extremely concerned about severe adverse impacts that will occur to Plummers Island. We support the efforts by the Washington Biologists' Field Club ("WBFC") to protect Plummers Island, a National Register of Historic Places eligible site of great historical and ecological significance and ongoing long-term research.

As we said before, a context-sensitive design option for Plummers Island needs to be pursued for this area of unique concern that will experience serious adverse effects. The WBFC has proposed specific mitigation measures that should be considered in the Section 106 process. Avoidance measures should be identified now and not deferred to the design review consultations during the design-build process. Delaying identification of the location and boundaries of this site until after implementation of a Programmatic Agreement prevents consideration of the impacts to the site during alternative selection under NEPA and undermines discussion of potential mitigation measures for any adverse effects under Section 106.

**Morningstar Tabernacle No. 88 Moses Hall and Cemetery:** The new information on this site is extraordinary. The boundaries of the Moses Hall and Cemetery site need to be redrawn taking into account the new information found in the two studies. The NRHP eligibility designation form also needs to be updated to reflect the new information found in the study, including the hundreds of new graves located and their spacing and extent. We fully support the Friends of Moses Hall in their requests for additional mitigation measures.

**Gibson Grove A.M.E. Zion Church:** The changes in the planning of the highway has resulted in new and increased impacts on the historic Gibson Grove A.M.E. Zion Church. The church will experience dramatic loss of integrity under MDOT's new plan. This church has extraordinary historical significance, and there is no justification for increasing the LOD near it as excessively as has been done. In DEIS Appendix F, page 26, Gibson Grove A.M.E. Zion Church is incorrectly listed as one of the "Section 4(f) Properties where there is no Use or Impact." on the 0.4 acre site. This assessment was incorrect then, and this adverse effect has now been magnified as reflected by the new plans in the SDEIS. MDOT's current actions are exacerbating a historic wrong to the Church, begun when the Church property was bisected by the original construction of the Beltway. Sarah Gibson, who gave her land for this church, is the Harriet Tubman of the Reconstruction Era who helped form the Gibson Grove community, and the impacts to the Church should be avoided to avoid environmental justice impacts as well. This is a grave historical error to harm the integrity of this site.

2

The new reports show graves in the church yard and other historical features. The boundaries of the Church need to be updated with the new information found in the reports shared as part of the Section 106 process. The NRHP eligibility form also needs to be updated with the new information and updated boundaries.

As we noted in prior comments, the Beltway runoff is likely why the Church was damaged by treefall in the first place, and this run-off will likely be exacerbated as a result of the project, posing a direct threat of damage to the historic structure. Any parking, staging, or construction on the church side of the road will adversely impact the church property. It will require infilling that dramatically changes the topography immediately adjacent to the church structure, which will have an adverse visual impact on the Church, detracting from the character and viewshed of the little white church on the hill. That no measures are being taken now to avoid, minimize, and mitigate adverse impacts to the Church is a major omission, as the adverse impacts to the site would be significant. Furthermore, as a place of worship, the site is highly sensitive to air quality and noise impacts, and the closer proximity of the highway to the Church will impair church activities, including the socializing and services and singing of hymns, which will no longer be able to occur in the ways that are needed for a church. There are many different dimensions of harm which the church will experience under MDOT's most recent plans. It also appears that there will be no space for congregants to park after MDOT has taken over all of this extra space, further harming the Church. The adverse impacts to the church site are exceptionally harmful and are certainly a very serious environmental injustice added to the historical injustice done in the building of the Beltway deliberately through the single Black settlement in the area.

**Cedar Lane Unitarian Universalist Church**: Cedar Lane Unitarian Universalist Church, which predates the Beltway, has a unique architectural design meant to blend with the environment. Designed by renowned architect Pietro Belluschi who designed the Julliard School building, Cedar Lane Unitarian Universalist Church should be considered for potential NRHP eligibility. This church is listed in the same table as the Gibson Grove A.M.E. Church, the table entitled: "Section 4(f) Properties where there is no Use or Impact". This church will be impacted. As was pointed out in DEIS testimony:

> "Cedar Lane Unitarian Universalist Church would be greatly impacted by this project, although the DEIS chart lists it as "no impact". The natural habitats and walking trails of Rock Creek Park are part of Cedar Lane's appreciation of spirituality in nature. The creek, the estuaries and wildlife adjoining Beach Drive and our church grounds are a community gathering place. The noise level is already extremely high and would be higher with this project." (DEIS testimony of Montgomery County Faith Alliance for Climate Solutions, October 27, 2020)

In conclusion, without a complete understanding of the Project's full range of environmental effects, including harm to historic properties, there is no way that the Agencies can reasonably select a preferred alternative as required by NEPA or identify an alternative that avoids use of historic properties, parks, and recreation areas unless no other feasible and prudent alternative is available as required by Section 4(f).

The identification of those historic properties and the Project's potential effects on them must be completed at a time when they can actually inform the selection of alternatives, rather than being deferred to a later date after alternatives have been foreclosed.

3

00006340

We look forward to an affirmative response to our request for an extension of the Section 106 comment period.

Thank you for the opportunity to comment on new information in the Section 106 process.


Josh Tulkin, State Director
Sierra Club Maryland Chapter

Comments on MDOT MLS Project Section 106 Materials provided 09/08/2021 by Steve Archer

Matt Virta, Cultural Resources Program Manager, NPS-GWMP for 10/08/21 Response

Archer letter of 09/08/21 includes on pp 2-3:

1) "*The APE for this project was previously defined as a 250-foot buffer of consideration on either side of the widest proposed build alternative's LOD (Alternative 10) and included additional buffer areas at the American Legion Bridge and elsewhere to capture setting, feeling, and viewshed effects*." **and** "*In Virginia, the revised APE generally follows the APE for the VDOT NEXT Project that was previously coordinated with VDHR, with some exceptions. The flyover ramps carrying managed lanes between the Capital Beltway and the George Washington Memorial Parkway have been eliminated. The revised APE includes a shared use path along the east side of I-495 in Virginia, across the American Legion Bridge to MacArthur Boulevard in Maryland.*"

In the MDOT/VDOT NPS Coordination Meeting of 09/30/21, the original flyover ramps were noted as being redesigned as stated but a possible need for other "flyover type" ramps was introduced and the shared use trail mentioned.  These should be noted/described and possibly factored into a broader "buffer of consideration" for APE size and for viewshed impacts.

On page 5:

2) "*Additional minimization efforts at the GWMP include a new interchange configuration that pulls roadwork off the GWMP mainline within the park boundary, and a refined signing layout that limits ground disturbance to only those areas where signs will be removed or placed and where electrical conduit must be placed. The minimization efforts have succeeded in reducing impacts to the GWMP to 4.4 acres, a reduction of 7.8 acres compared to the DEIS Alternative 9.*"

In the MDOT/VDOT NPS Coordination Meeting of 09/30/21, there was stated a potential need for other signage to address latest ramp re-configurations.  Additional signage possibilities should be noted/described and considered in APE size for impacts including viewshed.

On page 11:

3) On "*Site 44FX0381 is no longer impacted by the revised LOD, and MDOT SHA, on behalf of FHWA, finds that site 44FX0381 is no longer adversely affected. However, the remaining NRHP-eligible sites 44FX074, 44FX0379 and 44FX0389, and the Dead Run Ridges District (44FX3922) remain adversely affected, although the limits of disturbance have been minimized, and largely impact the margins of the affected sites.*"

00006342

Site 44FX0381 remains precariously close to impacts from project, and it and the other sites that still are "lesser impacted" by the LOD changes of the project should have physical barriers/protections (that do not contribute impacts on their own) from construction activities.

In attachments to letter:

4) *Attachment 1 Revised APE Corridor Map*

Archeological sites 44FX3160 (and 44FX3900) are not noted on mapping and, while they do not contribute to the NRHP Dead Run Ridges Archeological District for the purposes of Section 106 as historic properties (and 3900 is technically outside MDOT APE), their presence should be included because the NPS manages these sites as cultural resources and they are alarmingly close to/within LODs.



**National Trust** *for*
**Historic Preservation**
*Save the past. Enrich the future.*

October 8, 2021

Mr. Steve Archer
Cultural Resources Team Leader
Environmental Planning
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD 21202

>**Re: I-270 and I-495 Managed Lanes Study Section 106
>Consultation – Response to Updated Section 106
>Documentation**

To Mr. Archer:

The National Trust for Historic Preservation appreciates the opportunity to review the updated Section 106 documentation and revised Area of Potential Effects related to the I-270 and I-495 Managed Lanes Study, in particular the geophysical survey report generated for Morningstar Tabernacle No. 88 property and the Gibson Grove A.M.E. Zion Church.

We commend MDOT for pursuing the ground-penetrating radar (GPR) survey work on the Morningstar Tabernacle No. 88 property and the adjacent right-of-way, and for responding to the results of that survey by developing the option that avoids direct ground disturbance to the property and associated potential graves in a section of the adjacent right-of-way. Avoiding these areas significantly decreases the risk of impacting burial locations. Nonetheless, we appreciate and agree with the proposed determination that the Morningstar Tabernacle No. 88 property will still be adversely affected. We look forward to participating in the Section 106 consultation with the goal of seeking additional ways to avoid, minimize, and mitigate those adverse effects.

As MDOT and consulting parties consider further evaluation to assess and resolve the potential adverse effects to the cemetery, we strongly encourage MDOT to undertake additional non-invasive investigation in areas of the property and adjacent ROW that were not included in the previous GPR survey, in case additional potential graves may be found in these areas. We understand that lack of survey in these areas was due to obstacles; however,

The Watergate Office Building  2600 Virginia Avenue NW  Suite 1100  Washington, DC 20037
E info@savingplaces.org  P 202.588.6000  F 202.588.6038  SavingPlaces.org

00006344

obstacles such as bamboo stems, vegetation, fallen tree, and hay bales could be removed or temporarily relocated to allow additional study. Without additional study, our understanding of the footprint of the historic cemetery is incomplete, and direct adverse impacts to burial sites remains a serious risk.

Thank you for your consideration of these comments.

Sincerely,

Kendra Parzen
Field Officer

Elizabeth S. Merritt
Deputy General Counsel

2

# Washington Biologists' Field Club

October 8, 2021

Dear Mr. Archer,

We are writing you on behalf of the Washington Biologists' Field Club with regard to Plummers Island[1] and its associated channel and wetlands in response to the MDOT-SHA Section 106 letter of September 8, 2021 and including the email message from Mr. Archer entitled "I-495 and I-270 MLS Section 106 Materials, Comments Requested by October 8" and associated linked documents and attachments.

We frame our comments within the historical context of impacts to the long-term value of scientific research on Plummers Island and the biodiversity we have discovered there, and the quality of experience of the island, which are implicitly protected by recommendations for historical preservation of the place for future generations.

We remain highly concerned about the proposed I-495/I-270 and American Legion Bridge toll lane widening project and the significant, probable threats from bridge construction, operation, and maintenance to Plummers Island and its historic character, including its biota, and the century of intensive research activities that have taken place on the island. Since last writing and in line with our requests from April 2021, the Washington Biologists' Field Club (WBFC) has been added as a Section 106 consulting party, been recognized as a site of historic significance with National Register of Historic Places (NRHP) eligibility independent of the C & O Canal National Historical Park. Some of the project's adverse effects on the WBFC have also been recognized. These steps are important but do not go nearly far enough to protect Plummers Island, which the Federal Government agreed in 1959 to protect in perpetuity as a site for long-term scientific research so long as the WBFC still exists as an incorporated entity. In order to ensure that the proposed project's impacts on Plummers Island receive adequate attention and consideration, we have several concerns and requests which will be detailed in the remainder of this comment letter.

**As a reminder, Plummers Island is a small federally-owned island immediately downriver of the American Legion Bridge with unique historical, biological, and research value.** Plummers Island is NRHP eligible "under Criterion A for its association with contributions to science and conservation as the site of long-term scientific studies conducted by the club and as the meeting place for the club's collective membership of influential and accomplished scientists." The long-term, ongoing research value of Plummers Island is part of its NRHP eligibility. The I-495/I-270 project, which aims to nearly double the size of the American Legion Bridge, would have many adverse effects to the island's historic features and significance as a research site including:

---

[1] Montgomery County, Maryland, Potomac River, adjacent to the American Legion Bridge

00006346

1. Damage to waterways
2. Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of the island within the Zone of Destruction
3. Destruction of WBFC research plots
4. Destruction of past collection sites
5. Habitat destruction and disturbance lead to more invasive organisms
6. Potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction blow out
7. Sound from bridge construction and closer proximity of traffic in 2 new bridge lanes after they open on the bridge
8. Impacts on biota from salt, oil and other toxic runoff from the new bridge
9. Violation of long-term continuity of 120 years of research.

**Plummers Island must be fully protected from the MDOT plan to expand the American Legion Bridge.** The taking of Plummers Island lands by this project as well as the destructive proximity impacts are a violation of the agreement with the Federal Government signed in 1959 to protect the Island in perpetuity so long as the WBFC still existed as an incorporated entity. The damage proposed for the Island violates the very principal upon which the Federal Government signed the agreement with WBFC, that the value of the property was the historic nature of the long-term research on the biodiversity of the Island, which at that time exceeded 58 years with long-term goals. Now that research has extended to 120 years.

**Yet, it appears that the most damaging project alternative has been selected and the necessary mitigations we discussed earlier in the year were ignored.**[2] Plummers Island, far from being protected, will have most of the new bridge overhang, casting its rare, endangered, and threatened biota in shadow and increasing impacts of noise, runoff, and more. There is clearly a disconnect that the very process affirming that major historical and scientific research significance of the island. The plan seems to ignore the results of its own process, and the revised plan egregiously violates the historic and research integrity of the very property it is responsible for protecting.

1) **Regarding the NRHP eligibility, we have the following requests:**

- **The NRHP determination narrative should better contextualize Plummers Island in its unique location as highlighted below**. Plummers Island is located within the Potomac Gorge, which itself has unique and important features. This publication offers a suitable kind of description: "The 9,700-acre (3925.5 ha) Potomac Gorge project area (see map on inside front cover) is the 15-mile (21.4 km) river corridor from Great Falls to the Key Bridge, including parts of Maryland, Virginia, and the District of Columbia. It is in the midst of a major metropolitan region inhabited by over 4.5 million people (see Cohen, 2005). The Potomac Gorge is widely recognized as one of the most biologically rich areas in the eastern United States, with more than 400 known occurrences of 200 state or globally rare plant

---

[2] See Appendix B for more on our interactions with the MDOT Strike Team. (M: 12-46-2):

00006347

and animal species, and ten globally rare plant communities. The Gorge's unusual concentration of species diversity and rarity is the direct result of its unique hydrology, geology, and geomorphology. This wild and free-flowing section of the Potomac River is one of the most intact eastern Fall Zone river systems with an abundance of parkland not subject to the environmental pressures of residential or commercial development."

- **The NRHP determination narrative should recognize that the research sites within the WBFC are important contributing features.** Specifically, Plummers Island has had national and international significance and species not only rare but new to science continue to be found and studied there, as recently as 2014 (Szlávecz et al, 2014). It is worth recalling that the 1959 agreement between WBFC and the Federal Government states:
  - The said Plummers Island has become among systematic biologists one of the world's most famous collecting spots and type localities, and
  - The discoveries have indicated the probability of new knowledge in the field of biology and natural history, and
  - The fame of this island is world-wide and many scientific organizations are interested in its preservation as a source of discovery, and
  - The Washington Biologists' Field Club, Inc. and the United States Government desire to preserve this natural wild area as a sanctuary and scientific research preserve.

- **Correct inaccurate and misleading use of language related to Rock Run.** The Dovetail CRG report on the Maryland Historical Trust Determination of Eligibility Form continues the unprofessional practice of calling the channel separating Plummers Island from the mainland "Rock Run Culvert" (p. 1). This is an inaccurate and misleading name, mentioned in the DEIS, as the channel is neither a culvert nor is it any part of Rock Run (a nearby drainage with an outlet into the Potomac River about 1,000 ft. downstream from Plummers Island, and with its own real culvert passing under the C&O towpath just below Lock 11). The channel is a historical natural side stream of the Potomac River that prehistorically was more of a major river channel. When WBFC members reported this inaccurate name to the USGS and Board of Geographical Names, they fully agreed, and the name was removed from their listings (on or before 23 April 2021).The channel head has been displaced downstream about 40 feet (Soreng's estimate from a detailed 1950s topographical survey map and other observations), by ALB pier emplacements of 1960 and early 1990s, but the rest of the channel remains in its historical position from about 15 to 30 feet below the current channel head.

2) **We request that the understanding of the historic boundaries of Plummers Island be updated in all documentation pertaining to the project in light of the NRHP eligibility designation.** It is incorrect to say, "the majority of the historic features of the WBFC are outside the LOD." The entire island is NRHP eligible. Impacts to the

3

Western part of the island would be highly significant. The entire island is being used for research. Its associated channel and wetlands are, too. Encroaching on and over the island and placing piers on it is a direct adverse impact to one of the WBFC's most important and salient historic features: the long-term and ongoing use of the Island for research on the biodiversity of the Island.

3) **We request that those involved with this project make greater efforts to understand and recognize the scale and irreversibility of the adverse impacts the proposed plan would have and prioritize avoidance and mitigation of impacts.** Appendix C contains some examples of impacts to promote better understanding. Additional impact concerns are detailed in Appendices D and E. It is WBFC's view that Plummers Island was not part (or sufficiently part of) of the American Legion Bridge alignment decision making, and WBFC was not weighted properly in making this decision. At that time, no one was even talking about Plummers Island as it had barely been mentioned in the DEIS and had not been recognized as a significant historic site at that time. Avoiding Plummers Island is possible, it has just not been prioritized in MDOT's process. See SDEIS, at pp. 4-14- and 4-15. **The adverse impacts to Plummers Island affect the research value of the island. That is to say, the adverse impacts impact the qualities and attributes of the site that make it historically significant.** By destroying the value of the island for research of rare plant, insect, and other life forms, the project would be destroying decades of research. A complete and accurate identification of the project's effects on these sites and attributes is needed.

4) **More must be done to mitigate impacts. Moving the piers is not adequate mitigation**. Documentation sent as part of the Section 106 process on September 8, 2021 shows some of the adverse impacts to Plummers Island and yet they are still underestimated. **Moving the piers, as proposed by MDOT (below) is not sufficient mitigation to address the full spectrum of mitigation.** Additional minimum mitigations measures that are needed are listed in Appendix F, including shifting the ALB's 4 new lanes to the upstream side, rather than dividing those between the up and downstream sides.

> "The LOD adjoining Plummers Island along the American Legion Bridge will impact approximately 0.2 acre of the WBFC. This area is required for the bridge substructure, including permanent pier placement and construction activities. **Construction activities within the LOD at the WBFC may include excavation; demolition of the existing bridge foundation and piers; installation of proposed foundations, piers, or abutments; and slope protection.** Access to the existing and proposed piers is required for these activities. Impacts were minimized by strategically locating the new piers near the existing piers such that a single access method could be used for demolition of the existing and construction of the proposed structures. However, some impact is unavoidable based on construction requirements and the structural requirements for pier locations.

4

00006349

Although the majority of the historic features of the WBFC are outside the LOD, the proposed construction activities at the western edge of Plummers Island will alter the natural landscape of the island, a character-defining feature of the WBFC, resulting in diminishment of the property's integrity of setting. MDOT State Highway Administration has determined the project will adversely affect the WBFC." (Sept 8, 2021 letter to Elizabeth Hughes and Julie Langan from Steve Archer for Julie M. Schablitsky, pages 7-8)

5) **We have major concerns about damage from construction to the channel that separates Plummers Island from the mainland. More information needs to be provided to us about impacts to the channel as soon as possible. Some of the measures discussed for this sensitive area would exacerbate adverse effects.** We noted that on maps the LOD is marked on the land of the Island, while the channel itself is not identified as part of the WBFC are even with the area of potential effects. This channel is integral to the sustainability of the adjoining Plummers Island wetlands and floodplain. The channel and the Island's wetlands are Waters of the U.S. (WOTUS), thus requiring rigorous, protective oversight by the U.S. Army Corps of Engineers, Baltimore District. Yet, there is no discussion in the current plan of what MDOT plans to do with the channel, or with the wetlands along the Island's western perimeter. WBFC - and the National Park Service - consider the Island's emergent wetland perimeter to be part of the biodiverse whole, and since 1901 we have studied the biota of the wetlands and channel as an extension of the land above the official property waterline.

The MDOT Strike team indicated the original DEIS plan to fill in the "culvert" (channel) with spall for a construction platform has been modified. Now as we understand it MDOT intends to put planking of heavy timbers across the channel for a construction platform. This will have a serious adverse effect on the channel. With all the planned land-clearing and earth moving, and burming for construction ramps and the building of two new lanes on the downstream side of the ALB, there is no way MDOT can effectively protect the channel from excess accumulation of mud, rock, and other debris. This will adversely impact the water quality and wildlife of the channel and perimeter emergent wetlands of the Island in the short and long run. We have commented several times to MDOT that during the construction phase the elevated vulnerability of the Island and channel to damage from catastrophic flooding should be enhanced in construction plans. We have had no assurances on this front that adequate precautions will be taken to avoid damage in this time period. Catastrophic flooding could destroy much of the long-term, ongoing research value of Plummers Island, a part of the Island's NRHP eligibility. Further explanation of these concerns can be found in Appendix C.

6) **WBFC has had and continues to have a significant and primary responsibility to maintain this island as a long-term research site high in biodiversity with minimal disturbance. It must be protected.** Under the Section 106 process, requests can be

5

made for mitigation measures. There is a direct use of the island for purposes of Section 4(f) and a significant adverse effect under Section 106. Avoidance and mitigation measures cannot be deferred until later, after the Final Environmental Impact Statement, after the Record of Decision, or after predevelopment. That is already too late. We require assurances at an administrative level that Plummers Island will be avoided and that the needed mitigation measures will be put in place after all avoidance options are exhausted.

Our mission is to protect the biodiversity of Plummers Island including its perimeter wetlands, our long-term research efforts, and the quality of the place as a whole for future generations. We need your attention, your understanding of the Island's value and sensitive ecology, and your support in this effort.

Respectfully,

Robert Soreng, President

Carla Dove, Vice President

Lowell Adams, Secretary

On behalf of the 88 members of the Washington Biologists' Field Club

6

## Appendix A: Documentation of Experience with Strike Team

Two of the staff that have communicated with us have been professional and communicative with WBFC and led us to believe they have our best interests at heart. A MDOT-Strike Team asked WBFC to join them in a virtual video discussion in January of 2021. That hour long discussion considered our concerns documented by us as "Threats to Plummers Island" (see https://wbfc.science/plummers-island-threatened/) and discussed alternatives to the DEIS plans that might mitigate some damage to Plummers Island. The initial minutes of that meeting produced by the Strike Team provided a cursory account that basically said the meeting had taken place. We protested those minutes, and a fuller account was submitted by the Strike Team, but to our knowledge our further suggestions for modifications to the minutes were not added.

In the following week after the MDOT Strike Team meeting of January of 2021, WBFC was invited to join the Section 106 process as a consulting party. We did not recognize that invite until March of that year because the initial offer made by MDOT was sent through a clogged email box of a secondary contact rather than through the WBFC leader of the discussions, and once unearthed was then misunderstood. While we were heartened to be acknowledged as a consulting party, this delay caused us serious consternation that could have been avoided. However, most of the deliberations and communications of the section 106 process have been in meetings between Agencies that we were not privy to attend or review.

At our request, the Section 106 process has led to Plummers Island being recommended as a special historical place within the C & O Canal National Historical Park. We appreciate that MDOT hired a competent research company to study WBFC on Plummers Island and to file the Maryland Historical Trust Determination of Eligibility Form (DOE). That Form and report were submitted to MDOT in June of 2021, and the Section 106 supervisory team accepted that company's report (whether modified or not we do not know). The final report was sent to WBFC on 8 September 2021 and to the Maryland Historical Trust State Historic Trust Officer. The MDOT-SHA, Cultural Resources Team Leader, Mr. Archer, has answered multiple of our email questions in a prompt, professional and friendly manner, clarifying various aspects of the process and results. We believe that report represents a fair and unbiased, but brief, assessment of the history of the WBFC and some its most prominent members.

The report notes that WBFC contributions to science are many and details a few, but does not go into depth. To investigate the deeper impacts of the WBFC, its membership on society, and its science on biodiversity of the Potomac Gorge, on local and national scales DoveTail would have to access the full WBFC archives, and do further research stemming from those files. The DoveTail report notes WBFC archives were accessed in June of 2021. While it is true that most scientific publications and many photographs have been digitized, and many are available on-line, we note that the actual archives are stored in the Department of Botany, at the Smithsonian Institution, and could not have been accessed at that time due to Covid-19, nor could they have been accessed without knowledge or permission of the WBFC Archivist. Our Archivist has indicated that there are many more documents and photographs in the Archives that have not been digitized.

7

MDOT "Strike Team" representatives misled us in the meeting of January 2021, when they said they could potentially limit construction access under the ALB to from the upstream side (west side). This is confusing as on p. 5 paragraph 2 (MLS_106_Sept_8_Letter_sig) they write that that construction access will only be from the west side, while the map of 1 September and other communications suggest that the access will be from the "north side," which is both upstream and downstream through National Park land (i.e., nothing changed there). All this is disingenuous as in the building of the two east side lanes under Alternative 9, there is no way for them to not work on the east side of the bridge. The proposed solution of building the extra lanes only on the upstream side and other options presented to avoid damage to Plummers Island were rejected by the "stakeholders."

We request the evidence that these options were seriously considered and the full accounting of the reasons for their rejection. The public, their representatives, consulting parties, agencies, and contractors are all stakeholders. And all stakeholders are equal but some stakeholders are more equal than others, it appears. The Supplemental Draft Environmental Impact Statement (pp. 4-14- and 4-15) gives the description of the decision-making about the bridge construction, but it still doesn't explain how and to what extent Plummers Island was actually considered as a unique NRHP-eligible historical and important scientific research site within a national historical park.

In fact, WBFC was the prior owner of the NPS land on the downstream side of the ALB, now MDOT plans to turn that into a huge ramp to build the downstream lanes, if not to access the underside of the bridge and then to build it up and pave it over for new lanes.

MDOT, in the same January meeting, also said they could cantilever the bridge piers such that no piers would need to be placed on the island. That is not evident in the current MDOT plan. Moreover, they still plan to place a pier on the island.

The DEIS LOD on Plummers Island was crudely drawn, just a line across the head of the Island, with an additional 250-foot APE, extending to about 2/5ths of the Island. MDOT-SHA had Plummers Island LOD and APE zones surveyed in detail in the spring and summer of 2020 without consulting WBFC. Moreover, the survey team callously hacked down seven of the old age fringe trees on the island. The DEIS did not mention WBFC or consider the worth of 120 years of accounting and long-term research on the biota of Plummers Island by WBFC. Post the DEIS publication and comments period which ended in November of 2020, MDOT representatives keep saying in public comments, documents, and email messages to WBFC, that they had reduced the LOD on the Island significantly. Yet all they seem to have done in the current document (MLS_106_Sept_8_Att_1A_APE_Corridor_R, map 3) is draw a more precise but still-ragged LOD line of delineation. Map 3 also fails to capture lands in the NW corner of Plummers Island in Eligible / Listed, or Eligible – Pending SHPO Concurrence), and also fails in the same way to include the river front of Carderock section of the C & O National Historical Park upstream from the ALB. At one point this summer MDOT even publicized a map with no LOD line on the Island. We do not have faith that the LOD as currently mapped is more than a hollow public relations scheme to ward off complaints, or that it will even be adhered to if construction proceeds.

00006353

**Appendix B: Views on the Project**

From our (WBFC's) perspective, MDOT's selection of Alternative 9: Phase I South is the among the worst of the DEIS alternatives for it ignores and exacerbates climate change, puts the future of transit in the region in the reigns of a foreign conglomerate with a vested interest in opposing mass-transit options. Recent findings, detailed in *WTOP*, the *Washington Post*, and other media outlets, confirm what critics have been saying: that the whole freeway system is so backed up that adding capacity to a segment of I-495 is unlikely to result in long-term improvement to traffic flow. This undesirable alternative also has the most damaging impact on the Plummers Island scientific and historical site of the DEIS alternatives proposed.

From our perspective, the whole project was predicated on a need to rebuild the bridge in 10-15 years, when in fact the bridge is structurally sound and only requires redecking in 10 to 15 years.

From our perspective, reversing climate change requires doing things differently to reduce $CO_2$ output from personal vehicles, by adding mass transit alternatives and increasing people's reliance on telework, not to expand the current commuting status quo indefinitely.

From our perspective, adding 4 toll lanes to the ALB, is adding Luxury Lanes to keep those with deep pockets moving faster, while everyone else sits in congestion. And, as noted above, current studies using MWCOG traffic models confirm what critics have been saying: that the whole freeway system is so backed up that adding capacity to a segment of I-495 is unlikely to result in long-term improvement to traffic flow.

From our perspective, none of this achieves the goals of traffic improvement in the long-run. Recently published future congestion predictions tell us that within a decade after the project is completed (and noting there would be 10 years of miserable traffic during the construction project), in many places along the route and in the evening rush congestion would be no better that it is today. So, you get a 10-year window of viability of the project to reduce traffic … and lots of damage to historical properties and more $CO_2$. There absolutely needs to be smarter thinking of how people and goods are moved.

The project has been falsely pushed as something that must be urgently approved and driven by a private company as part of a public-private partnership, because it is too costly to be done using state funds. Therefore, it is argued, it must be designed to be extensive enough to be lucrative for the private sector. Yet, this very day, Maryland is sitting on a $5 billion dollar surplus of funds that could be used for transportation system improvements. *The Daily Record* reports on this in these articles: Maryland's flush finances have some officials pushing for more borrowing (Oct 4, 2021) and Hogan takes combative stance over use of state's revenue windfall (Oct 7, 2021).

00006354

**Appendix C: Impact Concerns**

On project maps, the limits of disturbance (LOD) is marked on the land of the Island, while the channel itself is not considered as integral to the sustainability of the adjoining Plummers Island wetlands and floodplain. The channel and the Island's wetlands are Waters of the U.S. (WOTUS), thus requiring rigorous, protective oversight by the U.S. Army Corps of Engineers, Baltimore District. Yet, there is no discussion in the current plan of what MDOT plans to do with the channel, or with the wetlands along the Island's western perimeter. WBFC - and the National Park Service - consider the Island's emergent wetland perimeter to be part of the biodiversity whole, and since 1901 we have studied the biota of the wetlands and channel as an extension of the land above the official property waterline. The MDOT Strike team indicated the original DEIS plan to fill in the "culvert" (channel) with spall for a construction platform has been modified. Now as we understand it MDOT intends to put planking of heavy timbers across the channel for a construction platform. Where is NEPA in this?

With all the planned land-clearing and earth moving, and burming for construction ramps and the building of two new lanes on the downstream side of the ALB, there is no way MDOT can effectively protect the channel from excess accumulation of mud, rock, and other debris. This will adversely impact the water quality and wildlife of the channel and perimeter emergent wetlands of the Island in the short and long run. We have commented several times to MDOT that during the construction phase the elevated vulnerability of the Island and channel to damage from catastrophic flooding should be enhanced in construction plans. We have had no assurances on this front that adequate precautions will be taken to avoid damage in this time period. Due to Climate Change, the NOAA Atlas 14 used in preparation of the DEIS, is well out-of-date for frequency and intensity of massive floods. So-called hundred-year floods in Atlas 14 Volume 2, Revision 3 (2006) are now 5-10-year events, and two such events occurred in the last 12 years.

Moreover, the DEIS planned their construction activities around flood levels recorded at Little Falls Gauging station 3 miles downstream from the ALB and in a wide section of the Potomac River. The flood levels at the ALB, situated in the narrows of Mather Gorge, are 7 feet higher than posted at Little Falls (Soreng observation, January 2021, photo documented). From our perspective what they need to do in in the construction period, is build a flood protection wall on upstream side of the ALB that will withstand extreme floods. If this is not done all the heavy timber planking used to cover the channel for a construction platform could blow out in a high flood, and then wash across the Island along with other construction mud and debris, with catastrophic consequences.

Additionally, the LOD boundaries exclude the rocks at the head of the island situated in the Potomac River, which are connected to the Island except in flood stages and which harbor the highly rare Natural Community: Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (*Hypericum prolificum, Eubotrys racemosus*) / *Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia* Herbaceous Vegetation (USNVC: CEGL006491).

00006355

Global/State Ranks: G2/S1. (Simmons et al., 2016, 2020). These rocks bear the only significant and sustainable population of this community on Plummers Island.

These rocks also protect and produce the rare Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): *Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus* Herbaceous Vegetation (USNVC: CEGL006483). Non-tidal mudflats. Global/State Ranks: G3/SNR. These communities occur downstream along the perimeter of Plummers Island and along the channel, and again are of small actual area on the Island such that any loss is a big loss to Plummers Island biodiversity.

MDOT representatives indicated that they considered our suggestion that the addition of 4 new lanes to the ALB could be made to the upstream side, rather than dividing those between the up and downstream sides. However, nothing changed their Alternative 9: Phase 1 South plan for two toll lanes on each side (in fact the bridge will have three lane widths added per direction!). These three additional lane widths on the downstream side would overshadow the Island by at least 20 ft. On top of this, MDOT's engineers ungraciously amended the Alternative 9 plans by placing a bike and foot traffic lane (requested by various consulting parties and DEIS comments) to the downstream side to further overshadow the Island.

Much of what we have discussed above relates to construction effects. However, there are myriad negative future effects to be concerned about.

Several rare plant species exist on the head of the Island adjacent to emergent perimeter wetlands. Their habitats will be utterly destroyed by the extended ALB lane overhang and emplacement of a pier on the Island. **This unnecessary "taking" of public lands and rare species cannot be mitigated with surveys, plant rescues/relocations, or other such measures. It will simply be forever lost. Moreover, there is no comparable occurrence of these rare species and habitats on the northwest side of the ALB.**

The noise in Plummers Island from the ALB, already injurious and distracting, will be exacerbated by the displacement of heavy vehicle traffic to the outermost lanes overhanging the Island, causing persistent and significant injury to the communications of native animals, human communications, and seriously impacting the quality of experience of the natural wild lands. We have discussed sound barriers and decking surfacing to reduce noise with MDOT representatives. However, we see nothing in the current document to address this.

WBFC has not found any MDOT plans to alter drainage to the channel or Plummers Island from the ALB in stormwater management (SWM) plans (Attachment 4 MLS Compensatory Stormwater Management Sites, September 2021). The low point on the ALB is just above the dogleg in the channel, and bridge scuppers drain the toxic runoff from there into the channel, further impacting and endangering the biota of the emergent wetlands and aquatic species. WBFC noted this problem in our DEIS comments and our Threats to Plummers Island document sent to MDOT and other organizations and agencies in early 2021.

00006356

**Appendix D: Endangered, Threatened, and Rare Species on Plummers Island**

The species on Plummers Island, including endangered, threatened, and rare species, have been studied since 1901. They are part of the island's historic and ongoing research value. Current awareness of and attention to their protection in the state's DEIS process has been inadequate.

Plummers Island has numerous state endangered, threatened, and rare species. Plummers Island has three extant endangered plants that have been considered endangered in Maryland for many years and were mentioned as endangered in the I-495/I-270 Managed Lanes DEIS, Appendix R of Appendix L, page 1. These state endangered plants are:

1. Coville's Phacelia *(Phacelia covellei)*
2. Horse-tail Paspalum *(Paspalum fluitans)*
3. Pale Dock *(Rumex altissimus)*

Curiously in March 2021, Maryland DNR downgraded two of those species (Coville's Phacelia and Horse-tail Paspalum) from endangered to threatened although their status, if anything, is more imperiled by the planned widening of the ALB. On what basis could these species have been downgraded? The WBFC cannot agree with this change without compelling evidence.

The above list of three state RTE plant species is not complete or exhaustive (see Simmons et al. 2020); there are additional Maryland RTE plants on the island, such as Smooth Rose Mallow *(Hibiscus laevis)* which is a rare plant of concern; Pink Valerian *(Valeriana pauciflora)* which is endangered; Leatherwood *(Dirca palustris)* which is threatened; and Sticky Goldenrod *(Solidago racemosa)* which is threatened and part of a rare natural community. There are also several grass and sedge species including Flat-spiked Sedge (*Carex planispicata*) and Open-flower Panic Grass (*Dichanthelium laxiflorum*). Other rare species include Ostrich Fern *(Matteuccia struthiopteris)* and Smooth Wild-petunia *(Ruellia strepens).*

RTE animals that live on or utilize the island include Eastern Small-footed Myotis (state endangered) and Northern Long Eared Bat (state threatened/US threatened). We can provide recent inventories of species on Plummers Island upon request.

The Endangered Species Act protects both federally listed endangered species and those species deemed endangered, threatened, or in need of conservation within the state, based on habitat and conservation factors. At the state level, threatened and endangered species are regulated under the Maryland Non-game and Endangered Species Act (Annotated Code of Maryland 10-2A-01).

Excerpts from a December 2020 *Washington Post* article by Katherine Shaver tell more of the story:

00006357

*Tucked below the American Legion Bridge on the Maryland side of the Potomac River … Plummers Island, … "the most thoroughly studied island in North America."*

*For nearly 120 years, the 12-acre patch of rock and woods has been home to the Washington Biologists' Field Club. Its 85 botanists, entomologists, ornithologists and other scientists have spent decades scrutinizing the island's thousands of species of plants, insects and wildlife.*

*Robert Soreng, the club's vice president and a botanist at the Smithsonian National Museum of Natural History, said Plummers Island provides a critical research site because of its remarkable biodiversity and protected status under the National Park Service. Studying the same wilderness since 1901, he said, has revealed how nature responds to human development, climate change, invasive species and other changes.*

*"This is incredibly valuable for studying long-term trends," Soreng said. "We know more about what's there than in any other place."*

*But Soreng and other scientists say the island's research value is in danger of being lost to a new, wider American Legion Bridge. Under a plan by Maryland Gov. Larry Hogan (R) to relieve traffic congestion on the Capital Beltway, an expanded bridge between Virginia and Maryland could require piers on the island's western edge. Trees would also have to be cut in that area to build a road for construction vehicles to access the bridge site over four to five years.*

***Plummers Island is in the Potomac Gorge, between Great Falls and Georgetown. The gorge is home to hundreds of rare species, including the highest concentration of rare plants in Maryland, according to the National Park Service.***

*Moreover, the biologists say, its protection from development has provided a rare chance to do fieldwork nine miles from downtown Washington.*

*"When you think about the Washington area, there aren't many places that haven't been disturbed by humans," said Matthew Perry, a club member and emeritus scientist with the Patuxent Wildlife Research Center in Laurel.*

*Soreng said more than 400 scientific papers have emerged from Plummers Island research. The most well-known study showed that many of the island's lichen species had died off and others had soaked up significantly more lead after the bridge was built, because of emissions from leaded gasoline used at the time.*

*… Club members have included legendary ornithologist Roger Tory Peterson; Gifford Pinchot, the first chief of the U.S. Forest Service; and Frederick Coville, who helped establish the National Arboretum.*

*"There's an extraordinary concentration of world-class biologists," said Bruce Stein, a club member and chief scientist for the National Wildlife Federation.*

*"Everything that's in there," Soreng said, "someone is recording."*

*Ralph Eckerlin, the club's president and a Northern Virginia Community College biology professor, said he worries about the birds, crickets, katydids and other species that rely on calling out to one another.*

*Pamela Goddard, a Mid-Atlantic specialist for the National Parks Conservation Association, said Plummers Island must be spared as precious urban green space.*

*"The promise for national parks is that they'll be protected," Goddard said. "They're not here as land to be developed for a highway."*

13

**APPENDIX E: April 2021 WBFC Comments on American Legion Bridge Construction and Expansion Impacts to Plummers Island**

**Threats to Plummers Island from American Legion Bridge Construction and Expansion** (Submitted to the MDOT-SHA Strike Team, February 28, 2021 for the March 1 joint meeting with WBFC)

1. **Damage to waterways:**
   a. Potomac River shore: mud flats and sandbars are wetland features in the MDOT recalibrated (post the DEIS comments) Zone of Destruction.
   b. We don't know what the new and reconstructed bridge piers will do to flow along the river or channel, particularly if the point of rocks and Rock of Gibraltar (at the upper tip of the island) are destroyed or significantly altered. Sand bars and mud flat habitats could be substantially reduced for plants and animals that depend on these.
   c. The Island Channel (AKA "Rock Run Culvert"). The head of the channel down to the dog leg would not see daylight for years of construction. After which this part of the channel would be overshadowed by the 2 added lanes on the island side of the bridge. What are the consequences to waterways there and downstream?
   d. With the Channel covered by planking for the construction platform, high and mid-level floods will be redirected over those onto the island flood plain, potentially adversely affecting much of that flood plain.
   e. If sub-point d happens, all research plots in the flood plain could be substantially altered, (including vegetation plots 1, 3, 9, 10, 11, 12, and habitats for plants and animals)
   f. The "frog water" pools at the head of the island noted in the DEIS and circumscribed in subsequent documents are highly vulnerable to disturbance (vegetation plot 3 is in this zone).
   g. Zone of potential effects/disturbance uncertain, but estimated by DEIS to be 2/5 of the island. What is the MDOT plan for protecting this zone?
   h. Amphibians are in global and local decline due to pollution, diseases, ozone, and habitat destruction. Eleven species of amphibians are known from Plummers Island (Manville 1968 and https://collections.nmnh.si.edu/search/herps/): *Acris crepitans*, northern cricket frog; *Hyla versicolor*, eastern gray treefrog; *Lithobates clamitans*, green tree frog; *Lithobates palustris*, pickerel frog; *Lithobates sylvaticus*, wood frog; *Pseudacris crucifer*, spring peeper; *Pseudacris feriarum*, upland chorus frog; *Ambystoma maculatum*, spotted salamander; *Eurycea longicauda longicauda*, long-tailed salamander; *Hemidactylium scutatum*, four-toed salamander; *Notophthalmus viridescens viridescens*, eastern newt; *Pseudotriton ruber*, northern red salamander.

2. **Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of Plummers Island within the Zone of Destruction:**

14

00006359

   a. *Hibiscus laevis* (mud flats just below and above point of rocks)
   b. *Solidago racemosa* (point of rocks, below Rock of Gibraltar)
   c. *Hypericum prolificum* (point of rocks, below Rock of Gibraltar)
   d. *Paspalum fluitans* (mud flats just below and above point of rocks)
   e. other native plants rare on the island occurring only on west end in Zone of Destruction: e.g., *Sedum ternatum*. (on Rock of Gibraltar)
   f. Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): *Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus* Herbaceous Vegetation (USNVC: CEGL006483). Non-tidal mudflats. Global/State Ranks: G3/SNR (Simmons et al. 2016)
   g. Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (*Hypericum prolificum, Eubotrys racemosa) / Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia* Herbaceous Vegetation (USNVC: CEGL006491). Global/State Ranks: G2/S1.

**3. Destruction of WBFC research plots:**
   a. Vegetation research plots from 1997 and 2013-2015 will be destroyed (plots 4, 5, on the sandbar at the head of the island will be totally destroyed [see also sub-point 1e]), A historic National Park Service vegetation plot on the Potomac River sandbar could be destroyed.

**4. Destruction of past collection sites:**
   a. many plants and animals were vouchered or recorded from the west end of the island, some are only known on the island from there.

**5. Habitat destruction and disturbance lead to more invasive organisms:**
   a. the west end of the island is covered in a tangle of oriental bittersweet (first recorded from the island in 1982), and shrubs of amur honeysuckle (first recorded from the island in 1997), among many other invasive plants recorded there. Invasive species establishment and expansion will be sorely exacerbated by disturbance involved the construction process.

**6. Potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction blow out. Construction timbers potentially could rip out acres of trees and other vegetation in the island flood plain. Note 1**: 51 out of the 100 recorded historic Potomac River floods (over 9.4 ft at Little Falls Gauge, NOAA data) were recorded since the first bridge was built in 1962, 33 since the midsection of the bridge was filled in 1992, 1996 included 2 of the top 7 floods, and 2018 included 4 historic floods. In 2019 the island flood plain was inundated on and off for much of winter and spring. **Note 2**: Mather Gorge (Cohn 2004) is much narrower at the American Legion Bridge and Plummers Island than at Little Falls Gauge, so the high-water marks listed below substantially underestimate the peak flows at the

15

bridge and head of Island by as much as 7 ft (verified at the bridge side of the channel bend, March 25, 2021).

| rank | height ft | date | | | |
|---|---|---|---|---|---|
| | | | 47 | 11.68 ft | 4/18/2011 |
| 5 | 19.29 ft | 1/21/1996 | 50 | 11.56 ft | 12/17/2018 |
| 7 | 17.84 ft | 9/8/1996 | 54 | 11.44 ft | 9/21/2003 |
| 31 | 12.82 ft | 3/15/2010 | 58 | 11.3 ft | 5/20/2011 |
| 36 | 12.38 ft | 6/5/2018 | 61 | 11.17 ft | 1/27/2010 |
| 37 | 12.35 ft | 3/6/1993 | 65 | 11.01 ft | 9/29/2018 |
| 46 | 11.7 ft | 5/18/2014 | 66 | 10.88 ft | 3/12/2011 |
| 67 | 10.87 ft | 12/12/2003 | 90 | 10.16 ft | 3/25/1993 |
| 68 | 10.85 ft | 9/11/2018 | 92 | 10.13 ft | 1/29/1993 |
| 70 | 10.79 ft | 3/22/1998 | 95 | 10.09 ft | 11/29/1993 |
| 77 | 10.55 ft | 4/18/1993 | 96 | 10.04 ft | 5/13/2008 |
| 81 | 10.43 ft | 1/10/1998 | 97 | 9.97 ft | 9/23/2003 |
| 82 | 10.37 ft | 3/30/1994 | 98 | 9.78 ft | 9/9/2011 |
| 86 | 10.33 ft | 10/31/2012 | 99 | 9.67 ft | 5/6/2009 |
| 87 | 10.28 ft | 3/30/2005 | 100 | 9.43 ft | 4/17/2007 |

7. **Sound from bridge construction and closer proximity of traffic in 2 new bridge lanes after they open on the bridge:**
   a. The noise factor cannot be ignored by humans or wildlife. Already the sound of traffic is disturbing to human conversation at our meeting place the WBFC Cabin grounds.

8. **Salt and oil runoff impacts on biota from the bridge:**
   a. This depends on where the outflow is drained from the bridge drainage scuppers (particularly at the bridge's low-point)
   b. The unintended consequences of that volume of road salts on freshwater ecosystems can be severe. A colleague is working on this very subject on area highways, and the impacts he found were surprisingly devastating. One of the worst impacts was mobilizing (and making bioavailable) toxic metals in waterways.

9. **Violation of long-term continuity of 120 years of research (Perry 2007; Shetler et al. 2006):**
   a. Lichen study on Plummers Island validated essentiality of long-term research contributing to national and global removal of Lead from gasoline: A drop from 70 species to 20 species due to sensitivity to Lead pollution on the island (Lawrey & Hale 1979).
   b. The decline of forest breeding birds on Plummers Island is related to the American Legion Bridge (Johnston & Winings 1987).

16

c. Insects, like other organisms, are experiencing major declines globally (Borenstein 2018; Hallman et al. 2017; Jarvis 2018; Vogel 2017). Giant silk moths (Saturniidae) include Imperial, Cercropia, Luna, Polyphemus, Royal Walnut, Rosy maple etc. In New England, most of these are state endangered species because they have been hammered by an introduced biocontrol agent -- a non-native tachinid fly, *Compsilura concinna*, which was introduced to try and control gypsy moths in Massachusetts. That fly has wreaked havoc in New England because it is a generalist and the Saturniids have been heavily impacted. This pest has arrived in DC and vicinity but impacts here are not yet known (John Lil pers. comm. 2020). Thanks to the long history of research on insects of Plummers Island (***more than 3000*** species documented there; Brown & Bahr 2008a,b), the island is a key place to further document this aspect of "insect apocalypse" (Jarvis 2018) assuming the island remains intact. Erwin (1981) and Brown (2001) have documented long-term trends in beetles and moths, respectively, with shifts in species composition related mainly to vegetation succession. The AL Bridge project puts WBFC Plummers Island research on trends in biodiversity in jeopardy.

d. Bellwether issues of plagues, invasions and expansion of exotic species are expected to be exacerbated due to disturbance from construction – some examples of timing of introductions spread, and manifestations of infestations of plants animals, and diseases from around the region are recorded from Plummers Island (plant records from Shetler et al. 2006, WBFC Invasive Biota Committee reports 2015-2020), and https://collections.nmnh.si.edu/search/botany/)

   i. arrival and expansion of garlic mustard (1915), now rampant

   ii. arrival and expansion of tree of heaven (or hell) (1933), now 50+ trees

   iii. arrival and expansion of Japanese honeysuckle (1949), now dominant

   iv. arrival and expansion of Japanese stilt grass (1979), now locally dominant

   v. arrival and expansion of oriental bittersweet (1982), now all over and covering trees

   vi. arrival and expansion of amur honeysuckle (1997), now dominant on west end

   vii. arrival and expansion of winter creeper (1997), now patchily established but potentially widespread.

   viii. arrival and expansion of ivy (ca 2015), now patchily established but potentially widespread

   ix. Emerald Ash Borer (EAB) arrival and expansion in 2015 and death of ash trees (2016), mass die off of ash trees, a major shift in forest climax community (Simmons et al. 2016)

   x. fig buttercup arrival and expansion and expansion (3 plants 2017, 50 plants in 2019, 160 plants 2020), expanding exponentially

17

00006362

xi.   arrival and expansion of European and Asian earthworms, which rapidly consume forest detritus and restructure soils, upending soil ecological processes and networks of indigenous species adapted to them, favoring colonization and replacement by invasive species, https://en.wikipedia.org/wiki/Invasive_earthworms_of_North_America

xii.   arrival and expansion of Asian clams (*Corbicula fluminea*), shells now abundant in sandy soils across the island (arrived in Ohio River Valley ca 1959, established in the Potomac River by 1982)

xiii.   Chestnut blight, was discovered in the USA in New York in 1904, arrived in Maryland by 1906, Chestnuts were historically on Plummers Island adjacent mainland, last documented in 1934, but considered extinct there by 1935. This once dominant species of the eastern deciduous forest was mostly wiped out within 50 years.

xiv.   Beech blight is coming. Popkin (2019) documents a deadly beech disease is spreading in the northeast USA. There is a mature beech forest on the mainland side of Plummers Island, near Lock 12. We will be watching for the blight here, unless the forest is cut down for the bridge construction.

e.   Research following climate change impacts to the ecosystems and organisms on Plummers Island will be conflated with issues involved with disturbance from bridge construction and emplacements.

## References

Borenstein, S. 2018. 'Windshield test' highlights big drop in flying bugs. *The Washington Post -HEALTH & SCIENCE* (2018-09-25).

Brown, J. W. 2001. Species turnover in the Leafrollers (Lepidoptera: Tortricicae) of Plummers Island, Maryland: Assessing a century of inventory data. *Proceedings of the Entomological Society of Washington* 103(3): 673-685. https://www.biodiversitylibrary.org/bibliography/2510

Brown, J. W., & S. M. Bahr II. 2008a. The Insect (Insecta) Fauna of Plummers Island, Maryland: Brief Collecting History and Status of the Inventory. *Bulletin of the Biological Society of Washington* 15: 54-64. http://dx.doi.org/10.2988/0097-0298(2008)15[54:TIIFOP]2.0.CO;2

Brown, J. W., & S. M. Bahr II. 2008b. Appendix List of the Invertebrates of Plummers Island, Maryland. *Bulletin of the Biological Society of Washington* 15: 192-226 http://dx.doi.org/10.2988/0097- 0298(2008)15[192:ALOTIO]2.0.CO;2

Brown, J. W., Epstein, M., Vann, K., Watkins, R., Bahr, S. M., Kolski, E. 2008. An overview of the Lepidoptera (Insecta) of Plummers Island, Maryland. *Bulletin of the Biological Society of Washington* 15: 65–74.

Cohn, J.P. 2004. The Wildest Urban River: Potomac River Gorge. *BioScience*, Volume 54(1): 8–14, https://doi.org/10.1641/0006-3568(2004)054[0008:TWURPR]2.0.CO;2

00006363

Erwin, T. L. 1981. Natural History of Plummers Island, Maryland. XXVI. The ground beetles of a temperate forest site (Coleoptera: Carabidae): an analysis of fauna in relation to size, habitat selection, vagility, seasonality, and extinction. *Bulletin of the Biological Society of Washington* 5: 105-224.

Hallmann, C. A., Sorg, M., Jongejans, E., Siepel, H., Hofland, N., Schwan, H., et al. 2017. More than 75 percent decline over 27 years in total flying insect biomass in protected areas. PLoS ONE 12 (10): e0185809. https://doi.org/10.1371/journal.pone.0185809

Jarvis, B. 2018. The insect apocalypse is here: What does it mean for the rest of life on Earth? *The New York Times Magazine*, 27 November 2018, pp. 41–48.

Johnston, W. H. & D.L. Winings. 1987. Natural History of Plummers Island, Maryland XXVII. The decline of forest breeding birds on Plummers Island, Maryland, and vicinity, by David W. Johnston and Daniel L. Winings. *Proceedings of the Biological Society of Washington* 100:762- 768. (December 31, 1987).

Lawrey, J. D., M. E. Hale Jr. 1979. Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution. *Science* Vol. 204, Issue 4391, pp. 423-424 https://dx.doi.org/10.1126/science.204.4391.423

Manville, R. H. 1968. Natural History of Plummers Island, Maryland XX. Annotated list of the vertebrates, by Richard H. Manville, except birds by Alexander Wetmore and Manville. Special Publication, Washington Biologists' Field Club, pp. 1-44. (January 1968.)

Perry, M. C. (ed.) 2007. THE WASHINGTON BIOLOGISTS' FIELD CLUB: ITS MEMBERS AND ITS HISTORY (1900-2006). The Washington Biologists' Field Club, printed by The Maple Press Company, York Pennsylvania. Pdf available under the About dropdown as WBFC Book at https://WBFC.science/wp-content/uploads/2019/09/wbfc_booksm.pdf

Popkin, G. 2019. A mysterious disease is striking American beech trees. *Science* Nov 14 2019 https://dx.doi.org/10.1126/science.aba2201

Shetler, S. G., S. S. Orli, E. F. Wells & M. Beyersdorfer. 2006 CHECKLIST OF THE VASCULAR PLANTS OF PLUMMERS ISLAND, MARYLAND. *Bulletin of the Biological Society of Washington*, 14(1): 1-57 https://wbfc.science/wp-content/uploads/2020/07/Checklist_Vasc_Plants_Plummers.pdf

Simmons, R.H, Fleming A.H., Soreng R.J. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Appendix 6, pdf. available at https://wbfc.science/wp-content/uploads/2019/09/plummer_island_nc_map_v1.3.pdf

Simmons R.H., Soreng R.J., Barrows E.M., Emmons L.H. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County. Maryland. Report prepared for the National Parks Conservation Association, July 2020. Appendix 5, pdf. available at https://WBFC.science

Vogel, G. 2017. Where have all the insects gone! *Science* 2 May 2017, Vol. 356, Issue 6338, pp. 576-579 https://science.sciencemag.org/content/356/6338/576.full

00006364

**Appendix F: Minimum Avoidance and Mitigation Measures Needed**

Below are the minimum avoidance measures, design considerations, and mitigations to avoid or reduce impacts that should be made to avoid, minimize, and mitigate adverse effects to Plummers Island and the ongoing research there. These provisions should have been considered from the beginning of the MDOT-SHA project development and in the DEIS. This content comes from WBFC's April 9, 2021 Section 106 comments.

No bridge alternatives were discussed in the Draft Environmental Impact Statement (DEIS), which is a major omission, and should have been presented there so that the public could have the same information to comment on. We would have certainly made DEIS comments on the bridge alternatives if any relevant information on bridge alternatives had been discussed in the DEIS. That information was lacking and clearly should have been included in the DEIS. A Supplemental DEIS has now been issued (October 1, 2021), and still no bridge alternatives are clearly delineated.

Clearly there needs to be a specific focus on design changes that will reduce and avoid impacts to Plummers Island. The first obvious choice for reducing and avoiding impacts is the "no build" option. Second is the upriver bridge alternative, which should have been evaluated in the DEIS and certainly must be now before the project is advanced.

Although WBFC is opposed to the American Legion Bridge (ALB) expansion, particularly with toll lanes and lack of mass transit in the design (vans and buses from a few points are not an acceptable replacement for dedicated mass transit), the following types of mitigations are necessary and non-negotiable.

To protect Plummers Island and its significant historic features and attributes, the minimum mitigations follow:

- Plan for major (not minor) flooding during the construction period.
- Avoid obstructing natural water flow into the Plummers Island channel.
- Build all the new lanes for the ALB on the upriver side of the bridge.
- Build the access to and the construction platforms themselves only on the upriver side of the bridge and under the bridge.
- In any case, add sound barriers to the downstream side of the bridge.
- Use lane surfacing that is as quiet as possible.
- Place the outflow from bridge scuppers somewhere the runoff will not enter into Plummers Island waters.
- Avoid fugitive dust blowing onto the island by use of dust minimization measures including spraying.
- A waste and hazardous material disposal plan must ensure off-site disposal so as not to flow to or near Plummers Island.
- Provide prior notification informing WBFC of work schedules so notice can be given to researchers.
- Piping of road runoff (that contains oil and salt) is a major issue; currently the main scupper drainage flows into the channel separating the island from the mainland; future drainage should avoid the wetlands including the channel.

20

00006365

- For the duration of construction, any construction infrastructure should be designed to withstand major floods (over 14 feet) not minor (10-12 feet) floods; there have been 3 moderate (12-14 feet) and 2 major floods (17-19 feet) in the past 25 years. However, even minor floods recorded at Little Falls produce major flooding in the Plummers Island channel adjacent to the bridge (see Appendix D, point 6).
- Monitor during construction to ensure that construction work is not impacting the island and no construction workers or project personnel visit the island unless oriented and approved by the Washington Biologists' Field Club. These requirements should be included in bidding document and contractor's work plan as part of the environmental specifications that will be followed.
- Chance find or inadvertent discovery procedures should be followed and incorporated into bidding documents and contracts. Please provide a copy for our review to ensure they meet the requirements for protection of Plummers Island.

00006366



**MONTGOMERY COUNTY PLANNING DEPARTMENT**
THE MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION

October 8, 2021

Steve Archer
Cultural Resources Team Leader
Environmental Planning
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD  21202

**RE: I-495/I-270 Managed Lanes Study:** *Geophysical Survey of Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M:35-212) and Gibson Grove Church (M:29-39), Revised APE, and Proposed Compensatory Stormwater Management Locations*

Dear Mr. Archer:

Thank you for providing us the opportunity to review and comment on the latest cultural resources materials for I-495 & I-270 Managed Lanes Study, including the geophysical report for Morningstar Tabernacle Cemetery (M:35-212) and Gibson Grove Church (M:29-39), Montgomery County, Maryland from July 2021 and a Revised Area of Potential Effects (APE) including numerous Compensatory Stormwater Management (SWM) sites throughout the county. We reviewed the unredacted materials as part of our continuing consultation under Section 106 of the National Historic Preservation Act for Project No. AW073D12, the I-495 & I-270 Managed Lanes Study (MLS). This letter reflects the comments from the Cultural Resources Sections of the M-NCPPC Park and Planning Departments.

**Morningstar Tabernacle 88 Moses Hall and Cemetery and Gibson Grove Geophysical Report**
This is an excellent report that provides invaluable information about the number and extent of potential grave locations at Moses Hall and Gibson Grove Church, which is significantly larger than previously understood. However, the northern and southern boundaries of the Moses Hall Cemetery site remain undefined. Additional geophysical survey is needed to establish the relationship between the cemetery and the MLS LOD in the area north of the Moses Hall foundation that was not studied by this report.

**Area of Potential Effects – Corridor Revised September 2021 Preferred Alternative**
- Map 4: Boundaries along the north and northeast side of the Morningstar Tabernacle No 88 Moses Hall and Cemetery and the Beltway Right of Way remain unidentified.
- Map 14: The boundaries of Site 18MO266 (Poor Farm Cemetery) have never been defined. Graves may extend well beyond where they were found by limited archaeological testing in the 1980s.
- In the table *Archaeological Investigations Required for the Revised APE* Sites 18MO191, 18MO457, and 18MO752 all are located on MNCPPC land. The table only indicates 18MO752 is MNCPPC land.

**Area of Potential Effects Compensatory SWM September 2021**
Additional information is needed to document the identification of historic properties in the proposed SWM APEs. An explanation and justification in the SWM table indicating the reasons which some will not require archaeological field survey and evaluation would be very helpful. Where MDOT SHA maps show an overlap between SWM APEs and historic properties, or properties not yet evaluated for the NRHP, additional discussion of future archaeological investigations is necessary.

1

Several of the proposed areas are near or within the environmental settings of historic properties or cemeteries listed in inventories maintained by M-NCPPC, but not indicated on the provided maps. In some cases, M-NCPPC inventories have wider boundaries than those maintained by MHT in order to include the broader environmental setting significant to the site. These are viewable via an interactive map at mctalas.org. Sites not included in MDOT SHA maps include the following:

| Sheet | APE | Cultural Resource | CR Type | Notes |
|---|---|---|---|---|
| Sheet 22 | WAS-4020 WAS-4154 | Welling Family Cemetery/Comus Seventh Day Adventist Cemetery (HP-004) | Montgomery County Burial Sites Inventory | The relationship between any ground disturbance for SWM and the cemetery needs to be established to assure that graves will not be impacted. |
| Sheet 23 | WAS-4026 | William T Poole Farm (MIHP 12-15) | Locational Atlas site | APE extends into environmental setting for the historic site. |
| Sheet 29 | WAS-4534 | Forest Oak Cemetery | Montgomery County Burial Sites Inventory | Frederick Road is much wider now that it was when the cemetery was established in the 1870s; archaeological investigations are needed to verify that graves did not once extend into or under what is now the road right of way. |
| Sheet 38 | WAS-4206 | L. Jones House (MIHP 12-37) | Locational Atlas site | APE extends into environmental setting for the historic site. |
| Sheet 40 | WAS-4370 WAS-4371 | Aix La Chapelle (MIHP 17-6) Brewer Family Cemetery | Locational Atlas Site Montgomery County Burial Sites Inventory | The location of the burial site is unknown. |
| Sheet 41 | WAS-4352 | John Dade House (MIHP 18-18) | Locational Atlas Site | APE extends into environmental setting for the historic site. |
|  | WAS-4391 | Hilary and Matilda Pyles Farm (MIHP 18-19) | Master Plan Site | APE extends into environmental setting for the historic site. |
| Sheet 43 | WAS-4414 WAS-4415 | Barn at Windolf-Williams Farm (MIHP 18-45) | Locational Atlas Site | APE extends into environmental setting for the historic site. |
| Sheet 51 | WAS-4342 | Richard T. White Farm (MIHP 18-13) | MP historic site | APE extends into environmental setting for the historic site. |
| Sheet 52 | WAS-4347 WAS-4349 | Joseph C White House (MIHP 18-14) | MP historic site and MHT easement | Are the APEs on the east side of Bucklodge Road? Note that the Joseph C White House is on the west side of Bucklodge Road in this location. |

M-NCPPC Parks staff reviewed the proposed Compensatory SWM areas for their impacts to Parkland. The table below outlines the seven large SWM areas proposed for location within existing Parkland that require additional information before M-NCPPC staff can concur with the recommendation that no Phase I survey is

2

needed in the entirety of these areas. Any additional information MDOT/SHA has on what specific factors were used to determine that these areas require no archaeological testing would be appreciated. The current SWM APEs do not appear to include consideration for access roads, storage areas, or additional LOD modifications that are usually expanded later in project development. M-NCPPC will need to review any modifications to the LOD to ensure no additional areas require survey to identify unknown sites or will impact previously recorded sites. In addition, any areas on Park land will be required to go through Parks Construction Permit review.

| SWM Site Name | Map Sheet | Location | MNCPPC comments |
|---|---|---|---|
| MO_00018 | 1 | APE within Heritage Farm Neighborhood Park | Needs additional information |
| MO_00047A | 2 | APE within Gunner's Branch Local Park | Needs additional information |
| MO_00051 | 3 | APE within Little Falls SVU2 | Needs additional information |
| MPOC_0006_0010_0011 | 3 | APE within Little Falls SVU2 | Needs additional information |
| MO_1540045 | 4 | APE within South Gunner's Branch LP | Needs additional information |
| MPOC-0009 | 5 | Entire APE within Cabin Branch SVP | Needs additional information |
| MPOC_0008 | 6 | Entire APE within Greenbriar LP | Needs additional information |

While we appreciate the scale and complexity of this project, the format of the review material made review unnecessarily difficult. Map pages included with review materials differed widely in the north orientation of the page and roads on some maps lacked labels (especially true for MLS_106_Sept_8_Att_1C_APE_StreamWetland.pdf) making the individual APEs very difficult to find in our GIS. In the future, we request that SHA/MDOT provide GIS shapefiles to expedite the review.

Thank you again for the opportunity to comment. If you have any questions or need to discuss this matter, please feel free to contact us at 301-563-3404; Rebeccah.Ballo@montgomeryplanning.org or 301-563-7532; Cassandra.Michaud@montgomeryparks.org.

Sincerely,

Rebeccah Ballo
Historic Preservation Supervisor, Montgomery County Planning

&

Cassandra Michaud
Acting Cultural Resources Manager, Montgomery Parks

3

cc:   Jeannette Mar, FHWA
       Tim Tamborino, Maryland Historical Trust
       Beth Cole, Maryland Historical Trust
       Debra Borden, M-NCPPC
       Darren Flusche, M-NCPPC
       Matt Harper, M-NCPPC

00006370

# CABIN JOHN CITIZENS ASSOCIATION
## P.O. BOX 31, Cabin John MD 20818

*Organized 1919 -- Charter Member Montgomery County Civic Federation*

Oct 8, 2021

**<u>Via Email</u>**
Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation
State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

**RE:    Cabin John Citizens Association Comments Regarding the I-495/I-270 Managed
        Lane Study Updated Section 106 documentation Transmitted Sept. 8**

Dear Mr. Archer:

On behalf of the 2,100 residents of Cabin John, Maryland and as a consulting party to the
NHPA Section 106 process, the Cabin John Citizens Association (CJCA) would like to provide
the following comments regarding the latest Section 106 materials shared via your Sept. 8 letter.

Since our community rests within the triangle created by the Clara Barton Parkway and the C&O
Canal on one side, I-495 itself on another side and the Cabin John Parkway completing the
triangle, many of our concerns with respect to the Section 106 process mirror those of the
Friends of Moses Hall, the National Park Service, the Carderock Springs Historic District and
the Maryland-National Capital Parking and Planning Commission.

**Moses Hall and Cemetery and the Discovery of Hundreds of Likely Gravesites**
The cemetery is the final resting place of a number of people who lived in Cabin John all their
lives. Descendants of those buried there still call Cabin John home. In the early 2000s members
of the community along with the Cabin John Citizens Association started a multi-year effort to
preserve the cemetery. We have worked with renewed effort in recent years.

The CJCA appreciates the various archeological efforts, especially the ground-penetrating radar
(GPS) work, that the state has undertaken to date. The results of the GPR are quite shocking
and point to the likelihood that the original Beltway construction in the 1960s and Beltway
expansion work in the 1990s did not respect the historical boundaries of the Morningstar Moses
property.

It is not acceptable for the cemetery boundaries to be disregarded again. The only way to know
for sure that the latest Limits of Disturbance (LOD) put forth as part of Alternative 9 "completely
avoids" gravesites is to conduct a complete GPR study of the cemetery and the existing right of

1

way north, west and east of the where the state has already done its work. This is not a time when cost considerations should determine how much the state does its due diligence.

When the state first started this project in 2018 the maps they shared with the public did not even acknowledge a cemetery where the Morningstar Moses Hall Cemetery property was located. Subsequently, there was documentation of asserting only a handful of graves at that location. With all due respect, having the State Highway Administration declare that this latest proposal completely avoids burial sites is suspect without completing the GPR work.

There is also significant concern that the lack of information about construction techniques also precludes a determination of no adverse affects not only to the Moses Hall Cemetery property, but also to the Carderock Springs Historic District. This dearth of construction information could also mean that the historic Gibson Grove Church property as well as the C & O Canal and other historic properties could suffer even greater impacts than what you are suggesting by the Limits of Disturbance.

The CJCA is concerned that the design modifications that minimize impacts to Morningstar Tabernacle 88 Moses Cemetery and Hall, are doing potential harm to historic properties on the other side of the Beltway, specifically the Carderock Springs Historic District and the historic Gibson Grove Church property.

Like the Moses Hall Cemetery property and local parklands, the church property has suffered cumulative impacts from stormwater damage over many years due to the original I-495 Beltway construction. Instead of piling on, SHA must right past wrongs by minimizing impacts to the Gibson Grove Church property and by mitigating damage caused by poor stormwater management.

 Actual encroachment on to these two historic properties as well as the detrimental effects posed by stormwater runoff, loss of vegetation and other environmental impacts in conjunction with the project are all adverse effects that are still not adequately detailed in the latest materials. As we have noted before, this makes the Design-Review process a critical component of collaborative mitigation.

As part of the final Section 106 Programmatic Agreement, we request the following as a consulting party:

- A stipulation that the SHA should require the pre-development contractor to reassess the River Rd. interchange with the goal of developing new design alternatives that prioritize avoidance of adverse effects per Section 106, which would require no encroachment of the LOD on Carderock Springs Historic District, Carderock Springs South, Gibson Grove Church or Moses Hall and Cemetery.

- A stipulation that the pre-development contractor avoids a flyover or other aerial structures that cause adverse visual impacts affecting these historic properties.

- A stipulation that the SHA and the pre-development contractor provide regular written communications and hold quarterly meeting to inform our communities of the status of the proposed project and any changes to the current design and to allow the community to voice concerns and ask questions.

2

00006372

- A stipulation that consulting parties are brought into the design review process for the road, sound walls, and associated signage and lighting with the P3 partner, and be given the opportunity to provide formal comments in response to the proposed design at the 30% / 50% / 90% design phases.

- The Programmatic Agreement allow for continued consultation should any unexpected discoveries or changes to the design be found necessary within the portion of the APE adjacent to the Clara Barton Parkway, I-495 and the Cabin John Parkway, i.e. the "boundaries" of Cabin John.

Cabin John homes abut both sides of the parkway and a stretch of the C&O Canal. The access road to the Clara Barton Parkway in Cabin John is **the only way** some 100 CJ homes can enter or exit the neighborhood. It is extremely important that the final design, the construction period and the new Clara Barton Parkway interchange take into account that hundreds of homes are adjacent to these historic sites.

Given the lack of information, it is imperative that the Cabin John Citizens Association be designated a property-specific consulting party with regard to the design-review process for both of these entities. With regard to the Clara Barton Parkway, we also ask the SHA stipulate that the contractor will protect trees and other vegetation outside the LOD, limit vegetation removal to the extent practicable and screen the parkway from bordering houses by planting new trees of a similar type replacing those removed during construction.

The Cabin John Citizens Association appreciates your consideration of our comments and proposed stipulations.

Sincerely,

Susan Shipp
President, Cabin John Citizens Association


cc:
Governor Lawrence J. Hogan – governor.mail@maryland.gov
Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
Treasurer Nancy Kopp – treasurer@treasurer.state.md.us
Kendra Parzen, National Trust for Historic Preservation - KParzen@savingplaces.org
Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
Julie Langan, Virginia DHR - julie.langan@dhr.virginia.gov
Julie Schablitsky, MDOT SHA – jschablitsky@mdot.maryland.gov
Richard Ervin, MDOT SHA – rervin@mdot.maryalnd.gov
Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
John Simkins, FHWA Virginia Division - john.simkins@dot.gov
Rebeccah Ballo, Montgomery County Planning Department – rebecccah.ballo@montgomeryplanning.org
Debra Borden, M-NCPPC – debra.borden@mncppc.org
Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
Eddie Bankhead, First Agape AME Zion Church - esbj@pobox.com
Rev. Edgar Bankhead, First Agape AME Zion Church - ebankjs@verizon.net

3

Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
Sara Love, Maryland State Delegate – sara.love@house.state.md.us
Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Gerald Cichy, Commissioner, Montgomery County Planning Board -MCP-Chair@mncppc-mc.org
Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
Gabe Albornoz, Montgomery County Councilmember - councilmember.albornoz@montgomerycountymd.gov
Andrew Friedson, Montgomery County Councilmember - councilmember.friedson@montgomerycountymd.gov
Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

00006374

# I-495 & I-270 MLS PA Draft #2
## NPS Comment Tracking

| ID | Reviewer | Stipulation | Comment |
|---|---|---|---|
| | NPS | V. Property Specific Commitments; C. Chesapeake and Ohio Canal NHP | please include a stipulation to cover the cost of cataloging documents associated with this project (administrative record) as well as any documentation associated with treatment, excavation, and associated artifacts. Essentially, they would pay for the curation of the information/data/documents generated as a result of this project should be covered by MDOT. |
| | NPS | Attachment 1, B. | If damage occurs to an arch site on NPS land, they must consult with the park staff and regional archeologist regarding review of the damage assessment report and negotiation of appropriate mitigation. |
| | NPS | Page 2, 2nd para | WHEREAS, the Project will involve the use of lands managed by the NPS within the Chesapeake and Ohio Canal National Historical Park, a unit of the National Park System, **AND** the George Washington Memorial Parkway (GWMP), a unit of the National Park System **THAT INCLUDES THE** ~~and~~ Clara Barton Parkway, ~~a unit of the National Park System;~~ and |
| | NPS | Page 2, 4th para | WHEREAS, the GWMP, a unit of the National Park System **FEATURING THE SCENIC GWMP PARKWAY**, with portions located in **MONTGOMERY COUNTY, MARYLAND**, Fairfax and Arlington Counties and **TRAVERSING WASHINGTON STREET IN** the City of Alexandria, Virginia, was established **FOLLOWING THE AUTHORIZATION OF THE PARKWAY** pursuant to what is known as the Capper-Cramton Act,.....  then add MD portion |
| | | Page 2 - Whereas clause at top of page | **Break into two Whereas clauses as follows:** WHEREAS, the National Park Service (NPS) agrees FHWA is the lead federal agency for purposes of ensuring that the Project complies with Section 106 of the NHPA, and has agreed to participate in this PA as an Invited Signatory. |
| | NPS | | WHEREAS, NPS would authorize permanent use of the affected Federal park property for the Project through coordination with FHWA for a Highway Deed Easement and would issue a special use permit for temporary use of land under its administration for construction-related activities. NPS intends to use this PA to comply with 36 C.F.R. Part 800, 54 U.S.C. § 100902, 36 C.F.R. Part 14; and |

| | | |
|---|---|---|
| | Add WHEREAS on page 2 after the GWMP whereas | WHEREAS, the Chesapeake and Ohio Canal National Historical Park, a unit of the national park system stretches along the Potomac River from Rock Creek at Georgetown in Washington, D.C., to Cumberland, Maryland, for 184.5 miles, was established as a national monument in 1961 and was then established as a national historical park by Congress in 1971, through Public Law 91-664 for the purpose of preserving and interpreting the 19th century transportation canal and its associated scenic, natural, and cultural resources; and providing opportunities for education and appropriate outdoor recreation.  The C&O Canal NHP is listed on the National Register of Historic Places and contains more than 1,300 historic structures, including one of the largest collections of 19th century canal features and buildings in the national park system. The towpath and canal cross underneath I-495 at the American Legion Bridge, in Bethesda, Maryland. |
| NPS | Add WHEREAS on page 2 after the CHOH whereas suggested above | WHEREAS, the Clara Barton Parkway, a portion of the George Washington Memorial Parkway that runs along the Maryland side of the Potomac River is the Clara Barton Parkway which also became part of the national park system through the Capper-Cramton Act (originally as the Maryland portion of the GW Memorial Parkway). The Clara Barton Parkway are on the National Register of Historic Places for its association with twentiethcentury parkway design, engineering, landscape architecture, park planning and conservation, commemoration, and an association with George Washington. |

**From:** Virta, Matthew <Matthew_Virta@nps.gov>
**Sent:** Tuesday, February 1, 2022 4:02 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Subject:** Re: [EXTERNAL] I-495 and I-270 MLS Section 106 Materials, PA Second Draft, Comments Requested by February 3, 2022

Greetings Steve,

Hope 2022 is treating you well.  Thanks for your continued assistance and patience on developing the PA.  Quite the undertaking (no pun intended!).  Seems to be shaping up quite well....

I have just a couple of clarifying editorial comments on the PA (most of my earlier comments on Draft 1 were addressed, subsumed under other comments, or are conditionally being addressed).

1. Page 2, 2nd para - correct the implication that Clara Barton Parkway is a **unit** of NPS (it is not a stand-alone park unit, but part of GWMP):

*WHEREAS, the Project will involve the use of lands managed by the NPS within the Chesapeake and Ohio Canal National Historical Park, a unit of the National Park System, **AND** the George Washington Memorial Parkway (GWMP), a unit of the National Park System **THAT INCLUDES THE** ~~and~~ Clara Barton Parkway, ~~a unit of the National Park System;~~ and*

2. Page 2, 4th para - only Virginia portions noted of Capper Cramton- why?; correct the missing Montgomery County, MD section containing Clara Barton Parkway (was originally also called GWMP roadway in MD) and also add the Maryland portions of Capper Cramton.   "Fun" Note - Capper Cramton Act actually restricted GWMP roadway from within bounds of City of Alexandria (uses Washington Street) and within bounds of DC, but some sections actually got built ... (original Mount Vernon Memorial Highway section was under construction on Columbia Island when Capper Cramton passed, and then later from MD-DC Line to Chain Bridge).  Distinguishing GWMP the park and GWMP the road often gets messy (sorry).

*WHEREAS, the GWMP, a unit of the National Park System **FEATURING THE SCENIC GWMP PARKWAY**, with portions located in **MONTGOMERY COUNTY, MARYLAND**, Fairfax and Arlington Counties and **TRAVERSING WASHINGTON STREET IN** the City of Alexandria, Virginia, was established **FOLLOWING THE AUTHORIZATION OF THE PARKWAY** pursuant to what is known as the Capper-Cramton Act,.....*  then add MD portion

*FROM CAPPER CRAMTON ACT*

*to include the shores of the Potomac, and adjacent lands, from Mount Vernon to a point above the Great Falls on the Virginia side, except within the City of Alexandria, and from Fort Washington to a similar point above the Great Falls on the Maryland side except within the District of Columbia,*


Regards,

*Matt Virta*

Cultural Resources Program Manager/Archeologist
National Park Service - George Washington Memorial Parkway
700 George Washington Memorial Parkway
Turkey Run Park
McLean, VA 22101

(Tel) 703-289-2535

"...just trying to keep the Parkway a Park" (and maintain that thin green line...)

Work Hours M-F 7:30-4:00

The National Park Service cares for special places
saved by the American people so that all
may experience our heritage.
EXPERIENCE YOUR HERITAGE

---

**From:** Steve Archer <SArcher@mdot.maryland.gov>
**Sent:** Tuesday, January 4, 2022 12:43 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Cc:** David Clarke, FHWA <david.clarke@dot.gov>; Jeanette Mar <jeanette.mar@dot.gov>; Marc Holma, Virginia DHR <marc.holma@dhr.virginia.gov>; Mandy Ranslow, ACHP <mranslow@achp.gov>; John Simkins, FHWA Virginia Division <john.simkins@dot.gov>; Beth Cole <beth.cole@maryland.gov>; Tim Tamburrino, MHT <tim.tamburrino@maryland.gov>
**Subject:** [EXTERNAL] I-495 and I-270 MLS Section 106 Materials, PA Second Draft, Comments Requested by February 3, 2022

> **This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

Greetings I-495 and I-270 MLS Section 106 Consulting Parties,

MDOT SHA is pleased to provide you with additional Section 106 documentation for your review and comment.  These materials include:

- APE mapping with minor updates to accommodate minor engineering adjustments, stormwater management, wetland and parkland mitigation
- Updated Eligibility and Effect findings, including for Morningstar Tabernacle No. 88 Moses Hall and Cemetery
- The Second Draft of the Project Programmatic Agreement (PA), including tables of contents for the treatment plans committed to in the PA
- A Comment-Response Matrix noting how comments received on the first draft of the PA have been taken into consideration

Further details are provided in the attached letter to the Maryland and Virginia State Historic Preservation Officers.  Attachments 3, 4, 5, and 6 are embedded within the attached letter.  Attachment 7, the second draft of the PA, is provided as a separate attachment to this email.  Attachments 1 (APE mapbooks), 2 (Updated Morningstar Tabernacle DOE) (APE) and 8 (Comment-response matrix) are larger files and may be downloaded at the following link:

https://sftp1.mdot.state.md.us/
Username: MLSResource
Password:  I495I270

**Note that consulting parties with qualified archaeological staff will again receive a separate link in an email from me to access unredacted attachments (showing specific archaeological site locations/detail)**.

MDOT SHA respectfully requests comments on these materials by no later than **Thursday, February 3, 2022**, close-of-business.  For the PA, *specific* comments or language suggestions, **keyed to stipulation number** are most helpful to the process.  Comments emailed directly to me are the most effective way to provide your input.   As MDOT SHA has noted in prior meetings and communications, we expect to have shorter review cycles for subsequent PA drafts, given that issues will have been considered or resolved and future changes to the PA will be less substantial.

Thank you, we appreciate your ongoing consultation.  Feel free to contact me with any questions or concerns.

Steve Archer

Cultural Resources Team Leader

Maryland Department of Transportation State Highway Administration

Environmental Planning Division

707 North Calvert Street

Baltimore, MD 21202

Phone 410-545-8508

sarcher@mdot.maryland.gov

Governor Hogan is committed to outstanding customer service. Tell us how we are doing. Click here.



Maryland now features 511 traveler information!
Call 511 or visit: www.md511.org

 Please consider the environment before printing this email

LEGAL DISCLAIMER - The information contained in this communication (including any attachments) may be confidential and legally privileged. This email may not serve as a contractual agreement unless explicit written agreement for this purpose has been made. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication or any of its contents is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender indicating that it was received in error and delete the original message and any copy of it from your computer system.



**FRIENDS OF MOSES HALL**
**MORNINGSTAR TABERNACLE NUMBER 88**
**ANCIENT UNITED ORDER OF SONS AND DAUGHTERS, BROTHERS AND SISTERS OF MOSES**
**7550 Seven Locks Road**
**Cabin John, MD 20818**
**morningstarmosescj@gmail.com**
**https://www.friendsofmoseshall.org/**

February 3, 2022

*By Email to:* sarcher@mdot.maryland.gov

Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation
State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

**Re: Draft Programmatic Agreement and No Adverse Effects Finding for Morningstar Tabernacle No. 88 Moses Hall and Cemetery, Cabin John, MD**

Dear Mr. Archer:

Thank you for the opportunity to review and comment on the Report on the draft Programmatic Agreement prepared by MDOT SHA. Friends of Moses Hall wish to again thank MDOT SHA for your reports and efforts to date.

Friends of Moses Hall (FMH) has serious concerns with the material presented to us and the decision-making approach that SHA has taken in the Section 106 and NEPA process. We believe that a reasonable third party would conclude that SHA has taken a series of arbitrary and capricious steps to avoid appropriate responsibility to the effects to the Morningstar site that are the result of proposed and past SHA actions.

We find the finding of no adverse effect to the site to be arbitrary in light of the facts on the ground. As we indicated in previous letters, the state's ground penetrating radar (GPR) efforts are incomplete. The tremendous volume of positive results should have resulted in a more thorough investigation of the area. We understand that incomplete bamboo removal and other physical obstacles prevented further GPR investigation in some locations; however, these

00006381

problems can be undoubtedly addressed to allow for a more thorough investigation. It is appropriate practice in a GPR survey to cast a wider buffer than is apparent from this work. The investigation should have continued northward up to the edge of the highway, as well as extending further east and west. The fact that the investigation did not continue further northward precludes any determination that the graves have been "completely avoided."

Instead of appropriately addressing this deficiency with the GPR, SHA presented FMH with an aerial photograph and indicated its belief that the 1957 image suggests that the boundary of the cemetery was a roadway. This may be true, but even if we assume for the purposes of our analysis here that it is true, it does not yield SHA's interpretation. The roadway curves northward into the limits of disturbance. The westernmost grave along the roadway is further north than the easternmost. Given the incomplete nature of the GPR, one might extrapolate that if the roadway is indeed the boundary of the cemetery and graves appear to be tracking it northward, graves may be located within the LOD. This conclusion is easily inferable from the provided material, but SHA chooses to make the inference that favors the agency's interests.

In making that determination, SHA also disregards our reasonable concern regarding **the location of the limits of disturbance (LOD) in relation to the *known* burial sites, which raises substantial questions about physical avoidance.** The updated LOD still appears to be immediately adjacent to a grave. As SHA's report acknowledges, GPR is imperfect. The entirety of the grave feature may not exactly correspond with the GPR findings. This risk is usually addressed by establishing a buffer, which still does not appear to have been done for this LOD.

Given these facts, one would reasonably conclude that a finding of direct **adverse effect** or **potential for adverse effect** would be appropriate. Instead, SHA has used a single picture from 1957 and an incomplete approach to GPR and setting of the LOD to make a definitive determination in the other direction that benefits the agency.

We find other evidence of arbitrary decision-making in the materials provided to us. SHA has made a reasonable commitment to transfer "the right-of-way where GPR has indicated potential burials to cemetery trustees." However, it noted that "Based on FHWA input, this commitment will NOT be in the Section 106 PA but may be documented in the ROD."

The decision to transfer the right-of-way is a *connected action* to the Managed Lane Study undertaking. If not for the study, SHA would not be engaging in this transfer. We and SHA know this because SHA took no action to engage in such a transfer until FMH and other stakeholders highlighted the Morningstar property. It even expanded the roadway in this vicinity previously while taking no such action. It is engaging in this transfer to respond to public policy concerns raised in the NEPA, Section 4(f), and Section 106 processes of this specific undertaking. It must, *not may*, be documented in the final documentation associated with all three regulatory processes. Failure to document this activity would violate the requirements under 40 CFR 1508.25 and represent an arbitrary approach to complying with well-established regulatory requirements and precedent.

We note briefly that the request for a shorter PA duration raised by multiple stakeholders was also met with arbitrary decision-making. We previously laid out our rationale for why seven years was more appropriate than 20. Rather than respond to any of the substantive points raised, MDOT SHA replied, "20-year agreement is FHWA's decision." FHWA has an obligation

00006382

to provide a rationale for this period. In fact, the FHWA template PA has a five-year duration.[1] Deviating from a standard "because FHWA said so," does not represent reasoned decision-making.

Having identified a pattern of *arbitrary* behavior, we turn to the *capricious* steps that SHA has taken during this process. On September 9, 2021, the *Washington Post* ran a story covering SHA's efforts to avoid impacts/effects to the Morningstar site.[2] In that story, Julie M. Schablitsky, chief archaeologist for the Maryland Department of Transportation, stated, "'We own the faults of the Maryland Roads Commission impacting the community 60 years ago…It's our responsibility now to repair the damage and come in and do the right thing.'"

As chief archaeologist for MDOT, Ms. Schablitsky is in an appropriate position to make such a statement concerning the responsibility that the state feels it has and the actions it intends to take.

On January 4, 2022, SHA concluded that it did not have to consider cumulative effects to the site because "Impacts to the Gibson Grove community occurred with original I-495 construction, prior to the passage of NEPA and NHPA (Section 106)."[3]

This set of statements is galling on a number of levels. First, it is contrary to the regulations. Section 106 requires consideration of cumulative effects (36 CFR 800.5 (a)(1)) and provides no carve out for effects that began before NHPA's passage. The NEPA regulations define cumulative impacts as those which result "from the incremental effect of an action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-federal) or person undertakes such actions" (40 CFR 1508.7). The regulations provide no carve out for excluding the pre-NEPA/NHPA timeframe from cumulative effects. In fact, CEQ's handbook *Considering Cumulative Effects Under the National Environmental Policy Act*, in seeking to answer the question of how far back to look at cumulative effects, noted, "The availability of data often determines how far back past effects are examined. Although certain types of data (e.g., forest cover) may be available for extensive periods in the past (i.e., several decades), other data (e.g., water quality data) may be available only for much shorter periods."[4] In this case, the data are available and clear regarding the State's continued actions in relation to the Morningstar site.

The second galling element at play here is that the framework for cumulative effects is clear. In building the Beltway, the State improperly incorporated a black cemetery into state public right-of-way. Several decades later, it widened the highway in the vicinity of the site without considering effects to it. And now, it aims to move that highway even closer, bringing the LOD immediately adjacent to the known burial site of a person whose resting place the state wrongly took control of several decades prior. These clear, discrete, definable additive effects are

---

[1] See here: https://www.fhwa.dot.gov/design/interstate/pa_template16.cfm
[2] Katherine Shaver, "African American gravesites detected near Capital Beltway will be spared in road-widening plans." *Washington Post* September 9, 2021.
[3] MDOT. "Morningstar/Moses Hall Cemetery Update." January 4, 2022.
[4] CEQ. *Considering Cumulative Effects Under the National Environmental Policy Act*. Section 2. Pages 17-19. https://ceq.doe.gov/docs/ceq-publications/ccenepa/sec2.pdf

00006383

precisely the kind of issue that NEPA/NHPA were designed to address. SHA must do so to comply with law and regulation.

But what is most concerning is the clear distinction between the public and the private statements. In a public forum in front of the media, the State declares, "We take responsibility." It says SHA will "repair the damage." In private, before the affected stakeholder, it declares, "We do not take responsibility." It offers nothing to repair the physical damage to the site. Such an about-face is the definition of a capricious act.

FMH once again stresses that the original I-495 construction had significant economic, physical, and social impacts on this historic community through land takings and the splitting of this once vibrant African American community in Cabin John. Evidencing the cumulative effects of racial inequity inherent in the original land takings, FMH shares our report of findings following our examination of Maryland State Roads Commission (MD SRC) records pertaining to the construction of I-495 from the late 1950s through the early 1960s **(Attached Exhibit A).**

**FMH also takes issue with the Determination of Eligibility (DOE) form submitted in December 2021 by MDOT SHA.** As with the original DOE prepared in May 2020 (to which FMH submitted corrections and edits on August 24, 2021), substantial errors and omissions are contained in this second DOE. While MDOT SHA says it agrees that the site is National Register-Eligible, thus far its two DOE reports have consistently minimized or omitted historical and archaeological facts. It is unclear whether this newly completed form is replacing or adding to the DOE submitted in May 2020 to MHT. FMH is deeply concerned that its previous edits to MDOT SHA's first DOE have been disregarded by MDOT SHA and MHT. The DOE becomes a permanent, public document. We believe accurate and complete information should be the basis of this document. Accordingly, we include FMH's comments to the DOE, attached as **Exhibit B.**

While FMH has serious concerns about the process and we believe a third party reviewing the record would share these concerns, we remain willing to work with SHA on appropriate mitigations for the direct and cumulative effects that the Morningstar site is likely to experience as a result of this Project. Our previous comments have outlined an appropriate set of activities consistent with those effects. However, SHA has categorically rejected these comments due to their no adverse effect finding. We welcome the opportunity to coordinate with SHA on these mitigations upon the agency's review of the points raised in this letter.

We appreciate your consideration of these comments and look forward to further coordination on revisions to the assessment of effects and to the PA that reflect the likely effects to this site and the public commitments that SHA has made.

Sincerely,

**FRIENDS OF MOSES HALL**
**and The Board of Trustees of**
**Morningstar Tabernacle Number 88, Incorporated**

**Diane E. Baxter**
President, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Dr. Charles W. Harris**
Vice President, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Eileen McGuckian**
Secretary, Morningstar Tabernacle Number 88, Incorporated
Historian and President, Montgomery Preservation

**Montgomery Crawford**
Treasurer, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Alexandra Jones, PhD, RPA**
Trustee, Morningstar Tabernacle Number 88, Incorporated
Executive Director and Founder, Archaeology in the Community

**Austin E. White**
Trustee, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Charlotte Troup Leighton**
Trustee and Chair, Friends of Moses Hall Committee,
Morningstar Tabernacle Number 88, Incorporated
Vice President of Advocacy, Cabin John Citizens Association

**L. Paige Whitley**
Chair, Research Committee, Morningstar Tabernacle Number 88, Incorporated
Independent Researcher

**Sondra Raspberry**
Descendant

**Shannon S. Steward**
Descendant

**Christopher Waynes**
Descendant

**Austin White II**
Descendant

**Nathan White II**
Descendant

**Pandora White**
Descendant

00006385

cc:    Governor Lawrence J. Hogan – governor.mail@maryland.gov
Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
Treasurer Nancy Kopp – treasurer@treasurer.state.md.us
Jeffrey T. Folden, MDOT SHA – mls-nepa-P3@mdot.maryland.gov
Kendra Parzen, National Trust for Historic Preservation - KParzen@savingplaces.org
Elizabeth S. Merritt, National Trust for Historic Preservation - emerritt@savingplaces.org
Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
Julie Langan, Virginia DHR - julie.langan@dhr.virginia.gov
Steve Archer, MDOT SHA – sarcher@mdot.maryland.gov
Julie Schablitsky, MDOT SHA – jschablitsky@mdot.maryland.gov
Richard Ervin, MDOT SHA – rervin@mdot.marylalnd.gov
David Clarke, USDOT - david.clarke@dot.gov
April Marchese, USDOT – april.marchese@dot.gov
Colleen Vaughn, USDOT – colleen.vaughn@dot.gov
Brenda Mallory, Chair, White House Council on Environmental Quality – brenda_mallory@ceq.eop.gov
Vivian Lee, National Capital Planning Commission – vivian.lee@ncpc.gov
Samantha Beers, US EPA - beers.samantha@epa.gov
Emily Biondi, Federal Highway Administration – emily.biondi@dot.gov
James Gavin, Federal Highway Administration – james.gavin@dot.gov
Jitesh Parikh, Federal Highway Administration – jitesh.parikh@dot.gov
Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
Reid Nelson, ACHP – rnelson@achp.gov
Mandy Ranslow, ACHP - mranslow@achp.gov
Jaime Loichinger, ACHP - jloichinger@achp.gov
Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
John Simkins, FHWA Virginia Division - john.simkins@dot.gov
Rebeccah Ballo, Montgomery County Planning Department – rebecccah.ballo@montgomeryplanning.org
Debra Borden, M-NCPPC – debra.borden@mncppc.org
Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
Eddie Bankhead, First Agape AME Zion Church - esbj@pobox.com
Rev. Edgar Bankhead, First Agape AME Zion Church - ebankjs@verizon.net
Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
Sara Love, Maryland State Delegate – sara.love@house.state.md.us
Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Carol Rubin, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Gerald Cichy, Commissioner, Montgomery County Planning Board -MCP-Chair@mncppc-mc.org
Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
Gabe Albornoz, Montgomery County Councilmember- councilmember.albornoz@montgomerycountymd.gov
Andrew Friedson, Montgomery County Councilmember- councilmember.friedson@montgomerycountymd.gov
Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

00006386

**EXHIBIT A**
**FRIENDS OF MOSES HALL**
**REPORT OF FINDINGS FROM HISTORICAL I-495 RIGHT-OF-WAY RECORDS RESEARCH**

In 2021, Friends of Moses Hall (FMH) received documents in response to our Maryland Public Information Act (PIA) requests to MDOT SHA. These documents, per our PIA request, included correspondence, appraisals, and other records pertaining to specific Right-of-Way (ROW) file numbers and court cases for the development of I-495 from the late 1950s through the early 1960s. Our PIA request was limited to those records involving landowners along the section of I-495 at Seven Locks Road. Friends of Moses Hall and others have been examining these documents and are alarmed by some of our findings.

FMH once again stresses that the original I-495 construction had significant economic, physical and social impacts on this historically black community through land takings and the splitting of this once vibrant Gibson Grove community in Cabin John. Furthermore, systemic racism ingrained in the state's land takings resulted in black landowners being compensated significantly less than adjacent white landowners. Different values were assigned to properties based on the race of the landowner, even though the properties were in the same neighborhood or even abutted each other. Additionally, there are noticeable record-keeping disparities between ROW files for black and white landowners. Many black landowner files delivered to us were heavily and inappropriately redacted, were of poor scanning copy quality compared to those of white landowner files, and contained scant records and/or inaccuracies. For example, the Morningstar Moses Cemetery file (MD SRC ROW files 46729 and 48363) incorrectly identified the site as "Moses Lodge #74" (Liber 344/F 274), a distant Order of Moses property located in Emory Grove. Additionally, the size of the land taking for this property was found to be inconsistent among the records reviewed.

Alarmingly, Law Case file 10749 "State Roads Commission vs. Mickens et al" involving Peter Jones property in MD SRC ROW file 48288 contains a "First and Final Account" of payouts in the case and we note specifically a 1963 payout to The McGuire Funeral Service, Inc. in the amount of $411.00 (**See Attachment 1**). This indicates that the MD SRC knew that burials were on the site, casting doubt on MDOT SHA's current claim of prior ignorance when burials were found within the ROW by ground penetrating radar (GPR) study done in July 2021. The Jones property was directly adjacent to the Morningstar Moses cemetery property (**See Attachment 2**).

One notable example of racial inequity inherent in the original I-495 land takings can be found in the Peter and Dorcas Jones files (Law Case 10749 for MD SRC ROW file 48288). The assessed value for the 2.5-acre parcel was $6,250.00 and the state's valuation for the complete taking of this land was $5,000 ($2,000 per acre). The case went to trial, with the state arguing that even the $5,000 valuation was excessive. We highlight the following appraisal notes from Law Case 10749:

> **MD SRC ROW File 48288, scanned in three file sections for FMH, contains an appraisal from Samuel E. Bogley Realtors appraisal (Robert Lebling appraiser*) dated 2/20/1961. It valued the property at $5,000 and noted "There are no improvements on the subject property. The surrounding neighborhood improvements at Seven Locks Road and along the deeded right of way, previously referred to, are of poor quality and negro inhabited. (See photographs herein)." Note that a photo of Moses Hall lodge is one of the referred photographs. See Peter and Dorcas Jones MD SRC ROW File 48288, file 1 of 3, digital image 49-50 of 91.**

> **Mr. Lebling's appraisal goes on to state: "It should be noted that the assessment on this property is extremely excessive in relation to the two nearest adjoining properties, both of which have access from dedicated and County maintained streets which the subject property lacks." The valuation summary states: "Seven Locks Road in this neighborhood consists of negro colony occupying, generally speaking, inferior and sub-standard homes in the price bracket ranging from an irreducible minimum of $250 to around $10,000. This value depressing influence has a very marked effect on the selectability of land in this negro inhabited pocket." See Peter and Dorcas Jones MD SRC ROW File 48288, file 1 of 3, digital image 51-52 of 91.**

The state's appraiser incorrectly states that the Jones and Morningstar Moses properties did not have road access from Seven Locks, while noting that the adjacent Farrar property had access to Seven Locks. In fact, all three properties had road access to Seven Locks.

*Robert Lebling conducted a number of appraisals for the I-495 land takings, but he was also a white landowner in the area subject to a land taking (MD SRC ROW file 46734) — an apparent conflict of interest.

The Jones defendants in Law Case 10749 retained a professional appraiser named Adolph C. Rohland to provide testimony at trial. The jury in the Jones Case 10749 ultimately awarded the Jones heirs $7,210 plus interest (~$3,000/acre) for a complete taking. Mr. Rohland was paid $225 for his service in the case.

Only one other eminent domain case for a black landowner went to trial in the Gibson Grove community, which was Law Case 10748 State Roads Commission vs. Elizah Harris et al (heirs to Mary Eliza Harris, daughter of Peter Jones) for SRC ROW file 46730. Harris' heirs were awarded a total of $3,500, with interest, at trial for a complete taking of 0.5 acres, including what the state's appraiser described as a "negro occupied" "shack" and 1-story frame "bungalow".

With the exception of these black landowner estate cases that went to trial, the ROW records for the Gibson Grove community revealed that black landowners were paid $2,000 to $2,500 per acre for their properties by the state. In stark contrast, white landowners were paid $3,500 to $7,000 per acre.

Wealthier white landowners in this area, such as the neighboring Lillie [sic] Stone estate (MD SRC ROW files 40826 and 46732), retained legal counsel to secure larger payments of $4,000 per acre plus "damages" in the amount of $21,000. Word of these larger payouts quickly spread within the white community in this area, causing other white landowners, like Frederick Farrar (MD SRC ROW file 46727), a US Navy doctor, to contest state payout offers. Although he initially demanded $55,000, in the end, Farrar was paid $33,000 for the state's taking of approximately 3.5 acres with a stucco cinder-block dwelling on the premises.

The apparent racial inequity evident in the records for the original I-495 construction project, as well as the detrimental social and economic impacts directly related to the project, set the stage for ongoing degradation of the Gibson Grove community in Cabin John, along with its historic and cultural resources. The psychological and economic damage inflicted on these once thriving and resilient communities is evidence of a history of racial inequity in infrastructure projects in Maryland.

# State Rds Comm vs. Andrew Mickens and Jones' heirs



STATE OF MARYLAND

Plaintiff

v.                                          Law No. 10749

ANDREW MICKENS, et al
                    Defendants.

FIRST AND FINAL ACCOUNT

Mr. James Harris
Mrs. Ida Stewart Hall
Mrs. Sarah Thompson
Mr. Charles Harris
The McGuire Funeral Service, Inc.
Mrs. Delores Crawford
Mrs. Susie Walker
Mr. Charles Harris
Miss Elizabeth Harris
Mrs. Helen Branch                   Executor's Fee
Joseph N. Dodson
Estate of Parnie Dodson
Mr. Andrew Mickens
Mrs. Lelia Lane
Mr. Walter Stewart
Miss Julia Stewart
Miss Julia Stewart
Mrs. Sadie Cross
Mr. Leroy Harris
Mr. Herbert Harris
Mrs. Hazel McKay
Mr. Ernest Harris
Mrs. Jessie Toney
Lester Harris
Mrs. Hester Harris
Mr. Worthy Harris
Mrs. Cecelia Lindsay
Mr. Leonard Harris
Mr. Percy Harris
Mrs. Lucille Cook
Newman Insurance Agency                 Bond
Mrs. Mabel G. Matthews        FILED
Mrs. Mildred Alexander
Mrs. Edna G. Lindsay
Mrs. Edna E. Gordon           JUN 15 1964        FILED

                                            JUN 15 1964

                              Total        $6489.19

Deposit in Riggs Bank 7th Branch

Jan 28 -1963                $6,488.49
Paid as above               6,487.19
                               $1.30
Balance

              Submitted by

Subscribed and sworn to before me this 29th day
of January 1964

**EXHIBIT A - ATTACHMENT 2**







**EXHIBIT B**
**FRIENDS OF MOSES HALL**
**COMMENTS REGARDING DETERMINATION OF ELIGIBILITY (DOE) FILED DECEMBER 2021**

FMH takes issue with statements in the Determination of Eligibility (DOE) form submitted in December 2021 by Matt Manning of MDOT SHA. As was the case with the original DOE prepared in May 2020 (to which FMH submitted corrections and edits on August 24, 2021), substantial errors and omissions are contained in this second DOE. While MDOT SHA says it agrees that the site is National Register-Eligible, thus far its two DOE reports have consistently minimized or omitted historical and archaeological facts. Both now and in August 2020 FMH has submitted comments to correct and add information deemed vital to the Morningstar Moses Cemetery and Hall site in Cabin John, Maryland. In a virtual meeting on September 16, 2021, Steve Archer of MDOT SHA stated that there would be future opportunities to incorporate a detailed and more complete history of the site.

The first line of the *Description of Property & Justification* reads "*This update to the 2020 Determination of Eligibility form provides new information regarding the property based in part on archaeological surveys completed in May and September 2021.*"

It is unclear whether this newly completed form is replacing or adding to the DOE submitted in May 2020 to MHT. FMH is deeply concerned that its edits to MDOT SHA's first DOE, submitted in August 2020, have been disregarded by MDOT SHA and MHT. As the DOE becomes a permanent, public document, we believe it should contain accurate and complete information.

FMH identifies the following substantive areas of concern within the DOE form submitted in December 2021.

**Morningstar Moses Hall foundation *extant***

**On page 3, paragraph 2:**   DOE states "Two other Moses tabernacles established in Montgomery County before 1900 were Mackalls in Norbeck and Moses Lodge No. 74 in Emory Grove.[1]  *Like Morningstar, neither organization's Moses Hall remains standing,* and the original construction dates of the buildings are unknown." (emphasis ours; please note corrected citations and references)

Correction: Morningstar Moses Hall is unique in Montgomery County in that its foundation *exists* as described by Horsley (August 2021) in his Geophysical Survey report.[2]  *Nothing* remains of Mackalls Lodge in Norbeck and Moses Lodge No. 74 in Emory Grove, the other two Montgomery County Moses lodges. FMH disagrees with MDOT SHA's minimization of the existence of Morningstar's foundation and the future potential it holds for more information to be realized.

The Moses Hall lodge foundation joins a number of important Morningstar artifacts that contribute to our understanding of and greater appreciation for the interred individuals of the Morningstar Moses Cemetery and their lives within the greater context of Segregation and African American benevolent societies. These unique items include grave and fieldstone markers, 300+ presumed or potential gravesites, a casket handle, a ceremonial Order of Moses sword, the Morningstar Tabernacle No. 88 minutes book dated 1904-1914, an embossing seal used for official Morningstar business, and records of funeral homes.

---

[1] Montgomery County, Maryland, Circuit Court, Charter Record EBP 1/235, 28 May 1895, Mackall's Tabernacle, Maryland State Archives, Annapolis, MD; Montgomery Co., deed JA 34/468, A. Lancaster to J. Ennis et al, 1 Nov 1892;

[2] Horsley, T. J. (August 2021) *Morningstar Tabernacle No. 88 Moses Hall and Cemetery and Gibson Grove A.M.E. Zion Church, Cabin John, Montgomery County, Maryland. Report on Geophysical Surveys, July 6-9, 2021.*

00006391

**Wrong conclusion re: use of Morningstar Moses Cemetery by other Moses tabernacles**

MDOT SHA shows a lack of understanding of the relationship between Morningstar Tabernacle No. 88 and its juvenile division called Lily of the Valley No. 36 (noted as a "Jubinicki" or "Jubinise" in the *Morningstar Minutes Book*) in the following statement made on **page 4, paragraph 1**:

> *"The Morningstar minutes book also confirms the cemetery was used by more than just members of Morningstar Tabernacle No. 88. In July 1910, the Morningstar members voted to allow another Moses society, the "Jubinickl" or "Jubinise" (possibly Jubinacle or a misspelling of Gemini/Geminis) Tabernacle No. 36, free use of the cemetery in exchange for $50 to be used for the repair of the Morningstar Moses Hall (Morningstar Tabernacle No. 88 1910, 143-145). It is possible similar arrangements were made with other Moses societies."*

In fact, members of the juvenile division No. 36 were the sons and daughters of Morningstar members. When they "graduated" they advanced to the adult Morningstar Tabernacle No. 88 division. In making the offer of $50 in June 1910 towards repairs of the hall, the younger set in effect asked that this payment be considered towards their cemetery dues normally paid as adults. The *Minutes Book* notes that the adult lodge accepted the $50 offer and moved and seconded "that the Jubinise Tab should have a place to berry [sic] the ded [sic] a free of charge at No. 88 bering [sic] ground."[3]  Juvenile members of No. 36 mentioned in the *Morningstar Minutes Book* (1904-1914) included Sarah C. Gibson, granddaughter of Gibson Grove community founder Sarah Gibson; Leita Carter, daughter of early landowner Henry Carter and Delia Crawford; William Coates, son of early landowner James Coates ; Jessie Harris, daughter of Charles D. Harris and Mary Eliza Jones and granddaughter of early landowners Peter and Dorcas Jones; and Lydia Burley, daughter of Rev. Lewis and Laura Virginia "Jennie" Burley.  Most former juveniles of No. 36 named in the *Minutes Book* are buried in the cemetery. Their names can be found on the Morningstar Burial List provided in an email to Steve Archer and others at MDOT SHA on March 30, 2021 by L. Paige Whitley and in the updated additions contained in this document.

**In sum, there is NO evidence in the *Morningstar Minutes Book* or other documents related to those buried in the cemetery that members of other local Moses tabernacles were sold plots and were buried in the Morningstar Moses Cemetery**.

**Demand for Removal of Sensitive Data on Plat of Survey**

Continuation Sheet Page 6 of 6 shows sensitive private information regarding adjacent homeowners to the cemetery.  Given that MDOT SHA required extensive redaction of 1960s-era ROW files shared with FMH, much of it containing addresses for lawyers and real estate offices involved in that era's land-taking, inclusion of current private information here is inconsistent with prior redaction of information.  SHA should include an informative plat of survey that redacts sensitive information.

**Updated Morningstar Moses Cemetery Burial Information**

Since Whitley's 2021 research, more burials have been identified through careful examination of the *Morningstar Minutes Book*, death certificates, newspaper death notices and/or information provided by descendants.  **Eighteen (18) additional burials have been discovered and are noted at the end of Exhibit B.** The

---

[3] *Morningstar Minutes Book*, June 20, 1910 pp. 143-144.

total listed on **page 3, paragraph 5** should thus indicate 95 (not 77) and **Table 2** should indicate the following numbers:

**Table 2.** *Confirmed Burials by Decade.*

| Decade | # of Confirmed Burials | Revised # of Confirmed Burials |
|--------|------------------------|--------------------------------|
| 1890 | 2 | 2 |
| 1900 | 4 | 13 |
| 1910 | 4 | 10 |
| 1920 | 10 | 10 |
| 1930 | 17 | 19 |
| 1940 | 18 | 18 |
| 1950 | 7 | 8 |
| 1960 | 8 | 8 |
| 1970 | 7 | 7 |
| **Total:** | **77** | **95** |

Please view *Updated Morningstar Moses Burial List* at end of this document.

<u>Incorrect citations</u>

There are numerous inaccurate citations made in the DOE text and in the references section. Sources were provided in FMH comments re: original DOE dated May 2020 and reaffirmed in attachment to FHM comments dated August 24, 2021. There is inconsistent use of secondary vs. primary sources, many with incorrect names. Corrections and comments are made in BOLD.

**On page 2, paragraph 3:** "It is possible one of these additions is a result of improvements by Charles Harris, who was approved in March 1910 to "make the hall larger" and plaster and wash coat the walls (Morningstar Tabernacle No. 88 1910, digital image 84 of 144). **This is a scanned book with digital page images; these images do not correspond to physical page numbers and should be noted accordingly. Also, convention in various documents until this DOE has been to use short form *Morningstar Minutes Book* as citation source. (The physical page is 140.)**

**On page 2, paragraph 4:** "The recovered portion of the minutes books also notes a "$110.00 draft [unreadable text] repairing the hall" from the January 27, 1904, meeting (Morningstar Tabernacle No. 88 1904, **image 4 of 144)  See above comment. (The physical page was also 4, in this case.)**

**On page 3, paragraph 1:** "In the minutes from a 1907 lodge meeting was a comment from Sarah Gibson that 'she had been a Moses since 1885' ... (Morningstar Tabernacle No. 88 1907, image 56 of 144)  See above comment. (The physical page is 87.)**

On page 3, paragraph 2:   "*Two other Moses tabernacles established in Montgomery County before 1900 were Mackalls in Norbeck and Moses Lodge No. 74 in Emory Grove.* **(MCDB 1895, MCDB 1892, ~~Troup Leighton et al. 2020~~)  DELETE Troup Leighton citation. The 1895 reference is to a charter document, not a land deed. The 1892 reference is to a land deed. The correct sources are as follows:**

> **Montgomery County, Maryland, Circuit Court, Charter Record EBP 1/235, 28 May 1895, Mackall's Tabernacle, Maryland State Archives, Annapolis, MD.**

Montgomery County, Maryland, Circuit Court, land deed JA 34/468, A. Lancaster to J. Ennis et al, 1 Nov 1892.

**Same paragraph**: "However, an article from *The Village News* (Martin, 1985)."  Author was ignored in citation; should be included here and in references.

**On page 4, paragraph 1**:  "In June ~~July~~ 1910, the Morningstar members voted to allow another Moses society, the "Jubinickl" or "Jubinise" (possibly Jubinacle or a misspelling of Gemini/Geminis) Tabernacle No. 36, free use of the cemetery in exchange for $50 to be used for the repair of the Morningstar Moses Hall (Morningstar Tabernacle No. 88 1910, **images 85-86 of 144.)  (Physical pages 143-144)**

**On page 5, References:**

"Appraisal Report of Frederick W. Farrar Property." Part of MDOT SHA Office of Real Estate Item No. 46727. January 11, 1961. **Specific page numbers should be given if this is considered to be a subsection of larger file, e.g. chapter in a book.**

Falchetta, J., Slovinac, P., McCarthy Watts, K. Mikolic, F., and Stevenson, R. *Cultural Resources Technical Report: Documentation and Archaeological Monitoring for the I-495 & I-270 Managed Lanes Study, Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M:35-212), Montgomery County, Maryland.* A. D. Marble. Archaeological Report Number 560. May 2021.

"Frederick W. Farrar **Right of Way** Report." MDOT SHA Office of Real Estate Item No. 46727. 1961. **Is this not the same as first?  And why is it not clearly stated "Right of Way" report?  R.W. is not specific enough nor is it part of the original file name.**

Horsley, T. J. "Morningstar Tabernacle No. 88 Moses Hall and Cemetery and Gibson Grove A.M.E. Zion Church, Cabin John, Montgomery County, Maryland. Report on Geophysical Surveys, July 6-9, 2021." Horsley Archaeological Prospection, LLC. August 2021.

Jones, Alexandra. "Gibson Grove A.M.E. Zion Church Gone But Not Forgotten: The Archaeology of an African American Church." Dissertation, University of California, Berkeley. 2010. Electronic document. Accessed November 8, 2021. https://escholarship.org/uc/item/8z67f3ns.

**Martin, Barbara.** "The People of Cabin John: Bill White: Always Part of Cabin John." *The Village News,* Volume 18, Number 6. February 1985. ~~**Article received from Charlotte Troup Leighton, Rockville, Cabin John, Maryland.**~~ **Why is this latter statement necessary?  Delete.**

**Montgomery County, Maryland, Circuit Court, Charter Record EBP 1/235, 28 May 1895, Mackall's Tabernacle, Maryland State Archives, Annapolis, MD.**

**Montgomery County, Maryland, Circuit Court, Land Deed JA 34/468, A. Lancaster to J. Ennis et al, 1 Nov 1892; Archives of Maryland Online, Electronic document, http://www.mdlandrec.net/, accessed April 2020.**

"Morning Star Lodge No. 88 **Right of Way** Report." MDOT SHA Office of Real Estate Item No. 48363. 1958-1962. **See Farrar comment above re: RW use**

***Morningstar Tabernacle No. 88 of the Ancient United Order of the Sons and Daughters, Brothers and Sisters of Moses: Minutes Book, 1904-1914,*** unpublished manuscript. Electronic document, pp. 1–144, on file at the Montgomery County Historical Society, Rockville, Maryland. Accessed November 4, 2021. https://mchdr.montgomeryhistory.org/xmlui/handle/20.500.12366/297 **Note title corrected as presented on Montgomery History website.  *Convention has used Morningstar Minutes Book as short form in text. Why not in this DOE?***

Nationwide Environmental Title Research, LLC [NETR]. Misc. years. Historic Aerial Mosaic Montgomery County, Maryland. Accessed May 20, 2021. https://www.historicaerials.com/viewer.

Whitley**, L. Paige**. "The History of the Gibson Grove Community and the Gibson Grove AMEZ Church, Cabin John School and Morningstar Tabernacle No. 88 Moses Hall and Cemetery." January 2021. Accessed September 28, 2021. https://mchdr.montgomeryhistory.org/xmlui/handle/20.500.12366/381.


**Additional Morningstar Moses Cemetery Burials and Death Information, updated January 2022**

**The below burials were identified via official Death Certificates, newspaper Death Notices or Obituaries, oral interviews and/or references in the *Morningstar Tabernacle No. 88 of the Ancient United Order of the Sons and Daughters, Brothers and Sisters of Moses: Minutes Book, 1904-1914*, cited simply as *Morningstar Minutes Book.* Presented in chronological order of burial.**
**Compiled by L. Paige Whitley**

1. Noah Mason, January 1904. Death mentioned in *Morningstar Minutes Book* on 27 Jan 1904 & 9 Mar 1904. *Minutes Book*, images 4-5 of 144.
2. Benjamin Harris, died 17 February 1904. *Morningstar Minutes Book* notes "About 4.20 oclock [sic] Bro Benjamin Harris departed his life."  Burial on February 19. The *Minutes Book* notes member processional from place of death on nearby farm to Moses Cemetery. *Morningstar Minutes Book*, image 18 of 144.
3. George Washington, Sr., died June 7, 1904.  *Morningstar Minutes Book* notes "departed this life about 2 o'clock June 7, 1904."  Bro. Silas Richards bought a coffin on the 8th and on June 9 the lodge "Buried Bro. George Washington in proper stile [sic]". *Morningstar Minutes Book*, image 8 of 144.
4. Alfred Stewart, died February 1906? Minutes Book notes "Alferd [sic] Stewart grave."  *Morningstar Minutes Book*, image 31 of 144.
5. **Two (2)** Children of Lloyd Jackson, mentioned March 1907 in the *Morningstar Minutes Book*. "... pass a resolution for Lloyd Jackson to fence his to [sic] children grave in to suit himself." *Morningstar Minutes Book*, images 47-48 of 144. **One possible child**:  "Fannie" Jackson, age sixteen, died 30 November 1899 of severe burns received while working in the Miles Fuller home in Somerset Heights, MD. Daughter of **Lloyd Jackson**, **early landowner, deed EBP 35/105.** "Undertaker will remove the remains to the home of her father."  News Article, *The Evening Times*, 30 Nov 1899, 1.
6. Annie Steward, died October 1908?  *Morningstar Minutes Book* mentions Bro Samuel Steward paid $3 for his Sister Annie Steward grave. *Morningstar Minutes Book*, image 70 of 144.
7. Henrietta Barber, died 14 April 1909. *Morningstar Minutes Book* mentions "death at 6 oclock [sic] this morning."  Burial 16 April. Funeral preached at No. 10 Hall at 11 o'clock. *Morningstar Minutes Book*, image 74 of 144; *MD Death Certificate.*
8. Child of Ella Crawford, Oct 1909?  *Morningstar Minutes Book* notes "It was moved and seckond [sic] to let sister Ellar Crofert [sic] have the hall anytime that she wanted it for to have her childe [sic] funel [sic] preached." *Minutes Book*, image 80 of 144.
9. Boy Stewart, died 28 July 1910 in Tenleytown, DC. *DC Death Certificate* indicates buried same day in Cabin John, Md.

00006395

10. <u>Daisy Crockett</u>, died December 1910. *Morningstar Minutes Book* on Dec. 28 notes "moved and Seckond [sic] to receive $3 from Bro Smiel [Samuel?] Steward for Disey [sic] Crockett's graive [sic]" *Morningstar Minutes Book*, image 93 of 144. *MD Death Certificate* for Mazie [sic] Crockett, died 25 December 1910 at age 15. Daughter of Julia Stewart and John Crockett of Scotland.

11. <u>John Price</u>, died 15 January 1911, buried January 17 at No. 10 Moses Cemetery, *MD Death Certificate*. *Morningstar Minutes Book* notes "Brother Philip Jackson reported that he had $3 for a grave which he sold for the body of John Price." *Minutes Book*, image 94 of 144.

12. <u>Anna Jackson</u>, died August 1911? *Morningstar Minutes Book* notes "receive the sum of $3 from Bro Lloyd Jackson for Miss Anner [sic] Jack [Jackson] grave." *Morningstar Minutes Book*, image 103 of 144.

13. <u>Lucy Dove</u>, died 27? October 1911. *Morningstar Minutes Book* notes "Call a meeting on the 27 Friday night for to perpair [prepare] for sis L Dove buriel [sic] ... Sunday morning perpaird [sic] for Bro Silas Richard buriel [sic] ... fond Sistr Hellon Dove $1 for not attending sister Lucie Dove funiel [sic]." *Morningstar Minutes Book*, images 107 & 111 of 144.

14. <u>Louise Dorsey</u>, died May? 1912. *Morningstar Minutes Book* mentions funeral expenses for Sis Louise Dorsey. *Morningstar Minutes Book*, image 114 of 144.

15. <u>Stanley Butler,</u> died 1 December 1936. Interment December 6. *Evening Star*, 5 December 1936, 12.

16. <u>Mary Catherine (nee Gravatt) Warren</u>, died 12 July 1937 age 37. Buried July 16, 1937 Cabin John #10 Cemetery. Father John Gravatt; mother Ada Stewart. *MD Death Certificate*.

17. <u>Cora Ann Dove</u>, died 20 April 1956. Funeral April 24th at Gibson Grove AME Church, Cabin John, Md. and burial at Moses Lodge Cemetery. *Evening Star*, 23 April 1956, A12.

00006396

# CABIN JOHN CITIZENS ASSOCIATION
## P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*
Susan Shipp – President; Bob Walsh – Treasurer; Meredith Griggs – Secretary

February 3, 2022

*By Email to:*
Mr. Steve Archer
Cultural Resources Team Leader
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD 21202

Re: The Latest Draft Programmatic Agreement and "No Adverse Effect" Finding for Cabin John's Morningstar Tabernacle No. 88 Moses Hall and Cemetery

Dear Mr. Archer:

In summer 2018 the Maryland State Highway Administration held a series of public workshops on the newly proposed $11 billion Beltway expansion plan. The maps they shared at those workshops did not even mark the site of the historic Morningstar Moses Hall & Cemetery property in Cabin John.

However, in the intervening years, you and others at the SHA worked closely with descendants of the cemetery, the Friends of Moses Hall, the Cabin John Citizens Association (CJCA), county officials, historic preservation groups and others to do right by the cemetery. We appreciated that you conducted an archeological survey, cleared invasive bamboo and, most recently, conducted an expensive ground-penetrating radar (GPR) survey of part of the property to look for gravesites.

As you know, the results of the GPR survey were stunning: more than 189 probable burials and 188 possible graves within the surveyed portion of the cemetery itself and, shockingly, evidence of 34 likely gravesites in the existing Beltway right-of-way.

It is unconscionable that the SHA and the Federal Highway Administration (FHWA) are now reverting back to their original stance and attempting to negate the cemetery by reversing the assessment made earlier in the Section 106 process and determining that the proposed Beltway expansion would have "no adverse effect" on the cemetery.

If that were not bad enough, in the course of the Jan. 4 Zoom meeting informing stakeholders of this reversal, you announced that the SHA is not responsible for any detrimental impacts to the cemetery and the Gibson Grove community caused by the original Beltway construction, since it occurred before the passage of the National Environmental Protection Act (NEPA) in 1970 and the National Historic Preservation Act (NHPA) in 1966.

To say that we feel betrayed by the "no adverse effect" determination is an understatement. The CJCA, Friends of Moses Hall, Montgomery Planning, State Delegate Sara Love and others have long raised the issue of environmental justice going back to the construction of the Beltway

in the early 1960s.  In a Nov. letter to the SHA, the National Trust for Historic Preservation summarized the issue forcefully:

> "The most important part of the cumulative impact analysis will be the *past* impacts – the damage and destruction directly and indirectly inflicted on this historic property, as well as on the Gibson Grove AME Zion Church and the wider Black community of Cabin John, by the earlier highway construction."

The Trust argued that the SHA should "ensure that robust mitigation is developed commensurate with the magnitude of these adverse cumulative impacts."

The SHA had appeared to agree.  In a Sept 2021 article in the *Washington Post*, Julie M. Schablitsky, the Maryland Department of Transportation's chief archaeologist is quoted as saying, "We own the faults of the Maryland Roads Commission impacting this community 60 years ago…It's our responsibility now to repair that damage and come in and do the right thing."

The SHA abdicating its responsibility at this crucial juncture is clearly not the right thing. The SHA acknowledges redrawing the cemetery property lines and placing the Limits of Disturbance right next to the property line. Now the SHA is declaring no harm, no foul for the cemetery. These are all a bunch of words that mean nothing with regard to avoiding gravesites because the SHA did not finish the archaeological investigation of the cemetery or the existing Beltway right-of-way.

The SHA based its decision on where to conduct the July 2021 GPR survey, in part, on a 1957 aerial view of the property, deciding not to survey land where a parking lot stood at that time. The SHA also chose not to continue down the Beltway right-of-way until it was certain there were no more burial sites, ignoring stakeholder requests to use GPR to help identify the natural boundaries of the cemetery, which quite clearly do not conform with past or present property boundary lines.

There are many indications, including the sheer number of likely graves in the surveyed section of the cemetery, that this property could have been a burial site even prior to the establishment of the Morningstar 88 fraternal order in the late 1800s, making the SHA decision to not survey the area that served as a parking lot in 1957 totally arbitrary. The only way to know with certainty that the cemetery legitimately deserves a finding of "no adverse effect" is to conduct a full GPR survey of the adjacent state right-of-way, as well as the entire cemetery.

At the Jan. 4 meeting, the SHA even acknowledged that additional grave sites could be found during the construction phase of the project. Clearly, there are doubts about this declaration of "no adverse effect." The SHA's suggestion to take a wait-and-see approach to this possibility is irresponsible, disrespectful and short-sighted.

The SHA made the correct decision when it announced plans to deed Morningstar Moses Hall and Cemetery the Beltway right-of-way land where the 2021 GPR survey found likely gravesites. But now the SHA and the FHWA face a quandary. Additional GPR work could find burials in the non-surveyed section of the existing Beltway right-of-way where it may not be feasible to deed the property to the cemetery. So, what to do?

The answer is not to redraw lines and play a game of semantics to be able to declare a "no adverse effect" finding. The right thing to do is to finish the GPR survey and continue to work with the descendants and other stakeholders. The GPR survey may find additional graves in the existing Beltway right-of-way that need to be reinterred within the cemetery boundaries. But the

00006398

only way to know where to possibly reintern the remains without desecrating another grave is if the GPR survey is completed.

It is clear that way back in 2018 when consultants for the SHA started to assess the land that would be impacted by a Beltway expansion, they thought no one would notice if they failed to acknowledge an old overgrown cemetery property with just a handful of headstones. In some ways, it may be a blessing that they made that flawed assumption.

In the three plus years since the SHA made its miscalculation, the descendants of those buried at the cemetery, including a number who live in Cabin John, the Friends of Moses Hall, the Cabin John Citizens Association, historical preservationists and others have banded together to protect and preserve this important historic African-American property. Documents, photographs and artifacts have been collected, enriching the story of the Morningstar Moses 88 Hall and Cemetery and the Gibson Grove community in Cabin John. A few intrepid researchers working countless hours have uncovered the identities and some history of 95 people buried in the cemetery. We all know there is much more to discover and share with the public.

As the Friends of Moses Hall has written in their "Report of Findings from Historical I-495 Right-of-Way Records Research" *(Attached below)*, the original Beltway construction literally and figuratively tore through the historic Gibson Grove area, dealing a devastating blow to a once vibrant and resilient African-American community. The brief report provides specifics on the racial inequities in payments made for land takings along Seven Locks Rd. There is more history to tell here too.

The State Highway Administration and the Federal Highway Administration not only need to reverse themselves again and change their determination in the Section 106 Programmatic Agreement, they need to do so much more. They need to use the Programmatic Agreement to mitigate the cumulative effects of improperly incorporating a historic black cemetery into a highway right-of-way.

The state and federal Departments of Transportation and the State of Maryland need to find ways to go beyond the framework of this project and provide funding to ensure that this property and the important piece of African-American history that it represents is preserved, restored and developed in a way that respects the hundreds of people buried there. Wouldn't it be a fitting tribute if it also honored them by educating Marylanders about the rich but rarely-told stories of black communities post-Civil War and in the segregation era of the United States?

Thank you for your consideration on these matters and for the opportunity to work with you going forward to ensure that our cultural and historical landmarks in Cabin John are properly preserved.

Sincerely,


Susan Shipp
President of the Cabin John Citizens Association


cc:     Governor Lawrence J. Hogan – governor.mail@maryland.gov
        Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
        Treasurer Dereck E. Davis – treasurer@treasurer.state.md.us

*Page 3 of 8*

00006399

Senators Ben Cardin and Chris Van Hollen
Rep. Jamie Raskin
Jeffrey T. Folden, MDOT SHA – mls-nepa-P3@mdot.maryland.gov
Kendra Parzen, National Trust for Historic Preservation - KParzen@savingplaces.org
Elizabeth S. Merritt, National Trust for Historic Preservation - emerritt@savingplaces.org
Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
Julie Langan, Virginia DHR - julie.langan@dhr.virginia.gov
Julie Schablitsky, MDOT SHA – jschablitsky@mdot.maryland.gov
Richard Ervin, MDOT SHA – rervin@mdot.marylnd.gov
David Clarke, USDOT - david.clarke@dot.gov
April Marchese, USDOT – april.marchese@dot.gov
Colleen Vaughn, USDOT – colleen.vaughn@dot.gov
Brenda Mallory, Chair, White House Council on Environmental Quality – brenda_mallory@ceq.eop.gov
Vivian Lee, National Capital Planning Commission – vivian.lee@ncpc.gov
Samantha Beers, US EPA - beers.samantha@epa.gov
Emily Biondi, Federal Highway Administration – emily.biondi@dot.gov
James Gavin, Federal Highway Administration – james.gavin@dot.gov
Jitesh Parikh, Federal Highway Administration – jitesh.parikh@dot.gov
Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
Reid Nelson, ACHP – rnelson@achp.gov
Mandy Ranslow, ACHP - mranslow@achp.gov
Jaime Loichinger, ACHP - jloichinger@achp.gov
Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
John Simkins, FHWA Virginia Division - john.simkins@dot.gov
Rebeccah Ballo, Montgomery County Planning Department – rebecccah.ballo@montgomeryplanning.org
Debra Borden, M-NCPPC – debra.borden@mncppc.org
Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
Eddie Bankhead, First Agape AME Zion Church - esbj@pobox.com
Rev. Edgar Bankhead, First Agape AME Zion Church - ebankjs@verizon.net
Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
Sara Love, Maryland State Delegate – sara.love@house.state.md.us
Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Carol Rubin, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Gerald Cichy, Commissioner, Montgomery County Planning Board -MCP-Chair@mncppc-mc.org
Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
Gabe Albornoz, Montgomery County Councilmember- councilmember.albornoz@montgomerycountymd.gov
Andrew Friedson, Montgomery County Councilmember-
councilmember.friedson@montgomerycountymd.gov
Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

00006400

**REPORT OF FINDINGS FROM HISTORICAL I-495 RIGHT-OF-WAY RECORDS RESEARCH**
**PREPARED BY FRIENDS OF MOSES HALL**
**FEBRUARY 2022**

In 2021, Friends of Moses Hall (FMH) received documents in response to our Maryland Public Information Act (PIA) requests to MDOT SHA. These documents, per our PIA request, included correspondence, appraisals, and other records pertaining to specific Right-of-Way (ROW) file numbers and court cases for the development of I-495 from the late 1950s through the early 1960s. Our PIA request was limited to those records involving landowners along the section of I-495 at Seven Locks Road. Friends of Moses Hall and others have been examining these documents and are alarmed by some of our findings.

FMH once again stresses that the original I-495 construction had significant economic, physical and social impacts on this historically black community through land takings and the splitting of this once vibrant Gibson Grove community in Cabin John. Furthermore, systemic racism ingrained in the state's land takings resulted in black landowners being compensated significantly less than adjacent white landowners. Different values were assigned to properties based on the race of the landowner, even though the properties were in the same neighborhood or even abutted each other. Additionally, there are noticeable record-keeping disparities between ROW files for black and white landowners. Many black landowner files delivered to us were heavily and inappropriately redacted, were of poor scanning copy quality compared to those of white landowner files, and contained scant records and/or inaccuracies. For example, the Morningstar Moses Cemetery file (MD SRC ROW files 46729 and 48363) incorrectly identified the site as "Moses Lodge #74" (Liber 344/F 274), a distant Order of Moses property located in Emory Grove. Additionally, the size of the land taking for this property was found to be inconsistent among the records reviewed.

Alarmingly, Law Case file 10749 "State Roads Commission vs. Mickens et al" involving Peter Jones property in MD SRC ROW file 48288 contains a "First and Final Account" of payouts in the case and we note specifically a 1963 payout to The McGuire Funeral Service, Inc. in the amount of $411.00 (**See Attachment 1**). This indicates that the MD SRC knew that burials were on the site, casting doubt on MDOT SHA's current claim of prior ignorance when burials were found within the ROW by ground penetrating radar (GPR) study done in July 2021. The Jones property was directly adjacent to the Morningstar Moses cemetery property (**See Attachment 2**).

One notable example of racial inequity inherent in the original I-495 land takings can be found in the Peter and Dorcas Jones files (Law Case 10749 for MD SRC ROW file 48288). The assessed value for the 2.5-acre parcel was $6,250.00 and the state's valuation for the complete taking of this land was $5,000 ($2,000 per acre). The case went to trial, with the state arguing that even the $5,000 valuation was excessive. We highlight the following appraisal notes from Law Case 10749:

> **MD SRC ROW File 48288, scanned in three file sections for FMH, contains an appraisal from Samuel E. Bogley Realtors appraisal (Robert Lebling appraiser\*) dated 2/20/1961. It valued the property at $5,000 and noted "There are no improvements on the subject property. The surrounding neighborhood improvements at Seven Locks Road and along the deeded right of way, previously referred to, are of poor quality and negro inhabited. (See photographs herein)." Note that a photo of Moses Hall lodge is one of the referred photographs. See Peter and Dorcas Jones MD SRC ROW File 48288, file 1 of 3, digital image 49-50 of 91.**

**Mr. Lebling's appraisal goes on to state: "It should be noted that the assessment on this property is extremely excessive in relation to the two nearest adjoining properties, both of which have access from dedicated and County maintained streets which the subject property lacks." The valuation summary states: "Seven Locks Road in this neighborhood consists of negro colony occupying, generally speaking, inferior and sub-standard homes in the price bracket ranging from an irreducible minimum of $250 to around $10,000. This value depressing influence has a very marked effect on the selectability of land in this negro inhabited pocket." See Peter and Dorcas Jones MD SRC ROW File 48288, file 1 of 3, digital image 51-52 of 91.**

The state's appraiser incorrectly states that the Jones and Morningstar Moses properties did not have road access from Seven Locks, while noting that the adjacent Farrar property had access to Seven Locks. In fact, all three properties had road access to Seven Locks.

*Robert Lebling conducted a number of appraisals for the I-495 land takings, but he was also a white landowner in the area subject to a land taking (MD SRC ROW file 46734) — an apparent conflict of interest.

The Jones defendants in Law Case 10749 retained a professional appraiser named Adolph C. Rohland to provide testimony at trial. The jury in the Jones Case 10749 ultimately awarded the Jones heirs $7,210 plus interest (~$3,000/acre) for a complete taking. Mr. Rohland was paid $225 for his service in the case.

Only one other eminent domain case for a black landowner went to trial in the Gibson Grove community, which was Law Case 10748 State Roads Commission vs. Elizah Harris et al (heirs to Mary Eliza Harris, daughter of Peter Jones) for SRC ROW file 46730. Harris' heirs were awarded a total of $3,500, with interest, at trial for a complete taking of 0.5 acres, including what the state's appraiser described as a "negro occupied" "shack" and 1-story frame "bungalow".

With the exception of these black landowner estate cases that went to trial, the ROW records for the Gibson Grove community revealed that black landowners were paid $2,000 to $2,500 per acre for their properties by the state. In stark contrast, white landowners were paid $3,500 to $7,000 per acre.

Wealthier white landowners in this area, such as the neighboring Lillie [sic] Stone estate (MD SRC ROW files 40826 and 46732), retained legal counsel to secure larger payments of $4,000 per acre plus "damages" in the amount of $21,000. Word of these larger payouts quickly spread within the white community in this area, causing other white landowners, like Frederick Farrar (MD SRC ROW file 46727), a US Navy doctor, to contest state payout offers. Although he initially demanded $55,000, in the end, Farrar was paid $33,000 for the state's taking of approximately 3.5 acres with a stucco cinder-block dwelling on the premises.

The apparent racial inequity evident in the records for the original I-495 construction project, as well as the detrimental social and economic impacts directly related to the project, set the stage for ongoing degradation of the Gibson Grove community in Cabin John, along with its historic and cultural resources. The psychological and economic damage inflicted on these once thriving and resilient communities is evidence of a history of racial inequity in infrastructure projects in Maryland.

00006402

**FRIENDS OF MOSES HALL**
**ATTACHMENT 1**

## State Rds Comm vs. Andrew Mickens and Jones' heirs

00006403

**FRIENDS OF MOSES HALL**
**ATTACHMENT 2**





*Page 8 of 8*

00006404



**CARDEROCK SPRINGS**
National Register of Historic Places

February 3, 2022

**Via E-mail:  sarcher@mdot.maryland.gov**

Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

    **Re:**    **I-495 and I-270 Managed Lanes Study, Programmatic Agreement Second Draft,
received January 4, 2022 (Section 106 Materials)**

Dear Mr. Archer,

Thank you for the opportunity to provide you with our comments to the Section 106 Materials.
Consistent with our April 12, 2021 comment letter on the First Draft Programmatic Agreement, we
disagree with SHA's determination that "the project will not adversely affect the Carderock Springs
Historic District." We continue to believe that the loss of mature trees and landscape buffer would
have an adverse effect on our community, since trees and natural landscape are one of the character-
defining features of the Carderock Springs Historic District.

We also request that the design of the sound barriers will be dealt with in a similar manner to other
neighborhoods which border I-490 / I-270. We did note that the Second Draft Programmatic
Agreement provides that, for the Morningstar Cemetery, the SHA is committing to "context-
sensitive design" and "context-sensitive solutions" such as "sympathetic design treatment of new
noise barrier that faces the cemetery, and potentially other design elements of the project that are
compatible and beneficial to the property." Since the views from our community are architecturally
significant for Carderock Springs as part of our bucolic setting, we request the same consideration
regarding the design of the sound barriers and the treatment of the mature trees, including a tree
survey and a plan to replant trees where they will need to be removed or will not survive the sound
barrier installation.

We read that the flyover ramp locations have been moved from their preliminary locations in the
SDEIS; however, we haven't found the exact location of these ramps to assess whether they would
still impact our community or not. Would you please let us know their new location so we can
evaluate their impact on the Carderock Springs Historic District?

The current plan as stated in the Section 106 PA is to meet with the Consulting Parties every 6
months. However, we believe that it is important to get updates more frequently, at least every 3