

months, as a design may be changing very quickly, and our community might not get a chance to comment on some important elements.

As part of the Programmatic Agreement, we request the following:

- to continue to search for creative design solutions that prioritize avoidance of adverse effects per Section 106, which would require no encroachment of the LOD on Carderock Springs Historic District, Carderock Springs South, Gibson Grove Church or Moses Hall and Cemetery, or adverse impacts on their visual and environmental qualities;

- that quarterly meetings be held to inform our community of the status of the proposed project and any changes to the current design and to allow the community to voice concerns and ask questions; and

- that we be a part of the design review process and given the opportunity to provide formal comments in response to the proposed design. Although our community doesn't concur with SHA findings in the PA, we wish to remain involved as a Consulting Party in the process

Thank you for consideration of these comments.

Jack Orrick
President, Carderock Springs Citizens Association

cc:     Governor Lawrence J. Hogan
        Comptroller Peter V.R. Franchot
        Treasurer Nancy Kopp
        County Executive Marc Elrich
        Councilmembers Andrew Friedson, Tom Hucker, Gabe Albornoz, Evan Glass, Will
        Jawando, and Hans Riemer
        Senator Susan Lee and Delegates Ariana Kelly, Marc Korman, and Sara Love
        Elizabeth Hughes
        Julie Langan
        Rebeccah Ballo

4854-5789-1340, v. 3


**National Trust** *for*
**Historic Preservation**
*Save the past. Enrich the future.*

February 3, 2022

*By Email to:* sarcher@mdot.maryland.gov

Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

**Re:    I-495 and I-270 Managed Lanes Study**
 **Section 106 Comments on Draft PA and No Adverse Effect Finding for**
 **Morningstar Tabernacle No. 88 Moses Hall and Cemetery,**
 **Cabin John, MD**

Dear Mr. Archer,

The National Trust for Historic Preservation appreciates the opportunity to comment on the Section 106 findings and Draft Programmatic Agreement (PA) for the I-495 and I-270 Managed Lanes Study.  We strongly support the comments submitted today by the Friends of Moses Hall, the Maryland National Capital Park and Planning Commission, the Cabin John Citizens Association, and the Sierra Club Maryland Chapter. In addition, many of the comments that we submitted on November 30, 2021 in response to the Draft Supplemental Environmental Impact Statement are directly relevant to the Section 106 issues (e.g., cumulative impacts) and remain unresolved.

**We Strongly Disagree with the "No Adverse Effect" Determination for the Morningstar Tabernacle No. 88 Moses Hall and Cemetery.**

We join the chorus of other consulting parties who have objected vehemently to the proposed determination that the project will have no adverse effect on the Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

At the very least, the finding of no adverse effect to the cemetery site is premature, because additional archeological research needs to be conducted. As we commented in our November 30 letter, and as many other parties have commented, additional archaeological investigation needs to include the use of Ground Penetrating Radar (GPR) to search for additional evidence of potential burials.

The other primary basis for the widespread disagreement with the agencies' proposed no adverse effect determination is the cumulative impacts of the project. As you know, the

The Watergate Office Building  2600 Virginia Avenue NW  Suite 1100  Washington, DC 20037
**E** law@savingplaces.org  **P** 202.588.6035  **F** 202.588.6272  **www.savingplaces.org**

00006407

Section 106 regulations explicitly require consideration of cumulative impacts, 36 C.F.R. § 800.5(a)(1), and cumulative impacts are defined as

> the impact on the environment which results from the incremental impact of the action when added to other *past*, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7 (1978) (emphasis added).

Given the overwhelming disagreements with this proposed no adverse effect determination, by a number of different consulting parties, it will be necessary for the Federal Highway Administration (FHWA) to refer this issue to the Advisory Council on Historic Preservation (ACHP) pursuant to 36 C.F.R. § 800.5(c)(2)(i). That referral to the ACHP carries with it the substantial risk that the issue could be elevated to the Administrator of the FHWA. *See id.* §§ 800.5(c)(2)(ii), 800.5(c)(3). Rather than pursuing this dispute resolution process, we urge the FHWA to adopt the much more efficient and responsive approach by modifying its determination to acknowledge the potential adverse effects to this important historic site.

**We Strongly Disagree with the New Argument That Cumulative Impacts Analysis Can Ignore Past Impacts Prior to the Passage of NEPA and the NHPA.**

During the January 4, 2022 consultation meeting, the highway agencies articulated a new argument regarding cumulative impacts analysis that we have never heard before. The argument is that, when looking to the "past" component of cumulative impacts (quoted above), the agency can put on blinders and disregard any past adverse impacts that occurred prior to the passage of NEPA (1970) or the NHPA (1966) – even when the agency that caused those past adverse impacts is the *same agency* as the current project proponent.

In response to this disturbing new argument, we reviewed guidance on cumulative impacts analysis issued by the FHWA and by the Council on Environmental Quality (CEQ), and we could find no reference whatsoever to any support for this rationale. *See, e.g.*, CEQ, *Considering Cumulative Effects Under the National Environmental Policy Act* (https://ceq.doe.gov/publications/cumulative_effects.html#:~:text=Considering%20Cumulative%20Effects%20Under%20the,additional%20information%20and%20background%20odata). In fact, one of the examples featured in the CEQ guidance itself involved a cumulative impact analysis of roads in the vicinity of Bandelier National Monument in New Mexico. The time period used for the cumulative impact analysis was 1935 to 1981. *See id.*, Chapter 3, at pp. 31-32 & Fig. 3-3. In short, there is absolutely no basis in law or precedent for this attempt to exclude the original construction of the highway from the analysis of cumulative impacts on the Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

This new argument also flies in the face of the administration's policy on environmental justice, as reflected in Executive Order 13990, 86 Fed. Reg. 7037 (Jan. 25, 2021) ("Where

the Federal Government has failed to meet that commitment in the past, it must advance environmental justice.")

**We Strongly Disagree with the Agencies' Refusal to Include a Commitment in the PA to Convey to the Cemetery Trustees Portions of the Right-of-Way with Potential Burials.**

The SHA has offered to convey to the trustees of the cemetery a portion of the existing right-of-way where GPR has indicated the potential presence of burials. If carried out, this could be a very meaningful measure to minimize and mitigate adverse effects. However, the highway agencies have refused to include this proposed offer as a stipulation in the Programmatic Agreement. Since the commitments in the PA will be binding and enforceable, this unwillingness to include the proposed conveyance in the PA suggests that the agencies want to keep open the option to renege on this offer. We urge that it be added as a commitment.

**Additional Consultation is Needed to Avoid, Minimize, and Mitigate Potential Adverse Effects to Historic Resources.**

The goal of the Section 106 consultation process is to develop and evaluate alternatives and modifications to the project that could avoid, minimize, and mitigate the adverse effects. 36 C.F.R. §§ 800.1(a), 800.6(a). There are several historic properties that the highway agencies have acknowledged are likely to be adversely affected by the project. These include the Gibson Grove A.M.E. Zion Church, the Washington Biologists' Field Club on Plummers Island, the C & O Canal National Historical Park, and the George Washington Memorial Parkway/Clara Barton Memorial Parkway. Yet the draft PA offers only token mitigation for these adverse effects, and does not include a process to develop alternatives and modifications to the project that could minimize those effects. The Section 106 consultation process should be used as the mechanism for developing much more robust mitigation, in addition to modifications that could minimize or avoid the effects entirely.

Thank you for considering the comments of the National Trust, and we appreciate the ability to continue our participation in the Section 106 consultation process, as many of these key issues are being further evaluated and resolved.

Sincerely,

Elizabeth S. Merritt
Deputy General Counsel

cc:

Brenda Mallory, Chair, White House Council on Environmental Quality –
        brenda_mallory@ceq.eop.gov
David Clarke, Federal Preservation Officer, FHWA - david.clarke@dot.gov
April Marchese, USDOT – april.marchese@dot.gov
Colleen Vaughn, Federal Preservation Officer, USDOT – colleen.vaughn@dot.gov
Emily Biondi, FHWA – emily.biondi@dot.gov
Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
Jaime Loichinger, ACHP - jloichinger@achp.gov
Mandy Ranslow, ACHP - mranslow@achp.gov
Vivian Lee, NCPC – vivian.lee@ncpc.gov
Samantha Beers, US EPA - beers.samantha@epa.gov
Julie Schablitsky, MDOT SHA – jschablitsky@mdot.maryland.gov
Richard Ervin, MDOT SHA – rervin@mdot.maryalnd.gov
Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
Rebeccah Ballo, Montgomery County Planning Dep't,
        rebecccah.ballo@montgomeryplanning.org
Brian Crane, Montgomery County Planning Dep't - brian.crane@montgomeryplanning.org
Debra Borden, M-NCPPC – debra.borden@mncppc.org
Charlotte Troupe Leighton, Friends of Moses Hall – troupleighton@gmail.com
Susan Shipp, Cabin John Citizens Ass'n – jsjshipp3@verizon.net
Paula Posas, Maryland Sierra Club – paula.posas@mdsierra.org
Kendra Parzen and Chris Cody, National Trust for Historic Preservation

**Date: 3 February 2022.**

Mr. Steven Archer

MDOT-SHA Cultural Resources Team Leader


Dear Mt. Archer,

Please see consider the included Washington Biologists' Field Club (WBFC) comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2. And include this report in the Administrative Record.


**Table of contents**

General WBFC comments on the importance of Plummers Island and the PA letter and Draft Agreement

APPENDIX A: Agreement with National Park Service, 1959

APPENDIX B: Avoidance, Minimization and Partial Mitigations

APPENDIX C: Maps of Plummers Island and Alternative 9 ALB emplacement

APPENDIX D: Administrative Record letter sent to US Army Corps of Engineers

APPENDIX E: WBFC replies to MLS-106 Comments Table 1 Responses

APPENDIX F: Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland

00006411

## General WBFC comments on PA letter and Draft Agreement.

**The Washington Biologists' Field Club (WBFC)** *declines to concur with this Programmatic Agreement*.*
(*with the one exception of the nomination of WBFC on Plummers Island to the National Register of Historic Places).

*The Washington Biologists' Field Club (WBFC) guiding mission is the study of long-term trends in biodiversity and community ecology on Plummers Island.*  We began this research in 1901 and continue it to this day.  MDOT's plan for expanding the American Legion Bridge onto Plummers Island and channel waters **seriously compromises our research goals of studying the Island as a whole system**.

Long-term studies such as those of WBFC are very important in this era of rapid change in climate, introduction of increasing numbers of invasive species and diseases, etc.  We can only conserve our natural resources if we understand "normal" ecosystem responses, and these require long-term monitoring of target sites.  The scientific community has responded to this need by creating new sites for long-term research, but it takes decades to build up a record long enough to understand many of the processes, and there are few sites that have been established long enough to give meaningful information.  Plummer's Island is one such site, and its preservation deserves high priority.

It must be emphasized that environmental damage cannot be "fixed" by any form of mitigation.  Plummer's Island is a research site conducting a multigenerational study of long-term ecological processes.  Destruction of the habitat, or serious damage to it, stops the ecological processes whose progress WBFC has been studying for over a century, and ends the long-term study.  Replanting will not continue these processes, it just makes a new beginning, returning the Island to where the WBFC study began in 1901.

Plummers Island is unjustly being treated as a sacrifice area.  The biodiversity on the Island is richly documented by 120 years of inventory by WBFC research.  This is a unique natural research area within close proximity to a heavily populated urban area. There are many rare species known here, including plants from within the LOD (**Appendix F**; Smithsonian National Museum of Natural History collections; and T & E survey done for NPS in 2020) (See also WBFC's DEIS, SDEIS and Section 106 comments of 2021 -- available at https://WBFC.science). Plants can't move out of the way, and natural habitat is being lost throughout the region. The rocky headland of the Island preserves a bit of the Potomac Gorge Riverside Outcrop Barren plant community (globally and state rare: G2, S1) -- possibly the eastern most extent of this vegetation unit in the Gorge (USNVC: CEGL006491) (Appendix C, map B). Not only is this area partly under the expanded ALB, *but the extended shadow will shade it out.*  This spit of land should be included as part of the Island, but Section 106 has incorrectly ruled it out of the historic property.  Ruling this piece of land out allows MDOT to say they are taking less of the Island than they actually are (see WBFC's virtual and written SDEIS comments, 2021). Additional rare communities within the APE and bordering on the LOD include; the Potomac River Bedrock Terrace Hardpan Forest (GEGL006209; G1G2/S1); Floodplain Terrace Forest (with wetland bedrock pools; and the Central Appalachian / Piedmont Basic Mesic Forest (USNVC: CEGL0084; G4G5/S4) with many sensitive species that are restricted to this habitat on the Island, several that are rare there.

00006412

The extent of the shadow cast by the nearly 100-yard-wide ALB will further shade out rare and sensitive plant and animal species and starve out native vegetation for some uncertain distance beyond the ALB but within the APE (this area is still unquantified by MDOT and its consultants - testament to the shoddy work and treatment given the Island by proponents of the project). Documenting the impacts of this shadow within the APE on plants and animals needs to be done for future transportation projects, but also for understanding perturbations to the long-term trends that are WBFC's guiding mission to document on the Island. WBFC calls for funding and conducting this research in Appendix B as partial mitigation for Alternative 9 (**Appendix B**).

The enlarged canopy of the nearly 100-yard-wide Alternative 9 ALB will predictably attract more homeless people.  The proximity of a homeless encampment presents significant additional problems for protecting Plummers Island and its historic cabin from vandalism.  There is abundant evidence of camping under the current ALB; leveled spots, campfire remains, trash, tree-cutting, and graffiti. Since the ALB was first constructed, the cabin, which up to then was in original condition, has deteriorated substantially due to vandalism, and sometimes has squatters living in it for months. Cutting down of trees for firewood has further disturbed the cabin grounds.  Section 106 documentation has utterly failed to take all of this into consideration.

Importantly, taking any part of Plummers Island violates the formal legally binding 1959 Agreement between WBFC and the National Park Service (**Appendix A**). Under this agreement WBFC gave the Island to the Federal Government in exchange for our continued maintenance and research of the Island as a wild natural area, so long as WBFC existed and complied with certain obligations.  WBFC has honored its part of the agreement for the ensuing 72 years.  WBFC has studied the Island for 121 years, making it a rare and precious part of the cultural and scientific natural heritage of the National Park system. The Section 106 process determined the *WBFC and Plummers Island* to be eligible for the Maryland Historical Trust and National Register of Historical Places, and this requires protecting the entire Island as a whole property.

With these points in mind, WBFC does not accept the MDOT's Alternative 9 plan. We consider it contrary to the above agreement, and the intent of NHPA laws protecting eligible Historical properties as whole units. We support the No Build Option (as stated in our DEIS, SDEIS, and Section 106 comments).  WBFC has fought to protect Plummers Island before, and here we are again. In addition to 7 years of legal battles to settle the patent dispute and purchase the Island in 1908, Club members held a 6-year vigil up to 1959 over the condemnation of the Island for the GW Parkway (resulting in the Appendix A agreement), and then spent 6 months more of wrangling in 1960 before the construction contract was let.  (see Washington Star articles in **Appendix A**)

Moreover, MDOT has failed to adequately and objectively justify the Least Environmentally Damaging Practicable Alternative (LEDPA) in the selection of Alternative 9.

WBFC commented on the DEIS, and was recognized as a consulting party in early 2021. The SDEIS is unacceptable, full of problems, and must be rewritten (WBFC separate, and co-signed Sierra Club comments submitted November 30, 2021). WBFC Section 106 comments were submitted in October 2021, and again with SDEIS comments.  Comments on the final Section 106 programmatic agreement are here by submitted by February 3, 2022.

00006413

One avoidance or minimization would be to redeck the ALB and not expand it. Alternative 5, adding only two lanes to the ALB, would be much less damaging to Plummers Island and adjacent waterways. Double decker or suspension bridges could significantly reduce damages to Plummers Island and adjacent waterways. However, the highway expansion plans do nothing to reduce the $CO_2$ emissions driving global Climate Change.   As MDOT Secretary Greg Slater stated in 2021, the ALB is structurally sound and only needed redecking within 10-20 years. WBFC supports this No Build Option.

If Alternative 9 goes forward as MDOT & P3 companies propose, WBFC proposes the following avoidance, minimization and ***partial mitigations*** be adopted and coordinated through NPS, in consultation with WBFC in-so-far as they affect Plummers Island and its waterways:

With these points in mind, WBFC attaches **Appendix B**: **Avoidance, Minimization and Partial Mitigations under Sections 106, NHPA, NEPA, and 4(f), 10, and 404:** There we outline specific avoidances, minimizations, and partial-mitigations in a framework of proposed research to evaluate the impacts of the ALB expansion on the biota of Plummers Island.  (see also https://wbfc.science/plummers-island-threatened/)

**Appendix C** includes maps of Plummers Island: Map A shows the ALB footprint and position of the LOD as best as can be determined from the MDOT images, in which the LOD is positioned on images that obscure the boundaries and features of Plummers Island (pink lines outline current ALB features, blue lines are Alternative 9 ALB outlines). Map B shows the LOD cutting through four vegetation zones, two research plots, and the rock buttresses along the channel, and the original head of the channel. Map B shows the positions of long-term vegetation plots. Map C is an image from MD iMAP, a Lidar map of ground level prominences, including the rock buttresses along the channel, and the current head of the channel. Map D is from a 1950s topographic survey with 1.5 ft contours, showing the rock buttresses, and the original head of the channel. Image E gives the source of Map D.

**Appendix D.** U.S. Army Corps of Engineers, Baltimore District MDOT's proposed Alternative 9 - Phase 1 South (Administrative Record letter sent January 19, 2022).  This letter requests careful attention to potential threats to Plummers Island, its channel and riparian wetlands, from hydrological impacts of the ALB Alternative 9 footprint and construction activities.  Changes to the flooding regime affect the land and thus affect the historical biological research and cultural aspects of the terrestrial property addressed in Section 106.

**Appendix E**. WBFC replies to responses on Comments on MLS 106 PA Comments Table 1 (MLS-106_Att-8_Jan-2022_PA_Draft_1_Comment Table.pdf). These are presented in table form with WBFC replies following each MLS-106 response.

**Appendix F**. Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland, documents rare plants and plant communities on the Island.

**Some WBFC specific comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2.***

*For more specific comments on the MLS Comments Table, see **Appendix E**.

00006414

"WHEREAS, the U.S. Department of Transportation, Federal Highway Administration (FHWA) plans to approve the I-495 and I-270 Managed Lanes Study (MLS), a proposed Public-Private Partnership (P3) administered by the Maryland Department of Transportation State Highway Administration (MDOT SHA); and"

**WBFC comment 1:**  *This assumes FHWA will approve the MLS. We don't think they should.*

"WHEREAS, the MLS Preferred Alternative, "Alternative 9 Phase I South" (Project) consists of construction of Priced Managed Lanes along Interstates 495 and 270, beginning in Fairfax County, Virginia, and extending north to approximately Interstate 370, and east along the separated portions of I-495 ("spurs") to approximately Maryland Route 187, as described in detail via documentation linked in Attachment 4; and"

**WBFC comment 2**:  *The P3 toll lane revenue objectives are the driving force in selection of Alternative 9. There is reasonable expectation that a simple tolling for all vehicles crossing the bridge would generate revenues to the States and pay for the project directly with State and Federal funds. This would avoid P3 partners controlling (to maximize profits) the beltway by blocking mass-transportation incorporation into the beltway.  Projections of future traffic were made without consideration of shifts to telecommuting, and potential reductions in traffic from adding effective mass-transit options. Moreover, the beltway expansion comes at the expense of accepting increased $CO_2$ emissions into the future faced by climate change driven by $CO_2$ emissions. The LEDPA for Alternative 9 is not justifiable nor even objectively evaluated for the alternatives proposed in the DEIS.  As for WBFC on Plummers Island, the PA simply accepts the damages to the Island, and states that damages are minimized.  WBFC believes that Plummers Island is being treated as a sacrifice area. This PA draft goes documents at great lengths avoiding and minimizing impacts to cemeteries and the ACHP site, but mentions Plummers Island only 4 times (briefly) in the cover document.  By placement of most of the ALB expansion over Plummers Island, rather than on the upstream side of the bridge, the Section 106 PA shows a callous disregard for the historical nature of our 120 years of scientific studies, and the impacts to the continuity of the long-term research. Significantly, the PA does not address the Legal Agreement between the NPS and WBFC set forth in 1959, which protects the Island as a Natural Wild Area (**Appendix A**).*

"WHEREAS, the MDOT SHA, with the approval of FHWA, intends to deliver the Project as a P3 using the services of a private sector developer or multiple developers who will advance the Project and be responsible for design, construction, operation and maintenance, subject to approvals by MDOT SHA and/or FHWA; and"

"WHEREAS, FHWA has determined that the Project will have an adverse effect on National Register of Historic Places (NRHP)-listed or eligible properties ("historic properties") including the George Washington Memorial Parkway (Clara Barton Parkway), the Chesapeake and Ohio Canal National Historical Park, the Washington Biologists' Field Club on Plummers Island, Gibson Grove African Methodist Episcopal Zion Church, archaeological sites 44FX3922 (Dead Run Ridges Archaeological District), 44FX0374, 44FX0379, 44FX0389, 18MO749 and 18MO751; *that additional effects may not be completely known*; and that FHWA intends to use this PA to comply with 36 C.F.R. Part 800, 54 U.S.C. § 100902, 36 C.F.R. Part 14 and to govern the implementation of the Project and the resolution of adverse effects; and"

00006415

"V. . Property-Specific Commitments
F. Washington Biologists' Field Club on Plummers Island
1. MDOT SHA will prepare a NRHP Nomination for the Washington
Biologists' Field Club on Plummers Island. MDOT SHA will provide a copy of
the nomination to NPS staff for review prior to submittal and address any
comments prior to formal submission of the nomination. Should the nomination
be unsuccessful, MDOT SHA will not be required to resubmit the nomination or
otherwise complete additional studies or research after addressing comments by
NPS staff."

**WBFC comment 3:** *We agree that WBFC on Plummers Island should be included in NRHP, and that Plummers Island should be protected as a whole. MDOT is requested to fully fund and fulfill the nomination process for NPS.* ***NPS*** *and* ***WBFC should be involved and consulted in the preparation of the nomination of Plummers Island.***

Again, The Washington Biologists' Field Club (WBFC) **declines to concur with this Programmatic Agreement**.*

(*with the one exception of the nomination of WBFC on Plummers Island to the NRHP).


Respectfully submitted, 3 February 2022,


Robert J. Soreng PhD., WBFC President

Carla Dove PhD, WBFC Vice President

Lowell W. Adams, WBFC Secretary


cc: Matt Manning (Consultant) <MManning.consultant@mdot.maryland.gov>, Alan T Whittemore <atwhittemore@gmail.com>, Lowell Adams <lwadams4@gmail.com>, Carla <DOVEC@si.edu>, Landsman, Andrew P <Andrew_Landsman@nps.gov>, Pamela Goddard <pgoddard@npca.org>, Kyle Hart <khart@npca.org>, Stidham, Tammy <Tammy_Stidham@nps.gov>; Elizabeth Hughes, Maryland Historical Trust <elizabeth.hughes@maryland.gov>.

Supporting information about WBFC
https://wbfc.science/
https://wbfc.science/about/
https://wbfc.science/plummers-island-threatened/
https://wbfc.science/research/


**Appendices A through F follow**.

00006416

## APPENDIX A:  Agreement with National Park Service, 1959

1) AGREEMENT WITH NATIONAL PARK SERVICE

AGREEMENT AND STIPULATIONS BETWEEN THE WASHINGTON BIOLOGISTS' FIELD CLUB, INC. AND THE UNITED STATES OF AMERICA

This agreement made this 5th day of March, 1959, by and between the Washington Biologists' Field Club, Inc. and the United States of America.

WITNESSETH:

WHEREAS, The United States Government has by condemnation proceedings, in the United States District Court for the District of Maryland in Civil No. 10676 and by order of Court made the 24th day of June, taken possession of the defendant's Washington Biologists' Field Club, property designated in said proceedings as parcels "A" and "B" in tract no. 7, and

WHEREAS, This property was acquired by the Washington Biologists' Field Club, Inc. and has been used by the said Club as a natural wild area for scientific research for over 50 years and a great many scientific papers have been written in reference to biological and natural history discoveries made on said land and, more particularly, on that part of said land known as parcel "B" and more familiarly known as Plummers Island containing some 12.238 acres more or less, and

WHEREAS, The said Plummers Island has become among systematic biologists one of the world's most famous collecting spots and type localities, and

WHEREAS, The discoveries have indicated the probability of new knowledge in the field of biology and natural history, and

WHEREAS, The fame of this island is world-wide and many scientific organizations are interested in its preservation as a source of discovery, and

WHEREAS, The Washington Biologists' Field Club, Inc. and the United States Government desire to preserve this natural wild area as a sanctuary and scientific research preserve.

Therefore, The United States Government's petitioner in the United States District Court for the District of Maryland in Civil No. 10676 and the Washington Biologists' Field Club, Inc., defendant, and the owner of said parcel of land known as parcel "B" containing some 12.238 acres more or less which said land is an island in the Potomac River and is more familiarly known as Plummers Island, do hereby stipulate and agree that the said parcel "B" be withdrawn from these proceedings and that the said Washington Biologists' Field Club, Inc. does hereby agree to deed the said island to the United States Government without monetary consideration reserving in said deed to the Washington Biologists' Field Club, Inc., the right to continue to maintain the island as a natural wild area and use it for scientific research and for meetings of the Club and to pursue its studies in the field of biology and natural history on the said island so long as the Washington Biologists' Field Club, Inc. exists and desires to continue to use the island for scientific research and so long as the further provisions and stipulations contained herein are complied with which are as follows:

00006417

1.      The Washington Biologists' Field Club, Inc. agrees to supply the National Park Service with copies of scientific papers resulting from research conducted on said island when available.

2.      The Washington Biologists' Field Club, Inc. will supply the National Park Service with an annual report and will include the names and addresses of the officers, list of the members, and a summarization of the scientific investigations carried on.

3.      The Washington Biologists' Field Club, Inc. will indemnify the United States against any loss or damage or injury due to the Club's negligence or any of its members or guests in the use and occupancy permitted under this agreement.

4.      The Washington Biologists' Field Club, Inc. shall maintain its building and facilities on the island or replace the same in orderly and safe condition without expense to the United States.

5.      No additional buildings, structures, or other physical facilities shall be constructed on the island by the Washington Biologists' Field Club, Inc. without first obtaining written approval of the National Park Service.

6.      It is further stipulated and agreed between the United States Government and the Washington Biologists' Field Club, Inc. that the membership of the Club as constituted on I August 1958,

Honorary Members:

| | | |
|---|---|---|
| Bartsch, Paul | Fuller, Henry S | Morrison, J. P. E. |
| Mann, William M. | Gabrielson, Ira N. | Nelson, A. L. |
| Ricker, P. L. | Gardner, Marshall C. | Oehser, Paul H. |
| Active Members: | Graham, Edward H. | Parker, Kenneth W. |
| Aldrich, John W. | Griffith, Richard E. | Presnall, Clifford C. |
| Appel, William D. | Handley, C. O., Jr. | Reed, Theodore H. |
| Benedict, J. E. | Hotchkiss, Neil | Russell, Paul G. |
| Blake, S. F. | Jackson, Hartley H. T. | Setzer, Henry W. |
| Brown, Edgar | Johnson , David H. | |
| Clarke, J. F. G. | Kelson, Keith R. | Smith, Albert C. |
| Compton, Lawrence V. | Killip. E. P. | Smith, Lyman B. |
| Davis, Malcolm | Krombein, Karl V. | Sohns, Ernest R. |
| Duvall, Allen J. | Leonard, Emery C. | Stevenson, James O. |
| Erickson, Ray C. | Lincoln, Frederick C. | Stewart, Robert E. |
| Erlanson, C. O. | Linduska, Joseph P. | Stickel, William H |
| Fredine, C. Gordon | Meehean, 0. Lloyd | Swift, Ernest F. |

00006418

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

| Uhler, F. M.      Vogt, George B. | Archino, Samuel | Fowler, James A. |
|---|---|---|
| | Bartlett, H. H. | Hamlet, John |
| Walker, Ernest P. | Bryant, Harold C. | Holt, Ernest 0. |
| Wetmore, Alexander | Cahalane, Victor H. | McAtee, W. L. |
| Zahniser, HowardNonresident Members: | Cottam, Clarence | Myers, G. S. |
| | Couch, Leo K. | Peterson, Roger T. |
| Allan, Philip F. | Dargan, Lucas M. | Wallis, William W. |
| Allen, Durward L. | Eklund, Carl R. | Wherry, Edgar T. |

shall have the privilege of having their ashes placed on said island and a small bronze plaque in their memory placed on the stones of said island and that this privilege shall apply only to the membership as named above as it shall exist as of 1 August 1958.

7.      It is further stipulated and agreed that the United States Government will allow the membership of the Washington Biologists' Field Club, Inc. to have access by foot over the land owned by the United States Government to the island at all times and whenever desired.

8.      The Washington Biologists' Field Club, Inc. will be permitted to maintain and operate passenger-carrying ferry boats from and to the island which is to be for the exclusive use of the Club and its members and guests for access to the island.

9.      The Washington Biologists' Field Club, Inc. will be permitted to erect and maintain a fence and gate at a suitable location to exclude the general public from the island, but the National Park Service is to be furnished keys to the lock or the National Park Service may provide its own lock if keys are delivered to the Washington Biologists' Field Club, Inc., and will also be permitted to clear the channel between the island and the Maryland shore to maintain a free flow of water therein.

10.      It is further stipulated and agreed that authorized agents and personnel of the National Park Service shall have access to the island and the right to take scientists to the island, but, in that event, the Washington Biologists' Field Club, Inc. shall not be responsible for any injuries or damages resulting to said persons due to conditions upon said island provided said injuries or damages are not caused by negligence of the Club or by a failure on the part of said Washington Biologists' Field Club, Inc. to comply with the requirements of this stipulation.

11.      It is further stipulated and agreed that all rights accruing to the Washington Biologists' Field Club, Inc, or to any member thereof by reason of the provisions of this stipulation or any amendment thereto may be terminated if said Washington Biologists' Field Club, Inc. no longer exists or in the event after due written notice that the provisions of this stipulation and/or deed which will be executed following signing of this stipulation have been violated and continue to be violated by said Washington Biologists' Field Club, Inc. or its members, guests, employees, or servants for a period of time in excess of six months after receipt of said notice, and further in the event the island shall be no longer used for scientific research by the Washington Biologists' Field Club, Inc. for more than two years then this

00006419

stipulation and any like provisions of the deed to be executed conveying the property to the United States shall terminate.

12.      It is further stipulated and agreed that the United States may construct or permit the construction of needed nonrecreational public improvements upon the island or a portion thereof, which said improvements shall not be inconsistent with the uses to which the island has been dedicated by the Washington Biologists' Field Club, Inc.

13.      It is further stipulated and agreed that this stipulation shall become effective after the filing and acceptance by the United States of a deed of conveyance containing the provisions outlined herein.

The United States of America

By: WILLIAM E. FINLEY

Director of the National

Capital Planning Commission

Condemning Authority


The    Washington Biologists' Field Club, Inc.

By: LLOYD W. SWIFT

President

1, Albert C. Smith, certify that I am the Secretary of the corporation named as party herein; that Lloyd W. Swift, who signed this contract on behalf of the party, was then President of said corporation; that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

ALBERT C. SMITH, Secretary

**Two Washingon Star articles from 1960 follow:**

Page **10** of **42**

00006420

# Beltway Span Contract Let

## Work Starts Soon At Cabin John

The Maryland State Roads Commission has formally awarded a $2.8 million contract for construction of the long-awaited Cabin John Bridge, which will carry the Capitol beltway across the Potomac River.

Work on the bridge will get under way soon, according to John B. Funk, director-chairman of the State commission. The total cost of the bridge is estimated at nearly $5 million.

The contract was awarded to two Indiana contractors who submitted a joint bid. The firms are Ruckman and Hansen, Inc., of Fort Wayne, and Roy Ryan Sons Co., Inc., of Evansville.

The bridge, to cross the river near Glen Echo in Montgomery County, will connect the Maryland stretch of the Washington circumferential freeway with the Virginia counterpart. Maryland has agreed to pay 79 per cent of the cost and Virginia 21 per cent, using Federal interstate and matching State funds.

The bridge, of steel construction, is expected to be completed by the fall of 1962. It will actually be two spans, each carrying traffic in one direction.

Last October an agreement was reached between the Maryland Roads Commission and the National Park Service that broke a six-month stalemate over design of the span. Maryland agreed to move its approach roads to the bridge 100 feet upstream, to avoid encroachment of a bird sanctuary at Plummer's Island.

The new bridge was given high priority because of the need to service the new Central Intelligence Agency headquarters at Langley, Va., now under construction. As a link in the circumferential highway it will help in siphoning traffic off congested arterial roads.

2) Washington Star 23 July 1960

00006421

7-5-60 STAR

# New Span to Unmask Island Jungle

**By ANNE H. CHRISTMAS**
*Star Staff Writer*

Fifty scientists are managing to hold on to an island sanctuary in the Potomac River despite encroachment on all sides.

The scientists have kept a six-year vigil to guard the privacy and natural beauty of the retreat.

The wooded isle is a 12-acre plot not far from the Maryland shore of Montgomery County, only nine miles from the White House. It has been known to generations of biologists as Plummers Island.

The scientific paradise—soon to be flanked by impressive highways — has been operated since 1901 by the Washington Biologists Field Club. Although the land was given to the Federal Government several years ago and is under the direction of the Interior Department, one of the terms of its transfer was that its use should be limited to club members and their guests.

### Trespassers Warned

Today the membership is "unhappy but resigned" over the imminent construction of the Cabin John Bridge, which will cross but not touch one of the tips of Plummers Island. The scientists were so dedicated to the cause of maintaining their bailiwick in its primitive state, for further biological studies, that they were able to convince

the Maryland State Roads Commission to move the site for the bridge upstream 200 yards.

Few outsiders know how to arrive at the sanctuary from the main road and this is precisely what the scientists had in mind when they built there long ago. The pathway is unmarked and Park police are quick to warn away trespassers. Even the small rowboat that ferries passengers to the island is tightly locked and only a few keys exist outside the club membership.

If he is made of stern stuff, the invited guest can hike across club-owned woodland on the mainland, then take the pulley-operated boat across a short stretch of the river to the island itself. The approaches to the boat landing are ankle deep in mud even in dry weather.

Once landed on the island, the visitor instantly is impressed with its untouched quality.

"The club intends that nature shall take her course unmolested," the by-laws declare firmly.

### Jungle to Penetrate

And unmolested it grows—a small jungle of undergrowth, a thick forest, great rocks and only a few narrow paths. Its only building is a 59-year-old cabin built by the earliest members on a rocky crest about 60 feet above the water.

With typical restraint, an early history says, "It will not be necessary to describe in detail the erection of the cabin, the difficulties experienced in conveying the material to the bank of the river, and the seemingly interminable labor of transporting it from there by wire trolley to the building site—it was completed November 28, 1901."

The club at that time was leasing Plummers for $30 a year and eager to buy the land, but its title was cloudy because ownership never had been established since the original grant of territory adjacent to the island was made in 1684. Seven years of legal battles finally resulted in issuance of a patent on the island by the Maryland State Land Commissioner to the club.

### One Large Room

The club house itself is virtually unchanged from its appearance when the house-warming was held in 1901. It is covered on the outside with

unpainted shingles laid upon solid lumber sheathing and lined with heavy building paper. It has only one large room, 14 by 28 feet, with a small kitchen in a lean-to at the rear, a broad porch facing the Virginia side, and a tremendous fireplace built to accommodate 4-foot logs.

In subsequent years the club bought 38 acres on the mainland, to insure its privacy and protect the right of way. It still is owned by the club.

One of the scientific objectives has been a thorough biological survey of the island. Members have logged in these species — 26 mammals, 186 birds, 22 reptiles, 20 amphibians, 33 fishes, 776 flowering plants, 70 mosses, 80 lichens and 118 fungi.

Today the quiet of Plummers Island is disturbed only by the distant roar of bulldozers on the Virginia shore where the George Washington parkway is being built.

Theodore V
Ex-AF Colo

3) Washington Star July 5, 1960

00006422

## APPENDIX B.  Avoidance, Minimization and Partial Mitigations

*For the Administrative Record*

Washington Biologists' Field Club's MDOT Avoidance, Minimization and Partial Mitigations Proposal

Date: February 3, 2022

Mr. Jeff Folden, I-495 & I-270
P3 Program Deputy Director I-495 & I-270 P3 Office
707 North Calvert Street,
Mail Stop P-60 Baltimore, Maryland, 21202
 MLS-NEPA-P3@mdot.maryland.gov

Mr. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza,
Suite 1520 Baltimore, Maryland 21201
jitesh.parikh@dot.gov

Elizabeth Hughes
Director/State Historic Preservation Officer
Maryland Historical Trust
100 Community Place, 3rd Floor
Crownsville, MD 21032-2023

***The Washington Biologists' Field Club (WBFC) guiding mission is the study of long-term trends in biodiversity and community ecology on Plummers Island.***  We began this research in 1901 and continue it to this day.  MDOT's plan for expanding the American Legion Bridge onto Plummers Island and channel waters **seriously compromises our research goals of studying the Island as a whole system**.

Long-term studies such as those of WBFC are very important in this era of rapid change in climate, introduction of increasing numbers of invasive species and diseases, etc.  We can only conserve our natural resources if we understand "normal" ecosystem responses, and these require long-term monitoring of target sites.  The scientific community has responded to this need by creating new sites for long-term research, but it takes decades to build up a record long enough to understand many of the processes, and there are few sites that have been established long enough to give meaningful information.  Plummer's Island is one such site, and its preservation deserves high priority.

It must be emphasized that environmental damage cannot be "fixed" by any form of mitigation.  Plummer's Island is a research site conducting a multigenerational study of long-term ecological processes.  Destruction of the habitat, or serious damage to it, stops the ecological processes whose progress WBFC has been studying for over a century, and ends the long-term study.  Replanting will not

continue these processes, it just makes a new beginning, returning the Island to where the WBFC study began in 1901.

Importantly, taking any part of Plummers Island violates the formal legally binding 1959 Agreement between WBFC and the National Park Service. Under this agreement WBFC gave the Island to the Federal Government in exchange for our continued maintenance and research of the Island as a wild natural area, so long as WBFC existed and complied with certain obligations.  WBFC has honored its part of the agreement for the ensuing 72 years.  WBFC has studied the Island for 121 years, making it a rare and precious part of the cultural and scientific natural heritage of the National Park system. The Section 106 process determined the *WBFC and Plummers Island* to be eligible for the Maryland Historical Trust and National Register of Historical Places, and this requires protecting the entire Island as a whole property.

With these points in mind, WBFC does not accept the MDOT's Alternative 9 plan. We consider it contrary to the above agreement, and the intent of NHPA laws protecting eligible Historical properties as whole units. We support the No Build Option (as stated in our DEIS, SDEIS, and Section 106 comments).

Moreover, MDOT has failed to adequately and objectively justify the Least Environmentally Damaging Practicable Alternative (LEDPA) in the selection of Alternative 9.

WBFC commented on the DEIS, and was recognized as a consulting party in early 2021. The SDEIS is unacceptable, full of problems, and must be rewritten (WBFC separate, and co-signed Sierra Club comments submitted November 30, 2021). WBFC Section 106 comments were submitted in October 2021, and again with SDEIS comments.  Comments on the final Section 106 programmatic agreement will be or will have been submitted by February 3, 2022.

**One avoidance** or minimization would be to redeck the ALB and not expand it. Alternative 5, adding only two lanes to the ALB, would be much less damaging to Plummers Island and adjacent waterways. Double decker or suspension bridges could significantly reduce damages to Plummers Island and adjacent waterways. However, the highway expansion plans do nothing to reduce the $CO_2$ emissions driving global Climate Change.   As MDOT Secretary Greg Slater stated in 2021, the ALB is structurally sound and only needed redecking within 10-20 years. We support this No Build Option.

If Alternative 9 goes forward as MDOT & P3 companies propose, WBFC proposes the following avoidance, minimization and ***partial mitigations*** be adopted and coordinated through NPS, in consultation with WBFC in-so-far as they affect Plummers Island and its waterways:

### Avoidance, Minimization and Partial Mitigations under Sections 106, NHPA, NEPA, and 4(f), 10, and 404 etc.:

**01 -- Nomination of WBFC on Plummers Island to the National Register of Historical Places**:  **A)** MDOT fully funds and fulfills the nomination process for NPS. WBFC and NPS should be involved and consulted in the preparation of the nomination of Plummers Island.

**02 -- Bike & Pedestrian lane emplacement:**  This lane could be placed under the bridge or on the upstream side (avoidance and minimization), rather on the Island side of the bridge (as currently proposed in the SDEIS and Section 106 documents). **A)** Please revise the MDOT plan accordingly. This

00006424

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

minimization would reduce shading of the Island, and possibly the need for caissons on the Island, and potentially reduce the LOD. **B)** Furthermore, we note that archaeological sites are not particularly endangered by shadows or cave effects, and the archaeological site on the west side of the ALB may even be further protected by ALB overhanging lanes.  We see no justification or advantage to placing overhanging lanes over the long-term ecological study site of Plummers Island rather than overhanging the already buried archaeological site.

**03 -- Flooding potential:** Flood frequency has now increased enough that 500-year events are now 100-year events, and former 100-year floods are now 10 to 20-year events.  Moreover, flood stages are 7 ft higher at the head of Plummers Island than at NOAA's Little Falls Gauging Station 3 miles downstream in a wide section of the Potomac River. MDOT's planned destruction of the top of the rock ridge at the head of the island lining the west end of the channel, within the LOD, will further increase flooding impacts to the Island. **A)** We request that MDOT and US-ACE take extreme precautions in evaluation and preparation for potential 500-year flooding events occurring within the construction and immediately following periods.  **B)** Protect the rock ridge from any damage. **C)** If there is flooding damage to the Island resulting from MDOT's project we expect major financial penalty to MDOT as compensation to WBFC for damages to the Island and its and waters, and full cleanup efforts from MDOT.

**04 -- Pier and Caisson emplacements**: Where are the engineers planning to put the east bound ALB lane Piers?  It was suggested by MDOT in meeting with WBFC in early 2021, that they could avoid placing piers on the Island. However, the SDEIS indicated support structures will be on the Island and in the channel. Newer MDOT plans (diagram shown to WBFC, November 29, 2021, in a joint MDOT Section 106 meeting), show three caissons on the island, and three more opposite those in and on the west side of the channel, this set of caissons placed about 75 ft north from the head of the channel.  (In the same meeting WBFC was told that these would be reduced to two caissons on either side of the channel.) These caissons will trap logs and jam up the waters within the channel causing flood waters to cross the low gap between the rock ridge along the west end of the channel and headwall of the Island. Furthermore, MDOT's diagram shows an elongated pier would be placed under the bridge at the dogleg in the channel where it bends eastward. The diagram shows that pier to be footed in the channel, a placement that will deflect flood waters onto the island. **A)** MDOT needs a new plan to avoid increased flooding of the Island. We reject the whole idea of placing ALB supports on the Island and its channel.

**05 -- ALB construction platforms:** Trestles are proposed for construction platforms covering the western portion of channel separating Plummers Island from the mainland and bridge foundation, and presumably the west end of the Island up to the LOD.  What is the plan for installing those trestles? And how will the trestles be decked (timbers?). What is to prevent those timbers and trestles from blowing out in a massive flood? **A)** Ensure that platform decking is secure in the events of minor to major flooding. **B)** keep them off the Island.

**06 -- Channel impacts from construction and vegetation removal:** Embankments within the LOD on both sides of Plummers Island's channel are expected to collapse after the soil is disturbed by construction activities, and vegetation is removed and the remaining vegetation is shaded out. The destabilized embankment soil will naturally be deposited further downstream in the channel. **A)** We expect MDOT to make every effort to avoid and minimize embankment collapse and further sedimentation of the channel.

00006425

**07 -- Historical Hydrology**:  The channel head has shifted downstream and lost flow due to past ALB pier emplacements, and also caused avulsion of the head of the Island. The loss of land and adverse hydrological effects are sections 4(f), 10, 404, NEPA, <u>and</u> NHPA, issues to address.  **A)** MDOT is requested to restore the channel to original position and flow, pre-ALB, or at least improve the channel to flow regularly even at low waters at their expense.

**08 -- Channel impacts in the event of restoration of channel flow:** WBFC members and other researchers need routine access to the Island. We send out a member each week with duty to check the cabin and surrounds for damage and debris from public visitors.  Researchers need access to their study sites on the island.  **A)** In the event that channel flow is increased such as limits our access, we request some enhanced access, which could be a locked bridge or caged boat dock (as permitted under the 1959 WBFC agreement with the National Park Service).  **B)** We request that MDOT fund the access construction that best suits WBFC needs and NPS guidelines. (Estimated cost to MDOT for NPS design and installation: $200,000).

**09 -- Researching disturbance:  A)** We request MDOT funding of a "record in time" photographic survey before, during and after ALB construction, along with long-term follow-up, up to the APE boundary. **B)** MDOT Funding for development of ArcGIS maps to catalogue current and historical study locations and key resources to visualized changes over time. **C)** MDOT funds are requested to purchase for WBFC a highly accurate GPS unit for recording plot points, plant locations (including mapping of tree species), and collection sites. (Estimated cost to MDOT for WBFC equipment purchases: $20,000). **D)** MDOT funding and coordination with NPS and WBFC of research on the effects of the expanded ALB shadow on vegetation, arthropods, and amphibians. Baseline vegetation plots are to be established before construction, followed by resampling at 5-year intervals for 20 years, using NPS circular plots from the LOD out to the APE.  This will also serve to track invasive species spread. NPS, in coordination with WBFC, will analyze the data and publish this research using MDOT funding. (Estimated cost to MDOT for Research, see Item 17).

**10 -- Invasive species:**  WBFC has been studying invasive species with our vegetation plots and 120 years of collection records. The most invasive are: Amur-honeysuckle, Japanese-honeysuckle, oriental-bittersweet, tree-of-heaven, gill-over-the-ground, Japanese-stiltgrass, garlic-mustard, and various knotweeds.  In 2017 WBFC asked Invasive Plant Control (IPC) Inc. for a bid to remove the invasive trees and shrubs.  Their bid was $75,000 (unaffordable to us).  Now fig-buttercup has come onto the island (3 plants first noted in 2017 at the head of the Island) and is expanding exponentially (250 plants seen in the spring of 2021, all across the Island): This weed is projected to extensively cover the lower flood plains of the Island in the near future.  Japanese-stiltgrass is expanding exponentially also.  The spread of these invasive species will be exacerbated by clearing of vegetation and soil disturbance associated with the ALB construction.  Cost is a major impediment to control. C&O Canal NHPS has minimal funds for invasive plant control, and their efforts were curtailed by the Park's Head Ranger in about 2016.  This is a long-term problem and requires long-term mitigation and research on effectiveness of methods of control. **A)** MDOT funding to NPS for invasive plant control and research is requested for the long term. (Estimated cost to MDOT for NPS expenses $5 million for invasive species control. For the Research budget see Item 17).

**11 – Abatement of Toxic Runoff**: The lowest point on the ALB drains through scuppers and culverts onto NPS land, cutting an erosional gully and then draining into our channel. The high point (75 m elevation)

00006426

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

along Maryland's I-495, ca. 1 mile NE from the ALB, drains down to the ALB the low point (36 m), just opposite the NW corner of Plummers Island. Road salts, antifreeze, and oils release toxic metals into the soil and water. Any accidental spill on the bridge or highway draining to the bridge currently dumps on to NPS land and then into our channel. **A)** MDOT must send this runoff elsewhere for treatment. **B)** MDOT Funding is requested for long-term research on toxic runoff from the ALB. **C)** Dust and debris from demolition and construction must be minimized to the maximal practicable extent. **D)** Effects of dust and sedimentation on the Island and in the channel must be studied as a long-term research project. (Estimated cost to MDOT for Research, see Item 17).

**12 – Abatement of Noise Pollution**: ALB traffic noise on the island disrupts animal communications and affects the quality of experience of the island for visitors. Having more lanes and traffic closer will amply the noise. Cutting of trees will also increase penetration of sound onto the island. **A)** Sound barriers, and special sound deadening tarmac surfacing must be added to MDOT plans for the ALB to minimize this impact. **B)** MDOT funding is requested for researching impacts of noise from the ALB and study of impacts on animal communications. **C)** Outdoor camera and microphone and monitoring equipment are requested for WBFC future research. (Estimated cost to MDOT for WBFC equipment purchases: $20,000). (Estimated cost to MDOT for Research, see Item 17).

**13 -- Vistas:** Clearing trees on the island and mainland adjacent to the Island adjacent to and under the newly expanded ALB will impact the quality of experience of the Island, and impact the remaining vegetation under the removed tree canopy and into the adjacent forest. The bridge itself will overhang the island up to the LOD, creating a cave, and an extended shadow that will limit afternoon sunlight to vegetation further inland. **A)** MDOT must limit tree cutting as much as possible. **B)** MDOT funding is requested to replant and reseed disturbed off-Island areas with hardy local strains of native trees, shrubs and herbaceous species as soon as possible, health of these plantings to be monitored by NPS.

**14 -- Expanded Online content**: **A)** MDOT Funding is requested for further digitization and cataloging of Smithsonian collections within the C&O NHP and Plummers Island. This would include funding for contractors and IT support. **B)** MDOT Funding is requested for digitization of WBFC archives of letters, photos and other documents at the Smithsonian. This would include contractors and IT support. NPS is also interested in this archive of materials for their historical records involving the 120-yearold WBFC cabin. **C)** MDOT Funding for WBFC website development to further share our mission and knowledge. This would include hiring of a professional website developer for WBFC. **D)** MDOT Funding is requested for diversity and inclusion of underrepresented peoples in our outreach and education initiatives. (Estimated cost to MDOT for the above items: $200,000).

**15 – Financial support for inventories of understudied groups on the island:** WBFC maintains documented inventories of organisms on the Island, but not able to ensure that inventories for all groups of organisms are up to date at any one time; provide funding to hire experts to update and document inventories for groups that need it.

**16 -- Access During Construction:** We also request that access to Plummers Island not be curtailed during construction. If the Clara Barton parkway is closed during construction of the ALB and ramps, we request a temporary parkway crossing from the westbound lane to Lock 10 parking on the eastbound lane be established. Researchers will need access to research plots up to the LOD.

**17 --Long-term research:** Including items listed above, long-term research on the impact of bridge expansion on Plummers Island is needed. This will inform future construction projects by expanding our knowledge base of the impacts on biodiversity and community ecology. This will also assist WBFC in understanding perturbations to long-term trends of the Island's ecosystem caused by the MDOT project. Neither WBFC nor NPS have the funds or staff to carry out the required new research projects. Baseline plot data gathering must be completed prior to beginning ALB construction. We request external contracting and funding by MDOT-SHA for research, to be conducted by consulting companies, research universities and institutions, in coordination with WBFC and NPS. (Estimated cost to MDOT over a 20-year time period is $20 million.)


Respectfully,

Robert Soreng PhD, WBFC President

Carla Dove PhD, WBFC Vice President

Lowell Adams PhD, WBFC Secretary

Warren Wagner PhD, WBFC Treasurer

On behalf of the hundreds of past and present WBFC members.


Cc:

00006428

## APPENDIX C: Maps of Plummers Island and Alternative 9 ALB emplacement



00006429



00006430

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2



00006431



00006432



**\*** For map images cited in **APPENDIX D**, see **APPENDIX C.**, maps A (ALB Alternative 9 with ALB),

## APPENDIX D: Administrative Record letter sent to U.S. Army Corps of Engineers

January 19, 2022

NAB-Regulatory@usace.army.mil
U.S. Army Corps of Engineers, Baltimore District
Regulatory Branch (CENAB-OPR)
2 Hopkins Plaza
Baltimore, MD 21201

[Re: The protection of Waters of the U.S., C&O Canal National Historical Park, and Plummers Island from adverse impacts of MDOT's proposed Alternative 9 - Phase 1 South]

Dear USACE Baltimore District Regulatory Branch,

We have serious concerns regarding the adverse impacts to Waters of the U.S., C&O Canal National Historical Park, and Plummers Island if MDOT's proposed Alternative 9 - Phase 1 South for widening the American Legion Bridge is constructed as planned. We are also very much concerned that environmental impacts are not adequately addressed in the DEIS/SEIS, that viable, less destructive alternatives were not properly analyzed and considered, and that Alternative 9 - Phase 1 South is not the Least Environmentally Damaging Practicable Alternative (LEDPA). In fact, it is perhaps the most environmentally destructive of alternatives to federally owned lands and waterways east of the bridge.



Fig. 1. Globally rare Potomac River Bedrock Terrace Hardpan Forest (CEGL006209) at Plummers Island, C&O Canal National Historical Park, Montgomery County, Maryland. The American Legion Bridge looms in the background at the head of the island. Photo by R.H. Simmons.

00006434

Plummers Island is a unique 12.2-acre natural area within the Potomac River Gorge, C&O Canal National Historical Park, Montgomery County, Maryland. It is widely known as "The Most Thoroughly Studied Island in North America" (NPS sign on Plummers Island). Its natural history has been a subject of more than 400 scientific papers. More than 4,000 species have been documented there, by over 40,000 collections housed in the National Museum of Natural History, Smithsonian Institution. Numerous rare plant and animal species, and four globally rare plant communities are documented there. Alluvial habitats with overland, non-tidal flooding regimes and diverse, specialized vegetation comprise much of the island (Figs. 2 and 3).



Fig. 2. Rock ridge straight across the channel from the shadow of the American Legion Bridge at the 9 ft. flood stage (NOAA Little Falls Gauging Station). Photo by R.J. Soreng, March 2, 2021.

In the DEIS and SEIS, alternatives were mainly considered for which best suited the transportation goals of the project, with required analyses of environmental impacts not presented or poorly discussed. (https://oplanesmd.com/wp-content/uploads/2021/11/I495I270MLS_SDEISUpdatedSection4f.pdf). For example, Alternative 9 as the presumed LEDPA is not justified and the number and type of environmental impacts are not discussed. In fact, no specific discussion of the LEDPA relative to any of the alternatives could be found in the document.

Alternative 9 - Phase 1 South is preferred by MDOT as purportedly the most cost effective of alternatives, but it is the most destructive to Plummers Island and adjacent lands and waterways - largely owing to the physical expansion of the bridge eastward onto the island and the construction of enormous caissons and footers in the existing channel that follows the interior edge of island.

00006435

**Significant adverse impacts to Plummers Island and adjacent lands and waterways resulting from Alternative 9 include** (but are not limited to):

* The taking of several acres of the head of the island (western and northwestern end) by the installation of enormous concrete footers and caissons, resulting in a permanent loss of land, wildlife habitat, wetlands, and functional floodplain.
* The destruction of the north-south section of the bedrock channel (WOTUS) adjacent to the bridge through the installation of enormous concrete footers and caissons directly in the channel, as well as the total and permanent eclipse of sunlight resulting from the bridge deck extending entirely across the channel.
* Adverse impacts to aquatic wildlife as a result of permanent alterations to the channel.
* The destruction of an imprecisely quantified area (by MDOT) of bedrock vernal wetlands (WOTUS) under the proposed new deck and caissons of the bridge.
* The destruction of a high-quality, low forested ridge of bedrock outcrops and rare flora, such as one of two extant stations on the island for the state-rare Leatherwood (*Dirca palustris*); G4/S2 T. (Simmons et al. 2020)
* The installation of caissons and footers in the channel and on the island will intensify the strength of flood flows eastward, resulting in accelerated stream bank and floodplain erosion on the southwest part of the island, as well as the destruction of several natural communities and habitats in this area. Sediment loads from this disturbance will also impact the channel and island.
* Caissons in the channel will trap logs and other debris, resulting in semi-permanent log jams in the channel and a seriously degraded waterway.
* Placing such an embankment or structure across an active floodplain and channel will effectively interrupt flood flows and force more water to the east against the cut bank, hastening the undermining of the floodplain and forested slope there.
* An embankment in the form of caissons at this location will likely also create an eddy during high water that intensifies erosion upstream of the bridge.
* Sedimentation is a vital part of the energy cycle in these ecologically important riparian areas. Caissons or other continuous impediments constructed across this section of the floodplain and channel will disrupt this process, likely causing: 1) the structures to be regularly inundated by alluvium during even minor floods; 2) frequent flood risk to upland areas of the island owing to the removal of the rock ridge that currently protects such areas; and 3) the riparian areas downstream to be robbed of their natural sediment supply, which adversely disrupts the nutrient/energy cycle of these areas and eventually cause deflation of the riparian landscape.
* Six flood-dependent natural communities, some globally rare, will be negatively impacted, including Piedmont / Central Appalachian Sand Bar / River Shore (Tall Herbs Type): (USNVC: CEGL006481); global and state rare Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (USNVC: CEGL006491); Piedmont / Central Appalachian Sycamore - River Birch Scour Woodland: (USNVC: CEGL003896); Floodplain Terrace Forest: (USNVC: CEGL002014); Piedmont / Central Appalachian Silver Maple Forest: (USNVC: CEGL006217); and globally rare Mid-Atlantic High Terrace Hardwood Floodplain Forest: (USNVC: CEGL006459). (Simmons et al. 2016)

00006436

- Three upland natural communities near the channel will also be adversely impacted, including the permanent deflection of solar exposure to light-demanding flora and habitats, because of hardscape encroachment across the channel onto the island: Coastal Plain / Outer Piedmont Basic Mesic Forest: (USNVC: CEGL006055); Central Appalachian Rich Red Oak - Sugar Maple Forest: (USNVC: CEGL008517); and the globally rare Potomac River Bedrock Terrace Hardpan Forest: (USNVC: CEGL006209).  (Simmons et al. 2016)
- The physical extent of the bridge decking will overtop the head of Plummers Island by 100 ft. or more, robbing vegetation and wildlife under the bridge of sunlight.
- Because of the proposed placement of the caissons in the channel and island, resulting in severely restricting water flow into the channel, the extensive, flood-dependent, state-rare Piedmont / Central Appalachian Rich Floodplain Forest: (USNVC: CEGL004073) along the channel on the mainland and island will be starved of their natural sediment supply, disrupting the nutrient/energy cycle and causing deflation of the riparian landscape.
- Bridge footings and caissons will likely create a pressure shadow in their lee that accelerate the deposition of sediment on the point bar and floodplain immediately downstream or change the form or composition. In this case, highly detrimental deposition and flood scouring is expected, especially in the form of smothering logs and debris deposits overtop vegetation, wildlife, and habitats on the island.



Fig. 3. Old-age Piedmont / Central Appalachian Silver Maple Forest: (USNVC: CEGL006217) along the rocky bedrock channel at Plummers Island, Montgomery County, Maryland.  Photo by R.H. Simmons.

Under CWA Section 404(b)(1) Guidelines Alternatives Requirements, a permit cannot be issued in circumstances where a less environmentally damaging practicable alternative for the project exists.  The

00006437

environmental impacts that would result from Alternative 9 - Phase 1 South are significant, not minor. The project will severely impact national parklands, wetlands, and waterways.

WBFC (as a Consulting Party) formally submitted comments on the DEIS, SDEIS, and Section 106 on November 30, 2021, when comments on the SEIS were due. We also met with MDOT on several occasions to discuss our many issues, including those specifically involving hydrology and flooding.

*Until recently, engineering designs were not well enough along for anyone to comment on, specifically to evaluate effects of the bridge caissons and pier emplacements, including the reduction of the channel and leveling of the rock ridge at the head of the island. The bridge design plan and placements were only made apparent in screen shares at the November 29, 2021, MDOT meeting. We did include some comments to that effect, but we needed more than 1 day to adequately evaluate the consequences.*

We respectfully request that USACE not grant any permits for the Preferred Alternative, Alternative 9 - Phase 1 South, thereby requiring the Applicant to redesign its plans and submit a pre-construction request that provides a proper analyses and rationale of the LEDPA and alternatives, a thorough assessment of the myriad of irreplaceable natural resources affected by the proposed alternative, and required protections for all of the WOTUS currently threatened by the project. The NEPA evaluation needs to be thorough and uncompromising in protecting this special place.

We also request that the above information be placed in the administrative record, courtesy copied to the Project Manager who received the PJD, and furthermore to request that the 15-day resource agency review be re-coordinated to include this new information.

Thank you for your consideration of this important matter.

Sincerely,

Robert J. Soreng, President, Washington Biologists' Field Club (WBFC) and Smithsonian Institution scientist
https://wbfc.science/
Roderick H. Simmons, environmental scientist, WBFC

CC:

National Park Service, C&O Canal National Historical Park
Environmental Protection Agency
U.S. Fish and Wildlife Service
Federal Highway Administration
Maryland Dept. of the Environment
Maryland Dept. of Natural Resources
National Parks Conservation Association

# APPENDIX E: WBFC replies to MLS-106 Table 1 Responses

## Page 23 of 57 Programmatic Agreement Draft #1 Comment Table

| Comment | Comment Author | Rejection Whereas | Topic Skill | Point | Comment | Response | WBFC Reply 2 Feb 2022 |
|---|---|---|---|---|---|---|---|
| 146 | Washington Biologists' Field Club (WBFC) | General and C&O Canal | | Plummers Island | 1 We request WBFC be added as a consulting party to Section 106 immediately due to our special relationship with Plummers Island. [note: see WBFC comment for full discussion of WBFC's relationship to Plummers Island.] Any mitigation measures for the C&O Canal National Historical Park as a whole would not be sufficient to protect Plummers Island. The WBFC as a discrete entity that has engaged in biological research on the island since 1901, is best able to determine which impacts would or could result from American Legion Bridge construction and operation activities and which measures are needed to avoid, minimize, and mitigate these impacts. | WBFC has been added as a consulting party. | NPS has not commented on it for MLS-106. WBFC was added as a consulting party. WBFC has been in joint meetings with MLS-106 crew on 3 or 4 occasions, and had several email correspondences with NPS, Archer and company. The PA does not further document compliance. WBFC Subject a partial mitigations letter with NPS Nov. 29 2021 (noted verbally by WBFC in the MLS-106 meeting Nov. 29). An expanded letter of partial mitigations is included here in a separate document. |

## Page 24 of 57 Programmatic Agreement Draft #1 Comment Table

| Comment | Comment Author | Rejection Whereas | Topic Skill | Point | Comment | Response | WBFC Reply 3 Feb 2022 |
|---|---|---|---|---|---|---|---|
| 147 | WBFC | General and C&O Canal | | Plummers Island | 1 We are dismayed that the cultural resource evaluations circulated as part of the DEIS fail to specifically identify or discuss the historic significance of Plummers Island. The Section 106 identification process should include an evaluation of the significance of Plummers Island as an individually significant historic site independent of the C&O Canal National Historical Park, or at minimum, should include additional descriptions of its contributing significance to that site. The cultural resource evaluations undertaken to date have largely ignored Plummers Island and its unique historic characteristics. | DOE is completed, property is eligible, and effects is adverse with SHPO concurrence October 2021. | NPS has not commented on it for MLS-106. Plummers Island must be protected as a whole under the eligibility criterion. |

## Page 25 of 57 Programmatic Agreement Draft #1 Comment Table

| Comment | Comment Author | Rejection Whereas | Topic Skill | Point | Comment | Response | WBFC Reply 3 Feb 2022 |
|---|---|---|---|---|---|---|---|
| | | | | | | Response | |

00006439

| Page 26 of 57 Programmatic Agreement Draft #1 Comment Table | | | | |
| Comment/Commenter/Author N/Section Milestone/Topic Type/Input/Comment | | | Response | |
|---|---|---|---|---|
| 149 WBFC | General | Plummers Island and C&O Canal | 1 We are troubled by the approach taken by the draft Section 106 Programmatic Agreement, which does not contemplate identifying the adverse impacts on Plummers Island or looking at ways to resolve those impacts until after key decisions about the project are made and mitigation measures foreclosed. It is not appropriate to defer the assessment of these impacts or any analysis of measures to mitigate or minimize them until after key decisions have been made about alternatives and the preferred alignment for the project, as worthy preferred alignment bridge alignment and construction alternatives. There is sufficient information available now to undertake these evaluations, and this should be done now, before the widest range of options for mitigating and minimizing adverse effects to Plummers Island have been foreclosed. The measures to protect the island and its trusts (the subject of long-term ongoing research) need to be considered now and in detail. A memorandum of agreement, which would be executed before the Record of Decision, is a more appropriate vehicle for resolving adverse effects on Plummers Island than a programmatic agreement. Due to the extraordinary sensitivity of the resources and the research that will be impacted by the Project, it is imperative that the resources be evaluated as impacts to Plummers Island be considered now, not deferred until after key project decisions have been made. We therefore request that commitments to avoid, reduce, and minimize effects to Plummers Island be included in a memorandum of agreement and ultimately, in the Record of Decision for the project. | Property is eligible and effect is adverse with SHPO concurrence October 2021. Will continue consultation on mitigation for the historic property, which will be documented in the Programmatic Agreement, not a separate Memorandum of Agreement. | NPS has not commented on FR for MLS-506. WBFC met 2 more times in 2021. No memorandum of agreement has been proposed. The PA does not further document mitigations. WBFC lodged a partial mitigations letter with NPS Nov. 29, 2021 [listed verbally by WBFC in the MLS-506 meeting Nov. 29]. An expanded letter of partial mitigations is included here in a separate document. WBFC comments, APPENDIX B. |
| 150 WBFC | General | and C&O Canal | 1 The unique history and significance of Plummers Island must be assessed independently of its status as part of the Chesapeake & Ohio Canal National Historical Park. [for full description of unique history see WBFC comment document] However, the significance of Plummers Island goes beyond that. The significance of the island is a long-term research site should give it protection as a wildlife management area, and it is sited a unique and significant historical site in its own right. The island's unique historic attributes indicate its value and history as an important research site [historic attributes are further reviewed in Appendix B]. | DGR completes property eligible with NPS has not commented on FR for MLS-506. Sierra Club SHPO concurrence October 2021. comment 149 is on target. WBFC wholly agrees. | WBFC Reply 3 Feb 2022 |

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

| 135/WBFC | General | Pharmacy Island and C&O Canal | Comment/Comment/Author N/Section Whereas/Topic Section/Comment Comments | Response | WBFC Reply 3 Feb 2022 |
|---|---|---|---|---|---|
| | | | 1 There are significant, irreversible adverse effects that would accrue to Pharmacy Island and WBFC research projects under the MDOT American Legion Bridge expansion plan. The ongoing and active research projects on this island are contributing to the historic features of the island, in addition to the architectural resources (the cable built in 1901). There are distinct adverse effects that impact a property of such high research value, these include destruction of areas of the island, noise pollutants that impair the quality of research value, and many more things listed below and described in greater detail in Appendix C of this letter. The sequence of effects to the Island's historical features and significance as a research site posed by the I-495/I-270 project are numerous and further detailed in Appendix C of this letter. They include: 1 Damage to waterways 2 Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of the island within the Zone of Destruction 3 Destruction of WBFC research plots 4 Destruction of past collection sites and disturbance to more invasive organisms to-potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction below out 7-Sound from bridge construction and closer proximity of traffic in 2 new bridge lanes after they open on the bridge 8 Impacts on biota from ash and run-off from the bridge 9 Violation of long-term continuity of 129 years of research. | Adverse effect; DOE complete. However, most concerns here are NEPA-related. | NPS has not commented on the MLS-106. The PA has not addressed land and property issues related to MLS-106. 2 Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of the island within the Zone of Destruction 3 Destruction of WBFC research plots 4 Destruction of past collection sites 5 Habitat destruction and disturbance to more invasive organisms 6 Violation of long-term continuity of 129 years of research. |

00006441

| Comment Number | Commenter/Author | Section/Milestone/Topic | Point of Comment | Response |
|---|---|---|---|---|
| 151 WBFC | General | Plummers Island and C&O Canal | To protect Plummers Island, the minimum mitigations follow: 1 Plan for major (not minor) flooding during the construction period. 2 Avoid obstructing natural water flow into the Plummers Island channel. 3 Build all the new lanes on the upstream side of the bridge. 4 Build the access to and the construction platforms themselves only on the upriver side of the bridge and under the bridge. In any case, add sound barriers to keep the downstream side of the bridge quiet. 5 Use lane surfacing that is as quiet as possible. 6 Plummers Island extends 7. Avoid negative impacts by use of at-rest minimization measures including pathways. 8 A waste and hazardous material disposal plan must ensure offsite disposal so as not to flow to or near Plummers Island. 9 Provide prior notification informing WBFC of work schedules so notice can be given to researchers. 10 Piping of road runoff that contains oil and tar is a major issue, currently the main water drainage flows into the island from the mainland. Future drainage should avoid the wetlands. 11 For the duration of construction, any construction infrastructure should be designed to withstand major floods (over 14 feet) not minor (10-12 feet) floods, there have been 3 moderate (12-14 feet) and 2 major floods (17-19 feet) in the past 35 years. However, even minor floods recorded at Little Falls produce major flooding on the Plummers construction to ensure that the construction work is not impacting the island during construction workers or project personnel visit the island unless oriented and approved by the Washington Biologists' Field Club. These requirements should be included in bidding document and contractor's work plan as part of the environmental specifications that will be followed. 13 Chance that or inadvertent discovery procedures should be followed and incorporated into bidding documents and contracts. Please provide a copy for our review to ensure they meet the requirements for protection of Plummers Island. | Scores of these best management protections will be captured in NEPA/permit conditions but may not be appropriate for 106 PA. MDOT SHA will continue to consult with the WBFC and NPS on appropriate assurances of monitoring the site is not damaged. Over a 1 mile interest in Maryland, I-495 passes down from 75 to I-295 at a low point on the A-B adjacent to Plummers Island. This is where much of the runoff drains out into the channel. This is totally unacceptable and must be corrected with any new construction. |
| 152 WBFC | General | and C&O Canal | Plummers Island is federally protected under legal agreements with the National Park Service and should become an additionally protected with a determination of individual National Register of Historic Places eligibility or, at a minimum, assessment of contributing significance to the C&O Canal National Historic Park as soon as possible with the biodiversity, engendered species, and research value of the island specifically identified as historical features of contributing importance. | NPS has not commented on PA for MLS-106. Plummers Island must be protected as a whole under the delegated eligibility criterion.<br><br>WBFC (Appx 3 Feb. 2022) |
| Other commenting agencies comments from Comment Table 1 | | | | |
| Comment Commenter/Author Section Milestone Topic Point of Comment | Response | | | |
| 468 NPS | KSmith | JHC | 1 These are not historic preservation mitigations thus they don't belong in this section. 106 agreement document. Reformentation could be considered a mitigation for changes no historically forested areas, but that needs to be itemized. Relative to Section 106 consultation happening can the proposed locations of these mitigations identified as historical features of contributing importance. | Not accepted. This section relates to WBFC notes that Plummers Island is a long-term have cultural resources effects are research site. Once this site is disturbed the continuity assessed in proposed reforestation of the long-term research is broken. for proposed effects to historic properties. |

00006442

| # / Source | Commenter | Category | | Comment | Comment noted | WBFC |
|---|---|---|---|---|---|---|
| 54/NPS | Kenneth, general | General | | It seems like there should be a broader mandate in this PA for ongoing consultation based on how the design has happened for the post phase 1 phases. The consulting parties haven't had the chance to see any detail and therefore can't offer specific advice on possible design minimizations. | This is a general statement and pertains to timelines and consultation points and are specified elsewhere. | WBFC agrees with the NPS comment. |
| 55/NPS | A. Young, whiteness | | | 2) WHEREAS, FHWA will ensure additional identification, evaluation, assessment, is completed in a timely manner prior to construction, to allow practical opportunities to avoid, minimize, or mitigate for any potential adverse effects to historic properties, as stipulated under this PA? Please clarify what constitutes a timely manner and what opportunities signatories will have for review. | | WBFC fully agrees with NPS comment. We still have seen only limited design plans. Thus, finalizing the PA is premature. |
| 522 Sierra Club (SC) | General | PA Process | | 1) The purely Programmatic Agreement approach for this project is inappropriate and inadequate as it impermissibly forecloses large measures to avoid impacts to historic properties (such as project scope, number of lanes, and road alignment). The Programmatic Agreement approach to the I-495 & I-270 MLS Section 106 process is not adequate to meet the requirements of federal law. The Section 106 regulations provide that a Programmatic Agreement approach is appropriate in certain limited situations, including "[w]hen effects on historic properties cannot be fully determined prior to approval of an undertaking." 36 C.F.R. §800.14(b)(1)(ii). Here, however, there is no reason to defer identification of historic properties within the area of potential effects or the assessment of adverse effects and any measures to avoid and mitigate until later. While there may be alignment refinements that will occur during the design-build process, there are no other circumstances to warrant a departure from the normal section 106 process. [lengthy comment continued in Comment letter.] (continued in 323) | The implementing regulations at 36 CFR 800.4(b)(1) for Section 106 of the National Historic Preservation Act (NHPA) require a reasonable and good faith identification effort for historic properties. 36 CFR 800.4(b)(1) also permits a phased identification and evaluation of historic properties where alternatives under consideration consists of corridors, large land areas, or where access to properties is restricted. Survey and Regional Register of Historic Places evaluation of hundreds of properties and archaeological survey areas was completed prior to the DEIS. Very little survey work remains and generally only in areas where property access has been denied. The Programmatic Agreement currently under development, which will be signed and executed prior to the Record of Decision, will provide a framework for ongoing identification, avoidance, minimization, and mitigation of historic properties. | WBFC fully agrees with SC comment. We still have seen only limited design plans for the ALB. |

WBFC Comments on MLS-106_Att-7_Jan-2022_495_270_MLS_PROGRAMMATIC AGREEMENT Draft 2

| 3238SC | General PA Process | | see reply under 3.2.2 | see WBFC comment under 3.2.2 |
|---|---|---|---|---|
| | | The approach to Section 106 taken here impermissibly defers full consideration of historic properties listed in or eligible for listing in the National Register of Historic Places by relying on a boilerplate Programmatic Agreement that the Agencies will not execute until after selecting a Preferred Alternative. Among other things, delaying full assessment of historic properties until a Programmatic Agreement is executed ignores the Agencies' present duty to comply with NEPA, which requires a "hard look" at all of the environmental consequences that will flow from the Project if the Agencies grant the permits needed for the Project to proceed. Selection of an Alternative in this ROD, including impacts on historic properties. For these reasons, relying on an unexecuted Programmatic Agreement to carry out the Section 106 review process precludes, rather than assists, the Agencies and the public from understanding how these effects might harm historic and cultural resources as required by NEPA, without a complete understanding of the Project's full range of environmental effects, including harms to historic properties, there is no way that the Agencies can reasonably select a preferred alternative as required by Section 401. Deferring the full identification of alternatives is available as required by NEPA or identify an alternative that avoids use of historic properties, parks, and recreation areas unless no other feasible and prudent alternative is available as required by Section 401. Deferring the full identification of historic properties may be acceptable where the nature and scope of this resources would allow them to be easily avoided, as in the case of archaeological sites that are significant under National Register Criterion D. However, resources such as historic properties require an entirely different approach, because preservation in place is the preferred treatment, and options to avoid harm to these historic properties and the Project's potential effects on them must be completed at a time when they can actually inform the selection of alternatives, rather than being deferred to a later date after Alternatives have been foreclosed. For the reasons discussed above, it is impossible to comment meaningfully on the Agencies' plans concerning historic and cultural resources because important baseline questions have not been decided. Outstanding issues that need to be resolved include the complete identification of | | |

00006444

| ID | | | | Comment | Response |
|---|---|---|---|---|---|
| 3.3.4.SC | N/C | C&O Canal / Plummers Island | Predevelopment Contract document review | 1. Plummers Island: One of the first sites at risk from Phase 1 of the I-495/270 Managed Lanes Project (MLP) is Plummers Island, an NPS historic site of ongoing long-term research. Plummers Island has historic status as part of the Chesapeake and Ohio (C&O) Canal National Historical Park. In addition to being part of the C&O Canal NHP, Plummers Island also has historic significance distinct from the C&O Canal NHP. The importance of Plummers Island is not even mentioned in the March 30, 2021 draft of the Section 106 Programmatic Agreement. The importance of Plummers Island has not yet been adequately recognized in the NEPA, DEIS, and Section 106 processes. See Washington Biologist Field Club Section 106 letter to Steve Archer dated April 9, 2021. There is a need to build in more specific avoidance, minimization, and mitigation measures for Plummers Island. Context sensitive design option for Plummers Island needs to be pursued for an area of unique concern that will experience serious adverse effects. The WBFC has proposed specific mitigation measures that should be considered as in the Section 106 process. Avoidance measures should be explored and not deferred to the design review consultations during this design-build process. Delaying identification of the location and boundaries of this site until after implementation of a Programmatic Agreement prevents consideration of the impacts to this site during alternatives selection under NEPA and undermines discussion of potential mitigation measures for any adverse effects under Section 106. | Washington Biologist Field Club and Plummers Island has been determined eligible for NRHP with SHPO concurrence; mitigation measures for 106 must be specific to the historic aspects of the property, other measures (construction impacts) are more appropriate in the construction contracting. Stipulations included in NEPA. Stipulations added results in the bridge along with protection site base, the landscape of the model was not made clear before section 106 comments were done in October 2021. It was only on 29 Nov 2021 WBFC was shown a draft model with the ALB extending to the LOD, this did at 30% SDFES comments were due. In January 2022, WBFC requested a detailed map of the LOD on a Section 106 borders performed WBFC two weeks later that they have no such map. Really? SHA had a detailed topographic survey of Plummers Island done in 2020, and a year and a half later, well into this process of pushing their project to the FEIS, MDOT says it can't provide a detailed map with the LOD on it? / WBFC asked for reconsiderations and prudentness. In essence, MDOT headers suggested terms, and then reneged on them. WBFC has no assurances that MDOT will stay within the LOD, or reasonably avoid damage to Plummers Island. Moreover, WBFC was provided no map or model showing the extent of damage. When WBFC requested earlier (this would be considered but MDOT's boundaries drawn up) / WBFC has asked for reconsiderations and prudentness. In essence, MDOT modified terms proposed, and impact limits suggested will be upheld. |
| 3.3.3.SC | N/A | | | 2. Although the DEIS mentioned a U.S. Coast Guard (USCG) letter stating that a bridge permit for the American Legion Bridge would not be required, a bridge permit should be required. The bridge permit process is a standard requirement that should be followed, and can further build awareness of the importance of the historic and ecological sites that fall in the vicinity of the American Legion Bridge, including Plummers Island and the C&O Canal NHP. | Permitting questions not applicable to WBFC fully agrees with SC comment Section 106. |
| 3.3.2.SC | N/A | Bridge Permit | | 2. The project's predevelopment contract documents should be immediately scrutinized for language that could be modified to historic sites, and any such wording discovered should be flagged by those involved in the Section 106 process to MDOT to have it amended or removed. The heavy involvement of the profit-driven private developer in the remainder of the NEPA process is concerning in its own right. The predevelopment contract expected to be signed within a month affects the developer team to: "Eliminate the potential for Unknown Archaeological Remains and Unknown Endangered Species". "Eliminate" is a very odd use of language to use when considering what could mean in our historical areas and sites of concern, including Normenglaar Tabernacle No. 88 Cemetery and Plummers Island. Contract language like that does not impart confidence about what future contracts may look like. Less extreme language such as "reassess" and "document any" seems more appropriate. | Noted on 30% SDFES, DeSite. |

| 339 NC | N/A | Dust and Crystalline Silica | Dust minimization and specifically OSHA crystalline silica construction dust standards must be upheld and the users and visitors of historic parkland and sites adjacent to this widening must be protected. Requirements for this should be included in the Programmatic Agreement. The roads and bridges deconstruction processes required for the Project will create massive amounts of toxic crystalline silica construction dust. This will occur on the American Legion Bridge and the Clara Barton Parkway and will impact Plummers Island and the C&O Canal National Historic Park (this widening must use several national parks during 2020), including its popular towpath. Plummers Island animal and plant life and the biologists studying it would be at risk from this dust. Visitors to the C&O Canal NHP and its towpath will be as well. Such toxic air pollution causes respiratory diseases including asthma, silicosis, chronic obstructive pulmonary disease (COPD), and lung cancer. This is an urgent public health issue. It is not addressed in the DEIS & nor in the Programmatic Agreement to date and it needs to be. | Not applicable to Section 106 | WBFC fully agrees with SC comment. Sending toxic dust over a historical property where action requires a ongoing must be relevant to Section 106. |
| 338 NC | N/A | AoB Alternatives | With reference to historic properties, there remain issues with the lack of appropriate alternative analysis for the American Legion Bridge. | Current LOD reflects minimization efforts at AoB | WBFC fully agrees with SC comment. The LEDPA has not been adequately or objectively justified as the selection of Alternative 9. Alternative 9 is clearly the most destructive to Plummers Island of all the Alternatives presented. |
| 338 NC | N/A | PA Process | A hybrid approach to the Section 106 process which involves Programmatic Agreement for some sites and Memoranda of Agreement for sites that will experience known adverse impacts is appropriate for a project of this cultural, magnitude, and complexity. | Decision: The PA will govern resolution of all adverse effects. | WBFC has asked for minimizations and avoidances in Section 106 meetings MDOT leaders suggested some, and then reneged on them. WBFC has no assurances that MDOT will stay within the LOD, or maximally avoid damage to Plummers Island. Moreover, WBFC was provided no map or model showing the extent of overhang of Alt 9 until Nov 29, 2021. WBFC requested that lanes be placed on the blue opposite side of the ALB and were told this would be considered by MDOT. MDOT's newest model instead added more extra lanes to the PI side of the bridge along with pedestrian bike lane. The landscape view of that model was not made clear before Section 106 comments were due in October 2021. It was only on 29 Nov 2021 WBFC was shown a draft model with the AoB extending to the LOD, the day before SDEIS comments were due. On January 6, 2021, WBFC requested a detailed new map of the LOD or a detailed context map of PI. Section 106 leaders informed WBFC two weeks later that they have no such map. Really? MDOT has a detailed topographic survey of Plummers Island done in 2020, and a year and a half later, well into the process of pushing their project to the FEIS, MDOT says it can't provide a detailed map with the LOD on it? |

**APPENDIX F: Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland**

# Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland



July 2020

00006447

## Introduction

Plummers Island - an ancient "knickpoint" or rocky falls in the Potomac River Gorge east of Great Falls - is a forested, 12-acre island about nine miles upriver from Washington, D.C. in Montgomery County, Maryland. It holds the distinction of being "the most thoroughly studied island in North America." Plummers Island has been the home of the Washington Biologists' Field Club (WBFC) since 1901, shortly after botanist Charles Louis Pollard formed the club and began the search for a field station near Washington, D.C.

In 1959, the club gave the island to the United States (U.S. National Park Service) and has since continued a program of scientific research. For further information on WBFC's research activities and scientific publications, see https://WBFC.science.

A total of 4 globally rare natural communities, two of which are state rare; 21 state-rare extant flora, including one globally rare extant species; and 36 state-rare historic flora, including 4 globally rare historic taxa are known from the island.

## Rare Flora and Natural Communities

**Rare Natural Communities** (in order of lowest to highest in elevation)

Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): *Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus* Herbaceous Vegetation (USNVC: CEGL006483). Non-tidal mudflats. Global/State Ranks: G3/SNR.

Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (*Hypericum prolificum, Eubotrys racemosa*) / *Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia* Herbaceous Vegetation (USNVC: CEGL006491). Global/State Ranks: G2/S1.

Mid-Atlantic High Terrace Hardwood Floodplain Forest: *Acer saccharum - Fraxinus americana / Carpinus caroliniana / Podophyllum peltatum* Forest (USNVC: CEGL006459). Global/State Ranks: G3?/SNR.

Potomac River Bedrock Terrace Hardpan Forest: *Carya glabra - Quercus (rubra, montana) - Fraxinus americana / Viburnum rafinesqueanum/ Piptochaetium avenaceum* Forest (USNVC: CEGL006209). Global/State Ranks: G1G2/S1.

**Rare Flora**

*Extant Flora*

White Bear Sedge (*Carex albursina*) G5/S3 (last vouchered in 2004; observed by Soreng in 2020)
Pubescent Sedge (*Carex hirtifolia*) G5/S3 (last vouchered in 1934)
Flat-spiked Sedge (*Carex planispicata*) G4Q/S1S2 (*R.H. Simmons 3525*, 4 May 2013)

1

00006448

Northern Leatherflower (*Clematis viorna*) G5/S3 (last vouchered in 1982)
Needle-leaf Panic Grass (*Dichanthelium aciculare*) G5/S2? (*R.J. Soreng, 8289a*, 25 May 2013)
Open-flower Panic Grass (*Dichanthelium laxiflorum*) G5/S1? (last vouchered in 1960; photographed by
    Simmons in 2015)
Leatherwood (*Dirca palustris*) G4/S2 T (*R.H. Simmons 4067*, 6 Nov 2015)
Harbinger of Spring (*Erigenia bulbosa*) G5/S3 (last vouchered in 1983; observed by Soreng in 2020)
Halberd-leaf Rose-mallow (*Hibiscus laevis*) G5/S3 (last vouchered in 1982; photographed by Soreng
    in 2020)
Green Violet (*Hybanthus concolor*) G5/S3 (last vouchered in 1960)
Ostrich Fern (*Matteuccia struthiopteris*) G5/S2S3 (One of the largest known stands in the state.
    *R.H. Simmons 3532*, 5 May 2013)
Two-flower Melic (*Melica mutica*) G5/S3 (last vouchered in 2015, *R.J. Soreng 8340*)
Horse-tail Paspalum (*Paspalum fluitans*) G5/S2 E (*E.F. Wells 4507*, 20 Sep 1997)
Coville's Phacelia (*Phacelia covellei*) G3/S2 E (*R.H. Simmons 3920*, 14 May 2015)
Miami-mist (*Phacelia purshii*) G5/S3 (last vouchered in 1983; observed by Soreng on mossy rocks by
    plot 21 between 2013 and 2015)
Hairy Hop-tree (*Ptelea trifoliata* var. *mollis*) G5/S3 (*R.H. Simmons 3585*, 2 Jun 2013)
Smooth Wild-petunia (*Ruellia strepens*) G4G5/S2S3 (*R.H. Simmons 4221*, 9 Oct 2016)
Pale Dock (*Rumex altissimus*) G5/S1 E (last vouchered in 1997)
Sticky Goldenrod (*Solidago racemosa*) G5T3?/S1 T (photographed by Soreng in 2020)
Pink Valerian (*Valeriana pauciflora*) G4/S1 E (last vouchered in 1982)
Golden-alexanders (*Zizia aurea*) G5/S3 (*R.J. Soreng 9336*, 29 Apr 2017)

*Historic Flora*

Earleaf False Foxglove (*Agalinis auriculata*) G3/S1 E (last vouchered in 1936)
Canada Milkvetch (*Astragalus canadensis* var. *canadensis*) G5/S1 E (last vouchered in 1940)
Blue Wild Indigo (*Baptisia australis* var. *australis*) G5/S2 T (last seen in 1935 by Killip & Blake)
Short's Rock Cress (*Boechera dentata*) G5/S3 (last vouchered in 1916)
Nottoway Valley Brome Grass (*Bromus nottowayanus*) G3G5/S3S4 (last vouchered in 1947)
Hitchcock's Sedge (*Carex hitchcockiana*) G5/S1 E (last vouchered in 1933)
Short's Sedge (*Carex shortiana*) G5/S3S4 E (last vouchered in 1928)
Bur-reed Sedge (*Carex sparganioides*) G5/S3 (last vouchered in 1933)
Slender Dayflower (*Commelina erecta*) G5/S3 (last vouchered in 1960)
Spring Coralroot (*Corallorhiza wisteriana*) G5/S1 E (last vouchered in 1915)
Smartweed Dodder (*Cuscuta polygonorum*) G5/S1 E (last vouchered in 1961)
Many-flowered Flatsedge (*Cyperus lancastriensis*) G5/S2S3 (last vouchered in 1997)
Reflexed Flatsedge (*Cyperus refractus*) G5/S2? (last vouchered in 1960)
Dwarf Larkspur (*Delphinium tricorne*) G5/S3 (last seen in 1935 by Killip & Blake)
Toothed Tick-trefoil (*Desmodium cuspidatum*) G5/S1 (last vouchered in 1960)
White Trout Lily (*Erythronium albidum*) G5/S2 T (last vouchered in 1983)
Downy Milkpea (*Galactia volubilis*) G5/S3 (last vouchered in 1961)
Striped Gentian (*Gentiana villosa*) G4/S1 E (last vouchered in 1903)
Western Sunflower (*Helianthus occidentalis*) G5/S1 T (last vouchered in 1940)

2

00006449

Eastern Bloodleaf (*Iresine rhizomatosa*) G5/S1 E (last vouchered in 1915)
[1]Violet Bush-clover (*Lespedeza frutescens*) G5/S3 (last vouchered in 1960)
Bog Twayblade (*Liparis loeselii*) G5/S1S2 (last vouchered in 1917)
Climbing Milkvine (*Matelea obliqua*) G4?/S1S2 E (last vouchered in 1937)
Purple Mecardonia (*Mecardonia acuminata* var. *acuminata*) G5/S2 E (last vouchered in 1939)
Basal Beebalm (*Monarda clinopodia*) G5/S3S4 (last vouchered in 1982)
Early Forget-me-not (*Myosotis verna*) G5/S3 (last vouchered in 1962)
Racemed Milkwort (*Polygala polygama*) G5/S1 T (last vouchered in 1950)
Small Pondweed (*Potamogeton pusillus* ssp. *pusillus*) G5/S2S4 (last vouchered in 1930)
Whorled Mountain-mint (*Pycnanthemum verticillatum*) G5/S1 E (last vouchered in 1951)
Virginia Sida (*Ripariosida hermaphrodita*) G3/S1 E (last vouchered in 1938)
Brown-eyed Susan (*Rudbeckia triloba*) G5/S3 (last vouchered in 1940)
Sessile-fruited Arrowhead (*Sagittaria rigida*) G5/S1 E (last vouchered in 1930)
Carolina Willow (*Salix caroliniana*) G5/S3 (last vouchered in 1982)
Snowy Campion (*Silene nivea*) G4?/S1 E (last vouchered in 1917)
Riverbank Goldenrod (*Solidago rupestris*) G4?/S1 X (last vouchered in 1903)
Sand Grape (*Vitis rupestris*) G3/S1 (last vouchered in 1906)

[1][= *Lespedeza violacea* (L.) Pers. (misapplied); "Due to a problem with the type specimen of
*Lespedeza intermedia*, the name *Lespedeza violacea*, by which this species has long been known,
applies to *L. intermedia*, and the name *L. frutescens* now applies to [*Lespedeza violacea*]" (VBA 2020)]

**Key to Global Rank**

G1: At very high risk of extinction due to extreme rarity (often 5 or fewer populations), very steep
  declines, or other factors.
G2: At high risk of extinction due to very restricted range, very few populations (often 20 or fewer), steep
  declines, or other factors.
G3: At moderate risk of extinction due to a restricted range, relatively few populations (often 80 or
  fewer), recent and widespread declines, or other factors.
G4: Uncommon but not rare; some cause for long-term concern due to declines or other factors.
G5: Common, widespread, and abundant.
GH: Known only from historical occurrences but still some hope of rediscovery.
GNR: Not ranked.
GX: Not located despite intensive searches and virtually no likelihood of rediscovery.

**Key to State Rank**

S1: At very high risk of extirpation from the state due to extreme rarity (often 5 or fewer populations),
  very steep declines, or other factors.
S2: At high risk of extirpation from the state due to very restricted range, very few populations (often 20
  or fewer), steep declines, or other factors.
S3: At moderate risk of extirpation from the state due to a restricted range, relatively few populations
  (often 80 or fewer), recent and widespread declines, or other factors.

3

00006450

S4: Uncommon but not rare; some cause for long-term concern due to declines or other factors.
S5: Common, widespread, and abundant.
SH: Known only from historical occurrences but still some hope of rediscovery.
SNR: Not ranked.
SX: Not located despite intensive searches and virtually no likelihood of rediscovery.

**Federal and State Status**

Legal status denotes a simple hierarchy of endangerment in three categories: Endangered (E), Threatened (T), and Endangered Extirpated (X). Federal Status is determined by the U.S. Fish and Wildlife Service.

*Federal Status*

LE = Listed Endangered - A taxon is threatened with extinction throughout all or a significant portion of its range.
LT = Listed Threatened - A taxon is likely to become endangered in the foreseeable future.

*State Status*

E = Endangered - A taxon is threatened with extinction throughout all or a significant portion of its range.
T = Threatened - A taxon is likely to become endangered in the foreseeable future.

## References

Fleming, A.H. 2015. Geologic-Geomorphic Map of Plummers Island. Unpublished report.

Harrison, J.W. 2016. The Natural Communities of Maryland: 2016 Natural Community Classification Framework. Maryland Department of Natural Resources, Wildlife and Heritage Service, Natural Heritage Program, Annapolis, Maryland. Unpublished report. 35 pages.

Maryland Natural Heritage Program. 2019. List of Rare, Threatened, and Endangered Plants of Maryland. Maryland Department of Natural Resources, 580 Taylor Avenue, Annapolis, MD 21401. DNR 03-031319-135

Shetler, S.G., S.S. Orli, E.F. Wells, and M. Beyersdorfer. 2006. Checklist of the Vascular Plants of Plummers Island, Montgomery County, Maryland. Bulletin of the Biological Society of Washington 14:1-57.

Simmons, R.H. 2015. Native Vascular Flora of the City of Alexandria, Virginia. City of Alexandria Department Recreation, Parks, and Cultural Activities, Alexandria, Virginia.

Simmons, R.H., A.H. Fleming, and R.J. Soreng. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Unpublished report.

Virginia Botanical Associates. 2020. Digital Atlas of the Virginia Flora (http://www.vaplantatlas.org, 23 July 2020). Virginia Botanical Associates, Blacksburg, Virginia.

4

00006451

Prepared by:

Roderick H. Simmons, Robert J. Soreng, Edward M. Barrows, and Louise H. Emmons for the National Parks Conservation Association, July 2020.

Citation:

Simmons, R.H., R.J. Soreng, E.M. Barrows, and L.H. Emmons. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland. Unpublished technical report.

Cover photo:

A female Silver-spotted Skipper (*Epargyreus clarus*) possibly obtaining nectar from a Northern Leatherflower (*Clematis viorna*). Photo by Meghan T. First.

S

00006452



**Sierra Club Maryland Chapter**
P.O. Box 278
Riverdale, MD 20738
(301) 277-7111

February 3, 2022

Steve Archer, Cultural Resources Team Leader
Maryland Department of Transportation
State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

Dear Mr. Archer,

The Sierra Club Maryland Chapter, a consulting party to the Section 106 process, is providing the following comments on the Section 106 documents recently forwarded for review.

## Site Specific Issues

Several issues have come to our attention that have not been addressed or addressed adequately in the Section 106 process and need to be addressed prior to the execution of any Programmatic Agreement.

### 1) Morningstar Tabernacle No. 88 Moses Hall and Cemetery

*MDOT/FHWA Cannot Claim No Adverse Effect*

The Section 106 materials presented on January 4, 2022 fail to acknowledge that the project will have an adverse effect on the Morningstar hall and cemetery site, now saying there is "no adverse effect" on this historic property.

We agree with the National Trust for Historic Preservation statements in their October 8, 2021 letter to Steve Archer that:

> "[w]ithout additional study, our understanding of the footprint of the historic cemetery is incomplete, and direct adverse impacts to burial sites remains a serious risk".

The requested additional investigations have not been conducted as of the issuance of the SDEIS, and there is no mention in the SDEIS of any intent to conduct such additional surveys.

We again strongly recommend that MDOT expand the survey area to the north, west, and east of the already-surveyed site, including within the existing right-of-way. We further recommend the inclusion of a more substantial buffer between the northernmost identified burial and the project's Limit of Disturbance. These recommendations are crucial to minimizing the risk of causing adverse impacts to burials.

Furthermore, since the "adverse effect" on the Morningstar Tabernacle property has been acknowledged (and appropriately so) for purposes of Section 106, the potential "use" of the historic property cannot qualify as "de minimis." 23 U.S.C. § 138(b)(2).

In other words, ground penetrating radar data collection at the site has been insufficient and inadequate to allow for a determination of "no adverse effect" under Section 106.

No evidence has been supplied to the consulting parties that this serious oversight has been rectified. Until there has been a fuller ground penetrating survey that expands outside the borders of the already-surveyed site, including within the existing right-of-way, it is premature and improper for MDOT to claim that adverse effects on the Morningstar Tabernacle property have been avoided or minimized.

*Eligibility Designation Needs to Be Updated with Updated Cemetery Boundary Information*

The boundaries of the Moses Hall and Cemetery site need to be redrawn taking into account the new information found in the two studies as part of the Section 106 process and a new fuller ground penetrating radar survey. The NRHP eligibility designation form also needs to be updated to reflect the new information found in the studies and new site boundaries. We fully support the Friends of Moses Hall in their requests for additional mitigation measures.

*No Basis for Cutoff Date for Cumulative Effects*

The most recent Section 106 documentation acknowledges the serious impact of the original construction of the Beltway on Moses Hall, but then posits that "[b]ecause the 1960s impacts occurred prior to laws that required consideration of effects, . . . . there is not an adverse effect to the historic property based on "cumulative" impacts." MDOT letter dated Jan. 4, 2022, Attachment 5, at 3. This

00006454

conclusion is wrong as a matter of both law and fact. As a matter of law, there is absolutely no support in the Section 106 regulations for this arbitrary cut-off date, which instead unconditionally state that "Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." 36 C.F.R. § 800.5(a)(1). Nor is there any authority for this arbitrary cut-off date in the Council on Environmental Quality's cumulative impact regulations or in related regulatory guidance on cumulative impact analyses.

Furthermore, not only were those impacts significant, they had a significant disproportionate impact on an environmental justice community and its most important community feature, Moses Hall. A grave injustice was done. The imperative to consider past wrongs to environmental justice community is confirmed by Executive Order 13990, 86 C.F.R 7037 (Jan. 20, 2021),[1] which applies to projects such as this one, that would utilize federal funding. The Executive Order cites the nation's commitment to "conserve our national treasures and monuments, places that secure our national memory. *Where the Federal Government has failed to meet that commitment in the past, it must advance environmental justice*." (emphasis added)

MDOT staff know this wrong needs to be redressed and mitigated. Julie Schablitsky, the Chief, Cultural Resources Section and Chief Archaeologist at MDOT said:

> "We own the faults of the Maryland Roads Commission impacting this community 60 years ago," Schablitsky said during a recent visit to the cemetery. "It's our responsibility now to repair that damage and come in and do the right thing."[2]

The refusal to take into account impacts from the original Beltway construction is contrary to environmental justice and to MDOT's own public comments that *"We own the faults of the Maryland Roads Commission impacting this community 60 years ago," Schablitsky said during a recent visit to the cemetery. "It's our responsibility now to repair that damage and come in and do the right thing."*

MDOT's January 4, 2022 letter also baldly asserts, without any substantiation, that no impacts to the cemetery occurred from the 1992 Beltway widening. That

---

[1] Exec. Order 13990, 86 C.F.R 7037 (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-public-health-and-environment-and-restoring-science-to-tackle-climate-crisis/

[2] Katherine Shaver, Maryland will avoid Moses Morningstar Cemetery when widening Beltway, state says, The Washington Post, Sept. 9, 2021, https://www.washingtonpost.com/transportation/2021/09/09/maryland-beltway-moses-morningstar-cemetery/

3

opinion, which is wholly unsupported by any evidence, is simply not credible. Basic math indicates that when you widen a highway, you have more throughput (which calculates to more noise), more impervious surface which results in greater runoff which this site is particularly vulnerable to by the state's own admission.

Clearly there are cumulative effects to consider and they cannot simply be brushed off.

The cemetery is of exceptional importance because there are few remaining examples of African American benevolent society cemeteries dating to the 1800s. Its significance has been recognized nationally by its listing as one of the National Trust for Historic Preservation's "America's 11 Most Endangered Historic Places".

The May 2021 MDOT–commissioned report[3] states:

> "While the Morningstar Cemetery and the nearby River Road Moses Cemetery have both been previously compared to the Upland South cemetery type, historic research suggests that the comparison may not be correct. Instead, *the cemetery represents a vernacular African American cemetery that does not appear to fall within a specific, previously defined type. Late–nineteenth and early–twentieth–century African American cemeteries associated with fraternal lodge organizations may have their own characteristics that merit further investigation.*" (italics added)

This cemetery also included burials from other African American cemeteries in the region, numbering in the hundreds. The extent of the burials is still not known, and therefore the cemetery, once fully surveyed with appropriate equipment will certainly continue to yield information important to history. This cemetery is also unusual in the fact that records continue to be unearthed regarding those buried within it and the direct descendant community remains involved and continues to reveal new artifacts and information. The project's adverse effects on this NRHP eligible cemetery must be acknowledged and measures must be considered to avoid or mitigate these adverse effects.

Sierra Club Maryland Chapter agrees with and incorporates by reference the comments submitted by Friends of Moses Hall, describing the profound and permanent negative effect of the original Beltway construction. MDOT's failure to

---

[3] Cultural Resources Technical Report Documentation and Archaeological Monitoring for the I-495 & I-270 Managed Lanes Study, Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M:35-212), Montgomery County, Maryland, Archaeological Report, Report Number 560. Project Number AW073D12.

00006456

consider the cumulative impacts associated with this discriminatory and destructive past action perpetuates and exacerbates this gross injustice.

## 2) Historic Gibson Grove A.M.E. Zion Church (now First Agape A.M.E. Zion Church)

*Highway stormwater runoff must be addressed to prevent adverse impacts to church*

As the only extant structure from the Gibson Grove settlement, this small white church on a hill has very high historic and cultural significance and needs to be carefully protected. The Gibson Grove Church property has suffered cumulative impacts from highway stormwater runoff damage over many years due to the original I-495 Beltway construction. It must be ensured through appropriate mitigation measures that that highway stormwater runoff not adversely impact the church site going forward.

*Historic boundaries of the Church need to be updated based on new research findings*

Reports shared in September 2021 as part of the Section 106 process show graves on the church property. The historic boundaries of the Church need to be updated taking into account the new information found in the reports. The NRHP eligibility designation also needs to be updated with the new information and updated site boundaries.

*Preserve tree canopy and historic appearance of site*

Additionally, SHA must minimize impacts to these historic Gibson Grove church and its cemetery by preserving most of the tree canopy and topography, constructing context sensitive noise barriers, preserving air quality, and minimizing visual impacts.

## 3) Plummers Island

We agree that the project will have an adverse effect on Plummers Island, a rare and nationally and internationally important historical site. Plummers Island is ground zero for construction of a new double wide American Legion Bridge. The whole of Plummers Island including its riparian fringes and waterways are the sites of historically significant ongoing research. MDOT SHA and the selected developer Transurban plan to take part of Plummers Island, place a pier on the Island, undertake construction from the island, destroy important research plots of rare plant species and habitat, and overshadow the island and its significant research areas by as much as 30 feet with noisy new bridge lanes.

Known impacts raised by the caretakers of the island, Washington Biologists' Field Club, were not included as project impacts in the SDEIS or in any

5

communications from Section 106 leaders. Yet they are real and serious and include: (1) damage to waterways, (2) destruction of rare plants and rare plant communities from the far west end of the island, (3) destruction of WBFC research plots, (4) destruction of past collection sites, (5) habitat destruction and disturbance lead to more invasive organisms, (6) potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction blow out, (7) sound from bridge construction and closer proximity of traffic in six new bridge lanes after they open on the bridge, (8) impacts on biota from salt, deicing compounds, and oil runoff from the bridge. All of these impacts destroy the long-term continuity of 120 years of research and thus severely impair this significant feature of the site that contributes critically to its historic significance.

Potential project-caused flooding impacts to Plummers Island have not been sufficiently acknowledged by project proponents in any of the three processes underway (NEPA, Section 106, and Section 4(f)). The water flooding issues from planned caisson emplacents (creating perfect conditions for logjams) and leveling or trimming the rock ridge that constrains the channel over flow from flooding the island are major and reasonably foreseeable adverse issues that require prompt attention and avoidance, minimization or mitigation. The resulting damage and loss of long-term research plots and impacts to rare, threatened, and endangered species on the island would be formidable.

Please see additional issues in the Sierra Club et al. comments and the comments, letters, and communications from Washington Biologists' Field Club, further elaborating on the severe Project impacts on Plummers Island. Sierra Club Maryland Chapter fully endorses and adopts the Section 106 comments of the Washington Biologists' Field Club.

### 4) Carderock Springs Community

*We support the Carderock Springs Citizens Association Section 106 comments*

We write in support of the points made by the Carderock Springs Citizens Association. A community of approximately 600 homes, Carderock Springs is designated as a National Register–Listed Historic District for being a notable example of "situated modernism." This community will experience significant adverse effects from the proposed toll lane highway expansion. Comments submitted by the Carderock Springs Citizens Association ("CSCA"), a community organization that represents Carderock Springs and Carderock Springs South, show that the SDEIS fails to include a sufficient visual impact analysis based on the scoping questionnaire and includes an inconsistent and misleading analysis of noise impacts on the Carderock Springs community.

6

The fields of Carderock Springs Elementary School, which are used by the community and adjacent to the highway, are also a Section 4(f)–protected public recreation area. The school will suffer noise impacts from a widened highway that will impact educational instruction. Proposed flyover ramps for the MD,190/Cabin John Parkway interchange have the potential to alter the visual setting and context of the adjacent historic district.

The issues raised by the Carderock Springs Citizens Association need to be addressed by MDOT SHA as part of the Section 106 process, prior to the execution of any Programmatic Agreement.  For these impacts and more, it is false to conclude, as MDOT does, that the preferred alternative would have no adverse impact on Carderock Springs or only de minimis impacts.

As a result of the preferred alternative, the residents of the community and the children and staff of the Carderock Springs Elementary School will be faced with loss of tree canopy, increased exposure to air pollution, and increased noise and visual impacts. These issues have been raised with MDOT SHA in DEIS, SDEIS, and Section 106 comments and need to be addressed as soon as possible before any Programmatic Agreement can be finalized.

## 5) Native American Site

*Inappropriate approach and disregard for an important Native American site*

Regarding Site 18MO749, a Native American site, we note a significant difference in what the DEIS appendix said about this archaeological site and what MDOT now states as part of the Section 106 process.

The July 10, 2020 DEIS Appendix stated that Site 18MO749:

> "is believed to have the ability to answer significant questions about precontact settlement patterns and the nature and use of the site through further research and excavation. [It] appears to retain a high degree of stratigraphic integrity and has the potential to provide meaningful new data on precontact lifeways in the area. It may also provide additional information that can be used to compare and contrast with the concentration of precontact sites located on the south shore of the Potomac River across from the site."

And yet, MDOT now proposes to defer the required Phase I survey until after a Programmatic Agreement is executed. See MDOT January 4, 2022 letter, at p. 7

More should be known about this site at this stage of the Section 106 process. Investigation and NRHP eligibility determination should not be deferred for such a historically significant archaeological site close to which there are proposed

7

wetland mitigations for impacts of the project to park wetlands. The archaeological site could be damaged if more is not known. Saying "The site may have been too poorly drained in the past to support human habitation, but this is not known with certainty" about a site next to the one described is careless and speculative, not at all in keeping with the due diligence and respect such a rare and unique archaeological site merits.

### 6) C&O Canal Lock House Keeper Site

*NRHP eligibility determination for C&O Canal Lock House Keeper site not provided and needs to be*

Another C&O Canal NHP site was recommended for NRHP eligibility in the July 10, 2020 DEIS for:

> [G]ood potential for the presence of additional cultural features and patterned artifact deposits. [It] has the potential to provide substantive data that could be useful in addressing a variety of regional research issues, including those related to early 19th through early 20th century consumer behavior and the lifeways of C&O Canal lock house keepers. This site is recommended eligible under NRHP Criteria A, C, and D, and avoidance or data recovery investigation is recommended.

Notwithstanding this acknowledgement, the status of this site's NRHP eligibility determination and avoidance, minimization, and mitigation measures are not disclosed in the SDEIS nor has any NRHP eligibility determination been shared as part of the Section 106 consulting party process. This omission must be remedied in advance of finalizing the Programmatic Agreement.

When available, we request to review the NRHP eligibility determination and request the close involvement of state historic preservation officers in protecting this site.

### 7) The Potomac River

*Lack of attention to historic Potomac River and mitigation of impacts on river and its users*

The Potomac River is nationally recognized as an important historic, scenic, and recreational waterway. The National Park Service (NPS) has designated the Potomac as a National resource – The Potomac Heritage National Scenic Trail and as part of the Captain John Smith Chesapeake National Historic Trail. Both of these National Trails include the section over which the new bridge will span. Yet the SDEIS does not assess impacts to the historic character of these NPS managed

00006460

trails. It does not appear that MDOT consulted with Maryland DNR Scenic and Wild Rivers Advisory Council or the managers of aforementioned trails regarding impacts to the Potomac River itself as a historic, scenic, and recreational resource.

Canoe Cruisers Association members actively use the Potomac River under the American Legion Bridge for paddling. The NPS and State of Maryland have recognized this section of the Potomac River as significant for its historical significance, scenery, and recreational opportunities. MDOT has not assessed the adverse impacts of replacing the American Legion Bridge to the Potomac itself nor to CCA members and the greater DC area paddling community.  Furthermore, MDOT has not described how it can and must avoid, minimize, and mitigate those adverse impacts.

Sierra Club Maryland Chapter agrees with the inadequate assessment of impacts of the project and bridge replacement on the Potomac River itself. This is an omission that requires immediate attention and remedy.

Sierra Club also notes that CCA's interests include historic and cultural resource protection and supports the Canoe Cruisers Association's request for Section 106 consulting party status.

For more information on each of these site issues (except Item 7), we refer you to the Sierra Club et al. comments on the SDEIS. We also refer you to the comments of the individual stakeholder entities, including Friends of Moses Hall, Washington Biologists' Field Club, Carderock Springs Citizens Association, and Canoe Cruisers Association.


**Bridge Alternatives**

A serious study of bridge alternatives and bridge construction impacts has not been undertaken. The DEIS merely notes that "Other minimizations options were also considered and discussed with NPS such as a double deck bridge, top-down construction and reduced typical sections and pier locations." The public has not been provided a meaningful opportunity to review potentially less damaging bridge alternatives. Given the scenic historic value of the river and the sensitivity of the historic and ecological significance of the sites under and around the American Legion Bridge, it is not acceptable to wave away consideration of alternatives with mention of the fact that there were prior discussions between MDOT and one federal agency. There are many stakeholders that deserve to be at the table for decisions about the American Legion Bridge, including the ones mentioned in this letter. These alternatives must be given serious consideration as part of the Section 106 consultation process.

9

**Impact Assessment for Cumulative Effects of Future Phases**

Detailed identification and impact assessments of historic sites for all of the I-495 & I-270 MLS are required. It is improper to not have reviewed Section 106 sites from upper 270 between I-370 and I-70, which are reasonably foreseeable results of the planned eastern I-495 and upper I-270 future phases. Impacted historic properties include the Monocacy Battlefield. The upper I-270 segment is already conditionally contracted to the developer Transurban and has a specific name (Phase 1 South plus upper I-270 is being called the American Legion Bridge Traffic Relief Plan). It is part of the plan and therefore needs to be considered a foreseeable future cumulative effect of the plan. The failure to review and disclose the impacts on historic properties in the upper I-270 segment deeply prejudices the consideration of alternatives and the integrity of the decision-making process for this controversial project.

**Area of Potential Effect and Limits of Disturbance**

We note that you have included in the Section 106 process and January 4, 2022 Section 106 materials some properties that are outside of the LOD/APE of the project, including in Prince George's County (which this part of the project will not touch). The findings of no effect for property outside the project will obviously need to be re-evaluated and reassessed if/when a future phase of the project is undertaken. It should be absolutely clear that if the project goes in the future to the original scope, those findings are invalid and the public and relevant consulting parties needs to be given an opportunity to comment on impacts of any new expansion in the future.

In light of the strong disagreements relating to the assessment of adverse effects noted above, it is entirely premature to execute a Programmatic Agreement that is predicated upon the flawed assessment of adverse effects and mitigation measures noted above. Instead, any PA must acknowledge the serious adverse impacts on the Morningstar Tabernacle No. 88 Moses Hall and Cemetery, and must do a better job of considering measures to avoid or mitigate harm to those historic properties, such as Plummers Island, that are acknowledged to be adversely affected by the Project.

We appreciate your prompt attention to these serious unresolved matters.

Josh Tulkin, Director
Sierra Club Maryland Chapter

00006462

**Karen Hutchins-Keim**

| | |
|---|---|
| **From:** | Steve Archer <SArcher@mdot.maryland.gov> |
| **Sent:** | Thursday, March 31, 2022 3:33 PM |
| **To:** | Karen Hutchins-Keim |
| **Cc:** | Richard Ervin; Matt Manning (Consultant) |
| **Subject:** | FW: I-495 and I-270 MLS Section 106 Materials, PA Third Draft, Comments Requested by April 14, 2022 |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

---

**EXTERNAL EMAIL:** Do not click links or open attachments unless you trust the 'Sender' and know the content is safe.

---

**From:** Roderick Mackler <rodmackler@gmail.com>
**Sent:** Thursday, March 31, 2022 3:31 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Cc:** Landsman, Andrew <andrew_landsman@nps.gov>; Jeri DeYoung <Jeri_DeYoung@nps.gov>; Edmund Preston <ned@presto77.com>; tammy_stidham@nps.gov
**Subject:** Re: I-495 and I-270 MLS Section 106 Materials, PA Third Draft, Comments Requested by April 14, 2022

Dear Steve,

Thanks as always for keeping the C&O Canal Association in the loop in this huge project.

As you know, the key interest of the Association is the project's impact on the C&O Canal National Historical Park. This iteration changes that impact in two particulars:

1. There are more specifics of plans to mitigate impact (including funding for baseline measurements) upon the Washington Biologists' Field Club research facility on Plummers Island, within the C&O Canal HNP. This should still be considered an adverse impact.

2. The idea to extend the "shared use path" connection to the sidepath on MacArthur Boulevard has been scrapped. Instead, the sidewalk (as I call it) will connect directly to the C&O Canal towpath. The second illustration, "LOD Location in Change, Clara Barton Parkway, 1b", shows the off ramp from the Beltway, north-bound, onto the Clara Barton Parkway (inbound), but does not show the connection to the towpath. Do you have any more detailed maps showing this connection? This change has the potential to increase Park visitor numbers in the Seven Locks area.

By the way, we had discussed how the shared use path will connect on the Virginia side, admittedly of lesser interest to both of our organizations. The short answer is that it will NOT connect to the GWMP, but rather, it will parallel the highway, behind the sound barriers, for some distance, until it can connect to Fairfax County parks. I haven't seen all the details, but I imagine something like I-66, where one can bike from near the East Falls Church Metro to the Key Bridge Marriott without crossing any streets at grade.

1

00006463

Finally, we have had a change in leadership at the C&O Canal Association. Ms. Tiffany Ahalt of Hagerstown has assumed the presidency of the Association in an election last week. She will likely be signing any formal "comment" on behalf of the Association, but I will remain the main point of contact for the Association under the National Historic Preservation Act of 1966 and the National Environmental Policy Act of 1969.

Thanks, again, Steve, for your excellent communication on this project.

Rod Mackler
Chair, Environmental Committee
C&O Canal Association

On Thu, Mar 31, 2022 at 1:16 PM Steve Archer <SArcher@mdot.maryland.gov> wrote:

Greetings I-495 and I-270 MLS Section 106 Consulting Parties,

MDOT SHA is pleased to provide you with additional Section 106 documentation for your review and comment. These materials include:

- ∞ MDOT SHA and FHWA's response to MHT regarding effects to the Morningstar Cemetery property, proposing to determine effects following completion of additional investigations under the PA.
- ∞ APE mapping with small updates to accommodate minor engineering adjustments, and two areas of LOD reduction that reduce potential impacts to historic resources. Callout maps showing the changes are attached to the letter; the remainder of the APE and LOD has not changed. However a full updated mapbook of the updated APE and LOD can be downloaded at the FTP site below.
- ∞ A Comment-Response Matrix noting how comments received on the second draft of the PA have been taken into consideration.
- ∞ The Third Draft of the Project Programmatic Agreement (PA), incorporating consulting party input.

**Drafts of the Archaeological Treatment Plan and Cemetery Treatment Plan (Attachments 4 and 5) will be transmitted only to the appropriate/qualified consulting parties in a separate email.**

**As noted in the letter, we request all potential concurring parties (listed in Attachment 3 of the Draft PA) provide us with the name and title of the individual representative who may sign on behalf of your party. We will use this information to prepare/offer concurring signature pages, but this does not obligate any party to provide signature. If we do not receive this information we will assume your party does not wish to concur in the PA as we prepare the final document. Please provide name and title to me via email by April 14, 2022.**

Further details are provided in the attached letter to the Maryland and Virginia State Historic Preservation Officers. Attachments 1a-c and 6 are embedded within the attached letter. Attachment 2 (Comment Responses) and Attachment 3 (Programmatic Agreement Third Draft) are provided as separate file attachments to this email. The APE

00006464

mapbooks are larger files and may be downloaded at the following link, which also contains the same files attached to this email:

https://sftp1.mdot.state.md.us/

Username:  MLSResource

Password:  I495I270

MDOT SHA respectfully requests comments on these materials by no later than **Thursday, April 14, 2022**, close-of-business.  For the PA, *specific* comments or language suggestions, **keyed to stipulation number** are most helpful to the process.  Comments emailed directly to me are the most effective way to provide your input.

Thank you, we appreciate your ongoing consultation.  Feel free to contact me with any questions or concerns.

Steve Archer

Cultural Resources Team Leader

Maryland Department of Transportation State Highway Administration

Environmental Planning Division

707 North Calvert Street

Baltimore, MD 21202

Phone 410-545-8508

sarcher@mdot.maryland.gov

Governor Hogan is committed to outstanding customer service. Tell us how we are doing. Click here.

3

00006465

 Maryland now features 511 traveler information!
Visit: www.md511.org

Please consider the environment before printing this email

 LEGAL DISCLAIMER - The information contained in this communication (including any attachments) may be confidential and legally privileged. This email may not serve as a contractual agreement unless explicit written agreement for this purpose has been made. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication or any of its contents is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender indicating that it was received in error and delete the original message and any copy of it from your computer system.

4



**Sierra Club Maryland Chapter**
P.O. Box 278
Riverdale, MD 20738
(301) 277-7111

April 6, 2022

Steve Archer, Cultural Resources Team Leader
Maryland Department of Transportation
State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

Dear Mr. Archer,

We received the new Section 106 materials less than a week ago on Thursday. These materials were provided with a two-week comment period ending on April 14, 2022. All previous Section 106 comment periods for the I-495 & I-270 Managed Lanes Study have been 30 days long.

We have learned of your denial of Friends of Moses Hall's request for the usual 30-day comment period on the new Section 106 materials.

We echo their concerns about the inadequacy of the proposed two-week review period, particularly when one of those weeks overlaps with the public school spring break in the affected jurisdictions. Many people, including my key staff, have previously scheduled vacations during this timeframe, and this will make it very difficult if not impossible to provide meaningful comments on the new materials.

There was no advance notice of when this new set of Section 106 materials would be circulated for public review and comment, so no advance planning was possible to schedule and reserve time to provide comments, an additional reason why a two-week period is not adequate.

We therefore ask that you reconsider the request for an enlargement of time to provide comments on these key documents and provide a 30-day comment period on the latest materials up to and including April 30, 2022.

Sincerely,

Josh Tulkin, Director
Sierra Club Maryland Chapter



**National Trust** *for*
**Historic Preservation**
*Save the past. Enrich the future.*

April 14, 2022

*By email to: sarcher@mdot.maryland.gov*

Mr. Steve Archer
Cultural Resources Team Leader
Environmental Planning
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD 21202

**Re: I-495 and I-270 MLS Section 106 Materials, PA Third Draft**

To Mr. Archer:

The National Trust for Historic Preservation appreciates the opportunity to review the updated Draft Programmatic Agreement (PA) for the I-270 and I-495 Managed Lanes Study. We support the comments submitted by the Maryland Historical Trust, the Friends of Moses Hall, the Maryland National Capital Park and Planning Commission, and the Sierra Club Maryland Chapter. We offer our own comments below.

**Inadequate Review Period**

First, we would like to echo the comments of other consulting parties that the two week review period provided for these materials was inadequate in length. For future review opportunities, we strongly encourage adhering to a standard thirty day comment period to allow all consulting parties sufficient time to review and comment.

**Finding of Impact Not Determined**

In our letter dated February 3, 2022, we stated our disagreement with the previous finding of "No Adverse Effect." We appreciate that the determination has at least been updated to impact "Not Determined." We continue to advocate for additional Ground Penetrating Radar (GPR) investigation to search for more potential burials.

00006468

However, we also believe that at this time, there is reason to conclude that, in fact, the proposed action *will* have an adverse effect on Morningstar Tabernacle No. 88 Moses Hall and Cemetery.  The limitations of the GPR investigation to date leave open the possibility that further investigation will uncover additional burials within the Limits of Disturbance (LOD).

For example, according to the presentation shared with the consulting parties at the Section 106 meeting on January 4, 2022, the portion of the cemetery that is within the existing right-of-way includes at least 14 "probable" burials, 13 "possible" burials, and 6 "tentative" burials.  And that's based on incomplete GPR investigation. It will be important to ensure that the PA includes a binding commitment to avoid any disturbance or physical intrusion whatsoever to this portion of the cemetery within the right-of-way.

**Failure to Assess Cumulative Effects**

In addition, the cumulative impacts of the original highway construction continue to reverberate at this site.  As we stated in our February 22 letter, we strongly disagree with the new argument that cumulative impacts analysis can ignore past impacts prior to the passage of NEPA and NHPA. There is no basis for excluding the original construction of the highway from the analysis of cumulative impacts to Morningstar Tabernacle No. 88 Moses Hall and Cemetery – especially since the original beltway construction that bulldozed a portion of the historic Cemetery was funded and carried out by the same agencies as those proposing the current project.  Indeed, the stormwater easement retained by SHA continues to cause adverse effects. This is not a case of cumulative impacts by an unrelated third party over which the current project proponent has no control.  Nor was the original beltway construction an individually minor action or one with speculative impacts. These cumulative impacts must be considered when making a final determination of effect. In our view, the cumulative impacts compel the unavoidable conclusion that the effect on the Morningstar Tabernacle No. 88 Moses Hall and Cemetery is and will continue to be adverse.

**Conveyance of a Portion of the Right-of-Way**

In our February 22 letter, we stated our disagreement with the agencies' refusal to include a commitment in the PA to convey to the cemetery trustees a portion of the right-of-way containing potential burials.  We continue to urge that a commitment to conveyance be recorded as part of the PA.  The responses to our previous round of comments state that the proposed conveyance "per FHWA . . . can not be in the 106 PA," but could potentially be

2

00006469

included in the ROD. However, the responses fail to provide an explanation as to WHY this commitment cannot be included in the Section 106 agreement.

**Additional Consultation is Needed**

We encourage MDOT and FHA to continue to work with local advocates to identify appropriate measures both to minimize and to mitigate potential adverse effects to Morningstar Tabernacle No. 88. Because of the historic impacts to this site, we believe that it would be appropriate for MDOT and FHWA to commit to pursuing these minimization and mitigation measures, regardless of the ultimate finding regarding adverse effect; however, at a minimum, these mitigation efforts should be agreed to conditionally if a finding of adverse effect is ultimately made.

**Comments on Stipulation V.G.**
**Morningstar Tabernacle No. 88 Moses Hall & Cemetery**

1.   Stipulation V.G.1. provides for the development of a context-sensitive treatment for the noise barrier facing the Cemetery, including appropriate decorative elements, memorial plaques, and/or signage, with input from consulting parties with a demonstrated interest in the Cemetery. This needs to be expanded to include a commitment to establish ADA-compliant public access to the cemetery. In addition, the National Trust requests to be included in this consultation process as a party with a demonstrated interest in the Cemetery.

2.   Stipulation V.G.2. addresses the use of additional studies in the treatment plans to further evaluate and address effects to the Cemetery. We strongly agree with the Maryland Historical Trust that the following sentence must be deleted from the Draft PA: "*If no interments are identified that would unavoidably be affected by the project, there will be no adverse effects to the cemetery from the Preferred Alternative.*"

We also object to the final sentence in Stipulation V.G.2., on two grounds.

*First,* it fails to spell out a procedure for determining whether "no additional project avoidance options are feasible," and appears to presume that MDOT-SHA will make this determination unilaterally.

*Second,* if the determination *is* made that "no additional project avoidance options are feasible," the Draft PA calls for the resulting

3

consultation (regarding likely adverse effects and mitigation options) to be carried out exclusively by the federal and state transportation agencies, without the involvement of the Maryland Historical Trust or any other consulting parties. This is unacceptable.


Thank you for considering the comments of the National Trust.  We appreciate the opportunity to continue our participation in the Section 106 consultation process.

Sincerely,

*Elizabeth Merritt*

Elizabeth S. Merritt
Deputy General Counsel

*Kendra P*

Kendra Parzen
Field Officer

4

00006471



**FRIENDS OF MOSES HALL**
**MORNINGSTAR TABERNACLE NUMBER 88**
**ANCIENT UNITED ORDER OF SONS AND DAUGHTERS, BROTHERS AND SISTERS OF MOSES**
**7550 Seven Locks Road**
**Cabin John, MD 20818**
**morningstarmosescj@gmail.com**
**www.friendsofmoseshall.org**

April 14, 2022

By Email to: sarcher@mdot.maryland.gov

Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation
State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

Re: I-495 and I-270 MLS Section 106 Materials, PA Third Draft

Dear Mr. Archer:

Thank you for the opportunity to review and comment on the most recent Section 106 materials and the third draft of the PA for the I-495 and I-270 Managed Lane Study. We wish to provide the following comments.

Most pressingly, we believe, for the reasons set forth in our previous communications, that MDOT SHA (hereafter "SHA") and FHWA have erred in concluding that there are not clear cumulative effects at the Morningstar site. The history of this site shows that SHA and its predecessors have repeatedly engaged in activities that have both cumulatively and negatively affected conditions at a historic, African-American cemetery. The record of this Section 106 process also shows how SHA has created an arbitrary cutoff for cumulative effects, has failed to provide reasoned decision-making on the topic, and has acted capriciously in the substantial difference between how it communicated to the public and the press and the ways it has sought to substantively address the issue with the affected party. We therefore strenuously object to FHWA's "finding," (March 31, 2022 update letter to MHT/DHR, P.4) that the cumulative effect issue has been addressed or settled. FHWA and SHA's continued inability to articulate a defensible rationale for their decision-making further strengthens our objections.

Because SHA and FHWA have misapplied the law and acted arbitrarily and capriciously on the issue of cumulative effects, as articulated in our previous letter, we are unable to support the current effects determination (or lack thereof) made by SHA.

In addition to this overarching concern, we here provide specific comments on the materials provided.

00006472

Update Letter

- We request the meeting notes from the referenced meeting with MHT Staff, as it relates directly to the Morningstar site and is critical for our understanding of effects under the Section 106 process.
- We note that within the letter, as well as in consulting party meetings, that SHA uses the term "boundaries of the cemetery." SHA is, in fact, now basing the cemetery boundary on a 1957 aerial map that was shared in consulting party meetings. The 1957 aerial was used as a graphic underlay for the depiction of grave shafts revealed in the limited area where GPR was conducted during a Consulting Party meeting with SHA on January 4, 2022. We reject SHA's assumption/interpretation as sufficient to evaluate the extent of the boundaries of the Morningstar Moses Cemetery.  Historical research and the absence of burial records for most of the 377 GPR-indicated probable and possible graves in the limited survey areas points to the distinct possibility that the cemetery is older than originally thought. The historical evidence suggests that this could be a Reconstruction-era cemetery. Most graves were marked by stones and not inscribed markers, and it is likely that landowners and descendants present in 1957 would not have been able to identify the boundaries of the cemetery. We reiterate:  SHA has presented a convenient definition of the boundary of the property that we reject.

Comment Responses

- **Re: Comment #68.** The comment notes that "FHWA has determined that [the future ROW transfer between SHA and Morningstar] cannot be a Section 106 PA commitment, but it can be documented in the ROD." This response fails to consider the rest of our comment, which notes that law and regulation require this act **to be so documented in the ROD.** It is a "must," not "can" situation and we request that this language be revised accordingly. Additionally, FHWA is required to provide justification for this determination, which has not been done to-date despite our repeated raising of this issue.

PA Third Draft

In addition to the following preliminary comments, we will share additional comments to the Cemetery Treatment Plan and the Archaeological Treatment Plan by SHA's deadline of May 2, 2022.

- **Section V.G.1.** Cumulative impacts caused by this project warrant stronger mitigation commitments. Mitigation proposed is insufficient, and fuzzy language, such as "may include," is unacceptable. Further, absent a commitment to the mitigation proposed in our April 12, 2021 first draft PA comment letter – specifically ADA-compliant access to the cemetery and SHA cleaning up its own perpetual stormwater easement on the property – the site must remain closed to the public.
- **Section V.G.2.** Define "unavoidably." Additionally, we concur with MHT's comment to this stipulation shared in their email to consulting parties shared this morning.
- **Section VII.I.** Confirm who determines the relocation site and what is included within the definition of "disposition" of human remains or associated funerary objects.
- **Section VII. Cemeteries and Human Remains Treatment Plan.** (Pg. 17) Regarding progress meetings, FMH reserves the right to request meetings at reasonable junctures once the timing and work plan is understood. We recommend that SHA be required to provide adequate information regarding timing and work plan to facilitate determining the appropriate cadence of meetings.
- **PA, Attachment 1: Inadvertent Discovery Plan.** (Pg. 21) Please confirm that FMH would be notified before any movement or removal of remains. Confirm that FMH would have input on any resource determined eligible for removal from the Morningstar site.

<u>Signature Block Information</u>

The correct name of our consulting/concurring party for all PA documents should read: **The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated and Friends of Moses Hall.**

The name and title of the person to sign for our consulting/concurring party is as follows:

**Diane E. Baxter**
President, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Member, Friends of Moses Hall
Descendant, Morningstar Tabernacle Number 88 Ancient United Order of Sons and Daughters, Brothers and Sisters of Moses

We appreciate your consideration of these comments.

Sincerely,

**The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated and Friends of Moses Hall**

**Diane E. Baxter**
President, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Descendant

**Dr. Charles W. Harris**
Vice President, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Descendant

**Eileen McGuckian**
Secretary, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Historian and President, Montgomery Preservation, Inc.

**Montgomery Crawford**
Treasurer, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Descendant

**Alexandra Jones, PhD, RPA**
Trustee, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Executive Director and Founder, Archaeology in the Community

**Austin E. White**
Trustee, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Descendant

**Charlotte Troup Leighton**
Chair, Friends of Moses Hall Committee
Trustee, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Vice President of Advocacy, Cabin John Citizens Association

**L. Paige Whitley**
Trustee and Chair, Research Committee, The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
Independent Researcher

00006474

**Sondra Raspberry**
Descendant

**Shannon S. Steward**
Descendant

**Christopher Waynes**
Descendant

**Austin White II**
Descendant

**Nathan White II**
Descendant

**Pandora White**
Descendant

00006475

cc:    Governor Lawrence J. Hogan – governor.mail@maryland.gov
       Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
       Treasurer Nancy Kopp – treasurer@treasurer.state.md.us
       Jeffrey T. Folden, MDOT SHA – mls-nepa-P3@mdot.maryland.gov
       Kendra Parzen, National Trust for Historic Preservation - KParzen@savingplaces.org
       Elizabeth S. Merritt, National Trust for Historic Preservation - emerritt@savingplaces.org
       Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
       Julie Langan, Virginia DHR - julie.langan@dhr.virginia.gov
       Steve Archer, MDOT SHA – sarcher@mdot.maryland.gov
       Julie Schablitsky, MDOT SHA – jschablitsky@mdot.maryland.gov
       Richard Ervin, MDOT SHA – rervin@mdot.maryland.gov
       David Clarke, USDOT - david.clarke@dot.gov
       April Marchese, USDOT – april.marchese@dot.gov
       Colleen Vaughn, USDOT – colleen.vaughn@dot.gov
       Brenda Mallory, Chair, White House Council on Environmental Quality – brenda_mallory@ceq.eop.gov
       Vivian Lee, National Capital Planning Commission – vivian.lee@ncpc.gov
       Samantha Beers, US EPA - beers.samantha@epa.gov
       Emily Biondi, Federal Highway Administration – emily.biondi@dot.gov
       James Gavin, Federal Highway Administration – james.gavin@dot.gov
       Jitesh Parikh, Federal Highway Administration – jitesh.parikh@dot.gov
       Jeanette Mar, FHWA Maryland Division – jeanette.mar@dot.gov
       Reid Nelson, ACHP – rnelson@achp.gov
       Mandy Ranslow, ACHP - mranslow@achp.gov
       Jaime Loichinger, ACHP - jloichinger@achp.gov
       Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
       Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
       Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
       John Simkins, FHWA Virginia Division - john.simkins@dot.gov
       Rebeccah Ballo, Montgomery County Planning Department – rebecccah.ballo@montgomeryplanning.org
       Debra Borden, M-NCPPC – debra.borden@mncppc.org
       Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
       Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
       Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
       Eddie Bankhead, First Agape AME Zion Church - esbj@pobox.com
       Rev. Edgar Bankhead, First Agape AME Zion Church - ebankjs@verizon.net
       Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
       Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
       Sara Love, Maryland State Delegate – sara.love@house.state.md.us
       Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
       Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
       Carol Rubin, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
       Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
       Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
       Gerald Cichy, Commissioner, Montgomery County Planning Board -MCP-Chair@mncppc-mc.org
       Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
       Gabe Albornoz, Montgomery County Councilmember-councilmember.albornoz@montgomerycountymd.gov
       Andrew Friedson, Montgomery County Councilmember- councilmember.friedson@montgomerycountymd.gov
       Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
       Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
       Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
       Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
       Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
       Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
       Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

00006476



Sierra Club Maryland Chapter
P.O. Box 278
Riverdale, MD 20738
(301) 277-7111

April 14, 2022

Steve Archer, Cultural Resources Team Leader
Maryland Department of Transportation
State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

Dear Mr. Archer,

The Sierra Club Maryland Chapter, a consulting party to the Section 106 process, has received the Section 106 materials and draft Programmatic Agreement (PA) for Phase 1 South of the I-495 & I-270 Managed Lanes Study which was sent for review on March 31, 2022. The materials included a revised area of potential effect and revisions in the limits of disturbance. Our comments, concerns, and requests follow, and they incorporate by reference here all of our previous comments.

**THE PA IS PREMATURE BECAUSE SERIOUS LEGAL ISSUES REGARDING CUMULATIVE EFFECTS WERE IGNORED**

Sierra Club and multiple consulting parties raised legal objections to the MDOT's arbitrary and incorrect argument that no cumulative effects prior to 1966 and 1970 could be considered.

Yet the March 31, 2022 MDOT Section 106 cover letter in this set of materials glosses over the legally insufficient argument, does not address that issue in the response matrix, and falsely implies there are no issues with cumulative impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery site, saying: "FHWA finds that the issues related to atmospheric, audible, visual, and cumulative effects to the property, have been addressed."

The MDOT cover letter further states,

> "In MHT's letter of February 4, 2022, the rationale for not concurring with the specific effect finding for Morningstar Cemetery was due to potential for

00006477

> additional burials outside the defined boundaries of the property that may
> exist or be impacted."

This is not accurate.

The MHT February 4, 2022 letter states regarding the Morningstar site that
(emphasis added):

> "Given the sensitivity of the resource, the potential for the presence of
> additional burials that may be impacted, and the overwhelming expression
> of concern for this resource expressed by multiple consulting parties, **it is
> our opinion that the finding of adverse effect remains valid for this
> historic property**."

The sensitivity of the resource and concern for the resource certainly include more
than just the possibility of additional burials that may be impacted and extend to
audible, visual, and cumulative effects, and site diminishment. That those issues
were spoken about generally as "sensitivity of the site" and "overwhelming
expression of concern" in the above MHT comment does not remove them as
issues from the Section 106 process. Cumulative impacts, for one, is still very
much an issue for this site.

Cumulative impacts from past Beltway construction are indisputably adverse; this
site has been subject to longstanding, historic race–based discrimination in
transportation planning in the state.

The PA is premature given that the serious legal issues regarding cumulative
effects have been ignored.

**MORNINGSTAR TABERNACLE NO. 88/MOSES HALL AND CEMETERY**

We endorse and incorporate by reference the April 14, 2022 comments of the
Friends of Moses Hall regarding the Morningstar Tabernacle No. 88 Moses Hall
and Cemetery site.

In additional to Sierra Club objecting to MDOT's dismissing and ignoring of
cumulative effects and other adverse effects to this site, as described above, we
have significant concerns about (1) MDOT's deferral of the determination of
effects for the site and (2) the lack of specificity in the PA language concerning the
site.

00006478

*Deferral of Effects Determination*

After a determination of adverse effects and then a contested determination of no adverse effect, MDOT is now proposing to defer its effects determination for the Morningstar Tabernacle No. 88 Hall and Cemetery in the historic Black community of Gibson Grove in Cabin John, Maryland.

The contentious issue surrounding the adverse effect determination for Morningstar Tabernacle No. 88 site cannot be deferred. In a letter to Dr. Julie M. Schablitsky of MDOT, the MHT clearly stated on February 4, 2022 that: "it is our opinion that the finding of adverse effect remains valid for this historic property."

Sierra Club objects to MDOT's deferral of the adverse effect determination for several additional specific reasons.

1. MDOT's new proposed plan to defer a determination of adverse effect for Morningstar Tabernacle No. 88 site until after issuance of the Record of Decision will foreclose major options for alternatives and redress.
2. Adverse effects are able to be determined now since there are over two dozen probable or possible grave shafts in the right-of-way abutting the land where the highway will be widened and heavy construction equipment will be used. The probable and possible grave shafts conform to the same patterns observed in the rest of the cemetery.
3. These effects, when added to the cumulative impacts from past Beltway construction, are indisputably adverse; hence, even assuming some degree of post-ROD mitigation, there is no basis for arguing that there would be no adverse cumulative effects to this important historical site, which has been subject to longstanding, historic race-based discrimination in transportation planning in this state.

In summary, while the full extent of the adverse effect can be addressed as part of the PA, the adverse effect determination must be made now.

*Programmatic Agreement*

In addition to the April 14, 2022 comments on the PA made by Friends of Moses Hall, we ask that:
1. the PA include a binding commitment to avoid any disturbance or physical intrusion to the portion of the cemetery within the right-of-way that contains the probable and possible grave shafts

3

2. the PA section pertaining to the Morningstar site be specific about which studies will be done and which boundaries (historical boundaries, or boundaries set on a certain date) are being referred to and include the referenced boundary map as an attachment to the PA

3. this statement in Section V.G.2 be removed from the PA as it is not accurate, legally or otherwise – "If no interments are identified that would unavoidably be affected by the project, there will be no adverse effects to the cemetery from the Preferred Alternative."

4. this statement in Section V.G.2 be amended to include italicized text: "Should interments be identified outside the identified boundary of the cemetery, and no additional project avoidance options are feasible, MDOT SHA, ~~and~~ FHWA *and Friends of Moses Hall, National Trust for Historic Preservation, M-NCPPC, MHT, Sierra Club Maryland Chapter and other interested parties* will consult on the likely adverse effect, identify mitigation options, and amend this PA as necessary following the procedures in Stipulations IV and XIII of this PA."

## PLUMMERS ISLAND/WASHINGTON BIOLOGISTS' FIELD CLUB

We endorse and incorporate by reference the April 14, 2022 comments of the Washington Biologists' Field Club.

Given the recent groundbreaking of the 495 NEXT toll lane expansion project in Virginia, cumulative effects (including stormwater runoff) of the 495 NEXT project combined with the Maryland toll lanes project need to be documented and taken into account for the intervening historical properties, Potomac River, and the American Legion Bridge, from which runoff will empty untreated into the Potomac River and directly impact Plummers Island.

## CARDEROCK SPRINGS

We endorse and incorporate by reference the April 2022 comments of Carderock Springs Citizens Association, who represent a National Register of Historic Places community.

4

00006480

**INSUFFICIENT COMMENT PERIOD**

Every other time Section 106 materials have been sent to consulting parties as part of the I-495 & I-270 Managed Lanes Study there has been a 30-day review period. This time, at the most critical juncture in this process, that of requesting concurrence, only a two-week comment period has been provided despite new information and materials to review, a change in determination status for an important historical site, and unresolved conflicts.

The regulations say that if information is missing, more time may be requested. "At the request of the agency official or any of the consulting parties, the Council shall review any disputes over whether documentation standards are met and provide its views to the agency official and the consulting parties."

In the comment response table circulated on March 31, 2022, there is a notably cursory and incomplete response to the issues raised by consulting parties in the last round of comments. In some cases, MDOT just picked out a single point to respond to, such as in the case of Friends of Moses Hall. In Sierra Club's case, MDOT only responded to three comments and ignored all the other issues raised.

MDOT has failed to respond to a significant number of consulting party substantive comments for this most recent Section 106 comment period, failing to address multiple Section 106 issues raised by the Maryland Historical Trust, National Trust for Historic Preservation, Friends of Moses Hall, and Sierra Club Maryland Chapter, among others. On that basis, Sierra Club continues to request more time for comment on this package of materials.

Attachment 6 "Eligibility and Effects Tables" also appears to be incomplete. It seems to be a summary of historic properties experiencing adverse effect, experiencing no adverse effect, and 4(f) *de minimis* properties, but it omits a list of 4(f) properties with more or less than *de minimis* impacts. For instance, the public playing field at Carderock Springs Elementary School is missing from the 4(f) impacts list. Also, for unexplained reasons, the 4(f) *de minimis* properties list includes Beltsville Agricultural Research Center (BARC) which is in Prince George's County, not in Phase 1 South of this project at all.

Secondly, a key legal matter (regarding cumulative effects) raised by multiple consulting parties was ignored. A response to that issue is missing from the documentation provided and is necessary for moving forward with the PA.

5

For these two reasons, Sierra Club on behalf of consulting parties continues to request more time for review and comment on the March 31, 2022 Section 106 package of materials.

**CLOSING AND NAME FOR PROGRAMMTIC AGREEMENT**

In closing, the PA is premature given that the serious legal issue regarding cumulative effects has been ignored.

While a more detailed analysis of the project's full adverse effects on the Morningstar Tabernacle No. 88 Moses Hall and Cemetery site can be addressed as part of the PA, the adverse effect determination must be made now.

In addition to Morningstar Moses Hall and Cemetery, there are still significant outstanding unresolved issues with regard to Plummers Island and Carderock Springs.

This latest 2-week comment period with only a few working days for individuals impacted by public school spring vacation seems intentionally designed to limit feedback from consulting parties. The short timeframe provided is not sufficient for review of the materials, much less formulation of thoughts, consultation, write up, and internal approvals. There is not one person or group who has only this project's Section 106 process as a fulltime job, which is why Sierra Club (Appendix A) and other consulting parties wrote in asking for a longer timeframe for comment.

On the basis of missing information, Sierra Club continues to request more time for review and comment on the March 31, 2022 Section 106 package of materials.

The requested name for the Programmatic Agreement is Josh Tulkin for Sierra Club Maryland Chapter. However, we do not concur with the Programmatic Agreement at this time and withhold signature unless and until such time as we deem that consulting party requests have been appropriately included in the Programmatic Agreement.

Sincerely,

Josh Tulkin, Director
Sierra Club Maryland Chapter

00006482

 **SIERRA CLUB**
MARYLAND CHAPTER

**Sierra Club Maryland Chapter**
P.O. Box 278
Riverdale, MD 20738
(301) 277-7111

April 6, 2022

Steve Archer, Cultural Resources Team Leader
Maryland Department of Transportation
State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

Dear Mr. Archer,

We received the new Section 106 materials less than a week ago on Thursday. These materials were provided with a two-week comment period ending on April 14, 2022. All previous Section 106 comment periods for the I-495 & I-270 Managed Lanes Study have been 30 days long.

We have learned of your denial of Friends of Moses Hall's request for the usual 30-day comment period on the new Section 106 materials.

We echo their concerns about the inadequacy of the proposed two-week review period, particularly when one of those weeks overlaps with the public school spring break in the affected jurisdictions. Many people, including my key staff, have previously scheduled vacations during this timeframe, and this will make it very difficult if not impossible to provide meaningful comments on the new materials.

There was no advance notice of when this new set of Section 106 materials would be circulated for public review and comment, so no advance planning was possible to schedule and reserve time to provide comments, an additional reason why a two-week period is not adequate.

We therefore ask that you reconsider the request for an enlargement of time to provide comments on these key documents and provide a 30-day comment period on the latest materials up to and including April 30, 2022.

Sincerely,

Josh Tulkin, Director
Sierra Club Maryland Chapter

00006483



 2425 Reedie Drive
Floor 14
Wheaton, MD 20902

MontgomeryPlanning.org

THE MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION

April 14, 2022

Steve Archer
Cultural Resources Team Leader
Environmental Planning
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD  21202

**RE:     I-495/I- 270 Managed Lanes Study: Section 106 and 3rd DRAFT PA Comments**

Dear Mr. Archer:

Thank you for providing the opportunity to review and comment on the Project No. AW073A13, I-495 & I-270 Managed Lanes Study (MLS).  These comments reflect the comprehensive comments from the Cultural Resources Sections of the M-NCPPC Park and Planning Departments on the 3rd Draft Programmatic Agreement. Our comments are as follows.

**Stipulation IV.B:** We echo the comments of the Maryland Historical Trust dated April 14, 2022 (email Tim Tamburrino to Steve Archer Re: I-495 and I-270 MLS Section 106 Materials, PA Third Draft, Comments Requested by April 14, 2022) noting that there should be greater specificity in Stipulation IV.B and support each of the text edits and updates requested by MHT for this Stipulation.

**Section V (Property-Specific Commitments)**

**G Morningstar Tabernacle No. 88 Moses Hall and Cemetery**

We agree with the statement of the MHT in its letter dated February 4, 2022: "Given the sensitivity of the resource, the potential for the presence of additional burials that may be impacted, and the overwhelming expression of concern for this resource expressed by multiple consulting parties, it is our opinion that the finding of adverse effect remains valid for this historic property. The Trust recommends that the Federal Highway Administration (FHWA) request the Advisory Council on Historic Preservation (ACHP) review of this issue pursuant to 36 C.F.R. §800.5(c)(2)(i)." We believe that this remains unresolved as the Consulting Parties to the undertaking, including this office as the Certified Local Government, object to the determination of no adverse effect. We continue to request that the Advisory Council review the determination before proceeding to the ROD.

We also note that the LOD east of the area of known graves appears to extend into the narrow access path from Seven Locks Road to the Cemetery. Such an encroachment would appear to be an adverse effect to the property as it would diminish the setting and further limit physical access to known gravesites.

We agree with the Historical Trust and Friends of Moses Hall that the PA should address the effects of MDOT SHA's commitment to transfer property in its ROW containing graves to the ownership of the Trustees of Morningstar Tabernacle Number 88. We note that MDOT SHA responded in the comment response matrix distributed in March 2022 that "per FHWA this cannot be in the 106 PA but can be in ROD." Transfer of property outside of federal ownership or control is an adverse effect; how can this be addressed in the ROD, but not mentioned in the PA?

We believe that an adverse effect determination is appropriate for Morningstar Tabernacle Cemetery as it is for Gibson Grove Church. For this reason, we also believe that it is necessary to consider and mitigate the cumulative adverse effects of the beltway's separation of these two historically adjacent properties at this juncture.

**G 1.** We are disappointed that MDOT SHA has declined to consider to assist with improving access to the cemetery. SHA/FHWA have already acknowledged an adverse effect from the undertaking as a whole and have acknowledged the adverse effect for the Gibson Grove property immediately to the North. Given the appropriateness of an adverse effect determination, an ADA compatible pedestrian access should be constructed along the northern portion of the cemetery property from Seven Locks Road in order for the design elements and any interpretive signage on the sound barrier to be accessible to the public. We note that under provision H.5, MDOT SHA proposes to construct sidewalk along Seven Locks Road in order to restore the historical physical connection between Gibson Grove Church and the Morningstar Cemetery severed by construction of the Beltway. Furthermore, we agree with the Friends of Moses Hall that SHA's perpetual stormwater management easement on the cemetery site has not been adequately maintained. This should be addressed in mitigation for adverse effects at the site and for the undertaking as a whole. Absent these mitigations, to whom are the interpretive signs directed and how will they be meaningfully accessible to the public or the descendant community? We believe that these are very modest requests.

**G.2:** We do not agree that MDOT SHA can limit its effects determination to the presence or absence of interments within the LOD. We note that MDOT SHA found the cemetery property eligible for the NRHP under Criteria A and C, and MHT has concurred. While the discovery of additional graves beyond the present real property boundary may warrant an expansion of the NHRP historic property boundary, any effects determination must take into consideration all aspects of the property that contribute to its NRHP eligibility, including the setting, and cannot be limited to the distribution of graves alone. We continue to believe that an adverse effect determination is appropriate.

**H.1.** The document should note that the Gibson Grove A.M.E. Zion Church is a designated Montgomery Master Plan Historic Site. All alterations on this property should be reviewed and permitted by the Historic Preservation Commission/M-NCPPC. MNCPPC should be included in these design discussions at each phase, as our agency will also be responsible for some of the permitting approvals that will be necessary on the Church property. Please amend Section H throughout to add "M-NCPPC, Historic Preservation Commission" as a party to each of the mitigation items called out in H.1-H.5.

**Attachment 1**

Per State of Maryland Criminal Code § 10-402, the State's Attorney must authorize movement or removal of any remains. The statute includes no exception for human remains "determined to be archaeological." Such language does not exist in the statute. Please revise language to note the steps that must be taken in coordination with the State's Attorney regarding the movement or removal of human remains.

**Attachment 2**

Cabin John Citizens Association appears to be missing from the list of consulting parties.

**Attachment 3**

The Maryland National Capitol Park and Planning Commission, Historic Preservation Office is the designated Certified Local Government (CLG)for this Undertaking with a clearly defined role under Section 106 proceedings. We request a line-item call-out in Attachment 3 as the CLG separate from "Local and Other Agencies and Groups".

**Page 7, II.A.7.**

There is no hyphen in 36 CFR 79 "Curation of Federally-Owned and Administered Archeological Collections" [sic]. Also, in contrast to most NPS usage, archaeology is spelled with two "a"s. It should read: "36 CFR Part 79: Curation of Federally Owned and Administered Archaeological Collections."

**General**

There is reference throughout the document on consulting with 'relevant SHPO(s) … and appropriate consulting parties' on further documentation and effects determinations. As the CLG, M-NCPPC expects to participate in each of those discussions that occur within the Maryland portion of the undertaking.

We look forward to submitting comments separately on the proposed Treatment Plan.

Thank you again for the opportunity to comment. If you have any questions or need to discuss these matters, please feel free to contact us at 301-563-3404; Rebeccah.Ballo@montgomeryplanning.org, or Cassandra.Michaud@montgomeryparks.org 301-563-7532.

Sincerely,


Rebeccah Ballo
Historic Preservation Supervisor, Montgomery County Planning


Cassandra Michaud
Cultural Resources Planner/Senior Archaeologist, Montgomery Parks

cc:    Jeannette Mar, FHWA
       Elizabeth Hughes, Maryland Historical Trust
       Tim Tamburrino, Maryland Historical Trust
       Beth Cole, Maryland Historical Trust
       Anne Schuyler, NCPC
       Elizabeth Merritt, National Trust for Historic Preservation
       Charlotte Leighton, Friends of Moses Hall
       Debra Borden, M-NCPPC

**From:** Hammig, Laurel D <Laurel_Hammig@nps.gov>
**Sent:** Thursday, April 14, 2022 4:03 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Cc:** Stidham, Tammy <Tammy_Stidham@nps.gov>
**Subject:** Re: [EXTERNAL] I-495 and I-270 MLS Section 106 Materials, PA Third Draft, Comments Requested by April 14, 2022

Hi Steve,
Below are comments on the PA from NPS.

Thank you,
Laurel

Att-1b_MLS_106_APE-LOD_ClaraBartonPkwy

- ∞ NRHP eligible boundaries are incorrect. Please refer to the boundaries provided from the Clara Barton Parkway CLI for the cultural landscape. The exhibit is not representing the entirety of the landscape, including the outbound lanes and the adjacent forested areas owned by the NPS.

MLS-106_APE-3_Corridor_2022-03

- ∞ They are not showing the correct boundaries for the Eligible/Listed property for the Clara Barton Parkway interchange!! Please refer to the Clara Barton Parkway CLI for the cultural landscape boundaries.

MLS-106_APE-6_ParkMitigation_2022-03

- ∞ Need to show a map for the Virginia Dead Run Ridges Arch. Site. Only show a portion of the boundaries, regarding "Further investigation or treatment proposed" for Dead Run Ridges are shown on PDF Pg 1.

Att-3_MLS_106_Programmatic Agreement -

- ∞ PDF Pg 10, V.A.2. GWMP - They have a three year time period to complete the CLR once funds are received is this a set time allotment? I recommend changing it to within 5-years to complete the CLR once NPS receives the funds, instead of 3-years. It has been a change to meet the Long Bridge mitigation time lines. At least with a 5-year time, we can make sure it is incorporated in our 5-year workplan. I am assuming these funds would be provided to a third party - the Conservation Fund?
- ∞ PDF Pg 11, V.A.1. Dead Run Ridges Arch Site - Phase III data recovery - does this include cost of cataloging artifacts? Mention Stipulation VI. F in comment response.
- ∞ PDF Pg 11, V.A.2. Dead Run Ridges Arch Site - Asking Matt and Jay if this is an acceptable language if VA DHR does not accept the nomination prepared by MDSHA.

∞ **PA Stipulation** V. B. 1  Phase III data recovery;  their archeological investigations will have to be done under an ARPA Permit that requires proper NPS cataloging and curation for the artifact collection

∞ Add bold text to PA Stipulation V.B *no later than 12 months following finalization of the report documenting the Phase III data recovery in Stipulation V. B. 1 above, basing the nomination on the report findings* **and the previous archeological investigations and the NRHP Keeper's Determination Of Eligibility dated  09/10/2020** .

∞ Add bold text to PA Stipulation VI.E *MDOT SHA will prepare a draft NRHP Nomination form for the Dead Run Ridges archaeological district based on the results of Phase III Data Recovery investigation* **and the previous archeological investigations and the NRHP Keeper's Determination Of Eligibility dated  09/10/2020** *as described in Stipulation V. B.*

Question- Will the final mitigation list be included via reference in the PA?

**Laurel Hammig, AICP | National Park Service**
Acting Memorials Program Manager
National Capital Region
1100 Ohio Drive SW
Washington, DC 20242

Call or text: 202-875-3609
Video: MS Teams preferred, others on request

**From:** Steve Archer <SArcher@mdot.maryland.gov>
**Sent:** Thursday, March 31, 2022 1:15 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Cc:** David Clarke, FHWA <david.clarke@dot.gov>; Mar, Jeanette (FHWA) <jeanette.mar@dot.gov>; Marc Holma, Virginia DHR <marc.holma@dhr.virginia.gov>; Mandy Ranslow, ACHP <mranslow@achp.gov>; John Simkins, FHWA Virginia Division <john.simkins@dot.gov>; Beth Cole <beth.cole@maryland.gov>; Tim Tamburrino, MHT <tim.tamburrino@maryland.gov>
**Subject:** [EXTERNAL] I-495 and I-270 MLS Section 106 Materials, PA Third Draft, Comments Requested by April 14, 2022

**This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

Greetings I-495 and I-270 MLS Section 106 Consulting Parties,

MDOT SHA is pleased to provide you with additional Section 106 documentation for your review and comment.  These materials include:

- ∞ MDOT SHA and FHWA's response to MHT regarding effects to the Morningstar Cemetery property, proposing to determine effects following completion of additional investigations under the PA.
- ∞ APE mapping with small updates to accommodate minor engineering adjustments, and two areas of LOD reduction that reduce potential impacts to historic resources.  Callout maps showing the changes are attached to the letter; the remainder of the APE and LOD has not changed.  However a full updated mapbook of the updated APE and LOD can be downloaded at the FTP site below.
- ∞ A Comment-Response Matrix noting how comments received on the second draft of the PA have been taken into consideration.
- ∞ The Third Draft of the Project Programmatic Agreement (PA), incorporating consulting party input.

**Drafts of the Archaeological Treatment Plan and Cemetery Treatment Plan (Attachments 4 and 5)  will be transmitted only to the appropriate/qualified consulting parties in a separate email.**

**As noted in the letter, we request all potential concurring parties (listed in Attachment 3 of the Draft PA) provide us with the name and title of the individual representative who may sign on behalf of your party.  We will use this information to prepare/offer concurring signature pages, but this does not obligate any party to provide signature.  If we do not receive this information we will assume your party does not wish to concur in the PA as we prepare the final document.  Please provide name and title to me via email by April 14, 2022.**

Further details are provided in the attached letter to the Maryland and Virginia State Historic Preservation Officers.  Attachments 1a-c and 6 are embedded within the attached letter.  Attachment 2 (Comment Responses) and Attachment 3 (Programmatic Agreement Third Draft) are provided as separate file attachments to this email.  The APE mapbooks are larger files and may be downloaded at the following link, which also contains the same files attached to this email:

https://sftp1.mdot.state.md.us/
Username:  MLSResource
Password:  I495I270

MDOT SHA respectfully requests comments on these materials by no later than **Thursday, April 14, 2022**, close-of-business.  For the PA, *specific* comments or language suggestions, **keyed to stipulation number** are most helpful to the process.  Comments emailed directly to me are the most effective way to provide your input.

Thank you, we appreciate your ongoing consultation.  Feel free to contact me with any questions or concerns.

Steve Archer

Cultural Resources Team Leader

Maryland Department of Transportation State Highway Administration

Environmental Planning Division

707 North Calvert Street

Baltimore, MD 21202

Phone 410-545-8508

sarcher@mdot.maryland.gov

Governor Hogan is committed to outstanding customer service. Tell us how we are doing. Click here.


Maryland now features 511 traveler information!
Visit: www.md511.org


Please consider the environment before printing this email

 LEGAL DISCLAIMER - The information contained in this communication (including any attachments) may be confidential and legally privileged. This email may not serve as a contractual agreement unless explicit written agreement for this purpose has been made. If you are not the intended recipient, you

are hereby notified that any dissemination, distribution, or copying of this communication or any of its contents is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender indicating that it was received in error and delete the original message and any copy of it from your computer system.

# 𝔚𝔞𝔰𝔥𝔦𝔫𝔤𝔱𝔬𝔫 𝔅𝔦𝔬𝔩𝔬𝔤𝔦𝔰𝔱𝔰' 𝔉𝔦𝔢𝔩𝔡 ℭ𝔩𝔲𝔟

Comments on draft 3 Final Section 106 Programmatic Agreement sent 31 March 2022

For the Administrative record:

Date: 14 April 2022

The Section 106 process has been a sham to WBFC. Plummers Island is unjustly being treated as a sacrifice area. The most environmentally damaging alternative, Alternative 9, has already been predestined for selection by Maryland government officials and the P3 financially interested construction and the preselected investor and toll road operator.

Section 106 was established to protect historical properties and requires meaningful consideration of alternatives, minimizations, and mitigations. The Section 106 process appropriately determined that the Washington Biologists' Field Club on Plummers Island as a historically significant property that is independently eligible for listing in the National Register of Historic Places. During the process, we have learned and proposed what might be done to limit damage to Plummers Island nature reserve and research station. However, MDOT then proceeded to support the worst alternative for Plummers Island; our worst fears of damage to the island have only been exceeded as more land has been added with the pending permanent long-term occupation of the LOD.

The plan to build a nearly football-field wide American Legion Bridge, the widest in America, over a historical Nature Reserve and long-term ecological change and biodiversity research site, WBFC's Research Station for over 120 years, which contributes importantly to the historic significance of WBFC, is an unconscionable travesty.

The early plans shown to the public and to WBFC in the DEIS, SDEIS, and prior MDOT Section 106 diagrams showed the ALB expanding laterally in equal directions on each side. Now the ALB plan is to expand almost entirely on the Plummers Island side. The planned ALB will overhang Plummers Island up to the LOD line, by some 60 ft at the widest point and extending in a wedge over 500 ft along the west end of the Island facing the channel that separates the Island from the mainland. The new ALB will cast a permanent cave-like shadow over the area within the LOD on the Island, which will extend substantially over the remaining APE. The plan requires cutting down the mature trees on the head of the island, which will result in total erosion of headland soil. With no light for vegetation there or under the rest of the bridge overhang, the whole embankment of the Island facing the channel will erode away and wash downstream into the channel and onto the Island in flood waters. MDOT's Section 106 team members suggested this erosion can be minimized, but has failed to provide any explanation for how this could be accomplished. (MDOT 106 WBFC meeting of 24 March 2022).

The latest construction plan further damages the Island by "lowering" the Island's rock ridge paralleling the channel, which served to protect downstream portions of Island from flooding

00006492

and resulted in the development of the Islands broad interior channel-side floodplain. The proposed emplacements of bridge caissons and piers further endangers the Island by encouraging log-jams and deflecting channel flood waters onto the Island. Runoff from the lowest point on this huge bridge, and long uphill highway lead-ins, will focus pollutants of salts, oils, and heavy metals, and accidental toxic spills into the channel and Island floodplains, poisoning the water and land alike. All of this totally disrupts the study of long-term ecological trends and Island biodiversity, to which the Club is dedicated, and which contributes importantly to WBFC's historic significance. The adverse effect on WBFC will be profound, severe, and irreparable.

WBFC **declines to concur** with the Section 106 Programmatic Agreement. In our view, the 106 team has not justly considered or included most of our partial recommendations for avoidance, minimization, and mitigations made in WBFC comments letter to Section 106, dated 2 February 2022.

In the 31 March 2022 Section 106 communication to consulting parties a signatory name for the Programmatic Agreement was requested. That name is Robert J. Soreng for the Washington Biologists' Field Club. However, concurrence is withheld and the signature area should remain blank until meaningful mitigation consistent with our previous requests (see Appendix A of this letter) has been appropriately included in the Programmatic Agreement and deemed adequate by the Washington Biologists' Field Club.

Respectfully yours,

On behalf of the 100s of past and present Club members,

Robert J. Soreng, WBFC President

sorengrj@gmail.com

00006493

**Appendix A.**

(*Appendix B in WBFC Section 106 PA Comments, Date: 3 February 2022*)

For the Administrative Record

Washington Biologists' Field Club's MDOT Avoidance, Minimization and Partial Mitigations Proposal

Date: February 3, 2022

Mr. Jeff Folden, I-495 & I-270
P3 Program Deputy Director I-495 & I-270 P3 Office
707 North Calvert Street,
Mail Stop P-60 Baltimore, Maryland, 21202
 MLS-NEPA-P3@mdot.maryland.gov

Mr. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza,
Suite 1520 Baltimore, Maryland 21201
jitesh.parikh@dot.gov

Elizabeth Hughes
Director/State Historic Preservation Officer
Maryland Historical Trust
100 Community Place, 3rd Floor
Crownsville, MD 21032-2023

***The Washington Biologists' Field Club (WBFC) guiding mission is the study of long-term trends in biodiversity and community ecology on Plummers Island.*** We began this research in 1901 and continue it to this day. MDOT's plan for expanding the American Legion Bridge onto Plummers Island and channel waters **seriously compromises our research goals of studying the Island as a whole system**.

Long-term studies such as those of WBFC are very important in this era of rapid change in climate, introduction of increasing numbers of invasive species and diseases, etc. We can only conserve our natural resources if we understand "normal" ecosystem responses, and these require long-term monitoring of target sites. The scientific community has responded to this need by creating new sites for long-term research, but it takes decades to build up a record long enough to understand many of the processes, and there are few sites that have been established long enough to give meaningful information. Plummer's Island is one such site, and its preservation deserves high priority.

It must be emphasized that environmental damage cannot be "fixed" by any form of mitigation. Plummer's Island is a research site conducting a multigenerational study of long-term ecological processes. Destruction of the habitat, or serious damage to it, stops the ecological processes whose progress WBFC has been studying for over a century, and ends the long-term study. Replanting will not

Page **3** of **8**

Washington Biologists' Field Club comments, 14 April 2022

continue these processes, it just makes a new beginning, returning the Island to where the WBFC study began in 1901.

Importantly, taking any part of Plummers Island violates the formal legally binding 1959 Agreement between WBFC and the National Park Service. Under this agreement WBFC gave the Island to the Federal Government in exchange for our continued maintenance and research of the Island as a wild natural area, so long as WBFC existed and complied with certain obligations.  WBFC has honored its part of the agreement for the ensuing 72 years.  WBFC has studied the Island for 121 years, making it a rare and precious part of the cultural and scientific natural heritage of the National Park system. The Section 106 process determined the *WBFC and Plummers Island* to be eligible for the Maryland Historical Trust and National Register of Historical Places, and this requires protecting the entire Island as a whole property.

With these points in mind, WBFC does not accept the MDOT's Alternative 9 plan. We consider it contrary to the above agreement, and the intent of NHPA laws protecting eligible Historical properties as whole units. We support the No Build Option (as stated in our DEIS, SDEIS, and Section 106 comments).

Moreover, MDOT has failed to adequately and objectively justify the Least Environmentally Damaging Practicable Alternative (LEDPA) in the selection of Alternative 9.

WBFC commented on the DEIS, and was recognized as a consulting party in early 2021. The SDEIS is unacceptable, full of problems, and must be rewritten (WBFC separate, and co-signed Sierra Club comments submitted November 30, 2021). WBFC Section 106 comments were submitted in October 2021, and again with SDEIS comments.  Comments on the final Section 106 programmatic agreement will be or will have been submitted by February 3, 2022.

**One avoidance** or minimization would be to redeck the ALB and not expand it. Alternative 5, adding only two lanes to the ALB, would be much less damaging to Plummers Island and adjacent waterways. Double decker or suspension bridges could significantly reduce damages to Plummers Island and adjacent waterways. However, the highway expansion plans do nothing to reduce the $CO_2$ emissions driving global Climate Change.   As MDOT Secretary Greg Slater stated in 2021, the ALB is structurally sound and only needed redecking within 10-20 years. We support this No Build Option.

If Alternative 9 goes forward as MDOT & P3 companies propose, WBFC proposes the following avoidance, minimization and **_partial mitigations_** be adopted and coordinated through NPS, in consultation with WBFC in-so-far as they affect Plummers Island and its waterways:

### Avoidance, Minimization and Partial Mitigations under Sections 106, NHPA, NEPA, and 4(f), 10, and 404 etc.:

**01 -- Nomination of WBFC on Plummers Island to the National Register of Historical Places**:  **A)** MDOT fully funds and fulfills the nomination process for NPS. WBFC and NPS should be involved and consulted in the preparation of the nomination of Plummers Island.

**02 -- Bike & Pedestrian lane emplacement:** This lane could be placed under the bridge or on the upstream side (avoidance and minimization), rather on the Island side of the bridge (as currently proposed in the SDEIS and Section 106 documents). **A)** Please revise the MDOT plan accordingly. This

00006495

Washington Biologists' Field Club comments, 14 April 2022

minimization would reduce shading of the Island, and possibly the need for caissons on the Island, and potentially reduce the LOD. **B)** Furthermore, we note that archaeological sites are not particularly endangered by shadows or cave effects, and the archaeological site on the west side of the ALB may even be further protected by ALB overhanging lanes.  We see no justification or advantage to placing overhanging lanes over the long-term ecological study site of Plummers Island rather than overhanging the already buried archaeological site.

**03 -- Flooding potential:** Flood frequency has now increased enough that 500-year events are now 100-year events, and former 100-year floods are now 10 to 20-year events.  Moreover, flood stages are 7 ft higher at the head of Plummers Island than at NOAA's Little Falls Gauging Station 3 miles downstream in a wide section of the Potomac River. MDOT's planned destruction of the top of the rock ridge at the head of the island lining the west end of the channel, within the LOD, will further increase flooding impacts to the Island. **A)** We request that MDOT and US-ACE take extreme precautions in evaluation and preparation for potential 500-year flooding events occurring within the construction and immediately following periods. **B)** Protect the rock ridge from any damage. **C)** If there is flooding damage to the Island resulting from MDOT's project we expect major financial penalty to MDOT as compensation to WBFC for damages to the Island and its and waters, and full cleanup efforts from MDOT.

**04 -- Pier and Caisson emplacements**: Where are the engineers planning to put the east bound ALB lane Piers?  It was suggested by MDOT in meeting with WBFC in early 2021, that they could avoid placing piers on the Island. However, the SDEIS indicated support structures will be on the Island and in the channel. Newer MDOT plans (diagram shown to WBFC, November 29, 2021, in a joint MDOT Section 106 meeting), show three caissons on the island, and three more opposite those in and on the west side of the channel, this set of caissons placed about 75 ft north from the head of the channel.  (In the same meeting WBFC was told that these would be reduced to two caissons on either side of the channel.) These caissons will trap logs and jam up the waters within the channel causing flood waters to cross the low gap between the rock ridge along the west end of the channel and headwall of the Island. Furthermore, MDOT's diagram shows an elongated pier would be placed under the bridge at the dogleg in the channel where it bends eastward. The diagram shows that pier to be footed in the channel, a placement that will deflect flood waters onto the island. **A)** MDOT needs a new plan to avoid increased flooding of the Island. We reject the whole idea of placing ALB supports on the Island and its channel.

**05 -- ALB construction platforms:** Trestles are proposed for construction platforms covering the western portion of channel separating Plummers Island from the mainland and bridge foundation, and presumably the west end of the Island up to the LOD.  What is the plan for installing those trestles? And how will the trestles be decked (timbers?). What is to prevent those timbers and trestles from blowing out in a massive flood? **A)** Ensure that platform decking is secure in the events of minor to major flooding. **B)** keep them off the Island.

**06 -- Channel impacts from construction and vegetation removal:** Embankments within the LOD on both sides of Plummers Island's channel are expected to collapse after the soil is disturbed by construction activities, and vegetation is removed and the remaining vegetation is shaded out. The destabilized embankment soil will naturally be deposited further downstream in the channel. **A)** We expect MDOT to make every effort to avoid and minimize embankment collapse and further sedimentation of the channel.

00006496

Washington Biologists' Field Club comments, 14 April 2022

**07 -- Historical Hydrology**:  The channel head has shifted downstream and lost flow due to past ALB pier emplacements, and also caused avulsion of the head of the Island. The loss of land and adverse hydrological effects are sections 4(f), 10, 404, NEPA, and NHPA, issues to address.  **A)** MDOT is requested to restore the channel to original position and flow, pre-ALB, or at least improve the channel to flow regularly even at low waters at their expense.

**08 -- Channel impacts in the event of restoration of channel flow:** WBFC members and other researchers need routine access to the Island. We send out a member each week with duty to check the cabin and surrounds for damage and debris from public visitors.  Researchers need access to their study sites on the island.  **A)** In the event that channel flow is increased such as limits our access, we request some enhanced access, which could be a locked bridge or caged boat dock (as permitted under the 1959 WBFC agreement with the National Park Service).  **B)** We request that MDOT fund the access construction that best suits WBFC needs and NPS guidelines. (Estimated cost to MDOT for NPS design and installation: $200,000).

**09 -- Researching disturbance:  A)** We request MDOT funding of a "record in time" photographic survey before, during and after ALB construction, along with long-term follow-up, up to the APE boundary. **B)** MDOT Funding for development of ArcGIS maps to catalogue current and historical study locations and key resources to visualized changes over time. **C)** MDOT funds are requested to purchase for WBFC a highly accurate GPS unit for recording plot points, plant locations (including mapping of tree species), and collection sites. (Estimated cost to MDOT for WBFC equipment purchases: $20,000). **D)** MDOT funding and coordination with NPS and WBFC of research on the effects of the expanded ALB shadow on vegetation, arthropods, and amphibians. Baseline vegetation plots are to be established before construction, followed by resampling at 5-year intervals for 20 years, using NPS circular plots from the LOD out to the APE.  This will also serve to track invasive species spread. NPS, in coordination with WBFC, will analyze the data and publish this research using MDOT funding. (Estimated cost to MDOT for Research, see Item 17).

**10 -- Invasive species:**  WBFC has been studying invasive species with our vegetation plots and 120 years of collection records. The most invasive are: Amur-honeysuckle, Japanese-honeysuckle, oriental-bittersweet, tree-of-heaven, gill-over-the-ground, Japanese-stiltgrass, garlic-mustard, and various knotweeds.  In 2017 WBFC asked Invasive Plant Control (IPC) Inc. for a bid to remove the invasive trees and shrubs.  Their bid was $75,000 (unaffordable to us).  Now fig-buttercup has come onto the island (3 plants first noted in 2017 at the head of the Island) and is expanding exponentially (250 plants seen in the spring of 2021, all across the Island): This weed is projected to extensively cover the lower flood plains of the Island in the near future.  Japanese-stiltgrass is expanding exponentially also.  The spread of these invasive species will be exacerbated by clearing of vegetation and soil disturbance associated with the ALB construction.  Cost is a major impediment to control. C&O Canal NHPS has minimal funds for invasive plant control, and their efforts were curtailed by the Park's Head Ranger in about 2016.  This is a long-term problem and requires long-term mitigation and research on effectiveness of methods of control. **A)** MDOT funding to NPS for invasive plant control and research is requested for the long term. (Estimated cost to MDOT for NPS expenses $5 million for invasive species control. For the Research budget see Item 17).

**11 – Abatement of Toxic Runoff**: The lowest point on the ALB drains through scuppers and culverts onto NPS land, cutting an erosional gully and then draining into our channel. The high point (75 m elevation)

00006497

Washington Biologists' Field Club comments, 14 April 2022

along Maryland's I-495, ca. 1 mile NE from the ALB, drains down to the ALB the low point (36 m), just opposite the NW corner of Plummers Island. Road salts, antifreeze, and oils release toxic metals into the soil and water. Any accidental spill on the bridge or highway draining to the bridge currently dumps on to NPS land and then into our channel. **A)** MDOT must send this runoff elsewhere for treatment. **B)** MDOT Funding is requested for long-term research on toxic runoff from the ALB. **C)** Dust and debris from demolition and construction must be minimized to the maximal practicable extent. **D)** Effects of dust and sedimentation on the Island and in the channel must be studied as a long-term research project. (Estimated cost to MDOT for Research, see Item 17).

**12 – Abatement of Noise Pollution**: ALB traffic noise on the island disrupts animal communications and affects the quality of experience of the island for visitors. Having more lanes and traffic closer will amply the noise. Cutting of trees will also increase penetration of sound onto the island. **A)** Sound barriers, and special sound deadening tarmac surfacing must be added to MDOT plans for the ALB to minimize this impact. **B)** MDOT funding is requested for researching impacts of noise from the ALB and study of impacts on animal communications. **C)** Outdoor camera and microphone and monitoring equipment are requested for WBFC future research. (Estimated cost to MDOT for WBFC equipment purchases: $20,000). (Estimated cost to MDOT for Research, see Item 17).

**13 -- Vistas:** Clearing trees on the island and mainland adjacent to the Island adjacent to and under the newly expanded ALB will impact the quality of experience of the Island, and impact the remaining vegetation under the removed tree canopy and into the adjacent forest. The bridge itself will overhang the island up to the LOD, creating a cave, and an extended shadow that will limit afternoon sunlight to vegetation further inland. **A)** MDOT must limit tree cutting as much as possible. **B)** MDOT funding is requested to replant and reseed disturbed off-Island areas with hardy local strains of native trees, shrubs and herbaceous species as soon as possible, health of these plantings to be monitored by NPS.

**14 -- Expanded Online content**: **A)** MDOT Funding is requested for further digitization and cataloging of Smithsonian collections within the C&O NHP and Plummers Island. This would include funding for contractors and IT support. **B)** MDOT Funding is requested for digitization of WBFC archives of letters, photos and other documents at the Smithsonian. This would include contractors and IT support. NPS is also interested in this archive of materials for their historical records involving the 120-yearold WBFC cabin. **C)** MDOT Funding for WBFC website development to further share our mission and knowledge. This would include hiring of a professional website developer for WBFC. **D)** MDOT Funding is requested for diversity and inclusion of underrepresented peoples in our outreach and education initiatives. (Estimated cost to MDOT for the above items: $200,000).

**15 – Financial support for inventories of understudied groups on the island:** WBFC maintains documented inventories of organisms on the Island, but not able to ensure that inventories for all groups of organisms are up to date at any one time; provide funding to hire experts to update and document inventories for groups that need it.

**16 -- Access During Construction:** We also request that access to Plummers Island not be curtailed during construction. If the Clara Barton parkway is closed during construction of the ALB and ramps, we request a temporary parkway crossing from the westbound lane to Lock 10 parking on the eastbound lane be established. Researchers will need access to research plots up to the LOD.

00006498

Washington Biologists' Field Club comments, 14 April 2022

**17 --Long-term research:** Including items listed above, long-term research on the impact of bridge expansion on Plummers Island is needed. This will inform future construction projects by expanding our knowledge base of the impacts on biodiversity and community ecology. This will also assist WBFC in understanding perturbations to long-term trends of the Island's ecosystem caused by the MDOT project. Neither WBFC nor NPS have the funds or staff to carry out the required new research projects.  Baseline plot data gathering must be completed prior to beginning ALB construction. We request external contracting and funding by MDOT-SHA for research, to be conducted by consulting companies, research universities and institutions, in coordination with WBFC and NPS. (Estimated cost to MDOT over a 20-year time period is $20 million.)


Respectfully,

Robert Soreng PhD, WBFC President

Carla Dove PhD, WBFC Vice President

Lowell Adams PhD, WBFC Secretary

Warren Wagner PhD, WBFC Treasurer

On behalf of the hundreds of past and present WBFC members.

00006499

DRAFT 3 – Deliberative and Pre-Decisional

## March 2022 – THIRD DRAFT
### PROGRAMMATIC AGREEMENT
#### Among the
#### FEDERAL HIGHWAY ADMINISTRATION,
#### MARYLAND DEPARTMENT OF TRANSPORTATION STATE HIGHWAY ADMINISTRATION,
#### NATIONAL PARK SERVICE,
#### MARYLAND STATE HISTORIC PRESERVATION OFFICER,
#### VIRGINIA STATE HISTORIC PRESERVATION OFFICER
#### AND
#### ADVISORY COUNCIL ON HISTORIC PRESERVATION

**Implementing Section 106 of the National Historic Preservation Act for the I-495 and I-270 Managed Lanes Study**

**Anne Arundel, Frederick, Montgomery and Prince George's Counties, Maryland and Fairfax County, Virginia**

**WHEREAS**, the U.S. Department of Transportation, Federal Highway Administration (FHWA) plans to approve the I-495 and I-270 Managed Lanes Study (MLS), a proposed Public-Private Partnership (P3) administered by the Maryland Department of Transportation State Highway Administration (MDOT SHA); and

**WHEREAS**, the MLS Preferred Alternative, "Alternative 9 Phase I South" (Project) consists of construction of Priced Managed Lanes along Interstates 495 and 270, beginning in Fairfax County, Virginia, and extending north to approximately Interstate 370, and east along the separated portions of I-495 ("spurs") to approximately Maryland Route 187, as described in detail via documentation linked in Attachment 4; and

**WHEREAS,** FHWA has determined that the Project is an undertaking, as defined in 36 C.F.R. §800.16(y), and thus is subject to review under Section 106 of the National Historic Preservation Act (NHPA), 54 U.S.C. § 306108, and its implementing regulations, 36 C.F.R. Part 800 as amended; and

**WHEREAS,** the MDOT SHA, with the approval of FHWA, intends to deliver the Project as a P3 using the services of a private sector developer or multiple developers who will advance the Project and be responsible for design, construction, operation and maintenance, subject to approvals by MDOT SHA and/or FHWA; and

**WHEREAS,** the Project may be implemented in construction phases, yet to be fully defined, and although this Programmatic Agreement (PA) reflects evaluation of the entire defined Project, certain commitments may require phased implementation; and

**WHEREAS**, FHWA is the lead agency for purposes of ensuring that the Project complies with Section 106 of the NHPA, as amended, and codified in its implementing regulations, 36 C.F.R. Part 800, as amended (August 5, 2004); and

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

**WHEREAS**, the National Park Service (NPS) agrees FHWA is the lead federal agency for purposes of ensuring that the Project complies with Section 106 of the NHPA, as amended, and codified in its implementing regulations, 36 C.F.R. Part 800, as amended (August 5, 2004) and has agreed to participate in this PA as an Invited Signatory; and

**WHEREAS,** NPS would authorize permanent use of the affected Federal park property for the Project through coordination with FHWA for a Highway Deed Easement and would issue a permit for temporary use of land under its administration for construction-related activities. NPS intends to use this PA to comply with 36 C.F.R. Part 800, 54 U.S.C. § 100902, 36 C.F.R. Part 14; and

**WHEREAS,** the Project will involve the use of lands managed by the NPS within the Chesapeake and Ohio Canal National Historical Park, a unit of the National Park System, and the George Washington Memorial Parkway (GWMP), a unit of the National Park System, that includes the Clara Barton Parkway; and

**WHEREAS,** NPS is charged in its administration of the units of the National Park System to meet the directives of other laws, regulations, and policies including the NPS Organic Act as codified in Title 54 U.S.C. § 100101(a) to "conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such a manner and by such means as will leave them unimpaired for the enjoyment of future generations"; and

**WHEREAS**, the GWMP, a unit of the National Park System, with portions located in Montgomery County, Maryland; and Fairfax and Arlington Counties and the City of Alexandria in Virginia, was established following the authorization of the parkway pursuant to what is known as the Capper-Cramton Act, Public Law 71-284, 46 Statute 482 (1930), and came to be administered by NPS pursuant to Executive Order 6166 of June 10, 1933. The GWMP is on the National Register of Historic Places (NRHP); and for its association with twentieth century parkway design, engineering, landscape architecture, park planning and conservation, commemoration, and an association with George Washington; and

**WHEREAS**, the Clara Barton Parkway is the portion of the GWMP that runs along the Maryland side of the Potomac River and which also became part of the national park system through the Capper-Cramton Act (originally as the Maryland portion of the GWMP). The Clara Barton Parkway, as a portion of the GWMP, is also on the NRHP; and

**WHEREAS**, the Chesapeake and Ohio Canal National Historical Park, a unit of the national park system stretches along the Potomac River from Rock Creek at Georgetown in Washington, D.C., to Cumberland, Maryland, for 184.5 miles, was established as a national monument in 1961 and was then established as a national historical park by Congress in 1971, through Public Law 91-664 for the purpose of preserving and interpreting the 19th century transportation canal and its associated scenic, natural, and cultural resources; and providing opportunities for education and appropriate outdoor recreation.  The Chesapeake and Ohio Canal National Historical Park is listed on the NRHP and contains more than 1,300 historic structures, including one of the largest

collections of 19th century canal features and buildings in the national park system. The towpath and canal cross underneath I-495 at the American Legion Bridge, in Bethesda, Maryland; and

**WHEREAS,** FHWA has elected to phase the identification, evaluation, and effects assessment of certain portions of the Area of Potential Effects (APE) and historic properties where unavailability of access or design information precluded such identification, evaluation and assessment, as provided in 36 C.F.R. 800.4(b)(2), and 36 C.F.R. 800.5(a)(3); and

**WHEREAS**, FHWA will ensure additional identification, evaluation, and assessment is completed in a timely manner prior to final design and construction, to allow for meaningful consultation and practical opportunities to avoid, minimize, or mitigate for any potential adverse effects to historic properties; and

**WHEREAS**, FHWA has initiated consultation pursuant to 36 C.F.R. 800.3(c) with the Maryland State Historic Preservation Office (MD SHPO) by letter on April 12, 2018 and the Virginia State Historic Preservation Office (VA SHPO) by letter on May 14, 2019, and the term "SHPO" is used to refer to both state offices when one is not specified; MDOT SHA on behalf of FHWA will continue to consult with the appropriate SHPO and consulting parties under the terms of this PA in order to identify historic properties, assess the effects of the Project on historic properties, and, if necessary, resolve adverse effects to historic properties; and

**WHEREAS,** FHWA, pursuant to 36 C.F.R. 800.6(a)(1)(i)(C), on March 26, 2018, initiated Section 106 consultation with the Advisory Council on Historic Preservation (ACHP), and the ACHP has chosen to participate in the consultation pursuant to 36 C.F.R. 800.6(a)(1)(iii); and

**WHEREAS**, FHWA, pursuant to 36 C.F.R. § 800.10(c), invited the Secretary of the Interior (Secretary) to participate in consultation by letter dated March 16, 2020, as the Project includes National Historic Landmarks (NHL) within the APE, and the National Park Service, National Capital Area NHL Program (NPS-NHL) has represented the Secretary concerning the NHLs within the Project throughout consultation and will continue to participate in future consultations involving the NHLs, and

**WHEREAS**, FHWA, ACHP, MDOT SHA, and the MD SHPO, under the *Amended Programmatic Agreement Among the Federal Highway Administration, the Maryland Department of Transportation State Highway Administration, the Advisory Council on Historic Preservation, the Maryland State Historic Preservation Officer, Implementing Section 106 of the National Historic Preservation Act for the Federal-aid Highway Program in Maryland* ("Statewide PA", linked in Attachment 4), have agreed to delegate certain authorities relating to Section 106 of the NHPA to MDOT SHA for Federal-aid Highway Projects in Maryland; and

**WHEREAS,** MDOT SHA, pursuant to the Statewide PA, employs professionals meeting the Secretary of the Interior's Professional Qualifications Standards (48 Fed. Reg. 44738-39, September 29, 1983) with experience and background in the fields of archaeology, architectural history and/or history who will oversee implementation of stipulations in this PA; and

**WHEREAS,** MDOT SHA, on behalf of FHWA, pursuant to 36 C.F.R. 800.4(a)(1), has established

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

and updated the APE for the Project in consultation with the MD and VA SHPO, has identified historic properties within the APE, and has identified adversely affected properties, as described in the *Draft Section 106 Technical Report* of January 2020 and subsequent documentation (linked in Attachment 4); and

**WHEREAS,** MDOT SHA and FHWA, pursuant to 36 C.F.R 800.2(d) have sought and considered the views of the public regarding the Project's effects on historic properties by providing notice and information in following its public involvement procedures under the National Environmental Policy Act (NEPA); and

**WHEREAS,** MDOT SHA, during the course of consultation, has invited the parties listed in Attachment 2 to participate in consultation on the Project; and

**WHEREAS,** the parties listed in Attachment 3, based on their relationship to specific actions as specified in this PA, or interest in historic properties affected by the project, have been invited to be consulting parties and concur by signing this PA; and

**WHEREAS**, MDOT SHA and FHWA, have initiated consultation with Federally-recognized Native American tribal nations (Tribes) listed in Attachment 2 and provided the Tribes with information about the Project.  MDOT SHA, on behalf of FHWA, has invited the same Tribes to be consulting parties, as shown in Attachment 3, and concur by signing this PA; and

**WHEREAS,** federal agencies which, at FHWA's invitation, designate FHWA as the lead federal agency for the Project may use this PA to fulfill their obligations under Section 106 of the NHPA according to 36 C.F.R. 800.2(a)(2), without the need for amendment of this PA, provided that FHWA follows the requirements of this PA; and

**WHEREAS,** FHWA has invited MDOT SHA and NPS to be invited Signatories to this PA, based on their responsibilities for implementation of its terms, and all Signatories, required and invited, are referred to as "Signatories" to this document; and.

**WHEREAS**, FHWA has determined that the Project will have an adverse effect on NRHP-listed or eligible properties ("historic properties") including the George Washington Memorial Parkway (Clara Barton Parkway), the Chesapeake and Ohio Canal National Historical Park, the Washington Biologists' Field Club on Plummers Island, Gibson Grove African Methodist Episcopal Zion Church, archaeological sites 44FX3922 (Dead Run Ridges Archaeological District), 44FX0374, 44FX0379, 44FX0389, 18MO749 and 18MO751; that additional effects may not be completely known; and that FHWA intends to use this PA to comply with 36 C.F.R. Part 800, 54 U.S.C. § 100902, 36 C.F.R. Part 14 and to govern the implementation of the Project and the resolution of adverse effects.

**NOW, THEREFORE**, FHWA, NPS, ACHP, MDOT SHA, MD SHPO, and VA SHPO, (hereinafter "Signatories") agree that the Project will be implemented in accordance with the following Stipulations in order to take into account the effect of the Project on historic properties and that these Stipulations will govern compliance of the Project with Section 106 of the NHPA until this PA expires or is terminated.

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

**Stipulations**

I.    **Roles and Responsibilities**

A.    **FHWA** is the lead federal agency and is responsible for ensuring the terms of this PA are carried out.

B.    **MDOT SHA** is delegated authority by FHWA under this PA and the Statewide PA to continue defined aspects of consultation, Project compliance review, and mitigation implementation.  MDOT SHA will be primarily responsible for implementation of this PA excepting where otherwise specified.  Additionally:

1.    MDOT SHA will enter into agreements with one or more developers to design, build, and operate the Project.  MDOT SHA will ensure the work of the developer or developers conforms to the requirements of this PA and may task the developer(s) with assistance with certain commitments (such as context-sensitive design); however, MDOT SHA may not delegate consultation obligations or other responsibilities specified in this PA to the developer(s).

2.    MDOT SHA will require the developer(s) to retain professionals meeting the Secretary of the Interior's Professional Qualifications Standards (48 Fed. Reg. 44738-39, September 29, 1983) with experience and background in the fields of archaeology, architectural history and/or history for the duration of design and construction to assist with design commitments, liaise with MDOT SHA cultural resources staff and facilitate compliance with this PA.

3.    MDOT SHA, on behalf of FHWA, will consult with the relevant SHPO(s) for actions under this PA and 36 C.F.R. 800.

C.    **NPS** is charged in its administration of the units of the National Park System to meet the directives of other laws, regulations, and policies including the NPS Organic Act as codified in Title 54 U.S.C. § 100101(a).

D.    **SHPO**: The Maryland Historical Trust (MD SHPO) has jurisdiction as established in the NHPA for historic properties in Maryland.  The Virginia Department of Historic Resources (VA SHPO) has jurisdiction as established in the NHPA for historic properties in Virginia. The SHPOs will:

1.    Respond to requests from MDOT SHA for concurrence on eligibility determinations, effect determinations, and technical documents within a 30-day review period unless otherwise specified in this PA, or MDOT SHA specifically provides for an extended review period at the time of submittal. MDOT SHA and FHWA may assume concurrence or no objection to determinations and submittals if no response is received within 30 days, if no extended timeline is specifically established in the review request or if no timeline is specified in 36 C.F.R. 800. All durations referenced in this PA refer to calendar days.

00006504

    2.    Provide written comments, share general technical assistance/guidance, and make available to MDOT SHA or its designates survey records or other documents necessary to fulfill the requirements of this PA.

**E.**    **ACHP** will provide policy guidance, provide comment on issues that may arise as requested by parties to this PA, and participate in dispute resolution as specified in Stipulation XIII.

**F.**    **Consulting Parties/Public**

    1.    MDOT SHA has consulted with or provided the opportunity to consult to the parties listed in Attachment 2 prior to finalizing this PA. Because the Preferred Alternative no longer affects numerous historic properties identified in earlier alternatives considered, several parties listed in Attachment 2 no longer have a demonstrable interest in historic properties affected by the Project. Parties listed in Attachment 3 continue to have a defined relationship to the Project and have been invited to concur in this PA.

    2.    MDOT SHA will provide all consulting parties in Attachment 3, regardless of concurring status, with opportunities to consult on Project changes or new elements with the potential to affect historic properties. MDOT SHA will offer other appropriate consulting parties the opportunity to rejoin or newly join consultation in the event of new or revised Project elements. Consulting parties may sign this PA as concurring parties at any time after execution of the PA with the invitation of MDOT SHA or FHWA. Additional consulting parties may be included in Attachment 3 without the need to amend this PA.

    3.    Concurrence with the PA by a party does not necessarily indicate that the party supports the Project, the Preferred Alternative, or endorses all stipulations of this PA, but rather indicates the desire of such parties to acknowledge consultation and/or remain involved in implementation of specific terms of this PA.

    4.    MDOT SHA will provide for notification of the public for substantial changes to the Project that would result in an expanded APE or new effects to historic properties consistent with 36 CFR 800.8(c)(1)(iv) and procedures under NEPA to ensure ongoing opportunities for public input. As appropriate, this process may identify new consulting or concurring parties who may wish to join the PA at a later time in response to Project refinement.

**II.**    **Professional Standards**

**A.**    Guidelines, standards and regulations relevant to this PA and its purposes are listed below, and links to these documents are found in Attachment 4. Additionally, it is the intention of the Signatories to interpret this PA to incorporate any subsequent

standards, revisions of standards, or applicable guidance issued by the Secretary, ACHP, or MD SHPO or VA SHPO as then in force during this PA.

1.    36 C.F.R. Part 800: Protection of Historic Properties, as amended (2004);

2.    *Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation* (1983);

3.    Secretary of the Interior's Professional Qualifications Standards (48 Fed. Reg. 44738-39, September 29, 1983)

4.    *Standards and Guidelines for Archeological Investigations in Maryland* (Shaffer and Cole 1994), including *Technical Update No. 1 of the Standards and Guidelines for Archaeological Investigations in Maryland: Collections and Conservation Standards* (2018);

5.    *Standards and Guidelines for Architectural and Historical Investigations in Maryland* (Maryland Historical Trust, Revised 2019);

6.    *Guidelines for Conducting Historic Resources Survey in Virginia* (Virginia Department of Historic Resources, revised September 2017)

7.    36 CFR Part 79: Curation of Federally-Owned and Administered Archeological Collections

8.    *NPS Museum Handbook,* National Park Service, revised 2019

9.    Program Comment for Actions Affecting Post-1945 Concrete Steel Bridges (77 FR 68790);

10.    *Exemption Regarding Historic Preservation Review Process for Effects to the Interstate Highway System* (ACHP Program Comment, 2005)

11.    *Section 106 Archaeology Guidance* (ACHP, 2009)

12.    Policy Statement Regarding Treatment of Burial Sites, Human Remains and Funerary Objects (ACHP February 2007);

13.    National Register of Historic Places Bulletin 15, *How to Apply the National Register Criteria for Evaluation* (National Park Service revised 1997), National Register of Historic Places Bulletin 16A, *How to Complete the National Register Registration Form* (National Park Service revised 1997), and other National Register Bulletins as applicable

14.    NPS Management Policies – Section 5, Cultural Resource Management (2006)

15.    Secretary of the Interior's Standards for the Treatment of Historic Properties (1995, Revised 2017); and accompanying guidelines for Treatment of Historic Properties (1995, Revised 2017) and Cultural Landscapes (1996)

## III.    General Project Section 106 Commitments

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

00006506

A.    MDOT SHA will implement mitigation concurrent with construction phasing where impacts will occur; in the event that the Project is modified or certain elements causing adverse effects are not constructed, MDOT SHA will notify Signatories and consulting parties of the change at such time as a final decision is made to remove such elements and amend the PA as necessary.

B.    MDOT SHA cultural resources staff who meet Secretary of the Interior's Professional Qualifications Standards will oversee implementation of all mitigation commitments and other terms of this PA.

C.    Consultation on Reforestation and other Mitigation Sites

1.    MDOT SHA is obligated to provide reforestation mitigation for the Project pursuant to the Maryland Reforestation Law (MD Nat Res Code § 5-103).  Reforestation must occur within 2 years or 3 growing seasons of completion of construction. MDOT SHA is also coordinating with the NPS to identify reforestation sites to account for impacted NPS-managed lands.  The locations to be used for reforestation are not yet fully identified.  Reforestation activities may take the form of conservation easements or other noninvasive activities which would not affect historic properties.  MDOT SHA will not consult on easements or conservation actions where no ground disturbance is involved.  If areas outside the APE are identified for reforestation where new plantings or other activities with the potential to affect historic properties are identified, MDOT SHA will consult in accordance with Stipulation IV to add such areas to the APE, identify historic properties, and evaluate effects to historic properties.  MDOT SHA will avoid adverse effects to historic properties to the maximum extent practicable in selecting reforestation planting sites.  If adverse effects are unavoidable, MDOT SHA will amend this PA in accordance with Stipulation XII to resolve any such adverse effects.

2.    As Project development proceeds, additional and revised mitigation or enhancement locations for impacts to resources other than historic properties may be identified.  These resources include, but are not limited to wetlands, stormwater, and parks.  To account for effects to historic properties at these locations, when actions are proposed at such locations that may affect historic properties, MDOT SHA will amend the APE and follow the procedure described in Stipulation IV below.

IV.    **Consultation Regarding Project Development**

A.    Further consultation requirements regarding specific historic properties affected by the Project are described in Stipulation V. As project design advances or ancillary activities not currently known are identified, MDOT SHA will initiate consultation with SHPOs and other consulting parties (as described below) using the following process.

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

1.      MDOT SHA cultural resources staff will review proposed changes that affect project location, design, methods of construction, materials, or limits of disturbance (LOD), for potential new effects to historic properties.  Should these changes necessitate an expansion of the APE, or if the changes would affect known or potential historic properties differently than described in this PA, MDOT SHA will consult on behalf of FHWA as described in Stipulation IV.B below.

2.      If MDOT SHA, working with the developer(s), finds design or construction solutions that avoid or further minimize adverse effects to historic properties, MDOT SHA will consult in accordance with the procedures in Stipulation IV.B to seek concurrence with any updated determinations of effect, and amend this PA in accordance with Stipulation XII.

3.      MDOT SHA, on behalf of FHWA, will consult upon changes to the LOD within the existing APE where additional archaeological investigation is recommended in the Cultural Resources Technical Report or where such recommendations are identified in subsequent consultation documentation, including the Treatment Plans described in Stipulations VI and VII.

4.      MDOT SHA, on behalf of FHWA, will consult as specified elsewhere in this PA regarding specific stipulations, including Monitoring of Performance (Stipulation VIII).

**B.**     MDOT SHA, on behalf of FHWA, consistent with the principles described in 36 C.F.R. §§ 800.3 – 6, will consult with the appropriate SHPO(s), Signatories, concurring parties to this PA, Tribes who may ascribe religious and cultural significance to properties pursuant to 36 C.F.R. § 800.3(f)(2), local public agencies with jurisdiction and other consulting parties identified for this undertaking as appropriate on:

1. Amendments to the APE, consistent with 36 C.F.R. § 800.16(d)

2. New or revised determinations of eligibility for historic properties within the APE as described above.

**C**.     MDOT SHA will consult with the relevant SHPO(s), Signatories, Tribes, and appropriate consulting parties on archaeology inventory, archaeological evaluations for NRHP eligibility, and effect determinations for archaeological historic properties.

**D.**     MDOT SHA will provide consultation materials in written or electronic form, and follow timelines for comment opportunity as specified in Stipulation I. D.

## V.     Property-Specific Commitments

MDOT SHA will be responsible for ensuring the following mitigation and commitments are carried out, under the oversight of FHWA.  MDOT SHA will either complete mitigation itself or enter into legally binding agreements with partner agencies to ensure the following stipulations are fulfilled, subject to the requirements of each stipulation

below. Mitigation and commitments will be implemented by authorized construction phase, unless there is opportunity to provide advanced mitigation that is mutually agreeable to all parties, is feasible to advance, and is identified by MDOT SHA as a priority. All commitments regarding design-review with consulting parties will be conducted in a timely manner prior to final design and construction, to allow for meaningful consultation and practical opportunities to influence design to avoid impacts or ensure compatibility to the extent practicable with historic properties.  Preliminary engineering activities to support design of future phases, such as geotechnical studies or other similar, minimally invasive activities with limited potential to affect historic properties may proceed within the APE prior to construction authorization and will not require consultation or advance mitigation.

A.      **George Washington Memorial Parkway (including Clara Barton Parkway)**

1.      MDOT SHA will continue property-specific Design-Review consultation with NPS and SHPOs to ensure a context-sensitive design for new facilities, and, through the ongoing design process, minimize, to the extent practicable, impacts to character-defining features and resources that contribute to the George Washington Memorial Parkway/Clara Barton Parkway as a historic property. Key elements for NPS review include the bridge design, trail connections, retaining walls, ramp improvements, signage plans and barrier.  MDOT SHA will provide NPS and SHPOs a comment opportunity on plans at a draft level of design and a second opportunity prior to finalization of design for elements on NPS property or within the APE adjacent to NPS property; for each review there will be minimum 30-day review period.  In the event of objections relating to the final design from NPS or SHPOs that cannot be resolved, MDOT SHA and FHWA will follow Stipulation XIII of this PA.

2.      MDOT SHA will provide NPS funding in an amount not to exceed $250,000 for a Cultural Landscape Report (CLR) for Clara Barton Parkway.  The CLR will include historical narrative, updated existing conditions and analysis and evaluation, and treatment guidelines for management of character defining features. NPS will complete the CLR within three (3) years of receipt of funds from MDOT SHA, provide a copy of the completed CLR to MD SHPO and MDOT SHA, along with a summary of implementation of any treatment measures in a timely manner following their implementation.

B.      **Dead Run Ridges Archaeological District (44FX3922) and individual sites 44FX0374, 44FX0379 and 44FX0389**

1.      In consultation with VA SHPO, NPS, and other appropriate consulting parties including consulting Tribes, MDOT SHA will develop and implement Phase III data recovery and associated public interpretation commitments on sites

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

44FX0374, 44FX0379, 44FX0389 and the Dead Run Ridges Archaeological District (44FX3922) as specified in Stipulation VI.

2.      MDOT SHA will prepare a NRHP nomination form for the Dead Run Ridges Archaeological District, no later than 12 months following finalization of the report documenting the Phase III data recovery in Stipulation V. B. 1 above, basing the nomination on the report findings.  MDOT SHA will provide a copy of the draft nomination to NPS staff for review and comment prior to formal submission of the draft nomination to VA SHPO.  MDOT SHA will work with VA SHPO's Register Program to develop a final draft nomination for the Dead Run Ridges Archaeological District, and VA SHPO's Register Program will process the final draft for listing in the NRHP pursuant to its established policies and procedures.  The Department of Historic Resources State Review Board is under no obligation to approve the nomination for listing in the NRHP. Should the nomination be unsuccessful, or additional information be requested beyond the scope of the completed data recovery efforts, MDOT SHA will not be required to complete further fieldwork or analysis beyond what is agreed to in the treatment plan, or otherwise pursue nomination of the district.

**C.      Chesapeake and Ohio Canal National Historical Park**

1.      MDOT SHA will continue property-specific Design-Review consultation with NPS to ensure a context-sensitive design for new facilities constructed as part of the Project, and, through the ongoing design process, minimize to the extent practicable impacts to character-defining features and resources that contribute to the Chesapeake and Ohio Canal National Historical Park as a historic property. MDOT SHA will provide NPS and MD SHPO a comment opportunity on design plans at a draft level of design, and a second opportunity prior to finalization of design for elements within the APE on or adjacent to NPS property; for each review there will be a minimum 30-day review period.  In the event of objections from NPS or MD SHPO that cannot be resolved relating to the final design, MDOT SHA and FHWA will follow Stipulation XIII of this PA.

2.      MDOT SHA will locate new bridge piers away from Lock 13 as part of the new Clara Barton Parkway Bridge and will avoid placing piers for the new structure closer to Lock 13 than the current bridge piers, as shown in the Preferred Alternative.

3.      MDOT SHA will protect Lock 13 in place during construction, by limiting LOD around the Lock structure and providing an appropriate buffer to prevent damage.  MDOT SHA will rehabilitate or restore the structure if needed following construction, with treatment determined by or in consultation with NPS and MD SHPO as described below in Stipulation V.C.4 and VC.5. As part of the Archaeological Treatment Plan in Stipulation VI, MDOT SHA will

include archaeological monitoring or other treatment approaches during construction in the area around Lock 13.

4.    MDOT SHA will conduct a condition assessment of lock structures, the Canal and the Towpath within the Project LOD prior to construction and provide copies of the assessment to MD SHPO and NPS.  MDOT SHA will provide for rehabilitation of lock structures, the Canal, and Towpath within the Project LOD following completion of substantial construction within the affected area. MDOT SHA will provide NPS and MD SHPO with a draft rehabilitation plan for review and comment prior to implementing the plan

5.    MDOT SHA will provide for vibration damage monitoring of other susceptible historic structures at Chesapeake and Ohio Canal National Historical Park within the APE during construction, specifically, Lock 12 and Lock 14. Additional vulnerable structures or features (such as masonry walls) to be monitored may be identified in consultation with NPS during the preparation and review of the condition assessment identified in Stipulation V.C.4.

a. Should notable acute or incremental damage directly resulting from construction means or methods be identified as a result of the vibration monitoring, MDOT SHA will follow Section A of the Inadvertent Discovery Plan (Attachment 1).

b. General wear or degradation of the historic fabric during construction that is not attributable to specific construction practices or incidents will be remediated by the rehabilitation plan in Stipulation V.C.4.

**D.    18MO749 Archaeological Site (C&O Canal)**

In consultation with the MD SHPO, NPS, and other appropriate consulting parties, including Tribes, MDOT SHA will develop and implement a Phase III Data Recovery and associated public interpretation commitments as specified in Stipulation VI.

**E.    18MO751 Archaeological Site (C&O Canal)**

In consultation with the MD SHPO, NPS, and other appropriate consulting parties, including Tribes, MDOT SHA will develop and implement a Phase III Data Recovery and associated public interpretation commitments as specified in Stipulation VI.

**F.    Washington Biologists' Field Club on Plummers Island**

1.    MDOT SHA will prepare a NRHP Nomination for the Washington Biologists' Field Club on Plummers Island.  MDOT SHA will provide a copy of the draft nomination to NPS staff and the Washington Biologists' Field Club (WBFC) for review prior to submittal to MD SHPO and address any comments prior to formal submission of the nomination. Should the nomination be unsuccessful, MDOT SHA will not be required to resubmit the nomination or

otherwise complete additional studies or research after addressing comments by NPS staff.

2.    MDOT SHA will place temporary fencing along the LOD within Plummers Island to delimit construction activities.

3.    MDOT SHA will fund or implement a photographic survey documenting conditions before, during and after construction is completed adjoining Plummers Island, within the APE boundary, and provide the results to WBFC and NPS.

4.    MDOT SHA will fund or develop GIS maps to document known current and historical study locations and key natural resource features within the APE to assist in documenting change over time and provide these files to WBFC and NPS.

5.    MDOT SHA will procure a sub-meter accurate GPS unit for WBFC to use in long-term monitoring of plant locations, collection sites, and other historical research features.

6.    MDOT SHA, subject to any availability or rights restrictions, will provide for digitization and cataloging of historical records related to the WBFC that are housed at the Smithsonian Museum of Natural History, specifically the collection, "SIA RU102005, Smithsonian Institution, Washington Biologists' Field Club, circa 1900-1966 Records" that are not currently available in electronic format, and provide the files to WBFC and NPS.

7.    MDOT SHA will provide WBFC historical content, such as a synthesis of the digitized materials in Stipulation V.F.6, to incorporate into their website.

8.    MDOT SHA will complete stipulations V.F.1-7., other than those requiring longer timeframes (such as photographic survey after construction), unless continued consultation should necessitate a longer timeframe, within two (2) years of commencement of construction activities on Plummers Island.

G.    **Morningstar Tabernacle No. 88 Moses Hall and Cemetery**

1.    As part of context-sensitive design, MDOT SHA will consult with the Trustees of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery, Friends of Moses Hall, First Agape A.M.E. Zion Church, Cabin John Citizens Association, and other consulting parties with a demonstrated interest in the cemetery on context-sensitive treatment of noise barrier facing the cemetery; MDOT will work with the above-listed consulting parties on a context-sensitive treatment of noise barrier facing the cemetery, which may include decorative elements appropriate to the historic property and/or such elements as memorial plaques or signage. MDOT SHA will provide these consulting parties and MD SHPO comment opportunity for Project elements, specifically noise barrier, within the APE adjacent to the cemetery at a draft level of design and a second

opportunity prior to finalization of design; for each review there will be a minimum 30-day review period. In the event MD SHPO does not agree with the final design, MDOT SHA and FHWA will follow Stipulation XIII of this PA.

2.    MDOT SHA will conduct further studies prior to final design and construction adjacent to the cemetery as part of the treatment plan specified in Stipulation VII.  Following completion of the studies in the treatment plan, MDOT SHA and FHWA will provide the results of the studies to MD SHPO and relevant consulting parties and determine project effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery based on the results of the studies. If no interments are identified that would unavoidably be affected by the project, there will be no adverse effects to the cemetery from the Preferred Alternative. Should interments be identified outside the identified boundary of the cemetery, and no additional project avoidance options are feasible, MDOT SHA and FHWA will consult on the likely adverse effect, identify mitigation options, and amend this PA as necessary following the procedures in Stipulations IV and XIII of this PA.

**H.    Gibson Grove A.M.E. Zion Church**

1.    MDOT SHA will provide First Agape A.M.E. Zion Church at Gibson Grove and MD SHPO a comment opportunity at a draft level of design and a second opportunity prior to finalization of design for Project elements on church property or within the APE adjacent to the church property, with a minimum 30-day review period.

2.    MDOT SHA will improve the stormwater drainage on the church property by routing drainage into a new underground culvert to be installed as part of the Project.

3.    MDOT SHA will ensure that a parking lot identified in the church's restoration plan is constructed on church property following installation of the culvert drainage design. MDOT SHA will work with First Agape A.M.E. Zion Church on schedule and timing of the culvert and parking lot work to be compatible with ongoing church restoration efforts to the extent practicable.

4.    MDOT SHA will ensure Project noise- or vibration- causing construction activities are restricted adjacent to the church during scheduled worship services or key events.

5.    MDOT SHA, in coordination with Montgomery County, will install sidewalk on the west side of Seven Locks Road to more accessibly connect Gibson Grove A.M.E. Zion Church and Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

**VI.    Archaeological Treatment Plan (ATP)**

00006513

MDOT SHA's goal is to have a comprehensive but flexible ATP that addresses the LOD but can be revised and updated in response to Project design advancement. Prior to construction within affected areas, MDOT SHA will develop an ATP in consultation with SHPOs and appropriate consulting parties. MDOT SHA will provide for a minimum 30-day review of the initial draft of the ATP. MDOT SHA will be responsible for implementing the provisions of the ATP. The ATP will include:

**A.**     Archaeological monitoring requirements during construction.

**B.**     Phase I Survey in areas where property access could not be obtained (as identified in the 2019 Technical Report, Volume 4, Chapter 5): RS-1; RS-2; S-4, SWM S-4, S-5, SWM S-5, S-6, SWM S-6; S-27; SWM S-27, S-8; S-10; S-53, and the vicinity of S-28.

**C.**     Phase I Survey in the vicinity of two sites, 18MO457 and18MO190, to define site boundaries and evaluate NRHP eligibility and potential impacts.

**D**.     Phase II Evaluation of sites 18MO191 and 18MO752.

**E.**     Phase III Data Recovery investigations, including public interpretation, at 18MO749 and 18MO751 within the Chesapeake and Ohio Canal National Historical Park and the Dead Run Ridges Archaeological District within the GWMP (44FX3922), and individually eligible sites within the district 44FX0374, 44FX0379 and 44FX0389. MDOT SHA will prepare a draft NRHP Nomination form for the Dead Run Ridges archaeological district based on the results of Phase III Data Recovery investigation as described in Stipulation V. B.

**F.**     Provisions in the treatment plan required for work on NPS federal property, including curation to NPS standards of artifacts and associated records, permitting under the Archaeological Resources Protection Act and compliance with the Native American Graves Protection and Repatriation Act (NAGPRA).

**G.**     If sites or areas proposed for archaeological treatment in the ATP are avoided by revising the Project LOD or other actions, MDOT SHA will document the revision, including updating effect determinations and seeking SHPO concurrence where required. MDOT SHA will provide such information to appropriate consulting parties and will thereby not need to complete treatment or investigation at such locations.

**H.**     MDOT SHA will ensure required consultation with the appropriate SHPO and appropriate consulting parties occurs on eligibility, effects, and treatment for any newly identified archaeological historic properties prior to final design and construction in areas identified for further archaeological treatment. Reports or similar deliverables will be provided to Signatories and appropriate consulting parties with a minimum 30-day review opportunity.

**I.**     MDOT SHA will consult with SHPO and appropriate consulting parties on the ATP and any revisions or modifications to the ATP. If SHPO concurs with the ATP or future revisions, no amendment of this PA is needed to implement or update the ATP. If

SHPO does not agree with the ATP or future proposed changes to the ATP, MDOT SHA will seek to resolve the disagreement or follow the provisions of Stipulation XIII.

## VII.    Cemeteries and Human Remains Treatment Plan

**A.**    MDOT SHA acknowledges there is some potential for human remains associated with historic properties to be present in at least two areas of the LOD (adjacent to Morningstar Tabernacle No. 88 Moses Hall and Cemetery and in the general location of the Montgomery County Poor Farm) which are not currently accessible for the types of thorough archaeological investigation necessary to definitively identify interments. MDOT SHA will work with the developer(s) to minimize LOD to the maximum extent practicable in these areas.

**B**.    The Treatment Plan will include proposed investigations to identify and evaluate potential graves or human remains in specified sensitive areas to the maximum extent practicable to ensure avoidance or treatment prior to final design and construction.

**C**.    MDOT SHA will consult with SHPO and, where identified, descendants, descendant communities and other appropriate consulting parties to fully identify, recover, and respectfully treat any human remains identified within LOD that cannot be avoided.

**D**.    MDOT SHA will consult with SHPO and where identified, descendants, descendant communities and other appropriate consulting parties on archaeological monitoring requirements for locations within LOD where potential for human remains is likely during construction, including unverified but reported locations of the Ball Family Cemetery.

**E.**    MDOT SHA will seek input from affected consulting parties and concurrence from SHPO on the treatment plan prior to its implementation.  MDOT SHA will be responsible for implementing the treatment plan.  If SHPO does not agree with the treatment plan, MDOT SHA will seek to resolve the disagreement or follow the provisions of Stipulation XIII.

**F.**    Activities on Federal Lands, including NPS-managed property, require adherence to NAGPRA.  The treatment plan will include provisions for NAGPRA compliance in the event of human remains or funerary objects discovery.

**G.**    MDOT SHA will ensure that at all times human remains are treated with dignity and respect in a manner consistent with ACHP's policy statement on the Treatment of Human Remains, Burial Sites and Funerary Objects.

**H.**    MDOT SHA will ensure no photographs of human remains or associated funerary objects are released to the press or general public.

**I.**    MDOT SHA will be responsible for all expenses for any removal, treatment and relocation/disposition of any human remains or funerary objects impacted by the Project.

**J.**    MDOT SHA will fully implement all relevant provisions of the cemetery treatment plan prior to final design and any construction impacts within specified cemetery investigation locations.

**VIII.  Monitoring of Performance**

**A.**    Specific points for continued consultation are defined in Stipulations IV and V.

**B.**    MDOT SHA will, for the duration of the Project, provide Signatories and consulting parties listed in Attachment 3 with a written progress report twice per calendar year describing status of implementation of this PA.

**C.**    MDOT SHA will provide for a meeting opportunity for Signatories and consulting parties listed in Attachment 3 following issuance of each progress report.

**D.**    MDOT SHA will convene additional consulting party meetings as necessary or when requested by any Signatory;

**E.**    MDOT SHA may cancel individual meetings if there are no significant issues for discussion and no Signatory objects to the cancellation.

**IX.    Post-Review Discovery of Human Remains**

MDOT SHA will develop human remains treatment provisions as part of the archaeological and cemetery and human remains treatment plans in Stipulations VI and VII.  MDOT SHA will follow the attached Inadvertent Discovery Plan (Attachment 1) should human remains be identified in any areas or situations not covered by the archaeological or cemetery treatment plans.

**X.     Other Post-Review Discoveries**

MDOT SHA will follow the procedures in Attachment 1 of this PA for any inadvertent archaeological discoveries or inadvertent effects to historic properties during construction. MDOT SHA will provide training for the developer(s) in the Inadvertent Discovery Plan requirements.

**XI.    Confidentiality**

The Signatories agree to provide by the provisions of Section 304 of the NHPA, and other applicable requirements, to withhold information concerning the location, character, or ownership of resources where release of such information may endanger the integrity of the resource.

**XII.   Amendment**

Any Signatory to this PA may request that it be amended, whereupon the Signatories will consult in accordance with 36 C.F.R. § 800.14 to consider such an amendment. Amendments will be effective upon the date of the last signature from the Signatories.

**XIII.  Dispute Resolution**

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

**A.**    Should any Signatory or consulting party object at any time to the manner in which the terms of this PA are implemented, within 30 days of information being provided relating to the issue forming the basis of the objection, or within 30 days where the objector can otherwise be reasonably assumed to be aware of the issue forming the basis of objection, FHWA shall consult with such party to resolve the objection. If FHWA determines that such objection cannot be resolved, FHWA will take the following steps:

    1.    Forward all documentation relevant to the dispute, including FHWA's proposed resolution, to ACHP. ACHP shall provide FHWA with its comment on the resolution of the objection within 30 days of receiving adequate documentation. Prior to reaching a final decision on the dispute, FHWA shall prepare a written response that takes into account any timely advice or comments regarding the dispute from ACHP, Signatories and consulting parties and provide them with a copy of this written response. FHWA will then proceed according to its final decision.

    2.    If ACHP does not provide its advice regarding the dispute within the 30-day period, FHWA may make a final decision on the dispute and proceed accordingly. Prior to reaching such a final decision, FHWA shall prepare a written response that takes into account any timely comments regarding the dispute from the Signatories and consulting parties to the PA and provide them and ACHP with a copy of such written response.

    3.    In the case of objections related to NRHP eligibility, any Signatory may object in writing within 30 days to an MDOT SHA or FHWA determination of eligibility.  If MDOT SHA and FHWA are unwilling to revise the determination in response to the objection or other relevant information, FHWA (or MDOT SHA on its behalf) will submit the determination to the Keeper of the National Register of Historic Places for a determination pursuant to 36 C.F.R. Part 63.

**B.**    Objections from the Public: Should a member of the public object to an action taken under this PA, or compliance with the PA, within 30 days of information being provided relating to the issue forming the basis of the objection, or within 30 days where the objector can otherwise be reasonably assumed to be aware of the issue forming the basis of objection, FHWA will ensure that MDOT SHA consults with the objecting party to respond to the objection in coordination with FHWA where relevant, provided the objection is made in writing to the FHWA or MDOT SHA contacts identified in Attachment 5 or any subsequent updates to Attachment 5.  MDOT SHA and FHWA will inform other Signatories of the objection and proposed resolution.  Should a Signatory disagree with the proposed resolution, the Signatories will follow Stipulation XIII.A.

**C.**    FHWA's responsibility to carry out all other actions subject to the terms of this PA that are not the subject of the dispute remain unchanged.

**XIV.  Termination**

**A.**  Any Signatory to this PA may terminate it by providing 30 days' notice in writing to the other Signatories, provided that the Signatories will consult during the period prior to termination to seek agreement on amendments or other actions that would avoid termination.

**B.**  If any Signatory to this PA determines that a term will not or cannot be carried out, that party shall immediately consult with the other Signatories to attempt to develop an amendment per Stipulation XII, above. If within 30 days (or another time period agreed to by all Signatories) an amendment cannot be reached, any signatory may terminate the PA upon written notification to the other Signatories.

**C.**  In the event of termination, FHWA will comply with 36 C.F.R. § 800 for all remaining actions, or until a new agreement is reached fulfilling such requirements.

This PA will continue in full force and effect until 20 years from the date of execution of the PA, or such time of final acceptance of the Project and when all terms of this PA have been met, should the terms be met prior to the 20-year expiration.  The PA will be invalid if the Project is terminated or authorization for the Project is rescinded.  At any time in the six-month period prior to its expiration, the Signatories will consult to consider an extension or amendment of the PA.  At such time, the Signatories may consider an amendment to extend the PA unmodified for an additional specified duration or consult to amend the PA in accordance with Stipulation XII. No extension or amendment will be effective until all Signatories have signed the amendment or amendment to extend.

**Signature Pages**

**Signatories: FHWA (Maryland Division), ACHP, MD SHPO, VA SHPO, NPS, MDOT SHA**

**Concurring Parties**

**Attachments**

    1.    Inadvertent Discovery Plan
    2.    All Parties Invited to Consult on the Project
    3.    Consulting Parties invited to Concur
    4.    Links to Documentation Referenced
    5.    Contact Information for FHWA and MDOT SHA staff responsible for PA implementation (to be updated as necessary)

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

## Attachment 1
## Inadvertent Discovery Plan

**A.     Unanticipated Impacts to Architectural Historic Properties:** if the Project causes unanticipated impacts to any National Register of Historic Places (NRHP) eligible, listed, or contributing buildings, sites, structures, or objects of the built environment, the contractor must notify the engineer and immediately cease any activity causing ongoing damage until consultation occurs.  MDOT SHA shall, in consultation with the appropriate SHPO (VA or MD), determine if adverse effects have occurred to the property/properties and develop a plan for the protection of the historic property, and minimization or mitigation of impacts.  If mitigation is identified, FHWA, MDOT SHA, SHPO, and other Signatories as necessary will execute a Memorandum of Agreement or amend this PA to record the identified mitigation.  MDOT SHA may hold the developer(s) liable for any or all costs resulting from this process following appropriate processes identified in its contract instruments.

**B.     Unanticipated Damage to Known Archaeological Resources:** if unauthorized excavation occurs outside the approved limits of disturbance (LOD) or other approved boundaries designed to protect archaeological resources or cemeteries and thereby causes impacts to known, NRHP-eligible properties, MDOT SHA will ensure any activity causing ongoing damage is stopped until consultation occurs.  MDOT SHA will conduct a damage assessment consistent with the model used for such assessments under the Archaeological Resources Protection Act (https://www.nps.gov/archeology/pubs/techbr/tchBrf20.pdf). MDOT SHA will use the results of the assessment in consultation with the relevant SHPO to determine if the resource has been adversely affected and determine appropriate mitigation.  If the resource is of known or suspected Native American affiliation, FHWA, with assistance from MDOT SHA shall consult with federally recognized Indian Tribes as appropriate.  If the resource is affiliated with other known descendant groups or consulting parties, MDOT SHA will consult with such parties as well.  Should damage occur on NPS land, MDOT SHA will consult with the NPS staff and regional archaeologist regarding the damage assessment report and any identified mitigation. If mitigation is identified, FHWA, MDOT SHA, SHPO, and other Signatories as necessary will execute a Memorandum of Agreement or amend this PA to record the identified mitigation.  MDOT SHA may hold the developer(s) liable for any or all costs resulting from this process following appropriate processes identified in its contract instruments.

**C.      Unanticipated Discovery of Human Remains:** Should any burials, interments, or human remains (hereafter, "remains") be encountered during construction, MDOT SHA will ensure all applicable construction work in the vicinity of the remains is immediately stopped to prevent damage to the remains, or to any additional remains that might be present in the vicinity.  A minimum 100-foot buffer around identified remains will be established by MDOT SHA free of disturbance, to be adjusted as appropriate for the site conditions. Construction may occur outside the buffer unless evidence of additional remains is found.  If remains are suspected to be human but not confirmed, MDOT SHA will ensure that such confirmation is made by a qualified professional.  Human remains will at all times be treated respectfully and access and visibility limited to the site of discovery to authorized personnel only.  Within Maryland, pursuant to State of Maryland Criminal Code § 10-402, the State's Attorney must authorize movement or removal of any remains until determined to be archaeological.  If the remains are determined to be archaeological, MDOT SHA and the relevant SHPO will consult to determine treatment of the remains and any other necessary treatment such as work needed to define extent of remains in the most expeditious manner feasible.  Within Virginia, human remains and associated funerary objects encountered during the course of actions taken as a result of this PA shall be treated in a manner consistent with the Virginia Antiquities Act (Code of Virginia 10.1-2305) and its implementing regulation (17VAC5-20), adopted by the Virginia Board of Historic Resources and published in the Virginia Register on July 15, 1991.

If the remains are determined archaeological and suspected to be of Native American origin, MDOT SHA, in coordination with FHWA, shall provide notification to tribal governments in accordance with any expressed tribal consultation preferences within 24 hours or as soon as practicable.  MDOT SHA and/or FHWA will consult with affected federally recognized Indian Tribes, the Maryland Commission on Indian Affairs and appropriate Maryland Indian groups as appropriate regarding treatment of the remains. MDOT SHA will accommodate tribal cultural preferences to the extent practicable during such an event.  If remains can be associated with other known descendant communities or organizations, including the cemetery-affiliated consulting or concurring parties to this PA, such parties shall also be consulted.

If the human remains are likely to be of Native American origin and are located on lands controlled or owned by the U.S. Government, including National Park Service Property within the APE, the Federal land managing agency will assume responsibility for compliance with the Native American Graves Protection and Repatriation Act (NAGPRA; 25 USC 3001), with MDOT SHA assistance.

In consultation with the relevant SHPO, Federally Recognized Indian Tribes, and FHWA as appropriate, and other identified descendant/affiliated consulting parties, the MDOT SHA shall develop a plan for the treatment or disposition of the remains or follow provisions of an existing Treatment Plan developed per this PA. MDOT SHA shall implement the provisions of the agreed Treatment Plan.

Should the remains be associated with, or constitute an intact archaeological resource, provision **D** below is also applicable.

**D.      Unanticipated Discovery of Archaeological Resources:** If previously unidentified archaeological features, artifacts, or other materials (hereafter, "resource") are discovered during construction, all ground-disturbing work in the vicinity of the

resource shall be temporarily suspended or modified to prevent further damage to the resource, and MDOT SHA will provide a reasonable buffer where ground disturbance is prohibited to cover the extent of the resource that may not be exposed.

The MDOT SHA archaeologist shall perform a preliminary inspection to identify the resource and evaluate its likelihood of NRHP eligibility.  Following this inspection, construction may resume in the vicinity of but outside the boundary of the archaeological resource as defined by the MDOT SHA archaeologist. If the resource is potentially eligible for the NRHP, MDOT SHA will consult with the relevant SHPO on an eligibility determination and, if determined eligible for the NRHP, every effort shall be made to minimize impacts through redesign or modification of construction methods. If the resource is of known or suspected Native American affiliation, FHWA, with assistance from MDOT SHA shall consult with federally recognized Indian Tribes as appropriate. If the resource can be reasonably identified with other descendant or affiliated communities, MDOT SHA shall also attempt to consult with such parties.

In consultation with the relevant SHPO, MDOT SHA shall develop a plan for the treatment of any resource determined eligible.  MDOT SHA shall describe actions proposed to avoid, minimize, or mitigate adverse effects, and request SHPO, tribal, and any other consulting party comments within 5 working days, unless there is a life or safety hazard requiring immediate interim action. MDOT SHA will disclose any interim action affecting the eligible resource taken in the event of a life or safety hazard.  MDOT SHA, at its discretion, may establish a longer comment period if practicable in consideration of potential safety, cost, public travel disruption, and other factors. MDOT SHA shall then implement the provisions of the agreed-upon plan and/or amend this PA to document the resolution, should the resource be determined eligible and should the Project adversely affect the resource.



## Attachment 2
## <u>All Parties Invited to Consult on the Project</u>

**Federally Recognized Tribal Nations**
*   **Absentee-Shawnee Tribe of Oklahoma**
*   **Delaware Nation**
*   **Delaware Tribe of Indians**
*   **Chickahominy Indian Tribe**
*   **Chickahominy Indians Eastern Division**
*   **Eastern Shawnee Tribe of Oklahoma**
*   **Monacan Indian Nation**
*   **Nansemond Indian Tribe**
*   **Oneida Indian Nation**
*   **Onondaga Nation**
*   **Pamunkey Indian Tribe**
*   **Rappahannock Tribe, Inc.**
*   **Saint Regis Mohawk Tribe**
*   **Seneca-Cayuga Nation**
*   **Shawnee Tribe**
*   **Tuscarora Nation**
*   **Upper Mattaponi Indian Tribe**

**State Recognized and Other Tribes**
*   **Piscataway Conoy Tribe of Maryland (PCT)**
*   **PCT - Cedarville Band of Piscataway**
*   **PCT - Choptico Band of Piscataway**
*   **Piscataway Indian Nation**

**Federal Agencies**
*   **Department of Defense**
*   **General Services Administration**
*   **Federal Railroad Administration**
*   **Federal Transit Administration**
*   **National Capital Planning Commission**
*   **National Institute of Standards and Technology**
*   **National Park Service**
*   **U.S. Army Corps of Engineers**
*   **U.S. Department of Agriculture**
*   **U.S. Postal Service**

**State Agencies and Organizations**
*   **Maryland Commission on Indian Affairs**

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

00006522

- **MDOT Maryland Transit Administration**
- **MDOT Maryland Transportation Authority**
- **Maryland Historical Trust**
- **Preservation Maryland**
- **Virginia Department of Historic Resources**
- **Virginia Department of Transportation**
- **Washington Metropolitan Area Transit Authority**

**County Agencies and Organizations**

- **Charles County Department of Planning**
- **Frederick County**
- **Frederick County Preservation Trust**
- **Maryland Milestones/Anacostia Trails Heritage Area, Inc.**
- **Montgomery County Department of Correction and Rehabilitation**
- **Montgomery County Department of General Services**
- **Montgomery County Department of Transportation**
- **Montgomery County Heritage Area, Heritage Tourism Alliance of Montgomery County**
- **Maryland Milestones**
- **Maryland-National Capital Parks and Planning Commission – Montgomery County Planning – Historic Preservation**
- **Maryland-National Capital Parks and Planning Commission – Montgomery Parks**
- **Maryland-National Capital Parks and Planning Commission – Prince George's County Planning – Historic Preservation**
- **Maryland-National Capital Parks and Planning Commission – Prince George's County Department of Parks and Recreation**
- **Montgomery Preservation, Inc.**
- **Prince George's County Historic Preservation Commission**
- **Prince George's County Historical and Cultural Trust**
- **Prince George's Heritage, Inc.**

**Municipal and Other Organizations**
- **Canoe Cruisers Association**
- **C&O Canal Association**
- **C&O Canal Trust**
- **Carderock Springs Citizens' Association**
- **City of Gaithersburg**
- **City of College Park**
- **City of Glenarden**
- **City of Greenbelt**
- **City of Rockville**
- **First Agape A.M.E. Zion Church at Gibson Grove**

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022



- **Frederick County Landmarks Foundation**
- **Heart of the Civil War Heritage Area**
- **Indian Spring Community Association**
- **National Park Seminary Master Association**
- **National Trust for Historic Preservation**
- **Peerless Rockville**
- **Rock Creek Conservancy**
- **Save Our Seminary at Forest Glen**
- **Sierra Club Maryland Chapter**
- **Silver Spring YMCA**
- **Trustees of Morningstar Tabernacle No. 88, Inc. (Friends of Moses Hall)**
- **Washington Biologists' Field Club**
- **Village of North Chevy Chase**

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

## Attachment 3
## Consulting Parties Invited to Concur

**Federally Recognized Tribes**
- **Absentee-Shawnee Tribe of Oklahoma**
- **Delaware Nation**
- **Delaware Tribe of Indians**
- **Chickahominy Indian Tribe**
- **Chickahominy Indians Eastern Division**
- **Eastern Shawnee Tribe of Oklahoma**
- **Monacan Indian Nation**
- **Nansemond Indian Tribe**
- **Oneida Indian Nation**
- **Onondaga Nation**
- **Pamunkey Indian Tribe**
- **Rappahannock Tribe, Inc.**
- **Saint Regis Mohawk Tribe**
- **Seneca-Cayuga Nation**
- **Shawnee Tribe**
- **Tuscarora Nation**
- **Upper Mattaponi Indian Tribe**

**State Recognized and Other Tribes**
- **Piscataway Conoy Tribe of Maryland (PCT)**
- **PCT - Cedarville Band of Piscataway**
- **PCT - Choptico Band of Piscataway**
- **Piscataway Indian Nation**

**Federal Agencies**

- **Department of Defense**
- **Federal Railroad Administration**
- **Federal Transit Administration**
- **National Capital Planning Commission**
- **National Institute of Standards and Technology**
- **U.S. Army Corps of Engineers**
- **U.S. Department of Agriculture**

**State Agencies**
- **Maryland Commission on Indian Affairs**
- **Maryland Department of Transportation – Maryland Transit Administration**
- **Maryland Transportation Authority**
- **Virginia Department of Transportation**

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

**Local and Other Agencies and Groups**
- **Cabin John Citizens Association**
- **Canoe Cruisers Association**
- **Carderock Springs Citizens Association**
- **City of Gaithersburg**
- **City of Rockville**
- **C&O Canal Association**
- **C&O Canal Trust**
- **First Agape A.M.E. Zion Church at Gibson Grove**
- **Maryland Milestones**
- **Maryland-National Capital Park and Planning Commission**
- **Montgomery County Heritage Area**
- **Montgomery Preservation, Inc.**
- **National Institute for Standards and Technology**
- **National Trust for Historic Preservation**
- **Peerless Rockville**
- **Preservation Maryland**
- **Trustees of Morningstar Tabernacle No. 88, Incorporated (Friends of Moses Hall)**
- **Virginia Department of Transportation**
- **Washington Biologists' Field Club**



I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

## Attachment 4
## Links to Documentation Referenced In the I-495 & I-270 Managed Lanes Study PA

**Federal Codes and Regulations**
16 U.S.C. 470aa-470mm
Archaeological Resources Protection Act (ARPA)
https://uscode.house.gov/view.xhtml?path=/prelim@title16/chapter1B&edition=prelim

25 U.S.C. Ch. 32 § 3001
Native American Graves Protection and Repatriation Act (NAGPRA)
https://uscode.house.gov/view.xhtml?path=/prelim@title25/chapter32&edition=prelim

36 C.F.R. Part 14 and 54 U.S.C. § 100902
Rights-of-Way
https://www.ecfr.gov/current/title-36/chapter-I/part-14
https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title54-section100902&num=0&edition=prelim

36 C.F.R. Part 63
Dispute Resolution of Determinations of Eligibility for Inclusion in the NRHP
https://www.ecfr.gov/current/title-36/chapter-I/part-63

36 C.F.R. Part 79
Curation of Federally Owned and Administered Archaeological Collections
https://www.ecfr.gov/current/title-36/chapter-I/part-79

36 C.F.R. Part 800
Implementing Regulations of Section 106 of the National Historic Preservation Act
https://www.ecfr.gov/current/title-36/chapter-VIII/part-800?toc=1

40 C.F.R. 1506.6(a)
Public involvement – National Environmental Policy Act
https://www.ecfr.gov/current/title-40/chapter-V/subchapter-A/part-1506#1506.6

54 U.S.C.
- National Park Service and Related Programs
     § 100101(a) Promotion and Regulation of the National Park Service (NPS Organic Act)
     - https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title54-section100101&num=0&edition=prelim
- National Historic Preservation Act
     § 306108 Effect of Undertaking on Historic Property

o https://uscode.house.gov/view.xhtml?req=(title:54%20section:306108%20edition:prelim)

§ 307103 Access to Information (Section 304)

o https://www.achp.gov/digital-library-section-106-landing/frequently-asked-questions-protecting-sensitive-information

Public Law 71-284, 46 Statute 482 (1930); Executive Order 6166 of June 10, 1933
Capper-Cramton Act and Administration by the National Park Service
https://www.ncpc.gov/about/authorities/cca/
https://www.nps.gov/parkhistory/online_books/anps/anps_3b.htm

**State Codes and Regulations**
Maryland Criminal Code § 0-402
Courts and Judicial Proceedings
https://law.justia.com/codes/maryland/2013/article-gcr/section-10-402

Maryland Natural Resources Code § 5-103
Reforestation
https://roads.maryland.gov/mdotsha/pages/index.aspx?PageId=158

Virginia Antiquities Act § 10.1-2305
Human Remains
https://law.lis.virginia.gov/vacode/title10.1/chapter23/section10.1-2305/
Implementation - Virginia Administrative Code 17VAC5-20
https://law.lis.virginia.gov/admincode/title17/agency5/chapter20/

**Guidelines and Standards**

***Advisory Council on Historic Preservation***

- *Exemption Regarding Historic Preservation Review Process for Effects to the Interstate Highway System* (ACHP Program Comment, 2005)
https://www.achp.gov/sites/default/files/exemptions/2017-01/final_interstate_exemption_notice.pdf

- *Policy Statement Regarding Treatment of Burial Sites, Human Remains, and Funerary Objects* (ACHP February 2007)
https://www.achp.gov/sites/default/files/policies/2018-06/ACHPPolicyStatementRegardingTreatmentofBurialSitesHumanRemainsandFuneraryObjects0207.pdf

- *Program Comment Issued for Streamlining Section 106 Review for Actions Affecting Post-1945 Concrete and Steel Bridges* (77 FR 68790)
https://www.federalregister.gov/documents/2012/11/16/2012-27866/program-comment-issued-for-streamlining-section-106-review-for-actions-affecting-post-1945-concrete

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

- *Section 106 Archaeology Guidance* (ACHP, 2009)
  https://www.achp.gov/sites/default/files/guidance/2017-02/ACHP%20ARCHAEOLOGY%20GUIDANCE.pdf

### The Maryland Historical Trust

- Standards and Guidelines for Archaeological Investigations in Maryland (Shaffer and Cole 1994)
  https://mht.maryland.gov/documents/PDF/archeology/Archeology_standards_investigations.pdf

- *Technical Update No. 1 of the Standards and Guidelines for Archaeological Investigations in Maryland: Collections and Conservation Standards* (2018)
  https://mht.maryland.gov/documents/PDF/archeology/Archeology_standards_curation.pdf

- Standards and Guidelines for Architectural and Historical Investigations in Maryland (Maryland Historical Trust, Revised 2019)
  https://mht.maryland.gov/documents/PDF/research/Survey_standards_architecture_web.pdf

### The National Park Service

- Management Policies – Section 5, Cultural Resource Management (2006)
  https://www.nps.gov/subjects/policy/upload/MP_2006.pdf

- NPS Museum Handbook, National Park Service, revised 2019
  https://www.nps.gov/museum/publications/handbook.html

- NRHP Bulletin 15 – How to Apply the National Register Criteria for Evaluation (National Park Service revised 1997)
  https://www.nps.gov/subjects/nationalregister/upload/NRB-15_web508.pdf

- Other NRHP Bulletins
  https://www.nps.gov/subjects/nationalregister/publications.htm#:~:text=national%20register%20of%20historic%20places%20bulletins

- The Secretary of the Interior's Guidelines for the Treatment of Cultural Landscapes (1996)
  https://www.nps.gov/tps/standards/four-treatments/landscape-guidelines/index.htm

- The Secretary of the Interior's Guidelines for the Treatment of Historic Properties (1995, Revised 2017)
   https://www.nps.gov/tps/standards/treatment-guidelines-2017.pdf

- The Secretary of the Interior's Professional Qualifications Standards
  https://www.nps.gov/articles/sec-standards-prof-quals.htm
  **OR** see 48 FR 44738
  https://www.nps.gov/subjects/historicpreservation/upload/standards-guidelines-archeology-historic-preservation.pdf

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

- The Secretary of the Interior's Standards and Guidelines for Archeology and Historic Preservation (1983)
  https://www.nps.gov/subjects/historicpreservation/upload/standards-guidelines-archeology-historic-preservation.pdf

- The Secretary of the Interior's Standards for the Treatment of Historic Properties (1995, Revised 2017)
  https://www.nps.gov/tps/standards/four-treatments.htm
  OR https://www.ecfr.gov/current/title-36/chapter-I/part-68

***The Virginia Department of Historic Resources***
- Guidelines for Conducting Historic Resources Survey in Virginia (Virginia Department of Historic Resources, revised September 2017)
  https://www.dhr.virginia.gov/wp-content/uploads/2018/06/SurveyManual_2017.pdf

**Other Referenced Information**
  - Alternative 9 Phase 1 South project description (currently available here: https://oplanesmd.com/environmental/alternatives/pa/)

  - First Agape A.M.E. Zion Church at Gibson Grove parking lot restoration plan (link forthcoming)

  - I-495 and I-270 Managed Lanes Study Draft Section 106 Technical Report:
    https://oplanesmd.com/deis/#:~:text=4(f)%20Evaluation-,appendix%20g,-Cultural%20Resources%20Technical

  - MDOT SHA Statewide PA:
    https://www.roads.maryland.gov/OPPEN/2021_PA_Amendment.pdf

**Attachment 5**
FHWA and MDOT SHA Staff Contact Information:

**For FHWA:**

Ms. Jeanette Mar
Environmental Program Manager
FHWA - Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore, MD 21201
phone (410) 779-7152
fax     (410) 962-4054
jeanette.mar@dot.gov

**For MDOT SHA:**

Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
707 N. Calvert Street
Baltimore, MD 21202
phone (410) 545-8508
sarcher@mdot.maryland.gov

I-495 and I-270 Managed Lanes Study Section 106 Programmatic Agreement DRAFT 3
March 2022

**From:** Hammig, Laurel D <Laurel_Hammig@nps.gov>
**Sent:** Friday, April 15, 2022 8:03 AM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Cc:** Stidham, Tammy <Tammy_Stidham@nps.gov>
**Subject:** Re: [EXTERNAL] I-495 and I-270 MLS Section 106 Materials, PA Third Draft, Comments
Requested by April 14, 2022

Hi Steve,
Sorry for the late addition. We have one additional comment:
Add an addendum in property specific commitments that if VA SHPO rejects the nomination,
MDOT will submit it to the Keeper.

Thank you,
Laurel

**Laurel Hammig, AICP | National Park Service**
Acting Memorials Program Manager
National Capital Region
1100 Ohio Drive SW
Washington, DC 20242

Call or text: 202-875-3609
Video: MS Teams preferred, others on request

---

**From:** Steve Archer <SArcher@mdot.maryland.gov>
**Sent:** Thursday, April 14, 2022 4:13 PM
**To:** Hammig, Laurel D <Laurel_Hammig@nps.gov>
**Cc:** Stidham, Tammy <Tammy_Stidham@nps.gov>
**Subject:** RE: [EXTERNAL] I-495 and I-270 MLS Section 106 Materials, PA Third Draft, Comments
Requested by April 14, 2022

Thank you Laurel!  Acknowledging receipt, we appreciate you meeting our timeframes as usual.

Steve

**From:** Hammig, Laurel D <Laurel_Hammig@nps.gov>
**Sent:** Thursday, April 14, 2022 4:03 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Cc:** Stidham, Tammy <Tammy_Stidham@nps.gov>
**Subject:** Re: [EXTERNAL] I-495 and I-270 MLS Section 106 Materials, PA Third Draft, Comments
Requested by April 14, 2022

Hi Steve,
Below are comments on the PA from NPS.

Thank you,
Laurel

00006532

Att-1b_MLS_106_APE-LOD_ClaraBartonPkwy
- NRHP eligible boundaries are incorrect. Please refer to the boundaries provided from the Clara Barton Parkway CLI for the cultural landscape. The exhibit is not representing the entirety of the landscape, including the outbound lanes and the adjacent forested areas owned by the NPS.

MLS-106_APE-3_Corridor_2022-03
- They are not showing the correct boundaries for the Eligible/Listed property for the Clara Barton Parkway interchange!! Please refer to the Clara Barton Parkway CLI for the cultural landscape boundaries.

MLS-106_APE-6_ParkMitigation_2022-03
- Need to show a map for the Virginia Dead Run Ridges Arch. Site. Only show a portion of the boundaries, regarding "Further investigation or treatment proposed" for Dead Run Ridges are shown on PDF Pg 1.

Att-3_MLS_106_Programmatic Agreement -
- PDF Pg 10, V.A.2. GWMP - They have a three year time period to complete the CLR once funds are received is this a set time allotment? I recommend changing it to within 5-years to complete the CLR once NPS receives the funds, instead of 3-years. It has been a change to meet the Long Bridge mitigation time lines. At least with a 5-year time, we can make sure it is incorporated in our 5-year workplan. I am assuming these funds would be provided to a third party - the Conservation Fund?
- PDF Pg 11, V.A.1. Dead Run Ridges Arch Site - Phase III data recovery - does this include cost of cataloging artifacts? Mention Stipulation VI. F in comment response.
- PDF Pg 11, V.A.2. Dead Run Ridges Arch Site - Asking Matt and Jay if this is an acceptable language if VA DHR does not accept the nomination prepared by MDSHA.
- PA Stipulation V. B. 1   Phase III data recovery;  their archeological investigations will have to be done under an ARPA Permit that requires proper NPS cataloging and curation for the artifact collection
- Add bold text to PA Stipulation V.B *no later than 12 months following finalization of the report documenting the Phase III data recovery in Stipulation V. B. 1 above, basing the nomination on the report findings* **and the previous archeological investigations and the NRHP Keeper's Determination Of Eligibility dated  09/10/2020** .
- Add bold text to PA Stipulation VI.E  *MDOT SHA will prepare a draft NRHP Nomination form for the Dead Run Ridges archaeological district based on the results of Phase III Data Recovery investigation* **and the previous archeological investigations and the NRHP Keeper's Determination Of Eligibility dated  09/10/2020** *as described in Stipulation V. B.*

Question- Will the final mitigation list be included via reference in the PA?

**Laurel Hammig, AICP | National Park Service**
Acting Memorials Program Manager
National Capital Region
1100 Ohio Drive SW
Washington, DC 20242

00006533

Call or text: 202-875-3609
Video: MS Teams preferred, others on request

---

**From:** Steve Archer <SArcher@mdot.maryland.gov>
**Sent:** Thursday, March 31, 2022 1:15 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Cc:** David Clarke, FHWA <david.clarke@dot.gov>; Mar, Jeanette (FHWA) <jeanette.mar@dot.gov>; Marc Holma, Virginia DHR <marc.holma@dhr.virginia.gov>; Mandy Ranslow, ACHP <mranslow@achp.gov>; John Simkins, FHWA Virginia Division <john.simkins@dot.gov>; Beth Cole <beth.cole@maryland.gov>; Tim Tamburrino, MHT <tim.tamburrino@maryland.gov>
**Subject:** [EXTERNAL] I-495 and I-270 MLS Section 106 Materials, PA Third Draft, Comments Requested by April 14, 2022

> **This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.**

Greetings I-495 and I-270 MLS Section 106 Consulting Parties,

MDOT SHA is pleased to provide you with additional Section 106 documentation for your review and comment.  These materials include:

- MDOT SHA and FHWA's response to MHT regarding effects to the Morningstar Cemetery property, proposing to determine effects following completion of additional investigations under the PA.
- APE mapping with small updates to accommodate minor engineering adjustments, and two areas of LOD reduction that reduce potential impacts to historic resources.  Callout maps showing the changes are attached to the letter; the remainder of the APE and LOD has not changed.  However a full updated mapbook of the updated APE and LOD can be downloaded at the FTP site below.
- A Comment-Response Matrix noting how comments received on the second draft of the PA have been taken into consideration.
- The Third Draft of the Project Programmatic Agreement (PA), incorporating consulting party input.

**Drafts of the Archaeological Treatment Plan and Cemetery Treatment Plan (Attachments 4 and 5)  will be transmitted only to the appropriate/qualified consulting parties in a separate email.**

**As noted in the letter, we request all potential concurring parties (listed in Attachment 3 of the Draft PA) provide us with the name and title of the individual representative who may sign on behalf of your party.  We will use this information to prepare/offer concurring signature pages, but this does not obligate any party to provide signature.  If we do not receive this information we will assume your party does not wish to concur in the PA as we prepare the final document.  Please provide name and title to me via email by April 14, 2022.**

Further details are provided in the attached letter to the Maryland and Virginia State Historic Preservation Officers.  Attachments 1a-c and 6 are embedded within the attached letter.  Attachment 2 (Comment Responses) and Attachment 3 (Programmatic Agreement Third Draft) are provided as separate file attachments to this email.  The APE mapbooks are larger files and may be downloaded at the following link, which also contains the same files attached to this email:

https://sftp1.mdot.state.md.us/
Username:  MLSResource
Password:  I495I270

MDOT SHA respectfully requests comments on these materials by no later than **Thursday, April 14, 2022**, close-of-business.  For the PA, *specific* comments or language suggestions, **keyed to stipulation number** are most helpful to the process.  Comments emailed directly to me are the most effective way to provide your input.

Thank you, we appreciate your ongoing consultation.  Feel free to contact me with any questions or concerns.

Steve Archer

Cultural Resources Team Leader

Maryland Department of Transportation State Highway Administration

Environmental Planning Division

707 North Calvert Street

Baltimore, MD 21202

Phone 410-545-8508

sarcher@mdot.maryland.gov

Governor Hogan is committed to outstanding customer service. Tell us how we are doing. Click here.


Maryland now features 511 traveler information!
Visit: www.md511.org

 Please consider the environment before printing this email

LEGAL DISCLAIMER - The information contained in this communication (including any attachments) may be confidential and legally privileged. This email may not serve as a contractual agreement unless explicit written agreement for this purpose has been made. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication or any of its contents is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender indicating that it was received in error and delete the original message and any copy of it from your computer system.

# CABIN JOHN CITIZENS ASSOCIATION
## P.O. BOX 31, Cabin John MD 20818

*Organized 1919     Charter Member Montgomery County Civic Federation*
Susan Shipp – President; Bob Walsh – Treasurer; Meredith Griggs – Secretary

April 14, 2022

*By Email to:*
Mr. Steve Archer
Cultural Resources Team Leader
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD 21202

**RE:     I-495/I-270 Managed Lanes Study: Section 106 and 3rd DRAFT Programmatic Agreement Comments**

Dear Mr. Archer:

It is truly hard to know where to begin when trying to respond to the latest Section 106 materials and the 3rd draft of the Programmatic Agreement as it's almost impossible to get past the omission, misrepresentation and inexcusable lack of action even a lay person can find in these documents.

Thankful I can turn to the expertise of a number of the other consulting parties and say that the Cabin John Citizens Association endorses and incorporates by reference the April 14, 2022 comments of the Friends of Moses Hall, The Maryland-National Capital Park and Planning Commission and the Sierra Club Maryland Chapter regarding the Morningstar Tabernacle No. 88 Moses Hall and Cemetery site as well as their comments regarding stormwater runoff into the Potomac River, and, I would add, Cabin John Creek.

While I defer to the above comments due to their robust specificity of detail and reference, I would like to explain the harsh judgement I rendered in the first paragraph because it is not given lightly.

In the State Highway Administration's March 31 transmittal letter for the packet of 3rd draft materials, Stever Archer, the agency's team lead for the Section 106 review, highlighted "A Comment-Response Matrix noting how comments received on the second draft of the PA have been taken into consideration."

But when reviewing the matrix, glaring omissions are evident. The matrix lists 91 comments from various consulting parties and provides what it calls the SHA "Response." There were many, many substantive comments not included in that document.

The most egregious omission may be the comments made by numerous consulting parties including the National Trust for Historic Preservation and the Maryland Historic Trust, strongly objecting to Maryland State Highway Administration (SHA) and the Federal Highway Administration (FHWA) changing their determination to find that the Beltway expansion project will have "no adverse effect" on the cemetery property in Cabin John.

The only comment captured on the matrix regarding the SHA/FHWA reversing course was the one made by the Cabin John Citizens Association (CJCA). While we were happy to see our comment included, why were so many, especially ones from those most knowledgeable on this matter, not acknowledged?

For example, the Maryland Historic Trust Feb. 4 comment letter stated "The potential for burials within the LOD cannot be ruled out. Given the sensitivity of the resource, the potential for the presence of additional burials that may be impacted, and the overwhelming expression of concern for this resource expressed by multiple consulting parties, it is our opinion that the finding of adverse effect remains valid for this historic property. "

A very substantive comment nowhere to be seen in the matrix.

What showed up in the Response column with regard the CJCA's concern about the new "no adverse effect" determination? Despite being years into the Section 106 process, the SHA and FHWA have changed their minds again, deciding not to make any determination about adverse impact to the cemetery until additional investigation occurs. Alarmingly, the matrix response – "A specific effect determination to Morningstar Cemetery will be made following investigations specified in the PA." – seems to infer that it won't make any determination until after the Programmatic Agreement is complete!

Another major omission had to do with the cemetery's boundary with the existing state right-of-way and the project's Limits of Disturbance. The Friends of Moses Hall Feb. 3 letter provided extensive comments questioning the SHA's determination of this boundary. The Feb. 4 Maryland Historict Trust also raised the concern, noting that, "it is known that African American cemeteries often extend beyond contained boundaries."

However, the SHA Comment-Response matrix is silent on cemetery boundaries.

The Friends of Moses Hall also raised a number of concerns with regard to the various Determination of Eligibility (DOE) forms that have been submitted as part of this process. The organization took the time to provide a substantive six-page critique of the Dec. 21, 2021 DOE with specific edits and clarifications.

Yet again, the SHA matrix makes no reference to the DOE form.

I could go on but will only share one more omission and it is perhaps the most surprising and disheartening of them all. Many consulting parties took issue with the SHA and FHWA declaring that cumulative impacts to the Morningstar cemetery and the Gibson Grove church from the initial Beltway construction in the 1960s did not have to be considered because they occurred prior to the passage of National Environmental Policy Act of 1970 or the National Historic Preservation Act, which became law in 1966.

In its Feb. 3 comment letter, the National Trust for Historic Preservation blasted the two agencies for this stance.  They said "we reviewed guidance on cumulative impacts analysis issued by the FHWA and by the Council on Environmental Quality (CEQ), and we could find no reference whatsoever to any support for this rationale."

They went on to say that "This new argument also flies in the face of the administration's policy on environmental justice, as reflected in Executive Order 13990, 86 Fed. Reg. 7037 (Jan. 25,

00006538

2021) ("Where the Federal Government has failed to meet that commitment in the past, it must advance environmental justice.")

And again, the SHA Comment-Response matrix does not include a single word about cumulative impacts with regard to the cemetery.

Significantly, it does include a comment regarding the "Gibson Grove Church property suffering cumulative impacts from highway stormwater runoff damage over many years due to the I-495 Beltway construction."

The response to this comment reads "Stormwater handling improvement compatible with church restoration plan is part of identified mitigation at Gibson Grove."

I am sure there is even more to uncover, but there is no time. Consulting parties were given two weeks to comment on this 3rd round of materials. When a number of the groups asked for more time, they were told by Steve Archer that "Changes to the PA are generally minor and of a clarifying nature as shown in our provided comment-response matrix. We emphasize that this is the third draft of an agreement that MDOT SHA has provided for prior review. We have consistently maintained that as the PA nears finalization, the review cycles/comment periods would be shorter for later drafts, as fewer changes and new content are included. A two-week review period affords adequate opportunity for comment given the parties have seen multiple prior versions of the document and the limited extent and nature of changes."

What a gross misrepresentation of this 3rd round of materials, especially the Comment-Response matrix. While I cannot speak on behalf of all the consulting parties, the Cabin John Citizens Association considers a new determination of no determination regarding adverse effects and the Morningstar cemetery to be quite significant as is the complete disregard for so many of the thoughtful, important and challenging comments that were supposed to have been considered as part of this 3rd draft of the Programmatic Agreement.

The requested name for the Programmatic Agreement is Susan Shipp for Cabin John Citizens Association.

Respectfully,

Susan Shipp
President of the Cabin John Citizens Association


cc:    Governor Lawrence J. Hogan – governor.mail@maryland.gov
       Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
       Treasurer Dereck E. Davis – treasurer@treasurer.state.md.us
       Senators Ben Cardin and Chris Van Hollen
       Rep. Jamie Raskin
       Jeffrey T. Folden, MDOT SHA – mls-nepa-P3@mdot.maryland.gov
       Kendra Parzen, National Trust for Historic Preservation - KParzen@savingplaces.org
       Elizabeth S. Merritt, National Trust for Historic Preservation - emerritt@savingplaces.org
       Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
       Julie Langan, Virginia DHR - julie.langan@dhr.virginia.gov
       Julie Schablitsky, MDOT SHA – jschablitsky@mdot.maryland.gov
       Richard Ervin, MDOT SHA – rervin@mdot.maryalnd.gov

David Clarke, USDOT - david.clarke@dot.gov
April Marchese, USDOT – april.marchese@dot.gov
Colleen Vaughn, USDOT – colleen.vaughn@dot.gov
Brenda Mallory, Chair, White House Council on Environmental Quality – brenda_mallory@ceq.eop.gov
Vivian Lee, National Capital Planning Commission – vivian.lee@ncpc.gov
Samantha Beers, US EPA - beers.samantha@epa.gov
Emily Biondi, Federal Highway Administration – emily.biondi@dot.gov
James Gavin, Federal Highway Administration – james.gavin@dot.gov
Jitesh Parikh, Federal Highway Administration – jitesh.parikh@dot.gov
Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
Reid Nelson, ACHP – rnelson@achp.gov
Mandy Ranslow, ACHP - mranslow@achp.gov
Jaime Loichinger, ACHP - jloichinger@achp.gov
Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
John Simkins, FHWA Virginia Division - john.simkins@dot.gov
Rebeccah Ballo, Montgomery County Planning Department – rebecccah.ballo@montgomeryplanning.org
Debra Borden, M-NCPPC – debra.borden@mncppc.org
Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
Eddie Bankhead, First Agape AME Zion Church - esbj@pobox.com
Rev. Edgar Bankhead, First Agape AME Zion Church - ebankjs@verizon.net
Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
Sara Love, Maryland State Delegate – sara.love@house.state.md.us
Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Carol Rubin, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Gerald Cichy, Commissioner, Montgomery County Planning Board -MCP-Chair@mncppc-mc.org
Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
Gabe Albornoz, Montgomery County Councilmember- councilmember.albornoz@montgomerycountymd.gov
Andrew Friedson, Montgomery County Councilmember-
councilmember.friedson@montgomerycountymd.gov
Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

00006540

**REPORT OF FINDINGS FROM HISTORICAL I-495 RIGHT-OF-WAY RECORDS RESEARCH**
**PREPARED BY FRIENDS OF MOSES HALL**
**FEBRUARY 2022**

In 2021, Friends of Moses Hall (FMH) received documents in response to our Maryland Public Information Act (PIA) requests to MDOT SHA. These documents, per our PIA request, included correspondence, appraisals, and other records pertaining to specific Right-of-Way (ROW) file numbers and court cases for the development of I-495 from the late 1950s through the early 1960s. Our PIA request was limited to those records involving landowners along the section of I-495 at Seven Locks Road. Friends of Moses Hall and others have been examining these documents and are alarmed by some of our findings.

FMH once again stresses that the original I-495 construction had significant economic, physical and social impacts on this historically black community through land takings and the splitting of this once vibrant Gibson Grove community in Cabin John. Furthermore, systemic racism ingrained in the state's land takings resulted in black landowners being compensated significantly less than adjacent white landowners. Different values were assigned to properties based on the race of the landowner, even though the properties were in the same neighborhood or even abutted each other. Additionally, there are noticeable record-keeping disparities between ROW files for black and white landowners. Many black landowner files delivered to us were heavily and inappropriately redacted, were of poor scanning copy quality compared to those of white landowner files, and contained scant records and/or inaccuracies. For example, the Morningstar Moses Cemetery file (MD SRC ROW files 46729 and 48363) incorrectly identified the site as "Moses Lodge #74" (Liber 344/F 274), a distant Order of Moses property located in Emory Grove. Additionally, the size of the land taking for this property was found to be inconsistent among the records reviewed.

Alarmingly, Law Case file 10749 "State Roads Commission vs. Mickens et al" involving Peter Jones property in MD SRC ROW file 48288 contains a "First and Final Account" of payouts in the case and we note specifically a 1963 payout to The McGuire Funeral Service, Inc. in the amount of $411.00 (**See Attachment 1**). This indicates that the MD SRC knew that burials were on the site, casting doubt on MDOT SHA's current claim of prior ignorance when burials were found within the ROW by ground penetrating radar (GPR) study done in July 2021. The Jones property was directly adjacent to the Morningstar Moses cemetery property (**See Attachment 2**).

One notable example of racial inequity inherent in the original I-495 land takings can be found in the Peter and Dorcas Jones files (Law Case 10749 for MD SRC ROW file 48288). The assessed value for the 2.5-acre parcel was $6,250.00 and the state's valuation of the complete taking of this land was $5,000 ($2,000 per acre). The case went to trial, with the state arguing that even the $5,000 valuation was excessive. We highlight the following appraisal notes from Law Case 10749:

> **MD SRC ROW File 48288, scanned in three file sections for FMH, contains an appraisal from Samuel E. Bogley Realtors appraisal (Robert Lebling appraiser*) dated 2/20/1961. It valued the property at $5,000 and noted "There are no improvements on the subject property. The surrounding neighborhood improvements at Seven Locks Road and along the deeded right of way, previously referred to, are of poor quality and negro inhabited. (See photographs herein)." Note that a photo of Moses Hall lodge is one of the referred photographs. See Peter and Dorcas Jones MD SRC ROW File 48288, file 1 of 3, digital image 49-50 of 91.**

00006541

**Mr. Lebling's appraisal goes on to state: "It should be noted that the assessment on this property is extremely excessive in relation to the two nearest adjoining properties, both of which have access from dedicated and County maintained streets which the subject property lacks." The valuation summary states: "Seven Locks Road in this neighborhood consists of negro colony occupying, generally speaking, inferior and sub-standard homes in the price bracket ranging from an irreducible minimum of $250 to around $10,000. This value depressing influence has a very marked effect on the selectability of land in this negro inhabited pocket." See Peter and Dorcas Jones MD SRC ROW File 48288, file 1 of 3, digital image 51-52 of 91.**

The state's appraiser incorrectly states that the Jones and Morningstar Moses properties did not have road access from Seven Locks, while noting that the adjacent Farrar property had access to Seven Locks. In fact, all three properties had road access to Seven Locks.

*Robert Lebling conducted a number of appraisals for the I-495 land takings, but he was also a white landowner in the area subject to a land taking (MD SRC ROW file 46734) — an apparent conflict of interest.

The Jones defendants in Law Case 10749 retained a professional appraiser named Adolph C. Rohland to provide testimony at trial. The jury in the Jones Case 10749 ultimately awarded the Jones heirs $7,210 plus interest (~$3,000/acre) for a complete taking. Mr. Rohland was paid $225 for his service in the case.

Only one other eminent domain case for a black landowner went to trial in the Gibson Grove community, which was Law Case 10748 State Roads Commission vs. Elizah Harris et al (heirs to Mary Eliza Harris, daughter of Peter Jones) for SRC ROW file 46730. Harris' heirs were awarded a total of $3,500, with interest, at trial for a complete taking of 0.5 acres, including what the state's appraiser described as a "negro occupied" "shack" and 1-story frame "bungalow".

With the exception of these black landowner estate cases that went to trial, the ROW records for the Gibson Grove community revealed that black landowners were paid $2,000 to $2,500 per acre for their properties by the state. In stark contrast, white landowners were paid $3,500 to $7,000 per acre.

Wealthier white landowners in this area, such as the neighboring Lillie [sic] Stone estate (MD SRC ROW files 40826 and 46732), retained legal counsel to secure larger payments of $4,000 per acre plus "damages" in the amount of $21,000. Word of these larger payouts quickly spread within the white community in this area, causing other white landowners, like Frederick Farrar (MD SRC ROW file 46727), a US Navy doctor, to contest state payout offers. Although he initially demanded $55,000, in the end, Farrar was paid $33,000 for the state's taking of approximately 3.5 acres with a stucco cinder-block dwelling on the premises.

The apparent racial inequity evident in the records for the original I-495 construction project, as well as the detrimental social and economic impacts directly related to the project, set the stage for ongoing degradation of the Gibson Grove community in Cabin John, along with its historic and cultural resources. The psychological and economic damage inflicted on these once thriving and resilient communities is evidence of a history of racial inequity in infrastructure projects in Maryland.

00006542

**FRIENDS OF MOSES HALL**
**ATTACHMENT 1**

## State Rds Comm vs. Andrew Mickens and Jones' heirs



STATE OF MARYLAND

Plaintiff

v.                                      Law No. 10749

ANDREW MICKENS, et al
Defendants.

FIRST AND FINAL ACCOUNT

Mr. James Harris
Mrs. Ida Stewart Hall
Mrs. Sarah Thompson
Mr. Charles Harris
The McGuire Funeral Service,Inc.
Mrs. Delores Crawford
Mrs. Susie Walker
Mr. Charles Harris
Miss Elizabeth Harris
Mrs. Helen Branch                    Executor's Fee
Joseph N. Dodson
Estate of Fernie Dodson
Mr. Andrew Mickens
Mrs. Lelia Lane
Mr. Walter Stewart
Miss Julia Stewart
Miss Julia Stewart
Mrs. Sadie Cross
Mr. Leroy Harris
Mr. Herbert Harris
Mrs. Hazel McKay
Mr. Ernest Harris
Mrs. Jessie Toney
Lester Harris
Mrs. Hester Harris
Mr. Worthy Harris
Mrs. Cecelia Lindsay
Mr. Leonard Harris
Mr. Percy Harris
Mrs. Lucille Cook
Newman Insurance Agency               Bond
Mrs. Mabel G. Matthews      FILED
Mrs. Mildred Alexander
Mrs. Edna G. Lindsay                   FILED
Mrs. Edna E. Gordon        JUN 15 1964
                                      JUN 15  4

                        Total        $6489.19

Deposit in Riggs Bank Ice Branch
                            $6,488.44
Jan 28  1963
                             6,487.18
Paid as above
                             $1.30
Balance

                    Submitted by

Subscribed and sworn to before me this 29th day
of January 1964

**FRIENDS OF MOSES HALL**
**ATTACHMENT 2**





00006544



May 2, 2022

Steve Archer
Cultural Resources Team Leader
Environmental Planning
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD  21202

**RE:    I-495/I- 270 Managed Lanes Study: Section 106 1st DRAFT Archaeological Treatment Plan and Cemetery Treatment Plan Comments**

Dear Mr. Archer,

Thank you for providing the opportunity to review and comment on the Project No. AW073A13, I-495 & I-270 Managed Lanes Study (MLS). Included in the current review are comments on the 1st draft of the Archaeological Treatment Plan (ATP) and the Cemetery Treatment Plan (CTP). These reflect the comprehensive comments from the Cultural Resources Sections of the M-NCPPC Park and Planning Departments. Our comments are as follows.

The two documents under review - the Archaeological Treatment Plan and the Cemetery Treatment Plan – provide an extensive outline of the proposed archaeological work to identify and mitigate impacts of the MLS project. The coordination between the ATP and the CTP is at times unclear; some of the unsurveyed areas proposed for STPs have the potential for burials relating to the Poor Farm Cemetery (18MO266), and the cemetery areas have the potential for significant non-burial features and the plans don't articulate how that will be addressed in each case.  Likewise, the Morningstar Cemetery and Moses Hall site (18MO782) is addressed in the cemetery treatment plan but should be considered as part of the ATP as well. The cemetery treatment plan seems to only be concerned with the presence of human remains and funerary objects, but MHT and M-NCPPC have recommended that the site be considered NRHP eligible under Criterion D as well as Criteria A and C. There is thus a potential for significant archaeological remains all along the edge of the LOD and the cemetery boundary, including the access path to Seven Locks Road, which has never been investigated archaeologically. Specific language addressing the fieldwork of that area needs to be included in the ATP. These two Plans do not work in isolation from each other and how they intersect needs to be outlined more thoroughly, not only for the pre-construction fieldwork but also during the construction phase, including monitoring.

00006545



**ARCHAEOLOGICAL TREATMENT PLAN**
**Site 18MO191 (Kavanagh XII)**
The language in the ATP regarding the total area to be tested at this site needs elaboration. Two possible boundaries for site 18MO191 are shown. The ATP notes that "STPs will be excavated at 50-ft (15-m) intervals across the LOD and buffer area within the site boundary" though is not clear about which site boundary. Given the uncertainty of the site location based on previous work, the proposed fieldwork should test within both recorded site boundaries and corresponding buffer areas. Based on the narrow survey corridor, the STP grid should be intentionally placed to ensure the greatest coverage and opportunity to identify the site and its boundaries.

The Land Use History and Current Conditions section makes a number of statements about what previous activities area likely to have happened at or near the site; while possible, there is only circumstantial supporting evidence that is the case, and the ATP language should reflect that the actual level of disturbance is unknown.

The ATP states, "The surface inspection will be conducted along transects placed at 33-ft (10-m) intervals to attempt to locate evidence of former structures." Entire building foundations could easily be overlooked at a 10m interval depending on ground visibility. Surface survey with a closer interval grid, such as 5m, is more productive for locating former structures.

Insert "Site 18MO191 is located within M-NPPC Montgomery Parks land and prior to beginning the archaeological fieldwork, SHA will secure a Montgomery Parks archaeology permit and ensure all permit requirements are met."

**Site 18MO457 (Booze Creek)**
Similarly, the total area to be subject to survey at 18MO457 is unclear and two site boundaries are shown as possible in the ATP. The ATP states, "Phase I survey will be confined to the portion of the potential site area within the Project LOD and at least a 50 ft (15 m) buffer area, assuming access permission can be secured, to ensure that the area examined will encompass all areas where Project impacts may occur. If possible, the full site boundary will be delineated by the survey." Given the uncertainty of the site location based on previous work, the fieldwork should test within both recorded site boundaries, the area between them, and corresponding buffer areas. Given the narrow survey corridor, the STP grid should be intentionally placed to ensure the greatest coverage and opportunity to identify the site and its boundaries.

The discussion of the Land Use History and Current Conditions is confusing since it is not clear which areas are being discussed. Additionally, while some roadwork related activities may have taken place in or near this area, there is no clear documentation that it did, nor what kind.

00006546



Insert "Site 18MO457 is located within M-NPPC Montgomery Parks land and prior to beginning the archaeological fieldwork, SHA will secure a Montgomery Parks archaeology permit and ensure all permit requirements are met."

**Site 18MO752 (Cabin John Site 1)**
The ATP recommends close interval STPs then EUs for this site, which was originally identified through shovel-testing.  Given the small size of the site, there doesn't seem to be much advantage to conducting additional closer-interval STPs first rather than focusing on EUs within the site boundary, which provide better coverage for identifying important site elements and features.

Insert "Site 18MO752 is located within M-NPPC Montgomery Parks land and prior to beginning the archaeological fieldwork, SHA will secure a Montgomery Parks archaeology permit and ensure all permit requirements are met."

**Previously Unsurveyed Area**
Areas RS-1, RS-2, S-4, SWM S-4, S-5, SWM S-5, S-6, SWM S-6, S-27, SWM-27, and S-28 are all associated with land that was once part of the Poor Farm, and so have a potential to have burials associated with the Poor Farm Cemetery. However, proposed survey methods are to "follow general methods established for the previously conducted MLS Project work (Arnold et al. 2021)." Those methodologies have generally relied on systematic shovel test pit survey, a method designed to find concentrations of artifacts, but poorly suited to identifying potential graves. The cemetery treatment plan references machine stripping followed by shovel scraping, which is appropriate for uncovering grave shafts, but the archaeological treatment plan isn't clear about how the two treatment plans and methodologies are to work together.

**Appendix 1 - Human Remains Protocols**
The statement regarding Maryland law concerning removal of human remains is erroneous. "Within Maryland, pursuant to State of Maryland Criminal Code § 10-402, the State's Attorney must authorize movement or removal of any remains until determined to be archaeological." According to the statute, unless the removal is temporary, the authorization of the State's Attorney is required for the removal of any remains for any reason, regardless of whether they are considered archaeological or for any other consideration. Critically, the section requires publication of "a notice of the proposed relocation in a newspaper of general circulation in the county where the burial site is located." Nowhere does the statute provide an exception to this requirement for archaeology. The statute does allow for remains to be reinterred in the presence of "a trained anthropologist or archaeologist" rather than a "a mortician, professional cemeterian, or other individual qualified in the interment of human remains" or "a minister, priest, or other religious leader." The text should read simply: "Within Maryland, pursuant to State of Maryland Criminal Code § 10-402, the State's Attorney must authorize movement or removal of any remains."



**CEMETERY TREATENT PLAN**
The Maryland Historical Trust in its letter of February 4, 2022 recommended that the cemetery site be considered eligible for the NRHP under Criterion D as well as Criteria A and C. We also believe the site is eligible under Criterion D and ask that MDOT SHA include Criterion D in its documentation and discussion of the site.

**Morningstar Moses Cemetery (18MO782)**
- The discussion of potential areas for further investigations seems to suggest that areas proposed for further investigations may be limited based on assumptions about the kinds of results that may be found. The design for survey areas should not presume what the results of such investigations may be before they are carried out. MDOT SHA must demonstrate through its investigations that its proposed undertaking will not impact graves associated with the cemetery.
- Testing or survey is needed along the portion of the LOD abutting the cemetery access path. This ground has never been subjected to archaeological investigations, so whether there are features or artifacts related to the site's significance in this area remains unknown. Archaeological investigations should be carried out along the entire length of the LOD next to the cemetery site.
- Will archaeological investigation of features and artifacts uncovered during mechanical stripping of the LOD be restricted solely to graves and associated funerary objects? Since the site is eligible for the NRHP, any potentially significant features or artifact concentrations should be investigated if they are uncovered. How will the topsoil in areas identified for mechanical stripping be sampled and screened for artifacts?
- The section on treatment of human remains or funerary objects reads: "If potential funerary artifacts are found in fill or otherwise cannot be reasonably associated with a particular burial, those artifacts will be analyzed and documented and curated at the Maryland Archaeological Conservation Laboratory." Final disposition for apparently unassociated funerary objects should be determined in consultation with the Friends of Moses Hall, Morningstar Cemetery Trustees, and descendants.

**Poor Farm Cemetery (18MO266)**
- Page 18: Brian Crane is on the staff of the Montgomery County Planning Department, Maryland-National Capital Park and Planning Commission.
- It would be helpful to summarize past discoveries of human remains by incident in a table that might include columns for date, approximate location, recovering organization, and estimate of the number of interments found.
- The last sentence on page 29 looks like it may be cut off.



- How will topsoil in areas identified for mechanical stripping be sampled for artifacts or human remains? Page 31 implies that screening of mechanically removed soils will occur if human remains or associated funerary objects are seen. Will there be any sampling other than through the initial shovel test survey and what is the interval?
- How wide would backhoe trenches be in sample stripping areas?
- Page 31-32 "It may not be practicable to remove or reinter larger items, such as casket fragments." Do you mean a burial vault? Whole caskets or casket fragments should certainly be exhumed and reinterred if they cannot remain in place.
- Page 32 "If potential funerary artifacts are found in fill or cannot be reasonably associated with a particular burial, those artifacts will be analyzed and discussed in the Project technical report and curated at the Maryland Archaeological Conservation Laboratory." Final disposition of funerary objects should be coordinated with consulting parties and descendants as possible.
- The Cemetery treatment plan should not presuppose a limited set of circumstances under which the Poor Farm archaeological site might be considered eligible for the National Register prior to the completion of archaeological investigations. Work is proposed for Poor Farm associated areas under both the archaeological treatment plan and the cemetery treatment plan. The overall approach to the site should be clearly integrated in these plans and include evaluation for NRHP eligibility based on what the archaeology finds. Development of a detailed data recovery plan and/or exhumation and burial relocation plan can then be developed as appropriate.
- Consultation with descendants of those buried at the Poor Farm is referenced multiple times. Existing historical research provides multiple names of those possibly interred in the Poor Farm. Will genealogical research be conducted in an effort to located descendants?

**Monitoring Plan**

Currently one area within the project is listed under the Monitoring Plan. A map showing the areas where archaeological monitoring is required would be illustrative and language that notes how the monitoring information will be conveyed to all contractors, archaeological and otherwise, who will be implementing the monitoring plan once construction begins.

Thank you again for the opportunity to comment and we look forward to reviewing the next draft of these important documents. If you have any questions or need to discuss these matters, please feel free to contact us at 301-563-3404; Rebeccah.Ballo@montgomeryplanning.org, or Cassandra.Michaud@montgomeryparks.org 301-563-7532.

00006549



Sincerely,

Rebeccah Ballo
Historic Preservation Supervisor, Montgomery County Planning

Cassandra Michaud
Cultural Resources Planner, Archaeologist, Montgomery Parks

cc:     Jeannette Mar, FHWA
        Elizabeth Hughes, Maryland Historical Trust
        Tim Tamburrino, Maryland Historical Trust
        Beth Cole, Maryland Historical Trust
        Anne Schuyler, NCPC
        Elizabeth Merritt, National Trust for Historic Preservation
        Charlotte Leighton, Friends of Moses Hall
        Debra Borden, M-NCPPC



**National Trust** *for*
**Historic Preservation**
*Save the past. Enrich the future.*

May 2, 2022

*By email to: sarcher@mdot.maryland.gov*

Steve Archer
Cultural Resources Team Leader
Environmental Planning
MDOT State Highways Administration
707 North Calvert Street
Baltimore, MD 21202

**Re:     I-495 and I-270 MLS Section 106 Materials, Comments on Draft**
**Archaeological Treatment Plan and Draft Cemetery Treatment Plan**

Mr. Archer:

The National Trust for Historic Preservation, along with many other consulting parties, submitted comments on April 14, 2022 regarding the Draft Section 106 Programmatic Agreement (PA) for the I-270 and I-495 Managed Lanes Study. In addition, your office invited comments by today on the Draft Archaeological Treatment Plan and the Draft Cemeteries and Human Remains Treatment Plan (Attachments 4 and 5). We have received and reviewed the comments on these two Draft Treatment Plans submitted today by the Maryland State Historic Preservation Office, the Maryland-National Capital Park and Planning Commission, and the Friends of Moses Hall. The purpose of this letter is to confirm that the National Trust strongly supports and reiterates the comments submitted by these three important parties. We urge you to revise the Draft Treatment Plans in accordance with the comments provided.

Thank you in advance for considering and responding to these three sets of comments, and any others that you have received addressing the Draft Treatment Plans.

Sincerely,

Elizabeth S. Merritt
Deputy General Counsel

The Watergate Office Building  2600 Virginia Avenue NW  Suite 1100  Washington, DC 20037
**E** law@savingplaces.org  **P** 202.588.6035  **F** 202.588.6272  **www.savingplaces.org**

00006551

Kendra Parzen
Field Officer

00006552

# Appendix B
## Consulting Parties List

00006553

**(Intentionally Left Blank)**

00006554

**I-495 & I-270 Managed Lanes Study**
**Section 106 Consulting Parties List**

**Federally Recognized Tribes**
- Absentee-Shawnee Tribe of Oklahoma
- Delaware Nation
- Delaware Tribe of Indians
- Chickahominy Indian Tribe
- Chickahominy Indians Eastern Division
- Eastern Shawnee Tribe of Oklahoma
- Monacan Indian Nation
- Nansemond Indian Tribe
- Oneida Indian Nation
- Onondaga Nation
- Pamunkey Indian Tribe
- Rappahannock Tribe, Inc.
- Saint Regis Mohawk Tribe
- Seneca-Cayuga Nation
- Shawnee Tribe
- Tuscarora Nation
- Upper Mattaponi Indian Tribe

**State Recognized and Other Tribes**
- Piscataway Conoy Tribe of Maryland (PCT)
- PCT - Cedarville Band of Piscataway
- PCT - Choptico Band of Piscataway
- Piscataway Indian Nation

**Federal Agencies**
- Department of Defense
- General Services Administration
- Federal Railroad Administration
- Federal Transit Administration
- National Capital Planning Commission
- National Institute of Standards and Technology
- National Park Service
- U.S. Army Corps of Engineers
- U.S. Department of Agriculture
- U.S. Postal Service

**State Agencies and Organizations**
- Maryland Commission on Indian Affairs
- MDOT Maryland Transit Administration
- MDOT Maryland Transportation Authority
- Maryland Historical Trust
- Preservation Maryland
- Virginia Department of Historic Resources
- Virginia Department of Transportation
- Washington Metropolitan Area Transit Authority

00006555

**I-495 & I-270 Managed Lanes Study**
**Section 106 Consulting Parties List**

## County Agencies and Organizations
- Charles County Department of Planning
- Frederick County
- Frederick County Preservation Trust
- Maryland Milestones/Anacostia Trails Heritage Area, Inc.
- Montgomery County Department of Correction and Rehabilitation
- Montgomery County Department of General Services
- Montgomery County Department of Transportation
- Montgomery County Heritage Area, Heritage Tourism Alliance of Montgomery County
- Maryland-National Capital Parks and Planning Commission – Montgomery County Planning – Historic Preservation
- Maryland-National Capital Parks and Planning Commission – Montgomery Parks
- Maryland-National Capital Parks and Planning Commission – Prince George's County Planning – Historic Preservation
- Maryland-National Capital Parks and Planning Commission – Prince George's County Department of Parks and Recreation
- Montgomery Preservation, Inc.
- Prince George's County Historic Preservation Commission
- Prince George's County Historical and Cultural Trust
- Prince George's Heritage, Inc.

## Municipal and Other Organizations
- Cabin John Citizens' Association
- Canoe Cruisers Association
- C&O Canal Association
- C&O Canal Trust
- Carderock Springs Citizens' Association
- City of Gaithersburg
- City of College Park
- City of Glenarden
- City of Greenbelt
- City of Rockville
- First Agape A.M.E. Zion Church at Gibson
- Frederick County Landmarks Foundation
- Heart of the Civil War Heritage Area
- Indian Spring Citizens Association
- National Park Seminary Master Association
- National Trust for Historic Preservation
- Peerless Rockville
- Save Our Seminary at Forest Glen
- Sierra Club Maryland Chapter
- Silver Spring YMCA
- Trustees of Morningstar Tabernacle No. 8, Inc. (Friends of Moses Hall)
- Village of North Chevy Chase
- Washington Biologists' Field Club

00006556

# Appendix C

## Map of Historic Properties within APE and Archaeological Sites and Survey Area Proposed for Treatment

00006557

(Intentionally Left Blank)

00006558

# Appendix C

## Map of Historic Properties within APE and Archaeological Sites and Survey Area Proposed for Treatment

**(Intentionally Left Blank)**



Legend

Area of Potential Effects

Map Match Line

1:85,000

0    3,000  6,000
Feet

Key
Sheet

Area of Potential Effects and
Summary of Cultural Resources
April 2022

00006561



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

0  100 200    400
Feet

**Area of Potential Effects and Summary of Cultural Resources April 2022**

Sheet : M-1

495 270 MANAGED LANES STUDY

00006562



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Current Map

MD

VA

DC

44FX3922 (Dead Run Ridges District)

GEORGE WASHINGTON MEMORIAL PKWY

George Washington Memorial Parkway

44FX0379

44FX0381

44FX0389

DEIDRE TER

MONIQUE CT

JILL CT

RIDGE DR

HEATHER BROOK

LUPINE LN

WEMBERLY WAY

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

N

0  100 200    400
Feet

**Area of Potential Effects and Summary of Cultural Resources**
**April 2022**

Sheet : M-2

495 270 MANAGED LANES STUDY

00006563



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

**Area of Potential Effects and Summary of Cultural Resources April 2022**

Sheet : M-3

495 270 MANAGED LANES STUDY

0 100 200    400 Feet

00006564



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Current Map

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

**Area of Potential Effects and Summary of Cultural Resources**
**April 2022**

Sheet : M-4

0  100 200    400
Feet

495 270 MANAGED LANES STUDY

00006565



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)

LOD - Preferred Alternative

Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA

Additional Archaeological Investigation Recommended

NRHP Eligible / Listed

0 100 200 400 Feet

**Area of Potential Effects and Summary of Cultural Resources April 2022**

Sheet : M-5

495 270 MANAGED LANES STUDY

00006566



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

**Area of Potential Effects and Summary of Cultural Resources**
**April 2022**

Sheet : M-6

0  100 200    400
Feet

00006567



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Current Map

MD

VA

DC

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

N

0  100 200      400
Feet

Area of Potential Effects and Summary of Cultural Resources
April 2022

Sheet : M-7

495 270 MANAGED LANES STUDY

00006568



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

Area of Potential Effects and Summary of Cultural Resources
April 2022

Sheet : M-8

0 100 200    400 Feet

00006569



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

**Area of Potential Effects and Summary of Cultural Resources**
**April 2022**

Sheet : M-9

0 100 200    400
Feet

495 270 MANAGED LANES STUDY

00006570



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries
Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

**Area of Potential Effects and Summary of Cultural Resources**
**April 2022**

Sheet : M-10

0  100 200    400
Feet

00006571



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

Area of Potential Effects and Summary of Cultural Resources
April 2022

Sheet : M-11

0 100 200    400 Feet

00006572



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

N

0  100 200      400
Feet

**Area of Potential Effects and Summary of Cultural Resources**
**April 2022**

Sheet : M-12

495 270 MANAGED LANES STUDY

00006573



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Current Map

MD

VA

DC

18MO191

18MO752

I-270

EISENHOWER MEM HWY

EISENHOWER MEMORIAL HWY

I-270

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

Area of Potential Effects and Summary of Cultural Resources
April 2022

Sheet : M-13

495 270 MANAGED LANES STUDY

0 100 200   400 Feet

00006574



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Current Map

MD
VA
DC

SEVEN LOCKS RD
MONTROSE RD
PARK POTOMAC EXIT RD
LANSING CIRCLE DR
OGBURN AVE
LINDSAY HUNTER
LINDA VIEW LN
FORTUNE TERR
PARK POTOMAC AVE
EISENHOWER MEMORIAL HWY
270
MONROE ST
SEVEN LOCKS RD
KETTLE POND CT
OAKENSHIELD DR
HALESWORTH DR
GLEN OAKS DR
WOOTTON PKWY
HENSLOWE DR
WILLOWLEAF WAY
SEVEN LOCKS RD
WHITE ROSE CT
CLIFFE HILL WAY
PASTURE BROOK CT

TOWER OAKS BLVD
TOWER OAKS BLVD
TOWER OAKS BLVD
WOOTTON PKWY
PRESERVE PKWY
S-28
S-27
SWM S-27
S-4
SWM S-4
S-6
S-5
SWM S-5
SWM S-6
RS-1
RS-2
270
GRAND OAKWAY
GRAND OAKWAY
VALLINGBY CIR
SAPPOLA CT
SCANDIA

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

Area of Potential Effects and Summary of Cultural Resources
April 2022

Sheet : M-14

0  100 200      400
Feet

495 270 MANAGED LANES STUDY

00006575



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

**Area of Potential Effects and Summary of Cultural Resources**
**April 2022**

Sheet : M-15

495 270 MANAGED LANES STUDY

00006576



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

**Area of Potential Effects and Summary of Cultural Resources**
**April 2022**

Sheet : M-16

0  100 200      400
Feet

00006577



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries
Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

**Area of Potential Effects and Summary of Cultural Resources**
**April 2022**

Sheet : M-17

00006578



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Current Map

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

Area of Potential Effects and Summary of Cultural Resources
April 2022

Sheet : M-18

0 100 200 400 Feet

495 270 MANAGED LANES STUDY

00006579



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status.

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Area of Potential Effects (APE)
LOD - Preferred Alternative
Parcel Boundaries

Archaeological Site Proposed for Further Treatment in PA
Additional Archaeological Investigation Recommended
NRHP Eligible / Listed

0  100 200    400
Feet

**Area of Potential Effects and Summary of Cultural Resources**
**April 2022**

Sheet : M-19

495 270 MANAGED LANES STUDY

00006580