

I-495 & I-270 Managed Lanes Study

# APPENDIX M

# FINAL NATURAL RESOURCES TECHNICAL REPORT

# June 2022



U.S. Department
of Transportation

**Federal Highway
Administration**




MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION



## TABLE OF CONTENTS

1   INTRODUCTION ............................................................................................................... 1

　1.1   Overview ............................................................................................................... 1

　1.2   Study Corridors and the Preferred Alternative ........................................................... 1

　1.3   Description of the Preferred Alternative ................................................................... 2

2   EXISTING CONDITIONS AND ENVIRONMENTAL EFFECTS ....................................................... 4

　2.1   Topography, Geology, and Soils ............................................................................... 4

　　2.1.1   Regulatory Context and Methods ...................................................................... 4

　　2.1.2   Existing Conditions ......................................................................................... 5

　　2.1.3   Environmental Effects ..................................................................................... 7

　　2.1.4   Avoidance, Minimization, and Mitigation ........................................................... 9

　2.2   Air Quality .......................................................................................................... 10

　　2.2.1   Regulatory Context and Methods .................................................................... 10

　　2.2.2   Existing Conditions ....................................................................................... 10

　　2.2.3   Environmental Effects ................................................................................... 11

　　2.2.4   Avoidance, Minimization, and Mitigation ......................................................... 12

　2.3   Waters of the US and Waters of the State, Including Wetlands .................................... 12

　　2.3.1   Regulatory Context and Methods .................................................................... 12

　　2.3.2   Existing Conditions ....................................................................................... 23

　　2.3.3   Environmental Effects ................................................................................... 25

　　2.3.4   Avoidance, Minimization, and Mitigation ......................................................... 32

　2.4   Watersheds and Surface Water Quality ................................................................... 36

　　2.4.1   Regulatory Context and Methods .................................................................... 36

　　2.4.2   Existing Conditions ....................................................................................... 42

　　2.4.3   Environmental Effects ................................................................................... 55

　　2.4.4   Avoidance, Minimization and Mitigation .......................................................... 58

　2.5   Groundwater and Hydrology ................................................................................. 60

　　2.5.1   Regulatory Context and Methods .................................................................... 60

　　2.5.2   Existing Conditions ....................................................................................... 61

　　2.5.3   Environmental Effects ................................................................................... 66

　　2.5.4   Avoidance, Minimization and Mitigation .......................................................... 66

　2.6   Floodplains ........................................................................................................ 66

00014915



I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

2.6.1    Regulatory Context and Methods .......................................................................... 67

2.6.2    Existing Conditions ............................................................................................... 68

2.6.3    Environmental Effects ........................................................................................... 69

2.6.4    Avoidance, Minimization, and Mitigation .............................................................. 69

2.7    Vegetation and Terrestrial Habitat ............................................................................. 70

2.7.1    Regulatory Context and Methods .......................................................................... 70

2.7.2    Existing Conditions ............................................................................................... 72

2.7.3    Environmental Effects ........................................................................................... 81

2.7.4    Avoidance, Minimization, and Mitigation .............................................................. 83

2.8    Terrestrial Wildlife .................................................................................................... 85

2.8.1    Regulatory Context and Methods .......................................................................... 85

2.8.2    Existing Conditions ............................................................................................... 87

2.8.3    Environmental Effects ........................................................................................... 89

2.8.4    Avoidance, Minimization, and Mitigation .............................................................. 90

2.9    Aquatic Biota ............................................................................................................ 91

2.9.1    Regulatory Context and Methods .......................................................................... 91

2.9.2    Existing Conditions ............................................................................................... 96

2.9.3    Environmental Effects ......................................................................................... 109

2.9.4    Avoidance, Minimization, and Mitigation ............................................................ 111

2.10    Rare, Threatened, and Endangered Species ............................................................ 113

2.10.1    Regulatory Context and Methods ........................................................................ 113

2.10.2    Existing Conditions ............................................................................................. 115

2.10.3    Environmental Effects ......................................................................................... 134

2.10.4    Avoidance, Minimization, and Mitigation ............................................................ 136

2.11    Unique and Sensitive Areas .................................................................................... 137

2.11.1    Regulatory Context and Methods ........................................................................ 137

2.11.2    Existing Conditions ............................................................................................. 139

2.11.3    Environmental Effects ......................................................................................... 139

2.11.4    Avoidance, Minimization, and Mitigation ............................................................ 140

REFERENCES ...................................................................................................................... 141

LIST OF ACRONYMS ............................................................................................................ 159

GLOSSARY .......................................................................................................................... 165

00014916


I-495 & I-270 Managed Lanes Study          Final Natural Resources Technical Report

## LIST OF TABLES

Table 2-1. Soils Hydrologic Group Descriptions ........................................................................... 6
Table 2-2. Impact to Soils by Type in Acres ................................................................................. 8
Table 2-3. Impacts to Steep Slopes and Highly Erodible Soils in Acres ........................................ 8
Table 2-4. Agency Coordination Meetings Since the Publication of the DEIS ............................. 17
Table 2-5. Total Delineated Features within the Phase 1 South Portion of the Corridor Study Boundary 24
Table 2-6. Wetland Function & Value Impact Summary .............................................................. 25
Table 2-7. Summary of Impacts to Wetlands and Waterways by Classification .......................... 27
Table 2-8. Summary of Impacts to Wetland Buffers by Classification ......................................... 27
Table 2-9. Summary of Impacts to Wetlands and Waterways by Classification within Virginia and Maryland Counties ..................................................................................................................................... 28
Table 2-10. Summary of Impacts to Waterways by Classification within USGS HUC8 Watersheds ........... 28
Table 2-11. Summary of Impacts to Wetlands and Waterways by Classification within MD 8-Digit Watersheds ................................................................................................................................. 29
Table 2-12. Summary of Impacts to Wetland Buffers by Classification within MD 8-Digit Watersheds .... 30
Table 2-13. Summary of Impacts to Wetlands and Waters by Classification within MD 12-Digit Watersheds ................................................................................................................................................. 31
Table 2-14. Summary of Impacts to Wetland Buffers by Classification within MD 12-Digit Watersheds 32
Table 2-15. Maryland COMAR Stream Designated Use Classifications ....................................... 39
Table 2-16. Maryland COMAR Stream Use Water Quality Criteria ............................................. 40
Table 2-17. Maryland Criteria and Federal Water Quality Recommendations ........................... 41
Table 2-18. Virginia Stream Class Water Quality Criteria .......................................................... 42
Table 2-19. Virginia Criteria and Federal Water Quality Recommendations ............................. 42
Table 2-20. Virginia Watershed Characteristics Summary ......................................................... 43
Table 2-21. Watershed Characteristics Summary ..................................................................... 44
Table 2-22. Summary of Chemical Grab Sample Water Quality Data for the Fairfax County Middle Potomac Watersheds .................................................................................................................................. 51
Table 2-23. Summary of In-situ Water Quality Data for the Fairfax County Middle Potomac Watersheds ................................................................................................................................................. 51
Table 2-24. Summary of In-situ Water Quality Data for the Rock Run Watershed .................... 52
Table 2-25. Summary of Chemical Grab Sample Water Quality Data for the Cabin John Creek Watershed ................................................................................................................................................. 53
Table 2-26. Summary of In-situ Water Quality Data for the Cabin John Creek Watershed ....... 54
Table 2-27. Summary of In-situ Water Quality Data for the Rock Creek Watershed ................. 54
Table 2-28. Summary of In-situ Water Quality Data for the Watts Branch Watershed ............. 55
Table 2-29. Summary of In-situ Water Quality Data for the Muddy Branch Watershed ........... 55
Table 2-30. Additional Impervious Surfaces by Watershed ....................................................... 58
Table 2-31. Common Highway Runoff Contaminants ................................................................. 63
Table 2-32. USGS Groundwater Wells Representing Aquifers that Underlie the Phase 1 South Portion of the Corridor Study Boundary ..................................................................................................... 64
Table 2-33. Groundwater Quality Data for Selected Pollutants ................................................ 65
Table 2-34. Waterways and Associated Floodplains within the Phase 1 South portion of the Corridor Study Boundary .................................................................................................................................. 68
Table 2-35. Impacts to FEMA 100-Year Floodplain in Acres ..................................................... 69

00014917

 I-495 & I-270 Managed Lanes Study     Final Natural Resources Technical Report

Table 2-36. NPS Property Tree Survey Results ...........................................................................................73
Table 2-37. M-NCPPC Property Tree Survey Results .................................................................................73
Table 2-38. Common Invasive Species within the Phase 1 South Portion of the Corridor Study Boundary
....................................................................................................................................................................77
Table 2-39. Forest Conservation Easements Within the Phase 1 South Portion of the Corridor Study
Boundary.....................................................................................................................................................79
Table 2-40. Impacts to Forests in Acres ...................................................................................................81
Table 2-41. Impacts to Surveyed Trees on NPS Properties.......................................................................82
Table 2-42. Impacts to Surveyed Trees on M-NCPPC Properties..............................................................82
Table 2-43. Impacts to TMDL and ICC Reforestation Sites in Acres.........................................................83
Table 2-44. Impacts to Potential FIDS Habitat within the Preferred Alternative LOD in Acres................90
Table 2-45. EPA Rapid Bioassessment Protocol Aquatic Habitat Ranking Criteria ...................................92
Table 2-46. MBSS Aquatic Habitat Ranking Criteria.................................................................................92
Table 2-47. VDEQ VSCI Scores and Rankings ...........................................................................................93
Table 2-48. FCDPWES Benthic IBI Scores and Rankings...........................................................................93
Table 2-49. MBSS Benthic IBI Scores and Rankings .................................................................................94
Table 2-50. MCDEP BIBI Scores and Rankings..........................................................................................94
Table 2-51. FCDPWES Fish IBI Scores and Rankings.................................................................................94
Table 2-52. MBSS Fish IBI Scores and Rankings .......................................................................................95
Table 2-53. MCDEP Fish IBI Scores and Rankings ....................................................................................95
Table 2-54. Range of Aquatic Habitat Scores for the Fairfax County Middle Potomac Watersheds..........97
Table 2-55. Range of Benthic IBI and VSCI Scores for the Fairfax County Middle Potomac Watersheds ..98
Table 2-56. Range of Fish IBI Scores for the Fairfax County Middle Potomac Watersheds .......................99
Table 2-57. Range of Aquatic Habitat Scores for the Potomac River/Rock Run Watershed......................99
Table 2-58. Range of Benthic IBI Scores for the Potomac River/Rock Run Watershed..............................99
Table 2-59. Range of Fish IBI Scores for the Potomac River/Rock Run Watershed..................................100
Table 2-60. Additional Fish Species Likely to Occur within the Potomac River and Chesapeake and Ohio
Canal .......................................................................................................................................................101
Table 2-61. Range of Aquatic Habitat Scores for the Cabin John Creek Watershed ...............................102
Table 2-62. Range of Benthic IBI Scores for the Cabin John Creek Watershed .......................................102
Table 2-63. Range of Fish IBI Scores for the Cabin John Creek Watershed.............................................103
Table 2-64. Range of Aquatic Habitat Scores for the Rock Creek Watershed .........................................104
Table 2-65. Range of Benthic IBI Scores for the Rock Creek Watershed.................................................105
Table 2-66. Range of Fish IBI Scores for the Rock Creek Watershed.......................................................106
Table 2-67. Range of Aquatic Habitat Scores for the Watts Branch Watershed .....................................106
Table 2-68. Range of Benthic IBI Scores for the Watts Branch Watershed .............................................106
Table 2-69. Range of Fish IBI Scores for the Watts Branch Watershed...................................................107
Table 2-70. Range of Aquatic Habitat Scores for the Muddy Branch Watershed ...................................107
Table 2-71. Range of Benthic IBI Scores for the Muddy Branch Watershed ...........................................108
Table 2-72. Range of Fish IBI Scores for the Muddy Branch Watershed .................................................109
Table 2-73. Additional Impervious Surfaces by Watershed.....................................................................111
Table 2-74. SSPRA Acreage within the  Phase 1 South Portion of the Corridor Study Boundary............119
Table 2-75. RTE Plant Species in Riparian Areas of the Potomac River Within The Phase 1 South Portion of
the Corridor Study Boundary, as Indicated by MDNR .............................................................................120

00014918



I-495 & I-270 Managed Lanes Study                    Final Natural Resources Technical Report

Table 2-76. RTE Targeted Plant Species Survey within the Potomac River Gorge Portion of the Preferred Alternative ............................................................................................................................................. 123

Table 2-77. First state records and rare invertebrates documented within the Potomac River Gorge of Maryland and Virginia.............................................................................................................................. 130

Table 2-78. Impacts to Unique and Sensitive Areas in Acres.................................................................... 139

## LIST OF FIGURES

Figure 1. I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative ........................................ 2

Figure 2. Preferred Alternative Typical Sections (HOT Managed lanes Shown in Yellow) .......................... 3

## LIST OF APPENDICES

Appendix A     Impact Tables

Appendix B     Natural Resources Inventory Maps

Appendix C     Soils Table

Appendix D     Overview and Key Maps

Appendix E     Delineated Features Table

Appendix F     Delineated Features Maps

Appendix G     Field Datasheets

Appendix H     Photo Documentation

Appendix I     NPS Property Additional Information

Appendix J     Wetland Functions and Values Table

Appendix K     Aquatic Biota and Water Quality Monitoring Stations Map

Appendix L     Observed Wildlife Table

Appendix M     Aquatic Biota Monitoring Table

Appendix N     Agency Correspondence

Appendix O     Sampled Fish Species Table

Appendix P     RTE Bat Bridge and Acoustic Surveys and Wood Turtle Survey

Appendix Q     Unique and Sensitive Areas Maps

Appendix R     RTE Plant Species Surveys

Appendix S     M-NCPPC Tree Inventory Report

Appendix T     Maryland Reforestation Law Mitigation Site Search Report

00014919

# 1 INTRODUCTION

## 1.1 Overview

The Federal Highway Administration (FHWA), as the Lead Federal Agency, and the Maryland Department of Transportation State Highway Administration (MDOT SHA), as the Local Project Sponsor, are preparing a Final Environmental Impact Statement (FEIS) in accordance with the National Environmental Policy Act (NEPA) for the I-495 & I-270 Managed Lanes Study (Study).  The I-495 & I-270 Managed Lanes Study (Study) is the first environmental study under the broader I-495 & I-270 Public-Private Partnership (P3) Program.

This Final Natural Resources Technical Report (NRTR) has been prepared to support the FEIS and focuses on the analysis of the Preferred Alternative. The Preferred Alternative, also referred to as Alternative 9 – Phase 1 South, includes building a new American Legion Bridge and delivering two high-occupancy toll (HOT) managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to west of MD 187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from east of MD 187 to I-270. Refer to **Figure 1**. This Preferred Alternative was identified after extensive coordination with agencies, the public and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach.

The purpose of the Final NRTR is to present the existing conditions, an assessment of potential direct impacts of the Preferred Alternative to natural resources and final mitigation, if applicable, for unavoidable impacts.  This Final NRTR builds upon the analysis in the Draft NRTR, DEIS and Supplemental DEIS (SDEIS), and has been prepared to support and inform the FEIS.

## 1.2 Study Corridors and the Preferred Alternative

In the SDEIS, published on October 1, 2021, FHWA and MDOT SHA identified the Preferred Alternative: Alternative 9 – Phase 1 South to be consistent with the previously determined phased delivery and permitting approach, which focuses on Phase 1 South. As a result, Alternative 9 – Phase 1 South includes the same improvements proposed as part of Alternative 9 in the DEIS but focuses the build improvements within the Phase 1 South limits only. The limits of Phase 1 South are along I-495 from the George Washington Memorial Parkway to west of MD 187 and along I-270 from I-495 to north of I-370 and on the I-270 east and west spurs as shown in dark blue in **Figure 1**. The improvements include two new HOT managed lanes in each direction along I-495 and I-270 within the Phase 1 South limits.  There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5 (shown in light blue in **Figure 1**). While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately and would be subject to additional environmental studies and analysis and collaboration with the public, stakeholders and agencies.

The 48-mile corridor Study limits remain unchanged: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, to west of MD 5 and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs in Montgomery and Prince George's Counties, Maryland (shown in both dark and light blue in **Figure 1**).

00014920

OP·LANES MARYLAND | I-495 & I-270 Managed Lanes Study | Final Natural Resources Technical Report

**Figure 1. I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative**



## 1.3    Description of the Preferred Alternative

The Preferred Alternative includes a two-lane HOT managed lanes network on I-495 and I-270 within the limits of Phase 1 South only (**Figure 2**). On I-495, the Preferred Alternative consists of adding two, new HOT managed lanes in each direction from the George Washington Memorial Parkway to east of MD 187. On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5. Along I-270, the existing collector-distributor (C-D) lanes from Montrose Road to I-370 would be removed as part of the proposed improvements. The managed lanes would be separated from the general purpose lanes using pylons placed within a four-foot wide buffer. Transit buses and HOV 3+ vehicles would be permitted to use the managed lanes toll-free.

00014921

 I-495 & I-270 Managed Lanes Study | Final Natural Resources Technical Report

## Figure 2. Preferred Alternative Typical Sections (HOT Managed lanes Shown in Yellow)

**I-495 from the George Washington Memorial Parkway to west of MD 187**



Approx. 194' - 198'

**I-495: American Legion Bridge (Looking north towards Maryland)**



Exit and entrance lanes provide access to the High-Occupancy Toll Lanes from the George Washington Memorial Parkway

Location for shared-use path on ALB

**I-495 west of MD 187 to west of MD 5 - NO ACTION AT THIS TIME**



Approx. 138' - 146'

**I-270 from I-495 to I-370**



Approx. 218' - 222'

00014922

 I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

## 2    EXISTING CONDITIONS AND ENVIRONMENTAL EFFECTS

The Existing Conditions and Environmental Effects section details the existing environmental features within the Phase 1 South portion of the corridor study boundary of the I-495 & I-270 Managed Lanes Study; the potential environmental effects to natural resources resulting from the Alternative 9 – Phase 1 South (Preferred Alternative); and the avoidance and minimization strategies used during the planning phase of this study. The field delineation and investigation of environmental features was conducted within the I-495 & I-270 Managed Lanes Study corridor study boundary, a 48-mile long and approximately 600-foot wide roadway corridor spanning two states, three counties, and 15 MD 12-digit watersheds, plus part of Fairfax County, Virginia. All agency coordination and data collection was conducted for the entire corridor study boundary. Only the features within the Phase 1 South portion of the corridor study boundary are presented in this report. The features in the remainder of the corridor study boundary are included in the Draft NRTR, Appendix R of the DEIS.

Impact tables included in **Appendix A** identify the quantifiable natural resource impacts of the Preferred Alternative LOD.

### 2.1    Topography, Geology, and Soils
#### 2.1.1    Regulatory Context and Methods

Environmental scientists conducted a desktop review of publicly available topography, geology, and soils data within the Phase 1 South portion of the corridor study boundary on behalf of MDOT SHA.  Geological and soils data were sourced from the US Department of Agriculture (USDA) Natural Resources Conservation Service (NRCS) website and Web Soil Survey, elevations were determined using US Geological Survey (USGS) geospatial data, and agricultural land was identified using Maryland's Environmental Resources and Land Information Network (MERLIN).

The Farmland Protection Policy Act (FPPA) 7 U.S.C. 4201 et seq, implementing regulations 7 CFR Part 658, of the Agriculture and Food Act of 1981, as amended aims to minimize the conversion of important food and fiber producing farmland into non-agricultural land by federal programs (USDA, 1981). Coordination of an FPPA review by NRCS must be completed at the Alternatives Retained for Detailed Study (ARDS) level if a project has the potential to convert prime, statewide, unique, or locally important farmland to non-farm use. Prime Farmland Soils, Soils of Statewide Importance, and unique farmland soils within the Phase 1 South portion of the corridor study boundary were identified using desktop review. FFPA does not apply to most of the Phase 1 South portion of the corridor study boundary because there is only a very small area that is not a census-designated urban area, which is excluded from FFPA regulation. If required, NRCS review establishes a farmland conversion impact rating score using a land evaluation and site assessment (LESA) system (Form AD-1006) to identify potential impacts to important agricultural land within federally funded or assisted project sites. Consideration of alternative sites is suggested if the score and potential adverse impacts on farmland exceed the recommended allowable level (USDA, 1981).

00014923

 I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

## 2.1.2    Existing Conditions

### A.    Topography and Geology

The Phase 1 South portion of the corridor study boundary is entirely within the Piedmont Plateau Physiographic Province and elevation in this area ranges from 51 to 495 feet above mean sea level (**Appendix B**).  The lowest elevations occur along the Potomac River near the American Legion Bridge on the western side of the project limits. The areas of highest elevation occur near the convergence of I-270 and I-370 along Shady Grove Road in Montgomery County.

The Piedmont Plateau Physiographic Province has broadly undulating to rolling topography underlain by metamorphic rock, with low knobs, ridges, and valleys. The Phase 1 South portion of the corridor study boundary includes two Physiographic Districts within the Piedmont Plateau Physiographic Province: the Hampstead Upland District and Middle Potomac Gorge District (Reger & Cleaves, 2008). The Hampstead Upland District consists of rolling to hilly uplands interrupted by steep-walled gorges. This district has distinctive ridges, hills, barrens, and valleys, and its streams include short segments of narrow, steep-sided valleys. The Middle Potomac Gorge District is where the Potomac River flows through a steep sided gorge. Bedrock islands are common in this district, while rapids and falls occur downstream, including the Great Falls of the Potomac River (USDA NRCS, 2018).

### B.    Soils

#### a.    Soil Types

A soil map unit is a collection of areas on a soil map defined by their dominant taxonomic components, which can include a combination of soil type and miscellaneous, non-soil areas (e.g. rock outcrop) (USDA NRCS, 2018). The USDA-NRCS Web Soil Survey (2018) identified 44 soil map units within the Phase 1 South portion of the corridor study boundary, as summarized in **Appendix C** and depicted in the Natural Resources Inventory Maps in **Appendix B.**

#### b.    Soil Hydrologic Groups

The USDA NRCS classifies soils into "hydrologic soil groups" based on estimates of runoff potential. Soils are assigned to one of four groups according to the rate of water infiltration that is expected to occur when the soils are not protected by vegetation, are thoroughly wet, and receive precipitation from long-duration storms.  The four hydrologic soil groups are defined in **Table 2-1.** If a soil is assigned to a dual hydrologic group (A/D, B/D, or C/D), the first letter refers to drained areas and the second refers to undrained areas. The majority of soils in the Phase 1 South portion of the corridor study boundary are in Hydrologic Groups B and C, with slow to moderate infiltration rates. Soils with slower infiltration rates have higher runoff potential during rain events (USDA NRCS, 2018).

00014924

**Table 2-1. Soils Hydrologic Group Descriptions**

| Group | Description |
|-------|-------------|
| A | Soils having a high infiltration rate (low runoff potential) when thoroughly wet. These consist mainly of deep, well drained to excessively drained sands or gravelly sands. These soils have a high rate of water transmission. |
| B | Soils having a moderate infiltration rate when thoroughly wet. These consist chiefly of moderately deep or deep, moderately well drained or well drained soils that have moderately fine texture to moderately coarse texture. These soils have a moderate rate of water transmission. |
| C | Soils having a slow infiltration rate when thoroughly wet. These consist chiefly of soils having a layer that impedes the downward movement of water or soils of moderately fine texture or fine texture. These soils have a slow rate of water transmission. |
| D | Soils having a very slow infiltration rate (high runoff potential) when thoroughly wet. These consist chiefly of clays that have a high shrink-swell potential, soils that have a high water table, soils that have a claypan or clay layer at or near the surface, and soils that are shallow over nearly impervious material. These soils have a very slow rate of water transmission. |

Source: NRCS Web Soil Survey

### c.   Hydric Soils

The National Technical Committee for Hydric Soils (NTCHS) defines hydric soils as soils that are saturated or inundated long enough during the growing season to become anaerobic in their upper layer and support the growth and reproduction of hydrophytic vegetation (59 FR 16835, proposed July 13, 1994). The hydric soil ratings shown in the soils tables in **Appendix C** indicate the percentage of the soil map units that meet the NRCS criteria for hydric soils. Map units are composed of one or more components or soil types, with each rated as hydric or not hydric soil. Each map unit is rated based on its respective components and the percentage of each component within the map unit. The five rating groups are separated as hydric (100 percent hydric components), predominantly hydric (66 to 99 percent hydric components), partially hydric (33 to 65 percent hydric components), predominantly non-hydric (1 to 32 percent hydric components), and non-hydric (less than one percent hydric components) (USDA NRCS, 2018).

Within the Phase 1 South portion of the corridor study boundary, two soil units are classified as hydric (covering approximately 2 percent of the area within the corridor study boundary), one soil unit is classified as predominantly hydric (covering approximately 5 percent of the area within the corridor study boundary), zero soil units are classified as partially hydric, 13 soil units are classified as predominantly non-hydric (covering approximately 36 percent of the area within the corridor study boundary), and 26 soil units are classified as non-hydric (covering the remaining 57 percent of the area within the corridor study boundary).

### d.   Highly Erodible Soils

Highly erodible soils are potentially more prone to erosion from wind, rain, and disturbance (USDA NRCS, 2010). The Code of Maryland Regulations (COMAR) defines "highly erodible soils" as soils with a slope greater than 15 percent, or those soils with a soil erodibility factor (K factor) greater than 0.35 and with slopes greater than 5 percent (COMAR 26.17.01). Based on this definition, 35 soil units within the Phase

00014925

 I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

1 South portion of the corridor study boundary are highly erodible. Highly erodible soils are located throughout the Phase 1 South portion of the corridor study boundary, with higher concentrations along I-270, and I-495 west of New Hampshire Avenue.

### e.    Prime Farmland, Soils of Statewide Importance, and Unique Farmland Soils

USDA NRCS classifies farmland soils as Prime Farmland Soils, Soils of Statewide Importance (also referred to as farmland of statewide importance), or Unique Farmland Soils by identifying the location and extent of soils that are best suited to growing human food, animal feed, fiber, forage, and oilseed crops. Prime Farmland Soils have the best quality, growing season, and moisture supply needed to economically produce sustained high yields of crops when treated and managed according to widely acceptable farming methods. In general, Prime Farmland Soils have an adequate and dependable water supply from precipitation or irrigation, favorable temperature and growing seasons, acceptable pH, adequate salt and sodium content, and few or no rocks. These soils are permeable to water and air, are not excessively erodible or saturated for long periods, and do not frequently flood (43 FR Ch 675.5, 1978).

Unique Farmland Soils are soils other than Prime Farmland Soils that have the best combination of physical and chemical characteristics to produce a specific high value food or fiber crop like citrus, tree nuts, olives, cranberries, fruits, or vegetables. Unique Farmland Soils have a combination of soil quality, growing season, temperature, humidity, air drainage, elevation, and other factors like nearness to market that favor the specific crop (USDA, 1981).

Soils of Statewide Importance are soils, in addition to prime and unique farmland soils, that are of statewide importance to produce human food, animal feed, fiber, forage, and oilseed crops as designated by the appropriate state agency. Soils of Statewide Importance are typically nearly Prime Farmland soils that produce high crop yields when managed properly (43 FR Ch 675.5, 1978).

Nine soils within the Phase 1 South portion of the corridor study boundary were identified by USDA NRCS (2018) as Prime Farmland Soils, all located on NPS land or within the Potomac River; seven soils were identified as Soils of Statewide Importance; and no soils were identified as Unique Farmland Soils.

## 2.1.3    Environmental Effects

### A.    Topography and Geology

Topography within the Preferred Alternative LOD construction areas would be altered by surficial excavation and grading, thereby changing the relative ground elevation, but this work is not anticipated to have a substantial effect on underlying sediments. Possible impacts to geologic formations and rock structures include impacts from construction activities, such as cutting and filling.

### B.    Soils

The primary impact to soils from the Preferred Alternative LOD would be soil removal or alterations to the soil profile and structure due to construction activities. Additional potential impacts could include leaching of chemicals into the soil from general construction or accidental spills, soil erosion, and soil compaction associated with the use of heavy equipment. Erosion of topsoil may result in the loss of soil nutrients and nutrient holding capacity, as well as a reduction of organic material in the soil. The loss of organic-rich topsoil reduces the soil's natural ability to provide nutrients to plants and regulate water flow, making the soil more susceptible to pests, disease, and compaction. Soil compaction reduces infiltration

00014926

rates and can cause rapid surface water runoff or ponding, resulting in shifts in vegetation from wet to dry or dry to wet. Soil compaction can also damage roots, leading to plant mortality. Erosion from construction sites can lead to the transport of excess nutrients and sediments downstream, but this will be minimized to the greatest extent possible by state required erosion and sediment control measures (USDA NRCS, 2000).

a.    **Hydric Soils and Highly Erodible Soils**

Impacts to soils within the Preferred Alternative LOD are presented in **Table 2-2**[1]. Note that hydric soil acreage identified in this section are as defined in the NRCS Web Soil Survey and do not reflect the hydric soils identified as jurisdictional wetlands.

**Table 2-2. Impact to Soils by Type in Acres**

|  | Perm | Temp | Total |
|---|---|---|---|
| Farmland of Statewide Importance[1] | 1.78 | 0.02 | 1.80 |
| Prime Farmland[2] | 0.00 | 0.00 | 0.00 |
| Hydric | 20.77 | 0.08 | 20.85 |
| Predominantly Hydric | 62.20 | 0.41 | 62.61 |
| Partially Hydric | 0.00 | 0.00 | 0.00 |
| Predominantly Non-Hydric | 408.12 | 5.06 | 413.18 |
| Non-Hydric | 587.98 | 25.97 | 613.95 |

Notes: [1] All of the Farmland of Statewide Importance are located within Virginia.
[2] Prime farmland soils exclude acres that are parkland or waterways.

Impacts to highly erodible soils by the Preferred Alternative LOD are summarized in **Table 2-3**.

**Table 2-3. Impacts to Steep Slopes and Highly Erodible Soils in Acres**

|  | Perm | Temp | Total |
|---|---|---|---|
| Steep Slopes > 5, K Factor > 0.35 | 222.40 | 4.31 | 226.71 |
| Steep Slopes 15 | 273.21 | 8.25 | 281.46 |

b.    **Prime Farmland, Soils of Statewide Importance, and Unique Farmland Soils**

A farmland assessment was conducted to refine the potential for impacts to Prime Farmland Soils and Soils of Statewide Importance. There are no Unique Farmland Soils within the Preferred Alternative LOD. Farmland soils occur throughout the Preferred Alternative LOD; however, many areas within the Preferred Alternative LOD that were once mapped as Prime Farmland Soils or Soils of Statewide Importance were developed or converted to impervious surface and no longer qualify as these soil types under the FPPA, Section 523.10.B(2). Consequently, lands identified as "urbanized area" (UA) on Census Bureau maps were removed from the calculation of farmland soil impacts to assess the potential for impacts to these resources. Impacts to Prime Farmland Soils and Farmland of Statewide Importance are in **Table 2-2**. The Preferred Alternative LOD will result in 1.8 acres of impacts to Farmland of Statewide Importance and will not impact Prime Farmland Soils since all Prime Farmland soils found within the Preferred Alternative LOD are located on parkland within the Potomac River.

---

[1] For reference, impact tables presented in the report are also included in Appendix A.

00014927

As noted in the *I-495 & I-270 Managed Lanes Study Community Effects Assessment and Environmental Justice Analysis (CEAEJ) Technical Report*, the Preferred Alternative LOD is not within the Maryland Agricultural Land Preservation Program, the Maryland Agricultural Easement Program, the Maryland Environmental Trust (MET), the Maryland Rural Legacy Program, or the Montgomery County Agricultural Reserve, (MCATLAS, 2019; Montgomery County Rustic Roads Advisory Committee, 2015). See the CEAEJ Technical Report for further information.

## 2.1.4    Avoidance, Minimization, and Mitigation

Detailed geotechnical studies will be performed prior to construction to identify subsurface issues that may impact project construction or the surrounding environment. MDOT SHA will mitigate any negative effects, such as unstable soils or high-water table, through engineering design. Negative impacts to the surrounding environment, such as sedimentation, will be mitigated through implementation and strict adherence to erosion and sediment control plans.

Construction within the Preferred Alternative LOD requires consideration of hydric and highly erodible soils, as well as steep slopes. Measures to protect soils from erosion would be implemented based on approved Erosion and Sediment Control Plans (E&S Plans) prepared in accordance with the "Maryland Standards and Specifications for Soil Erosion and Sediment Control" (MDE, 2011) and the Virginia Erosion and Sediment Control Law (VDEQ, 2014) in accordance with the Virginia Erosion and Sediment Control Handbook (VDEQ, 1992) and the VDOT Drainage Manual (VDOT, 2017). The E&S Plans will be prepared by the Developer during final design and include erosion and sediment control devices to avoid or minimize the impacts of soil erosion such as: sediment traps, silt fencing, sedimentation basins, interception channels, and seeding and mulching.  Drainage patterns would be preserved to the extent practicable during future design which would maintain hydric soils where possible. Additionally, BMPs will be considered to prevent negative impacts to hydric soils and wetlands such as the use of matting in temporarily impacted wetlands to avoid soil compaction.

Additional water quality protection measures are required for highway construction projects in Maryland to prevent soil erosion and subsequent sediment influx into nearby waterways. Construction contractors are designated as co-permittees on the National Pollutant Discharge Elimination System (NPDES) permit to ensure compliance. This permit is issued under Maryland's General Permit for construction activities and is implemented with a regular inspection program for construction site sediment control devices that includes penalties for inadequate maintenance. To ensure compliance, onsite evaluations by an MDE certified erosion and sediment control "Responsible Person" would occur throughout the duration of construction.

Fairfax County, Virginia requires any projects with land-disturbing activities exceeding 2,500 square feet (SF) to prepare an erosion and sediment control plan (Fairfax County, 2018a). The County must approve each plan before any land-disturbing activities begin, and each project is subject to inspections throughout the duration of land-disturbing activities to prevent erosion and sediment control violations.

00014928

## 2.2    Air Quality

### 2.2.1    Regulatory Context and Methods

As required by the Clean Air Act and Amendments, the US Environmental Protection Agency (EPA) sets the National Ambient Air Quality Standards (NAAQS) for airborne pollutants that have adverse impacts on human health and the environment, referred to as criteria pollutants. The criteria pollutants are carbon monoxide (CO), sulfur dioxide ($SO_2$), ozone ($O_3$), particulate matter ($PM_{2.5}$ and $PM_{10}$), nitrogen dioxide ($NO_2$), and lead (Pb). In addition to the criteria pollutants for which there are NAAQS, EPA also regulates Mobile Source Air Toxics (MSATs). The nine priority MSATs are: benzene, 1,3-butadiene, formaldehyde, acrolein, acetaldehyde, diesel particulate matter, ethylbenzene, naphthalene, and polycyclic organic matter. Greenhouse gases (GHGs) are another pollutant monitored by EPA. The primary GHGs in the Earth's atmosphere are Carbon Dioxide ($CO_2$), Methane ($CH_4$), Nitrous Oxide ($N_2O$), and Fluorinated Gases. The methodologies for assessing the pollutants is summarized in the **DEIS, Chapter 4, Section 4.8** and within the *Air Quality Technical Report* (AQTR) (**DEIS, Appendix I**) ([https://oplanesmd.com/wp-content/uploads/2020/07/DEIS_AppI_Air-Quality_web.pdf](https://oplanesmd.com/wp-content/uploads/2020/07/DEIS_AppI_Air-Quality_web.pdf)), and **FEIS, Appendix K** the *Final Air Quality Technical Report*.

### 2.2.2    Existing Conditions

The Preferred Alternative is located in Montgomery County, Maryland and a small area in Fairfax County, Virginia. The EPA Green Book[2] lists these counties as attainment for all NAAQS with the exception of the 2015 8-hour ozone standard,[3] for which the counties are nonattainment. The EPA recently redesignated the area to maintenance/attainment for the 2008 8-hour ozone standard.[4] The 2015 Ozone NAAQS (0.070ppm) are more stringent than the 2008 NAAQS (0.075ppm). Maryland, Virginia and the District of Columbia submitted maintenance plans to EPA that demonstrated maintenance of the 2008 ozone NAAQS through 2030 and therefore their request to be redesignated to maintenance/attainment of those NAAQS was granted by EPA in April 2019. The measured ambient air concentrations closest to the study area were all well below the corresponding NAAQS, except for the exceedance of the 2015 8-hour ozone standard recorded at all the monitor locations.

The Maryland counties were redesignated from a nonattainment area to attainment and entered a 20-year maintenance period for CO in March 1996. The area was considered a maintenance area for the 20 years following until March 2016 when the counties completed the maintenance period. Since the Maryland counties have completed the maintenance period, transportation conformity no longer applies for CO. The study corridor is an attainment area for fine particulate matter (PM2.5). Similarly, Fairfax County is designated attainment for CO, and is also considered attainment for the 1997 PM2.5 NAAQS per the EPA 2016 ruling.

The Study is currently included in the NCRTPB Fiscal Year (FY) 2019 – 2024 TIP [TIP ID 6432 and Agency ID AW0731 (planning activities)] and the NCRTPB Visualize 2045 Long Range Plan (CEID 1182, CEID 3281, and

---

[2] [https://www.epa.gov/green-book](https://www.epa.gov/green-book)
[3] These counties were redesignated to attainment of the 2008 ozone NAAQS, effective May 15, 2019 (See: [https://www.federalregister.gov/documents/2019/04/15/2019-06128/air-plan-approval-district-of-columbia-maryland-and-virginia-maryland-and-virginia-redesignation](https://www.federalregister.gov/documents/2019/04/15/2019-06128/air-plan-approval-district-of-columbia-maryland-and-virginia-maryland-and-virginia-redesignation)).
[4] [https://www.federalregister.gov/documents/2019/04/15/2019-06128/air-plan-approval-district-of-columbia-maryland-and-virginia-maryland-and-virginia-redesignation](https://www.federalregister.gov/documents/2019/04/15/2019-06128/air-plan-approval-district-of-columbia-maryland-and-virginia-maryland-and-virginia-redesignation)

00014929

 I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

Appendix B page 56). This Study is included in the Air Quality Conformity Determination that accompanies the Visualize 2045 Plan. The Visualize 2045 Air Quality Analysis is based upon the latest planning assumptions available for the Washington region. The analysis used MOVES2014a, the latest emission factor model specified by EPA for use in preparation of state implementation plans and conformity assessments at the time of analysis.

## 2.2.3    Environmental Effects

The DEIS presented the results of the potential impacts for CO at worst-case intersections throughout the study corridors. The methodologies and assumptions applied for the analysis are consistent with FHWA[5] and EPA guidance.[6,7] An updated traffic analysis to determine the worst-case intersections and interchanges on Preferred Alternative throughout the corridors was performed. The results of the traffic study showed that, although some different interchanges and intersections were identified as being worst case in the updated analysis, overall the maximum peak hour volumes and maximum peak hour delays were less than the top three intersections and interchanges used in the DEIS analysis. For this reason, the DEIS analysis can still be assumed to have projected worst-case emissions and that there would not be an exceedance of the CO NAAQS.

In accordance with the latest MSAT guidance, the Study is still best characterized as one with "higher potential MSAT effects" since the projected Design Year traffic is still expected to reach the 140,000 to 150,000 AADT criteria.[8] Therefore, a quantitative MSAT analysis was conducted. The results of the MSAT analysis show that all of the MSAT pollutant emissions are expected to increase slightly for the Preferred Alternative when compared to the No Build condition for 2025 and 2045. All MSAT pollutant emissions are expected to significantly decline in the Opening (2025) and Design years (2045) when compared to existing conditions (2016). These long-term reductions occur despite projected increase in VMT from 2016 to the 2025 and 2045 Build scenarios. Refer to **FEIS, Appendix K, Section 3.3.3** for additional detail on the MSAT results.

Consistent with the 2016 Council of Environmental Quality Final GHG NEPA guidance[9], a quantitative GHG assessment was conducted. The analysis shows GHG emissions under the Preferred Alternative are expected to decline in the Opening (2025) and Design (2045) years for all GHG pollutants when compared to existing conditions. Specifically, for CO2e, there is projected to be a 94,664 TPY decrease (13% reduction) in the Opening year and a 67,272 TPY decrease (9% reduction) in the Design year. These reductions occur despite projected increase in VMT on the affected network between the 2016 and 2025 and 2045 Build scenarios. Refer to **FEIS, Appendix K, Section 3.4.1** for additional detail on the GHG results.

---

[5] https://www.environment.fhwa.dot.gov/projdev/impTA6640.asp

[6] https://www3.epa.gov/scram

[7] https://nepis.epa.gov/Exe/ZyPdf.cgi?Dockey=P100M2FB.pdf

[8] Updated Interim Guidance on Mobile Source Air Toxic Analysis in NEPA Documents. October 18, 2016. https://www.fhwa.dot.gov/environMent/air_quality/air_toxics/policy_and_guidance/msat/page03.cfm

[9] https://www.federalregister.gov/documents/2016/08/05/2016-18620/final-guidance-for-federal-departments-and-agencies-on-consideration-of-greenhouse-gas-emissions-and

00014930

### 2.2.4   Avoidance, Minimization, and Mitigation

While no mitigation measures are required since the Preferred Alternative does not cause or contribute to a violation of the NAAQS, additional measures have been considered and committed to by MDOT SHA to further reduce impacts to air quality. Measures that will be implemented during construction to help minimize emissions include the following:

- Implementing a *Diesel Emissions Reduction Program* that exceeds pertinent Federal and state regulations to minimize air pollution including MSAT emissions during construction.
- Implementing a *Greenhouse Gas Reduction Program* to reduce emissions during construction.
- Implementing an **Anti-Idling Policy** to avoid unnecessary idling of construction equipment in order to reduce engine emissions and to provide air quality benefits to those who live and work in or adjacent to the construction sites.

For additional detail on these measures refer to **FEIS, Appendix K, Section 4.**

## 2.3   Waters of the US and Waters of the State, Including Wetlands

Only nontidal wetlands and waterways are located within the Phase 1 South portion of the corridor study boundary; therefore, this section will only reference non-tidal wetlands and waterways regulations.

### 2.3.1   Regulatory Context and Methods

#### A.   Regulations

Wetlands and waterways are protected by several federal and state regulations. Jurisdictional Waters of the US, including wetlands, are jointly defined by the Environmental Protection Agency (EPA) and the US Army Corps of Engineers (USACE) in 40 CFR 230.3(s) and 33 CFR 328.3. Executive Order 11990 of the Federal Register (FR), entitled *Protection of Wetlands*, was enacted to avoid, to the extent possible, the long- and short-term adverse impacts associated with the destruction or modification of wetlands; to avoid direct or indirect support of new construction in wetlands wherever there is a practicable alternative; and "each agency, to the extent permitted by law, shall avoid undertaking or providing assistance for new construction located in wetlands unless the head of the agency finds: (1) that there is no practicable alternative to such construction, and (2) that the proposed action includes all practicable measures to minimize harm to wetlands which may result from such use" (42 FR 26961, E.O. 11990, May 1977).

The EPA and USACE implemented the Navigable Waters Protection Rule (85 FR 22250) on June 22, 2020. The Navigable Waters Protection Rule (NWPR) replaced the Clean Water Rule as the federal regulation defining Waters of the US. The rule defined four categories of jurisdictional waters and 12 categories of exclusions, in addition to clarifying terms used to define these waters and exclusions. However, on June 9, 2021, the EPA and USACE announced their intent to revise the definition of Waters of the US, arguing that the NWPR defined Waters of the US too narrowly and would reduce clean water protections. On August 30, 2021, the EPA and USACE received a court order to vacate the NWPR, prompting the USACE to implement a reversion to the pre-2015 regulatory regime until further notice. Therefore, the FEIS reports all wetlands and waterway features within the Phase 1 South portion of the corridor study boundary in accordance with the pre-2015 regulatory definitions.

00014931

 I-495 & I-270 Managed Lanes Study                    Final Natural Resources Technical Report

Unavoidable impacts caused by the discharge of dredge or fill material into Waters of the US, including wetlands, within the Preferred Alternative LOD are federally regulated under Section 404 of the Clean Water Act (CWA) (33 U.S.C. 1344) and Section 10 of the Rivers and Harbors Act (33 U.S.C. 403). Section 404 of the CWA provides regulatory authority to the USACE to issue or deny permits for the discharge of dredged or fill material into Waters of the US, including wetlands, and a Section 404 permit is required for impacts.  Authorization under a Section 404 Permit, a MDE Nontidal Wetlands and Waterways Permit, and a Virginia Water Protection Permit (VWPP) are required prior to any construction. Section 10 of the Rivers and Harbors Act provides regulatory authority to the US Coast Guard (USCG) for the permitting of bridges over navigable rivers and the USACE for the permitting of piers, abutments, and associated impacts. In a letter dated September 19, 2019, included in **Appendix N**, the USCG stated that the ALB reconstruction over the Potomac River would not require a bridge permit. However, the USACE would permit the ALB piers and abutments within the Potomac River under Section 10. Section 10 will only apply to the Potomac River for the I-495 & I-270 Managed Lanes Study.

The NPS has developed a set of policies and procedures found in Director's Order (D.O.) #77-1: Wetland Protection (NPS, 2010) and Procedural Manual #77-1: Wetland Protection (NPS, 2016) to comply with Executive Order 11990 within the context of the NPS's mission. These policies and procedures emphasize: 1) exploring all practical alternatives to building on, or otherwise adversely affecting, wetlands; 2) reducing impacts to wetlands whenever possible; and 3) providing direct compensation for any unavoidable wetland impacts by restoring degraded or destroyed wetlands on other NPS properties. If a preferred alternative would have adverse impacts on wetlands, a Statement of Findings (SOF) must be prepared that documents the above steps and presents the rationale for choosing an alternative that would have adverse impacts on wetlands. The SOF includes a mitigation plan proposed to compensate for impacts to wetlands and floodplains on NPS land.

Wetlands and their buffers are also protected by the State of Maryland Environment Article Title 5, Subtitles 5 and 9 of the Maryland Annotated Code. Pursuant to the Maryland Code, the MDE has promulgated stringent regulations to protect wetlands (COMAR, Title 26). Nontidal wetlands and their buffers are defined in COMAR 26.23.01.01. Nontidal wetlands are defined as "an area that is inundated or saturated by surface water or ground water at a frequency and duration sufficient to support, and that under normal circumstances does support, a prevalence of vegetation typically adapted for life in saturated soil conditions, commonly known as hydrophytic vegetation." A buffer is "a regulated area, 25 feet in width, surrounding a nontidal wetland, measured from the outer edge of the nontidal wetland." According to COMAR 26.23.01.04, nontidal wetland buffers shall be expanded in special circumstances. Wetlands of Special State Concern are examples of Maryland's most valuable wetlands resources and are designated for special protection under COMAR 26.23.06. These wetlands have high ecological or educational value and may provide specialized habitat for rare plant or animal species. Waterways regulated by the State are defined in COMAR 26.17.04.02 as Waters of the State and include the 100-year floodplain. Impacts to waterways, 100-year floodplains, nontidal wetlands, 25-foot nontidal wetland buffers, or 100-foot expanded buffers require a Maryland Nontidal Wetlands and Waterways Permit. Additionally, a Section 401 Water Quality Certification from MDE is required for any impacts to waterways or wetlands requiring a USACE Section 404 permit.

00014932

In Virginia, the Virginia Department of Environmental Quality (VDEQ) is the authority that provides the Section 401 certification through its VWPP Program (9VAC 25-210), which gets its statutory authority from the Code of Virginia (Va. Code §62.1-44.15). State law requires that a VWPP be obtained before disturbing a stream by clearing, filling, excavating, draining, or ditching (VDEQ, 2018). Work in non-tidal streams with drainage areas greater than five square miles also requires a permit from the Virginia Marine Resources Commission (VMRC) under the authority of the Code of Virginia (Va. Code §28.2-1204).

## B.   Methodology

Prior to beginning the field investigation, environmental scientists conducted a desktop review of mapped waterways and nontidal wetlands within the corridor study boundary on behalf of MDOT SHA using existing National Wetlands Inventory (NWI) and Maryland Department of Natural Resources (MDNR) Wetlands and Waters Geographic Information System (GIS) data. No similar statewide wetland and stream GIS layer exists for Virginia. The results of the desktop investigation for the area within the Phase 1 South portion of the corridor study boundary are included in **Appendix B**.

The I-495 & I-270 Managed Lanes Study corridor study boundary, a 48-mile long and approximately 600-foot-wide roadway corridor, was split into 29 field sub-segments (See **Appendix D, Overview Map**) for the purposes of the wetlands and waterways field investigation, and field sub-segment numbers were incorporated into the naming convention of features within each sub-segment. Field sub-segment breaks were established at major road crossings to provide clear physical boundaries and to limit the number of features that may occupy more than one segment.

The 48-mile corridor study boundary remains unchanged: I-495 from south of the GWMP in Fairfax County, Virginia, to west of MD 5 and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs in Montgomery and Prince George's Counties, Maryland.   The Preferred Alternative, Alternative 9 - Phase 1 South (shown in dark blue in **Figure 1**), includes build improvements within the limits of Phase 1 South only, totaling approximately 15 miles of proposed improvements. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5 (shown in light blue in **Figure 1**). While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the scope of the Study area, future improvements on these remaining parts of the system may still be needed.

A two-tier approach was applied to fieldwork within the corridor study boundary since properties adjacent to the ROW were not fully accessible when delineation efforts began. Before delineation efforts began, MDOT SHA notified property owners of non-invasive fieldwork (i.e., involving no soil disturbance). When field teams identified potential wetland areas based on the non-invasive field visit, letters were then sent to the respective properties to request invasive access. Tier one fieldwork consisted of full delineation of wetlands and waterways features within the MDOT SHA ROW, and non-invasive access to properties adjacent to the ROW. Non-invasive access allows access for stream delineation, flagging, photography, characterization of vegetation, and surface hydrology, but not digging soil pits for soil characterization or groundwater hydrology. In areas outside of the MDOT SHA ROW, field crews delineated waterway features and conducted planning level investigation of wetlands, including conservative estimations of potential wetland boundaries based on surface hydrology and vegetation. Tier two fieldwork consisted of soils investigations to finalize delineations of the potential wetland areas identified during tier one

00014933

fieldwork on public and private properties where the property owners granted MDOT SHA access to perform invasive investigations.

Environmental scientists delineated wetlands and waterways within the corridor study boundary on behalf of MDOT SHA and VDOT from March 2018 through October 2021, with delineation areas revised as the LOD was refined. Much of the MDOT SHA ROW within the corridor study boundary was previously delineated as part of the Prince George's and Montgomery County Integrated Roadside Vegetation Management (IRVM) and I-270 ICM projects. All previously delineated features were field reviewed, and delineations were revised as needed for the purposes of the I-495 & I-270 Managed Lanes Study. No previous delineations were referenced for the Virginia portion of the corridor study boundary. Environmental scientists completed data sheets for features delineated in areas that were not previously delineated by the IRVM or ICM projects, previously delineated features without data sheets, and previously delineated features that changed classification (e.g., palustrine emergent [PEM] wetland to palustrine forested [PFO] wetland or intermittent to perennial stream) since the previous delineation. All features were photographed and given a unique identifier containing the number of its associated field sub-segment. Data obtained from the field reconnaissance was collected with an iPad and boundary points were located using global positioning systems (GPS).

Wetlands features were delineated in accordance with the following:

- USACE Wetlands Delineation Manual, Y-87-I (Environmental Laboratory, 1987);
- USACE 2012 Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Eastern Mountains and Piedmont Region Version 2.0 (USACE, 2012); and
- USACE 2010 Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Atlantic and Gulf Coastal Plain Region (USACE, 2010).

These manuals employ a three-parameter approach to wetland identification, including (1) hydrology, (2) hydrophytic vegetation, and (3) hydric soils. All three parameters must be present for an area to be considered a jurisdictional wetland under Section 404 of the CWA. Routine wetland determination methods with onsite inspection were used to determine the presence of wetlands in the corridor study boundary. Wetlands including dying ash trees were characterized as PFO wetlands, as requested by MDE and USACE. Wetlands and waterways located on National Park Service (NPS) park land were identified by Cowardin classification including the system, subsystem, class, subclass, and any applicable modifiers (Cowardin, 1979).

Wetland scientists completed a functions and values assessment for all delineated wetlands using the USACE New England Method as presented in The Highway Methodology Workbook Supplement – Wetland Functions and Values; A Descriptive Approach (USACE, 1999). Along with the best professional judgment of an experienced wetland scientist, this method uses the presence of certain physical characteristics broadly understood to indicate the presence of related functions. The functions and values assessed include:

- Groundwater Recharge/Discharge,
- Floodflow Alteration,
- Fish and Shellfish Habitat,
- Sediment/Toxicant Retention,
- Nutrient Removal,
- Production Export,

00014934

 

I-495 & I-270 Managed Lanes Study       Final Natural Resources Technical Report

- Sediment/Shoreline Stabilization,
- Wildlife Habitat,
- Recreation,

- Educational/Scientific value,
- Uniqueness/Heritage,
- Visual quality/Aesthetics, and
- Endangered Species Habitat.

Waterways features were delineated using the limits defined in 33 Code of Federal Regulations (CFR) § 328. The boundaries of nontidal waterways features were set at the ordinary high water (OHW) mark and include but are not limited to: in-line stormwater management (SWM) ponds, palustrine open water (POW or ponds), stream systems (waterways), and some disturbed areas. The OHW mark was determined in the field using physical characteristics established by the fluctuations of water (e.g., change in plant community, changes in the soil character, shelving) in accordance with USACE Regulatory Guidance Letter No. 05-05.   Prior to August 16, 2018, CWA jurisdiction of delineated features was determined in accordance with the June 5, 2007, joint guidance issued by EPA and USACE following the US Supreme Court's decision in the Rapanos case; and the January 19, 2001, joint guidance issued by EPA and USACE following US Supreme Court's decision in SWANCC. After August 16, 2018, jurisdiction of new delineated features was determined in accordance with the Clean Water Rule (CWR), and previously delineated feature data was revised to determine likely jurisdiction under the new jurisdictional definitions of Waters of the US outlined by the rule.  Between July 2018 and December 2019, representatives from the USACE, MDE, and EPA conducted field review of numerous wetland and waterways features delineated within the corridor study boundary.  The goal of the meetings was to review representative delineated wetlands and waterways to gain general concurrence on the delineation in support of a preliminary jurisdictional determination (JD).

After June 22, 2020, federal jurisdiction of new delineated features was determined in accordance with the Navigable Waters Protection Rule, and previously delineated feature data was revised to reflect jurisdiction under the new jurisdictional definitions of Waters of the US outlined by the rule. All ephemeral channels and some isolated ditches and wetlands were removed from USACE jurisdiction. After August 30, 2021, jurisdiction of new delineated features was determined in accordance with pre-2015 regulatory definitions, and previously delineated feature data was revised to reflect jurisdiction under the pre-2015 definitions. Ephemeral channels and ditches were added back to the data if jurisdictional under the pre-2015 definitions, and some wetlands were returned to jurisdictional status for the USACE under pre-2015 definitions.

Waterway function and value was assessed based on the Maryland Stream Mitigation Framework (MSMF) using the USACE Stream Mitigation Calculator (Stream Calculator) (USACE, 2020). The MSMF requires that the habitat of existing stream reaches be assessed and scored based on the length of the existing reach that will be impacted. If 300 linear feet (LF) or less of a stream reach will be impacted, then a habitat based bioassessment was completed as detailed in the Rapid Bioassessment Protocols (RBP) for Use in Streams and Wadeable Rivers (Barbour et al., 1999). If greater than 300 LF of a stream reach will be impacted, then a function-based assessment is required as outlined in the Rapid Function-Based Stream Assessment Methodology (FBSAM) (Starr et al., 2015).

The Stream Calculator considers the impact activity type, reach length, channel thread, drainage area, site sensitivity score, and temporal loss of a given channel to determine the mitigation need for each activity. The functional feet required to mitigate each impact activity is determined by inputting the existing and

00014935

proposed condition information into the Stream Calculator. All positive values output by the calculator for any given stream reach will be given a value of 0 in the Stream Calculator and that impact activity will not require mitigation. All negative values output by the Stream Calculator are totaled for each stream reach to determine the overall mitigation need in functional feet. The waterway mitigation determination process is discussed further in Section 4 of the Final CMP.

The MDE regulation of nontidal wetlands, nontidal wetland buffers, and waterways is based on the COMAR Title 26 Subtitle 17, Water Management; COMAR Title 26 Subtitle 23, Nontidal Wetlands; and field review of delineated features. Unlike USACE, MDE does not regulate ephemeral channels, however it does regulate isolated wetlands and certain intermittent features that may not be considered jurisdictional by USACE. USACE and MDE jurisdictional results for each delineated feature are represented in **Appendix E.** VDEQ determines jurisdiction based on Virginia Code §62.1-44.15 and VMRC based on the Virginia Code §28.2-1204. Virginia state permits will be acquired by the end of the NEPA process. In addition, wetlands and waterways located on NPS park land were identified by Cowardin classification including the system, subsystem, class, subclass, and any applicable modifiers (Cowardin, 1979).

Since the publication of the DEIS, the MLS Natural Resources Team has participated in the agency coordination meetings listed in **Table 2-4** below, including coordination for: nontidal wetlands and waterways mitigation, permitting, Section 401 Water Quality Certification, Tier II coordination, NPS wetland and floodplain SOF, MSMF, Section 7 Consultation, property access, culvert augmentation analysis, DEIS comment discussion, interagency coordination, and NEPA document coordination.

Table 2-4. Agency Coordination Meetings Since the Publication of the DEIS

| Date | Name of Meeting | Agencies Included | General Topics Covered |
|------|-----------------|-------------------|------------------------|
| July 9, 2020 | MLS Public Hearing Logistics Meeting | MDE, USACE | Discussion of the logistics of the MLS Public Hearings, both virtual and in-person for Section 404/401 purposes. |
| July 21, 2020 | AN-6 Mitigation Meeting | DNR | Review Additional Potential Fish Blockages noted by MDE and USFWS Upstream and Downstream of the 404 Mitigation Paint Branch Fish Passage Site (AN-6) |
| July 22, 2020 | CA-5 Concept Design Mitigation Meeting | M-NCPPC Montgomery County | Montgomery County M-NCPPC Comments on the 404 Mitigation Tributary to Seneca Creek Site (CA-5) Concept Design |
| July 24, 2020 | MLS Mitigation Concept Design Meeting | WSSC | Logistics for Proposed Mitigation Site Work Over WSSC Sewer and Water Lines. |
| August 12, 2020 | AN-1 Concept Design Mitigation Meeting | M-NCPPC Montgomery County | Montgomery County M-NCPPC & WSSC Comments on the Crabbs Branch Site (AN-1) 404 Mitigation Concept Design |
| August 12, 2020 | MLS JD Discussion | USACE | Discussion of new regulatory definition of Waters of the U.S. (WUS) and any implications on the Jurisdictional Determination |
| August 27, 2020 | MLS Tier II Coordination Meeting | MDE | Discussion of impacts within the MDE Tier II boundary and the Tier II package requirements |

00014936

 I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

| Date | Name of Meeting | Agencies Included | General Topics Covered |
|------|-----------------|-------------------|------------------------|
| September 3, 2020 | MLS NPS Wetlands Mitigation Kick-Off Meeting | NPS | Discussion of the Statement of Findings requirement as it pertains to MLS and path forward for coordination meetings. |
| September 4, 2020 | MLS Stream Calculator Assessment Discussion | USACE, MDE | Discussion with the regulatory agencies about how to apply the MSMF stream calculator and which stream assessments to use. |
| September 29, 2020 | CA-2/3 Preliminary Design Mitigation Meeting | M-NCPPC Montgomery County | 404 Mitigation Magruder Branch (CA-2/3) Site Preliminary Design |
| September 29, 2020 | Culvert/Permitting Meeting with FHWA | FHWA | Culvert augmentation |
| Bi-weekly, started on September 29, 2020 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | Provide project updates and receive updates from the regulatory agencies related to MLS permitting. This meeting focused on: Rock Run culvert/Plummers Island, mitigation site schedule, and Virginia mitigation. |
| September 29, 2020 | MLS Informal Section 7 Consultation | DNR, USFWS | 2020 Bat Survey Results |
| October 5, 2020 | NPS Wetland Mitigation Meeting for CHOH and GWMP | NPS | Discuss CHOH and GWMP potential mitigation opportunities |
| October 14, 2020 | NPS Wetland Mitigation Meeting for NACE | NPS | Discuss NACE potential mitigation opportunities |
| October 15, 2020 | MLS Permitting Discussion | FHWA, USACE, MDE | Culvert augmentation LOD expansion and permitting |
| October 16, 2020 | CA-2/3 & AN-3 Preliminary Design Mitigation Meeting | MDE, USACE, DNR, EPA | 404 Mitigation Magruder Branch (CA-2/3) and Pebblestone Dr. Tributary Preliminary Designs |
| October 29, 2020 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | Vernal pools, Compensatory Stormwater Quality Treatment, Section 7 Consultation, MSMF |
| November 9, 2020 | MLS Permitting Discussion Follow-Up Meeting | FHWA, USACE, MDE | Culvert augmentation permitting discussion continued |
| November 12, 2020 | MLS Permitting Update Meeting | USACE, MDE | Public comments, off-site SWM, M-NCPPC SWM discussions, MSMF stream calculator, augmented culverts |
| November 18, 2020 | MLS M-NCPPC Montgomery County SWM Field Meeting | M-NCPPC Montgomery County | Sligo Creek and Indian Spring Terrace Local Park |
| November 19, 2020 | MLS Stream Assessment Field Meeting | USACE, MDE | Review stream functional assessment activities |
| November 19, 2020 | CA-2/3 Wetland Delineation Review Meeting | MDE, USACE | 404 Mitigation Magruder Branch (CA-2/3) Wetland Delineation Field Review |
| November 24, 2020 | MLS Permitting Meeting | USACE, MDE | Identify augmented culvert locations for field meeting, off-site SWM site GIS data review |
| December 1, 2020 | MLS M-NCPPC Montgomery County SWM Field Meeting | M-NCPPC Montgomery County | Review SWM locations on M-NCPPC Montgomery County property |
| December 2, 2020 | MLS ROE Agreement Extension Meeting with M-NCPPC Prince George's County | M-NCPPC Prince George's County | ROE Agreement extension |

00014937

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

| Date | Name of Meeting | Agencies Included | General Topics Covered |
|---|---|---|---|
| December 8, 2020 | Plummers Island Coordination Meeting | USACE, MDE, FHWA, DNR, USFWS, NPS | DEIS LOD for Plummers Island; Wetland, tree, RTE impacts |
| December 10, 2020 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | Augmented culverts, Compensatory Stormwater Quality Treatment, phased permitting, RFP-5 mitigation site, ALB/Plummers Island |
| December 11, 2020 | MLS Culvert Field Meeting with Agencies | EPA, MDE, USACE, FHWA | Augmented culverts |
| December 14, 2020 | NPS DEIS Comments Discussion | NPS, FHWA | DEIS comments |
| December 14, 2020 | MLS Phased Permit Process Discussion | EPA, FHWA, USACE, MDE | Discuss potential for phased permitting |
| December 21, 2020 | MLS Culvert Field Visit | MDE, USACE | Augmented culverts |
| January 7, 2021 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | Compensatory Stormwater Quality Treatment, wetland delineation field reviews, stream assessments, Tier II, mitigation package with phase permitting |
| January 14, 2021 | CA-5 & AN-1 Wetland Delineation Review Meeting | MDE, USACE | 404 Mitigation Seneca Creek Tributary (CA-5) and Crabbs Branch (AN-1) Wetland Delineation Field Reviews |
| January 19, 2021 | MLS 401 WQC Working Session | MDE, USACE, EPA | Schedule; public notices/meetings |
| January 21, 2021 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | Compensatory Stormwater Quality Treatment, Tier II, mitigation package for Phase I |
| January 22, 2021 | RFP-5 & RFP-6 Wetland Delineation Review Meeting | MDE | 404 Mitigation Henson Creek (RFP-5) and Mill Swamp Creek (RFP-6) Wetland Delineation Field Reviews |
| February 3, 2021 | NCPC's DEIS Comments Discussion | FHWA, NCPC | NCPC DEIS comments and responses |
| February 4, 2021 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | Compensatory Stormwater Quality Treatment, augmented culverts, permitting schedule |
| February 8, 2021 | MLS – ALB and BW Parkway Discussion | FHWA, NPS | A discussion of the avoidance and minimization at the American Legion Bridge and Baltimore Washington Parkway |
| February 9, 2021 | MDOT-VDOT Coordination Meeting | VDOT | Coordination between MLS and project NEXT |
| February 9, 2021 | DNR's DEIS Comments Discussion | DNR, FHWA | Review DNR's DEIS comments and responses |
| February 10, 2021 | USACE and MDE's DEIS Comments Discussion | USACE, MDE, FHWA | Review USACE and MDE's DEIS comments and responses |
| February 16, 2021 | MLS and MSMF Meeting | USACE, MDE | A presentation to the regulatory agencies of how the Maryland Stream Mitigation Framework stream calculator is being applied to the MLS. |
| February 17, 2021 | MLS February IAWG Meeting | All Participating and Cooperating Agencies | Agency and stakeholder coordination and collaboration efforts, design efforts to address common comments, phased delivery approach, MDOT SHA's RPA Alternative 9 |

00014938

| Date | Name of Meeting | Agencies Included | General Topics Covered |
|---|---|---|---|
| February 18, 2021 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | Compensatory Stormwater Quality Treatment, mitigation site review schedule, refined Alternative 9 LOD, nontidal wetlands and waterways mitigation |
| February 18, 2021 | EPA's DEIS Comments Discussion | EPA, FHWA | EPA's DEIS comments and responses |
| February 22, 2021 | MLS 401 WQC Working Session #2 | MDE, USACE, EPA | 401 WQC Request |
| March 1, 2021 | Washington Biologists Field Club Coordination Meeting | NPS | Plummers Island |
| March 4, 2021 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | Compensatory Stormwater Quality Treatment, Konterra |
| March 4, 2021 | MLS NPS Coordination Meeting | NPS, FHWA | ALB, GWMP, BW Parkway |
| March 9, 2021 | RFP-2 & AN-3 Wetland Delineation Review Meeting | MDE, USACE | 404 Mitigation Cabin Branch (RFP-2) and Pebblestone Dr. Tributary (AN-3) Wetland Delineation Field Reviews |
| March 10, 2021 | M-NCPPC Phase 1 South DEIS Comments and Off-Site SWM Discussion | M-NCPPC Montgomery County | MNCPPC's DEIS comments and responses and off-site SWM |
| March 15, 2021 | M-NCPPC Montgomery County DEIS Comments – Continued Discussion | M-NCPPC Montgomery County | MNCPPC's DEIS comments and responses |
| March 18, 2021 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | Off-site SWM, Konterra Stream Site Phase II 1st draft |
| March 19, 2021 | CA-5 Semi-Final Design Mitigation Meeting | PEPCO | 404 Mitigation Tributary to Seneca Creek (CA-5) Semi-Final Design |
| March 19, 2021 | M-NCPPC Prince George's County SWM Meeting | M-NCPPC Prince George's County | HP Johnson Park and Cherry Hill Park |
| March 24, 2021 | CA-5 Semi-Final Design Mitigation Meeting | M-NCPPC Montgomery County, MDE, USACE | 404 Mitigation Tributary to Seneca Creek (CA-5) Semi-Final Design |
| April 1, 2021 | RFP-1 Wetland Delineation Review Meeting | MDE, USACE | 404 Mitigation Indian Creek and Tributaries at Konterra (RFP-1) Wetland Delineation Field Review |
| April 6, 2021 | USACE/MDE ALB Discussion | USACE, MDE | ALB alignment options |
| April 9, 2021 | CA-2/3 PRD Site Development Submittal Meeting | PRD | 404 Mitigation PRD Comments on the Magruder Branch (CA-2/3) Site Development Submittal |
| April 12, 2021 | M-NCPPC Montgomery County DEIS Comments | M-NCPPC Montgomery County | M-NCPPC DEIS comments and responses regarding the Rock Creek Area |
| April 14, 2021 | City of Rockville SWM Discussion | City of Rockville | SWM within the City of Rockville |
| April 16, 2021 | RFP-1 Wetland Delineation Review Meeting | MDE, USACE | 404 Mitigation Indian Creek and Tributaries at Konterra (RFP-1) Wetland Delineation Field Review |
| April 22, 2021 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | Off-site SWM; ALB temporary access requirements, geotechnical investigation permitting |
| April 29, 2021 | City of Rockville Park Land and Mitigation Coordination Meeting | City of Rockville | Mitigation for the City of Rockville |

00014939

 I-495 & I-270 Managed Lanes Study          Final Natural Resources Technical Report

| Date | Name of Meeting | Agencies Included | General Topics Covered |
|---|---|---|---|
| May 6, 2021 | CA-2/3 Semi-Final Design Mitigation Meeting | M-NCPPC Montgomery County, MDE, USACE | 404 Mitigation Magruder Branch (CA-2/3) Semi-Final Design |
| May 12, 2021 | IAWG Meeting | All Participating and Cooperating Agencies | Recommended Preferred Alternative, Supplemental Draft Environmental Impact Statement, Combined FEIS/ROD, MLS schedule |
| May 12, 2021 | M-NCPPC Montgomery County Phase 1 South Park Mitigation Meeting | M-NCPPC Montgomery County | M-NCPPC park mitigation discussion |
| May 20, 2021 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | New permitting/NEPA/WQC combined schedule, off-site SWM, Avoidance and Minimization documentation approach, mitigation site prioritization |
| June 15, 2021 | MLS Discussion Regarding the JPA and NEPA Documents | MDE, USACE | Discussion of impact presentation in JPA and NEPA documents |
| June 21, 2021 | NPS Coordination Meeting | NPS, FHWA | ALB trail connection |
| June 25, 2021 | Off-site Compensatory Stormwater Quality Treatment Delineation Field Review | USACE, MDE | Review Off-site Compensatory Stormwater Quality Treatment delineations |
| July 1, 2021 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | Off-site SWM, mussel survey, National Capital Region Transportation Planning Board vote, temporary and permanent impacts, AMR narrative, permitting/NEPA/WQC combined schedule |
| July 15, 2021 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | Off-site SWM, schedule updates, MSMF update, Henson Creek Revised Phase II Plan, Phase I South Mitigation Plan |
| August 4, 2021 | I-495 & I-270 – LOD Review | USACE, MDE | Walk-through LOD and proposed impacts |
| August 19, 2021 | Change in Jurisdiction for Navigable Waters | USACE | Discuss jurisdictional changes as they relate to the MLS. |
| August 25, 2021 | FHWA SDEIS Comment Discussion | FHWA | FHWA's SDEIS comments and responses |
| August 26, 2021 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | Off-site SWM, Henson Creek Revised Phase II Plan, Alternate Limits (LOR, LOS, LOI) |
| September 9, 2021 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | Off-site SWM, USACE jurisdiction/WUS definition, Approach to defining jurisdictional features in FEIS |
| September 24, 2021 | Compensatory Stormwater Quality Treatment Field Review | USACE, MDE, USFWS, MDNR, EPA, M-NCPPC | Review of off-site compensatory stormwater quality treatment site delineations |
| September 30, 2021 | NPS Coordination Meeting | NPS | Wetland and Floodplain Statement of Findings; ALB access road |
| October 13, 2021 | LOD Review Meeting | USACE, MDE | Review minor changes to LOD |
| October 14, 2021 | NPS Coordination Meeting | NPS | Chesapeake and Ohio Canal Lock 13. wetland mitigation site, mitigation items |
| October 14, 2021 | M-NCPPC Coordination Meeting | M-NCPPC | Mitigation package for Cabin John Regional Park, screening barriers, parkland |

00014940



I-495 & I-270 Managed Lanes Study                    Final Natural Resources Technical Report

| Date | Name of Meeting | Agencies Included | General Topics Covered |
|---|---|---|---|
| | | | replacement acquisition options, potential mitigation options |
| October 28, 2021 | NPS Natural Resources Coordination Meeting | NPS | Temporary LOD, animal translocation, RTE plant species mitigation, stream restoration |
| October 28, 2021 | NPS Reforestation Coordination Meeting | NPS | Forest mitigation, valuation for trees |
| October 28, 2021 | M-NCPPC Coordination Meeting | M-NCPPC Montgomery County | Mitigation package for Cabin John Stream Valley Park – Unit 2, parkland replacement, NEPA schedule/mandatory referral process |
| November 3, 2021 | Nontidal Wetlands and Waterways Permitting Update Meeting | USACE, MDE | LOD changes, AMP design, AMP SWM concept, JPA schedule |
| November 5, 2021 | M-NCPPC Park Mitigation Stormwater Outfalls Field Meeting | M-NCPPC Montgomery County | Park mitigation and stormwater outfalls |
| November 9, 2021 | I-495 & I-270 Managed Lanes Study and NEXT Project Overlapping Impacts | VDOT | MLS and NEXT Project overlapping impacts |
| November 10, 2021 | M-NCPPC Forest Mitigation Field Meeting | M-NCPPC Montgomery County | Review forest mitigation |
| November 18, 2021 | NPS Coordination Meeting | NPS | Response to GWMP comments, Chesapeake and Ohio Canal Lock 13 and tow path, shared use path, stream restorations, condition assessment requests, archaeological district National Register nomination, parkland replacement properties |
| November 22, 2021 | City of Rockville Coordination Meeting | City of Rockville | MD-189 interchange, parkland mitigation |
| December 14, 2021 | M-NCPPC Mitigation Discussion | M-NCPPC | SWM SDEIS comment response, LOD discussion, Final Mitigation Package |
| December 15, 2021 | NPS Coordination Meeting | NPS | GWMP renderings, signing plan near GWMP, Final Mitigation Plan |
| December 15, 2021 | Inter-Agency Working Group Meeting | Various | SDEIS comments, COVID traffic update, design updates, bicycle/pedestrian improvements, intersection improvements, Environmental Justice Initiative, Section 106 update |
| December 21, 2021 | JPA Package Review Meeting | USACE, MDE | Review JPA package components |
| January 7, 2022 | I-495 & I-270 MLS: SWM Discussion | USACE, MDE, M-NCPPC Montgomery County, MDNR, FHWA, EPA | Discuss stormwater concept on-site and off-site |
| January 25, 2022 | JPA and Water Quality Certification Request Review Meeting | USACE, MDE | JPA package and WQC Request |
| February 22, 2022 | Water Quality Certification Request Check-In and JPA Comment Clarification Meeting | USACE, MDE | JPA package and WQC Request |

00014941

OP·LANES™
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

| Date | Name of Meeting | Agencies Included | General Topics Covered |
|---|---|---|---|
| March 4, 2022 | American Legion Bridge Alignment Options Review | USACE, MDE | Review ALB alignment options |
| March 10, 2022 | Hardened Channels and Avoidance and Minimization | USACE, MDE | Review hardened channels and Avoidance and Minimization areas requested by USACE |
| March 14, 2022 | Aquatic Life Passage Discussion | NMFS, EPA, USFWS, USACE, MDNR, MDE | Aquatic life passage |
| March 18, 2022 | Plummers Island Field Visit | USACE, MDE | Plummers Island |

Unavoidable impacts to regulated wetlands and waterways within the Preferred Alternative LOD in Maryland are subject to a Section 404 permit from the USACE, a Maryland Nontidal Wetlands and Waterways Permit, and Section 401 Water Quality Certification. USACE Baltimore District will be the lead district for permitting impacts to Waters of the US within both the Virginia and Maryland portions of the Preferred Alternative LOD. The Potomac River is considered a Traditionally Navigable Water (TNW) under Section 10 of the Rivers and Harbors Act. Typically, the designation of a waterway under Section 10 would require a bridge permit to be issued by the USCG, but in a letter dated September 19, 2019, the USCG stated that a bridge permit would not be required under Section 10 for the ALB. USACE will regulate the Potomac River under Section 10 regarding the piers and abutments for the ALB reconstruction. In Virginia, VDEQ is the authority that provides the Section 401 certification through its VWPP Program (9VAC25-210). Work in non-tidal streams with drainage areas greater than five square miles also require a permit from the VMRC under the authority of the Code of Virginia (Va. Code §28.2-1204).

## 2.3.2    Existing Conditions

A total of 66 nontidal wetlands and 239 stream segments were delineated within the Phase 1 South portion of the corridor study boundary. Only one TNW, the Potomac River, was identified within the Phase 1 South portion of the corridor study boundary. All other perennial waters are classified as tributaries of the Potomac River. Long stream channels were segmented due to changes in classification, splitting by culverted sections, or other refinement needs during data processing. Therefore, the number of individual stream segments is greater than the features presented in field documents. No Wetlands of Special State Concern or outstanding national resource waters are within the Phase 1 South portion of the corridor study boundary. The quantity of features delineated within the Phase 1 South portion of the corridor study boundary and quantity of the delineated features by classification are provided in **Table 2-5**. A detailed summary of surface water resources, including stream systems, is included in **Section 2.4**.

00014942

**Table 2-5. Total Delineated Features within the Phase 1 South Portion of the Corridor Study Boundary**

| Features | Totals |
|---|---|
| **Wetlands** | **66** |
| Palustrine Emergent (PEM) | 27 |
| Palustrine Forested (PFO) | 38 |
| Palustrine Scrub-Shrub (PSS) | 1 |
| **Waterways** | **239** |
| Ephemeral | 19 |
| Intermittent | 102 |
| Perennial | 118 |

The delineated wetland and waterway features are summarized in **Appendix E** and maps of each feature's location and boundaries within the Phase 1 South portion of the corridor study boundary are provided in **Appendix F**. Routine Wetland Determination Data Forms, Waters Datasheets, and Wetland Functions and Values Evaluation Forms completed for each delineated feature are included in **Appendix G**, and photographs of each feature are included in **Appendix H**.

A total of three palustrine and nine riverine NPS wetlands were identified on NPS park land within the Preferred Alternative LOD. Impacts to, and full Cowardin classification of these features are summarized in **Appendix I** and the Draft NPS SOF, Appendix G of the SDEIS. A final signed SOF will be attached to the Record of Decision (ROD) as a separate document.

Wetlands in the Phase 1 South portion of the corridor study boundary provide one or more ecological functions such as:

- Groundwater Recharge/Discharge,
- Floodflow Alteration,
- Fish and Shellfish Habitat,
- Sediment/Toxicant Retention,
- Nutrient Removal,
- Production Export,
- Sediment/Shoreline Stabilization,
- Wildlife Habitat,
- Recreation,
- Educational/Scientific value,
- Uniqueness/Heritage,
- Visual quality/Aesthetics, and
- Endangered Species Habitat.

The quantity and degree of wetland functions varies based on location, vegetation type, hydroperiod, and level of disturbance. Principal functions for each wetland are listed in the Summary of Wetland Functions and Values Table (**Appendix J**). A summary of the impacts to the functions and values of wetlands within the Preferred Alternative LOD is presented in **Table 2-6.**

00014943

Table 2-6. Wetland Function & Value Impact Summary

| | Function/Value | On-Site Improvements | | |
| | | Function/Value Loss (AC) | Number of Wetlands with Function/Value Loss | Percentage of Wetlands with Function/Value Loss |
|---|---|---|---|---|
| Functions | Nutrient Removal | 3.50 | 35 | 97 |
| | Sediment/Toxicant Retention | 3.45 | 34 | 94 |
| | Groundwater Discharge/Recharge | 3.40 | 33 | 92 |
| | Floodflow Alteration | 3.31 | 28 | 78 |
| | Wildlife Habitat | 2.92 | 21 | 58 |
| | Sediment/Shoreline Stabilization | 2.71 | 15 | 42 |
| | Production Export | 2.67 | 12 | 33 |
| | Fish and Shellfish Habitat | 2.46 | 9 | 25 |
| Values | Uniqueness/Heritage | 2.48 | 4 | 11 |
| | Visual Quality/Aesthetics | 2.34 | 5 | 14 |
| | Recreation | 1.55 | 3 | 8 |
| | Education/Scientific Value | 1.46 | 2 | 6 |
| | Endangered Species Habitat | 0.00 | 0 | 0 |

Note: The Preferred Alternative will permanently impact a total of 36 wetlands, resulting in 3.51 acres of permanent impact. Temporary impacts do not require mitigation.

### 2.3.3   Environmental Effects

Direct impacts to wetlands, their buffers, waterways, and floodplains associated with construction of the Preferred Alternative LOD include roadway impacts (i.e., widening, grading, etc.), bridge expansions or rehabilitations, culvert extensions or augmentations, relocation of impacted channels, SWM facility outfalls, noise barriers, and construction-related access.

Indirect impacts to wetlands, their buffers, waterways, and floodplains from the Preferred Alternative LOD may result from roadway runoff, sedimentation, and changes to hydrology. A detailed assessment of hydrologic effects will occur once final areas of cut and fill are determined in the final phase of engineering design.

Direct and indirect impacts may lead to a decrease in available wetland and waterway habitat within the project area and ultimately a decrease in plant and animal species inhabiting these areas. Impacts to wetland functions may include losses of groundwater recharge/discharge, fish and shellfish habitat, sediment/toxicant/pathogen retention, nutrient removal/retention/transformation, production export, sediment/shoreline stabilization, wildlife habitat, recreation, educational/scientific value, uniqueness/heritage, visual quality/aesthetics, wildlife habitat, endangered species habitat, and capacity for floodflow alteration. Since the DEIS was published in July 2020, design has advanced, and quantified impacts have been further broken down into permanent or long-term effects and temporary or short-term construction-related effects. The JPA Impact Plates display two Preferred Alternative LODs, one representing permanent and one representing temporary activities. Some impacts to Waters of the US or Waters of the State will be considered permanent despite being partially or entirely located within the temporary LOD. In addition to the temporary and permanent LODs, several areas within the Phase 1 South limits will be

00014944



I-495 & I-270 Managed Lanes Study | Final Natural Resources Technical Report

considered limits of restoration, stabilization, or improvements to stormwater capacity. These three categories will be displayed as unique limits within the Preferred Alternative LODs and additional regulatory agency review and approval will be required prior to any clearing or construction in these areas. The three limits categories are: Limits of Restoration (LOR), Limits of Stabilization (LOS), and Limits of Improvements to Stormwater Capacity (LOI).

LOR relate to on-site stream restoration activities that will impact some streams and the wetlands adjacent to those streams. Impacts to these environmentally sensitive areas are often associated with culvert augmentation. These impacts typically result from excavation and/or fill associated with stream restoration treatments that may include, but are not limited to: rock toe protection, log vanes, cross vanes, and boulder step pools. At this preliminary stage of design, the details of the restoration have not been completed and the estimated limits are conservative. To ensure environmentally sensitive design and to prevent unnecessary tree clearing or impacts, these stream restoration areas have been excluded from the LOD and included in LOR linework on the JPA impact plates. In LOR areas, USACE and MDE approval of final restoration design and permit authorization is required prior to conducting any clearing or construction.

LOS relate to on-site stream stabilization activities that will impact some short segments of stream and wetlands adjacent to these streams. Impacts to these environmentally sensitive areas are often associated with culvert augmentation. These impacts typically result from excavation and/or fill associated with stream stabilization treatments that may include, but are not limited to, scour pools and bank armoring. At this preliminary stage of design, the details of the stabilization have not been completed and the estimated limits are conservative. To ensure environmentally sensitive design and to prevent unnecessary clearing or impacts, these stream stabilization areas have been excluded from the LOD and included in the LOS linework on the JPA impact plates. In LOS areas, USACE and MDE approval of final stabilization design and permit authorization is required prior to conducting any clearing or construction.

LOI are related to modifications to stormwater treatment facilities that will impact streams and wetlands. In some cases, these modifications are necessary to increase storage capacity upstream of culverts and in other cases, modification may be needed to increase on-site stormwater quality or quantity treatment. Final stormwater design and culvert analysis cannot be completed at this stage of design and the estimated limits are conservative. To prevent unnecessary clearing and impacts, these improved stormwater and storage areas have been excluded from the LOD and included in LOI linework on the JPA impact plates. In LOI areas, USACE and MDE approval of stormwater treatment modifications and permit authorization is required prior to conducting any clearing or construction.

Detailed impacts to nontidal wetlands, their buffers, and waterways from the Preferred Alternative LOD are included in **Appendix A. Table 2-7** to **Table 2-14**[10] summarize the impacts to wetlands and waterways in square feet (SF), linear feet (LF), or acres (AC), by classification in total, by county, by federal USGS 8-digit hydrologic unit code (HUC), by Maryland 8-digit, and by MD 12-digit watersheds. The impact numbers presented are the total impacts for the project and do not represent either the total USACE or total MDE impacts, due to jurisdictional differences. The MD 12-digit watershed that will be least impacted is Rock Creek (021402060836), with no proposed temporary and approximately 400 linear feet of permanent impact to waterways, and no proposed temporary or permanent impacts to wetlands. The MD 12-digit watershed that will incur the most impact would be Cabin John Creek (021402070841), with more than 90 LF of proposed

---

[5] For reference, impact tables presented in the report are also included in Appendix A.

00014945

OP·LANES
M A R Y L A N D    | I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

temporary and more than 30,000 LF of proposed permanent impact to waterways, and 0.01 acres of proposed temporary and more than 1 acre of proposed permanent impact to wetlands.

Impacts to these features along with their functions and values are summarized for each NPS property by Cowardin classification in **Appendix I** and the SDEIS, Appendix G, Draft SOF. A final signed SOF will be attached to the ROD as a separate document.

Table 2-7. Summary of Impacts to Wetlands and Waterways by Classification

| Type | Classification | AC | SF | AC | SF | AC | SF |
|---|---|---|---|---|---|---|---|
| | | Permanent | | Temporary | | Total | |
| Wetlands | PEM | 2.64 | 115,107 | 0.15 | 6,273 | 2.79 | 121,380 |
| | PFO | 0.86 | 37,346 | 0.27 | 11,832 | 1.13 | 49,178 |
| | PSS | 0.01 | 481 | 0.00 | 0 | 0.01 | 481 |
| | **Grand Total** | **3.51** | **152,934** | **0.42** | **18,105** | **3.93** | **171,039** |
| | | LF | SF | LF | SF | LF | SF |
| | | Permanent | | Temporary | | Total | |
| Waterways | Ephemeral | 1,334 | 6,225 | 11 | 65 | 1,345 | 6,290 |
| | Intermittent | 11,551 | 94,158 | 1,226 | 8,386 | 12,777 | 102,544 |
| | Perennial | 27,048 | 536,697 | 1,116 | 314,685 | 28,164 | 851,382 |
| | **Grand Total** | **39,933** | **637,080** | **2,353** | **323,136** | **42,286** | **960,216** |

Table 2-8. Summary of Impacts to Wetland Buffers by Classification

| Classification | AC | SF | AC | SF | AC | SF |
|---|---|---|---|---|---|---|
| | Permanent | | Temporary | | Total | |
| PEM | 3.36 | 146,183 | 0.16 | 6,908 | 3.52 | 153,091 |
| PFO | 2.79 | 121,535 | 0.08 | 3,455 | 2.87 | 124,990 |
| PSS | 0.11 | 4,841 | 0.00 | 0 | 0.11 | 4,841 |
| **Grand Total** | **6.26** | **272,559** | **0.24** | **10,363** | **6.50** | **282,922** |

00014946

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study | Final Natural Resources Technical Report

**Table 2-9. Summary of Impacts to Wetlands and Waterways by Classification within Virginia and Maryland Counties**

| Type | Classification | AC | SF | AC | SF | AC | SF |
|------|---------------|-----|-----|-----|-----|-----|-----|
| | | Permanent | | Temporary | | Total | |
| Wetlands | **Fairfax** | **0.00** | **0** | **0.05** | **2,166** | **0.05** | **2,166** |
| | PFO | 0.00 | 0 | 0.05 | 2,166 | 0.05 | 2,166 |
| | **Montgomery** | **3.51** | **152,934** | **0.37** | **15,939** | **3.88** | **168,873** |
| | PEM | 2.64 | 115,107 | 0.15 | 6,273 | 2.79 | 121,380 |
| | PFO | 0.86 | 37,346 | 0.22 | 9,666 | 1.08 | 47,012 |
| | PSS | 0.01 | 481 | 0.00 | 0 | 0.01 | 481 |
| | **Grand Total** | **3.51** | **152,934** | **0.42** | **18,105** | **3.93** | **171,039** |
| | | LF | SF | LF | SF | LF | SF |
| | | Permanent | | Temporary | | Total | |
| Waterways | **Fairfax** | **897** | **14,387** | **47** | **455** | **944** | **14,842** |
| | Ephemeral | 26 | 358 | 5 | 31 | 31 | 389 |
| | Intermittent | 871 | 14,029 | 42 | 424 | 913 | 14,453 |
| | Perennial | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Montgomery** | **39,036** | **622,693** | **2,306** | **322,681** | **41,342** | **945,374** |
| | Ephemeral | 1,308 | 5,867 | 6 | 34 | 1,314 | 5,901 |
| | Intermittent | 10,680 | 80,129 | 1,184 | 7,962 | 11,864 | 88,091 |
| | Perennial | 27,048 | 536,697 | 1,116 | 314,685 | 28,164 | 851,382 |
| | **Grand Total** | **39,933** | **637,080** | **2,353** | **323,136** | **42,286** | **960,216** |

NOTES: 1. All wetland buffers are in Montgomery County, MD, since Virginia does not regulate wetland buffers.

**Table 2-10. Summary of Impacts to Waterways by Classification within USGS HUC8 Watersheds**

| Watershed Number and Classification | LF | SF | LF | SF | LF | SF |
|-------------------------------------|-----|-----|-----|-----|-----|-----|
| | Permanent | | Temporary | | Total | |
| **Middle Potomac-Catoctin (02070008)** | **39,526** | **633,199** | **2,353** | **323,136** | **41,879** | **956,335** |
| Ephemeral | 1,334 | 6,225 | 11 | 65 | 1,345 | 6,290 |
| Intermittent | 11,347 | 93,523 | 1,226 | 8,386 | 12,573 | 101,909 |
| Perennial | 26,845 | 533,451 | 1,116 | 314,685 | 27,961 | 848,136 |
| **Middle Potomac-Catoctin-Occaquan (02070010)** | **407** | **3,881** | **0** | **0** | **407** | **3,881** |
| Intermittent | 204 | 635 | 0 | 0 | 204 | 635 |
| Perennial | 203 | 3,246 | 0 | 0 | 203 | 3,246 |
| **Grand Total** | **39,933** | **637,080** | **2,353** | **323,136** | **42,286** | **960,216** |

NOTES: 1. All wetland buffers are in Montgomery County, MD, and all wetlands are within the Middle Potomac-Catoctin (02070008) HUC8 watershed.

00014947

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

Table 2-11. Summary of Impacts to Wetlands and Waterways by Classification within MD 8-Digit Watersheds

| Type | Watershed Number and Classification | AC | SF | AC | SF | AC | SF |
|------|-------------------------------------|-----|-----|-----|-----|-----|-----|
| | | Permanent | | Temporary | | Total | |
| Wetlands | Potomac River - Montgomery County (02140202) | 2.20 | 95,980 | 0.36 | 15,582 | 2.56 | 111,562 |
| | PEM | 1.64 | 71,455 | 0.14 | 5,916 | 1.78 | 77,371 |
| | PFO | 0.55 | 24,044 | 0.22 | 9,666 | 0.77 | 33,710 |
| | PSS | 0.01 | 481 | 0.00 | 0 | 0.01 | 481 |
| | Cabin John Creek (02140207) | 1.31 | 56,954 | 0.01 | 357 | 1.32 | 57,311 |
| | PEM | 1.00 | 43,652 | 0.01 | 357 | 1.01 | 44,009 |
| | PFO | 0.31 | 13,302 | 0.00 | 0 | 0.31 | 13,302 |
| | **Grand Total** | 3.51 | 152,934 | 0.37 | 15,939 | 3.88 | 168,873 |
| | | LF | SF | LF | SF | LF | SF |
| | | Permanent | | Temporary | | Total | |
| Waterways | Potomac River - Montgomery County (02140202) | 8,024 | 143,436 | 2,208 | 319,484 | 10,232 | 462,920 |
| | Ephemeral | 174 | 604 | 0 | 0 | 174 | 604 |
| | Intermittent | 4,136 | 40,852 | 1,174 | 7,884 | 5,310 | 48,736 |
| | Perennial | 3,714 | 101,980 | 1,034 | 311,600 | 4,748 | 413,580 |
| | Rock Creek (02140206) | 407 | 3,881 | 0 | 0 | 407 | 3,881 |
| | Intermittent | 204 | 635 | 0 | 0 | 204 | 635 |
| | Perennial | 203 | 3,246 | 0 | 0 | 203 | 3,246 |
| | Cabin John Creek (02140207) | 30,605 | 475,376 | 98 | 3,197 | 30,703 | 478,573 |
| | Ephemeral | 1,134 | 5,263 | 6 | 34 | 1,140 | 5,297 |
| | Intermittent | 6,340 | 38,642 | 10 | 78 | 6,350 | 38,720 |
| | Perennial | 23,131 | 431,471 | 82 | 3,085 | 23,213 | 434,556 |
| | **Grand Total** | 39,036 | 622,693 | 2,306 | 322,681 | 41,342 | 945,374 |

00014948

OP·LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

**Table 2-12. Summary of Impacts to Wetland Buffers by Classification within MD 8-Digit Watersheds**

| Watershed Number and Classification | AC | SF | AC | SF | AC | SF |
|---|---|---|---|---|---|---|
| | Permanent | | Temporary | | Total | |
| **Potomac River - Montgomery County (02140202)** | **2.70** | **117,522** | **0.24** | **10,265** | **2.94** | **127,787** |
| PEM | 1.12 | 48,599 | 0.16 | 6,810 | 1.28 | 55,409 |
| PFO | 1.47 | 64,082 | 0.08 | 3,455 | 1.55 | 67,537 |
| PSS | 0.11 | 4,841 | 0.00 | 0 | 0.11 | 4,841 |
| **Cabin John Creek (02140207)** | **3.56** | **155,037** | **0.00** | **98** | **3.56** | **155,135** |
| PEM | 2.24 | 97,584 | 0.00 | 98 | 2.24 | 97,682 |
| PFO | 1.32 | 57,453 | 0.00 | 0 | 1.32 | 57,453 |
| **Grand Total** | **6.26** | **272,559** | **0.24** | **10,363** | **6.50** | **282,922** |

00014949

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study        Final Natural Resources Technical Report

Table 2-13. Summary of Impacts to Wetlands and Waters by Classification within MD 12-Digit Watersheds

| MDNR Watershed Number and Classification | AC/LF | SF | AC/LF | SF | AC/LF | SF |
|---|---|---|---|---|---|---|
| | Permanent | | Temporary | | Total | |
| **Potomac River/Rock Run (021402020845)** | | | | | | |
| **Waterway** | **1,538** | **34,478** | **2,208** | **319,484** | **3,746** | **353,962** |
| Ephemeral | 126 | 364 | 0 | 0 | 126 | 364 |
| Intermittent | 886 | 6,034 | 1,174 | 7,884 | 2,060 | 13,918 |
| Perennial | 526 | 28,080 | 1,034 | 311,600 | 1,560 | 339,680 |
| **Wetland** | **0.26** | **11,368** | **0.36** | **15,508** | **0.62** | **26,876** |
| PEM | 0.14 | 6,127 | 0.14 | 5,842 | 0.28 | 11,969 |
| PFO | 0.12 | 5,241 | 0.22 | 9,666 | 0.34 | 14,907 |
| **Watts Branch (021402020846)** | | | | | | |
| **Waterway** | **4,295** | **73,410** | **0** | **0** | **4,295** | **73,410** |
| Ephemeral | 48 | 240 | 0 | 0 | 48 | 240 |
| Intermittent | 2,637 | 29,268 | 0 | 0 | 2,637 | 29,268 |
| Perennial | 1,610 | 43,902 | 0 | 0 | 1,610 | 43,902 |
| **Wetland** | **1.94** | **84,612** | **0** | **74** | **1.94** | **84,686** |
| PEM | 1.50 | 65,328 | 0 | 74 | 1.50 | 65,402 |
| PFO | 0.43 | 18,803 | 0 | 0 | 0.43 | 18,803 |
| PSS | 0.01 | 481 | 0 | 0 | 0.01 | 481 |
| **Muddy Branch (021402020848)** | | | | | | |
| **Waterway** | **2,180** | **35,479** | **0** | **0** | **2,180** | **35,479** |
| Intermittent | 602 | 5,481 | 0 | 0 | 602 | 5,481 |
| Perennial | 1,578 | 29,998 | 0 | 0 | 1,578 | 29,998 |
| **Rock Creek (021402060836)** | | | | | | |
| **Waterway** | **407** | **3,881** | **0** | **0** | **407** | **3,881** |
| Intermittent | 204 | 635 | 0 | 0 | 204 | 635 |
| Perennial | 203 | 3,246 | 0 | 0 | 203 | 3,246 |
| **Cabin John Creek (021402070841)** | | | | | | |
| **Waterway** | **30,616** | **475,445** | **98** | **3,197** | **30,714** | **478,642** |
| Ephemeral | 1,134 | 5,263 | 6 | 34 | 1,140 | 5,297 |
| Intermittent | 6,351 | 38,711 | 10 | 78 | 6,361 | 38,789 |
| Perennial | 23,131 | 431,471 | 82 | 3,085 | 23,213 | 434,556 |
| **Wetland** | **1.31** | **56,954** | **0.01** | **357** | **1.32** | **57,311** |
| PEM | 1.00 | 43,652 | 0.01 | 357 | 1.01 | 44,009 |
| PFO | 0.31 | 13,302 | 0.00 | 0 | 0.31 | 13,302 |
| **Grand Total Waterways** | **39,036** | **622,693** | **2,306** | **322,681** | **41,342** | **945,374** |
| **Grand Total Wetlands** | **3.51** | **152,934** | **0.37** | **15,939** | **3.88** | **168,873** |

00014950

Table 2-14. Summary of Impacts to Wetland Buffers by Classification within MD 12-Digit Watersheds

| MDNR Watershed Number and Classification | AC | SF | AC | SF | AC | SF |
|---|---|---|---|---|---|---|
| | Permanent | | Temporary | | Total | |
| Potomac River/Rock Run (021402020845) | 1.03 | 44,998 | 0.22 | 9,306 | 1.25 | 54,304 |
| PEM | 0.43 | 18,858 | 0.14 | 5,851 | 0.57 | 24,709 |
| PFO | 0.60 | 26,140 | 0.08 | 3,455 | 0.68 | 29,595 |
| Watts Branch (021402020846) | 1.67 | 72,524 | 0.02 | 959 | 1.69 | 73,483 |
| PEM | 0.69 | 29,741 | 0.02 | 959 | 0.71 | 30,700 |
| PFO | 0.87 | 37,942 | 0.00 | 0 | 0.87 | 37,942 |
| PSS | 0.11 | 4,841 | 0.00 | 0 | 0.11 | 4,841 |
| Cabin John Creek (021402070841) | 3.56 | 155,037 | 0.00 | 98 | 3.56 | 155,135 |
| PEM | 2.24 | 97,584 | 0.00 | 98 | 2.24 | 97,682 |
| PFO | 1.32 | 57,453 | 0.00 | 0 | 1.32 | 57,453 |
| Grand Total | 6.26 | 272,559 | 0.24 | 10,363 | 6.50 | 282,922 |

### 2.3.4    Avoidance, Minimization, and Mitigation

### A.    Avoidance and Minimization

Wetland and stream impacts from the Preferred Alternative LOD are unavoidable. The area within the Preferred Alternative LOD is characterized by an extensive network of streams and wetlands that are located adjacent to and flow beneath the existing roadway, resulting in unavoidable impacts to these resources with roadway modification and/or widening. However, efforts to avoid and minimize impacts have occurred throughout the planning process and would continue during more detailed phases of project design.

Avoidance and minimization efforts to reduce impacts to Waters of the US, including wetlands, involve a two-tiered approach. The first tier occurred during the planning stage of the study, where every reasonable effort was made to avoid wetlands and waterways to the maximum extent practicable. Agency recommendations for avoidance and minimization were evaluated and implemented wherever practicable. Permit conditions requiring avoidance of features would be included in the Nontidal Wetlands and Waterways Permit issued by MDE, and Department of the Army authorization issued by USACE under Section 404. Efforts to avoid and minimize direct impacts to stream channels and wetlands to date have included alignment shifts, alteration of SWM swales, addition of retaining walls, and revision of preliminary SWM and sound wall locations to avoid streams and wetlands. The Avoidance, Minimization, and Impacts Report (AMR) discusses avoidance and minimization efforts during the NEPA process in detail, including targeted avoidance and minimization areas. The AMR is a supporting document of the JPA and an appendix to the MLS FEIS. MDOT SHA is committed to continuing efforts to maximize avoidance and minimization where practicable.

The second tier of avoidance and minimization occurred at the public-private partnership (P3) design stage, with advancement of the design and further refinements to the limits of disturbance (LOD). The P3 Developer reduced impacts to wetlands and streams wherever practicable and their design was incorporated into the

00014951



FEIS LOD. Impacts to wetlands and waterways will continue to be reduced wherever practicable as design is refined and finalized. The Developer will continue to look for opportunities to avoid and minimize impacts throughout the remainder of the design process to the greatest extent practicable. Monetary incentives have been added to the Section Developer's Technical Provisions to encourage further avoidance and minimization of impacts to wetlands and waterways.

Impacts to several waterways, wetlands and wetland buffers were reduced following public and agency comments received during the DEIS public comment period. All sound wall locations were reviewed and revised, as needed, to avoid impacts to wetlands and waterways. MDOT SHA and FHWA coordinated closely with M-NCPPC in a series of office and field meetings to avoid and minimize impacts to wetlands and waterways within all M-NCPPC parks located within the Preferred Alternative LOD. The most significant avoidance and minimization focus area since the DEIS is the area surrounding the American Legion Bridge.

### American Legion Bridge Strike Team Avoidance and Minimization

MDOT SHA and Federal Highway Administration met with the NPS on December 8, 2020, to discuss the LOD in the vicinity of the American Legion Bridge that was presented in the MLS DEIS. The NPS requested that MDOT SHA re-assess the LOD in the vicinity of the ALB to limit impacts to NPS land and its natural resources. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the Chesapeake and Ohio Canal National Historic Park (CHOH) and GWMP units of the NPS.*

The ALB Strike Team conducted an intensive investigation in January 2021 to explore alternative design solutions, project phasing solutions, site access solutions, and the potential use of specialty construction techniques to limit the LOD. The ALB Strike Team presented its results to the NPS on February 8, 2021.

MDOT SHA established the Base LOD as the "Base Option," which includes a conventionally constructed bridge structure built in two phases on the existing bridge centerline with the assumption of temporary construction access over the Potomac River via trestles and causeways. This Base Option included minor LOD reductions from the DEIS LOD to minimize impacts to Plummers Island. The Base Option also started with construction access in all four quadrants and was minimized to remove the construction access in the southwest, southeast, and northeast quadrants, which significantly reduced impacts to NPS property.

The ALB Strike Team first reviewed the avoidance and minimization options developed by MDOT SHA to date, and agreed that these options were not practicable, except perhaps the top-down construction option, which they investigated in further detail. The Strike Team then reviewed the viability of the Base Option and confirmed that this on-center alignment with a conventional construction approach was a viable option. The ALB Strike Team also considered a "west shift" of the LOD to entirely avoid impacts to Plummers Island and determined that a conventional construction approach with a west shift was also a viable option.

The ALB Strike Team then considered other bridge construction approaches to determine if any of them could limit the LOD further than the Base Option could. The Strike Team conducted detailed investigation on a top-down segmental construction approach; a top-down cable stayed approach; and a slide-in place bridge construction approach.

00014952



After field analysis and known information review, MDOT SHA and the ALB Strike Team determined that access to the site at river level could be consolidated to the north side of the river along CBP, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of the Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the Chesapeake and Ohio Canal and a temporary haul road paralleling the Chesapeake and Ohio Canal towpath.

MDOT SHA determined the LOD options for the ALB based on the results of the ALB Strike Team investigations. The bridge construction types with the smallest LOD footprint were the Base Option and the Cast-In-Place Segmental Option, both with a similar LOD requirement. Both construction types could be built with an on-center alignment or a west-shift alignment. MDOT SHA compared the NPS land impacts and those of the natural and cultural resources surrounding the ALB and determined that the on-center alignment would impact the least amount of total NPS Land; would not require re-configuration of the CBP interchange; and would not require residential displacement, as the west shift alignment would. For these reasons, the on-center alignment with the reduced LOD required by the Base Option or Cast-In-Place Segmental bridge types was incorporated into the Preferred Alternative LOD.

Avoidance and minimization was coordinated closely with the NPS in the vicinity of the ALB. The NPS requires that a wetland and floodplain SOF be prepared in accordance with the Procedural Manual #77-1: Wetland Protection (NPS, 2016) during the NEPA process, documenting compliance with Director's Orders #77-1 and #77-2 for proposed actions that would result in adverse impacts to wetlands and floodplains. The NPS SOF characterizes the wetland and floodplain resources that may be adversely impacted within NPS managed lands as a result of implementing the Preferred Alternative LOD, describes adverse impacts that the project would likely have on these resources, and documents the steps that have been taken to avoid, minimize, and offset these impacts.

## B.    Screened Alternatives and Avoidance and Minimization Steps

A LOD was established for each Screened Alternative. Refer to the DEIS, Appendix L, Section 2.3.4.B for details regarding the Screened Alternatives LOD determination process and general avoidance and minimization protocols of natural resource features.

## C.    Mitigation

As part of the permitting process, a detailed Final Compensatory Wetlands and Waterways Mitigation Plan (CMP), including final nontidal wetlands and waterways mitigation design, has been developed and will require approval by the USACE and MDE prior to permit issuance. All nontidal wetlands and waterways mitigation measures employed to compensate for unavoidable project impacts to Waters of the US or Waters of the State would follow the federal Compensatory Mitigation Rule (33 CFR Parts 325 and 40 CFR Part 230), and other state nontidal wetlands and waterways compensatory mitigation guidelines, as well as other recommendations from federal and state resource agencies. When practicable measures have been taken to avoid and minimize impacts to aquatic resources, mitigation may be required in the form of establishment/creation, enhancement, or preservation to replace the loss of wetland, stream, and/or other aquatic resource functions.  Nontidal wetlands and waterways mitigation options under both the federal Compensatory Mitigation Rule and state mitigation guidelines would follow a watershed approach.

00014953

 I-495 & I-270 Managed Lanes Study                    Final Natural Resources Technical Report

For further information regarding the nontidal wetlands and waterways compensatory mitigation process, refer to the DEIS, Appendix L, Section 2.3.4.C.

In Maryland, nontidal wetland mitigation requirements were developed based on MDE's *Maryland Nontidal Wetland Mitigation Guidance, Second Edition January 2011*. The MDE guidelines include standard replacement ratios based on the wetland type (e.g., emergent, forested, etc.) being impacted. Waterway (stream) mitigation requirements in Maryland were determined based on the USACE's *Maryland Stream Mitigation Framework Calculator Beta Version May 11, 2020* (MSMF). The MSMF is a new method that was developed primarily as a tool for the USACE in Maryland to promote minimization and avoidance of impacts to streams and provide an accounting tool when unavoidable impacts occur and must be mitigated, with the goal of achieving "no net loss." The new method provides a consistent and transparent process for stream impacts and mitigation quantification based on resource type, reach length, stream quality, drainage area, site sensitivity, and several other input values, resulting in a stream mitigation requirement that is recorded in functional feet. While all streams within the permanent LOD are considered impacted, they are not all filled or placed in culverts. Some streams will be relocated or altered as part of the Preferred Alternative. A conservative assessment of the final condition of each stream considered permanently impacted was used to determine the stream quality after construction in the MSMF.

Based on the Preferred Alternative impacts, the current mitigation requirement estimate in Maryland includes 4.38 acres of wetland mitigation credits and 7,511 functional feet of stream credits. No mitigation bank credits, or in-lieu fee programs were identified in Maryland when MDOT SHA initiated the project in 2018, and therefore MDOT SHA decided to pursue permittee-responsible nontidal wetlands and waterways mitigation for the requirements. For further details on the permittee-responsible nontidal wetlands and waterways mitigation site selection process refers to the Final Compensatory Wetlands and Waterways Mitigation Plan (CMP) (FEIS, Appendix O).

Off-site nontidal wetland and waterway compensatory mitigation in Maryland consists of two permittee-provided mitigation sites including a total of 4.61 acres of potential wetland mitigation credits and 6,304 functional feet of potential stream mitigation credits. The remaining required stream mitigation credits will be provided by purchasing credits from a mitigation bank that will have an initial credit release in the fall of 2022. Details on the Preferred Alternative impacts, nontidal wetland and waterway mitigation requirements, proposed mitigation sites, and Phase II mitigation plans will be included in the Final CMP.

Based on the Preferred Alternative impacts, in Virginia, wetland mitigation requirements were determined based on replacement ratios in the Virginia Administrative Code (9VAC25-680-70), and stream mitigation requirements were developed based on the USACE's *Unified Stream Methodology for use in Virginia, January 2007*. Privately-owned mitigation banks will be used to fulfill the current mitigation requirement estimate of 472 riverine mitigation credits in the Fairfax County Middle Potomac-Catoctin watershed. There are no permanent wetland impacts requiring mitigation in Virginia. MDOT SHA has identified specific mitigation bankers and confirmed credit availability in the Final CMP.

There will be temporary and some permanent wetlands and waterways impacts associated with the Section 404 nontidal wetland and waterway compensatory mitigation sites. However, these impacts will be compensated for onsite, since the mitigation site will result in overall function and value uplift.

00014954

 I-495 & I-270 Managed Lanes Study          Final Natural Resources Technical Report

NPS requires avoidance, minimization, and compensation for unavoidable adverse impacts to NPS wetlands via restoration of degraded wetlands on NPS property at a minimum of a 1:1 restoration/replacement ratio that can be adjusted upward to ensure functional replacement. NPS requires that a wetland SOF be prepared in accordance with the Procedural Manual #77-1: Wetland Protection (NPS, 2016) during NEPA documenting compliance with D.O. #77-1 for proposed actions that would result in adverse impacts to wetlands. A Draft SOF was included in the SDEIS, Appendix G, and a final signed SOF will be attached to the ROD as a separate document.

The current NPS wetland mitigation requirement estimate includes a total of 0.90 acres of NPS wetland mitigation based on the functional impact replacement ratios that are described in the Final SOF. MDOT SHA worked with NPS to identify one mitigation site (CHOH-13) that includes approximately 1.49 acres of potential wetland mitigation. The site was identified in the NPS *Environmental Assessment (EA) for the Wetland Restoration Action Plan (WRAP) for Catoctin Mountain Park, Chesapeake & Ohio Canal National Historical Park, Harpers Ferry National Historical Park, Monocacy National Battlefield, April 2017* and is considered a high priority site due to its location within one of the NPS wetlands being impacted by the project. The CHOH-13 mitigation site is not included in the proposed MDE and USACE mitigation credit totals and has been identified for the sole purpose of fulfilling the NPS mitigation requirement. A concept design of the proposed mitigation site is included in the draft SOF (SDEIS, Appendix G) and will also be included in the Final SOF.

## 2.4    Watersheds and Surface Water Quality

### 2.4.1    Regulatory Context and Methods

#### A.    Surface Waters and Watershed Characteristics

Surface waters include rivers, streams, and open water features such as ponds and lakes. Streams are generally defined as water flowing in a channel with defined bed and bank and an ordinary high water mark. Section 401 and Section 402 of the Federal CWA (33 U.S.C. 1341 and 1342) regulate water quality and the introduction of contaminants to waterbodies. Section 401 of the CWA prohibits any applicant for a federal permit or license "to conduct any activity that may result in any discharge into waters of the United States, unless the State or authorized Tribe where the discharge would originate either issues a Section 401 water quality certification finding compliance with applicable water quality requirements or certification is waived" (40 CFR Part 121). The I-495 & I-270 Managed Lanes Study requires a Section 401 water quality certification from MDE and VDEQ indicating that anticipated discharges from the I-495 & I-270 Managed Lanes Study will comply with state water quality standards. MDE and VDEQ are the regulatory agencies responsible for ensuring adherence to water quality standards in Maryland and Virginia, respectively. In general, the National Pollutant Discharge Elimination System (NPDES) stormwater program requires permits for discharge from construction activities that disturb one or more acres, and discharges from smaller sites that are part of a larger common plan of development. Individual permits for erosion and sediment control approval will be submitted and approved as contract packages are developed.

Under the COMAR: Title 26 Department of the Environment, Subtitle 08 Water Pollution, Chapter 02 Water Quality (26.08.02), the State of Maryland has adopted water quality standards to enhance and protect water resources and serve the purposes of the Federal CWA. Similarly, all of Virginia's surface waters are classified by VDEQ according to designated uses promulgated in Virginia's water quality standards (9VAC 25-260). The water quality standards serve this purpose by designating uses to the waters of the state and setting criteria

00014955



I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

by which these uses are protected. Water quality in Maryland and Virginia shall be protected and maintained for these "Designated Uses." Coordination with the MDNR Environmental Review Program (ERP) and online research through the MDE and VDEQ websites was conducted to determine designated uses and regulations for the waters crossed by the Phase 1 South portion of the corridor study boundary.

MDE has also designated certain surface waters of the state as Tier II (High Quality) waters, based on monitoring data that documented water quality conditions that exceeded the minimum standard necessary to meet designated uses. In accordance with federal antidegradation regulations (40 CFR 131.12), these waters are afforded additional antidegradation protections to ensure that these high-quality waters are maintained (COMAR 26.08.02.04-1). Impacts to Tier II waters are reviewed by MDE for certain state permits and approvals (including Wetlands and Waterways permits and authorizations), with the purpose of preventing degradation to high quality waters as a result of permitted activities. The review process would identify Tier II impacts associated with the Preferred Alternative, and then determine if there are opportunities to avoid these impacts, as well as potentially requiring additional minimization measures to further protect water quality.

Included in this review is an evaluation of the assimilative capacity of the Tier II waters. Assimilative capacity is defined as the difference between the Tier II water quality of the stream segment at the time it was designated as Tier II and the overall state-wide Tier II water quality listing threshold. Impacts to Tier II waters determined to have no remaining assimilative capacity will trigger additional steps and permit requirements, such as additional Best Management Practices (BMPs) or mitigation, during the review process.

In compliance with CWA Sections 303(d), 305(b), and 314 and the Safe Drinking Water Act (SDWA), states develop a prioritized list of waterbodies that currently do not meet water quality standards. The 303(d) prioritized list includes those waterbodies and watersheds that exhibit levels of impairment requiring further investigation or restoration. MDE and VDEQ use monitoring data to compare stream conditions to water quality standards and determine which streams should be listed. Parameters monitored include: temperature, dissolved oxygen (DO), pH, Escherichia coli (E. coli), enterococci, total phosphorus, chlorophyll a, benthic macroinvertebrates, as well as metals and toxics in the water column, sediments, and fish tissues. The waterbodies on this list may be subject to a total maximum daily load (TMDL) of these constituents under Section 303(d) of the CWA. A TMDL is a calculation of the maximum amount of a pollutant that a waterbody can receive and still meet water quality standards. Waterbodies can also be listed under Category 5 on the 303(d) list for impairment, which indicates that the waterbody is impaired, does not meet the water quality standard, and that a TMDL is required.

Like all surface waters, surface drinking water supplies are protected under Section 401 and Section 402 of the Federal CWA (33 U.S.C. 1341 and 1342), which regulate water quality and the introduction of contaminants to waterbodies based on designated use classes. Surface drinking water supplies are also protected under the SDWA, which was enacted to protect public health by regulating the nation's public drinking water supply. The SDWA sets enforceable maximum contaminant levels and post-treatment testing requirements that are enforced during water treatment and delivery. It also sets up a framework for source water protection and prevention to provide multiple barriers to pollution of waterways that provide raw water for drinking water use.

00014956



I-495 & I-270 Managed Lanes Study                          Final Natural Resources Technical Report

Information on surface water resources and water quality within the Phase 1 South portion of the corridor study boundary was primarily gathered from available published sources through background research, online sources, and agency coordination. This review involved consultation with various state and local agencies including MDE, MDNR's Maryland Biological Stream Survey (MBSS), Montgomery County Department of Environmental Protection (MCDEP), VDEQ, and Fairfax County Department of Public Works and Environmental Services (FCDPWES). These agencies and monitoring groups use a broad range of data to assess overall watershed health and condition, including data on chemical water quality, fish and benthic macroinvertebrate communities, aquatic habitat, land use characteristics, riparian buffer conditions, and impervious surface coverage. Data collected on aquatic habitat conditions and fish and benthic macroinvertebrate communities are often used to summarize existing water quality conditions based on an overall narrative rating (e.g., Very Poor, Poor, Fair, Good, etc.), using established methodologies. These methodologies and rating criteria are detailed in **Section 2.9, Aquatic Biota**.

## B.    Scenic and Wild Rivers

The federal Wild and Scenic Rivers system was created to protect "rivers of the nation which, with their immediate environments, possess outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural, or other similar values." The system is administered by four lead federal agencies—the Bureau of Land Management (BLM), NPS, US Forest Service (USFS) and US Fish and Wildlife Service (USFWS). "Rivers included in the National System at the request of a governor and designated by the Secretary of the Interior (under Section 2(a)(ii) of the Act) are administered by their respective state(s), with the NPS or another of the three lead agencies making determinations under Section 7 of the Act" (IWSRCC, 2018).

The Maryland Scenic and Wild Rivers Act of 1968 established the Maryland Scenic and Wild Rivers System to preserve and protect the natural values and enhance the water quality of rivers, or segments of rivers, which possess outstanding scenic, geologic, ecologic, historic, recreational, agricultural, fish, wildlife, cultural, and other similar resource values. A Scenic River is a "free-flowing river whose shoreline and related land are predominantly forested, agricultural, grassland, marshland, or swampland with a minimum of development for at least two miles of the river length." A Wild River is a "free-flowing river whose shoreline and related land are undeveloped, inaccessible except by trail, or predominantly primitive in a natural state for at least four miles of the river length" (Md. Code Ann., Nat. Res. § 8-402). The Scenic and Wild Rivers Act mandates the preservation and protection of natural values associated with rivers designated as Scenic and/or Wild. Each unit of state and local government, in recognizing the intent of the Act and the Scenic and Wild Rivers Program, is required to take whatever action is necessary to protect and enhance the qualities of a designated river. Potential effects to scenic and wild rivers are reviewed and coordinated by the MDNR.

The Virginia Scenic Rivers Act of 1970 established the Virginia Scenic Rivers Program with the intent to identify, designate, and help protect rivers and streams that "possess superior natural and scenic beauty, fish and wildlife, and historic, recreational, geologic, cultural, and other assets." River segments are evaluated based on 13 criteria, including water quality, corridor development, recreational access, historic features, natural features, visual appeal, quality of fisheries, and the presence of unique habitats or species. If a waterway qualifies for designation, the Virginia Department of Conservation and Recreation (VDCR) prepares a report including supporting comments by local governments and state agencies. For the designation to take effect, it must be passed by the General Assembly and receive final approval by the governor.

00014957

 I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

Environmental scientists accessed online information on behalf of MDOT SHA from the National Wild and Scenic River System website, the VDCR Scenic Rivers Program website, and the MDNR Scenic and Wild Rivers Program to determine if any federally designated Wild and Scenic Rivers or state-designated Scenic and Wild Rivers were located within the Phase 1 south portion of the corridor study boundary (IWSRCC, 2018; MDNR, 2018a; VDCR, 2018a). These results are summarized in **Section 2.4.2.B, Scenic and Wild Rivers**.

## C.  Surface Water Quality

For the purposes of this document, discussions of water chemistry include both in-situ multi-probe sampling and chemical grab sampling. In-situ data are defined as data collected with field measurement techniques such as water quality meters, while chemical grab sampling is defined as sampling in which water samples were collected in the field and transported to a laboratory for detailed analysis.

For Maryland waterways, existing in-situ and chemical water grab sample quality data were gathered from MBSS, MCDEP, MDE, and various other organizations through the National Water Quality Monitoring Council (NWQMC) database. Primary data sources from the NWQMC database include: Chesapeake Bay Program, MDE, MDNR, NPS, and USGS. In general, water quality data collected within 1 mile of the Phase 1 South portion of the corridor study boundary were considered most relevant to characterize existing conditions and are summarized in this report. Available water quality data from 2007 through 2017 were summarized for all Maryland data sources, except for the NWQMC database, which included data collected through August of 2018.

In Maryland, MDE established acceptable standards for several parameters under each designated stream use classification. The Use Class designation for streams within the Maryland portion of the Phase 1 South portion of the corridor study boundary are shown in **Table 2-15** below. All Maryland streams within the Phase 1 South portion of the corridor study boundary are classified as nontidal.

**Table 2-15. Maryland COMAR Stream Designated Use Classifications**

| Use Class | Description | Applicable Watersheds |
|---|---|---|
| I | Water Contact Recreation and Protection of Nontidal Warmwater Aquatic Life | All waters within the Rock Creek watershed. |
| I-P | Water Contact Recreation, Protection of Nontidal Warmwater Aquatic Life, and Public Water Supply | All waters within the Potomac River/Rock Run watershed, Cabin John Creek watershed, Watts Branch watershed, and Muddy Branch watershed. |

Source: Maryland COMAR

The Maryland standards for the use classes of streams are listed in COMAR 26.08.02.03-3–Water Quality and are shown in **Table 2-16.** Each parameter measured by in-situ sampling and regulated by the State of Maryland can have an impact on the aquatic communities of streams. In general, data on pH, DO, conductivity, temperature, and turbidity data are collected during in-situ sampling, often as part of biological sampling efforts by state and county monitoring groups.

00014958

OP•LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

**Table 2-16. Maryland COMAR Stream Use Water Quality Criteria**

| Parameter | Use I and I-P |
|-----------|---------------|
| Temperature | Maximum of 90°F (32°C) or ambient temperature, whichever is greater |
| pH | 6.5 to 8.5 Standard Units (SU) |
| Dissolved Oxygen | Minimum of 5 mg/L |
| Turbidity | Maximum of 150 Nephelometric Turbidity Units (NTU) and maximum monthly average of 50 NTU |

*Source: Maryland COMAR*

Some of the sampled parameters have associated Maryland state and federal standards for the protection of aquatic life. EPA established aggregate reference condition values, based on ecoregions, for total nitrogen and total phosphorus (EPA, 2000). These reference condition values were developed to be used by state agencies as guidelines for developing criteria and have no standalone regulatory importance. Ranges for other parameters indicative of anthropogenic stress were determined for the state by MBSS. These benchmarks developed by MBSS are only used as a management guideline and do not carry the same weight as the regulatory standards set by the state and federal governments. These parameters include ammonia, nitrate, nitrite, phosphorus, and sulfate. These benchmark levels, as well as the state and federal standards and recommendations, are found in **Table 2-17**.

Excess levels of these metals and nutrients have negative effects on fish and macroinvertebrate communities. According to the EPA, acute effects are those that show up in zero to seven days, while chronic effects can take years or lifetimes to be seen. Each of the following parameters was determined to have negative effects by the EPA "Gold Book" of water quality criteria (EPA, 1986).

00014959

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

Table 2-17. Maryland Criteria and Federal Water Quality Recommendations

| Parameter Tested | Maryland | | EPA Recommendations | |
|---|---|---|---|---|
| | Acute | Chronic | Acute | Chronic |
| Ammonia (mg/L) | >0.03* | | None | |
| Alkalinity (mg/L) | None | | None | 20 |
| Chromium (mg/L) | 0.570 | 0.074 | 0.570 | 0.074 |
| Chloride (mg/L) | None | | 860 | 230 |
| Copper (mg/L) | 0.013 | 0.009 | 0.013 | 0.009 |
| Lead (mg/L) | 0.065 | 0.0025 | 0.065 | 0.0025 |
| Nickel (mg/L) | 0.470 | 0.052 | 0.470 | 0.052 |
| Selenium (mg/L) | 0.020 | 0.005 | None | 0.005 |
| Silver (mg/L) | 0.0032 | None | 0.0032 | None |
| Zinc (mg/L) | 0.120 | 0.120 | 0.120 | 0.120 |
| Biochemical Oxygen Demand (mg/L) | None | | 8.41 | |
| Total Suspended Solids (mg/L) | None | | None | |
| Nitrate Nitrogen (mg/L) | >1* | | 0.89 | |
| Nitrite Nitrogen (mg/L) | >0.0025* | | 0.01 | |
| Nitrogen (Total) (mg/L) | >1.5* | | 0.69 | |
| Phosphorus (Total) (mg/L) | >0.025* | | 0.037 | |
| Orthophosphate (mg/L) | >0.008* | | None | |

\* Threshold level used by MBSS as an indication of anthropogenic stress.

Source: Maryland COMAR regulation 26.08.02.03-2, EPA Ambient Water Quality Criteria Recommendations, 2000, and MBSS 2000-2004 Volume II Ecological Assessment of Streams Sampled in 2001.

For Virginia waterways, existing in-situ and chemical grab sample water quality data were gathered from VDEQ and FCDPWES, as well as from the USGS through the NWQMC database. In general, water quality data collected within 1 mile of the Phase 1 South portion of the corridor study boundary were considered most relevant to characterize existing conditions and are summarized in this report. Available water quality data from 2007 through 2017 were summarized for all Virginia data sources, except for the NWQMC database, which included data collected through March of 2019.

All waters in Virginia are designated for recreational uses; the propagation and growth of a balanced, indigenous population of aquatic life, wildlife; and the production of edible and marketable natural resources. VDEQ established acceptable standards for ambient water quality parameters for seven different classifications of waters (e.g., tidal waters, nontidal waters, natural trout streams) to determine whether a waterbody is attaining the aquatic life use, and these standards are listed in the VAC 9VAC25-260-50– Numerical criteria for dissolved oxygen, pH, and maximum temperature. All Virginia streams within the Phase 1 South portion of the corridor study boundary fall under the nontidal waters classification. The standards for the Virginia nontidal waters in the Phase 1 South portion of the corridor study boundary are shown in **Table 2-18**. In addition to aquatic life protections, Virginia also designated the nontidal waters within the Phase 1 South portion of the corridor study boundary for the protection of public water supply.

00014960

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

**Table 2-18. Virginia Stream Class Water Quality Criteria**

| Class of Waters | Description | Dissolved Oxygen (mg/L) | | pH (SU) | Maximum Temperature (C°) |
|---|---|---|---|---|---|
| | | Min. | Daily Av. | | |
| III | Nontidal Waters | 4.0 | 5.0 | 6.0-9.0 | 32 |

Source: Virginia Administrative Code

Some of the sampled parameters have associated Virginia state and federal standards for the protection of aquatic life. As described above, EPA established aggregate reference condition values, based on ecoregions, for nutrient parameters (EPA, 2000). These reference condition values were developed to be used by state agencies as guidelines for developing criteria and have no standalone regulatory applicability. VDEQ has also established threshold values for other water quality parameters for use as benchmarks in selecting reference sites, which are considered to be least-degraded within the state (VDEQ, 2006). These benchmarks used by VDEQ do not carry the same weight as the regulatory standards set by the state and federal governments but are useful for characterizing relative impairment. These parameters include conductivity, nitrogen, and phosphorus. The benchmark levels, as well as the state and federal standards and recommendations, are found in **Table 2-19.**

**Table 2-19. Virginia Criteria and Federal Water Quality Recommendations**

| Parameter Tested | Virginia | EPA Recommendations |
|---|---|---|
| Ammonia (mg/L; varies based on pH) | 1.32 – 48.8 | None |
| Conductivity (µS/cm) | 250* | None |
| Nitrate Nitrogen (mg/L) | None | 0.89 |
| Nitrite Nitrogen (mg/L) | None | 0.01 |
| Nitrogen (Total) (mg/L) | 1.5* | 0.69 |
| Phosphorus (Total) (mg/L) | 0.05* | 0.037 |
| Orthophosphate (mg/L) | None | None |
| E. coli (cfu/100mL; monthly geometric mean) | 126 | None |

* Threshold level used by VDEQ as a cutoff for reference, or least-degraded, stream conditions.

Source: 9VAC25-260 Water Quality Standards, EPA Ambient Water Quality Criteria Recommendations, 2000, and VDEQ 2006 Using Probabilistic Monitoring Data to Validate the Non-Coastal Virginia Stream Condition Index.

## 2.4.2    Existing Conditions

### A.    Surface Waters and Watershed Characteristics

Within Virginia, the Phase 1 South portion of the corridor study boundary crosses the Potomac River drainage basin in Fairfax County. More specifically, the Phase 1 South portion of the corridor study boundary crosses the Middle Potomac watersheds, comprised of the Bull Neck Run, Scotts Run, Dead Run, Turkey Run, and Pimmit Run subwatersheds (FCDPWES, 2008). For the purposes of this document, only streams within the Fairfax County Middle Potomac watersheds that cross the Phase 1 South portion of the corridor study boundary are discussed. These subwatersheds include the Scotts Run and Dead Run watersheds. Characteristics of the Fairfax County Middle Potomac watersheds are detailed below and summarized in **Table 2-20**.

00014961

Table 2-20. Virginia Watershed Characteristics Summary

| Watershed | Drainage Area (Square Miles) | Class | 303(d) Impairments Listings | |
|---|---|---|---|---|
| | | | Completed TMDL (Category 4a) | TMDL Potentially Needed (Category 5) |
| Fairfax County Middle Potomac Watersheds | 9[1] | III | None | Unknown pollutants in Dead Run (based benthic IBIs) |

[1]Drainage area for the Scotts Run and Dead Run subwatersheds

Within Maryland, the Phase 1 South portion of the corridor study boundary crosses the Potomac River drainage basin, and within this basin, the Phase 1 South portion of the corridor study boundary crosses the state-designated Washington Metropolitan watershed (MDE 6-digit watershed), encompassing the Potomac River-Montgomery County, Cabin John Creek, and Rock Creek, subbasins (MD 8-digit watersheds). Each subbasin that crosses the Phase 1 South portion of the corridor study boundary in Maryland contains numerous smaller watersheds (MD 12-digit). For the purposes of this document, only streams with watersheds that cross the Phase 1 South portion of the corridor study boundary are discussed. These watersheds include Potomac River/Rock Run, Cabin John Creek, Rock Creek, Watts Branch, and Muddy Branch. Characteristics of Maryland watersheds are detailed below and summarized in **Table 2-21**. Watershed locations are shown in **Appendix K**.

The Potomac River is classified as Use I-P and is protected for Water Contact Recreation, Protection of Aquatic Life, and Public Water Supply due to its role as the primary source of drinking water for the District of Columbia, and many of the surrounding communities. The Washington Aqueduct, which is operated by the U.S. Army Corps of Engineers, withdraws and treats approximately 150 million gallons of water per day on average from the Potomac River to provide drinking water to the District of Columbia, as well as Fairfax and Arlington Counties, Virginia. The Aqueduct's primary water intake is located above Great Falls, several miles upstream of the Preferred Alternative's crossing of the Potomac on the American Legion Bridge. However, the Aqueduct system also has an intake at the dam at Little Falls, approximately 3 miles downstream of the Preferred Alternative, and is used intermittently for drinking water supplies according to the National Pollution Discharge Elimination System (NPDES) permit for the Aqueduct (NPDES Permit No. DC0000019). In addition, the Preferred Alternative crosses the Source Water Protection Area for the Aqueduct and the delineated Community Water System Areas for the City of Rockville and Washington Suburban and Sanitary Commission. Delineated as the entire watershed upstream of the water intake point, the Community Water System Areas largely mirror the Source Water Protection Area for the Aqueduct. Within the Preferred Alternative, the Source Water Protection Area includes the river itself and the landward area on either side of the river to the watershed boundary, but overall encompasses the entire Potomac River watershed in Maryland and Virginia.

00014962

**Table 2-21. Watershed Characteristics Summary**

| MD Watershed | | MD Watershed | Drainage Area (Square Miles) | Designated Use | 303(d) Impairments Listings | |
|---|---|---|---|---|---|---|
| 6-digit Name | 8-digit Name | 12-digit Name (Number)[1] | | | Completed TMDL (Category 4a) | TMDL Potentially Needed (Category 5) |
| Potomac River – Washington Metropolitan | Potomac River – Montgomery County | Potomac River/Rock Run (021402020845) | 15 | I-P | Total suspended solids | Chlorides and sulfates in first through fourth order streams; pH[2] and polychlorinated biphenyls in fish tissue in the Potomac River mainstem |
| | Cabin John Creek | Cabin John Creek (021402070841) | 26 | I-P | Total suspended solids; Escherichia coli | Chlorides; sulfates |
| | Rock Creek | Rock Creek (021402060836) | 18 | I | Total suspended solids; phosphorus; Enterococcus | None |
| | Potomac River – Montgomery County | Watts Branch (021402020846) | 22 | I-P | Total suspended solids | Chlorides and sulfates in first through fourth order streams |
| | | Muddy Branch (021402020848) | 20 | I-P; III-P[3] | Total suspended solids | Chlorides and sulfates in first through fourth order streams |

[1] 12-digit watersheds are listed by their location relative to the Phase 1 South portion of the corridor study boundary from west to east along I-495 and south to north along I-270.

[2] The Category 5 impairment listing for high pH is based on data collected well upstream of the 12-digit Potomac River/Rock Run watershed.

[3] The only portion of the 12-digit Muddy Branch watershed that contains Use III-P waters is located near Blockhouse Point Conservation Park and does not receive drainage from the Phase 1 South portion of the corridor study boundary.

*Sources: MDE, 2018a; MDE, 2018b*

00014963

 I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

### a.    Fairfax County Middle Potomac Watersheds

The Fairfax County Middle Potomac watersheds drain approximately 26 square miles in Fairfax County, Virginia and are comprised of the Bull Neck Run, Scotts Run, Dead Run, Turkey Run, and Pimmit Run subwatersheds (FCDPWES, 2008). The Scotts Run and Dead Run subwatersheds are crossed by the Phase 1 South portion of the corridor study boundary. Within Virginia, the majority of the Phase 1 South portion of the corridor study boundary crosses the Scotts Run subwatershed, which drains the I-495 corridor from Leesburg Pike to the Potomac River. A small section of the Phase 1 South portion of the corridor study boundary, just north of Georgetown Pike, crosses the Dead Run subwatershed to the east. Characteristics of these two Fairfax County Middle Potomac watersheds are summarized in **Table 2-20**.

The Scotts Run subwatershed drains approximately 6 square miles, with its headwaters beginning slightly outside of the Phase 1 South portion of the corridor study boundary in Tysons Corner (FCDPWES, 2008). Flowing northeast, the Scotts Run mainstem parallels I-495 and gradually turns north to intersect Georgetown Pike, eventually joining the Potomac River on the western side of Scott's Run Nature Preserve. The subwatershed is 25 percent impervious, and 9 percent of the land use is vacant/undeveloped (USGS, 2019). Dominant land uses include residential, open space/parks/recreational areas, road ROWs, and commercial. The 2008 Fairfax County Middle Potomac Watersheds Management Plan describes the majority of the in-stream habitat quality in the Scotts Run subwatershed as Fair. Scotts Run was also noted as having inadequate riparian buffers that are less than 100 feet wide or with non-native, non-diversified, or insufficient vegetation. Several unnamed tributaries drain directly into the Potomac River between the Scotts Run mainstem and I-495. These tributaries drain approximately 1 square mile within the Scotts Run Nature Preserve, bound by Georgetown Pike to the south and I-495 to the east. For these unnamed Potomac River direct tributaries, the land use is 46 percent open space/parks/recreational areas, with other dominant land uses including residential, commercial, and vacant/undeveloped (FCDPWES, 2008).

The Dead Run subwatershed drains an area of approximately 3 square miles, entirely to the east of the I-495 corridor (FCDPWES, 2008). The headwaters begin just upstream of McLean Central Park, north of the intersection of Dolley Madison Boulevard and Old Dominion Drive. The Dead Run mainstem flows north, intersecting Georgetown Pike and George Washington Memorial Parkway and joining the Potomac River to the east of I-495. The Dead Run subwatershed is 25 percent impervious and 3 percent vacant/undeveloped. Dominant land uses include open space/parks/recreational areas, residential, commercial, and road right-of-way. The 2008 Fairfax County Middle Potomac Watersheds Management Plan describes the majority of the habitat quality in the Dead Run subwatershed as Fair, while having inadequate riparian buffers that are less than 100 feet wide or with non-native, non-diversified, or insufficient vegetation.

Within the vicinity of the Phase 1 South portion of the corridor study boundary, all streams in the Fairfax County Middle Potomac watersheds are designated as Class III waters (nontidal waters). In addition to aquatic life protections, Virginia has also designated the waters within the vicinity of the Phase 1 South portion of the corridor study boundary for the protection of public water supply. There are no completed TMDLs for the Fairfax County Middle Potomac watersheds within the vicinity of the Phase 1 South portion of the corridor study boundary, but Dead Run has a Category 5 impairment listing for aquatic life based on benthic macroinvertebrate bioassessments (VDEQ, 2016).

00014964

 I-495 & I-270 Managed Lanes Study         Final Natural Resources Technical Report

**b.    Potomac River/Rock Run**

The Potomac River/Rock Run watershed (MD 12-digit: 021402020845), hereafter referred to as Rock Run, is located within the Piedmont Plateau physiographic province, within and extending south of Potomac, Maryland. The Phase 1 South portion of the corridor study boundary crosses the Rock Run watershed from the Potomac River to just east of Seven Locks Road. The MD 12-digit watershed drains an area of 15 square miles, entirely within Montgomery County (MDE, 2018b). Within the vicinity of the Phase 1 South portion of the corridor study boundary, Rock Run and several unnamed tributaries drain into the Chesapeake and Ohio Canal or directly into the Potomac River near the head of tide.

Near the headwaters of the Rock Run watershed is a major commercial area, Potomac Village, and the rest of the watershed is dominated by low-density, large-lot residential development and steep, wooded stream valleys (M-NCPPC, 2002). Impervious surfaces, primarily roads and rooftops, comprise approximately 11 percent of the Rock Run watershed, and are mostly located along the Potomac River south of Great Falls, Maryland, and within the Avenel Farm in Potomac, Maryland (MCDEP, 2011). The watershed is 38 percent forested with much of the contiguous forest cover located within public parks or along waterways (MCDEP, 2011; M-NCPPC, 2002). As of 2011, at least 60 percent of the Rock Run watershed had a minimum riparian buffer of 100 feet; however, only a small portion is protected by park land (MCDEP, 2011; M-NCPPC, 2002).

Aquatic habitat within the Rock Run watershed is generally Good due to forested stream valleys and relatively recent development (MCDEP, 2011). Despite generally Good habitat, a 2011 MCDEP report indicated that fish and benthic macroinvertebrate communities were generally Fair or Poor (MCDEP, 2011). While the Rock Run watershed is predominantly residential land use, historic land uses were associated with gold-mining practices. Legacy sediments from this historic land use and runoff from recent development have resulted in impaired stream conditions (MCDEP, 2011).

All Rock Run watershed streams in the vicinity of the Phase 1 South portion of the corridor study boundary are classified as Use I-P (water contact recreation, protection of aquatic life, and public water supply). As part of the greater Potomac River-Montgomery County watershed, the Rock Run watershed currently has a TMDL for total suspended solids and Category 5 impairment listings for chlorides and sulfates in first through fourth order streams and for polychlorinated biphenyls in fish tissue in the Potomac River mainstem. Upstream of the 12-digit Rock Run watershed, the Potomac River Montgomery County watershed also has a Category 5 listing for high pH on the Potomac River mainstem (MDE, 2018a).

**c.    Cabin John Creek**

The Cabin John Creek watershed (MD 12-digit: 021402070841) runs parallel to the Phase 1 South portion of the corridor study boundary, with its headwaters beginning just south of MD 28 and continuing until it joins the Potomac River at the intersection of Cabin John Parkway and Clara Barton Parkway. The MD 12-digit Cabin John Creek watershed drains approximately 26 square miles, entirely within Montgomery County (MDE, 2018b). Of the major tributaries to Cabin John Creek, Bogley Branch, Old Farm Creek, Thomas Branch, and Booze Creek flow within the vicinity of the Phase 1 South portion of the corridor study boundary.

00014965



Because of its proximity to the Phase 1 South portion of the corridor study boundary, land use within the Cabin John Creek watershed has been subject to urban development and is comprised of approximately 21 percent impervious surfaces. Over 70 percent of the land cover is residential, followed by 13 percent municipal/institutional, and seven percent roadway (MCDEP, 2012a). Due to the presence of Montgomery County's stream valley park system, some riparian zone protection exists throughout the watershed, but only five percent of the land cover is considered forest (MCDEP, 2012a).

The mainstem of Thomas Branch was assessed and delineated from River Road to just North of Democracy Boulevard. The headwaters of the stream is located outside of the Phase 1 South portion of the corridor study boundary, northeast of the Democracy Boulevard and I-270 interchange. Thomas Branch is a highly-restricted stream system confined by concrete trapezoidal channels; bedrock; sheet pile soundwalls; high, steep valley walls; and residential development. I-495 was constructed in the center of the narrow, steep-sided Thomas Branch stream valley and a large portion of the stream was relocated to build the current alignment of I-495. The majority of Thomas Branch is characterized by a high level of bank erosion where the banks are not armored; a shallow, wide channel incised in some areas with sheer 15-foot banks; bedrock blockages to aquatic life passage; little instream habitat; low head dams; concrete trapezoidal channels, integrated concrete weirs, and riprap; and sheet pile walls abutting the stream or at the top of its banks.

Inorganic pollutants are present in roughly 95 percent of the Cabin John Creek stream miles and have led to the degradation of the watershed's biological communities (MDE, 2012a). With respect to stream resources, around 83 percent of the stream miles in the Cabin John Creek watershed were assessed as Fair, and the remaining 17 percent were assessed as Poor (MCDEP, 2012a). All Poor stream resource conditions were found in the Booze Creek and Thomas Branch subwatersheds, in the vicinity of the Phase 1 South portion of the corridor study boundary. Other anthropogenic influences, such as channelization and flow/sediment impacts, have led to degraded water quality and current TMDL impairments. Over half of the degraded stream miles in the Cabin John Creek watershed are channelized (MDE, 2012a).

All streams within the Cabin John Creek watershed are classified as Use I-P waters (MDE, 2012a). Cabin John Creek currently has TMDLs for total suspended solids and Escherichia coli concentrations, and Category 5 impairment listings for chlorides and sulfates (MDE, 2018a).

### d.    Rock Creek

The greater MD 8-digit Rock Creek watershed (MD 8-digit: 02140206) begins in Laytonsville, Maryland and flows approximately 21 miles through the Piedmont Plateau physiographic province before entering Washington, DC and eventually joining the Potomac River. The MD 12-digit Rock Creek watershed (021402060836) is located entirely within Montgomery County and has a drainage area of 18 square miles (MDE, 2018b). The Phase 1 South portion of the corridor study boundary crosses the Rock Creek watershed from approximately MD 187 eastward to MD 97. Note that while the Preferred Alternative LOD impacts the Rock Creek watershed (021402060836), the stream of Rock Creek is not within the Preferred Alternative LOD and is not impacted by the build improvements included in the Preferred Alternative.

00014966

 I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

Impervious surfaces, including primarily rooftops, paved roads, and parking lots, comprise approximately 21 percent of the greater Rock Creek watershed within Maryland (MDE, 2012b; MCDEP, 2012c). The Maryland portion of the watershed is heavily developed, with 75 percent urban land use and 16 percent forested cover (MDE, 2012b). The greatest development densities occur in the lower portions of the watershed in southern Montgomery County, within and adjacent to the Phase 1 South portion of the corridor study boundary. Within the vicinity of the Preferred Alternative, the majority of the forested area exists as a riparian corridor around waterways, within protected county stream valley parks.

In 2012, 53 percent of Rock Creek was rated as having Fair overall stream conditions, based on assessments of physical and biological parameters (MCDEP, 2012c). The least degraded portion of the greater Rock Creek watershed is upstream of MD 28, where development densities are lower and stream conditions range from Fair to Good (MCDEP, 2012c). Downstream of MD 28, in the vicinity of the Phase 1 South portion of the corridor study boundary, the watershed is highly developed, densely populated, and stream quality is more degraded, with stream conditions ranging from Fair to Poor (MCDEP, 2012c). Many of the developed areas in the southern portion of the watershed lack stormwater BMPs, leading to unmitigated flows that have negatively impacted Rock Creek and its tributaries. Other anthropogenic influences including dams and old sanitary sewer pipes have created barriers to aquatic life passage and prevent Rock Creek from fully functioning in a natural state (DDOE, 2010; MDNR, 2016a).

In the vicinity of the Preferred Alternative, all streams within the Rock Creek watershed are classified as Use I waters (water contact recreation and protection of nontidal warmwater aquatic life). The Rock Creek watershed currently has TMDLs for phosphorus, Enterococcus, total suspended solids, and no Category 5 impairment listings (MDE, 2018a).

### e.    Watts Branch

The Watts Branch watershed (MD 12-digit: 021402020846) has a drainage area of 22 square miles and begins east of I-270 in the City of Rockville, Maryland, continuing southwest until it crosses under MD 190 and flows into the Potomac River, south of Travilah, Maryland (MDE, 2018b). The Watts Branch headwaters cross the Phase 1 South portion of the corridor study boundary, with all major tributaries joining the mainstem well downstream of the Preferred Alternative. Watts Branch is located entirely within the Piedmont Plateau physiographic province in Montgomery County.

According to 2011 National Land Cover Data, urban development comprises 64 percent of land use in the Watts Branch watershed, with 15 percent impervious surface and 23 percent forested cover (USGS, 2018). Within the City of Rockville, land use is 79 percent residential and commercial/industrial development, and 19 percent open space, which includes forest, water, and farmland. Rockville's impervious surfaces comprise over 40 percent of the Watts Branch watershed, and within City of Rockville limits, 16.6 stream miles of Watts Branch have highly eroded banks, widened stream channels, piped/straightened channels, and/or little riparian buffer (City of Rockville, 2015). Overall, the Watts Branch headwaters are highly developed and have been impacted by runoff from impervious areas, leading to over-widened channels with little floodplain connectivity (MCDEP, 2012b).

The lower portions of the watershed, downstream of the Phase 1 South portion of the corridor study boundary, are dominated by lower density residential land use and still support more diverse aquatic communities (MCDEP, 2012b). Piney Branch, a major tributary to Watts Branch downstream of the

00014967

 I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

Preferred Alternative, was designated as a Special Protection Area by the MCDEP in 1995 and is largely forested (MCDEP, 2012b).

All streams within the Watts Branch watershed are classified as Use I-P waters. Watts Branch currently has a TMDL for total suspended solids and Category 5 impairment listings for chlorides and sulfates in first through fourth order streams (MDE, 2018a).

### f.    Muddy Branch

The Muddy Branch watershed (MD 12-digit: 021402020848) originates upstream of MD 355 in Gaithersburg, Maryland, and flows southwest to the Potomac River within Blockhouse Point Conservation Park. The watershed crosses the northwest portion of the corridor study boundary of Phase 1 South, bound by MD 124 to the north and Shady Grove Road to the south, and falls entirely within the Piedmont Plateau physiographic province. The Muddy Branch watershed has a drainage area of approximately 20 square miles (MDE, 2018b).

The Muddy Branch watershed is approximately 67 percent developed and 21 percent forested (USGS, 2018). Impervious surfaces comprise approximately 18 percent of the overall watershed (USGS, 2018). The upper watershed, in the vicinity of the Phase 1 South portion of the corridor study boundary, falls within the City of Gaithersburg, where development is highly concentrated, while the lower portions of the watershed are considerably less developed. Within the City of Gaithersburg, Muddy Branch is comprised of 37 percent impervious surfaces (URS, 2014). Within the vicinity of the Phase 1 South portion of the corridor study boundary, the mainstem of Muddy Branch is primarily forested as it flows through Morris Park and Malcolm King Park adjacent to the I-270 corridor. The lower portions of the Muddy Branch mainstem are largely forested due to a series of stream valley parks downstream of the Phase 1 South portion of the corridor study boundary. In 2012, Good water quality conditions were observed in the lower Muddy Branch watershed, while Fair water quality conditions were observed in the upper Muddy Branch watershed (MCDEP, 2012b; URS, 2014).

All Muddy Branch watershed streams in the vicinity of the Phase 1 South portion of the corridor study boundary are classified as Use I-P waters. One unnamed tributary in the lower portion of Muddy Branch, well downstream of the Phase 1 South portion of the corridor study boundary is classified as Use III-P waters (nontidal coldwater and public water supply). Muddy Branch currently has a TMDL for total suspended solids and Category 5 impairment listings for chlorides and sulfates in first through fourth order streams (MDE, 2018b).

## B.    Scenic and Wild Rivers

Based on review of available information on the National Wild and Scenic River System website, there are no federally designated Wild and Scenic Rivers in Maryland or Virginia (IWSRCC, 2018). No waterways within the Virginia portion of the Phase 1 South portion of the corridor study boundary are state-designated as Scenic Rivers (VDCR, 2018a). The Potomac River in Montgomery County is state-designated as Scenic under the Maryland Scenic and Wild Rivers Program (MDNR, 2018a; Md. Code Ann., Nat. Res. § 8-402). All Maryland streams within the Preferred Alternative, with the exception of tributaries to Rock Creek, are regulated under the Maryland Scenic and Wild Rivers Act, as they drain to the Montgomery County portion of the Potomac River. It is anticipated that most aesthetic impacts would be temporary, during construction activities. However, replacement or major modification of the ALB could have a

00014968

longer-term aesthetic effect on the designated river and would therefore be designed to protect the scenic value of the resource. MDNR will assist the project team with coordination for Maryland Scenic Rivers.

## C.    Surface Water Quality

Existing conditions for surface water quality are discussed by watershed, as defined in **Section 2.4.2.A**, above. For both in-situ and chemical grab sample parameters, state and federal standards and recommendations, as well as benchmark levels used to indicate anthropogenic stress, are presented in **Section 2.4.2.C**.

### a.    Fairfax County Middle Potomac Watersheds

Within the vicinity of the Phase 1 South portion of the corridor study boundary, recent chemical grab sample data for the Fairfax County Middle Potomac watersheds were available for Dead Run from NWQMC (**Table 2-22**). At the single monitoring site located just north of Whann Avenue, individual chemical grab sample parameter values varied across sampling events. Ammonia values were generally low and did not exceed Virginia state standards. Although E. coli levels were reported in different units than the Virginia state criterion, E. coli levels within Dead Run were well below state standards based on the magnitude of reported values. All nutrient parameters were also variable among sampling events, but values frequently exceeded the state and federal benchmarks used to indicate anthropogenic stress.

In-situ water quality data were available for the Fairfax County Middle Potomac watersheds from FCDPWES. In-situ data were available for the Scotts Run mainstem, Unnamed Tributary 1 to Scotts Run, Unnamed Tributary 2 to Scotts Run, the Dead Run mainstem, and Unnamed Tributary 1 to Dead Run. Unnamed Tributary 1 and Unnamed Tributary 2 to Scotts Run both enter the Scotts Run mainstem downstream of I-495. Unnamed Tributary 1 to Dead Run joins the Dead Run mainstem to the east of I-495, at the southern end of Turkey Run Park. With the exception of pH, all in-situ water quality parameters met Virginia standards for Class III waters (**Table 2-23**). One pH value, collected in the spring on Unnamed Tributary 2 to Scotts Run, had a pH value of 5.8, which is slightly below the Virginia minimum threshold. For the Scotts Run and Dead Run mainstems, conductivity values exceeded the benchmark used by VDEQ to categorize streams as least-degraded.

00014969

**Table 2-22. Summary of Chemical Grab Sample Water Quality Data for the Fairfax County Middle Potomac Watersheds**

| Waterway | Dead Run |
|---|---|
| Source Data | NWQMC |
| Year[1] | 2008 – 2019 |
| Number of Sampling Sites | 1 |
| Ammonia (mg/L) | 0.016 – 0.255 |
| E. coli (MPN/100 mL) | 0.393 – 2.500 |
| Nitrate Nitrogen (mg/L) | 0 – 3.7 |
| Nitrite Nitrogen (mg/L) | 0.35 – 6.70 |
| Nitrogen (Total) (mg/L) | 0 – 6.3 |
| Orthophosphate (mg/L) | 0.004 – 9.000 |
| Phosphorus (Total) (mg/L) | 0 – 2,350 |

[1]Sampling may not have been conducted during all years within year ranges.

**Table 2-23. Summary of In-situ Water Quality Data for the Fairfax County Middle Potomac Watersheds**

| Waterway | Scotts Run | Unnamed Tributary 1 to Scotts Run | Unnamed Tributary 2 to Scotts Run | Dead Run | Unnamed Tributary 1 to Dead Run |
|---|---|---|---|---|---|
| Source Data | FCDPWES | FCDPWES | FCDPWES | FCDPWES | FCDPWES |
| Year[1] | 2012-2014 | 2009 | 2014 | 2010-2015 | 2008 |
| Number of Sampling Sites | 3 | 1 | 1 | 4 | 1 |
| DO (mg/L) | 8.1-13.1 | 11.5 | 10.3 | 6.2-14.0 | 12.1 |
| pH | 6.8-9.0 | -- | 5.8 | 6.8-7.4 | 8.0 |
| Conductivity (µS/cm) | 331-650 | 168 | 96 | 178-456 | 212 |
| Water Temp. (°C) | 12.0-23.3 | 9.0 | 11.3 | 6.7-22.4 | 9.0 |

[1]Sampling may not have been conducted during all years within year ranges.

**b.    Potomac River/Rock Run**

No recent chemical grab sample data were available for the Potomac River/Rock Run watershed within the vicinity of the Phase 1 South portion of the corridor study boundary; however, MCDEP collected in-situ water quality data along Rock Run, upstream of the Phase 1 South portion of the corridor study boundary. With the exception of pH, all in-situ water quality parameters met COMAR criteria for Use I-P streams (**Table 2-24**). One pH value of 9.0, collected in spring, exceeded the COMAR criterion of 8.5.

00014970

**Table 2-24. Summary of In-situ Water Quality Data for the Rock Run Watershed**

| Waterway | Rock Run |
|---|---|
| Source Data | MCDEP |
| Year[1] | 2010-2014 |
| Number of Sampling Sites | 1 |
| DO (mg/L) | 7.1 – 13.5 |
| pH (SU) | 7.2 – 9.0 |
| Conductivity (µS/cm) | 211 – 308 |
| Water Temp. (°C) | 14.0 – 24.5 |

[1]Sampling may not have been conducted during all years within year ranges.

**c.    Cabin John Creek**

Within the vicinity of the Phase 1 South portion of the corridor study boundary, recent chemical grab sample data for the Cabin John Creek watershed were available for Booze Creek, Cabin John Creek, Ken Branch, Thomas Branch, and Unnamed Tributary 1 to Snakeden Branch from MBSS and NWQMC (**Table 2-25**). Ammonia concentration was only assessed along Cabin John Branch and Ken Branch, and all concentrations fell below the threshold of 0.03 mg/L used by MBSS to indicate anthropogenic stress. Alkalinity levels were only monitored along Cabin John Creek, with all values exceeding the chronic exposure criterion of 20 mg/L recommended by EPA for freshwater aquatic life. Conductivity and chloride levels were highly variable across all waterways and generally fluctuated between sampling events. While no state or federal ambient surface water quality criteria exist for conductivity, most sampled waterways exceeded EPA's recommended aquatic life criterion for chronic chloride exposure. Booze Creek, Cabin John Creek, and Thomas Branch also exceeded criteria for acute chloride exposure. High conductivity and chloride levels in the spring are often associated with deicing procedures, as runoff from roadways can transport deicing compounds into nearby waterbodies. Two recent pH readings along Booze Creek fell below the minimum COMAR criterion of 6.5 SU for Use I-P streams. Alternatively, one recent pH reading within Unnamed Tributary 1 to Snakeden Branch exceeded the maximum COMAR criterion.

Turbidity measurements were also variable among sites and sampling events. Although the COMAR monthly average turbidity criterion of 50 Nephelometric Turbidity Units (NTU) was frequently exceeded within the watershed, the instantaneous turbidity criterion of 150 NTU was only exceeded at Cabin John Creek. Nutrient compounds (those containing nitrogen and phosphorus) across the watershed generally exceeded thresholds used by state and federal agencies to indicate anthropogenic stress. All other chemical water quality parameters, including all heavy metals, met state and federal criteria.

Within the Cabin John Creek watershed, in-situ water quality data are available for Booze Creek, Cabin John Creek, Ken Branch, Old Farm Creek, Thomas Branch, Unnamed Tributary 1 to Cabin John Creek, and Unnamed Tributary 1 to Old Farm Creek (**Table 2-26**). Several pH readings at Cabin John Creek exceeded COMAR criterion for Use I-P streams and one recent reading in Old Farm Creek fell below COMAR criterion. All other in-situ water quality parameters within the Cabin John Creek watershed met COMAR criteria. During several sampling events, conductivity levels along the Cabin John Creek mainstem and Unnamed Tributary 1 to Cabin John Creek were notably elevated. Conductivity levels as low as 247 and

00014971



I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

469 µS/cm, have been documented to correlate with impaired benthic macroinvertebrate and fish communities in Maryland, respectively (Morgan et al., 2007).

**Table 2-25. Summary of Chemical Grab Sample Water Quality Data for the Cabin John Creek Watershed**

| Waterway | Booze Creek | Cabin John Creek | | Ken Branch | | Thomas Branch | Unnamed Tributary 1 to Snakeden Branch |
|---|---|---|---|---|---|---|---|
| Source Data | NWQMC | NWQMC | MBSS | NWQMC | MBSS | NWQMC | NWQMC |
| Year[1] | 2008 – 2016 | 2007 – 2017 | 2008 – 2017 | 2008 – 2016 | 2008 | 2008 – 2016 | 2016 |
| Number of Sampling Sites | 2 | 8 | 3 | 2 | 1 | 2 | 1 |
| Ammonia (mg/L) | -- | -- | 0.006 – 0.009 | -- | 0.009 | -- | -- |
| Alkalinity (mg/L) | -- | 22 – 96 | -- | -- | -- | -- | -- |
| Biochemical Oxygen Demand (mg/L) | -- | 0.1 – 8.2 | -- | -- | -- | -- | -- |
| Chloride (mg/L) | 28 – 3,333 | 16 – 4,558 | 105 – 161 | 29 – 752 | 50 | 65 – 2,503 | 149 – 203 |
| Conductivity (µS/cm) | 287 – 11,200 | 124 – 13,473 | 516 – 720.5 | 227 – 3,084 | 337 | 283 – 12,890 | 275 – 2,952 |
| Copper (µg/L) | -- | -- | 3.8 | -- | -- | -- | -- |
| DO (mg/L) | 5.3 – 15.2 | 6.7 – 16.4 | -- | 7.6 – 15.1 | -- | 7.9 – 15.9 | 12.3 – 14.6 |
| Nitrate Nitrogen (mg/L) | -- | -- | 0.79 – 1.41 | -- | 1.14 | -- | -- |
| Nitrite Nitrogen (mg/L) | -- | -- | 0.0029 – 0.0115 | -- | 0.0022 | -- | -- |
| Nitrogen (Total) (mg/L) | -- | 0.49 – 2.36 | 0.95 – 1.67 | -- | 1.22 | -- | -- |
| Orthophosphate (mg/L) | -- | -- | 0.001 – 0.005 | -- | 0.002 | -- | -- |
| pH | 5.1 – 8.4 | 6.5 – 8.7 | 7.3 – 8.1 | 7.2 – 8.4 | 7.6 | 6.5 – 8.4 | 7.6 – 8.7 |
| Phosphorus (Total) (mg/L) | -- | -- | 0.007 – 0.019 | -- | 0.008 | -- | -- |
| Total Suspended Solids (mg/L) | -- | 0 – 932 | -- | -- | -- | -- | -- |
| Turbidity (NTU) | 0 – 89 | 0 – 1,185 | -- | 0 – 83 | -- | 0 – 88 | 0 – 25 |
| Zinc (µg/L) | -- | -- | 17.0 | -- | -- | -- | -- |

[1]Sampling may not have been conducted during all years within year ranges.

00014972

OP·LANES™ MARYLAND   I-495 & I-270 Managed Lanes Study   Final Natural Resources Technical Report

Table 2-26. Summary of In-situ Water Quality Data for the Cabin John Creek Watershed

| Waterway | Booze Creek | Cabin John Creek | | | Ken Branch | Old Farm Creek | Snakeden Branch | Unnamed Tributary 1 to Cabin John Creek | Unnamed Tributary 1 to Old Farm Creek |
|---|---|---|---|---|---|---|---|---|---|
| Source Data | MCDEP | MCDEP | MBSS | NWQMC | MBSS | MCDEP | MCDEP | NWQMC | MCDEP |
| Year[1] | 2008 | 2008 – 2014 | 2008 | 2008 – 2017 | 2008 | 2008 – 2014 | 2008 – 2014 | 2015 | 2015 – 2017 |
| Number of Sampling Sites | 1 | 4 | 3 | 8 | 1 | 1 | 1 | 1 | 1 |
| DO (mg/L) | 6.9 – 11.5 | 6.1 – 16.8 | 9.9 – 11.7 | 7.8 – 15.2 | 8.8 | 8.5 – 11.5 | 9.9 – 12.1 | 12.3 | 6.9 – 9.5 |
| pH | 7.6 – 8.4 | 6.5 – 8.8 | 7.4 – 7.5 | 7.0 – 8.7 | 7.3 | 6.4 – 7.7 | 7.4 – 7.6 | 7.7 – 8.0 | 7.4 – 7.5 |
| Conductivity (μS/cm) | 530 – 563 | 202 – 649 | 402 – 403 | 79 – 3,752 | 289 | 224 – 631 | 354 – 444 | 873 – 1,984 | 605 – 830 |
| Water Temp. (°C) | 14.7 – 19.9 | 11.5 – 23.5 | 21.9 – 24.5 | -- | 22.7 | 12.4 – 20.1 | 12.6 – 13.1 | -- | 10.0 – 14.5 |
| Turbidity (NTU) | -- | -- | 1.6 – 1.8 | -- | 1.5 | -- | -- | -- | -- |

[1]Sampling may not have been conducted during all years within year ranges.

d.   **Rock Creek**

No recent chemical grab sample data were available for the Rock Creek watershed within the vicinity of the Preferred Alternative; however, in-situ water quality data were collected by MBSS and MCDEP along Alta Vista Tributary, Luxmanor Branch, and Rock Creek (**Table 2-27**). All in-situ water quality parameters met COMAR criteria for Use I streams, except for one DO reading at Luxmanor Branch. Several conductivity measurements were notably elevated throughout the watershed.

Table 2-27. Summary of In-situ Water Quality Data for the Rock Creek Watershed

| Waterway | Alta Vista Tributary | Luxmanor Branch | Rock Creek |
|---|---|---|---|
| Source Data | MCDEP | MCDEP | MCDEP |
| Year[1] | 2011 – 2013 | 2008 – 2017 | 2008 – 2017 |
| Number of Sampling Sites | 2 | 4 | 2 |
| DO (mg/L) | 4.6 – 12.7 | 3.6 – 8.3 | 4.6 – 12.7 |
| pH | 6.7 – 8.0 | 6.8 – 7.6 | 6.7 – 8.0 |
| Conductivity (μS/cm) | 375 – 761 | 279 – 654 | 159 – 761 |
| Water Temp. (°C) | 6.4 – 24.1 | 15.0 – 26.0 | 6.4 – 24.7 |

00014973

e.    **Watts Branch**

No recent chemical grab sample data were available for the Watts Branch watershed within the vicinity of the Phase 1 South portion of the corridor study boundary; however, in-situ water quality data were collected by MCDEP along Watts Branch, downstream of I-495. All water quality parameters met COMAR criteria for Use I-P streams (**Table 2-28**).

Table 2-28. Summary of In-situ Water Quality Data for the Watts Branch Watershed

| Waterway | Watts Branch |
|---|---|
| Source Data | MCDEP |
| Year[1] | 2007 – 2014 |
| Number of Sampling Sites | 2 |
| DO (mg/L) | 6.8 – 14.1 |
| pH | 6.8 – 7.7 |
| Conductivity (µS/cm) | 395 – 790 |
| Water Temp. (°C) | 11.6 – 24.2 |

[1]Sampling may not have been conducted during all years within year ranges.

f.    **Muddy Branch**

No recent chemical grab sample data were available for the Muddy Branch watershed within the vicinity of the Phase 1 South portion of the corridor study boundary; however, in-situ water quality data were collected by MCDEP along Muddy Branch and Decoverly Tributary, downstream of I-495. All water quality parameters met COMAR criteria for Use I-P streams. Although no state or federal criteria exist, conductivity was somewhat elevated at Muddy Branch, approaching 1,000 µS/cm (**Table 2-29**).

Table 2-29. Summary of In-situ Water Quality Data for the Muddy Branch Watershed

| Waterway | Decoverly Tributary | Muddy Branch |
|---|---|---|
| Source Data | MCDEP | MCDEP |
| Year[1] | 2007 | 2007 – 2014 |
| Number of Sampling Sites | 1 | 2 |
| DO (mg/L) | 6.9 – 7.1 | 6.5 – 11.9 |
| pH | 6.6 – 7.4 | 6.7 – 7.7 |
| Conductivity (µS/cm) | 477 – 497 | 440 – 996 |
| Water Temp. (°C) | 17.0 – 22.2 | 9.1 – 23.7 |

[1]Sampling may not have been conducted during all years within year ranges.

## 2.4.3    Environmental Effects

## A.    Surface Waters and Watershed Characteristics

The Preferred Alternative LOD will affect surface waters and watershed characteristics due to direct and indirect impacts to ephemeral, intermittent, and perennial stream channels. Impacts to jurisdictional surface waters are discussed in **Section 2.2.3** and the impacts to jurisdictional surface waters by MD 12-digit watershed are included in **Table 2-13**. Watersheds would also be impacted by increasing impervious surface area. SWM controls will be included in the final design to reduce velocity of runoff flow and negative impact to water quality. **Section 2.4.3.C** includes more information regarding environmental

00014974

effects to water quality. Additional information regarding SWM assumptions are discussed in FEIS, Chapter 3, Section 3.1.6. No Tier II waters were identified within the Preferred Alternative LOD, no waterways within the Preferred Alternative LOD drain to Tier II waters, and the Preferred Alternative LOD does not cross any Tier II watershed boundaries.

## B.    Scenic and Wild Rivers

Based on review of available information on the National Wild and Scenic River System website, there are no federally-designated Wild and Scenic Rivers in Maryland or Virginia (IWSRCC, 2018). No waterways within the Virginia portion of the Preferred Alternative LOD are state-designated as Scenic Rivers (VDCR, 2018a). The Preferred Alternative LOD will affect the Potomac River and its tributaries which are designated as Scenic under the Maryland Scenic and Wild Rivers Program (MDNR, 2018a). It is anticipated that most aesthetic impacts would be temporary, during construction activities. However, replacement of the ALB could have a longer-term aesthetic effect and will be designed to protect the scenic value of the resource. MDNR will assist the project team with coordination for Maryland Scenic Rivers.

## C.    Surface Water Quality

The Preferred Alternative LOD may affect surface water quality in the project area due to direct and indirect impacts to ephemeral, intermittent, and perennial stream channels and increases in impervious surface in their watersheds.

Impacts during construction include physical disturbances or alterations, accidental spills, and sediment releases. These impacts can affect aquatic life through the potential to contaminate waterways in the vicinity of the Preferred Alternative LOD and could potentially increase contaminants in the raw water for the drinking water supply. Direct stream channel impacts associated with the Preferred Alternative LOD are quantified in **Section 2.3.3**. The potential negative water quality results of these impacts are discussed below.

During construction, large areas of exposed soil can be severely eroded by wind and rain when the vegetation and naturally occurring soil stabilizers are removed. Erosion of these exposed soils can considerably increase the sediment load to receiving waters (Barrett et al., 1993). Sediment loads caused by construction could eventually enter the intermittent drinking water intake at Little Falls dam if not controlled. These increased sediment loads can destroy or damage fish spawning areas and macroinvertebrate habitat and could increase maintenance and sediment removal cycles for the drinking water supply system. An accidental sediment release in a stream can clog the respiratory organs of fish, macroinvertebrates, and the other members of their food web (Berry et al., 2003). Additional suspended sediment loads have also been shown to cause stream warming by reflecting radiant energy (CWP, 2003).

An additional impact associated with the initial construction phase of roadway improvements is the removal of trees and other riparian buffer vegetation. The removal of riparian vegetation greatly reduces the buffering of nutrients and other materials and allows unfiltered water to enter a stream channel directly (Trombulak and Frissell, 2001). Tree removal during the construction process can reduce the amount of shade provided to a stream and thereby raise the water temperature of that stream. In addition to tree removal, stormwater discharges also have the potential to increase surface water temperatures in nearby waterways. The effect of the temperature change depends on stream size, existing temperature regime, the volume and temperature of stream baseflow, and the degree of shading.

00014975



Impacts associated with the use of the road after construction are mainly based on the potential for contamination of surface waters and related drinking water supplies by runoff from new impervious roadway surfaces. Potential contaminants to surface waters include heavy metals, deicing compounds, organic pollutants, contaminants of emerging concern, hazardous chemical spills, pathogens, and sediment.

The most common heavy metal contaminants are lead, aluminum, iron, cadmium, copper, manganese, titanium, nickel, zinc, and boron. Most of these contaminants are related to gasoline additives and regular highway maintenance. Other sources of metals include mobilization by excavation, vehicle wear, combustion of petroleum products, historical fuel additives, and catalytic-converter emissions. Generally, heavy metals from highways found in streams are not at concentrations high enough to cause acute toxicity (CWP, 2003).

Deicing compounds that are used during the winter for highway safety maintenance also pose a threat to water quality. Sodium chloride is the most common deicing compound, but it can also be blended with calcium chloride or magnesium chloride. Urea and ethylene glycol are also sometimes used to deice. MDOT SHA most commonly uses rock salt (sodium chloride), a salt brine, and magnesium chloride as deicing agents. Chlorides from these salts can cause acute and chronic toxicity in fish, macroinvertebrates, and plants. The effect of chlorides in streams is dependent on the amount that is applied and the dilution of the receiving waters. Runoff containing road salts, among other things, can cause elevated conductivity in streams, especially during the spring. Applications of deicing materials can also cause several issues with drinking water systems including altered taste and odor, pipe corrosion, modification of treatment, mobilization of harmful nutrients, and potential loss or need to mitigate drinking water sources.

Organic pollutants, including dioxins and PCBs, have been found in higher concentrations along roadways. Sources of these compounds include runoff derived from exhaust, fuel, lubricants, and asphalt (Buckler and Granato, 1999). These organic pollutants are known to accumulate in concentrations that can cause mortality and affect growth and reproduction in aquatic organisms (Lopes and Dionne, 1998).

New impervious surfaces may result in an increase in the presence of contaminants of emerging concern in surface waters, including the downstream water supply. These include contaminants such as pharmaceuticals and personal care products (PPCPs), endocrine disrupting chemicals (EDCs), organic wastewater contaminants (OWCs), persistent organic pollutants (POPs), microconstituents, and nanomaterials. There is evidence indicating that even low levels of some contaminants of emerging concern in the environment may affect wildlife, but no indication that they pose a threat to human health from consuming water treated to current EPA standards. According to DC Water, the levels at which these chemicals have currently been detected in water treated from the Washington Aqueduct are very small.

Surface water contamination may also occur due to sudden hazardous spills on new impervious surfaces from the Preferred Alternative that could affect aquatic life and the water supply. The Potomac River Basin Drinking Water Source Protection Partnership Early Warning and Emergency Response Workgroup works with the local utilities and response agencies to prepare, practice, and respond to spills of hazardous materials to minimize effects from hazardous spills on Potomac River drinking water sources.

Sediments are also a primary pollution concern associated with an increase in impervious areas. The Preferred Alternative LOD would add the most impervious surface to the Cabin John Creek MD 12-digit

00014976

watershed, with 77 acres added. The least additional impervious surface would be added to the Rock Creek watershed, with less than 0.8 acres added. See **Section 2.3.4** for a discussion of jurisdictional surface water impacts and **Table 2-30** below for additional impervious surface for the Preferred Alternative LOD. Additional impervious surface includes all new impervious surface outside of the existing roadway footprint.

**Table 2-30. Additional Impervious Surfaces by Watershed**

| MD 12-Digit Watershed Name | MD 12-Digit Watershed | USGS 12-digit HUC Name | USGS 12-digit HUC Number | AC | SF |
|---|---|---|---|---|---|
| Potomac River/Rock Run | 21402020845 | Nichols Run-Potomac River | 20700081003 | 15.0 | 654,707 |
| Cabin John Creek | 21402070841 | Cabin John Creek | 20700081003 | 77.0 | 3,355,862 |
| Rock Creek | 21402060836 | Lower Rock Creek | 20700100102 | 0.8 | 32,670 |
| Muddy Branch | 21402020848 | Muddy Branch | 20700081001 | 7.2 | 313,196 |
| Watts Branch | 21402020846 | Watts Branch | 20700081002 | 3.2 | 137,214 |

Note: Part of the additional impervious surface area is in the Nichols Run-Potomac River HUC12 Watershed in Virginia and is not associated with an MD 12-digit Watershed.

### 2.4.4    Avoidance, Minimization and Mitigation

### A.    Surface Waters and Watershed Characteristics

Impacts to surface waters from the Preferred Alternative will be unavoidable. However, efforts to avoid and minimize impacts have occurred throughout the planning process and will continue in final design. MDOT SHA has worked with regulatory agencies and resource managers to identify sensitive aquatic resources and determine further avoidance and minimization possibilities. Agency recommendations have been evaluated and implemented wherever practicable. Efforts to avoid and minimize direct impacts to stream channels to date have included alignment shifts, alteration of roadside ditch design, addition of retaining walls, shifting the locations of noise barriers, and revision of preliminary SWM locations to avoid streams.

Avoidance and minimization efforts to reduce impacts to surface waters, including wetlands, involve a two-tiered approach. The first tier occurred during the planning stage where every reasonable effort was made to avoid wetlands and waterways to the maximum extent practicable at that stage of design. The second tier of avoidance and minimization occurred as the P3 Developer reduced impacts to wetlands and streams wherever practicable and their design was incorporated into the FEIS LOD. Impacts to wetlands and waterways will continue to be reduced wherever practicable as design is refined and finalized.

Any unavoidable impacts will be regulated under state and federal wetlands and waterways permits that would be issued for the project. Detailed information regarding avoidance and minimization of direct impacts to waterways for the I-495 & I-270 Managed Lanes Study can be found in **Section 2.3.4** and is further detailed in the AMR (FEIS, Appendix N). In addition, detailed information regarding avoidance and minimization with respect to surface water quality can be found in **Section 2.4.4.C.**

00014977

 I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

## B.    Scenic and Wild Rivers

Maryland Scenic Rivers and/or their tributaries within the Preferred Alternative LOD include the Montgomery County portion of the Potomac River and its tributaries. Impacts to the Wild and Scenic Potomac River and its tributaries have been avoided and minimized to the maximum extent practicable during preliminary design.  Coordination with MDNR and efforts to reduce impacts further will continue throughout future project design phases.  Specifically, the ALB over the Potomac River will be designed in coordination with MDNR to ensure that the scenic and wild values of the Potomac River would not be negatively affected. Typically, protection of tributaries to state-designated Scenic Rivers is achieved through application of BMPs and avoidance and minimization measures to reduce impacts to water quality that are already being applied to waterways within the Preferred Alternative LOD. Detailed information regarding avoidance and minimization for impacts to wetlands and waterways within the Preferred Alternative LOD can be found in **Section 2.3.4** and is further detailed in the AMR (FEIS, Appendix N).

## C.    Surface Water Quality

The I-495 & I-270 Managed Lanes Study requires a Section 401 water quality certification from MDE and VDEQ indicating that anticipated discharges from the I-495 & I-270 Managed Lanes Study will comply with federally-mandated water quality standards. In support of the water quality certification requirements, avoidance and minimization measures would be further evaluated through each design phase of the I-495 & I-270 Managed Lanes Study. Minimization efforts for potential water quality impacts that could result from road crossings may include the proper maintenance of flood-prone flows through proposed structures using flood relief culverts to avoid increased scour and sedimentation. Most of the stream systems within the Preferred Alternative LOD currently have floodplain access; this should be retained as much as possible to preserve benefits such as velocity dissipation, storage, and sedimentation/stabilization. Other efforts should consider retaining or adding riparian buffers, as well as aquatic life passage through structures. Post-construction SWM and compliance with TMDLs will be accounted for in the stormwater design and water quality monitoring to comply with required permits.

Erosion and sediment control, as well as SWM techniques, are the most important minimization efforts in relation to chemical water quality. Impacts to chemical water quality would be minimized through strict adherence to erosion and sediment control procedures and MDE stormwater management regulations. In 2012, MDE revised erosion and sediment control regulations in adherence with the 2011 Maryland Standards and Specifications for Soil Erosion and Sediment Control (MDE, 2014a). These revisions include the establishment of a grading unit criteria, along with stricter stabilization requirements to more thoroughly protect water quality.

Potential organic (e.g., PCBs and dioxins) and heavy metal pollutants are generally sediment-bound or behave like sediment with respect to runoff and transport. Current research is limited; however, settling and filtering urban BMP removal mechanisms have been shown to achieve reductions of 50 to 90 percent with respect to toxic contaminants (Schueler and Youngk, 2015). Therefore, SWM techniques aimed at reducing erosion and sediment transport would also reduce the transport of toxic contaminants into downstream waterways. The International Stormwater BMP Database 2020 Summary Statistics also indicate that commonly used stormwater BMPs reduce total suspended solids, total nitrogen, total phosphorous, and heavy metals such as copper, lead, and zinc from stormwater before it enters streams (Water Research Foundation, 2020).

00014978

 I-495 & I-270 Managed Lanes Study                Final Natural Resources Technical Report

SWM will be developed in compliance with all applicable MDE regulations and guidance and designed in accordance with MDE's 2000 Maryland Stormwater Design Manual (MDE, 2009) and MDE's SWM Act of 2007. The 2007 SWM Act requires establishing a comprehensive approach to SWM through the implementation of Environmental Site Design (ESD) to the maximum extent practicable, and only using structural practices where necessary. The SWM Design Manual requires small-scale SWM practices, nonstructural techniques, and better site planning to mimic natural hydrologic runoff characteristics. Micro-scale practices, such as water quality swales, would be used to capture and treat runoff closer to the source, as well as increase recharge by infiltrating some or all of the storage volume. The practicability of diverting bridge scupper drainage into SWM areas would be investigated as part of the future planning process, on a structure-by-structure basis. Structural SWM techniques such as underground vaults are proposed to attenuate water flow from stormwater runoff. Due to the importance of protecting water quality in the study area, MDOT SHA has undertaken initial analysis of SWM needs for the project in preliminary planning rather than in later phases of the project.

This early analysis ensures that the feasibility of providing effective SWM has been considered throughout the planning process and allowed for identification of ROW needs for the most effective SWM solutions, and avoidance of additional natural resource impacts from SWM to the maximum extent practicable. Water quantity treatment will be met onsite or through waiver requests in specific areas. The project will attempt to meet water quality treatment requirements onsite, where practicable. Where this is not practicable, water quality requirements will be met off-site in accordance with MDE regulations. The Compensatory Stormwater Management Plan details off-site stormwater quality treatment and is included as Appendix D of the FEIS. Other measures may also be considered in particularly sensitive watersheds after further coordination with resource agencies, such as redundant erosion and sediment control measures in especially sensitive watersheds and/or providing on-site environmental monitors during construction to provide extra assurance that erosion and sediment control measures are fully implemented and functioning as designed. These measures will also minimize potential impacts of contaminants on downstream drinking water supplies. Contaminants entering the Washington Aqueduct are also treated by the Dalecarlia and McMillan treatment plants, which must meet EPA's drinking water standards prescribed in the Aqueduct's NPDES Permit.

## 2.5    Groundwater and Hydrology

### 2.5.1    Regulatory Context and Methods

In 1974, Congress passed the SDWA to regulate the public drinking water supply (EPA, 2004). The SDWA Amendments of 1986 require each state to develop Wellhead Protection Programs to assess, delineate, and map source protection areas for their public drinking water sources, and determine potential risks to those sources (42 U.S.C. 300h-7). Wellhead Protection specifically manages the land surface around a well where activities might affect water quality (MDE, 2018c). Source water protection is not specifically mandated by the SDWA, though it does mandate source water assessments, as described below. This allows for flexibility in the delineation and development of source water protection areas to fit the needs of the state (42 U.S.C. 300j-13). States, tribes, and communities are encouraged to use SDWA guidance to protect their public water sources from pollution of major concern and to pass local regulations (EPA, 2004). The EPA approved Maryland's Wellhead Protection Program in June of 1991, and Maryland's Source Water Assessment Program in November of 1999. The EPA approved Virginia's Source Water Assessment Program in October 1999, and their Wellhead Protection Program in 2005 (VDH, 1999; VDEQ, 2005). Both Virginia's and Maryland's program provides technical assistance, information, and funding to

00014979


local governments to aid in water supply protection. The SDWA does not regulate private wells serving fewer than 25 individuals (EPA, 2004).

The EPA, as authorized by Section 1424(e) of the SDWA, is responsible for the Sole Source Aquifer (SSA) Program, which allows the EPA to designate an aquifer as a sole source of drinking water and establish a review area for any federally-funded projects that fall within the area (42 U.S.C. 300h-6). SSAs are defined as providing at least 50 percent of the drinking water for its service area, and where that service area has no reasonably available alternative drinking water sources. No SSAs cross the Phase 1 South portion of the corridor study boundary.

Data on wells and groundwater conditions within the Phase 1 South portion of the corridor study boundary were gathered from online sources from the USGS, Maryland Geological Survey (MGS), Virginia Department of Health (VDH), and the EPA. Groundwater well data were gathered from the USGS National Water Information System (USGS, 2017).

## 2.5.2    Existing Conditions

The hydrogeology of the Phase 1 South portion of the corridor study boundary is largely defined by the geology of the area. According to USGS and MGS, the Phase 1 South portion of the corridor study boundary is underlain by the crystalline-rock and undifferentiated sedimentary-rock aquifer, one of the three primary aquifers of the Piedmont and Blue Ridge Physiographic Province (USGS, 2017; MGS, 2018).

Most of the Piedmont and Blue Ridge Physiographic Province is underlain by dense impermeable bedrock that yields water from secondary porosity and permeability provided by fractures. Recharge is highly variable in these aquifers because it is determined by local precipitation and runoff, which are influenced by topographic relief, roadway infrastructure, land use, and the infiltration rates of the available land surface (USGS, 1997). The crystalline-rock and undifferentiated sedimentary-rock aquifers are composed of mainly crystalline metamorphic and igneous rocks. An unconsolidated, permeable material called regolith overlies these aquifers. The regolith consists of saprolite, colluvium, alluvium, and soil. The hydraulic properties of the regolith vary greatly due to its variation in thickness, composition, and grain size. The recharge and discharge process occurs in these aquifers through instream areas where precipitation enters the regolith and then moves laterally through the material, discharging into nearby streams. However, some water moves downward through the regolith until it reaches bedrock, where it enters fractures in crystalline rocks. Base flow ranges from 33 to 67 percent of stream flow in the Maryland drainage basins underlain by crystalline rocks, which is consistent with flow ranges in other states with crystalline rock basins (USGS, 1997). The majority of these aquifers are unconfined, allowing contaminants to enter the aquifers. Common contaminants include nitrate from fertilizers and chloride from road salts. Because water relies on fractures for movement, availability for groundwater usage is limited and well rates are usually only a few gallons per minute. Wells are often drilled deep and left open to allow water to infiltrate from fractures along the drill hole (MGS, 2014).

As mentioned above, the crystalline-rock and undifferentiated sedimentary-rock aquifers consist primarily of metamorphic and igneous rocks, but also include small areas of sedimentary rocks, principally conglomerate, sandstone, and shale. These rocks consist mostly of silica and silicate minerals that are not readily dissolved. Dissolved-solids concentrations in water from these aquifers average about 120 milligrams per liter. The water is soft; hardness averages about 63 milligrams per liter. The median

00014980


hydrogen ion concentration, which is measured in pH units, is 6.7, meaning the water is slightly acidic. The median iron concentration is 0.1 milligram per liter, but concentrations as large as 25 milligrams per liter have been reported. Typical groundwater is comprised of dissolved calcium bicarbonate and magnesium bicarbonate ions (USGS, 1997).

Groundwater contaminants can come from a variety of sources, but the type of contaminant is often tied to the pollution source. Common highway runoff contaminants that impact both surface and groundwater are listed in **Table 2-31** (Kobringer and Geinopolos, 1984; Barrett et al., 1995). The EPA's National Primary Drinking Water Standards regulate the allowable amounts of these listed compounds within drinking water due to concerns over human and environmental health (EPA, 2009). The Secondary Drinking Water Standards recommend acceptable levels of compounds that can cause cosmetic effects or aesthetic effects to drinking water, such as poor taste or smell (EPA, 2009). This designation is listed in the table where applicable, as well as the origin of these pollutants within the scope of highway activities.

USGS groundwater well data were reviewed to establish water quality trends within the vicinity of the Phase 1 South portion of the corridor study boundary. Three USGS groundwater wells with recent water quality data were identified within the Piedmont and Blue Ridge crystalline-rock and unconsolidated sedimentary-rock aquifer. The specific well information is presented in **Table 2-32.**

00014981

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

**Table 2-31. Common Highway Runoff Contaminants**

| Contaminant | Primary Source on Roadways | Primary or Secondary Pollutant* | EPA Maximum Contaminant Limit (MCL)* | Units |
|---|---|---|---|---|
| Arsenic | Fossil fuel combustion | Primary | 10 | ug/L |
| Cadmium | Exhaust, tire wear | Primary | 5 | ug/L |
| Chromium | Wear of engine parts, brake lining wear | Primary | 100 | ug/L |
| Lead | Exhaust, tire wear, fossil fuels | Primary | 15 | ug/L |
| Nitrate (measured as Nitrogen) | Roadside fertilizer | Primary | 10,000 | ug/L |
| Nitrite (measured as Nitrogen) | Roadside fertilizer | Primary | 1,000 | ug/L |
| Turbidity | Sediment runoff, pavement wear, highway maintenance | Primary | 1 | NTU |
| Copper | Vehicle fluids and fuel | Primary/Secondary | 1,300/1,000 | ug/L |
| Total Dissolved Solids | Includes salts from roadway deicing. | Secondary | 500,000 | ug/L |
| Iron | Auto body rust, metal roadway components (bridges, guardrails, etc.), wear of engine parts | Secondary | 300 | ug/L |
| Manganese | Wear of engine parts | Secondary | 50 | ug/L |
| Zinc | Tire wear, motor oils | Secondary | 5,000 | ug/L |
| Sulfate | Pavement, fuel, deicing salts | Secondary | 250,000 | ug/L |
| Nickel | Fossil fuels, metal plating, brake wear, asphalt paving | N/A | N/A | |
| Ammonia | Roadside fertilizer | N/A | N/A | |
| Phosphorus | Roadside fertilizer | N/A | N/A | |

*N/A = No EPA Primary or Secondary Drinking Water Standard, but still a known constituent of highway runoff with potential environmental effects.

*Source: Kobringer and Geinopolos,1984; Barrett et al., 1995; EPA, 2009.*

00014982

**Table 2-32. USGS Groundwater Wells Representing Aquifers that Underlie the Phase 1 South Portion of the Corridor Study Boundary**

| USGS Code | Well Name | Latitude | Longitude | National Aquifer | Local Aquifer |
|---|---|---|---|---|---|
| 390533077125201 | MO De 52 | 39°05'33.18" | 77°12'52.32" | Piedmont and Blue Ridge crystalline-rock | Upper Pelitic Schist of Wissahickon Formation |
| 385929077020901 | WW Ac 8 | 38°59'29.3" | 77°02'08.6" | Piedmont and Blue Ridge crystalline-rock | NR* |
| 385644077061101 | WW Ba 28 | 38°56'44" | 77°06'11" | Piedmont and Blue Ridge crystalline-rock | Sykesville Formation |

*Not reported.
Source: USGS, 2017

Groundwater quality data was reviewed within these three wells to provide a snapshot of existing conditions relative to the pollutants listed in **Table 2-31**. As shown in **Table 2-33**, chemical constituents vary across all wells (USGS, 2017). At the time of sampling, two of the three wells showed total dissolved solids above Secondary Drinking Water Standards. These elevated values could indicate impacts from current road salting operations, the existing geology, or a combination of both geologic components and human activities in the surrounding area. Levels of manganese, which is naturally occurring within the surrounding geology of these aquifers, was elevated slightly above the Secondary Drinking Water pollutant levels in two of the three wells.

00014983

OP·LANES
MARYLAND    I-495 & I-270 Managed Lanes Study                Final Natural Resources Technical Report

#### Table 2-33. Groundwater Quality Data for Selected Pollutants

| Well Name | MO De 52 | WW Ac 8 | WW Ba 28 |
|---|---|---|---|
| pH | 7.2 | 5.0 | 7.2 |
| Arsenic (ug/L) | 0.53 | 0.37 | 1.6 |
| Cadmium (ug/L) | <0.030 | 0.573 | 0.030 |
| Chromium (ug/L) | 1.7 | 0.65 | <0.50 |
| Lead (ug/L) | <0.040 | 0.046 | 0.020 |
| Nitrate (ug/L as N) | 2,010 | 7,060 | 14 |
| Nitrite (ug/L as N) | <1 | <1 | <1 |
| Turbidity (NTU) | 0.8 | NR* | 0.3 |
| **Total Dissolved Solids (ug/L)** | **590,000** | **741,000** | 266,000 |
| Copper (ug/L) | <0.80 | <0.80 | <0.20 |
| Iron (ug/L) | <4.0 | <4.0 | 31.8 |
| Manganese (ug/L) | 2.84 | **152** | **470** |
| Zinc (ug/L) | <2.0 | 3.4 | 8.2 |
| Sulfate (mg/L) | 32.6 | 53.5 | 41,200 |
| Nickel (ug/L) | 34.9 | 2.6 | 3.6 |
| Ammonia (ug/L as N) | <10 | <10 | 10 |
| Ortho-phosphate (ug/L as P) | 140 | 28 | 17 |

Bold values indicate a concentration higher than the established water quality standards (Table 2-31. Common Highway Runoff Contaminants).
*Source: USGS, 2016*

As discussed above, the aquifers beneath the Phase 1 South portion of the corridor study boundary are used for groundwater withdrawals. MDE has documented numerous groundwater wells within Montgomery County, although the majority of these are located far from the Phase 1 South portion of the corridor study boundary where homes still use well water (MDE, 2015). MDE does not release the exact locations of groundwater wells for landowner privacy and security, therefore the exact location of most wells within the Phase 1 South portion of the corridor study boundary cannot be determined.

The EPA's Drinking Water Mapping Application to Protect Source Waters (DWMAPS) contains information on Wellhead Protection Areas across the country. These data are presented at the HUC12 scale as the percentage of each HUC12 watershed that falls within a Wellhead Protection Area. Of the HUC12 watersheds crossed by the Phase 1 South portion of the corridor study boundary, 17% (4 drinking water wells) and 21% (12 drinking water wells) of the Watts Branch (HUC12: 020700081005) and Nichols Run-Potomac River (HUC12: 020700081002) watersheds are identified as being within a Wellhead Protection Area, respectively. No other HUC12 watershed crossed by the Phase 1 South portion of the corridor study boundary are located within a Wellhead Protection Area (EPA, 2021). However, the EPA mapping is presented at a broad watershed scale and does not provide specific well or well-head protection locations. Based on more detailed information provided by MDE, there are no Maryland Wellhead Protection Areas located in the vicinity of the Phase 1 South portion of the corridor study boundary (MDE, 2019). In Maryland, the Phase 1 South portion of the corridor study boundary falls within the service area of the Washington Suburban Sanitary Commission (WSSC), which receives its water from the Potomac River and

00014984

the Patuxent River. WSSC provides all drinking water within the Phase 1 South portion of the corridor study boundary. Similarly, in Virginia, the Fairfax County Water Authority serves the areas immediately surrounding the Phase 1 South portion of the corridor study boundary and receives its water from the Potomac River via the Washington Aqueduct (Fairfax Water, 2018). Less than 20 percent of the population in Fairfax County is served by private wells (VDH, 2019). Groundwater wells within the Phase 1 South portion of the corridor study boundary that are still in use are generally for commercial and industrial usage, and not used as drinking water.

### 2.5.3    Environmental Effects

The Preferred Alternative LOD may affect groundwater and hydrology in the project area, mainly due to highway runoff impacts from stormwater infiltration. Groundwater can be contaminated by roadway runoff including substances such as gasoline, oil, and road salts that can seep into the soil and enter the groundwater flow. Soil composition affects how readily contaminants may reach groundwater sources. For example, contaminants are more likely to reach groundwater in sandy soils, which allow more infiltration, than clay soils, which have low infiltration rates. The entire Preferred Alternative LOD falls within the service area of the WSSC in Maryland and Fairfax County Water Authority in Virginia, which receive their drinking water supply from the Potomac River and/or the Patuxent River. Groundwater wells within the Preferred Alternative LOD that are still in use are generally for commercial and industrial usage, and not for drinking water. Consequently, drinking water impacts from groundwater sources are not anticipated. Groundwater impacts are highly geographically variable, based on local soil types, slope variability, impervious area, and widespread construction throughout the region. Therefore, groundwater impacts are difficult to quantify and attribute to one source.

### 2.5.4    Avoidance, Minimization and Mitigation

During construction activities within the Preferred Alternative LOD, erosion and sediment control plans with the most appropriate BMPs will be in place to mitigate potential impacts to groundwater and hydrology by capturing sediment and pollutants before they are released to the surrounding environment. As described in **Section 2.4.4.C**, ESD SWM will be developed to maintain current infiltration rates to the greatest extent practicable. This will ensure that recharge of the local water table and shallow aquifers is maintained, to preserve local groundwater quantities. The use of the latest SWM BMPs in the Preferred Alternative LOD, including wet ponds and bioswales that filter pollutants through vegetation and soil mediums, would also help to reduce the potential for contamination of shallow groundwater resources, while promoting infiltration.

### 2.6    Floodplains

Floodplains provide numerous natural and beneficial functions including: flood moderation; water impurity and sediment filtration; groundwater recharge; habitat for fish, terrestrial wildlife, and plants; outdoor recreation space; and open space for agriculture, aquaculture, and forestry (USDOT, 1979). Floodplains naturally and economically help to maintain water quality and reduce flood property damage by providing floodwater storage and decreasing water flow velocity and sedimentation. Floodplains also provide protected environments for plants to grow and for fish and other wildlife to breed and forage. In addition to the advantage of flood damage reduction, humans also benefit from floodplains through the agricultural and recreational space they provide (FEMA, 2018).

00014985

 I-495 & I-270 Managed Lanes Study                          Final Natural Resources Technical Report

### 2.6.1    Regulatory Context and Methods

Executive Order 11988, US Department of Transportation (USDOT) Order 5650.2, and the National Flood Insurance Act of 1968 govern the construction and fill of floodplains to ensure proper consideration to the avoidance, minimization, and mitigation of floodplain development and associated adverse effects. In addition to enforcing floodplain regulations, the National Flood Insurance Act and its National Flood Insurance Program (NFIP) provide affordable flood insurance to property owners (FEMA, 2018). Work within floodplains on NPS lands must adhere to NPS Floodplain Management D.O. #77-2 (NPS, 2002), as developed by NPS to comply with E.O. 11988 Floodplain Management, unless exempted.

Floodplains are governed by local Flood Insurance Programs and supervised by Federal Emergency Management Agency (FEMA) (FEMA, 2015). MDE houses Maryland's Coordinating Office for the NFIP and is responsible for coordination of all state floodplain programs in Maryland under the Maryland Model Floodplain Management Ordinance (MDE, 2014b). Impacts to 100-year floodplain must be included in the Joint federal/State Permit Application for the Alteration of any Floodplain, Waterway, Tidal or Nontidal Wetland in Maryland and coordinated through MDE's Water Management Administration – Regulatory Services Coordination Office and the USACE. Regulatory authority for floodplain impacts includes Section 404 of the CWA; Environment Article Title 5, Subtitle 5-501 through 5-514; and COMAR 26.17.04 (Waterway and 100-year Flood Plain) (MDOT, 2015). Floodplain approvals will be obtained by the appropriate jurisdiction.

The VDCR floodplain management program and Virginia Department of Transportation (VDOT) construction specifications for roadways also address roadway construction within floodplains. Sections 107 and 303 of VDOT's Road and Bridge Specifications require the use of SWM practices to address issues such as post-development storm flows and downstream channel capacity (VDOT, 2018). These standards require that SWM be designed to reduce stormwater flows to preconstruction conditions for up to a ten-year storm event. As part of these regulations, the capture and treatment of the first half-inch of runoff in a storm event is required, and all SWM facilities must be maintained in perpetuity.

Fairfax County Floodplain Regulations are more stringent than the federal minimum requirements of the NFIP. Activities within their floodplains may require written approval from the Fairfax County Department of Public Works and Environmental Services, or a Special Exception approval issued by the Board of Supervisors (Fairfax County, 2018b).

Floodplains within the Phase 1 South portion of the corridor study boundary were identified using Maryland iMap and the FEMA Effective Floodplain GIS layer. Acreage of the 100-year floodplains within the Preferred Alternative LOD was calculated using GIS. No floodplain fieldwork was conducted.

Section 14 of the Rivers and Harbors Act of 1899, as amended and codified in 33 US Code (USC) 408 (Section 408) regulates alteration of USACE civil work's projects, such as dams, levees, or flood channels. The I-495 & I-270 Managed Lane Study coordinated with USACE to determine applicability of Section 408 to the proposed study. The Section 408 review process typically includes review of engineering, environmental, legal, and safety issues associated with the requested alteration(s). USACE Engineering Circular No. 1165-2-220 issued on September 10, 2018, provides procedural guidance for processing Section 408 requests.

00014986



I-495 & I-270 Managed Lanes Study                Final Natural Resources Technical Report

## 2.6.2    Existing Conditions

The Phase 1 South portion of the corridor study boundary crosses the FEMA 100-year floodplains of several large streams in Montgomery County, Maryland, including: Muddy Branch, Watts Branch, an unnamed tributary to Watts Branch, Cabin John Creek, Booze Creek, an unnamed tributary to Old Farm Creek, Thomas Branch, the Potomac River, Rock Run, Rock Creek, and an unnamed tributary to Muddy Branch. The Phase 1 South portion of the corridor study boundary in Fairfax County crosses the FEMA 100-year floodplains of the Potomac River and Dead Run. The Phase 1 South portion of the corridor study boundary overlaps the FEMA 100-year floodplains of these stream systems to varying degrees. **Table 2-34** lists each stream and the location where its associated floodplain crosses or enters the Phase 1 South portion of the corridor study boundary, and all FEMA 100-year floodplains within the Phase 1 South portion of the corridor study boundary are depicted on the Natural Resources Inventory Maps in **Appendix B**.

USACE identified one Section 408 resource near the Phase 1 South portion of the corridor study boundary, the Washington Aqueduct, located adjacent to Clara Barton Parkway near the Potomac River.

**Table 2-34. Waterways and Associated Floodplains within the Phase 1 South portion of the Corridor Study Boundary**

| Name of Associated Waterway | Location Where Floodplain Crosses Phase 1 South portion of the Corridor Study Boundary |
|---|---|
| Muddy Branch | Crosses I-270, north of I-370 interchange and enters SE of I-270/Muddy Branch Road intersection |
| Watts Branch | Crosses I-270, NW of W Montgomery Ave interchange |
| Unnamed Tributary to Watts Branch | Small area between I-270 and Watts Branch Pkwy near Fallswood Ct |
| Cabin John Creek | Enters NE portion of I-270/Montrose Rd interchange, enters south of the I-495/Cabin John Parkway, crosses the I-495/Cabin John Parkway interchange, enters southwest of I-495/River Road interchange |
| Booze Creek | Southwest of the I-495/Cabin John Parkway |
| Unnamed Tributary to Old Farm Creek | Small area between I-270 and Windermere Court |
| Thomas Branch | Follows Thomas Branch from I-270 Spur S at Democracy Blvd (starting at NE corner of interchange), south along I-495 to the River Road interchange where it meets Cabin John Creek |
| Potomac River | At the Maryland/Virginia border |
| Rock Run | Northwest of I-495/Clara Barton Parkway interchange |
| Rock Creek | Along 495 from I-270 to Jones Mill Road |
| Unnamed tributary to Muddy Branch | Northeast of I-270/I-370 interchange |
| Dead Run | George Washington Memorial Parkway, east of I-495 |

00014987

### 2.6.3    Environmental Effects

Development and fill in the floodplain alter flooding dynamics by reducing flood storage capacity and/or increasing the velocity of flood flows.

The 100-year floodplain impacts presented in **Table 2-35**[5] represent the estimated total footprint of construction activities in floodplains of the Preferred Alternative LOD. Actual analysis of potential project related changes to hydraulic function and elevation of floodplains would be determined using hydraulic and hydrologic floodplain modeling as part of the engineering process for each structure and fill in final phases of design. Construction of roadway improvements across drainageways and in floodplains may lead to increases in floodplain elevation and size, which must be addressed. Detailed analysis and design solutions will be required to accommodate increased flood volumes to eliminate impacts to insurable properties. MDOT SHA conducted an assessment to determine where culvert augmentations could affect floodplain elevation either from culvert extensions or increased capacity. The estimated area of potential effect was included in the Preferred Alternative LOD.  Additional culvert pipes running alongside the existing culverts are proposed in those areas where flood risk potential was identified. Roadway expansion and augmented culverts associated with the Preferred Alternative may increase the size of existing floodplain encroachments but would not result in new significant encroachments into the floodplain as defined in CFR §650.105(q). The proposed expansion of the roadway would increase the size of existing encroachments but would not result in new significant encroachments.

Table 2-35. Impacts to FEMA 100-Year Floodplain in Acres

|  | Permanent | Temporary | Total |
|---|---|---|---|
| FEMA 100-Year Floodplain | 24.16 | 7.42 | 31.58 |

Impacts to floodplains within NPS park land are detailed in **Appendix I** and the Final SOF. One Section 408 resource was identified by USACE near the Preferred Alternative LOD, the Washington Aqueduct, adjacent to the Clara Barton Parkway near the Potomac River. The USACE determined that the Preferred Alternative would not result in an adverse effect to this resource and further coordination is not needed.

### 2.6.4    Avoidance, Minimization, and Mitigation

FEMA 100-year floodplain impacts were avoided and minimized to the greatest extent practicable while also minimizing increases to flooding levels. Impacts to large, vegetated floodplains such as Rock Creek were avoided and minimized to maintain hydrologic function as well as wildlife habitat. A detailed hydrologic and hydraulic (H&H) study will be prepared during final design to identify the existing storm discharge and floodplain extent. All construction occurring within the FEMA designated floodplains must comply with FEMA-approved local floodplain construction requirements. These requirements consider structural evaluations, fill levels, and grading elevations. SWM will be provided, and all hydraulic structures will be designed to accommodate flood volumes without causing substantial impact. MDOT SHA will employ BMPs within the 100-year floodplain as required by MDE permits, including but not limited to, restricting the stockpiling or storage of construction debris within the floodplain and placing equipment on mats to prevent damage within the floodplain.

---

[5] For reference, impact tables presented in the report are also included in Appendix A.

00014988



Culverts and bridges will be designed to limit the increase of the regulatory flood elevation to protect structures from flooding risks, and the use of standard hydraulic design techniques for all waterway openings will be used where feasible to maintain current flow regimes, limit upstream flooding, and preserve existing downstream flow rates (COMAR 26.17.04). The use of state-of-the-art erosion and sediment control techniques and SWM controls will also minimize the risks or impacts to beneficial floodplain values due to encroachments.

If H&H studies find that the flood elevation would change, floodplain storage mitigation or other actions will be required in accordance with floodplain regulations. MDOT SHA will submit project plans to MDE for approval of structural evaluations, fill volumes, proposed grading evaluations, structural flood-proofing, and flood protection measures in compliance with FEMA requirements, USDOT Order 5650.2, "Floodplain Management and Protection," and Executive Order 11988. Improvements at existing culverts are required to maintain existing 100-year flood high water elevations. At new culverts, 100-year high water elevation is required to be contained within either right-of-way or permanent easement. Culvert improvements and new culvert design will ensure that flood risk to adjacent properties is not increased, a requirement of COMAR 26.17.04.11.

23 CFR § 650.115(a) will be consulted when determining design standards for flood control measures. The requirement set forth in 23 CFR § 650.111 will be complied with at later stages of design to complete location hydraulic studies for floodplain encroachment areas.

Floodplain mitigation will not be required for the unavoidable impacts to floodplains on NPS land resulting from the Preferred Alternative. The I-495 & I-270 Managed Lanes Study will comply with the NIFP and will not increase flooding on NPS land.

## 2.7    Vegetation and Terrestrial Habitat

### 2.7.1    Regulatory Context and Methods

Terrestrial habitats identified within the Phase 1 South portion of the corridor study boundary include: forests, urban and maintained areas, open fields, and barren lands. While some wetlands have adjacent terrestrial zones, they are considered a separate and distinct habitat type for the purposes of this document and are discussed in **Section 2.3**.

Forest is the most common terrestrial habitat within the Phase 1 South portion of the corridor study boundary. COMAR (2016) defines a forest as, "a biological community dominated by trees and other woody plants covering a land area of 10,000 SF or larger. It includes areas that have at least 100 trees per acre with at least 50 percent of those having a two-inch or greater diameter at breast height (DBH), and forest areas that have been cut but not cleared (08.19.03.01, Article 2.17)." State funded highway construction projects that involve cutting and clearing of forests are regulated under Maryland Reforestation Law, a regulation created to protect Maryland forests and mitigate for the loss of forest cover. Forest impacts must be replaced on an acre-for-acre or one-to-one basis on public lands, within two years or three growing seasons of project completion (MDNR, 2013a).

Virginia Department of Forestry (VDOF) regulates the use of state forests. No state forests exist within the Virginia portion of the Phase 1 South portion of the corridor study boundary. The only forest resources

00014989



within the Phase 1 South portion of the corridor study boundary in Virginia are on NPS property. Any impact to forests on NPS lands must be coordinated directly with the NPS.

Forest conservation easements are often required as a condition of development to preserve forested land in perpetuity and to mitigate impacts to forests at the state and county level. Montgomery County Category I easements protect existing and future forested areas from being cleared for construction, paving, or grading. Montgomery County Category II easements prohibit construction activities but are also designed to protect large specimen trees in non-forested areas (M-NCPPC, 2016). Deeds of Conservation Easements are also administered at the state level through the MDNR MET (MET, 2016). Existing county and state forest conservation easement locations within the Phase 1 South portion of the corridor study boundary were determined using data provided by Montgomery County. No Virginia Outdoors Foundation (VOF) open space easements or Agricultural/Forestal Districts are located within the study area.

Individual forest stand characterization data was not able to be collected in the field for the Study due to the extent of the study area. However, GIS forest cover data from the Chesapeake Conservancy Conservation Innovation Center's High Resolution Land Cover Data for tree canopy cover and the VDOF 2005 Virginia Forest Cover dataset (VDOF, 2014) were used to identify forest coverage within the Phase 1 South portion of the corridor study boundary. Data from the 2006 MDOT SHA Draft Capital Beltway Study Natural Environmental Technical Report (NETR) and the 2017 MDOT SHA I-270 ICM Project provide vegetation cover type information that remains applicable within the Maryland portions of the Phase 1 South portion of the corridor study boundary. Land cover types were identified according to the Anderson Land Use Classification System (Anderson et al., 1976). Forests were classified by cover types in the 2006 and 2017 studies in accordance with "Forest Cover Types of the United States and Canada" (Eyre, 1980) and associations in accordance with the "Vegetation Map of Maryland" (Brush et al., 1976). The aerial extent of vegetation cover within the Phase 1 South portion of the corridor study boundary was identified using GIS data obtained from the Chesapeake Conservancy Conservation Innovation Center's High Resolution Land Cover Data for tree canopy cover and the VDOF 2005 Virginia Forest Cover dataset (VDOF, 2014).

Since the DEIS was published, a tree inventory and four-season RTE plant survey were conducted on NPS property. The RTE surveys are discussed in **Section 2.10**. The tree survey was conducted on NPS property within the extent of the DEIS Alternative 9 LOD plus 50-feet, to ensure that all critical root zones within the LOD would be included. Following the guidance in the *Forest Inventory and Analysis National Core Field Guide. Volume I: Field Data Collection Procedures for Phase 2 Plots. Version 9.0, October 2019*, an inventory of all trees and standing dead trees ≥ 5 inches diameter at breast height (4.5 feet, DBH) was completed, including the identification of all significant trees (trees ≥ 24 inches DBH < 30 inches) and specimen trees ($\geq$ 30 inches DBH or 75% of the size of the state champion).

Since the DEIS was published, M-NCPPC requested a tree inventory on their property within the Preferred Alternative LOD plus a 50-foot buffer. An inventory of all trees and standing dead trees > 6 inches DBH (4.5 feet, DBH) was completed within the survey limits, including the identification of all significant trees (trees ≥ 24 inches DBH < 30 inches) and specimen trees ($\geq$ 30 inches DBH or 75% of the size of the state champion).

00014990

 I-495 & I-270 Managed Lanes Study — Final Natural Resources Technical Report

## 2.7.2   Existing Conditions

The following land cover types were identified within the Phase 1 South portion of the corridor study boundary: residential; commercial and services; industrial; transportation, communication, and utilities; industrial and commercial complexes; mixed urban or built-up land; cropland and pasture; orchards, groves, vineyards, nurseries, and ornamental horticultural areas; strip mines, quarries, and gravel pits; open fields/meadows/grasslands, scrub/shrub lands, and deciduous, evergreen, and mixed forests. Wetlands and streams, while classified under the Anderson hierarchy, are discussed in **Section 2.3**. Descriptions of land cover included below were adapted from the Draft Capital Beltway Study NETR (MDOT SHA, 2006) and the I-270 ICM Program field investigation. Although the Draft Capital Beltway Study NETR information was collected in 2006, the land cover is still generally the same based on windshield survey and aerial review; therefore, the data collected for this purpose remains valid.

### A.   Urban/Built-up and Maintained Areas

Urban and built-up land covers most of the Phase 1 South portion of the corridor study boundary, including dense clusters of old and new residential, commercial, and industrial land cover types on formerly forested areas. Vegetation in these areas is dominated by tulip poplar (*Liriodendron tulipifera)* forest, landscaped areas and lawns, and ornamental and non-native shrubs and trees. Consequently, most wildlife within the Phase 1 South portion of the corridor study boundary is adapted to human-modified environments, especially where development occurred near existing forest or where wildlife has been displaced. Many wildlife species can be found in older residential developments with mature landscape plantings, a variety of fruit or seed producing vegetation, established forest corridors, or food in feeders. See **Section 2.8 Terrestrial Wildlife** for more detail.

### B.   Agricultural Land, Open Fields, Meadow, and Grassland

Anderson et al. (1976) defines agricultural land as areas that are tilled for crops or mowed or grazed so few woody species can establish. No agricultural land was identified within the Phase 1 South portion of the corridor study boundary in Montgomery County or Fairfax County.

The Phase 1 South portion of the corridor study boundary also includes meadow habitats and open fields. Anderson et al. (1976) defines the old field/meadow cover type as abandoned land that has a large portion of shrubs, a few trees, and an extensive herbaceous layer containing a mix of grasses and other plants. The majority of meadow habitat within the Phase 1 South portion of the corridor study boundary consists of meadow "edge" habitats, which occur in strips along roadways, trails, and fields and were historically mowed (MDNR, 2017). MDOT SHA commonly uses seed mixes that promote pollinator species on roadsides and edges and will continue this practice within the Phase 1 South portion of the corridor study boundary.

### C.   Barren Land

Barren land within the Phase 1 South portion of the corridor study boundary is composed entirely of quarries and gravel pits. Active and recently abandoned sand and gravel mines occur in Montgomery County at the I-495/MD 190 interchange. Soil in these areas has been excavated to varying depths, and vegetation typically consists of pioneer herbaceous species and early successional forest dominated by Virginia pine (*Pinus virginiana*).

00014991

 I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

## D.    Forested Areas

Forested land within the Phase 1 South portion of the corridor study boundary occurs predominantly as small strips along roadsides and interchanges, stream valleys, and steep slopes, with larger tracts occurring on undeveloped park lands. Individual forest stands in Montgomery County are typically smaller and fragmented, most likely due to a high level of development adjacent to I-495 and I-270 in Montgomery County (MDOT SHA, 2006). The only forest resources within the Phase 1 South portion of the corridor study boundary in Virginia are on NPS property.

Large tracts of contiguous forest are necessary to support Forest Interior Dwelling Species (FIDS) and Green Infrastructure (GI) habitats. FIDS habitats are specifically discussed in **Section 2.8** and GI habitats are discussed in **Section 2.11.**

NPS Tree Survey limits include NPS properties located in Chesapeake and Ohio Canal National Historical Park, Clara Barton Parkway, George Washington Memorial Parkway, Baltimore Washington Parkway/Greenbelt Park and Suitland Parkway. Species, DBH, and condition was recorded for each of the inventoried trees. A total of 22,598 trees were inventoried across the entire study area (the DEIS Alternative 9 LOD plus 50 feet). The Preferred Alternative LOD includes Chesapeake and Ohio Canal National Historical Park, Clara Barton Parkway, and George Washington Memorial Parkway NPS properties. Living and standing dead inventoried trees and the total DBH recorded are included in **Table 2-36**. See the NPS Tree Inventory Report (**Appendix I**) for more information.

### Table 2-36. NPS Property Tree Survey Results

| NPS Property | Number of Live Individual Trees | Number of Standing Dead Trees | Total inches of DBH |
|---|---|---|---|
| Chesapeake and Ohio Canal | 1,544 | 244 | 19,345 |
| Clara Barton Parkway | 756 | 114 | 10,098 |
| George Washington Memorial Parkway | 2,175 | 154 | 31,900 |
| **Total** | **4,475** | **512** | **61,343** |

The M-NCPPC tree inventory included Cabin John Regional Park, Cabin John SVP Unit 6, Cabin John SVP Unit 2, Old Farm NCA, and Tilden Woods SVP properties within the Preferred Alternative LOD plus 50 feet. Species DBH and condition were recorded for each of the inventoried trees. Living and standing dead inventoried trees and the total DBH recorded are included in **Table 2-37**. The M-NCPPC tree inventory is included in **Appendix S**.

### Table 2-37. M-NCPPC Property Tree Survey Results

| M-NCPPC Property | Number of Live Individual Trees | Number of Standing Dead Trees | Total inches of DBH |
|---|---|---|---|
| Cabin John Regional Park | 1,727 | 100 | 23,918 |
| Cabin John SVP, Unit 6 | 364 | 28 | 5,041 |
| Cabin John SVP, Unit 2 | 681 | 83 | 9,473 |
| Old Farm NCA | 30 | 3 | 725 |
| Tilden Woods SVP | 116 | 4 | 2,060 |
| **Total** | **2,918** | **218** | **41,217** |

00014992

 I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

Forest associations commonly found in central Maryland and northern Virginia and their general descriptions are provided below.

### a.    Red Maple Association

The Red Maple Association grows in a wide variety of locations over an extensive range in the Eastern US and is comprised mostly of red maple (*Acer rubrum*). There has been an increased presence of red maple in forest stands in the Mid-Atlantic, most likely due to changes in forest composition resulting from clearcutting, removal of other more desirable trees for lumber, and the decline of American elm (*Ulmus americana*) due to Dutch elm disease. Due to the adaptable nature of red maple, this association can be found on sites ranging from extremely wet to dry. The Red Maple Association is generally considered an early to mid-successional forest type.

The Red Maple Association occurs throughout the Phase 1 South portion of the corridor study boundary (MDOT SHA, 2006). The Montgomery County-Prince George's County line roughly matches the Atlantic Seaboard Fall Line, which separates the Piedmont and Atlantic Coastal Plain Physiographic Provinces. Associated species include sycamore (*Platanus occidentalis*), tulip poplar, silver maple (*Acer saccharinum*), box elder (*Acer negundo*), black cherry (*Prunus serotina*), ash (*Fraxinus sp.*), slippery elm (*Ulmus rubra*), sweetgum (*Liquidambar styraciflua*), black gum (*Nyssa sylvatica*), black locust (*Robinia pseudoacacia*), spicebush (*Lindera benzoin*), flowering dogwood (*Cornus florida*), southern arrowwood (*Viburnum dentatum*), and poison ivy (*Toxicodendron radicans*).

### b.    Tulip Poplar Association

The Tulip Poplar Association is typically found in the Eastern US at lower elevations and can occur in large, uninterrupted stands. Soils in this association tend to be moderately deep to deep, moist, well-drained, and medium to fine in texture, and are derived primarily from sandstones or shales.

The Tulip Poplar Association comprises the majority of the mid to late-successional forest stands within the I-495 portion of the Phase 1 South portion of the corridor study boundary. This association is common in Montgomery County most likely due to the County's location within the drier moisture regime of the Piedmont Physiographic province (MDOT SHA, 2006). Associated species commonly include: red maple, sycamore,  American beech (*Fagus grandifolia*), oaks (*Quercus sp.*), hickory (Carya sp.), black locust, sassafras (*Sassafras albidum*), spicebush, flowering dogwood, southern arrowwood, American hornbeam (*Carpinus caroliniana*), viburnum (*Viburnum sp.*), American holly (*Ilex opaca*), greenbrier (*Smilax rotundifolia*), blackberry (*Rubus sp.*), poison ivy, Virginia creeper (*Parthenocissus quinquefolia*), wintercreeper (*Euonymus fortunei*), Christmas fern (*Polystichum acrostichoides*), and scattered false solomon's seal (*Maianthemum racemosum*).

### c.    Black Locust Association

The Black Locust Association is a pioneer forest type that is found extensively throughout the Eastern US, most often in highly-disturbed areas such as mines and recently cleared areas. Common associate species are extremely variable due to the early successional nature of this forest type, and could include: red maple, box elder, silver maple, black cherry, ash, American elm, staghorn sumac (*Rhus typhina*), winged sumac (*Rhus copallinum*), Eastern red-cedar (*Juniperus virginiana*), black walnut (*Juglans nigra*), sassafras, blackberry, Virginia creeper, and grapevine (*Vitis sp.*).

00014993

 I-495 & I-270 Managed Lanes Study                    Final Natural Resources Technical Report

### d.    White Oak-Black Oak-Northern Red Oak Association

The White Oak-Black Oak-Northern Red Oak Association occurs over a wide range of areas within the I-495 portion of the Phase 1 South portion of the corridor study boundary, with dominant canopy species including white oak (*Quercus alba*), black oak (*Quercus velutina*), and red oak (*Quercus rubra*) (MDOT SHA, 2006). This forest association occurs on glaciated and non-glaciated soils, and most of the stands are mid-successional. White oak is present over the greatest range of sites from moist to dry, northern red oak is more common on moist lower and middle slopes, and black oak is more common on drier, upper slopes. Northern red oak is the most common species in the association, followed by white oak, and then black oak. Other common associate species include: hickory, tulip poplar, American beech, black gum, American hornbeam, and Christmas fern.

### e.    Northern Red Oak Association

The Northern Red Oak Association occurs infrequently in the northeastern US and is most common on sites with intermediate moisture regimes. Several Northern Red Oak Associations occur along I-495 within the Montgomery County portion of the Phase 1 South portion of the corridor study boundary (MDOT SHA, 2006). Common associate species include: tulip poplar, red maple, American beech, white oak, green ash (*Fraxinus pennsylvanica*), white ash (*Fraxinus americana*), southern red oak (*Quercus falcata*), and flowering dogwood.

### f.    Sycamore-Green Ash-Box Elder-Silver Maple Association

The Sycamore-Green Ash-Box Elder-Silver Maple Association is typically found in wetter areas and common associate species include sassafras, elm (*Ulmus sp.*), ash, white oak, box elder, black cherry, American hornbeam, spicebush, Virginia creeper, poison ivy, and grapevine. Ash trees are one of the most common landscaping and native forest trees in Maryland, however the emerald ash borer (EAB) (*Agrilus planipennis*), an invasive beetle species native to Asia, has killed millions of ash trees in the central and northeastern US resulting in millions of dollars of losses to municipalities, property owners, nurseries, and other forest-related industries. EAB larvae tunnel into and feed on ash trees, stopping nutrient and water movement, which kills large trees within three years after infestation (University of Maryland, 2018). The species composition of the Sycamore-Green Ash-Box Elder-Silver Maple Association forests within Maryland will continue to evolve as the EAB infestation results in mortality of ash trees statewide.

### g.    River Birch-Sycamore Association

The River Birch-Sycamore Association is typically found along rivers and streams in eastern North America and includes dominant species of river birch (*Betula nigra*) and sycamore. The association typically appears in the earlier stages of floodplain establishment and is most well-suited to generally moist, periodically drained alluvial areas. Common associate species include box elder, red maple, tulip poplar, black walnut, elm, sweet gum, cottonwood (*Populus deltoides*), black cherry, white oak, overcup oak (*Quercus lyrata*), spicebush, American hornbeam, American holly, sassafras, southern arrowwood, and poison ivy.

### h.    White Oak Association

The White Oak Association is found on dry to moderately wet sites, occasionally occurring on poorly-drained bottomland soils with high clay content. White oak is a common species within several parts of the Phase 1 South portion of the corridor study boundary, but the White Oak Association is not very

00014994



common. Commonly associated species include: northern red oak, tulip poplar, hickory, and flowering dogwood.

### i.    Cottonwood Association

The Cottonwood Association is commonly found along rivers and streams and quickly establishes in areas with bare, moist soils. This forest type is typically classified as early successional, as it establishes very quickly within the floodplain following disturbance. Associate species include sycamore, box elder, and black locust.

### j.    Pioneer/Invasive Areas

Forested areas dominated by the non-native species tree of heaven (*Ailanthus altissima*) and occurring in highly-disturbed areas were grouped as Pioneer/Invasive. Associate species include black walnut, Eastern red-cedar, staghorn sumac, multiflora rose, Japanese knotweed (*Polygonum cuspidatum*), porcelain berry, oriental bittersweet, Japanese honeysuckle, poison ivy, and Callery (Bradford) pear.

### k.    Chestnut Oak Association

Chestnut Oak Association forests are typically found on dry, upland sites with steep, rocky slopes and outcrops with thin soils. Common associate species include hickory, white ash, and flowering dogwood

### l.    Tulip Poplar-White Oak-Northern Red Oak Association

The Tulip Poplar-White Oak-Northern Red Oak Association is commonly observed at higher elevations in the eastern US and can be found on drier sites in the Piedmont Plateau. Common associate species include hickory and Christmas fern.

### m.    Virginia Pine Association

The Virginia Pine Association is most often identified as early-successional, as it tends to be relatively short-lived. Virginia pine is tolerant of poor site conditions and typically invades old fields or disturbed areas. Common associate species include various oak species, Eastern red-cedar, sassafras, greenbrier, blackberry, and poison ivy.

## E.    Invasive and Exotic Species

Invasive and exotic plants thrive in vegetative edge and fragmented forest environments, competing with and often displacing native plant species. This results in a reduction in diversity of native plant and animal species and overall health of the ecological community (Swearingen et al., 2002). The Phase 1 South portion of the corridor study boundary contains miles of linear vegetative edges along the roadway, as well as extensive forest fragments within highway interchanges. **Table 2-38** lists the most common invasive species identified within these areas during the IRVM program.

MDOT SHA began management of invasive species within the I-495 ROW in May 2016 as part of the IRVM program. This vegetation management included cutting, removal, and chemical control of invasive tree, shrub, and herbaceous species along I-495 in Montgomery County, from south of the Chesapeake and Ohio Canal to the Prince George's County line.

00014995

OP·LANES
MARYLAND    I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

Table 2-38. Common Invasive Species within the Phase 1 South Portion of the Corridor Study Boundary

| Common Name | Scientific Name | Stratum | Ecological Threat |
|---|---|---|---|
| Norway maple | *Acer platanoides* | Tree | Norway maple spreads rapidly by seed, and shades out native trees and shrubs. |
| Tree-of-Heaven | *Ailanthus altissima* | Tree | Tree of heaven invades urban areas, where it can cause damage to man-made structures, and natural habitats, where it displaces native plants and produces toxins, which prevent nearby plants from establishing and/or surviving. |
| Silktree | *Albizia julibrissin* | Tree | Tolerant of a wide variety of conditions, silktree is prolific and displaces native trees and shrubs. |
| Princesstree | *Paulownia tomentosa* | Tree | Princesstree is highly adaptable and can be found in a wide variety of habitats, where it displaces native vegetation. |
| Callery (Bradford) Pear | *Pyrus calleryana* Dcne. | Tree | Callery pear forms dense thickets that push out other plants including native species that can't tolerate the deep shade or compete with pear for water, soil, and space. It produces copious amounts of seeds that are readily dispersed by animals, grows rapidly in disturbed areas, and lacks natural controls like insects and disease. |
| Privet | *Ligustrum sp.* | Shrub | Privets form dense thickets, thereby outcompeting and eventually excluding native vegetation. |
| Morrow's honeysuckle; Twinsisters; other bush honeysuckles | *Lonicera morrowi and Lonicera tatarica; other Lonicera species* | Shrub | Bush honeysuckles compete with and eventually displace native shrubs, thereby altering the natural habitat. These shrubs also outcompete native shrubs for pollinators and seed-dispersing animals, such as birds. |
| Multiflora rose | *Rosa multiflora* | Shrub | Multiflora rose can invade a wide range of habitats, and displaces native shrubs and herbs, possibly decreasing nesting areas for native birds. |
| Amur peppervine | *Ampelopsis brevipedunculata* | Vine | Spreading vine, which invades disturbed and open areas, threatens native vegetation by shading out herbs, trees, and shrubs. |
| Asian bittersweet | *Celastrus orbiculatus* | Vine | Spreading vine, which is tolerant of a wide range of conditions and threatens native vegetation by shading out herbs, trees, and shrubs, or girdling native trees and shrubs or uprooting them due to added weight. |
| Winter creeper | *Euonymus fortunei* | Vine | Spreading evergreen vine, which is tolerant of a wide range of conditions and threatens native vegetation by shading out herbs, trees, and shrubs; especially common in forest openings. |

00014996

 I-495 & I-270 Managed Lanes Study        Final Natural Resources Technical Report

| Common Name | Scientific Name | Stratum | Ecological Threat |
|---|---|---|---|
| English ivy | *Hedera helix* | Vine | Evergreen spreading vine, which threatens native vegetation by shading out herbs, trees, and shrubs, or girdling native trees and shrubs or uprooting them due to added weight. |
| Japanese honeysuckle | *Lonicera japonica* | Vine | Evergreen spreading vine, which threatens native vegetation by shading out herbs, trees, and shrubs, or girdling young trees and shrubs. |
| Asiatic tearthumb | *Persicaria perfoliata* | Vine | Spreading vine, which invades disturbed and open areas threatens native vegetation by shading out herbs, trees, and shrubs. |
| Kudzu | *Pueraria montana var. lobata* | Vine | Spreading vine, which threatens native vegetation by shading out herbs, trees, and shrubs, and possibly girdling native trees and shrubs or uprooting them due to added weight. Kudzu can grow up to one foot per day. |
| Garlic-mustard | *Alliaria petiolata* | Herb | Extremely shade tolerant, garlic mustard invades forested areas and shades out native wildflowers, eventually displacing them. |
| Bamboo | *Bambusa, Phyllostachys, and Pseudosasa species* | Herb | Bamboo is widely planted by humans as a landscape plant, but if not controlled, forms dense, spreading thickets, which will displace native vegetation. |
| Japanese stilt grass | *Microstegium vimineum* | Herb | Japanese stiltgrass is tolerant of a wide range of conditions, and invades both full sun and shaded areas, eventually shading out native vegetation. |
| Common reed | *Phragmites australis* | Herb | Grass species, which invades wet areas, such as marshes, drainage areas, and riverbanks. Forms expansive monocultures, which threaten biodiversity in these areas. |
| Japanese knotweed | *Polygonum cuspidatum* | Herb | Knotweed is tolerant of a wide range of conditions, but is most commonly found on stream and riverbanks, where it spreads quickly, outcompeting native vegetation. |

## F.    Reforestation Areas

MDOT SHA planted trees within the Phase 1 South portion of the corridor study boundary under the Chesapeake Bay TMDL Tree Program and the Intercounty Connector (ICC) Project Mitigation Program, with the goal of establishing new forested areas to mitigate for stormwater runoff and project construction impacts. The EPA developed the Chesapeake Bay TMDL to establish the maximum amount of nitrogen, phosphorus, and sediment that the Chesapeake Bay can receive and still meet water quality standards as required by the Federal CWA. MDOT SHA is required to meet the reductions in the Bay TMDL as a condition of its NPDES Municipal Separate Storm Sewer System (MS4) Permit 11-DP-3313 issued on October 9, 2015. The MS4 permit requires MDOT SHA to treat or offset pollutants from stormwater runoff from 20 percent of MDOT SHA's untreated impervious surfaces using BMPs approved by the MDE by October 8, 2020.

00014997

 I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

Tree planting in state road rights-of-way or state-owned properties is one of the most cost-effective and widely implemented MDOT SHA strategies for meeting the MS4 permit requirements, and TMDL tree planting sites are located in interchanges throughout the Phase 1 South portion of the corridor study boundary.

The ICC is an 18.8-mile-long six-lane toll highway that connects Gaithersburg in Montgomery County to Laurel in Prince George's County. In accordance with Maryland Reforestation Law, reforestation areas were established within the MDOT rights-of-way along I-495 and I-270 to mitigate for forest impacts associated with ICC construction. One reforestation site (REF-6D1) is located in Montgomery County in the eastern clover leaf of the I-270/Shady Grove Road interchange.

No reforestation areas were identified by VDOT within the Virginia portion of the Phase 1 South portion of the corridor study boundary.

## G.    Forest Conservation Easements

A total of 61 local forest conservation easements fall within the Phase 1 South portion of the corridor study boundary, according to MD iMap data. These protected forest areas are described in **Table 2-39** below with location and category information. There are no state held forest conservation easements within the Phase 1 South portion of the corridor study boundary according to available GIS data from MD DNR. No Virginia Department of Forestry open space easements or Agricultural/Forestal Districts are located within the Phase 1 South portion of the corridor study boundary.

**Table 2-39. Forest Conservation Easements Within the Phase 1 South Portion of the Corridor Study Boundary**

| Property | Category[1] | Location |
|---|---|---|
| M-NCPPC | I | West of I-495, east of Tammy Court |
| M-NCPPC | I | Southeast of the I-270/Old Georgetown Road interchange (1) |
| M-NCPPC | I | Southwest of the I-270/Old Georgetown Road interchange (2) |
| M-NCPPC | I | South of I-270, north of Aubinoe Farm Drive |
| M-NCPPC | I | West of I-270, east of Snow Point Drive |
| M-NCPPC | I | East of I-270, west f Grosvenor Place |
| M-NCPPC | I | North of I-495, east of Greentree Road |
| M-NCPPC | I | South of I-495, west of Fernwood Road |
| M-NCPPC | I | South of I-495, north of Maplewood Park Drive |
| M-NCPPC | I | East of I-495, north of Bradley Boulevard |
| M-NCPPC | I | East of I-495, west of Armat Drive |
| M-NCPPC | I | East of I-495, south of Bradley Boulevard |
| M-NCPPC | I | West of I-495, north of MacArthur Boulevard |
| M-NCPPC | I | West of I-495, north of Cindy Lane |
| M-NCPPC | I | West of I-495, northeast of Lonesome Pine Road (1) |
| M-NCPPC | I | West of I-495, northeast of Lonesome Pine Road (2) |
| M-NCPPC | I | West of I-495, northeast of Old Seven Locks Road |
| M-NCPPC | I | Northwest of the I-495/River Road interchange (1) |
| M-NCPPC | I | Northwest of the I-495/River Road interchange (2) |

00014998

 I-495 & I-270 Managed Lanes Study    Final Natural Resources Technical Report

| Property | Category[1] | Location |
|---|---|---|
| M-NCPPC | I | Northeast of the I-495/River Road interchange (1) |
| M-NCPPC | I | Northeast of the I-495/River Road interchange (2) |
| M-NCPPC | I | South of I-495, north of Endicott Court |
| M-NCPPC | I | North of I-495, west of Persimmon Tree Road |
| M-NCPPC | I | East of I-270, west of Earlsgate Lane |
| M-NCPPC | I | East of I-270, south of Tuckerman Lane |
| M-NCPPC | I | East of I-270, north of Tuckerman Lane (1) |
| M-NCPPC | I | East of I-270, north of Tuckerman Lane (2) |
| M-NCPPC | I | East of I-270, north of Tuckerman Lane (3) |
| M-NCPPC | I | West of I-270, south of Montrose Road |
| Rockville | | East of I-270, north of Montrose Road |
| Wheel of Fortune II | Individual Tree | East of I-270, south of Tower Oaks Boulevard |
| M-NCPPC | I | East of I-270, south of Preserve Parkway |
| M-NCPPC | I | West of I-270, south of Fortune Terrace |
| Rockville | - | West of I-270, south of Wooton Parkway (1) |
| Rockville | - | West of I-270, south of Wooton Parkway (2) |
| Rockville | - | West of I-270, south of Wooton Parkway (3) |
| Rockville | - | East of I-270, south of Wooton Parkway (1) |
| Rockville | - | East of I-270, south of Wooton Parkway (2) |
| Rockville | - | East of I-270, north of Wooton Parkway (1) |
| Rockville | - | East of I-270, north of Wooton Parkway (2) |
| Rockville | - | East of I-270, north of Wooton Parkway (3) |
| Rockville | - | West of I-270, south of Falls Road |
| Rockville | - | East of I-270, west of Tower Oaks Boulevard |
| Rockville | - | East of I-270, northwest of Great Falls Road |
| Rockville | - | East of I-270, west of Blaze Cumber Way |
| Bou Property | Individual Tree | East of I-270, west of Blue Hosta Way |
| Rockville | Individual Tree | West of I-270, east of W Montgomery Avenue (1) |
| Research Row | Individual Tree | West of I-270, east of W Montgomery Avenue (2) |
| National Capital Research Park | Individual Tree | West of I-270, east of Research Boulevard |
| Rockville | - | West of I-270, east of Research Boulevard |
| Rockville | | East of I-270, west of Carnation Drive |
| 1330 Piccard Drive | Individual Tree | East of I-270, west of Piccard Drive |
| 4 Research Place | Individual Tree | West of I-270, north of Research Place |
| 1 Research Court | Individual Tree | West of I-270, east of Research Court (1) |
| Crown Plaza Hotel | Individual Tree | West of I-270; east of Research Court (2) |
| Rockville | - | East of I-270, west of Redland Boulevard |
| Rockville | - | West of I-270, east of Shady Grove Road |
| Upper Rock Blocks A, B, C, G, H | Individual Tree | East of I-270, east of Shady Grove Road |
| M-NCPPC | II | South of Y-split of I-270, northwest of Rockledge Drive |

00014999

OP·LANES
M A R Y L A N D   I-495 & I-270 Managed Lanes Study          Final Natural Resources Technical Report

| Property | Category[1] | Location |
|----------|----------|----------|
| Gaithersburg | I | Northwest of the I-270/I-370 interchange |
| Gaithersburg | I | Northeast of the I-270/I-370 interchange |

[1] Montgomery County Category I easements protect existing and future forested areas from being cleared for construction, paving, or grading. Montgomery County Category II easements protect large specimen trees in non-forested areas.

Other forest conservation easements exist within close proximity to the Phase 1 South portion of the corridor study boundary, and any changes to the Preferred Alternative Phase 1 South limits could impact forest conservation easements not listed here.

In Virginia, the resource protection areas (RPAs) within the corridor study boundary include the land within 100 feet of the Potomac River and Dead Run, some of which will be affected by the project. Vegetation within RPAs is subject to regulation under the Chesapeake Bay Protection Act.

### 2.7.3   Environmental Effects

Forested areas naturally filter ground water, reduce runoff from impervious surfaces, contribute to lower stream temperatures, supply necessary habitat for wildlife, sequester carbon, and contribute to air filtration and cooling (M-NCPPC, 1992). Construction of the Preferred Alternative LOD for the I-495 & I-270 Managed Lanes Study will involve the removal and disturbance of vegetated areas, including forests, within the LOD due to clearing and grading of land needed for construction of highway travel lanes; highway interchanges, ramps, and service roads; construction of noise barriers; and construction of required SWM BMPs. Fewer impacts will occur to non-forested areas, such as managed lawns, landscaped areas, and cropland or pastures within interchanges, along the roadside, and within adjacent parcels to the existing roadway rights-of-way.

Larger forested areas within the Preferred Alternative LOD are found on parkland and within stream valleys, with smaller areas of mostly disturbed vegetation occurring in residential and commercial areas. Total forest canopy and conservation easement impacts from the Preferred Alternative LOD are shown in **Table 2-40**[5] below. Temporary forest canopy impacts are areas in which forest will be cleared that will not be permanently acquired or altered by roadway construction and will be replanted.

#### Table 2-40. Impacts to Forests in Acres

|  | Perm | Temp | Total |
|--|------|------|-------|
| Forest Canopy[1] | 438.47 | 16.49 | 454.96 |
| Forest Conservation Act Easements | 10.43 | 0.67 | 11.10 |
| NPS Forest Canopy | 1.96 | 7.82 | 9.78 |

[1]Tree cover removed where wetlands overlapped.

Impacts to trees surveyed on NPS properties within the DEIS Alternative 9 LOD plus 50 feet are included in **Table 2-41**. The NPS Tree Survey Report is included in **Appendix I**.

---

[5] For reference, impact tables presented in the report are also included in Appendix A.

00015000