## T.1.B Supplemental Draft Environmental Impact Statement (SDEIS) Comments

## T.1.B.1 Cooperating Agencies

**Department of the Interior - SDEIS Comments**

| No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|
| 1 | | General, LOD | Most construction activities at both the American Legion Bridge (ALB) and the Clara Barton Parkway interchange are anticipated to be completed from below the existing ALB, due to the need to access the existing and proposed piers, including but not limited to abutments and girder lines for proposed construction and demolition activities. MDOT SHA is proposing a two (2) lane, 40-foot-wide construction road within the C&O Canal NHP to accommodate two-way construction traffic and queuing. Minimum lane widths are 11-feet with an additional 5-foot shoulder on each side of the roadway. We understand from a June 9, 2021, ALB Proposed Construction Access white paper from MDOT SHA, that the lane and shoulder widths are needed to allow for queued vehicles to be passed by other vehicles. An additional 4-feet of Limit of Disturbance (LOD) is anticipated that are the required grading for the temporary construction access road and for necessary erosion and sediment control devices. This level of detail is absent from the SDEIS. | Additional details for the construction access road that is needed for the ALB, which crosses the Chesapeake and Ohio Towpath and temporary impacts NPS property were added to FEIS Chapter 3, Section 3.1.8. |
| 2 | | RTE | The area of the proposed construction access road is home to approximately 41 species of Rare, Threatened, and Endangered (RTE) plants. Six plant species would be permanently impacted by the preferred alternative due to the extent and length of the construction work: tall dock (Rumex atissimus), Carey's sedge (Carex careyana), buttercup scorpion-weed (Phacelia covillei), horsetail Paspalum (Paspalum fluitans), halberd-lead rose-mallow (Hibiscus laevis), and racemose goldenrod (Solidago var. racemosa). The SDEIS enumerates the number of species impacted; 10 – 15 individuals of tall dock, 10 – 15 Carey's sedges, thousands of individuals of horse-tail Paspalum, 50 halberd-lead Rose-mallow plants, and 10 –15 individuals of racemose goldenrod. For buttercup scorpion-weed, approximately 80 percent of its impacted area, including tens of thousands of plants would be impacted. In addition to the RTE species impacted, approximately 1,212 live trees comprising 15,255 diameter (breast height) are projected to be removed. **While MDOT SHA has expended significant effort to substantiate their requirements for the construction access road, scant work has been done to minimize its impacts.** The NPS understands the need for safe access during the construction, and that some level of park impacts cannot be avoided. However, it will take 50 – 80 years for this area to recover from the effects of this access road and there needs to be significant effort by MDOT SHA to reduce the width down to 20-feet or less in order to reduce its impacts. Without substantial effort, the RTE species are likely to be lost. | MDOT SHA has expended significant effort to minimize impacts to RTEs in the area surrounding the American Legion Bridge. MDOT SHA gathered a Strike Team to determine the least impactful bridge construction alignment and limit of disturbance and the least impactful access road to construct the American Legion Bridge. Whereas previously, there were four construction access roads, one in each quadrant of the bridge, there is now one proposed access road in the NW quadrant only.  MDOT SHA developed a white paper outlining the constructability review of the access road that was shared with NPS. The size and alignment of the access road was minimized to the maximum extent practicable, while still allowing the equipment necessary to safely construct the bridge and providing the minimum access road size required by regulation. MDOT SHA has coordinated closely with NPS to determine the scope for an Ecological Restoration Plan, that will mitigate for and restore the RTE plant species and the forest habitat in the area where impacts are unavoidable. |

| No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|
| 3 | | Impact Analysis | The NPS submitted comments on the administrative draft SDEIS in late August 2021 and noted that there was a general lack of impact analysis regarding impacts to the proposed shared-use trail bridge. This proposal would result in new permanent infrastructure on three units of the NPS (the GW Memorial Parkway, the C&O Canal NHP, and the Clara Barton Parkway) and impacts to viewsheds and cultural resources, and would result in additional loss of vegetation. In addition, it would create perpetual maintenance needs, and additional considerations for appropriate stormwater management. The response the NPS had received stated, *"The shared use trail is accounted for in the Preferred Alternative LOD and therefore the impacts presented in the SDEIS include the area needed for all three options. There are three options under consideration and documented in Chapter 2, Section 2.3.8. Once an option is identified the final impacts to NPS property and resources will be coordinated with staff."* The NPS understands that the proposed shared-use trail is within the delineated LOD and that there is a broad description of the impacts that would occur. **However, the NPS requires more detailed information in the Final Environmental Impact Statement (FEIS) including, a quantified impact analysis on all impacted resources. This information, including renderings, is also needed to inform the process needed to comply with Section 106 of the National Historic Preservation Act (NHPA).** | The property impact analysis detailed in FEIS Chapter 5, Section 5.4.3 and FEIS, Appendix G reflects the permanent and temporary needs for construction of the proposed improvements, including the shared use path along the I-495 inner loop that would connect to the Fairfax County trail system in Virginia (within VDOT ROW) and the Chesapeake and Ohio Canal Towpath in Maryland. Within the GW Memorial Parkway, the shared use path requires a linear (sliver) right-of-way impact along the I-495 inner loop. Across the American Legion Memorial Bridge, the shared use path results in a 14-foot wider bridge with no additional piers required and no additional permanent (for pier placement) or temporary (for barge placement) impacts. Within the Chesapeake and Ohio Canal National Historical Park, the shared use path requires permanent property impacts at the connection with the towpath, but the additional impact would be for providing multi-modal connections. No additional temporary impacts would be needed as the shared use path is within the area needed for the roadway and bridge construction. The Visual Impact Assessment (VIA) prepared for the Preferred Alternative is provided in FEIS Appendix H and includes renderings of the proposed conditions of the shared use path on NPS property. |
| 4 | | Shared-use Trail | The SDEIS also lacks a discussion of how NPS will authorize the use of its property for a shared use trail and its required infrastructure. NPS will require additional clarification from FHWA whether, on these facts, the shared use trail could be authorized by a Title 23 Highway Easement Deed (HED). Questions remain regarding the authorization of trails and paths raised during previous meetings of the Interagency Federal Lands Transfer Working Group. Communications with NPS regarding which authority is to be cited needs to be finalized in the FEIS so it can be reflected in the Record of Decision. | It is MDOT SHA's understanding that the shared use trail could be authorized under the provisions related to a project constructed in relation to a Federal-aid highway, where such project is eligible for Federal funding or Federal participation and such transportation use is in accordance with environmental document authorizing the project. |





| No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|
| 5 | | Viewsheds, Visual Impacts | The SDEIS provides a generic analysis on viewsheds and visual impacts from the point of view of someone traveling along the interstate rather than from a visitor within a park. The NPS needs to evaluate how the new interstate infrastructure affects views or vistas towards the I-495 corridor from NPS lands. The NPS can provide a list of viewpoints to be considered. The visual impacts for each of the NPS-administered units affected by the project will vary, as impacts from new infrastructure will vary based on location and the amount of disturbance from the project. This information is also needed to fully assess the impacts to the cultural resources and would likely be required to finalize the NHPA Section 106 process. | A Visual Impact Assessment (VIA) has been prepared for the Preferred Alternative in accordance with FHWA's Guidance for Visual Impact Assessment of Highway Projects, see FEIS Appendix H. The VIA was developed with input from affected regulatory agencies and the public obtained through the NEPA process to ascertain viewer preferences directly and accurately. The VIA focuses on the views from five key locations within the study corridor. These locations were identified in response to comments and consultation with regulatory agencies and the public. These locations include public parks and facilities under the jurisdiction of the National Park Service, as well as locations within Montgomery County, Maryland. Key locations under the jurisdiction of NPS include: George Washington Memorial Parkway, Chesapeake and Ohio Canal National Historic Park, and Clara Barton Parkway. The VIA details two types of viewsheds within the area of visual effect (AVE) which includes: dynamic viewsheds composed of the views from travelers using the highway with "views from the road" and static viewsheds consisting of what neighbors of the highway can see from a single viewpoint. Neighbors of the highway are individuals or institutions that are adjacent to the study corridors and have "views of the road". The VIA includes details and renderings of how the new interstate infrastructure affects views or vistas towards the I-495 corridor from NPS lands with renderings. |
| 6 | | Section 4(f) Evaluation | Based on the SDEIS, MDOT SHA will need to acquire a reality interest in lands within and over the C&O Canal NHP, the GW Memorial Parkway, and the Clara Barton Parkway from the NPS in order to construct this project. This needs to be addressed in the FEIS in order for the NPS to adopt the document for use in working with FHWA to execute a HED to MDOT SHA for both the land to be used for the project infrastructure, the lands currently in use for infrastructure, and any aerial crossings of NPS lands. The portions of the Clara Barton Parkway that are within the LOD were purchased with Capper-Cramton funds and will require coordination by MDOT SHA with the Maryland National Capital Park and Planning Commission and the National Capital Planning Commission prior to NPS execution of an easement to MDOT SHA. | NPS authorization decision relating to consideration of a Special Use Permit for the temporary use of land under its administration for construction and execution of a highway deed easement by FHWA is included in this FEIS, Chapter 5, Section 5.25.<br><br>MDOT SHA acknowledges NCPC and M-NCPPC's roles in compliance with the Capper-Cramton Act. |

OP·LANES™
M A R Y L A N D
I-495 & I-270 Managed Lanes Study

**FINAL ENVIROMENTAL IMPACT STATEMENT**

| No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|
| 7 | | Section 4(f) Evaluation | Pursuant to 23 CFR 774.3(c)(1), if the avoidance analysis determines that there is no feasible and prudent avoidance alternative, then only the alternative that causes the least overall harm may be approved. After review of all the alternatives presented in this Section 4(f), and those in the previous Section 4(f), the Preferred Alternative, as presented, causes the least overall harm when compared with the other alternatives presented. Even with that understanding, the impacts resulting from the replacement of the ALB and the installation of the new infrastructure for the shared use trail on NPS property will be significant. To minimize harm, the FHWA and MDOT SHA should, through ongoing design and coordination, look for means to reduce the LOD wherever possible. | Thank you for your comment that the Preferred Alternative causes the least overall harm.  MDOT SHA has expended significant effort to minimize impacts to NPS property surrounding the American Legion Bridge. MDOT SHA gathered a Strike Team to determine the least impactful bridge construction alignment and limit of disturbance and the least impactful access road to construct the American Legion Bridge. Whereas previously, there were four construction access roads, one in each quadrant of the bridge, there is now one proposed access road in the NW quadrant only. The size and alignment of the access road was minimized to the maximum extent practicable, while still allowing the equipment necessary to safely construct the bridge and providing the minimum access road size required by regulation. MDOT SHA has complete additional minimization measures including reducing the number of signs on the George Washington Memorial Parkway, avoiding permanent impacts to the parkway portion of the George Washington Memorial Parkway, developing multiple shared use path options to minimize impacts, and avoiding stormwater management on NPS property. MDOT SHA and FHWA will continue to coordinate closely with NPS to further evaluate means to reduce the LOD. |
| 8 | | Bat Acoustic Surveys | The Service has Indiana bat and northern long-eared bat (NLEB) acoustic detection and mist-netting results from 2016 to 2018 surveys conducted by Virginia Tech. However, we have not received data from 2019 surveys as stated available in the SDEIS. Any Indiana bat and NLEB results beyond the 2016 to 2018 surveys from the corridor study area should be shared with the Service. | MDOT SHA apologizes, but this was a typo. The 2019 survey data was not provided by Virginia Tech for NLEB acoustic surveys. |
| 9 | | Mussel Survey | MDOT SHA has committed to a mussel survey surrounding the American Legion Bridge (ALB) crossing of the Potomac River. However, it is unclear if the survey is intended to be a general community survey, or will target rare, threatened, or endangered species and include relocations. The federally listed endangered dwarf wedge mussel (Alasmidonta heterodon) and threatened yellow lance (Elliptio lanceolate) are present in the Potomac River but are not known to occur near the ALB. The Service is developing mussel survey protocols with the Maryland Department of Natural Resources and should be included on any coordination meetings to determine scope of surveys and to develop avoidance and minimization measures for federally listed mussels. | The mussel survey will record any mussel species identified, but will target state and federal rare, threatened, and endangered species and will involve relocations if any of these species are identified. MDOT SHA will include USFWS and NPS in any future meetings regarding the ALB mussel survey and avoidance and minimization measures for federally listed mussels. MDOT SHA will follow the latest applicable protocols at the time of survey. |
| 10 | | Spotted Turtle | The spotted turtle (Clemmys guttata) and wood turtle (Glyptemys insculpta) may be present within the project action area. Both species have been petitioned for listing under the Endangered Species Act (ESA) and the Service is conducting a species status assessment for each to determine if listing is warranted. Spotted turtles favor shallow water, vegetated wetlands, but can also be found in upland areas and forest during their active season. Wood turtles occupy terrestrial and aquatic habitats and tend to stay near streams and creeks. We recognize the wood turtle is a state listed threatened species in Virginia and MDOT SHA conducted a wood turtle habitat survey following recommendations from the Virginia Department of Wildlife Resources. However, these surveys were limited to Virginia and did not include Maryland portions of the study corridor. | The spotted turtle and wood turtle are not listed as threatened or endangered in Maryland according to the Federal and state agencies responsible for listing and management of rare, threatened and endangered species. Should they become listed Federally or in Maryland as threatened or endangered, MDOT SHA will extend surveys for these species in Maryland. |

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study

| No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|
| 11 | | Monarch Butterfly | The monarch butterfly (Danaus plexippus) is present within the study corridor. The Service completed a species status assessment and designated the monarch butterfly as a candidate species in December 2020. Candidate species warrant ESA listing but are precluded from listing by other higher priority listing activities. Candidate species have no statutory protections under the ESA, but a species status review is required each year until the Service undertakes a proposal to list or makes a not-warranted finding. | As your comment notes, the monarch butterfly has been identified within the corridor study boundary. |
| 12 | | General | If additional information on the distribution of federally listed, proposed, or candidate species becomes available, further Section 7 coordination with the Service may be required. | Comment noted. |
| 13 | | | The Draft Environmental Impact Statement (DEIS) and Natural Resources Technical Report cites the U.S. Department of the Interior Solicitor's Opinion M-37050 which determined the Migratory Bird Treaty Act (MBTA) does not prohibit incidental take. Solicitor Opinion M-37050 was revoked by Final Rule on October 4, 2021 and Director's Order No. 225 was issued on October 5, 2021 to confirm the Service's policy to enforce incidental take of migratory birds under the MBTA. MDOT SHA should adopt and implement construction best management practices to avoid and minimize incidental take of migratory birds. | The FEIS has been revised to reflect this policy change. |
| 14 | | Fish & Wildlife | The Service acknowledges MDOT SHA use of the ALB Strike Team to reduce limits of disturbance and protect sensitive resources along the Potomac River corridor. MDOT SHA has committed to an ALB replacement design that avoids fish passage impacts by maintaining Potomac River flow conditions at or below 3 feet per second, however, the SDEIS does not reference how this criterion was established. The Federal Interagency Nature-like Fishway Passage Design Guidelines for Atlantic Coast Diadromous Fishes1 lists species-specific criteria to support passage by anadromous and catadromous fishes. Considering the ALB's proximity to Great Falls, which is the upstream migration limit for anadromous fish in the Potomac River, maintaining habitat conditions suitable for passage and spawning is especially important at this location. In addition to anadromous fish, the SDEIS lists 41 plants with either a 'rare' or 'vulnerable' state conservation rank present within the Potomac River corridor portion of the Preferred Alternative, as noted by the National Park Service in the Department's November 10, 2021, comments. Due to the significant natural and cultural resources present, the Service recommends continued interagency coordination throughout the National Environmental Policy Act (NEPA) study and project design and construction phases to avoid and minimize impacts to sensitive resources. | The FEIS indicates how the 3 feet per second flow conditions for the Potomac River were established. MDOT SHA will continue interagency coordination throughout the NEPA study and project design and construction phases to continue attempts to avoid and minimize impacts to sensitive resources. |
| 15 | | SWM | MDOT SHA is seeking to treat approximately 114 acres of impervious area off-site to meet stormwater management water quality requirements. The Service recognizes the Alternative 9 – Phase 1 South corridor is predominantly built-out and therefore on-site opportunities to provide stormwater management is limited. However, the Service recommends any stormwater management proposed off-site should prioritize pavement removal and stormwater facility approaches. | The SWM analysis completed for the DEIS and SDEIS was a planning level analysis for determination of LOD and costs.  A more detailed SWM analysis was completed for the FEIS based on standard MDE approved hydrology and hydraulic procedures.  Based on the more detailed preliminary SWM concept developed for the FEIS, the anticipated offsite requirements for the Preferred Alternative have been significantly reduced from 114 acres to 2.5 acres. Refer to Chapter 3, Section 3.1.6 of the FEIS.

If stream restoration is considered in the future it will be applied in a hierarchical approach with pavement removal and stormwater facilities prioritized over stream restoration. |
| 16 | | Culverts | The SDEIS anticipates many existing cross-culverts will need to be extended to accommodate roadway widening or augmented to meet regulatory hydrologic and hydraulic requirements. Culvert extensions and augmentation should be designed to avoid reduction of aquatic organism passage. Furthermore, Old Farm Creek, Cabin John Creek, and Watts Branch are identified as ecologically significant corridors by the Service's Nature's Network (http://www.naturesnetwork.org/) habitat prioritization webtool and therefore, any culvert extension or augmentation work proposed should consider aquatic organism passage needs to improve connectivity along these corridors. | Culvert extensions and augmentations will be designed to avoid reduction of aquatic life passage. Any culvert extension or augmentation work at Old Farm Creek, Watts Branch, and Cabin John Creek will consider aquatic organism passage. |

## DEPARTMENT OF THE INTERIOR (LETTER 11/10/2021)

| | |
|---|---|
| **From:** | Lazinsky, Diane <Diane_Lazinsky@ios.doi.gov> |
| **Sent:** | Wednesday, November 10, 2021 11:38 AM |
| **To:** | SHA OPLANESMLS |
| **Cc:** | jeanette.mar@dot.gov; Stidham, Tammy |
| **Subject:** | DOI Comments SDEIS Managed Lanes |
| **Attachments:** | DOI Comments SDEIS I-495 I-270 Managed Lanes Study.pdf |

Dear Mr. Folden:

Please see the attached file for comments from the U.S. Department of the Interior for the Supplemental Draft Environmental Impact Statement and Draft Section 4(f) Evaluation, I-495 and I-270 Managed Lanes Study. Thank you and please feel free to contact me if you have questions.

Best regards,
Diane Lazinsky
---------------
Diane Lazinsky
Regional Environmental Protection Specialist
U.S. Department of the Interior
Region I North Atlantic - Appalachian
Office of Environmental Policy and Compliance
5 Post Office Square, Suite 18011
Boston, MA 02109
Office: 617 223-8565 Cell: 617 686-1780
diane_lazinsky@ios.doi.gov



## United States Department of the Interior

OFFICE OF THE SECRETARY
Office of Environmental Policy and Compliance
5 Post Office Square, Suite 18011
Boston, Massachusetts  02109

November 10, 2021

4111
ER 21/0425

Jeff Folden
Program Deputy Director
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21202
oplanesMLS@mdot.maryland.gov

**Re:   Supplemental Draft Environmental Impact Statement**
**Draft Section 4(f) Evaluation**
**I-495 and I-270 Managed Lanes Study**

Dear Mr. Folden:

The U. S. Department of the Interior (Department) has reviewed the I-495 & I-270 Managed Lanes Study Draft Environmental Impact Statement (SDEIS) and draft Section 4(f) evaluation and submits the following comments on behalf of the National Park Service (NPS).

The Federal Highway Administration (FHWA), in conjunction with the Maryland Department of Transportation State Highway Administration (MDOT SHA) has released the SDEIS and updated draft Section 4(f) Evaluation to consider new information relative to the Preferred Alternative, Alternative 9 – Phase 1 South (RPA).  The SDEIS builds from the existing Draft Environmental Impact Statement (DEIS) but describes a new preferred alternative and focuses on new information while referencing the DEIS for information that remains valid.

The Department submitted comments on the DEIS on November 9, 2020, which highlighted significant concerns related to deficiencies in the document as well as concerns with the impacts associated with the proposed project on NPS parklands within the Baltimore-Washington Parkway (BW Parkway), Greenbelt Park, Chesapeake and Ohio Canal National Historical Park (C&O Canal NHP), Suitland Parkway, and the George Washington Memorial Parkway (GW Memorial Parkway), which also includes the Clara Barton Parkway.  Through the development of this new RPA, impacts to the BW Parkway, Greenbelt, and Suitland Parkway have been eliminated and impacts to the GW Memorial Parkway have been greatly reduced.

2

The NPS was copied on a June 10, 2021, MDOT SHA's letter (attached) to the FHWA that indicated certain commitments to further minimize impacts to C&O Canal NHP and Clara Barton Parkway. The NPS appreciates these commitments and the continued coordination on the project but remains concerned with the significant impacts to the C&O Canal NHP and the Clara Barton Parkway.

Most construction activities at both the American Legion Bridge (ALB) and the Clara Barton Parkway interchange are anticipated to be completed from below the existing ALB, due to the need to access the existing and demolished piers, including but not limited to abutments and girder lines for proposed construction and demolition activities. MDOT SHA is proposing a two (2) lane, 40-foot-wide construction road within the C&O Canal NHP to accommodate two-way construction traffic and queuing. Minimum lane widths are 11-feet with an additional 5-foot shoulder on each side of the roadway. We understand from a June 9, 2021, ALB Proposed Construction Access white paper from MDOT SHA, that the lane and shoulder widths are needed to allow for queued vehicles to be passed by other vehicles. An additional 4-feet of Limit of Disturbance (LOD) is anticipated that are the required grading for the temporary construction access road and for necessary erosion and sediment control devices. This level of detail is absent from the SDEIS.

The area of the proposed construction access road is home to approximately 41 species of Rare, Threatened, and Endangered (RTE) plants. Six plant species would be permanently impacted by the preferred alternative due to the extent and length of the construction work: tall dock (*Rumex altissimus*), Carey's sedge (*Carex careyana*), buttercup scorpion-weed (*Phacelia covillei*), horse-tail Paspalum (*Paspalum fluitans*), halberd-lead rose-mallow (*Hibiscus laevis*), and racemose goldenrod (*Solidago var. racemosa*). The SDEIS enumerates the number of species impacted; 10 – 15 individuals of tall dock, 10 – 15 Carey's sedges, thousands of individuals of horse-tail Paspalum, 50 halberd-lead Rose-mallow plants, and 10 –15 individuals of racemose goldenrod. For buttercup scorpion-weed, approximately 80 percent of its impacted area, including tens of thousands of plants would be impacted. In addition to the RTE species impacted, approximately 1,212 live trees comprising 15,255 diameter (breast height) are projected to be removed. While MDOT SHA has expended significant effort to substantiate their requirements for the construction access road, scant work has been done to minimize its impacts. The NPS understands the need for safe access during the construction, and that some level of park impacts cannot be avoided. However, it will take 50 – 80 years for this area to recover from the effects of this access road and there needs to be significant effort by MDOT SHA to reduce the width down to 20-feet or less in order to reduce its impacts. Without substantial effort, the RTE species are likely to be lost.

The NPS submitted comments on the administrative draft SDEIS in late August 2021 and noted that there was a general lack of impact analysis regarding impacts to the proposed shared-use trail bridge. This proposal would result in new permanent infrastructure on three units of the NPS (the GW Memorial Parkway, the C&O Canal NHP, and the Clara Barton Parkway) and impacts to viewsheds and cultural resources, and would result in additional loss of vegetation. In addition, it would create perpetual maintenance needs, and additional considerations for appropriate stormwater management. The response the NPS had received stated, *"The shared use trail is accounted for in the Preferred Alternative LOD and therefore the impacts presented*

3

*in the SDEIS include the area needed for all three options. There are three options under consideration and documented in Chapter 2, Section 2.3.8. Once an option is identified the final impacts to NPS property and resources will be coordinated with staff."* The NPS understands that the proposed shared-use trail is within the delineated LOD and that there is a broad description of the impacts that would occur. However, the NPS requires more detailed information in the Final Environmental Impact Statement (FEIS) including, a quantified impact analysis on all impacted resources. This information, including renderings, is also needed to inform the process needed to comply with Section 106 of the National Historic Preservation Act (NHPA).

The SDEIS also lacks a discussion of how NPS will authorize the use of its property for a shared use trail and its required infrastructure. NPS will require additional clarification from FHWA whether, on these facts, the shared use trail could be authorized by a Title 23 Highway Easement Deed (HED). Questions remain regarding the authorization of trails and paths raised during previous meetings of the Interagency Federal Lands Transfer Working Group. Communications with NPS regarding which authority is to be cited needs to be finalized in the FEIS so it can be reflected in the Record of Decision.

The SDEIS provides a generic analysis on viewsheds and visual impacts from the point of view of someone traveling along the interstate rather than from a visitor within a park. The NPS needs to evaluate how the new interstate infrastructure affects views or vistas towards the I-495 corridor from NPS lands. The NPS can provide a list of viewpoints to be considered. The visual impacts for each of the NPS-administered units affected by the project will vary, as impacts from new infrastructure will vary based on location and the amount of disturbance from the project. This information is also needed to fully assess the impacts to the cultural resources and would likely be required to finalize the NHPA Section 106 process.

**SECTION 4(F) EVALUATION**

The Department understands that there is likely to be no feasible and prudent alternatives that avoid use of at least some of the Section 4(f) properties identified. The Department also understands that the Preferred Alternative presented in this SDEIS was developed as a Section 4(f) minimization alternative based in part on extensive coordination with input from agencies and stakeholders. We appreciate MDOT SHA's efforts to minimize impacts to NPS properties in the vicinity of the ALB that has led to reductions of 5.3 acres at the C&O Canal NHP, 0.7 acres at the Clara Barton Parkway, and 7.8 acres at the GW Memorial Parkway and in avoidance of all impacts to the BW Parkway, Greenbelt Park, and the Suitland Parkway.

Based on the SDEIS, MDOT SHA will need to acquire a realty interest in lands within and over the C&O Canal NHP, the GW Memorial Parkway, and the Clara Barton Parkway from the NPS in order to construct this project. This needs to be addressed in the FEIS in order for the NPS to adopt the document for use in working with FHWA to execute a HED to MDOT SHA for both the land to be used for the project infrastructure, the lands currently in use for infrastructure, and any aerial crossings of NPS lands. The portions of the Clara Barton Parkway that are within the LOD were purchased with Capper-Cramton funds and will require coordination by MDOT SHA



4

with the Maryland National Capital Park and Planning Commission and the National Capital Planning Commission prior to NPS execution of an easement to MDOT SHA.

Pursuant to 23 CFR 774.3(c)(1), if the avoidance analysis determines that there is no feasible and prudent avoidance alternative, then only the alternative that causes the least overall harm may be approved. After review of all the alternatives presented in this Section 4(f), and those in the previous Section 4(f), the Preferred Alternative, as presented, causes the least overall harm when compared with the other alternatives presented. Even with that understanding, the impacts resulting from the replacement of the ALB and the installation of the new infrastructure for the shared use trail on NPS property will be significant. To minimize harm, the FHWA and MDOT SHA should, through ongoing design and coordination, look for means to reduce the LOD wherever possible.

We appreciate the close coordination that FHWA and MDOT SHA have had with the NPS and the Department on this project. We are confident, through close collaboration, that those issues we have identified in this letter can be resolved in a manner acceptable to all. For further coordination, please contact: Tammy Stidham, National Park Service, Region 1 – National Capital Area, Deputy Associate Area Director, Lands and Planning at 202-438-0038 or tammy_stidham@nps.gov. Please contact me at (617) 223-8565 if I can be of further assistance.

Sincerely,

Andrew L. Raddant
Regional Environmental Officer

ATTACHMENT

CC:    FHWA, Jeanette Mar
        NPS, Tammy Stidham

Right side of the page is intentionally left blank.



I-495 & I-270 Managed Lanes Study



**DEPARTMENT OF THE INTERIOR (LETTER 11/22/2021)**



### United States Department of the Interior

OFFICE OF THE SECRETARY
Office of Environmental Policy and Compliance
5 Post Office Square, Suite 18011
Boston, Massachusetts 02109

November 22, 2021

4111
ER 21/0425

Jeff Folden
Program Deputy Director
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21202
oplanesMLS@mdot.maryland.gov

Re:    **Supplement to the U.S. Department of the Interior Comments
Supplemental Draft Environmental Impact Statement
Draft Section 4(f) Evaluation
I-495 and I-270 Managed Lanes Study
Montgomery and Prince George's Counties, Maryland
Fairfax County, Virginia**

Dear Mr. Folden:

This letter is a supplement to comments submitted by the U.S. Department of the Interior (Department) on November 10, 2021, and responds to the Federal Highway Administration's (FHWA) and Maryland Department of Transportation State Highway Administration's (MDOT SHA) Supplemental Draft Environmental Impact Statement (SDEIS) for the I-495 and I-270 Managed Lanes Study dated October 2021.

The SDEIS considers new information related to the Preferred Alternative, Alternative 9 – Phase 1 South and there is no action included at this time for the remainder of the study corridor. The SDEIS public comment period was extended to November 30, 2021, by an Amended Notice published in the November 12, 2021, Federal Register. The Department submits the following comments on behalf on the U.S Fish and Service (Service) and are provided in accordance with Section 7 of the Endangered Species Act (87 Stat. 884, as amended; 16 U.S.C. 1531 *et seq.*), the Migratory Bird Treaty Act (16 U.S.C. 703-712 *et seq.*), and the Fish and Wildlife Coordination Act (48 Stat. 401; 16 U.S.C. 661 *et seq.*).

2

**Section 7 of the Endangered Species Act Comments**

Bat acoustic surveys were originally intended to be a coarse screening tool to target locations for mist-netting surveys. However, due to concerns with possible human transmission of COVID-19 to bats, the Service and MDOT SHA agreed acoustic surveys would be the method used to determine presence or probable absence of Indiana bat (*Myotis sodalis*) and northern long-eared bat (*Myotis septentrionalis*) within the corridor study boundary.

The Service has Indiana bat and northern long-eared bat (NLEB) acoustic detection and mist-netting results from 2016 to 2018 surveys conducted by Virginia Tech. However, we have not received data from 2019 surveys as stated available in the SDEIS. Any Indiana bat and NLEB results beyond the 2016 to 2018 surveys from the corridor study area should be shared with the Service.

MDOT SHA has committed to a mussel survey surrounding the American Legion Bridge (ALB) crossing of the Potomac River. However, it is unclear if the survey is intended to be a general community survey, or will target rare, threatened, or endangered species and include relocations. The federally listed endangered dwarf wedge mussel (*Alasmidonta heterodon*) and threatened yellow lance (*Elliptio lanceolate*) are present in the Potomac River but are not known to occur near the ALB. The Service is developing mussel survey protocols with the Maryland Department of Natural Resources and should be included on any coordination meetings to determine scope of surveys and to develop avoidance and minimization measures for federally listed mussels.

The spotted turtle (*Clemmys guttata*) and wood turtle (*Glyptemys insculpta*) may be present within the project action area. Both species have been petitioned for listing under the Endangered Species Act (ESA) and the Service is conducting a species status assessment for each to determine if listing is warranted. Spotted turtles favor shallow water, vegetated wetlands, but can also be found in upland areas and forest during their active season. Wood turtles occupy terrestrial and aquatic habitats but tend to stay near streams and creeks. We recognize the wood turtle is a state listed threatened species in Virginia and MDOT SHA conducted a wood turtle habitat survey following recommendations from the Virginia Department of Wildlife Resources. However, these surveys were limited to Virginia and did not include Maryland portions of the study corridor.

The monarch butterfly (*Danaus plexippus*) is present within the study corridor. The Service completed a species status assessment and designated the monarch butterfly as a candidate species in December 2020. Candidate species warrant ESA listing but are precluded from listing by other higher priority listing activities. Candidate species have no statutory protections under the ESA, but a species status review is required each year until the Service undertakes a proposal to list or makes a not-warranted finding.

If additional information on the distribution of federally listed, proposed, or candidate species becomes available, further Section 7 coordination with the Service may be required.

3

**Migratory Bird Treaty Act Comment**

The Draft Environmental Impact Statement (DEIS) and Natural Resources Technical Report cites the U.S. Department of the Interior Solicitor's Opinion M-37050 which determined the Migratory Bird Treaty Act (MBTA) does not prohibit incidental take. Solicitor Opinion M-37050 was revoked by Final Rule on October 4, 2021 and Director's Order No. 225 was issued on October 5, 2021 to confirm the Service's policy to enforce incidental take of migratory birds under the MBTA. MDOT SHA should adopt and implement construction best management practices to avoid and minimize incidental take of migratory birds.

**Fish and Wildlife Coordination Act Comments**

The Service acknowledges MDOT SHA use of the ALB Strike Team to reduce limits of disturbance and protect sensitive resources along the Potomac River corridor. MDOT SHA has committed to an ALB replacement design that avoids fish passage impacts by maintaining Potomac River flow conditions at or below 3 feet per second, however, the SDEIS does not reference how this criterion was established. The *Federal Interagency Nature-like Fishway Passage Design Guidelines for Atlantic Coast Diadromous Fishes*[1] lists species-specific criteria to support passage by anadromous and catadromous fishes. Considering the ALB's proximity to Great Falls, which is the upstream migration limit for anadromous fish in the Potomac River, maintaining habitat conditions suitable for passage and spawning is especially important at this location. In addition to anadromous fish, the SDEIS lists 41 plants with either a 'rare' or 'vulnerable' state conservation rank present within the Potomac River corridor portion of the Preferred Alternative, as noted by the National Park Service in the Department's November 10, 2021, comments. Due to the significant natural and cultural resources present, the Service recommends continued interagency coordination throughout the National Environmental Policy Act (NEPA) study and project design and construction phases to avoid and minimize impacts to sensitive resources.

MDOT SHA is seeking to treat approximately 114 acres of impervious area off-site to meet stormwater management water quality requirements. The Service recognizes the Alternative 9 – Phase 1 South corridor is predominantly built-out and therefore on-site opportunities to provide stormwater management is limited. However, the Service recommends any stormwater management proposed off-site should prioritize pavement removal and stormwater management facility approaches.

The SDEIS anticipates many existing cross-culverts will need to be extended to accommodate roadway widening or augmented to meet regulatory hydrologic and hydraulic requirements. Culvert extensions and augmentation should be designed to avoid reduction of aquatic organism passage. Furthermore, Old Farm Creek, Cabin John Creek, and Watts Branch are identified as ecologically significant corridors by the Service's Nature's Network (http://www.naturesnetwork.org/) habitat prioritization webtool and therefore, any culvert

---

[1] Turek, J. A. Haro, and B. Towler. 2016. Federal Interagency Nature-like Fishway Passage Design Guidelines for Atlantic Coast Diadromous Fishes. Interagency Technical Memorandum. 46 pp.

4

extension or augmentation work proposed should consider aquatic organism passage needs to improve connectivity along these corridors.

The Service appreciates the opportunity to provide comments on the SDEIS and looks forward to continuing coordination with FHWA and MDOT SHA. Should you have any questions or concerns regarding this letter please contact Ray Li of my staff at ray_li@fws.gov. Please contact me at (617) 223-8565 if I can be of further assistance.

Sincerely,

ANDREW
RADDANT
Digitally signed by
ANDREW RADDANT
Date: 2021.11.22
12:42:16 -05'00'

Andrew L. Raddant
Regional Environmental Officer

CC:    FHWA, Jeanette Mar
       USFWS, Ray Li
       USFWS, Genevieve LaRouche
       NPS, Tammy Stidham

**DEPARTMENT OF THE INTERIOR (EMAIL FROM JEFF FOLDEN, 06/10/2021)**



MARYLAND DEPARTMENT
OF TRANSPORTATION

STATE HIGHWAY
ADMINISTRATION

Larry Hogan
Governor

Boyd K. Rutherford
Lt. Governor

Gregory Slater
Secretary

Tim Smith, P.E.
Administrator

June 10, 2021

Mr. John V. Nelson,
Regional Environmental Officer
U.S. Department of Interior
Office of the Secretary
Office of Environmental Policy and Compliance
Custom House, Room 244
200 Chestnut Street
Philadelphia PA 19106-2904

Dear Mr. Nelson:

The Federal Highway Administration (FHWA) and Maryland Department of Transportation State Highway Administration (MDOT SHA) have recently identified a new Recommended Preferred Alternative (RPA) in compliance with the National Environmental Policy Act (NEPA) for the I-495 & I-270 Managed Lanes Study (MLS) located in Fairfax County, Virginia and Montgomery and Prince George's counties, Maryland. The new RPA, Alternative 9: Phase 1 South, consists of adding two High Occupancy Toll (HOT) lanes in each direction on I-495 and converting the existing High Occupancy Vehicle (HOV) lane to a HOT lane and adding one additional HOT lane in each direction on I-270 within the limits of Phase 1 South and with the No Action Alternative outside of these limits. The limits of Phase 1 South are from the George Washington Memorial Parkway in Virginia to east of MD 187 on I-495, on I-270 from I-495 to north of I-370, and on the I-270 eastern spur from east of MD 187 to I-370. Identifying the build improvements only with Phase 1 South aligns the Environmental Impact Statement (EIS) with the State's phased delivery and permitting plan. While the No Action Alternative is recommended outside of Phase 1 South under the current study, improvements to this section of I-495 would be the subject of future environmental study(ies) after additional analyses and collaboration with agencies and stakeholders. The new RPA will be the subject of a Supplemental Draft Environmental Impact Statement (SDEIS) anticipated to be published in late summer 2021.

Alternative 9: Phase 1 South has many advantages over the other Build Alternatives including performing the best for three key traffic metrics: average speed, level of service and effect on the local roadway network. Alternative 9: Phase 1 South also provides similar overall operational benefits as the Draft Environmental Impact Statement (DEIS) Build Alternatives, but with fewer impacts, lower cost and encourages the use of HOVs by providing toll-free travel for HOV 3+ and free bus usage, thereby reducing dependency on single occupancy vehicles.

Mr. John V. Nelson
Page Two

Through review of comments on the DEIS and extensive agency and stakeholder coordination, MDOT SHA identified certain recommendations and additional project enhancements that go beyond mitigation to address unavoidable direct impacts. These commitments focus on supporting new options for travel, reducing reliance on single occupancy vehicles, supporting new opportunities for regional transit service, and providing meaningful enhancements to adjacent resources (such as streams and parkland) to improve their values and functions.

Based on comments received from the National Park Service (NPS), MDOT SHA has continued to refine the design and to avoid and minimize impacts to multiple NPS units including the George Washington Memorial Parkway, C&O Canal National Historic Park (C&O), Clara Barton Parkway, Greenbelt Park, and the Baltimore-Washington Parkway. This process has been collaborative between our agencies, and we appreciate NPS' willingness to attend multiple meetings, review information and provide substantive feedback. The new RPA which includes improvements within Phase 1 South only was chosen to be responsive to public, stakeholder, and agency comments. We look forward to continued collaboration with you and other agency partners and stakeholders to further reduce and avoid potential project impacts. Additionally, the new RPA also eliminates impacts to NPS properties, Baltimore-Washington Parkway, Greenbelt Park, and Suitland Parkway,

Based on our collaboration with NPS, MDOT SHA is committed to incorporating certain design refinements into the RPA to minimize impacts to NPS units within Phase 1 South. These commitments will be documented in the Final EIS (FEIS) and, if a build alternative is selected, committed to in the Record of Decision (ROD):

**George Washington Memorial Parkway (GWMP):**

- MDOT SHA will incorporate the interchange design into the RPA that avoids permanent roadway modifications on GWMP within the park boundary and minimizes visual impacts. Continued coordination with the Virginia Department of Transportation (VDOT) will be necessary to ensure design compatibility between the MLS and Virginia's I-495 Northern Extension Project.
- MDOT SHA will incorporate a retaining wall along the backside of the proposed shared use path between the GWMP and inner loop of I-495 to minimize physical impacts to the park.
- MDOT SHA will commit to avoiding construction access for American Legion Bridge (ALB) construction within the GWMP, also identified as the southeast quadrant of the Potomac River and ALB on the Virginia shoreline.
- MDOT SHA will commit to incorporating the signing concept as coordinated between NPS, VDOT, MDOT SHA and FHWA (Attachment 1) that reduces the number of signs, consolidates signs, and minimizes electronic tolling signs within GWMP boundaries. Additional coordination with VDOT, FHWA and NPS will need to occur to finalize design of the signing plan.
- MDOT SHA will commit to not placing stormwater management facilities within the boundaries of the GWMP.

707 North Calvert St., Baltimore, MD 21202 | 410.637.3320 | 1.833.858.5960 | Maryland Relay TTY 800.735.2258 | roads.maryland.gov

Mr. John V. Nelson
Page Three

**C&O Canal and Clara Barton Parkway:**

- MDOT SHA is committed to elimination of the temporary access road which was proposed in the DEIS in the northeast quadrant of the ALB crossing of the Potomac River to further minimize impacts to the C&O Canal property and Plummers Island.
- MDOT SHA is committed to avoiding physical impacts to Locks 12, 13 and 14, except as needed solely for restoration activities as agreed upon by NPS and MDOT SHA.
- MDOT SHA will commit to not placing stormwater management facilities within the boundaries of the C&O Canal property (not within transportation use) and will manage the stormwater off the new ALB so that it does not drain outside of transportation easement or on the C&O Canal towpath.
- MDOT SHA will commit to further review of the temporary access road in the northwest quadrant that is critical to allowing construction of the ALB to determine if further design refinements are possible to minimize impacts.
- MDOT SHA will commit to restoring the area upon which the temporary access road will be located, at a minimum, to its present condition including reforestation. The restoration plan will be developed in coordination with NPS.
- MDOT SHA will commit to minimizing the use of Clara Barton Parkway by truck traffic during construction by providing a crossing from the I-495 ramp to the temporary access road.

**Baltimore-Washington Parkway (BWP), Greenbelt Park and Suitland Parkway:**

- The new RPA will not include improvements outside of Phase 1 South; therefore, no impacts to the Baltimore-Washington Parkway, Greenbelt Park or Suitland Parkway are proposed.

MDOT SHA acknowledges that coordination between our agencies on many of these efforts will continue as we develop the Final Section 4(f) Evaluation and FEIS and ROD, as well as through final design of the improvements. We remain committed to those productive efforts. Again, we appreciate NPS' active participation in the MLS over the last few years and we look forward to continued coordination. Should you have any questions, please contact Ms. Caryn J. G. Brookman, Environmental Program Manager at cbrookman@mdot.state.md.us or 410-637-3335.

Sincerely,

*Jeffrey T. Folden*

Jeffrey T. Folden, P.E., DBIA
Deputy Director, I-495 & I-270 P3 Office

cc:     Ms. Laurel Hammig, NPS
        Ms. Tammy Stidham, NPS
        Ms. Megan Cogburn, FHWA
        Ms. Jeanette Mar, FHWA
        Mr. Jitesh Parikh, FHWA
        Ms. Keilyn Perez, FHWA
        Ms. Caryn J. G. Brookman, MDOT SHA

**Right side of the page is intentionally left blank.**



**Environmental Protection Agency - SDEIS Comments**

| No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|
| 1 | | Air Quality | Section 4.8.3 states that "All Build Alternatives are projected to slightly increase annual tailpipe GHG emissions by an average of 1.4 percent compared to the No Build Alternative in 2040." In addition, to the tailpipe emission, GHG emissions will also be generated during the construction of this large infrastructure project. EPA recommends considering practicable mitigation strategies to reduce emissions. These could include implementing dust suppression techniques noted in section 4.8.4 of the SDEIS as well as other best practices described in the documents referenced below. For additional guidance on reducing construction emissions and improving energy efficiency during construction, we recommend accessing the resources provided by EPA's Diesel Emissions Reduction Act program, available at: https://www.epa.gov/dera/reducing-diesel-emissions-construction-andagriculture, and employing the operational and equipment strategies detailed in the EPA publication, "Cleaner Diesels: Low Cost Ways to Reduce Emissions from Construction Equipment," available at https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1009QEO.pdf. These strategies include equipment idle reduction, engine preventive maintenance, equipment operator training, and various fuel strategies, such as retrofit technologies, engine upgrades, and electrification. | MDOT SHA reviewed the referenced documents and incorporated emission reduction strategies and best practices into the FEIS to the extent practicable. In addition to an analysis of operational emissions of GHG in the FEIS, an analysis of construction GHG emissions associated with the Preferred Alternative using the FHWA Infrastructure Carbon Estimator (ICE) is included in the FEIS. Refer to FEIS, Chapter 5 and FEIS, Appendix K. FHWA's ICE analysis is a planning level analysis that uses high-level estimates of construction activity in terms of lane miles or track miles before refined estimates are available. It is appropriate to analyze decisions that are made in the long-range planning or project development processes, before details about specific facility dimensions, materials, and construction practices are known. Since the estimation of emissions is derived from engineering factors such as new lane miles added and number of bridges being constructed or reconstructed, estimated emissions for construction of each of the Build Alternatives would likely be very similar so conducting an ICE analysis on each alternative would not have provided meaningful information to differentiate between alternatives.  The results of the ICE analysis for the Preferred Alternative show that the construction and maintenance of the project would produce approximately 1.1 million metric tons per year of CO2 equivalents.  The majority of these emissions are associated with vehicles using the roadway during normal operations and delays associated with the construction of the project.<br><br>The following measures will be implemented to help minimize emissions during construction:<br><br>• Ensuring diesel powered construction equipment to meet minimum emissions reduction requirements by engine manufacturer, or by being properly retrofitted with emissions control devices, or that clean fuels be used if necessary to meet the emissions reduction requirements.<br>• Retrofitting equipment that is used to be on the EPA Verified Retrofit Technology List.<br>• Requiring the use of ultra-low sulfur diesel fuel in construction equipment.<br>• Implementing a Driver Training program to provide incremental savings by more efficiently operating mobile and stationary machinery;<br>• Implementing a Truck Staging Area Plan for all construction vehicles waiting to load or unload material where emissions will have the least impact on sensitive areas and the public. These include but not limited to hospitals, schools, residences, motels, hotels, daycare facilities, elderly housing and convalescent facilities. All sources of emissions shall be located as far away as possible from fresh air intakes, air conditioners and windows.<br>• Implementing an anti-idling policy<br>• Use of alternative fuels and vehicle hybridization of construction vehicles, to the maximum extent practicable<br>• Maintaining existing vegetation, where possible<br>• Use of recycled and reclaimed materials, including use of recycled asphalt, use of industrial byproducts as cement substitutes, and recycled concrete, to the maximum extent practicable. |



I-495 & I-270 Managed Lanes Study

**FINAL ENVIROMENTAL IMPACT STATEMENT**

| No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|
| 2 | | EJ | EPA appreciates the lead agencies' planning and coordination of the Environmental Justice Working Group (EJWG). EPA encourages the continued scheduling of regular EJWG meetings to discuss and address EJ-related topics and potential concerns. EPA recommends keeping the EJWG apprised of EJ-related analyses, outreach efforts, and mitigation progress to support a transparent NEPA process and avoid adverse or disproportionate impacts to vulnerable communities. | MDOT SHA appreciates EPAs participation in the EJ Working Group. To date, three meetings of the EJ Working Group have been held with additional coordination via email. The coordination and participation by the EJ Working Group resulted in development and implementation of a robust EJ engagement initiative in the Fall of 2021. MDOT SHA will continue to schedule meetings with the EJ Working Group as needed. |
| 3 | | EJ | EPA notes that the next steps for the EJ analysis, to be documented in the final EIS, include consideration of mitigation and enhancement measures if unavoidable adverse effects may occur under the Preferred Alternative. An additional and potentially valuable step will be the continued use of a communication strategy to convey findings. It may be beneficial to engage communities to address the significance of changes in land use and construction-related effects. | The potential for EJ populations to experience project impacts that are disproportionately high and adverse as compared to non-EJ populations is described in FEIS Appendix F (Community Effects Assessment and Environmental Justice Technical Report) Chapter 5, Sections 6 and 7. The results of the EJ Analysis, as well as the efforts undertaken as part of the EJ Engagement Initiatives described in FEIS Appendix F (Community Effects Assessment and Environmental Justice Technical Report), Chapter 5, Section 4.5.<br><br>MDOT SHA implemented additional public-facing EJ outreach efforts to engage more meaningfully and directly with underserved communities; identify strategies to minimize impacts and implement; and identify community enhancements that could potentially be incorporated into the project. Due to the large study area, MDOT SHA developed an online survey to seek feedback from EJ and other underserved populations on existing community concerns and potential enhancements in their communities that could be implemented to address those concerns. The survey was distributed in a variety of ways including through multiple community "pop up" events hosted by MDOT SHA at local specialty markets in areas noted as having high percentages of low-income and/or minority populations. These community events allowed for meaningful face-to-face engagement. Community members were able to complete the survey on iPads and ask questions of the staff. Multi-lingual staff were present at each pop-up event.<br><br>The survey was open for approximately six weeks, allowing respondents to complete the questions at their own pace. In addition to English, the survey was provided in Spanish, French, Amharic, Chinese, and Korean— the same top five non-English spoken languages that DEIS and SDEIS materials were translated into based on Montgomery County's Department of Transportation 2020 Language Assistance Plan. The survey is provided in Appendix H of FEIS Appendix F (Community Effects Assessment and Environmental Justice Analysis Technical Report). |

00022057



| No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|
| | | | (Comment #3 continued) | In addition to the direct face-to-face engagement, postcards, flyers, yard signs, targeted social media, local agency and community organization coordination, and direct face-to-face engagement were used to promote the survey.  Promotional materials included a QR code with a direct link to the survey online; the flyer also included the survey questions themselves. All outreach materials were translated into the top five non-English languages identified above.  Postcards and flyers were placed at local health clinics, specialty markets, grocery stores and places of worship. Yard signs with the QR code were placed at affordable housing complexes and near bus transit stations. In addition, an email with the survey was sent to 230 community email addresses informing people about the survey, inviting them to participate, and encouraging them to share the information with their community. Lastly, approximately 49 places of worship were contacted and, where allowed postcards and yard signs with the QR code were distributed. |
| 4 | | EJ | Table 4-45 indicates that block groups which the project characterizes as EJ and Non-EJ may face similar environmental consequences from certain hazards (e.g., air pollution). EPA notes that certain populations (e.g., low-income and/or people of color populations) may face elevated susceptibility to impacts that may affect other populations less severely. Therefore, EPA encourages the project to address the potential for adverse impacts in areas of potential EJ concern even if less vulnerable areas may face similar conditions. EPA emphasizes the importance of mitigating natural resource impacts within underserved communities to preserve the benefits of those resources for local populations. | MDOT SHA further enhanced its EJ analysis for the Preferred Alternative by using analytical tools available on-line through the US EPA, EJSCREEN, and through the state of Maryland, EJSCREEN.  Refer to SDEIS, Appendix K.  In general, these tools assist agencies in the analysis of potential EJ impacts by identifying primary risk factors and indicators of exposure to known pollutants, hazardous substances, and proximity to health hazards that historically have had the tendency to disproportionately impact EJ communities. Application of these tools confirmed that methodology and identification of potential EJ communities was consistent with similar assessments completed by outside expert institutions. Refer to FEIS Chapter 5, Section 5.21; FEIS Chapter 9, Section 9.3.4.D; and FEIS Appendix F for detailed information on the EJ analysis. |
| 5 | | SWM | EPA recognizes the effort that the DEIS and SDEIS placed on addressing stormwater requirements. EPA discourages the use of existing wetlands, streams, and other existing aquatic resources to treat and manage stormwater as it may result in degradation of those resources. EPA recommends continued coordination with agencies to ensure stormwater mitigation on and/or off site is appropriate. EPA also recommends that any proposed stormwater mitigation that includes stream restoration also focus on managing stormwater from adjacent upland areas and surrounding developed sites prior to entering the proposed stream restoration site and not rely only on restoration as mitigation. Incorporating this additional consideration may alleviate recent stream degradation that occurred from increased development and create a more flood resilient stream, which is an important consideration of climate adaptation. | MDOT SHA understands EPA's concern and will prioritize treatment of stormwater in upland areas and prior to runoff entering WUS or wetland resources.  MDOT SHA will continue to coordinate with the agencies throughout the design-build process. |
| 6 | | Aquatic Resources/ Wetlands/ Waters | All action alternatives include substantial permanent, indirect, and cumulative impacts to aquatic resources. EPA recommends the Final EIS fully evaluate the preferred alternative and include any new details regarding onsite designs that will avoid and minimize impacts to aquatic resources to the maximum extent practicable. EPA also recommends that the FHWA and MDOT SHA continue to coordinate with EPA, the United States Army Corps of Engineers, Maryland Department of the Environment, and other cooperating agencies throughout the design build process to verify and permit impacts to aquatic resources, ensure avoidance and minimization to the maximum extent practical, and determine appropriate mitigation and compensatory mitigation. | FHWA and MDOT SHA continue to coordinate with EPA, USACE, MDE, and other cooperating agencies in the Planning phase of the project and will continue throughout the design-build process to verify and permit impacts to aquatic resources and ensure avoidance and minimization to the maximum extent practicable. Mitigation and compensatory mitigation commitments are included in the FEIS, Chapter 7. The FEIS fully evaluates the Preferred Alternative and includes all details regarding design to avoid and minimize impacts to aquatic resources to the maximum extent practicable. |

**ENVIRONMENTAL PROTECTION AGENCY**

**From:** Witman, Timothy <witman.timothy@epa.gov>
**Sent:** Tuesday, November 30, 2021 3:16 PM
**To:** Jeffrey Folden <JFolden1@mdot.maryland.gov>; Parikh, Jitesh (FHWA) <Jitesh.Parikh@dot.gov>
**Cc:** jeanette.mar@dot.gov; Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>; Erron Ramsey <eramsey@rkk.com>; Karen Kahl <kkahl@rkk.com>; Stacy Talmadge (Consultant) <STalmadge.consultant@mdot.maryland.gov>; David Thomas (Consultant) <DThomas6.consultant@mdot.maryland.gov>; Nevshehirlian, Stepan <Nevshehirlian.Stepan@epa.gov>
**Subject:** EPA Comments SDEIS I-495 & I-270 Managed Lanes Study

Mr. Folden and Mr. Parikh,

EPA has reviewed the SDEIS for the I-495 & I-270 Managed Lanes Study Project. Attached to this email is our comment letter with enclosure. If you have any questions, please contact me. We look forward to working with you as continue the NEPA process.

Thank you,

Tim

**Timothy Witman**
Environmental Assessment Branch
Office of Communities, Tribes and Environmental Assessment
Phone: (215) 814-2775
Email: Witman.Timothy@EPA.GOV

**USEPA - Mid-Atlantic Region**
1650 Arch Street (3RA12)
Philadelphia, PA 19103-2029



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania 19103-2029**

November 30, 2021

Mr. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201

Mr. Jeffrey T. Folden, P.E., DBIA
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, Maryland 21201

**Subject**: I-495 & I-270 Managed Lanes Study, Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation CEQ# 20210149

Dear Mr. Parikh and Mr. Folden:

The U.S. Environmental Protection Agency has reviewed the Supplemental Draft Environmental Impact Statement (SDEIS) dated October 2021 for the I-495 & I-270 Managed Lanes Study (MLS), Montgomery and Prince George's Counties, Maryland & Fairfax County, Virginia (CEQ# 20210149) pursuant to Section 309 of the Clean Air Act and Section 102(2)(C) of the National Environmental Policy Act (NEPA).

The Maryland Department of Transportation State Highway Administration (MDOT SHA), in association with the Federal Highway Administration (FHWA), prepared this SDEIS to consider new information relative to the newly identified Preferred Alternative, Alternative 9 - Phase 1 South. The Study's purpose is to develop a travel demand management solution(s) that address congestion, improves trip reliability on I-495 and I-270 within the Study limits, and enhances existing and planned multimodal mobility and connectivity.

The SDEIS focuses on new information since the July 10, 2020 DEIS and describes the background and context in which Alternative 9 – Phase 1 South was identified. The DEIS originally identified eight alternatives with Alternative 9 announced as the MDOT SHA Recommended Preferred Alternative. After several months of coordination, the new Preferred Alternative, Alternative - Phase 1 South, includes a two-lane High Occupancy Toll (HOT) managed lanes network on I-495 and I-270 within the limits of Phase 1 South only. On I-495 the Preferred Alternative consists of adding two, new HOT managed lanes in each direction from the George Washington Memorial Parkway to east of MD 187.

On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east west spurs. There are no actions or improvements currently proposed on I-495 east of the I-270 spur to MD 5.

As noted in the SDEIS avoidance and minimization opportunities have resulted in avoiding over 100 acres of parkland, and hundreds of wetland and stream features. In addition, MDOT and FHWA established an Environmental Justice (EJ) Working Group (EJWG) that collaborated to refine the EJ analysis and improve community outreach. The efforts to avoid, minimize, and mitigate impacts will continue through ongoing and future coordination with the applicable regulatory and resource agencies. The final avoidance, minimization and mitigation will be documented in the Final EIS.

EPA has worked closely with the agencies throughout the planning process and appreciates the coordination efforts that have occurred. We have reviewed and provided comments for previous components of the EIS, as part of the cooperating agency agreement with FHWA. The DSEIS includes supplemental information that adequately addresses and responds to our previous comments. We expect that additional avoidance and minimization of adverse impacts can be achieved in more advanced design phases. EPA looks forward to reviewing project details that were deferred to the Final EIS and seeing development of mitigation to offset unavoidable impacts. Please consider the enclosed technical comments, based on the SDEIS information. EPA appreciates the opportunity to remain involved in the project design, review, planning, and construction process.

If you have any questions regarding our comments, please feel free to contact Timothy Witman, at (215) 814-2775 or by email at Witman.Timothy@epa.gov.

Sincerely,

Stepan Nevshehirlian
Environmental Assessment Branch Chief
Office of Communities, Tribes and
Environmental Assessment

Enclosure

---

**Enclosure**
**Technical Comments**
I-495 & I-270 MLS, SDEIS

**Air Quality**

Section 4.8.3 states that "All Build Alternatives are projected to slightly increase annual tailpipe GHG emissions by an average of 1.4 percent compared to the No Build Alternative in 2040." In addition, to the tailpipe emission, GHG emissions will also be generated during the construction of this large infrastructure project. EPA recommends considering practicable mitigation strategies to reduce emissions. These could include implementing dust suppression techniques noted in section 4.8.4 of the SDEIS as well as other best practices described in the documents referenced below.

For additional guidance on reducing construction emissions and improving energy efficiency during construction, we recommend accessing the resources provided by EPA's Diesel Emissions Reduction Act program, available at: https://www.epa.gov/dera/reducing-diesel-emissions-construction-and-agriculture, and employing the operational and equipment strategies detailed in the EPA publication, "Cleaner Diesels: Low Cost Ways to Reduce Emissions from Construction Equipment," available at https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1009QEO.pdf. These strategies include equipment idle reduction, engine preventive maintenance, equipment operator training, and various fuel strategies, such as retrofit technologies, engine upgrades, and electrification.

**Environmental Justice**

EPA appreciates the lead agencies' planning and coordination of the Environmental Justice Working Group (EJWG). EPA encourages the continued scheduling of regular EJWG meetings to discuss and address EJ-related topics and potential concerns. EPA recommends keeping the EJWG apprised of EJ-related analyses, outreach efforts, and mitigation progress to support a transparent NEPA process and avoid adverse or disproportionate impacts to vulnerable communities.

EPA notes that the next steps for the EJ analysis, to be documented in the final EIS, include consideration of mitigation and enhancement measures if unavoidable adverse effects may occur under the Preferred Alternative. An additional and potentially valuable step will be the continued use of a communication strategy to convey findings. It may be beneficial to engage communities to address the significance of changes in land use and construction-related effects.

Table 4-45 indicates that block groups which the project characterizes as EJ and Non-EJ may face similar environmental consequences from certain hazards (e.g., air pollution). EPA notes that certain populations (e.g., low-income and/or people of color populations) may face elevated susceptibility to impacts that may affect other populations less severely. Therefore, EPA encourages the project to address the potential for adverse impacts in areas of potential EJ concern even if less vulnerable areas may face similar conditions. EPA emphasizes the importance of mitigating natural resource impacts within underserved communities to preserve the benefits of those resources for local populations.

**Stormwater**

EPA recognizes the effort that the DEIS and SDEIS placed on addressing stormwater requirements. EPA discourages the use of existing wetlands, streams, and other existing aquatic resources to treat and manage stormwater as it may result in degradation of those resources. EPA recommends continued coordination with agencies to ensure stormwater mitigation on and/or off site is appropriate. EPA also recommends that any proposed stormwater mitigation that includes stream restoration also focus on managing stormwater from adjacent upland areas and surrounding developed sites prior to entering the proposed stream restoration site and not rely only on restoration as mitigation. Incorporating this additional consideration may alleviate recent stream degradation that occurred from increased development and create a more flood resilient stream, which is an important consideration of climate adaptation.

**Aquatic Resources - Wetlands and Waters of the United States**

All action alternatives include substantial permanent, indirect, and cumulative impacts to aquatic resources. EPA recommends the Final EIS fully evaluate the preferred alternative and include any new details regarding onsite designs that will avoid and minimize impacts to aquatic resources to the maximum extent practicable. EPA also recommends that the FHWA and MDOT SHA continue to coordinate with EPA, the United States Army Corps of Engineers, Maryland Department of the Environment, and other cooperating agencies throughout the design build process to verify and permit impacts to aquatic resources, ensure avoidance and minimization to the maximum extent practical, and determine appropriate mitigation and compensatory mitigation.

*This page is intentionally left blank.*

**Maryland Department of the Environment - SDEIS Comments**

| No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|
| | | | DEIS Comments from Nov. 2020 submitted as reference to SDEIS comments. | MDOT SHA acknowledges receipt of the DEIS comments letter dated November 2020. Refer to Appendix T for a response to the DEIS comments. |
| 1 | | General | During the public hearing on the SDEIS on November 1, 2021, concerns were raised by Dr. Robert Soreng on behalf of the *Washington Biologists' Field Club* regarding the boundaries of the wetlands on Plummers Island, and meeting with the biologists regarding these locations. Please coordinate with Dr. Soreng regarding their concerns and incorporate any updates into the FEIS and upcoming JPA amendment. | MDOT SHA has continued coordination with Dr. Soreng regarding the Washington Biologists' Field Club's concerns, including meeting with them to discuss their concerns. During coordination, the focus of the discussions have been on the Section 106 limits of Plummers Island and not on the wetland delineation. Wetlands and waterways were delineated in accordance with Section 404 requirements and MDE regulations. Riparian areas above the OHW mark were not identified as wetlands, since they did not meet the three parameter requirement. No updates to wetlands and waterways boundaries were necessary as a result of this coordination and they did not need to be updated in the FEIS or JPA. |
| 2 | | General | Will there be any work within Tier II Catchments due to the Preferred Alternative, or associated activities, including stormwater management sites? If so, the work within a Tier II Catchment under a JPA triggers MDE's antidegradation review (regardless if there are impacts to wetlands, waterways, 25-foot wetland buffers, or the 100-year non tidal floodplain in the Tier II Catchment). If any work will occur in a Tier II Catchment, additional details should be added to the FEIS regarding impacts to Tier II resources. | The Preferred Alternative does not include any construction within Tier II catchments. |
| 3 | 3, Section 3, JPA Req. | Compensatory Stormwater Mitigation Report | The wording in this section is confusing, please clarify. Mitigation requirements for MDE stormwater management derive from Stormwater Management Program regulations, and the impacts to nontidal wetlands and waterways due to placement of stormwater management facilities are regulated under a separate set of regulations from the Wetlands and Waterways Program. Please ensure this section explains the separate requirements clearly. | The language in the JPA section of the Compensatory SWM Mitigation Plan has been revised to clarify the difference between the Wetlands and Waterways Program mitigation requirements and MDE's SWM regulations. |
| 4 | 7, Section 4.1 | Compensatory Stormwater Mitigation Report | This section states that, "...stream restoration on sites...are assumed to be self-mitigating by nature." This statement is inaccurate. Stream restoration designs are reviewed to ensure the design is appropriate including the overall functional uplift of a site. Mitigation may be required depending on the site-specific impacts and the appropriateness of the overall design. | Currently, stream restoration is not included in the Compensatory SWM Mitigation Plan and the language identified in the comment has been removed from Section 4.1. Refer to Chapter 3 of the FEIS, Section 3.1.6 for a summary of the Compensatory SWM Mitigation. If stream restoration is considered during final design, it will be evaluated to ensure the design results in overall functional uplift and mitigates site specific impacts. If site specific impacts are not mitigated by overall functional uplift, the restoration will be abandoned or additional mitigation may be provided as negotiated with the resource agencies. |
| 5 | | Compensatory Stormwater Mitigation Report, General | Coordination between MDE and MDOT SHA is ongoing regarding the overall stormwater management approach for the project. As coordination moves forward, provide updates on this Report for agency review. | The updated Compensatory Stormwater Mitigation Report is included as Appendix D to the FEIS. |
| 6 | | Compensatory Stormwater Mitigation Report, General | MDE is currently discussing when, how, and where compensatory stormwater management will be acceptable for this project. It is premature at this time to make assumptions on how and when compensatory stormwater management will be accepted. Issues under discussion include but are not limited to location of water quality management with respect to impacts, compensatory management within a Tier II drainage area, and the acceptable watershed banking HUC level. Stream restoration is currently not an acceptable stormwater management practice for new development impacts. While there are discussions underway between MDE and MDOT on the use of stream restoration for new development impacts for this project, it is premature for MDOT to plan for its application at this time. Until the details of the agreement between MDE and MDOT are worked out, any assumptions on the applicability of compensatory stormwater management are unsupported. | MDOT SHA acknowledges this comment. Currently, stream restoration is not included in the Compensatory Mitigation Plan. However, MDOT SHA looks forward to future discussions with MDE to include stream restoration for water quality credit in a hierarchical approach and will work with MDOT SHA OHD PRD on the review and approval of all offsite SWM mitigation in accordance with the banking agreement. |

00022062

**MARYLAND DEPARTMENT OF THE ENVIRONMENT**

**From:** Emily Dolbin -MDE- <emily.dolbin@maryland.gov>
**Sent:** Tuesday, November 30, 2021 2:39 PM
**To:** Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>
**Cc:** Amanda Sigillito <amanda.sigillito@maryland.gov>; Jack Dinne <john.j.dinne@nab02.usace.army.mil>; Heather Nelson <hnelson@maryland.gov>; William Seiger <william.seiger@maryland.gov>; Kelly Neff -MDE- <kelly.neff@maryland.gov>; Steve Hurt -MDE- <steve.hurt1@maryland.gov>
**Subject:** I-495 & I-270 Managed Lanes Study- SDEIS - MDE Comments

Good Afternoon Caryn,

On behalf of Amanda Sigillito, attached are MDE's comments on the SDEIS for the I-495 & I-270 Managed Lanes Study.

Please let us know if you have any questions.

Thank you,

Emily Dolbin
Consultant Reviewer
Wetlands and Waterways Program
Water and Science Administration
Maryland Department of the Environment
1800 Washington Boulevard
Baltimore, Maryland 21230
Emily.Dolbin@maryland.gov
$
$

Click here to complete a three question customer experience survey.



**Maryland**
Department of
the Environment

Larry Hogan, Governor
Boyd K. Rutherford, Lt. Governor

Ben Grumbles, Secretary
Horacio Tablada, Deputy Secretary

November 15, 2021

Ms. Caryn J G Brookman
I-495 & I-270 P3 Office
601 N. Calvert Street
Baltimore, Maryland 21202

Mailing Address:
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21201

Re: I-495 & I-270 Managed Lanes Study (SHA FMIS No. AW073A11),
Supplemental Draft Environmental Impact Statement Published October 1, 2021

Dear Ms. Brookman:

The Maryland Department of the Environment, Wetlands and Waterways Program ("the Program") has reviewed the *I-495 & I-270 Managed Lanes Study, Supplemental Draft Environmental Impact Statement* (SDEIS) published October 1, 2021. Please find the Program's comments on the SDEIS in Attachment A. Also attached are the Program's previous comments on the Draft Environmental Impact Statement (DEIS) dated November 9, 2020 (Attachment B), and the Program's previous comments on the Administrative Draft of the SDEIS dated August 18, 2021 (Attachment C). Comments that are still outstanding should be addressed in the Final Environmental Impact Statement (FEIS). Numerous comments will also affect the JPA Amendment for the project and should be considered during its preparation.

If you need any further information or assistance, please do not hesitate to contact Steve Hurt by telephone at (410) 336-1528 or by email at Steve.Hurt1@maryland.gov, or Emily Dolbin by telephone at (667) 219-3279 or by email at Emily.Dolbin@maryland.gov.

Sincerely,

Amanda Sigillito, Chief
Nontidal Wetlands Division
Wetlands and Waterways Program

Attachments:    Attachment A – MDE's SDEIS Comments
           Attachment B – MDE's DEIS Comments
           Attachment C – MDE's Administrative Draft SDEIS Comments

Cc:    Jack Dinne, U.S. Army Corps of Engineers
      Heather Nelson, MDE
      William Seiger, MDE
      Kelly Neff, MDE
      Steve Hurt, MDE   Emily Dolbin, MDE

1800 Washington Boulevard | Baltimore, MD 21230 | 1-800-633-6101 | 410-537-5000 | TTY Users 1-800-735-2258
www.mde.maryland.gov

00022063



**Supplemental DEIS**
Errata Sheet

| Comment No. | Commenting Agency | Page and Section | Comment |
|---|---|---|---|
| 1 | MDE | General | During the public hearing on the SDEIS on November 1, 2021, concerns were raised by Dr. Robert Soreng on behalf of the *Washington Biologists' Field Club* regarding the boundaries of the wetlands on Plummers Island, and meeting with the biologists regarding these locations. Please coordinate with Dr. Soreng regarding their concerns and incorporate any updates into the FEIS and upcoming JPA amendment. |
| 2 | MDE | General | Will there be any work within Tier II Catchments due to the Preferred Alternative, or associated activities, including stormwater management sites? If so, the work within a Tier II Catchment under a JPA triggers MDE's antidegradation review (regardless if there are impacts to wetlands, waterways, 25-foot wetland buffers, or the 100-year non tidal floodplain in the Tier II Catchment). If any work will occur in a Tier II Catchment, additional details should be added to the FEIS regarding impacts to Tier II resources. |
| 3 | MDE | Compensatory Stormwater Mitigation Report, PG 3, Section 3 JPA Requirements | The wording in this section is confusing, please clarify. Mitigation requirements for MDE stormwater management derive from Stormwater Management Program regulations, and the impacts to nontidal wetlands and waterways due to placement of stormwater management facilities are regulated under a separate set of regulations from the Wetlands and Waterways Program. Please ensure this section explains the separate requirements clearly. |
| 4 | MDE | Compensatory Stormwater Mitigation Report, PG 7, Section 4.1 | This section states that, "...stream restoration sites...are assumed to be self-mitigating by nature." This statement is inaccurate. Stream restoration designs are reviewed to ensure the design is appropriate including the overall functional uplift of a site. Mitigation may be required depending on the site-specific impacts and the appropriateness of the overall design. |
| 5 | MDE | Compensatory Stormwater Mitigation Report, General | Coordination between MDE and MDOT SHA is ongoing regarding the overall stormwater management approach for the project. As coordination moves forward, provide updates on this Report for agency review. |
| 6 | MDE | Compensatory Stormwater Mitigation Report, General | MDE is currently discussing when, how, and where compensatory stormwater management will be acceptable for this project. It is premature at this time to make assumptions on how and when compensatory stormwater management will be accepted. Issues under discussion include but are not limited to location of water quality management with respect to impacts, compensatory management within a Tier II drainage area, and the acceptable watershed banking HUC level. Stream restoration is currently not an acceptable stormwater management practice for new development impacts. While there are discussions underway between MDE and MDOT on the use of stream restoration for new development impacts for this project, it is premature for MDOT to plan for its application at this time. Until the details of the agreement between MDE and MDOT are worked out, any assumptions on the applicability of compensatory stormwater management are unsupported. |

OP·LANES
MARYLAND
I-495 & I-270 Managed Lanes Study

**FINAL ENVIROMENTAL IMPACT STATEMENT**

| | | | | | |
|---|---|---|---|---|---|
| **Maryland-National Capital Park and Planning Commission - SDEIS Comments** | | | | | |
| ** MDOT SHA numbered the comments in the 2nd column based on where they originated. There are 3 sets of numbering: Letter-1 through Letter-37; #1 through #209; and MCPLAN-1 through MCPLAN-59. | | | | | |
| **M-NCPPC Ref Doc_#** | **MDOT SHA Comment No.** | **Page** | **SDEIS Section** | **Comment** | **Response** |
| **Comments from MNCPPC_18-page Letter** | | | | | |
| | Letter-1 | 1 | General | The Maryland-National Capital Park and Planning Commission ("M-NCPPC" or "the Commission") submits the following comments, along with the attached and incorporated by reference Comment Response Table, regarding the Supplemental Draft Environmental Impact Statement ("SDEIS") prepared by the Maryland Department of Transportation State Highway Administration ("MDOT SHA") and the Federal Highway Administration ("FHWA") (collectively the "Lead Agencies") for the I-495 & I-270 Managed Lanes Study (the "Project"). Through this letter, the Commission shares its concerns with the Lead Agencies' updated analysis underpinning the SDEIS, including, among others, concerns resulting from the limited scope of the Project's current National Environmental Policy Act ("NEPA") analysis, potential impacts to protected parkland and natural resources subject to M-NCPPC's jurisdictions, equity and cultural considerations, transportation and local roadway impacts, and generally inadequate mitigation measures. | Thank you for your comments submitted on FHWA and MDOT SHA's SDEIS. |
| | Letter-2 | 1-2 | General | Although the Lead Agencies narrowed the scope of their preferred alternative (the "Preferred Alternative") in response to comments in the Draft Environmental Impact Statement ("DEIS"), significant issues remain that require further review and potential adjustments to the Project's planning and design, along with commitments to ensure that the Lead Agencies comply with NEPA and all other applicable federal laws, including the Capper-Cramton Act (the "CCA"). | No response required. |
| | Letter-3 | 2 | General | M-NCPPC does not intend for its comments to express a decision to oppose or support the Project or the Lead Agencies' Preferred Alternative. Rather, as the governing body of this Cooperating Agency, the Commission is carrying out its responsibilities as the planning agency for Montgomery and Prince Georges Counties and as the parkland steward in these counties. M-NCPPC has made the Lead Agencies aware of its concerns regarding the environmental review process, attributable largely to the Lead Agencies' failure to undertake a comprehensive analysis of reasonable alternatives, impacts, and mitigation measures, and failure to incorporate best practices in transportation, environmental protection, and land use planning. | No response required. |
| | Letter-4 | 2 | General | The Lead Agencies' approach remains at odds with M-NCPPC's statutory obligation to make well-reasoned and informed decisions regarding parkland, cultural resources, and historic resources. Still, M-NCPPC is, as it has been throughout this process, committed to collaborating with the Lead Agencies as they continue their environmental review of the Project and proceed through the NEPA review process. The Commission remains optimistic that the Lead Agencies will consider changes to the Project that minimize impacts to parkland, streams, and protected cultural and historic resources. M-NCPPC is also hopeful that the Lead Agencies will take meaningful steps to responsibly address the unavoidable impacts to parkland that could result from the Project, notwithstanding its narrower scope compared to the build alternatives initially proposed. | No response required. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| | No. | Page | I. Background | | |
| | | | A. The Maryland-National Capital Park and Planning Commission | | |
| | Letter-5 | 2-3 | General | The Maryland General Assembly created M-NCPPC in 1927 to plan for the orderly development, acquisition and maintenance of parkland and open space, and to protect natural resources in Prince George's and Montgomery Counties. Since that time, M-NCPPC has acquired several hundred parks in the two counties, including parks requiring special protection due to their acquisition with funds made available from the federal government and state of Maryland pursuant to the CCA.

The parkland acquired with CCA funds includes areas in the vicinity of the Clara Barton Parkway covered by agreements between M-NCPPC, the National Capital Planning Commission ("NCPC"), and the federal government that require the land to be used for park purposes and give M-NCPPC authority to approve or reject its use for other purposes.

The Lead Agencies engaged M-NCPPC as a Cooperating Agency to provide input regarding the environmental impacts of the Project. To fulfill its role as a Cooperating Agency, M-NCPPC must ensure that the Project is undertaken in compliance with NEPA and that M-NCPPC complies with its own mandates under state and federal law. As a Cooperating Agency, M-NCPPC staff has taken its responsibilities seriously by fully engaging with the Lead Agencies and the Interagency Working Group established by the Lead Agencies during every stage of review of the Project. | M-NCPPC was invited to be a cooperating agency in the Study due to the agency's special expertise related to county-owned parkland and resources associated with that parkland. As a local cooperating agency, M-NCPPC is responsible for providing information related to resources under their jurisdiction to contribute to the lead agencies consideration during the NEPA process and to assist with decision making. |
| | MDOT SHA Comment No. | Page | I. Background | | |
| | | | B. Development of Preferred Alternative | | |
| | Letter-6 | 3 | General | The stated purpose of the Project is to develop travel demand management solutions that address congestion, improve trip reliability on I-495 and I-270 within the Project limits, and enhance existing and planned multimodal mobility. The stated needs for the Project are: accommodating existing traffic and long-term traffic growth, enhancing trip reliability, providing additional roadway travel choices, enhancing homeland security, and facilitating the movement of goods and the ability of businesses to provide services. The Project limits are: I-495 from south of the George Washington Memorial Parkway in Virginia, including improvements to the American Legion Bridge ("ALB") over the Potomac River, to the west of MD 5 in Maryland and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs in Montgomery and Prince George's Counties. | No response required, this paragraph repeats text from SDEIS. |
| | Letter-7 | 3 | General | The Lead Agencies issued their DEIS and Draft Section 4(f) Evaluation for the Project and published a Notice of Availability in the Federal Register on July 10, 2020. The Lead Agencies considered a range of 15 preliminary alternatives and retained and analyzed seven alternatives in the DEIS. The DEIS noted that after circulating the DEIS and receiving comments, the Lead Agencies would issue a Final Environmental Statement ("FEIS") that would identify the Preferred Alternative as well as respond to substantive comments. M-NCPPC, as a Coordinating Agency, provided comments to MDOT SHA by letter dated November 9, 2020, raising concerns about the effect of the alternatives on parkland, traffic and historic resources, wetlands, and environmental justice communities. In January 2021, the Lead Agencies announced Alternative 9 as their Preferred Alternative based on the results of public comment and the ongoing traffic, engineering, financial, and environmental analyses. Alternative 9 envisioned the addition of two priced, managed lanes in each direction on I-495 and the conversion of one existing high-occupancy vehicle lane to a price-managed lane and addition of one priced, managed land in each direction on I-270. | No response required, this paragraph explains the timeline for the study and key milestones. |
| | Letter-8 | 4 | General | After Coordinating Agencies and other stakeholders raised concerns about the impacts of Alternative 9 and in particular those on and around I-495 east of the I-270 spur to MD 5, the Lead Agencies decided to change the Preferred Alternative to Alternative 9 - Phase I South, which would consist of building a new American Legion Bridge and delivering two high-occupancy toll managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to east of MD 187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from east of MD 187 to I-270." The Lead Agencies issued their SDEIS on October 1, 2021 describing the change in the Preferred Alternative and seeking comments from interested parties. | No response required, this paragraph explains the timeline for the study and key milestones. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| | Letter-9 | 4 | General | While M-NCPPC appreciates that the Lead Agencies have narrowed the Project to avoid the most significant impacts, the newly envisioned Preferred Alternative should be adjusted to have the fewest practicable impacts. Through this letter, M-NCPPC provides comments focused on that purpose. | Thank you for providing comments. |
| | MDOT SHA Comment No. | Page | II. Discussion<br>A. The Preferred Alternative must reflect the "No-Build Alternative" outside of Phase 1 and should include both transportation demand management (formerly Alternative 2) and transit (formerly Alternative 14). | | |
| | Letter-10 | 4 | General | The Lead Agencies should clarify their obligation to conduct a new or updated NEPA analysis when considering improvements outside of Phase 1 of the Project. Although the area outside Phase 1 (i.e., I-495 east of Old Georgetown Road) is neither specifically included as part of the Preferred Alternative nor included in the upcoming 2022 update to the Visualize 2045 Long Range Plan being advanced by the National Capital Region Transportation Planning Board ("TPD"), the SDEIS does not indicate clearly that I-495 east of Old Georgetown Road is now excluded from the NEPA analysis. To the contrary, the SDEIS states, "There is no action or no improvements on I-495 east of the I-270 east spur to MD 5. While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the scope of this Study, improvements on the remainder of the interstate system may still be needed in the future and would advance separately, subject to additional environmental studies, analysis and collaboration with the public, stakeholders and local agencies." While the Lead Agencies correctly acknowledge that future environmental studies and analysis would be needed prior to future phases, the Lead Agencies should clarify in the FEIS that a new NEPA study is required by law prior to any development in the area of I-495 east of Old Georgetown Road. | The Study Limits of the Managed Lanes Study have not changed and include the 48 miles as described in the Notice of Intent. The Preferred Alternative includes build improvements only within the area of Phase 1 South and includes no action or no improvements on I-495 east of the I-270 east spur to west of MD 5. Future improvements on the remainder of the interstate system would be subject to additional studies and analyses and would proceed separate from the current NEPA process. |
| | Letter-11 | 4-5 | | The Lead Agencies' state in the SDEIS that all of the parkland outside of the Phase 1 area is now "avoided." Should the Lead Agencies determine to build future phases, it stands to reason that they would be required to conduct a new study to determine the impacts of the future alignments on natural resources. This must be the case even if the Preferred Alternative reflects the "No--Build Alternative" for future phases, since the NEPA analysis to date did not adequately consider all potential impacts to protected parkland and natural resources, such as local bodies of water. The Lead Agencies also must ensure that their selection of the Preferred Alternative does not commit them to a course of action that they have not fully analyzed.<br><br>With that said, even the Preferred Alternative requires further analysis. For example, if the portion of I-495 outside of Phase 1 is no longer part of the Managed Lanes Study, the transition areas to I-495 on the east spur travelling south and north from the ALB to Old Georgetown Road from the "split" may not be necessary. Creating the transition in this manner would encourage vehicle travel to continue on I-495, as described in the Commission's SDEIS Comment #6. Therefore, as MDOT Secretary Slater noted during the Washington Council of Government's Transportation Planning Board July 21, 2021, meeting, TDM such as dynamic signage is necessary to direct traffic to use the I-270/MD 200 combination for travel along the I-95 corridor. Encouraging vehicle travel on that route will provide additional capacity on the topside of I-495 for local travel needs. All of these impacts must be properly assessed, especially if the Project will include future phases. | The Study Limits of the Managed Lanes Study remain the same as described in the DEIS and continue to include 48 miles on both I-495 and I-270. However, as described in the SDEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. This includes consideration of the well documented comments from M-NCPPC to avoid impacts to significant parkland such as Rock Creek Park, Sligo Creek Park and Northwest Branch Stream Valley Park and to avoid displacements on the topside of I-495.<br><br>The Study fulfills the requirement to thoroughly evaluate potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives.  As required by the CEQ NEPA regulations, the DEIS summarized the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail and the SDEIS and now FEIS summarized the environmental effects of the Preferred Alternative.  These analyses directly contributed to MDOT SHA's evaluation of the alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided.  Refer to the FEIS Executive Summary, Chapter 5 and Chapter 7 for details on these efforts.  The operations at the transition areas have been evaluated as part of the Interstate Access Point Approval process, and the design of the transition areas has been updated to ensure acceptable operations.  The results are included in FEIS, Appendix B. |
| | Letter-12 | 5 | | Project-related mitigation also should include travel demand management and transportation system management ("TSM") measures, such as improvements along impacted corridors outside the project limits, including I-495 between the I-270 western spur and US 50. The Lead Agencies should consider incorporating into the Project TSM improvements, such as those being implemented along I-370 as part of the I-270 Innovative Congestion Management project, including variable message signage and ramp metering. FHWA's NEPA regulations are designed to facilitate this type of analysis before FHWA commits to an alternative. The Lead Agencies should consider incorporating TSM/TDM and transit into the Project as part and parcel of the Preferred Alternative, not as ancillary components. | TDM/TSM and transit were evaluated as standalone alternatives during the alternatives development process and were dismissed from further consideration as the alternatives would not address the Purpose and Need. Refer to FEIS Chapter 9, Section 9.3.2B. However, both TDM/TSM and transit elements are part of the Preferred Alternative.  TDM and TSM measures were considered and were applied, where reasonable and feasible.  For travel demand management, MDOT SHA has moved forward with modifications to existing dynamic signing to show travel times between I-95 and Virginia for both MD 200 and I-495, as suggested by M-NCPPC.  For TSM measures, ramp metering along I-495 was evaluated but would have resulted in additional environmental impacts (due to required ramp widening to accommodate queues at the metering signals), and was therefore dropped from consideration. Along I-270, TSM measures have already recently been implemented as part of the ICM project, as you noted. Refer to FEIS Chapter 3, Section 3.1.4 for transit-related elements. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| | Letter-13 | 6 | | While the Lead Agencies considered these elements as alternatives early in the NEPA process, they quickly eliminated them from further consideration, finding that they do not "support long-term traffic growth" or "would not enhance trip reliability." After dropping these alternatives, MDOT SHA promised that "transit solutions are part of the overall traffic relief plan" and would play a role in the Preferred Alternative. The SDEIS's brief discussion of "transit-related elements"-which describes the ability of transit buses to use high-occupancy travel lanes without charge, connections to existing transit stations, and regional transit improvements (e.g., new bus bays and parking capacity in two areas)—contemplates transit improvements that fall considerably short of the type necessary to have a real impact on traffic congestion in the area – much less to mitigate or avoid the economic and environmental consequences of increasing reliance on travel by automobile, including, without limitation, the emissions associated with increasing vehicle miles traveled and the disruption to sound land use planning caused by the project. In order to follow through on transit commitments the Lead Agencies made to Montgomery County during the early stages of the NEPA process, which are integral to the Project's success, the Lead Agencies should designate transit as a contributing alternative, as opposed to an ancillary improvement. | See response to comment Letter-12 and refer to FEIS Chapter 3, Section 3.1.4 and Chapter 9. |
| | MDOT SHA Comment No. | Page | II. Discussion | B. The SDEIS does not consider adequately environmental justice, equity, and historic resource preservation concerns. | |
| | Letter-14 | 6 | General | The Lead Agencies must identify impacts to all resources of environmental, cultural, and historic significance, as opposed to evaluating these concerns in a piecemeal approach. NEPA requires the Lead Agencies, in consultation with the Coordinating Agencies, to "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." The consulting parties must consult with one another to find ways to avoid, minimize, or mitigate adverse effects on historic property and summarize their agreed-upon course of action in a memorandum of agreement. This consultation process should occur early in the NEPA review process to allow adequate time for the agencies to consider all potential impacts on historic properties and alternatives to avoid, minimize, or mitigate such impacts. In other words, the Lead Agencies must take steps now, before promulgation of the FEIS, to conduct a comprehensive evaluation of these properties for historic and cultural significance. | The implementing regulations at 36 CFR 800.4(b)(1) for Section 106 of the National Historic Preservation Act (NHPA) require a reasonable and good faith identification effort for historic properties. 36 CFR 800.4(b)(2) also permits a phased identification and evaluation of historic properties where alternatives under consideration consists of corridors, large land areas, or where access to properties is restricted. Cultural resources survey and National Register of Historic Places evaluations of hundreds of properties and archaeological survey areas was completed prior to the DEIS and SDEIS. Very little survey work remains and generally only in areas where property access was not available. The Programmatic Agreement will be signed and executed prior to the Record of Decision and will provide a framework for ongoing identification, avoidance, minimization, and mitigation at historic properties. |
| | Letter-15 | 6-7 | | M-NCPPC also notes that while the Lead Agencies have taken steps to consider environmental justice and features of cultural and historic significance, they must take more significant action to ensure that minority and low-income populations are not disparately impacted by the Project. Of note, the Lead Agencies have consulted with local stakeholders and conducted a ground-penetrating radar survey to identify some areas of potential disturbance to the impacted historic cemeteries, such as the Morningstar Tabernacle No. 8 Moses Hall and Cemetery. While this effort is a good first step, the Lead Agencies' assessment of impacts needs to include all of the cemetery property (including all potential grave sites), the results of which should inform specific mitigation measures that the Lead Agencies tailor appropriately to reduce or avoid those impacts to the maximum extent possible. | The proposed design at this location has been revised and impacts eliminated since MDOT SHA made its initial adverse effect determination for the Morningstar property in July 2020. Further research and archaeological survey efforts have revealed new information about the property, including the discovery of possible burials indicated by ground-penetrating radar that may extend into MDOT SHA right-of-way. As a result of these investigations, MDOT SHA developed and presented in the SDEIS an alternative that eliminates all project impacts within the property boundary and avoids associated potential burial features within right-of-way adjacent to the modern cemetery boundary. No property is needed from the cemetery for either temporary construction or permanent acquisition. The area of possible burial features within right-of-way has now been included within the National Register eligible boundary of the property via an update in 2021. Additional survey in areas not currently accessible or practicable for further GPR survey at this time may still be needed and will be identified under the Programmatic Agreement. The Treatment Plan in the PA will include proposed investigations to identify and evaluate potential graves or human remains in specified sensitive areas to the maximum extent practicable to ensure avoidance or treatment prior to final design and construction. |
| | Letter-16 | 7 | | Furthermore, the SDEIS indicates that environmental justice issues omitted from the SDEIS will be remedied in the FEIS. This is far from a best practice since it obstructs public comment and community input. Waiting until after selection of a preferred alternative to evaluate impacts to minority communities means that disproportionate impacts will not be considered in the formulation of the preferred alternative and thus do not receive the attention MDOT SHA and Title VI of the Civil Rights Act of 1964 ("Title VI") demand from the Lead Agencies. This course of action also runs afoul of Department of Transportation Order 5610.2(a), which commits the Department to promote the principles of environmental justice "by fully considering environmental justice principles throughout planning and decision-making processes in the development of programs, policies, and activities, using the principles of the National Environmental Policy Act of 1969 … " FHWA Order 6640.23A espouses a similar theme, committing FHWA to "identify and prevent discriminatory effects … to ensure that social impacts to communities and people are recognized early and continually throughout the transportation decision-making process-from early planning through implementation." Acting later, after the Lead Agencies have already responded to stakeholder concerns and continued designing the Project, would violate Title VI, these orders, and fundamental environmental justice principles. | The Environmental Justice (EJ) Analysis presented in the DEIS and SDEIS were conducted in compliance with Title VI of the 1964 Civil Rights Act; Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations; USDOT Order 5610.2(a): Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (2012 revision); FHWA Order 6640.23A: FHWA Actions to Address Environmental Justice in Minority Populations and Low-Income Populations; and FHWA memorandum Guidance on Environmental Justice and NEPA (2011); and other applicable agency guidance. The process used to assess EJ impacts was consistent with FHWA guidance and methodology and fully incorporated stakeholder input. Per the methodology approved by FHWA, the first steps of the EJ Analysis were completed in the DEIS and SDEIS. The remaining steps, including a comparison of impacts from the Preferred Alternative to EJ populations versus impacts to non-EJ populations which was done at a preliminary level in the SDEIS for public comment, are completed in this FEIS. See FEIS Chapter 5, Section 21.1 for detail on the EJ Analysis methodology and steps. |



| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| | Letter-17 | 7 | | The SDEIS's community and environmental justice analysis of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery and the Poor Farm Cemetery acknowledges that the Project may impact culturally significant sites. However, the SDEIS's environmental justice discussion relates primarily to current minority population concentrations and fails to address how the Project may exacerbate the historical and ongoing injustice to small African American communities displaced by construction of the Beltway. The National Trust for Historic Preservation explicitly acknowledged this issue as key to social justice by selecting the Moses Cemetery as one of the 11 most endangered historic sites in the United States in 2021. To their credit, the Lead Agencies promised to "fully investigate areas to be impacted by construction." A "full investigation," however, means complete ground-penetrating radar surveys of all potential historic grave sites, as well as robust and frequent communication with local community members. The Lead Agencies must ensure that their analysis is fulsome and exhaustive prior to approving any further development in these historically and culturally significant areas that already faced significant disruption in the past. | See response to MDOT SHA Comment Letter-15. |
| | Letter-18 | 8 | | Additionally, neither the DEIS nor the SDEIS reference any cumulative effects to specific cultural resources. For instance, additional historical research conducted subsequent to the DEIS in Cabin John related to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery and associated Gibson Grove community show that the construction of the Beltway divided the fraternal hall and cemetery from the neighboring church, physically fragmented the community, and contributed to the decline of these institutions. The community's decline, in turn, contributed to the closure and loss to fire of the Moses fraternal hall. As currently designed, the Preferred Alternative will result in a "long-term diminishment of the property's setting and feeling due to construction impacts on a small sized property ." This "diminishment" is just the latest in a series of diminishments beginning with the Beltway that the Lead Agencies do not appear to account for or seek to mitigate. By failing to account for cumulative impacts on cultural resources, the Lead Agencies risk violating NEPA and Title VI. | The most recent highway impacts that diminished the larger Gibson Grove community in the past (including the cemetery and church) were associated with the original I-495 construction, prior to the passage of NEPA or the National Historic Preservation Act.  In 1992, I-495 was widened from three to four lanes in each direction, however, the outside edge of I-495 was held and all widening occurred within the grassy median, which was replaced with travel lanes and concrete barrier.  No impacts to the cemetery occurred from the 1992 improvements. Refer to FEIS Chapter 5, Section 21.3 for more information on historical context

Following consulting party input and extensive minimization and avoidance efforts, MDOT SHA and FHWA have determined that the project will not adversely affect the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. The proposed design will entirely avoid the historic property boundary as defined in 2021 and will not affect the property's character-defining features, which are confined within the historic boundary. The project will not impact any markers, any known or suspected burials and will avoid all impacts to the archaeological foundation.  The proposed noise barrier will further screen the property from visual and audible effects already present along I-495.  No diminishment of location, design, materials, or association will occur, and feeling will remain the same or improved from the condition existing today. MDOT SHA's proposed activities will not alter the characteristics that qualify Morningstar Tabernacle No. 88 Moses Hall and Cemetery for the NRHP and do not constitute an adverse effect as defined at 36 CFR §800.5(1).

MDOT SHA will continue to commit to "context-sensitive design", "context-sensitive solutions" or "community enhancements" such as improved and new pedestrian connections between the cemetery and church, sympathetic design treatment of new noise barrier that faces the cemetery, and potentially other design elements of the project that are compatible and beneficial to the property, but are not mitigation.

MDOT SHA will further commit to additional archaeological investigation and/or monitoring as part of Treatment Plans identified in the PA.  Remaining uninvestigated areas of the LOD bordering the cemetery, which are currently impractical to investigate due to mature vegetation, slope, accessibility, and other issues, appear to have low potential for additional burials. They are either significantly removed from the historically understood boundaries of the property or are within disturbed cut/fill areas.

Regardless, MDOT SHA will continue to commit to further investigation to be developed in consultation with MHT and appropriate consulting parties as part of the proposed archaeological and human remains treatment plans.  In the event of a late discovery indicating human remains or funerary objects where not currently expected, MDOT SHA would consult on such findings and amend the PA as appropriate, consistent with our established inadvertent discovery plan or the specific provisions of the PA. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| | MDOT SHA Comment No. | Page | II. Discussion C. The Preferred Alternative's design will shift bottleneck issues instead of relieving traffic congestions at the ALB. | | |
| | Letter-19 | 8-9 | General | A detailed technical transportation review of the SDEIS concludes that the Preferred Alternative will relieve congestion at the ALB. However, the Preferred Alternative does not eliminate congestion in the corridors studied but and instead shifts it from the vicinity of the ALB ( e.g., McLean and Potomac) to other areas in Maryland. While some of these bottleneck shifts were expected, the degree of congestion resulting from the proposed project is severe on I-270 north of I-370, on the Inner Loop on the top side of the Beltway, and on the Inner Loop in Prince George's County. These bottlenecks are Project-related impacts, and so the Lead Agencies should address mitigation measures to minimize these projected deficiencies in the SDEIS and incorporate them into the Project design. NEPA requires the Lead Agencies to consider mitigation measures that address adverse impacts, including, among others, areas of traffic congestion points. | The updated analysis results presented in the FEIS Chapter 4 reflect design changes and other mitigation measures to reduce the impacts of shifting the bottleneck.  Additionally, mitigation of operational impacts is included as part of MDOT SHA's Application for Interstate Access Point Approval, FEIS Appendix B. The Preferred Alternative is projected to provide meaningful operational benefits to the system even though it includes no action or no improvements for a large portion of the study area to avoid and minimize environmental and property impacts. This alternative would significantly increase throughput across the American Legion Bridge and on the southern section of I-270 while reducing congestion.  It would also increase speeds, improve reliability, and reduce travel times and delays along the majority of I-495, I-270, and the surrounding roadway network compared to the No Build Alternative. The Preferred Alternative shows a reduction in delay on the surrounding local roadways, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges. |
| | Letter-20 | 9 | | Specifically, if the construction of Phase 1A is likely to shift congestion in a way that logically requires construction of Phase 1B (currently the subject of the I-270 Pre-NEPA Study) in order to avoid creation of new bottlenecks, then it follows that any decision to proceed with Phase 1A must await completion of the NEPA analysis for Phase 1B. MDOT SHA should further consider the implications of language in the FEIS concerning the impact of Section 27.3 of the Phase Public Private Partnership Agreement (the "P3 Agreement").  Section 27.3 is entitled Financial Viability of an Uncommitted Section and it explicitly states that future phases may be cut based upon a financial viability formula applied to a prior phase of the project. The FEIS should at minimum discuss the impact of this language on the effect of a decision to construct Phase 1A for construction of Phase 1B. In other words, the traffic analysis raises serious questions about how a decision on Phase 1A can or should be made in the absence of a comprehensive analysis that assesses the impact of building this segment on future phases. | The geographic scope of the Managed Lanes Study, while large, is distinctly defined.  It includes 37 miles of I-495 and 11 miles of I-270 and this remains the same as noted in the DEIS. Consistent with CEQ NEPA regulations 40 CFR 1502.4(a) and 1508.25(a), as well as FHWA NEPA regulations at 23 CFR 771.111(f), MDOT SHA and FHWA have identified the MLS as an independent action that may proceed regardless of whether other actions of the P3 Program are implemented. Furthermore, the identified scope of the MLS has been sufficiently defined to be advanced with a project-level NEPA document. Consistent with FHWA regulations, other proposed actions, such as potential improvements to I-270 from I-370 to I-70 (Phase 1 North) have been determined to possess independent utility from the MLS and thus will require separate project-level NEPA documents. |
| | Letter-21 | 9 | | For the other bottleneck issues, M-NCPPC recommends the following design changes to the Preferred Alternative: • Eliminate the managed lanes from the I-270 Eastern Spur between I-270 and I-495 because I-270 traffic headed south to the eastern spur would not use the managed lane network. The managed lanes would provide minimal travel time benefits for drivers from Gaithersburg and Rockville to most Montgomery County destinations. • Eliminate the managed lanes and exit/entrance ramps from I-495 between the two spurs. • Managed lane traffic destined to and from the Inner Loop should enter/exit the managed lane network at the River Road crossover interchange. | The project team received many suggestions for potential design changes from many different stakeholders throughout the NEPA process, and has considered the feasibility, advantages, and disadvantages of each one, including these suggestions. Ultimately, it was concluded that the managed lane connections on the east spur and on I-495 between the spurs were necessary to avoid overloading the general purpose lanes and to maintain system connectivity. As a result, design in the FEIS has been updated to improve the bottleneck issues identified in the SDEIS, while also considering other factors, such as environmental resources and property impacts.  As shown in Table 4-7 in the FEIS, projected speeds along the I-495 Inner Loop general purpose lanes between the GWMP and I-270 West Spur during the 2045 PM peak period following the design updates are projected to be 15 mph, which is better than No Build (14 mph), and also improved compared to the preliminary results presented in the SDEIS (7 mph), while the HOT lanes in this segment are projected to operate at free-flow speeds (62 mph). |
| | Letter-22 | 9 | | Additionally, there are a number of inconsistent conclusions and assumptions in the SDEIS's transportation modeling and forecasts. The Project claims to improve traffic congestion, but its analysis finds that there are significant segments where the General Purpose lanes worsen significantly as a result of this Project. While the cause of these issues may be subject to debate, MDOT SHA surely has a responsibility to explain or reanalyze the transportation model, its assumptions, and conclusion to resolve these inconsistencies. The purpose and need cannot be achieved if the very basis of the Project, to relieve congestion, is called into question. | The goal of the project is to provide improved operations for all users in the managed lanes, general purpose lanes, and the surrounding roadway network. The traffic analysis shows the Preferred Alternative improves traffic congestion and have operational benefits.  The total system delay is reduced in both peak periods (SDEIS Table 3-6), average speeds increase in the general purpose lanes (SDEIS Table 3-4), and daily delay is also reduced in the surrounding local roadway network in Montgomery County, Prince George's County, and in the District of Columbia (SDEIS Table 3-13). The few locations in the SDEIS that could experience degraded operations were examined in more detail as part of the development of the FEIS and the final traffic analysis. The assumptions in the transportation model were reviewed and the traffic analysis was updated to reflect the latest design in the FEIS; operational issues were mitigated, where feasible. |



| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| | MDOT SHA Comment No. | Page | II. Discussion<br>D. The FEIS must address impacts to the local road network during this phase of Project planning. | | |
| | Letter-23 | 10 | General | Because the SDEIS lacks travel time index ("TTI") results from areas extending beyond the Managed Lanes Study area, it is critical that the Lead Agencies address impacts to the local road network in the FEIS in order to incorporate appropriate considerations into the Project design. To do this, the Lead Agencies must extend the Interchange Access Point Approval ("IAPA") study now under development beyond a single intersection, since the increased congestion on I-270 and I-495 undoubtedly will lead both to peak spreading effects and local traffic diversions that the Lead Agencies have not considered adequately to date.<br>Courts have found that, where impacts on local road networks are possible, FHWA and its state partners must address these issues prior to or in the FEIS. In Sierra Club v. United States DOT, plaintiffs successfully challenged a FHWA decision to build a toll road across an Illinois river without adequately evaluating the extent to which the road would alleviate local transportation problems. There, FHWA decided to wait for additional studies to demonstrate that the selected alternative would improve travel times, but the court required FHWA to produce additional studies evaluating the degree to which various alternative would meet current transportation needs and improve travel times. In another case where FHWA and the New Hampshire Department of Transportation proposed a highway expansion to address traffic congestion, FHWA's traffic sensitivity analysis failed to account for the project's indirect effects on secondary road traffic.<br>Finding that the EIS process "guarantees that the relevant information will be made available to the larger audience that may also play a role both in the decision-making process and the implementation of that decision," the court remanded the FEIS to the lead agencies. FHWA must expand the scope of the IAPA in order to avoid relying on a study with similar deficiencies. | The study limits for MDOT SHA's Application for Interstate Access Point Approval were coordinated between FHWA and MDOT and were selected per the FHWA policy on access to the interstate system. The analysis for MDOT SHA's Application for Interstate Access Point Approval adequately captures the impact of potential local traffic diversions at proposed HOT lane access locations. The Preferred Alternative is expected to reduce peak spreading, as the freeways will be able to accommodate more throughput during the peak hours.<br><br>The remainder of the comment expresses legal opinions regarding rulings in cases with different fact patterns and does not require a response. |
| | Letter-24 | 11 | | If an expanded IAPA is conducted, mitigation of local road impacts could be considered and included in the FEIS. In the absence of an expanded analysis, there is no opportunity to analyze indirect effects on secondary road traffic, which may include maintenance frequency as well as funding. | MDOT SHA's Application for Interstate Access Point Approval is included as FEIS Appendix B, and the results are summarized in Chapter 4. Mitigation on local roads is proposed where required to maintain acceptable operations on the surrounding roadway network, and the geometric concepts have been updated to include these improvements, see Appendix E. |
| | MDOT SHA Comment No. | Page | II. Discussion<br>E. The Preferred Alternative's bicycle and pedestrian improvements are inconsistent with local master plans, particularly related to design. | | |
| | Letter-25 | 11 | General | The Lead Agencies made commitments during prior coordination meetings with Commission staff to construct the new high-occupancy travel lanes in accordance with local master plans. The SDEIS indicates that the FEIS will include an "updated review of the county and local master plans," but the document does not contain any statements reflecting this commitment. Courts generally expect agencies to honor commitments made prior to or during the NEPA review process, even if a Project otherwise complies with NEPA. Accordingly, M-NCPPC respectfully requests that the Lead Agencies memorialize this commitment and take steps to implement it in the FEIS. | MDOT SHA reviewed local master plans during scoping of the study to help identify needs and to evaluate consistency with local master plans. Additionally, as the Study progressed, MDOT SHA committed to construct bike and ped facilities per local master plans to the extent practicable as reflected in the SDEIS and the FEIS. As stated in FEIS Chapter 3, Section 3.1.5, "The updates since the SDEIS consist of additional consideration of the proposed master plan facilities, refinement of the design criteria based on the Montgomery County draft Complete Streets Design Guide (February 2021) in consultation with Montgomery County through multiple meetings, and continued evaluation of the proposed shared use path connection across the ALB between Maryland and Virginia.<br><br>As stated in the SDEIS, existing pedestrian and bicycle facilities impacted by the Preferred Alternative would be replaced in-kind or upgraded to meet the master plan recommended facilities. Provision of these upgraded facilities would be subject to maintenance agreements between MDOT SHA and the local jurisdictions in compliance with Maryland law." |

OP·LANES™
MARYLAND
I-495 & I-270 Managed Lanes Study

FINAL ENVIROMENTAL IMPACT STATEMENT

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| | No. | Page | II. Discussion | | |
| | | | F. The Cooperating Agencies have not completed their analysis of the parkland limit of disturbance, and so the FEIS will need to resolve potential parkland impacts. | | |
| | Letter-26 | 11-12 | General | Before the Lead Agencies finalize the FEIS and any work can occur on parkland, M-NCPPC must review and approve the limits and nature of the work and grant permission for construction to commence, consistent with the CCA. The CCA authorized federal funding for M-NCPPC to acquire land in Maryland for the development of a comprehensive park, parkway, and playground system in the National Capital area. Congress charged M-NCPPC with representing the State of Maryland in protecting and stewarding CCA-acquired property in the state, in accordance with plans approved by NCPC. At the time of its enactment, the CCA's drafters recognized that the law's purpose is "to preserve for all time to come the natural scenic beauty of the upper and lower Potomac River valleys, to insure a continuous flow of water into Rock Creek, and to enable the National Capital Park and Planning Commission to procure many delightful wooded areas and charming valleys in the District of Columbia before they are destroyed by building or some other operation." That purpose continues to be of paramount importance today, nearly one hundred years later, as the Lead Agencies plan to make significant changes to the highway infrastructure surrounding these critical protected areas. | MDOT SHA acknowledges NCPC and M-NCPPC's roles in compliance with the Capper-Cramton Act. However, based on NCPC's letter to MDOT SHA on November 10, 2021 and recent research by M-NCPPC, NCPC has acknowledged that it does not have Capper-Cramton jurisdiction over the two potentially impacted Cabin John Stream Valley Park locations in Maryland. Additionally, since the land is already owned by the State of Maryland and the project is a state-sponsored project, NCPC also acknowledged that it does not have jurisdiction over the two Cabin John land parcels under the Planning Act. |
| | Letter-27 | 12-13 | | Over time, M-NCPPC acquired and assisted in the acquisition of various properties for parkland and parkway purposes. Properties acquired under the CCA are governed by a series of agreements between M-NCPPC and NCPC. These include, among others, a September 15, 1939 agreement (the "1939 Agreement") through which the Clara Barton Parkway (formerly the George Washington Memorial Parkway) in Montgomery County, which the Project will impact, was acquired. The 1939 Agreement included a map, known as "Plan No. 105.31-455," identifying the land acquired. Although title of the land vested in the United States, the 1939 Agreement contained a key provision relevant to the Project: That except as provided in this agreement, the property shall be acquired only for park and parkway purposes and that the United States will never use the land so acquired for any other purpose except with the consent of the Maryland Commission. It is further agreed that the National Commission will use its best efforts to see that the areas acquired under this agreement are developed and maintained in a manner similar to other comparable park areas of the National Capital and environs. (emphasis added). The 1939 Agreement was signed by M-NCPPC, NCPC, and the President of the United States. On October 1, 1941, M-NCPPC and NCPC entered into another agreement (the "1941 Agreement"), which governed the acquisition "of units of park lands needed for said George Washington Memorial Parkway in the Maryland-Washington Metropolitan District." Notably, this Agreement contained a similar prohibition on the use of the acquired land for anything other than park or parkway purposes by providing that "no part of the lands so acquired for the George Washington Memorial Parkway shall in any manner be used or developed by the National Commission or by the United States of America for other than park or parkway purposes." The CCA and M-NCPPC's enabling law limit disposition of M-NCPPC-administered parkland for purposes inconsistent with their use as parkland, and the agreements described above give M-NCPPC authority to approve or reject the use of land subject to such agreements for purposes other than park purposes. While there are circumstances in which M-NCPPC-administered parkland can be used for legitimate, non-park purposes with M-NCPPC's consent, the CCA's underlying presumption is that this land should be prioritized for protection and, where complete protection is not possible, appropriate mitigation. | No response needed; this paragraph provides M-NCPPC's interpretation of existing agreements. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| | Letter-28 | 13 | | Because MDOT SHA does not plan to finalize the Project's design until after it completes the NEPA review, there is significant risk that the Project's limit of disturbance ("LOD") will be much larger than what is reflected in the SDEIS. M-NCPPC described this issue at length in its November 9, 2020, DEIS comment letter, but some points are worth raising again here. Specifically, proper avoidance and minimization measures call for minimizing the roadway footprint while maintaining a larger LOD to account for environmental issues and to restore disturbed areas. A larger LOD is warranted to ensure that the Project will appropriately handle the increased drainage pressures that will result from advancing one of the build alternatives in the future. The Project's ongoing design changes also must incorporate stable tie-ins for outfalls, protection and restoration of stream banks, and improvements to resources based on anticipated Project impacts. Although MDOT SHA has stated that "[a]ll possible planning to minimize harm will additionally involve an agreement document that outlines the process to continue coordination with the OWJs over Section 4(f) properties through the design phase of the project," the impacts to parkland are not known at this time.

The Lead Agencies cannot fully address these impacts until the developer completes the Project's design, and so need to build into the NEPA review a mechanism to account for these adjustments resulting in a larger LOD. A larger LOD that extends beyond the confines of Phase 1 of the Project should account for potential future impacts to parkland that will result after the NEPA process, including potential impacts on lands acquired with CCA funds that are not currently located in the immediate vicinity of the Preferred Alternative's footprint. If the Lead Agencies decide that the Project should progress under the current LOD, M-NCPPC respectfully requests an opportunity for further consultation in the event additional disturbance is anticipated in the future as a result of the current scope of the Project or future phases. | Refer to FEIS Chapter 9, Section 9.3.4 A for a discussion about the Limits of Disturbance.

MDOT SHA employed a conservative approach to defining the LOD for all the DEIS Build Alternatives and Preferred Alternative. The LOD represent the proposed boundary within which all construction, mainline widening, managed lane access, intersection improvements, construction access, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, stream stabilization, and related activities to the proposed roadway and interchange improvements. The reasonableness of the LOD applied for determining resource impacts was further reinforced by performing a constructability analysis. This ensured that adequate area within the LOD was provided to construct all project elements, including bridges, retaining walls, noise walls, drainage structures, and interchange ramps, among others.

When the project advances to final design, it is anticipated that the design will closely adhere to the LOD defined in the FEIS, as the LOD was established to include a reasonable area to construct the Preferred Alternative. An important benefit to conducting a P3 process with pre-development work concurrent with the NEPA process is to increase efficiency by receiving input by the Developer on design and ancillary elements of the project such as stormwater management. This collaborative effort ensures that the design and associated LOD are appropriate and feasible ahead of final design. While additional LOD changes may occur during final design, including additional avoidance and minimization, the risk of substantial changes in the LOD or substantial increase in environmental impacts is significantly lowered by the early involvement of the Developer. Additionally, monetary incentives have been added to the Developer's Technical Provisions to encourage further avoidance and minimization of impacts to wetlands, waterways, forest, and parkland.

As noted, MDOT SHA and the Developer will continue to coordinate with M-NCPPC through final design as the ultimate needs and impacts are finalized. |
| | MDOT SHA Comment No. | Page | **II. Discussion**<br>**G. The Project's proposed stormwater management plans are inadequate.** | | |
| | Letter-29 | 14 | General | Although the Preferred Alternative addresses stormwater management, the SDEIS ignores existing untreated impervious surfaces and requires a minimum of 50% treatment only if the roadway is fully reconstructed. Additionally, the SDEIS only requires that 45% of the required water quality treatment occur on site. This is insufficient to protect the quality of local and downstream waters, which some stakeholders claim are among the worst water quality offenders in Montgomery County. While M-NCPPC is pleased that the Lead Agencies have considered stormwater management issues in the SDEIS, the Lead Agencies must take greater responsibility for protecting downstream water resources, the quality of which will never improve and may be further degraded absent proper planning and implementation of the Project. M-NCPPC encourages the Lead Agencies to take this responsibility seriously and follow the example of other federal agencies that have addressed cumulative impacts of stormwater runoff by imposing stringent stormwater management standards that strive to exceed the minimum criteria required under state law.

To mitigate the Project's anticipated impacts on water quality, the Lead Agencies should prioritize on-site stormwater quality treatment to a minimum of 80% of the environmental site design requirements, thereby allowing for a maximum of 20% to be treated with the use of compensatory stormwater management mitigation at off-site sources. The Lead Agencies also need to make specific commitments to incentivize the chosen developer to use innovative technologies and techniques to maximize on-site stormwater quality treatment. The situation involving untreated stormwater runoff entering our streams and rivers is an issue that will worsen due to climate change. This project presents a singular opportunity to address this issue, an opportunity which is unlikely to ever occur again. Requiring minimum standards for stormwater treatment under these circumstances is extremely short-sighted. | Maryland SWM permitting regulations require that all new impervious area and a minimum of 50 percent of existing reconstructed impervious area be treated to mimic the runoff characteristics of woods in good condition. Based on preliminary engineering, approximately 70 acres of untreated existing impervious area would be treated, in addition to all the new impervious area. The amount of untreated existing impervious area that would receive water quality treatment as part of this project will improve downstream waters.

In addition, the SWM analysis completed for the DEIS and SDEIS was completed to a conservative planning level analysis used for determining the LOD and costs. A more detailed SWM analysis was completed for the FEIS based on standard MDE approved hydrology and hydraulic procedures; however, it was still a preliminary concept. Based on this more detailed preliminary SWM concept developed for the FEIS, the anticipated offsite requirements for the Preferred Alternative have been significantly reduced from 114 acres to 2.5 acres, representing approximately 95 percent of environmental site design requirements being met onsite. Refer to FEIS Chapter 3, Section 3.1.6.

MDOT SHA understands the unique opportunity afforded by this project to improve existing conditions. The Developer intends to exceed SWM requirements but at this time MDOT SHA cannot elaborate on how they will accomplish this. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| | Letter-30 | 14-15 | | A similar issue arises in the Lead Agencies' use of the Maryland Department of the Environment's 6-digit watershed scale for off-site stormwater management water quality projects. This scale does not address the severe water quality impacts of the existing highways and proposed expansion. To account for those impacts, the Lead Agencies must consider off-site compensatory stormwater management mitigation within 1,500 feet of the LOD. By doing so, the Lead Agencies would make the realized mitigation benefits meaningful to the location of the impacts and the surrounding waterways. Moreover, a maximum of 25% of the off-site compensatory storm water impervious area treatment should come from stream restoration in order to ensure that the most critical waterways surrounding the Project receive appropriate mitigation. | MDOT SHA understands that the offsite SWM water quality treatment should be as close to the project as possible. The priority is to provide water quality treatment onsite and the preliminary SWM Concept developed for the FEIS has significantly reduced the offsite SWM requirement from 114 acres to 2.5 acres. Refer to Chapter 3, Section 3.1.6.<br><br>MDOT SHA has evaluated providing compensatory SWM within the requested 1500'; however, due to the constraints within the study area and the need to limit overall impacts, it was not feasible to provide it all within the requested 1500' offset, which is a significant reduction beyond the current MDE regulations and requirements.<br><br>MDOT SHA has committed to a hierarchical approach to offsite SWM locations which considers locations within the 12-digit watershed first, then the 8-digit watershed and finally the 6-digit watershed, if needed, before considering stream restoration. The preliminary SWM concept developed for the FEIS provides the required offsite SWM within the 8-digit watershed. Due to the number of unknowns at this point in the design process and likelihood that many of the selected sites could prove infeasible during final design, MDOT SHA cannot commit to keeping the offsite SWM locations within a specific distance of the project other than the 6-digit watershed area.<br><br>MDOT SHA is pursuing use of stream restoration for water quality credit. At this stage, the offsite SWM is met through the use of traditional SWM facilities, therefore no offsite stream restoration locations are proposed for water quality mitigation. If stream restoration is considered in the future it will be applied in a hierarchical approach with pavement removal and stormwater facilities prioritized over stream restoration. |
| | Letter-31 | 15 | | Lastly, the Lead Agencies should continue to consider stormwater management opportunities located on parkland. The SDEIS effectively eliminates any consideration of mitigation opportunities on parkland despite the copious amount of time M-NCPPC spent working with MDOT SHA to identify and review potential off-site compensatory stormwater management opportunities on parkland. These measures can have minimal or non-existent impacts on parkland and natural resources but provide an effective and feasible mechanism to address the off-site water quality concerns. | The 67 offsite SWM locations proposed as part of the FEIS avoid park property impacts. If during final design, additional sites are needed, they can be considered on park property. MDOT SHA will communicate to the Developer that potential SWM locations should not be eliminated solely for being located on park property and that they should coordinate with M-NCPPC regarding those opportunities. |
| | MDOT SHA Comment No. | Page | **II. Discussion**<br>**H. The Lead Agencies have not established an adequate Section 4(f) mitigation plan for natural resources or historic and cultural resources.** | | |
| | Letter-32 | 15 | General | The Lead Agencies must comply with Section 4(f) of the Department of Transportation Act, which, like the CCA, protects the natural and built land the Project has the potential to impact. Section 4(f) and the statute's implementing regulations require avoidance, minimization, and, lastly, mitigation of the Project's impacts to parkland. FHWA may not approve a transportation project that uses any Section 4(f) property unless it determines that: (1) there is no feasible and prudent avoidance alternative to the use of the property and the action includes all possible planning to minimize harm to the property resulting from such use; or (2) the use of the property, including any measures to minimize harm committed by the applicant, will have a de minimis impact on the use of the property. If the avoidance analysis determines that there is no feasible and prudent avoidance alternative, then FHWA may approve the alternative that causes the least overall environmental harm. The appropriate time to identify avoidance and mitigation measures is prior to the elimination of reasonable alternatives that have fewer environmental impacts than the retained alternatives. NEPA requires and courts have recognized-that agencies must take a "hard look" at impacts to sensitive resources throughout the environmental review process. | The Study fulfills the requirement to thoroughly evaluate potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS summarized the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail and the SDEIS summarized the environmental effects of the Preferred Alternative. These analyses directly contributed to MDOT SHA's evaluation of the alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided. The FEIS reflects further design refinements and details, including final mitigation and commitments of the Preferred Alternative, many of which directly responded to public comments.<br><br>MDOT SHA has conducted the evaluation of parks and historic properties in accordance with Section 4(f) and applicable regulations at 23 CFR 774. This has included extensive coordination with the Officials with Jurisdiction over Section 4(f) properties, evaluation of feasible and prudent avoidance alternatives. All possible planning to minimize harm has been incorporated into the Preferred Alternative through avoidance and minimization of Section 4(f) impacts. Where impacts could not be avoided, an extensive package of mitigation measures has been developed in coordination with the Officials with Jurisdiction over Section 4(f) properties. The results of the Section 4(f) process are detailed in the FEIS Appendix G, Final Section 4(f) Evaluation, and summarized in FEIS Chapter 6. |

OP·LANES
MARYLAND   I-495 & I-270 Managed Lanes Study

FINAL ENVIROMENTAL IMPACT STATEMENT

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| | Letter-33 | 16 | | The SDEIS's Section 4(f) evaluation does not include enough specificity to allow M-NCPPC to review or comment on a "mitigation plan," which, requires the Commission's approval. As the Lead Agencies are well aware, the Project will impact land of significant natural and cultural value due to its geographic location in a largely developed area with little "unused" land. M-NCPPC appreciates that the Lead Agencies have evaluated potential impacts to some land under M-NCPPC's jurisdiction, such as Cabin John Stream Valley Park Unit 2. Unfortunately, the Lead Agencies have yet to provide the Commission with a mitigation plan outlining, with specificity, what steps they plan to take to minimize and avoid impacts to all land under M-NCPPC's jurisdiction. For example, MDOT SHA committed to identifying and pursuing the acquisition of replacement parkland or implementing other mitigation measures at Cabin John Stream Valley Park Unit 2, such as construction of visual barriers, stream bank and bed stabilization, and removal of concrete lined channels. M-NCPPC welcomes these discussions, but reiterates that those discussions must occur before the Lead Agencies finalize the EIS. As the Lead Agencies are well aware, land acquisition is a timely process. Therefore, mitigation properties to be acquired must be presented to M-NCPPC for approval before the FEIS and forthcoming Record of Decision. Consistent with the Supreme Court's recognition that lead agencies must provide a "detailed discussion of possible mitigation measures " so that "interest groups and individuals can properly evaluate the severity of the adverse effects," M-NCPPC simply will not consider any impact to be de minimis until it approves formally the chosen parkland mitigation requirements. | At the time the SDEIS was published, coordination between MDOT SHA and M-NCPPC related to mitigation for park impacts was still ongoing and, therefore, the specificity sought by M-NCPPC was not yet available to be included in the SDEIS as the effort to continue to avoid and minimize through design refinements was ongoing. Coordination continued during the development of the FEIS to further minimize park impacts and identify the specific measures to be provided to mitigate the remaining unavoidable park impacts, including the identification of replacement park property. The final, detailed mitigation plan is presented in FEIS Chapter 7, Section 7.2. The effort to further avoid and minimize impacts during final design will continue in final design and monetary incentives to further reduce impacts have been included in the Section Developer's Technical Provisions. MDOT SHA acknowledges that the finalization of the detailed mitigation was necessary before M-NCPPC was able acknowledge FHWA's intent to make de minimis Section 4(f) determinations for certain M-NCPPC park properties and to determine if they are in agreement that the proposed Section 4(f) uses of those properties would not adversely affect the features, attributes, or activities qualifying the properties for protection under Section 4(f). |
| | Letter-34 | 16-17 | | Similarly, Section 4(f) requires that the Lead Agencies avoid historic and cultural resources, unless they can demonstrate that other alternatives are infeasible and contrary to the purpose and use of the undertaking. To date, the Lead Agencies have conducted limited investigation of the Moses Hall Tabernacle and Cemetery, but the limits of the burial sites have not been established. We are concerned that the public commitment made by the Lead Agencies to avoid disturbing burial sites cannot be honored if limits of the area containing gravesites have not been established. Avoidance alternatives for Section 4(f) use of the Moses Hall Tabernacle and Cemetery, the Gibson Grove Church, and the Carderock Springs National Register Historic District should be prioritized. Further impacts to the Gibson Grove Church, a historic resource that has already suffered cumulative adverse effects from the first Beltway construction, should not be accepted as a 4(f) alternative to avoid impacts to Moses Hall Tabernacle and Cemetery. If the Lead Agencies plan to use this land for the Project, they must evaluate other design solutions and demonstrate avoidance is infeasible. On this point, M-NCPPC notes that a 4(f) use may be the most appropriate use of this land given the Project's design; however, the Lead Agencies must undertake additional detailed design work in coordination with all stakeholders in the community to evaluate alternatives as required. | See response to MDOT SHA Comment Letter-15. |
| | Letter-35 | 17 | | Lastly, M-NCPPC hopes that the conclusion of the Lead Agencies' ongoing Section 106 review process under the National Historic Preservation Act ("NHPA") yields strong commitments to avoid, minimize, and, if necessary, mitigate adverse effects to the historic properties described above and those additional properties identified in the SDEIS, including the Clara Barton Parkway. Given the nature of these historic properties, which are important not just for historic purposes but also from an equity perspective due to their significance for minority communities, M-NCPPC expects the Lead Agencies to take every precaution to avoid impacts. | MDOT SHA has developed design options that minimize impacts to adversely affected historic properties, including the Chesapeake and Ohio Canal National Historical Park, the George Washington Memorial Parkway/Clara Barton Parkway, the Washington Biologists' Field Club, Gibson Grove AME Zion Church, and the Dead Run Ridges Archaeological District. MDOT is committing to mitigation through a Programmatic Agreement developed in compliance with Section 106 of the National Historic Preservation Act. |
| | Letter-36 | 17 | | Consistent with its statutory duties, M-NCPPC will require a thorough and implementable mitigation package to include park enhancements, extensive parkland replacement, and consideration of the valuable natural, cultural, and historic resources present in the Project's vicinity. As currently drafted, meaningful mitigation commitments and progress are absent from the SDEIS, and so significant advancements are necessary prior to publication of the FEIS. A lack of progress in the development of an acceptable mitigation plan could endanger the aggressive schedule set forth by MDOT SHA. | See response to MDOT SHA Comment Letter-33. |
| | Letter-37 | 18 | | M-NCPPC appreciates the Lead Agencies' consideration of the comments provided above. The Commission will continue to work with the Lead Agencies to ensure that the Project's impacts to parkland, stream, and wetland resources are avoided, minimized, and mitigated to the maximum extent possible. M-NCPPC also would like to remind the Lead Agencies that it will not concur with the Preferred Alternative until the Lead Agencies present a thorough and reasonable mitigation package that includes park enhancements and extensive parkland replacement, as well as adequate consideration of alternatives to avoid impacts to properties of historic and cultural significance. The Commission welcomes the opportunity to engage further with the Lead Agencies to prepare mitigation and design plans, and to evaluate all of the Project's significant impacts. | See response to MDOT SHA Comment Letter-33. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| **Comments from MNCPPC File Labeled SDEIS Major Issues_9.19.21 document** | | | | | |
| NOTE: THESE COMMENTS FROM M-NCPPC APPEAR TO BE MADE ON A DRAFT VERSION OF THE SDEIS THAT WAS PROVIDED TO ALL COOPERATING AGENCIES FOR REVIEW, FOLLOWING NEPA PRACTICE. | | | | | |
| **MNCPPC Ref Doc_#** | **MDOT SHA Comment No.** | **Page** | **SDEIS Section** | **Comment** | **Response** |
| Major_1 | 1 | | General-RPA | _Revised RPA._  The RPA must reflect i) the "No-Build Alternative" outside of Phase 1, and ii) include both TDM (Alternative 2) and Transit (Alternative 14) as part of the RPA. We need affirmative assurance that future consideration of improvements outside of Phase 1 will be through a new NEPA Study. Although the area outside Phase 1 (essentially I-495 east of Old Georgetown Road), is neither specifically included as part of the RDA in the SDEIS, nor to be included in the 2022 update to Visualize 2045 being advanced by the TPB, the draft SDEIS uses language that does not clearly remove I-495 east of Old Georgetown Road  from the NEPA Study.<br>a. The SDEIS states: "There is no action or no improvements on I-495 east of the I-270 east spur to MD 5.  While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the scope of this Study, future improvements on the remainder of the system may still be needed in the future." | The Preferred Alternative, Alternative 9 - Phase 1 South, includes build improvements within the limits of Phase 1 South only. There is no action or no improvements included at this time on I-495 east of the I-270 east spur to MD 5. While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the scope of the Study, improvements on the remainder of the interstate system may still be needed in the future and would advance separately, subject to additional environmental studies, analysis and collaboration with the public, stakeholders and local agencies.  This Preferred Alternative was identified after coordination with resource agencies, including M-NCPPC, the public, and stakeholders to respond directly to feedback received on the DEIS, and to align the NEPA approval with the P3 Program's planned project phased delivery and permitting approach. |
| Major_1 | 2 | | General-RPA | b. That portion of the Study area that is moving forward is still referred to as Phase 1.  And AMP, the P3 concessionaire has referred to future phases in some of its own materials. | The portion of Phase 1 that is moving forward within the limits of the MLS is considered Phase 1-South and was referenced as such throughout the SDEIS and the FEIS. |
| Major_1 | 3 | | General-RPA | c. Appendix C still addresses "future phases" in its discussion of offsite storm water mitigation. | The Final Compensatory SWM Plan, FEIS Appendix D, has been revised to focus on the Preferred Alternative, which includes build improvements within the limits of Phase 1 South only.  Additionally, Appendices A through M of the Final Plan focus on the 67 compensatory SWM sites that have been undergone and environmental inventory to determine the potential for environmental impacts.  Appendix O is the only section that includes all 810 compensatory SWM sites vetted during discipline review efforts.  The Compensatory SWM Plan is very clear that use of any sites beyond the 67 that are included in the Plan would require additional permitting efforts. Two of the 67 selected off-site compensatory SWM sites have waterway and floodplain impacts and are included in the Joint Permit Application package. |
| Major_1 | 4 | | General-RPA | d. Since all of the parkland outside of Phase 1 is now classified as "avoided," then there must also be affirmative language that describes the process to be imposed in the event these natural resources are NOT avoided in the future. | While the Study limits remain the same as noted in the DEIS and include the 48 miles along I-495 and I-270, the limits of build improvements under the Preferred Alternative are focused within Phase 1 South only. There is no action or no improvements included at this time on I-495 east of the I-270 east spur to MD 5.  Therefore, the Preferred Alternative would avoid the use of 37 Section 4(f) properties that were previously reported as Section 4(f) uses in the DEIS and Draft Section 4(f) Evaluation, totaling approximately 105 acres.  Improvements on the remainder of the interstate system may still be needed in the future and would have to advance separately, subject to additional environmental studies (including Section 4(f)), analysis and collaboration with the public, stakeholders and local agencies. |
| Major_1 | 5 | | General-RPA | e. If I-495 outside of Phase 1 is no longer part of this Study, then the transition areas i) to I-495 on the east spur travelling south, and ii) north from the ALB to Old Georgetown Road from the "split" are not necessary.  In fact, creating the transition in this manner encourages vehicular travel to unnecessarily continue on I-495 as described in the TDM comment. | The study limits for the MLS remain the same; however, the limit of build improvements has been reduced to the area within Phase 1 South.<br>See response to MDOT SHA Comment Letter-21. |
| Major_1 | 6 | | General-RPA | f. TDM such as dynamic signage is necessary to direct traffic to use the I-270/MD 200 combination for travel along the I-95 corridor as stated by Secretary Slater during the July 21, 2021 TBP discussion of the Project for reinstatement to the 2022 update to Visualize 2045.  Encouraging vehicle travel on that route will open up additional capacity on the topside of I-495 for local travel needs.  Project-related mitigation can also include travel demand management and transportation management measures, such as improvements along impacted corridors outside the project limits, including I-495 between the I-270 western spur and US 50. The addition of TSM improvements, how being implemented along I-370 as part of the I-270 Innovative Congestion Management project should be considered, including variable message signage and ramp metering. | In response to comments received on the DEIS, MDOT SHA has moved forward with modifications to existing dynamic signing to show travel times between I-95 and Virginia for both MD 200 and I-495.  Text was included in SDEIS Section 3.4 to call out the proposed dynamic signing.<br>TSM improvements, including ramp metering along I-495, was also evaluated but would have resulted in additional environmental impacts (due to required ramp widening to accommodate queues at the metering signals), and was therefore dropped from consideration. |
| Major_1 | 7 | | General-RPA | g. In order to confirm the transit commitments made to Montgomery County that have become an agreed-upon integral part of the Project, transit should be designated as a contributing Alternative as opposed to an ancillary improvement. | Refer to Chapter 3, Section 3.1.4 for a list of Transit-related elements in the Preferred Alternative including Enhanced Transit Mobility and Connectivity, BPW and Regional Transit Services, American Legion Bridge Transit and TDM Plan. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| Major_2 | 8 | | General-EJ | _Environmental Justice_ . The DEIS, and now the SDEIS is inadequate in its treatment of environmental equity.  The SDEIS indicates that environmental justice issues omitted from the SDEIS will be remedied in the FEIS, which is not a best practice  and obstructs public comment and community input . <br> a. Waiting until after selection of a preferred alternative means that disproportionate impacts will not be considered in the formulation of the preferred alternative. | See response to Comment # Letter-16. |
| Major_2 | 9 | | General-EJ | b. The Morningstar Tabernacle No. 88 Moses Hall and Cemetery and the Poor Farm Cemetery are listed as sites that may be culturally significant in its Community and Environmental Justice Analysis.  However, the Environmental Justice discussion concerns itself primarily with current minority population concentrations and **does not address historical and ongoing injustice to small African American communities displaced by construction of the beltway and further threatened by the proposed expansion**. This issue was explicitly acknowledged as related to social justice by the National Trust for Historic Preservation in their selection of the Moses Cemetery as one of the 11 most endangered historic sites in America in 2021. This listing and the environmental justice issues raised by it should be acknowledged and discussed in the SDEIS. | Throughout the Managed Lanes Study, MDOT SHA has coordinated and consulted with interested stakeholders on potential impacts to the Morningstar Cemetery and the Montgomery County Poor Farm in compliance with the National Environmental Policy Act and Section 106 of the National Historic Preservation Act.  Given the uncertainty over the historic location of burials related to the Poor Farm, investigation of areas that may be impacted after design is advanced is the most efficient way to identify impacts, given the large area that has potential to be associated with the Poor Farm. The specifics of this investigation will be subject to consultation under the PA.  MDOT SHA's goal has always been to avoid impacts to the Morningstar Cemetery as the agency worked to address some of the nation's worst traffic congestion in the National Capital Region.  As part of continuing investigations, MDOT SHA conducted a ground penetrating radar (GPR) survey at Morningstar Tabernacle No. 88 Moses Hall and Cemetery, including the adjoining MDOT SHA right-of-way, and provided the results to MHT and consulting parties on September 8, 2021.  The results suggested the potential for additional interments outside the cemetery property boundary. Based on this additional information, MDOT SHA worked to modify the design and limits of disturbance near the cemetery to avoid the areas where GPR indicated potential for grave features, included additional buffer around this area within state owned right-of-way to avoid possible impacts, and updated the historic property boundary to reflect the potential for additional interments. These design refinements have been incorporated into the Preferred Alternative and are outlined in the SDEIS and FEIS. <br><br> Also, see response to MDOT SHA Comment Letter-15. |
| Major_2 | 10 | | General-EJ | c. On August 10th, Congress passed a once-in-a-generation investment in infrastructure throughout the U.S. with bi-partisan support.  Included in the measure is a commitment to "Reconnecting Communities," a concept not even mentioned in the SDEIS.  "Too often, past transportation investments divided communities or it left out the people most in need of affordable transportation options. In particular, significant portions of the interstate highway system were built through Black neighborhoods. The Federal Infrastructure Bill creates a first-ever program to reconnect communities divided by transportation infrastructure.  The program will fund planning, design, demolition, and reconstruction of street grids, parks, or other infrastructure through $1 billion of dedicated funding.  This concept should be included as part of this project. | MDOT SHA has incorporated pedestrian and bicycle improvements into the project to support the need to enhance multimodal connectivity and mobility and to ensure equitable transportation options. These improvements include both improving existing facilities by replacing or upgrading or creating new facilities and were determined in consultation with the local jurisdictions and counties.  Additionally, through coordination with  interested stakeholders, a commitment to construct a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection between First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall and Cemetery has been made as well as widening the existing shared use path. |
| Major_2 | 11 | | General-EJ | d. Neither the DEIS nor the SDEIS reference any cumulative effects to specific cultural resources. Additional historical research conducted subsequent to the DEIS in Cabin John related to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery and associated Gibson Grove community show that the construction of the beltway separated the fraternal hall and cemetery from the neighboring church, physically fragmented the community and contributed to the decline of these institutions. The community's decline in turn contributed to the closure and loss to fire of the Moses fraternal hall. | See responses to MDOT SHA Comment Letter-18 and Comment #10. |
| Major_3 | 12 | | General-Bottleneck Issues | _Shifting Bottleneck Issues Related to Project Design._ A detailed technical transportation review of the SDEIS shows impacts of "relieving" congestion at the American Legion Bridge (ALB)  **does not eliminate congestion but shifts**  it from the ALB vicinity (McLean and Potomac) to other areas in Maryland.  While some of these bottleneck shifts were expected, the degree of congestion resulting from the proposed project is severe on I-270 north of I-370, on the Inner Loop on the top side of the Beltway, and on the Inner Loop in Prince George's County. These bottleneck shifts are project-related impacts, and mitigation measures should be addressed in the SDEIS and included as part of project design to minimize these projected deficiencies. | See response to MDOT SHA Comment Letter-19. |
| Major_3 | 13 | | General-Bottleneck Issues | a. Phase 1A and 1B should be constructed concurrently to reduce or eliminate bottlenecks on I-270. | See response to MDOT SHA Comment Letter-19. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| Major_3 | 14 | | General-Bottleneck Issues | b. For the other bottleneck issues, we recommend the following design changes to the Preferred Alternative:<br>i. Eliminate the managed lanes from the I-270 Eastern Spur between I-270 and I-495 because I-270 traffic headed south to the eastern spur would not use the managed lane network. The managed lanes would provide minimal travel time benefits for drivers from Gaithersburg and Rockville to most Montgomery County destinations.<br>ii. Eliminate the managed lanes and exit/entrance ramps from I-495 between the two spurs.<br>iii. Managed lane traffic destined to and from the Inner Loop should enter/exit the managed lane network at the River Road crossover interchange. | See response to MDOT SHA Comment Letter-21 |
| Major_4 | 15 | | General | _Local Road Impact Analyses_. Without TTI results beyond the Study area, it is more critical that the impact to the local road network be addressed sooner in order to make appropriate considerations for design . The Interchange Access Point Approval (IAPA) study now under development must be extended beyond a single intersection since the increased congestion on I-270 and I-495 will undoubtedly lead to both peak spreading effects and local traffic diversions that have not been adequately considered to date. When it can take over 30 minutes to travel 2 to 3 miles on some segments of the Beltway as presented in this SDEIS, traffic will not subject themselves to this on a daily basis, and they will find the shorter travel time route, regardless of local street impact. The scope therefore agreed upon by FHWA for the IAPA (performing traffic operational analyses at ramp terminal intersections and one adjacent intersection (on both sides) beyond service interchanges that are modified by the study) will be inadequate in areas where either I-270 or I-495 has very high TTIs and extreme congestion. In those areas, the study area should follow all significant diversionary traffic that switches to the local road network (defined as all non-interstate roads). The study area can be determined by adding routes on parallel routes with travel times equal to the GP lanes travel time. | The results of the final traffic analysis indicate that the net impact of the Preferred Alternative will be an overall reduction in delay on the surrounding arterials, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges. The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of this FEIS, and mitigation was proposed where needed to maintain acceptable operations and safety per FHWA Interstate Access Point Approval (IAPA) guidelines. In addition, based on follow-up meetings between MDOT SHA and Rockville, additional improvements were considered and incorporated where feasible, including modifications to the right-turning movement from the I-270 off-ramp onto eastbound MD 189, and additional turn lanes at Wootton Parkway at Seven Locks Road, Gude Drive at Research Boulevard, and MD 189 at Great Falls Road. All these enhancements will help manage and/or improve the function of the local roadway network.<br><br>FHWA is the agency responsible for approving the IAPA. The methodology, assumptions, analysis parameters were extensively coordinated with FHWA throughout the process following established IAPA guidelines. The analysis results from MDOT SHA's Application for the IAPA (FEIS Appendix B) are presented as part of the FEIS and mitigation is included to address impacts to the local road network, as needed. |
| Major_5 | 16 | | General | _Bike/Ped Improvements_ are inconsistent with master plans, particularly related to design . The commitment made during meetings to construct per local master plans must be reflected in the SDEIS. | The commitment to construct bike and ped facilities per local master plans is reflected in the SDEIS and the FEIS. As stated in FEIS Chapter 3, Section 3.1.5, "The updates since the SDEIS consist of additional consideration of the proposed master plan facilities, refinement of the design criteria based on the Montgomery County draft Complete Streets Design Guide (February 2021) in consultation with Montgomery County through multiple meetings, and continued evaluation of options for the proposed shared use path connection across the ALB between Maryland and Virginia.<br><br>As stated in the SDEIS, existing pedestrian and bicycle facilities impacted by the Preferred Alternative would be replaced in-kind or upgraded to meet the master plan recommended facilities. Provision of these upgraded facilities would be subject to maintenance agreements between MDOT SHA and the local jurisdictions in compliance with Maryland law." |
| Major_6 | 17 | pages 1 and 17 | General | _Parkland LOD is not final for purposes of impact resolution._ Before any work is permitted to occur on Parkland the limits and nature of the work will need to be reviewed and approved by M-NPCC and permission granted for construction to commence. Because MDOT SHA does not plan to finalize the Project's design until after it completes the NEPA review and awards a contract to a firm to undertake the project, there is significant risk that the LOD will need to be much larger than what is reflected in the SDEIS. An important aspect of avoidance and minimization is minimizing the roadway footprint while still keeping a larger LOD to address environmental issues and/or adequately restore disturbed areas to ensure that they will appropriately handle the increased drainage pressures that will result from advancing one of the Build Alternatives. Ongoing design of the Project must ensure stable tie-ins for outfalls, protection and restoration of stream banks, and improvements to resources based on Project impacts. Although MDOT SHA has committed to the following: " All possible planning to minimize harm will additionally involve an agreement document that outlines the process to continue coordination with the OWJs over Section 4(f) properties through the design phase of the project," the impacts to parkland are not known and cannot be fully addressed until design of the project is created by the P3. | The proposed limits of disturbance have been delineated to sufficiently capture potential environmental impacts associated with construction related activities of the Preferred Alternative based on planning level design. Per federal regulations, final design cannot occur until after the Record of Decision so as not to commit resources prejudicing selection of an alternative prior to making a final decision. An important benefit to conducting a P3 process with pre-development work concurrent with the NEPA process is to increase efficiency by receiving input by the Developer on design and ancillary elements of the project such as stormwater management. This collaborative effort ensures that the design and associated LOD are appropriate and feasible ahead of final design. While additional LOD changes may occur during final design, including additional avoidance and minimization, the risk of substantial changes in the LOD or substantial increase in environmental impacts is significantly lowered by the early involvement of the Developer. Design changes and any associated environmental impacts would be reevaluated to determine if the NEPA decision remains valid. Finally, monetary incentives have been added to the Developer's Technical Provisions to encourage further avoidance and minimization of impacts to wetlands, waterways, forest, and parkland. |



| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| Major_7 | 18 | page 6 | General-SWM Plans | Storm Water Management plans proposed by MDOT SHA are inadequate. a. Ignoring existing untreated impervious surfaces and requiring 50% treatment only if the roadway is fully reconstructed is insufficient to protect downstream waters.  Under the SDEIS, only 45% of the water quality treatment that is required is proposed to occur onsite.  That is unacceptable, as on-site stormwater quality treatment must be prioritized to a minimum of 80% of the Required ESD onsite (allowing for a maximum of 20% to be treated with the use of compensatory SWM mitigation offsite). MDOT/SHA needs to be specific in their commitment to incentivize innovative technologies and techniques by the P3 to show their commitment to maximizing on-site stormwater quality treatment. These highways are among the worst water quality offenders in the County and the project needs to take more responsibility for protecting the downstream water resources, which will never be improved if we don't take the appropriate steps as part of this project.

Revised Comment from M-NCPPC: Parks requests more information on the 20% banking fee for providing SWM offsite. Storm Water Management plans proposed by MDOT SHA are inadequate. a. Ignoring existing untreated impervious surfaces and requiring 50% treatment only if the roadway is fully reconstructed is insufficient to protect downstream waters.  Under the SDEIS, only 45% of the water quality treatment that is required is proposed to occur onsite.  That is unacceptable, as on-site stormwater quality treatment must be prioritized to a minimum of 80% of the Required ESD onsite (allowing for a maximum of 20% to be treated with the use of compensatory SWM mitigation offsite). MDOT/SHA needs to be specific in their commitment to incentivize innovative technologies and techniques by the P3 to show their commitment to maximizing on-site stormwater quality treatment. These highways are among the worst water quality offenders in the County and the project needs to take more responsibility for protecting the downstream water resources, which will never be improved if we don't take the appropriate steps as part of this project. | See the response to MDOT SHA Comment Letter-29. |
| Major_7 | 19 | Appx A | General-SWM Plans | b. The MDE 6-digit watershed scale for offsite SWM water quality projects is meaningless to address the severe water quality impacts of the existing highways and proposed expansion.  Offsite compensatory SWM mitigation must be within 1500' of the LOD.  This would make the benefits seen by the compensatory mitigation meaningful to the location of the impacts and the surrounding waterways.  Moreover, a maximum of 25% of the off-site compensatory stormwater IAT should come from stream restoration. | See the response to MDOT SHA Comment Letter-30. |
| Major_7 | 20 | Section 5.1.8 page 14 | General-SWM Plans | c. SWM opportunities should not be eliminated due to their location on Parkland.  Conversely, we have spent copious amounts of time working with the MDOT/SHA project team to identify and review potential offsite compensatory SWM opportunities on Parkland when it can be effective with minimal resource impacts. | MDOT SHA has coordinated extensively with M-NCPPC and has incorporated sites, where feasible, into the conceptual SWM plan.  Impacts associated with these facilities have been included as park impacts in the Section 4(f) Evaluation.  The effort to incorporate sites into the current design and limits of disturbance included both office and field meetings to walk through each and every site M-NCPPC provided in comments on the DEIS and SDEIS.

Based on planning level design, MDOT SHA has developed a conceptual SWM plan that is anticipated to meet current SWM requirements.  FHWA may apply flexibility on a case-by-case basis during development of the final SWM plan post ROD if the facility benefits or enhances an activity, feature, or attribute that qualifies the property for protection under Section 4(f) with agreement by the Official with Jurisdiction, or M-NCPPC in this case. |
| Major_8 | 21 | Section 5.1.8 page 14 | General | *Inadequate 4(f) Mitigation Plan for Natural Resources . The SDEIS does not include enough specificity for 4(f) requirements in order for M-NCPPC to review or comment on a "mitigation plan," which requires approval by the Commission.  M-NCPPC will require a thorough and implementable mitigation package to include park enhancements and extensive parkland replacement . The parkland affected by this project has significant value due to its geographic location in a largely developed area with little "unused" land.  Land acquisition is a timely process and properties to be acquired must be presented to M-NCPPC for approval before the FEIS and ROD. M-NCPPC will not consider any impact to be de minimis until parkland mitigation requirements are met and formally approved by M-NCPPC.* | See response to MDOT SHA Comment Letter-33. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| Major_9 | 22 | | General | *Inadequate 4(f) Mitigation Plan for Historical and Cultural Resources . Section 4(f) requires avoidance of the use of historical and cultural resources unless other alternatives are demonstrated to be infeasible and contrary to the purpose and use of the undertaking. There have been no detailed design or schematic drawings shown to date that have demonstrated that alternatives were considered that would have avoided a Section 4(f) use of the Moses Hall Tabernacle and Cemetery, the Gibson Grove Church, and the Carderock Springs National Register Historic District . Further impacts to the Gibson Grove Church, an historic resource that has already suffered cumulative adverse effects from the first Beltway construction, should not be accepted as a 4(f) alternative to avoid impacts to Moses Hall Tabernacle and Cemetery. Section 4(f) requires consideration of other design solutions must be evaluated to demonstrate avoidance is infeasible. Noting the likelihood of a 4(f) use at this stage is welcome; however, additional detailed design work should be undertaken with all stakeholders in the community to evaluate alternatives as required.* | In response to public, agency and stakeholder comments following the DEIS publication, MDOT SHA refined the LOD at the Morningstar Tabernacle No. 88 Moses Hall and Cemetery property. In late winter 2020, impacts to Morningstar Cemetery were reduced from 0.3 acres (13,068 square feet) reported in the DEIS for Alternative 9 to approximately 14 square feet of temporary area needed for the construction of a noise barrier adjacent to the property. This effort also avoided all ground disturbance within the cemetery boundary. The reduction was in response to public and agency comments and resulted from design modifications, including changes to the Cabin John Parkway interchange ramp configuration, to minimize impacts to the cemetery property. In summer 2021, additional investigation was conducted to detect and map both potential marked and unmarked graves within and adjacent to the Morningstar Cemetery boundary. Further design refinements were made in response to the results of this investigation and complete avoidance of the Morningstar Cemetery property has now been achieved as was documented in the SDEIS and now in the FEIS.<br><br>While a shift in the centerline of I-495 was necessary to completely avoid the Morningstar Cemetery and potential grave sites, the change in impact to Carderock Springs Historic District and Gibson Grove Church is minimal. The Preferred Alternative would result in a Section 4(f) use of less than 0.1 acres of the Carderock Springs Historic District, including less than 0.1 acres of permanent impact and less than 0.1 acres of temporary impact. No contributing resource structures will be impacted. The Preferred Alternative would result in a Section 4(f) use of 0.1 acres of the Gibson Grove AME Zion Church property, all of which would be temporary impacts. The Gibson Grove Church building will not be directly impacted by the Preferred Alternative.<br><br>MDOT SHA continues to coordinate directly with the Church leaders on addressing drainage issues, ensuring the construction of a parking lot, increasing connectivity between the Church and Cemetery, and limiting noise and vibration creating activities during worship services as mitigation for the impacts. |
| **Comments from M-NCPPC_2_MCParks SDEIS 8.19.21 document** | | | | | |
| *NOTE:  THESE COMMENTS FROM M-NCPPC APPEAR TO BE MADE ON A DRAFT VERSION OF THE SDEIS THAT WAS PROVIDED TO ALL COOPERATING AGENCIES FOR REVIEW, FOLLOWING NEPA PRACTICE.* | | | | | |
| MNCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
| 1 | 23 | Page ES-1 | What is the Focus of the SDEIS? | "No action or no improvements" should be characterized as the preferred No Build Alternative for portions of the study area being removed from the project | See response to MDOT SHA Comment #1. |
| 2 | 24 | Page ES-1 | What is the Focus of the SDEIS? | Delete "While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the scope of the Study, future improvements of the remainder of the system may still be needed in the future." suppositional and not relevant to the newly determined preferred alternative. | The limits of the Managed Lanes Study remain the same and include 48 miles.  The overall need for improvements in the study limits remains valid, regardless of the change to the limits of build improvements for a preferred alternative. In particular, the traffic analyses, demographic studies (population and job growth rates), as well as planning decisions that have included the entire P3 Program of 70 miles in the constrained long-range plan, all support the continued need for congestion relief along the Capital Beltway and I-270.  The stated project needs, to accommodate existing and long-term traffic growth, to enhance trip reliability, and to provide additional roadway choices, are all still necessary to address transportation challenges within the study limits.  The Preferred Alternative was chosen largely in response to public and agency comments to focus the build improvements west of the I-270 spurs specifically to avoid residential/business displacements, significant stream valley parks, NPS resources and historic resources. |
| 3 | 25 | Page ES-3 | Will comments on the DEIS be addressed? | Delete "appropriate" from first bullet on page.  No value in this qualifier and misleading. | The word "appropriate" is not included in the first bullet.  It was removed prior to publication of the SDEIS. |
| 4 | 26 | Page ES-7 | What is the Preferred Alternative? | "No action, or no improvements included at this time" should be characterized as the preferred No Build Alternative for portions of the study area being removed from the project | See response to MDOT SHA Comment #23. |
| 5 | 27 | Page ES-10 | What Happens to the Improvements That Were Studied for the I-495, East of the I-270 East Spur? | This section does not provide a clear answer to how the areas of the study area being removed will be addressed as part of the larger NEPA process.  Need a statement that clearly describes that the NEPA process for this project moving forward eliminates any consideration of a Build Alternative east of the I-270 east spur and any future consideration of improvements to these areas would need to leverage updated information and require an entirely new environmental review process. | While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately and would be subject to additional environmental studies and analysis and collaboration with the public, stakeholders and agencies. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 6 | 28 | Page Map 23 | Section Appx D | 3660+00 Old farm NCA, expand planting area and include NNI control on parkland and adjacent ROW. | Outside of the existing LOD, an opportunity was previously identified by MDOT SHA and shared with M-NCPPC for additional planting to offset tree loss. MDOT SHA commits to developing and implementing a plan for forest and terrestrial vegetation mitigation within Old Farm NCA to include NNI control for 7 years within a 50-foot buffer of the LOD and infill planting to consist of shrubs, understory/canopy trees, and herbaceous seedlings within the NNI control areas (50-feet buffer from LOD). |
| 7 | 29 | Page 2-3, paragraph 3 | Section 2.1 | Delete "initially" as there is no commitment as part of this process to add lanes to areas of the study area that have been dropped from consideration. | This comment was already addressed in the SDEIS. |
| 8 | 30 | Page 2-3, paragraph 5 | Section 2.1 | If the study limits are to remain unchanged, the No Build Alternative should be selected for the areas of the study area where no improvements are being considered. Consideration of any improvements to the dropped portions of this study would be subject to a completely new environmental study and NEPA process that would take into account new transportation improvements, new demands on the system, and changes to natural resources. This paragraph is not clear in this regard and falsely suggests that the current study could be used as a mechanism to carry forward improvements in the areas where the No Build Alternative is being applied. | See response to MDOT SHA Comment #23. |
| 9 | 31 | Page 2-4, paragraph 1 | Section 2.2 | Delete "included at this time". | Improvements on the remainder of the interstate system may still be needed but would be subject to additional environmental studies and coordination. |
| 10 | 32 | Page 2-4, Figure 2-2 | Section 2.2 | Delete "at this time". | See response to MDOT SHA Comment #32. |
| 11 | 33 | Page 2-7, Table 2-1 | Section 2.3.1 | Remove list of the I-495 interchange locations within the Study Area and outside of Phase 1 South limits. They are no longer relevant to the project and the SDEIS is clearly intended only to focus on aspects of the project related to the new Preferred Alternative. | The I-495 & I-270 Managed Lanes Study remains the same as the DEIS and includes the limits of I-495 to west of MD 5. The text provides clarity that some of the interchanges listed in Table 2-1 are outside of the Phase 1 South limits. |
| 12 | 34 | Page 2-7 | Section 2.3.1 | Delete the last sentence of the last paragraph as it is not relevant to the SDEIS or the Preferred Alternative. | See response to MDOT SHA Comment #33. |
| 13 | 35 | Page 2-10 | Section B | As stated in Park SDEIS comments, we feel that ignoring the existing untreated road pavement and requiring 50% treatment only if the roadway is fully reconstructed is insufficient to protect downstream waters. A higher goal closer to 50% of all existing untreated roadways would be more effective in protecting downstream waters. | Maryland SWM permitting regulations require that all new impervious area and a minimum of 50 percent of existing reconstructed impervious area be treated to mimic the runoff characteristics of woods in good condition. Based on preliminary engineering, approximately 70 acres of untreated existing impervious area would be treated, in addition to all the new impervious area. The amount of untreated existing impervious area that would receive water quality treatment as part of this project will improve downstream waters. |
| 14 | 36 | Page 2-11, Table 2-2 | Section C | The project needs to commit to significantly improving the Provided ESD surface area to a minimum of 80% of the Required ESD onsite (allowing for a maximum of 20% to be treated with the use of compensatory SWM mitigation offsite). These highways can be considered the worst water quality offenders in the County and the Project needs to take more responsibility for protecting the downstream water resources, which will never be improved if we don't take the appropriate steps as part of this project. The Project should achieve better than this current projection. | The SWM analysis completed for the DEIS and SDEIS was completed to a conservative planning level analysis used for determining the LOD and costs. A more detailed SWM analysis was completed for the FEIS based on standard MDE approved hydrology and hydraulic procedures. Based on this more detailed preliminary SWM concept developed for the FEIS, the anticipated offsite requirements for the Preferred Alternative have been significantly reduced from 114 acres to 2.5 acres, representing approximately 95 percent of environmental site design requirements being met onsite. Refer to FEIS Chapter 3, Section 3.1.6. |
| 15 | 37 | Page 2-11 | Section C | The statement that "use of innovative technologies may reduce the compensatory stormwater management requirements" is insufficient. MDOT/SHA needs to be specific in their committal to financially incentivize innovative technologies and techniques by the P3 to show their commitment to maximizing on-site water quality treatment.<br><br>Revised Comment from M-NCPPC: Parks requests more detail on the 20% banking fee. The statement that "use of innovative technologies may reduce the compensatory stormwater management requirements" is insufficient. MDOT/SHA needs to be specific in their committal to financially incentivize innovative technologies and techniques by the P3 to show their commitment to maximizing on-site water quality treatment. | Environmental Site Design (ESD) will be required to the Maximum Extent Practical (MEP), which means that the Developer will be required to justify why the full water quality requirement cannot be met onsite before looking toward off-site mitigation. The more detailed SWM analysis completed for the FEIS, which included innovative technology, resulted in a significant reduction in the anticipated offsite requirements, from 114 acres to 2.5 acres. Refer to FEIS Chapter 3, Section 3.1.6. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 16 | 38 | Page 2-12, paragraph 1 | Section D.a | The MDE 6-digit watershed scale for offsite SWM water quality projects is meaningless to address the severe water quality impacts of the existing highways and proposed expansion. All offsite compensatory mitigation should take place within 1500' of the approved LOD. | MDOT SHA has evaluated providing compensatory SWM within the requested 1500'; however, due to the constraints of the study area, it was not possible to provide it all within the requested offset, which extends requirements beyond existing MDE regulations and requirements. The MDOT SHA and the Developer will be required to follow the three-step procedure per the MDE 2000 SWM Manual for selecting on-site and off-site locations best suited for achieving the SWM water quality requirements and for permitting the sites through MDOT SHA Plan Review Division and MDE.<br><br>MDOT SHA understands that the offsite SWM water quality treatment should be as close to the project as possible and therefore has committed to a hierarchical approach to offsite SWM locations which considers locations within the 12-digit watershed first, then the 8-digit watershed and finally the 6-digit watershed, if needed. |
| 17 | 39 | Page 2-12, paragraph 2 | Section D.a | The credit potential of one-acre IAT credit per 100 linear foot stream restored is based on outdated crediting methodology. The project should be held to the most recent guidance at the time of permitting; at this time that is the 2020 Wasteload Allocations Document. | For SWM approval, MDE has typically used the 2014 Wasteload Allocation Manual. The 1 IAT/100 LF is considered a conservative crediting approach compared to other possible methods and was used to ensure a conservative estimate of credit. Language is indicating in the Compensatory SWM Plan indicating that 1 IAT/100 LF of stream restored will be re-evaluated during the final design and permitting process as the current guidance may change. |
| 18 | 40 | Page 2-12 | Section D.b | Project needs to show a real commitment to treating additional onsite stormwater runoff (80% min) and existing offsite impervious within a meaningful distance to the project (within 1500') in order to follow through on the Study's Purpose and Need goal of Environmental Responsibility. This commitment needs to be made before a Developer is brought in and given free rein to identify projects that are prioritized by financial goals rather than environmental stewardship. For the maximum 20% water quality treatment achieved off-site, only a maximum of 25% of the IAT shall be achieved through stream restoration and outfall stabilization. The remaining 75% + shall be achieved through pavement reduction/removal, Ch 3 and Ch5 SWM practices in order to best | The SWM analysis completed for the DEIS and SDEIS was completed to a conservative planning level analysis used for determining the LOD and costs. A more detailed SWM analysis was completed for the FEIS based on standard MDE approved hydrology and hydraulic procedures. Based on this more detailed preliminary SWM concept developed for the FEIS, the anticipated offsite mitigation acres for the Preferred Alternative have been significantly reduced from 114 acres to 2.5 acres, representing approximately 95 percent of environmental site design requirements being met onsite. Refer to FEIS Chapter 3, Section 3.1.6.<br><br>MDOT SHA has evaluated providing compensatory SWM within the requested 1500'; however, due to the constraints of the study area, it was not possible to provide it all within the requested offset, which extends requirements beyond existing MDE regulations and requirements. The MDOT SHA and the Developer will be required to follow the three-step procedure per the MDE 2000 SWM Manual for selecting on-site and off-site locations best suited for achieving the SWM water quality requirements and for permitting the sites through MDOT SHA Plan Review Division and MDE.<br><br>MDOT SHA is pursuing use of stream restoration for water quality credit. **At this stage, the offsite SWM is met through the use of traditional SWM facilities, therefore no offsite stream restoration locations are proposed for water quality mitigation.** |
| 19 | 41 | Page 2-17 | Section 2.3.5 | Need to explicitly show on plans areas designated for temporary construction access, staging, and materials storage for further evaluation and review. | The known areas are identified on the mapping in Appendix E. These areas will be further defined as design progresses. |
| 20 | 42 | Page 2-27 | Section 2.4.1 | Commitment to priority bicycle and pedestrian connections needs to include lengthening the I-270 bridge over Tuckerman Ln to accommodate future pedestrian/bicycle facilities along Tuckerman Ln and widening the existing variable-width side path along Seven Locks Rd under I-495 (Cabin John Trail). | This commitment was included in the SDEIS under the Preferred Alternative, Section 2.4 and reaffirmed in the FEIS, Chapter 3, Section 3.1.5 and includes the following language: "Lengthening the I-270 bridge over Tuckerman Lane to accommodate future pedestrian/bicycle facilities along Tuckerman Lane" and "widening the existing variable-width sidepath along Seven Locks Road under I-495 (Cabin John Trail)." |
| 21 | 43 | Page 2-27 | Section 2.4.3 | Need much more detail on the environmental enhancements that are mentioned in order to comment on them. Where are they, what are the limits, and how many of them are there? Parks needs specific locations and work plans outlined to concur with the project. | See response to MDOT SHA Comment Letter-36. |
| 22 | 44 | Page 2-28 | Section 2.5 | Need to more explicitly the process by which remaining parts of I-495 could progress – new NEPA process entirely. | See response to MDOT SHA Comment #1. |
| 23 | 45 | Page Map 4 & 5 | Section Appx D | FIDS area shown for Cabin John SVP Unit 2, how are these areas being addressed?<br><br>Revised Comment from M-NCPPC: The impacts to Cabin John SVU 2, Cabin John Regional Park, and Cabin John SVU 6 relocate the forest edge and subsequently impact forest interior on parkland. Forest "interior" refers to the area in the center of a forest which is surrounded by "edge". The forest area within 300 feet of a forest edge is considered "edge" habitat. "Interior habitat" is commonly defined as the forest area found greater than 300 feet from the forest edge. Interior habitat functions as the highest quality breeding habitat for forest interior dwelling birds (FIDS). Parks expects further coordination to reduce forest interior impacts and to mitigate for unavoidable impacts. | Impacts to natural and parkland resources continued to be avoided and minimized after the SDEIS. Refer to FEIS, Chapter 5. FIDS impacts have been avoided and minimized to the maximum extent practicable. While FIDS-specific mitigation is not required for this project, impacts to forested areas will be mitigated as required by the Maryland Reforestation Law. |

00022082

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 24 | 46 | Page Map 7 | Section Appx D | 197+00 west side Cabin John SVP Unit 2 details for construction of proposed pipe augmentation. Stream work and need LOD up stream of outfall.\n\nRevised Comment from M-NCPPC: 197+00 west side Cabin John SVP Unit 2 continue to Coordinate with MNCPPC on the appropriate stream work and LOD needed in this location. | No augmentation is proposed on the west side of I-495 at Sta. 197+00.  Preliminary engineering indicates that a culvert augmentation is needed at this location under Cabin John Parkway on the east side.  Final determination of whether a culvert augmentation is needed will be based on more detail Hydraulics and Hydrology modeling and will occur during later design phases.  Details about outfall stabilization or stream work will be based on the details of the culvert augmentation. The LOD upstream of the culvert on the east side is needed for ramp realignment and pavement removal. MDOT SHA will continue to coordinate with M-NCPPC on the improvements at this location. |
| 25 | 47 | Page Map 7 | Section Appx D | 195+00 east side – Justify large LOD offset from alignment into CJ SVU2. The LOD should be as tight and minimal as possible to the alignment. Add plunge pool where outfall interfaces with stream to ensure stable transition into Cabin John Mainstem.\n\nRevised Comment from M-NCPPC: 195+00 east side –The large LOD offset from alignment into CJ SVU2 should be as tight and minimal as possible to the alignment. Add plunge pool where outfall interfaces with stream to ensure stable transition into Cabin John Mainstem. | The LOD along the I-495 inner loop at Sta. 195+00 has been set based on a minimal offset behind the proposed retaining wall and noise barrier. Near Cabin John Parkway, the LOD is required for replacement/relocation of the I-495 inner loop bridge over Cabin John Creek and Cabin John Parkway. The impacts to Cabin John SVP Unit 2 at this location have been minimized and reduced since the SDEIS by reconfiguring the inner loop managed lane exit ramp. Culvert augmentation to 22H_C under Cabin John Parkway will determine elements needed downstream of outfall and will be coordinated through final design. |
| 26 | 48 | Page Map 8 | Section Appx D | 200+00 – does SHA intend to modify the bridge over Booze Creek? If so, the stream should have a natural bottom.\n\nRevised Comment from M-NCPPC: 200+00 – since the bridge over Booze Creek will be modified, SHA should commit to rebuilding the structure with a natural bottom. This would result in a net benefit to the resource, which is  what SHA has committed to for natural resource protection. | The proposed limits of improvements along Cabin John Parkway have been refined in the FEIS based on the Developer's concept. The limits of disturbance along Cabin John Parkway at the crossing and south of Booze Creek stay within existing right-of-way are needed for maintenance of traffic and pavement marking restriping. The existing structure is a box culvert that carries Booze Creek under Cabin John Parkway and will not be widened or replaced as part of the Preferred Alternative. If it is determined that it is needed during final design, the structure can be extended without replacing the existing portions of the culvert. |
| 27 | 49 | Page Map 10 | Section Appx D | 225+00 west side – the tie in of feature 21C_C2 into Cabin John Creek must include appropriate stream structures to ensure stability, energy dissipation, and utility protection. There is an adjacent sewer crossing that should receive a sill and riffle structure for protection. | MDOT SHA will ensure a stable outfall within the LOD at the tie-in at the confluence of Thomas Branch and Cabin John Creek. |
| 28 | 50 | Page Map 10 | Section Appx D | 225+00 west side –the proposed augmentation pipe that are under River Rd should not extend to the bank of Cabin John Creek. The end wall should be as far from the stream bank as possible. | See response to MDOT SHA Comment #49. |
| 29 | 51 | Page Map 9 | Section Appx D | 220+00 – west side - the outfall should be cut back and a stable channel with step pools built from the manhole labeled "handle 2454" | MDOT SHA appreciates M-NCPPC's comment; however, steep grading in the area and the realignment of the ramp from River Road along the I-495 outer loop limit the opportunity to shorten the existing storm drain pipe.  MDOT SHA will ensure a stable outfall within the LOD at this location. |
| 30 | 52 | Page Map 9 | Section Appx D | 220+00 – west side - a stream structure such as a crossvane and/or riffle should be built in the mainstem of rock creek in conjunction with the outfall channel to ensure the stability of the mainstem at the confluence. | See response to MDOT SHA Comment #51. |
| 31 | 53 | Page Map 23 | Section Appx D | 3685+00 East side of I270 – The LOD area along Tuckerman Lane and Old Farm Creek is too large. The LOD on the South side of Old Farm Creek should maintain the same distance from I270 as the LOD on the north side of Old Farm Creek. Access can be achieved from Tuckerman Lane adjacent to the outfall channel that runs parallel to I270 from Tuckerman Lane to Old Farm Creek.  The justification for this large park impact on Map 12 is stated as the augmentation culvert, but the proposed aerial structure negates the need for the culvert. | The LOD bumpout in this area has been reduced and is shown in the FEIS. In addition, a Limit of Stabilization (LOS) restriction has been included in the JPA for the remaining LOD bumpout.  The LOS restriction will require MDE and USACE approval of final design prior to conducting any clearing or construction in order to protect the area in case the full LOD is not needed. |
| 32 | 54 | Page Map 23 | Section Appx D | 3685+00 East Side of I270 – There is an outfall channel from Tuckerman Lane adjacent to I270 that flows into Old Farm Creek on the upstream side of the culver under I270. This channel must be restored using pools/riffles/cascades if it is disturbed. | MDOT SHA will ensure a stable conveyance of this outfall to the receiving channel. |
| 33 | 55 | Page Map 23 | Section Appx D | 3685+00 The Old Farm Creek stream channel must be rebuilt to a natural bottom that ties in with the upstream elevation of Old Farm Creek when the culvert is replaced with a highway bridge. | As mitigation for impacts to M-NCPPC parkland, a bridge(s) over Tuckerman Lane and Old Farm Creek will be designed and constructed to allow for wildlife passage, stream restoration, and improved pedestrian and bicycle access along Tuckerman Lane. |
| 34 | 56 | Page Map 23 | Section Appx D | 3685+00 The new highway bridge spanning Old Farm Creek must allow for a natural surface trail under the bridge adjacent to the stream. | As mitigation for impacts to M-NCPPC parkland, a bridge(s) over Tuckerman Lane and Old Farm Creek will be designed and constructed to allow for wildlife passage, stream restoration, and improved pedestrian and bicycle access along Tuckerman Lane. |
| 35 | 57 | Page Map 23 | Section Appx D | 3685+00 West Side I270 – On the north side of Old Farm Creek, the LOD can be enlarged to encompass an existing WSSC access road area if that is helpful to site access, staging, storage. This would shift the LOD line approximately 30ft to the north. | MDOT SHA acknowledges M-NCPPC's willingness to expand the LOD at this location; however, due to existence of a high quality wetland regulated by MDE and USACE, the LOD was not expanded. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 36 | 58 | Page Map 23 | Section Appx D | 3685+00 West Side I270 – The LOD on the south side of Old Farm Creek is too large for the proposed stream work. The stream can be access from the north. The area between Old Farm Creek and Tuckerman Lane is riparian habitat within the floodplain of Old Farm Creek. This area is important to protect due to the understory of native shrubs and the mature tree canopy. | The LOD at this location is necessary for constructability. |
| 37 | 59 | Page Map 23 | Section Appx D | 3685+00 West Side I270 – The new proposed culver under Tuckerman Lane has significant impact to the existing riparian habitat. This new pipe should be removed or use an alignment much closer to the highway since there will be a new bridge designed for this location. If the new aerial structure dictates a pipe replacement, the pipe should be as short as possible and outfall before the stream into a pool system. | The culvert under Tuckerman Lane will continue to be evaluated in final design to determine if it needs to be replaced or augmented. However, there are several major utilities along Tuckerman Lane that will affect the location and elevation of the culvert if it does need to be replaced.<br><br>As mitigation for impacts to M-NCPPC parkland, a bridge or bridges over Tuckerman Lane and Old Farm Creek will be designed and constructed that could affect the replacement of the culvert under Tuckerman Lane.<br><br>MDOT SHA and the Developer will continue to coordinate with M-NCPPC regarding the improvements in this area. If it is determined that the culvert under Tuckerman needs to be replaced, MDOT SHA will work to minimize impacts to existing riparian habitat in the area.<br><br>Note this is the culvert under Tuckerman not I-270 but response still depends on whether there is an aerial structure. |
| 38 | 60 | Page Map 23 | Section Appx D | 3685+00 west side I270 – The proposed aerial structure spanning Tuckerman Lane and Old Farm creek will result in the removal of long culvert in Old Farm Creek, Parks is supportive of this new bridge looks forward to assisting in the design of the new stream channel underneath the bridge. | As part of the final mitigation package, MDOT SHA has agreed to span the Old Farm Creek, see FEIS Chapter 7 for the documentation. |
| 39 | 61 | Page Map 23 | Section Appx D | 3685+00 west side I270 – the note on the LOD size along Old Farm Creek states the LOD is for culvert augmentation. The new aerial structure will negate the need for culvert augmentation. The LOD in the stream should be noted as for stream restoration. | The LOD surrounding Old Farm Creek is designated Limits of Stabilization to accommodate any stream work needed based on regulatory agency assessment of aquatic life passage and tie-in of the culvert to the stream channel.<br>Also see response to MDOT SHA Comment #53. |
| 40 | 62 | Page Map 24 | Section Appx D | 3629+00 west side.  The ownership of this parcel is under investigation. | MDOT SHA record research indicated that the triangular-shaped parcel on the west side of I-270 at Sta. 3629+00 is within existing MDOT SHA through-highway right-of-way. |
| 41 | 63 | Page Map 24 | Section Appx D | 3625+00 daylight outfall, add step pools and stabilize overland flow. | MDOT SHA will ensure a stable outfall within the LOD at this location. |
| 42 | 64 | Page Map 24 | Section Appx D | 3629+00 Describe what LOD shown around outfalls needed for.  Parks does not concur with the LOD needs. Eliminate LOD and temporary and permanent impacts. | The LOD on the west side of I-270 at and near Sta. 3629+00 is needed for augmentation of the existing culvert (24F_C2) under I-270 and construction of a retaining wall along southbound I-270. The LOD on the east side of I-270 at and near Sta. 3629+00 is needed for construction of a retaining wall and noise barrier along northbound I-270, utility installation, augmentation of the existing culvert (24F_C2) under I-270, and to ensure stable storm drain outfalls. |
| 43 | 65 | Page Map 24 | Section Appx D | 3640+00 west side - ensure the drainage channel that flows downslope from 3645+00 has a stable tie in to the channel from the culvert under I270. There is a new end wall proposed and the LOD does not seem to account for the other drainage channel. | The LOD in this area has been expanded to include the outfall ditch and is shown in the FEIS. See response to Comment #54 |
| 44 | 66 | Page Map 24 | Section Appx D | 3640+00 west side - A fiberglass bridge per Parks Specification should be included to route the natural surface trail over the stream downstream of the end wall. | As part of the base project design, access to this trail will be maintained throughout construction.  Any impact to the trail at the location of the stream as a result of the proposed culvert augmentation and associated stream stabilization will be addressed and the trail will be restored to a condition that is as good or better than that which currently exists.  Because there is not currently a bridge crossing of the stream at this location, MDOT SHA will consider the addition of a fiberglass bridge per Parks specifications as part of the park mitigation package.  This item is included in the FEIS Chapter 7 mitigation list. |
| 45 | 67 | Page Map 24 | Section Appx D | 3640+00 west side - The stormwater design must accommodate the rerouted natural surface trail. The trail needs to be located within well drained areas to prevent trail use issues. | Any impact to the trail at the location of the proposed stormwater facility will be addressed and the trail will be rerouted around the stormwater facility. The trail will be constructed to a condition that is as good or better than the existing condition. |
| 46 | 68 | Page Map 24 | Section Appx D | 3640+00 west side – the outfall from the stormwater management facility must be addressed all the way to the confluence with the tributary. The limited LOD prevents this connection as it is currently shown. Enlarge the LOD or justify that the flows can be discharged in the location shown without causing erosion and future degradation. | The LOD in this area has been reduced to avoid impacts to a high quality wetland regulated by MDE and USACE, see FEIS Appendix E.  The stormwater facility will be required to have a stable outfall, with outfall protection as necessary. |
| 47 | 69 | Page Map 24 | Section Appx D | 3635+00 west side – tighten the LOD (90-degree corner) so that it is closer to the SWM facility and does not impact the natural surface trails. | The LOD around the proposed SWM facility in this area has been reduced and is shown in the FEIS, Appendix E. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 48 | 70 | Page Map 24 | Section Appx D | 3630+60 east side – LOD should not extend upstream of the confluence between Cabin John creek and the tributary, remove this large LOD "bump out". Parks does not agree with impacts to stable stream to tie-in grade 130 ft up stream of the crossing. | The LOD bump out at this location is for a potential culvert augmentation. A Limit of Stabilization (LOS) restriction has been included in the JPA for the area upstream of the confluence between Cabin John Creek and the tributary. The LOS restriction will require MDE and USACE approval of final design prior to conducting any clearing or construction in order to protect the area in case the full LOD is not needed. |
| 49 | 71 | Page Map 24 | Section Appx D | 3630+60 east side – the outfall from the highway should be a cascade or other stable system. | See response to MDOT SHA Comment #54. |
| 50 | 72 | Page Map 24 | Section Appx D | 3630+60 east side – Parks does not concur with the need for the augmentation culvert. Provide more analysis of the existing pipe system. | Detailed hydraulics and hydrology calculations will be performed during final design to determine if culvert augmentation is required; however, preliminary calculations indicate that this culvert does not meet current MDOT SHA regulations that require the 100-year storm to not overtop I-270.

MDOT SHA recognizes that this stream crossing is an environmentally sensitive resource and as such, additional JPA restrictions have been placed on the LOD both upstream and downstream of this culvert. In these JPA-restricted areas, USACE and MDE approval of final design is required prior to conducting any clearing or construction in order to protect the area in case the full LOD is not needed. For areas withing M-NCPPC parkland, the approval for clearing and construction lies with M-NCPPC. |
| 51 | 73 | Page Map 24 | Section Appx D | 3630+60 east side – tighten the LOD on the east side of the stormwater facility, the LOD should not go up the slope. | The LOD is this area is needed due to steep side slopes to allow for tie-in grading. |
| 52 | 74 | Page Map 24 | Section Appx D | 3641+50 east side –The stream stabilization work should take place even if augmentation not found to be necessary. | The stream restoration work at station 3641+50 R (west side) is included in the LOD and will be conducted as determined by the regulatory agencies and in coordination with M-NCPPC. |
| 53 | 75 | | Appendix D | Final ROW in locations of impact to Parkland will need to be coordinated with and approved by Parks.

Revised Comment from M-NCPPC: Final ROW in locations of impact to Parkland will need to be coordinated with and approved by Parks and identified in the FEIS/ROD. A procedure for dealing with ROW expansion after the ROD must be approved in the FEIS/ROD. | ROW acquisition in the locations of impacts to M-NCPPC parks will continue to be coordinated with M-NCPPC following NEPA. A MOU has been developed to outline roles, responsibilities and coordination between MDOT SHA, M-NCPPC and the Developer. |
| 54 | 76 | Page 5-1 | Section 5.1.1 | Since this 4(f) chapter in the SDIES does not replace the 4(f) information from the DEIS, all of Parks previous comments related to 4(f) still stand. | MDOT SHA acknowledges receipt of M-NCPPC's DEIS comments. Refer to Appendix T for a response to the DEIS comments. |
| 55 | 77 | Page 5-2 | Section 5.1.2 | "There is no action, or no improvements included at this time on I-495 east of the I-270 east spur (shown in light blue in Figure 5-1)." Please clarify this statement, what does this mean for the rest of the alignment. Will a new NEPA review, DEIS, FEIS, and ROD be completed if SHA decided to move forward with "improvements" on the rest of I-495? | See response to MDOT SHA Comment #1 |
| 56 | 78 | Page 5-3 | Section 5.1.3 | Montgomery Parks does not consider the coordination on the park land affected by the preferred alternative to be sufficient to this point and much more effort to minimize impacts is needed. The comments provided here reference many instances of LOD modification that will need further coordination.

Revised Comment from M-NCPPC: Montgomery Parks does not consider the coordination on the park land affected by the preferred alternative to be sufficient to this point and much more effort to minimize impacts is needed. The comments provided here reference many instances of LOD modification that will need further coordination. SHA must clarify how the opportunities for additional impact minimization and further adjustment of the LOD during Final Design will occur; the process should be in the FEIS/ROD. | See response to MDOT SHA Comment Letter-33. |
| 57 | 79 | Page 5-6, Table 5-1 | | Some Parks have "Constructive Use" impacts as well as Permanent and Temporary. These need to be accounted for in this table and in all discussions regarding Park impacts and mitigation. Examples of constructive use may include impacts to tree CRZs outside of the LOD, impacts to trails outside of the LOD, impacts to campgrounds near the LOD, etc.

Revised Comment from M-NCPPC: arks believes that some park locations have "Constructive Use" impacts as well as Permanent and Temporary. These need to be accounted for in this table and in all discussions regarding Park impacts and mitigation. Examples of constructive use may include impacts to tree CRZs outside of the LOD, impacts to trails outside of the LOD, impacts to campgrounds near the LOD, etc. | Based on the analysis included in the Final Section 4(f) Evaluation, no constructive use impacts to Section 4(f) properties have been identified per the regulations in 23 CFR 774.15. MDOT SHA will continue to coordinate with M-NCPPC throughout the remaining duration of the NEPA effort and through final design and construction regarding impacts to Section 4(f) properties. The Final Section 4(f) Evaluation is documented in FEIS, Appendix G and summarized in FEIS, Chapter 6. |



| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 58 | 80 | Page 5-5 | Section 5.2.1 | Table 5-1 – Cabin John Regional – the impact can only be considered *de minimis* once the required parkland mitigation requirements are met and approved by M-NCPPC. There has not been a significant effort by SHA to present a sufficient parkland mitigation package at this point.<br><br>Revised Comment from M-NCPPC: A complete Park Mitigation package must be approved by MNCPPC. | See response to MDOT SHA Comment Letter-33. |
| 59 | 81 | Page 5-5 | Section 5.2.1 | Table 5-1 – Cabin John SVU2 – the impact can only be considered *de minimis* once the required parkland mitigation requirements are met and approved by M-NCPPC. There has not been a significant effort by SHA to present a sufficient parkland mitigation package at this point.<br><br>Revised Comment from M-NCPPC: Table 5-1 – Cabin John SVU2 – There has not been a enough effort by SHA to present a sufficient parkland mitigation package at this point.  A complete Park Mitigation package  must be approved by MNCPPC. | See response to MDOT SHA Comment Letter-33. |
| 60 | 82 | Page 5-5 | Section 5.2.1 | Table 5-1 – Tilden Woods Stream Valley Park – the impact can only be considered *de minimis* once the required parkland mitigation requirements are met and approved by M-NCPPC. There has not been significant effort by SHA to present a sufficient parkland mitigation package at this point.<br><br>Revised Comment from M-NCPPC: Table 5-1 – Tilden Woods Stream Valley Park – There has not been a enough effort by SHA to present a sufficient parkland mitigation package at this point.  A complete Park Mitigation package  must be approved by MNCPPC. | See response to MDOT SHA Comment Letter-33. |
| 61 | 83 | Page 5-5 | Section 5.2.1 | Table 5-1 – Old Farm Neighborhood Conservation Area – the impact can only be considered de minimis once the required parkland mitigation requirements are met and approved by M-NCPPC. There has not been significant effort by SHA to present a sufficient parkland mitigation package at this point.<br><br>Revised Comment from M-NCPPC: Table 5-1 – Old Farm Neighborhood Conservation Area– There has not been a enough effort by SHA to present a sufficient parkland mitigation package at this point.  A complete Park Mitigation package  must be approved by MNCPPC. | See response to MDOT SHA Comment Letter-33. |
| 62 | 84 | Page 5-5 | Section 5.2.1 | Table 5-1 – Cabin John SVU6 – the impact can only be considered de minimis once the required parkland mitigation requirements are met and approved by M-NCPPC. There has not been a significant effort by SHA to present a sufficient parkland mitigation package at this point.<br><br>Revised Comment from M-NCPPC: Table 5-1 – Cabin John SVU6 -  There has not been a enough effort by SHA to present a sufficient parkland mitigation package at this point.  A complete Park Mitigation package  must be approved by MNCPPC. | See response to MDOT SHA Comment Letter-33. |
| 63 | 85 | Page 5-5 | Section 5.2.1 | "Therefore, the Preferred Alternative would avoid the use of 37 Section 4(f) properties that were previously reported as Section 4(f) uses in the DEIS and Draft Section 4(f) Evaluation, totaling approximately 105 acres." If SHA is going to consider the park properties on the rest of the alignment as avoided, then this implies that any proposed future "improvements" would require a completely new NEPA process. | See response to MDOT SHA Comment #1. |
| 64 | 86 | Page 5-23 | Section 5.2.8 | "No recreational facilities within Cabin John Stream Valley Park Unit 2 would be impacted by the Preferred Alternative." This statement is false. Any further development of the existing highway is detrimental to the park user experience on the natural surface trail.<br><br>Revised Comment from M-NCPPC:  "No recreational facilities within Cabin John Stream Valley Park Unit 2 would be impacted by the Preferred Alternative." This statement is false. Any further development of the existing highway is detrimental to the park user experience on the natural surface trail even if the actual trail is not removed or relocated for the new highway alignment | This statement is intended to convey that no direct impacts to park facilities would occur from the transportation improvements. |
| 65 | 87 | Page 5-5 | Section 5.2 | Until a robust, complete, and implementable mitigation plan detailing on site mitigation and restoration and parkland replacement is proposed and approved by M-NCPPC no concurrence on the 4(f) status can be provided. | See response to MDOT SHA Comment Letter-33. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 66 | 88 | Page 5-23 | Section 5.2.8 | LOD adjustments are required adjacent to Cabin John creek where the outfalls enter the stream. To ensure long-term stability in Cabin John creek, stream stabilization is required in the mainstem at the outfalls due to the increased flows from the new highway.<br><br>Revised Comment from M-NCPPC: LOD adjustments are required adjacent to Cabin John creek where the outfalls enter the stream. To ensure long-term stability in Cabin John creek, stream stabilization is required in the mainstem at the outfalls due to the increased flows from the new highway. SHA needs to define the process for how opportunities for additional impact minimization and further adjustment of the LOD during Final Design will occur. | A Limits of Stabilization (LOS) has been added to the area where Thomas Branch outfalls to the Cabin John Creek mainstem, to ensure that the mainstem is stabilized to accommodate any increased flow.  The LOS restriction will require MDE and USACE approval of final design prior to conducting any clearing or construction. |
| 67 | 89 | Page 5-28 | Section 5.2.11 | "No other recreational facilities would be impacted by the Preferred Alternative." It is Parks position that any widening will have an adverse impact on the public use campground, even if the actual campsites are not physically impacted. For example, noise and visual experience of the campground will be diminished by any increase in the highway size. | This statement is intended to convey that no direct impacts to facilities would occur via incorporation into the transportation facility. |
| 68 | 90 | Page 5-28 | Section 5.2.11 | Parks has made numerous comments linked to App D that detail the numerous LOD modifications that are still required. | MDOT SHA has responded to all DEIS and SDEIS comments in FEIS Appendix T.  Additionally, MDOT SHA has continued coordination with M-NCPPC between the SDEIS and the FEIS to address comments on the LOD. |
| 69 | 91 | Page 5-28 | Section 5.2.11 | "Expansion of the LOD in certain areas was in response to M-NCPPC's comments to ensure stable outfall channels." We appreciate these changes and believe that providing stable outfalls is essential due to the large increases in stormwater runoff that are not being fully treated. | MDOT SHA agrees that providing stable outfalls is essential and will continue to work with M-NCPPC to ensure that appropriate outfalls are included within areas under M-NCPPC jurisdiction. |
| 70 | 92 | Page 5-28 | Section 5.2.11 | The relocation of the trail impacted by the proposed SWM facility should not be considered mitigation. The project is directly affecting the trail and it must be rebuilt as part of the project. Mitigation for the trail disturbance will also be required that will be above and beyond the relocation and rebuilding of the impacted trail section.<br><br>Revised Comment from M-NCPPC: As SHA has stated to Parks, the relocation of the trail impacted by the proposed SWM facility should not be considered mitigation. The project is directly affecting the trail and it must be rebuilt as part of the project. Mitigation for the trail disturbance will also be required that will be above and beyond the relocation and rebuilding of the impacted trail section. | The relocation of the impacted trail at this location is not considered to be part of the park mitigation package, but the trail will be rebuilt as part of the project.  The full mitigation plan is available in FEIS Chapter 7. |
| 71 | 93 | Page 5-28 | Section 5.2.11 | Noise/visual barrier should be pursued for all areas of parkland. Parks expectation that any areas shown with retaining wall adjacent to parkland within Phase 1 South, should also incorporate noise wall/visual barrier and vegetative barrier where appropriate. | Noise barriers are currently proposed in all areas where a barrier is warranted due to noise impacts and has been determined to be reasonable and feasible according to MDOT SHA's noise policy.  A noise barrier extension is warranted for the portion of Cabin John Stream Valley Park along the inner loop of I-495, identified as part of NSA 1-04.  Noise barriers are not reasonable for Cabin John Regional Park (identified as NSA 5-28) or the portion of Cabin John Stream Valley Park located along the outer loop of I-495 (identified as part of NSA 2-01), although this parcel will be partially protected by a proposed barrier extension. |
| 72 | 94 | Page 5-30 | Section 5.2.12 | I-270 should pass over Old Farm Creek via a roadway bridge and the existing culvert should be removed allowing Old Farm Creek to have a natural channel bottom. This would represent a significant improvement to the existing condition and is reasonable considering the numerous aquatic resource impacts posed by this project. | As part of the final mitigation package, MDOT SHA has agreed to span the Old Farm Creek, see FEIS Chapter 7 for the documentation. |
| 73 | 95 | Page 5-30 | Section 5.2.12 | The LOD on the east side I-270 in Tilden Woods SVP should more closely resemble the LOD submitted with the DEIS. Parks does not support the larger LOD. Is the larger LOD intended for the new aerial structure spanning Old Farm Creek? If so, Parks looks forward to discussing this in further detail. | See response to MDOT SHA Comment #53. |
| 74 | 96 | Page 5-31 | Section 5.2.13 | Tree planting should be maximized at Old Farm NCA. NNI control is expected to be park of the tree planting and be applied the entire parcel. | See response to MDOT SHA Comment #28. |
| 75 | 97 | Page 5-33 | Section 5.2.14 | "The Preferred Alternative would not impact to Cabin John Trail, or any other recreational facilities in Cabin John Stream Valley Park Unit 6." Remove this reference as there are no trails in CJ SVU 6. | This comment was addressed in the published SDEIS. |
| 76 | 98 | Page 5-33 | Section 5.2.14 | The LOD on the west side of I-270 is too large. It needs to be tighter around the SWM facility and not go further than the confluence. | The LOD bumpout at this location has been removed in the FEIS. |
| 77 | 99 | Page Map 24 | Section Appx D | 3620+00 west side. Remove LOD bump out at existing and recently restored outfall | The LOD in this area is provided to allow for upgrades to the storm drain pipe and outfall protection, if needed. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 78 | 100 | Page 5-33 | Section 5.2.14 | Parks does not concur with the need for an augmentation culvert and the associated impacts. | There is not a culvert augmentation proposed at this location on page 5-33 in Section 5.2.14. |
| 79 | 101 | Page 5-50 | Section 5.3 | "The Preferred Alternative presented in this SDEIS would not avoid the use of all Section 4(f) properties. It would, however, avoid the use of 37 Section 4(f) properties for which impacts totaling roughly 105 acres as were reported in the DEIS (Table 5-2). Those 105 acres of impact to 37 properties through the design phase of the project." M-NCPPC takes this statement to mean that any future improvements to the highway outside of the Phase 1 area would need a new and separate NEPA process. | See response to MDOT SHA Comment #1. |
| 80 | 102 | Page 5-51 | Section 5.4.1 | "All possible planning to minimize harm will additionally involve an agreement document that outlines the process to continue coordination with the OWJs over Section 4(f) properties through the design phase of the project." M-NCPPC Montgomery Parks will continue to require extensive review of all impacts to Parkland with the goal to continue to minimize those impacts. Before any work is permitted to occur on Parkland a Park Construction Permit must be issued. | MDOT SHA acknowledges the need for a Park Construction Permit. MDOT SHA and the Developer will continue to coordinate with M-NCPPC through the design and construction phases of the project and a MOU will document the coordination process. |
| 81 | 103 | Page 5-51 | Section 5.4.2 | "Consideration of improvements to those remaining parts would have to advance separately, and would be subject to additional environmental studies, and analysis and collaboration with the public, stakeholders, and agencies."<br><br>Change this sentence to "Consideration of improvements to those remaining parts would have to advance separately, and would be subject to a new NEPA study, independent of the previous Phase 1 studies, and new collaboration with the public, stakeholders, and agencies. | See response to MDOT SHA Comment #1. |
| 82 | 104 | Page 5-52 | Section 5.4.5 | M-NCPPC will require a thorough and implementable mitigation package to include extensive parkland replacement. The parkland affected by this project has significant value due to its geographic location in a largely developed area with little "unused" land. SHA must recognize that land acquisition is a timely process and properties should be acquired and presented to M-NCPPC as soon as possible so that M-NCPPC can approve the properties as part of the 4(f) discussion. Leading to the FIES and ROD. | See response to MDOT SHA Comment #33. |
| 83 | 105 | Page 5-61 | Section 5.7 | "Based on the information presented in the Draft Section 4(f) Evaluation and this Updated Draft Section 4(f) Evaluation, FHWA and MDOT SHA have reached a preliminary conclusion that the Preferred Alternative is the alternative with least overall harm." Add to the end of the statement "due to avoiding the parks and natural resources involved in the alternatives that include the rest of I-495. | The least overall harm conclusion was based on multiple factors defined in  23 CFR 774.3(c)(1), as summarized in SDEIS Chapter 5, Table 5-4. |
| 84 | 106 | Page 4-10 | Section 4.4.2 | It needs to be stated clearly that any future improvements on the rest of I-495 not in Phase 1 would require a new and separate NEPA process since those resources and properties are being considered avoided for the purpose of this NEPA study. | See response to MDOT SHA Comment #1. |
| 85 | 107 | Page 4-10 | Section 4.4.3 | M-NCPPC is requesting the creation of a clear and concise set of figures and digital GIS data that shows the new proposed ROW after construction.<br><br>Revised Comment from M-NCPPC: Before any MOU, mitigation package approval, or publication of the FEIS/ROD, M-NCPPC will require the review of a clear and concise set of figures and digital GIS data that shows the new proposed ROW after construction. | MDOT SHA has provided M-NCPPC with the digital GIS data showing the permanent and temporary limits of disturbance (LOD) within M-NCPPC properties presented in the SDEIS. The permanent LOD represents proposed area under fee simple right-of-way or perpetual easement after construction. Additional breakdown of the LOD to identify fee-simple right-of-way acquisition versus permanent easements would be determined during the Final Design stage of the project. Revised figures and digital GIS data depicting the permanent and temporary LOD within M-NCPPC properties to be presented in the FEIS/Final Section 4(f) Evaluation can be provided to M-NCPPC with the publication of the FEIS. |
| 86 | 108 | Page 4-16 | Section 4.4.3 B b | Table 4-9 SHA must provide documentation to prove the use of Capper-Cramton funds to purchase Cabin John Regional Park and Cabin John SVU2. M-NCPPC does not consider those parks to have been purchased with Capper-Cramton Funds. | See response to MDOT SHA comment Letter-26. |
| 87 | 109 | Page 4-17 | Section 4.4.3 B c | It needs to be stated clearly that any future improvements on the rest of I-495 not in Phase 1 would require a new and separate NEPA process since those resources and properties are being considered avoided for the purpose of this NEPA study. | See response to MDOT SHA comment #1. |
| 88 | 110 | Page 1 Paragraph 1 | Appendix C Compensatory SW Mitigation Plan | Phase I South is the only area being evaluated at this time.  All other areas should be specified as no build. | See response to MDOT SHA comment #3. |

OP·LANES
M A R Y L A N D

I-495 & I-270 Managed Lanes Study

FINAL ENVIROMENTAL IMPACT STATEMENT

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 89 | 111 | Page 1 Paragraph 2 | Appendix C Compensatory SW Mitigation Plan Part | The project needs to commit to significantly improving the Provided ESD surface area to a minimum of 80% of the Required ESD onsite (allowing for a maximum of 20% to be treated with the use of compensatory SWM mitigation offsite). These highways can be considered the worst water quality offenders in the County and the Project needs to take more responsibility for protecting the downstream water resources, which will never be improved if we don't take the appropriate steps as part of this project. The Project must try harder. | See response to MDOT SHA Comment Letter-29. |
| 90 | 112 | Page 1 Paragraph 2 | Appendix C Compensatory SW Mitigation Plan Part 1 | As the SDEIS only covers Phase I South and specifies that all other areas are no build with the selected alternative, this entire document should only address Phase I South. | See response to MDOT SHA Comment #3. |
| 91 | 113 | Page 1 Paragraph 2 Last sentence | Appendix C Compensatory SW Mitigation Plan Part 1 | Clarify Phase I south (There is also Phase I north). | Phase 1 South was previously defined in the Compensatory SWM Plan to avoid confusion. |
| 92 | 114 | Page 1 Paragraph 3 | Appendix C Compensatory SW Mitigation Plan Part 1 | Need to be more specific about how more environmental impacts won't result from this SWM effort and how they will be mitigated for. As the P3 can choose any sites (not just from this list) to move forward with, limitations on the amount of environmental resources allowed to be impacted cumulatively for this effort need to be set. Mitigation is not sufficient to compensate for impacts resulting from compensatory offsite SWM. | Impacts to resources have been avoided and minimized to the greatest extent practicable in the Comprehensive SWM Mitigation Plan. The Developer/MDOT SHA will be responsible for further avoidance and minimization as indicated in the Compensatory SWM Plan and other NEPA documents. If further impacts occur as a result of using any compensatory SWM site or other sites, then a re-evaluation will be prepared. |
| 93 | 115 | Page 1 Paragraph 3 | Appendix C Compensatory SW Mitigation Plan Part 1 | Instead of prioritizing existing MDOT SHA ROW for offsite compensatory mitigation in a large geographic area (that becomes meaningless on a 6-digit HUC scale it is so large), instead this effort should be to concentrate on all untreated impervious areas within 1500' of the LOD. This would make the benefits seen by the compensatory mitigation meaningful to the location of the impacts and the surrounding waterways. | See response to MDOT SHA Comment #38. |
| 94 | 116 | Page 2 Figure 1-1 | Appendix C | "Future Phases" is inconsistent with the rest of the SDEIS document. "No Build" should be used instead. | This text has been revised to be more consistent with the rest of the FEIS. |
| 95 | 117 | Page 3 Paragraph 1 | Appendix C Compensatory SW Mitigation Plan Part 1 | Stating that it is "desirable" for SWM to be met onsite is insufficient. The on-site SWM efforts shown are not enough; currently less than 45% of stormwater water quality treatment is proposed onsite. The percentage of on-site SWM treatment should be at least 80%, and then the remaining 20% that is offsite should occur within 1500' of the LOD corridor. | The SWM analysis completed for the DEIS and SDEIS was completed to a conservative planning level analysis used for determining the LOD and costs. A more detailed SWM analysis was completed for the FEIS based on standard MDE approved hydrology and hydraulic procedures. Based on this more detailed preliminary SWM concept developed for the FEIS, the anticipated offsite requirements for the Preferred Alternative have been significantly reduced from 114 acres to 2.5 acres, representing approximately 95 percent of environmental site design requirements being met onsite. Refer to FEIS Chapter 3, Section 3.1.6.

MDOT SHA has evaluated providing compensatory SWM within the requested 1500'; however, due to the constraints of the study area, it was not possible to provide it all within the requested offset, which extends requirements beyond current MDE regulations and requirements. The MDOT SHA and the Developer will be required to follow the three-step procedure per the MDE 2000 SWM Manual for selecting on-site and off-site locations best suited for achieving the SWM water quality requirements and for permitting the sites through MDOT SHA Plan Review Division and MDE. |
| 96 | 118 | Page 3 Paragraph 1 | Appendix C Compensatory SW Mitigation Plan Part 1 | The MDE 6-digit watershed is too large in this case and puts the compensatory SWM sites too far away from the impacts. All off-site compensatory SWM mitigation should occur within 1500' of the LOD to be proximate and meaningful in its effect on the local water quality. | See response to MDOT SHA Comment #38. |
| 97 | 119 | Page 3 Paragraph 4 | Appendix C Compensatory SW Mitigation Plan Part 1 | Property owners of proposed sites need to be notified sooner. Parks owns some of the proposed sites and we were previously unaware of their inclusion in this plan. We do not approve the use of any of these sites (or the LODs shown) without separate, further coordination to understand the impacts these are mitigating for. | The intent of the Compensatory SWM Plan is to provide a list of possible SWM sites that have been vetted through NEPA for use to meet the Phase 1 South SWM requirements. Through coordination between MDOT SHA, the Developer, and the regulatory agencies, there are 67 sites that have been preliminary cleared for inclusion in the Compensatory SWM Plan - they are all SWM facilities. MDOT SHA will coordinate with property owners if the site is carried forward into final design and permitting. |
| 98 | 120 | Page 3 Paragraph 4 | Appendix C Compensatory SW Mitigation Plan Part 1 | The MDE 6-digit watershed, even overlaid with the Federal 8-digit HUC, is too large in this case and puts the compensatory SWM sites too far away from the impacts. All off-site compensatory SWM mitigation should occur within 1500' of the LOD to be proximate and meaningful in its effect on the local water quality. | See response to MDOT SHA Comment #38. |

00022089

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 99 | 121 | Page 4 Figure 2-1 | Appendix C Compensatory SW Mitigation Plan Part 1 | Specify that this document only covers Phase I south. All other areas should be labeled "No Improvements" | See response to MDOT SHA Comment #3. |
| 100 | 122 | Page 5 Paragraph 1 and Paragraph 2 | Appendix C Compensatory SW Mitigation Plan Part 1 | The SDEIS only covers Phase I south Alternative 9. The rest of alternative 9 is no improvements and those impacts should not be included in this document. | See response to MDOT SHA Comment #3. |
| 101 | 123 | Page 5 Paragraph 3 | Appendix C Compensatory SW Mitigation Plan 1 | Be more specific about how the P3 will be incentivized to provide as much on-site SWM as possible. A minimum of 80% of water quality WM should be required to be treated onsite, with strong incentives to treat the remaining 20% on-site as well (or maybe through disincentivizing off-site compensatory SWM). All off-site SWM should be withing 1500' of the LOD. | See response to MDOT SHA Comment #117. |
| 102 | 124 | Page 5 Paragraph 4 | Appendix C Compensatory SW Mitigation Plan 1 | Omit information for full alternative 9. It is confusing and not relevant – No Improvements are proposed there as the No Build option was selected for that area. Thus there should be no SWM treatment required for the area with no improvements. | See response to MDOT SHA Comment #3. |
| 103 | 125 | Page 5 Paragraph 4 | Appendix C Compensatory SW Mitigation Plan 1 | 92 onsite /114 offsite is less than 45% treated onsite. This is an unacceptable onsite/offsite ratio. A minimum of 167 acres of water quality SWM should be provided onsite. | See response to MDOT SHA Comment #36. |
| 104 | 126 | Page 5 Paragraph 5 | Appendix C Compensatory SW Mitigation Plan 1 | Should be the number for Phase I South only (206), not the 351. Where no improvements/no build are proposed, there should not be impacts. | See response to MDOT SHA Comment #3. |
| 105 | 127 | Page 6 Table 3-1 | Appendix C Compensatory SW Mitigation Plan 1 | This table is incredibly confusing. Simplify it by including only Phase I south numbers and dropping anything related to what you are calling future phases, which are really where there are No Improvements/No Build proposed. | See response to MDOT SHA Comment #3. |
| 106 | 128 | Page 6 | Appendix C Section 4.1 Part 1 | MDOT SHA should consider outfall stabilization (using environmentally sensitive techniques) to be a type of compensatory SWM mitigation. SHA owns a plethora of severely eroding outfalls which send tons of sediment downstream each year. Given the status of SHA's storm drain infrastructure, this technique shows real improvement to the local waterways.<br><br>Revised Comment from M-NCPPC: MDOT SHA should restore degraded outfalls in addition to the required SWM.SHA owns a plethora of severely eroding outfalls which send tons of sediment downstream each year. Given the status of SHA's storm drain infrastructure, this technique shows real improvement to the local waterways. Outfall restoration could help SHA reach their stated goal of a net benefit to affected resources. | Currently, outfall stabilization is not approved by MDE or MDOT SHA PRD for SWM IAT credit. If the guidance changes, the Developer/MDOT SHA could revise the Compensatory SWM Plan IART potential during final design and permitting and provide NEPA reevaluation for those sites. |
| 107 | 129 | Page 6 | Appendix C Section 4.1 Part 1 | Impervious removal, Chapter 3, and Chapter 5 facilities should account for at least 75% of the SWM compensatory mitigation, with stream restoration accounting for no more than 25% of the IAT. | MDOT SHA is pursuing use of stream restoration for water quality credit. At this stage, the offsite Compensatory SWM is met through the use of traditional SWM facilities, therefore no compensatory stream restoration locations are proposed for water quality mitigation in the FEIS. Refer to Chapter 3, Section 3.1.6.<br><br>If stream restoration is considered in the future it will be applied in a hierarchical approach with pavement removal and stormwater facilities prioritized over stream restoration. |
| 108 | 130 | Page 6 | Appendix C Section 4.1 Part 1 | All compensatory SWM sites should be within 1500' of LOD corridor for Phase I South. | MDOT SHA has evaluated providing compensatory SWM within the requested 1500'; however, due to the constraints of the study area, it was not possible to provide it all within the requested offset, which extends requirements beyond current MDE regulations and requirements. The MDOT SHA and the Developer will be required to follow the three-step procedure per the MDE 2000 SWM Manual for selecting on-site and off-site locations best suited for achieving the SWM water quality requirements and for permitting the sites through MDOT SHA Plan Review Division and MDE. |

OP·LANES
MARYLAND   I-495 & I-270 Managed Lanes Study

FINAL ENVIROMENTAL IMPACT STATEMENT

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 109 | 131 | Page 7 | Appendix C Section 4.1 Part 1 | Stream restoration for compensatory SWM mitigation should only take place in close proximity (1500') of the impacts and should only be proposed in watersheds with ample stormwater management already in place (low % of untreated impervious). | See response to MDOT SHA Comment #129. |
| 110 | 132 | Page 7 | Appendix C Section 4.1 Part 1 | Specify stringent measures associated with tree loss for compensatory SWM sites.  Since these sites could be avoided by choosing other sites, the threshold for tree loss should be low. | Tree loss at compensatory SWM sites will be minimized during design to the maximum extent practicable while still fulfilling the project purpose. Mitigation will be conducted per Maryland Reforestation Law and landowner requirements, with an emphasis on replacing trees on-site whenever possible.  The language in the Compensatory SWM Plan in the SDEIS indicated this. |
| 111 | 133 | Page 7 | Appendix C Section 4.1 Part 1 | The credit potential of one-acre IAT credit per 100 linear foot stream restored is based on outdated crediting methodology.  The project should be held to the most recent guidance at the time of permitting; at this time that is the June 2020 Wasteload Allocations Document. | See response to MDOT SHA Comment #39. |
| 112 | 134 | Page 7 | Appendix C Section 4.1 Part 1 | Of the 1,174 compensatory SWM sites, any outside of the corridor 1500' around the LOD should be automatically eliminated from this project. | See response to MDOT SHA Comment #130.  Note that the number of Compensatory SWM sites has been reduced to 67 sites in response to the reduction in required offsite IART.  Refer to the FEIS Chapter 3, Section 3.1.6. |
| 113 | 135 | Page 8 | Appendix C Section 4.2.1 Part 1 | Parks will need to review and approve any compensatory mitigation sites on Parkland for cultural resources impacts. | MDOT SHA and the Developer will continue to coordinate with M-NCPPC on any parkland impacts associated with compensatory SWM sites. |
| 114 | 136 | Page 9 | Appendix C Section 4.2.6 Part 1 | Only the most minimal wetlands and waterways impacts should be accepted, and to the lowest quality resources. | During the evaluation of the compensatory SWM sites through the NEPA process, numerous sites were dropped from consideration due to significant impacts to wetlands/waterways or any impacts to high valued resources wetlands/waterways.  The remaining compensatory SWM sites have impacts to wetlands/waterways that have been assumed to be acceptable for use based on the amount of impact and quality of the given resource.  Additionally, the number of sites in the Compensatory SWM Plan in the FEIS has been decreased to 67, thus decreasing any associated wetland impacts. |
| 115 | 137 | Page 9 | Appendix C Section 4.2.8 Part 1 | After reviewing the maps, it is not true that all compensatory SWM sites that would incur a use of a Section 4(f) properties were eliminated.  There are several stream restoration sites as well as a few Chapters 3/5 sites.  Edit this statement for accuracy. | The Compensatory SWM Plan has been revised to focus on the 67 compensatory SWM sites that were selected for the FEIS and preliminarily cleared for NEPA purposes.  The mapping, tables and Appendices A through M have been updated and do not include reference to any Section 4(f) properties. |
| 116 | 138 | Page 9 | Appendix C Section 4.2.8 Part 1 | Montgomery Parks does not feel that good potential SWM opportunities should be eliminated due to their location on Parkland.  Conversely, we have spent copious amounts of time working with the MDOT/SHA project team to identify and review potential offsite compensatory SWM opportunities on Parkland.  Our priority remains to lessen the effects that this highway expansion will have on downstream waterways and properties, many of which are Parkland.  Montgomery Parks is committed to being a partner in finding solutions to treat stormwater runoff and hold the project accountable for its environmental impacts.  This includes the use of Parkland for compensatory stormwater mitigation when it can be effective. | See response to MDOT SHA Comment #20. |
| 117 | 139 | Page 11 | Appendix C Section 4.4 Part 1 | See above.  If sites fit all other criteria for compensatory SWM mitigation and are on Parkland, they should be discussed with the landowner and considered (not just unduly removed from consideration). | See response to MDOT SHA Comment #20. |
| 118 | 140 | Page 13 Table 4-3 | Appendix C Part 1 | Sites outside of the 1500' buffer surrounding the LOD should be removed from consideration.  The majority of these 754 sites aren't even proximate to the impervious being installed. | See response to MDOT SHA Comment #130.  Note that the number of Compensatory SWM sites has been reduced to 67 sites in response to the reduction in required offsite IART.  Refer to the FEIS Chapter 3, Section 3.1.6. |
| 119 | 141 | Page 13 | Appendix C Section 5 Part 1 | The P3 should be held strictly accountable for treating a minimum of 80% of the SWM water quality onsite, and the remaining maximum of 20% within 1500' of the corridor. | See response to MDOT SHA Comments #117. |
| 120 | 142 | Page 14 | Appendix C Section 5.1.8 Part 1 | This is inaccurate; section 4(f) land is included in this document. | See response to MDOT SHA Comment #137. |
| 121 | 143 | Page 16 Table 6-1 | Appendix C Part 1 | Table should include information for Phase I South only.  All other areas are No Improvements/No Build. | See response to MDOT SHA Comment #3. |
| 122 | 144 | Page 17 Figure 6-1 | Appendix C Part 1 | This map shows how far away so many of the proposed sites are currently.  All sites outside of within 1500' of the Phase I south LOD should be eliminated. | See response to MDOT SHA Comment #130. |
| 123 | 145 | Page 18 Figure 6-2 | Appendix C Part 1 | Delete graphic.  Not relevant to Phase I South. | See response to MDOT SHA Comment #3. |
| 124 | 146 | Page 20 Table 6-2 | Appendix C Part 1 | This table should include Phase I South only. | See response to MDOT SHA Comment #3. |
| 125 | 147 | Page 20 Table 6-2 | Appendix C Part 1 | All sites not within 1500' of the LOD should be removed from consideration for this project. | See response to MDOT SHA Comment #130. |

OP·LANES
M A R Y L A N D
I-495 & I-270 Managed Lanes Study

**FINAL ENVIROMENTAL IMPACT STATEMENT**

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 126 | 148 | Page 20 Table 6-2 | Appendix C Part 1 | Although the document states that parkland sites were removed, it appears that multiple park sites still remain on this list. Any sites will have to be vetted by Park staff prior to use and have all approvals/permissions issued prior to construction. To date no permissions have been granted or LODs approved for use of any Parkland for SWM compensatory mitigation. Parks are willing to work with the project team on good quality opportunities and coordinate accordingly as needed but need to be a part of the decision making and approval process. | See response to MDOT SHA Comment #137. |
| 127 | 149 | Appendix A Page A-3 Table A-4 | Appendix C Compensatory SW Mitigation Plan Part 1 | Stream restoration crediting should be updated to June 2020 Wasteload Allocations document guidance. | See response to MDOT SHA Comment #39. |
| 128 | 150 | Appendix A Page A-3 Table A-4 | Appendix C Compensatory SW Mitigation Plan Part 1 | MDOT SHA should consider outfall stabilization (using environmentally sensitive techniques) to be a type of compensatory SWM mitigation. SHA owns a plethora of severely eroding outfalls which send tons of sediment downstream each year. Given the status of SHA's storm drain infrastructure, this technique could help improve the local waterways.

Revised Comment from M-NCPPC: MDOT SHA should restore degraded outfalls in addition to the required SWM.SHA owns a plethora of severely eroding outfalls which send tons of sediment downstream each year. Given the status of SHA's storm drain infrastructure, this technique shows real improvement to the local waterways. Outfall restoration could help SHA reach their stated goal of a net benefit to affected resources. | See response to MDOT SHA Comment #128. |
| 129 | 151 | Appendix A Page A-4 Table A-3 and paragraph above | Appendix C Compensatory SW Mitigation Plan Part 1 | Only numbers relevant to the development of Phase I south should be included. All other areas have no improvements proposed. | See response to MDOT SHA Comment #3. |
| 130 | 152 | Appendix A Page A-4 Table A-4 | Appendix C Compensatory SW Mitigation Plan Part 1 | Table should reflect only Phase I south. Sites further than 1500' outside of the LOD should be eliminated. | See responses to MDOT SHA Comment #3 and #130. |
| 131 | 153 | Appendix A Page A-4 Table A-4 | Appendix C Compensatory SW Mitigation Plan Part 1 | Site summary needs to include the type of IAT crediting used. Stream restoration should only be used for a maximum of 25% of credits needed. | See response to MDOT SHA Comment #129. |
| 132 | 154 | Appendix A Table A-5 | Appendix C Compensatory SW Mitigation Plan Part 1 | Table should reflect only Phase I south. Sites further than 1500' outside of the LOD should be eliminated. | See responses to MDOT SHA Comment #3 and #130. |
| 133 | 155 | Appendix A Table A-5 | Appendix C Compensatory SW Mitigation Plan Part 1 | Although the document states that parkland sites were removed, it appears that multiple park sites still remain on this list. Any sites will have to be vetted by Park staff prior to use and have all approvals/permissions issued prior to construction. To date no permissions have been granted or LODs approved for use of any Parkland for SWM compensatory mitigation. Parks are willing to work with the project team on good quality opportunities and coordinate accordingly as needed, but need to be a part of the decision making and approval process. | See response to MDOT SHA Comment #137. |
| 134 | 156 | Appendix B Page B-1 | Appendix C Compensatory SW Mitigation Plan Part 1 | All park sites will need to be evaluated by Parks Cultural Resources staff. | See response to MDOT SHA Comment #135. |
| 135 | 157 | Appendix C Page C-1 | Appendix C Compensatory SW Mitigation Plan Part 1 | Forest impacts in Parkland will also require Park mitigation. | MDOT SHA has been and will continue to coordinate with M-NCPPC regarding forest impacts on parkland. MDOT SHA coordinated the development of a conceptual forest mitigation approach for impacts on M-NCPPC property and it is included in the FEIS. The final forest mitigation plan will be developed by the Developer in conjunction with MDOT SHA and the affected jurisdictions and landowners including M-NCPPC during the final design phase of the project. |

OP·LANES
M A R Y L A N D   I-495 & I-270 Managed Lanes Study

**FINAL ENVIROMENTAL IMPACT STATEMENT**

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 136 | 158 | Appendix D | Appendix C Compensatory SW Mitigation Plan Part 2 | Should reflect only Phase I south.  Sites further than 1500' outside of the LOD should be eliminated. | See responses to MDOT SHA Comment #3 and #130. |
| 137 | 159 | Appendix E | Appendix C Compensatory SW Mitigation Plan Part 2 | Should reflect only Phase I south.  Sites further than 1500' outside of the LOD should be eliminated. | See responses to MDOT SHA Comment #3 and #130. |
| 138 | 160 | Appendix F | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south.  Sites further than 1500' outside of the LOD should be eliminated. | See responses to MDOT SHA Comment #3 and #130. |
| 139 | 161 | Appendix G | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south.  Sites further than 1500' outside of the LOD should be eliminated. | See responses to MDOT SHA Comment #3 and #130. |
| 140 | 162 | Appendix G Page G-1 last paragraph | Appendix C Compensatory SW Mitigation Plan Part 3 | Parkland use may also require Parkland mitigation.  Parkland use shall require coordination with and approval by Parks. | See response to MDOT SHA Comment #119. |
| 141 | 163 | Appendix H | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south.  Sites further than 1500' outside of the LOD should be eliminated. | See responses to MDOT SHA Comment #3 and #130. |
| 142 | 164 | Appendix H Page H-1 Section 2 | Appendix C Compensatory SW Mitigation Plan Part 3 | Although the document states that parkland sites were removed, it appears that multiple park sites still remain on this list.  Any sites will have to be vetted by Park staff prior to use and have all approvals/permissions issued prior to construction.  To date no permissions have been granted or LODs approved for use of any Parkland for SWM compensatory mitigation.  Parks are willing to work with the project team on good quality opportunities and coordinate accordingly as needed but need to be a part of the decision making and approval process. | See response to MDOT SHA Comment #137. |
| 143 | 165 | Appendix H Page H-1/2 Table H-1 | Appendix C Compensatory SW Mitigation Plan Part 3 | Any Montgomery Parks sites will have to be vetted by Park staff prior to use and have all approvals/permissions issued prior to construction.  To date no permissions have been granted or LODs approved for use of any specific Parkland for SWM compensatory mitigation.  Parks are ready to work with the project team on good quality opportunities to effectively treat stormwater on Parkland and be a partner in lessening the effects of this roadway on downstream waterways. | See response to MDOT SHA Comment #119. |
| 144 | 166 | Appendix H Table H-2 | Appendix C Compensatory SW Mitigation Plan Part 3 | Any Montgomery Parks sites will have to be vetted by Park staff prior to use and have all approvals/permissions issued prior to construction.  To date no permissions have been granted or LODs approved for use of any specific Parkland for SWM compensatory mitigation.  Parks are ready to work with the project team on good quality opportunities to effectively treat stormwater on Parkland and be a partner in lessening the effects of this roadway on downstream waterways. | See response to MDOT SHA Comment #119. |
| 145 | 167 | Appendix I | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south.  Sites further than 1500' outside of the LOD should be eliminated. | See responses to MDOT SHA Comment #3 and #130. |
| 146 | 168 | Appendix J | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south.  Sites further than 1500' outside of the LOD should be eliminated. | See responses to MDOT SHA Comment #3 and #130. |

OP·LANES™
M A R Y L A N D    I-495 & I-270 Managed Lanes Study

**FINAL ENVIROMENTAL IMPACT STATEMENT**

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 147 | 169 | Appendix J | Appendix C Compensatory SW Mitigation Plan | Electronic utility information is available from most utility owners and could have better informed of this investigation. | Readily available digital utility information was utilized during the vetting of the compensatory SWM sites.  In addition, the field investigations performed by MDOT SHA reviewers and street view imagery were leveraged to provide additional utility assessment.  The Developer/MDOT SHA will be required to obtain detailed utility information for sites during final design to demonstrate feasibility and constructability. |
| 148 | 170 | Appendix K | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south.  Sites further than 1500' outside of the LOD should be eliminated. | See responses to MDOT SHA Comment #3 and #130. |
| 149 | 171 | Appendix M | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south.  Sites further than 1500' outside of the LOD should be eliminated. | See responses to MDOT SHA Comment #3 and #130. |
| 150 | 172 | Appendix L | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south.  Sites further than 1500' outside of the LOD should be eliminated. | See responses to MDOT SHA Comment #3 and #130. |
| 151 | 173 | Appendix L Map 25 Site WAS 4457 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC and WSSC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |
| 152 | 174 | Appendix L Map 36 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |
| 153 | 175 | Appendix L Map 38 WAS 4038 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |
| 154 | 176 | Appendix L Map 40 MPOC_008 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |
| 155 | 177 | Appendix L Map 101 MPAO_0022 Backup | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |
| 156 | 178 | Appendix L Map 106 WAS- 2505 & WAS-2506 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |
| 157 | 179 | Appendix L Map 108 MO_0029 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |
| 158 | 180 | Appendix L Map 115 all sites | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |
| 159 | 181 | Appendix L Map 136 MO_00018 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |
| 160 | 182 | Appendix L Map 186 MPAO_0014 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |

00022094

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 161 | 183 | Appendix L Map 208 SSS-150023 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |
| 162 | 184 | Appendix L Map 210 MPOC_009 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |
| 163 | 185 | Appendix L Map 211 MO_00047A | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |
| 164 | 186 | Appendix L Map 212 WAS_5308 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |
| 165 | 187 | Appendix L Map 213 MPAO_0015 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | See response to MDOT SHA Comment #119. |
| 166 | 188 | Page 4-27 | Chapter 4 4.6.3 Environmental Consequences | Noise/visual barrier should be pursued for all areas of parkland. Parks expectation that any areas shown with retaining wall adjacent to parkland within Phase 1 South, should also incorporate noise wall/visual barrier. In addition to the noise/visual barriers requires landscape plantings adjacent to all wall/barrier locations, include planting of specifically designed vegetative buffers.  This would consist of plantings at least 5m wide with a diverse type of woody plants planted at a higher density. As far as the Visual Screening Options memo, Parks would like some discussion about the construction techniques and minimum footprints required to construct Timber Noise Barriers and Concrete Noise Barriers in conjunction with/on top of retaining walls.  The LOD construction offset to the proposed retaining walls is shown in the most recent plans at approx. 15', Parks needs to understand any additional impacts being incurred as a result of adding this element to the design. Parks could be open to a combination of timber and concrete noise barriers along all parkland and would want to work with them to identify what is most appropriate in each area and look at heights that would be meaningful. | Noise barriers are currently proposed in all areas where a barrier is warranted due to noise impacts and has been determined to be reasonable and feasible according to MDOT SHA's noise policy.  A noise barrier extension is warranted for the portion of Cabin John Stream Valley Park along the inner loop of I-495, identified as part of NSA 1-04.  Noise barriers are not reasonable for Cabin John Regional Park (identified as NSA 5-28) or the portion of Cabin John Stream Valley Park located along the outer loop of I-495 (identified as part of NSA 2-01), although this parcel will be partially protected by a proposed barrier extension. |
| 167 | 189 | Map 8 | Environmental Resource Mapping Appx D | Add noise wall STA 192+50 to 197+00 on west side and 195+00 to 220+00 on east side. | See response to MDOT SHA Comment #188. |
| 168 | 190 | Map 9 | Environmental Resource Mapping Appx D | Add noise wall STA 203+00 to 220+00 and along River Road on east side. | See response to MDOT SHA Comment #188. |
| 169 | 191 | Map 23 | Environmental Resource Mapping Appx D | Add noise wall STA 3683+00 to 3680+00 along east side and STA 3684+00 to 3669+00. | See response to MDOT SHA Comment #188. |
| 170 | 192 | Map 23 | Environmental Resource Mapping Appx D | Add noise wall STA 3669+00 to 3619+00 on west side. | See response to MDOT SHA Comment #188. |
| 171 | 193 | Page 4-10 | Section 4.4.3 B b | Parks does not recognize any NCPC authority over the Cabin John Regional Park or Cabin John SVU2. SHA and NCPC will have to provide clear documentation that those parks were purchased with Capper-Cramton funds. | See response to MDOT SHA Comment Letter-26. |
| 172 | 194 | Page 4-55 | Chapter 4 Section 4.11.4 | M-NCPPC expects E&S measures beyond what is required to protect aquatic resources on park land | MDOT SHA will meet MDE Erosion and Sediment Control Standards in adherence with the 2011 Maryland Standards and Specifications for Soil Erosion and Sediment Control (MDE, 2014). |
| 173 | 195 | Page 4-57 | Chapter 4 Section 4.12.3 | SHA is considering the impact area of the preferred alternative to have been significantly reduced, this implies that the rest of the alignment outside of Phase 1 should be clearly labeled as "no build" and any future improvements would require a new NEPA process. | See response to MDOT SHA Comment #1. |



**FINAL ENVIROMENTAL IMPACT STATEMENT**

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 174 | 196 | Page 4-57 | Chapter 4 Section 4.12.3 | Indirect impacts to wetlands and waterways should be mitigated for by the construction of environmental stewardship projects design to enhance and protect the environment. | MDOT SHA committed to bringing no net loss to resources with the goal of net benefit and to develop meaningful mitigation for direct impacts. To fulfill this goal, environmental enhancements have been developed based on identified M-NCPPC priorities that would provide meaningful benefits to adjacent resources to improve the values, services, attributes and functions which may be compromised. These environmental enhancements include water quality improvements, stream restoration, and removal of invasive species on county parkland, above mitigation for direct impacts.  These enhancements have been coordinated with M-NCPPC and are documented in the FEIS 7. |
| 175 | 197 | Page 4-63 to 4-72 | Chapter 4 Section 4.13 | Parks requires further coordination for the impacts to wetlands and waterways on parkland as listed in table 4-24, 4-26 and 4-27. | MDOT SHA has been and will continue to coordinate with M-NCPPC regarding wetland and waterway impacts on parkland. The referenced tables include impacts to all properties within Phase I South, not just park impacts. The 404 mitigation package will mitigate for impacts to wetlands and waterways. Additional parks mitigation has been coordinated with M-NCPPC and is included in FEIS Chapter 7. |
| 176 | 198 | Page 4-63 to 4-72 | Chapter 4 Section 4.13 | Parks requires further coordination for the impacts to forest impacts on parkland and potential mitigation. | See response to MDOT SHA Comment #157. |
| 177 | 199 | Page 4-71 | Chapter 4 Section 4.13.3 | Parks requires further coordination for the increase in impervious areas, 98.2 acres of impervious added to Cabin John Creek watershed and other impacts listed in Table 4-28. Discuss BMPs being employed and long-term water quality impacts.  SHA should commit to environmental stewardship projects in the watershed that are above and beyond required stormwater management and 404 mitigation. | MDOT SHA has been and will continue to coordinate with M-NCPPC regarding BMPs and water quality impacts.  MDOT SHA previously committed to environmental enhancements that would provide meaningful benefits to adjacent resources to improve the values, services, attributes and functions which may be compromised including water quality improvements, stream restoration, and removal of invasive species on county parkland.  The enhancements involving M-NCPPC properties have been coordinated with M-NCPPC and are documented in the FEIS/Final Section 4(f) Evaluation, Chapter 6, and Chapter 7. |
| 178 | 200 | Page 4-71 | Chapter 4 Section 4.13.4 | Parks requires further coordination for avoidance and minimization through design and construction. Work to coordinate retention and addition of riparian buffers as well as aquatic passage through structures. Retain floodplain access and preserve existing stream buffers. Increase SWM techniques to improve water quality. | MDOT SHA has been and will continue to coordinate with M-NCPPC parks regarding wetland and waterway impacts on parkland and potential mitigation. The Developer will coordinate with M-NCPPC on specific avoidance and minimization techniques in final design. Aquatic passage was considered when designing augmented culverts. MDOT SHA is working with MDNR to determine high priority aquatic passage locations. Decreases to floodplain access and impacts to stream buffers have been minimized to the greatest extent possible. SWM techniques will be implemented wherever practicable to improve water quality. |
| 179 | 201 | Page 4-73 | Chapter 4 Section 4.14.4 | The project needs to commit to significantly improving the Provided ESD surface area to a minimum of 80% of the Required ESD onsite (allowing for a maximum of 20% to be treated with the use of compensatory SWM mitigation offsite).  These highways can be considered the worst water quality offenders in the County and the Project needs to take more responsibility for protecting the downstream water resources, which will never be improved if we don't take the appropriate steps as part of this project. | See response to MDOT SHA Comment 36. |
| 180 | 202 | Page 4-75 | Chapter 4 Section 4.15.3 | Parks requires further coordination for culvert augmentations and floodplain encroachments on Parkland to reduce impacts to hydrologic function and wildlife habitat. | MDOT SHA has been and will continue to coordinate with M-NCPPC regarding culvert augmentation and floodplain encroachments on parkland and potential mitigation. |
| 181 | 203 | Page 4-76 | Chapter 4 Section 4.16.2 | Further coordination on impacts to forested areas on Parkland, including impacts FIDS habitat species and NNI treatment. Coordinate reforestation on and offsite. SDEIS lists 9.5 acres of potential tree planting opportunities on M-NCPPC Parkland. | MDOT SHA has been and will continue to coordinate with M-NCPPC regarding forest impacts on parkland. MDOT SHA coordinated the development of a conceptual forest mitigation approach for impacts on M-NCPPC property, including NNI treatment and reforestation opportunities, and it is included in the FEIS. The final forest mitigation plan will be developed by the Developer in conjunction with MDOT SHA and the affected jurisdictions and landowners including M-NCPPC during the final design phase of the project. |
| 182 | 204 | Page 4-82 | Chapter 4 Section 4.18.2 | Indirect impacts to wetlands and waterways should be mitigated for by the construction of environmental stewardship projects design to enhance and protect the environment. | MDOT SHA committed to bringing no net loss to resources with the goal of net benefit and to develop meaningful mitigation for direct impacts. To fulfill this goal, environmental enhancements have been developed based on identified M-NCPPC priorities that would provide meaningful benefits to adjacent resources to improve the values, services, attributes and functions which may be compromised. These environmental enhancements include water quality improvements, stream restoration, and removal of invasive species on county parkland, above mitigation for direct impacts.  These enhancements have been coordinated with M-NCPPC and are documented in the FEIS 7. |
| 183 | 205 | Page ES-11 | Section ES | This table notes that there are 2 historic properties where the adverse effect cannot yet be determined. It should also note that there are a number of outstanding evaluations to determine if properties are eligible for the NR or not.  The total number of Historic Properties is not yet determined, nor is the adverse effect on them. | No historic properties identified through the Section 106 consultation process remain without an effect determination. All properties have effect determinations as of February 2022 and the FEIS documents effects to all known historic properties. See response to MDOT SHA Comment Letter-14. |
| 184 | 206 | Page 4-4 | Section Table 4-1 | Same as above. | See response to MDOT SHA Comment #205. |

OP·LANES
MARYLAND
I-495 & I-270 Managed Lanes Study

**FINAL ENVIROMENTAL IMPACT STATEMENT**

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 185 | 207 | Page 4-25 | Section 106 Consult | SDEIS states two archaeological sites were identified on BARC in Montgomery County. BARC is in PG County, not Montgomery. | "Montgomery County" is not included in the text. It was removed prior to publication of the SDEIS. |
| 186 | 208 | Page 4-28 | Section Archaeological Resources | Same as above – BARC and sites 18PR113 and 18PR1190 are in PG County, based on the site forms in MHT's MEDUSA system. | "Montgomery County" is not included in the text. It was removed prior to publication of the SDEIS. |
| 187 | 209 | | General | We reiterate our ongoing concern that the DEIS is being reviewed before all the potential Historic Properties have been fully evaluated under Section 106 of NHPA and without a clear understanding of the number and kind of Historic Properties within the APE. This work is also happening before the Programmatic Agreement is finalized and the preferred APE is clearly defined. The project impacts to Historic Properties are currently not fully known. | MDOT SHA has completed historic properties inventory on all accessible property. A small amount of archaeological work (inventory and Phase II) is slated to be completed under the Programmatic Agreement, Section 106 specifically allows both Phased Identification 36 CFR 800.4(b)(2) and 36 CFR 800.14(b). |

**Comments from MNCPPC_3_MCPlanning_SDEIS_8.19.21**

*NOTE: THESE COMMENTS FROM M-NCPPC APPEAR TO BE MADE ON A DRAFT VERSION OF THE SDEIS THAT WAS PROVIDED TO ALL COOPERATING AGENCIES FOR REVIEW, FOLLOWING NEPA PRACTICE.*

| MNCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 1 | MCPLAN-1 | | General | **TTIs for Managed Lanes:** TTI results are not presented for the managed lanes in any of the documentation. Please provide this information. We assume that it is typically better than either the No Build or the Preferred Alternative. It would be useful to know where the managed lanes will be more heavily used/constrained along the facility. | For consistency in reporting, the FEIS included the same MOEs as the DEIS/SDEIS, but TTI values in the managed lanes would be in the uncongested category for all segments. |
| 2 | MCPLAN-2 | | ES-11 and Chapter 3 | **Generalization/Overstatements on Project Benefit:** The paragraph summarizing the Preferred Alternative's Transportation & Traffic conditions states that the Preferred Alternative will ""increase speeds, improve reliability, and reduce travel times and delays." In reviewing the Chapter 3 (Transportation & Traffic), however, there appear to be multiple segments where this will not be the case. It appears to be inaccurate to make this assertion without further detail and refinement. | See response to MDOT SHA Comment Letter-22. |
| 3 | MCPLAN-3 | ES-11 | | **Need for More Environmental Metrics:** Table ES-1 should include additional environmental metrics, such as those pertaining to air quality & emissions, indirect impacts of how this project may enable environmentally damaging development patterns, how this project may erode Non-Auto Drive Mode Share efforts, and impacts to VMT. | Table ES-1 is a summary of key environmental resources. It is not intended to provide all detailed impacts. Those were included in SDEIS, Chapter 4 and applicable appendices and updated in FEIS, Chapter 5 and applicable appendices. |
| 4 | MCPLAN-4 | | Section 3.1.4 | **Effects of Covid-19:** It may be helpful to include a line on the COVID Traffic Impacts graph in the SDEIS that shows where trending traffic growth would have been expected to be were the pandemic not to have occurred. Even if traffic were to return to the 0% mark on this graph, there remains a year and a half of lost traffic growth that would have extended the ""normal target"" above the 0% line. This also does not capture that the timing and nature of trips has shifted during the pandemic. | The comment was addressed in the SDEIS - the text was included in Section 3.1.4, last sentence of first paragraph. |
| 5 | MCPLAN-5 | | Section 2.3.7 & 2.4 | Where BRT facilities are master planned, please include BRT facilities across the 270 and 495 corridors at interchanges. | The Corridor Cities Transitway and the North Bethesda Transitway, identified in the 2013 Countywide Transit Corridors Functional Master Plan, cross I-270 within the Phase 1 South limits. Other BRT corridors cross I-495 within the Study Limits, but outside of the improvement limits. The preliminary design for the Corridor Cities Transitway included a new bridge crossing of I-270 south of Shady Grove Road to carry the dedicated lanes. MDOT SHA and the Developer will continue to coordinate with Montgomery County during final design to consider accommodations for the future transitway bridge crossing. The segment of the North Bethesda Transitway that would cross the I-270 east spur along MD 187 and I-270 west spur along Westlake Terrace includes dedicated lanes for BRT; however, specific treatment for dedicated lanes has not been designated. The BRT study would need to go through a full planning study before the potential typical section configuration is confirmed. MDOT SHA and the Developer have and will continue to coordinate with Montgomery County during final design to accommodate the transitway configuration as additional details become available. The Preferred Alternative design concept does not include replacement of the MD 187 bridge over the I-270 east spur, and the design assumes that existing travel lanes along Westlake Terrace will be converted to dedicated BRT lanes. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 6 | MCPLAN-6 | | Chapter 3 | **Ramp Operational Analyses:** For this section and in general, have operational analyses been performed for the interchange ramps and ramp terminal intersections on the interchange cross streets? Section 3.3.6 provides information about overall network delay to the local roadway network, but there is language about some increased delays around managed lane entrance points on the cross streets. Were just the ramps and ramp terminal intersections modeled, or did the model continue on either side of the interchange to get a clearer representation of these cross street operations in the vicinities of interchanges? We want to be sure that operational benefits to the freeway system do not result in operational failures or safety concerns on the ramps or cross streets, so it would be beneficial to have an idea of any localized issues as well. | The traffic model included the cross streets on either side of the interchanges, and the impacts to these locations are reflected in the results presented in the FEIS. The FEIS and MDOT SHA's Application for the IAPA (FEIS Appendix C) include details regarding the operations of the Preferred Alternative, including at interchange ramps and ramp terminal intersections, as well as a discussion of any operational failures or safety concerns on the ramps and cross streets, with proposed mitigation. |
| 7 | MCPLAN-7 | | Section 3.3 | **AADT Increases with Proposed Project:** Table 3-3 shows 2045 Build Traffic. The Build alternatives show ADTs that are higher than No-Build. It may be helpful to discuss this growth in the context of induced demand and diverted trips: are these additional trips new trips? Are they trips that were occurring at different times, or that were using different routes? Are they trips that have shifted from non-auto modes? All these trip types need to quantified to fairly understand how the proposed project is changing mode choice and travel characteristics. | On page 3-8, the text describes this increase as being the result of the freeways accommodating latent demand under the Build conditions. |
| 8 | MCPLAN-8 | | Section 3.3 | **Travel Speeds:** While this section alludes to more detailed travel speed information in Appendix A, it may be helpful to provide a general note highlighting any significant speed benefits or impedances experienced on a segment level, which may be watered down by taking an average of a much longer corridor. | Chapter 4 of the FEIS includes a discussion of notable speed benefits/impedances, and comprehensive speed data is included in FEIS, Appendix A. |
| 9 | MCPLAN-9 | | Section 3.3.2 | **System-Wide Delay:** The Delay metric appears to combine both General Purpose and Managed Lanes. As such, this is not a particularly useful metric. | As the agency responsible for providing a safe, well-maintained, reliable highway system, MDOT SHA believes that system-wide metrics are useful when evaluating alternatives. |
| 10 | MCPLAN-10 | | Section 3.3.3 | **Worsening of General Purpose Lanes:** This project claims to improve traffic, but the project's analysis finds that in there are significant segments where the General Purpose lanes worsen significantly as compared to No Build conditions. Does MDOT accept degraded performance of the General Purpose lanes in the interest of providing priced managed lanes? Penalizing current users of these roads does not seem to be consistent with the stated policy objectives of this program. If MDOT does accept this outcome, it is imperative that equity be considered, and actions be incorporated into the project to address the needs of users that are most adversely impacted. | See response to MDOT SHA Comment Letter-22. |
| 11 | MCPLAN-11 | | Section 3.3.3 | **Project Purpose and Need and Proposed Project:** The project's Purpose & Need includes creating new options for users, but the Preferred Alternative instead appear to reduce options available to users unable to afford or otherwise access the managed lanes | In consideration of FHWA's policy priorities and MDOT's interest in having an equitable transportation solution for everyone, MDOT SHA has incorporated elements into the Preferred Alternative that support fair, accessible and affordable transportation options for everyone, including traditionally underserved communities, including the following. <br>• Supporting additional affordable, multi-modal travel options including toll-free travel for new bus transit on managed lanes for a faster, more reliable trip; toll-free travel for carpools/vanpools with three or more (3+) users; new pedestrian and bicycle facilities including a shared use path on the American Legion Bridge, new sidepaths across MD 190 over I-495, constructing a new sidewalk along Seven Locks Road to re-establish the historic connection in the historically African American community of Gibson Grove. <br>• Improving accessibility to work, school and other modes of transportation by upgrading existing pedestrian and bicycle facilities impacted by the Preferred Alternative by replacing in-kind or upgrading to meet the master plan recommended facilities; where I-495 and I-270 or associated ramps cross over a roadway and the bridge would be replaced, the mainline and ramp bridges will be lengthened to accommodate the footprint of the master plan facility; providing direct and indirect access ramps from the managed lanes to existing transit stations including Shady Grove, Twinbrook, Rockville, and Medical Center Metro stations and Montgomery Mall Transit Center; providing safer pedestrian and bicycle improvements including modifications to the right-turning movement from the I-270 off-ramp onto eastbound MD 189, additional turn lanes at Wootton Pkwy at Seven Locks Road, and additional turn lanes at Gude Drive at Research Boulevard. <br>• Enhancing multimodal connectivity and mobility by increasing the number of bus bays at WMATA Shady Grove Metrorail Station and increasing parking at the Westfield Montgomery Mall Transit Center. <br>• Upgrading existing transportation facilities throughout Phase 1 South for all users by replacing or rehabilitating all existing bridge on or over I-495 and I-270 within the Phase 1 South corridor and rehabilitating and repaving the existing general-purpose lanes for smoother and safer travel for all users. |


| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 12 | MCPLAN-12 | | Section 3.3.5 | **Level of Service Metric**: The Level of Service metric appears to combine both General Purpose and Managed Lanes. As such, this is not a particularly useful metric.<br><br>The aggregate nature of this metric may allow the effects of the managed lanes or the general purpose lanes to be over representative, and we urge that this metric account separately for managed lanes and general purpose lanes. | The metrics evaluated in the FEIS are the same as were evaluated in the DEIS and SDEIS.  Some metrics, like LOS, use aggregate results, while others (such as TTI and average speed) look specifically at the GP lanes. |
| 13 | MCPLAN-13 | | General | **I-270 ICMS Project**: The ICMS document stated that there would be transportation benefits from their proposed actions up to 2040 and beyond. Given that this was a $100M investment from the state, how much of those improvements will actually contribute to alleviating the 2045 No Build condition? How much of the Preferred Alternative actually removes or significantly modifies the improvements spent on the ICMS project? Clearly, given the abrupt decision of the MDOT SHA design team to re-design the build alternatives on I-270 mid-stream to eliminate the express/local lane system, why was this not considered in the ICMS project? In hindsight, this appears to be a very shortsighted, short-term decision that will never achieve the cost-benefit ratios projected. | TSM/TDM is already being implemented along I-270 as part of the I-270 ICM project.  The ICM project is designed to address existing issues and short-term needs, unlike the Managed Lanes Study, which includes addressing long-term traffic growth as part of the purpose and need.<br><br>The Managed Lanes Study is compatible with the improvements implemented under the I-270 ICM project.  Elements of the ICM improvements will be maintained following construction of the Preferred Alternative, including ramp metering, the additional auxiliary lane added in both directions along the I-270 west spur and I-270 mainline up to Montrose Road, auxiliary lanes between MD 189 (Falls Road) and MD 28 interchanges, and all improvements north of I-370.  Elements that will not be maintained involve changes to the access and auxiliary lanes associated with the existing C-D road, which will be removed as part of the Preferred Alternative. |
| 14 | MCPLAN-14 | | Section 4.1 | This section should include information on how this project will affect land use & zoning beyond the immediate impacts of the project.  This includes a focus on how this may affect environmentally damaging development patterns and efforts toward Non-Auto Driver Mode Share (NADMS) goals. | Consideration of land impacts outside the limits of disturbance are discussed in the Indirect and Cumulative Effects Analysis. Refer to FEIS, Appendix Q and FEIS, Chapter 5, Section 5.22.<br><br>The Preferred Alternative, Alternative 9 - Phase 1 South, includes HOT lanes, which promote the use of non-SOV vehicles by providing a free, reliable trip for HOV 3+ vehicles and buses.  Additionally, the project includes commitments for bicycle, pedestrian, and further transit improvements.  See Chapter 3, Section 3.1.4 for transit-related elements and Section 3.1.5 for pedestrian and bicycle facilities associated with the Preferred Alternative. |
| 15 | MCPLAN-15 | | Section 4.8.1 | This page includes the following statement: "Because the new Preferred Alternative, Alternative 9: Phase 1 South, includes no action for the majority of the study area, the affected network was updated to focus on just those segments near the project area..." This does not appear to be an appropriate assumption, as the Transportation & Traffic chapter demonstrates that the Preferred Alternative will have increased vehicle volumes throughout the entire study area, and additional congestion in multiple segments within the study area. These impacts must be included for a complete analysis. It is also unclear whether local roadways have been included in this analysis, particularly noting the lack of Transportation & Traffic information on these same roadways. | The traffic analysis area for the SDEIS and FEIS extended beyond the Study limits to capture upstream and downstream effects, plus cross streets on either side of the interchanges. Evaluation of the Preferred Alternative in the FEIS used the same limits for the VISSIM simulation models as in the SDEIS/DEIS as listed below:<br>•I-495 from VA 193 in Virginia across the American Legion Bridge (ALB) and through the state of Maryland to the Woodrow Wilson Bridge<br>•I-270 from the I-70 ramp merges to I-495, including the East and West Spurs |
| 16 | MCPLAN-16 | | Section 4.8.1 | **GHG Emissions**: This page includes the following statement: "GHG emissions on the affected transportation network for all modeled Build Alternatives in the DEIS are projected to be lower in the opening (2025) and design (2040) years compared to base year conditions. All Build Alternatives are projected to slightly increase annual tailpipe GHG emissions by an average of 1.4 percent compared to the No Build Alternative in 2040."<br><br>First, it sounds like the 1st sentence says this will have lower emissions, but the 2nd sentence says this will have higher emissions. How do these differ? Is it that the 1st sentence appears to account for *all* GHG emissions, and the 2nd sentence appears to focus only on tailpipe GHG emissions? More detail is needed.<br><br>Second, if this is asserting that the project will reduce emissions: much more detail is needed on methodology and assumptions, as this result seems counterintuitive given that the project is increasing vehicle volumes and VMT.  Noting the State's interest in Electric Vehicles: if electric vehicles are a substantive part of this reduction, it will be important to account for the impacts of the electric vehicles themselves.<br>Electric vehicles have substantial impacts:<br>- Extracting the resources needed for their production (particularly their batteries)<br>- Impacts of production<br>- Energy requirements, which at present is generated through unsustainable & polluting sources<br>- Severely impactful waste issues (again largely due to the batteries)<br>- EVs are still vehicles: they demand pavements (concrete and asphalt; both depend on highly impactful cement and petroleum production) and pose safety risks that erode Non-Auto and Vision Zero efforts. | To clarify the first sentence in question, the modeled GHG emissions in both 2025 (opening year in the air analysis) and 2040 (the design year) are projected to be lower for all of the Build Alternatives presented in the DIES when compared to the modeled emissions for the existing condition (2016 or base year).  In other words, compared to today (2016), the projected GHG emissions in 2025 and 2040 would be lower regardless of which alternative was chosen.<br><br>To clarify the second sentence in question, when comparing the modeled No Build Alternative in 2040 to each of the Build Alternatives in 2040, there is a slight increase (1.4% average) in GHG emissions seen in the Build Alternatives. So compared to the No Build Alternative in the design year (2040), any Build Alternative could be expected to result in approximately 1.4% higher GHG emissions than the No Build condition in 2040.<br><br>The decrease in GHG over time (from existing to design year – first sentence) can be attributed to improvements in fuel and vehicle technologies and standards that are accounted for in the MOVES model.  Electric vehicles are accounted for in the project level analysis as a part of the MOVES model based on their presence in the fleet data we received from MWCOG.  At a program level, electric vehicles are one of the strategies MDOT is exploring as part of its plan to reduce emissions for the transportation sector as a whole, but separate from the project level emissions analysis completed for the MLS. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 17 | MCPLAN-17 | Table 3-9, page 3-12 | Section 3.3.4 | **Percent of Lane-Miles Operating at LOS F:** Do these results include the managed lane-miles or just the general-purpose lane-miles? If it includes the managed lanes, we request that this section be modified to also provide a comparison of percent lane-miles between the No Build and the Preferred Alternative in the General-Purpose Lanes only. | The results include all lane miles in both the managed lanes and the GP lanes. The metrics evaluated in the SDEIS are the same as were evaluated in the DEIS. Some metrics, like LOS, use aggregate results, while others (such as TTI and average speed) look specifically at the GP lanes. |
| 18 | MCPLAN-18 | Page 3-12 (Data obtained from Appendix A, Attachment F Link Eval. Results) | Section 3.3.4 | **I-495 east of I-270 LOS F conditions:** It is stated that "29 percent of the lane miles would continue to operate at LOS F in the design year of 2045 under the Preferred Alternative, primarily in areas along I-495 east of the I-270 east spur that would have no action." This statement does not seem accurate, as AM peak hour conditions will grow considerably worse overall in certain sections of I-495 due to the proposed project. The localized summary of impacts had not been presented in Table 3-9 or anywhere in the SDEIS.

Between MD 355 (I-270 East Spur) and I-95, there are 52 Inner Loop analysis segments totaling 8.8 miles. During the 2045 AM Peak Hour, 20 of these segments (3.4 miles or 39 percent of this section of I-495) operate at LOS F in the No Build Condition, but 46 segments (8.28 miles or 94 percent of this section of I-495) operate at LOS F with the Preferred Alternative in place. Clearly, neither the Chapter 3 presentation nor Appendix A provides any of this fine-grained analysis or conclusions. The data in Attachment F had to be combed through to discover this significant impact. This evaluation should be enhanced to look at discrete sections of I-270 and I-495 where significant congestion effects should be noted, acknowledged, and considered for mitigation through modification of the proposed project by design element changes or toll strategy modifications. This degradation seems to be a significant impact of the proposed project, but it has been overlooked using a simplistic and abbreviated summary of LOS F conditions. Frankly, an over-simplification of analysis results is not isolated to this one example. To often, EISs in the interest of brevity, shorten presentations so much to the point where any significant conclusions are not discernable to the average reader. The DEIS chapters are intended to lay out the **significant impacts** with more detail provided in Appendices. This document misses this on LOS F, and many of the other transportation metrics studied | The calculations for percent lane miles operating at LOS F within the study area have been checked and they are accurate. Overall, the preferred alternative results in a lower amount of failing lane miles. However, we acknowledge that there are more failing segments along the Inner Loop between MD 355 and I-95 under Build conditions, and the numbers presented in this comment are accurate. On the flip side, there are fewer failing segments along the Outer Loop between I-95 and MD 355 under Build conditions despite no improvements in this section because downstream congestion is relieved by the Preferred Alternative. The goal of the SDEIS was to evaluate overall impacts of Alternative 9 - Phase 1 South using the same key metrics as were used in the DEIS to compare alternatives. The FEIS and MDOT SHA's Application for IAPA include more detailed reviews of the nuances of the model results and localized impacts. Refer to FEIS Chapter 4 and Appendices A and B. |
| 19 | MCPLAN-19 | Page 3-9 | Section 3.3 (page 9 of 16) | **2045 Inner Loop PM Peak Hour VISSIM Travel Speed in the Managed Lanes:** During the PM peak hour, the route from the GW Parkway to the I-270 West Spur is projected is projected to take only 4.2 minutes for a 4.3-mile section of road (61 mph), not the 23 mph reported in Table 3-5. The 4.2-minute travel time was obtained from Appendix A - Attachment D – Travel Time Matrices for the ETL (PM Peak Hour). There must be an error in one of these travel time/speed measurements as they do not match. | The difference in the numbers is a result of a different endpoint for each value. In Appendix A - Attachment D, the travel time and speed are shown for a trip that continues north up the I-270 west spur. This trip is free flow (61 mph). Table 3-5 reflects a trip that continues along the Inner Loop and also accounts for the segment where the HOT lanes tie back to the GP lanes. Speeds in the merging segment are lower, which brings down the overall average. |
| 20 | MCPLAN-20 | Page 3-11 | Section 3.3.3 | **Table 3-8 – TTI Results for General Purpose Lanes:** The preferred alternative appears to cause a significant congestion effect on one area outside the project limits, specifically during the 2045 AM peak hour on the Inner Loop between I-270 and I-95 ("top side" of the Beltway) where the TTI increases from No Build conditions of 1.3 to 2.7 in the General Purpose Lanes ( 208% increase). During the 2045 PM peak hour, the Inner Loop from VA 193 to I-270 West Spur also shows a decrease from No Build conditions of 6.6 to 6.9. What is causing the reduction in non-tolled TTI in each of these sections? | Text in Section 3.3.3 has been updated to explain the degradation in TTI for these segments, as follows. "*However, the I-495 inner loop from I-270 to I-95 would be projected to degrade during the 2045 AM peak hour from moderate congestion (TTI of 1.3) to severe congestion (TTI over 2.0) due to congestion on the top side of I-495 in the proposed no action area. Additionally, the segment of the I-495 inner loop from Virginia 193 to I-270 would also degrade slightly during the 2045 PM peak hour due to residual effects of congestion in the proposed no action area on the top side of I-495.*" |
| 21 | MCPLAN-21 | Appendix A, Page 3-11 and Appendix A, Attachment D and B | Section 3.3.3 | **2045 Inner Loop PM Peak Hours TTIs:** The TTIs for the Inner Loop PM peak hour from VA 193 to I-270 do not seem to match with travel time data provided in Appendix A, Attachment D. Is congested TTI defined based on the posted speed limit of 55 mph or based on observations of existing off-peak speeds on that stretch of road? The travel time for this 5.1-mile segment for the managed lanes is shown as 5.3 minutes in Appendix A, Attachment D (page 133 of 184). This equates to an average speed of 58 mph. What is the TTI in the Managed Lanes through this same section? As an example, could you provide the TTI calculations for this segment for Alt 1, GP lanes and the Managed Lanes? | A speed of 60 mph was assumed to reflect free flow conditions for the purposes of calculating TTI. For consistency with the DEIS, TTI was reported for the GP lanes only. TTI for the HOT lanes would be in the "uncongested" category for all segments. |

OP·LANES
M A R Y L A N D
I-495 & I-270 Managed Lanes Study

**FINAL ENVIROMENTAL IMPACT STATEMENT**

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 22 | MCPLAN-22 | Attachment D and B | Appendix A | **2045 PM Peak Hour Travel Times from VA 193 to I-270 and Delay/Demand Imbalance**: Alternative 1 (No Build) has a 38.6-minute travel time and the Preferred Alternative - GP lanes has a 40.1-minute travel time. The managed lanes have a 5.3-minute travel time. The travel time differential through this section seems totally unbalanced, as a managed lane toll strategy should seek to achieve a much lower speed than is forecast and still operate acceptably (by reducing the toll) until a 45-mph average speed is achieved in the managed lanes. 2,535 vph is the projected Inner Loop 6-7 PM toll volume at the ALB (page 101 of 184, Appendix A, Attachment B). Using MDOT SHA's vphpl lane max for a managed lane of 1700 vphpl, it appears that there is excess room in the PM Inner Loop managed lanes for an additional 865 vehicles during the highest 6-7 PM peak hour (more in the other 3 PM hours). This would represent a 13 percent reduction in volumes in the GP lanes if the toll was lowered to induce more traffic to use the managed lanes to achieve this balance. This might help to mitigate the poor GP lane conditions, so it is at least better than Alternative 1 (No Build). In general, it seems that this type of critical thinking and manual toll adjustments should have been a standard step in the toll assignment process. It is easy to diagnose, and likely can be fixed with a few iterative model runs with reduced tolls when this occurs. | Forecasts were developed for the SDEIS using a consistent methodology as the DEIS, which was approved by FHWA. Forecasts have been refined in the FEIS and the suggestions were considered in the development of the final traffic analysis. The results in the FEIS now include more iterative modeling to better capture assumed toll lane demand, as suggested. |
| 23 | MCPLAN-23 | Page 123 | Appendix A SDEIS Traffic Evaluation Memo – Attachment C | **2045 AM Peak Hour I-270 Congestion**: Per the I-270 SB Speed AM profile, peak hour speeds will be disrupted significantly on the MD 121 to Middlebrook Road segment of I-270 during the 2045 AM peak hour due to the addition of the proposed project. This is likely to seriously increase travel delay for commuters living in UpCounty Montgomery County and Frederick County. Please provide more travel time summaries for more common travel patterns, including Frederick to Rockville, Clarksburg to the GW Parkway, and Clarksburg to MD 97. Please explain why increased congestion is projected to occur many miles upstream from the project area. We anticipate that instead of this very long delay, you would continue to see worsened peak spreading into the shoulder hours during the AM commute period. This project seems to be setting up the need for Phase 1b by design. In that sense, I think it is clear that the segmentation of this project on I-270 into Phase 1A and Phase 1B was not fully thought out, as widening on Phase 1A precipitates the need for Phase 1B. From early on, the constraint at the Montgomery/Frederick County line has been identified as a major bottleneck that is more of immediate action. | The purpose of the SDEIS is to provide the same level of detail for Alternative 9 - Phase 1 South as the alternatives presented in the DEIS. There is a demonstrated independent utility or need for improvements in Phase 1 North with or without the Phase 1 South improvements. |
| 24 | MCPLAN-24 | Page 125 | Appendix A SDEIS Traffic Evaluation Memo – Attachment C | **2045 AM Peak Hour Inner Loop Congestion in Prince George's County**: Per the I-495 Inner Loop Speed PM profile, peak hour speeds will be disrupted significantly on the US 1 to US 50 sections of the Inner Loop during the 2045 PM peak hour due to the addition of the proposed project. Please explain why this project-related impact is projected to occur in Prince George's County? | There are some residual effects outside the Build limits due to changes in volumes in the system. These impacts have been thoroughly evaluated and discussed in the FEIS. Refer to FEIS, Chapter 4 and Appendices A and B. |
| 25 | MCPLAN-25 | | Section 3.3.1 | **Managed Lane versus General Purpose Lane Speeds**: The General Purpose lanes are projected to operate at nearly the same speed as the Managed Lanes in the segments listed below, which may affect the usefulness of the Managed Lanes. This could in-turn affect how much traffic chooses to instead remain in the General Purpose lanes, and it is unclear how this evaluated such feedback processes & whether an equilibrium was identified. This may also affect the HOT lanes' financial viability. This, in general, highlights a serious concern with how managed lane volumes were estimated.<br><br>- AM peak, 495 Outer Loop between 270 and GW Pkwy (8% faster)<br>- AM peak, 495 Inner Loop between GW Pkwy and 270 (13% faster)<br>- AM peak, NB 270 between 495 and 370 (3% faster)<br>- AM peak, SB 270 between 370 and 495 (16% faster)<br>- PM peak, 495 Outer Loop between 270 and GW Pkwy (13% faster)<br>- PM peak, SB 270 between 370 and 495 (equal speed) | Comment noted. The methodology used in the SDEIS was consistent with the DEIS. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 26 | MCPLAN-26 | | Appendix D SDEIS Traffic Evaluation Memo – Attachment D Travel Time Matrix | **Review of Travel Time Projections**: A review was conducted of travel time savings using travel time projections provided in Attachment A. Note that this data is limited to the project study area, not the modeled area, so travel time data on I-270 north of I-370 was not provided. See the AM and PM peak hour tables below for typical Montgomery County O-D pairs. Expanding the attachment D data to show the entire I-270 corridor studied would have been useful. In addition, given that there appears to be some very large regional traffic shifts on I-495 between the Maryland and Virginia sides, it would be useful to see travel time data for larger segments of I-495 in Virginia (i.e., VA 193 to Tysons, Tysons to I-95, and I-95 to MD 414.  Please provide similar data for the I-495 Virginia segments and more O-D travel time summaries for UpCounty Montgomery County and Frederick County commuters. | Comment noted. The information provided in the SDEIS is consistent with what was provided in the DEIS. |
| 27 | MCPLAN-27 | | Appendix D SDEIS Traffic Evaluation Memo – Attachment D Travel Time Matrix | **Impact of Managed Lanes System on General Purpose Traffic:** : Based on observation of the data reported in the tables above, here are some areas of concern: 1) The 2045 AM peak hour trip from the GW Parkway to MD 97 (Inner Loop) increases from Alternative 1 - No Build to Preferred Alternative General Purpose Lanes by 8.3 minutes (63 percent increase). 2) The 2045 AM peak hour trip from MD 189 (Falls Road) to I-95 (I-270 and Inner Loop) increases by 14.3 minutes (62 percent increase). 3) The 2045 AM peak hour trip from MD 190 to MD 355 (Inner Loop) increases by 4.7 minutes (200% increase). 4) The 2045 PM peak hour trip from the GW Parkway to MD 189 (Falls Road) increases by 10 minutes (31% increase). Question 1: How does MDOT SHA justify making 2045 traffic conditions worse (Alternative 1 – No Build versus the Proposed Project - GP Lanes) for the benefit of toll paying drivers for these locations? These travel time losses are being incurred by the commuting population and essentially subsidizing the cost of the managed lanes as a result. Wherever possible, the toll strategy should be adjusted to ensure that GP Lane travel times are no worse than Alternative 1 – No Build conditions. This is basic traffic impact mitigation, and this evaluation should be conducted for all locations where this impact to GP traffic is projected. Question 2: Any worsening of the General Purpose lanes to benefit Tolled Lanes presents a major equity issue that needs to be directly and substantively addressed. How will this be addressed from an equity/environmental justice lens? | These areas of concern have been noted.  The FEIS and MDOT SHA's Application for IAPA include a more detailed review of the nuances of the model results and localized impacts design refinements of the Preferred Alternative.  Potential mitigation is evaluated in the draft IAPA as explained in FEIS Appendix B.

The Preferred Alternative is projected to provide meaningful operational benefits to the system even though it includes no action or no improvements for a large portion of the study area to avoid and minimize impacts.  Although the Preferred Alternative provides less improvement to traffic operations when compared to the Build Alternatives that included the full 48-mile study limits evaluated in the DEIS (such as Alternatives 9 and 10), it was chosen based in part on feedback from the public and stakeholders, including M-NCPPC, who indicated a strong preference for eliminating property and environmental impacts on the top and east side of I-495. The Preferred Alternative will significantly increase throughput across the ALB and on the southern section of I-270 while reducing congestion.  It would also increase speeds, improve reliability, and reduce travel times and delays along I-495, I-270, and the surrounding local roadway network compared to the No Build Alternative. |
| 28 | MCPLAN-28 | | Appendix D SDEIS Traffic Evaluation Memo – Attachment D Travel Time Matrix | **Travel Time Benefit of Managed Lanes for Montgomery County users**: Using the data in the previous tables, here are some areas of concern: 1) During the 2045 AM peak hour, none of the typical O-D patterns in Montgomery County show any benefits of using the managed lanes at all with projected travel time savings ranging from 0.3 to 1.6 minutes. 2) During the 2045 PM peak hour, the GW Parkway to MD 97 route shows a 39-minute travel time savings, although, this travel time savings is earned over a very short section of the Inner Loop between the GW Parkway and the I-270 west spur. 3) During the 2045 PM peak hour, the GW Parkway to MD 189 (Falls Road) route shows a 33-minute travel time savings; however, this is only a 23-minute net travel time savings over No Build conditions. 4) During the 2045 PM peak hour for all other Montgomery County patterns evaluated, the projected travel time benefits are negligible (ranging rom 0.4 to 1.1 minutes). Question 1 from this data: Why does this proposed project provide almost no travel time benefits for the vast majority of Montgomery County commuters? Question 2 from this data: The modeling assumptions seem suspect as a result, as most Montgomery County commuters will learn pretty quickly that the Managed Lanes have little benefit to their daily commute trip. Who are the actual projected users of these Managed Lanes? Who benefits and is that reflected in the modeling assumptions? Understanding the O-D patterns of ALB users would help to understand who these managed lanes are designed for. We recommend that select link analyses be conducted using the travel demand model in order to provide more detail and clarity. | See response to MDOT SHA Comment # MCPLAN-27. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 29 | MCPLAN-29 | | Appendix D SDEIS Traffic Evaluation Memo – Attachment D Travel Time Matrix | **Travel Time Impacts on I-495 in Prince George's County**: On observation of data reported in the previous tables, the travel time on I-495 between MD 5 and MD 97 was evaluated. During the 2045 PM peak hour, a very anomalous result was found with the MD 5 to MD 97 route (Outer Loop) showing a 36-minute travel time benefit between the No Build and the Preferred Alternative. Based on 2045 PM peak hour Inner Loop results on the northeastern side of the Beltway, it appears that a dramatic regional shift is projected from traffic with an origin in Virginia and with a Maryland destination that now (and during the 2045 No Build condition) uses I-495 in Virginia crossing the Woodrow Wilson bridge. Lacking travel time data for I-495 in most of Virginia, this is speculative. Question from this review: What is causing this significant travel time savings from a regional perspective? To what extent is Prince George's County projected to benefit or projected to be impacted by a project so far away from their jurisdiction? | MDOT SHA expected that the No Build and Build would operate similarly in Prince George's County outside of the Phase 1 South footprint and also identified those anomalies in the preliminary results presented in the SDEIS. Upon further review of the preliminary results, we identified some inconsistencies in the modeling assumptions in this area and corrected them for the FEIS. Refer to FEIS, Chapter 4 and Appendices A and B, for the latest results. |
| 30 | MCPLAN-30 | Pages 144 and 155 | Appendix A SDEIS Traffic Evaluation Memo – Attachment F | **AM Peak Hour Bottleneck Shift to Top Side of Beltway – Level of Service**: A comparison of the link evaluation results for the I-495 Inner Loop 2045 AM Peak Hour shows how Inner Loop congestion will increase due to the addition of the proposed project. Comparing graphics on page 144 and 155, you can see the extent of congestion between the I-270 Western Spur to MD 193 caused by the project increases significantly, jamming up the entire top side of the Beltway, as more traffic is allowed to funnel into the top side of the Beltway than it can handle. This will be devastating to AM peak hour traffic conditions on the top side of the Inner Loop within most of Montgomery County during the 2045 AM peak hour. In the 2045 No Build condition, only 4 of the total 48 road segments evaluated were projected with Level of Service F conditions between I-270 western spur and MD 193. With the preferred alternative, a total of 41 out of the total 48 road segments are projected to operate at Level of Service F conditions during the 2045 AM peak hour. | The results presented in the SDEIS were based on the design of the Preferred Alternative at that time. Further coordination and collaboration with the Developer resulted in refinements to design of the Preferred Alternative. Forecasts and models have been updated and refined for the Preferred Alternative to address operational issues and potential discrepancies, such as those noted here. Refer to FEIS, Chapter 4, and Appendices A and B. |
| 31 | MCPLAN-31 | Pages 147 and 159 | Appendix A SDEIS Traffic Evaluation Memo – Attachment F | **Increased Southbound Congestion at Existing I-270 Bottleneck at Montgomery/Frederick County Line**: A comparison of the link evaluation results for the I-270 SB 2045 AM Peak Hour shows how I-270 SB congestion will increase due to the addition of the proposed project. Comparing graphics on page 147 and 159, one can see the extent of congestion between four segments north of MD 121 to Middlebrook Road caused by the project. In the 2045 No Build condition, only 9 of the total 25 road segments evaluated were projected with Level of Service F conditions within this area. With the preferred alternative, a total of 24 out of the total 25 road segments are projected to operate at Level of Service F conditions during the 2045 AM peak hour. The projected worsening of traffic conditions in this section of I-270 seems to be caused by the presence of additional capacity downstream, with more drivers willing to suffer through this congestion in the Clarksburg area. Even if this results in a faster commute for some, it does increase the intensity of the existing bottleneck congestion. | See response to MDOT SHA Comment # MCPLAN-30. |
| 32 | MCPLAN-32 | Pages 152 and 164 | Appendix A SDEIS Traffic Evaluation Memo – Attachment F | **Increased Northbound Congestion at Existing I-270 Bottleneck at Montgomery/Frederick County Line**: A comparison of the link evaluation results for the I-270 NB 2045 PM Peak Hour shows how I-270 NB congestion will increase due to the addition of the proposed project. Comparing graphics on page 152 and 164, one can see the extent of NB I-270 congestion between MD 121 to MD 85 caused by the project. In the 2045 PM peak hour No Build condition, only 7 of the total 51 road segments evaluated were projected with Level of Service F conditions within this area. With the preferred alternative, a total of 43 out of the total 51 road segments are projected to operate at Level of Service F conditions during the 2045 AM peak hour. This is clearly an example of the existing ALB bottleneck being shifted to north of the Managed Lane project terminus. | See response to MDOT SHA Comment # MCPLAN-30. |
| 33 | MCPLAN-33 | Pages 148 and 160 | Appendix A SDEIS Traffic Evaluation Memo – Attachment F | **Regional Outer Loop Traffic Diversions Impact I-495 in Prince George's County**: A comparison of the link evaluation results for the I-495 Outer Loop 2045 PM Peak Hour shows how Outer Loop congestion is projected to increase due to the addition of the proposed project. Comparing graphics on page 148 and 160, one can see the extent of Outer Loop congestion between MD 5 and US 50 caused by the project, jamming up the entire southeastern side of the Beltway. In the 2045 PM peak hour No Build condition, only 11 of the total 54 road segments evaluated were projected to operate at Level of Service F conditions between MD 5 and US 50. With the preferred alternative, a total of 41 out of the total 54 road segments are projected to operate at Level of Service F conditions during the 2045 PM peak hour. Please explain why this level of traffic congestion is projected along this segment of the Beltway, as this section of I-495 is far away from the project limits? | See response to MDOT SHA Comment # MCPLAN-30. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 34 | MCPLAN-34 | Pages 150 and 162 | Appendix A SDEIS Traffic Evaluation Memo – Attachment F | **Regional Inner Loop Traffic Diversions Impact I-495 in Prince George's County**: A comparison of the link evaluation results for the I-495 Inner Loop 2045 PM Peak Hour shows how Inner Loop congestion is projected to increase due to the addition of the proposed project. Comparing graphics on page 150 and 162, one can see the extent of Inner Loop congestion between US Route 1 and US Route 50 caused by the project, jamming up the entire northeastern side of the Beltway. In the 2045 No Build condition, only 8 of the total 36 road segments evaluated were projected with Level of Service F conditions between US 1 and US 50. With the preferred alternative, a total of 34 out of the total 36 road segments evaluated are projected to operate at Level of Service F conditions during the 2045 PM peak hour. Please explain why this level of traffic congestion is projected along this segment of the Beltway, as this section of I-495 is far away from the project limits? | See response to MDOT SHA Comment # MCPLAN-30. |
| 35 | MCPLAN-35 | Pages 152 and 164) | Appendix A SDEIS Traffic Evaluation Memo – Attachment F | **Delay increases on I-270**: With the addition of the proposed project during the 2045 PM peak hour, almost all general-purpose travel lane segments on NB I-270 between Middlebrook Road and MD 121 (21 out of 22 segments) are projected to experience increases in delay. How will the P3 contractor mitigate this project-related impact? Their profits are essentially exacerbating this congestion increase at the expense of UpCounty Montgomery County and Frederick County taxpayers. | The projected delay increases on I-270 north of the Phase 1 South limits shown in the preliminary results presented in the SDEIS were the result of a modeling issue that was identified and corrected for the FEIS. The updated results presented in the FEIS show similar operations along I-270 northbound between Middlebrook Road and MD 121 under 2045 Build and 2045 No Build conditions, as would be expected. |
| 36 | MCPLAN-36 | | General | **Bottleneck Issues Related to Project Design**: Most of the issues identified above clearly show impacts of relieving the congestion at the American Legion Bridge (ALB). In all cases, this does not eliminate congestion but shifts it from the ALB vicinity (McLean and Potomac) to other areas in Maryland. While some of these bottleneck shifts were expected, the degree of congestion resulting from the proposed project is severe on I-270 north of I-370, on the Inner Loop on the top side of the Beltway, and very surprisingly, on the Inner Loop in Prince George's County. More attention needs to be spent on the project design to mitigate these projected deficiencies. For I-270, a solution would be to more closely link Phase 1A and 1B so that they are constructed concurrently. For the other bottleneck issues, we are recommending the following design changes to the Preferred Alternative:<br>1) Eliminate the managed lanes from the I-270 Eastern Spur between I-270 and Old Georgetown Road,<br>2) Eliminate the managed lanes and exit/entrance ramps from I-495 between the I-270 west spur and Old Georgetown Road,<br>3) Managed lane traffic destined to and from I-495 to the east of the I-270 west spur ("top side of the Beltway")would enter/exit the managed lane network at the River Road crossover interchange. It is uncertain that this crossover has adequate capacity, but this limitation is likely to help reduce the "Top Side" bottleneck discussed earlier.<br>4) I-270 Montgomery County drivers headed to the eastern spur would not use the Managed Lane network at all. Clearly, for most Montgomery County travelers, the managed lanes would provide minimal travel time benefits for drivers from Gaithersburg and Rockville to most Montgomery County destinations. | The numbers presented in the SDEIS were preliminary.  As part of the ongoing NEPA process and to address concerns like those raised here, the design has been refined and the forecasting assumptions were revisited for the FEIS, resulting in improved projected operations on I-495 and I-270 compared to what was reported in the SDEIS, without requiring the changes suggested here that would have resulted in reduced system connectivity.  See FEIS Chapter 4, Section 4.3.  The HOT lanes are now projected to achieve at least 45 mph in the design year, and speeds in the general purpose lanes under the Preferred Alternative would be as good or better than the No Build condition in the design year of 2045, while operations outside the Phase 1 South limits are projected to be similar under Build and No Build conditions, as would be expected. |
| 37 | MCPLAN-37 | | General | **Proportional highway/transit investment based on where bottleneck congestion is created by the Project**: Since this project is clearly shifting the congestion almost as much as it is actually reducing the congestion, MDOT SHA should actively plan to invest in the areas where bottleneck congestion will be created or worsened. | The SDEIS presents many traffic metrics that demonstrate an overall reduction in congestion as a result of the Preferred Alternative.  Network-wide delay will reduce by 18% to 32% during the peak periods, average speeds will increase by 5 mph, person-throughput will increase by up to 20% on I-270 and by up to 30% on the ALB, and daily delay will reduce on the surrounding local road network.  Therefore, we disagree with the assertion that the project is only shifting congestion. The final traffic analysis as summarized in FEIS, Chapter 4 and Appendix A shows more operational benefit from the Preferred Alternative. |

OP·LANES
M A R Y L A N D
I-495 & I-270 Managed Lanes Study

**FINAL ENVIROMENTAL IMPACT STATEMENT**

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 38 | MCPLAN-38 | | General | **Bottleneck Congestion leads to Local Street Diversions/Congestion**: We have never been satisfied with the extremely simplistic local street evaluation presented in the DEIS and SDEIS. We are expecting to see more detail from MDOT SHA (and be included in the review process) for the Interchange Access Point Approval (IAPA) study now under development. The increased congestion on I-270 and I-495 will undoubtedly lead to both peak spreading effects and local traffic diversions that have not been adequately considered to-date. When it can take over 30 minutes (TTIs greater than 6.0) to travel 2 to 3 miles on some segments of the Beltway as presented in this SDEIS, drivers will not subject themselves to this on a daily basis, and they will seek to find the shorter travel time route, regardless of local street impact. The scope therefore agreed upon by FHWA for the IAPA (performing traffic operational analyses at ramp terminal intersections and one adjacent intersection (on both sides) beyond service interchanges that are modified by the study, when within one mile) is likely to be inadequate in areas where either I-270 or I-495 exhibits very high projected TTIs and extreme congestion. In those areas, the study area should follow all significant diversionary traffic that switches to the local road network (defined as all non-interstate roads). In the Clarksburg area, this includes many parallel roads, including MD 355, MD 28, Thurston Road, State Quarry Road, and Price's Distillery Road. Along the Beltway, any parallel road or road that crosses I-495 may be the recipient of significant diversion traffic depending on location of projected congestion. This includes Seven Locks Road, Burdette Road, and Democracy Boulevard. The study area can be determined by adding routes on parallel routes with travel times equal to the GP lanes travel time. | See response to MDOT SHA comment # Letter-19. |
| 39 | MCPLAN-39 | | General | **Need for Improved Performance Data for I-270 north of I-370**: All of the evaluation material in Chapter 3 does not report comparable transportation performance metrics (travel time, delay, Level of Service, TTI) within the I-270 modeled area to the north of I-370 where the proposed action may create congestion. Without this information, it is difficult to determine travel time and delay for commuters living north of I-370, including Germantown, Clarksburg, and Frederick County residents. From a review of the link evaluation results presented in Appendix A, Attachment F, it is clear that I-270 to the north of I-370 will experience greater congestion with the proposed project. This was demonstrated in Attachment F mentioned in Comments 14 and 15 above. Please provide more detailed performance metrics for I-270 to the north of I-370 so that the full transportation effects of this bottleneck condition can be assessed. | Metrics are provided for all areas within the project limits, consistent with the DEIS. See response to MDOT SHA Comment # Letter-20. |
| 40 | MCPLAN-40 | | General | **Lack of Feedback Loop in Modeling Process – Assumptions versus Results**: While we recognize that simplistic assumptions are often needed to evaluate transportation projects, the tolling assumptions with Managed Lanes do not mesh with the travel demand shown using the managed lanes versus the travel time benefit provided. Unfortunately, there is no information provided to validate the validity of the managed lane use assumptions. When large portions of the managed lanes show little to no travel time benefit, who is using the managed lanes and what percent of the driving population do they represent? Are the estimates used reasonable? What are the origins and destinations of these managed lane users? They can't be most local Montgomery County trips, as preceding comments in this submission clearly show pretty clearly that most typical O-D commuting pairs within the County have little use or benefit from the managed lanes. | Evaluation methodology used was approved by FHWA and consistent with methodology used in DEIS. See response to MDOT SHA Comment # MCPLAN-30. |
| 41 | MCPLAN-41 | | General | **Percent of Total Demand Using Managed Lanes**: A review was conducted of the peak hour travel demand presented in Appendix A - Attachments A (Peak Period Volumes) and Attachment B (Travel Demand Tables). Link demand on each segment of I-495 and I-270 within the project area was projected. Based on this review, the percent of total demand using the managed lanes over the four-hour commuting periods are shown in the following four tables: I-270 AM, I-270 PM, I-495 AM, I-495 PM. For each, managed lane demand varied by hour between 6 and 10 AM and between 3 and 7 PM. Questions related to these tables are provided in following comments. | Evaluation methodology used was approved by FHWA and consistent with methodology used in DEIS. See response to MDOT SHA Comment # MCPLAN-30. |
| 42 | MCPLAN-42 | | Appendix A Attachments A and B | **Percentage of total demand using managed lanes on I-270 Western Spur During the AM Peak hours**: Between 27 and 39 percent of total demand uses the Managed Lanes on Southbound I-270 approaching I-495 during the AM peak hours. This entire travel path only shows a 2.5-minute savings using the Managed Lanes along its 14-mile tolled length. Between 42 and 52 percent of total demand uses the Managed Lanes on Northbound I-270 just north of I-495 during the AM peak hours. This entire path only shows a 1.3-minute travel time savings over its 14-mile tolled length. How are the percent demand achieved using the managed lanes possible if the travel time benefit is so small (in other words, why pay when it is not worth the cost)? | Evaluation methodology used was approved by FHWA and consistent with methodology used in DEIS. See response to MDOT SHA Comment # MCPLAN-30. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 43 | MCPLAN-43 | | Appendix A Attachments A and B | **Percentage of total demand using managed lanes on I-270 Western Spur During the PM Peak hours:** Between 42 and 45 percent of total demand uses the Managed Lanes on Southbound I-270 approaching I-495 during the PM peak hours. This entire travel path only shows a 1.3-minute savings using the Managed Lanes along its 14-mile tolled length. Between 39 and 41 percent of total demand uses the Managed Lanes on Northbound I-270 just north of I-495 during the PM peak hours. This entire path shows a 38-minute travel time savings over its 14-mile tolled length. Again, the demand allocated to the managed lanes and the methodology for this is questioned. There are just too many inconsistencies between demand and travel time benefits. | Evaluation methodology used was approved by FHWA and consistent with methodology used in DEIS. See response to MDOT SHA Comment # MCPLAN-30. |
| 44 | MCPLAN-44 | | Modeling Process | **Modeling process detailed in DEIS Traffic Technical Report:** Validation versus travel time benefits: Recognizing that there was some iterative modeling adjustments used to achieve a 45 mph average travel speed or higher and keep the maximum lane volume in the 1600-1700 vehicles per hour range in the Managed Lanes, shouldn't there have also been an iterative process to adjust modeling adjustments based on some screenline O-D pair travel time assessments? For example, for the demand volume estimated to travel between I-370 and the ALB, does the actual travel time benefit and cost paid to achieve that benefit mesh with measured managed lane toll rates and cost per mile or cost per minute saved across the country on similar managed lane facilities now in operation? | Evaluation methodology used was approved by FHWA and consistent with methodology used in DEIS. See response to MDOT SHA Comment # MCPLAN-30. |
| 45 | MCPLAN-45 | Page 99 of 84 | Appendix A, Attachment B | **2045 PM Peak Hour Inner Loop Volumes:** The hourly volumes presented in Attachments B and D do not match. The table below shows a summary for the 2045 PM Peak Hour Inner Loop GP Lane Volumes. Please explain this discrepancy. It appears that this discrepancy is not isolated to these three sections. | The comment appears to refer to data in Attachment F, not Attachment D. The volumes shown in Attachment F represent throughput volumes in the GP lanes, while the numbers reported in Attachment B represent demand volumes, which explains the difference. |
| 46 | MCPLAN-46 | Page 2-23 | | **Bike lane definition:** Separated bike lanes do not have to be located "on-street" as stated in the "Bike lane" definition. Per the Montgomery County Bicycle Master Plan, separated bike lanes "are exclusive bikeways that combine the user experience of a sidepath with the on-street infrastructure of a conventional bike lane. They are physically separated from motor vehicle traffic and distinct from the sidewalk. They operate one-way or two-way." | No change needed. Page 2-24 already states the definition of bike lane per your comment. Page 2-23 is the transit section. |
| 47 | MCPLAN-47 | Page 2-23 | | **Pedestrian and Bicycle Facilities:** The SDEIS is inconsistent with the "Design Recommendation / Implication" identified in the "MLS Existing Bridge Inventory_Montgomery Ped-Bike Facilities_12-11-2020_All.pdf" document. Specifically, the SDEIS states: "The preliminary design approach for facilities along crossroads where the crossroad bridge would be reconstructed is to replace, upgrade or provide new pedestrian/bicycle facilities consistent with the master plan, where adjacent connections on either side of the bridge currently exist." However, the "Design Recommendation" included in the "MLS Existing Bridge Inventory_Montgomery Ped-Bike Facilities_12-11-2020_All.pdf" document recommended that the project add pedestrian and bicycle facility on most crossroads regardless of whether adjacent connections on either side of the bridge currently exist. Please remove: "The preliminary design approach for facilities along crossroads where the crossroad bridge would be reconstructed is to replace, upgrade or provide new pedestrian/bicycle facilities consistent with the master plan, where adjacent connections on either side of the bridge currently exist." as it conflicts with previous agreements. | The FEIS is consistent with agreements that have been discussed with M-NCPPC and Montgomery County DOT more recently than December 2020. The SDEIS described the approach for providing pedestrian and bicycle facilities and additional commitments along specific corridors. Where connections to adjacent facilities may not currently exist, but MDOT SHA has agreed to construct the master plan facilities, those facilities are captured in the ped/bike enhancements listed in the commitments, refer to FEIS Chapter 3, Section 3.1.5. |
| 48 | MCPLAN-48 | Page 2-23 | | Add a statement to the last paragraph that expresses this sentiment: "Where the I-495 and I-270 mainline or ramps cross under a roadway or pedestrian/bicycle facility and the bridge would be replaced, the cross road bridge would construct pedestrian and bicycle facilities over the structure." | No change needed. Page 2-24 already includes this statement. Page 2-23 is the transit section. |
| 49 | MCPLAN-49 | Page 2-23 | | **Pedestrian and Bicycle Facilities:** Identify the pedestrian and bicycle facilities to be constructed by the project and the pedestrian and bicycle facilities to be accommodated by the project based on the "MLS Existing Bridge Inventory_Montgomery Ped-Bike Facilities_12-11-2020_All.pdf" document. | See response to MDOT SHA Comment MCPLAN-47. |
| 50 | MCPLAN-50 | Page 2-23 | | **Design Parameters:** Indicate that pedestrian and bicycle facilities will be designed in accordance with Montgomery County's Complete Streets Design Guide and Montgomery's Planning Bicycle Master Plan Facility Design Toolkit | The FEIS includes a reference to Montgomery's Planning Bicycle Master Plan Facility Design Toolkit and the Montgomery County's Complete Streets Design Guide. |
| 51 | MCPLAN-51 | Page 2-27 | | **Enhancements:** "Lengthening the I-270 bridge over Tuckerman Lane to accommodate future pedestrian/bicycle facilities along Tuckerman Lane" should be identified as an enhancement, as it appears to meet the conditions at the bottom of page 2-23. | The lengthening of the Tuckerman Lane bridge is a commitment that was already noted in the SDEIS Chapter 2, Section 2.4 and is also included in the FEIS. |

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 52 | MCPLAN-52 | Page 4-33 | Section 4.7.3 | Archaeological investigations at the Poor Farm Cemetery site remain deferred. This has prevented adequate consideration of the effects to this site in the DEIS and SDEIS and under Section 4F. | Section 106 specifically allows both Phased Identification - 36 CFR 800.4(b)(2) and 36 CFR 800.14(b). Given the uncertainty over the historic location of burials related to the Poor Farm, investigation of areas that will be impacted after design is advanced is the most efficient way to identify impacts, given the large area that has potential to be associated with the Poor Farm. The specifics of this investigation will be subject to consultation under the PA, see FEIS Appendix J. |
| 53 | MCPLAN-53 | Pages 4-79-82 | Section 4.2.1 | The SDEIS environmental justice discussion should incorporate findings from the May 2021 technical report about Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M:35-212). This report provides detailed historical background about the cemetery and the historical African American community along Seven Locks road that was displaced by the original construction of the beltway. Construction was routed through the middle of the community leaving the church and fraternal hall and cemetery on opposite sides of the highway. Archaeological survey showed that the cemetery is larger in extent and closer to the ROW and LOD than understood at the time of the DEIS. This new information highlights the vulnerability of the church and cemetery to the managed lanes project and should be discussed in the Environmental Justice and Cumulative Impacts sections of the SDEIS. The DEIS identifies the Morningstar Tabernacle No. 88 Moses Hall and Cemetery and the Poor Farm Cemetery as sites that may be culturally significant in its Community and Environmental Justice Analysis. However, the Environmental Justice discussion concerns itself primarily with current minority population concentrations and does not address historical and ongoing injustice to small African American communities displaced by construction of the beltway and further threatened by the proposed expansion. This issue was explicitly acknowledged as related to social justice by the National Trust for Historic Preservation in their selection of the Moses Cemetery as one of the 11 most endangered historic sites in America in 2021. This listing and the environmental justice issues raised by it should be acknowledged and discussed in the SDEIS. Likewise, environmental justice issues are mentioned with respect to the Poor Farm Cemetery site in the DEIS. This site contains the remains of an unknown number of individuals, many of them African American. African American burial sites have frequently suffered from inadequate consideration during development projects unsympathetic to their preservation. This was plainly the case at the Poor Farm, and its extent and boundaries remain unidentified in the Managed Lanes study and review process. | See response to MDOT SHA Comment #9.

Throughout the I-495 & I-270 Managed Lanes Study (MLS), MDOT SHA has coordinated and consulted with interested stakeholders on potential impacts to the Morningstar Cemetery in compliance with the National Environmental Policy Act and Section 106 of the National Historic Preservation Act. MDOT SHA's goal has always been to avoid impacts to the Morningstar Cemetery as the agency worked to address some of the nation's worst traffic congestion in the National Capitol Region. Through our coordination, the Preferred Alternative avoids all impacts to the cemetery, based on the currently historic boundary. The design refinements have been incorporated as detailed in the SDEIS and FEIS.

A commitment to construct a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection between First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall and Cemetery has been made.

Because the boundaries of the Poor Farm Cemetery are poorly understood and no marked graves remain, MDOT SHA will fully investigate and treat the limits of disturbance with exact methods to be determined through consultation under the PA. Methods will likely include full removal of topsoil in areas identified for impact to identify and relocate burials which cannot be avoided. However, since the DEIS and SDEIS, the LOD in the southeast quadrant of I-270 and Wootton Parkway has been significantly reduced to minimize the potential of impacting archeological remains. |
| 54 | MCPLAN-54 | Pages 4-82-83 | Section 4.22 | Neither the DEIS nor the SDEIS reference any cumulative effects to specific cultural resources. Additional historical research conducted subsequent to the DEIS in Cabin John related to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery and associated Gibson Grove community show that construction of the beltway separated the fraternal hall and cemetery from the neighboring church, physically fragmented the community and contributed to the decline of these institutions. The community's decline in turn contributed to the closure and loss to fire of the Moses fraternal hall.

Zoning limitations on the church parcel arising from the proximity of the beltway have significantly delayed repair and rehabilitation of the church following a fire in the mid-2000s. The initial construction of the Beltway resulted in an oddly-shaped parcel and this has made it challenging for the property owners to move new construction permitting through zoning reviews. These cumulative delays to the rehabilitation, created in part from the Beltway's construction, should be accounted as part of the DEIS review of cumulative impacts.

The descendant community continues in the area, but the remaining cultural institutions are threatened by the proposed expansion of the Beltway. | See response to MDOT SHA Comment MCPLAN-53. |
| 55 | MCPLAN-55 | | 4(f) | Archaeological investigations at the Poor Farm Cemetery site remain deferred, thus it has not been evaluated for eligibility to the National Register of Historic Places. This has prevented the site from being discussed as a historic site under the Section 4(f) analysis in the DEIS and SDEIS. | See response to MDOT SHA Comment #9.
Our collaborative efforts also led to the cemetery being formally identified as eligible for listing on the National Register of Historic Places. Additionally, MDOT SHA worked with the Friends of Moses Hall and other stakeholders on efforts to address invasive vegetation, drainage, access and aesthetics on the property. |