OP·LANES
M A R Y L A N D
I-495 & I-270 Managed Lanes Study

FINAL ENVIROMENTAL IMPACT STATEMENT

| M-NCPPC Ref Doc_# | MDOT SHA Comment No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|---|
| 56 | MCPLAN-56 | | 4(f) | The 4F evaluation does not take into account those portions of the Moses Hall and Cemetery that already exist within the footprint and right of way of the existing Beltway. Recent land records research and other information provided demonstrates evidence for this and because there has not been a final boundary determination, it cannot yet be ruled out of the analysis. Therefore the Permanent Impact cannot be avoided under any scenario and should account for acreage already within the footprint of the current Beltway. Additionally, the construction of a noise barrier should not be taken as the de facto solution for noise abatement at this property. Avoiding the use associated with the retaining wall requires additional study of potential mitigation efforts such as quiet pavement technology or additional roadway designs. Until those solutions have been demonstrated as infeasible, they must be explored to avoid the adverse effects and the required use of the property for the retaining walls under 4F. | Based on the current historic boundary, the Preferred Alternative will avoid direct impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Additionally, no atmospheric, audible, or visual effects to the property have been identified from the Preferred Alternative. No diminishment of location, design, setting, materials, workmanship, feeling or association has been found in these areas. The project will be governed by a programmatic agreement, including a treatment plan that specifies the methods, limits and consultation procedures for further investigation of areas with the potential for additional burials outside of the current historic boundary, no specific determination of effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery will be made at this time, and will be made following completion of the additional investigations specified in the Programmatic Agreement and treatment plan (Refer to FEIS, Appendix J). |
| 57 | MCPLAN-57 | | 4(f) | Additional use of the Gibson Grove Church site in order to minimize impacts to the Moses Hall Cemetery must be avoided. As noted above, Section 4F requires avoidance of these uses unless other alternatives are demonstrated to be infeasible and contrary to the purpose and use of the undertaking. There have been no design or schematic drawings shown to date that have demonstrated that alternatives were considered. Further impacts to the Gibson Grove Church, an historic resource that has already suffered cumulative adverse effects from the first Beltway construction, should not be accepted as a 4F alternative to avoid impacts to Moses Hall. Other design solutions must be evaluated. | For the Gibson Grove A.M.E. Zion Church, additional design concepts have identified potential construction activities at this location including outfall stabilization, culvert augmentation, bridge construction, and construction access. Some of these activities are included to improve the condition of the highway drainage on the property, as requested by the current church leaders. Physical impacts to the church property are limited to 0.1 acres of permanent impacts along the north side of I-495, on a steep hillside adjoining the church as compared to less than 0.1 acre in the DEIS. The church building would not be impacted by the proposed improvements. The increase in impact from the DEIS is due to design refinements including outfall stabilization, culvert augmentation, bridge reconstruction, and construction access. A shift of the roadway centerline towards the Gibson Grove AME Zion Church was included in the Preferred Alternative to avoid impacts to Morningstar Cemetery, located on the opposite side of I-495 from the Gibson Grove Church. MDOT SHA has determined the project will adversely affect the Gibson Grove A.M.E. Zion Church, pending MHT concurrence. Mitigation for the use of Gibson Grove AME Zion Church would be consistent with stipulations identified in the Section 106 Programmatic Agreement and be coordinated with the MHT and Section 106 consulting parties. |
| 58 | MCPLAN-58 | | 4(f) | As noted above, 4F uses and impacts to the Carderock Springs Historic District from retaining walls and design changes meant to protect Gibson Grove and the Moses Hall Cemetery do not include any evaluation of design alternatives for review. This all calls into question what exactly they are doing. If all 3 of these resources are suffering from 4F uses and encroachments to protect each other, but they are all having adverse effects, what is being achieved here? We are all in the dark without a chance to sit at the table and design this all out as a group. It is unacceptable under 4F. 4F requires avoidance, different from Section 106. Only if the 'use' of the property is DEMONSTRATED that it cannot be avoided, then it can be done, but there must be discussion and consideration of the options. | As of September 8, 2021, MDOT SHA has made a finding of no adverse effect to Carderock Springs, as new design information has become available. There are no elements of the project identified that would diminish its qualification for the NRHP. |
| 59 | MCPLAN-59 | | Chapter 3 | Provide an O-D Matrix of travel times for the No-Build, Managed and General Purpose lanes for each access point along I-270 and I-495 (with accompanying narrative, as needed). This will help better understand flows, identify specifically failing pairings, and better tailor responses to these needs. This is especially important considering it is our understanding that many/most trips along these facilities are relatively short in nature, using the interstate for only a few interchanges. Therefore longer & larger systemic effects may be of less utility to actual users. | The requested data was provided in SDEIS Appendix A, Attachment D.<br><br>It is also available in FEIS Appendix A, Attachment E. |



**MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION**

| | |
|---|---|
| From: | Borden, Debra <Debra.Borden@mncppc.org> |
| Sent: | Tuesday, November 30, 2021 1:31 PM |
| To: | SHA OPLANESMLS |
| Cc: | Anderson, Casey; BaucumColbert, Jordan; Gardner, Adrian; Wright, Gwen; Rubin, Carol |
| Subject: | I-495 I-270 Managed Lanes SDEIS MNCPPC Comment Letter and Response Table |
| Attachments: | SDEIS Comment Response Table_MNCPPC_09-27-2021 - updated 11.29.2021.pdf; SDEIS MNCPPC Comment Cvrltr_11.30.21.pdf |

Attached, please find M-NCPPC's comment cover letter and response table with our detailed technical comments on the I-495 I-270 Managed Lanes SDEIS. Please contact me with any questions. Thank you.

*Debra S. Borden*
Deputy General Counsel
Maryland-National Capital Park and Planning Commission
6611 Kenilworth Avenue
Suite 200
Riverdale, Maryland 20737
Office: 301.454.1670
Email: Debra.Borden@mncppc.org



*This page is intentionally left blank.*

00022109

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| Major_1 | 1 | | General-RPA | *Revised RPA. . The RPA must reflect i) the "No-Build Alternative" outside of Phase 1, and ii) include both TDM (Alternative 2) and Transit (Alternative 14) as part of the RPA.  We need affirmative assurance that future consideration of improvements outside of Phase 1 will be through a new NEPA Study. Although the area outside Phase 1 (essentially I-495 east of Old Georgetown Road), is neither specifically included as part of the RDA in the SDEIS, nor to be included in the 2022 update to Visualize 2045 being advanced by the TPB, the draft SDEIS uses language that does not clearly remove I-495 east of Old Georgetown Road from the NEPA Study.* a. The SDEIS states: "There is no action or no improvements on I-495 east of the I-270 east spur to MD 5. While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the scope of this Study, future improvements on the remainder of the system may still be needed in the future." | |
| Major_1 | 2 | | General-RPA | b. That portion of the Study area that is moving forward is still referred to as Phase 1.  And AMP, the P3 concessionaire has referred to future phases in some of its own materials. | |
| Major_1 | 3 | | General-RPA | c. Appendix C still addresses "future phases" in its discussion of offsite storm water mitigation. | |
| Major_1 | 4 | | General-RPA | d. Since all of the parkland outside of Phase 1 is now classified as "avoided," then there must also be affirmative language that describes the process to be imposed in the event these natural resources are NOT avoided in the future. | |
| Major_1 | 5 | | General-RPA | e. If I-495 outside of Phase 1 is no longer part of this Study, then the transition areas i) to I-495 on the east spur travelling south, and ii) north from the ALB to Old Georgetown Road from the "split" are not necessary.  In fact, creating the transition in this manner encourages vehicular travel to unnecessarily continue on I-495 as described in the TDM comment. | |
| Major_1 | 6 | | General-RPA | f. TDM such as dynamic signage is necessary to direct traffic to use the I-270/MD 200 combination for travel along the I-95 corridor as stated by Secretary Slater during the July 21, 2021 TPB discussion of the Project for reinstatement to the 2022 update to Visualize 2045.  Encouraging vehicle travel on that route will open up additional capacity on the topside of I-495 for local travel needs. Project-related mitigation can also include travel demand management and transportation systems management measures, such as improvements along impacted corridors outside the project limits, including I-495 between the I-270 western spur and US 50. The addition of TSM improvements, how being implemented along I-370 as part of the I-270 Innovative Congestion Management project should be considered, including variable message signage and ramp metering. | |

00022110

## I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| Major_1 | 7 | | General-RPA | g. In order to confirm the transit commitments made to Montgomery County that have become an agreed-upon integral part of the Project, transit should be designated as a contributing Alternative as opposed to an ancillary improvement. | |
| Major_2 | 8 | | General-EJ | *Environmental Justice . The DEIS, and now the SDEIS is inadequate in its treatment of environmental equity. The SDEIS indicates that environmental justice issues omitted from the SDEIS will be remedied in the FEIS, which is not a best practice and obstructs public comment and community input . a. Waiting until after selection of a preferred alternative means that disproportionate impacts will not be considered in the formulation of the preferred alternative.* | |

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| Major_2 | 9 | | General-EJ | b. The Morningstar Tabernacle No. 88 Moses Hall and Cemetery and the Poor Farm Cemetery are listed as sites that may be culturally significant in its Community and Environmental Justice Analysis.  However, the Environmental Justice discussion concerns itself primarily with current minority population concentrations and **does not address historical and ongoing injustice to small African American communities displaced by construction of the beltway and further threatened by the proposed expansion**. This issue was explicitly acknowledged as related to social justice by the National Trust for Historic Preservation in their selection of the Moses Cemetery as one of the 11 most endangered historic sites in America in 2021. This listing and the environmental justice issues raised by it should be acknowledged and discussed in the SDEIS. | |
| Major_2 | 10 | | General-EJ | c. On August 10th, Congress passed a once-in-a-generation investment in infrastructure throughout the U.S. with bi-partisan support.  Included in the measure is a commitment to "Reconnecting Communities," a concept not even mentioned in the SDEIS. "Too often, past transportation investments divided communities or it left out the people most in need of affordable transportation options. In particular, significant portions of the interstate highway system were built through Black neighborhoods. The Federal Infrastructure Bill creates a first-ever program to reconnect communities divided by transportation infrastructure.  The program will fund planning, design, demolition, and reconstruction of street grids, parks, or other infrastructure through $1 billion of dedicated funding.  This concept should be included as part of this project. | |

Page 3

00022112

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| Major_2 | 11 | | General-EJ | d. Neither the DEIS nor the SDEIS reference any cumulative effects to specific cultural resources. Additional historical research conducted subsequent to the DEIS in Cabin John related to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery and associated Gibson Grove community show that the construction of the beltway separated the fraternal hall and cemetery from the neighboring church, physically fragmented the community and contributed to the decline of these institutions. The community's decline in turn contributed to the closure and loss to fire of the Moses fraternal hall. | |
| Major_3 | 12 | | General-Bottleneck Issues | *Shifting Bottleneck Issues Related to Project Design. A detailed technical transportation review of the SDEIS shows impacts of "relieving" congestion at the American Legion Bridge (ALB)* **does not eliminate congestion but shifts** *it from the ALB vicinity (McLean and Potomac) to other areas in Maryland. While some of these bottleneck shifts were expected, the degree of congestion resulting from the proposed project is severe on I-270 north of I-370, on the inner Loop on the top side of the Beltway, and on the Inner Loop in Prince George's County. These bottleneck shifts are project-related impacts, and mitigation measures should be addressed in the SDEIS and included as part of project design to minimize these projected deficiencies.* | |
| Major_3 | 13 | | General-Bottleneck Issues | a. Phase 1A and 1B should be constructed concurrently to reduce or eliminate bottlenecks on I-270. | |

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| Major_3 | 14 | | General-Bottleneck Issues | b. For the other bottleneck issues, we recommend the following design changes to the Preferred Alternative:<br>i. Eliminate the managed lanes from the I-270 Eastern Spur between I-270 and I-495 because I-270 traffic headed south to the eastern spur would not use the managed lane network. The managed lanes would provide minimal travel time benefits for drivers from Gaithersburg and Rockville to most Montgomery County destinations.<br>ii. Eliminate the managed lanes and exit/entrance ramps from I-495 between the two spurs.<br>iii. Managed lane traffic destined to and from the Inner Loop should enter/exit the managed lane network at the River Road crossover interchange. | |
| Major_4 | 15 | | General | *Local Road Impact Analyses* . Without TTI results beyond the Study area, it is more critical that the impact to the local road network be addressed sooner in order to make appropriate considerations for design . The Interchange Access Point Approval (IAPA) study now under development must be extended beyond a single intersection since the increased congestion on I-270 and I-495 will undoubtedly lead to both peak spreading effects and local traffic diversions that have not been adequately considered to-date. When it can take over 30 minutes to travel 2 to 3 miles on some segments of the Beltway as presented in this SDEIS, traffic will not subject themselves to this on a daily basis, and they will find the shorter travel time route, regardless of local street impact. The scope therefore agreed upon by FHWA for the IAPA (performing traffic operational analyses at ramp terminal intersections and one adjacent intersection (on both sides) beyond service interchanges that are modified by the study) will be inadequate in areas where either I-270 or I-495 has very high TTIs and extreme congestion. In those areas, the study area should follow all significant diversionary traffic that switches to the local road network (defined as all non-interstate roads). The study area can be determined by adding routes on parallel routes with travel times equal to the GP lanes travel time. | |
| Major_5 | 16 | | General | *Bike/Ped Improvements* are inconsistent with master plans, particularly related to design . The commitment made during meetings to construct per local master plans must be reflected in the SDEIS. | |

00022114

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| **Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document** | | | | | |
| Major_6 | 17 | page 1 and 17 | General | *Parkland LOD is not final for purposes of impact resolution.* Before any work is permitted to occur on Parkland the limits and nature of the work will need to be reviewed and approved by M-NPPC and permission granted for construction to commence. Because MDOT SHA does not plan to finalize the Project's design until after it completes the NEPA review and awards a contract to a firm to undertake the project, there is significant risk that the LOD will need to be much larger than what is reflected in the SDEIS. An important aspect of avoidance and minimization is minimizing the roadway footprint while still keeping a larger LOD to address environmental issues and/or adequately restore disturbed areas to ensure that they will appropriately handle the increased drainage pressures that will result from advancing one of the Build Alternatives. Ongoing design of the Project must ensure stable tie-ins for outfalls, protection and restoration of stream banks, and improvements to resources based on Project impacts. Although MDOT SHA has committed to the following: " All possible planning to minimize harm will additionally involve an agreement document that outlines the process to continue coordination with the OWls over Section 4(f) properties through the design phase of the project," the impacts to parkland are not known and cannot be fully addressed until design of the project is created by the P3. | |
| Major_7 | 18 | page 6 | General-SWM Plans | *Storm Water Management plans proposed by MDOT SHA are inadequate. a. Ignoring existing untreated impervious surfaces and requiring 50% treatment only if the roadway is fully reconstructed is insufficient to protect downstream waters. Under the SDEIS, only 45% of the water quality treatment that is required is proposed to occur onsite. That is unacceptable, as on-site stormwater quality treatment must be prioritized to a minimum of 80% of the Required ESD onsite (allowing for a maximum of 20% to be treated with the use of compensatory SWM mitigation offsite). MDOT/SHA needs to be specific in their commitment to incentivize innovative technologies and techniques by the P3 to show their commitment to maximizing onsite stormwater quality treatment. These highways are among the worst water quality offenders in the County and the project needs to take more responsibility for protecting the downstream water resources, which will never be improved if we don't take the appropriate steps as part of this project.* | Parks requests more information on the 20% banking fee for providing SWM offsite. Storm Water Management plans proposed by MDOT SHA are inadequate. a. Ignoring existing untreated impervious surfaces and requiring 50% treatment only if the roadway is fully reconstructed is insufficient to protect downstream waters. Under the SDEIS, only 45% of the water quality treatment that is required is proposed to occur onsite. That is unacceptable, as on-site stormwater quality treatment must be prioritized to a minimum of 80% of the Required ESD onsite (allowing for a maximum of 20% to be treated with the use of compensatory SWM mitigation offsite). MDOT/SHA needs to be specific in their commitment to incentivize innovative technologies and techniques by the P3 to show their commitment to maximizing on-site stormwater quality treatment. These highways are among the worst water quality offenders in the County and the project needs to take more responsibility for protecting the downstream water resources, which will never be improved if we don't take the appropriate steps as part of this project. |
| Major_7 | 19 | Appx A | General-SWM Plans | b. The MDE 6-digit watershed scale for offsite SWM water quality projects is meaningless to address the severe water quality impacts of the existing highways and proposed expansion. Offsite compensatory SWM mitigation must be within 1500' of the LOD. This would make the benefits seen by the compensatory mitigation meaningful to the location of the impacts and the surrounding waterways. Moreover, a maximum of 25% of the off-site compensatory stormwater IAT should come from stream restoration. | |

00022115

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
|  | | | | **I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021** | |
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | Revised comments where applicable |
| Major_7 | 20 | Section 5.1.8 page | General-SWM Plans | c. SWM opportunities should not be eliminated due to their location on Parkland.  Conversely, we have spent copious amounts of time working with the MDOT/SHA project team to identify and review potential offsite compensatory SWM opportunities on Parkland when it can be effective with minimal resource impacts. | |
| Major_8 | 21 | Section 5.1.8 page | General | *Inadequate 4(f) Mitigation Plan for Natural Resources .  The SDEIS does not include enough specificity for 4(f) requirements in order for M-NCPPC to review or comment on a "mitigation plan," which requires approval by the Commission. M-NCPPC will require a thorough and implementable mitigation package to include park enhancements and extensive parkland replacement . The parkland affected by this project has significant value due to its geographic location in a largely developed area with little "unused" land.  Land acquisition is a timely process and properties to be acquired must be presented to M-NCPPC for approval before the FEIS and ROD. M-NCPPC will not consider any impact to be de minimis until parkland mitigation requirements are met and formally approved by M-NCPPC.* | |

| I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021 | | | | | |
|---|---|---|---|---|---|
| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| Major_9 | 22 | | General | _Inadequate 4(f) Mitigation Plan for Historical and Cultural Resources_ . Section 4(f) requires avoidance of the use of historical and cultural resources unless other alternatives are demonstrated to be infeasible and contrary to the purpose and use of the undertaking. There have been no detailed design or schematic drawings shown to date that have demonstrated that alternatives were considered that would have avoided a Section 4(f) use of the Moses Hall Tabernacle and Cemetery, the Gibson Grove Church, and the Carderock Springs National Register Historic District . Further impacts to the Gibson Grove Church, an historic resource that has already suffered cumulative adverse effects from the first Beltway construction, should not be accepted as a 4(f) alternative to avoid impacts to Moses Hall Tabernacle and Cemetery. Section 4(f) requires consideration of other design solutions must be evaluated to demonstrate avoidance is infeasible. Noting the likelihood of a 4(f) use at this stage is welcome; however, additional detailed design work should be undertaken with all stakeholders in the community to evaluate alternatives as required. | |
| Comments from M-NCPPC_2_MCParks SDEIS 8.19.21 document | | | | | |
| 1 | 23 | Page ES-1 | What is the Focus of the SDEIS? | "No action or no improvements" should be characterized as the preferred No Build Alternative for portions of the study area being removed from the project | |
| 2 | 24 | Page ES-1 | What is the Focus of the SDEIS? | Delete "While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the scope of the Study, future improvements of the remainder of the system may still be needed in the future." suppositional and not relevant to the newly determined preferred alternative. | |

Page 8

OP·LANES™
MARYLAND
I-495 & I-270 Managed Lanes Study

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 3 | 25 | Page ES-3 | Will comments on the DEIS be addressed? | Delete "appropriate" from first bullet on page.  No value in this qualifier and misleading. | |
| 4 | 26 | Page ES-7 | What is the Preferred Alternative? | "No action, or no improvements included at this time" should be characterized as the preferred No Build Alternative for portions of the study area being removed from the project | |
| 5 | 27 | Page ES-10 | What Happens to the Improvements That Were Studied for the I-495, East of the I-270 East Spur? | This section does not provide a clear answer to how the areas of the study area being removed will be addressed as part of the larger NEPA process.  Need a statement that clearly describes that the NEPA process for this project moving forward eliminates any consideration of a Build Alternative east of the I-270 east spur and any future consideration of improvements to these areas would need to leverage updated information and require an entirely new environmental review process. | |
| 6 | 28 | Page Map 23 | Section Appx D | 3660+00 Old form NCA, expand planting area and include NNI control on parkland and adjacent ROW. | |
| 7 | 29 | Page 2-3, paragraph 3 | Section 2.1 | Delete "initially" as there is no commitment as part of this process to add lanes to areas of the study area that have been dropped from consideration. | |
| 8 | 30 | Page 2-3, paragraph 5 | Section 2.1 | If the study limits are to remain unchanged, the No Build Alternative should be selected for the areas of the study area where no improvements are being considered.  Consideration of any improvements to the dropped portions of this study would be subject to a completely new environmental study and NEPA process that would take into account new transportation improvements, new demands on the system, and changes to natural resources.  This paragraph is not clear in this regard and falsely suggests that the current study could be used as a mechanism to carry forward improvements in the areas where the No Build Alternative is being applied. | |
| 9 | 31 | Page 2-4, paragraph 1 | Section 2.2 | Delete "included at this time". | |
| 10 | 32 | Page 2-4, Figure 2-2 | Section 2.2 | Delete "at this time". | |
| 11 | 33 | Page 2-7, Table 2-1 | Section 2.3.1 | Remove list of the I-495 interchange locations within the Study Area and outside of Phase 1 South limits.  They are no longer relevant to the project and the SDEIS is clearly intended only to focus on aspects of the project related to the new Preferred Alternative. | |
| 12 | 34 | Page 2-7 | Section 2.3.1 | Delete the last sentence of the last paragraph as it is not relevant to the SDEIS or the Preferred Alternative. | |


### I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 13 | 35 | Page 2-10 | Section B | As stated in Parks DEIS comments, we feel that ignoring the existing untreated road pavement and requiring 50% treatment only if the roadway is fully reconstructed is insufficient to protect downstream waters. A higher goal closer to 50% of all existing untreated roadways would be more effective in protecting downstream waters. | |
| 14 | 36 | Page 2-11, Table 2-2 | Section C | The project needs to commit to significantly improving the Provided ESD surface area to a minimum of 80% of the Required ESD onsite (allowing for a maximum of 20% to be treated with the use of compensatory SWM mitigation offsite). These highways can be considered the worst water quality offenders in the County and the Project needs to take more responsibility for protecting the downstream water resources, which will never be improved if we don't take the appropriate steps as part of this project. The Project should achieve better than this current projection. | |
| 15 | 37 | Page 2-11 | Section C | The statement that "use of innovative technologies may reduce the compensatory stormwater management requirements" is insufficient. MDOT/SHA needs to be specific in their committal to financially incentivize innovative technologies and techniques by the P3 to show their commitment to maximizing on-site water quality treatment. | Parks requests more detail on the 20% banking fee. The statement that "use of innovative technologies may reduce the compensatory stormwater management requirements" is insufficient. MDOT/SHA needs to be specific in their committal to financially incentivize innovative technologies and techniques by the P3 to show their commitment to maximizing on-site water quality treatment. |
| 16 | 38 | Page 2-12, paragraph 1 | Section D.a | The MDE 6-digit watershed scale for offsite SWM water quality projects is meaningless to address the severe water quality impacts of the existing highways and proposed expansion. All offsite compensatory mitigation should take place within 1500' of the approved LOD. | |
| 17 | 39 | Page 2-12, paragraph 2 | Section D.a | The credit potential of one-acre IAT credit per 100 linear foot stream restored is based on outdated crediting methodology. The project should be held to the most recent guidance at the time of permitting; at this time that is the 2020 Wasteload Allocations Document. | |
| 18 | 40 | Page 2-12 | Section D.b | Project needs to show a real commitment to treating additional onsite stormwater runoff (80% min) and existing offsite impervious within a meaningful distance to the project (within 1500') in order to follow through on the Study's Purpose and Need goal of Environmental Responsibility. This commitment needs to be made before a Developer is brought in and given free rein to identify projects that are prioritized by financial goals rather than environmental stewardship. For the maximum 20% water quality treatment achieved off-site, only a maximum of 25% of the IAT shall be achieved through stream restoration and outfall stabilization. The remaining 75% + shall be achieved through pavement reduction/removal, Ch 3 and Ch5 SWM practices in order to best | |
| 19 | 41 | Page 2-17 | Section 2.3.5 | Need to explicitly show on plans areas designated for temporary construction access, staging, and materials storage for further evaluation and review. | |
| 20 | 42 | Page 2-27 | Section 2.4.1 | Commitment to priority bicycle and pedestrian connections needs to include lengthening the I-270 bridge over Tuckerman Ln to accommodate future pedestrian/bicycle facilities along Tuckerman Ln and widening the existing variable-width side path along Seven Locks Rd under I-495 (Cabin John Trail). | |
| 21 | 43 | Page 2-27 | Section 2.4.3 | Need much more detail on the environmental enhancements that are mentioned in order to comment on them. Where are they, what are the limits, and how many of them are there? Parks needs specific locations and work plans outlined to concur with the project. | |

Page 10

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| | | | | **Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document** | |
| 22 | 44 | Page 2-28 | Section 2.5 | Need to state more explicitly the process by which remaining parts of I-495 could progress – new NEPA process entirely. | |
| 23 | 45 | Page Map 4 & 5 | Section Appx D | FIDS area shown for Cabin John SVP Unit 2, how are these areas being addressed? | The impacts to Cabin John SVU 2, Cabin John Regional Park, and Cabin John SVU 6 relocate the forest edge and subsequently impact forest interior on parkland. Forest "interior" refers to the area in the center of a forest which is surrounded by "edge". The forest area within 300 feet of a forest edge is considered "edge" habitat. "interior habitat" is commonly defined as the forest area found greater than 300 feet from the forest edge. Interior habitat functions as the highest quality breeding habitat for forest interior dwelling birds (FIDS). Parks expects further coordination to reduce forest interior impacts and to mitigate for unavoidable impacts. |
| 24 | 46 | Page Map 7 | Section Appx D | 197+00 west side Cabin John SVP Unit 2 details for construction of proposed pipe augmentation. Stream work and need LOD up stream of outfall. | 197+00 west side Cabin John SVP Unit 2 continue to Coordinate with MNCPPC on the appropriate stream work and LOD needed in this location. |
| 25 | 47 | Page Map 7 | Section Appx D | 195+00 east side – Justify large LOD offset from alignment into CJ SVU2. The LOD should be as tight and minimal as possible to the alignment. Add plunge pool where outfall interfaces with stream to ensure stable transition into Cabin John Mainstem. | 195+00 east side –The large LOD offset from alignment into CJ SVU 2 should be as tight and minimal as possible to the alignment. Add plunge pool where outfall interfaces with stream to ensure stable transition into Cabin John Mainstem. |
| 26 | 48 | Page Map 8 | Section Appx D | 200+00 – does SHA intend to modify the bridge over Booze Creek? If so, the stream should have a natural bottom. | 200+00 - since the bridge over Booze Creek will be modified, SHA should commit to rebuilding the structure with a natural channel bottom. This would result in a net benefit to the resource, which is what SHA has committed to for natural resrouce protection. |
| 27 | 49 | Page Map 10 | Section Appx D | 225+00 west side – the tie in of feature 21C_C2 into Cabin John Creek must include appropriate stream structures to ensure stability, energy dissipation, and utility protection. There is an adjacent sewer crossing that should receive a sill and riffle structure for protection. | |
| 28 | 50 | Page Map 10 | Section Appx D | 225+00 west side – the proposed augmentation pipe that are under River Rd should not extend to the bank of Cabin John Creek. The end wall should be as far from the stream bank as possible. | |
| 29 | 51 | Page Map 9 | Section Appx D | 220+00 – west side - the outfall should be cut back and a stable channel with step pools built from the manhole labeled "handle 2454" | |
| 30 | 52 | Page Map 9 | Section Appx D | 220+00 – west side - a stream structure such as a crossvane and/or riffle should be built in the mainstem of rock creek in conjunction with the outfall channel to ensure the stability of the mainstem at the confluence. | |
| 31 | 53 | Page Map 23 | Section Appx D | 3685+00 East side of I270 – The LOD area along Tuckerman Lane and Old Farm Creek is too large. The LOD on the South side of Old Farm Creek should maintain the same distance from I270 as the LOD on the north side of Old Farm Creek. Access can be achieved from Tuckerman Lane adjacent to the outfall channel that runs parallel to I270 from Tuckerman Lane to Old Farm Creek. The justification for this large park impact on Map 12 is stated as the augmentation culvert, but the proposed aerial structure negates the need for the culvert. | |
| 32 | 54 | Page Map 23 | Section Appx D | 3685+00 East Side of I270 – There is an outfall channel from Tuckerman Lane adjacent to I270 that flows into Old Farm Creek on the upstream side of the culver under I270. This channel must be restored using pools/riffles/cascades if it is disturbed. | |
| 33 | 55 | Page Map 23 | Section Appx D | 3685+00 The Old Farm Creek stream channel must be rebuilt to a natural bottom that ties in with the upstream elevation of Old Farm Creek when the culvert is replaced with a highway bridge. | |

Page 11

OP·LANES
MARYLAND
I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

| I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021 | | | | | |
|---|---|---|---|---|---|
| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 34 | 56 | Page Map 23 | Section Appx D | 3685+00 The new highway bridge spanning Old Farm Creek must allow for a natural surface trail under the bridge adjacent to the stream. | |
| 35 | 57 | Page Map 23 | Section Appx D | 3685+00 West Side I270 - On the north side of Old Farm Creek, the LOD can be enlarged to encompass an existing WSSC access road area if that is helpful to site access, staging, storage. This would shift the LOD line approximately 30ft to the north. | |
| 36 | 58 | Page Map 23 | Section Appx D | 3685+00 West Side I270 – The LOD on the south side of Old Farm Creek is too large for the proposed stream work. The stream can be access from the north. The area between Old Farm Creek and Tuckerman Lane is riparian habitat within the floodplain of Old Farm Creek. This area is important to protect due to the understory of native shrubs and the mature tree canopy. | |
| 37 | 59 | Page Map 23 | Section Appx D | 3685+00 West Side I270 – The new proposed culvert under Tuckerman Lane has significant impact to the existing riparian habitat. This new pipe should be removed or use an alignment much closer to the highway since there will be a new bridge designed for this location. If the new aerial structure dictates a pipe replacement, the pipe should be as short as possible and outfall before the stream into a pool system. | |
| 38 | 60 | Page Map 23 | Section Appx D | 3685+00 west side I270 – The proposed aerial structure spanning Tuckerman Lane and Old Farm creek will result in the removal of long culvert in Old Farm Creek, Parks is supportive of this new bridge and looks forward to assisting in the design of the new stream channel underneath the bridge. | |
| 39 | 61 | Page Map 23 | Section Appx D | 3685+00 west side I270 – the note on the LOD size along Old Farm Creek states the LOD is for culvert augmentation. The new aerial structure will negate the need for culvert augmentation. The LOD in the stream should be noted as for stream restoration. | |
| 40 | 62 | Page Map 24 | Section Appx D | 3629+00 west side.   The ownership of this parcel is under investigation. | |
| 41 | 63 | Page Map 24 | Section Appx D | 3625+00 daylight outfall, add step pools and stabilize overland flow. | |
| 42 | 64 | Page Map 24 | Section Appx D | 3629+00 Describe what LOD shown around outfalls needed for.  Parks does not concur with the LOD needs. Eliminate LOD and temporary and permanent impacts. | |
| 43 | 65 | Page Map 24 | Section Appx D | 3640+00 west side - ensure the drainage channel that flows downslope from 3645+00 has a stable tie in to the channel from the culvert under I270. There is a new end wall proposed and the LOD does not seem to account for the other drainage channel. | |
| 44 | 66 | Page Map 24 | Section Appx D | 3640+00 west side - A fiberglass bridge per Parks Specification should be included to route the natural surface trail over the stream downstream of the end wall. | |
| 45 | 67 | Page Map 24 | Section Appx D | 3640+00 west side - The stormwater design must accommodate the rerouted natural surface trail. The trail needs to be located within well drained areas to prevent trail use issues. | |
| 46 | 68 | Page Map 24 | Section Appx D | 3640+00 west side – the outfall from the stormwater management facility must be addressed all the way to the confluence with the tributary. The limited LOD prevents this connection as it is currently shown. Enlarge the LOD or justify that the flows can be discharged in the location shown without causing erosion and future degradation. | |

Page 12

OP·LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| **Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document** | | | | | |
| 47 | 69 | Page Map 24 | Section Appx D | 3635+00 west side – tighten the LOD (90-degree corner) so that it is closer to the SWM facility and does not impact the natural surface trails. | |
| 48 | 70 | Page Map 24 | Section Appx D | 3630+60 east side – LOD should not extend upstream of the confluence between Cabin John creek and the tributary, remove this large LOD "bump out". Parks does not agree with impacts to stable stream to tie-in grade 130 ft up stream of the crossing. | |
| 49 | 71 | Page Map 24 | Section Appx D | 3630+60 east side – the outfall from the highway should be a cascade or other stable system. | |
| 50 | 72 | Page Map 24 | Section Appx D | 3630+60 east side – Parks does not concur with the need for the augmentation culvert. Provide more analysis of the existing pipe system. | |
| 51 | 73 | Page Map 24 | Section Appx D | 3630+60 east side – tighten the LOD on the east side of the stormwater facility, the LOD should not go up the slope. | |
| 52 | 74 | Page Map 24 | Section Appx D | 3641+50 east side –The stream stabilization work should take place even if augmentation not found to be necessary. | |
| 53 | 75 | | Appendix D | Final ROW in locations of impact to Parkland will need to be coordinated with and approved by Parks. | Final ROW in locations of impact to Parkland will need to be coordinated with and approved by Parks and identified in the FEIS/ROD. A procedure for dealing with ROW expansion after the ROD must be approved in the FEIS/ROD. |
| 54 | 76 | Page 5-1 | Section 5.1.1 | Since this 4(f) chapter in the SDEIS does not replace the 4(f) information from the DEIS, all of Parks previous comments related to 4(f) still stand. | |
| 55 | 77 | Page 5-2 | Section 5.1.2 | "There is no action, or no improvements included at this time on I-495 east of the I-270 east spur (shown in light blue in Figure 5-1)." Please clarify this statement, what does this mean for the rest of the alignment. Will a new NEPA review, DEIS, FEIS, and ROD be completed if SHA decided to move forward with "improvements" on the rest of I-495? | |
| 56 | 78 | Page 5-3 | Section 5.1.3 | Montgomery Parks does not consider the coordination on the park land affected by the preferred alternative to be sufficient to this point and much more effort to minimize impacts is needed. The comments provided here reference many instances of LOD modification that will need further coordination. | Montgomery Parks does not consider the coordination on the park land affected by the preferred alternative to be sufficient to this point and much more effort to minimize impacts is needed. The comments provided here reference many instances of LOD modification that will need further coordination. SHA must clarify how the opportunities for additional impact minimization and further adjustment of the LOD during Final Design will occur; the process should be in the FEIS/ROD. |
| 57 | 79 | Page 5-6, Table 5-1 | | Some Parks have "Constructive Use" impacts as well as Permanent and Temporary. These need to be accounted for in this table and in all discussions regarding Park impacts and mitigation. Examples of constructive use may include impacts to tree CRZs outside of the LOD, impacts to trails outside of the LOD, impacts to campgrounds near the LOD, etc. | Parks believes that some park locations have "Constructive Use" impacts as well as Permanent and Temporary. These need to be accounted for in this table and in all discussions regarding Park impacts and mitigation. Examples of constructive use may include impacts to tree CRZs outside of the LOD, impacts to trails outside of the LOD, impacts to campgrounds near the LOD, etc. |
| 58 | 80 | Page 5-5 | Section 5.2.1 | Table 5-1 – Cabin John Regional – the impact can only be considered *de minimis* once the required parkland mitigation requirements are met and approved by M-NCPPC. There has not been a significant effort by SHA to present a sufficient parkland mitigation package at this point. | A complete Park Mitigation package must be approved by MNCPPC. |
| 59 | 81 | Page 5-5 | Section 5.2.1 | Table 5-1 – Cabin John SVU2 – the impact can only be considered *de minimis* once the required parkland mitigation requirements are met and approved by M-NCPPC. There has not been a significant effort by SHA to present a sufficient parkland mitigation package at this point. | Table 5-1 – Cabin John SVU2 – There has not been a enough effort by SHA to present a sufficient parkland mitigation package at this point. A complete Park Mitigation package must be approved by MNCPPC. |
| 60 | 82 | Page 5-5 | Section 5.2.1 | Table 5-1 – Tilden Woods Stream Valley Park – the impact can only be considered *de minimis* once the required parkland mitigation requirements are met and approved by M-NCPPC. There has not been significant effort by SHA to present a sufficient parkland mitigation package at this point. | Table 5-1 – Tilden Woods Stream Valley Park – There has not been a enough effort by SHA to present a sufficient parkland mitigation package at this point. A complete Park Mitigation package must be approved by MNCPPC. |

Page 13

00022122

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 61 | 83 | Page 5-5 | Section 5.2.1 | Table 5-1 – Old Farm Neighborhood Conservation Area – the impact can only be considered de minimis once the required parkland mitigation requirements are met and approved by M-NCPPC. There has not been significant effort by SHA to present a sufficient parkland mitigation package at this point. | Table 5-1 – Old Farm Neighborhood Conservation Area– There has not been a enough effort by SHA to present a sufficient parkland mitigation package at this point.  A complete Park Mitigation package  must be approved by MNCPPC. |
| 62 | 84 | Page 5-5 | Section 5.2.1 | Table 5-1 – Cabin John SVU6 – the impact can only be considered de minimis once the required parkland mitigation requirements are met and approved by M-NCPPC. There has not been a significant effort by SHA to present a sufficient parkland mitigation package at this point. | Table 5-1 – Cabin John SVU6 –  There has not been a enough effort by SHA to present a sufficient parkland mitigation package at this point.  A complete Park Mitigation package  must be approved by MNCPPC. |
| 63 | 85 | Page 5-5 | Section 5.2.1 | "Therefore, the Preferred Alternative would avoid the use of 37 Section 4(f) properties that were previously reported as Section 4(f) uses in the DEIS and Draft Section 4(f) Evaluation, totaling approximately 105 acres." If SHA is going to consider the park properties on the rest of the alignment as avoided, then this implies that any proposed future "improvements" would require a completely new NEPA process. | |
| 64 | 86 | Page 5-23 | Section 5.2.8 | "No recreational facilities within Cabin John Stream Valley Park Unit 2 would be impacted by the Preferred Alternative." This statement is false. Any further development of the existing highway is detrimental to the park user experience on the natural surface trail. | "No recreational facilities within Cabin John Stream Valley Park Unit 2 would be impacted by the Preferred Alternative." This statement is false. Any further development of the existing highway is detrimental to the park user experience on the natural surface trail even if the actual trail is not removed or relocated for the new highway alignment |
| 65 | 87 | Page 5-5 | Section 5.2 | Until a robust, complete, and implementable mitigation plan detailing on site mitigation and restoration and parkland replacement is proposed and approved by M-NCPPC no concurrence on the 4(f) status can be provided. | |
| 66 | 88 | Page 5-23 | Section 5.2.8 | LOD adjustments are required adjacent to Cabin John creek where the outfalls enter the stream. To ensure long-term stability in Cabin John creek, stream stabilization is required in the mainstem at the outfalls due to the increased flows from the new highway. | LOD adjustments are required adjacent to Cabin John creek where the outfalls enter the stream. To ensure long-term stability in Cabin John creek, stream stabilization is required in the mainstem at the outfalls due to the increased flows from the new highway. SHA needs to define the process for how opportunities for additional impact minimization and further adjustment of the LOD during Final Design will occur. |
| 67 | 89 | Page 5-28 | Section 5.2.11 | "No other recreational facilities would be impacted by the Preferred Alternative." It is Parks position that any widening will have an adverse impact on the public use campground, even if the actual campsites are not physically impacted.  For example, noise and visual experience of the campground will be diminished by any increase in the highway size. | |
| 68 | 90 | Page 5-28 | Section 5.2.11 | Parks has made numerous comments linked to App D that detail the numerous LOD modifications that are still required. | |
| 69 | 91 | Page 5-28 | Section 5.2.11 | "Expansion of the LOD in certain areas was in response to M-NCPPC's comments to ensure stable outfall channels." We appreciate these changes and believe that providing stable outfalls is essential due to the large increases in stormwater runoff that are not being fully treated. | |
| 70 | 92 | Page 5-28 | Section 5.2.11 | The relocation of the trail impacted by the proposed SWM facility should not be considered mitigation. The project is directly affecting the trail and it must be rebuilt as part of the project. Mitigation for the trail disturbance will also be required that will be above and beyond the relocation and rebuilding of the impacted trail section. | As SHA has stated to Parks, the relocation of the trail impacted by the proposed SWM facility should not be considered mitigation. The project is directly affecting the trail and it must be rebuilt as part of the project. Mitigation for the trail disturbance will also be required that will be above and beyond the relocation and rebuilding of the impacted trail section. |
| 71 | 93 | Page 5-28 | Section 5.2.11 | Noise/visual barrier should be pursued for all areas of parkland. Parks expectation that any areas shown with retaining wall adjacent to parkland within Phase 1 South, should also incorporate noise wall/visual barrier and vegetative barrier where appropriate. | |

Page 14

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| | | | | **Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document** | |
| 72 | 94 | Page 5-30 | Section 5.2.12 | I-270 should pass over Old Farm Creek via a roadway bridge and the existing culvert should be removed allowing Old Farm Creek to have a natural channel bottom. This would represent a significant improvement to the existing condition and is reasonable considering the numerous aquatic resource impacts posed by this project. | |
| 73 | 95 | Page 5-30 | Section 5.2.12 | The LOD on the east side I-270 in Tilden Woods SVP should more closely resemble the LOD submitted with the DEIS. Parks does not support the larger LOD. Is the larger LOD intended for the new aerial structure spanning Old Farm Creek? If so, Parks looks forward to discussing this in further detail. | |
| 74 | 96 | Page 5-31 | Section 5.2.13 | Tree planting should be maximized at Old Farm NCA. NNI control is expected to be part of the tree planting and be applied the entire parcel. | |
| 75 | 97 | Page 5-33 | Section 5.2.14 | "The Preferred Alternative would not impact to Cabin John Trail, or any other recreational facilities in Cabin John Stream Valley Park Unit 6." Remove this reference as there are no trails in CJ SVU 6. | |
| 76 | 98 | Page 5-33 | Section 5.2.14 | The LOD on the west side of I-270 is too large. It needs to be tighter around the SWM facility and not go further than the confluence. | |
| 77 | 99 | Page Map 24 | Section Appx D | 3620+00 west side. Remove LOD bump out at existing and recently restored outfall | |
| 78 | 100 | Page 5-33 | Section 5.2.14 | Parks does not concur with the need for an augmentation culvert and the associated impacts | |
| 79 | 101 | Page 5-50 | Section 5.3 | "The Preferred Alternative presented in this SDEIS would not avoid the use of all Section 4(f) properties. It would, however, avoid the use of 37 Section 4(f) properties for which impacts totaling roughly 105 acres as were reported in the DEIS (Table 5-2). Those 105 acres of impact to 37 properties would be fully avoided by the Preferred Alternative." M-NCPPC takes this statement to mean that any future improvements to the highway outside of the Phase 1 area would need a new and separate NEPA process. | |
| 80 | 102 | Page 5-51 | Section 5.4.1 | "All possible planning to minimize harm will additionally involve an agreement document that outlines the process to continue coordination with the OWJs over Section 4(f) properties through the design phase of the project." M-NCPPC Montgomery Parks will continue to require extensive review of all impacts to Parkland with the goal to continue to minimize those impacts. Before any work is permitted to occur on Parkland a Park Construction Permit must be issued. | |
| 81 | 103 | Page 5-51 | Section 5.4.2 | "Consideration of improvements to those remaining parts would have to advance separately, and would be subject to additional environmental studies, and analysis and collaboration with the public, stakeholders, and agencies." Change this sentence to "Consideration of improvements to those remaining parts would have to advance separately, and would be subject to a new NEPA study, independent of the previous Phase 1 studies, and new collaboration with the public, stakeholders, and agencies. | |

Page 15

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.15.21 document | | | | | |
| 82 | 104 | Page 5-32 | Section 5.4.5 | M-NCPPC will require a thorough and implementable mitigation package to include extensive parkland replacement. The parkland affected by this project has significant value due to its geographic location in a largely developed area with little "unused" land. SHA must recognize that land acquisition is a timely process and properties should be acquired and presented to M-NCPPC as soon as possible so that M-NCPPC can approve the properties as part of the 4(f) discussion. Leading to the FEIS and ROD. | |
| 83 | 105 | Page 5-61 | Section 5.7 | "Based on the information presented in the Draft Section 4(f) Evaluation and this Updated Draft Section 4(f) Evaluation, FHWA and MDOT SHA have reached a preliminary conclusion that the Preferred Alternative is the alternative with least overall harm." Add to the end of the statement "due to avoiding the parks and natural resources involved in the alternatives that include the rest of I-495. | |
| 84 | 106 | Page 4-10 | Section 4.4.2 | It needs to be stated clearly that any future improvements on the rest of I-495 not in Phase 1 would require a new and separate NEPA process since those resources and properties are being considered avoided for the purpose of this NEPA study. | |
| 85 | 107 | Page 4-10 | Section 4.4.3 | M-NCPPC is requesting the creation of a clear and concise set of figures and digital GIS data that shows the new proposed ROW after construction. | Before any MOU, mitigation package approval, or publication of the FEIS/ROD, M-NCPPC will require the review of a clear and concise set of figures and digital GIS data that shows the new proposed ROW after construction. |
| 86 | 108 | Page 4-16 | Section 4.4.3 B b | Table 4-9 SHA must provide documentation to prove the use of Copper-Cramton funds to purchase Cabin John Regional Park and Cabin John SVU2. M-NCPPC does not consider those parks to have been purchased with Copper-Cramton Funds. | |
| 87 | 109 | Page 4-17 | Section 4.4.3 B c | It needs to be stated clearly that any future improvements on the rest of I-495 not in Phase 1 would require a new and separate NEPA process since those resources and properties are being considered avoided for the purpose of this NEPA study. | |
| 88 | 110 | Page 1 Paragraph 1 | Appendix C Compensatory SW Mitigation Plan | Phase I South is the only area being evaluated at this time. All other areas should be specified as no build. | |
| 89 | 111 | Page 1 Paragraph 2 | Appendix C Compensatory SW Mitigation Plan Part 1 | The project needs to commit to significantly improving the Provided ESD surface area to a minimum of 80% of the Required ESD onsite (allowing for a maximum of 20% to be treated with the use of compensatory SWM mitigation offsite). These highways can be considered the worst water quality offenders in the County and the Project needs to take more responsibility for protecting the downstream water resources, which will never be improved if we don't take the appropriate steps as part of this project. The Project must try harder. | |
| 90 | 112 | Page 1 Paragraph 2 | Appendix C Compensatory SW Mitigation Plan Part 1 | As the SDEIS only covers Phase I South and specifies that all other areas are no build with the selected alternative, this entire document should only address Phase I South. | |

Page 16

00022125

OP·LANES
MARYLAND
I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

### I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 91 | 113 | Page 1 Paragraph 2 Last sentence | Appendix C Compensatory SW Mitigation Plan Part 1 | Clarify Phase I south (There is also Phase I north). | |
| 92 | 114 | Page 1 Paragraph 3 | Appendix C Compensatory SW Mitigation Plan Part 1 | Need to be more specific about how more environmental impacts won't result from this SWM effort and how they will be mitigated for. As the P3 can choose any sites (not just from this list) to move forward with, limitations on the amount of environmental resources allowed to be impacted cumulatively for this effort need to be set. Mitigation is not sufficient to compensate for impacts resulting from compensatory offsite SWM. | |
| 93 | 115 | Page 1 Paragraph 3 | Appendix C Compensatory SW Mitigation Plan Part 1 | Instead of prioritizing existing MDOT SHA ROW for offsite compensatory mitigation in a large geographic area (that becomes meaningless on a 6-digit HUC scale it is so large), instead this effort should be to concentrate on all untreated impervious areas within 1500' of the LOD. This would make the benefits seen by the compensatory mitigation meaningful to the location of the impacts and the surrounding waterways. | |
| 94 | 116 | Page 2 Figure 1-1 | Appendix C | "Future Phases" is inconsistent with the rest of the SDEIS document. "No Build" should be used instead. | |
| 95 | 117 | Page 3 Paragraph 1 | Appendix C Compensatory SW Mitigation Plan Part 1 | Stating that is is "desirable" for SWM to be met onsite is insufficient. The on-site SWM efforts shown are not enough; currently less than 45% of stormwater water quality treatment is proposed onsite. The percentage of on-site SWM treatment should be at least 80%, and then the remaining 20% that is offsite should occur within 1500' of the LOD corridor. | |
| 96 | 118 | Page 3 Paragraph 1 | Appendix C Compensatory SW Mitigation Plan Part 1 | The MDE 6-digit watershed is too large in this case and puts the compensatory SWM sites too far away from the impacts. All off-site compensatory SWM mitigation should occur within 1500' of the LOD to be proximate and meaningful in its effect on the local water quality. | |
| 97 | 119 | Page 3 Paragraph 4 | Appendix C Compensatory SW Mitigation Plan Part 1 | Property owners of proposed sites need to be notified sooner. Parks owns some of the proposed sites and we were previously unaware of their inclusion in this plan. We do not approve the use of any of these sites (or the LODs shown) without separate, further coordination to understand the impacts these are mitigating for. | |
| 98 | 120 | Page 3 Paragraph 4 | Appendix C Compensatory SW Mitigation Plan Part 1 | The MDE 6-digit watershed, even overlaid with the Federal 8-digit HUC, is too large in this case and puts the compensatory SWM sites too far away from the impacts. All off-site compensatory SWM mitigation should occur within 1500' of the LOD to be proximate and meaningful in its effect on the local water quality. | |
| 99 | 121 | Page 4 Figure 2-1 | Appendix C Compensatory SW Mitigation Plan Part 1 | Specify that this document only covers Phase I south. All other areas should be labeled "No Improvements" | |
| 100 | 122 | Page 5 Paragraph 1 and Paragraph 2 | Appendix C Compensatory SW Mitigation Plan Part 1 | The SDEIS only covers Phase I south Alternative 9. The rest of alternative 9 is no improvements and those impacts should not be included in this document. | |
| 101 | 123 | Page 5 Paragraph 3 | Appendix C Compensatory SW Mitigation Plan Part 1 | Be more specific about how the P3 will be incentivized to provide as much on-site SWM as possible. A minimum of 80% of water quality WM should be required to be treated onsite, with strong incentives to treat the remaining 20% on-site as well (or maybe through disincentivizing off-site compensatory SWM). All off-site SWM should be withing 1500' of the LOD. | |

00022126

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| | | | **Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document** | | |
| 102 | 124 | Page 5 Paragraph 4 | Appendix C Compensatory SW Mitigation Plan Part 1 | Omit information for full alternative 9. It is confusing and not relevant – No improvements are proposed there as the No Build option was selected for that area. Thus there should be no SWM treatment required for the area with no improvements. | |
| 103 | 125 | Page 5 Paragraph 4 | Appendix C Compensatory SW Mitigation Plan Part 1 | 92 onsite /114 offsite is less than 45% treated onsite. This is an unacceptable onsite/offsite ratio. A minimum of 167 acres of water quality SWM should be provided onsite. | |
| 104 | 126 | Page 5 Paragraph 5 | Appendix C Compensatory SW Mitigation Plan Part 1 | Should be the number for Phase I South only (206), not the 351. Where no improvements/no build are proposed, there should not be impacts. | |
| 105 | 127 | Page 6 Table 3-1 | Appendix C Compensatory SW Mitigation Plan Part 1 | This table is incredibly confusing. Simplify it by including only Phase I south numbers and dropping anything related to what you are calling future phases, which are really where there are No improvements/No build proposed. | |
| 106 | 128 | Page 6 | Appendix C Section 4.1 Part 1 | MDOT SHA should consider outfall stabilization (using environmentally sensitive techniques) to be a type of compensatory SWM mitigation. SHA owns a plethora of severely eroding outfalls which send tons of sediment downstream each year. Given the status of SHA's storm drain infrastructure, this technique shows real improvement to the local waterways. | MDOT SHA should restore degraded outfalls in addtion to the required SWM.SHA owns a plethora of severely eroding outfalls which send tons of sediment downstream each year. Given the status of SHA's storm drain infrastructure, this technique shows real improvement to the local waterways. Outfall restoration could help SHA reach their stated goal of a net benefit to affected resources. |
| 107 | 129 | Page 6 | Appendix C Section 4.1 Part 1 | impervious removal, Chapter 3, and Chapter 5 facilities should account for at least 75% of the SWM compensatory mitigation, with stream restoration accounting for no more than 25% of the IAT. | |
| 108 | 130 | Page 6 | Appendix C Section 4.1 Part 1 | All compensatory SWM sites should be within 1500' of LOD corridor for Phase I South. | |
| 109 | 131 | Page 7 | Appendix C Section 4.1 Part 1 | Stream restoration for compensatory SWM mitigation should only take place in close proximity (1500') of the impacts and should only be proposed in watersheds with ample stormwater management already in place (low % of untreated impervious). | |
| 110 | 132 | Page 7 | Appendix C Section 4.1 Part 1 | Specify stringent measures associated with tree loss for compensatory SWM sites. Since these sites could be avoided by choosing other sites, the threshold for tree loss should be low. | |
| 111 | 133 | Page 7 | Appendix C Section 4.1 Part 1 | The credit potential of one-acre IAT credit per 100 linear foot stream restored is based on outdated crediting methodology. The project should be held to the most recent guidance at the time of permitting; at this time that is the June 2020 Wasteload Allocations Document. | |
| 112 | 134 | Page 7 | Appendix C Section 4.1 Part 1 | Of the 1,174 compensatory SWM sites, any outside of the corridor 1500' around the LOD should be automatically eliminated from this project. | |
| 113 | 135 | Page 8 | Appendix C Section 4.2.1 Part 1 | Parks will need to review and approve any compensatory mitigation sites on Parkland for cultural resources impacts. | |
| 114 | 136 | Page 9 | Appendix C Section 4.2.6 Part 1 | Only the most minimal wetlands and waterways impacts should be accepted, and to the lowest quality resources. | |
| 115 | 137 | Page 9 | Appendix C Section 4.2.8 Part 1 | After reviewing the maps, it is not true that all compensatory SWM sites that would incur a use of a Section 4(f) properties were eliminated. There are several stream restoration sites as well as a few Chapters 3/5 sites. Edit this statement for accuracy. | |

Page 18

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 116 | 138 | Page 9 | Appendix C Section 4.2.8 Part 1 | Montgomery Parks does not feel that good potential SWM opportunities should be eliminated due to their location on Parkland. Conversely, we have spent copious amounts of time working with the MDOT/SHA project team to identify and review potential offsite compensatory SWM opportunities on Parkland. Our priority remains to lessen the effects that this highway expansion will have on downstream waterways and properties, many of which are Parkland. Montgomery Parks is committed to being a partner in finding solutions to treat stormwater runoff and hold the project accountable for its environmental impacts. This includes the use of Parkland for compensatory stormwater mitigation when it can be effective. | |
| 117 | 139 | Page 11 | Appendix C Section 4.4 Part 1 | See above. If sites fit all other criteria for compensatory SWM mitigation and are on Parkland, they should be discussed with the landowner and considered (not just unduly removed from consideration). | |
| 118 | 140 | Page 13 Table 4-3 | Appendix C Part 1 | Sites outside of the 1500' buffer surrounding the LOD should be removed from consideration. The majority of these 754 sites aren't even proximate to the impervious being installed. | |
| 119 | 141 | Page 13 | Appendix C Section 5 Part 1 | The P3 should be held strictly accountable for treating a minimum of 80% of the SWM water quality onsite, and the remaining maximum of 20% within 1500' of the corridor. | |
| 120 | 142 | Page 14 | Appendix C Section 5.1.8 Part 1 | This is inaccurate; section 4(f) land is included in this document. | |
| 121 | 143 | Page 16 Table 6-1 | Appendix C Part 1 | Table should include information for Phase I South only. All other areas are No Improvements/No Build. | |
| 122 | 144 | Page 17 Figure 6-1 | Appendix C Part 1 | This map shows how far away so many of the proposed sites are currently. All sites outside of within 1500' of the Phase I south LOD should be eliminated. | |
| 123 | 145 | Page 18 Figure 6-2 | Appendix C Part 1 | Delete graphic. Not relevant to Phase I South. | |
| 124 | 146 | Page 20 Table 6-2 | Appendix C Part 1 | This table should include Phase I South only. | |
| 125 | 147 | Page 20 Table 6-2 | Appendix C Part 1 | All sites not within 1500' of the LOD should be removed from consideration for this project. | |
| 126 | 148 | Page 20 Table 6-2 | Appendix C Part 1 | Although the document states that parkland sites were removed, it appears that multiple park sites still remain on this list. Any sites will have to be vetted by Park staff prior to use and have all approvals/permissions issued prior to construction. To date no permissions have been granted or LODs approved for use of any Parkland for SWM compensatory mitigation. Parks are willing to work with the project team on good quality opportunities and coordinate accordingly as needed but need to be a part of the decision making and approval process. | |
| 127 | 149 | Appendix A Page A-3 Table A-4 | Appendix C Compensatory SW Mitigation Plan Part 1 | Stream restoration crediting should be updated to June 2020 Wasteload Allocations document guidance. | |
| 128 | 150 | Appendix A Page A-3 Table A-4 | Appendix C Compensatory SW Mitigation Plan Part 1 | MDOT SHA should consider outfall stabilization (using environmentally sensitive techniques) to be a type of compensatory SWM mitigation. SHA owns a plethora of severely eroding outfalls which send tons of sediment downstream each year. Given the status of SHA's storm drain infrastructure, this technique could help improve the local waterways. | MDOT SHA should restore degraded outfalls in addition to the required SWM. SHA owns a plethora of severely eroding outfalls which send tons of sediment downstream each year. Given the status of SHA's storm drain infrastructure, this technique shows real improvement to the local waterways. Outfall restoration could help SHA reach their stated goal of a net benefit to affected resources. |

Page 19

00022128

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 129 | 151 | Appendix A Page A-4 Table A-3 and paragraph above | Appendix C Compensatory SW Mitigation Plan Part 1 | Only numbers relevant to the development of Phase I south should be included. All other areas have no improvements proposed. | |
| 130 | 152 | Appendix A Page A-4 Table A-4 | Appendix C Compensatory SW Mitigation Plan Part 1 | Table should reflect only Phase I south. Sites further than 1500' outside of the LOD should be eliminated. | |
| 131 | 153 | Appendix A Page A-4 Table A-4 | Appendix C Compensatory SW Mitigation Plan Part 1 | Site summary needs to include the type of IAT crediting used. Stream restoration should only be used for a maximum of 25% of credits needed. | |
| 132 | 154 | Appendix A Table A-5 | Appendix C Compensatory SW Mitigation Plan Part 1 | Table should reflect only Phase I south. Sites further than 1500' outside of the LOD should be eliminated. | |
| 133 | 155 | Appendix A Table A-5 | Appendix C Compensatory SW Mitigation Plan Part 1 | Although the document states that parkland sites were removed, it appears that multiple park sites still remain on this list. Any sites will have to be vetted by Park staff prior to use and have all approvals/permissions issued prior to construction. To date no permissions have been granted or LODs approved for use of any Parkland for SWM compensatory mitigation. Parks are willing to work with the project team on good quality opportunities and coordinate accordingly as needed, but need to be a part of the decision making and approval process. | |
| 134 | 156 | Appendix B Page C | Appendix C Compensatory SW Mitigation Plan Part 1 | All park sites will need to be evaluated by Parks Cultural Resources staff. | |
| 135 | 157 | Appendix C Page C | Appendix C Compensatory SW Mitigation Plan Part 1 | Forest impacts in Parkland will also require Park mitigation. | |
| 136 | 158 | Appendix D | Appendix C Compensatory SW Mitigation Plan Part 2 | Should reflect only Phase I south. Sites further than 1500' outside of the LOD should be eliminated. | |
| 137 | 159 | Appendix E | Appendix C Compensatory SW Mitigation Plan Part 2 | Should reflect only Phase I south. Sites further than 1500' outside of the LOD should be eliminated. | |
| 138 | 160 | Appendix F | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south. Sites further than 1500' outside of the LOD should be eliminated. | |
| 139 | 161 | Appendix G | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south. Sites further than 1500' outside of the LOD should be eliminated. | |
| 140 | 162 | Appendix G Page G-1 last paragraph | Appendix C Compensatory SW Mitigation Plan Part 3 | Parkland use may also require Parkland mitigation. Parkland use shall require coordination with and approval by Parks. | |
| 141 | 163 | Appendix H | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south. Sites further than 1500' outside of the LOD should be eliminated. | |

| I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021 | | | | | |
|---|---|---|---|---|---|
| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 142 | 164 | Appendix H Page H-1 Section 2 | Appendix C Compensatory SW Mitigation Plan Part 3 | Although the document states that parkland sites were removed, it appears that multiple park sites still remain on this list. Any sites will have to be vetted by Park staff prior to use and have all approvals/permissions issued prior to construction. To date no permissions have been granted or LODs approved for use of any Parkland for SWM compensatory mitigation. Parks are willing to work with the project team on good quality opportunities and coordinate accordingly as needed but need to be a part of the decision making and approval process. | |
| 143 | 165 | Appendix H Page H-1/2 Table H-1 | Appendix C Compensatory SW Mitigation Plan Part 3 | Any Montgomery Parks sites will have to be vetted by Park staff prior to use and have all approvals/permissions issued prior to construction. To date no permissions have been granted or LODs approved for use of any specific Parkland for SWM compensatory mitigation. Parks are ready to work with the project team on good quality opportunities to effectively treat stormwater on Parkland and be a partner in lessening the effects of this roadway on downstream waterways. | |
| 144 | 166 | Appendix H Table H-2 | Appendix C Compensatory SW Mitigation Plan Part 3 | Any Montgomery Parks sites will have to be vetted by Park staff prior to use and have all approvals/permissions issued prior to construction. To date no permissions have been granted or LODs approved for use of any specific Parkland for SWM compensatory mitigation. Parks are ready to work with the project team on good quality opportunities to effectively treat stormwater on Parkland and be a partner in lessening the effects of this roadway on downstream waterways. | |
| 145 | 167 | Appendix I | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south. Sites further than 1500' outside of the LOD should be eliminated. | |
| 146 | 168 | Appendix J | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south. Sites further than 1500' outside of the LOD should be eliminated. | |
| 147 | 169 | Appendix J | Appendix C Compensatory SW Mitigation Plan | Electronic utility information is available from most utility owners and could have better informed of this investigation. | |
| 148 | 170 | Appendix K | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south. Sites further than 1500' outside of the LOD should be eliminated. | |
| 149 | 171 | Appendix M | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south. Sites further than 1500' outside of the LOD should be eliminated. | |
| 150 | 172 | Appendix L | Appendix C Compensatory SW Mitigation Plan Part 3 | Should reflect only Phase I south. Sites further than 1500' outside of the LOD should be eliminated. | |
| 151 | 173 | Appendix L Map 25 Site WAS 4457 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC and WSSC is needed for approval of use of this site. LOD not approved. | |

Page 21

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 152 | 174 | Appendix L Map 36 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | |
| 153 | 175 | Appendix L Map 38 WAS 4038 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | |
| 154 | 176 | Appendix L Map 40 MPOC_C08 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | |
| 155 | 177 | Appendix L Map 101 MPAO_0022-Backup | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | |
| 156 | 178 | Appendix L Map 106 WAS-2505 & WAS-2506 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | |
| 157 | 179 | Appendix L Map 108 MO_0029 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | |
| 158 | 180 | Appendix L Map 113 all sites | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | |
| 159 | 181 | Appendix L Map 136 MO_00018 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | |
| 160 | 182 | Appendix L Map 186 MPAO_0014 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | |
| 161 | 183 | Appendix L Map 208 SSS-150023 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | |
| 162 | 184 | Appendix L Map 210 MPOC_C09 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | |
| 163 | 185 | Appendix L Map 211 MO_00047A | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | |
| 164 | 186 | Appendix L Map 212 WAS_5308 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | |
| 165 | 187 | Appendix L Map 213 MPAO_0015 | Appendix C Compensatory SW Mitigation Plan | Coordination with M-NCPPC is needed for approval of use of this site.  LOD not approved. | |

00022131

## I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 166 | 188 | Page 4-27 | Chapter 4 4.6.3 Environmental Consequences | Noise/visual barrier should be pursued for all areas of parkland. Parks expectation that any areas shown with retaining wall adjacent to parkland within Phase 1 South, should also incorporate noise wall/visual barrier. In addition to the noise/visual barriers requires landscape plantings adjacent to all wall/barrier locations, include planting of specifically designed vegetative buffers. This would consist of plantings at least 5m wide with a diverse type of woody plants planted at a higher density. As far as the Visual Screening Options memo, Parks would like some discussion about the construction techniques and minimum footprints required to construct Timber Noise Barriers and Concrete Noise Barriers in conjunction with/on top of retaining walls. The LOD construction offset to the proposed retaining walls is shown in the most recent plans at approx. 15', Parks needs to understand any additional impacts being incurred as a result of adding this element to the design. Parks could be open to a combination of timber and concrete noise barriers along all parkland and would want to work with them to identify what is most appropriate in each area and look at heights that would be meaningful. | |
| 167 | 189 | Map 8 | Environmental Resource Mapping Appx D | Add noise wall STA 192+50 to 197+00 on west side and 195+00 to 220+00 on east side. | |
| 168 | 190 | Map 9 | Environmental Resource Mapping Appx D | Add noise wall STA 203+00 to 220+00 and along River Road on east side. | |
| 169 | 191 | Map 23 | Environmental Resource Mapping Appx D | Add noise wall STA 3683+00 to 3680+00 along east side and STA 3684+00 to 3669+00. | |
| 170 | 192 | Map 23 | Environmental Resource Mapping Appx D | Add noise wall STA 3669+00 to 3619+00 on west side. | |
| 171 | 193 | Page 4-10 | Section 4.4.3 3 b | Parks does not recognize any NCPC authority over the Cabin John Regional Park or Cabin John SVU2. SHA and NCPC will have to provide clear documentation that those parks were purchased with Capper-Cramton funds. | |
| 172 | 194 | Page 4-55 | Chapter 4 Section 4.11.4 | M-NCPPC expects E&S measures beyond what is required to protect aquatic resources on park land | |
| 173 | 195 | Page 4-57 | Chapter 4 Section 4.12.3 | SHA is considering the impact area of the preferred alternative to have been significantly reduced, this implies that the rest of the alignment outside of Phase 1 should be clearly labeled as "no build" and any future improvements would require a new NEPA process. | |
| 174 | 196 | Page 4-57 | Chapter 4 Section 4.12.3 | Indirect impacts to wetlands and waterways should be mitigated for by the construction of environmental stewardship projects design to enhance and protect the environment. | |
| 175 | 197 | Page 4-63 to 4-72 | Chapter 4 Section 4.13 | Parks requires further coordination for the impacts to wetlands and waterways on parkland as listed in table 4-24, 4-26 and 4-27. | |

00022132

## I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 176 | 198 | Page 4-63 to 4-72 | Chapter 4 Section 4.13 | Parks requires further coordination for the impacts for forest impacts on parkland and potential mitigation. | |
| 177 | 199 | Page 4-71 | Chapter 4 Section 4.13.3 | Parks requires further coordination for the increase in impervious areas, 98.2 acres of impervious added to Cabin John Creek watershed and other impacts listed in Table 4-28. Discuss BMPs being employed and long-term water quality impacts.  SHA should commit to environmental stewardship projects in the watershed that are above and beyond required stormwater management and 404 mitigation. | |
| 178 | 200 | Page 4-71 | Chapter 4 Section 4.13.4 | Parks requires further coordination for avoidance and minimization through design and construction. Work to coordinate retention and addition of riparian buffers as well as aquatic passage through structures. Retain floodplain access and preserve existing stream buffers. Increase SWM techniques to improve water quality. | |
| 179 | 201 | Page 4-73 | Chapter 4 Section 4.14.4 | The project needs to commit to significantly improving the Provided ESD surface area to a minimum of 80% of the Required ESD onsite (allowing for a maximum of 20% to be treated with the use of compensatory SWM mitigation offsite). These highways can be considered the worst water quality offenders in the County and the Project needs to take more responsibility for protecting the downstream water resources, which will never be improved if we don't take the appropriate steps as part of this project. | |
| 180 | 202 | Page 4-75 | Chapter 4 Section 4.15.3 | Parks requires further coordination for culvert augmentations and floodplain encroachments on Parkland to reduce impacts to hydrologic function and wildlife habitat. | |
| 181 | 203 | Page 4-76 | Chapter 4 Section 4.16.2 | Further coordination on impacts to forested areas on Parkland, including impacts FIDS habitat species and NNI treatment. Coordinate reforestation on and offsite. SDEIS lists 9.5 acres of potential tree planting opportunities on M-NCPPC Parkland. | |
| 182 | 204 | Page 4-82 | Chapter 4 Section 4.18.2 | Indirect impacts to wetlands and waterways should be mitigated for by the construction of environmental stewardship projects design to enhance and protect the environment. | |
| 183 | 205 | Page ES-11 | Section ES | This table notes that there are 2 historic properties where the adverse effect cannot yet be determined. It should also note that there are a number of outstanding evaluations to determine if properties are eligible for the NR or not. The total number of Historic Properties is not yet determined, nor is the adverse effect on them. | |

00022133

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 184 | 206 | Page 4-4 | Section Table 4-1 | Same as above. | |
| 185 | 207 | Page 4-25 | Section 106 Consul: | SDEIS states two archaeological sites were identified on BARC in Montgomery County. BARC is in PG County, not Montgomery. | |
| 186 | 208 | Page 4-28 | Section Archaeological Resources | Same as above – BARC and sites 18PR113 and 18PR1190 are in PG County, based on the site forms in MHT's MEDUSA system. | |
| 187 | 209 | | General | We reiterate our ongoing concern that the DEIS is being reviewed before all the potential Historic Properties have been fully evaluated under Section 106 of NHPA and without a clear understanding of the number and kind of Historic Properties within the APE. This work is also happening before the Programmatic Agreement is finalized and the preferred APE is clearly defined. The project impacts to Historic Properties are currently not fully known. | |
| Comments from MNCPPC_3_MCPlanning_SDEIS_8.19.21 | | | | | |
| 1 | 1 | | General | **TTIs for Managed Lanes:** TTI results are not presented for the managed lanes in any of the documentation. Please provide this information. We assume that it is typically better than either the No Build or the Preferred Alternative. It would be useful to know where the managed lanes will be more heavily used/constrained along the facility. | |
| 2 | 2 | | ES-11 and Chapter 3 | **Generalization/Overstatements on Project Benefit:** The paragraph summarizing the Preferred Alternative's Transportation & Traffic conditions states that the Preferred Alternative will ""increase speeds, improve reliability, and reduce travel times and delays."" In reviewing the Chapter 3 (Transportation & Traffic), however, there appear to be multiple segments where this will not be the case. It appears to be inaccurate to make this assertion without further detail and refinement. | |
| 3 | 3 | ES-11 | | **Need for More Environmental Metrics:** Table ES-1 should include additional environmental metrics, such as those pertaining to air quality & emissions, indirect impacts of how this project may enable environmentally damaging development patterns, how this project may erode Non-Auto Drive Mode Share efforts, and impacts to VMT. | |
| 4 | 4 | | Section 3.1.4 | **Effects of Covid-19:** It may be helpful to include a line on the COVID Traffic impacts graph in the SDEIS that shows where trending traffic growth would have been expected to be were the pandemic not to have occurred. Even if traffic were to return to the 0% mark on this graph, there remains a year and a half of lost traffic growth that would have extended the ""normal target"" above the 0% line. This also does not capture that the timing and nature of trips has shifted during the pandemic. | |
| 5 | 5 | | Section 2.3.7 & 2.4 | Where BRT facilities are master planned, please include BRT facilities across the 270 and 495 corridors at interchanges. | |

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 6 | 6 | | Chapter 3 | **Ramp Operational Analyses:** For this section and in general, have operational analyses been performed for the interchange ramps and ramp terminal intersections on the interchange cross streets? Section 3.3.6 provides information about overall network delay to the local roadway network, but there is language about some increased delays around managed lane entrance points on the cross streets. Were just the ramps and ramp terminal intersections modeled, or did the model continue on either side of the interchange to get a clearer representation of these cross street operations in the vicinities of interchanges? We want to be sure that operational benefits to the freeway system do no result in operational failures or safety concerns on the ramps or cross streets, so it would be beneficial to have an idea of any localized issues as well. | |
| 7 | 7 | | Section 3.3 | **AADT Increases with Proposed Project:** Table 3-3 shows 2045 Build Traffic. The Build alternatives show AOTs that are higher than No-Build.  It may be helpful to discuss this growth in the context of induced demand and diverted trips: are these additional trips new trips? Are they trips that were occurring at different times, or that were using different routes? Are trips that have shifted from non-auto modes? All these trip types need to quantified to fairly understand how the proposed project is changing mode choice and travel characteristics. | |
| 8 | 8 | | Section 3.3 | **Travel Speeds:** While this section alludes to more detailed travel speed information in Appendix A, it may be helpful to provide a general note highlighting any significant speed benefits or impedances experienced on a segment level, which may be watered down by taking an average of a much longer corridor. | |
| 9 | 9 | | Section 3.3.2 | **System-Wide Delay:** The Delay metric appears to combine both General Purpose and Managed Lanes. As such, this is not a particularly useful metric. | |
| 10 | 10 | | Section 3.3.3 | **Worsening of General Purpose Lanes:** This project claims to improve traffic, but the project's analysis finds that in there are significant segments where the General Purpose lanes worsen significantly as compared to No Build conditions. Does MDOT accept degraded performance of the General Purpose lanes in the interest of providing priced managed lanes? Penalizing current users of these roads does not seem to be consistent with the stated policy objectives of this program.  If MDOT does accept this outcome, it is imperative that equity be considered, and actions be incorporated into the project to address the needs of users that are most adversely impacted. | |
| 11 | 11 | | Section 3.3.3 | **Project Purpose and Need and Proposed Project:** The project's Purpose & Need includes creating new options for users, but the Preferred Alternative instead appear to reduce options available to users unable to afford or otherwise access the managed lanes | |
| 12 | 12 | | Section 3.3.5 | **Level of Service Metric:** The Level of Service metric appears to combine both General Purpose and Managed Lanes. As such, this is not a particularly useful metric.<br><br>The aggregate nature of this metric may allow the effects of the managed lanes or the general purpose lanes to be over representative, and we urge that this metric account separately for managed lanes and general purpose lanes. | |

00022135

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 13 | 13 | | General | **I-270 ICMS Project:** The ICMS document stated that there would be transportation benefits from their proposed actions up to 2040 and beyond. Given that this was a $100M investment from the state, how much of those improvements will actually contribute to alleviating the 2045 No Build condition? How much of the Preferred Alternative actually removes or significantly modifies the improvements spent on the ICMS project? Clearly, given the abrupt decision of the MDOT SHA design team to re-design the build alternatives on I-270 mid-stream to eliminate the express/local lane system, why was this not considered in the ICMS project? In hindsight, this appears to be a very shortsighted, short-term decision that will never achieve the cost-benefit ratios projected. | |
| 14 | 14 | | Section 4.1 | This section should include information on how this project will affect land use & zoning beyond the immediate impacts of the project. This includes a focus on how this may affect environmentally damaging development patterns and efforts toward Non-Auto Driver Mode Share (NADMS) goals. | |
| 15 | 15 | | Section 4.8.1 | This page includes the following statement: "Because the new Preferred Alternative, Alternative 9: Phase 1 South, includes no action for the majority of the study area, the affected network was updated to focus on just those segments near the project area..." This does not appear to be an appropriate assumption, as the Transportation & Traffic chapter demonstrates that the Preferred Alternative will have increased vehicle volumes throughout the entire study area, and additional congestion in multiple segments within the study area. These impacts must be included for a complete analysis. It is also unclear whether local roadways have been included in this analysis, particularly noting the lack of Transportation & Traffic information on these same roadways. | |

| I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021 | | | | | |
|---|---|---|---|---|---|
| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 16 | 16 | | Section 4.8.1 | **GHG Emissions:** This page includes the following statement: "GHG emissions on the affected transportation network for all modeled Build Alternatives in the DEIS are projected to be lower in the opening (2025) and design (2040) years compared to base year conditions. All Build Alternatives are projected to slightly increase annual tailpipe GHG emissions by an average of 1.4 percent compared to the No Build Alternative in 2040."<br><br>First, it sounds like the 1st sentence says this will have lower emissions, but the 2nd sentence says this will have higher emissions. How do these differ? is it that the 1st sentence appears to account for *all* GHG emissions, and the 2nd sentence appears to focus only on tailpipe GHG emissions? More detail is needed.<br><br>Second, if this is asserting that the project will reduce emissions: much more detail is needed on methodology and assumptions, as this result seems counterintuitive given that the project is increasing vehicle volumes and VMT. Noting the State's interest in Electric Vehicles: if electric vehicles are a substantive part of this reduction, it will be important to account for the impacts of the electric vehicles themselves.<br><br>Electric vehicles have substantial impacts:<br>- Extracting the resources needed for their production (particularly their batteries)<br>- Impacts of production<br>- Energy requirements, which at present is generated through unsustainable & polluting sources<br>- Severely impactful waste issues (again largely due to the batteries)<br>- EVs are still vehicles: they demand pavements (concrete and asphalt; both depend on highly impactful cement and petroleum production) and pose safety | |
| 17 | 17 | Table 3-9, page 3-12 | Section 3.3.4 | **Percent of Lane-Miles Operating at LOS F:** Do these results include the managed lane-miles or just the general-purpose lane-miles? if it includes the managed lanes, we request that this section be modified to also provide a comparison of percent lane-miles between the No Build and the Preferred Alternative in the General-Purpose Lanes only. | |

00022137

## I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
|  | Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | |
| 18 | 18 | Page 3-12 (Data obtained from Appendix A, Attachment: F Link Evaluation Results) | Section 3.3.4 | **I-495 east of I-270 LOS F conditions:** It is stated that "29 percent of the lane miles would continue to operate at LOS F in the design year of 2045 under the Preferred Alternative, primarily in areas along I-495 east of the I-270 east spur that would have no action." This statement does not seem accurate, as AM peak hour conditions will grow considerably worse overall in certain sections of I-495 due to the proposed project. The localized summary of impacts has not been presented in Table 3-9 or anywhere in the SDEIS.

Between MD 355 (I-270 East Spur) and I-95, there are 52 Inner Loop analysis segments totaling 8.8 miles. During the 2045 AM Peak Hour, 20 of these segments (3.4 miles or 39 percent of this section of I-495) operate at LOS F in the No Build Condition, but 46 segments (8.28 miles or 94 percent of this section of I-495) operate at LOS F with the Preferred Alternative in place. Clearly, neither the Chapter 3 presentation nor Appendix A provides any of this fine-grained analysis or conclusions. The data in Attachment F had to be combed through to discover this significant impact. This evaluation should be enhanced to look at discrete sections of I-270 and I-495 where significant congestion effects should be noted, acknowledged, and considered for mitigation through modification of the proposed project by design element changes or toll strategy modifications. This degradation seems to be a significant impact of the proposed project, but it has been overlooked using a simplistic and abbreviated summary of LOS F conditions. Frankly, an over-simplification of analysis results is not isolated to this one example. To often, EISs in the interest of brevity, shorten presentations so much to the point where any significant conclusions are not discernable to the average reader. The DEIS chapters are intended to lay out the **significant impacts** with more detail provided in Appendices. This document misses this on LOS F, and many of the other transportation metrics studied | |
| 19 | 19 | Page 3-9 | Section 3.3 (page 9 of 16) | **2045 Inner Loop PM Peak Hour VISSIM Travel Speed in the Managed Lanes:** During the PM peak hour, the route from the GW Parkway to the I-270 West Spur is projected to take only 4.2 minutes for a 4.3-mile section of road (61 mph), not the 23 mph reported in Table 3-5. The 4.2-minute travel time was obtained from Appendix A - Attachment D – Travel Time Matrices for the ETL (PM Peak Hour). There must be an error in one of these travel time/speed measurements as they do not match. | |
| 20 | 20 | Page 3-11 | Section 3.3.3 | **Table 3-8 – TTI Results for General Purpose Lanes:** The preferred alternative appears to cause a significant congestion effect on one area outside the project limits, specifically during the 2045 AM peak hour on the Inner Loop between I-270 and I-95 ("top side" of the Beltway) where the TTI increases from No Build conditions of 1.3 to 2.7 in the General Purpose Lanes (108% increase). During the 2045 PM peak hour, the Inner Loop from VA 193 to I-270 West Spur also shows a decrease from No Build conditions of 6.6 to 6.9. What is causing the reduction in non-tolled TTI in each of these sections? | |

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from M/NCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 21 | 21 | Appendix A, Page 3-11 and Appendix A, Attachment D and B | Section 3.3.3 | **2045 Inner Loop PM Peak Hours TTIs:** The TTIs for the Inner Loop PM peak hour from VA 193 to I-270 do not seem to match with travel time data provided in Appendix A, Attachment D.  Is congested TTI defined based on the posted speed limit of 55 mph or based on observations of existing off-peak speeds on that stretch of road? The travel time for this 5.1-mile segment for the managed lanes is shown as 5.3 minutes in Appendix A, Attachment D (page 133 of 184). This equates to an average speed of 58 mph. What is the TTI in the Managed Lanes through this same section? As an example, could you provide the TTI calculations for this segment for Alt 1, GP lanes and the Managed Lanes? | |
| 22 | 22 | Attachment D and B | Appendix A | **2045 PM Peak Hour Travel Times from VA 193 to I-270 and Delay/Demand Imbalance:** Alternative 1 (No Build) has a 38.6-minute travel time and the Preferred Alternative - GP lanes has a 40.1-minute travel time. The managed lanes have a 5.3-minute travel time. The travel time differential through this section seems totally unbalanced, as a managed lane strategy should seek to achieve a much lower speed than is forecast and still operate acceptably (by reducing the toll) until a 45-mph average speed is achieved in the managed lanes. 2,535 vph is the projected Inner Loop 6-7 PM toll volume at the Alt 8 (page 101 of 184, Appendix A, Attachment B). Using MDOT SHA's vphpl lane max for a managed lane of 1700 vphpl, it appears that there is excess room in the PM Inner Loop managed lanes for an additional 865 vehicles during the highest 6-7 PM peak hour (more in the other 3 PM hours). This would represent a 13 percent reduction in volumes in the GP lanes if the toll was lowered to induce more traffic to use the managed lanes to achieve this balance. This might help to mitigate the poor GP lane conditions, so it is at least better than Alternative 1 (No Build). In general, it seems that this type of critical thinking and manual toll adjustments should have been a standard step in the toll assignment process. It is easy to diagnose, and likely can be fixed with a few iterative model runs with reduced tolls when this occurs. | |
| 23 | 23 | Page 123 | Appendix A SDEIS Traffic Evaluation Memo – Attachment C | **2045 AM Peak Hour SB I-270 Congestion:** Per the I-270 S3 Speed AM profile, peak hour speeds will be disrupted significantly on the MD 121 to Middlebrook Road segment of I-270 during the 2045 AM peak hour due to the addition of the proposed project. This is likely to seriously increase travel delay for commuters living in UpCounty Montgomery County and Frederick County. Please provide more travel time summaries for more common travel patterns, including Frederick to Rockville, Clarksburg to the GW Parkway, and Clarksburg to MD 97. Please explain why increased congestion is projected to occur many miles upstream from the project area. We anticipate that instead of this very long delay, you would continue to see worsened peak spreading into the shoulder hours during the AM commute period. This project seems to be setting up the need for Phase 1B by design. In that sense, I think it is clear that the segmentation of this project on I-270 into Phase 1A and Phase 1B was not fully thought out, as widening on Phase 1A precipitates the need for Phase 1B. From early on, the constraint at the Montgomery/Frederick County line has been identified as a major bottleneck that is more of immediate action. | |

Page 30

OP LANES
MARYLAND

I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

| | | | | | |
|---|---|---|---|---|---|
| I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021 | | | | | |
| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 24 | 24 | Page 125 | Appendix A SDEIS Traffic Evaluation Memo – Attachment C | **2045 AM Peak Hour Inner Loop Congestion in Prince George's County**: Per the I-495 Inner Loop Speed PM profile, peak hour speeds will be disrupted significantly on the US 1 to US 50 sections of the Inner Loop during the 2045 PM peak hour due to the addition of the proposed project. Please explain why this project-related impact is projected to occur in Prince George's County? | |
| 25 | 25 | | Section 3.3.1 | **Managed Lane versus General Purpose Lane Speeds**: The General Purpose lanes are projected to operate at nearly the same speed as the Managed Lanes in the segments listed below, which may affect the usefulness of the Managed Lanes. This could in-turn affect how much traffic chooses to instead remain in the General Purpose lanes, and it is unclear how this evaluated such feedback processes & whether an equilibrium was identified. This may also affect the HOT lanes' financial viability. This, in general, highlights a serious concern with how managed lane volumes were estimated.<br><br>- AM peak, 495 Outer Loop between 270 and GW Pkwy (8% faster)<br>- AM peak, 495 Inner Loop between GW Pkwy and 270 (13% faster)<br>- AM peak, NB 270 between 495 and 370 (3% faster)<br>- AM peak, SB 270 between 370 and 495 (16% faster)<br>- PM peak, 495 Outer Loop between 270 and GW Pkwy (13% faster)<br>- PM peak, SB 270 between 370 and 495 (equal speed) | |
| 26 | 26 | | Appendix D SDEIS Traffic Evaluation Memo – Attachment D Travel Time Matrix | **Review of Travel Time Projections**: A review was conducted of travel time savings using travel time projections provided in Attachment D. Note that this data is limited to the project study area, not the modeled area, so travel time data on I-270 north of I-370 was not provided. See the AM and PM peak hour tables below for typical Montgomery County O-D pairs. Expanding the attachment D data to show the entire I-270 corridor studied would have been useful. In addition, given that there appears to be some very large regional traffic shifts on I-495 between the Maryland and Virginia sides, it would be useful to see travel time data for larger segments of I-495 in Virginia (i.e., VA 193 to Tysons, Tysons to I-95, and I-95 to MD 414. Please provide similar data for the I-495 Virginia segments and more O-D travel time summaries for UpCounty Montgomery County and Frederick County commuters. | |

Page 31

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| | | | | **Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document** | |
| 27 | 27 | | Appendix D SDEIS Traffic Evaluation Memo – Attachment D Travel Time Matrix | **Impact of Managed Lanes System on General Purpose Traffic: :** Based on observation of the data reported in the tables above, here are some areas of concern:<br>1) The 2045 AM peak hour trip from the GW Parkway to MD 97 (Inner Loop) increases from Alternative 1 - No Build to Preferred Alternative General Purpose Lanes by 8.3 minutes (63 percent increase).<br>2) 2045 AM peak hour trip from MD 189 (Falls Road) to I-95 (I-270 and Inner Loop) increases by 14.3 minutes (62 percent increase).<br>3) the 2045 AM peak hour trip from MD 190 to MD 355 (Inner Loop) increases by 4.7 minutes (200% increase).<br>4) The 2045 PM peak hour trip from the GW Parkway to MD 189 (Falls Road) increases by 10 minutes (31% increase).<br>Question 1: How does MDOT SHA justify making 2045 traffic conditions worse (Alternative 1 – No Build versus the Proposed Project - GP Lanes) for the benefit of toll paying drivers for these locations? These travel time losses are being incurred by the commuting population and essentially subsidizing the cost of the managed lanes as a result. Wherever possible, the toll strategy should be adjusted to ensure that GP Lane travel times are no worse than Alternative 1 – No Build conditions. This is basic traffic impact mitigation, and this evaluation should be conducted for all locations where this impact to GP traffic is projected. Question 2: Any worsening of the General Purpose lanes to benefit Tolled Lanes presents a major equity issue that needs to be directly and substantively addressed. How will this be addressed from an equity/environmental justice lens? | |
| 28 | 28 | | Appendix D SDEIS Traffic Evaluation Memo – Attachment D Travel Time Matrix | **Travel Time Benefit of Managed Lanes for Montgomery County users:** Using the data in the previous tables, here are some areas of concern:<br>1) During the 2045 AM peak hour, none of the typical O-D patterns in Montgomery County show any benefits of using the managed lanes at all with projected travel time savings ranging from 0.3 to 1.6 minutes.<br>2) During the 2045 PM peak hour, the GW Parkway to MD 97 route shows a 39-minute travel time savings, although, this travel time savings is earned over a very short section of the Inner Loop between the GW Parkway and the I-270 west spur.<br>3) During the 2045 PM peak hour, the GW Parkway to MD 189 (Falls Road) route shows a 33-minute travel time savings; however, this is only a 23-minute net travel time savings over No Build conditions.<br>4) During the 2045 PM peak hour for all other Montgomery County patterns evaluated, the projected travel time benefits are negligible (ranging from 0.4 to 1.1 minutes).<br>Question 1 from this data: Why does this proposed project provide almost no travel time benefits for the vast majority of Montgomery County commuters? Question 2 from this data: The modeling assumptions seem suspect as a result, as most Montgomery County commuters will learn pretty quickly that the Managed Lanes have little benefit to their daily commute trip. Who are the actual projected users of these Managed Lanes? Who benefits and is that reflected in the modeling assumptions? Understanding the O-D patterns of ALB users would help to understand how these managed lanes are designed for. We recommend that select link analyses be conducted using the travel demand model in order to provide more detail and clarity. | |

Page 32

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 29 | 29 | | Appendix D SDEIS Traffic Evaluation Memo – Attachment: D Travel Time Matrix | **Travel Time Impacts on I-495 in Prince George's County:** On observation of data reported in the previous tables, the travel time on I-495 between MD 5 and MD 97 was evaluated. During the 2045 PM peak hour, a very anomalous result was found with the MD 5 to MD 97 route (Outer Loop) showing a 36-minute travel time benefit between the No Build and the Preferred Alternative. Based on 2045 PM peak hour Inner Loop results on the northeastern side of the Beltway, it appears that a dramatic regional shift is projected from traffic with an origin in Virginia and with a Maryland destination that now (and during the 2045 No Build condition) uses I-495 in Virginia crossing the Woodrow Wilson bridge. Lacking travel time data for I-495 in most of Virginia, this is speculative. Question from this review: What is causing this significant travel time savings from a regional perspective? To what extent is Prince George's County projected to benefit or projected to be impacted by a project so far away from their jurisdiction? | |
| 30 | 30 | Pages 144 and 155 | Appendix A SDEIS Traffic Evaluation Memo – Attachment F | **AM Peak Hour Bottleneck Shift to Top Side of Beltway – Level of Service:** A comparison of the link evaluation results for the I-495 Inner Loop 2045 AM Peak Hour shows how Inner Loop congestion will increase due to the addition of the proposed project. Comparing graphics on page 144 and 155, you can see the extent of congestion between the I-270 Western Spur and MD 193 caused by the project increases significantly, jamming up the entire top side of the Beltway, as more traffic is allowed to funnel into the top side of the Beltway than it can handle. This will be devastating to AM peak hour traffic conditions on the top side of the Inner Loop within most of Montgomery County during the 2045 AM peak hour. In the 2045 No Build condition, only 4 of the total 48 road segments evaluated were projected with Level of Service F conditions between the I-270 western spur and MD 193. With the preferred alternative, a total of 41 out of the total 48 road segments are projected to operate at Level of Service F conditions during the 2045 AM peak hour. | |
| 31 | 31 | Pages 147 and 159 | Appendix A SDEIS Traffic Evaluation Memo – Attachment F | **Increased Southbound Congestion at Existing I-270 Bottleneck at Montgomery/Frederick County Line:** A comparison of the link evaluation results for the I-270 SB 2045 AM Peak Hour shows how I-270 SB congestion will increase due to the addition of the proposed project. Comparing graphics on page 147 and 159, one can see the extent of congestion between four segments north of MD 121 to Middlebrook Road caused by the project. In the 2045 No Build condition, only 9 of the total 25 road segments evaluated were projected with Level of Service F conditions within this area. With the preferred alternative, a total of 24 out of the total 25 road segments are projected to operate at Level of Service F conditions during the 2045 AM peak hour. The projected worsening of traffic conditions in this section of I-270 seems to be caused by the presence of additional capacity downstream, with more drivers willing to suffer through this congestion in the Clarksburg area. Even if this results in a faster commute for some, it does increase the intensity of the existing bottleneck congestion. | |

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| | | | | **Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document** | |
| 32 | 32 | Pages 152 and 164 | Appendix A SDEIS Traffic Evaluation Memo – Attachment F | **Increased Northbound Congestion at Existing I-270 Bottleneck at Montgomery/Frederick County Line:** A comparison of the link evaluation results for the I-270 NB 2045 PM Peak Hour shows how I-270 NB congestion will increase due to the addition of the proposed project. Comparing graphics on page 152 and 164, one can see the extent of NB I-270 congestion between MD 121 to MD 85 caused by the project. In the 2045 PM peak hour No Build condition, only 7 of the total 51 road segments evaluated were projected with Level of Service F conditions within this area. With the preferred alternative, a total of 43 out of the total 51 road segments are projected to operate at Level of Service F conditions during the 2045 AM peak hour. This is clearly an example of the existing ALB bottleneck being shifted to north of the Managed Lane project terminus. | |
| 33 | 33 | Pages 148 and 160 | Appendix A SDEIS Traffic Evaluation Memo – Attachment F | **Regional Outer Loop Traffic Diversions Impact I-495 in Prince George's County:** A comparison of the link evaluation results for the I-495 Outer Loop 2045 PM Peak Hour shows how Outer Loop congestion is projected to increase due to the addition of the proposed project. Comparing graphics on page 148 and 160, one can see the extent of Outer Loop congestion between MD 5 and US 50 caused by the project, jamming up the entire southeastern side of the Beltway. In the 2045 PM peak hour No Build condition, only 11 of the total 54 road segments evaluated were projected with Level of Service F conditions between MD 5 and US 50. With the preferred alternative, a total of 41 out of the total 54 road segments are projected to operate at Level of Service F conditions during the 2045 PM peak hour. Please explain why this level of traffic congestion is projected along this segment of the Beltway, as this section of I-495 is far away from the project limits? | |
| 34 | 34 | Pages 150 and 162 | Appendix A SDEIS Traffic Evaluation Memo – Attachment F | **Regional Inner Loop Traffic Diversions Impact I-495 in Prince George's County:** A comparison of the link evaluation results for the I-495 Inner Loop 2045 PM Peak Hour shows how Inner Loop congestion is projected to increase due to the addition of the proposed project. Comparing graphics on page 150 and 162, one can see the extent of Inner Loop congestion between US Route 1 and US Route 50 caused by the project, jamming up the entire northeastern side of the Beltway. In the 2045 No Build condition, only 8 of the total 36 road segments evaluated were projected with Level of Service F conditions between US 1 and US 50. With the preferred alternative, a total of 34 out of the total 36 road segments evaluated are projected to operate at Level of Service F conditions during the 2045 PM peak hour. Please explain why this level of traffic congestion is projected along this segment of the Beltway, as this section of I-495 is far away from the project limits? | |
| 35 | 35 | Pages 152 and 164) | Appendix A SDEIS Traffic Evaluation Memo – Attachment F | **Delay increases on I-270:** With the addition of the proposed project during the 2045 PM peak hour, almost all general-purpose travel lane segments on NB I-270 between Middlebrook Road and MD 121 (21 out of 22 segments) are projected to experience increases in delay. How will the P3 contractor mitigate this project-related impact? Their profits are essentially exacerbating this congestion increase at the expense of UpCounty Montgomery County and Frederick County taxpayers. | |

00022143

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 36 | 36 | | General | **Bottleneck Issues Related to Project Design:** Most of the issues identified above clearly show impacts of relieving the congestion at the American Legion Bridge (ALB). In all cases, this does not eliminate congestion but shifts it from the ALB vicinity (McLean and Potomac) to other areas in Maryland. While some of these bottleneck shifts were expected, the degree of congestion resulting from the proposed project is severe on I-270 north of I-370, on the Inner Loop on the top side of the Beltway, and very surprisingly, on the Inner Loop in Prince George's County. More attention needs to be spent on the project design to mitigate these projected deficiencies. For I-270, a solution would be to more closely link Phase 1A and 1B so that they are constructed concurrently. For the other bottleneck issues, we are recommending the following design changes to the Preferred Alternative:<br>1) Eliminate the managed lanes from the I-270 Eastern Spur between I-270 and Old Georgetown Road,<br>2) Eliminate the managed lanes and exit/entrance ramps from I-495 between the I-270 west spur and Old Georgetown Road,<br>3) Managed lane traffic destined to and from I-495 to the east of the I-270 spur ("top side of the Beltway") would enter/exit the managed lane network at the River Road crossover interchange. It is uncertain that this crossover has adequate capacity, but this limitation is likely to help reduce the "Top Side" bottleneck discussed earlier.<br>4) I-270 Montgomery County drivers headed to the eastern spur would not use the Managed Lane network at all. Clearly, for most Montgomery County travelers, the managed lanes would provide minimal travel time benefits for drivers from Gaithersburg and Rockville to most Montgomery County destinations. | |
| 37 | 37 | | General | **Proportional highway/transit investment based on where bottleneck congestion is created by the Project:** Since this project is clearly shifting the congestion almost as much as it is actually reducing the congestion, MDOT SHA should actively plan to invest in the areas where bottleneck congestion will be created or worsened. | |

Page 35

| I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021 |
|---|---|---|---|---|---|
| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | |
| 38 | 38 | | General | **Bottleneck Congestion leads to Local Street Diversions/Congestion:** We have never been satisfied with the extremely simplistic local street evaluation presented in the DEIS and SDEIS. We are expecting to see more detail from MDOT SHA (and be included in the review process) for the Interchange Access Point Approval (IAPA) study now under development. The increased congestion on I-270 and I-495 will undoubtedly lead to both peak spreading effects and local traffic diversions that have not been adequately considered to-date. When it can take over 30 minutes (TTIs greater than 6.0) to travel 2 to 3 miles on some segments of the Beltway as presented in this SDEIS, drivers will not subject themselves to this on a daily basis, and they will seek to find the shorter travel time route, regardless of local street impact. The scope therefore agreed upon by FHWA for the IAPA (performing traffic operational analyses at ramp terminal intersections and one adjacent intersection (on both sides) beyond service interchanges that are modified by the study, when within one mile) is likely to be inadequate in areas where either I-270 or I-495 exhibits very high projected TTIs and extreme congestion. In those areas, the study area should follow all significant diversionary traffic that switches to the local road network (defined as all non-interstate roads). In the Clarksburg area, this includes many parallel roads, including MD 355, MD 28, Thurston Road, State Quarry Road, and Price's Distillery Road. Along the Beltway, any parallel road or road that crosses I-495 may be the recipient of significant diversion traffic depending on location of projected congestion. This includes Seven Locks Road, Burdette Road, and Democracy Boulevard. The study area can be determined by adding parallel routes with travel times equal to the GP lanes travel time. | |
| 39 | 39 | | General | **Need for Improved Performance Data for I-270 north of I-370:** All of the evaluation material in Chapter 3 does not report comparable transportation performance metrics (travel time, delay, Level of Service, TTI) within the I-270 modeled area to the north of I-370 where the proposed action may create congestion. Without this information, it is difficult to determine travel time and delay for commuters living north of I-370, including Germantown, Clarksburg, and Frederick County residents. From a review of the link evaluation results presented in Appendix A, Attachment F, it is clear that I-270 to the north of I-370 will experience greater congestion with the proposed project. This was demonstrated in Attachment F mentioned in Comments 14 and 15 above. Please provide more detailed performance metrics for I-270 to the north of I-370 so that the full transportation effects of this bottleneck condition can be assessed. | |

## I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| | | | | **Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document** | |
| 40 | 40 | | General | **Lack of Feedback Loop in Modeling Process – Assumptions versus Results:** While we recognize that simplistic assumptions are often needed to evaluate transportation projects, the tolling assumptions with Managed Lanes do not mesh with the travel demand shown using the managed lanes versus the travel time benefit provided. Unfortunately, there is no information provided to validate the validity of the managed lane use assumptions. When large portions of the managed lanes show little to no travel time benefit, who is using the managed lanes and what percent of the driving population do they represent? Are the estimates used reasonable? What are the origins and destinations of these managed lane users? They can't be most local Montgomery County trips, as preceding comments in this submission clearly show pretty clearly that most typical O-D commuting pairs within the County have little use or benefit from the managed lanes. | |
| 41 | 41 | | General | **Percent of Total Demand Using Managed Lanes:** A review was conducted of the peak hour travel demand presented in Appendix A - Attachments A (Peak Period Volumes) and Attachment B (Travel Demand Tables). Link demand on each segment of I-495 and I-270 within the project area was projected. Based on this review, the percent of total demand using the managed lanes over the four-hour commuting periods are shown in the following four tables: I-270 AM, I-270 PM, I-495 AM, and I-495 PM. For each, managed lane demand varied by hour between 6 and 10 AM and between 3 and 7 PM. Questions related to these tables are provided in following comments. | |
| 42 | 42 | | Appendix A Attachments A and B | **Percentage of total demand using managed lanes on I-270 Western Spur During the AM Peak hours:** Between 27 and 39 percent of total demand uses the Managed Lanes on Southbound I-270 approaching I-495 during the AM peak hours. This entire travel path only shows a 2.5-minute savings using the Managed Lanes along its 14-mile tolled length. Between 42 and 52 percent of total demand uses the Managed Lanes on Northbound I-270 just north of I-495 during the AM peak hours. This entire path only shows a 1.3-minute travel time savings over its 14-mile tolled length. How are the percent demand achieved using the managed lanes possible if the travel time benefit is so small (in other words, why pay when it is not worth the cost)? | |
| 43 | 43 | | Appendix A Attachments A and B | **Percentage of total demand using managed lanes on I-270 Western Spur During the PM Peak hours:** Between 42 and 45 percent of total demand uses the Managed Lanes on Southbound I-270 approaching I-495 during the PM peak hours. This entire travel path only shows a 1.3-minute savings using the Managed Lanes along its 14-mile tolled length. Between 39 and 41 percent of total demand uses the Managed Lanes on Northbound I-270 just north of I-495 during the PM peak hours. This entire path shows a 38-minute travel time savings over its 14-mile tolled length. Again, the demand allocated to the managed lanes and the methodology for this is questioned. There are just too many inconsistencies between demand and travel time benefits. | |

OP·LANES™
MARYLAND
I-495 & I-270 Managed Lanes Study

| I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021 | | | | | |
|---|---|---|---|---|---|
| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 44 | 44 | | Modeling Process | **Modeling process detailed in DEIS Traffic Technical Report:** Validation versus travel time benefits: Recognizing that there was some iterative modeling adjustments used to achieve ≥ 45 mph average travel speed or higher and keep the maximum lane volume in the 1600-1700 vehicles per hour range in the Managed Lanes, shouldn't there have also been an iterative process to adjust modeling adjustments based on some screenline O-D pair travel time assessments? For example, for the demand volume estimated to travel between I-370 and the ALB, does the actual travel time benefit and cost paid to achieve that benefit mesh with measured managed lane toll rates and cost per mile or cost per minute saved used across the country on similar managed lane facilities now in operation? | |
| 45 | 45 | Page 99 of 84 | Appendix A, Attachment B | **2045 PM Peak Hour Inner Loop Volumes:** The hourly volumes presented in Attachments B and D do not match. The table below shows a summary for the 2045 PM Peak Hour Inner Loop GP Lane Volumes. Please explain this discrepancy. It appears that this discrepancy is not isolated to these three sections. | |
| 46 | 46 | Page 2-23 | | **Bike lane definition.** Separated bike lanes do not have to be located "on-street" as stated in the "Bike lane" definition. Per the Montgomery County Bicycle Master Plan, separated bike lanes "are exclusive bikeways that combine the user experience of a sidewalk with the on-street infrastructure of a conventional bike lane. They are physically separated from motor vehicle traffic and distinct from the sidewalk. They operate one-way or two-way." | |
| 47 | 47 | Page 2-23 | | **Pedestrian and Bicycle Facilities:** The SDEIS is inconsistent with the "Design Recommendation / Implication" identified in the "MLS Existing Bridge Inventory_Montgomery Ped-Bike Facilities_12-11-2020_All.pdf" document. Specifically, the SDEIS states: "The preliminary design approach for facilities along crossroads where the crossroad bridge would be reconstructed is to replace, upgrade or provide new pedestrian/bicycle facilities consistent with the master plan, where adjacent connections on either side of the bridge currently exist." However, the "Design Recommendation" included in the "MLS Existing Bridge Inventory_Montgomery Ped-Bike Facilities_12-11-2020_All.pdf" document recommended that the project add pedestrian and bicycle facility on most crossroads regardless of whether adjacent connections on either side of the bridge currently exist. Please remove: "The preliminary design approach for facilities along crossroads where the crossroad bridge would be reconstructed is to replace, upgrade or provide new pedestrian/bicycle facilities consistent with the master plan, where adjacent connections on either side of the bridge currently exist." as it conflicts with previous agreements. | |
| 48 | 48 | Page 2-23 | | Add a statement to the last paragraph that expresses this sentiment: "Where the I-495 and I-270 mainline or ramps cross under a roadway or pedestrian/bicycle facility and the bridge would be replaced, the cross road bridge would construct pedestrian and bicycle facilities over the structure." | |
| 49 | 49 | Page 2-23 | | **Pedestrian and Bicycle Facilities:** Identify the pedestrian and bicycle facilities to be constructed by the project and the pedestrian and bicycle facilities to be accommodated by the project based on the "MLS Existing Bridge Inventory_Montgomery Ped-Bike Facilities_12-11-2020_All.pdf" document. | |

Page 38

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| | | | | **Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document** | |
| 50 | 50 | Page 2-23 | | **Design Parameters**: Indicate that pedestrian and bicycle facilities will be designed in accordance with Montgomery County's Complete Streets Design Guide and Montgomery's Planning Bicycle Master Plan Facility Design Toolkit | |
| 51 | 51 | Page 2-27 | | **Enhancements**: "Lengthening the I-270 bridge over Tuckerman Lane to accommodate future pedestrian/bicycle facilities along Tuckerman Lane" should be identified as an enhancement, as it appears to meet the conditions at the bottom of page 2-23. | |
| 52 | 52 | Page 4-33 | Section 4.7.3 | Archaeological investigations at the Poor Farm Cemetery site remain deferred. This has prevented adequate consideration of the effects to this site in the DEIS and SDEIS and under Section 4F. | |
| 53 | 53 | Pages 4-79-82 | Section 4.2.1 | The SDEIS environmental justice discussion should incorporate findings from the May 2021 technical report about Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M:35-212). This report provides detailed historical background about the cemetery and the historical African American community along Seven Locks road that was displaced by the original construction along the beltway. Construction was routed through the middle of the community leaving the church and fraternal hall and cemetery on opposite sides of the highway. Archaeological survey showed that the cemetery is larger in extent and closer to the ROW and LOD than understood at the time of the DEIS. This new information highlights the vulnerability of the church and cemetery to the managed lanes project and should be discussed in the Environmental Justice and Cumulative Impacts sections of the SDEIS.<br><br>The DEIS identifies the Morningstar Tabernacle No. 88 Moses Hall and Cemetery and the Poor Farm Cemetery as sites that may be culturally significant in its Community and Environmental Justice Analysis. However, the Environmental Justice discussion concerns itself primarily with current minority population concentrations and does not address historical and ongoing injustice to small African American communities displaced by construction of the beltway and further threatened by the proposed expansion. This issue was explicitly acknowledged as related to social justice by the National Trust for Historic Preservation in their selection of the Moses cemetery as one of the 11 most endangered historic sites in America in 2021. This listing and the environmental justice issues raised by it should be acknowledged and discussed in the SDEIS.<br><br>Likewise, environmental justice issues are mentioned with respect to the Poor Farm Cemetery site in the DEIS. This site contains the remains of an unknown number of individuals, many of them African American. African American burial sites have frequently suffered from inadequate consideration during | |

Page 39

## I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | | | | | |
| 54 | 54 | Pages 4-82-83 | Section 4.22 | Neither the DEIS nor the SDEIS reference any cumulative effects to specific cultural resources. Additional historical research conducted subsequent to the DEIS in Cabin John related to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery and associated Gibson Grove community show that the construction of the beltway separated the fraternal hall and cemetery from the neighboring church, physically fragmented the community and contributed to the decline of these institutions. The community's decline in turn contributed to the closure and loss to fire of the Moses fraternal hall.

Zoning limitations on the church parcel arising from the proximity of the beltway have significantly delayed repair and rehabilitation of the church following a fire in the mid-2000s. The initial construction of the Beltway resulted in an oddly-shaped parcel and this has made it challenging for the property owners to move new construction permitting through zoning reviews. These cumulative delays to the rehabilitation, created in part from the Beltway's construction, should be accounted as part of the DEIS review of cumulative impacts.

The descendant community continues in the area, but the remaining cultural institutions are threatened by the proposed expansion of the Beltway. | |
| 55 | 55 | | 4(f) | Archaeological investigations at the Poor Farm Cemetery site remain deferred, thus it has not been evaluated for eligibility to the National Register of Historic Places. This has prevented the site from being discussed as a historic site under the Section 4(f) analysis in the DEIS and SDEIS. | |
| 56 | 56 | | 4(f) | The 4F evaluation does not take into account those portions of the Moses Hall and Cemetery that already exist within the footprint and right of way of the existing Beltway. Recent land records research and other information provided demonstrates evidence for this and because there has not been a final boundary determination, it cannot yet be ruled out of the analysis. Therefore the Permanent Impact cannot be avoided under any scenario and should account for acreage already within the footprint of the current Beltway. Additionally, the construction of a noise barrier should not be taken as the de facto solution for noise abatement at this property. Avoiding the use associated with the retaining wall requires additional study of potential mitigation efforts such as quiet pavement technology or additional roadway designs. Until those solutions have been demonstrated as infeasible, they must be explored to avoid the adverse effects and the required use of the property for the retaining walls under 4F. | |

00022149

**I-495 & I-270 Managed Lanes Study- Draft Supplemental Draft Environmental Impact Statement (SDEIS) M-NCPPC Comment/Response Errata- November 29, 2021**

| MNCPPC Ref Doc_# | No. | Page | SDEIS Section | Comment | Revised comments where applicable |
|---|---|---|---|---|---|
| | | | | Comments from MNCPPC_1_SDEIS Major Issues_9.19.21 document | |
| 57 | 57 | | 4(f) | Additional use of the Gibson Grove Church site in order to minimize impacts to the Moses Hall Cemetery must be avoided. As noted above, Section 4F requires avoidance of these uses unless other alternatives are demonstrated to be infeasible and contrary to the purpose and use of the undertaking. There have been no design or schematic drawings shown to date that have demonstrated that alternatives were considered. Further impacts to the Gibson Grove Church, an historic resource that has already suffered cumulative adverse effects from the first Beltway construction, should not be accepted as a 4F alternative to avoid impacts to Moses Hall. Other design solutions must be evaluated. | |
| 58 | 58 | | 4(f) | As noted above, 4F uses and impacts to the Carderock Springs Historic District from retaining walls and design changes meant to protect Gibson Grove and the Moses Hall Cemetery do not include any evaluation of design alternatives for review.                         This all calls into question what exactly they are doing. If all 3 of these resources are suffering from 4F uses and encroachments to protect each other, but they are all having adverse effects, what is being achieved here? We are all in the dark without a chance to sit at the table and design this all out as a group. It is unacceptable under 4F. 4F requires avoidance, different from Section 106. Only if the 'use' of the property is DEMONSTRATED that it cannot be avoided, then it can be done, but there must be discussion and consideration of the options. | |
| 59 | 59 | | Chapter 3 | Provide an O-D Matrix of travel times for the No-Build, Managed and General Purpose lanes for each access point along I-270 and I-495 (with accompanying narrative, as needed). This will help better understand flows, identify specifically failing pairings, and better tailor responses to these needs. This is especially important considering it is our understanding that many/most trips along these facilities are relatively short in nature, using the interstate for only a few interchanges. Therefore longer & larger systemic effects may be of less utility to actual users. | |



THE MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION
6611 Kenilworth Avenue · Riverdale, Maryland 20737

November 30, 2021

Jeanette Mar
Environmental Program Manager
U.S. Department of Transportation
Federal Highway Administration
Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza
Suite 1520
Baltimore, MD 21201

Tim Smith
Administrator
Maryland Department of Transportation
State Highway Administration
Mailstop C-400
MDOT State Highway Administration
PO Box 717
Baltimore, MD 21203-0717

Re:    I-495 & I-270 Managed Lanes Study – Supplemental Draft Environmental Impact
       Statement

Dear Ms. Mar and Mr. Smith:

The Maryland-National Capital Park and Planning Commission ("M-NCPPC" or "the Commission") submits the following comments, along with the attached and incorporated by reference Comment Response Table, regarding the Supplemental Draft Environmental Impact Statement ("SDEIS") prepared by the Maryland Department of Transportation State Highway Administration ("MDOT SHA") and the Federal Highway Administration ("FHWA") (collectively the "Lead Agencies") for the I-495 & I-270 Managed Lanes Study (the "Project"). Through this letter, the Commission shares its concerns with the Lead Agencies' updated analysis underpinning the SDEIS, including, among others, concerns resulting from the limited scope of the Project's current National Environmental Policy Act ("NEPA") analysis, potential impacts to protected parkland and natural resources subject to M-NCPPC's jurisdiction, equity and cultural considerations, transportation and local roadway impacts, and generally inadequate mitigation measures. Although the Lead Agencies narrowed the scope of their preferred alternative (the "Preferred Alternative") in response to comments to the Draft Environmental Impact Statement

---

Jeannette Mar & Tim Smith
November 30, 2021
Page 2

("DEIS"), significant issues remain that require further review and potential adjustments to the Project's planning and design, along with commitments to ensure that the Lead Agencies comply with NEPA and all other applicable federal laws, including the Capper-Cramton Act (the "CCA").

M-NCPPC does not intend for its comments to express a decision to oppose or support the Project or the Lead Agencies' Preferred Alternative. Rather, as the governing body of this Cooperating Agency, the Commission is carrying out its responsibilities as the planning agency for Montgomery and Prince Georges Counties and as the parkland steward in these counties. M-NCPPC has made the Lead Agencies aware of its concerns regarding the environmental review process, attributable largely to the Lead Agencies' failure to undertake a comprehensive analysis of reasonable alternatives, impacts, and mitigation measures, and failure to incorporate best practices in transportation, environmental protection, and land use planning.

The Lead Agencies' approach remains at odds with M-NCPPC's statutory obligation to make well-reasoned and informed decisions regarding parkland, cultural resources, and historic resources. Still, M-NCPPC is, as it has been throughout this process, committed to collaborating with the Lead Agencies as they continue their environmental review of the Project and proceed through the NEPA review process. The Commission remains optimistic that the Lead Agencies will consider changes to the Project that minimize impacts to parkland, streams, and protected cultural and historic resources. M-NCPPC is also hopeful that the Lead Agencies will take meaningful steps to responsibly address the unavoidable impacts to parkland that could result from the Project, notwithstanding its narrower scope compared to the build alternatives initially proposed.

I.    Background

      A. The Maryland-National Capital Park and Planning Commission

The Maryland General Assembly created M-NCPPC in 1927 to plan for the orderly development, acquisition and maintenance of parkland and open space, and to protect natural resources in Prince George's and Montgomery Counties.[1] Since that time, M-NCPPC has acquired several hundred parks in the two counties, including parks requiring special protection due to their acquisition with funds made available from the federal government and state of Maryland pursuant to the CCA.

---

[1] The Maryland Court of Appeals has outlined M-NCPPC's regional functions as follows:

The [M-NCPPC], as its name suggests, administers parks, public recreation, and, in conjunction with the governments of Prince George's and Montgomery counties..., participates in the planning of development within the [Maryland-Washington Regional District]. Among other things, [a Maryland statute] authorizes the MNCPPC to: (1) acquire property for parks, forests, roads, and other public spaces; (2) rename streets and highways and number and renumber houses within the district to fix mistakes, remove confusion, and establish uniformity; (3) acquire, improve, and manage land for flood control purposes; (4) establish road grades in Montgomery County; and, (5) recommend amendments to the zoning laws and subdivision regulations.

*Cty. Council of Prince George's Cty. v. Zimmer Dev. Co.*, 120 A.3d 677, 699 (2015) (internal citations omitted).

2


Jeannette Mar & Tim Smith
November 30, 2021
Page 3

The parkland acquired with CCA funds includes areas in the vicinity of the Clara Barton Parkway covered by agreements between M-NCPPC, the National Capital Planning Commission ("NCPC"), and the federal government that require the land to be used for park purposes and give M-NCPPC authority to approve or reject its use for other purposes.

The Lead Agencies engaged M-NCPPC as a Cooperating Agency to provide input regarding the environmental impacts of the Project. To fulfill its role as a Cooperating Agency, M-NCPPC must ensure that the Project is undertaken in compliance with NEPA and that M-NCPPC complies with its own mandates under state and federal law. As a Cooperating Agency, M-NCPPC staff has taken its responsibilities seriously by fully engaging with the Lead Agencies and the Interagency Working Group established by the Lead Agencies during every stage of review of the Project.

**B. Development of the Preferred Alternative**

The stated purpose of the Project is to develop travel demand management solutions that address congestion, improve trip reliability on I-495 and I-270 within the Project limits, and enhance existing and planned multimodal mobility.[2] The stated needs for the Project are: accommodating existing traffic and long-term traffic growth, enhancing trip reliability, providing additional roadway travel choices, enhancing homeland security, and facilitating the movement of goods and the ability of businesses to provide services.[3] The Project limits are: I-495 from south of the George Washington Memorial Parkway in Virginia, including improvements to the American Legion Bridge ("ALB") over the Potomac River, to the west of MD 5 in Maryland and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs in Montgomery and Prince George's Counties.[4]

The Lead Agencies issued their DEIS and Draft Section 4(f) Evaluation for the Project and published a Notice of Availability in the Federal Register on July 10, 2020. The Lead Agencies considered a range of 15 preliminary alternatives and retained and analyzed seven alternatives in the DEIS. The DEIS noted that after circulating the DEIS and receiving comments, the Lead Agencies would issue a Final Environmental Statement ("FEIS") that would identify the Preferred Alternative as well as respond to substantive comments. M-NCPPC, as a Coordinating Agency, provided comments to MDOT SHA by letter dated November 9, 2020, raising concerns about the effect of the alternatives on parkland, traffic and historic resources, wetlands, and environmental justice communities. In January 2021, the Lead Agencies announced Alternative 9 as their Preferred Alternative based on the results of public comment and the ongoing traffic, engineering, financial, and environmental analyses.[5] Alternative 9 envisioned the addition of two priced, managed lanes in each direction on I-495 and the conversion of one existing high-occupancy vehicle lane to a price-managed lane and addition of one priced, managed land in each direction on I-270.[6]

<hr>

[2] SDEIS at 1-2.
[3] SDEIS at 1-2, 1-3.
[4] SDEIS at 1-2.
[5] SDEIS at 1-1.
[6] DEIS at ES-8.

Jeannette Mar & Tim Smith
November 30, 2021
Page 4

After Coordinating Agencies and other stakeholders raised concerns about the impacts of Alternative 9 and in particular those on and around I-495 east of the I-270 spur to MD 5, the Lead Agencies decided to change the Preferred Alternative to Alternative 9 – Phase 1 South, which would consist of building a new American Legion Bridge and delivering two high-occupancy toll managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to east of MD 187 and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from east of MD 187 to I-270.[7] The Lead Agencies issued their SDEIS on October 1, 2021 describing the change in the Preferred Alternative and seeking comments from interested parties.

While M-NCPPC appreciates that the Lead Agencies have narrowed the Project to avoid the most significant impacts, the newly envisioned Preferred Alternative should be adjusted to have the fewest practicable impacts. Through this letter, M-NCPPC provides comments focused on that purpose.

**II. Discussion**

**A. The Preferred Alternative must reflect the "No-Build Alternative" outside of Phase 1 and should include both transportation demand management (formerly Alternative 2) and transit (formerly Alternative 14).**

The Lead Agencies should clarify their obligation to conduct a new or updated NEPA analysis when considering improvements outside of Phase 1 of the Project. Although the area outside Phase 1 (i.e., I-495 east of Old Georgetown Road) is neither specifically included as part of the Preferred Alternative nor included in the upcoming 2022 update to the Visualize 2045 Long Range Plan being advanced by the National Capital Region Transportation Planning Board ("TPD"), the SDEIS does not indicate clearly that I-495 east of Old Georgetown Road is now excluded from the NEPA analysis.[8] To the contrary, the SDEIS states, "There is no action or no improvements on I-495 east of the I-270 east spur to MD 5. While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the scope of this Study, *improvements on the remainder of the interstate system may still be needed in the future* and would advance separately, subject to additional environmental studies, analysis and collaboration with the public, stakeholders and local agencies."[9] While the Lead Agencies correctly acknowledge that future environmental studies and analysis would be needed prior to future phases, the Lead Agencies should clarify in the FEIS that a new *NEPA* study is required by law prior to any development in the area of I-495 east of Old Georgetown Road.

The Lead Agencies' state in the SDEIS that all of the parkland outside of the Phase 1 area is now "avoided." Should the Lead Agencies determine to build future phases, it stands to reason that they would be required to conduct a new study to determine the impacts of the future alignments

<hr>

[7] *Id.*
[8] SDEIS at 1-2.
[9] SDEIS at ES-1 (emphasis added).

Jeannette Mar & Tim Smith
November 30, 2021
Page 5

on natural resources.[10] This must be the case even if the Preferred Alternative reflects the "No-Build Alternative" for future phases, since the NEPA analysis to date did not adequately consider all potential impacts to protected parkland and natural resources, such as local bodies of water.[11] The Lead Agencies also must ensure that their selection of the Preferred Alternative does not commit them to a course of action that they have not fully analyzed.[12]

With that said, even the Preferred Alternative requires further analysis. For example, if the portion of I-495 outside of Phase 1 is no longer part of the Managed Lanes Study, the transition areas to I-495 on the east spur travelling south and north from the ALB to Old Georgetown Road from the "split" may not be necessary. Creating the transition in this manner would encourage vehicle travel to continue on I-495, as described in the Commission's SDEIS Comment #6.[13] Therefore, as MDOT Secretary Slater noted during the Washington Council of Government's Transportation Planning Board July 21, 2021, meeting, TDM such as dynamic signage is necessary to direct traffic to use the I-270/MD 200 combination for travel along the I-95 corridor.[14] Encouraging vehicle travel on that route will provide additional capacity on the topside of I-495 for local travel needs. All of these impacts must be properly assessed, especially if the Project will include future phases.[15]

Project-related mitigation also should include travel demand management and transportation system management ("TSM") measures, such as improvements along impacted corridors outside the project limits, including I-495 between the I-270 western spur and US 50. The Lead Agencies should consider incorporating into the Project TSM improvements, such as those being implemented along I-270 as part of the I-270 Innovative Congestion Management project, including variable message signage and ramp metering. FHWA's NEPA regulations are designed to facilitate this type of analysis before FHWA commits to an alternative.[16] The Lead Agencies should consider incorporating TSM/TDM and transit into the Project as part and parcel of the Preferred Alternative, not as ancillary components.

---

[10] *See* SDEIS at ES-13 ("The Preferred Alternative, with build improvements only within the limits of Phase 1 South, avoids over 100 acres of parkland and hundreds of wetland and stream features.").

[11] *See* 40 C.F.R. § 1502.9(c)(1)(i), (ii) (requiring a supplemental EIS if an agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts").

[12] *Defs. of Wildlife v. N.C. DOT*, 762 F.3d 374, 397 (4th Cir. 2014).

[13] M-NCPPC's SDEIS Comment/Response Errata dated November 4, 2021.

[14] mwcog.org/events/2021/7/21/transportation-planning-board/

[15] *See Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 426 (4th Cir. 2012) (quoting *Coal. on W. Valley Nuclear Wastes v. Chu*, 592 F.3d 306, 311 (2d Cir. 2009)) (prohibiting agencies from engaging "in segmentation, which involves 'an attempt to circumvent NEPA by breaking up one project into smaller projects and not studying the overall impacts of the single overall project'").

[16] *See* 23 C.F.R. § 771.111(f) (purpose of FHWA's NEPA regulations is to "ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated").

5

---

Jeannette Mar & Tim Smith
November 30, 2021
Page 6

While the Lead Agencies considered these elements as alternatives early in the NEPA process, they quickly eliminated them from further consideration, finding that they do not "support long-term traffic growth" or "would not enhance trip reliability."[17] After dropping these alternatives, MDOT SHA promised that "transit solutions are part of the overall traffic relief plan" and would play a role in the Preferred Alternative. The SDEIS's brief discussion of "transit-related elements"—which describes the ability of transit buses to use high-occupancy travel lanes without charge, connections to existing transit stations, and regional transit improvements (e.g., new bus bays and parking capacity in two areas)—contemplates transit improvements that fall considerably short of the type necessary to have a real impact on traffic congestion in the area – much less to mitigate or avoid the economic and environmental consequences of increasing reliance on travel by automobile, including, without limitation, the emissions associated with increasing vehicle miles traveled and the disruption to sound land use planning caused by the project.[18] In order to follow through on transit commitments the Lead Agencies made to Montgomery County during the early stages of the NEPA process, which are integral to the Project's success, the Lead Agencies should designate transit as a contributing alternative, as opposed to an ancillary improvement.

**B. The SDEIS does not consider adequately environmental justice, equity, and historic resource preservation concerns.**

The Lead Agencies must identify impacts to all resources of environmental, cultural, and historic significance, as opposed to evaluating these concerns in a piecemeal approach.[19] NEPA requires the Lead Agencies, in consultation with the Coordinating Agencies, to "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties."[20] The consulting parties must consult with one another to find ways to avoid, minimize, or mitigate adverse effects on historic property and summarize their agreed-upon course of action in a memorandum of agreement.[21] This consultation process should occur early in the NEPA review process to allow adequate time for the agencies to consider all potential impacts on historic properties and alternatives to avoid, minimize, or mitigate such impacts.[22] In other words, the Lead Agencies must take steps now, before promulgation of the FEIS, to conduct a comprehensive evaluation of these properties for historic and cultural significance.

M-NCPPC also notes that while the Lead Agencies have taken steps to consider environmental justice and features of cultural and historic significance, they must take more significant action to ensure that minority and low-income populations are not disparately impacted by the Project. Of note, the Lead Agencies have consulted with local stakeholders and conducted a ground-penetrating radar survey to identify *some* areas of potential disturbance to the impacted historic

---

[17] "Screened Alternatives," MDOT SHA, https://oplanesmd.com/environmental/alternatives/screened-alternatives/ (last visited Oct. 29, 2021).

[18] SDEIS at 2-22 to 2-23.

[19] *See, e.g.*, 54 U.S.C. § 306108; 36 C.F.R. 800 *et seq.* (requiring agencies to consider a federal project's effects on historic resources and consult with parties having jurisdiction over the same).

[20] 36 C.F.R. §800.6(a).

[21] 36 C.F.R. § 800.6(c).

[22] 36 C.F.R. § 800.8(a)(2).

6


Jeannette Mar & Tim Smith
November 30, 2021
Page 7

cemeteries, such as the Morningstar Tabernacle No. 8 Moses Hall and Cemetery. While this effort is a good first step, the Lead Agencies' assessment of impacts needs to include *all* of the cemetery property (including *all* potential grave sites), the results of which should inform specific mitigation measures that the Lead Agencies tailor appropriately to reduce or avoid those impacts to the maximum extent possible.

Furthermore, the SDEIS indicates that environmental justice issues omitted from the SDEIS will be remedied in the FEIS. This is far from a best practice since it obstructs public comment and community input. Waiting until after selection of a preferred alternative to evaluate impacts to minority communities means that disproportionate impacts will not be considered in the formulation of the preferred alternative and thus do not receive the attention NEPA and Title VI of the Civil Rights Act of 1964 ("Title VI") demand from the Lead Agencies.[23] This course of action also runs afoul of Department of Transportation Order 5610.2(a), which commits the Department to promote the principles of environmental justice "by fully considering environmental justice principles *throughout planning and decision-making processes* in the development of programs, policies, and activities, using the principles of the National Environmental Policy Act of 1969 . . ." FHWA Order 6640.23A espouses a similar theme, committing FHWA to "identify and prevent discriminatory effects . . . to ensure that social impacts to communities and people are recognized early and continually throughout the transportation decision-making process—from early planning through implementation." Acting later, after the Lead Agencies have already responded to stakeholder concerns and continued designing the Project, would violate Title VI, these orders, and fundamental environmental justice principles.

The SDEIS's community and environmental justice analysis of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery and the Poor Farm Cemetery acknowledges that the Project may impact culturally significant sites. However, the SDEIS's environmental justice discussion relates primarily to *current* minority population concentrations and fails to address how the Project may exacerbate the historical and ongoing injustice to small African American communities displaced by construction of the Beltway.[24] The National Trust for Historic Preservation explicitly acknowledged this issue as key to social justice by selecting the Moses Cemetery as one of the 11 most endangered historic sites in the United States in 2021.[25] To their credit, the Lead Agencies promised to "fully investigate areas to be impacted by construction." A "full investigation,"

[23] *See* 2 U.S.C. § 2000d *et seq.* ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); Promising Practices for EJ Methodologies in NEPA Reviews, FED. INTERAGENCY WORKING GROUP ON ENVIRON. JUSTICE & NEPA COMM. (March 2016), https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practice_document_2016.pdf ("Agencies may wish to consider which alternative(s) have the least impact to minority populations and low-income populations and alternatives that would minimize or mitigate disproportionately high and adverse impacts as a factor when identifying reasonable alternatives and the preferred alternative").

[24] SDEIS at 4-33.

[25] "Discover America's 11 Most Endangered Historic Places for 2021," NAT'L TRUST FOR HIST. PRESERVATION (June 3, 2021), https://savingplaces.org/stories/11-most-endangered-historic-places-2021#.YXoRGhrMl2w.

7

---

Jeannette Mar & Tim Smith
November 30, 2021
Page 8

however, means complete ground-penetrating radar surveys of all potential historic grave sites, as well as robust and frequent communication with local community members. The Lead Agencies must ensure that their analysis is fulsome and exhaustive prior to approving any further development in these historically and culturally significant areas that already faced significant disruption in the past.[26]

Additionally, neither the DEIS nor the SDEIS reference any cumulative effects to specific cultural resources. For instance, additional historical research conducted subsequent to the DEIS in Cabin John related to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery and associated Gibson Grove community show that the construction of the Beltway divided the fraternal hall and cemetery from the neighboring church, physically fragmented the community, and contributed to the decline of these institutions.[27] The community's decline, in turn, contributed to the closure and loss to fire of the Moses fraternal hall. As currently designed, the Preferred Alternative will result in a "long-term diminishment of the property's setting and feeling due to construction impacts on a small sized property."[28] This "diminishment" is just the latest in a series of diminishments beginning with the Beltway that the Lead Agencies do not appear to account for or seek to mitigate. By failing to account for cumulative impacts on cultural resources, the Lead Agencies risk violating NEPA and Title VI.[29]

**C. The Preferred Alternative's design will shift bottleneck issues instead of relieving traffic congestion at the ALB.**

A detailed technical transportation review of the SDEIS concludes that the Preferred Alternative will relieve congestion at the ALB. However, the Preferred Alternative does not eliminate congestion in the corridors studied but and instead shifts it from the vicinity of the ALB (e.g., McLean and Potomac) to other areas in Maryland. While some of these bottleneck shifts were expected, the degree of congestion resulting from the proposed project is severe on I-270 north of

[26] On November 15, 2021, the President signed into law the Infrastructure Investment and Jobs Act ("IIJA"), which is a once-in-a-generation investment in infrastructure throughout the country with bipartisan support. Included in the measure is a commitment to "Reconnecting Communities," a concept not even mentioned in the SDEIS. "Too often, past transportation investments divided communities or it left out the people most in need of affordable transportation options. In particular, significant portions of the interstate highway system were built through Black neighborhoods. The IIJA creates a first-ever program to reconnect communities divided by transportation infrastructure. The program will fund planning, design, demolition, and reconstruction of street grids, parks, or other infrastructure through $1 billion of dedicated funding." *See* IIJA Sec. 11509. While this is a grant program that does not bear directly on the Project, the Lead Agencies should take notice of Congress's focus on restoring divided communities and commitment to considering these communities in future transportation planning.

[27] *See generally* Alexandra Jones, *Gibson Grove Gone But Not Forgotten: The Archaeology of an African American Church*, Univ. of Cal., Berkeley (2010), https://escholarship.org/content/qt8z67f3ns/qt8z67f3ns_noSplash_ef033302034ec0876e83c89e1b0e66f0.pdf.

[28] SDEIS at 4-36.

[29] *See Te-Moak Tribe of W. Shoshone of Nev. v. United States DOI*, 608 F.3d 592, 607 (9th Cir. 2010) (Bureau of Land Management's environmental assessment inadequate because the agency failed to conduct a proper analysis of a project's cumulative impacts on cultural resources).

8

Jeannette Mar & Tim Smith
November 30, 2021
Page 9

I-370, on the Inner Loop on the top side of the Beltway, and on the Inner Loop in Prince George's County. These bottleneck shifts are Project-related impacts, and so the Lead Agencies should address mitigation measures to minimize these projected deficiencies in the SDEIS and incorporate them into the Project design. NEPA requires the Lead Agencies to consider mitigation measures that address adverse impacts, including, among others, areas of traffic congestion points.[30]

Specifically, if the construction of Phase 1A is likely to shift congestion in a way that logically requires construction of Phase1B (currently the subject of the I-270 Pre-NEPA Study) in order to avoid creation of new bottlenecks, then it follows that any decision to proceed with Phase 1A must await completion of the NEPA analysis for Phase 1B. MDOT SHA should further consider the implications of language in the FEIS concerning the impact of Section 27.3 of the Phase Public Private Partnership Agreement (the "P3 Agreement").[31] Section 27.3 is entitled Financial Viability of an Uncommitted Section and it explicitly states that future phases may be cut based upon a financial viability formula applied to a prior phase of the project. The FEIS should at minimum discuss the impact of this language on the effect of a decision to construct Phase 1A for construction of Phase 1B. In other words, the traffic analysis raises serious questions about how a decision on Phase 1A can or should be made in the absence of a comprehensive analysis that assesses the impact of building this segment on future phases.

For the other bottleneck issues, M-NCPPC recommends the following design changes to the Preferred Alternative:

- Eliminate the managed lanes from the I-270 Eastern Spur between I-270 and I-495 because I-270 traffic headed south to the eastern spur would not use the managed lane network. The managed lanes would provide minimal travel time benefits from Gaithersburg and Rockville to most Montgomery County destinations.
- Eliminate the managed lanes and exit/entrance ramps from I-495 between the two spurs.
- Managed lane traffic destined to and from the Inner Loop should enter/exit the managed lane network at the River Road crossover interchange.

Additionally, there are a number of inconsistent conclusions[32] and assumptions in the SDEIS's transportation modeling and forecasts.[33] The Project claims to improve traffic congestion, but its

---

[30] *See O'Reilly v. United States Army Corps of Eng'rs*, 477 F.3d 225, 233-34 (5th Cir. 2007) (environmental assessment failed to demonstrate that mitigation measures adequately address and remediate adverse impacts to traffic and transportation patterns).

[31] P3 Agreement at 74.

[32] SDEIS, Appendix D Traffic Evaluation Memo – Attachment D Travel Time Matrix states that during the 2045 PM peak hour, the MD 5 to MD 97 route (Outer Loop) results in a 36-minute travel time benefit between the No Build and the Preferred Alternative. Based on 2045 PM peak hour Inner Loop results on the northeastern side of the Beltway, it appears that a dramatic regional shift is projected from traffic with an origin in Virginia and with a Maryland destination that now (and during the 2045 No Build condition) uses I-495 in Virginia crossing the Woodrow Wilson bridge. Lacking travel time data for I-495 in most of Virginia, this is both anomalous and speculative.

[33] SDEIS, Table 4 of Appendix A states that the Travel Time Index worsens from 6.6 to 6.9 in the

9

---

Jeannette Mar & Tim Smith
November 30, 2021
Page 10

analysis finds that there are significant segments where the General Purpose lanes worsen significantly as a result of this Project. While the cause of these issues may be subject to debate, MDOT SHA surely has a responsibility to explain or reanalyze the transportation model, its assumptions, and conclusion to resolve these inconsistences. The purpose and need cannot be achieved if the very basis of the Project, to relieve congestion, is called into question.

**D. The FEIS must address impacts to the local road network during this phase of Project planning.**

Because the SDEIS lacks travel time index ("TTI") results from areas extending beyond the Managed Lanes Study area, it is critical that the Lead Agencies address impacts to the local road network in the FEIS in order to incorporate appropriate considerations into the Project design. To do this, the Lead Agencies must extend the Interchange Access Point Approval ("IAPA") study now under development beyond a single intersection, since the increased congestion on I-270 and I-495 undoubtedly will lead both to peak spreading effects and local traffic diversions that the Lead Agencies have not considered adequately to date.

A simple example demonstrates the issue that the Lead Agencies need to consider. While it can take over 30 minutes to travel two to three miles on some segments of the Beltway, as presented in this SDEIS, this is not always the case. Traffic will vary on a daily basis, and some travelers will identify shorter travel time routes, regardless of the impact to local streets. The scope therefore agreed upon by FHWA for the IAPA (i.e., performing traffic operational analyses at ramp terminal intersections and one adjacent intersection on both sides of the road beyond service interchanges that the Managed Lane Study will modify) is inadequate in areas where either I-270 or I-495 exhibit high TTIs and extreme congestion. In those areas, the Managed Lane Study area should follow all significant diversionary traffic that switches to the local road network, defined as all non-interstate roads. The Lead Agencies can determine the extent of this additional study area by adding routes on parallel roads with travel times equal to the general-purpose lanes travel time.

Courts have found that, where impacts on local road networks are possible, FHWA and its state partners must address these issues prior to or in the FEIS. In *Sierra Club v. United States DOT*, plaintiffs successfully challenged a FHWA decision to build a toll road across an Illinois river without adequately evaluating the extent to which the road would alleviate local transportation problems.[34] There, FHWA decided to wait for additional studies to demonstrate that the selected alternative would improve travel times, but the court required FHWA to produce additional studies evaluating the degree to which various alternative would meet current transportation needs and improve travel times.[35] In another case where FHWA and the New Hampshire Department of Transportation proposed a highway expansion to address traffic congestion, FHWA's traffic sensitivity analysis failed to account for the project's indirect effects on secondary road traffic.[36]

---

un-tolled lanes west of I-270 but improves from 4.8 to 3.0 between I-270 and I-95. The implication is that congestion on the Inner-Loop in Montgomery County will get worse where the highway is widened and get better where it is not.

[34] 962 F. Supp. 1037, 1044 (N.D. Ill. 1997).

[35] *Id.*

[36] *Conservation Law Found. v. FHA*, 630 F. Supp. 2d 183, 213 (D.N.H. 2007) (quoting *Robertson*

10

Jeannette Mar & Tim Smith
November 30, 2021
Page 11

Finding that the EIS process "guarantees that the relevant information will be made available to the larger audience that may also play a role in the decision-making process and the implementation of that decision," the court remanded the FEIS to the lead agencies.[37] FHWA must expand the scope of the IAPA in order to avoid relying on a study with similar deficiencies.

If an expanded IAPA is conducted, mitigation of local road impacts could be considered and included in the FEIS. In the absence of an expanded analysis, there is no opportunity to analyze indirect effects on secondary road traffic, which may include maintenance frequency as well as funding.

**E. The Preferred Alternative's bicycle and pedestrian improvements are inconsistent with local master plans, particularly related to design.**

The Lead Agencies made commitments during prior coordination meetings with Commission staff to construct the new high-occupancy travel lanes in accordance with local master plans. The SDEIS indicates that the FEIS will include an "updated review of the county and local master plans," but the document does not contain any statements reflecting this commitment.[38] Courts generally expect agencies to honor commitments made prior to or during the NEPA review process, even if a Project otherwise complies with NEPA.[39] Accordingly, M-NCPPC respectfully requests that the Lead Agencies memorialize this commitment and take steps to implement it in the FEIS.

**F. The Cooperating Agencies have not completed their analysis of the parkland limit of disturbance, and so the FEIS will need to resolve potential parkland impacts.**

Before the Lead Agencies finalize the FEIS and any work can occur on parkland, M-NCPPC must review and approve the limits and nature of the work and grant permission for construction to commence, consistent with the CCA.[40] The CCA authorized federal funding for M-NCPPC to acquire land in Maryland for the development of a comprehensive park, parkway, and playground system in the National Capital area. Congress charged M-NCPPC with representing the State of Maryland in protecting and stewarding CCA-acquired property in the state, in accordance with

---

[37] *v. Methow Valley Citizen's Council*, 490 U.S. 332, 349 (1989).
[37] *Id.* at 216.
[38] SDEIS at p. 4-106.
[39] *Saint Paul Branch of the NAACP v. United States DOT*, 764 F. Supp. 2d 1092, 1109 (D. Minn. 2011) ("The Court hopes and expects that the Agencies will continue to honor their commitment to resolving community concerns going forward, despite their technical compliance to NEPA."); *see also Cty. of Rockland v. FAA*, 335 F. App'x 52, 55 (D.C. Cir. 2009) (suggesting in dicta that an agency's "firm commitment" to undertake an initiative during the NEPA process may be binding upon the agency).
[40] Act of May 29, 1930 (66 Stat. 482), as amended by the Act of August 8, 1946 (60 Stat. 960), Section 3 of the Act of July 19, 1952 (66 Stat. 781, 791), and the Act of August 21, 1958 (72 Stat. 705) at § 1(b) ("The title to the lands acquired hereunder shall vest in the State of Maryland. The *development and administration thereof shall be under [M-NCPPC]* and in accordance with plans approved by [NCPC].") (emphasis added).

11

---

Jeannette Mar & Tim Smith
November 30, 2021
Page 12

plans approved by NCPC.[41] At the time of its enactment, the CCA's drafters recognized that the law's purpose is "to preserve for all time to come the natural scenic beauty of the upper and lower Potomac River valleys, to insure a continuous flow of water into Rock Creek, and to enable the National Capital Park and Planning Commission to procure many delightful wooded areas and charming valleys in the District of Columbia before they are destroyed by building or some other operation."[42] That purpose continues to be of paramount importance today, nearly one hundred years later, as the Lead Agencies plan to make significant changes to the highway infrastructure surrounding these critical protected areas.

Over time, M-NCPPC acquired and assisted in the acquisition of various properties for parkland and parkway purposes. Properties acquired under the CCA are governed by a series of agreements between M-NCPPC and NCPC. These include, among others, a September 15, 1939 agreement (the "1939 Agreement") through which the Clara Barton Parkway (formerly the George Washington Memorial Parkway) in Montgomery County, which the Project will impact, was acquired. The 1939 Agreement included a map, known as "Plan No. 105.31-455," identifying the land acquired. Although title of the land vested in the United States, the 1939 Agreement contained a key provision relevant to the Project:

> That except as provided in this agreement, the property *shall be acquired only for park and parkway purposes and that the United States will never use the land so acquired for any other purpose except with the consent of the Maryland Commission.* It is further agreed that the National Commission will use its best efforts to see that the areas acquired under this agreement are developed and maintained in a manner similar to other comparable park areas of the National Capital and environs.

(emphasis added). The 1939 Agreement was signed by M-NCPPC, NCPC, and the President of the United States.

On October 1, 1941, M-NCPPC and NCPC entered into another agreement (the "1941 Agreement"), which governed the acquisition of "units of park lands needed for said George

---

[41] The Maryland Court of Appeals recently described M-NCPPC's role with respect to the CCA as follows:

> MNCPPC is responsible for protecting lands under the Capper-Cramton Act, which was enacted by Congress in 1930 to "protect land on both sides of the Potomac River as an integrated park and parkway system known as the George Washington Memorial Parkway." Land Use § 15-302(3) provides MNCPPC with the authority to act as the representative of this State in fulfilling the mandate of the Capper-Cramton Act in Maryland. The Act enables MNCPPC to enter into agreements with the National Capital Park and Planning Commission ("NCPPC") for extending and developing protected lands in Maryland. Therefore, the Capper-Cramton Act provided for cooperation between NCPPC and MNCPPC, enabling MNCPPC to act as administrator over preserved lands.

> *Town of Forest Heights v. Maryland-Nat'l Capital Park & Planning Comm'n*, 463 Md. 469, 518-19, 205 A.3d 1067, 1096 (2019) (internal citations omitted).
[42] CR-1930-0127, 2414, 2456 (Jan. 27, 1930).

12

---

Jeannette Mar & Tim Smith
November 30, 2021
Page 13

Washington Memorial Parkway in the Maryland-Washington Metropolitan District." Notably, this Agreement contained a similar prohibition on the use of the acquired land for anything other than park or parkway purposes by providing that "no part of the lands so acquired for the George Washington Memorial Parkway shall in any manner be used or developed by the National Commission or by the United States of America for other than park or parkway purposes."[43]

The CCA and M-NCPPC's enabling law limit disposition of M-NCPPC-administered parkland for purposes inconsistent with their use as parkland, and the agreements described above[44] give M-NCPPC authority to approve or reject the use of land subject to such agreements for purposes other than park purposes. While there are circumstances in which M-NCPPC-administered parkland can be used for legitimate, non-park purposes with M-NCPPC's consent, the CCA's underlying presumption is that this land should be prioritized for protection and, where complete protection is not possible, appropriate mitigation.[45]

Because MDOT SHA does not plan to finalize the Project's design until after it completes the NEPA review, there is significant risk that the Project's limit of disturbance ("LOD") will be much larger than what is reflected in the SDEIS. M-NCPPC described this issue at length in its November 9, 2020, DEIS comment letter, but some points are worth raising again here. Specifically, proper avoidance and minimization measures call for minimizing the roadway footprint while maintaining a larger LOD to account for environmental issues and to restore disturbed areas. A larger LOD is warranted to ensure that the Project will appropriately handle the increased drainage pressures that will result from advancing one of the build alternatives in the future. The Project's ongoing design changes also must incorporate stable tie-ins for outfalls, protection and restoration of stream banks, and improvements to resources based on anticipated Project impacts. Although MDOT SHA has stated that "[a]ll possible planning to minimize harm will additionally involve an agreement document that outlines the process to continue coordination with the OWJs over Section 4(f) properties through the design phase of the project," the impacts to parkland are not known at this time.[46]

The Lead Agencies cannot fully address these impacts until the developer completes the Project's design, and so need to build into the NEPA review a mechanism to account for these adjustments

---

[43] The 1941 Agreement contains a limited exception on the park/parkway restriction by referencing subsection 1(a) of the CCA. That subsection provides a limited exception for "such works as Congress may in the future authorize for the improvement and the extension of navigation, including the connecting of the upper Potomac River with the Ohio River, or for flood control irrigation or drainage, or for the development of hydroelectric power."

[44] M-NCPPC and NCPC also entered into a February 12, 1951, agreement that referenced the 1941 Agreement and approved the acquisition of "the balance of the land in Montgomery County needed for said George Washington Memorial Parkway."

[45] See CCA-1930-0127, 2414, 2458 (Jan. 27, 1930) ("[T]his bill does not tie the hand of Congress. There is nothing in it to declare any priority policy, *but it does morally afford a priority for park purposes.*") (emphasis added).

[46] SDEIS at 5-51.

13

---

Jeannette Mar & Tim Smith
November 30, 2021
Page 14

resulting in a larger LOD. A larger LOD that extends beyond the confines of Phase 1 of the Project should account for potential future impacts to parkland that will result after the NEPA process, including potential impacts on lands acquired with CCA funds that are not currently located in the immediate vicinity of the Preferred Alternative's improvements. If the Lead Agencies decide that the Project should progress under the current LOD, M-NCPPC respectfully requests an opportunity for further consultation in the event additional disturbance is anticipated in the future as a result of the current scope of the Project or future phases.

**G. The Project's proposed stormwater management plans are inadequate.**

Although the Preferred Alternative addresses stormwater management, the SDEIS ignores existing untreated impervious surfaces and requires a minimum of 50% treatment only if the roadway is fully reconstructed.[47] Additionally, the SDEIS only requires that 45% of the required water quality treatment occur on site. This is insufficient to protect the quality of local and downstream waters, which some stakeholders claim are among the worst water quality offenders in Montgomery County.[48] While M-NCPPC is pleased that the Lead Agencies have considered stormwater management issues in the SDEIS, the Lead Agencies must take greater responsibility for protecting downstream water resources, the quality of which will never improve and may be further degraded absent proper planning and implementation of the Project. M-NCPPC encourages the Lead Agencies to take this responsibility seriously and follow the example of other federal agencies that have addressed cumulative impacts of stormwater runoff by imposing stringent stormwater management standards that strive to exceed the minimum criteria required under state law.[49]

To mitigate the Project's anticipated impacts on water quality, the Lead Agencies should prioritize on-site stormwater quality treatment to a minimum of 80% of the environmental site design requirements, thereby allowing for a maximum of 20% to be treated with the use of compensatory stormwater management mitigation at off-site sources. The Lead Agencies also need to make specific commitments to incentivize the chosen developer to use innovative technologies and techniques to maximize on-site stormwater quality treatment. The situation involving untreated stormwater runoff into our streams and rivers is an issue that will worsen due to climate change. This project presents a singular opportunity to address this issue, an opportunity which is unlikely to ever occur again. Requiring minimum standards for stormwater treatment under these circumstances is extremely short-sighted.

A similar issue arises in the Lead Agencies' use of the Maryland Department of the Environment's 6-digit watershed scale for off-site stormwater management water quality projects. This scale does

---

[47] SDEIS at 2-10.

[48] Stormwater issues with I-495 and I-270 expansion, STORMWATER PARTNERS OF MONTGOMERY COUNTY, https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/Stormwater%20issues%20with%20I-495%20and%20I-270%20plan.pdf.

[49] E.g., Sierra Club v. United States Army Corps of Eng'rs, 464 F. Supp. 2d 1171, 1222 (M.D. Fla. 2006).

14

Jeannette Mar & Tim Smith
November 30, 2021
Page 15

not address the severe water quality impacts of the existing highways and proposed expansion. To account for those impacts, the Lead Agencies must consider off-site compensatory stormwater management mitigation within 1,500 feet of the LOD. By doing so, the Lead Agencies would make the realized mitigation benefits meaningful to the location of the impacts and the surrounding waterways. Moreover, a maximum of 25% of the off-site compensatory stormwater impervious area treatment should come from stream restoration in order to ensure that the most critical waterways surrounding the Project receive appropriate mitigation.

Lastly, the Lead Agencies should continue to consider stormwater management opportunities located on parkland. The SDEIS effectively eliminates any consideration of mitigation opportunities on parkland despite the copious amount of time M-NCPPC spent working with MDOT SHA to identify and review potential off-site compensatory stormwater management opportunities on parkland. These measures can have minimal or non-existent impacts on parkland and natural resources but provide an effective and feasible mechanism to address the off-site water quality concerns.

**H. The Lead Agencies have not established an adequate Section 4(f) mitigation plan for natural resources or historic and cultural resources.**

The Lead Agencies must comply with Section 4(f) of the Department of Transportation Act, which, like the CCA, protects the natural and built land the Project has the potential to impact. Section 4(f) and the statute's implementing regulations require avoidance, minimization, and, lastly, mitigation of the Project's impacts to parkland.[50] FHWA may not approve a transportation project that uses any Section 4(f) property unless it determines that: (1) there is no feasible and prudent avoidance alternative to the use of the property and the action includes all possible planning to minimize harm to the property resulting from such use; or (2) the use of the property, including any measures to minimize harm committed by the applicant, will have a *de minimis* impact on the use of the property.[51] If the avoidance analysis determines that there is no feasible and prudent avoidance alternative, then FHWA may approve the alternative that causes the least overall environmental harm.[52] The appropriate time to identify avoidance and mitigation measures is prior to the elimination of reasonable alternatives that have fewer environmental impacts than the retained alternatives. NEPA requires—and courts have recognized—that agencies must take a "hard look" at impacts to sensitive resources throughout the environmental review process.[53]

[50] 23 U.S.C. § 138; 49 U.S.C. § 303; 23 C.F.R. Part 774.
[51] 23 C.F.R. § 774.3(a), (b).
[52] 23 C.F.R. § 774.3(c).
[53] *See Davis v. Mineta,* 302 F.3d 1104, 1120 (10th Cir. 2002) (NEPA review failed to take a "hard look" by rejecting avoidance alternatives and failing to consider transportation systems management, mass transit, and various build alternatives by simply concluding that they were unfeasible); *see also Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp.,* 153 F.3d 1131 (10th Cir. 1998) ("§4(f) requires the problems encountered by proposed alternatives to be truly unusual or to reach extraordinary magnitudes if parkland is taken.") (internal quotation marks and citation omitted); *Assn Concerned About*

15

Jeannette Mar & Tim Smith
November 30, 2021
Page 16

The SDEIS's Section 4(f) evaluation does not include enough specificity to allow M-NCPPC to review or comment on a "mitigation plan," which requires the Commission's approval. As the Lead Agencies are well aware, the Project will impact land of significant natural and cultural value due to its geographic location in a largely developed area with little "unused" land. M-NCPPC appreciates that the Lead Agencies have evaluated potential impacts to some land under M-NCPPC's jurisdiction, such as Cabin John Stream Valley Park Unit 2.[54] Unfortunately, the Lead Agencies have yet to provide the Commission with a mitigation plan outlining, with specificity, what steps they plan to take to minimize and avoid impacts to all land under M-NCPPC's jurisdiction. For example, MDOT SHA committed to identifying and pursuing the acquisition of replacement parkland or implementing other mitigation measures at Cabin John Stream Valley Park Unit 2, such as construction of visual barriers, stream bank and bed stabilization, and removal of concrete lined channels.[55] M-NCPPC welcomes these discussions, but reiterates that these discussions must occur *before* the Lead Agencies finalize the EIS. As the Lead Agencies are well aware, land acquisition is a timely process. Therefore, mitigation properties to be acquired must be presented to M-NCPPC for approval before the FEIS and forthcoming Record of Decision. Consistent with the Supreme Court's recognition that lead agencies must provide a "detailed discussion of possible mitigation measures" so that "interest groups and individuals can properly evaluate the severity of the adverse effects," M-NCPPC simply will not consider any impact to *de minimis* until it approves formally the chosen parkland mitigation requirements.[56]

Similarly, Section 4(f) requires that the Lead Agencies avoid historic and cultural resources, unless they can demonstrate that other alternatives are infeasible and contrary to the purpose and use of the undertaking. To date, the Lead Agencies have conducted limited investigation of the Moses Hall Tabernacle and Cemetery, but the limits of the burial sites have not been established. We are concerned that the public commitment made by the Lead Agencies to avoid disturbing burial sites cannot be honored if limits of the area containing gravesites have not been established. Avoidance alternatives for Section 4(f) use of the Moses Hall Tabernacle and Cemetery, the Gibson Grove Church, and the Carderock Springs National Register Historic District should be prioritized. Further impacts to the Gibson Grove Church, a historic resource that has already suffered cumulative adverse effects from the first Beltway construction, should not be accepted as a 4(f) alternative to avoid impacts to Moses Hall Tabernacle and Cemetery. If the Lead Agencies plan to use this land for the Project, they must evaluate other design solutions and demonstrate

*Tomorrow, Inc. (ACT) v. Dole,* 610 F. Supp. 1101, 1113 (N.D. Tex. 1985) (requiring supplementation of a NEPA analysis when a road would have traversed public parkland containing relatively unique vegetation); *Klein v. U.S. Dep't of Energy,* 753 F.3d 576, 584 (6th Cir. 2014) (NEPA review must consider the unique characteristics of a region); *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs,* 479 F. Supp. 2d 607, 634 n.33 (S.D. W. Va. 2007) (same), *rev'd and remanded on different grounds sub nom. Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,* 556 F.3d 177 (4th Cir. 2009).
[54] SDEIS at 5-19 to 5-21.
[55] SDEIS at 5-21.
[56] *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 352 (1989).

16

Jeannette Mar & Tim Smith
November 30, 2021
Page 17

avoidance is infeasible. On this point, M-NCPPC notes that a 4(f) use may be the most appropriate use of this land given the Project's design; however, the Lead Agencies must undertake additional detailed design work in coordination with all stakeholders in the community to evaluate alternatives as required.

Lastly, M-NCPPC hopes that the conclusion of the Lead Agencies' ongoing Section 106 review process under the National Historic Preservation Act ("NHPA") yields strong commitments to avoid, minimize, and, if necessary, mitigate adverse effects to the historic properties described above and those additional properties identified in the SDEIS, including the Clara Barton Parkway.[57] Given the nature of these historic properties, which are important not just for historic purposes but also from an equity perspective due to their significance for minority communities, M-NCPPC expects the Lead Agencies to take every precaution to avoid impacts.

Consistent with its statutory duties, M-NCPPC will require a thorough and implementable mitigation package to include park enhancements, extensive parkland replacement, and consideration of the valuable natural, cultural, and historic resources present in the Project's vicinity. As currently drafted, meaningful mitigation commitments and progress are absent from the SDEIS, and so significant advancements are necessary prior to publication of the FEIS. A lack of progress in the development of an acceptable mitigation plan could endanger the aggressive schedule set forth by MDOT SHA.

* * *

---

[57] *See* 36 C.F.R. § 800.6(c) (requiring consulting parties to find ways to avoid, minimize, or mitigate adverse effects on historic property and summarize their agreed-upon course of action in a memorandum of agreement).

17

Jeannette Mar & Tim Smith
November 30, 2021
Page 18

M-NCPPC appreciates the Lead Agencies' consideration of the comments provided above. The Commission will continue to work with the Lead Agencies to ensure that the Project's impacts to parkland, stream, and wetland resources are avoided, minimized, and mitigated to the maximum extent possible. M-NCPPC also would like to remind the Lead Agencies that it will not concur with the Preferred Alternative until the Lead Agencies present a thorough and reasonable mitigation package that includes park enhancements and extensive parkland replacement, as well as adequate consideration of alternatives to avoid impacts to properties of historic and cultural significance. The Commission welcomes the opportunity to engage further with the Lead Agencies to prepare mitigation and design plans, and to evaluate all of the Project's significant impacts.

Sincerely,

*Elizabeth M. Hewlett*

Elizabeth M. Hewlett
Chair

Casey Anderson
Vice Chair

Attachment – SDEIS Comment Response Table

18

OP·LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study

**FINAL ENVIROMENTAL IMPACT STATEMENT**

**United States Army Corps of Engineers - SDEIS Comments**

| No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|
| 1 | 3 | | Thank you for acknowledging in the document that there will no longer be a joint FEIS Record of Decision for the Study. The project is still listed on the Dashboard as a One Federal Decision project is this still correct? | The MLS project is listed under "Major Infrastructure Projects" in the Permitting Dashboard. There is a note stating the EO 13807 has been revoked, but that the project will continue to be tracked on the Permitting Dashboard. |
| 2 | ES-7 | | Should there be mention of the proposed MLS I-270 project north of I-370 as a separate study here and elsewhere in the SDEIS? | The proposed I-270 North study that would extend from I-370 to I-70 is part of the P3 Program, but not part of the Managed Lanes Study. It will be a separate and independent NEPA effort, so it is not discussed in the Executive Summary. The study is mentioned in FEIS Appendix Q for the Final Indirect and Cumulative Effects; FEIS Chapter 3; and FEIS Chapter 4, Section 4.1.3. |
| 3 | ES-10 | | Page ES-10 mentions a potential water quality waiver for the Potomac River drainage. Please keep the Corps informed of this potential WQ waiver for that drainage. | MDOT SHA will keep USACE informed about the waiver. Note that waivers will not be requested or granted until final design. |
| 4 | | General | Please note that changes to the definition of waters of the U.S. will likely change the proposed project stream and wetland temporary and permanent impact totals. The Corps acknowledges that a revised Joint Permit application will be available with these revised impacts totals. | Wetland and stream data has been updated to the most recent regulatory guidance. The revised JPA package submitted to USACE and MDE in April 2022 will reflect this update in jurisdiction. |
| 5 | 2-13, Table 2-4 | | Table 2-4 page 2-13 outlines potential waters of the U.S. impacts from SWM including approximately 4.7 acres of wetlands and over 25,000 linear feet of perennial and intermittent stream. However, the table does not break out impacts into permanent verses temporary and will need to be updated per the new waters of the U.S. definition including any jurisdictional ephemeral stream. | The waterway and wetland impacts for the Compensatory SWM Plan have been significantly reduced between the SDEIS and the FEIS. Refer to Chapter 3, Section 3.1.6.\n\nAt this time, all waterway impacts are being considered permanent. With additional design, some of the waterway impacts may be able to be classified as temporary impacts. All wetland impacts for the Compensatory SWM Plan have been avoided. In addition, jurisdictional ephemeral streams were included in waterway impacts, as requested. |
| 6 | 2-27 | | Please continue to coordinate the proposed bike path and MacArthur Boulevard tie-in options with the Corps. | MDOT SHA understands the USACE's responsibility with MacArthur Boulevard and will continue to coordinate regarding any potential connections. However, public comments supporting a direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath were received by MDOT SHA, FHWA, and NPS during the SDEIS public comment period. To be responsive to these comments, a direct connection to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative LOD and impact analyses. The three shared use path options connecting to MacArthur Boulevard presented in the SDEIS are no longer under consideration in this FEIS. The direct connection to the Chesapeake and Ohio Canal towpath results in fewer impacts to NPS property and natural resources. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the Study Area. |
| 7 | 2-30, 2.5.2, 2nd para | | Do the stake holders include government entities in Virginia (i.e., Frederick and Montgomery are called out but not a VA county along the alignment)? | The stakeholder list includes Fairfax County and the FEIS has been updated to reflect a more inclusive list. |

00022160

| No. | Page | SDEIS Section | Comment | Response |
|-----|------|---------------|---------|----------|
| 8 | 3-5, 2nd to last para | | Page 3-5 second to last paragraph states traffic was "only" down 7% from 2019 levels for the week in August. It is understood in the context of the traffic reductions during the height of the pandemic that this represents a rebound almost back to previous levels; however, isn't a 7% reduction in traffic fairly still noteworthy? How does a 7% reduction in traffic compared with the potential traffic improvements estimated for the project? | The phrase "only down 7%" meant that it was a much lower traffic reduction than at the peak of the pandemic when the traffic was down more than 50%.<br><br>Regarding future considerations, MDOT has closely monitored changes in traffic patterns throughout the pandemic, and as of publication of the FEIS, daily traffic volumes are rebounding to close to pre-COVID levels. Although there is still uncertainty surrounding traffic projections resulting from the COVID-19 pandemic, transportation experts have analyzed pandemic traffic conditions and future traffic demand inputs and note that traffic volumes have continued to recover since the rollout of the vaccines in early 2021. Traffic volumes are anticipated to return to pre-COVID levels before the time the HOT lanes are operational. Given the ultimate 2045 design year, the high-occupancy toll ("HOT") lanes will be required to accommodate long-term traffic.<br><br>To adapt to the ongoing and potential long-term travel impacts associated with the pandemic, MDOT SHA developed a COVID-19 Travel Analysis and Monitoring Plan, see FEIS, Appendix C. The plan includes three components: monitoring, research, and sensitivity analyses. The plan aims to continually evaluate transportation trends and to apply that analysis to determine whether the capacity improvements proposed under the Preferred Alternative would be needed and effective, even if future demand were different from the forecasts developed pre-pandemic.<br><br>Refer to FEIS Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic, as well as FEIS Appendix C Final COVID Travel Analysis & Monitoring Plan. |
| 9 | 4-55, Section 4.12 | | Please note this section will need to be updated with information about the current waters of the U.S. definition and any on-going proposed revisions. | This Section has been updated with information about the current waters of the US definition in the FEIS and other revisions as determined in coordination with USACE since the SDEIS. |
| 10 | Appendix C, Page 3, Section 3 | | The Corps does not have regulations that "require" compensatory mitigation occur within a certain size HUC. | The language in this section has been updated to indicate that mitigation within the same Federal 8-digit HUC is a preference, not a requirement. |
| 11 | Appendix C | | Please consider shading the table of SWM sites and impacts specifically in Phase I South to make them easier for the reader to identify. | The Compensatory SWM Plan and associated tables have been updated to only include sites and impacts specific to Phase 1 South, with 67 sites in total. |
| 12 | Appendix F | | Impacts to waterways by ID. Do the bridge impacts listed on the table as open channel also include shading, causeway, and piers? | The portion of a channel that is bridged is not listed as "Open Channel" in Appendix F. Yes, the impacts for bridged of channels listed on the impact tables includes existing shading and piers. Open channels that will be bridged in the future and are shown as impacted in the tables reflect shading and pier impacts as well as impacts associated with construction (e.g. causeways, trestles, etc.). |
| 13 | Appendix F | | The mapping has DNR wetlands displayed under existing buildings and roadways, is this intentional? | MDOT SHA will remove the NWI/DNR data from the Environmental Resource mapping because the delineated data is more accurate. The Corridor Study Boundary will be added because that shows the limits of where the resources were field delineated. |

## UNITED STATES ARMY CORPS OF ENGINEERS

**From:** Dinne, John J CIV USARMY CENAB (USA) <JOHN.J.DINNE@usace.army.mil>
**Sent:** Tuesday, November 30, 2021 12:31 PM
**To:** Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>; Mar, Jeanette (FHWA) <jeanette.mar@dot.gov>
**Cc:** Ozburn, Nicholas R CIV USARMY CENAB (USA) <Nicholas.R.Ozburn@usace.army.mil>
**Subject:** Corps comments on the MLS SDEIS

Caryn,

Thank you for the opportunity to review the Supplemental Draft Environmental Impact Statement (SDEIS) for the I-495/I-270 Managed Lanes Study (MLS). The Corps provides the following comments.

Page 3. Thank you for acknowledging in the document that there will no longer be a joint FEIS Record of Decision for the Study. The project is still listed on the Dashboard as a One Federal Decision project is this still correct?

Page ES-7. Should there be mention of the proposed MLS I-270 project north of I-370 as a separate study here and elsewhere in the SDEIS?

Page ES-10 mentions a potential water quality waiver for the Potomac River drainage. Please keep the Corps informed of this potential WQ waiver for that drainage.

Please note that changes to the definition of waters of the U.S. will likely change the proposed project steam and wetland temporary and permanent impact totals. The Corps acknowledges that a revised Joint Permit application will be available with these revised impacts totals.

Table 2-4 page 2-13 outlines potential waters of the U.S. impacts from SWM including approximately 4.7 acres of wetlands and over 25,000 linear feet of perennial and intermittent stream. However, the table does not break out impacts into permanent verses temporary and will need to be updated per the new waters of the U.S. definition including any jurisdictional ephemeral stream.

Page 2-27. Please continue to coordinate the proposed bike path and MacArthur Boulevard tie-in options with the Corps.

Page 2-30 2.5.2 second paragraph. Do the stake holders include government entities in Virginia (i.e., Frederick and Montgomery are called out but not a VA county along the alignment)?

Page 3-5 second to last paragraph states traffic was "only" down 7% from 2019 levels for the week in August. It is understood in the context of the traffic reductions during the height of the pandemic that this represents a rebound almost back to previous levels; however, isn't a 7% reduction in traffic fairly still noteworthy? How does a 7% reduction in traffic compared with the potential traffic improvements estimated for the project?

Page 4-55 Section 4.12. Please note this section will need to be updated with information about the current waters of the U.S. definition and any on-going proposed revisions.

Appendix C
Page 3 Section 3. The Corps does not have regulations that "require" compensatory mitigation occur within a certain size HUC.

Please consider shading the table of SWM sites and impacts specifically in Phase I South to make them easier for the reader to identify.

Appendix F
Impacts to waterways by ID. Do the bridge impacts listed on the table as open channel also include shading, causeway, and piers?

The mapping has DNR wetlands displayed under existing buildings and roadways, is this intentional?

Please note, as previously discussed, Corps and EPA HQ are in the process of evaluating the impact of a recent decision on the Section 401 WQC process. The Corps will provide additional guidance when it is available.

Thank you again for the opportunity to review and provide comments on the SDEIS.

Jack Dinne
Baltimore District, Regulatory Branch
Mitigation Banking & ILF Program POC
Maryland Section
410 962-6005 (o)
410 935-3787 (m)

Assist us in better serving you!
Please complete our brief customer survey, located at the following link:
https://regulatory.ops.usace.army.mil/customer-service-survey/


## T.1.B.2 Cooperating Agencies

**FEDERAL RESERVE BOARD**

| | |
|---|---|
| **From:** | Steve Sharpe <steve.a.sharpe@frb.gov> |
| **Sent:** | Monday, November 29, 2021 11:42 AM |
| **To:** | SHA OPLANESMLS |
| **Subject:** | Re: MDOT's plans to add toll lanes to the Beltway and I-270 |

Hello,
My main question/objection to the current plan is that I haven't seen any analysis or even discussion on how this project will effect MD's ability to lower its GHG over next 10 years.
Thanks,
--Steve

Steven A. Sharpe
Senior Advisor
Divison of Research and Statistics
Federal Reserve Board
(202)471-0776 (mobile)
http://www.federalreserve.gov/econresdata/steven-a-sharpe.htm



**Response to Comment:**

A qualitative and quantitative GHG analysis conducted on the six build alternatives was included in the DEIS which was published on July 10, 2020. This analysis was updated for the preferred alternative and the results of the updated analysis are documented in FEIS Chapter 5, Section 5.8 and FEIS Appendix K. Maryland's Greenhouse Gas Reduction Act Plan documents Maryland's existing and future emissions reductions under several scenarios, all of which include the Managed Lanes Study. The document illustrates that Maryland will not only meet the 40% by 2030 goal, but that we are dedicated to working together to exceed that goal and to strive for a 50% reduction by 2030.

**Maryland Department of Natural Resources - SDEIS Comments**

| No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|
| 1 | | 2.3.2 SWM & Appendix C | DNR has concerns regarding the use of stream restoration as Compensatory SWM, especially off-site stream restoration as compensatory stormwater credits. DNR expressed these concerns in a letter (September 30, 2021 - attached) to SHA and the agencies. DNR appreciates SHA's response on October 27, 2021; however, the original concerns still remain. Additionally, this practice is inconsistent with DNR's Stream Restoration Policy (Protocols and Criteria for Review and Evaluation of Stream Restoration Projects and Practices, Policy Number 2015:01). DNR is requesting further coordination regarding this issue. | The current draft Stormwater Concept for the Preferred Alternative does not include off-site stream restoration for water quality credit. However, MDOT SHA is pursuing the use of stream restoration for water quality credit as part of a state-wide effort. Stream restoration will use a hierarchical approach so that it is a last resort option. In addition, crediting will be conservative so that stream restoration will not be incentivized over other types of water quality treatment. |
| 2 | | 2.3.2 SWM | Siting of stormwater facilities should minimize impacts to forested areas and comply with the Forest Conservation Act. | MDOT SHA agrees with the comment and stormwater facilities will be sited to avoid impacts to forest to the maximum extent possible. In addition, the project will comply with the Forest Conservation Act. |
| 3 | | 2.3.2 | Is it possible for the American Legion Bridge design to include some water quality treatment of stormwater run off? | Water quality treatment for the American Legion Bridge (ALB) is not feasible because NPS has indicated that they will not accept any SWM on their land and all the land surrounding the ALB is owned by NPS. Some alternative practices exist that may be feasible to provide some level of pretreatment of the bridge or approaches that may be incorporated into the drainage design. These practices are not approved to provide water quality credit in Maryland and may prove to be infeasible given the various site constraints during final design. However, MDOT SHA will consider use of these alternative practices on or around the ALB area within MDOT SHA ROW. |
| 4 | | 4.4.3 | As stated in the SDEIS, DNR has rare, threatened, or endangered plant species concerns within the project footprint around the American Legion Bridge. Rare plant populations delineated in this area may be impacted by design studies and construction of the bridge. Coordination on these resources is ongoing between DNR and the SHA project team. Please include NPS, USFWS, and DNR on coordination regarding impacts to these resources. | MDOT SHA will continue to include NPS, USFWS, and DNR in future coordination regarding impacts to the RTE plant species within the project LOD around the American Legion Bridge. |
| 5 | | 4.12.4 & App. N | DNR generally concurs with the three wetland and stream restoration sites (Figure 4-2) identified for mitigation. DNR reviews design plans for the proposed mitigation sites as they become available from MDE, and is providing comments for each site through this process. Coordination regarding impacts of some of the mitigation sites related to rare/ threatened/ endangered species, stream health, and impact minimization is ongoing. | Comment noted. |
| 6 | | 4.12 & 4.13 | MDNR 12-digit watersheds within the LOD of the preferred alternative include the Potomac River/Rock Run, Cabin John Creek, Watts Branch, and Muddy Branch with 46,402 LF of impacts to perennial and intermittent streams identified. These warmwater (Use I-P) waterways are urban streams with elevated percentages of impervious surfaces and are highly degraded. Approximately 68 percent of the impacts occur in Cabin John Creek. MBSS sites within Cabin John Creek document very degraded conditions represented by poor benthic and fish indexes of biotic integrity (IBI). MBSS temperature and fish data from the other impacted watersheds also documents degraded, warmwater environments. | Comment noted. |

00022164



| No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|
| 7 | | 4.12 & 4.13 | However, fish IBIs in the lower reaches of Watts Branch and Muddy Branch were in the good range and documented a diversity of warmwater fish species. The furthest downstream, western tributary to Muddy Branch has a Use III-P designation due to the presence of coldwater obligate macroinvertebrates. Although this tributary would not be impacted directly by I-270 construction in the headwaters of Muddy Branch, stormwater management and erosion control measures should be protective of downstream habitats in both Muddy Branch and Watts Branch to maintain the existing diversity of fish species. | MDOT SHA agrees with the comment and stormwater and erosion control measures will be designed per regulations to provide protection downstream. |
| 8 | | 4.13.3 | Thank you for acknowledging that Scenic Rivers coordination will continue with DNR related to impacts of the American Legion Bridge design and construction to the Scenic River status of the Potomac River. Coordination with DNR should continue throughout project design. | Scenic rivers coordination with DNR will continue throughout project design. |
| 9 | | 4.18 | Culvert augmentation and other alterations should not result in reduced aquatic passage at road crossings. DNR, USFWS, and MDE have begun coordination with the project team about maintaining passage and mitigating impacts at crossings. DNR appreciates SHA's continued coordination on this topic. | Comment noted. |
| 10 | | 4.18 | Thank you for acknowledging the ongoing mussel coordination for American Legion Bridge replacement. Coordination with DNR should continue throughout project design. | MDOT SHA will continue coordination with DNR regarding the mussel survey in the Potomac River required for this project. |


## MARYLAND DEPARTMENT OF NATURAL RESOURCES

**From:** Gwendolyn Gibson -DNR- <gwendolyn.gibson@maryland.gov>
**Sent:** Tuesday, November 30, 2021 9:26 AM
**To:** SHA OPLANESMLS; Jeffrey Folden; Caryn Brookman (Consultant); Stacy Talmadge (Consultant)
**Cc:** Richard Ortt -DNR-; Tony Redman -DNR-; Greg Golden -DNR-; Martha Stauss
**Subject:** DNR's comment to I495-I270 Managed Lane Study SDEIS
**Attachments:** SDEIS DNR comments.pdf

hello,
DNR's comments to the I495-I270 Managed Lane Study SDEIS are attached.
Thank you for the opportunity to review and comment. Feel free to contact me if you have any questions or would like further discussion.
Thanks,
Gwen Gibson

Gwen Gibson
Maryland Environmental Service/ SHA Liaison
Environmental Review Program
Department of Natural Resources
580 Taylor Avenue, B-3
Annapolis, Maryland 21401
410-260-8405 (office)
240-278-6429 (cell)
gwendolyn.gibson@maryland.gov

dnr.maryland.gov

Click here to complete a three question customer experience survey.



Larry Hogan, *Governor*
Boyd Rutherford, *Lt. Governor*
Jeannie Haddaway-Riccio, *Secretary*
Allan Fisher, *Deputy Secretary*

November 30, 2021

Jeffrey T. Folden, P.E., DBIA
Director, I-495 & I-270 P3 Office Maryland Department of Transportation State Highway Administration
707 North Calvert Street
Mail Stop P-601, Baltimore, MD 21202

Re: Maryland Department of Natural Resources comments to the I495 & I270 Managed Lane Study Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation

Dear Mr. Folden;

The Maryland Department of Natural Resources (DNR) is a Participating Agency for the I495 & I270 Managed Lane Study. DNR has reviewed the Supplemental Draft Environmental Impact Statement (SDEIS) and Updated Draft Section 4(f) Evaluation. DNR supports the revised preferred alternative of Phase I South for the I495-I270 Managed Lane Study and is offering the following supplemental comments. These comments are in addition to any comments that DNR has provided for previous versions of the EIS and in coordination meetings to date.

- Section 2.3.2 - Stormwater Management (SWM) & Appendix C- DNR has concerns regarding the use of stream restoration as Compensatory SWM, especially off-site stream restoration as compensatory stormwater credits. DNR expressed these concerns in a letter (September 30, 2021 - attached) to SHA and the agencies. DNR appreciates SHA's response on October 27, 2021; however, the original concerns still remain. Additionally, this practice is inconsistent with DNR's Stream Restoration Policy (Protocols and Criteria for Review and Evaluation of Stream Restoration Projects and Practices, Policy Number 2015:01). DNR is requesting further coordination regarding this issue.
- Section 2.3.2 – Stormwater Management – Siting of stormwater facilities should minimize impacts to forested areas and comply with the Forest Conservation Act.
- Section 2.3.2 – Is it possible for the American Legion Bridge Design to include some water quality treatment of stormwater run-off?
- Section 4.4.3 – As stated in the SDEIS, DNR has rare, threatened, or endangered plant species concerns within the project footprint around the American Legion Bridge. Rare plant populations delineated in this area may be impacted by design studies and construction of the bridge. Coordination on these resources is ongoing between DNR and the SHA project team. Please include NPS, USFWS, and DNR on coordination regarding impacts to these resources.
- Section 4.12.4 & Appendix N – DNR generally concurs with the three wetland and stream restoration sites (Figure 4-2) identified for mitigation. DNR reviews design plans for the proposed mitigation sites as they become available from MDE, and is providing comments for each site through this process. Coordination regarding impacts of some of the mitigation sites related to rare/ threatened/ endangered species, stream health, and impact minimization is ongoing.
- DNR Fisheries has provided the following information to Section 4- sub-sections 4.12 and 4.13.:

Tawes State Office Building – 580 Taylor Avenue – Annapolis, Maryland 21401
410-260-8DNR or toll free in Maryland 877-620-8DNR – *dnr.maryland.gov* – TTY Users Call via the Maryland Relay

- o MDNR 12-digit watersheds within the LOD of the preferred alternative include the Potomac River/Rock Run, Cabin John Creek, Watts Branch, and Muddy Branch with 46,402 LF of impacts to perennial and intermittent streams identified. These warmwater (Use I-P) waterways are urban streams with elevated percentages of impervious surfaces and are highly degraded. Approximately 68 percent of the impacts occur in Cabin John Creek. MBSS sites within Cabin John Creek document very degraded conditions represented by poor benthic and fish indexes of biotic integrity (IBI). MBSS temperature and fish data from the other impacted watersheds also documents degraded, warmwater environments.
- o However, fish IBIs in the lower reaches of Watts Branch and Muddy Branch were in the good range and documented a diversity of warmwater fish species. The furthest downstream, western tributary to Muddy Branch has a Use III-P designation due to the presence of coldwater obligate macroinvertebrates. Although this tributary would not be impacted directly by I-270 construction in the headwaters of Muddy Branch, stormwater management and erosion control measures should be protective of downstream habitats in both Muddy Branch and Watts Branch to maintain the existing diversity of fish species.

- Section 4.13.3 - Thank you for acknowledging that Scenic Rivers coordination will continue with DNR related to impacts of the American Legion Bridge design and construction to the Scenic River status of the Potomac River. Coordination with DNR should continue throughout project design.
- Section 4.18 - Culvert augmentation and other alterations should not result in reduced aquatic passage at road crossings. DNR, USFWS, and MDE have begun coordination with the project team about maintaining passage and mitigating impacts at crossings. DNR appreciates SHA's continued coordination on this topic.
- Section 4.18 - Thank you for acknowledging the ongoing mussel coordination for American Legion Bridge replacement. Coordination with DNR should continue throughout project design.

The Maryland Department of Natural Resources appreciates the opportunity to review and comment on the I495 & I270 Managed Lane Study SDEIS and Updated Draft Section 4(f) Evaluation. Based on existing conditions in the affected watersheds and the constraints due to current development and space, the primary concerns for DNR include adequate stormwater management facilities, maintaining fish passage at additional and/or expanded culverts, sediment and erosion control during construction, maintenance of water quality, and mitigation for unavoidable impacts. We look forward to our continued participation in this project. Please feel free to contact me if you would like to discuss these comments in further detail.

Sincerely,

*Gwen Gibson*

Gwen Gibson
Maryland Environmental Service/ Transportation Liaison
Environmental Review Program
Department of Natural Resources

*This page is intentionally left blank.*

**MARYLAND DEPARTMENT OF PLANNING STATE CLEARINGHOUSE**

**From:** myra.barnes@maryland.gov <myra.barnes@maryland.gov>
**Sent:** Wednesday, November 10, 2021 3:37 PM
**To:** Jeffrey Folden <JFolden1@mdot.maryland.gov>; Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>
**Cc:** myra.barnes@maryland.gov <myra.barnes@maryland.gov>; Tyson Byrne <tbyrne@mdot.maryland.gov>
**Subject:** Review and Recommendation of Clearinghouse Project: MD20211001-0794

Hello Mr. Jeffrey Folden & Ms. Caryn Brookman,

The following link below includes the State Clearinghouse Review and Recommendation letter for your project, Federal Highway Admin. (FHWA) and Md. Dept. of Transportation/State Highway Admin. (MDOT/SHA) SUPPLEMENTAL Draft Environment. Impact Statement and Updated Section 4(f) Determination for the I-495 & I-270 Managed Lanes Study. The Public Comment Period Opens on 10/1/2021 and Continues Until 11/15/2021.

Click this link to view the letter,
**https://apps.planning.maryland.gov/EMIRC_Files/MD20211001-0794.zip** . This is a 800 MB file.

Thank you.

Myra Barnes, Lead Clearinghouse Coordinator
myra.barnes@maryland.gov

Please take our customer service survey.

Thank you for your comments.

Larry Hogan, Governor
Boyd Rutherford, Lt. Governor

Robert S. McCord, Secretary
Sandy Schrader, Deputy Secretary



**Maryland**
**DEPARTMENT OF PLANNING**

October 5, 2021

Mr. Jeffrey Folden
Deputy Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
601 N Calvert Street
Baltimore, MD 21202

STATE CLEARINGHOUSE REVIEW PROCESS
**State Application Identifier:**    MD20211001-0794
**Reply Due Date:**    11/09/2021
**Project Description:**  Federal Highway Admin. (FHWA) and Md. Dept. of Transportation/State Highway
Admin. (MDOT/SHA) SUPPLEMENTAL Draft Environment. Impact Statement and Updated Section
4(f) Determination for the I-495 & I-270 Managed Lanes Study. The Public Comment Period Opens on
10/1/2021 and Continues Until 11/15/2021
**Project Address:**   I-495 & I-270, Bethesda, MD 20817
**Project Location:**   County(ies) of Montgomery and Prince George's;  Municipality(ies) of Montgomery-City of
Gaithersburg, Montgomery-City of Rockville, Montgomery-Town of Kensington, Montgomery-Village
of North Chevy Chase, Prince George's-City of College Park, Prince George's-City of District Heights,
Prince George's-City of Glenarden, Prince George's-City of Greenbelt, Prince George's-City of New
Carrollton, Prince George's-Town of Berwyn Heights and Prince George's-Town of Morningside
**Clearinghouse Contact:**    Myra Barnes

Dear Mr. Folden:

Thank you for submitting your project for intergovernmental review.  Your participation in the Maryland
Intergovernmental Review and Coordination (MIRC) process helps to ensure that your project will be consistent
with the plans, programs, and objectives of State agencies and local governments.

We have forwarded your project to the following agencies and/or jurisdictions for their review and comments: the
Maryland Department(s) of the Environment, Natural Resources; the Regional Agency(ies) of National Capital
Planning Commission, Maryland-National Capital Park and Planning Commission in Montgomery, Maryland-
National Capital Park and Planning Commission in Prince George's; and the Maryland Department of Planning;
including the Maryland Historical Trust.  A composite review and recommendation letter will be sent to you by the
reply due date.  Your project has been assigned a unique State Application Identifier that you should use on all
documents and correspondence.

Please be assured that we will expeditiously process your project.  The issues resolved through the MIRC process
enhance the opportunities for project funding and minimize delays during project implementation.

Maryland Department of Planning  ●  301 West Preston Street, Suite 1101  ●  Baltimore  ●  Maryland  ●  21201

Tel: 410.767.4500  ●  Toll Free: 1.877.767.6272  ●  TTY users: Maryland Relay  ●  Planning.Maryland.gov

This page is intentionally left blank.



Mr. Jeffrey Folden
Page 2
State Application Identifier #:  MD20211001-0794

If you need assistance or have questions, contact the State Clearinghouse staff noted above at 410-767-4490 or through e-mail at myra.barnes@maryland.gov.  Thank you for your cooperation with the MIRC process.

Sincerely,

Myra Barnes, Lead Clearinghouse Coordinator

MB:MB
cc:  Tyson Bryne - MDOT
*11-0794_NRRNEW.docx*

*This page is intentionally left blank.*

MD20211001-0794   FINANCIAL ASSISTANCE

**Maryland Department of Transportation State Highway Administration and Maryland Department of Transportation State Highway Administration**

Federal Highway Admin. (FHWA) and Md. Dept. of Transportation/State Highway Admin. (MDOT/SHA) SUPPLEMENTAL Draft Environment.

Tyson Bryne - MDOT

U.S. Department of Transportation (DOT/FHWA)
—MD

Mr. Jeffrey Folden
Deputy Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
601 N Calvert Street
Baltimore, MD  21202

Ms. Caryn Brookman
Environmental Program Manager, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
601 N Calvert Street
Baltimore, MD  21202

*This page is intentionally left blank.*

00022171



Larry Hogan, Governor
Boyd Rutherford, Lt. Governor



Robert S. McCord, Secretary
Sandy Schrader, Deputy Secretary

## Maryland
### DEPARTMENT OF PLANNING

November 10, 2021

Mr. Jeffrey Folden
Deputy Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
601 N Calvert Street
Baltimore, MD  21202

**STATE CLEARINGHOUSE RECOMMENDATION**
 **State Application Identifier:**   MD20211001-0794
 **Applicant:**   Maryland Department of Transportation State Highway Administration (MDOT/SHA)
 **Project Description:**  Federal Highway Admin. (FHWA) and Md. Dept. of Transportation/State Highway Admin.
   (MDOT/SHA) SUPPLEMENTAL Draft Environment. Impact Statement and Updated Section 4(f)
   Determination for the I-495 & I-270 Managed Lanes Study. The Public Comment Period Opens on 10/1/2021
   and Continues Until 11/15/2021
 **Project Address:**   I-495 & I-270, Bethesda, MD 20817
 **Project Location:**   County(ies) of Montgomery and Prince George's;  Municipality(ies) of Montgomery-City of
   Gaithersburg, Montgomery-City of Rockville, Montgomery-Town of Kensington, Montgomery-Village of
   North Chevy Chase, Prince George's-City of College Park, Prince George's-City of District Heights,
   Prince George's-City of Glenarden, Prince George's-City of Greenbelt, Prince George's-City of New Carrollton, Prince
   George's-Town of Berwyn Heights and Prince George's-Town of Morningside
 **Approving Authority:**  U.S. Department of Transportation/Federal Highway Administration (DOT/FHWA)
 **Recommendation:**    **Consistent with Qualifying Comments and Contingent Upon Certain Actions**

Dear Mr. Folden:

In accordance with Presidential Executive Order 12372 and Code of Maryland Regulation 34.02.01.04-.06, the State
Clearinghouse has coordinated the intergovernmental review of the referenced project.  This letter constitutes the State
process review and recommendation.  This recommendation is valid for a period of three years from the date of this letter.

Review comments were requested from the Maryland Department(s) of Natural Resources, the Environment; the
Maryland National Capital Parks and Planning Commission - Montgomery County, Maryland National Capital Parks and
Planning Commission - Prince George's County, National Capital Planning Commission; and the Maryland Department of
Planning, including the Maryland Historical Trust.   The Maryland Department of Natural Resources did not have
comments.

The Regional Agency(ies) of the National Capital Planning Commission, the Maryland-National Capital Park and
Planning Commission in Montgomery County, and the Maryland-National Capital Park and Planning Commission in
Prince George's County are all reviewing this project; and will provide comments through the National Environmental
Policy Act (NEPA) process.

301 West Preston Street  -  Suite 1101  -  Baltimore  -  Maryland  -  21201
Tel: 410.767.4500  -  Toll Free: 1.877.767.6272  -  TTY users: Maryland Relay  -  Planning.Maryland.gov

*This page is intentionally left blank.*

Mr. Jeffrey Folden
November 10, 2021
Page 2
State Application Identifier: MD20211001-0794

"The Maryland Department of Planning (Planning) has reviewed the Supplemental Draft Environmental Impact Statement (SDEIS) for the I-495 & I-270 Managed Lanes Study (the I-495 & I-270 MLS) and offers the following comments:

Planning staff found that overall, the SDEIS presented detailed information on the Preferred Alternative (PA) (i.e., Alternate 9-Phase 1 South) and the PA's effects on the transportation system and impacts environmental resources and socio-economic factors. As noted in the SDEIS, the upcoming [Final Environmental Impact Statement] FEIS will provide the final mitigation measures to address the identified environmental and socio-economic impacts of the PA. Planning recognizes that the purpose and need of the overall I-495 & I-270 MLS remain the same despite the PA would only improve a portion of the I-495 and I-270 project, that improvements on the remainder of the project may still be needed in the future to address the overall needs, and that future new improvements would be subject to additional environmental studies and coordination with agencies, stakeholders, and the public.

**#1** Planning provided MDOT SHA with comments on the DEIS in November 2020. Some of our DEIS comments such as those about transit and transportation demand management (TDM) elements are addressed by the SDEIS. Our continuous coordination with MDOT SHA also helped clarify some issues such as local roadway impacts. Planning expects the FEIS would address our other DEIS comments such as the need to revise the contents regarding the Planning Act and the Priority Funding Areas Law.

**#2** Planning is glad to see the SDEIS includes updated information on the transit, transit demand management (TDM), and pedestrian and bicycle facility elements of the PA. The SDEIS also states that MDOT SHA will continue coordinating with agencies and stakeholders to further strategize and define these elements through the development of the FEIS, [Record of Decision] ROD, and [Public Private Partnership] P3 agreements. Planning suggests MDOT SHA establish a multi-modal implementation group, which can be built or expanded upon the Transit Work Group, to oversee the continuous development and implementation of the transit, TDM, and pedestrian & bicycle facility elements through and beyond the development of the FEIS, ROD, and P3 agreement. Planning noted that in addition to the committed transit elements described on page 2-22, MDOT SHA in coordination with agencies and stakeholders may evaluate other transit services or studies due to the transit funding commitments from the P3 developer and MDOT (page 2-22). Currently, the PA does not include specific TDM improvements identified in the I-495/[American Legion Bridge] ALB Transit/TDM Final Report and Plan (page 2-23). In addition, Montgomery County is finalizing "Corridor Forward: The I-270 Transit Plan" (https://montgomeryplanning.org/planning/transportation/transit-planning/corridor-forward-the-i-270-transit-plan/) and continuing coordination with the County would help finalize the PA's transit element. A multi-modal implementation group would ensure a coordinated and focused effort to address these moving targets so that the transit, TDM, and pedestrian/bicycle facility elements can be implemented accordingly.

**#3** The section, 2.3.8 Pedestrian and Bicycle Facility Considerations (page 2-24), should include the information on how the proposed American Legion Bridge (ALB) shared-use path would connect with the planned Fairfax County trail system in Virginia as the SDEIS did for the Maryland side. Regarding the proposed ALB shared-use path options, Planning strongly encourages MDOT SHA in working with federal, state, and local agencies and pedestrian and bicycle stakeholders to consider a direct connection between the proposed ALB shared-use pathway and the C&O Canal Towpath in addition to the connection with MacArthur Blvd.

**Response to SDEIS Comment #1**
MDOT SHA acknowledges receipt of MDP's DEIS comments dated August 2020. Refer to FEIS Appendix T for a response to all DEIS and SDEIS comments.

**Response to SDEIS Comment #2**
Thank you for the suggestion to form a multi-modal implementation group to oversee the development and implementation of the transit, TDM, and pedestrian and bicycle facility elements. MDOT SHA will consider MDP's suggestion on implementing a working group to oversee these multi-modal elements.

**Response to SDEIS Comment #3**
A description of how the ALB shared-use path would connect to the planned Fairfax County trail system has been added to the FEIS. In summary, an existing Fairfax County trail on the west side of I-495 will be extended by VDOT through the I-495 NEXT project along the inner loop of I-495 to the GW Parkway. The ALB shared use path along the inner loop will then extend along I-495 through the GW Parkway to connect to the Fairfax County trail.

Public comments supporting a direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath were received by MDOT SHA, FHWA and NPS during the SDEIS public comment period. To be responsive, a direct connection to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative LOD and impact analyses. The three shared use path options connecting to MacArthur Boulevard presented in the SDEIS are no longer under consideration in this FEIS. The direct connection to the Chesapeake and Ohio Canal towpath results in fewer NPS property and natural resource impacts. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the Study Area. The alignment of the proposed shared use path connection to the Chesapeake and Ohio Canal towpath is shown in FEIS Appendix E.

00022173

Mr. Jeffrey Folden
November 10, 2021
Page 3
State Application Identifier: MD20211001-0794

**#3 cont.**

The proposed active transportation connection from the intersection of the ALB shared-use path and the MacArthur Blvd side-path to the C&O Canal Towpath is two (2)-miles long. In addition, the southbound route between MacArthur Blvd and the C&O Towpath requires people riding bikes to share travel lanes with motor vehicles on Riverside Drive, which may present a challenge for many bicycle riders. Perhaps, the project could evaluate a direct connection between the switchback ramp in Option 4 Alignment (page 2-27) and the C&O Canal towpath.

**#4**

The section, 3.1.4 Impact of COVID-19 Pandemic on Traffic Demand and Forecasts (page 3-5), indicates that MDOT SHA is conducting a COVID-19 travel impact sensitivity analysis due to potential changes resulting from COVID-19 related teleworking, e-commerce, and transit use and that the analysis result will be presented in the FEIS. Planning staff suggests the sensitivity analysis include the evaluation of peak hours traffic impacts. The SDEIS only discussed the overall daily traffic volume changes and did not include any information on the peak hour traffic impacts. Some COVID-19 travel analyses conducted in other places showed that although daily traffic volumes on major roads may have rollbacked or even exceeded the pre-pandemic levels, the peak hour congestion on certain major highways is not back to the pre-pandemic levels. It will be good to see how peak period traffic on major highways would be affected COVID-19. Please include [the Maryland Department of Planning] "MDP" in the May 12 [Interagency Working Group] IAWG meeting column in Table 7-5 (page 7-13) since MDP attended the meeting.

The Maryland Department of Environment (MDE) found this project to be generally consistent with their plans, programs, and objectives, but included certain qualifying comments summarized below.

**#5**

1.  Construction, renovation and/or demolition of buildings and roadways must be performed in conformance with State regulations pertaining to "Particulate Matter from Materials Handling and Construction" (COMAR 26.11.06.03D), requiring that during any construction and/or demolition work, reasonable precaution must be taken to prevent particulate matter, such as fugitive dust, from becoming airborne.

**#6**

2.  During the duration of the project, soil excavation/grading/site work will be performed; there is a potential for encountering soil contamination. If soil contamination is present, a permit for soil remediation is required from MDE's Air and Radiation Management Administration. Please contact the New Source Permits Division, Air and Radiation Management Administration at (410) 537-3230 to learn about the State's requirements for those permits.

**#7**

3.  If any project can be considered regionally significant, such as a shopping mall, a sports arena, industrial complex, or an office complex, the project may need to be identified to the regional Metropolitan Planning Organization (MPO). Project managers who need a project for their projects to a State or federal highway should contact the Planning Division of the Planning and Monitoring Program, Air and Radiation Administration, at (410) 537-3240 for further guidance

**#8**

4.  If a project receives federal funding, approvals and/or permits, and will be located in a nonattainment area or maintenance area for ozone or carbon monoxide, the applicant needs to determine whether emissions from the project will exceed the thresholds identified in the federal rule on general conformity. If the project emissions will be greater than 25 tons per year, contact the Air Quality Planning Program of the Air and Radiation Administration, at (410) 537-4125 for further information regarding threshold limits.

---

**Response to SDEIS Comment #4**

As requested, the sensitivity analysis presented in the FEIS includes an evaluation of peak hours traffic impacts, see FEIS Chapter 9, Section 3.1. The COVID plan presented in the FEIS includes an assessment of hourly volumes at each count station along I-495 and I-270, examines congestion, speeds, and travel times in the AM and PM peak hours. It also presents the results of a sensitivity analysis using the VISSIM simulation model that specifically evaluates projected traffic operations during the peak hours under a potential lower demand scenario consistent with November 2021 conditions. Refer to FEIS Appendix A (Final Traffic Analysis Technical Report) and Appendix C (Final COVID Travel Analysis & Monitoring Plan).

**Response to SDEIS Comment #5**

Comment noted and will be included in the construction specifications. To manage fugitive dust emissions during construction, MDOT SHA will require the contractor to use some or all of the following dust control measures, to minimize and mitigate, to the greatest extent practicable, impacts to air quality:

- Minimize land disturbance
- Cover trucks when hauling soil, stone, and debris (MDE Law);
- Use water trucks to minimize dust;
- Use dust suppressants if environmentally acceptable;
- Stabilize or cover stockpiles;
- Construct stabilized construction entrances per construction standard specifications;
- Regularly sweep all paved areas including public roads;
- Stabilize onsite haul roads using stone; and
- Temporarily stabilize disturbed areas per MDE erosion and sediment standards.

As the project advances into final design and construction, applicable construction-related permits for air quality compliance and hazardous materials/soil contamination will be obtained from the MDE prior to construction.

**Response to SDEIS Comment #6**

Comment noted and will be included in the construction specifications.

**Response to SDEIS Comment #7**

This project is a regionally significant project by TPB and is included as such in the regional air quality emissions analysis.

**Response to SDEIS Comment #8**

The Air Quality Analysis Study Area (i.e., Montgomery County and Fairfax County) is in an attainment area for fine particulate matter (PM2.5), therefore, transportation conformity requirements pertaining to PM2.5 do not apply for this Project and no further analysis of PM2.5 was required.

The Study is located in a region where the maintenance period for CO has expired and the CO NAAQS no longer apply, (**DEIS, Chapter 4, Section 4.8.2**) and the EPA project-level ("hot-spot") transportation conformity requirements do not apply. However, CO is highlighted in the FHWA 1987 guidance as a transportation pollutant to be summarized in an EIS. Therefore, the DEIS presented the results of the potential impacts for CO at worst-case intersections throughout the study corridors. An updated traffic analysis to determine the worst-case intersections and interchanges on Preferred Alternative throughout the corridors was performed. The results of the traffic study showed that, although some different interchanges and intersections were identified as being worst case in the updated analysis, overall the maximum peak hour volumes and maximum peak hour delays were less than the top three intersections and interchanges used in the DEIS analysis. For this reason, the DEIS analysis can still be assumed to have projected worst-case emissions and that there would not be an exceedance of the CO NAAQS.

Mr. Jeffrey Folden
November 10, 2021
Page 4
State Application Identifier: MD20211001-0794

**#9**

5.  If the proposed project involves demolition – Any above ground or underground petroleum storage tanks that may be on site must have contents and tanks along with any contamination removed.  Please contact the Oil Control Program at (410) 537-3442 for additional information.

**#10**

6.  Any solid waste including construction, demolition and land clearing debris, generated from the subject project, must be properly disposed of at a permitted solid waste acceptance facility, or recycled if possible.  Contact the Solid Waste Program at (410) 537-3315 for additional information regarding solid waste activities and contact the Resource Management Program at (410) 537-3314 for additional information regarding recycling activities.

**#11**

7.  The Resource Management Program should be contacted directly at (410) 537-3314 by those facilities which generate or propose to generate or handle hazardous wastes to ensure these activities are being conducted in compliance with applicable State and federal laws and regulations.  The Program should also be contacted prior to construction activities to ensure that the treatment, storage or disposal of hazardous wastes and low-level radioactive wastes at the facility will be conducted in compliance with applicable State and federal laws and regulations.

**#12**

8.  The proposed project may involve rehabilitation, redevelopment, revitalization, or property acquisition of commercial, industrial property.  Accordingly, MDE's Brownfields Site Assessment and Voluntary Cleanup Programs (VCP) may provide valuable assistance to you in this project.  These programs involve environmental site assessment in accordance with accepted industry and financial institution standards for property transfer.  For specific information about these programs and eligibility, please Land Restoration Program at (410) 537-3437.

**#13**

9.  Borrow areas used to provide clean earth back fill material may require a surface mine permit.  Disposal of excess cut material at a surface mine may requires site approval.  Contact the Mining Program at (410) 537-3557 for further details.

The Maryland Historical Trust (MHT) stated that their finding of consistency is/ contingent upon the applicant taking the action(s) summarized below.

**#14**

MHT indicated that "the undertaking will adversely affect historic properties.  The [Maryland Historic Preservation Office] MD SHPO is continuing to work with FHWA and MDOT SHA to avoid and minimize impacts to cultural resources and develop measures to mitigate effects through the execution of an agreement document."

Any statement of consideration given to the comments should be submitted to the approving authority, with a copy to the State Clearinghouse.  The State Application Identifier Number <u>must</u> be placed on any correspondence pertaining to this project.  The State Clearinghouse must be kept informed if the approving authority cannot accommodate this recommendation.

Please remember, you must comply with all applicable state and local laws and regulations.  If you need assistance or have questions, contact the State Clearinghouse staff person noted above at 410-767-4490 or through e-mail at myra.barnes@maryland.gov.  Also please complete the attached form and return it to the State Clearinghouse as soon as the status of the project is known.  *Any substitutions of this form <u>must</u> include the State Application Identifier Number.*  This will ensure that our files are complete.

---

The National Capital Region Transportation Planning Board (TPB) is currently updating the Visualize 2045 plan, to be completed in 2022. The design concept and scope for the Preferred Alternative is included in the Air Quality Conformity analysis accompanying the update to *Visualize 2045* which will be approved in 2022.

As the Study is included in the currently conforming long-range plan, it is not anticipated that the updated Air Quality Conformity analysis which includes the Preferred Alternative would cause an exceedance of the NAAQS for ozone.

**Response to SDEIS Comment #9**
Comment noted and will be included in the construction specifications.

**Response to SDEIS Comment #10**
Comment noted and will be included in the construction specifications.

**Response to SDEIS Comment #11**
Comment noted and will be included in the construction specifications.

**Response to SDEIS Comment #12**
Comment noted and will be included in the construction specifications.

**Response to SDEIS Comment #13**
Comment noted and will be included in the construction specifications.

**Response to SDEIS Comment #14**
Comment noted.  MDOT SHA and FHWA will continue to work with MHT regarding all adversely affected historic properties, as presented and discussed in FEIS Appendices I (Final Cultural Resources Technical Report) and J (Section 106 Programmatic Agreement).

00022175

Mr. Jeffrey Folden
November 10, 2021
Page 5
State Application Identifier:  MD20211001-0794

Thank you for your cooperation with the MIRC process.

Sincerely,

Myra Barnes, Lead Clearinghouse Coordinator

MB:MB
Enclosure(s)
cc:   Tyson Bryne - MDOT
       Amanda Redmiles - MDE          Neil Braunstein -          Bihui Xu - MDP-T
       Tony Redman - DNR               MNCPPCM                Joseph Griffiths - MDPL
       Matthew Fils - NCPC            Ivy Thompson - MNCPPCP    Beth Cole - MHT

       *21-0794_CRR CLS2.docx*

*This page is intentionally left blank.*


Larry Hogan, Governor
Boyd Rutherford, Lt. Governor



Robert S. McCord, Secretary
Sandy Schrader, Deputy Secretary

**Maryland**
**DEPARTMENT OF PLANNING**

PROJECT  STATUS  FORM

Please complete this form and return it to the State Clearinghouse upon <u>receipt of notification</u> that the project has been approved or not approved by the approving authority.

TO:    **Maryland State Clearinghouse**         **DATE:** _____
       Maryland Department of Planning          (Please fill in the date form completed)
       301 West Preston Street
       Room 1104
       Baltimore, MD  21201-2305

FROM: _____           **PHONE:** ___-___-____
       (Name of person completing this form.)       (Area Code & Phone number)

RE:    **State Application Identifier:**    **MD20211001-0794**
       **Project Description:**    Federal Highway Admin. (FHWA) and Md. Dept. of Transportation/State Highway
                                   Admin. (MDOT/SHA) SUPPLEMENTAL Draft Environment. Impact Statement and
                                   Updated Section 4(f) Determination for the I-495 & I-270 Managed Lanes Study. The Public
                                   Comment Period Opens on 10/1/2021 and Continues Until 11/15/2021

| PROJECT APPROVAL | | |
|---|---|---|
| **This project/plan was:** | ☐ **Approved**      ☐ **Approved with Modification** | ☐ **Disapproved** |
| **Name of Approving Authority:** _____ | | **Date Approved:** _____ |

| FUNDING APPROVAL | | | |
|---|---|---|---|
| *The funding (if applicable) has been approved for the period of:* | | | |
| _____, 201____ to _____, 201____ as follows: | | | |
| **Federal $:** _____ | **Local $:** _____ | **State $:** _____ | **Other $:** _____ |

| OTHER |
|---|
| ☐ *Further comment or explanation is attached* |

Maryland Department of Planning  ●  301 West Preston Street, Suite 1101  ●  Baltimore  ●  Maryland  ●  21201

Tel: 410.767.4500  ●  Toll Free: 1.877.767.6272  ●  TTY users: Maryland Relay  ●  Planning.Maryland.gov

MDPCH-1F

---

Thank you for providing the Project Status Form. MDOT SHA will complete this form after the Record of Decision is published.

Mr. Jeffrey Folden
Deputy Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
601 N Calvert Street

Baltimore, MD  21202

Tyson Bryne - MDOT

U.S. Department of Transportation (DOT/FHWA)
----MD

Ms. Carys Brookman
Environmental Program Manager, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
601 N Calvert Street
Baltimore, MD  21202

*This page is intentionally left blank*

**Montgomery County Department of Transportation - SDEIS Comments**

| No. | Page | SDEIS Section | Comment | Response |
|-----|------|---------------|---------|----------|
| 1 | General | General | These comments are supplemental to previous comments provided on the DEIS. These comments attempt to focus only on new information resulting from the SDEIS. | Thank you.  MDOT SHA has responded to all prior comments on the DEIS in Appendix T of the FEIS. |
| 2 | General | General | The SDEIS documents appear to have been created in such a way as to prevent the copying of text from the document. This hampers the ease with which the public can review and comment on the document, requiring data sets to be manually reentered in order to provide an independent evaluation, and making it harder to quote segments of the document in comments.  This is a setting that must be deliberately activated for this to occur, and is unclear for what purpose the State would choose to do this. | The PDFs of the project files posted on the website are protected PDFs.  The PDFs can be printed but not copied and pasted. This is to ensure that the text can not be altered and to maintain the formatting and federal and state 508 compliance requirements. |
| 3 | ES-3 | Executive Summary | Will Comments on the DEIS be addressed? Toll-free travel must also be extended to state and local government vehicles. | MDOT SHA has responded to all prior comments on the DEIS in Appendix T of the FEIS. Comment noted regarding tolling exemptions. These will be established outside of the NEPA study. |
| 4 | ES-10 to ES-11 | Executive Summary, Toll Rates | Comments on Tolling have been submitted separately. | Thank you.  The toll rate range setting process was separate from the NEPA study.  The toll rate ranges were approved by MDTA in November 2021.  The information can be found on their website: https://mdta.maryland.gov/ALB270TollSetting/TollRateRangeSettingProcessAndApproved TollRateRanges |
| 5 | ES-12 | Executive Summary, Transportation & Traffic | The paragraph summarizing the Preferred Alternative's Transportation & Traffic conditions states that the Preferred Alternative will "increase speeds, improve reliability, and reduce travel times and delays". In reviewing the Chapter 3 (Transportation & Traffic), however, there appear to be multiple segments where this will not be the case. It appears to be inaccurate to make this assertion without further detail and refinement. | The rest of the sentence says ".....along the majority of I-495, I-270, and the surrounding local roadway network", because we acknowledge that there are some segments where this is not the case, as noted.  But in general, average speeds are higher, TTI is lower, and system-wide delays are reduced under the Preferred Alternative. |
| 6 | ES-13 | Executive Summary, Environmental | Table ES-1 should include additional environmental metrics, such as those pertaining to air quality & emissions, impacts to VMT, and indirect impacts of how this project may erode Non-Auto Drive Mode Share impacts and enable environmentally damaging development patterns. | The impact summary table in the Executive Summary provides an overview of the quantifiable impacts. It is not intended to be all encompassing of all impacts.  The impacts are presented throughout the document in Chapters 3, 4, 5, and 6 as well as the supporting technical reports. |
| 7 | 2-21 to 2-23, 2-28 | 2 - Alternatives, 2.3.7, 2.4 | Where BRT facilities are master planned: include BRT facilities across the 270 and 495 corridors at interchanges. | Because the limits of the Preferred Alternative have been reduced to Phase 1 South only, there are no proposed Master Plan BRT facilities that would cross I-495 and I-270 on structure. |

| | | | | |
|---|---|---|---|---|
| 8 | 2-24 to 2-25, 2-28 | 2 - Alternatives, 2.3.8, 2.4 | Include ped/bike facilities across the 270 and 495 corridors at interchanges as well as at non-interchange crossing points.  Facilities are expected to meet applicable standards, best practices, and master plans, particularly the approved Bicycle Master Plan and the Pedestrian Master Plan currently in development.  Replacing-in-kind (as stated on page 2-47) is NOT acceptable.

Note that the Bike Master Plan calls for grade separated crossings across free-flow ramps. We also remind that while our Bicycle Master Plan includes prioritization for bikeways, it also states that any bikeways where other projects are occurring are to be considered the highest priority for purposes of implementation with those projects. | While replacement in-kind is all that is required, accommodations for replacement, upgraded, and new pedestrian and bicycle facilities at interchange locations and at-non interchange crossings of I-495 and I-270 are included in the Preferred Alternative design approach, see FEIS Chapter 3, Section 3.1.5. MDOT SHA and the Developer have and will continue to coordinate with Montgomery County to refine the design criteria. The Bicycle Master Plan and draft Complete Streets Design Guide have informed the location and design of proposed facilities. The Pedestrian Master Plan, if made available during the design process, will also be considered by the Developer to inform the design of pedestrian facilities. Existing pedestrian and bicycle facilities impacted by the Preferred Alternative are assumed to be replaced in kind unless the master plan recommendations or design standards identify upgrades of the existing facilities.

Considerations for the provision of signalized or grade-separated crossings of free-flow interchange ramps, including safety, will continue through final design in coordination with local agencies. All bikeways along crossroads that cross I-495 and I-270 in the current master plan are included in the Preferred Alternative design concept. |
| 9 | 2-24 | 2 - Alternatives, 2.3.8 | Separated bike lanes do not have to be located "on-street" as stated in the definition for Bike Lanes. Per the Montgomery County Bicycle Master Plan, separated bike lanes "are exclusive bikeways that combine the user experience of a sidepath with the on-street infrastructure of a conventional bike lane. They are physically separated from motor vehicle traffic and distinct from the sidewalk. They operate one-way or two-way."

The Complete Streets Design Guide (approved by the Planning Board; code updates forthcoming to Council in coming weeks) reinforces that separated bike lanes should be designed to be in the Active Zone, located behind the curb. | The definition of separated bike lanes included in the SDEIS, Chapter 2, Section 2.3.8 does not materially differ from this statement. As stated on page 2-24, "Separated bike lanes, or cycle tracks, are exclusive bikeways that are physically separated from both traffic and the sidewalk. They operate one-way or two-way." Updates to the Preferred Alternative since the SDEIS include refinement of the design criteria based on considerations of the Montgomery County draft Complete Streets Design Guide (February 2021) and in consultation with Montgomery County through multiple meetings. |
| 10 | 2-24 | 2 - Alternatives, 2.3.8 | The last paragraph includes this line: "The preliminary design approach for facilities along crossroads where the crossroad bridge would be reconstructed is to replace, upgrade or provide new pedestrian/bicycle facilities consistent with the master plan, where adjacent connections on either side of the bridge ***currently exist***."  [asterisks added for emphasis]

This statement conflicts with past agreements, which have concurred that the project add master planned pedestrian and bicycle facility on crossroads regardless of whether adjacent connections on either side of the bridge currently exist.

Replace that sentence with something like the following: "All impacted facilities along crossroads where the crossroad bridge would be reconstructed will replace, upgrade or provide new pedestrian, bicycle, and transit facilities consistent with the master plan and, if along a County roadway, also County design guidance and standards." | Within the Phase 1 South limits, adjacent connections to existing pedestrian and/or cyclist facilities already exist along the cross roads that cross over I-495 and I-270 on one or both sides of the bridge crossing. Therefore, the Preferred Alternative includes the replacement, upgrade, or construction of new pedestrian/bicycle facilities consistent with the current master plan along cross roads where the cross road bridge would be reconstructed. |

OP·LANES™
M A R Y L A N D     I-495 & I-270 Managed Lanes Study

| 11 | 2-24 to 2-27 | 2 - Alternatives, 2.3.8 | 2-24 to 2-27 Comments on the ALB Sidepath are ongoing separately from the SDEIS. | Public comments supporting a direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath were received by MDOT SHA, FHWA and NPS during the SDEIS public comment period.  To be responsive, a direct connection to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative LOD and impact analyses. The three shared use path options connecting to MacArthur Boulevard presented in the SDEIS are no longer under consideration in this FEIS. The direct connection to the Chesapeake and Ohio Canal towpath results in fewer NPS property and natural resource impacts. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the study area. The alignment of the proposed shared use path connection to the Chesapeake and Ohio Canal towpath is shown in FEIS Appendix E. |
| 12 | General | 3- Transportation & Traffic | There are major traffic impacts identified by looking closely at the information provided in Appendix A which are not noted at all in the tables and narrative in Chapter 3. We expand upon these issues in subsequent comments.<br><br>This evaluation should be enhanced to look at discrete sections of I-270 and I-495 where significant congestion effects should be noted, acknowledged, and considered for mitigation through modification of the proposed project by design element changes or toll strategy modifications.<br><br>This traffic degradation identified in Appendix A seems to have a significant impact to the proposed project, but it has been overlooked using a simplistic and abbreviated summary of LOS F conditions. The current emphasis on brevity in this SDEIS truncates information to the point where any significant conclusions are not discernable to the average reader.  DEIS chapters should be intended to lay out the significant impacts with more detail provided in Appendices, but this document misses many important transportation findings. | The intent of the SDEIS was to evaluate a new alternative, Alternative 9 Phase 1 South, to determine the relative merit of this alternative in several key operational metrics. The results of the detailed evaluation proposed was completed as part of  MDOT SHA's Application for Interstate Access Point Approval and corresponding design changes and enhancements to mitigate operational issues were documented in the SDEIS. Refer to FEIS Chapter 4 and FEIS Appendix B for the detailed analysis results. |

| 13 | General | 3- Transportation & Traffic | This project claims to improve traffic, but the project's own analyses finds that in there are significant segments where the General Purpose lanes worsen significantly as compared to No Build conditions.<br><br>Does MDOT accept degraded performance of the General Purpose lanes in the interest of providing priced managed lanes? Penalizing current users of these roads does not seem to be consistent with the stated policy objectives of this program.  If MDOT does accept this outcome, it is imperative that equity be considered, and actions be incorporated into the project to address the needs of users that are most adversely impacted.<br><br>The project's Purpose & Need includes creating new options for users, but the Build alternatives instead appear to reduce options available to users unable to afford or otherwise access the managed lanes.  Based on this traffic information, none of these Build alternatives should be considered to satisfy this metric of the Purpose & Need. | The goal of the project is to provide improved operations for all users in the managed lanes, general purpose lanes, and the surrounding roadway network. The traffic analysis shows the Preferred Alternative improves traffic congestion and has operational benefits.  The total system delay is reduced in both peak periods (SDEIS Table 3-6), average speeds increase in the general purpose lanes (SDEIS Table 3-4), and daily delay is also reduced in the surrounding local roadway network in Montgomery County, Prince George's County, and in the District of Columbia (SDEIS Table 3-13).  In nearly all cases, any projected degradation in general purpose lane operations under the Preferred Alternative compared to No Build conditions is 1) isolated to a small segment, 2) relatively minor in magnitude, and 3) offset by improvements elsewhere in the network, as evidenced by the system-wide metrics noted above all showing a net improvement in operations.<br><br>Therefore, we do not agree with the contention that there are "significant segments where the General Purpose lanes worsen significantly as compared to No Build conditions."  The few locations in the SDEIS that could experience degraded operations were examined in more detail as part of the development of the FEIS and the final traffic analysis.  The assumptions in the transportation model were reviewed and the traffic analysis was updated to reflect the latest design in the FEIS; operational issues were mitigated, where feasible.<br><br>For example, Table 3-8 in the SDEIS showed that the projected travel time index (TTI) for the I-495 Inner Loop from I-270 to I-95 would be projected to increase from 1.3 to 2.7 during the AM peak under the Preferred Alternative, which appeared to be a significant degradation.<br><br>However, Table 3-8 in the SDEIS also showed that the downstream segment of the I-495 Inner Loop from I-95 to MD 5 would be projected to improve from 2.5 to 1.9 during the AM peak under the preferred alternative.  Upon further review, the forecasting assumptions in the SDEIS models near the Greenbelt Metro Interchange were found to be causing more congestion upstream and less congestion downstream under the Build condition.<br><br>This issue was corrected in the FEIS, and Table 4-5 in the FEIS shows that the TTI in these segments would be similar under No Build and Build conditions, as expected. |

| | | | (Comment #13 continued) | In consideration of FHWA's policy priorities and MDOT's interest in having an equitable transportation solution for everyone, MDOT SHA has incorporated elements into the Preferred Alternative that support fair, accessible, and affordable transportation options for everyone, including traditionally underserved communities, including the following.

• Supporting additional affordable, multimodal travel options including toll-free travel for new bus transit on managed lanes for a faster, more reliable trip; toll-free travel for carpools/vanpools with three or more (3+) occupants, and working with the local communities to expand transit fare subsidies for eligible low-income riders.

• Improving accessibility to work, school, and other modes of transportation via pedestrian and bicycle improvements by upgrading existing pedestrian and bicycle facilities impacted by the Preferred Alternative by replacing in-kind or upgrading to meet the master plan recommended facilities; where I-495 and I-270 or associated ramps cross over a roadway and the bridge would be replaced, the mainline and ramp bridges will be lengthened to accommodate the footprint of the master plan facility under the structure; new pedestrian and bicycle facilities including a shared use path on the ALB; new sidepaths across MD 190 over I-495; new sidewalk along Seven Locks Road to re-establish the historic connection in the historically African American community of Gibson Grove; and providing safer pedestrian and bicycle improvements and connecting with planned City of Rockville improvements at the MD 189 and I-270 interchange.

• Enhancing transit connectivity and mobility by providing direct and indirect access ramps from the managed lanes to existing transit stations including Shady Grove, Twinbrook, Rockville Metro Stations and Westfield Montgomery Mall Transit Center; increasing the number of bus bays at WMATA Shady Grove Metrorail Station; and increasing parking capacity at the Westfield Montgomery Mall Transit Center.

• Upgrading existing transportation facilities throughout Phase 1 South for all users of the Study roadways by replacing or rehabilitating all existing bridges on or over I-495 and I-270 within the Phase 1 South corridor and rehabilitating and repaving the existing general purpose lanes for smoother and safer travel for all users. |



| 14 | General | 3- Transportation & Traffic | In several segments and peak periods the General Purpose lanes operate nearly as well as the managed lanes. This could in-turn affect how much traffic chooses to instead remain in the GP lanes.<br><br>Conversely, some other segments appear to show degraded General Purpose Lanes at the same time as Managed Lanes are operated well above the 45 MPH design speed, implying that tolls might be lowered in those segments to attract more General Purpose traffic.<br><br>Both of these indicate an apparent lack of adequate iterative modeling, as it appears that this analysis has not yet found the right balance / equilibrium.<br><br>This will affect the ultimate traffic findings and may also affect the Managed Lanes' financial presumptions. | The results presented in the SDEIS were preliminary and were developed before toll range setting had been completed.  The results in the FEIS include more iterative modeling to better capture assumed toll lane demand. Refer to FEIS Chapter 4 and FEIS Appendix B for the detailed analysis results. |
| 15 | General | 3- Transportation & Traffic | Provide an O-D Matrix of travel times for both the Managed and General Purpose lanes for each access point along I-270 and I-495 (with accompanying narrative, as needed).  This will help better understand flows, identify specifically failing pairings, and better tailor responses to these needs.<br><br>This is especially important considering it is our understanding that many/most trips along these facilities are relatively short in nature, using the interstate for only a few interchanges. Therefore longer & larger systemic effects may be of less utility to actual users. | The requested data was provided in SDEIS Appendix A, Attachment D.<br><br>It is also available in FEIS Appendix A, Attachment E. |
| 16 | General | 3- Transportation & Traffic | For this section and in general, has any operational analysis been performed for the interchange ramps and ramp terminal intersections on the interchange cross streets? Section 3.3.6 provides information about overall network delay to the local roadway network, but there is language about some increased delays around managed lane entrance points on the cross streets.<br><br>Were just the ramps and ramp terminal intersections modeled, or did the model continue on either side of the interchange to get a clearer representation of these cross street operations in the vicinities of interchanges?<br><br>We want to be sure that operational benefits to the freeway system do not result in operational failures or safety concerns on the ramps or cross streets, so it would be important to have an idea of any localized issues as well. | Operational analysis focusing on the interchange ramps, ramp terminal intersections, and adjacent cross street intersections was completed as part of MDOT SHA's Application for IAPA, and the results are included in FEIS Appendix B.  Mitigation is proposed on cross streets in locations where additional traffic is projected as a result of the Preferred Alternative to ensure that acceptable traffic operations are maintained on the surrounding roadway network. |

00022184

OP·LANES™
M A R Y L A N D    I-495 & I-270 Managed Lanes Study

**FINAL ENVIROMENTAL IMPACT STATEMENT**

| 17 | 3-4 | 3- Transportation & Traffic, 3.1.3 | On page 3-4 it is stated that this analysis accounts for the State's Innovative Congestion Management (ICM) project along I-270, but the results provided in this section appear to conflict with the analyses from the ICM project, which would seem to imply that the I-270 corridor would operate adequately under No Build conditions. Provide narrative clarifying this difference.<br> | The analysis includes the I-270 ICM improvements as one of the background projects that is included in the No Build. The I-270 ICM project was designed to provide **near term** congestion relief along I-270. However, HOT lanes are needed in this segment to address **long-term** needs and to provide system connectivity between the existing and proposed HOT lanes on I-495 in Maryland and Virginia and MD 200.<br><br>The results are consistent with the ICM findings. Refer to Table 5-3 of DEIS Appendix C (Traffic Analysis Technical Report) which shows a reduction in travel time along I-270 under 2025 No Build conditions compared to Existing Conditions due to the ICM improvements, as noted in the footnote. However, by 2040, congestion is projected to increase again with travel times approaching pre-ICM levels, demonstrating the need for additional capacity long-term. FEIS Chapter 4 includes additional narrative on the ICM project, as requested. |
| 18 | 3-4 | 3- Transportation & Traffic, 3.1.3 | The base network includes several significant transit projects where State commitment has been lacking. Does this indicate that the State has a renewed willingness to fund and implement these projects, perhaps including them as part of the P3 project? | The base network includes all multi-modal transportation initiatives and projects included in the MWCOG model for 2045, which is based on the "Visualize2045" plan, adopted by the MWCOG in October 2018 and the Constrained Long Range Plan. For example, the traffic models for the No Build and Build Alternatives assumed that major transit projects would be in place like the North Bethesda Transitway BRT, Veirs Mill Road BRT, MD 355 BRT, Randolph Road BRT, New Hampshire Ave BRT, MARC increase in trip capacity and frequency, and the Purple Line Light Rail. Visualize2045 and the CLRP do not state who will construct and pay for the projects, just that they are expected to be in place by 2045; therefore, MDOT SHA included them in the traffic model.<br><br>Additionally, refer to Chapter 3, Section 3.1.4 for a list of Transit-related elements that are included in the Preferred Alternative including Enhanced Transit Mobility and Connectivity, BPW and Regional Transit Services, American Legion Bridge Transit and TDM Plan. |
| 19 | 3-5 | 3- Transportation & Traffic, 3.1.4 | While traffic has recovered to an estimated 90% of expected "normal" levels, it may be worth noting whether the nature of these trips has changed. It is my understanding that we continue to see a lower share of peak commute trips, and a higher share of off-peak non-commute trips. It may be helpful to explore the nature of how trip types have shifted and how they are trending. | Evaluation of traffic trends during the pandemic has been completed and is documented in FEIS Appendix C. Additionally, refer to FEIS Chapter 9, Section 3.1 for a response on Purpose and Need and the effects of the Pandemic. |
| 20 | 3-8 | 3- Transportation & Traffic, 3.3 | Table 3-3 shows 2045 Build Traffic. The Build alternatives show ADTs that are higher than No-Build. It may be helpful to discuss this growth in the context of induced demand and diverted trips: are these additional trips new trips? Are they trips that were occurring at different times, or that were using different routes? Are they trips that have shifted from non-auto modes? | As set forth in the text above SDEIS Table 3-3 "the Preferred Alternative would be projected to see an increase in daily traffic volumes served compared to the No Build Alternative because the freeways would be able to accommodate latent demand that would otherwise use the local roadway network to avoid congestion." So as identified, the additional ADT results most notably from latent demand, as you note this includes trips diverted from the local roadway network. See also, Chapter 9, Section 3.4.B for discussion on induced demand. |

00022185

| 21 | 3-8, 3-9 | 3- Transportation & Traffic, 3.3.1 | While this section alludes to more detailed travel speed information in the appendices, it may be helpful to provide a general note highlighting any significant speed benefits or impedances experienced on a segment level, which may be watered down by taking an average of a much longer corridor. | Chapter 4 of the FEIS includes a discussion of notable speed benefits/impedances. A comprehensive speed data is included in FEIS Appendix A. |
|---|---|---|---|---|
| 22 | 3-9 | 3- Transportation & Traffic, 3.3.1 | The General Purpose lanes operate more slowly than No Build conditions under the following scenarios:<br><br>-AM peak, NB 270 between 495 and 370 (3% reduction)<br>-PM peak, NB 270 between 495 and 370 (3% reduction)<br>-PM peak, SB 270 between 370 and 495 (7% reduction)<br><br>Any worsening of the General Purpose lanes to benefit Tolled Lanes presents a major equity issue that needs to be directly and substantively addressed. | The results presented in the SDEIS were preliminary. The noted issues referenced here were investigated during development of the FEIS, and the updated results no longer show a reduction in GP lane speeds in these areas. Refer to FEIS Chapter 4 and FEIS Appendix A for detailed traffic analysis results. |
| 23 | 3-9 | 3- Transportation & Traffic, 3.3.1 | The General Purpose lanes operate nearly the same speed as the HOT lanes in the segments listed below, which may affect the usefulness of the HOT lanes. This could in-turn affect how much traffic chooses to instead remain in the GP lanes, and it is unclear how this evaluated such feedback processes & whether an equilibrium was identified. This may also affect the HOT lanes' financial viability.<br><br>-AM peak, 495 O/L between 270 and GW Pkwy (8% slower than HOT lanes)<br>-AM peak, 495 I/L between GW Pkwy and 270 (13% slower than HOT lanes)<br>-AM peak, NB 270 between 495 and 370 (3% slower than HOT lanes)<br>-AM peak, SB 270 between 370 and 495 (16% slower than HOT lanes)<br>-PM peak, 495 O/L between 270 and GW Pkwy (13% slower than HOT lanes)<br>-PM peak, SB 270 between 370 and 495 (equal speed) | The results presented in the SDEIS were preliminary. The noted issues referenced here were investigated during development of the FEIS, and the updated results show increased benefits in the HOT lanes compared to the adjacent GP lanes than were reported in the SDEIS. Additionally, there are additional benefits to traveling in the HOT lanes, including increased trip reliability, particularly during non-recurring congestion. Refer to FEIS Chapter 4 and FEIS Appendix A for detailed traffic analysis results. |
| 24 | 3-9 | 3- Transportation & Traffic, 3.3.1 | RE: 2045 Inner Loop PM Peak Hour VISSIM Travel Speed in the Managed Lanes -<br>During the PM peak hour, the route from the GW Parkway to the I-270 West Spur is projected is projected to take only 4.2 minutes for a 4.3-mile section of road (61 mph), not the 23 mph reported in Table 3-5. The 4.2-minute travel time was obtained from Appendix A - Attachment D – Travel Time Matrices for the ETL (PM Peak Hour). There must be an error in one of these travel time/speed measurements as they do not match. | The difference in the numbers is a result of a different endpoint for each value. In Appendix A - Attachment D, the travel time and speed are shown for a trip that continues north up the I-270 west spur. This trip is free flow (61 mph). However, SDEIS Table 3-5 reflects a trip that continues along the Inner Loop and also accounts for the segment where the HOT lanes tie back to the general purpose lanes. |
| 25 | 3-10 | 3- Transportation & Traffic, 3.3.2 | The Delay metric appears to combine both General Purpose and Managed Lanes. As such, this is not a particularly useful metric.<br><br>The aggregate nature of this metric may allow the effects of the managed lanes or the general purpose lanes to be over representative, and we urge that this metric account separately for managed lanes and general purpose lanes. | Some metrics, like system-wide delay, use aggregate results, while others (such as TTI and average speed) look specifically at the GP lanes. |
| 26 | 3-11 | 3- Transportation & Traffic, 3.3.3 | Define what "Weighted Average TTI" means in this section. | This value reflects the average of the 16 TTI values in SDEIS Table 3-8, weighted based on segment length. |

| 27 | 3-11 to 3-12 | 3- Transportation & Traffic, 3.3.3 | The General Purpose lanes have a higher TTI than No Build conditions in the following segments:<br><br>- AM peak, 495 I/L between 270 and 95 (107% worse and now failing)<br>- PM peak, 495 I/L between VA 193 and 270 (5% worse)<br>- PM peak, 495 I/L between 95 and MD 5 (20% worse) | Noted.  The revised results in the FEIS based on the updated design only show one location with higher TTI in the Preferred Alternative compared to the No Build - I-495 Inner Loop from VA 193 to I-270.  This is due to traffic being metered from reaching this location under the No Build condition due to congestion in Virginia approaching the American Legion Bridge. |
| 28 | 3-11 to 3-12 | 3- Transportation & Traffic, 3.3.3 | The focus only on the General Purpose lanes ignores that Managed Lanes users using sliplanes will also be affected by the General Purpose lane's congestion.<br><br>Given the increased delays in the General Purpose lanes, if there are any cases where managed lanes users  must use at-grade sliplanes to enter or exit the sliplanes: clarify whether there are any O-D pairings whereby the additional time spent in the General Purpose lanes is such that a Managed Lane user's net travel time is worse than the same trip under No Build conditions. | At-grade slip lanes are only provided in one location within the project limits – on the West Spur of I-270.  Operations of these slip lanes were evaluated, and they were deemed to operate acceptably.  The results presented account for the interaction between the Managed Lanes and General Purpose Lanes. The vast majority of Managed Lane trips will use direct access ramps to enter and exit the Managed Lanes. For trips that do include travel in both the Managed Lanes and General Purpose Lanes, a net travel time benefit would be expected. |
| 29 | 3-11 to 3-12 | 3- Transportation & Traffic, 3.3.3 | There are no TTI evaluations provided for the managed lanes. Given that the Travel Speeds may imply limited difference between the General Purpose Lanes and Managed Lanes in some segments, it may be helpful to see how this also manifests in the TTI. | A note has been added in the FEIS that the TTI for the HOT lanes is less than 1.15 (i.e. "uncongested") for all segments. |
| 30 | 3-12 | 3- Transportation & Traffic, 3.3.3 | RE: 2045 Inner Loop PM Peak Hours TTIs -<br><br>The TTIs for the Inner Loop PM peak hour from VA 193 to I-270 do not seem to match with travel time data provided in Appendix A, Attachment D. Is congested TTI defined based on the posted speed limit of 55 mph or based on observations of existing off-peak speeds on that stretch of road? The travel time for this 5.1-mile segment for the managed lanes is shown as 5.3 minutes in Appendix A, Attachment D (page 133 of 184). This equates to an average speed of 58 mph. What is the TTI in the Managed Lanes through this same section? As an example, could you provide the TTI calculations for this segment for Alt 1, GP lanes and the Managed Lanes? | The updated TTIs presented in the FEIS are based on the posted speed limit of 55 mph. For the Inner loop PM peak hour section from VA 193 to I-270, the free flow travel time for this 5.4 mile segment is calculated based on the 55 mph posted speed, which equates to 5.85 minutes. TTIs for Alternative 1, the Build GP Lanes, and the Managed Lanes are calculated by dividing the respective alternative travel times for this section with free-flow travel time and they are listed below:<br>- Alternative 1 (No Build) = 22.5/5.85 = 3.8<br>- Build GP Lanes =23.62/5.85=4.0<br>- Build Managed Lanes=5.25/5.85= 0.9 |
| 31 | 3-12 | 3- Transportation & Traffic, 3.3.4 | The Level of Service metric appears to combine both General Purpose and Managed Lanes. As such, this is not a particularly useful metric.<br><br>The aggregate nature of this metric may allow the effects of the managed lanes or the general purpose lanes to be over representative, and we urge that this metric account separately for managed lanes and general purpose lanes. | Some metrics, like LOS, use aggregate results, while others (such as TTI and average speed) look specifically at the GP lanes. |

| 32 | 3-12 | 3- Transportation & Traffic, 3.3.4 | I-495 east of I-270 LOS F conditions: It is stated that "29 percent of the lane miles would continue to operate at LOS F in the design year of 2045 under the Preferred Alternative, primarily in areas along I-495 east of the I-270 east spur that would have no action." This statement does not seem accurate, as AM peak hour conditions will grow considerably worse overall in certain sections of I-495 due to the proposed project. The localized summary of impacts has not been presented in Table 3-9 or anywhere in the SDEIS.<br><br>Between MD 355 (I-270 East Spur) and I-95, there are 52 Inner Loop analysis segments totaling 8.8 miles. During the 2045 AM Peak Hour, 20 of these segments (3.4 miles or 39 percent of this section of I-495) operate at LOS F in the No Build Condition, but 46 segments (8.28 miles or 94 percent of this section of I-495) operate at LOS F with the Preferred Alternative in place.<br><br>Clearly, neither the Chapter 3 presentation nor Appendix A provides any of this fine-grained analysis or conclusions. The data in Attachment F had to be combed through to discover this significant impact. This evaluation should be enhanced to look at discrete sections of I-270 and I-495 where significant congestion effects should be noted, acknowledged, and considered for mitigation through modification of the proposed project by design element changes or toll strategy modifications. | The calculations for percent lane miles operating at LOS F within the study area have been checked and they are accurate. Overall, the preferred alternative results in a lower amount of failing lane miles. However, we acknowledge that there are more failing segments along the Inner Loop between MD 355 and I-95 under Build conditions, and the numbers presented in this comment are accurate. On the flip side, there are fewer failing segments along the Outer Loop between I-95 and MD 355 under Build conditions despite no improvements in this section because downstream congestion is relieved by the Preferred Alternative. The goal of the SDEIS was to evaluate overall impacts of Alternative 9 - Phase 1 South using the same key metrics as were used in the DEIS to compare other alternatives. The FEIS and MDOT SHA's Application for Interstate Access Point Approval include a more detailed review of the nuances of the model results and localized impacts. Refer to FEIS Chapter 4 and Appendices A and B. |
| 33 | 3-13 | 3- Transportation & Traffic, 3.3.5 | The first sentence references throughput as quantifying "how efficiently goods, services, and people" can move through the system, but this does not appear to address these.<br><br>This does not consider person-throughput (only vehicle throughput) which could affect High Occupancy and Transit provisions, assumptions, and utilization. MDOT has previously expressly declined to follow industry practices in evaluating person-throughput, which we feel to be a significant oversight in duly evaluating the alternatives and ensuring an optimal design.<br><br>There is no narrative at all toward freight movement. It is unclear how goods movement will be affected by the Managed Lanes and whether trucks would or would not be permitted to use the lanes. Where are freight trips coming from & destined to?  Are there yards, distribution centers, major warehousing facilities, etc. that are key focal points, or any other key freight movements?  How does the Managed Lanes project reflect and serve these needs and patterns? Again, this is a major role of an interstate that appears to have been given minimal consideration. | Person-throughput was evaluated and was included in Table 5-16 of DEIS, Appendix C. However, the metric of vehicle-throughput was reported here because it is a direct output of the VISSIM model.  MDOT SHA expects that the project will lead to higher vehicle occupancy by providing opportunities for buses to use the HOT lanes and by permitting HOV 3+ to use the lanes for free.  However, it is difficult to quantify this increase in vehicle occupancy, and therefore vehicle-throughput was used as a proxy for person-throughput in this section (a conservative approach as to not overstate the potential benefits).  Trucks will be permitted to use the HOT lanes in Maryland.  I-495 and I-270 currently serve a large amount of regional freight traffic and it is logical to assume that the demonstrated benefits experienced by all vehicles would also apply to trucks. |
| 34 | 3-14 | 3- Transportation & Traffic, 3.3.5 | Regarding Table 3-11 - It would be helpful to mention in the narrative (or possibly a footnote) why the 2045 No Build is not compared to the 2040 No Build. | SDEIS Table 3-2 includes a comparison of 2040 No Build and 2045 No Build ADT volumes.  For the operational metrics (including SDEIS Table 3-11), the intent was to show the relative difference between 2045 No Build and 2045 Build.  Year 2040 data was not included in the operational metric tables to avoid confusion. |

| 35 | 3-15 | 3- Transportation & Traffic, 3.3.6 | This evaluation appears to average together the impacts to all local streets across all times of day, which results in a metric that offers no substantive value & may misinform the public. Some corridors are likely to benefit, such as MD 355 outside the Beltway, MD 192, MD 547, and potentially MD 586.<br><br>Conversely, we suspect that the radial corridors inside the Beltway are likely to experience significant adverse impacts, particularly during the AM peak as more traffic is enabled to arrive at these centralized points faster, and in greater volume (as demonstrated with the Vehicle Throughput results on page 3-14).<br><br>Beyond the Phase 1 South area: additional congestion may also occur due to the new and shifted bottlenecks created by this project, as reinforced by the traffic analyses in Appendix A. These local corridors are often already congested and travel through urban areas where automotive traffic is not the priority mode. This may cause greater amounts of peak spreading & may result in traffic shifting to alternative routes that have not been adequately considered to-date.<br><br>Furthermore: averaging the local impacts into daily values erases the effects of peak periods in peak directions. Delays, speeds, and travel time information for the Local Network is extremely important information that needs to be known at this stage. That this study does not give this level of information on the impacts to the local road network is a complete aberration from what is expected out of a traffic analyses at this stage of the project.<br><br>The Next Steps notes the Interstate Access Point Approval process will evaluate these, but at such a late stage this same text lists potential treatments that may run the risk of being bandaids on a much larger and more significant issue that should have been identified and evaluated at a far earlier stage. | The evaluation demonstrates that the net impact of the project will be an overall reduction in delay on the surrounding arterials, despite some localized increases in arterial traffic near the managed lane access points in interchanges. The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of the FEIS, and mitigation is proposed where needed to maintain acceptable operations per FHWA Interstate Access Point Approval guidelines. |
| 36 | 4-3 to 4-4 | 4 - Environmental, 4.1 | This section should include information on how this project will affect land use & zoning beyond the immediate impacts of the project. This includes a focus on how this may affect environmentally damaging development patterns and efforts toward Non-Auto Driver Mode Share (NADMS) goals. | Consideration of land use impacts outside the limits of disturbance are discussed in the Indirect and Cumulative Effects Analysis. Refer to FEIS, Appendix Q and FEIS, Chapter 5, Section 5.22.<br><br>The Preferred Alternative, Alternative 9 - Phase 1 South, includes HOT lanes, which promote the use of non-SOV vehicles by providing a free, reliable trip for HOV 3+ vehicles and buses. Additionally, the project includes commitments for bicycle, pedestrian, and further transit improvements. See FEIS Chapter 3, Section 3.1.4 for transit-related elements and FEIS Chapter 3, Section 3.1.5 for pedestrian and bicycle facilities associated with the Preferred Alternative. |
| 37 | 4-42 to 4-44 | 4 - Environmental, 4.8.3 | As Air Quality metrics are prepared for the presentation in the FEIS, ensure that the information for the Preferred Alternative considers the increased vehicle volumes and increased congestion in multiple segments within the study area. These impacts must be included for a complete analysis.<br><br>It is also unclear whether local roadways have been included in this analysis, particularly noting the lack of Transportation & Traffic information on these same roadways. | Noted. The air quality analysis accounts for volume and congestion changes throughout the affected network, and includes local roadways, where appropriate. |

| 38 | 4-36 | 4 - Environmental, 4.8.1 | This page includes the following statement: "GHG emissions on the affected transportation network for all modeled Build Alternatives in the DEIS are projected to be lower in the opening (2025) and design (2040) years compared to base year conditions. All Build Alternatives are projected to slightly increase annual tailpipe GHG emissions by an average of 1.4 percent compared to the No Build Alternative in 2040."<br><br>First, I may be misinterpreting something, but it sounds like the 1st sentence says this will have lower emissions, but the 2nd sentence says this will have higher emissions. How do these differ? Is it that the 1st sentence appears to account for *all* GHG emissions, and the 2nd sentence appears to focused only on tailpipe GHG emissions? More detail is needed.<br><br>Second, if this is asserting that the project will reduce emissions: much more detail is needed on methodology and assumptions, as this result seems counterintuitive given that the project is increasing vehicle volumes and VMT. Noting the State's interest in Electric Vehicles: if electric vehicles are a substantive part of this reduction, it will be important to account for the impacts of the electric vehicles themselves.<br>While an improvement over the existing fossil fuel based car fleet, electric vehicles also carry substantial impacts:<br><br>-Extracting the resources needed for their production (particularly their batteries)<br>-Impacts of production<br>-Energy requirements, which at present is generated through unsustainable & polluting sources<br>-Severely impactful waste issues (again largely due to the batteries)<br>-EVs are still vehicles: they demand pavements (concrete and asphalt; both depend on highly impactful cement and petroleum production) and pose safety risks that erode Non-Auto and Vision Zero efforts. | To clarify the first sentence in question: We are saying that the modeled GHG emissions in both 2025 (what we call the opening year in the air analysis) and 2040 (the design year) are projected to be lower for all of the Build Alternatives presented in the DEIS when compared to the modeled emissions for the existing condition (2016 or base year). In other words, compared to 2016, the projected GHG emissions in 2025 and 2040 would be lower regardless of which alternative was chosen.<br><br>To clarify the second sentence in question: When comparing the modeled No Build Alternative in 2040 to each of the Build Alternatives in 2040, there is a slight increase (1.4% average) in GHG emissions seen in the Build Alternatives. So compared to the No Build Alternative in the design year (2040), any Build Alternative could be expected to result in approximately 1.4% higher GHG emissions than the No Build condition in 2040.<br><br>The decrease in GHG over time (from existing to design year – first sentence) can be attributed to improvements in fuel and vehicle technologies and standards that are accounted for in the MOVES model. Electric vehicles are accounted for in the project level analysis as a part of the MOVES model based on their presence in the fleet data we received from MWCOG. At a program level, electric vehicles are one of the strategies MDOT is exploring as part of its plan to reduce emissions for the transportation sector as a whole, but separate from the project level emissions analysis completed for the MLS. |
| 39 | 5-3, 5-8 to 5-10 | 5 - Section 4F | The first paragraph of 5.1.3 (page 5-3) and the lists in 5.2.1 (pages 5-8 to 5-10) identifies impacts that have been reduced due largely to reducing the project's scope only to Phase 1 South. As the remainder of the project remains nominally active, however, these aren't really reductions in the spirit of reducing the impacts of the overall full-build project.<br><br>This information should focus on how impacts *within the same geographic span of the Phase 1 South segment* have been reduced since the DEIS, which allows a more apples-to-apples consideration. This also helps avoid a "taking up smoking in order to quit" approach of padding the DEIS with a large amount of impacts, and then claiming reductions by later cutting those impacts. | The Study Limits of the Managed Lanes Study remain the same as described in the DEIS and continue to include 48 miles on both I-495 and I-270. However, as described in the SDEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. Therefore, impacts to resources outside of Phase 1 South have been avoided under the Preferred Alternative. Since the DEIS and the SDEIS, MDOT SHA has continued to avoid and minimize impacts to resources within the Phase 1 South area. Refer to the FEIS Executive Summary, Chapter 5, and Chapter 7 for details on these efforts. |

| 40 | 12 | Appendix A | Table 6 provides a summary of the effects of the No-Build and Alternative 9 - Phase 1 South Alternatives on the County's local roadway network.  For Montgomery County, Alternative 9 shows a 4.8% reduction in daily delay (vehicle-hours) for all arterials, but this statistic appears fairly generic.  It is not clear how the increased throughput on segments of I-495 and I-270 would affect radial routes/arterials specifically.  This is critical to clarify to avoid situations where local arterials are overloaded and fail operationally or create safety concerns.  Please provide an analysis summary or discussion that examines the operational impact to radial routes (such as MD 97, MD 185, MD 355, MD 190, Cabin John Parkway, etc.) under Alternative 9 – Phase 1 South, compared to No-Build, during peak periods. | SDEIS Table 6 demonstrates that the net impact of the project will be an overall reduction in delay on the surrounding arterials, despite some localized increases in arterial traffic near the managed lane access interchanges.  The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of the FEIS, and mitigation is proposed where needed to maintain acceptable operations per FHWA Interstate Access Point Approval guidelines. Refer to FEIS Appendix B for the detailed analysis results in MDOT SHA's Application for Interstate Access Point Approval. |
| --- | --- | --- | --- | --- |
| 41 | Attachments B and D | Appendix A | RE: 2045 PM Peak Hour Travel Times from VA 193 to I-270 and Delay/Demand Imbalance - Alternative 1 (No Build) has a 38.6-minute travel time and the Preferred Alternative GP lanes have a 40.1-minute travel time. The managed lanes have a 5.3-minute travel time. The travel time differential through this section seems totally unbalanced, as a managed lane toll strategy should seek to achieve a much lower speed than is forecast and still operate acceptably (by reducing the toll) until a 45-mph average speed is achieved in the managed lanes.

2,535 vph is the projected Inner Loop 6-7 PM toll volume at the ALB (page 101 of 184, Appendix A, Attachment B). Using MDOT SHA's vphpl lane max for a managed lane of 1700 vphpl, it appears that there is excess room in the PM Inner Loop managed lanes for an additional 865 vehicles during the highest 6-7 PM peak hour (more in the other 3 PM hours). This would represent a 13 percent reduction in volumes in the GP lanes if the toll was lowered to induce more traffic to use the managed lanes to achieve this balance.

This might help to mitigate the poor GP lane conditions, so it is at least better than Alternative 1 (No Build).  In general, it seems that this type of critical thinking and manual toll adjustments should have been a standard step in the toll assignment process. It is easy to diagnose, and likely can be fixed with a few iterative model runs with reduced tolls when this occurs. | Forecasts were developed for the SDEIS using a methodology based on generally accepted principles that was consistent with the DEIS and was approved by FHWA. Forecasts have been refined in the FEIS and these suggestions were considered in the development of the final traffic analysis.  For example, iterative model runs were conducted, as suggested, to reassign volumes between the HOT lanes and General Purpose lanes. |
| 42 | Attachments A and B | Appendix A | RE: Percentage of total demand using managed lanes on I-270 Western Spur During the AM Peak hours - Between 27% - 39% of total demand uses the Managed Lanes on Southbound I-270 approaching I-495 during the AM peak hours. This entire travel path only shows a 2.5-minute savings using the Managed Lanes along its 14-mile tolled length.

Between 42% - 52% of total demand uses the Managed Lanes on Northbound I-270 just north of I-495 during the AM peak hours. This entire path only shows a 1.3-minute travel time savings over its 14-mile tolled length.

How are the percent demand achieved using the managed lanes possible if the travel time benefit is so small? | The methodology used to evaluate the traffic was based on generally accepted principles, was approved by FHWA, and was consistent with the methodology used in DEIS.  Also see response to Comment #46 below. |

| 43 | Attachments A and B | Appendix A | RE: Percentage of total demand using managed lanes on I-270 Western Spur During the PM Peak hours | Evaluation methodology used was based on generally accepted principles, was approved by FHWA, and was consistent with methodology used in the DEIS.  Also see response to Comment #46 below. |
| --- | --- | --- | --- | --- |
| | | | Between 42% - 45% of total demand uses the Managed Lanes on Southbound I-270 approaching I-495 during the PM peak hours. This entire travel path only shows a 1.3-minute savings using the Managed Lanes along its 14-mile tolled length. | |
| | | | Between 39% - 41% of total demand uses the Managed Lanes on Northbound I-270 just north of I-495 during the PM peak hours. This entire path shows a 38-minute travel time savings over its 14-mile tolled length. | |
| | | | Again, the demand allocated to the managed lanes and the methodology for this is questionable. | |
| 44 | Attachments B and D | Appendix A | RE: 2045 PM Peak Hour Inner Loop Volumes - The hourly volumes presented in Attachments B and D do not match. The 2034 Alt 9 Phase 1 PM Peak Hour Volumes are… | The comment appears to refer to data in Attachment F, not Attachment D.  The volumes shown in Attachment F represent throughput volumes in the GP lanes, while the numbers reported in Attachment B represent demand volumes, which explains the difference. |
| | | | -7615 (Appx B) - 5390 (Appx D) - At the ALB | |
| | | | -8680 (Appx B) - 4199 (Appx D) - 190 to 270 West Spur | |
| | | | -8685 (Appx B) - 2142 (Appx D) - 270 West Spur to MD 187 | |
| | | | Please explain this discrepancy. It appears that this discrepancy is not isolated to these three sections. | |
| 45 | Attachment C, 123 | Appendix A | RE: 2045 AM Peak Hour SB I-270 Congestion - Per the I-270 SB Speed AM profile, peak hour speeds will be disrupted significantly on the MD 121 to Middlebrook Road segment of I-270 during the 2045 AM peak hour due to the addition of the proposed project. This is likely to seriously increase travel delay for commuters living in UpCounty Montgomery County and Frederick County. | The purpose of the SDEIS is to provide the same level of detail for Alternative 9 - Phase 1 South as the alternatives presented in the DEIS. |
| | | | Please provide more travel time summaries for more common travel patterns, including Frederick to Rockville, Clarksburg to the GW Parkway, and Clarksburg to MD 97. Please explain why increased congestion is projected to occur many miles upstream from the project area. We anticipate that instead of this very long delay, you would continue to see worsened peak spreading into the shoulder hours during the AM commute period. | The Preferred Alternative meets the applicable standards for logical termini (I-495 in Virginia at the George Washington Memorial Parkway Interchange, across the American Legion Bridge, and the major interchanges at I-370 along I-270 North and MD 5 in Prince George's County) and independent utility.  A discussion of the rationale for identifying the logical termini for the MLS which reflects the area of influence for traffic and environmental analyses, was included in the DEIS in Chapter 1, Section 1.1. A demonstration of the proposed action's operational independence is also included as part of FHWA's Interstate Access Point Approval process, which provides a traffic and safety operational analysis of adjacent interstate segments beyond the limits of improvements as well as on the local street network at existing and proposed interchanges.  FHWA has carefully reviewed issues related to segmentation and has not found basis to reject the independent utility and operational independence. For MDOT SHA's Application for Interstate Access Point Approval, refer to FEIS, Appendix B.  With respect to a proposed action on I-270 north of the I-370 interchange, a pre-NEPA Study is being conducted independent from the MLS. |
| | | | This project seems to be setting up the need for Phase 1B by design. In that sense, I think it is clear that the segmentation of this project on I-270 into Phase 1A and Phase 1B was not fully thought out, as widening on Phase 1A precipitates the need for Phase 1B. From early on, the constraint at the Montgomery/Frederick County line has been identified as a major bottleneck that is more of immediate action. | |

| 46 | Attachment F, 144-155 | Appendix A | RE: AM Peak Hour Bottleneck Shift to Top Side of Beltway – Level of Service - A comparison of the link evaluation results for the I-495 Inner Loop 2045 AM Peak Hour shows how Inner Loop congestion will increase due to the addition of the proposed project. Comparing graphics on page 144 and 155, the extent of congestion between the I-270 Western Spur to MD 193 caused by the project increases significantly, jamming up the entire top side of the Beltway as more traffic is allowed to funnel into the top side of the Beltway than it can handle.

This will be devastating to AM peak hour traffic conditions on the top side of the Inner Loop within most of Montgomery County during the 2045 AM peak hour. In the 2045 No Build condition, only 4 of the total 48 road segments evaluated were projected with Level of Service F conditions between the I-270 western spur and MD 193. With the preferred alternative, a total of 41 out of the total 48 road segments are projected to operate at Level of Service F conditions during the 2045 AM peak hour. | The results presented in the SDEIS were based on the design of the Preferred Alternative at that time. Further coordination and collaboration with the Developer resulted in refinements to design elements of the Preferred Alternative as described in FEIS Chapter 2. Traffic forecasts and models were also updated and refined for the Preferred Alternative to address operational issues and potential discrepancies, such as those noted here. Refer to FEIS, Chapter 4, and Appendices A and B. |
|---|---|---|---|---|
| 47 | Attachment F, 147-159 | Appendix A | RE: Increased Southbound Congestion at Existing I-270 Bottleneck at Montgomery/Frederick County Line - A comparison of the link evaluation results for the I-270 SB 2045 AM Peak Hour shows how I-270 SB congestion will increase due to the addition of the proposed project. Comparing graphics on page 147 and 159, one can see the extent of congestion between four segments north of MD 121 to Middlebrook Road caused by the project.

In the 2045 No Build condition, only 9 of the total 25 road segments evaluated were projected with Level of Service F conditions within this area. With the preferred alternative, a total of 24 out of the total 25 road segments are projected to operate at Level of Service F conditions during the 2045 AM peak hour. The projected worsening of traffic conditions in this section of I-270 seems to be caused by the presence of additional capacity downstream, with more drivers willing to suffer through this congestion in the Clarksburg area. Even if this results in a faster commute for some, it does increase the intensity of the existing bottleneck congestion. | See response to Comment #46. |
| 48 | Attachment F, 148-160 | Appendix A | RE: PM Peak Hour Bottleneck Shift to Top Side of Beltway – Level of Service - A comparison of the link evaluation results for the I-495 Outer Loop 2045 PM Peak Hour shows how Outer Loop congestion is projected to increase due to the addition of the proposed project. Comparing graphics on page 148 and 160, one can see the extent of Outer Loop congestion between MD 5 and US 50 caused by the project, jamming up the entire southeastern side of the Beltway.

In the 2045 PM peak hour No Build condition, only 11 of the total 54 road segments evaluated were projected with Level of Service F conditions between MD 5 and US 50. With the preferred alternative, a total of 41 out of the total 54 road segments are projected to operate at Level of Service F conditions during the 2045 PM peak hour.

Please explain why this level of traffic congestion is projected along this segment of the Beltway, as this section of I-495 is far away from the project limits? | The counterintuitive findings between MD 5 and US 50 shown in the preliminary results presented in the SDEIS were the result of a modeling issue that was identified and corrected for the FEIS. The updated results presented in the FEIS show similar operations between MD 5 and US 50 under 2045 Build and 2045 No Build conditions, as would be expected. |

| 49 | Attachment F, 152-164 | Appendix A | RE: Increased Northbound Congestion at Existing I-270 Bottleneck at Montgomery/Frederick County Line - <br> A comparison of the link evaluation results for the I-270 NB 2045 PM Peak Hour shows how I-270 NB congestion will increase due to the addition of the proposed project. Comparing graphics on page 152 and 164, one can see the extent of NB I-270 congestion between MD 121 to MD 85 caused by the project. <br> In the 2045 PM peak hour No Build condition, only 7 of the total 51 road segments evaluated were projected with Level of Service F conditions within this area. With the preferred alternative, a total of 43 out of the total 51 road segments are projected to operate at Level of Service F conditions during the 2045 AM peak hour. <br><br> This is clearly an example of the existing ALB bottleneck being shifted to north of the Managed Lane project terminus. | See response to Comment #46. |
| 50 | Attachment F, 152-164 | Appendix A | Delay increases on I-270 - <br><br> With the addition of the proposed project during the 2045 PM peak hour, almost all general-purpose travel lane segments on NB I-270 between Middlebrook Road and MD 121 (21 out of 22 segments) are projected to experience increases in delay. How will the P3 contractor mitigate this project-related impact? Their profits are essentially exacerbating this congestion increase at the expense of UpCounty Montgomery County and Frederick County taxpayers. | The projected delay increases on I-270 north of the Phase 1 South limits shown in the preliminary results presented in the SDEIS were the result of a modeling issue that was identified and corrected for the FEIS.  The updated results presented in the FEIS show similar operations along I-270 northbound between Middlebrook Road and MD 121 under 2045 Build and 2045 No Build conditions, as would be expected. |
| 51 | Map 15 | Appendix D | LOD includes two County owned properties, Tax ID 07-00635940 (0 Rockhurst Road) and Tax ID 07-00635938 (0 Singleton Drive). While vacant, these properties need to be carefully considered due to environmental features (wetlands), stormwater management and drainage that occur on site. | The extent of work along I-495 between the I-270 west and east spurs was refined since the SDEIS based on the location of the HOT lane system terminus and tie-in with the general purpose lanes. The physical improvements and the limits of disturbance described in the FEIS have been limited to west of MD 187, as opposed to east of MD 187 as described in the SDEIS. The Preferred Alternative limits of disturbance along I-495 currently end west of both County-owned properties (0 Rockhurst Road and 0 Singleton Drive); therefore, there are no anticipated impacts to these properties. |
| 52 | Maps 27-29 | Appendix D | LOD includes two County owned properties with existing County facilities that operate 24/7 with critical operations for Corrections, Facilities Management, Transit and Highway Services. These properties must be carefully considered because of the potential for significant impact. DGS recommends continued collaboration through the study period. | Where the LOD extends beyond existing highway right-of-way along southbound I-270 north of Wootton Parkway, the proposed activities anticipated to occur include side slope grading, construction of retaining walls and stormwater management facilities, and culvert augmentation. MDOT SHA and the Developer will continue to coordinate with Montgomery County DGS regarding proposed impacts during final design and construction. |

**MONTGOMERY COUNTY DEPARTMENT OF TRANSPORTATION**

| | |
|---|---|
| **From:** | Jeffrey, Heather <Heather.Jeffrey@montgomerycountymd.gov> |
| **Sent:** | Tuesday, November 30, 2021 10:26 AM |
| **To:** | SHA OPLANESMLS |
| **Cc:** | jfolden@sha.state.md.us; Wellington, Meredith; Erenrich, Gary; Cordova, Maricela; Bossi, Andrew; Orlin, Glenn; debra.borden@ppd.mncppc.org; Henn, Hannah; Conklin, Christopher |
| **Subject:** | MCDOT's SDEIS Comments |
| **Attachments:** | 2021 11 29 - SDEIS Comments Doc.pdf |

Good Morning,

Please see the attached from Director Conklin.

Thank you,

Heather Jeffrey
Senior Executive Administrative Aide
Office of the Director
Montgomery County Department of Transportation
101 Monroe Street, 10th Floor
Rockville, MD 20850
heather.jeffrey@montgomerycountymd.gov or 240-777-7168
Follow us on Twitter: MCDOT@MCDOTNow





**For COVID-19 information and resources, visit:** www.montgomerycountymd.gov/COVID19

---



Marc Elrich
*County Executive*

Christopher R. Conklin
*Director*

**DEPARTMENT OF TRANSPORTATION**

**M E M O R A N D U M**

November 29, 2021

**TO:**     Jeffrey T. Folden, Project Director
            Maryland State Highway Administration

**FROM:**   Christopher Conklin, P.E., Director
            Department of Transportation

**SUBJECT:** I-495 and I-270 Opportunity Lanes / Managed Lanes Study
             Comments on the Supplemental Draft Environmental Impact Statement (SDEIS)

Thank you for the opportunity to provide input on the Supplemental Draft Environmental Impact Statement (SDEIS) for the I-495 and I-270 Opportunity Lanes / Managed Lanes Study. Included here are highlights of our most substantial comments. Footnotes in this memo are used to reference comments in the attached detailed technical comments.

Our comments are consistent with those provided throughout the development of the DEIS and SDEIS since early 2018. These comments also reflect input from other Montgomery County agencies including the Departments of Environmental Protection, Finance, General Services, and others. Our comments focus on the information presented in the SDEIS and should be considered in addition to our prior comments on the DEIS[1], tolling proposals[4], pedestrian/bicycle facilities as part of the American Legion Bridge[11], and other related communication.

The most pressing concerns relating to the SDEIS relate to traffic and environmental impacts. As noted in a letter from the County Executive to Secretary Slater in response to the SDEIS, the project asserts that it will "increase speeds, improve reliability, and reduce travel times and delays"; however, the project's analyses in Chapter 3 do not appear to support this assertion.[5] Based on the State's analysis in Chapter 3 there are multiple segments where the General Purpose Lanes' performance worsen significantly[22,23,37], as well as segments of I-270 and I-495 beyond the project limits that also worsen significantly as bottlenecks shift, rather than resolve.[45,46,47,48,49,50] A detailed review of Appendix A finds many more traffic impacts that are not mentioned in the Executive Summary nor Chapter 3,[12,21,32] and for several important metrics the General Purpose

I-495 and I-270 Opportunity Lanes / Managed Lanes Study Comments on the Supplemental Draft
Environmental Impact Statement (SDEIS)
November 29, 2021
Page 2 of 3

Lane and Opportunity Lane metrics are combined into one[23,31] or metrics for the Opportunity
Lanes are missing entirely.[29]

In several segments the General Purpose Lanes and the Opportunity Lanes operate nearly as well
as each other[14,23,42], and conversely in some other segments the General Purpose Lanes appear to
significantly worsen while the adjoining Opportunity Lanes are operating well above their 45
MPH design speeds. These two conditions would imply a lack of iterative modeling, as it
appears that the analysis has not yet resulted in the desired equilibrium. A detailed review of
Appendix A indicates several other potential errors and inconsistencies.[24,36,43,44] In addition, the
project claims to include the I-270 Innovative Congestion Management (ICM) project in its
background conditions. However, given that the ICM's analysis forecast relatively good
conditions into the future, it is not immediately clear where the discrepancy lies between the
ICM's 2017 analysis and the SDEIS' 2021 analysis.[17] These critical issues may affect the
ultimate traffic findings and may also affect the Opportunity Lanes' financial presumptions.

The SDEIS does not give any significant consideration of traffic conditions at interchange ramps,
cross-streets, nor along local roadways.[16] The analysis of local roadways groups all roadways
together, which averages those that may benefit (such as MD 355 outside the Beltway) with
those that may worsen (such as the radial arterials within the Beltway).[40] The analysis also uses
daily values, which erases issues associated with peak hours and peak directions. Delays, speeds,
and travel time information for the Local Network is extremely important information that needs
to be known at this stage of the SDEIS.[35]

The project's Purpose & Need calls for the creation of new options for users, but with the
adverse impacts to the General Purpose Lanes, as well as the segments beyond the limits of the
project, this appears to reduce options available to users unable to afford, or otherwise access, the
managed lanes.[13] The Purpose & Need also references throughput, defined in Chapter 3 as "how
efficiently goods, services, and people" can move through the system, however the SDEIS does not
appear to address these considerations. Past decisions have explicitly chosen to focus on vehicle
throughput rather than person throughput, potentially biasing the project against High Occupancy and
Transit considerations. The Purpose & Need also calls for Freight Movement and Homeland Security
considerations, but we did not notice any reference in the SDEIS to either of these goals.[33]

Regarding Environmental considerations, Table ES-1 and the accompanying narrative should
include additional environmental metrics such as those pertaining to air quality and emissions,
impacts to VMT, and indirect impacts of how this project may erode Non-Auto Drive Mode
Share efforts.[6,36] Air Quality metrics prepared for the FEIS must consider the impacts of
increased vehicle volumes, increased congestion in multiple segments of the study area,
environmental metrics due to any impacts to local roadways,[37] and must also resolve remaining
inconsistencies and shortcomings.[38] Furthermore, the SDEIS appears to treat environmental

---

I-495 and I-270 Opportunity Lanes / Managed Lanes Study Comments on the Supplemental Draft
Environmental Impact Statement (SDEIS)
November 29, 2021
Page 3 of 3

impacts shifted to future phases as project savings and benefits, despite these still ultimately
being long-term impacts associated with the project.[39]

We reiterate our continued expectation that the project will construct all associated planned
pedestrian, bicycle, and transit infrastructure in accordance with master plans, and that County
facilities will meet all local applicable standards, guidance, and best practices.[7,8,9,10] The project
impacts several County properties, including those with critical operations for Corrections,
Facilities Management, Transit, and Highway Services. Detailed coordination of this work is
expected to take place with County authorities, as these properties must be carefully considered
due to the potential for significant impact.[51,52]

The base model network includes implementation of several major transit projects. We expect
the State will show significant commitment to progressing these projects by its own action
or through a Memorandum of Understanding with the County as required by the Board of Public
Works (BPW).[18] The State action should exceed the commitments memorialized at the BPW
meeting this summer and by the Metropolitan Washington Council of Governments in its
resolution to include the project in the Long Range Transportation Plan. A better outcome would
be produced by the implementation of these transit projects if directly coordinated with the
construction of the Opportunity Lanes project. We appreciate the $60 million committed by
MDOT and the $300 million in funding included in the Phase Developer's proposal over the
estimated 50-year operating term, but caution that these amounts may not be adequate to meet
the needs of this corridor, especially in the context of impacts to the General Purpose Lanes and
related equity impacts.[13,22] We encourage MDOT to take the necessary steps to realize
meaningful transit investment coincident with the critical nature of this highway project.

As a final and comparatively minor note, we thank the State for extending toll-free travel to
HOV-3+ vehicles and motorcycles, and we request that toll-free use be extended also to both
state and local government vehicles.[3]

Should you have any questions regarding our comments on the plan, please feel free to contact me or
Mr. Andrew Bossi, Senior Engineer, at andrew.bossi@montgomerycountymd.gov.

Attachments:  Detailed Comments Spreadsheet

CC:AB

cc:  Meredith Wellington, CEX
     Gary Erenrich, MCDOT
     Maricela Cordova, MCDOT
     Andrew Bossi, MCDOT
     Glenn Orlin, Montgomery County Council
     Debra Borden, MNCPPC

**MCDOT Technical Comments on the Opportunity Lanes SDEIS**
November 15, 2021

| 0 | 🔲 | Document | Section | Page | Comment |
|---|---|---|---|---|---|
| 1 | | General | General | General | These comments are supplemental to previous comments provided on the DEIS. These comments attempt to focus only on new information resulting from the SDEIS. |
| 2 | * | General | General | General | The SDEIS documents appear to have been created in such a way as to prevent the copying of text from the document. This hampers the ease with which the public can review and comment on the document, requiring data sets to be manually reentered in order to provide an independent evaluation, and making it harder to quote segments of the document in comments. This is a setting that must be deliberately activated for this to occur, and is unclear for what purpose the State would choose to do this. |
| 3 | | Executive Summary | Will Comments on the DEIS be Addressed? | ES-1 | Toll-free travel must also be extended to state and local government vehicles. |
| 4 | * | Executive Summary | Toll Rates | ES-10 to ES-11 | Comments on Tolling have been submitted separately. |
| 5 | *** | Executive Summary | Transportation & Traffic | ES-12 | The paragraph summarizing the Preferred Alternative's Transportation & Traffic conditions states that the Preferred Alternative will "increase speeds, improve reliability, and reduce travel times and delays." In reviewing the Chapter 3 (Transportation & Traffic), however, there appear to be multiple segments where this will not be the case. It appears to be inaccurate to make this assertion without further detail and refinement. |
| 6 | *** | Executive Summary | Environmental | ES-13 | Table ES-1 should include additional environmental metrics, such as those pertaining to air quality & emission, impacts to VMT, and indirect impacts of how this project may erode Non-Auto Drive Mode Share efforts and enable environmentally damaging development patterns. |
| 7 | *** | 2 - Alternatives | 2.3.7 2.4 | 2-23 to 2-23, 2-28 | Where BRT facilities are master planned: include BRT facilities across the 270 and 495 corridors at interchanges. |
| 8 | *** * | 2 - Alternatives | 2.3.8 2.4 | 2-24 to 2-25, 2-28 | Include ped/bike facilities across the 270 and 495 corridors at interchanges as well as at non-interchange crossing points. Facilities are expected to meet applicable standards, best practices, and master plans, particularly the approved Bicycle Master Plan and the Pedestrian Master Plan currently in development.  Replacing-in-kind (as stated on page 2-47) is NOT acceptable. Note that the Bike Master Plan calls for grade separated crossings across free-flow ramps. We also remind that while our Bicycle Master Plan includes prioritization for bikeways, it also states that any bikeways where other projects are occurring are to be considered the highest priority for purposes of implementation with those projects. |
| 9 | * | 2 - Alternatives | 2.3.8 | 2-24 | Separated bike lanes do not have to be located "on-street" as stated in the definition for Bike Lanes. Per the Montgomery County Bicycle Master Plan, separated bike lanes "are exclusive bikeways that combine the user experience of a sidepath with the on-street infrastructure of a conventional bike lane. They are physically separated from motor vehicle traffic and distinct from the sidewalk. They operate one-way or two-way." The Complete Streets Design Guide (approved by the Planning Board) code updates forthcoming to Council in coming weeks) reinforces that separated bike lanes should be designed to be in the Active Zone, located behind the curb. |
| 10 | * | 2 - Alternatives | 2.3.8 | 2-24 | The last paragraph includes this line: "The preliminary design approach for facilities along crossroads where the crossroad bridge would be reconstructed is to replace, upgrade or provide new pedestrian/bicycle facilities consistent with the master plan, where adjacent connections on either side of the bridge ***currently exist***." (asterisks added for emphasis). This statement conflicts with past agreements, which have concurred that the project add master planned pedestrian and bicycle facility on crossroads regardless of whether adjacent connections on either side of the bridge currently exist. Replace that sentence with something like the following: "All impacted facilities along crossroads where the crossroad bridge would be reconstructed will replace, upgrade or provide new pedestrian, bicycle, and transit facilities consistent with the master plan and, if along a County roadway, also County design guidance and standards." |
| 11 | * | 2 - Alternatives | 2.3.8 | 2-24 to 2-27 | Comments on the ALB Sidepath are ongoing separately from the SDEIS. |

*1 of 8*

**MCDOT Technical Comments on the Opportunity Lanes SDEIS**
November 15, 2021

| 12 | | 3 - Transportation & Traffic | General | General | There are major traffic impacts identified by looking closely at the information provided in Appendix A which are not noted at all in the tables and narrative in Chapter 3. We expand upon these issues in subsequent comments. This evaluation should be enhanced to look at discrete sections of I-270 and I-495 where significant congestion effects should be noted, acknowledged, and considered for mitigation through modification of the proposed project by design element changes or toll strategy modifications. This traffic degradation identified in Appendix A seems to have a significant impact to the proposed project, but it has been overlooked using a simplistic and abbreviated summary of EOS F conditions. The current emphasis on brevity in this SDEIS truncates information to the point where any significant conclusions are not discernable to the average reader. DEIS chapters should be intended to lay out the significant impacts with more detail provided in Appendices, but this document misses many important transportation findings. |
| 13 | *** | 3 - Transportation & Traffic | General | General | This project claims to improve traffic, but the project's own analysis finds that in there are significant segments where the General Purpose Lanes worsen significantly as compared to No Build conditions. Does MDOT accept degraded performance of the General Purpose Lanes in the interest of providing priced managed lanes? Penalizing current users of these roads does not seem to be consistent with the stated policy objectives of this program. If MDOT does accept this outcome, it is imperative that equity be considered, and actions be incorporated into the project to address the needs of users that are most adversely impacted. The project's Purpose & Need includes creating new options for users, but the Build alternatives instead appear to reduce options available to users unable to afford or otherwise access the managed lanes.  Based on this traffic information, none of these Build alternatives should be considered to satisfy this metric of the Purpose & Need. |
| 14 | *** | 3 - Transportation & Traffic | General | General | In several segments and peak periods the General Purpose lanes operate nearly as well as those occurring point along I-270 and 495 (with accompanying narrative, as needed). This will help better understand flows, identify specifically failing pairings, and better tailor responses to these needs. Conversely, some other segments appear to show degraded General Purpose Lanes at the same time as Managed Lanes are operated well above the 45 MPH design speed, implying that tolls might be lowered in those segments to attract more General Purpose traffic. Both of these indicate an apparent lack of adequate iterative modeling, as it appears that this analysis has not yet found the right balance / equilibrium. This will affect the ultimate traffic findings and may also affect the Managed Lanes' financial presumptions. |
| 15 | *** | 3 - Transportation & Traffic | General | General | Provide an O-D Matrix of travel times for both the Managed and General Purpose lanes for each access point along I-270 and I-495 (with accompanying narrative, as needed). This will help better understand flows, identify specifically failing pairings, and better tailor responses to these needs. It is especially important considering it is our understanding that many/most trips along these facilities are relatively short in nature, using the interstate for only a few interchanges. Therefore longer & larger systemic effects may be of less utility to actual users. |
| 16 | *** | 3 - Transportation & Traffic | General | General | For this section and in general, has any operational analysis been performed for the interchange ramps and ramp terminal intersections on the interchange cross streets? Section 3.3.6 provides information about overall network delay to the local roadway network, but there is language about some increased delays around managed lane entrance points on the cross streets. Were just the ramps and ramp terminal intersections modeled, or did the model continue on either side of the interchange to get a cleaner representation of these cross street operations in the vicinity of interchanges? We want to be sure that operational benefits to the freeway system do not result in operational failures or safety concerns on the ramps or cross streets, so it would be important to have an idea of any localized issues as well. |

*2 of 8*

00022197



I-495 & I-270 Managed Lanes Study

**MCDOT Technical Comments on the Opportunity Lanes SDEIS**
November 15, 2021

| | | | | |
|---|---|---|---|---|
| 17 | *** | 3 - Transportation & Traffic | 3.1.3 | 3-4 |

On page 3-4 it is stated that this analysis accounts for the State's Innovative Congestion Management (ICM) project along I-270, but the results provided in this section appear to conflict with the analysis from the ICM project, which would seem to imply that the I-270 corridor would operate adequately under No Build conditions. Provide narrative clarifying this difference.



| | | | | |
|---|---|---|---|---|
| 18 | ** | 3 - Transportation & Traffic | 3.1.3 | 3-4 |

The base network includes several significant transit projects where State commitment has been lacking. Does this indicate that the State has a renewed willingness to fund and implement these projects, perhaps including them as part of the P3 project?

| | | | | |
|---|---|---|---|---|
| 19 | | 3 - Transportation & Traffic | 3.1.4 | 3-5 |

While traffic has recovered to an estimated 90% of expected "normal" levels, it may be worth noting whether the nature of these trips has changed. It is my understanding that we continue to see a lower share of peak commute trips, and a higher share of off-peak non-commute trips. It may be helpful to explore the nature of how trip types have shifted and how they are trending.

| | | | | |
|---|---|---|---|---|
| 20 | * | 3 - Transportation & Traffic | 3.3 | 3-8 |

Table 3-3 shows 2045 Build Traffic. The Build alternatives show ADTs that are higher than No-Build. It may be helpful to discuss this growth in the context of induced demand and diverted trips: are these additional trips new trips? Are they trips that were occurring at different times, or that were taking different routes? Are they trips that have shifted from non-auto modes?

| | | | | |
|---|---|---|---|---|
| 21 | ** | 3 - Transportation & Traffic | 3.3.1 | 3-8, 3-9 |

While this section alludes to more detailed travel speed information in the appendices, it may be helpful to provide a general note highlighting any significant speed benefits or impedances experienced on a segment level, which may be watered down by taking an average of a much longer corridor.

| | | | | |
|---|---|---|---|---|
| 22 | *** | 3 - Transportation & Traffic | 3.3.1 | 3-9 |

The General Purpose lanes operate more slowly than No Build conditions under the following scenarios:
- AM peak, NB 270 between 495 and 370 (3% reduction)
- PM peak, NB 270 between 495 and 370 (3% reduction)
- PM peak, SB 270 between 370 and 495 (7% reduction)

Any worsening of the General Purpose lanes to benefit Tolled Lanes presents a major equity issue that needs to be directly and substantively addressed.

| | | | | |
|---|---|---|---|---|
| 23 | *** | 3 - Transportation & Traffic | 3.3.1 | 3-9 |

The General Purpose lanes operate nearly the same speed as the HOT lanes in the segments listed below, which may affect the usefulness of the HOT lanes. This could in turn affect how much traffic chooses to instead remain in the GP lanes, and it is unclear how this evaluated such feedback processes & whether an equilibrium was identified. This may also affect the HOT lanes' financial viability.
- AM peak, 495 O/L between 270 and GW Pkwy (8% slower than HOT lanes)
- AM peak, 495 I/L between GW Pkwy and 270 (13% slower than HOT lanes)
- AM peak, NB 270 between 495 and 370 (3% slower than HOT lanes)
- AM peak, SB 270 between 370 and 495 (16% slower than HOT lanes)
- PM peak, 495 O/L between 270 and GW Pkwy (13% slower than HOT lanes)
- PM peak, SB 270 between 370 and 495 (equal speed)

| | | | | |
|---|---|---|---|---|
| 24 | | 3 - Transportation & Traffic | 3.3.1 | 3-9 |

RE: 2043 Inner Loop PM Peak Hour VB5RM Travel Speed in the Managed Lanes -
During the PM peak hour, the route from the GW Parkway to the I-270 West Spur is projected is projected to take only 4.2 minutes for a 4.5-mile section of road (63 mph), not the 23 mph reported in Table 3-5. The 4.2-minute travel time was obtained from Appendix A - Attachment D – Travel Time Matrices for the ETL (PM Peak Hour). There must be an error in one of these travel time/speed measurements as they do not match.

| | | | | |
|---|---|---|---|---|
| 25 | *** | 3 - Transportation & Traffic | 3.3.2 | 3-10 |

The Delay metric appears to combine both General Purpose and Managed Lanes. As such, this is not a particularly useful metric. The aggregate nature of this metric may allow the effects of the managed lanes or the general purpose lanes to be over-representative, and we urge that this metric account separately for managed lanes and general purpose lanes.

| | | | | |
|---|---|---|---|---|
| 26 | ** | 3 - Transportation & Traffic | 3.3.3 | 3-11 |

Define what "Weighted Average TTI" means in this section.

| | | | | |
|---|---|---|---|---|
| 27 | *** | 3 - Transportation & Traffic | 3.3.3 | 3-11 to 3-12 |

The General Purpose lanes have a higher TTI than No Build conditions in the following segments:
- AM peak, 495 I/L between 270 and 95 (107% worse and now failing)
- PM peak, 495 I/L between VA 193 and 270 (5% worse)
- PM peak, 495 I/L between 95 and MD 5 (20% worse)

3 of 8

**MCDOT Technical Comments on the Opportunity Lanes SDEIS**
November 15, 2021

| | | | | |
|---|---|---|---|---|
| 28 | *** | 3 - Transportation & Traffic | 3.3.3 | 3-11 to 3-12 |

The focus only on the General Purpose lanes ignores that Managed Lanes users using slip lanes will also be affected by the General Purpose lane's congestion.

Given the increased delays in the General Purpose lanes, if there are any cases where managed lanes users must use at-grade slip lanes to enter or exit the slip lanes; clarify whether there are any O-D pairings whereby the additional time spent in the General Purpose lanes is such that a Managed Lane users' net travel time is worse than the same trip under No Build conditions.

| | | | | |
|---|---|---|---|---|
| 29 | * | 3 - Transportation & Traffic | 3.3.1 | 3-11 to 3-12 |

There are no TTI evaluations provided for the managed lanes. Given that the Travel Speeds may imply limited difference between the General Purpose Lanes and Managed Lanes in some segments, it may be helpful to see how this also manifests in the TTI.

| | | | | |
|---|---|---|---|---|
| 30 | | 3 - Transportation & Traffic | 3.3.3 | 3-12 |

RE: 2045 Inner Loop PM Peak Hours TTIs -
The TTIs for the Inner Loop PM peak hour from VA 193 to I-270 do not seem to match with travel time data provided in Appendix A, Attachment D. Is congested TTI defined based on the posted speed limit of 55 mph or based on observations of existing off-peak speeds on that stretch of road? The travel time for this 5.1-mile segment for the managed lanes shown as 5.3 minutes in Appendix A, Attachment D (page 153 of 184). This equates to an average speed of 58 mph. What is the TTI in the Managed Lanes through this same section? As an example, could you provide the TTI calculations for this segment for Alt 1, GP lanes and the Managed Lanes?

| | | | | |
|---|---|---|---|---|
| 31 | ** | 3 - Transportation & Traffic | 3.3.4 | 3-12 |

The Level of Service metric appears to combine both General Purpose and Managed Lanes. As such, this is not a particularly useful metric.
The aggregate nature of this metric may allow the effects of the managed lanes or the general purpose lanes to be over-representative, and we urge that this metric account separately for managed lanes and general purpose lanes.

| | | | | |
|---|---|---|---|---|
| 32 | | 3 - Transportation & Traffic | 3.3.4 | 3-12 |

I-495 east of I-270 LOS F conditions: It is stated that "29 percent of the lane miles would continue to operate at LOS F in the design year of 2045 under the Preferred Alternative, primarily in areas along I-495 east of the I-270 east spur that would have no action." This statement does not seem accurate, as AM peak hour conditions will grow considerably worse overall in certain sections of I-495 due to the proposed project. The localized summary of impacts has not been presented in Table 3-9 or anywhere in the SDEIS.

Between MD 355 (I-270 East Spur) and I-95, there are 52 lane-loop analysis segments totaling 8.8 miles. During the 2045 AM Peak Hour, 20 of these segments (3.4 miles or 39 percent of this section of I-495) operate at LOS F in the No Build Condition, but 49 segments (8.28 miles or 94 percent of this section of I-495) operate at LOS F with the Preferred Alternative in place.

Clearly, neither the Chapter 3 presentation nor Appendix A provides any of this fine-grained analysis or conclusions. The data in Attachment A should be combed through to discover this significant impact. This evaluation should be enhanced to look at discrete sections of I-270 and I-495 where significant congestion effects should be noted, acknowledged, and considered for mitigation through modification of the proposed project by design element changes or toll strategy modifications.

| | | | | |
|---|---|---|---|---|
| 33 | *** ** | 3 - Transportation & Traffic | 3.3.5 | 3-13 |

The first sentence references throughput as quantifying "how efficiently goods, services, and people" can move through the system, but this does not appear to address these.

This does not consider person-throughput (only vehicle throughput) which could affect High Occupancy and Transit provisions, assumption, and utilization. MDOT has previously expressly declined to follow industry practices in evaluating person-throughput, which we feel to be a significant oversight in duly evaluating the alternatives and ensuring an optimal design.

There is no narrative at all toward freight movement. It is unclear how goods movement will be affected by the Managed Lanes and whether trucks would or would not be permitted to use the lanes. Where are freight trips coming from & destined to? Are there ports, distribution centers, major warehousing facilities, etc. that are key focal points, or any other key freight movements? How does the Managed Lanes project reflect and serve these needs and patterns? Again, this is a major role of an interstate that appears to have been given minimal consideration.

| | | | | |
|---|---|---|---|---|
| 34 | * | 3 - Transportation & Traffic | 3.3.5 | 3-14 |

Regarding Table 3-11 - It would be helpful to mention in the narrative (or possibly a footnote) why the 2045 No Build is not compared to the 2040 No Build.

4 of 8

**MCDOT Technical Comments on the Opportunity Lanes SDEIS**
November 15, 2021

| | | | | |
|---|---|---|---|---|
| 35 | *** | 3 – Transportation & Traffic | 3.3.6 | 3-15 |

This evaluation appears to average together the impacts to all local streets across all times of day, which results in a metric that offers no substantive value & may misinform the public.

Some corridors are likely to benefit, such as MD 355 outside of the Beltway, MD 192, MD 547, and potentially MD 586.

Conversely, we suspect that the radial corridors inside the Beltway are likely to experience significant adverse impacts, particularly during the AM peak as more traffic is enabled to arrive at these centralized points faster, and in greater volume (as demonstrated with the Vehicle Throughput results on page 3-34).

Beyond the Phase 1 South area, additional congestion may also occur due to the new and shifted bottlenecks created by this project, as reinforced by the traffic analyses in Appendix A.

These local corridors are often already congested and travel through urban areas where automotive traffic is not the priority mode. This may cause greater amounts of peak spreading & may result in traffic shifting to alternative routes that have not been adequately considered to-date.

Furthermore, averaging the local impacts into daily values erases the effects of peak periods in peak directions.

Delays, speeds, and travel time information for the Local Network is extremely important information that needs to be known at this stage. That this study does not give this level of information on the impacts to the local road network is a complete aberration from what is expected out of a traffic analyses at this stage of the project.

The Next Steps notes the Interstate Access Point Approval process will evaluate these, but at such a late stage this same text bars potential treatments that may ease the risk of being bandaids on a much larger and more significant issue that should be been identified and evaluated at a far earlier stage.

| | | | | |
|---|---|---|---|---|
| 36 | *** | 4 – Environmental | 4.1 | 4-3 to 4-4 |

This section should include information on how this project will affect land use & zoning beyond the immediate impacts of the project. This includes a focus on how this may affect environmentally damaging development patterns and efforts toward Non-Auto Driver Mode Share (NADMS) goals.

| | | | | |
|---|---|---|---|---|
| 37 | *** | 4 – Environmental | 4.8.3 | 4-42 to 44 |

As Air Quality metrics are prepared for the presentation in the FEIS, ensure that that the information for the Preferred Alternative considers the increased vehicle volumes and increased congestion in multiple segments within the study area. These impacts must be included for a complete analysis.

It is also unclear whether local roadways have been included in this analysis, particularly noting the lack of Transportation & Traffic information on these same roadways.

| | | | | |
|---|---|---|---|---|
| 38 | *** | 4 – Environmental | 4.8.1 | 4-36 |

This page includes the following statement: "GHG emissions on the affected transportation network for all modeled Build Alternatives in the DEIS are projected to be lower in the opening (2025) and design (2040) years compared to base year conditions. All Build Alternatives are projected to slightly increase annual tailpipe GHG emissions by an average of 1.4 percent compared to the No Build Alternative in 2040."

First, I may be misinterpreting something, but it sounds like the 1st sentence says this will have lower emissions, but the 2nd sentence says this will have higher emissions. How do these differ? Is it that the 1st sentence appears to account for "all" GHG emissions, and the 2nd sentence appears to focused only on tailpipe GHG emissions? More detail is needed.

Second, if this is asserting that the project will reduce emissions: much more detail is needed on methodology and assumptions, as this crash seems counterintuitive given that the project is increasing vehicle volumes and VMT. Noting the State's interest in Electric Vehicles: if electric vehicles are a substantive part of this reduction, it will be important to account for the impacts of the electric vehicles themselves.

While an improvement over the existing fossil fuel based car fleet, electric vehicles also carry substantial impacts:
- Extracting the resources needed for their production (particularly their batteries)
- Impacts of production
- Energy requirements, which at present is generated through unsustainable & polluting sources
- Severely impactful waste issues (again largely due to the batteries)
- EVs are still vehicles: they demand pavements (concrete and asphalt; both depend on highly impactful cement and petroleum production) and pose safety risks that erode Non-Auto and Vision Zero efforts.

| | | | | |
|---|---|---|---|---|
| 39 | | 5 – Section 4f | 5.1.3 5.2.1 | 5-3 5-8 to 5-10 |

The first paragraph of 5.1.1 (page 5-3) and the lists in 5.2.1 (pages 5-8 to 5-10) identifies impacts that have been reduced due largely to reducing the project's scope only to Phase 1 South. As the remainder of the project remains nominally active, however, these aren't really reductions in the spirit of reducing the Impacts of the overall full-build project.

This information should focus on how impacts "within the same geographic span of the Phase 1 South segment" have been reduced since the DEIS, which allows a more apples-to-apples comparison. This also helps avoid a "taking up smoking in order to quit" approach of padding the DEIS with a large amount of impacts, and then claiming reductions by later cutting those impacts.

---

**MCDOT Technical Comments on the Opportunity Lanes SDEIS**
November 15, 2021

| | | | |
|---|---|---|---|
| 40 | *** | Appendix A | 32 |

Table 6 provides a summary of the effects of the No Build and Alternative 9 - Phase 1 South Alternatives on the County's local roadway network. For Montgomery County, Alternative 9 shows a 4.8% reduction in daily delay (vehicle-hours) for all arterials, but this statistic appears fairly generic. It is not clear how the increased throughput on segments of I-495 and I-270 would affect radial routes/arterials specifically. This is critical to clarify to avoid situations where local arterials are overloaded and fail operationally or create safety concerns. Please provide an analysis summary or discussion that examines the operational impact to radial routes (such as MD 97, MD 185, MD 355, MD 109, Calvin John Parkway, etc.) under Alternative 9 – Phase 1 South, compared to No-Build, during peak periods.

| | | | |
|---|---|---|---|
| 41 | | Appendix A | Attachment B and D |

RE: 2045 PM Peak Hour Travel Times from VA 193 to I-270 and Delay/Demand Imbalance -

Alternative 1 (No Build) has a 38.6-minute travel time and the Preferred Alternative GP lanes have a 40.1-minute travel time. The managed lanes have a 5.5-minute travel time. The travel time differential through this section seems totally unbalanced, as a managed lane toll strategy should seek to achieve a much lower speed than is forecast and still operate acceptably (by reducing the toll) until a 45-mph average speed is achieved in the managed lanes.

2,535 vph in the projected lower loop 6-7 PM toll volume at the ALB (page 101 of 184, Appendix A, Attachment B). Using MDOT SHA's vphpl lane max for a managed lane of 1700 vphpl, it appears that there is excess room in the PM lower loop managed lanes for an additional 865 vehicles during the highest 6-7 PM peak hour (more in the other 3 PM hours). This would represent a 13 percent reduction in volumes in the GP lanes if the toll was lowered to induce more traffic to use the managed lanes to achieve this balance.

This might help to mitigate the poor GP lane conditions, so it is at least better than Alternative 1 (No Build). In general, it seems that this type of critical thinking and manual toll adjustments should have been a standard step in the toll assignment process. It is easy to diagnose, and likely can be fixed with a few iterative model runs with reduced tolls when this occurs.

| | | | |
|---|---|---|---|
| 42 | | Appendix A | Attachments A and B |

RE: Percentage of total demand using managed lanes on I-270 Western Spur During the AM Peak hours -

Between 27% - 39% of total demand uses the Managed Lanes on Southbound I-270 approaching I-495 during the AM peak hours. This entire travel path only shows a 2.5-minute savings using the Managed Lanes along its 14-mile tolled length.

Between 43% - 53% of total demand uses the Managed Lanes on Northbound I-270 just north of I-495 during the AM peak hours. This entire path only shows a 1.3-minute travel time savings over its 14-mile tolled length.

How are the percent demand achieved using the managed lanes possible if the travel time benefit is so small?

| | | | |
|---|---|---|---|
| 43 | | Appendix A | Attachments A and B |

RE: Percentage of total demand using managed lanes on I-270 Western Spur During the PM Peak hours -

Between 43% - 53% of total demand uses the Managed Lanes on Southbound I-270 approaching I-495 during the PM peak hours. This entire travel path only shows a 1.3-minute savings using the Managed Lanes along its 14-mile tolled length.

Between 39% - 43% of total demand uses the Managed Lanes on Northbound I-270 just north of I-495 during the PM peak hours. This entire path shows a 38-minute travel time savings over its 14-mile tolled length.

Again, the demand allocated to the managed lanes and the methodology for this is questionable.

| | | | |
|---|---|---|---|
| 44 | | Appendix A | Attachments B and D |

RE: 2045 PM Peak Hour Inner Loop Volumes -

The hourly volumes presented in Attachments B and D do not match. The 2034 Alt 9 Phase 1 PM Peak Hour Volumes are...

- 7615 (Appx B) - 5390 (Appx D) - At the ALB
- 8040 (Appx B) - 190 to 270 West Spur
- 4685 (Appx B) - 2142 (Appx D) - 270 West Spur to MD 187

Please explain this discrepancy. It appears that this discrepancy is not isolated to these three sections.

OP·LANES™
MARYLAND
I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

MCDOT Technical Comments on the Opportunity Lanes SDEIS
November 15, 2021

| 45 | Appendix A | Attachment C | 123 | RE: 2045 AM Peak Hour SB I-270 Congestion - |
|---|---|---|---|---|

RE: 2045 AM Peak Hour SB I-270 Congestion -

Per the I-270 SB Speed AM profile, peak hour speeds will be disrupted significantly on the MD 121 to Middlebrook Road segment of I-270 during the 2045 AM peak hour due to the addition of the proposed project. This is likely to seriously increase travel delay for commuters living in UpCounty Montgomery County and Frederick County.

Please provide more travel time summaries for more common travel patterns, including Frederick to Rockville, Clarksburg to the GW Parkway, and Clarksburg to MD 97. Please explain why increased congestion is projected to occur many miles upstream from the project area. We anticipate that instead of this very long delay, you would continue to see worsened peak spreading into the shoulder hours during the AM commute period.

This project seems to be setting up the need for Phase 1B by design. In that sense, I think it is clear that the segmentation of this project on I-270 into Phase 1A and Phase 1B was not fully thought out, as widening on Phase 1A precipitates the need for Phase 1B. From early on, the constraint at the Montgomery/Frederick County line has been identified as a major bottleneck that is more of immediate action.

| 46 | Appendix A | Attachment F | 144-155 | RE: AM Peak Hour Bottleneck Shift to Top Side of Beltway – Level of Service - |
|---|---|---|---|---|

RE: AM Peak Hour Bottleneck Shift to Top Side of Beltway – Level of Service -

A comparison of the link evaluation results for the I-495 Inner Loop 2045 AM Peak Hour shows how Inner Loop congestion will increase due to the addition of the proposed project. Comparing graphics on page 144 and 155, the extent of congestion between the I-270 Western Spur to MD I93 caused by the project increases significantly, jamming up the entire top side of the Beltway as more traffic is allowed to funnel into the top side of the Beltway than it can handle.

This will be devastating to AM peak hour traffic conditions on the top side of the Inner Loop within most of Montgomery County during the 2045 AM peak hour. In the 2045 No Build condition, only 4 of the total 88 road segments evaluated were projected with Level of Service F conditions between the I-270 western spur and MD I93. With the preferred alternative, a total of 41 out of the total 88 road segments are projected to operate at Level of Service F condition during the 2045 AM peak hour.

| 47 | Appendix A | Attachment F | 147-159 | RE: Increased Southbound Congestion at Existing I-270 Bottleneck at Montgomery/Frederick County Line - |
|---|---|---|---|---|

RE: Increased Southbound Congestion at Existing I-270 Bottleneck at Montgomery/Frederick County Line -

A comparison of the link evaluation results for the I-270 SB 2045 AM Peak Hour shows how I-270 SB congestion will increase due to the addition of the proposed project. Comparing graphics on page 147 and 159, one can see the extent of congestion between four segments north of MD 121 to Middlebrook Road caused by the project.

In the 2045 No Build condition, only 9 of the total 25 road segments evaluated were projected with Level of Service F conditions within this area. With the preferred alternative, a total of 24 out of the total 25 road segments are projected to operate at Level of Service F conditions during the 2045 AM peak hour.

The projected worsening of traffic conditions in this section of I-270 seems to be caused by the presence of additional capacity downstream, with more drivers willing to suffer through this congestion in the Clarksburg area. Even if this results in a faster commute for some, it does increase the intensity of the existing bottleneck congestion.

| 48 | Appendix A | Attachment F | 148-160 | RE: PM Peak Hour Bottleneck Shift to Top Side of Beltway – Level of Service - |
|---|---|---|---|---|

RE: PM Peak Hour Bottleneck Shift to Top Side of Beltway – Level of Service -

A comparison of the link evaluation results for the I-495 Outer Loop 2045 PM Peak Hour shows how Outer Loop congestion is projected to increase due to the addition of the proposed project. Comparing graphics on page 148 and 160, one can see the extent of Outer Loop congestion between MD 5 and US 50 caused by the project, jamming up the entire southeastern side of the Beltway.

In the 2045 PM peak hour No Build condition, only 11 of the total 54 road segments evaluated were projected with Level of Service F conditions between MD 5 and US 50. With the preferred alternative, a total of 41 out of the total 54 road segments are projected to operate at Level of Service F conditions during the 2045 PM peak hour.

Please explain why this level of traffic congestion is projected along this segment of the Beltway, as this section of I-495 is far away from the project limits?

| 49 | Appendix A | Attachment F | 152-164 | RE: Increased Northbound Congestion at Existing I-270 Bottleneck at Montgomery/Frederick County Line - |
|---|---|---|---|---|

RE: Increased Northbound Congestion at Existing I-270 Bottleneck at Montgomery/Frederick County Line -

A comparison of the link evaluation results for the I-270 NB 2045 PM Peak Hour shows how I-270 NB congestion will increase due to the addition of the proposed project. Comparing graphics on page 152 and 164, one can see the extent of NB I-270 congestion between MD 121 to MD 85 caused by the project.

In the 2045 PM peak hour No Build condition, only 7 of the total 51 road segments evaluated were projected with Level of Service F conditions within this area. With the preferred alternative, a total of 43 out of the total 51 road segments are projected to operate at Level of Service F conditions during the 2045 PM peak hour.

This is clearly an example of the existing ALB bottleneck being shifted to north of the Managed Lane project terminus.

MCDOT Technical Comments on the Opportunity Lanes SDEIS
November 15, 2021

| 50 | Appendix A | Attachment F | 152-164 | RE: Delay increases on I-270 - |
|---|---|---|---|---|

RE: Delay increases on I-270 -

With the addition of the proposed project during the 2045 PM peak hour, almost all general-purpose travel lane segments on NB I-270 between Middlebrook Road and MD 121 (21 out of 22 segments) are projected to experience increases in delay. How will the P3 contractor mitigate this project-related impact? That profits are essentially exacerbating this congestion increase at the expense of UpCounty Montgomery County and Frederick County taxpayers.

| 51 | Appendix D | Map 15 | 15 | EOD includes two County owned properties, Tax ID 07-00635940 (0 Rockhurst Road) and Tax ID 07-00635938 (0 Singleton Drive). While vacant, these properties need to be carefully considered due to environmental features (wetlands), stormwater management and drainage that occur on site. |
|---|---|---|---|---|

| 52 | Appendix D | Maps 27-29 | 27-29 | EOD includes two County owned properties with existing County facilities that operate 24/7 with critical operations for Corrections, Facilities Management, Transit and Highway Services. These properties must be carefully considered because of the potential for significant impact. DGS recommends continued collaboration through the study period. |
|---|---|---|---|---|

APPENDIX T – SDEIS COMMENTS – MONTGOMERY COUNTY DEPARTMENT OF TRANSPORTATION

AG-695

00022200

OP·LANES™
MARYLAND | I-495 & I-270 Managed Lanes Study

FINAL ENVIROMENTAL IMPACT STATEMENT

**National Oceanic and Atmospheric Administration - SDEIS Comments**

| No. | Page | SDEIS Section | Comment | Response |
|---|---|---|---|---|
| 1 | n/a | General, Fish & Wildlife | On November 5, 2020, we provided you with comments on the DEIS which included several recommendations pursuant to the Fish and Wildlife Coordination Act (FWCA). The information contained in that letter regarding potential impacts to our trust resources (e.g., migratory fish) and the corresponding recommendations remain applicable to this SDEIS and should continue to be considered during your review of agency comments. Similar to the SDEIS, this letter is focused on information provided for the designated Preferred Alternative - Phase 1 South.<br><br>The Fish and Wildlife Coordination Act (FWCA) requires that all federal agencies consult with us when proposed actions might result in modifications to a natural stream or body of water. It also requires that they consider the effects that these actions would have on fish and wildlife and must also provide for the improvement of these resources. Under this authority, we work to protect, conserve and enhance species and habitats for a wide range of aquatic resources such as shellfish, diadromous species, and other commercially and recreationally important species that are not managed by the federal fishery management councils and do not have designated essential fish habitat (EFH). As the nation's federal trustee for the conservation and management of marine, estuarine, and anadromous fishery resources, we provide the following comments and recommendations pursuant to the authority of the FWCA. | MDOT SHA acknowledges receipt of NOAA's DEIS comments dated November 2020.  Refer to Appendix T for a response to the DEIS comments. |
| 2 | n/a | Fish & Wildlife | Based on the SDEIS, it does not appear that existing culverted road-stream crossings in the Phase 1 area are being considered to be replaced with structures that are more amenable to fish passage (e.g., bridges) solely due to considerations of construction impacts on traffic. While we understand this limitation, we encourage you to retain this alternative for culverted road-stream crossings in designated anadromous fish use areas during the development of future project phases. Also, as we indicated in our previous letter, the majority of proposed impacts to anadromous fish use areas are associated with the replacement of the ALB. Due to the complexity of this action, we continue to recommend that you coordinate with us during the development of plans for this bridge replacement to ensure that impacts to this productive anadromous fish spawning habitat are adequately avoided/minimized. | MDOT SHA will continue to coordinate with NOAA during the development of the plan to replace the ALB to ensure that impacts are adequately avoided/minimized. |

00022201

| 3 | n/a | Fish & Wildlife | Finally, compensatory mitigation for unavoidable impacts to waterways is detailed in the SDEIS. This includes several stream/wetland restoration projects in the Seneca Creek watershed, designated CA-2/3, CA-5, and RFP-2. Because Seneca Creek enters the Potomac River above Great Falls, which is a natural migratory barrier, this watershed does not provide habitat for anadromous fish and therefore the proposed mitigation actions do not adequately offset impacts to our trust resources. The draft Compensatory Mitigation Plan that accompanied the DEIS included a fish passage enhancement project on Paint Branch and it is unclear why this project was not further considered in the SDEIS. Because the majority of impacts to anadromous fish spawning areas are associated with the replacement of the ALB, the proposed compensatory mitigation for Phase 1 should be designed to offset the impacts to these important habitats. | The Preferred Alternative focuses build improvements within the area of Phase 1 South and includes no action or no improvements on I-495 east of the I-270 east spur. Therefore, no improvements would occur to the structures over Paint Branch. If another study of this area proceeds in the future, it will be subject to a new environmental study and agency coordination. A fish passage enhancement project could occur at that time. The compensatory mitigation plan is focused on Section 404 impacts and replacing the wide variety of wetland/stream functions and values occurring projectwide. The mitigation package was based on a watershed approach and the fish passage project on Paint Branch was removed from the package, since it is located outside of the affected watershed.<br><br>To avoid and minimize impacts to anadromous fish MDOT SHA has committed to considering aquatic passage during bridge design and construction for the ALB, the bridge over the Potomac River, and the bridge over Cabin John Creek to protect anadromous fish species known to spawn in these waterways. MDOT SHA commits to maintaining existing or improving aquatic life passage in the culverts conveying Old Farm Creek and Watts Branch under I-270 (FEIS Chapter 5, Section 5.18.4). MDOT SHA will continue to coordinate with NOAA to ensure adequate avoidance and minimization. |
| 4 | n/a | Fish & Wildlife | As proposed, the project may prevent or reduce upstream passage of diadromous fish to important spawning habitat and degrade spawning, migration, nursery, foraging and resting habitat within, upstream and downstream of the project area for up to five spawning and nursery seasons, and will result in the permanent elimination and degradation of riverine habitat. Therefore, impacts to anadromous fish from the proposed project could be significant. Our November 5, 2020, letter contained several recommendations pursuant to the FWCA to guide avoidance, minimization, and mitigation measures relevant to these aquatic resources. While additional information has been provided in the SDEIS, these recommendations are still applicable in their entirety and should be addressed in the Final Environmental Impact Statement (FEIS). This includes the recommendation that unavoidable impacts to anadromous fish spawning habitats be offset to mitigate for losses of this unique and productive habitat. Finally, because impacts to fish passage will be largely dependent upon the final design and construction, consultation with us should be reinitiated following the selection of an alternative and the initiation of project design. This will ensure that each crossing with potential impacts to anadromous fish has been designed and will be constructed in a manner that will avoid and minimize impacts to these important habitats to the extent practicable. | MDOT SHA will continue to coordinate with NOAA to ensure adequate avoidance and minimization is addressed during final design and construction and to ensure minimal degradation to existing habitat following construction. |
| 5 | n/a | IAWG Meetings | Finally, when future meetings of the Interagency Working Group (IAWG) are scheduled, we ask that these dates be scheduled with as much notice as possible and no less than two weeks ahead of time to allow us to adjust schedules accordingly. Scheduling meetings based on availability polling would also be helpful to ensure our participation in light of many recurring meetings. | Thank you for the comment. MDOT SHA will schedule future IAWG meetings as far out as possible. |

## NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION

**From:** Jonathan Watson - NOAA Federal <jonathan.watson@noaa.gov>
**Sent:** Tuesday, November 30, 2021 8:37:36 PM (UTC+00:00) Monrovia, Reykjavik
**To:** SHA OPLANESMLS <oplanesMLS@mdot.maryland.gov>
**Cc:** Karen Greene - NOAA Federal <karen.greene@noaa.gov>; Ray Li <ray_li@fws.gov>; Gwen Gibson
<gwendolyn.gibson@maryland.gov>; Mar, Jeanette (FHWA) <Jeanette.Mar@dot.gov>; Dinne, John J CIV USARMY
CENAB (USA) <JOHN.J.DINNE@usace.army.mil>; Fitzgerald, Megan <fitzgerald.megan@epa.gov>
**Subject:** I-495 & I-270 MLS SDEIS - NMFS HESD response

Good Afternoon,

Please find attached our letter containing recommendations related to the SDEIS for the proposed MDOT SHA I-495/I-270 Managed Lanes Study. In our previous letter (also attached) dated November 5, 2020, written in response to the DEIS, we issued several recommendations pursuant to the Fish and Wildlife Coordination Act related to concerns about potential impacts to migratory fish. As we indicated in our attached letter in response to the SDEIS, many of these concerns remain and our previous recommendations are still applicable. If you have any questions, please contact me in the Annapolis Field Office.

Thank You,

Jonathan Watson

--
*Jonathan M. Watson* (he, him, his)
*Marine Habitat Resource Specialist*
*NOAA Fisheries Greater Atlantic Regional Fisheries Office*
*Habitat & Ecosystem Services Division (Habitat Conservation)*
*Annapolis, MD Field Office*
*(410) 295-3152 (office, forwarded to cell)*



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

November 30, 2021

Jeffrey T. Folden, P.E., DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21202

Dear Mr. Folden:

We have reviewed the Supplemental Draft Environmental Impact Statement (SDEIS) for the proposed I-495/I-295 Managed Lanes Study (MLS). The Federal Highway Administration (FHWA) and Maryland Department of Transportation State Highway Administration (MDOT SHA) are evaluating potential transportation improvements to approximately 48 miles of the I-495 and I-270 corridors in Montgomery and Prince George's County, Maryland and Fairfax County, Virginia. Specifically, the SDEIS presents information relevant to the Preferred Alternative - Phase 1 South, which includes build improvements in a subset of the area examined in the previous Draft Environmental Impact Statement (DEIS). This area includes I-495 from its junction with VA-193 north to its connection with I-270/MD-187 and considers full replacement of the American Legion Bridge (ALB) where I-495 crosses the Potomac River.

The study corridor includes areas containing wetlands and waterways under the jurisdiction of the U.S. Army Corps of Engineers and Maryland Department of the Environment. In the SDEIS, the Preferred Alternative is estimated to impact approximately 23.36 acres of waterways across approximately 46,553 linear feet. Of these, permanent impacts include 15.45 acres of waterways across 43,852 linear feet. A suite of mitigation options has been explored and a portfolio of sites/approaches has been identified in the Draft Compensatory Mitigation Plan (Draft CMP). The final mitigation will be identified in the Final Environmental Impact Statement (FEIS)

On November 5, 2020, we provided you with comments on the DEIS which included several recommendations pursuant to the Fish and Wildlife Coordination Act (FWCA). The information contained in that letter regarding potential impacts to our trust resources (e.g., migratory fish) and the corresponding recommendations remain applicable to this SDEIS and should continue to be considered during your review of agency comments. Similar to the SDEIS, this letter is focused on information provided for the designated Preferred Alternative - Phase 1 South.





**Fish and Wildlife Coordination Act (FWCA)**

The Fish and Wildlife Coordination Act (FWCA) requires that all federal agencies consult with us when proposed actions might result in modifications to a natural stream or body of water. It also requires that they consider the effects that these actions would have on fish and wildlife and must also provide for the improvement of these resources. Under this authority, we work to protect, conserve and enhance species and habitats for a wide range of aquatic resources such as shellfish, protected species, and other commercially and recreationally important species that are not managed by the federal fishery management councils and do not have designated essential fish habitat (EFH). As the nation's federal trustee for the conservation and management of marine, estuarine, and anadromous fishery resources, we provide the following comments and recommendations pursuant to the authority of the FWCA.

The study corridor contains several perennial streams and rivers that provide important habitat for anadromous fish such as alewife *(Alosa pseudoharengus)*, blueback herring *(A. aestivalis)* and American shad *(A. sapidissima)*, which use the river including the areas in and around the proposed project site as migratory, spawning, nursery, resting, and foraging habitat. In our November 5, 2020, letter we provided information regarding the depressed status of these stocks and approaches to avoid, minimize, mitigate, or otherwise offset impacts. The specific design of each waterway crossings has yet to be determined, but a suite of avoidance/minimization approaches has been identified to avoid/minimize impacts to migratory fish. These include avoiding in-water work during the period in which migratory fish are likely to be present (March 1 – June 15), maintaining adequate passage zones/stream velocities for aquatic life, and examining potential impacts to fish passage where the corridor crosses streams with relatively large (i.e., drainage area upstream of crossing ≥ 132 acres) streams. In the SDEIS, anadromous fish use areas are now properly designated using the Chesapeake Fish Passage Prioritization tool.

Based on the SDEIS, it does not appear that existing culverted road-stream crossings in the Phase 1 area are being considered to be replaced with structures that are more amenable to fish passage (e.g., bridges) solely due to considerations of construction impacts on traffic. While we understand this limitation, we encourage you to retain this alternative for culverted road-stream crossings in designated anadromous fish use areas during the development of future project phases. Also, as we indicated in our previous letter, the majority of proposed impacts to anadromous fish use areas are associated with the replacement of the ALB. Due to the complexity of this action, we continue to recommend that you coordinate with us during the development of plans for this bridge replacement to ensure that impacts to this productive anadromous fish spawning habitat are adequately avoided/minimized.

Finally, compensatory mitigation for unavoidable impacts to waterways is detailed in the SDEIS. This includes several stream/wetland restoration projects in the Seneca Creek watershed, designated CA-2/3, CA-5, and RFP-2. Because Seneca Creek enters the Potomac River above Great Falls, which is a natural migratory barrier, this watershed does not provide habitat for anadromous fish and therefore the proposed mitigation actions do not adequately offset impacts to our trust resources. The draft Compensatory Mitigation Plan that accompanied the DEIS included a fish passage enhancement project on Paint Branch and it is unclear why this project was not further considered in the SDEIS. Because the majority of impacts to anadromous fish

spawning areas are associated with the replacement of the ALB, the proposed compensatory mitigation for Phase 1 should be designed to offset the impacts to these important habitats.

**Recommendations**

As proposed, the project may prevent or reduce upstream passage of diadromous fish to important spawning habitat and degrade spawning, migration, nursery, foraging and resting habitat within, upstream and downstream of the project area for up to five spawning and nursery seasons, and will result in the permanent elimination and degradation of riverine habitat. Therefore, impacts to anadromous fish from the proposed project could be significant. Our November 5, 2020, letter contained several recommendations pursuant to the FWCA to guide avoidance, minimization, and mitigation measures relevant to these aquatic resources. While additional information has been provided in the SDEIS, these recommendations are still applicable in their entirety and should be addressed in the Final Environmental Impact Statement (FEIS). This includes the recommendation that unavoidable impacts to anadromous fish spawning habitats be offset to mitigate for losses of this unique and productive habitat. Finally, because impacts to fish passage will be largely dependent upon the final design and construction, consultation with us should be reinitiated following the selection of an alternative and the initiation of project design. This will ensure that each crossing with potential impacts to anadromous fish has been designed and will be constructed in a manner that will avoid and minimize impacts to these important habitats to the extent practicable.

Finally, when future meetings of the Interagency Working Group (IAWG) are scheduled, we ask that these dates be scheduled with as much notice as possible and no less than two weeks ahead of time to allow us to adjust schedules accordingly. Scheduling meetings based on availability polling would also be helpful to ensure our participation in light of many recurring meetings.

**Conclusion**

We look forward to continued coordination with you on this project as it moves forward. If you have any questions or need additional information, please do not hesitate to contact Jonathan Watson in our Annapolis, MD field office at jonathan.watson@noaa.gov or (410) 295-3152.

Sincerely,

GREENE.KAREN.M.13 Digitally signed by
65830785

Karen M. Greene
Chief, Mid-Atlantic Branch
Habitat and Ecosystem Services Division

cc:  FHWA – J. Mar
USACE – J. Dinne
NPS – T. Morrison
EPA – M. Fitzgerald
FWS – R. Li
MDE – S Hurt
MDNR – G. Gibson



**UNITED STATES DEPARTMENT OF COMMERCE**
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
GREATER ATLANTIC REGIONAL FISHERIES OFFICE
55 Great Republic Drive
Gloucester, MA 01930-2276

November 5, 2020

Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21201

Dear Ms. Choplin:

We have reviewed the draft Environmental Impact Statement (DEIS) and materials contained in the JPA document for the proposed I-495/I-295 Managed Lanes Study (MLS). The Federal Highways Administration (FHWA) and Maryland Department of Transportation State Highway Administration (MDOT SHA) are evaluating potential transportation improvements to approximately 48 miles of the I-495 and I-270 corridors in Montgomery and Prince George's County, Maryland and Fairfax County, Virginia. Specifically, this includes I-495 from south of the George Washington Memorial Parkway, including the American Legion Bridge (ALB) crossing over the Potomac River, to west of MD 5; and I-270 from its juncture with I-495 to I-370, including the east and west I-270 spurs north of I-495. The corridor study boundary was defined as 300 feet on either side of the centerline of the aforementioned roadways. Several alternative designs were retained for the analysis presented in the DEIS, all with similar extents of temporary and permanent impacts. The purpose of this study is to evaluate options for easing traffic congestion in these areas.

The study corridor includes areas containing wetlands and waterways under the jurisdiction of the U.S. Army Corps of Engineers and Maryland Department of the Environment. The screened alternatives evaluated in the DEIS are estimated to impact approximately 16 acres of non-tidal wetlands and approximately 44 acres of waterways across approximately 155,000 linear feet. At this stage, all impacts described are considered permanent and temporary impacts will be determined/defined at a later stage of design. A suite of mitigation options has been explored and a portfolio of sites/approaches has been identified. This is detailed in the Draft Compensatory Mitigation Plan (Draft CMP) and includes approximately 30 acres of non-tidal wetland mitigation and approximately 100,000 linear feet (approx. 19 miles) of stream mitigation. Mitigation is not proposed for approximately 52,000 linear feet of streams which currently flow beneath/through existing bridges/culverts. A variety of mitigation approaches were explored for the Draft CMP (e.g., on-site stream restoration, mitigation banking, in-lieu fee programs, and off-site permittee-responsible). Permittee-responsible mitigation sites, some of which are located on-site, were prioritized based on a variety of criteria including proximity to the study area and



potential to demonstrate ecological uplift. Approximately 40,500 linear feet of stream mitigation credits are proposed to be fulfilled off-site. Of those, approximately 5,258 linear feet of credits are proposed to be fulfilled by the removal of a barrier to fish movement located on Paint Branch, which may benefit anadromous fish by increasing passage to potential spawning habitat.

Our primary concern is related to impacts to areas where the existing roadways cross perennial streams that provide spawning habitat and/or migration corridors for anadromous fish. The specific design of each of these crossings has yet to be determined, but a suite of avoidance/minimization approaches has been identified to offset impacts to migratory fish. These include avoiding in-water work during the period in which migratory fish are likely to be present (March 1 – June 15), maintaining adequate passage zones for aquatic life, and examining potential impacts to fish passage where the corridor crosses streams with relatively large (i.e., drainage area upstream of crossing ≥ 132 acres) streams. While these approaches do largely address concerns we previously described, we offer the following information/guidance to further ensure that impacts to these species are minimized to the extent practicable.

*Fish and Wildlife Coordination Act (FWCA)*
The Fish and Wildlife Coordination Act (FWCA), as amended in 1964, requires that all federal agencies, including FHWA, consult with us when proposed actions might result in modifications to a natural stream or body of water. It also requires that they consider the effects that these projects would have on fish and wildlife and must also provide for the improvement of these resources. Under this authority, we work to protect, conserve and enhance species and habitats for a wide range of aquatic resources such as shellfish, diadromous species, and other commercially and recreationally important species that are not managed by the federal fishery management councils and do not have designated essential fish habitat (EFH). As the nation's federal statute for the conservation and management of marine, estuarine, and anadromous fishery resources, we provide the following comments and recommendations pursuant to the authority of the FWCA.

**Aquatic Resources**
The study corridor contains several perennial streams and rivers that provide important habitat for anadromous fish such as alewife (*Alosa pseudoharengus*), blueback herring (*A. aestivalis*) and American shad (*A. sapidissima*), which use the river including the areas in and around the proposed project site as migratory, spawning, nursery, resting, and foraging habitat. These species have complex life cycles where individuals spend most of their lives at sea then migrate great distances to return to freshwater rivers to spawn. American shad (stocks north of Cape Hatteras, N.C.), alewife, and blueback herring are believed to be repeat spawners, generally returning to their natal rivers to spawn (Collette and Klein-MacPhee 2002; Pess et al., 2014). They have also been documented to exhibit some degree of iteroparity (i.e., adults return to spawn multiple times throughout their life) in urbanized tributaries to the Chesapeake Bay (M. Ogburn, Smithsonian Environmental Research Center, pers. comm.).

Alosines are important forage for several species managed by the New England Fishery Management Council and the Mid-Atlantic Fishery Management Council as they provide trophic linkages between freshwater/estuarine and marine food webs. Buckel and Conover (1997) in Fahay et al. (1999) report that diet items of juvenile bluefish include *Alosa* species. Additionally,

2

juvenile *Alosa* species have all been identified as prey species for summer flounder (*Paralichthys dentatus*) and windowpane flounder (*Scophthalmus aquosus*) in Steimle et al. (2000). As a result, actions that reduce the availability of prey species, either through direct harm or capture, or through adverse impacts to their spawning habitat may adversely impact federally managed fisheries and their EFH.

American shad, blueback herring, and alewife formerly supported the largest and most important commercial and recreational fisheries throughout their range, with fishing activities spanning across rivers (both fresh and saltwater), tributaries, estuaries, and the ocean. Commercial landings for these species have declined dramatically from historic highs (ASMFC 2018). The most recent American shad stock assessment report identified that American shad stocks are, in all likelihood, currently at all-time lows following a period of recent (i.e., within the past decade) coast-wide decline (ASMFC 2020). In the Potomac River, the recent estimate of adult mortality was described as "unsustainable", indicating that there is a net loss of adults returning to the system to spawn each year. Throughout their range, American shad stocks do not appear to be recovering (ASMFC 2007). The 2007 stock assessment concluded that new protection and restoration actions needed to be identified and applied, which led to the development of Amendment 3 to the Interstate Fishery Management Plan for Shad and River Herring (American Shad Management). Amendment 3 identified significant threats to American shad, including spawning and nursery habitat degradation or blocked access to habitat, resulting from dam construction, increased erosion and sedimentation, and losses of wetland buffers. Protecting, restoring and enhancing American shad habitat, including spawning, nursery, rearing, production, and migration areas, are necessary for preventing further declines in American shad abundance, and restoring healthy, self-sustaining, robust, and productive American shad stocks to levels that will support the desired ecological, social, and economic functions and values of a restored Atlantic Coast American shad population (ASMFC 2010).

In the Mid-Atlantic, landings of alewife and blueback herring, collectively known as river herring, have declined since the mid-1960's and have remained very low in recent years (ASMFC 2017). The 2012 river herring benchmark stock assessment found that of the 52 stocks of alewife and blueback herring assessed, 23 were depleted relative to historic levels, one was increasing, and the status of 28 stocks could not be determined due to a lack of long-term data (ASMFC 2012a). The 2017 stock assessment update indicates that river herring remain depleted at near historic lows coast-wide. The "depleted" determination was used in 2012 and 2017 instead of "overfished" to indicate factors besides fishing have contributed to the decline of these species, including habitat loss, habitat degradation and modification, and climate change (ASMFC 2017).

Because landing statistics and the number of fish observed on annual spawning runs indicate a drastic decline in alewife and blueback herring populations throughout much of their range since the mid-1960s, they have been designated as a Species of Concern by NOAA. Species of Concern are those about which we have concerns regarding their status and threats, but for which insufficient information is available to indicate a need to list the species under the Endangered Species Act (ESA). We wish to draw proactive attention and conservation actions to these species.

The area of the proposed project is also migration, spawning, nursery, and foraging habitat for the American eel. Catadromous American eels spawn in the Sargasso Sea and transit the Chesapeake Bay then the tributaries to the Potomac River as elvers as part of their migration. They inhabit these freshwater areas until they return to the sea as adults. According to the 2012 benchmark stock assessment, the American eel population is depleted in U.S. waters. The stock is at or near historically low levels due to a combination of historical overfishing, habitat loss, food web alterations, predation, hydroelectric turbine mortality, environmental changes, exposure to toxins and contaminants, and disease (ASMFC 2012b). Actions being considered as part of the proposed project may impede the movements of these species between important freshwater habitats and the Atlantic Ocean in a number of ways including altering hydrologic conditions such as velocity and flow patterns, as well as changing water quality.

**Adverse Effects to Aquatic Resources**
*Impacts*
The JPA and DEIS documents described permanent impacts of approximately 153,000 linear feet of waterways, some of which provide spawning habitat for anadromous fish. Due to scale, spatial extent, and relative complexity of the proposed action, impacts to anadromous fish will likely occur through a variety of both direct (e.g., passage restriction, channelization) and indirect (e.g., increased impervious surface, riparian buffer disturbance) pathways. In-river construction for the project, including use of barges, cofferdams, causeways/riprap pads, and other large machinery is currently proposed to last approximately five years, encompassing several consecutive migration/spawning (February to June) and nursery seasons (July to October). Numerous adverse impacts from causeway/trestle construction, demolition of existing structures, channel realignment/armoring, culvert augmentation/replacement, dredging, pile/cofferdam installation, permanent shading, and others are discussed below.

A significant contributing factor to the dramatic declines in shad and river herring populations is decreases in water quality, channelization, dredging, and in-water construction (ASMFC 2010; ASMFC 2017). Anthropogenic-induced elevated levels of turbidity and sedimentation, above background (e.g., natural) levels, can lead to various adverse impacts on diadromous fish and their habitats. Increases in turbidity due to the resuspension of sediments into the water column during activities such as dredging can degrade water quality, lower dissolved oxygen levels, and potentially release chemical contaminants bound to the fine- grained sediments (Johnson et al. 2008). Suspended sediment can also mask pheromones used by migratory fishes to reach their spawning grounds and impede their migration, as well as smother immobile benthic organisms and demersal newly-settle juvenile fish (Auld and Schubel 1978; Breitburg 1988; Newcombe and MacDonald 1991; Burton 1993; Nelson and Wheeler 1997). Additionally, other effects from suspended sediments may include (a) lethal and non-lethal damage to body tissues, (b) physiological effects including changes in stress hormones or respiration, or (c) changes in behavior (Kjelland et al. 2015).

Noise from other construction activities, such as driving piles for trestle/pier construction, may also result in adverse effects to various fish species. Our concerns about noise effects come from an increased awareness that high-intensity sounds have the potential to adversely impact aquatic vertebrates (Fletcher and Busnel 1978; Kryter 1984; Popper 2003; Popper et al. 2004). Effects may include (a) lethal and non-lethal damage to body tissues, (b) physiological effects including

3

4

OP·LANES
M A R Y L A N D    I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-4    Filed 10/30/23    Page 100 of 103

FINAL ENVIRONMENTAL IMPACT STATEMENT

changes in stress hormones, hearing capabilities, or sensing and navigation abilities, or (c) changes in behavior (Popper et al. 2004).

Shading from over-water structures can adversely affect migratory fish by degrading habitat quality in, and near, the shadow cast by the structure and by altering behavior and predator-prey interactions (Nightingale and Simenstad, 2001; Hanson et al., 2003). Shading results from the attenuation, interference or blocking of sunlight. For elevated bridges such as those proposed to be expanded, the primary causes of shading are superstructures (e.g., deck), though substructures (e.g., towers) can also cause shading. The shadow cast by a structure may also increase predation on species by creating a light-dark interface that allows ambush predators to remain in darkened areas and wait for prey to swim by against an illuminated background, resulting in high contrast and high visibility (Helfman, 1981). Prey species moving around the structure may be unable to see predators in the dark area under the structure or have decreased predator reaction distances and times, thus making them more susceptible to predation (Helfman, 1981; Bash et al., 2001).

American shad and river herring appear to be particularly susceptible to the shadow cast by overwater structures (Moser and Terra, 1999). American shad tend to be diurnal in their migratory habits and tend to migrate primarily during the day, while falling back to lower-velocity zones at night; adults and juveniles use side-channel and shallower areas near shorelines at day and night (Fisher, 1997; Haro and Kynard, 1997; Theiss, 1997; Sullivan, 2004). American shad are reluctant to immediately pass under darkened areas of channels, specifically under low bridges or strong shadows, or where there is a strong light transition (Haro and Castro-Santos, 2012). The extension of existing culverts will also increase the linear extent of heavily shaded areas associated with these structures. American shad school as both juveniles and adults and have a low likelihood of separating from a school in order to pass a structure or its shadow (Larinier et al., 2002). River herring require light to form schools, are most active during the day, and have difficulty avoiding obstacles at night (Blaxter and Parrish 1965; Blaxter and Batty 1985). Similarly, laboratory observations of alewives indicated that both juveniles and adults are most active during the day (Richkus and Winn, 1979). Moser and Terra (1999) performed a field study to investigate low light as an impediment to river herring migrations and found significantly higher numbers of herring passed through unshaded treatments, as compared to shaded treatments. Fish often require visual cues for orientation and exhibit faster swimming speeds at increased light levels (Pavlov et al., 1972, Katz, 1978).

*Avoidance and Minimization*
Steps FHWA, and MDOT SHA, have taken to avoid or minimize impacts from the proposed project include undertaking in-water work in anadromous fish use areas only from June 16 to February 28 of each year (no in-water work conducted between March 1 and June 15) and shifting roadway alignments to avoid riparian areas in the Rock Creek corridor. While we appreciate these avoidance and minimization efforts as the project is currently proposed, further avoidance and minimization appears feasible.

**Recommendations**
As recommended, the project may prevent or reduce upstream passage of diadromous fish to important spawning habitat and degrade spawning, migration, nursery, foraging and resting habitat within, upstream and downstream of the project area for up to five spawning and nursery

seasons, and will result in the permanent elimination and degradation of riverine habitat. Therefore, impacts to diadromous fish from the proposed project could be significant.

Determining whether a particular road crossing will affect anadromous fish entails examining available data to determine whether they are likely to use particular areas. While the presence of anadromous fish species (e.g., American eel, sea lamprey *Petromyzon marinus*) is well described for several waterways in the DEIS Natural Resources Technical Report (Appendix L), the monitoring efforts upon which these observations are based (e.g., Maryland Biological Stream Survey) do not target anadromous fish due to the fact that these programs generally survey when those species are not present (i.e., summer). Thus, the lack of detection of these species in the survey data does not mean these species are not present and should not be used to eliminate the need to ensure anadromous fish passage, follow the appropriate time of year restrictions, or adequately mitigate for unavoidable impacts to passage. Instead, presence of anadromous fish should be inferred through use of mapping resources available in the Freshwater Network Chesapeake Region Chesapeake Fish Passage Prioritization project tool.

Waterways which currently provide spawning habitat for anadromous fish, based on documented spawning activity and/or lack of impassable barriers to passage and presence of suitable habitat designated by that tool, include: Potomac River at American Legion Bridge, Cabin John Creek, Rock Creek, Southwest Branch Patuxent River, Bald Hill Branch, and Henson Creek. While barriers may exist downstream of the corridor crossing locations, at least two of these dams (i.e., Little Falls, Pierce Mill) have recently been retrofitted with fish passage structures suitable for anadromous species. Waterways that would likely provide spawning habitat to river herring if one barrier located downstream of the I-495 corridor underwent passage improvement include: Paint Branch, Little Paint Branch, and Northeast Branch. Those waterways with potential habitat and two or more barriers downstream of the I-495 corridor include: Sligo Creek, Northwest Branch, and Indian Creek. The existence of barriers downstream of a perennial stream that has been designated as potential habitat using this tool should not preclude the requirement of suitable construction approaches or final designs to accommodate migrating fish as these barriers may be removed or modified to allow fish passage in the future.

During the development of project design, following the selection of a screened alternative, proposed methods of construction should be evaluated for potential impacts to anadromous fish migration corridors and spawning habitat and an analysis should detail how practicable alternatives would impact diadromous fish and their habitats. These alternatives should include, but not be limited to, using temporary work trestles in lieu of the proposed rock jetties extending from the river bank onto river bottom habitat. We are particularly concerned about impacts to spawning habitat and passage associated with the expansion of the ALB. Passage to the Potomac River above the Little Falls dam was restored after a fishway was constructed in 2000. Spawning habitat above Little Falls, including areas in the vicinity of the ALB, offers valuable spawning habitat for Alosines (Cummins, 2016). Installation of the causeways/riprap pads and cofferdams in the Potomac River at the ALB will result in changes to the hydrodynamics of the river, as water is funneled through reduced cross sections of the river. Causeway/riprap pad and cofferdam placement will likely represent a substantial reduction in the typical estimated bank-full width of the river. Increased water velocity may limit the upstream migration of fish or lead to the use of excess energy, leading to a loss of fitness. Additional effects to individuals from the

5

6

presence of the rock jetties and other construction-related activities may include behavior modification and avoidance.

Should the replacement of the ALB move ahead as generally proposed (e.g., alignment and access), the causeways/riprap pads should be eliminated entirely and replaced with other construction-facilitation methods, such as temporary work trestles, or reduced to the greatest extent practicable. Various alternatives to the currently proposed riprap placement strategy should be developed that do not constrict flows or degrade important habitat for diadromous fish. These access structures should also be designed to withstand a reasonable flood stage (e.g., 100 year) so as to avoid disturbing adjacent habitats if these structures should become destabilized. Finally, any in-water piles or sheetpiles (i.e., those not installed behind dewatered cofferdams) planned in this area should not be installed during the period in which anadromous fish are present.

To avoid and minimize potential impacts to migratory fish species, we recommend that FHWA and MDOT SHA fully evaluate a suite of passage-friendly alternative alignments/designs to roadway crossings and channel relocations. Any introduction of armoring or realignment of waterways should be designed to minimize potential impacts to fish passage by maintaining suitable flows across river discharge levels. The modification of road crossings of perennial streams may result in reduced fish passage in many instances. In JPA Part 12 – Avoidance Minimization and Impacts Report, several of these stream crossings are described. It has been determined that culvert/bridge replacement will be required at several of these crossings. Because these projects are still in the preliminary design phase, it is unclear to what extent passage may be affected. We recommend that these crossings be designed to minimize potential impacts to fish passage by replacing traditional box culverts, where practicable, with bridged or oversized bottomless culverts. Where existing culverts are not currently being considered for replacement, we recommend that retrofitting existing culverts to include nature-like bottoms continue to be considered. We also recommend that any new culverts installed be countersunk according to regional regulations and designed to ensure passage during low-flow conditions.

Finally, because impacts to fish passage will be largely dependent upon the final design and construction, we also request that consultation with us be reinitiated following the selection of an alternative and the initiation of project design. This will ensure that each crossing with potential impacts to anadromous fish has been properly designed and the associated construction will avoid and minimize impacts to these important habitats to the extent practicable.

**Fish and Wildlife Coordination Act Recommendations**
As proposed, the project may prevent or reduce upstream passage of diadromous fish to important spawning habitat and will result in permanent elimination and degradation of riverine habitat. To avoid and minimize these impacts, we recommend the following, pursuant to the Fish and Wildlife Coordination Act (FWCA):

- Presence of anadromous fish (e.g., river herring) should be inferred through use of mapping resources available in the Freshwater Network Chesapeake Region Chesapeake Fish Passage Prioritization project tool.

7

- In instances where an existing culverted stream crossing of a designated "major stream crossing" (i.e., drainage area > 1.5 square miles) requires complete replacement, it should be designed to meet the passage criteria described by USFWS (2019). This could be achieved by using oversized, bottomless culverts or bridges in place of existing box culverts. In areas where culverts are being extended or augmented, retrofitting with a natural or nature-like stream bottom should continue to be considered as an option.

- Causeways and trestles proposed adjacent to the existing ALB should be designed to minimize in-water fill and avoid impacting fish passage by maintaining river velocities below approximately 3 feet per second at commonly observed discharges (e.g., below 90 percentile) during the period in which anadromous fish are spawning (February 15 - June 15). Trestles should be used in areas of deeper water (e.g., extending from the southern bank) to the extent practicable to minimize fill and associated flow restrictions.

- Construction approaches which minimize the temporal extent of in-water activities, such as the use of dewatered cofferdams, for the installation of ALB piers should be considered to the extent practicable.

- Construction of causeways/trestles at the ALB should continue to be considered a permanent impact and compensatory mitigation should be provided due to their planned installation for up to five years.

- Mitigation for impacts to anadromous fish use areas (e.g., Potomac River, Cabin John Creek, Paint Branch, Northwest Branch) should benefit those species by enhancing fish passage to viable spawning habitats in the vicinity of the project area.

- Re-consult with us when plans are developed for roadway crossings in anadromous fish use areas (e.g., ALB expansion) to ensure that impacts due to construction and permanent fill are minimized to the extent practicable and adequate mitigation is achieved.

**Conclusion**
We look forward to continued coordination with you on this project as it moves forward. If you have any questions or need additional information, please do not hesitate to contact Jonathan Watson in our Annapolis, MD field office at jonathan.watson@noaa.gov or (410) 295-3152.

Sincerely,

GREENE.KAREN.M.1365    Digitally signed by
850785                GREENE.KAREN.M.1365850785
                      Date: 2020.11.05 14:46:44 -05'00'

Karen M. Greene
Mid-Atlantic Field Office Supervisor
Habitat Conservation Division

cc:  FHWA – J. Mar
     USACE – J. Dinne
     NPS – T. Morrison
     EPA – M. Fitzgerald
     FWS – C. Gay
     FWS – R. Li
     MDE – S Hurt
     MDNR – G. Gibson

8

**Literature Cited**

ASMFC. 2007. Stock Assessment Report No. 07-01 (Supplement) of the Atlantic States Marine Fisheries Commission - American Shad Stock Assessment Report for Peer Review Volume I. Washington, DC. 238 p.

ASMFC. 2010. Amendment 3 to the Interstate Fishery Management Plan for Shad and River Herring (American Shad Management). Washington, D.C. 169 p.

ASMFC. 2012a. River Herring Benchmark Stock Assessment Volume II. Stock Assessment Report No. 12-02. Washington D.C. 710 p.

ASMFC. 2012b. American Eel Benchmark Stock Assessment. Stock Assessment Report No. 12-01. Washington, DC. 29 p.

ASMFC. 2017. River Herring Stock Assessment Update Volume I: Coastwide Summary. Washington, D.C. 193 p.

ASMFC. 2018. Review of the ASMFC Fishery Management Plan for Shad and River Herring (*Alosa* spp.) for the 2017 Fishing Year. Washington D.C. 19 p.

ASMFC. 2020. 2020 American Shad benchmark stock assessment and peer review report. Washington D.C. 1188 p.

Auld, A.H. and J.R. Schubel. 1978. Effects of suspended sediments on fish eggs and larvae: a laboratory assessment. Estuar. Coast. Mar. Sci. 6:153-164.

Bash, J., Berman, C., and Bolton, S. 2001. Effects of turbidity and suspended solids on salmonids. Washington State Transportation Center (TRAC) Report No. WA-RD 526.1. Olympia, WA. 92 p.

Blaxter, J.H.S. and B.B. Parrish. 1965. The importance of light in shoaling, avoidance of nets and vertical migration by herring. J. Cons. perm. int. Explor. Mer. 30:40-57.

Blaxter, J.H.S. and R.S. Batty. 1985. Herring behaviour in the dark: responses to stationary and continuously vibrating obstacles. J. mar. biol. Assoc. U.K. 65:1031-1049.

Breitburg, D.L. 1988. Effects of turbidity on prey consumption by striped bass larvae. Trans. Amer. Fish. Soc. 117: 72-77.

Buckel, J.A. And D.O. Conover. 1997. Movements, feeding periods, and daily ration of piscivorous young-of-the-year bluefish, *Pomatomus saltatrix*, in the Hudson River estuary. Fish. Bull. (U.S.) 95:665-679.

Burton, W.H. 1993. Effects of bucket dredging on water quality in the Delaware River and the potential for effects on fisheries resources. Prepared for: Delaware Basin Fish and Wildlife Management Cooperative, by Versar Inc, Columbia MD.

Collette, B.B. and G. Klein-MacPhee. eds. 2002. Bigelow and Schroeder's fishes of the Gulf of Maine. Smithsonian Institute. Washington D.C.

Cummins, J. 2016. Restoration of American shad in the Potomac River. Presentation delivered to the 21st annual Shad Teacher Training. March 12, 2016.

Fahay, M.P., P.L. Berrien, D.L. Johnson and W.W. Morse. 1999. Essential Fish Habitat Source Document: Bluefish, *Pomatomus saltatrix* life history and habitat characteristics. U.S. Dep. Commer., NOAA Technical Memorandum NMFS-NE-144.

Fisher, M.T. 1997. Temporal and spatial patterns of anadromous fish passage at Boshers Dam vertical-slot fishway on the James River, Richmond, Virginia. Master's thesis. Virginia Commonwealth University, Richmond.

Fletcher, J.L. and R.G. Busnel. 1978. Effects of Noise on Wildlife. Academic Press, New York.

Greene, K. E., J. L. Zimmerman, R. W. Laney, and J. C. Thomas-Blate. 2009. Atlantic coast diadromous fish habitat: A review of utilization, threats, recommendations for conservation, and research needs. Atlantic States Marine Fisheries Commission Habitat Management Series No. 9, Washington, D.C. 484 p.

Hanson, J., Helvey, M., Strach, R., editors. 2003. Non-fishing impacts to essential fish habitat and recommended conservation measures. Long Beach (CA): National Marine Fisheries Service (NOAA Fisheries) Southwest Region. Version 1. 75p.

Haro, A., and B. Kynard. 1997. Video evaluation of passage efficiency of American shad and sea lamprey in a modified Ice Harbor fishway. North American Journal of Fisheries Management 17:981–987.

Haro, A., and Castro-Santos, T. 2012. Passage of American Shad: Paradigms and Realities. Marine and Coastal Fisheries, 4(1), 252-261. doi:10.1080/19425120.2012.675975

Helfman, G.S. 1981. Twilight Activities and Temporal Structure in a Freshwater Fish Community Canadian Journal of Fisheries and Aquatic Sciences 38(11): 1405-1420.

Johnson M.R., Boelke C., Chiarella L.A., Colosi P.D., Greene K., Lellis K., Ludemann H., Ludwig M., McDermott S., Ortiz J., et al. 2008. Impacts to marine fisheries habitat from nonfishing activities in the Northeastern United States. NOAA Tech. Memo. NMFS-NE-209.

Katz, H.M. 1978. Circadian rhythms in juvenile American shad, *Alosa sapidissima*. J. Fish Biol. 12:609-614.

Kenworthy, W.J. and Haunert, D.E. 1991. Light requirements of seagrasses: proceedings of a workshop to examine the capability of water quality criteria, standards and monitoring programs to protect seagrasses. NOAA, Tech. Memo NMFS-SEFC-287. Beaufort, N.C. 181 pp.

Kjelland, M.E., Woodley, C.M., Swannack, T.M., and Smith, D.L. 2015. A review of the potential effects of suspended sediment on fishes: potential dredging-related physiological,

00022209

behavioral, and transgenerational implications. Environment Systems and Decisions 35:334-350.

Kryter, K.D. 1985. The handbook of hearing and the effects of noise (2nd ed.) Academic Press, Orlando, Florida.

Larinier, M., F. Travade, and J.P. Porcher. 2002. Fishways: biological basis, design criteria and monitoring. Bulletin Francais de la Peche et de la Pisciculture. 364 (Spécial milieu tropicaux), p. 208.

Moser, M.L. and M.E. Terra. 1999. Low light as an impediment to river herring migration. Final Report to North Carolina Department of Transportation, Raleigh, NC, 112 pp.

Nelson, D.A., and J.L. Wheeler. 1997. The influence of dredging-induced turbidity and associated contaminants upon hatching success and larval survival of winter flounder, Pleuronectes americanus, a laboratory study. Final report, Grant CWF #321-R, to Connecticut Department Environmental Protection, by National Marine Fisheries Service, Milford CT.

Newcombe, C.P., and D.D. MacDonald. 1991. Effects of suspended sediments on aquatic ecosystems. N. Amer. J. Fish. Manag. 11: 72-82.

Nightingale, B., and Simenstad, C.A. 200l. Overwater Structures: Marine Issues. White Paper Research Project Tl 803, Task 35. WSDOT.

Pavlov, D.S., Y.N. Sbikin, A.Y. Vashinniov and A.D. Mochek. 1972. The effect of light intensity and water temperature on the current velocities critical to fish. J. Ichthyol.12 :703-711.

Pess, G.E., T.P. Quinn, S.R. Gephard, R. Saunders. 2014. Re-colonization of Atlantic and Pacific rivers by anadromous fishes: linkages between life history and the benefits of barrier removal. Reviews in Fish Biology and Fisheries 24: 881-900.

Popper, A.N. 2003. Effects of anthropogenic sound on fishes. Fisheries 28:24 –31.

Popper, A.N., J. Fewtrell, M.E. Smith, and R.D. McCauley. 2004. Anthropogenic sound: Effects on the behavior and physiology of fishes. MTS J. 37:35 –40

Richkus, W.A. and H.E. Winn. 1979. Activity cycles of adult and juvenile alewives recorded by two methods. Trans. Am. Fish. Soc. 108: 358-365.

Steimle, F.W., R.A. Pikanowski, D.G. McMillan, C.A. Zetlin, and S.J. Wilk. 2000. Demersal fish and American lobster diets in the Lower Hudson-Raritan Estuary. NOAA Technical Memorandum NMFS-NE-161. Woods Hole, MA. 106 p.

Sullivan, T. 2004. Evaluation of the Turners Falls fishway complex and potential improvements for passing adult American shad. Master's thesis. University of Massachusetts, Amherst.

Theiss, E. J. 1997. Effect of illumination intensity on the water velocity preference of three Alosa species. Master's thesis. University of Massachusetts, Amherst.

USFWS (U.S. Fish and Wildlife Service). 2019. Fish Passage Engineering Design Criteria. USFWS, Northeast Region R5, Hadley, Massachusetts.

11

12