OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study — Case 8:22-cv-02597-DKC   Document 61-5   Filed 10/30/23   Page 1 of 69

FINAL ENVIRONMENTAL IMPACT STATEMENT

## T.2 COMMUNITY ORGANIZATION COMMENTS AND RESPONSES

### T.2.A Draft Environmental Impact Statement Community Organization Comments and Responses

**350MOCO – LISA JO FINSTROM**

| | |
|---|---|
| **From:** | Lisa Jo Finstrom <lisajofinstrom@gmail.com> |
| **Sent:** | Monday, November 9, 2020 10:24 AM |
| **To:** | MLS-NEPA-P3 |
| **Subject:** | Comments on DEIS for Beltway Expansion |
| **Attachments:** | letter opposing beltway expansion.docx |

November 9th, 2020

Attention Maryland Department of Transportation:

My name is Lisa Jo Finstrom and I am commenting on the DEIS on behalf of 350MoCo and our nearly 2000 supporters. 350MoCo is an offshoot of 350.org, the international environmental group co-founded by Bill McKibben that is dedicated to working towards a just and renewable future without fossil fuels.

350MoCo strongly opposes the proposed for-profit expansion of the Beltway and I-270. We support a no-build option.

**#1** We oppose the for-profit expansion for many reasons. First and foremost, the for-profit expansion project represents a move in the wrong direction for the planet, a move towards greater dependence on cars and fossil fuels in an age when the very survival of our species depends on reducing carbon emissions. In addition to polluting the air, the proposed expansion threatens the loss of green space and recreation areas. 550 new acres of impervious surface area will mean greater runoff, flooding, and pollution. Nowhere in the report's over 19,000 pages is the full environmental impact of this pro-fossil fuel plan truly analyzed.

**#2** As we've seen with the Purple Line, these kinds of projects are often plagued by cost overruns. WSSC is already estimating that it will cost at least $2 billion just to move water and sewer lines to accommodate the Beltway expansion. Who will end up paying that money? We worry that the cost will be passed along to all consumers -- many of whom won't be able to afford the additional fees. The added expense will be especially burdensome for residents already suffering the economic fallout from COVID, especially from low-income communities, which tend to be disproportionately Black and Brown residents.

**#3** We are dismayed that the Draft Environmental Impact Statement does not consider other viable options to relieve traffic. There is really no logical way to know if the expansion is the region's best approach to addressing traffic congestion without comparing expansion to other viable options. This is a fundamental flaw in project evaluation.

**#4** In addition, If other projects of this nature are any indication, traffic will only be reduced for a few years before increasing again. So we don't see this solution as strategic. And during the few years of reduced traffic, low-income people will be denied the full benefit of reduced traffic because they generally won't be able to afford the luxury toll lanes.

As we all know, traffic has gone down during COVID. It apparently takes only a small drop in the number of cars on the road to see rather dramatic improvements in traffic flow. The long-term consequences of COVID on our traffic patterns will probably result in fewer cars on the road as many people continue working from home. It's anticipated that many companies will be cutting rather than expanding office space in the coming years.

350MoCo stands firmly against the proposed 11 billion dollar public-private Beltway expansion project. This highly flawed study must start over from the beginning and honestly evaluate the environmental impact of the project. It must also study viable alternatives to for-profit toll roads. It must consider that expensive tolls

1

**Response to DEIS Comment #1**
NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.4.E for a response to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

Chapter 9, Section 3.4.F for a response to adverse impacts to air quality.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.


disadvantage low-income communities. It must also consider the COVID "wild card" factor. Most likely, telework will result in fewer cars on the road. Last but not least, the new study must be transparent.

Sincerely,

Lisa Jo Finstrom
Steering Committee
www.350moco.com

2

*This page is intentionally left blank.*


November 9th, 2020

Attention Maryland Department of Transportation:

My name is Lisa Jo Finstrom and I am commenting on the DEIS on behalf of 350MoCo and our nearly 2000 supporters. 350MoCo is an offshoot of 350.org, the international environmental group co-founded by Bill McKibben that is dedicated to working towards a just and renewable future without fossil fuels.

350MoCo strongly opposes the proposed for-profit expansion of the Beltway and I-270. We support a no-build option.

We oppose the for-profit expansion for many reasons. First and foremost, the for-profit expansion project represents a move in the wrong direction for the planet, a move towards greater dependence on cars and fossil fuels in an age when the very survival of our species depends on reducing carbon emissions. In addition to polluting the air, the proposed expansion threatens the loss of green space and recreation areas. 550 new acres of impervious surface area will mean greater runoff, flooding, and pollution. Nowhere in the report's over 19,000 pages is the full environmental impact of this pro-fossil fuel plan truly analyzed.

As we've seen with the Purple Line, these kinds of projects are often plagued by cost overruns. WSSC is already estimating that it will cost at least $2 billion just to move water and sewer lines to accommodate the Beltway expansion. Who will end up paying that money? We worry that the cost will be passed along to all consumers -- many of whom won't be able to afford the additional fees. The added expense will be especially burdensome for residents already suffering the economic fallout from COVID, especially from low- income communities, which tend to be disproportionately Black and Brown residents.

We are dismayed that the Draft Environmental Impact Statement does not consider other viable options to relieve traffic. There is really no logical way to know if the expansion is the region's best approach to addressing traffic congestion without comparing expansion to other viable options. This is a fundamental flaw in project evaluation.

In addition, If other projects of this nature are any indication, traffic will only be reduced for a few years before increasing again. So we don't see this solution as strategic. And during the few years of reduced traffic, low-income people will be denied the full benefit of reduced traffic because they generally won't be able to afford the luxury toll lanes.

As we all know, traffic has gone down during COVID. It apparently takes only a small drop in the number of cars on the road to see rather dramatic improvements in traffic flow. The long-term consequences of COVID on our traffic patterns will probably result in fewer cars on the road as many people continue working from home. It's anticipated that many companies will be cutting rather than expanding office space in coming years.

350MoCo stands firmly against the proposed 11 billion dollar public-private Beltway expansion project. This highly flawed study must start over from the beginning and honestly evaluate the environmental impact of the project. It must also study viable alternatives to for-profit toll roads. It must consider that expensive tolls disadvantage low-income communities. It must also consider the COVID "wild card" factor. Most likely, telework will result in fewer cars on the road. Last but not least, the new study must be transparent.

Duplicate comment, please see responses to these comments received via an email presented above.

Sincerely,

Lisa Jo Finstrom
Steering Committee
www.350moco.com

*This page is intentionally left blank.*

00022214

**AFSCME Maryland Council 3 – LANCE KILPATRICK**

| | |
|---|---|
| **From:** | Lance Kilpatrick <lkilpatrick@afscmemd.org> |
| **Sent:** | Friday, November 6, 2020 6:23 PM |
| **To:** | MLS-NEPA-P3 |
| **Cc:** | Patrick Moran |
| **Subject:** | Re: DEIS for I-495 and I-270 |
| **Attachments:** | DEIS letter Nov.[1].pdf |

Please see the attached from President Patrick Moran.

Lance C. Kilpatrick
Legislative & Political Director
410-547-1515 x216 (w)
443-562-1118 (m)



1

*This page is intentionally left blank.*

00022215



AFSCME 3

190 West Ostend St., #101
Baltimore, MD 21230
Phone: 410.547.1515
Fax: 410.837.9438

**Patrick Moran**
President

**Flo Jones**
Secretary-Treasurer

**Executive Vice-Presidents:**

Lisa James-Henson
Local 1427

Patrick Okafor
Local 1678

Moe Said
Local 539

**Regional Vice-Presidents:**

Larry Chrisose
Central Region

Charlotte Leach
Central Region

Caron Mackall
Central Region

Anissa Heron-Sessoms
Eastern Region

Jody Curry
Southern Region

Frederick Okawoye
Southern Region

Jeff Grobenstein
Western Region

Ginger Noble
Western Region

**Unit Vice-Presidents:**

Cherrish Vick
DHS

Denise Henderson
DJS

Wynton Johnson
DOT

Rowntte Stevens
DPSCS

Sally Davis
Higher Education

Mildred Womble
MVA

Rei Douglas
P&P

Jason Sugge
SUPE

**Trustees:**

Jeff Flory
Local 1072

Pat Davis
Local 3555

November 6, 2020

Ms. Lisa B. Choplin, DBIA Director
I-495 and I-270 P3 Office
Maryland Department of Transportation
State Highway Administration
707 North Calvert St.
Mail Stop P-601, Baltimore, MD 21202

Dear Ms. Choplin,

**#1**
On behalf of the members of the American Federation of State, County and Municipal Employees (AFSCME) Council 3, I am writing to comment on the draft Environmental Impact Statement (DEIS) of the I-495 and I-270 Managed Lanes Study and the Governor's plan to add private toll lanes to these highways through a public-private partnership (P3). AFSCME Council 3 opposes this P3 project and supports the no-build option among the alternatives presented in the DEIS.

Governor Hogan and the Maryland Department of Transportation (MDOT) have repeatedly promised that the State would not use taxpayer resources to fund this project. On the basis of this promise, the DEIS only includes options that would add private toll lanes to these highways and fails to evaluate other options for relieving traffic congestion.

**#2**
However, the DEIS reveals that all of the build alternatives will require a state subsidy to the developer ranging from $482 million to more than $1 billion. Moreover, this subsidy does not include billions of additional taxpayer dollars that will be needed for this project. Although not included in the DEIS, the Washington Suburban Sanitation Commission revealed earlier this year that it will cost ratepayers at least $1 billion and up to $1.8 billion to relocate water and sewer lines. According to an October 28 report in *Maryland Matters*, there may be as many as 21 utilities with underground lines that would be impacted by the project. In addition to water and sewer lines, this includes electricity, gas, oil, internet and cable lines. The DEIS provides no discussion of these underground assets and no estimate of the potential cost to Maryland taxpayers to move them.

**#3**
The promise of free infrastructure is an alluring one. But as we've seen in other jurisdictions, including Northern Virginia, P3s do not deliver on the promise. The Commonwealth of Virginia did not plan to subsidize their I-495 Express Lanes, but was forced to do so in order to reach a deal with developers. In the era of COVID-19, the bargaining climate for Maryland may be even worse. There is significant uncertainty over the level of telework that will continue over the long term. Even small reductions in traffic could have a significant impact on tolls collected. The risk of reduced tolls will lead private investors to seek to shift financial burden onto the State. Yet, the DEIS does not evaluate the impact that telework may have on traffic congestion and the financing of the I-495/I-270 project.

Every AFSCME Maryland State and University contract guarantees a right to union representation.
An employee has the right to a union representative if requested by the employee.
800.492.1996

Find us: afscmemd.org
Like us: facebook.com/AFSCMEMD
Follow/Tweet us: @afscmemaryland

**Response to DEIS Comment #1**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to DEIS Comment #2**

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**Response to DEIS Comment #3**

MDOT has closely monitored changes in traffic patterns throughout the pandemic, and as of early 2022, daily traffic volumes have already recovered back to over 90 percent of pre-COVID levels. Although there is still uncertainty surrounding traffic projections resulting from the COVID-19 pandemic, transportation experts have analyzed pandemic traffic conditions and future traffic demand inputs and note that traffic volumes have continued to recover since the rollout of the vaccines in early 2021. Traffic volumes are anticipated to return to pre-COVID levels before the time the HOT lanes are operational. Given the ultimate 2045 design year, the HOT lanes will be required to accommodate long-term traffic.

Given the uncertainty surrounding resolution of the pandemic and how travel patterns will adjust, and over what time period, no definitive traffic model exists to predict how the global pandemic will affect long-term mobility patterns. To adapt to the ongoing and potential long-term travel impacts associated with the pandemic, MDOT SHA developed a COVID-19 Travel Analysis and Monitoring Plan. Refer to **FEIS, Appendix C** for a copy of the latest version of that plan and results. The plan included three components:

- Monitoring: tracking changes in roadway and transit travel during the pandemic, i.e., how travel varies in response to infection figures, vaccine distribution, unemployment rates, school closings, and policy changes;

- Research: reviewing historical data and projections from the Transportation Research Board and the National Capital Region Transportation Planning Board; and

- Sensitivity Analyses: evaluating "what if" scenarios, including potential changes in teleworking, eCommerce, and transit use on projected 2045 travel demand and operations.

The monitoring effort included tracking changes in traffic volumes and transit usage throughout the pandemic, and the corresponding impact on speeds and congestion along I-495 and I-270. The data shows a severe drop in traffic volumes

00022216



**#4**

AFSCME 3

190 West Ostend St., #101,
Baltimore, MD 21230
Phone: 410.547.1515
Fax: 410.637.9436

Patrick Moran
President

Flo Jones
Secretary-Treasurer

**Executive Vice-Presidents:**

Lisa James-Hanson
Local 1427

Patrick Okafor
Local 1678

Moe Sald
Local 539

**Regional Vice-Presidents:**

Larry Chrisoce
Central Region

Charlotte Leach
Central Region

Garon Mackall
Central Region

Anissa Herce-Seasons
Eastern Region

Jody Curry
Southern Region

Frederick Okawoye
Southern Region

Jeff Grobenstein
Western Region

Ginger Noble
Western Region

**Unit Vice-Presidents:**

Cherrish Vick
DHS

Denise Henderson
DJS

Wynten Johnson
DOT

Rowelke Stevens
DPSCS

Sally Davies
Higher Education

Mildred Womble
MVA

Rei Douglas
P&P

Jason Suggs
SLEFE

**Trustees:**

Jeff Fiery
Local 1072

Pat Davis
Local 3655

(2)

The National Environmental Policy Act requires that agencies consider whether the harmful impact of a project is borne disproportionately by Environmental Justice (EJ) communities, or communities primarily made up of residents who are people of color or have low-incomes. NEPA requires that a DEIS evaluate the impacts of a project on EJ communities compared with non-EJ communities. But there is no such comparison in the DEIS.

Almost the entire length of the Beltway in Prince George's County is bordered by EJ communities. We know that their proximity to the Beltway exposes these residents to increased air pollutants which are linked to negative impacts to health. But the DEIS fails to identify or evaluate the adverse impact of construction activities and increased traffic on EJ communities.

The DEIS also fails to assess the impact of congestion pricing on EJ communities compared with non-EJ communities. Managed lanes benefit those who can afford to pay the tolls. In order to maximize toll revenue, it is necessary for developers to maintain congestion in the public lanes. Yet, the DEIS does not discuss whether those who cannot afford to pay tolls will experience worse traffic congestion and whether this has a broadly negative impact on EJ communities compared with non-EJ communities.

The consequences for moving the I-495/I-270 project forward on the basis of a highly flawed environmental impact statement are significant. Despite even greater study and preparation, the Purple Line is disarray because the private partner abandoned the project. The Maryland Department of Transportation should not rush forward on an even larger and more complicated P3 with an insufficient DEIS and before the contractual failure of the P3 for the Purple Line is fully understood.

Sincerely,

Patrick Moran
President, AFSCME Council 3

Every AFSCME Maryland State and University contract guarantees a right to union representation. An employee has the right to a union representative if requested by the employee.
800.492.1996

Find us: afscmemd.org
Like us: facebook.com/AFSCMEMD
Follow/Tweet us: @afscmemaryland

in April 2020 after stay-at-home orders were issued across Maryland, with daily traffic volumes on I-270 and I-495 reducing by more than 50 percent compared to April 2019. After the stay-at-home order was replaced with a "safer at home" advisory in May 2020, traffic volumes gradually increased throughout the summer, stabilizing at approximately 15 percent less than typical conditions during Fall 2020. As cases began to surge in November/December 2020, traffic volumes dipped again through the winter. With the rollout of vaccines in early 2021, the corresponding drop in COVID-19 cases, and the gradual reopening of schools and businesses, daily traffic volumes have continued to recover. Statewide, weekly traffic volumes were only down five (5) percent for the week of November 8, 2021 compared to the same week in 2019, per MDOT's coronavirus tracking website, linked below. https://www.mdot.maryland.gov/tso/Pages/Index.aspx?PageId=141 . Transit use has been slower to recover, with use of Maryland Transit Administration (MTA) services statewide down over 40 percent compared to pre-pandemic levels as of October 2021 (see link above).

Based upon historic research of other similar dramatic societal effects on travel and the most recent data suggesting that traffic is rebounding close to pre-pandemic levels, the 2045 forecasts and results presented in **FEIS, Section 4.3** using models that were developed and calibrated prior to the onset of the COVID-19 pandemic have been determined to be reasonable for use in evaluating projected 2045 conditions. However, MDOT SHA acknowledges that residual effects of some of the near-term changes in travel behavior could be carried forward into the future. Therefore, a sensitivity analysis evaluating several "what if" scenarios related to future travel demand due to potential long-term changes to teleworking, e-commerce, and transit use was also conducted. The first part of the sensitivity analysis involved modifying input parameters in the MWCOG regional forecasting model based on observed changes in travel behavior during the pandemic to evaluate a range of potential long-term scenarios. The second part of the sensitivity analysis involved re-running the 2045 No Build and 2045 Build VISSIM models that were used to generate the operational results presented **Chapter 4, Section 4.3** of this FEIS, but with reduced demand volumes to account for potential sustained impacts from the pandemic. The results of the MWCOG and VISSIM sensitivity analyses confirm that the capacity improvements proposed under the Preferred Alternative would be needed and effective even if future demand changes from the pre-pandemic forecasts based on potential long-term impacts to teleworking, ecommerce, and transit use that are not formally accounted for in the current regional forecasting models. **Refer to FEIS, Appendix C.**

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impact of teleworking/remote working.

**Response to DEIS Comment #4**
As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. Therefore the EJ populations in Prince George's County are located outside the Preferred Alternative limits of build improvements, potential impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

00022217

**ANACOSTIA WATERSHED SOCIETY – JIM FOSTER**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Jim Foster

**Joint Public Hearing Date:** 8/18/2020

**Type/Session:** Live/Afternoon

**Transcription:**

Hello. My name is Jim Foster. I'm president of the Anacostia Watershed Society. We are located at 4302 Baltimore Avenue in Bladensburg, Maryland, 20710. The Anacostia Watershed Society has worked for 30 years to restore the Anacostia River, and we are dedicated to making the river fishable and swimmable and boatable again, hopefully by 2025. So this project caught our attention for its scale and potential impact to the Anacostia River that could be with us for the next 50 years. We have endured impacts from the construction of the original Beltway that was built with no environmental, basically no environmental protections and such. We have endured construction of the Intercounty Connector while one of the greenest roadways in the country, it's also promoting other development along its way.

So, I think briefly, Anacostia Watershed Society is fully supportive of the comments from Maryland-National Capital Park and Planning Commission. We second their comments. We wish to highlight and reinforce the most salient points that will have great impacts on the Anacostia River. Our position is that you can have your pound of flesh, but not a drop of blood. Meaning, we expect you to meet a high standard for environmental and community protection. Frankly, water pollution issues in the Anacostia River are directly attributable to designing our communities around automobiles rather than people. This process is used simply to justify the need to do more than ever downward spiral of unsustainable practices.

So, let's take a second to review the historic damage done by constructing the Beltway to reduce congestion on East West Highway over 50 years ago. Neither roadway was built to any environmental standards. We've been retrofitting for the last 30 years at great expense and with relatively poor outcomes. We are very, very interested in preventing water pollution, not having to clean it up. So we would like to see the environmental impact concerns and considerations take into account the best management practices of having zero discharge from any alternative and all existing highway retrofit to manage the stormwater. Fifty percent just isn't doing anything for our rivers. We strongly request no net loss of tree canopy or wetlands in each sub-watershed, and without mitigation outside the watershed. We need well-funded enforcement of noise, water pollution, management structures, vehicle exhaust, and speed. And then on the alternatives, is there an opportunity to explore a Metro ring under the Beltway to connect each line of the Metro all the way around the Beltway? Thank you very much.

#1

#2

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to the Anacostia Watershed. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Anacostia Watershed is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

**Response to DEIS Comment #2**

Refer to Chapter 9, Section 3.4.E for a response to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

OP·LANES™
MARYLAND   I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

**AUDUBON NATURALIST SOCIETY – LISA ALEXANDER**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Lisa Alexander

**Date/Hearing:** 8/25/20

**Type/Session:** Live/Morning

**Transcription:**

#1  Hello. My name is Lisa Alexander (L-I-S-A A-L-E-X-A-N-D-E-R) and I'm the Executive Director of the Audubon Naturalist Society located at 8940 Jones Mill Road in Chevy Chase, Maryland. We do not support the Beltway and I-270 Expansion Project. The Audubon Naturalist Society and the 10,000 members we represent stand in favor of the No Build option for the following reasons:

#2  In the face of the dual crises of climate change and the COVID pandemic, expanding a roadway at the expense of water quality, parkland, and tree cover is short-sighted. The MDOT SHA has done a woefully inadequate job of evaluating additional alternatives, especially for public transit. In the wake of the pandemic our region's work patterns will be changed forever with telework taking a leading role. By rushing through the planning and NEPA process, MDOT SHA's plans recommend a 20th century solution to a pressing and rapidly evolving 21st century problem. Let me be specific. During the pandemic, Woodend, ANS's headquarters and 40 acres Nature Sanctuary located just 1,000 feet from I-495 has seen unprecedented use. People have flocked to Woodend and all of our regions scarce remaining green spaces to find respite. This project will negatively impact both the humans and wildlife that rely on Woodend for sanctuary. Construction noise followed by additional highway noise will despoil a rare 40-

#3  acre parcel of natural land that is free and open to the public 365 days a year inside the Beltway. The DEIS estimates up to a 135 acres of parkland will be negatively impacted, degrading or eliminating scares and critical habitat for wildlife. It will shrink public green space pushing people into ever smaller parcels of green and open land, thus making overcrowding of our natural resources a permanent problem for the region.

#4  The project plan does not properly mitigate negative impacts, especially on air and water quality. Construction will destabilize stream banks and add sediment to our local streams. These are the very streams where ANS teaches people of all ages to value water quality. More lanes will add vehicles that pour additional $CO_2$ into the air and will accelerate negative climate impacts experienced in our region and at our sanctuary, including flooding, high winds, and tree damage. Increased traffic will impede our staff, visitors, rental customers, shoppers, preschool families, and school field trips from reaching our sanctuary. And of course, this ill-conceived project will heap hardship on our already struggling urban wildlife by shrinking vital habitat corridors that support migrating birds, scarce reptiles and amphibians like frogs, and mammals like opossums that find shelter in our green spaces and eat thousands of ticks

#5  each year. In summary on behalf of Audubon Naturalist Society, I request that MDOT SHA pursue sustainable transit alternatives that reduce traffic congestion without exacerbating climate change or encroach wildlife habitat and accessible green space that people in our region need more than ever now. Thank you.

**Response to DEIS Comment #1**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

**Response to DEIS Comment #3**
Thank you for your comment concerning impacts to the Woodend Sanctuary. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Woodend Sanctuary is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.4.E for a response to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

Refer to Chapter 9, Section 3.4.F for a response to adverse impacts to air quality.

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

00022219

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-5    Filed 10/30/23    Page 10 of 69

FINAL ENVIRONMENTAL IMPACT STATEMENT

## AUDUBON NATURALIST SOCIETTY – ELIZA CAVA

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Eliza Cava

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Live Testimony/Afternoon

**Transcription:**

#1
Hello, my name is Eliza Cava, E-L-I-Z-A, C like Charles, A-V-A and I'm the Director of Conservation at the Audubon Naturalist Society, located 8940 Jones Mill Road in Chevy Chase, Maryland. I'm also the Co-Chair of the Storm Water Partners Network of Montgomery County, a coalition of 37 organizations committed to healthy watersheds. As an organization and as a co-chair of the network, I do not support the Beltway and I-270 expansion project. The Audubon Naturalist Society and our 10,000 members stand in favor of the No Build option for the following reasons. In addition to those previously said by my colleagues [INAUDIBLE]

#2
and Lisa Alexander. Mainly in the DEIS and MDOT and SHA mitigation measures were vague, insufficient and let me see. I will detail a few examples around stormwater. First, the DEIS fails to include stormwater management requirements in Virginia by omitting Fairfax County and VDOT from Section 2.7.2. This is inappropriate as all impacts should be considered in the environmental impact study. Second, at this high-level stage of NEPA planning a proper impacts evaluation should be overly conservative rather than optimistic. Instead of, the DEIS assumes very optimistically that all shoulders and twenty five percent of existing lanes will need to be reconstructed. Really, the project should assume that all lanes will be reconstructed and stormwater management applied accordingly and then plan to scale back and reduce budget expectations later during more detailed design. Not doing so creates a potentially very large hidden costs that will need to be paid for later. As an engineer might say get all your pipes done at once. Don't make Montgomery and Prince George's counties continue to pay for the damage caused by old state highway infrastructure, when if you're going to be working on the highway, you can fix it now. Third, the DEIS fails to consider the locations that upgrade needs, even of existing stormwater management facilities. The treatment and storage of any existing facilities within the limits of disturbance, such as those with the traffic lights where I-270 meets Monocacy Boulevard, which you can see on Appendix D map 99 may need to be replaced, moved or upgraded. Those impacts and costs are not included in the DEIS.

#3
And finally, there is no mention of the increased need for stormwater management due to heavier and more frequent rainstorms due to climate change. Adding more pavement, even treated to current standards would degrade water quality in our streams. An Environmental Impact Study should take this extra impact into account and clearly this one does not. Without adequate stormwater management now, we will fail to protect the health of our people and our streams in the future. I want to mention one more concern out of many that go beyond stormwater and that is climate change. Many have made this point before, but it is, frankly, the height of societal irresponsibility to be increasing our reliance on highways, single passenger vehicles, the fossil fuels. We are in a climate emergency and we need to act like it. The DEIS Appendix I, page 110 said in general greenhouse gas emissions are expected to increase for all screened alternatives when compared to the No Build conditions for 2040. That is more truthful than what the Hogan administration said last year. When MDE Secretary Grumbles told the Board of Public Works.

**Response to DEIS Comment #1**
NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to DEIS Comment #2**
A conceptual identification of stormwater management (SWM) needs was considered in the DEIS, refer to Chapter 2, Section 2.7.2. The conceptual stormwater analysis was updated based on the Preferred Alternative in the SDEIS and FEIS. Refer to SDEIS, Chapter 2, Section 2.3.2 and SDEIS, Appendix C Draft Compensatory Stormwater Management Plan and FEIS, Chapter 3, Section 3.1.6 and FEIS, Appendix D Final Compensatory Stormwater Management Plan for details. Maryland Stormwater Management Law is relatively strict with the goal of maintaining post development runoff as nearly as possible to pre-development runoff characteristics. Water quantity is required to be managed onsite to match existing conditions for the 10-year storm. Water quality is required to treat all new impervious area and 50% of reconstructed existing impervious area to match the runoff characteristics of woods in good condition.

Coordination with VDOT on the 495 Express Lanes Northern Extension (495 NEXT) project is on-going and will continue through final design. Virginia Department of Environmental Quality (DEQ) requires the 2-year storm be managed for erosion control and requires the 10-year storm be managed to match existing conditions if there are documented downstream flooding concerns. For water quality treatment, DEQ requires that nutrient loading based on land cover be calculated and that a minimum of 75 percent of the difference between existing and proposed nutrient loads be treated on-site. The remaining 25 percent can be purchased from a Nutrient Credit Bank. A preliminary stormwater management evaluation was completed for the Virginia section of the Preferred Alternative. Since the 495 NEXT project will be constructed first, the proposed conditions for the 495 NEXT project were used as the existing land cover for the Preferred Alternative. The SWM evaluation resulted in a required reduction of approximately 20 pounds of phosphorus to meet water quality requirements.

The redevelopment assumption of both shoulders and 25% of existing lanes is a conservative assumption since existing lanes only need to be reconstructed if the subbase is in poor condition. All lanes will be milled and overlaid, however, this is considered a maintenance activity and certain exemptions may apply.

This project will base stormwater runoff estimates on NOAA Atlas 14 historical rainfall averages, per MD requirements.

Refer to Chapter 9, Section 3.4.E for additional information related to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.4.G for a response to climate change and greenhouse gas considerations.

I-495 & I-270 Managed Lanes Study

| #3 Con't | I-495 and I-270 Managed Lanes Study<br>Joint Public Hearing Testimony<br><br>We believe you're going to see some improvements in the right trajectory in greenhouse gas emissions, including with this large project. That statement was unbelievable at the time. And as the DEIS now finally makes clear, it is shameful to see a government supposedly committed to fighting climate change, instead trying to ram through this giant highway project. In summary, on behalf of Audubon Naturalist Society [INAUDIBLE] pursue sustainable transit alternatives that reduce traffic congestion without exacerbating climate change or harming critical wildlife habitat and greenspace that people in our region need more than ever now. Thank you. | See response to Comment #3 above. |

**AUDUBON NATURALIST SOCIETY – DENISSE GUITARRA**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Denisse Guitarra

**Date/Hearing:** 8/25/20

**Type/Session:** Live/Morning

**Transcription:**

Hello. My name is Denisse Guitarra, spelled D-E-N-I-S-S-E G-U-I-T-A-R-R-A. I am here representing Audubon National Society as a Maryland conservation advocate. I live in Germantown Maryland. For a 123 years ANS's mission has been to inspire people to enjoy, learn about, and protect nature. Today, we're here to testify against the Beltway I-270 expansion. We support the No Build option in the Beltway Managed Lanes Study DEIS due to the following three reasons:

First, the DEIS dismisses transit alternatives, like sustainable transportation demand management, when in fact, the DEIS should consider all alternatives at this stage. The expansion should accommodate rail and public transportation, especially at the American Legion Bridge. Given the context of today's pandemic, teleworking must also be considered as one of the alternatives. On Appendix P, page 16, it says that during the scoping period, people were concerned that the highway expansion could bring more environmental damage, noise, air pollution, loss of property, and degrade the quality of life, and instead, supported more transit alternatives such as expanding the Metro and local bus routes. We share these concerns.

2.) The DEIS failed to conduct outreach to communities of color and failed to complete a full environmental justice review. MDOT SHA did not include a full cumulative effects and impact study on the DEIS. During the scoping and commenting period, outreach and informational material, like interpretation messages, are still largely available in English only. And multilingual fact sheets are hard to find on the website. On Appendix P, page 18, it shows that the percentages of people who provided input during the scoping of the Project was significantly less in Prince George's County, which is majority African-American and Latin mix than in Montgomery County. These are clear violations to the principles of environmental justice.

3.) Climate change. MDOT SHA fails to include any specific wildlife or environmental mitigation, resilience, and adaptation requirements as part of the expansion. There are numerous wetlands, waterways, and wildlife impacts not listed on the DEIS. On Appendix O, page 66, it states that the review identified 243 state- and federally-listed threatened and endangered species, but these are not listed anywhere.

Under our 4.), Concurrent public health climate and economic and social crises. It just does not make sense to add more air polluting lanes. We ask MDOT SHA to seek more sustainable transit-oriented solutions that reduce our traffic congestion and our greenhouse gases. We won't exchange our precious lands for pricey luxury lanes. Thank you.

#1

#2

#3

#4

**Response to DEIS Comment #1**
NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

Refer to Chapter 9, Section 3.7 for a response to comments related to public involvement and engagement.

**Response to DEIS Comment #3**
The FEIS includes the final mitigation plan, including mitigation for historic properties, parklands, wetlands, waterways, forests, rare threatened and endangered species, and floodplains. Refer to FEIS, Chapter 7 for the comprehensive list of mitigation and commitments.

Refer to Chapter 9, Section 3.4.G for a response to climate change and greenhouse gas considerations.

Refer to Chapter 9, Section 3.4.E for a response to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.4.L for a response to public health impacts.

**CABIN JOHN CITIZENS ASSOCIATION – SUSAN SHIPP (EMAIL)**

**From:** Charlotte Troup Leighton <troupleighton@gmail.com>
**Sent:** Friday, October 16, 2020 4:14 PM
**To:** Lisa Choplin <LChoplin@mdot.maryland.gov>
**Cc:** Treasurer@treasurer.state.md.us; pfranchot@comp.state.md.us; governor.mail@maryland.gov; senator@cardin.senate.gov; senator@vanhollen.senate.gov; jamie@jamieraskin.com; marc.elrich@montgomerycountymd.gov; Lee, Susan Senator <susan.lee@senate.state.md.us>; Kelly, Ariana Delegate <ariana.kelly@house.state.md.us>; Korman, Marc Delegate <marc.korman@house.state.md.us>; Love, Sara Delegate <sara.love@house.state.md.us>; SUSAN SHIPP <jsjshipp3@verizon.net>
**Subject:** DEIS Comment Letter from the Cabin John Community

Good afternoon,

Attached please find the DEIS comment letter of the Cabin John Citizens Association on behalf of the Cabin John Community.

Thank you for your consideration.

Sincerely,
Susan Shipp
President, Cabin John Citizens Association
jsjshipp3@verizon.net

Thank you for your comment, responses are provided on the following pages.

1

**CABIN JOHN CITIZENS ASSOCIATION**
P.O. BOX 31, Cabin John MD 20818

*Organized 1919   Charter Member Montgomery County Civic Federation*

October 15, 2020

Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Baltimore, MD 21201

**RE: I-495/I-270 Managed Lane Study Draft Environmental Impact Statement, Draft Section 4(f) Evaluation, and Draft Section 106 Assessment of Effects Report**

Dear Ms. Choplin:

My name is Susan Shipp and serve as president of the Cabin John Citizens Association (CJCA), which represents the more than 700 families that reside in Cabin John. The community is geographically defined, in part, by the highways that touch its borders – I-495 to the west and north, the Cabin John Parkway to the east and the Clara Barton Parkway, which runs along the southern edge.

**#1**

However, these highways do not define us as a community. We are a close-knit community whose residents greatly appreciate and take advantage of our proximity to the Potomac River, the C&O Canal National Historical Park and Cabin John Creek parklands. We consider ourselves stewards of the natural beauty that makes Cabin John so unique. We also are committed to preserving the Moses Hall & Cemetery – a site that is not only of historical significance as the first known Moses organization and burial ground in Montgomery County, but also of significance to current Cabin John families who are descendants of Moses Hall and have family buried in its cemetery.

We have serious concerns regarding many of the impacts identified in the Draft Environmental Impact Statement (Draft EIS) for the I-495/I-270 Managed Lane Study. The Evergreen neighborhood in Cabin John, which includes the Moses Hall & Cemetery property is directly threatened by this project. They also face serious noise, stormwater and tree canopy impacts as does other parts of Cabin John.

**#2**

We also found the analysis to be inadequate or missing in several crucial areas, especially when it comes to traffic issues. This is cause for significant alarm as we are already impacted daily by the traffic congestion on I-495 and I-270 as well as the roads that feed those highways. Our major access roads are Clara Barton Parkway, Seven Locks Road and MacArthur Blvd., which also serves as Cabin John's main street.

**#3**

With Cabin John's identity inexorably entwined with our local natural and cultural resources, we are quite concerned by the impacts of the project on our parklands and the C&O Canal. We wish to reinforce any concerns that the National Park Service and Maryland-National Capital Park and Planning Commission may raise regarding park impacts in their comment letters and briefly summarize the issues that we have identified below.

---

**Response to DEIS Comment #1**

Since the publication of the DEIS, additional and successful avoidance and minimization efforts also involved the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Through additional investigation and survey including ground penetrating radar (GPR), MDOT SHA identified potential unmarked graves within state-owned right-of-way adjacent to I-495. The Preferred Alternative incorporates design refinements that minimized the overall width of the improvements to completely avoid the cemetery property and the known area of state-owned right-of-way that has the potential for unmarked graves.

**Response to DEIS Comment #2**

Updated traffic analysis for the design year of 2045 indicates that the Preferred Alternative will provide operational benefits compared to the full No Build Alternative in six key metrics (system-wide delay, corridor travel time and speed, density and level of service, travel time index, vehicle throughput, and local network delay).  Refer to FEIS, Appendix A. The Preferred Alternative would significantly increase throughput across the ALB and on the southern section of I-270 while reducing congestion. The net impact of the project will be an overall reduction in delay on the surrounding arterials, despite some localized increases in arterial traffic near the managed lane access interchanges. Specific areas, such as MD 190/Cabin John, were evaluated in more detail as part of the FEIS, and mitigation is proposed where needed to maintain acceptable operations per FHWA Interstate Access Point Approval guidelines. Refer to FEIS, Appendix B, for MDOT SHA's Application for Interstate Access Point Approval.

The traffic results showing delay increases on River Road and Clara Barton Parkway were preliminary and were based on draft designs. Now that the Preferred Alternative has been identified and the design has been updated, these results have been updated. The results indicate that the net impact of the Preferred Alternative will be an overall reduction in delay on the surrounding arterials, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges.  The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of this FEIS, and mitigation was proposed where needed to maintain acceptable operations and safety per FHWA Interstate Access Point Approval guidelines. Refer to FEIS Appendix B. Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**Response to DEIS Comment #3**

In addition to the significant work to avoid all direct impact to the Morningstar Tabernacle No.88 Moses Hall and Cemetery property, the SDEIS and FEIS describe reduction of impacts to the other resources that you have noted. Significant avoidance and minimization efforts also focused around the American Legion Bridge and adjacent National Park Service (NPS) properties. MDOT SHA and FHWA met with the NPS on December 8, 2020, to discuss the limits of disturbance (LOD) in the vicinity of the ALB that was presented in the DEIS. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources who were charged with the following mission: *To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the Chesapeake and Ohio Canal National Historic Park and George Washington Memorial Parkway units of the NPS.*

The ALB Strike Team considered bridge construction approaches to determine if any of them could limit the LOD further. The ALB Strike Team conducted detailed investigation on a top-down segmental construction approach; a top-down cable stayed approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of additional information, MDOT SHA and the ALB Strike Team determined that access to the site at river level could be consolidated to the north side of the river along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of the Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the Chesapeake and Ohio Canal and a temporary haul road paralleling the Chesapeake and Ohio Canal towpath. This effort resulted in a 7.8 acre reduction in impact to the George Washington Memorial Parkway and a 5.3 acre reduction at the Chesapeake & Ohio Canal National Historical Park.  Refer to *SDEIS, Chapter 4, Section 4.12.4* for additional details on the ALB Strike Team's efforts.

Based on the current design and as presented in the FEIS, the Preferred Alternative would have an estimated permanent impact of 1.0 acres to the Chesapeake and Ohio Canal National Historical Park, and an estimated temporary impact of 9.1 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 1.1 acres to Clara Barton Parkway, and an estimated temporary impact of 0.7 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 5.7 acres to Cabin John Regional Park, and an estimated temporary impact of 0.6 acres during construction.

Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

**CABIN JOHN CITIZENS ASSOCIATION**

P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*

#4

First, I would like to state that the CJCA, on behalf of the community, is unable to support any of the alternatives analyzed in the DEIS. Furthermore, we question the need for the project given the massive shift in traffic patterns due to the novel coronavirus pandemic. As of March 2020, commuter traffic became a tiny fraction of what it had been. With a vaccine for COVID-19 not expected to be widely available until mid-2021, there is no telling how profoundly different workplaces, jobs and, consequently, traffic will be in a post-pandemic world. The State Highway Administration (SHA) should, therefore, there re-evaluate the need, purpose, approaches and alternatives of this project.

I will now shift to commenting on specific aspects of the Draft EIS.

#5

**Traffic Impacts**
The traffic impacts to our local community are inadequately evaluated or described in the Draft EIS. Both construction period impacts and long-term impacts must be further evaluated. Additionally, the long-term impacts on local traffic conditions in our area that can be inferred from the Draft EIS are severe and must be mitigated.

#6

**Construction Impacts**
During the construction period, the replacement of I-495 bridges over local roadways or the reconstruction of local roadway bridges over the highway could have substantial impact on our community's commutes and quality of life.

In particular, we noted that the I-495 bridges over MacArthur Boulevard and Seven Locks Road would need to be rebuilt. The Draft EIS does not provide information about the impacts to the local roadways below. The Persimmon Tree bridge over I-495 would be rebuilt. The Draft EIS does not provide information regarding the approach to this reconstruction or the impact to operations on Persimmon Tree.

While the construction approach likely remains in early stages of planning, the Final EIS must include information concerning potential roadway closures and modifications that would be needed in these locations. Given the constrained access to our community, these closures must be coordinated so that multiple access points are available to residents at all times. Failure to do so could lead to unacceptable detours and diversions.

We also note scant information regarding construction means and methods and staging. Along the 1.2 miles of I-495 between MacArthur Boulevard and Seven Locks Road, we wish to understand how construction materials would be stored and staged. While the Draft EIS indicates that the *Environmental Resources Mapping* (Appendix D) provides the location of staging and materials storage (Section 4.23, Pg. 4-157), a review of Appendix D does not offer clarity on what that means for our geographic area of concern.

The Draft EIS provides only two pages of substantive discussion of construction impacts (Pgs.4-157-158). This discussion is inadequate for the scale and scope of the undertaking. 40 CFR 1502.9 requires the Draft EIS to adequately describe the impacts of the Project in the Draft EIS. The current construction analysis fails in that regard.

In fact, the substantial quantitative construction information needed to appropriately assess the construction impacts, which SHA promises to provide in the Final EIS, are substantial enough to

2

---

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and the effects on the Pandemic.

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**Response to DEIS Comment #6**
It is anticipated that construction will last approximately five to six years. Details related to precisely when and where construction related activities will occur will be determined in final design, however, the project will likely require night work to occur when activities could not be completed safely during the day. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. Impacts associated with construction that will be further evaluated for the Selected Alternative in final design include traffic congestion associated with construction maintenance of traffic, utility disruptions, construction vibration, erosion and sediment and control, and construction related noise.

The management of construction impacts is addressed in an agreement between MDOT SHA and the Developer. Pursuant to that agreement, coordination with the neighboring communities will continue through final design and construction. The agreement includes requirements to minimize impacts to surrounding communities and the traveling public, while completing construction as soon as possible. Work hours and duration of construction will be identified to minimize impacts to traffic in an effort to reduce construction related congestion and in consideration of noise and vibration impacts to adjacent communities. Construction methods and materials will comply with contract, state and federal regulation, and environmental permits and mitigation requirements. Careful attention will be taken to assure that material placement will occur when weather conforms to industry standards and regulation. In addition to required governmental inspections, the Developer is required by contract to provide independent environmental, quality, and safety oversight of its contractor's performance. Refer to Final Phase 1 P3 Agreement, https://oplanesmd.com/p3-information/phase-1-agreement/. Once the Developer has selected a Design-Build Contractor(s), the schedule and duration for Phase 1 South construction will be made available to the public.

Refer to Chapter 9, Section 3.4.I for a response to construction impacts.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

OP·LANES
MARYLAND | I-495 & I-270 Managed Lanes Study | Case 8:22-cv-02597-DKC     Document 61-5     Filed 10/30/23     Page 16 of 69

FINAL ENVIRONMENTAL IMPACT STATEMENT

**CABIN JOHN CITIZENS ASSOCIATION**
P.O. BOX 31, Cabin John MD 20818

*Organized 1919     Charter Member Montgomery County Civic Federation*

**#7**

require that SHA produce a Supplemental Draft EIS to report these impacts and disclose them to the public for comment and feedback. 40 CFR 1502.9(c)(ii) requires an agency to prepare a supplemental EIS if "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or impact." The unreported construction impacts pass the second part of that test, meriting further disclosure before a Final EIS is prepared.

In addition to these disclosures in the Final EIS or a Supplemental Draft EIS, a Construction Management Plan will need to be developed as a mitigation to the construction-period impacts. Further, our community would object to any staging and storage that causes disruption for our residents and/or affects sensitive areas like parkland. Such uses should be avoided, and such avoidance should be committed to in the Final EIS.

**#8**

***Long-Term Impacts***
**Over the long-term, the induced traffic created by the Project could cause substantial harm to our neighborhood.** We are concerned that these impacts are not adequately evaluated in the Draft EIS. Rather, claims made regarding traffic impacts to local roadways are misleading.

The *Traffic Technical Report* (Appendix D) provides the evaluation of the detailed traffic impacts of the Project, including those on local roadways. While Section 5.9 indicates that, in the aggregate, local roadway congestion would be reduced (Pg. 148), Figure 5-73 indicates that the local roadways most relevant for our community, Clara Barton Parkway and River Road, would see greater than 10% increases in delays as a result of the Project. Despite this clear impact, this effect is not reported in the Draft EIS and is not proposed for mitigations. This failure must be addressed in a Supplemental Draft EIS and the impacts to our community substantively resolved.

Upon more detailed evaluation of the data presented in the *Traffic Technical Report*, we are further concerned that the traffic impacts from the managed lanes on our local roadways have not been adequately considered for several reasons.

First, the analysis of arterials that do not intersect I-495 is limited and inconsistent, as reported in Figure 5-73. While MD 410 is analyzed for the traffic impacts, other east-west state highways like MD 188 or MD 614 are not evaluated.

Further, critical non-state roads that serve as major commuting routes, such as Seven Locks Road or MacArthur Boulevard, do not receive any analysis for the traffic impacts. The modeling performed to estimate the local traffic impacts are insufficient for adequately describing them to the public. This modeling should be expanded and refined in a Supplemental Draft EIS.

The failure to analyze MacArthur Boulevard is a significant concern. As SHA is aware, MacArthur Boulevard sits atop the Washington Aqueduct and has weight restrictions as a result of the sensitive infrastructure. Continued traffic pressure on the roadway could cause deleterious impacts to the water infrastructure in the region. While the *Cultural Resources Technical Report* (Appendix G) identifies potential for impacts from a construction standpoint (Pg. 33), there is no consideration of how induced traffic could create impacts. SHA must coordinate with the U.S. Army Corps of Engineers (USACE) to consider this impact.

3

**Response to DEIS Comment #7**
An Environmental Impact Statement (EIS) may be supplemented at any time, in accordance with 23 CFR 771.130, when the Federal Highway Administration (FHWA) determines that changes to the proposed action or new information relevant to environmental concerns or impacts from the proposed action were not evaluated in the Draft EIS (DEIS). A Supplemental Draft Environmental Impact Statement (SDEIS) was prepared to consider new information relative to the Preferred Alternative, Alternative 9 – Phase 1 South. Building off the analysis in the existing DEIS, the SDEIS disclosed new information relevant to the Preferred Alternative focusing on new information while referencing the DEIS for information that remains valid. The SDEIS also described the background and context in which the Preferred Alternative, Alternative 9 – Phase 1 South was identified. The SDEIS was available for the public to review and comment on the Preferred Alternative during a 60-day comment period.

**Response to DEIS Comment #8**
MDOT understands the phenomenon of induced demand, and it is a consideration on all of our large roadway projects. In this case, MDOT is recommending adding capacity via managed lanes (HOT lanes) instead of widening with additional general purpose lanes. Managed lanes do a better job at regulating demand, including induced demand, due to dynamic pricing.

Our study shows that there could be some induced demand as a result of this project, but the impact will be small (less than 1% increase in vehicle miles traveled (VMT) in the region) and those effects are fully accounted for in the regional traffic models COG and TPB use. Even with these effects, the proposed managed lanes would reduce regional congestion delays and significantly improve travel times along both freeway corridors and on local roads throughout the region. MDOT SHA will coordinate with USACE to consider the impacts on MacArthur Boulevard.

As noted in Section 3.3.6 of the DEIS, the net impact of the project will be an overall reduction in delay on the surrounding arterials, despite some localized increases in arterial traffic near the managed lane access interchanges. Information in the DEIS was based on preliminary design that did not include direct access at Gude Drive or Wootton Parkway. Since that time, MDOT SHA has coordinated with various stakeholders, including the City of Rockville, and has updated the design to include direct access connections to the managed lane system at these two interchanges. The results presented in the SDEIS and FEIS account for these updates. The results indicate that the net impact of the Preferred Alternative will be an overall reduction in delay on the surrounding arterials, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges. The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of this FEIS, and mitigation was proposed where needed to maintain acceptable operations and safety per FHWA Interstate Access Point Approval guidelines. In addition, based on follow-up meetings between MDOT SHA and Rockville, additional improvements were considered and incorporated where feasible, including modifications to the right-turning movement from the I-270 off-ramp onto eastbound MD 189, and additional turn lanes at Wootton Pkwy at Seven Locks Rd, Gude Dr at Research Blvd, and MD 189 at Great Falls Road. All these enhancements will help manage and/or improve the function of the local roadway network.
Mitigation as presented in FEIS Appendix B-Interstate Access Point Approval has been coordinated with NPS and USACE, where appropriate.

### CABIN JOHN CITIZENS ASSOCIATION
P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*

**#8 Cont**

Second, the specific volumes identified in the *Traffic Technical Report* are cause for concern. As indicated in Appendix A of the *Traffic Technical Report*, the MD 190, Cabin John Parkway, and Clara Barton Parkway exit ramps will see large increases in volumes – up to 55% increases over existing volumes and up to 40% over volumes in the No-Build Alternative. With no substantial modifications to these roads planned by SHA, Montgomery County Department of Transportation, or National Park Service (NPS), it is unclear how these additional volumes would be successfully accommodated on these roadways. The failure to analyze local traffic impacts sufficiently is magnified by the scale of the traffic volume increase.

The future traffic volumes on Clara Barton Parkway are likely to make use of MacArthur Boulevard at the Cabin John and Glen Echo exits. The existing peak-hour operating conditions at those exits are already unacceptable. At Cabin John, traffic queues regularly back from MacArthur across the overpass, down the on-ramp, and even onto the main line of the Clara Barton Parkway. During the PM peak hour, the queue to exit at Glen Echo can cause 15-30-minute delays for drivers to get off the highway. Increased volumes would only exacerbate these conditions.

Due to the constrained infrastructure in the area, including the Union Arch Bridge and the reversible lane management at the Glen Echo exit, there are limited opportunities to address these increased volumes. Historic and cultural resource considerations represent a challenge for improvements. The Supplemental Draft EIS and then the Final EIS must include appropriate mitigations to reduce the likelihood of impacts for our community as regional commuter traffic spills over into our neighborhood.

These mitigations should be coordinated with NPS and USACE. Mitigations should also include policy measures that can reduce the volume of traffic making use of Clara Barton Parkway and access control policies, developed in concert with MCDOT, that can reduce the risk of spillover from increased arterial congestion onto known cut-through routes like Tomlinson Avenue. Such mitigation steps are needed to adequately address the impacts to our community revealed, but not described, in the Draft EIS.

**#9**

*Moses Hall & Cemetery*
The Moses Hall & Cemetery property is described in the DEIS as being "adversely affected" by all six build alternatives. According to MDOT SHA, the work proposed at this location includes widening along the outside of the I-495 inner loop to construct two new managed lanes and a new ramp to connect the managed lanes with River Road at the existing interchange.

As currently designed, the limits of disturbance (LOD) would impact the historic property, including portions of the Moses Hall foundation wall, a section of the former access road from Seven Locks Road, as well as potential grave locations. MDOT indicates that the agency is continuing to examine engineering avoidance alternatives at this location. This is unacceptable and the final EIS must offer mitigation that protects this historic property.

**#10**

*Noise Analysis and Barriers*
Past promises to provide noise barriers along I-495 in our vicinity have not been kept. While we are pleased that the Noise Analysis Technical Report (Appendix J) indicates that it is feasible and reasonable to construct noise barriers along both sides of I-495 between Persimmon Tree

4

**Response to DEIS Comment #9**
See response to Comment #1 above.

**Response to DEIS Comment #10**
As part of this project, a new barrier system is proposed along the inner loop of I-495 from MacArthur Boulevard to just south of Cabin John Parkway, with a break at Persimmon Tree Road. The new barrier system will be constructed as close to the roadway as possible to minimize or avoid property impacts. As described in the Supplemental DEIS (SDEIS) and the supporting Noise Analysis Technical Report Addendum the noise analysis is based on the current preferred alternative design and MDOT SHA's Highway Noise Abatement Planning and Engineering Guidelines ("Noise Guidelines"), which detail implementation guidance, critical background information, rationale, and other comprehensive criteria associated with a highway noise study. The noise policy and guidelines are based upon the provisions contained in Title 23 of the Code of Federal Regulations Part 772 (23 CFR 772), Procedures for Abatement of Highway Traffic Noise and Construction Noise and the Federal Highway Administration (FHWA) report FHWA-HEP-10-025, Highway Traffic Noise: Analysis and Abatement Guidance and subsequent revisions.

The DEIS, SDEIS and FEIS all include the "Statement of Likelihood" that is required by FHWA regulation 23 CFR 772.13(g)(3):

"A statement of likelihood shall be included in the environmental document since feasibility and reasonableness determinations may change due to changes in project design after approval of the environmental document. The statement of likelihood shall include the preliminary location and physical description of noise abatement measures determined feasible and reasonable in the preliminary analysis. The statement of likelihood shall also indicate that final recommendations on the construction of an abatement measure(s) is determined during the completion of the project's final design and the public involvement processes."

Because we are in the NEPA phase of this project, we do not yet have detailed engineering plans, including soil borings and field surveyed topography. This level of detail is obtained during the final design phase of a project. The design, appearance and final alignment of the sound barriers will also be finalized during final design. The project must receive NEPA approval before final design is initiated, per 23 CFR 771.113(a).

As shown in SDEIS Noise Analysis Technical Report Addendum figure, Land Uses and Receptors Build Condition, Page 4 of 18, the ramp movements for the I-495 and MD 190 proposed interchange were accounted for in our noise analysis. At this time there is no sound barrier proposed along the flyover ramps at River Road, however this area will continue to be evaluated during final design.

At this time, there is no mechanism for the state to provide noise abatement to your community outside of a roadway improvement project such as the Managed Lanes Study. While MDOT SHA does participate in FHWA's voluntary Type 2 noise abatement program, there is currently no funding programmed for Type 2 noise abatement projects.



## CABIN JOHN CITIZENS ASSOCIATION
P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*

**#10 Cont**

Lane and Seven Locks Rd., the Final EIS, Record of Decision, and project implementation need to see the SHA should ensure that the noise barriers are constructed along this section of I-495 on both the north and south sides of the highway and at no direct cost to local residents.

The noise barrier design should be advanced to provide sufficient information to our community about the location, height, grading, tree takings, and acoustical effectiveness of the noise barrier. Additionally, the noise study must also include "barrier optimization guidance" based on this advanced noise barrier design and input from the community to provide adequate information to the P3 contractor to design and build an acceptable noise barrier.

Properly sited and designed noise barriers are essential mitigations for the noise impacts associated with this project. **Even if the project not move forward, we need noise mitigation to manage the daily impacts faced by the families in the homes adjacent to I-495. The community implores SHA and our local Montgomery County officials to develop a program and associated funding to provide the resources for so-called "Type II" noise barrier projects.**

**#11**

*Adverse Impact of a new River Rd. (MD190) Off-Ramp*
The noise impacts as well as the visual impacts of the new MD 190 off-ramp are inadequately analyzed in the Draft EIS. A Visual Impact Assessment should be prepared before moving forward and incorporated into a Supplemental Draft EIS for review and comment.

The MD 190 off-ramp would negatively affect sensitive wetlands and parkland, as shown in Appendix D. Section 4(f) considerations require the evaluation of approaches to avoid the use of such parkland. Because of the unacceptable visual and property impacts, the Final EIS should remove an eastbound flyover off-ramp onto MD 190 and replace it with an at-grade exit.

**#12**

**Park Impacts**
**We are concerned by the impacts to parks surrounding our community and insufficient efforts to avoid their use.** Consistent with Section 4(f) of the Department of Transportation Act, use of Federal and local parkland should be avoided wherever possible. As indicated in the Environmental Resource Mapping (Appendix D), the construction of the Project would affect meaningful portions of the C&O Canal and the Clara Barton Parkway.

In particular, the off-ramp from I-495 to MD 190 would require substantial use of Cabin John Park. The *Draft Section 4(f) Evaluation* (Appendix F) fails to document any efforts to avoid this use. Further avoidance measures must be pursued and described in the Final EIS.

**#13**

**Stormwater Impacts**
**The stormwater analysis in the Draft EIS is inadequate to provide our community with adequate assurances that stormwater associated with the Project will be addressed in a way that ensures that existing and future stormwater and runoff issues are managed.** According to the *Natural Resources Technical Report* (Appendix L), the Cabin John Creek watershed would see substantial impacts (Table 2.3-8). These impacts would result from additional impervious surfaces from the Alternatives (Table 2.9-60). Meanwhile, the stormwater approaches detailed in the technical report remain highly conceptual (Section 2.3.4.B).

5

---

**Response to DEIS Comment #11**
The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes at Seven Locks Road. Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction. An acceleration lane will also be built along the outer loop for approximately 1000-feet east of Seven Locks Road. No ramps are proposed in this area. The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop. The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier. Flyover ramps are no longer proposed in this area and thus will not create a visual impact. A noise barrier in this area is anticipated to be located close to the existing right of way line. Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

Since the DEIS, the Preferred Alternative eliminates of flyover ramps at MD 190/River Road by adjusting the location of the HOT lane direct access ramps between I-495 and MD 190. All HOT lanes direct access ramps within this interchange are now proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of flyover ramps.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and managed lanes separate to allow space for highway ramps. The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities. The existing loop ramps at the MD 190 interchange will be replaced with diamond ramps. This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

**Response to DEIS Comment #12**
See response to Comment #3 above.

**Response to DEIS Comment #13**
Impacts to receiving waters, including Cabin John Creek, will be addressed through the Maryland permitting process, which this project will be required to follow. Maryland Stormwater Management Law is relatively strict with the goal of maintaining post development runoff as nearly as possible to pre-development runoff characteristics. Water quantity is required to be managed onsite to match existing conditions for the 10-year storm. Water quality is required to treat all new impervious area and 50% of reconstructed existing impervious area to match the runoff characteristics of woods in good condition. Refer to Chapter 9, Section 3.4.E for additional information on impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**#13 Cont**

**CABIN JOHN CITIZENS ASSOCIATION**
P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*

While we are pleased to see a commitment to best management practices and environmental site design in the document (Section 2.4.4.C), the Final EIS must contain more detailed information regarding the Preferred Alternative approach to addressing stormwater in the areas around our community.

Thank you for your consideration of these comments. Our community will remain involved through the EIS process and the Board of Public Works review. We look forward to seeing the steps that SHA takes to address the issues raised.

Sincerely,

Susan Shipp
President, Cabin John Citizens Association

CC:    Governor Lawrence J. Hogan
       Comptroller Peter V.R. Franchot
       Treasurer Nancy Kopp
       Senator Ben Cardin
       Senator Chris Van Hollen Jr.
       Representative Jamie Raskin
       County Executive Marc Elrich
       Councilmembers Andrew Friedson, Gabe Albornoz, Evan Glass, Will Jawando, and Hans Riemer
       Senator Susan Lee and Delegates Ariana Kelly, Marc Korman, and Sara Love

6

See response to Comment #13 above.

00022229

**CABIN JOHN CITIZENS ASSOCIATION – SUSAN SHIPP (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Susan Shipp

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Live Testimony/Afternoon

**Transcription:**

Well, I'm very confused. Hello? For some reason, you have the wrong name for me, which is why I'm totally confused. Ok, let me let me start. My name is Susan Shipp, it's S-U-S-A-N, S-H-I-P-P. I live at 7725 Tomlinson Avenue in Cabin John. As the president of the Cabin John Citizens Association, I'm providing comments today on behalf of the Cabin John community. We will be submitting more specific written comments prior to the November nine deadline. Cabin John, a bucolic, historic community with some 2,200 residents located in the triangle created by Cabin John Parkway, the CNO Canal and I-495 from the American Legion Bridge to just past the bridge over Seven Locks Road. Cabin John's Evergreen neighborhood, which backs

#1  up to the Beltway, is directly threatened by this project and the Citizens Association stands united with these families in opposition to property takings as part of this project and with the need for effective noise barriers and stormwater management, which has never been addressed despite more than a quarter million vehicles using this stretch of I-495 every day. We also agree with the other very critical concerns

#2  they are raising in their testimony, also backing up to the Beltway is the Moses Hall and cemetery property, historically significant for the role it played in Cabin Jones African-American community during the segregated post slavery era. This property is also directly linked to the current Cabin John residents who have family buried in the cemetery. The Draft EIS says that the properties, including grave locations, is adversely affected by all six build alternatives. This is unacceptable to the community, as is the inadequate study of this site that has been conducted today under Section 106 and Section 4(f).

#3  The construction of a flyover ramp from the managed lanes to River Road would adversely impact the Evergreen Homes. The Moses Hall and cemetery property and nearby parklands highly utilized by the community. It also would have adverse visual impacts for the Cabin John community as a whole. The draft EIS does not evaluate this in any meaningful way. Another major concern is the traffic impacts both during construction and longer term. The Environmental Resource Mapping Appendix B appears to indicate that both the Persimmon Tree Lane Bridge over I-495 and the I-495 bridge over Seven Locks Road will need to be replaced. The construction period information presented in the draft EIS does not adequately describe

#4  the disruptions that residents will experience. Even more alarming, the traffic analysis technical report Appendix C indicates that both the River Road and the Clara Barton Parkway, two major thoroughfares used by the community to access Washington, will see a greater than 10 percent increase in delay with managed lanes on I-495. This is a major adverse impact for Cabin John residents. Evidence that the DEIS documents the impacts on critical local connector roads, including Persimmon Tree Road, Seven Locks Road, MacArthur Boulevard, which is Cabin John's Main Street, and where commuter traffic has already slows to a crawl due to the historic one lane Union Arch Bridge. The impacts to these roads must be thoroughly evaluated and final mitigation incorporated through improvements to these roadways. Thank you very much for your consider, excuse me, your consideration.

**Response to DEIS Comment #1**

Sliver impacts to properties along I-495 within the Carderock Springs community are proposed for elements such as roadside grading, retaining wall construction, on-site drainage and stormwater management, and noise barrier replacement/construction. These partial property acquisitions are considered ones that do not cause a business or residential relocation and have been assumed where a principle building of a residence, business, or community facility is located more than 20 feet from the Preferred Alternative limits of disturbance.

As part of this project, a new barrier system is proposed along the inner loop of I-495 from MacArthur Boulevard to just south of Cabin John Parkway, with a break at Persimmon Tree Road. The new barrier system will be constructed as close to the roadway as possible to minimize or avoid property impacts. As described in the Supplemental DEIS (SDEIS) and the supporting Noise Analysis Technical Report Addendum the noise analysis is based on the current preferred alternative design and MDOT SHA's Highway Noise Abatement Planning and Engineering Guidelines ("Noise Guidelines"), which detail implementation guidance, critical background information, rationale, and other comprehensive criteria associated with a highway noise study. The noise policy and guidelines are based upon the provisions contained in Title 23 of the Code of Federal Regulations Part 772 (23 CFR 772), Procedures for Abatement of Highway Traffic Noise and Construction Noise and the Federal Highway Administration (FHWA) report FHWA-HEP-10-025, Highway Traffic Noise: Analysis and Abatement Guidance and subsequent revisions.

Refer to Chapter 9, Section 3.4.E for a response to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**Response to DEIS Comment #2**

Since the publication of the DEIS, additional and successful avoidance and minimization efforts also involved the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Through additional investigation and survey including ground penetrating radar (GPR), MDOT SHA identified potential unmarked graves within state-owned right-of-way adjacent to I-495. The Preferred Alternative incorporates design refinements that minimized the overall width of the improvements to completely avoid the cemetery property and the known area of state-owned right-of-way that has the potential for unmarked graves.

**Response to DEIS Comment #3**

Since the DEIS, the Preferred Alternative eliminates of flyover ramps at MD 190/River Road by adjusting the location of the HOT lane direct access ramps between I-495 and MD 190. All HOT lanes direct access ramps within this interchange are now proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of flyover ramps.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and managed lanes separate to allow space for highway ramps. The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities. The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps. This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

Refer to Chapter 9, Section 3.4.I for a response to construction impacts.

**Response to DEIS Comment #4**

Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**CARDEROCK SPRINGS CITIZENS ASSOCIATION – GIDFAR FIROOZ**

| | |
|---|---|
| **From:** | firooz gidfar <Firoozg@yahoo.com> |
| **Sent:** | Monday, September 21, 2020 9:33 PM |
| **To:** | MLS-NEPA-P3 |
| **Subject:** | DEIS Carderock testimony |
| **Attachments:** | DEIS Carderock testimony FG.pdf |

To whom it may concern;

Kindly find attached to be introduced into records regarding DEIS feedback / testimony.

Thank you,

Firooz Gidfar

1

*This page is intentionally left blank.*

00022231

**#1**

Testimony on behalf of the Carderock Springs community at the I-495 & I-270 Managed

Lanes Study Joint Public Hearing, September 2020

My name is Firooz Gidfar and I live at 7511 Hamilton Spring Road in Carderock Springs,

MD.

Our community is greatly concerned about the negative impact of the highway on our

health and property value. The Carderock Springs Citizens Association has commented

on each step of SHA's process open to the public and requested in multiple letters that:

- 1. Sound barriers must be installed,

- 2. The SHA shouldn't carry forward any alternative that would add 2 lanes in each

  direction and

- 3. The SHA should minimize impacts of the Beltway expansion on arterial roads.

Since my neighbors have given testimony on item #3, I will mainly discuss the first two

points.

**#2**

We were surprised to learn in the SHA public workshop on April 13th 2019 that SHA plans

to add an elevated ramp to connect the Managed Lanes with River Road. This addition

will significantly expand the areas impacted by noise from the Beltway. We were assured

at the same meeting by SHA staff that the SHA will provide necessary analyses in order

to plan for effective noise abatement. Unfortunately, the current EIS fails to do so. We

request that such analysis be provided, and effective noise abatement be planned and

built.

Despite our requests to not proceed with alternatives that are adding 2 lanes in each

direction, SHA proceeded only with those options. Four lanes will greatly increase

---

**Response to DEIS Comment #1**

Sliver impacts to properties along I-495 within the Carderock Springs community are proposed for elements such as roadside grading, retaining wall construction, on-site drainage and stormwater management, and noise barrier replacement/construction. These partial property acquisitions are considered ones that do not cause a business or residential relocation and have been assumed where a principle building of a residence, business, or community facility is located more than 20 feet from the Preferred Alternative limits of disturbance. The Preferred Alternative would not eliminate access or provide new access to properties, nor would it impede access between residences, community facilities, and businesses as no properties are accessed directly from I-495 or I-270. MDOT SHA will continue to make minimizing impacts a priority through design and construction and is committed to further coordination with neighboring communities and individual property owners. Based upon the overall project benefits and strong values of communities currently located near the Study, any projected decline or increase in property values related to the construction of the Project but not directly impacted is speculative. Where MDOT SHA acquires property, property owners are compensated for decreases in value to the remainder of the property.

Refer to Chapter 9, Section 3.4.L for a response to public health impacts.

**Response to DEIS Comment #2**

The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes at Seven Locks Road. Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction. An acceleration lane will also be built along the outer loop for approximately 1000-feet east of Seven Locks Road. No ramps are proposed in this area. The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop. The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier. Flyover ramps are no longer proposed in this area and thus will not create a visual impact. A noise barrier in this area is anticipated to be located close to the existing right of way line. Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

Since the DEIS, the Preferred Alternative eliminates of flyover ramps at MD 190/River Road by adjusting the location of the HOT lane direct access ramps between I-495 and MD 190. All HOT lanes direct access ramps within this interchange are now proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of flyover ramps.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and managed lanes separate to allow space for highway ramps. The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities. The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps. This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

As part of this project, the existing sound barrier that crosses Seven Locks Road along the outer loop of I-495 will be replaced and extended along the outer loop of I-495 to Persimmon Tree Road. A new barrier is proposed along the inner loop of I-495 from just south of Cabin John Parkway to Persimmon Tree Road. The new barriers will be constructed as close to the roadway as possible to minimize or avoid property impacts. As described in the FEIS and the supporting Final Noise Analysis Technical Report (FEIS, Appendix L) the noise analysis is based on the current preferred alternative design and MDOT SHA's Highway Noise Abatement Planning and Engineering Guidelines ("Noise Guidelines"), which detail implementation guidance, critical background information, rationale, and other comprehensive criteria associated with a highway noise study. The noise policy and guidelines are based upon the provisions contained in Title 23 of the Code of Federal Regulations Part 772 (23 CFR 772), Procedures for Abatement of Highway Traffic Noise and Construction Noise and the Federal Highway Administration (FHWA) report FHWA-HEP-10-025, Highway Traffic Noise: Analysis and Abatement Guidance and subsequent revisions.

The DEIS, SDEIS and FEIS all include the "Statement of Likelihood" that is required by FHWA regulation 23 CFR 772.13(g)(3):

"A statement of likelihood shall be included in the environmental document since feasibility and reasonableness determinations may change due to changes in project design after approval of the environmental document. The statement of likelihood shall include the preliminary location and physical description of noise abatement measures determined feasible and reasonable in the preliminary analysis. The statement of likelihood shall also indicate that final recommendations on the construction of an abatement measure(s) is determined during the completion of the project's final design and the public involvement processes."

00022232

**#3**

disturbances in our neighborhood. We request that the need for adding four lanes be re-evaluated to better reflect current changes in travel needs and future automotive technological advances that will allow for more efficient use of current infrastructure.

If the only reason to add four lanes is to generate more revenue, it shouldn't proceed. LOD in the EIS for our area is overly optimistic as it appears to be nearly overlapping with the location of the noise barrier. We request SHA review the appropriate LOD in this corridor and where property impacts are shown, the Final EIS should be clear on how SHA will eliminate the need for property acquisition.

**#4**

Furthermore, Carderock Springs Elementary School provides publicly accessible playing fields and therefore qualifies as a public recreation area for Section 4(f) review under 23 CFR 774.17. We remind that Section 4(f) analysis of Carderock Springs Elementary School be provided in the Final EIS.

**#5**

In general, I would also like to voice my opposition to this project. Highway expansions have historically proven to be ineffective as long term solutions to commute time reduction. The minimal projected impacts on commute time savings will end up being zero if policies are not undertaken that lead to a reduction of the number of commutes by single occupant vehicles. The solution is not increased arterial capacity. If that were the case, we wouldn't be going through these exercises every few years.

Thanks again for providing the Carderock community with an opportunity to voice our concerns and requests.

---

Because we are in the NEPA phase of this project, we do not yet have detailed engineering plans, including soil borings and field surveyed topography. This level of detail is obtained during the final design phase of a project. The design, appearance and final alignment of the sound barriers will also be finalized during final design. The project must receive NEPA approval before final design is initiated, per 23 CFR 771.113(a). MDOT SHA is sensitive to the visual impact of a sound barrier when it is located directly adjacent to a residence. Sound barriers are most effective when placed directly adjacent to either the noise source (the highway) or the receiver (the residence). Ideally sound barriers are placed close to the highway, but in some cases, they must be located close to a residence in order to maximize the effectiveness. Sound barriers have a height limitation of 40 feet, and any structure over 24 feet requires a significantly larger foundation (which leads to more ground disturbance and environmental impacts). MDOT SHA will make every effort to keep the sound barriers as close to the highway as possible, but because of the varied topography of the Carderock Springs Community, it may be necessary to locate the walls at the top of the slope in order for them to effectively reduce the highway noise levels.

**Response to DEIS Comment #3**
Chapter 2 of the DEIS summarizes the process by which MDOT SHA considered and evaluated a full range of potential alternatives; greater detail is provided in Appendix B to the DEIS. This alternatives analysis process included Alternative 5 which consisted of adding one HOT managed lane in each direction on I-495 and converting the one existing HOV lane in each direction to a HOT managed lane on I-270. Based on additional analysis, FHWA and MDOT SHA found that Alternative 5 would fail in certain aspects and in others would perform so poorly in addressing the Study's Purpose and Need that it was not a reasonable or feasible alternative. During the alternatives screening process, Alternative 5 was rated "low" for system-wide delay, TTI in the GP lanes, density, LOS, and vehicle-throughput. In addition, Alternative 5 was determined to not be financially viable. Consequently, it was determined that Alternative 5 did not meet the Study's Purpose and Need and would not be one of the ARDS. However, Alternative 5 was evaluated to the same level as other ARDS and was included in Chapters 3 and 4 of DEIS as a useful means of comparison to the Build and No Build Alternatives.

**Response to DEIS Comment #4**
MDOT SHA appreciates your comment regarding impacts to Carderock Springs Elementary School and the applicability of Section 4(f) protection to the school's recreational facilities. The Preferred Alternative would have an estimated 0.2 acres of impact to the Carderock Springs Elementary School property. There would be no impact to the recreational facilities present on the school campus. In accordance with the 2012 FHWA Section 4(f) Policy Paper (Policy Paper), school playgrounds and other recreational facilities on school campuses are eligible for Section 4(f) protection. The Policy Paper states:
"When a public school playground is open to the public and serves either organized or substantial walk-on recreational purposes that are determined to be significal[...] it will be subject to the requirements of Section 4(f)". (Part II, #14)

The Policy Paper includes this further clarification:
"The term playground refers to the area of the school property developed and/or used for public park or recreation purposes such as baseball diamonds, soccer fields, tennis courts, track and field facilities, and other features such as jungle gyms or swing sets. This can also include open space or practice fields if those areas serve a park or recreation function. Section 4(f) would apply to the playground areas only and not the entire campus, unless the school and campus are also significant historic "sites." (Part II, #14)
Therefore, because the recreational facilities present on the Carderock Springs Elementary School campus would not be impacted by the Preferred Alternative, no Section 4(f) use would occur.

**Response to DEIS Comment #5**
NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C. Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.
Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.
Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 Phase I South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.


**CARDEROCK SPRINGS CITIZENS ASSOCIATION – PETRA JACOBS (EMAIL)**

| | |
|---|---|
| **From:** | Petra Jacobs <petraejacobs@gmail.com> |
| **Sent:** | Tuesday, August 25, 2020 6:14 PM |
| **To:** | MLS-NEPA-P3; Lisa Choplin |
| **Cc:** | Caryn Brookman (Consultant); Orrick, Jack |
| **Subject:** | oral testimony: text to include into today's P3 hearing records |
| **Attachments:** | DEIS Carderock testimony for 8-25 final.docx |

Dear Lisa and SHA representatives,
Would you please include the enclosed text to the oral testimony records from today's 5 pm I-495 & I-270 hearing?
Please let me know if I need to contact anyone else in order to incorporate my testimony into today's records.
Thanks in advance.
Petra

Petra Jacobs, 7508 Hamilton Spring Rd., Carderock Springs.

1

*This page is intentionally left blank.*

00022234

#1

Testimony on behalf of the Carderock Springs community at the I-495 & I-270 Managed Lanes Study Joint Public Hearing, August 25, 2020

My name is Petra Jacobs and I live at 7508 Hamilton Spring Road in Carderock Springs. I am here today as a Maryland resident, a parent, and a board member of the Carderock Springs Citizens Association representing the Carderock community, who together with many other neighbors has spent countless hours working to protect the Carderock Springs and South Carderock neighborhoods against dangerous air and noise pollution caused by the Beltway. I would like to thank SHA for the opportunity to be part of this hearing.

The Carderock Springs and South Carderock neighborhoods are located directly adjacent to the Beltway, between the River Road and Clara Barton Parkway exits. In addition to 569 households, there is also an elementary school with its play areas and ball fields located virtually next to the Beltway. Like many others, we are greatly concerned about the air pollution from highways on children's lung development and the impact of highway noise on the general health, cardiovascular systems and quality of life of the residents of our community as well as the impact on our property. We are experiencing these impacts today which have been getting worse each year. If the Beltway is expanded, the impacts on our community will be severe. Not only will there be more cars and trucks, but traffic will be even closer to sensitive receptors such as our children, Carderock Springs Elementary School, and our homes. Given what is at stake, our community has commented on each step of SHA's process and requested in many letters (incl. October 1, 2018) 1. Installation of sound/air pollution barriers, 2. That SHA shouldn't carry forward any alternative that would add 2 lanes in each direction as these alternatives would reduce the distance between the Beltway and school/residencies and significantly increase noise/air pollution harms. 3. SHA should ensure that its project includes measures to minimize impacts on arterial roads (River Rd,

**Response to DEIS Comment #1**

Due to extensive coordination and consultation with local, state, and federal resource agencies and stakeholders throughout the NEPA process, MDOT SHA was able to advance avoidance and minimization measures for regulated and sensitive resources and property displacements along I-495 and I-270. This process resulted in an LOD that significantly avoided and minimized impacts associated with the DEIS Build Alternatives while appropriately addressing a wide range of water resources, parkland, and historic and/or cultural resources. MDOT SHA accomplished this through a number of approaches, including the elimination or relocation of managed lane access points, shifting the centerline alignment, reducing lanes, changing interchange configurations and other design refinements. Refer **to DEIS, Appendix B, Alternatives Technical Report, SDEIS, Chapter 2 and FEIS, Chapter 3**. Sliver impacts to properties along I-495 within the Carderock Springs community are proposed for elements such as roadside grading, retaining wall construction, on-site drainage and stormwater management, and noise barrier replacement/construction. These partial property acquisitions are considered ones that do not cause a business or residential relocation and have been assumed where a principle building of a residence, business, or community facility is located more than 20 feet from the Preferred Alternative limits of disturbance.

Refer to Chapter 9, Section 3.4.L for a response to public health impacts and see response to Comment #2 below regarding proximity impacts and noise mitigation.

Seven Locks Rd). Since my fellow CSCA Board member commented on #3 and partially on #1, my testimony will focus on the rest.

#2

Ad 1. Installation of sound/air pollution barrier.

We were shocked to learn in the SHA public workshop on April 13th 2019 that in addition to the Beltway expansion SHA plans to add an elevated ramp to connect Managed Lanes with River Road. This addition will significantly expand the area of noise and air pollution to places not previously impacted by the Beltway. However, we were assured at the same meeting by SHA personnel that SHA will provide necessary analyses in this area to plan for effective noise abatement. Unfortunately, the current EIS fails to adequately evaluate a noise wall to address impacts in this area for Carderock Springs residents along Seven Locks Road. We request that such analysis be provided, and effective noise/pollution abatement be included in the Final EIS, Record of Decision, and project implementation.

#3

Ad 2. Selected alternatives: Despite our (and other) communities requests during the SHA comment process to not proceed with alternatives that are adding 2 lanes in each direction, SHA proceeded only with those options, affecting negatively adjacent properties and elementary school. This is an important comment especially now, during the COVID pandemic, when employment and infrastructure is being re-designed to minimize the need for people to travel. We request that the need for adding four lanes (two lanes in each direction) be re-evaluated to better reflect revolutionary changes in travel needs. If the only reason to add total four lanes is to generate more revenue, it shouldn't proceed.  Such a decision has a crucial impact on the limits of disturbance (LOD) in our area.  As shown in the Environmental Resource Mapping (Appendix D, Maps 59 and 126), LOD for the Project appear to be overly optimistic at the current level of design. For areas of I-495 adjacent to properties along Hamilton Spring Rd and Stone Trail Drive, the LOD appears to be nearly overlapping with the location of the noise barrier. At the current level of planning, at least 10-15 feet of LOD should be assumed, in order to capture potential slope and grading

#4

Response to DEIS Comment #2

The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes.  Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction.  An acceleration lane will also be built along the outer loop for approximately 1000-feet east of Seven Locks Road.  No ramps are proposed in this area.  The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop.  The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier.  Flyover ramps are no longer proposed in this area and thus will not create a visual impact.  A noise barrier in this area is anticipated to be located close to the existing right of way line.  Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and price managed lanes separate to allow space for highway ramps.  The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190.  Third-level flyover bridges above the existing beltway grades will be avoided by providing median ramps from the price managed lanes to MD 190 which connect into the center of the MD 190 bridge over I-495.  New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities.  The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps.  This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

As part of this project, the existing sound barrier that crosses Seven Locks Road along the outer loop of I-495 will be replaced and extended along the outer loop of I-495 to Persimmon Tree Road.  A new barrier is proposed along the inner loop of I-495 from just south of Cabin John Parkway to Persimmon Tree Road.  The new barriers will be constructed as close to the roadway as possible to minimize or avoid property impacts.  As described in the FEIS and the supporting Final Noise Analysis Technical Report (FEIS, Appendix L) the noise analysis is based on the current preferred alternative design and MDOT SHA's Highway Noise Abatement Planning and Engineering Guidelines ("Noise Guidelines"), which detail implementation guidance, critical background information, rationale, and other comprehensive criteria associated with a highway noise study. The noise policy and guidelines are based upon the provisions contained in Title 23 of the Code of Federal Regulations Part 772 (23 CFR 772), Procedures for Abatement of Highway Traffic Noise and Construction Noise and the Federal Highway Administration (FHWA) report FHWA-HEP-10-025, Highway Traffic Noise: Analysis and Abatement Guidance and subsequent revisions.

The DEIS, SDEIS and FEIS all include the "Statement of Likelihood" that is required by FHWA regulation 23 CFR 772.13(g)(3):

"A statement of likelihood shall be included in the environmental document since feasibility and reasonableness determinations may change due to changes in project design after approval of the environmental document. The statement of likelihood shall include the preliminary location and physical description of noise abatement measures determined feasible and reasonable in the preliminary analysis. The statement of likelihood shall also indicate that final recommendations on the construction of an abatement measure(s) is determined during the completion of the project's final design and the public involvement processes."

Because we are in the NEPA phase of this project, we do not yet have detailed engineering plans, including soil borings and field surveyed topography.  This level of detail is obtained during the final design phase of a project. The design, appearance and final alignment of the sound barriers will also be finalized during final design. The project must receive NEPA approval before final design is initiated, per 23 CFR 771.113(a).  MDOT SHA is sensitive to the visual impact of a sound barrier when it is located directly adjacent to a residence.  Sound barriers are most effective when placed directly adjacent to either the noise source (the highway) or the receiver (the residence).  Ideally sound barriers are placed close to the highway, but in some cases, they must be located close to a residence in order to maximize the effectiveness.


*This page is intentionally left blank.*

Sound barriers have a height limitation of 40 feet, and any structure over 24 feet requires a significantly larger foundation (which leads to more ground disturbance and environmental impacts). MDOT SHA will make every effort to keep the sound barriers as close to the highway as possible, but because of the varied topography of the Carderock Springs Community, it may be necessary to locate the walls at the top of the slope in order for them to effectively reduce the highway noise levels.

**Response to DEIS Comment #3**

Chapter 2 of the DEIS summarizes the process by which MDOT SHA considered and evaluated a full range of potential alternatives; greater detail is provided in Appendix B to the DEIS. This alternatives analysis process included Alternative 5 which consisted of adding one HOT managed lane in each direction on I-495 and converting the one existing HOV lane in each direction to a HOT managed lane on I-270. Based on additional analysis, FHWA and MDOT SHA found that Alternative 5 would fail in certain aspects and in others would perform so poorly in addressing the Study's Purpose and Need that it was not a reasonable or feasible alternative. During the alternatives screening process, Alternative 5 was rated "low" for system-wide delay, Travel Time Index (TTI) in the general purpose lanes, density, Level of Service (LOS), and vehicle-throughput. In addition, Alternative 5 was determined to not be financially viable. Consequently, it was determined that Alternative 5 did not meet the Study's Purpose and Need and would not be one of the ARDS. However, Alternative 5 was evaluated to the same level as other ARDS and was included in Chapters 3 and 4 of DEIS as a useful means of comparison to the Build and No Build Alternatives.

**Response to DEIS Comment #4**

MDOT SHA employed a conservative approach to defining the LOD for all the DEIS Build Alternatives and Preferred Alternative. The LOD represent the proposed boundary within which all construction, mainline widening, managed lane access, intersection improvements, construction access, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, stream stabilization, and related activities to the proposed roadway and interchange improvements. Property impacts associated with the LOD were broken into permanent (long-term) and temporary (short-term) areas. This conservative approach to defining the LOD fairly captured the full scope of potential impacts. Moreover, the methodology used to assess impacts to a number of key resources appropriately considered a broader geographic area than the LOD immediately surrounding the anticipated construction and related activity boundaries. When the project advances to final design, it is anticipated that the design will closely adhere to the LOD defined in the FEIS, as the LOD was established to include a reasonable area to construct the Preferred Alternative. For complete graphic descriptions of the Preferred Alternative LOD across the entire span of study limits, refer to the FEIS, Appendix E- Environmental Resource Mapping. Refer to Chapter 9, Section 3.4.A for a response on Limits of Disturbance.

Specifically at Stoney Trail Drive and Hamilton Spring Road, the LOD is set to account for the noise barrier and construction of the noise barrier. The LOD is set with a design assumption of 10 feet behind the noise barrier for construction. Refer to FEIS, Appendix E- Environmental Resource Mapping, Map 7. As presented in the DEIS, SDEIS, and FEIS, preliminary determination of horizontal and vertical alignment for the noise barriers was made based on the latest design concept; however, final determination of noise barrier feasibility, reasonableness, dimensions and locations will be made in final design. Engineering changes reflected in final design could alter the conclusions reached in this analysis, leading to recommendations to add or omit noise barrier locations. A Final Design Noise Analysis will be performed for this Study based on detailed engineering information during the final design phase. Refer to FEIS, Chapter 5, Section 5.9 and FEIS, Appendix L for more details.

00022237

**#4 Cont**

issues. Our concern about the LOD is analogous to a similar LOD concern expressed by the staff of the Maryland-National Capital Park and Planning Commission (M-NCPPC) in their July 15 memorandum. The result of this LOD approach is that property impacts and potential tree loss from noise barrier construction may be understated. We request SHA review the appropriate LOD in this corridor and provide further documentation of why the LOD is located where it is. Where property impacts are shown, particularly along Thornley Court and on the Carderock Springs Elementary School property, the Final EIS should include, as mitigation, the direction that SHA take practicable steps to eliminate the need for property acquisition in this section of the Project.

**#5**

Furthermore, Carderock Springs Elementary School provides publicly accessible playing fields and therefore qualifies as a public recreation area for Section 4(f) review under 23 CFR 774.17. No analysis of the impacts of the Project on the Elementary School is provided in the Draft Section 4(f) Evaluation. However, there is potential for use of the Section 4(f) resource.

For the Action Alternatives under consideration, all envision some use of the southwest corner of the public school property, as shown in the maps in the Environmental Resource Mapping (Appendix D). At the scale of the drawings provided and due to the larger issue related to an appropriate LOD, it is difficult to determine whether any impacts to the parking lot would occur. The loss of spaces in the parking lot may diminish access to the public playing fields, which are regularly used for weekend recreational sports. We request that Section 4(f) analysis of Carderock Springs Elementary School BE provided in the Final EIS.

Thanks again for providing the Carderock community with an opportunity to voice our concerns and requests.

See response to Comment #4 above.

**Response to DEIS Comment #5**

MDOT SHA appreciates your comment regarding impacts to Carderock Springs Elementary School and the applicability of Section 4(f) protection to the school's recreational facilities. The Preferred Alternative would have an estimated 0.2 acres of impact to the Carderock Springs Elementary School property. There would be no impact to the recreational or parking facilities present on the school campus. In accordance with the 2012 FHWA Section 4(f) Policy Paper (Policy Paper), school playgrounds and other recreational facilities on school campuses are eligible for Section 4(f) protection. The Policy Paper states:

"When a public school playground is open to the public and serves either organized or substantial walk-on recreational purposes that are determined to be significant [...] it will be subject to the requirements of Section 4(f)". (Part II, #14)

The Policy Paper includes this further clarification:

"The term playground refers to the area of the school property developed and/or used for public park or recreation purposes such as baseball diamonds, soccer fields, tennis courts, track and field facilities, and other features such as jungle gyms or swing sets. This can also include open space or practice fields if those areas serve a park or recreation function. Section 4(f) would apply to the playground areas only and not the entire campus, unless the school and campus are also significant historic sites." (Part II, #14)

Therefore, because the recreational facilities present on the Carderock Springs Elementary School campus would not be impacted by the Preferred Alternative, no Section 4(f) use would occur.

**CARDEROCK SPRINGS CITIZENS ASSOCIATION – PETRA JACOBS (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Petra Jacobs

**Date/Hearing:** 8/25/20

**Type/Session:** Live/Evening

**Transcription:**

Can you hear me? [FACILITATOR SPEAKS]. Yes, this is Petra Jacobs. Good evening. Can you hear me OK? [FACILITATOR SPEAKS]. OK. I will do that. Thank you. So my name is Petra Jacobs (P-E-T-R-A J-A-C-O-B-S). And I live at 7508 Headmilton Springs Road in Carderock Springs. And as the previous speaker, I am here today as a Maryland resident, a parent, and a board member of the Carderock Springs Citizens Association. Our community is greatly concerned about the negative impact of the high rate on our health and properties. We commented on each step of SHA's process and requested in many letters. Number 1, installation of sound barrier; Number 2, that SHA shouldn't carry forward any alternative that would add two lanes in each direction; and Number 3, SHA should minimize the impacts of the [INAUDIBLE] expansion on arterial roads.

**#1** Since my fellow association board member commented on August 20 on number three and partial number one, I will talk with what's on the rest. Number one, we were shocked to learn on the SHA public workshop on April 13, 2019 that SHA plans to add an elevated ramp to connect managed lanes to River Road. This addition will significantly expand the area of noise to places not previously impacted by the Beltway. We were assured at the same meeting by SHA personnel that SHA will provide necessary analysis to plan for effective noise abatement. Unfortunately, the current EIS fails to evaluate a noise wall for our residents affected by the abated ramp. We request that such analysis be provided and effective noise

**#2** abatement be included. Number two, despite the request to not proceed with alternative that adding two lanes in each direction SHA proceeded only with those options. We requested the need for adding four lanes be aberrated to better reflect current Covid and post-Covid changes and travel needs. If the only reason to add total four lanes is to generate more revenue, it shouldn't proceed. Such a decision has a crucial impact on the limits of disturbance in our area, although DEIS—sorry, OK— is overly optimistic as

**#3** it appears to be overly overlapping with the location of noise barriers. We request that SHA review the appropriate LOD in this corridor and where property impacts are shown, the Final EIS should include how SHA will eliminate the need for property acquisition. Furthermore, Carderock Springs Elementary School provides publicly accessible playing fields and therefore qualifies as a public recreation area for Section 4(f) under 23 CFR 774.17. We request that Section 4(f) analysis of Carderock Springs Elementary School be provided in the Final EIS. Thanks again for providing the Carderock community the opportunity to voice other concerns and requests.

**Response to DEIS Comment #1**

The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes. Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction. An acceleration lane will also be built along the outer loop for approximately 1000-feet east of Seven Locks Road. No ramps are proposed in this area. The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop. The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier. Flyover ramps are no longer proposed in this area and thus will not create a visual impact. A noise barrier in this area is anticipated to be located close to the existing right of way line. Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and price managed lanes separate to allow space for highway ramps. The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, I-495 managed lanes, and MD 190. Third-level flyover bridges above the current beltway grades will be avoided by providing median ramps from the price managed lanes to MD 190 which connect into the center of the MD 190 bridge over I-495. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities. The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps. This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

As part of this project, the existing sound barrier that crosses Seven Locks Road along the outer loop of I-495 will be replaced and extended along the outer loop of I-495 to Persimmon Tree Road. A new barrier is proposed along the inner loop of I-495 from just south of Cabin John Parkway to Persimmon Tree Road. The new barriers will be constructed as close to the roadway as possible to minimize or avoid property impacts. As described in the FEIS and the supporting Final Noise Analysis Technical Report (FEIS, Appendix L) the noise analysis is based on the current preferred alternative design and MDOT SHA's Highway Noise Abatement Planning and Engineering Guidelines ("Noise Guidelines"), which detail implementation guidance, critical background information, rationale, and other comprehensive criteria associated with a highway noise study. The noise policy and guidelines are based upon the provisions contained in Title 23 of the Code of Federal Regulations Part 772 (23 CFR 772), Procedures for Abatement of Highway Traffic Noise and Construction Noise and the Federal Highway Administration (FHWA) report FHWA-HEP-10-025, Highway Traffic Noise: Analysis and Abatement Guidance and subsequent revisions.

The DEIS, SDEIS and FEIS all include the "Statement of Likelihood" that is required by FHWA regulation 23 CFR 772.13(g)(3):

"A statement of likelihood shall be included in the environmental document since feasibility and reasonableness determinations may change due to changes in project design after approval of the environmental document. The statement of likelihood shall include the preliminary location and physical description of abatement measures determined feasible and reasonable in the preliminary analysis. The statement of likelihood shall also indicate that final recommendations on the construction of an abatement measure(s) is determined during the completion of the project's final design and the public involvement processes."

Because we are in the NEPA phase of this project, we do not yet have detailed engineering plans, including soil borings and field surveyed topography. This level of detail is obtained during the final design phase of a project. The design, appearance and final alignment of the sound barriers will also be finalized during final design. The project must receive NEPA approval before final design is initiated, per 23 CFR 771.113(a). MDOT SHA is sensitive to the visual impact of a sound barrier when it is located directly adjacent to a residence. Sound barriers are most effective when placed directly adjacent to either the noise source (the highway) or the receiver (the residence). Ideally sound barriers are placed close to the highway, but in some cases, they must be located close to a residence in order to maximize the effectiveness. Sound barriers have a height limitation of 40 feet, and any structure over 24 feet requires a significantly larger foundation (which leads to more ground disturbance and environmental impacts). MDOT SHA will make every effort to keep the sound barriers as close to the

*This page is intentionally left blank.*

highway as possible, but because of the varied topography of the Carderock Springs Community, it may be necessary to locate the walls at the top of the slope in order for them to effectively reduce the highway noise levels.

**Response to DEIS Comment #2**

Chapter 2 of the DEIS summarizes the process by which MDOT SHA considered and evaluated a full range of potential alternatives; greater detail is provided in Appendix B to the DEIS. This alternatives analysis process included Alternative 5 which consisted of adding one HOT managed lane in each direction on I-495 and converting the one existing HOV lane in each direction to a HOT managed lane on I-270. Based on additional analysis, FHWA and MDOT SHA found that Alternative 5 would fail in certain aspects and in others would perform so poorly in addressing the Study's Purpose and Need that it was not a reasonable or feasible alternative. During the alternatives screening process, Alternative 5 was rated "low" for system-wide delay, TTI in the GP lanes, density, LOS, and vehicle-throughput. In addition, Alternative 5 was determined to not be financially viable. Consequently, it was determined that Alternative 5 did not meet the Study's Purpose and Need and would not be one of the ARDS. However, Alternative 5 was evaluated to the same level as other ARDS and was included in Chapters 3 and 4 of DEIS as a useful means of comparison to the Build and No Build Alternatives.

**Response to DEIS Comment #3**

Due to extensive coordination and consultation with local, state, and federal resource agencies and stakeholders throughout the NEPA process, MDOT SHA was able to advance avoidance and minimization measures for regulated and sensitive resources and property displacements along I-495 and I-270. This process resulted in an LOD that significantly avoided and minimized impacts associated with the DEIS Build Alternatives while appropriately addressing a wide range of water resources, parkland, and historic and/or cultural resources. MDOT SHA accomplished this through a number of approaches, including the elimination or relocation of managed lane access points, shifting the centerline alignment, reducing lanes, changing interchange configurations and other design refinements. **Refer to DEIS, Appendix B, Alternatives Technical Report, SDEIS, Chapter 2 and FEIS, Chapter 3.** Sliver impacts to properties along I-495 within the Carderock Springs community are proposed for elements such as roadside grading, retaining wall construction, on-site drainage and stormwater management, and noise barrier replacement/construction. These partial property acquisitions are considered ones that do not cause a business or residential relocation and have been assumed where a principle building of a residence, business, or community facility is located more than 20 feet from the Preferred Alternative limits of disturbance.

MDOT SHA appreciates your comment regarding impacts to Carderock Springs Elementary School and the applicability of Section 4(f) protection to the school's recreational facilities. The Preferred Alternative would have an estimated 0.2 acres of impact to the Carderock Springs Elementary School property. There would be no impact to the recreational or parking facilities present on the school campus. In accordance with the 2012 FHWA Section 4(f) Policy Paper (Policy Paper), school playgrounds and other recreational facilities on school campuses are eligible for Section 4(f) protection. The Policy Paper states:

"When a public school playground is open to the public and serves either organized or substantial walk-on recreational purposes that are determined to be significant [...] it will be subject to the requirements of Section 4(f)". (Part II, #14)

The Policy Paper includes this further clarification:

"The term playground refers to the area of the school property developed and/or used for public park or recreation purposes such as baseball diamonds, soccer fields, tennis courts, track and field facilities, and other features such as jungle gyms or swing sets. This can also include open space or practice fields if those areas serve a park or recreation function. Section 4(f) would apply to the playground areas only and not the entire campus, unless the school and campus are also significant historic sites." (Part II, #14)

Therefore, because the recreational facilities present on the Carderock Springs Elementary School campus would not be impacted by the Preferred Alternative, no Section 4(f) use would occur.

**CARDEROCK SPRINGS CITIZENS ASSOCIATION – JACK ORRICK (EMAIL)**

*This page is intentionally left blank.*

| | |
|---|---|
| **From:** | Orrick, Jack <Jack.Orrick@offitkurman.com> |
| **Sent:** | Tuesday, October 6, 2020 12:57 PM |
| **To:** | MLS-NEPA-P3 |
| **Cc:** | governor.mail@maryland.gov; pfranchot@comp.state.md.us; Treasurer@treasurer.state.md.us; councilmember.friedson@montgomerycountymd.gov; councilmember.albornoz@montgomerycountymd.gov; councilmember.glass@montgomerycountymd.gov; councilmember.jawando@montgomerycountymd.gov; councilmember.riemer@montgomerycountymd.gov; susan.lee@senate.state.md.us; marc.korman@house.state.md.us; sara.love@house.state.md.us; ariana.kelly@house.state.md.us |
| **Subject:** | Comments of Carderock Springs Citizens Association - I-495/I-270 Managed Lane Study - Draft Environmental Impact Statement |
| **Attachments:** | 2020 10 05 DEIS comment letter signed.pdf |

Attached is the comment letter of Carderock Springs Citizens Association to the I-495/I-270 Managed Lane Study - Draft Environmental Impact Statement, Section 4(f) Evaluation and Draft Section 106 Assessment of Effects Report.

Jack Orrick
CSCA President



**Offit | Kurman**®
Attorneys At Law

**Jack Orrick**
Principal
D 240.507.1785
Jack.Orrick@offitkurman.com

7501 Wisconsin Ave.
Suite 1000W
Bethesda, MD 20814
T 240.507.1700
F 240.507.1735
offitkurman.com

👤 View My Bio ››

in f 🐦 📷

**PRIVILEGED COMMUNICATION PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential. It is solely intended for use by the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and delete this communication.

Any tax advice included in this communication may not contain a full description of all relevant facts or a complete analysis of all relevant tax issues or authorities. This communication is solely for the intended recipient's benefit and may not be relied upon by any other person or entity.

1

00022241





**CARDEROCK SPRINGS**
National Register of Historic Places

October 5, 2020

Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21201

**RE:    I-495/I-270 Managed Lane Study Draft Environmental Impact Statement, Draft Section 4(f) Evaluation, and Draft Section 106 Assessment of Effects Report**

Dear Ms. Choplin:

I am President of the Carderock Springs Citizens Association, a community organization that represents Carderock Springs and Carderock Springs South, which together include approximately 600 homes. Carderock Springs is designated as a National Historic District as a notable example of "situated modernism," and Carderock Springs South is indicated in the *Cultural Resources Technical Report* (Appendix G) as an eligible historic district.

We have closely followed the I-495/I-270 Managed Lanes Study environmental process and have been pleased to participate as a Consulting Party in the Section 106 consultation process. This letter provides our comments regarding the Draft EIS, the Section 4(f) analysis, and the Section 106 analysis. A brief summary of our concerns is followed by a more detailed discussion of the policy issues raised by the study documents.

Based on our review of the materials provided at this juncture, we wish to highlight nine central concerns related to the impacts and effects of the Project on the Carderock Springs community.

    1)  **We are unable to support any of the retained Alternatives analyzed in the DEIS and, at this juncture, would recommend that the State Highway Administration (SHA) not proceed with the Project. Given the fundamental shifts in travel demand due to Covid 19 and work from home trends, SHA must re-evaluate the purpose and need, and alternatives in the light of these changed conditions. Further, we believe that SHA erred in its rejection of Alternative 5 earlier in the environmental process.**

**Carderock Springs Citizens' Association**
P.O. Box 237, Cabin John, MD 20818-0237

www.carderocksprings.net

Thank you for your comments. Responses to the 9 issues highlighted in your letter are addressed on the following pages.


Lisa B. Choplin, DBIA
October 5, 2020
Page 2

2) The noise analysis for the Draft EIS indicates that it is feasible and reasonable to construct a noise wall along both sides of I-495 between Persimmon Tree Lane and Seven Locks Road. The statement of likelihood provided in the Draft EIS does not address whether and how further analysis of the feasibility and reasonableness of the barrier extension would be conducted during the final design of the project given that it is expected to be procured using a public-private partnership (P3) project delivery. The construction of an appropriate noise wall in this location must be committed to as a mitigation in the Final EIS and Record of Decision and incorporated into the P3 Concessionaire's designs. The cost of the wall must be included within the construction budget at no cost to the community.

3) The noise analysis fails to adequately evaluate a potential noise wall on the I-495 entrance ramp off of MD 190 to address impacts for certain Carderock Springs residents along Seven Locks Road. The analysis must be augmented to consider the feasibility and reasonableness of noise abatement for these residents as planned and discussed at an SHA public meeting on April 13, 2019.

4) The design and the impacts of the noise walls must be further refined. The proposed 30-foot wall's size, location, and aesthetics must be further evaluated for compatibility with the neighborhood and historic setting, particularly for residents whose homes are located above the grade of the Beltway.

5) The LOD indicated on the Environmental Resource Mapping (Appendix D) appears to be overly optimistic with noise barriers being located essentially at the LOD limit. This may result in additional potential for property takings and additional tree loss in these areas.

6) Regarding the Section 106 analysis, the potential aesthetic and tree loss impacts from the construction of the noise wall is likely to have an adverse impact on the setting of the Carderock Springs Historic District.

7) The Section 4(f) analysis fails to consider potential use of Carderock Springs Elementary School, a public recreation site, or the constructive use of the Historic District due to noise.

8) The traffic analysis associated with construction and long-term impacts is inadequate and potential impacts are not addressed.

9) The DEIS failed to analyze the impacts of the "Elevated Option" as part of an alternative. Its potential for additional visual and noise impacts means that the option should be eliminated.

Please find a more detailed discussion of these issues below.

#1

Alternatives Analysis

Due to the impacts that the Project would have on our community, both during the operational and construction periods, Carderock Springs Citizens Association is unable to support any of the retained Alternatives. We encourage SHA to push pause on this Project.

**Carderock Springs Citizens' Association**
P.O. Box 237, Cabin John, MD 20818-0237

www.carderocksprings.net

This page is intentionally left blank.

00022243

Lisa B. Choplin, DBIA
October 5, 2020
Page 3

**#1
Cont**

If SHA does continue the process, we also note two fundamental issues with the analysis of the alternatives that must be addressed in a Supplemental Draft EIS and that should affect how SHA seeks to make a decision on this project. First, as SHA is well-aware and notes briefly and perfunctorily in the Executive Summary (ES-3), the COVID-19 pandemic has substantially altered the transportation landscape, with significant decreases in tripmaking. Not only has this shift in transportation demand affected the use of roadways generally, and therefore the need for potential expansion, the drop in demand has altered the financial context of privately-operated infrastructure. For example, Transurban has reported an 88% reduction in toll revenues in Q2 2020.[1] The type of P3 approach envisioned by SHA depends on a reliable stream of users to generate necessary revenues. The current conditions call into question the suitability of projections made earlier in this process. 40 CFR 1502.9(c)(ii) requires an agency to prepare a supplemental EIS if "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or impact." These conditions merit such a re-analysis provided in a supplemental document.

As part of SHA's consideration of the significant new circumstances, SHA should consider whether the Purpose and Need for the Project is still appropriate. Changing travel patterns may fundamentally alter the current traffic baseline and the long-term traffic growth in the region. These changes, such as increased telecommuting, may fundamentally reduce the need for highway expansion to address roadway travel choices or trip reliability. SHA should evaluate this information consistent with the direction in 40 CFR 1502.22 regarding incomplete information. Above all, SHA should give this issue the "hard look" required by NEPA case law (for example, *Marsh v. Oregon Natural Resources Council*).

**#2**

Second, we believe that SHA erred in excluding Alternative 5 from further consideration, particularly in light of changing conditions. While the DEIS indicates that any change in inputs would affect all Alternatives equally (Appendix B, Pg. 112), the economic impact to the current P3 market suggests that SHA should reconsider whether the financial viability metric for evaluation remains reliable. In a time of uncertain conditions, Alternative 5 achieves approximately half of the estimated travel time benefits (Appendix B, Table 6-7) and has substantially fewer negative impacts (Appendix B, Table 6-19). While Alternative 5 is 86% of the cost of Alternative 10, the most costly alternative, we are concerned that the cost numbers are insufficiently justified – it beggars belief that alternatives that double the lanes constructed, substantially increase the new impervious surface, and require additional grading and sitework would only be 10-14% more expensive than Alternative 5. However, even if Alternative 5's relative costs were correct, we believe that the social and economic costs of the avoided impacts of Alternative 5 would support its consideration on a cost-benefit analysis basis.

Should the Project move forward, we would see Alternative 5 as a viable compromise approach that could ease some of our concerns about the detrimental effects of this Project.

---

[1] Transurban. 2020. *FY20 Results.* https://www.transurban.com/content/dam/investor-centre/01/FY20-ResultsPresentation.pdf

**Carderock Springs Citizens' Association**
P.O. Box 237, Cabin John, MD 20818-0237

www.carderocksprings.org

---

**Response to DEIS Comment #1**
An Environmental Impact Statement (EIS) may be supplemented at any time, in accordance with 23 CFR 771.130, when the Federal Highway Administration (FHWA) determines that changes to the proposed action or new information relevant to environmental concerns or impacts from the proposed action were not evaluated in the Draft EIS (DEIS). A Supplemental Draft Environmental Impact Statement (SDEIS) was prepared to consider new information relative to the Preferred Alternative, Alternative 9 - Phase 1 South. Building off the analysis in the existing DEIS, the SDEIS disclosed new information relevant to the Preferred Alternative focusing on new information while referencing the DEIS for information that remains valid. The SDEIS also described the background and context in which the Preferred Alternative, Alternative 9 - Phase 1 South was identified. The SDEIS was available for the public to review and comment on the Preferred Alternative during a 60-day comment period.

New information related to MDOT SHA's monitoring of COVID-19 related traffic impacts was included in the SDEIS and has been updated in this FEIS. MDOT has closely monitored changes in traffic patterns throughout the pandemic, and as of early 2022, daily traffic volumes have already recovered back to over 90 percent of pre-COVID levels. Although there is still uncertainty surrounding traffic projections resulting from the COVID-19 pandemic, transportation experts have analyzed pandemic traffic conditions and future traffic demand inputs and note that traffic volumes have continued to recover since the rollout of the vaccines in early 2021. Traffic volumes are anticipated to return to pre-COVID levels before the time the HOT lanes are operational. Given the ultimate 2045 design year, the HOT lanes will be required to accommodate long-term traffic.

Given the uncertainty surrounding resolution of the pandemic and how travel patterns will adjust, and over what time period, no definitive traffic model exists to predict how the global pandemic will affect long-term mobility patterns. To adapt to the ongoing and potential long-term travel impacts associated with the pandemic, MDOT SHA developed a COVID-19 Travel Analysis and Monitoring Plan. **Refer to FEIS, Appendix C** for a copy of the latest version of that plan and results.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impact of teleworking/remote working.

**Response to DEIS Comment #2**
Chapter 2 of the DEIS summarizes the process by which MDOT SHA considered and evaluated a full range of potential alternatives; greater detail is provided in Appendix B to the DEIS. This alternatives analysis process included Alternative 5 which consisted of adding one HOT managed lane in each direction on I-495 and converting the one existing HOV lane in each direction to a HOT managed lane on I-270. Based on additional analysis, FHWA and MDOT SHA found that Alternative 5 would fail in certain aspects and in others would perform so poorly in addressing the Study's Purpose and Need that it was not a reasonable or feasible alternative. During the alternatives screening process, Alternative 5 was rated "low" for system-wide delay, Travel Time Index (TTI) in the general purpose lanes, density, Level of service (LOS), and vehicle-throughput. In addition, Alternative 5 was determined to not be financially viable. Consequently, it was determined that Alternative 5 did not meet the Study's Purpose and Need and would not be one of the ARDS. However, Alternative 5 was evaluated to the same level as other ARDS and was included in Chapters 3 and 4 of DEIS as a useful means of comparison to the Build and No Build Alternatives.

**#3**

Lisa B. Choplin, DBIA
October 5, 2020
Page 4

Noise Analysis and Barriers

Our community is particularly concerned about noise impacts associated with the Project. Past promises to provide barriers along I-495 in our vicinity have not been kept. While we are pleased that the *Noise Analysis Technical Report* (Appendix J) indicates that it is feasible and reasonable to construct noise barriers along both sides of I-495 between Persimmon Tree Lane and Seven Locks Road, we have a number of concerns that the State Highway Administration (SHA) should address in the Final EIS, Record of Decision, and project implementation.

First, SHA should ensure that the noise barriers are constructed along I-495 between Persimmon Tree and Seven Locks Road, on both the north and south sides of the highway and at no direct cost to local residents. Construction of barriers in this location is a necessary mitigation for the adverse noise impacts that we would experience. We believe that, given the findings of the Noise Analysis Technical Report, failure to provide noise barriers under this P3 Project would violate SHA's noise policy, as indicated in Appendix I of the SHA *Highway Noise Abatement Planning and Engineering Guidelines*. The noise barrier design should be advanced to provide sufficient information to our community about the location, height, grading, tree takings, and acoustical effectiveness of the noise barrier. This information is necessary for our community to build consensus around the noise barrier approach or, if necessary, to vote on sound walls prior to the P3 procurement process. Additionally, the noise study must also include "barrier optimization guidance" based on this advanced noise barrier design and input from the community to provide adequate information to the P3 contractor to design and build an acceptable noise barrier.

Second, SHA should evaluate whether noise barriers would be appropriate along the MD 190 entrance ramp onto the managed lanes from the west side of I-495. Impacted receptors R2-1-1, R2-1-2, and R2-1-3 would receive little insertion loss (1 dB) from the proposed barriers along I-495, yet their noise levels exceed the threshold for mitigation. These impacted receptors are important members of our community who deserve appropriate mitigation. Further, the change in the nature of that ramp to an elevated flyover of the roadway may alter the noise impacts to the detriment of those who live along Seven Locks Road. Representatives of SHA previously indicated at a meeting held on April 13, 2019 that these impacts would be evaluated. There is no evidence in the *Noise Analysis Technical Report* that noise abatement for these impacts has been appropriately considered. Based on the noise conditions, the flyover entrance ramps must include noise barriers that are committed to as mitigations in the Record of Decision and included in the P3 Concessionaire's charge.

Third, flaws in the Draft EIS underestimate the benefits of noise barriers for Carderock Springs. We note that the noise study does not include Traffic Noise Model (TNM) modeling of the loudest-hour existing or design-year no-build noise conditions at receptors, which is inconsistent with best practice. Additionally, the noise study does not compare the noise reduction benefits of the replacement noise barrier against the noise barrier that exists near Seven Locks Road today. Further, the below data gaps and errors in the *Noise Analysis Technical Report* should be addressed:

- Neither the noise impact assessment results (Table D-1) nor the noise barrier analysis tables (Tables 4-9 & 4-10) indicate the number of residences that are assigned to each receptor

**Carderock Springs Citizens' Association**
P.O. Box 237, Cabin John, MD 20818-0237
www.carderocksprings.net

---

**Response to DEIS Comment #3**

As part of this project, the existing sound barrier that crosses Seven Locks Road along the outer loop of I-495 will be replaced and extended along the outer loop of I-495 to Persimmon Tree Road. A new barrier is proposed along the inner loop of I-495 from just south of Cabin John Parkway to Persimmon Tree Road. The new barriers will be constructed as close to the roadway as possible to minimize or avoid property impacts. As described in the Supplemental DEIS (SDEIS) and the supporting Noise Analysis Technical Report Addendum the noise analysis is based on the current preferred alternative design and MDOT SHA's Highway Noise Abatement Planning and Engineering Guidelines ("Noise Guidelines"), which detail implementation guidance, critical background information, rationale, and other comprehensive criteria associated with a highway noise study. The noise policy and guidelines are based upon the provisions contained in Title 23 of the Code of Federal Regulations Part 772 (23 CFR 772), Procedures for Abatement of Highway Traffic Noise and Construction Noise and the Federal Highway Administration (FHWA) report FHWA-HEP-10-025, Highway Traffic Noise: Analysis and Abatement Guidance and subsequent revisions.

The DEIS, SDEIS and FEIS all include the "Statement of Likelihood" that is required by FHWA regulation 23 CFR 772.13(g)(3):

"A statement of likelihood shall be included in the environmental document since feasibility and reasonableness determinations may change due to changes in project design after approval of the environmental document. The statement of likelihood shall include the preliminary location and physical description of noise abatement measures determined feasible and reasonable in the preliminary analysis. The statement of likelihood shall also indicate that final recommendations on the construction of an abatement measure(s) is determined during the completion of the project's final design and the public involvement processes."

Because we are in the NEPA phase of this project, we do not yet have detailed engineering plans, including soil borings and field surveyed topography. This level of detail is obtained during the final design phase of a project. The design, appearance and final alignment of the sound barriers will also be finalized during final design. The project must receive NEPA approval before final design is initiated, per 23 CFR 771.113(a). MDOT SHA is sensitive to the visual impact of a sound barrier when it is located directly adjacent to a residence. Sound barriers are most effective when placed directly adjacent to either the noise source (the highway) or the receiver (the residence). Ideally sound barriers are placed close to the highway, but in some cases, they must be located close to a residence in order to maximize the effectiveness. Sound barriers have a height limitation of 40 feet, and any structure over 24 feet requires a significantly larger foundation (which leads to more ground disturbance and environmental impacts). MDOT SHA will make every effort to keep the sound barriers as close to the highway as possible, but because of the varied topography of the Carderock Springs Community, it may be necessary to locate the walls at the top of the slope in order for them to effectively reduce the highway noise levels.

As shown in SDEIS Noise Analysis Technical Report Addendum figure, Land Uses and Receptors Build Condition, Page 4 of 18, the ramp movements for the I-495 and MD 190 proposed interchange were accounted for in our noise analysis. At this time there is no sound barrier proposed along the flyover ramps at River Road, however this area will continue to be evaluated during final design. The noise levels that were shown in the DEIS, as well as the 66 dBA contour line, were developed assuming the existing sound barrier was not there. This was done in order to get a baseline worst case future noise level for design of the replacement sound barrier. As shown in the above referenced mapping and described in the SDEIS, the receptors along Seven Locks Road north of I-495 are not impacted by noise under future build conditions.

Future No-Build noise levels are included in the FEIS. Existing noise levels are not modeled for each receptor, because they are not required to determine reasonableness in this location. Per the MDOT SHA Noise Guidelines, cost reasonableness is assessed using a square footage per benefited residence (sfpr) metric rather than cost. This is because materials costs fluctuate based upon market and supply chain conditions, and MDOT SHA believes that all communities should be evaluated equally regardless of the materials costs at the time of the noise analysis. The Carderock Springs communities along the inner and outer loop of I-495 both qualify for the highest square footage threshold allowable in the MDOT SHA Noise Guidelines: 2,700 square feet per benefited residence.

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-5    Filed 10/30/23    Page 36 of 69

FINAL ENVIRONMENTAL IMPACT STATEMENT

Lisa B. Choplin, DBIA
October 5, 2020
Page 5

location. This information should be disclosed to allow the community to properly understand the impact of the proposed project and the feasibility and reasonableness of potential noise abatement. The noise study report does not disclose the number of impacted residences for each receptor, within each NSA, or within the overall project. The study also does not identify the Activity Category of the receptors.

- In NSA 2-01, there are generally minor differences (i.e., 1 dB) between the noise impact assessment (Table D-1) and the noise barrier analyses table (Table 4-10) without the existing noise barrier. This is assumed to relate to zero-foot noise barriers rather than no noise barriers being used in the TNM model. True no-barrier sound levels should be used to evaluate the insertion loss to more accurately predict insertion loss and the potential benefit of proposed noise barriers.

- There is an inconsistency in the results for receptor R2-01-05 between the impact assessment results (67 dBA for Alts 8, 9, 10, 13B and 13C) and the noise barrier analysis results (55 dBA). The noise barrier analysis indicates there would be no impact and no noise reduction offered to this receptor by a noise barrier that raises the barrier area per benefitted receptor. The noise study should correct this inconsistency.

- In NSA 1-03, there are several receptors (i.e., M1-03-02, M1-03-03, R1-03-04, R1-03-07, R1-03-08, R1-03-09, and R1-03-10) with substantial differences (i.e., approximately 6 to 10 dBA) between results reported for the noise impact assessment (Table D-1) and the noise barrier analyses (Tables 4-9 and 4-10). It is possible that these differences relate to zero-foot noise barriers being modeled rather than no noise barriers in the barrier analysis runs. It is important to properly assess noise barrier insertion loss since it relates to two factors used to determine the reasonableness of a noise barrier; 1) whether noise levels exceed 75 dBA and 2) whether at least 50% or three (whichever is greater) impacted residences are benefited by the barrier.

- The results for R1-03-02 are not included in the noise impact assessment results (Table D-1) and should be reported.

These issues matter because we believe that the calculation of total barrier area per benefited resident is too low for the proposed noise walls. A higher calculation of benefit would improve likelihood of ultimate implementation and would provide opportunity for refinement of design while meeting noise reduction goals. Certain homes on Hamilton Spring Road and Stone Trail Drive are located above the existing grade of I-495, which exposes the residents in these homes to a high level of noise under existing conditions.

As suggested above, the design, placement, and aesthetics of the noise barriers must be considered as part of the mitigation process. The *Noise Analysis Technical Report* calls for 30' walls on ground

Carderock Springs Citizens' Association
P.O. Box 237, Cabin John, MD 20818-0237

www.carderocksprings.net

---

**#3 Cont**

**#4**

---

MDOT SHA has modeled existing noise levels at locations that do not qualify for the maximum square footage threshold to determine whether there is a 3 dBA increase that would allow for a higher square footage threshold.

To address your comment about the square footage per benefited residence being too low, the DEIS listed the outer loop barrier system as 2,578 sfpr and the inner loop barrier system as 2,211 sfpr; the SDEIS listed the outer loop barrier system as 2,026 sfpr and the inner loop barrier system as 2,380 sfpr. The sfpr value is used only in determining whether the barrier is reasonable to construct and is influenced by the density of residences as much as by the size of the barrier. This value will be further refined during the final design process as the barrier panel heights are optimized. Having a sfpr value below the threshold allows the design-builder the flexibility to increase panel heights if necessary (for example, by locating the barrier closer to the roadway rather than upslope to avoid tree impacts). If the sfpr is very close to the threshold, there is not much flexibility allowed for shifting the alignment to avoid other resources. Also note that the sfpr is not calculated for replacement sound barriers because MDOT SHA has committed to replacing all impacted sound barriers regardless of whether they are cost effective.

R1-03-02 is no longer a valid receptor and is not included in the SDEIS or FEIS. This receptor location was evaluated in the 2005 analysis, prior to the major renovation of Carderock Elementary School in 2010. For the DEIS, MDOT SHA added additional receptor locations but did not remove any from the 2005 analysis. When preparing the SDEIS, MDOT SHA noted the conflicting location of R1-03-02 in regard to the current school building and opted to remove this receptor location from the analysis.

Regarding your comment about Tables D-1, 4-9 and 4-10, aside from R1-03-02, the missing information has been included in the SDEIS. Tables 4-6 and 4-8 in the SDEIS Noise Analysis Technical Report Addendum list equivalent residences for each modeled receptor. Regarding your comment about discrepancies between Tables D-1, 4-8 and 4-10 for NSAs 1-03 and 2-01, these tables have been updated in the SDEIS and FEIS and the data matches.

**Response to DEIS Comment #4**
See Response to Comment #3.

**#4 Cont**

Lisa B. Choplin, DBIA
October 5, 2020
Page 6

and 22' walls on structure. The *Environmental Resources Mapping* document (Appendix D) indicates that the noise wall would be located along a relative high point that largely corresponds with the right-of-way line. The proximity of a large wall to existing homes, when combined with potential tree loss, could have a negative visual impact on properties and should be addressed through design refinements committed to in the Final EIS. Specifically, we recommend that the noise barriers be built in front of the existing tree line, where possible, to save trees and meet the noise reduction goals.

**#5**

Limit of Disturbance and Property Impacts

As shown in the *Environmental Resource Mapping* (Appendix D, Maps 59 and 126), the limits of disturbance (LOD) for the Project appear to be overly optimistic at the current level of design. For areas of I-495 adjacent to properties along Hamilton Spring Road and Stone Trail Drive, the LOD appears to be nearly overlapping with the location of the noise barrier. At the current level of planning, at least 10-15 feet of LOD should be assumed, in order to capture potential slope and grading issues. Our concern about the LOD is analogous to a similar LOD concern expressed by the staff of the Maryland-National Capital Park and Planning Commission (M-NCPPC) in their July 15 memorandum.

The result of this LOD approach is that property impacts and potential tree loss from noise barrier construction may be understated. We request SHA review the appropriate LOD in this corridor and provide further documentation of why the LOD is located where it is. Where property impacts are shown, particularly along Thornley Court, Stone Trail Drive, Hamilton Spring Road and on the Carderock Springs Elementary School property, the Final EIS should include, as mitigation, the direction that SHA take practicable steps to eliminate the need for property acquisition in this section of the Project.

**#6**

Section 106 Analysis

The *Cultural Resources Technical Report* (Appendix G) identifies that the potential adverse effects to Carderock Springs Historic District cannot be fully determined (Table 3-2), while acknowledging that the Project "may result in loss of tree and landscape buffer that could create a diminishment of the design and setting of contributing elements of the district" (Pg. 27). We believe that this loss *would* have an adverse effect on the Historic District. Trees are a character-defining feature of the Historic District. Their substantial removal would alter the visual character of the community, in addition to its bucolic setting. Avoidance measures must be taken to reduce the number of trees affected by the Project and these measures should be documented in detail in the Programmatic Agreement.

However, this analysis fails to identify the adverse effect that noise would have on the Historic District. This effect could be minimized through the proposed noise barriers. However, if not appropriately designed, the noise barriers may be incompatible with the design character of the neighborhood. In conjunction with an effective, "right-sized" barrier, as a neighborhood we would like to see avoidance measures that maintain as many trees as possible since these play such an

Carderock Springs Citizens' Association
P.O. Box 237, Cabin John, MD 20818-0237
www.carderocksprings.net

**Response to DEIS Comment #5**

MDOT SHA employed a conservative approach to defining the LOD for all the DEIS Build Alternatives and Preferred Alternative. The LOD represent the proposed boundary within which all construction, mainline widening, managed lane access, intersection improvements, construction access, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, stream stabilization, and related activities to the proposed roadway and interchange improvements. Property impacts associated with the LOD were broken into permanent (long-term) and temporary (short-term) areas. This conservative approach to defining the LOD fairly captured the full scope of potential impacts. Moreover, the methodology used to assess impacts to a number of key resources appropriately considered a broader geographic area than the LOD immediately surrounding the anticipated construction and related activity boundaries. When the project advances to final design, it is anticipated that the design will closely adhere to the LOD defined in the FEIS, as the LOD was established to include a reasonable area to construct the Preferred Alternative. For complete graphic descriptions of the Preferred Alternative LOD across the entire span of study limits, Refer to the **FEIS, Appendix E- Environmental Resource Mapping**. The Preferred Alternative limits of disturbance results in sliver impacts to properties along I-495 on Thornley Court within the Carderock Springs community. Sliver impacts are proposed for elements such as roadside grading, retaining wall and bridge construction, on-site drainage and stormwater management, and noise barrier replacement/construction. These partial property acquisitions are considered ones that do not cause a residential relocation and have been assumed where a principle building of a residence is located more than 20 feet from the Preferred Alternative limits of disturbance.

Specifically at Stoney Trail Drive and Hamilton Spring Road, the LOD is set to account for the noise barrier and construction of the noise barrier. The LOD is set with a design assumption of 10 feet behind the noise barrier for construction. Refer to FEIS, Appendix E- Environmental Resource Mapping, Map 7. As presented in the DEIS, SDEIS, and FEIS, preliminary determination of horizontal and vertical alignment for the noise barriers was made based on the latest design concept; however, final determination of noise barrier feasibility, reasonableness, dimensions and locations will be made in final design. Engineering changes reflected in final design could alter the conclusions reached in this analysis, leading to recommendations to add or omit noise barrier locations. A Final Design Noise Analysis will be performed for this Study based on detailed engineering information during the final design phase. Refer to FEIS, Chapter 5, Section 5.9 and FEIS, Appendix L for more details.

**Response to DEIS Comment #6**

Project activities within the Carderock Springs Historic District are unchanged since the publication of the DEIS, but design advancement and further analysis of the limits of disturbance have resulted in a finding of no adverse effect for the property, with concurrence from the Maryland Historical Trust. The Preferred Alternative would result in impacts of less than 0.1 acre of the historic district, including permanent and temporary impacts. These actions will not disturb the original topography and natural vegetation within the District itself, and the proposed noise wall will further screen the district from visual and audible effects already present along I-495. No diminishment of location, design, materials, association, and workmanship will occur, and setting and feeling will remain consistent with the existing highway facility. See response to Comment #3 regarding noise analysis and mitigation. Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

**Response to DEIS Comment #7**

See response to Comment #5 regarding no adverse effect to the Carderock Springs Historic District.

MDOT SHA appreciates your comment regarding impacts to Carderock Springs Elementary School and the applicability of Section 4(f) protection to the school's recreational facilities. The Preferred Alternative would have an estimated 0.2 acres of impact to the Carderock Springs Elementary School property. There would be no impact to the recreational or parking facilities present on the school campus. In accordance with the 2012 FHWA Section 4(f) Policy Paper (Policy Paper), school playgrounds and other recreational facilities on school campuses are eligible for Section 4(f) protection. The Policy Paper states:

"When a public school playground is open to the public and serves either organized or substantial walk-on recreational purposes that are determined to be significant [...] it will be subject to the requirements of Section 4(f)". (Part II, #14)

The Policy Paper includes this further clarification:

"The term playground refers to the area of the school property developed and/or used for public park or recreation purposes such as baseball diamonds, soccer fields, tennis courts, track and field facilities, and other features such as jungle gyms or swing sets. This can also include open space or practice fields if those areas serve a park or recreation function. Section 4(f) would apply to the playground areas only and not the entire campus, unless the school and campus are also significant historic sites." (Part II, #14)

Therefore, because the recreational facilities present on the Carderock Springs Elementary School campus would not be impacted by the Preferred Alternative, no Section 4(f) use would occur.

---

Lisa B. Choplin, DBIA
October 5, 2020
Page 7

**#6 Cont**

important role not only as character-defining features of the neighborhood, but also as an effect means of reducing noise and pollution impacts.

We look forward to continuing to participate in the Section 106 consultation process to resolve the Programmatic Agreement and address these issues. However, we have concerns about the current level of information regarding the Programmatic Agreement and the process ahead. The outline of the Programmatic Agreement is at an extremely high level. The opportunity for Consulting Parties to have meaningful input into the process is not explained, and the proposed processes to address to avoid and minimize impacts are similarly not described. Our community needs more clarity on the proposed next steps to address these, and other issues, in the Programmatic Agreement.

**#7**

_Section 4(f) Evaluation: Historic District and Elementary School_

The _Draft Section 4(f) Evaluation_ (Appendix F) indicates that there is "No Use" of the Carderock Springs Historic District. This determination is premature due to the unresolved questions related to the appropriateness of the Limits of Disturbance (LOD) and inconsistent with the findings of the Draft Section 106 analysis. As noted above, more design work is needed to determine whether there are any adverse effects to the Historic District from the construction of the Project. Advancement of this design and resolution of the LOD is needed to confirm that there is no use of the Historic District.

In the absence of such resolution, there are potential Section 4(f) uses, including constructive use, to the Historic District:

- Incorporation of property in the Historic District for the construction of noise barriers and other Project elements.
- Constructive use of the Historic District due to the noise impacts associated with the Project. The National Register nomination form identifies the Historic District as a defining example of "situational modernism." This term denotes a style of modernist design that emphasized modern architecture in the context of a pastoral setting. Disruption to the pastoral setting from the noise impacts of the Project could result in a constructive use of the historic site if not appropriately mitigated through noise barriers.

Carderock Springs Elementary School provides publicly accessible playing fields, and therefore qualifies as a public recreation area for Section 4(f) review under 23 CFR 774.17. No analysis of the impacts of the Project on the Elementary School is provided in the Draft Section 4(f) Evaluation. However, there is potential for use of the Section 4(f) resource.

For the Action Alternatives under consideration, all envision some use of the southwest corner of the public school property, as shown in the maps in the _Environmental Resource Mapping_ (Appendix D). At the scale of the drawings provided and due to the larger issue related to an appropriate LOD, it is difficult to determine whether any impacts to the parking lot would occur. The loss of spaces in the parking lot may diminish access to the public playing fields, which are regularly used for weekend recreational sports.

**Carderock Springs Citizens' Association**
P.O. Box 237, Cabin John, MD 20818-0237

www.carderocksprings.net

Lisa B. Choplin, DBIA
October 5, 2020
Page 8

**#7 Cont**

Additionally, noise disturbances from the Project may create a constructive use of the property. As a public area designed for younger children, users of the fields at Carderock Springs Elementary School are particularly sensitive to noise disturbance.

Further, the Environmental Protection Agency in its report entitled *Best Practices for Reducing Near-Road Pollution Exposure at Schools* has identified the inclusion of roadside barriers and vegetation along the right-of-way as means to reduce the adverse impact of air pollutants generated by traffic, which has been linked to a wide variety of short- and long-term health effects, including asthma, reduced lung function, impaired lung development in children and cardiovascular effects in adults.[2] While the macroscopic air quality analysis indicated corridor-wide air quality benefits, the microscopic impacts on schools like Carderock Springs Elementary School should be considered.

Section 4(f) analysis of Carderock Springs Elementary School should be provided in the Final EIS. A 4(f) use could be avoided through the installation of an appropriately sited noise barrier and preservation of trees and other vegetation protecting the Elementary School.

**Traffic and Construction Impacts**

The *Environmental Resource Mapping* (Appendix D) appears to indicate that the existing Persimmon Tree Road bridge over I-495, the I-495 bridge over Seven Locks Road, and the River Road (MD 190) bridge over I-495 would all need to be replaced. There would also be substantial reconstruction of the MD 190/I-495 interchange (Exit 39). The construction period information presented in the Draft EIS is insufficient to understand what impact these disruptions may have on Persimmon Tree Road, Seven Locks Road, and MD 190. In particular, the construction of the new entrance and exit ramps at elevated levels at the MD 190 interchange would likely impact traffic proceeding along the main line of MD 190, as well as access onto and off of I-495. The Final EIS should provide more information regarding these construction-period roadway impacts. As mitigation for the expected disruption, any impacts to these roadways should be mitigated through appropriate construction communication and coordination activities documented in a Construction Management Plan.

**#8**

The *Traffic Analysis Technical Report* (Appendix C) indicates impacts to local roadways in the vicinity of Carderock Springs (Figure 5-73). According to the information provided, both River Road (MD 190) and Clara Barton Parkway would see a greater than 10% increase in delay due to the implementation of two managed lanes. This increase in delay represents a major adverse impact for Carderock Springs. These two routes represent the main arterials into the District of Columbia from the neighborhood. These impacts are not documented in the Draft EIS. Rather, the Draft EIS only notes the regional positive impacts to local road traffic (Pg. 4-17). The impacts to these local roads must be further discussed in the Final EIS and must be mitigated, either through improvements to these roadways or policies to reduce their levels of traffic congestion.

[2] EPA. 2015. *Best Practices for Reducing Near-Road Pollution Exposures at Schools.* Accessed at: https://www.epa.gov/sites/production/files/2015-10/documents/ochp_2015_near_road_pollution_booklet_v16_508.pdf.

**Carderock Springs Citizens' Association**
P.O. Box 237, Cabin John, MD 20818-0237
www.carderocksprings.org

---

**Response to DEIS Comment #8**

Impacts during construction are a key consideration for the overall project. As the design is finalized, constructability reviews will be completed, and a Transportation Management Plan will be developed to assess operations during construction and lay out a set of strategies that will be implemented to manage work zone impacts.

It is anticipated that construction will last approximately five to six years. Details related to precisely when and where construction related activities will occur will be determined in final design, however, the project will likely require night work to occur when activities could not be completed safely during the day. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. Impacts associated with construction that will be further evaluated for the Selected Alternative in final design include traffic congestion associated with construction maintenance of traffic, utility disruptions, construction vibration, erosion and sediment and control, and construction related noise.

The management of construction impacts is addressed in an agreement between MDOT SHA and the Developer. Pursuant to that agreement, coordination with the neighboring communities will continue through final design and construction. The agreement includes requirements to minimize impacts to surrounding communities and the traveling public, while completing construction as soon as possible. Work hours and duration of construction will be identified to minimize impacts to traffic in an effort to reduce construction related congestion and in consideration of noise and vibration impacts to adjacent communities. Construction methods and materials will comply with contract, state and federal regulation, and environmental permits and mitigation requirements. Careful attention will be taken to assure that material placement will occur when weather conforms to industry standards and regulation. In addition to required governmental inspections, the Developer is required by contract to provide independent environmental, quality, and safety oversight of its contractor's performance. Refer to Final Phase 1 P3 Agreement, https://oplanesmd.com/p3-information/phase-1-agreement/. Once the Developer has selected a Design-Build Contractor(s), the schedule and duration for Phase 1 South construction will be made available to the public.

The results showing delay increases on River Road and Clara Barton Parkway were preliminary and were based on draft designs. Now that the Preferred Alternative has been identified and the design has been updated, these results have been updated. The results indicate that the net impact of the Preferred Alternative will be an overall reduction in delay on the surrounding arterials, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges. The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of this FEIS, and mitigation was proposed where needed to maintain acceptable operations and safety per FHWA Interstate Access Point Approval guidelines. Refer to **FEIS Appendix B**. In addition, based on follow-up meetings between MDOT SHA and Rockville, additional improvements were considered and incorporated where feasible, including modifications to the right-turning movement from the I-270 off-ramp onto eastbound MD 189, and additional turn lanes at Wootton Pkwy at Seven Locks Rd, Gude Dr at Research Blvd, and MD 189 at Great Falls Road. All these enhancements will help manage and/or improve the function of the local roadway network.

#9

Lisa B. Choplin, DBIA
October 5, 2020
Page 9

**Elevated Option**

The *Alternatives Technical Report* (Appendix B) identifies that an elevated option for managed lanes is being considered as a "means and method" for implementing the managed lanes (Pg. 60). While Appendix B indicates that this option is not a standalone alternative, this option would have substantially different construction, noise, and visual impacts on Carderock Springs, were it to be pursued as part of a Preferred Alternative. These impacts are not specifically analyzed in the Draft EIS. However, because of the likely impacts from an elevated structure, Carderock Springs Citizens Association opposes an Elevated Option and recommends that it be eliminated in the Final EIS. If SHA retains this option the analysis of its impacts would qualify as "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or impacts."

(40 CFR 1502.9) which would require a Supplemental DEIS under both the regulations and the standard articulated in *Marsh*.

Thank you for your consideration of our community's comments and concerns. In particular, we look forward to working with SHA on the installation of appropriate noise barriers to improve the livability of our highway-adjacent, historic community. We will continue to remain engaged through the NEPA and Section 106 processes.

Sincerely,

Jack Orrick
CSCA President

CC:   Governor Lawrence J. Hogan
       Comptroller Peter V.R. Franchot
       Treasurer Nancy Kopp
       County Executive Marc Elrich
       Councilmembers Andrew Friedson, Gabe Albornoz, Evan Glass, Will Jawando, and Hans Riemer
       Senator Susan Lee and Delegates Ariana Kelly, Marc Korman, and Sara Love

**Carderock Springs Citizens' Association**
P.O. Box 237, Cabin John, MD 20818-0237
www.carderocksprings.net

**Response to DEIS Comment #9**

The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes.  Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction.  An acceleration lane will also be built along the outer loop for approximately 1000-feet east of Seven Locks Road.  No ramps are proposed in this area.  The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop.  The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier.  Flyover ramps are no longer proposed in this area and thus will not create a visual impact.  A noise barrier in this area is anticipated to be located close to the existing right of way line.  Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

Since the DEIS, the Preferred Alternative eliminates of flyover ramps at MD 190/River Road by adjusting the location of the HOT lane direct access ramps between I-495 and MD 190. All HOT lanes direct access ramps within this interchange are now proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of flyover ramps.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and managed lanes separate to allow space for highway ramps.  The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities.  The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps.  This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

**CARDEROCK SPRINGS CITIZENS ASSOCIATION – JACK ORRICK (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

Name: Jack Orrick

Date/Hearing: 8/25/20

Type/Session: Live/Evening

Transcription:

Yes, I believe you have the name of my law firm, my name is Jack Orrick (O-R-R-I-C-K). I live at 8212 Fenway Road in Carderock Springs and I am testifying on the behalf of the Carderock Springs Citizens Association, a community association representing approximately six-hundred homes located in Carderock Springs and Carderock Rock Springs South. These neighborhoods are located directly adjacent to the Beltway between River Road and Persimmon Tree Road. And Carderock Springs has been designated an historic district. The Carderock Springs Citizens Association is a Section 106 Consulting Party in the NEPA process. We will be providing written comments on the Draft Environmental Impact Statement, and I wanted to summarize some of these points today.

#1 First, we do not believe that there is a need for two additional lanes to be constructed in each direction of the Beltway given the reduced traffic load and more spread out commuting patterns after COVID-19. We support the no-build alternative or if necessary, the one lane alternative 5. If the if there is to be construction, we strongly believe that there is a need for a noise barrier along both sides of the Beltway. While the DEIS indicates that the construction of such a barrier is quote reasonable and feasible close quote. We would like to receive assurances that the noise barriers will in fact be constructed. There is a history of the SHA promising noise barriers along the Beltway near Carderock Springs, which have not been fulfilled. The DEIS fails to indicate that there will be a noise barrier along the to be constructed fly over ramps coming from River Road onto the Beltway. As we understand that these will be elevated the noise impacts on the residents living along Seven Locks Road will be enhanced and therefore a noise barrier needs to be included to protect those residents. The DEIS also does not clearly indicate that the design of the noise barrier, what the design will be.

#2 Given that Carderock Springs is in a historic district, we believe that it is imperative that the barrier be designed to incorporate elements that are compatible with our historic district status. We believe that the boundaries for the limits of disturbance shown on the maps accompanying the DEIS are overly optimistic given that the line for the LOD overlaps the line for the location of the noise barrier walls. We believe that this needs to be closely examined in order to assure there will not be additional property takings from private residence along the Beltway and the tree loss will be mitigated. In that regard, we would strongly advocate for the retention of a replanting of trees along the noise barriers, as these can mitigate the impacts of noise, as well as mitigate air pollution. In that regard, we also note that the section

#3 4(f) analysis does not address the existence of or impacts on Carderock Springs Elementary School, which itself is adjacent to the Beltway and provides playing fields for the public. Finally, we we believe that the DEIS also does not adequately address the potential for traffic delays located along the arterial roads

#4 adjoining our neighborhoods such as, River Road and MacArthur Boulevard due to construction work on the interchange of River Road and Beltway and the bridges over the Beltway along Persimmon Tree Road and Seven Locks Road. Thank you very much.

**Response to DEIS Comment #1**

As part of this project, the existing sound barrier that crosses Seven Locks Road along the outer loop of I-495 will be replaced and extended along the outer loop of I-495 to Persimmon Tree Road. A new barrier is proposed along the inner loop of I-495 from just south of Cabin John Parkway to Persimmon Tree Road. The new barriers will be constructed as close to the roadway as possible to minimize or avoid property impacts. As described in the Supplemental DEIS (SDEIS) and the supporting Noise Analysis Technical Report Addendum the noise analysis is based on the current preferred alternative design and MDOT SHA's Highway Noise Abatement Planning and Engineering Guidelines ("Noise Guidelines"), which detail implementation guidance, critical background information, rationale, and other comprehensive criteria associated with a highway noise study. The noise policy and guidelines are based upon the provisions contained in Title 23 of the Code of Federal Regulations Part 772 (23 CFR 772), Procedures for Abatement of Highway Traffic Noise and Construction Noise and the Federal Highway Administration (FHWA) report FHWA-HEP-10-025, Highway Traffic Noise: Analysis and Abatement Guidance and subsequent revisions.

The DEIS, SDEIS and FEIS all include the "Statement of Likelihood" that is required by FHWA regulation 23 CFR 772.13(g)(3):

"A statement of likelihood shall be included in the environmental document since feasibility and reasonableness determinations may change due to changes in project design after approval of the environmental document. The statement of likelihood shall include the preliminary location and physical description of noise abatement measures determined feasible and reasonable in the preliminary analysis. The statement of likelihood shall also indicate that final recommendations on the construction of an abatement measure(s) is determined during the completion of the project's final design and the public involvement processes."

Because we are in the NEPA phase of this project, we do not yet have detailed engineering plans, including soil borings and field surveyed topography. This level of detail is obtained during the final design phase of a project. The design, appearance and final alignment of the sound barriers will also be finalized during final design. The project must receive NEPA approval before final design is initiated, per 23 CFR 771.113(a). MDOT SHA is sensitive to the visual impact of a sound barrier when it is located directly adjacent to a residence. Sound barriers are most effective when placed directly adjacent to either the noise source (the highway) or the receiver (the residence). Ideally sound barriers are placed close to the highway, but in some cases, they must be located close to a residence in order to maximize the effectiveness. Sound barriers have a height limitation of 40 feet, and any structure over 24 feet requires a significantly larger foundation (which leads to more ground disturbance and environmental impacts). MDOT SHA will make every effort to keep the sound barriers as close to the highway as possible, but because of the varied topography of the Carderock Springs Community, it may be necessary to locate the walls at the top of the slope in order for them to effectively reduce highway noise levels.

As shown in SDEIS Noise Analysis Technical Report Addendum figure, Land Uses and Receptors Build Condition, Page 4 of 18, the ramp movements for the I-495 and MD 190 proposed interchange were accounted for in our noise analysis. At this time there is no sound barrier proposed along the flyover ramps at River Road, however this area will continue to be evaluated during final design. The noise levels that were shown in the DEIS, as well as the 66 dBA contour line, were developed assuming the existing sound barrier was not there. This was done in order to get a baseline worst case future noise level for design of the replacement sound barrier. As shown in the above referenced mapping and described in the SDEIS, the receptors along Seven Locks Road north of I-495 are not impacted by noise under future build conditions.

Future No-Build noise levels are included in the FEIS. Existing noise levels are not modeled for each receptor, because they are not required to determine reasonableness in this location. Per the MDOT SHA Noise Guidelines, cost reasonableness is assessed using a square footage per benefited receptor (sfpr) metric rather than cost. This is because materials costs fluctuate based upon market and supply chain conditions, and MDOT SHA believes that all communities should be evaluated equally regardless of the materials costs at the time of the noise analysis. The Carderock Springs communities along the inner and outer loop of I-495 both qualify for the highest square footage threshold allowable in the MDOT SHA Noise Guidelines: 2,700 square feet per benefited residence. MDOT SHA has modeled existing noise levels at locations that

00022251

*This page is intentionally left blank.*

do not qualify for the maximum square footage threshold to determine whether there is a 3 dBA increase that would allow for a higher square footage threshold.

To address your comment about the square footage per benefited residence being too low, the DEIS listed the outer loop barrier system as 2,578 sfpr and the inner loop barrier system as 2,211 sfpr; the SDEIS listed the outer loop barrier system as 2,026 sfpr and the inner loop barrier system as 2,380 sfpr.  The sfpr value is used only in determining whether the barrier is reasonable to construct and is influenced by the density of residences as much as by the size of the barrier.  This value will be further refined during the final design process as the barrier panel heights are optimized.  Having a sfpr value below the threshold allows the design-builder the flexibility to increase panel heights if necessary (for example, by locating the barrier closer to the roadway rather than upslope to avoid tree impacts).  If the sfpr is very close to the threshold, there is not much flexibility allowed for shifting the alignment to avoid other resources.  Also note that the sfpr is not calculated for replacement sound barriers because MDOT SHA has committed to replacing all impacted sound barriers regardless of whether they are cost effective.

R1-03-02 is no longer a valid receptor and is not included in the SDEIS or FEIS. This receptor location was evaluated in the 2005 analysis, prior to the major renovation of Carderock Elementary School in 2010. For the DEIS, MDOT SHA added additional receptor locations but did not remove any from the 2005 analysis. When preparing the SDEIS, MDOT SHA noted the conflicting location of R1-03-02 in regard to the current school building and opted to remove this receptor location from the analysis.

Regarding your comment about Tables D-1, 4-9 and 4-10, aside from R1-03-02, the missing information has been included in the SDEIS. Tables 4-6 and 4-8 in the SDEIS Noise Analysis Technical Report Addendum list equivalent residences for each modeled receptor.  Regarding your comment about discrepancies between Tables D-1, 4-8 and 4-10 for NSAs 1-03 and 2-01, these tables have been updated in the SDEIS and FEIS and the data matches.

**Response to DEIS Comment #2**
Project activities within the Carderock Springs Historic District are unchanged since the publication of the DEIS, but design advancement and further analysis of the limits of disturbance have resulted in a finding of no adverse effect for the property, with concurrence from the Maryland Historical Trust. The Preferred Alternative would result in impacts of less than 0.1 acre of the historic district, including permanent and temporary impacts. These actions will not disturb the original topography and natural vegetation within the district itself, and the proposed noise wall will further screen the district from visual and audible effects already present along I-495. No diminishment of location, design, materials, association, and workmanship will occur, and setting and feeling will remain consistent with the existing highway facility.  See response to Comment #1 regarding noise analysis and mitigation.

Sliver impacts to properties along I-495 within the Carderock Springs community are proposed for elements such as roadside grading, retaining wall construction, on-site drainage and stormwater management, and noise barrier replacement/construction. These partial property acquisitions are considered ones that do not cause a business or residential relocation and have been assumed where a principle building of a residence, business, or community facility is located more than 20 feet from the Preferred Alternative limits of disturbance.

**Response to DEIS Comment #3**
MDOT SHA appreciates your comment regarding impacts to Carderock Springs Elementary School and the applicability of Section 4(f) protection to the school's recreational facilities. The Preferred Alternative would have an estimated 0.2 acres of impact to the Carderock Springs Elementary School property. There would be no impact to the recreational facilities present on the school campus. In accordance with the 2012 FHWA Section 4(f) Policy Paper (Policy Paper),  school playgrounds and other recreational facilities on school campuses are eligible for Section 4(f) protection. The Policy Paper states:

"When a public school playground is open to the public and serves either organized or substantial walk-on recreational purposes that are determined to be significant [...] it will be subject to the requirements of Section 4(f)". (Part II, #14)

 **OP·LANES™** MARYLAND    I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-5    Filed 10/30/23    Page 43 of 69

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

*This page is intentionally left blank.*

The Policy Paper includes this further clarification:

"The term playground refers to the area of the school property developed and/or used for public park or recreation purposes such as baseball diamonds, soccer fields, tennis courts, track and field facilities, and other features such as jungle gyms or swing sets. This can also include open space or practice fields if those areas serve a park or recreation function. Section 4(f) would apply to the playground areas only and not the entire campus, unless the school and campus are also significant historic sites." (Part II, #14)

Therefore, because the recreational facilities present on the Carderock Springs Elementary School campus would not be impacted by the Preferred Alternative, no Section 4(f) use would occur.

**Response to DEIS Comment #4**

Impacts during construction are a key consideration for the overall project. As the design is finalized, constructability reviews will be completed and a Transportation Management Plan will be developed to assess operations during construction and lay out a set of strategies that will be implemented to manage work zone impacts.

It is anticipated that construction will last approximately five to six years. Details related to precisely when and where construction related activities will occur will be determined in final design, however, the project will likely require night work to occur when activities could not be completed safely during the day. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. Impacts associated with construction that will be further evaluated for the Selected Alternative in final design include traffic congestion associated with construction maintenance of traffic, utility disruptions, construction vibration, erosion and sediment and control, and construction related noise.

The management of construction impacts is addressed in an agreement between MDOT SHA and the Developer. Pursuant to that agreement, coordination with the neighboring communities will continue through final design and construction. The agreement includes requirements to minimize impacts to surrounding communities and the traveling public, while completing construction as soon as possible. Work hours and duration of construction will be identified to minimize impacts to traffic in an effort to reduce construction related congestion and in consideration of noise and vibration impacts to adjacent communities. Construction methods and materials will comply with contract, state and federal regulation, and environmental permits and mitigation requirements. Careful attention will be taken to assure that material placement will occur when weather conforms to industry standards and regulation. In addition to required governmental inspections, the Developer is required by contract to provide independent environmental, quality, and safety oversight of its contractor's performance. Refer to Final Phase 1 P3 Agreement, https://oplanesmd.com/p3-information/phase-1-agreement/. Once the Developer has selected a Design-Build Contractor(s), the schedule and duration for Phase 1 South construction will be made available to the public.

The results showing delay increases on River Road and Clara Barton Parkway were preliminary and were based on draft designs. Now that the Preferred Alternative has been identified and the design has been updated, these results have been updated. The results **indicate** that the net impact of the Preferred Alternative will be an overall reduction in delay on the surrounding arterials, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges. The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of this FEIS, and mitigation was proposed where needed to maintain acceptable operations and safety per FHWA Interstate Access Point Approval guidelines. Refer to **FEIS Appendix B**. In addition, based on follow-up meetings between MDOT SHA and Rockville, additional improvements were considered and incorporated where feasible, including modifications to the right-turning movement from the I-270 off-ramp onto eastbound MD 189, and additional turn lanes at Wootton Pkwy at Seven Locks Rd, Gude Dr at Research Blvd, and MD 189 at Great Falls Road. All these enhancements will help manage and/or improve the function of the local roadway network.

**CARDEROCK SPRINGS CITIZENS ASSOCIATION – JENNIFER SPREITZER**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Jennifer Spreitzer

**Joint Public Hearing Date:** 8/20/2020

**Type/Session:** Live / Afternoon

**Transcription:**

Jennifer Spreitzer (S-P-R-E-I-T-Z-E-R). I live at 8212 Thomlinson Avenue, Bethesda, Maryland. I'm a board member of the Carderock Springs Citizens Association, which will be submitting written comments and providing additional testimony in these hearings. Today, I'm speaking primarily as a resident of Carderock Springs South, which lies directly south of the Beltway. First, let me say, we are strongly in favor of the No Build option until the State has a much clearer idea of what future traffic patterns will be. Should the state

#1  vote to proceed with construction, the three issues of most concern to us in Carderock Springs South are the mitigation of noise, traffic, and construction impacts caused by Beltway expansion. First – noise barriers. My house is approximately 250 yards from I-495. Beltway noise now is loud enough that we rarely open our windows or socialize in our yard and expanding the number of lanes on the Beltway and increasing traffic will make it much louder. The DEIS confirms this, deeming it reasonable and feasible for noise barriers to be built both north and south of I-495 between Persimmon Tree and Seven Locks Roads. I'm here today to ask the SHA to ensure that these noise barriers be constructed and at no cost to local residents. The noise barrier design should be advanced in the Final EIS to provide much more information to our community about the noise barriers to be built. Additionally, the DEIS must also include barrier optimization guidance, directing the P3 contractor to preserve right-sized barriers that maintain as many trees and plantings as possible.

#2  My second area of concern today regards construction impacts for our neighborhood. The DEIS appears to indicate that the bridges over I-495 at Persimmon Tree at Seven Locks Road will need to be replaced. The Final EIS needs to adequately describe the disruptions that residents will experience. These disruptions should be mitigated through appropriate construction, communication, and coordination activities documented in a construction management plan shared with impacted residents.

#3  Third, my final comment regards the long-term traffic impacts for our neighborhood. The DEIS indicates that should Beltway expansion proceed, drivers on both River Road and the Claire Barton Parkway will see a greater than 10 percent increase in traffic delay. This is a major adverse impact for residents of our neighborhood and adjoining communities since these are the two major roads used by residents to access Washington, D.C.. The impacts to these local roads must be further documented and discussed and must be mitigated either through improvements to these roadways or policies to reduce their levels of traffic congestion. In summary, the No Build option is preferable until future traffic patterns have been adequately assessed. Should construction proceed, the Final EIS needs to include appropriate noise barriers to be built at no cost to residents, minimization of construction impacts, and mitigation for traffic delays on River Road and the Clara Barton Parkway. Thank you.

**Response to DEIS Comment #1**

As part of this project, the existing sound barrier that crosses Seven Locks Road along the outer loop of I-495 will be replaced and extended along the outer loop of I-495 to Persimmon Tree Road. A new barrier is proposed along the inner loop of I-495 from just south of Cabin John Parkway to Persimmon Tree Road. The new barriers will be constructed as close to the roadway as possible to minimize or avoid property impacts. As described in the Supplemental DEIS (SDEIS) and the supporting Noise Analysis Technical Report Addendum the noise analysis is based on the current preferred alternative design and MDOT SHA's Highway Noise Abatement Planning and Engineering Guidelines ("Noise Guidelines"), which detail implementation guidance, critical background information, rationale, and other comprehensive criteria associated with a highway noise study. The noise policy and guidelines are based upon the provisions contained in Title 23 of the Code of Federal Regulations Part 772 (23 CFR 772), Procedures for Abatement of Highway Traffic Noise and Construction Noise and the Federal Highway Administration (FHWA) report FHWA-HEP-10-025, Highway Traffic Noise: Analysis and Abatement Guidance and subsequent revisions.

The DEIS, SDEIS and FEIS all include the "Statement of Likelihood" that is required by FHWA regulation 23 CFR 772.13(g)(3):

"A statement of likelihood shall be included in the environmental document since feasibility and reasonableness determinations may change due to changes in project design after approval of the environmental document. The statement of likelihood shall include the preliminary location and physical description of noise abatement measures determined feasible and reasonable in the preliminary analysis. The statement of likelihood shall also indicate that final recommendations on the construction of an abatement measure(s) is determined during the completion of the project's final design and the public involvement processes."

Because we are in the NEPA phase of this project, we do not yet have detailed engineering plans, including soil borings and field surveyed topography. This level of detail is obtained during the final design phase of a project. The design, appearance and final alignment of the sound barriers will also be finalized during final design. The project must receive NEPA approval before final design is initiated, per 23 CFR 771.113(a). MDOT SHA is sensitive to the visual impact of a sound barrier when it is located directly adjacent to a residence. Sound barriers are most effective when placed directly adjacent to either the noise source (the highway) or the receiver (the residence). Ideally sound barriers are placed close to the highway, but in some cases, they must be located close to a residence in order to maximize the effectiveness. Sound barriers have a height limitation of 40 feet, and any structure over 24 feet requires a significantly larger foundation (which leads to more ground disturbance and environmental impacts). MDOT SHA will make every effort to keep the sound barriers as close to the highway as possible, but because of the varied topography of the Carderock Springs Community, it may be necessary to locate the walls at the top of the slope in order for them to effectively reduce the highway noise levels.

**Response to DEIS Comment #2**

The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes. Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction. An acceleration lane will also be built along the outer loop for approximately 1000-feet east of Seven Locks Road. No ramps are proposed in this area. The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop. The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier. Flyover ramps are no longer proposed in this area and thus will not create a visual impact. A noise barrier in this area is anticipated to be located close to the existing right of way line. Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

*This page is intentionally left blank.*

Since the DEIS, the Preferred Alternative eliminates of flyover ramps at MD 190/River Road by adjusting the location of the HOT lane direct access ramps between I-495 and MD 190. All HOT lanes direct access ramps within this interchange are now proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of flyover ramps.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and managed lanes separate to allow space for highway ramps. The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities. The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps. This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

Impacts during construction are a key consideration for the overall project. As the design is finalized, constructability reviews will be completed and a Transportation Management Plan will be developed to assess operations during construction and lay out a set of strategies that will be implemented to manage work zone impacts.

It is anticipated that construction will last approximately five to six years. Details related to precisely when and where construction related activities will occur will be determined in final design, however, the project will likely require night work to occur when activities could not be completed safely during the day. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. Impacts associated with construction that will be further evaluated for the Selected Alternative in final design include traffic congestion associated with construction maintenance of traffic, utility disruptions, construction vibration, erosion and sediment and control, and construction related noise.

The management of construction impacts is addressed in an agreement between MDOT SHA and the Developer. Pursuant to that agreement, coordination with the neighboring communities will continue through final design and construction. The agreement includes requirements to minimize impacts to surrounding communities and the traveling public, while completing construction as soon as possible. Work hours and duration of construction will be identified to minimize impacts to traffic in an effort to reduce construction related congestion and in consideration of noise and vibration impacts to adjacent communities. Construction methods and materials will comply with contract, state and federal regulation, and environmental permits and mitigation requirements. Careful attention will be taken to assure that material placement will occur when weather conforms to industry standards and regulation. In addition to required governmental inspections, the Developer is required by contract to provide independent environmental, quality, and safety oversight of its contractor's performance. Refer to Final Phase 1 P3 Agreement, https://oplanesmd.com/p3-information/phase-1-agreement/. Once the Developer has selected a Design-Build Contractor(s), the schedule and duration for Phase 1 South construction will be made available to the public.

**Response to DEIS Comment #3**
The results showing delay increases on River Road and Clara Barton Parkway were preliminary and were based on draft designs. Now that the Preferred Alternative has been identified and the design has been updated, these results have been updated. The results indicate that the net impact of the Preferred Alternative will be an overall reduction in delay on the surrounding arterials, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges. The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of this FEIS, and mitigation was proposed where needed to maintain acceptable operations and safety per FHWA Interstate Access Point Approval guidelines. Refer to FEIS Appendix B. In addition, based on follow-up meetings between MDOT SHA and Rockville, additional improvements were considered and incorporated where feasible, including modifications to the right-turning movement from the I-270 off-ramp onto eastbound MD 189, and additional turn lanes at Wootton Pkwy at Seven Locks Rd, Gude Dr at Research Blvd, and MD 189 at Great Falls Road. All these enhancements will help manage and/or improve the function of the local roadway network.

**CARDEROCK SPRINGS ELEMENTARY SCHOOL EDUCATIONAL FOUNDATION – PAMELA LIPTAK**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Pamela Liptak

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Live Testimony/Morning

**Transcription:**

Morning. Hope everyone's staying healthy. My name is Pamela Liptak. That's P-A-M-E-L-A L-I-P, P like Peter, T like Tom, A-K and I live at 8121 Lily Stone Drive, Bethesda, Maryland, 20817. This is a statement in support of Beltway noise and pollution mitigation from the Carderock Springs Elementary School Educational Foundation.

**#1**

The Carderock Springs Elementary School Education Foundation is committed to fostering a healthy, positive and effective teaching and learning environment for every student at Carderock Springs Elementary School. At CSES, we are situated in close proximity to Interstate 495, the Beltway. Traffic noise emanating from the Beltway can be heard throughout the school grounds at significant volume. Scientific studies have demonstrated that prolonged exposure to traffic noise has numerous harmful impacts on children, including impaired cognitive, attentional span, reading comprehension, speech intelligibility, memory learning, and problem solving, as well as increased frustration. The current proposal will cause detrimental harm to the children of CSES if the additional noise and air pollution that the proposed expansion will cause are not addressed.

**#2**

In addition, the playing field of Carderock Springs Elementary School are publicly accessible to the larger community and used by both the larger area and the local community. No analysis of the project's impact to CSES has been provided in Draft Section 4(f), even though the school and its grounds will be directly impacted. The foundation believes that as public educational institution is being directly affected, the current proposals neglect to take into consideration the disparate impact the expansion will have on this community's school. Must be pleased addressed. We thank you for your time and consideration and hope you'll have a lovely day. Take care.

**Response to DEIS Comment #1**

As part of this project, the existing sound barrier that crosses Seven Locks Road along the outer loop of I-495 will be replaced and extended along the outer loop of I-495 to Persimmon Tree Road. A new barrier is proposed along the inner loop of I-495 from just south of Cabin John Parkway to Persimmon Tree Road. The new barriers will be constructed as close to the roadway as possible to minimize or avoid property impacts. As described in the Supplemental DEIS (SDEIS) and the supporting Noise Analysis Technical Report Addendum the noise analysis is based on the current preferred alternative design and MDOT SHA's Highway Noise Abatement Planning and Engineering Guidelines ("Noise Guidelines"), which detail implementation guidance, critical background information, rationale, and other comprehensive criteria associated with a highway noise study. The noise policy and guidelines are based upon the provisions contained in Title 23 of the Code of Federal Regulations Part 772 (23 CFR 772), Procedures for Abatement of Highway Traffic Noise and Construction Noise and the Federal Highway Administration (FHWA) report FHWA-HEP-10-025, Highway Traffic Noise: Analysis and Abatement Guidance and subsequent revisions.

The DEIS, SDEIS and FEIS all include the "Statement of Likelihood" that is required by FHWA regulation 23 CFR 772.13(g)(3):

"A statement of likelihood shall be included in the environmental document since feasibility and reasonableness determinations may change due to changes in project design after approval of the environmental document. The statement of likelihood shall include the preliminary location and physical description of noise abatement measures determined feasible and reasonable in the preliminary analysis. The statement of likelihood shall also indicate that final recommendations on the construction of an abatement measure(s) is determined during the completion of the project's final design and the public involvement processes."

Because we are in the NEPA phase of this project, we do not yet have detailed engineering plans, including soil borings and field surveyed topography. This level of detail is obtained during the final design phase of a project. The design, appearance and final alignment of the sound barriers will also be finalized during final design. The project must receive NEPA approval before final design is initiated, per 23 CFR 771.113(a). MDOT SHA is sensitive to the visual impact of a sound barrier when it is located directly adjacent to a residence. Sound barriers are most effective when placed directly adjacent to either the noise source (the highway) or the receiver (the residence). Ideally sound barriers are placed close to the highway, but in some cases, they must be located close to a residence in order to maximize the effectiveness. Sound barriers have a height limitation of 40 feet, and any structure over 24 feet requires a significantly larger foundation (which leads to more ground disturbance and environmental impacts). MDOT SHA will make every effort to keep the sound barriers as close to the highway as possible, but because of the varied topography of the Carderock Springs Community, it may be necessary to locate the walls at the top of the slope in order for them to effectively reduce the highway noise levels.

**Response to DEIS Comment #2**

MDOT SHA appreciates your comment regarding impacts to Carderock Springs Elementary School and the applicability of Section 4(f) protection to the school's recreational facilities. The Preferred Alternative would have an estimated 0.2 acres of impact to the Carderock Springs Elementary School property. There would be no impact to the recreational facilities present on the school campus. In accordance with the 2012 FHWA Section 4(f) Policy Paper (Policy Paper), school playgrounds and other recreational facilities on school campuses are eligible for Section 4(f) protection. The Policy Paper states:

"When a public school playground is open to the public and serves either organized or substantial walk-on recreational purposes that are determined to be significant [...] it will be subject to the requirements of Section 4(f)". (Part II, #14)

The Policy Paper includes this further clarification:

"The term playground refers to the area of the school property developed and/or used for public park or recreation purposes such as baseball diamonds, soccer fields, tennis courts, track and field facilities, and other features such as jungle gyms or swing sets. This can also include open space or practice fields if those areas serve a park or recreation function.

00022256

I-495 & I-270 Managed Lanes Study

*This page is intentionally left blank.*

Section 4(f) would apply to the playground areas only and not the entire campus, unless the school and campus are also significant historic sites." (Part II, #14)

Therefore, because the recreational facilities present on the Carderock Springs Elementary School campus would not be impacted by the Preferred Alternative, no Section 4(f) use would occur.

Sliver impacts to properties along I-495 within the Carderock Springs community are proposed for elements such as roadside grading, retaining wall construction, on-site drainage and stormwater management, and noise barrier replacement/construction. These partial property acquisitions are considered ones that do not cause a business or residential relocation and have been assumed where a principle building of a residence, business, or community facility is located more than 20 feet from the Preferred Alternative limits of disturbance.

**CHESAPEAKE BAY FOUNDATION – LEE EPSTEIN**

#1

| | |
|---|---|
| From: | Lee Epstein <LEpstein@cbf.org> |
| Sent: | Monday, July 27, 2020 1:51 PM |
| To: | MLS-NEPA-P3 |
| Subject: | I-495 and I-270 P3 EIS |

Sir/Madam:

In light of the COVID-10 pandemic, will the state be making available on-line various EIS documents? People over 60 or those with certain health conditions or compromised immune systems would otherwise need to put their health at risk in order to view such documents live, in libraries or other locations.
Lee Epstein

Lee R. Epstein
Lands Program Director and Special Counsel
Chesapeake Bay Foundation
6 Herndon Avenue
Annapolis, MD 21403
410-268-8816
lepstein@cbf.org



CHESAPEAKE BAY
FOUNDATION
Saving a National Treasure

1

**Response to DEIS Comment #1**

Recognizing the importance of providing access to the DEIS and supporting documents in a time with COVID-19 restrictions, MDOT SHA provided the opportunity for persons without electronic access to view the DEIS in hard copy at multiple locations across the study area. The agency employed innovative approaches to identify locations that were convenient to affected communities, despite widespread closures of many public facilities as a result of the pandemic. The DEIS was available for viewing at 21 public locations. Temporary facilities to house the DEIS for public review were provided and staffed at eight public library parking lot locations along the study corridors, as well as one location in Washington, DC. Lobbies at six centrally located post offices in Montgomery and Prince George's Counties were also used for DEIS viewing locations. Locations were available during the week and weekend days, with day and evening hours to provide adequate options for the public to view the documents. Lastly, six select MDOT SHA, Maryland Transportation Authority (MDTA), and Virginia Department of Transportation (VDOT) offices within or near the study area were also open to the public for viewing the DEIS and Technical Reports. Each DEIS viewing location was compliant with the Americans with Disabilities Act (ADA), provided hard copy documents and computers for electronic viewing, and were equipped with required Personal Protective Equipment (PPE), including masks, hand sanitizers, and antibacterial cleaning solution. A strict safety protocol, in compliance with the State-mandated COVID-19 guidelines, was followed to ensure the safety of the public and study staff. DEIS comments were accepted through the following ways:

- Oral testimony at one of the public hearings in the main hearing room
- Oral testimony to a verbatim recorder at a private room at the public hearing
- Written comments on a comment form at the public hearing
- Letters to the P3 Program Office
- Online comment forms
- Emails to the P3 Program Office
- Voicemail

The DEIS was also made available on the I-495 & I-270 P3 Program webpage (https://495-270-p3.com/deis/) and on the US Environmental Protection Agency (EPA) EIS Database webpage. The DEIS comment period was 123-days, from July 10, 2020 to November 9, 2020. With the extended formal comment period and a continuous series of wide-ranging informal efforts to ensure a variety of safe opportunities to participate in the NEPA process, sufficient time was allowed for public consideration of and comment on the DEIS and SDEIS.

Refer to Chapter 9, Section 3.7 for a response to comments related to public involvement and engagement.

## CHESAPEAKE CLIMATE ACTION NETWORK – MYLES COOPER (EMAIL)

| From: | Myles Cooper (myles@chesapeakeclimate.org) Sent You a Personal Message <automail@knowwho.com> |
|---|---|
| Sent: | Monday, August 31, 2020 12:56 PM |
| To: | MLS-NEPA-P3 |
| Subject: | I have concerns about the Draft EIS on the I-495 and I-270 plan |

Dear Lisa Choplin,

DEIS on I-495 and I-270 Expansion

Good afternoon.

My name is Myles Cooper, Policy Associate for the Chesapeake Climate Action Network.

**#1** Thank you for allowing me to have the opportunity to comment on the Draft Environmental Impact Statement (DEIS) on the I-495 and I-270 expansion lanes. CCAN, along with the Sierra Club, are concerned that this proposed project threatens the region's capability to successfully reduce Maryland's greenhouse gas emission by 40% before the year 2030. We fear that the proposed expansion will also result in greater PM2.5, CO, ozone, NO2, and greenhouse gas emissions when compared to the no-build alternative or the ignored public transit-based alternatives.

Additionally, The DEIS fails to analyze harmful air emissions from construction activities, including increased particulate matter, CO, and greenhouse gas emissions. The Agencies' partial attempt to justify this does not meet the Agencies' obligations under NEPA.

**#2** The Draft Environmental Impact Statement (DEIS) on the I-495 and I-270 plan failed to study the full range of impacts that the highway plan could have on our environment, health, and communities. Even this incomplete review shows that plans to widen I-495 and I-270 for private toll lanes would harm Maryland residents in many ways and require enormous state subsidies. Therefore, a ?no-build? option must be selected so that the project does not proceed.

The DEIS does not properly analyze many impacts from the project such as:

**#3** -How the proposed expansion and expected high toll prices would disproportionately impact low-income or environmental justice communities.

**#4** -How increased stormwater runoff from the proposed expansion would damage local waterways and increase flood risk

**#5** in adjacent communities.

-How harmful pollution such as particulate matter from construction activities and additional pollution from increased traffic would damage our climate and people?s health.

**#6** The DEIS also did not consider how increased telecommuting as a result of COVID-19 will impact the traffic growth patterns on the Capital Beltway and I-270, nor did it provide feasible and prudent alternatives to avoid impacts to parkland and historical and cultural resources. Instead, the DEIS only considered alternatives which involved adding managed highway lanes, when it should have considered public transit options and transportation demand management strategies like ridesharing.

1

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.4.G for a response to adverse impacts to air quality and greenhouse gases.

**Response to DEIS Comment #2**
The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS summarized the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail and the DEIS and SDEIS summarized the environmental effects of the Preferred Alternative. These analyses directly contributed to MDOT SHA's evaluation of the alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.4.E for a response to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.4.G for a response to adverse impacts to air quality and greenhouse gases.

**Response to DEIS Comment #6**
Refer to Chapter 9, Section 3.1 for a response for Purpose and Need, effects of the Pandemic, and impacts of teleworking/ remote working.

00022259

**Response to DEIS Comment #7**
Refer to Chapter 9, Section 3.7 for a response to comments related to public involvement and engagement.

#7

The comment period is not long enough for residents, political leaders, and impacted communities to fully review the over 18,000 page document, especially with limited in-person hours in library trailers during the COVID-19 pandemic and should be extended to 120 days.

Sincerely,

Myles Cooper
1739 Dearbought Dr.
Frederick , MD 21701
myles@chesapeakeclimate.org
(301) 502-0383

This message was sent by KnowWho, as a service provider, on behalf of an individual associated with Sierra Club. If you need more information, please contact Lillian Miller at Sierra Club at core.help@sierraclub.org or (415) 977-5500.

2

**CHESAPEAKE CLIMATE ACTION NETWORK – MYLES COOPER (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Myles Cooper

**Date/Hearing:** 8/25/20

**Type/Session:** Live/Evening

**Transcription:**

#1

(M-Y-L-E-S C-O-O-P-E-R) My address is 1739 Deer [INAUDIBLE] Drive and I'm a resident of Frederick County, Maryland. I'm a policy associate at the Chesapeake Climate Action Network and I will be speaking on behalf of C-CAN. C-CAN is a nonprofit organization that is working on the national, local and state level directly addressing global warming. We at C-CAN do not support the proposed project and back a no build option until MDOT FHA provides the public a comprehensive evaluation of all our alternatives, which must include public transit, transportation, demand management, telecommuting and multi-modal transit transportation systems. This project must not move forward.

#2

One of our biggest issues with the proposed project is that the DEIS fails to fully analyze the increased harmful air emissions the proposed expansion would cause. Instead, the DEIS seeks to minimize these harms by relying on unrelated increases and deal with this issue. Just as problematic the DEIS estimates these fuel efficiency increases based on fuel efficiency standards that another agency within the Department of Transportation revoked four months ago. The proposed expansion will result in greater carbon monoxide, ozone and nitrous, nitrogen dioxide and gas emissions when compared to the no build alternative or the more and the or the ignored public transit based alternatives. The proposed expansion will further exacerbate climate change and hurt Maryland's ability to reduce its greenhouse gas emissions by 40 percent by 2030. Under Maryland's Gas Greenhouse Gas Reduction Act, DEIS fails to analyze her before air and support air emissions from construction activities, including increased particulate matter. See carbon monoxide and greenhouse gas emissions. The agency's partial attempt to justify this failure by claiming that construction will be segmented and each construction segment will take far less than five years, does not meet the agency's obligations under NEPA. The agency's claim that the greenhouse gas impacts from construction will be analyzed in the Final EIS is insufficient. It prevents meaningful public comment and informed decision making. I yield my comment. [FACILITATOR SPEAKS]. Sorry. Yes, sure. My name is Myles Cooper (M-Y-L-E-S C-O-O-P-E-R) .

**Response to DEIS Comment #1**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multimodal transportation initiatives and projects included in the "Visualize2045" plan adopted by the Metropolitan Washington Council of Governments (2018). See DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No-Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. See DEIS, Chapter 3 and DEIS Appendix C.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarized the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail and the SDEIS summarized the environmental effects of the Preferred Alternative. These analyses directly contributed to MDOT SHA's evaluation of the alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided.

Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study

**Response to DEIS Comment #2**

Refer to Chapter 9, Section 3.4.G for a response to adverse impacts to air quality and greenhouse gases.

**CHEVY CHASE RECREATION ASSOCIATION – BILL SANDMEYER (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

Name: Bill Sandmeyer

Joint Public Hearing Date: 9/3/2020

Type/Session: Live Testimony/Evening

Transcription:

Yes. Bill Sandmeyer, 3908 Carsons Road, Chevy Chase, Maryland 20815. I'm on the board of directors. Oh, thank you. Apologies. Sandmeyer S-A-N-D-M-E-Y-E-R.

**#1**

How's that? Thank you. I'm on a board of directors, which represents the Chevy Chase Recreation Association, CCRA, in Chevy Chase, Maryland. CCRA is a property and a community just south of the Beltway and Connecticut Avenue junction. On the property there's a certified historic section on which sits Fairchild House, which houses the outdoor nursery school owned and cared for by CCRA. There is also a CCRA recreational facility. There are about 600 permanent and 300 temporary membership families who belong to CCRA. And there are many more families associated with the outdoor nursery school. All told, thousands of people are associated with CCRA in some way. We believe the following points are not only in the best interests of our community, but also of many other communities affected by this proposed project. Our position in descending hierarchical order are: one, the no build scenario for several reasons. One is negative natural environmental impact by construction, infrastructure, pollution, climate [INAUDIBLE] and more. Another is traffic impact, either not impact or worsened impact. Some

**#2**

perspectives claim the teleworking smart development may reduce traffic demand in the future. Another perspective includes many examples in history of how adding bridges, highways and traffic lanes induces demand for more traffic. Read the Wikipedia discussion titled induced demand with international examples from the last century. We have other concerns that

**#3**

economic costs and risk and uncertainty about P3 success. In short, we prefer the no build scenario.

Two, in the unfortunate instance that the project progresses, CCRA prefers Alternative 9M. That limits lane expansion to only one lane around the middle north section of the Beltway. In addition to natural environment and [INAUDIBLE], another concern is noise. Alternative 9M might induce

**#4**

less noise near CCRA and the adjoining neighborhood of about 60 homes.

Three, for Alternative 9M to be actualized, CCRA requests an extension to the noise wall already present near the historic part of the CCRA property. We appreciate the details that were put into the DEIS to assess noise at eight points on the CCRA property as done with many other properties that reveal noise close to, but not over the 66 decibel threshold required for consideration of noise mitigation. Still the noise on the [INAUDIBLE] part of the property remains significant, as if getting a second opinion will measure decibel levels ourselves and follow up with you. Four, if Alternative 9M is actualized with or without noise wall mitigation we request at the very least using planting of noise, screening trees to help mitigate noise. Again, our first position is the No-build scenario. Thank you.

---

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to the Chevy Chase Recreation Association property and community. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Chevy Chase Recreation Association property and community are located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

**Response to DEIS Comment #2**

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to DEIS Comment #3**

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and teleworking.

MDOT understands the phenomenon of induced demand, and it is a consideration on all of our large roadway projects. In this case, MDOT is recommending adding capacity via managed lanes (HOT lanes) instead of widening with additional general purpose lanes. Managed lanes do a better job at regulating demand, including induced demand, due to dynamic pricing.

Our study shows that there could be some induced demand as a result of this project, but the impact will be small (less than 1% increase in vehicle miles traveled (VMT) in the region) and those effects are fully accounted for in the regional traffic models COG and TPB use. Even with these effects, the proposed managed lanes would reduce regional congestion delays and significantly improve travel times along both freeway corridors and on local roads throughout the region.

**Response to DEIS Comment #4**

As noted in response to Comment #1, the Preferred Alternative was Alternative 9 in the DEIS and includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. Alternative 9M was not carried forward.

See response to Comment #1, because the Chevy Chase Recreation Association property and community are located outside the Preferred Alternative limits of build improvements, a noise barrier will not be considered as part of the current study.

00022262

**CHEVY CHASE RECREATION ASSOCIATION – BILL SANDMEYER (WEBSITE)**

Thank you for your comment, responses are provided on the following pages.

Chevy Chase Recreation Association

The Chevy Chase Recreation Association presented oral testimony regarding the I-495 & I-270 Managed Lanes Study DEIS/ Draft on September 3, 2020. Attached (below) is written documentation of that testimony.

00022263

**OP·LANES** MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-5    Filed 10/30/23    Page 54 of 69

FINAL ENVIRONMENTAL IMPACT STATEMENT

**Testimony for Maryland State Highway Administration**
**Regarding I495/I270 Managed Lanes Study**
**Virtual Hearing**

**Bill Sandmeyer, CCRA Board of Directors**
**September 3, 2020, 5-8pm**
**(3 Minutes)**

#1

I'm on a Board of Directors which represents the Chevy Chase Recreation Association (CCRA) in Chevy Chase, MD. CCRA is a property and a community just south of the Beltway and Connecticut Avenue junction. On the property, there's a certified historic section on which sits historic Fairchild House, which houses the Outdoor Nursery School, owned and cared for by CCRA. The other section is the CCRA recreational facility. There are about 600 permanent and 300 temporary membership families who belong to CCRA. And there are many more families associated with the Outdoor Nursery School. All told, thousands of people are associated with CCRA in some way.

We believe the following points are not only in the best interest of our community but also of many other communities affected by this proposed project. Our positions, in descending hierarchical order, are:

1. The **No-Build scenario**, for several reasons. One is **negative natural environmental impact**, by construction, infrastructure, pollution, climate affect, and more. Another is **traffic impact**, either non-impact or worsened impact. Some perspectives claim that telework and smart development may reduce traffic demands in the future. Another perspective includes many examples in history of widening bridges, highways, and traffic lanes **induces demand** for more traffic (Read the Wikipedia discussion entitled "Induced Demand" with national and international examples across the last century). We have other concerns about economic cost and risk, and uncertainty about P3 success. In short, we prefer the No-Build scenario.

#2

2. In the unfortunate instance that the project progresses, CCRA prefers **Alternative 9 M.** It limits lane expansion to only one lane around the middle-north section of the Beltway. In addition to natural environment, traffic, and economy, another concern is **noise**. Alternative 9 M might induce less noise near CCRA and the adjoining neighborhood of about 60 homes.

#3

3. Were Alternative 9 M to be actualized, CCRA requests an **extension to the noise wall** already present near the historic part of the CCRA property. We appreciate the detailed effort put into the DEIS to assess noise at eight points on the CCRA property. It revealed noise close to but not over the 66 decibel threshold required for consideration of noise mitigation. Still, the noise on the unshielded part of the property remains significant. As with getting a second opinion, we'll measure decibel levels ourselves and follow up with you.

#4

4. If Alternative 9 M is actualized, with or without noise wall mitigation, we request at the very least, **planting of noise screening trees** along the Beltway boarder.

Again, our first position, is the **No-Build Scenario**.

Thank you.

---

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to the Chevy Chase Recreation Association property and community. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Chevy Chase Recreation Association property and community are located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C.

MDOT understands the phenomenon of induced demand, and it is a consideration on all of our large roadway projects. In this case, MDOT is recommending adding capacity via managed lanes (HOT lanes) instead of widening with additional general purpose lanes. Managed lanes do a better job at regulating demand, including induced demand, due to dynamic pricing.

Our study shows that there could be some induced demand as a result of this project, but the impact will be small (less than 1% increase in vehicle miles traveled (VMT) in the region) and those effects are fully accounted for in the regional traffic models COG and TPB use. Even with these effects, the proposed managed lanes would reduce regional congestion delays and significantly improve travel times along both freeway corridors and on local roads throughout the region.

**Response to DEIS Comment #2**

See response to Comment #1 related to the Preferred Alternative that includes no action on the topside of I-495 to MD 5 and avoids impact to CCRA property or community.

**Response to DEIS Comment #3**

As the Preferred Alternative includes no action east of the I-270 east spur, noise mitigation is not warranted outside the limits of build improvements, including CCRA property and community.

**Response to DEIS Comment #4**

See response to Comment #1.

OP·LANES™
MARYLAND | I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

**CITIZENS AGAINST BELTWAY EXPANSION (CABE) – BRAD GERMAN (EMAIL)**

Thank you for your comment, responses are provided on the following pages.

| | |
|---|---|
| **From:** | Citizens Against Beltway Expansion <495cabe@gmail.com> |
| **Sent:** | Monday, November 9, 2020 6:58 PM |
| **To:** | MLS-NEPA-P3 |
| **Cc:** | aklase@marylandtaxes.gov; treasurer@treasurer.state.md.us; Barbara Coufal; Tom Hucker; Susan Lee; Marc Korman |
| **Subject:** | Citizens Against Beltway Expansion Comment on I-495/I-270 Managed Lane Draft Environmental Impact Statement |
| **Attachments:** | CABE -- Nov 9 DEIS Comment Letter.pdf |

Attached are CABE's formal comments on the July 20 Draft Environmental Impact Statement. Please don't hesitate to reach out if you have questions about our positions.

Best regards,

Brad German
Co-Chair
Citizens Against Beltway Expansion
301-651-2087

1

**Citizens Against Beltway Expansion
Comments on I-495/I-270 Managed Lane Study
Draft Environmental Impact Statement
November 9, 2020**

#1   Citizens Against Beltway Expansion supports the no-build option in the I-495/I-270 Managed Lane July 2020 Draft Environmental Impact Statement for the following reasons:

#2   The DEIS is flawed and fails to inform the public about the full environmental and fiscal impacts of the build proposals on taxpayers, communities, and federal and local parks. In addition, the information and analysis of traffic volumes provided in the DEIS are incomplete and fail to justify the construction of four privatized tollways as a viable way to achieve the goals in the Purpose and Need Statement.

These problems are covered in detail in comments submitted by the Maryland-National Capital Park and Planning Commission (M-NCPPC), National Capital Park and Planning Commission (NCPC), Smart Mobility, Inc., Maryland Sierra Club and Maryland Transportation Opportunities Coalition. (We incorporate their comments herein by reference).

#3   In addition, the 2020 DEIS fails to document how any of the proposed build options overcome the obstacles that led MDOT to reject a similar expansion proposal in 2005[1].

The 2005 analysis indicated that expanding I-495 by two lanes on either side was infeasible due to the cost and difficulty of avoiding, minimizing or mitigating environmental damage to a route that

---

**Response to DEIS Comment #1**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to DEIS Comment #2**

The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarize the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail. This analysis directly contributed to MDOT SHA's evaluation of these alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided.

**Response to DEIS Comment #3**

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

#3
Cont

cuts through densely populated communities marbled with national parks, stream valleys, and many other environmentally and culturally sensitive resources.

There is no evidence in the DEIS that any of the impacts and concerns raised in the 2005 analysis have vanished or any of the costs have gone down.

#4

Another problem with the DEIS is the conflict between the proposed build options and the Purpose and Need screening criteria. For example, the build options fail to reliably achieve the Purpose and Need of reducing traffic congestion and facilitating the movement of goods and services. Tables 5.5 and 5.6 in Appendix C show rush hour delays on I-270 worsening compared to the no-build option.

#5

The DEIS financial impact analysis fails to show how the build options would generate net positive cashflow for the State, another Purpose and Need requirement. Federal and independent studies of public-private partnership (P3) highway financing – as well as the 2020 financial failure of the Purple Line P3 – illustrate the significant long-term taxpayer risks of the P3 options described in the DEIS.

These risks are underscored by the fact the I-495 Express Lanes in Northern Virginia have generated annual losses (now totaling $429.5 million) since they opened in 2013.[2] The 2020 DEIS does not provide any reliable data showing why identical tollways on I-495 will perform differently in Maryland.

The DEIS neglects to explain why the public should not be concerned that the P3 business model depends on sustaining high levels of congestion to create market demand for the tollways. Rather than relieve congestion as required by the

See response to Comment #3 above.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

00022267

**#5 Cont**

Purpose and Need selection criteria, P3 tollways do the opposite – they keep congestion levels high to monetize them.[3]

**#6**

The Metropolitan Washington Council of Governments has determined, on the basis of data in the DEIS, that rush hour tolls on I-270 between Frederick and Shady Grove could top $49 per trip.[4] However, the DEIS fails to discuss such high toll rates as a barrier to the build options achieving the Purpose and Needs Statement.

**#7**

The DEIS financial impact analysis also neglects to acknowledge or analyze other likely taxpayer costs. For example, the likely cost of relocating lines from as many as 21 utilities[5] and how that would affect ratepayers' bills. Moving the water pipes alone could add up to $2 billion dollars in costs that would be placed on citizens, not the private partner, according to the Washington Suburban Sanitation Commission.[6]

**#8**

One more point: the DEIS' contention that land use around I-270 and I-495 won't change if the roads are expanded for tollways is unrealistic and inconsistent with modern real estate development practices. The phenomenon of induced demand, commonly referred to by the idea of "build it, they will come," is well documented[7] as is the connection between development, density and road capacity.

In conclusion, CABE concurs with the comments made by M-NCPPC, NCPC, Montgomery and Prince George's Counties, Maryland Sierra Club, and MTOC. Given the technical, analytical, and data quality that we, and they, have raised in our comments.

See response to Comment #5 above.

**Response to DEIS Comment #6**
Refer to Chapter 9, Section 3.6.B for a response to toll ranges and toll rate setting process.

**Response to DEIS Comment #7**
Refer to Chapter 9, Section 3.4.M for a response to impacts to utilities and associated costs.

**Response to DEIS Comment #8**
MDOT understands the phenomenon of induced demand, and it is a consideration on all of our large roadway projects. In this case, MDOT is recommending adding capacity via managed lanes (HOT lanes) instead of widening with additional general purpose lanes. Managed lanes do a better job at regulating demand, including induced demand, due to dynamic pricing.

Our study shows that there could be some induced demand as a result of this project, but the impact will be small (less than 1% increase in vehicle miles traveled (VMT) in the region) and those effects are fully accounted for in the regional traffic models COG and TPB use. Even with these effects, the proposed managed lanes would reduce regional congestion delays and significantly improve travel times along both freeway corridors and on local roads throughout the region.

The DEIS does not support the build options, cannot satisfy the requirements of National Environmental Policy Act, and cannot be the basis of a Record of Decision.

MDOT and the Federal Highway Administration must provide a completely new DEIS that fixes these problems and includes a new Purpose and Need Statement that focuses on the need to improve affordable transportation options without forcing undisclosed and unaffordable burdens on taxpayers, communities or the environment.

Barbara Coufal
Co-Chair
Citizens Against Beltway Expansion

Brad German
Co-Chair
Citizens Against Beltway Expansion

Contact: 495CABE@gmail.com

---

[1] Capital Beltway Study Technical Memorandum, Secondary and Cumulative Effects, May 24, 2005 and Capital Beltway Studies Informational Public Workshop Display Boards, May 6, 2004.

[2] Transurban Group Annual Financial Results, 2013-2020

[3] Public-Private Partnerships for Transportation and Water Infrastructure. Congressional Budget Office, January 21, 2020

[4] "Nearly $50 toll projected in draft study of I-270 project", *WUSA*, October 15, 2020

[5] "Pipes, cables could face major disruption by plan to widen Beltway and I-270", *Maryland Matters*, October 21, 2020

*This page is intentionally left blank.*

[6]"Moving pipes to add toll lanes to Beltway, I-270 will cost up to $2 billion, WSSC Water says", *The Washington Post*, March 11, 2020

[7] Melo PC, Graham DJ, Canavan S., *Effects of Road Investments on Economic Output and Induced Travel Demand: Evidence for Urbanized Areas in the United States*, Transportation Research Record, 2297(1), 163 (2012)

*This page is intentionally left blank.*

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

**CITIZENS AGAINST BELTWAY EXPANSION (CABE)– BRAD GERMAN (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Brad German

**Date/Hearing:** 8/25/20

**Type/Session:** Live/Evening

**Transcription:**

#1 My name is Brad German. 9926 Julliard Drive Bethesda, Maryland. I represent Citizens Against Beltway Expansion, a coalition of civic associations and citizens who support the No Build alternative and the latest version of the July 10th Draft Environmental Impact Statement for the I-495 I-270 Managed Lanes proposal. We also plan to submit written comments. The No Build option we support is the same position Maryland took on the 2005 environmental analysis of one- and two-lane expansion proposals for I-495.

#2 The problems been cited included the cost and dividing, minimizing or mitigating environmental damage from a route that would cut through densely populated communities marbled with national parks, stream valleys, and environmentally and culturally sensitive resources. Since then our population has grown, the environment is still threatened, and the parks are still precious. We don't see where the DEIS provides any new details that should cause the public or the State to change their minds.

#3 The new DEIS, unlike the 2005 analysis, also fails to itemize potential negative impacts in detail. It also lacks a full analysis of such fundamentals as air contamination during and after construction, hazardous waste disposal, stormwater runoff, stream valley damage, and other impacts of public health communities and the environment. Rather, it defers these critical details until a final statement when there will be fewer opportunities for the public to protect itself from a bad choice. Another reason we support the No Build option is that the DEIS shows that the other alternatives actually worsened rush hour on I-270 for most drivers or at best shaves off a few minutes on average at the cost of millions, millions of dollars per minute saved. This is shown in Tables 5.5 and 5.6 in Appendix C. This finding underscores our concerns

#4 that the proposal ultimately monetize congestion for private investors, a significant taxpayer risk. I say that because one of the few things regarding taxpayer risk, one of the few things that has changed since 2005 is that the track record for public-private partnerships has gotten worse. P3 tollways here and abroad are struggling to reduce congestion and they ultimately depend on extensive taxpayer subsidies. This is according to numerous reports from federal and private analysts. The fact is that today's P3s barely resembled the ones during the Carter and Reagan administrations when they attracted about $4 of private funds for every public dollar. By contrast, the 495 Express Lane in Virginia, 83% of that was funded by taxpayers; only 17% by the private sector and the taxpayer support came through grants, federal loans, or federal loan guarantees. The bottom line is the P3s are no free lunch. A detailed independence statistical analysis is needed now, not later to prevent another expensive disaster down the road. In conclusion, we strongly urge you to provide an interim DEIS that fills in the blanks and includes a serious independent fiscal analysis for the public to comment on. This would be the best way for us to meet regional transportation challenges, benefit the public, and better protect our wallets and homes. Thank you again for this opportunity to comment.

**Response to DEIS Comment #1**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to DEIS Comment #2**

The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarized the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail. These analyses directly contributed to MDOT SHA's evaluation of the alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided.

With respect to the level of details concerning the build alternatives presented in the DEIS and the Preferred Alternative in the SDEIS, this information accurately reflected the level of design available to the agency during different phases of its NEPA review and was appropriate to ascertain environmental information and potential impacts. FHWA regulations prohibit agencies from advancing to final design for a proposed action prior to completion of NEPA. Therefore, the DEIS and SDEIS were based on preliminary levels of design for the likely engineering elements of the proposed build alternatives. The Preferred Alternative presented in the SDEIS was refined based on additional survey information, an assessment of constructability and permanent and temporary impacts, as well as avoidance and minimization efforts resulting from interagency coordination. The SDEIS presented updated information based on the Preferred Alternative (Alternative 9-Phase 1 South) and additional coordination that occurred in the 10 months following publication of the DEIS. The FEIS reflects further design refinements and details, including final mitigation and commitments of the Preferred Alternative, many of which directly responded to public comments.

**Response to DEIS Comment #3**

Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**Response to DEIS Comment #4**

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**CITIZENS TO CONSERVE AND RESTORE INDIAN CREEK – LUTZ RASTAETTER**

| | |
|---|---|
| **From:** | Lutz Rastaetter <lutz_rastaetter@yahoo.com> |
| **Sent:** | Monday, November 9, 2020 9:30 AM |
| **To:** | MLS-NEPA-P3 |
| **Cc:** | Lisa Choplin; jeanette.mar@dot.gov |
| **Subject:** | Public comments on Draft EIS for Beltway widening project |
| **Attachments:** | 2020-11-06-Comments on DEIS, 4(f), and JPA (1).pdf |

Citizens to Conserve and Restore Indian Creek would like to be on the record as an additional organization supporting the attached comments.

Sincerely,

Lutz Rastaetter, Acting Chairperson
Citizens to Conserve and Restore Indian Creek
P.O. Box 1032
Greenbelt, MD 20768

1

MDOT SHA acknowledges receipt of your comment. The attachment submitted in your email was the same commented submitted by the Maryland Chapter of the Sierra Club. The Sierra Club comment letter has been responded to in detail and can be found in Appendix T.

**OP·LANES**
MARYLAND    I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

**CLEANWATER LINGANORE – MARY SMITH**

| | |
|---|---|
| From: | Mary Smith <hallschoice11258@gmail.com> |
| Sent: | Wednesday, October 21, 2020 11:58 AM |
| To: | MLS-NEPA-P3 |
| Subject: | Public Comment on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement |

Our grass roots neighborhood organization ( with outreach to over 300) Cleanwater Linganore Inc is strongly opposed to the expansion to 270 and 495 as currently planned. It is too destructive to neighborhoods, private properties, parks and the environment. It is too costly in terms of additional needed infrastructure, and asset allocation.
Now that most people can telework, is this huge project still relevant? Would like to see the data suggesting it is still needed.

Best regards
Betsy Smith, president Cleanwater Linganore

#1

1

**Response to DEIS Comment #1**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C. Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the pandemic.

00022273

**COALITION FOR SMARTER GROWTH – JANE LYONS (EMAIL)**

**#1**

| From: | Jane Lyons <jane@smartergrowth.net> |
|---|---|
| Sent: | Thursday, November 5, 2020 10:05 AM |
| To: | MLS-NEPA-P3; john.l.dinne@usace.army.mil; MDE.SHAprojects@maryland.gov |
| Cc: | treasurer@treasurer.state.md.us; kumar.barve@house.state.md.us; aklase@marylandtaxes.gov; nancy.king@senate.state.md.us; County.Council@montgomerycountymd.gov; MCP-Chair; CountyExecutiveIEQ@montgomerycountymd.gov; managed.lanes@montgomerycountymd.gov; Stewart Schwartz; councilmember.hucker@montgomerycountymd.gov; CExecutive@co.pg.md.us |
| Subject: | Coalition for Smarter Growth Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement |
| Attachments: | 2020.11.05 CSG Draft EIS Comments on I-495 I-270 -Managed Lanes Study - FINAL.pdf |

Good morning,

The Coalition for Smarter Growth submits the attached comments in response to the Notice of Availability of the I-495 & I-270 Managed Lanes Study Draft Environmental Impact Statement and Draft Section 4(f) Evaluation. We have also signed onto the comments that will be submitted by the Sierra Club.

We oppose the addition of managed lanes to expand I-495 & I-270 and support the No Build alternative, pending development of a more sustainable and effective alternative, with fewer impacts. The DEIS and Section 4(f) evaluation are insufficient and do not fully consider the impacts of the proposed expansion, a massive alternation to our landscape that comes at an extremely high cost to neighborhoods, community health, the natural environment, and taxpayers. There was no meaningful consideration of viable alternatives to constructing new toll lanes. We request that the U.S. Department of Transportation Federal Highway Administration and the Maryland Department of Transportation State Highway Administration stop and restart this process to fully address all gaps in the current DEIS and fulfill the requirements of NEPA and Section 4(f).

Please see the attachment for our full comments.

Thank you,
Jane

--
Jane Lyons (she/her) | Maryland Advocacy Manager
Coalition for Smarter Growth
P.O. Box 73282, 2000 14th St NW
Washington, DC 20009
(410) 474-0741 | jane@smartergrowth.net
*Your gift helps keep CSG's advocacy going! Donate today!*

1

**Response to DEIS Comment #1**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

00022274

**1. The purpose and need is narrow, biased, and does not screen alternatives accurately**

The stated purpose and need is unreasonably narrow and restricts the range of alternatives considered. There is no meaningful consideration of other viable alternatives, including a comprehensive transit, demand management, and land use alternative.

The stated purpose and needs statement presuppose a roadway expansion. First with "accommodate existing traffic and long-term traffic growth," which assumes that traffic outcomes are inevitable and not influenced by malleable land uses, transit options, and demand management policies. As will be discussed below, the Metropolitan Washington Council of Governments (COG) model used by the Agencies in the DEIS over-predicts future traffic. Additionally, it is not in the public interest to accommodate growth in vehicle miles traveled (VMT), given its association with higher greenhouse gas emissions. Instead, the goal should be to decrease average trip lengths, total and per capita VMT, and to increase non-auto mode share. The conclusions-oriented reasoning of the purpose and need statement is furthered through the stated goal to "provide additional roadway travel choices." This limits travel choices to additional roadways, thus ensuring that the alternatives retained for detailed study (ARDS) would include roadway expansions.

The criteria used to screen the alternatives were similarly biased toward a managed lanes option and inconsistently screened out alternatives. Namely, the criterion of financial viability. The transit alternatives were not retained for detailed study due to their estimated negative cash flow, but the same was also found to be true of several of the ARDS. Every single ARDS will run a deficit between $482 million to $1.01 billion. Instead of removing these alternatives, the analysis was redone in such a way that was supportive of their inclusion, using conservative cost and cost-overrun estimates as well as omitting the high costs of utility relocation. Alternatives that would result in less environmental degradation were arbitrarily rejected on the basis that they require a public subsidy when there is still not an accurate understanding of how much the managed lane options would cost, and when they too require a public subsidy in direct funding and discounted federal loans, along with potentially much higher community, environmental, and public utility relocation costs.

Finally, the limited study area means that non-highway land use and transportation alternatives were discounted, such as a combination of the MARC Brunswick line, Montgomery County Bus Rapid Transit plan, the Purple Line, transit-oriented development at Metro and Purple Line stations, and demand management policies. The areas served by I-495 and I-270 extend much farther than the 1.5-mile limit imposed on the study area. Transportation solutions for I-495 and I-270, as well as an integrated land use solution that reduces demand, would involve areas beyond the limited corridor identified in the study.

Thus, because of the narrow purpose and need favoring similar alternatives for adding managed toll lanes, the resulting ARDSs essentially have the same environmental impact, aside from the No Build option. Alternatives that would potentially have lessened environmental and community impacts were not studied in detail for the DEIS analysis.

**2. Traffic modeling assumptions are deeply flawed**

2

**Response to DEIS Comment #2**

Refer to Chapter 1, Section 3.1 for a response on Purpose and Need.

**Response to DEIS Comment #3**

Concerns with congestion on I-495 and I-270 and planning to accommodate anticipated future growth have been the subject of numerous studies conducted by the Maryland Department of Transportation (MDOT), Virginia Department of Transportation (VDOT), and regional planning agencies for many years. These studies reflect how the Washington metropolitan area has continued to experience considerable growth in population and employment. Specifically, population in the study area has increased from 14.6 percent in Montgomery County and 20.1 percent in Prince George's County between 2000 and 2020. Continued growth is anticipated as Metropolitan Washington Council of Governments (MWCOG) estimates that between 2020 and 2045, the population in Montgomery County and Prince George's County will increase approximately 16.3 percent and 7.9 percent, respectively. Additionally, this area is one of the most intensive employment, residential and transportation corridors in the State. Virtually all of these studies reflect, in part, some of the operational and/or engineering alternatives that are included in the DEIS and SDEIS. Specifically, these studies, dating back to 2004, evaluated various options of building managed lanes along these highways and means to connect that additional capacity to other regional transportation facilities. Importantly, these studies also considered various transit improvements, including major projects such as the Purple Line which is currently under construction. None of the various analyses supported the principle that transit and/or multi-modal transportation options by themselves, could alleviate traffic congestion or accommodate anticipated future demand. Refer to **DEIS, Appendix A**, page 4-8.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.
Refer to Chapter 9, Section 3.4.F for a response to adverse impacts to air quality.
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**Response to DEIS Comment #4**

For the purposes of a comparison of alternatives under NEPA, the DEIS assessed a broad analysis of the potential for each alternative to be financially self-sufficient. This analysis included multiple factors to determine potential cash flows such as a range of capital costs, initial revenue projections, preliminary operations and maintenance costs, and a range of interest rates. The results showed that some alternatives would have a higher likelihood of being cash flow positive and others would have a higher likelihood of being cash flow negative. These wide ranges were necessary to take into account various market conditions that could change as the program continues forward.

Refer to Chapter 9, Section 3.2 for a response to Screening of Preliminary Alternatives Process.
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Costs.

**Response to DEIS Comment #5**

The decision concerning the scope of analysis to be conducted under NEPA lies within the discretion of the project proponent, MDOT SHA, and lead federal agency, FHWA. Depending on the factual circumstances, a programmatic or a project-specific analysis could be conducted to fulfill NEPA's procedural requirements. In this case, proceeding with a project-level review for the Study was entirely appropriate.

The geographic scope of the Study, while large, is distinctly defined. It includes 37 miles of I-495 and 11 miles of I-270. Consistent with CEQ NEPA regulations 40 CFR 1502.4(a) and 1508.25(a), as well as FHWA NEPA regulations at 23 CFR 771.111(f), MDOT SHA and FHWA have identified the Study as an independent action that may proceed regardless of whether other actions of the Traffic Relief Plan or P3 Program are implemented.

Furthermore, the identified scope of the Study has been sufficiently defined to be advanced with a project-level NEPA document, and does not exclude the possibility that a broader planning effort could be evaluated at some other time in a Programmatic EIS. Consistent with FHWA regulations, other proposed actions, such as potential improvements to I-270 from I-370 to I-70, have been determined to possess independent utility from the Study (and other actions in the TRP and P3 Program) and thus will require separate project-level NEPA documents.

Refer to Chapter 9, Section 3.2 for response to Screening of Preliminary Alternatives Process.

OP·LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study     Case 8:22-cv-02597-DKC     Document 61-5     Filed 10/30/23     Page 66 of 69

FINAL ENVIRONMENTAL IMPACT STATEMENT

We incorporate by reference the comprehensive technical analysis completed by Norman Marshall of Smart Mobility, Inc. on behalf of Sierra Club, Coalition for Smarter Growth, and other partners which is included in the joint comments submitted by Sierra Club.[1] Accurate traffic modeling is critical because the implications of the traffic analysis inform the consideration of alternatives and the rest of the analysis of the Project's environmental and community impacts.

The model over-predicts future traffic: The DEIS uses a flawed model from the Metropolitan Washington Council of Governments (COG) that: 1) does not constrain traffic flow to capacity, 2) does not properly feed congested travel times back to non-work trip destinations, 3) assumes no increased traffic from road expansion, 4) fails to accurately forecast bottlenecks, 5) does not calculate net congestion tradeoffs, and 6) does not accurately model peak period conditions.

The DEIS falsely claims that if the Project is not constructed, corridor traffic volumes and delays will grow exponentially. Traffic cannot grow significantly unless highways are widened to accommodate such growth by changing the road's hourly capacity. Without expansion, traffic growth is constrained. Widening will shift more traffic into peak hours and increase congestion on connecting roads. Due to the increased number of trips during peak hours, widening will not significantly reduce congestion in general purpose lanes. Widening will instead create bottlenecks and increase peak hour trips on connecting roads.

Toll lanes need congested general lanes: The express toll and high occupancy toll lane models rely on general purpose lanes being congested enough for a certain number of drivers to be willing to pay tolls. Extreme congestion is needed to justify the high tolls required to cover the high construction costs of the additional lanes and make a profit for the private concessionaire. Those drivers who are willing and able to pay will see improved trips times, but those numbers are not enough to result in an efficient use of infrastructure. In Virginia, similar managed lanes tend to carry about ¼ of daily traffic, despite being ⅓ of the highway capacity.

Induced demand is not accounted for: Studies and real-life experience show that induced demand is real. Highway expansions only relieve congestion for a short period of time. In the near term, people shift back into the peak hour, leave transit or carpools to drive solo again, or simply change their route. In the medium to long-term, highway expansions fuel sprawling land uses, leading to an overall increase in vehicle trips and VMT, adding even more new users. This is why the DC urbanized area's travel delay grew 144 percent between 1993 and 2017, while population growth and freeway lane-miles growth were roughly on-par.[2] The fact that increased vehicles, vehicle trips, and VMT from induced demand were not taken into consideration means that the associated air pollution, water pollution, and greenhouse gas emissions were not adequately considered, analyzed, and detailed.

[1] Norman Marshall (October 2020), *Review of Maryland I-493 & I-270 Managed Lanes Project Draft Environmental Impact Statement and Draft Section 4(f) Evaluation.* Available at:
https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/MD%20Managed%20Lanes%20DEIS%20Traffic%20Review%2010-29-2020.pdf
[2] Transportation for America (2020), *The Congestion Con.* Available from: https://t4america.org/wp-content/uploads/2020/03/Congestion-Report-2020-FINAL.pdf

3

#6

#7

#8

**Response to DEIS Comment #6**
See response to Comment #3.

**Response to DEIS Comment #7**
Refer to Chapter 9, Section 3.6.A for a response on opposition to managed lanes or tolling public roads.

Refer to Chapter 9, Section 3.6.B for a response to toll rate ranges and toll rate setting process.

**Response to DEIS Comment #8**
MDOT understands the phenomenon of induced demand, and it is a consideration on all of our large roadway projects. In this case, MDOT is recommending adding capacity via managed lanes (HOT lanes) instead of widening with additional general purpose lanes. Managed lanes do a better job at regulating demand, including induced demand, due to dynamic pricing.

Our study shows that there could be some induced demand as a result of this project, but the impact will be small (less than 1% increase in vehicle miles traveled (VMT) in the region) and those effects are fully accounted for in the regional traffic models COG and TPB use. Even with these effects, the proposed managed lanes would reduce regional congestion delays and significantly improve travel times along both freeway corridors and on local roads throughout the region.

Refer to Chapter 9, Section 9.3.4B for a response to traffic modeling and analysis including induced demand.

Existing and future land use is directed by the County's Master Plans. Refer to the FEIS, Chaper 5, Section 5.22 and FEIS, Appendix Q for details.

**#9**

Commuting patterns are changing: Due to unforeseen circumstances, there is a new need to take increased telecommuting into consideration given recent changes to work habits and travel patterns resulting from the COVID-19 pandemic. A recent study from the University of Maryland's Transportation Institute showed that a 5 to 15 percent reduction in vehicles on the road during peak hours would essentially eliminate congestion. This future is now more in reach and often an everyday reality as more people adjust to permanently teleworking full-time or more often — a shift that is expected to outlast the COVID-19 pandemic.

### 3. Transit, land use, and comprehensive solutions were not taken into consideration

The 20 Project alternatives and variations were considered as separate and isolated alternatives by mode of transportation, thus the Agencies did not consider the full spectrum of possible roadways alterations, transit improvements, and transportation systems management/transportation demand management combinations. Instead of considering a comprehensive transit, land use, and system/demand management solution, the analysis in the DEIS appears designed to put up segmented alternatives destined to fail, in order to support a preconceived conclusion to construct new toll lanes.

**#10**

The transit options that are included in the DEIS are not fully analyzed. For example, the DEIS does not provide an accurate assessment of existing and future transit ridership, meaning that the analysis of modal shift is incomplete. Further, it is disingenuous to say that the Purple Line light rail is the transit portion of the Project. The DEIS does not analyze this as an alternative and instead relies, for the Purple Line and transit alternatives that were originally included, on past studies.

There is no discussion or analysis of how to bring transit across the Woodrow Wilson Bridge, which was designed and built to accommodate rail as part of a significant investment from the State of Maryland. Similarly, there is no indication or commitment by the state to make the same rail engineering accommodations on the rebuilt American Legion Bridge. Given the 50-year term proposed for the public-private partnership (P3), these accommodations for future rail and transit should be a part of planning for the comprehensive transit system.

The DEIS also ignores the interconnectedness of land use and transportation. The prudent and feasible alternative that will result in shorter travel times, fewer VMT, and better use of existing infrastructure is a comprehensive land use, transit, and system/demand management plan. This was supported by a 2017 long-range analysis prepared for the National Capital Region Transportation Planning Board, showing that travel demand management scenario was the best way to cut daily vehicle hours of delay by 24 percent, followed by the regional land use balance scenario, providing reductions of 18 percent.[3] The regional balanced land use scenario would steer more growth in jobs and housing to underused rail stations and city centers with high-capacity transit.[4] These two scenarios were shown to be equally beneficial and superior to other

---

[3] National Capital Region Transportation Planning Board (2017), *Long-Range Plan Task Force: Draft Analysis Results.* Available from: https://www.mwcog.org/file.aspx?&A=p4JtCe45zbv1oUd3kATAKPZvxi5jPC2LqnK%2feA4dpYQw%3d
[4] Metropolitan Washington Council of Governments (December 20, 2017), *News Release: Transportation Planning Board approves five initiatives to improve region's transportation system.* Available from:

4

---

**Response to DEIS Comment #9**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

**Response to DEIS Comment #10**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

OP · LANES™
MARYLAND  I-495 & I-270 Managed Lanes Study   Case 8:22-cv-02597-DKC   Document 61-5   Filed 10/30/23   Page 68 of 69

FINAL ENVIRONMENTAL IMPACT STATEMENT

**#10 cont**

scenarios, including the express toll lanes alternative (which included both funded transit and HOV running free), in lowering VMT per capita. In addition, the regional land use balance was the best option for decreasing average car commute times.

Additional studies support the idea that getting more people to live and work near Maryland's 26 Metro stations and future Purple Line stations would do more to reduce long-distance commuting and traffic than further widening highways. This includes the Washington Metropolitan Area Transit Authority's (WMATA) 2014 Connect Greater Washington Long Range Transit Plan, which shows that buildout of development at Metro stations, particularly those on the east side of the region would provide significant benefits to the highway network. There is also significant research showing success in reducing congestion by pricing existing general-purpose travel lanes and allowing high-occupancy vehicles to travel for free in dedicated lanes.

**4. Environmental and community impacts are detrimental and the analysis is inadequate**

**#11**

This section details the harmful environmental and community impacts that are outlined in the DEIS, which fail to constitute a "hard look." Feasible and prudent alternatives to avoid direct, indirect, and cumulative harm have not been considered. Among other things, these negative impacts have not been fully analyzed due to an unrealistic Limited of Disturbance (LOD) and illegal segmentation.

First, the LOD is unrealistic to depend on for measuring impacts to parkland, waterways, and historic properties given that it is a preliminary planning tool and is subject to change given the final design of the private concessionaire. This cannot be a legally adequate basis to evaluate the Project's environmental impact.

**#12**

Second, the environmental effects of widening I-270 are being studied in two separate EISs, constituting illegal segmentation, and do not take into account the combined environmental impacts of the Project's two phases. This segmentation also has implications for which ARDS were selected (for example, eliminating MARC expansion alternatives) and brings into question the conclusions of the traffic modeling, given that the full extent of the Project area has not been included in this DEIS's study area and thus the impacts were not analyzed comprehensively. Given the full, regional I-495 & I-270 P3 program proposal at hand, the Agencies should have performed a Programmatic EIS.

**#13**

Water quality & stormwater management: The DEIS fails to calculate the amount of stormwater generated or how it would impact water quality. Instead of modeling the impacts, the DEIS uses estimates and places a heavy reliance on nutrient trading credits to meet stormwater treatment requirements. Over 550 acres of new impervious surfaces are highly likely to increase runoff, pollution, and flooding, especially if mitigation efforts are primarily done offsite and inside impacted watersheds. Thus, it is not clear that the Project will not violate water quality standards

https://www.mwcog.org/newsroom/2017/12/20/transportation-planning-board-approves-five-initiatives-to-improve-regions-transportation-system/

5

---

**Response to DEIS Comment #11**

The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarized the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail and the SDEIS summarized the environmental effects of the Preferred Alternative. These analyses directly contributed to MDOT SHA's evaluation of the alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided.

The limits of disturbance (LOD) as been refined throughtout the NEPA process based on addtioanl design details and extensive coordination with regulatory and resource agencies to avoid and minimize impacts. As the design is advanced on the Preferred Alternative there may be further reductions in impacts. An important benefit to conducting a P3 process with pre-development work concurrent with the NEPA process is to increase efficiency by receiving input by the Developer on design and ancillary elements of the project such as stormwater management. This collaborative effort ensures that the design and associated limits of disturbance (LOD) are appropriate and feasible ahead of final design. While additional LOD changes may occur during final design, including additional avoidance and minimization, the risk of substantial changes in the LOD or substantial increase in environmental impacts is significantly lowered by the early involvement of the Developer. Refer to Chapter 9, Section 3.4.A for a response to Limits of Disturbance.

**Response to DEIS Comment #12**

The decision concerning the scope of analysis to be conducted under NEPA lies within the discretion of the project proponent, MDOT SHA, and lead federal agency, FHWA. Depending on the factual circumstances, a programmatic or a project-specific analysis could be conducted to fulfill NEPA's procedural requirements. In this case, proceeding with a project-level review for the Study was entirely appropriate.

The geographic scope of the Study, while large, is distinctly defined. It includes 37 miles of I-495 and 11 miles of I-270. Consistent with CEQ NEPA regulations 40 CFR 1502.4(a) and 1508.25(a), as well as FHWA NEPA regulations at 23 CFR 771.111(f), MDOT SHA and FHWA have identified the Study as an independent action that may proceed regardless of whether other actions of the Traffic Relief Plan or P3 Program are implemented.

Furthermore, the identified scope of the Study has been sufficiently defined to be advanced with a project-level NEPA document, and does not exclude the possibility that a broader planning effort could be evaluated at some other time in a Programmatic EIS. Consistent with FHWA regulations, other proposed actions, such as potential improvements to I-270 from I-370 to I-70, have been determined to possess independent utility from the Study (and other actions in the TRP and P3 Program) and thus will require separate project-level NEPA documents.

Refer to Chapter 9, Section 3.1 for a response to Purpose and Need.

Potential roadway or transit improvements on I-270 from north of I-370 to I-70 were not included as part of this Study, as alternatives for that segment will be developed as part of a separate, independent planning study (https://495-270-p3.com/i270-environmental/). An Environmental Impact Statement (EIS) may be supplemented at any time, in accordance with 23 CFR 771.130, when the Federal Highway Administration (FHWA) determines that changes to the proposed action or new information relevant to environmental concerns or impacts from the proposed action were not evaluated in the Draft EIS (DEIS). A Supplemental Draft Environmental Impact Statement (SDEIS) was prepared to consider new information relative to the Preferred Alternative, Alternative 9 – Phase 1 South. Building of the analysis in the existing DEIS, the SDEIS disclosed new information relevant to the Preferred Alternative focusing on new information while referencing the DEIS for information that remains valid. The SDEIS also described the background and context in which the Preferred Alternative, Alternative 9 – Phase 1 South was identified. The SDEIS was available for the public to review and comment on the Preferred Alternative during a 60-day comment period.

See response to DEIS Comment #13, below.

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-5    Filed 10/30/23    Page 69 of 69

FINAL ENVIRONMENTAL IMPACT STATEMENT

and the public's interest in high quality waterways. Thus, the Clean Water Act 404 permit should be denied.

**#14**

Greenhouse gases & air quality: The Project would increase greenhouse gas emissions compared to a No Build alternative, potentially violating the Maryland Greenhouse Gas Emissions Reduction Act of 2016. The emissions are also too conservatively estimated, ignoring induced demand and increase in vehicle trips and VMT. Higher greenhouse gas emissions will contribute to global warming with more days of extreme heat, unhealthy air quality, and heavier precipitation events with more flooding. The DEIS also does not take into account greenhouse gas emissions from the construction of the Project, nor does it adequately address the human health impacts of other pollutants including particulate matter (PM2.5) which has a particularly harmful effect on the lungs of our children. Homes, schools, hospitals, local businesses, and parks surround I-495 and I-270, and residents' health will be at-risk from further highway expansion spurring more particulate matter, carbon monoxide, ozone, nitrous oxides and volatile organic compounds in their communities.

**#15**

Parks & natural resources: Dozens of parks will be negatively impacted, losing greenspace, trails, and the forest canopy critical for reducing the CO2 that contributes to global warming. Further, hundreds of acres of streams, wetlands, and land designated as sensitive habitat for wildlife will be negatively impacted. MDOT is required to minimize impacts to parks and determine how to make the park system whole again, which has not been done in this DEIS.

**#16**

Homes and other properties: Up to 34 homes will be destroyed, with 1,500 more properties negatively impacted through partial takings and increased noise, air, and water pollution. Low-income and minority communities will bear the brunt of these negative impacts for generations to come, further reducing the value of their properties and exacerbating the east-west socioeconomic divide in the DC region.

     **5. Taxpayer dollars will be used ineffectually and irresponsibly**

**#17**

The full financial cost and risk is not adequately presented in this DEIS. Utility relocation costs are left out, including the estimate from the Washington Suburban Sanitary Commission (WSSC) that water and sewer relocations necessitated by the Project could cost $2 billion. This means that even if a rate payer in Maryland's Washington suburbs never uses the managed toll lanes, they would still be paying for the Project through greatly increased water and sewer charges, up to a 277 percent increase over the next 40 years.

We are concerned by the likelihood that the Project's developers will require an assurance of minimum revenues from the state, requiring payouts if the Project is at some point cancelled, has cost overruns, or competition. Because the contract is not complete at this time, the financial risks cannot be fully known. Given restrained state resources, any subsidy for this Project would result in less investment in transit and other sustainable modes of transportation that will decrease Maryland's transportation greenhouse gas emissions. During an environmental crisis, this costly Project is not the best use of taxpayers' financial resources.

     **6. Equity analyses are incomplete**

6

---

**Response to DEIS Comment #13**

The project will be required to obtain a SWM and Erosion & Sediment permit. In order to obtain these permits, the project will be required to control stormwater runoff for the 10-year storm to match existing conditions, provide water quality treatment for all new impervious area and 50% of reconstructed existing impervious area to match the runoff characteristics of woods in good condition and manage the 2-year storm during construction so that sediment is not released to local waterways. Variances can be requested for minimal increases in stormwater runoff, however, detailed hydrologic calculations will be required to show that the minimal increases will not result in downstream flooding or erosion. Given the strict permitting requirements, impacts to downstream water quality from stormwater runoff are not expected. Refer to Chapter 9, Section 3.4.E for additional information related to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**Response to DEIS Comment #14**

Refer to Chapter 9, Section 3.4.F for a response to adverse impacts to air quality.

Refer to Chapter 9, Section 3.4.G for a response to climate change and greenhouse gas considerations.

**Response to DEIS Comment #15**

Refer to Chapter 9, Section 3.4.C for a response to analyses of parkland and historic resources.

**Response to DEIS Comment #16**

The Preferred Alternative, Alternative 9 – Phase 1 South, avoids all residential and commercial displacements.

Refer to Chapter 9, Section 3.4.K for a response to impacts to properties and communities, including community facilities.

**Response to DEIS Comment #17**

Potential cost of utility relocation has consistently been factored into the overall estimates developed for the project. The reduced footprint of proposed improvements associated with the Preferred Alternative as compared to the Build Alternatives discussed in the DEIS, together with ongoing coordination to identify, avoid and minimize conflicts with existing infrastructure to the maximum extent practicable have lowered the cost estimates significantly. It is too early in the predevelopment process to determine the exact scope and cost of any utility relocations that may still be required, but it now appears that these costs will be significantly lower than WSSC's original estimates.

Refer to Chapter 9, Section 3.4.M for a response to impacts to utilities and associated costs as well as Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.