**#18**

The environmental justice (EJ) analysis uses a flawed methodology by using Census data because it ignores small pockets of minority and low-income communities. DEIS declines to address EJ impacts and does not compare impacts to the general population to determine whether there is a disproportionate effect, as is legally required.

Among the potential impacts that should be considered are the cost of using the toll lanes compared to income levels by race and the potential that the lanes will lock in the regional jobs/housing imbalance. Today, most jobs and most well-paying jobs are located in the I-270 and Virginia Dulles Toll Road corridors, not in Prince George's. The expansion of I-270 to 12 lanes in the early 90s was demonstrated to have shifted development to the I-270 corridor and away from DC and Prince George's.[5] A comprehensive land use, transit, and demand management alternative that put transit-oriented development in the forefront and includes build-out at the 15 Prince George's Metro stations, Purple Line stations, and east side Red Line stations would more effectively address the region's transportation needs, while also addressing our regional racial and economic inequities. Therefore, a full and comparative racial equity analysis needs to be included.

**#19**

#### Conclusion

Even with the inadequate analysis provided, it is shown that the Project cannot be justified due to its associated environmental, community, and public health impacts. The Agencies should select the No Build alternative and then restart the process with the full proper analyses, including a comprehensive land use, transit, and system/demand management solution that will reduce travel times, VMT, and environmental impacts.

[5] Sipress, Alan, *MD's Lesson: Widen the Roads and the Drivers Will Come*, Washington Post, p. B-1, Jan 4, 1999. This article was followed by a Metropolitan Washington Council of Governments Transportation Planning Board analysis that confirmed the conclusion of the article.

7

**Response to DEIS Comment #18**

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

The congestion and other transportation issues facing this region are so immense that multiple transportation initiatives are necessary to address or have a notable effect on reducing the negative impacts of transportation problems or fulfilling a transportation need. The Purple Line, which was selected after a review of transit alternatives in the region, will address or have a notable effect on addressing the need to provide faster, more direct, and more reliable east-west transit service connecting major activity centers in the corridor including Bethesda, Silver Spring, Takoma/Langley Park, College Park/University of Maryland, and New Carrollton. It will provide better connections to existing Metrorail and MARC commuter rail services and improve mobility and connectivity to the communities in the corridor located between existing rail lines. When evaluating the need for the Study the projected benefits to the 495/270 Study area were included. As set forth in the Study, Purpose and Need, the Managed Lanes Study was a critical adjunct to the regional plan.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

The Study uses the MWCOG model, which includes all existing and approved planned transportation projects in the Washington, D.C., Metropolitan region. The traffic analysis for the 2045 design year assumed completion of several background projects, both highway and transit projects, were included. The impacts of these background projects were assumed as part of the baseline conditions for the design year 2045 No Build Alternative and the 2045 Preferred Alternative. The background transit projects include: Purple Line Light Rail, Corridor Cities Transitway (CCT)US 29 Bus Rapid Transit (BRT), Randolph Road BRT and North Bethesda Transitway. Refer to FEIS, Chapter 3, Section 4.1.3.

**Response to DEIS Comment #19**

Responses addressed above.

**COALITION FOR SMARTER GROWTH – JANE LYONS (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Jane Lyons

**Date/Hearing:** 8/25/20

**Type/Session:** Live/Morning

**Transcription:**

Good morning. My name is Jane Lyons (J-A-N-E L-Y-O-N-S) and I'm representing the Coalition for Smarter Growth, which has an address at 316 F Street Northeast in Washington, DC, although we have thousands of supporters in both Montgomery and Prince George's counties and in the rest of Maryland. We will also submit more extensive comments prior to the deadline, which we urge you to extend.

**#1** We have several major concerns about the 495/270 Managed Lanes Project and strongly support the No Build option. First, this Project will make traffic worse, not better. Time after time, highway expansions fall victim to induced demand. There is no data in the DEIS to show how induced demand was accounted for in the Study. Any minimal speed and travel time reductions would largely only benefit those who are willing to pay the tolls. In certain areas, average travel speeds will go down for those in general purpose lanes, especially during rush hour. Furthermore, if it induces additional peak-hour driving, traffic will increase on connecting roads.

**#2** Furthermore, an unprecedented increase in teleworking post-COVID has the potential to rewrite all assumptions underlying existing traffic models. It doesn't make sense to move forward with a costly generation-altering highway expansion when we can't even project future travel demand. In addition, the Project is financially opaque and unviable. MDOT still doesn't know how much this will cost taxpayers. The Project will need significant public revenue between 500 million and more than a billion, yet the true financial risk will not be revealed without a final contract. The financial analysis also does not account for adequate environmental mitigation for their shocking water and sewer relocation estimates that could result in a tripling of water bills in Montgomery and Prince George's counties. A preferred alternative should not be selected without understanding these costs. For these reasons, the ARDS do not need the MDOT defined purpose and need, which includes the goals of not requiring public subsidy and reducing traffic. Other alternatives that would result in less environmental degradation were arbitrarily rejected on the basis that they require a public subsidy. Because of this, MDOT must re-evaluate additional alternatives, including a comprehensive transit, land use, and demand management alternative that reduces vehicle trips, vehicle miles traveled, and greenhouse gas emissions. These ARDS will not achieve any of those goals.

**#3**

**#4** We're also disappointed by the few environmental impact minimization or mitigation measures. The DEIS must fully determine the impact of increased air pollutants and stormwater runoff as well as harm to adjacent parks, wetlands, waterways, homes, schools, and more. The extent of these impacts is incorrectly analyzed due to the narrow and unrealistic limit of disturbance. In conclusion, this Project fails to fully account for environmental, community, and financial costs and favors wealthy long-distance commuters. It ignores the climate crisis and the goal of a more sustainable future. Thank you.

---

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

MDOT understands the phenomenon of induced demand, and it is a consideration on all of our large roadway projects. In this case, MDOT is recommending adding capacity via managed lanes (HOT lanes) instead of widening with additional general purpose lanes. Managed lanes do a better job at regulating demand, including induced demand, due to dynamic pricing.

Our study shows that there could be some induced demand as a result of this project, but the impact will be small (less than 1% increase in vehicle miles traveled (VMT) in the region) and those effects are fully accounted for in the regional traffic models COG and TPB use. Even with these effects, the proposed managed lanes would reduce regional congestion delays and significantly improve travel times along both freeway corridors and on local roads throughout the region.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.4.M for a response to impacts to utilities and associated costs.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

**Response to DEIS Comment #4**
The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarized the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail and the SDEIS summarized the environmental effects of the Preferred Alternative. These analyses directly contributed to MDOT SHA's evaluation of the alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided.

Due to extensive coordination and consultation with local, state, and federal resource agencies and stakeholders throughout the NEPA process, MDOT SHA was able to advance avoidance and minimization measures for regulated and sensitive resources and property displacements along I-495 and I-270. This process resulted in a LOD that significantly avoided and minimized impacts associated with the DEIS Build Alternatives while appropriately addressing a wide range of water resources, parkland, and historic and/or cultural resources. MDOT SHA accomplished this through a number of approaches, including the elimination or relocation of managed lane access points, shifting the centerline alignment, reducing lanes, changing interchange configurations and other design refinements. Refer to **DEIS, Appendix B**, Alternatives Technical Report, **SDEIS, Chapter 2** and **FEIS, Chapter 3**. For the environmentally sensitive area surrounding the ALB, a separate "Strike Team" was convened to develop and evaluate alternatives for replacement of the ALB to avoid and minimize overall impacts to the (Chesapeake and Ohio) Chesapeake and Ohio Canal National Historical Park, Clara Barton Parkway, and the George Washington Memorial Parkway. Refer to **SDEIS, Chapter 4, Section 4.4**.

Refer to Chapter 9, Section 3.4.A for a response to Limits of Disturbance.

00022281



**CONSERVATION MONTGOMERY – CAREN MADSEN**

Thank you for your comment, responses are provided on the following pages.

| | |
|---|---|
| **From:** | Caren Madsen <carenmadsen@msn.com> |
| **Sent:** | Monday, November 9, 2020 10:32 AM |
| **To:** | MLS-NEPA-P3 |
| **Subject:** | COMMENTS from Conservation Montgomery |
| **Attachments:** | Conservation Montgomery comments on Beltway Expansion DEIS.pdf |

Our comments on the DEIS are attached.

**Caren Madsen**
Yoga and Pilates, Group and Private Exercise Instructor
(301) 943-8240



   

1



Conservation Montgomery

November 9, 2020

The Honorable Larry Hogan
The Honorable Peter Franchot
Gregory I. Slater, Maryland Department of Transportation
The Honorable Nancy Kopp
The Honorable Nancy King
The Honorable Al Carr
The Honorable Jeff Waldstreicher
The Honorable Cheryl Kagan
The Honorable Kumar Barve
The Honorable Lourig Charkoudian

**TRANSMITTED VIA EMAIL**

Dear Governor Hogan and Maryland Officials:

As you may be aware, Conservation Montgomery several years ago joined the Citizens Against Beltway Expansion and our colleagues with the Maryland Sierra Club, the Rock Creek Conservancy, the National Parks Conservation Association and Audubon Naturalist Society in opposing expansion of Interstate 495. I am writing on behalf of our board of directors and supporters to underscore our strong opposition to this project with a separate letter. Please enter our comments in the public record.

There are many factors which make Beltway Expansion a bad idea, not the least of which are the obvious ways the project would affect valuable natural resources. In addition, we wish to point out the way that commuting patterns are changing as a result of the pandemic and its overall impact on the economy and remote work for many companies and organizations. Now is **not** the time to consider spending $11 billion on this project when many companies will continue to downsize or cease to operate brick and mortar locations altogether, not that telework has proven to be productive and cost-effective.



Figure 1

A Brookings Institution analysis tells us that the COVID-19 pandemic is, among other things, "a massive experiment in telecommuting." With up to half of American workers currently working from home -- more than double the fraction who worked from home (at least occasionally) in 2017-18 -- the pandemic has made the multiple benefits of telework obvious. And researchers at the Maryland Transportation Institute have noted that "..the state can achieve significant    improvements in commute times by getting a relatively small percentage of people to work from home on a long-term basis."

Conservation Montgomery
P.O. Box 7292
Silver Spring, MD  20907

#1

#2

---

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.4 for a response on Resource Impacts Assessment.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic and teleworking.

#2 cont

The Metropolitan Council of Governments has also published data in its Commuter Connections report supporting the fact that more than half of the regional worksites will most likely continue to offer telework options long after the pandemic. (Fig. 1.) As a result of less commuter traffic, the region has seen improved air quality, which could give us a fighting chance to be part of a regional climate change effort.

#3

You have heard from many others noting the fact that the Beltway project would destroy more of our limited green space, including having an irreversible impact on 16 Montgomery County parks and 16 Prince George's County parks. Where there is green space, this is habitat for wildlife that represents valuable resources in our local ecosystem. We find that the discussion of environmental impacts in the State's DEIS for this project to be inadequate at best. The air quality section does not acknowledge the impact that Beltway expansion would have on already disproportionately affected areas in our communities, which already experience pollution at an unacceptable level.

#4

Current reductions in commuting to work by car offer us an opportunity to mitigate the impacts of climate change, and we need to seize the moment rather than expand I-495 and promote moving more cars on the Beltway. The State DEIS acknowledges that the Beltway expansion proposal will lead to increased particulate matter, carbon dioxide, ozone, nitrous dioxide and greenhouse gas emissions in local communities. Yet the document fails to address these concerns and how the impacts would be mitigated.

In addition to the way that Beltway expansion would be detrimental to air quality and add to climate change impacts, Conservation Montgomery is opposed to this project adding more than 550 acres of impervious surfaces to the area, drastically increasing the level of stormwater runoff, water pollution and risks from flash flooding. Watersheds such as Rock Creek, the Northwest Branch of the Anacostia River and Sligo Creek already suffer from the impacts of overdevelopment. The DEIS shows that nearly 30 miles of local streams, creeks and rivers would be adversely affected by Beltway expansion, and more than 50 acres of wetlands would be damaged or destroyed altogether.

#5

Expanding the Beltway makes no sense at a time when we are in transition as a society. We are rethinking how and where we work, and our natural resources will be the beneficiaries of more thoughtful planning that is compatible with changes in our commuting patterns. The consequences on vital natural resources is far too great to pursue Beltway expansion.

For the reasons we have outlined, we hope you will take this ill-fated project off of the table and instead, focus on improving public transportation and encouraging Maryland businesses and organizations to offer telework options to employees post-pandemic. Let's work together to learn from the lessons the pandemic has shown us – less vehicular commuting results in less damage to the environment. Beltway expansion is a ludicrous proposal and will only invite more traffic congestion over time.

Sincerely,

*Caren Madsen*

Caren Madsen
Chair, Board of Directors
CarenMadsen@gmail.com
ConservationMontgomery@live.com

Conservation Montgomery
P.O. Box 7292
Silver Spring, MD 20907

---

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.4.J for a response to impacts to wildlife and wildlife habitat.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.4.F for a response to adverse impacts to air quality.

Chapter 9, Section 3.4.E for a response to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**Response to DEIS Comment #5**
See responses above.

OP·LANES
MARYLAND | I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

**DONTWIDEN270.ORG – JANET GALLANT (EMAIL)**

| | |
|---|---|
| **From:** | Janet Gallant <jmbgallant@gmail.com> |
| **Sent:** | Sunday, November 8, 2020 1:51 PM |
| **To:** | MLS-NEPA-P3 |
| **Subject:** | Comments on I-495 & I-270 Managed Lanes Study DEIS |
| **Attachments:** | DontWiden270.org Comments on DEIS_Final.pdf |

Please see the attached comments on the I-495 and I-270 Managed Lanes Study DEIS/Draft Section 4(f) Evaluation submitted for your review by DontWiden270.org.

Thank you,

Janet Gallant, submitting on behalf of DontWiden270.org
664 Azalea Drive
Rockville, MD 20850
jmbgallant@gmail.com

Thank you for your comment, responses are provided on the following pages.

1

00022285

**Comments on the I-495 and I-270 Managed Lanes Study**
**Draft Environmental Impact Statement/Draft Section 4(f) Evaluation**
**Submitted by DontWiden270.org**

#1

DontWiden270.org supports the no-build option and opposes the addition of managed lanes to I-495 and I-270. This submission documents a substantive flaw in the DEIS for the I-495 & I-270 project (the "Project"): the Maryland Department of Transportation's (MDOT's) systematic undercounting and misrepresentation of public comments opposing the Project.

**Summary of DontWiden270.org's Findings**

#2

- Public comments are a critically important part of the NEPA process and must inform Project decision-making.
- Based on evidence in the DEIS, MDOT failed to carry out NEPA requirements related to public comments.
- MDOT used biased policies and processes to systematically undercount and mischaracterize public comments opposing the Project.
- MDOT had a written policy that applied only to opposition comments and led to undercounting.
- MDOT effectively hid opposition comments, including substantive technical comments, behind opaque, neutral theme labels incapable of conveying opposition content.
- MDOT's decisions about which types of comments to include in its totals led to undercounting of opposition comments.
- Of the 16,129 comments MDOT labeled and tabulated across three public comment periods, it identified only 955, or 6%, as opposing anything at all about the Project. This is not credible.
- The systematic undercounting and misrepresentation of opposition comments removes the public voice from decision-making about the Project and is a substantive deficiency in the DEIS.
- MDOT must correct this deficiency by relabeling and re-tabulating all previously submitted comments, this time using unbiased policies, processes, and tools.
- MDOT must fully, accurately, and publicly report on opposition submissions for the DEIS public comment period and ensure their use in decision-making.

#3

Under the NEPA process, MDOT is required to accurately report on the public comments it solicits and use those comments to inform decision-making about the Project. Instead of straightforwardly documenting public comments that were opposed to parts of all of the

1

**Response to DEIS Comment #1**
NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C. For a discussion of the basis for the Purpose and Need refer to **Section 9.3.1** and for the Selection of the Preferred Alternative refer to **Section 9.3.3.C**.

**Response to DEIS Comment #2**
The comments raised in the bullet points are addressed in the following pages.

**Response to DEIS Comment #3**
The Study began with publication of a Notice of Intent (NOI) on March 16, 2018. At the same time, the I-495 & I-270 Program website was launched as a means to share information and to gather feedback from the public (https://oplanesmd.com/). Pursuant to the CEQ regulations, publication of the NOI also began a formal "scoping" period. MDOT SHA conducted a series of four Public Scoping Open Houses around the study area, which hosted close to 400 attendees across Montgomery and Prince George's Counties. These open houses were widely advertised through advertisements in traditional media, correspondence, information posted on the Program website, and a variety of social media posts. Refer to **DEIS, Appendix P**.

In addition to the mandatory scoping requirements, MDOT SHA conducted additional information sessions, open houses, and provided comment periods during the development of the range of alternatives to be considered in the DEIS. Outreach on the first stage of alternatives development, the Preliminary Range of Alternatives, was conducted between July 2018 and January 2019. As with the first round of public scoping open houses, four large Preliminary Alternatives Public Workshops were broadly attended, with close to 600 attendees, including over a dozen elected officials. Attendees were able to listen to a presentation regarding the project, review display boards and a summary handout, ask questions of study team, interact with technical staff at small working group tables, and comment publicly on project information in front of the agency and other citizens. The comment period on the Preliminary Range of Alternatives was broadly utilized, with 2,282 submissions via hard copy comment forms, online forms, telephone, mail, and email. Refer to **DEIS, Appendix P**.

This transparent process of alternatives development continued into 2019 with another series of public meetings and outreach focused on the Alternative to be Retained for Detailed Study (ARDS) in the DEIS. From March to mid-June 2019, MDOT SHA conducted another eight large Alternatives Retained for Detailed Study Public Workshops and offered another comment period between April 11, 2019 and June 14, 2019. Over 1,000 people attended the workshops and the agency received over 1,000 comment submissions at the workshops or by mail or email.

Knowing the broad extent of public interest in the study and need for ample public involvement, MDOT SHA also conducted over 40 meetings during the alternatives development stage with various community associations, legislators, stakeholder organizations, and large property holders in the study area. Refer to **Table 5-5, DEIS, Appendix P**. In addition, MDOT SHA extended this outreach strategy to include many informal opportunities for interaction with the study team and agency staff between June 2019 and April 2020, prior to official publication of the DEIS. MDOT SHA conducted over 100 such meetings during that time period with individuals as well as small and large groups. All these meetings were organized and conducted in addition to the required formal comment periods.

**#3 Cont**

Project, MDOT systematically employed policies, processes, and practices that kept opposition comments from being accurately characterized and counted in reported data. As a result, MDOT presented decision-makers and the public with a false picture of the extent, nature, and substance of opposition to the Project.

The following sections present evidence of MDOT's intentional downplaying of opposition comments. The evidence comes from MDOT's own public-comment period summary documents and appendices as included in or referenced in the DEIS.

According to the DEIS, MDOT received over 3,900 public comment submissions over three public comment periods (DEIS, Chapter 7, p.2).[1]  Per MDOT documentation, the comment submissions contained 16,129[2] separate comments.

**MDOT Has a Written Policy That Applies to Opposition Comments Only**

MDOT quantifies and reports on the content of public comments by tabulating the theme labels it assigns to each comment.

MDOT established a policy to label a comment as being in opposition to the Project only if the submitter used exactly the right words. No comparable policy was established for pro-Project comments.

In MDOT's own words:
> "'Opposition to I-495 & I-270 Managed Lanes Study' was typically only selected [as a theme label] when a submitter stated it directly. Otherwise, opposition or critical sentiments toward the Study/proposed improvements may be interpreted through [such theme labels as] 'Support for Alternate Transportation Improvements,' 'Effectiveness of Proposed Alternatives in Addressing Traffic,' 'Support for Transit,' or 'Support for Alternative 1/No-Build'"(Summary of Public and Stakeholder Engagement for the Recommended ARDS, p. 24).

A clear example of how this played out is the unequal treatment of an opposition letter signed by multiple grassroots groups and a pro-Project letter signed by multiple business groups[3]:
- The opposition letter spoke of the "egregious failures" of Project alternatives. MDOT gave the letter the following three theme labels, none of which indicate opposition of any kind:

---

[1] All page numbers refer to pages in the PDF file, not necessarily numbers on the pages themselves. A list of references and their URLs is at the end of this document.
[2] The total of 16,129 separate comments is derived from the following: Scoping Report, Table 4, pgs. 10-11; Alternative Public Workshops Summary, unnumbered tables on p. 55; and ARDS Summary, text on p. 24.
[3] The opposition letter is at ARDS Summary, p. 419; its MDOT-assigned theme labels, p. 292. The regional businesses letter is at ARDS Summary, p. 446; its MDOT-assigned theme labels, p. 294.

2

---

In total, over 5,000 comments were received during the study comment periods from Scoping through SDEIS. These comments were organized into relevant comment themes and summarized in respective reports. To be fully transparent and to ensure all comments were able to reach other citizens, the comment summary reports, including the individual submissions, were made publicly available on the Program website.

Finally, based on the extensive comments received both in and outside of formal comment periods, MDOT SHA made substantive changes to the Preliminary Range of Alternatives considered, added new alternatives, altered study elements of proposed build alternatives, conducted additional analyses and outreach, refined design to avoid and minimize impacts and ultimately chose a Preferred Alternative that addressed concerned raised over the life of the study.

Refer to Chapter 9, Section 3.7 for a response to comments related to public involvement and engagement.

See response to Comment #3 above.

**#3 Cont**

- "I-495 & I-270 Managed Lanes Study Process/NEPA"
- "Public-Private Partnership Program"
- "Support for Transit"
  - o In contrast, the business groups' pro-Project letter – nearly identical in length to the opposition letter – received seven theme labels, five of which call out support, even though the letter writers used the word "support" only once:
    - "Public-Private Partnership Program"
    - "Regional Economy"
    - "Support for General Price-Managed/Toll Lanes"
    - "Support for High-Occupancy Vehicle Lanes"
    - "Support for I-495 & I-270 Managed Lanes Study"
    - "Support for Specific ARDS Build Alternative"
    - "Support for Transit"
  - o MDOT interpreted multiple instances of support in the pro-Project letter – not hard to do.
  - o But MDOT failed to interpret any opposition in the letter that speaks of the Project's "egregious failures".
  - o The disparity is significant first because in MDOT's accounting, numbers matter. In the case of these two letters, the theme label count of 0 instances of opposition and 5 instances of support presents a dishonest picture of the points raised.
  - o The disparity is also significant because MDOT effectively hid from decisionmakers the presence of substantive technical information contained in the opposition letter.

The following are two examples of the significant number of individual submissions with MDOT-assigned theme labels that nullified the writers' opposition to the Project:
  - o "Terrible idea! You're going to adversely impact quality of life and potentially adversely impact property values for an entire community with no likely long-term benefit to the traffic conditions in Montgomery County. This looks like a fast-moving train by financially interested parties, with no concern for affected Montgomery homeowners. The Governor should care about these voters' concerns and rights!! Over the long haul, this will reduce the excellence of one of our school systems in the country because of impact on community" (*ARDS Summary*, p. 148).
    - MDOT did not label this submission as opposing anything. The comment's three assigned theme labels effectively hide the writer's voice and intent:
      - "Property/Community Impacts"
      - "Effectiveness of Proposed Alts. in Addressing Traffic"
      - "I-495 & I-270 Managed Lanes Study Process/NEPA"
  - o "Please please make sure the tolls are reasonable for average people. $45 tolls like they have in VA would mean only rich folk could use the road. We cannot treat taxpayers that way" (*Scoping Report*, p. 141).
    - MDOT actually labeled this submission as supporting the project and gave it two other labels, both opaque: "Study Integrity" and "Quality of Life."

3

#4

**MDOT Says Opposition Must Be "Interpreted" from the Theme Labels, but MDOT Makes That Impossible**

MDOT chose varying menus of primarily neutral, opaque theme labels that were incapable of effectively conveying the points found in opposition submissions. MDOT's themes worked to confuse, neutralize, and hide the content of public opposition comments.

MDOT even acknowledged this in writing: "Comments under neutral themes (i.e., comment themes without "support" or "opposition") are not necessarily neutral in tone" (_ARDS Summary_, p.24).

In the NEPA process for a program as large, costly, long, consequential, and controversial as this one, there is no excuse for not having a menu of theme labels that actually fits the Project and is capable of capturing and conveying the public's reaction to it. Anything less, including what we see here, violates the requirements of the NEPA public comment process.

What we see includes numbers, names, and definitions of themes varying significantly across the three comment periods, making it impossible to compare theme totals, or to "interpret" – as MDOT says we must – what the public in aggregate was saying.
- The first public comment period had 17 themes; the second comment period had 7; the third comment period had 38 (_DEIS Appendix P_, pp. 17, 32-33, 52-56).
- The names and definitions/scopes of the themes changed between comment periods:
  - The theme "Environmental" in the first comment period is defined as "Mentioned environmental aspects, such as wildlife and natural resources" (ibid., p. 16).
  - The theme "Environmental Considerations" in the second period covered natural resources and wildlife habitat, traffic noise levels, vehicle emissions, air quality, residential property, and overall quality of life (_Alternative Public Workshops Summary_, pgs. 16-17). NOTE: Including opposition comments about 'residential property' and 'overall quality of life' under Environmental Considerations in this context is the same as burying those comments.
  - The theme "General Environmental Impacts" in the third period meant general pollution and potential physical impacts to the environment (_DEIS Appendix P_, p. 53).
- The definitions of themes became increasingly opaque from one comment period to the next. In the first period, at least some of the definitions included the word "concerns" indicating, for instance, that a comment labeled "Noise" was about "Specific noise concerns" (_DEIS Appendix P_, p. 17). By the second and third periods, the word "concerns" disappeared, and all theme labels just indicated that the commenter made a statement, question, or suggestion about the theme. Most theme labels gave no indication of the writer's opinion or point of view.

For the second comment period, MDOT did not provide a matrix showing each individual comment matched to its theme labels. We know the matching was done because there are

4

**Response to DEIS Comment #4**

The common themes are unique to each comment period based on the comments received. They have evolved as the Study has moved throught the NEPA process. As noted earlier idneitfying common themes is common-practice and allowable by CEQ regulations when there are voluminous comments. Most importantly, MDOT SHA and FHWA reviewed and considered all comments received over the life of the study. The comments received have informed the NEPA process from Scoping through identification of the Preferred Alternative. Refer to DEIS Chapter 7, SDEIS Chapter 7, and FEIS Chapter 8.

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study   Case 8:22-cv-02597-DKC   Document 61-6   Filed 10/30/23   Page 11 of 97

FINAL ENVIRONMENTAL IMPACT STATEMENT

#4
Cont

cumulative totals in the summary table in the *Alternative Public Workshops Summary* (Appendix C, p. 55). We also know because MDOT speaks in vague terms about it: "A number of comment submissions stated preference for HOV lanes, opposition to HOV lanes or suggestion on how to most effectively implement HOV lanes in the Study, and questions about tolling" (*DEIS Appendix P*, p. 32).

But for the second comment period, we can't see individual comments matched to their MDOT comment labels. Here's why this disadvantages opposition comments:
   o The second comment period had the largest number of submissions: 2,282.
   o The majority of comments were from Rockville and Silver Spring (*DEIS Appendix P*, p. 32), where levels of opposition to the P3 project were -- and remain -- high.
   o That means many of the comment submissions for this period were in opposition to the Project.
   o But without the ability to see comments matched with their theme labels, the public has no way to verify the accuracy of MDOT's labeling and characterizations and no way to hold MDOT responsible for mislabeling and miscounting.
   o The voices of opposition comment submitters are functionally lost.

#5

**MDOT's Decisions about Which Comment Submissions to Include in Its Totals Led to Undercounting of Opposition Voices**

The following examples are evidence of how MDOT's "gatekeeper" decisions disfavored opposition submissions.

MDOT counted two opposition petitions, with a total of 1,950 signatures, as only <u>two</u> comments in the official tally:
   o In MDOT's own words: "Petitions were received from Growing East County (with 1,323 signatures) and Sierra Club, Maryland Chapter (with 627 signatures). Each petition was counted as one comment submission" (*Alternative Public Workshops Summary*, p. 14).
   o MDOT did this, even though the submitter of the Growing East County petition wrote: "Attached are signatures and comments...in opposition to the proposed Beltway widening. Contact information for each of the petition signers can be provided if necessary for the public record" (ibid., p. 97).

In contrast, MDOT appeared to count **supportive submissions with identical content as discrete submissions.** In MDOT's own words: "Submissions with almost identical content in support of the Study accounted for 141 submissions containing the 'Support for I-495 & I-270 Managed Lanes Study' comment theme" (*ARDS Summary* p. 24). This appears to mean that of the 157 comments listed in the ARDS final summary table (pgs. 24-25) as being in support of the Managed Lanes Study, 141 were cut-and-pastes of identical text.

5

**Response to DEIS Comment #5**
As mentioned above, a comment received is only counted once in the totals presented. A single comment submitted could raise many issues or common themes but it is still only counted once in the total. Likewise a comment or petition submitted that is signed by many signatories is only counted once. Also a comment stating support or opposition is not a yes/no vote for a project.

See response to Comment #5 above.

**#5 Cont**

Comments received by telephone during the second comment period, as recorded in the *Alternative Public Workshops Summary* table (p. 55), show 115 calls received: 12 of the callers were counted as not supporting the Managed Lane Study. However, one of the 115 lines detailing those calls says, "8/8/2018: 26 calls captured - Opposed to project – destroy homes, community – Rockville" (p. 57). Those 26 opposition calls were counted as only one call.

**MDOT's Treatment of Opposition Comments Makes Its Final Accounting Not Credible**

Given MDOT's systematic downplaying of opposition comments, it's no surprise that the third comment period's summary table, in quantifying 3,873 comments found in 1,035 submissions, identified only 335 comments, or less than 10%, as opposing anything at all (*ARDS Summary*, pp. 24-25). Even with the addition of the 81 comments labeled "Support for Alternative 1-No Build," the total shown as opposing any part of the Project is under 11%.

MDOT's combined totals for all three public comment periods identifies only 955 comments out of 16,129 -- 6% -- as opposed to any part of the Project.

This accounting is not credible and not acceptable. As the evidence presented here indicates, significant numbers of opposition comments were systematically neutralized. The actual voice of the public was effectively removed from the DEIS and the decision-making process.

**MDOT Must Give the Public Back Its Voice and Give Decision-Makers Access to Accurate Information about Public Opposition to the Project**

MDOT was required to fully and accurately report on public comments as part of the NEPA process. The evidence found in or referenced in the DEIS of biased policies, processes, and practices, and the resulting minimizing of public comments in opposition to the Project is proof that MDOT has not complied with this requirement.

MDOT must correct the record of all three public comment periods:
- MDOT must create new menus of themes that enable the truthful and accurate capture of opposition comments.
- MDOT must relabel all comment submissions from the first three comment periods using the new menus of themes.
- MDOT must compile individual comment/theme-label matrices and summary tables for all three comment periods and make them easily accessible by the public as part of the process of addressing the DEIS deficiencies.
- MDOT must allow the public an opportunity to review and comment on the accuracy and completeness of the corrected record of public comments.

For the DEIS public comment period, MDOT must use new, unbiased policies, processes, and tools to ensure that all opposition comments are fully and accurately reported on for public review and use by decision-makers.

6

**References**

*Alternative Public Workshops Summary*
https://495-270-p3.com/wp-content/uploads/2019/01/495270MLS_PW_Summary012418_FINAL.pdf

*Draft Environmental Impact Statement, Appendix P - Public Involvement & Agency Coordination Technical Report*
https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_AppP_PITR_web.pdf

*Draft Environmental Impact Statement, Chapter 7 - Public Involvement and Agency Coordination*
https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_Ch7_PublicInvoAgencyCoord.pdf

*Scoping Report*
https://495-270-p3.com/wp-content/uploads/2018/06/ScopingReportWithAppendices_06.22.2018.pdf

*Summary of Public and Stakeholder Engagement for the Recommended Alternatives Retained for Detailed Study (ARDS)*
https://495-270-p3.com/wp-content/uploads/2019/09/FINAL_SummaryPublicStakeholderEngagementRecARDS_wApp_REDUCED.pdf

*This page is intentionally left blank.*

7

**DONTWIDEN270.ORG – JANET GALLANT (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Janet Gallant

**Joint Public Hearing Date:** 8/18/2020

**Type/Session:** Live/Morning

**Transcription:**

This is Janet Gallant. [FACILITATOR SPEAKS] I'm Janet Gallant, G-A-L-L-A-N-T. I'm representing dontwiden270.org. I live at 664 Azalea Drive in Rockville.

#1

Our organization with over a thousand members does not support the I-495 & I-270 P3 project. We support the No Build option. This is the fourth public comment period. Per MDOT, the public previously submitted over 3,900 comments. We reviewed DEIS source documents to see how MDOT handled the comments and it's troubling. MDOT undercounted public comments opposing the P3 project. This matters. Agencies can't make informed decisions without accurate data. I'll give examples and document them in my written submission. Here's a specific case of undercounting from the alternative public workshop summary. These are MDOT's own words.

Quote, "Petitions were received from growing East County with 1,323 signatures and Sierra Club Maryland chapter with 627 signatures. Each petition was counted as one comment submission." End quote. 1,950 people counted as 2.

Here's another case. MDOT gave labels to every public comment like, 'supports the project' or 'opposes the project' or something more neutral like, 'commute.' MDOT tallied the labels to summarize public input, but MDOT labeled the comment as 'opposing the project' only if the submitter had used exactly the right words. There was no such rule for comments supporting the project. You can view the rule in MDOT's own words on page 24 of the ARDS summary. To see how this played out, listen to 3 excerpts from public comments in MDOT's files.

#2

1.) Our opposition will never seize to proposals that benefit only the privileged. 2.) We should not be spending resources and time on twentieth century solutions proven to increase car trips. 3.) When is a large road too big? When local citizens, who would be affected by the road are up in arms against this expansion. Not one of these comments was counted as opposing the project. So it's no surprise that the ARDS summary says that of over 3,800 comments, less than 10 percent were opposed to anything. The public has been reaching out to MDOT since 2018, saying this project's too costly, too destructive, and won't fix congestion. If our voices have not been accurately counted, what other MDOT data can't we trust? This is a new comment period so to MDOT, this time, label and accurately count the thousands of public comments telling you, in whatever words they used, this P3 project has to stop. Thank you.

**Response to DEIS Comment #1**
Refer to the responses to your same concerns addressed in the comment received via email above.

**Response to DEIS Comment #2**
The Study's Purpose and Need allowed for a robust analysis of a full range of alternative that included evaluation of non-tolled, general purpose lanes, tolled managed lanes, transit only, and a combination of highway and transit improvements. Initially a range of 15 preliminary alternatives were identified and analyzed based on previous studies and planning documents, input from the public and federal, state and local agencies during the scoping process. Additional alternatives were identified and analyzed in direct response to public and agency comments for a total of eighteen different alternatives.

Non-highway alternatives were considered during the alternatives screening process. These included heavy rail and light rail parallel to the existing alignments (the Purple Line Light Rail was already proceeding), fixed guideway or Bus Rapid Transit along a new alignment parallel to the existing highway alignments and dedicated managed bus lanes on I-495 and I-270. *See DEIS Appendix B* at pgs. 19-27. As with all the alternatives under the Preliminary Range of Alternatives, these non-highway options were evaluated using the various project needs, a review of available data, similar proposals that had been made over time, as well as a qualitative traffic assessment of each alternative's potential to reduce congestion on I-495 and I-270. For all the major areas of concern, the standalone transit options failed to address the Study's Purpose and Need and had major engineering and operational challenges associated with them. Based upon the analysis conducted and presented and input from agencies and public, FHWA and MDOT determined they would not adequately address long-term traffic growth, address trip reliability, roadway choices, and none of them accommodated homeland security and freight movement needs. For these reasons, those preliminary standalone transit alternatives were dropped from further consideration.

Refer to Chapter 9, Section 3.7 for a response to comments related to public involvement and engagement.

DONTWIDEN270.ORG – SALLY STOLZ

NAME: SALLY STOLZ                          I OPPOSE this project.
5 Lochness Ct., Rockville, MD              I support the No-Build Alternative
sallystolz@aol.com  (301) 906-4908
I am a co-coordinator of DontWiden270.org

Testimony.
**Documentation added in bold. (Anything in bold won't be read)**

I am Sally Stolz. I have lived at 5 Lochness Ct., Rockville, MD for 32 years.

I am a former CPA and Montgomery County Public Schools math teacher. I began
researching this P3 project over two years ago. .I strongly oppose this project. I
support the No Build alternative.

This project has MANY fatal flaws. In my 3 minutes, I will list a few. The written copy
I am submitting details the sources of all my facts and quotes..

**#1**

1. **THE WHOLE DEIS SHOULD BE REDONE TO STUDY ALTERNATIVE
   CONGESTION RELIEF MEASURES**

**#2**

2. At this point, embarking on this project would be CREATING congestion
   where none exists. The pandemic has forced workers and employers to make
   teleworking work. Currently traffic is only 85% of its pre-pandemic level and
   traffic congestion is essentially gone. ..**Research by the Maryland
   Transportation Institute at the University of Maryland found that a 15%
   reduction in cars during peak hours gives a 71% reduction in
   congestion on I-270. At the Aug. 13 briefing at the Transportation and
   Environment Subcommittee of the House Appropriations Committee
   Lei Zhang of the Maryland Transportation Institute said "If we just look
   at I-270 and get 15% fewer drivers that equals a 71% reduction in
   congestion on I-270!"**

**#3**

3. except for the northbound I-270 bottleneck, north of I-370, which would
   become WORSE if the toll road were built. . **[This is where 6 lanes funnel
   into two lanes. If the toll road were built, eight lanes would funnel into
   two lanes.]**

**#4**

4. We have conquered congestion through telework and there is no going back.
   **In partnership with Intel, Bert Sperling, founder of BestPlaces, found
   that "A single Washington, D.C. office worker who teleworks JUST ONE
   DAY each week can see annual average savings of $645 in
   transportation costs and $3,769 in time savings. According to Bert
   Sperling, founder of BestPlaces, a publisher of city rankings that
   partnered with Intel to look at which cities would benefit most from
   teleworking. He was quoted in a June 9 AARP article.
   [https://www.aarp.org/work/working-at-50-plus/info-2020/telework-**

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

**OP·LANES™**
MARYLAND
I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

#5

Purple Line builders quit, state transit chief tells court" by Katherine Shaver, Washington Post September 8, 2020] MDOT is desperate for budget cuts. CUT HERE. **For an Aug. 3 National Public Radio (NPR) article ["Maryland Says It Needs More Federal Aid to Survive Economic Effects of COVID-19"] Maryland's State Budget Secretary, David Brinkley, said the state ended its fiscal year on June 30 with a $925 million drop in tax revenue and he expects it to be down $2 billion for the current fiscal year. The article delineated some approved budget cuts, such as nearly $190 million from higher education and community colleges, and quoted Gov. Hogan saying "Responding to this crisis has created a multiyear budget crisis unlike anything the state has ever faced before, more than three times worse than the Great Recession."**

[12] It would be a dereliction of duty to put Maryland taxpayers at such dire financial risk for a project which will do immeasurably more harm than good.

Sally Stolz

This comment is a duplicate of the comment above, see previous pages for responses to your comments.

I am a former CPA and Montgomery County Public Schools math teacher. I began researching this P3 project over two years ago. I strongly oppose this project. I support the No Build alternative.

This project has MANY fatal flaws. In my 3 minutes, I will list a few. The written copy I am submitting details the sources of all my facts and quotes.

1. **FIRST: THE WHOLE DEIS SHOULD BE REDONE TO STUDY ALTERNATIVE CONGESTION RELIEF MEASURES**
2. At this point, embarking on this project would be CREATING congestion where none exists. The pandemic has forced workers and employers to make teleworking work. Currently traffic is only 85% of its pre-pandemic level and traffic congestion is essentially gone, except for the northbound I-270 bottleneck, north of I-370, which would become WORSE if the toll road were built.
3. We have conquered congestion through telework and there is no going back.
4. Teleworking works, is popular, saves workers thousands of dollars annually and can improve their quality of life and health.
5. This DEIS never studied viable congestion relief alternatives such as teleworking or expanding transit. It began with only one GOAL in mind – adding a toll road. Since we KNOW teleworking WILL solve congestion, the whole DEIS should be redone to study alternative congestion relief measures.
6. **SECOND: THE TOLL ROAD IS INEQUITABLE!!.**
7. The DEIS shows the only RELIABLE benefit of the toll road would be for TOLL ROAD USERS - the wealthy people who could afford the VERY HIGH TOLLS. 85 TO 90% of commuters on 270 will be in the regular lanes. The DEIS numbers show their commute will be unpredictable, unreliable and SLOWER than it is now. MDOT has been misleading the public. The DEIS shows insignificant and unreliable traffic reduction in the general lanes.
8. **THIRD: Most TAXPAYERS WILL see NO BENEFIT from this project, BUT BEAR HUGE COSTS AND RISK!** Chapter 2 states it would cost from $482 million to $1 billion in taxpayer subsidies. And the DEIS doesn't even consider the $1 - $2 billion for relocating WSSC pipes or the huge secondary expenses for Rockville and other communities. And what if there are problems, such as the Purple Line is experiencing?
9. RISKY BUSINESS! The collapse of the Purple Line has demonstrated how risky P3s are! The pandemic has drastically altered Maryland's finances. The state is already facing $3 billion in possible transportation cuts over the next six years, MTA administrator Kevin B. Quinn Jr. reported, and financing the remaining Purple Line consruction would require the state to divert money from other transit systems. MDOT is desperate for budget cuts. CUT HERE.
10. It would be a dereliction of duty to put Maryland taxpayers at such dire financial risk for a project which will do immeasurably more harm than good.

00022296

**ENVIRONMENTAL JUSTICE OF THE CEDAR LANE UNITARIAN UNIVERSALIST CHURCH – CHRISTIANE GRAHAM**

Maryland Department of Transportation
Lisa B. Choplin, DBIA

707 North Calvert Street, Mail Stop P601

Baltimore, MD 21202

November 6, 2020

Re.: I vote against the P3 project, widening of I-495 and I-270

Dear Ms Choplin,

**#1**

As a person of faith I speak out against the widening of I-495 and I-270 with 4 luxury toll lanes (P-3 Plan) and support a no-build option. As Unitarian Universalist I believe in our 7th principle: "Respect for the interdependent web of all existence of which we are a part."

It is unconscionable to pursue the widening of these two highways and the associated negative environmental impacts on our parks, wetlands and waterways, the increased noise levels to adjacent properties, and increase in global warming vehicle emissions.

**#2**

In addition I am disappointed by the lack of transparency by our political representatives. Recently a $ 2 billion price tag came to light from the Washington Suburban Sanitary Commission (WSSC) to pay for moving sewer/water lines and storm water management systems. WSSC has informed Prince Georges and Montgomery counties about this hefty sum with all costs falling on the customers of the utility under current law.

The private company that would build the lanes and collect the tolls won't have to pay anything to defray the costs projected by WSSC, Should their income quota from tolls not be reached, we, the tax payers have to make up the differences in addition to covering the $ 2 billion with rate increases.

**#3**

Currently both highways are easy to travel on during rush hour due to COVID-19 work-from-home measures. The full economic impact of COVID-19 has yet to be determined, but it is already clear that the economic downturn and restructuring will last for years to come. Many businesses are closing office space permanently to save costs with more staff working remotely.

**#4**

It is highly irresponsible of our elected officials to further spend tax payer funds on pursuing the expansion of I-495 and I-270, that only some well to do consumers will benefit from.

---

**Response to DEIS Comment #1**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives.

Refer to DEIS, Chapter 3 and DEIS Appendix C. Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarized the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail and the SDEIS summarized the environmental effects of the Preferred Alternative. These analyses directly contributed to MDOT SHA's evaluation of the alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.4.M for a response to impacts to utilities and associated costs.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section for a response on Purpose and Need and effects of the Pandemic.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

#5

It would be advisable to seriously consider exploration of public transportation options that have minor environmental impact, would cost a fraction of the P-3 option and serve the whole community.

Please view this clip on monorail trains for further information:

https://vimeo.com/311318253?ref=fb-share&fbclid=IwAR1GKT-iChJjxOyutW26y04ABC8SMNLMR5JfWOuarxBoYWI6WSDcWWGfxIM

Sincerely

Christiane Graham, *Christiane Graham*

Member of the Environmental Justice Ministry,

Cedar Lane Unitarian Universal Church, Bethesda, MD

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

**ENVIRONMENTAL JUSTICE OF THE CEDAR LANE UNITARIAN UNIVERSALIST CHURCH – LEE MCNAIR**

**From:** lee mcnair <dragonpern132@gmail.com>
**Sent:** Monday, November 9, 2020 4:55 PM
**To:** MLS-NEPA-P3
**Subject:** EJM supports the NO-BUILD option

#1 I am co-leader of the Cedar Lane Environmental Justice Ministry (9601 Cedar Lane, Bethesda, MD, 20815) and am submitting this testimony for our organization. We support the NO-BUILD option of the P3 highway project. We'll not list all the reasons we oppose this project as we would likely be writing for the next three weeks. Here are just a few of our objections.

#2 We oppose harm to the marginalized communities along the highways.

#3 We don't believe this will solve the traffic problem. In fact, we believe it will increase the problem. (See the pre-covid situation on I-495 in Virginia. The claims of the Maryland DEIS are the same as those made in the Virginia FEIS and obviously were in error. Why on earth would anyone expect a different outcome from a similar situation?)

The DEIS claims to offer "choice " but the only choice is extreme congestion or extreme tolls.

#4 So many questions have not been answered. Where are the environmental impact studies? Where are the comparative studies of mass transit to highway widening, for example?

We believe that this project will harm, not only humans, but biodiversity, parklands, stormwater runoff management, our streams, rivers, our Bay. It will harm the wellbeing of countless Marylanders, their churches, homes, schools, and communities.

Therefore we oppose highway widening and we support the NO-BUILD option.

Lee (she, her)
"May you be filled with loving kindness.
May you be safe from inner and outer harm.
May you be healthy in body and mind.
May you find Peace and be truly happy. "

1

**Response to DEIS Comment #1**
NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives.

Refer to DEIS, Chapter 3 and DEIS Appendix C. Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 Phase I South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

Refer to Chapter 9, Section 3.6.B for a response to toll rate ranges and toll rate setting process.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**ENVIRONMENTAL JUSTICE OF THE CEDAR LANE UNITARIAN UNIVERSALIST CHURCH – NANCI WILKINSON**

Thank you for your comment, responses are provided on the following pages.

| | |
|---|---|
| **From:** | nanci wilkinson <nancivilkinson@gmail.com> |
| **Sent:** | Thursday, October 15, 2020 6:00 PM |
| **To:** | MLS-NEPA-P3 |
| **Cc:** | managed.lanes@montgomerycountymd.gov |
| **Subject:** | Cedar Lane Unitarian Universalist Church Ministers and Environmental Justice Ministry support the NO BUILD Alternative for the Beltway Expansion |
| **Attachments:** | Best Abhi Testimony Beltway.pdf |

Sirs:

Please find attached our testimony for the NO BUILD Alternative on the Beltway expansion.

Thank you.

Nanci Wilkinson
Chair
Environmental Justice Ministry
Cedar Lane Unitarian Universalist Church

1

00022300

**Cedar Lane Unitarian Universalist Church Ministers and Environmental Justice Ministry Support the No Build Alternative**

#1

The Cedar Lane Unitarian Universalist Church in Bethesda is located right next to the Beltway and would be very adversely affected if the Beltway was widened. We support the No Build Alternative.

#2

Cedar Lane is a religious community that holds respect for the interdependent web of all existence of which we are a part as one of its main principles. The natural habitats and walking trails of Rock Creek Park are part of Cedar Lane's appreciation of spirituality in nature. The creek, the estuaries and wildlife adjoining Beach Drive and our church grounds are a community gathering place. The effect on Cedar Lane because of its bucolic setting may greatly impact its membership and growth.

Construction on the beltway widening would remove the natural habitat surrounding Rock Creek and would result in stream degradation. The Draft Environmental Impact Statement states this removal of natural habitat would be mitigated but, because it would take place in an area far removed from this affected part of Rock Creek, is not a true mitigation as it can never replace the existing forest, wildlife and plant life. The DEIS would give "water quality credits" for mitigation purposes which would amount to buying rights and easements in other wetlands far from the affected area.

**Response to DEIS Comment #1**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to DEIS Comment #2**

Thank you for your comment concerning impacts to the Cedar Lane Unitarian Universalist Church, Cedar Lane, and Rock Creek Park. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the Supplemental DEIS on pg. 1-2. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Cedar Lane Unitarian Universalist Church, Cedar Lane, and Rock Creek Park are located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

See response to #2 above.

#2
Cont

Healthy rivers and streams require a natural buffer from human development due to erosion and pollution runoff. The 52-63 acres of impervious surface water runoff in Rock Creek watershed would put forests at risk throughout the affected 10 mile segment. Storm water management would be increasingly strained on already insufficient piping, and the relocation of 27 miles of required WSSC water and sewer lines would cost approximately 1 billion dollars, an item not addressed in the DEIS economic impact.

Since the Maryland Department of Transportation and the Federal Highway Administration have changed the configuration of the affected Rock Creek Park area to be closer to the Cedar Lane congregation, the noise level would be even higher than originally proposed. It is difficult to see in the DEIS how high the noise level would be. The loss of tree canopy would add to the increase in noise. Even now, the congregation members, who take pride in taking care of Rock Creek Park twice a year, have great difficulty hearing when there are outdoor events, such as our cleanups of Rock Creek Park, nature walks and spirituality retreats. The existing vegetation and forested areas would never be the same, particularly with the hugely increased noise levels affecting all the wildlife, birds and stream beds and natural habitats in the park. The CDC says noise levels above 70dB may damage a person's hearing but in the DEIS there is no definition of how high the noise would be in the affected Rock Creek area.

#2
Cont

It is fortunate that the Maryland National Parks and Planning Commission (M-NCPPC) at least partially owns both Rock Creek and Sligo Creek Park under the Capper-Cramton Act. This would prohibit the use, unless agreed to by the M-NCPPC, by the FHA, the MD DOT & the SHA for construction and expansion purposes on the Rock Creek parkland according to sources at the M-NCPPC. The acceleration of this environmentally detrimental project has made it imperative that we ensure that this historic law continues to protect our parklands.

The total impact on about 80 acres, which this proposed project is attempting to buy, use or usurp by eminent domain is shocking. Included are:

#3

47 different parks (6 national
    & 41 local and regional)
130 acres of parkland
1500 acres of tree canopy
130 miles of stream beds
410 acres of sensitive & unique
    Areas
16 acres on the C&0 Canal
    (under construction for 5
    Years)
One third of Plumbers Island
Road Widening loss of tree
Canopy on:
69.3 acres on BW Pkway
1.8 acres on Clara Barton Pkway
12.2 acres on GW Pkway

See response to #2 above.

**Response to DEIS Comment #3**
Due to extensive coordination and consultation with local, state, and federal resource agencies and stakeholders throughout the NEPA process, MDOT SHA was able to advance avoidance and minimization measures for regulated and sensitive resources and property displacements along I-495 and I-270. This process resulted in a Limit of Disturbance (LOD) that significantly avoided and minimized impacts associated with the DEIS Build Alternatives while appropriately addressing a wide range of water resources, parkland, and historic and/or cultural resources. MDOT SHA accomplished this through a number of approaches, including the elimination or relocation of managed lane access points, shifting the centerline alignment, reducing lanes, changing interchange configurations and other design refinements. The final environmental impacts associated with the Preferred Alternative are presented in FEIS, Chapter 5.

#3
Cont

10 mile segment of Rock Creek
Park
52-63 acres of impervious
Surface runoff in Rock Creek
Watershed
Historic properties

#4

The proposed project conflicts with other Unitarian Universalist principles that affirm and promote justice, equity and compassion in human relations and the inherent worth and dignity of every person. The marginalized communities living near the project widening areas who are massively impacted by the air pollution and adverse effects from the current auto carbon/methane emissions they breathe are greatly overlooked in the DEIS. The greenhouse gas emissions with harmful particulates in the air will increase during and after construction of the Beltway. In addition, as a further inequity, these communities cannot afford either the managed (toll) lanes or the time lost in the intentionally slower (general) lanes in the proposed widened Beltway. The choices for these lower income communities to have transportation to work are very few and may result in more job losses and greater inequities as a result of this project. Overall, this project would have a disproportionate negative effect on these communities.

The DEIS fails to satisfy the stated purpose (to improve traffic) and needs (to protect the environment) that it was instructed to do. Key among these issues are that the DEIS:

See response to Comment #3 on previous page.

**Response to DEIS Comment #4**
The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts, including Environmental Justice, and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarized the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail and the SDEIS summarized the environmental effects of the Preferred Alternative. These analyses directly contributed to MDOT SHA's evaluation of the alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.


See response to Comment #4 above.

**#4 Cont**

- 1st, fails to conduct and display the required "hard look" at the potential for adverse health and environmental impacts including environmental justice, effects, especially in light of recently curtailed national air pollution, fuel efficiency, and other rules, which thus violates rules allowing the public to understand and comment and allowing relevant agencies to completely consider impacts and mitigations,

**#5**

- 2nd, uses an overly narrow set of options, which are simply variations on a theme of highway expansion and tolls, with no meaningful variety and especially any local-serving transit and related options, which thus violates EIS rules regarding the need for a reasonable range of alternatives, as clearly described in cases such as NRDC v. Morton, 1972,

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.2.A for a response to Screening of Preliminary Alternative Process.

**Response to DEIS Comment #6**
Refer to Chapter 9, Section 3.1 for a response on the Purpose and Need and effects of the Pandemic.

**#6**

- 3rd, fails to address the pandemic's effects, per 40 CFR 1502.9(c)(1), which states that agencies shall prepare supplements if there are significant new circumstances or information; this is a monumental omission that demands a full stop to the process until adequate supplements are developed and given proper public review,

**Response to DEIS Comment #7**
Refer to Chapter 9, Section 3.1 for a response on the Purpose and Need and effects of the Pandemic.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**#7**

- 4th, will not pay for itself as claimed, but rather will cost the state billions, especially given the pandemic's long-term effects, and yet no itemized budget has ever been shared, which is yet another violation of the rules, and

**Response to DEIS Comment #8**
Refer to Chapter 9, Section 3.4.G for a response to climate change and greenhouse gas considerations.

**#8**

- 5th, perhaps the most significant issue of all, lacks any consideration of county, state, or international climate crisis plans, without even one mention of climate effects

See response to Comment #8 above.

**#8 Cont**

in the DEIS, and with flawed and laughable assumptions such as little or no increase in vehicle miles traveled (VMT); to be clear, this failure ignores the very real and existential impact on our sheer existence and that of every other species, which would be—and this is no exaggeration—a crime against humanity and nature.

The project would completely conflict with the Maryland Greenhouse Gas Reduction Act of 40% reduction by 2030. The list of negative environmental impacts includes the degradation of waterways and wetlands. The Limits of Disturbance (LOD) are not thoughtfully examined in all their social, economic and cultural elements. The five year construction period is barely mentioned, yet it would have huge implications for human well being, health and work issues. It would be foolhardy to have the Limits of Disturbance examined only after the final design and engineering by a private contractor.

Finally, beyond the local and county concerns for parkland is the climate havoc this widening proposal would have on our personal health and lack of clean air in Montgomery and Prince George's Counties. More lanes of traffic would bring more cars and more carbon emissions and less reliance on alternative modes of travel that have much better and lower carbon output. Why are alternatives such as increased mass transit, rapid rail, rapid bus lanes and many other options not being seriously considered? Why can we not learn from other areas that have tried more lanes and found the disappointing effects of sometimes bankrupt private partnerships, high tolls and even

**#9**

**Response to DEIS Comment #9**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.



See response to Comment #9 above.

more congestion in single driver cars. This Beltway Expansion proposal is a threat to our health and would adversely impact our climate.  We must take action to prevent this.

We the Ministers and the Environmental Justice Ministry Team of Cedar Lane Unitarian Universalist Church support the No Build Alternative.

Sincerely,                                    October 15, 2020

Rev. Abhi Janamanchi
Senior Minister

![OP·LANES MARYLAND] I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-6    Filed 10/30/23    Page 29 of 97

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

**FOREST ESTATES COMMUNITY ASSOCIATION – VALERIE GRUSSING**

| | |
|---|---|
| **From:** | Valerie Grussing <vjgrussing@gmail.com> |
| **Sent:** | Monday, November 9, 2020 7:18 PM |
| **To:** | MLS-NEPA-P3 |
| **Cc:** | treasurer@treasurer.state.md.us; aklase@marylandtaxes.gov |
| **Subject:** | I-495 Managed Lanes Comment -- Forest Estates Community Association |
| **Attachments:** | I495 Managed Lanes Comment_Forest Estates Community Association.pdf |

To Whom It May Concern:

#1 The Forest Estates Community Association (FECA) is a neighborhood association located in the Forest Glen area of Silver Spring. FECA opposes both the substance and the process of this proposed project, including any alternatives that would widen and/or elevate the Beltway with toll lanes, and the myriad of unlawful aspects of the Draft Environmental Impact Statement (DEIS).

#2 We support the no-build alternative, but only as the least objectionable of the remaining alternatives. We question whether any alternatives would accomplish the project goals, and now whether it is even necessary. FECA opposes this proposed project on its current trajectory and recommends a renewed focus on improving mass transit, supporting reversible lanes, and promoting telework options to reduce traffic and support climate change mitigation efforts.

Please review and consider our attached letter. Thank you for the opportunity to provide comments, and we look forward to further engagement as MDOT carefully considers its approach to this proposed project.

Sincerely,

Valerie Grussing
Vice President
Forest Estates Neighborhood Association

Attachment

1

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to the Forest Estates community. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Forest Estates community is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

**Response to DEIS Comment #2**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C. Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

The Study did consider transit, reversible and teleworking options. Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study. Refer to Chapter 9, Section 3.3.B on consideration of No Build, as well as Chapter 9, Section 3.1 for a response on Purpose and Need and teleworking.

00022308



Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21201

November 9, 2020

RE: Opposition to MDOT's <u>Draft Environmental Impact Statement (DEIS)</u> for the proposed I-495 & I-270 Managed Lane Study

To Whom It May Concern:

The Forest Estates Community Association (FECA) is a neighborhood association located in the Forest Glen area of Silver Spring. Our neighborhood borders begin three blocks north of the Beltway at Exit 31.

**#2 Cont**

FECA opposes both the substance and the process of this proposed project, including any alternatives that would widen and/or elevate the Beltway with toll lanes, and the myriad of unlawful aspects of the Draft Environmental Impact Statement (DEIS). We support the no-build alternative, but only as the least objectionable of the remaining alternatives. Of the initial 15 alternatives, none truly considered multimodal transportation options, and the remaining alternatives will do nothing to accomplish the stated project goals. Our objections include:

**#3**

1. **Expense:** The project could require not only $1 billion in state subsidies, but also another $2B from ratepayers who would support the Washington Suburban Sanitary Commission's efforts to move water and sewer pipes to make way for it. This could result in increased costs to both taxpayers and ratepayers – including those who never use the Beltway.

**#4**

2. **Impact on local communities:** Local communities like ours will be hit the hardest by this proposal. The <u>DEIS</u> acknowledges that roughly 1,500 properties will be affected, and up to 34 homes will have to be bulldozed completely (Table ES-2 on page ES-17). This could include several homes just south of us as well as an area next to Holy Cross Hospital through which the hugely popular Sligo Creek Trail runs (see <u>this map</u>). We are the ones who will face the most impacts such as increased noise and air pollution as well as increased risk of flooding and water pollution, while wealthy out-of-town commuters who can afford to pay the high toll fees reap the rewards of less minutes stuck in traffic. The proposal also will impact dozens of community resources such as schools, parks, hospitals, local business and more.

**#5**

3. **Impacts on the environment:** There are numerous environmental concerns with this proposal. The DEIS acknowledges that the project will lead to increased particulate matter, carbon monoxide, ozone, nitrous dioxide, and greenhouse gas emissions yet it fails to adequately address how it will mitigate these concerns. This project moves Maryland drastically backwards in attempts to reduce climate pollution at a time when action is needed most.

---

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.4.M for a response to impacts to utilities and associated costs.

**Response to DEIS Comment #4**
Thank you for your comment concerning impacts to the Forest Estates community, Holy Cross Hospital, and Sligo Creek. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Forest Glen community, Holy Cross Hospital, and Sligo Creek are located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

The Preferred Alternative does not result in any full acquisitions or residential or business displacements; therefore, no homes would be taken due to the proposed roadway widening.

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.4.F for a response to air quality and Chapter 9, Section 3.4.G for a response to climate change and greenhouse gas considerations.

00022309

Ultimately, FECA opposes this project and questions whether any alternatives would accomplish the project goals, and now whether it is even necessary. MDOT has failed to consider:

#6

a. Pandemic impacts on traffic – whether this project will even be needed once we recover from the COVID19 pandemic. Experts agree that there is much uncertainty regarding traffic and congestion in the years to follow COVID stay-at-home orders. Work from home/telework, staggered commute times, and more will all likely impact traffic in the region.

#7

b. Induced demand – traffic could be right back to where it is today in as little as five years after expansion of the Beltway. Expansion of highways almost never results in the desired reduction of traffic and congestion.

FECA opposes this proposed project on its current trajectory and recommends a renewed focus on improving mass transit, supporting reversible lanes, and promoting telework options to reduce traffic and support climate change mitigation efforts. A recent study by the Maryland Transportation Institute at the University of Maryland found that only a 5-15 percent reduction in cars on the road during rush hour would virtually end congestion, making any expansion pointless.

Thank you for the opportunity to provide comments, and we look forward to further engagement as MDOT carefully considers its approach to this proposed project.

Sincerely,

Valerie J. Grussing

Valerie Grussing
Vice President
Forest Estates Neighborhood Association

**Response to DEIS Comment #6**

Refer to chatper 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

**Response to DEIS Comment #7**

MDOT understands the phenomenon of induced demand, and it is a consideration on all of our large roadway projects. In this case, MDOT is recommending adding capacity via managed lanes (HOT lanes) instead of widening with additional general purpose lanes. Managed lanes do a better job at regulating demand, including induced demand, due to dynamic pricing.

Our study shows that there could be some induced demand as a result of this project, but the impact will be small (less than 1% increase in vehicle miles traveled (VMT) in the region) and those effects are fully accounted for in the regional traffic models COG and TPB use. Even with these effects, the proposed managed lanes would reduce regional congestion delays and significantly improve travel times along both freeway corridors and on local roads throughout the region.

Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**FOREST GLEN COMMUNITY ASSOCIATION**

| From: | K K <forestglencitizensassociation@yahoo.com> |
|---|---|
| Sent: | Sunday, November 8, 2020 3:19 AM |
| To: | MLS-NEPA-P3 |
| Cc: | aklase@marylandtaxes.gov; treasurer@treasurer.state.md.us; managed.lanes@montgomerycountymd.gov |
| Subject: | Draft Environmental Impact Statement |
| Attachments: | Comments on Draft Environmental Impact Statement.pdf |

Comments about the Draft Environmental Impact Statement (DEIS) from Forest Glen Citizens Association are attached.

**We endorse the no build option.**

Thank you for the opportunity to read and respond to the DEIS.

Dr. Kelly for

Forest Glen Citizens Association (est. 1964)

forestglencitizensassociation@yahoo.com

301-587-1494

#1

1

**Response to DEIS Comment #1**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

00022311

Comments on Draft Environmental Impact Statement (DEIS)

I-495 & I-270 Managed Lanes Study

**#2**

The Forest Glen Citizens Association endorses the no build option to the Public Private Partnership (PPP) plan to widen 495/270 roadways. The present pandemic has shown that teleworking works for a vast number of employees which eliminates traffic congestion. In the past, road crowding only occurred for six hours week days (6-9 am and 4-7 pm). The proposed expenditure to build is not justified by the few hours of use.

**#3**

To add a few more concerns, so many properties and parklands would be disrupted to make room to build. The recent northern Virginia experience with a toll road has proven to be unprofitable and currently seeking investors. Commuters have found alternate paths to avoid paying the tolls. The pollution level would increase toxicity. The safe enjoyment of all properties along the path of the construction will be inconvenienced and impaired for an extended period without compensation.

**#4**

The DEIS, though exceedingly long, was inadequate in expressing trade offs or adequate rationale for stated actions. Time frames and financial obligations were inadequately described to show convincingly certain return on investment. A business analysis of DEIS would likely require a rewrite to include elements to justify the decision to build. The DEIS appears to be incomplete and inadequate for decision making.

The Forest Glen Citizens Association is bordered by the Capital Beltway on the south, Georgia Avenue on the east, Hildarose Drive on the north, and Capital View Avenue on the west. Thank you for the opportunity to read and respond to the DEIS.

Dr. Kelly for
Forest Glen Citizens Association (est. 1964)
forestglencitizensassociation@yahoo.com
301-587-1494

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

**Response to DEIS Comment #3**
As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to east of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Forest Glen community is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies. Refer to Chapter 9, Section 3.4.K for additional information on to impacts to properties and communities, including community facilities.

Refer to Chapter 9, Section 3.4.F for a response to adverse impacts to air quality.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program or Board of Public Works and Project Costs.

00022312

**FREDERICK COUNTY CHAMBER OF COMMERCE – RICK WELDON**

| | |
|---|---|
| **From:** | MLS-NEPA-P3 <MLS-NEPA-P3@mdot.maryland.gov> |
| **Sent:** | Thursday, September 3, 2020 11:12 AM |
| **To:** | |
| **Subject:** | please incl attachment |
| **Attachments:** | MDOT Hearing testimony on the 495 270 P3.docx |

**From:** Rick Weldon <rweldon@frederickchamber.org>
**Sent:** Thursday, September 3, 2020 8:22 AM
**To:** MLS-NEPA-P3 <MLS-NEPA-P3@mdot.maryland.gov>
**Subject:** Written testimony on the P3 DEIS hearings

Dear MDOT Team,

I plan to try to provide oral testimony during the love hearing, but wanted to ensure that my comments are made an official part of the record in case there's a technology issue.

My formal comments, on behalf of the 900+ organizational members of the Frederick County Chamber of Commerce, are included as an attachment.



**Rick Weldon**

**President & CEO**

Frederick County Chamber of Commerce

P 301.662.4164 x 203 |

frederickchamber.org | Insights

Governor Hogan is committed to outstanding customer service. Tell us how we are doing. Click here.

1

*This page is intentionally left blank.*

I-495 & I-270 Managed Lanes Study

MDOT Hearing on the 495/270 DEIS

My name is Rick Weldon, and I am the President/CEO of the Frederick County Chamber of Commerce. In addition to leading one of the largest County Chamber's in Maryland, I was a 10-year commuter on I270 and 495. I drove a 15-passenger Dodge Van from Frederick County to the Pentagon and Crystal City for 10 years, and rode the MARC rail for several years.

In addition, I had the good fortune to serve two terms in the Maryland House of Delegates, dealing with our great state's many competing priorities and obligations to serve the needs of all 8 million Marylanders.

**#1**

I am strongly supportive of proceeding with the Public/Private Partnership, and I firmly believe the Draft Environment Impact Statement gives us the necessary justification and purpose to do just that. In fact, to add further delay or confusion would amount to a monumental act of public sector negligence.

The DEIS demonstrates conclusively that several build alternatives will dramatically relieve congestion, improve peak hour speeds, enhance mass transit options through bus rapid transit usage, as well as generating meaningful long-term revenue generation through the managed toll process.

**#2**

It's important to note that none of the standalone transit alternatives discussed to this point would make any meaningful difference in the future projected traffic growth. We're already experiencing increased post-COVID increases, despite many workers exercising the option to work remotely. An increasing number of these teleworkers will eventually return to pre-COVID commuting patterns.

**Response to DEIS Comment #1**
Thank you for your comments supporting improvements. The purpose of the Managed Lanes Study is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the Study limits, and enhances existing and planned multimodal mobility and connectivity.

FHWA and MDOT SHA have considered all comments received on the proposed improvements in the context of the Purpose and Need for the project and have identified Alternative 9 – Phase 1 South as the Preferred Alternative. This alternative would best accomplish the Purpose and Need of the proposed action while fulfilling FHWA's statutory mission and responsibilities, giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

Delay designed to satisfy politically motivated opponents is blatantly irresponsible. Granting the power to delay or obstruct long-needed improvements within Frederick County to politicians from Montgomery County is slap in the fact to the many thousands of Frederick County commuters, not to mention the through commuters from PA and western Maryland. Some of the environmental objections raised to date are intended to increase the overall cost of the project. Then, if those specious arguments are allowed to prevail, the opponents will just shift their focus to an economic argument.

It's time to end the delays, ignore the obfuscations, and get on with I495/270 P3 project.

*This page is intentionally left blank.*

**FRIENDS OF CABIN JOHN CREEK – SANDY LADEN**

Friends of Cabin John Creek

Please see attachment containing comments from Friends of Cabin John Creek regarding the DEIS for I495/I270 expansion project This project will dramatically affect the ecology, as well as the public parks system within the Cabin John Creek watershed.

Thank you for your comment, responses are provided on the following pages.

Responses to Comments are addressed collectively below.  The history and data provided is appreciated.

## Friends of the Cabin John Creek
P.O. Box 267, Cabin John, MD  20818

Incorporated 2013

**Comments by the Friends of Cabin John Creek (FoCJC)**
**on the Draft Environmental Impact Statement (DEIS) for Possible I-495/I-270 Expansion**

### A. Description of Friends of Cabin John Creek (FoCJC)

The Friends of Cabin John Creek (FoCJC) is an incorporated 501(c)(3) entity that works to protect and enhance the Cabin John Creek (CJ Creek) watershed.  FoCJC strongly advocates for mitigating impacts of any I-495/I-270 expansion on the watershed. Many of the alternatives have the potential to have both short-term and long-term negative impacts on the watershed. It is our position that the chosen alternative must avoid or mitigate all short- and long-term negative impacts to the health of the watershed.  Additionally, because stormwater runoff is the CJ Creek's main enemy, we strongly support the following: (1) the retrofitting of the existing highway system with current best management practices for stormwater management, (2) close adherence to current stormwater management regulations for new public construction, and (3) minimizing the destruction of parkland for highway expansion since that has adverse impacts for the local streams.

The CJ Creek watershed is and will be the most impacted watershed as a result of any changes to I-495/I-270.  Both Green Infrastructure (GI) hubs and Targeted Ecological Areas (TEAs) and a large variety of fish species are associated with the Cabin John Creek watershed. This is a watershed where extra effort should be made to protect it.

Unless noted otherwise, all citations below refer to chapters, appendices and pages in the DEIS.

### B. Background - Original Construction of I-495/I-270 Disregarded Impacts of Stormwater Runoff

The Beltway (I-495) was constructed between 1961-1964 and I-270 between 1962-1975, a time when there were no stormwater runoff regulations. The actions being considered by the state of Maryland in initiating an I-495/I-270 Public-Private Partnership (P3) Program will likely require actions along all of the 70 plus miles of interstate in Maryland, including the 10 miles or so that falls within the CJ Creek watershed.  All of the work will fall within someone's watershed.

### C. Current Impacted State of the CJ Creek Watershed

#### 1. Description of the CJ Creek Watershed

The Cabin John Creek Watershed is located in southern Montgomery County, Maryland, just northwest of Washington, DC.  The headwaters of Cabin John Creek originate in the City of Rockville. The creek flows south about 10 miles, passing under Interstate 270, through Cabin John

Regional Park, under the Capital Beltway (I-495), and the historic Cabin John Bridge, to its confluence with the Potomac River near the towns of Cabin John and Glen Echo. Old maps refer to the Creek as Captain John's Run, a possible reference to Captain John Smith who explored the Chesapeake Bay and parts of the Potomac River in the early 1600's.

The major tributaries of the creek are: Bogley Branch, Booze Creek, Buck Branch, Congressional Branch, Ken Branch, Old Farm Branch, Snakeden Branch, Thomas Branch (also called Beltway Branch).

The watershed is in Maryland's Piedmont Plateau geologic province, with an area of about 16,022 acres (25 square miles). The watershed has been significantly affected by high-density residential and commercial development. There are parks, trails and natural areas throughout the watershed. In addition to the Regional Park, there are wooded park lands and buffer areas along several miles of the Creek mainstem and tributaries.

Zip code boundaries do not align with watershed boundaries, but the Cabin John Creek Watershed extends into: 20854 - Potomac, 20852 - North Bethesda, 20850 - Rockville, 20818 - Cabin John, 20812 - Glen Echo, 20817 - Bethesda, and 20814 - Bethesda (small portion).

### 2. Current Environmental Status of the CJ Creek and Watershed

The CJ Creek Watershed contains a large forested stream valley park with valuable environmental resources, including officially designated Targeted Ecological Areas (TEAs), Green Infrastructure (GI) hubs and corridors, a large variety of fish species, etc. Those resources have already been impacted by the original construction of I-495 and I-270.

<u>Surface Water</u>: Four CJ tributaries are within the vicinity of the corridor study boundary. Appendix L, page 49. I-495 was constructed in the center of the Thomas Branch Valley and a large portion of the stream was relocated to accommodate the current alignment of I-495. Appendix L, page 50. Appendix L enumerates a list of adverse environmental effects suffered by Thomas Branch as a result of I-495, including severe erosion, poor habitat, and bedrock blockages of aquatic life. *Id.* Around 83% of CJ stream miles are assessed as Fair, with the remaining 17% assessed as Poor. *Id.* EPA (and other) water quality recommended levels for surface waters are exceeded for a variety of parameters in Cabin John Watershed, e.g., alkalinity, chloride (both acute and chronic exposure levels), turbidity, nitrogen and phosphorous. Ch. 4, page 63.

<u>Aquatic Biota</u>: Studies during 2008-2017 within the Creek mainstem and tributaries produced aquatic habitat assessments ranging from Fair to Good and benthic macroinvertebrate assessments ranging from Fair to Very Poor. Appendix L, pgs 122-23. To Mother Nature's credit, the CJ Creek watershed does have 33 documented fish species, more than any other watershed in the study. Appendix L, pg 124. This includes several sensitive/intolerant species indicative of better water quality, and gamefish such as black crappie and bass. *Id.* The CJ Creek Watershed is rated "Fair-Good" for aquatic habitat, but only "Very Poor – Poor/Fair" for benthic invertebrates. (Ch. 4, p. 106)

2

*This page is intentionally left blank.*

<u>Terrestrial Wildlife</u>: CJ has a forested stream corridor where I-495 crosses the Creek and a larger forested area in the I-270 portion. Many of these areas are designated by MDNR as Green Infrastructure (GI) hubs or corridors, which are important habitats for wildlife. Page 109. CJ Creek park contains Forest Interior Dwelling Species (FIDS) habitat. Ch. 4, p. 110.

<u>Unique & Sensitive Areas</u>: Green Infrastructure (GI) hubs or corridors are identified by the Maryland Greenways Commission and the MDNR Green Infrastructure Assessments (GIA) as "the most ecologically critical undeveloped lands remaining in Maryland." Appendix L, pgs 163-64. Targeted Ecological Areas (TEAs) are "established to protect Maryland's most ecologically valuable natural lands and watersheds" and are "identified by MDNR as conservation priorities for natural resources protection and receive a majority of Maryland's Program Open Space funds." *Id.* Both GIs and TEAs are associated with the Cabin John Watershed. Appendix L, p. 164.

**D. Likely Environmental Issues/Impacts Identified by the DEIS Regarding CJ Creek Watershed**

The Cabin John Stream Valley and Regional Park is listed as one of the nine largest parks within the CEA Analysis Area. (Ch. 4, p. 19). The CJ Creek watershed is and will be the most impacted watershed as a result of any changes to I-495/I-270. It is one of four MDNR 12-digit watersheds with more than 17,000 LF of potential impact from this project. Appendix L, page 22. Among all the affected watersheds, **"[a]ll Screened Alternatives would add the most impervious surface to Cabin John Creek" Watershed**, between 80.6 acres to 117.7 acres for Alternative 10. Appendix L, pages 80-81. All Screened Alternatives are estimated to have approximately equivalent severe environmental impacts, except the No Build Alternative. See, e.g., Table 2.11-1 on Ch. 4, p. 165. "All Build Alternatives would affect surface waters, surface water quality, and watershed characteristics in the corridor study boundary due to direct and indirect impacts to ... stream channels and increases in impervious surface in their watersheds." (Ch. 4, p. 89)

Many acres in the overall project will require off-site stormwater treatment compensatory mitigation, because not all stormwater can be handled on-site. The total for the entire project ranges from 321-434 acres, depending on the Build Alternative. (Ch. 2, p. 38)

Four sections of the Cabin John Stream Valley and Regional Park would be impacted by all the Build alternatives. Impacts in each section would range from 0.3 acre to 7.2 acres. Total area impacted in the CJ stream valley and regional park would be 8.0-10.8 acres. (Ch. 4, p. 20-21). The four sections are: Cabin John Stream Valley Park (Rockville), Cabin John Regional Park, Cabin John Stream Valley Park Unit 2, and Cabin John Stream Valley Park Unit 6.

The DEIS notes that a "removal of trees and landscaping that buffer the park from the study corridors would occur but will be minimized to the greatest extent possible." (Ch. 4, p. 19) It would appear that MDOT proposes to remove trees/forested areas that they, MDOT, planted previously to mitigate impacts from the ICC and for TMDL remediation. Removal of such vegetation would appear to be contrary to the reason for the plantings in the first place. (Ch. 4, p. 99-100)

3

*This page is intentionally left blank.*

The DEIS does note various mitigations that are anticipated, such as: potential mitigation for parks including landscaping and restoring streams. (Ch. 4, p. 22); Thomas Branch - there will be stream relocation and culvert construction along Thomas Branch in Area 4 and Area 28 (Ch. 4, p. 25-26) We understand that the planners have determined a way to reduce waterway impacts to Thomas Branch by 592 linear feet, so kudos for that), vegetation removal will be minimized and additional landscaping may be incorporated. (Ch. 4, p. 35)

**E. Comments**

**#1**

**Comment #1** - To give the reader of the EIS a feel for the impact of any highway expansion on the stormwater runoff into CJ Creek, the section dealing with stormwater impacts should provide the following: (1) a calculation of the amount of current impervious surface the two highways have in the CJ Creek watershed, (2) the percentage of impervious surface in the CJ Creek watershed that this represents, and (3) the additional amount of impervious surface that each alternative will add to the existing roadway overall, and particularly in the CJ Creek watershed. Our back-of-the-napkin calculations are as follow:

(a) Impervious Surface Acreage from I-495 and I-270 in the CJ Creek Watershed - I-270 is 211 feet wide., I-495 is 131 feet wide., and there is approximately 4.5 miles of I-495 and 5.5 miles of I-270 in the CJ Creek Watershed. These numbers convert to 71.45 acres of impervious surface tied to I-495 and 140.67 acres of impervious surface tied to I-270. Thus, there is approximately 212.12 acres of impervious surface from those two highways in the CJ Creek watershed. Since the watershed has 16,022 total acres, these two highways currently cover approximately 1.32% of our total watershed. The U.S. interstate highways have standard lanes 12 feet wide, so each additional lane will add that much width to the existing impervious surface.

(b) Percentage of Impervious Cover - According to Montgomery County's 2012 Cabin John Creek Implementation Plan, there were 3,402 acres of impervious cover in the CJ Creek watershed at that time. The current 212 acres of I-495/I-270 highway equals 6.23% of the impervious cover. <u>The opportunity to address not only any new pavement but such a sizeable portion of the watershed's existing impervious surface is unique and should be seized upon and not be wasted.</u>

**#2**

**Comment #2** - the EIS should clearly state the major requirements affecting stormwater runoff, which we understand to be the following: (1) there can't be any increase in "total" stormwater coming off of I-495/I-270 as a result of adding new lanes, and (2) since this is a "re-development" project, there must be a 50% treatment/improvement in the quality of stormwater coming off existing impervious surfaces. If our understanding of the requirements is incorrect, the relevant section in the EIS needs to clarify why that is the case.

**#3**

**Comment #3** - the EIS should reflect the threat to three specific parts of the CJ Creek watershed. Two sections of the watershed have been identified as "priority catchments" by Montgomery County and border I-270 and the I-495 spur. The streams here are already in need of restoration. One section of the watershed has been identified as "priority conservation catchment" by the County and it is adjacent to I-495 in Cabin John. This area contains critically significant, extremely significant, and highly significant conservation areas.

4

**Response to DEIS Comment #1**
While there has not been an exact calculation of the percentage of impervious area in the Cabin John Creek watershed as opposed to the whole project, the land use change represented by this project is, from a review of the mapping and from your estimate, a small percentage when compared to the overall watershed. SWM regulations in Maryland are stringent and will be fully met and enforced under required permits.

**Response to DEIS Comment #2**
This project will be required to meet Maryland SWM permitting requirements, which includes managing SWM runoff for the 10-year to match existing conditions and providing water quality treatment for all new impervious area and 50% of reconstructed existing impervious area. As noted, a sizeable portion of pre-existing untreated impervious surface, estimated to be approximately 72 acres, will now be treated resulting in improved downstream conditions. In addition, a more detailed SWM analysis was completed for the FEIS based on standard MDE approved hydrology and hydraulic procedures. Based on this more detailed preliminary SWM concept developed for the FEIS, the anticipated offsite requirements for the Preferred Alternative have been significantly reduced from 114 acres to 2.5 acres, representing approximately 95 percent of environmental site design requirements being met onsite. Refer to FEIS Chapter 3, Section 3.1.6.

**Response to DEIS Comment #3**
The existing stream degradation within the Cabin John Creek Watershed is reported in the Natural Resources Technical Report Section 2.4.2 (FEIS Appendix M), including issues from channelization and poor water quality. These support the statement that the streams within the watershed are already in need of restoration. FEIS Appendix M, Final Natural Resources Technical Report, Section 2.3.3, reflects the Preferred Alternative impacts to the Cabin John Creek Watershed as 31,556 linear feet of waterway impact and 1.36 acres of wetland impact. As noted in the FEIS, Chapter 7, mitigation is proposed at Site RFP-2: Stream restoration (6,074 functional feet) and wetland creation/restoration (4.61 acres of credit) along Cabin Branch east and west of Montgomery Village Avenue at Montgomery Village Golf Club.

00022320

OP·LANES™
MARYLAND
I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

**#4**

**Comment #4** - the EIS should state how the I-495/I-270 proposal relates to the state's commitments under the EPA's MS4 permit and the Chesapeake Bay cleanup plan. The document needs to illustrate the plan to accomplish less stormwater runoff and less roadway pollution going into the streams in CJ Creek watershed, which subsequently runs into the Potomac River, and finally into the Chesapeake Bay.

**#5**

**Comment #5** - The DEIS should address and analyze the current and potential future impacts of I-495 & I-270 on wildlife and recreational <u>connectivity</u>. Both highways currently form essentially impenetrable barriers for many species of native terrestrial wildlife which inhabit the Cabin John Creek and other impacted watersheds, preventing them from reaching potential new territories and mates, thus reducing genetic diversity. Likewise, these highways restrict or prevent recreational connectivity through publicly owned parkland in Cabin John Creek (and Watts Branch as well), making it impossible to fully experience the entire watershed as one connected entity. The mitigation section of the DEIS should carefully analyze potential approaches to restore wildlife connectivity under (or over) I-270; these approaches should also analyze opportunities to connect recreational trails as well.

**#6**

**Comment #6** - The DEIS should address the impact of invasive species that will thrive in any area disturbed by the project that is not paved over or made impervious in other fashion. There will obviously be a great deal of :disturbed area" as a result of the project.

**#7**

**Comment #7** - in evaluating the amount of stormwater runoff that will result from any expansion of 495/270, the EIS should base estimates on rainfalls that are likely to increase in density as a result of climate change. We have seen the density of thunderstorms increase in the recent past, resulting in larger amounts of rain per hour. The EIS will be flawed if it bases stormwater runoff amount estimates solely on past data without looking ahead to what is the likely scenario in the future.

**#8**

**Comment #8** - Flood Plains: There are a number of laws governing development within floodplains. A Finding of No Practical Alternative may be required for crossing the FEMA 100-yr floodplain of Cabin John Creek.

**#9**

**Comment #9** - FoCJC should be mentioned in the list of relevant community organizations. (Ch. 4, p. 37). We have been advocating officially on behalf of the CJ Creek since incorporating in 2013 and receiving our 501(c)(3) status in 2014. We provided comments regarding the initial pre-DEIS proposal on June 14, 2019.

**F. FoCJC Positions**

1. We are opposed to the taking of public open space that protects creeks. In Cabin John CEA Analysis Area, the project will require partial right-of-way acquisition of 5 acres from 3 parks. (Appendix E, p . 172 in the PDF – also labeled as Technical report, Appendix D, p.6). As noted in the DEIS, we would expect MDOT to make "every reasonable effort" to avoid wetlands, waterways and parklands.

5

---

**Response to DEIS Comment #4**
By meeting the MD SWM permitting requirements, the project will be compliance with the MS4 permit. Refer to FEIS Chapter 3, Section 3.1.6 for an explanation of the MD permitting requirements.

**Response to DEIS Comment #5**
I-495 and I-270 currently separate wildlife corridors. The widening of these roadways will not exacerbate this problem, since the roadways are currently impassable by wildlife.

Refer to Chapter 9, Section 3.3.D for a response to bicycle and pedestrian connectivity. Refer to Chapter 7 of the FEIS for mitigation and commitments.

**Response to DEIS Comment #6**
Temporary impact areas will include removal of invasive species and will be replanted with native species as part of the mitigation under Maryland Reforestation Law.

**Response to DEIS Comment #7**
This project will base stormwater runoff estimates on NOAA Atlas 14 historical rainfall averages, which is the most recent statewide precipitation data and includes record data through December 2000. Use of NOAA Atlas 14 rainfall data is standard practice for MDOT SHA projects. At this time, Maryland does not require increased intensity or amount of rainfall to account for future climate change.

**Response to DEIS Comment #8**
MDOT SHA will meet all floodplain requirements and laws.

**Response to DEIS Comment #9**
Your participation has been noted. See reference in the DEIS page 4-37, is a table listing the Section 106 Consulting Parties for consultation on historic properties.

**#10**

2. We support retrofitting the existing roadway with stormwater management facilities to slow the water down, settle out the sediment, and increase the amount of water that goes into the ground rather than rushing into the stream. This is a unique opportunity to benefit the CJ Creek watershed. Why not take the opportunity to ensure that the existing roadway meets current stormwater runoff control standards?

3. Any new construction must adhere to the most current stormwater regulations and be continuously monitored and updated in order to minimize impact to the surrounding natural landscape. Storm Water Management must be emphasized regardless of whatever alternative is selected, and this project viewed as an opportunity to exceed legal minimums.

4. We are especially concerned about the threat to three parts of our watershed as mentioned in Comment #1 above.

5. The No Build Alternative should be strongly considered, due to the following factors: (a) high probability of a long-term decrease in traffic and need for road expansion due to the "new normal" of massively increased telework due to Covid-19, (b) urgent threats posed by man-induced global climate change, (c) the DEIS itself admits that "opportunities for avoidance and minimization of impacts to roadside resources are limited due to the fixed nature of the highway corridor." Appendix L, page 165.

6. Green Infrastructure (GI) hubs and corridors should be maximized to promote both wildlife and human enjoyment

Thank you for considering our comments and concerns.

Sincerely,

Sandy Laden
FoCJC - Vice President

6

---

**Response to DEIS Comment #10**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**FRIENDS OF MOSES HALL – CHARLOTTE TROUP LEIGHTON (EMAIL)**

**From:** Charlotte Troup Leighton <troupleighton@gmail.com>
**Sent:** Friday, October 16, 2020 5:13 PM
**To:** Lisa Choplin <LChoplin@mdot.maryland.gov>
**Cc:** governor.mail@maryland.gov; pfranchot@comp.state.md.us; treasurer@treasurer.state.md.us; elizabeth.hughes@maryland.gov; julie.langan@dhr.virginia.gov; Jeanette Mar, FHWA <jeanette.mar@dot.gov>; Beth Cole, MHT <beth.cole@maryland.gov>; Tim Tamburrino, MHT <tim.tamburrino@maryland.gov>; Marc Holma, Virginia DHR <marc.holma@dhr.virginia.gov>; John Simkins, FHWA Virginia Division <John.Simkins@dot.gov>; Ballo, Rebeccah <rebeccah.ballo@montgomeryplanning.org>; Rubin, Carol <carol.rubin@montgomeryplanning.org>; Wright, Gwen <gwen.wright@montgomeryplanning.org>; Crane, Brian <brian.crane@montgomeryplanning.org>; SUSAN SHIPP <jsjshipp3@verizon.net>; Greg Pawlson <gpawlson@gmail.com>; Orrick, Jack <jack.orrick@offitkurman.com>; Lee, Susan Senator <susan.lee@senate.state.md.us>; Korman, Marc Delegate <marc.korman@house.state.md.us>; Love, Sara Delegate <sara.love@house.state.md.us>; Kelly, Ariana Delegate <ariana.kelly@house.state.md.us>; MCP-Chair@mncppc-mc.org; marc.elrich@montgomerycountymd.gov; Councilmember.Albornoz@montgomerycountymd.gov; Councilmember Friedson <councilmember.friedson@mccouncilmd.lmhostediq.com>; Councilmember.Glass@montgomerycountymd.gov; councilmember.hucker@montgomerycountymd.gov; Councilmember.Jawando@montgomerycountymd.gov; councilmember.katz@montgomerycountymd.gov; councilmember.Navarro@montgomerycountymd.gov; councilmember.Rice@montgomerycountymd.gov; councilmember.Riemer@montgomerycountymd.gov; managedlanes@montgomerycountymd.gov; Alexandra Jones <ajones@archaeologyincommunity.com>; Austin White <austin.white5454@gmail.com>; Nathan White II <gixxer1100@live.com>; Steward, Shannon S. <ShannonSteward1@gmail.com>; pandora white <pdenniswhite12@yahoo.com>; Diane Baxter <baxterd9@aol.com>; Christopher Waynes <chrisw1330@hotmail.com>; montgomery crawford <mceye.photo@gmail.com>; Edgar Bankhead <ebankjs@verizon.net>; Eddie Bankhead <esbj@pobox.com>; Judi Bankhead <judibankhead@yahoo.com>; Eileen McGucklan <phileen3@verizon.net>; L. Paige Whitley <lpwhitley@me.com>; Steve Archer <SArcher@mdot.maryland.gov>
**Subject:** Friends of Moses Hall Comments: DEIS - Draft Section 4(f) Evaluation, and Draft Section 106 Report

1

Thank you for your comment, responses are provided on the following pages.



I-495 & I-270 Managed Lanes Study

Dear Ms. Choplin,

Friends of Moses Hall submits our attached comments and concerns regarding the Draft EIS for the I-495/I-270 Managed Lanes Study. The Morningstar Tabernacle No. 88 Moses Hall and Cemetery is eligible for listing on the National Register of Historic Places and is a historic African American cultural site and burial ground (MIHP No. M: 35-212). We represent descendants of the families who used the hall and are buried here and concerned neighbors who want to see this asset protected and preserved. We are a Consulting Party for the purposes of the Section 106 process.

For your convenience, we have also attached two prior FMH consulting party comment letters to Steve Archer dated August 24 and September 17, 2020.

Sincerely,
**Friends of Moses Hall CP**

**Charlotte Troup Leighton**
Vice President of Advocacy, Cabin John Citizens Association
troupleighton@gmail.com

**Alexandra Jones, PhD, RPA**
Executive Director and Founder, Archaeology in the Community
ajones@archaeologyincommunity.com

**Austin White**
Descendant
austin.white5454@gmail.com

**Austin White II**
Descendant
gixxer1100@live.com

**Nathan White II**
Descendant
gixxer1100@live.com

**Shannon S. Steward**
Descendant
shannonsteward1@gmail.com

2

*This page is intentionally left blank.*

**Pandora White**
Descendant
pdenniswhite12@yahoo.com

**Diane Baxter**
Descendant
baxterd9@aol.com

**Christopher Waynes**
Descendant
chrisw1330@hotmail.com

**Montgomery Crawford**
Descendant
mceye.photo@gmail.com

**Rev. Edgar S. Bankhead, Sr.**
Gibson Grove A.M.E. Zion Church
ebankjs@verizon.net

**Eddie Bankhead**
Gibson Grove A.M.E. Zion Church
esbj@pobox.com

**Judi Bankhead**
Gibson Grove A.M.E. Zion Church
judibankhead@yahoo.com

**Eileen McGuckian**
Historian and President, Montgomery Preservation
phileen3@gmail.com

**L. Paige Whitley**
Independent Researcher and Author
lpwhitley@me.com

3

*This page is intentionally left blank.*



**FRIENDS OF MOSES HALL MORNINGSTAR TABERNACLE NUMBER 88**
ANCIENT UNITED ORDER OF SONS AND DAUGHTERS, BROTHERS AND SISTERS OF MOSES
c/o Charlotte Troup Leighton
8005 Cypress Grove Lane
Cabin John, MD 20818
troupleighton@gmail.com

October 16, 2020

*By Email to:*
Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21201

**RE: I-495/I-270 Managed Lane Study Draft Environmental Impact Statement, Draft Section 4(f) Evaluation, and Draft Section 106 Assessment of Effects Report**

Dear Ms. Choplin:

Friends of Moses Hall (hereafter FMH) herein submits our comments and concerns regarding the Draft EIS for the I-495/I-270 Managed Lanes Study. The Morningstar Tabernacle No. 88 Moses Hall and Cemetery (hereafter Moses Hall) is eligible for listing on the National Register of Historic Places and is a historic African American cultural site and burial ground (MIHP No. M: 35-212). We represent descendants of the families who used the hall and are buried here and concerned neighbors who want to see this asset protected and preserved. We are a Consulting Party for the purposes of the Section 106 process.

Below, we articulate our concerns about the materials developed thus far in the Draft Environmental Impact Study, Draft Assessment of Effects Report, Draft Programmatic Agreement, and Draft Section 4(f) Evaluation. To summarize, there are six key issues with the study documents and the process to-date:

- **The NEPA and Section 106 requirements to first seek to avoid and minimize impacts have not been met.**
- **While progress is being made, investigation and evaluation of the Cemetery remains inadequate to fully understand impacts.**
- **The Programmatic Agreement has been insufficiently developed.**
- **The Section 4(f) evaluation in the Draft EIS is insufficient and inconsistent with the regulations.**
- **The cumulative impacts analysis must be revised to consider the sustained impacts to Moses Hall by repeated actions to disrupt and disturb the site and community.**

Page 1

Responses to your specific concerns listed on this page are addressed in the following pages of the response.

00022326


- **The Draft EIS fails to adequately disclose impacts in a number of different areas, which will require a Supplemental Draft EIS. A Supplemental Draft EIS should be used to develop a more thorough analysis of avoidance and minimization options in the area of Moses Hall.**

Before we discuss our concerns in greater detail, we do wish to extend our thanks to SHA staff for the work that they have done over the past few weeks in concert with us. Mr. Steven Archer has taken time to meet with our members and further discuss the process. SHA is moving forward to clear the site so that investigations continue. We recognize and appreciate the time and effort that has been taken with us. We look forward to further coordination to address these important issues. We are pleased that SHA has determined that the site of Moses Hall is eligible for listing in the National Register of Historic Places and that MHT concurs with that determination.

**#1**

1) **NEPA and Section 106 requirements to first seek to avoid and minimize impacts have not been met.**

The regulations governing Project review under both NEPA and Section 106 obligate agencies to work to avoid impacts, then minimize such impacts, and, only if such avoidance and minimization are not possible, to seek to mitigate impacts that do result. As we document throughout this comment letter, SHA has consistently failed to appropriately document any meaningful avoidance and minimization activities taken to avoid impacts to this sensitive resource. This approach is inconsistent with the regulations and case law and makes it challenging for our organization to truly understand the nature of impacts on the site.

2) **While progress is being made, the investigation/evaluation of the Cemetery is inadequate**

**#2**

We are pleased that SHA has gained access to the Moses Hall site so that investigation and evaluation of the cemetery can begin. Thus far, the information developed by SHA has been inadequate to fully understand the nature of impacts to the cemetery from the undertaking. We are hopeful current investigations will change that. Numerous additional burials are believed to exist beyond the burials that have been identified to date, and there is visual evidence and potential for graves to be located further afield within the proposed limits of disturbance.

Further, our ability to evaluate the work that SHA has conducted is hampered by insufficient information. SHA "updates" are merely placeholders. Archaeological reports cited in the Draft Assessment of Effects Report have not been shared due to being in "draft" status, despite page numbers being cited. We believe that, under 40 CFR 1502.21, these should be provided to us, considering that these reports are being used as the basis for project decisions. We understand that an archaeological report will be complete and available to us in December, in advance of the Final EIS, per an email from Mr. Archer dated October 6, 2020. We will need time to review that report and provide comment before further conversations are advanced.

3) **The Programmatic Agreement has been insufficiently developed**

**#3**

The Draft Programmatic Agreement (PA) consists of a very basic outline, with no actual processes or information on how the process should work. How are Consulting Parties to have any assurance that Section 106 will be adequately addressed with no information on the proposed procedures? We note some specific issues below that we are hopeful will be affirmatively addressed in the next iteration of the PA.

The Draft PA notes that Consulting Parties "may have opportunities" to provide input. This language is inadequate. Without specific information on procedures for providing input, we are concerned that

FMH DEIS Comments                     10.16.20                          Page  2

---

**Response to DEIS Comment #1**

Due to extensive coordination and consultation with local, state, and federal resource agencies and stakeholders throughout the NEPA process, MDOT SHA was able to advance avoidance and minimization measures for regulated and sensitive resources and property displacements along I-495 and I-270 since the DEIS. Design has also advanced since the SDEIS, as discussed in Chapters 2 and 3 of this document, resulting in further avoidance and minimization of the environmental resources as discussed throughout this chapter. Further avoidance and minimization since the SDEIS has been accomplished through a number of approaches including modification of stormwater management location and design, relocation of managed lane access points, shifting the centerline alignment, reduction in lanes and shoulder widths near sensitive resources, changing interchange configurations and other design refinements. These measures have been incorporated into the Preferred Alternative and as outlined in this Chapter, impacts associated with the Preferred Alternative have been significantly avoided and minimized compared to the DEIS Build Alternatives. For example as noted in the SDEIS and FEIS, the Morningstar Tabernacle No. 88 Moses Hall and Cemetery is avoided by the Preferred Alternative based on the current historic boundary.

**Response to DEIS Comment #2**

Additional archeological reports have been prepared and provided to Section 106 Consulting Parties. Background Research May 27, 2021 and Ground Penetrating Radar September 8, 2021. Consultation with the Friends of Moses Hall and other interested stakeholders including meeting both in office and in the field and sharing of background research, property information and ground penetrating radar results have been done throughout the study and will continue through final design.

**Response to DEIS Comment #3**

The first draft of the PA was provided in March 2021 and the revised PA was shared in January 2022. The revised PA incorporated changes and more detail based on input received from the Section 106 consulting parties including the Friends of Moses Hall.  The Final PA is included with the FEIS, Appendix J.

**#3 Cont**

the Consulting Parties are being denied an opportunity to meaningfully participate in the Section 106 process.

The Draft PA presumes that the Cemetery will be adversely affected but that the effects cannot be fully determined. We recognize that not all impacts are currently known due to the early stage of the process, and that the PA is a tool to address that problem. However, we note again SHA has not provided sufficient information on efforts to date to avoid and minimize impacts to historic resources under Section 106. SHA appears to have abdicated its responsibility under Section 106 to avoid and minimize impacts, and SHA appears to be inappropriately moving into an adverse effect and mitigation approach through the PA without meaningful consultation.

The Draft PA includes a provision for "performance monitoring." Performance monitoring is not well defined. The best performance monitoring would be regular engagement and consultation with Friends of Moses Hall and other Consulting Parties throughout the process and its associated decision-making. Mere updates as to actions already undertaken by SHA is inadequate to fulfill the spirit of Section 106.

Inadvertent discoveries are also noted in the Draft PA. We are concerned about the potential location of additional human remains at Moses Hall given the inadequacy of the investigations to date. The Draft PA notes that SHA has a policy to encapsulate human remains. We find it doubtful that this approach would be possible in the area of Moses Hall due to the topography. What provisions would be made for meaningful input from Consulting Parties if an inadvertent discovery of human remains occurs at Moses Hall? This issue must be addressed in the PA.

We understand that a more fully developed version of the PA is to be shared with Consulting Parties this fall. It is imperative that the FMH CP provide input on the PA language. However, it seems odd and is unfortunate that the FMH CP is expected to provide this input absent any actual knowledge of the impacts. We are pleased that SHA agrees that any construction activity outside of the existing right-of-way would constitute an adverse effect on Moses Hall; however, additional graves may exist within the existing right-of-way of I-495, and we cannot fully understand the effects until the archaeological investigations are complete.

**#4**

4) **The standards of Section 4(f) have not been met**

Section 4(f) requires that SHA must first avoid impacts to eligible historic resources, unless avoidance is not feasible or prudent (23 CFR 774). SHA has not sufficiently demonstrated its efforts to avoid impacts to Moses Hall. Redesigning and/or relocating the proposed ramp to access Cabin John Parkway and River Road/MD 190, or using an at-grade managed lanes approach, has the potential to avoid impacts to Moses Hall. The changes would be minor to the overall project footprint, and the Project would still meet its Purpose and Need even if the proposed interchange were removed. In fact, this sort of change is a strategy employed by SHA in the Alternatives where regulatory hurdles like the preservation of park land exist. An at-grade solution for access to Clara Barton Parkway is proposed in the Project Alternatives. Given that the MD 190 ramp faces similar Section 4(f) hurdles, why was a similar approach not pursued here? The *Alternatives Technical Report* (Appendix B) does not document a logic for why certain exits are served with direct access ramps or with at-grade options.

Similarly, SHA has insufficiently demonstrated its efforts to minimize impacts at Moses Hall even if they cannot be avoided. Again, redesigning or relocating the proposed ramp would substantially reduce impacts to the property without compromising the project goals.

SHA is attempting to proceed without a good faith analysis of alternatives under Section 4(f). No information has been provided to substantiate that avoiding Moses Hall is not feasible or prudent. As a result, we believe that the Draft Section 4(f) analysis is insufficient under the regulations. The lack of

**Response to DEIS Comment #4**

Based on the current historic boundary, the Preferred Alternative will avoid direct impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Additionally, no atmospheric, audible, or visual effects to the property have been identified from the Preferred Alternative. No diminishment of location, design, setting, materials, workmanship, feeling or association has been found in these areas. The project will be governed by a programmatic agreement, including a treatment plan that specifies the methods, limits and consultation procedures for further investigation of areas with the potential for additional burials outside of the current historic boundary, no specific determination of effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery will be made at this time, and will be made following completion of the additional investigations specified in the programmatic agreement and treatment plan (Refer to **FEIS, Appendix J**).

OP·LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study     Case 8:22-cv-02597-DKC     Document 61-6     Filed 10/30/23     Page 50 of 97

FINAL ENVIRONMENTAL IMPACT STATEMENT

#5

documentation of why certain exits are treated differently suggests an arbitrary and capricious approach to designing exits in the context of sensitive, 4(f) resources, and is further inconsistent with appropriate practice.

5) **Cumulative impacts and Environmental Justice**

We believe that impacts to Moses Hall would constitute an adverse cumulative impact to this historic resource. This resource was already adversely affected by the construction of the highway in the 1960s, which appears to have physically impacted the property, as well as isolated it from surrounding resources, such as Gibson Grove A.M.E. Zion Church. SHA is now proposing further adverse impacts to this resource. These cumulative impacts have not been analyzed in the Draft EIS, as required by 40 CFR 1508.7, and the Cultural Resources Technical Report.

Moses Hall is a key and central feature of the remaining African American community in the Cabin John area. In the context of cumulative impacts and Environmental Justice, this community has already experienced disproportionately high and adverse impacts from the construction of I-495, which bisected the Gibson Grove Church property from the Moses Hall site and cemetery. In addition to the direct physical impacts to the community, the construction of I-495 and similar interstate highways in the DC region during a time of racial housing segregation led to the displacement of existing, poor African-American communities like the community in Cabin John in favor of new, white suburban developments. SHA is proposing to add further cumulative impacts to this community. In particular, Moses Hall is an extremely sensitive site to this community (as a burial ground), and SHA has failed to demonstrate that these impacts to this community cannot be avoided.

#6

6) **The Draft EIS fails to adequately disclose impacts in a number of different areas, which will require a Supplemental Draft EIS. The deeper analysis can provide the context for deeper evaluation of how to avoid and minimize impacts to Moses Hall.**

While it is an important NEPA policy goal to have timely completion of transportation projects, the Draft EIS unfortunately suffers from a number of fatal flaws that have been identified by other Parties. The Environmental Justice disproportionate impact analysis has not been performed. A Visual Impact Assessment has not been conducted. The discussion of construction-period impacts is extremely high-level. An "elevated option" is not analyzed in the Draft EIS, despite being identified as a potential implementation approach. There is a general strategy articulated in the Draft EIS to provide assessment of the Preferred Alternative at a substantively different level in the Final EIS from how the other Alternatives are treated. This approach is inconsistent with 40 CFR 1502.14, as further interpreted by the *Forty Questions*.

The collective deficiencies of the document lead to a reasonable conclusion that a Supplemental Draft EIS would be required, and appropriate, to provide additional information and to resolve the issues identified by multiple stakeholders. This deeper analysis would give us the opportunity to work with SHA to develop approaches to avoid and minimize impacts to Moses Hall.

Thank you for your continued attention to the consequences of the Project on Morningstar Tabernacle No. 88 Moses Hall and Cemetery. We appreciate the opportunity to continue to consult with SHA through the Section 106 process and to work with the other stakeholders to protect the history of this important resource. Our cause to have this site treated fairly by SHA and this Project has been buoyed by the support of elected officials and other Cooperating Agencies. Delegate Sara Love has indicated her concern that the treatment of Moses Hall in the process to-date is inconsistent with a reasonable understanding of environmental justice. Commissioners of NCPC, particularly Commissioner Trueblood, indicated their attention to the impacts to this site. As a regulatory matter, this Project may require NCPC action consistent with their authority over Capper-Cramton Lands, such as the adjacent

FMH DEIS Comments                    10.16.20                    Page 4

---

**Response to DEIS Comment #5**

Refer to FEIS Chapter 5, Section 21.3 for more information on historical context.

Understanding that the Beltway was constructed adjacent to these sensitive resources, MDOT SHA has committed to construct the following pedestrian connections between the Gibson Grove A.M.E. Zion Church and the Morningtar Tabernacle No. 88 Moses Hall Cemetery to restore the historic connection along Sevel Locks Road:

- Widening the existing variable-width sidepath along Seven Locks Road under I-495 (Cabin John Trail)
- Constructing a new sidewalk along the west side of Seven Locks Road under I-495 to directly connect First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall and Cemetery

The Preferred Alternative includes the following elements and commitments related to the First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall Cemetery:

- Direct and indirect impacts to historically African American Gibson Grove Community significantly minimized
- Gibson Grove Church is avoided with impacts minimized to 0.1 acre of temporary easement needed for drainage
- All direct and indirect impacts to Moses Hall Cemetery completely avoided
- Noise barrier with context sensitive treatment at the Moses Hall Cemetery
- Gifting land owned by MDOT SHA with potential graves back to Trustees of Moses Hall Cemetery
- Completing drainage improvements on Gibson Grove property and clearing space for their proposed parking lot
- Upgrading parking lot on the east side Seven Locks Road and making the sidewalk and path improvements to connect to the existing parking lot.
- Constructing a new sidewalk along the west side of Seven Lock Road under I-495 to reestablish the historic connection between Gibson Grove Church and the Moses Hall Cemetery.

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to DEIS Comment #6**

MDOT SHA and FHWA prepared a Supplemental DEIS to present new information relative to the Preferred Alternative, Alternative 9 – Phase 1 South. FHWA and MDOT SHA have identified Alternative 9 Phase 1 South as the Preferred Alternative. The SDEIS supplements the existing DEIS that was published on July 10, 2020. The SDEIS was limited to focus on new information while referencing the DEIS for information that remains valid. The public comment period for the SDEIS was from October 1, 2021 to November 30, 2021. As stated above the Preferred Alternative avoids the Morningstar Tabernacle No.88 Moses Hall and Cemetery property based on the current historic boundary.

Cabin John Park area. We will continue to follow the different regulatory actions needed to implement the Project to make sure our concerns are heard and addressed.

Because of the serious procedural issues we have identified, Friends of Moses Hall continues to believe that it is imprudent to proceed forward with the Programmatic Agreement or the Final EIS until more is known about the Moses Hall site and more design work to consider avoidance and minimization options has been advanced.

We remain available to discuss these concerns further with SHA at your convenience.

Sincerely,

**Charlotte Troup Leighton**
Moses Hall Neighbor and
Vice President of Advocacy, Cabin John Citizens Association
troupleighton@gmail.com

**Alexandra Jones, PhD, RPA**
Executive Director and Founder, Archaeology in the Community
ajones@archaeologyincommunity.com

**Austin White**
Descendant
austin.white5454@gmail.com

**Austin White II**
Descendant
gixxer1100@live.com

**Nathan White II**
Descendant
gixxer1100@live.com

**Shannon S. Steward**
Descendant
shannonsteward1@gmail.com

**Pandora White**
Descendant
pdenniswhite12@yahoo.com

**Diane Baxter**
Descendant
baxterd9@aol.com

**Christopher Waynes**
Descendant
chrisw1330@hotmail.com

**Montgomery Crawford**
Descendant
mceye.photo@gmail.com

FMH DEIS Comments                10.16.20                              Page   5

*This page is intentionally left blank.*



This page is intentionally left blank.

**Rev. Edgar S. Bankhead, Sr.**
Gibson Grove A.M.E. Zion Church
ebankjs@verizon.net

**Eddie Bankhead**
Gibson Grove A.M.E. Zion Church
esbj@pobox.com

**Judi Bankhead**
Gibson Grove A.M.E. Zion Church
judibankhead@yahoo.com

**Eileen McGuckian**
Historian and President, Montgomery Preservation
phileen3@gmail.com

**L. Paige Whitley**
Independent Researcher and Author
lpwhitley@me.com

[s/CTL]

cc to:  Governor Lawrence J. Hogan – governor.mail@maryland.gov
Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
Treasurer Nancy Kopp – treasurer@treasurer.state.md.us
Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
Julie Langan, Virginia DHR – julie.langan@dhr.virginia.gov
Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
John Simkins, FHWA Virginia Division - john.simkins@dot.gov
Rebeccah Ballo, Montgomery County Planning Department – rebeccah.ballo@montgomeryplanning.org
Carol Rubin, M-NCPPC – carol.rubin@montgomeryplanning.org
Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
Greg Pawlson, Cabin John Citizens Association – gpawlson@gmail.com
Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
Sara Love, Maryland State Delegate – sara.love@house.state.md.us
Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Natali Fani-Gonzalez, Vice-Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Gerald Cichy, Commissioner, Montgomery County Planning Board -MCP-Chair@mncppc-mc.org
Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
Gabe Albornoz, Montgomery County Councilmember - councilmember.albornoz@montgomerycountymd.gov
Andrew Friedson, Montgomery County Councilmember - councilmember.friedson@montgomerycountymd.gov
Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

FMH DEIS Comments                          10.16.20                          Page    6

00022331



**FRIENDS OF MOSES HALL MORNINGSTAR TABERNACLE NUMBER 88**
ANCIENT UNITED ORDER OF SONS AND DAUGHTERS, BROTHERS AND SISTERS OF MOSES
c/o Charlotte Troup Leighton
8005 Cypress Grove Lane
Cabin John, MD 20818
troupleighton@gmail.com

September 17, 2020

*By Email to:*
Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202
Phone 410-545-8508
sarcher@mdot.maryland.gov

**RE: I-495 and I-270 Managed Lanes Study – 9/16/20 FMH CP Meeting Follow-Up**

Dear Mr. Archer:

Thank you and your team, as well as Beth Cole with MHT and Jeanette Mar with FHWA, for meeting with the Friends of Moses Hall consulting party last night. We appreciate your sharing additional details about the Section 106 process and a status update, as well as an informal response to some of the issues raised in our August 24 letter.

This letter is intended to share our understanding of what we learned in our meeting and to review next steps related to the Section 106 process. I've attached your slides from the meeting for reference. As stated in our August 24 letter, we intend to subsequently provide more detailed comments on the DEIS during the public comment period, which has been extended to close on November 9, 2020.

We are pleased that SHA has determined that the site of Morningstar Tabernacle No. 88 Moses Hall and Cemetery (a/k/a Moses Hall) is eligible for listing in the National Register of Historic Places and that MHT concurs with this determination. Our corrections and additions to the DOE form were deemed moot; therefore, they will not be incorporated now to more fully and accurately describe the resource. You mentioned that there will be future opportunities to incorporate a detailed and more complete history of the site, which FMH researchers look forward to providing.

SHA has filed a petition with the Montgomery County Circuit Court to gain access to the property for the purposes of clearing bamboo and other vegetation required to complete additional field investigations. No detail was provided as to the method of bamboo removal. We would like to specify that no heavy equipment should be allowed on the site, and the bamboo removal should be

Friends of Moses 88 CP                    September 17, 2020                    Page        1

This letter was included as an attachment with the DEIS Comment Letter and therefore the copy of the letter is included here. However, MDOT SHA acknowledges receipt of this letter is related to the Section 106 process and has addressed the comments raised through the Section 106 Consulting Parties process.

00022332


conducted using hand tools given the sensitive nature of the site. We are pleased that the bamboo removal process (beginning to end) will be completed under the supervision of an archaeologist, and we reserve the right to observe; however, we would like to clarify that this bamboo removal must be done in a manner that avoids damage to graves, grave markers, historic landscape features/plantings, the Moses Hall lodge foundation, and any other funerary or historic objects. We are told that a 30-day advance notice will be provided to us prior to any work at the site. We understand that we will be provided with copies of all field investigation reports and surveys once they are complete; however, we remain concerned that SHA has not provided us with information regarding the methodology of the archaeological investigation of the site or the results before the ROD, as we can not fully assess the impact of the project without understanding the boundary of the site. It is also our understanding that no invasive or excavation work will be planned for, or performed at, the property without the prior input of the community and the FMH CP. Please note that the FMH CP is currently working to address the ownership matters for the property and will provide updates to SHA as appropriate.

SHA intends to move forward with development of the Programmatic Agreement and will share an initial draft of the PA to consulting parties this fall (date unknown). It is imperative that the FMH CP provide input on the PA language. However, it seems odd and is unfortunate that the FMH CP is expected to provide this input absent any actual knowledge of the impacts. We are pleased that SHA agrees that any construction activity outside of the existing right-of-way would constitute an adverse effect on Moses Hall; however, additional graves may exist within the existing right-of-way of I-495, and we cannot fully understand the effects until the archaeological investigations are complete.

We strongly believe that the Moses Hall property should be avoided. ANY encroachment of construction that extends beyond the existing I-495 right-of-way will impact the Moses Hall lodge foundation and any gravesites within the LOD, decimating the character of this significant property. Accordingly, it is safe to conclude that any PA will need to incorporate very detailed provisions for the following:

- Procedures for the engagement and participation of FMH CP and the community in decision-making for the duration of the PA, as well as performance monitoring;
- Best practice and safe methodologies for further archaeological investigations;
- Procedures for meaningful consultation with FMH CP in the evaluation of design alternatives and treatments in the area of Moses Hall in order to avoid the property and minimize any unavoidable impacts;
- Procedures related to the development of a landscape management plan due to the potential for impacts to the Moses Hall property, including the removal of felled trees/invasive vegetation, protection of existing tree canopy and other sensitive plantings (such as periwinkle), protection of grave markers and other funerary objects, and stormwater management (including mitigation of past damage and prevention of future damage);
- Minimization and mitigation for anticipated and cumulative impacts, including past and anticipated visual and noise impacts that prevent peaceful enjoyment of the property;
- Commitments for potential mitigation including improved pedestrian access (including disabled access); tangible, public recognition and interpretation of the history, archaeology, and interments at the site;
- Concrete support for FMH CP's work for long-term preservation, historic marking and maintenance at the site;
- Meaningful commitment to the correction of past social justice and cumulative environmental impacts to the Gibson Grove community in Cabin John;
- In the event that avoidance is impossible, provisions regarding the relocations of remains and the consultation process with FMH CP and descendants. We strongly object to the relocation of remains; however, any relocated remains must be reinterred on the site. The burial ground was and is a community built around kinship and Morningstar Tabernacle No. 88 membership. All interments must remain together;

- In the event that avoidance is deemed impossible, provisions regarding the relocation of the Moses Hall foundation on site in the consultation process with FMH CP. We strongly object to any removal or relocation of the foundation;
- Procedures for handling of inadvertent discovery of human remains during construction, as well as provisions for meaningful input from FMH CP in the event of such discoveries.

We reiterate our deep concerns that anything other than complete avoidance of these resources will perpetuate the cycle of continued racial injustice to the community. We are **not convinced** that the overwhelmingly negative impacts to this historic community cannot be avoided. We remain opposed to any piecemeal approach to mitigation involving the historic Gibson Grove community.

In conclusion, thank you for your continued attention to the effects of the Managed Lanes project on Morningstar Tabernacle No. 88 Moses Hall and Cemetery, as well as the Gibson Grove Church property. We appreciate the opportunity to continue to consult with SHA and work with the other Consulting Parties to protect the history and character of these important resources in Cabin John.

Sincerely,

**Charlotte Troup Leighton**
Moses Hall Neighbor and
Vice President of Advocacy, Cabin John Citizens Association
troupleighton@gmail.com

**Alexandra Jones, PhD, RPA**
Executive Director and Founder, Archaeology in the Community
ajones@archaeologyincommunity.com

**Austin White**
Descendant
austin.white5454@gmail.com

**Austin White II**
Descendant
gixxer1100@live.com

**Nathan White II**
Descendant
gixxer1100@live.com

**Shannon S. Steward**
Descendant
shannonsteward1@gmail.com

**Pandora White**
Descendant
pdenniswhite12@yahoo.com

**Diane Baxter**
Descendant
baxterd9@aol.com

Friends of Moses 88 CP                September 17, 2020                Page        2

Friends of Moses 88 CP                September 17, 2020                Page        3

This page is intentionally left blank.

**Christopher Waynes**
Descendant
chrisw1330@hotmail.com

**Montgomery Crawford**
Descendant
mceye.photo@gmail.com

**Rev. Edgar S. Bankhead, Sr.**
Gibson Grove A.M.E. Zion Church
ebankjs@verizon.net

**Eddie Bankhead**
Gibson Grove A.M.E. Zion Church
esbj@pobox.com

**Judi Bankhead**
Gibson Grove A.M.E. Zion Church
judibankhead@yahoo.com

**Eileen McGuckian**
Historian and President, Montgomery Preservation
phileen3@gmail.com

**L. Paige Whitley**
Independent Researcher and Author
lpwhitley@me.com

[s/CTL]
w/attachment

cc to:   Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
Julie Langan, Virginia DHR – julie.langan@dhr.virginia.gov
Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
Marc Holma, Virginia DHR – marc.holma@dhr.virginia.gov
John Simkins, FHWA Virginia Division - john.simkins@dot.gov
Rebeccah Ballo, Montgomery County Planning Department – rebeccah.ballo@montgomeryplanning.org
Carol Rubin, M-NCPPC – carol.rubin@montgomeryplanning.org
Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
Greg Pawlson, Cabin John Citizens Association – gpawlson@gmail.com
Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
Sara Love, Maryland State Delegate – sara.love@house.state.md.us
Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Natali Fani-Gonzalez, Vice-Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Gerald Cichy, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
Gabe Albornoz, Montgomery County Councilmember - councilmember.albornoz@montgomerycountymd.gov

Friends of Moses 88 CP                    September 17, 2020                    Page        4

Andrew Friedson, Montgomery County Councilmember - councilmember.friedson@montgomerycountymd.gov
Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

*This page is intentionally left blank.*

Friends of Moses 88 CP                    September 17, 2020                    Page        5

**FRIENDS OF MOSES HALL – CHARLOTTE TROUP LEIGHTON (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Charlotte Troup Leighton

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Live Testimony/Evening

**Transcription:**

My name is Charlotte Troup Leighton, and that's spelled LEIGHTON. I live at 8005 Cypress Grove Lane in Cabin John, Montgomery County, Maryland. I'm a member of the Friends of Moses Hall 88 Consulting Party for the Section 106 process. I am also here representing Evergreen neighborhood of 27 households immediately to the south of I- 495 off of Seven Locks Road in Cabin John. Many of my neighbors, as well as the historic African-American Moses Hall, Morningstar Cemetery and Gibson Grove Church sites backup to the I-495 right of way and are within the limits of disturbance. We appreciate your careful consideration of my community's concerns, which will further, will be further articulated in a formal written response. Notwithstanding our overarching concerns about the negative impacts, fiscal looked viability and the short-sighted approach of the Managed Lanes plan, our community has four primary areas

#1
of concern based on the material in the draft DEIS. For storm water and runoff, our community experiences existing runoff and erosion conditions due to the highway. The expansion will create more impervious surface and more runoff. The DEIS does not provide information regarding the stormwater management strategy in our area. None of the typical sections shown explain what the stormwater management approach would be in conjunction with noise barriers. The stormwater management strategy must be further refined in the final EIS and the approach that SHA takes must address existing and future runoff. Second, we are glad to see noise barriers

#2
proposed for our community. These noise barriers are a necessary mitigation for the noise impacts we will experience and must be committed, committed to in the final EIS and Record of Decision. However, the placement and design of those noise barriers needs to be refined. The property impacts associated with the barriers placed as shown in Appendix D would have major negative consequences for our community. The barriers should be placed in a way that avoids property impacts and minimizes tree impacts. Their design should be compatible with our residential community. Third, the construction of a flyover ramp from the Managed Lanes to

#3
Maryland 190, which is River Road, would create new visual impacts for a community and adjacent cultural resources. These visual impacts are not adequately evaluated in the draft DEIS. To reduce visual and other negative impacts to Evergreen and avoid the Moses Hall historic site, the flyover should be replaced with an at grade access option, as is provided at Clara Barton Parkway. Fourth, the construction impacts associated with the project are insufficiently and improperly defined. We are concerned that the limits of disturbance close proposed noise walls at this level of design. The impacts to Seven Locks Road from the reconstruction of the I-495 overpass are not defined. We are greatly worried about extended noise impacts as the project is

#4
built. These are real impacts for our community that will affect our quality of life and property values. We look forward to these issues being affirmatively addressed in the final EIS. Thank you again for your time and consideration.

**Response to DEIS Comment #1**
Since there is a documented drainage complaint at the Moses Cemetery the current draft SWM concept presented in the FEIS diverts all the impervious area from I-495 away from the cemetery property to the north side of the highway where it is treated in a SWM facility. As a result, the houses between I-495 and Cypress Grove Lane will see a significant reduction in surface runoff.

The majority of the SWM runoff along Cypress Grove Lane will be diverted, however, some runoff will still be directed to the existing 21"RCP located behind 8021 Cypress Grove Lane and the existing swale located between Osage Lane and Cypress Grove Lane. This project will be required to control stormwater runoff for the 10-year storm to match existing conditions prior to leaving MDOT SHA ROW; therefore the runoff at both locations will not be increased and given that the surface runoff is being directed elsewhere, the total runoff will be significantly reduced.

**Response to DEIS Comment #2**
The noise analysis for the Study included a noise receptor at the cemetery. The existing noise level is 70 dBA, future noise level without a barrier is also 70 dBA. A noise barrier is proposed and will result in a noise reduction to 60 dBA. The barrier is currently recommended to be 24 feet tall. The height could change during final design, however the FEIS includes a commitment to a noise barrier with context sensitive treatment at the Moses Hall Cemetery

**Response to DEIS Comment #3**
The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes at Seven Locks Road. Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction. An acceleration lane will also be built along the outer loop for approximately 1000-feet east of Seven Locks Road. No ramps are proposed in this area. The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop. The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier. Flyover ramps are no longer proposed in this area and thus will not create a visual impact. A noise barrier in this area is anticipated to be located close to the existing right of way line. Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

Since the DEIS, the Preferred Alternative eliminates of flyover ramps at MD 190/River Road by adjusting the location of the HOT lane direct access ramps between I-495 and MD 190. All HOT lanes direct access ramps within this interchange are now proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of flyover ramps.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and managed lanes separate to allow space for highway ramps. The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities. The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps. This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

**Response to DEIS Comment #4**
MDOT SHA employed a conservative approach to defining the limits of disturbance (LOD) for all the DEIS Build Alternatives and Preferred Alternative. The LOD represent the proposed boundary within which all construction, mainline widening, managed lane access, intersection improvements, construction access, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, stream stabilization, and related activities to the proposed roadway and interchange improvements. Property impacts associated with the LOD were broken into permanent (long-term) and temporary (short-term) areas. This conservative approach to defining the LOD fairly captured the full scope of potential impacts.

00022336

*This page is intentionally left blank.*

Moreover, the methodology used to assess impacts to a number of key resources appropriately considered a broader geographic area than the LOD immediately surrounding the anticipated construction and related activity boundaries. When the project advances to final design, it is anticipated that the design will closely adhere to the LOD defined in the FEIS, as the LOD was established to include a reasonable area to construct the Preferred Alternative.  For complete graphic descriptions of the Preferred Alternative LOD across the entire span of study limits, Refer to the FEIS, Appendix E, Environmental Resource Mapping.)

The impacts assessment accounts for all land needed for construction, including areas for staging, materials storage, and access needs at specific locations.  These areas are identified in the DEIS and SDEIS, Appendix D, Environmental Resource Mapping and FEIS, Appendix E. The SDEIS and FEIS present quantified property impacts of the Preferred Alternative and are categorized by permanent (or long-term) effects and temporary (or short-term) effects. See SDEIS, Chapter 4, Section 4.5 and FEIS, Chapter 5, Section 5.5.

It is anticipated that construction will last approximately five to six years. Details related to precisely when and where construction related activities will occur will be determined in final design, however, the project will likely require night work to occur when activities could not be completed safely during the day. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. Impacts associated with construction that will be further evaluated for the Selected Alternative in final design include traffic congestion associated with construction maintenance of traffic, utility disruptions, construction vibration, erosion and sediment and control, and construction related noise.

**FRIENDS OF SLIGO CREEK – KIT GAGE**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Kit Gage

**Date/Hearing:** 8/25/20

**Type/Session:** Live/Morning

**Transcription:**

Hi, my name is Kit Gage (K-I-T G-A-G-E). The address of Friends of Sligo Creek, which I represent is Post Office Box 11572, Takoma Park, Maryland 20913 and I live in Silver Spring, Maryland. I'm Advocacy Director of Friends of Sligo Creek and we oppose the managed lane plans for I-495 and I-270. We support, instead, transit solutions to the traffic issues raised by this DEIS. Our almost twenty-year-old, non-profit community organization is dedicated to protecting improving and appreciating the ecological health of Sligo Creek Park and its surrounding watershed. We are a very diverse down county area ranging from Wheaton Headwaters through Silver Spring to Takoma Park. In a time of COVID-19 the value of parks has #2 been stunning and well-documented. This Project would impede on hundreds of acres of parkland that abut the Beltway. It's horrifying to look at the many charts in the DEIS documenting the loss of green space. This would exacerbate the tree canopy loss occurring despite current planting efforts. [INAUDIBLE] #3 Sligo Creek Park in the watershed are less impinged upon by Beltway expansion plans compared with Rock Creek, for example, as Jeanne pointed out. Nonetheless, it would be damaged in multiple ways during construction and after. That part of Sligo Creek crossed by the Beltway is relatively wide and so the effects on the diverse wildlife, trees, stormwater, and the historic Sligo Golf Course are significant. A challenged watershed would be further hurt by a huge construction project and increase of impervious surface.

#4 Let me focus for a minute on stormwater. When built, the Beltway didn't capture and infiltrate, infiltrate stormwater. Instead, as was typical in the 1950s, the hot, polluted runoff went into storm drains and directly into our creeks. As we know from our neighborhood experience, this is not the rule these days for good reason and would violate the Clean Water Act. The state of Maryland has decided that it only needs to capture stormwater runoff from new lanes. 25% of the roadbed not from the total roadbed. This is despite the fact that the existing roadbed is slated to be completely reconstructed. As with the Purple Line, the State is trying to get away with less than halfway measures. When you tear up a road that should be, as in Montgomery County, the trigger for requiring stormwater management for all that's torn up not just new construction. In our area, runoff from the Beltway is a significant contributor to impervious surface flow and pollution. There will be no other time to do the right thing and to reflect the purposes of Clean Water Act. One of the troubling details exemplified under Section 4.5, Property Acquisitions and Relocations on page 4-24 under Mitigation, the first suggested fix is elimination of stormwater bioswales that otherwise would be installed. It's deeply troubling that the State proposes trading off one problem for another and that stormwater retrofits are proposed as the first to go. The massive DEIS and its thousands of examples of environmental damage can numb us to their total impact.

Instead, it should be the trigger for a re-evaluation. Maryland should use Beltway fixes as an exemplar for climate change modifications, fund transit, save the environment, preserve and protect our parks. It's not too late to do the right thing. Thank you.

#1 (marked in left margin)
#2 (marked in left margin)
#3 (marked in left margin)
#4 (marked in left margin)

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

**Response to DEIS Comment #2**
Selection of the Preferred Alternative was based in part on extensive coordination with and input from agencies and stakeholders, including the Officials with Jurisdiction (OWJs) for Section 4(f) properties. Refer to **DEIS, Chapter 5; SDEIS, Chapter 5; FEIS, Chapter 6**. Agency and stakeholder comments on the DEIS and Draft Section 4(f) Evaluation specifically requested avoidance of parkland and historic resources within the study area. The Preferred Alternative is responsive to the comments received and aligns the Study to be consistent with the phased delivery and permitting approach, which limits the build improvements to Phase 1 South and avoids improvements on I-495 east of the I-270 east spur. The result is complete avoidance of a substantial number of Section 4(f) properties and a large reduction of parkland acreage impacts within the Study limits (over 100 acres). Design refinements have progressed since the Preferred Alternative was identified, resulting in additional avoidance and minimization of impacts.

The total number of Section 4(f) properties impacted was reduced by 38 properties after the DEIS based on the revised limits of the Preferred Alternative and other minimization measures. Since the SDEIS, impacts to two additional parks were avoided including Cabin John Stream Valley Park (Rockville) and Morris Park based on further design refinements. One additional Section 4(f) property was identified (the Washington Biologists' Field Club on Plummers Island) bringing the final total to 20 properties. The Preferred Alternative requires use of a total of 33.2 acres from 20 Section 4(f) properties and avoids the use of approximately 113 acres of Section 4(f) properties compared to the Build Alternatives in the DEIS.

**Response to DEIS Comment #3**
Thank you for your comment concerning impacts to Sligo Creek and Rock Creek. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because Sligo Creek and Rock Creek are located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

**Response to DEIS Comment #4**
The project will be required to obtain a SWM and Erosion & Sediment permit. In order to obtain these permits, the project will be required to control stormwater runoff for the 10-year storm to match existing conditions, provide water quality treatment for all new impervious area and 50% of reconstructed existing impervious area to match the runoff characteristics of woods in good condition and manage the 2-year storm during construction so that sediment is not released to local waterways. Variances can be requested for minimal increases in stormwater runoff, however, detailed hydrologic calculations will be required to show that the minimal increases will not result in downstream flooding or erosion. Given the strict permitting requirements, impacts to downstream water quality from stormwater runoff are not expected. Refer to Chapter 9, Section 3.4.E for additional information related to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-6    Filed 10/30/23    Page 60 of 97

FINAL ENVIRONMENTAL IMPACT STATEMENT

**GAITHERSBURG-GERMANTOWN CHAMBER OF COMMERCE, INC. – MARILYN BALCOMBE (EMAIL)**

| | |
|---|---|
| **From:** | Marilyn Balcombe <MBalcombe@GGChamber.org> |
| **Sent:** | Tuesday, August 25, 2020 3:21 PM |
| **To:** | MLS-NEPA-P3 |
| **Subject:** | 495 & 270 Managed Lane Study - DEIS Written Testimony |
| **Attachments:** | MDOT DEIS Public Hearing.doc |

Please accept this written testimony on the 495 & 270 Managed Lane Study



Marilyn Balcombe
President and CEO


Gaithersburg-Germantown
Chamber of Commerce, Inc.

910 Clopper Road, Suite 205N
Gaithersburg, MD 20878
301-840-1400 x15
mbalcombe@ggchamber.org



1

*This page is intentionally left blank.*

00022339





## Gaithersburg-Germantown Chamber of Commerce, Inc.

910 Clopper Road, Suite 205N, Gaithersburg, Maryland 20878 (301) 840-1400, Fax (301) 963-3918

**I-495 & I-270 Managed Lanes Study**
**Draft Environmental Impact Statement (DEIS)**
Federal Highway Administration, Maryland Department of Transportation, Maryland State Highway
Administration and Maryland Department of the Environment
**Public Hearing – August 25, 2020**
**SUPPORT**

**#1**

Increased capacity of I-270 has been a top priority for businesses in Upper Montgomery County for a very long time. We cannot really address the significant traffic burden without a comprehensive investment in real solutions on I-270. This cannot be done without private investment. The I-495 and I-270 P3 Program is the first real opportunity to address the significant congestion along the I-270 Corridor.

The Gaithersburg-Germantown Chamber of Commerce has been engaged in this project through the years and have reviewed the results of the traffic operational analyses outlined in the Draft Environmental Impact Statement (DEIS) for the I-495 & I-270 Managed Lanes Study. We were not surprised that the No Build Alternative (#1) would not address any of the operational issues experienced under existing conditions and would not be able to accommodate long-term traffic growth. The traffic is untenable now and will only get increasingly worse.

Based on the DEIS, both Alternatives 9 and 10 "consistently perform well in all the operational metrics studied, and each alternative ranked first in three of the six key metrics." **We reviewed both options and believe Alternative #9 to be the best option for several reasons.** The most important being the use of HOT Managed Lanes vs. ETL Managed Lanes. Having HOT Lanes will continue to provide incentives for carpooling, taking cars off the road further increasing capacity on I-270.

Other important metrics include:

- **Local Network** - While all the Build Alternatives would result in a net reduction in traffic delays on the surrounding arterials, Alternative #9 performs best in terms of improving the local network. Given to burden of traffic on local roads, this is an important metric to consider.
- **Level of Service** - Alternative #9 also performs the best on the Level of Service (LOS) metric. The study indicates that the No Build Alternative would operate at a letter grade of "F" 53% of lane-miles operating during the afternoon peak rush hour (28% "F" during morning rush hour). While it would be great to project that the new system would never fail, but that would not be cost-effective. Alternative #9 vastly improves the No Build Alternative level of service with a failing grade of only 12% of the operating lanes-miles for both morning and evening peaks.
- **Speed of GP Lanes** - Throughout the project, there has been great concern and debate about toll lanes vs. free lanes. It is important to reiterate that all but one of the alternatives did not take away general purpose lanes. Only one alternative suggested converting a general purpose lane as a contraflow lane during peak periods. It's important that the general public understand that adding toll lanes does not slow down traffic in general purpose lanes. In fact, the average speed increases in the general purpose

---

**Response to DEIS Comment #1**

Thank you for your comments supporting the MLS NEPA process and the proposed improvements. The purpose of the Managed Lanes Study is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the Study limits, and enhances existing and planned multimodal mobility and connectivity.

FHWA and MDOT SHA have considered all comments received on the proposed improvements in the context of the Purpose and Need for the project and have identified Alternative 9 – Phase 1 South as the Preferred Alternative. This alternative would best accomplish the Purpose and Need of the proposed action while fulfilling FHWA's statutory mission and responsibilities, giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

#1
Cont

lanes for all No Build Alternatives. This means that even if an individual commuter chooses NOT to use a toll lane, their individual commute will be faster. Alternative 9 performs best in this metric, increasing average speed in general purpose lanes from 25mph (No Build) to an average of 41 mph.

There are a few more thoughts about the project and the DEIS.

1. We agree that the first priority for I-495 & I-270 is the American Legion Bridge. Fixing that bottle neck is not only an economic imperative, it is a matter of National security. Increasing capacity on the bridge cannot happen without the P3 project.

2. We also want to strongly oppose the MD 200 "short cut". In some circumstances the MD 200 Alternative Diversion may save time for I-95 through trips, but dumping additional cars onto I-270 from 370 to the spur, will negatively impact the travel time for those already traveling on I-270. Encouraging MD200 as a "short-cut" could be disastrous for Montgomery County and Frederick County commuters.

3. We support the option of free bus usage in the managed lanes along I-270 connecting to local bus services, as well as to the Shady Grove Metro station. Now that the Watkins Mill Interchange is open, there is also the opportunity to efficiently connect to the Metropolitan Grove MARC Station via I-270.

4. The section of I-270 between I-370, the spur, and ultimately the American Legion Bridge is in critical need of increased capacity. However, increasing capacity from I-370 north to I-70 in Frederick is equally important. We encourage fast tracking the northern phase of I-270 to create a seamless transition from the American Legion Bridge to Frederick.

Thank you for your time and consideration.

Sincerely,

Marilyn Balcombe
President & CEO
mbalcombe@ggchamber.org

Comment addressed above.

**GAITHERSBURG-GERMANTOWN CHAMBER OF COMMERCE, INC. – MARILYN BALCOMBE (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Marilyn Balcombe

**Joint Public Hearing Date:** 8/25/20

**Type/Session:** Live/Evening

**Transcription:**

Hi, my name is Marilyn Balcombe (M-a-r-i-l-y-n-B-a-l-c-o-m-b-e). My address is 13518 Ansel Terrace, Germantown.

Hi, I'm the President and CEO of the Gaithersburg-Germantown Chamber of Commerce. Increased capacity of I-270 has been a top priority for our economy for a very long time. We strongly support the 495 and 270 P3 as the only real opportunity to address the significant congestion along the I-270 Corridor. Based on the DEIS, both Alternatives 9 and 10 consistently perform well on all the operational metrics studies. We reviewed both options and believe Alternative 9 to be the best option for several reasons. The most important being the use of HOT Managed Lanes versus ETL Managed Lanes. Having HOT Lanes will continue to provide incentives for carpooling, taking cars off the road, further increasing capacity on I-270. Other important - important metrics include the local road network. Alternative 9 performs fast and reducing traffic delays on the surrounding arterials and generally improving the local road network. Alternative 9 also performs best on the Level of Service metric. The No-build Alternative was given a failing grade for 53 percent of the lane miles operating during the afternoon. Alternative 9 is a vast improvement with only 12 percent of lane miles failing for both morning and evening peaks. The speed of the General Purpose lane. Throughout the Project, there's been a great debate about toll lanes versus free lanes. It's important that the general public understand that adding toll lanes does not slow down traffic in general purpose lanes. In fact, the average speed increases in the General Purpose lanes for all No-build Alternatives. This means that even if a driver chooses not to use the toll lane their commute will be faster. Alternative 9 performs best in this metric, increasing average speed in the General Purpose lanes from 25 - for the No-build - to an average of 41 miles per hour. For these reasons, we support Alternative 9. We also agree with the first priority for the Project - is the American Legion Bridge. Fixing that bottleneck is not only an economic imperative, it's a matter of National security. Increase in capacity on the bridge cannot happen without the P3 Project. We also strongly oppose the MD 200 Shortcut. Regardless of any improvement on I-95 through trips, dumping these cars onto I-270 will negatively impact the travel time for drivers who travel I-270 every day. We wholeheartedly agree that I-270 South is in desperate need of increased capacity. However, increasing capacity from I-370 North to I-270 is equally. We encourage fast-tracking the Northern Phase of the I-270 to create a seamless transition from the American Legion Bridge to Frederick. Thank you for your time and consideration.

#1

**Response to DEIS Comment #1**

Thank you for your comments supporting improvements. The purpose of the Managed Lanes Study is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the Study limits, and enhances existing and planned multimodal mobility and connectivity.

FHWA and MDOT SHA have considered all comments received on the proposed improvements in the context of the Purpose and Need for the project and have identified Alternative 9 – Phase 1 South as the Preferred Alternative. This alternative would best accomplish the Purpose and Need of the proposed action while fulfilling FHWA's statutory mission and responsibilities, giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.



**GIBSON GROVE AME ZION CHURCH/FIRST AGAPE AME ZION CHURCH – EDGAR BANKHEAD**

#1

## Gibson Grove AME Zion Church/First Agape AME Zion Church

The historic Gibson Grove AME Zion Church, Moses Hall, and Morning Star Cemetery are unique cultural resources. They are the factual evidence of America's unconscionable cruelties against a people, kidnapped, enslaved for over two hundred years to advance its economy.

Moreover, the cultural resources are of a people stripped of their language, culture, heritage, all items of human worth and dignity, legislated by law to be three-fifths of a human being; released from slavery unto the same for over four hundred years; a target of systemic racism unto this very day.

These resources are unique beyond their antiquity in days, their architectural design to the very core, the source of their existence, slavery, and all its oppressive aftermaths that followed. These cultural resources are not ordinary as others in the Maryland Historic Trust; they are the very bootstraps for a pullup from justice denied, and harrows suffered for centuries.

The restoration, preservation, and new construction of Gibson Grove AME Zion Church and the preservation of Moses Hall and Morning Star cemetery is paramount to offset the initial impact of I-495 Beltway widening in the 1960s. The church is in agreement with all consulting and supporting parties for these cultural resources to be preserved within the expansion project's limits without further harm. The MDOT SHA I-495 and I-270 Managed Lanes P3 program threatens the existence of and functionality of these cultural resources to survive.

In response to Montgomery County Historic Commission and Maryland Historical Trust restrictions on the historic church, avenues to expand the facility to achieve its mission without impinging on the historic structure were sought. In doing so, it was discovered in 2006 that SHA had miss plotted the northern slope of the beltway, causing the tributary that was farther South of the church before the beltway was built to flow farther north to pass through church property. Members of the church at that time recall the tributary being farther south and deep enough for water baptism by immersion; Methodist doctrine permits three forms of water baptism, Immersion, Sprinkling, or Pouring.

The church, in response to this miss plot and the damage it is causing to the church, plans for restoration and new construction were submitted to MHG (Marcis, Hendricks & Glasscock, P. A.) to develop a site plan, which is attached.

This site plan is to offset the damage caused by SHA's survey miss plot, stormwater erosion of north slope of the beltway, and south slope of Gibson Grove AME Zion Church. This erosion is so extensive it clogs the culvert under Seven Locks Road, forcing runoffs across the church and bordering property front easements.

Mitigation concepts to mitigate damage to Gibson Grove Church, Moses Hall, and Morning Star Cemetery are attached. The mitigation concepts call for a basement with adjoining classrooms beneath the historic church, underground stormwater conduit beneath porous concrete parking surface, a concept for reconnecting the Gibson Grove church with sidewalks, and parking for public

---

**Response to DEIS Comment #1**

Thank you for your comments on mitigation for the Gibson Grove AME Zion Church/First Agape AME Zion Church. As you know through the Section 106 Consultation Process MDOT SHA has been coordinating directly with you and the Friends of Moses Hall on avoidance, minimization, and mitigation to these two properties.

Regarding the Morningstar Tabernacle No.88 Moses Hall and Cemetery: MDOT SHA has been continuing investigation of the Morningstar Tabernacle No.88 Moses Hall and Cemetery, and consultation with community representatives since publication of the DEIS and SDEIS. The Preferred Alternative avoids ground disturbance within the current historic boundary and sensitive areas within state-owned right-of-way. MDOT SHA will commit to context-sensitive treatment of the cemetery in the Record of Decision and through a Programmatic Agreement developed in compliance with Section 106 of the National Historic Preservation Act. Commitments will include context-sensitive treatment of noise barrier facing the cemetery, which may include decorative elements appropriate to the historic property and/or such elements as memorial plaques or signage; and further studies prior to final design and construction adjacent to the cemetery, and/or archaeological monitoring requirements for construction, as part of the treatment plan specified in the Programmatic Agreement. MDOT SHA will provide consulting parties with a demonstrated interest in the cemetery and MD SHPO comment opportunity for Project elements, specifically noise barrier, within the APE adjacent to the cemetery.

Regarding the Gibson Grove AME Zion Church/First Agape AME Zion Church, the Preferred Alternative would result in 0.1 acres of impacts to this property, all of which would be permanent impact. The Gibson Grove Church building will not be directly impacted by the Preferred Alternative. The 0.1 acres of impact is required to accommodate outfall stabilization, culvert augmentation, bridge reconstruction, and construction access. A shift of the roadway centerline towards the Gibson Grove AME Zion Church was included in the Preferred Alternative to avoid impacts to Morningstar Cemetery, located on the opposite side of I-495 from the Gibson Grove Church. As mitigation for the adverse effect to the church, MDOT SHA will: provide First Agape A.M.E. Zion Church at Gibson Grove and MD SHPO a comment opportunity at a draft level of design and a second opportunity prior to finalization of design for Project elements on church property or within the APE adjacent to the church property; improve the stormwater drainage on the church property by routing drainage into a new underground culvert to be installed as part of the Project; ensure that a parking lot identified in the church's restoration plan is constructed on church property following installation of the culvert drainage design; work with First Agape A.M.E. Zion Church on schedule and timing of the culvert and parking lot work to be compatible with ongoing church restoration efforts to the extent practicable; ensure Project noise- or vibration- causing construction activities are restricted adjacent to the church during scheduled worship services or key events; and, in coordination with Montgomery County, install sidewalk on the west side of Seven Locks Road to more accessibly connect Gibson Grove A.M.E. Zion Church and Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

**#1**

**Cont**

access to Moses Hall and the cemetery, with additional retainer walls and noise barriers.

On Mon, Nov 9, 2020, at 9:43 PM, Edgar Bankhead wrote:
The historic Gibson Grove AME Zion Church, Moses Hall and Morning Star Cemetery are unique cultural resources. They are the factual evidence of America's unconscionable cruelties against a people, kidnapped, enslaved for over two hundred years to advance its economy.

Moreover, the cultural resources are of a people stripped of their language, culture, heritage, all items of human worth and dignity, legislated by law to be three-fifths of a human being; released from slavery unto the same for over four hundred years; a target of systemic racism unto this very day.

These resources are unique beyond their antiquity in days, their architectural design to the very core, the source of their existence, slavery, and all its oppressive aftermaths that followed. These cultural resource are not ordinary as others in the Maryland Historic Trust they are the very boot straps for a pullup from justice denied and harrows suffered for centuries.

The restoration, preservation and new construction of Gibson Grove AME Zion Church and the preservation of Moses Hall and Morning Star cemetery is paramount to offset the initial impact of I-495 Beltway widening in the 1060's. The church is in agreement with all consulting and supporting parties for these cultural resources to be preserved within the limits of the expansion project Without further harm. The MDOT SHA I-495 and I-270 Managed Lanes P3 program threatens the existence of and functionality of these cultural resources to survive.

In response to Montgomery County Historic Commission and Maryland Historical Trust restrictions on the historic church, avenues to expand the facility to achieve its mission without impinging on the historic structure were sought. In doing so, it was discovered in 2006 that SHA had miss plotted the northern slope of the beltway causing the tributary that was farther South of church, before the beltway was built, to flow farther north to pass through church property. Members of the church at that time recall the tributary being farther south and deep enough for water baptism by immersion; Methodist doctrine permits three forms of water baptism, Immersion, Sprinkling or Pouring.

The church, in response to this miss plot and the damage it is causing to the church, plans for restoration and new construction were submitted to MHG (Marcis, Hendricks & Glasscock, P. A.) to develop a site plan which is attached.

This site plan is to offset damage caused by SHA's survey miss plot, storm water erosion of north slope of the beltway and south slope of Gibson Grove AME Zion Church. This erosion is so extensive it clogs the culvert under Seven Locks Road forcing runoffs across church and bordering property front easements

Mitigation concepts to mitigate damage to Gibson Grove Church, Moses Hall and Morning Star Cemetery are attached. The mitigation concepts call for a basement with adjoining classrooms beneath historic church, underground stormwater conduit beneath porous concrete parking surface, a concept for reconnecting the Gibson Grove church with sidewalks and parking for public access to Moses Hall and the cemetery, with additional retainer walls and noise barriers.

Attachments:

Comment addressed above.

The following pages reflect the attachments included in the letter. There are no comments or responses provided on these pages; they are included for the record.

site plan MHG_AME_Church_Site_Plan_Sketch_12-14-12.pdf
stabable plan First Agape Church-S1.0.pdf
Stable Sheet 2.pdf
A Church Access HSA Right-of Way copy.pdf
P Gibson Grove SHA 2005-2006.pdf
Parking Concept B - 2020-11-05.pdf
Parking Concept C - 2020-11-05.pdf
Retainer photo Links and Pictures.docx
1604976061597blob.jpg



00022345



**FIRST AGAPE AME ZION CHURCH**
**7700 SEVEN LOCK ROAD**
**BETHESDA, MARYLAND 20866**

16 November 2006

First Agape African Methodist Episcopal Zion Church
7700 Seven Locks Road
Bethesda, Maryland 20817

Ref: Ltr dated: 29 March 2006

Maryland State Highway Administration
Mr. Douglas Mills, District Right of Way Chief
9300 Kenilworth Avenue
Greenbelt, Maryland 20770

Dear Mr. Mills:

In reference to request for regrading of slope pertaining to the historical First Agape AME Zion church by the Maryland State Highway Administration , discovery of the common by our surveyor, licensed by the State of Maryland, indicates Right of Way and easement markers placed by SHA are incongruent to and in excess of established property boundaries as delineated by existing plats recorded by Maryland's Office of Land Records.

An explanation of right away and easement marker stakes placed by SHA must be verified within existing recorded boundaries as set forth by Maryland law.

All survey points must be official and in agreement for the survey of the First Agape AME Zion Church property to be completed and recorded.  Our surveyor, civil engineer and architect require a resolution to this matter for completion of church plans for restoration and construction.

For administrative clarity, efficiency and expedience the SHA's contract surveyor may  present their measured survey findings to First Agape African Methodist Episcopal Zion Church's surveyor at:          Duval & Associates, P. A.
                                        Surveyors, Engineers
                                        1729 York Road, Suite 205
                                        Lutherville, MD 21093          Phone 410-666-5467
                                                                                       FAX 410 -583-4688
                                                                                       Email: DUVALAPA@VERIZON.NET.

For questions you may contact me at: 301- 879-3341 or cell: 301-767-9727

Rev. Edgar S. Bankhead
Pastor, First Agape AME Zion Church

00022346

FIRST AGAPE AME ZION CHURCH
7700 SEVEN LOCK ROAD
BETHESDA, MARYLAND 20866

cc:

Office of the Governor
Office of the LT. Governor
The Honorable Brian E. Frosh
The Honorable R. Goldwater, R.N., F.A.A.N
The Honorable Susan C. Lee
The Honorable William A. Bronnott
Office of the Administrator, State Highway Administration
Montgomery County Executive
Montgomery County Council
The Maryland-National Capital Park & Planning Commission
Historic Preservation Commission
Cabin John Community Association

---

FIRST AGAPE A.M.E. ZION CHURCH
Gibson Grove
7700 Seven Locks Road
Bethesda, Maryland, 20817

20 June 2006

Joseph T. Giloley, Chief
Department of Housing and Community Affairs
Division of Housing and Code Enforcement

Ref: Case # 55922
7700 Seven Locks Rd.
Bethesda, 2081 Dtd 23 May 2006

Dear Chief Giloley:

On or about 12 October 2005, correspondence addressed to Department of Housing and Community Affairs ATTN: Unray Peters in response to a request for plans to restore the fire damaged property. This correspondence contained two attachments: a letter addressed to Montgomery County Council requesting assistance in restoring the property and a second document of building plans, i.e., copy of blueprints entitled:**"FIRST AGAPE A.M.E.ZION CHURCH RESTORATION/ REPLACEMENT FOR FIRE DAMAGE, 7700 SEVEN LOCKS ROAD BETHESDA MARYLAND."**

The posture and commitment of First Agape African Methodist Episcopal Zion Church to repair and rebuild remain. Permitting and Construction have been delayed pending requests of Rights-of-Way improvements by Maryland State Highway Administration. Although submitted request were not granted, the SHA's failure to address the long term adverse impact 495 Belt-Way has caused over the years is unacceptable and the church will continue to seek relief from ongoing systemic damages.

Therefor, requests for Right-of-Way improvements to include retaining walls and slope adjustments will be resubmitted during the design phase of the Capital Beltway HOV project. The Master Plan of Highways notes that: "Noise walls or other **mitigating techniques** may be implemented **prior to construction** of the HOV project."

Additionally, Right-of-Way issues pertaining to First Agape will be addressed when consultation requirements with the Maryland Historical Trust and Montgomery County's preservation staff are initiated as required under the federal Section 106 process.

We will continue to pursue all means available to restore this historical treasure in a manner reflective of the proud heritage and dignity of the Cabin John community with a vision for tomorrow.

Currently, Architectural and Civil Engineering designs require alterations in a manner that will permit restoration and construction as we continue to address pertinent issues with the SHA.

All broken glass by vandals removed from broken Church Markey , and smashed in side door repaired April 2006 (Montgomery County Police Report filed, April 2006). The lawn is cut biweekly. The

1

00022347

**FIRST AGAPE A.M.E. ZION CHURCH**
Gibson Grove
7700 Seven Locks Road
Bethesda, Maryland, 20817

building has been secured by Minkoff Company, Inc. Community volunteers removed all solid waste from church interior.

The building plans submitted to your office cost over $25,000. It cost over $10,000 to secure the building. Cost of Civil Engineering is estimated at over $14,000. All in the interest of our most valuable asset the community.

The rebuilding of this church is a very complex matter requiring many Federal, State, County and local officials; as such, it requires more time than most building projects.

Montgomery County permit office will not allow any contractor to touch the building without a permit and no contractor will touch the building without authentic blueprints for cosmetic or any other purposes. We ask that you bear with us concerning the matter. For questions you may contact me at (301) 767 9727, Cell or (301) 879 3341, Home.

For your information only, an Action Summary is attached:

Sincerely,

Reverend Edgar S. Bankhead Sr., Pastor
First Agape African Methodist Episcopal Zion Church

Attachments:
(1)   Page 6 of Master Plan of Highways Amendment
        Planning Board Draft dated April 2003
(2)   Work Authorization Contract, Minkoff Company, Inc pp.1-4
(3)   Letter to The Honorable Steven A. Silverman, ref date30 March 2004
(4)   Letter, dtd 31 March 2004, Advance Structural Concepts, Inc, authorizing safety of building for
        community clean-up
(5)   Advanced Structural Concepts, ltr. dtd, 31 March 2004, proposal offer for Blueprints.
(6)   Signed acceptance of Advanced Structural Concepts, Inc. proposal signed 25 May 2004
(7)   Garland Conner's changes submitted to Advanced Structural Concepts, Inc. dtd 11 June 2004
(8)   Garland Conner's changes submitted to Advanced Structural Concepts, Inc. Dtd 11 July 2004
(9)   Corrected copy of First Agape letter request for Right-of-Way slope adjustments to abate land
        corrosion and earth shifting caused by 496 Belt-Way traffic. And to accommodate handicap
        access, handicap parking and vehicle turn-around area, dtd. 23 September 2004.
(10)  Garland Conner's changes submitted to Advanced Structural Concepts, Inc. dtd 26 October 2004
(11)  Garland Conner changes submitted to Advanced Structural Concepts, Inc. Dtd 28 October 2004.
(12)  First Agape letter to Montgomery County Council request for assistance for Right-of-Way access

2

**FIRST AGAPE A.M.E. ZION CHURCH**
Gibson Grove
7700 Seven Locks Road
Bethesda, Maryland, 20817

to building for handicap access, parking and turnaround; dtd 18 April 2005.
(12)  Application for Commercial Building Permit submitted dtd. 15 August 2005 by Reverend Edgar S.
        Bankhead Sr., Pastor First Agape African Methodist Episcopal Zion Church, pp. 1,2.
(14)  State Highway Administration, Baltimore, MD Records and Research Section; cover letter, dtd 1
        February 2006, for documents requested by Garland Conner was instructed by State Highway
        Commission at Greenbelt, Right-of-Way office to expedite Right-of-Way determination, pp. 1,2.
(15)  Copy of e-mail dtd 17 March 2006 from Montgomery County Council.
(16)  Copy of ltr. Dtd 21 March 2006 from The Maryland General Assembly, Sixteenth District
        Delegation,
(17)  The Maryland General Assembly Sixteenth District Delegation letter to SHA Greenbelt, MD dtd
        21 March 2006
(18)  Maryland General Assembly Sixteenth District Delegation response cover ltr,dtd 4 April 2006, to
        SHA Greenbelt response.
(19)  State Highway Administration at Greenbelt, MD response.

cc:     County Executive
        Montgomery County Council
        Montgomery County Department of Park & Planning
        Historical Preservation Commission
        Cabin John Community Association
        Neil J. Pedersen, Administrator, State Highway Administration,
        The Honorable Brian Frosh, Maryland State Senate
        The Honorable Marilyn Goldwater, Maryland House of Delegates
        The Honorable Susan Lee, Maryland House of Delegates
        The Honorable William Bronrott, Maryland House of Delegates
        Mike Donahue, Fire Marshal's Office
        Cynthia Gaffney, Licensing and Registration Unit.

3

p. 1



**SHA**
**State Highway**
Administration ©

Robert L. Ehrlich, Jr., *Governor*
Michael S. Steele, *Lt. Governor*

Robert L. Flanagan, *Secretary*
Neil J. Pedersen, *Administrator*

Maryland Department of Transportation

March 29, 2006

The Honorable Brian E. Frosh
Senate of Maryland
2E Miller Senate Building
11 Bladen Street
Annapolis MD 21401-1991

The Honorable William A. Bronrott
The Honorable Susan C. Lee
Maryland House of Delegates
221 House Office Building
6 Bladen Street
Annapolis MD 21401-1991

The Honorable Marilyn R. Goldwater
Maryland House of Delegates
241 House Office Building
6 Bladen Street
Annapolis MD 21401-1991

Dear Senator Frosh and Delegates Bronrott, Goldwater, and Lee:

Thank you for your letter regarding the First Agape Church at Gibson Grove, 7700 Seven Locks Road. We appreciate the opportunity to report our findings on these issues.

In speaking with Mr. Augustine Rebish, District 3 Utility Engineer, it is true that he did indicate that the State Highway Administration (SHA) will not release or make available land that was purchased for the construction of the beltway. The SHA-owned parcel is an integral part of the existing Capital Beltway as it has supporting slopes and drainage traversing it. In addition, the parcel may be part of any future beltway improvements. This transaction was a legal purchase made between the SHA and the Gibson Grove Church.

Our toll-free number is: 1.800.749.0737
Maryland Relay Service for Impaired Hearing or Speech: 1.800.735.2258 Statewide Toll Free

Street Address: 9300 Kenilworth Avenue • Greenbelt, Maryland 20770 • Phone: 301.513.7300 • www.marylandroads.com

---

p. 2

The Honorable Brian E. Frosh
The Honorable William A. Bronrott
The Honorable Marilyn R. Goldwater
The Honorable Susan C. Lee
Page Two

While the Capital Beltway did impact this community, accessibility to the community assets were preserved by the improvements made to Seven Locks Road. Parking as it is today at no charge is by virtue of an unwritten agreement between SHA, Montgomery County, Maryland National Capital Park & Planning Commission and Gibson Grove Church. Additionally, all construction practices utilized in the completion of the beltway were within the specific code or regulations of that time period.

Thank you, again, for your letter. If you have any further questions or comments, please do not hesitate to contact Mr. Douglas Mills, District Right of Way Chief, SHA at 301-513-7470, toll-free 800-749-0737 or via email at dmills@sha.state.md.us. He will be pleased to assist you.

Sincerely,

Darrell B. Mobley
District Engineer

cc:  Mr. Douglas Mills, District Right of Way Chief, SHA
     Mr. Neil J. Pedersen, Administrator, SHA
     Mr. Augustine Rebish, District Utility Engineer, SHA

**FIRST AGAPE A.M.E. ZION CHURCH**
Gibson Grove
7700 Seven Locks Road
Bethesda, Maryland 20617

18 April 2005

To:    Montgomery County Council
100 Maryland Avenue
Rockville, Maryland 20850

At your request, we are resubmitting our request dated 23 September 2005 for your assistance with the restoration of Gibson Grove Church and Moses Hall Burial Grounds, Cabin John, MD. Enclosed are the long awaited building plans. After many months in the drafting stage, the blueprints have finally been completed and permits requested.

As you consider our request, please keep in mind that before the beltway and before Cabin John, a former slave woman swam the Potomac River with her two young children holding on to a log to freedom in Maryland. She worked for a plantation owner as a seamstress earning enough money to buy seven acres of land where she dedicated and covenated this land in question to the Holy One who made her freedom possible, her Lord. Because the building of the beltway substantially effected the destruction of the church as much as the fire, we are asking you to be a part of the remedy.

Please help us preserve a vital Cabin John historical site, a black female historical heritage: Gibson Grove African Methodist Episcopal Zion Church founded by Sarah Gibson, a former slave, in 1897, a log cabin later replaced by present edifice. She also founded Moses Hall – used as a school and social hall, and a burial ground known as Morning Star, a significant Montgomery county historical cemetery.

The construction of 495-Beltway required acquisition of Gibson Grove land which caused immediate and long term problems:
1. It has eliminated space for parking and other church activities.
2. The weight shifting from beltway traffic is causing soil erosion near the church foundation, if not checked, the church foundation will collapse ; (church will fall down the hill).
3. Beltway construction has cut off church assess to Sarah Gibson's burial ground.
4. No parking for visitors to historical  site and church activities put children, senior citizens and other at risk to street crossing in a high traffic area.

To preserve a Cabin John historical site, a viable black heritage of Montgomery county, we request:
1. That the land acquired near the drainage run be regraded for ground access to church.
2. That storm drains be install in regraded area for proper drainage to prevent soil erosion.
3. That retainer walls be constructed to prevent further ground slope erosion caused by overhead 495-Beltway traffic weight shifting.
4. That a pathway be constructed for access to the historical Sarah Gibson burial site.

cc:
Montgomery County Department of Parks and Planning
Maryland State Highway Commission
Historical Preservation Commission
Cabin John Community Association

*Reverend Edgar S. Bankhead Sr., Pastor <10 Cabin creek Court, Institutville, Maryland 20866 > (301)  879-3341*

Copy of Page 1.pdf

---

in conjunction with the recommended Capital Beltway HOV project. Noise walls or other mitigation techniques may be implemented prior to construction of the HOV project, if warranted and funded.

On page 109, Table 4 (Street and Highway Classifications) add to the text under "Freeways" to read as follows:

| | |
|---|---|
| **Roadway** | F-8 Capital Beltway (I-495) |
| **Limits** | I-270 Spur to Potomac River |
| **Minimum ROW Width (feet)** | 300 |
| **Number of Travel Lanes** | 8, plus 2 HOV, divided |

On page 114, after the third paragraph under the heading "Roadway Functional Classification Changes, Recommended Rights-of-Way, and Alignment Changes," add the following paragraph:

With regard to the recommended Capital Beltway HOV project, SHA should minimize right-of-way impacts on nearby homes, as well as on the historic First Agape AME Zion Church. SHA should meet with affected communities to address their concerns and use mitigation techniques, such as retaining walls, adjustments to slopes, and narrow shoulders. The church is designated on Montgomery County's *Master Plan for Historic Preservation.* When the project enters its design phase, consultation with the Maryland Historical Trust and with Montgomery County's preservation staff must be initiated under the federal Section 106 process.

On page 114, at the end of "Recommendations," add the following paragraph:

- During the design process and federal Section 106 process for the Capital Beltway HOV project, SHA will need to make extensive efforts to avoid adverse effects on nearby homes and the historic First Agape AME Zion Church.

Bethesda-Chevy Chase Master Plan, 1990

On page 112, second column, insert a new sub-heading after the main heading  "Major Highway Needs," as follows:

Capital Beltway

This Plan recommends adding high occupancy vehicle (HOV) lanes on the portion of the Capital Beltway (I-495), between the American Legion Bridge and the West Spur I-270. Some segments of the Capital Beltway between the American Legion Bridge and the West Spur I-270 are experiencing congestion conditions (level of service F) during the morning rush hour of 8:00-9:00 AM. In the evening, conditions are worse, with congested conditions over the three-hour period of 4:00 – 7:00 PM. The proposed HOV lanes have the potential to make vehicular use of the Beltway more efficient and to mitigate some of the congestion that would otherwise occur. This proposed project would connect the existing HOV lanes on I-270 with the proposed HOV lanes on the Virginia segments of the Capital Beltway. The project would consist of one HOV

| | | |
|---|---|---|
| Master Plan of Highways Amendment | Page 6 | Planning Board Draft April 2003 |

OP·LANES™
MARYLAND
I-495 & I-270 Managed Lanes Study







I-495 & I-270 Managed Lanes Study



# SHA
## State Highway
Administration
Maryland Department of Transportation

Martin O'Malley, Governor
Anthony G. Brown, Lt. Governor

John D. Porcari, Secretary
Neil J. Pedersen, Administrator

*To: Joe Miklochik*
*cc: Sue Ranyan*

TO: Mr. Raja Veeramachaneni
   Director, Office of
   Planning and Preliminary Engineering

FROM: Bruce Grey
   Deputy Director, Office of
   Planning and Preliminary Engineering

DATE: May 5, 2008

SUBJECT: **First AGAPE AME Zion Feasibility Study**

The Capital Beltway Project Team has reviewed the Feasibility Study prepared by Macris, Hendricks, & Glascock, P.A. on the historic restoration and construction of First AGAPE AME Zion church and offers the following comments:

Impacts

Capital Beltway Study impacts on the First AGAPE AME Zion Church:

- In the vicinity of the church, the Capital Beltway improvements would include widening along the outer loop (including widening the bridge over Seven Locks Road) and building a SWM facility along the outer loop just to the southwest of the church property.

- The Capital Beltway Study does not require any right-of-way from the existing church structure, the planned addition to the church, and the church property.

First AGAPE AME Zion Church impacts affecting Maryland State Highway Administration (SHA) property:

- The proposed driveway for the church onto Seven Locks Road passes through SHA property.

- The proposed parking lot & driveway impacts an existing drainage ditch within SHA easement.

My telephone number/toll-free number is _____
Maryland Relay Service for Impaired Hearing or Speech: 1.800.735.2258 Statewide Toll Free
Street Address: 707 North Calvert Street  ·  Baltimore, Maryland 21202  ·  Phone: 410.545.0300  ·  www.marylandroads.com

Mr. Raja Veeramachaneni
Page Two

Report Comments

The proposed addition to the church could impact existing wetlands located on the property adjacent to SHA's right-of-way.

The report does note the potential for environmental impacts, including impacts to the existing drainage and recommends a Natural Resources Inventory and development of a Stormwater Management Concept. The report also indicates that presence of wetlands or waters of the U.S. on the site could limit or restrict potential development.

Another item noted was the difference in elevation shown on their plans compared to our plans. The site plan shows existing contours for this area that are approximately 50 feet lower than the actual ground elevations. This is could be a concern if these contours are from survey that will be used for the design and construction.

Recommendations

1. We recommend allowing the First AGAPE AME Zion Church to place the proposed driveway across the SHA Right-of-way since it would not interfere with the proposed Capital Beltway improvements. However, we would request that the driveway be located at least 30 feet away from the existing overpass over Seven Locks Road. This may require a right-of-way acquisition or easement .
2. We do not recommend allowing construction over the existing SHA drainage easement unless the improvements will take into consideration SHA's needs and reconfiguration of the ditch.
3. We request that the Church complete a natural resources inventory and stormwater management plan. They should also consider mitigation if they impact the waters of the U.S. ditch, because it would be their responsibility to perform mitigation associated with the impacts even if it is within SHA right-of-way.

If you have any questions or comments, please contact the project manager Ms. Sue Rajan at 410-545-8514 or at srajan@sha.state.md.us.

cc:    Mrs. R. Suseela Rajan
       Mr. Donald Sparklin
       Ms. Nicole Washington

---

Attachments to SHA Review Documents 11/6/20

Link to Washington Post Article

https://www.washingtonpost.com/local/trafficandcommuting/maryland-beltway-expansion-might-require-moving-part-of-historical-african-american-cemetery/2020/10/17/ae4696ca-0da5-11eb-8a35-237ef1eb2ef7_story.html

Link to pictures of cemetery

https://drive.google.com/drive/folders/1y3dYZkGoIybCF2DlwbLdDDZC2uIYCA8M?usp=sharing

Picture of retaining wall





## I-495 History

Construction of the Capital Beltway began in 1955 as part of the Interstate Highway System that was created in the Federal-Aid Highway Act of 1956. The first section of the highway opened in 1961, and the highway was completed in 1964. Originally, I-95 was planned to serve downtown Washington from the south and north, intersecting the Beltway in Virginia and Maryland. However, the plan was canceled in 1977, and the completed portion of I-95 inside the Beltway from the south running north into downtown Washington, D.C._____

- I-495 History Construction of the Capital Beltway began in 1955 as part of the Interstate Highway System that was created in the Federal-Aid Highway Act of 1956. The first section of the highway opened in 1961, and the highway was completed in 1964.

**Timeline-- Sarah Gibson, founder and Gibson Grove Church**

1861-- Sarah was born a slave on plantation near Bull Run/ Manassas Virginia.  Battle of Bull Run reveals the cartage reality of the bloody war. (Henderson, Stonewall Jackson).  She worked as a seamstress.  Her husband was a wagon driver for "the master".  Eleven years after the Civil War Battle of Bull Run, nine years after Lincoln signed the Emancipation Proclamation and four years after the 14th Amendment giving freed slaves citizenship, Sarah-- through many challenges including hiding from the renegade soldiers, stepping over bloody bodies in Bull Run Creek, swimming across the Potomac River holding on to a log with her two little children-- arrives in Potomac, Md via of Shiloh Baptist Church (A refuge for freed slaves).  (As told by niece Thelma Young and Robert Gibson grandson 1989 Church Records)

1872--1888 Sarah_____and finds work in Potomac Md. She worked for 16 years saving enough money to buy 4 to 5 acres of land. She could not read or write but could quote the scripture word for word. Because of her faith, knowing that it was God that brought her through,she made a commitment to dedicate a portion of this land to God for his glory.

1898-- Sarah donates part of her land to the African Methodist Episcopal Zion Church,  grateful to God for protecting her, taking care of her and her children throughout the journey from Manassas to Maryland. Gibson Grove School is built right by the church as there was no school in Montgomery County for African Americans. (1898 Massacre of successful African Americans, Wilmington, NC, News Paper Article Attached.)

1912—Land was used for Church and a portion of the grounds was used for burials and baptisms in a creek near the church. There was also a small building used for a school This school was on the lower south side of the Church.  It flourished until 1923 when the church was rebuilt and the school was moved to the community center called Moses Hall.

1923—New Church is relocated a few feet away with boards rather than logs from the land. The creek is still used for baptism. (see attached from record book noting baptism 1950).  There are several graves here.  Graveyard extended to cemetery at Moses Hall a few feet from the church.

1929—Sarah Gibson dies and is buried in cemetery at Moses Hall.  Montgomery County pays $8.00 a year for use of the "school for colored people."

1961—100 years after the Battle of Bull Run, Beltway comes to the church relocating baptismal creek, destroying some of the graves on the south side of the church and separating the church from Moses Hall and other gravesites.

1955--495 Beltway invades the community

1974—Church refurbished with bathrooms, kitchen and office

2002—Membership of Gibson Grove Church dwindles. Bishop Williams of the Philadelphia Baltimore Conference requests that First Agape occupy the church until its own church was constructed.

2003—Members of First Agape at Gibson Grove refurbish the church and ordered gas furnace to replace oil furnace.

2004—Church is almost completely destroyed by fire from misfiring of the oil furnace.



OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study | Case 8:22-cv-02597-DKC    Document 61-6    Filed 10/30/23    Page 77 of 97

FINAL ENVIRONMENTAL IMPACT STATEMENT



## News

# First Agape Fire

FROM PAGE 3

the congregation intends to preserve them. "We're going to save as much of it as we can," she said.

The church's insurance will probably not cover the entire rebuilding costs. The community has already begun to rally around the historic congregation. Danny Harris, a resident of Cabin John, came to the burned building on the day after the fire to offer his support and a donation to the church. "We're willing to help," Harris said of the community.

Glen Echo Baptist and St. Andrew's churches have already offered the congregation a place to worship, and the church's trustees are looking at other places where they might go while they rebuild the church.

"It will make us stronger and bring us closer together," said Rev. Bankhead.

Church members say that the floorboards date to the original construction.

### Historic Gibson Grove

Sarah Gibson hung onto a log as she and her two children crossed a river, according to church documents. She had been a slave in Virginia and was separated from her husband when the Union soldiers came. Sarah and her children found their way to Shiloh Baptist church in Washington, and from there to Potomac, where she worked as a seamstress.

After 16 years, she had saved enough to buy about 4 1/2 acres on Seven Locks Road, probably around 1885. In 1898, Gibson donated a portion of that land for the purpose of creating a church to serve the community, and a log structure was built on the property, establishing the Gibson Grove AME Zion Church, which is now known as First Agape.

Sarah Gibson died in January 1929 and was buried at Moses Hall.

According to the Potomac Master Plan, the current structure was built in 1923, and a rear frame was added in 1979. "This church represents the historic Gibson Grove community of African-Americans established in the late 1800s. The church structure exemplifies a popular building type for modest rural churches with a one room block and off-center belfry."







OP·LANES
MARYLAND
I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**



## brief History of the Physical Church

- Established in 1898: An historic witness to Zion Methodism in Montgomery County, Maryland. Now in our second century of service to God and God's people. Our Church is a legacy of our benefactor, Sarah Gibson, a former slave. She escaped bondage from the South with her children in tow, eluding slave catchers, fording rivers, even to the point of grasping a log. Mrs. Gibson became a successful seamstress and later acquired a tract of land (now a part of Cabin John Maryland. Her belief in God and in education was manifested with the building of a small structure which served as a one room school house for her people, during a time when educational opportunities for former slaves and their families were almost non-existent. This building was later called "Moses Hall" when a school for Negroes was established by the County years later. Moses Hall then served as a Church until its present structure was built in 1922. In 1974 a new annex was constructed which encompassed restrooms, office, kitchen and dining facilities. In 1994-97 major renovations and improvements were done, including a new pulpit and choir loft flooring, reconstruction of the deteriorating rear wall as well as a redesign of the roofing, and new sound enhancement system.

## A brief Description of our Belief

- We are a Christ-centered, Bible **believing** Church that steadfastly believes in the power of prayer. First Agape at Gibson Grove believes in and practices that mandate that Jesus gives us in Matt 6:33, " ... but seek ye first, the kingdom of God and His righteousness, and all these things shall be added unto you." First Agape at Gibson Grove puts First Things First: God before all as we follow Christ.

00022357









*This page is intentionally left blank.*



**GREATER FARMLAND CIVIC ASSOCIATION**

STATEMENT OF ED RICH, PRESIDENT
GREATER FARMLAND CIVIC ASSOCIATION
MARYLAND DEPARTMENT OF TRANSPORTATION
I-270 & I-495 MANAGED LANE STUDY
November 3, 2020

These comments on the Draft Environmental Impact Statement (DEIS) are submitted on behalf of the Greater Farmland Civic Association (GFCA), representing a community of 981 homes in the Old Farm, Tilden Woods, Hickory Woods, and Walnut Woods neighborhoods. From our location just south of Montrose Road and adjacent to I-270, we have had a front row seat for repeated I-270 expansions, all sold as "traffic solutions." We have followed the current P3 program of proposed managed lanes with increasing skepticism. Having processed the hundreds and hundreds of pages of the DEIS and the Joint Federal/State Application (JPA) for impacts to wetlands, waterways and floodplains, we find our skepticism has been well founded. We share the concerns expressed by the Maryland National Capital Park and Planning Commission (M-NCPPC) in their October 19, 2020 rejection of the plan and by many members of the Maryland General Assembly in their letter of September 23, 2020, to Lisa Choplin, the Director of this project for the Maryland Department of Transportation's State Highway Administration (MDOT-SWA). The financial risks of the P3 structure; the ecological, social, and cultural sacrifices necessary; and the proposed 50-year term of the contract which substantially limits how we will meet future needs—each of these, in our view, is a deal-breaker. We also question the numerous assumptions and guesses made in forecasting future traffic demand, in predicting motorist behavior, and in determining air quality. Our rejection of the P3 program and its alternatives, however, is ultimately based on the flawed goal of the project: to create additional roadway capacity to carry more cars (Executive Summary, 4-10). Not only will a project focused on a simplistic solution to a complex issue fail to alleviate traffic congestion, but it will

#1

**Response to DEIS Comment #1**

MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts, including Environmental Justice, and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarize the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail. This analysis directly contributed to MDOT SHA's evaluation of these alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided. Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

Refer to Chapter 9, Section 3.4.G for a response to climate change and greenhouse gas considerations.

Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

|   |   |   |
|---|---|---|
| #1 Cont | Climate Goals (October 15, 2019) states that transportation accounted for 40% of Maryland's gross greenhouse gas (GHG) emissions in 2017. It is hard to see how the P3 will help accomplish the reduction of emissions when, as Chapter 3 of the DEIS specifies, the I-270 managed lanes in 2040 will support an average daily traffic of more than 300,000 cars. The few P3 alternatives which retain HOV lanes would operate at HOV-3, and nowhere is there a provision for approved plug-in EVs to use the HOV or HOT lanes even if they are traveling solo, as is provided in the Clean Cars Act of 2017. While the DEIS bases projections of air quality on projections of future car efficiency, the Climate Goals report admits that challenges to lowering GHG emissions include the EPA's rolling back rules to earlier, lesser standards for fuel economy. The Climate Goals draft plan also states that public transportation "emits roughly 40% to 50% less GHG emissions per passenger mile than an average single occupancy vehicle," and calls for expanded investment in public transit—a position extremely limited in the P3 program, which has dismissed transit-only alternatives. According to the DEIS Executive Summary, the P3 agreements will provide for "specific transit investment," and mentions two particulars: allowing BRT to ride free on the managed lanes, and building a ramp on I-270 to the Montgomery Mall Transit Center. In fact, the DEIS presents no comprehensive plan to develop an accessible and reliable Bus Rapid Transit (BRT) system. It refers us to the Transit Service Coordination Report, released in June 2020, which lauds the managed lanes as an "opportunity to create a suburban transit network that is a time competitive alternative to driving." This report posits "new transit centers" and "new transit services" to support an "underserved transit market" of nineteen to twenty-two thousand commuters who currently drive between Montgomery County and Fairfax County. The report fails to provide details or a plan to actually develop these services, however, and admits that there is no money to do so.

3 | Comments addressed above. |

#1
Cont

With transit-only alternatives dismissed and providing no actual commitment to BRT, the DEIS' boast that the project aligns with Visualize 2045 is all the more objectionable. The writers are guilty of cherry-picking here. Visualize 2045 clearly states that its goal is to get cars off the road, and six out of seven points advocate car-less options, including transit such as BRT and rail. Far from aligning with Visualize 2045, the project as made clear by the DEIS is all about the car—about its convenience and the revenue that the project planners and advocates expect to generate from it.

The P3's goal of enabling substantially more cars on the road is an overly simplistic response to growth that, far from "free" as Governor Hogan touts this scheme, comes at too high a price, both in taxpayer dollars and damage to the environment. And for what? The DEIS clarifies that the managed lanes, to be built at a high cost to the environment and those who live in it, will save commuters less than 10 minutes during a peak-time trip. Table ES-2 indicates that "system-wide delay savings" for motorists range from 33% to 35%. Like good marketing, this figure sounds compelling until one reads in Chapter 3 that the system-wide delay savings of 33% in the PM peak for Alternative 9 in 2040 equates to 7.9 minutes saved. Considering what is lost to build the new managed lanes, these few minutes come at a price much higher than the money to build them or the money earned from them. This includes the loss of an Early Woodland archeological site near the river, the loss of the historic Moses Hall Cemetery, and the significant degradation of the Glenarden historic African-American community. The DEIS dismisses the importance of the slender habitat of trees along the road, but the wildlife living there will be forced into isolated and small tracts that cannot adequately support them. The law requires trees removed from parkland to be replaced 1:1; however, it is unclear where the replanting will happen. And the list goes on.

4

Comments addressed above.

I-495 & I-270 Managed Lanes Study

Comments addressed above.

#1
Cont

In Chapter 4, section 24, the DEIS considers the "irreversible and irretrievable commitment of resources," including the "irreversible dedication of land to transport use." The P3 contract would be for 50 years. It is disingenuous at best for the writers to say, "if a greater need arises for the land or if the transport facility is no longer needed, the land can be converted to another use." How would the contract be voided to provide space for transit, should transit become essential in a near-future world heavily affected by a climate change driven by car GHG emissions? The DEIS confirms for us that the cost of building four extra lanes on the highways is too high for what we in fact get. We get an expensive set of toll lanes that keep drivers in their cars, living far from work, paying high tolls, and sending lots of greenhouse gases into the air. We get impoverished ecosystems and diminished communities and quality of life along the highway. We sign over control of a key portion of land that might be used instead for rail or other transit alternatives to a for-profit private company for 50 years, a period of time that scientists acknowledge to be the most critical for fighting climate change. And in exchange, some commuters may, for a few precious years, save a few minutes on their commutes and some local entities and the state get some money for other things (which, if the Purple Line debacle is any indication, is a pipedream). It is a bad bargain.

This P3 Managed Lanes study should be scrapped before too many more precious tax dollars are spent on an approach that is doomed to failure and that will have a significantly negative effect on the quality of life in our neighborhood, our county and our state.

5

**GREATER WASHINGTON BOARD OF TRADE – DANIEL FLORES (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Daniel Flores

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Live Testimony/Evening

**Transcription:**

Good afternoon, my name is Daniel Flores D-A-N-I-E-L, F-L-O-R-E-S. I am at 800 hundred Connecticut Avenue North West in Washington DC. I am the President of the Greater Washington Board of Trade. I am here in support of the Managed Lane Expansion and I'm also past resident of Montgomery County. I live in the county for well over 30 years, most of them in Gaithersburg, and have experience the I-270 and I-495 daily traffic tie ups that led me to move to Virginia. Many companies and new residents that look to relocate here to look for good schools, jobs and good transit and road networks systems that will get them to a destination in a reasonable time and not to spend two plus hours in traffic every day, as I did for much of my 30 years in Maryland. Now, alleviating traffic congestion in greater Washington to reduce the costs of congestion and to attract and retain qualified employees, keep businesses and attract new ones, is one of our Board of Trade priorities. On the infrastructure side, we support the transit and bridges and funding needed to secure improvements for roads. Examples of water trade priorities such included. the Intercounty Connector and a regional system of hot lanes complementing those now in Virginia and more. We highly recommend that Maryland proceed with Alternative 9, which will add two new hot lanes, high occupancy lanes, connecting those in Virginia that want to improve mobility, increase travel reliability, reduce congestion and incentivize carpooling and transit ridership. Virginia's plan to expand these HOT lanes network to the American Legion Bridge and with the potential matching lanes on the Maryland side in both directions, will create a seamless express network in the greater Washington region. Moreover, allowing you to be in transit vehicles to use the Managed Lanes for free, will encourage people to carpool [INAUDIBLE] take transit. We are the fifth most congested region in the country and the 21st most congested in the world. Increasing the average travel speeds will reduce per vehicle greenhouse gas emissions. The I-270 and I-495 Managed Lanes project is critical to the quality of life and mobility in greater Washington region. In addition to reduction of delays on 495 and 270, Maryland will increase reliability for all modes of transportation. This project will infuse 9 to 11 billion of private funding into Maryland's economy, create tens of thousands of much needed new jobs for the next several years. We believe ultimately that the entire region interstate highway system needs to be upgraded and modernized in the new Managed Lanes and express bus transit service for the entire network. Thank you for the opportunity to testify today.

**#1**

**Response to DEIS Comment #1**
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**GREATER WASHINGTON BOARD OF TRADE – DANIEL FLORES (WEBSITE)**

Greater Washington Board of Trade

The Board of Trade is in support of the Managed Lanes (I-495/I-270) and our testimony is attached.

thank you
Daniel Flores

*This page is intentionally left blank.*



**GREATER WASHINGTON**
**Board of Trade**

**Statement of Daniel Flores**
**Vice President, Government Relations**
**Greater Washington Board of Trade**

**Maryland Department of Transportation**
**State Highway Administration**
**September 3, 2020**

My name is Daniel Flores, I am the Vice President of Government Relations for the Greater Washington Board of Trade. I am here in support of the managed lanes expansion. I am also a past resident of Montgomery County. I lived in the county for well over 30 years most of them in Gaithersburg and have experienced the I-270 and I-495 daily traffic tie ups that lead me to move to Virginia.

Many companies and new residents that look to relocate here, look for good schools, jobs and a good transit and road network system that will get them to their destination in a reasonable time and not spend 2 plus hours in traffic every day as I did for much of my 30 years in Maryland.

Alleviating traffic congestion in Greater Washington to reduce the costs of congestion and to attract and retain qualified employees, keep businesses and attract new ones is one of the Board of Trade's priorities. On the infrastructure side, we support the construction of new roads, transit and bridges and the funds needed to secure these improvements. Examples of Board of Trade priorities have included the Intercounty Connector, a regional system of HOT lanes complimenting those now in Virginia and more. We highly recommend that Maryland proceed with Alternative 9 which will add two new HOT (High Occupancy Lanes) connecting those in Virginia that would improve mobility, increase travel reliability, reduce congestion and incentivize carpooling and transit ridership.

Virginia's plan to extend its HOT Lanes network to the American Legion Bridge and with the potential matching lanes on the Maryland side on both directions, will create a seamless express network in the greater Washington region. Moreover, allowing HOV and transit vehicles to use the managed lanes for free will encourage people to carpool and take transit.

**Response to DEIS Comment #1**

MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

#1

Comments addressed above.

We are the 5th most congested region in the country and 21st most congested in the world, increasing the average travel speeds will reduce per vehicle greenhouse gas emission.

The I-270 and I-495 managed lanes project is critical to the quality of life and mobility in the Greater Washington Region.  In addition to reduction of delays on 495 and 270, Maryland will increase reliability for all modes of transportation.

This project will infuse $9 – 11 billion of private funding into Maryland's economy, create tens of thousands of much needed new jobs for the next several years.

We believe, ultimately, that the entire region's Interstate Highway System needs to be upgraded and modernized, with new managed lanes and express-bus transit service on the entire network.

The P3 program is vital to the region's economic vitality. We need to keep this program moving forward.

Thank you for the opportunity to testify.

**GREATER WASHINGTON PARTNERSHIP**

| | |
|---|---|
| **From:** | Joe McAndrew <jmcandrew@greaterwashingtonpartnership.com> |
| **Sent:** | Monday, November 9, 2020 5:22 PM |
| **To:** | MLS-NEPA-P3 |
| **Cc:** | Parsons, Richard |
| **Subject:** | Public Comment on Maryland's I-495 and I-270 Managed Lanes Project |
| **Attachments:** | 11.2020_495NEXT_MDManagedLane_PubComment_Final.pdf |

Please accept the attached public comment from the Greater Washington Partnership for Maryland's I-495 and I-270 Managed Lanes Project.

Best,
Joe

Joe McAndrew
Managing Director, Transportation
202.871.9908

 GREATER WASHINGTON PARTNERSHIP
FROM BALTIMORE TO RICHMOND
FOSTERING UNITY, ADVANCING GROWTH

Sign-up for our Capital Region biweekly newsletter

1

*This page is intentionally left blank.*

00022368



GREATER WASHINGTON PARTNERSHIP
FROM BALTIMORE TO RICHMOND
FOSTERING UNITY ADVANCING GROWTH

November 9, 2020

Honorable Gregory Slater
Secretary of Transportation
State of Maryland
7201 Corporate Center Drive
Hanover, MD 21076

Honorable Shannon Valentine
Secretary of Transportation
Commonwealth of Virginia
1111 East Broad Street
Richmond, VA 23219

**RE: Public Comment for Maryland's I-495 and I-270 Managed Lanes Project, Virginia's 495 NEXT Project, and the joint I-495/American Legion Bridge Transit and TDM Project**

Dear Secretaries Slater and Valentine:

The Greater Washington Partnership (the Partnership) commends your leadership, and that of Governors Hogan and Northam for close coordination to deliver a world-class transportation system for the Capital Region of Baltimore, Washington, and Richmond. The Partnership is a civic alliance of the leading employers in the region who employ more than 250,000 residents and are committed to making the region one of the best places to live, work, and build a business.

We write today to offer public comments supporting your continued forward momentum to deliver upon the promise of the historic Capital Beltway Accord announced in 2019, which requires successful completion, and close coordination, of Maryland's I-495 and I-270 Managed Lanes Project, Virginia's 495 NEXT Project, and your shared efforts on the I-495/American Legion Bridge Transit and TDM Project. These projects, once complete, will alleviate the Capital Region's number one vehicle bottleneck – the American Legion Bridge – and provide more reliable travel for those in cars and new mobility options for millions of residents, employers and visitor to access worksites, educational opportunities and our region's rich cultural assets. The replacement and expansion of this bridge has been a priority for the region's leaders for decades, but a solution has been elusive until now. We cannot let this opportunity pass us by and we support your efforts to get all three projects done as early as possible.

In 2018, the Partnership released our principles for the development and delivery of a performance-driven toll network, which, if implemented, can reduce congestion and single-occupancy vehicle use by creating incentives for residents to divert trips to non-peak periods, increase the number of vehicle occupants, or choose public transportation and carpooling. As a result, congestion on those roadways is reduced, speeds are increased, transit use may rise, and reliability improves for everyone.

We provide the following comments that are cross-cutting for all three projects:

**Toll planning should be coordinated regionally to deliver the benefits of greater mobility, accessibility, and reliability to all users of the transportation system**

GREATER WASHINGTON PARTNERSHIP
1200 17th St NW, Suite 550
Washington, DC 20036

greaterwashingtonpartnership.org
202.765.2024
info@greaterwashingtonpartnership.org

#1

**Response to DEIS Comment #1**

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

Refer to Chapter 9, Section 3.6A for a response on opposition to managed lanes or tolling public roads.

00022369

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-6    Filed 10/30/23    Page 91 of 97

FINAL ENVIRONMENTAL IMPACT STATEMENT

p. 2

**#1 Cont**

We are encouraged by the close coordination occurring between each of your teams, as well as with regional stakeholders, local elected officials, and residents. Strong regional collaboration and policy alignment is necessary across these projects to ensure the roadway tolling policies are complementary and seamless for residents. The close coordination must continue as these projects move forward.

**Prioritize enhanced connectivity for the greatest number of people, not moving the most vehicles or generating the most revenue**

**#2**

Prioritizing people throughout enhances the efficiency of the roadway's carrying capacity, providing the greatest number of people reliable access to their destination. This is a long-recognized goal for the region's transportation investments, and we recommend that the Preferred Alternatives for these projects be the one that is most effective at moving the most people via multiple modes of transportation.

**Enhance planning and investments to limit adverse impacts for historically marginalized communities, and proactively work to ensure residents of all income levels benefit from the tolling investment, including those without the financial means to afford the tolls**

**#3**

We must be intentional about limiting adverse impacts for communities of color and low-income areas. The Washington Post's article from October 17, 2020 titled *Maryland Beltway expansion might require moving part of historic African American cemetery* raises serious concerns. We cannot support a long-term investment that disproportionately impacts communities where most of the residents are minority or low-income, or Environmental Justice ("EJ") communities. At the same time, we strongly encourage both states to proactively improve mobility and access for EJ communities through these projects by making investments in high-quality public transportation options adjacent to or near the toll corridor, provide incentives that encourage HOV use, and/or provide vouchers or discounts to low-income residents. Additionally, these projects should reduce barriers to using the toll facilities that disproportionately impact those without access to the internet, bank accounts and credit cards— the assets often required to efficiently pay tolls and use the tolling technology. As you advance these critical projects, we also urge you to work to deliver quality jobs and community benefits, and to maximize job opportunities for Capital Region residents providing them access to strong workforce and apprenticeship programs with a proven track record for placing people in careers. Additionally, we support deployment of a robust Minority Business Enterprises (MBEs) and Women Business Enterprises (WBEs) contracting program.

**Clarify how these projects, collectively, will enhance public transportation and other mobility options**

**#4**

It is critical that these new tolling projects provide residents the freedom to opt out of paying the toll all together through high-quality, cost-effective non-toll trip alternatives (e.g. carpool, vanpool, bus, rail, and cycling). These travel options should be supported by toll revenues. The I-495/American

GREATER WASHINGTON PARTNERSHIP        greaterwashingtonpartnership.org
1200 17th St NW, Suite 550                          202.765.2024
Washington, DC 20036                                 info@greaterwashingtonpartnership.org

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

Refer to Chapter 9, Section 3.3.D for a response to Analysis of Alternatives Retained for Detailed Study.

MDOT SHA, as stated in Chapter 2.4 of the Supplemental DEIS, has committed to priority bicycle and pedestrian connections to remove barriers and provide connectivity for bicyclists and pedestrians including construction of a new pedestrian/bicycle shared use path across the American Legion Bridge to connect facilities in Maryland and Virginia.

p. 3

**#4 Cont**

Legion Bridge Transit and TDM Project is expertly tackling this question. We recommend the following measures to mitigate the projects' environmental impacts be included:

- Construct a new multi-use trail option to safely access and traverse the American Legion Bridge;
- Specify the process and expected revenue that would be generated to support transit investments within Maryland and Virginia, and those that connect both jurisdictions, including high-quality commuter bus transit using the HOT managed lanes, Bus Rapid Transit in parallel and nearby arterial roads, and improvements to the MARC system;
- Design the new American Legion Bridge to accommodate future rail transit options and/or conduct a thorough cost-benefit analysis to compare the bridge's design with and without future rail transit options; and,
- Explore innovative concepts to incent meaningful behavioral change, such as matching employer transit benefits to incent different travel patterns.

**#5**

Specific to Maryland's I-495 and I-270 Managed Lanes Project, we recommend that Alternative 9 and Alternative 13B be further explored using the priorities in this letter to inform the ultimate Preferred Alternative. In addition, we recommend that the state select the Preferred Alternative that will minimize the Project's impact and costs, and ensure the Project is delivered in a reasonable time period. If the EIS schedule gets severely delayed due to public concerns raised about this Project, we encourage the state to consider limiting the scope of the Preferred Alternative and the analysis in the FEIS by only including the Managed Lane Study Corridors' segments included in the state's I-495 & I-270 P3 Program Phase 1 solicitation.

Thank you both for your leadership and continued commitment to collaboration and unity.

Sincerely,

*JB Holston*

JB Holston
Chief Executive Officer
Greater Washington Partnership

CC: Stephen Brich, Commissioner, VDOT
    Jennifer Mitchell, Director, Virginia DRPT
    Kevin Quinn, Administrator, MDOT MTA
    Tim Smith, Administrator, MDOT SHA

GREATER WASHINGTON PARTNERSHIP       greaterwashingtonpartnership.org
1200 17th St NW, Suite 550           202.765.2024
Washington, DC 20036                 info@greaterwashingtonpartnership.org

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.3.C for a response to Analysis of Alternatives Retained for Detailed Study.

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-6    Filed 10/30/23    Page 93 of 97

FINAL ENVIRONMENTAL IMPACT STATEMENT

**GREENBELT HOMES, INC. – AGNES ARSKINE**

| From: | MGMT Office <mgmtoffice@ghi.coop> |
|---|---|
| Sent: | Wednesday, November 4, 2020 10:46 AM |
| To: | Eldon Ralph |
| Subject: | DEIS Letter to Lisa Choplin |
| Attachments: | 11-2-20 DEIS Letter to Lisa Choplin.pdf |

Greetings—

Greenbelt Homes Inc. (GHI), a housing cooperative comprised of 1,600 member owners, is providing you a copy of the attached letter that was recently sent to Ms. Lisa Choplin, P3 Director at the Maryland Department of Transportation State Highway Administration. The letter outlines the reasons why GHI and its members support the No-Build Alternative, opposing all of the single-mode road alternatives presented for the expansion of the I-270 and I-495 highways in Maryland. We urge you to support the No-Build Alternative for this proposed project.

Sincerely,

Agnes Erskine

Executive Assistant
Management Office
Greenbelt Homes, Inc.
1 Hamilton Place
Greenbelt, MD 20770
(301) 474-4161- office
(301) 474- 4006- fax
www.ghi.coop



1

*This page is intentionally left blank.*



**GREENBELT HOMES, INC.**

HAMILTON PLACE, GREENBELT, MARYLAND 20770

Area Code (301) 474-4161    Fax (301) 474-4006



November 2, 2020

Lisa B. Choplin, DBIA Director
I-495 & I-270 P3 Office
707 North Calvert Street Mail Stop P-601
Baltimore, MD 21202

We are writing on behalf of the member-owners of Greenbelt Homes, Incorporated (GHI) to provide comments on the Draft Environmental Impact Statement (DEIS) for the I-495 and I-270 Managed Lanes Study. **GHI and its members support the NO-BUILD Alternative, opposing all of the single-mode road alternatives presented for the expansion of I-270 and I-495.**

Greenbelt Homes, Inc. (GHI) is part of the federally built town with a surrounding "green belt" that was conceived and constructed in the 1930s and 1940s under the New Deal, and is now listed as a National Historic Landmark District. The Greenbelt Historic District includes an extensive forest preserve and maintained by the City of Greenbelt (hereinafter "the City" or "Greenbelt"), the Roosevelt Center commercial area, and the GHI area consisting of the 1,600 housing units occupied by GHI members, 60 apartment units, and 250.7 acres of land cooperatively owned by the members of GHI. Some of the Historic District, including many GHI homes, is adjacent to the proposed expansions for I-495, including alterations to the Baltimore Washington Parkway and nearby interchanges and bridges associated with planned reconfiguration/replacement of the intersection between those two expressways. All of the Greenbelt Historic District is in close proximity to the planned expansion project.

Since its inception, GHI has continued to offer affordable housing in the costly DC housing market. In 2018, the median home price in Greenbelt was 189 percent lower than the median house price in Washington, DC, and all but one of the GHI houses sold in that year sales were below the median house price in Prince George's County, most by $100,000 or more.) Hence, GHI meets a critical need for home ownership that is accessible to low- and moderate-income wage earners and to retirees and others living on a fixed income. GHI's residents are attracted to the community by the ease of walking and biking on the internal paths built into our design, the accessibility to nearby wooded greenspace and the proximity to amenities for daily living, social life, entertainment, and recreation at the Roosevelt Center or nearby. Our community consists of people who are committed to environmental quality, who highly value our ready access to parks, greenspaces and the green canopy that is always within our view despite the expressways that border the edges of the community.

We begin our comments with this description because it is salient to our advocacy for the NO-BUILD Alternative and our opposition to all of the proposed managed Toll lanes/expansion plans in the DEIS. Many of the aspects of our quality of life that are described above would suffer immediate and on-going negative impacts—harm that cannot be easily mitigated—from the widening of I-495 and the associated changes to interchanges with the Baltimore-Washington

1

**#1**

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to Greenbelt Homes, Inc. properties near the I-495 interchange at the Baltimore-Washington Parkway. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the I-495 interchange at MD 650 is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarize the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail. This analysis directly contributed to MDOT SHA's evaluation of these alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided. Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

The benefits of the proposed transit projects mentioned (Corridor Cities Transitway, Randolph Road BRT, and North Bethesda Transitway) are accounted for in the modeling, as noted on page 3-4 of the DEIS. The forecasts assume that all of those transit projects will be in place by the design year, and the forecasts account for potential reductions in automobile traffic due to travelers using transit instead. The results show that there is still a need for widening I-270 and I-495 despite these transit improvements.

Parkway and other interchanges and bridges. We will highlight here our many concerns about the DEIS and the project that contribute to our judgment in support of the NO-BUILD Alternative.

**#1 Cont**

1. **The DEIS is too vague and too full of general promises rather than specific details about or commitment to ameliorative actions for the negative impacts on our community discussed below.** We note at the onset that the DEIS delays detailed attention to legally required remediation and mitigation to later in the process *after* the selection of a final alternative and design by a P3 concessionaire. This hampers our ability to evaluate the adequacy of the attention to the many environmental impacts of the project and plans for ameliorating them. For example, as noted in section 2B, below, the DEIS lacks sufficient detail about noise barriers to mitigate the increased noise that nearby residents will experience; the DEIS declines to provide specific and detailed descriptions of the barriers, and instead offers statements such as "[c]oncrete is the typical material used for construction of noise barriers." (DEIS, Appendix J, ES-5.) This lack of detail and analysis defies our attempt to envision what our lives would be like living next to such a structure or experiencing the altered viewshed of our homes. It does not answer basic questions such as, how tall and wide will the barriers be from their base and from the "ground level" of the closest homes? What will the materials actually be and how will the materials reflect or absorb the sun's rays, impacting the ambient temperature and reflectivity for the residents of the closest homes? What is the likely shadow effect? Will there be room for planting of new trees between them and housing units? If so, would that be done and, would plantings be of sufficient age/height to temper the noise, visual, and heat impacts immediately for nearby residents? Deficiencies throughout the DEIS in specification of detail for remediation and mitigation efforts deprive us of the ability to realistically imagine what our community might look like and how seriously our general quality of life might be negatively impacted by the build alternatives of the P3 project of the Study. We believe this lack of care and consideration obviates the entire purpose of NEPA and an EIS.

**#2**

2. **The DEIS mischaracterizes or underplays potential impacts that we believe are threats to the quality of life in Greenbelt and GHI.** The Managed Lanes project described by the DEIS portrays swaths of land that would be converted from vegetated areas with green canopy to built structures. This includes not only expanded (and in some cases, elevated) roadway, but also associated new storm water management (SWM) facilities, culvert extension and augmentation, noise barriers, retaining walls, and considerably more impervious surfaces with a very large reconfiguration envisioned for the interchange between I-495 and the Baltimore-Washington Parkway. Even though the DEIS lacks sufficient detail for us to fully assess the impact on our community, living in such close proximity to the affected roadways, we do not need such technical analysis to conclude that life in our community will be irreparably and negatively impacted by the proposed project. The following are likely negative outcomes of this project:

   A. **Air quality and local street congestion:** The DEIS claims that projected reduction in idling-time of expressway cars and expected reduction in use of local streets by drivers frustrated by delays will improve local street congestion and air quality. However, the DEIS also indicates that there will be exceptions to this general claim—already contested by some—with a projected expectation of "localized increases in arterial traffic near the managed lane access interchanges." (DEIS 3-13, 14.) We are concerned that our community would become the exception to the general air quality benefit claimed by the DEIS, so we do not accept the claim of

2

**Response to DEIS Comment #2**

Refer to Chapter 9, Section 3.4.F for a response to adverse impacts to air quality.

Refer to Chapter 9, Section 3.4.H for a response to noise impacts and mitigation.

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

Refer to Chapter 9, Section 3.4.K for a response to impacts to properties and communities, including community facilities.

The federal and state planning regulations, including NEPA, seeks to present to appropriate decision makers sufficient information to identify potential advantages and disadvantages to a proposed action before taking final action and incurring significant costs associated with final design and construction. The FHWA and MDOT SHA appreciate the communities' comments regarding potential impacts.

Comments addressed above.

**#2 Cont**

improved air quality as a positive impact from construction of the project for our residents. In fact, we believe that the destruction of large areas of managed woodlands and the further encroachment of highways can only degrade the air quality in our community. Obviously, the highway encroachment also impacts the general claims of reduced traffic on local streets as the DEIS projects that more traffic would result on our streets that are close to the reconfigured interchange of I-495 and the Baltimore-Washington Parkway. In attempting to anticipate shorter-term construction impacts, the DEIS contains little information or consideration about the extent to which streets where GHI residents live, such as Southway Road, would be used for moving construction equipment and materials. We are concerned and left uninformed by the DEIS about how construction transportation would be managed on Southway Road, which is an already very busy route for emergency vehicles, first responders, and public transit buses.

B. **The adverse impacts of increased noise from the proposed lane additions, elevation of roads, and reconfiguration of the nearby interchanges.** Although the DEIS confirms that the quality of life from enduring and increased noise will be degraded by the project, the claim is made throughout the Study that an increase in noise will be experienced only by those immediately adjacent to the road's edge and not "by properties set back from the highway," where it claims the increased noise "would be negligible." (DEIS Appendix J, p. 32.) Yet, for some of our residents, whose homes are "set back," but not abutting the current roadway edge of the Baltimore-Washington Parkway, particularly the houses on Southway and portions of Ridge Road, the steady road noise from the Baltimore-Washington Parkway is already part of their daily experience—and that is with the current level of extensive tree and vegetative cover, which would be reduced under the project. With the expansion bringing the elevated road edges closer to the homes already affected by roadway noise, and without the protective parkway tree coverage, the DEIS's dismissive posture does not fully account for the impact of increased and relentless noise. Furthermore, amelioration that might be offered for the noise impact is too poorly described and lacks the necessary detail to permit assessment of their effectiveness.

C. **Views for GHI residents would likely be significantly destroyed through the addition of expanded corridors, elevated roadways, vegetation removal, deforestation, insertion of constructed noise barriers, and by negative impacts on parks in our immediate area.** We are very concerned about the loss of tree canopy and woodlands as the experience of green viewsheds is central to the original historical conception and building of our community as well as to our general quality of life. The City and GHI have made the conscious decision, with broad public support, to set aside undeveloped woodlands in our community in order to preserve the unique character and quality of the environment, a decision that benefits the entire region. Despite an elaborate methodology for identifying different viewsheds along the corridor, the DEIS deploys a misleading strategy of aggregation, appearing to lump all the corridor communities together, to offer the reductionist conclusion that the altered viewshed will be sufficiently similar to the current "urban scene" to be an insignificant change. (Mentioned in DEIS 4-16 and repeated in many other areas of text.) Although this characterization may be accurate for some communities along the corridor, it is a gross misrepresentation of our viewshed, which is currently green and untouched. Also, to remove the tree coverage along the Baltimore-Washington Parkway—in our viewshed—is to

3

#2 Cont

denigrate its historic character as a garden parkway—an idea embodied in the very name of the roadway. To state, as the DEIS does, that the project would "likely diminish the integrity of the Parkway's setting and association as a designated scenic parkway" (DEIS 4-47) is a gross understatement. Moreover, since our quality of life is substantially enhanced by ready access to at least six public parks and recreation areas listed in the impact section of the DEIS, we are gravely concerned about loss of green canopy and other intrusions from the proposed project on the City-owned parks and recreational areas of McDonald Field, Buddy Attick Lake Park, Indian Springs Park, and the Spellman Overpass as well as the National Park Service (NPS) areas of Greenbelt Park and the Baltimore-Washington Parkway. We especially note with dismay that, of all the many parks to be impacted by the proposed project, the Baltimore-Washington Parkway would bear the brunt, with 52 percent of the total median acreage impacted across all screened build-alternatives. (DEIS, 4-20.21: Table 4.5.)

D. **Other environmental impacts presented in the DEIS that concern us: Aspects of air pollution not discussed in section 2A above; projections on noise impacts not discussed in 2B above; storm water issues, particularly related to predictable run-off from large increases in impervious ground and loss of vegetation cover and trees; hazardous waste and its management; and ground-water quality.** We are aware of comments to be provided by our City and County, the M-NCPPC, and several environmental advocacy groups, all of whom have access to professional planners and technical experts informing their judgements. We defer to these more technical and nuanced explanations of our shared concerns about the adequacy of the DEIS and endorse their comments concerning assessment of the environmental impacts from this P3 Project.

#3

3. **The facts forming the basis for the project have dramatically altered since the initiation of the Managed Lane Study DEIS and undercut its viability. Absent are a valid and reliable post-COVID-19 traffic modeling and study, and recognition that the pre-COVID formulation of the problem that led to the I-495/I-270 Managed Lanes Study DEIS is no longer viable.** The DEIS acknowledges that because of "the reduced traffic on interstates such as I-495 and I-270 due to the COVID-19 stay-at-home order….[and] the uncertainty surrounding post-shutdown traffic levels and transit use" … "[t]here is no definitive traffic model to predict how this unprecedented global pandemic will affect long-term future traffic projections and transit use." (DEIS, ES-3) We agree that the inability to predict the effects on traffic and transportation by other modes attributable to the now-unknowable future patterns of teleworking and flexible work times supports the conclusion that the traffic model on which the Study relied is no longer valid. The next logical conclusion is that, until we have established the post-COVID "new normal" travel patterns that permit long-term projections, a sound replacement model cannot be constructed and this Study is moot. We believe that it is irresponsible for the state to commit to this project when it is not possible to assess its necessity, financial viability, or benefit to the region because of changed conditions. It is also impossible to conduct such review until after the impact of the COVID-19 pandemic has dissipated.

#4

4. **The new estimates by the Washington Suburban Sanitary Commission (WSSC) for moving 70 miles of large water and sewer pipes for the proposed project will cost up to $2 billion and creates a substantial additional financial cost to taxpayers and ratepayers that has not been appropriately factored into the actual cost of the**

4

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.4.M for a response to impacts to utilities and associated costs.