**#4 Cont**

project. The WSSC reported to the MD County Council that "paying off the debt to move the pipes would cost customers' water and sewer rates to swell by 277 percent over the next four decades…. [a] typical household paying an additional $2,253 over that time." (The Washington Post, 3/12/2020). This potential liability adds significant risk to Greenbelt and Maryland residents as ratepayers and, potentially, also as taxpayers.

5. **Problems, such as cost overruns, that have become more apparent recently with the P3 strategy used for the Purple Line have increased concerns about risks associated with the model used to design the DEIS and the project.** The imminent threat of unanticipated taxpayer expense, cost exposure, and project risk associated with the Purple Line P3 project demonstrate that the P3 strategy for the I-495/I-270 widening is too risky given the higher costs and greater complexity associated with the I-495/I-270 widening project. The central focus on privately operated toll lanes is a solution in search of a problem, and a solution that may not be necessary. Given the impact of the pandemic on overall traffic congestion and the likelihood that traffic loads will not return to pre-pandemic levels for some time, we argue that the P3 strategy as a high-risk solution in search of a currently-unknowable problem.

**#5**

6. **A basic flaw in the DEIS is its failure to fully consider the alternatives of public transit and the MD 200 Diversion Alternative, particularly by including analysis of MD 200 without the I-95 segment; and this failure violates Section 4(f) of the US Department of Transportation Act of 1961, which requires reasonable avoidance of impacts.** We are informed by the work of the Maryland National Capital Park and Planning Commission (M-NCPPC) that noted the following: "[The] managed lane addition to I-95 results in the need to evaluate a MD-200 alternative and it dilutes the benefits of the MD-200 Managed Lane route, creates environmental impacts that would otherwise be avoided, AND creates traffic impacts on I-495 in Prince George's County." The failure to include the MD-200 Alternative without the I-95 segment further undermines the DEIS by dismissing that option for Section 4(f) of the US Department of Transportation Act of 1961, which requires reasonable avoidance of impacts. The M-NCPPC continues: "Without the I-95 segment, the reduction in environmental impact provides a greater benefit for the MD-200 Alternative under the Commission's Park Policy and under Section 4(f) of the Federal Transportation laws. . . . Therefore, the analysis provided by MDOT SHA fails to demonstrate that it is not a reasonable avoidance technique under Section 4(f)." (M-NCPPC Briefing and Discussion for July 15, 2020, Full Commission Meeting, I-495 & I-270 Managed Lanes Study-DEIS Comments, p.3-4) This particular issue is of concern to GHI and its members, because there are a number of historic and environmental sites vitally important to our quality of life and to the state of Maryland to which Section 4(f) applies: The Greenbelt Historic District, Buddy Attick Lake Park, McDonald Field, the Baltimore-Washington Parkway, and Greenbelt Park. (DEIS, Table 5-3, Inventory of Section 4(f) Properties with Use, 5-10)

**#6**

We further note that our community is well-situated for access to the larger DC metropolitan area through the Metro system, and Metro is a popular transportation mode for our residents. The effect of P3 Purple Line completion on auto traffic estimates for this area are missing from the projections for the project corridors, as well as consideration of how the Purple Line might further contribute to a public transit alternative that could offer reasonable avoidance of impact under Section 4(f).

5

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**Response to DEIS Comment #6**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

Concerns with congestion on I-495 and I-270 and planning to accommodate anticipated future growth have been the subject of numerous studies conducted by the Maryland Department of Transportation (MDOT), Virginia Department of Transportation (VDOT), and regional planning agencies for many years. These studies reflect how the Washington metropolitan area has continued to experience considerable growth in population and employment. Specifically, population in the study area has increased from 14.6 percent in Montgomery County and 20.1 percent in Prince George's County between 2000 and 2020. Continued growth is anticipated as Metropolitan Washington Council of Governments (MWCOG) estimates that between 2020 and 2045, the population in Montgomery County and Prince George's County will increase approximately 16.3 percent and 7.9 percent, respectively. Additionally, this area is one of the most intensive employment, residential and transportation corridors in the State. Virtually all of these studies reflect, in part, some of the operational and/or engineering alternatives that are included in the DEIS and SDEIS. Specifically, these studies, dating back to 2004, evaluated various options of building managed lanes along these highways and means to connect that additional capacity to other regional transportation facilities. Importantly, these studies also considered various transit improvements, including major projects such as the Purple Line which is currently under construction. None of the various analyses supported the principle that transit and/or multi-modal transportation options by themselves, could alleviate traffic congestion or accommodate anticipated future demand. Refer to **DEIS, Appendix A**, page 4-8.

**GREEN SANCTUARY COMMITTEE UNITARIAN UNIVERSALIST CHURCH OF SILVER SPRING – DONEBY SMITH**

| | |
|---|---|
| From: | Doneby Smith <donebys@gmail.com> |
| Sent: | Tuesday, November 3, 2020 2:18 PM |
| To: | MLS-NEPA-P3 |
| Subject: | Comment opposing the P3 plan to widen I-270/I-495 for privatized toll lanes. |

**#1**

The Green Sanctuary Committee of the Unitarian Universalist Church of Silver Spring opposes the P3 plan to widen I-270/I-495 for privatized toll lanes. We support the no-build option. It is clear to us that bias was built into the considerations of ways to address congestion through an overly narrow set of initial options. In addition, the DEIS has many gaps where critical analyses are deferred to the final EIS, depriving citizens of our right to comment on a complete and fully articulated delineation of the environmental impact of this proposed project before it comes up for final approval.

**#2**

As persons of faith, we are concerned that the P3 project will not serve our community in an equitable way. Transportation needs of low-income households will not see a benefit. Many households can expect higher water bills as WSSC passes on the cost of relocating infrastructure. A number of homes and small businesses and hundreds of acres of parklands will be destroyed. As seen with the Purple Line project, public-private partnerships are not without risks to taxpayers. The longer-term impact of this project on greenhouse gas emissions and resulting climate change will hit marginalized communities first and worst.

K J Doneby Smith, chair

---

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to the Green Sanctuary Committee of the Unitarian Universalist Church of Silver Spring community near the I-495 interchange at the MD 650. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the I-495 interchange at MD 650 is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarize the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail. This analysis directly contributed to MDOT SHA's evaluation of these alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided. Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts

**Response to DEIS Comment #2**

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

Refer to Chapter 9, Section 3.4.M for a response to impacts to utilities and associated costs.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

## HOUSING OPPORTUNITIES COMMISSION OF MONTGOMERY COUNTY – NICK DRIBAN

*This page is intentionally left blank.*

| | |
|---|---|
| **From:** | MLS-NEPA-P3 <MLS-NEPA-P3@mdot.maryland.gov> |
| **Sent:** | Thursday, September 24, 2020 8:02 AM |
| **To:** | |
| **Subject:** | |
| **Attachments:** | Duffie_HOC Comments_20200921.pdf |

**From:** ndriban@lenharttraffic.com <ndriban@lenharttraffic.com>
**Sent:** Tuesday, September 22, 2020 12:40 PM
**To:** MLS-NEPA-P3 <MLS-NEPA-P3@mdot.maryland.gov>
**Cc:** 'Shane Pollin' <spollin@duffieinc.com>; 'Goyer Roberts' <groberts@duffieinc.com>; 'Kathryn Hollister' <kathryn.hollister@hocmc.org>; 'Zach Marks' <zachary.marks@hocmc.org>; 'mlenhart' <mlenhart@LENHARTTRAFFIC.COM>
**Subject:** Comments on the I-495 and I-270 Managed Lanes Project

To Whom it May Concern,

Please accept the attached comment letter regarding the I-495 and I-270 Managed Lanes Study. The letter was prepared by Lenhart Traffic Consulting on behalf of The Duffie Companies and the Housing Opportunities Commission of Montgomery County (HOC).

Should you need to contact us for any reason, the relevant points of contact and associated contact information are as follows:

- **The Duffie Companies:** Shane Pollin, spollin@duffieinc.com, 301 434-3040 Ext. 800
- **Housing Opportunities Commission of Montgomery County:** Kathryn Hollister, kathryn.hollister@hocmc.org, (240) 627-9551
- **Lenhart Traffic Consulting:** Nick Driban, ndriban@lenharttraffic.com, (410) 777-9253

Please reply to confirm receipt.

Thanks,

Nick

1

*This page is intentionally left blank.*

**Nick Driban, P.E., PTOE**

Associate Vice President

| | |
|---|---|
| Cell Phone: | (410) 294-7195 |
| Direct Dial: | (410) 777-9253 |
| Office Directory: | (410) 216-3333 |

**LENHART TRAFFIC CONSULTING, INC.**
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

Governor Hogan is committed to outstanding customer service. Tell us how we are doing. Click here.

Maryland now features 511 traveler information!
Call 511 or visit: www.md511.org

Please consider the environment before printing this email

**LEGAL DISCLAIMER** - The information contained in this communication (including any attachments) may be confidential and legally privileged. This email may not serve as a contractual agreement unless explicit written agreement for this purpose has been made. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication or any of its contents is strictly prohibited. If you have received this communication in error, please re-send this communication to the sender indicating that it was received in error and delete the original message and any copy of it from your computer system.

2

00022380



## Lenhart Traffic Consulting, Inc.
Traffic Engineering & Transportation Planning

September 21, 2020

To: Project Team for I-495 & I-270 Managed Lanes Study
c/o Ms. Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21201

RE: Public Comment

To Whom it May Concern:

The purpose of this letter is to provide comments on the I-495 & I-270 Managed Lanes Study Draft Environmental Impact Statement (DEIS). This letter has been prepared on behalf of The Duffie Companies ("Duffie") and the Housing Opportunities Commission of Montgomery County ("HOC") who requested that Lenhart Traffic Consulting review the alternatives evaluated in the DEIS to determine any potential impacts to the properties owned by these two organizations and to provide comments on their behalf.

Duffie owns several properties in close proximity to the I-495 and MD 650 interchange including the Hillandale Shopping Center, Home 2 Suites hotel, 10001 New Hampshire Avenue, and 10140 New Hampshire Avenue. The Home 2 Suites and 10001 New Hampshire Avenue parcels were each recently developed with state-of-the-art, LEED-certified buildings. Additionally, the site of what was once Holly Hall Apartments is owned by HOC. Holly Hall Apartments and 10140 New Hampshire Avenue is the future site of the Hillandale Gateway development, which will be developed and owned in partnership by and between Duffie and HOC. Hillandale Gateway is currently moving through the Montgomery County entitlements process for a mixed-use, mixed-income development. Exhibit 1 provides a map of the aforementioned properties.

Together, these developments are reshaping Hillandale, providing substantial economic growth and improvement for this area of Montgomery County. As such, it is of utmost importance to Duffie and HOC that the comments contained in this letter be considered as part of the I-495 & I-270 Managed Lanes project.

**LENHART TRAFFIC CONSULTING, INC.**
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

Phone (410) 216-3333
Fax (443) 782-2288

Thank you for your comment concerning impacts to Duffie and HOC properties near the I-495 interchange at MD 650. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the I-495 interchange at MD 650 is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

Because the I-495 interchange at MD 650 is located outside the Preferred Alternative limits, the proposed slip ramp across MD 650 providing direct access from Elton Road to I-495 will not be precluded by the build improvements.



*This page is intentionally left blank.*

Both Duffie and HOC are in support of efforts to relieve local and regional congestion, but would like to offer the following comments for consideration as this project moves forward:

1) **Neither Duffie, nor HOC would be in support of any alternative that impacted property owned by Duffie or HOC or the associated building setback requirements for their properties.** The appendices of the DEIS contain information regarding properties that will be impacted by the proposed project, which indicates that properties owned and operated by Duffie and HOC will not be impacted. However, if at any point as the process moves forward alternatives are added or modified in such a way that would impact properties owned by Duffie or HOC, we would request to be notified immediately of these potential impacts and would likely not be in support of these alternatives.

2) **A slip ramp across MD 650 providing direct access from Elton Road to I-495 is currently being reviewed by the Montgomery County Department of Transportation. We request that any alternative(s) carried forward as part of the I-495 & I-270 Managed Lanes Project not preclude the ability to construct the proposed slip ramp.** An analysis of the proposed slip ramp was previously reviewed and approved by both Montgomery County and MDOT-SHA. In addition, the slip ramp was the subject of a public hearing held by Montgomery County, and is currently undergoing additional detailed study by the County. It should also be noted that information regarding the proposed slip ramp was conveyed to Mr. Jeff Folden of the I-495 & I- 270 Managed Lanes project team via email on May 23, 2019. A concept plan showing the slip ramp, the email to Mr. Jeff Folden, and the analysis originally included with the email are attached to this letter.

The purpose of the Elton Road slip ramp is to improve the adjacent failing intersection of MD 650 & Powder Mill Road, in conjunction with other planned improvements occurring directly at that intersection. Specifically, the slip ramp will provide a direct connection to the Beltway for a substantial number of vehicles along MD 650 that currently make a northbound U-turn at the Powder Mill Road intersection in order to access the Beltway. The connection would also provide a more direct route for a significant number of vehicles that currently access the beltway by exiting the north side of the Hillandale Shopping Center and turning left from Powder Mill Road onto southbound MD 650.

**LENHART TRAFFIC CONSULTING, INC.**
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

Phone (410) 216-3333
Fax (443) 782-2288
email: mlenhart@lenharttraffic.com

00022382

The following pages reflect the attachments included in the letter. There are no comments or responses provided on these pages; they are included for the record.

The changes in travel patterns associated with the slip ramp, described above, would reduce the volume of several critical movements that are operating unacceptably at MD 650 & Powder Mill Road, thereby substantially improving operations at the intersection. The improvements to intersection delay are projected to be approximately 40% during the AM peak hour and 45% during the PM peak hour compared to the 2040 No Build condition. This is accomplished with no projected degradation in the acceptable level of service at the MD 650 & Elton Road intersection. Because of the operational improvements to the MD 650 & Powder Mill Road intersection, the slip ramp is also projected to have the effect of improving travel times for through vehicles along northbound- and southbound MD 650 by between 14% and 66% depending on the direction/peak hour, and to substantially reduce the total delay to all vehicles in the study area.

As such, the slip ramp is a vital component of ensuring mobility in the Hillandale area and the ability to construct it must be maintained.

As stated above, based on a review of the DEIS, Duffie and HOC support the intent of the I-495 & I-270 Managed Lanes project to relieve congestion and are not opposed to any of the alternatives so long as they do not impact property lines, associated building setbacks, or the feasibility of the proposed Elton Road slip ramp.

Should you have any questions or comments regarding this information, please do not hesitate to contact me at mlenhart@lenharttraffic.com or (410) 216-3333.

Sincerely,

Michael M. Lenhart, P.E., P.T.O.E.
President – Lenhart Traffic Consulting, Inc.

**LENHART TRAFFIC CONSULTING, INC.**
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

Phone (410) 216-3333
Fax (443) 782-2288
email: mlenhart@lenharttraffic.com





## Attachments

Elton Road Slip Ramp Concept
Email to Mr. Jeff Folden re: Slip Ramp
Letter/Analysis of Slip Ramp

18 of 53

00022384








NEW HAMPSHIRE AVENUE
(MD RTE 650)

WASHINGTON MCLAUGHLIN CHRISTIAN SCHOOL

LATIP EXHIBIT
(SLIP LANE)
DRAFT

BOHLER

**ndriban@lenharttraffic.com**

| From: | Jeffrey Folden <JFolden1@mdot.maryland.gov> |
|---|---|
| Sent: | Thursday, May 23, 2019 1:24 PM |
| To: | Nick Driban |
| Cc: | 'Shane Pollin'; Goyer Roberts; mlenhart |
| Subject: | RE: Hillandale Analyses near I-495 & MD 650 |

Nick:

Thanks!  It was received.

Jeff



Jeffrey T. Folden, PE, DBIA
Deputy Director
I-495 & I-270 P3 Office

Email - jfolden1@mdot.maryland.gov
Office - 410.637.3321
Mobile - 443.604.4629
www.roads.maryland.gov
www.495-270-P3.com

I-495 & I-270 P3 Office
601 North Calvert Street
Baltimore MD 21202

**Mailing Address**
707 North Calvert Street
P-601
Baltimore MD 21202



**From:** Nick Driban [mailto:ndriban@LENHARTTRAFFIC.COM]
**Sent:** Thursday, May 23, 2019 1:19 PM
**To:** Jeffrey Folden <JFolden1@mdot.maryland.gov>
**Cc:** 'Shane Pollin' <spollin@cuffieinc.com>; Goyer Roberts <groberts@cuffieinc.com>; mlenhart <mlenhart@LENHARTTRAFFIC.COM>
**Subject:** Hillandale Analyses near I-495 & MD 650

Hi Jeff,

Shane Pollin asked me to reach out to you to provide information on the traffic analysis work we've been doing in the Hillandale area along MD 650 in the vicinity of the Beltway.  I understand you're working on the Beltway widening project and there is likely some overlap between the benefits of the improvements that are being proposed along MD 650 and your project.  As such, I've attached the most recent analysis, a previous iteration of which was reviewed and approved by both Montgomery County and SHA [Access Management tracking no. 18APMO006], for your use.  The first three pages of the attachment provide an executive summary detailing the history of the analysis as well as the relevant findings, but here are a few additional notes to try to provide a more concise summary:

1



- The analysis was conducted for 2040 conditions based on volume projections provided by Montgomery County.
- The focus of the analysis was to improve the intersection of MD 650 & Powder Mill Road, which was proposed to be accomplished by 1) lengthening the existing westbound right-turn lane, which is typically blocked by vehicles in the other lanes, 2) providing additional lanes on the eastbound approach, and 3) adding a slip ramp at the adjacent intersection of MD 650 & Elton Road to provide a direct connection between westbound Elton Road and the Outer Loop of the Beltway.
- Improvement 3 was developed in order to provide a direct connection to the Beltway for a substantial number of vehicles along MD 650 that currently make a northbound U-turn at the Powder Mill Road intersection in order to access the Beltway. These vehicles are primarily generated by business along Elton Road as well as the shopping center located along the east side of MD 650 north of Elton Road. The Elton Road slip ramp connection would also provide a more direct connection for a significant number of vehicles that currently access the beltway by exiting the north side of the shopping center and turning left from Powder Mill Road onto southbound MD 650.
- The changes in travel patterns associated with the slip ramp, described above, would reduce the volume of several critical movements at the MD 650 & Powder Mill Road that are operating unacceptably, thereby substantially improving operations at the intersection. The improvements to intersection delay are projected to be approximately 40% during the AM peak hour and 45% during the PM peak hour compared to the No Build condition. This is accomplished with no projected degradation in the acceptable level of service at the MD 650 & Elton Road intersection.
- Because of the operational improvements to the MD 650 & Powder Mill Road intersection, the slip ramp is also projected to have the effect of improving travel times for through vehicles along northbound- and southbound MD 650 by between 14% and 66% depending on the direction/peak hour, and to substantially reduce the total delay to all vehicles in the study area.

As demonstrated by the analysis, the proposed Elton Road slip ramp, as well as the associated improvements, will appreciably enhance traffic operations along MD 650 in the vicinity of the Beltway.

Please let me know if you have any questions or need any additional information.

Thanks,
Nick

**Nick Driban, P.E., PTOE**
Associate Vice President

Direct Dial: (410) 777-9253
Cell Phone: (410) 294-7195
Office Directory: (410) 216-3333

**LENHART TRAFFIC CONSULTING, INC.**
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

2

# Lenhart Traffic Consulting, Inc.
Transportation Planning & Traffic Engineering

November 12, 2018

Ms. Stacy Leach
Montgomery County Department of Transportation
101 Monroe Street, 10th Floor
Rockville, Maryland 20850

**Re: REVISED White Oak LATIP Supplemental Transportation Analysis – Proposed Improvements at MD 650 (New Hampshire Avenue) & Powder Mill Road/Elton Road**

Dear Ms. Leach:

This letter is being prepared to provide an executive summary and additional context related to the attached memorandum detailing the *REVISED White Oak LATIP Supplemental Analysis – MD 650 & Powder Mill Road*. The attached memorandum represents the most recent revision to a series of analyses conducted in support of the improvements proposed in the Hillandale area as part of the White Oak LATIP. This revision is necessary in order to provide an updated assessment of the benefits of the proposed improvements package which is being considered in the Public Hearing scheduled for November 15, 2018. Included herein is a brief history of the LATIP analyses in this area and a summary of the findings of this current revision to the analyses.

On February 14, 2017, the Montgomery County Council passed the Local Area Transportation Improvement Program (LATIP) for the White Oak Science Gateway area. As part of Council approval, $5,000,000 for work was assigned to the MD 650/Powder Mill Road intersection for traffic operations improvements, but specific improvements were not identified. At the time, specific improvements were not identified in this area because there were some anomalies noted in the original analysis conducted in support of the LATIP which resulted in recommendations that differed substantially from the White Oak Science Gateway Master Plan and from trip analyses previously conducted by the Maryland State Highway Administration (SHA).

The specific anomalies identified in the original LATIP analysis included the omission of a substantial volume of u-turning traffic along northbound MD 650 at Powder Mill Road, as well as the incorrect coding of volumes within the traffic model for the northbound through movement along MD 650 at Powder Mill Road. Based on the original analysis conducted with these anomalies, the recommended LATIP improvement at the intersection of MD 650 at Powder Mill Road was the addition of a northbound right-turn lane, which the original analysis showed would reduce the average delay at the intersection to less than 80 seconds (the threshold for acceptable operations for the area according to the LATIP). However, when the anomalies in the traffic analysis were corrected, the new analysis showed that the recommended addition of the northbound right-turn lane did not, in fact, improve average delay to less than 80 seconds at the intersection. Further, as noted in the discussion above, the northbound right-turn lane was not consistent with the proposed Master Plan improvements at the intersection.

Based on these findings, a supplemental analysis was conducted by Lenhart Traffic Consulting in the spring of 2017 in order to determine improvements that would reduce delay for the MD 650 at Powder Mill Road intersection to less than the 80 second threshold, thereby meeting the LATIP adequacy requirement. The starting point for addressing the identified traffic operations issue in the supplemental analysis was the consideration of the Master Planned improvements. The Master Plan improvements call for, "from Holly Hall, add an eastbound left-turn lane; on Powder Mill Road, add a

## Lenhart Traffic Consulting, Inc.
Transportation Planning & Traffic Engineering

westbound right-turn lane; and on MD 650, add a southbound left-turn lane." The eastbound left-turn lane and westbound right-turn lane were included in the proposed improvement package in the supplemental analysis document, as construction of these improvements appeared to be feasible with limited impacts to the surrounding land uses. In contrast, the Master Plan recommended southbound left-turn lane was not included in the improvements package analysis as it was determined that its construction would be so materially impactful and require such significant takings of land (e.g. the properties to the northeast, northwest and southeast would all be significantly impacted including impacts to existing parking and structures) that this improvement would simply be too costly and infeasible in the short, intermediate, and likely long terms.

Traffic analysis was therefore conducted with the two, viable identified improvements along Powder Mill *only*, however the results showed that the intersection would not operate below the 80 second delay threshold without additional improvements. As such, and in order to address the unsafe u-turn traffic along northbound MD 650 at Powder Mill Road that was omitted from the original LATIP analysis, the slip-ramp from Elton Road was added to the two proposed improvements at the Powder Mill Road intersection. The reason for this improvement, as stated in the supplemental analysis, was to address the need to provide an alternate route to keep northbound u-turning traffic seeking to access the ramp to westbound I-495 (The Capital Beltway) away from the problematic intersection of MD 650 at Powder Mill Road in order to provide more 'green time' to the tremendous volume of vehicles traveling along MD 650. While other improvements at the intersection of MD 650 at Powder Mill Road were considered in lieu of the slip ramp, the close proximity of businesses along the northbound- and southbound approaches to the intersection simply left little room for any further improvement to take place directly at the intersection; stated differently, there are limited reasonable, feasible improvements at the intersection of MD 650 at Powder Mill Road beyond the Master Plan improvements along the eastbound- and westbound approaches to the intersection, which re included as part of the proposed package. The results of the supplemental analysis showed that with the improvements along eastbound and westbound Powder Mill Road, as well as the slip ramp, the intersection of MD 650 at Powder Mill Road would operate with delay below 80 seconds.

IT IS IMPORTANT TO NOTE that all supplemental analyses conducted prior to the version in the attached memo assumed that the only traffic reassigned to the Elton Road slip ramp was the northbound u-turning vehicles at the intersection of MD 650 at Powder Mill Road (shown on Exhibit 8a in the attached memo). The assumption to only reassign this volume was made in order to provide the most conservative analysis for agency review (SHA & MCDOT). Even with this highly conservative analysis, the improvements at the intersection of MD 650 at Powder Mill Road were shown to be so substantial (and with nearly no impact to the intersection of MD 650 at Elton Road) that both SHA and MCDOT concurred with the findings and recommendations of the analysis.

THE PURPOSE OF THE ATTACHED REVISED SUPPLEMENTAL ANALYSIS is to provide a more realistic analysis of the proposed improvements package. Specifically, it is likely that with the implementation of the Elton Road slip ramp, a substantial portion of the traffic that currently exits the north side of the shopping center located in the southeast corner of the MD 650 at Powder Mill Road intersection and turns left onto Powder Mill Road before turning left onto New Hampshire Avenue would instead exit the southside of the shopping center to turn right onto Elton Road and immediately access the new slip ramp (see Exhibit 8b in the attached memo). A traffic count was conducted to determine what proportion of the *total* left-turn volume from westbound Powder Mill Road onto MD

2

650 is traffic that exits the north end of the shopping center and makes this movement in order to access the I-495 ramp. The results of this count indicated that approximately 20% of the *total* westbound left-turn volume from Powder Mill Road onto New Hampshire Avenue comes from the shopping center. While it is believed that if given the opportunity the vast majority of this traffic would instead choose to exit the south side of the shopping center to utilize the Elton Road slip ramp, for the purposes of providing a conservative (but more reasonable analysis) it was assumed that 75% of the traffic making this movement would divert to the proposed slip ramp. This equates to a diversion of only 15% of the total westbound left-turns from Powder Mill Road onto New Hampshire Avenue (75% x 20% = 15%) and the resulting diverted volume is shown on Exhibit 8b of the attached memo (this analysis remains conservative in not accounting for any trips originating from within Hillandale currently exiting Green Forest Drive which could also utilize the ramp if given the opportunity).

Based on the assumptions documented above, as shown on Exhibit 9 of the attached memo the proposed improvements are projected to decrease delay for the intersection of MD 650 at Powder Mill Road by 40% in the AM peak hour and 45% in the PM peak hour compared to the No Build, with no measurable degradation in the level of service (LOS 'A') for the MD 650 at Elton Road intersection. THIS SIGNIFICANT IMPROVEMENT RESULTS *with no diversion assumed through the neighborhood*, but instead with traffic only diverted from the northbound u-turns and the shopping center traffic turning left onto Powder Mill Road and left onto MD 650 in order to access I-495 west. The proposed improvements package is also shown to decrease peak hour travel times along MD 650 by between 14% and 66%, and to substantially reduce delay to all vehicles in the area.

Importantly, the substantial improvements in traffic operations at the intersection of MD 650 at Powder Mill Road, as well as for vehicles along MD 650 and within the overall study area are likely to negate some amount of the cut-through traffic that has been a perennial concern to neighbors along Elton Road and Wooded Way. As traffic moves more freely along the major roadways and through the larger intersections designed to handle it, the incentive to find alternate routes through local streets is decreased. To the degree cut-through traffic is an existing issue for the neighborhood, traffic calming remedies are included as part of the proposed improvements package which have the ability to further reduce the desirability of this maneuver, thereby mitigating cut-through traffic.

Based on the findings of the attached *REVISED White Oak LATIP Supplemental Analysis – MD 650 & Powder Mill Road*, as well as the information contained in this letter, it is recommended that the proposed improvements included in the attached memo be approved and carried forward for design and construction as part of the White Oak LATIP.

Sincerely,

*[signature]*

Michael Lenhart, P.E., PTOE
President

Enclosure:  REVISED White Oak LATIP Supplemental Analysis – MD 650 & Powder Mill Road

3



## Lenhart Traffic Consulting, Inc.
### Transportation Planning & Traffic Engineering

**Memorandum:**

*Date:*    November 12, 2018

TO:    Mr. Chris Conklin                    FROM: Mike Lenhart
       Montgomery County DOT
       101 Monroe Street, #10
       Rockville, MD 20850

RE:    REVISED White Oak LATIP Supplemental Analysis – MD 650 & Powder Mill Road

As part of this analysis, two scenarios were evaluated including:
- Total Conditions with no improvements (No Build) to intersection geometry and timings.
- Total Conditions with the following improvements:
    1. An additional EB left-turn lane (including modifications to existing lane use) and WB right-turn lane at the intersection of MD 650 & Powder Mill Road. Note that a dedicated WB right-turn lane at the intersection of MD 650 & Powder Mill Road is present under Existing Conditions, however, the westbound right turn lane is only 50' long. This is far shorter than a typical turn lane and is completely unusable because access to the right turn lane is blocked by queues in the adjacent lanes. Therefore, this 50' lane was not treated as a right turn lane in the analysis of existing geometrics.
    2. A slip ramp at the intersection of MD 650 & Elton Road to provide direct access from Elton Road to I-495 WB.
    3. Traffic calming along Elton Road in order to reduce speeds and enhance safety.

The following intersections were analyzed as part of this analysis including:
    1. MD 650 & Powder Mill Road
    2. MD 650 & Elton Road

In addition to this memo, the following exhibits and appendices have been included:

Exhibit 1    Presents a location map and shows the study intersections.

Exhibit 2    Provides the existing lane use and traffic controls devices.

Exhibit 3    Includes the existing peak hour traffic volumes at the intersections. Note that these counts were taken from SHA's ITMS website, and are the same counts used in the LATIP analysis. It should be noted however that the LATIP analysis had two errors in their existing traffic counts. The LATIP study failed to include northbound and southbound MD 650 U-turns, and had an incorrect through volume for northbound MD 650 in the morning peak hour.

Exhibit 4    Provides the 2040 background peak hour traffic volumes which were taken from the White Oak LATIP with the exception of the background growth in traffic on the west leg of MD 650 at Powder Mill Road in and out of the Holly Hall apartments. The growth in traffic on the west leg is calculated in Exhibits 5 and 6 as follows.

Exhibit 5    Contains the trip generation table for the Hillandale Gateway development. While the 2040 peak hour volumes from the White Oak LATIP generally accounted for traffic from planned developments in the area, in order to be conservative, trip generation and assignment were conducted separately for the Hillandale Gateway development as part of this study due to its immediate proximity to the study intersections and because it is one of the first sites planned for development in the White Oak LATIP area. Note that a trip credit was assumed for the existing 96 senior adult dwelling units. The proposed development is understood to consist of 146 senior adult dwelling units, 350 apartment units, and 24,500 square feet of shopping center.

Exhibit 6a-c    Exhibits 6a-6c detail the residential, retail, and pass-by trip assignments for the planned Hillandale Gateway development. The trip assignment is based on the net increase in trips over and above the existing use. It should be noted that a right-in/right-out driveway is planned for the site in addition to the access from the west leg of the MD 650 & Powder Mill Road intersection.

Exhibit 7    Combines the 2040 background peak hour traffic volumes shown on Exhibit 4 with the trip assignments shown on Exhibits 6a-6c to provide total traffic volumes.

Exhibits 8a-b    Shows the assumed traffic diversions as a result of the construction of a slip ramp which would provide direct access from Elton Road to I-495 WB.

Exhibit 8c    Combines the total traffic volumes shown on Exhibit 7 with the traffic diversions shown on Exhibits 8a-8b to provide total peak hour volumes with diversions. Note that these volumes were used in the "Total with Improvements" scenario.

Exhibit 9    Provides a table showing Level of Service using the HCS methodology at the two study intersections. The LATIP uses an 80 second threshold for the determination of intersection adequacy. In addition, the table provides overall corridor measures of effectiveness including travel time along MD 650 between the Capital Beltway and north of Powder Mill Road, as well as the total delay experienced by all vehicles traveling in the area (based on the study area included within the traffic model).

Exhibit 10    Shows the proposed lane use and traffic control devices under the "Total with Improvements" scenario.

Appendix A    Provides supplemental information and turning movement counts.

Appendix B    Provides the Synchro/SimTraffic worksheets.

Appendix C    Includes concept design plans for the proposed improvements.

**LENHART TRAFFIC CONSULTING, INC.**
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

OFFICE: (410) 216-3333
FAX: (443) 782-2288
EMAIL: mlenhart@lenharttraffic.com

2 of 53

00022388

## Lenhart Traffic Consulting, Inc.
### Transportation Planning & Traffic Engineering

The following information is a summary of the results of our analyses:

➢ Under Total Conditions without any improvements (No Build) to intersection geometry or timing, the signalized study intersection of MD 650 & Powder Mill Road will operate with an overall intersection delay of **greater than 80 seconds during the PM peak hour** (76.9 seconds and 125.0 seconds during the AM and PM peak hours respectively). As mentioned previously, the LATIP uses an 80 second threshold for the determination of intersection adequacy. Therefore, intersection improvements are required in order to meet the LATIP guidelines.

➢ The "Total with Improvements" scenario includes a portion of the Master Plan improvements (EB Left + WB Right at MD 650 & Powder Mill Road) and a slip ramp at the intersection of MD 650 & Elton Road to provide direct access from Elton Road to I-495 WB. Under this scenario, the signalized study intersection of MD 650 & Powder Mill Road will operate with an overall intersection delay of **less than 80 seconds** (46.0 seconds and 69.0 seconds during the AM and PM peak hours respectively) which satisfies the LATIP requirements. In addition, the intersection of MD 650 & Elton Road will operate with 10 seconds of delay or less during both the AM and PM peak hours.

➢ It should also be noted that the MD 650 Corridor will experience overall travel time improvements ranging from 14% to 66% depending on the direction of travel and peak hour. Furthermore, the total delay for all vehicles traveling in the area will be reduced by 38% in the AM peak hour and 14% in the PM peak hour with the proposed improvements.

Based on the results of this analysis, all signalized study intersections under the "Total with Improvements" scenario will operate with less than 80 seconds of delay and will satisfy LATIP requirements. If you have any questions regarding this matter, please do not hesitate to contact me at the number below. We look forward to your feedback and guidance in how you would like to proceed.

Thanks,
Mike



**LENHART TRAFFIC CONSULTING, INC.**
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

Office: **(410) 216-3333**
Fax: **(443) 782-2288**
Email: mlenhart@lenharttraffic.com

3 of 53



Exhibit 1

Location Map

4 of 53

Study Intersections:
1. MD 650 & Powder Mill Road
2. MD 650 & Elton Road

White Oak LATIP Analysis

LENHART TRAFFIC CONSULTING, INC.
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

OP·LANES
M A R Y L A N D
I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**



White Oak LATIP Analysis

Existing Lane Use & Traffic Control Devices

Exhibit 2

5 of 53



White Oak LATIP Analysis

Existing Peak Hour Volumes

Exhibit 3

Key:  xx = AM Peak Vol's   (xx) = PM Peak Vol's

6 of 53

## Left Exhibit (Exhibit 4)

Powder Mill Road

Elton Road

Holly Hall

Powder Mill Rd.

135 (300)
17 (25)
840 (485)

8 (10)
2510 (2440)
110 (240)
2 (5)

(38) 16
(16) 8
(70) 48

(53) 26
(35) 48
(2160) 2155
(290) 170

2540 (1990)
50 (15)
20 (45)
100 (215)

(2045) 2345
(345) 170

MD 650
650
MARYLAND

White Oak LATIP Analysis

**2040 Background Peak Hour Volumes**

LENHART TRAFFIC CONSULTING, INC.
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

Key: xx = AM Peak Vol's   (xx) = PM Peak Vol's

**Exhibit 4**

7 of 53

## Right Exhibit (Exhibit 5)



Trip Generation for Hillandale Development

White Oak LATIP Analysis

LENHART TRAFFIC CONSULTING, INC.

**Exhibit 5**

8 of 53

OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**



White Oak LATIP Analysis

Trip Assignment for
Hillandale (Residential)

Exhibit
6a

LENHART TRAFFIC CONSULTING, INC.
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

Key:  xx = AM Peak Vol's   (xx) = PM Peak Vol's

**Primary Trips**

|       | AM  | PM  |
|-------|-----|-----|
| In    | 40  | 148 |
| Out   | 149 | 82  |

9 of 53



White Oak LATIP Analysis

Trip Assignment for Hillandale
(Shopping Center)

Exhibit
6b

LENHART TRAFFIC CONSULTING, INC.
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

Key:  xx = AM Peak Vol's   (xx) = PM Peak Vol's

**Primary Trips**

|       | AM  | PM  |
|-------|-----|-----|
| In    | 15  | 29  |
| Out   | 9   | 31  |

10 of 53

00022392



White Oak LATIP Analysis

Total
Peak Hour Volumes

Exhibit
7

LENHART TRAFFIC CONSULTING, INC.
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

Key: xx = AM Peak Vol's    (xx) = PM Peak Vol's

12 of 53



White Oak LATIP Analysis

Pass-by Trip for Hillandale
(Shopping Center)

Exhibit
6c

LENHART TRAFFIC CONSULTING, INC.
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

Key: xx = AM Peak Vol's    (xx) = PM Peak Vol's

11 of 53

| Pass-by Trips | AM | PM |
|---|---|---|
| In | 0 | +15 |
| Out | 0 | -18 |

00022393





OP·LANES™
MARYLAND
I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**



White Oak LATIP Analysis

**Potential Diversion at Intersection 1 (Westbound Left-Turn)**

**Exhibit 8b**

Key: xx = AM Peak Vol's  (xx) = PM Peak Vol's

LENHART TRAFFIC CONSULTING, INC.
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

14 of 53



White Oak LATIP Analysis

**Total Peak Hour Volumes with Diversions**

**Exhibit 8c**

Key: xx = AM Peak Vol's  (xx) = PM Peak Vol's

LENHART TRAFFIC CONSULTING, INC.
645 BALTIMORE ANNAPOLIS BLVD, SUITE 214
SEVERNA PARK, MD 21146
www.lenharttraffic.com

15 of 53

### 2040 Traffic Operations Summary
#### Intersection Operations
(Level of Service / Average Delay per Vehicle in Seconds)

| Morning Peak Hour | No Build | With Improvements |
|---|---|---|
| 1). MD 650 & Powder Mill Road | E / 76.9 | D / 46.0 |
| *Percent Improvement compared to No Build* | --- | *40%* |
| 2). MD 650 & Elton Road | A / 4.8 | A / 10.0 |

| Evening Peak Hour | No Build | With Improvements |
|---|---|---|
| 1). MD 650 & Powder Mill Road | F / 125.0 | E / 69.0 |
| *Percent Improvement compared to No Build* | --- | *45%* |
| 2). MD 650 & Elton Road | A / 9.6 | A / 9.1 |

Notes: 1. Results shown in the following format: Level of Service / Average Delay per Vehicle in Seconds
2. The Average Delay per Vehicle in Seconds is the average delay experienced by each and every vehicle passing through the intersection, i.e. an average delay of 60.0 seconds indicates that it takes every vehicle, on average, one minute to get through the intersection, regardless of which direction the vehicle is traveling.
3. All results are from Synchro/SimTraffic, a traffic analysis and microsimulation software package.

#### Corridor Measures of Effectiveness

| Morning Peak Hour | No Build | With Improvements |
|---|---|---|
| MD 650 Travel Time (See Note 1, below) | | |
| *Northbound* | 151 secs. | 124 secs. |
| *Percent Improvement compared to No Build* | --- | *18%* |
| *Southbound* | 504 secs. | 170 secs. |
| *Percent Improvement compared to No Build* | --- | *66%* |
| Total Network Delay (See Note 2, below) | 593 hours | 369 hours |
| *Percent Improvement compared to No Build* | --- | *38%* |

| Evening Peak Hour | No Build | With Improvements |
|---|---|---|
| MD 650 Travel Time (See Note 1, below) | | |
| *Northbound* | 634 secs. | 546 secs. |
| *Percent Improvement compared to No Build* | --- | *14%* |
| *Southbound* | 583 secs. | 413 secs. |
| *Percent Improvement compared to No Build* | --- | *29%* |
| Total Network Delay (See Note 2, below) | 600 hours | 514 hours |
| *Percent Improvement compared to No Build* | --- | *14%* |

Notes: 1. Average travel time in seconds from Capital Beltway to north of Powder Mill Road. This is a measure of how effectively traffic is moving along MD 650.
2. Total Network Delay = Number of Vehicles x Average Delay per Vehicle within the traffic model, which extends along MD 650 from Oakview Drive to Chalmers Road. It is a measure of how the overall transportation system is performing in this area.
3. All results are from Synchro/SimTraffic, a traffic analysis and microsimulation software package.

| White Oak LATIP Analysis — LENHART TRAFFIC CONSULTING, INC. | Results of Traffic Operations Analyses | Exhibit 9 |
|---|---|---|

16 of 53



| White Oak LATIP Analysis — LENHART TRAFFIC CONSULTING, INC. | Proposed Lane Use & Traffic Control Devices — Existing ➝ / Proposed ⇒ | Exhibit 10 |
|---|---|---|

17 of 53

**INDIAN SPRING RESIDENTS OPPOSED TO BELTWAY WIDENING GROUP – TONY HAUSNER**

| | |
|---|---|
| **From:** | Tony Hausner <thausner@gmail.com> |
| **Sent:** | Thursday, November 5, 2020 6:24 PM |
| **To:** | MLS-NEPA-P3 |
| **Subject:** | Testimony on 495/270 Managed Lane Study |
| **Attachments:** | Testimony on 495-270 DEIS.docx; Final testimony for virtual hearing on Aug 18 Ole Varmer.docx |

This is to inform you that we have formed the following group: Indian Spring Residents Opposed to Beltway Widening Group (ISROBWG). Our group consists of 98 residents in the Indian Spring Neighborhood which is adjacent to the 495 Beltway, between the US29 and University Blvd. Building the beltway will take away significant property from many homes, severely undermine the Indian Spring Terrace Park along with its recreation center and playground, and destroy part of the YMCA which is located within our boundaries. Further it will significantly increase traffic on roads that feed 495 such as US29 and University Blvd. In addition, the increased traffic will lead to increases in air pollution that will especially have greater impact on our neighborhood since we are right next to the beltway.

Attached are copies of the oral testimonies on the DEIS presented by two of our residents, myself and Ole Varmer, at the hearings conducted by MDOT in August.

Tony Hausner

--
Tony Hausner
Founder, Safe Silver Spring
safesilverspring.org
Past Chair,
AAII Chapter Leaders Executive Committee
aaii.com
Cell: 301-641-0497

Thank you for your comment concerning impacts to the Indian Spring neighborhood. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Indian Spring neighborhood is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

Testimony on DEIS for 495/270 Project

Tony Hausner, Indian Spring Neighborhood

I am Tony Hausner. I live at 203 Brewster Ave, Silver Spring, MD. I live in the Indian Spring neighborhood which is immediately adjacent to the Beltway just south of it, between Colesville Road and University Blvd. We have 800 homes. We have lived here for 43 years and have been involved in a number of transportation projects over the years.

I oppose the managed lane plans for I495 and I270.  I support transit solutions to the traffic issues raised by this DEIS.

Widening the beltway will result in the following impacts to our neighborhood.

**#1**

- Impacting a number of homes that are currently right next to the Beltway. They will at least lose a significant portion of their backyards and could lose more.
- A park and playground in the middle of our neighborhood would be significantly reduced as well as a county recreation center which is in the middle of the park and which our neighborhood makes great use of.

I have the following comments on transportation issues as discussed in Chapter 3.

**#2**

- The DEIS study does not include all the way to Frederick which is an essential part of the plan.
- The DEIS mentions the Corridor Cities transitway, the Randolph Road BRT, and the North Bethesda Transit Way. However, the DEIS does not take into account whether or not these projects will or will not be completed. If these projects were completed it would significantly reduce the need for widening 270 and 495. Further, neither MDOT nor other agencies have not made any commitment to these Projects. In addition, MDOT should consider other transit options beyond these projects, including the use of transit on the American Legion Bridge as recommended by M-NCPCC.
- The M-NCPCC recommended that the State examine using the ICC as an alternative to widening the Beltway.  The DEIS dismisses this alternative without providing any analysis.  We are very skeptical that this study has been adequately performed.
- The DEIS does not take into account the impact that COVID-19 has had on traffic.  There have been significant reductions in traffic due to teleworking and much of these changes are likely to persist after COVID19 ends. Studies by KPMG, and the Maryland Transportation Institute project a 5-10% long term decrease in traffic due to teleworking beyond the end of Covid-19. Further, MDOT has indicated that there has been a 17% decrease in traffic compared to last year.

Thank you.  https://tinyurl.com/th495270DEIStestimony

**Response to DEIS Comment #1**
The benefits of the proposed transit projects mentioned (Corridor Cities Transitway, Randolph Road, and North Bethesda Transitway) are accounted for in the modeling, as noted on page 3-4 of the DEIS.  The forecasts assume that all of those transit projects will be in place by the design year, and the forecasts account for potential reductions in automobile traffic due to travelers using transit instead.  The results show that there is still a need for widening I-270 and I-495 despite these transit improvements.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

Comments addressed above.

<u>Final 3-minute testimony for virtual hearing on Aug 18:  Ole Varmer 9706</u>
<u>Lawndale Drive, Silver Spring, Md 20901</u>

I live in Indian Spring Country Club Estate that I learned in reading the DEIS is
eligible for listing on the National Register of Historic Places.   The Beltway
construction started in 1957 and it was opened for traffic on August 17, 1964. I
recall my father loading up the family in our Corvair and driving the entire
circumference of this grand new 6 lane highway.  Of course, this was all before the
enactment of the 1969 National Environmental Protection Act and the 1966
National Historic Preservation Act.  Public concern about the destruction of
historic properties from construction like the Beltway was a primary catalyst for
the enactment of the NHPA.  So, we don't have a lot of information about what
history or natural environment was destroyed as the adverse effect were not
considered much less given the "hard look" now required under NEPA that I fear
is not taking place.  I know the Indian Spring Country Club had to relocate.  I also
know that the last time WSSC tried to address the stormwater drainage issues it
resulted in Indian Spring meandering under my house and causing flooding every
time it rained.  That resulted in me having to spend several thousand dollars for a
drainage field under my basement.

Most important, the DEIS was compiled before the pandemic so it does not discuss
the increase in teleworking, reduction in traffic and other strategies and alternatives
that should be considered before exacerbating the harm to the environment already
done.  Finally, Please look at how Public Private Partnership for the Purple Line is
blowing up in our face, and hurting students and parents going to the University of
Md.  At NOAA, they used PPP so that nautical charts could be printed out at local
marinas.  That worked until we realized that the a competition clause precluded
NOAA from sharing its charts with the United Kingdom which is the world's
largest provider of nautical charts resulting in foreign flag vessels plying US
waters with charts that were not up to date.  Please press pause and take a harder
look.  And to be clear, I oppose the expansion of the Beltway and support the No
Build option.

**KENSINGTON HEIGHTS CIVIC ASSOCIATION – KAREN CORDRY**

| | |
|---|---|
| **From:** | Karen Cordry <karenc425@aol.com> |
| **Sent:** | Monday, November 9, 2020 1:55 PM |
| **To:** | MLS-NEPA-P3 |
| **Subject:** | Comments on proposed I-495/270 Toll Lanes |
| **Attachments:** | 495_270 Comments.docx |

Please find comments from the Kensington Heights Civic Association. Thank you for your attention to these and for keeping us on the list for future information on developments.

Karen Cordry, President
KHCA

1

*This page is intentionally left blank.*

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study   Case 8:22-cv-02597-DKC   Document 61-7   Filed 10/30/23   Page 25 of 69

**FINAL ENVIRONMENTAL IMPACT STATEMENT**



**Comments of KHCA on Proposed I-495/270 Managed Lanes Project Study**

**#1** Kensington Heights Civic Association ("KHCA") submits the following comments in opposition to the proposed I-495/I-270 Managed Lanes Project and in support of the "no-build" option at this time.

KHCA represents a neighborhood of about 1,000 single-family detached homes and townhouses surrounding the Westfield Wheaton Mall, which lies approximately 1.5 miles north of I-495 and Georgia Avenue. While that makes use of the Beltway convenient, our homes are also located only a few minutes walk from the Red Line Metro station in Wheaton, which means that many, if not most, of us are heavy users of transit for our work-related commutes. Or, at least we were, in the pre-COVID days.

**#2** In terms of commenting on the current DEIS study on this project, we note that we are probably still a year away from returning to anything like normal – and, when we do, the "new normal" may bear little resemblance to the past as employers have found that remote work and telecommuting has been surprisingly practical. That may well affect many decisions about how and where to work will be carried out going forward and those collective decisions will have a significant impact on the commuting patterns of the whole region. As such, it is far too early to be making any significant commitments.

**#3** The other significant factor that has changed since this study began is the current failure of the P3 partnership for the Purple Line and the breakdown of work on that project. That situation makes clear that such a partnership is no panacea for completing a significant project such as this and suggests that the State will probably want and need to maintain closer control over any similar projects in the future. And, in any event, in light of the stage to which that project has progressed and the significant burdens that have been imposed on those along its route for the last several years, the State should be concentrating its efforts on that effort and not on starting a huge additional new matter.

**#4** In terms of that project, we have looked at comments from both the Maryland National Capital Park and Planning Commission (M-NCPPC) and the Sierra Club as well as information from utilities near the project that indicate that the widening project could impact their facilities and require relocation costs that could exceed thousands of dollars per household. What all three sets of comments make clear – and what we wholeheartedly agreed with -- is that this DEIS, which at 18,000 pages is quite impossible for any normal resident to review or comprehend, is still full of gaps and failures to adequately or accurately analyze the many impacts this project will have. As such, it cannot possibly be used to justify moving forward at this time.

This may be, in part, because, while the state Board of Public Works only authorized the State Highway Administration to move forward on procurement related to the Phase 1 aspect of the project (i.e., the western portion of I-495 leading from the American Legion Bridge up to I-270 and then extending up I-270), the DEIS attempts to analyze the entire project extending east on I-495 all the way

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**Response to DEIS Comment #4**
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**#5**

to MD 5 in Prince George's County. It also appears that the limited analysis derives from the fact that it is assumed that most of the detailed engineering and design will be done by the private partner. As a result, the analysis and the decision as to which options to proceed with is being done on the basis of limited and incomplete information. Not surprisingly, as both the M-NCPPC and Sierra Club comments note, and as we concur, the final product leaves much to be resolved and ensures that any decision on those alternatives is likely to be flawed. As we have seen with the Purple Line, it is simply not responsible to blithely assume that the P3 process will take care of all of these issues.

Among the points we are particularly concerned with:

**#6**

a. The premature decision to eliminate viable alternatives for detailed study, including reliance on MD 200 (the Intercounty Connector) – a roadway parallel to I-495 that was built in the relatively recent past specifically to move east-west traffic, as well as transit alternatives and demand management. (The latter again relates back to the question of whether we will see significantly different travel patterns even after the effects of the COVID pandemic subside).

This is particularly problematic since any of the Build Alternatives would have much greater impacts of streams, wetlands, and floodplains than the use of MD 200. It is also problematic in that much of the detailed design work on mitigation and the like are left under this proposal to development by the private partner at a later date.

**#7**

b. Failure to explicitly ensure minimization or mitigation of any effects on parkland will take place.

**#8**

c. Failure to deal with social equity concerns arising from the construction of lanes that can only be afforded by the affluent, while leaving most of the burdens, including increased air pollution, to be borne by communities of color and low-income residents.

**#9**

d. Failure to account for *all* of the required costs including the utility issues noted above, and the possibilities of delay from litigation, design issues, and land acquisition problems as has occurred with the Purple Line. We agree with the M-NCPPC that the project will likely require government subsidies in any event and, as such, there is no reason to exclude transit alternatives.

**#10**

e. Failure to adequately consider the potential for "induced demand" pulling more traffic onto the roadways if expansion is perceived as providing "open space" for driving, thus detracting from the goals of reducing auto usage and emissions resulting in highways that are just as crowded within only a few years and that will continue to adversely affect our efforts to combat climate change and to protect the health of the citizenry.

**#11**

f. Likely impacts on school buildings and playing fields that are located in close proximity to I-495 and may lose space needed for their operations.

In short, our view is that this project, in general, and the DEIS in particular, needs to be returned to the drawing board, and re-examined with a critical eye to ensure that the result satisfies the needs of all those most affected thereby, not just the desires of a limited number to obtain a faster driving experience.

---

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**Response to DEIS Comment #6**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

**Response to DEIS Comment #7**
The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarize the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail. This analysis directly contributed to MDOT SHA's evaluation of these alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided. Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to DEIS Comment #8**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to DEIS Comment #9**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**Response to DEIS Comment #10**
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**Response to DEIS Comment #11**
See the response to Comment #7 above.

**LEAGUE OF WOMEN VOTERS OF MARYLAND – NANCY SORENG**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Nancy Soreng

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Live Testimony/Afternoon

**Transcription:**

Hi, can you hear me?

Sure, I'm Nancy Soreng, N-A-N-C-Y, S-O-R-E-N-G. I live at 5506 Uppingham Street, Chevy Chase, Maryland. Today, I'm testifying on behalf of the League of Women Voters of Maryland and our nearly 1,500 members statewide. My remarks are based on the league's positions in support of transparency, equity, environmental protection, and sound physical policy. We oppose this highway expansion project and the only option in the DEIS that we can support is No Build. Based on the league's position of transparency in government, we are concerned that this project has been framed as a progressive, predevelopment, public private partnership. That means most of the engineering will be left to the winning bidders, so the public really doesn't know the projects to true monetary and environmental costs. A preferred alternative should not be picked without understanding and analyzing the impacts of our land and commute to our land and communities and cost to our taxpayers.

We are very concerned that the DEIS does not adequately address impacts to economically challenged population and social equity as required by NEPA. In one place, the DEIS concludes that everyone will benefit. Well given that the managed lanes are intended only for those with the ability to pay and depend on congestion and the free lanes to be financially viable, how can that be a benefit to all? The limit of disturbance defined in the DEIS is based on a rudimentary planning as determined by MDOT and SHA's very preliminary planning designs. Without detailed engineering and constructability analysis, how can there be an accurate evaluation of what culturally significant sites, including cemeteries, parks and schools will be affected? A good project should be fiscally prudent. Can a private company default and leave the taxpayers with the [INAUDIBLE] liabilities? We've been at hearings and briefings where SHA made assurances that the bondholders, not the taxpayers, would assume responsibility for completion of the project should the concessionaire walk away? Well that certainly has not been the case with the Purple Line. Will the tolls be so high that drivers choose not to use the managed lane, just thus reducing revenue projections, as happened in Virginia? And the DEIS doesn't address how the increased use of telecommuting in the future will impact the financial feasibility of paying for this project solely with toll revenue. Commuters turned to their computers instead of their cars during COVID. And we will likely do that when these highways are torn up by construction. Will we ever return to using our cars the way we did pre-pandemic? If not, doesn't that make all the traffic projections invalid? Protection of natural resources and environment is a high priority for the League of Women Voters. The stormwater management and the DEIS is insufficient and [INAUDIBLE] this already been caused. Thank you for the opportunity to present my concerns.

**#1**

**#2**

**#3**

**#4**
**#5**

**#6**

**#7**

**#8**

---

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to DEIS Comment #4**
MDOT SHA employed a conservative approach to defining the LOD for all the DEIS Build Alternatives and Preferred Alternative. The LOD represent the proposed boundary within which all construction, mainline widening, managed lane access, intersection improvements, construction access, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, stream stabilization, and related activities to the proposed roadway and interchange improvements. Property impacts associated with the LOD were broken into permanent (long-term) and temporary (short-term) areas. This conservative approach to defining the LOD fairly captured the full scope of potential impacts. Moreover, the methodology used to assess impacts to a number of key resources appropriately considered a broader geographic area than the LOD immediately surrounding the anticipated construction and related activity boundaries. When the project advances to final design, it is anticipated that the design will closely adhere to the LOD defined in the FEIS, as the LOD was established to include a reasonable area to construct the Preferred Alternative. For complete graphic descriptions of the Preferred Alternative LOD across the entire span of study limits, Refer to the FEIS, Appendix E- Environmental Resource Mapping. Refer to Chapter 9, Section 3.4.A for a response to Limits of Disturbance.

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

**Response to DEIS Comment #6**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**Response to DEIS Comment #7**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

**Response to DEIS Comment #8**
Refer to Chapter 9, Section 3.4.E for a response to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**LOCUST HILL CITIZENS ASSOCIATION – RICHARD LEVINE**

**STATEMENT OF RICHARD LEVINE**

9402 Locust Hill Road, Bethesda, MD 20814

ON BEHALF OF THE LOCUST HILL CITIZENS ASSOCIATION

ON THE I-495 & I-270 DRAFT ENVIRONMENTAL IMPACT STATEMENT

SEPTEMBER 10, 2020

Locust Hill is a single-family community bounded on the north and east by the arc of Rock Creek Stream Valley Unit ("SVU") 3 and the Beltway within it, from the MD-355/I-495/I-270 interchange around to the Cedar Lane overpass.

Given the many comments that address the P3 Project and the DEIS generally, our comments focus on issues that have particular impact for us; these assume that Phase 2 goes ahead in some form, **which we do not advocate**, *given skepticism about the financial stability of P3s and lack of valid assumptions regarding commuting patterns and vehicle technology characteristics for 2045:*

**#1**

First, **there must be greater segmentation** in traffic assessments for Alternative 9M, especially for less-than-two-HOT/ETL expansions for the Beltway between the Spurs, on the I-270 east spur, and the Beltway between Rockville Pike and Connecticut Avenue. I have served as a member of the Citizens Advisory Committee for the MD 355 bus rapid transit project, whose EIS process employed VISSIM modeling and the COG Regional Traffic model, along with detailed origin and destination ("O & D") data. One key lesson was that detailed project segmentation is a necessity, focused on both differing traffic and ridership patterns among roadway segments and differing right-of-way constraints.

Locust Hill's earlier comments to SHA argued against the addition of two lanes on both the I-270 east spur and on the Beltway segment between the spurs because that would result in the need for a lengthy eastbound 2 lane + 2 lane = 2 lane merge area, causing unnecessary roadway width expansion that would be eliminated by having only one additional lane on those two segments. New Alternative 9M does this one better by not expanding the number of lanes on the I-270 east spur at all, and constructing only a one-lane expansion on the rest of the Beltway from the I-270 west spur to I-95. However, a 9M-type alternative should not be rejected if it is a good choice, including 4(f) issues, but only from the I-270 west spur around to, e.g. MD 355, Connecticut Avenue or Georgia Avenue, with a 2-lane expansion needed east of that. For example, recently-released Appendix A to the Traffic Analysis Technical Report shows that future pm volumes are significantly less between the Spurs than eastward.

**Given the tremendous amount of work involved in preparing the DEIS, it would seem a significant false economy to discard Alternative 9M or other limited-lane scenarios without undertaking analyses using MD 355, Connecticut Avenue, and Georgia Avenue as potential segmentation endpoints.**

**#2**

Second, **the project Record of Decision must require the concessionaire to conduct an Environmental Assessment (EA)** to demonstrate that its design for a given segment

1

---

Thank you for your comment concerning impacts to Rock Creek Stream Valley Park and Sligo Creek Parkway. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Rock Creek Stream Valley Park and Sligo Creek Parkway are located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

Refer to Chapter 9, Sections 3.3.B and 3.3.C for a responses to Analysis of Alternatives Retained for Detailed Study.

**Response to DEIS Comment #2**
Following the Record of Decision, if there are any substantial changes to the limits of disturbance with the Developers design, a reevaluation of the environmental impacts would be required by FHWA in accordance with NEPA.

Refer to Chapter 9, Section 3.4.H for a response to noise impacts and mitigation.

**#2 Cont**

**minimizes harm.** The Alternatives remain at a high level and SHA intends to grant the concessionaire significant flexibility in constructing the chosen Alternative. There is thus a need for the winning bidder to demonstrate that its final design, construction, and maintenance-of-traffic plans are the least impactful of the potential solutions within the scope of the preferred alternative, using an EA process with opportunity for community comment. In addition to minimizing disturbances within the project Limits of Disturbance ("LODs"), the concessionaire needs to conduct noise analyses and required abatements, e.g., for new fly-over ramps at interchanges. Further, we note the FHWA has developed a construction noise model and the concessionaire should be required to use it in its construction planning. Requiring an EA will thus help ensure the concessionaire's responsibilities are met.

**#3**

Next, the 4(f) section 106 analyses must be modified to address deficiencies related to **the reconstruction of the Cedar Lane underpass and its impacts on the Elmhirst Parkway Trail and Neighborhood Park.** According to the draft 4(f) analysis of SVU-3, at 47-48, to avoid relocation of Rock Creek at Cedar Lane, all roadway expansion would be southward, i.e., toward the Locust Hill community. And Figure 2-9 shows a significant southward jog in the LOD just west of Cedar Lane. While the draft analysis discusses the minor impacts on the Locust Hill Community Park (section 2.1.10), there is no discussion whatever regarding impacts inside the Beltway, including construction impacts, within SVU-3 on the Elmhirst Parkway Trail, which falls within the LOD west of Cedar Lane, or on the popular playground in the Elmhirst Parkway Neighborhood Park adjacent to the LOD boundary. There is also a wide pedestrian-bicycle trail under the Beltway that provides connectivity from Elmhirst Trail to the Rock Creek Trail. We note Appendix G, § 3.1.1(I) contains commitments to maintain access for the Rock Creek Trail, but not the Elmhirst Parkway Trail.

Importantly, the Elmhirst Trail provides a bicycle *commuting* path to NIH and Walter Reed for residents east of MD 355; its *recreational* use has been highlighted in the press as the access route used by Dr. Anthony Fauci on his long-standing lunchtime runs from NIH into Rock Creek Park. The EIS must thus include the playground and trail in the cultural inventory and provide impact minimization and commitments to preserve the playground and trail and access during construction.

**#4**

Finally, we believe that current planning uncertainties underscore the risk of Build decisions based on a regional traffic model normed to 2010 behavioral patterns; **the COG model may be the best available, but it is inherently a poor indicator of traffic conditions in 2045.** Not only are there uncertainties regarding post-COVID-19 commuting patterns, but there is the certainty that vehicle automation developments and vehicle sharing arrangements will effect radical changes on highway use—if only knew what they would be. **So a timeout before choosing a Build Alternative to watch crucial developments unfold and to develop detailed O & D would be the friend, not the enemy, of sound transportation planning.**

Thanks for listening.

2

**Response to DEIS Comment #3**
As noted above, because the Preferred Alternative limits include no action or no improvements at this time on I-495 east of the I-270 spur to MD 5; therefore impacts to Cedar Lane, the Elmhirst Parkway Trail, and Elmhirst Parkway Neighborhood Conversation Area are avoided.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**MARYLAND BICYCLE AND PEDESTRIAN ADVISORY COMMITTEE – NATE EVANS**

| | |
|---|---|
| **From:** | Nate Evans <nevans1@mdot.maryland.gov> |
| **Sent:** | Friday, October 30, 2020 10:30 AM |
| **To:** | Lisa Choplin; Jon Morrison; MLS-NEPA-P3 |
| **Cc:** | Jeff Hirsch; Heather Murphy; Marty Baker; Jeffrey Folden |
| **Subject:** | MBPAC Comments on Managed Lanes Study DEIS |
| **Attachments:** | MBPAC_comments_on_Managed_Lanes_Project_FINAL.pdf |

Good Morning Lisa,

Acting in its advisory role, the Maryland Bicycle and Pedestrian Advisory Committee (MBPAC) has reviewed the Draft Environmental Impact Statement/Section 4(f) Evaluation and provides the attached comments. At the October 23, 2020 meeting, the committee voted to approve the comments, under the direction of committee chair, Jon Morrison.

If you have any questions or comments, please let me know.

Hope all's well,
Nate

**Nate Evans**
Active Transportation Planner
Office of Planning and Capital Programming
Maryland Department of Transportation
7201 Corporate Center Drive
Hanover, Maryland 21076
410-865-1301
nevans1@mdot.maryland.gov

1

*This page is intentionally left blank.*

October 23, 2020

Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21201

Maryland Department of the Environment
Wetlands and Waterways Program
Attn: Mr. Steve Hurt
1800 Washington Blvd., Suite 4300
Baltimore, MD 21230-1708

Dear Ms. Chopin and Mr. Hurt:

On behalf of the Maryland Bicycle and Pedestrian Advisory Committee (MBPAC), I am writing to provide comments on the "I-495 & 1-270 Managed Lanes Study: Draft Environmental Impact Statement (DEIS) and Draft Section 4(f) Evaluation". The advisory committee was established in 1991 by § 2-606 of the Transportation Article of the Maryland Code, with the purpose of advising state agencies on bicycle and pedestrian (bike-ped) issues. Although our focus is transportation, our comments are relevant to both MDOT and MDE because some alternatives for improving bike-ped impacts would also reduce impacts on nontidal wetlands and floodplains. At its quarterly meeting in July, the committee decided to review the Managed Lanes Study and provide comments in accordance with MBPAC's charter.

As envisioned, the Managed Lanes Project would make a major contribution to bicycle and pedestrian transportation in the greater Washington Area by including a multiuse trail on the new American Legion Bridge over the Potomac River. We are also pleased to note that the plans as conveyed in the DEIS are satisfactory in identifying pedestrian considerations, including those faced by individuals with disabilities.

#1

On the other hand, the Managed Lanes Project as envisioned in the draft study is likely to have several adverse impacts on bicycle and pedestrian transportation across I-495 and I-270, especially in Prince George's County. In many locations, these two interstate highways are significant barriers to bicycle and pedestrian transportation because they cannot be safely or conveniently crossed. During the last few decades, state and local governments have been gradually mitigating these barriers by building pedestrian bridges over the highways and trails that cross underneath the highways, and by retrofitting interchanges with improved bike-ped accommodation. Additional improvements are included in approved plans or are under

**Response to DEIS Comment #1**

Refer to Chapter 9, Section 3.3.D for a response to Analysis of Alternatives Retained for Detailed Study.

As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the planned pedestrian and cyclist improvements in Prince George's County are located outside the Preferred Alternative limits of build improvements, those potential impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

The Preferred Alternative reflects a strong commitment to bicycle and pedestrian connectivity and mobility in the study area in response to comments received throughout the NEPA process. Refer to **FEIS Chapter 3, Section 3.1.5**. Existing pedestrian and bicycle facilities impacted by the Preferred Alternative would be replaced in kind or upgraded to meet current local master plans for recommended facilities. In addition, new pedestrian and bicycle facilities identified in those plans would be constructed where adjacent connections exist. These efforts respond directly to the Purpose and Need goal of enhancing multi-modal connectivity by removing barriers to non-vehicular mobility and comments received from local agencies and stakeholders. In response to input received from the City of Rockville, the Montgomery County Department of Transportation, and stakeholder organizations, the Preferred Alternative will accommodate pedestrian/bicycle facilities throughout the study area, including improvements currently noted in Rockville and Montgomery County master plans and are assumed under the Preferred Alternative base design. These include:

- New sidepath (west side) and new sidewalk (east side) on Persimmon Tree Road over I-495;
- New bike lanes (both directions) and new sidepaths (both sides) on MD 190 over I-495;
- New bike lanes (both directions), new sidewalk (south side), and new sidepath (north side) on MD 191 over I-495;
- Reconstructed sidewalk (south side) and sidepath (north side) on Democracy Boulevard over I-270 west spur;
- New two-way separated bike lanes (south side), and reconstructed sidewalks (both sides) on Westlake Terrace over I-270 west spur;
- New Breezeway (south side) and reconstructed sidewalk (north side) on Montrose Road over I-270;
- Reconstructed sidewalk (south side) and shared use path (north side) on Wootton Parkway over I-270;
- New bike lanes (both directions) and new sidewalks (both sides) on MD 189 over I-270;
- New bike lanes/bikeable shoulders (both directions), reconstructed shared use path (south side), and new sidewalk (north side) on MD 28 over I-270;
- New bike lanes (both directions), reconstructed shared use path (Millennium Trail, south side), and new sidewalk (north side) on Gude Drive over I-270; and
- New Breezeway (south side) and new sidepath (north side) on Shady Grove Road over I-270.

Additionally, the Preferred Alternative includes pedestrian and bicycle enhancements and new connections that are beyond the base design approach but are accounted for in the Preferred Alternative limits of disturbance. Refer to **FEIS Chapter 3, Section 3.2.2**. These include:

- Construct a new pedestrian/bicycle shared use path across the ALB to connect facilities in Maryland and Virginia;
- Widen the existing variable-width sidepath along the east side of Seven Locks Road under I-495 (Cabin John Trail); and
- Construct a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection between Gibson Grove Church and Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

**M A R Y L A N D**
**Bicycle and Pedestrian Advisory Committee**

#1
Cont

consideration—and these improvements are likely to continue. Depending on design, the Managed Lanes Project could either thwart or accelerate ongoing and planned improvements to bike-ped transportation across I-270 and I-495.

#2

We believe that the DEIS and the Section 4(f) evaluation each need a section to explicitly address how and where this project may affect bicycle and pedestrian transportation. Widening an interstate roadbed will generally increase the cost of, and possibly preclude, planned trail crossings; but alternative designs could facilitate crossings. For example, in 2008, the Maryland National Capital Parks and Planning Commission (M-NCPPC) completed 30% design plans to extend the Henson Creek Trail across the Capital Beltway to the Branch Avenue Metrorail Station. M-NCPPC asked MDOT for permission to run the trail through one of the culverts the creek follows under the Beltway. Secretary John Porcari denied the request for safety reasons but added:

"If the culverts at Henson Creek are replaced by a bridge, we could certainly reinitiate discussions regarding a trail crossing during the project planning process."

Widening the roadbed and lengthening the culvert would tend to preclude the eventual crossing envisioned by Secretary Porcari's letter, which is an environmental impact that the DEIS should consider. The Section (4)(f) evaluation could also consider the bridge alternative, to mitigate the impact on park amenities of widening the highway over a longer culvert. (A bridge can also have a smaller environmental impact on nearby wetlands and floodplains than a culvert.)

#3

The DEIS and Section 4(f) evaluation should consider the potentially significant impacts of the Managed Lanes Project on several other planned and potential bicycle and pedestrian crossings, as well as ways to mitigate such impacts. For each crossing, a key question for the DEIS is whether the Managed Lanes Project facilitates the needed crossing or decreases its feasibility. Where the Capital Beltway crosses a park stream valley, a key question for the Section 4(f) evaluation would be whether replacing a culvert with a bridge, lengthening an existing bridge to create more room for a shared-use path, or building a bike-ped tunnel would mitigate the impact on park resources.

Although a complete list of such impacts is beyond our capacity, MBPAC members have identified the following crossings based on published plans and consultation with local planners:

- Trails crossing under the Capital Beltway along Little Paint Branch and Henson Creek, originally proposed to MDOT during the 2000's (EIS and 4f implications);
- A trail crossing the Capital Beltway at Southwest Branch (EIS and 4f implications);
- A planned pedestrian bridge over the Capital Beltway connecting Whitfield Chapel Park to the New Carrollton Station (EIS and 4f implications);

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis

MDOT SHA is committed to working with the officials with jurisdiction over park properties, such as M-NCPPC, to ensure bicycle and pedestrian transportation considerations are incorporated into the project to the extent practicable.

I-495 & I-270 Managed Lanes Study

Comments addressed above.

**#3
Cont**

MARYLAND
Bicycle and Pedestrian Advisory Committee

- Possible pedestrian bridges as part of the Central Avenue Trail north of Central Avenue, between Woodmore Town center and the former Landover Mall site, and east of MD 201;
- The planned extension of the WB&A Trail over the Capital Beltway along the MD 704 bridge;
- Sidepaths at the Capital Beltway interchanges with MD 210, MD 4, MD 202, MD 193, MD 201, and US 1;
- Sidepaths along Cherry Hill Rd and Arena Drive Temple Hill Road over the Capital Beltway;
- Sidepaths along Rhode Island Avenue, MD 193, MD 450, Richie Marlboro Road, and Suitland Parkway under the Capital Beltway;
- Widening sidewalks over the Capital Beltway along Fernwood and Greentree roads;
- Adding sidewalks to one or both sides of bridges where Bradley Boulevard, Rockville Pike, and Persimmon Tree Road cross over the Capital Beltway;

The EIS should also consider the MNCPPC list of Master-Planned Bicycle-Pedestrian Accommodations and the Capital Trails Network.

Finally, the committee is concerned that the DEIS fails to answer a number of key questions concerning the potential impacts on bike-ped safety. What measures (if any) will be taken at the highway ramps to mitigate potential hazards from the anticipated increase in motor vehicle traffic? What will be the impact of the new ramps that lead directly to the toll lanes? Will the absence of toll-road ramps at some interchanges increase the traffic on roads parallel to the managed lanes, and thereby create additional hazards to bicycles and pedestrians, or will the project take measures to avoid such hazards?

We appreciate the opportunity to provide our comments on the draft Managed Lanes Project and look forward to seeing the next version of this important analysis.

Yours truly,

Jonathan B. Morrison, Chairperson

00022409

**MARYLAND TRANSIT OPPORTUNITIES COALITION – BEN ROSS**

### Comments on Draft Environmental Impact Statement

### I-495 & I-270 Managed Lanes Study

**#1**

The Draft Environmental Impact Statement is fatally flawed because it misrepresents the purpose and need of the project. The project is advertised to the public as "traffic relief." The true purpose is to generate large amounts of toll revenue to create profits for private investors, dealmakers, and construction firms. For this purpose, congestion must be so severe that drivers will pay high tolls to avoid it.

To get around the contradiction between the stated and true purposes, MDOT rigged its analysis to come to a predetermined conclusion – the construction of toll lanes. To do so, it improperly screened out alternatives and arbitrarily limited the scope of analysis.

**#2**

To ensure that the EIS reached its predetermined conclusion, MDOT refused to analyze alternatives that fail to generate toll revenue, such as rail transit and TSM/TDM. These alternatives were eliminated by such means as:

- In the initial screening, all-transit alternatives were ruled out on the grounds that they would require state financial support and toll lane alternatives would not. Subsequent analysis found that toll lane alternatives require state financial support too, yet those alternatives were not ruled out.

- One element of the purpose and need was stated as "accommodate existing traffic and long-term traffic growth." Another element is to "provide additional roadway travel choices." This is circular reasoning; non-roadway travel choices and choices that involve less motor vehicle travel are arbitrarily excluded.

- The geographic scope of the alternatives was arbitrarily limited to the existing alignment of the I-270 and I-495 roadways. This rules out most demand management methods as well as alternate routes for transit (such as a third track on the MARC Brunswick Line).

**#3**

These are not the only fatal flaws in this NEPA process. The environmental effects of widening I-270 are being studied in two separate EISs. This constitutes illegal "segmentation." Not only is MDOT currently procuring a single contractor to widen the entirety of I-270, but widening just the southern part, as analyzed in this EIS, would make traffic worse on the northern part. Only if the northern part is widened as well could there be any "traffic relief."

1

**Response to DEIS Comment #1**

The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarize the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail. This analysis directly contributed to MDOT SHA's evaluation of these alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided. Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to DEIS Comment #2**

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

**Response to DEIS Comment #3**

Maryland's Traffic Relief Plan is statewide and includes I-95, I-695, I-495, I-270, MD 295, and the Smart Signals Program. Overall, this plan includes three elements: P3 Program, Baltimore Area Traffic Relief Plan, and Smart Traffic Signals. The Study focuses specifically on one element of that plan in one region of the state. The intent of the I-495 & I-270 P3 Program is to reduce congestion on I-495 and I-270 by seeking input from the private sector to design, build, finance, operate, and maintain improvements along the corridors. The plan is focused on transforming these overloaded interstates to allow people to reach their destinations faster and to remove overflow traffic from the local roads.

The geographic scope of the Study, while large, is distinctly defined. It includes 37 miles of I-495 and 11 miles of I-270. Consistent with CEQ NEPA regulations 40 CFR 1502.4(a) and 1508.25(a), as well as FHWA NEPA regulations at 23 CFR 771.111(f), MDOT SHA and FHWA have identified the Study as an independent action that may proceed regardless of whether other actions of the Traffic Relief Plan or P3 Program are implemented.

Furthermore, the identified scope of the Study has been sufficiently defined to be advanced with a project-level NEPA document. Consistent with FHWA regulations, other proposed actions, such as potential improvements to I-270 from I-370 to I-70, have been determined to possess independent utility from the Study (and other actions in the TRP and P3 Program) and thus will require separate project-level NEPA documents.

*This page is intentionally left blank.*

| From: | Maryland Transit Opportunities Coalition <TransitForMaryland@gmail.com> |
|---|---|
| Sent: | Saturday, November 7, 2020 10:52 AM |
| To: | MLS-NEPA-P3 |
| Subject: | DEIS comment submission |
| Attachments: | DEIS_Comment.pdf; DEIS_Comment_Cites.pdf |

By email and certified mail

Lisa B. Choplin, Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street, Mail Stop P-601
Baltimore, MD 21201

Dear Ms. Choplin,

Attached are comments in response to the "I-495 and I-270 Managed Lanes Study Draft
Environmental Impact Statement/Draft Section 4(f) Evaluation."

These comments are submitted by the following organizations (mailing addresses are listed in the
comments):
Action Committee for Transit
Baltimore Transit Equity Coalition
Central Maryland Transportation Alliance
Citizens Against Beltway Expansion
Coalition for Transit Alternatives to Mid-County Highway Extended
Don't Widen 270
Maryland Rail Passengers Association
Maryland Transit Opportunities Coalition
Prince George's Advocates for Community-Based Transit
Trains Not Tolls

Also attached is a file containing material cited via hyperlinks in the comments as submitted
electronically. Please include this file in the Administrative Record as a backup to the hyperlinks.

Sincerely,

Ben Ross
Chair
Maryland Transit Opportunities Coalition

1

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

#1

**Purpose and Need Statement**

The Purpose and Need Statement is incoherent nonsense. The purpose of the project is entirely misrepresented. No real need is identified.

This is so because the entire project is built on a lie. Governor Hogan announced that its purpose is "traffic relief." The real purpose is to generate profits for investors, dealmakers, and construction contractors. These profits are to be derived from high tolls, which motorists will not pay unless traffic remains severely congested.

The Purpose and Need Statement furthers this deceit by describing the purpose as "a travel demand management solution(s) that addresses congestion…" In the light of the governor's statements, the ordinary reader will interpret "addressing congestion" as lessening congestion. But the project does not lessen congestion; it addresses congestion by maintaining it and exploiting it for private profit.

The Statement then lists five "needs." Two of these assume the desired answer: new lanes. The other three purported needs are mere verbal decoration; the DEIS in its 19,000 pages fails to analyze whether any alternative will meet them:

- **Accommodate existing traffic and long-term traffic growth** - This is circular reasoning, prejudging the outcome by defining the goal as the movement of increased numbers of motor vehicles. The actual need is access – the ability to reach places people need or want to go.[1] Travel by private automobile on interstate highways is only one means of access, and usually an inefficient means.

- **Enhance trip reliability** - The DEIS makes no attempt to measure the variability of travel speeds on the general-purpose lanes of I-495 and I-270 or on any of the roadways that connect those highways to origins and destinations. It simply asserts that increasing average vehicle travel speeds will also increase reliability. Thus, for trips using the GP lanes (the vast majority of trips) the DEIS provides no information about whether any alternative satisfies this need. Even for trips that use toll lanes for part of the journey (no trip is entirely on an interstate highway), the DEIS cannot determine whether the net effect of an alternative on reliability is positive or negative.

---

[1] Measuring What Matters: Access to Destinations. Center for Transportation Studies, University of Minnesota, http://hdl.handle.net/11299/101339.

2

**#1 Cont**

- **Provide additional roadway travel choices** - This again is circular reasoning. The ostensible need is more choice, but the choice is limited to roadways. The only way to add roadways is to add roadways.

- **Accommodate homeland security** - Widening the Beltway and I-270 south of Shady Grove would not assist "population evacuation." Evacuation routes are perpendicular to the Beltway, and the choke points on I-270 are north of Shady Grove. As for "emergency response access," the vast majority of emergency response travel is on local roads. Adding more capacity and traffic to the interstates is likely to increase congestion on arterials;[2] the DEIS does not address this beyond some vague conclusory statements.

- **Improve movement of goods and services** - Under the bi-state accord announced in November 2019, northbound toll lanes on the American Legion Bridge will be operated as part of the Virginia toll lane system.[3] Trucks with more than two axles are banned. The DEIS does not even mention this. Moreover, the DEIS traffic model analyzes trips that move goods and services during rush hour using travel times during uncongested off-peak hours. The DEIS does not tell us whether any alternative improves the movement of goods and services, and its traffic model is, *by design*, incapable of finding out.

**Screening of Alternatives**[4]

**#2**

The criteria used to screen out non-highway alternatives were inconsistent, misleading, and biased. As a result, the DEIS analyzes in detail only variants of toll lanes (along with the legally required no-build alternative).

**#3**

**Financial viability** - The screening criterion for financial viability was positive net cashflow to the state. All-transit alternatives were eliminated early in the process of EIS preparation on this basis. MDOT then estimated construction costs for the remaining alternatives and performed a financial analysis. This analysis, completed in June 2019, found that Alternatives 5, 13B, and 13C had a negative cashflow. However, instead of screening these alternatives out, MDOT redid the financial analysis.

---

[2]See comments by Norman Marshall, Smart Mobility Inc., submitted separately by others. We incorporate those comments herein by reference.

[3]See Gov. Northam's Nov. 12, 2019 press release and Transurban's 2020 annual report, pp. 27, 46.

[4]These comments are in addition to the comments previously submitted by the Maryland Transit Opportunities Coalition and other signers on Scoping, Preliminary Range of Alternatives, and Recommended ARDS, which are incorporated herein by reference.

3

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

**#3 Cont**

In the re-analysis, the construction cost of the toll lanes was first estimated using the MDOT SHA *Highway Construction Cost Estimating Manual*. Even using the lowest allowable contingency percentage, the result (which MDOT refuses to disclose) was apparently too high to support MDOT's predetermined decision to build toll lanes. So the agency arbitrarily lowered its cost estimate to match Governor Hogan's earlier claims about project cost, citing unexplained "assumed efficiencies." Even after these manipulations, Alternatives 13B and 13C are barely cashflow-positive – the cashflow is negative if the actual construction cost exceeds the estimate by just 5%. Cost growth of 5% is highly likely for any project at this stage of development and nearly certain in the light of the $2 billion cost of water and sewer infrastructure that was identified after the June 2019 analyses were completed.[5] Yet 13B and 13C remain among the screened alternatives, while transit alternatives go unanalyzed.

The DEIS [Appendix A, p. 40] justifies eliminating alternatives with negative cashflow on the basis of federal policy that "restricts issuance of a NEPA decision document unless the project is fiscally-constrained." This misrepresents the policy and is contrary to both law and policy. Alternatives must be analyzed even if no funding is available for them. As discussed in more detail in our scoping comments, 40 CFR 1502.14 requires the inclusion of reasonable alternatives, such as mass transit, not within the jurisdiction of the lead agency.

**#4**

**Study area** - The DEIS [p. 1-1] further restricts alternatives by shrinking the study area to a narrow strip along I-270 and I-495, with fingers reaching out along some connecting arterial highways to a maximum distance of 1.5 miles. This is a much smaller area than the corridor the plan is designed to serve; most trip origins and destinations do not adjoin the interstate.

Limiting the location of new infrastructure to a highway corridor biases the analysis against non-highway alternatives. For example, a third track on the MARC Brunswick Line is an obvious alternative to widening I-270, but the narrow study area definition rules it out because the existing tracks aren't right next to the highway. The study area definition also biases the analysis against Transportation Demand Management, which generally requires action at trip origins and destinations rather than along the highway.

---

[5]DEIS p. 2-6; Appendix B, Alternatives Technical Report, pp. 110-115, 148; B. DePuyt, As Hogan's Highway-Widening Plan Changes, $9 Billion Price Tag Does Not, *Maryland Matters*, Sept. 1, 2020.

4

**Response to DEIS Comment #4**

The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarize the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail. This analysis directly contributed to MDOT SHA's evaluation of these alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided. Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

#5

**Traffic congestion** - The DEIS purports to screen alternatives by their ability to "relieve" traffic congestion [p. 2-3]. It does not, in fact, measure congestion. And even if accurately measured, congestion reduction would not be an appropriate screening criterion.

The screening criteria involve vehicle movement only within the very narrow study area. The great majority of trips on I-270 and I-495 begin or end outside the study area and use connecting roads to access the interstates. Increased vehicle throughput on the interstates necessarily increases traffic volumes on those connecting roads, creating increased congestion which is not captured in the DEIS's calculations.

Moreover, the traffic analysis does not measure congestion; it measures "delay" which combines time stopped at intersections with congestion delays. This intrinsically biases the analysis toward expansion of limited-access highways which don't have traffic lights. For example, consider a trip that takes the same amount of time on straight local roads or on a longer route that uses the Beltway. On the local roads, a car moves for 10 minutes and stops at lights for 5 minutes. The Beltway route has no traffic lights but due to the added distance the car has to keep moving for 15 minutes. Switching this trip from the local roads to the Beltway yields a 5-minute reduction in model-calculated "delay" even though the actual trip time is identical.

Even if they were accurately measured, traffic congestion and vehicle speed would be inherently biased screening criteria. They measure vehicle movement rather than access to destinations. A simple example illustrates the difference. If I walk across the street to a store, I reach my destination in less than a minute, but a vehicle may need to stop for a few seconds while I cross. If I drive to a store ten miles away at 60 mph, there is no vehicle delay. When congestion and speed are screening criteria, infrastructure that forces me to drive 10 miles appears to be better than infrastructure that lets me cross the street, because the few seconds a driver waits count and the nine minutes I save by walking don't count.

#6

**Transportation systems management** - The explicit justification offered on p. 2-11 for eliminating the TSM/TDM alternative is an unsupported assertion that TSM/TDM cannot meet the stated needs. This is simply false. For example, ramp metering with queue-jumper lanes for trucks and buses could potentially satisfy several of the purported needs:

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**Response to DEIS Comment #6**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

5

**#6 Cont**

- It would enhance trip reliability on all lanes on I-270 and I-495. This is better than the alternatives that passed the screening, which only enhance reliability on the toll lanes. (The DEIS did not analyze trip reliability on the arterial roads that lead to the interstate ramps.)

- It would provide an additional roadway travel choice.

- It would improve the movement of goods and services.

Other variants of TSM/TDM require analysis as well.

### Segmentation

**#7**

Governor Hogan's announcement of this project made clear that the state considers his proposed new lanes on I-270, the Beltway, and Baltimore-Washington Parkway to be a single integrated project whose purpose is to improve "traffic in the region."[6] It must be compared to transit alternatives with a similar regional scope, such as the Maryland Transit Opportunities Coalition's rail transit plan.[7]

More specifically, the scope of the DEIS excludes the portion of I-270 between Frederick and Shady Grove, which the state is preparing to analyze in a separate NEPA document. Phase 1 of the toll lane procurement, which has been under way since last February, combines this road segment with portions of the DEIS build alternative in a single contract.

Widening the southern portion of I-270, now six lanes wide, without widening the northern portion would exacerbate congestion at the northbound merge points where the road would narrow from eight to two lanes. The DEIS admits this, in a figure buried on page 150 of Appendix C, but glosses over it in its alternatives analysis. Moreover, the traffic analysis does not accurately measure the added congestion, and very likely greatly underestimates it. The computer model does not consider traffic backups south of the merge points, a phenomenon that every I-270 driver knows is the main source of congestion.[8]

---

[6] http://www.roads.maryland.gov/OC/Traffic-Relief-Plan-Press-Release.pdf;

[7] https://www.transitformaryland.org/

[8] Marshall, *op. cit.*

6

**Response to DEIS Comment #7**

Maryland's Traffic Relief Plan is statewide and includes I-95, I-695, I-495, I-270, MD 295, and the Smart Signals Program. Overall, this plan includes three elements: P3 Program, Baltimore Area Traffic Relief Plan, and Smart Traffic Signals. The Study focuses specifically on one element of that plan in one region of the state. The intent of the I-495 & I-270 P3 Program is to reduce congestion on I-495 and I-270 by seeking input from the private sector to design, build, finance, operate, and maintain improvements along the corridors. The plan is focused on transforming these overloaded interstates to allow people to reach their destinations faster and to remove overflow traffic from the local roads.

The geographic scope of the Study, while large, is distinctly defined. It includes 37 miles of I-495 and 11 miles of I-270. Consistent with CEQ NEPA regulations 40 CFR 1502.4(a) and 1508.25(a), as well as FHWA NEPA regulations at 23 CFR 771.111(f), MDOT SHA and FHWA have identified the Study as an independent action that may proceed regardless of whether other actions of the Traffic Relief Plan or P3 Program are implemented.

Furthermore, the identified scope of the Study has been sufficiently defined to be advanced with a project-level NEPA document. Consistent with FHWA regulations, other proposed actions, such as potential improvements to I-270 from I-370 to I-70, have been determined to possess independent utility from the Study (and other actions in the TRP and P3 Program) and thus will require separate project-level NEPA documents.

**#7 Cont**

Dividing this contract into two separate NEPA processes also adds to the heavy bias against rail transit. Trains on the MARC Brunswick Line primarily serve trips from north of Shady Grove to areas within or south of the study corridors, such as Silver Spring, the District of Columbia, or (via the Red Line) Bethesda. To increase capacity, track must be added both north and south of Shady Grove. Cutting off the analysis at Shady Grove makes it impossible to fairly evaluate this alternative.

Limiting the geographic scope of this DEIS clearly constitutes segmentation, an evasive action that has been ruled illegal by the courts because it violates the spirit and letter of NEPA.

**Procurement Method**

**#8**

In January 2020, the Maryland Board of Public Works made major revisions to the procurement process for the toll lanes, which this NEPA process has been rigged to justify. These revisions significantly alter the environmental impacts of the project. The DEIS mentions these changes on p. 2-47, but it analyzes the project only as it was conceived prior to these alterations.

The procurement is now a two-stage process in which MDOT first selects a "Phase Developer." An initial contract with the Phase Developer closes after the Record of Decision is issued. The Phase Developer then designs the toll lanes. After the project is designed, MDOT negotiates a build-finance-operate-maintain contract with the Phase Developer on a sole-source basis.

The BPW also altered the scope of the first phase of the project, which now runs from the American Legion Bridge to I-270 in Frederick. Out of Maryland's 42 miles of I-495, only the short segment from the Bridge to the I-270 west spur is included. This phasing makes it certain that toll lanes on the remainder of the Beltway will not be built until many years in the future, and there is a strong likelihood that they will never be built.

MDOT has not initiated procurement of the Phase Developer contract for the rest of the Beltway and does not plan to do so for many years. The limitations on use of park land under the Capper-Cramton Act, the high costs of utility relocation, and local government opposition create enormous financial and political obstacles to widening the Beltway east of I-270, especially given MDOT's assertions that it will rely on toll revenues to cover the entire project cost.

7

**Response to DEIS Comment #8**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.



#8
Cont

The most likely outcome of this NEPA process, if a build alternative is selected, is that only the first segment, running from the American Legion Bridge to the I-270 spur and up I-270 to Shady Grove, will ever be built. The toll lanes would then funnel four additonal lanes of traffic, two from the Bridge and two from I-270, into the merge near Wisconsin Avenue. That would exacerbate the already severe congestion at the merge point. Such an outcome would be the opposite of "traffic relief." It would reduce trip reliability and impede the movement of goods and services.

**Conclusion**

#9

The entire process leading to this DEIS is fatally flawed. It cannot be the basis for a Record of Decision.

MDOT and FHWA must restart the process with a new, unbiased Purpose and Need Statement. The study must address the entire region through which I-270 and I-495 run, from Frederick and the American Legion Bridge to the Woodrow Wilson Bridge. All-transit alternatives, such as MARC rail expansion, must be among the ARDS. Transit alternatives must be located where they will most productively improve transit service and not be constrained by the locations of highway infrastructure.

This is not the first NEPA study of toll lanes on the Beltway or I-270. A Beltway managed lane study was initiated in 1996. In response to scoping comments from the public and local government, a transit alternative of light rail from Bethesda to New Carrollton was added to the study. That alternative, the Purple Line, was found to outperform added highway capacity and is now under construction.

We believe an unslanted analysis of the so-called Traffic Relief Plan would reach a similar conclusion. Others may not share that belief; the only way to find out who is right is through a completely new study that rejects the biases and preconceived conclusions that pervade this DEIS. Only such a study can satisfy the requirements of NEPA.

Submitted by:

Maryland Transit Opportunities Coalition
8725 Warm Waves Way
Columbia, MD 21045

8

**Response to DEIS Comment #9**
The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarize the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail. This analysis directly contributed to MDOT SHA's evaluation of these alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided. Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

No comments on this page, therefore, no responses needed.

The following pages reflect the attachments included in the letter. There are no comments or responses provided on these pages; they are included for the record.

Action Committee for Transit
P.O. Box 7074
Silver Spring, MD 20907

Baltimore Transit Equity Coalition
P.O. Box 23141
Baltimore, MD 21203

Central Maryland Transportation Alliance
2 East Read Street
Baltimore, MD 21202

Citizens Against Beltway Expansion
219 Indian Spring Drive
Silver Spring, Maryland 20901

Coalition for Transit Alternatives to Mid-County Highway Extended
11425 Neelsville Church Road
Germantown, MD 20876

Don't Widen 270
P.O. Box 10461
Rockville, Maryland 20849

Maryland Rail Passengers Association
7 Renmark Court
Gaithersburg, MD 20878

Prince George's Advocates for Community-Based Transit
4704 Calvert Road, Apt 2
College Park, MD 20740

Trains Not Tolls
7005 Runny Court
Frederick, MD 21701

9

## Getting There: Access and the Future of the Twin Cities Region



### Measuring What Matters: Access to Destinations

Access to Destinations Study Research Summary No. 2

August 2010
CTS 10-11



CENTER FOR
TRANSPORTATION STUDIES
UNIVERSITY OF MINNESOTA

### PREFACE

The Access to Destinations Study is an interdisciplinary research and outreach effort coordinated by the University of Minnesota's Center for Transportation Studies, with support from sponsors including the Minnesota Department of Transportation, Hennepin County, the Metropolitan Council, and the McKnight Foundation. A full description of the study is available at www.cts.umn.edu/access-study/studyframework.

The research takes a new approach to understanding how people use the transportation system and how transportation and land use interact. Research activities were divided into three major research components:

**I. Understanding Travel Dimensions and Reliability**
This research focuses on improving our understanding of travel within urban transportation systems. Current travel measures are informative but are of limited use in helping us understand what is happening in specific locations and across a spectrum of different transportation modes.

**II. Measuring Accessibility**
This research uses detailed data on land use, travel behavior, and population demographics over the past

10 years, in combination with the research findings from Component I of the study, to develop methods for describing how our accessibility is changing.

**III. Exploring Implications of Alternative Transportation and Land-Use Systems**
The work undertaken in Components I and II will contribute to the development of an alternative approach to evaluating and planning our transportation system—one that takes into account all travel modes and land-use decisions.

**Acknowledgments**
This research summary incorporates findings from 11 research reports completed under the Access to Destinations study, available at www.cts.umn.edu/access-study/publications.

**Research Team**
Gary A. Davis, Professor, Department of Civil Engineering, University of Minnesota Twin Cities
Ahmed M. El-Geneidy, Assistant Professor, School of Urban Planning, McGill University
John Hourdos, Director, Minnesota Traffic Observatory, University of Minnesota Twin Cities
Michael Iacono, Research Fellow, Department of Civil Engineering, University of Minnesota Twin Cities
Robert Johns, Director, John A. Volpe National Transportation Systems Center (former director, Center for Transportation Studies, University of Minnesota)
Kevin Krizek, Associate Professor of Planning and Design, University of Colorado
Eil Kwon, Director, Northland Advanced Transportation Research Laboratories, University of Minnesota Duluth
Taek Kwon, Professor, Department of Electrical and Computer Engineering, University of Minnesota Duluth
David M. Levinson, Associate Professor, Department of Civil Engineering, University of Minnesota Twin Cities
Chen-Fu Liao, Educational Systems Manager, Minnesota Traffic Observatory, University of Minnesota Twin Cities
Panos Michalopoulos, Professor, Department of Civil Engineering, University of Minnesota Twin Cities
Ted Morris, Laboratory Manager, Minnesota Traffic Observatory, University of Minnesota Twin Cities

**McKnight Advisory Panel**
The McKnight Foundation has supported the outreach activities of the study and has provided oversight and guidance for the preparation of this document.
Ann Canby, President, Surface Transportation Policy Project
Caren Dewar, Executive Director, Urban Land Institute Minnesota
Jim Erkel, Attorney and Program Director, Minnesota Center for Environmental Advocacy
Brian Gage, Engineer Senior Administrative, Office of Capital Programs and Performance Measures, Minnesota Department of Transportation
Curtis Johnson, Principal, Citistates Group
Eric Muschler, Program Officer, McKnight Foundation
Mark B. Nelson, Director, Office of Statewide Multimodal Planning, Minnesota Department of Transportation
Lee Sheehy, Program Director, McKnight Foundation
Dave Van Hattum, Policy and Advocacy Program Manager, Transit for Livable Communities
Sam Zimbabwe, Technical Assistance Director, Reconnecting America

**Resource Staff**
Gina Baas, Assistant Director, Education and Outreach, Center for Transportation Studies, University of Minnesota
Stephanie Malinoff, Manager, Outreach Services and Events, Center for Transportation Studies, University of Minnesota

Published by the Center for Transportation Studies
University of Minnesota
August 2010

Writer: Curtis Johnson, Principal, Citistates Group
Editor: Pamela Snopl, Center for Transportation Studies
Graphic Designer: Cadie Wright Adhikary, Center for Transportation Studies
Photographers: Jonathan Chapman, Matt Miranda

Opinions expressed in this document do not represent official policy of the study's sponsors. Any factual errors are the sole responsibility of the Center for Transportation Studies.

Getting There: Access and the Future of the Twin Cities Region

# Measuring What Matters:
# Access to Destinations

### ACCESS TO DESTINATIONS STUDY RESEARCH SUMMARY NO. 2



## EXECUTIVE SUMMARY

In what is likely to be an enduring period of constrained public resources, lawmakers and government executives will seek the best information possible for making policy choices and deciding where to make public investments. In a landmark series of studies known as *Access to Destinations*, the Center for Transportation Studies (CTS) at the University of Minnesota has opened up new frontiers of information for better policy and investment decisions.

> *The actual ease of reaching destinations has been getting better all over the region, especially by auto—and land-use changes and increased development densities explain most of the improvement.*

In this series CTS researchers analyzed, described, mapped, and charted how "accessibility" has changed over recent decades in the Minneapolis-St. Paul metropolitan region. They began by changing the question—from *how fast is traffic moving (mobility)* to *how easily are people reaching places they need or want to go (accessibility)*. Asking the *accessibility* question stands in stark contrast to news accounts about traffic and the way most people talk about transportation. Every year the Texas Transportation Institute (TTI), working on the "mobility" question, publishes its ranking of which metro areas have the worst congestion, and which ones are getting worse faster.

The TTI report gets wide coverage, understandably so, because congestion can damage a schedule (making anyone's day less efficient), worsen air quality, and certainly be irritating. Congestion also has a "good side"— it signifies a successful region, with a growing number of people going places.

But in this research series, scholars were asking a different question, and they found a different answer: while until this last decade congestion had been steadily worsening, the actual ease of reaching destinations has been getting better—all over the region. And especially

by automobile. Accessibility has improved also via walking, biking, and public transit, but the striking findings are the improving access by automobile— *and discovering that land-use changes and increased development densities explain most of the improvement.*

Getting to useful answers to this new question required sorting through every available means of measuring ease of access. Researchers mapped modes of travel (auto, transit, walking, biking) in relation to the dominant destinations most people have. They analyzed the attributes of destinations that would affect which mode of travel people would ordinarily choose. They measured travel times by each mode to regular destinations with and without using a motorized vehicle. They probed more deeply into the interactions between changes in land use and the mode people chose for access to their destinations.

They also produced a new Web-based tool that

## KEY FINDINGS



In this study, the research team developed a new way to understand and analyze the relationship between transportation and land use. Among the notable findings:

- While congestion has been worsening, the ease of reaching destinations has been getting better almost everywhere in the region—especially by automobile. Accessibility has improved also via walking, biking, and public transit. The greatest increases in access occurred in the developing edges of the region.
- Although some new roads were added and others were improved, land-use changes and increased development densities explain most of the accessibility improvement.
- In 1995 only one traffic analysis zone (near the center of the metro region) could reach more than one million jobs within 20 minutes. By 2005, there were 20 zones with that claim. Well over half the population of the region can reach more than one million jobs within 30 minutes. And if 45 minutes is the standard, almost

everyone can reach a million jobs.
- These accessibility increases occurred while the center of gravity for employment was shifting—slightly—toward the south and west of the region. Accessibility got better despite the absence of a matching shift on the part of workers. The labor force tended to shift more toward zones north and south of Minneapolis. Still, the researchers found the overall ratio of jobs to workers was improving (getting closer to 1:1) in most areas of the region.
- High accessibility to jobs has a positive effect on home values. High accessibility to workers has the opposite effect—indicating homebuyers will pay a premium to live near jobs and away from competing workers.
- The area has seen small but measurable decreases in walking travel time. Making it easier and safer to walk (e.g., expanded facilities/network such as the Midtown Greenway in Minneapolis) raises walking's desirability and lowers the time involved in a trip.

policymakers and transportation managers can use to analyze the likely effects of new transportation investments on accessibility.

Given how little interaction there's been historically between the transportation and land-use planning sectors, this series forms a new foundation for what should be an extensive period of further investigation of how to improve access with public policy tools. It also marks the development of a new performance-measurement tool, in a time when performance management is of growing focus in transportation circles and is expected to be a key element of the next federal surface transportation bill.

Getting There: *Access and the Future of the Twin Cities Region*

- A third of walking trips exceeded a mile, questioning the long-standing belief that a quarter of a mile was the limit of willingness to walk on a regular basis to any destination.
- New bike networks and facilities (such as the off-street trail along Hiawatha Avenue) also had a measurable effect.
- Multiple measures showed the impact of adding the region's first light-rail line. Overall, the region's accessibility is increasing, and proportionately more along the Hiawatha corridor and bus lines with high-frequency service.

> *Well over half the population of the region can reach more than one million jobs within 30 minutes.*

 ## LOOKING BACK ON REGIONAL DEVELOPMENT

Over the past two decades, the policy ground shifted for both transportation and land planning groups. Conference agendas began to feature workshops on "context sensitive" street design and strategies for mixed-use zoning. Planners were relearning how to allow multiple types of destinations to be closer together. Engineers were shifting to recognize opportunities for getting to these destinations without driving. Legislatures at all levels heard heightened pleas for investments in more transit, broad sidewalks, dedicated bicycling lanes. In the Minneapolis–St. Paul region, the Metropolitan Council, whose current members reflect a conservative political philosophy, notably produced a *Guide for Transit-Oriented Development* in 2006. During this period, town centers began to spring up in suburbs, many of which had long been a seamless series of subdivisions interspersed by retail and commercial services.

As described in a 2001 report, *Market Choices and Fair Prices* (CTS 03-02), regions such as Minneapolis–St. Paul, unconstrained by mountains

or oceans as natural boundaries, saw a constantly developing edge, energized both by population growth and people moving farther out in search of what they believed to be housing and property "value." The transportation system, though not always promptly, cooperated with new or upgraded roads. And of course, if a new road opened new territory, the whole corridor started filling up, along with the need for all the infrastructure of schools and shops and clinics—all the necessities that form the orbit around residential zones. As employers followed the path people made, employment became less centralized, moving to new areas even more rapidly than the labor force. Despite the best service that a good bus system could deploy, the region became utterly dependent on automobiles to get to most places. And though a rail and bus rapid transit system is on the drawing boards, with two rail lines and several BRTs already in service, the region's movement of people and goods continues to be mostly in private vehicles over roads.

   

## MAPPING VARIATIONS BY MODE: THE MATRIX

The ultimate goal CTS researchers had is a matrix that both describes and potentially predicts how people access destinations by different modes (see below). The matrix itself is simple to use: Array in columns the most common destination people have—employment, shopping, schools, parks. Then in the rows list the available modes of travel—auto, transit, bicycling, and walking. Using travel time as a filter, the matrix paints a more coherent picture of the capacity of different modes to facilitate the choices people make to get to their destinations.

As a starting point, this research series focused on employment as the destination and the automobile as the mode. Researchers then had to test the usefulness of competing ways to measure access. Without getting into technical details, let's just say there are three choices: Cumulative Opportunity, Gravity, and Place Rank. None is perfect. All have to be applied by mode (i.e., driving, transit, walking,

biking) and point in time (e.g., the morning peak period, the afternoon peak, off-peak) for a particular type of opportunity (e.g., jobs, resident workers, shops, etc.).

*Cumulative Opportunity* calculates the number of opportunities that can be reached in a specific period of travel time (such as 30 minutes).

*Gravity* measures access in terms of the "cost" of getting there (travel time), and like Newton's law of gravity, finds nearby things exert stronger attraction than those far away.

Theoretically, *Place Rank* appears to be the most robust metric, despite its complexity; Place Rank basically accounts for the number of opportunities that an individual foregoes in a zone to reach an opportunity in another zone. For example, a high ranking would be awarded to a destination that attracts more workers from zones that have high numbers of jobs.

### A Matrix of Metro Accessibility

People who make transportation and land-use decisions in the Minneapolis–St. Paul region have a new tool: an online "accessibility matrix" that captures variations in accessibility to different types of destinations for travelers who drive, bike, walk, or use transit.

For each origin area, a user can create a matrix with columns representing types of destinations and rows representing travel modes. Each cell tells how easy it is to reach the specified destination activity using a chosen mode. For example, a resident of Anoka could learn the accessibility of jobs in Eden Prairie by bus or by car.

The Web interface—at www.cts.umn .edu/access-study—has a number of predefined maps and also allows users to create their own maps at the census block level. Users can select up to three filters, including year, mode, purpose, and destination type (such as retail, food, or time of day).

"It's a way of showing thousands of data points in a simple way," says David Levinson, one of the researchers.



*The accessibility matrix is available on the study's Web site.*

As of the publication of this report, MnDOT had approved funding for Phase 4 of the Access to Destinations Study. Plans are to enhance the tool so that users can do scenario planning—estimating the impact on accessibility, for example, of a new lane, bus route, or private development—and make more-informed policy and investment choices.

Among the most interesting findings: a high accessibility ranking to jobs has a positive effect on home sales (in other words, a premium in the market for the ease of getting to work). But, just as important for planning, accessibility to workers has the opposite effect on real estate values, leading to the double-sided conclusion that homebuyers will pay a premium to live near jobs, *and* away from competing workers. The "competition" is both over jobs and over implied living space, not competing for space in close quarters.

Place Rank is not a perfect tool; the complexity of calculations requires a great deal of computational capacity and data on place-to-place flows. But it is also exceptional in that it can be put in play without depending on travel time data and, drawing on U.S. Census Bureau data and origin and destination data from regional sources, it can be comparably deployed in any region. In some of the studies, where each metric tracked a similar pattern, Cumulative Opportunity, with its more straightforward explanations, proved the most useful approach.

 ## ARRIVING WITHOUT DRIVING

Even though the overwhelming majority of all long trips are still made using automobiles, this look ahead adopted by researchers supports getting good measures of changing accessibility to destinations by walking, bicycling, and transit. The objective was to assess how changes to the networks (the underlying infrastructure facilitating these modes) changed travel times, comparing 1995, 2000, and 2005.

Measures here necessarily rely on data about travel times, and those cannot be assessed without knowledge about the networks that support each mode. How fast do people typically walk, adjusted for the conditions under which they can walk? Dedicated bike lanes produce different average travel times than trips where bicyclists are competing with auto traffic for space. Getting to precise measures is complicated by incomplete historical mapping of infrastructure, such as when sidewalks were added, or when more extensive bike trails and dedicated lanes were built. And of course any assessment of travel times by transit is immensely complicated—by trips involving transfer, by the time required to get to a transit connection, and by the time to walk from the transit ride to the final destination.

*The research shows small though measurable decreases in travel time for walking, owing to improved or expanded facilities. New bike networks and facilities also had a measurable effect.*

decreases in travel time, owing logically to improved or expanded facilities or what researchers called the "network." Researchers cited two Twin Cities zones that serve to illustrate the point by their improved travel times: the area just north of the Midtown Greenway in Minneapolis, and the area immediately southwest of downtown St. Paul. The study confirms something already intuitive: making it easier and safer to walk raises the desirability of walking and lowers the time involved in a trip, thus increasing the likelihood of walking as a selected mode of travel. What is not intuitive is the magnitude of these changes, which researchers can now measure.

### Walking
Given a broad consensus about speed—people seem to walk at an average of 3.4 miles per hour—the research shows over time small though measurable

### Bicycling
Traveling on a bike is by its nature subject to a wide variety of conditions that affect average travel times.

---

So researchers took an empirical sampling approach. They used a sample of actual bicyclists outfitted with GPS devices on their helmets. Since it was only a sample and subjects could have been influenced by being part of a study, researchers exercise caution in drawing conclusions. The research was also limited by the incomplete historical mapping of bicycling trails and lane networks. Still it was possible to see how the differences in facilities created

*Multiple measures showed the impact of adding the region's first light-rail line.*

"impedances," or slow-downs, and affected the range of destinations that could be considered accessible by bicycle. What was encouraging was the confirmation that adding new networks has a measurable effect, citing the off-street trail along Hiawatha Avenue as a prime exhibit.

### Transit
Travel times on transit are considerably more complex to measure. Researchers experimented with ways to mitigate the likely error in measurement. But what still came through clearly was the expected impact of adding new capacity. Multiple measures showed the effects of adding the region's first light-rail line, along the Hiawatha Corridor. For example, travel times to and from the MSP airport showed decreases attributable to the introduction of this new capacity.

## DRIVING—GETTING MORE PRECISE ON TRAVEL TIMES

Automobile travel times have primarily focused on freeways. And even there, the measurement system is only slowly maturing. The Minnesota Department of Transportation has been measuring travel time data on freeways since the mid-1990s, when loop detectors began to be installed in the freeway system. By 2009 there were 4,500 loop detectors. While this now yields more data, comparative measurements over time are constrained by the missing data from the years of less-intensive measurement. Researchers used here what they called "multiple spatial and temporal imputation," a system of estimating error that succeeded in driving down the data deficit factor to less than 2 percent, resulting in significant improvements in the reliability of estimations.

But interest in travel times, in addition to probing nonmotorized modes, also deliberately went beyond the conventional focus on freeways. This turns out to be very difficult, which partially explains why the professional literature is so spare on this subject.

Arterials pose the biggest challenge. Speeds vary and are complicated by signals at intersections. In a corridor without red and green lights, researchers could easily produce a calculus of free-flow speeds,

capacity of the road, and volume of traffic. But signalization alters the network travel time. After sorting through the available metrics (and also bowing to the fiscal constraints of the research itself), researchers chose the "matching license plate" method, which, like it sounds, tracks the movement of specific cars. It requires only two people in the field to monitor movement. Even with this method, researchers found an underestimation of the actual travel time on signalized roads using conventional models. Using a model named for the researchers who estimated it (Skabardonis and Dowling), the Access to Destinations researchers were able to mitigate the bias and get state-of-the-art estimates of travel times on the signalized arterial network.



00022423



## MEASURING BY MODE AND PURPOSE

Here again the study series found research territory with few previous footprints. In most planning analyses, trip purposes are represented only in highly aggregated terms. Very little has been known about how far people will actually travel to reach a variety of destinations and what differences there may be among those types of destinations. Getting these answers required plumbing new sources of data, such as parcel-level information for the seven-country metro region, and GIS datasets covering the 135,928 known business locations in the region. And deploying an unusually disaggregated "zonal" structure that stems from U.S. Census data, producing measures for nonmotorized travel that are remarkably aligned with actual bicycle and pedestrian travel behavior. Researchers concede that sample sizes are smaller but the data appear as scalable as computing power will permit.

How far people will walk is, in research terms, characterized in the negative: that is, by a "distance decay" model. This metric tracks the limits of willingness to travel certain distances. The analysis relies on a combination of data: the 2000 (every 10-year) Travel Behavior Inventory sponsored by the Metropolitan Council; the Council's origin-and-destination data; 3,000 on-board transit surveys; and field surveys of multi-use trail users.

### Walking

Most walking trips involved distances of 1.86 miles or less. But up to a third of trips exceeded a mile, a finding with potentially breakthrough implications

> Up to a third of walking trips exceeded a mile, a finding with potentially breakthrough implications for assumptions about people's willingness to walk on a regular basis to any destination.

for the long-standing belief that a quarter of a mile was the limit of willingness to walk on a regular basis to any destination. If these are the new tolerances for walking distances, the implications for scaling activity-dense zones could be quite significant.

### Bicycling

Here the longest trips bicyclists were willing to make were for recreation, personal entertainment, or fitness. But next longest were work trips. More than any other mode, the trip length tolerance varies significantly by trip purpose. Clearly, motivation to use a bicycle seems to be at its highest when the purpose of the trip is not an obligatory journey, but something for personal enrichment.

### Transit

Here again the complications caused by time involved in getting to transit connections via car or walking or biking, and then the distortion of data generated by the pattern of transfers involved in arriving at intended destinations—all compound to limit conclusions from data. But, still, it is all about speed. Transit users seem to have a time budget. If it takes more time to get to a transit connection (or from it to a destination), the tendency is to use transit for shorter-haul trips. These thresholds, as expected, change when the form of service is express bus or rail.

### Auto

No surprise to anyone—people's choice of the auto mode is limited primarily by their estimates of traffic delay. In the largest study of the series, researchers concentrated on the number of opportunities accessible by automobile from points of reference all over the region. Rather than rely only on the modeled travel times used by other studies, this effort took actual traffic data from both freeways and arterial roads, with travel times incorporating calculations of the delay caused by ramp metering. The land-use data for points of reference came from a combination of Metropolitan Council estimates of number of jobs, persons, and households, backed up by Census data.

The single most striking finding: accessibility

Getting There: Access and the Future of the Twin Cities Region

by automobile, from 1995–2005, increased almost everywhere in the region. The greatest increases in access occurred in the developing edges of the region, in part because there was little real growth at or near the center where access was already high. And while some new roads were built in this period and others were improved, nothing explains these gains except changes in land use and increased densification in multiple zones of the region.

In 1995 only one traffic analysis zone (near the center) in the entire region could reach more than one million jobs within 20 minutes. By 2005 there were 20 zones with that claim. Well over half the population of the region can reach over one million jobs within 30 minutes. And if 45 minutes is the

standard, almost everyone can reach a million jobs. And these accessibility increases occurred while the center of gravity for employment was shifting—though slightly—toward the south and west of the region. It increased despite the absence of a matching shift on the part of workers. The labor force tended to shift more toward zones north and south of Minneapolis.

Research found the overall ratio of jobs to workers was improving (getting closer to 1:1) in most areas of the region. As one of the researchers, David Levinson, puts it, "Think of the region as a plate. It's a substantial plate overall, but the edges have become thicker and the southwestern arc of the plate the thickest."

## ASSESSING THE ROLE OF LAND USE

These studies break new ground in relating how transportation behavior relates to changes in land use.

The access by automobile portion of the study, in addition to its access metrics, shows how cities (or entire metro areas) display the drive for efficiency of location. Firms seek productivity potential in locating near some combination of customers, suppliers, workers—even competitors. These tendencies are a kind of centripetal force, drawing activities in, together. But an equally powerful tendency pushes things outward—centrifugally. Firms and households both seek cheaper land and operating costs. While workers prefer proximity to work, they often also highly value a larger but affordable home with more land. As these forces compete, regions elude both maximum-possible as well as minimal densities—producing a largely market-driven scattering of destinations.

Since public policy influences market behavior in land uses, it becomes important to understand the dynamics of land-use decisions. This series also focused on "transitions" in the way land is used in the region. Easily recognized is vacant land becoming developed for some purpose. More complicated dynamics unfold when already developed land gets retooled for a new purpose or land gets cleared and

reused in some different way. When transportation corridors are developed or significantly upgraded, this induces new clusters of land-use activity. But while these changes are observable enough, behind the curtain some mystery persists as to why land use in urban areas "organizes" the way it does. Researchers in this series made serious efforts to demystify this phenomenon, to model the complexity, to understand, explain, even forecast the changes.

The models used treat land-use outcomes as a function of the interaction between transportation networks and urban land markets. When decisions get made about the location and intensity of new uses of urban land, some (even rough) measure of accessibility seems to be the thread that ties together the decision dynamics. Probing this at very intense levels of detail is tempting, but is also fraught with complexity that is difficult to manage in a research setting. So, the researchers in this study series actually sought to recast the process of modeling and forecasting land-use change in deliberately simpler terms. In fact, they pushed to compress the process into a few basic principles, after which they tested the data available from 1958 to 2005.

Again, there are competing models. One is the Markov Chain approach, which fundamentally



Getting There: *Access and the Future of the Twin Cities Region*

forecasts future land use as a function of current land use—rather like how weather forecasters work, proceeding on the principle that the change from today to tomorrow will be much like the change from yesterday to today.

An alternative approach builds on the Markov Chain by feeding in empirical determinants such as neighboring land uses, proximity to highways, and measures of regional accessibility, subjecting the mix to a regression model of analysis. Still another directly extends the Markov Chain regime to neighboring land uses.

All approaches relied on the parcel-level datasets now available from the Metropolitan Council. Researchers took these data and created new "cell-level" data that divides parcels into 75-meter-squared cells that are classified by the predominant land-use type in the cell, drawing from a taxonomy of 10 types. Researchers then used what is known as "backcasting" to base forecasts on historical land-use data. Two study areas were selected: the whole metro region as it stood in 1958 and also a small sample drawn from the corridor of a two-mile perimeter around the newly developed SH 610 freeway in the northwestern part of the region.

Despite pioneering research, getting to precise forecasting and effects of land-use changes remains elusive. No known models can yet fully reproduce patterns of land-use change over time. The simplest Markov Chain model tended to produce more dispersed and mixed patterns than actually occurred. The modified Markov Chain model reduced some error but still fell short of reliable predictive power. The regression model scored best, particularly in predicting commercial and industrial uses and spatial clustering, but also consistently overpredicted some



land uses, chiefly residential.

So, in sum, no known measure of gauging land-use change is good enough yet for prime time. Predicting the exact location of future development is hard, probably harder than predicting future traffic. But this research makes real gains in mashing up complex data with simple, transparent models on which future analyses may be built.

 **POLICY IMPLICATIONS**

The Access to Destinations research has shown the power of asking a more relevant question. It has demonstrated that changes in individual and firm market choices, combined with land-use and transportation policies, enable people to reach more destinations in less time, even under conditions of worsening congestion. That is a headline for policymakers anywhere.

*Questions*
- Might the State of Minnesota forge a new framework through which transportation investments and changes are considered jointly with land-use planning?
- Should the Metropolitan Council petition the state to make all transportation investments subject to a new standard—one centered on whether and how much any new infrastructure or service might raise access to destinations?
- As a hedge against major energy, fiscal, and climate crises, should the state consider a strategy of investment in a more robust network of nonmotorized travel infrastructure—backed up by solid research about modes that maximize more access to destinations?
- How might government at all levels reset the incentives to improve "access?" Public policy and investments clearly drive the market for housing and provide capacity to transport

people and goods. When roads, water, and sewer capacity are extended, development, often at low densities, follows. Investments that encourage non-auto modes and more intense use of land have the same potential for shaping the interaction of land use and travel behavior.

- Should public officials in charge of the transportation system incorporate access into their criteria for operational policies? For example, are residents who choose to live in cities penalized by ramp meters in favor of residents who choose to drive long distances to work and other destinations—an issue certainly ripe for debate? And should not all modes of transportation—from roads to every known type of transit—be subject to rigorous analysis of capacity to increase access to destinations?
- Does this initial series on "access" suggest that the State of Minnesota should build on this body of research and invest in further study, in part to establish the state as a leader in this field and, even more important, to leverage limited transportation dollars toward the greatest dividends? It seems clear that being closer to destinations increases system efficiency, decreases environmental impacts, and raises the quality of life experience for residents.


**CENTER FOR TRANSPORTATION STUDIES**
**UNIVERSITY OF MINNESOTA**
*www.cts.umn.edu*

The University of Minnesota is committed to the policy that all persons shall have equal access to its programs, facilities, and employment without regard to race, color, creed, religion, national origin, sex, age, marital status, disability, public assistance status, veteran status, or sexual orientation.
♻ Printed on recycled paper with 30 percent postconsumer waste.



**For Immediate Release:** November 12, 2019
**Contacts:** Office of the Governor: Alena Yarmosky, Alena.Yarmosky@governor.virginia.gov | Office of the Governor: Angela Berard, angela.berard@maryland.gov

# Governor Northam, Governor Hogan Announce Historic 'Capital Beltway Accord' to Rebuild American Legion Bridge, Connect Interstate Highway System

### Partnership will deliver infrastructure and congestion relief, expand bicycle and pedestrian access

**WASHINGTON, DC**—Governor Ralph Northam (D-VA) and Governor Larry Hogan (R-MD) today announced a bi-state, bipartisan accord to create a new, unified Capital Beltway, replace the aging American Legion Bridge and relieve congestion at one of the country's worst traffic chokepoints. The two governors made the announcement at the annual Capital Region Transportation Forum in Washington, DC.

"A new bridge means commuters will get to work and back home faster," **said Governor Northam.** "Our teams have identified a way to fix one of the worst traffic hot spots in the country. This demonstrates what can get done when leaders come together to find shared solutions to tough regional problems. This is about helping people see their families more, grow their businesses, and further unlock the region's vast economic potential."

"The 'Capital Beltway Accord' is a once-in-a-generation achievement for the capital region," **said Governor Hogan.** "A bipartisan, commonsense, interstate agreement such as this has eluded elected leaders throughout the region for many decades. Together with our partners in Virginia, we are building a foundation for even greater economic growth, greater

opportunity for our citizens, and advancing real, lasting, transformative improvements for the entire Washington metropolitan region."

The project complements ongoing plans by both governors in their jurisdictions—advancing a region-wide vision for a seamless network of reliable travel options around the Capital Beltway, and along Interstates 270 and 95, 395, and 66.

The project is expected to cut commuting time in half for many travelers, reduce congestion in the regular lanes by 25 percent, provide 40 percent more lane capacity over the old bridge, and include bicycle and pedestrian paths across the Potomac River.

The American Legion Bridge has been operating beyond its capacity for nearly four decades. Daily traffic has grown 390 percent since the bridge opened in 1962, with 235,000 vehicles using it daily. More than 40 percent of the region's population travels this segment of the Capital Beltway, and the region expects to grow by another 1.2 million people by 2040. Both governors have made it a top priority to identify a long-term, seamless solution for the Capital Beltway.

The project will replace the existing lanes in each direction across the Potomac River and add two new Express Lanes in each direction for approximately three miles between the George Washington Memorial Parkway in Virginia to the vicinity of River Road in Maryland. New bicycle and pedestrian access will connect trails on both sides of the Potomac River. The project is being designed predominantly within the footprint of the existing bridge and right-of-way to minimize impact to travelers, the environment, and surrounding communities. No homes or businesses are expected to require relocation.

"This is once-in-a-generation project that will improve accessibility throughout the region," **said Virginia Secretary of Transportation Shannon Valentine.** "This is a milestone in regional cooperation. We in Virginia look forward to working hand-in-hand with Maryland to deliver this transformative transportation solution."

Virginia announced plans earlier this year to leverage its existing public-private partnership with Transurban, the operator of the 495 Express Lanes, to extend the lanes approximately two miles north toward the American Legion Bridge and add new connections at the Dulles Toll Road and the George Washington Memorial Parkway. Construction on what is known as "Project Next" could begin as early as 2021.

Maryland's Board of Public Works has approved advancing a bold and innovative Traffic Relief Plan that includes improvements to I-270 and I-495. It is the largest public-private partnership of its kind in the world.

"Our transportation network cannot function without fixing the American Legion Bridge, I-495 and I-270," **said Maryland Secretary of Transportation Pete Rahn.** "Without these improvements, our horrendous congestion will only get worse. I commend Governors Hogan and Northam for reaching this historic agreement that will have lasting benefits for our region for decades to come."

Virginia Governor Ralph Northam - November          https://www.governor.virginia.gov/newsroom/all-releases/2019/novembe...

The new American Legion Bridge will be delivered in coordination with these other projects and will leverage private capital through public-private partnerships to reduce the need for public funding and shift key traffic and construction risks to the private sector.

The states have agreed to a bi-state funding plan to accelerate the delivery of these critical improvements, including all of the infrastructure needed for connections between George Washington Parkway and MD-190/River Road.

Maryland will cover 79 percent of the General Purpose Lanes on the new American Legion Bridge, 50 percent of the Express Lanes on the new American Legion Bridge, and 100 percent of the southbound Express Lanes and General Purpose Lanes from MD-190/River Road to the George Washington Parkway.

Virginia will cover 21 percent of the General Purpose Lanes on the new American Legion Bridge, 50 percent of the Express Lanes on the new American Legion Bridge, and 100 percent of the northbound Express Lanes and General Purpose Lanes from the George Washington Parkway to MD-190/River Road.

# # #





3 of 3                                                                11/7/2020, 10:09 AM





### 495 EXPRESS LANES NORTHERN EXTENSION—
# Critical connections

The 495 Northern Extension project will extend the 495 Express Lanes 3.2km towards the Maryland border and is expected to save motorists up to 25 minutes during peak traffic times.

The project will also return local streets to local communities by reducing cut-through traffic that now plagues residential neighbourhoods along the Capital Beltway. The project sets the stage for the future extension of the Express Lanes north across the American Legion Bridge into Maryland.

During FY20 we commenced the process to select a design and build subcontractor for the project. The Request for Qualifications process concluded in April 2020. Transurban remains committed to working with the Commonwealth of Virginia and advancing the project.

The project is anticipated to open to traffic 2024/2025.

**Project features**

- Expands the existing Express Lanes by 3.2km and improves connections at the Dulles Toll Road and George Washington Memorial Parkway

- Estimated 7,000 jobs generated from economic impact of project

- US$800 million economic boost projected

**FY20 milestones**

- Procurement process commenced for a design and build subcontractor

EXPRESSLANES.COM/NEXT-PROCUREMENT

### CAPITAL BELTWAY ACCORD—

Transurban, in partnership with the Maryland and Virginia Governments, is progressing a project to extend the 495 Express Lanes in Virginia by approximately 4.2kms north across the Potomac River and into Maryland (see page 45).

The project involves upgrading four general-purpose lanes in both directions and replacing and upgrading the aging American Legion Bridge to add two Express Lanes, alleviating a major pinch point on the Capital Beltway and one of the worst bottlenecks in the Greater Washington Region. Transurban will work to deliver Virginia's project components as part of this historic bi-state effort.

### Projects set industry-best standards for sustainability

All of our Australian projects are designed to achieve a rating of "Excellent" or above under criteria set by the Infrastructure Sustainability Council of Australia (ISCA)—a comprehensive system for evaluating sustainability across the planning, design, construction and operational phases of infrastructure projects. Our contractors must achieve that same rating for project construction. To achieve the ratings, we set targets and monitor performance across project management, procurement, environmental impact, community wellbeing, stakeholder engagement, and innovation.

ISCA ratings for our projects:

- "Leading" As Built rating—New M4 tunnels and Logan Enhancement Project (the first ever Leading rating for a road project in Queensland)

- "Leading" Design rating—NorthConnex and M8 tunnels

In North America, our project procurement process requires contractors to achieve a rating using the Envision infrastructure sustainability rating system. We are currently working to achieve an Envision Silver rating for the design and construction of the Fredericksburg Extension project.



Australian Prime Minister Scott Morrison and New Premier Gladys Berejiklian outside the NorthConnex tunnel—where construction activities had been completed

# Partnering to progress government transport agendas

In FY20, we delivered two major projects for our government partners in Australia and another in Virginia, US and in July 2020 opened the second stage of Sydney's WestConnex project, the M8.

We are set to open the NorthConnex project, a critical missing link in the Sydney orbital network. In the coming months and are progressing another five projects to benefit two growing cities and regions (see pages 22–27).

In November 2019, we also announced that we would join the Virginian government in a Public Private Partnership (PPP) with the Maryland government to replace the ageing American Legion Bridge, which is one of the worst bottlenecks on the Capital Beltway in the Greater Washington area and one of the most congested highway corridors in the US.

Known as the Capital Beltway Accord, the partnership is one of the first bi-state, bipartisan PPPs in the US and sets a precedent for states under different party leadership to work together to advance solutions to regional issues. By utilising private capital, both states will be able to fast-track a critical infrastructure project.

The project will widen the 10-lane bridge and extend our 495 Express Lanes across the Potomac River into Maryland. Daily traffic has increased 350% since the bridge was built in 1962 and the region

is expected to grow by another 1.2 million by 2040. More than 40% of the region's 6.6 million population travels this section of the Capital Beltway.

Under the agreement, each state will have a private partner to fund rebuilding of a portion of the bridge. Transurban will fund Virginia's portion. Maryland's partner is expected to be announced in 2021 as part of the Maryland Express Lanes Project. The Maryland Department of Transportation is running a multi-step competitive selection process for a developer to enter a PPP to deliver the first phase of the project, estimated to cost US$9-4 billion. The phased and collaborative approach to development of the Express Lanes is attractive to Transurban, and we are a bidder for this project.

### Contributing to transport policy

As a leading transport and infrastructure provider we believe it is important to contribute to policy development and thought leadership activities in the sector.

During the year, we contributed to a number of government inquiries in Australia into road safety to share our expertise in operating roads that have been evaluated as being up to 66% safer than like roads.

We highlighted measures that have proven effective in reducing road trauma and improving driver behaviour including average-speed cameras, mobile phone detection cameras, improved vehicle safety and government infrastructure funding and approval tied to the design and construction of safe roads.

We also shared findings from some of our activities including dynamic speed management trials and work zone safety initiatives including remotely controlled traffic cones.

### Sharing learnings

During the year we hosted delegations from North America to discuss transportation challenges and priorities for our countries.

Transurban sponsored the 2020 Australia Canada Economic Leadership Forum, which is the premier leadership dialogue between the two countries and coordinated locally by the Business Council of Australia. In Sydney, we also hosted a delegation of public and private infrastructure leaders through the National Governors Association (NGA), a bipartisan American public policy organisation. Led by Maryland Governor Larry Hogan, the NGA's 2019–2020 focus is infrastructure and the visit gave us the opportunity to showcase our major projects, and highlight to governors across the US the innovative ways Australia has harnessed the private sector to help deliver new and improved infrastructure.



I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

# As Hogan's Highway-Widening Plan Changes, $9 Billion Price Tag Does Not – Maryland Matters

*Bruce DePuyt*



Traffic on the American Legion Bridge connecting Maryland and Virginia. Photo by Chip Somodevilla/Getty Images

When Gov. Lawrence J. Hogan Jr. (R) unveiled his plan to widen three interstate highways in September 2017, he and then-Transportation Secretary Pete K. Rahn boasted that it would be the largest public-private partnership in North America.

The surprise project would be "absolutely transformative" for traffic-weary commuters and would cost $9 billion to $11 billion, he said.

At the time, Hogan's vision was to add four "Express Toll Lanes" — two in each direction — to portions of Interstate 270, the Capital Beltway (I-495) and the federally-owned Baltimore-Washington Parkway (MD 295).

The first in-person public hearing on a key planning document for the highway plan, the Draft Environmental Impact Statement (DEIS), will be held on Tuesday in

Largo. It's the fourth of six public comment sessions (the first three were virtual) that the State Highway Administration and the Federal Highway Administration have scheduled.

Hogan's project has undergone significant changes in the nearly three years since he and Rahn announced it:

- The widening of a large portion of the Beltway in Montgomery County, from the I-270 spur east to the Prince George's County line, has been relegated to what SHA euphemistically refers to as the second phase of Phase 1.

- The widening of the Beltway from the Prince George's-Montgomery border south to MD 5 has been put off into the indefinite future.

- The widening of I-270 north of I-370 has been deferred.

- Hogan and his Virginia counterpart, Gov. Ralph S. Northam (D) announced, with great fanfare, the signing of the Capital Beltway Accord — an agreement to contract with a group of for-profit firms to rebuild and widen the American Legion Bridge, a notorious choke-point for commuters in the Washington, D.C., suburbs.

- WSSC Water (the bicounty utility formerly known as the Washington Suburban Sanitary Commission) announced that the cost of moving large pipes that run along the Beltway would run between $1 billion and $2 billion.

- From all outward appearances, the Baltimore-Washington Parkway has quietly slipped out of the plan. Although a Maryland Department of Transportation spokeswoman, Erin Henson, insisted last week that the governor's proposal is "still pending with ongoing discussions," there is no indication that the U.S. Department of Interior wants to part with the road. The DEIS makes little mention of it.

Despite all the changes to the project over the 35 months that have elapsed since Hogan's announcement, one thing has remained remarkably constant: the price.

The draft EIS, a massive 18,000-page document that itself has been the subject of controversy, includes just half a page on what the addition of Express Toll Lanes to portions of I-495 and I-270 will cost.

Of the six design alternatives under active consideration, two are said to be the most popular within MDOT — those known as Alternative 9 and Alternative 10.

Alt. 9 would cost $8.7 billion to $9.6 billion, according to the DEIS. Alt. 10 would cost $9 billion to $10 billion.

Critics of the highway-widening plan find the remarkable consistency in price difficult to swallow.

Montgomery County Council Vice President Tom Hucker (D) said "it's not possible" that a project could undergo so many changes but retain its Day 1 pricing.

"I don't know serious people that have any confidence in MDOT's cost estimates," he said in an interview. "You simply can't add a bridge and utility relocation costs,

00022429

subtract Maryland 295, and say 'oh, it all costs the same as we thought in the first place.' Nothing works that way."

Del. Marc Korman (D-Montgomery) said the never-changing price undermines the credibility of the process.

"You could just do back-of-the-envelope math to compare the 70 miles of I-495 and I-270 to Virginia, and you would have seen that that should have cost around $15.5 billion," he said. The $9 billion to $11 billion initial cost "was always sort of an arbitrary figure from Secretary Rahn."

Montgomery County Planning Board Chairman Casey Anderson said "the range of possibilities" in the environmental report "highlight just how uncertain this kind of prediction can be."

"To be charitable, forecasting the cost of a project of this scope, which is breathtaking, is an extremely difficult exercise," he said. "And it's probably a good idea for both opponents of the project and supporters of the project to be careful about making definitive claims concerning future costs."

"Generally speaking, the numbers get worse, not better, over time," Anderson added. "But in any event, it's safe to say that the ability to predict with any kind of confidence… is just fraught with uncertainty — and people should not be taking any of that to the bank."

In a statement, MDOT spokesman Terry Owens said planning-stage cost estimates "are often very stable throughout and contain a fair number of contingencies built in for unknowns."

"As projects progress towards implementation, the design gets more detailed and cost estimates get refined," he added. "Most changes in estimates happen in the later stages of design closer to any implementation, when all of the detailed project factors are completely known."

Owens said the initial cost of the project included a replacement for the American Legion Bridge, which Hogan and Northam heralded as an historic breakthrough for Maryland and Virginia.

"The costs also include utility relocation costs," Owens said, although MDOT has consistently resisted saying whether underground infrastructure belonging to utilities other than WSSC Water will need to be relocated.

In the brief discussion of cost (Appendix B of the DEIS, Page 148) is language that opponents found difficult to decipher.

According to the document, construction cost estimates were "adjusted" to "reflect assumed efficiencies in costs for major items such as asphalt pavement and structural materials."

There is no further discussion of why — or by how much — costs were adjusted, or whether such adjustments are commonplace on large-scale projects.

"They made an estimate and it was too high, and they just arbitrarily changed it," charged Ben Ross, head of the Maryland Transit Opportunities Coalition, last

month. "They used their cost-estimating manual and then they changed the numbers."

Cynicism deepened after the discovery of the online transcript of a conversation that Transurban Group CEO Scott Charlton had with a moderator during a call with industry analysts.

Transurban has an extensive network of Express Toll Lanes in Northern Virginia and will build Virginia's half of the new American Legion Bridge, Northam announced last year.

The company is part of a consortium seeking the Maryland P3 contract — one of four recently deemed qualified to handle the project.

Asked how much capital the company would need for the first phase of the "Maryland Express Lanes," Charlton said, "it's too early to speculate."

"I think the government has talked about in the order of about USD [U.S. dollars] 4 billion for that first phase," he said. "That's just a high level, I think, public number."

*bruce@marylandmatters.org*

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-7    Filed 10/30/23    Page 55 of 69

FINAL ENVIRONMENTAL IMPACT STATEMENT



# LARRY HOGAN
## OFFICE OF THE GOVERNOR

For immediate release:
September 21, 2017
Contact:
Hannah Marr hannah.marr@maryland.gov
Shareese Churchill shareese.churchill@maryland.gov
410-974-2316

### Governor Hogan Announces Widening of I-270, Capital Beltway (I-495), and Baltimore-Washington Parkway (MD 295)
### $9 Billion Traffic Relief Plan, Largest Highway P3 in North America RFI Released Today

**ANNAPOLIS, MD** – Delivering on his commitment to provide innovative transportation solutions for Maryland, Governor Larry Hogan today announced the administration's plans to add four new lanes to I-270, the Capital Beltway (I-495), and the Baltimore-Washington Parkway (MD 295). The $9 billion Traffic Relief Plan for these three major state highways will reduce congestion for millions of drivers and mark the beginning of a historic and transformative effort to significantly improve the traffic conditions on some of Maryland's most traveled roads and highways for years to come.

"These three massive, unprecedented projects to widen I-495, I-270, and MD 295 will be absolutely transformative, and they will help Maryland citizens go about their daily lives in a more efficient and safer manner," said Governor Hogan. "Today, we are turning Maryland's celebrated innovation into real action. These projects will substantially and dramatically improve our state highway system and traffic in the region."

Joining the governor were Maryland Department of Transportation (MDOT) Secretary Pete K. Rahn, MDOT State Highway Administrator Greg Slater, Maryland Transportation Authority Executive Director Kevin Reigrut, as well as elected officials and community and business representatives from throughout the Baltimore-Washington region.

Today's announcement officially begins the process to solicit the Public-Private Partnership (P3) industry for input and solutions to provide major congestion relief to these key transportation routes. With the total project estimated value at $9 billion, the P3 portion to add four new lanes on both I-495 and I-270 is the largest proposed P3 highway project in North America. The P3 will be seeking private developers to design, build, finance, operate, and maintain new lanes on I-495 between the American Legion Bridge and the Woodrow Wilson Bridge and on I-270 between I-495 and I-70. Once completed, the Traffic Relief Plan will deliver new express toll lanes, in addition to existing lanes, on I-495, I-270, and MD 295.

"Using innovation and partnering with some of the greatest minds in the world, Maryland is going to finally get some congestion relief by investing $9 billion in three of the most congested highways in the state," said Secretary Rahn.

The first step to build new express toll lanes on MD 295 will begin with the transfer of MD 295 from the U.S. Department of the Interior to the Maryland Transportation Authority. Governor Hogan has already personally started this process during a recent meeting with Interior Secretary Ryan Zinke and has directed MDOT officials to move forward with the transfer negotiations. Following the transfer, the Maryland Transportation Authority would then build, operate, and maintain the new lanes and maintain existing lanes between Baltimore and Washington, D.C.

The Traffic Relief Plan announced today is critical to spurring increased economic development and restoring quality of life for countless Marylanders who have been negatively affected by years of traffic congestion. Maryland has the second-longest commuting times in the country, and the National Capital Region is the most congested region in the nation based on annual delay and congestion cost per auto-commuter. The statewide cost of congestion based on auto delay, truck delay, and wasted fuel and emissions was estimated at $2 billion in 2015. This is an increase of 22 percent from the $1.7 billion estimated cost of congestion in 2013. More than 98 percent of the weekday congestion cost was incurred in the Baltimore/Washington region.

In making this announcement today, Governor Hogan has directed MDOT to issue the Request for Information to the P3 industry and continue the transfer process with the U.S. Department of the Interior.

-###-



## MARYLAND TRANSIT OPPORTUNITIES COALITION

### A Vision of a Connected Maryland.

Home | About | Legislative Program | Frequently Asked Questions | Latest News | Contribute | Join our Wc

With trains running all day, every day, on a network that stretches from Elkton to Frederick and from Waldorf to Towson. Maryland can do it. For less the cost of the Maryland Dept. of Transportation's Lexus Lane plan, Maryland could build:

- **The Baltimore Red Line**
  to create a connected Baltimore transit network
- **Southern Maryland Light Rail**
  from the Branch Avenue Metro station to Waldorf and White Plains in Charles County
- **2007 MARC Growth and Investment Plan**
  including trains every 15-20 minutes all day from Washington through Baltimore Penn Station to White Marsh, all-day two-way service from Washington to Frederick and to Camden Yards and from Baltimore to Aberdeen, and trains from Baltimore to Elkton and on into Delaware



Follow @TransitForMD

Email us at TransitForMaryland@gmail.com

Contact transit advocates in your community

8725 Warm Waves Way, Columbia MD 21045 TransitForMaryland@gmail.com

**MARYLAND TRANSIT OPPORTUNITIES COALITION – BEN ROSS**

| | |
|---|---|
| **From:** | MLS-NEPA-P3 <MLS-NEPA-P3@mdot.maryland.gov> |
| **Sent:** | Tuesday, November 17, 2020 11:36 AM |
| **To:** | |
| **Subject:** | FW: DEIS comment submission |
| **Attachments:** | DEISSuppComment.pdf |

**From:** Maryland Transit Opportunities Coalition <TransitForMaryland@gmail.com>
**Sent:** Monday, November 9, 2020 2:25 PM
**To:** MLS-NEPA-P3 <MLS-NEPA-P3@mdot.maryland.gov>
**Subject:** DEIS comment submission

By email and certified mail

Lisa B. Choplin, Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street, Mail Stop P-601
Baltimore, MD 21201

Dear Ms. Choplin,

Please see the attached supplementary comment from the Maryland Transit Opportunities Coalition. This is in addition to our previously submitted comment.

Sincerely,


Ben Ross
Chair
Maryland Transit Opportunities Coalition

1

*This page is intentionally left blank.*

00022433

**Maryland Transit Opportunities Coalition**

8725 Warm Waves Way, Columbia MD 21045
TransitForMaryland@gmail.com

November 9, 2020

By email and certified mail

Lisa B. Choplin, Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street, Mail Stop P-601
Baltimore, MD 21201

Dear Ms. Choplin,

This is a supplementary comment by the Maryland Transit Opportunities Coalition on the "I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation." This is in addition to our comment submitted two days ago.

On the morning of the final day of the comment period, MDOT released tables of travel times on I-270 for the alternatives retained for detailed study. These tables, which are attached, were not included in the DEIS text or in its 1556-page Travel Time Technical Report (Appendix C).[1]

**#1**

Alternatives 13B and 13C convert the two existing one-way HOV lanes to a pair of reversible HOT lanes. According to the tables released this morning, pm peak general-purpose-lane travel speeds in these two alternatives are substantially faster than the no-build alternative between I-370 and MD 121, but slower farther north to Frederick.

These results are inexplicable unless Alternatives 13B and 13C convert the entire length of the HOV lanes to reversible lanes, including the portion north of I-370 that is outside the DEIS study area.

This portion of Alternatives 13B and 13C was hidden from public commenters. The DEIS states on page 1-2 that the northern terminus of the study area on I-270 is 0.6 miles north of I-370. That page further states that "The HOV lane from 0.6 miles north of I-370, will continue to its current terminus at MD 121 (Clarksburg Road), 8 miles north of I-370." This concealment denied the public the ability to comment meaningfully on the project.

[1] The tables appear to erroneously report the travel times for Alternative 9, which are shown as identical to the no-build case.

**Response to DEIS Comment #1**

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Maryland's Traffic Relief Plan is statewide and includes I-95, I-695, I-495, I-270, MD 295, and the Smart Signals Program. Overall, this plan includes three elements: P3 Program, Baltimore Area Traffic Relief Plan, and Smart Traffic Signals. The Study focuses specifically on one element of that plan in one region of the state. The intent of the I-495 & I-270 P3 Program is to reduce congestion on I-495 and I-270 by seeking input from the private sector to design, build, finance, operate, and maintain improvements along the corridors. The plan is focused on transforming these overloaded interstates to allow people to reach their destinations faster and to remove overflow traffic from the local roads.

The geographic scope of the Study, while large, is distinctly defined. It includes 37 miles of I-495 and 11 miles of I-270. Consistent with CEQ NEPA regulations 40 CFR 1502.4(a) and 1508.25(a), as well as FHWA NEPA regulations at 23 CFR 771.111(f), MDOT SHA and FHWA have identified the Study as an independent action that may proceed regardless of whether other actions of the Traffic Relief Plan or P3 Program are implemented.

Furthermore, the identified scope of the Study has been sufficiently defined to be advanced with a project-level NEPA document. Consistent with FHWA regulations, other proposed actions, such as potential improvements to I-270 from I-370 to I-70, have been determined to possess independent utility from the Study (and other actions in the TRP and P3 Program) and thus will require separate project-level NEPA documents.

Lisa B. Choplin, November 9, 2020                                    Page 2

#1
Cont

The 22-mile section of I-270 north of I-370 is to be the subject of a separate NEPA study. Yet the current study involves major capital construction extending 7.4 miles into that study area -- over one-third of its length. Clearly, separating these two studies constitutes improper segmentation.[2]

#2

Moreover, the selection of Alternatives Retained for Detailed Study that involve major construction extending 7.4 miles outside the study area is inconsistent with the rejection of other alternatives, such as transit alternatives and Transportation Demand Management, that involve action a similar distance outside the study area. This impermissibly biases the selection of alternatives and the analysis of the ARDS.

The DEIS fails to analyze the environmental impacts of construction in the I-270 corridor between I-370 and MD 121.

MDOT must withdraw the DEIS and recommence the study with a study area extending to Frederick. At a minimum, it must clarify the definition of alternatives and offer an additional public comment period.

Sincerely,

/signed/

Ben Ross
Chair
Maryland Transit Opportunities Coalition

_____

[2]The DEIS states that "the logical termini for the area of environmental review and analysis area [sic] have been extended beyond these intersecting roadways to account for the necessary distance for the mainline improvements to tie into the existing roadway operations." If MDOT believes that the "necessary distance for the mainline improvements to tie into the existing roadway operations" includes one third of the entire length of the northern segment of I-270, that is even more reason that separating I-270 into two separate NEPA processes constitutes improper segmentation.

**Response to DEIS Comment #2**
The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarize the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail. This analysis directly contributed to MDOT SHA's evaluation of these alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided. Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

The following pages reflect the attachments included in the letter. There are no comments or responses provided on these pages; they are included for the record.

OP·LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

October 2020

**Northbound - 2040 AM Travel Time (minutes)**

| Travel Time Section | Distance (Miles) | Freeflow AM | Existing AM | No Build | Alt 8 (GP) | Alt 9 (GP) | Alt 9M | Alt 10 (GP) | Alt 13B (GP) | Alt 13C (GP) |
|---|---|---|---|---|---|---|---|---|---|---|
| VA-193/Georgetown Pike | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| GW Memorial Parkway | 1.0 | 0.9 | 0.9 | 0.5 | 0.4 | 1.5 | 1.9 | 0.5 | 1.4 | 1.5 |
| American Legion Bridge | 1.5 | 1.4 | 3.7 | 1.6 | 3.2 | 1.5 | 1.9 | 1.8 | 3.6 | 2.9 |
| | 1.7 | 1.5 | 4.1 | 3.6 | 3.3 | 3.0 | 3.4 | 3.7 | 5.7 | 4.9 |
| Clara John Parkway | 1.8 | 1.6 | 4.3 | 3.8 | 5.3 | 3.4 | 3.9 | 3.7 | 6.2 | 5.2 |
| | 1.9 | 1.8 | 4.5 | 4.0 | 5.5 | 3.6 | 4.1 | 3.9 | 6.4 | 5.4 |
| MD 190 | 3.3 | 3.0 | 5.9 | 5.4 | 6.0 | 3.8 | 4.3 | 4.1 | 6.7 | 5.6 |
| I-270 & I-495 Merge | 3.7 | 3.4 | 6.3 | 5.8 | 7.6 | 5.4 | 5.7 | 5.6 | 8.1 | 7.1 |
| Democracy Blvd | 4.0 | 3.7 | 6.7 | 6.2 | 7.6 | 5.6 | 6.1 | 6.0 | 8.3 | 7.5 |
| | 5.1 | 4.7 | 7.9 | 7.4 | 7.9 | 5.9 | 6.4 | 6.3 | 8.6 | 7.8 |
| I-270 Spur | 5.5 | 5.0 | 8.7 | 8.2 | 9.1 | 7.2 | 6.5 | 6.5 | 8.9 | 9.0 |
| Montrose Rd | 6.4 | 5.9 | 9.1 | 8.6 | 10.3 | 8.4 | 8.9 | 7.5 | 10.1 | 10.2 |
| | 7.2 | 6.7 | 9.9 | 9.4 | 10.7 | 8.7 | 9.2 | 8.7 | 11.3 | 11.1 |
| MD 189 | 8.1 | 7.5 | 10.8 | 10.2 | 11.2 | 9.2 | 9.7 | 9.6 | 12.1 | 11.9 |
| | 9.0 | 8.3 | 11.6 | 11.1 | 12.0 | 10.0 | 10.6 | 10.4 | 13.0 | 13.0 |
| | 9.9 | 9.1 | 12.4 | 11.9 | 13.7 | 11.7 | 12.1 | 12.1 | 14.7 | 13.6 |
| MD 28 | 10.2 | 9.4 | 12.8 | 12.3 | 14.1 | 12.1 | 12.6 | 12.5 | 15.0 | 14.0 |
| Shady Grove Rd | 11.1 | 10.2 | 13.3 | 12.8 | 14.6 | 12.6 | 13.1 | 13.0 | 15.6 | 14.6 |
| | 11.3 | 10.4 | 13.8 | 13.4 | 15.2 | 13.2 | 13.7 | 13.6 | 16.1 | 15.1 |
| | 13.7 | 11.7 | 14.3 | 13.9 | 15.4 | 13.5 | 14.0 | 13.9 | 16.5 | 16.5 |
| | 14.6 | 13.6 | 16.0 | 15.7 | 17.5 | 15.5 | 16.0 | 15.9 | 18.5 | 17.6 |
| I-370 | 15.3 | 14.1 | 16.5 | 16.3 | 18.5 | 16.5 | 16.6 | 16.6 | 19.3 | 18.0 |
| | 15.1 | 13.9 | 17.4 | 17.3 | 19.0 | 17.1 | 17.4 | 17.4 | 20.0 | 18.9 |
| MD 121 | 15.4 | 14.2 | 17.7 | 17.5 | 19.3 | 17.4 | 17.7 | 17.7 | 20.3 | 19.2 |
| | 15.8 | 14.6 | 18.1 | 18.1 | 19.7 | 17.8 | 18.0 | 18.0 | 20.6 | 19.5 |
| MD 124 | 16.5 | 15.3 | 18.7 | 18.7 | 20.4 | 18.5 | 19.0 | 18.8 | 21.4 | 20.3 |
| | 18.3 | 16.9 | 20.4 | 20.4 | 22.1 | 20.3 | 20.8 | 20.6 | 23.1 | 22.0 |
| MD 109 | 18.6 | 17.2 | 20.7 | 20.7 | 22.4 | 20.5 | 21.0 | 20.8 | 23.4 | 22.3 |
| | 19.0 | 17.5 | 21.1 | 21.1 | 22.8 | 21.0 | 21.5 | 21.3 | 23.8 | 22.7 |
| MD 80 | 19.6 | 18.1 | 21.7 | 21.7 | 23.4 | 21.6 | 22.1 | 21.9 | 24.3 | 23.3 |
| | 20.5 | 19.0 | 22.5 | 22.6 | 24.3 | 22.5 | 23.0 | 22.8 | 25.2 | 24.1 |
| MD 85 | 22.8 | 21.0 | 24.6 | 24.8 | 26.4 | 24.6 | 25.1 | 24.9 | 27.3 | 26.3 |
| | 23.7 | 21.8 | 24.9 | 25.0 | 26.6 | 24.8 | 25.3 | 25.1 | 27.5 | 26.5 |
| | 26.8 | 24.8 | 28.5 | 28.8 | 30.4 | 28.7 | 29.1 | 29.0 | 31.3 | 30.2 |
| | 27.0 | 25.0 | 28.7 | 29.0 | 30.6 | 28.9 | 29.3 | 29.2 | 31.5 | 30.4 |
| | 30.5 | 28.2 | 32.1 | 32.6 | 34.1 | 32.4 | 32.8 | 32.6 | 34.9 | 33.8 |
| | 30.7 | 28.4 | 32.2 | 32.8 | 34.3 | 32.7 | 33.0 | 32.8 | 35.0 | 34.0 |
| | 35.5 | 32.9 | 36.8 | 37.3 | 38.7 | 37.0 | 37.6 | 37.4 | 39.6 | 38.5 |
| | 36.0 | 33.2 | 37.3 | 37.8 | 39.3 | 37.7 | 38.1 | 37.9 | 40.1 | 39.0 |

October 2020

**Southbound - 2040 AM Travel Time (minutes)**

| Travel Time Section | Distance (Miles) | Freeflow AM | Existing AM | No Build | Alt 8 (GP) | Alt 9 (GP) | Alt 9M | Alt 10 (GP) | Alt 13B (GP) | Alt 13C (GP) |
|---|---|---|---|---|---|---|---|---|---|---|
| MD 85 | 0.0 | 0.0 | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| MD 80 | 0.5 | 0.4 | 2.8 | 2.8 | 1.7 | 2.8 | 2.8 | 3.0 | 1.4 | 3.0 |
| | 5.3 | 4.9 | 9.0 | 9.2 | 17.6 | 19.4 | 19.4 | 18.8 | 17.8 | 20.0 |
| MD 109 | 5.5 | 5.1 | 9.8 | 9.9 | 18.4 | 20.2 | 20.2 | 20.6 | 20.6 | 20.8 |
| | 9.0 | 8.3 | 18.5 | 28.2 | 26.7 | 28.4 | 28.8 | 28.7 | 29.7 | 29.4 |
| MD 121 | 12.8 | 11.8 | 23.8 | 34.0 | 32.7 | 34.2 | 34.6 | 34.2 | 35.2 | 35.5 |
| | 13.2 | 12.2 | 24.3 | 34.5 | 33.3 | 34.8 | 35.2 | 34.7 | 35.7 | 36.1 |
| | 15.2 | 14.1 | 27.7 | 39.6 | 38.3 | 39.8 | 40.2 | 40.0 | 39.5 | 40.3 |
| MD 118 | 15.9 | 14.7 | 31.3 | 43.6 | 44.0 | 45.5 | 45.9 | 45.4 | 42.4 | 43.5 |
| | 16.3 | 15.1 | 33.5 | 45.7 | 46.5 | 48.0 | 48.4 | 48.0 | 44.6 | 45.8 |
| | 16.9 | 15.6 | 36.1 | 47.6 | 48.7 | 50.2 | 50.6 | 50.1 | 46.3 | 47.7 |
| | 17.4 | 16.1 | 37.5 | 48.6 | 49.2 | 50.7 | 51.0 | 50.6 | 48.0 | 48.7 |
| | 17.7 | 16.4 | 38.1 | 49.0 | 49.7 | 50.7 | 50.9 | 50.5 | 47.1 | 48.0 |
| MD 124 | 19.7 | 18.1 | 43.4 | 53.5 | 51.7 | 50.1 | 49.8 | 50.8 | 49.9 | 51.5 |
| | 19.9 | 18.4 | 44.3 | 54.5 | 52.1 | 50.1 | 49.8 | 51.1 | 50.3 | 51.8 |
| | 20.5 | 18.9 | 46.6 | 56.7 | 53.9 | 52.5 | 52.3 | 53.4 | 52.9 | 54.0 |
| | 20.8 | 19.2 | 46.8 | 55.7 | 56.6 | 53.8 | 53.1 | 52.7 | 51.2 | 53.0 |
| I-370 | 22.5 | 20.5 | 48.9 | 59.3 | 56.4 | 54.1 | 53.3 | 54.8 | 53.6 | 55.4 |
| | 22.8 | 21.1 | 53.8 | 61.3 | 58.0 | 55.3 | 53.8 | 55.8 | 53.9 | 55.2 |
| Shady Grove Rd | 23.9 | 22.1 | 53.5 | 62.0 | 57.6 | 56.5 | 56.7 | 57.1 | 55.6 | 57.2 |
| | 24.7 | 22.8 | 59.5 | 66.0 | 59.5 | 57.3 | 57.9 | 57.4 | 55.7 | 57.7 |
| MD 28 | 25.2 | 23.3 | 60.8 | 66.1 | 60.8 | 58.0 | 58.6 | 58.1 | 56.4 | 58.7 |
| | 25.8 | 23.9 | 60.9 | 60.0 | 60.6 | 58.1 | 58.7 | 58.3 | 56.6 | 58.9 |
| MD 189 | 25.0 | 24.2 | 60.9 | 67.2 | 63.0 | 60.3 | 60.9 | 60.6 | 58.9 | 61.2 |
| | 28.8 | 26.6 | 70.0 | 70.1 | 66.0 | 63.3 | 61.5 | 63.7 | 61.1 | 62.1 |
| | 29.4 | 27.3 | 72.8 | 70.8 | 67.0 | 64.0 | 62.2 | 64.8 | 61.9 | 62.0 |
| Montrose Rd | 29.5 | 27.3 | 74.2 | 73.5 | 67.8 | 64.9 | 63.7 | 65.8 | 62.1 | 64.0 |
| | 30.0 | 27.7 | 74.2 | 73.5 | 67.8 | 65.0 | 63.8 | 66.1 | 62.5 | 64.0 |
| I-270 Split | 30.8 | 28.4 | 76.9 | 74.2 | 70.0 | 65.8 | 66.8 | 66.9 | 65.9 | 68.3 |
| | 31.1 | 28.7 | 77.3 | 74.6 | 71.0 | 66.5 | 67.8 | 75.3 | 66.9 | 69.7 |
| Democracy Blvd | 32.0 | 29.5 | 77.4 | 74.6 | 71.8 | 67.4 | 68.1 | 68.7 | 73.1 | 74.5 |
| | 32.6 | 30.1 | 78.2 | 75.2 | 71.8 | 67.4 | 68.8 | 76.8 | 66.8 | 81.8 |
| I-270 & I-495 Merge | 33.6 | 31.0 | 79.9 | 77.3 | 73.6 | 69.2 | 71.2 | 78.7 | 70.3 | 83.7 |
| | 33.8 | 31.2 | 80.5 | 77.4 | 74.1 | 69.6 | 71.6 | 79.3 | 70.9 | 84.0 |
| Clara John Parkway | 34.0 | 31.5 | 80.4 | 77.2 | 77.9 | 69.6 | 71.6 | 79.1 | 70.7 | 84.1 |
| | 34.2 | 31.6 | 80.7 | 77.3 | 74.1 | 69.8 | 71.8 | 79.3 | 79.9 | 84.4 |
| | 34.4 | 31.7 | 80.9 | 77.5 | 74.1 | 70.0 | 71.8 | 79.6 | 80.3 | 84.6 |
| American Legion Bridge | 35.0 | 32.3 | 81.2 | 78.0 | 74.3 | 70.5 | 72.5 | 80.0 | 71.6 | 84.9 |
| GW Memorial Parkway | 35.6 | 32.9 | 81.6 | 78.4 | 74.8 | 70.9 | 72.9 | 80.2 | 71.9 | 84.6 |
| VA-193/Georgetown Pike | 35.8 | 33.1 | 82.2 | 79.0 | 75.2 | 71.5 | 73.5 | 81.0 | 72.6 | 85.9 |

**OP·LANES™ MARYLAND**  I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

## Northbound – 2040 PM Travel Times (minutes)

| Travel Time Section | Distance (miles) | Freeflow PM | Existing PM | No Build PM | Alt 8 (GP) | Alt 8 (ETL) | Alt 9 (GP) | Alt 9 (ETL) | Alt 9M | Alt 9 (GP) | Alt 10 | Alt 13B | Alt 13C |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| VA-193/Georgetown Pike | 0.4 | 0.4 | 7.4 | 0.4 | 1.0 | 0.4 | 1.0 | 0.0 | 0.4 | 0.4 | 0.4 | 0.4 | 0.4 |
| G W Memorial Parkway | 0.9 | 0.8 | 6.4 | 1.0 | 2.8 | 1.0 | 2.8 | 0.5 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| American Legion Bridge | 1.3 | 1.3 | 8.9 | 8.8 | 5.4 | 4.8 | 5.4 | 1.6 | 1.9 | 1.9 | 1.8 | 1.8 | 1.8 |
| Clara Barton Parkway | 1.5 | 1.4 | 9.3 | 9.3 | 5.8 | 5.4 | 5.8 | 1.9 | 2.0 | 2.1 | 1.9 | 1.8 | 1.8 |
| | 1.8 | 1.6 | 10.0 | 9.9 | 6.7 | 6.7 | 6.7 | 2.1 | 2.4 | 3.1 | 2.1 | 2.1 | 2.1 |
| MD 190 | 3.1 | 2.9 | 15.4 | 13.8 | 14.1 | 14.1 | 4.5 | 5.1 | 3.4 | 3.6 | 3.6 | 3.6 | 3.6 |
| | 3.6 | 3.3 | 17.1 | 17.0 | 15.2 | 16.0 | 5.1 | 6.1 | 4.4 | 4.1 | 4.6 | 4.4 | 4.9 |
| I-270 & I-495 Merge | 3.6 | 3.3 | 17.6 | 18.6 | 17.0 | 17.0 | 6.1 | 7.2 | 4.4 | 7.2 | 6.1 | 6.1 | 6.1 |
| Democracy Blvd | 4.9 | 4.6 | 21.3 | 12.1 | 24.6 | 24.6 | 12.1 | 13.4 | 6.6 | 8.0 | 8.0 | 8.9 | 8.9 |
| | 5.8 | 5.3 | 22.5 | 13.0 | 25.5 | 25.5 | 13.0 | 14.4 | 7.6 | 8.3 | 8.9 | 9.9 | 9.9 |
| I-270 Spur | 6.6 | 6.1 | 24.7 | 13.9 | 26.4 | 26.4 | 13.9 | 15.3 | 8.5 | 9.8 | 10.8 | 10.8 | 10.8 |
| | 7.5 | 7.0 | 25.8 | 14.4 | 26.9 | 26.9 | 14.4 | 15.9 | 9.5 | 10.8 | 10.8 | 11.6 | 11.4 |
| Montrose Rd | 7.9 | 7.3 | 26.7 | 15.4 | 27.9 | 27.9 | 15.4 | 16.8 | 10.1 | 11.3 | 12.4 | 13.5 | 13.4 |
| | 8.9 | 8.2 | 27.9 | 16.5 | 29.0 | 29.0 | 16.5 | 17.9 | 11.1 | 12.4 | 13.5 | 13.5 | 13.5 |
| MD 189 | 9.6 | 8.8 | 28.8 | 17.5 | 29.9 | 29.9 | 17.5 | 18.9 | 11.8 | 12.8 | 13.8 | 14.8 | 14.4 |
| | 10.0 | 9.3 | 29.3 | 17.9 | 30.3 | 30.3 | 17.9 | 19.3 | 13.0 | 13.8 | 14.8 | 14.4 | 14.5 |
| MD 28 | 11.1 | 10.3 | 30.5 | 19.1 | 31.6 | 31.6 | 19.1 | 20.5 | 13.3 | 15.3 | 15.0 | 16.1 | 16.1 |
| | 12.5 | 11.5 | 32.1 | 20.8 | 33.2 | 33.2 | 20.8 | 22.4 | 19.5 | 16.7 | 18.7 | 18.2 | 18.2 |
| Shady Grove Rd | 12.9 | 11.9 | 32.3 | 21.4 | 33.8 | 33.8 | 21.4 | 23.0 | 20.3 | 17.2 | 18.9 | 18.9 | 19.9 |
| | 13.4 | 12.4 | 34.2 | 22.2 | 34.3 | 34.3 | 22.2 | 24.6 | 21.6 | 18.2 | 20.7 | 18.9 | 18.9 |
| I-370 | 14.9 | 13.9 | 36.1 | 24.2 | 36.9 | 36.9 | 24.2 | 26.6 | 22.3 | 20.6 | 23.0 | 20.9 | 20.9 |
| | 15.3 | 14.1 | 39.3 | 27.9 | 38.1 | 38.1 | 27.9 | 31.3 | 24.7 | 23.0 | 25.0 | 24.2 | 24.2 |
| MD 124 | 16.3 | 15.1 | 41.2 | 29.5 | 38.9 | 38.9 | 29.5 | 32.7 | 25.5 | 24.9 | 25.0 | 27.3 | 27.3 |
| | 16.4 | 15.1 | 43.3 | 32.3 | 41.5 | 41.5 | 32.3 | 36.3 | 28.0 | 30.4 | 30.4 | 27.7 | 27.7 |
| MD 118 | 16.5 | 15.7 | 46.6 | 40.5 | 46.9 | 46.9 | 40.5 | 42.7 | 33.4 | 38.2 | 34.3 | 34.3 | 34.3 |
| | 17.4 | 16.1 | 47.4 | 43.5 | 51.3 | 51.3 | 43.5 | 45.0 | 36.5 | 36.9 | 41.1 | 36.1 | 36.1 |
| | 18.4 | 17.4 | 48.3 | 45.6 | 53.8 | 53.8 | 45.6 | 46.8 | 38.3 | 41.2 | 36.1 | 39.3 | 39.3 |
| MD 121 | 19.0 | 18.0 | 49.3 | 46.8 | 55.5 | 55.5 | 46.8 | 46.8 | 39.7 | 44.3 | 39.3 | 39.3 | 39.3 |
| | 20.4 | 19.8 | 50.5 | 49.3 | 58.6 | 58.6 | 49.3 | 53.9 | 42.4 | 46.4 | 42.8 | 42.8 | 42.8 |
| MD 109 | 23.0 | 22.4 | 52.5 | 54.2 | 62.5 | 62.5 | 54.2 | 58.2 | 52.6 | 50.6 | 50.6 | 50.4 | 50.4 |
| | 26.9 | 26.8 | 53.8 | 58.2 | 67.2 | 67.2 | 58.2 | 62.9 | 59.3 | 55.4 | 55.4 | 54.4 | 54.4 |
| MD 80 | 30.6 | 30.6 | 59.8 | 67.6 | 73.6 | 73.6 | 67.6 | 72.2 | 62.8 | 64.4 | 61.8 | 61.8 | 61.8 |
| | 33.2 | 32.6 | 63.8 | 71.6 | 81.8 | 81.8 | 71.6 | 77.6 | 66.9 | 68.4 | 65.9 | 65.9 | 65.9 |
| MD 85 | 35.4 | 32.6 | 69.5 | 77.5 | 89.2 | 89.2 | 77.5 | 82.0 | 72.9 | 74.2 | 71.8 | 71.8 | 71.8 |
| | 35.9 | 33.1 | 70.1 | 78.0 | 89.7 | 89.7 | 78.0 | 82.6 | 73.3 | 74.7 | 72.3 | 72.3 | 72.3 |

October 2020

## Southbound – 2040 PM Travel Times (minutes)

| Travel Time Section | Distance (miles) | Freeflow PM | Existing PM | No Build PM | Alt 8 (GP) | Alt 8 (ETL) | Alt 9 (GP) | Alt 9 (ETL) | Alt 9M | Alt 9 (GP) | Alt 10 | Alt 13B | Alt 13C |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MD 85 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| MD 80 | 0.5 | 0.4 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| | 5.3 | 4.9 | 5.2 | 5.2 | 5.3 | 5.3 | 5.3 | 5.4 | 5.3 | 5.3 | 5.4 | 5.4 | 5.4 |
| MD 109 | 5.5 | 5.1 | 5.4 | 5.4 | 5.4 | 5.4 | 5.4 | 5.4 | 5.4 | 5.4 | 5.4 | 5.4 | 5.4 |
| | 9.0 | 8.5 | 9.0 | 9.0 | 9.2 | 9.2 | 9.1 | 9.1 | 9.1 | 9.1 | 9.1 | 9.1 | 9.1 |
| MD 121 | 9.2 | 8.5 | 9.3 | 9.4 | 9.6 | 9.6 | 9.4 | 9.4 | 9.6 | 9.4 | 9.4 | 9.4 | 9.4 |
| | 12.8 | 11.8 | 12.9 | 13.0 | 13.1 | 13.1 | 13.0 | 13.0 | 12.9 | 13.5 | 13.3 | 13.5 | 13.5 |
| | 13.2 | 12.2 | 13.4 | 13.4 | 13.7 | 13.7 | 13.4 | 13.5 | 14.3 | 15.2 | 15.0 | 16.1 | 16.1 |
| MD 118 | 13.8 | 14.1 | 15.4 | 15.4 | 15.6 | 15.6 | 15.4 | 15.4 | 16.0 | 16.1 | 15.2 | 15.9 | 16.5 |
| | 15.9 | 14.7 | 15.9 | 16.0 | 16.2 | 16.2 | 16.0 | 16.0 | 16.6 | 16.5 | 15.4 | 16.4 | 16.5 |
| MD 124 | 16.9 | 15.6 | 16.8 | 16.9 | 17.1 | 17.1 | 17.2 | 17.2 | 17.0 | 16.8 | 17.0 | 17.0 | 17.0 |
| | 17.4 | 16.1 | 17.4 | 17.4 | 17.6 | 17.6 | 17.7 | 17.7 | 17.5 | 17.3 | 17.8 | 17.5 | 17.5 |
| | 17.7 | 16.3 | 17.6 | 17.9 | 18.2 | 18.2 | 18.7 | 18.7 | 17.9 | 19.5 | 17.9 | 19.7 | 19.7 |
| I-370 | 19.7 | 18.1 | 19.5 | 19.5 | 19.7 | 19.7 | 19.8 | 19.8 | 19.6 | 19.5 | 19.7 | 18.9 | 19.7 |
| | 20.2 | 18.6 | 19.9 | 20.0 | 20.3 | 20.3 | 20.5 | 20.5 | 20.0 | 19.8 | 19.7 | 19.7 | 19.0 |
| | 20.8 | 19.2 | 20.5 | 20.6 | 20.8 | 20.8 | 20.9 | 20.9 | 20.6 | 20.7 | 20.5 | 20.5 | 20.7 |
| Shady Grove Rd | 22.5 | 20.9 | 21.9 | 22.0 | 22.7 | 22.7 | 23.9 | 23.9 | 21.4 | 22.0 | 21.8 | 22.9 | 22.3 |
| | 22.8 | 21.1 | 22.5 | 22.6 | 23.9 | 23.9 | 24.3 | 24.3 | 22.2 | 22.5 | 22.3 | 23.3 | 22.8 |
| MD 28 | 24.7 | 22.8 | 24.4 | 24.4 | 25.7 | 25.7 | 24.8 | 24.8 | 24.6 | 24.6 | 24.4 | 24.7 | 24.7 |
| | 25.2 | 23.3 | 24.9 | 25.0 | 25.8 | 25.8 | 25.4 | 25.4 | 25.2 | 25.3 | 25.1 | 25.5 | 25.4 |
| MD 189 | 26.2 | 24.2 | 25.8 | 26.0 | 26.3 | 26.3 | 26.9 | 26.9 | 26.0 | 27.7 | 26.4 | 27.5 | 26.5 |
| | 26.9 | 24.8 | 26.5 | 26.7 | 27.2 | 27.2 | 27.2 | 27.2 | 31.2 | 27.6 | 30.3 | 27.2 | 27.2 |
| Montrose Rd | 27.9 | 25.8 | 27.5 | 27.6 | 28.3 | 28.3 | 28.9 | 28.9 | 33.2 | 30.0 | 31.3 | 29.9 | 29.9 |
| | 28.8 | 26.6 | 28.5 | 28.6 | 40.8 | 40.8 | 33.5 | 33.5 | 32.6 | 31.8 | 46.9 | 33.8 | 33.8 |
| I-270 Spur | 29.2 | 27.1 | 29.1 | 29.2 | 40.8 | 40.8 | 33.8 | 33.8 | 33.4 | 32.4 | 47.5 | 34.4 | 34.4 |
| | 29.4 | 27.3 | 29.3 | 29.4 | 41.4 | 41.4 | 34.1 | 34.1 | 33.6 | 32.6 | 47.5 | 35.0 | 34.4 |
| Democracy Blvd | 30.0 | 27.7 | 29.7 | 29.8 | 42.5 | 42.5 | 34.7 | 34.7 | 34.3 | 33.9 | 48.2 | 35.1 | 35.1 |
| | 31.1 | 29.7 | 36.2 | 32.2 | 44.0 | 44.0 | 37.1 | 37.1 | 36.2 | 35.8 | 50.5 | 37.4 | 37.4 |
| I-270 & I-495 Merge | 31.8 | 28.4 | 35.6 | 31.8 | 44.3 | 44.3 | 38.7 | 38.7 | 35.9 | 36.4 | 50.5 | 37.4 | 37.4 |
| | 32.1 | 29.7 | 36.8 | 32.2 | 44.4 | 44.4 | 37.1 | 37.1 | 36.2 | 36.4 | 50.5 | 37.0 | 37.0 |
| Cabin John Parkway | 32.6 | 30.1 | 38.8 | 32.7 | 45.0 | 45.0 | 37.6 | 37.6 | 36.8 | 37.0 | 51.1 | 37.9 | 37.9 |
| | 33.8 | 31.2 | 41.9 | 34.1 | 46.6 | 46.6 | 38.8 | 38.8 | 38.0 | 38.8 | 52.4 | 39.3 | 39.3 |
| American Legion Bridge | 34.2 | 31.6 | 42.3 | 34.6 | 46.8 | 46.8 | 39.3 | 39.3 | 38.4 | 39.8 | 52.9 | 39.8 | 39.8 |
| | 34.4 | 31.7 | 42.4 | 34.8 | 47.0 | 47.0 | 39.6 | 39.6 | 38.8 | 38.0 | 53.2 | 39.9 | 39.9 |
| G W Memorial Parkway | 34.9 | 32.3 | 44.5 | 35.4 | 47.7 | 47.7 | 40.3 | 40.3 | 39.5 | 39.5 | 53.7 | 40.5 | 40.6 |
| | 35.3 | 33.0 | 46.6 | 36.1 | 48.1 | 48.1 | 40.6 | 40.6 | 40.1 | 40.1 | 54.0 | 41.1 | 41.1 |
| VA-193/Georgetown Pike | 35.8 | 33.5 | 47.1 | 36.4 | 48.7 | 48.7 | 41.3 | 41.3 | 40.5 | 40.5 | 54.7 | 41.6 | 41.6 |

October 2020

**MARYLAND TRANSPORTATION BUILDERS AND MATERIALS ASSOCIATION – PETER PLACKE**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Peter Placke

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Live Testimony/Afternoon

**Transcription:**

Hi, my name is Peter Placke, P-E-T-E-R, P-L-A-C-K-E. I represent the Maryland Transportation Builders and Materials Association. As a past Chairman, and I'm also the Vice President Senior Estimator for Gray and Son Incorporated. The address is 430 West Padonia Road, Timonium, Maryland 21093. Our association and members support the P3 Program solution for the I-495 270 expansion. The traffic congestion here in Maryland especially around the DC area and those counties is a major problem for commuters and also for Maryland's economic health. Not only will this project solve the biggest concern being traffic, but it has other benefits than it think this program is expected to create somewhere between 117,000 and 143,000 new jobs, which are high paying, high quality, highly skilled jobs, which is very important, especially with the shape our economy is in right now. This project, I know, is supposed to be somewhere, I believe, in the $9 to $11 billion dollar range, and we all know that the Maryland Department Transportation itself cannot possibly fund this type of investment so that the most financially. The P3 Program solution is probably the most financially viable and fastest method and most efficient method to reduce the traffic congestion. Thank you for your time.

**#1**

**Response to DEIS Comment #1**
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 Phase I South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**MARYLAND TRANSPORTATION BUILDERS AND MATERIALS ASSOCIATION – MICHAEL SAKATA**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Michael Sakata

**Joint Public Hearing Date:** 8/18/20

**Type:** Voicemail

**Transcription:**

Michael Sakata - Maryland Transportation Builders and Materials Association - Hearing for the P3 Program Joint Public Hearing.

Hi. Michael Sakata, President and CEO of Maryland Transportation Builders Materials Association, which has been and continues to serve as a voice for Maryland Transportation Industry since 1932. Our association is comprised of over 200 members and it promotes and protects the needs of transportation construction and materials industry. Our association, and its members, support the I-495/270 P3 Program and are ready to supply the workforce and materials needed to get Maryland moving again. I don't think anyone doubts the traffic concerns around I-270 and I-495 are terrible and cause an insurmountable amount of stress to Maryland residents any time they get on those roads - or really any of the surrounding roads. We desperately need a solution and this Project is the proven answer. In reference to the recent TRIP report, we have the second-worst congestion in the country. Maryland's interstate system is vital to Maryland's transportation network and the backbone of the state's economy. More than 80 percent of the length of Maryland's urban interstate is congested. Travel on Maryland's interstate highway is increasing at a rate nine times faster than the rate at which new lane capacity is being added. Not only will this solve - this project - solve our biggest concern, that being traffic, but has so many other additional benefits. The Program is expected to create 117,000 to 143,000 new jobs - high paying, high quality, highly skilled jobs. MDOT has planned a robust inclusion requirement, which requires that Maryland residents do the construction. In a recent project in Atlanta, Georgia where they implemented express toll roads, they found that rush hour speeds on the highway have doubled - more than 28 miles per hour to 40 miles per hour. Private involvement will alleviate the maintenance cost of a new construction, saving the state millions of dollars to the future. Just to maintain the current road that I-495/I-270, the State will need to invest 1.7 billion dollars that comes - that comes with no congestion relief. Instead this Project will free up that 1.7 billion dollars for other vital projects in the state. Congested, costing our local economy, 1.3 billion dollars in added cost per year. This drives up the cost of doing business, causing residents and taxpayers foot the bill. Please support the I-495/270 P3 Program. Once again, Michael Sakata, Maryland - President and CEO, Maryland Transportation Builders Materials Association. Thank you for your... [recording ends].

**Response to DEIS Comment #1**
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

#1

**MARYLAND TRANSPORTATION BUILDERS AND MATERIALS ASSOCIATION – CAROLINA WALKER**

#1

**Voicemail Testimony added to file on Oct. 23, 2020**

Joint Public Hearing— September 3, 2020—Voicemail        I-495 and I-270 Managed Lanes Study

**Name:** Carolina Walker

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Voicemail

**Transcription:**

My name is Carolina Walker. I'm with Maryland Transportation Builders Materials Association. I am calling in support of the P3 program because Maryland has the second worst congestion in the country. Maryland's interstate highway system is vital to the transportation network and is the backbone of the state's economy. When 80% of the length of Maryland's urban interstates are congested, we need this P3. Thank you.

**Response to DEIS Comment #1**
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**MARYLAND TRANSPORTATION BUILDERS AND MATERIALS ASSOCIATION – LAURIE WALLER**

#1

**Voicemail Testimony added to file on Oct. 23, 2020**

Joint Public Hearing— September 3, 2020—Voicemail    I-495 and I-270 Managed Lanes Study

**Name:** Laurie Waller

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Voicemail

**Transcription:**

Hi, my name is Laurie Waller and I'm calling on behalf of Maryland Transportation Builders and Materials Association located in Glen Burnie, Maryland, which we continue to serve as a voice for Maryland's construction transportation industry since 1932. Our association here is comprised of around 200 members, which we encourage develop protect the prestige of the transportation construction material industry of Maryland by establishing and maintaining the respective relationships with federal, state, and local public officials. Our association's members support the I-495/270 P3 program and we are ready to supply the workforce and materials needed to get Marylander's continuing to move forward. I don't think anyone doubts that the traffic concerns around I-270 and I-495 are terrible and the cause of this amount of stress to Maryland residents has caused any time that they have to get on these roads or really any of the surrounding roads. We really need a solution for them to protect the way that they get to work, come back from work, all-in-all just everyday transportation issues. And recent we had a trip report in collaboration with MDOT and the trip community. We have found during this trip report that the second-worst congestion in the country is in Maryland. Maryland's interstate highway system is vital to Maryland Transportation Network and the backbone of this state's economy. More than 80% of the length of the Maryland's urban interstate are congested and travel on Maryland's interstate highway is increasing at a rate nine times faster than the rate of which through-lane capacity is being added. Not only will this project solve our biggest concern, traffic, but it has also so many other additional benefits to include a program that is expected to create an abundance of jobs anywhere between 120,000 to over 140 that are high paying, high quality, and high-skilled which our economy currently needs severely. MDOT has also planned a robust inclusion requirement which ensures that Maryland residents do the construction. In addition private involvement will alleviate the maintenance cost of the new construction saving the state millions of dollars in the future just to maintain the current roads on the 495/270. The state would need to invest 1.7 billion that comes with no congestion relief. Instead this project will free up that 1.7 billion for all the other vital projects in the state of Maryland. I appreciate your time and thank you.

**Response to DEIS Comment #1**

MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**MONTGOMERY COUNTY CIVIC FEDERATION**

#1

## Montgomery County Civic Federation

The following Resolution was approved by the Montgomery County Civic Federation at its General Meeting on September 12, 2020.

Resolution of the Montgomery County Civic Federation - Draft Environmental Impact Statement - I495-I270 Expansion

Whereas The Maryland Department of Transportation State Highway Administration's (MDOT SHA) 18,000 page Draft Environmental Impact Statement (DEIS) for SHA's proposed Beltway and Interstate 270 widening plan was released on July 10 with a comment period initially established for October 8 and subsequently extended to November 9; and

Whereas, the Maryland-National Capital Park and Planning Commission (M-NCPPC) and other agencies have raised serious objections about the $11 billion project and did not concur with the proposed list of alternatives. These objections include but are not limited to: a lack of financial viability and incomplete project costs; the proposed Limits of Disturbance (LOD) does not adequately reflect the area that will be impacted during expansion of the highway; an insufficient range of alternatives; and

Whereas the Montgomery County Civic Federation, Inc. (MCCF) concurs with many of M-NCPPC's concerns; and

Whereas the MCCF believes that residents and Montgomery County government agencies need significantly more time to review, evaluate and comment on the DEIS; and

Whereas the MCCF believes that the underlying assumptions of the 300 page DEIS and its 18,000 pages of appendices need to be reevaluated in light of the changing economic and transportation conditions resulting from the global coronavirus pandemic, notably the increase in the use of telework and the recent decline in traffic volumes;

Therefore Be it Resolved that the Montgomery County Civic Federation, Inc. requests that MDOT SHA place the project on hold until the health emergency is over, and that the traffic data analysis be reevaluated based on the new travel conditions.

Approved this 14th day of September 2020.

Karen Cordry, Secretary

**Response to DEIS Comment #1**

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

![OP LANES MARYLAND] I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-7    Filed 10/30/23    Page 67 of 69

FINAL ENVIRONMENTAL IMPACT STATEMENT

**MONTGOMERY COUNTY FAITH ALLIANCE FOR CLIMATE SOLUTIONS – WALTER WEISS**

Nanci Wilkinson

Dear Sirs:

Please find attached the testimony of the Montgomery County Faith Alliance for Climate Solutions (MC-FACS) of October 27, 2020 for the NO BUILD Alternative for the above proposed project. MC-FACS is a volunteer
organization comprising over 52 diverse congregations and groups that unites people of all faiths in Montgomery County to help solve the climate emergency that is threatening our earth.

Thank you.
Walter Weiss
Montgomery County Faith Alliance for Climate Solutions

**[attachment text as follows:]**

**MONTGOMERY COUNTY FAITH ALLIANCE FOR CLIMATE SOLUTIONS
SUPPORTS THE NO BUILD ALTERNATIVE**

#1
The Montgomery County Faith Alliance for Climate Solutions (MC-FACS) supports the No Build Alternative for the Beltway Expansion project. MC-FACS is a volunteer organization comprising over 52 diverse congregations and groups in Montgomery County that unites people of all faiths to help solve the climate emergency that is threatening our earth.

#2
MC-FACS objects to the proposed Expansion of I-495 and I-270 as the project conflicts with the justice, equity and compassion principles that confirm the inherent worth and dignity of every person. The marginalized communities living near the project widening would be massively impacted by air pollution from the carbon emissions, disruption of community bonds, loss of homes and community centers. Such impacts were overlooked in the Draft Environmental Impact Statement (DEIS). According to the DEIS, 109 places of worship are located within the economic justice analysis, most of which are low income. (Appendix E Table 3-10) The harmful particulates in the greenhouse gas emissions would increase during and after construction of the Beltway, endangering public health. Low income communities cannot afford to use either the managed (toll) lanes or the time lost in the intentionally slower (general) lanes in the proposed widened Beltway.

#3
These inequities are heightened by the lack of adequate bus and transit transportation. An example of the removal of graves in the historic Moses Morningstar Cemetery because of the Beltway expansion would be the second huge impact on this low income community which was split in the early 1960's by the original Capital Beltway with the cemetery on one side and the community church on the other.

#4
The Beltway Expansion would completely conflict with the Maryland Greenhouse Gas Reduction Act of 40% reduction by 2030. The list of negative environmental impacts includes the degradation of waterways and wetlands. The Limits of Disturbance (LOO) were not thoughtfully examined in all their social, economic and cultural elements. The five year construction period was barely mentioned, yet it would have huge implications for human well being, health and work issues. It would be foolhardy to have the Limits of Disturbance examined only after the final design and

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.4.F for a response to adverse impacts to air quality. Refer to Chapter 9, Section 3.4.G for a response to climate change and greenhouse gas considerations.

#4
Cont

engineering by a private contractor.

The DEIS fails to satisfy the stated purpose {to improve traffic) and needs (to protect the environment) that it was instructed to do. Key among these issues are that the DEIS:

#5

• 1st, fails to conduct and display the required "hard look" at the potential for adverse health and environmental impacts including environmental justice effects, especially in light of recently curtailed national air pollution, fuel efficiency, and other rules. This violates rules allowing the public to understand and comment and allowing relevant agencies to completely consider impacts and mitigations,

#6

• 2nd, uses an overly narrow set of options, which are simply variations on a theme of highway expansion and tolls, with no meaningful variety and especially any local-serving transit and related options, which thus violates EIS rules regarding the need for a reasonable range of alternatives, as clearly described in cases such as N RDC v. Morton, 1972,

#7

• 3rd, fails to address the pandemic's effects, per 40 CFR 1502.9{c)(I), which states that agencies shall prepare supplements if there are significant new circumstances or information. This is a monumental omission that demands a full stop to the process until adequate supplements are developed and given proper public review,

#8

• 4th, will not pay for itself as claimed, but rather will cost the state billions, especially given the pandemic's
long-term effects, and yet no itemized budget has ever been shared, which is yet another violation of the rules, and

#9

• 5th, perhaps the most significant issue of all, lacks any consideration of county, state, or international climate crisis plans, without even one mention of climate effects in the DEIS, and with flawed and laughable assumptions such as little or no increase in vehicle miles traveled {VMT). To be clear, this failure ignores the very real and existential impact on our sheer existence and that of every other species, which would be-and this is no exaggeration-a crime against humanity and nature.

The total impact on about 80 acres, which this proposed project is attempting to buy, use or usurp by eminent domain includes:

#10

47 different parks (6 national
& 41 local and regional)
130 acres of parkland
1500 acres of tree canopy
130 miles of stream beds
410 acres of sensitive & unique Areas
16 acres on the C&O Canal (construction for 5 yrs)
One third of Plumbers Island
Road widening loss of tree canopy
69.3 acres on BW Pkway
1.8 acres on Clara Barton Pkway
12.2 acres on GW Pkway
10 mile segment of Rock Creek Park

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to DEIS Comment #6**
Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

**Response to DEIS Comment #7**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

**Response to DEIS Comment #8**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**Response to DEIS Comment #9**
Refer to Chapter 9, Section 3.4.G for a response to climate change considerations.

**Response to DEIS Comment #10**
Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

Thank you for your comment concerning impacts to resources outside of the Phase 1 South limits. As described in the Supplemental DEIS, certain churches, parks and natural resources are located outside the Preferred Alternative limits of build improvements and impacts have now been completely avoided. See Figure 1-1 in the FEIS. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies

00022444

**#10 Cont**

52-63 acres of impervious surface runoff in Rock Creek Watershed Historic properties
Many schools

Many Montgomery County congregations including Christ Congregational Church in Indian Springs would be significantly impacted by the taking of land and community assets with the Beltway Widening. Cedar Lane Unitarian Universalist Church, would be greatly impacted by this project, although the DEIS chart lists it as "no impact". The natural habitats and walking trails of Rock Creek Park are part of Cedar Lane's appreciation of spirituality in nature. The creek, the estuaries and wildlife adjoining Beach Drive and our church grounds are a community gathering place. The noise level is already extremely high and would be higher with this project.

Construction on the Beltway widening would remove the natural habitat surrounding Rock Creek and would result in stream degradation and increased sedimentation. The Draft Environmental Impact Statement states this removal of natural habitat would be mitigated but, because it would take place in an area far removed from this affected part of Rock Creek, is not a true mitigation as it can never replace the existing forest, wildlife and plant life. The DEIS would give "water quality credits" for mitigation purposes which would amount to buying rights and easements in other wetlands far from the affected area.

Healthy rivers and streams require a natural buffer from human development due to erosion and pollution runoff. The 52-63 acres of impervious surface water runoff in Rock Creek watershed would put forests at risk throughout the affected 10 mile segment. Storm water management would be increasingly strained on already insufficient piping, and the relocation of 27 miles of required WSSC water and sewer lines would cost approximately 1 billion dollars, an item not addressed in the DEIS economic impact.

**#11**

Finally, beyond the local and county concerns for parkland is the climate havoc this widening proposal would have on our personal health and lack of clean air in Montgomery and Prince George's Counties. More lanes of traffic would bring more cars and more carbon emissions and less reliance on alternative modes of travel that have much lower carbon output. Why are alternatives such as increased mass transit, rapid rail, rapid bus lanes and many other options not being seriously considered? Why can we not learn from other areas that have tried more lanes and found the disappointing effects of sometimes bankrupt private partnerships, high tolls and even more congestion in single driver cars? This Beltway Expansion proposal is a threat to our health and would adversely impact our climate. We must take action to prevent this. MC-FACS supports the No Build Alternative.

Walter Weiss
Montgomery County Faith Alliance for Climate Solutions

**Response to DEIS Comment #11**

Refer to Chapter 9, Section 3.4.F for a response to adverse impacts to air quality.

Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.