**MONTGOMERY COUNTY FAITH ALLIANCE FOR CLIMATE SOLUTIONS – NANCI WILKINSON**

SEE RESPONSE ABOVE TO **MONTGOMERY COUNTY FAITH ALLIANCE FOR CLIMATE SOLUTIONS – WALTER WEISS**.

| | |
|---|---|
| **From:** | nanci wilkinson <nanciwilkinson@gmail.com> |
| **Sent:** | Tuesday, October 27, 2020 10:02 AM |
| **To:** | MLS-NEPA-P3 |
| **Subject:** | Public Comment on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement |
| **Attachments:** | MCFACS best with signature Beltway Widening.pdf |

Dear Sirs:

Please find attached the testimony of the Montgomery County Faith Alliance for Climate Solutions (MC-FACS) of October 27, 2020 for the NO BUILD Alternative for the above proposed project. MC-FACS is a volunteer
organization comprising over 52 diverse congregations and groups that unites people of all faiths in Montgomery County to help solve the climate emergency that is threatening our earth.
Thank you.

Walter Weiss
Montgomery County Faith Alliance
   for Climate Solutions

1

Comments addressed above

## MONTGOMERY COUNTY FAITH ALLIANCE FOR CLIMATE SOLUTIONS SUPPORTS THE NO BUILD ALTERNATIVE

The Montgomery County Faith Alliance for Climate Solutions (MC-FACS) supports the No Build Alternative for the Beltway Expansion project. MC-FACS is a volunteer organization comprising over 52 diverse congregations and groups in Montgomery County that unites people of all faiths to help solve the climate emergency that is threatening our earth.

MC-FACS objects to the proposed Expansion of I-495 and I-270 as the project conflicts with the justice, equity and compassion principles that confirm the inherent worth and dignity of every person.  The marginalized communities living near the project widening would be massively impacted by air pollution from the carbon emissions, disruption of community bonds, loss of homes and community centers. Such impacts were overlooked in the Draft Environmental Impact Statement (DEIS). According to the DEIS, 109 places of worship are located within the economic justice analysis, most of which are low income. (Appendix E Table 3-10) The harmful particulates in the greenhouse gas emissions would increase during and after construction of the Beltway, endangering public health. Low income communities cannot afford to use either the managed (toll) lanes or the time lost in the intentionally slower (general) lanes in the proposed widened Beltway. These inequities are heightened by the lack of adequate bus and transit transportation. An example of the removal of graves in the

Comments addressed above

historic Moses Morningstar Cemetery because of the Beltway expansion would be the second huge impact on this low income community which was split in the early 1960's by the original Capital Beltway with the cemetery on one side and the community church on the other.

The Beltway Expansion would completely conflict with the Maryland Greenhouse Gas Reduction Act of 40% reduction by 2030. The list of negative environmental impacts includes the degradation of waterways and wetlands. The Limits of Disturbance (LOD) were not thoughtfully examined in all their social, economic and cultural elements. The five year construction period was barely mentioned, yet it would have huge implications for human well being, health and work issues. It would be foolhardy to have the Limits of Disturbance examined only after the final design and engineering by a private contractor.

The DEIS fails to satisfy the stated purpose (to improve traffic) and needs (to protect the environment) that it was instructed to do. Key among these issues are that the DEIS:
- 1st, fails to conduct and display the required "hard look" at the potential for adverse health and environmental impacts including environmental justice effects, especially in light of recently curtailed national air pollution, fuel efficiency, and other rules. This violates rules allowing the public to understand and comment and allowing relevant agencies to completely consider impacts and mitigations,

OP·LANES™
MARYLAND
I-495 & I-270 Managed Lanes Study

Comments addressed above

- 2nd, uses an overly narrow set of options, which are simply variations on a theme of highway expansion and tolls, with no meaningful variety and especially any local-serving transit and related options, which thus violates EIS rules regarding the need for a reasonable range of alternatives, as clearly described in cases such as NRDC v. Morton, 1972,
- 3rd, fails to address the pandemic's effects, per 40 CFR 1502.9(c)(1), which states that agencies shall prepare supplements if there are significant new circumstances or information. This is a monumental omission that demands a full stop to the process until adequate supplements are developed and given proper public review,
- 4th, will not pay for itself as claimed, but rather will cost the state billions, especially given the pandemic's long-term effects, and yet no itemized budget has ever been shared, which is yet another violation of the rules, and
- 5th, perhaps the most significant issue of all, lacks any consideration of county, state, or international climate crisis plans, without even one mention of climate effects in the DEIS, and with flawed and laughable assumptions such as little or no increase in vehicle miles traveled (VMT). To be clear, this failure ignores the very real and existential impact on our sheer existence and that of every other species, which would be—and this is no exaggeration—a crime against humanity and nature.

00022449

Comments addressed above

The total impact on about 80 acres, which this proposed project is attempting to buy, use or usurp by eminent domain includes:

- 47 different parks (6 national & 41 local and regional)
- 130 acres of parkland
- 1500 acres of tree canopy
- 130 miles of stream beds
- 410 acres of sensitive & unique Areas
- 16 acres on the C&0 Canal (construction for 5 yrs)
- One third of Plumbers Island
- Road widening loss of tree canopy
  - 69.3 acres on BW Pkway
  - 1.8 acres on Clara Barton Pkway
  - 12.2 acres on GW Pkway
- 10 mile segment of Rock Creek Park
- 52-63 acres of impervious surface runoff in Rock Creek Watershed
- Historic properties
- Many schools

Many Montgomery County congregations including Christ Congregational Church in Indian Springs would be significantly impacted by the taking of land and community assets with the Beltway Widening. Cedar Lane Unitarian Universalist Church, would be greatly impacted by this project, although the DEIS chart lists it as "no impact". The natural habitats and walking trails of Rock Creek Park are part of Cedar Lane's appreciation of spirituality in nature. The creek, the estuaries and wildlife adjoining Beach Drive and our church grounds are a community gathering place. The noise level is already extremely high and would be higher with this project.

Comments addressed above

Construction on the Beltway widening would remove the natural habitat surrounding Rock Creek and would result in stream degradation and increased sedimentation. The Draft Environmental Impact Statement states this removal of natural habitat would be mitigated but, because it would take place in an area far removed from this affected part of Rock Creek, is not a true mitigation as it can never replace the existing forest, wildlife and plant life. The DEIS would give "water quality credits" for mitigation purposes which would amount to buying rights and easements in other wetlands far from the affected area.

Healthy rivers and streams require a natural buffer from human development due to erosion and pollution runoff. The 52-63 acres of impervious surface water runoff in Rock Creek watershed would put forests at risk throughout the affected 10 mile segment. Storm water management would be increasingly strained on already insufficient piping, and the relocation of 27 miles of required WSSC water and sewer lines would cost approximately 1 billion dollars, an item not addressed in the DEIS economic impact.

Finally, beyond the local and county concerns for parkland is the climate havoc this widening proposal would have on our personal health and lack of clean air in Montgomery and Prince George's Counties. More lanes of traffic would bring more cars and more carbon emissions and less reliance on alternative modes of travel that have much lower carbon output. Why are

FINAL ENVIRONMENTAL IMPACT STATEMENT

alternatives such as increased mass transit, rapid rail, rapid bus lanes and many other options not being seriously considered? Why can we not learn from other areas that have tried more lanes and found the disappointing effects of sometimes bankrupt private partnerships, high tolls and even more congestion in single driver cars? This Beltway Expansion proposal is a threat to our health and would adversely impact our climate.  We must take action to prevent this. MC-FACS supports the No Build Alternative.


Walter Weiss                                    October 27,2020
Montgomery County Faith Alliance
    for Climate Solutions

Comments addressed above

00022452

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study     Case 8:22-cv-02597-DKC    Document 61-8    Filed 10/30/23    Page 8 of 106

FINAL ENVIRONMENTAL IMPACT STATEMENT

**MONTGOMERY PRESERVATION, INC. – EILEEN MCGUCKIAN**

| | |
|---|---|
| From: | Eileen McGuckian <phileen3@verizon.net> |
| Sent: | Monday, November 9, 2020 1:53 PM |
| To: | MLS-NEPA-P3 |
| Cc: | Steve Archer; elizabeth.hughes@maryland.gov; beth.cole@maryland.gov; tim.tamburrino@maryland.gov; sara.love@house.state.md.us; rebeccah.ballo@montgomeryplanning.org; councilmember.friedson@montgomerycountymd.gov; ebankjs@verizon.net |
| Subject: | DEIS Comments -- MDOT SHA I-495 & I-270 Managed Lanes P3 Program |
| Attachments: | MPI  DEIS COMMENTS 11.2020.docx |

Hon. Nicole R. Nason, Administrator
**Federal Highway Administration**
Washington, DC 20590

Hon. Aimee Jorjani, Chair
**Advisory Council on Historic Preservation**
Washington, DC 20001

Lisa B. Choplin, DBIA Director, I-495 & I-270 P3 Office
**Maryland Department of Transportation, SHA**
Baltimore, MD 21201

Jeanette Mar, Environmental Manager
Maryland Division, **Federal Highway Administration**
Baltimore, MD 21201

Steve Archer, Cultural Resources Team Leader
**Maryland DOT, State Highway Administration**
Baltimore, MD

Attached find a letter from Montgomery Preservation, Inc., a Consulting Party for the referenced project, with comments on the DEIS.

Our comments reflect concern about historic resources in Montgomery County: Moses Morningstar Hall/Cemetery and Gibson Grove AME Zion Church in Cabin John, and Montgomery County Poor Farm Cemetery in Rockville.

Thank you very much,

Eileen McGuckian, President
Montgomery Preservation, Inc.

1

See responses to your comments on the following pages.

LETTERHEAD and November 9, 2020

Hon. Nicole R. Nason, Administrator
**Federal Highway Administration**
Washington, DC 20590

Hon. Aimee Jorjani, Chair
**Advisory Council on Historic Preservation**
Washington, DC 20001

Lisa B. Choplin, DBIA Director, I-495 & I-270 P3 Office
**Maryland Department of Transportation, SHA**
Baltimore, MD 21201

Jeanette Mar, Environmental Manager
Maryland Division, **Federal Highway Administration**
Baltimore, MD 21201

*Re: MDOT SHA I-495 & I-270 Managed Lanes P3 Program – DEIS Comments*
*Historic resources in Montgomery County: Moses Morningstar Hall/Cemetery and Gibson Grove*
*AME Zion Church in Cabin John, Montgomery County Poor Farm Cemetery in Rockville*

**#1**

Montgomery Preservation, Inc. (MPI), as a recognized Consulting Party for the referenced project, calls your attention to insufficient analysis and safeguards provided to three historic resources identified in the Draft Environmental Impact Statement now under review.

The three sites are Moses Morningstar Cemetery (M: 35-212) and Montgomery County Poor Farm Cemetery (18MO266), two burial grounds listed in the Montgomery County Burial Sites Inventory (adopted by Montgomery County Planning Board in May 2019) and Gibson Grove A.M.E. Zion Church (M: 29-39), designated on the Montgomery County Master Plan for Historic Preservation in 1993.

All three of these sites require and are worthy of further documentation and analysis in the EIS. All three are placed at serious risk under the known plans for this road program, and they are located within the LOD for the proposed project.

Moses Morningstar Tabernacle No. 88 Hall and Cemetery and Gibson Grove A.M.E. Zion Church are prominent historic resources, extant representatives and the heart of the thriving post-Emancipation African American community in Cabin John. Throughout this year, MPI has been participating in documentation, clean-up, and title clarification activities on behalf of the cemetery. Both sites were so damaged by construction of the Capital Beltway in the 1960s and would be so adversely affected by this current road project that avoidance is the only appropriate strategy to employ.

The Montgomery County Poor Farm cemetery is an archaeological resource identified by the National Park Service and in the County Burial Sites Inventory. Construction of the interstate in the 1950s unearthed human remains that were near the known cemetery area of this 130-acre property, and subsequent construction projects in the 1980s and 1990s resulted in removals of more human

**Response to DEIS Comment #1**

MDOT SHA has been continuing investigation of the Morningstar Tabernacle No.88 Moses Hall and Cemetery, and consultation with community representatives since publication of the DEIS and the SDEIS. The Preferred Alternative avoids ground disturbance of the Morningstar Tabernacle No.88 Moses Hall and Cemetery and MDOT SHA will commit to context-sensitive treatment of the cemetery through a Programmatic Agreement developed in compliance with Section 106 of the National Historic Preservation Act. The Gibson Grove First Agape AME Zion Church structure will not be affected, although there will be temporary construction use of a portion of the property. MDOT SHA will stipulate measures to avoid, minimize, or mitigate effects to the church as part of the Section 106 Programmatic Agreement. MDOT SHA acknowledges there is some potential for human remains associated with historic properties to be present adjacent to the Morningstar Tabernacle No.88 Moses Hall and Cemetery and in the general location of the Montgomery County Poor Farm, which are not currently accessible for the types of thorough archaeological investigation necessary to definitively identify interments. MDOT SHA will work with the developer to minimize LOD to the maximum extent practicable in these areas. The Treatment Plan included in the Programmatic Agreement will include proposed investigations to identify and evaluate potential graves or human remains in specified sensitive areas to the maximum extent practicable to ensure avoidance or treatment prior to final design and construction.

#1
Cont

remains, some of which were reinterred elsewhere.    While at any given time small numbers of dependent, needy persons were living at this institution, burials over some 200 years did add up to a substantial amount.  Without question, more human remains can be expected to be discovered in place when new construction begins.

Federal, State, and local protections need to be aggressively invoked within the Managed Lanes project.  All three were adversely impacted by either the 1950s or the 1960s construction of these interstate highways. These previous physical and environmental impacts must be must be taken into account while evaluating current plans, that propose to add further cumulative impacts. Without fully analyzing these sites and possible effects, SHA cannot adequately evaluate alternatives that could avoid or mitigate negative impacts on recognized historic sites.

        Both avoidance and mitigation

#2

I am writing in support of the ongoing efforts of the Friends of Moses, a recognized consulting party of descendants and community stakeholders under NEPA and Section 106 for MDOT SHA's I-495 & I-270 Managed Lanes P3 project, to protect, restore, and preserve the Morningstar Moses Hall and Cemetery, as well as the Gibson Grove First Agape A.M.E. Zion Church, in Cabin John, Maryland. As you are aware, both of these historic cultural resources are threatened by MDOT SHA's I-495 & I-270 P3 Program Phase I.

#3

        I insist that consulting parties be assured to have meaningful input and review of all phases of site design and its associated decision-making, and it is imperative that the MDOT SHA's P3 partner commit to this as a requirement of the State.

    Sincerely,

    _____

    cc:
    Steve Archer, MDOT SHA - sarcher@mdot.maryland.gov
    Elizabeth Hughes, Director, Maryland Historical Trust and SHPO
    Hon. Sidney Katz, President, Montgomery County Council
    Friends of Moses Hall   morningstarmosescj@gmail.com
    Rebeccah Ballo, Montgomery Planning   rebeccah.ballo@montgomeryplanning.org
    Bankheads
    Tim Tamborrino

**Response to DEIS Comment #2**
Through the Section 106 review, MDOT SHA has completed extensive historical and archaeological research that thoroughly documents the Morningstar Tabernacle No. 88 Moses Hall Cemetery and its significant features, allowing the Preferred Alternative to avoid all known impacts.  MDOT SHA will continue to work with the community through the project's Programmatic Agreement.

**Response to DEIS Comment #3**
The first draft of the PA was provided in March 2021 and the revised PA was shared in January 2022. The revised PA incorporated changes and more detail based on input received from the Section 106 consulting parties including the Friends of Moses Hall.  The Final PA will be included with the FEIS.

00022455

**MULTIPLE ORGANIZATIONS – JEANNE BRAHA**

| | |
|---|---|
| **From:** | Jeanne Braha <jbraha@rockcreekconservancy.org> |
| **Sent:** | Tuesday, August 25, 2020 7:48 AM |
| **To:** | jeanette.mar@dot.gov; 495-270-P3 |
| **Cc:** | Josh Tulkin; Jeanne Braha |
| **Subject:** | Request for extension of comment period on Draft Environmental Impact Statement for 495/270 P3 |

August 25th, 2020

Jeanette Mar
Environmental Program Manager
Federal Highway Administration, Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore MD 21201
jeanette.mar@dot.gov

Lisa B. Choplin
Project Director
I-495 and I-270 P-3 Project Office
Maryland Department of Transportation State Highway Administration
707 North Calvert Street, Mail Stop P-601
Baltimore MD 21202
495-270-P3@sha.state.md.us

Dear Ms. Mar and Ms. Choplin,

**#1**

We, the undersigned organizations, strongly urge the Maryland Department of Transportation State Highway Administration and the Federal Highway Administration (Agencies) to announce that the Draft Environmental Impact Statement (DEIS) of the proposed I-495 & I-270 Public-Private Partnership (P3) Program posted on the website on July 10, 2020 was incomplete, and provide an itemized list of what changes were made to the posted DEIS after it was originally posted and when these changes were made. The Agencies must then extend the comment period to **90 days from the day of that announcement.**

This announcement should be sent to all interested parties and at least everyone who signed up to receive email updates. We request that the Agencies explain whether any of the in-person viewers of the DEIS and appendices viewed the incomplete DEIS. We request a list of all the locations in which the full DEIS document and all appendices can be viewed in hard copy.

**#2**

The Agencies released a DEIS of the proposed I-495 & I-270 Public-Private Partnership (P3) Program on July 10, 2020 for public review. After this official release there were then changes made to the posted documents. These changes were reported in *Bethesda Magazine*, and the changes bring the already voluminous DEIS to over 19,000 pages. The changes to the initial posting are verifiable by anyone who downloaded documents on the first day and by the Wayback Machine from the morning of Saturday, July 11 which has a different file name for Appendix C Traffic Analysis Technical Report than the one online today.
By law, the public is entitled to review entire documents in relation to the over 70 mile, $11 billion proposed project, which is expected to have significant negative impacts on parklands, taxpayers, communities, climate, and public health. The project will impact dozens of community resources such as schools, parks, hospitals, local businesses, and more. Downstream impacts of the project would range from Rock Creek Park in our region all the way to the Chesapeake Bay in relation to stormwater runoff.

1

**Response to DEIS Comment #1**

The DEIS and supporting technical studies were made available from July 10, 2020 to November 9, 2020, a total of 123-days. Refer to Chapter 9, Section 3.7 for a response to comments related to public involvement and engagement.

**Response to DEIS Comment #2**

On July 10, 2020, the DEIS was released on the I-495 & I-270 P3 Program website and on the U.S. Environmental Protection Agency (USEPA) EIS Database webpage, along with all supporting technical reports. The agency included technical reports consistent with existing (and proposed revised) NEPA regulations, which state that if an agency prepares an appendix to an EIS, that appendix "shall be circulated with the EIS or be readily available on request." See 1502.18 (19)

The full set of DEIS and 19 technical documents was available at the in-person DEIS viewing locations in hard copy (DEIS and JPA) on iPads (Technical Reports) starting on July 10th and all documents in hard copy at two of the MDOT SHA in-person DEIS viewing locations also starting on July 10th. The full set of documents were also available on the USEPA EIS Database website as referenced in the Federal Register.

However, on July 11, 2020 staff noted that supporting documents (technical appendices) to 2 of the 19 technical reports, the Alternatives Technical Report and Traffic Technical Report, were not immediately uploaded to the I-495 & I-270 P3 Program website. Again, the underlying Reports summarized in the DEIS were available, only a few supporting appendices to these reports did not appear on the website. It was immediately corrected and within 24-hours of the original uploading of the DEIS, the missing supporting documents were uploaded to the P3 Program website.

Comments addressed above.

**#2 Cont**

Under both the old and new NEPA regulations, the Agencies are required to circulate the appendices with the environmental impact statement or for them to be readily available upon request. 40 C.F.R. § 1502.18; 85 Fed. Reg. 43,304, 43,366 (July 16, 2020) (to be codified at 40 C.F.R. § 1502.19). By changing the version of Appendix C and belatedly posting Appendix A & B (together adding over 1,600 pages), the Agencies did not meet this requirement and provided an incomplete DEIS. Everyone who downloaded the files before the Agencies updated the appendices, including many of the undersigned organizations, has unknowingly been reviewing incomplete information. As the Agencies have access to the download numbers, we request to know how many people downloaded documents in error.

It is unclear why the Agencies didn't inform and still haven't informed those people that they did not receive the entire environmental impact statement. Until the Agencies do so, the 90 day comment period cannot begin; it would arbitrarily shorten the comment period for those people or worse, leave some of the public commenting on incomplete information, and would be unlawful. Further, the Agencies must add public hearings at least 15 days after the Agencies provide notice to the public that the posted DEIS was incomplete. 40 C.F.R. § 1506(c).

Respectfully submitted,

Alliance for Regional Cooperation
Audubon Naturalist Society
Baltimore Transit Equity Coalition
Cedar Lane Unitarian Universalist Church Environmental Justice Ministry
Central Maryland Transportation Alliance
Chesapeake Bay Foundation
Citizens Against Beltway Expansion
Coalition for Smarter Growth
Conservation Montgomery
Corazón Latino
Dontwiden270.org
DoTheMostGood Montgomery County
Forest Estates Community Association
Friends Of Sligo Creek
Glen Echo Heights Mobilization
HoCo Climate Action
Interfaith Power & Light (DC.MD.NoVA)
League of Women Voters of Maryland
Maryland Conservation Council
Maryland Legislative Coalition
Maryland Sierra Club
Maryland Native Plant Society
National Parks Conservation Association
Neighbors of the Northwest Branch
North Hills of Sligo Creek Civic Association
Rock Creek Conservancy
Sunrise Howard County
Takoma Park Mobilization Environment Committee
The Advocacy Committee at Greater Greater Washington
The Canto Law Firm, LLC
Unitarian Universalist Legislative Ministry of Maryland
Washington Area Bicyclist Association
WISE
Wyngate Citizens Association

--

2



I-495 & I-270 Managed Lanes Study

Jeanne Braha
Executive Director
**Rock Creek Conservancy**
7200 Wisconsin Avenue, Suite 500, Bethesda, MD 20814
jbraha@rockcreekconservancy.org
301-579-3105

Friend us on Facebook
Follow us on Twitter
Follow us on Instagram

3

*This page is intentionally left blank.*

OP·LANES MARYLAND | I-495 & I-270 Managed Lanes Study     Case 8:22-cv-02597-DKC    Document 61-8    Filed 10/30/23    Page 14 of 106

FINAL ENVIRONMENTAL IMPACT STATEMENT

**NATIONAL PARKS CONSERVATION ASSOCIATION – PAMELA GODDARD**

| From: | Pamela Goddard <PGoddard@npca.org> |
|---|---|
| Sent: | Tuesday, November 3, 2020 3:38 PM |
| To: | MLS-NEPA-P3; john.j.dinne@usace.army.mil; MDE.SHAprojects@maryland.gov |
| Subject: | : I-495 & I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA) |



November 3, 2020

Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21201

Jack Dinne
USACE Baltimore District
2 Hopkins Plaza
Baltimore, MD 21201-2930

Steve Hurt
MDE Wetlands and Waterways Program
1800 Washington Blvd., Suite 4300
Baltimore, MD 21230-1708

Submitted via email to MLS-NEPA-P3@mdot.maryland.gov, john.j.dinne@usace.army.mil,
MDE.SHAprojects@maryland.gov

**Re: I-495 & I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA)**

To Whom It May Concern:

**#1** I am writing on behalf of the 1.4 million members and supporters of the National Parks Conservation Association, a nonpartisan nonprofit organization dedicated to preserving and protecting our national park sites for present and future generations. We are writing to share our support for *Alternative 1: No Build* listed in the Draft Environmental Impact Statement (DEIS) of the I-495 & I-270 Managed Lanes Study.

**#2** We oppose the build alternatives in the proposed highway expansion because:
- this project would cost billions of dollars with $1 billion or more borne predominantly by Maryland taxpayers with little public benefit;
- decades of studies demonstrate that building more highways will not alleviate traffic congestion and transit-friendly alternatives were not considered;
- changes in traffic patterns due to the coronavirus have not been assessed;

1

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

00022459

OP-LANES MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-8    Filed 10/30/23    Page 15 of 106

FINAL ENVIRONMENTAL IMPACT STATEMENT

**#2 Cont**

- impacts to economically challenged populations have not been studied;
- the DEIS purpose and need is written so narrowly that it precludes viable alternatives to building more roads;
- the proposed expansion would negatively impact seven national parks sites; and
- the DEIS and the 4(f) evaluation are incomplete, preventing agencies and the public from knowing the true impacts of the highway expansion and how these impacts could be avoided or mitigated.

**A Supplemental EIS and a Revised Section 4(f) Evaluation are Necessary Before a Final EIS is Released**

**#3**

Because the DEIS's analysis is incomplete, it is impossible for the Agencies to assess, and the public to comment on, the Project's impacts. In numerous instances throughout the DEIS, it is stated that the information required will be shared in the final EIS, which is contrary to the law. The Agencies cannot wait until a final EIS is complete to analyze the Project's impacts, as it will then be too late for the public to meaningfully comment on them and for the Agencies to consider the public's comments and choose the alternative that best alleviates the impacts based on this information. In addition, the Section 4(f)
Evaluation is incomplete because the Agencies did not complete the full identification of historic resources and the full extent of their use. The Agencies also failed to address the direct and indirect impacts to these historic resources.

We respectfully request that the Agencies conduct a supplemental EIS and a revised Section 4(f) Evaluation to provide the public the ability to meaningfully review and comment on potential impacts **before** a final EIS is produced.

The National Parks Conservation Association has worked with a coalition of groups and individuals including the Maryland Sierra Club, the Audubon Naturalist Society, the Rock Creek Conservancy, and the Coalition for Smart Growth, represented by the law firm Jill Grant & Associates, to submit group comments on the DEIS. NPCA wholly supports the coalition comments as submitted. We are submitting this letter in addition to the coalition comments to share our specific concerns regarding impacts to our national park sites by the *I-485 & I-270 MANAGED LANES STUDY DEIS*.

**Impacts to Seven National Park Sites**

**#4**

As proposed, this project would harm more than 130 acres of park lands, comprising almost 100 acres at six national parks sites including Greenbelt Park, the Chesapeake & Ohio Canal National Historical Park, the George Washington Memorial Parkway, the Clara Barton Memorial Parkway, the Baltimore-Washington Parkway, and Suitland Parkway. These parks would lose woodlands, nature trails and recreational sites, as well as habitat for wildlife and endangered plants. In total, 1,500 acres of forest canopy would be lost, nearly 30 miles of streams would be affected, and four acres of wetlands would be filled.

The project would also create an additional 550 acres of new pavement in the region, increasing polluted stormwater runoff in Rock Creek Park and the Chesapeake Bay. The DEIS seeks to place stormwater abatement infrastructure in the parks, taking additional park acreage and requiring the National Park Service to manage the stormwater impacts, rather than leaving that responsibility with the Maryland Department of Transportation. Finally, this project would increase air pollution and greenhouse gas emissions throughout the region.

Greenbelt Park, the Chesapeake & Ohio Canal National Historical Park, George Washington Memorial Parkway, Clara Barton Memorial Parkway, Baltimore Washington Parkway, Suitland Parkway, and Rock Creek Park are each listed or eligible for listing in the National Register of Historic Places.

**C & O Canal, Greenbelt, and Rock Creek Parks**

The C & O Canal, Greenbelt and Rock Creek Parks provide critical green space to outdoor enthusiasts in an urban area. Visitation has increased dramatically during the coronavirus pandemic. Constructed in the early 19th century, the **Chesapeake & Ohio Canal** connected growing industrial areas west of the Appalachian Mountains with Atlantic ports and trade. For almost 100 years it served as a critical link in bringing coal to power the Mid-Atlantic region before becoming a

2

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.3.D for a response to Analysis of Alternatives Retained for Detailed Study.

Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

**Response to DEIS Comment #4**
The Preferred Alternative would have an estimated permanent impact of 1.0 acres to the Chesapeake and Ohio Canal National Historical Park, and an estimated temporary impact of 9.1 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 0.6 acres to George Washington Memorial Parkway, and an estimated temporary impact of 3.8 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 1.1 acres to Clara Barton Parkway, and an estimated temporary impact of 0.7 acres during construction.

Thank you for your comment concerning impacts to The Baltimore-Washington Parkway, Suitland Parkway, and Greenbelt Park. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because Baltimore-Washington Parkway, Suitland Parkway and Greenbelt Park are located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

Comments addressed above.

**#4 Cont**

national monument in 1961. The highway expansion threatens up to 16 acres of the canal. Expanding the nearby highway overpasses will increase air, noise, and light pollution, hindering enjoyment of many of the historic locks used to allow boat crossing in the past and the towpath along its bank that is visited by millions each year. Within the Canal lies the ecologically and historically unique Plummers Island that is known for its incredible biodiversity and wide ranging geologically features. Up to 50% of this island could be impacted by the expansion. And the DEIS states that sections of this national park site would be closed to visitors for up to five years during highway construction, preventing the enjoyment of this park by the over 5 million hikers, campers, bicyclists, and outdoor enthusiasts who visit the park each year.

**Greenbelt Park,** a green oasis in the midst of the greater DC region, is beloved by the over 150,000 annual visitors who come to hike, bike, picnic or camp to escape the bustle of the city. Proposed elevated traffic ramps and sound walls will encroach into the park's Perimeter Trail, one of the park's most utilized features by cyclists, runners, and hikers. Increased traffic noise and highway lighting will negatively impact the park experience for those sleeping in the park's 174 camp sites or hiking its trails.

**Rock Creek Park** provides over 2000 acres of green space to the DC area's 2.2 million visitors yearly, all brought to life by the creek itself. Multiple stream valley units north of the park protect its water quality, wildlife habitat, and connectivity. More than 4 of these acres could be impacted, creating a ripple effect into Rock Creek Park itself. The addition of up to 63 miles of impervious surfaces, removal of trees and vegetation, and soil degradation from construction activity upstream will damage the park's water quality and overall environmental health.

**Scenic Parkways**

Parkways are a special class of national park intentionally designed as a scenic road to connect sites of historic significance. Four Scenic Parkways, three of which are listed on the National Register of Historic Places, would be damaged by the highway expansion. The **Baltimore-Washington Parkway** faces almost 70 acres of the park paved or otherwise disrupted. This parkway was designed to welcome visitors to our nation's capital. **Clara Barton Memorial Parkway** leads visitors to the home of Barton, founder of the American Red Cross, in Glen Echo, Maryland.

Over 12 acres of one of our oldest parkways, the **George Washington Memorial Parkway,** is at risk. This parkway connects over 7.5 million motorists to sites honoring George Washington, Clara Barton, Teddy Roosevelt, and Lady Bird Johnson each year.

Built during World War II, **Suitland Parkway** was created to provide a direct route from military facilities and the United States Capitol. Like the Baltimore-Washington Parkway, Suitland Parkway is listed on the National Register of Historic Places. Maryland DOT states in the DEIS that it does not know the full extent of the impact to Suitland; that it may seek complete ownership of the Parkway or complete use under a Special Use Permit. The fact that the DEIS cannot identify potential acreage and impacts to this park site dramatically underscores the need for a supplemental EIS before a final EIS is released.

The proposed expansion will require numerous changes to each parkway experience including the additions of large signs both metal and electric, access and exit ramps that disrupt the flow of traffic along the parkway, the addition of large elevated exit and entrances, and new overpasses. Parkways were never intended to serve as commuter routes and the highway expansion would increase speed limits, leading to even more noise pollution. Large trucks are currently not allowed on the parkways to prevent noise and air pollution and it is unclear in the DEIS if this restriction will remain. Noise abatement is not discussed in the DEIS for the parkways. The proposed highway expansion will escalate polluted stormwater runoff, remove important habitat, fragment wildlife corridors, spread invasive plants, and increase noise and visual intrusion on these scenic parkways.

Finally, complete impacts to the national parks by the proposed highway expansion is difficult to determine because the DEIS is so sorely lacking in specific details. Because the project would be designed and construction by a so far unknown

3



**#4 Cont**

private company, the limits of disturbance (LOD) can only be estimated by MDOT. The Maryland National Capital Park and Planning Commission's Special Project Manager Carol S. Rubin stated in an October 19 briefing memo to the Commission that "there is significant risk that the LOD will be much larger than what is reflected in the DEIS". She also noted that "M-NCPPC has identified numerous locations where the LOD does not appear adequate for construction of these outfalls, necessary perennial stream stabilization, and roadway infrastructure." Not knowing the actual LOD makes it impossible for the public to know what will be impacted and therefore unable to comment on these impacts. The Commission unanimously voted to oppose the project.

**USACE and MDE Must Reject Clean Water Permits**

**#5**

Although all build alternatives in the DEIS would have substantial direct impacts to streams, wetlands, and floodplains, Maryland Department of Transportation State Highways Administration (MDOT SHA) has not demonstrated that practicable alternatives have been analyzed and that the regulated activity has no practicable alternative. The U.S. Army Corps of Engineers and the Maryland Department of the Environment must reject MDOT's application for a Clean Water Act Section 404 permit or any alteration of a floodplain waterway tidal or nontidal wetland in Maryland unless and until MDOT SHA demonstrates that impacts have been avoided, minimized and/or mitigated.

On behalf of the National Parks Conservation Association, we reiterate our support for *Alternative 1: No Build* listed in the Draft Environmental Impact Statement (DEIS) of the I-495 & I-270 Managed Lanes Study. We urge both the U.S. Army Corps of Engineers and Maryland Department of the Environment to deny any Clean Water Act Section 404 permit and any permit to alter a floodplain wetland under Maryland law for this proposal. Finally, we strongly urge MDOT SHA to conduct a Supplemental EIS to complete the multitude of gaps in the present DEIS before a final EIS is released.

Sincerely,

*Pamela E. Goddard*

Pamela E Goddard
Senior Program Director,
Mid-Atlantic Region
National Parks Conservation Association
pgoddard@npca.org
202.604.3781

Headquarters
777 6th Street, NW, Suite 700
Washington, DC 20001
P 202.NAT.PARK  |  202.628.7275          NPCA.org

 **Pamela E. Goddard**
*Senior Program Director, Mid-Atlantic Region* | National Parks Conservation Association
*Your parks. Your turn.*

4

**Response to DEIS Comment #5**

MDOT SHA has demonstrated that impacts have been avoided and minimized to the greatest extent practicable at this stage of design and has provided a comprehensive mitigation plan in the JPA package, which includes an Avoidance, Minimization, and Impacts Report and the Final Compensatory Mitigation Plan.

A Supplemental Draft Environmental Impact Statement (SDEIS) was prepared to consider new information relative to the Preferred Alternative, Alternative 9 - Phase 1 South. Building off the analysis in the existing DEIS, the SDEIS disclosed new information relevant to the Preferred Alternative focusing on new information while referencing the DEIS for information that remains valid. The SDEIS also described the background and context in which the Preferred Alternative, Alternative 9 - Phase 1 South was identified. The SDEIS was available for the public to review and comment on the Preferred Alternative during a 60-day comment period.

**NATIONAL PARKS CONSERVATION ASSOCIATION – KYLE HART**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Kyle Hart

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Live Testimony/Afternoon

**Transcription:**

No worries, no worries. My name is Kyle Hart, K-Y-L-E, H-A-R-T and I live at 1714 13th Street, Northwest Washington, D.C., 20009. Today, I'm speaking on behalf of the National Parks and Conservation Association, NPCA. I am also a regular user of the dozens of local parks that this proposal would impact. NPCA works daily to protect and enhance America's National Parks system and preserve it for present and future generations. We have over 70,000 members and supporters in the Maryland, Virginia, and D.C. region. NPCA fully opposes the proposed widening of I-495 and I-270 as written in the DEIS. At this time, Alternative 1, No Build is the only considered alternative that we could support. This proposal will directly impact 47 parks, including six distinct units of the National Park System, Greenbelt Park, Chesapeake and Ohio Canal, George Washington Memorial Parkway, Clara Barton Parkway, the Suitland Parkway, and Baltimore Washington Parkway. It will also indirectly impact Rock Creek Park and all of the other numerous National Park units downstream of this proposal all the way into the Chesapeake Bay. In total 100 acres of the National Park, about 100 acres of the National Park land fall within the limit of disturbance. This is of course, not to mention the numerous more acres of local and regional parks under threat. Parks in developed areas are now more important than ever. COVID lockdowns have pushed people in this region to parks in droves. And any attempt to turn 130 acres of these park lands into pavement is simply unacceptable in our eyes. The Department of Transportation Act of 1966, Section 4(f) stipulates that all DOT agencies cannot approve the use of land from publicly owned parks and recreation areas unless there is no feasible and proven alternative to the use of the land.

However, many alternatives to this massive highway expansion were not studied in depth in this DEIS. They were scratched at the very, very outset. Alternatives 2, 12a, 12b, 13a, 14a, 14b, 14c, and 15 would all likely have negligible impacts on park lands and reduce traffic to some degree. Therefore, NPCA urges MDOT SHA to go back to the drawing board and fully study the numerous alternatives that were scratched in the very beginning of this DEIS. The public deserves to know what those alternatives could look like, their potential for traffic reduction and their impacts to park and community resources. Only then should MDOT move forward on making a final decision on this project. NPCA looks forward to submitting more comments in depth on this proposal in the future and continuing to participate in this process. Thank you for your time.

**Response to DEIS Comment #1**
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**Response to DEIS Comment #2**
The Preferred Alternative would have an estimated permanent impact of 1.0 acres to the Chesapeake and Ohio Canal National Historical Park, and an estimated temporary impact of 9.1 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 0.6 acres to George Washington Memorial Parkway, and an estimated temporary impact of 3.8 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 1.1 acres to Clara Barton Parkway, and an estimated temporary impact of 0.7 acres during construction.

Thank you for your comment concerning impacts to The Baltimore-Washington Parkway, Suitland Parkway, and Greenbelt Park. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because Baltimore-Washington Parkway, Suitland Parkway and Greenbelt Park are located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.


**NATIONAL PARK SEMINARY MASTER ASSOCIATION – CHRIS OSWALD (EMAIL)**

*This page is intentionally left blank.*

| | |
|---|---|
| **From:** | Chris Oswald <cj.oswald@gmail.com> |
| **Sent:** | Friday, November 6, 2020 7:52 PM |
| **To:** | MLS-NEPA-P3 |
| **Cc:** | Lois Todhunter; Marty Reed; Xiomara Metcalfe; Bob Biersner; Vos, Dave |
| **Subject:** | Comments--DEIS, I-495 and I-270 Managed Lanes Study |
| **Attachments:** | NPSMA DEIS Comments (Final 201106)_signed.pdf |

Ms. Choplin:

I have attached comments that the National Park Seminary Master Association (NPSMA) has prepared regarding the Draft Environmental Impact Study for the I-495 and I-270 Managed Lanes Study. I am submitting these comments on behalf of Lois Todhunter, President of the NPSMA's Board of Directors.

We appreciate consideration of our comments by the Maryland State Highway Administration.  If you have any questions regarding these comments, please contact me at cj.oswald@gmail.com or Lois Todhunter at lois.todhunter@gmail.com.

Sincerely,
Chris Oswald
Treasurer
National Park Seminary Master Association

1



**NATIONAL PARK SEMINARY**
Modern Living | Historic Setting
www.nationalparkseminary.org

Lois Todhunter
President
Board of Directors
National Park Seminary Master Association
9610 Dewitt Dr., #SH102
Silver Spring, MD 20910

November 6, 2020

Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21201

Dear Ms. Choplin:

I am pleased to submit the following comments regarding the Draft Environmental Impact Study (DEIS) for the I-495 & I-270 Managed Lanes Study (the Project) on behalf of the National Park Seminary Master Association (NPSMA). The NPSMA Board of Directors has authorized me to submit these comments on behalf of the entire NPSMA membership.

The National Park Seminary (NPS) is a unique historic (recently renovated) residential community of single-family homes, condominiums, townhomes, and apartments located in the Forest Glen section of Silver Spring, MD, with almost 900 linear feet abutting I-495 just south of the noise reduction barriers installed during the previous highway expansion. Our Master Association, a registered homeowners association in the State of Maryland, encompasses 25 acres of land that includes 7 single-family homes; 90 townhomes; 76 condominiums; a county-managed, 20-bed facility currently used as office space for homeless housing assistance organizations; and 66 apartments. Six of the single-family homes, and all the condominiums and apartments, are situated in historic structures. Forty-four of the 66 apartments are Section 42 affordable housing units, reserved for those with incomes at or below 60% of our area's median income, creating a diverse neighborhood serving people of all incomes. NPSMA estimates that over 500 residents live here, including between 100 and 130 residents (adults and children).

*This page is intentionally left blank.*

Ms. Choplin
November 6, 2020
Page 2

Much of NPS is located within the 21-acre National Park Seminary Historic District in the Forest Glen neighborhood section of Silver Spring—which is listed on the National Register of Historic Places and on the State of Maryland's Inventory of Historic Sites. As such, our property is subject to Section 106 of the National Historic Preservation Act. Our Historic District encompasses all our historic structures, which date back to 1887 as well as the heavily wooded and variable terrain that provides the setting and environmental context that is significant to the historic character of the buildings. Even the DEIS itself acknowledges this by noting, "Elements that contribute to the significance of the historic site include the 22 standing structures, *surrounding wooded landscape,* stone retaining walls, statuary, numerous walkways, and numerous footbridges."[1] [Emphasis added.]

The community's grounds are open to the public from dawn to dusk and are a unique and irreplaceable historic, cultural, and natural resource to Montgomery County and the State of Maryland. As noted on the nomination form that led to the property's inclusion in the National Register:

[The] acres of wooded land create a rural vista in the midst of congested, suburban Washington. The Seminary grounds offer welcome open space and lend an air of bucolic dignity to homeowners in the vicinity.[2]

### NPSMA Position Regarding the Project

The NPS opposes all of the build alternatives[3] proposed in the DEIS. All would dramatically, directly, and adversely impact the NPS. We do support Alternative 1, the No Build Alternative.

We are extremely concerned by the insufficient and incomplete work in the DEIS, particularly with respect to the presumptive and problematic structuring of the project purpose and need, incomplete and insufficient alternatives analysis, woefully deficient assessments of alternative impacts and mitigation, and an insufficient public involvement process particularly given the extenuating circumstances of the COVID-19 pandemic.

### Key NPSMA Concerns Regarding the Project Impacts

The NPSMA is concerned about the Project's impacts on the quality of life of the residents of the NPS and our neighbors in the surrounding communities of Forest Glen Park, Forest Glen, and Montgomery Hills. We also are concerned about the direct adverse impacts the Project will have on

---

[1] P. 61, Appendix F—Draft Section 4(f) Evaluation, *Draft Environmental Impact Statement and Draft Section 4(f) Evaluation,* May 2020.
[2] P. 7, National Register of Historic Places Nomination Form—*National Park Seminary Historic District,* September 14, 1972. (Available at https://catalog.archives.gov/id/106777846)
[3] Alternatives 8, 9, 9 Modified, 10, 13B, and 13C.

**#1** (left margin)

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to the National Park Seminary. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the National Park Seminary is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

Potential cost of utility relocation has consistently been factored into the overall estimates developed for the project. The reduced footprint of proposed improvements associated with the Preferred Alternative as compared to the Build Alternatives discussed in the DEIS, together with ongoing coordination to identify, avoid and minimize conflicts with existing infrastructure to the maximum extent practicable have lowered the cost estimates significantly. It is too early in the predevelopment process to determine the exact scope and cost of any utility relocations that may still be required, but it now appears that these costs will be significantly lower than WSSC's original estimates.

Refer to Chapter 9, Section 4.M for a response to impacts to utilities and associated cost of repairs as well as Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

00022466

Comments addressed above.

Ms. Choplin
November 6, 2020
Page 3

**#1 Cont**

our unique historic property. These concerns involve impacts that will occur during the construction of the Project and those that will occur for decades to come after the project is completed.

The NPSMA owns a large parcel of property that abuts I-495 as depicted in Figure 1. This parcel contains our historic glen and the tributaries of Rock Creek that run through it (referred to henceforth as "the Glen"). Numerous historic structures and architectural features are located within the Glen, a serene parklike setting that residents and the general public enjoy.



*Figure 1*

The Project will require relocation of the Linden Lane and CSX railroad bridges over I-495 onto the northwestern and northeastern corners of our property, causing adverse impacts to our historic site.[4]

From the Project diagrams shown in Map 68 of Appendix D of the DEIS[5] and Impact Plate 14A of the Joint Federal/State Permit Application (JPA) for the I-495 & I-270 Managed Lanes Study,[6] prepared concurrently with the DEIS, it appears that the Project will directly disturb more than an acre of NPSMA property in, and adjacent to, the Glen, with most of this area being proximate to historic

_____

[4] P. 24, Appendix G—Cultural Resources Technical Report, Volume 1, *Draft Environmental Impact Statement and Draft Section 4(f) Evaluation*, December 2019.
[5] P. 69, Appendix D—Environmental Resource Mapping, *Draft Environmental Impact Statement and Draft Section 4(f) Evaluation*, June 2020.
[6] P. 26, Part 2A, Impact Plates, *Joint Federal/State Permit Application (JPA) for the I-495 & I-270 Managed Lanes Study*, April 2020.

00022467

Comments addressed above.

**#1 Cont**

Ms. Choplin
November 6, 2020
Page 4

structures on our property, as well as an adjacent historic property. Appendix F of the DEIS indicates that between 1.2 and 1.3 acres of the NPS site would be directly impacted as part of the Project.[7]

The natural setting of the Glen and historic structures therein would be replaced by bridge abutments and piers, and the tributaries to Rock Creek would be rechanneled. Moreover, it appears that at least some of the property acquired from us for the Project would be used to accommodate the relocated bridges.

From our review of the documentation provided in the DEIS, the Project will have the following impacts on the NPSMA:

- Irreversible alteration of historic and culturally significant National Park Seminary property, especially in the Glen on the northern portion of our property.

- Increased noise impacts on NPS residents, particularly those residents who occupy historic, multistory NPS structures. These structures have top stories higher than proposed sound walls, exposing them to both direct and reflected noise from the increased traffic volumes served by the widened I-495 highway. The historic structures accommodate all forty-four Section 42 affordable housing units, raising associated environmental justice concerns.

- Alteration of the natural course used by the tributaries of Rock Creek, identified in the DEIS as Delineated Features 16G and 16I, that flow through the Glen on the northern portion of the property, potentially adversely impacting water quality and changing the natural character of the Glen.

- Disruption of the natural environment in the Glen, adversely affecting enjoyment of the Glen, which is open to both NPSMA residents and the general public, because of likely closures of substantial portions of the Glen during construction.

- Substantial, but yet unassessed, construction impacts to the NPSMA's residents and their property, including noise, air quality, water quality, and parkland impacts.

- As shown in Figure 2, I-495 is 20 to 30 feet above the floor of the Glen. Therefore, significant grading, embankment construction, and/or retaining wall construction will be needed to accommodate the southward widening of the highway. Extremely rough conceptual designs shown in the DEIS (e.g., DEIS Section 5.2.3), provide very little insight into where embankments or retaining walls would be constructed, and how they would impact the natural viewscape in the Glen. Although the DEIS states that "a retaining wall would be

[7]P. 62, Appendix F—Draft Section 4(f) Evaluation, *Draft Environmental Impact Statement and Draft Section 4(f) Evaluation*, May 2020.

00022468

Comments addressed above.

#1
Cont

Ms. Choplin
November 6, 2020
Page 5

constructed from the shoulder of I-495, eliminating the need for construction access within the historic site,"[8] no preliminary designs or other evidence are presented regarding the feasibility of such an approach.



*Figure 2*

- The planned relocation of the Linden Lane and CSX Railroad bridges would require intensive construction activity and construction vehicle access in the Glen itself. Stockpiling construction materials, and building staging areas, for the Project on or near the NPSMA would cause additional adverse impacts. The need for vehicle access into the Glen for construction of the relocated Linden Lane and CSX Railroad Bridges does not appear to be addressed in the DEIS at all.

- Adverse impacts to the local transportation networks on which NPSMA residents rely. These impacts would result from increased traffic volumes feeding onto and from I-495 from secondary routes such as Connecticut Avenue and Georgia Avenue, as well as increased traffic volumes on local roadways such as Linden Lane, Beach Drive, Forsythe Avenue, and Newcastle Avenue (which NPSMA residents use to access their property).

- Reductions in the value of the property owned by NPSMA members due to the aforementioned impacts and anticipated property takings required to accommodate the relocated CSX Railroad and Linden Lane bridges.

_____

[8]P. 55, *Draft Environmental Impact Statement and Draft Section 4(f) Evaluation*, June 2020.

00022469

OP·LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-8    Filed 10/30/23    Page 25 of 106

FINAL ENVIRONMENTAL IMPACT STATEMENT

Comments addressed above.

**#1 Cont**

Ms. Choplin
November 6, 2020
Page 6

### Deficiencies in DEIS Mitigation Analyses

With respect to the impact assessment, the DEIS notes that the NPS "would be adversely affected" by the Project.[9] Although the specific impact acknowledged in the DEIS involves cultural resources, adverse impacts also include increased noise, reduced water quality, and the construction acquisition and activities noted above.

The significance of these adverse impacts is partially acknowledged in the DEIS. As the document states:

> The landscape of the National Park Seminary Historic District is an element that contributes to its significance; because the LOD would expand into the existing landscape and convert a portion of the property to highway use, the project would diminish the integrity of design and setting of the historic district. The park also contains an additional archaeological resource within the LOD (18MO514) requiring additional investigation to determine eligibility for the NRHP (see Section 4).[10]

Despite recognition of adverse impacts on the NPS, neither the DEIS nor the JPA provide substantive information regarding how these impacts would be mitigated, deferring this discussion to some undetermined point in the future. Additionally, neither document provides assessments of how construction activities and impacts would be accommodated during the many years of construction involved in completing the Project.

Regarding mitigation, the DEIS notes, "[The Maryland Department of Transportation State Highway Administration] will conduct consultation to identify mitigation to include in the [Programmatic Assessment] for properties that would experience an adverse effect under any of the Build Alternatives."[11] However, at the time of this writing, the NPSMA has not been consulted regarding the nature or extent of such mitigation. As the owner of the property, we believe that such consultation is essential.[12] Similarly, the NPSMA has not been consulted or notified by the MDOT SHA regarding the unavoidable impacts of the Project on the Glen during and after construction.

### Undisclosed Costs and Project Impacts Associated with Utilities Relocations

NPSMA residents are alarmed by information disclosed by the Washington Suburban Sanitary

---

[9] P. 24, Appendix G-Cultural Resources Technical Report, Volume 1, *Draft Environmental Impact Statement and Draft Section 4(f) Evaluation*, December 2019.
[10] Ibid.
[11] P. 4-56, Ibid.
[12] Save Our Seminary, a volunteer, nonprofit membership organization formed in 1989 to preserve the unique historic resources at the National Park Seminary has been involved in the JPA consultation process, but the NPSMA—which represents the owners of the NPS property—has not.

Comments addressed above.

**#1 Cont**

Ms. Choplin
November 6, 2020
Page 7

Commission (WSSC) in March 2020 regarding the scope and scale of sewer and watermain relocations that the Project would require, the cost of which are not currently included in Project as described and evaluated in the DEIS. Preliminary cost estimates made by WSSC for these relocations—which are only part of the underground utilities that would be impacted by the Project—are between $1.3 billion and $2 billion. Members of the WSSC's governing board noted that these costs would ultimately need to be passed on to rate payers—including NPSMA residents—in the form of increased water and sewer fees. The WSSC's CFO in a March 2020 hearing testified that the average cost to ratepayers would be more than $2,000 per household. Relocation of telecommunications, gas, electrical, and other utilities necessary for the Project would increase costs to ratepayers even more.

**Conclusion**

To reiterate, the NPSMA opposes all build alternatives due to the significant impacts all of them would have on NPSMA property, an irreplaceable historic, cultural, and environmental resource to Montgomery County and the State of Maryland. The NPSMA is proud to be one among a broad array of community stakeholders that oppose this ill-conceived project.

The NPSMA appreciates this opportunity to submit comments regarding the DEIS for the Managed Lane Study. We hope that you and the Project Team give these comments due consideration. Please contact me if you have any questions regarding our comments.

Sincerely,

*Lois Todhunter*

Lois Todhunter
President

cc: National Park Seminary Board of Directors

**NATIONAL PARK SEMINARY MASTER ASSOCIATION – CHRIS OSWALD (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Christopher Oswald

**Date/Hearing:** 8/25/20

**Type/Session:** Live/Evening

**Transcription:**

Christopher Oswald:  Good evening. Hello? [FACILITATOR SPEAKS]. Sure. Sure. Thanks. Christopher Oswald (C-h-r-i-s-t-o-p-h-e-r-O-s-w-a-l-d) 9562 Ament Street in Silver Spring, Maryland  20910.

Good evening. My name is Christopher Oswald and I live at 9562 Ament Street in Silver Spring Maryland. I'm here tonight representing the National Park Seminary Master Association of which I'm a volunteer Board Member and Treasurer. The Master Association has authorized me to speak on their behalf. In addition to serving with the Master Association, I'm a civil engineer and planner with specialization in transportation. I've been involved with numerous National Environmental Policy Act efforts in my 25-year professional career. National Park Seminary is a unique, historic, and recently renovated residential community of single-family homes, condominiums, townhomes...townhouses, and apartments located in the Forest Glen section of Silver Spring, Maryland with approximately eleven hundred feet abutting the Capital Beltway just beyond the noise reduction barriers that were installed during the previous Capital Beltway expansion. Our Master Association, a registered homeowners association in the state of Maryland, encompasses 25 acres of land and include seven single-family homes, 90 townhomes, 76 condominiums, and a 20-bed transitional housing facility, and 66 apartments. Six of the single-family homes and all the condominiums and apartments are situated in historic structures, 44 of the 66 apartments are Section 42 affordable housing units reserved for those with incomes at or below 60 percent of the area's median income, creating a diverse neighborhood, serving people of all incomes. Much of the NPS is located within the 21-acre National Park Seminary historic district of the Forest...in the Forest Glen neighborhood dating back to 1887. It also includes the heavily wooded and variable terrain that provides the setting and environmental character that was so significant to the historic functions of the building, a direct citation from the Natural...National Register. The community's grounds are open to the public from dawn till dusk and are unique in their irreplaceable historic and cultural and natural resource to Montgomery County, the State of Maryland, and the United States. The NPS opposes all the Build Alternatives proposed in the DEIS. All would dramatically, directly, and adversely affect our historic property as Marycon...Maryland tax payers or community members are also extremely concerned by the insufficient and incomplete work in the DEIS; particularly with respect to the presumptive and problematic structuring of project, purpose, and need. Incomplete and insufficient Alternatives analysis, woefully deficient assessments of Alternative impacts and mitigation, and an early insufficient public involvement process, particularly given the extenuating circumstances of the COVID-19 pandemic. We'll describe these concerns in our written comments later this fall. Tonight I wanted to focus on two specific issues: the Project's adverse and unmitigated impacts on our...on Seminary and it's woefully insufficient public involvement process. With respect to impact assessment, there...the DEIS clearly states there would be significant impacts from all Build Alternatives on the NPS, but provides no information whatsoever on the scope...the scope of those impacts or mitigation. With respect to community involvement, we find it shameful that the MDOT and FHWA would deny request from numerous political leaders, community groups, and other stakeholders to extend the comment period in the DEIS, particularly since not all of the documents associated with the DEIS were published and made available to the public on the date that uh...uh, the comment period began...or our involvement period began. [FACILITATOR SPEAKS]. I understand the rush and I do thank you for your time and consideration of my comments.

#1

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to the National Park Seminary.  As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS.  The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area.  Because the National Park Seminary is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided.  Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

**NATIONAL PARK SEMINARY MASTER ASSOCIATION – LOIS TODHUNTER**

| | |
|---|---|
| From: | Chris Oswald |
| To: | Dinne, John J CIV USARMY CENAB (USA) |
| Cc: | Lois Todhunter; Marty Reed; Xiomara Metcalfe; Bob Brenner; Vos, Dave |
| Subject: | [Non-DoD Source] Comments--USACE Application Number (NAB-2018-02152) |
| Date: | Friday, November 06, 2020 7:44:37 PM |
| Attachments: | NPSMA JPA Comments, CDE (Final 201106)_signed.pdf |

Mr. Dinne:

I have attached comments that the National Park Seminary Master Association (NPSMA) has prepared regarding USACE Application Number (NAB-2018-02152), the Joint Federal/State Permit Application for the I-495 and I-270 Managed Lanes Study. I am submitting these comments on behalf of Lois Todhunter, President of the NPSMA's Board of Directors.

We appreciate consideration of our comments by the U.S. Army Corps of Engineers. If you have any questions regarding these comments, please contact me at cj.oswald@gmail.com <mailto:cj.oswald@gmail.com> or Lois Todhunter at lois.todhunter@gmail.com <mailto:lois.todhunter@gmail.com> .

Sincerely,
Chris Oswald
Treasurer
National Park Seminary Master Association

Thank you for your comment concerning impacts to the National Park Seminary. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the National Park Seminary is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

Comments addressed above.



**NATIONAL PARK SEMINARY**
Modern Living | Historic Setting
www.nationalparkseminary.org

Lois Todhunter
President
Board of Directors
National Park Seminary Master Association
9610 Dewitt Dr., #SH102
Silver Spring, MD 20910

November 6, 2020

USACE Baltimore District
Attn: Mr. Jack Dinne
2 Hopkins Plaza
Baltimore, MD 21201-2930

RE: USACE Application Number (NAB-2018-02152): Joint Federal/State Permit Application, I-495 &
I-270 Managed Lanes Study,

Dear Mr. Dinne:

I am pleased to submit the following comments regarding the Joint Federal/State Permit Application
Maryland (JPA) associated with the I-495 & I-270 Managed Lanes Study (the Project) on behalf of
the National Park Seminary Master Association (NPSMA). The NPSMA Board of Directors has
authorized me to submit these comments on behalf of the entire NPSMA membership.

The National Park Seminary (NPS) is a unique historic (recently renovated) residential community of
single-family homes, condominiums, townhouses, and apartments located in the Forest Glen
section of Silver Spring, MD, with almost 900 linear feet abutting I-495 just south of the noise
reduction barriers installed during the previous highway expansion. Our Master Association, a
registered homeowners association in the State of Maryland, encompasses 25 acres of land that
includes 7 single-family homes; 90 townhomes; 76 condominiums; a county-managed, 20-bed
facility currently used as office space for homeless housing assistance organizations; and 66
apartments. Six of the single-family homes, and all the condominiums and apartments, are situated
in historic structures. Forty-four of the 66 apartments are Section 42 affordable housing units,
reserved for those with incomes at or below 60% of our area's median income, creating a diverse
neighborhood that serves people of all incomes. NPSMA estimates that over 500 residents live here,
including between 100 and 130 residents (adults and children) in the Section 42 units.



Comments addressed above.

Mr. Jack Dinne
November 6, 2020
Page 2

Much of NPS is located within the 21-acre National Park Seminary Historic District in the Forest Glen neighborhood section of Silver Spring—which is listed on the National Register of Historic Places and on the State of Maryland's Inventory of Historic Sites. As such, our property is subject to Section 106 of the National Historic Preservation Act. Our Historic District encompasses all our historic structures, which date back to 1887 as well as the heavily wooded and variable terrain that provides the setting and environmental character that was significant to the historic function of the buildings. Even the DEIS itself acknowledges this by noting, "Elements that contribute to the significance of the historic site include the 22 standing structures, *surrounding wooded landscape*, stone retaining walls, statuary, numerous walkways, and numerous footbridges."[1] (emphasis added)

The community's grounds are open to the public from dawn to dusk and are a unique and irreplaceable historic, cultural, and natural resource to Montgomery County and the State of Maryland. As noted on the nomination form that led to the property's inclusion in the National Register:

> [The] acres of wooded land create a rural vista in the midst of congested, suburban Washington. The Seminary grounds offer welcome open space and lend an air of bucolic dignity to homeowners in the vicinity.[2]

### NPSMA Position Regarding the Project

The NPS opposes all the build alternatives[3] proposed in the Draft Environmental Impact Statement (DEIS) for the I-495 & I-270 Managed Lane Study, the Project for which the JPA has been submitted. All proposed build alternatives—including the State of Maryland's preferred Alternative 9—would dramatically, directly, and adversely impact the NPS. We do support Alternative 1, the No Build alternative.

We are extremely concerned by the insufficient and incomplete work in the DEIS, particularly with respect to the presumptive and problematic structuring of the project purpose and need, incomplete and insufficient alternatives analysis, woefully deficient assessments of alternative impacts and mitigation, and an insufficient public involvement process particularly given the extenuating circumstances of the COVID-19 pandemic.  Furthermore, we believe that current assessments of the Project's impacts to the NPS and proposed mitigations of these impacts are deficient and incomplete. Consequently, we urge the United States Army Corps of Engineers (USACE) to reject the JPA it at this time.

---

[1] p. 61, Appendix F-Draft Section 4(f) Evaluation, *Draft Environmental Impact Statement and Draft Section 4(f) Evaluation*, May 2020.
[2] p. 7, *National Register of Historic Places Nomination Form—National Park Seminary Historic District*, September 14, 1972. (Available at https://catalog.archives.gov/id/106777846)
[3] Alternatives 8, 9, 9 Modified, 10, 13B, and 13C.

Comments addressed above.

Mr. Jack Dinne
November 6, 2020
Page 3

Key NPSMA Concerns Regarding the Project Impacts

The NPSMA is concerned about the Project's impacts on the quality of life of the residents of the NPS and our neighbors in the surrounding communities of Forest Glen Park, Forest Glen, and Montgomery Hills. We also are concerned about the direct adverse impacts the Project will have on our unique historic property. These concerns involve impacts that will occur during the construction of the Project and those that will occur for decades to come after the project is completed.

The NPSMA owns a large parcel of property that abuts I-495 as depicted in Figure 1. This parcel contains our historic glen and the tributaries of Rock Creek that run through it (referred to henceforth as "the Glen"). Numerous historic structures and architectural features are located within the Glen, a serene parklike setting that residents and the general public enjoy.



*Figure 1*

The Project will require relocation of the Linden Lane and CSX railroad bridges over I-495 onto the northwestern and northeastern corners of our property, causing adverse impacts to our historic site.[4]

From the Project diagrams shown in Map 68 of Appendix D of the DEIS[5] and Impact Plate 14A of the Joint Federal/State Permit Application (JPA) for the I-495 & I-270 Managed Lanes Study,[6] prepared concurrently with the DEIS, it appears that the Project will directly disturb more than an acre of

_____

[4] P. 24, Appendix G—Cultural Resources Technical Report, Volume 1, *Draft Environmental Impact Statement and Draft Section 4(f) Evaluation*, December 2019.
[5] P. 69, Appendix D—Environmental Resource Mapping, *Draft Environmental Impact Statement and Draft Section 4(f) Evaluation*, June 2020.
[6] P. 26, Part 2A, Impact Plates, *Joint Federal/State Permit Application (JPA) for the I-495 & I-270 Managed Lanes Study*, April 2020.


Comments addressed above.

Mr. Jack Dinne
November 6, 2020
Page 4

NPSMA property in, and adjacent, to the Glen, with most of this area being proximate to historic structures on our property, as well as an adjacent historic property. Appendix F of the DEIS indicates that between 1.2 and 1.3 acres of the NPS site would be directly impacted as part of the Project.[7]

The natural setting of the Glen and historic structures therein would be replaced by bridge abutments and piers, and the tributaries to Rock Creek would be rechanneled. Moreover, it appears that at least some of the property acquired from us for the Project would be used to accommodate the relocated bridges.

From our review of the documentation provided in the DEIS, the Project will have the following impacts on the NPSMA:

- Irreversible alteration of historic and culturally significant National Park Seminary property, especially in the Glen on the northern portion of our property.

- Increased noise impacts on NPS residents, particularly those residents who occupy historic, multistory NPS structures. These structures have top stories higher than proposed sound walls, exposing them to both direct and reflected noise from the increased traffic volumes served by the widened I-495 highway. The historic structures accommodate all forty-four Section 42 affordable housing units, raising associated environmental justice concerns.

- Alteration of the natural course used by the tributaries of Rock Creek, identified in the DEIS as Delineated Features 16G and 16I, that flow through the Glen on the northern portion of the property, potentially adversely impacting water quality and changing the natural character of the Glen.

- Disruption of the natural environment in the Glen, adversely affecting enjoyment of the Glen, which is open to both NPSMA residents and the general public, because of likely closures of substantial portions of the Glen during construction.

- Substantial, but yet unassessed, construction impacts to the NPSMA's residents and their property, including noise, air quality, water quality, and parkland impacts.

- As shown in Figure 2, I-495 is 20 to 25 feet above the floor of the Glen. Therefore significant grading, embankment construction, and/or retaining wall construction will be needed to accommodate the southward widening of the highway. Extremely rough conceptual designs shown in the DEIS (e.g., DEIS Section 5.2.3), provide very little insight into where embankments or retaining walls would be constructed, and how they would impact the

---

[7]P. 62, Appendix F—Draft Section 4(f) Evaluation, *Draft Environmental Impact Statement and Draft Section 4(f) Evaluation*, May 2020.

Comments addressed above.

Mr. Jack Dinne
November 6, 2020
Page 5

natural viewscape in the Glen. Although the DEIS states that "a retaining wall would be constructed from the shoulder of I-495, eliminating the need for construction access within the historic site,"[8] no preliminary designs or other evidence are presented regarding the feasibility of such an approach.



*Figure 2*

- The planned relocation of the Linden Lane and CSX Railroad bridges would require intensive construction activity and construction vehicle access in the Glen itself. Stockpiling construction materials, and building staging areas, for the Project on or near the NPSMA would cause additional adverse impacts. The need for vehicle access into the Glen for construction of the relocated Linden Lane and CSX Railroad Bridges does not appear to be addressed in the DEIS at all.

- Adverse impacts to the local transportation networks on which NPSMA residents rely. These impacts would result from increased traffic volumes feeding onto and from I-495 from secondary routes such as Connecticut Avenue and Georgia Avenue, as well as increased traffic volumes on local roadways such as Linden Lane, Beach Drive, Forsythe Avenue, and Newcastle Avenue (which NPSMA residents use to access their property).

- Reductions in the value of the property owned by NPSMA members due to the aforementioned impacts and anticipated property takings required to accommodate the relocated CSX Railroad and Linden Lane bridges.

---

[8] P. 55, *Draft Environmental Impact Statement and Draft Section 4(f) Evaluation*, June 2020.

Comments addressed above.

Mr. Jack Dinne
November 6, 2020
Page 6

### Deficiencies in Mitigation Analyses

With respect to the impact assessment, the DEIS notes that the NPS "would be adversely affected" by the Project.[9] Although the specific impact acknowledged in the DEIS involves cultural resources, adverse impacts also include increased noise, reduced water quality, and the construction acquisition and activities noted above.

The significance of these adverse impacts is partially acknowledged in the DEIS. As the document states:

> The landscape of the National Park Seminary Historic District is an element that contributes to its significance; because the LOD would expand into the existing landscape and convert a portion of the property to highway use, the project would diminish the integrity of design and setting of the historic district. The park also contains an additional archaeological resource within the LOD (18MO514) requiring additional investigation to determine eligibility for the NRHP (see Section 4).[10]

Despite recognition of adverse impacts on the NPS, neither the DEIS nor the JPA provide substantive information regarding how these impacts would be mitigated, deferring this discussion to some undetermined point in the future. Additionally, neither document provides assessments of how construction activities and impacts would be accommodated during the many years of construction involved in completing the Project.

Regarding mitigation, the DEIS notes, "[The Maryland Department of Transportation State Highway Administration] will conduct consultation to identify mitigation to include in the [Programmatic Assessment] for properties that would experience an adverse effect under any of the Build Alternatives."[11] However, at the time of this writing, the NPSMA has not been consulted regarding the nature or extent of such mitigation. As the owner of the property, we believe that such consultation is essential.[12] Similarly, the NPSMA has not been consulted or notified by the MDOT SHA regarding the unavoidable impacts of the Project on the Glen during and after construction.

### Conclusion

To reiterate, the NPSMA believes the DEIA and JPA provide insufficient and deficient assessments of the impacts of the proposed Project and mitigation alternatives. In addition, we—the owner of a

_____

[9] P. 24, Appendix G-Cultural Resources Technical Report, Volume 1, *Draft Environmental Impact Statement and Draft Section 4(f) Evaluation*, December 2019.
[10] Ibid.
[11] P. 4-56, Ibid.
[12] Save Our Seminary, a volunteer, nonprofit membership organization formed in 1989 to preserve the unique historic resources at the National Park Seminary has been involved in the JPA consultation process, but the NPSMA—which represents the owners of the NPS property—has not.

Comments addressed above.

Mr. Jack Dinne
November 6, 2020
Page 7

historic resource that will be directly impacted by the Project—have not been consulted regarding
the Project nor any of the proposed mitigations during development of the DEIS and JPA. Given
these substantive issues, we urge the USACE to reject the JPA at this time.

The NPSMA appreciates this opportunity to submit comments regarding the JPA for the Managed
Lane Study. We hope that you and the Project Team give these comments due consideration. Please
contact me if you have any questions regarding our comments.

Sincerely,

Lois Todhunter

Lois Todhunter
President

cc:  National Park Seminary Board of Directors

NEIGHBORS OF THE NORTHWEST BRANCH OF THE ANACOSTIA RIVER – ANNE AMBLER

*This page is intentionally left blank.*

Anne Ambler

Please see attached file.



My name is Anne Ambler. I live at 12505 Kuhl Road, Silver Spring, MD 20902. As president of the Neighbors of the Northwest Branch of the Anacostia River, I am authorized to speak on its behalf concerning the Draft Environmental Impact Statement (DEIS) on beltway and I-270 expansion. Neighbors of the NW Branch, with members and supporters in Montgomery and Prince George's counties, is chartered in Maryland and dedicated to the ecological protection and restoration of the Northwest Branch.

**We oppose all of the "Build" alternatives. We support the "No-Build" option.** At the very least, a preferred alternative should not be chosen until the true monetary and environmental costs of the entire project are known. In the case of the Northwest Branch and its tributary Sligo Creek, these costs relate not only to deconstruction and construction damage to the Northwest Branch Stream Valley Park, and expansion and staging area damage to Sligo Creek, but continuing damage from the increased polluted runoff from two to four additional lanes of concrete. In addition, our members would be deprived of the enjoyment of the parks, subjected to worse air quality, and stuck with possibly immense monetary costs from relocation of major WSSC assets for a project that would, according to the traffic analysis in DEIS Chapter 3, likely worsen rather than improve mobility in the region for most residents.

At 19,000 pages, the DEIS represents quite a *tour de force*, and yet it fails to provide the information needed to guide such a huge undertaking, while offering abundant evidence that the project **should not proceed.** Given our concern with the restoration of the Northwest Branch, we focus on how the DEIS treats it and Sligo Creek, with the understanding that their treatment is just one small part of this mistaken proposal, but applicable to all.

**Legal Requirements for this DEIS**

**National Environmental Policy Act (NEPA) Environmental Impact Statements** must describe the affected environment and discuss any resulting direct effects, indirect effects, and cumulative impacts (40 C.F.R. Section 1508(a) and (b), and 40 C.F.R. Section 1508.7). They must then address **"all relevant, reasonable mitigation measures that could improve the project"** and **"use all practicable means...to restore and enhance the quality of the human environment and avoid or minimize any possible adverse**

#1

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to Northwest Branch. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because Northwest Branch is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

Comments addressed above.

**#1 Cont**

[environmental] effects" (40 C.F.R. Sections 1500.2, 1502.14(f) and 1502.16(h)).  In other words, the expected damage must be described and mitigation discussed in enough detail that environmental consequences can be realistically evaluated.

The highway expansion project also must answer to **Section 4(f)** of the **Department of Transportation Act**, which **requires avoidance where possible, minimization of impacts, and then mitigation,** actually limiting use of parks, recreation area, or wildlife refuges; and **Section 106 of the National Historic Preservation Act (NHPA)** which requires agencies to account for and consider a project's impacts to historic sites and cultural properties.

**We believe this Draft Environmental Impact Statement fails to meet NEPA DEIS, 4(f), and NHPA requirements.**

Chapter 5 (Table 5-2) recognizes that both the Northwest Branch Stream Valley Park Unit 3 and Sligo Creek Park and Parkway qualify as 4(f) and require individual evaluation. Sligo Creek Parkway also qualifies as a historic property.

**Starting with the Northwest Branch**: We are frankly horrified at the deconstruction/construction proposals as discussed in Appendix M, Section 3.3.4 and in Appendix F, Section 2.1.23 B.  Although the two discussions differ by 40 feet in how high the existing bridge is and do not agree on some other details, one can piece together the following plan:

Bulldozers would gouge switchbacks 50 feet wide nearly 140 feet down almost vertical slopes on both sides of the stream.  Trucks and cranes would descend to stream level, break up and lower the bridge span pieces onto trucks and carry them back up the switchbacks. Service roads would be cut through the park on both sides of the valley to connect with the existing roadway.   A temporary bridge 140 feet up, 45 feet wide and 105 feet long with deep footings would be constructed over the valley. No bridge at stream level is mentioned.  The permanent bridge would have "multi-column piers 120-130 feet tall...founded beneath the Northwest Branch stream invert" (Appendix M, Section 3.3.4).  **Although the report recognizes this as a very difficult construction environment, no mention is made of the sewer trunk line that risks being cut or crushed by these activities.**

**Avoidance** measures discussed are deconstruction from the surface rather than from the valley, a longer bridge, and off-site staging; or rehabilitation of the existing spans. These are ruled out as very much more expensive (Appendix F, Section 5.1.8B).  The required **"minimization" consists of limiting the dual switchbacks to the south side of the Beltway,** even though, according to the report, deconstruction and reconstruction

2 | P a g e

00022483



Comments addressed above.

**#1 Cont**

would be greatly facilitated by switchbacks on the north side as well. What do you suppose would happen in the final design?

It is not hard to imagine the muddy surges of runoff resulting from these actions, especially as the area experiences increasingly heavy rains from our changing climate, *which incidentally is nowhere mentioned in the report.* Heavy sedimentation will clog the gills of the fish, and post construction, the NWB will be dealing with runoff from an additional four lanes of roadway. Further, because the ROW for the current spans is part owned by MDOT and the rest under an easement, the report says **that damage there does not count as an impact to a 4(f) property. No mitigation is necessary** (Appendix F, Section 2.1.23 A).

The DEIS **does not analyze just** *what* **impacts are expected specifically here and thus exactly what needs to be mitigated. It** merely says that up to 7 acres, up to 794 linear feet of the main stem, and up to 794 linear feet of tributaries will be **impacted** (Table 3-4, Appendix M, p. 23). Then the reduced requirement for **mitigation** of harm to the Northwest Branch is left to the permitting process and off-site mitigation (Appendix L, Section 2.4.3 C). The water quality trading credits discussed would not help the NWB, and **no Northwest Branch mitigation sites appear on the mitigation site table** (Appendix N, Section 6.2), despite our understanding that **the law requires on-site mitigation for 4(f) properties.**

**Sligo Creek Parkway and Sligo Creek**

According to the Avoidance and Minimization Report (Appendix M), the Sligo Creek culvert would need neither replacement nor widening to accommodate 4 more lanes (!), so "no targeted avoidance or minimization is possible in this location" (Appendix M, Section 3.3.4). Table 3-10 shows up to 549 linear feet affected. However, contrary to Appendix M, according to the draft Section 4(f) evaluation, **the culvert** *would indeed need to be augmented*, and construction and staging use of the park would require up to 4.1 acres. These activities include "tree removal, grading, movement of construction vehicles and materials, and construction and operation of a stormwater management facility" Appendix F, Section 2.2.17, B). Two tee boxes would also need to be moved.

As with the Northwest Branch SVP, some of these activities would occur within the easement MDOT already has, so the damaged area needing mitigation is reduced from 4.1 to just 3.2 acres. Again, there is **no discussion of exactly what impacts would be expected or how they would be mitigated, leaving that to permitting and off site mitigation credits, although the park would apparently be used for some stormwater runoff from the highway by way of the new stormwater pond.**

3 | P a g e

Comments addressed above.

**#1 Cont**

In addition to requiring more explicit discussion of impacts and mitigation than is offered, NEPA requires this discussion **now, during the NEPA review process, when an alternative lacking such impacts might be chosen instead**. But missing from consideration **is such an alternative**. All the screened alternatives have basically the same impact. Transit considerations were dismissed for cost, and demand management was dismissed because it didn't "add capacity" (Appendix F, Section 3.3.3). **Contrary to NEPA requirements, the Purpose and Need statement was drawn so narrowly that only additional lanes of concrete with tolls would qualify.**

The extensive maps of the project (e.g., Appendix F, Figure 2-16, Map 13 of 35) show narrow limits of disturbance, minimizing the acknowledged impact to the Northwest Branch and Sligo Creek. It defies reason to expect the affected area to be limited to where the switchbacks are cut or where the access roads and staging areas are placed. What about the runoff from two or four additional lanes of polluting vehicles? The muddy runoff will affect fish viability and pollutant load far downstream. **By making the limits of disturbance so narrow, the DEIS fails to recognize and analyze the real impacts, which reach much farther.**

Considering the entire DEIS, we are very concerned about the plans and calculation method for stormwater management overall. The existing lanes of the beltway were built without adequate stormwater control. The DEIS says that stormwater controls will be provided at 50% for lanes dug out to the underlying dirt. But these will be very few. Yet all will be reconstructed, and all existing lanes need stormwater control. Further reducing the linear stream feet deemed to require mitigation is a deduction overall by the width of existing bridges (Appendix N, Section 4.1).

Admittedly, adequate mitigation anywhere along the beltway is problematic. The report describes *in general* the severe environmental impacts of road construction (e.g., Chapter 4, Section 4.13.3; Appendix L, Section 2.4.3, C) --tree loss, erosion, increases in sediment loads, nutrient pollution, thermal effects, fish mortality, heavy metal and sodium chloride contamination, etc. These pages demonstrate the folly of trying to add more lanes of concrete to the beltway. The DEIS acknowledges in several places that the beltway corridor is a highly developed area with no more room for development or impact remediation (e.g., Chap. 2, Section 2.7.2; Appendix M p. 42; Appendix Q p. 6.) Fifteen years ago, this very fact was a major argument for constructing the Intercounty Connector instead of expanding the beltway, despite the significant environmental and community destruction caused by cutting a new six-lane divided highway through forested land, across 5 stream valleys, and bisecting several communities.

The DEIS in Appendix L describes in detail, based on an outdated 2010 report, the existing condition of the Northwest Branch and Sligo Creek (Appendix L, Section 2.4.2, E & F), and the "current" water quality based on testing from several years ago (Appendix L, Section 2.4.3, E & F). It lists the Northwest Branch as a Use IV stream, that is, intended

4 | P a g e

Comments addressed above.

**#1 Cont**

to be clean enough to support fish. Sligo Creek is a Use I stream, intended for water contact recreation. Note that Summer-fall 2020 testing by the Anacostia Riverkeeper (obviously not included in the DEIS), partly carried out by NNWB members, indicates that the current bacterial load is too high for safe contact in either stream.

Under the Clean Water Act, the Northwest Branch has been given a Total Maximum Daily Load (TMDL) limit for bacteria as part of the effort to address pollution in the Anacostia River. It is not under that limit.

Given the already poor quality of the streams, the expansion project will all but ensure that the Northwest Branch and Sligo Creek will fail to comply with the Clean Water Act. This degradation will harm the humans, wildlife, and the flora that call these streams home, as they will encounter higher numbers of pollutants.  How then will Montgomery and Prince George's counties meet their requirements under the Chesapeake Bay TMDL?  Maryland should not be in the business of making it harder for counties to comply with clean water standards.

**Conclusion**

**The DEIS, despite its 19,000 plus pages and extensive maps, does not meet its legal obligations under NEPA, the Transportation Act Section 4(f), and Section 106 of the National Historic Preservation Act with respect to the Northwest Branch and Sligo Creek.  It very probably does not meet these obligations throughout the report.**

**On the other hand, the DEIS demonstrates very clearly that adding tolled lanes of concrete is a "solution" that no longer makes sense.  We urge that state planners instead work with the local jurisdictions to analyze current and future mobility needs in light of climate change and COVID-19 adaptations.  The full range of options produced by this process will be more worthy of the state of Maryland and will position our state for a prosperous future.**

Respectfully submitted,

Anne Ambler
anne@neighborsnwb.org

5 | Page

00022486

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study | Case 8:22-cv-02597-DKC    Document 61-8    Filed 10/30/23    Page 42 of 106

FINAL ENVIRONMENTAL IMPACT STATEMENT

**NEW MARK COMMONS HOMES ASSOCIATION**

## NEW MARK COMMONS Homes Association

#1

The Board of Directors of the New mark Commons (NMC) Homes Association wishes to express our support for the No Build option and its opposition to the other proposed alternative highway options in the draft Environmental Impact Statement (DEIS) to expand I-270 and I-495 currently under consideration by the State of Maryland Department of Transportation (MDOT).

NMC is a 53-year-old community of 384 homes (detached and townhouses) located in Rockville, just off of Exit 5 (Falls Road exit on I-270). In 2017, the community earned the distinction of being placed on the National Register of Historic Places.

While we welcome the State's interest in relieving automotive congestion on the thoroughfares, we are deeply concerned about the specific impact on our community. The interactive map posted by the State Highway Administration (SHA) clearly shoes that the already high noise levels in our area will increase significantly. Furthermore, the construction plans show substantial encroachment on adjacent property, including Julius West Middle School and lark land adjacent to our community.

#2

Like almost every other state, Maryland has seen a dramatic reduction in traffic due to COVID-19 and it is widely assumed that significant and perhaps dramatic increase in the number of people working from home will continue into the future. Maryland is struggling to revise and reduce its current budget to reflect a major loss of income due to ongoing pandemic. Given that reality, it is foolhardy to move forward with a multi-billion dollar highway expansion project at the time that may not be necessary to accommodate future traffic flows on I-270. If the State wishes to reduce traffic congestion, we believe attention must first be paid to widening I-270 to the north -- above Gaithersburg-- where the highway drops from 12 lanes near Exit 5 to a mere four lanes. Congestion is severe in both directions to the north of Gaithersburg during rush hours, and increasing on weekends.

Even MDOT recognizes this problem, yet it appears determined to proceed to make the project financially attractive for a private bidder who can generate significant revenues through the proposed toll lanes if I-270 is widened below Gaithersburg.

#3

The failure of the Purple Line project to be completed in a timely and cost-effective manner reveals the vulnerability of the public-private partnership. Moreover, the DEIS does not acknowledge the required expenditure of $1-2 billion dollars for the Washington Suburban Sanitary Commission (WSSC) to move and reconstruct water and sewage lines because of the construction of the toll road alternatives.

Significantly, the combination of the Purple line financial failure as a public private partnership and the lack of fully accounting for and acknowledging the toll alternatives financial impact on WSSC in the DEIS, raises serious questions about the criteria MDOT used to remove all public transit alternatives to this proposed project.

At the December 2018 Board of Public Works meeting, Comptroller Franchot outlined three criteria he would use in evaluating whether or not to support the project: 1) it should be environmentally responsible; 2) fiscally prudent; and 3) effective in resolving traffic congestion

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

#3
Cont

problems.

In our judgement, the current plan fails to meet any of these critical objectives. As such, we respectfully urge the Board of Public Works to disapprove the current P3 proposal.

Comment addressed above.


**NORTH COLLEGE PARK COMMUNITY ASSOCIATION – MARY COOK**

| | |
|---|---|
| **From:** | Mary Cook <marycookcp@gmail.com> |
| **Sent:** | Wednesday, October 28, 2020 3:22 PM |
| **To:** | MLS-NEPA-P3 |
| **Cc:** | Council District 1; Garcia, Michelle J.; Jim Rosapepe; Lehman, Mary Delegate; Ben Barnes; Pena-Melnyk, Joseline Delegate |
| **Subject:** | I-495 & I-270 DEIS comments |

**North College Park Community Association**
**4912 Nantucket**
**College Park, MD 20740**

October 28, 2020

Ms. Lisa B. Choplin, DBIA
I-495 & I-270 P3 Program Director
I-495 & I-270 P3 Office
707 North Calvert St.
Mail Stop P-601
Baltimore, MD 21202

Re: Draft DEIS and Draft Section 4(f) Document
I-495 and I-270 Managed Lanes Study

Dear Ms. Choplin:

**#1**

At the October 8 meeting of the North College Park Community Association, the members voted to submit a letter regarding the I-495 & I-270 Managed Lanes Study DEIS/Draft Section 4(f) Evaluation as the residents of the area just north and south of the beltway in College Park will be directly impacted by the construction of managed lanes.

We must emphasize passionately that two dozen of our homes will have part of their backyards taken in support of this project. Some of us homeowners will be so close as to be able to offer beltway drivers a hamburger from our family barbecue.

Hundreds of other residents will suffer the ill effects of environmental damage that will come along with this project. We will suffer from air and noise pollution that will further deteriorate our quality of life and health. Such contaminants will lead to or exacerbate our asthma, COPD and cancer. The youth at the school situated right next to the beltway will also suffer the negative impacts.

Currently, the noise from the beltway, although buffered in some spots by noise walls, can be heard at least a half mile away forcing many of us to keep our windows closed.

Finally, since the College Park Polish Club bought the property at Edgewood Rd and 53rd Avenue in the 1970's, the six-acre plot has been a green buffer for the neighborhood. If the managed lanes are

1

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to the College Park Community Association and the Polish Club Property on Edgewood Road. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the College Park Community Association and Polish Club Property are located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

| | | Comments addressed above. |
|---|---|---|
| #1 Cont | constructed, the land will be razed, eliminating trees, decimating endangered species, and spoiling the local wetlands and wildlife habitat for the purpose of a staging area for construction vehicles. We would like to suggest the staging area be moved to an alternative site such as the Greenbelt Metro northern parking lot which will allow for the vehicles to be safeguarded while permitting them quick access to the project.

Finally, your department has never approached the Polish Club regarding the use of their property for the managed lanes project. However, they have stated in a letter to the College Park City Council that should the property be used as a staging area that it be returned to its natural state upon completion of the project.

We thank you for your time and consideration, and urge you to protect our properties and the local environment.

Sincerely,

*Mary C. Cook*
NCPCA President


Cc:  County Councilmember Thomas Dernoga
       Maryland District 21 Delegation | |

<div align="center">2</div>

00022490

**NORTHERN VIRGINIA TRANSPORTATION ALLIANCE – JASON STANFORD**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Jason Stanford

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Live Testimony/Afternoon

**Transcription:**

My name is Jason, J-A-S-O-N, Stanford, S-T-A-N-F-O-R-D. My address is 8260 Greensborough Drive, McClain, Virginia. Thank you for the opportunity to comment on the 495 270 Managed Lanes Study today, I am the Executive Director of the Northern Virginia Transportation Alliance. For more than 30 years, the Alliance has been the visionary leader, advancing regional transportation solutions that improve our community's quality of life and economic prosperity. On behalf of the Alliance's members and partners in the Northern Virginia Transportation Business Coalition, which includes many of the largest Chambers and business organizations across Northern Virginia. I'm here today to reaffirm our strong support for this project, which is vital to the future of our region. In fact, the region's Transportation Planning Board adopted a Regional Express Lanes network as one of its top aspirational goals in 2018. Furthermore, we strongly urge you to move forward with Alternative 9, which will create a seamless connection with Virginia's HOT Lanes network dramatically increased travel reliability, reduce regional congestion and delays, and incentivize carpooling and transit ridership. According to the DEIS, Alternative 9 would reduce delays on 495 and 270 by 34 percent in both the AM and PM peak and local road network delays by seven percent in 2014. That translates into an average annual time savings of 72 hours for Maryland commuters. Even commuters in the non-toll lanes will see a significant time savings when compared to the No Build scenario and delays will be considerably less than under current conditions all the way out to 2040.

Moreover, congestion managed lanes create a new option for a faster, more reliable trip. Reliability is extremely important to economic development decisions, as well as the decision to carpool or take public transportation. In fact, reliability is a key driver of transit ridership, which is why Maryland is already working with Virginia to study and improve regional transit options using the new express lanes over the American Legion Bridge. This project will also inject $9 to $11 billion dollars of private funding into our economy at a time when we need it the most. This will result in tens of thousands of new jobs in our entire region over the next several years. Alternative 9 is also likely to lead to a windfall of $1 to $2.7 billion dollars from Maryland that could be used to further improve transit service and other transportation needs in this vital corridor. Doing nothing is not an option the No Build alternative leads to unacceptable levels of congestion that are not sustainable from an economic, environmental or quality of life standpoint. It's time for Maryland to move forward with improvements to the American Legion Bridge 495 and 270 that will benefit our community now. Thank you.

#1

**Response to DEIS Comment #1**
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-8    Filed 10/30/23    Page 47 of 106

FINAL ENVIRONMENTAL IMPACT STATEMENT

**PAMUNKEY INDIAN TRIBE – TERRY CLOUTHIER**

*This page is intentionally left blank.*

**From:** Terry Clouthier <terry.clouthier@pamunkey.org>
**Sent:** Thursday, July 23, 2020 3:22:49 PM
**To:** Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>
**Subject:** RE: I-495 & I-270 Managed Lanes Study- Draft Environmental Impact Statement and Draft Section 4(f) Evaluation Notice of Availability

Good Afternoon,

My name is Terry Clouthier and I have recently been hired as the Cultural Resource Director for the Pamunkey Indian Tribe. I handle all consultation requests for NHPA, NAGPRA and NEPA.

Attached are our comments for the proposed undertaking.

Feel free to email if you have any questions

Sincerely,

Terry Clouthier


Pamunkey Indian Tribe
Cultural Resource Director
1054 Pocahontas Trail
King William, VA 23086


**From:** Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>
**Sent:** Thursday, July 09, 2020 4:47 PM
**To:** Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>
**Subject:** I-495 & I-270 Managed Lanes Study- Draft Environmental Impact Statement and Draft Section 4(f) Evaluation Notice of Availability

Good afternoon,

The Federal Highway Administration (FHWA) and the Maryland Department of Transportation State Highway Administration (MDOT SHA) have completed the Draft Environmental Impact Statement (DEIS) and Draft Section 4(f) Evaluation for the I-495 & I-270 Managed Lanes Study in Montgomery and Prince George's Counties, Maryland and Fairfax County, Virginia, with the *Notice of Availability to be published in the Federal Register, tomorrow, July 10, 2020*. The DEIS includes traffic, environmental, engineering and financial analyses of the Build Alternatives and the No Build Alternative. The DEIS provides an opportunity for the public, stakeholders and agencies to review and provide comment on the proposed federal action and the adverse and beneficial environmental impacts and proposed mitigation for unavoidable impacts.

1

00022492

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study | Case 8:22-cv-02597-DKC    Document 61-8    Filed 10/30/23    Page 48 of 106

FINAL ENVIRONMENTAL IMPACT STATEMENT



## PAMUNKEY INDIAN TRIBE

Terry Clouthier
Cultural Resource
Director

**TRIBAL GOVERNMENT**
*Tribal Office*

1054 Pocahontas Trail
King William, VA 23086

(804) 843-2109
FAX (866) 422-3387

THPO File Number: 2020-497                                Date: 07/23/2020

Caryn J. G. Brookman
Environmental Program Manager
Maryland Department of Transportation
State Highway Administration
707 North Calvert Street
P-601
Baltimore, MD 21202

**RE: I-495 & I-270 Managed Lanes Study- Draft Environmental Impact Statement and Draft Section 4(f) Evaluation Notice of Availability**

Dear Ms. Brookman,

#1

Thank you for contacting the Pamunkey Indian Tribe regarding the I-495 & I-270 Managed Lanes Study- Draft Environmental Impact Statement and Draft Section 4(f) Evaluation Notice of Availability. My office offers the following comments regarding the proposed signage.

We would like to remain consulting parties for the remainder of this undertaking.

Please forward any updates to these documents electronically to my office. We look forward to participating in the upcoming joint public meetings.

My office concurs with the findings within Appendix F and G and does not wish to comment further at this time.

Thank you for considering our cultural heritage in your decision-making process.

If you have any questions feel free to email me at terry.clouthier@pamunkey.org.

Sincerely,

**Response to DEIS Comment #2**
The Pamunkey Indian Tribe will remain a consulting party per the stated request.

**POLISH CLUB OF COLLEGE PARK – MARY ANN JARVIS**

| | |
|---|---|
| From: | mi17527035@aol.com |
| Sent: | Monday, October 12, 2020 2:51 PM |
| To: | cpmc@collegeparkmd.gov; MLS-NEPA-P3 |
| Subject: | Fwd: City letter about Beltway expansion - draft language about Polish Club Property |

Sorry there was a delay in sending this to you. I was given an incorrect email. Thank you. Mary Ann Jarvis

-----Original Message-----
From: mi17527035@aol.com
To: L. M. Miovski <L. M.Miovski@gmail.com> cmpc@collegeparkmd.gov <cmpc@collegeparkmd.gov>;
fkabirA@collegeparkmd.gov <fkabirA@collegeparkmd.gov>; cityclerkoffice@collegeparkmd.gov
<cityclerkoffice@collegeparkmd.gov>; planning@collegeparkmd.gov <planning@collegeparkmd.gov>
Sent: Mon, Oct 12, 2020 11:51 am
Subject: Fwd: City letter about Beltway expansion - draft language about Polish Club Property
,MLS-

-----Original Message-----
From: mi17527035@aol.com
To: cpmc@collegepark.gov <cpmc@collegepark.gov>; l.miovski@gmail.com <l.miovski@gmail.com>;
cityclerkoffice@collegepark.gov <cityclerkoffice@collegepark.gov>; planning@collegepark.gov
<planning@collegepark.gov>
Sent: Mon, Oct 12, 2020 11:28 am
Subject: City letter about Beltway expansion - draft language about Polish Club Property

Good morning, I'm Mary Ann Navalaney Jarvis, President of the Polish Club of College Park, PNA Lodge #3191. It was
Founded and chartered in 1970 by 25 College Park residents to promote the Polish American heritage in the Metropolitan
Washington Area. Our organization has been the owner of this property since 1979 .The property was purchased in
hopes of building a community center which would be used for our events such as dance lessons, a place for, our then
Polka Belles and Beaus dance group. We wanted a place to have our meetings, Christmas party, etc. We hoped that it
also would be a place that the College Park residents could hold community meetings such as scouts, sports and club
meetings. Plans were drawn and we presented them to the city. There were public forums with the residents about the
plans. To our dismay, the residents were strongly opposed to our plans. We didn't move forward after that. We have
always felt that this parcel of land should be part of the community.

Now, we don't have any immediate plans for the property. We've been approached numerous times by developers. We've
repeatedly declined these proposals because we don't want to destroy the property with more houses. We feel it is
important to have a green buffer in the community.

We would like the wording in the draft letter changed to reflect restoring the property to its natural sate **IF** it is must be
used short term. We would very much like the state to look at alternative sites for the storage o equipment and storm
water management pond. We very much support the residents in their opposition to the States plans.

Please include me in all future communication regarding the Beltway Expansion. My email address is above. My phone #
is 301-221-3909. Please note that I have included our Polish Club officers in this email so they are aware of the situation.

Thank you for your including us in our proposed communication to the state.

Sincerely,

Mary Ann Navalaney Jarvis, President
Polish Club of Collage Park, PNA Lodge #3191

1

**#1**

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to the Polish Club Property on Edgewood Road. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Polish Club property is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

**ROCK CREEK CONSERVANCY OFFICIAL SUBMITTAL**

| | |
|---|---|
| **From:** | Jeanne Braha <jbraha@rockcreekconservancy.org> |
| **Sent:** | Monday, November 9, 2020 2:32 PM |
| **To:** | MLS-NEPA-P3; Lisa Choplin |
| **Subject:** | Rock Creek Conservancy Comments on 495/270 DEIS |
| **Attachments:** | 2020 11 09 RCC DEIS Comments to SHA 495 270.pdf |

Please find attached comments from Rock Creek Conservancy. I appreciate your confirming receipt.

Thank you,
Jeanne

--
Jeanne Braha
Executive Director
Rock Creek Conservancy
7200 Wisconsin Avenue, Suite 500, Bethesda, MD 20814
jbraha@rockcreekconservancy.org
301-579-3105

Friend us on Facebook
Follow us on Twitter
Follow us on Instagram

1

Refer to page CO-410 for the full Rock Creek Conservancy comment letter and page CO-419 for the Rock Creek Conservancy comment response.

## ROCK CREEK CONSERVANCY – JEANNE BRAHA

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Jeanne Braha

**Date/Hearing:** 8/25/20

**Type/Session:** Live/Morning

**Transcription:**

Hi, I'm Jeanne Braha (J-E-A-N-N-E) Braha (B-R-A-H-A). I am the Executive Director of Rock Creek Conservancy. Our address is 7200 Wisconsin Avenue, Suite 500 in Bethesda, Maryland. Rock Creek Conservancy is a non-profit organization based in Bethesda, Maryland that restores Rock Creek and its parklands for all people to appreciate and protect. More than 4,500 Conservancy volunteers each year engage in people-powered restoration for our watershed. Rather than focus on the flawed approach the State has taken to the NEPA process, I'd like to use my time today to highlight the potential for major, and avoidable, impacts of the proposed project on Rock Creek. Given the lack of specificity and accountability suggested by the DEIS, the Conservancy is unable to support any but the No Build Alternative at this time. Of particular note, the DEIS fails to demonstrate there is no practicable alternative with less extensive impacts to wetlands, streams, and parks in the proposed expansions. One obvious alternative is the Maryland 200 or ICC Diversion Alternative, which would have avoided direct impacts on Rock Creek and avoided residential property takings.

Rock Creek is a primary driver of quality of life in our region for people and our ecosystem. Replacing land and/or mitigating damages to the Rock Creek Stream Valley Park with land miles away strips local residents of the quality of life benefits in favor of a short-lived travel time benefits for drivers and at a great cost to the taxpayers of Maryland. Approximately three miles of Rock Creek Stream Valley channels runs alongside the current Beltway and within Rock Creek Stream Valley Parks Units 2 and 3, managed by the Maryland-National Capital Park and Planning Commission. Section 4(f) of the US Department of Transportation Act mandates that projects like this may only use parks' recreation areas or wildlife refuges if no feasible and prudent alternatives exist. In its 4(f) review that the DEIS failed to consider alternatives, taking a significant wetlands and floodplains on parkland by only considering single-mode road alternatives. Data on Parks and Rec facilities were gathered using desktop sources. A project with this scale of impact merits careful analysis, including ground truthing of those assumptions. Had DEIS preparers walked the three miles of Rock Creek along the Beltway, they would have seen one of the largest remaining down county wetlands as well as migratory birds that use the Rock Creek Stream Valley parks as part of their migration along the Atlantic flyway. A more thorough investigation would allow for more qualitative, rather than just quantitative assessment of impact, ensuring the myriad ecosystem services of the area are protected. This might include building noise barriers along the highway to protect wildlife and recreational users from the significant noise more traffic will create.

In addition, the DEIS fails to analyze the impacts of, the extent of, impacts the parklands, including their connection of the cohesive system, as required by Section 106 of the National Historic Preservation Act. The DEIS includes only rudimentary information about this National Register eligible site and does not consider the project proximity to impacts to parkland. The DEIS notes that in addition to permanent conversion of Rock Creek Stream Valley Units 2 and 3 to highway or transit use, construction

**#1** **#2** **#3** **#4**

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to the Rock Creek Park. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Rock Creek Park is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

**Response to DEIS Comment #2**

In your comments on alternatives, you raised the concern about consideration of MD 200 as an alternative to avoid environmental resources. Following the Spring 2019 Public Workshops and agency meetings, several Cooperating and Participating Agencies requested that MDOT SHA evaluate an alternative that would provide an alternate route for travelers to use MD 200 (Intercounty Connector) instead of the top side of I-495 between I-270 and I-95 to avoid or reduce impacts to significant, regulated resources and residential relocations to that section of I-495. Refer to DEIS, Appendix B. Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

**Response to DEIS Comment #3**

The Preferred Alternative impacts the MDE 12-Digit Rock Creek Watershed. The waterway impacts include two culverts that won't be touched, but were required by the regulatory agencies to be included as impacts. There are also 0.8 acres of new impervious surface being added within the MDE 12-Digit Rock Creek Watershed. Refer to Chapter 5, Section 5.13 for information on watersheds and Section 5.18 for information on aquatic biota and FEIS, Appendix M for additional details.

**Response to DEIS Comment #4**

The Preferred Alternative does not impact Rock Creek Stream Valley Park. Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

Also refer to page CO-410 for the full Rock Creek Conservancy comment letter and page CO-419 for the Rock Creek Conservancy comment response.

00022496

OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

Comment addressed above.

| #4 Cont | I-495 and I-270 Managed Lanes Study |
| | Joint Public Hearing Testimony |

impacts may also temporarily diminish the integrity of the setting and feeling of the property. There's no doubt that there would be a diminishment in the setting and feeling of, to visitors each year. Rock Creek Park, a unit of the National Park Service, is just a few miles downstream of the Project area and would be adversely impacted by polluted stormwater runoff. The Capper-Cramton Act [INAUDIBLE] continuous Stream Valley protection extending from the National Park into Montgomery County. This Project would eliminate that. The Project will dramatically increase stormwater runoff to Rock Creek at a time when Maryland is struggling to manage suburban stormwater pollution. The alternatives retained for design would add between 52 and nearly 63 additional acres of impervious surface. Alternative 5, which was dropped in consideration, would add only 43 additional acres and the I-200 Diversion would add 0. [FACILITATOR SPEAKS]. I'm almost done. The Limits of Disturbance for the Project may need to be increased to accommodate on-site treatment of new and existing runoff to protect Rock Creek from the impacts of this roadway. Thank you.

00022497

**SAFE SILVER SPRING – TONY HAUSNER**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Tony Hausner

**Joint Public Hearing Date:** 8/20/2020

**Type/Session:** Live / Morning

**Transcription:**

This is Tony Hausner (H-A-U-S-N-E-R), I live at 203 Brewster Avenue, Silver Spring, Maryland, 20901. [FACILITATOR SPEAKS] I live in the Indian Spring neighborhood, which is immediately adjacent to the Beltway, just south of it, between Colso Road and University Boulevard. We have eight hundred homes. I have lived here for 43 years and involved in a number of transportation projects over the years. I oppose the managed lane plans for I-495 and I-270. I support transit solutions to the traffic issues raised by the DEIS. Widening the Beltway will result in the following impacts to our neighborhood, impacting a number of homes that are currently right next to the Beltway. They will at least lose a significant portion of their backyards and could lose more. The park and playground in the middle of our neighborhood would be significantly reduced, as well as the county recreation center, which is in the middle of the park, which I know makes great use of. I have the following comments on transportation issues as discussed in Chapter 3.

The DEIS study does not include all the way to Frederick, which is an essential part of the plan. The DEIS mentions the Corridor Cities Transitway, the Randolph Road BRT and North Bethesda Transitway. However, the DEIS does not take into account whether or not these projects will or will not be completed. If these projects were completed, it would significantly reduce the need for widening 270 and 495. Further, neither MDOT nor other agencies have made any commitments to these projects. In addition, MDOT considers other transit options beyond these projects, including the use of transit on the American Legion Bridge, as recommended by the Planning Commissions. The Planning Commissions recommended that the State examine the use, using the ICC as an alternative to widening the Beltway. The DEIS dismisses this alternative without providing any analysis. We are very skeptical that this Study has been adequately performed. Finally, the DEIS does not take into account the impact that COVID-19 has had on traffic. There has been a significant reductions in traffic due to teleworking. Much of these changes are likely to persist after COVID-19 ends. Studies by KPMG and the Maryland Transportation Institute project a 5 to 10 percent long-term decrease in traffic due to teleworking. And this is beyond the COVID-19 period. Further, MDOT has indicated there has been a 17 percent decrease in traffic already compared to last year. Thank you.

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to the Indian Spring neighborhood. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Indian Spring neighborhood is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

The benefits of the proposed transit projects mentioned (Corridor Cities Transitway, Randolph Road BRT, and North Bethesda Transitway) are accounted for in the modeling, as noted on page 3-4 of the DEIS. The forecasts assume that all of those transit projects will be in place by the design year, and the forecasts account for potential reductions in automobile traffic due to travelers using transit instead. The results show that there is still a need for widening I-270 and I-495 despite these transit improvements.

**SAVE OUR SEMINARY AT FOREST GLEN – BONNIE ROSENTHAL**

| From: | Save Our Seminary <info@saveourseminary.org> |
|---|---|
| Sent: | Sunday, November 8, 2020 1:05 PM |
| To: | MLS-NEPA-P3; Lisa Choplin |
| Subject: | Comments on DEIS for I-495 Managed Lanes Study |
| Attachments: | DEIS comments_SOS_signed.pdf |

We respectfully submit the attached comments from Save Our Seminary at Forest Glen Inc. (SOS) on the DEIS for the I-495 and I-270 Managed Lanes Study for your review and consideration. We appreciate this opportunity to comment on such important potential affects on the historic property of National Park Seminary in Silver Spring.

Bonnie Rosenthal
Executive Director
Save Our Seminary
9615 Dewitt Drive #68
Silver Spring, MD 20910
301-589-1715
info@saveourseminary.org
www.saveourseminary.org
www.facebook.com/SaveOurSeminary

1

*This page is intentionally left blank.*





**SAVE OUR SEMINARY**

**AT FOREST GLEN**

9615 Dewitt Drive #68
Silver Spring, MD 20910
301-589-1715
info@saveourseminary.org
www.saveourseminary.org

*Officers and Directors*
Don Hall, President
Eugene Rich, Vice President
Erin Mielke, Treasurer
Frank Riley, Secretary
Cassandra Ashman
Toni Bailey
Anne Brockett
Pat Crawford
Ann Hall
Patti Horrall
Linda Lyons
Chris Maines

*Executive Director*
Bonnie Rosenthal

November 9, 2020

Ms. Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Dept. of Transportation State Highway Administration
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21201

RE: DEIS comments – National Park Seminary Historic District

Dear Ms. Choplin:

Our organization, Save Our Seminary at Forest Glen Inc. (SOS), has reviewed the Draft Environmental Impact Statement (DEIS) and submits the following comments specific to the National Register-listed National Park Seminary Historic District. While SOS has no ownership of the National Park Seminary buildings or grounds, our longtime involvement, deep knowledge of the history and development of the site, and our extensive archival collection confirm our capability both to comment on the proposed undertaking with authority and to express our concerns.

Save Our Seminary is a nonprofit membership organization formed in 1989 to marshal public and private support to preserve the National Park Seminary Historic District. We have largely succeeded in our original goals and continue under our mission to communicate the history of the National Park Seminary property and promote preservation and public enjoyment of its buildings, artifacts, and landscape. Please refer to the description of National Park Seminary in DEIS Appendix F, Draft Section 4(f) Evaluation, Section 2.1.12A, p. 54. We particularly would like to note this statement: "Elements that contribute to the significance of the historic site include the 22 standing structures, surrounding wooded landscape, stone retaining walls, statuary, numerous walkways, and rustic footbridges."

Expanding on the importance of the landscape, the DEIS declares that "The landscape of National Park Seminary Historic District/Forest Glen is a defining characteristic of the historic site" (Appendix F p. 55). This assertion of the landscape's significance is affirmed again in DEIS Chapter 4: "The landscape of the National Park Seminary Historic District is an element that contributes to its significance; because the LODs would expand into the existing landscape and convert a portion of the property to highway use, the project would diminish the integrity of design and setting of the historic district" (p. 52). We agree, and are therefore

#1

1

**Response to DEIS Comment #1**
Thank you for your comment concerning impacts to the National Park Seminary. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the National Park Seminary is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

00022500

Comments addressed above.

**#1 Cont**

concerned that these unique features are gravely threatened by the Proposed Action. Indeed, MDOT SHA found that the site would experience adverse effects from the Proposed Action and the Maryland Historical Trust (MHT) concurred (Appendix F p. 55).

Despite its acknowledgement of the significance of National Park Seminary and its features, the DEIS appears to adopt a dismissive stance regarding National Park Seminary. In speaking to the effects, it states: "The vast majority of Section 4(f) properties are composed of sliver property impacts to areas that currently abut the existing transportation facility without affecting the features and attributes that qualify the properties for Section 4(f) protection" (Appendix F p. 19). National Park Seminary is among the Section 4(f) properties. It abuts I-495 for over 800 linear feet, all of which would be affected by grading and tree removal, not including the areas adjacent to the Linden Lane bridge and CSX railroad, where more land would be affected (Appendix F pp. 54-55). If the landscape of National Park Seminary is a defining characteristic containing contributing features, as affirmed in the DEIS, then the sacrifice of that landscape, with all its features, to the Proposed Action, is a very serious impact.

Likewise, the minimization plans MDOT SHA has crafted are insufficient to offset the damage to the site, continuing the lack of appreciation for the impact. With some adjustments, the agency has reduced the affected area from 1.3 acres to 1.2 acres, a reduction of only one-tenth of an acre (Appendix F p. 55). While it is true that the entire National Park Seminary Historic District is approximately 23 acres, the part of the National Park Seminary Historic District directly affected is the 13-acre area known as the Glen. 1.2 acres represents nearly 10% of the Glen, and those 1.2 acres would experience a profound and devastating alteration that the DEIS has not considered sufficiently. Indeed, the Maryland-National Capital Park and Planning Commission (M-NCPPC) in its DEIS review has noted that the current LOD is inadequate to fully encompass the area necessary to accomplish all construction-related activities, and M-NCPPC predicts that the LOD will be expanded (10-21-20 Staff Report to Commission). This prospect is alarming and unacceptable to us.

Notably, in the discussion of Least Overall Harm, Section 5.3 Proposed Action (Appendix F p. 259-269), National Park Seminary is overlooked in the analysis of Factor 3, which concerns "the relative significance of each 4(f) property" (Appendix F p. 165). This oversight is evidenced by the lack of inclusion of National Park Seminary in the collection of most significant Section 4(f) properties affected by the Proposed Action. The DEIS itself states that significance is determined by eligibility for, or listing in, the National Register of Historic Places (Appendix F p. 13). National Park Seminary has been listed since 1972. As a listed property, National Park Seminary should be included in this group, as it is in Section 6.2.1 of Appendix 6, Volume 2 of the Cultural Resources Technical Report (p.50). Additionally, National Park Seminary is listed on the State of Maryland Inventory of Historic Sites. It is not clear whether the DEIS's failure to include National Park Seminary in all references to significant 4(f) properties is an inadvertent omission, or if National Park Seminary has not been sufficiently considered. This inconsistency is a deficiency in the DEIS.

We find additional inconsistencies in discussions of impacted features on the property. Figure 2-13 (Appendix F p.62) maps National Park Seminary but does not indicate any impacted contributing resources in the historic district, namely a 1907 contributing building known as the

2

00022501

Comments addressed above.

#1
Cont

Italianate Villa; a large statue of Minerva; and the Villa Gardens, a historic designed landscape, all of which would be affected by the railroad realignment. Appendix G, Volume 2 of the Cultural Resources Technical Report, Sections 5.1.2 (p. 47) and 7.4.2 (p. 93), which lists archeological site 18MO514 on the National Park Seminary property, includes the following resources:

- A former water pumping station;
- 3 cisterns, one constructed of stone;
- A retaining wall;
- Traces of a possible dam; and
- The abutments of two footbridges over the stream.

All of the above artifacts, as well as portions of two recently uncovered stone walking paths, are in the path of the realignment of the Linden Lane bridge and the expanded footprint of I-495.

Per the DEIS, site 18MO514 has been expanded to include all of the National Park Seminary Historic District, and the DEIS states that further investigation and evaluation are required (Appendix G p. 97). We concur with the recommendation for further evaluation. The DEIS has failed to consider the impacts of the Proposed Action on the resources above or the expanded site 18MO514.

Keeping in mind the DEIS's own admission that the landscape of National Park Seminary is significant, the DEIS does not fully consider how the Proposed Action impacts the streams on the property. Plates 14A and 14B (JPA Part 2A Impact Plates) indicate that the only impacted waterways are the portions to the east, where an existing outfall will be "improved" (Appendix F p. 55), and to the west, near the Linden Lane bridge, while indicating that the length of the stream between those two locations has no impact. The modifications to the outfall are not specified, so it is unknown what the path, volume, and speed of the stream will be as a result of the "improvement." Additionally, the DEIS states that MDOT SHA's applied minimization includes stormwater vaults beneath the shoulders of the roadway. However, it does not specify the capacity of those vaults, how the captured stormwater will be discharged, and where the overflow from those vaults will be directed (Appendix F p. 55). According to the DEIS (Chapter 4, Table 4-29), National Park Seminary's watershed, Rock Creek, will receive an additional 56.5 additional acres of impervious surfaces, which will yield runoff. SOS has seen over time that the streams greatly influence almost everything that occurs on the site: stream flow has altered paths and destroyed historic stone bridges, changing the nature of circulation throughout the site and challenging preservation of built features. We expect that there will certainly be indirect impacts from the modifications but the DEIS does not address that.

Along with the stream, another significant aspect affecting the landscape is the presence of WSSC infrastructure. The utility holds a network of easements, stormwater facilities, and underground water and sewer pipes that crisscross the wooded Glen landscape. The Glen, as stated above, is directly impacted by the Proposed Action, being the area of National Park Seminary that includes the LOD. WSSC anticipates the Proposed Action will make it necessary to relocate any pipes affected by the project. Because of WSSC's complicated presence in the Glen, we expect a major, lengthy disturbance to occur within this historic cultural landscape if

3

Comments addressed above.

**#1 Cont**

the utility is forced to reconfigure its activity in the Glen. Yet the DEIS does not address this eventuality, merely commenting in Appendix F that it has made a preliminary assessment of potential impacts of utility relocation (p. 159) but providing no additional information. With this omission, the DEIS has failed to explain fully the direct and indirect impacts of the Proposed Action.

Another area of concern to SOS is air quality. We will leave it to others to determine whether the DEIS has sufficiently addressed the potential air quality impacts on human health. Our focus is the effects pollutants have on the historic artifacts at National Park Seminary, particularly in the Glen, the area closest to the existing roadway and railroad. We have witnessed degradation to statuary in those areas, possibly due to emissions gases and particulate matter from both vehicular and rail traffic. We note that Build Alternative 9 (apparently emerging as MDOT SHA's preferred alternative) is likely to push heavy trucks to the outer lanes, directing their emissions even closer to the historic site. Yet nowhere in the statement does the DEIS address this aspect of air quality (DEIS Chapter 4, Section 4.8). Even if MDOT SHA is not required to examine this type of impact, mitigation should be considered.

While we found that DEIS Chapter 4 methodically discusses a series of potential environmental impacts, there are areas of analysis that should receive additional study, particularly the effects the Proposed Action may have on invasive plant species. 9.17 acres of National Park Seminary Historic District are protected by Category I Forest Conservation Easements. Per the DEIS, National Park Seminary would lose canopy trees and potentially gain invasive species. We agree with the assessment of direct and indirect impacts to forests, especially the potential for increased introduction of invasive species (Chapter 4 p. 4-100). The DEIS goes on to state that "Increased edge-to-edge interior ratio in forests also results in increased introduction of invasive plant species, resulting in lower plant biodiversity and fewer native plant species that support wildlife" (Chapter 4 p. 4-101). We concur on this point, but find the analysis incomplete, because it does not address the impact of invasive species on historic cultural landscapes and their artifacts. The Glen in National Park Seminary has been invaded by a profusion of many invasive plant species which threaten the stability of historic features, requiring considerable expenditure of time and funds to manage them. Would the Proposed Action exacerbate the problem, and if so, what are the costs likely to be? An additional unanswered question is how air quality, particularly increased $CO_2$ emissions, might influence the growth of invasive species, as numerous studies indicate. The DEIS has not addressed these critical questions for historic sites.

Indeed, National Park Seminary checks the boxes for a number of environmental impacts suggested by the DEIS: slopes with highly erodible soils, loss of tree canopy, applications of de-icing compounds on roadways, sedimentation in the stream, and soil contamination from organic compounds (DEIS Chapter 4). All of these problems currently exist, inside and outside the LOD, seriously affecting the historic cultural landscape, and have the potential to be amplified if the Proposed Action proceeds. The analysis provided by the DEIS makes these outcomes quite clear.

With so many unknown effects such as those described above, it is clear that additional study is necessary. However, the agencies intend to rely on an unexecuted Programmatic Agreement related to Section 106 requirements to satisfy Section 4(f) requirements. Doing so seems

4

Comments addressed above.

**#1 Cont**

premature and does not do justice to the process spelled out in the relevant legislation, nor does the incomplete information fully advise all stakeholders of the impacts of the project. A more detailed review is critical, especially since this significant cultural resource stands to suffer irretrievable and irreversible losses (DEIS Chapter 4 p. 4-159). Sadly, this would result in more historic fabric being sacrificed to inadequate transportation planning.

One of the influencing factors that received no attention in the DEIS is the current, ongoing pandemic that has transformed travel in the region. We believe the Purpose and Need of the study is too narrowly written and should be reevaluated in light of current and future roadway use and demand. In fact, rather than adding more roads, existing roads have been closed to meet the demand for recreation, revealing the reduced need to accommodate vehicular traffic. As the pandemic illustrates, outdoor spaces have become more important than ever, as safe and restorative areas for recreation and relief. The Glen at National Park Seminary is among those spaces. Though privately owned, it is open to the public and regularly visited by many in the community. The DEIS has not sufficiently studied use of this type, assuming that the land within the LOD is merely a sliver (see above) with no significant assets, but that is not the case, as we have explained. The DEIS appears to discount the value of this type of space as opposed to the value of the Proposed Action. In fact, the DEIS plainly states "The Build Alternatives would result in the conversion of existing land uses to right-of-way for transportation use across each of the seven land use types…" (Chapter 4 p. 4-7). Additional study of use of these spaces is required, addressing the questions of impact on the community and whether the Proposed Action serves the common good.

Despite the various shortcomings we have identified, we found much valuable and sobering information in the DEIS. In DEIS Chapter 4, numerous environmental consequences were determined to result in impacts with **all** the Build Alternatives. As we have explained, many of these environmental consequences directly and indirectly impact the National Park Seminary Historic District. The Maryland-National Capital Park and Planning Commission has pointed out that parkland and sites such as National Park Seminary have suffered years of degradation as a result of previous transportation projects. Indeed, the DEIS appears to agree: "Many of the resources described above have already been impacted by the development and subsequent expansions of I-495 and I-270" (Appendix F p. 269). It falls to the property owners and other stakeholders therefore to manage the negative consequences. The construction of I-495 in 1964 has already taken its toll: a portion of the historic cultural landscape of the National Park Seminary was removed, and the impact is still felt today. We have seen the future, if the Proposed Action goes forward. Given that, SOS is unable to support any of the Build Alternatives and endorses the No Build option.

Sincerely,

Bonnie Rosenthal

Bonnie Rosenthal, Executive Director
Save Our Seminary at Forest Glen Inc.

5

## SEVEN LOCKS CIVIC ASSOCIATION – JERRY GARSON

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Jerry Garson

**Date/Hearing:** 8/20/2020

**Type/Session:** Live / Morning

**Transcription:**

I am Jerry Garson (J-E-R-R-Y, Garson G-A-R-S-O-N), residing at 8308 Raymond Lane in Potomac, Maryland.

#1 I am speaking on behalf of the Seven Locks Civic Association, Inc., a nonprofit organization representing the people in the Seven Locks region. We are in favor of rebuilding and widening of the American Legion Bridge and I-495 from the western spur of I-270 to the American Legion Bridge as the first part of this project. This would normally be considered Alternative 9 with two HOT-managed lanes. We then favor widening I-270 northbound from north of I-370 where the most of the afternoon traffic congestion occurs. All other sections could be completed after these first two sections are completed.

#2 I have been analyzing the daily traffic counts from the four, quarter-mile traffic counts that are the State Highway Administration have located in Montgomery County for the last 20 years. In the beginning of the COVID-19 shutdowns in March 2020, we saw a rapid decline in traffic on the interstate highways in Montgomery County. We have now seen a return to almost pre-COVID-19 levels. We saw the Metro rail ridership drop by 90 percent. It has not returned from these levels in July or August 2020. The average weekday daily round trips for this period on all of WMATA rail is now only 38,458 passengers. While the average number of round trips, just at the traffic counter west of New Hampshire Avenue is 101,220. Until the COVID-19 pandemic is solved we will need much more road capacity. It looks like that Metro Rail will not return to its pre-COVID levels for the next few years. One additional reason is that WMATA rail use will continue to decrease is due to the increase in number of people working from home, and the second is the fear of people being in crowded subway cars without the possibility of people being at least six feet from other people in the subway car. Therefore, traffic in the next few years will probably increase on our local roads. We also know that only 20 percent of the vehicles on the interstate highways are commuters going to and from work. The non-commuting trips will probably not decrease.

We are now seeing in August the peak afternoon traffic eastbound at the Persimmon Tree automatic traffic counters returning to Maryland is between 2 and 4 PM, which is similar to the traffic before the COVID-19 shutdowns in March 2020. We are seeing the peak AM westbound traffic on I-495 at the traffic counter west of New Hampshire now recording the AM peak between 6 and 7 AM. most weekdays, instead of 5 to 6 AM, which occurred before COVID-19. This indicates a reduction in traffic in July and August due to inadequate road capacity between 7 and 9 AM. Thank you.

**Response to DEIS Comment #1**
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

**SIERRA CLUB MARYLAND – BRIAN DITZLER**

| | |
|---|---|
| | Refer to page CO-535 for the Sierra Club comment response. |

**Brittany Rolf (Consultant)**

| | |
|---|---|
| **From:** | Brian Ditzler <brian.ditzler@mdsierra.org> |
| **Sent:** | Friday, August 28, 2020 9:24 PM |
| **To:** | MLS-NEPA-P3 |
| **Cc:** | Lindsey Mendelson |
| **Subject:** | Comments on 495-270 Managed Lanes Study |
| **Attachments:** | Capital Beltway Accord Letter 8-27-20.pdf |

The attached letter was sent to Governors Hogan and Northam, and MDOT Secretary Slater was copied on it.

Please include it in comments submitted on the Managed Lanes Study DEIS. An even more detailed set of comments on the DEIS will be submitted by some of the signatories on this letter in October or early November.

Brian Ditzler
Maryland Sierra Club

1



Refer to page CO-535 for the Sierra Club comment response.

August 27, 2020

Hon. Ralph Northam
Governor of Virginia
P.O. Box 1475
Richmond, VA 23218

Hon. Larry Hogan
Governor of Maryland
100 State Circle
Annapolis, MD 21401

  **Re**: Capital Beltway Accord project

Dear Governor Northam and Governor Hogan:

As Maryland and Virginia work together to develop plans to expand capacity on the Capital Beltway from the George Washington Memorial Parkway to River Road ("Capital Beltway Accord project"), the undersigned groups believe any project that is advanced must be designed to substantially expand transportation choices and align with both states' goals for reducing greenhouse gas emissions and other air pollutants. We recognize the need to rehabilitate the American Legion Bridge and expand its capability to carry more people, but it is imperative that the project plans be developed with full transparency and public input to ensure that these goals are met and that public benefits are maximized.

In contrast, we believe a conclusions-first approach was used in the development of Maryland's Beltway/I-495 and I-270 Managed Lanes proposal[1] ("495-270 proposal") and Virginia's I-495 Express Lanes Northern Expansion ("495 NEXT") project. As a result, the proposals that have emerged from those processes are overwhelmingly focused on facilitating only one travel mode—single occupancy vehicles (SOVs)—and miss a major opportunity to reduce air and climate pollution. We strongly urge you to take a very different and far more holistic approach with the Capital Beltway Accord project, as discussed further below.

Specific shortcomings of Maryland's 495-270 proposal and Virginia's 495 NEXT project include:

- Inadequate support for transit: Neither project provides adequate funding for transit enhancements despite a demonstrated need for better transit along the Beltway corridor. This is inconsistent with local land use plans. For example, Fairfax County's comprehensive plan recognizes that high-quality transit service on dedicated or express

---

[1] Some of the signatories to this letter will be submitting a more detailed response to the Draft Environmental Impact Statement on this project in Maryland.

1

Refer to page CO-535 for the Sierra Club comment response.

lanes is essential to the growth of Tysons.[2] Similarly, Montgomery's land use and transportation consistently calls for the integration of bus rapid transit and other transit modes into the county and region's transportation system.

- **Insufficient alternatives analysis**: Any effort to determine the most beneficial and environmentally responsible options for improving I-495 through Maryland and Virginia should evaluate a scenario focused on transit improvements with supportive land uses, as recommended as one of the most cost-effective scenarios in the Metropolitan Washington Council of Governments' Visualize2045 Long-Range Transportation Plan.[3] The addition of improved and supported telework could enhance such alternatives. Yet the reviews for both of these proposals under the National Environmental Policy Act ("NEPA") have failed to assess a robust range of alternatives and instead have focused too heavily on expanding SOV travel capacity. Highway expansion has repeatedly been proven to fail in reducing congestion, and it results in increases in greenhouse gas emissions and other pollution over time.[4]

- **Insufficient transparency**: Virginia has, in recent years, strengthened its Public-Private Transportation Act to improve transparency. However, in both states there are ongoing communications with potential concessionaires that are shrouded from public view, and these can result in projects like the 495-270 proposal and 495 NEXT being predicated on maximizing toll revenue to meet financing assumptions rather than prioritizing public and environmental benefits.

- **Undermining of air quality and greenhouse gas emissions goals**: Transportation is the leading contributor to greenhouse gas emissions in Virginia and Maryland, driven largely by private auto travel. Further, the D.C metropolitan area is currently in non-attainment of Federal ozone standards, and the health costs of highway-related particulate matter (PM 2.5) pollution are increasingly apparent. To reduce greenhouse gas emissions and other air pollution, state governments must promote more transit, bicycling, walking, and transit-oriented development (TOD) rather than facilitating and encouraging more driving. Yet the 495-270 proposal and 495 NEXT project both promote and facilitate SOV travel, undermining both states' efforts to reduce greenhouse gas emissions and improve air quality.

- **Economic and social inequity**: It costs an average of $9,282 a year to own and maintain a car, according to 2019 AAA figures (https://newsroom.aaa.com/auto/your-driving-costs/), and many in the workforce earn less than $50,000 a year. These two projects based on

---

[2] See Comprehensive Plan-Tysons Corner Urban Center, "Public Transportation Goals," ppg. 42-43, at https://www.fairfaxcounty.gov/tysons/sites/tysons/files/assets/documents/pdf/comprehensive_plan/fc_comp_plan2017ed_tysons_amended04_04_2017.pdf
[3] See Metropolitan Washington Transportation Planning Board Visualize 2045 Long-Range Plan (approved 2018), Chapter 4 (Aspirational Element), https://www.mwcog.org/assets/1/6/Final_Visualize_2045_-_Chapter_4.pdf. The balanced jobs-housing scenario was found to be one of the cost-effective ways to mitigate congestion.
[4] For a recent study of the ineffectiveness of road capacity expansion to provide long-term congestion relief, see Todd Litman, *Generated Traffic and Induced Travel: Implications for Transport Planning*, Victoria Transport Policy Institute, 2020. https://www.vtpi.org/gentraf.pdf

2


Refer to page CO-535 for the Sierra Club comment response.

variably-priced express lanes that will be too expensive for many workers to use will do too little to expand access to jobs and services for residents who cannot afford the high costs of owning a car. Construction of the proposed Maryland 495-270 managed lanes will directly impact areas where 60% of the population is minority (African-Americans, Latinx, and Asian), according to the Draft Environmental Impact Statement.[5]

- Negative impacts to national, state and local parks in both states, and notable environmental impacts: As currently proposed, these two projects will directly or indirectly damage six national parks and acres of regional park sites. The reviews of these projects under NEPA, Section 4(f) of the Department of Transportation Act, and Section 106 of the National Historic Preservation Act have failed to result in sufficient avoidance and minimization of impacts to parkland and historic resources. The environmental impacts of both projects are significant, as documented in their environmental analyses. The 495-270 project will result in the loss of some 1,500 acres of tree canopy, 16 acres of wetlands, approximately 50 acres of wetland buffers, and will have direct and indirect impacts on 30 miles of streams.[6] The 495 NEXT project will result in loss of 118 acres of tree canopy, and have direct impacts on 19.8 acres of wetlands and more than two miles of streams.[7]

**Strengthening the Capital Beltway Accord**

Many of the undersigned groups are working to address these and other flaws with the Maryland 495-270 and Virginia 495 NEXT proposals within our respective jurisdictions. However, because Maryland and Virginia are proceeding with planning the Capital Beltway Accord project, and because that project implicates the interests of all of our groups, we are jointly sending this letter to request that your efforts to develop plans for the Capital Beltway Accord project avoid the mistakes listed above by including the following elements:

- **Commitment to a transparent project review process that includes a full analysis of alternatives.** Virginia's experience with using public-private partnerships to advance transportation proposals has shown the review processes must be structured very carefully and transparently to deliver maximum public benefits, and that rigorous NEPA reviews can help officials avoid wasting public money and resources on flawed and environmentally destructive projects. Any public-private partnership pursued for the Capital Beltway Accord project must not short-circuit important aspects of transportation project planning and approval under the NEPA process. The alternatives studied must

---

[5] Draft Environmental Impact Statement, I-270 and I-495 managed lanes study, Section 4.2.2 on p. 4-10. https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_Ch4_Environmental.pdf
[6] Ibid., Table 4-1 on p. 4-3.
[7] Draft Environmental Assessment, Natural Resources Technical Report, 495-NEXT, p. 11 (stream impacts); p. 20 (wetlands impacts); p. 39 (tree loss). /www.495northernextension.org/documents/pim032020/i-495_next_7_natural_resources_tech_report_final.pdf

3

00022509

**Refer to page CO-535 for the Sierra Club comment response.**

include integrated land use (transit-oriented development and jobs/housing balance), expanded transit options, and travel demand management (including telecommuting and park & ride expansion). Estimates of likely greenhouse gas emissions should be provided for each of the different alternatives.

One viable alternative to study would be to combine expanded telecommuting with new transit. Over the last six months, hundreds of thousands of the region's erstwhile commuters successfully and efficiently worked from home. While the region's workers may not all be able to make this a permanent condition, if a significant proportion of telecommuting continued into the future, even if combined with regular in-office meetings and off-peak in-office work commuting, it could well eliminate the need for a significant amount of new investment in SOV access. Instead of investment in hundreds of new lane-miles, vastly improved high-speed internet capacity and access -- especially for those who do not currently have it -- might provide an effective substitute, with substantially lower environmental impacts and costs.

- **A significant contribution to expanded transit**. As noted above, both the 495-270 project and 495 NEXT provide inadequate funding for transit. The Capital Beltway Accord project provides an opportunity to remedy this by funding enhanced transit service along the Beltway corridor between Virginia and Maryland as well as on neighboring roads. The I-66 Outside the Beltway concession includes annual dedicated funding for enhanced transit. A similar funding commitment should be part of the Capital Beltway Accord project to activate high-quality transit on 495.

- **Full evaluation of accommodations for heavy rail on the American Legion Bridge**. In order to achieve climate goals and meet the travel needs of future populations in the Tysons-Bethesda corridor, evaluation of alternatives for bridge rehabilitation or expansion must fully analyze accommodation of heavy rail, such as expansion of the Purple Line into Virginia. The design for the Woodrow Wilson Bridge provides a good example, as it allows for future rail or other high-capacity transit on two of that bridge's twelve lanes.

- **Grade-separated bicycle and pedestrian facilities that connect with trail systems in Maryland and Virginia**. Including bicycle and pedestrian facilities across the American Legion Bridge is essential to overcoming its current barriers to active transportation and providing a much-needed connection to a regional multi-use trail network. Ensuring these facilities are provided and take the form of grade-separated interchanges would provide maximum safety to all trail users. These should be designed in full coordination with the National Park Service and local park authorities to ensure they avoid park resources and maximize protection of environmental resources.

4

Thank you for your consideration of our comments and concerns. We look forward to being involved in the planning process for the Capital Beltway Accord project. Please note that some of the signatories to this letter will be submitting in October a detailed analysis of the DEIS for Maryland's 495-270 proposal.

Sincerely,

Karen Campblin and Douglas Stewart
Transportation Co-Chairs, Virginia Sierra Club

Josh Tulkin
Director, Maryland Sierra Club

Shruti Bhatnagar
Chair, Montgomery County Sierra Club Group

Stewart Schwartz
Executive Director, Coalition for Smarter Growth

Morgan Butler, Senior Attorney
Southern Environmental Law Center

Denisse Guitarra
Maryland Conservation Advocate
Audubon Naturalist Society

Renee Grebe
Northern Virginia Conservation Advocate
Audubon Naturalist Society

Pamela Goddard
Senior Program Director, Mid-Atlantic Region, National Parks Conservation Association

Alison Prost, Esq.
Vice President for Environmental Protection and Restoration
Chesapeake Bay Foundation

Brad German
Citizens Against Beltway Expansion, Maryland

5

**Refer to page CO-535 for the Sierra Club comment response.**

00022511

*This page is intentionally left blank.*

cc: Shannon Valentine, Virginia Secretary of Transportation
   Nick Donohue, Virginia Deputy Secretary of Transportation
   Gregory Slater, Maryland Secretary of Transportation
   Peter Franchot, Maryland Comptroller
   Nancy K. Kopp, Maryland Treasurer

6

00022512

**SIERRA CLUB MARYLAND – JOSH TULKIN**

Refer to page CO-535 for the Sierra Club comment response.

| | |
|---|---|
| **From:** | Josh Tulkin <josh.tulkin@mdsierra.org> |
| **Sent:** | Friday, October 23, 2020 4:13 PM |
| **To:** | Lisa Choplin; Parikh, Jitesh (FHWA); jeanette.mar@dot.gov; 495-270-P3; MLS-NEPA-P3 |
| **Subject:** | Request for I-495/I-270 DEIS underlying data |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Good afternoon, Ms. Choplin and Mr. Parikh:

In previous emails we have provided the legal basis for requesting underlying data used in the I-495/I-270 Managed Lanes Study Draft Environmental Impact Statement (DEIS). Specifically,

> 40 C.F.R. § 1500.1(b) (2019) ("NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA"); id. § 1502.21 (2019) (underlying data may be incorporated by reference only if "it is reasonably available for inspection by potentially interested persons within the time allowed for comment"); WildEarth Guardians v. Mont. Snowmobile Ass'n, 790 F.3d 920, 925 (9th Cir. 2015) ("To fulfill NEPA's public disclosure requirements, the agency must provide to the public 'the underlying environmental data' from which the [agency] develops its opinions and arrives at its decisions.").

**We are therefore requesting:**

1) The underlying data and complete itemized budget that went into Table 8-1 (Appendix B, page 148), including the assumed "efficiencies" coefficient and detailed explanation of any and all assumptions used to lower the estimates.

2) The breakdown of the numbers in Table 3-10 (Appendix E, page 63) in terms of lists of place names. The place name information is not clearly presented in the DEIS and appendices, and is in many cases not determinable from the information provided in the DEIS.

3) The breakdown of the numbers in Table 3-11 (Appendix E, page 66) in terms of lists of place names and addresses.

4) The DEIS provided estimated opening year (2025) average weekday toll rates per mile, varying from $0.68 per mile to $0.77 per mile. In order to calculate an average, the data necessarily contains maximum and minimum tolls. Please provide the underlying data for 13 time periods and underlying data for the average tolls given on DEIS page 2-43, including the maximum and minimum tolls.

5) The AM peak per mile rates were given on page 883 of Appendix C. Please provide the equivalent table for the PM peak.

6) Any cost-benefit or value-for-money analysis done for this project to establish the cost-savings of using the public-private partnership financing method in place of increasing bonding capacity and using a more traditional design-build approach.

We need this information for our comments on the DEIS. We request this data by November 4, 2020.

Many thanks,
Josh Tulkin

1



--

**Josh Tulkin**
State Director
Maryland Sierra Club
josh.tulkin@mdsierra.org

Sierra Club Maryland Chapter
7338 Baltimore Avenue #102
College Park, MD 20740
Direct: 240-764-5307
Mobile: 650-722-3171
http://sierraclub.org/maryland

*In today's political climate, state-based action is the best way to move towards zero waste, clean transportation and 100% renewable energy. Support Sierra Club's bold, grassroots approach: Donate to the Maryland Chapter today.*

2

*This page is intentionally left blank.*

00022514


**SIERRA CLUB MARYLAND CHAPTER ET AL.**

Refer to page CO-424 for the full Sierra Club comment letter and page CO-535 for the Sierra Club comment response.

Sierra Club Maryland Chapter

Please find the attached comments on the I-495 and I-270 Managed Lanes Study Draft
Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application
(JPA) for your review and consideration (USACE Application Number (NAB-2018-02152) and the
MDE Tracking Numbers 20-NT-0114 / 202060649). Also attached is a list of attachments to the
comments (the actual files will be sent separately) for your review and consideration. Please
confirm receipt. The comments are submitted on behalf of the following Organizations:

Sierra Club Maryland Chapter
350 Montgomery County, MD
Audubon Naturalist Society
Baltimore 350
Baltimore Transit Equity Coalition
Bikemore
Breathe Free Montgomery
Cedar Lane Unitarian Universalist Church Environmental Justice Ministry
Central Maryland Transportation Alliance
Chesapeake Bay Foundation
Citizens Against Beltway Expansion
Coalition for Smarter Growth
DontWiden270.org
DoTheMostGood Montgomery County
Forest Estates Civic Association
Forest Glen Citizens Association
Friends of Moses Hall Consulting Party (Cabin John, MD)
Friends of Quincy Watershed
Friends of Sligo Creek
Greenbelt Climate Action Network
HoCo Climate Action (Howard County)
Indian Spring Residents Opposed to Beltway Widening Group (ISROBWG)
Indivisible Howard County
Interfaith Power & Light (DC.MD.NoVA)
League of Women Voters of Maryland
Long Branch Civic Association
Maryland Conservation Council
Maryland Legislative Coalition
Maryland PIRG
College Park Mayor Patrick Wojahn
Montgomery County Faith Alliance for Climate Solutions
NAACP Maryland State Conference
National Parks Conservation Association
Neighbors of the Northwest Branch
North Hills of Sligo Creek Civic Association
Our Revolution Maryland
Nova Citizens Association

00022515

**SIERRA CLUB MARYLAND CHAPTER ET AL. – IAN FISHER**

| Refer to page CO-535 for the Sierra Club comment response. |
|---|

| From: | Ian Fisher <ifisher@jillgrantlaw.com> |
|---|---|
| Sent: | Monday, November 9, 2020 9:29 AM |
| To: | MLS-NEPA-P3; Lisa Choplin; jeanette.mar@dot.gov |
| Cc: | Mary Clemmensen |
| Subject: | Question re submitting comment attachments |

Good Morning,

We have around 190 attachments to comments from Sierra Club Maryland Chapter et al. on the I-495 I-270 Managed Lane Study DEIS. We see that the online form only allows 5 at a time and it is likely that the email to submit comments to will reject a submission with a large amount of attachments. We were wondering if the attachments can be submitted by uploading them to a third party file sharing website (such as Dropbox) and then sending the link for the files to be downloaded to the record and to be considered? Or is there another option that would be more efficient? Thank you for your help.

Ian

Ian Fisher
Associate Attorney
Jill Grant & Associates, LLC
1319 F Street NW, Suite 300
Washington, DC 20004
Tel: 202-821-1948
Fax: 202-459-9558
ifisher@jillgrantlaw.com
www.jillgrantlaw.com

Linked in | Follow @jkyantlaw

If this email concerns legal matters, this communication and any attachments are attorney-client privileged and confidential and intended for use only by the individual or entity named above as the intended recipient. If you are not the intended recipient, reading, distributing, or copying this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender at ifisher@jillgrantlaw.com and delete this email and any attachments. Thank you.

1

00022516

**SUBURBAN MARYLAND TRANSPORTATION ALLIANCE (SMTA) – JENNIFER RUSSEL**

| | |
|---|---|
| **From:** | jenrusselbhi@gmail.com |
| **Sent:** | Wednesday, August 26, 2020 2:55 PM |
| **To:** | MLS-NEPA-P3 |
| **Cc:** | jenrusselbhi@gmail.com |
| **Subject:** | Testimony of the I-495/I-270 P3 DEIS |
| **Attachments:** | DEIS testimony.docx |

Attached please find testimony I delivered last week on August 20, 2020 representing Suburban Maryland Transportation Alliance/Citizens4 Traffic Relief.

1

*This page is intentionally left blank.*



**SUBURBAN MARYLAND TRANSPORTATION ALLIANCE**

#1

Good afternoon. I am Jennifer Russel Vice Chair of Suburban Maryland Transportation Alliance, also known as SMTA. I am speaking on behalf of SMTA and its grass-roots organization Citizens 4 Traffic Relief. We wish to heartily support moving forward with the P3 Project which seeks to improve I-495/I-270. The DEIS is of course an overwhelming document and much has been said about time to respond, insertion of new information and the like. However, the bottom line remains the same, in the real world, as opposed to the current Covid nightmare, we will still be strangulating in traffic as data incorporated in the DEIS cites 2040 highway speeds of 15 mph or less extending beyond traditional rush hour periods because another 1.2 million people will be populating the region by that year. Efforts to delay the process for the P3 seem to be the opposition's answer to reduce current (non-pandemic) congestion and congestion in the future-how does that make sense as an answer?

More delay must not be the answer for a project that has been under study for 30 years as part of the Region's long-range plan. We must also not make the grievous error of thinking that recent increases in tele-work which have reduced commuting trips in the short term will rid us of congestion. Be aware that commuting trips only make up about 20% of all trips and there are sectors of the economy that will never enjoy that opportunity.

Several of the proposed alternatives will make significant impacts on congestion by reducing system wide delays of up to 35%. This is a no-brainer that we must embrace. It is vital that we recognize the unique value of the P3 as an instrument to provide the funding that the State does not have the money or bonding capacity to produce. There is no other viable means to acquire the funds to underwrite such an ambitious road project whose key improvement to the American Legion Bridge has been needed in the region for years.

We suggest that Alternatives 9 and 10 perform well with respect to metrics, with Alternative 9 offering the added benefits of boosting carpool and vanpool usage due to the use of HOV lanes. It is also important to realistically evaluate the environmental impacts of the project which are less than other projects of this scale, because importantly the project only involves widening existing facilities.

SMTA and Citizens4 Traffic Relief say let's be smart and take the bull by the horns and use this opportunity to move forward for the region. Thank you for the opportunity to testify.

Jennifer Russel, Vice Chair

SMTA

Citizens4 Traffic Relief

**Response to DEIS Comment #1**
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**SUBURBAN MARYLAND TRANSPORTATION ALLIANCE (SMTA) – EMMET TYDINGS**

Emmet Tydings

I am in total support of the P3 tolled lanes project for I495/I270/ALB with four new lanes and am attaching a statement of support from my position as Executive Director Pro Tem of Suburban Maryland Transportation Alliance.

**Response to DEIS Comment #1**

MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

The following pages reflect the attachments included in the letter. There are no comments or responses provided on these pages; they are included for the record.

#1



**I-495 & I-270 Managed Lanes Study**

**Draft Environmental Impact Statement (DEIS):**

**Highlights and Key Findings**

**November 9th, 2020**

**About the Suburban Maryland Transportation Alliance (SMTA):**

The Suburban Maryland Transportation Alliance (SMTA) was formed to get Maryland moving again by providing expert analysis, public education, and ongoing advocacy for a more efficient, safe, and balanced transportation network in Suburban Maryland.

For more information visit:
MdTransportation.org



### Executive Summary – The Three Most Important Conclusions from the I-495 & I-270 Managed Lanes Study Draft Environmental Impact Statement (DEIS):

This DEIS is <u>the</u> definitive study to date of the various options available to address current and future traffic congestion on this portion of the Beltway and I-270, as part of the larger I-495 & I-270 P3 Program. The Managed Lanes Study DEIS includes most of the Capital Beltway, from the American Legion Bridge to Route 5, and the lower section of I-270, as far north as the I-370 interchange. Future studies will address the remainder of I-270 and the Beltway in Maryland. Figure ES-1 (p. ES-1) illustrates the study corridors.

Elected officials and residents of these two heavily congested corridors should take the time to read the DEIS, or at least the executive summary (21 pages) and some of the key sections of the main report (353 pages). This summary is intended to cover the most important points in the report and provide additional context on some of its key findings. Much of the data in the DEIS is presented visually in graphs and data tables that are easily digested by transportation experts and non-professionals alike. It is posted at: 495-270-p3.com/DEIS/

**Figure ES-1: I-495 & I-270 Managed Lanes Study Corridors**

The DEIS clearly answers many of the questions people have raised in the public discussion of this project, including these three key questions that ought to inform the public debate on the P3 Program:

1. **Do we need to move forward with these improvements to the Beltway and I-270?** Yes, we do, clearly. The DEIS underscores the importance of moving ahead with congestion relief for the American Legion Bridge, I-495 and I-270 in Maryland. Traffic is forecast to grow much worse between now and 2040, as another 1.2 million people are projected to be living here by then and using our already outdated and overburdened transportation networks. The DEIS analysis shows clearly that a "no-build" scenario will lead to dramatically worse levels of congestion, well above current levels, that are not sustainable from a quality-of-life, economic, or environmental standpoint. There is no indication that the current COVID-19 pandemic, or any changes in telework patterns (even if they prove lasting), will have any significant impact on these 2040 conditions, other than recent expert projections that traffic may get slightly worse as a result of the COVID pandemic, as more people shift from public transit to private automobiles, due to growing health concerns regarding shared public spaces.

2. **Which alternatives were studied, and which perform best?** The DEIS documents a long list of alternatives that were considered, including many forms of mass transit and other non-toll alternatives, and the reasons why some were dropped. In the case of all the stand-alone transit options, a range of light-rail, heavy-rail and bus alternatives were studied and rejected. All were dropped because they were found not to be effective in addressing congestion and because they were not found to be financially viable (all previous studies in these corridors have reached similar conclusions). The remaining build alternatives

now under consideration all include adding new managed lanes in both corridors, along with an extensive network of express-bus service using the new managed lanes, as called for in our region's approved long-range plans. These build alternatives offer a range of benefits and impacts:

- Alternatives 9 and 10 clearly perform best in terms of addressing current and future traffic and financial viability. Alternative 9 provides more incentive for carpools and vanpools and has a slightly smaller footprint, and therefore is the best option in our judgement.

- Alternatives 8, 9M, 13B and 13C offer more modest travel benefits, with only slightly fewer environmental impacts, and are less financially viable (and therefore more likely to require some public subsidy).

- The No-build Alternative (Alternative 1), and two other build options that were studied but rejected (Alternative 5 and the MD-200 Diversion Plan offered by Montgomery County) are clearly not viable, based on the DEIS results, and are not being considered further.

The environmental and right-of-way impacts among the various build alternatives does not differ dramatically, and these impacts are significantly less than several other recently approved projects in our region (like the ICC and the Purple Line). For this reason, SMTA recommends selection of a preferred alignment based mainly on transportation performance metrics. It is also worth noting that significant new transit services and Transportation Demand Management (TDM) solutions have been incorporated into all the remaining build alternatives.

3. **Is the P3 Program financially viable and can this Program be delivered at no taxpayer expense?** Yes, it can. The DEIS explains why we need a P3 Program to deliver these improvements, as the State of Maryland lacks funding and bond capacity to fund it any other way. The DEIS reveals that all of the build alternatives can provide a very substantial positive cash flow under both the low-cost and medium-cost assumptions. Only the worst-case assumptions regarding future interest rates and higher construction costs would produce negatives cashflows. So the P3 Program does appear to be financially viable and can be delivered at no cost to taxpayers. Financial risk can best be minimized by moving the project forward quickly, to take full advantage of historic low interest rates we are now seeing. Further delay adds significant cost to the project. So Maryland officials would be wise to do their best to avoid further delay on a project that has already been studied for 30 years.

The DEIS findings on these three questions should reassure the public and local officials regarding the critical importance and effectiveness of the proposed improvements to the American Legion Bridge, the Beltway and I-270. These improvements remain top priorities for Montgomery, Frederick and Prince George's Counties, and should move forward as called for in our region's adopted long-range transportation plans.

The next step is to get public feedback, not just from the usual opposition groups who are always heard from, but from the other 90% of us who use our road network every day and are fed up with sitting in stalled traffic and crushing congestion delays on the American Legion Bridge and I-270.

We all know the current conditions during this pandemic are just a temporary reprieve, and traffic will soon be back to our usual nightmarish normal. Now is our chance to move forward on some of the long-term, multi-modal solutions outlined in the DEIS that we now know will bring lasting and dramatic relief.

Anyone can review the documents at 495-270-p3.com/DEIS/ and submit public comments in various ways as indicated on the Program website. We encourage everyone who uses our region's crowded highways to read the report and make sure they comment. A more detailed analysis follows below.

now under consideration all include adding new managed lanes in both corridors, along with an extensive network of express-bus service using the new managed lanes, as called for in our region's approved long-range plans. These build alternatives offer a range of benefits and impacts:

- Alternatives 9 and 10 clearly perform best in terms of addressing current and future traffic and financial viability. Alternative 9 provides more incentive for carpools and vanpools and has a slightly smaller footprint, and therefore is the best option in our judgement.

- Alternatives 8, 9M, 13B and 13C offer more modest travel benefits, with only slightly fewer environmental impacts, and are less financially viable (and therefore more likely to require some public subsidy).

- The No-build Alternative (Alternative 1), and two other build options that were studied but rejected (Alternative 5 and the MD-200 Diversion Plan offered by Montgomery County) are clearly not viable, based on the DEIS results, and are not being considered further.

The environmental and right-of-way impacts among the various build alternatives does not differ dramatically, and these impacts are significantly less than several other recently approved projects in our region (like the ICC and the Purple Line). For this reason, SMTA recommends selection of a preferred alignment based mainly on transportation performance metrics. It is also worth noting that significant new transit services and Transportation Demand Management (TDM) solutions have been incorporated into all the remaining build alternatives.

**3. Is the P3 Program financially viable and can this Program be delivered at no taxpayer expense?** Yes, it can. The DEIS explains why we need a P3 Program to deliver these improvements, as the State of Maryland lacks funding and bond capacity to fund it any other way. The DEIS reveals that all of the build alternatives can provide a very substantial positive cash flow under both the low-cost and medium-cost assumptions. Only the worst-case assumptions regarding future interest rates and higher construction costs would produce negatives cashflows. So the P3 Program does appear to be financially viable and can be delivered at no cost to taxpayers. Financial risk can best be minimized by moving the project forward quickly, to take full advantage of historic low interest rates we are now seeing. Further delay adds significant cost to the project. So Maryland officials would be wise to do their best to avoid further delay on a project that has already been studied for 30 years.

The DEIS findings on these three questions should reassure the public and local officials regarding the critical importance and effectiveness of the proposed improvements to the American Legion Bridge, the Beltway and I-270. These improvements remain top priorities for Montgomery, Frederick and Prince George's Counties, and should move forward as called for in our region's adopted long-range transportation plans.

The next step is to get public feedback, not just from the usual opposition groups who are always heard from, but from the other 90% of us who use our road network every day and are fed up with sitting in stalled traffic and crushing congestion delays on the American Legion Bridge and I-270.

We all know the current conditions during this pandemic are just a temporary reprieve, and traffic will soon be back to our usual nightmarish normal. Now is our chance to move forward on some of the long-term, multi-modal solutions outlined in the DEIS that we now know will bring lasting and dramatic relief.

Anyone can review the documents at 495-270-p3.com/DEIS/ and submit public comments in various ways as indicated on the Program website. We encourage everyone who uses our region's crowded highways to read the report and make sure they comment. A more detailed analysis follows below.

2



## I-495 & I-270 Managed Lanes Study DEIS: Highlights and Key Findings

**Introduction:**

The Suburban Maryland Transportation Alliance (SMTA) has reviewed the I-495 & I-270 Managed Lanes Study Draft Environmental Impact Statement (DEIS) and encourages everyone to read at least the 21-page executive summary. Key sections of the 353-page study are summarized below, including the chapters detailing how the various alternatives perform in terms of traffic relief and other key metrics.



We wish to point out, at the outset, that this is just the latest study of transportation options in these two heavily congested corridors, in what has already been a 30-year study process. Three previous major corridor studies have already been conducted on both the Capital Beltway and I-270 corridors. All of these studies have produced similar findings: Namely, that a combination of new lane capacity and enhanced transit is needed in both corridors to address current and future travel needs. Not only do we need to address the needs of commuters (who comprise 19% of daily trips), but other needs for interstate travel, errands and other non-commuting trips, shipping and freight deliveries as well.

This is important because **non-commuting trips make up 81% of daily traffic in our region** and these trips will never be served to any significant degree by transit or telework. That is why all previous studies, and this one, indicate that the only effective solution to congestion in these corridors must include new lane capacity on our major interstates as part of the solution, along with any new transit services.

For this reason, after several years of study, the Metropolitan Washington Council of Governments Transportation Planning Board (TPB) adopted a long-range plan, called "Visualize 2045," to meet the needs of the estimated 1.2 million more residents the region is projected to add by 2040. That plan includes adding two new managed lanes to the Beltway and I-270, with express buses using the new lanes. Several of the build alternatives in the DEIS are consistent with the region's adopted long-range plan. The "No-build Alternative" is not consistent with the region's adopted long-range plan.

We encourage everyone to review the DEIS and submit comments during the official comment period. You can review the full report, and learn more about how and when to comment, at: 495-270-p3.com/deis/

This overview of the key findings of the DEIS is intended to help brief public officials, transportation reporters, residents and other stakeholders in our community who wish to know the facts but do not have time to read the entire 353-page DEIS. The following pages summarize the key findings of the DEIS, including excerpts from key sections (with citations to the pages in the DEIS) and additional observations based on our expertise on regional transportation issues.

3

OP·LANES MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-8    Filed 10/30/23    Page 78 of 106

FINAL ENVIRONMENTAL IMPACT STATEMENT

**The MLS Draft Environmental Impact Statement and the NEPA Study Process:**

The Managed Lanes Study Draft Environmental Impact Statement is a 353-page document that provides a wealth of information about the various alternatives now under study to relieve severe traffic congestion on two of Maryland's most crowded interstates. The issuance of a DEIS for public comment is a required step in the National Environmental Policy Act (NEPA) study process. The entire DEIS report is now available for public comment at: 495-270-p3.com/DEIS.

The DEIS includes a 21-page Executive Summary of the report on the same website, as well as roughly 18,000 pages of highly detailed technical analyses and other details in the appendices. It is not necessary to read through all the technical analysis, as the findings of that analysis are presented in the DEIS itself.

The Executive Summary describes where we are in the study process, the initial range of 15 major alternatives that were considered, and how those alternatives were narrowed down to the 6 remaining build alternatives retained in the DEIS. A brief overview of the key findings for each of the build alternatives is also presented in the Executive Summary, along with answers to many of the key questions about the Managed Lanes Study and the broader I-495 & I-270 P3 Program. The figure below illustrates where we are in the MLS study process.

**Figure ES-2: Alternatives Screening Process**



The public now has an opportunity to comment on the DEIS. The Maryland Department of Transportation (MDOT), State Highway Administration (SHA), and Federal Highway Administration (FHWA) will then respond to those comments, prior to the issuance of a Final Environmental Impact Statement (FEIS) expected sometime next year. Once the FEIS is completed, and a Record of Decision Signed, the State can proceed to obtaining permits and start construction on whichever alternative is selected, using an innovative public-private-partnership (P3) model for financing and construction of the project.

**Key Questions Answered by this DEIS:**

As noted, this is not the first major study of these corridors, so much is already known about the impact various types of investments would have on congestion. With the publication of this DEIS, several key questions about the MLS have now been answered even more definitively, and significant new information has come to light that underscores the importance of this project, which addresses a need identified by regional transportation experts as a top priority roughly three decades ago. As one of the main transportation advocacy organizations in the Greater Washington Region, since 2009, the Suburban Maryland Transportation Alliance has participated in many previous studies on both the I-270 and I-495 corridors. Drawing upon this experience, and the expertise of our members and Advisory Board, we have organized this report around the three key questions transportation experts ask about this project, all of which the DEIS answers definitively.

4

---

1. **Do we need to move forward with these improvements to the Beltway and I-270?**

The answer is a clear and unequivocal "**yes.**" The DEIS underscores many of the key reasons for moving ahead with congestion relief for the American Legion Bridge, I-495 & I-270 in Maryland that emerged from previous studies.

First, traffic is forecast to get much worse as the region continues to grow between now and 2045. The DEIS analysis of no-build conditions indicates levels of congestion that are not sustainable, from a quality of life, economic development, or environmental standpoint. The need for the project is quite clear and compelling (see DEIS pp. 1-4 to 1-13). There is also no indication in any data we have seen that the current COVID-related shutdown will have any long-term effects on population growth or traffic levels in 2040, 2045 or beyond. Consider these key facts:

- The region's population is projected grow by nearly 22% by 2045, an increase of over 1.2 million people compared to our population today (DEIS p. 1-5). All those additional people will be traveling on interstates that are already heavily congested today.

- Table 1-1 in the DEIS shows the growth in travel demand that is projected.

**Table 1-1: Regional Population Growth**

| Geography | 2000 | 2020 | % Increase Since 2000 | 2045 Forecast | Forecasted % Increase 2020 to 2045 |
|---|---|---|---|---|---|
| Montgomery County | 875,672 | 1,052,000 | 20.1% | 1,223,300 | 16.3% |
| Prince George's County | 805,723 | 923,100 | 14.6% | 995,900 | 7.9% |
| Inner Washington, DC Suburbs[1] | 390,386 | 529,400 | 35.6% | 681,500 | 28.7% |
| Outer Washington, DC Suburbs[2] | 891,273 | 1,093,000 | 22.6% | 1,204,700 | 10.2% |
| MWCOG Planning Area Counties Total | 4,385,759 | 5,690,000 | 29.7% | 6,925,700 | 21.7% |

Sources: MWCOG (2006, 2018)
[1] As defined by MWCOG and includes Calvert, Chares, and Frederick Counties.
[2] As defined by MWCOG and includes Anne Arundel, Carroll, and Howard Counties.

- The region's employment base is projected to grow by 27% by 2045, an increase of about 913 million jobs (DEIS, p. 1-6). However, employers will not come here to Maryland, or stay in the I-270 corridor if we do not address the severe congestion on I-270 and the American Legion Bridge.

- Severe congestion in these corridors poses a serious long-term threat to our quality of life, employment growth and air quality, and it is among the top complaints local employers hear in trying to recruit top talent to live or work in the Maryland portion of our region.

- The need for this project, and the boost it will provide to future job growth, adding at least 13,000 new highly-paid jobs a year for each $1 billion spent (on an $8-10 billion project) has never been more important than it is now, given rising unemployment and a severe economic downturn. This $8-10 billion stimulus effect is nearly five times larger than the entire State of Maryland received from Congress in COVID relief funds. Literally nothing on the horizon would do more to get our regional economy going again.

5

00022523

- COVID has not changed any of the forecasts on which this project is based. In fact, vehicle traffic has already rebounded to almost pre-COVID levels. Meanwhile, mass transit ridership remains severely reduced from pre-COVID levels, and may take much longer to rebound, driving more people to shift from transit to autos and increasing total auto trips over the long run. As recently reported (WTOP on 7/16/20), INRIX data reveal that auto traffic is now back up to pre-COVID conditions, while transit ridership is down by as much as 90% from pre-COVID levels, and is not yet rebounding significantly.

- Recent changes in telework will not have much impact on future traffic volumes either, for the obvious reason that **only 19% of our daily trips involve commuting**, and entire sectors of our workforce can never telecommute anyway (for example, manufacturing, bio-tech, retail services, hospitality, healthcare, etc.). So even a large increase in telework rates only impacts a small fraction of the less-than-one-fifth of all daily trips that involves commuting in the first place. This will never be enough to ease congestion in our region's congested highways, because it does not even address the vast majority of the trips we make, which have nothing to do with going to and from work. This remaining 81% of daily trips, where telework will have exactly zero impact, includes non-work trips like shopping, errands, interstate through-trips, package and freight deliveries, movement of goods and services, tourism, client meetings, etc.-- none of these trips are impacted by telecommuting by one iota – and these are most of the trips we make. It critically important that policymakers understand that transportation is about a lot more than just commuting to and from work, and this is precisely why telework alone can never address the future congestion levels we are facing by 2040, 2045 and beyond.

The DEIS analysis shows us exactly how bad traffic is forecast to become if we do nothing. For more, see Chapter 3 on "Transportation and Traffic" (DEIS pp. 3-5 to 3-7). Consider these findings from the DEIS regarding how bad traffic is today and the level of increase projected in daily traffic volumes:

- Many segments of I-270 and I-495 are currently among "the most heavily traveled, most congested, and most unreliable roadway segments in Maryland" (DEIS p. 3-5).

- Many segments are currently operating at less than 20mph, with some sections of the Beltway operating at less than 10mph during peak periods (DEIS p. 3-6).

- Average daily traffic is projected to increase by up to 17% in some of these sections by 2040 (DEIS p. 3-7), meaning these major highways, and the local streets surrounding them, will become much more congested in 2040 than they are now if we do nothing to add new capacity.

Table 3-2: 2040 No Build Average Daily Traffic (ADT)

| Corridor | Segment | Existing (2017) | No Build (2040) | Percent Increase |
|---|---|---|---|---|
| I-270 | I-370 to MD 28 | 226,000 | 265,000 | 17% |
| | MD 28 to I-270 Spur | 259,000 | 299,000 | 15% |
| I-495 | at American Legion Bridge | 243,000 | 277,000 | 14% |
| | MD 190 to I-270 Spur | 253,000 | 282,000 | 11% |
| | Between I-270 Spurs | 119,000 | 127,000 | 7% |
| | MD 355 to I-95 | 235,000 | 252,000 | 7% |
| | I-95 to US 50 | 230,000 | 245,000 | 7% |
| | US 50 to MD 214 | 235,000 | 252,000 | 7% |
| | MD 214 to MD 4 | 221,000 | 244,000 | 10% |
| | MD 4 to MD 5 | 198,000 | 218,000 | 10% |

6

The Purpose and Need Statement for the MLS Study (DEIS, p. ES-6) lays out a clear rationale for the project, which includes the need to:

- Accommodate Existing Traffic and Long-Term Traffic Growth
- Enhance Trip Reliability
- Provide Additional Roadway Travel Choices
- Accommodate Homeland Security
- Improve Movement of Goods and Services

Two additional goals for the Study are: Financial viability and environmental responsibility. Several of the build alternatives in the DEIS meet these needs and goals to varying degrees.

The DEIS makes clear that adding new managed lanes to portions of I-495 and I-270 is both much needed and long overdue. We also wish to point out that "Fix 270 Now," from the American Legion Bridge to Frederick, was SMTA's rallying cry back in 2015 and 2016, and we had overwhelming support for doing so among Montgomery and Frederick County elected officials, including most of the State legislators, county council members, and other local officials. This included both the current County Executives in Montgomery and Frederick County. Both Counties have also submitted language explicitly calling for new managed lanes on I-270 and portions of I-495 in their official "Priority" letters to MDOT since at least 2015, and the region adopted a new long-range plan in 2017, after many years of study, that explicitly adds two new lanes in each direction on all of I-270 and all of I-495 in Maryland. All of these agencies and leaders have recognized and agreed with the need for these improvements. So we will now turn to which alternatives delivers the best results.

2. **Which Alternatives were Studied, and Which Perform Best?**

A wide range of alternatives were considered in the DEIS, including various forms of transit and other non-road options that were later dropped after being found to be ineffective, fiscally unrealistic or both. Opponents' repeated claims that these options were not considered are patently false.

In addition, two new alternatives were studied extensively at the same level of detail as the other alternatives retained for study in the DEIS:

- MD-200 (ICC) Diversion Alternative. This option was evaluated at the request of Montgomery County. This added new managed lanes on I-270 and portions of I-495 but did not add any new lanes on the topside of the Beltway between I-270 and I-95. The theory was that enough people would divert up I-95, across on the ICC, and down I-270 again, to avoid that heavily congested section of I-495. Traffic modeling results did not support this alternative, which performed poorly on most traffic metrics, led to increased congestion and was not financially viable. It was dropped from further consideration but retained in the DEIS analysis. The DEIS concluded this alternative "would perform the worst of all Screened Alternatives" and "would have the lowest average speed compared to the Screened Alternatives" (DEIS, p. 2-21).

- Alternative 9M. This is a combination of Alternative 9 (a 2-lane HOT system) and Alternative 5 (a 1-lane HOT system). Alternative 5 was found not to address congestion and underperformed all the build alternatives. However, a new Alternative 9M was created combining Alternative 9 with a one-lane HOT system, similar to Alternative 5, on the topside of the Beltway between I-270 and I-95, with a 2-lane HOT system everywhere else, to meet Montgomery County's concerns.

7

Here is the complete list of preliminary alternatives that were studied (see DEIS p. 2-8):

- Alternative 1: No Build
- Alternative 2: Transportation Systems Management)/Transportation Demand Management (TSM/TDM)
- Alternative 3: Add one GP Lane in each direction on I-495 and I-270
- Alternative 4: Add one HOV lane in each direction on I-495 and retain existing HOV lane in each direction on I-270
- Alternative 5: Add one priced managed lane in each direction on I-495 and convert one existing HOV lane in each direction to a priced managed lane on I-270
- Alternative 6: Add two GP lanes in each direction on I-495 and I-270
- Alternative 7: Add two HOV lanes in each direction on I-495 and retain one existing HOV lane and add one HOV lane in each direction on I-270
- Alternative 8: Add two priced managed lanes in each direction on I-495 and add one priced managed lane in each direction and retain one existing HOV lane in each direction on I-270
- Alternative 9: Add two priced managed lanes in each direction on I-495 and convert one existing HOV lane to a priced managed lane and add one priced managed lane in each direction on I-270
- Alternative 10: Add two priced managed lanes in each direction on I-495 and on I-270 and retain one existing HOV lane in each direction on I-270 only
- Alternative 11: Physically separate traffic using C-D lanes, adding two GP lanes in each direction on I-495
- Alternative 12A: Convert existing GP lane on I-495 to contraflow lane during peak periods
- Alternative 12B: Convert existing HOV lane on I-270 to contraflow lane during peak periods
- Alternative 13A: Add two priced managed reversible lanes on I-495
- Alternative 13B: Convert existing HOV lanes to two priced managed reversible lanes on I-270
- Alternative 13C: Add two priced managed reversible lanes and retain one existing HOV lane in each direction on I-270
- Alternative 14A: Heavy Rail® transit
- Alternative 14B: Light Rail® transit
- Alternative 14C: Fixed guideway Bus Rapid Transit (BRT)SE off alignment of existing roadway
- Alternative 15: Add one dedicated bus lane on I-495 and I-270

Refer to the *Alternatives Technical Report* (**Appendix B, Section 4.4**) for additional details on the Preliminary Range of Alternatives.

> **What are Managed Lanes?**
> Managed lanes are highway facilities that use strategies, such as lane-use restrictions or congestion pricing, to optimize the number of vehicles that can travel the highway to maintain free-flowing speeds. Managed lanes are designed to improve highway operations and provide the driving public, as well as transit riders, with reduced congestion and improved trip reliability. Managed lanes operate at an acceptable level of service even when the adjacent general purpose lanes are congested because they are managed to control the number of vehicles using the lane to keep them flowing. Managed lanes provide users with a more reliable option to reach their destination(s). Managed Lanes may include but are not limited to: High Occupancy Vehicles (HOV) lanes, High Occupancy Toll (HOT) lanes, Express Toll Lanes (ETL), and bus-only lanes.

After detailed analysis was completed, the Alternatives were narrowed down to the following build alternatives in the DEIS, all of which were found to meet the purpose and need for the project (with the exception of Alternative 1, the No-Build Alternative, which does not meet the purpose and need).

**It is important to note that all the build alternatives, including the No-Build Alternative, <u>include</u> many of the transit options opponents have repeatedly called for as stand-alone alternatives. So the performance of these alternatives <u>has</u> been studied and is assumed in all the remaining Alternatives. These include the Purple Line, MARC system expansion, Corridor Cities Transitway and other proposed bus-rapid transit lines. So when we hear opponents say, "we should upgrade MARC and other transit instead," all of these are part of the No-Build Alternative, which we already know leads to unacceptable levels of congestion.**

8



**ALT 1: No Build (Existing)**

All projects in the Financially Constrained Long Range Transportation Plan (CLRP) including I-270 Innovative Congestion Management (ICM) Improvements, Purple Line, Corridor City Transitway Bus Rapid Transit, and increased trip capacity and frequency along all MARC lines.

Approx. 138' - 146'



Approx. 218' - 230'

**ALT 8: 2 ETL Managed Lanes in I-495; 1 ETL and 1 HOV Managed Lane on I-270**

Add two ETL managed lanes in each direction on I-495 and add one ETL managed lane and retain one HOV lane in each direction on I-270



Approx. 194' - 198'



Approx. 218' - 222'

**ALT 9: HOT Managed Lanes**

Add two HOT managed lanes in each direction on I-495 and convert one existing HOV lane to a HOT managed lane and add one HOT managed lane in each direction on I-270.



Approx. 194' - 198'



Approx. 218' - 222'

9

00022525

**ALT 9M:** 2 HOT Managed Lanes on West side and East side of I-495 and I-270; 1 HOT Managed Lane on Top side of I-495

Add two HOT managed lanes in each direction on I-495 between the study limits south of the George Washington Memorial Parkway and the I-270 West Spur, including the American Legion Bridge (ALB) and on I-495 between I-95 and the study limits west of MD 5. Add one HOT managed lane in each direction on I-495 between the I-270 West Spur and I-95. On I-270, convert one existing HOV lane to a HOT managed lane and add one HOT managed lane in each direction.

**I-495 from south of the ALB to I-270 west spur and I-495 from I-95 to west of MD 5**



**I-495 from I-270 west spur to I-95**



**I-270**



**ALT 10:** 2 ETL Managed Lanes and 1 HOV Managed Lane on I-270

Add two ETL managed lanes in each direction on I-495 and on I-270 and retain one existing HOV lane in each direction on I-270 only.



**ALT 13B:** 2 HOT Managed Lanes on I-495, 2 Reversible HOT Managed Lanes on I-270

Add two HOT managed lanes in each direction on I-495 and convert existing HOV lanes to two HOT managed reversible lanes on I-270 while maintaining General Purpose lanes.





**ALT 13C:** 2 ETL Managed Lanes on I-495; Reversible ETL Managed Lane plus 1 HOV Managed Lane on I-270

Add two ETL managed lanes in each direction on I-495 and add two managed, reversible ETLs on I-270 while retaining HOV lanes adjacent to General Purpose lanes.





DEIS Ch. 2 & Appendix B

**How Did the Various Build Alternatives Perform?**

The DEIS documents reveal that **several of the build alternatives would provide dramatic and lasting traffic congestion relief, reduced travel times, and better transit access** (more on this below). It also quantifies the environmental and other impacts each alternative would have, which are not as severe as several other recent projects that have won approval. Among the highlights:

- Alternatives 9 and 10, for example, will reduce overall delay by 33% to 35%, a massive time savings for millions of area residents (along with associated fuel savings and emission reductions). All other build alternatives would reduce delay by at least 22% (DEIS p. 3-10).

- The DEIS flatly debunks several other transit and TDM/TSM options that opponent repeatedly cite and that this study proves are simply not viable. These were evaluated in previous studies as well and also found not to address our transportation needs in these corridors. However, robust transit and TDM/TSM elements now have been incorporated into all the remaining build alternatives.

10

11

The tables below from the 495-270-p3.com website and the DEIS document summarize how each alternative performs on the most important transportation metrics: reductions in average delay, person throughput, and travel time savings.

Here are some of the highlights:

- **Dramatic Traffic Relief:** Several of the Build-Alternatives provide dramatic and lasting relief, with 2040 conditions significantly better and less congested than either the 2040 No-build Alternative or even compared to current conditions.

- **Average speeds:** Peak-hour speeds improve from 25mph in the 2040 No-build Alternative, to between 38mph and 41mph overall, depending on which alternative we choose (DEIS p. 3-8). In most cases, the study shows both the new managed lanes AND the existing general-purpose lanes will be moving not just faster, but much faster, in most sections compared to the no-build alternative (See Table 3-5 on p. 3-9):

  ○ **Average speeds for AM Peak trips on the outer loop of I-495 at the American Legion Bridge go from 23mph (no-build) to 37mph in the non-toll "General Purpose" (or GP) lanes (a 60% increase), or to 62mph in the managed lanes (nearly a 200% increase).**

  ○ **PM Peak trips on that section go from just 19mph in 2040 (no-build) all the way up to 52mph in the non-toll lanes, and to 62mph in the managed lanes, major improvements for toll and non-toll users alike.** Imagine going at least 52 mph during the PM rush hour on the American Legion Bridge, without paying a toll, or moving in free-flow conditions in the managed lanes. That is a dramatic improvement over current conditions.

  ○ Alternatives 9 and 10 generally provide the most traffic relief among the build alternatives in terms of improved peak-period travel speeds.

  ○ Some peak-period trips show less improvement, and in one case no improvement, but most sections of both corridors improve dramatically on this key metric.

- **Travel Delay:** The time we waste sitting in traffic delays is also significantly reduced under all the build alternatives, as the following tables from the DEIS Hearing Materials demonstrate:

  ○ **Several build alternatives reduce delays by well over 30%, with as much as a 35% reduction in delay** during the AM Peak period. The first table below details these reductions across the entire study area.

  ○ The second table below summarizes the **reductions in delay on surrounding local roads** from the various alternatives, which are also significant and range from a 5.9% to a 7.0% reduction in local traffic under each alternative. This indicates less congestion and cut-through traffic on local and neighborhoods streets, as more passengers shift to less congested and safer highway trips and carpools.

12

## How Much Would the Alternatives Reduce Congestion and Delay?

- Average delay per vehicle quantifies the amount of time motorists are delayed in traffic congestion on the highways within the study area.
- All Build Alternatives are projected to reduce delay by 20% or more compared to the No Build condition, as shown below.



| Alternatives | I-495 & I-270 Delay Reduction vs No Build | |
|---|---|---|
| | AM Peak | PM Peak |
| Alternative 1 (No Build) | 0% | 0% |
| Alternative 8 | 23% | 33% |
| Alternative 9 | 34% | 33% |
| Alternative 9M | 35% | 36% |
| Alternative 10 | 35% | 34% |
| Alternative 13B | 27% | 32% |
| Alternative 13C | 26% | 34% |

*SOURCE: VISSIM SIMULATION MODEL. VALUES REFLECT DELAY IN ALL LANES (GP & HOT/ETL) IN THE YEAR 2040, AND ALSO INCLUDE INTERCHANGE RAMPS AND JUNCTIONS.

Legend
- 30% decrease in average delay
- 25% - 30% decrease in average delay
- 20% - 25% decrease in average delay



| Alternatives | % Decrease Daily Delay Local Roads |
|---|---|
| Alternative 1 (No Build) | 0% |
| Alternative 8 | 6.9% |
| Alternative 9 | 7.0% |
| Alternative 9M | 5.9% |
| Alternative 10 | 6.5% |
| Alternative 13B | 6.8% |
| Alternative 13C | 6.4% |

*SOURCE: MWCOG REGIONAL FORECASTING MODEL

Legend
- >5% reduction in daily delay on local roadway network
- >5% reduction in daily delay on local roadway network

Source: *DEIS Hearing Materials, Online Presentation, at 495-270-p3.com*

- **Person-Throughput:** This measures the efficiency of the roadway network in moving people to their destinations. Person-throughput measures how many people pass a given point on the roadway within a set amount of time. Increases in person-throughput reflect not only numbers of vehicles, but also increased vehicle occupancy as people shift to increased use of carpools, vanpools and transit in these multi-modal corridors.

  ○ Several build alternatives significantly **boost person-throughput by as much as 110%,** and almost all segments show some significant improvement (*DEIS Hearing Materials*).

  ○ In a part of our region, the Maryland portion, which has not significantly added highway capacity to its network over the past 40 years to keep up with past population and job growth (only one major new highway was added during that entire time), this is a key metric for how well the build alternatives can help meet the increased demand we know is coming, as **1.2 million more people are expected to be living here by 2040.**

13



*Source: DEIS Hearing Materials, Online Presentation, at 495-270-p3.com*

- **Travel Time Savings:** Both the time it takes to get from one place to another, and the reliability and predictability of that trip, are perhaps the most important considerations for area residents when it comes to evaluating any major transportation infrastructure investment from the users' standpoint. A trip that should take 20 minutes or less to go 15 miles ends up taking an hour or more under current conditions across the Greater Washington Region. This contributes to higher emissions, wasted time, and growing frustration by the public. The DEIS documents impressive time savings on most sections of the Beltway and I-270 from several of the build alternatives.

  Here are the highlights (See DEIS, Chapter 3):

  - The new managed lanes would offer more reliable, free-flow travel at or above 45mph on all segments of the system, during both peak periods, leading to dramatic travel time savings compared to the No-build alternative.

  - Significant reductions in travel time are also seen in the general-purpose (GP) lanes as some users opt for the managed lanes instead, reducing peak period volumes on the free lanes and improving average travel times significantly in most segments even for those who do not wish to pay a toll.

  - A great deal of additional information on travel time saving is presented in the DEIS Traffic Analysis Technical Report in Appendix C.

  - The DEIS Hearing Materials provide several specific examples of travel time reductions on various segments, including some of the most heavily traveled sections of I-495 and I-270, as indicated in the map and tables below.

14

Some Specific Examples of General-Purpose Lane Travel Time Savings in the DEIS:



*(Source: DEIS Hearing Materials, Online Presentation, at 495-270-p3.com)*

- A morning rush-hour trip from College Park to Bethesda that would take you 43 minutes in the 2040 no-build Alternative, will take you just 15 minutes in the free lanes (Alternative 9), saving you 7,020 minutes a year (that's 117 hours a year you won't be spending stuck in traffic), and that is without paying a toll. Travel time in the toll lanes is just 10 minutes for the same trip.

- An afternoon trip from the American Legion Bridge to the ICC, that would take you 33 minutes in the 2040 no-build, will take you just 23 minutes in the free lanes, or just 15 minutes if you want to pay the toll. Either way, you are saving over 30 hours a year in travel time.

- A morning trip from Suitland to Greenbelt is cut from 27 minutes to just 17 minutes in the free lanes, or 15 in the toll lanes.

- An afternoon trip from Silver Spring to Rockville goes from 28 minutes in the no-build to just 15 minutes in the free lanes, or 14 minutes in the toll lanes.

15


Which Alternatives Performed Best?

<u>Key Finding #1:</u> Lots of transit and TDM/TSM Alternatives WERE studied, but none offers a viable solution.

**No viable non-managed-lane alternatives were found that reduce congestion, improve travel speeds, or reduce travel times in these corridors to any significant degree. It is not that these options were not studied. It is that they DO NOT WORK, and we could not afford them even if they did.**

One key takeaway from this DEIS, is that there are no viable stand-alone transit or TDM/TSM alternatives, either alone or in combination, that have ever been shown to be cost-effective, or provide anything close to the improvements that the Managed Lane Study Build Alternatives have been shown to provide in the DEIS, as summarized above.

In this DEIS, and multiple previous studies of these corridors, all the non-road "alternatives" have been studied and rejected because they were found not to relieve congestion, not to be financially viable, or both (see DEIS, pp. ES-7 to ES 11, and 2-11 to 2-22). Multiple previous studies are also listed on the P3 Program website (see: 495-270-p3.com/environmental/resources/).

These non-road options included heavy-rail transit, light-rail transit, fixed guideway bus-rapid-transit (BRT) and many other transit-only alternatives, all of which were studied in this DEIS (see DEIS, p. ES-8). These were rejected early on in the process because they did not reduce current congestion levels, did not accommodate future growth in demand, and/or did not have a viable source of funding (DEIS pp. 2-13 to p. 2-15). It is simply not accurate to say that these options have not been studied. They have. They just don't offer a viable solution.

- The DEIS concludes: **"Transit alone would not meet this Study's Purpose and Need to address the existing and long-term traffic growth in the study corridors"** (DEIS, p. 2-13). It doesn't get much clearer than that.

- The TSM/TDM alternatives were found to provide some improvement, and were incorporated into all the build alternatives, but did not by themselves "support long-term traffic growth" (p. 2-11).

- Previous studies, including the Purple Line's DEIS, have also rejected transit-only solutions for the same reason as they were not found to reduce traffic congestion on the Beltway or I-270 to any significant degree. No study has ever shown any amount of transit, by itself, can ease future congestion at the American Legion Bridge (ALB) or I-270. None. Ever.

This is why adding two new managed lanes on both interstates is in our region's adopted long-range plan (Visualize 2045) after the regional Transportation Planning Board (TPB) and others spent many years studying this very question and reached the same conclusion. There is no amount of transit or transit-oriented development that can meet the demonstrated demand, and projected future demand, for travel on I-495 and I-270, and even if there were, we could never afford to build or operate it in the current fiscal climate. That is why, in addition to the billions we continue to spend on transit in this region, there also needs to be some new lane capacity on these key bottlenecks, as part of a balanced multimodal approach.

HOV and general-purpose lanes were also studied and rejected, not only because they do not provide a source of funding. They also do not perform as well as managed lanes in maximizing efficiency, reducing congestion, increasing person-throughput, ensuring efficient operations and improving peak-hour speeds (DEIS, p. 2-11 to 2-12).

<u>Key Finding #2:</u> There are transit services that could work well IN COMBINATION WITH the managed lanes.

**It is important to note that significant transit components have been added to all the build alternatives.**

A robust set of new and expanded transit services is now included in the P3 Program (DEIS, pp. ES-11 to ES-12, and 2-45 to 2-47). The DEIS states: "While stand-alone transit alternatives were found to not meet the Study's Purpose and Need, each Build Alternative includes the following transit elements consistent with the project purpose of enhancing existing and planned multimodal mobility and connectivity (see DEIS, p. ES-11):

- Allowing free bus usage in the managed lanes...

- Accommodating direct and indirect connections to existing transit stations and planned Transit-Oriented Development at the Silver Spring/MARC (US 29), Shady Grove Metro (I-370), Twinbrook Metro (Wooten Parkway), Montgomery Mall Transit Center (Westlake Terrace), Medical Center Metro (MD 187 and MD 185), Kensington MARC (MD 185), Greenbelt Metro/MARC (Cherrywood Lane), New Carrollton metro/MARC/Amtrak (US 50), Largo Town Center Metro (MD 202 and MD 214), and Branch Avenue Metro (MD 5)."

- This would give Montgomery and Frederick Counties the ability to link key transit centers, from Frederick to Bethesda, or College Park, or Tysons Corner, and all points between – including many key metro stations – with much faster, more reliable transit.

- The DEIS also provides Prince George's County with a cost-effective way to extend the reach of the Purple Line to key employment and retail centers, as a Virtual BRT. (pages 2-45 to 2-47) Providing express-bus service between all these locations through a P3 program would provide a robust transit system, and a significant portion of the capital costs could be funded as part of the construction of the managed lanes. These lanes would then function as a fixed guideway for transit vehicles, offering them a congestion-free option for vastly improved transit travel times.

<u>Key Finding #3:</u> Alternatives 9 and 10 performed best on most key transportation metrics.

**Alternative 9 and Alternative 10 performed best in the key operational metrics, including average speed, congestion (levels of service, or LOS), reducing traffic on surrounding local roads, travel time savings, reduced delays, and throughput. Alternative 9 would also add more incentives for carpooling.**

Alternatives 9 and 10 each ranked first in three of the six key transportation performance metrics. However, Alternative 9 also offers advantages in sustainability with a slightly smaller footprint (see environmental impacts table) and greater incentives to shift away from single-occupancy-vehicle trips and more to carpools and vanpools.

In terms of cost and financial viability, both seem the most viable and cost-effective as well, meaning lower toll rates presumably, although toll rates are not set as part of the DEIS process.

More detailed transportation performance results for each of the alternatives can be found in Section 3:

1. Existing and future Conditions: pp. 3-5 to 3-8
2. Travel Speeds: pp. 3-8 to 3-9
3. Travel Delay: pp. 3-9 to 3-10
4. Travel Time: pp. 3-10 to 3-11
5. Congestion – Levels of Service (LOS): p. 3-12
6. Local network pp. 3-13 to 3-15
7. Summary: p. 3-16

16

17



Key Finding #4: The environmental impacts of the various build alternatives are relatively similar, with some tradeoffs between transportation performance and community and environmental impacts.

**The Alternative with the lowest number of impacts, the no-build, also performs the worst on all the key transportation metrics and would lead to catastrophic levels of congestion.**

Environmental and community impacts are presented in Chapters 4 and 5 of the DEIS, and the appendices, are summarized in the Executive Summary and in Table ES-2 below (pages ES-14 to ES-16).

The no-build alternative clearly has the lowest impacts, but creates a level of severe, persistent traffic congestion that is unsustainable, is inconsistent with adopted regional long-term transportation and economic development plans, and incompatible with the needs of a sound economy, future job growth, and a good quality of life for area residents. It clearly is unacceptable on many levels.

Of the build alternatives, there is some reduction in impacts in the areas near the topside of the Beltway in Alternative 9M, but those reductions in environmental and community impacts are not as significant as one might expect. Instead of 34 residential displacements under most of the other alternatives, for example, Alternative 9M has 25, which is less but not significantly. Either number is roughly half the number of residential displacements the Purple Line involved, and all the alternatives show relatively small impacts for a project of this scope.

**Table ES-2: Summary of Effects Comparison of the Alternatives[1]**

| Resource | | Alt 1 No Build | Alt 5[2] | Alt 8 | Alt 9 | Alt 9M | Alt 10 | Alt 13B | Alt 13C |
|---|---|---|---|---|---|---|---|---|---|
| Environmental | Total Potential Impacts to Section 4(f) Properties including park and historic properties (acres) | 0 | 141.7 | 146.8 | 146.8 | 144.7 | 149.0 | 145.5 | 146.7 |
| | Number of Historic Properties with Adverse Effect[3] [Adverse effect cannot be determined][4] | 0 | 13 [7] | 13[7] | 13[7] | 13[7] | 13[7] | 13[7] | 13[7] |
| | 100-Year Floodplain (acres) | 0 | 114.3 | 119.5 | 119.5 | 116.5 | 120.0 | 119.5 | 119.9 |
| | Unique and Sensitive Areas (acres) | 0 | 395.3 | 408.2 | 408.2 | 410.6 | 410.8 | 406.7 | 408.6 |
| | Sensitive Species Project Review Area (acres) | 0 | 151.7 | 155.0 | 155.0 | 153.7 | 155.0 | 155.0 | 155.0 |
| | Forest canopy (acres) | 0 | 1,434 | 1,497 | 1,497 | 1,497 | 1,515 | 1,489 | 1,503 |
| | Wetlands of Special State Concern (acres) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Wetlands, Field-Reviewed (acres) | 0 | 15.4 | 16.3 | 16.3 | 16.1 | 16.5 | 16.3 | 16.1 |
| | Wetlands 25-foot buffer (acres) | 0 | 51.2 | 53.1 | 53.1 | 52.7 | 53.6 | 53.1 | 53.5 |
| | Waters of the US (linear feet) | 0 | 153,701 | 155,922 | 155,922 | 155,229 | 156,948 | 155,822 | 156,632 |
| | Tier II Catchments (acres) | 0 | 55.2 | 55.3 | 55.3 | 55.3 | 55.3 | 55.3 | 55.3 |
| | Noise Receptors Impacted[5] | 0 | 3,661 | 4,470 | 4,470 | 4,249 | 4,581 | 4,411 | 4,461 |
| Traffic | System-wide Delay Savings vs. No Build (AM/PM)[6] | 0 | 20%/22% | 23%/33% | 34%/33% | 30%/30% | 35%/34% | 27%/22% | 26%/34% |
| Engineering | Total Right-of-way Required[7] (acres) | 0 | 284.9 | 323.5 | 323.5 | 313.4 | 337.3 | 318.9 | 329.1 |
| | Number of Properties Directly Affected | 0 | 1,240 | 1,475 | 1,475 | 1,393 | 1,518 | 1,447 | 1,479 |
| | Number of Residential Relocations | 0 | 25 | 34 | 34 | 25 | 34 | 34 | 34 |
| | Number of Business Relocations | 0 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| | Width of Pavement on I-495 (feet) | 138-146 | 170-174 | 194-198 | 194-198 | 170-198 | 194-198 | 194-198 | 194-198 |
| | Width of Pavement on I-270 (feet) | 228-256 | 194-198 | 218-222 | 218-222 | 218-222 | 242-246 | 202-206 | 226-230 |
| | Capital Cost Range (Construction & ROW)[8] (billions) | N/A | $7.8– $8.5 | $8.7 – $9.6 | $8.7 – $9.6 | $8.5-$9.4 | $9.0 – $10.0 | $8.7 – $9.6 | $8.8 - $9.7 |

Notes: [1] Preliminary impacts represented in this table assume total impacts; permanent and temporary impacts will be distinguished in the FEIS.
[2] MDOT SHA and FHWA determined Alternative 5 is not a reasonable alternative, but it is included in the DEIS for comparison purposes only.
[3] Refer to Chapter 4, Section 4.7 and Appendix G, Volume 1 for additional details on the effects to historic properties.
[4] Based on current design information, effects cannot be fully determined on these 7 historic properties. MDOT SHA will evaluate these properties further as design advances.
[5] Noise receptors are noise-sensitive land uses which include residences, schools, places of worship, and parks, among other uses. Note that these numbers include receptors that do not have an existing noise wall as well as receptors that have an existing noise wall which is expected to be replaced
[6] Previous versions of this table used a similar metric of Annual Average Hours of Savings per Commuter. System-Wide Delay Savings better reflects benefits to all road users.]
[7] The right-of-way is based on State records research and filled in with county right-of-way, as necessary. With the Section 4(f) properties, some boundaries vary based on the presence of easements and differences in the size and location of historic and park boundaries.

As the differences between the build alternatives are relatively modest in terms of environmental and community impacts, but the differences in transportation performance are more wide-ranging, we

encourage more significant focus on the performance of each option on transportation metrics, while seeking to further minimize or avoid environmental and community impacts on all the alternatives.

The DEIS does not indicate that there are severe environmental or community impacts that would rise to the level of negating the well documented and extremely significant transportation and economic benefits the P3 program would bring to our region.

**3. Is the P3 Program Financially Viable and Can this Program be Delivered at no Taxpayer Expense?**

The DEIS shows that all the build alternatives can be financially viable, depending on various risk factors (such as construction costs and interest rates) and that it can be delivered at no taxpayer expense, depending on three possible sets of estimates based on these potential risks (DEIS p. 2-50). We believe the current economic climate makes this project more crucial than ever for state taxpayers, as it can be delivered at no taxpayer expense, and can help simulate our stalled economy more than any other investment we could make in this region right now.

- The P3 Program has strong financial interest among investors, appears to be financially viable, and can be delivered at no cost to taxpayers, and even generating a large windfall to taxpayers under most circumstances. However, this will depend on factors like interest rates and construction costs that might be impacted by any additional delay that may occur.

- Several build alternatives can provide very substantial positive cash flows to the State – as much as a $2.8 billion surplus – or may fall short by as much as $1.1 billion – but all the mid-range estimates are positive. So it does appear it is more likely to be financially viable than not, and therefore can be delivered at no cost to taxpayers.

- Only the worst-case projections show a potential shortfall, but this is an argument to minimize delays and accelerate the project to take advantage of the current historic-low interest rates.

- These are the cashflow projections under various assumptions (DEIS, p. 2-50):



Draft Environmental Impact Statement

**Table 2-6: Estimated Cashflows for Build Alternatives**

| Build Alternative | Cash Flow (in millions) | | |
|---|---|---|---|
| | Low Capital Cost & Low Interest Rate | Mid Capital Cost & Mid Interest Rate | High Capital Cost & High Interest Rate |
| Alternative 8 | $2,627 | $833 | - $584 |
| Alternative 9 | $2,762 | $960 | - $482 |
| Alternative 9M | $2,190 | $459 | - $827 |
| Alternative 10 | $2,711 | $866 | - $604 |
| Alternative 13B | $1,907 | $196 | - $1,088 |
| Alternative 13C | $2,065 | $328 | - $998 |

Notes:
1. The results summarized in this table must be considered in the context presented in DEIS Section 2.8 Financial Viability.
2. The analysis is preliminary because the value of numerous input assumptions used to compute the financial viability of the Build Alternatives could change. A constant methodology was used to estimate the revenue and consistent financial assumptions were used for all Build Alternatives summarized herein.
3. This analysis considered multiple factors including estimates of: preliminary capital costs (a high and low range of ±5 percent of the base cost), initial revenue projections, preliminary operations and maintenance costs, and the likely methods for how construction phases would be financed.
4. The key input of interest rates considered a high and low range of ±0.50 percent from the base assumptions.
5. Refer to Chapter 6, Section 2.3 of the Alternatives Technical Report (Appendix B) for additional information.

*This page is intentionally left blank.*

As you can see, the DEIS estimates range from a shortfall of $1.1 billion, to a net positive cashflow of $2.8 billion, depending on various assumptions on interest rates and construction costs. All the mid-level estimates, for all 6 alternatives, show a POSITIVE net cash flow, with some Alternatives performing much better than others, meaning it is very likely that the P3 can deliver a significant positive revenue stream for Maryland residents.

**Several recent public comments have focused only on the worst-case column in this chart. This is highly misleading and inaccurate, and presents a distorted portrayal of the DEIS findings, as it ignores the much larger potential that exists for a net positive return for Maryland taxpayers.** We believe, based on this study and the performance of most other recent managed lane projects around the country, a large positive return is far more likely than a shortfall. Further, it has been made clear that if there is a shortfall in revenue, that risk will not fall on Maryland taxpayers, but on the P3 concessionaire and their investors.

The bottom line is, the DEIS finds the project can be delivered in a way that is financially viable and can provide a significant new revenue stream to the state, under most scenarios.

Actual tolling rates are not provided in the DEIS, as those will be set much later through a public process by the Maryland Transportation Authority, but it is clear that toll financing is the only option for a program of this scale and in this fiscal climate. A P3 structure, using toll financing to deliver these improvements, is the only viable way to bring a project of this scope, now estimated at $8 to $10 billion (p. ES-11), in light of the extremely limited funds or bonding capacity by the State of Maryland today.

The fiscal stimulus effects of the P3 Program are extremely significant, and the COVID-related shutdown makes it even more urgent to tackle this project now, with no further delay. Every $1 billion investment in public infrastructure creates 13,000 high-paying jobs for a year, and this is an $8-10 billion project. We need those new jobs now more than ever in light of national forecasts indicating 11% unemployment by year-end. With State tax revenues in steep decline, and more constrained than before, the P3 option is literally the only game in town with the potential to positively impact State finances.

**Main Conclusion:**

In summary, the I-495 & I-270 Managed Lanes Study DEIS, which is the definitive study to date of these heavily congested corridors, only confirms:

- The critical importance of the P3 Program to Montgomery, Prince George's and Frederick County residents and businesses, as well as to all other users of our interstate highway system;
- That the build alternatives in the DEIS deliver dramatic and lasting traffic relief on the American Legion Bridge, I-495 and I-270, including significant travel time savings during both peak periods;
- That several of the Build Alternatives, and Alternative 9 in particular, perform very well across a range of performance metrics and meet the purpose and need for the Managed Lanes Study, with fewer environmental or community impacts than several other recently approved major projects, (including the Purple Line); and
- That a P3 Program that includes one of these Build Alternatives can be financially viable.

We recommend everyone take the time to read the 353-page DEIS online and continue participating in the Managed Lanes Study environmental review process.

Anyone can review the DEIS documents at: https://495-270-p3.com/DEIS/.

20



**THE EVERGREEN COMMUNITY – CHARLOTTE TROUP LEIGHTON**

Thank you for your comment, responses are provided on the following pages.

**From:** Charlotte Troup Leighton <troupleighton@gmail.com>
**Sent:** Friday, October 16, 2020 4:32 PM
**To:** Lisa Choplin <LChoplin@mdot.maryland.gov>
**Cc:** Treasurer@treasurer.state.md.us; pfranchot@comp.state.md.us; governor.mail@maryland.gov; senator@cardin.senate.gov; jamie@jamieraskin.com; marc.elrich@montgomerycountymd.gov; Lee, Susan Senator <susan.lee@senate.state.md.us>; Kelly, Ariana Delegate <ariana.kelly@house.state.md.us>; Korman, Marc Delegate <marc.korman@house.state.md.us>; Love, Sara Delegate <sara.love@house.state.md.us>; SUSAN SHIPP <jsjshipp3@verizon.net>; Orrick, Jack <jack.orrick@offitkurman.com>; managedlanes@montgomerycountymd.gov; Rubin, Carol <carol.rubin@montgomeryplanning.org>; Councilmember.Albornoz@montgomerycountymd.gov; Councilmember Friedson <councilmember.friedson@mccouncilmd.lmhostediq.com>; Councilmember.Glass@montgomerycountymd.gov; councilmember.hucker@montgomerycountymd.gov; Councilmember.Jawando@montgomerycountymd.gov; councilmember.katz@montgomerycountymd.gov; councilmember.Navarro@montgomerycountymd.gov; councilmember.Rice@montgomerycountymd.gov; councilmember.Riemer@montgomerycountymd.gov; MCP-Chair@mncppc-mc.org
**Subject:** DEIS Comment Letter from the Evergreen Community in Cabin John

Good afternoon,

Attached please find the DEIS comment letter of the Evergreen community in Cabin John.

Thank you for your consideration.

Sincerely,
**EVERGREEN COMMUNITY RESIDENTS**

Charlotte Troup Leighton and Russell Leighton (8005 Cypress Grove Lane)

Frank L Wright III and Marcy Harrison (8014 Cypress Grove Lane)

Andrew Strasfogel and Elizabeth Jackson (7913 Cypress Grove Lane)

WeiWei and Fenhua He-Han (7910 Cypress Grove Lane)

Manny and Elizabeth Andrade (7909 Cypress Grove Lane)

Matt and Min Shih (7900 Cypress Grove Lane)

Cindy and Leslie Miller (7905 Cypress Grove Lane)

Gladys Vaughn (7920 Cypress Grove Lane)

Ellen and Steve Futterman (8000 Cypress Grove Lane)

Kara Cunzeman and Marc Bosch (8009 Cypress Grove Lane)

1

00022532

Michael and Gail Marcus (8026 Cypress Grove Lane)

Gregory and Sheila Duncan-Peters (8037 Cypress Grove Lane)

Sheryl and Peter Bloch (7920 Cypress Grove Lane)

Edwin and Olga Paxson (8041 Cypress Grove Lane)

Maryann Veloso and Lyle Ishida (8033 Cypress Grove Lane)

Khalid and Ruham Usmani (8013 Cypress Grove Lane)

Donald and Sedene Dunac (8021 Cypress Grove Lane)

Assiatu and Richard Crossman (8025 Cypress Grove Lane)

*This page is intentionally left blank.*

2

Thank you for your comments. The 10 major issues listed on pages 1 and 2 of your comment letter are addressed on the subsequent pages associated with each detailed discussion in your letter.



**The Evergreen Community**
**7900-8041 Cypress Grove Lane**
**Cabin John, MD 20818**

October 16, 2020

Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21201

**RE: I-495/I-270 Managed Lane Study Draft Environmental Impact Statement, Draft Section 4(f) Evaluation, and Draft Section 106 Assessment of Effects Report**

Dear Ms. Choplin:

We are members of the Evergreen community, a collection of 27 homes along Cypress Grove Lane in Cabin John, Maryland. As adjacent neighbors to I-495, we have been closely engaged in the I-495/I-270 Managed Lanes Study environmental process. We wish to provide comments on the Draft EIS through this letter.

The material in the Draft EIS raises ten issues that must be further considered and analyzed before the Project can advance. In some cases, these issues raise new and significant information, requiring SHA and FHWA to issue a Supplemental Draft EIS before proceeding forward (*See* 40 CFR 1502.9 and *Marsh v. Oregon Natural Resources Council*). We briefly summarize our major issues in the list below, followed by a more detailed discussion of the topics.

1) **The alternatives still under consideration in the Draft EIS would have <u>devastating property impacts to houses in our community,</u> based on the limits of disturbance presented in Appendix D. These impacts must be substantially minimized and avoided to avoid partial and full takings.**

2) **The alternatives still under consideration in the Draft EIS would have adverse cumulative impacts to the neighboring Morningstar Tabernacle No. 88 Moses Hall and Cemetery site (MIHP No. M: 35-212), as well as to the Gibson Grove First Agape A.M.E. Zion Church property (MIHP No. M: 29-39). <u>These historic resources must be avoided.</u>**

1

00022534

3) The noise analysis for the Draft EIS indicates that it is feasible and reasonable to construct a noise wall along I-495 between Persimmon Tree Lane and Seven Locks Road. The construction of an appropriate noise abatement wall in this location must be committed to as a mitigation in the Final EIS and Record of Decision. The P3 Concessionaire's designs must include these noise walls at no cost to our community.

4) The proposed location of the noise barriers would exacerbate property impacts to local residents, as well as to the historic Morningstar Tabernacle No. 88 Moses Hall and Cemetery site, and the Gibson Grove First Agape A.M.E. Zion Church property (MIHP No. M: 29-39). The location of noise barriers should be adjusted and refined in the Final EIS and the final design of the selected Alternative.

5) Our community has existing runoff and erosion issues from I-495. The Draft EIS does not provide sufficiently detailed information regarding the strategy to manage the existing and future stormwater generated by the impervious service of the highway. The Final EIS must provide additional detail and strong commitments to manage stormwater impacts.

6) The visual impacts of the proposed new MD 190 off-ramp are inadequately analyzed in the Draft EIS. A Visual Impact Assessment should be prepared before moving forward and incorporated into a Supplemental Draft EIS for review and comment. Because of the unacceptable visual and property impacts in the Alternatives, the exit at this location should be replaced with an at-grade approach.

7) The documentation associated with construction is inadequate and potential impacts are not addressed.

8) Local traffic impacts caused by the Project are neither identified nor mitigated.

9) The impacts of the "Elevated Option" are not evaluated in the DEIS. Its potential for additional visual and noise impacts means that the option should be eliminated and that a Supplemental Draft EIS must be prepared if it is further advanced.

10) SHA should more substantively address the impacts that COVID-19 may have on travel demand, and the purpose and need for this Project.

Please find a more detailed discussion of these issues below.

**Property Impacts**

As shown in the *Environmental Resources Mapping* (Appendix D), our community along Cypress Grove Lane would experience substantial property incursions under the current planning assumptions of the evaluated Alternatives. The limits of disturbance (LOD) indicate construction and/or permanent impacts to multiple properties in our community, often quite close to these existing homes. Some of these impacts result from stormwater management and noise considerations, which we address substantively below. In the Final EIS, SHA must take steps to avoid and/or minimize any impacts to private property in our community consistent with NEPA regulations.

2

#1

**Response to DEIS Comment #1**

The Preferred Alternative, does not result in any full acquisitions or residential or business displacements; therefore, no homes would be taken due to the proposed roadway widening.

Sliver impacts to properties along I-495 within the Evergreen community are proposed for elements such as roadside grading, on-site drainage and stormwater management, and noise barrier replacement/construction. These partial property acquisitions are considered ones that do not cause a residential relocation and have been assumed where a principle building of a residence or community facility is located more than 20 feet from the Preferred Alternative limits of disturbance.

As the design is advanced on the Preferred Alternative there may be further reductions in impacts. An important benefit to conducting a P3 process with pre-development work concurrent with the NEPA process is to increase efficiency by receiving input by the Developer on design and ancillary elements of the project such as stormwater management. This collaborative effort ensures that the design and associated limits of disturbance (LOD) are appropriate and feasible ahead of final design. While additional LOD changes may occur during final design, including additional avoidance and minimization, the risk of substantial changes in the LOD or substantial increase in environmental impacts is significantly lowered by the early involvement of the Developer.

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study · Case 8:22-cv-02597-DKC · Document 61-8 · Filed 10/30/23 · Page 91 of 106

FINAL ENVIRONMENTAL IMPACT STATEMENT

**#1 Cont**

We request additional information regarding the nature of potential property impacts. Appendices D and E (*Community Effects Assessment*) provide insufficient information for residents potentially affected by property acquisition. The *Community Effects Assessment* identifies 10.2 acres of residential property acquisition in the Cabin John area (Appendix D of the *CEA*, Pg. 6). Appendix D indicates that seven to eight properties in our community would see at least partial impacts based on where the LOD is currently indicated. As measured from the Map 59, At least four of these homes would be within 20' of the LOD. Our community is prepared to pursue legal remedies to protect our property rights, consistent with the Uniform Act, as these property impacts are unacceptable to us and unnecessary to implement the Project.

**Cumulative Impacts to Neighboring African American Historic Properties**

**#2**

Our community believes that the DEIS has failed to adequately disclose impacts to the neighboring Morningstar Tabernacle No. 88 Moses Hall and Cemetery site (MIHP No. M: 35-212), as well as to the Gibson Grove First Agape A.M.E. Zion Church property (MIHP No. M: 29-39). Both of these sites are a key and central feature of the remaining African American community in Cabin John.

The limits of disturbance (LOD) indicate that the Moses Hall foundation and Cemetery will be adversely affected by any encroachment of construction that extends beyond the existing I-495 right-of-way. Furthermore, any new I-495 construction could adversely affect the planned reconstruction of the Gibson Grove Church property. The Draft EIS fails to provide sufficient information on efforts to date to avoid and minimize impacts to these valuable resources. The Moses Hall and Gibson Grove properties are an important part of Cabin John that were disproportionately affected by the original I-495 construction in the 1960s. We believe that SHA should take an active role in righting past racial injustice by avoiding further cumulative impacts to this community. We are deeply supportive of these historic resources. We note specific impacts to the Moses Hall and Gibson Grove properties from the Project and construction period below.

**Noise Analysis and Noise Barriers**

**#3**

In reviewing the *Noise Analysis Technical Report* (Appendix J), we are pleased to see that a noise barrier is considered feasible and reasonable for the section of I-495 adjacent to Evergreen. This noise barrier must be included as mitigation in the Final EIS, committed to in the Record of Decision, and included in the designs advanced by the Concessionaire. Additionally, we note below a few concerns with the analysis conducted in the Draft EIS regarding noise.

Neither the noise impact assessment results (Appendix J, Table D-1) nor the noise barrier analysis table (Appendix J, Tables 4-5) indicate the number of residences that are assigned to each receptor location. This information should be disclosed to allow the community to properly understand the impact of the proposed project and the feasibility and reasonableness of potential noise abatement. The noise study report does not disclose the number of impacted residences for each receptor, within each NSA, or within the overall project. The study also does not identify the activity category of the receptors.

There are generally minor differences (i.e., 1 to 2 dB) between the noise impact assessment results (Appendix J, Table D-1) and the noise barrier analyses table (Appendix J, Table 4-5)

3

---

**Response to DEIS Comment #2**

Since the publication of the DEIS, additional and successful avoidance and minimization efforts also involved the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Through additional investigation and survey including ground penetrating radar (GPR), MDOT SHA identified potential unmarked graves within state-owned right-of-way adjacent to I-495. The Preferred Alternative incorporates design refinements that minimized the overall width of the improvements to completely avoid the cemetery property and the known area of state-owned right-of-way that has the potential for unmarked graves.

Understanding that the Beltway was constructed adjacent to these sensitive resources, MDOT SHA has committed to construct the following pedestrian connections between the Gibson Grove A.M.E. Zion Church and the Morningstar Tabernacle No. 88 Moses Hall Cemetery to restore the historic connection along Sevel Locks Road:

- Widen the existing variable-width sidepath along the east side of Seven Locks Road under I-495 (Cabin John Trail)

- Constructing a new sidewalk along the west side of Seven Locks Road under I-495 to directly connect First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall and Cemetery

The Preferred Alternative includes the following elements and commitments related to the First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall Cemetery:

- Direct and indirect impacts to historically African American Gibson Grove Community significantly minimized

- Gibson Grove Church is avoided with impacts minimized to 0.1 acre of temporary easement needed for drainage

- All direct and indirect impacts to Moses Hall Cemetery completely avoided

- Noise barrier with context sensitive treatment at the Moses Hall Cemetery

- Gifting land owned by MDOT SHA with potential graves back to Trustees of Moses Hall Cemetery

- Completing drainage improvements on Gibson Grove property and clearing space for their proposed parking lot

- Upgrading parking lot on the east side Seven Locks Road and making the sidewalk and path improvements to connect to the existing parking lot.

- Constructing a new sidewalk along the west side of Seven Lock Road under I-495 to reestablish the historic connection between Gibson Grove Church and the Moses Hall Cemetery.

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to DEIS Comment #3**

As part of this project, a new barrier system is proposed along the inner loop of I-495 from Persimmon Tree Road to just south of Cabin John Parkway. The new barrier system will be constructed as close to the roadway as possible to minimize or avoid property impacts. As described in the Supplemental DEIS (SDEIS) and the supporting Noise Analysis Technical Report Addendum the noise analysis is based on the current preferred alternative design and MDOT SHA's Highway Noise Abatement Planning and Engineering Guidelines ("Noise Guidelines"), which detail implementation guidance, critical background information, rationale, and other comprehensive criteria associated with a highway noise study. The noise policy and guidelines are based upon the provisions contained in Title 23 of the Code of Federal Regulations Part 772 (23 CFR 772), Procedures for Abatement of Highway Traffic Noise and Construction Noise and the Federal Highway Administration (FHWA) report FHWA-HEP-10-025, Highway Traffic Noise: Analysis and Abatement Guidance and subsequent revisions.

The DEIS, SDEIS and FEIS all include the "Statement of Likelihood" that is required by FHWA regulation 23 CFR 772.13(g)(3):

"A statement of likelihood shall be included in the environmental document since feasibility and reasonableness determinations may change due to changes in project design after approval of the environmental document. The statement of likelihood shall include the preliminary location and physical description of noise abatement measures determined feasible and reasonable in the preliminary analysis.

00022536

**#3 Cont**

without the proposed noise barrier. We assume this difference to relate to zero-foot noise barriers rather than no noise barriers being used in the model. True no-barrier sound levels should be used instead to evaluate the insertion loss to more accurately predict insertion loss and the potential benefit of proposed noise barriers.

For noise abatement, the Evergreen neighborhood is combined within the larger NSA 1-04 and is evaluated as a barrier system with other NSAs, including 1-02 and 1-05. Table 4-8 of Appendix J indicates that the barrier height would average 26 feet within NSA 1-04. However, the results in the Executive Summary indicate the barrier height is 27 feet. As shown in Map 1 of Appendix J and Map 4 of Appendix D, the horizontal alignment of the barrier is shown to substantially intrude upon the residential properties on Cypress Grove Lane, which would require property acquisition. While there is a need to avoid a delineated waterway west of Cypress Grove Lane, the proposed barrier alignment does not appear to be justified given the topography in the area. The base of the noise barrier should generally be at a higher elevation. It appears that such an alignment may be feasible closer to, and within, the I-495 right-of-way. Such an approach would also preserve more trees in our backyards. These trees are not only an important aesthetic feature of our neighborhoods that reduces the negative visual effects of the highway, they also serve to blunt the annoyance associated with roadway noise. A revised alignment would also avoid the Moses Hall Foundation and Cemetery

As many of our homes are adjacent to the highway, traffic noise is already a daily condition with which we live. When this section of I-495 was widened in the early 1990s, our community was promised that noise barriers could be provided to address the increased noise that would result from a planned expansion in highway capacity. The fact that this promise was not kept previously makes us particularly concerned that SHA would abandon its commitment to address these issues should the project move forward.

The *Noise Analysis Technical Report* includes a statement of likelihood for the proposed noise barrier which indicates that "engineering changes reflected in final design could alter the conclusions reached in this analysis leading to recommendations to add or omit noise barrier locations" (Appendix J, Pg. 1). Appendix J also indicates that a final design noise analysis will be performed during the design phase of the project and that the opinions of all benefited property owners and residences will be solicited through public involvement and outreach during final design. While we look forward to the opportunity to coordinate further with SHA on the design of the noise barriers, we wish to reiterate that properly sited and designed noise barriers are essential mitigations for the noise impacts associated with this Project. We also note that the MDOT SHA *Highway Noise Abatement Planning and Engineering Guidelines* require that any proposed barrier optimization during final design of an innovative contracting project, like this P3 project, must maintain or improve upon the results in the noise analysis report (Appendix I of the *Guidelines*).

Even if the Project does not move forward, we need noise mitigation to manage the daily impacts that we face. We implore SHA and our local Montgomery County officials to develop a program and associated funding to provide the resources for so-called "Type II" noise barrier projects. Many other neighborhoods along I-495, including our neighbors in Carderock Springs, share a need for noise abatement regardless of the direction the State takes on this particular Project. We appreciate your attention to this issue outside of the DEIS context, as well.

4

The statement of likelihood shall also indicate that final recommendations on the construction of an abatement measure(s) is determined during the completion of the project's final design and the public involvement processes."

Because we are in the NEPA phase of this project, we do not yet have detailed engineering plans, including soil borings and field surveyed topography. This level of detail is obtained during the final design phase of a project. The design, appearance and final alignment of the sound barriers will also be finalized during final design. The project must receive NEPA approval before final design is initiated, per 23 CFR 771.113(a).

Discrepancies between Tables D-1 and 4-5 have been corrected in the SDEIS. Table 4-6 in the SDEIS (formerly DEIS Table 4-5) now includes a column listing equivalent residences for each modeled receptor. Noise levels have been updated and the data in Table 4-6 matches the data in Appendix B (formerly DEIS Appendix D).

Previous studies have shown that your community warrants noise abatement. The MDOT SHA Noise Policy in place in 1990 used a cost criterion as part of the determination of reasonableness. Increased costs during the evaluation process caused the barrier previously proposed for your community to fail reasonableness criteria. This policy has since been updated (first in 2011 and again in 2020) to assess cost reasonableness using a square footage per benefited residence (sfpr) metric rather than cost. This is because materials costs fluctuate based upon market and supply chain conditions, and MDOT SHA believes that all communities should be evaluated equally regardless of the materials costs at the time of the noise analysis. The Evergreen Community qualifies for the highest square footage threshold allowable under the MDOT SHA Noise Policy (2,700 sfpr).

At this time, there is no mechanism for the state to provide noise abatement to your community outside of a roadway improvement project such as the Managed Lanes Study. While MDOT SHA does participate in FHWA's voluntary Type 2 noise abatement program, there is currently no funding programmed for Type 2 noise abatement projects.

00022537

#4

### Stormwater and Runoff

Through the EIS, SHA must take more substantive steps to address existing and future stormwater and runoff than are presented in the draft document.

The properties within the Evergreen subdivision along Cypress Grove Lane, as well as the Moses Hall and Cemetery property, are downslope of the I-495 roadway. For most of the length of highway abutting the Evergreen subdivision, the land adjacent to the highway shoulder includes a drainage ditch and then a berm, before the land slopes down into the community, including the Moses Hall and Cemetery. This is true except for three low points, one located west of the subdivision (*see* Location A in **Attachment A** to this letter), another in the vicinity of 8021 Cypress Grove Lane (Location B) and lastly, east of 8005 Cypress Grove Lane (Location C). Based on Montgomery County GIS mapping, runoff from I-495 currently drains at Location A into an existing stream valley. However, at Location B and C, runoff drains into the back of several properties. Drainage along the north side of Cypress Grove Lane currently flows in a southeasterly direction, through properties and into an existing drainage ditch that runs along the shoulder of Cypress Grove Lane and flows to the east.

These existing flows create substantial damage to our properties and the Moses Hall and Cemetery property on a regular basis. The water creates erosion across our backyards that results in long gullies where dirt, rocks, and sticks accumulate. As shown in **Attachment B** to this letter, these conditions are not only unsightly, but also result in real degradation to property condition and value. Stormwater erosion has seriously degraded the Moses Hall and cemetery property.

The *Natural Resources Technical Report* (Appendix L) notes that stormwater management will be provided as required by the state. Current Maryland stormwater management (SWM) regulations require that environmental site design (ESD) practices be implemented to the maximum extent practical. The report notes that design for on-site SWM was developed to a concept level of detail and included within the Limits of Disturbance (LOD). What is unclear is what SWM is proposed for the length of I-495 abutting the Evergreen Subdivision. A concept SWM feature is shown at the headwater of the existing stream valley west of the subdivision at the previously identified Location A. Otherwise, the report provides five roadside typical sections, two of which include SWM features. However, none of the five section illustrations or descriptions depict how noise barriers would be integrated into the section, and if those sections include SWM.

Greater amounts of runoff will result from widening I-495 as a result of the increase in impervious area. The approach to managing this increased runoff must be more clearly documented. If SWM is being provided, then where runoff will drain to once it exits the SWM feature must be documented in the Final EIS. If runoff is projected to drain into the subdivision, the quantity and frequency of flows must be determined and documented in the Final EIS to ensure that the receiving and downslope areas are suitable. This analysis must encompass recent heavy precipitation events that are becoming more frequent and almost routine as a result of climate change. If concentrated runoff does drain into the subdivision and into the Moses Hall and cemetery property, then evaluation of the receiving areas should be included to determine if those areas are appropriate and sufficient to convey flows without erosion or other property

5

### Response to DEIS Comment #4

Since there is a documented drainage complaint at the Moses Cemetery the current draft SWM concept presented in the FEIS diverts all the impervious area from I-495 away from the cemetery property to the north side of the highway where it is treated in a SWM facility. As a result, the houses between I-495 and Cypress Grove Lane will see a significant reduction in surface runoff.

The majority of the SWM runoff along Cypress Grove Lane will be diverted, however, some runoff will still be directed to the existing 21"RCP located behind 8021 Cypress Grove Lane and the existing swale located between Osage Lane and Cypress Grove Lane. This project will be required to control stormwater runoff for the 10-year storm to match existing conditions prior to leaving MDOT SHA ROW; therefore the runoff at both locations will not be increased and given that the surface runoff is being directed elsewhere, the total runoff will be significantly reduced.

00022538

**#4 Cont**

damage, since in all cases, runoff will be entering the Moses Cemetery and backyards of residential properties where defined waterways do not exist and where conditions may not be suitable for concentrated flow. The absence of such analysis, and appropriate mitigations based on its findings, could result in a failure to recognize the deleterious impacts to property conditions and home values of the proposed Project.

The Final EIS should provide additional detail to confirm the SWM management approach for the section of I-495 adjacent to Evergreen and to ensure that the SWM approach **improves upon the existing, inadequate SWM mitigation framework**, rather than cause further detrimental impact to our community.

<u>Visual and Property Impacts of MD 190 Off-Ramp</u>

The proposed direct access off-ramp from the eastbound managed lanes onto MD 190 is a major source of concern for our community. The Final EIS should advance an alternative that does not include an eastbound flyover off-ramp onto MD 190.

As indicated in the *Environmental Resources Mapping* (Appendix D), the ramp would create new property impacts for residents in our community and the adjacent Moses Hall and Cemetery site that would not be present should at-grade slip ramps be used instead. Additionally, a new elevated off-ramp would have an adverse impact on the views from our community and potentially privacy issues as well. The viewshed analysis conducted for the Draft EIS is insufficient, fails to take the "hard look" required under *Marsh, Methow Valley*, and other relevant case law, and therefore fails to comply with the NEPA regulations. The analysis broadly concludes that "Where new direct access at-grade auxiliary lanes or ramps would be constructed, visual impacts would be readily apparent, but would not contribute to a change in the character of the existing viewsheds" (DEIS Pg. 4-34). However, the analysis also notes that a Visual Impact Assessment (VIA) has yet to be conducted. In the absence of such a VIA, we believe that visual impacts have not been adequately documented. 40 CFR 1502.9 requires that the Draft EIS adequately disclose the impacts associated with the Project. Additionally, 40 CFR 1502.14(b), as further articulated by the *Forty Questions*, requires that all Alternatives be treated substantially similarly. SHA suggests, instead, that a VIA "in accordance with FHWA's guidance" will only be performed once "design advances on a Preferred Alternative" (DEIS Pg. 4-34).

The failure to complete a VIA with the Draft EIS and the recommendation that the VIA only be prepared for the Preferred Alternative together mean that SHA and FHWA have failed to comply with the NEPA regulations. These serious omissions deprive the public of the ability to truly understand the visual impacts associated with the Project and require that a Supplemental Draft EIS to be prepared.

What we do see in the Draft EIS regarding the flyover also concerns us. The MD 190 off-ramp would negatively affect sensitive wetlands and parkland, as shown in Appendix D. Section 4(f) considerations require the evaluation of approaches to avoid the use of such parkland. The *Section 4(f) Evaluation* (Appendix F) is inadequate in this regard. The approach to minimization focuses solely on the stormwater strategy as a means of reducing the property impacts to Cabin John Stream Valley Park, Unit 2 (Pg. 39). A serious consideration of avoidance and minimization would pursue a different approach to serving this off-ramp. The Section 4(f) evaluation must be revised to consider an alternative exit layout.

6

**#5**

**Response to DEIS Comment #5**

The Visual Impact Assessment (VIA) was completed on the Preferred Alternative and documented in the FEIS in Chapter 5, Section 5.6 and FEIS, Appendix H and includes renderings in the area of concern around Seven Locks Road and Cabin John Stream Valley Park, Unit 2. The VIA concluded that construction of the Preferred Alternative would not introduce new elements incompatible with the existing visual character or qualities along the study corridors or that experienced by neighbors. Vegetation removal will be mitigated based on state and local agency requirements and standards to maintain the visual quality of the key locations. It is expected that aesthetic and landscaping guidelines will detail materials, lighting, signage, and vegetation standards contextually compatible with the study corridor. Aesthetic and landscaping guidelines will vary along the study corridor to incorporate the aesthetic and context of the neighbor stakeholders and surrounding resources. By inviting neighbor stakeholders in the development of the aesthetic and landscaping guidelines, MDOT SHA would ensure that the Preferred Alternative would be consistent with applicable laws, ordinances, regulations, policies, and standards. As a result, the contextual compatibility impact of the proposed action would be low.

The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes at Seven Locks Road. Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction. An acceleration lane will also be built along the outer loop for approximately 1000-feet east of Seven Locks Road. No ramps are proposed in this area. The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop. The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier. Flyover ramps are no longer proposed in this area and thus will not create a visual impact. A noise barrier in this area is anticipated to be located close to the existing right of way line. Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

Since the DEIS, the Preferred Alternative eliminates of flyover ramps at MD 190/River Road by adjusting the location of the HOT lane direct access ramps between I-495 and MD 190. All HOT lanes direct access ramps within this interchange are now proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of flyover ramps.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and managed lanes separate to allow space for highway ramps. The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities. The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps. This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-8    Filed 10/30/23    Page 95 of 106

FINAL ENVIRONMENTAL IMPACT STATEMENT

**#5 Cont**

With our concerns with the flyover laid out, we note that an alternative approach consistent with the Project's Purpose and Need does exist. The *Alternatives Technical Report* (Appendix B) provides scant documentation as to why a direct access option is based on this location. Instead, we note that at-grade slip ramps are proposed for the Clara Barton Parkway off-ramps. Similar conditions exist for the MD 190 off-ramp and an at-grade slip MD to be pursued in this location.

Further, should the Project move forward as currently proposed, we concur with the recommendation in the Draft EIS (4-35) that design mitigations be advanced, in consultation with the community, to lessen the visual consequences of this Project. This approach should be committed to as a formal mitigation in the Final EIS. The Evergreen community would be available to coordinate with the Project team.

**Construction Impacts**

The *Environmental Resource Mapping* (Appendix D) indicates that the existing I-495 bridge over Seven Locks Road would need to be replaced to construct the Alternatives. We request additional information regarding the impacts that this construction would have on access to our community, which can only be reached from Seven Locks Road. While we recognize that additional design may help to resolve the nature of these impacts, the Final EIS should include information about the nature of disruption, the duration of that disruption, and how construction impacts will be mitigated. This information should also carefully consider impacts to Moses Hall and Gibson Grove Church from construction. Additionally, there is limited information in the Draft EIS regarding construction staging for the construction of the main line of I-495 and the means and methods of constructing the new MD 190 off-ramp. In total, the information is inadequate for our community to fully understand the nature of impact that we will experience as highway-adjacent residents. As SHA committed to in Chapter 4, the Final EIS must have detailed and quantitative assessment of construction impacts and serious mitigation to address them. We would further appreciate the opportunity to review and comment on mitigation approaches relevant for our community.

**#6**

**Long-Term Traffic Impacts**

The long-term consequences of the Project on the roadway network are inadequately evaluated in the Draft EIS. The *Traffic Analysis Technical Report* (Appendix C) shows impacts to local arterials that serve as major access routes for Evergreen (Figure 5-73). The figure indicates that MD 190 and Clara Barton Parkway would see a greater than 10% increase in delay due to the Project. These two routes represent the major regional routes serving our community. These impacts are not documented in the Draft EIS. The impacts to these local roads must be further discussed in the Final EIS and must be mitigated. We also believe the underlying rationale for this Project is called into question as a result of the unprecedented COVID-19 pandemic and its effects on driving patterns (see below).

We have significant concerns that non-state roads that serve as major commuting routes, such as Seven Locks Road and MacArthur Boulevard (sensitive, weight-restricted infrastructure), do not receive any analysis for induced traffic impacts. Traffic impacts to major commuting routes and arterial roads must be addressed by SHA in coordination with USACE, the NPS, and MCDOT.

**#7**

7

---

See response to Comment #5 above.

**Response to DEIS Comment #6**

Impacts during construction are a key consideration for the overall project. As the design is finalized, constructability reviews will be completed and a Transportation Management Plan will be developed to assess operations during construction and lay out a set of strategies that will be implemented to manage work zone impacts.

It is anticipated that construction will last approximately five to six years. Details related to precisely when and where construction related activities will occur will be determined in final design, however, the project will likely require night work to occur when activities could not be completed safely during the day. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. Impacts associated with construction that will be further evaluated for the Selected Alternative in final design include traffic congestion associated with construction maintenance of traffic, utility disruptions, construction vibration, erosion and sediment and control, and construction related noise.

The management of construction impacts is addressed in an agreement between MDOT SHA and the Developer. Pursuant to that agreement, coordination with the neighboring communities will continue through final design and construction. The agreement includes requirements to minimize impacts to surrounding communities and the traveling public, while completing construction as soon as possible. Work hours and duration of construction will be identified to minimize impacts to traffic in an effort to reduce construction related congestion and in consideration of noise and vibration impacts to adjacent communities. Construction methods and materials will comply with contract, state and federal regulation, and environmental permits and mitigation requirements. Careful attention will be taken to assure that material placement will occur when weather conforms to industry standards and regulation. In addition to required governmental inspections, the Developer is required by contract to provide independent environmental, quality, and safety oversight of its contractor's performance. Refer to Final Phase 1 P3 Agreement, https://oplanesmd.com/p3-information/phase-1-agreement/. Once the Developer has selected a Design-Build Contractor(s), the schedule and duration for Phase 1 South construction will be made available to the public.

For additional information refer to Chapter 9, Section 3.4.I for a response to construction impacts.

**Response to DEIS Comment #7**

The results of the updated traffic analysis in the FEIS indicate that the net impact of the Preferred Alternative will be an overall reduction in delay on the surrounding arterials, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges. The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of this FEIS, and mitigation was proposed where needed to maintain acceptable operations and safety per FHWA Interstate Access Point Approval guidelines. In addition, based on follow-up meetings between MDOT SHA and Rockville, additional improvements were considered and incorporated where feasible, including modifications to the right-turning movement from the I-270 off-ramp onto eastbound MD 189, and additional turn lanes at Wootton Pkwy at Seven Locks Rd, Gude Drive at Research Blvd, and MD 189 at Great Falls Road. All these enhancements will help manage and/or improve the function of the local roadway network.

Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

#8

**Elevated Option**

The *Alternatives Technical Report* (Appendix B) identifies that an elevated option for managed lanes is being considered as a "means and method" for implementing the managed lanes (Pg. 60). As we have expressed above, our community is greatly concerned by the inadequate visual analysis conducted in the Draft EIS. The elevated option is not evaluated in any meaningful way in Appendix B or in Chapter 4 of the DEIS. The elevated option would have additional adverse impacts to views from our community and would generate a substantially different noise profile and possible intrusions on the privacy of community residences. While we oppose the elevated option and recommend it be eliminated from future consideration, this option is substantially and materially different from the Alternatives evaluated in the Draft EIS. Should an elevated option be considered in this section of I-495, these different impacts would need to be evaluated through a Supplemental Draft EIS. A Supplemental Draft EIS would be required because 40 CFR 1502.9 requires that agencies prepare supplements to draft statements if the agency makes substantial changes to the proposed action.

#9

**COVID-19 Impacts**

Beyond a short paragraph in the Executive Summary (ES-3), the Draft EIS has limited mention of the impacts that the COVID-19 pandemic – such as widespread teleworking - may have on short- and long-term travel demand and therefore need for this highway expansion project. Given the substantial impacts that this has regionally and specifically on communities like ours, SHA should evaluate how COVID may shift highway use as part of a Supplemental Draft EIS. In particular, SHA should evaluate how resulting changes (and likely reductions) in congestion would adjust projections regarding usage of the managed lanes and the financial approach of the Project. Doing so would meet the requirement to take a "hard look" at key issues with bearing on impacts and to affirmatively address issues where there is incomplete or unavailable information (40 CFR 1502.21).

We believe that COVID impacts are not temporary; we believe that we are experiencing epoch change in how we live, work, and play. This is on top of clearly apparent trends in autonomous vehicle transportation that we expect to become commonplace not long after the I-495 P3 project construction is complete. We urge SHA to reevaluate the purpose and need of this Project that will so greatly affect our communities and taxpayers.

Thank you for your consideration of our community's comments and concerns. We look forward to SHA addressing these issues in the Final EIS and working with our community on appropriate mitigations for this Project. We will continue to remain engaged through the NEPA and Section 106 processes, as well as other comment and approval steps throughout Project development.

Sincerely,

**EVERGREEN COMMUNITY RESIDENTS**

Charlotte Troup Leighton and Russell Leighton (8005 Cypress Grove Lane)

Frank L Wright III and Marcy Harrison (8014 Cypress Grove Lane)

8

**Response to DEIS Comment #8**

An elevated alternative was not carried forward as preliminary alternative. The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes. As described in the Supplemental DEIS, the Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to east of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs.

**Response to DEIS Comment #9**

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

Andrew Strasfogel and Elizabeth Jackson (7913 Cypress Grove Lane)

WeiWei and Fenhua He-Han (7910 Cypress Grove Lane)

Manny and Elizabeth Andrade (7909 Cypress Grove Lane)

Matt and Min Shih (7900 Cypress Grove Lane)

Cindy and Leslie Miller (7905 Cypress Grove Lane)

Gladys Vaughn (7920 Cypress Grove Lane)

Ellen and Steve Futterman (8000 Cypress Grove Lane)

Kara Cunzeman and Marc Bosch (8009 Cypress Grove Lane)

Michael and Gail Marcus (8026 Cypress Grove Lane)

Gregory and Sheila Duncan-Peters (8037 Cypress Grove Lane)

Sheryl and Peter Bloch (7920 Cypress Grove Lane)

Edwin and Olga Paxson (8041 Cypress Grove Lane)

Maryann Veloso and Lyle Ishida (8033 Cypress Grove Lane)

Khalid and Ruham Usmani (8013 Cypress Grove Lane)

Donald and Sedene Dunac (8021 Cypress Grove Lane)

Assiatu and Richard Crossman (8025 Cypress Grove Lane)

*Also Provided:*

**Attachment A:** Drainage from I-495 at Evergreen Community

**Attachment B:** Photographs of Damage from I-495 Stormwater Run-off

CC:    Governor Lawrence J. Hogan
       Comptroller Peter V.R. Franchot
       Treasurer Nancy Kopp
       County Executive Marc Elrich
       Councilmembers Andrew Friedson, Gabe Albornoz, Evan Glass, Will Jawando, and Hans
       Riemer
       Senator Susan Lee and Delegates Ariana Kelly, Marc Korman, and Sara Love

9

*This page is intentionally left blank.*

ATTACHMENT A

Location A    Location B    Location C

**Legend**

2-Foot Contour

Property Line

Evergreen Drainage (Source: Montgomery County GIS Mapping)

Montgomery County, MD

10

ATTACHMENT B



Existing I-495 Stormwater Drain Clogged with Vegetation and Debris





11

OP·LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

**UNION OF CONCERNED SCIENTISTS – EYAL LI (EMAIL)**

*This page is intentionally left blank.*

| | |
|---|---|
| **From:** | Eyal Li <ELi@ucsusa.org> |
| **Sent:** | Friday, October 30, 2020 11:51 AM |
| **To:** | MLS-NEPA-P3 |
| **Subject:** | Union of Concerned Scientists Comment on I-495 and I-270 Managed Lanes Study DEIS |
| **Attachments:** | MDOT 495 & I-270 Managed Lanes DEIS Comment UCS.pdf |

Dear MDOT SHA Staff,

On behalf of the Union of Concerned Scientists, I am submitting the attached comment on the I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement.
Please let me know if you have any questions.

Regards,
Eyal Li
Campaign Associate
pronouns: he / him / his
Union of Concerned Scientists
1825 K St NW #800 | Washington, DC 20006 | P: 240-374-8960

*Help boost the science vote in 2020! Find the tools you need to register, learn about state-specific voting information, and learn how to organize your own voter registration events at ScienceRising.org.*

www.ucsusa.org | Join our action network or expert network | Support our work.
Join the conversation on the UCS blog and All Things Nuclear or follow us on Facebook, Twitter, and Instagram

1

00022544

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

**Union of Concerned Scientists**
Science for a Healthy Planet and Safer World

Maryland Department of Transportation State Highway Administration

October 23rd, 2020

**RE: I-495 & I-270 Managed Lanes Study**

Dear Administrator Smith,

Thank you for the opportunity to comment on the I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement. The Union of Concerned Scientists (UCS) is the nation's leading science-based nonprofit putting rigorous, independent science to work to solve our planet's most pressing problems.

**#1**

**#2**

On behalf of our 24,000 supporters in Maryland, and network of more than 26,000 scientists, engineers, and public health professionals nationwide, UCS strongly opposes the Maryland Department of Transportation State Highway Administration's (MDOT SHA) proposed addition of managed lanes to I-495 and I-270, and supports a no-build option. As detailed in the draft environmental impact statement (DEIS), the proposed added lanes would increase vehicle miles travelled, leading to higher global warming emissions and traffic related air pollution. We urge MDOT to evaluate additional alternatives for detailed study that provide equitable and sustainable mobility options for Maryland residents including public transit, transportation demand management on existing roadways, and transit-oriented land use that weren't considered in depth in the DEIS.

**#3**

MDOT's proposed managed lanes will have detrimental impacts on public health, racial equity and the climate if finalized as proposed in any of the managed lane alternatives. Notably, the impacts of the COVID-19 pandemic on travel behavior call into question the suitability of the managed lanes project to meet the needs of our future transportation system and they should be considered in the final environmental impact statement.

**#4**

**Public Health & Racial Equity**

UCS is particularly concerned about the project's disproportionate health impacts on marginalized communities near the highways. The race and ethnicity characteristics of the Analysis area reveal that Latino, Asian-American, and African Americans are overrepresented by 50%, 49%, and 9%, respectively while white residents are underrepresented by 37% compared to their population statewide (Figure 3-7 in DEIS Appendix E). In 2019, UCS released a study showing African American and Latinx Marylanders are exposed to levels of traffic related air pollution that are 12 and 11 percent higher than the average while white Marylanders breathe air that is 8 percent cleaner than the average Maryland resident (Pinto de Moura 2019). Increasing the throughput capacity of I-495 and I-270 would increase traffic related air pollution in the surrounding communities, exacerbating the burden of breathing higher levels of air pollution in these disproportionately African American, Latinx, and Asian American communities.

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

00022545


**#4
Cont**

Chronic exposure to particulate matter pollution from vehicles causes increased death rates attributed to cardiovascular disease and respiratory ailments including COVID-19, among other conditions (American Lung Association 2020). The DEIS does not assess whether environmental justice (EJ) populations will bear a disproportionate burden of the adverse effects of the managed lanes project. The final DEIS should compare the adverse impacts of the project borne by EJ communities to those borne by non-EJ communities. Given the systematic oppression of marginalized groups throughout history, we call on MDOT to shoulder a greater burden of proof that its actions are not harmful to the health and wellbeing of minority populations, low-income populations, and/or indigenous peoples.

**#5**

**Traffic Demand**

The DEIS fails to consider the impacts of increased road capacity on long term traffic demand and on land use. It is misleading to claim the proposed managed lanes would reduce congestion when the DEIS estimates show the managed lanes would cause increased travel times on I-270's general lanes during the PM peak travel time (Table 5-6 in DEIS Appendix C). While the DEIS seems to ignore the projected increases in traffic caused by the managed lanes, the Traffic Technical Analysis Report omits a discussion of the impacts of induced travel demand. The overwhelming research on roadway expansions has concluded that they fail to alleviate congestion and actually increase vehicle miles travelled (VMT) in the long term (Handy 2015). In the EPA's 2002 "Guidebook on Induced Travel Demand," a case study examines how after the 1989 6-lane expansion of I-270 in Montgomery County, MD, traffic counts in 1999 exceeded those predicted for 2010, "and traffic congestion had already returned to unacceptable levels" (United States Environmental Protection Agency 2002).

The proposed addition of *managed* lanes does not address the congestion impacts of induced demand since the increased road capacity will only provide congestion relief to drivers who can afford tolls in the priced lanes. This raises equity concerns for drivers who are unable to afford tolls and who will be stuck in congested traffic in the non-priced lanes.

As stated in the EPA's 2002 report, "the omission of induced travel demand results in underestimation of highway project costs and impacts, and hampers thorough understanding and assessment of regional transportation, land use and environmental conditions." Moreover, the induced travel demand from the proposed managed lanes will spill over onto roads adjacent to I-495 and I-270 that are unable to support increased traffic capacity. MDOT's 2017 Attainment Report details the phenomena of induced travel demand and underscores the importance of incorporating induced travel when evaluating the costs and benefits of adding roadway capacity (MDOT SHA 2017). The lack of an appropriate analysis of induced travel demand and its impacts calls into question the accuracy of the environmental impact study for each managed lane alternative.

**#6**

**Climate Change**

The omission of an analysis of the impacts of induced travel demand and the resulting underestimate of projected VMT lead to inaccurate estimates of greenhouse gas (GHG)

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

Refer to Chapter 9, Section 3.4.L for a response to public health impacts.

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**Response to DEIS Comment #6**
Refer to Chapter 9, Section 3.4.G for a response to climate change and greenhouse gas considerations.

00022546

**#6 Cont**

emissions resulting from the proposed managed lanes (Table 3-37 in DEIS Appendix I). The GHG emissions analysis also notes the impact that the finalized Safer Affordable Fuel-Efficient (SAFE) rule will have on GHG emissions from passenger vehicles but fails to provide an estimate of exactly how much emissions will increase under this rule.

UCS urges MDOT SHA to incorporate induced travel effects into their travel forecasting models in the environmental impact study to better understand the relationship between transportation capacity, behavioral responses, and land use patterns. Moreover, it is critical that MDOT SHA evaluate the impact of the SAFE rule on GHG emissions from vehicles using the roadway to estimate GHG emissions for each alternative. Once these two factors are incorporated into a GHG emissions analysis, MDOT must evaluate how each proposed alternative will help or hinder Maryland's progress in achieving its goal of a 40 percent reduction of GHG emissions from 2006 levels by 2030 under the 2015 update to the Greenhouse Gas Emissions Reduction Act (Maryland Department of the Environment 2019).

The GHG emissions estimates for each alternative must also be evaluated with consideration to Maryland's stated goals of joining the Transportation Climate Initiative: to develop "a policy that accelerates the transition to a low-carbon transportation future and delivers a better, cleaner, more resilient transportation system that benefits all our communities particularly those underserved by current transportation options and overburdened by pollution, while making significant reductions in GHGs and other harmful air pollution across the region" (Section 3.5 in DEIS Appendix I). Using state funds to expand roadways prioritizes wealthier residents who own cars. Investing in the underfunded Maryland Transit Administration and prioritizing congestion-fighting strategies such as bus rapid transit and bus-only lanes would improve the transportation system for communities underserved by current transportation options.

**COVID-19**

**#7**

The DEIS does not take into account changes in travel behavior resulting from the COVID-19 pandemic and resulting shifts in commuting patterns. It is irresponsible to not evaluate how these shifting travel patterns will impact the need for the proposed managed lanes and their alternatives.

The lack of a clear discussion of induced travel demand, coupled with MDOT's inappropriately constrained consideration of public health and climate impacts, especially those impacting environmental justice populations, guarantees that the negative impacts of the proposed managed lanes in the DEIS are artificially low. MDOT should evaluate additional alternatives for study that include public transit, transportation demand management on existing roadways, and land uses that would meet the transportation needs of the region. It is critical that the purpose and needs of the project focus on the movement of people and goods rather than accommodating vehicular traffic growth. The adoption of the recommended areas of study will enable MDOT staff to plan for regional transportation systems that enhance access, improve transportation efficiency, and create more livable communities for all.

**Response to DEIS Comment #7**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

On behalf of the Union of Concerned Scientists:

*Maria Cecília Pinto de Moura*

Maria Cecília Pinto de Moura
Senior Engineer | Clean Transportation Program

*Eyal Li*

Eyal Li
Campaign Associate | Clean Transportation Program
pronouns: he / him / his
Union of Concerned Scientists
1825 K St NW #800 | Washington, DC 20006 | P: 240-374-8960

References

*This page is intentionally left blank.*

"2017 Annual Attainment Report On Transportation System Performance." 2017. Maryland Department of Transportation. http://www.mdot.maryland.gov/newMDOT/Planning/AR/Archived%20ARs/2017%20Attainment%20Report.pdf.

"2019 GGRA Draft Plan Executive Summary." 2019. Maryland Department of the Environment. https://mde.maryland.gov/programs/Air/ClimateChange/Documents/2019GGRAPlan/2019%20GGRA%20Draft%20Plan%20Executive%20Summary%20(10-15-2019)%20POSTED.pdf.

American Lung Association. 2020. "Particle Pollution." American Lung Association Particle Pollution. April 20, 2020. https://www.lung.org/clean-air/outdoors/what-makes-air-unhealthy/particle-pollution.

Handy, Susan. n.d. "Increasing Highway Capacity Unlikely to Relieve Traffic Congestion." *National Center for Sustainable Transportation*, 2.

"Managed Lanes Study Draft Environmental Impact Statement Appendix C Traffic Analysis Technical Report." 2020. Maryland Department of Transportation State Highway Administration. https://495-270-p3.com/wp-content/uploads/2020/07/APP-C_MLS_Traffic-Tech-Report-Appendices.pdf.

"Managed Lanes Study Draft Environmental Impact Statement Appendix E Community Effects Assessment and Environmental Justice Analysis." 2020. Maryland Department of Transportation State Highway Administration. https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_AppE_CEA-EJ-Tech-Report_web.pdf.

"Managed Lanes Study Draft Environmental Impact Statement Appendix I Air Quality Technical Report." 2020. Maryland Department of Transportation State Highway Administration. https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_AppI_Air-Quality_web.pdf.

Pinto de Moura, Maria Cecilia. 2019. "Inequitable Exposure to Air Pollution from Vehicles in Maryland." Union of Concerned Scientists. *Inequitable Exposure to Air Pollution from Vehicles in Maryland* (blog). November 15, 2019. https://blog.ucsusa.org/cecilia-moura/air-pollution-from-vehicles-maryland.

United States Environmental Protection Agency. 2002. "Guidebook on Induced Travel Demand." Jack Faucett Associates. https://nepis.epa.gov/Exe/ZyPDF.cgi/94004L98.PDF?Dockey=94004L98.PDF.

*This page is intentionally left blank.*

**UNION OF CONCERNED SCIENTISTS – EYAL LI (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Eyal Li

**Joint Public Hearing Date:** 8/18/2020

**Type/Session:** Live/Afternoon

**Transcription:**

Good afternoon. My name is Eyal Li. Eric Goldstein, my father must have been the phone number you reached. My name is spelled E-Y-A-L and my last name is spelled Li, L-I. My address is 7001 Poplar Avenue in Takoma Park, Maryland. I'm an environmental engineer and an advocate for clean transportation policy with the Union of Concerned Scientists, abbreviated UCS. On behalf of our 24,000 supporters in Maryland and our network of more than 26,000 scientists, engineers and public health professionals nationwide, you see us strongly opposes the proposed addition of lanes to I-495 and I-270 and supports a No Build option. We urge the MDOT SHA to evaluate additional alternatives for detailed study that provide equitable and sustainable mobility options for Maryland residents, including public transit, transportation, demand management on existing roadways, and transit-oriented land use that weren't considered in-depth in the DEIS.  **#1**

As detailed in the DEIS, the proposed added lanes would increase vehicle miles traveled, leading to higher global warming emissions and traffic related air pollution. UCS is particularly concerned about the project's disproportionate health impacts on marginalized communities near the highways. The race and ethnicity characteristics of the analysis area reveal that Latino, Asian Americans, and African-Americans are overrepresented by 50, 49, and 9 percent, respectively, while white residents are underrepresented by 37 percent compared to their population statewide. In 2019, UCS released a study showing African-American and Latino Marylanders are exposed to levels of traffic-related air pollution that are 12 and 11 percent higher than the average, while white Marylander's breathe air that is eight percent cleaner than the average Maryland resident. Chronic exposure to particulate matter pollution from vehicles causes increased death rates attributed to cardiovascular disease and respiratory ailments, including COVID-19, among other conditions. Given the systematic oppression of marginalized groups throughout history, we call on the Maryland DOT to shoulder a greater burden of proof that its actions are not harmful to the health and well-being of minority populations, low-income populations and/or indigenous peoples.  **#2 #3**

Furthermore, the DEIS fails to consider the impacts of increased road capacity on land use and on long-term traffic demand. It is misleading to claim the posed new managed lanes would reduce congestion when the overwhelming research on roadway expansions, that they fail to alleviate congestion and actually increase VMT in the long term. The lack of quantification of the effects of induced travel demand calls into question the accuracy of the environmental impact statement as a whole. We can improve mobility and access to opportunity for Maryland residents and the way to do so at I-495 and I-270. Thank you very much for your consideration.  **#4**

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.4.F for a response to adverse impacts to air quality.

Refer to Chapter 9, Section 3.4.G for a response to climate change considerations.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.4.L for a response to public health impacts.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**VILLAGE OF NORTH CHEVY CHASE – DANA PETERSON**

See the following pages for a response to your comments.

| | |
|---|---|
| **From:** | nccinfo@northchevychase.org |
| **Sent:** | Tuesday, September 22, 2020 10:50 AM |
| **To:** | MLS-NEPA-P3 |
| **Subject:** | Village of North Chevy Chase DEIS Comments |
| **Attachments:** | VNCC Statement on I495 DEIS Sept 2020.pdf |

Ms. Choplin - On behalf of the Village of North Chevy Chase, please find attached comments on the DEIS, which highlight the Village's significant concerns about environmental protections within a P3 structure and oversight of a private contractor, the opaque decision making with respect to the 6 alternatives beyond "No Build", the detrimental impacts in using MD-185/Connecticut Ave as an on-ramp for toll lanes, and the critical importance of revisiting alternatives in light of the COVID-19 pandemic and its effects on traffic patterns throughout the area. Thank you very much.

Dana Peterson
Manager
Village of North Chevy Chase
Mobile: 301-654-7084

1