

### VILLAGE OF NORTH CHEVY CHASE

September 21, 2020

Testimony to Federal Highway Administration (FHWA), the Maryland Department of Transportation (MDOT), the State Highway Administration (SHA) and the Maryland Department of the Environment (MDE)

**#1**

As part of public testimony in response to the I-495/I-270 Managed Lanes Study Draft Environmental Impact Statement (DEIS) and as residents and elected officials of the Village of North Chevy Chase, we would like to reiterate the Village's significant concerns about any expansion of I-495, including use of MD-185 (Connecticut Ave) for toll lane access. While our community abuts the portion of I-495 that has been slated for Phase II of any potential project, given that the DEIS addresses both phases of the project, we would like to speak to our ongoing concern about the potential environmental impacts arising from the proposed public-private partnership structure and potential environmental impacts for our community and the region as a whole of any I-495 expansion.

As you can imagine, our community and numerous others are highly skeptical of the proposed public-private partnership in which any proposed construction of I-495 and I-270 would take place. The recent contract negotiations with the Purple Line Transit Partners have highlighted the significant risks to taxpayers in such arrangements, including the possibility of significant environmental disruption for a project that may ultimately fail to be constructed. While State officials and planners have highlighted that there will be no cost to taxpayers for the beltway project, utility companies such as WSSC have calculated that it could cost up to $2 billion to move pipes and infrastructure to accommodate the planned widening of I-270 and I-495, which could add thousands of dollars to residents' utility bills and which infrastructure relocations themselves could have serious environmental impacts unaddressed at all in the DEIS. Of particular concern is how any contract would be structured to ensure that the winning bid adheres to the State's environmental requirements and critically, property acquisitions and relocations. Once control of the project shifts from government authorities to private contractors, the ability to ensure that environmental concerns rather than the economic self-interest of those private contractors are fully taken into account is a paramount concern, yet this is in no way addressed in the DEIS document.

Our community is also gravely concerned about the total lack of transparency in the project to date. The study notes that the 6 alternatives beyond No Build all involve widening the pavement of I-495. The Village has residents whose property abuts the beltway as well as MD-185/Connecticut Avenue leading to the I-495 on ramp. Residents of the Village of North Chevy Chase received letters from State Highway Administration in November 2019 notifying them that SHA would be accessing their private property to "complete field research and survey activities" as part of the I-495 & I-270 P3 Program. Despite our efforts, including State Delegates' efforts, to receive information from SHA on which properties received the letters to better understand the breadth of the survey, SHA would not disclose the information, citing an act meant to protect citizens' personal data. Adding to the perception of opaque decision making is giving individuals and communities a relatively limited time period (originally 90 days and only recently extended to 120 days) to absorb and assess an 18,000-page technical document in the middle of a pandemic.

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to the Village of North Chevy Chase. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS . The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Village of North Chevy Chase is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

Refer to Chapter 9, Section 3.7 for a response to comments related to public involvement and engagement.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

00022552



Comments addressed above.

#1
Cont

We are very concerned about proposals to utilize Connecticut Ave (MD-185) as an on ramp to proposed toll lanes. While SHA is currently undertaking improvements to the intersection of Connecticut Ave and Jones Bridge Rd as part of the overall BRAC project, there is significant congestion throughout the area during the day, with virtually no opportunities to expand the streets further given the dense population of the area. The community has already suffered from significant canopy loss due to Purple Line construction as well as large multi-family complexes such as Chevy Chase Lake, impacting the area's air quality and storm water management capacities.

We strongly encourage you to revisit the alternatives beyond the No Build in the Managed Lane Study to draw lessons from the COVID-19 pandemic and its effects on traffic patterns. The notable reduction in traffic along I-495 and I-270 during the pandemic highlights opportunities to more fully take account of the manner in which virtual work and staggered work hours at businesses and government offices throughout the area will affect future travel volumes and density. Rather than looking forward to an honest assessment of future transportation needs and how best to meet them, it appears as though the impetus for this project is focused on a rear-view mirror assessment of problems that are in no way related to the traffic situation and transportation needs likely to be present over the next 20 years. Avoidance of unnecessary and harmful environmental impacts for a project that is ill-suited to meet the actual transportation requirements of the next quarter century should be a paramount priority for all those involved. Governor Hogan and Governor Northam have cooperated on proposals for expansion of the American Legion Bridge – it would seem beneficial for them to combine efforts in looking more thoroughly at no build alternatives as well for the region as a whole.

Sincerely,

Council of the Village of North Chevy Chase

Adrian Andreassi, Chair

Brian Hoffner, Vice Chair

Maury Mechanick, Secretary

Chas Stuart, Treasurer

Ronald Jones, Member

cc:     Maryland House of Delegates Representatives Carr, Shetty and Solomon

Maryland State Senator Waldstreicher

Montgomery County Executive Elrich

Montgomery County Council Representatives Friedson, Albornoz, Glass, Jawando and Riemer

U.S. Congress Representative Raskin

U.S. Senators Cardin and Van Hollen

Maryland Governor Hogan

Maryland Comptroller, Peter Franchot

Maryland Treasurer Kopp

**WASHINGTON BIOLOGISTS' FIELD CLUB – ALBERT MANVILLE**

| | |
|---|---|
| From: | Albert Manville <amanville634@gmail.com> |
| Sent: | Monday, November 9, 2020 5:01 PM |
| To: | MLS-NEPA-P3 |
| Cc: | Albert Manville; Albert Manville |
| Subject: | Testimony from a WBFC Member on I-485 & I-270 DEIS |
| Attachments: | DEIS Plummers Island Comments-Final.docx |

Dear Officials at the Maryland Department of Transportation:

Kindly accept my following comments as a member in good standing of the Washington Biologists' Field Club, and our cabin and Plummers Island property donated to the National Park Service. Thank you. -AMM-

Albert M. Manville, II, Ph.D., C.W.B., and WBFC Member
2124 Greenwich Street
Falls Church, VA 22043

November 9, 2020
[DEIS Plummers Island Comments-Final.docx]
Attn: Ms. Lisa B. Choplin
DBIA, Director, I-495 & I-270 P3 Office
MDOT State Highway Administration
707 N. Calvert Street
Baltimore, MD 21201 VIA Email

Dear Ms. Choplin and MDOT Officials:

As a member in good standing of the Washington Biologists' Field Club (WBFC; official website https://WBFC.science) since 1991, I submit for the record the following comments opposing the I-495/I-270 DEIS, and kindly request that you accept my brief comments for the administrative record.

**My positions on the DEIS:** As a Ph.D. certified wildlife biologist, former Federal environmental/wildlife official, long-standing member of the WBFC and former chairman of the Centennial Committee, and current graduate university program instructor, I

1. **oppose** this highway expansion project including, the portion of the project calling for expansion of the American Legion Bridge;
2. **strongly support** the no-build option;
3. find **none** of the other DEIS **alternatives acceptable**; and
4. find the DEIS **legally deficient, faulty**, and **incomplete** — including but by no means limited to:

- destruction of Maryland State Park and National Park Service parklands and wetlands;
- destruction of the Rock Run Culvert which will totally disrupt the biological and physical integrity of Plummers Island;
- a complete failure to understand the biological and historical research significance of Plummers Island and the adjoining parklands which WBFC members and others have been studying and publishing on for more than 120 years;
- a grossly incomplete and inadequate analysis of the island's wetland and rare plant communities (some surveyed at inappropriate seasonal times, lacking robust survey protocols);
- the failure to include any alternatives to condemning part of Plummers Island for the Cabin John Bridge expansion;
- a failure to include additional transportation options such as electric buses, light rail expansion, new high occupancy vehicle requirements, or other environmentally-friendly alternatives;
- massive costs, almost certain massive cost-overruns (think the Purple Line experience), and high toll prices (think: VA 1495 and I66 peak toll costs), and cost overruns which will be passed on as additional taxes and fees to the taxpayers;
- the complete failure to seriously consider let alone address massive traffic congestion, gridlock and wasted fuel (think pollution, greenhouse gases, and climate change) during the projected 5-10 years of construction, or longer, with no discussion on reducing highway use rather than *increasing* it — ultimately resulting in no-net change in gridlock and congestion; and
- the failure to include those and other issues as part of the cumulative impacts analysis in the DEIS National Environmental Policy Act (NEPA) review. This incomplete and inadequate NEPA review and analysis in the DEIS, including reduced traffic consequences from the current Covid-19 pandemic, makes it impossible for all the affected agencies to assess overall impacts, let alone for the public to review and comment on those impacts. Once the EIS is final, it will be too late to assess these issues.

**Brief Discussion:** I am a Ph.D. professional wildlife biologist by training, certified by The Wildlife Society, and retired in 2014 as a Senior Wildlife Biologist for the Division of Migratory Bird Management (DMBM), U.S. Fish & Wildlife Service (USFWS), Washington DC headquarters office, after 17 years with DMBM. I was my agency's national lead on all things human-related impacting migratory birds, including tree cutting,

1

**#1**
**#2**
**#3**
**#4**

**Response to DEIS Comment #1**
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**Response to DEIS Comment #2**
NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multimodal transportation initiatives and projects included in the "Visualize2045" plan adopted by the Metropolitan Washington Council of Governments (2018). See DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No-Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. See DEIS, Chapter 3 and DEIS Appendix C. For a discussion of the basis for the Purpose and Need and for the Selection of the Preferred Alternative, please see related Common Theme Responses and the SDEIS and FEIS.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to DEIS Comment #4**
Wetlands were delineated according to NPS requirements and RTE plant species on NPS land within the project LOD were surveyed as part of a four-season survey coordinated closely with NPS, DNR, and VDWR. NPS reviewed the survey report and responded that the survey and report were well done, and they had no comments.

The project has worked closely with USFWS and there is no indication that the project would result in un-permitted take of migratory birds.

As described in Chapter 2 of the Supplemental DEIS, the Preferred Alternative includes the full replacement of the American Legion Bridge (ALB) on I-495 spanning the Potomac River with a new, wider bridge on the existing centerline. Comments on the Build Alternatives presented in the DEIS reflected a common support for advancing replacement of the ALB. With its location over the Potomac River and adjacent to several federally-owned parks, MDOT SHA created a separate group (the ALB Strike Team) whose mission was to investigate alternative bridge designs and construction techniques that could be employed to reduce, minimize, and avoid impacts to water and parkland resources in and around the ALB. The results of the effort are reflected in the Preferred Alternative and are the result of the coordination with key agency and public stakeholders, including NPS, M-NCPPC, USACE, MDE, and Maryland DNR. The National Park Service properties that border the Potomac River at the ALB include the George Washington Memorial Parkway, the Chesapeake and Ohio Canal National Historic Park (including the Chesapeake and Ohio Canal Towpath and Plummer's Island), and Clara Barton Parkway. In addition to these sensitive properties, there are also many construction challenges associated with replacement of the ALB, such as access constraints. A number of bridge types and construction methods (both standard and innovative) were evaluated during the Strike Team's analysis. A westward/upstream shift of the bridge alignment and additional phases of construction were also evaluated for the different bridge options. These options were presented to the stakeholders and a conventional structure was recommended that remained on the existing bridge centerline. Impacts to Plummer's Island were significantly reduced compared to those presented for the Build Alternatives in the DEIS by strategically locating the proposed piers for the replacement bridge and eliminating construction access from the island. In addition to a reduction of total impacts at the bridge construction site, the Strike Team effort resulted in a reduction of the number of construction access locations from all four quadrants, as noted in the DEIS, to the northwest quadrant only, due to its grade and proximity to a nearby roadway. This change substantially minimized impacts to the surrounding land.

**#4 Cont**

road building, water diversion, bridge building and expansion, habitat destruction/degradation, and the "take" (un-permitted killing, injury, or crippling loss) of Federally protected migratory birds — among many other issues. Un-permitted "take" (including so-called incidental or unintentional take — which are still illegal) will most certainly occur if this road building and expansion project is approved and initiated. From what I can tell, these issues of migratory bird "take" (e.g., loss of active nests, chick abandonment, hatchling starvation, and Bald Eagle disruption and disturbance) have not been addressed in any significant detail if at all in the DEIS, including the cumulative impacts of bird "take" under the authority of a NEPA review.

Cumulative impacts must be evaluated in detail under an EIS through full NEPA review, and the previous bird "take" enforcement authority under the Obama Administration's Migratory Bird Treaty Act Solicitor's enforcement provisions are now back in force. Under the Trump Administration's 2017 M-37050 legal opinion, most previous migratory bird enforcement provisions had been rescinded, but U.S. District Judge Valerie Caproni in her August 11, 2020, ruling reversed the Trump decision. I was invited to provide an affidavit in this case. Now once again, un-permitted "take" of migratory birds is a potential criminal offense, with potential legal consequences which have not been evaluated in the DEIS.

I also am a Senior Lecturer and Adjunct Professor for the Advanced Academic [Graduate] Programs, Johns Hopkins University, Washington, DC Campus. Early on when I was a youngster, my father, the late Dr. Richard H. Manville (formerly WBFC Secretary) mentored me in the importance of protecting this wonderful Island, and its native flora and fauna. On several occasions we overnighted at the WBFC Plummers Island cabin, and he shared with me some of his research publications about Plummers Island and its wildlife (e.g., Manville, R.H., USFWS. 1968. Natural History of Plummers Island, Maryland, Special Publication of the Washington Biologists' Field Club, XX Annotated List of the Vertebrates. 44 pp.; among others).

This Island, its adjoining parklands, the history of biological discovery and investigation, and the flora and fauna present are incredibly important to me. Their loss, degradation, and/or destruction will irrevocably affect my standing as a Club member and wildlife biologist who has for years enjoyed, visited, overnighted, fished, and even swum the Potomac River from Maryland to Virginia and back. That will all change if this massive project is allowed to proceed.

Thank you for the opportunity for me to provide these comments on issues of great importance to me, the environment, and collectively to the planet. Respectfully submitted,

/s/

Albert M. Manville, II, Ph.D.

Certified Wildlife Biologist (CWB), The Wildlife
Society; Senior Lecturer and Adjunct Professor, Krieger School of Arts and
Sciences, Advanced Academic Programs, Johns Hopkins University, Wash DC
Campus (21 years); Sole Proprietor, Wildlife and Habitat Conservation Solutions LLC (registered w/
VA State Corporation Commission); and retired Senior Wildlife Biologist, Division of Migratory Bird Management, U.S. Fish & Wildlife Service, Wash. DC
HQ Office (17 years)
amanville634@gmail.com; amanvil1@jhu.edu

2

It is anticipated that construction will last approximately five to six years. Details related to precisely when and where construction related activities will occur will be determined in final design, however, the project will likely require night work to occur when activities could not be completed safely during the day. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. Impacts associated with construction that will be further evaluated for the Selected Alternative in final design include traffic congestion associated with construction maintenance of traffic, utility disruptions, construction vibration, erosion and sediment and control, and construction related noise.

The management of construction impacts is addressed in an agreement between MDOT SHA and the Developer. Pursuant to that agreement, coordination with the neighboring communities will continue through final design and construction. The agreement includes requirements to minimize impacts to surrounding communities and the traveling public, while completing construction as soon as possible. Work hours and duration of construction will be identified to minimize impacts to traffic in an effort to reduce construction related congestion and in consideration of noise and vibration impacts to adjacent communities. Construction methods and materials will comply with contract, state and federal regulation, and environmental permits and mitigation requirements. Careful attention will be taken to assure that material placement will occur when weather conforms to industry standards and regulation. In addition to required governmental inspections, the Developer is required by contract to provide independent environmental, quality, and safety oversight of its contractor's performance. Refer to Final Phase 1 P3 Agreement, https://oplanesmd.com/p3-information/phase-1-agreement/. Once the Developer has selected a Design-Build Contractor(s), the schedule and duration for Phase 1 South construction will be made available to the public. Refer to Chapter 9, Section 3.4.I for a response to construction impacts.

Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

**WASHINGTON BIOLOGISTS' FIELD CLUB – ROBERT SORENG (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Robert Soreng

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Live Testimony/Morning

**Transcription:**

My name is Robert Soaring, R-O-B-E-R-T S-O-R-E-N-G. My address is 5506, Uppingham Street, Chevy Chase, Maryland, 20815.

Can you hear me?

**#1**  I am opposed to the highway expansion project. I support the No Build option. None of the presented DEIS alternatives are acceptable. I am a professional botanist and field biologist with a Bachelors, Masters and Ph.D in Science. I'm also a member of the Washington Biologists' Field Club, WBFC.science. I'm also testifying on behalf of the Washington Biologist Field Club. WBFC purchased the property known as Plummers Island and the adjacent mainland up to the C&O Canal Towpath in 1901 for a meeting place and research station. The Club has been meeting on Plummers Island continuously for nearly 120 years. The Club gave the property to the National Park Service on July 24, 1959, with a written understanding that the Club retained the right to maintain the island as a natural wild area for its use, for scientific research, for meetings of the Club and to purchase, pursue the studies in field biology and natural history. The American Legion Bridge was constructed immediately to the west of the island starting in 1962. That construction led to many invasive plants infesting the island and disturbing the water flow to its flanking wetlands. Plummers Island is known as the most thoroughly studied island in North America and perhaps the world. Since 1901, nearly 400 scientific publications have focused on the island's biota. Birds, fish, mammals, reptiles, amphibians, plants, insects and others who'd been stated that the Potomac Gorge is a gem among our national parks. And I would say Plummers Island is a crown jewel in that. The plant and animal diversity are tremendous, with many rare species and long-term ongoing research projects. I and many other biologists have walked and observed every nook and cranny of this topologically diverse island with its rocky hills and cliffs, including

**#2**  the globally and state rare Potomac River bedrock terrace [INAUDIBLE] forest and sensitive wetland bottoms. We love this place. Rebuilding and expanding the American Legion Bridge on the island would destroy much of it. I and all other WBFC members beg you to preserve this national treasure. Please visit our website WBFC.science. We will present more detail on our written testimony. Thank you.

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to DEIS Comment #2**
As described in Chapter 2 of the Supplemental DEIS, the Preferred Alternative includes the full replacement of the American Legion Bridge (ALB) on I-495 spanning the Potomac River with a new, wider bridge on the existing centerline. Comments on the Build Alternatives presented in the DEIS reflected a common support for advancing replacement of the ALB. With its location over the Potomac River and adjacent to several federally-owned parks, MDOT SHA created a separate group (the ALB Strike Team) whose mission was to investigate alternative bridge designs and construction techniques that could be employed to reduce, minimize, and avoid impacts to water and parkland resources in and around the ALB. The results of the effort are reflected in the Preferred Alternative and are the result of the coordination with key agency and public stakeholders, including NPS, M-NCPPC, USACE, MDE, and Maryland DNR. The National Park Service properties that border the Potomac River at the ALB include the George Washington Memorial Parkway, the Chesapeake and Ohio Canal National Historic Park (including the Chesapeake and Ohio Canal Towpath and Plummer's Island), and Clara Barton Parkway. In addition to these sensitive properties, there are also many construction challenges associated with replacement of the ALB, such as access constraints. A number of bridge types and construction methods (both standard and innovative) were evaluated during the Strike Team's analysis. A westward/upstream shift of the bridge alignment and additional phases of construction were also evaluated for the different bridge options. These options were presented to the stakeholders and a conventional structure was recommended that remained on the existing bridge centerline. Impacts to Plummer's Island were significantly reduced compared to those presented for the Build Alternatives in the DEIS by strategically locating the proposed piers for the replacement bridge and eliminating construction access from the island. In addition to a reduction of total impacts at the bridge construction site, the Strike Team effort resulted in a reduction of the number of construction access locations from all four quadrants, as noted in the DEIS, to the northwest quadrant only, due to its grade and proximity to a nearby roadway. This change substantially minimized impacts to the surrounding land.

**WASHINGTON BIOLOGISTS' FIELD CLUB – ROBERT SORENG (WEBSITE)**

## Washington Biologists' Field Club

For full comments on the DEIS Please see the attached pdf WBFC written Testimony
This Authorized I-495 and I-270 P3 Program DEIS Testimony is submitted on behalf of The
Washington Biologists' Field Club (WBFC). November 2020.
Our website is https://WBFC.science
Dear MDOT Officials:
Thank you for the opportunity to comment on this important issue.

**#1**

The WBFC is OPPOSED to the highway expansion project including the American Legion Bridge
(ALB) expansion project.
WBFC supports the NO BUILD OPTION
None of the other presented DEIS alternatives are acceptable.

**#2**

WBFC considers the DEIS legally faulty and incomplete for many reasons, including:
- Destruction and disturbance of State of Maryland and Virginia parklands with wetlands, including
but not limited to several miles of Rock Creek Regional Park (including moving substantial
stretches of Rock Creek), and ca. 80 acres of the Chesapeake & Ohio National Historical Park
(CONHP), including ca. 5 acres of the 12 acre Plummers Island and moving "Rock Run".
- The destruction of "Rock Run Culvert" in building the American Legion Bridge violates the
integrity of Plummers Island (CONHP, Montgomery Co., Maryland).
- Lack of understanding or recognition of the value of the extensive historical and ongoing
biological research on Plummers Island and the WBFC's 120 years of contributions and
commitments to that. Records of many rare plants, animals and habitats from the Island were not
considered.
- Lack of Due Diligence on study of impacts on Plummers Island's wetlands and rare plant
communities, and rare plant and animal species (the evaluation of the organisms on the Island was
apparently based on one summertime visit to the head of the Island in 2019). DEIS APPENDIX L.
(Natural Resources Technical Report) subordinate Appendices A-R cover Natural Resources
considered along the route. As is documented below, APPENDIX L is woefully incomplete as
concerns Plummers Island. Plummers Island is in the large Potomac River / Rock Run (PR/RR)
Natural Resources unit. The DEIS surveys for rare plants and animals on the Island was cursory,
brief, and at the wrong season of the year to identify many of the organisms of concern.
- Lack of alternatives to condemning part of Plummers Island for the ALB proposed project.
- Lack of consideration of the impact of the Covid-19 epidemic on present and future transportation
loads and patterns (many folks are teleworking and attending virtual meetings). With peak traffic
flows down due to changed behavior patterns resulting from Covid-19, toll lanes will be unlikely to
provide revenue streams of sufficient reward to P3 contractors, likely leaving taxpayers on the hook
for billions of dollars.
- Lack of forward thinking on Climate Change (only more cars powered by petrol).
- Lack of accepted Build options with mass transportation options (trains, light rail, monorail, etc.)
- Massive costs, with near certain cost overruns passed on to taxpayers. Regarding Washington
Suburban Sanitary Commission (WSSC) expenditures, estimated to be $2 billion, It remains unclear
if ratepayers would be responsible for this cost.
- Toll lanes that could cost as much as $50 in peak traffic hours, which would provide little benefit
to the average commuter.
- Massive traffic congestion and delays during the construction period lasting 5-10 years, after
which the traffic flow will be just as congested as it was prior to the construction due to the

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.3.B for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to DEIS Comment #2**
Since the DEIS and Draft Section 4(f) Evaluation, substantial efforts to avoid and minimize impacts to park and historic resources around the American Legion Bridge (ALB) has occurred. MDOT SHA and FHWA met with the National Park Service (NPS) on December 8, 2020 to discuss the limit of disturbance (LOD) in the vicinity of the ALB that was presented in the DEIS. The ALB Strike Team considered bridge construction approaches to determine if any of the approaches could further reduce the LOD. The Strike Team conducted detailed investigation of a top-down segmental construction approach; a top-down cable stayed design approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of readily available information, MDOT SHA and the ALB Strike Team determined that access to the existing bridge could be consolidated to the northwest quadrant along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land.

MDOT SHA has minimized impacts to the Chesapeake & Ohio National Historical Park and would impact 0.28 acres of Plummers Island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. Impacts would not relocate Rock Run or destroy the Rock Run Culvert. MDOT SHA assembled a team of bridge specialists from around the country to consider all alternatives for replacement of the American Legion Bridge. The Preferred Alternative represents the least impactful alternative to NPS land and resources. MDOT SHA understands the value of the extensive historical and ongoing biological research on Plummers Island and has considered the rare plants, animals, and habitats on Plummers Island and within the Chesapeake and Ohio Canal National Historical Park in general. MDOT SHA is working closely with NPS to devise an ecological restoration plan to mitigate for project impacts in this area. A four season survey of RTE plant species on NPS lands within the project LOD was conducted in 2020 and will inform the ecological restoration in this area. MDOT SHA conducted a thorough analysis of potential COVID-19 impacts on traffic and determined that there would be a short-term reduction in traffic load, however it would soon return to pre-COVID 19 levels.

As described in Chapter 2 of the Supplemental DEIS, the Preferred Alternative includes the full replacement of the ALB on I-495 spanning the Potomac River with a new, wider bridge on the existing centerline. Comments on the Build Alternatives presented in the DEIS reflected a common support for advancing replacement of the ALB. With its location over the Potomac River and adjacent to several federally-owned parks, MDOT SHA created a separate group (the ALB Strike Team) whose mission was to investigate alternative bridge designs and construction techniques that could be employed to reduce, minimize, and avoid impacts to water and parkland resources in and around the ALB. The results of the effort are reflected in the Preferred Alternative and are the result of the coordination with key agency and public stakeholders, including NPS, M-NCPPC, USACE, MDE, and Maryland DNR. The National Park Service properties that border the Potomac River at the ALB include the George Washington Memorial Parkway, the Chesapeake and Ohio Canal National Historic Park (including the Chesapeake and Ohio Canal Towpath and Plummer's Island), and Clara Barton Parkway. In addition to these sensitive properties, there are also many construction challenges associated with replacement of the ALB, such as access constraints. A number of bridge types and construction methods (both standard and innovative) were evaluated during the Strike Team's analysis. A westward/upstream shift of the bridge alignment and additional phases of construction were also evaluated for the different bridge options. These options were presented to the stakeholders and a conventional structure was recommended that remained on the existing bridge centerline. Impacts to Plummer's Island were significantly reduced compared to those presented for the Build Alternatives in the DEIS by strategically locating the proposed piers for the replacement bridge and eliminating construction access from the island. In addition to a reduction of total impacts at the bridge construction site, the Strike Team effort resulted in a reduction of the number of construction access locations from all four quadrants, as noted in the DEIS, to the northwest quadrant only, due to its grade and proximity to a nearby roadway. This change substantially minimized impacts to the surrounding land.

00022557

Comments addressed above.

**#2 Cont**

encouragement of more cars to be on the road, also known as induced demand.
- Because the DEIS's analysis is incomplete, it is impossible for the concerned Agencies to assess, and the public to comment on, the proposed project's impacts. The Agencies cannot wait until a final EIS is complete to analyze the project's full impacts, as it will then be too late for the public to meaningfully comment on them and for the Agencies to consider the public's comments and choose the alternative that best alleviates the impacts based on this information. We respectfully request that the Agencies conduct a supplemental EIS to provide the public the ability to meaningfully review and comment on the impacts before a final EIS is produced.
Alternative placement of the Bridge not considered in the DEIS
- MDOT should consider building and placing construction platforms only upstream from the current bridge to reduce impacts to the Chesapeake and Ohio Canal NHP and Plummers Island.
- MDOT should consider construction of other crossings to alleviate traffic over the ALB instead of bridge enlargement.
- We respectfully ask that agencies consider these options to the ALB portion of this project to reduce and minimize impacts to Plummers Island and the surrounding area.

WBFC Background. The WBFC (the Club) was founded in 1900 by professional field biologists living and working in the Washington, DC vicinity (Perry 2007). Perry (2007) provides a detailed history of the Club, the Island, and brief biographies of the hundreds of past and present members up to that time. The members are all professional biologists. Plummers Island, Chesapeake & Ohio Canal National Historical Park, Montgomery County, Maryland, has been the WBFC research station and meeting place since 1901 (Appendix 1). Plummers Island is located immediately downstream from the ALB. The Island covers 12.2 acres of land, the widest part of which is on the ALB end. The proposed expansion of the ALB, as part of the I-495 expansion, threatens the existence, and violates the integrity, of the Island as a designated natural wild area (Appendix 2). "Rock Run Culvert" as identified in the DEIS is actually a natural Potomac River channel that has divided the Island from the mainland since time immemorial (Perry 2007). There is a small true concrete and pipe culvert running under the ALB which drains into the river channel where the channel bends eastward (water apparently rarely flows from this ALB culvert).
The current ALB proposal would cut across the Island, move or destroy the true channel "Culvert" that separates the Island from the mainland, clear the trees and level a substantial part of the Island, clear the significant healthy native beech tree forest on the mainland side (Popkin 2019, a deadly beech disease is spreading in the NE US), destroy the wetlands associated with the island and mainland, and result in major infestations of invasive plants. If implemented this DEIS project would jeopardize future research on trends in biodiversity on the Island. Noise pollution from expanding the ALB onto the Island would make WBFC meetings meetings on the Island nearly impossible.

Old map (above) showing the real Rock Run and Plummers Island (copied from Perry 2007). Map of Plummers Island Pre-ALB (below). Calling the Potomac River channel "Rock Run Culvert" allows it to be "excluded" from consideration as a protected wetland in the DEIS Natural Resources APPENDIX L. It is not a Culvert! And "Rock Run" has been misapplied to it.

Head of Plummers Island adjacent to ALB separated by "Rock Run" channel or "Culvert" from the mainland, showing Potomac Gorge Riverside Outcrop Barrens, wetland mud flats (inundated here) and sandbars.

The Draft EIS is seriously flawed in many ways. The most pertinent to the WBFC is the failure to

Comments addressed above.

**#2 Cont**

discuss and evaluate the impact of the destruction of part of Plummers Island, a historical and biological treasure within the Chesapeake and Ohio Canal National Historical Park. There is not even a footnote about the incalculable value of the long-term research on the biology of this Island, and nothing about WBFC's place in it.

The WBFC leased Plummers Island in June 8, 1901, for a meeting place and research station, and built the cabin that year. The WBFC finally settled the legal purchase the property known as Plummers Island (Appendix 1), and most of the adjacent mainland up to the C&O Canal Tow Path, in 1908 (Perry 2007).

The Club has been meeting on Plummers Island continuously for nearly 120 years, and conducting research there on a wide range of subjects. The Club gave the property to the National Park Service on July 24, 1959, with the written understanding (Appendix 2) that the Club retained the right to maintain the island as a natural wild area, use it for scientific research, for meetings of the Club, and to pursue its studies in the field of biology and natural history.

Plummers Island is known as "The most thoroughly studied island in North America", and perhaps in the world.

The Club holds events each year on the Island where members gather with guests. We maintain the historic Club cabin, "Winnemana Lodge," built in 1901. The name Winnemana was the name originally given to the cabin (Lodge) in 1906 and is translated from a Native American language meaning "beautiful island." The epithet winnemana has been given to Latin names for various insects and mammals described from Plummers Island collections.

Winnemana Lodge built in 1901. The Cabin is still standing and well maintained by WBFC. There are always research projects ongoing on the Island, conducted both by members and by grantees funded by our Endowment Research funds. Many of these projects run for years, and are follow-ups to pre-ALB censuses, showing impacts of pollution, and changes in fauna and flora. WBFC reviews dozens of research grant proposals each year and usually funds 5 to 10 of them each year, with first priority given to studies on the Island, second priority to the Potomac Gorge, eventually allowing studies in the Mid-Atlantic region. Voucher specimens for plants and animals collected for the scientific studies on the Island are housed and catalogued in the National Museum of Natural History, Smithsonian Institution. These specimens and observations from catch and release and other sightings are reported in hundreds of published scientific papers.

The ALB was constructed immediately to the west (up river) of the island starting in 1962. The placement of the original bridge was intentionally positioned to protect the Island (Appendix 2 & 3) to ensure the continuation of WBFC's valuable long-term biological research program. When the ALB was expanded in the early 1990s, the expansion was done by filling in the gap between the north and south-bound lanes, again avoiding direct damage to the Island. Despite the best efforts of engineers and construction implementation to avoid impacting the Island, the original ALB construction and 1992 expansion led to many invasive plants infesting the Island, and disturbing the water flow to its flanking wetlands. The worst of the invasive plant infestations are on the head of the Island adjacent to the ALB. Negative impacts of local environmental pollution on lichens and insects have been documented on the Island. Traffic on the ALB also led to Lead pollution from vehicle exhaust and declines in lichen species, which are particularly sensitive, from 70 to 20 (Lawrey & Hale 1979). This illustrates the importance of long-term scientific research on the Island, which influenced legislation to reduce lead in gasoline, and eventual reduction in lead contamination locally and world-wide.

Excerpt of Washington Post article 19 May 1994 by D'Vera Cohn about lichens and Pollution.

Since 1901, over 400 scientific publications have focused on the Island's biota: birds, fish, mammals, reptiles and amphibians, plants, insects, arachnids, nematodes, and other groups (Many published titles in the Proceedings of the Biological Society of Washington, available at https://WBFC.science/biological-studies/) (see Appendix 7 for titles in this series)

An article in the Potomac Basin Reporter (1973) (Appendix 4) cited "1,226 species of plants and 4,293 species of animals on the Island...." including "1500 species of beetles" and "300 to 400 species of bees". The Island "is 'type-locality' for at least 175 species, ..." "No less than 16 genera and three families of plants and animals have been described on the basis of specimens collected on the Island." Some of these numbers were overestimates made before computer databases were compiled. Insect inventories are still substantially incomplete (see Brown & Bahr 2008). The number of vascular plants recorded on the Island, stands around 900 (Shetler et al. 2006; including newer records).

Many thousands of plants and animals have been documented from Plummers Island over 120 years of WBFC research.

Invertebrates on the Island

The Brown & Bahr (2008b) appendix lists all Invertebrate taxa known from the Island, including Insects. (Taxa are taxonomic groups of any rank, such as a species, genus, family, order, or class).

Class Insecta diversity on the Island

Brown & Bahr (2008a & b) documented the known insect species records for the Island. "Based on an examination of the insect collection of the National Museum of Natural History and a review of relevant literature, we document 3012 insect species in 253 families, encompassing 18 insect orders: Collembola, Odonata, Dermaptera, Blattodea, Phasmatodea, Orthoptera, Psocoptera, Thysanoptera, Hemiptera, Neuroptera, Megaloptera, Coleoptera (beetles), Mecoptera, Trichoptera, Lepidoptera, Diptera, Siphonaptera, and Hymenoptera." The authors acknowledge that 16 families of the 600 beetle species have been recorded for the Island, yet they conclude this probably includes only a quarter of the families likely present. Among insects recorded from Plummers Island are 836 species of butterflies and moths (Lepidoptera), with 27 different species of moths described from specimens collected on the island (Brown et al. 2008). Many of these species were described from collections made on the Island. No site in North America has been surveyed as intensively, yet much of the insect fauna remains to be studied, with hundreds of additional species likely to be documented.

Many of these Insect orders depend on wetland habitats for all or much of their life-cycles. Seven types of wetlands are characterized on the Island (Simmons et al. 2016, units 1-5).

Steiner (2000) documented a globally and state-rare click beetle on the Island. Steiner (2008) inventoried 128 species of Tenebrionidae beetles from Maryland, most of which occur on Plummers Island.

A few of the many Tenebrionidae from Plummers Island and nearby. (Steiner 2008 fig. 1-16)

In 2015 Steiner collected the first Emerald Ash Borer (EAB) on the Island. Within the following two years nearly all the mature American and Green Ash trees on the Island were dead or dying. These trees were major components of vegetation types 5 to 11 (see Plummers Island Plant Communities section, below), and they have been decimated over much of Eastern North America.

**#3**

Imperial moth caterpillar (Eacles imperialis) at head Plummers Island, Oct. 2013 (Soreng photo). These moths are rarely seen any more in the area.

Insects, like other organisms, are experiencing major declines globally (Borenstein 2018; Hallman et al. 2017; Jarvis 2018; Vogel 2017). Giant silk moths (Saturniidae) include Imperial, Cercropia, Luna, Polyphemus, Royal Walnut, Rosy maple etc. In New England, most of these are state

---

**Response to DEIS Comment #3**

MDOT SHA has worked with NPS to identify minimization measures at the American Legion Bridge location to reduce impacts to Plummers Island to the maximum extent practicable. The Preferred Alternative impacts approximately 0.28 acres of Plummers Island along its western edge, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. The majority of the island will not be impacted by the project and biodiversity research will be able to continue.

MDOT SHA has coordinated closely with USFWS regarding the Peregrine Falcon nest box on the American Legion Bridge. The nest box will be removed from the bridge prior to construction and replaced post-construction. Removal of the nest box is necessary, since the entire bridge will be replaced. Nesting at this location will be interrupted for the duration of construction. Since Plummers Island is located near suburban communities and is in close proximity to several existing roadways, it is likely its bird communities are currently and will continue to be affected by vehicular traffic and other nearby human activities.

MDOT SHA conducted a bat bridge survey at the American Legion Bridge as well as an acoustic survey throughout the corridor study boundary in coordination with the US Fish and Wildlife Service and Maryland Department of Natural Resources. The Northern Long-Eared bat and the Eastern Small-footed Myotis were not detected around the American Legion Bridge during this study. MDOT SHA is aware that several bat species and various other mammalian species occur in the vicinity of Plummers Island.

MDOT SHA is aware of the various plant communities and vegetation zones on Plummers Island. MDOT SHA conducted a four-season rare plant survey on NPS lands within the project LOD in 2020 and the small portion of Plummers Island that is within the LOD was included in this survey.

**#3 Cont**

endangered species because they have been hammered by an introduced biocontrol agent -- a non-native tachinid fly, Compsilura concinna, which was introduced to try and control gypsy moths in Massachusetts. That fly has wreaked havoc in New England because it is a generalist and the Saturniids have been heavily impacted. This pest has arrived in DC and vicinity but impacts here are not yet known (John Lil pers. comm. 2020). Thanks to the long history of research on insects of Plummers Island, the Island would be a key place to further document this "insect apocalypse," assuming the Island remains intact. The DEIS ALB project puts WBFC Plummers Island research on trends in biodiversity in jeopardy.

Birds on the Island and American Legion Bridge
An established Peregrine Falcon nest is located on the American Legion Bridge and two adults and at least one chick was observed this past June (Putnam 2020). The nest box was put there by MD State Highway Association (SHD) working with US Fish & Wildlife Service (USFWS) in 2007, and peregrines have been nesting there for 12 years. In the DEIS document, "they propose moving the nest box to another location just before nesting season when the bridge constructions begins, but as an established nest this recommendation may not be successful" (Carla Dove, WBFC member, Smithsonian Ornithologist, pers. comm.). A Mississippi Kite was also observed this year. Wetmore & Manville (in Manville 1968) account for birds known from the Island to that time. Johnston & Winings (1987) attribute the decline of forest breeding birds on the Island and vicinity to vehicular traffic.

Mammals on the Island
Five bat species are documented by Smithsonian collections from the Island. Among these are the Endangered northern long-eared bat, Myotis septentrionalis, and the eastern small-footed Myotis, Myotis leibii. The latter was separately described as Myotis winnemana. Other mammals collected include shrews, moles, mice, voles, eastern cottontail, eastern gray squirrel. Georgian bat, large brown bat, red bat, evening bat, whitetail deer, eastern skunk, mink, eastern long-tailed weasel, fox squirrel, eastern flying squirrel, eastern otter, chipmunk, eastern red fox, Virginia muskrat, and woodchucks have also been recorded (Manville 1968). Mammologists these days often monitor by catch and release and other methods, rather than preparing museum specimens from animals on the Island. For example, the last regional report of an eastern wood rat was reported on Plummers Island. Also, DNA from bones, feathers, fur, or feces can now be used to precisely identify species.

Plummers Island Plant Communities
The National Park Service prepared a map of the vegetation zones in the region with a coarse map for Plummers Island. The plant communities were remapped in finer detail in 2016 (Simmons et al. 2016). (Appendix 6, also available at WBFC.science). This map included 12 communities, 8 within wetlands, and one upland type that is unique to the Potomac Gorge. These plant communities are proxies for where other organisms also live or might be found.

**#4**

Plummers Island wetlands (units 1 to 7).
The Island's wetland habitats were mapped by Simmons et al. (2016). These were divided into 5 major communities, with 3 subdivisions within those. These include sandbars and mud flats (units 1 & 2), rocky outcrop barrens (3A & B), to regularly flooded bottom land forests (4-6). These areas flood frequently. Community 7 is higher and infrequently flooded. Community 8, i Piedmont Basic Mesic Forest, includes a rich herb layer that is rare in the Potomac Gorge and is rarely flooded. The sandbars, mud flats, and rock barrens occur on the Potomac River side. Mud flats also occur along the usually sluggish "Rock Run" channel. The flooded bottom bench lands (units 5, 6 & 7)

---

Comment #3 addressed above

**Response to DEIS Comment #4**
The small portion of Plummers Island that is within the project LOD was delineated for wetlands and waterways based on Section 404 methods, as regulated by the US Army Corps of Engineers, and using NPS wetland delineation methodology as required in DO #77-1. The regulated wetlands within the LOD are depicted and reported in the DEIS and FEIS. This area was also included in the 4-season rare plant survey conducted in 2020 for the project. All rare plants targeted by the survey were reported in the survey report, including *Hibiscus laevis* and *Paspalum fluitans*. If these species were not reported in a particular location, then they were not observed within the survey area on the days in which the surveys were conducted.

Construction plans for the I-495 & I-270 Managed Lanes Study will seek to avoid changes in flow to the oxbow channel around Plummers Island and the Potomac River mainstem.

MDOT SHA is aware that Plummers Island supports a broad variety of plant species, some of which are rare and only found within the Potomac Gorge. MDOT SHA is coordinating closely with NPS to minimize impacts to the flora and fauna of Plummers Island and other NPS lands to the maximum extent practicable and to develop an ecosystem restoration plan to limit impacts and restore communities that are affected.

Comments addressed above.

**#4 Cont**

cover much of the area adjacent to "Rock Run" channel and the toe of the Island. There are some rock-bottomed swales in the interior the Island (unit 5A). The low benches are mostly flooded only when high waters reach above the 9 ft mark at Little Falls Gauging Station (3 miles downstream) (https://water.weather.gov/ahps2/hydrograph.php?gage=brkm2&wfo=lwx). This level is reached or exceeded often in winter and spring, but frequency and duration vary greatly from year to year. There are rare plants and animals in these zones. Many species records for the Island come only from these zones, and many of these species are reliant on these different wetland habitats for some or all of their life-cycles. Flooding above the 4.5 ft mark, basically makes the Island inaccessible even by wading, and covers all the sand and mud flats up to the breaks to the bench lands. See Brown & Bahr (2008) for Insect inhabitants of the riparian zones.

Populations of two rare plants of concern were observed within the zone of disturbance in the riverside mud flats (Simmons et al. 2016, unit 1) on 31 October 2020 Hibiscus laevis and Paspalum fluitans. Neither of these were reported by the survey crew contracted for the DEIS. Any DEIS related construction plans should seek to avoid changes to water flowing to Plummers Island wetlands including "Rock Run" channel.

Hibiscus laevis in mud flats between Potomac Gorge Riverside Outcrop Barrens (by DEIS SHH102 survey stake, Soreng photo 2020). This species also occurs at the closer head of the Island Potomac Gorge Riverside Outcrop Barrens

The rocky Potomac Gorge headlands on Plummers Island harbor the rare Solidago racemosa, and Hypericum prolificum. These barrens are routinely scoured by high floods, but these plants hang on!

Solidago racemosa, Potomac Gorge Riverside Outcrop Barrens at the head of the Island (Soreng photo 2020).

Potomac Gorge Riverside Outcrop Barrens near the head of the Island Hibiscus laevis in foreground. ALB in background (Simmons photo 2020).

Piedmont Basic Mesic Forest (unit 8).

This vegetation zone floods rarely, being more than 15 ft above the low flow. This area is rich in herbaceous plant species known only here on the island. And it is gorgeous to see in the spring. It includes the largest population of Jeffersonia diphylla (Twinleaf) that we know of in the Potomac Gorge. The rare Phacelia covillei thrives here, as does the rare Erigenia bulbosa and Valeriana pauciflora, and the leatherwood shrub, Dirca palustris.

Piedmont Basic Mesic Forest includes a large stand of Jeffersonia diphylla (Soreng photo).

Potomac River Bedrock Terrace Hardpan Forest (unit 12)

This Globally and State rare plant community is endemic to the Potomac River Gorge. On the Island it covers the east and west knolls which rarely ever flood, being as much as 60 ft above the riparian zone. The vegetation is markedly different from the other zones as soils are thin over bedrock, and the trees and shrubs are stunted and slow growing. Various sedges and grass species (e.g. including Melica mutica, Dichanthelium aciculare, Piptochaetium avenaceum), and trees and shrubs, are only known from this zone on the Island.

Potomac River Bedrock Terrace Hardpan Forest (unit 12) ◆ Piptochaetium avenaceum / blackseed needle grass glade on ALB survey line. The bridge is visible in the background (Simmons photo 2020).

The Potomac Gorge is a gem among our National Parks



The following pages reflect the attachments included in the letter. There are no comments or responses provided on these pages; they are included for the record.

(https://academic.oup.com/bioscience/article/54/1/8/234660),
Plummers Island is a special part of the middle section of the Potomac Gorge. The plant and animal diversity are tremendous with many rare species and long-term ongoing research projects. State and Globally rare plants and Natural Vegetation Communities are documented in Simmons et al. 2016 & 2000 (Appendix 5 & 6). These reports were based on over 120 years of collecting plants and making herbarium vouchers (detailed in Shetler et al. 2006), species surveys for a DNA barcoding project led by J. W. Kress (Gambino, 2009), and vegetation plots established from 1998 to 2000 by E. Fortson-Wells to document invasive plants in the flood plains of the island, followed up by a three year survey of invasive plants and vegetation between 2012 and 2015, conducted by the WBFC Invasive Biota Committee. Voucher specimens, housed at the United States National Herbarium, Department of Botany, National Museum of Natural History, Smithsonian Institution, are recorded and mostly imaged (records available online at https://collections.nmnh.si.edu/search/botany/ ). Many plants and animals occur in the Potomac Gorge at the northern extensions of their geographic ranges.

Many biologists have walked and observed every nook and cranny of this topographically diverse island with its rocky hills and cliffs, including the globally and state rare Potomac River Bedrock Terrace Hardpan Forest, and sensitive wetland bottoms of "Rock Run" Channel and sand lenses and mud flats on the Potomac River side of the island. We love this place and its historical, current, and hopefully future biological relevance. Rebuilding and expanding any part of the American Legion Bridge or access to that on the Island would destroy or seriously damage much of it and violate the integrity of the Island.

The noise pollution and visual impact of the current ALB are annoying at best to our meetings on the Island. Expanding the ABL onto the Island will make conversation at meetings at the Cabin on the Island nearly impossible. The noise and air pollution will be much worse during the construction phase. The noise impact on birds may be more extreme (Johnston & Winings 1987). Rare plants and animals and habitat will be lost. It will no longer be "Winnemac", a beautiful island.

If you argue otherwise, we are lost as a Nation. The efforts of science are meaningless. Losing even a piece of this Island is to lose the heart and soul of what our conservation ethic means.

We believe Plummers Island is as important as any of the national museums in Washington, DC, and WBFC members implore MDOT to preserve intact this Historical and Biological National Treasure.

Please visit our web site ◆ https://WBFC.science

Thank you
WBFC President, Vice President, and members

Literature Cited
Borenstein, S. 2018. 'Windshield test' highlights big drop in flying bugs. The Washington Post -HEALTH & SCIENCE (2018-09-25).
Brown, J. W., & S. M. Bahr II. 2008a. The Insect (Insecta) Fauna of Plummers Island, Maryland: Brief Collecting History and Status of the Inventory. Bulletin of the Biological Society of Washington 15: 54-64. http://dx.doi.org/10.2988/0097-0298(2008)15[54:TIIFOP]2.0.CO;2
Brown, J. W., & S. M. Bahr II. 2008b. Appendix List of the Invertebrates of Plummers Island, Maryland. Bulletin of the Biological Society of Washington 15: 192-226 http://dx.doi.org/10.2988/0097-0298(2008)15[192:ALOTIO]2.0.CO;2
Brown, J. W., Epstein, M., Vann, K., Watkins, R., Bahr, S. M., Kolski, E. 2008. An overview of the Lepidoptera (Insecta) of Plummers Island, Maryland. Bulletin of the Biological Society of Washington 15: 65◆74.

Cohn, J.P. 2004. The Wildest Urban River: Potomac River Gorge. BioScience, Volume 54(1): 8�14, https://doi.org/10.1641/0006-3568(2004)054[0008:TWURPR]2.0.CO;2

Fleming G. 2006. VEGETATION ECOLOGY OF THE POTOMAC GORGE, pdf. Virginia Department of Conservation and Recreation, Division of Natural Heritage. powerpoint document. https://www.dcr.virginia.gov/natural-heritage/document/pogovegecol3.pdf

Gambino, M. 2009 Craking the DNA Code. Smithsonian Magazine August 2009. https://www.smithsonianmag.com/science-nature/cracking-the-dna-code-33970231/

Hallmann, CA, Sorg, M, Jongejans, E, Siepel, H, Hofland, N, Schwan, H, et al. 2017. More than 75 percent decline over 27 years in total flying insect biomass in protected areas. PLoS ONE 12 (10): e0185809. https://doi.org/10.1371/journal. pone.0185809

Jarvis, B. 2018. The insect apocalypse is here: What does it mean for the rest of life on Earth? The New York Times Magazine, 27 November 2018, pp. 41�48.

Johnston, W. H. & D.L. Winings. 1987. Natural History of Plummers Island, Maryland XXVII. The decline of forest breeding birds on Plummers Island, Maryland, and vicinity, by David W. Johnston and Daniel L. Winings. Proceedings of the Biological Society of Washington 100:762-768. (December 31, 1987).

Lawrey, J. D., M. E. Hale Jr. 1979. Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution. Science Vol. 204, Issue 4391, pp. 423-424 https://dx.doi.org/10.1126/science.204.4391.423

Manville, R. H. 1968. Natural History of Plummers Island, Maryland XX. Annotated list of the vertebrates, by Richard H. Manville, except birds by Alexander Wetmore and Manville. Special Publication, Washington Biologists' Field Club, pp. 1-44. (January 1968.)

Perry, M. C. (ed.) 2007. THE WASHINGTON BIOLOGISTS' FIELD CLUB: ITS MEMBERS AND ITS HISTORY (1900-2006). The Washington Biologists' Field Club, printed by The Maple Press Company, York Pennsylvania. Pdf available under the About dropdown as WBFC Book at https://WBFC.science/wp-content/uploads/2019/09/wbfc_booksm.pdf

Popkin, G. 2019. A mysterious disease is striking American beech trees. Science Nov 14 2019 https://dx.doi.org/10.1126/science.aba2201

Putnam, J. 2020. eBird Checklist: https://ebird.org/ebird/view/checklist/S70502036 -- eBird: An online database of bird distribution and abundance [web application]. eBird, Ithaca, New York. Available: http://www.ebird.org (Accessed: 2 November 2020]).

Shetler, S. G., S. S. Orli, E. F. Wells & M. Beyersdorfer. 2006 CHECKLIST OF THE VASCULAR PLANTS OF PLUMMERS ISLAND, MARYLAND. Bulletin of the Biological Society of Washington, 14(1): 1-57 https://wbfc.science/wp-content/uploads/2020/07/Checklist_Vasc_Plants_Plummers.pdf

Simmons, R.H, Fleming A.H., Soreng R.J. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Appendix 6, pdf. available at https://WBFC.science/wp-content/uploads/2019/09/plummer_island_nc_map_v1.3.pdf

Simmons R.H., Soreng R.J., Barrows E.M., Emmons L.H. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland. Report prepared for the National Parks Conservation Association, July 2020. Appendix 5, pdf. available at https://WBFC.science

Steiner, W. E. Jr. 2000. Records and habitat of the "rare click beetle," Cerophytum pulsator (Haldeman), in Virginia and Maryland (Coleoptera: Cerophytidae). Banisteria 15:43-45.

Steiner, W. E., Jr. 2008. A Checklist of the Darkling Beetles (Insecta: Coleoptera: Tenebrionidae) of Maryland, with Notes on the Species Recorded from Plummers Island Through the 20th Century. Bulletin of the Biological Society of Washington 15: 233-140.

Vogel, G. 2017. Where have all the insects gone? Science 2 May 2017, Vol. 356, Issue 6338, pp. 576-579 https://science.sciencemag.org/content/356/6338/576.full

Appendices:
1. WBFC Deed to Plummers Island (1908).
2. Transfer of the WBFC property to United States Government (1959).
3. Washington Post article, 1959
4. Potomac Basin Reporter, 1973 [Plummer Island Beetles & Bees and Type locality]
5. Rare Flora and Natural Communities of Plummers Island, Montgomery County. Maryland.
6. Natural Communities of Plummers Island, Montgomery County, Maryland.
(Vegetation plots are numbered. Plot 4 was lost due to the ALB abutments redirecting the flow of Rock Run Channel / "Culvert" between 2000 and 2013. Plots not mapped, nor are two newer plots and older NPS plots)
7. Titles in the Bulletin of the Biological Society of Washington series "Natural History of Plummers Island, Maryland," and other key publications.

Appendix 1. Title to Plummers Island and adjacent mainland

Appendix 1. cont.

Appendix 1. cont.

Appendix 2 AGREEMENT WITH NATIONAL PARK SERVICE, 1959
AGREEMENT WITH NATIONAL PARK SERVICE
AGREEMENT AND STIPULATIONS BETWEEN THE WASHINGTON BIOLOGISTS' FIELD CLUB, INC. AND THE UNITED STATES OF AMERICA
This agreement made this 5th day of March, 1959, by and between the Washington Biologists' Field Club, Inc. and the United States of America.
WITNESSETH:
WHEREAS, The United States Government has by condemnation proceedings, in the United States District Court for the District of Maryland in Civil No. 10676 and by order of Court made the 24th day of June, taken possession of the defendant's Washington Biologists' Field Club, property designated in said proceedings as parcels "A" and "B" in tract no. 7, and
WHEREAS, This property was acquired by the Washington Biologists' Field Club, Inc. and has been used by the said Club as a natural wild area for scientific research for over 50 years and a great many scientific papers have been written in reference to biological and natural history discoveries made on said land and, more particularly, on that part of said land known as parcel "B" and more familiarly known as Plummers Island containing some 12.238 acres more or less, and
WHEREAS, The said Plummers Island has become among systematic biologists one of the world's most famous collecting spots and type localities, and
WHEREAS, The discoveries have indicated the probability of new knowledge in the field of biology and natural history, and
WHEREAS, The fame of this island is world-wide and many scientific organizations are interested in its preservation as a source of discovery, and
WHEREAS, The Washington Biologists' Field Club, Inc. and the United States Government desire to preserve this natural wild area as a sanctuary and scientific research preserve.
Therefore, The United States Government's petitioner in the United States District Court for the District of Maryland in Civil No. 10676 and the Washington Biologists' Field Club, Inc., defendant, and the owner of said parcel of land known as parcel "B" containing some 12.238 acres more or

00022564

less which said land is an island in the Potomac River and is more familiarly known as Plummers Island, do hereby stipulate and agree that the said parcel "B" be withdrawn from these proceedings and that the said Washington Biologists' Field Club, Inc. does hereby agree to deed the said island to the United States Government without monetary consideration reserving in said deed to the Washington Biologists' Field Club, Inc., the right to continue to maintain the island as a natural wild area and use it for scientific research and for meetings of the Club and to pursue its studies in the field of biology and natural history on the said island so long as the Washington Biologists' Field Club, Inc. exists and desires to continue to use the island for scientific research and so long as the further provisions and stipulations contained herein are complied with which are as follows:

1. The Washington Biologists' Field Club, Inc. agrees to supply the National Park Service with copies of scientific papers resulting from research conducted on said island when available.

2. The Washington Biologists' Field Club, Inc. will supply the National Park Service with an annual report and will include the names and addresses of the officers, list of the members, and a summarization of the scientific investigations carried on.

3. The Washington Biologists' Field Club, Inc. will indemnify the United States against any loss or damage or injury due to the Club's negligence or any of its members or guests in the use and occupancy permitted under this agreement.

4. The Washington Biologists' Field Club, Inc. shall maintain its building and facilities on the island or replace the same in orderly and safe condition without expense to the United States.

5. No additional buildings, structures, or other physical facilities shall be constructed on the island by the Washington Biologists' Field Club, Inc. without first obtaining written approval of the National Park Service.

6. It is further stipulated and agreed between the United States Government and the Washington Biologists' Field Club, Inc. that the membership of the Club as constituted on 1 August 1958,

Honorary Members:
Bartsch, Paul
Mann, William M.
Ricker, P. L.

Active Members:
Aldrich, John W.
Appel, William D.
Benedict, J. E.
Blake, S. F.
Brown, Edgar
Clarke, J. F. G.
Compton, Lawrence V.
Davis, Malcolm
Duvall, Allen J.
Erickson, Ray C.
Erlanson, C. 0.
Fredine, C. Gordon
Fuller, Henry S
Gabrielson, Ira N.
Gardner, Marshall C.
Graham, Edward H.
Griffith, Richard E.
Handley, C. 0., Jr.
Hotchkiss, Neil

Jackson, Hartley H. T. Johnson , David H.
Kelson, Keith R.
Killip. E. P.
Krombein, Karl V.
Leonard, Emery C.
Lincoln, Frederick C.
Linduska, Joseph P.
Meehean, 0. Lloyd
Morrison, J. P. E.
Nelson, A. L.
Oehser, Paul H.
Parker, Kenneth W.
Presnall, Clifford C.
Reed, Theodore H.
Russell, Paul G.
Setzer, Henry W.
Smith, Albert C.
Smith, Lyman B.
Sohns, Ernest R.
Stevenson, James 0.
Stewart, Robert E.
Stickel, William H
Swift, Ernest F.
Uhler, F. M. Vogt, George B.
Walker, Ernest P.
Wetmore, Alexander
Zahniser, HowardNonresident Members:
Allan, Philip F.
Allen, Durward L.
Archino, Samuel
Bartlett, H. H.
Bryant, Harold C.
Cahalane, Victor H.
Cottam, Clarence
Couch, Leo K.
Dargan, Lucas M.
Eklund, Carl R.
Fowler, James A.
Hamlet, John
Holt, Ernest 0.
McAtee, W. L.
Myers, G. S.
Peterson, Roger T.
Wallis, William W.
Wherry, Edgar T.

shall have the privilege of having their ashes placed on said island and a small bronze plaque in their memory placed on the stones of said island and that this privilege shall apply only to the membership as named above as it shall exist as of 1 August 1958.

7. It is further stipulated and agreed that the United States Government will allow the membership of the Washington Biologists' Field Club, Inc. to have access by foot over the land owned by the United States Government to the island at all times and whenever desired.

8. The Washington Biologists' Field Club, Inc. will be permitted to maintain and operate passenger-carrying ferry boats from and to the island which is to be for the exclusive use of the Club and its members and guests for access to the island.

9. The Washington Biologists' Field Club, Inc. will be permitted to erect and maintain a fence and gate at a suitable location to exclude the general public from the island, but the National Park Service is to be furnished keys to the lock or the National Park Service may provide its own lock if keys are delivered to the Washington Biologists' Field Club, Inc., and will also be permitted to clear the channel between the island and the Maryland shore to maintain a free flow of water therein.

10. It is further stipulated and agreed that authorized agents and personnel of the National Park Service shall have access to the island and the right to take scientists to the island, but, in that event, the Washington Biologists' Field Club, Inc. shall not be responsible for any injuries or damages resulting to said persons due to conditions upon said island provided said injuries or damages are not caused by negligence of the Club or by a failure on the part of said Washington Biologists' Field Club, Inc. to comply with the requirements of this stipulation.

11. It is further stipulated and agreed that all rights accruing to the Washington Biologists' Field Club, Inc, or to any member thereof by reason of the provisions of this stipulation or any amendment thereto may be terminated if said Washington Biologists' Field Club, Inc. no longer exists or in the event after due written notice that the provisions of this stipulation and/or deed which will be executed following signing of this stipulation have been violated and continue to be violated by said Washington Biologists' Field Club, Inc. or its members, guests, employees, or servants for a period of time in excess of six months after receipt of said notice, and further in the event the island shall be no longer used for scientific research by the Washington Biologists' Field Club, Inc. for more than two years then this stipulation and any like provisions of the deed to be executed conveying the property to the United States shall terminate.

12. It is further stipulated and agreed that the United States may construct or permit the construction of needed nonrecreational public improvements upon the island or a portion thereof, which said improvements shall not be inconsistent with the uses to which the island has been dedicated by the Washington Biologists' Field Club, Inc.

13. It is further stipulated and agreed that this stipulation shall become effective after the filing and acceptance by the United States of a deed of conveyance containing the provisions outlined herein.

The United States of America
By: WILLIAM E. FINLEY
Director of the National
Capital Planning Commission
Condemning Authority

The Washington Biologists' Field Club, Inc.
By: LLOYD W. SWIFT
President
1, Albert C. Smith, certify that I am the Secretary of the corporation named as party herein; that Lloyd W. Swift, who signed this contract on behalf of the party, was then President of said corporation; that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.
ALBERT C. SMITH, Secretary

Appendix 3. Washington Post Article, 1959.

Appendix 4. Potomac Basin Reporter - 1973 Beetles and Bees & Type locality

Appendix 5. Rare Plants of Plummers Island (Excerpt).
A total of 4 globally rare natural communities, two of which are state rare; 21 state-rare extant flora, including one globally rare extant species; and 36 state-rare historic flora, including 4 globally rare historic taxa are known from the island.

Rare Flora and Natural Communities
Rare Natural Communities (in order of lowest to highest in elevation)

Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus Herbaceous Vegetation (USNVC: CEGL006483). Non-tidal mudflats. Global/State Ranks: G3/SNR

Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (Hypericum prolificum, Eubotrys racemosa) / Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia Herbaceous Vegetation (USNVC: CEGL006491). Global/State Ranks: G2/S1.

Mid-Atlantic High Terrace Hardwood Floodplain Forest: Acer saccharum - Fraxinus americana / Carpinus caroliniana / Podophyllum peltatum Forest (USNVC: CEGL006459). Global/State Ranks: G3?/SNR.

Potomac River Bedrock Terrace Hardpan Forest: Carya glabra - Quercus (rubra, montana) - Fraxinus americana / Viburnum rafinesqueanum/ Piptochaetium avenaceum Forest (USNVC: CEGL006209). Global/State Ranks: G1G2/S1.
Rare Flora

Extant Flora
White Bear Sedge (Carex albursina) G5/S3 (last vouchered in 2004; observed by Soreng in 2020)
Pubescent Sedge (Carex hirtifolia) G5/S3 (last vouchered in 1934)
Flat-spiked Sedge (Carex planispicata) G4Q/S1S2 (R.H. Simmons 3525, 4 May 2013)
Northern Leatherflower (Clematis viorna) G5/S3 (last vouchered in 1982)
Needle-leaf Panic Grass (Dichanthelium aciculare) G5/S2? (R.J. Soreng, 8289a, 25 May 2013)
Open-flower Panic Grass (Dichanthelium laxiflorum) G5/S1? (last vouchered in 1960; photographed by
Simmons in 2015)
Leatherwood (Dirca palustris) G4/S2 T (R.H. Simmons 4067, 6 Nov 2015)
Harbinger of Spring (Erigenia bulbosa) G5/S3 (last vouchered in 1983; observed by Soreng in 2020)
Halbert-leaf Rose-mallow (Hibiscus laevis) G5/S3 (last vouchered in 1982; photographed by Soreng
in 2020)
Green Violet (Hybanthus concolor) G5/S3 (last vouchered in 1960)
Ostrich Fern (Matteuccia struthiopteris) G5/S2S3 (One of the largest known stands in the state.
R.H. Simmons 3532, 5 May 2013)
Two-flower Melic (Melica mutica) G5/S3 (last vouchered in 2015, R.J. Soreng 8340)
Horse-tail Paspalum (Paspalum fluitans) G5/S2 E (E.F. Wells 4507, 20 Sep 1997)

00022566

Coville's Phacelia (Phacelia covellei) G3/S2 E (R.H. Simmons 3920, 14 May 2015)
Miami-mist (Phacelia purshii) G5/S3 (last vouchered in 1983; observed by Soreng on mossy rocks by
plot 21 between 2013 and 2015)
Hairy Hop-tree (Ptelea trifoliata var. mollis) G5/S3 (R.H. Simmons 3585, 2 Jun 2013)
Smooth Wild-petunia (Ruellia strepens) G4G5/S2S3 (R.H. Simmons 4221, 9 Oct 2016)
Pale Dock (Rumex altissimus) G5/S1 E (last vouchered in 1997)
Sticky Goldenrod (Solidago racemosa) G5T3?/S1 T (photographed by Soreng in 2020)
Pink Valerian (Valeriana pauciflora) G4/S1 E (last vouchered in 1982)
Golden-alexanders (Zizia aurea) G5/S3 (R.J. Soreng 9336, 29 Apr 2017)

Historic Flora
Earleaf False Foxglove (Agalinis auriculata) G3/S1 E (last vouchered in 1936)
Canada Milkvetch (Astragalus canadensis var. canadensis) G5/S1 E (last vouchered in 1940)
Blue Wild Indigo (Baptisia australis var. australis) G5/S2 T (last seen in 1935 by Killip & Blake)
Short's Rock Cress (Boechera dentata) G5/S3 (last vouchered in 1916)
Nottoway Valley Brome Grass (Bromus nottowayanus) G5/S3S4 (last vouchered in 1947)
Hitchcock's Sedge (Carex hitchcockiana) G5/S1 E (last vouchered in 1933)
Short's Sedge (Carex shortiana) G5/S3S4 E (last vouchered in 1928)
Bur-reed Sedge (Carex sparganioides) G5/S3 (last vouchered in 1933)
Slender Dayflower (Commelina erecta) G5/S3 (last vouchered in 1960)
Spring Coralroot (Corallorhiza wisteriana) G5/S1 E (last vouchered in 1915)
Smartweed Dodder (Cuscuta polygonorum) G5/S1 E (last vouchered in 1961)
Many-flowered Flatsedge (Cyperus lancastriensis) G5/S2S3 (last vouchered in 1997)
Reflexed Flatsedge (Cyperus refractus) G5/S2? (last vouchered in 1960)
Dwarf Larkspur (Delphinium tricorne) G5/S3 (last seen in 1935 by Killip & Blake)
Toothed Tick-trefoil (Desmodium cuspidatum) G5/S1 (last vouchered in 1960)
White Trout Lily (Erythronium albidum) G5/S2 T (last vouchered in 1983)
Downy Milkpea (Galactia volubilis) G5/S3 (last vouchered in 1961)
Striped Gentian (Gentiana villosa) G4/S1 E (last vouchered in 1903)
Western Sunflower (Helianthus occidentalis) G5/S1 T (last vouchered in 1940)
Eastern Bloodleaf (Iresine rhizomatosa) G5/S1 E (last vouchered in 1915)
◆Violet Bush-clover (Lespedeza frutescens) G5/S3 (last vouchered in 1960)
Bog Twayblade (Liparis loeselii) G5/S1S2 (last vouchered in 1917)
Climbing Milkvine (Matelea obliqua) G4?/S1S2 E (last vouchered in 1937)
Purple Mecardonia (Mecardonia acuminata var. acuminata) G5/S2 E (last vouchered in 1939)
Basal Beebalm (Monarda clinopodia) G5/S3S4 (last vouchered in 1982)
Early Forget-me-not (Myosotis verna) G5/S3 (last vouchered in 1962)
Racemed Milkwort (Polygala polygama) G5/S1 T (last vouchered in 1950)
Small Pondweed (Potamogeton pusillus ssp. pusillus) G5/S2S4 (last vouchered in 1930)
Whorled Mountain-mint (Pycnanthemum verticillatum) G5/S1 E (last vouchered in 1951)
Virginia Sida (Ripariosida hermaphrodita) G3/S1 E (last vouchered in 1938)
Brown-eyed Susan (Rudbeckia triloba) G5/S3 (last vouchered in 1940)
Sessile-fruited Arrowhead (Sagittaria rigida) G5/S1 E (last vouchered in 1930)
Carolina Willow (Salix caroliniana) G5/S3 (last vouchered in 1982)
Snowy Campion (Silene nivea) G4?/S1 E (last vouchered in 1917)
Riverbank Goldenrod (Solidago rupestris) G4?/S1 X (last vouchered in 1903)
Sand Grape (Vitis rupestris) G3/S1 (last vouchered in 1906)

◆[= Lespedeza violacea (L.) Pers. (misapplied); "Due to a problem with the type specimen of
Lespedeza intermedia, the name Lespedeza violacea, by which this species has long been known, applies to L. intermedia, and the name L. frutescens now applies to [Lespedeza violacea]" (VBA 2020)]

Key to Global Rank
G1: At very high risk of extinction due to extreme rarity (often 5 or fewer populations), very steep declines, or other factors.
G2: At high risk of extinction due to very restricted range, very few populations (often 20 or fewer), steep
declines, or other factors.
G3: At moderate risk of extinction due to a restricted range, relatively few populations (often 80 or fewer), recent and widespread declines, or other factors.
G4: Uncommon but not rare; some cause for long-term concern due to declines or other factors.
G5: Common, widespread, and abundant.
GH: Known only from historical occurrences but still some hope of rediscovery.
GNR: Not ranked.
GX: Not located despite intensive searches and virtually no likelihood of rediscovery.
Key to State Rank
S1: At very high risk of extirpation from the state due to extreme rarity (often 5 or fewer populations),
very steep declines, or other factors.
S2: At high risk of extirpation from the state due to very restricted range, very few populations (often 20
or fewer), steep declines, or other factors.
S3: At moderate risk of extirpation from the state due to a restricted range, relatively few populations
(often 80 or fewer), recent and widespread declines, or other factors.
S4: Uncommon but not rare; some cause for long-term concern due to declines or other factors.
S5: Common, widespread, and abundant.
SH: Known only from historical occurrences but still some hope of rediscovery.
SNR: Not ranked.
SX: Not located despite intensive searches and virtually no likelihood of rediscovery.
Federal and State Status
Legal status denotes a simple hierarchy of endangerment in three categories: Endangered (E), Threatened (T), and Endangered Extirpated (X). Federal Status is determined by the U.S. Fish and Wildlife Service.
Federal Status
LE = Listed Endangered - A taxon is threatened with extinction throughout all or a significant portion of
its range.
LT = Listed Threatened - A taxon is likely to become endangered in the foreseeable future.
State Status
E = Endangered - A taxon is threatened with extinction throughout all or a significant portion of its range.
T = T

00022567

**#1**

WBFC DEIS Comments and Testimony, November 2020

My name is Ralph Eckerlin, WBFC President
    My address is 4955 Roslyn Road, Annandale, VA 22003
    I am a Research Biologist, B.A, M.S.., Ph.D. (1974) in Zoology.
    I am a Research Associate with the Smithsonian Institution, National Museum of Natural History.

My name is Robert Soreng, WBFC Vice-president
    My address is 5506 Uppingham St. Chevy Chase, MD 20815
    I am a Research Biologist, B.S., M.S., Ph.D. (1986) in Plant Sciences.
    I am a Research Associate with the Smithsonian Institution, National Museum of Natural History.

**This Authorized I-495 and I-270 P3 Program DEIS Testimony is submitted on behalf of The Washington Biologists' Field Club (WBFC)**. November 2020.

Our website is https://WBFC.science

Dear MDOT Officials:

Thank you for the opportunity to comment on this important issue.

The WBFC is **OPPOSED** to the highway expansion project including the American Legion Bridge (ALB) expansion part.

WBFC supports the **NO BUILD OPTION**

None of the other presented DEIS alternatives are acceptable.

**WBFC considers the DEIS legally faulty and incomplete for many reasons, including:**

- Destruction and disturbance of State of Maryland and National parklands with wetlands, including but not limited to several miles of Rock Creek Regional Park (including moving substantial stretches of Rock Creek), and ca. 80 acres of the Chesapeake & Ohio National Historical Park (CONHP), including ca. 5 acres of the 12 acre Plummers Island and moving "Rock Run".

- The destruction of "Rock Run Culvert" in building the American Legion Bridge violates the integrity of Plummers Island (CONHP, Montgomery Co., Maryland).

- Lack of understanding or recognition of the value of the extensive historical and ongoing biological research on Plummers Island and the WBFC's 120 years of contributions and commitments to that. Records of many rare plants, animals and habitats from the Island were not considered.

1 | P a g e

---

**Response to DEIS Comment #1**

Refer to Chapter 9, Section 3.3.B for a response to Analysis of Alternatives Retained for Detailed Study.

Since the DEIS and Draft Section 4(f) Evaluation, substantial efforts to avoid and minimize impacts to park and historic resources around the American Legion Bridge (ALB) has occurred. MDOT SHA and FHWA met with the National Park Service (NPS) on December 8, 2020 to discuss the limit of disturbance (LOD) in the vicinity of the ALB that was presented in the DEIS. The ALB Strike Team considered bridge construction approaches to determine if any of the approaches could further reduce the LOD. The Strike Team conducted detailed investigation of a top-down segmental construction approach; a top-down cable stayed design approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of readily available information, MDOT SHA and the ALB Strike Team determined that access to the existing bridge could be consolidated to the northwest quadrant along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land.

The Preferred Alternative does not impact Rock Creek Regional Park or Rock Creek. MDOT SHA has minimized impacts to the Chesapeake & Ohio National Historical Park and would impact 0.28 acres of Plummers Island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. Impacts would not relocate Rock Run or destroy the Rock Run Culvert. MDOT SHA assembled a team of bridge specialists from around the country to consider all alternatives for replacement of the American Legion Bridge. The Preferred Alternative represents the least impactful alternative to NPS land and resources. MDOT SHA understands the value of the extensive historical and ongoing biological research on Plummers Island and has considered the rare plants, animals, and habitats on Plummers Island and within the Chesapeake and Ohio Canal National Historical Park in general. MDOT SHA is working closely with NPS to devise an ecological restoration plan to mitigate for project impacts in this area. A four season survey of RTE plant species on NPS lands within the project LOD was conducted in 2020 and will inform the ecological restoration in this area. MDOT SHA conducted a thorough analysis of potential COVID-19 impacts on traffic and determined that there would be a short-term reduction in traffic load, however it would soon return to pre-COVID 19 levels.

As described in Chapter 2 of the Supplemental DEIS, the Preferred Alternative includes the full replacement of the ALB on I-495 spanning the Potomac River with a new, wider bridge on the existing centerline. Comments on the Build Alternatives presented in the DEIS reflected a common support for advancing replacement of the ALB. With its location over the Potomac River and adjacent to several federally-owned parks, MDOT SHA created a separate group (the ALB Strike Team) whose mission was to investigate alternative bridge designs and construction techniques that could be employed to reduce, minimize, and avoid impacts to water and parkland resources in and around the ALB. The results of the effort are reflected in the Preferred Alternative and are the result of the coordination with key agency and public stakeholders, including NPS, M-NCPPC, USACE, MDE, and Maryland DNR. The National Park Service properties that border the Potomac River at the ALB include the George Washington Memorial Parkway, the Chesapeake and Ohio Canal National Historic Park (including the Chesapeake and Ohio Canal Towpath and Plummer's Island), and Clara Barton Parkway. In addition to these sensitive properties, there are also many construction challenges associated with replacement of the ALB, such as access constraints. A number of bridge types and construction methods (both standard and innovative) were evaluated during the Strike Team's analysis. A westward/upstream shift of the bridge alignment and additional phases of construction were also evaluated for the different bridge options. These options were presented to the stakeholders and a conventional structure was recommended that remained on the existing bridge centerline. Impacts to Plummer's Island were significantly reduced compared to those presented for the Build Alternatives in the DEIS by strategically locating the proposed piers for the replacement bridge and eliminating construction access from the island. In addition to a reduction of total impacts at the bridge construction site, the Strike Team effort resulted in a reduction of the number of construction access locations from all four quadrants, as noted in the DEIS, to the northwest quadrant only, due to its grade and proximity to a nearby roadway. This change substantially minimized impacts to the surrounding land.

Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

MDOT SHA did consider records of many rare plants, animal, and habitats within the Potomac Gorge. Information related specifically to Plummers Island was added to the SDEIS and FEIS.

---

#1 Cont

WBFC DEIS Comments and Testimony, November 2020

- Lack of Due Diligence on study of impacts on Plummers Island's wetlands and rare plant communities, and rare plant and animal species (the evaluation of the organisms on the Island was apparently based on one summertime visit to the head of the Island in 2019). DEIS APPENDIX L. (Natural Resources Technical Report) subordinate Appendices A-R cover Natural Resources considered along the route.  As is documented below, APPENDIX L is woefully incomplete as concerns Plummers Island. Plummers Island is in the large Potomac River / Rock Run (PR/RR) Natural Resources unit. The DEIS surveys for rare plants and animals on the Island was cursory, brief, and at the wrong season of the year to identify many of the organisms of concern.

- Lack of alternatives to condemning part of Plummers Island for the ALB proposed project.

- Lack of consideration of the impact of the Covid-19 epidemic on present and future transportation loads and patterns (many folks are teleworking and attending virtual meetings). With peak traffic flows down due to changed behavior patterns resulting from Covid-19, toll lanes will be unlikely to provide revenue streams of sufficient reward to P3 contractors, likely leaving taxpayers on the hook for billions of dollars.

- Lack of forward thinking on Climate Change (only more cars powered by petrol).

- Lack of accepted Build options with mass transportation options (trains, light rail, monorail, etc.)

- Massive costs, with near certain cost overruns passed on to taxpayers.  Regarding Washington Suburban Sanitary Commission (WSSC) expenditures, estimated to be $2 billion, It remains unclear if ratepayers would be responsible for this cost.

- Toll lanes that could cost as much as $50 in peak traffic hours, which would provide little benefit to the average commuter.

- Massive traffic congestion and delays during the construction period lasting 5-10 years, after which the traffic flow will be just as congested as it was prior to the construction due to the encouragement of more cars to be on the road, also known as induced demand.

- Because the DEIS's analysis is incomplete, it is impossible for the concerned Agencies to assess, and the public to comment on, the proposed project's impacts. The Agencies cannot wait until a final EIS is complete to analyze the project's full impacts, as it will then be too late for the public to meaningfully comment on them and for the Agencies to consider the public's comments and choose the alternative that best alleviates the impacts based on this information. We respectfully request that the Agencies conduct a supplemental EIS to provide

2 | P a g e

MDOT SHA conducted a detailed, four-season rare plant survey on National Park Service lands within the project LOD, including the 0.28-acre portion of Plummers Island that is within the project LOD and would be affected. The survey targeted 41 rare plant species and methodology and results are included in the *Rare, Threatened, and Endangered Plant Survey Report* (November 2020).

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

Refer to Chapter 9, Section 3.4.G for a response to climate change considerations.

Comments addressed above.

**#1 Cont**

WBFC DEIS Comments and Testimony, November 2020

the public the ability to meaningfully review and comment on the impacts before a final EIS is produced.

**Alternative placement of the Bridge not considered in the DEIS**

- MDOT should consider building and placing construction platforms only upstream from the current bridge to reduce impacts to the Chesapeake and Ohio Canal NHP and Plummers Island.

- MDOT should consider construction of other crossings to alleviate traffic over the ALB instead of bridge enlargment.

- We respectfully ask that agencies consider these options to the ALB portion of this project to reduce and minimize impacts to Plummers Island and the surrounding area.

**WBFC Background.** The WBFC (the Club) was founded in 1900 by professional field biologists living and working in the Washington, DC vicinity (Perry 2007). Perry (2007) provides a detailed history of the Club, the Island, and brief biographies of the hundreds of past and present members up to that time. The members are all professional biologists. Plummers Island, Chesapeake & Ohio Canal National Historical Park, Montgomery County, Maryland, has been the WBFC research station and meeting place since 1901 (Appendix 1). Plummers Island is located immediately downstream from the ALB. The Island covers 12.2 acres of land, the widest part of which is on the ALB end. The proposed expansion of the ALB, as part of the I-495 expansion, threatens the existence, and violates the integrity, of the Island as a designated **natural wild area** (Appendix 2). "Rock Run Culvert" as identified in the DEIS is actually a natural Potomac River channel that has divided the Island from the mainland since time immemorial (Perry 2007). There is a small true concrete and pipe culvert running under the ALB which drains into the river channel where the channel bends eastward (water apparently rarely flows from this ALB culvert).

The current ALB proposal would cut across the Island, move or destroy the true channel "Culvert" that separates the Island from the mainland, clear the trees and level a substantial part of the Island, **clear the significant healthy native beech tree forest on the mainland side** (Popkin 2019, a deadly beech disease is spreading in the NE US), destroy the wetlands associated with the island and mainland, and result in major infestations of invasive plants. **If implemented this DEIS project would jeopardize future research on trends in biodiversity on the Island**. Noise pollution from expanding the ALB onto the Island would make WBFC meetings meetings on the Island nearly impossible.

3 | P a g e

*This page is intentionally left blank.*

WBFC DEIS Comments and Testimony, November 2020



Old map (above) showing the real Rock Run and Plummers Island (copied from Perry 2007). Map of Plummers Island Pre-ALB (below). Calling the Potomac River channel "Rock Run Culvert" allows it to be "excluded" from consideration as a protected wetland in the DEIS Natural Resources APPENDIX L. It is not a Culvert!  And "Rock Run" has been misapplied to it.



4 | P a g e

Comments addressed above.

WBFC DEIS Comments and Testimony, November 2020



Head of Plummers Island adjacent to ALB separated by "Rock Run" channel or "Culvert" from the mainland, showing Potomac Gorge Riverside Outcrop Barrens, wetland mud flats (inundated here) and sandbars.

#1
Cont

The Draft EIS is seriously flawed in many ways. The most pertinent to the WBFC is the failure to discuss and evaluate the impact of the destruction of part of Plummers Island, a historical and biological treasure within the Chesapeake and Ohio Canal National Historical Park. There is not even a footnote about the incalculable value of the long-term research on the biology of this Island, and nothing about WBFC's place in it.

The WBFC leased Plummers Island in June 8, 1901, for a meeting place and research station, and built the cabin that year. The WBFC finally settled the legal purchase the property known as Plummers Island (Appendix 1), and most of the adjacent mainland up to the C&O Canal Tow Path, in **1908** (Perry 2007).

The Club has been meeting on Plummers Island continuously for nearly 120 years, and conducting research there on a wide range of subjects. The Club gave the property to the National Park Service on July 24, 1959, with the written understanding (Appendix 2) that the Club retained the right to maintain the island as a **natural wild area**, use it for scientific

5 | P a g e

Comments addressed above.

#1
Cont

WBFC DEIS Comments and Testimony, November 2020

research, for meetings of the Club, and to pursue its studies in the field of biology and natural history.

Plummers Island is known as "**The most thoroughly studied island in North America**", and perhaps in the world.



The Club holds events each year on the Island where members gather with guests.  We maintain the historic Club cabin, "Winnemana Lodge," built in 1901. The name Winnemana was the name originally given to the cabin (Lodge) in 1906 and is translated from a Native American language meaning "beautiful island." The epithet *winnemana* has been given to Latin names for various insects and mammals described from Plummers Island collections.

6 | P a g e

00022573

*This page is intentionally left blank.*



WBFC DEIS Comments and Testimony, November 2020



**Winnemana Lodge** built in 1901. The Cabin is still standing and well maintained by WBFC.

There are always research projects ongoing on the Island, conducted both by members and by grantees funded by our Endowment Research funds. Many of these projects run for years, and are follow-ups to pre-ALB censuses, showing impacts of pollution, and changes in fauna and flora. WBFC reviews dozens of research grant proposals each year and usually funds 5 to 10 of them each year, with first priority given to studies on the Island, second priority to the Potomac Gorge, eventually allowing studies in the Mid-Atlantic region. Voucher specimens for plants and animals collected for the scientific studies on the Island are housed and catalogued in the National Museum of Natural History, Smithsonian Institution. These specimens and observations from catch and release and other sightings are reported in hundreds of published scientific papers.

The ALB was constructed immediately to the west (up river) of the island starting in 1962. The placement of the original bridge was intentionally positioned to protect the Island (Appendix 2 & 3) to ensure the continuation of WBFC's valuable long-term biological research program.

WBFC DEIS Comments and Testimony, November 2020

When the ALB was expanded in the early 1990s, the expansion was done by filling in the gap between the north and south-bound lanes, again avoiding direct damage to the Island. Despite the best efforts of engineers and construction implementation to avoid impacting the Island, the original ALB construction and 1992 expansion led to many invasive plants infesting the Island, and disturbing the water flow to its flanking wetlands. The worst of the invasive plant infestations are on the head of the Island adjacent to the ALB. Negative impacts of local environmental pollution on lichens and insects have been documented on the Island. Traffic on the ALB also led to Lead pollution from vehicle exhaust and declines in lichen species, which are particularly sensitive, from 70 to 20 (Lawrey & Hale 1979). This illustrates the importance of long-term scientific research on the Island, which influenced legislation to reduce lead in gasoline, and eventual reduction in lead contamination locally and world-wide.

**Excerpt of Washington Post article 19 May 1994 by D'Vera Cohn about lichens and Pollution.**

Lichen research also shows that the bridge has become a dominant factor in shaping the island's ecology.

Lichens, which are crusty combinations of algae and fungus, are superb barometers of pollution. They soak up nutrition from the air, along with any toxins hanging about. There were 70 species of lichen on Plummers Island at the turn of the century; now there are 20.

Their decline began after the bridge was built. When Lawrey and his late colleague and mentor, Mason Hale, scraped lichen samples off rocks and had them analyzed, they found their lead content had more than tripled from 1958 to 1970. Their joint article on their findings, blaming car exhaust for the pollution, was published in the journal Science in 1979.

Recent lichen research is more encouraging. Lead concentrations have been dropping, in tandem with the phasing out of leaded gasoline. Eventually, Lawrey hopes, the number of lichen species will rise, as has happened in other locales.

"We'll have to just wait and see," he said. "Fortunately, the club will be here forever, and some club member—if it is not me—will find out the answer."

This page is intentionally left blank.

*This page is intentionally left blank.*

WBFC DEIS Comments and Testimony, November 2020

Since 1901, over 400 scientific publications have focused on the Island's biota: birds, fish, mammals, reptiles and amphibians, plants, insects, arachnids, nematodes, and other groups (Many published titles in the Proceedings of the Biological Society of Washington, available at https://WBFC.science/biological-studies/) (see Appendix 7 for titles in this series)

An article in the Potomac Basin Reporter (1973) (Appendix 4) cited "1,226 species of plants and 4,293 species of animals on the Island…." including "1500 species of beetles" and "300 to 400 species of bees". The Island "is 'type-locality' for at least 175 species, …" "No less than 16 genera and three families of plants and animals have been described on the basis of specimens collected on the Island." Some of these numbers were overestimates made before computer databases were compiled. Insect inventories are still substantially incomplete (see Brown & Bahr 2008). The number of vascular plants recorded on the Island, stands around 900 (Shetler et al. 2006; including newer records).

Many thousands of plants and animals have been documented from Plummers Island over 120 years of WBFC research.

**Invertebrates on the Island**

The Brown & Bahr (2008b) appendix lists all Invertebrate taxa known from the Island, including Insects. (Taxa are taxonomic groups of any rank, such as a species, genus, family, order, or class).

**Class Insecta diversity on the Island**

Brown & Bahr (2008a & b) documented the known insect species records for the Island. "Based on an examination of the insect collection of the National Museum of Natural History and a review of relevant literature, we document 3012 insect species in 253 families, encompassing 18 insect orders: Collembola, Odonata, Dermaptera, Blattodea, Phasmatodea, Orthoptera, Psocoptera, Thysanoptera, Hemiptera, Neuroptera, Megaloptera, Coleoptera (beetles), Mecoptera, Trichoptera, Lepidoptera, Diptera, Siphonaptera, and Hymenoptera." The authors acknowledge that 16 families of the 600 beetle species have been recorded for the Island, yet they conclude this probably includes only a quarter of the families likely present. Among insects recorded from Plummers Island are 836 species of butterflies and moths (Lepidoptera), with 27 different species of moths described from specimens collected on the island (Brown et al. 2008). Many of these species were described from collections made on the Island. *No site in North America has been surveyed as intensively, yet much of the insect fauna remains to be studied, with hundreds of additional species likely to be documented.*

9 | P a g e

WBFC DEIS Comments and Testimony, November 2020

Many of these insect orders depend on wetland habitats for all or much of their life-cycles. Seven types of wetlands are characterized on the Island (Simmons et al. 2016, units 1-5).

Steiner (2000) documented a globally and state-rare click beetle on the Island. Steiner (2008) inventoried 128 species of Tenebrionidae beetles from Maryland, most of which occur on Plummers Island.



A few of the many Tenebrionidae from Plummers Island and nearby. (Steiner 2008 fig. 1-16)

10 | P a g e

*This page is intentionally left blank.*

*This page is intentionally left blank.*

WBFC DEIS Comments and Testimony, November 2020

In 2015 Steiner collected the first Emerald Ash Borer (EAB) on the Island. Within the following two years nearly all the mature American and Green Ash trees on the Island were dead or dying. These trees were major components of vegetation types 5 to 11 (see Plummers Island Plant Communities section, below), and they have been decimated over much of Eastern North America.



Imperial moth caterpillar (*Eacles imperialis*) at head Plummers Island, Oct. 2013 (Soreng photo). These moths are rarely seen any more in the area.

Insects, like other organisms, are experiencing major declines globally (Borenstein 2018; Hallman et al. 2017; Jarvis 2018; Vogel 2017).  Giant silk moths (Saturniidae) include Imperial, Cercropia, Luna, Polyphemus, Royal Walnut, Rosy maple etc. In New England, most of these are state endangered species because they have been hammered by an introduced biocontrol agent  -- a non-native tachinid fly, *Compsilura concinna*, which was introduced to try and control gypsy moths in Massachusetts.  That fly has wreaked havoc in New England because it is a generalist and the Saturniids have been heavily impacted. This pest has arrived in DC and vicinity but impacts here are not yet known (John Lil pers. comm. 2020). Thanks to the long

*This page is intentionally left blank.*

WBFC DEIS Comments and Testimony, November 2020

history of research on insects of Plummers Island, the Island would be a key place to further document this "insect apocalypse," assuming the Island remains intact. *The DEIS ALB project puts WBFC Plummers Island research on trends in biodiversity in jeopardy*.

### Birds on the Island and American Legion Bridge

An established Peregrine Falcon nest is located on the American Legion Bridge and two adults and at least one chick was observed this past June (Putnam 2020). The nest box was put there by MD State Highway Association (SHD) working with US Fish & Wildlife Service (USFWS) in 2007, and peregrines have been nesting there for 12 years. In the DEIS document, "*they propose moving the nest box to another location just before nesting season when the bridge constructions begins, but as an established nest this recommendation may not be successful*" (Carla Dove, WBFC member, Smithsonian Ornithologist, pers. comm.). A Mississippi Kite was also observed this year. Wetmore & Manville (in Manville 1968) account for birds known from the Island to that time. Johnston & Winings (1987) attribute the decline of forest breeding birds on the Island and vicinity to vehicular traffic.

### Mammals on the Island

Five bat species are documented by Smithsonian collections from the Island. Among these are the Endangered northern long-eared bat, *Myotis septentrionalis*, and the eastern small-footed Myotis, *Myotis leibii*. The latter was separately described as *Myotis winnemana*. Other mammals collected include shrews, moles, mice, voles, eastern cottontail, eastern gray squirrel. Georgian bat, large brown bat, red bat, evening bat, whitetail deer, eastern skunk, mink, eastern long-tailed weasel, fox squirrel, eastern flying squirrel, eastern otter, chipmunk, eastern red fox, Virginia muskrat, and woodchucks have also been recorded (Manville 1968). Mammologists these days often monitor by catch and release and other methods, rather than preparing museum specimens from animals on the Island. For example, the last regional report of an eastern wood rat was reported on Plummers Island. Also, DNA from bones, feathers, fur, or feces can now be used to precisely identify species.

### Plummers Island Plant Communities

The National Park Service prepared a map of the vegetation zones in the region with a coarse map for Plummers Island. The plant communities were remapped in finer detail in 2016

12 | P a g e

WBFC DEIS Comments and Testimony, November 2020

(Simmons et al. 2016). (Appendix 6, also available at WBFC.science). This map included 12 communities, 8 within wetlands, and one upland type that is unique to the Potomac Gorge. These plant communities are proxies for where other organisms also live or might be found.

**Plummers Island wetlands (units 1 to 7).**

The Island's wetland habitats were mapped by Simmons et al. (2016). These were divided into 5 major communities, and 3 subdivisions within those. These include sandbars and mud flats (units 1 & 2), rocky outcrop barrens (3A & B), to regularly flooded bottom land forests (4-6). These areas flood frequently. Community 7 is higher and infrequently flooded. Community 8, i Piedmont Basic Mesic Forest, includes a rich herb layer that is rare in the Potomac Gorge and is rarely flooded.

The sandbars, mud flats, and rock barrens occur on the Potomac River side. Mud flats also occur along the usually sluggish "Rock Run" channel. The flooded bottom bench lands (units 5, 6 & 7) cover much of the area adjacent to "Rock Run" channel and the toe of the Island. There are some rock-bottomed swales in the interior the Island (unit 5A). The low benches are mostly flooded only when high waters reach above the 9 ft mark at Little Falls Gauging Station (3 miles downstream) (https://water.weather.gov/ahps2/hydrograph.php?gage=brkm2&wfo=lwx). This level is reached or exceeded often in winter and spring, but frequency and duration vary greatly from year to year. There are rare plants and animals in these zones. Many species records for the Island come only from these zones, and many of these species are reliant on these different wetland habitats for some or all of their life-cycles. Flooding above the 4.5 ft mark, basically makes the Island inaccessible even by wading, and covers all the sand and mud flats up to the breaks to the bench lands. See Brown & Bahr (2008) for Insect inhabitants of the riparian zones.

**Populations of two rare plants of concern were observed within the zone of disturbance in the riverside mud flats (Simmons et al. 2016, unit 1) on 31 October 2020** *Hibiscus laevis* **and** *Paspalum fluitans.* **Neither of these were reported by the survey crew contracted for the DEIS.** Any DEIS related construction plans should seek to avoid changes to water flowing to Plummers Island wetlands including "Rock Run" channel.

#1

**Response to DEIS Comment #1**

It appears from Simmons *et al.*, 2016 that Unit 1 is outside of the Study Preferred Alternative Limits of Disturbance. Our plant survey did document populations of *Hibiscus laevis* and *Paspalum fluitans* within Unit 2 of Simmons *et al.*, 2016, which is within the Study Preferred Alternative Limits of Disturbance. The project has agreed to conducting additional rare plant surveys during the flowering season of each of the rare plant species documented in the 2020 rare plant survey prior to construction.

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-9    Filed 10/30/23    Page 30 of 82

FINAL ENVIRONMENTAL IMPACT STATEMENT



WBFC DEIS Comments and Testimony, November 2020



*Hibiscus laevis* in mud flats between Potomac Gorge Riverside Outcrop Barrens (by DEIS SHH102 survey stake, Soreng photo 2020). This species also occurs at the closer head of the Island

**Potomac Gorge Riverside Outcrop Barrens**

The rocky Potomac Gorge headlands on Plummers Island harbor the rare *Solidago racemosa*, and *Hypericum prolificum*. These barrens are routinely scoured by high floods, but these plants hang on!

14 | P a g e

*This page is intentionally left blank.*



*This page is intentionally left blank.*



WBFC DEIS Comments and Testimony, November 2020



*Solidago racemosa*, Potomac Gorge Riverside Outcrop Barrens at the head of the Island (Soreng photo 2020).



Potomac Gorge Riverside Outcrop Barrens near the head of the Island *Hibiscus laevis* in foreground.  ALB in background (Simmons photo 2020).

15 | P a g e

*This page is intentionally left blank.*

WBFC DEIS Comments and Testimony, November 2020

**Piedmont Basic Mesic Forest (unit 8).**

This vegetation zone floods rarely, being more than 15 ft above the low flow. This area is rich in herbaceous plant species known only here on the island. And it is gorgeous to see in the spring. It includes the largest population of *Jeffersonia diphylla* (Twinleaf) that we know of in the Potomac Gorge. The rare *Phacelia covillei* thrives here, as does the rare *Erigenia bulbosa* and *Valeriana pauciflora*, and the leatherwood shrub, *Dirca palustris*.



Piedmont Basic Mesic Forest includes a large stand of *Jeffersonia diphylla* (Soreng photo).

**Potomac River Bedrock Terrace Hardpan Forest (unit 12)**

This Globally and State rare plant community is endemic to the Potomac River Gorge.  On the Island it covers the east and west knolls which rarely ever flood, being as much as 60 ft above

16 | P a g e

*This page is intentionally left blank.*

WBFC DEIS Comments and Testimony, November 2020

the riparian zone. The vegetation is markedly different from the other zones as soils are thin over bedrock, and the trees and shrubs are stunted and slow growing. Various sedges and grass species (e.g. including *Melica mutica, Dichanthelium aciculare, Piptochaetium avenaceum*), and trees and shrubs, are only known from this zone on the Island.



Potomac River Bedrock Terrace Hardpan Forest (unit 12) – *Piptochaetium avenaceum* / blackseed needle grass glade on ALB survey line. The bridge is visible in the background (Simmons photo 2020).

**The Potomac Gorge is a gem among our National Parks**
(https://academic.oup.com/bioscience/article/54/1/8/234660),

Plummers Island is a special part of the middle section of the Potomac Gorge.  The plant and animal diversity are tremendous with many rare species and long-term ongoing research projects. State and Globally rare plants and Natural Vegetation Communities are documented in Simmons et al. 2016 & 2000 (Appendix 5 & 6). These reports were based on over 120 years

Comments addressed above

WBFC DEIS Comments and Testimony, November 2020

of collecting plants and making herbarium vouchers (detailed in Shetler et al. 2006), species surveys for a DNA barcoding project led by J. W. Kress (Gambino, 2009), and vegetation plots established from 1998 to 2000 by E. Fortson-Wells to document invasive plants in the flood plains of the island, followed up by a three year survey of invasive plants and vegetation between 2012 and 2015, conducted by the WBFC Invasive Biota Committee. Voucher specimens, housed at the United States National Herbarium, Department of Botany, National Museum of Natural History, Smithsonian Institution, are recorded and mostly imaged (records available online at https://collections.nmnh.si.edu/search/botany/ ). Many plants and animals occur in the Potomac Gorge at the northern extensions of their geographic ranges.

Many biologists have walked and observed every nook and cranny of this topographically diverse island with its rocky hills and cliffs, including the globally and state rare **Potomac River Bedrock Terrace Hardpan Forest**, and sensitive **wetland bottoms** of "Rock Run" Channel and sand lenses and mud flats on the Potomac River side of the Island. We love this place and its historical, current, and hopefully future biological relevance. **Rebuilding and expanding any part of the American Legion Bridge or access to that on the Island would destroy or seriously damage much of it and violate the integrity of the Island.**

#2

The noise pollution and visual impact of the current ALB are annoying at best to our meetings on the Island. Expanding the ABL onto the Island will make conversation at meetings at the Cabin on the Island nearly impossible. The noise and air pollution will be much worse during the construction phase. The noise impact on birds may be more extreme (Johnston & Winings 1987). Rare plants and animals and habitat will be lost. It will no longer be "Winnemana", a beautiful island.

If you argue otherwise, we are lost as a Nation. The efforts of science are meaningless. Losing even a piece of this Island is to lose the heart and soul of what our conservation ethic means.

We believe Plummers Island is as important as any of the national museums in Washington, DC, and WBFC members *implore* MDOT to preserve intact this **Historical and Biological National Treasure**.

**Please visit our web site – https://WBFC.science**

Thank you

WBFC President, Vice President, and members

**Response to DEIS Comment #2**
In earlier coordination, NPS requested that no noise barriers be constructed within NPS-managed land due to Section 4(f) concerns.

18 | P a g e

00022585

WBFC DEIS Comments and Testimony, November 2020

**Literature Cited**

Borenstein, S. 2018. 'Windshield test' highlights big drop in flying bugs. *The Washington Post - HEALTH & SCIENCE* (2018-09-25).

Brown, J. W., & S. M. Bahr II. 2008a. The Insect (Insecta) Fauna of Plummers Island, Maryland: Brief Collecting History and Status of the Inventory. *Bulletin of the Biological Society of Washington* 15: 54-64. http://dx.doi.org/10.2988/0097-0298(2008)15[54:TIIFOP]2.0.CO;2

Brown, J. W., & S. M. Bahr II. 2008b. Appendix List of the Invertebrates of Plummers Island, Maryland. *Bulletin of the Biological Society of Washington* 15: 192-226 http://dx.doi.org/10.2988/0097-0298(2008)15[192:ALOTIO]2.0.CO;2

Brown, J. W., Epstein, M., Vann, K., Watkins, R., Bahr, S. M., Kolski, E. 2008. An overview of the Lepidoptera (Insecta) of Plummers Island, Maryland. *Bulletin of the Biological Society of Washington* 15: 65–74.

Cohn, J.P. 2004. The Wildest Urban River: Potomac River Gorge. *BioScience*, Volume 54(1): 8–14, https://doi.org/10.1641/0006-3568(2004)054[0008:TWURPR]2.0.CO;2

Fleming G. 2006. VEGETATION ECOLOGY OF THE POTOMAC GORGE, pdf. Virginia Department of Conservation and Recreation, Division of Natural Heritage. powerpoint document. https://www.dcr.virginia.gov/natural-heritage/document/pogovegecol3.pdf

Gambino, M. 2009 Craking the DNA Code. *Smithsonian Magazine* August 2009. https://www.smithsonianmag.com/science-nature/cracking-the-dna-code-33970231/

Hallmann, CA, Sorg, M, Jongejans, E, Siepel, H, Hofland, N, Schwan, H, et al. 2017. More than 75 percent decline over 27 years in total flying insect biomass in protected areas. PLoS ONE 12 (10): e0185809. https://doi.org/10.1371/journal. pone.0185809

Jarvis, B. 2018. The insect apocalypse is here: What does it mean for the rest of life on Earth? *The New York Times Magazine*, 27 November 2018, pp. 41–48.

Johnston, W. H. & D.L. Winings. 1987. Natural History of Plummers Island, Maryland XXVII. The decline of forest breeding birds on Plummers Island, Maryland, and vicinity, by David W. Johnston and Daniel L. Winings. *Proceedings of the Biological Society of Washington* 100:762- 768. (December 31, 1987).

*This page is intentionally left blank.*

*This page is intentionally left blank.*

WBFC DEIS Comments and Testimony, November 2020

Lawrey, J. D., M. E. Hale Jr. 1979.  Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution. *Science* Vol. 204, Issue 4391, pp. 423-424 https://dx.doi.org/10.1126/science.204.4391.423

Manville, R. H. 1968. Natural History of Plummers Island, Maryland XX. Annotated list of the vertebrates, by Richard H. Manville, except birds by Alexander Wetmore and Manville. Special Publication, Washington Biologists' Field Club, pp. 1-44. (January 1968.)

Perry, M. C. (ed.) 2007. THE WASHINGTON BIOLOGISTS' FIELD CLUB: ITS MEMBERS AND ITS HISTORY (1900-2006). The Washington Biologists' Field Club, printed by The Maple Press Company, York Pennsylvania.  Pdf available under the About dropdown as WBFC Book at https://WBFC.science/wp-content/uploads/2019/09/wbfc_booksm.pdf

Popkin, G. 2019. A mysterious disease is striking American beech trees. *Science* Nov 14 2019 https://dx.doi.org/10.1126/science.aba2201

Putnam, J. 2020. eBird Checklist: https://ebird.org/ebird/view/checklist/S70502036 -- eBird: An online database of bird distribution and abundance [web application]. *eBird*, Ithaca, New York. Available: http://www.ebird.org (Accessed: 2 November 2020)).

Shetler, S. G., S. S. Orli, E. F. Wells & M. Beyersdorfer. 2006 CHECKLIST OF THE VASCULAR PLANTS OF PLUMMERS ISLAND, MARYLAND. *Bulletin of the Biological Society of Washington*, 14(1): 1-57 https://wbfc.science/wp-content/uploads/2020/07/Checklist_Vasc_Plants_Plummers.pdf

Simmons, R.H, Fleming A.H., Soreng R.J. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Appendix 6, pdf. available at https://WBFC.science/wp-content/uploads/2019/09/plummer_island_nc_map_v1.3.pdf

Simmons R.H., Soreng R.J., Barrows E.M., Emmons L.H. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland. Report prepared for the National Parks Conservation Association, July 2020. Appendix 5, pdf. available at https://WBFC.science

Steiner, W. E. Jr. 2000. Records and habitat of the "rare click beetle," *Cerophytum pulsator* (Haldeman), in Virginia and Maryland (Coleoptera: Cerophytidae). *Banisteria* 15:43-45.

Steiner, W. E., Jr. 2008. A Checklist of the Darkling Beetles (Insecta: Coleoptera: Tenebrionidae) of Maryland, with Notes on the Species Recorded from Plummers Island Through the 20th Century. *Bulletin of the Biological Society of Washington* 15: 233-140.


WBFC DEIS Comments and Testimony, November 2020

Vogel, G. 2017. Where have all the insects gone! *Science*  2 May 2017,  Vol. 356, Issue 6338, pp. 576-579 https://science.sciencemag.org/content/356/6338/576.full

**Appendices:**

1. WBFC Deed to Plummers Island (1908).

2. Transfer of the WBFC property to United States Government (1959).

3. Washington Post article, 1959

4. Potomac Basin Reporter, 1973 [Plummer Island Beetles & Bees and Type locality]

5. Rare Flora and Natural Communities of Plummers Island, Montgomery County. Maryland.

6. Natural Communities of Plummers Island, Montgomery County, Maryland.

 (Vegetation plots are numbered. Plot 4 was lost due to the ALB abutments redirecting the flow of Rock Run Channel / "Culvert" between 2000 and 2013. Plots not mapped, nor are two newer plots and older NPS plots)

7. Titles in the Bulletin of the Biological Society of Washington series "Natural History of Plummers Island, Maryland," and other key publications.

The following pages reflect the attachments included in the letter. There are no comments or responses provided on these pages; they are included for the record.



WBFC DEIS Comments and Testimony, November 2020

**Appendix 1.  Title to Plummers Island and adjacent mainland**



22 | Page

WBFC DEIS Comments and Testimony, November 2020

**Appendix 1.  cont.**



23 | Page

WBFC DEIS Comments and Testimony, November 2020

**Appendix 1. cont.**



WBFC DEIS Comments and Testimony, November 2020

**Appendix 2 AGREEMENT WITH NATIONAL PARK SERVICE, 1959**

### AGREEMENT WITH NATIONAL PARK SERVICE

**AGREEMENT AND STIPULATIONS BETWEEN THE WASHINGTON BIOLOGISTS' FIELD CLUB, INC. AND THE UNITED STATES OF AMERICA**

This agreement made this 5th day of March, 1959, by and between the Washington Biologists' Field Club, Inc. and the United States of America.

WITNESSETH:

WHEREAS, The United States Government has by condemnation proceedings, in the United States District Court for the District of Maryland in Civil No. 10676 and by order of Court made the 24th day of June, taken possession of the defendant's Washington Biologists' Field Club, property designated in said proceedings as parcels "A" and "B" in tract no. 7, and

WHEREAS, This property was acquired by the Washington Biologists' Field Club, Inc. and has been used by the said Club as a natural wild area for scientific research for over 50 years and a great many scientific papers have been written in reference to biological and natural history discoveries made on said land and, more particularly, on that part of said land known as parcel "B" and more familiarly known as Plummers Island containing some 12.238 acres more or less, and

WHEREAS, The said Plummers Island has become among systematic biologists one of the world's most famous collecting spots and type localities, and

WHEREAS, The discoveries have indicated the probability of new knowledge in the field of biology and natural history, and

WHEREAS, The fame of this island is world-wide and many scientific organizations are interested in its preservation as a source of discovery, and

WHEREAS, The Washington Biologists' Field Club, Inc. and the United States Government desire to preserve this natural wild area as a sanctuary and scientific research preserve.

OP·LANES™
MARYLAND
I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

WBFC DEIS Comments and Testimony, November 2020

Therefore, The United States Government's petitioner in the United States District Court for the District of Maryland in Civil No. 10676 and the Washington Biologists' Field Club, Inc., defendant, and the owner of said parcel of land known as parcel "B" containing some 12.238 acres more or less which said land is an island in the Potomac River and is more familiarly known as Plummers Island, do hereby stipulate and agree that the said parcel "B" be withdrawn from these proceedings and that the said Washington Biologists' Field Club, Inc. does hereby agree to deed the said island to the United States Government without monetary consideration reserving in said deed to the Washington Biologists' Field Club, Inc. the right to continue to maintain the island as a natural wild area and use it for scientific research and for meetings of the Club and to pursue its studies in the field of biology and natural history on the said island so long as the Washington Biologists' Field Club, Inc. exists and desires to continue to use the island for scientific research and so long as the further provisions and stipulations contained herein are complied with which are as follows:

1. The Washington Biologists' Field Club, Inc. agrees to supply the National Park Service with copies of scientific papers resulting from research conducted on said island when available.
2. The Washington Biologists' Field Club, Inc. will supply the National Park Service with an annual report and will include the names and addresses of the officers, list of the members, and a summarization of the scientific investigations carried on.
3. The Washington Biologists' Field Club, Inc. will indemnify the United States against any loss or damage or injury due to the Club's negligence or any of its members or guests in the use and occupancy permitted under this agreement.
4. The Washington Biologists' Field Club, Inc. shall maintain its building and facilities on the island or replace the same in orderly and safe condition without expense to the United States.
5. No additional buildings, structures, or other physical facilities shall be constructed on the island by the Washington Biologists' Field Club, Inc. without first obtaining written approval of the National Park Service.
6. It is further stipulated and agreed between the United States Government and the Washington Biologists' Field Club, Inc. that the membership of the Club as constituted on 1 August 1958,

Honorary Members:

Johnson , David H.
Kelson, Keith R.
Killip. E. P.

Vogt, George B.
Walker, Ernest P.
Wetmore, Alexander

26 | P a g e

WBFC DEIS Comments and Testimony, November 2020

Bartsch, Paul
Mann, William M.
Ricker, P. L.

Active Members:

Aldrich, John W.
Appel, William D.
Benedict, J. E.
Blake, S. F.
Brown, Edgar
Clarke, J. F. G.
Compton, Lawrence V.
Davis, Malcolm
Duvall, Allen J.
Erickson, Ray C.
Erlanson, C. O.
Fredine, C. Gordon
Fuller, Henry S
Gabrielson, Ira N.
Gardner, Marshall C.
Graham, Edward H.
Griffith, Richard E.
Handley, C. O., Jr.
Hotchkiss, Neil
Jackson, Hartley H. T.

Krombein, Karl V.
Leonard, Emery C.
Lincoln, Frederick C.
Linduska, Joseph P.
Meehean, 0. Lloyd
Morrison, J. P. E.
Nelson, A. L.
Oehser, Paul H.
Parker, Kenneth W.
Presnall, Clifford C.
Reed, Theodore H.
Russell, Paul G.
Setzer, Henry W.
Smith, Albert C.
Smith, Lyman B.
Sohns, Ernest R.
Stevenson, James 0.
Stewart, Robert E.
Stickel, William H
Swift, Ernest F.
Uhler, F. M.

Zahniser, Howard Nonresident Members:
Allan, Philip F.
Allen, Durward L.
Archino, Samuel
Bartlett, H. H.
Bryant, Harold C.
Cahalane, Victor H.
Cottam, Clarence
Couch, Leo K.
Dargan, Lucas M.
Eklund, Carl R.
Fowler, James A.
Hamlet, John
Holt, Ernest 0.
McAtee, W. L.
Myers, G. S.
Peterson, Roger T.
Wallis, William W.
Wherry, Edgar T.

shall have the privilege of having their ashes placed on said island and a small bronze plaque in their memory placed on the stones of said island and that this privilege shall apply only to the membership as named above as it shall exist as of 1 August 1958.

7. It is further stipulated and agreed that the United States Government will allow the membership of the Washington Biologists' Field Club, Inc. to have access by foot over the land owned by the United States Government to the island at all times and whenever desired.
8. The Washington Biologists' Field Club, Inc. will be permitted to maintain and operate passenger-carrying ferry boats from and to the island which is to be for the exclusive use of the Club and its members and guests for access to the island.
9. The Washington Biologists' Field Club, Inc. will be permitted to erect and maintain a fence and gate at a suitable location to exclude the general public from the island, but the National Park Service is to be furnished keys to the lock or the National Park

27 | P a g e

WBFC DEIS Comments and Testimony, November 2020

Service may provide its own lock if keys are delivered to the Washington Biologists' Field Club, Inc., and will also be permitted to clear the channel between the island and the Maryland shore to maintain a free flow of water therein.

10. It is further stipulated and agreed that authorized agents and personnel of the National Park Service shall have access to the island and the right to take scientists to the island, but, in that event, the Washington Biologists' Field Club, Inc. shall not be responsible for any injuries or damages resulting to said persons due to conditions upon said island provided said injuries or damages are not caused by negligence of the Club or by a failure on the part of said Washington Biologists' Field Club, Inc. to comply with the requirements of this stipulation.

11. It is further stipulated and agreed that all rights accruing to the Washington Biologists' Field Club, Inc, or to any member thereof by reason of the provisions of this stipulation or any amendment thereto may be terminated if said Washington Biologists' Field Club, Inc. no longer exists or in the event after due written notice that the provisions of this stipulation and/or deed which will be executed following signing of this stipulation have been violated and continue to be violated by said Washington Biologists' Field Club, Inc. or its members, guests, employees, or servants for a period of time in excess of six months after receipt of said notice, and further in the event the island shall be no longer used for scientific research by the Washington Biologists' Field Club, Inc. for more than two years then this stipulation and any like provisions of the deed to be executed conveying the property to the United States shall terminate.

12. It is further stipulated and agreed that the United States may construct or permit the construction of needed nonrecreational public improvements upon the island or a portion thereof, which said improvements shall not be inconsistent with the uses to which the island has been dedicated by the Washington Biologists' Field Club, Inc.

13. It is further stipulated and agreed that this stipulation shall become effective after the filing and acceptance by the United States of a deed of conveyance containing the provisions outlined herein.

The United States of America
By: WILLIAM E. FINLEY

*Director of the National*

*Capital Planning Commission*

*Condemning Authority*

WBFC DEIS Comments and Testimony, November 2020

The Washington Biologists' Field Club, Inc.

By: LLOYD W. SWIFT

President

1, Albert C. Smith, certify that I am the Secretary of the corporation named as party herein; that Lloyd W. Swift, who signed this contract on behalf of the party, was then President of said corporation; that said contract was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

ALBERT C. SMITH, *Secretary*

00022592

WBFC DEIS Comments and Testimony, November 2020

**Appendix 3. Washington Post Article, 1959.**

### —It's for the Birds

Plummers Island is for the birds, and it's going to stay that way.

The National Capital Planning Commission voted yesterday to accept an offer by the Washington Biologists Field Club, Inc., to donate the Potomac island near Cabin John as part of the George Washington Memorial Parkway.

The deed will stipulate that the nature group can continue to use the island for its bird s t u d i e s. The Commission will drop a condemnation s u i t to acquire the island, but still plans to push another suit involving Club-owned land on the Maryland shore.

WBFC DEIS Comments and Testimony, November 2020

**Appendix 4. Potomac Basin Reporter - 1973 Beetles and Bees & Type locality**

### Plummers Island: Unknown, But Famous in Its Way

Plummers Island, a tiny, rocky 12 acres jutting out of the Potomac River above Washington, D.C., is unknown to the general public. Among biologists, however, this spot downstream from Cabin John is one of the world's most famous spots for studying plants and animals. On any given day, a scientist probably could discover a new insect species on the Island.

Discovering new species or a preponderance of old ones has been the particular concern of members of the Washington Field Biologists Club, a professional organization of limited membership, since the turn of the Century. The Club acquired the Island in 1901 and later gave it to the National Park Service with the stipulation that members could continue research on flora and fauna. Inaccessibility and a heavy insect population at certain times of the year have made the Island undesirable to visitors — and thus preserved it, somewhat.

Members of the Club have listed more than 1,226 species of plants and 4,293 species of animals on the Island (everything from a dog to a jumping mouse or a rare bird; 1500 species of beetles alone live on Plummers, along with 300 to 400 species of bees). It is the "type-locality" for at least 175 species, meaning it is associated with the discovery of new species. No less than 16 genera and three families of plants and animals have been described on the basis of specimens collected on the Island.

Because these scientists have had unique access to specimens collected over three-quarters of a century, many comparative studies were possible. One recent study of lichens suggests that metropolitan Washington air pollution is weakening the relative immunity of certain kinds of lichen to insects, causing them to disappear.

Important news about measuring environmental changes from these and other biological indicators will be forthcoming from the Biologists Club.

WBFC DEIS Comments and Testimony, November 2020

## Appendix 5.  Rare Plants of Plummers Island (Excerpt).

A total of 4 globally rare natural communities, two of which are state rare; 21 state-rare extant flora, including one globally rare extant species; and 36 state-rare historic flora, including 4 globally rare historic taxa are known from the island.

### Rare Flora and Natural Communities
**Rare Natural Communities** (in order of lowest to highest in elevation)

Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): *Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus* Herbaceous Vegetation (USNVC: CEGL006483). Non-tidal mudflats. Global/State Ranks: G3/SNR

Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (*Hypericum prolificum, Eubotrys racemosa) / Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia* Herbaceous Vegetation (USNVC: CEGL006491). Global/State Ranks: G2/S1.

Mid-Atlantic High Terrace Hardwood Floodplain Forest: *Acer saccharum - Fraxinus americana / Carpinus caroliniana / Podophyllum peltatum* Forest (USNVC: CEGL006459). Global/State Ranks: G3?/SNR.

Potomac River Bedrock Terrace Hardpan Forest: *Carya glabra - Quercus (rubra, montana) - Fraxinus americana / Viburnum rafinesquaenum/ Piptochaetium avenaceum* Forest (USNVC: CEGL006209). Global/State Ranks: G1G2/S1.
**Rare Flora**

#### Extant Flora
White Bear Sedge (*Carex albursina*) G5/S3 (last vouchered in 2004; observed by Soreng in 2020)
Pubescent Sedge (*Carex hirtifolia*) G5/S3 (last vouchered in 1934)
Flat-spiked Sedge (*Carex planispicata*) G4Q/S1S2 (*R.H. Simmons 3525*, 4 May 2013)
Northern Leatherflower (*Clematis viorna*) G5/S3 (last vouchered in 1982)
Needle-leaf Panic Grass (*Dichanthelium aciculare*) G5/S2? (*R.J. Soreng, 8289a*, 25 May 2013)
Open-flower Panic Grass (*Dichanthelium laxiflorum*) G5/S1? (last vouchered in 1960; photographed by Simmons in 2015)
Leatherwood (*Dirca palustris*) G4/S2 T (*R.H. Simmons 4067*, 6 Nov 2015)
Harbinger of Spring (*Erigenia bulbosa*) G5/S3 (last vouchered in 1983; observed by Soreng in 2020)
Halberd-leaf Rose-mallow (*Hibiscus laevis*) G5/S3 (last vouchered in 1982; photographed by Soreng in 2020)
Green Violet (*Hybanthus concolor*) G5/S3 (last vouchered in 1960)
Ostrich Fern (*Matteuccia struthiopteris*) G5/S2S3 (One of the largest known stands in the state. *R.H. Simmons 3532*, 5 May 2013)
Two-flower Melic (*Melica mutica*) G5/S3 (last vouchered in 2015, *R.J. Soreng 8340*)
Horse-tail Paspalum (*Paspalum fluitans*) G5/S2 E (*E.F. Wells 4507*, 20 Sep 1997)
Coville's Phacelia (*Phacelia covillei*) G3/S2 E (*R.H. Simmons 3920*, 14 May 2015)
Miami-mist (*Phacelia purshii*) G5/S3 (last vouchered in 1983; observed by Soreng on mossy rocks by plot 21 between 2013 and 2017)
Hairy Hop-tree (*Ptelea trifoliata* var. *mollis*) G5/S3 (*R.H. Simmons 3585*, 2 Jun 2013)
Smooth Wild-petunia (*Ruellia strepens*) G4G5/S2S3 (*R.H. Simmons 4221*, 9 Oct 2016)
Pale Dock (*Rumex altissimus*) G5/S1 E (last vouchered in 1997)
Sticky Goldenrod (*Solidago racemosa*) G5T3?/S1 T (photographed by Soreng in 2020)
Pink Valerian (*Valeriana pauciflora*) G4/S1 E (last vouchered in 1982)
Golden-alexanders (*Zizia aurea*) G5/S3 (*R.J. Soreng 9336*, 29 Apr 2017)

WBFC DEIS Comments and Testimony, November 2020

#### Historic Flora
Earleaf False Foxglove (*Agalinis auriculata*) G3/S1 E (last vouchered in 1936)
Canada Milkvetch (*Astragalus canadensis* var. *canadensis*) G5/S1 E (last vouchered in 1940)
Blue Wild Indigo (*Baptisia australis* var. *australis*) G5/S2 T (last seen in 1935 by Killip & Blake)
Short's Rock Cress (*Boechera dentata*) G5/S3 (last vouchered in 1916)
Nottoway Valley Brome Grass (*Bromus nottowayanus*) G3G5/S3S4 (last vouchered in 1947)
Hitchcock's Sedge (*Carex hitchcockiana*) G5/S1 E (last vouchered in 1933)
Short's Sedge (*Carex shortiana*) G5/S3S4 E (last vouchered in 1928)
Bur-reed Sedge (*Carex sparganioides*) G5/S3 (last vouchered in 1933)
Slender Dayflower (*Commelina erecta*) G5/S3 (last vouchered in 1960)
Spring Coralroot (*Corallorhiza wisteriana*) G5/S1 E (last vouchered in 1915)
Smartweed Dodder (*Cuscuta polygonorum*) G5/S1 E (last vouchered in 1961)
Many-flowered Flatsedge (*Cyperus lancastriensis*) G5/S2S3 (last vouchered in 1997)
Reflexed Flatsedge (*Cyperus refractus*) G5/S2? (last vouchered in 1960)
Dwarf Larkspur (*Delphinium tricorne*) G5/S3 (last seen in 1935 by Killip & Blake)
Toothed Tick-trefoil (*Desmodium cuspidatum*) G5/S1 (last vouchered in 1960)
White Trout Lily (*Erythronium albidum*) G5/S2 T (last vouchered in 1983)
Downy Milkpea (*Galactia volubilis*) G5/S3 (last vouchered in 1961)
Striped Gentian (*Gentiana villosa*) G4/S1 E (last vouchered in 1903)
Western Sunflower (*Helianthus occidentalis*) G5/S1 T (last vouchered in 1940)
Eastern Bloodleaf (*Iresine rhizomatosa*) G5/S1 E (last vouchered in 1915)
[1]Violet Bush-clover (*Lespedeza frutescens*) G5/S3 (last vouchered in 1960)
Bog Twayblade (*Liparis loeselii*) G5/S1S2 (last vouchered in 1917)
Climbing Milkvine (*Matelea obliqua*) G4?/S1S2 E (last vouchered in 1937)
Purple Mecardonia (*Mecardonia acuminata* var. *acuminata*) G5/S2 E (last vouchered in 1939)
Basal Beebalm (*Monarda clinopodia*) G5/S3 (last vouchered in 1982)
Early Forget-me-not (*Myosotis verna*) G5/S3 (last vouchered in 1962)
Racemed Milkwort (*Polygala polygama*) G5/S1 T (last vouchered in 1950)
Small Pondweed (*Potamogeton pusillus* ssp. *pusillus*) G5/S2S4 (last vouchered in 1930)
Whorled Mountain-mint (*Pycnanthemum verticillatum*) G5/S1 E (last vouchered in 1951)
Virginia Sida (*Ripariosida hermaphrodita*) G3/S1 E (last vouchered in 1938)
Brown-eyed Susan (*Rudbeckia triloba*) G5/S3 (last vouchered in 1940)
Sessile-fruited Arrowhead (*Sagittaria rigida*) G5/S1 E (last vouchered in 1930)
Carolina Willow (*Salix caroliniana*) G5/S3 (last vouchered in 1982)
Snowy Campion (*Silene nivea*) G4?/S1 E (last vouchered in 1917)
Riverbank Goldenrod (*Solidago rupestris*) G4?/S1 X (last vouchered in 1903)
Sand Grape (*Vitis rupestris*) G3/S1 (last vouchered in 1906)

[1][= *Lespedeza violacea* (L.) Pers. misapplied); "Due to a problem with the type specimen of *Lespedeza intermedia*, the name *Lespedeza violacea*, by which this species has long been known, applies to *L. intermedia*, and the name *L. frutescens* now applies to [*Lespedeza violacea*]" (VBA 2020)]

**Key to Global Rank**
G1: At very high risk of extinction due to extreme rarity (often 5 or fewer populations), very steep declines, or other factors.
G2: At high risk of extinction due to very restricted range, very few populations (often 20 or fewer), steep declines, or other factors.
G3: At moderate risk of extinction due to a restricted range, relatively few populations (often 80 or fewer), recent and widespread declines, or other factors.
G4: Uncommon but not rare; some cause for long-term concern due to declines or other factors.
G5: Common, widespread, and abundant.


WBFC DEIS Comments and Testimony, November 2020

GH: Known only from historical occurrences but still some hope of rediscovery.
GNR: Not ranked.
GX: Not located despite intensive searches and virtually no likelihood of rediscovery.
**Key to State Rank**
S1: At very high risk of extirpation from the state due to extreme rarity (often 5 or fewer populations), very steep declines, or other factors.
S2: At high risk of extirpation from the state due to very restricted range, very few populations (often 20 or fewer), steep declines, or other factors.
S3: At moderate risk of extirpation from the state due to a restricted range, relatively few populations (often 80 or fewer), recent and widespread declines, or other factors.
S4: Uncommon but not rare; some cause for long-term concern due to declines or other factors.
S5: Common, widespread, and abundant.
SH: Known only from historical occurrences but still some hope of rediscovery.
SNR: Not ranked.
SX: Not located despite intensive searches and virtually no likelihood of rediscovery.
**Federal and State Status**
Legal status denotes a simple hierarchy of endangerment in three categories: Endangered (E), Threatened (T), and Endangered Extirpated (X). Federal Status is determined by the U.S. Fish and Wildlife Service.
*Federal Status*
LE = Listed Endangered - A taxon is threatened with extinction throughout all or a significant portion of its range.
LT = Listed Threatened - A taxon is likely to become endangered in the foreseeable future.
*State Status*
E = Endangered - A taxon is threatened with extinction throughout all or a significant portion of its range.
T = Threatened - A taxon is likely to become endangered in the foreseeable future.

**References**

Fleming, A.H. 2015. Geologic-Geomorphic Map of Plummers Island. Unpublished report. (https://wbfc.science/wp-content/uploads/2019/09/geologic_map_plummers_island.pdf

Harrison, J.W. 2016. The Natural Communities of Maryland: 2016 Natural Community Classification Framework. Maryland Department of Natural Resources, Wildlife and Heritage Service, Natural Heritage Program, Annapolis, Maryland. Unpublished report. 35 pages.

Maryland Natural Heritage Program. 2019. List of Rare, Threatened, and Endangered Plants of Maryland. Maryland Department of Natural Resources, 580 Taylor Avenue, Annapolis, MD 21401. DNR 03-031319-135

Shetler, S.G., S.S. Orli, E.F. Wells, and M. Beyersdorfer. 2006. Checklist of the Vascular Plants of Plummers Island, Montgomery County, Maryland. Bulletin of the Biological Society of Washington 14:1-57.
https://wbfc.science/wp-content/uploads/2020/07/Checklist_Vasc_Plants_Plummers.pdf

Simmons, R.H. 2015. Native Vascular Flora of the City of Alexandria, Virginia. City of Alexandria Department Recreation, Parks, and Cultural Activities, Alexandria, Virginia.

Simmons, R.H., A.H. Fleming, and R.J. Soreng. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Unpublished report. https://wbfc.science/wp-content/uploads/2019/09/plummer_island_nc_map_v1.3.pdf

Virginia Botanical Associates. 2020. Digital Atlas of the Virginia Flora (http://www.vaplantatlas.org , 23 July 2020). Virginia Botanical Associates, Blacksburg, Virginia.

34 | P a g e

WBFC DEIS Comments and Testimony, November 2020

**Appendix 6. Natural Communities of Plummers Island**



35 | P a g e

00022595

WBFC DEIS Comments and Testimony, November 2020

Appendix 7. Titles in the *Proceedings of the Biological Society of Washington* series
<u>Natural History of Plummers Island, Maryland</u>, and other key publications.

The series "<u>Natural History of Plummers Island, Maryland</u>," was published in the *Proceedings of the Biological Society of Washington* as listed below, except for XX, XXV, and XXVI, which were published elsewhere:

I. Introduction, by William R. Maxon. Vol. 48, p. 115-117. August 22, 1935.

II. Flowering plants and ferns, by Ellsworth P. Killip and Sidney F. Blake. Vol. 48, pp. 118-134. August 22, 1935.

III. Mosses, by Emery C. Leonard. Vol. 48, pp. 135-137. August 22, 1935.

IV. Birds, by Albert K. Fisher, Vol. 48, pp. 159-167. November 15, 1935.

V. Fungi, by John A. Stevenson and Edna M. Ermold. Vol. 49, pp. 123-131. August 22, 1936.

VI. Reptiles and amphibians, by Maurice K. Brady. Vol. 50, pp. 137-139. September 10, 1937.

VII. Hepaticae, by Emory C. Leonard and M. E. Pierce. Vol. 52, pp. 21-22. March 11, 1939.

VIII. Lichens, by Emory C. Leonard and Ellsworth P. Killip. Vol. 52, pp. 23-26. March 11, 1939.

IX. Mammals, by Edward A. Goldman and Hartley H. T. Jackson. Vol. 52, pp. 131-134. October 11, 1939.

X. Flowering plants and ferns-Supplement 1, by Ellswoth P. Killip and Sidney F. Blake. Vol. 66, pp. 31-38. March 30, 1953.

XI. Blue-green algae (Myxophyceae), by Francis Drouet. Vol. 67, pp. 239-241. November 15, 1954.

XII. A biological note on Trypoxylon richardsi Sandhouse, by Karl V. Krombein. Vol. 72, pp. 101-102. July 24, 1959.

XIII. Descriptions of new wasps from Plummers Island, Maryland (Hymenoptera: Aculeata), by Karl V. Krombein. Vol. 75, pp. 1-17. March 30, 1962.

XIV. Biological notes and description of the larva and pupa of Copelatus glyphicus (Say) (Coleoptera: Dytiscidae), by Paul J. Spangler. Vol. 75, pp. 19-23. March 30, 1962.

XV. Descriptions of the stages of Chaetodactylus krombeini, new species, a mite associated with the bee, Osmia lignaria Say (Acarina: Chaetodactylidae), by Edward W. Baker. Vol. 75, pp. 227-236. August 28, 1962.

XVI. Biological notes on Chaetodactylus krombeini Baker, a parasitic mite of the megachilid bee, Osmia (Osmia) lignaria Say (Acarina: Chaetodactylidae), by Karl V. Krombein. Vol. 75, pp. 237-249. August 28, 1962.

XVII. Annotated list of the wasps, by Karl V. Krombein. Vol. 76, pp. 255-280. December 31, 1963.

XVIII. The hibiscus wasp, an abundant rarity, and its associates (Hymenoptera: Sphecidae), by Karl V. Krombein. Vol. 77, pp. 73-112. June 26, 1964.

XIX. Annotated list of the aphids (Homoptera: Aphididae), by Mortimer D. Leonard. Vol. 79, pp. 117-126. May 23, 1966.

XX. Annotated list of the vertebrates, by Richard H. Manville, except birds by Alexander Wetmore and Manville. Special Publication, Washington Biologists' Field Club, pp. 1-44. January 1968.

XXI. Infestation of the lichen Parmelia baltimorensis Gyel. & For, by Hypogastrura packardi Folsom (Collembola), by Mason E. Hale, Jr. Vol. 85, pp. 287-296. August 30, 1972.

XXII. Biting midges (Diptera: Ceratopogonidae). 1: introduction and key to genera, by Willis W. Wirth, Nipban C. Ratanaworabhan, and Donald H. Messersmith. Vol. 90, pp. 615-647. October 17, 1977.

00022596

OP·LANES™
MARYLAND  | I-495 & I-270 Managed Lanes Study

WBFC DEIS Comments and Testimony, November 2020

XXIII. Studies on lichen growth rate at Plummers Island, Maryland, by James D. Lawrey and Mason E. Hale, Jr. Vol. 90, pp. 698-725. October 17, 1977.

XXIV. Biting midges (Diptera: Ceratopogonidae). 2: the species of the tribes Heteromyiini and Sphaeromiini, by Willis W. Wirth and William L. Grogan, Jr. Vol. 91, pp. 847-903. February 23, 1979.

XXV. Biting midges (Diptera: Ceratopogonidae), 3: the species of the tribe Stilobezziini, by Willis W. Wirth and William L. Grogan, Jr. *Bulletin of the Biological Society of Washington* No. 5, pp. 1-102. December 9, 1981.

XXVI. The ground beetles of a temperate forest site (Coleoptera: Carabidae): An analysis of fauna in relation to size, habitat selection, vagility, seasonality, and extinction, by Terry L. Erwin. *Bulletin of the Biological Society of Washington* No. 5, pp. 104-224. December 9, 1981.

XXVII. The decline of forest breeding birds on Plummers Island, Maryland, and vicinity, by David W. Johnston and Daniel L. Winings. Proceedings of the Biological Society of Washington 100:762-768. December 31, 1987.

XXVII [XXVIII]. Current diversity, historical analysis, and biotic integrity of fishes in the lower Potomac basin in the vicinity of Plummers Island, Maryland, by Wayne C. Starnes. Proceedings of the Biological Society of Washington 115(2):273-320. 2002.

XXIX. Checklist of the vascular plants of Plummers Island, Maryland, by Stanwyn G. Shetler, Sylvia S. Orli, Elizabeth F. Wells, and Marcie Beyersdorfer. Bulletin of the Biological Society of Washington 14: 1-58. Jan 2006].

SELECTED OTHER PUBLICATIONS COVERING PLUMMERS ISLAND

Among other publications dealing at least in part with Plummers Island or the Washington Biologists' Field Club are the following:

Adamski, D. and Ronald W. Hodges. 1996. An annotated list of North American Blastobasinae (Lepidoptera: Gelechioidea: Coleophoridae). *Proceedings of the Entomological Society of Washington* 98: 708–740.

WBFC DEIS Comments and Testimony, November 2020

Allan, Philip. 1952. Craspedacusta sowerbii in Maryland. *Proceedings Biological Society of Washington* 65:109110.

Bailey, Vernon. 1923. Mammals of the District of Columbia. *Proceedings Biological Society of Washington* 36:103-138.

Baker, Edward, W. 1964. Vidia cooremani, a new species of Saproglyphidae from a crabronine wasp (Acarina). *Entomology News* 75:43-46.

Banks, N., C. T. Greene, Waldo L. McAtee and Raymond C. Shannon. 1916. District of Columbia Diptera: Syrphidae. *Proceedings of the Biological Society of Washington* 29: 173–204.

Barber, Herbert S. 1951. North American fireflies of the genus Photuris. *Smithsonian Miscellaneous Collections* 117(1). vi + 58 pp.

Barrows, Edward M., Aaron F.Howard, Brent W. Steury. 2012. Fruit Production and Phenology of Phocelia coviili S. Watson (Hyrophyll aceae) in the Potomac Gorge Area of Maryland and Virginia. *Marilandica* Spring: 1-16.

Barrows, Edward M. 2013. Habitat abundances of a cricket-parasitizing wasp Rhopalosoma nearcticum (Hymenoptera Rhopalosomatidae) in a United States mid-Atlantic park. *Open Journal of Animal Sciences*. 3(4): 311-313.

Brown, John W. 2001. Species turnover in the leafrollers (Lepidoptera: Tortricidae) of Plummers Island, Maryland: Assessing a century of inventory data. *Proceedings of the Entomological Society of Washington* 103: 673–685.

Brown, John W. 2005. Long-term data show declines in insect composition on Plummers Island, Chesapeake and Ohio Canal National Historic Park. *Natural Resource Year In Review-2004*: 69.

Brown, K. M., G. A. Baltazar, B. N. Weinstein, and M. B. Hamilton. 2003. Isolation and characterization of nuclear microsatellite loci in the anadromous marine fish Morone saxatilis (striped bass). *Molecular Ecology Notes* 3: 414-416.


WBFC DEIS Comments and Testimony, November 2020

Brown, K. M., G.A. Baltazar, M. B. Hamilton. 2005. Reconciling nuclear microsatellite and mitochondrial marker estimates of population structure: breeding population structure of Chesapeake Bay striped bass (Morone saxatilis). *Heredity* 94:606-615.

Busck, August 1906. Notes on some tortricid genera with descriptions of new American species. *Proceedings of the Biological Society of Washington* 19: 173–182.

Busck, August 1906. New American Tineina. *Canadian Entomologist* 38: 121–125.

Busck, August 1907. A review of the tortricid subfamily Phaloniinae with descriptions of new American species. *Journal of the New York Entomological Society* 15: 19–36.

Busck, August 1907. New genera and species of American Microlepidoptera. *Journal of the New York Entomological Society* 15: 134–140.

Busck, August 1908. A generic revision of American moths of the family Oecophoridae with descriptions of new species. *Proceedings of the United States National Museum* 35 (1644): 187– 207.

Busck, August 1909. Notes on Microlepidoptera, with descriptions of new North American species. *Proceedings of the Entomological Society of Washington* 11: 87–103.

Busck, August and C. Heinrich. 1922. Life history of Ethmia macelhosiella Busck. *Proceedings of the Entomological Society of Washington* 24: 1–9.

Butte, Janardhan R. 1968. Revision of the tribe Chalepini of America north of Mexico (Coleoptera: Chrysomelidae). I. Genus Xenochalepus Weise. *Coleopterist Bulletin* 22(2): 45-62.

Butte, Janardhan G. 1968. II. Genus Chalepus Tbunberg. *Journal New York Entomology Society* 76: 117-133.

Butte, Janardhan G. 1968. III. Genus Odontota Chevrolat. *Coleopterist Bulletin* 22(4):101-124.

Christmas, Anne H. 1960. New span to unmask island jungle. *Washington evening Star*, p. B-3. (July 5).

WBFC DEIS Comments and Testimony, November 2020

Clarke, John F. G. 1941. Revision of the North American moths of the family Oecophoridae, with descriptions of new genera and species. *Proceedings of the United States National Museum* 90: 33–286.

Cole, F. R., J. R. Malloch and Waldo L. McAtee. 1924. District of Columbia Diptera: Tromoptera (Cyrtidae, Bombyliidae, Therevidae, Scenopidae). *Proceedings of the Entomological Society of Washington* 26: 181–195.

Cooke, May T. 1929. Birds of the Washington, D.C. region. *Proceedings of the Biological Society of Washington* 42:1-80.

Crawford, James C. 1909. A new family of parasitic Hymenoptera. *Proceedings of the Entomological Society of Washington* 11:63-64.

Davis, Donald R. 1990. Superfamily Tineiodea, pp. 50–55. In: Miller, Scott E. and Ronald W. Hodges (eds.), Primary types of microlepidoptera in the Museum of Comparative Zoology (with a discussion on V. T. Chambers' work). *Bulletin of the Museum of Comparative Zoology* 152.

Donnelly, Thomas W. 1961. The Odonata of Washington, D.C., and vicinity. *Proceedings of the Entomological Society of Washington* 63:1-13.

Ethridge, Mark, Jr. 1951. Biologists devote half century to lab on Potomac island. *Washington Post*, p. A-1. (August 20).

Fischer, Max. 1967. Die nearktischen Arten der Gattung Synaldis (Hymenoptera, Braconidae). *Polskie Pismo Entomologiczne* 37:464-467.

Fisher, James. 1955. Excerpt from "City in the Woods" [account of 1953 shad bake], pp. 51-52 in <u>Wild America: the record of a 30,000 mile journey around the continent by a distinguished naturalist and his British colleague by Roger Tory Peterson and James Fisher</u>. Boston: Houghton Mifflin. 434 pp.

Fleming, Peggy, and Raclare Kanal. 1992. Newly documented species of vascular plants in the District of Columbia. *Castanea* 57:132-146.

00022598

WBFC DEIS Comments and Testimony, November 2020

Frye, C. T., and C. Lea. Atlas and Annotated List of Carex (Cyperaceae) of Maryland and the District of Columbia. *Maryland Naturalist* 44(2):41-108.

Gardner, Marshal C. 1950. A list of Maryland mammals; Part I, marsupials and insectivores; Part II, bats. *Proceedings of the Biological Society of Washington* 63:65-68, 111-114.

Gardner, Marshall C. 1950. A list of Maryland mammals. Part II, bats. *Proceedings of the Biological Society of Washington* 63: 111–114.

Hale, Mason E., Jr. 1970. Single-lobe growth-patterns in the lichen Parmelia caperata. *Bryologist* 73: 72-81.

Hale, Mason E., Jr. and James D. Lawrey. 1985. Annual rate of lead accumulation in the lichen Pseudoparmelia baltimorensis. *Bryologist* 88:5-7.

Hart, C. W., Jr. 1964. Two new entocytherid ostracods from the vicinity of Washington, D.C. *Proceedings of the Biological Society of Washington* 77:243-246.

Heinrich, C. 1923. Revision of the North American moths of the subfamily Eucosminae of the family Olethreutidae. *United States National Museum Bulletin* 123, 298 pp.

Heinrich, C. 1926. Revision of the North American moths of the subfamilies Laspeyresiinae and Olethreutinae. *United States National Museum Bulletin* 132, 216 pp.

Hodges, Ronald W. 1962a. The genus Perimede Chambers in North America. *Proceedings of the Entomological Society of Washington* 64: 145–154.

Hodges, Ronald W. 1962b. A review of the genus Periploca with descriptions of nine new species. *Pan-Pacific Entomologist* 38: 83–97.

Hodges, Ronald W. 1964. A review of the North American moths of the family Walshiidae. *Proceedings of the United States National Museum* 115: 289–330.

Hodges, Ronald W. 1969. Nearctic Walshiidae-notes and new taxa (Lepidoptera: Gelechioidea). *Smithsonian Contributions to Zoology* 18:1-30.

Hoffman, R. L., S. M. Roble and W. E. Steiner, Jr. 2002. Thirteen additions to the known beetle fauna of Virginia (Coleoptera: Scirtidae, Bothrideridae, Cleridae, Tenebrionidae, Melyridae, Callirhipidae, Cerambycidae, Chrysomelidae). *Banisteria* 20: 53–61.

Hood, J. Douglas. 1917. An annotated list of the Thysanoptera of Plummer's Island, Maryland. *Insecutor Inscitiae Menstruus* 5:53-65.

Jeannel, R. 1963. Supplement a la monographie des Anillini: sur quelques especes nouvelles de l'Amerique du Nord. *Revue Francaise d'Entomologie* 30:145-152.

Kalmbach, E. R. 1968. An ornithological treasure awaits resurrection. *Auk* 85:703-706. [McAtee MS on bird names.]

Karren, Jay. 1966. A revision of the genus Exema of America north of Mexico (Chrysomelidae, Coleoptera). *University of Kansas Science Bulletin* 46: 647-695.

Killip, Ellsworth P. 1931. Plants recently discovered on Plummers Island as a result of low-water conditions. *Proceedings of the Biological Society of Washington* 44:111-115.

Knab, F., and Raymond C. Shannon. 1916. Tanypezidae in the United States. *Insecutor Inscitiae Menstruus* 4:33-36.

Krombein, Karl V. 1963. Notes on the Entomognathus of eastern United States. *Proceedings of the Biological Society of Washington* 76:247-254.

Krombein, Karl V. 1963. A new Chrysura from Plummers Island, Maryland. *Entomology News* 74:149-152.

Krombein, Karl V. 1963. The host-parasite relationship of Xylocelia virginiana Rohwer and Omalus intermedius (Aaron). *Proceedings of the Entomological Society of Washington* 65: 264.

WBFC DEIS Comments and Testimony, November 2020

Krombein, Karl V. 1964. Miscellaneous prey records of solitary wasps, V. (Hymenoptera: Aculeata). *Bulletin of the Brooklyn Entomological Society* 58:118-120.

Krombein, Karl V. 1967. Trap-nesting wasps and bees: life histories, nests, and associates. Smithsonian Publication 4670, Smithsonian Press, Washington, D.C. vi + 570 pp.

Lawrey, James D., and Mason E. Hale, Jr. 1981. Retrospective study of lichen lead accu-mulation in the northeastern United States. *Bryologist* 84:449-456.

Lawrey, James D., and Mason E. Hale, Jr. 1991. The species-area curve as an index of disturbance in saxicolous lichen communities. *Bryologist* 94:377382.

Lawrey, James D. 1992. Natural and randomly-assembled lichen communities compared using the species area curve. *Bryologist* 95(2):137-141.

Lawrey, James D., and Mason E. Hale, Jr. 1979. Lichen growth responses to stress induced by automobile exhaust pollution. *Science* 204:423-424.

Lea, C., and C. T. Frye. 2002. Carex (Cyperaceae) in the Potomac River Gorge of Maryland, Virginia, and the District of Colombia. *Bartonia* No. 61: 93-116.

Leonard, Mortimer D. 1968. Further records of aphids from Plummers Island, Md. (Homoptera: Aphididae). *Proceedings of the Entomological Society of Washington* 70: 84.

Long, E. John. 1957. A haven for the biologist is Plummers Island. *Nature Magazine* 50: 465-468.

Long, E. John. 1966. The island. *American Forests* 72: 22-24, 59-61.

Malloch, J. R., and Waldo L. McAtee. 1924. Flies of the family Drosophilidae of the District of Columbia region. *Proceedings of the Biological Society of Washington* 37: 25-42.

Malloch, J. R., C. T. Greene, and Waldo L. McAtee. 1931. District of Columbia Diptera: Rhagionidae. *Proceedings of the Entomological Society of Washington* 33: 213-220.

WBFC DEIS Comments and Testimony, November 2020

Manville, Richard H. 1972. A "sister" organization. *Cosmos Club Bulletin* 25(5):7-10.

Margolis, B. E., M. S. Castro, and R. L. Raesly. 2001. The impact of beaver impoundments on the water chemistry of two Appalachian streams. *Canadian Journal of Fisheries and Aquatic Sciences* 58: 2271-2283.

Margolis, B. E., R. L. Raesly, and D. L. Shumway. 2001. The effects of beaver-created wetlands on the benthic macroinvertebrate assemblages of two Appalachian streams. *Wetlands* 21(4):554-563.

McAtee, Waldo L. 1908. Notes on an orthopterous leaf roller. *Entomological News* 19:488-491.

McAtee, Waldo L. 1918. A sketch of the natural history of the District of Columbia. *Bulletin of the Biological Society of Washington* 1:1-142.

McAtee, Waldo L., and Alfred C. Weed. 1915. First list of the fishes of the vicinity of Plummers Island, Maryland. *Proceedings of the Biological Society of Washington* 28:1-14.

McAtee, Waldo L. 1920. Cercopidae of the vicinity of Washington, D.C., with the descriptions of new varieties of Clastoptera (Homoptera). *Proceedings of the Biological Society of Washington* 33: 171–176.

McAtee, Waldo L. 1921. Membracidae of the vicinity of Washington, D.C. *Proceedings of the Biological Society of Washington* 34: 123–134.

McAtee, Waldo L. 1927. Cicadidae of the vicinity of Washington, D.C. *Proceedings of the Entomological Society of Washington* 29: 70–72.

McAtee, Waldo L. and N. Banks. 1920. District of Columbia Diptera: Asilidae. *Proceedings of the Entomological Society of Washington* 22: 13–33.

McAtee, Waldo L. and A. N. Caudell. 1917. First list of the Dermaptera and Orthoptera of Plummer's Island, Maryland, and vicinity. *Proceedings of the Entomological Society of Washington* 19: 100–122.

WBFC DEIS Comments and Testimony, November 2020

McAtee, Waldo L. and W. R. Walton.1918. District of Columbia Diptera: Tabanidae. *Proceedings of the Entomological Society of Washington* 20: 188–206.

McComb, Charles V. 1963. A checklist and host index of the Diaspididae of Maryland and the District of Columbia. *University of Maryland Entomology Leaflet 50,* 38 pp., mimeo.

McComb, Charles W. 1967. A revision of the Chelonus subgenus Microchelonus in North America north of Mexico (Hymenoptera: Braconidae). *University of Maryland, Agricultural Experiment Station Bulletin* A-149. 148 pp.

McComb, Charles W., and R. A. Bram. 1963. A checklist and host index of the tetranychoid mites of Maryland and nearby areas. *University of Maryland Entomology Leaflet 49.* 20 pp., mimeo.

Miller, D. C. 1974. Revision of the New World Chaetarthria (Coleoptera: Hydrophilidae). *Entomologica Americana* 49:1-123.

Miller, S. E. and Ronald W. Hodges. 1990. Primary types of microlepidoptera in the Museum of Comparative Zoology (with a discursion on V. T. Chambers' work). *Bulletin of the Museum of Comparative Zoology* 152: 45–87.

Muesebeck, Carl F. W. 1963. A platygasterid parasite of certain wasp larvae. *Beitraege zur Entomologie* 13: 391-394.

Orr, R. L. 1994. Baseline survey of Odonata (dragonflies and damselflies) of the C&O Canal National Historical Park (Potomac River Corridor. Unpublished report to C&O National Historical Park. 16 October 1994.

Orr, R. L. 1995. Odonata of Plummers Island. *Argia* 7: 6–8.

Paradiso, John L. 1969. Mammals of Maryland. *North American Fauna* 66. iv + 193 pp.

Peck, S. B. 1982. A review of the ectoparasitic beetles of North America (Coleoptera: Leptinidae). *Canadian Journal of Zoology* 60: 1517-1527.

WBFC DEIS Comments and Testimony, November 2020

Perkins, P. D. 1981 (1980). Aquatic beetles of the family Hydraenidae in the Western Hemisphere: Classification, biogeography and inferred phylogeny (Insecta: Coleoptera). *Quaestiones Entomologicae* 16(12): 15-54.

Ribble, D. W. 1968. Revision of two subgenera of Andrena: Micrandrena Ashmead and Derandrena, new subgenus (Hymenoptera: Apoidea). *Bulletin of the Nebraska State Museum* 8: 237–394.

Robbins, C. A., and Sidney F. Blake. 1931. Cladonia in the District of Columbia and vicinity. *Rhodora* 33: 145-159.

Robinson, Harold. 1967. New species of Dolichopodidae from the United States and Mexico (Diptera). *Proceedings of the Entomological Society of Washington* 69: 114-127.

Sherwood, John. 1977. The curious world called Winnemana. *Washington Star* (May 8).

Smetana, A. 1974. Revision of the genus Cymbiodyta Bed. (Coleoptera: Hydrophilidae). *Memoirs of the Entomology Society of Canada* 93. iv + 113 pp.

Smetana, A. 1978. Revision of the subfamily Sphaeridiinae of America north of Mexico (Coleoptera: Hydrophilidae). *Memoirs of the Entomology Society of Canada* 105. 292 pp.

Smetana, A. 1980. Revision of the genus Hydrochara Berth. (Coleoptera: Hydrophilidae). *Memoirs of the Entomology Society of Canada* 111. 100 pp.

Smetana, A. 1985. Revision of the Subfamily Helophorinae of the Nearctic Region (Coleoptera: Hydrophilidae). *Memoirs of the Entomology Society of Canada* 131, 154 pp.

Smith, D. R. 1969. Nearctic sawflies I. Blennocampinae: Adults and larvae (Hymenoptera: Tenthredinidae). *United States Department of Agriculture Technical Bulletin* No. 1397, 179 pp. + 19 pls.

Solis, M. A. 2008. Pyraloidea and their known hosts (Lepidoptera: Insecta) from Plummers Island. *Bulletin of the Biological Society of Washington* 15(1): 88-106.

WBFC DEIS Comments and Testimony, November 2020

Sommer, Stefan Andreas 1986. The pollination ecology and breeding system of Hamamelis virginiana L. (Hamamelidaceae). M.S. Thesis, University of Maryland, College Park, MD. vii, 83 leaves.

Staines, C. L. 2004. Changes in the chrysomelid (Coleoptera) community over a 95-year period on a Maryland river island (USA), pp. 613 –622. In Jolivet, P., J. A. Santiago-Blay & M. Schmitt (eds.), New developments in the biology of Chrysomelidae. Academic Publishing, The Hague.

Staines, C. L. and S. L. Staines. 1999. Observations on Euphoria inda (L.) (Insecta: Coleoptera: Scarabaeidae). *The Maryland Naturalist* 43: 31–33.

Staines, C. L. and S. L. Staines. 1998. The leaf beetles (Insecta: Coleoptera: Chrysomelidae): potential indicator species assemblages for natural area monitoring, pp. 233–244. In: Therres, G. D. (ed.), Conservation of biological diversity: A key to the restoration of the Chesapeake Bay Ecosystem and beyond. *Maryland Department of Natural Resources*, Annapolis, Maryland.

Steiner, W. E., Jr. 2000. Records and habitat of the "rare click beetle," Cerophytum pulsator (Haldeman), in Virginia and Maryland (Coleoptera: Cerophytidae). *Banisteria* 15: 43–45.

Steiner, W. E., Jr. 2008. A Checklist of the Darkling Beetles (Insecta: Coleoptera: Tenebrionidae) of Maryland, with Notes on the Species Recorded from Plummers Island Through the 20th Century. *Bulletin of the Biological Society of Washington* 15: 233-140.

Stewart, Robert E., and Chandler S. Robbins. 1958. Birds of Maryland and the District of Columbia. United States Department of Interior, North American Fauna 62. 401 pp.

Steyskal, G. C. 1963. A second North American species of Traginops Coquillett. *Proceedings of the Entomological Society of Washington* 65: 51-54.

Stork, N. E. 1984. Additions to the list of Carabidae (Coleoptera) in the fauna of Plummers Island, Maryland. *Coleopterists' Bulletin* 28: 137–141.

Tauber, C. A. 1969. Taxonomy and biology of the lacewing genus Meloema. *University of California Publications in Entomology* 58. 94 pp.

WBFC DEIS Comments and Testimony, November 2020

Viereck, Henry L. 1912. Descriptions of one new family, eight new genera, and thirty-three new species of ichneumon-flies. *Proceedings of the U.S. National Museum* 43: 575-593.

Zimmerman, J. 1970. A taxonomic revision of the aquatic beetle genus Laccophilus (Dytiscidae) of North America. *Memoirs of the American Entomological Society* 26. 275 pp.

**WEST END CITIZENS ASSOCIATION – BRIAN SHIPLEY**



## WEST END CITIZENS ASSOCIATION
### Rockville, Maryland

November 9, 2020

Maryland Department of Transportation
707 North Calvert Street, Mail Stop P-601
Baltimore, MD 21202

To Whom It May Concern,

I am writing to you as President of the West End Citizen Association (WECA), a community of 1,600 homes in Rockville, MD. I-270 Exits 5 and 6 offer direct access to our community and our entire western boarder is I-270 – we rely on I-270 and will be greatly impacted by any changes.

**#1**

Our community members have been actively engaged in understanding and evaluating the seven alternatives presented in Chapter 2 of the Draft Environmental Impact Study. When put to a vote, the community selected the NO BUILD option because we believe that the other six alternatives will NOT positively impact congestion along I-270. Additionally, it is predicted that teleworking will be more acceptable and widely implemented in the future, which will likely lower traffic volumes on I-495 and I-270. Therefore, it only makes sense to hold off on next steps for this project until a new purpose and need is defined.

Thank you.

Sincerely,

Brian Shipley
President, West End Citizens Association

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**WEST MONTGOMERY COUNTY CITIZENS ASSOCIATION – CAROL VAN DAM FALK**

**From:** Carol Van Dam Falk <carolvandam1@gmail.com>
**Sent:** Monday, November 9, 2020, 10:52 AM
**To:** Lisa Choplin; governor.mail@maryland.gov; pfranchot@comp.state.md.us;
Treasurer@treasurer.state.md.us; marc.elrich@montgomerycountymd.gov;
councilmember.friedson@montgomerycountymd.gov;
councilmember.albornoz@montgomerycountymd.gov;
councilmember.glass@montgomerycountymd.gov;
councilmember.jawando@montgomerycountymd.gov;
councilmember.riemer@montgomerycountymd.gov; susan.lee@senate.state.md.us;
ariana.kelly@house.state.md.us; Korman, Marc Delegate; sara.love@house.state.md.us
**Subject:** Beltway Expansion DEIS

November 9, 2020

Dear Ms. Choplin, Director, I-495, I-270 P-3 Office, Md-DOT,

#1    The Draft Environmental Impact Study (DEIS) and other independent analyses has shown that Governor Hogan's beltway expansion project would hurt local ratepayers, Maryland taxpayers, and would be especially devastating for local residents. In March, the Washington Suburban Sanitary Commission (WSSC) estimated the cost would be $2 billion to move water and sewer pipes to make way for the project; that's more than double the original estimate from MDOT. The state has consistently refused to acknowledge who will cover the cost. WSSC

**Response to DEIS Comment #1**
Refer to Chapter 9, Section 3.4.M for a response to impacts to utilities and associated costs.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**#1 Cont**

fears it may have to raise ratepayers' water bills. Despite Governor Hogan's claims that the proposal will cost Maryland taxpayers nothing, the DEIS admits that upwards of $1 billion in state subsidies might be needed to complete the project (Washington Post).

Other public/private partnership projects like the Purple Line have run over budget to the tune of $755 million. Developers have demanded the state cough up additional funding to keep the project alive. The governor's response? Crickets. The DEIS acknowledges that under high cost and high interest rate scenarios, every single alternative will run a deficit between $482 million to $1.01 billion for building the Purple Line.

**#2**

Local communities will pay the biggest price for the beltway project. The DEIS acknowledges that 1,500 properties will be negatively impacted, and up to 34 homes will have to be bulldozed completely.

**#3**

The project will disproportionately impact local communities, particularly low-income communities and communities of color, all of whom will be forced to cope with increased noise and air pollution and increased risk of flooding and water pollution.

**#4**

The proposal would also negatively impact dozens of community resources including schools, parks, and hospitals, not to mention the numerous environmental concerns. The DEIS acknowledges that the project will lead to increased particulate matter, carbon monoxide, ozone, carbon dioxide, and greenhouse gas emissions in local communities, yet it does not adequately address these concerns.

**#5**

The goal of the project is to increase highway capacity, which obviously leads to far more vehicles on the road and increased greenhouse gases for generations to come. Climate change, the number one priority for people across the world, is mentioned only once in the main body of the 350 page report and makes no attempt to mitigate the increased greenhouse gas emissions.
At a time when all efforts should be concentrated on reducing climate pollution, this project would do the exact opposite. Over 550 acres of new impervious surfaces will be added, drastically increasing stormwater runoff, pollution, and flash flood risk for local communities.

**Response to DEIS Comment #2**

Thank you for your comment concerning impacts to Rock Creek Stream Valley Park and Indian Spring Terrace Local Park. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because Rock Creek Stream Valley Park and Indian Spring Terrace Local Park are located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

Refer to Chapter 9, Section 3.4.F for a response to adverse impacts to air quality.

Refer to Chapter 9, Section 3.4.G for a response to climate change and greenhouse gas considerations.

**Response to DEIS Comment #5**
Refer to Chapter 9, Section 3.4.G for a response to climate change considerations.

00022605

#6

Nearly all of the stormwater mitigation efforts will need to be done off site, frequently outside the impacted watersheds, further burdening local communities and their watershed. Rock Creek, Sligo Creek, Northwest Branch, and other local creeks will all be impacted. Over 50 acres of wetlands could be impacted, further worsening stormwater runoff and destroying wildlife. Nearly 30 miles of local streams, creeks, and rivers would be negatively impacted in total (Table ES-2). Dozens of local parks, including the C&O Canal, Cabin John Regional Park, Indian Spring Terrace Local Park, Rock Creek Stream Valley Parks, and many, many more (Table 4-5)- will be negatively impacted.

#7

Approximately 1,500 acres of forest canopy will be removed. 155 acres of area of sensitive species review will be impacted, hurting wildlife, increasing habitat fragmentation, and harming endangered and threatened plant species (Table ES-2). From the beginning, the DEIS review process has been deeply flawed. The state has always favored an extensive-build option, even though every Environmental Impact Statement is required to include a "Statement of Purpose and Need," a justification of why the proposed project should be built. This project's purpose and need includes language to ensure that the only project that could receive approval are massive highway expansions that have the potential to create revenue for private corporations. All proposed and studied alternatives include nearly identical impacts to the environment and local communities (Table ES-2), which intentionally allows the state to exclude viable alternatives to massive highway expansion, such as expanding other transit options that are likely to involve a lower cost and far less impact on the environment.

#8

Beyond all that, the burning question now is do we even need this project? Private and public companies, corporations and agencies based in Maryland and DC have demonstrated convincingly during the coronavirus pandemic for the past nine months that commuting to work by car is unnecessary. Work from home/telework and staggered commute times is the new norm, all of which is to say there is no evidence that this project will be needed once the nation recovers from the COVID-19 pandemic.
Even if there was no pandemic, numerous studies have shown that expanding highways almost never results in the desired goal of traffic

**Response to DEIS Comment #6**

The Preferred Alternative would have an estimated permanent impact of 1.0 acres to the Chesapeake and Ohio Canal National Historical Park, and an estimated temporary impact of 9.1 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 5.7 acres to Cabin John Regional Park, and an estimated temporary impact of 0.6 acres during construction.

SWM quantity management will be required on-site. SWM water quality treatment will be required to be maximized on-site. A more detailed analysis for the FEIS has resulted in a significant reduction in offsite water quality treatment. However, some offsite SWM water quality treatment is expected due to the numerous constraints located along the study corridor, which is heavily developed with numerous natural, cultural, and socioeconomic resources.

**Response to DEIS Comment #7**

The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarize the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail. This analysis directly contributed to MDOT SHA's evaluation of these alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided. Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to DEIS Comment #8**

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

00022606

OP·LANES™
M A R Y L A N D  | I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

**#8 Cont**

reduction; the costly I-270 expansion in Montgomery County more than 20 years ago serves as a perfect example. Within a few years of the project's completion, bottlenecks were a common site along the I-270 corridor.

A recent study by the Maryland Transportation Institute at the University of Maryland found that only a 5-15% reduction in cars on the road during rush hour would virtually end congestion, making any expansion pointless (Maryland Matters). Even if only a small percentage of people switch to teleworking for good, the state needs to fully examine and study whether this project is viable.

**#9**

West Montgomery County Citizens Association firmly believes a more thorough examination is required before the state moves forward with the beltway expansion project. We support the "no-build" option.

Sincerely,

Carol V. Falk, WMCCA Board Member
On behalf of the West Montgomery County Citizens Association

Carolvandam1@gmail.com

**Response to DEIS Comment #9**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

00022607

**WINGATE CITIZENS ASSOCIATION – ROSS CAPON**

#1

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Ross Capon

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Live Testimony/Afternoon

**Transcription:**

'm Ross R-O-S-S, Capon C-A-P-O-N. I live 24 years at 9220 Shelton Street, Bethesda. Former president of Wingate Citizens Association, which abuts the Beltway, I'm testifying on their behalf. The association supports the No Build option, not the toll lanes project. Investments that encourage idle commuting would worsen our serious air quality and global warming problems and our ability to compete with regions which are adhering to sustainability principles. Some of the recent shift to telecommuting is likely permanent. So, this is the wrong time for big investments and expanded highway capacity. An article posted today at Maryland Matters says if just 50 percent of drivers take the toll lanes, congestion would disappear. This is nonsense. Since congestion avoidance is the primary incentive to use the toll lanes. The same commentary is silent on environmental issues and on the recent continuing improvements being made to 270 and presumes that more road capacity is the only meaningful transportation investment. Some early promises are invalid. This project will impose big dollar costs on taxpayers and WSSC ratepayers. A recent report cites the roughly $1 trillion dollar shortfall over the next decade facing US surface transportation and continues, "P3's are often mentioned as a solution to this shortfall. This idea is simply wrong as the US Treasury Department notes, all infrastructure investments ultimately depend on either user fees, government tax revenues or a combination of the two. Second, the project will not remain within the existing highway footprints there will be major takings. Moreover, it will increase pressure to widen the Beltway east through Silver Spring and beyond, where more substantial takings will be required. The DEIS identifies loss of park land, 15 hundred acres of tree canopy, impacts to 1,500 properties, and the taking of up to 34 homes. Moreover, Parks and Planning says the limits of disturbance are not realistic and the impacts could be greater, especially regarding parks and open space. Chapter four notes increased flood risk in adjacent communities, impacts on 47 parks, removal of trees and landscaping that buffer parks, decrease in available wetland and waterway habitat and plant and animal species in those areas, and destruction of 21 known national historic properties. It would be financially irresponsible for Maryland to undertake this project when two huge transit needs and replacement of the aging Bay Bridge must be addressed. And with MTA proposing big cuts to transit service with no clear plan duration, we need a transportation system that reduces economic inequality, not increases it, and that system will provide jobs if we just get the right leadership and direction. Thank you very much for your time.

**Response to DEIS Comment #1**

Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**WOODMOOR-PINECREST CITIZENS ASSOCIATION – HARRIET QUINN**

| | |
|---|---|
| **From:** | wpatraffic <wpcatraffic@yahoo.com> |
| **Sent:** | Monday, November 9, 2020 10:11 PM |
| **To:** | MLS-NEPA-P3 |
| **Cc:** | Gregory Slater; Nick Brady; wpcatrffic@yahoo.com |
| **Subject:** | Woodmoor-Pinecrest Citizens Association MLS DEIS Comments |
| **Attachments:** | WPCA_MLS_P3_DEIS_Comments.pdf |

Dear Director Choplin:

Attached are comments on the Draft Environmental Impact Statement for the I-495/I-270 Managed Lanes Study from the Woodmoor-Pinecrest Citizens Association in Silver Spring.

We thank you for your work and request your careful and thoughtful consideration of these comments.

Sincerely,
Harriet Quinn
Woodmoor-Pinecrest Citizens' Association

1

*This page is intentionally left blank.*



WOODMOOR PINECREST CITIZENS' ASSOCIATION

November 9, 2020

Lisa Choplin
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation
State Highway Administration
707 North Calvert Street, Mail Stop P-601
Baltimore, MD 21202

VIA EMAIL: MLS-NEPA-P3@mdot.maryland.gov

**RE: I-495/ I-270 Managed Lanes Draft Environmental Impact Statement (DEIS)**

Dear Director Choplin:

The Woodmoor-Pinecrest Citizens' Association (WPCA) is a civic association serving a community of more than 1,150 families located in eastern Silver Spring. The neighborhood is over 78 years old and has housed generations of families. The borders of our neighborhood are I-495, the Northwest Branch of the Anacostia River, Colesville Road (US 29) and University Boulevard (MD-193).

As a neighborhood bordered by three state highways, we have worked collaboratively for decades with the Maryland Department of Transportation (MDOT) State Highway Administration (SHA) on many projects that provided solutions to various issues. While we appreciate the opportunity to submit comments on the I-495 /I-270 Managed Lanes Study (MLS) DEIS, we object to the insufficient time allowed to review the 19,000+ pages contained in the Study that were released in the midst of the Covid-19 pandemic.

The WPCA previously submitted comments on the Scoping and Alternatives Retained for Detailed Study (ARDS) for the MLS and provided testimony during the public hearing.

**Oppose all Build Options**

The proposed highway expansion project would cut through the heart of our community. Due to the significant negative direct and indirect impacts of the proposed project and the many unanswered questions, the WPCA voted unanimously to support the No Build option (Alternative 1) and does not support the current slate of build alternatives identified by MDOT.

#1

1

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to the Woodmoore-Pinecrest Community. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the I-495 interchange at Colesville Road and facilities such as Montgomery Blair High School and the Silver Spring YMCA are located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

The Supplemental DEIS and FEIS include additional details regarding the impact of the pandemic on travel, including results of a COVID-19 Travel Analysis and Monitoring Plan developed for the project. Refer to **FEIS, Appendix C** for a copy of the latest version of that plan and results.

The intent of the project is to improve operations for all users, not just those "willing to pay the tolls". The results of the operational analysis indicate that congestion will be reduced in the general purpose lanes and delays will be reduced on the local roads in most areas because the HOT lanes serve traffic that otherwise would be using the general purpose lanes and local roads. Additionally, HOV 3+ and transit vehicles will also be able to use the managed lanes (and obtain the associated speed and travel time benefits) without paying a toll.

The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. However, widening adjacent to Colesville Road is no longer included in this project. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.


Comments addressed above.

November 9, 2020

**#1 Cont**

**Request to Pause MLS during Covid-19 and Reassess Purpose and Need**

We request that the project be paused during the Covid-19 pandemic. The pandemic has fundamentally altered this region's commerce, employment, and traffic patterns. All of the current project's key assumptions and financials, including traffic volumes and the expected tolls, are based on assumptions and projections from prior to the Covid-19 pandemic and are no longer applicable. The project should be reassessed after the pandemic subsides.

Experts agree that there is great uncertainty regarding traffic and congestion in the years to follow COVID-19 stay-at-home orders. A recent study performed by AECOM – a widely respected transportation consultant for Northern Virginia Transportation Authority (NVTA) - predicts far lower Vehicle Miles Traveled ("VMT") across the DMV in 2025: VMT post pandemic could see a 40% decrease. [1]

Another recent study by Maryland's leading transportation analysts, the Maryland Transportation Institute (MTI) at the University of Maryland, found that a 5% -15% reduction in cars on the road during rush hour would virtually end congestion and that a 10% reduction in peak-hour outer loop Beltway traffic resulted in a 61% reduction in delays. [2]

Yet, the DEIS only makes a passing reference to the effects of the pandemic on commuting in one short paragraph in 19,000+ pages. It is clear, that the DEIS does not have an adequate analysis of something that will likely impact this project in its entirety.

We should fully study whether this project will even be viable if just a small percentage of people switch to telework on a long-term basis. Even without COVID-19, numerous studies show that expanding highways almost never results in the desired reduction of traffic and congestion. Induced demand has led to highway expansion projects being back to pre-build traffic levels in as little as 5 years.

Finally, nearly all of the benefits listed in the DEIS for traffic speed and travel times only benefit those willing to pay the tolls, which the DEIS shows could be well over $2.00 per mile for some segments (Appendix C, p. 883). For some sections of the highway, the DEIS admits that average travel speed will actually decrease for those in the toll-free lanes during peak times (Table 3-5).

---

[1] *Pandemic has Reshaped Northern Virginia's Commute for Years to Come*. WTOP, August, 19, 2020 wtop.com/dc-transit/2020/08/pandemic-has-reshaped-northern-virginias-commute-for-years-to-come

[2] *Analysts: More Telework, Change in Habits Could Dramatically Ease Congestion*, Maryland Matters, August 14, 2020. www.marylandmatters.org/2020/08/14/analysts-more-telework-change-in-habits-could-dramatically-ease-congestion

Page 2 of 6

Comments addressed above.

#1
Cont

November 9, 2020

**Neighborhood Community Impacts**

Our Woodmoor neighborhood and the surrounding Four Corners communities that abut I-495 would be disproportionately affected by the proposed project. These communities were already established prior to the construction of the Beltway and have experienced the negative impacts and separation due to the highway construction and expansion over the years. The DEIS analysis minimizes the actual impacts to these communities and suggestions for mitigation are insufficient. Moreover, the limits of disturbance (LOD) in the DEIS do not adequately reflect the likely impacts. Since MDOT SHA will not finalize the design until after it awards a contract to a private partner to engineer, design and construct, there is significant risk that the LOD will be much broader than what is characterized in the DEIS and would affect more property owners and businesses than currently shown.

MDOT is proposing to add up to six additional lanes (not four) to the Beltway between Brunett Avenue and University Boulevard. Two of those lanes would be elevated to Colesville Road, causing even more property and noise impacts to the adjacent areas. This appears to be the only area in the project with a configuration that adds six lanes. This configuration would also include adding three additional traffic signals at the ramps with Colesville Road, which would cause additional backups that will result in cut through traffic through our neighborhood. Colesville Road would be one of the few access points to the toll lanes in the Silver Spring area, which would result in redirecting many vehicles through this community and would increase, not reduce traffic on our local roads.

Three bridges within our community would require reconstruction: Colesville Road over the Beltway, University Boulevard over the Beltway and the Beltway Bridge over the Northwest Branch. Our neighborhood is adjacent to the latter two bridges, and both were reconstructed within the last five years. The impacts to our community were significant during reconstruction, in terms of traffic backups on the highway, resulting neighborhood cut through traffic as well as construction noise at night.

Our neighborhood high school, Montgomery Blair, the largest public school in Maryland, would lose athletic field space. It is already very constrained in terms of land. Blair High School is home to a very diverse population of over 3,200 students and 400 staff, who would be ill-served by losing space that is currently dedicated to sports and recreational activities. The students at Blair represent underserved communities and deserve to be able to play sports at school on the currently existing fields.

The intense construction activity and noise immediately adjacent to the school and neighborhoods and the resulting additional emissions would surround the area for years, impacting the health and well-being of residents, students and staff.

Page 3 of 6

OP•LANES™
MARYLAND
I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

| | | Comments addressed above. |
|---|---|---|

**#1 Cont**

November 9, 2020

The preliminary noise pollution analysis map indicates noise levels above 66 dB into the Montgomery Blair High School building area. In addition to traffic noise levels beyond the acceptable standards propagating to the school building with perhaps the inability to mitigate due to the proposed height of the new lanes, the school would be subjected to years of very significant construction noise from 3 adjacent sides because in addition to the Beltway reconstruction, as previously mentioned, the adjacent bridges over the Beltway on Colesville Road and University Boulevard would have to be reconstructed. The students at Blair HS, particularly those from underserved communities, can ill-afford the long-term negative effects of these unnecessary distractions on their studies.

Dozens of homes within our neighborhood boundaries would lose property to additional Beltway expansion.  Dozens of other residences in the surrounding Four Corners neighborhoods would also lose property and some would be completely displaced. Several businesses in Four Corners on Forest Glen Road would be displaced.  In addition to displacing residents and businesses and reducing property values for owners, these takings would also affect the character of the neighborhoods.

The historic Silver Spring YMCA would be forced to leave the neighborhood area. This facility is a longstanding and tremendous community resource for our area, providing fitness classes, workout facilities, two swimming pools, as well as day care and summer camps and recreation for area families. The loss of the YMCA in this densely populated area would be devastating.

The DEIS does not address the impact of widening on the connecting local roads, such as Colesville Road (US 29), where there are currently five access ramps for the Beltway, or University Boulevard (MD-193) where there are six access ramps. The DEIS should provide analysis of the traffic impacts of Beltway expansion on local neighborhood streets and arterials, especially for those areas with proposed access points to toll lanes.

Eventual widening of Colesville Road in the Four Corners area would devastate our robust commercial district. The numerous neighborhoods surrounding Four Corners rely on the shops and restaurants in this district, which is the exact mix of walkable commercial and residential property that is so desired by both the planners in our region and by residents.

The loss of adjacent park land would have a negative impact on the health and environment of the surrounding area.

The loss of hundreds of acres of adjacent irreplaceable tree canopy would have a negative impact on the health and environment of the surrounding area. There would not be room in the immediate area for replacement of the trees lost.

Page 4 of 6


Comments addressed above.

**#1 Cont**

November 9, 2020

**Stormwater Management and Public Utilities in the Area**

We are very concerned with how proposed expansion would affect stormwater management in this area that impacts three watersheds. We also do not want WSSC or any other utilities to shoulder any costs related to relocation of water, sewer, gas, power, or telecommunications infrastructure and then transferring that cost to their customers. WSSC has estimated the expansion would cost them over $2 billion for relocation of pipes. There has been no assessment performed of the actual costs of and subsidies for this project. No budget has been shared with the public.

**Purple Line P3 Default**

The massive budget overruns on the Purple Line implementation demonstrate the risks with management of P3 transportation projects. Given that the private contractor has stated their intention to abandon the Purple Line project in the middle of construction, those issues must be resolved before the State considers any contracts for another massive P3 transportation project for Montgomery County.

**Alternatives Omitted from Study**

Prior to the DEIS, the Agencies unreasonably defined the study's purpose and need so narrowly that they only considered alternatives which involved construction of two to six new toll lanes. The Agencies did not analyze other, much less expensive and less disruptive options for smaller scale roadway improvements, or transportation systems and transportation demand management options. Given the changing dynamic in commuting patterns with the current public health emergency, it is irresponsible to not take these tremendous shifts into account.

Further, there has been insufficient study of both the MD-200 (ICC) Diversion Alternative as well as Transportation Systems Management (TSM) and Travel Demand Management (Alternative 2). Under NEPA requirements, Agencies must consider all alternatives that are "practical or feasible from a technical and economic standpoint."

**Conclusion**

In conclusion, due to numerous harmful impacts to residents, homes, students, parkland, and the environment, as well as the many unanswered questions and insufficient information, the WPCA supports the No Build option (Alternative 1) for I-495 east of I-270.
MDOT should prioritize and consider other immediate, easier to implement, less disruptive, less harmful, and less expensive solutions to traffic and congestion issues such as the MD-200 Diversion Alternative as well as Transportation Systems and Travel Demand Management.

Page 5 of 6

00022614

November 9, 2020

Respectfully submitted,

Greg Siers, President
Woodmoor~Pinecrest Citizens' Association
Silver Spring, Maryland  20901

Cc:
Gregory Slater, Secretary, Maryland Department of Transportation

Page 6 of 6

*This page is intentionally left blank.*

00022615

**WOODMOOR-PINECREST CITIZENS ASSOCIATION – MICHELE RILEY**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** Michele Riley

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Live Testimony/Afternoon

**Transcription:**

#1

My name is Michele Riley. M-I-C-H-E-L-E, R-I-L-E-Y. My address is 416 Hillmoor Drive, H-I-L-L-M-O-O-R Drive in Silver Spring 20901. I'm a resident of the Woodmore neighborhood in the Four Corners area of Silver Spring and a member of the board of the Woodmore Pine Crest Citizens Association, which has over 1,100 homes. Our association will be providing more comprehensive written comments on the DEIS to be submitted prior to the close of the public comment period. Our neighborhoods boundaries are I-495, University Boulevard, Colesville Road, and the northwest branch of the Anacostia. This project would cut through the heart of our community. Our association supports the No Build option for the Beltway east of I-270 because of the significant direct and indirect impacts to our neighborhood and surrounding community, including 1.) the limits of disturbance that would be required for any of the build alternatives will likely be much broader than characterized in the DEIS. 2.) the Silver Spring YMCA would be forced to leave the neighborhood area. This facility is a longstanding and tremendous community resource for our area, providing fitness classes, workout facilities and two swimming pools, as well as day care and summer camps for area families, and the loss of the YMCA in this densely populated area would be devastating. 3.) Our neighborhood high school, Montgomery Blair, the largest high school in Maryland, would lose athletic field space, which is already very constrained. Blair High School is home to a very diverse population of over 3,200 students and 400 staff who would be ill served by losing space currently dedicated to sports and recreational activities to this beltway expansion. The students at Blair High School represent underserved communities and deserve to be able to play sports at school on the currently existing field. Moreover, the intense construction activity and noise immediately adjacent to the school and the resulting additional emissions would surround the school for years, impacting the health and well-being of students and staff. 4.) The eventual widening of Colesville Road in the Four Corners area would devastate our robust commercial district. The numerous neighborhoods surrounding Four Corners rely on the shops and restaurants in this district, which is a mix of walkable commercial and residential property that is so desired by the planners in our region and by residents. 5.) Dozens of homes in our neighborhood would lose property to the beltway expansion project. And 6.) the loss of adjacent park land and irreplaceable tree canopy would have a negative impact on the health and environment of the surrounding area. There would not be room in the immediate area for replacement of the trees lost. For these reasons, the Woodmore Pine Crest Citizens Association supports the No Build option. We encourage MDOT to reconsider this project and evaluate other alternatives that are less impactful and reflect the fact that congestion and vehicle miles traveled have dropped significantly due to the global pandemic. These changes may be permanent due to significant increases in adoption of telework by many employers. Thank you for your time.

**Response to DEIS Comment #1**

Thank you for your comment concerning impacts to the Woodmore community. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Four Corners community is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

## WOODSIDE FOREST CIVIC ASSOCIATION – DANIEL HATTIS

| | |
|---|---|
| **From:** | Daniel Hattis <danhattis@gmail.com> |
| **Sent:** | Monday, November 9, 2020 4:35 PM |
| **To:** | MLS-NEPA-P3 |
| **Cc:** | aklase@marylandtaxes.gov; treasurer@treasurer.state.md.us |
| **Subject:** | Comment to I-495/I-270 DEIS |

To Whom It May Concern:

I write on behalf of the Woodside Forest Civic Association (WFCA) to oppose widening of I-495 and I-270, and to support the no-build option.

**#1**

Woodside Forest is a community in Silver Spring between Georgia Avenue to the west and Colesville Road to the east. I-495 and Sligo Creek Park form our northern boundary. As such, any change to I-495 would have a dramatic impact on our neighborhood.

Being so close to Washington, DC and surrounded by major roads, transportation issues are critical to Woodside Forest. Many of our residents use I-495 every day to commute or to go about their daily business. We are very familiar with the flow of traffic on that road and, during the hours when traffic is slow, we get just as frustrated as anyone else. Therefore, we welcome reasonable efforts to improve our ability to move more expeditiously and safely throughout the region.

However, the current expansion effort under discussion is not the answer. Not only would it fail to fix traffic flow, it would lead to major problems both for Woodside Forest, for our region, and for the entire state.

As noted, Woodside Forest is adjacent to I-495 and some homes are very close to the soundwall. It is clear that any expansion to the existing roadway would cause these residents would lose their homes. The residents who remain will need to contend with far more noise pollution and the sight of the soundwall or road right next to their homes. This is untenable, would reduce the quality of life for residents, and lower home values significantly.

In addition, bringing the road closer to residents would increase air pollution for those families. Studies have shown that living within 200 yards of an interstate can have a negative impact on child development, including showing a correlation to reduced IQ. Bringing the road closer to hundreds of homes would impact many children and others who are vulnerable, such as those with asthma. In addition to the road being closer to homes, studies have shown that the additional lanes would bring an increased number of vehicles. This would further exacerbate the amount of air pollution in Woodside Forest.

Expansion of I-495 would also require a reduction to Sligo Creek Park. This is an extremely popular park and is one of the few remaining green spaces in southern Montgomery County. It is a home to many different plant and animal species, many of which are rare to see this close to a major city. In addition, thousands of residents from all over the area use its trails each day, both for recreation and to commute. Every day, children can be seen playing alongside the water and biking past deer, rabbits, toads, foxes, turtles, and other park residents. Expanding the road would do great damage to this critical natural resource. Along with the loss of trees, there would certainly be damage from water runoff from which the creek and park would never be able to recover. In addition, the state's plan to mitigate this damage by protecting lands in other parts of Maryland is not a solution. In an area where there is a distinct lack of nature with the exception of this wonderful park right outside our homes. For most residents here, the park is a big reason why we live here. It is not a solution to replace the parkland with a land far from where we live, and from which we will not derive any benefit.

1

### Response to DEIS Comment #1

Thank you for your comment concerning impacts to the Woodside Forest community. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to west of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County. See Figure 1-1 in the FEIS. The potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Four Corners community is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

Comments addressed above.

**#1 Cont**

Beyond the physical and environmental issues, this plan will do additional damage to our community and to all Maryland residents. While there are claims that this project will not cost taxpayers any money, this has been refuted by numerous reports and from the experiences of communities with similar projects. Already, we have seen that the Purple Line is costing the state vast sums of money, with more costs on the horizon. The media has also reported that the costs of moving water delivery systems is likely to be at least $2 billion--money which will be borne by residents. This does not even account for at least $1 billion which the state is putting on taxpayers to move this project forward. And then there are likely to be huge costs down the line, if there are cost overruns or if revenue does not meet expectations. In these cases, the taxpayers have been on the hook. At a time of decreased state revenue and great need to fix aging transportation infrastructure, these costs will greatly hinder the state's ability to keep up with existing and ongoing needs for decades to come. This creates a major burden on all Maryland residents.

Despite all of these problems, some may argue that the cost is worth the benefit. However, this plan will not actually reduce traffic congestion or improve the lives of Maryland residents. In fact, studies and experience have found that these types of express lanes suffer from fatal errors. First, they are only useful when there is significant traffic congestion in the free lanes. This means they are not going to reduce congestion, but are actually dependent on it. Second, they get more expensive depending on how much the roadway is used--very likely up to nearly $50 each way. This means that during the heaviest traffic periods--the time periods these lanes are supposedly most intended to address--they will be so expensive that only the wealthiest will be able to use them. We have seen from pricing in places like Virginia that the average resident will not be able to benefit from these lanes. In effect, taxpayers are subsidizing (through loss of money, land, and the environment) the wealthiest people and corporations which are willing and able to pay such exorbitant costs. Third, as noted above, it has been found that these projects only increase traffic. In all likelihood, the free lanes will wind up more congested than ever and the toll lanes will carry more cars in addition.

Once again, the WFCA opposes widening of I-495 and I-270 and supports the no-build option for the reasons noted above. We are very willing to discuss any of these issues in more detail.

Best,
Daniel Hattis
President, Woodside Forest Civic Association

2

## OP·LANES™ MARYLAND
I-495 & I-270 Managed Lanes Study
Case 8:22-cv-02597-DKC    Document 61-9    Filed 10/30/23    Page 68 of 82

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

**WYNGATE CITIZENS ASSOCIATION – JAMES LAURENSON**

I-495 and I-270 Managed Lanes Study
Joint Public Hearing Testimony

**Name:** James Laurenson

**Joint Public Hearing Date:** 9/3/2020

**Type/Session:** Live Testimony/Morning

**Transcription:**

Hi, my name is James Laurenson, it's J-A-M-E-S L-A-U-R-E-N-S-O-N. I am at 5916 Melvern Drive Bethesda. I'm the chair of the Land Use and Legislation Committee of the Wyngate Citizens Association of Bethesda, Maryland, and co-founder of the Montgomery County Faith Alliance for Climate Solutions in the Cedar Land Ecosystems Study Group, a member of several local environmental and public interest groups. In December, I emailed the State to express Wyngate's support of the non-concurrent expressed by the Park and Planning Commission of the ARDS. Sadly, these issues still exist and now there are more. Many of which, others have gone into in great, great detail. The DEIS fails to conduct and display the required hard look at the potential for adverse health and environmental, including environmental justice effects, especially in light of recently curtailed national air pollution, fuel efficiency and other rules, which thus violates rules allowing the public to understand and comment, and allowing relevant agencies to completely consider impacts and litigations.

**#1**

**#2**
Second, it uses an overly narrow set of options, which are simply variations on a theme of highway expansion and polls with no meaningful variety, and especially any locals serving transit and related options, which thus violates EIS rules regarding the need for a reasonable range of alternatives as clearly described in cases such as NRDC versus Mortin, 1972.

**#3**
Third, it fails to address the pandemic's effects, and per 40 CFR 1502.9C1, which states that agencies shall prepare supplements if there are significant new circumstances or information and it does not do this. This is a monumental omission that demands a full stop to the process until adequate supplements are developed and given proper public review.

**#4**
Fourth, it will not pay for itself as claimed, and rather, will cost the state billions, especially given the pandemic's long-term effects. And yet no itemized budget has ever been shared, which is yet another violation of the rules. And fifth, perhaps the most significant issue of all – lacks any consideration of county, state, or international climate crisis plans without even one mention of climate effects in the DEIS and with flawed and laughable assumptions that just little or no increase in VMT. Let me be clear. This failure ignores the very real and existential impact on our shear existence and that of every other species, which would be, and this is no exaggeration, a crime against humanity and nature. Therefore, I, and those I represent do not support the 495 270 Managed Lanes P3 Program. And instead, because we have no other choice, support the No Build option. Federal and state employees – do the right thing. That should be why you joined government work. And in any case, that is what we pay you for. Thank you.

**Response to DEIS Comment #1**
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 – Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**Response to DEIS Comment #2**
Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

**Response to DEIS Comment #3**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

**Response to DEIS Comment #4**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

## ROCK CREEK CONSERVANCY – COMPLETE LETTER SUBMITTAL

**From:** Jeanne Braha <jbraha@rockcreekconservancy.org>
**Sent:** Monday, November 9, 2020 2:32 PM
**To:** MLS-NEPA-P3; Lisa Choplin
**Subject:** Rock Creek Conservancy Comments on 495/270 DEIS
**Attachments:** 2020 11 09 RCC DEIS Comments to SHA 495 270.pdf

Please find attached comments from Rock Creek Conservancy. I appreciate your confirming receipt.

Thank you,
Jeanne

--

Jeanne Braha
Executive Director
**Rock Creek Conservancy**
7200 Wisconsin Avenue, Suite 500, Bethesda, MD 20814
jbraha@rockcreekconservancy.org
301-579-3105



Friend us on Facebook
Follow us on Twitter
Follow us on Instagram



*Rock Creek Conservancy exists to restore Rock Creek and its parklands as a natural oasis for all people to appreciate and protect.*

**Rock Creek Conservancy**
**Comments on Managed Lanes Study Draft Environmental Impact Statement**
November 9, 2020

*Submitted via email to: MLS-NEPA-P3@mdot.maryland.gov, LChoplin@mdot.maryland.gov*

Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21201

Re: Rock Creek Conservancy Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation

Rock Creek Conservancy (the Conservancy) submits these comments in support of the no-build option.

The alternatives presented in the Draft Environmental Impact Statement (DEIS) and Draft Section 4(f) Evaluation for the 475/270 Managed Lanes Study would create major – and avoidable – impacts on Rock Creek. Given the lack of specificity and accountability suggested by the DEIS, the Conservancy supports the no build alternative at this time.

The U.S. Department of Transportation (DOT) Federal Highway Administration (FHWA) and the Maryland Department of Transportation (MDOT) State Highway Administration (SHA) (together, Agencies) should not go forward with this flawed DEIS. At a minimum, the Agencies should not move forward with any of the fundamentally flawed build alternatives without redoing the DEIS and providing the public an opportunity to review and comment on the impacts the Agencies failed to evaluate, particularly the specific plans for mitigation of impacts to the Rock Creek watershed.

Rock Creek Conservancy is a non-profit organization based in Bethesda, MD that restores Rock Creek and its parklands for all people to appreciate and protect, and annually engages more than 4,500 volunteers in people-powered restoration.

I.      Alternatives

The DEIS acknowledges that the preliminary range of alternatives "could have a varying degree of potential environmental impacts" but states that the Agencies screened out all options that did not meet "the transportation purpose and need," and so "the consideration of the potential for varying degrees of environmental impacts was not a differentiator in whether the alternative should be retained or dismissed." DEIS, App. B, at 94. The objective of NEPA is to rigorously explore all reasonable alternatives in light of their environmental impacts. By not considering and comparing the environmental impacts of the preliminary range of alternatives, the Agencies failed to identify whether any of these preliminary alternatives may have had less environmental impact than the screened alternatives. This is particularly

7200 Wisconsin Avenue, Suite 500 | Bethesda, MD 20814
(301) 579-3105 | info@rockcreekconservancy.org
rockcreekconservancy.org | #LoveRockCreek

1

problematic because, as the DEIS acknowledges, "The overall difference in environmental impacts between the Screened Alternatives was not significant." DEIS, App. B, at 95. The Agencies improperly screened out any alternatives that may have had less impact and improperly narrowed the alternatives to be studied in detail in the DEIS to those that have almost identical environmental impacts. This result directly conflicts with the objectives of NEPA and is a fundamental flaw of the DEIS.

The alternatives presented in the Draft Environmental Impact Statement (DEIS) for the 475/270 Managed Lanes Study would have significant impacts on Rock Creek and these impacts can be avoided by the selection of other alternatives. Of particular concern, is the Agencies' failure to consider alternatives that would avoid or minimize adverse impacts to wetlands, streams, floodplains and parks. There is virtually no difference in impacts to Maryland wetlands and streams regardless of which alternative is selected, and no difference at all in impacts to Palustrine Open Waters and Virginia wetlands and streams. The DEIS fails to consider any alternatives, other than the no build alternative, that might have fewer adverse environmental impacts. None of the alternatives considered would avoid or minimize adverse impacts. Furthermore, the DEIS fails to demonstrate that there is no practicable alternative with less extensive impacts to wetlands and waterways than the proposed highway expansion alternatives. One obvious alternative is the MD 200 (ICC) Diversion Alternative, which would have avoided direct impacts on Rock Creek and avoided residential property takings. This alternative should be analyzed fully in a new DEIS.

The DEIS presents an MD 200 Diversion Alternatives Analysis but it improperly adds managed lanes to I-95 to the model, which reduces that alternative's environmental and traffic benefits. The addition of these managed lanes is not necessary to evaluate the MD 200 Diversion Alternative and the Agencies must analyze the Diversion without this addition. The MD 200 Diversion Alternative should be studied in more detail with various modeling assumptions, including analyses with and without the I-95 segment. Furthermore, the Agencies failed to consider a variety of assumptions that would incentivize the MD 200/I-270 route as opposed to traveling on I-495/I-95 through operational changes such as restructuring the tolling systems and speed limits currently in place and adding more dynamic signage. Without the I-95 managed lane segment, the reduction in environmental impact provides a greater benefit for the MD 200 Alternative. Therefore, the analysis provided by MDOT SHA fails to demonstrate that it not a reasonable alternative under NEPA or a reasonable avoidance technique under Section 4(f)." This alternative would eliminate impacts to the Rock Creek watershed.

### II.    Impacts on Wildlife and Habitat

Rock Creek is a primary driver of quality of life in our region – for people and for our ecosystems. The ribbon of green around Rock Creek from Laytonsville to Georgetown provides not only recreational benefits to residents but also habitat connectivity to wildlife, from the endangered Hays spring amphipod[1] to birds who use the parks as part of their migratory flyway.

#### A.    The DEIS Fails to Adequately Identify and Analyze Impacts on Aquatic Species, Aquatic Habitat, and Fisheries

The Project would impact more than 16,000 linear feet of Rock Creek, and yet the DEIS fails to provide a detailed description and analysis of the impacts of the Project on aquatic biotic resources. Instead the

[1] Center for Biological Diversity. Hay's Spring Amphipod.
https://www.biologicaldiversity.org/species/invertebrates/Hays_spring_amphipod/index.html

DEIS provides only a "watershed quality index" that includes a brief narrative description ("good," "poor," "very poor") of existing aquatic conditions for habitat, benthic invertebrates, and fish but provides no analysis of direct or indirect effects on aquatic biotic resources. See DEIS, at 4-106. Rock Creek's aquatic habitats are rated fair to good/fair; benthic invertebrate score range is very poor to poor/fair; fish range is very poor to good. This current state is, in large part, a function of degradation due to stormwater runoff from existing highway surfaces[2] and should not preclude protection of the creek.

The DEIS Natural Resources Technical Report (NRTR), see DEIS, App. L, is referenced several times as containing further information regarding impacts to aquatic resources, but this appendix also fails to indicate how aquatic habitat, benthic invertebrates, or fish will be impacted by the build alternatives. Appendix L simply provides additional information on the current conditions of aquatic habitat, fish populations, and benthic macroinvertebrates, DEIS, App. L, at 113 to 146. The analysis of impacts in the NRTR is limited to one conclusory statement:

> all Screened Alternatives have the potential to affect aquatic biota in the corridor study boundary due to direct and indirect impacts to perennial and intermittent stream channels. Stream channel impacts associated with the Screened Alternatives range from 153,702 to 156,984 LF and wetland impacts range from 15.4 to 16.5 acres. Impacts are provided in more detail in Section 2.3.3 and in Table 2.9-58 and Table 2.9-59 below."

DEIS, App. L, at 146. Wetland impacts in Rock Creek are relatively modest, but the features in the watershed are particularly notable: one of the largest remaining wetlands in the downcounty area and the DEIS notes that Rock Creek had the most vernal pools in its floodplain throughout the project area (at 4-103).

The citations referenced in the above excerpt from the DEIS provide no further analysis, but rather present summaries of the impervious surface, in feet and acres, that would be added under the build alternatives. The linear feet and acres of impervious surface to be added by the build alternatives tells the Agencies and the public nothing about how the build alternatives would impact aquatic biota. Other than the no-build alterative, the alternatives would add 54.5 to 62.9 acres of impervious surface to the Rock Creek watershed.

Given the complete lack of information on impacts, it is no surprise that the DEIS also fails to provide any information on how the Agencies plan to mitigate potential impacts to aquatic biota. Section 4.18.4 of the DEIS states that MDOT SHA will continue to coordinate with regulatory agencies and resource managers to identify sensitive aquatic resources and determine potential avoidance and minimization as Project designs are refined, DEIS, at 4-109, but these issues must first be addressed in the DEIS in order for the environmental impacts of the Project to be considered. There is general information on aquatic resources and mitigation in several DEIS appendices, but none of this information provides any analysis of impacts to the existing aquatic biota. See DEIS, NRTR, App. N, Agency Correspondence; DEIS, App. M, AMR; DEIS, NRTR, App. M; DEIS, App. N, Compensatory Mitigation Plan, App. A – M. The DEIS must be supplemented with sufficient data to analyze direct and indirect effects on biotic aquatic resources and provide a detailed description of proposed mitigation of those impacts.

[2] MNCPPC staff report October 22, 2020 (ck date)



The delineated parameters of the Corridor Study Boundary defines the area in which data on existing environmental conditions were collected (300 feet on either side of the centerline of I-495 and I-270). DEIS, at 4-2. This area is too limited to fully evaluate the direct effects of the Project on aquatic biota in streams and wetland and is certainly too restricted to evaluate indirect downstream effects. For direct effects, the study boundary needs to be expanded to include all waterways and wetlands that would receive stormwater from or otherwise be impacted by construction and operation of the Project. For indirect effects, the analysis should consider all cumulative and secondary effects on aquatic ecosystems, including those downstream from the waters that are directly impacted. Rock Creek Park, a national park, is approximately three miles downstream of the project area and would be adversely impacted by increased stormwater flows.

Separately, the Conservancy requests that the Agencies reference in the body of the DEIS the aquatic biota maps that currently are buried in appendices. *See, e.g.*, DEIS, NRTR, App. B, Natural Resources Inventory Mapbook_Part1 to Part 4; *See also*, NRTR, App. K, Aquatic Biota and Surface Water Sampling Monitoring Map. Although this information does not help the public determine the potential impacts of the project on aquatic biotic resources, it at least provides information on the location of these resources.

B. *The DEIS Fails to Adequately Identify and Analyze Impacts on Federal and State Rare, Threatened, or Endangered Species and Habitats*

The Endangered Species Act (ESA) establishes a process for identifying and protecting plant and animal species that are "threatened" or "endangered." 16 U.S.C. §§ 1533-1544. Section 7 of the ESA requires federal agencies to consult with U.S. Fish and Wildlife Service (FWS) and National Marine Fisheries Service (NMFS) to make sure that any proposed federal agency action is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [the species' critical] habitat . . . ." 16 U.S.C. § 1536(a)(2). If FWS or NMFS advises the agency that the proposed action area includes neither a listed species nor its critical habitat, then there is no need for further consultation. 50 C.F.R. § 402.12(d)(1). However, if the agency determines that the action is likely to adversely affect a listed species or its critical habitat, then the agency must engage in formal consultation, which requires the agency to prepare a "biological assessment" of the action and requires FWS or NMFS to issue a "biological opinion" as to whether the action is likely to "jeopardize the continued existence of any listed species or destroy or adversely modify" critical habitat. 50 C.F.R. § 402.14(h).

In addition, the Agencies may need to reopen the consultation process when "new information reveals effects of the action that may affect listed species or critical habitat." 50 C.F.R. § 402.16(b). If the biological opinion finds jeopardy of species or destruction or adverse modification of critical habitat, the FWS or NMFS must suggest "reasonable and prudent alternatives" to the proposed activity that would not violate the ESA. 16 U.S.C. § 1536(b)(4). The agencies would have to agree to a reasonable and prudent alternative approved by FWS or NMFS and receive an incidental take statement from FWS or NMFS before the proposed action can move forward. *Id.*

The Maryland Nongame Endangered Species Conservation Act regulates activities in a similar fashion but applies to impacts on plants and wildlife, including their habitats, listed on the Maryland Threatened and Endangered Species list. Md. Code Ann., Nat. Res., § 10-2A-01 to 10-2A-09. The Maryland Threatened and Endangered Species list is more expansive than the federal list and also requires protections for animals that are deemed in "Need of Conservation."

C. The DEIS Fails to Adequately Identify Impacts on the Northern Long-Eared Bat

Two federally listed bat species, including the Northern Long-eared Bat, which is found in Rock Creek Park, have been identified by FWS as potentially being impacted by the build alternatives. DEIS, at 4-111. Therefore, a formal ESA § 7 consultation must take place, requiring FHWA to perform biological assessments and FWS to issue biological opinions pursuant to 50 C.F.R. § 402.14(h). The DEIS states that field studies will be conducted to identify whether the bats are using habitat that may be impacted by the build alternatives. DEIS, at 4-111. It appears that no biological opinion has been issued yet, given that none is referenced in the DEIS. Moreover, the field studies FWS directed FHWA to conduct have not yet been performed. DEIS, at 4-111. The biological assessments along with the FWS determinations as to whether the build alternatives will cause "jeopardy or adverse modification" must be completed prior to the conclusion of the NEPA process. Furthermore, if FWS determines that the species may be jeopardized, destroyed or adversely modified, then the Project must incorporate the alternative actions suggested by FWS.

D. The DEIS Fails to Adequately Identify Maryland Aquatic Species and Fails to Account for Impacts to Maryland Species

The DEIS does not identify Maryland special-status aquatic species that may be present in waterways within the corridor study boundary area or areas that may be affected downstream. Some fish species and aquatic invertebrate species possibly occurring in the project area are identified in Appendix N of DEIS Appendix L (NRTR: Agency Correspondence), however, it is unclear whether this appendix provides the complete list of Maryland aquatic rare, threatened, or endangered species. This information should be provided in the main DEIS document.

The DEIS also fails to provide any information on how the Agencies plan to avoid, and if necessary, mitigate any harm to Maryland rare, threatened, or endangered species. *See* DEIS, at 4-109 to 4-112. All proposed mitigation measures should be included in NEPA documents to provide the public with information regarding how the Agencies plan to avoid illegal takings of these species during any proposed construction and operation of the build.

III. The DEIS and Section 4(f) Analysis Fail to Adequately Address the Project's Effects on Historic and Cultural Resources Impacts to Parklands

Approximately three miles of the Rock Creek stream channel runs alongside the current Beltway and within Rock Creek Stream Valley parks (units 2 and 3), managed by the Maryland-National Capital Parks and Planning Commission. Section 4(f) of the US Department of Transportation Act mandates that projects like this may only use parks, recreation areas, or wildlife refuges if no feasible and prudent avoidance alternative exists.

In its 4(f) review, the DEIS fails to consider alternatives to taking these significant wetlands and floodplains on parkland by considering only single-mode road alternatives. Data on parks and rec facilities were gathered using desktop sources including GIS data and relevant county planning documents[3]. A project with this scale of impact merits careful analysis, including ground truthing of those assumptions. Had DEIS preparers walked the three miles of Rock Creek along the beltway, they would have seen one of the largest remaining downcounty wetlands, as well as migratory birds that use the Rock Creek stream

---

[3] p 18, ch 4

valley parks as part of their migration along the Atlantic flyway. A more thorough investigation would allow for more qualitative – rather than just quantitative – assessment of impact, ensuring that the myriad ecosystem services of the area are protected. Mitigation of these impacts should include building noise barriers along the highway to protect wildlife and recreational users from the significant noise more traffic will create.

In addition, the DEIS fails to analyze the extent of impacts to parkland, including their connection as a cohesive system, as is required by Section 106 of the National Historic Preservation Act. The DEIS's reliance on a smaller "Limits of Disturbance" radius, instead of a broader Area of Potential Effect that would consider all potential direct, indirect, and cumulative effects, impermissibly restricts consideration of the Project's true effects on historic and cultural resources and incorrectly limits effects considered to physical impacts only, even though adverse visual, audible, and atmospheric effects are also expected. The DEIS includes only rudimentary information about Rock Creek Stream Valley Parks units 2 and 3, which are part of a National Register-eligible site and does not consider the project's proximity to parkland. The DEIS notes that, in addition to the negative effects of permanent conversion of Rock Creek Stream Valley units 2 and 3 from parkland to highway/use for transportation, 'construction impacts MAY also temporarily diminish the integrity of the setting and feeling of the property.' There is no doubt that a project like this would diminish the setting and feeling of the property to the thousands of visitors who use the park each year.

Rock Creek Park, a unit of the National Park Service, is just a few miles downstream of the project area and would be adversely affected by polluted stormwater runoff. In addition, the Capper Cramton Act[4] envisioned continuous stream valley protection extending from the national park into Montgomery County – this project would frustrate that experience for recreational users and wildlife.

IV. The DEIS Fails to Examine How Increased Stormwater Will Affect Receiving Waterways

Under NEPA, the Agencies must "carefully consider detailed information concerning significant environmental impacts" and make the public aware of those environmental effects before a proposed action is chosen. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010). Among other things, the Agencies must provide detailed information on how polluted stormwater from the Project will affect receiving waterways.

The Clean Water Act (CWA) prohibits discharges of pollutants to waters of the United States without a permit. 33 U.S.C. §§ 1311, 1342. The Agencies state that they will meet all required permitting for stormwater runoff but fail to address how increased stormwater runoff and the associated increase in pollutant loads to receiving waterways will meet established effluent limitations. *See id.* § 1362(11) (defining an effluent limitation as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance"). The type, quantity, and contents of the discharge determine the types of limitations the permit must impose on the discharger and should be carefully considered in the

[4] https://www.ncpc.gov/docs/publications/Capper_Cramton_Resource_Guide_2019.pdf

DEIS. Stormwater collects pollutants on its way to stormwater management facilities and eventually into municipal storm sewer systems, when they exist, and receiving waterways. These discharges can negatively impact the chemical, physical, and biological conditions of waterways. It is well recognized that stormwater can degrade water quality, particularly in urban settings, yet the DEIS fails to take a hard look at how the large increases in stormwater from the build alternatives will impact water quality.[5] The Maryland Department of the Environment has itself stated that "[i]t becomes fairly easy for all organizations, individuals, and government agencies to agree that urban stormwater is a problem that must be addressed." MDE, Response to Formal Comments for Montgomery County NPDES Permit (2009).

This project would dramatically increase stormwater runoff to Rock Creek, at a time when Maryland is struggling to manage suburban stormwater pollution under the Chesapeake Bay agreement. The alternatives retained for design would add between 52 and nearly 63 additional acres of impervious surface to the Rock Creek watershed. Alternative 5, which has been dropped from consideration, would add only 43.7 acres of impervious surface – and the I-200 diversion would add 0 additional acres to the Rock Creek watershed.

The Rock Creek watershed is already impaired by phosphorus, bacteria[6], and sediment[7] in Maryland for one or more designated use, meaning that the waterways in these watersheds currently do not meet water quality standards because they already receive high levels of one or more pollutant. DEIS, App. L, at 47, 48; *see* 33 U.S.C. § 1313. DEIS, App. L, at 55. The build alternatives would increase impervious surface and the numbers of vehicles traveling the Beltway and I-270, thereby increasing stormwater runoff and pollutant loads. Stormwater impacts will be one of the largest environmental impacts of this Project and yet the DEIS fails to identify to what extent new stormwater loads will impact the water quality of receiving waterways.

A. The DEIS Fails to Identify Stormwater Volume and Pollutant Loads

DEIS Section 2.7.2 provides an overview of applicable federal, state, and local stormwater and water quality requirements that the selected alternative will need to meet under the Clean Water Act, Maryland Stormwater Management Act, and Montgomery County and Prince George's County stormwater management requirements, and identifies how much impervious surface would be added by the build alternatives (Table 2-5) and how many major culvert crossings may be built. DEIS, pp. 2-37 to 2-39. The DEIS fails, however, to provide an estimate of stormwater volumes or pollutant loads by alternative. DEIS, at 2-39. Instead, the Agencies punt this analysis until after the NEPA process is concluded. DEIS, at 2-39 ("A detailed SWM analysis will be performed for the Selected Alternative during final design to determine required and provided stormwater management volumes."). It appears the Agencies may have already conducted some volume calculations given that this information is needed to estimate the location and type of stormwater facilities needed along the proposed new highway lanes, DEIS, at 2-37 to 2-38, but this information is not included in the DEIS.

[5] *See, e.g.*, National Academies of Science, Committee on Reducing Stormwater Discharge Contributions to Water Pollution, *Urban Stormwater Management in the United States* (2009); *see also* Hallie Miller, *Report Faults Maryland for Failings in Chesapeake Bay Pollution*, Washington Post (Aug. 18, 2020), https://www.washingtonpost.com/local/report-faults-maryland-for-failings-in-chesapeake-bay-pollution/2020/08/18/8c4421f2-e193-11ea-b69b-64f7b0477ed4_story.html.
[6] https://mde.maryland.gov/programs/water/TMDL/ApprovedFinalTMDLs/Pages/TMDL_final_Rock_Creek_Nutrient.aspx
[7] https://mde.maryland.gov/programs/water/TMDL/ApprovedFinalTMDLs/Pages/TMDL_final_Rock_Creek_Nutrient.aspx

B. The DEIS Fails to Take a "Hard Look" at How Increased Stormwater Will Affect Receiving Waterways

The impacts of stormwater on receiving waterways is discussed only superficially in the DEIS. Although the DEIS mentions that "[a]n evaluation of potential water quality loss and major culvert crossings was also conducted," DEIS, at 2-37, there are no data presented for water quality loss, only tables and estimates of the amount of impervious surface to be added and conclusory statements indicating that stormwater will negatively impact receiving waterways. The DEIS also fails to model how anticipated increases of stormwater volumes will impact water chemistry.

For example, DEIS § 4.13.3 states:

All Build Alternatives would affect surface waters, surface water quality, and watershed characteristics in the corridor study boundary due to direct and indirect impacts to ephemeral, intermittent, and perennial stream channels and increases in impervious surface in their watersheds. The impacts to jurisdictional surface waters by classification are summarized in Table 4-20 of this chapter. The impacts to jurisdictional surface waters by MDNR 12-digit and USGS HUC8 watersheds are provided in the Natural Resources Technical Report (Appendix L, Section 2.3).

DEIS, at 4-89; *see also id.* at 4-90 to 4-91. However, those references do not discuss the likely impacts to water quality in any detail. Table 4-20 provides information on the total square footage and acres of wetlands and waterways that would be disturbed by each alternative but provides no information on impact to water chemistry. The flaws in Appendix L, also referenced here, are discussed further below.

Similarly, DEIS § 4.13.3 states:

In addition to tree removal, stormwater discharges also have the potential to increase surface water temperatures in nearby waterways. The effect of the temperature change depends on stream size, existing temperature regime, the volume and temperature of stream baseflow, and the degree of shading. Thermal effects from decreased shading and stormwater discharge are of particular concern for Use III and IV stream networks, such as Paint Branch and Northwest Branch, as they support aquatic biota less tolerant of warmwater conditions.

DEIS, at 4-90. Yet the DEIS fails to quantify the likely temperature changes or to discuss their likely impacts on the affected waterways. *See also* discussion at DEIS, at 4-90 to 4-91 (providing general descriptions of the effects of chlorides, organic pollutants, and sediments on water quality, but neglecting to specify or otherwise analyze their effects in the context of the Project, except to say that they "increase in impervious areas"). The DEIS identifies where the most and least impervious areas would be added, but still does not analyze the impacts and refers to the same flawed Appendix L that is discussed below.

*Id.* at 4-91. Table 4-29 simply provides the amount of impervious surface (52.5 – 62.9 acres in Rock Creek) to be added to each of the seventeen impacted watersheds.

Appendix L, Section 2.3, identifies existing water quality conditions for the watersheds and the most common contaminants found in highway stormwater before making the conclusory statement that:

There would be no effect on surface waters and watershed characteristics from the No Build Alternative. However, all Screened Alternatives would affect surface waters and watershed characteristics in the corridor study boundary due to direct and indirect impacts to ephemeral, intermittent, and perennial stream channels. Impacts to jurisdictional surface waters are discussed in Section 2.3.3 and the impacts to jurisdictional surface waters by MDNR 12-digit watershed are included in Table 2.3-8. Watersheds would also be impacted by increasing impervious surface area. SWM controls will be included in the final design to reduce velocity of runoff flow and negative impact to water quality. Section 2.4.3.C includes more information regarding environmental effects to water quality. Additional information regarding SWM measures are discussed in Section 2.7.3 of the DEIS. Note that although the corridor study boundary intersects the Piscataway Creek Tier II watershed, no features were identified and therefore no impacts would occur within this watershed.

DEIS, App. L, at 78.

Appendix L, Section 2.3.3 makes no reference to stormwater impacts. Table 2.3-8 provides the total area of wetlands and waterways that will be disturbed. Appendix L, Section 2.4.3 simply restates information provided in Section 4.13.3 of the main DEIS document.

In Appendix L, Section 2.3, the Agencies provide thirty-three pages of data and discussion showing the existing chemical and physical conditions of each impacted watershed, DEIS, App. L, at 45-78, but fail to provide any analysis of the effect the most common contaminants found in highway stormwater runoff would have on the water quality in these watersheds. *Id.* at 78; § 2.4.3(A), (C). In fact, the only time the effects of stormwater are ever mentioned in the summary of watershed existing conditions is in a small section discussing Sligo Creek that states, "direct effects of runoff would likely affect water quality." DEIS, App. L, at 66. There is no information cited to support how the Agencies arrived at this conclusion or to what extent Sligo Creek would be impacted. There is no discussion of stormwater in the existing conditions sections for the other sixteen watersheds, including the Rock Creek watershed.

The Agencies must identify specifically how building new highway lanes and reconstructing existing lanes, which are the only build alternatives being considered, will increase stormwater flow and pollutant loads. DOT should model the anticipated stormwater runoff to identify and characterize the quantity and quality of runoff, including identifying estimated total volumes, peak discharge, and velocity. This discussion should include an itemized calculation of stormwater from each drainage area for each proposed alternative and models showing how this stormwater would impact the ability of the receiving waterway to meet existing effluent limitations. This analysis should also consider the impact on local waterways from the lack of proposed onsite treatment and the impact of using water quality trading credits relied upon by the Agencies to meet stormwater permitting requirements.

More information on issues with the proposed water quality trading proposed in the DEIS is provided in the Subsection II.C.4. of this comment document. There are models readily available to the Agencies that would allow them to provide meaningful information about the risk of adverse effects of runoff on receiving waterways, which can then inform a determination of impact, the need for mitigation measures, and the potential effectiveness of such management measures for reducing these risks. *See for example*, Stochastic Empirical Loading Dilution Model, FHWA (2013), https://pubs.usgs.gov/tm/04/c03/.

00022624

The Agencies must provide a supplemental EIS containing a stormwater impact analysis and provide the public with an opportunity to comment on these proposed projects impacts.

C. The Analysis Used to Identify Stormwater Management Needs Is Incomplete and Lacks Supporting Data

The Agencies must evaluate all relevant data and "articulate a satisfactory explanation" for the conclusions reached in the EIS. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Agencies fail to explain and provide sufficient data in the DEIS to support the stormwater management needs identified in the DEIS. The Agencies must provide an explanation for the findings in Table 2-5 as to the number of lanes that will need to be reconstructed. Additionally, the DEIS fails to consider impacts to smaller culverts.

> i. The DEIS Provides Insufficient Data to Support its Impervious Surface Area Calculations and the Selection of Stormwater Management Facilities Proposed

Section 2.7.2 identifies the types of stormwater management to be used to manage the large quantities of stormwater that will be produced by all build alternatives. DEIS, at 2-37 to 2-39. The DEIS identifies the type of stormwater facilities (quantity ponds, ESD ponds, swales, quantity vaults, and water quality vaults) and water culverts to be used and their proposed locations based on the amount of impervious surface area calculated for each build alternative. DEIS, at 2-38; Table 2-5. However, no photos, maps, or data are provided to support the calculated impervious areas presented in Table 2-5. *Id.* (Table 2-5 provides the acres of impervious area for each build alternative broken down by: Required Quantity surface area (acres); Provided Quantity surface area (acres); Required ESD surface area (acres); Provided ESD surface area (acres); and Impervious Area Requiring Offsite Treatment (acres)). A footnote to Table 2-5 states that, "Offsite requirements are based on the engineering design as of January 2020." This design should have been included in the DEIS, but it was not.

The DEIS proposes new stormwater facilities to be built along the study corridor to accommodate stormwater runoff but fails to consider impacts to existing stormwater management facilities. DEIS, at 2-38; *see* DEIS, App. D, EnvMapping_web_part1 to EnvMapping_web_part4. The DEIS does not provide information on existing stormwater management facilities. Given this lack of information, it is unclear how the construction of new facilities will impact existing facilities proposed at the same site. It appears that some newly proposed facilities would be built on top of or overlapping existing stormwater management facilities. For example, Map 99 in Appendix D, Environmental Mapping, proposes three new facilities within the traffic loops where I-270 meets Democracy Boulevard. There are already seven existing facilities located at the same location as the proposed facilities (numbers 150657 through 150060). *See* MDOT SHA NPDES SWM FAC mapping tool, available at https://www.arcgis.com/home/webmap/viewer.html?useExisting=1&layers=d588b42cc24f4ef48235a86259da3270.

The DEIS also fails to describe or account for how existing stormwater runoff will be managed if and when existing facilities are removed or replaced to site new facilities. Moreover, in situations where new facilities replace old facilities, the DEIS should explain how they will be built with sufficient capacity to address all existing and new stormwater runoff. There are several publicly available resources the

Agencies can use to identify existing facilities along the study corridor.[8] The Agencies established the limits of disturbance (LOD) by estimating the areas around the build alternatives that will be impacted by "construction, construction access, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, and related activities." DEIS, at 2-40. The LOD for each alternative should be cross-referenced with the appropriate local map and loss of treatment and storage should be accounted for in the planning and design of stormwater management facilities. Proposed stormwater management facilities are shown on the DEIS Environmental Resource Maps, but the maps fail to show the drainage areas to the facilities. *See* DEIS, App. D, EnvMapping_web_part1 to EnvMapping_web_part4. These maps also fail to show where facilities will connect into existing drainages networks. All drainage areas and areas used to connect facilities to existing drainage networks need to be included within the LOD. It is unclear whether the LOD currently includes these areas given that they are not shown on any of the DEIS maps. Without maps showing the drainage areas and any other data used to calculate the impervious surface areas provided in Table 2-5 and identify connection points to existing drainage infrastructure, the public is foreclosed from reviewing and commenting on the sufficiency of the proposed stormwater management facilities.

> ii. No Information is Provided to Support the Percentage of Existing Lanes to be Reconstructed

The amount and type of stormwater management required under the Maryland Stormwater Management Act of 2007 is dictated in part by the amount of impervious surface area created and reconstructed. Md. Code Ann., Env't §§ 4-201.1, 4-203 (2014). Specifically, if the percentage of lanes that need to be reconstructed exceeds 40 percent, "all existing impervious areas located within a project's LOD are required for management." Maryland Stormwater Design Manual, Chapter 5, p. 5-117. To calculate the amount of new and reconstructed impervious surface, the Agencies "assum[ed] all shoulders and 25 percent of the existing lanes would need to be reconstructed." DEIS, at 2-37. The Agencies calculated this percentage by conducting "field investigat[ions] to determine existing conditions." *Id.* However, no information is provided to support the conclusion that only 25 percent of existing impervious surface will be reconstructed. The public is currently unable to review and comment on this finding given a lack of supporting information. The Agencies must provide sufficient information to support their conclusion, including field logs, maps, photos, or other information used to calculate this important number.

Regardless of the percentage of reconstructed impervious surface, the Conservancy encourages the Agencies to account for and provide for treatment of all stormwater from existing lanes given that much of this polluted water is currently untreated, as is clear from a visual observation of degraded outfalls along the highway. Additionally, the DEIS assumes that culverts that need to be replaced to accommodate increased stormwater volumes will be installed using trenchless construction techniques that will not disturb the existing road. Although this would be an ideal outcome, there is no information presented in the DEIS to suggest all culverts can be replaced using trenchless technology and the Conservancy urges

---

[8] MDOT SHA NPDES SWMFAC:
https://www.arcgis.com/home/webmap/viewer.html?useExisting=1&layers=d588b42cc24f4ef48235a86259da3270.
Prince George's County Clean Water Map: https://www.arcgis.com/apps/webappviewer/index.html?id=dc168a43d3554905b4edd6e61799025f.
Montgomery County (map at bottom of page): https://www.montgomerycountymd.gov/water/stormwater/maintenance.html.
Fairfax County:
https://www.fairfaxcounty.gov/GeoApps/JadeIndex.html?configBase=https://www.fairfaxcounty.gov/GeoApps/Geocortex/Essentials/REST/sites/Jade/viewers/Jade/virtualdirectory/Resources/Config/Default.


the Agencies to consider that at least some percentage of replaced culverts may require road reconstruction.

iii.   Impacts to Culverts Smaller Than 36 Inches Must be Considered

DEIS Section 2.7.2.c looks at how major culverts, defined as culverts 36 inches in diameter or greater, will be impacted by the increase of stormwater flow and proposes that some culverts will need to be replaced by larger culverts. DEIS, at 2-38. However, no consideration is given to smaller culvert channels. Adding impervious surface area will have more significant detrimental impact on smaller channels with smaller drainage areas given that the percentage of impervious surface area added will be higher for these channels. As is the case for the issues discussed above, the DEIS fails to identify exactly which culverts would need to be replaced with larger ones and where these culverts are located. A list of the culverts to be replaced should be provided along with the data used to identify these culverts. The proposed new culverts should be included on the Environmental Resource Maps, DEIS, App. D, EnvMapping_web_part1 to EnvMapping_web_part4.

E. The DEIS Fails to Consider Viable Stormwater Avoidance and Mitigation Options

The DEIS fails to sufficiently consider stormwater avoidance and mitigation options that would avoid or minimize stormwater impacts. The DEIS fails to consider areas immediately surrounding the build alternatives, but outside the LOD, for possible stormwater management. The DEIS explains that "[t]he design for on-site SWM [stormwater management], including ponds and large facilities along the roadside and within interchanges, was developed to a concept level of detail and was included within the LOD." DEIS, App. L, at 32. This statement effectively means that any amount of stormwater that cannot be managed and treated by a stormwater management facility within the LOD will be addressed offsite and possibly outside of the Rock Creek watershed.

The Agencies propose to address a large amount of stormwater from the Project through the use of compensatory stormwater management, i.e., treating stormwater in another area instead of treating the stormwater created by the Project (also known as water quality trading). The Agencies base this proposal on a finding that there is not enough land available along the study corridor to hold and treat all stormwater projected by the selected alternatives. DEIS, at 2-37. The DEIS explains the need for so much offsite treatment as follows: "[d]ue to the large amount of impervious area requiring treatment for each Build Alternative and existing site constraints, ESD could not be met for the Build Alternatives within the study area." DEIS, at 2-38. For example, alternative 10 (add two priced managed lanes in each direction on I-495 and on I-270 and retain one existing HOV lane in each direction on I-270 only) would require 434 acres of offsite treatment, id., meaning that the stormwater from 434 acres of impervious surface (a volume that is not disclosed in the DEIS, as is discussed above) will go untreated if alternative 10 is selected.

F. The DEIS fails to analyze whether underground storage or stormwater swales could be used to manage stormwater.

For example, the build alternatives could utilize more space within the right of way for stormwater treatment, and proposed drainage swales could be designed as stormwater management swales. Underground storage could also be built into the shoulders/medians where there is less regular traffic. See the revised alternative image below for an example:

**Figure 2-6: Alternative 9 Typical Sections**



SWM Swale            UG

G.   The DEIS suggests Using a Water Quality Bank Rather Than Mitigation Within Affected Watersheds.

The Agencies propose using a project-specific Water Quality Bank that will utilize water quality trading credits to meet the requirement to make up for the lack of onsite treatment for any build alternative selected. The DEIS states that this bank will be "developed through a variety of means including but not limited to the transfer of excess water quality credits from other MDOT programs (e.g. the TMDL program)." DEIS, at 2-38. The DEIS fails to provide information regarding where these offsite treatment credits would come from or whether there are sufficient credits available within the local watershed. Furthermore, it is unclear how many credits will be coming from the MDOT SHA banking program or if MDOT SHA currently has sufficient credits available within its program to meet the credit needs of this proposed project. MDOT SHA already struggles to supply sufficient credits to meet the proposed project stormwater permitting requirements. Will credits be obtained from within the local 8-digit watershed? Will the credits come from an MDOT SHA or private stream restoration project or some other credit source? Where would the credits come from if MDOT SHA's NPDES MS4 permit is not reissued? Without knowing where the credits will come from it is impossible for the Agencies to determine whether the proposed build alternatives will cause violations of the Clean Water Act, 33 U.S.C. §§ 1311, 1342. If the Agencies have conducted this analysis and know the source of these credits, this information must be provided during the NEPA process and the public should be afforded the opportunity to comment on this new information.

The Conservancy objects to the manner with which the credit ratio for impacts is restricted to stream resources classified as having "medium" function value. Rock Creek's classification is less than high quality primarily because of degradation caused by lack of stormwater and environmental treatment from

existing runoff from I-495, as well as inadequate and inconsistent maintenance of the current outfalls[9]. MDOT SHA cannot cause the degradation, then use the degradation it caused to suggest that less mitigation is needed. The stream features should be treated in the same way as the high quality resources are treated. The highly urbanized nature of the Rock Creek area must be accounted for and the extremely high functional value ecosystem functions of these resources must be appropriately mitigated.

Replacing land in or mitigating damages to the Rock Creek stream valley parks with land miles away strips local residents of the quality of life benefits[10] for drivers and at a great cost to the taxpayers of Maryland. In addition, the DEIS underestimates the amount of mitigation required because it may have underestimated the limits of disturbance of the project. The limits of disturbance should be expanded to accommodate onsite treatment of new and existing runoff to protect Rock Creek from the impacts of this roadway.

H.  The DEIS Does Not Consider All Alternatives for Mitigation of Project-Generated Stormwater.

Stormwater management should be as close as possible to the project site, and all facilities should be within the Rock Creek watershed. The stormwater management strategies used should reduce more stormwater runoff than the volume flowing off all existing and additional lanes into Rock Creek. Rainfall estimates used to calculate those stormwater volumes should account for the more intense storms expected as a function of climate change. Techniques used should emphasize reduction in sediment, bacteria, and phosphorous. Section V.C., below, offers comments on specific sites proposed in the DEIS.

The project's innovative design should extend to stormwater management. This might include considering the significant opportunity for restoration projects that exist downstream, particularly in Rock Creek Park of the National Park Service in Washington DC. Areas of parkland that currently hold recreational facilities (such as ballfields) could be restored and additional parkland acquired elsewhere nearby. Green streets projects could be used creatively to manage stormwater that flows to the creek and calm traffic that may be an incidental effect of the new traffic patterns. Stormwater storage could be placed under the current I-495road bed, or the road could be raised to cover additional storage.

A credit system to develop stormwater management on private (or federal, like the Uniformed Services University) land could be developed similar to the stormwater retention credit program in the District of Columbia: landowners would be compensated for the value of stormwater management on their private property.  An independent entity would need to approve plans, inspect, and ensure annual maintenance of the facilities. These could be placed throughout the Rock Creek watershed to reduce volume into the creek and its tributaries, with emphasis on lands that drain to the project area or those areas that experience indirect stormwater impacts.

The highway could be covered with a "roof" over the current highway and add parkland on top to replace recreational areas along the creek and then restore existing recreational areas as natural areas. Freeway cap parks have been constructed in Dallas (Klyde Warren Park) and Seattle (Freeway Park)[11].

---

[9] From MNCPPC presentation to commission (https://www.mncppc.org/DocumentCenter/View/15750/102120-Commission-Meeting-Staff-Report-DEIS-and-JPA-comments-ARGDSB)
[10] https://www.bloomberg.com/news/articles/2018-09-06/traffic-jam-blame-induced-demand
[11] https://www.americancityandcounty.com/2019/08/07/from-freeway-to-walkway/#:~:text=On%20June%2014%2C%20the%20city,called%20a%20freeway%20cap%20park.

---

V. The Joint Federal/State Application (JPA) for a Clean Water Act § 404 permit fails to meet Clean Water Act requirements and is not in the public interest.

A. The JPA Fails to Meet CWA § 404(b)(1) Requirements

The Corps should deny the JPA for a Section 404 permit because the permit application fails to meet EPA's Section 404(b)(1) requirements. First, the JPA must be denied because there is "a practicable alternative to the proposed discharge which could have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). Second, pursuant to 40 C.F.R. § 230.10(b), the Corps must deny the permit unless it finds that the proposed discharges would not violate state water quality standards or toxic effluent standards under CWA § 307, 33 U.S.C. § 1317(a)(1), or jeopardize the existence of endangered or threatened species, including all species listed in the DEIS Natural Resources Technical Report, Appendix N, Agency Correspondence. Third, pursuant to 40 C.F.R. § 230.10(c), the Corps should deny the JPA because the discharges are likely to contribute to significant degradation of water quality. The additional discharges proposed under the JPA will contribute cumulatively to significant degradation of wetlands, life stages of aquatic life and other water-dependent wildlife, aquatic ecosystem diversity, and aesthetic value of the impacted wetlands and waterways. Fourth, pursuant to 40 C.F.R. § 230.10(d), the JPA must be denied because the Agencies have failed to take sufficient steps to minimize harm to protected waters, which includes waters of the United States and wetlands that serve as habitat to plants and animals, 40 C.F.R. § 230.3.

B. Issuing a CWA § 404 Permit Would Not be in the Public Interest

Even if the JPA for a Section 404 permit meets EPA's Section 404(b)(1) guidelines, the Corps should deny the permit because the proposed build alternatives are not in the public interest. The Corps must conduct a public interest review to evaluate "the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a). This review should also reflect that "wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b).

C. The Draft Compensatory Mitigation Plan is Incomplete, and the Final Plan Should be Made Available to the Public Prior to Issuing any Permit

The current Draft Compensatory Mitigation Plan is incomplete, and the final plan should be made available to the public prior to issuing any permit. the draft compensatory mitigation plan does not provide detailed information on the proposed mitigation plan, performance standards, mitigation work plan, monitoring requirements, long-term management plan, adaptive management plan, or financial assurances but states that these issues will be addressed during the development of the Phase II Mitigation Design Plans. DEIS, JPA, Part 13, at 29-31. Additionally, the DEIS does not appear to consult existing watershed planning, although the document does refer to county master plans to justify the need for expanded highways. The organizations urge the Corps to take a watershed approach to compensatory mitigation as is recommended by guidance.[12] Although the JPA provides a brief summary of Project

---

[12] The 2000 in-lieu fee guidance embraces the watershed approach for in-lieu fee mechanisms, stating, "[l]ocal watershed planning efforts, as a general matter, identify wetland and other aquatic resources that have been degraded and usually have

objectives it fails to provide sufficient details as to how the lost wetland and stream functionality will be replaced by the proposed compensatory mitigation. *See* DEIS, JPA, Part 13, at 30. This of particular concern given that most of the Phase I proposed sites are far away from the proposed build alternatives and will not abate localized wetland and stream functionality degradation. *See* DEIS, JPA, Part 18, Figure J-1, at 69. Furthermore, the objectives fail to provide concrete information determining what success will look like at the proposed sites because there are no performance standards provided. *See* DEIS, JPA, Part 13, at 30. The JPA simply states, "[p]erformance standards for all of the wetland mitigation sites will be in accordance with the Performance Standards and Monitoring Protocol for Permittee-Responsible Nontidal Wetland Mitigation Sites in Maryland, April 20, 2018." *Id.*

The Conservancy does not support the use of mitigation banks rather than permittee-responsible mitigation or in-lieu fee programs. Although this stated goal for the mitigation package is "to improve upon the ecological functions in these watersheds with a focus on the impaired conditions and needs," and the mitigation sites are to be selected in part on their "potential for watershed improvements," and proximity to the impaired areas and "replacement of lost functions and values," DEIS, App. N, at 4, 9, 20, in practice construction feasibility and mitigation credits tied to theoretical functional uplift seemed to be more important criteria. Ultimately, the sites selected were those with the simplest index, acreage, for wetland credit, and its analog, linear feet for streams. This gives no real way to assess the true value of the exchange of the wetland or stream lost to highway construction for one or another alternative proposed mitigation site, as a function-based system might.

Should the Corps decide to approve the permit, the Conservancy supports the selection of the proposed site in Rock Creek (MPAO0032)[13] particularly as it is in the same watershed where the Rock Creek Conservancy recently did a conservation landscaping project. Furthermore, the Conservancy also supports proposed restoration sites: MO 00029[14], MO 00034[15], WSS150159.[16] The Conservancy generally recommends coupling stream restoration projects with upland stormwater management – if there is not a reduction in stormwater flows to restored streams, they are vulnerable to degradation in the future. The Organizations also support the restoration of the mainstem of Portal Branch, particularly if paired with green streets installations within the watershed (as most of its impairment is due to stormwater that flows from nearby outfalls). Most of the watershed that feeds (and damages) Portal is in Montgomery County. Deerprint Run, a small stream off Daniel Road near Beach Drive, is currently inundated with sediment and is a good candidate for restoration given that the removal of sediments and the addition of regenerative stormwater conveyances would allow for the reestablishment of amphibian habitat in what is an existing wetland. Finally, the organizations encourage the Agencies to review the Potomac River

Tunnel project currently under development by DC Water under the C&O Canal and parts of Rock Creek Park, as this project offers a model for adding stormwater storage relatively unobtrusively and without significant disruption aboveground.

Additionally, the Conservancy requests that the permit require site monitoring for a period sufficient to ensure the stream and ecosystems return to a self-stable state, and that the mitigation is meeting all performance standards, and that the Corp not waive any monitoring. 33 C.F.R. § 332.6 ("The mitigation plan must provide for a monitoring period that is sufficient to demonstrate that the compensatory mitigation project has met performance standards, but not less than five years. A longer monitoring period must be required for aquatic resources with slow development rates (e.g., forested wetlands, bogs)."). The DEIS states that following construction, the public mitigation sites will be placed in MDOT SHA's monitoring program and will be monitored separately by the private remediation site providers for up to ten years. DEIS, App. N, at 30-31. However, stream and wetland ecosystems, once disturbed, including by restoration, may take up to 20 years to return to a self-stable state.

### D. The DEIS Fails to Provide Information Regarding the Status of the CWA § 401 Certification Process

The DEIS also fails to indicate the status of the state water quality certifications that are required before any CWA § 404 permit is authorized unless the certification is waived. 33 U.S.C. § 1341(a)(1); 40 C.F.R. Part 121. The DEIS simply indicates that a Section 401 Water Quality Certificate is required from both Maryland and Virginia. DEIS, at 4-78. The Organizations ask for an update on the status of the certification process.

### VI. The DEIS Does Not Sufficiently Present or Analyze the Costs of the Project or Its Impacts on Public and Private Property.

Based on the promise of no taxpayer funding, together with claims that the State does not have the funds to pay for improvements, alternatives that would require public subsidy to deliver were previously eliminated from review. *E.g.*, DEIS, at ES-9, *id.*, App. B, at 29-30.

However, the DEIS shows that each of the retained build alternatives would require the government to relocate 25-34 homes. DEIS, at ES-17. These build alternatives would also destroy hundreds of acres of parkland and historic properties, and would directly affect, even if not condemn, nearly 1,500 additional private properties. *Id.* It appears MDOT and state taxpayers will be responsible for the costs of these takings and other damages.

The DEIS also estimates that the build alternatives might require a state subsidy to be paid to the developer ranging from $482 million to more than $1 billion depending on the construction price and interest rates. DEIS, at 2-48 to 2-50. Further, that subsidy does not include an estimated $1 to $2 billion needed to fund the required relocation of water and sewer infrastructure,[17] nor does it account for the

---

established a prioritization list of restoration needs. In-lieu fee mitigation projects should be planned and developed to address the specific resource needs of a particular watershed." 65 Fed. Reg. 66,914-17 (Nov. 7, 2000).

The 1995 mitigation banking guidance encourages a watershed-based approach as the overall goal of a mitigation bank: "The overall goal of a mitigation bank is to provide economically efficient and flexible mitigation opportunities, while fully compensating for wetland and other aquatic resource losses in a manner that contributes to the long-term ecological functioning of the watershed within which the bank is to be located. The goal will include the need to replace essential aquatic functions that are anticipated to be lost through authorized activities within the bank's service area. In some cases, banks may also be used to address other resource objectives that have been identified in a watershed management plan or other resource assessment." 60 Fed. Reg. 58,605-14 (Nov. 28, 1995).

[13] Although many of Rock Creek's tributaries and the main stem are in poor to fair condition. This should not exclude them from consideration; expectations should just be managed accordingly.

[14] This site was eliminated because of a culvert in need of repair. The culvert should be included in the project. While potential for ecological uplift may be somewhat limited, removal of current and reduction of sediments would be a benefit from a stormwater perspective.

[15] Access constraints should be further explored before eliminating.

[16] Being high in the landscape should not be an immediate disqualifier; it may simply call for different techniques.

[17] Letter from Montgomery County Council to Gregory Slater (May 14, 2020), https://mtn1.squarespace.com/static/5b72a8ada02be0dd472b6b/t/5ee01b95a5310741a4b615e29/1589648273826/WSSC-MDOT-Letter.pdf; Memorandum to Prince George's County Council and Montgomery County Council re Agenda Item #1: Briefing: Possible Impacts of the I-270 and I-495 Road Widening P3 Project on WSSCWATER Infrastructure (March 20, 2020), https://www.montgomerycountymd.gov/council/Resource/Files/agenda/cm/2020/20200313/20200312_TETBSEL-2.pdf; Dominique Maria Bonessi, *Water Bills In Maryland Could Nearly Triple Under Beltway and I-270 Expansion Plan*, WAMU (March 16, 2020), https://wamu.org/story/20/03/16/water-bills-in-maryland-could-nearly-triple-under-beltway-and-i-270-expansion-plans/; Express Toll Lanes

cost of adequate environmental mitigation. Moreover, although it is not clear what risks MDOT, the State of Maryland, and Maryland taxpayers will be liable for, it is likely these could be significant. These are all funds the state might choose to use to enhance and protect our natural and cultural resources and quality of life rather than destroying them.

Could Raise Water Bills in Montgomery and Prince George's, Maryland Matters (March 13, 2020), https://www.marylandmatters.org/2020/03/13/express-toll-lanes-could-raise-water-bills-in-montgomery-and-prince-georges/.

**MDOT SHA Response to Rock Creek Conservancy:**

Thank you for your comment concerning impacts to Rock Creek's park and watershed as well as wetlands, streams, and floodplains. As described in the Supplemental DEIS, the Preferred Alternative was identified after coordination with resource agencies, the public, and stakeholders to respond directly to feedback received on the DEIS to avoid displacements and impacts to significant environmental resources, and to align the NEPA approval with the planned project phased delivery and permitting approach which focused on Phase 1 South only. The Preferred Alternative includes two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to east of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. The Preferred Alternative includes no action or no improvements at this time on I-495 east of the I-270 spur to MD 5 in Prince George's County.

As acknowledged in your letter of November 2021, the potential impacts raised in your comment had been identified in the DEIS related to build alternatives that would have spanned the entire study area. Because the Rock Creek Stream Valley Park is located outside the Preferred Alternative limits of build improvements, those impacts have now been completely avoided. The Preferred Alternative impacts the MDE 12-Digit Rock Creek Watershed. The waterway impacts include two culverts that will not be touched, but are included as impacts for regulatory review. There are also 0.8 acres of new impervious surface being added within the MDE 12-Digit Rock Creek Watershed. Additional response to the issues raised are responded to below.

**I. Alternatives**

Pursuant to the CEQ regulations and FHWA guidance, agencies perform an assessment of potential project alternatives to determine if they warrant being advanced to detailed study in an EIS. The screening of alternatives is an essential part of the NEPA process designed to focus attention of the public, stakeholders and the agency decision-makers on the actions most likely to address the Purpose and Need and to avoid wasteful analysis on options that could not address the identified fundamental needs. This process involves application of the Study's established Purpose and Need elements, as well as other criteria related to transportation planning and the sources of financing a proposed action. Refer to DEIS, Appendix B.

For the Study, the alternatives screening process first focused on four transportation assessments. Each of the preliminarily identified alternatives were evaluated on whether or how they addressed: (1) existing traffic and long-term traffic growth, (2) trip reliability (dependable travel times); (3) additional roadway travel choice, and (4) ease of usage for travelers. In addition, the Purpose and Need elements were applied to evaluate whether each alternative could: (1) accommodate population evacuations or emergency response, (2) improve the movement of freight, services and commuting employees, (3) provide a revenue source, (4) promote multi-modal connectivity, and (5) address expected environmental impacts. These criteria were applied to all 15 preliminary alternatives to gauge how they would be expected to satisfy the project Purpose and Need. Refer to DEIS, Appendix B.

In your comments on alternatives, you raised the concern about consideration of MD 200 as an alternative to avoid environmental resources. Following the Spring 2019 Public Workshops and agency meetings, several Cooperating and Participating Agencies requested that MDOT SHA evaluate an alternative that would provide an alternate route for travelers to use MD 200 (Intercounty Connector) instead of the top side of I-495 between I-270 and I-95 to avoid or reduce impacts to significant, regulated resources and residential relocations to that section of I-495. Refer to DEIS, Appendix B.

Importantly, this new screened alternative was developed and analyzed with input from the agencies to the same level of detail and using the same approach for the anticipated limits of disturbance as all other screened alternatives. Detailed traffic analyses were completed on the MD 200 Diversion Alternative to assist in evaluating its ability to meet the Study's Purpose and Need, again, using the same methodology that was used for the Screened Alternatives. The methodology included a three-step process:

- A regional forecasting model was developed for the MD 200 Diversion Alternative using the Metropolitan Washington Council of Governments Travel Demand Model (MWCOG model), the model typically used by MDOT SHA and other transportation agencies to evaluate projects in the Washington, DC metropolitan area;

- Outputs from the MWCOG model were used to develop balanced traffic volume projections for the design year of 2040 for each roadway segment and ramp movement within the Study limits;

- Traffic simulation models for the MD 200 Diversion Alternative were developed using VISSIM software to determine the projected operational performance in several key metrics.

Two key underlying factors played a large role in evaluating whether the MD 200 Diversion Alternative could meet the project Purpose and Need. First, the portion of I-495 proposed to be excluded from any improvements is one of the most congested and least reliable segments of highway in Maryland. While the presumed TSM/TDM measures could slightly improve congestion there, that portion of I-495 would still experience severe congestion. Second, while MD 200 currently has adequate capacity to accommodate the potential for diverted traffic, it was anticipated that portions of MD 200 would reach capacity during peak travel periods by 2040. Therefore, the ability to handle diverted traffic would be limited in the future.

Traffic analysis was performed using the same key traffic metric applied to all Screened Alternatives (System-Wide Delay, Corridor Travel Time and Speed, Level of Service (LOS), Travel Time Index (TTI), Vehicle Throughput; and Effect on Local Roadway Network). After this comprehensive evaluation, MDOT SHA determined that the MD 200 Alternative would not address the Study's Purpose and Need of accommodating long-term traffic growth, enhancing trip reliability, or improving the movement of goods and services. In fact, the MD 200 Diversion Alternative was the worst performing of the various Build Alternatives and provided the least congestion relief benefits. Refer to DEIS, Chapter 2 and DEIS, Appendix B. Similar to the MD 200 Diversion Alternative, the Preferred Alternative provides less improvement to traffic operations when compared to the Build Alternatives that included the full 48-mile study limits evaluated in the DEIS (such as Alternatives 9 and 10). However, the Preferred Alternative was chosen based in part on feedback from the public and stakeholders who indicated a strong preference for eliminating property and environmental impacts on the top and east side of I-495. As the analysis indicates, congestion would still be present during the PM peak period on I-270 northbound and the I-495 inner loop in the design year of 2045 due to downstream bottlenecks outside of the Preferred Alternative limits but would not get worse due to implementing the Preferred Alternative.

Therefore, even recognizing that the MD 200 Diversion Alternative would have avoided all residential displacements and all but one business displacement and would have reduced the number of parks and historic resources potentially impacted by the proposed action, MDOT SHA's final conclusion, concurred in by the FHWA, was that this alternative would not adequately meet the established Purpose and Need.

Although the Preferred Alternative also avoids improvements to the topside of I-495 and provides less improvement to traffic operations when compared to the DEIS Build Alternatives, it was chosen based in part in response to comments received from the public, partner agencies and stakeholders who indicated a strong

preference for eliminating property and environmental impacts on the top and east sides of I-495.

## II. Impacts to Wildlife and Habitat

The Preferred Alternative impacts the MDE 12-Digit Rock Creek Watershed. The waterway impacts include two culverts that won't be touched, but were required by the regulatory agencies to be included as impacts. There are also 0.8 acres of new impervious surface being added within the MDE 12-Digit Rock Creek Watershed. Refer to Chapter 5, Section 5.13 for information on watersheds and Section 5.18 for information on aquatic biota and FEIS, Appendix M for additional details.

Throughout the NEPA phase of the Study, MDOT SHA has had extensive coordination with federal and state agencies related to the rare, threatened and endangered (RTE) species. The coordination related to RTE species was documented in the DEIS in Chapter 4, Section 4.19, SDEIS, Chapter 4, Section 4.19, FEIS, Chapter 5, Section 5.19 and FEIS, Appendix M. The species-specific surveys and additional coordination were documented in the Supplemental DEIS (October 1, 2021) in Chapter 4, Section 4.19 as well as SDEIS, Appendix H.

MDOT SHA coordinated closely with the US Fish and Wildlife Service (USFWS) and the Maryland Department of Natural Resources (DNR) to conduct bridge and acoustic surveys for Northern Long-Eared Bat and Indiana Bat within the study corridors and reports for these efforts are appended to the SDEIS, Appendix H, and FEIS, Appendix M. Informal consultation between the FHWA, MDOT SHA and the USFWS continued with submittal of the habitat assessment and acoustic study report to the USFWS and MDNR. In a letter to the FHWA dated January 13, 2021, the USFWS issued a "no effect" determination for the IB based on the absence of documented IB during bridge, emergence, and acoustic surveys. The USFWS also indicated that the project is covered by the January 5, 2016, Programmatic Biological Opinion on Final 4(d) Rule for the NLEB and Activities Excepted from Take Prohibitions since the area where forest clearing would occur does not have known maternity roost trees or hibernacula. In their letter, the USFWS stated that the project was "not likely to adversely affect" the NLEB. MDOT SHA coordinated closely with USFWS and MDNR regarding NLEB and Indiana bat, and Endangered Species Act Section 7 consultation has concluded. MDOT SHA and FHWA have worked closely with USFWS and MDNR to ensure protection of listed bat species. While the Study was determined to have "no effect" on the IB and "not likely to adversely affect" the NLEB, MDOT SHA voluntarily committed to a time of year restriction for tree clearing from May 1 through July 31 of any year within a 3-mile buffer around each positive NLEB detection location within the study corridor to go above and beyond what is required to protect this bat species. One of the three positive detection locations for NLEB is located within the Phase 1 South limits of the corridor study boundary. IB was not detected in the acoustic or bridge surveys.

Maryland special status aquatic species that may be present in waterways within the corridor study boundary were provided by DNR and are included in the DEIS, Appendix L and presented in FEIS, Chapter 5, Section 5.18. MDE and USACE will include permit conditions related to aquatic life passage to ensure that aquatic life is protected at new and replaced culverts and bridges. MDOT SHA is in coordination with MDE, DNR, USFWS, and NMFS to ensure that commitments are included in the ROD to protect aquatic life passage.

## III. Project's Effects on Historic and Cultural Resource Impacts to Parkland

Section 4(f) of the U.S Department of Transportation (USDOT) Act of 1966 as amended (49 USC 303(c)) is a Federal law that protects significant publicly-owned public parks, recreation areas, wildlife and/or waterfowl refuges, or

00022630

**OP LANES**
MARYLAND    I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

any significant public or private historic sites. Section 4(f) applies to all transportation projects that require funding or other approvals by the USDOT. As a USDOT agency, FHWA must comply with Section 4(f) and its implementing regulations at 23 CFR 774. The Draft Section 4(f) Evaluation for the proposed action is appended to the DEIS (Appendix F) and summarized in Chapter 5 of the DEIS with updated information related to the Preferred Alternative summarized in Chapter 5 of the SDEIS. The Final Section 4(f) Evaluation can be found in FEIS, Appendix G, and FEIS Chapter 6.

Selection of the Preferred Alternative was partly based on extensive coordination with and input from agencies and stakeholders, including the Officials with Jurisdiction (OWJs) for Section 4(f) properties. See DEIS, Chapter 5, Section 5.4; SDEIS, Chapter 7; FEIS Chapter 6. Agency and stakeholder comments on the DEIS and Draft Section 4(f) Evaluation specifically requested avoidance of parkland and historic resources within the study area. The Preferred Alternative is responsive to the comments received and aligns the Study to be consistent with the phased delivery and permitting approach, which limits the build improvements to Phase 1 South and avoids improvements on I-495 east of the I-270 east spur. The result is complete avoidance of a substantial number of Section 4(f) properties and a large reduction of parkland acreage impacts within the Study limits, which remain the same as in the DEIS. Design refinements have progressed since the Preferred Alternative was identified, resulting in additional avoidance and minimization of impacts. and quantified impacts have been broken down into permanent or long-term effects and temporary or short-term construction-related effects.

As noted previously, the Preferred Alternative avoids impacts to Rock Creek Stream Valley Park, in fact the Preferred Alternative avoids over 100 acres of park and historic properties, including:

- Minimize impacts by over 50% to National Parks near the American Legion Bridge (George Washington Memorial Parkway and Chesapeake & Ohio Canal National Historical Park) and completely avoid three other National Parks: Baltimore Washington Parkway, Greenbelt Park, and Suitland Parkway.

- Avoids approximately 20 acres of Maryland-National Capital Park and Planning Commission parkland including Rock Creek, Sligo Creek, and Northwest Branch Stream Valley Parks.

The Preferred Alternative will result in the use of 33.2 acres of Section 4(f) properties. The DEIS presented measures that had been identified to ensure all possible planning to minimize harm and mitigate for adverse impacts and effects. See DEIS, Appendix F; SDEIS, Section 5.4. Additional minimization and mitigation efforts have been implemented in conjunction with the Preferred Alternative, as described in the Updated Section 4(f) Evaluation. SDEIS Chapter 5 and Final Section 4(f) Evaluation FEIS, Appendix G. More specifically, MDOT SHA has identified and will pursue the acquisition of replacement parkland in coordination with NPS, M-NCPPC, the City of Rockville, and the City of Gaithersburg as potential mitigation for parkland impacts. MDOT SHA has also identified other potential mitigation opportunities, including trail and path improvements; improvements to park facilities and amenities, tree planting and invasive species removal, water quality improvements, ecological restoration, as applicable. Refer to FEIS, Chapters 6 and 7, and FEIS Appendix G. Mitigation for the use of NPS-owned parkland would also be consistent with stipulations identified in the Section 106 Programmatic Agreement and would be coordinated with the MHT and Section 106 consulting parties.

Final mitigation commitments are included in the Final Section 4(f) Evaluation and in the FEIS. Refer to Chapters 6 and 7 and FEIS, Appendix G. The final commitments include all possible planning to minimize harm.

## IV. Analysis of How Increased Stormwater Will Affect Receiving Waterways

Maryland Stormwater Management Law is relatively strict with the goal of maintaining post development runoff as nearly as possible to pre-development runoff characteristics. This project will require both Erosion and Sediment Control permits and Stormwater Management Permits and will have to meet a high standard of providing protection to receiving waters both during and after construction.

The project is required to provide stormwater treatment for all new impervious area, which includes approximately 0.8 acres in the Rock Creek watershed. Given the strict stormwater permitting requirements, impacts to downstream water quality from stormwater runoff are not expected.

A conceptual preliminary level of identification of stormwater management (SWM) needs was considered throughout the Phase 1 South limits when establishing the LOD for the Preferred Alternative. The Maryland *Stormwater Management Act of 2007* emphasizes environmental site design (ESD) and consideration of SWM early in the planning stage of a project to better balance transportation needs, right-of-way considerations, and requirements of the Act, which include both water quality (i.e., ESD) and water quantity management. Water quality management treats the first flush of rainfall to remove pollutants and improve downstream conditions. Water quantity management stores and slowly releases water to reduce downstream flooding.

Final design is necessary for completion of the SWM permits. One purpose of NEPA is to encourages and in some cases forbids the use of federal funds for completion of final design until after a ROD to avoid the expense of performing final design on multiple alternatives. If a Build Alternative is selected in the ROD, final design will progress and permits relying upon final design will progress. Erosion and Sediment Control permits will be required and BMPs, such as, super silt fence, clear water diversion and sediment traps will be used to protect receiving waters during construction. Stormwater management permitting will be required to protect receiving waters after construction. Stormwater management permits require that all discharges for the 10-year storm be controlled to match the existing discharges. Detailed calculations will be required to show that runoff leaving the ROW will be conveyed in a stable manner and not worsen downstream flooding. In addition, all new impervious area will require water quality treatment onsite. Onsite water quality treatment is preferred, however, if it is not possible to provide all water quality onsite, offsite water quality will be allowed for existing "reconstructed" impervious area. The offsite treatment must be provided in the same 6-digit watershed. Therefore, the impacts to receiving waters both in terms of total pollutant loads and increased stormwater volumes will be minimal

In addition, sensitive waters, such as, Tier I watersheds and Use III and IV watersheds have additional requirements and restrictions on the type of SWM that can be used to provide extra protection for these sensitive resources.

A SWM analysis was updated for the SDEIS and FEIS based on the Preferred Alternative. Refer to SDEIS, Chapter 2, Section 2.3.2 and FEIS, Chapter 3, Section 3.1.6.Impacts to existing SWM facilities, as identified in the NPDES database, was also included in the analysis. All existing shoulders and 25% of existing lanes were assumed to require reconstruction, which results in 39 to 44% of existing pavement assumed to be reconstructed. Environmental mapping included in Appendix E of the FEIS displays the impervious area associated with the Preferred Alternative. It also shows the proposed SWM facilities along the alignment. Through continued coordination with agencies, including M-NCPPC, US Army Corp of Engineers, and MDE, the proposed SWM facility locations have been refined in response to agency comments. The proposed SWM facilities inform the LOD, which is then commented on by the public. Culverts under 36" in size were not included in the culvert analysis because there are very few culverts smaller than 36". Since MD SWM Law requires that stormwater volumes be controlled to existing levels prior to leaving

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 61-9    Filed 10/30/23    Page 81 of 82

FINAL ENVIRONMENTAL IMPACT STATEMENT

the site, existing culverts will not see increases in SWM flows from this project. Preliminary hydrology was done on all culverts over 36" in diameter in order to identify culverts that are potentially undersized in existing conditions, due to development upstream of the project.

Avoidance and minimization was considered in siting on-site and offsite SWM facilities in order to avoid or reduce impacts to natural resources, Section 4(f), Section 106, and private properties. Coordination meetings with agencies, including MNCPPC, MDE, US Army Corps of Engineers, National Park Service, etc., were conducted to minimize or eliminate impacts to sensitive areas. Many SWM facilities were eliminated due to impacts, which is why underground vaults were incorporated into the SWM analysis.

Section 2.3.2 of the SDEIS includes a discussion of the types of SWM considered. Both stormwater swales and underground storage were included. Swales are provided along the alignment wherever feasible. Coordination meetings with agencies, including MNCPPC, MDE, US Army Corps of Engineers, National Park Service resulted in elimination of some swale locations in order to reduce/eliminate impacts to sensitive resources. In addition, underground vaults are provided under both the outside and inside shoulders where feasible.

Due to the heavily urbanized areas and numerous resources along the study corridors that limit the amount of SWM water quality that can be practically provided on-site, alternate means for providing SWM were evaluated. MDOT SHA performed an extensive planning-level study to identify compensatory, or off-site, SWM opportunities to ensure the SWM water quality requirements of the Preferred Alternative could be met. The results of this evaluation, as originally presented in the SDEIS, were modified for the FEIS based on further analysis and development of the on-site SWM and the compensatory SWM analysis. Refer to Appendix C of the SDEIS for the Draft Compensatory SWM Plan and Appendix D of the FEIS for the Final Compensatory SWP Plan. Both documents show sufficient water quality credits to meet the anticipated offsite requirements within the watershed.

Stormwater management permits will require that onsite SWM be maximized and that all new pavement and 50 percent of reconstructed pavement be treated. If the full water quality cannot be provided onsite, offsite stormwater management locations will be allowed within the same 6-digit watershed.

## V.  The Joint Federal/State Application (JPA) for a Clean Water Act § 404 Permit

MDOT SHA has worked closely with the regulatory agencies to ensure that the JPA meets Clean Water Act requirements. MDOT SHA maintains that the record supports a finding that there is no practicable alternative that could have less adverse impact on the aquatic ecosystem, while still meeting the study's Purpose and Need and other environmental avoidance and minimization requirements. The Corps will determine based on its own separate analysis whether the Preferred Alternative is the least environmentally damaging practicable alternative (LEDPA).

The Draft Compensatory Mitigation Plan was included as Appendix N to the DEIS. This plan outlined the detailed mitigation site search as well as the resulting mitigation sites identified for stream and wetland restoration as 404 mitigation for the I-495 & I-270 MLS. The Final Compensatory Mitigation Plan is included in FEIS Appendix O and includes the Phase II mitigation plans for the selected stream and wetland mitigation sites in Maryland. Virginia has a mitigation credit program that identifies appropriate sites for wetland and stream mitigation to compensate for unavoidable impacts. Onsite stormwater management has been maximized to the greatest extent practicable within the Study Preferred Alternative LOD. The remaining stormwater treatment will be achieved offsite. The Final Compensatory Stormwater Mitigation Plan is in the FEIS, Appendix D and includes a summary of the site search process and the resulting stormwater sites identified for offsite stormwater

management to cover the stormwater treatment need for the Study.

The Study requires a Clean Water Act Section 401 Water Quality Certification from Maryland and Virginia indicating that anticipated discharges from the Study will comply with state water quality standards. MDOT SHA has coordinated closely with MDE, the Virginia Department of Environmental Quality (VDEQ), and the USACE to ensure that all state water quality standards are met for the Study. Permits will be sought from the USACE, MDE, and VDEQ for unavoidable impacts to wetlands and waterways concurrent with publication of the FEIS. Maryland and Virginia Water Quality Certifications will be requested at the same time. Minimization efforts for potential water quality impacts that could result from road crossings may include the proper maintenance of flood-prone flows through proposed structures using flood relief culverts to avoid increased scour and sedimentation. Most of the stream systems within the corridor study boundary currently have floodplain access; this should be retained as much as possible to preserve benefits such as velocity dissipation, storage, and sedimentation/stabilization. Other efforts would consider retaining or adding riparian buffers, as well as maintaining or improving aquatic life passage. The complete Joint Permit Application is also included in FEIS, Appendix P.

## VI.  Costs of the Project and Its Impacts on Public and Private Property

As disclosed in the SDEIS and FEIS, the Preferred Alternative would between $3.0 and $3.5 Billion. This estimate includes costs for construction, property acquisition, and environmental mitigation. The Preferred Alternative avoids all residential and commercial displacements. The FEIS presents the results of the estimated property impacts based on preliminary design. As the design of the Preferred Alternative progressed, property impacts were minimized where feasible. All affected private property owners will be compensated for the fair market value of the acquired portion of land and any structures acquired for the construction of the Preferred Alternative. The final right-of-way requirements for the project will be determined in final design.

MDOT does not have enough funds to construct improvements of the magnitude associated with the Preferred Alternative. Additionally, MDOT does not have enough bonding capacity to take out loans to pay for the improvements, even with the promise of tolls to pay them back. Therefore, MDOT elected to use a Public-Private Partnership or P3 approach to fund the project.

A P3 is an alternative model for delivery of a capital project in which the governmental sector works with the private entities. The particular P3 model identified for the Study is a progressive multi step approach. This P3 model, like others, seeks to make the most of private sector expertise, innovation, and financing to deliver public infrastructure for the benefit of the public owner and users of the infrastructure. This P3 agreement includes designing, building, financing, operating, and maintaining a transportation facility, however, MDOT SHA would continue to own all lanes and infrastructure on I-495 and I-270 and ensure the highway meets their intended transportation function. Many comments expressed concern over the use of the P3 model, specifically pointing out challenges to the delivery of the Purple Line project, which was also done through a P3 agreement. While concerns over the Purple Line project are understandable, the Study P3 Agreements are different from the Purple Line and other P3s in Maryland, in that this process uses a multi-step Progressive P3 model to further identify and reduce impacts and risks. The first step of this process is the collaborative Predevelopment Work. The evaluation criteria for the Predevelopment Work focused on reducing project risk, providing schedule certainty and the ability to deliver Phase 1 with no State of Maryland funding. The selected concessionaire for the project proposed a sound approach to delivering Phase 1 that will greatly reduce the likelihood of challenges that other projects have faced. The Progressive P3 approach allows the concessionaire to closely collaborate with MDOT, Maryland Transportation Authority (MDTA) and other stakeholders during the Predevelopment phase before finalizing its

design and pricing, which will reduce and mitigate risks and challenges that would exist in a more traditional procurement process as well as other P3 models.

MDOT SHA acknowledges receipt of your SDEIS Comment Letter dated November 15, 2021. Refer to Appendix T for a response to this SDEIS Comment Letter.

*This page is intentionally left blank.*