**SIERRA CLUB MARYLAND CHAPTER (FULL SUBMITTAL)**

## Sierra Club Maryland Chapter

Please find the attached comments on the I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA) for your review and consideration (USACE Application Number (NAB-2018-02152) and the MDE Tracking Numbers 20-NT-0114 / 202060649). Also attached is a list of attachments to the comments (the actual files will be sent separately) for your review and consideration. Please confirm receipt. The comments are submitted on behalf of the following Organizations:

Sierra Club Maryland Chapter
350 Montgomery County, MD
Audubon Naturalist Society
Baltimore 350
Baltimore Transit Equity Coalition
Bikemore
Breathe Free Montgomery
Cedar Lane Unitarian Universalist Church Environmental Justice Ministry
Central Maryland Transportation Alliance
Chesapeake Bay Foundation
Citizens Against Beltway Expansion
Coalition for Smarter Growth
DontWiden270.org
DoTheMostGood Montgomery County
Forest Estates Civic Association
Forest Glen Citizens Association
Friends of Moses Hall Consulting Party (Cabin John, MD)
Friends of Quincy Watershed
Friends of Sligo Creek
Greenbelt Climate Action Network
HoCo Climate Action (Howard County)
Indian Spring Residents Opposed to Beltway Widening Group (ISROBWG)
Indivisible Howard County
Interfaith Power & Light (DC.MD.NoVA)
League of Women Voters of Maryland
Long Branch Civic Association
Maryland Conservation Council
Maryland Legislative Coalition
Maryland PIRG
College Park Mayor Patrick Wojahn
Montgomery County Faith Alliance for Climate Solutions
NAACP Maryland State Conference
National Parks Conservation Association
Neighbors of the Northwest Branch
North Hills of Sligo Creek Civic Association
Our Revolution Maryland
Nova Citizens Association

Rock Creek Conservancy (the Conservancy is a signatory for the JPA comments (Section ILC.5 and ILC.6) only)
Rock Creek Hills Citizens' Association
Save Our Seminary at Forest Glen Inc.
Sierra Club
Takoma Park Mobilization
The Climate Mobilization Montgomery County chapter
The Ocean Foundation
U.S. Public Interest Research Group (U.S. PIRG)
Union of Concerned Scientists
Unitarian Universalist Legislative Ministry of Maryland
Virginia Parks Matter
Washington Area Bicyclist Association
West Montgomery County Citizens Association

Thank you,

November 6, 2020

*Submitted via email to: MLS-NEPA-P3@mdot.maryland.gov, LChoplin@mdot.maryland.gov, Jeanette.Mar@dot.gov, john.j.dinne@usace.army.mil, MDE.SHAprojects@maryland.gov*

Lisa B. Choplin, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21201

Jeanette Mar
Environmental Program Manager
Federal Highway Administration, Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore MD 21201

Jack Dinne
USACE Baltimore District
2 Hopkins Plaza
Baltimore, MD 21201-2930

Steve Hurt
MDE Wetlands and Waterways Program
1800 Washington Blvd., Suite 4300
Baltimore, MD 21230-1708

**Re: Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA) (USACE Application Number (NAB-2018-02152) and the MDE Tracking Numbers 20-NT-0114 / 202060649)**

On behalf of the undersigned Organizations and their members and supporters, we submit the following comments in response to Notice of Availability of the I- 495 & I-270 Managed Lanes Study Draft Environmental Impact Statement (DEIS) and Draft Section 4(f) Evaluation. 85 Fed. Reg. 41,583.

We oppose the addition of managed lanes to expand I-495 & I-270. The expansion would harm human health and the environment, destroy homes and parkland, and reduce property values. The expansion would also cost billions of dollars, likely to be borne by Maryland citizens, and provide benefits to a small minority of drivers who are wealthy enough to afford the high tolls or fortunate enough to have their toll payments reimbursed. The DEIS and Draft Section 4(f) Evaluation are woefully insufficient and do not provide the public or the deciding agencies with the opportunity to meaningfully review and consider the impacts of the proposed

November 6, 2020
Page ii

expansion. Additionally, the joint Clean Water Act § 404 permit application for the expansion should be denied because it fails to meet Clean Water Act requirements and is not in the public interest.

In light of such a basis (or lack thereof), no build alternative can be selected. The DEIS and procurement process should be stopped until an unbiased purpose and need statement has been articulated and received concurrence from cooperating agencies; a wider set of reasonable alternatives have been added and retained for detailed study; and a DEIS is prepared that appropriately presents the impacts of the proposed project and alternatives on the public and the environment.

Sincerely,

Sierra Club Maryland Chapter[1]

350 Montgomery County, MD

Audubon Naturalist Society

Baltimore 350

Baltimore Transit Equity Coalition

Bikemore

Breathe Free Montgomery

Cedar Lane Unitarian Universalist Church Environmental Justice Ministry

Central Maryland Transportation Alliance

Chesapeake Bay Foundation

---

[1] The Organizations would like to acknowledge Jill Grant & Associates, LLC, Norm Marshall (Smart Mobility Inc.), Will Cook (Cultural Heritage Partners, PLLC), John Zamurs (Zamurs and Associates, LLC), and Mark Stout (Mark L. Stout Consulting) for assisting the groups in drafting these comments. We would also like to thank the many volunteers who dedicated their time and expertise to these comments: Aileen Craig, The Nature Conservancy; Robin Clark Eilenberg, Maryland Staff Attorney, Chesapeake Bay Foundation; Lee Epstein, Director of Lands Program and Special Counsel, Chesapeake Bay Foundation; Janet Gallant, DontWiden270.org; Pamela Goddard and Kyle Hart, National Parks Conservation Association; Denisse Guitarra and Eliza Cava, Audubon Naturalist Society; Amanda Hungerford; Arthur Katz; Sarah Lesher; Rodolfo E. Pérez, P.E., Consulting Engineer; Klaus Philipsen, FAIA, President ArchPlan Inc.; Stewart Schwartz, Executive Director, Coalition for Smarter Growth; Ole Varmer, Sr., Fellow, The Ocean Foundation; B. Peter Yarrington, Freshwater Ecologist/Fisheries Biologist.

November 6, 2020
Page iii

Citizens Against Beltway Expansion

Coalition for Smarter Growth

DontWiden270.org

DoTheMostGood Montgomery County

Forest Estates Civic Association

Forest Glen Citizens Association

Friends of Moses Hall Consulting Party (Cabin John, MD)

Friends of Quincy Watershed

Friends of Sligo Creek

Greenbelt Climate Action Network

HoCo Climate Action (Howard County)

Indian Spring Residents Opposed to Beltway Widening Group (ISROBWG)

Indivisible Howard County

Interfaith Power & Light (DC.MD.NoVA)

League of Women Voters of Maryland

Long Branch Civic Association

Maryland Conservation Council

Maryland Legislative Coalition

Maryland PIRG

College Park Mayor Patrick Wojahn

Montgomery County Faith Alliance for Climate Solutions

NAACP Maryland State Conference

National Parks Conservation Association

Neighbors of the Northwest Branch

November 6, 2020
Page iv

North Hills of Sligo Creek Civic Association

Our Revolution Maryland

Nova Citizens Association

Rock Creek Hills Citizens' Association

Rock Creek Conservancy (the Conservancy is a signatory for the JPA comments (Section II.C.5 and II.C.6) only)

Save Our Seminary at Forest Glen Inc.

Sierra Club

Takoma Park Mobilization

The Climate Mobilization Montgomery County chapter

The Ocean Foundation

U.S. Public Interest Research Group (U.S. PIRG)

Union of Concerned Scientists

Unitarian Universalist Legislative Ministry of Maryland

Virginia Parks Matter

Washington Area Bicyclist Association

West Montgomery County Citizens Association

Woodside Forest Civic Association

November 6, 2020
Page v

## COMMENTS ON THE BELTWAY EXPANSION PROJECT DEIS AND JPA

### Table of Contents

I.    The DEIS Does Not Sufficiently Analyze or Present the Costs of the Project or Its
      Impacts on Public and Private Property ......................................................................... 3

II.   Problems with the NEPA Analysis ............................................................................... 12

      A.   Segmentation Problems ........................................................................................ 13

           1.   The DEIS Unlawfully Considers the Impacts from Only a Segment
                of the Broader P3 Program to Add Managed Lanes to I-495 &
                I-270........................................................................................................... 13

           2.   The Agencies Should Have Performed a Programmatic EIS to
                Consider the Impacts of the Project within the Context of the P3
                Program or the Greater Regional Plan......................................................... 15

      B.   Problems with the Purpose and Need Statement and the Alternatives
           Considered in the DEIS ........................................................................................ 16

           1.   The Purpose and Need Statement is Unreasonably Narrow and
                Unlawfully Constrains the Range of Considered Alternatives.................. 16

           2.   The Project Purpose and Need Is Based on Inaccurate Traffic and
                Financial Assumptions................................................................................ 19

           3.   The Agencies Failed to Consider All Reasonable Alternatives,
                Making the Alternatives Analysis Inadequate ........................................... 22

      C.   The DEIS Does Not Adequately Address the Water Quality Impacts from
           the Project ............................................................................................................. 42

           1.   The DEIS Fails to Examine How Increased Stormwater Will
                Affect Receiving Waterways ...................................................................... 42

           2.   The Analysis of Stormwater Management Needs is Incomplete and
                Lacks Supporting Data................................................................................ 47

           3.   The DEIS Fails to Account for MS4 Permitting Requirements ............... 50

           4.   The DEIS Fails to Consider Viable Stormwater Avoidance and
                Mitigation Options ..................................................................................... 50

           5.   The Corps Should Deny the Joint Permit Application for a Clean
                Water Act § 404 Permit Because It Fails to Meet Clean Water Act
                Requirements and Is Not in the Public Interest ......................................... 52

November 6, 2020
Page vi

           6.   The Draft Compensatory Mitigation Plan is Incomplete, and the
                Final Plan Should be Made Available to the Public Prior to Issuing
                any Permit ................................................................................................... 56

           7.   The DEIS Fails to Consider Alternatives That Would Avoid or
                Minimize Adverse Impacts to Waterways, Wetlands, Floodplains,
                and Other Natural Resources ...................................................................... 60

      D.   The DEIS Lacks Information Supporting the Decision Not to Require a
           Permit for Construction at the American Legion Bridge........................................ 64

      E.   The DEIS Fails to Adequately Identify and Analyze Impacts on Aquatic
           Species, Aquatic Habitat, and Fisheries................................................................. 64

      F.   The DEIS Fails to Adequately Identify and Analyze Impacts on Federal
           and State Rare, Threatened, or Endangered Species and Habitats ...................... 66

           1.   The DEIS Fails to Adequately Identify Impacts on the Northern
                Long-Eared Bat and Indiana Bat................................................................ 66

           2.   The DEIS Fails to Adequately Identify Maryland Aquatic Species
                and Fails to Account for Impacts to Maryland and Virginia Species ....... 67

      G.   The DEIS Does Not Sufficiently Evaluate Hazardous Materials ........................ 67

      H.   The DEIS Does Not Adequately Analyze Air Emissions...................................... 72

           1.   The DEIS Does Not Perform Sufficient Emissions and Health
                Analyses for Particulate Matter ($PM_{10}$ and $PM_{2.5}$) or Nitrogen
                Dioxide ($NO_2$)............................................................................................. 73

           2.   The DEIS's Air Quality Analysis Missed Parking Lots .......................... 82

           3.   The DEIS Fails to Properly Address Ozone and its Precursors................ 83

           4.   The DEIS Fails to Sufficiently Address Mobile Source Air Toxics......... 86

           5.   The DEIS Does Not Properly Perform the Necessary Carbon
                Monoxide Hot-Spot Analysis .................................................................... 90

           6.   Climate Change and Greenhouse Gas Emissions ..................................... 91

           7.   The DEIS Fails to Consider the Relationship Between Air Quality
                and Covid-19; the Agencies Must Release a Supplemental EIS
                That Does So............................................................................................... 99

           8.   The DEIS and Its Reference to Visualize 2045 Lack Clarity in
                Data Sets and Prevent Meaningful Public Review .................................. 101

November 6, 2020
Page vii

9.  The DEIS's (Insufficient) GHG and Other Emissions Analyses are Based on Data that Were Already Outdated When the DEIS was Published .................................................................................. 102

10. The DEIS's Air Quality Environmental Justice Discussion is Insufficient .................................................................................. 104

11. The DEIS's Analysis of Construction Impacts is Insufficient ............... 106

12. The DEIS Ignores the Impacts of Construction-Generated Silica Dust, Which is a Public Health Hazard ........................................... 108

13. Technical Errors and Omissions ................................................. 109

I.   The DEIS Fails to Adequately Identify and Analyze Impacts to Forests ........... 111

J.   The DEIS Does Not Sufficiently Consider Noise ..................................... 112

K.   The DEIS Relies on Flawed Traffic Modeling ........................................ 113

1.  Flaws in the MWCOG Model Used in the I-495 and I-270 DEIS ......... 115

2.  Foreseeable Impacts of Building I-495 and I-270 Managed Lanes ........ 133

3.  Appendix A: Traffic Forecasts ................................................. 144

4.  Appendix B: DEIS Wrongly Claims that Over-Capacity Assignments Indicate Latent Demand ....................................... 146

5.  Appendix C: The Virginia Express Lanes Caused the Worst Bottleneck on I-495 .............................................................. 150

L.   Other Traffic Problems in the DEIS ................................................... 155

1.  Increase in "Heavy Truck versus Car" Crashes and Fatalities ............ 155

2.  Bottlenecks: Traffic Will Stall and Pollute as it Funnels Down ........... 156

M.  The Agencies Failed to Take the Required "Hard Look" At Environmental Justice Issues ............................................................................ 156

1.  The Agencies' Methodology for Identifying Environmental Justice Populations Is Fundamentally Flawed ....................................... 157

2.  The Agencies' Discussion of Environmental Justice Lacks Any Meaningful Analysis of Impacts to Environmental Justice Populations ...................................................................... 158

3.  The Agencies Failed to Consider Whether the Project Will Disproportionately Affect Environmental Justice Populations ............. 159

November 6, 2020
Page viii

4.  The Agencies' Failure to Take a "Hard Look" at Environmental Justice Impacts Precluded Meaningful Participation by Environmental Justice Populations ....................................... 160

N.   The DEIS Does Not Address Induced Demand .................................... 161

O.   The DEIS Does Not Adequately Examine The American Legion Bridge Contingencies ............................................................................ 165

P.   NEPA Procedural Problems ........................................................... 167

1.  The Agencies Violated NEPA by Initially Providing the Public with an Incomplete DEIS and then Adding Appendices Without Notifying the Public ............................................................ 167

2.  The Agencies Systematically Downplayed and Miscounted Public Comments Opposing the Project ............................................. 170

3.  The Agencies' Decision to Hold Public Hearings During a Time that Guaranteed Lower Public Participation ............................... 175

4.  The Agencies' Refusal to Provide Underlying Environmental Data, Files and Referenced Documents in the DEIS Hinders Meaningful Public Review and Violates NEPA .......................................... 176

III. Problems with the Section 4(f) and National Historic Preservation Act Analyses ......... 195

A.   The DEIS and Section 4(f) Analysis Fail to Adequately Address the Project's Effects on Historic and Cultural Resources .......................... 195

1.  The Agencies Failed to Take a "Hard Look" at the Project's Effects on Historic and Cultural Resources Because Information Related to These Resources is Not Complete ............................... 196

2.  The Agencies Have Failed to Comply With Section 110(f) of the National Historic Preservation Act ........................................... 198

B.   The Agencies' Section 4(f) Analysis Fails to Comply With the Letter and Intent of the Department of Transportation Act Because it Does Not Consider the Full Range of Ways That the Project Will Use—Directly, Indirectly, and Constructively—Historic Sites of Local, State, or National Significance, and Parks ............................................................... 200

C.   The Agencies Cannot Reasonably Rely on a Non-Executed Programmatic Agreement to Satisfy NEPA, Section 110(f), or Section 4(f) .................. 203

IV.  Conclusion ................................................................................... 204

00022638

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 1

The draft environmental impact statement (DEIS) for the proposed I-495 and I-270 expansion (Project) violates the National Environmental Policy Act (NEPA) and is a disservice to the public because it presents incomplete and inadequate analyses.[2] Moreover, even the inadequate information presented in the DEIS shows that the Project will harm Maryland citizens and their environment and cannot be justified. **The Organizations oppose the build alternatives retained for detailed study in the DEIS (all for tolled highway expansion) and support the no build alternative.** The U.S. Department of Transportation (DOT) Federal Highway Administration (FHWA) and the Maryland Department of Transportation (MDOT) State Highway Administration (SHA) (together, Agencies) must not go forward with this flawed DEIS.

These comments identify the Organizations' key concerns regarding the DEIS, including but not limited to the following:

- The DEIS fails to adequately present the true costs of the Project. The DEIS presents an incomplete and vague estimate of capital costs and revenues and ignores significant financial costs the Project would impose on the state and its citizens, including a direct subsidy to a private developer, costs of relocation of utilities, decreases in property values, and financial risks associated with the Public Private Partnership (P3) Program.

- The DEIS improperly considers only one segment of the proposed I-495 and I-270 managed lane expansion P3 expansion Project, preventing meaningful evaluation of other viable, less costly, and less harmful alternatives to roadway expansion that would actually relieve congestion.

- The DEIS's purpose and need statement is unreasonably narrow and unlawfully restricts the range of alternatives considered to various permutations of managed lane highway expansions, all of which have nearly identical environmental impacts. As a result, the DEIS fails to consider other reasonable types of alternatives, such as multimodal alternatives.

- The DEIS fails to analyze the Project's water quality impacts, including how increased stormwater generated by the Project will affect receiving waterways. The DEIS fails to consider viable stormwater avoidance and mitigation options that would avoid or minimize adverse impacts on waterways, wetlands, floodplains, and other natural resources.

- The Joint Federal/State Application for a Clean Water Act (CWA) § 404 permit fails to meet CWA requirements and is not in the public interest.

---

[2] The Project consists of the segment covering 48 miles from I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including improvements to the American Legion Bridge over the Potomac River, to west of MD 5, and along I-270 from I-495 to north of I-370.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 2

- The DEIS does not adequately analyze impacts on aquatic species, aquatic habitat, fisheries, state and federal rare, threatened, or endangered species, or forests.

- The DEIS does not sufficiently analyze how hazardous materials located along the highway corridors may be disturbed by the Project.

- The DEIS does not adequately analyze air emissions, including the increase the Project will cause in harmful particulate matter and greenhouse gas emissions. The limited and error-filled air quality analysis presented in the DEIS does not support the general statements in that document downplaying air quality impacts, and in fact shows the Project will impair the health of communities around the Project, including environmental justice communities.

- The DEIS's traffic modeling, which is central to the DEIS, is flawed and fails to acknowledge or address foreseeable impacts from the Project such as induced demand and greater congestion and backups on arterial roads connecting to the managed lanes. Few will benefit from the managed lanes but the majority will subsidize them.

- The DEIS fails to take the required hard look at environmental justice issues. It uses a flawed methodology and fails to perform any meaningful analysis of impacts, let alone disproportionate impacts, thereby precluding meaningful participation by environmental justice communities.

- The DEIS fails to adequately address the Project's effects on historic and cultural resources.

- The DEIS process itself was flawed. DEIS appendices were added after the DEIS was released, without notice to the public. The DEIS also relies on documents and data that the Agencies have unlawfully withheld from the public.

The DEIS appears designed to reach a pre-determined result—expand I-495 and I-270 with managed lanes—without adequately considering the Project's impacts or considering viable alternatives. The Agencies' consistent failure, in every section of the DEIS, to take the required hard look at the Project's impacts and their failure to provide the public with documents and data underlying the DEIS's conclusions prevent meaningful public comment and render the process unlawful.

The Agencies must use all available information to analyze less costly multimodal options to relieve congestion in the region, ones that do not cause such significant harm to human health and the environment, and they must provide the public with a true opportunity to review and comment on these options. At a minimum, the Agencies must not move forward with any of the fundamentally flawed build alternatives without a new purpose and need statement, additional new alternatives, and a new DEIS that addresses the failures identified in these comments. The new DEIS must align with the actual phasing of the Project and provide the public an opportunity to review and comment on the impacts that the Agencies glossed over, pushed off to later, inappropriately minimized, or altogether failed to evaluate.

00022639

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 3

## I. The DEIS Does Not Sufficiently Analyze or Present the Costs of the Project or Its Impacts on Public and Private Property

MDOT SHA and Governor Hogan have repeatedly promised that the P3 Program, adding toll lanes to 70 miles of I-495 and I-270, will not use Maryland taxpayer dollars or require the destruction and relocation of any homes.[3] The website for the Project says:

> The overall P3 Program will be delivered at no net cost to the State, with no public Transportation Trust Fund contribution and with all debt non-recourse to the State. MDOT will ensure each P3 Agreement is implemented to meet this commitment.[4]

Further, the DEIS itself states:

> The State of Maryland does not have the funds to construct improvements of this magnitude with an estimated cost of approximately $8 to 10 Billion. Additionally, even with the tolls to pay back loans, the State does not have enough bonding capacity to take out loans to pay for the improvements.

DEIS, at ES-12; *see also id.* at ES-20, 1-14; 2-42; *id.*, App. P, at 7, 81, 160, 244 ("New bridges and smoother pavement will be provided for all users at no cost to the Transportation Trust Fund").

---

[3] *See, e.g.*, Dominque Maria Bonessi, *Here's Everything You Need To Know About The Capital Beltway Expansion*, WAMU88.5 (May 29, 2019), https://wamu.org/story/19/05/29/heres-everything-you-need-to-know-about-the-capital-beltway-expansion/; Mitti Hicks, *MDOT Officials on Widening I-270: "We're Not Going to Take Your Home,"* Montgomery Community Media (Oct. 11, 2018), https://www.mymcmedia.org/mdot-officials-on-widening-i-270-were-not-going-to-take-your-home/; Kate Ryan, *Despite Skepticism, Hogan Says No Homes Will be Razed for I-270 Widening*, WTOPnews (Sept. 4, 2018) https://wtop.com/maryland/2018/09/despite-skepticism-hogan-says-no-homes-will-be-razed-for-i-270-widening/; Katherine Shaver, *Hogan's Plan to Add Additional Toll Lanes Faces a Long, Tough Road Ahead*, Frederick News-Post (Oct. 22, 2017), https://www.fredericknewspost.com/news/politics_and_government/transportation/hogan-s-plan-to-add-additional-toll-lanes-faces-a/article_596a73a6-8b97-5124-b731-ff2a847bed37.html ("The state's only expense, Rahn said, would come in hiring 'the very best' lawyers and financial consultants to oversee its interests in what are typically highly complex deals. He said the private companies would be on the hook for paying off the construction debt, regardless of how much toll revenue materialized."); Robert McCartney, et al., *Maryland Gov. Larry Hogan Proposes Widening the Beltway and I-270 to Include 4 Toll Lanes*, Washington Post (Sept. 21, 2017), https://www.washingtonpost.com/local/trafficandcommuting/maryland-gov-hogan-announces-9b-traffic-relief-plan-for-beltway-other-major-highways/2017/09/21/c15c14a0-9ec8-11e7-9083-fbfddf68804c2_story.html?noredirect=on&utm_term=.fc47aabe6d1d.

[4] Updates, FAQs, https://495-270-p3.com/updates/faqs/ (visited Oct. 8, 2020).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 4

Based on the promise of no taxpayer funding, together with claims that the state does not have the funds to pay for improvements, the Agencies eliminated alternatives that would have required public subsidy to deliver. *E.g.*, DEIS, at ES-9, *id.*, App. B, at 29-30.

However, the DEIS shows that each of the retained build alternatives would require the government to relocate 25-34 homes. DEIS, at ES-17. These build alternatives would also destroy hundreds of acres of parkland and historic properties, and would directly affect, even if not condemn, nearly 1,500 additional private properties, cratering their property value. *Id.* It appears MDOT and state taxpayers will be responsible for the full costs of these takings and other damages.

Based on its likely inaccurate cost estimates, the DEIS also estimates that the build alternatives might require a state subsidy to be paid to the developer ranging from $482 million to more than $1 billion depending on the construction price and interest rates. DEIS, at 2-48 to 2-50. This range is an underestimate of the true extent of the subsidy: in particular, it does not include an estimated $1 to $2 billion needed to fund the required relocation of water and sewer infrastructure[5] and other kinds of utility relocation (electricity, gas, internet and cable television);[6] compensation to unsuccessful bidders;[7] or the $125 million already spent or

---

[5] Letter from Montgomery County Council to Gregory Slater (May 14, 2020), https://static1.squarespace.com/static/5b72c6a8da02bc640472bf8c/t/5ee01b95ac35107c14b15b29/1589648277828/WSSC-MDOT-Letter.pdf; Memorandum to Prince George's County Council and Montgomery County Council re Agenda Item #1: Briefing: Possible Impacts of the I-270 and I-495 Road Widening P3 Project on WSSCWATER Infrastructure (March 12, 2020), https://www.montgomerycountymd.gov/council/Resources/Files/agenda/cm/2020/20200312/20200312_TETIEE1-2.pdf; Dominique Maria Bonessi, *Water Bills In Maryland Could Nearly Triple Under Beltway And I-270 Expansion Plan*, WAMU (March 16, 2020), https://wamu.org/story/20/03/16/water-bills-in-maryland-could-nearly-triple-under-beltway-and-i-270-expansion-plan/; Bruce DePuyt, *Express Toll Lanes Could Raise Water Bills in Montgomery and Prince George's*, Maryland Matters (March 13, 2020), https://www.marylandmatters.org/2020/03/13/express-toll-lanes-could-raise-water-bills-in-montgomery-and-prince-georges/.

[6] Bruce DePuyt, *Pipes, Cables Could Face Major Disruption by Plan to Widen Beltway and I-270*, WTOPnews (Oct. 28, 2020), https://wtop.com/dc-transit/2020/10/pipes-cables-could-face-major-disruption-by-plan-to-widen-beltway-and-i-270/; Bruce DePuyt, *Labyrinth of Pipelines and Cables Could Face Major Disruption by Highway Plan — And Who Would Foot the Bill?*, Maryland Matters (Oct. 28, 2020), https://www.marylandmatters.org/2020/10/28/labyrinth-of-pipelines-and-cables-could-face-major-disruption-by-highway-plan-and-who-would-foot-the-bill/.

[7] Board of Public Works Transcript, at 32 (June 5, 2019), https://bpw.maryland.gov/MeetingDocs/2019-Jun-5-Transcript.pdf.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 5

budgeted,[8] nor does it account for the cost of adequate environmental mitigation, promised transit, or long-lasting pandemic supply chain issues (which will likely increase costs). For example, it is estimated that the average customer would pay an extra $2,250 per household over the next 20 years for the water and sewer relocations required by the Project, yet this is not disclosed or analyzed in the DEIS.[9]

Moreover, although it is not clear what risks MDOT, the State of Maryland, and Maryland taxpayers will be liable for, it is likely these could be significant. For example, one of the private entities that is on MDOT's shortlist for the P3 contract recommended, based on recent projects they participated in, that risks of encountering unknown pre-existing historical, environmental, or hazardous conditions, unforeseen geotechnical and soil conditions, the need for right of way acquisition, interface with utility owners, and many other risks be allocated to MDOT.[10] Transurban, another bidder, recently has been involved in a dispute in a P3 project in Australia that is likely to result in taxpayers being on the hook for an additional $750 million due to contamination that should have been foreseen.[11] MDOT has created or intends to create a term sheet outlining risk allocations but has not publicly released that document.[12] MDOT's supplement to the Presolicitation Report for the P3 Program already provides for the state to pay for some risks, including some governmental approvals, certain unspecified events, some

---

[8] $90 million plus $35 million. Michael Laris, *Rejected Maryland Toll-Road Contract Goes to Different Bidder*, Washington Post (Dec. 19, 2018), https://www.washingtonpost.com/local/trafficandcommuting/rejected-maryland-toll-road-contract-goes-to-different-bidder/2018/12/19/b6216b36-039d-11e9-b5df-5d3874f1ac36_story.html; Danielle E. Gaines, *Reaction to Governor's Budget Proposal: Upbeat So Far*, Maryland Matters (Jan. 15, 2020), https://www.marylandmatters.org/2020/01/15/reaction-to-governors-budget-proposal-upbeat-so-far/.

[9] Bruce DePuyt, *Pipes, Cables Could Face Major Disruption by Plan to Widen Beltway and I-270*, WTOPnews (Oct. 28, 2020), https://wtop.com/dc-transit/2020/10/pipes-cables-could-face-major-disruption-by-plan-to-widen-beltway-and-i-270/.

[10] ACS Infrastructure Development, Response to Request for Information, at 4-6 https://www.roads.maryland.gov/OC/ACS_Infrastructure_Development.pdf.

[11] Kieran Rooney and Matt Johnston, *West Gate Tunnel's Toxic Soil Removal to Cost Victorian Taxpayers up to $750m*, Herald Sun (Sept. 22, 2020), https://www.heraldsun.com.au/news/west-gate-tunnels-toxic-soil-removal-to-cost-victorian-taxpayers-up-to-750m/news-story/99b1dbc85a1be0dfaa6ee5e5b5e65457.

[12] Maryland Transportation Authority and Maryland Department of Transportation, Request for Qualifications, § 3.4 (Feb. 7, 2020) https://threeeconsultinggroup.com/wp-content/uploads/2020/04/00-I-495_I-270_P3_Phase_1_RFQ-1.pdf.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 6

financial risks from interest rate assumptions, toll collection, enforcement, and leakage risk, as well as risks of termination or developer default.[13]

Because the allocation of risk can completely change the financial viability of the Project (particularly from MDOT's and the State of Maryland's point of view), and financial viability was used to screen alternatives and is a key part of the consideration of the alternatives in the DEIS, MDOT must publicly release its allocation of risk outline and utilize all available financial information in selecting and analyzing alternatives and their financial viability. These risks underscore the need for a new and complete evaluation of the Project's environmental impacts and the harms that would occur should the Agencies move forward with the current insufficient analysis. Who is going to bear these costs? Why are these costs not considered in the financial viability analysis? The Agencies must not move forward without providing an accurate analysis of the Project's financial viability that does not ignore significant expenses.

The DEIS also does not explain assumptions made regarding the cost of construction, which impacts the Project's financial viability and the public subsidy the state would pay the private company.

First, no itemized budget has ever been shared with the public, precluding meaningful review and comment. The DEIS does not disclose assumptions in the cost estimate. For example, the traffic analysis in the DEIS assumes fewer exits from the toll lanes than are now expected; does the cost estimate include the costs of the extra exit ramps that were added later in the process? What assumptions does the cost estimate make about exit and entrance ramp configurations where there will be separate ramps for general purpose lanes and the toll lanes? Does the cost estimate take into account the need to have spatial separation to avoid traffic conflicts such as backups from one ramp that block the other ramp?

Additionally, the DEIS states that the Agencies screened alternatives based on calculated construction costs using the MDOT State Highway Administration's (MDOT SHA's) 2017 Highway Construction Cost Estimating Manual as well as unit costs from the March 2018 and July 2019 Common Item Guides. DEIS, at 2-6; DEIS, App. B, at 148. However, the Agencies have not provided public access to these documents, despite the requirement in NEPA that they be publicly available. 40 C.F.R. § 1502.21 (2019); *id.* § 1501.12 (2020).[14] This lack of transparency precludes meaningful public comment.

---

[13] Supplement to the Presolicitation Report for the I-495 and I-270 P3 Program, at 2, 4-6 (Apr. 12, 2019), https://495-270-p3.com/wp-content/uploads/2019/04/PSR-Supplement.pdf.

[14] Since the DEIS was published, revised Council on Environmental Quality (CEQ) regulations implementing NEPA went into effect. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020). These regulations are likely unlawful and already subject to four lawsuits. *See* Compl. for Declaratory and Injunctive Relief, California v. Council on Env't Quality, No. 3:20-cv-06057 (N.D. Cal. Aug. 28, 2020); Compl., Env't Just. Health All. v. Council on Env't Quality, No 1:20-cv-06143 (S.D.N.Y. Aug. 6, 2020); Compl., Wild Va. v. Council on Env't Quality, No. 3:20-cv-

00022641

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 7

Second, it appears that the capital cost estimate was calculated based on lane miles to be repaired[15] without considering the unique costs of this Project, including 1) expanding the highway, 2) building entrances and exits, 3) dealing with elevated lanes, 4) 170 bridges that would need to be re-built, and 5) any other specific infrastructure or mitigation costs necessary when adding two separated managed lanes in both directions.[16] It appears that the capital cost estimates assume 25% roadway rebuilding without explanation, but this assumption is not supported and makes no sense given Maryland Secretary of Transportation Pete Rahn's statement that "it needs to be reconstructed because we have mush underneath it and the system frankly has got to be taken right down to the dirt and brought back up."[17]

Third, the DEIS estimates capital costs for the build alternatives ranging from $8.7 billion to $10 billion. DEIS, at ES-17. However, these cost estimates, which were used to analyze financial viability for this Project—the 48-mile segment that the DEIS purports to address—are similar to those presented for the entire P3 Program, which includes two other segments purportedly excluded from the DEIS. *See* Supplemental PSR Report (stating that estimates indicate that the P3 Program, which covers more than 70 miles of highway, will require more

---

[15] 00045-NKM (W.D. Va. July 29, 2020); Compl. for Declaratory and Injunctive Relief, Alaska Cnty. Action on Toxics v. Council on Env't Quality, No. 3:20-cv-05199 (N.D. Cal. July 29, 2020). If the Agencies move forward with the NEPA process, they should comply with the old regulations, as well as DOT regulations, rather than applying new regulations retroactively. Acting based on regulations that are both unlawful in themselves and unlawfully applied would render the Agencies' actions also unlawful. Nevertheless, under either of CEQ's regulations, the DEIS is insufficient and unlawful. This letter cites to both regulations throughout these comments, using the year to differentiate between them: 2019 vs. 2020.

[15] Sean Emerson, *Hogan's Proposed Beltway Widening Project Could Require Taxpayer Funding and Exorbitant Tolls*, Greater Greater Washington (Dec. 1, 2017), https://ggwash.org/view/65741/hogans-proposed-beltway-widening-project-could-require-taxpayer-funding-and-exorbitant-tolls ("Rahn said the $9 billion cost estimate for the three corridors was generated based on the approximate cost per lane mile of repairing parts of area Interstates ($100 million per lane mile,) multiplied by the number of lane miles in the concept.").

[16] Maryland's Secretary of Transportation Pete Rahn previously explained that "the Washington Beltway that can no longer be expanded and it needs to be reconstructed because we have mush underneath it and the system frankly has got to be taken right down to the dirt and brought back up." Sean Slone, *Transportation Policy Academy 2015 – DC – Maryland Secretary of Transportation Pete Rahn*, The Council of State Governments (May 19, 2015), https://web.archive.org/web/20200906121216/https://knowledgecenter.csg.org/kc/content/transportation-policy-academy-2015-%E2%80%93-dc-%E2%80%93-maryland-secretary-transportation-pete-rahn.

[17] *Id.*

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 8

than $9 billion - $11 billion in investment).[18] The Agencies must clarify the basis for their cost estimates and which segments of I-495 and I-270 they cover.

If the costs presented in the DEIS are only for this 48-mile segment, then MDOT has been misleading the public about the total 70-mile P3 Program's cost, which would be significantly higher than promised. *See* Larry Hogan, Office of the Governor, Press Release (Sept. 21, 2017), https://www.roads.maryland.gov/OC/Traffic-Relief-Plan-Press-Release.pdf (Governor Hogan Announces Widening of I-270, Capital Beltway (I-495), and Baltimore-Washington Parkway (MD 295) $9 Billion Traffic Relief Plan, Largest Highway P3 in North America RFI Released Today" "With the total project estimated value at $9 billion"). What will be the total cost of the entire 70-mile P3 Program?

Fourth, the DEIS states that the recommended range of contingency factors for capital cost estimates in the planning/concept development phase, which is the current phase of the Project, is 25 to 40%. DEIS, App. B, at 148. The DEIS states that the preliminary capital cost estimates include a 25% contingency. *Id.* However, the DEIS does not: 1) explain the source of this recommended range, nor 2) explain why the Agencies picked the low end of this range. It does not appear there is any justification for this decision. Adding to the confusion, the DEIS Appendix B says a more detailed assessment of financial viability, which was completed in November 2019 and updated in January 2020, used a 10% range between the high and low capital costs. DEIS, App. B, at 94. The DEIS does not explain why this range was used either. Such a low range is not justified until a project is near its final design phase, which the Project certainly has not reached; in fact, the DEIS tries to excuse much of its cursory environmental analysis by asserting the Project is only in an early planning stage. Therefore, it appears likely that the subsidy described in the DEIS on 2-48 through 2-50 in the high capital cost scenario will be significantly higher than the $500 million to $1 billion presented.

Fifth, hidden in Appendix B, the DEIS states that in the preliminary capital cost estimates, "construction costs were adjusted to reflect assumed efficiencies in costs for major items such as asphalt pavement and structural materials." DEIS, App. B, at 148. The DEIS does not, however, explain what adjustments were made or the amount of the adjustments. Without this information, the public cannot meaningfully review and comment on the validity of these adjustments.

Sixth, despite multiple drastic changes in the project scope, the estimated capital cost of around $9 billion dollars has remained surprisingly constant. Since it was first announced, the P3 Program has been separated into phases, expanded to include an agreement to rebuild and widen the American Legion Bridge, and amended to require billions in water pipe infrastructure

---

[18] *See also* Sean Emerson, *Hogan's Proposed Beltway Widening Project Could Require Taxpayer Funding and Exorbitant Tolls*, Greater Greater Washington (Dec. 1, 2017), https://ggwash.org/view/65741/hogans-proposed-beltway-widening-project-could-require-taxpayer-funding-and-exorbitant-tolls (stating $9 billion cost estimate was for the three corridors).

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 9

relocation.[19] The estimated capital cost, on the other hand, has not been adjusted to reflect these significant revisions.

Last, MDOT has repeatedly asserted as a reason for eliminating other alternatives that the state does not have the ability to finance any type of congestion relief. However, the ability to finance a congestion relief alternative depends on the cost of that alternative, which MDOT has not revealed. Moreover, after the breakdown in negotiations regarding the Purple Line P3, with the private party seeking to terminate the P3 agreement, MDOT's chief financial officer conceded that the state could issue new bonds and seek a low-interest federal loan to cover the over $1 billion of project costs remaining.[20] A similar approach appears to have been rejected out of hand for the current Project, without explanation by MDOT.

How can the Agencies eliminate alternatives and analyze the retained alternatives for financial viability without having an accurate picture of the finances of the Project (the 48-mile segment at issue)? How can the public meaningfully comment on the Agencies' conclusions without an accurate picture of the Project's finances? The fact is that neither party can do so, meaning that the public should not move forward with the Project without supplementing the DEIS and providing the public an opportunity to review and comment on the Project's financial viability. While MDOT-SHA wants the Project to proceed as a pre-development public-private-partnership, it must first disclose and analyze the Project's true monetary and environmental costs and allow the public to meaningfully review and comment on these costs before a final EIS is released. The Agencies certainly should not release a Record of Decision selecting a preferred alternative without understanding and analyzing these costs.

Relatedly, the DEIS cover page states that it was submitted not only by DOT FHWA but also by MDOT SHA, and page ES-2 states that both FHWA, as the lead Federal Agency, and MDOT SHA, as the Local Project Sponsor, have prepared the DEIS. MDOT SHA has stated that that there is no federal funding for the Project and that they have spent significant funds on planning for the Project, which they expect to be repaid through the P3 Program (if it goes forward). If a different option is chosen, such as the no build alternative or an alternative consisting of transportation demand management and public transit (which should have been analyzed), MDOT SHA might not be repaid their planning funds. MDOT SHA also has agreed to pay millions of dollars in application costs to the private bidders for the P3 if they are not

---

[19] Bruce DePuyt, *As Hogan's Highway-Widening Plan Changes, $9 Billion Price Tag Does Not*, Maryland Matters (Sept. 1, 2020), https://www.marylandmatters.org/2020/09/01/as-hogans-highway-widening-plan-changes-9-billion-price-tag-does-not/.

[20] Bruce DePuyt, *Purple Line Will be Delayed as MDOT Seeks Management Solution*, WTOPnews (Sept. 23, 2020), https://wtop.com/maryland/2020/09/purple-line-will-be-delayed-as-mdot-seeks-management-solution/; Katherine Shave, *Maryland Would Have to Divert Money from Other Projects if Purple Line Builders Quit, State Transit Chief Tells Court*, Washington Post (Sept. 8, 2020), https://www.washingtonpost.com/local/trafficandcommuting/maryland-would-have-to-divert-money-from-other-projects-if-purple-line-builders-quit-state-transit-chief-tells-court/2020/09/08/85dd149a-ee22-11ea-99a1-71343d03bc29_story.html.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 10

chosen or the Project does not go forward.[21] MDOT therefore has violated NEPA's requirement that Agencies cannot commit resources prejudicing selection of alternatives before making a final decision. 40 C.F.R. §§ 1502.2(f); 1506.1 (2019). MDOT SHA has not disclosed how much it has already spent on the planning for the P3 Program nor how much it intends to spend going forward, but those amounts appear to be significant.[22] Moreover, MDOT SHA has not disclosed the financial interests of contractors that have assisted with the NEPA and P3 process, even though their participation likely creates a conflict of interest. MDOT must disclose its own financial interests and conflicts regarding the DEIS as well as those of the contractors, especially because they may have influenced the selection of alternatives. *See, e.g.*, 40 C.F.R. § 1506.5(c) (2019).

Additionally, if an appropriation will be required due to the likelihood of a substantial public subsidy, as discussed above, then the DEIS should have discussed the applicability of the Maryland Environmental Policy Act (MEPA), which requires state agencies to prepare an "environmental effects report" on "each proposed State action significantly affecting the quality of the environment." Md. Code Ann., Nat. Res. § 1-304(a). MEPA defines "proposed state action" to include "requests for legislative appropriations and other legislative actions." *Id.* § 1-301(d). Maryland's Guidelines for Implementation of the Maryland Environmental Policy Act, which are applicable to all state agencies, define "other legislative actions" as "requests by the unit of the Department [or other State agency] for proposed legislative acts and/or a change in existing acts or agency authority." Guidelines, IV.A.3 (June 28, 1974). Because MDOT has not been transparent about the finances of this Project, it is not clear if the Project will require a

---

[21] *See* MDOT and MDTA, Request for Qualifications, Phase 1 of the I-495 & I-270 P3 Program, at 27-28 (Feb. 7, 2020), ("MDOT intends to provide each Shortlisted Proposer who delivers a compliant Proposal and is not selected as the Selected Proposer with a transportation payment"); ACS Infrastructure Development, Response to Request for Information, at 12-13 https://www.roads.maryland.gov/OC/ACS_Infrastructure_Development.pdf (one of the entities on the P3 shortlist responding to MDOT's question of how much the stipend for reimbursement should be as $1,500,000 - $2,000,000 after issuance of the final RFP and $2,000,000 - $3,000,000 after submission of proposal).

[22] MDOT-SHA has hired Ernst & Young LLP as a Financial Transaction and Market Advisor, CDM Smith as Traffic Revenue Consultants, as well as Ashurst and Venable as outside legal counsel, but has not disclosed the amounts of taxpayer dollars spent on these lawyers and consultants nor how they will be paid. MDOT-SHA, I-495 & I-270 P3 Program Industry Forum, at 27, https://495-270-p3.com/wp-content/uploads/2018/12/Industry-Forum-PPP_2018-12-10_WEBUPLOADONLY.pdf; https://495-270-p3.com/p3-information/industry-information/; Katherine Shaver, *Hogan's Plan to Add Additional Toll Lanes Faces a Long, Tough Road Ahead*, Frederick News-Post (Oct. 22, 2017), https://www.fredericknewspost.com/news/politics_and_government/transportation/hogan-s-plan-to-add-additional-toll-lanes-faces-a/article_596a73a6-8b97-5124-b731-f2a847bed37.html ("The state's only expense, Rahn said, would come in hiring "the very best" lawyers and financial consultants to oversee its interests in what are typically highly complex deals."). The DEIS's also lists sixty-six individuals representing seventeen private entities as preparers. DEIS, at 8-3.

00022643


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 11

request for appropriations such that an environmental effects report must be prepared. However, it does appear that MDOT has already spent a significant amount of taxpayer funds on the Project, intends to spend significant additional taxpayer funds through a subsidy, and intends to transfer additional liability onto taxpayers for water, sewer, and other environmental impacts. Therefore, it appears likely that the Project will require legislative appropriations, other legislative actions, or both and so is subject to the MEPA's requirements.

Given the high costs likely to be borne by the State of Maryland and its citizens, contrary to the DEIS's stated purpose and need, the Project will strain Maryland's ability to pay for critical infrastructure needs. The American Society of Civil Engineers (ASCE) Report Card for Maryland's Infrastructure gave the state an overall C grade because its infrastructure is in "mediocre condition requiring attention."[23] The ASCE identified the following as among the state's most critical infrastructure challenges:

- Drinking Water: C. Aging drinking water infrastructure negatively affects the reliability of the water system. To safeguard reliable supply of potable water more funding is needed to pay $9.3 billion in drinking water infrastructure over the next 20 years.

- Wastewater: C. Maryland continues to face significant wastewater challenges including reducing the sanitary sewer overflows, leakage from urban areas that have aging pipes, and quantity of inadequate or failing septic systems. From rehabilitation of aging collection systems to completion of treatment works, the projected wastewater infrastructure capital costs for the next 20 years will be on the order of $10 billion.

- Stormwater: C. The Chesapeake Bay water quality has steadily declined over the last decades. In 2010, new limits on the pollutants that can enter the bay were set, but stormwater infrastructure costs to comply with these regulations are projected to be more than $3 billion and will tax the already limited resources of local municipalities and the state.

- Transit: D. Maryland's transit system includes buses, MARC, Baltimore light rail and its share of the Metro subway. The system faces a $2 billion budget shortfall to achieve both a state of good repair and on-time service performance across all its modes.

- Hazardous Dams: C. Dams are an essential part of Maryland's infrastructure to provide flood control, drinking water supply, agriculture irrigation, hydropower

---

[23] ASCE 2020 Report Card for Maryland's Infrastructure covers twelve categories: aviation, bridges, dams, drinking water, energy, ports, rail, roads, solid waste, stormwater, transit, and wastewater. ASCE graded the roads network C based on traffic congestion but, since approximately 80% of the roads network is in fair to very good condition, ASCE did not specify a funding gap to repair those conditions.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 12

and recreation. There are currently 539 dams in Maryland of which approximately 45% are high hazard and significant hazard dams that require repairs at a cost of $218 million.

- Schools and Deficient Bridge Needs. The ASCE also estimates a $615 million funding gap in school capital expenditures and that $623 million are necessary to replace the structural deficient bridges in the state's inventory.

The total funding gap the ASCE reports for the previous listing of infrastructure priorities is $25.76 billion. Launching a P3 venture to build the Project poses credible risks that a failed P3 might put the Project's financial burden back on the state and thereby divert a significant portion of funds that otherwise could be used to close the $25.76 billion infrastructure funding gap. The Project will also push billions of its own costs onto the providers of this infrastructure. These concerns are compounded by the COVID-19 pandemic's substantial impact on travel, which has reduced gas tax revenue and vaporized billions of dollars necessary to maintain Maryland's infrastructure in a state of good repair.

## II.    Problems with the NEPA Analysis

The DEIS fails to take the required hard look at the human health and environmental impacts of the Project. From the outset, MDOT had already determined that "a system of priced managed lanes . . . is the only means to provide congestion relief in the near term for the region."[24] To facilitate this pre-ordained conclusion, the Agencies repeatedly provide excuses in the DEIS for their cursory review by noting that many Project details remain unknown. The analysis presented in the DEIS therefore is lacking and is contrary to the purpose of NEPA. By failing to adequately study the available information, the DEIS prevents the public from understanding and commenting on the consequences of the Project. The DEIS also prevents the Agencies from reaching a decision on the Project that is based on a complete consideration of environmental impacts and that utilizes all practicable measures to avoid harms.

As explained throughout these comments, the Agencies should not move forward with a build alternative in the NEPA process but should work to identify a solution that will provide true congestion relief. Should the Agencies nevertheless decide to move forward with the Project, the agencies must start over and prepare a new DEIS that addresses the insufficient analyses of financial and environmental impacts discussed in these comments and provides the public with a meaningful opportunity to comment on these impacts. At a minimum, the Agencies must provide a supplemental EIS.

Additionally, DOT NEPA regulations and guidance state that the DOT should release a separate Final EIS (FEIS) and Record of Decision (ROD) and provide agencies and the public an opportunity to comment on the FEIS either if DOT did not identify the preferred alternative in the DEIS, 23 C.F.R. §771.123(c), or if there is a substantial degree of controversy regarding the

---

[24] Letter from Pete K. Rahn to Comptroller Peter Franchot, et al., at 2 (Dec. 11, 2018), https://495-270-p3.com/wp-content/uploads/2018/12/PSR_Final_inc-Cover-Letter-1.pdf.



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 13

preferred alternative, DOT, Guidance on the Use of Combined Final Environmental Impact Statements/Records of Decision and Errata Sheets in National Environmental Policy Act Reviews, at 3. Both those factors are present here. Therefore, if FHWA eventually publishes a FEIS, it should issue the FEIS separately from and in advance of issuing a ROD in order to afford the public an opportunity to comment. Also the FEIS and ROD should not be combined because, regardless of what happens next, the public will need an opportunity to comment on the FEIS before the ROD is adopted.

## A. Segmentation Problems

### 1. The DEIS Unlawfully Considers the Impacts from Only a Segment of the Broader P3 Program to Add Managed Lanes to I-495 & I-270

Agencies are required to consider connected actions in the same EIS. 40 C.F.R. § 1508.25(a)(1) (2019). This requirement prevents agencies from engaging in segmentation, that is, circumventing NEPA by not studying the cumulative impacts of a single project. "This rule against segmentation was developed to prevent the piecemeal environmental analysis of interrelated projects, which could give an inaccurate impression of overall environmental effects." *N.C. All. for Transp. Reform v. DOT*, 151 F. Supp. 2d 661, 680 (M.D.N.C. 2001).

Under Council of Environmental Quality (CEQ) regulations, "cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts . . . should therefore be discussed in the same impact statement." *Id.* § 1508.25(a)(2) (2019). Courts consider three factors to determine if separate project segments are in fact cumulative actions that, based on the CEQ regulations, should be discussed in the same impact statement: (1) whether they are part of a single project; (2) whether they were announced simultaneously; and (3) whether construction of both (or in the case of the Project all three) portions was reasonably foreseeable. *N.C. All. for Transp. Reform*, 151 F. Supp. 2d 661, 684-85 (citing *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214-15 (9th Cir. 1998)).

In addition, under DOT regulations, three criteria must be met by any transportation action reviewed under an individual EIS. First, the action being reviewed must "[c]onnect logical termini and be of sufficient length to address environmental matters on a broad scope." 23 C.F.R. § 771.111(f)(1). Second, the action is required to "[h]ave independent utility or independent significance, *i.e.*, be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made." *Id.* § 771.111(f)(2). Lastly, the action must not "restrict consideration of alternatives for other reasonably foreseeable transportation improvements." *Id.* § 771.111(f)(3).

The DEIS unlawfully segments the P3 Program, which proposes to add managed lanes throughout I-495 and I-270 and analyzes only the 48-mile segment covered by the Project, violating both CEQ and FHWA regulations. The DEIS violates the CEQ regulations because the segment it addresses is part of a larger single project to expand I-495 and I-270; the three segments of the single project were announced simultaneously; and construction of all three segments is reasonably foreseeable, especially since MDOT-SHA is moving forward with contracting and construction planning on all three.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 14

The DEIS violates the FHWA regulations because the segment it addresses does not connect logical termini. For example, it would create bottlenecks and worsen traffic at its endpoints if it were the only segment constructed. The DEIS also fails to provide the public with documents the Agencies relied on to decide on the segment's termini, precluding meaningful review, in violation of NEPA. *See infra* Section 2.P.4.d. The DEIS also violates the independent utility requirement because none of the three segments would "'have taken place in the other's absence.'" *Defs. of Wildlife v. N.C. Dept. of Transp.*, 762 F.3d 374, 395 (4th Cir. 2014) (quoting *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 426 (4th Cir. 2012)). In fact, because the Project segment does not match up with any of the phases in the P3 program, this segment cannot be funded without the other segments. Finally, by limiting the scope of the DEIS to a segment that is only part of the overall P3 Program, the DEIS restricts consideration of partial or full public transportation options (such as expanding the Maryland Area Regional Commuter line) that would be viable if evaluated based on the entire P3 Program. Going forward with this segmentation will also prevent similar public transit options from being considered when the other two segments go through the NEPA process.

Further, the impacts of widening Upper I-270 are purposely being ignored until a later date, while trying to get the first part of the larger project NEPA-approved and underway. Not addressing Upper I-270 issues in this DEIS precludes an adequate evaluation of Project's direct impacts, indirect impacts, and cumulative effects and foreseeable project risks (such as the private developer not being willing to complete Upper I-270 with the political risks; Section 4(f) risks; and the fact that that portion would not meet the narrow purpose and need or be profitable without state subsidy.[25] Former Transportation Secretary Pete Rahn disclosed during an October 2019 interview that I-270 was divided into two phases because of issues with the Monocacy Battlefield:

> the governor's direction was that I-270 be our first phase. And he didn't say 370 to the Beltway. He said 370. So we now have Phase 1A and 1B — 1B being north of 370. And what we're having to deal with there is a uniqueness to I-270, particularly impacted by the Monocacy Battlefield. That's why 270 has been separated into two. We currently have [taken] the initial steps of the NEPA [National Environmental Policy Act] process for that section north. So we're not ignoring it.[26]

Monocacy National Battlefield, which directly touches the current Upper I-270, is on the National Register of Historic Places. Any attempts at expanding that highway would create significant environmental and Section 4(f) impacts. Attempting to order to avoid analysis of a

---

[25] "From the very beginning, our statement of goal has been net zero cost to the state. The word 'net' is important here, because we know there are areas like 270 north that will have a cost that is going to exceed our projections for revenue generated by that section. That by itself would equal a subsidy or 'gap funding.'" *A Transportation Q&A: Rahn Talks I-270, Partnerships, Growth and More*, Bethesda Magazine (Oct. 24, 2019), https://bethesdamagazine.com/bethesda-beat/traffic/a-transportation-qa-rahn-talks-i-270-partnerships-growth-and-more/.

[26] *Id.* (alterations in original).

00022645

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 15

unique segment, with a historic National Battlefield, is not a valid reason to segment a proposal's NEPA review. End points may not be created simply to avoid proper analysis of environmental impacts.

No action on Lower I-270 should proceed without completing a NEPA-compliant evaluation of impacts arising from widening Upper I-270 and studying the cumulative impacts of this single project.

### 2. The Agencies Should Have Performed a Programmatic EIS to Consider the Impacts of the Project within the Context of the P3 Program or the Greater Regional Plan

In addition to the prohibition in NEPA against segmentation, NEPA requires that, if a "systematic program is likely to generate disparate yet related impacts," the Agencies must at least consider whether a Programmatic EIS (PEIS) is required and must articulate "a rational connection between the facts and the choice made." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 160 (D.C. Cir. 1985) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Whether a PEIS is required is based on: "(a) Could the [PEIS] be sufficiently forward looking to contribute to the [agency's] basic planning of the overall program? and, (b) Does the [agency] purport to 'segment' the overall program, thereby unreasonably constricting the scope of . . . environmental evaluation?" *Piedmont Envtl. Council v. F.E.R.C.*, 558 F.3d 304, 316 (4th Cir. 2009) (quoting *Nat'l Wildlife Fed'n v. Appalachian Reg'l Comm'n*, 677 F.2d 883, 888-89 (D.C. Cir. 1981) (alterations in original). A PEIS should be prepared when federal actions are connected or cumulative, 40 C.F.R. § 1508.25(a)(1)-(2) (2019), or when actions are similar, and a single statement is the best vehicle for assessing environmental effects, *id.* § 1508.25(a)(3) (2019). For actions that are a series of interrelated proposals, courts look to whether cumulative systemic effects from different projects could be meaningfully evaluated together. The crucial issue is whether the multiple actions have a combined effect that could be overlooked if evaluated separately.

The Agencies' failure to perform a PEIS first for the region's Traffic Relief Plan and then for the P3 Program violates NEPA. The DEIS is limited in scope to a mere 48-mile segment of the P3 Program, which addresses I-495 and I-270 as well as the region's overall Traffic Relief Plan to reduce congestion through projects around the Washington, DC/Baltimore region, even though the DEIS recognizes the need for enhanced connectivity to other forms of transportation in the region and for improvement of a "major regional transportation network[] that supports the movement of passenger and freight travel within the National Capital Region." *See* MDOT, "Purpose and Need," https://495-270-p3.com/environmental/purpose-and-need/. Furthermore, the Notice of Intent to prepare this Project's EIS notes that "Express Toll Lanes on I-495 and I-270, **as well as other corridors in the Baltimore Washington Region,** [are] part of the 'Constrained Long-Range Plan'" to "ease the impact of congestion." 83 Fed. Reg. 11,812, 11,813 (March 16, 2018) (emphasis added). Given the Notice of Intent's recognition of a regionwide plan to ease traffic congestion and the subsequently planned improvements, through the Project, to lower I-495 and the portion of I-270 from I-370 to I-70, the Project must be seen as one of several "related enterprises associated within a single program and planned together," and therefore requires a PEIS. *Nat'l Wildlife Fed'n*, 677 F.2d at 887-88.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 16

The current DEIS segment is part of a "systematic program likely to generate disparate yet related impacts." Maryland's Traffic Relief Plan as well as the P3 Program are single programs comprised of multiple associated enterprises planned together with a singular purpose: relieving traffic congestion in the region surrounding Washington, DC. Subsequent traffic relief projects are already planned and may result in a need for further congestion-relief actions in the future. These subsequent actions would also require EISs and are an "interdependent part of a larger action" that share "mutual dependence with other actions requiring an EIS." *Piedmont Envtl. Council*, 558 F.3d at 317. Therefore, a PEIS is required.

The DEIS also improperly segments the currently studied Project in a way that unreasonably constricts the scope of environmental evaluation. Given the subsequent actions to be undertaken that are directly tied to the P3 Program and the Traffic Relief Plan, the limited scope of the DEIS prevents a complete environmental evaluation from taking place. The segmentation does not allow the evaluation of the larger P3 Program or the Traffic Relief Plan for the region; yet, the approval of this first segment will commit the Agencies to particular choices with regard to the subsequent segments. On the other hand, the cumulative effects of the entire Traffic Relief Plan, or at the very least of the P3 Program, have a combined effect that could and should be evaluated together.

Considering the regional scope of the Project, within the broader P3 Program and Traffic Relief Plan, at a minimum the Agencies were obligated to consider the need for a PEIS and explain why a PEIS was not performed. By not doing so, the Agencies have prevented the public from meaningful input into this decision.

### B. Problems with the Purpose and Need Statement and the Alternatives Considered in the DEIS

#### 1. The Purpose and Need Statement is Unreasonably Narrow and Unlawfully Constrains the Range of Considered Alternatives

Section 102 of NEPA requires a federal agency to include a detailed statement on the environmental impacts of the proposed action, any adverse environment effects which cannot be avoided should the proposal be implemented, and alternatives to the proposed action. 42 U.S.C. § 4332(C). In order to comply with Section 102, an EIS must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives." 40 C.F.R. § 1502.13 (2019). The Purpose and Need Statement sets the parameters for the range of alternatives that the agency will consider in the EIS. *See Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195-96 (D.C. Cir. 1991). Agencies may not define a project's "objectives in unreasonably narrow terms." *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). Further, a Purpose and Need Statement premised on false or inaccurate information fails to provide a basis for "informed evaluation or a reasoned decision," and therefore does not satisfy NEPA's requirements. *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1030 (2d Cir. 1983).

A Purpose and Need Statement must allow an EIS to be more than a "foreordained formality," *Citizens Against Burlington*, 938 F.2d at 196. Though an agency must take an

00022646



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 17

applicant's objectives into account when developing the purpose and need statement, it is the agency's duty to "defin[e] the objectives of an action." *Colo. Env't Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999). An agency "may not circumvent the proscription" against defining its objectives in unreasonably narrow terms "by adopting private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives." *Nat'l Parks Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).

The DEIS states that its purpose is to "develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within [Project] limits and enhances existing and planned multimodal mobility and connectivity." DEIS, at 1-4. The DEIS states that the needs being addressed are to: "Accommodate Existing Traffic and Long-Term Traffic Growth; Enhance Trip Reliability; Provide Additional Roadway Travel Choices; Improve Movement of Goods and Services; and Accommodate Homeland Security." *Id.* In addition, the DEIS provides two goals: the use of alternative funding approaches for financial viability, and environmental responsibility. *Id.* at ES-6, 1-14.

This narrow purpose statement limits the possible alternatives to traffic management strategies and so eliminates any alternative that does not involve managed lanes and cannot attract highway toll concessionaires. *See* DEIS, App. B, at 94. Specifically, the DEIS states that traffic management strategies represent only "*one option* in the transportation 'tool-kit' that [has] been identified to address the growing congestion." DEIS, at 1-7 (emphasis added). Further, the DEIS notes that "[m]anaged lanes are *an* option to provide users with a more reliable travel time for their trip" and "*an* option to provide drivers with a choice to pay for a less congested trip." *Id.* at 1-9 (emphasis added).

As a result, the Agencies, guided by the narrow Purpose and Need Statement, gave detailed consideration to only the alternatives that included some form of traffic management. DEIS, at 2-24. The Notice of Intent to prepare the EIS states that "[m]anaged lanes are needed," and "[a]dditional roadway management options are needed."[27] Rather than being evaluated as an option among alternatives, the Project's Federal Register notice says a P3 will be "pursued."[28] This clearly indicates that this NEPA process was skewed toward the privately operated toll roads from the beginning; non-managed lane alternatives put forward in the DEIS were mere window dressing. Prior to reviewing alternatives or selecting a preferred alternative, the Agencies had already concluded that, "MDOT's traditional funding sources would be unable to effectively finance, construct, operate, and maintain highway systems of this magnitude."[29] By including "additional roadway travel choices" in the Purpose and Need Statement, DEIS, at 1-4, and restricting consideration to a limited category of alternatives, the Agencies foreclosed the

---

[27] Notice of Intent to Prepare Environmental Impact Statement, I-495 & I-270 Managed Lanes Study, 83 Fed. Reg. 11,812, 11,812 (March 16, 2018).

[28] *Id.*

[29] *Id.*

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 18

possibility of meeting the broader project goals by other reasonable means, such as TSM/TDM, mass transit, or multimodal strategies. The Maryland-National Capital Parks and Planning Commission (M-NCPPC) and National Capital Planning Commission (NCPC), both Cooperating Agencies, have raised these issues with the Agencies throughout the NEPA process.[30] M-NCPPC's non-concurrence on the Purpose and Need Statement and the ARDS, and NCPC's abstention from concurring on the ARDS are noted in the DEIS, at 1-1, 2-2.[31] Montgomery County has also repeatedly raised the issue of the insufficiency of the purpose and need and limited alternatives.[32]

The narrowness of the Purpose and Need Statement can be traced to the nature of the Project. The DEIS "is the first element of the broader I-495 & I-270 Public-Private Partnership (P3) Program." DEIS, at 1-1. The P3 Program, in turn, is itself the largest component of MDOT SHA's broad Traffic Relief Plan.[33] Under the P3 Program, MDOT SHA is "seeking input from the private sector to design, build, finance, operate, and maintain improvements on both I-495 and I-270."[34] Under the P3 model, a private company would build and manage the proposed Project in exchange for receiving the revenue from the managed lane tolls for a certain period of time. Because private investors rely on high profit margins to recoup their investments and make

---

[30] The One Federal Decision policy states that the FHWA, "should obtain a written concurrence from all cooperating agencies whose authorization is required for the project at three key milestones: 1) Purpose and Need, 2) Alternatives To Be Carried Forward for Evaluation, and 3) the Preferred Alternative." Memorandum of Understanding Implementing One Federal Decision under Executive Order 13807 (April 9, 2018), https://www.whitehouse.gov/wp-content/uploads/2018/04/MOU-One-Federal-Decision-m-18-13-Part-2-1.pdf.

[31] M-NCPPC non-concurrences are explained in more detail in the following documents. Planning Department letter to MDOT-SHA P3 Director, I-495 and I-270 Managed Lanes Study Purpose and Need Statement M-NCCCP Comments (Oct. 18, 2018), https://montgomeryplanningboard.org/wp-content/uploads/2018/10/I-495-and-I-270-Managed-Lanes-Study-Purpose-and-Need-Statement-M-NCPPC-Comments_web.pdf; M-NCPPC Reaffirms Non-Concurrence Vote on the Revised Alternatives for the Interstates 495 and 270 Managed Lanes Study on November 20 (Nov 20, 2020), https://montgomeryplanning.org/m-ncppc-reaffirms-non-concurrence-vote-on-the-revised-alternatives-for-the-interstates-495-and-270-managed-lanes-study-on-november-20/.

[32] I-495 & I-270 Managed Lanes Study Purpose: Briefing (Sept. 11, 2018), at 60, 66, 80, 90, https://www.montgomerycountymd.gov/council/Resources/Files/agenda/col/2018/180911/20180911_3.pdf.

[33] MDOT SHA, Maryland Traffic Relief Plan, https://www.roads.maryland.gov/mdotsha/pages/index.aspx?PageId=581.

[34] *Id.*

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 19

a profit, traffic management strategies like managed toll lanes are common in P3 projects.[35] The DEIS claims that the state lacks the funding resources to "effectively finance, construct, operate, and maintain highway improvements of the magnitude that are needed to address roadway congestion and enhance trip reliability in these study corridors," and therefore any such options considered in the study must use "a P3 in order to design, build, finance, operate, and maintain the proposed infrastructure improvements." DEIS, at 1-14. By limiting the Purpose and Need Statement to travel demand management solutions that are financially profitable to a private sector investor the Agencies unlawfully adopted the private interests of potential P3 investors and excluded alternatives that did not meet their specific private objectives. The purpose and need must be rewritten to allow for a legitimate search for solutions to congestion in the Maryland side of the Greater Washington Region. The Agencies should then consider a diverse range of alternatives, as is discussed in more detail in Section II.B.3.

**2.    The Project Purpose and Need Is Based on Inaccurate Traffic and Financial Assumptions**

NEPA requires that an EIS contain high-quality information and accurate analysis. *See* 40 C.F.R. § 1500.1(b) (2019). If an agency relies on incomplete data, or if data relevant to the proposed project is unavailable, the EIS must disclose this shortcoming. *See Lands Council v. Powell*, 395 F.3d 1019, 1032 (9th Cir. 2005) (Forest Service violated NEPA by relying on data that it knew had shortcomings but did not disclose those shortcomings until its decision was challenged). Further, the use of inaccurate data to support the need for a proposed project is a violation of NEPA. *See N.C. All. for Transp. Reform v. DOT*, 151 F. Supp. 2d 661, 688 (M.D.N.C. 2001) (DOT violated NEPA by premising the need for a transportation project on overstated traffic projection estimates).

The Agencies state that one need for the Project is to "Accommodate Existing Traffic and Long-Term Traffic Growth." DEIS, at 1-4. The DEIS bases this need on the existing traffic and growth projection data found in the *2018 Maryland State Highway Mobility Report*. *Id.* at 1-6. However, this data does not incorporate the impact of COVID-19 on existing and future traffic patterns. Since March of 2020, traffic patterns have changed significantly in response to COVID-19; schools and businesses across America have closed and travel patterns have been upended. Due to the closures, many Americans who are working are doing so remotely from home, and there are predictions of large exoduses from urban centers that could change city populations for years to come.[36] In addition, because of long-term school closures and a lack of childcare resources, many employees of businesses that have reopened their offices are likely to continue

---

[35] *See Public–Private Partnership Concessions for Highway Projects: A Primer*, at 13 (2010), https://www.fhwa.dot.gov/ipd/pdfs/p3/p3_concession_primer.pdf ("From the private perspective, large projects provide sufficient profit potential to merit the substantial investment required to participate in a procurement process.").

[36] Pete Bigelow, *Transportation's Moving Target: Wave of Relocations Prompted by COVID-19*, Automotive News (October 8, 2020), https://www.autonews.com/mobility-report-newsletter/transportations-moving-target-wave-relocations-prompted-covid-19.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 20

working remotely for the foreseeable future. The country is also facing record unemployment rates, which may be forcing many to stay home or travel less.[37] As a result, the nation's roadways—including I-495 and I-270—are less-traveled.

The Agencies already have data on how COVID-19 has affected traffic patterns in the region, and can look at recent data from Virginia managed lanes to see how COVID-19 has changed their travel patterns and managed lane use. The Agencies must go back and reevaluate the Purpose and Need Statement (as well as the DEIS analyses) based on this data.

Even if a COVID-19 vaccine is available in the coming months, many businesses have made decisions to continue having employees work remotely or provide more flexibility to work from home part-time or on occasion. In the event that a vaccine is not quickly available and more businesses decide to have some employees return to offices, safety and health concerns are predicted to relegate the vast majority of the commuters to their own vehicles, putting a stop to carpooling that reduced rush hour traffic in the past.

Overall, the impact of COVID-19 on traffic patterns is unclear. As some projections suggest, COVID-19 may result in lasting reductions in rush hour traffic, especially for non-freight travel.[38] However, health precautions may result in more cars being on the road. In either event, the Agencies must consider the possible eventualities and their implications for the Project. If the long-term impact is less traffic, there may be no need for the Project and going forward with a P3 for managed lanes would amount to a financial boondoggle. If, on the other hand, there is substantially more traffic than projected in the *2018 Maryland State Highway Mobility Report*, the Project may be insufficient and a wasted investment in permanent infrastructure. The Agencies must consider both possibilities, analyze the ways in which COVID-19 may impact future traffic patterns, and evaluate whether the stated need for the Project is still appropriate.

Additionally, the stated need does not take into account changes in traffic from the construction or stopping of construction of the Purple Line and the Innovative Congestion Management Project along the I-270 corridor. The Purple Line has not been completed and that project is in fact in difficulty, as discussed in more detail in Section I, but the DEIS relies on its

---

[37] Carmen Reinicke, *Fewer Than Half of Working Americans Will Have a Paycheck in May as Devastating Coronavirus Layoffs Persist, Economist Says*, Business Insider (April 24, 2020), https://www.businessinsider.com/layoffs-coronavirus-less-than-half-american-workers-paycheck-wage-may-2020-4.

[38] Bob Pishue, *Traffic Speeds Continue Falling Across the Country, But Still Up vs Pre-COVID*, INRIX (Aug. 4, 2020), https://inrix.com/blog/2020/08/us-speeds/ ("Despite the growth in the AM commute in most cities, however, traffic congestion has yet to return in a significant way in the morning. Seattle, Boston and Washington DC, for example, show no change in [increased] travel speeds from a month ago").

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 21

completion in order to eliminate other transit options. This reliance is misplaced and should not be factored into the need for this Project.

The financial assumptions that underlie the Project's purpose and need are also inaccurate. The DEIS bases the financial viability requirement on the assumption that Maryland cannot fund large-scale infrastructure projects without utilizing a P3 model and that the Project will cost taxpayers no money if delivered through such a model. As is discussed in more detail in Section 1 of this document, the DEIS makes unsupported claims that managed toll lanes provided through a P3 private concessionaire "provide[s] needed large-scale improvements decades earlier than would otherwise be realized using traditional funding." DEIS, at 1-14. The ability for a P3 to deliver this type of project earlier or for less cost to the state flies in the face of Maryland's recent experience with the Purple Line and other states' P3 experiences. MDOT SHA repeatedly made similar claims when defending its decision to deliver the Purple Line through a P3, which it claimed could achieve "up to 20 percent in cost savings for the project over its life and allow MTA to deliver the project without adding significant organizational and internal cost responsibilities to the agency."[39] However, these claims have proven unfounded as the P3 concessionaire that was contracted to deliver the Purple Line has walked away from the project after more than three years of project delays[40] and "nearly $800 million in cost overruns."[41]

The DEIS also claims that "the State's traditional funding sources, including the Maryland Transportation Trust Fund, are unable to effectively finance, construct, operate, and maintain highway improvements of the magnitude that are needed to address roadway congestion and enhance trip reliability in these study corridors, due to the fiscal constraints of the program and the state-wide transportation needs." DEIS, at 1-14. However, as discussed in more detail in Section I, these claims are not supported by the information in the DEIS and are counter to statements made by MDOT-SHA indicating that the state can indeed issue new bonds backed by transit revenue streams, like tolls or transit fares, and can seek low-interest federal loans similar to those which concessionaires have access to. *Supra* note 20.

The financial assumptions underlying the purpose and need statement are also faulty because they rely on toll lane revenue projections that do not take into account the impact of COVID-19. The financial viability of toll lanes looks even more uncertain now that toll revenues have plummeted throughout the country, spurring the toll road association to ask Congress for a

---

[39] Purple Line FEIS, Record of Decision, Att. C, at 136, https://www.purplelinemd.com/component/jdownloads/send/20-record-of-decision/81-attachment-c-feis-comments-and-responses.

[40] Briana Adhikusuma, *State Figuring Out Who Will Take Over Purple Line Project*, Bethesda Magazine (Sept. 15, 2020), https://bethesdamagazine.com/bethesda-beat/transportation/state-figuring-out-who-will-take-over-purple-line-project/.

[41] Bruce DePuyt, *Purple Line Will be Delayed as MDOT Seeks Management Solution*, WTOP (Sept. 23, 2020), https://wtop.com/maryland/2020/09/purple-line-will-be-delayed-as-mdot-seeks-management-solution/.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 22

$9.2 billion COVID-19 relief package to assist the toll industry with staying afloat.[42] Additionally, in April, 2020 the I-95 Express Lanes, a managed-lane project, saw its credit rating "downgraded due to its high vulnerability to congestion levels."[43] In sum, the financial assumptions underlying the financial viability criteria for the Project come nowhere near being the high-quality information or support for the accurate analysis required by NEPA, and instead are fatally flawed. *See* 40 C.F.R. § 1500.1(b) (2019).

**3.    The Agencies Failed to Consider All Reasonable Alternatives, Making the Alternatives Analysis Inadequate**

The alternatives analysis is the "heart" of an EIS. 40 C.F.R. § 1502.14 (2019). NEPA requires that an agency "[r]igorously explore and objectively evaluate *all* reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14(a) (2019) (emphasis added). An agency must consider a range of alternatives "sufficient to permit a reasoned choice among the options." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1243 (10th Cir. 2011) (quoting *Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1130 (10th Cir. 1998)); *see also Sierra Club v. Watkins*, 808 F. Supp. 852, 872 (D.D.C. 1991) (agency is required to "consider a range of alternatives that covers the full spectrum of possibilities"). The DEIS, however, fails to consider many reasonable alternatives to the Project, examples of which are discussed below, and is therefore inadequate. *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985) ("[T]he existence of a viable but unexamined alternative renders an environmental impact statement inadequate.").

a.    The Agencies Did Not Consider Multimodal Alternatives in the Alternatives Analysis

With the input of state, federal, and local regulatory agencies, the Agencies identified a preliminary range of alternatives based on previous transportation studies in the region and proposed engineering improvements. DEIS, at 2-7. In addition to the no build alternative, alternatives included adding general purpose lanes, High-Occupancy (HOV) lanes, priced managed lanes, transportation systems/demand management, contraflow lanes, and reversible lanes. DEIS, at 2-8. In all, FHWA's preliminary range included 20 alternatives and variations, the vast majority of which involved adding lanes:

---

[42] Ed Blazina, *Toll Road Association: Federal Money is Route to Recovery*, Pittsburgh Post-Gazette (May 25, 2020), https://www.post-gazette.com/news/transportation/2020/05/25/Toll-road-association-Federal-money-now-will-help-it-be-part-of-recovery-effort-tomorrow/stories/202005230019.

[43] Trevor d'Olier-Lees and Dhaval Shah, *North America's P3 Toll Roads to Avoid Permanent Traffic Reduction, After lockdowns Led to Financial Duress, S&P Global Ratings' See an Uncertain Road to Recovery*, Infrastructure Investor (July 6, 2020), https://www.infrastructureinvestor.com/north-americas-p3-toll-roads-to-avoid-permanent-traffic-reduction/.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 23

- Alternative 1: No Build
- Alternative 2: Transportation Systems Management/Transportation Demand Management (TSM/TDM)
- Alternative 3: Add one GP Lane in each direction on I-495 and I-270
- Alternative 4: Add one HOV lane in each direction on I-495 and retain existing HOV lane in each direction on I-270
- Alternative 5: Add one priced managed lane in each direction on I-495 and convert one existing HOV lane in each direction to a priced managed lane on I-270
- Alternative 6: Add two GP lanes in each direction on I-495 and I-270
- Alternative 7: Add two HOV lanes in each direction on I-495 and retain one existing HOV lane and add one HOV lane in each direction on I-270
- Alternative 8: Add two priced managed lanes in each direction on I-495 and add one priced managed lane in each direction and retain one existing HOV lane in each direction on I-270
- Alternative 9: Add two priced managed lanes in each direction on I-495 and convert one existing HOV lane to a priced managed lane and add one priced managed lane in each direction on I-270
- Alternative 10: Add two priced managed lanes in each direction on I-495 and on I-270 and retain one existing HOV lane in each direction on I-270 only
- Alternative 11: Physically separate traffic using C-D lanes, adding two GP lanes in each direction on I-495
- Alternative 12A: Convert existing GP lane on I-495 to contraflow lane during peak periods
- Alternative 12B: Convert existing HOV lane on I-270 to contraflow lane during peak periods
- Alternative 13A: Add two priced managed reversible lanes on I-495
- Alternative 13B: Convert existing HOV lanes to two priced managed reversible lanes on I-270
- Alternative 13C: Add two priced managed reversible lanes and retain one existing HOV lane in each direction on I-270
- Alternative 14A: Heavy Rail transit
- Alternative 14B: Light Rail transit
- Alternative 14C: Fixed guideway Bus Rapid Transit (BRT)10 off alignment of existing roadway
- Alternative 15: Add one dedicated bus lane on I-495 and I-270

DEIS, at 2-8 to 2-9.

These preliminary alternatives were assessed using six criteria related to the Purpose and Need Statement: Engineering Considerations, Homeland Security, Movement of Goods and Services, Multimodal Connectivity, Financial Viability, and Environmental. DEIS, at 2-3 to 2-7. Based on these factors, Alternatives 1, 5, 8, 9, 10, 13B, and 13C—all involving priced managed lanes (other than the no build alternative)—were given further consideration. DEIS, at 2-10.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 24

Each of the 20 preliminary alternatives was dedicated to a single project with one mode of transportation, that is, either fully transit or fully highway. However, as the Agencies admitted in the DEIS, the I-495 and I-270 congestion problem is "so great that no single highway or transit improvement will provide significant relief to the long-term demand." DEIS, at 2-13. In order to consider the "full spectrum of possibilities" required by NEPA, the Agencies must consider multimodal alternatives that combine both transit and highway improvements. And there are reasonable alternatives for managing congestion that consist of mixed transit and highway actions that went ignored.

To sidestep the obvious availability of multimodal alternatives, FHWA reiterated MDOT's claim that the proposed Purple Line light rail project is the "transit portion" of the proposed project. See generally DEIS, at 2-14, 2-15. However, simply referencing the Purple Line does not satisfy NEPA requirements as it does not analyze the option and it ignores the myriad other transit options that alone or in conjunction with a highway action could relieve traffic congestion. Additionally, as of the date of these comments, the Purple Line remains tied up in disputes. Further, eliminating transit and other non-highway expansion alternatives early in the NEPA analysis prevents the Agencies from choosing a mixture of different alternatives in the record of decision. At a minimum the Agencies should consider alternatives that include TSM/TDM, mass transit options, multimodal options, and the MD 200 Diversion alternative as put forward by county leaders (not the version reviewed by the Agencies). Mobility plans should also tie in holistically to land use and economic development planning, which the Project does not do. Additionally, FHWA must consider combinations of alternatives, such as the SMART alternative developed below, see infra Section II.B.3.g.

> b. None of the Alternatives Retained for Detailed Study Incorporated Transit Crossing Woodrow Wilson Bridge or the American Legion Bridge

The stated goal of a project "necessarily dictates the range of 'reasonable alternatives'" considered in the EIS. Westlands Water Dist. v. U.S. Dept. of Interior, 376 F.3d 853, 865 (9th Cir. 2004) (quoting City of Carmel-By-The-Sea, 123 F.3d at 1155). FHWA included "multimodal connectivity" as a need of the DEIS. DEIS, at 2-5. Woodrow Wilson Bridge is vital to that multimodal connectivity. At significant cost to the State of Maryland, the bridge was designed and built to accommodate rail traffic. However, the DEIS does not analyze, or even discuss, how any of the alternatives will ensure that rail traffic will cross the Woodrow Wilson Bridge.

It is essential that the new American Legion Bridge accommodate rail traffic, as was done for the Woodrow Wilson Bridge. But none of the build alternatives accommodate rail, and therefore the Project fails to meet the stated purpose of enhancing existing and planned multimodal mobility and connectivity.

The Capital Beltway/Purple Line Study of 2002 developed six rail alternatives, including two alternatives across the Potomac River. The alternatives analysis for the DEIS should have evaluated all six of these alternatives, identified those to be carried forward as alternatives retained for detailed study, and explained why each alternative not carried forward was not

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 25

selected.[44] While the DEIS cites the Purple Line as a transit alternative in the I-495 corridor, in fact, only 38% of the Purple Line as recommended in the 2002 report is under construction. The DEIS provides no evaluation of completing the other 62% of the Purple Line and no explanation for why this alternative was not evaluated. MDOT should have considered the developed rail alternative and explained specifically why each was dropped from further study in similar detail to the 17 rejected alignment modifications discussed on pages 1-11 to 1-17 in the Purple Line DEIS Definition of Alternatives Technical Report.[45]

c.    The Agencies Improperly Eliminated Alternatives that Could Meet Some Purposes of the Project

NEPA does not mandate that an EIS consider any specific project alternatives. At the same time, however, it does not allow an agency to eliminate alternatives "merely because they do not offer a complete solution" to the purpose and need of the proposed project. *Nat. Res. Def. Council v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972).

The Agencies eliminated non-managed lane alternatives because those alternatives did not meet one or two specific aspects of the purpose and need of the Project, even though the Agencies admitted that those alternatives met other aspects (and even though the alternatives selected also did not meet all aspects). In particular, the Agencies eliminated alternatives because they were not based on the type of P3 program that MDOT SHA wanted and would not bring in revenue, and therefore the Agencies found they were not financially viable. For example, the Agencies found that alternative 2, the TSM/TDM alternative, "would improve the operations of the existing transportation system." DEIS, at 2-11. This finding is consistent with a recent study by the National Capital Region Transportation Planning Board that found transportation demand management offered the most traffic reductions.[46] But at least in part due to considering this alternative only as a stand-alone option, the Agencies dropped it from further consideration,

---

[44] SHA, MTA, Rummel, Klepper, & Kahl, and Parsons Brinckerhoff. Capital Beltway/Purple Line Study Initial Findings & Recommendations Draft, 2002, at S-12, Figure S-8. https://495-270-p3.com/wp-content/uploads/2019/07/Capital_Beltway_Purple_Line_Study_2002.pdf. This report is cited on page 5 of Appendix A of the DEIS.

[45] Purple Line Alternatives Analysis/Draft Environmental Impact Statement, 2008. *See* the Definition of Alternatives Technical Report. https://purplelinemd.com/index.php/12yahuscc9z11835j/aa-deis-technical-reports.

[46] National Capital Region Transportation Planning Board, *An Assessment of Regional Initiatives for the National Capital Region*, Technical Report on Phase II of the TPB Long-Range Plan Task Force, at xi, ix, 61 (Dec. 2017), https://www.mwcog.org/file.aspx?D=fvBRBNQUuDN48QEXRe3bNHLp8vtrsSEVcg%2fTMPrzu7g%3d&A=NYyETN4WuxQWWyImU6a2FRzM83OmR9W9kAJRDxObZ6I%3d; David Alpert, *The Best Way to Improve Transportation in Our Region is…*, Greater Greater Washington (Nov. 16, 2017), https://ggwash.org/view/65596/the-best-way-improve-transportation-our-region-tpb-study.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 26

citing its failure to address long-term traffic growth and the fact that it would not provide a revenue source. *Id.*

Additionally, the Agencies dropped alternatives 3 and 6 (adding one or two general-purpose lanes), because they would not provide a revenue source and there would be no ability to manage long-term demand and ensure that the highways (with one or two additional general lanes) would not exceed their projected capacity. *Id.* at 2-11 to 2-12. But this determination means that under the retained managed lane build alternatives, there would also be no ability to manage long-term demand and ensure the general-purpose lanes would not exceed capacity. In fact, with one or two fewer general-purpose lanes, capacity would be exceeded sooner. In the managed lane build alternatives, those who cannot afford or opt not to pay the tolls, or freight traffic which generally will not pay the tolls, will be left as badly or even worse off than they would be under alternatives 3 and 5. Yet, the Agencies did not include any discussion of this concern in the DEIS.

The Agencies also eliminated transit-only alternatives. Those include heavy rail, light rail, bus rapid transit, and dedicated bus-only managed lanes. The Agencies claimed that those alternatives would not address existing and long-term traffic growth in the study corridors or improve trip reliability. DEIS, at 2-13 to 2-17. But their statement is unexplained and unsupported; if done correctly, including by combining them with highway options as discussed in subsection (a) above, transit options could significantly reduce traffic in the region and improve trip reliability, even more so than managed lanes. The Agencies also dropped those alternatives from consideration because they would not provide an additional roadway travel choice. *Id.* However, transit alternatives do provide additional roadway travel choices, and further, to the extent the Agencies are in effect requiring an alternative to include new car-driving choices, such a requirement would be unreasonably narrow.

It appears the main reason for eliminating the transit-only alternatives was concern about their financial viability, particularly the lack of a revenue stream that would enable a P3 to construct the alternative at no cost to the state. This reasoning is faulty. Public transit options do provide a revenue stream. Public transit options can be implemented using a P3 (*see* the Purple Line project). MDOT has recently conceded that it could finance a significant public transit project. *See supra* note 20.

Significantly, the Agencies did not equally apply the financial viability screening criteria to the managed lane build alternatives. As discussed above, the managed lane alternatives will likely require a direct subsidy to the builder of $500 million to $1 billion or more, will require billions of dollars in funds to relocate water infrastructure (burdening Maryland ratepayers), and will transfer significant risks to the state. *See supra* Section I. These risks are magnified by the COVID-19 pandemic and the changes to toll use that have led to a significant decrease in toll revenue.[47] The lack of transparency regarding these costs throughout the alternatives

---

[47] Maryland Transportation Authority, which runs the state's eight toll facilities, announced a gloomy financial forecast through 2026, citing a $422 million reduction in toll revenue. Luz Lazo, *People are Driving Less and Skipping the Toll Roads, Leaving Less Money for Local Projects*, Washington Post (July 4, 2020).


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 27

development and the DEIS makes it impossible for either the Agencies or the public to understand or meaningfully consider the extent to which the managed lane build alternatives may not be financially viable. Additionally, the DEIS shows that the managed lane build alternatives cannot be completed while meeting the goal of environmental responsibility, yet Agencies did not examine this in any detail or remove the alternatives that failed to meet this goal, as discussed more fully in Section II.B.3.d.

> ### d. The Agencies Did Not Use Environmental Impact as a Differentiator Between Preliminary Alternatives

The DEIS acknowledges that the preliminary range of alternatives "could have a varying degree of potential environmental impacts" but states that the Agencies screened out all options that did not meet "the transportation purpose and need," and so "the consideration of the potential for varying degrees of environmental impacts was not a differentiator in whether the alternative should be retained or dismissed." DEIS, App. B, at 94. The objective of NEPA is to rigorously explore all reasonable alternatives in light of their environmental impacts. By not considering and comparing the environmental impacts of the preliminary range of alternatives, the Agencies failed to identify whether any of these preliminary alternatives may have had less environmental impact than the screened alternatives. This is particularly problematic because, as the DEIS acknowledges, "The overall difference in environmental impacts between the Screened Alternatives was not significant." DEIS, App. B, at 95. The Agencies improperly screened out any alternatives that may have had less impact and improperly narrowed the alternatives to be studied in detail in the DEIS to those which have almost identical environmental impacts. This approach directly conflicts with the objectives of NEPA and is a fundamental flaw in the DEIS.

---

https://www.washingtonpost.com/local/trafficandcommuting/people-are-driving-less-and-skipping-the-toll-roads-leaving-less-money-for-local-projects/2020/07/04/76e15ef2-ba0f-11ea-8cf5-9c1b8d7f84c6_story.html. Virginia Department of Transportation's 66 Express Lanes "yielded $238,000 in toll revenue in May, down 90 percent from May 2019 when the tolls generated $2.5 million" and the Dulles Toll Road had a year-to-date revenue drop of 33 percent, or $26.8 million. *Id.*; *see also* Jack Moore, *DC-Area Toll Revenue Plunges 90% Amid Coronavirus Pandemic*, WTOPnews (Aug. 12, 2020), https://wtop.com/dc-transit/2020/08/dc-area-toll-revenue-plunges-90-amid-coronavirus-pandemic/ (toll revenue generated by the 495 Express Lanes in Virginia fell to just $3 million in April, May and June, down by 88% compared to the same time period last year); *Editorial: Commuting Habits Have Changed During COVID-19. What's the Future?*, Richmond Times-Dispatch (Oct. 12, 2020), https://richmond.com/opinion/editorial/editorial-commuting-habits-have-changed-during-covid-19-what-s-the-future/article_6534fb67-2aa2-53d9-8f0a-4568afadeb3f.html.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 28

> ### e. The DEIS Failed to Analyze a True Intercounty Connector/Maryland 200 Diversion Alternative to the Top Side of the Beltway That Would Avoid Expansion in Sensitive Areas and Property Relocations

The DEIS presents an MD Diversion Alternative Analysis but it improperly adds managed lanes to I-95 to the model, which reduces that alternative's environmental and traffic benefits. The addition of these managed lanes is not necessary to evaluate the MD 200 Diversion Alternative and the Agencies must analyze the Diversion without this addition. The MD 200 Diversion Alternative should be studied in more detail with various modeling assumptions, including analyses with and without the I-95 segment.

Furthermore, the Agencies failed to consider a variety of assumptions that would incentivize the MD 200/I-270 route over traveling on I-495/I-95, for example, the use of operational changes such as restructuring the tolling systems and speed limits currently in place and adding more dynamic signage. Without the I-95 managed lane segment there is a reduction in environmental impact, which results in a greater benefit coming from the MD 200 Alternative. The analysis provided by MDOT SHA fails to demonstrate that the MD 200 Diversion is not a reasonable alternative under NEPA or a reasonable avoidance technique under Section 4(f).

> ### f. The DEIS Failed to Consider Rail Transportation as a Reasonable Alternative to Additional Highway Lanes

The DEIS fails to consider rail transportation, and specifically the Maryland Area Regional Commuter (MARC) Brunswick Line, as a reasonable alternative to further highway expansion. Instead, the DEIS states that the MARC Brunswick Line would not improve trip reliability along I-495 or the I-270 corridor based solely on cursory citations from the 2007 MARC Growth Plan, which extends until 2035, rather than considering the 2018 MARC Cornerstone Plan for 2045 that better fits the 2040 planning horizon of the DEIS.[48] The MARC Cornerstone Plan outlines $1.34 billion in capital investments for the Brunswick Line (more than twice the investments in the 2007 plan), including over $700 million for additional mainline track segments designated as critical path items because these are essential to realize the line's full potential to support the I-270 corridor.[49] The Cornerstone Plan notes that the major impediment to improve passenger service and reach the Brunswick Line's ridership targets is that CSX, not MARC, owns the right of way and the priority for CSX is moving freight, not passengers.[50]

---

[48] Maryland Department of Transportation Maryland Transit Administration, MARC Cornerstone Plan, https://s3.amazonaws.com/mta-website-staging/mta-website-staging/files/Transit%20Projects/Cornerstone/MCP_MARC.pdf.

[49] *Id.* at 59.

[50] *Id.* at 12.

00022652

OP·LANES
MARYLAND    I-495 & I-270 Managed Lanes Study    **FINAL ENVIRONMENTAL IMPACT STATEMENT**

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 29

This impediment has notoriously plagued the line during peak travel hours, restrained the daily number of operable trains and schedules, and underscores the urgency for the additional mainline tracks to enable MARC to operate more fluidly. CSX will allow MARC to increase the number and frequency of trains only when the MDOT implements the installation of additional tracks. Unfortunately, the ball has been in MDOT's court for over a decade.

The DEIS says nothing about the ridership gains to be realized by 2035 with additional tracks for the Brunswick Line. For example, if the planned segments had been added by 2020, the line would have a daily seating capacity of 19,400 passengers. Instead, the line's daily ridership has remained flat, hovering just above 7,000 passengers because MDOT has not delivered these critical path items.

The DEIS is supposed to examine ways to improve trip reliability along I-270 and address a net traffic growth[51] of 36,400 non-truck vehicles by 2040. However, the DEIS says nothing about how many of those vehicle drivers could turn into MARC passengers if the critical Brunswick Line improvements were implemented over the 23 years it takes to reach that traffic estimate. The DEIS therefore does not provide taxpayers with a transparent examination of the obstacles and untapped potential for a rail line that carries 95% of commuting trips, offers 70% of its passengers easy driving access to stations, and has over 1.3 million jobs located within a 30-minute walk or transit trip to the stations.

If the last segment of additional mainline track is installed by 2040, the Brunswick Line daily seating capacity would be 26,400 passengers, which is 19,000 more than the daily passengers recorded in 2017. This growth in passenger capacity is equivalent to over half the traffic growth forecast for I-270 and provides ample margin to accommodate the share of future drivers who could gravitate towards more convenient rail service if MDOT funds and implements the line improvements.

The DEIS estimates that the toll lanes alternatives that the DEIS promotes, when compared to the no build alternative, will only save up to 4 minutes in peak travel time (25% trip reduction) and only in the I-270 Southbound direction; none of the toll lanes alternatives saves time when traveling in the I-270 Northbound direction.[52] These meager toll lane results, when compared to the potential of the Brunswick Line if properly funded, make the Agencies' refusal to study non-highway alternatives fatally flawed.

To provide all taxpayers with a comprehensive transportation network that truly supports mobility and enhances equal opportunity for economic prosperity, the Agencies must rigorously

---

[51] The DEIS Traffic Analysis Technical Report, Figure 3-1: Annual Average Daily Traffic (AADT) along Study Roadways, projects a traffic growth for I-270 of 40,000 vehicles from 2017 to 2040. The DEIS also says that 9% of this traffic are trucks which leaves 36,400 non-truck vehicles as the potential market for alternative travel modes.

[52] DEIS, Traffic Analysis Technical Report, Tables 5-5 and 5-6 (Corridor Travel Time Summary (minutes) AM and PM Peak Periods).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 30

and transparently examine all alternatives leveraging the knowledge gained from the work by the Transportation Planning Board and Montgomery County planners.

**e.** <u>The Agencies Must Consider a System Management/Accessibility/Rapid Transit (SMART) Alternative</u>

**i     Deficiency of the Alternatives Analysis**

The Alternatives Analysis proceeds from a badly flawed Purpose and Need Statement, which appears to be "precooked" to favor a toll-financed highway widening scheme. The Purpose element states as follows:

The Purpose of the Study is to develop a travel demand solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the study limits and enhances existing and planned multimodal mobility and connectivity.[53]

The flaws in this statement include the use of the word "congestion" instead of "mobility" or "accessibility" (which we will return to later), the focus on two facilities rather than two corridors, and the absence of broader concerns, such as climate change and social and economic equity. The Needs element adds to the trouble.

The Purpose and Need Statement identifies "Accommodate Existing Traffic and Long-Term Traffic Growth" as a primary need.[54] The discussion muddles the concept of congestion (delay) with increased traffic (vehicle miles traveled, or VMT). However, as we demonstrate, these are different phenomena.[55] The proposed roadway widening (the build alternatives) will accommodate more automobile traffic (more VMT) but will <u>not</u> (after a few years) reduce delay. Increasing VMT is an accelerant to climate change (greenhouse gas emissions) and is harmful to broad social and environmental goals, including equitable access to housing and jobs. Increased VMT should be considered a negative outcome, not a need.

The Purpose and Need Statement lists the statement "Incorporate Alternative Funding Sources to Achieve Financial Viability" under "Other Goals and Objectives," but it is in fact a

---

[53] DEIS, 1-4.

[54] DEIS, 1-4.

[55] M-NCPPC has made similar observations: "The Purpose and Need does not clearly articulate the problem, as congestion is merely a symptom. Specifically, we are looking for analysis of the regional travel patterns that contribute to the congestion now experienced on I-495 and I-270, what type of congestion is occurring and whether it is link or merge or weaving capacity, where is the congestion occurring, and how frequently it occurs." M-NCPPC, *Briefing and Discussion for October 2018 Full Commission Meeting I-495 & I-270 Managed Lanes Study* (Oct. 11, 2018), https://montgomeryplanningboard.org/wp-content/uploads/2018/10/Briefing_and_discussion_for_October_Full_Commission_Meeting.pdf.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 31

main driver of the DEIS.[56] Alternative funding is not a transportation need; it is an implementation strategy. And in this case, the failure of the Purple Line P3 scheme casts a long shadow on the "financial viability" of this implementation strategy.

These two elements of the Purpose and Need Statement—traffic growth and tolling—are then used as the main criteria for vetting the alternatives. If an alternative does not widen the highway and does not include toll revenue, it fails the Purpose and Need!

The Alternatives Analysis dismisses all alternatives to a managed lane expansion rather summarily. The DEIS starts with 20 alternatives, including the required "no build" option (which in practice it is never selected), one TSM/TDM option, five very sketchily described transit options, and 14 highway options.[57]

The TSM/TDM option is dismissed because it would not prevent congestion from returning to current levels by 2040 (even though the preferred option would not prevent that either!).[58] However, the 2004/2005 Capital Beltway Study, cited in the DEIS as a framework study for the Project, states that MDOT SHA believed the TSM/TDM alternative should be "carried forward and incorporated into all build alternates."[59] The elements of the TSM/TDM alternative will be discussed at greater length under the Transportation Systems Management and Operations (TSMO) section of our proposed Robust Alternative below.

The five transit options are also quickly dismissed: "Transit alone would not meet this Study's Purpose and Need to address the existing and long-term traffic growth in the study corridors."[60] Interestingly, the writers of the DEIS support this conclusion with a quotation from a 2002 MDOT study: "Congestion on the Beltway itself as well as demand on the other transportation facilities is so great that no single highway or transit improvement will provide significant relief to the long-term demand."[61]

---

[56] DEIS, 1-14.

[57] DEIS, 2-8 – 2-9.

[58] DEIS, 2-11.

[59] MDOT SHA, Capital Beltway Study Public Display Boards (May 6, 2004), https://web.archive.org/web/20170202174503/http://apps.roads.maryland.gov/WebProjectLifeCycle/AW518_11/HTDOCS/Documents/Informational_Public_Workshop/AW518%20Display%20Boards.FINAL.5-6-04a.pdf.

[60] DEIS, 2-13.

[61] DEIS, 2-13.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 32

For the present purpose it is not necessary to review all the highway alternatives. It is enough to say that the whole exercise leads inexorably to a toll-financed highway widening as the preferred alternative.

### ii    A Robust Alternative

Since the alternatives to a toll-financed highway widening were poorly drawn and cavalierly dismissed in the DEIS Alternatives Analysis, what would a genuine alternative look like?

First, a reworded Purpose statement should be advanced:

The Purpose of the Study is to develop infrastructure and policy solutions that will improve accessibility and mobility in the Northwest and Beltway corridors while reducing vehicle miles traveled, supporting sustainable land use and economic development, and promoting social, environmental, and economic equity.[62]

The Robust Alternative presented below attempts to address this restated Purpose, and includes a set of infrastructure and policy initiatives that, working together, should advance this goal more efficiently than the toll-financed highway widening scheme and without its huge negative environmental impacts.

For discussion purposes, these comments call this alternative the SMART Alternative, an acronym for System Management/Accessibility/Rapid Transit, the three elements of the program.

Transit

We address the transit element of the SMART alternative first. Residents of the Northwest (I-270) corridor—and to a lesser extent the Beltway corridor—already have access to a better transit system than most suburban Americans. The next challenge is to develop the existing pieces, along with some new elements, to form a network of transit options that will enable these residents to use transit to move about their towns and their region for their daily needs.

The Rapid Transit element of the SMART Alternative is a set of transit improvements that will provide the high capacity, high frequency, high quality element of the transit network. These include, for the Northwest corridor, the Metro Red Line, the Brunswick MARC Line, and the Montgomery County Bus Rapid Transit (BRT) lines.

---

[62] This broader Purpose and Need reflects the broader objectives used in some past Maryland studies. For example, the 2004/2005 Capital Beltway Study purpose and need included objectives like: improve regional mobility; provide enhanced safety; maximize travel operational efficiencies; provide cost-effective transportation infrastructure; and support the area's economic growth and the environment. Capital Beltway Study Public Display Boards, see supra, note 59.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 33

Brunswick MARC Line

The most underutilized public transportation asset in the Northwest corridor is the MARC Brunswick commuter rail line. The Brunswick Line runs roughly parallel to I-270 and the Red Line through Montgomery County and has the potential—with appropriate infrastructure improvements and institutional realignment—to become a high-capacity, high-quality regional rail line.

The Brunswick Line runs for a total of 88 route miles[63], extending from Union Station in Washington DC to Brunswick MD, with some trains going on to Martinsburg WV and some going on a branch line to Frederick MD. It runs adjacent to the Metro Red Line in central Montgomery County between the White Flint Metro station and the northwestern terminus of the Red Line at Shady Grove, with an interchange station at Rockville. South of White Flint, the Brunswick Line takes an easterly route to Union Station through Silver Spring, while the Red Line follows a more westerly alignment through Bethesda.

The Brunswick Line currently (pre-pandemic) runs 9 morning peak-hour trains eastbound toward Union Station and 9 evening peak-hour trains westbound, with one midday westbound train and no trains on weekends. This limited service generates only some 6,000 or so daily riders.[64]

The service and capacity on the Brunswick Line *can* be dramatically expanded. The Maryland Transit Administration (MTA) developed a plan for upgrading all three MARC lines in its 2007 MARC Growth and Investment Plan. That plan called for increasing seating capacity on the Brunswick Line from 7,000 to 26,000,[65] with frequent peak-hour service, and increasing off-peak and weekend service. The plan sketched out a set of incremental capital improvements needed to make this growth possible, centered on adding a third track through much of Montgomery County, but also including new rail cars and improved station facilities.[66] The total capital cost of these upgrades was estimated at $531 million with an additional $18 million in annual operations and maintenance costs.[67]

The Growth and Investment Plan schedule for the Brunswick Line improvements would have extended to 2035, but even that distant date has been removed from MTA documents,

---

[63] *Maryland Statewide Rail Plan*, April 2015, 4-27.

[64] *Maryland Statewide Rail Plan*, April 2015, 4-27.

[65] *MARC Growth and Investment Plan*, 2007, 29.

[66] *MARC GIP*, 23-26.

[67] *MARC GIP*, 30-31.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 34

which currently show no commitment to those improvements.[68] In fact, these improvements—and more—can and should be made much more quickly. A planning document by the advocacy group Action Committee for Transit provides a more richly detailed "feasibility study" than MTA's outline.[69]

What kind of difference can a high-quality, high-capacity regional rail line provide? For reference, the Caltrain commuter rail line south of San Francisco, already a major carrier of passengers, is planning to upgrade from typical commuter service to frequent all-day service. Their business plan projects that ridership will increase from 65,000 per day to 180,000 per day, which is equivalent, according to their press office, to adding 5 ½ lanes to the adjacent freeway.[70]

The Growth and Investment Plan identifies one key impediment to improving the Brunswick Line that must be addressed: the line is owned and operated by the freight railroad CSX. As the plan notes, MARC must "negotiate" time slots with CSX.[71] Although adding a third track on the mainline (and a second track to Frederick) should provide ample capacity for both passenger and freight rail operations, there is no guarantee that that will happen. Experience in other rail corridors suggests that when a freight railroad owns and operates trackage (including dispatching trains in real time), passenger traffic always has a lower priority than freight. It is unrealistic to shut down freight traffic on the Brunswick Line (mainly known as the Metropolitan Subdivision in CSX parlance). CSX identifies this line as an element of its National Gateway system, which includes improving rail routes to permit "double-stacking" of containers moving mainly Chinese manufactured goods from the Port of Baltimore to Midwest destinations. Although a more northerly route (the old B&O Mainline) travels a shorter distance to the port, that route is constrained by tunnels and is limited to a single track for double-stack trains. Therefore, freight must be part of the equation on the Brunswick Line.

To resolve this problem, we strongly recommend that the Brunswick Line be taken into public ownership. This would probably require an act of Congress, as CSX would be expected to aggressively resist this change. Ownership and operation of the line should pass to Maryland

---

[68] Alex Holt, *Is MARC's Newest Plan to Improve Service a Step Backwards?*, Greater Greater Washington (Dec. 3, 2019), https://ggwash.org/view/74948/is-marc-train-rail-new-cornerstone-plan-a-step-backwards.

[69] Action Committee for Transit, *MARC Brunswick/Frederick Line Improvement Proposal*, (Nov. 2016), http://actfortransit.org/archives/reports_and_other/MARCImprovementProposal.pdf.

[70] Erin Baldassari, *Caltrain has an Ambitious Plan to Run BART-Like Service. Here's What it Will Mean for Bay Area Traffic*, The Mercury News (July 22, 2019), https://www.mercurynews.com/2019/07/22/caltrain-has-an-ambitious-plan-to-run-bart-like-service-heres-what-it-will-mean-for-bay-area-traffic/.

[71] *MARC GIP*, 10.

00022655

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 35

DOT—or Amtrak—which would guarantee that passenger traffic has priority while preserving freight movements.

Metro Red Line

The Red Line is the core transit spine of the Northwest Corridor, running from Union Station in Washington to Shady Grove, with eight stations along the corridor in Montgomery County (and another branch via Silver Spring to Glenmont). WMATA, the transit agency, has recently expanded capacity on the outer portion of the line by eliminating the "Grosvenor turnaround."[72] Planning should be undertaken for a possible Red Line extension to Germantown, as proposed by transit advocates,[73] and more Transit Oriented Development opportunities.

Bus Rapid Transit

A planned network of Bus Rapid Transit (BRT) routes in Montgomery County will provide another layer of high-quality public transportation in the Northwest Corridor.

As defined by the Federal Transit Administration:

Bus Rapid Transit (BRT) is a high-quality bus-based transit system that delivers fast and efficient service that may include dedicated lanes, busways, traffic signal priority, off-board fare collection, elevated platforms and enhanced stations...Because BRT contains features similar to a light rail or subway system, it is often considered more reliable, convenient and faster than regular bus services.[74]

Montgomery County has adopted a transit plan outlining 10 county BRT lines plus one MDOT line, the Corridor Cities Transitway, although that line was defunded last year.[75] The first county line, the US 29 "Flash" between Silver Spring Transit Center and Burtonsville, began operations

---

[72] Stephen Repetski, *Metro Reasons: More Trains Bring More Riders to the Red Line*, Greater Greater Washington (July 25, 2019), https://ggwash.org/view/73123/metro-reasons-more-trains-bring-more-riders-to-metros-red-line.

[73] Montgomery County Advocates for Better Transportation, *A Transit Vision for the I-270 Corridor*, http://actfortransit.org/I-270_corridor.html.

[74] Federal Transit Administration, *Bus Rapid Transit*, (Dec. 9, 2015), https://www.transit.dot.gov/research-innovation/bus-rapid-transit.

[75] Montgomery County Planning Department, *Countywide Transit Corridors Functional Master Plan*, (Dec. 2013), http://www.montgomeryplanning.org/transportation/highways/documents/countywide_transit_corridors_plan_2013-12.pdf.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 36

on October 14, 2020.[76] Although this line is not likely to have an effect on either the Northwest or Beltway corridors, it will provide operating experience and real travel data that will inform future projects.

Three projects would directly benefit mobility in the Northwest corridor: MD 355, the Corridor Cities Transitway, and Veirs Mill Road.

The MD 355 Flash BRT[77] is one of the first three BRT routes to be implemented by the county. It would traverse MD 355 from the Bethesda Metro to Clarksburg, partially on separate lanes and partially in mixed traffic (with the exact alignment to be determined). The southern half of the line would run parallel to the Metro Red Line, with a likely interchange at the Rockville Metro with the Red Line and MARC and presumably at other Metro stations as well. The entire route north of the Beltway would parallel I-270 and would provide an alternative travel option for people to gain access both to activity centers along MD 355 and to higher speed transit (MARC and Red Line) without using a car. The line will provide service to existing[78] and planned developments along the corridor.[79]

The Corridor Cities Transitway,[80] if it is re-funded, would also improve mobility in the Northwest corridor, tying together a number of residential and employment centers at 16 stations on a somewhat circuitous 15-mile route between Shady Grove Metro and the COMSAT site near Clarksburg. Although not suited for long-distance travel, the alignment could provide relief for I-270 through its direct access to these centers. Initially planned as a light rail route, then reconfigured for BRT, the project was defunded by MDOT in 2019 as part of a general retreat from transit. The project should be revisited as part of the overall BRT plan.

---

[76] Press Release, *Montgomery County's Department of Transportation Launches 'Flash,' Maryland's First Bus Service of its Kind, in Ceremonies Led by County Executive Elrich and Council President Katz*, Montgomery County Government (Oct. 14, 2020), https://www2.montgomerycountymd.gov/mcgportalapps/Press_Detail.aspx?Item_ID=26954.

[77] *See* Montgomery County Department of Transportation, *MD355 Bus Rapid Transit*, https://www.montgomerycountymd.gov/dot-dte/projects/MD355BRT/ and , Montgomery County Department of Transportation, *MD 355 BRT Corridor Planning Study Phase 2 (Draft)*, (June 2019), https://montgomeryplanningboard.org/wp-content/uploads/2019/06/Attachment-A-DRAFT-MD-355-BRT-Corridor-Summary-Report.pdf .

[78] https://www.rockvillemd.gov/DocumentCenter/View/21729/Rockville-2040-Open-House-Poster---Transportation?bidId=

[79] MD 355 BRT Corridor Planning Study, 78.

[80] *See* Montgomery Planning, *Corridor Cities Transitway*, https://montgomeryplanning.org/planning/transportation/transit-planning/corridor-cities-transitway/.

00022656


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 37

The third BRT route providing support for the Northwest corridor will traverse Veirs Mill Road for seven miles between Rockville and Wheaton Metro stations.[81]

### Beltway corridor

The Capital Beltway (I-495), which was designed for Interstate highway connectivity, has few transit alternatives. The most important one is the Purple Line, which if it is completed will connect several radial Metro lines and important activity centers (Bethesda, Silver Spring, College Park, etc.).[82]

### Transportation Systems Management and Operations (TSMO)

The second element of our proposed SMART alternative is System Management. This is a broad term for a set of strategies that highway agencies use to improve the operation and reliability of a roadway without adding additional through-traffic lanes. Examples include "smart" (computerized) traffic signals, variable message signs, and online and telephone traveler information. The DEIS discusses—but then dismisses—this idea under Alternative 2: TSM/TDM (transportation system management/transportation demand management). The DEIS states that "these types of solutions optimize the existing system" but rejects them because they "do not support long-term traffic growth." It notes that some TSM/TDM are already being implemented on I-270 under the Innovative Congestion Management project, but states that although there are near-term benefits, modeling predicts that traffic will "return to existing levels of congestion by 2040." ( As discussed elsewhere, congestion should be expected to return to current levels by then even with a major capacity increase.) The DEIS does state that some elements of the TSM/TDM alternative will be kept in the Project. DEIS, at 2-11.

Although we have used the labels "system management" and "TSM/TDM" for this category of transportation strategies, the current technical term is Transportation Systems Management and Operations (TSMO), defined in federal law as an integrated set of "strategies to optimize the performance of existing infrastructure through the implementation of multimodal and intermodal, cross-jurisdictional systems, services, and projects designed to preserve capacity and improve security, safety, and reliability of the transportation system."[83]

MDOT is no stranger to TSMO techniques. The DEIS, as noted above, references TSMO strategies already implemented on I-270, with more to come. In fact, MDOT is one of the national leaders in this field. The agency has adopted a TSMO strategic plan that chronicles its

[81] Montgomery County Department of Transportation, *Viers Mill Road Bus Rapid Transit*, https://www.montgomerycountymd.gov/dot-dte/projects/VeirsMillBRT/.

[82] Coalition for Smarter Growth, *Purple Line*, https://www.smartergrowth.net/maryland/purple-line/.

[83] MAP-21, Pub. L. 112-141, 126 Stat. 405, 422, § 1103(a)(30)(A).

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 38

experience and sets out a full set of goals, objectives, and strategies for expanding and implementing TSMO activities in the state.[84]

Interestingly, the TSMO Strategic Plan takes a decidedly more positive view than the DEIS does of TSMO as an alternative to capacity increases:

When comparing TSMO improvements to capacity improvements, the return on investment and benefit cost analysis usually justifies the operational improvement. This is particularly evident when investigating the travel time reliability on severely congested roadways. Monetizing the improvements by selecting indicators such as value of time, value of travel time reliability, and fuel costs allows for direct comparisons. MDOT SHA monitors some of these costs through their annual mobility reporting process. The net cost and time savings outcomes favor TSMO from a traveler's perspective. Additionally, projects adding capacity often have huge environmental impacts, which delay project development as well as construction.[85]

Or, in summary form:

Compared to capacity expansion, TSMO strategies:

• Address all sources of congestion, recurring and non-recurring

• Are inexpensive and cost-effective

• Take little or no extra right-of-way

• Can be deployed in months rather than years[86]

MDOT has recently adopted an implementation plan for the next generation of TSMO projects.[87] The Northwest corridor is included as "System 12" in the plan. System 12 includes the TSMO work currently being implemented on I-270 and references the proposed widening

[84] MDOT SHA, *TSMO: Maryland Transportation Systems Management & Operations: Strategic Plan*, (Oct. 2018), https://www.roads.maryland.gov/OPPEN/2018_MDOT_TSMO_Strategic_Plan.pdf.

[85] TSMO Strategic Plan, 12.

[86] TSMO Strategic Plan, 27.

[87] MDOT SHA, *TSMO Master Plan*, (July 2020), https://roads.maryland.gov/OPPEN/TSMO_Master_Plan.pdf.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 39

project. Also included is a major installation of TSMO elements on MD 355, including closed circuit TV, "smart" traffic signals, and fiber optic links.[88]

The Beltway corridor is not included in the TSMO master plan, and this is a corridor where TSMO planning and implementation should have the highest priority.

Accessibility

The third leg of the SMART alternative is Accessibility; this is the transportation and land use piece of the puzzle. Transportation planners have long realized that building pieces of infrastructure without linking that work to land use planning can cause more problems than it solves. Fortunately, today both transportation planners and land use planners are generally well aware of the need to work together. One sign of their awareness is the choice often made today to focus on improving "accessibility"—the ability of people to easily gain access to desired destinations—rather than "mobility"—the business of moving vehicles through space.

Land use patterns have a major impact on travel behavior. A 2017 report prepared by the Washington, DC-area Metropolitan Planning Organization compared 10 transportation infrastructure and policy initiatives, ranging from a Regional Express Travel Network to Transit Rail Extensions to Optimize Regional Land Use Balance, on a variety of measurements.[89] The Transit Rail Extensions to Optimize Regional Land Use Balance (which included East/West population shifts as well as densification) scored second in Reduction of Daily Vehicle Hours of Delay and tied for first in both Reduction of Vehicle Miles Traveled and Average Best Travel Times to Intercity Hubs (major airports and train stations.)[90]

A new report from the Brookings Institution explores this topic in depth, especially focusing on the importance of proximity to key services.[91] The key takeaways:

- People travel over 7 miles on average for every trip they take, but these distances vary widely across different metro areas and neighborhoods;

---

[88] TSMO Master Plan, 56-58.

[89] National Capital Region Transportation Planning Board, An Assessment of Regional Initiatives for the National Capital Region, (Dec. 2017), https://www.mwcog.org/file.aspx?D=fvBRBNQUuDN48QEXRc3bNHLp8ytrsSEVcg%2fTMPr zu7g%3d&A=NYyETN4WuxQWWyImU6a2FRzM83OmR9W9kAJRDxObZ6I%3d.

[90] Id. at xi; Transportation Planning Board, "Long-Range Plan Task Force: Draft Analysis Results," 15 November 2017.

[91] Adie Tomer, Joseph Kane, and Jennifer S. Vey, Connecting People and Places: Exploring New Measures of Travel Behavior, Brookings Institution (Oct. 2020), https://www.brookings.edu/wp-content/uploads/2020/10/Corridors-of-Demand.pdf.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 40

- Human-scale neighborhood designs lead to shorter distance trips;

- People traveling in automobile-oriented neighborhoods face longer trips overall, regardless of the trip's purpose;

- Trip distances vary by income and race, reflecting patterns of racial and economic segregation;

- Transportation policy should use pricing and performance measurement to more actively support human-scaled neighborhoods;

- Land use policies should promote growth in neighborhoods that support proximity and spatial equity; and

- America must electrify its vehicle fleet in order to mitigate climate change while new policies and practices are being developed.[92]

Of particular importance for our purposes is the adoption by state and local agencies of integrated land use and transportation plans and policies that will maximize the benefit and utility of transportation investments. Sadly, the State of Maryland has in recent years retreated from its earlier role as a national leader in Smart Growth planning, but other jurisdictions have continued to do valuable transportation and land use planning.

Montgomery County, known as a pioneer in good regional planning, has published a new draft master plan, Thrive Montgomery 2050, which aggressively addresses the challenges of our times and lays out a set of principles that are congruent with the SMART alternative.[93] The "Trends and Challenges" section includes several pertinent points, including:

- We are not producing enough housing in accessible locations to meet our needs;

- We need to stop planning for cars and emphasize transit, walking and biking;

- Declining trends in public health and well-being indicate a growing need for a healthier more active lifestyle; and

- Climate change threatens all aspects of life.[94]

---

[92] Tomer, 4-5.

[93] Thrive Montgomery 2050, Public Hearing Draft Plan, Montgomery Planning (Oct. 2020), https://montgomeryplanning.org/wp-content/uploads/2020/10/Public-Hearing-Draft-Plan-Thrive-Montgomery-2050-final-10-5.pdf.

[94] Thrive Montgomery, 19-24.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 41

The "major themes" of the plan are:

- Complete Communities through compact form of development and urbanism;

- Corridors are the place for new growth;

- Start planning for people instead of planning for cars;

- Eradicate greenhouse gas emissions;

- Evolution of single-family neighborhoods near transit;

- Racial justice and equity;

- Great design and the importance of place; and

- Regional solutions and strategies.[95]

*Thrive Montgomery* goes on to catalog a comprehensive list of goals, policies, and actions that will advance these themes.[96] This plan is a solid foundation for the SMART alternative in Montgomery County and runs completely counter to the direction taken by the Project.

More localized planning efforts also support the SMART alternative. For example, Montgomery County has adopted a neighborhood plan for the Veirs Mill corridor, a largely single-family home area with a planned Bus Rapid Transit line referred to earlier in these comments. The plan "seeks to improve connectivity between transit and community uses and facilities, enhance safety for all users of Veirs Mill Road, support the existing residential scale and character, and introduce limited redevelopment opportunities to strengthen the existing neighborhood centers and identity."[97] This is a good example of how linking transportation and land use planning can improve mobility, accessibility, and quality of life for residents in a variety of settings.

Much farther out on the Northwest corridor, Frederick County is developing a plan for a sprawling, auto-oriented zone south of the city of Frederick. The plan includes moving toward mixed-use development, interconnectivity of roads and streets, form-based codes, and transit-oriented development at the Monocacy MARC station.[98]

---

[95] *Thrive Montgomery*, 37-45.

[96] *Thrive Montgomery*, 54-56.

[97] Veirs Mill Corridor Master Plan, at 2 (April 2019), https://montgomeryplanning.org/wp-content/uploads/2020/01/Veirs-Mill-Corridor-Master-Plan-Approved-and-Adopted-WEB.pdf.

[98] The South Frederick Corridors Plan: Briefing Book, September 2020, 59-63.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 42

The Beltway corridor is so far-ranging that land use policies must be adopted at a local scale to have a beneficial effect. We also must recognize that the pandemic has led to a significant increase in working from home, some portion of which may be long-lasting,[99] supporting what some have called the "great localization."[100]

**C.**    **The DEIS Does Not Adequately Address the Water Quality Impacts from the Project**

**1.**    **The DEIS Fails to Examine How Increased Stormwater Will Affect Receiving Waterways**

Under NEPA the Agencies must "carefully consider[] detailed information concerning significant environmental impacts" and make the public aware of those environmental effects before a proposed action is chosen. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010). Among other things, the Agencies must provide detailed information on how polluted stormwater from the Project will affect receiving waterways.

The Clean Water Act (CWA) prohibits discharges of pollutants to waters of the United States without a permit. 33 U.S.C. §§ 1311, 1342. The Agencies state that they will meet all required permitting for stormwater runoff but fail to address how increased stormwater runoff and the associated increase in pollutant loads to receiving waterways will meet established effluent limitations. *See id.* § 1362(11) (defining an effluent limitation as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance"). The type, quantity, and contents of the discharge determine the limitations the permit must impose on the discharger and should be carefully considered in the DEIS.

Stormwater collects pollutants on its way to stormwater management facilities and eventually into municipal separate storm sewer systems and receiving waterways. These discharges can negatively impact the chemical, physical, and biological conditions of waterways. It is well-recognized that stormwater can degrade water quality, particularly in urban settings, yet the DEIS fails to take a hard look at how the large increases in stormwater from the build

---

[99] Jonathan Captriol, *D.C.-Area Employers are Open to the Idea of More Permanent Teleworking. That Could Help Traffic*, Washington Business Journal (Sept. 16, 2020), https://www.bizjournals.com/washington/news/2020/09/16/teleworking-survey-mwcog.html.

[100] Mitch Shaw, *Transportation Officials Anticipating 'Great Localization' After COVID-19*, Standard-Examiner (Sept. 16, 2020), https://www.standard.net/news/transportation/transportation-officials-anticipating-great-localization-after-covid-19/article_40589d81-3d3e-59ff-8885-be3df6c83b78.html.


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 43

alternatives will impact water quality.[101] The Maryland Department of the Environment has itself stated that "[i]t becomes fairly easy for all organizations, individuals, and government agencies to agree that urban stormwater is a problem that must be addressed." MDE, Response to Formal Comments for Montgomery County NPDES Permit (2009).

Fifteen Maryland watersheds (MDNR 12-digit) and two Virginia watersheds will be affected by the build alternatives. *See* DEIS, App. L, pp. 45, 47 (Table 2.4-7). (Maryland: Potomac River – Rock Run, Cabin John Creek, Rock Creek, Sligo Creek, Anacostia River – Northwest Branch, Paint Branch, Little Paint Branch, Northeast Branch, Bald Hill Branch, Upper Beaverdam Creek, Patuxent River Western Branch – Upper Southwest Branch, Patuxent River Western Branch – Lower Southwest Branch, Upper Henson Creek, Watts Branch, and Muddy Branch. Virginia: Scotts Run, Dead Run). All impacted Maryland and Virginia watersheds except Scotts Run are already impaired by one or more pollutant for one or more designated use, meaning that the waterways in these watersheds currently do not meet water quality standards. DEIS, App. L, at 47, 48; *see* 33 U.S.C. § 1313. DEIS, App. L, at 55. The build alternatives would increase impervious surface areas and the numbers of vehicles traveling the Beltway and I-270, thereby increasing stormwater runoff and pollutant loads. The build alternatives would add between 49.4 and 108.4 acres of impervious surface in the Cabin John Creek, Northeast Branch, and Upper Beaverdam watersheds, and between 0-13.9 acres in Northwest Branch, Little Paint Branch, Muddy Branch, Watts Branch, and Bald Hill Branch watersheds. DEIS, at 4-91. The DEIS lists assessments of these watersheds' water quality in Table 4-28 (Summary of Watershed Quality Index Narrative Score Results) and the majority are classified as poor or very poor in Indices of Biological Integrity (IBI) scores. DEIS, at 4-106. For example, the Upper Beaverdam is classified as "Very Poor-Fair" in benthic invertebrate IBI scores and "Very Poor-Fair" in fish IBI scores. The increase in impervious surface cover in a watershed with an already low IBI score, such as Upper Beaverdam, will further degrade stream conditions. Stormwater impacts will be one of the largest environmental impacts of this Project and yet the DEIS fails to specify how new stormwater loads will impact the water quality of receiving waterways.

> a.    The DEIS Fails to Identify Stormwater Volume and Pollutant Loads

DEIS Section 2.7.2 provides an overview of applicable federal, state, and local stormwater and water quality requirements that the selected alternative will need to meet under the Clean Water Act, Maryland Stormwater Management Act, and Montgomery County and Prince George's County stormwater management requirements. It identifies how much impervious surface would be added by the build alternatives (Table 2-5) and how many major culvert crossings may be built, DEIS, at 2-37 to 2-39, but doesn't discuss Fairfax County

---

[101] *See, e.g.*, National Academies of Science, Committee on Reducing Stormwater Discharge Contributions to Water Pollution, *Urban Stormwater Management in the United States* (2009), https://www.nap.edu/read/12465/chapter/1; *see also* Hallie Miller, *Report Faults Maryland for Failings in Chesapeake Bay Pollution*, Washington Post (Aug. 18, 2020), https://www.washingtonpost.com/local/report-faults-maryland-for-failings-in-chesapeake-bay-pollution/2020/08/18/8e4421f2-e193-11ea-b69b-64f7b0477ed4_story.html.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 44

stormwater management (SWM) requirements. Importantly, the DEIS fails to provide an estimate of stormwater volumes or pollutant loads by alternative. DEIS, at 2-39. Instead, the Agencies punt this analysis until after the NEPA process is concluded. DEIS, at 2-39 ("A detailed SWM analysis will be performed for the Selected Alternative during final design to determine required and provided stormwater management volumes."). It appears the Agencies may have already conducted some volume calculations given that this information is needed to estimate the location and type of stormwater facilities needed along the proposed new highway lanes, DEIS, at 2-37 to 2-38, but this information is not included in the DEIS.

> b.    The DEIS Fails to Take a "Hard Look" at How Increased Stormwater Will Affect Receiving Waterways

The impacts of stormwater on receiving waterways is discussed only superficially in the DEIS. The DEIS mentions that "[a]n evaluation of potential water quality loss and major culvert crossings was also conducted" and that "SWM water quality requirements and treatment . . . will improve current conditions." DEIS, at 2-37. It is hard to imagine, however, how increased stormwater will improve current conditions. Even if it were to do so, there are no data presented regarding water quality loss or improvement, only tables and estimates of the amount of impervious surface to be added and conclusory statements indicating that stormwater will negatively impact receiving waterways.

The DEIS also fails to model how anticipated increases of stormwater volumes will impact water chemistry. For example, DEIS § 4.13.3 states:

> All Build Alternatives would affect surface waters, surface water quality, and watershed characteristics in the corridor study boundary due to direct and indirect impacts to ephemeral, intermittent, and perennial stream channels and increases in impervious surface in their watersheds. The impacts to jurisdictional surface waters by classification are summarized in Table 4-20 of this chapter. The impacts to jurisdictional surface waters by MDNR 12-digit and USGS HUC8 watersheds are provided in the Natural Resources Technical Report (Appendix L, Section 2.3).

DEIS, at 4-89; *see also id.* at 4-90 to 4-91. However, those references do not discuss the likely impacts to water quality in any detail. Table 4-20 provides information on the total square footage and acres of wetlands and waterways that would be disturbed by each alternative but provides no information on impact to water chemistry. The flaws in Appendix L, which also is referenced, are discussed further below.

Similarly, DEIS § 4.13.3 states:

> In addition to tree removal, stormwater discharges also have the potential to increase surface water temperatures in nearby waterways. The effect of the temperature change depends on stream size, existing temperature regime, the volume and temperature of stream baseflow, and the degree of shading. Thermal effects from decreased shading and stormwater discharge are of particular concern


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 45

for Use III and IV stream networks, such as Paint Branch and Northwest Branch, as they support aquatic biota less tolerant of warmwater conditions.

DEIS, at 4-90. Yet the DEIS fails to quantify the likely temperature changes or to discuss their likely impacts on the affected waterways. *See also* discussion at DEIS, at 4-90 to 4-91 (providing general descriptions of the effects of chlorides, organic pollutants, and sediments on water quality, but neglecting to specify or otherwise analyze their effects in the context of the Project, except to say that they "increase in impervious areas").

The DEIS identifies where the most and least impervious areas would be added, but still does not analyze the impacts and refers to the same Appendix L that is discussed below:

All Build Alternatives would add the most impervious surface to the Cabin John Creek, Northeast Branch, and Upper Beaverdam MD 12-digit watersheds, with between 49.4 and 108.4 acres added. The least additional impervious surface would be added to Northwest Branch, Little Paint Branch, Muddy Branch, Watts Branch, and Bald Hill Branch watersheds, with between 0 and 13.9 acres added. The only Tier II watershed that would experience an increase in impervious surface is the Beaverdam Creek – Northeast Branch watershed, with an increase of less than 0.1 acres. Refer to the *Natural Resources Technical Report* (Appendix L, Section 2.3) for a discussion of jurisdictional surface water impacts and Table 4-29 for additional impervious surface by Build Alternative.

*Id.* at 4-91. Table 4-29 simply provides the amount of impervious surface to be added to each of the seventeen analyzed watersheds.

The DEIS also fails to provide any details on the mitigation measures that would be required, other than to say:

Water quality would be protected by implementing strict erosion and sediment control plans with BMPs [best management practices] appropriate to protect water quality during construction activities. Post-construction stormwater management and compliance with total maximum daily loads (TMDLs) will be accounted for in the stormwater design and water quality monitoring to comply with required permits.

*Id.*

Appendix L, Section 2.3, identifies existing water quality conditions for the watersheds and the most common contaminants found in highway stormwater before making the following conclusory statement:

There would be no effect on surface waters and watershed characteristics from the No Build Alternative. However, all Screened Alternatives would affect surface waters and watershed characteristics in the corridor study boundary due to direct and indirect impacts to ephemeral, intermittent, and perennial stream channels.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 46

Impacts to jurisdictional surface waters are discussed in Section 2.3.3 and the impacts to jurisdictional surface waters by MDNR 12-digit watershed are included in Table 2.3-8. Watersheds would also be impacted by increasing impervious surface area. SWM controls will be included in the final design to reduce velocity of runoff flow and negative impact to water quality. Section 2.4.3.C includes more information regarding environmental effects to water quality. Additional information regarding SWM assumptions are discussed in Section 2.7.3 of the DEIS. Note that although the corridor study boundary intersects the Piscataway Creek Tier II watershed, no features were identified and therefore no impacts would occur within this watershed.

DEIS, App. L, at 78.

Appendix L, Section 2.3.3 makes no reference to stormwater impacts. Table 2.3-8 merely provides the total area of wetlands and waterways that will be disturbed. Appendix L, Section 2.4.3 simply restates information provided in Section 4.13.3 of the main DEIS document.

In Appendix L, Section 2.3, the Agencies provide thirty-three pages of data and discussion showing the existing chemical and physical conditions of each impacted watershed, DEIS, App. L, at 45-78, but fail to provide any analysis of the effect that the most common contaminants found in highway stormwater runoff would have on water quality in these watersheds. *Id.* at 78; § 2.4.3(A), (C). In fact, the only time the effects of stormwater are ever mentioned in the summary of watershed existing conditions is in a small section discussing Sligo Creek that states, "direct effects of runoff would likely affect water quality." DEIS, App. L, at 66. There is no information cited to support how the Agencies arrived at this conclusion or to what extent Sligo Creek would be impacted. There is no discussion of stormwater in the existing conditions sections for the other sixteen watersheds.

The Agencies must identify how building new highway lanes and reconstructing existing lanes, which are the only build alternatives being considered, will increase stormwater flow and pollutant loads. DOT should model the anticipated stormwater runoff to identify and characterize the quantity and quality of runoff, including identifying estimated total volumes, peak discharge, and velocity. This discussion should include an itemized calculation of stormwater from each drainage area for each proposed alternative and models showing how this stormwater would impact the ability of the receiving waterway to meet existing effluent limitations. The analysis should also consider how the lack of proposed onsite treatment and the water quality trading credits relied upon by the Agencies to meet stormwater permitting requirements will impact local waterways.

More comments on the proposed use of water quality trading are provided in Section II.C.4. of this document. There are models readily available to the Agencies that would allow them to provide meaningful information about the risk of adverse effects of runoff on receiving waterways, which could then be used to inform a determination of the degree and nature of that impact, the need for mitigation measures, and the potential effectiveness of such management measure for reducing these risks. *See for example*, Storm Water Management Model (SWMM), EPA, https://www.epa.gov/water-research/storm-water-management-model-swmm. The DEIS

00022661


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 47

must contain a stormwater impact analysis and provide the public with an opportunity to comment on these Project impacts.

> **2.    The Analysis of Stormwater Management Needs is Incomplete and Lacks Supporting Data**

The Agencies must evaluate all relevant data and "articulate a satisfactory explanation" for the conclusions reached in the EIS. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Agencies fail to explain and provide sufficient data in the DEIS to support the stormwater management needs identified in the DEIS. The Agencies must provide an explanation for the findings in Table 2-5 as to the number of lanes that will need to be reconstructed. Additionally, the DEIS fails to consider impacts to smaller culverts.

> > a.    The DEIS Provides Insufficient Data to Support its Impervious Surface Area Calculations and the Selection of Stormwater Management Facilities That is Proposed

Section 2.7.2 identifies the types of stormwater management to be used to manage the large quantities of stormwater that will be produced by all build alternatives. DEIS, at 2-37 to 2-39. The DEIS identifies the type of stormwater facilities (quantity ponds, Environmental Site Design (ESD) ponds, swales, quantity vaults, and water quality vaults) and water culverts to be used and their proposed locations based on the amount of impervious surface area calculated for each build alternative. DEIS, at 2-38; Table 2-5. However, no photos, maps, or data are provided to support the calculated impervious areas presented in Table 2-5. *Id.*[102] A footnote to Table 2-5 states that, "Offsite requirements are based on the engineering design as of January 2020." This design should have been included in the DEIS, but it was not.

The DEIS proposes new stormwater facilities to be built along the study corridor to accommodate stormwater runoff but fails to consider impacts to existing stormwater management facilities. DEIS, at 2-38; *see* DEIS, App. D, EnvMapping_web_part1 to EnvMapping_web_part4. The DEIS does not provide information on existing stormwater management facilities. Due to this lack of information it is unclear how the construction of new facilities will impact existing facilities proposed at the same site. It appears that some newly proposed facilities would be built on top of or overlapping existing stormwater management facilities. For example, Map 99 in Appendix D, Environmental Mapping, proposes three new facilities within the traffic loops where I-270 meets Democracy Boulevard. There are already seven existing facilities located at the same location as the proposed facilities (numbers 150657 through 150660). *See* MDOT SHA NPDES SWM FAC mapping tool, available at

---

[102] Table 2-5 provides the acres of impervious area for each build alternative broken down by: Required Quantity surface area (acres); Provided Quantity surface area (acres); Required ESD surface area (acres); Provided ESD surface area (acres); and Impervious Area Requiring Offsite Treatment (acres).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 48

https://www.aregis.com/home/webmap/viewer.html?useExisting=1&layers=d588b42ce24f4ef48235a86259da3270.

The DEIS also fails to describe or account for how existing stormwater runoff will be managed if and when existing facilities are removed or replaced new facilities. Moreover, in situations where new facilities replace old facilities, the DEIS should explain how they will be built with sufficient capacity to address all existing and new stormwater runoff. There are several publicly available resources the Agencies can use to identify existing facilities along the study corridor.[103] The Agencies established the limits of disturbance (LOD) by estimating the areas around the build alternatives that will be impacted by "construction, construction access, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, and related activities." DEIS, at 2-40. The LOD for each alternative should be cross-referenced with the appropriate local map and loss of treatment and storage should be accounted for in the planning and design of stormwater management facilities. Proposed stormwater management facilities are shown on the DEIS Environmental Resource Maps, but the maps fail to show the drainage areas to the facilities. *See* DEIS, App. D, EnvMapping_web_part1 to EnvMapping_web_part4. These maps also fail to show where facilities will connect into existing drainages networks. All drainage areas and areas used to connect facilities to existing drainage networks need to be included within the LOD. It is unclear whether the LOD currently includes these areas given that they are not included on any of the DEIS maps. Without maps showing the drainage areas and any other data used to calculate the impervious surface areas provided in Table 2-5 and identify connection points to existing drainage infrastructure, the public is foreclosed from reviewing and commenting on the sufficiency of the proposed stormwater management facilities.

---

[103] MDOT SHA NPDES SWMFAC:
https://www.aregis.com/home/webmap/viewer.html?useExisting=1&layers=d588b42ce24f4ef48235a86259da3270.

Prince George's County Clean Water Map:
https://www.aregis.com/apps/webappviewer/index.html?id=dc168a43d3554905b4e4d6e61799025f.

Montgomery County (map at bottom of page):
https://www.montgomerycountymd.gov/water/stormwater/maintenance.html.

Fairfax County:
https://www.fairfaxcounty.gov/GeoApps/Jade/Index.html?configBase=https://www.fairfaxcounty.gov/GeoApps/Geocortex/Essentials/REST/sites/Jade/viewers/Jade/virtualdirectory/Resources/Config/Default.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 49

b. **No Information is Provided to Support the Percentage of Existing Lanes to be Reconstructed**

The amount and type of stormwater management required under the Maryland Stormwater Management Act of 2007 is dictated in part by the amount of impervious surface area created and reconstructed. Md. Code Ann., Env't §§ 4-201.1, 4-203 (2014). Specifically, if the percentage of lanes that need to be reconstructed exceeds 40%, "all existing impervious areas located within a project's LOD are required for management." Maryland Stormwater Design Manual, Chapter 5, p. 5-117. To calculate the amount of new and reconstructed impervious surface, the Agencies "assum[ed] all shoulders and 25 percent of the existing lanes would need to be reconstructed." DEIS, at 2-37. The Agencies calculated this percentage by conducting "field investigat[ions] to determine existing conditions." *Id.* However, no information is provided to support the conclusion that only 25% of existing impervious surface will be reconstructed, leaving the public unable to review and comment on this finding. In fact, there appears to be little basis for arriving at the 25% figure, particularly in light of a statement by former Maryland Secretary of Transportation Pete Rahn that the "Washington Beltway [] can no longer be expanded and it needs to be reconstructed because we have much underneath it and the system frankly has got to be taken right down to the dirt and brought back up."[104] The Agencies must provide sufficient information to support their conclusion, including field logs, maps, photos, or other information used to calculate this important number.

Regardless of the percentage of reconstructed impervious surface,[105] the Organizations encourage the Agencies to account for and provide for treatment of all stormwater from existing lanes given that much of this polluted water is currently untreated.[106] Additionally, the DEIS assumes that culverts that need to be replaced to accommodate increased stormwater volumes will be installed using trenchless construction techniques that will not disturb the existing road. Although this would be an ideal outcome, there is no information presented in the DEIS to suggest all culverts can be replaced using trenchless technology and the Organizations urge the Agencies to consider that at least some percentage of replaced culverts may require road reconstruction.

---
[104] Sean Slone, *Transportation Policy Academy 2015 – DC – Maryland Secretary of Transportation Pete Rahn*, The Council of State Governments (May 19, 2015), https://web.archive.org/web/20200906121216/https://knowledgecenter.csg.org/kc/content/transportation-policy-academy-2015-%E2%80%93-dc-%E2%80%93-maryland-secretary-transportation-pete-rahn.

[106] The MDOT SHA NPDES SWMFAC shows that much of the existing highway does not have stormwater management facilities. The MDOT SHA NPDES SWM FAC mapping tool, available at https://www.arcgis.com/home/webmap/viewer.html?useExisting=1&layers=d588b42cc24f4ef48235a86259da3270.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 50

c. **Impacts to Culverts Smaller Than 36 Inches Must be Considered**

DEIS Section 2.7.2.c examines how major culverts, defined as culverts 36 inches in diameter or greater, will be impacted by the increase of stormwater flow and proposes that some culverts will need to be replaced by larger culverts. DEIS, at 2-38. However, no consideration is given to smaller culverts. Adding impervious surface area will have more significant detrimental impact on smaller channels with smaller drainage areas given that the percentage of impervious surface area added will be higher for these channels. As is the case for the issues discussed above, the DEIS fails to identify exactly which culverts would need to be replaced with larger ones and where these culverts are located. A list of the culverts to be replaced should be provided along with the data used to identify these culverts. The proposed new culverts should be included on the Environmental Resource Maps, DEIS, App. D, EnvMapping_web_part1 to EnvMapping_web_part4.

3. **The DEIS Fails to Account for MS4 Permitting Requirements**

The DEIS does not discuss how the stormwater management proposed for Scotts Run and Dead Run will comply with the Virginia Stormwater Management Act and the Fairfax County stormwater management ordinance. These laws control the Virginia Stormwater Management Program and Municipal Separate Storm Sewer System (MS4) permitting requirements, Va. Code Ann. § 62.1-44.15:24, *et seq.*; 9 Va. Admin. Code §§ 25-870 *et seq.*; Code of the County of Fairfax, Virginia § 124-1-1 *et. seq.* The DEIS is also silent on how the build alternatives may impact MDOT SHA's ability to meet existing National Pollutant Discharge Elimination System (NPDES) MS4 permit requirements, including MDOT SHA's obligation to restore 20% of impervious highway surfaces that have no other treatment in order to reduce stormwater runoff. National Pollutant Discharge Elimination System, Municipal Separate Storm Sewer System Discharge Permit for Maryland State Highway Administration (SHA), No. 11-DP-3313 (MD0068276) (Oct. 9, 2015) (requiring restoration of "20% of MDOT SHA's impervious area (i.e., the ISR requirement)," as well as the development of "restoration plans to meet stormwater WLAs to address Chesapeake Bay and local water quality impacts.").

4. **The DEIS Fails to Consider Viable Stormwater Avoidance and Mitigation Options**

The DEIS fails to sufficiently consider stormwater avoidance and mitigation options that would avoid or minimize stormwater impacts. Instead, the Agencies claim that impacts to waterways will be sufficiently addressed through the permitting process that will occur after the NEPA process is complete. The permitting process will not, however, fulfill the Agencies' obligations under NEPA to fully evaluate alternatives; the Agencies must consider viable stormwater avoidance and mitigation options to allow for the proper consideration of the build options and other available alternative that would have less impact.

The DEIS fails to consider areas immediately surrounding the build alternatives, but outside the LOD, for possible stormwater management. The DEIS explains that "[t]he design for on-site SWM, including ponds and large facilities along the roadside and within interchanges, was developed to a concept level of detail and was included within the LOD." DEIS, App. L, at

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 51

32. This statement effectively means that any amount of stormwater that cannot be managed and treated by a stormwater management facility within the LOD will not be addressed onsite.

Furthermore, the impacted waterways already classified as less than high quality are impaired primarily because of degradation caused by lack of stormwater management and environmental treatment from existing runoff from I-495, as well as inadequate and inconsistent maintenance of the current outfalls.[107] MDOT SHA is responsible for this existing degradation, and should not be allowed to use the degradation it caused to suggest that less mitigation is needed. These impacted waterways should be treated in the same way as the high-quality resources are treated. The highly urbanized nature of the Rock Creek area must be accounted for and the extremely high value ecosystem functions of these resources must be appropriately mitigated.

The Agencies propose to address a large amount of stormwater from the Project through the use of compensatory stormwater management, i.e., treating stormwater in another area instead of treating the stormwater created by the Project (also known as water quality trading). The Agencies base this proposal on a finding that there is not enough land available along the study corridor to hold and treat all stormwater projected by the selected alternatives. DEIS, at 2-37. The DEIS explains the need for offsite treatment as follows: "[d]ue to the large amount of impervious area requiring treatment for each build alternative and existing site constraints, ESD could not be met for the build alternatives within this study area." DEIS, at 2-38. For example, alternative 10 (add two priced managed lanes in each direction on I-495 and on I-270 and retain one existing HOV lane in each direction on I-270 only) would require 434 acres of offsite treatment, id., meaning that the stormwater from 434 acres of impervious surface (a volume that is not disclosed in the DEIS, as discussed above) will go untreated if alternative 10 is selected. The Agencies do not indicate how they plan to meet Fairfax County's requirement that water quantity requirements be met on-site. Also, Fairfax County only allows for water quality requirements to be met by off-site credits or other off-site compliance options for up to 25% of water quality pollutant reductions. Code of the County of Fairfax, Virginia § 124-4-4 to 124-4-5.

The DEIS fails to analyze whether underground storage or stormwater swales could be used to manage stormwater. For example, the build alternatives could utilize more space within the right of way for stormwater treatment, and proposed drainage swales could be designed as stormwater management swales. Underground storage could also be built into the shoulders/medians where there is less regular traffic. See the revised alternative image below for an example:

[107] Carol S. Rubin, Memo to M-NCPPC, Comments to DEIS and Joint Permit Application, at 5 (Oct. 19, 2020) https://www.mncppc.org/DocumentCenter/View/15750/102120-Commission-Meeting-Staff-Report-DEIS-and-JPA-comments-ARGDSB.



**Figure 2-6: Alternative 9 Typical Sections**

SWM Swale          UGS

The Agencies propose using a project-specific Water Quality Bank that will utilize water quality trading credits to meet the requirement to make up for the lack of onsite treatment for any build alternative selected. The DEIS states that this bank will be "developed through a variety of means including but not limited to the transfer of excess water quality credits from other MDOT programs (e.g. the TMDL program)." DEIS, at 2-38. The DEIS fails to provide information regarding where these offsite treatment credits would come from or whether there are sufficient credits available within the local watershed. Furthermore, it is unclear how many credits will be coming from the MDOT SHA banking program or if MDOT SHA currently has sufficient credits available within its program to meet the credit needs of this proposed project. MDOT SHA already struggles to meet its requirements under its NPDES MS4 permit and it is unclear how the Agency intends to obtain sufficient credits to meet the proposed project stormwater permitting requirements. Will credits be obtained from within the local 8-digit watershed? Will the credits come from an MDOT SHA or private stream restoration project or some other credit source? Where would the credits come from if MDOT SHA's NPDES MS4 permit is not reissued? Without knowing where the credits will come from it is impossible for the Agencies to determine whether the proposed build alternatives will cause violations of the Clean Water Act, 33 U.S.C. §§ 1311, 1342. The Agencies must provide this information during the NEPA process and the public should be afforded the opportunity to comment on this new information.

5. **The Corps Should Deny the Joint Permit Application for a Clean Water Act § 404 Permit Because It Fails to Meet Clean Water Act Requirements and Is Not in the Public Interest**

The Agencies have submitted a Joint Federal/State Application (JPA) for alterations to waterways and wetlands, including for discharges of dredged and fill material into waters of the

00022664



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 53

United States. DEIS, JPA, Part 1. CWA § 404 permits are required for such discharges, 33 U.S.C. § 323.3, and the U.S. Army Corps of Engineers (Corps) and MDE must conduct their review of 404 permit applications in accordance with EPA § 404(b)(1) Guidelines, 40 C.F.R. Part 230; the Corps' implementing regulations, 33 C.F.R. Part 325, Appendix B; and the Maryland Department of the Environment's wetland regulations, Md. Code Regs. §§ 26.17.01.01 *et. seq.*; Md. Code Regs. §§ 26.23.01.01 *et. seq.* Maryland also has its own mitigation ratios that must be used depending on the type of wetland impacted and the type of mitigation approved. Md. Code Regs. §§ 26.23.04.03, 26.24.05.01.

### a.   The JPA Fails to Meet CWA § 404(b)(1) Requirements

The Corps should deny the JPA for a Section 404 permit because the permit application fails to meet CWA § 404(b)(1) requirements. First, the JPA must be denied because there is a "practicable alternative to the proposed discharge which could have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). The DEIS fails to consider the alternatives in sufficient detail to satisfy this requirement. Furthermore, CWA § 404(b)(1) creates a presumption that a practicable alternative to the build alternatives is available because the proposed build alternatives would negatively impact wetlands, which are considered a "special aquatic site." 40 C.F.R. § 230.10(d); *id.* § 230.41. It appears that the alternatives analysis in the DEIS is being used to support the JPA application, however, the Corps is required to conduct their own independent analysis of alternatives, which should include any alternatives not examined in the DEIS which might have fewer adverse impacts. Any additional alternatives considered by the Corps must be included in the DEIS because the CWA § 404 permit process is running concurrently with the NEPA process. In any event, the Organizations suggest that the Corps consider the alternatives discussed in Section II.B.3 of this document to determine if these alternatives would have fewer adverse impacts on the aquatic ecosystem. These practicable alternatives were not considered in the DEIS and "could be reasonably obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity" but not cause as much harm to wetlands and waterways. 40 C.F.R. § 230.10(a)(2).Second, pursuant to 40 C.F.R. § 230.10(b), the Corps must deny the permit unless it finds that the proposed discharges would not violate state water quality standards or toxic effluent standards under CWA § 307, 33 U.S.C. § 1317(a)(1), or jeopardize the existence of endangered or threatened species, including all species listed in the DEIS Natural Resources Technical Report, Appendix N, Agency Correspondence. Potential violations of water quality standards are discussed in more detail in Section II.C.1 and Section II.C.2. of this document.

The Corps must adhere to the Endangered Species Act (ESA) requirements discussed in Section II.F. of this comment document and must deny the CWA § 404 permit requested for the Project if the proposed discharges will jeopardize the existence of any endangered or threatened species or if it could result in a likelihood of the destruction or adverse modification of formally designated critical habitat. 40 C.F.R. § 230.10(b). The DEIS fails entirely to identify how the Project or the proposed compensatory mitigation plan will impact endangered species or habitat (aquatic and otherwise). The DEIS fails to even specify which species reside in the various waterways and other areas that may be affected by the Project. Despite the lack of detail in the JPA, a careful review of the JPA application, read together with the relevant DEIS documents,

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 54

suggests that sensitive species could be affected by the Project and the proposed compensatory mitigation plans, but the application fails to take these impacts into consideration.

The draft compensatory mitigation plan, DEIS, JPA, Part 13, at 32, states that a preliminary review of the U.S. Fish & Wildlife Service (FWS) online database to identify potential rare, threatened, or endangered species on record for mitigation sites was conducted, but no consultation with FWS or NFSW was conducted. The Agencies must consult with FWS and National Marine Fisheries Service (NMFS) to determine what species may be present at the mitigation sites and determine if a biological opinion is needed. *See also* DEIS, JPA, Part 18, at 38 ("DNR [Maryland Department of Natural Resources] noted that fish passage will be a concern and should be considered . . . [GreenVest] stated that the proposed restoration approach would consider fish passage"); DEIS, JPA, Part 18, at 60 ("it was noted that the site is within a Sensitive Species Project Review Area"). The failure to examine what species are on proposed mitigation sites, or how their habitat might be disrupted, is particularly concerning given that wetland mitigation areas are deemed "not acceptable" by Maryland if they have been "identified as important habitat for rare, threatened and endangered plants or wildlife."[108] The JPA should be rejected given its failure to specify, for each mitigation site, which species are present, and how the Project may affect those species and their habitat.

Third, pursuant to 40 C.F.R. § 230.10(c), the Corps should deny the JPA because the discharges are likely to contribute to significant degradation of water quality. The additional discharges proposed under the JPA will contribute cumulatively to significant degradation of wetlands, life stages of aquatic life and other water-dependent wildlife, aquatic ecosystem diversity, and aesthetic value of the discharge wetlands and waterways.

Fourth, pursuant to 40 C.F.R. § 230.10(d), the JPA must be denied because the Agencies have failed to take sufficient steps to minimize harm to protected waters, which include wetlands that serve as habitat to plants and animals, 40 C.F.R. § 230.3. Adverse impacts may be minimized by the selection of the discharge location, treating or limiting the material to be discharged, controlling the material after it has been discharged and the method of dispersion, utilizing technology to reduce impacts, and avoiding interference with animals and their habitat. *See* 40 C.F.R. Subpart H.

### b.   Issuing a CWA § 404 Permit Would Not be in the Public Interest

Even if the JPA for a Section 404 permit meets EPA's Section 404(b)(1) guidelines, the Corps should deny the permit because the proposed build alternatives are not in the public interest. The Corps must conduct a public interest review to evaluate "the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a). During this review the Corps must give equal weight to all comments from local municipalities, in addition to those from state and federal agencies and any

---

[108] Maryland Nontidal Wetland Mitigation Guidance, Second Edition, at 74 (2011), https://mde.maryland.gov/programs/Water/WetlandsandWaterways/AboutWetlands/Documents/ www.mde.state.md.us/assets/document/wetlandswaterways/MITGUIDEfeb72011.pdf.

00022665

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 55

expert analyses provided. 33 C.F.R. § 320.4(a)(3). This review should reflect that "wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b).

Furthermore, because this Project is at least partially funded by federal and state agencies, the Corps "shall avoid undertaking or providing assistance for new construction located in wetlands unless the head of the agency finds (1) that there is no practicable alternative to such construction, and (2) that the proposed action includes all practicable measures to minimize harm to wetlands which may result from such use." Exec. Order No. 11,990, 42 Fed. Reg. 26,961 (May 24, 1977). The Corps' regulations at 33 C.F.R. § 320.4(b)(5) also require the Corps to consider Maryland's wetland protection laws, including the state's goal to achieve "no net overall loss in nontidal wetland acreage and function, and to strive for a net resource gain in nontidal wetlands." Md. Code Regs. 26.23.04.03. The public interest review must also consider information provided through the consultation process required with the FWS, NMFS, and DNR. Additionally, the Corps is required to avoid authorizing floodplain development whenever practicable alternatives exist outside the floodplain because they "possess significant natural values and carry out numerous functions important to the public interest." 33 C.F.R. § 320.4(l).

The JPA and DEIS fail to provide information on the status of the public interest analysis. However, given that the Corps has included a Draft Compensatory Mitigation Plan and this plan "presents the approach to compensatory mitigation for the unavoidable impacts from the Build Alternatives and includes Phase I Mitigation Design Plans for permittee-responsible mitigation," it can be assumed that the Corps has made some determination regarding whether the Project would be in the public interest. The Organizations request the Corps to provide the public with its public interest determination and any information not already included in the DEIS that it relied upon to support its determination. Without this information, and the additional information requested throughout this comment document, the Organizations and the public are unable to fully assess and comment on the Corps' public interest determination. The information that has been provided in the DEIS and JPA fails to show that the relative extent of the public and private need for the Project will outweigh the Project's negative impact on air and water quality, aesthetics, wetlands, historic properties, fish and wildlife, the floodplain, scenic values, recreation, and private property.

Should the Corps decide to approve the permit, it must include special conditions that: (a) "identify the party responsible for providing the compensatory mitigation;" (b) "incorporate, by reference, the final mitigation plan approved by the district engineer;" (c) "state the objectives, performance standards, and monitoring required for the compensatory mitigation project, unless they are provided in the approved final mitigation plan; and (d) "describe any required financial assurances or long-term management provisions for the compensatory mitigation project, unless they are specified in the approved final mitigation plan." 33 C.F.R. § 332.3(k). Additionally, the Organizations request that the permit require monitoring for a period sufficient to ensure that the affected streams and ecosystems return to a self-stable state and the mitigation is meeting all performance standards, and also request that the Corp not waive any monitoring. 33 C.F.R. § 332.6 ("The mitigation plan must provide for a monitoring period that is sufficient to demonstrate that the compensatory mitigation project has met performance standards, but not less than five years. A longer monitoring period must be required for aquatic resources with slow

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 56

development rates (e.g., forested wetlands, bogs)."). The DEIS states that, following construction, the public mitigation sites will be placed in MDOT SHA's monitoring program and will be monitored separately by the private remediation site providers for up to ten years. DEIS, App. N, at 30-31. However, stream and wetland ecosystems, once disturbed, including by restoration, may take up to 20 years to return to a self-stable state.

c.    The DEIS Fails to Provide Information Regarding the Status of the CWA § 401 Certification Process

The DEIS also fails to indicate the status of the state water quality certifications that are required before any CWA § 404 permit is authorized, unless the certification is waived. 33 U.S.C. § 1341(a)(1); 40 C.F.R. Part 121. The DEIS simply indicates that a Section 401 Water Quality Certificate is required from both Maryland and Virginia. DEIS, at 4-78. The Organizations ask for an update on the status of the certification process.

6.    The Draft Compensatory Mitigation Plan is Incomplete, and the Final Plan Should be Made Available to the Public Prior to Issuing any Permit

Pursuant to the Corps' regulations, a comprehensive compensatory mitigation plan must include the following information: clear objectives, a description of legal arrangements and instruments to be used to ensure long-term protection of the mitigation sites, baseline information, identification of credits, mitigation work plan, maintenance plan, detailed performance standards, monitoring requirements, long-term management plan, an adaptive management plan, and financial assurance. 33 C.F.R. § 332.4. The Organizations request the final compensatory mitigation plan be made available to the public prior to issuing any permit and that the public be afforded the opportunity to comment on the final plan.

The JPA currently provides proposed impact plates, tables, wetland delineation information, and a partial draft compensatory mitigation plan (including Phase I Design Plans). DEIS, JPA, Part 1 – Part 21. However, the draft compensatory mitigation plan does not provide detailed information on the proposed maintenance plan, performance standards, mitigation work plan, monitoring requirements, long-term management plan, adaptive management plan, or financial assurances but states that these issues will be addressed during the development of the Phase II Mitigation Design Plans. DEIS, JPA, Part 13, at 29-31. Additionally, the DEIS does not appear to take existing watershed planning into account, although the document refers to county master plans to justify the need for expanded highways. The Organizations urge the Corps to take a watershed approach to compensatory mitigation, as recommended by the relevant guidance.[109]

───────────────────

[109] The 2000 in-lieu fee guidance embraces the watershed approach for in-lieu fee mechanisms, stating, "[l]ocal watershed planning efforts, as a general matter, identify wetland and other aquatic resources that have been degraded and usually have established a prioritization list of


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 57

Although the JPA provides a brief summary of Project objectives it fails to provide sufficient details as to how lost wetland and stream functionality will be replaced by the proposed compensatory mitigation. *See* DEIS, JPA, Part 13, at 30. This omission is of particular concern given that most of the Phase I proposed sites are far away from the proposed build alternatives and will not abate localized wetland and stream functionality degradation. *See* DEIS, JPA, Part 18, Figure J-1, at 69. Furthermore, the objectives fail to provide concrete information as to what success will look like at the proposed sites because there are no performance standards provided. *See* DEIS, JPA, Part 13, at 30. The JPA simply states, "[p]erformance standards for all of the wetland mitigation sites will be in accordance with the Performance Standards and Monitoring Protocol for Permittee-Responsible Nontidal Wetland Mitigation Sites in Maryland, April 20, 2018." *Id.* The Organizations urge the Agencies to use mitigation banks rather than permittee-responsible mitigation or in-lieu fee programs. Although the stated goal for the mitigation package is "to improve upon the ecological functions in these watersheds with a focus on the impaired conditions and needs," and the mitigation sites are to be selected in part on their "potential for watershed improvements," proximity to the impaired areas, and "replacement of lost functions and values," DEIS, App. N, at 4, 9, 20, in practice more weight appears to have been given to construction feasibility and mitigation credits tied to theoretical functional uplift. Ultimately, the sites selected were those evaluated with the simplest index: acreage, for wetland credit, and its analog, linear feet for streams. These measurements do not allow for a true assessment of the value of the exchange of the wetland or stream lost to highway construction for one or another alternative proposed mitigation site, unlike a function-based system.

In addition to the traditional search for mitigation sites on public lands, "MDOT SHA issued a Request for Proposals (RFP) for full delivery services to provide permittee-responsible stream and wetland mitigation credits on private lands," DEIS, App. N, at 23. Likely because of the limited methods used for selecting potential mitigation sites, no attempt was made to find mitigation sites within the impacted 12-digit subwatersheds. The mitigation plan does not attempt to assess the overall impact on ecosystem function of each subwatershed beyond a catalog of the additional impervious surface by watershed of each build alternative, nor is there a description in any of the proposed mitigation sites of how they will contribute to the 8-digit watersheds (the smaller and more localized watersheds in which they are situated. A few of the proposed sites are paired, usually a stream with adjacent wetland. The DEIS occasionally

restoration needs. In-lieu fee mitigation projects should be planned and developed to address the specific resource needs of a particular watershed." 65 Fed. Reg. 66,914-17 (Nov. 7, 2000).

The 1995 mitigation banking guidance encourages a watershed-based approach as the overall goal of a mitigation bank: "The overall goal of a mitigation bank is to provide economically efficient and flexible mitigation opportunities, while fully compensating for wetland and other aquatic resource losses in a manner that contributes to the long-term ecological functioning of the watershed within which the bank is to be located. The goal will include the need to replace essential aquatic functions that are anticipated to be lost through authorized activities within the bank's service area. In some cases, banks may also be used to address other resource objectives that have been identified in a watershed management plan or other resource assessment." 60 Fed. Reg. 58,605-14 (Nov. 28, 1995).

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 58

discusses how the function of a proposed mitigation site might be improved upon by being connected with individual waterway reaches above or below the site, but more often than not it appears that most sites will not be connected to individual waterway reaches. But there seems to be no effort to analyze the contribution of mitigation at the specified site to improved function of the whole watershed, nor an explanation of how function lost to the Project will be compensated by these mitigations. Instead, in a series of tables analyzing each of the 40-odd sites examined as possible mitigation sites, the criteria seem to be focused on the potential for uplift (functional and ecological) of that site taken as a stand-alone unit, and consequently the credit that might accrue after proposed mitigation measures are applied to transform the site. Instead of this approach, the Organizations recommend the Corps take a function-based approach when assessing impacts and mitigation credits.[110]

Another issue of concern is the selection of private sites from the responses to the RFP. The largest of such sites is the Konterra mitigation project, which proposes over 27,000 linear feet of stream and 30 acres of wetland mitigation. This site is described as containing "former sand/gravel borrow pits, which later served as a depository for washings from excavated materials. The cells are comprised of poor quality, monotypic wetlands." DEIS, App. N, Agency Meeting Minutes. It is unclear whether a wetland can even be engineered from the shale clay at this site. Instead of this site, the Organizations support the proposed site in Rock Creek (MPAO0032),[111] particularly as it is in the watershed where the [Rock Creek Conservancy recently did a conservation landscaping] project. Rock Creek Conservancy also supports

---

[110] A number of function-based frameworks have been proposed and are available for use: The Wetland Evaluation Technique (WET) (Adamus, 1987) cited in Richard Reppert, *Wetlands Mitigation Banking Demonstration Study July 1992* US Army Corp of Engineers, IWR Report 92-WMB-1;

Maryland Department of the Environment, *Performance Standards and Monitoring Protocol For Permittee- Responsible Nontidal Wetland Mitigation Sites*, (April 20, 2018);Richard Starr, Will Harman and Sandra Davis, *Final Draft Function-Based Rapid Stream Assessment Methodology*, Habitat Restoration Division Chesapeake Bay Field Office U.S. Fish and Wildlife Service CAFE – 815 – 06 (May 2015);

EPA Office of Wetlands, Oceans, and Watersheds, *A Function-Based Framework for Stream Assessment and Restoration Projects. US Environmental Protection Agency*, EPA 843-K-12-006 (May 2012);

Margaret A. Palmer, Kelly L. Hondula, and Benjamin J. Koch, *Ecological Restoration of Streams and Rivers: Shifting Strategies and Shifting Goals*, Annu. Rev. Ecol. Evol. Syst., 45:247–69 (2014).

[111] Although many of Rock Creek's tributaries and the main stem are in poor to fair condition. This should not exclude them from consideration; expectations should just be managed accordingly.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 59

restoration sites MO 00029,[112] MO 00034,[113] and WSS150159.[114] The Conservancy generally recommends coupling stream restoration projects with upland stormwater management, because if there is not a reduction in stormwater flows to restored streams they are vulnerable to degradation in the future.

The Organizations also support the restoration of the mainstem of Portal Branch, particularly if paired with green streets installations within the watershed (as most of its impairment is due to stormwater that flows from nearby outfalls). Most of the watershed that feeds (and damages) Portal Branch is in Montgomery County. Deerprint Run, a small stream off Daniel Road near Beach Drive, is inundated with sediment and is a good candidate for restoration given that the removal of sediments and the addition of regenerative stormwater conveyances would allow for the reestablishment of amphibian habitat in what is an existing wetland. Finally, the Organizations encourage the Agencies to review the Potomac River Tunnel project currently under development by DC Water under the C&O Canal and parts of Rock Creek Park, as this project offers a model for adding stormwater storage relatively unobtrusively and without significant disruption aboveground.

Although the DEIS discusses potential remedial sites, there does not appear to be any examination of records that would indicate whether hazardous waste may be located at or near the proposed mitigation sites.[115] There is only the most tangential reference to the indirect impact of the expanded highways on the proposed mitigation sites and the rest of the ecosystem, namely that there will be an increase in impervious surface. The Agencies should examine whether the proposed remedial sites have hazardous substances in soil or groundwater that would require additional expenditures to remediate. This issue is of particular concern at sites within or near industrial areas.

The JPA does not include sufficient information to determine the soundness of the proposed mitigation plan. This information must be completed by the Corps, 33 C.F.R. § 332.4(c), and should be provided to the public given the large amount of wetlands and streams that will be lost under each of the proposed build alternatives, the amount of controversy surrounding the overall Project, and Maryland's goal of "no net overall loss in nontidal wetland acreage and function, and to strive for a net resource gain in nontidal wetlands," Md. Code Regs. 26.23.04.03. Furthermore, this information will improve the chances that the proposed mitigation projects, to be conducted on both private and public lands, will actually meet the mitigation objectives. The Organizations request that the Corps provide actual copies of the Phase II

---

[112] This site was eliminated because of a culvert in need of repair. The culvert should be included in the project. While potential for ecological uplift may be somewhat limited, removal of current and reduction of sediments would be a benefit from a stormwater perspective.

[113] Access constraints should be further explored before eliminating.

[114] Being high in the landscape should not be an immediate disqualifier; it may simply call for different techniques.

[115] See discussion of further issues related to hazardous substances in Section II.G.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 60

Mitigation Design Plans, mitigation work plan, performance standards, monitoring requirements, long-term management and adaptive management plan, and financial assurances documents, rather than just summaries of these documents.

**7.    The DEIS Fails to Consider Alternatives That Would Avoid or Minimize Adverse Impacts to Waterways, Wetlands, Floodplains, and Other Natural Resources**

**a.    All Build Alternatives Have Similar Impacts**

The impacts to wetlands and waterways summarized in Table 4-20 indicate that all of the build alternatives that were considered have similar, if not identical, impacts.

**Table 4-20: Summary of Impacts to USACE/MDE Wetlands and Waterways Corridor-wide**

| Type | Classification | ALT 9 | | ALT 8 & ALT 9* | | ALT 9M | | ALT 13 | | ALT 13B | | ALT 13C | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | AC | SF | AC | SF | AC | SF | AC | SF | AC | SF | AC | SF |
| Wetlands | PFM | 3.7 | 162,549 | 8.9 | 387,750 | 8.9 | 387,750 | 4.0 | 173,615 | 8.6 | 162,589 | 4.0 | 172,980 |
| | PFO | 10.7 | 464,917 | 11.4 | 497,307 | 11.2 | 488,314 | 11.5 | 499,176 | 11.4 | 498,180 | 11.4 | 498,356 |
| | PSS | 1.0 | 45,539 | 1.1 | 46,802 | 1.1 | 46,802 | 3.1 | 46,802 | 1.1 | 46,802 | 1.1 | 46,802 |
| | **Total** | **15.4** | **673,000** | **16.3** | **711,850** | **16.1** | **700,412** | **16.5** | **719,590** | **16.3** | **710,071** | **16.5** | **717,940** |
| | | LF | SF | LF | SF | LF | SF | LF | SF | LF | SF | LF | SF |
| Waterways | Ephemeral | 10,629 | 46,058 | 11,167 | 47,298 | 11,135 | 47,558 | 11,199 | 47,558 | 11,167 | 47,298 | 11,196 | 47,549 |
| | Intermittent | 84,252 | 368,275 | 65,354 | 376,047 | 64,980 | 373,177 | 65,580 | 373,839 | 65,287 | 372,041 | 65,445 | 374,103 |
| | Perennial | 73,028 | 1,470,373 | 79,401 | 1,424,712 | 79,124 | 1,416,147 | 80,205 | 1,432,726 | 79,368 | 1,425,235 | 79,951 | 1,429,246 |
| | POW* | N/A | 64,134 | N/A | 64,134 | N/A | 64,134 | N/A | 64,134 | N/A | 64,134 | N/A | 64,134 |
| | **Total** | **151,912** | **1,875,790** | **155,922** | **1,309,586** | **155,229** | **1,893,026** | **156,984** | **1,920,205** | **155,822** | **1,908,693** | **156,612** | **1,915,242** |

DEIS, at 4-81.

This conclusion is confirmed in the JPA:

In Maryland, DEIS Build Alternative impacts range from **16.08 to 16.52 acres of wetlands, and 151,880 to 153,635 linear feet of streams. Each alternative would permanently impact 1.48 acres of Palustrine Open Waters (POWs)**. These impacts occur in the following three federal HUC-8 watersheds: Middle Potomac-Anacostia Oeeoquan, Middle Potomac-Catoctin, and Patuxent. **In Virginia, each DEIS Build Alternative would impact a total of 0.05 acres of wetland and 3,349 linear feet of streams in the Middle Potomac-Catoctin watershed.**

DEIS, JPA, Part 13, at 4 (emphasis added).

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 61

Table 3-12 provides a list of direct impacts to surface waters, wetlands, and 100-year floodplain, by acreage.

| Table 3-12: Natural Resources Direct Impacts | | | | | | |
|---|---|---|---|---|---|---|
| **Alternative** | **5** | **8** | **9** | **10** | **13B** | **13C** |
| Surface Water (linear feet) | 149,800 | 152,000 | 152,000 | 152,000 | 151,900 | 152,600 |
| Wetlands (acres) | 15 | 16 | 16 | 16 | 16 | 16 |
| 100-Year Floodplain (acres) | 114 | 120 | 120 | 120 | 120 | 120 |
| Unique and Sensitive Areas (acres) | 395 | 408 | 408 | 411 | 407 | 409 |
| Targeted Ecological Areas | 75 | 77 | 77 | 77 | 77 | 77 |
| Green Infrastructure Hubs | 42 | 45 | 45 | 46 | 44 | 44 |
| Green Infrastructure Corridors | 279 | 286 | 286 | 288 | 286 | 287 |
| Rare Threatened and Endangered Species Habitat (acres) | 177 | 183 | 183 | 183 | 183 | 183 |
| FIDS (acres) | 25 | 28 | 28 | 28 | 28 | 28 |
| Forest Canopy (acres) | 1,434 | 1,497 | 1,497 | 1,515 | 1,489 | 1,503 |

DEIS, App. O, at 56. Other than alternative 5, which the Agencies excluded from further consideration, all the alternatives have almost identical impacts on all of the natural resources listed.

There is virtually no difference in impacts on Maryland wetlands and streams regardless of which alternative is selected, and no difference at all in impacts to Palustrine Open Waters and Virginia wetlands and streams. The DEIS fails to consider any alternatives, other than the no build alternative, that might have adverse environmental impacts. The NEPA process is intended to provide "a full and fair discussion of [the project's] significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. None of the alternatives considered would avoid or minimize adverse impacts. Furthermore, the DEIS fails to demonstrate that there is no practicable alternative with less extensive impacts to wetlands and waterways than the proposed highway expansion alternatives.

**b.    The DEIS Fails to Study or Mitigate Indirect Impacts**

The DEIS does not contain any examination of indirect impacts from the build alternatives, let alone consider ways to mitigate those impacts. First, the Agencies' analysis of downstream impacts from stormwater is conclusory and incomplete. The only information provided on this issue is a conclusion that some indirect downstream impacts will occur, but they would be:

minimized through the development and application of approved erosion and sediment control plans and stormwater-related best management practices (BMPs). In addition, coordination with state and local agencies overseeing water resources in the ICE Analysis Area will continue throughout the study to determine appropriate mitigation for impacts.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 62

DEIS, at 4-154, 4-156 (Table 4-41).

Second, the DEIS is silent on the impact that climate change and the associated increase of heavy rain events will have on future volumes of stormwater. It is well-accepted that climate change can significantly increase stormwater. EPA has said that "climate changes, such as the amount, timing, and intensity of rain events, in combination with land development, can significantly affect the amount of stormwater runoff that needs to be managed."[116] MDE has stated that:

More intense rainfall resulting from the combined effects of global climate change and localized factors, for example, the influence of the urban canopy on rainfall, is likely to increase peak flooding in urban environments. Continued increase in impervious surfaces attendant with development would exacerbate this problem. Aquatic ecosystems will likely be degraded by more flashy runoff and increased temperatures. Intensified rainfall events and warmer surfaces (roads, roofs, etc.) would result in rapid increases in stream temperatures, limiting habitat suitability for native fishes and other organisms. Higher peak flows and degraded streams would also transmit more nutrients and sediments to the Chesapeake Bay and its tidal tributaries, contributing to water quality impairment in the estuaries.[117]

The DEIS must consider how anticipated increases of stormwater will impact receiving waterways, and must incorporate this information into the stormwater volume and impact modeling conducted by the Agencies to determine the impact of the build alternatives on receiving waterways. Areas of the Beltway already flood during heavy rain,[118] making it paramount that the analysis conducted for any added lanes should incorporate anticipated increases of stormwater in the cumulative impacts analysis.

**c.    The Limit of Disturbance Delineation is Inaccurate**

The DEIS incorrectly defines the area that will be disturbed by the proposed expansion by too narrowly delineating the LOD and fails to account for all impacts to streams and

---

[116] EPA, *Stormwater Management In Response To Climate Change Impacts: Lessons From The Chesapeake Bay And Great Lakes Regions (Final Report)*, EPA/600/R-15/087F (Mar. 2016), at 1, https://cfpub.epa.gov/si/si_public_file_download.cfm?p_download_id=536300&Lab=NCEA.

[117] MDE, University of Maryland, *Maryland Department of Natural Resources, Comprehensive Assessment of Climate Change Impacts in Maryland*, Chapter Two (July 2018), at 2, https://mde.state.md.us/programs/Air/ClimateChange/Documents/FINAL-Chapt%202%20Impacts_web.pdf.

[118] Jason Samenow and David Streit, *Torrential Rain Triggers Widespread Flooding in D.C. Area, Inundating Roads, Stranding Motorists, Up to 6 Inches of Rain Fell*, Washington Post (Sept. 10, 2020), https://www.washingtonpost.com/weather/2020/09/10/dc-area-forecast-tropical-downpours-today-could-produce-areas-flooding/.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 63

wetlands. The current LOD is based on standard roadway sections and modeling and fails to include all actual impacts. This approach minimizes the appearance of impacts and artificially limits the scope of impacts analyzed. The LOD does not adequately address likely environmental impacts to natural resources, including impacts to receiving waterways, as some of these impacts occur outside the artificially narrowed LOD.

Detailed field review demonstrates that the current LOD does not comprehensively reflect expectations of environmental impact and what would be needed to restore and mitigate after the Project. The LOD needs adjustments in many locations, often to allow for stable outfall transitions, stormwater management, or rehabilitation of impacted assets. Both the locations and the choice between direct access ramps or slip lanes appear to be based entirely on geographic impact without consideration of the relationship to existing and future origin-destination patterns, planned land use, economic development considerations including major facility planning, social equity, safe and efficient access to transit facilities, or effect on local traffic patterns.

As indicated earlier, the private concessionaire, not the state, will be responsible for the design and engineering of the highway improvements. Therefore, the access decisions presented within the LOD are based on the Agencies' preliminary planning and design without adequate consideration of local planning and needs, and with minimal, if any, engineering and constructability analyses. Moreover, the Agencies have created the LOD without the detailed analysis that the private concessionaire will apply during the design phase, particularly based on the economics of the project.

An example is provided by the LOD adjustments that were made to Rock Creek SVU2. The road edge along Rock Creek near Cedar Drive has been designed with a retaining wall in an attempt to avoid impacting Rock Creek. See DEIS, APP. D, EnvMapping_web_part2, Map 67. The LOD does not account for impacts to Rock Creek that would likely occur in-stream because the LOD stops at the bank. Installation of the retaining wall proposed for this location would impact the stream, including increasing instability to the streambank and the stream bed. Moreover, for the stream to have long term stability along the retaining wall (and not undermine the wall), in-stream stabilization measures will be necessary, which are not accounted for in the DEIS because the stream is not included within the LOD. The LOD needs to include all impacted areas and should also include potentially impacted areas given that the LOD may need to be revised once design details are available, which will occur after the completion of the NEPA process.

> d. **The DEIS Fails to Sufficiently Analyze the Impact to Floodplains and Increase in Flood Risks**

The DEIS states that, "[t]he full [indirect and cumulative effects] Analysis Area contains approximately … 6,700 acres of FEMA's 100-year floodplains." DEIS, at 148. Yet, despite this enormous impact to floodplains, the Agencies have decided, "[f]loodplain analysis will be conducted at a later stage of design." DEIS, at 4-95. The DEIS fails to analyze how the build alternatives would increase flood risks by changing the hydraulic function and elevation of floodplains. There is consensus that impervious surface increases flooding and models exist that would allow the Agencies to estimate the causal effects of impervious surface on flood

magnitude.[119] The Agencies must conduct a floodplain impact analysis that looks at direct and cumulative effects in the DEIS and the public must be afforded the opportunity to comment on the Agencies' findings.

> D. **The DEIS Lacks Information Supporting the Decision Not to Require a Permit for Construction at the American Legion Bridge**

The DEIS states that the U.S. Coast Guard (USCG) will not be requiring a bridge permit for the proposed construction at the American Legion Bridge, despite the fact that such construction would usually require a permit under 33 C.F.R. § 115.01. The Agencies do not explain, but simply state that "the USCG stated that a bridge permit would not be required under Section 10 [of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403)] for the American Legion Bridge" and cite to Appendix N of the Natural Resources Technical Report (Appendix L). DEIS, at 4-79. We were unable to locate this letter in the appendix. If this letter is included somewhere else within the DEIS documents, please indicate where it is located. If it is not included in the DEIS, the Organizations request that the Agencies make this letter and any other information supporting the bridge permit determination available to the public and provide the public with an opportunity to comment on this information.

> E. **The DEIS Fails to Adequately Identify and Analyze Impacts on Aquatic Species, Aquatic Habitat, and Fisheries**

The Project would impact approximately 152,000 linear feet of waterways, and yet the DEIS fails to provide a detailed description and analysis of the impacts of the Project on aquatic biotic resources. Instead the DEIS provides only a "watershed quality index" that includes a brief narrative description ("good," "poor," "very poor") of existing aquatic conditions for habitat, benthic invertebrates, and fish but provides no analysis of direct or indirect effects on aquatic biotic resources. *See* DEIS, at 4-106. The DEIS Natural Resources Technical Report (NRTR), *see* DEIS, App. L, is referenced several times as containing further information regarding impacts to aquatic resources, but this appendix also fails to indicate how aquatic habitat, benthic invertebrates, or fish will be impacted by the build alternatives. Appendix L simply provides additional information on the current conditions of aquatic habitat, fish populations, and benthic macroinvertebrates, DEIS, App. L, at 113 to 146. The analysis of impacts in the NRTR is limited to one conclusory statement:

---

[119] Erica Gies, *Expanding Paved Areas Has an Outsize Effect on Urban Flooding*, Scientific American (May 15, 2020) ("[E]very time a city expands roads, sidewalks or parking lots by one percentage point, the annual flood magnitude in nearby waterways increases by 3.3 percent."), https://www.scientificamerican.com/article/expanding-paved-areas-has-an-outsize-effect-on-urban-flooding1/; Annalise G. Blum, Paul J. Ferraro, Stacey A. Archfield, Karen R. Ryberg, *Causal Effect of Impervious Cover on Annual Flood Magnitude for the United States*, Geophysical Research Letters, Vol. 47, Issue 5, e2019GL086480 (Feb. 13, 2020), https://doi.org/10.1029/2019GL086480.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 65

all Screened Alternatives have the potential to affect aquatic biota in the corridor study boundary due to direct and indirect impacts to perennial and intermittent stream channels. Stream channel impacts associated with the Screened Alternatives range from 153,702 to 156,984 LF and wetland impacts range from 15.4 to 16.5 acres. Impacts are provided in more detail in Section 2.3.3 and in Table 2.9-58 and Table 2.9-59 below."

DEIS, App. L, at 146.

The citations referenced in the above excerpt from the DEIS provide no further analysis, but rather present summaries of the amount of impervious surface, in feet and acres, that would be added under the build alternatives. The linear feet and acres of impervious surface to be added by the build alternatives tells the Agencies and the public nothing about how the build alternatives would impact aquatic biota.

Given the complete lack of information on impacts, it is no surprise that the DEIS also fails to provide any information on how the Agencies plan to mitigate potential impacts to aquatic biota. Section 4.18.4 of the DEIS states that MDOT SHA will continue to coordinate with regulatory agencies and resource managers to identify sensitive aquatic resources and determine potential avoidance and minimization as Project designs are refined, DEIS, at 4-109, but these issues must first be addressed in the DEIS in order for the environmental impacts of the Project to be considered. There is general information on aquatic resources and mitigation in several DEIS appendices, but none of this information provides any analysis of impacts to the existing aquatic biota. See DEIS, NRTR, App. N, Agency Correspondence; DEIS, App. M, AMR; DEIS, NRTR, App. M; DEIS, App. N, Compensatory Mitigation Plan, App. A – M. The DEIS must be supplemented with sufficient data to analyze direct and indirect effects on biotic aquatic resources and provide a detailed description of proposed mitigation of those impacts.

The delineated parameters of the Corridor Study Boundary define the area in which data on existing environmental conditions were gathered: 300 feet on either side of the centerline of I-495 and I-270. DEIS, at 4-2. This area is too limited to fully evaluate the direct effects of the Project on aquatic biota in streams and wetlands and is restricted to evaluate indirect downstream effects. For direct effects, the study boundary needs to be expanded to include all waterways and wetlands that would receive stormwater from or otherwise be impacted by construction of the Project. For indirect effects, the analysis should consider all cumulative and secondary effects on aquatic ecosystems, including those downstream from the waters that are directly impacted.

Separately, the Organizations request that the Agencies reference in the body of the DEIS the aquatic biota maps that currently are buried in appendices. See, e.g., DEIS, NRTR, App. B, Natural Resources Inventory Mapbook, Part1 to Part 4; See also, NRTR, App. K, Aquatic Biota and Surface Water Sampling Monitoring Map. Although this information does not help the public determine the potential impacts of the Project on aquatic biotic resources, it at least provides information on the location of these resources.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 66

**F.      The DEIS Fails to Adequately Identify and Analyze Impacts on Federal and State Rare, Threatened, or Endangered Species and Habitats**

The Endangered Species Act establishes a process for identifying and protecting plant and animal species that are "threatened" or "endangered." 16 U.S.C. §§ 1533-1544. Section 7 of the ESA requires federal agencies to consult with the FWS and National Marine Fisheries Service to make sure that any proposed federal agency action is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [the species' critical] habitat . . . ." 16 U.S.C. § 1536(a)(2). If FWS or NMFS advises the agency that the proposed action area includes neither a listed species nor its critical habitat, then there is no need for further consultation. 50 C.F.R. § 402.12(d)(1). However, if the agency determines that the action is likely to adversely affect a listed species or its critical habitat, then the agency must engage in formal consultation, which requires the agency to prepare a "biological assessment" of the action and requires FWS or NMFS to issue a "biological opinion" as to whether the action is likely to "jeopardize the continued existence of any listed species or destroy or adversely modify" critical habitat. 50 C.F.R. § 402.14(h).

In addition, the agencies may need to reopen the consultation process when "new information reveals effects of the action that may affect listed species or critical habitat." 50 C.F.R. § 402.16(b). If the biological opinion finds jeopardy of species or destruction or adverse modification of critical habitat, the FWS or NMFS must suggest "reasonable and prudent alternatives" to the proposed activity that would not violate the ESA. 16 U.S.C. § 1536(b)(4). The agencies would have to agree to a reasonable and prudent alternative approved by FWS or NMFS and receive an incidental take statement from FWS or NMFS before the proposed action can move forward. Id.

The Maryland Nongame Endangered Species Conservation Act regulates activities in a similar fashion but applies to impacts on plants and wildlife, including their habitats, listed on the Maryland Threatened and Endangered Species list. Md. Code Ann., Nat. Res., § 10-2A-01 to 10-2A-09. The Maryland Threatened and Endangered Species list is more expansive than the federal list and also requires protections for animals that are deemed in "Need of Conservation." In Virginia, federally listed threatened and endangered wildlife species are protected under the Virginia Endangered Species Act of 1972, Va. Code Ann., § 29.1-563 to 29.1-570, and Virginia's listed threatened and endangered plant and insect species are protected under the Endangered Plant and Insect Species Act of 1979. Va. Code Ann., § 3.2-1000 to 3.2-1011). The Virginia Threatened and Endangered Species list also is more expansive than the federal list.

**1.      The DEIS Fails to Adequately Identify Impacts on the Northern Long-Eared Bat and Indiana Bat**

Two federally listed bat species, the Northern Long-Eared Bat and Indiana Bat, have been identified by FWS as potentially being impacted by the build alternatives. DEIS, at 4-111. Therefore, a formal ESA § 7 consultation must take place, requiring FHWA to perform biological assessments and FWS to issue biological opinions pursuant to 50 C.F.R. § 402.14(h). The DEIS states that field studies will be conducted to identify whether the bats are using habitat that may be impacted by the build alternatives. DEIS, at 4-111. It appears that no biological



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 67

opinion has been issued yet, given that none is referenced in the DEIS. Moreover, the field studies FWS directed FHWA to conduct have not yet been performed. DEIS, at 4-111. The biological assessments along with the FWS determinations as to whether the build alternatives will cause "jeopardy or adverse modification" must be completed prior to the conclusion of the NEPA process. Furthermore, if FWS determines that the species may be jeopardized, destroyed or adversely modified, then the Project must incorporate the alternative actions suggested by FWS.

 2.    **The DEIS Fails to Adequately Identify Maryland Aquatic Species and Fails to Account for Impacts to Maryland and Virginia Species**

The DEIS does not identify Maryland special-status aquatic species that may be present in waterways within the corridor study boundary area or areas that may be affected downstream. Some fish species and aquatic invertebrate species possibly occurring in the project area are identified in Appendix N of DEIS Appendix L (NRTR: Agency Correspondence), however, it is unclear whether this appendix provides the complete list of Maryland aquatic rare, threatened, or endangered species. Importantly, there are a number of state rare, threatened or endangered species identified in close proximity to the Project, including freshwater mussels, several wet meadow plants and a rare crayfish. Several of the State-listed species are sensitive to changes in hydrology, sedimentation, and temperature. The wetlands review that the Agencies conducted relied solely on the National Wetlands Inventory, an out-of-date resource that underrepresents forested wetlands. An extensive on-the-ground wetland survey should be conducted along the Project route with specific attention to wetlands that could, if disturbed, result in changes to hydrology, temperature or sedimentation. This information should be provided in the main DEIS document.

The DEIS also fails to provide any information on how the Agencies plan to avoid, and if necessary, mitigate any harm to Maryland or Virginia rare, threatened, or endangered species. *See* DEIS, at 4-109 to 4-112. All proposed mitigation measures should be included in NEPA documents to provide the public with information regarding how the Agencies plan to avoid illegal takings of these species during any proposed construction and operation of the build alternatives.

 G.    **The DEIS Does Not Sufficiently Evaluate Hazardous Materials**

The DEIS does not adequately assess hazardous materials along the highway corridors. It identifies hazardous waste sites but does not consider the specific hazardous substances that may be present nor their site distribution. At a minimum, water and soil sampling for hazardous substances of concern should be conducted at the 65 High Priority sites identified in the DEIS. A discovery of additional hazardous materials after the EIS is completed may cause expensive delays in the Project, with any required cleanup likely to be paid for with taxpayer funds rather than by the private sector. But the DEIS nevertheless postpones investigation of this issue until after a decision on the alternatives is made.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 68

The DEIS states:

> At the time of this assessment, the anticipated depths of subsurface disturbance for areas with known or potential hazardous waste or contaminants is uncertain and additional design modifications may avoid many, if not all, of the identified sites of concern and PECs [Potential Environmental Concerns]. If, following the selection of a preferred alternative, proposed construction could impact an identified or potentially hazardous waste or contaminated site, the Final EIS would address and resolve issues associated with the site(s), identified by the Study Team, raised by the public and responsible government agencies.

DEIS, App. K, at 13. First, it is unclear what the Agencies propose to do once a preferred alternative is selected. Would the selection change if it would impact contaminated sites? This question argues for performing a more thorough investigation of hazardous materials in the first place and presenting the information in the DEIS, which also would allow the public to review and comment on the issue.

According to the DEIS, the hazardous materials investigation was based on a one-quarter mile buffer from the limits of disturbance. DEIS, at 4-2, 4-72. The DEIS also explains that the build alternatives would result in similar limits of disturbance. *Id.* at 4-23. Therefore, as explained in the DEIS, the number of sites of concern for hazardous materials is the same for all the build alternatives. *Id.* at 4-73. Whether proposed construction could impact a potentially hazardous waste or contaminated site should have been evaluated before releasing the DEIS; the Agencies must not move forward with this Project before performing and releasing this evaluation.

It appears that there has been no soil or groundwater sampling or reporting of hazardous substances and that there will not be any until construction starts. Nor does there appear to be any system proposed to monitor for hazardous substances during construction, after soil disturbance occurs due to the construction or severe weather events.

Appendix K states that the Agencies evaluated potential sites of concern within a one-quarter mile buffer of each of the screened alternatives using a methodology comparable to the 2005 Initial Site Assessment for the Capital Beltway Study (MDOT SHA, 2005). DEIS, App. K, at 10. Appendix K further states that "Seven criteria were used to rank the sites of concerns based on the general ranking methodology used in the Draft December 2005 Initial Site Assessment Capital Beltway Study." *Id.* at 11. However, the Agencies have refused to provide the referenced Capital Beltway Study, precluding meaningful review of this methodology. *See infra* Section II.P.4.a. The Agencies must not move forward with the NEPA process until this information is made publicly available.

The Sites of Concern Priority Maps included in Appendix K show 22 very large pink areas, within and spreading out from the Limit of Disturbance, representing Listed Site/Unknowns, that is, very large areas where the presence or absence of hazardous waste is unknown. There does not seem to be any plan for investigating potential hazards in these areas before construction begins.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 69

Appendix Q of the DEIS (Conceptual Mitigation Report) says that hazardous waste sites identified as High Priority in that appendix, mapped in bright red, with "the potential for contaminant mobilization within or adjacent to the LODs of the Build Alternatives," and which include "gasoline stations, businesses operating at former gasoline stations, auto repair facilities, dry cleaning facilities, former dry cleaning facilities, government facilities, landfills, and the Joint Base Andrews Air Force Base National Priorities List site . . . may require additional investigation to determine the extent and location of existing contaminants and whether or not these contaminants would impact construction activities. These sites have a high potential for contaminant mobilization." DEIS, App. Q, at 37. Appendix Q also confirms that, for the 22 sites in pink on the Sites of Concern Priority Maps, a "review of detailed site documentation for properties within and in vicinity of the final LODs would occur in future design phases of the Study, when property access is obtained to characterize contaminant distributions, and/or their potential for mobilization during construction activities." *Id.* In other words, the DEIS postpones this analysis, as noted above, leaving taxpayers to bear the liability for risks from unknown hazardous materials. *See supra* Section I.

The 83 sites identified in Appendix Q as Moderate/High Priority and the 34 sites identified as Moderate Priority "could include: underground storage tanks containing materials other than gasoline, jet fuel, kerosene fuel, waste oil or solvents, surface dumps with empty drums, unidentifiable mounds [sic] aboveground storage tanks with surface stains, suspected Polychlorinated Biphenyl containing transformers, stressed vegetation, and hazardous materials storage sites. These sites may or may not require additional evaluation and characterization based on the needs of the final design and construction in the area." DEIS, App. Q, at 37. Again, the DEIS postpones this analysis and allows for future surprises.

Appendix Q states:

Because the study corridors have been used for vehicular traffic since [the Beltway's and I-270's] construction in the 1950s, it's reasonable to assume that the highway has been the scene of several vehicle accidents, break-downs, and other automotive issues – due to both its daily use and its required maintenance activities. These would have resulted in numerous releases of fuel and other petroleum oils – including leaded gasoline before its gradual phase-out in the late 1970s. Since the locations of these releases **and their subsequent subsurface transport** are poorly documented, this hazardous material concern would need to be considered a non-point source pollution concern affecting the entire corridor. Pollutants of concern would be diesel-range and gasoline-range petroleum products, and hazardous metals. This concern would be most pronounced within the urbanized areas and other sections of high vehicle use along the corridor. Since this contaminant risk cannot be quantified or used in addressing areas of greater or lesser priority, this concern was not evaluated as part of this assessment. However, it is recommended that this non-point source pollution concern should be addressed in any PSI [Preliminary Site Investigation] conducted within the investigation area, **with the possibility that contingency plans for contaminated soils would need to be initiated.**

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 70

DEIS, App. Q, at 38 (emphasis added). In other words, the whole corridor is likely contaminated from vehicle accidents, including major fluid spills, such as the tank truck that flipped on the Maryland side of the American Legion Bridge on March 28, 2019, releasing a substantial quantity of fuel.[120] But the Agencies do not evaluate this contamination at all in the DEIS, despite their obligation under NEPA to take a hard look at all the environmental impacts in the DEIS.

Appendix Q further states:

**Following the evaluation of additional information, subsurface sampling would be conducted for those properties needing additional soil and/or groundwater analysis beyond the information documented in detailed regulatory records.** The PSIs would implement a tiered approach to any additional investigation based on the risk of contaminant mobilization, distance from the alignment, and likelihood of impact due to environmental factors such as depth to groundwater and construction requirements (refer to **DEIS Chapter 4, Section 4.23.2** and *Hazardous Materials Technical Report* (**DEIS Appendix K**) for additional details).

DEIS, App. Q, at 38 (first emphasis added). Similarly, Appendix K recommends that Preliminary Site Investigations (PSIs) be conducted prior to construction by MDOT SHA. DEIS, App. K, at 26. The DEIS explains that after conducting PSIs, the "developer would be required to use best management practices to minimize the release of any hazardous materials during construction." DEIS, at 4-158. Again, these are issues that should be investigated and addressed now, rather than after decisions are made. Because the build alternatives have the same LODs and the hazardous materials investigation was based on a one-quarter mile buffer from the LODs, there does not appear to be any difference between the build alternatives that would justify waiting for the selection.

Relatedly, the DEIS explains:

Site owners of many of the identified properties may have undertaken additional site characterization studies and/or remediation pursuant to various state and federal regulatory programs, including UST, RCRA, CERCLA, and VCP requirements. Prior to designing the PSI, coordination should be made with MDE, VDEQ and USEPA to obtain additional information on the identified properties in order to further assess potential impacts anticipated during project construction and develop the scope for additional investigation.

DEIS, App. K, at 26. This statement suggests that information may already exist characterizing and addressing some of the hazardous materials issues likely to arise from the build alternatives.

---

[120] Jennifer Ortiz and Reem Nadeem, *Traffic Terrors: After 13-Hour Shutdown, Lanes Reopen on Inner Loop at American Legion Bridge*, WTOPnews (Mar. 29, 2019), https://wtop.com/local/2019/03/lanes-reopen-on-inner-loop-on-american-legion-bridge/.



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 71

It appears, however, that the Agencies did not attempt to obtain it, or even find out which of the identified properties have undertaken additional site characterization or remediation. The DEIS should not ignore this important data.

The DEIS also seems to rely on an assumption that only point sources of hazardous wastes within a quarter mile of the DEIS analysis area need be considered. This is a faulty assumption for two reasons. First, the LOD is inaccurately reported and far too small for the actual proposed build alternatives. *See supra* Section II.C.7.c. Second, no reason is provided for the quarter mile cut off. There is virtually no attention paid (there are a few exceptions) to potential plumes of hazardous waste extending beyond the LOD, either as they exist now or as they might be disturbed by construction (highway or otherwise) or by the torrential rain events the region is experiencing more and more often with climate change; for example, there was a 6" plus rain event on Sept. 10, 2020, centered on Hyattsville but also reaching close to the existing Beltway near New Hampshire Ave.[121] Even pollutants not particularly soluble in water can migrate through soils during such events. The decision to only analyze within a quarter mile of the LOD is without justification.

Furthermore, there does not seem to be any analysis of hazardous wastes in areas proposed for mitigating wetland and watershed loss, nor any proposal to proactively analyze these areas for such wastes. While many of these proposed sites are in rural or relatively undeveloped areas, agricultural practices in the past included the use of long-lasting toxic chemicals such as arsenic. If these sites are disturbed by land-moving equipment in the process of (re)constructing stream channels and wetlands, toxic chemicals can be mobilized and moved into ground and surface water.

The DEIS also improperly ignores PFAS contamination. Andrews Naval Air Force Base on I-495 is on the National Priorities List and is known to have contaminated soil, sediment, surface water and groundwater with petroleum and hazardous chemicals, including PFAS. DEIS, App. E to App. K, at PDF pp. 28-29.[122] The DEIS makes no further mention of PFAS contamination at Andrews Air Force Base or other sites. On February 14, 2019, EPA published

---

[121] Jason Samenow and David Streit, *Torrential Rain Triggers Widespread Flooding in D.C. Area, Inundating Roads, Stranding Motorists, Up to 6 Inches of Rain Fell*, Washington Post (Sept. 10, 2020), https://www.washingtonpost.com/weather/2020/09/10/dc-area-forecast-tropical-downpours-today-could-produce-areas-flooding/.

[122] *See also* Letter from Lee Currey to Community Water Systems, et al., PFAS (Dec. 18, 2019), https://mde.maryland.gov/programs/Water/water_supply/Documents/PFAS-MDE_memo_to_CommunityAndNCNT_PWS2019-12-18_final.pdf; Pat Elder, *Report Shows 15 Military Bases in Maryland Contaminated With PFAS, Civilian Exposure*, https://www.civilianexposure.org/report-shows-15-military-bases-in-maryland-contaminated-with-pfas/.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 72

the PFAS Action Plan.[123] On February 20, 2020, the EPA issued preliminary determinations to regulate PFOA and PFAS in drinking water and also issued a supplemental proposal regulating new uses of PFAS as requiring review under TSCA.[124] Currently, there are multiple legislative proposals in Congress to address the challenges associated with PFAS. There is no justification for ignoring this problem in the DEIS. Any site with PFAS should be identified and mitigation proposed for work in that area. PFAS discovered after the EIS process is completed are likely to cause delays and to be mitigated with taxpayer funds rather than being paid by or negotiated with the private sector. This concern is borne out by a P3 project in Australia (the West Gate Tunnel), involving one of the P3 bidders here, Transurban, which was recently delayed, with the builders trying to walk away, based on $1 billion cost overruns and claims that the extent of PFAS contamination discovered during construction was an unforeseeable force majeure event, despite warnings of the contamination early on.[125] The omission from the DEIS of any analysis of PFAS contamination appears to invite the exact same problems of substantial delay and cost overruns.

## II.     The DEIS Does Not Adequately Analyze Air Emissions

The Federal Highway Administration has a webpage devoted to transportation and public health (https://www.fhwa.dot.gov/planning/health_in_transportation/). It promises that "USDOT is committed to promoting better consideration of health outcomes in transportation." Among other objectives, the webpage indicates that the Agency is focused on improving air quality. In conjunction with the Centers for Disease Control, it developed a Transportation Health Tool (https://www.transportation.gov/mission/health/transportation-health-tool-background).

---

[123] U.S. Envtl. Prot. Agency, *EPA's Per- and Polyfluoroalkyl Substances (PFAS) Action Plan*, EPA 823R18004 (Feb. 2019), https://www.epa.gov/sites/production/files/2019-02/documents/pfas_action_plan_021319_508compliant_1.pdf.

[124] Press Release, U.S. Envtl. Prot. Agency, *EPA Announces Proposed Decision to Regulate PFOA and PFOS in Drinking Water* (Feb. 20, 2020), https://www.epa.gov/newsreleases/epa-announces-proposed-decision-regulate-pfoa-and-pfos-drinking-water.

[125] Timna Jacks and Clay Lucas, *Transurban Asked to Rip Up West Gate Tunnel Contract, Court Documents Allege*, The Age (June 9, 2020), https://www.theage.com.au/national/victoria/transurban-launches-legal-action-against-west-gate-tunnel-s-builders-20200609-p550on.html; Timna Jacks, *Transurban Warned on PFAS Before West Gate Tunnel Contracts Signed*, The Age (Jan. 31, 2020), https://www.theage.com.au/national/victoria/transurban-warned-on-pfas-before-west-gate-tunnel-contracts-signed-20200131-p53wna.html; Richard Willingham, *West Gate Tunnel Builders Seek to Terminate Contract Over Contaminated Soil, Transurban Tells ASX*, ABC News (Jan. 29, 2020), https://www.abc.net.au/news/2020-01-29/west-gate-tunnel-builders-seek-to-terminate-contract-over-pfas/11909402; Richard Willingham, *West Gate Tunnel Workers Laid Off After Delays Caused by PFAS Contamination*, ABC News (Jan. 22, 2020), https://www.abc.net.au/news/2020-01-23/west-gate-tunnel-workers-laid-off-contamination/11891456.

00022674

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 73

The Agency fails to meet this commitment in its consideration of potential air quality impacts from this extensive Project. To better address the air quality and related public health impacts, the air quality analysis must correct errors, add analysis and assessment of the additional items (as indicated) and perform a complete re-analysis of the Project to more accurately and completely assess and describe to the public and decisionmakers the potential negative air quality impacts of the Project.

1. **The DEIS Does Not Perform Sufficient Emissions and Health Analyses for Particulate Matter (PM$_{10}$ and PM$_{2.5}$) or Nitrogen Dioxide (NO$_2$)**

The DEIS only contains a microscale (or hot spot) analysis for carbon monoxide (CO). Based on scale and scope, this Project should have a hot-spot analysis performed for both species of particulate matter (PM$_{10}$ and PM$_{2.5}$) and for nitrogen dioxide (NO$_2$). These three pollutants are transportation-related pollutants for which there are short-term National Ambient Air Quality Standards (NAAQS). The fact that there are short-term NAAQS for these pollutants indicates that ambient concentrations can fluctuate significantly in the short term and that even short-term exposures can have negative health effects.

In establishing the NAAQS for the particulate matter species, USEPA reviewed health studies and found that particulate pollution exposure can lead to many problems, including:

- premature death in people with heart or lung disease

- nonfatal heart attacks

- irregular heartbeat

- aggravated asthma

- decreased lung function

- increased respiratory symptoms, such as irritation of the airways, coughing or difficulty breathing.

Similarly for NO$_2$, USEPA found that breathing air with a high concentration of NO$_2$ can irritate airways in the human respiratory system which can aggravate respiratory diseases, particularly asthma, evidenced by respiratory symptoms (such as coughing, wheezing or difficulty breathing) and leading to hospital admissions and visits to emergency rooms.

Although these pollutants all have serious negative health impacts, some are more dangerous to the public than others. McCubbin and Delucchi examined the health effects (morbidity, hospitalizations, and mortality) of various pollutants.[126] They found that CO, the

---

[126] D. R. McCubbin and M. A. Delucchi, *The Health Costs of Motor Vehicle Related Air Pollution*, Journal of Transport Economics and Policy 33, 253–286 (Sept. 1999).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 74

pollutant analyzed in the DEIS, has the fewest impact of the three on public health (although it is still of importance). They found that NO$_2$ has about 1.3 times more negative effects on public health than CO. Of most concern was particulate matter, where they found: "The most striking results are the large damages caused by ambient particulate matter (PM), and the large contribution of motor vehicles to ambient particulate levels." The authors calculated that PM exposure is about 50 times more damaging to public health than CO.

Appendix I of the DEIS states that the Project area is in attainment of the NAAQS for these three pollutants (NO$_2$, PM$_{10}$ and PM$_{2.5}$) and therefore a consideration of these pollutants is not necessary to meet the requirements of the transportation conformity regulations (40 C.F.R. Parts 51 and 93)Even if that is correct, there is nothing preventing the Project sponsors from considering these pollutants for the purposes of NEPA, to completely and thoroughly assess the impacts of the Project, and to fully inform the affected residents of, and visitors to, the area. In particular, NEPA requires the analysis of all environmental impacts, direct, indirect, and cumulative; the DEIS should take a hard look at the air impacts of the Project, including impacts that are caused by future segments of the P3 Program and associated land use changes.

Importantly, the attainment status of the overall area for PM$_{10}$, PM$_{2.5}$ and NO$_2$ is not representative of the air quality and the potential health outcomes in the more immediate area surrounding the Project. The pollutants at issue are microscale pollutants, meaning that their concentration can change greatly over short distances, as shown in the figure below.



*From "Prediction and analysis of near-road concentrations using a reduced-form emission/dispersion model"; Batterman, Zhang and Kononowech; Environmental Health; June 2010*

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 75

The concentration of these pollutants can vary substantially at only a few meters' distance. As a result, people in the houses, buildings, playgrounds, and on the sidewalks nearest the Project roadways will experience the greatest health impacts. The emission loading from additional vehicles traveling on the roadways due to this Project would serve to exacerbate existing pollutant concentrations. Despite the area's attainment status for some criteria pollutants, the actual concentrations of these microscale pollutants in the Project area and along its roadways are not known.

The attainment or non-attainment status of an area is determined by monitoring of ambient air quality at various locations that meet siting and equipment criteria promulgated by USEPA. None of these monitoring sites are in the Project area or even close to the Project area. Figures 2-1 through 2-3 of Appendix I show the locations of the nearest monitors for some of these pollutants. These monitors are located at substantial distances from the Project area and therefore do not represent air quality in the Project area nor at individual intersections or analysis sites in the Project area. The above figure shows how the concentration of an air pollutant, and thus its health impact, can taper off within less than 100 meters, yet the nearest ambient monitor for $PM_{2.5}$ and $PM_{10}$ is approximately 3.1 miles (almost 5,000 meters) from the Project area (Monitor 240330030 in Maryland) and the nearest monitor for $NO_2$ is approximately 2.0 miles (over 3,000 meters) from the Project area (Monitor 110010050 in the District of Columbia).

In addition, the Project area's attainment status for $PM_{2.5}$ is tenuous. Table 2-4 of Appendix I indicates that Monitor 110010051, located in the District of Columbia, has measured a weighted arithmetic mean concentration of $PM_{2.5}$ of 10.2 $ug/m^3$. This is very close to the NAAQS annual standard of $PM_{2.5}$ of 12 $ug/m^3$. Thus, even a small incremental contribution from this project could cause air quality in the Project area to exceed the health-based NAAQS for $PM_{2.5}$.

The air quality analysis for this Project must include a localized, hot-spot analysis for $PM_{10}$, $PM_{2.5}$ and $NO_2$, not just for CO. This localized analysis is necessary to inform the public, and in particular residents and visitors to the area, of the potential negative health effects associated with the Project which, as discussed above, stem more from PM and $NO_2$ than from CO. The current PM and $NO_2$ air quality monitoring sites do not provide useful information, for the reason explained above. Also, the near violation of the $PM_{2.5}$ NAAQS strongly suggests that any incremental addition of $PM_{2.5}$ pollution due to the Project could cause the entire region to be declared unhealthful for $PM_{2.5}$.

    a.    Fine Particulate Matter Conformity

Clean Air Act (CAA) Section 176(c), 42 U.S.C. § 7506(c), requires that federally approved highway and transit activities be consistent with ("conform to") the purpose of the State Implementation Plan (SIP). "Conformity to the purpose of the SIP" means that transportation activities will not cause or contribute to new air quality violations, worsen existing violations, or delay timely attainment of the relevant NAAQS or any interim milestones. *Id.*

The DEIS states that "The Air Quality Analysis Study Area (i.e., Montgomery County, Prince George's County, and Fairfax County) is in an attainment area for fine particulate matter

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 76

($PM_{2.5}$), and therefore transportation conformity requirements pertaining to $PM_{2.5}$ do not apply for this Project and no further analysis of $PM_{2.5}$ emissions were evaluated per FHWA guidance." DEIS at 4-59 (footnotes omitted). The DEIS also states:

For background, the EPA issued a final rule (81 FR 58010), effective October 24, 2016, on "Fine Particulate Matter National Ambient Air Quality Standards: State Implementation Plan Requirements" that stated, in part: "Additionally, in this document the EPA is revoking the 1997 primary annual standard for areas designated as attainment for that standard because the EPA revised the primary annual standard in 2012." (See: https://www.gpo.gov/fdsys/pkg/FR-2016-08-24/pdf/2016-18768.pdf). Accordingly, Fairfax County is no longer designated as maintenance for $PM_{2.5}$, and the associated USEPA regulatory requirements for conformity for $PM_{2.5}$ are eliminated for northern Virginia.

MDOT is correct in its plain reading that the Final Rule implementing the 2012 $PM_{2.5}$ NAAQS revoked the 1997 primary annual standard for areas designated attainment for that standard, the Washington, DC-MD-VA area had indeed been re-designated as maintenance for the 1997 $PM_{2.5}$ NAAQS,[127] and the Washington, DC-MD-VA area is in attainment of the 2012 $PM_{2.5}$ NAAQS. However, EPA cannot revoke conformity requirements for so-called "orphan areas," or areas that were designated nonattainment or maintenance for the now-revoked NAAQS. Thus, this Project will need to demonstrate conformity against the $PM_{2.5}$ maintenance plan, including with the $PM_{2.5}$ transportation conformity budgets, for the Washington, DC-MD-VA area, and the Agencies must analyze $PM_{2.5}$ emissions.

The 2016 Rule explained that areas that have been redesignated to attainment for the 1997 NAAQS "will be required to implement their approved maintenance plan for the 1997 primary annual $PM_{2.5}$ NAAQS and their PSD program. The approved maintenance plan can only be revised if the revision meets the requirements of CAA section 110(I) and, if applicable, CAA section 193." 81 Fed. Reg. at 58,142.

CAA § 193 prohibits modification of a control requirement in effect or required to be adopted as of November 15, 1990 (the date of enactment of the 1990 CAA Amendments), unless such a modification would ensure equivalent or greater emissions reductions. CAA § 172(e), which addresses relaxations of the NAAQS, requires protections for areas that have not attained the NAAQS prior to a relaxation by requiring controls that are at least as stringent as the controls applicable in nonattainment areas prior to any such relaxation.

When revoking the 1997 NAAQS, EPA explained that "Continued attainment of the 1997 primary annual $PM_{2.5}$ NAAQS in areas that have been redesignated to attainment for that NAAQS will be ensured through the ongoing implementation of the approved maintenance plan

---

[127] Approval and Promulgation of Air Quality Implementation Plans; District of Columbia, Maryland, and Virginia; Approval of the Redesignation Requests and Maintenance Plan of the Washington, DC–MD–VA Nonattainment Area for the 1997 Annual Fine Particulate Matter Standard, 79 Fed. Reg. 60,081 (Oct. 6, 2014).

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 77

that applies in these areas. These areas are required to implement their approved CAA section 175A maintenance plan for the 1997 primary annual PM$_{2.5}$ NAAQS." 81 Fed. Reg. at 58,143.

The United States Court of Appeals for the District of Columbia Circuit issued a decision in *South Coast Air Quality Management District v. E.P.A. (South Coast II)*, 882 F.3d 1138 (D.C. Cir. 2018), making this obligation clear. This case involved a challenge to EPA's final rule for implementing the 2008 Ozone NAAQS, the 2008 Ozone NAAQS Implementation Rule. The court vacated portions of EPA's 2008 Ozone NAAQS SIP Requirements Rule, in particular those providing that EPA could revoke conformity requirements for areas that were attaining the 2008 Ozone NAAQS but were in maintenance (or nonattainment) for the revoked 1997 Ozone NAAQS. The court explained that conformity requirements are "controls" subject to the CAA's anti-backsliding provisions. *Id.* at 1149. The court further explained that CAA anti-backsliding requirements apply to both maintenance and nonattainment orphan areas: "Even after revocation of the 1997 NAAQS, an orphan maintenance area is 'an area that *was* designated as a nonattainment area but that *was* later redesignated . . . as an attainment area.'" *Id.* at 1155. The court concluded that "the revocation of the 1997 NAAQS does not waive the unambiguous mandate that conformity requirements apply to orphan maintenance areas." *Id.* This is true regardless of whether the more recent NAAQS is more stringent.

Requirements for conformity do not differ from pollutant to pollutant, but instead are all governed under CAA § 176(c), 42 U.S.C. § 7506(c). The situation of the Washington, DC-MD-VA being an "orphan maintenance area" is therefore covered by *South Coast II* and conformity must be completed for this Project with regards to PM$_{2.5}$ under the 1997 NAAQS.

      b.    The DEIS Must Include a PM$_{2.5}$ Hot-Spot Analysis and an Analysis of PM$_{2.5}$ Health Impacts

In addition to the required conformity determination, the Organizations request that the Agencies perform a PM$_{2.5}$ modeling analysis to analyze the impact of emissions from the Project both on NAAQS compliance and on the public health.

First, the Agencies must perform a PM$_{2.5}$ hot-spot analysis based on the project being constructed in an orphan maintenance area (in addition to the reasons provided in Section II.H.1.) as explained directly above, the area is still subject to controls due to the CAA's anti-backsliding provisions. Moreover, the DEIS ignores other times a hot-spot analysis is required, for example: "New highway projects that have a significant number of diesel vehicles, and expanded highway projects that have a significant increase in the number of diesel vehicles;" and "Projects affecting intersections that are at Level-of-Service D, E, or F with a significant number of diesel vehicles, or those that will change to Level-of-Service D, E, or F because of increased traffic volumes from a significant number of diesel vehicles related to the project." 40 C.F.R. § 93.123(b)(1)(i), (ii). The DEIS states that the Project will accommodate increased movement of freight trucks. *See, e.g.*, DEIS, at 4-161. The Organizations therefore believe the proposed Project requires a hot-spot analysis. Or, regardless of CAA requirements, such an analysis should be done to truly take a hard look at the Project's environmental and human health impacts.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 78

Second, the EIS requirement serves two important functions: "It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The EIS is one of NEPA's action-forcing procedures to ensure that agencies take a hard look at the environmental consequences of proposed actions. *Id.* at 350.

It is scientifically established that increased PM$_{2.5}$ concentrations at levels below the current primary annual NAAQS (12 µg/m³) cause human health harms (such as respiratory, cardiovascular, nervous system, cancer, and mortality). The DEIS must not ignore these health impacts based on claims of purported conformity.

EPA itself has recognized this link:

- Evidence continues to support a linear, no-threshold concentration—response relationship, but with less certainty in the shape of the curve at lower concentrations (i.e., below about 8 µg/m³). Integrated Science Assessment for Particulate Matter (ISA), EPA/600/R-19/188, at ES-23 (Dec. 2019).

- Recent studies that focus on the shape of the C-R [concentration-response] curve expand upon the health effects evaluated in previous reviews and continue to provide evidence of a linear, no-threshold relationship between both short- and long-term PM$_{2.5}$ exposure and several respiratory and cardiovascular effects, and mortality. *Id.* at 1-48.

- For long-term PM$_{2.5}$ exposure, most of the evidence on the shape of the C-R curve comes from studies of mortality with some initial recent evidence from studies of respiratory and cardiovascular effects, as well as lung cancer mortality and incidence. Epidemiologic studies of long-term PM$_{2.5}$ exposure and mortality used a variety of statistical approaches and cutpoint analyses, which support a linear, no-threshold relationship for total (nonaccidental) mortality, especially at lower ambient PM$_{2.5}$ concentrations, with confidence in some studies in the range of 5–8µg/m³. Additionally, there is initial evidence indicating that the slope of the C-R curve may be steeper (supralinear) at lower concentrations for cardiovascular mortality. Evaluation of the C-R relationship is more limited for respiratory and cardiovascular effects, but overall initial assessments support a linear relationship, specifically at long-term PM$_{2.5}$ concentrations ranging from 10–12 and 5–10µg/m³, respectively. *Id.* at ES-19.

*See also* ISA at ES-9 to ES-17. The Independent Particulate Matter Review Panel, made up of former members of the EPA Clean Air Scientific Advisory Committee Particulate Matter Review Panel, recently explained:


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 79

We concluded that the current PM$_{2.5}$ standards are insufficient to protect public health, on the basis of a review of the scientific evidence from epidemiologic studies, toxicologic studies in animals, and controlled human exposure studies; this evidence is consistent within each discipline and coherent among the multiple disciplines in supporting a causal, biologically plausible relationship between ambient concentrations well below the current PM$_{2.5}$ standards and adverse health effects, including premature death.[128]

It is also scientifically certain that short-term exposure to PM$_{2.5}$ concentrations causes human health harms. EPA explains, "A large body of scientific evidence spanning many decades clearly demonstrates there are health effects attributed to both short-and long-term PM exposure, with the strongest evidence for a relationship between some health effects and PM$_{2.5}$." ISA at ES-22. EPA further explains that short-term exposure to PM$_{2.5}$ causes cardiovascular effects and mortality and is likely to cause respiratory effects. *Id.* at 1-20. A recent comprehensive study examining over 13 years of hospital admissions records for Medicare beneficiaries found:

For the rarely studied diseases, each 1 μg/m$^3$ increase in short term PM$_{2.5}$ was associated with an annual increase of 2050 hospital admissions (95% confidence interval 1914 to 2187 admissions), 12 216 days in hospital (11 358 to 13 075), US$31m (£24m, €28m; $29m to $34m) in inpatient and post-acute care costs, and $2.5bn ($2.0bn to $2.9bn) in value of statistical life. For diseases with a previously known association, each 1 μg/m$^3$ increase in short term exposure to PM$_{2.5}$ was associated with an annual increase of 3642 hospital admissions (3434 to 3851), 20098 days in hospital (18 950 to 21 247), $69m ($65m to $73m) in inpatient and post-acute care costs, and $4.1bn ($3.5bn to $4.7bn) in value of statistical life.[129]

The Organizations ask: Do the Agencies believe that there are no human health harms from PM$_{2.5}$ below the current primary annual NAAQS of 12 μg/m$^3$? If so, what is the basis for this belief? If not, why are the Agencies performing no analysis of the human health impact from PM$_{2.5}$ emissions caused by the proposed alternatives? There is no valid justification for not considering and analyzing these well-documented impacts.

---

[128] Independent Particulate Matter Review Panel, *The Need for a Tighter Particulate-Matter Air-Quality Standard*, N. Engl. J. Med. 383;7 (Aug. 13, 2020); *see also* Advice from the Independent Particulate Matter Review Panel (formerly EPA CASAC Particulate Matter Review Panel) on EPA's Policy Assessment for the Review of the National Ambient Air Quality Standards for Particulate Matter (External Review Draft –September 2019); Docket ID No. EPA–HQ–OAR–2015–0072 (Oct. 22, 2019).

[129] Yanguang Wei, et al., *Short Term Exposure to Fine Particulate Matter and Hospital Admission Risks and Costs in the Medicare Population: Time Stratified, Case Crossover Study*, BMJ. 2019; 367: l6258 (Nov. 27, 2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6880251/.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 80

Moreover, the DEIS fails to consider PM$_{2.5}$ concentrations at monitors close to the Beltway, I-270, or other nearby highways. A 2015 study using PM$_{2.5}$ monitoring at 150 meters (approximately 500 feet) from the Beltway in Largo, Maryland found that roadway traffic contributes 12 to 17% of the total PM$_{2.5}$ concentration.[130] The near road monitor consistently showed higher concentrations than Maryland's other, non-near-road monitors. Sadly, the estimated annual PM$_{2.5}$ concentration for the full years of the study was 13.0 μg/m$^3$, which is above the current standard of 12 μg/m$^3$. Further concerning, the data showed fifteen days during the monitoring period when the concentration exceeded 35 μg/m$^3$, with the highest 24-hour concentrations each year between 39.9 and 41.4 μg/m$^3$, and an hour when the concentration rose as high as 255 μg/m$^3$. These concentrations are at levels scientifically accepted to cause adverse health effects, including premature death. And that is without the additional construction and cars that the Project would create.

For whatever reason, MDOT did not continue monitoring near the Beltway and the DEIS does not even mention this study. But the study shows that were the Agencies to measure concentrations near the Beltway today, the concentrations would likely exceed or be close to exceeding the NAAQS. And the added PM$_{2.5}$ emissions from the Project, due to construction and increased vehicle miles traveled (which were not analyzed in the DEIS), would likely cause a near road monitor to exceed the NAAQS while also certainly causing negative health outcomes.

Unfortunately, Maryland does not currently operate any near road PM$_{2.5}$ monitors in the Washington, DC-MD-VA area, despite that area having over 2.5 million people. *See* 40 C.F.R. § 58.10(a)(8)(i), Appendix D § 4.7.1(b)(2) (requiring operational near-road PM$_{2.5}$ monitors in areas having over 2.5 million people by January 1, 2015). Washington, DC has one, along the Anacostia Freeway, which has different attributes from the Beltway and I-270, and the monitor has only one year of valid measurements (2019). That monitor and other non-near-road monitors also show elevated annual PM$_{2.5}$ concentrations,[131] which even if they do not violate the NAAQS are well above values that are known to cause harm. At these levels, small increases are proven to cause additional harms, yet the DEIS does not even consider these harms. The Agencies must analyze the impacts the Project, and its PM$_{2.5}$ emissions, will have on the public.

A study based on a road-widening project in London explained that there is clear evidence that new or expanded roads rapidly fill with either displaced or induced traffic, offsetting any short-term gains in eased traffic flows. More importantly, that study found:

PM$_{10}$ increased during the construction period up to 15μgm$^{-3}$ during working hours compared to concentrations before the road works. . . . After the completion of the

---

[130] Helen Ginzburg, et al., *Monitoring Study of the Near-Road PM$_{2.5}$ Concentrations in Maryland*, Journal of the Air & Waste Management Association Volume 65, 2015 - Issue 9 (Aug. 14, 2015), https://www.tandfonline.com/doi/full/10.1080/10962247.2015.1056887.

[131] *See* Design Values 2019, Fine Particulate Annual (PM$_{2.5}$) Standard, https://epa.maps.arcgis.com/apps/MapSeries/index.html?appid=bc6f3a961ea14013afb2e0d0e450b0d1.


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 81

widening there was an increase in all pollutants from the road during rush hour: 2–4$\mu$g m$^{-3}$ for PM$_{10}$; 1 $\mu$g m$^{-3}$ for PM$_{2.5}$; 40 and 8 $\mu$g m$^{-3}$ for NO$_X$ and NO$_2$, respectively.[132]

Another study found that "Annual average incremental PM$_{2.5}$ from major roadways ranged from 0.1 to 2.0 $\mu$g/m$^3$."[133]

A recent report found that highway vehicles are responsible for up to 0.55 $\mu$g/m$^3$ of ambient PM$_{2.5}$ in Virginia, with some of those emissions coming from bordering states such as Maryland.[134] The report summarized the measurable transportation-attributable health burden in Virginia, including a mean estimate of 190 premature deaths and $1.6 billion in social welfare costs. Moreover, this burden was found to disproportionately impact socially vulnerable communities.

Converting the pollutant increases from the proposed added lanes into harms using a concentration response curve shows the Project will harm the public, increase hospitalizations and cause premature deaths. A 2018 meta-analysis found "a 1$\mu$g/m$^3$ increase in PM$_{2.5}$ was associated with a 1.29% increase in all-age all-cause mortality (95% CI [Confidence Interval] 1.09-1.50) at a mean exposure of 10 $\mu$g/m$^3$, which decreased to 1.03% (95% CI 0.97-1.11) at a mean exposure of 15.7 $\mu$g/m$^3$ (the mean level across all studies), and to 0.82% (95% CI-0.52-1.12) at 30 $\mu$g/m$^3$."[135] The study found the "increase was larger for cardiopulmonary, cardiovascular and elderly mortality with 1.92% (95% CI 1.59–2.25), 1.46% (95% CI 1.25–1.67) and 1.61% (95% CI 1.35–1.85), respectively at a mean exposure of 10 $\mu$g/m$^3$, but smaller for

---

[132] Anna Font, et al., *Degradation in Urban Air Quality From Construction Activity and Increased Traffic Arising From a Road Widening Scheme*, Science of the Total Environment 497–498, at 123–132 (Aug. 14, 2014), https://reader.elsevier.com/reader/sd/pii/S0048969714010900?token=A5B950B19982401FAD8 BBACE5551B265662A D2645B417D342D369CEB6274AEF922E10C9C7494A18362653D794 DCBF24A.

[133] Anondo Mukherjee, et al., *Influence of Roadway Emissions on Near-Road PM$_{2.5}$: Monitoring Data Analysis and Implications*, Transportation Research Part D: Transport and Environment Volume 86, 102442 (July 2, 2020), https://www.sciencedirect.com/science/article/pii/S1361920920306295.

[134] *An Assessment of the Health Burden of Ambient PM$_{2.5}$ Concentrations in Virginia*, Industrial Economics, Inc. prepared for the Energy Foundation and Virginia Clinicians for Climate Action, at 8-10 (Oct. 28, 2020), https://cee8204b-70a4-447f-9567-a8b385f8bd93.filesusr.com/ugd/b42d13_16d1da1c63e84d328db4239aea371617.pdf.

[135] Alina Vodonos, Yara Abu Awad, and Joel Schwartz, *The Concentration-Response Between Long-Term PM$_{2.5}$ Exposure and Mortality; A Meta-Regression Approach*, Environmental Research 166, 677–689, at 679 (Aug. 1, 2018), http://www.scientificintegrityinstitute.org/ERMAPM25JS080118.pdf.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 82

respiratory and lung cancer deaths with 1.13% (95% CI 0.85–1.41) and 1.22% (95% CI 0.87–1.39), respectively."[136] "Moreover, geographical locations with higher percent of PM$_{2.5}$ sourced from traffic was significantly associated with higher estimates with a 2.05% increase in mortality rate (95% CI 1.89–2.81) per $\mu$g/m$^3$."[137] The study concluded:

Assuming that the space time models have higher effect estimates because of smaller exposure error, the best estimated all-cause mortality effect size at 10 $\mu$g/m$^3$ would be 1.61% (95% CI 1.18–2.04). In addition, our meta-regression restricted to studies with mean concentrations below 10 $\mu$g/m$^3$ was significant with a 2.4% increase per 1 $\mu$g/m$^3$, 95% (95% CI 0.8–4.0).[138]

The Agencies could use well-supported concentration-response curves such as this to estimate the mortality impacts of increased PM$_{2.5}$ emissions from the build alternatives. With millions of people living in Montgomery and Prince George's County, even a 1 $\mu$g/m$^3$ increase in PM$_{2.5}$ concentrations caused by the build alternatives compared to the no build alternative would lead to thousands of premature deaths, thousands more hospitalizations, and billions in lost social welfare costs. Real lives will be harmed by even small increases in PM$_{2.5}$ concentrations. To comply with NEPA and make a decision on the project with an understanding of its impacts, the Organizations request that the Agencies conduct PM$_{2.5}$ monitoring near the Beltway and I-270, analyze the current concentrations and increases that would be caused by the build alternatives, and study the health impacts of the build alternatives. NEPA requires that FHWA consider reasonable alternatives that will reduce emissions and pollutant exposures; it is not reasonable or legally permissible under NEPA for the Agencies not to use the best science available to estimate the impact of the build alternatives' emissions on concentrations of PM$_{2.5}$ and the corresponding health impacts that would result.

**2.      The DEIS's Air Quality Analysis Missed Parking Lots**

The air quality analysis that is reported in Appendix I missed an important source of emissions which should be included in the air quality studies. The CO analysis and the required analysis for PM$_{10}$, PM$_{2.5}$ and NO$_2$ (as described above) must include emissions from the operation of vehicles in nearby major parking lots (greater than 100 spaces).

The importance of parking lots as a source of indirect motor vehicle pollution has been well known for many years and has been the subject of regulation and permitting across the nation. *See, e.g.*, Oregon Department of Environmental Air Quality, Rule 340-254-0060, https://oregon.public.law/rules/oar_340-254-0060; North Carolina Department of Environment and Natural Resources, Guidelines for Evaluating the Air Quality Impacts of Transportation Facilities, https://www.buncombecounty.org/common/WncAir/forms/tf-guide.pdf; Broward

---

[136] *Id.* at 684.

[137] *Id.*

[138] *Id.*

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 83

County, Florida, Broward County Parking Facility License.
https://library.municode.com/fl/broward_county/codes/code_of_ordinances. Studies have found that levels of air pollution are higher (more unhealthful) in the vicinity of parking lots. Baltrenas, Kaziukoniene, and Kvausaskas discovered that nitrogen oxide (including $NO_2$) levels were up to 1.9 times greater than accepted levels and CO levels also exceeded acceptable levels.[139] (They did not look at $PM_{10}$ and $PM_{2.5}$.) Similarly, Steinberga and Kleperis found elevated levels of CO (up to 35% higher), nitrogen oxides (including $NO_2$) and volatile organic compounds (including benzene) near parking facilities.[140]

These findings are not surprising since vehicles operate differently in parking lots than they do on roadways or Interstates. In parking lots, vehicles cruise around looking for a parking spot at slow speeds, which elevates emissions. They also idle for extended periods, which elevates emissions. In parking lots vehicle engines are started after being turned off for a period of time, which also elevates emissions. Many vehicles undergoing these "cold-starts," slow speeds and idling concentrate these higher emissions in and near parking lots. Analytic techniques for including emissions from parking lots are well known. In formulating its Motor Vehicle Emission Simulator (MOVES), its current emissions model, EPA recognized the different operating characteristics of vehicles in and around parking lots and devised an "off-network" mode for the model, designed specifically to analyze and calculate the emissions associated with parking lot conditions. Information and guidance on how to use MOVES for parking lots is available. *See* Chapter 4 of Input Guidelines for Motor Vehicle Emissions Simulator Model, Volume 2: Practitioners' Handbook: Project Level Inputs, NCHRP 25-38. EPA's approved dispersion model, AERMOD, could then be used to calculate concentrations of these pollutants to generate more accurate estimates of air pollution associated with this Project.

The Project sponsor should examine the land uses within 1000 meters of the analysis sites to determine if there are any major parking lots located nearby. Sites with nearby parking lots must be re-analyzed to include parking lot emissions of CO, $PM_{10}$, $PM_{2.5}$ and $NO_2$.

###### 3.    The DEIS Fails to Properly Address Ozone and its Precursors

There is a large body of peer-reviewed and accepted research, built over the past 40 years, connecting both regional and localized air pollutants to adverse public health outcomes such as pulmonary disease, cardiovascular disease, neurological effects, and even cancer.[141] Ground-level ozone is particularly harmful for the most vulnerable members of society,

---

[139] Pranas Baltrenas, Danguole Kaziukoniene, & Mindaugas Kvasauskas, *Air Pollution at Parking Lots of Vilnius*, Journal of Engineering and Landscape Management, 12:1, 38-43 (2004), https://www.tandfonline.com/doi/pdf/10.1080/16486897.2004.9636813.

[140] I. Steinberga & J. Kleperis, *Urban Air Pollution: Input from Car Parking Places*, 75 Urban Transport X 851, (2004), https://www.witpress.com/Secure/elibrary/papers/UT04/UT04083FU.pdf.

[141] *See, e.g.*, 83 Fed. Reg. 42,986, 43,337 (Aug. 24, 2018).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 84

including those with pre-existing health conditions, the elderly, and children.[142] Low-income families and communities of color are disproportionately exposed to elevated levels of ozone pollution and other factors that exacerbate the risks of exposure, such as inadequate access to health care and proximity to sources of harmful pollution, including heavy traffic.[143] In its 2013 Integrated Science Assessment, EPA found that "most studies of individuals have reported that individuals with low SES [socioeconomic status] and those living in neighborhoods with low SES [socioeconomic status] are more at risk for $O_3$ [ozone]-related health effects, resulting in increased risk of respiratory hospital admissions and ED [emergency department] visits."[144] Yet the DEIS performs no health analysis beyond referencing a NAAQS conformity modeling performed two years prior.

Based on the scale and scope of the Project, the air quality analysis should include a regional emissions analysis (or mesoscale analysis) of ozone precursors (volatile organic compounds (VOCs) and nitrogen oxides ($NO_x$)). The Project area is in a moderate ozone non-attainment area. If the Project is completed, it will result in a massive increase in VMT of about one thousand million annual VMT, based on traffic projections for the build alternatives.

---

[142] *See* EPA, Integrated Science Assessment for Ozone and Related Photochemical Oxidants, Sections 8.3.1.1, 8.3.1.2, 8.2.2, 8.2.3, EPA-600/R-10/076F (2013).

[143] *See* D.E. Schraufnagel, et al., *Air Pollution and Noncommunicable Diseases: A Review by the Forum of International Respiratory Societies' Environmental Committee, Part 1: The Damaging Effects of Air Pollution*, Chest, 155(2), 409–416 (Nov. 9, 2018), https://doi.org/10.1016/j.chest.2018.10.042 ("Susceptibility is partly under genetic and epigenetic regulation. Although air pollution affects people of all regions, ages, and social groups, it is likely to expose greater illness in those with heavy exposure and greater susceptibility. Persons are more vulnerable to air pollution if they have other illnesses or less social support."); RC Gwynn, and GD Thurston, *The Burden of Air Pollution: Impacts in Racial Minorities*, Envtl. Health Perspectives, 109(4): 501-6 (Aug. 2001) (identifying socioeconomic status and access to healthcare as key factors influencing risk of negative health effects from exposure to ozone and other air pollutants); M.L. Bell, F. Dominici, *Effect Modification by Community Characteristics on the Short-Term Effects of Ozone Exposure and Mortality in 98 US Communities*, 167 Am. J. Epidemiology 986 (Apr. 15, 2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2430754/ (finding that "some populations (i.e., Black/African American and the unemployed) may bear a higher health burden from ozone and that a higher prevalence of central air conditioning may modify ozone exposure, thereby lessening its health impacts."); B. Ostro et al., *Air Pollution and Exacerbation of Asthma in African-American Children in Los Angeles*, Epidemiology, Vol. 12 (2): 200-8 (Mar. 2001); *see also*, J.T. Lee et al., *Effect of Air Pollution on Asthma-Related Hospital Admissions for Children by Socioeconomic Status Associated with Area of Residence*, 61 Archives Envtl. Occupational Health 123 (2006); S. Cakmak et al., *The Risk of Dying on Days of Higher Air Pollution Among the Socially Disadvantaged Elderly*, 111 Envtl. Res. 388 (2011).

[144] EPA, *Integrated Science Assessment for Ozone and Related Photochemical Oxidants*, EPA-600/R-10/076F, at 8-28 (2013).

00022680

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 85

Although the area's latest transportation conformity determination indicates that, with the completion of this Project,[145] the area will meet the required emissions tests for VOCs and $NO_x$, the Project still will generate large amounts of these ozone precursors. These amounts should be reported so that the public and decisionmakers are aware of the Project's impact on emissions of these pollutants.

In addition, since the formation of ozone occurs miles downwind and hours after the release of ozone precursors, the regional emissions of ozone precursors should be reported and assessed for their potential impact on downwind areas that also do not meet the ozone NAAQS. These areas may include the Baltimore area, the Philadelphia area, the Seaford City area in Delaware, and Kent and Queen Anne Counties in Maryland, among others. The Project sponsor should consult with officials in the affected nonattainment areas to determine if these areas will be able to complete successful future transportation conformity determinations and meet their air quality attainment goals despite the transport of ozone and ozone precursors into these areas as a result of the Project.

FHWA Technical Advisory T 6640.8A (Oct. 30, 1987), Guidance for Preparing and Processing Environmental and Section 4(f) Documents, states that a DEIS should, when addressing air quality concerns that occur on the mesoscale, present information on ozone and related pollutants:

> Ozone (O3), Hydrocarbons (HC), and Nitrogen Oxide (NOx) air quality concerns are regional in nature and as such meaningful evaluation on a project-by-project basis is not possible. Where these pollutants are an issue, the air quality emissions inventories in the State Implementation Plan (SIP) should be referenced and briefly summarized in the draft EIS. Further, the relationship of the project to the SIP should be described in the draft EIS . . . .

Ozone pollution is a significant issue in the geographic area in which the Project is proposed. The Washington, DC-MD-VA nonattainment area is in maintenance status for the 2008 ozone NAAQS and must address conformity levels in its maintenance plan. The region is also currently in non-attainment for the 2015 ozone NAAQS and a monitor located several miles upwind of this project has a current design value that is 2 ppb above the health-based standard. The correct thing to do from the standpoint of public health and welfare would be to evaluate whether the Project will allow the Washington, DC area to achieve all health-based federal ozone standards. The bare minimum would be for the DEIS to at least include summary information, as recommended by FHWA guidance, on ozone precursor levels related to the conformity levels, but the DEIS failed to do so.

The lack of ozone precursor information in the DEIS is particularly troubling since the evidence from *Visualize 2045* shows that for both VOCs (Exhibit 17) and NOx emissions during

---

[145] Air Quality Conformity Analysis of Visualize 2045 and the FY 2019 – 2024 Transportation Improvement Program. October 17, 2018, https://www.mwcog.org/visualize2045/document-library/.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 86

ozone season (Exhibit 18), the maintenance plan for the area at issue is above the agreed-to Tier 1 budgets for both 2025 and 2030.

**4.    The DEIS Fails to Sufficiently Address Mobile Source Air Toxics**

FHWA guidance requires that a project of this size be evaluated with regards to Mobile Source Air Toxics (MSATs). While the DEIS provides information about how the levels of various MSATs will change because of a build alternative, the Agencies just insert template EIS language that has been used by Departments of Transportation (DoTs) around the country for years to avoid evaluating the health impacts of MSATs. This omission is not acceptable.

Motor vehicles are a primary source of Benzene emissions (second only to smoking).[146] EPA last updated the Integrated Risk Assessment (IRA) for Benzene in 2003 and it was determined to be a human carcinogen, the highest level of certainty of adverse health impacts available. EPA, through the Integrated Risk Information System (IRIS), provides both a Reference Dose (RfD) and Reference Concentration (RfC) for Benzene.[147] These data can easily be used in conjunction with modeled emissions from EPA's MOVES and information about the populations that live, go to school, work, and otherwise inhabit the area near I-495 and I-270 to determine the impact that the change in Benzene levels would have on public health, and thereby to determine if the increased risk is acceptable.

Benzene is not the only air toxic associated with motor vehicles. EPA also provides the same degree of information for numerous other air toxics such as:

- Diesel PM – Likely to be a human carcinogen (Evaluated 2003)[148]

- Formaldehyde – Probable human carcinogen (Evaluated 1990)[149]

- 1,3-butadiene – Carcinogenic to humans by inhalation (Evaluated 2002)[150]

- Acetaldehyde – Probable human carcinogen (Evaluated 2002)[151]

---

[146] Wallace L. A., *Major Sources of Benzene Exposure*, Environmental Health Perspectives, 82, 165–169 (1989), https://doi.org/10.1289/ehp.8982165.

[147] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=276.

[148] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=642.

[149] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=419.

[150] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=139.

[151] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=290.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 87

- Napthalene – Impacts nervous and respiratory function (Evaluated 1998)[152]

- Toulene – Impacts kidney function (Evaluated 2005)[153]

- Xylene – Impacts nervous function (Evaluated 2003)[154]

Even though this information has been available for nearly 20 years, due to amendments to the Clean Air Act put in place 30 years ago, MDOT states:

In particular, the tools and techniques for assessing project-specific health outcomes as a result of lifetime MSAT exposure remain limited. These limitations impede the ability to evaluate how potential public health risks posed by MSAT exposure should be factored into project-level decision-making within the context of NEPA.

DEIS, App. I, at 77. It is absurd that in the past 30 years MDOT has not developed an approach to evaluate MSATs. This language comes from a template utilized by DoTs around the country that claim we can never know if people exposed to these toxics will get cancer. The DEIS uses this language despite the fact that FHWA in the mid-2000's developed a protocol that can be the basis of a system to evaluate MSATs.[155] It is hard to understand how 15 years later, the DEIS would still be claiming that tools and techniques do not exist to evaluate MSATs for a highway project.

Additionally, the DEIS also could have utilized systems developed by other agencies to conduct an evaluation of the health impacts from MSATs:

- Minnesota Department of Transportation – Air toxics template dated 2007[156]

---

[152] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=436.

[153] https://cfpub.epa.gov/ncea/iris2/chemicalLanding.cfm?&substance_nmbr=118.

[154] https://cfpub.epa.gov/ncea/iris2/chemical_Landing.cfm?&substance_nmbr=270.

[155] Michael Claggett and Terry L. Miller, *Recent Examinations of Mobile Source Air Toxics: A Methodology for Evaluating Mobile Source Air Toxic Emissions Among Transportation Project Alternatives*, U.S. Dept. of Transportation, Federal Highway Administration, https://www.fhwa.dot.gov/ENVIRonment/air_quality/air_toxics/research_and_analysis/mobile_source_air_toxics/msatemissions.cfm.

[156] http://www.dot.state.mn.us/stateaid/projectdelivery/environmental/guidance-air-toxics-category2-sample-writeup-new-interchange-new-connector-roadway.doc.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 88

- South Coast Air Quality Management District – *Health Risk Assessment Guidance for Analyzing Cancer Risks from Mobile Source Diesel Idling Emissions for CEQA Air Quality Analysis* (August 2003)[157]

- Sacramento Metropolitan Air Quality Management District – *Mobile Sources Air Toxics Protocol* (2019)[158]

Given that there are eleven public schools (five in Montgomery County and six in Prince George's County) that are within 500 meters of I-495 and I-270 within the scope of the Project, such as Montgomery Blair High School that directly abuts the Project area, at a minimum the impacts of increased air toxics being breathed day in and day out by young Marylanders must be evaluated. We know young people will be in those facilities nearly half of the year, for years on end, breathing these toxics. MDOT can develop approximations for exposure that these vulnerable populations are likely to experience, and it has an obligation to do so.

For MDOT to have failed to come up with a solution to evaluate MSATs, despite the decades it had available, the numerous data points provided by EPA and other researchers, and the examples provided by other jurisdictions, and instead for MDOT to cut and paste form language into the DEIS to avoid analyzing the risk of getting cancer or experiencing other negative health effects from MSATs, is completely unacceptable.

Additionally, the MSAT analysis presented in Appendix I downplays the significance of the findings regarding this important set of air pollutants. The discussion in the Appendix emphasizes a reduction in MSAT emissions over time and minimizes the large increase in MSAT emissions and, therefore, exposures, associated with the Project (the build versus no-build comparisons). Figures 3-41 to 3-49 show substantial decreases in MSAT emissions over time, but those emission declines have nothing to do with completion of this Project. Those declines are the result of improvements in vehicle and fuel technology mandated by the federal government and have no relation to the Project or the selection of any of its alternatives. Instead, the DEIS should focus on the substantial increase in emissions of MSATs, ranging from 4.1% to 13.3% (see Table 3-36 of Appendix I), directly attributable to the Project. Five of the six analyzed alternatives show these increases, with the range depending on the alternative and the specific pollutant considered.

Although there are no NAAQS established for these pollutants, the Maryland Department of Environmental Quality (MDEQ) has established "screening levels" for a myriad of hazardous air pollutants, (https://mde.maryland.gov/programs/Permits/AirManagementPermits/Documents/2012-Revised-

---

[157] http://www.aqmd.gov/docs/default-source/ceqa/handbook/mobile-source-toxics-analysis.doc?sfvrsn=2.

[158] http://www.airquality.org/Residents/CEQA-Land-Use-Planning/Mobile-Sources-Air-Toxics-Protocol.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 89

TAP-Screening-Levels-cas-sort.pdf) with various compound forms of the pollutants listed by MDEQ. This list includes the MSATs analyzed for the Project. For example:

| MSAT | 1-hour screening level (ug/m3) | 8-hour screening level (ug/m3) |
|---|---|---|
| acrolein | | 2.29 |
| benzene | 28.0 | 82.0 |
| 1,3 butadiene | | 29.11 |
| formaldehyde | | 6.3 |
| naphthalene | | 36.49 |
| acetaldehyde | | 5.46 |
| ethylbenzene | | 5400.0 |

These chemical compounds are associated with elevated cancer risks and other major health concerns. The MSAT analysis for the Project should assess whether the increased exposures of these pollutants due to the construction and operation of the Project, or any increased exposure, are acceptable, rather than using uncertainties in the science and analytical techniques as justification to sidestep the issue, as is done in the MSAT discussion in Appendix I. A health risk assessment should be performed to more completely assess the potential air quality and health impacts of the Project and to evaluate the need for mitigation measures to reduce the risk of exposing residents and the general public to these dangerous chemicals.

The screening levels shown above and on the MDEQ hazardous air pollutant list are geared toward worker exposures and protections. However, they offer a starting point for analysis. Historically, screening levels or other standards to protect the health of the general population are more stringent than guidelines for worker protection. Nevertheless, the DEIS should use these values to analyze the Project's potential MSAT health impacts. Specifically, it should:

- determine the appropriate screening level from several related hazardous pollutants on the MDEQ list to compare to the MSAT compounds emission rates determined by MOVES runs and analyzed for the DEIS

- re-run MOVES as necessary (see comment regarding speeds, Section II.II.13)

- determine appropriate concentration levels for each MSAT for each appropriate time scale (1-hour, 8-hour, daily, annual, etc.)

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 90

- compare against appropriate screening level

- perform a health risk assessment to indicate increased cancer and other disease risks

- determine if this acceptable to build this project.

The analytical approach described above and the preparation of a health risk assessment to assess health impacts of MSATs from transportation projects is not new. The California Department of Transportation has performed health risk assessments for its projects (*e.g.*, Schuyler Heim Bridge Replacement and Truck Expressway), using guidance provided by the California Air Resources Board (http://www.airquality.org/Residents/CEQA-Land-Use-Planning/Mobile-Sources-Air-Toxics-Protocol). It is not clear why the residents in and around the Project area are being accorded less protection than the residents of California.

Finally, the MSAT discussion in Section 3.4 of Appendix I is unclear. The opening discussion suggests that only the portion of the Project area that exceeds FHWA's threshold for a quantitative MSAT analysis was considered in the study. Yet much of the discussion later in the section focuses on the "affected network." This inconsistency should be clarified and an MSAT analysis should be done for the entire affected network, not just those segments that meet FHWA's thresholds.

**5.      The DEIS Does Not Properly Perform the Necessary Carbon Monoxide Hot-Spot Analysis**

The carbon monoxide (CO) hot-spot analysis presented in the DEIS incorrectly applies EPA's CO Hot-Spot modeling guidance, Guideline for Modeling Carbon Monoxide from Roadway Intersections, USEPA-454/R-92-005, Office of Air Quality Planning and Standards, November 1992, in two important respects. Correct application of the Guidance would likely result in higher predicted CO concentrations resulting from the Project, and, potentially, reveal a greater air quality impact from the Project.

The misapplications relate to the temperature and stability class used in the analysis.

Temperature – Table 3-25 indicates that the emission factors were derived for the average temperature for January. However, EPA's Hot Spot Guidance states that the temperature used in a hot-spot analysis should correspond to the average of the ten highest non-overlapping 8-hour CO readings from an appropriately sited CO monitor (page 4-7 of the Guidance). The Project sponsors should calculate the correct temperature to be used, based on the Guidance; re-run the MOVES model to generate correct emission factors; and re-run the CAL3QHC dispersion model to obtain the correct predicted CO concentrations.

Stability class – Table 4-8 of EPA's Hot-Spot Guidance identifies two stability classes that may be used in a CO analysis: stability class D and stability class E. Stability class D applies to urban areas and stability class E applies to rural areas. The Guidance offers advice if an analysis area has a mixture of land uses (i.e., use class D if more than half the area is urban). The air quality analysis for this Project assumed a stability class D (urban) for every analysis site

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 91

within the Project corridor. The Project corridor is 48 miles long. While some of the analysis sites are likely urban in character, and thus appropriately modeled as stability class D, other sites are likely more suburban or rural in character. If the area of these sites is less the half urban in character, they should be modeled with stability class E. Rather than making a blanket assumption that stability class D applies throughout the Project corridor, the Project sponsors should review each analysis site to determine its urban/suburban/rural character and model each site with the appropriate stability class.

It should not be overlooked that the Project will increase CO concentrations at every site that was analyzed, in many cases nearly doubling the expected concentrations under a build scenario compared to the no-build case (see Table 3-29). The build concentrations, while still below the 1-hour and 8-hour CO NAAQS, represent a substantial negative impact on air quality. CO is a poison to the human body, and any increase represents an unneeded exposure to this poison for nearby residents and visitors to the Project area. The build alternatives increase VMT and congestion, reduce vehicle efficiency, and cause much higher concentrations of carbon monoxide at the sites analyzed.

Two other issues should be considered as well with regard to the CO analysis for the Project:

1) The CO analysis in Table 3-29 only looked at intersections and interchanges in the immediate Project corridor. However, the greenhouse gas and MSAT analyses uncovered a much wider "affected network" with many more intersections negatively affected by the Project. CO hot spot analyses were not done at any of these locations. Performing analyses at these locations will almost certainly uncover similar findings, i.e., a substantial increase in CO concentrations. Thus, it appears that the entire region will experience a substantial increase in CO levels as a result of this Project.

2) As pointed out below, there are several other technical errors and omissions in the air quality analysis. When those errors and omissions are corrected and the air quality analysis is redone, it is expected to reveal much higher CO emissions and CO concentrations at the analyzed locations and at locations yet to be analyzed on the "affected network." Some of those re-calculated CO concentrations may approach or exceed the 8-hour CO NAAQS. If that is the case, then this Project will be the reason for new or exacerbated violations of an air quality standard. This result would be highly significant, impacting public health for years to come, and should not be allowed unless sufficient mitigation measures can be found and implemented to reduce those concentrations to safe levels.

6.    **Climate Change and Greenhouse Gas Emissions**

Construction and operation of this Project will violate the spirit, if not the letter, of the Maryland Greenhouse Gas Reduction Act of 2009 and the Greenhouse Gas Emissions Reduction Act – Reauthorization (GGRA of 2016), which requires a 40% reduction in greenhouse gas emissions (GHGs) by 2030 from 2006 levels. While this target applies across all sectors of the Maryland economy, the transportation sector is required to help achieve this target. Construction

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 92

and completion of this Project will seriously stymie and delay, if not prevent, achievement of this target, placing a greater burden on other sectors of the Maryland economy to reach the target.

The Air Quality Appendix of the DEIS (Appendix I) acknowledges that the transportation sector accounts for 28% of Maryland's greenhouse gas emissions. Examination of the Greenhouse Gas Emissions Reduction Act 2019 Draft Plan shows that Maryland's transportation sector's share will rise to 40% of economy-wide GHGs as other sectors of the economy get cleaner. *See* The Greenhouse Gas Emissions Reduction Act: 2019 GGRA Draft Plan, Appendix C, Figure ES-1, transportation on-road plus transportation non-road. **Yet those figures do not even include the excess GHGs that will be generated by the construction and operation of this Project!**

Appendix I also shows that of the six alternatives analyzed and compared to the no-build alternative, five would increase GHGs substantially. (As noted above, the DEIS indicates that Alternative 5, the one screened alternative that reduces GHGs, has been dropped from further consideration.) The increases range from over 300 thousand tons per year of $CO_2e$ to nearly 500 thousand tons per year of $CO_2e$ in the opening year of 2025. This magnitude of GHG increases will occur just within the Project area. Appendix J of the Greenhouse Gas Emissions Reduction Act: 2019 GGRA Draft Plan identifies a number of transportation strategies that the Plan indicates are necessary to even approach the GHG reduction target for the transportation sector. Many of these strategies are challenging to implement from an administrative, financial, logistical and policy perspective. It is unfortunate that the difficult work undertaken to implement these strategies will be undermined, to a large degree, by the construction and operation of this Project.

For example, alternative 8 for this Project shows a 499 thousand ton increase in GHGs compared to the no-build alternative in 2025 (Table 3-38 of Appendix I). To use the units of Appendix J of the 2019 GGRA Draft Plan, this translates to 0.0006 million metric tons of $CO_2e$. Table 6.1 of Appendix J identifies a number of strategies and their potential greenhouse gas emission reductions. For example:

·    Intermodal Freight Centers Access Improvement         0.017 mmt $CO_2e$

·    Lead by example - Alternative Fuel Usage in State Fleet      0.004 mmt $CO_2e$

·    Truck Stop Electrification                           0.007 mmt $CO_2e$

It is unfortunate that the GHG increase from the Project area will substantially reduce the effectiveness of the above-listed and many other strategies.

The DEIS misleadingly states:

By reducing congestion and increasing speeds, vehicle travel duration and the associated amount of fuel combustion and associated emissions will decrease, minimizing the impacts of GHGs. Thus, the study area would see a net reduction

00022684


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 93

in GHG emissions under any of the Build Alternatives, even though VMT increases relative to the No Build Alternative and 2015 levels.

DEIS at 4-62. The DEIS claims, but fails to quantify, supposed reductions in GHGs that the build alternatives will bring based on reduced congestion and increased speeds. The Organizations have repeatedly asked the Agencies for the basis of this claim but it has not been provided. Again, what is the basis for this claim in the DEIS? How much will reduced congestion and increasing speeds reduce GHGs in the build alternatives? What levels of reduced congestion are the Agencies relying on, and how does that congestion compare to the level the Agencies rely on elsewhere in the DEIS to make the managed lanes financially viable? To what extent, and how, does this claim account for induced demand or land use changes? The Agencies presumably have performed this calculation in their analysis, so it should be easy to present. Why are the Agencies hiding this impact, and presenting the public with only the final result of changes in GHGs (one which incorporates other factors such as fuel efficiency increases)?

There also is an inconsistency between the DEIS and the 2019 FFRA Draft Plan with respect to GHGs, resulting in incorrect information for Maryland's climate change planning efforts. The DEIS for this project shows a substantial increase in GHGs associated with this Project, as presented in Appendix I. On the other hand, in Appendix J of the 2019 GGRA Draft Plan, MDOT identifies "Managed Lanes (I-270/I-495 Traffic Relief Plan Implementation)" as an "Emerging Policy Scenario" with a 0.051 mmt $CO_2e$ emission **reduction** (Table 6.1 of Appendix J). Appendix B of Appendix J does not provide any significant information on how these emission reductions were derived. What assumptions was MDOT relying on in the GGRA Draft Plan to reach this conclusion? Clearly there is a discrepancy in the climate change planning scenarios, with the newer calculations in the Project demonstrating that the optimistic assumptions and outcomes for the previous, older Managed Lanes (I-270/I-495 Traffic Relief Plan Implementation) strategy are not correct. When will MDOT update the GGRA Plan to fix these faulty assumptions and incorrect GHG impact? How can MDOT say in one arena the Project will reduce GHGs while saying in another arena that the Project will increase GHGs?

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 94



The attached Figure from Appendix J of the Draft Plan shows how tenuous the achievement of the "40 by 30" target is in the transportation sector, relying on "Emerging" and "Innovative" strategies to achieve the target. Construction and completion of this Project may prevent the emission reduction target from being achieved and so undermine Maryland's GHG policy.

Further, Maryland's 2019 GGRA Draft Plan of 2019 assumes deployment of 600,000 electric vehicles in Maryland by 2030.[159] This assumption forms the bulk of the projected emissions reductions necessary to achieve the "40 by 30" target. Yet, in its 2019 Annual Report,[160] the Maryland Electric Vehicle Infrastructure Council reports that only approximately 23,000 plug-in electric vehicles had been registered in Maryland by the end of 2019. This statistic makes the likelihood of reaching the electric vehicle deployment goal and, therefore, the "40 by 30" target highly unlikely, even without the Project, which will add large amounts of unaccounted for GHGs into the atmosphere and will essentially make Maryland's climate action targets impossible to attain.

---

[159] https://mde.maryland.gov/programs/Air/ClimateChange/Documents/2019GGRAPlan/Appendices/Appendix%20J%20-%20MDOT%20GGRA%20Draft%20Plan.pdf.

[160] http://www.mdot.maryland.gov/newMDOT/Planning/Electric_Vehicle/Documents/2019-ZEEVIC_Annual_Report_Final.pdf.

00022685



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 95

Appendix I of the DEIS does not provide information on the GHGs associated with construction of the Project, postponing disclosure of that impact to the Final EIS. This omission violates the requirements of NEPA because it keeps important information from the public and decisionmakers—information needed to evaluate the potential environmental impacts of the Project—and thereby favors selection of one of the build alternatives. The construction of new highway lanes is an intense activity using many types of equipment. The operation of this equipment will generate large amounts of GHGs. For the 48-mile segment of the Project, the construction will be long-lasting and involve many different pieces of equipment. This activity will use fuel for power and will produce emissions that include greenhouse gasses. It is expected that the greenhouse gas emission tonnage will be large and will, in addition to the increase in GHGs from vehicle operation on the expanded highways, offset much of the progress that Maryland is trying to accomplish in attaining its GHG reduction targets.

The following list contains off-road equipment commonly used in highway construction, with the most common engine and fuel type and the emissions (kg) of $CO_2$ per 100 hours of operation.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 96

Aerial Lifts   Diesel   739

Air Compressors   Gas 4-Stroke   777

Bore/Drill Rigs   Gas 4-Stroke   326

Cement and Mortar Mixers   Gas 4-Stroke   521

Concrete/Industrial Saws   Gas 2-Stroke   255

Cranes   Diesel   4,600

Crawler Tractors Diesel 27,030

Crushing/Proc. Equipment   Gas 4-Stroke   935

Dumpers/Tenders   Gas 4-Stroke   467

Excavators   Diesel   5,774

Forklifts   LPG   1,353

Generator Sets   Gas 4-Stroke   830

Graders   Diesel   6,585

Off-Highway Tractors Diesel 27,030

Off-Highway Trucks Diesel 27,078

Other Construction Equipment Diesel 10,190

Other General Industrial Equipment   Gas 4-Stroke   474

Other Material Handling Equipment   Diesel   1,673

Pavers   Diesel   3,810

Paving Equipment   Gas 4-Stroke   655

Plate Compactors   Gas 4-Stroke   367

Pressure Washers   Gas 4-Stroke   750

Pumps   Gas 4-Stroke   621

Rollers   Diesel   3,070

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 97

Rough Terrain Forklifts   Diesel   3,200

Rubber Tired Dozers   Diesel   7,815

Rubber Tired Loaders   Diesel   7,815

Scrapers   Diesel   12,412

Signal Boards   Diesel   513

Skid Steer Loaders   Diesel   724

Surfacing Equipment   Gas 4- Stroke   543

Sweepers/Scrubbers   Diesel   2,220

Tractors/Loaders/Backhoes   Diesel   1,342

Source: National Cooperative Highway Research Program, Greenhouse Gas Mitigation Measures for Transportation Construction, Maintenance, and Operations Activities, Program 25-25, Task 58.

The actual equipment used for construction of the Project will depend on the items and specifications for the Project. There are tools available to calculate the emissions associated with the construction of a roadway project. Section 3.6 of Appendix I of the DEIS identifies one tool available to calculate greenhouse gas emissions from construction of the project: Infrastructure Carbon Estimator (ICE), https://www.fhwa.dot.gov/environment/sustainability/energy/tools/carbon_estimator/. However, to apply this tool requires specific details about the project and its construction methods which are not generally available to the public reviewers of a DEIS.

Examination of the literature, however, shows a number of studies that have examined GHGs from construction of roadways and that can be used to provide generalized estimates of greenhouse gas emissions from the construction of this Project. These include Chehovits and Galehouse, *Energy Usage and Greenhouse Gas Emissions of Pavement Preservation Processes for Asphalt Concrete Pavements* (July 2010)[161]; Williams-Derry, *Increases in Greenhouse-Gas Emissions From Highway-Widening Projects*, (Oct. 2007)[162]; Egis *Greenhouse Gas Emissions Mitigation in Road Construction and Rehabilitation A Toolkit for Developing Countries*[163], etc. Chehovits and Galehouse calculated that construction of a new roadway (which would be the

[161] https://www.pavementpreservation.org/icpp/paper/65_2010.pdf.

[162] http://www.jtc.sala.ubc.ca/reports/analysis-ghg-roads.pdf.

[163] https://www.esmap.org/sites/default/files/esmap-files/Road_Emission_Optimization_User_Manual%5B1%5D.pdf.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 98

case for this Project) generates 24.1 lbs of greenhouse gas emissions per square yard. Using this emission factor and assuming 12-foot-wide lanes, 6-foot-wide shoulders on each side of the roadway, and new roadways in each direction for the Project yields construction greenhouse gas estimates of:

| One lane, each direction | 8, 143 tons greenhouse gasses |
| Two lanes each direction | 12, 216 tons greenhouse gasses |

While these are very large tonnages, they are still conservative figures. They do not include several important additional considerations that would lead to higher greenhouse gas emissions:

-   Bridge construction. The estimates do not include additional emissions due to bridge construction, including the American Legion Bridge. FHWA estimates that bridge construction could increase construction emissions by 30% (Infrastructure Carbon Estimator Final Report and User's Guide).

-   Routine Maintenance. Typically, roadways require repaving after 15 years of use and reconstruction after 30 years of use. They also require snow removal and vegetation management. This could lead to another 120 gallons of diesel fuel consumed for each lane mile of the Project. These impacts have also not been added to the above estimates.

-   Operational impacts on the existing facility. During construction, there will likely be impacts on the existing roadway. These include lane closures, lane narrowing, and detours. These impacts will affect traffic speeds, causing traffic to move at a slower speed and concomitantly increasing greenhouse gas emissions. The actual increase in emissions will depend on the length and duration of the actual lane closures and detours.

In reality, therefore, the actual greenhouse gas emissions due to the construction of the Project will likely be much higher than the conservative tonnage estimates calculated above.

The Sierra Club Maryland Chapter expressed these concerns in its comments to the Board of Public Works on the I-495 and I-270 P3 Program on June 4, 2019 ("Climate Change Impacts of Proposed Expansion of I-270 and I-495" Author: David Smedick, Policy Director, Maryland Sierra Club), but they still were not addressed in the DEIS.

Thus, GHGs from construction, in combination with the increase in GHGs from the operation of the expanded highway (up to 499 thousand tons per year of $CO_2$e plus the conservative estimate of 12 thousand tons of $CO_2$ emissions associated with the construction of the project's roadways) yield a massive increase in GHGs associated with this Project and puts Maryland's greenhouse gas emissions reduction targets seriously in jeopardy.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 99

### 7.    The DEIS Fails to Consider the Relationship Between Air Quality and Covid-19; the Agencies Must Release a Supplemental EIS That Does So

Especially given the current environment, it is not acceptable for the DEIS to not include an analysis of air quality impacts on public health. As of writing these comments, the two counties that this project runs through have the highest levels of COVID-19 infections and deaths in Maryland (32,800 infections and 835 deaths in Prince George's County, 25,692 infections and 832 deaths in Montgomery County).[164] Many of these deaths are in communities that are near I-495 and I-270.

Since COVID-19 began devastating communities in Maryland and throughout the nation, researchers have been hard at work understanding the illness. One thing has become clear: higher levels of air pollution are correlated with higher incidence and mortality from COVID-19. Some of the studies that have related negative health outcomes from COVID-19 and automobile-related air pollution have found:

- "Chronic [NO₂] exposure could be an important contributor to the high COVID-19 fatality rates observed."[165]

- "Statistically significant, positive associations between long-term exposure to $NO_2$ and COVID-19 case-fatality rate and mortality rate, independent of $PM_{2.5}$ and ozone."[166]

- "We found that an increase of 1 µg/m3 in the long-term average PM2.5 is associated with a statistically significant 11% (95% CI, 6 to 17%) increase in the county's COVID-19 mortality rate."[167]

---

[161] https://coronavirus.maryland.gov/ Accessed October 29, 2020.

[165] Ogen Y., *Assessing Nitrogen Dioxide (NO2) Levels as a Contributing Factor to Coronavirus (COVID-19) Fatality*, The Science of the Total Environment, 726, 138605 (Apr. 11, 2020), https://doi.org/10.1016/j.scitotenv.2020.138605.

[166] Liang, D., Shi, L., Zhao, J., Liu, P., Schwartz, J., Gao, S., Sarnat, J., Liu, Y., Ebelt, S., Scovronick, N., & Chang, H. H., *Urban Air Pollution May Enhance COVID-19 Case-Fatality and Mortality Rates in the United States*, The Innovation (Oct. 8, 2020), https://doi.org/10.1016/j.xinn.2020.100047.

[167] X. Wu et al, *Air Pollution and COVID-19 Mortality in the United States: Strengths and Limitations of an Ecological Regression Analysis*, Science Advances 2020, 6 : eabd4049 (Nov. 4, 2020), https://advances.sciencemag.org/content/advances/6/45/eabd4049.full.pdf.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 100

- "Short-term exposure to higher concentrations of $PM_{2.5}$, $PM_{10}$, CO, $NO_2$ and ozone is associated with an increased risk of COVID-19 infection."[168]

- "[Re-]enforcing pollutant release limits is indeed related to health betterment in society", "cumulative exposure to HAPs at levels below reference concentration (RfC), an estimate of daily inhalation exposure likely to be without an appreciable risk of deleterious effects during a lifetime (EPA 2020d), may heighten population vulnerability to COVID-19 mortality," and "signals of cumulative exposure [to air toxics] impacting COVID-19 mortality."[169]

- $PM_{2.5}$ contributed ~15% to COVID-19 mortality worldwide, 27% in East Asia, 19% in Europe, and 17% in North America.[170]

- According to our results, a one µg/m3 increase in $PM_{2.5}$ (about 15% of the average concentration of $PM_{2.5}$) increases the number of severe cases by roughly 2% and same-day deaths by 3% from the mean case rate in a county.[171]

Based on these studies, additional analysis is needed in the DEIS to demonstrate how this Project will or will not adversely impact communities experiencing higher levels of mortality and other negative health impacts from COVID-19.

---

[168] Zhu, Y., Xie, J., Huang, F., & Cao, L., *Association Between Short-Term Exposure to Air Pollution and COVID-19 Infection: Evidence from China*, Science of the Total Environment, 727, 138704 (July 20, 2020), https://doi.org/10.1016/j.scitotenv.2020.138704.

[169] Petroni, Michael, Dustin Hill, Lylla Younes, Liesl Barkman, Sarah Howard, I Brielle Howell, Jaime Mirowsky and Mary B Collins, *Hazardous Air Pollutant Exposure as a Contributing Factor to COVID-19 Mortality in the United States*, Environmental Research Letters, Volume 15, Number 9 (Sept. 11, 2020), https://iopscience.iop.org/article/10.1088/1748-9326/abaf86#:~:text=Early%20inquiry%20suggests%20preexisting%20conditions,exposure%20could%20exacerbate%20this%20relationship.&text=We%20find%20that%20an%20increase,increase%20in%20COVID%2D19%20mortality.

[170] Andrea Pozzer et al., *Regional and Global Contributions of Air Pollution to Risk of Death from COVID-19*, Cardiovascular Research (Oct. 26, 2020), https://academic.oup.com/cardiovascres/advance-article/doi/10.1093/cvr/cvaa288/5940460.

[171] Wes Austin, et al., *COVID-19 Mortality and Contemporaneous Air Pollution*, International Center for Public Policy, Working Paper 20-16 (Oct. 2020), https://icepp.gsu.edu/files/2020/10/paper2016.pdf.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 101

### 8. The DEIS and Its Reference to Visualize 2045 Lack Clarity in Data Sets and Prevent Meaningful Public Review

A build alternative from this Project cannot be approved unless it is included in a regional emissions analysis and "the project's design concept and scope have not changed significantly from those that were included in the regional emissions analysis . . ." 40 C.F.R. § 93.121 (a).

Appendix I states that the managed lanes for I-270 and I-495 are included in the NCRTPB Fiscal Year (FY) 2019 – 2024 TIP (Visualize 2045).[172] DEIS, App. I, at 23. Appendix B of Visualize 2045 mentions managed lanes for I-270 and I-495 as stated, but that is where the clarity ends. There are four discrepancies that need to be resolved.

First, Visualize 2045 relies on a base case of 2019 for its projections. Yet all of the analysis presented in Appendix I is based on 2016. The previously approved Constrained Long Range Plan (CLRP) was 2016-based, but Appendix B of the 2016 CLRP does not include the managed lane project. It is unclear whether the data being shown in the DEIS corresponds to Visualize 2045 and its base case of 2019 and if so how that is being presented as a 2016 base case, or if outdated modeling is being used. All work should only rely on data used in Visualize 2045 and the assessment should be redone to reflect that data.

Secondly, only one option is presented for managed lanes on I-270 and I-495 in Visualize 2045 in terms of modeling assumptions. Yet five alternatives are proposed in the DEIS that include High Occupancy Toll (HOT) lanes and Express Toll Lanes (ETL). Since no ozone precursor information is presented, nor is it made clear which alternative was considered in Visualize 2045, it is not possible to evaluate if some, if not most, of the alternatives increase emissions beyond the approved CLRP or even beyond the approved conformity budgets. It appears that Visualize 2045's conformity analysis assumes mostly ETL lanes and some High Occupancy Vehicle (HOV) lanes, but no HOT lanes.[173] It also appears Visualize 2045's analysis is based on the entire 70 miles of the P3 Program with a completion year of 2025 but that appears extremely unlikely and this DEIS is only about a segment of the Program. Table 3-39 of Appendix I shows that $CO_2$ emissions from Alternatives 8, 9, 10 13B, and 13C range from an increase in $CO_2$ emissions by 7.3% to 12.4% in the 2025 opening year. Depending on which alternative was included as the baseline assumptions in Visualize 2045, it is quite possible that alternative could lead to future emissions that do not conform with the CLRP, but this analysis does not provide any clarity as to whether they would and so should be redone.

Thirdly, there is no evaluation of 2030 or another year between 2025 and 2040. Conformity regulations require no more than 10 years between conformity evaluations. 2030 was the year chosen in Visualize 2045, and therefore will be assumed to be the most logical year to

---

[172] FY 2019 – 2024 Transportation Improvement Program for the National Capital Region (Oct. 17, 2019), https://www.mwcog.org/visualize2045/document-library/.

[173] "Air Quality Conformity Analysis," Visualize 2045, A Long-Range Transportation Plan for the National Capital Region, at B-43 to B-45 (Oct. 17, 2018).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 102

choose. It is particularly troubling that 2030 was not included in the DEIS because that year appears to have the greatest potential to lead to conformity problems given that the modeled emissions for both VOC (Exhibit 17) and $NO_X$ (Exhibit 18) are the closest to violating the Tier 2 budgets (they both also violate the Tier 1 budgets already). In both cases the projected ozone season day emissions are within 5 tons per day of the Tier 2 budget. As a result, evaluation of 2030 is necessary for an acceptable analysis.

Finally, these discrepancies could have been resolved had model inputs for MOVES been provided. In Appendix D of the Air Quality Technical Report, RunSpecs for MOVES were provided. While these would be necessary to conduct a thorough review of the inputs used in the modeling as well as the outputs that were created by MOVES, they do not provide the truly necessary data, namely the MySQL input and output databases from the MOVES runs. Without this information, it is impossible to determine if MDOT is relying on valid assumptions for vehicle speeds, VMT growth, vehicle ages, the split between diesel and gasoline vehicles, etc. This also makes it impossible to compare the alternatives to what was modeled in Visualize 2045. Finally, it makes it impossible to evaluate whether the alternatives that were not the basis for Visualize 2045 would indeed allow this project to remain under conformity budgets. Without this information the air quality assessment cannot be considered a truly open public process and therefore it should be revised and a new public comment period provided to allow for evaluation of this additional and revised analysis.

### 9. The DEIS's (Insufficient) GHG and Other Emissions Analyses are Based on Data that Were Already Outdated When the DEIS was Published

The DEIS ignores EPA's and National Highway Traffic Safety Administration's revocation of California fuel efficiency standards and their weakening of national fuel efficiency standards.[174]

The DEIS states:

It should be noted that the Safer Affordable Fuel Efficient (SAFE) Vehicles Rule, finalized on March 30, 2020 may affect the EIA [Energy Information Administration] estimates. This new rule would require less stringent CAFE and $CO_2$ emissions standards through 2026 compared to the standards implemented in 2012 which it replaces. . . . A major factor in mitigating the GHG emissions associated with this increase in VMT is more stringent fuel economy standards. EIA projects that vehicle energy efficiency, thus GHG emissions, on a per-mile basis, will improve by 28 percent between 2012 and 2040.

---

[174] The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021–2026 Passenger Cars and Light Trucks, 85 Fed. Reg. 24,174 (April 30, 2020); The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule Part One: One National Program, 84 Fed. Reg. 51,310 (Sept. 27, 2019).


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 103

DEIS, at 4-62; *id.,* App. I, at 118-19. The Agencies appear to: 1) recognize the significance of fuel efficiency standards, and 2) recognize the significant roll back of those standards. Nevertheless, the emissions analyses in the DEIS rely on fuel efficiency gains from now-revoked standards. The two final rules mentioned above, revoking California's waiver (whose standards Maryland also had adopted) and the SAFE Vehicles Rule, contain detailed analyses of their impacts on fuel efficiency. The rulemaking dockets also contain detailed analyses disputing the rules' analyses. Do the Agencies believe the rules' analyses are scientifically sound? Why does the DEIS fail to address the impact of the two rules? What would the GHG emissions from the build alternatives be under the currently effective legal landscape?

Whatever the Agencies' reasoning for ignoring these issues in the DEIS, they must supplement the DEIS to analyze GHG and other air emissions using modeling based on currently effective fuel efficiency standards. The Agencies certainly should not reach a decision based only on what the air emissions from the various alternatives would have been under now revoked standards.

Not only does the 2020 SAFE Vehicles Rule impact the emission estimates the DEIS presents that relied on Energy Information Administration (EIA) data, the SAFE Vehicles Rule also impacts the entirety of the MOVES model that was used throughout the DEIS and Visualize 2045, including for determining conformity. The MOVES model is based on the earlier fuel efficiency standards, so the Agencies are relying on a now outdated model. The SAFE Vehicles Rule changes fleet size, fleet age distribution, fleet mix of vehicle types, VMT by vehicle type, and VMT growth rates.[175] Any planning done with an outdated MOVES model lacks a basis in reality and is unlawful. As explained in comments on the SAFE Rule: "The SAFE Vehicles Rule, by changing the fundamental assumptions of vehicle fuel-efficiency, would invalidate California's air quality emissions model (known as EMFAC) which is used by the State to meet the Federal Highway Administration's transportation planning requirements."[176] The DEIS does not explain how the Agencies have adjusted the model (it appears they have not).

Moreover, the increased emissions of all air pollutions from the California waiver revocation and the weakened SAFE Vehicles Rule impact the ability to meet the Ozone and other NAAQS. The Metropolitan Washington Council of Governments and National Capital Region Transportation Planning Board commented that they "are concerned that any relaxation of the 2012 Greenhouse Gas and CAFE Final Rule will make it increasingly difficult for the region to realize the reductions in NO$_x$ emissions needed to comply with the 2015 Ozone

---

[175] *See* North Carolina Department of Environmental Quality, *Comments on Proposed Rulemaking and Draft Environmental Impact Statement for "The Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule for Model Years 2021-2026 Passenger Cars and Light Trucks",* Docket ID Nos. NHTSA-2018-0067/EPA-HQ-OAR-2018-0283 (Oct. 26, 2018), https://www.regulations.gov/document?D=EPA-HQ-OAR-2018-0283-4209.

[176] Letters from Industry Coalition to Diane Feinstein and California Congressional Delegation, (September 10, 2019 and June 12, 2019).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 104

NAAQS."[177] The DEIS does not explain if or how the new standards were taken into account in determining the project's conformity (it appears they were not). Have the Agencies evaluated whether the build alternatives would cause or contribute to a NAAQS violation under the current legal landscape, with the SAFE Rule and waiver revocation, as well as all of the current Administration's rollbacks of regulations that provided for decreased emissions of ozone, PM$_{2.5}$, and other criteria pollutants? The Agencies must do so before moving forward and present the results for public comment.

Further, the GHG emissions estimates do not appear to consider the effects of induced demand or land use changes after the highways are expanded.

The Agencies must start over and properly analyze the proposed alternatives' impacts on air emissions, including GHGs, based on accurate and current laws, data, and models.

**10.    The DEIS's Air Quality Environmental Justice Discussion is Insufficient**

Appendix E and Section 21 of Chapter 4 of the DEIS purport to address environmental justice concerns. These sections of the DEIS are completely inadequate to address the air quality concerns of environmental justice communities negatively impacted by this Project. They are inadequate in two significant respects:

1)    These sections misrepresent the discussion and findings from the air quality studies carried out for the Project and documented in Appendix I. They minimize the outcome of the air quality studies by focusing on their least negative aspects . For example, Chapter 4 Section 21.5.3.b states " … the Build Alternatives are not predicted to increase emission burdens compared to the No Build Alternative in 2040, aside from a slight increase in ghg emissions; nor cause or contribute to a violation of the NAAQS, no long-term or regional air quality impacts are anticipated, and no mitigation measures are warranted." (Page 4-138). Yet Appendix I tells a different story. Tables 3-34 through 3-36 show increases in MSATs in 2025 for all likely build alternatives and continue to show increases in 2040 for some MSATs for some alternatives. Similarly, Tables 3-37 through 3-39 show increases in greenhouse gas emissions for all likely build alternatives with continuing increases in greenhouse gas emissions for all likely build alternatives in 2040. Thus, the Project corridor and the environmental justice communities will be subject to increased MSAT and greenhouse gas emissions starting in 2025 and continuing every year through at least 2040! The above quote also downplays the near doubling of projected CO concentrations due to this Project at analyzed locations and likely elsewhere in the Project area (the affected network) as well.

---

[177] MWCOG Comment on the Proposed SAFE Vehicle Rule for CAFE and Tailpipe Carbon Dioxide Emissions Standards for Model Year 2021-2026 Light-Duty Vehicles, Docket ID No. EPA-HQ-OAR-2018-0283 (Oct. 17, 2018), https://www.regulations.gov/document?D=EPA-HQ-OAR-2018-0283-3326.