Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 105

2) These sections are incomplete because it does not identify additional air quality sources and stressors for the environmental justice communities. Industrial and commercial emissions sources such as power plants, freight yards, rail yards, truck terminals, bus terminals, ports, depots, etc. have historically been sited in environmental justice communities and disproportionately negatively affect these communities. The increased emissions from the Project would impose an additional emissions burden on these communities. The Environmental Justice Chapter and Appendix must address this aspect of the Project. The Project sponsors must inventory the Project corridor and the affected network to identify these types of industrial and commercial emission sources and assess the impact of the Project's new and additional emissions, and downgraded air quality, on those communities already suffering from excess air pollution from other sources.

3) We also agree with the deficiencies identified by Ron Bialek and Eyal Li in their testimony presented during the Project public hearings.

Ron Bialek, Public Health Foundation CEO, stated in his September 3, 2020 testimony:

One of the most grievous examples of how human health was not adequately considered is found in Chapter our in Appendix 8 [sic], both addressing environmental justice and the impact on minority communities. The study notes that there are 199 black groups within the Environmental Justice Analysis area and 107 have minority populations equal to or greater than 50 percent. Unfortunately, the health impacts of minority communities have been excluded from the document. Chapter four in Appendix E states that excess emissions may be reduced. Even in the unlikely event this is true, those emissions will be closer where people live and play with many fewer trees to filter the pollutants. And what about emissions increases on the roads to and from the Beltway to 270? In Chapter four, there are 61. The following statement is made. Information is currently incomplete or unavailable to credibly predict the study's specific health impacts. This is an inaccurate statement. Valid and reliable data exist and science exists to model and predict health impacts. Unfortunately, none of these are addressed in the study. And looking at the study team of over 70 individuals, I was unable to find a single individual with an MPH degree in epidemiology, with expertise to analyze the data and human health impacts. The absence of facts, data and data sources about the impacts on human health and no evidence sound public health science has been used in developing D- DEIS is unacceptable and is an embarrassment to the state and to the citizens. In the event that any of the global trends continue to be considered, this DEIS must be redone. That is a legal requirement.[178]

---

[178] I-495 and I-270 Managed Lanes Study Joint Public Hearing, at 11-12 (Sept. 3, 2020), https://495-270-p3.com/wp-content/uploads/2020/10/MLS_JPH_September_3_Combined.pdf.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 106

Eyal Li, an environmental engineer at the Union of Concerned Scientists, stated:

On behalf of our 24,000 supporters in Maryland and our network of more than 26,000 scientists, engineers and public health professionals nationwide, you see us strongly oppose the proposed addition of lanes to I-495 and I-270 and supports a No Build option. We urge the MDOT SHA to evaluate additional alternatives for detailed study that provide equitable and sustainable mobility options for Maryland residents, including public transit, transportation, demand management on existing roadways, and transit-oriented land use that weren't considered in-depth in the DEIS.

UCS is particularly concerned about the project's disproportionate health impacts on marginalized communities near the highways. The race and ethnicity characteristics of the analysis area reveal that Latino, Asian Americans, and African-Americans are overrepresented by 50, 49, and 9 percent, respectively, while white residents are underrepresented by 37 percent compared to their population statewide. In 2019, UCS released a study showing African-American and Latino Marylanders are exposed to levels of traffic-related air pollution that are 12 and 11 percent higher than the average, while white Marylander's breathe air that is eight percent cleaner than the average Maryland resident. Chronic exposure to particulate matter pollution from vehicles causes increased death rates attributed to cardiovascular disease and respiratory ailments, including COVID-19, among other conditions. Given the systematic oppression of marginalized groups throughout history, we call on the Maryland DOT to shoulder a greater burden of proof that its actions are not harmful to the health and well-being of minority populations, low-income populations and/or indigenous peoples.[179]

**11.    The DEIS's Analysis of Construction Impacts is Insufficient**

The DEIS fails to analyze harmful air emissions from construction activities, including increased particulate matter, silica dust particles, CO, and greenhouse gas emissions. The Agencies attempt to justify this failure by claiming that construction will be segmented and each construction segment will take less than five years. DEIS at 4-158.

This justification does not meet the Agencies' obligations under NEPA or the CAA. First, it is unlawful to segment a project in order to avoid analyzing the impacts from construction. Second, construction, even within the currently studied segment of the plan, will certainly take more than five years. Even ignoring the 32 additional miles of proposed construction that will be needed for the overall P3 program, this study is proposing to construct managed lanes on 48 miles and re-construct the American Legion Bridge. By contrast, the $2 billion Virginia I-495

---

[179] I-495 and I-270 Managed Lanes Study Joint Public Hearing, at 5-6 (Aug. 18, 2020), https://495-270-p3.com/wp-content/uploads/2020/10/MLS_JPH_August_18_Combined.pdf.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 107

Capital Beltway High-Occupancy Toll Lanes project that added four new managed lanes to 14 miles of the Beltway contracted for five years of construction and took 4.5 years to construct.[180] The DEIS states that "It is anticipated that construction of any phase will last approximately four to five years." DEIS, at 4-157. However, the DEIS does not explain the basis for this expectation. The Agencies have not specified how long they intend the construction to be under contract, but it certainly will be longer than 5 years even for phases, let alone for the entire P3 program. The Agencies must analyze the air emissions and other impacts construction will have on the environment and human health and provide that analysis to the public in a supplemental EIS.

The DEIS states that "A quantitative analysis of the construction related GHG emissions for the Preferred Alternative will be conducted using FHWA's Infrastructure Carbon Estimator tool. The results of that analysis will be included in the FEIS." DEIS, at 4-158; see also DEIS, App 1, at 119. Delaying an analysis until after the public comment period on the DEIS has closed prevents meaningful public comment and informed decision-making and violates NEPA. Why are the Agencies waiting until an FEIS (which they plan to release at the same time as the ROD) to consider and provide the public with such important information about the Project's impacts? There is no justification for withholding this information or rushing the Project through without considering it. The Agencies must provide that information to the public before proceeding before proceeding with the NEPA process.

Further, the assertion in the DEIS that detours need not be considered in an air quality analysis of a transportation project is misleading. The stated reference only applies to the maximum allowed duration of a detour before it must be included in the modeling analysis for a project-level "hot-spot" conformity determination in a CO, PM₁₀ or PM₂.₅ nonattainment or maintenance area. There is no prohibition against considering the air quality impacts of detours and traffic diversions in an air quality analysis conducted under NEPA .

The EIS for this Project should assess and report the potential air quality impacts of detours and diversions that are in place for at least one year. For those locations where traffic detours and diversions result in air quality impacts, appropriate mitigation measures must be identified. Detours and diversions have the effect of adding traffic to existing roadways, and/or narrowing roadways and causing lane closures, thereby reducing those roadways' capacity. This leads to higher traffic volumes, lower speeds and greater congestion, resulting in greater emissions and higher pollutant concentrations, which negatively affect public health. To address the health concerns of residents and visitors to the Project area during construction, a thorough, detailed, project-wide consideration of detours and diversions should be included in the air quality studies for this Project.

---

[180] U.S. Dept. of Transp. Federal Highway Admin, Public-Private Partnership (P3) Procurement: A Guide for Public Owners (March 2019), https://www.fhwa.dot.gov/ipd/p3/toolkit/publications/other_guides/p3_procurement_guide_0319/appb.aspx.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 108

Also, the DEIS discusses air quality mitigation measures in generic terms. More information must also be presented on mitigation measures to protect and limit exposure to harmful pollutants for construction workers.

It is important to raise and discuss worker safety and health issues in the DEIS, rather than leaving it as an item in the Project's final construction details and specifications, where this issue is often addressed. Typically, a state DOT may insert a simple catch-all that imposes all responsibility on the contractor, requiring the contractor to observe and follow all laws, rules, and regulations.

Working on transportation facilities can be hazardous for the contractor's employees. Studies have shown that exposure to harmful levels of pollutants are frequently encountered. For example, a recent report indicated that "Airborne levels of crystalline silica associated with 7 major road repair tasks . . . indicated a significant risk of overexposure to crystalline silica for workers who performed the 5 highway repair tasks involving concrete."[181] This type of information should be made available to the public and decision makers so that projected costs can be more fully assessed and risks to worker health can be weighed with other risks and benefits of the Project.

12.    **The DEIS Ignores the Impacts of Construction-Generated Silica Dust, Which is a Public Health Hazard**

The roads and bridges deconstruction processes required for the Project will create massive amounts of toxic crystalline silica construction dust. Such toxic air pollution will cause respiratory diseases in children, grandchildren, and the entire public, especially for those closer to I-495 and I-270.[182] These illnesses include asthma, silicosis, chronic obstructive pulmonary disease (COPD), and lung cancer.[183] This is an urgent public health issue. And it is not addressed in the DEIS.

---

[181] David J. Valiante, et al., Highway Repair: A New Silicosis Threat, American Journal of Public Health Research and Practice, Vol 94, No. 5, 878 (May 2004), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1448352/pdf/0940876.pdf.

[182] Id. at 876-80; Examples of Silica Dust-Producing Tasks, Highway/Road Construction and Repair, New Jersey Occupational Health Surveillance Program Silicosis Surveillance & Intervention Project, https://www.nj.gov/health/workplacehealthandsafety/documents/silicosis/highwayphotos.pdf; Silicosis There is No Cure But it Can be Prevented!, New York State Department of Health (June 2017), https://www.health.ny.gov/environmental/workplace/lung_disease_registry/docs/silicosis_road.pdf.

[183] Danger in the Air: Health Concerns for Silica in Outdoor Air, Environmental Working Group (Sept. 25, 2014), https://www.ewg.org/research/sandstorm/health-concerns-silica-outdoor-air.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 109

According to the National Cancer Institute and OSHA, and various other U.S. and British sources, workers in such environments must wear respiratory protection masks and take various other precautions. As the I-495 and I-270 road and bridge construction occurs, with the continuous generation of harmful silica dust, without significant mitigation measures being taken, it will become necessary for schools to prohibit outdoor recess, sports events, and all outdoor activities (no walking, no bicycling). Some schools may have to shut down, such as Julius West Middle School, Farmland Elementary, Carderock Elementary, and Walter Johnson High. And what about precautions for others, of whatever age, should they also stay indoors and then need to wear respiratory facemasks when they go outside?

The massive and continuous generation of toxic silica dust will require major mitigation measures, such as vacuum systems and watering by tanker trucks, which are only marginally effective.[184] There is also the issue of disposal of this toxic material and its environmental impact. Moreover, these necessary precautions will require more equipment and workers and will generate more traffic and pollution (and costs) during the deconstruction phase. Yet, none of this is covered in the DEIS.

**13.   Technical Errors and Omissions**

Review of the air quality analysis for the Project revealed several technical errors and omissions, all of which, individually and in combination, tend to underestimate vehicular emissions and air pollutant concentrations and, therefore, understate potential impacts to overall air quality and public health. Specifically:

- Page 42 of Appendix I indicates that posted speeds were used to generate emission factors for the dispersion analysis and Page 96 indicates average speeds were used for the greenhouse gas and MSAT analyses. These data are not appropriate for use in the air quality analysis at issue here. Peak hour speeds, rather than posted speeds and average speeds, should be used. Peak hour speeds are slower than posted and average speeds, thereby producing higher emissions and higher concentrations of pollutants. This makes the analysis more conservative and more reflective of periods associated with higher levels of air pollution. Peak hour speeds are typically used on project-level air quality analysis for transportation projects. The Traffic Technical Analysis Report (Appendix C) indicates that peak-hour speeds are available. Consequently, all the air quality analyses must be redone with peak hour speeds. This affects the hot-spot analysis and the regional or mesoscale analyses (the MSAT and greenhouse gas analyses).

---

[184] This reference concerns air quality criteria and mitigation measures for silica dust for above ground construction works in a project. *MetroTunnel Environmental Management Framework*, Melbourne MetroRail Authority, at 32-33 (Dec. 2019), https://metrotunnel.vic.gov.au/__data/assets/pdf_file/0006/96135/Environment-Management-Framework-updated-December-2019.pdf. This Project should also have these kind of mitigation measures, particularly when road, soundwall, and bridge demolition will occur near "sensitive receptors," including schools.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 110

- The state-of-the-art practice for an air quality analysis for a transportation project is to examine three years for analysis. Typically, the opening year is analyzed, an intermediate year (such as 10 years after opening) and an outer year (such as 20 years after opening). This is done to capture the year with highest emissions, combining two different competing effects. Due to improvement in vehicle technology and cleaner fuels, emissions are expected to decrease into the future. On the other hand, increasing VMT with time leads to higher emissions. By analyzing appropriately separated years, the year with the highest emissions, and potentially the greatest air quality and public health impact, is captured. The analysis for this project did look at the opening year but instead chose to analyze a year 15 years after opening. By doing so, the analysis may have missed the year with the highest emissions and therefore have understated the potential emissions and air pollutant concentrations.

- Examination of the Traffic Technical Analysis Report discloses that no indication of the effects of induced demand were accounted for in the future traffic estimates. Induced demand is a well-known phenomenon that results in additional travel when highways are expanded, or capacity is increased. This means that for the air quality analyses, the traffic volumes used are underestimated and speeds are overestimated, leading to lower emission estimates than would actually occur. Techniques are available to account for induced demand, such as Susan Handy and Marlon Boarnet, *Impact of Highway Capacity and Induced Travel on Passenger Vehicle Use and Greenhouse Gas Emissions Policy Brief*, California Environmental Protection Agency Air Resources Board (Sep. 30, 2014), https://ww2.arb.ca.gov/sites/default/files/2020-06/Impact_of_Highway_Capacity_and_Induced_Travel_on_Passenger_Vehicle_Use_and_Greenhouse_Gas_Emissions_Policy_Brief.pdf, and Volker et al., *Induced Vehicle Travel in the Environmental Review Process*, Transportation Research Record (June 15, 2020).

- There is a discrepancy in what is defined as the project area for the hot-spot analysis and for the MSAT and greenhouse gas analyses. There should only be one project area for this Project. The hot-spot analysis considered intersections and interchanges in the immediate Project corridor, while the other two analyses looked at the "affected network" as determined from changed conditions on various roadways based on runs of the National Capital Region Transportation Planning Board transportation demand model. The transportation demand model identified many additional roadways that are affected by the Project. This affected network now becomes the project area for air quality analysis purposes. The hot-spot analysis should examine the intersections in the affected network to determine if any meet the criteria for a hot-spot analysis. If any do, then they must undergo an analysis. This will provide a more complete picture of potential air quality impacts of the Project.

- Appendix I mentions the Safer Affordable Fuel-Efficient (SAFE) Vehicles Rule, finalized on March 30, 2020. This new rule requires less stringent emission standards through 2026 compared to the standards which they replace. Since these standards have gone through the review and public processes and have been finalized, they should be

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 111

part of the air quality analysis for this Project. Emission rates for the hot-spot analysis and the MSAT and greenhouse gas analyses should be recalculated and the appropriate comparisons for each analysis re-examined. In general, this new rule is expected to show higher emission rates and greater levels of air pollutants.

The fact that every error and omission results in an underreporting of emissions and air quality effects is troubling. The outcome is a minimization and an undervaluation of the impacts this Project would have on air quality and public health throughout the entire region.

### I.    The DEIS Fails to Adequately Identify and Analyze Impacts to Forests

Tree canopy provides extraordinary ecological value for habitat, water processing and cleansing, and mitigating climate change by sequestering carbon and providing cooling shade. Forested lands are increasingly scare in the impacted counties, whose streams are already under assault. Approximately 1,500 acres of "tree canopy"/forest loss is anticipated for each build alternative. DEIS, at 4-100. Of that amount, about 19 acres are county and state Forest Conservation Act (FCA) areas with easements, 61 acres are TMDL-required reforestation sites, and almost five acres are tree replacement mitigation sites created to mitigate impacts from the construction of the Intercounty Connector. *Id.*, Table 4-25. These re- or afforested areas are often found in highway cloverleafs. 76 acres of forest loss would occur on National Park land. *Id.*, Table 4-26. It is telling that both FCA- and ICC-required forest mitigation sites, even if protected by easements, may so readily be lost due to the construction of yet more highway. Indeed, it should be made especially difficult to take such areas for any purposes, let alone the construction of additional highway lane-miles.

While both forest mitigation processes and costs/acre for paying fees-in-lieu into a Maryland Department of Natural Resources (MDNR) mitigation fund are mentioned in the DEIS, DEIS, at 4-101, no detail is provided. For example, there is no discussion of where tree mitigation will occur, whether it will occur near where trees are destroyed, or whether sufficient forest mitigation funds are available for these two counties and in the impacted sub-watersheds. In addition, Maryland FCA mitigation requirements are relatively weak in terms of their replacement ratios, currently allowing thousands of acres of forested land to be lost to development and not replaced each year; neither Montgomery nor Prince George's County has enacted a stronger program, such as Anne Arundel, Howard, and Frederick Counties have recently done. The DEIS must provide more detailed information on how the loss of tree canopy in the impacted watershed will be avoided and mitigated.

Instead, the public is asked to take on faith that the already inadequate mitigation promised in the DEIS will be accomplished, and that the newly planted trees or forest will, in fact, remain intact—but apparently, only until the next new highway, highway alteration, or highway expansion. This is neither the way that Forestland should be treated in general, nor the way that state-mandated forest mitigation laws envision addressing deforestation.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 112

### J.    The DEIS Does Not Sufficiently Consider Noise

The noise analysis contains rather neutral and therefore misleading conclusions with respect to the amount, duration, and effect of construction noise, as it shows that in some cases at least, with respect to continuous traffic noise, the Project would negatively impact quality of life for those living, working, or attending school nearby. DEIS, at 4-67, Table 4-15. Examples of the latter include several instances of parkland (one with a public golf course that has significant amount of citizen usage, Sligo Creek Park); single family residences near schools, playing fields and churches, all of which are proximate to where I-95 meets I-495; an apartment complex along I-270; and single family residences in the Adelphi area. The DEIS ignores or glosses over the additional houses and properties impacted by noise from the build alternatives, which can be seen on maps, but are not quantified because the DEIS only describes impacts to overall areas. The public should know whether their property would be subject to loud noise because of the Project.

Regular, heavy construction noise that exceeds 70-75 dBA—sometimes substantially, since dBA is on a logarithmic scale—and which drones and rattles and pounds for 6-8 hours/day over a period of months and years, has adverse health consequences, and these will be experienced by many if not most of the 36 environmental justice communities impacted by the Project. These health consequences include sleep deprivation, hearing loss, increased heart rate, constriction of the blood vessels and elevated blood pressure, as well as increased risk of Alzheimer's disease and other forms of dementia.[185] High volume traffic noise resulting from the newly configured highway can also be incessant and health-damaging. Where high volume traffic noise is adequately mitigated by noise barriers, those noise volumes can be reduced, but if effective barriers are deemed too costly the impacts on nearby populations and homes can be severe. It is not clear in the DEIS that mitigation will be forthcoming in those instances, and once again, environmental justice communities will suffer disproportionately. The DEIS even states that noise barrier systems will not be installed in nine areas with environmental justice communities. DEIS, at 4-139. Instead of merely assuming or recommending some noise barriers, the Agencies must commit to noise walls along all stretches of the Project that impact communities, schools, parkland, and places of worship. Given that the LODs for all the built alternatives are virtually identical, there is no justification for delaying this decision. This should not be left to the whim of a private developer to decide based on what is most profitable for them; if it is, it is clear that the barriers will not be built, and the communities will suffer. Moreover, the DEIS must fully consider and analyze the health impacts from the increased and expanded noise of the Project with and without any barriers that are not committed to be built.

---

[185] Jennifer Weuve, et al., *Long-Term Community Noise Exposure in Relation to Dementia, Cognition, and Cognitive Decline in Older Adults*, Alzheimer's & Dementia (Oct. 20, 2020), https://alz-journals.onlinelibrary.wiley.com/doi/10.1002/alz.12191. Nicholas Bakalr, *Living in Noisy Neighborhoods May Raise Your Dementia Risk*, New York Times (Oct. 28, 2020), https://www.nytimes.com/2020/10/28/well/mind/living-in-noisy-neighborhoods-may-raise-your-dementia-risk.html.

OP·LANES™
MARYLAND   I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 113

### K.    The DEIS Relies on Flawed Traffic Modeling[186]

The Maryland I-495 & I-270 Managed Lanes Project Draft Environmental Impact Statement and Draft Section 4(f) Evaluation (DEIS) tells a simplistic traffic story. It claims that if the Project is not constructed, corridor traffic volumes will grow significantly and delays will grow exponentially. It claims that the Project will reduce congestion in the general-purpose lanes relative to traffic conditions today. It claims that the Project will alleviate congestion on other roads.[187]

This simple story is wrong. The same promises were made in the Virginia I-495 Express Lanes Final Environmental Impact Statement (FEIS), and the results were completely different. During the peak traffic periods, the Express Toll lanes created what is the worst bottleneck on I-495 today—at the northern terminus of the lanes. The FEIS either did not disclose this impact or it was not anticipated. As a result, the Virginia Department of Transportation (VDOT) had to quickly open a shoulder lane to partially mitigate this bottleneck.

(Pre-Covid) travel times in the Virginia I-495 general-purpose lanes are _higher_ today than they were before the Express Lanes opened and much higher than forecast in the FEIS. The FEIS got this wrong. Otherwise in the peak periods, the effects of the Express Lanes are complex, causing both increases in traffic on some roads and decreases on others. The FEIS wrongly claimed that the project would only benefit other roads.

_____

[186] This Traffic Modeling Section was prepared by Norman Marshall, President, Smart Mobility, Inc. Mr. Marshall received a B.S. in Mathematics from Worcester Polytechnic Institute (1977) and an M.S. in Engineering Sciences from Dartmouth College (1982). Mr. Marshall's studies at Dartmouth College included graduate courses in transportation modeling. Mr. Marshall has 33 years of professional experience in transportation modeling and transportation planning including 14 years at RSG Inc. (1987-2001) and 19 years at Smart Mobility Inc. (2001-now). Mr. Marshall's primary professional focus is regional travel demand modeling and related transportation planning. Mr. Marshall is a nationally known expert in this field and has completed projects in over 30 states including work for the U.S. government, state Departments of Transportation, Metropolitan Planning Organizations, cities and non-profit organizations. One of Mr. Marshall's particularly notable projects is a $250,000 project with the California Air Resources Board where he led a team including the University of California in reviewing the state's regional travel demand models. Mr. Marshall has many peer-reviewed publications and conference presentations, including presentations at national Transportation Research Board conferences in 2017, 2018 and 2019. Mr. Marshall is an Associate Member of the Transportation Research Board. Mr. Marshall's resume is attached to these comments.

[187] Current Transportation Secretary Greg Slater commented in January 2020 about this Project: "And what we're showing is a 35 percent reduction in delay on 495 and 270, as well as a seven percent reduction in delay on the surrounding arterial roads." Board of Public Works Meeting, at 24 (Jan. 8, 2020), https://bpw.maryland.gov/MeetingDocs/2020-Jan-8-Transcript.pdf.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 114

Part of the reason things in Virginia did not turn out as anticipated is due to reliance on flawed modeling. Flaws in the Metropolitan Washington Council of Governments (MWCOG) model include that it: (1) does not constrain traffic flow to capacity; (2) does not properly feed congested travel times back to non-work trip destinations; (3) assumes no increased traffic from road expansion; (4) fails to accurately forecast bottlenecks; (5) cannot calculate net congestion tradeoffs; and (6) cannot accurately model peak period conditions.

The claims made in the Maryland DEIS are the same as those made in the Virginia FEIS. The underlying modeling approach is the same.

Based on empirical data from Virginia and Maryland, understanding of model flaws, and data analysis, the reasonably foreseeable impacts of constructing managed lanes on I-495 and I-270 follow.

1)   Expanding I-495 and I-270 will shift traffic from the shoulder hours into the peak hours and create and/or exacerbate bottlenecks. The flawed models employed in the DEIS analyses are incapable of forecasting this type of problem. As bottlenecks are most likely at the terminus of the managed lanes, project phasing is critically important as well as the final extent of the project.

2)   An improvement in general-purpose lane speed is unlikely because constructing the managed lanes will shift traffic from the shoulder hours to the peak hours, and the general-purpose lanes will be just as congested during the peak hours as they would have been otherwise. The foundational premise of this Project is that extreme congestion in the general-purpose lanes is needed to justify the high tolls that will be required to fund the project.

3)   Constructing the I-495 and I-270 managed lanes is likely to make arterial congestion worse. No trip begins or ends on a limited access highway, and traffic does not magically switch between limited access highways and arterials as is presented in the DEIS. Any shifts between these roadway classes increases traffic on some arterials and decreases traffic on others. As managed lanes concentrate traffic in peak hours, arterial roads at I-495 and I-270 interchanges will be severely impacted, and these impacts are likely to outweigh the congestion benefits of traffic diversion from other arterials. The DEIS models are incapable of calculating these tradeoffs.

4)   If the managed lanes are constructed, it is likely that there will be significant traffic growth (induced travel) and induced land use impacts.

5)   Managed lane proponents stress "choice." In fact, the choice is between two bad options: extreme congestion vs. extremely high tolls. Only about 1/6 of the daily traffic is carried by the Virginia I-495 Express Lanes despite the Express Lanes having 1/3 of the roadway capacity. This is an inefficient use of infrastructure. The other 5/6 of traffic is carried by the general-purpose lanes. The estimates in the DEIS are consistent with those ratios. The toll lanes are "chosen" primarily by high-income travelers and/or travelers who are having the tolls reimbursed. This elite group will remain small because increases in

00022695



I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 115

demand by other users will prompt the tolls to increase further, becoming even less affordable.

6) The managed lanes would benefit only the few who are able to outbid the majority of travelers. There would be no benefits for non-users of the toll lanes, that is, most travelers. Non-users of the toll lanes would face continued high congestion in the general-purpose lanes and increased congestion on arterial roadways accessing I-495 and I-270 interchanges. Nevertheless, a portion of their taxes likely would go toward subsidizing the private toll lanes as has occurred in Virginia.

The flawed traffic models used in the DEIS overestimate future congestion to justify the project. The DEIS then fails to acknowledge that the project depends on peak period general purpose lane congestion while also causing additional connecting arterial congestion and large bottlenecks where the toll lanes end. The proposed managed lanes in Maryland would make congestion worse for the majority of peak period drivers and push drivers to choose between extreme congestion and extremely high tolls to make the lanes profitable. The promised benefits for non-users of the toll lanes will not materialize, and taxpayers will likely have to subsidize the project.

1. **Flaws in the MWCOG Model Used in the I-495 and I-270 DEIS**

Traffic growth forecasts in the Maryland I-495 & I-270 Managed Lanes Project Draft Environmental Impact Statement (DEIS) are unrealistically high. The projected forecasts are based on the Metropolitan Washington Council of Governments (MWCOG) regional travel demand model, which has two fatal flaws that exaggerate traffic growth in congested conditions:

1) The MWCOG model does not constrain traffic flow to capacity; and

2) The MWCOG model does not properly feed congested travel times back to non-work trips.

a. MWCOG Model Does Not Constrain Traffic Flow to Capacity

The MWCOG model includes an hourly capacity value for each roadway segment. Modeling best practice is to use "ultimate capacity", i.e. the "maximum volume that should be assigned to a link by the forecasting model."[188] The MWCOG model sets freeway capacity at 2,000 vehicles per lane per hour in lower-density areas and 1,900 per-lane per hour in higher-density areas. As shown in Figure 1 reproduced from the DEIS, the maximum traffic volumes mostly max out around 8000 for the four-lane sections (not including segments with more lanes including the American Legion Bridge, the split south of the I-270 spur, the I-95 interchange area, and the approach to the Woodrow Wilson Bridge).

[188] Cambridge Systematics, Vanasse Hangen Brustlin, Gallop, Bhat, C.R., Shapiro Transportation Consulting and Martin/Alexious/Bryson. Travel Demand Forecasting: Parameters and Techniques, National Cooperative Highway Research Program Report 716, 2012.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 116

As the modeling reference states, the MWCOG's model capacity is the "maximum volume that should be assigned to a link by the forecasting model." Assigned volumes that exceed capacity are errors, and assigned volumes that greatly exceed capacity are serious model errors. Alan Horowitz, one of the most respected experts in travel demand modeling wrote:

*I am quite familiar with alternatives that assign traffic well beyond a volume-to-capacity ratios (v/c) of 1, and I cannot fathom why anybody would take any of this seriously, either as a realistic representation of the future or as a strawman case study...*

*... do not publish any alternative/scenarios with facilities loaded beyond a v/c ratio of 1.1.*[189] *(Horowitz 2019)*

In the DEIS, many segments of I-495, I-270 and other roads are loaded with v/c greater than 1.1 (Figure 2). Horowitz admonishes that the DEIS modeling should not be published with v/c > 1.1. Therefore, these model results should not be used for planning purposes. However, not only does the DEIS publish these modeling results and use them for planning, but it even goes so far as to represent these over-capacity assignments as a performance measure. This claim is false and is rebutted in the Appendix B of this section.

The MWCOG model relies on 40-year-old Static Assignment Algorithm (STA) that was adopted when computers were less powerful that today's smart phones. STA treats every road segment as independent of other road segments. In peak periods, traffic on I-495 and I-270 is characterized by queues behind bottlenecks. In STA there are no queues behind bottlenecks, and the MWCOG models cannot capture backups at the merges on I-270/I-495 or accurately model conditions during the peak of rush hour traffic

A peer-reviewed journal article authored by Norm Marshall: *Forecasting the Impossible: The Status Quo of Estimating Traffic Flows With Static Traffic Assignment and the Future of Dynamic Traffic Assignment*[190], documents that STA always produces impossibly high freeway traffic volumes in congested networks and cannot be relied on for planning. The only solution is to replace STA with a more modern Dynamic Traffic Assignment (DTA) algorithm. MWCOG has a long-term plan to replace STA with DTA. Alan Horowitz also wrote: "*Choose DTA over STA whenever possible."*[191]

[189] Horowitz, Alan. Posting on the Travel Model Improvement Program (TMIP) listserv, March 2019.

[190] Marshall, Norman. Forecasting the impossible: The status quo of estimating traffic flows with static traffic assignment and the future of dynamic traffic assignment, *Research in Transportation Business & Management*, Volume 29, 2018, 85-92. https://www.sciencedirect.com/science/article/pii/S2210539517301232?via%3Dihub.

[191] Horowitz, Alan. Posting on the Travel Model Improvement Program (TMIP) listserv, March 2019.

00022696

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 117

*Figure 1: 2017 I-495 Inner and Outer Loop Peak Period Hourly Volumes*





Source: DEIS, 2020.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 118

*Figure 2: Impossible Traffic Forecasts in MWCOG 2040 No Build Afternoon Peak Period*
*(Segments with Volume/Capacity Greater than 1.1 Shown in Red)[192]*



Source: Mapped from MWCOG model link in DEIS.

[192] Loaded network file downloaded from
ftp://dtpcog.cog.dtp@ftp.mwcog.org/MD_SHA_TRP_Study_2040_Alt1_Model_Files.zip
referenced in DEIS, App. C, at 841.

00022697

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 119

All the model traffic forecasts for roadway segments shown in red have volume-to-capacity ratios greater than 1.1. As Horowitz advises, these results should neither be published nor used in planning. The AM peak period map is similar.

> b.  MWCOG Model Does Not Properly Feed Congested Travel Times
>     Back to Non-Work Trip Destinations

All good travel demand models employ a feedback process so that the destinations chosen are sensitive to congested travel time. The MWCOG model feeds back congested travel time from the morning peak period, but only for work trips. The destination choices for the other trip types are based on off-peak travel times. This is inadequate. As Norm Marshall commented about the MWCOG model in 2002:

> The TPB DCV2 model does include distribution feedback. However, the feedback mechanism is only applied to home-based work trips. Specifically, AM congested times are used to distribute HBW trips while off-peak uncongested times are used to distribute HBS, HBO, and NHB trips.[193] The underlying assumption by TPB staff is that congestion does not influence non-work trip making…

> In a publication by the Travel Model Improvement Program (TMIP) – a program sponsored by the EPA and U.S. DOT – entitled *Incorporating Feedback in Travel Forecasting: Methods, Pitfalls, and Common Concerns* dated March 1996, the authors provide technical guidance on incorporating feedback in the traditional four-step model. Some of the findings published in the report … [include] … Feedback should be implemented for the work-related trips at a minimum, and the other purposes should be examined for their percentage of peak travel.[194]

In the 2002 review, in the forecast year, modeled congestion on the Potomac River crossings was severe. The MWCOG model assumed that non-work travelers, including those making shopping trips, would cross the river regardless of congestion, because peak period congestion did not affect their destination choices in the model. Perversely, these non-work travelers crowded out work trips from the Potomac River bridges in the model during peak times. It appears that these problems remain in the MWCOG model today and are especially relevant to modeling the American Legion Bridge. The MWCOG model over-assigns non-work trips to all the bridges during peak periods because the model is not representing travel times for these trips properly.

In the DEIS 2040 no build model, MWCOG morning and afternoon peak period traffic volumes for all Potomac River bridge crossings are ridiculously high (Figure 3). All greatly

---

[193] HBS - Home-based Shop; HBO - Home-Based Other, NHB - Non Home-Based

[194] Letter Concerning "Effects of Proposed Potomac River Crossings on Land Use and Traffic and Identification of Serious Deficiencies in TPB Version 2 Transportation Model." (Nov. 4, 2002), http://www1.mwcog.org/uploads/committee-documents/pF1eWV020040726152612.pdf.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 120

exceed the 1.1 volume-to-capacity ratio threshold, and range as high as 2.75, i.e., the bridge traffic volume is 275% of the highest possible volume.



*Figure 3: Wildly Impossible Potomac Bridge Traffic Forecasts in MWCOG 2040 No Build Morning and Afternoon Peak Periods*



| | Point of Rocks | American Legion | Chain | Francis Scott Key | Theodore Roosevelt | Arlington Memorial | I-395 | Woodrow Wilson |
|---|---|---|---|---|---|---|---|---|
| ■ AM | 2.75 | 1.36 | 2.48 | 1.63 | 1.42 | 1.67 | 1.44 | 1.37 |
| ■ PM | 2.50 | 1.27 | 2.33 | 1.67 | 1.40 | 1.59 | 1.30 | 1.29 |

Source: I extracted data from MWCOG model link in DEIS.

> c.  MWCOG Model Assumes No Increased Traffic from Road
>     Expansion

In general, freeway expansion causes induced travel. A review of the induced travel research by Handy and Boarnet (2014) concluded that induced travel is real, and that the magnitude is enough to prevent capacity expansion from reducing congestion:

> Thus, the best estimate for the long-run effect of highway capacity on VMT [vehicle miles traveled] is an elasticity close to 1.0, implying that in congested metropolitan areas, adding new capacity to the existing system of limited-access highways is

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 121

*unlikely to reduce congestion or associated GHG [greenhouse gas] in the long-run.[195]*

The DEIS rejected Alternative 6 adding only general-purpose lanes because of the induced travel impacts:

*The results of the Alternative 6 modeling indicated that latent demand, meaning trips from other routes, times and modes, would be expected to fill the GP lanes by 2040, resulting in worse traffic operations than all of the Screened Alternatives in several metrics, including network-wide delay and average travel time. (DEIS, at 2-12)[196]*

Induced travel represents the difference between Build Vehicle Miles Traveled (VMT) and no build VMT. The DEIS models cannot accurately account for induced travel because the MWCOG model overestimates traffic growth in the no build alternative.

In the long-term, induced land use is an important cause of induced travel. Widening I-270 in the late 1980s is a classic case study.

*In the five years before construction began, officials endorsed 1,745 new homes in the area stretching from Rockville to Clarksburg. During the next five years, 13,642 won approval.[197]*

By 1997, I-270 was routinely overrunning its designed capacity, and peak-hour traffic volumes on some segments had surpassed levels forecasted for 2010.

A primary cause of the inaccurate traffic forecasts was inaccurate land use forecasts which were assumed to be the same for both no build and build analyses. The total number of households forecast for the Washington region for the year 2000 was only off by 2 percent. However, the forecasts were completely wrong about the distribution of the households.[198]

---

[195] Susan Handy and Marlon G. Boarnet, *Impact of Highway Capacity and Induced Travel on Passenger Vehicle Use and Greenhouse Gas Emissions: Policy Brief*, prepared for California Air Resources Board (Sept. 30, 2014).

[196] See Appendix B of this report for a discussion of latent demand, induced travel and generated traffic.

[197] Alan Sipress, *Md.'s Lesson: Widen the Roads, Drivers Will Come*, Washington Post (Jan. 4, 1999). https://www.washingtonpost.com/wp-srv/digest/traffic4.htm.

[198] Data from National Capital Region Transportation Planning Board, Metropolitan Washington Council of Governments, "Comparison of 1984 Study Forecasts with Most Recent Data: I-270 Corridor, June 18, 2001.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 122

Growth was much lower in the region's core than forecast, and much higher in western suburban areas, especially in the I-270 corridor.

Figure 4 compares the 2000 forecast made before the I-270 widening with actual 2000 numbers. The largest forecasting error was for Montgomery County in the I-270 corridor, where the actual number of households in 2000 exceeded the forecast by 27 percent. Widening I-270 was a primary cause.

*Figure 4: Washington DC Region: Suburban Freeway Projects Shifted Households to Suburbs from Core[199]*



Source: Data from National Capital Region Transportation Planning Board and MWCOG.

The total number of regional households in 2000 was 2 percent less than forecast prior to the I-270 widening project. When the I-270 widening project was planned, forecast housing and employment growth in the corridor was moderate, and growth in the region's core was expected to be much stronger.[200] The forecasts were completely wrong about the distribution of the households. Growth was much lower in the region's core than forecast, and much higher in western suburban areas, especially in the I-270 corridor.

---

[199] National Capital Region Transportation Planning Board and Metropolitan Washington Council of Governments. Induced Travel: Definition, Forecasting Process, and a Case Study in the Metropolitan Washington Region, September 19, 2001.

[200] Data from National Capital Region Transportation Planning Board, Metropolitan Washington Council of Governments, "Comparison of 1984 Study Forecasts with Most Recent Data: I-270 Corridor, June 18, 2001.

00022699

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 123

The other areas where growth exceeded the forecast are suburban Virginia areas where freeway capacity also was expanded. Projects in these areas include construction of the Dulles Greenway, the Route 234 Bypass, and widening I-66.

The suburban increases were balanced by declines and slower growth in the core of the region, including D.C., Arlington, Prince George's County, and Alexandria.

The I-495 and I-270 DEIS states on page 144, "As the land use assumptions do not vary between Alternative 1/No Build and the Build Screened Alternatives, all the trip generators are equal among scenarios: there will not be new housing developments or new places of employment." Such assumptions are clearly debatable. Widening I-270 and I-495 will likely induce land use and travel. Induced travel causes increased energy use and air pollution, including greenhouse gas emissions.

The DEIS also asserts: "Induced demand represents new trips. While the project may generate some new trips, MWCOG modeling shows that the amount of induced demand caused directly by the project would be less than 1% of the total VMT in the region."[201] Despite this assertion, due to its deficiencies, the MWCOG model cannot accurately account for induced travel. (See Appendix B.)

> d.   MWCOG Model Fails to Accurately Forecast Bottlenecks

Figures 5 and 6 show the traffic increases in peak hour traffic on Virginia I-495 following the opening of the Express Lanes (EL) and General-Purpose Lanes (GPL). The increases are calculated as the average of post-construction 2013-2019 to pre-construction 2005-2007. Appendix C provides details of how these numbers were estimated.

---

[201] DEIS, App. C, Traffic Analysis Technical Report, May 2020, at 144.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 124

*Figure 5: Change in Outer Loop GPL Peak Hour Traffic in Virginia After Express Lanes Opening (change per segment comparing 2013-2019 to 2005-2007 traffic volumes)*



*Figure 6. Change in Inner Loop GPL Peak Hour Traffic in Virginia After Express Lanes Opening (change per segment comparing 2013-2019 to 2005-2007 traffic volumes)*



Source: Virginia Department of Transportation traffic count reports.

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 125

In general, the before and after decreases in peak hour GPL traffic volumes are small, on the order of 200-300 per hour, or less than 5% of the total GPL peak hour traffic volume. The one outlier shown in Figure 5 for the Outer Loop southbound between SR 193 to the Dulles Toll Road is not an exception but is just a quirk in the data. The Express Lanes begin in this section, and the VDOT traffic count is after the split. If the count were upstream of the split, no such large reduction would be shown.

What is most striking in the data is that the higher peak hour volumes carried in 6 lanes (4 GPL + 2 EL) also extend into the 4-lane GPL sections north and south of the endpoints of the Express Lanes. There is little, if any, congestion relief where the Express Lanes are parallel to the general-purpose lanes, but much worse congestion upstream and downstream. This large increase in peak hour traffic was caused by the opening of the Express Lanes and has resulted in the worst bottleneck on I-495 in the afternoon on the Inner Loop where the Express Lanes must merge back into the general-purpose lanes. (See Appendix C for more details.)

The Express Lanes opened in November 2012. This bottleneck problem was not anticipated or disclosed in the planning process. Only a few months later in June 2013, VDOT announced a plan to partially address these problems by opening a shoulder lane on the left side of the Inner Beltway to increase the effective width to five general-purpose lanes at the merge.

Expanding I-495 and I-270 in Maryland likely will result in similar unintended negative congestion impacts, creating and/or exacerbating bottlenecks. The Virginia modeling was not up to the task of forecasting these types of problems and the DEIS modeling is not either.

e.    MWCOG Model Cannot Calculate Net Congestion Tradeoffs

The MWCOG model treats daily traffic as a composite of four time periods[202] including a 3-hour morning peak period (6-9 a.m.) and a 4-hour afternoon peak period (3-7 p.m.). The time shifts that resulted from the opening of the Express Lanes in Virginia is mostly within these peak periods, i.e., it shifts traffic from what planners call the "shoulder" hours into the peak hour. The MWCOG model does not have any way of considering time shifts within the peak periods and therefore cannot calculate the congestion changes related to such shifts.

Instead, the MWCOG model calculates vehicle hours of delay (VHD) as if traffic volumes are constant throughout the 3-hour morning peak period and 4-hour afternoon peak period. The calculated VHD grows exponentially as a function of the volume-to-capacity ratio (V/C)—especially when modeled V/C exceeds 1.0. As discussed above, V/C greater than 1.0 is impossible and represents model errors. Figure 7 shows MWCOG model arterial delay in minutes per mile as a function of V/C.

---
[202] Four time periods: morning peak, midday, afternoon peak, and overnight.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 126

*Figure 7: MWCOG Model Vehicle Minutes of Delay Per Mile for 40 mph Arterial[203]*



Source: MWCOG model documentation.

In the figure, a road segment with calculated V/C = 1.0 has 1.5 minutes of delay per mile, and modeled delay grows exponentially with an impossible V/C > 1.0. V/C in the MWCOG model is not capped at 1.2, and there are higher V/C road segments in the model, including the value of 2.75 for the Point of Rocks Bridge shown in Figure 3. Beyond the V/C point shown in the Figure 7, MWCOG model VHD continues to increase exponentially – 6.6 minutes per mile at V/C = 1.3, 8.6 minutes per mile at V/C = 1.4, and so forth with MWCOG model table values as high as V/C = 3.0.

As shown in Figure 8, 81% of regional afternoon peak period VHD in the 2040 no build modeling is from impossible assignments with volume-to-capacity ratio exceeding 1.0. The exponential increases in modeled delay as a function of V/C makes MWCOG model VHD more of a metric of model errors than a metric of real-world performance.

---
[203] Calculated from MWCOG. Calibration Report for the TPB Travel Forecasting Model, Version 2.3, on the 3,722-Zone Area System: Final Report, January 20, 2012.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 127

*Figure 8: 2040 No Build Regional Afternoon Peak Period VHD – Road Segments with Possible v/c ≤ 1.0 vs. Impossible v/c > 1.0*



Source: Data extracted from MWCOG model link in DEIS.

The DEIS VHD calculations are invalid. However, even if they were valid, they do not provide a compelling case for the proposed managed lanes project. Figure 9 takes the DEIS VHD numbers for a combination of Montgomery and Prince George's Counties and divides by current and 2040 population so the alternatives can be compared on a per capita basis.

*Figure 9: DEIS Vehicle Minutes of Delay Per Capita for Montgomery and Prince George's Counties[204]*



Source: DEIS, 2020.

---

[204] Numbers from DEIS Table 1-1, p. 1-5 and DEIS, App. C, Table 5-23, at 149.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 128

The DEIS modeling proposes that congestion is going to get much worse in the future, but that I-495/I-270 managed lanes will make it somewhat less bad. In fact, however, the real story told by the VHD outputs is that the MWCOG model overestimates future traffic volumes and translates relatively small increases in VMT into larger increases in VHD. For example, for an arterial roadway in the model where the volume has reached capacity in the peak period, a 1% increase in traffic volume in the MWCOG model translates into a 10% increase in VHD per vehicle. This amplification of small VMT changes into large VHD numbers is just a way of making impacts look larger.

  f.  DEIS Models Cannot Accurately Model Peak Period Conditions

As documented above, the peak period traffic volume outputs from the MWCOG model are not capacity constrained. The model forecasts impossibly high volumes for many roadway segments including segments of I-495 and I-270 that are the focus of the DEIS.

The DEIS analysis takes these over-capacity assignments and uses them as inputs to a VISSIM microsimulation model that is capacity constrained. This is a useless exercise because the VISSIM model can only report that the inputs are impossible. The DEIS tries to represent what are essentially VISSIM error messages as measure of latent demand. This claim is false and is rebutted in the Appendix B of this report.

This is an example of an old computer adage—"garbage in—garbage out." The two-model process is analogous to money laundering. Bad forecasts from the MWCOG model are filtered through the VISSIM model and come out as very detailed precise-looking numbers. However, the underlying MWCOG model forecasts are invalid, and the VISSIM outputs also are invalid.

Figure 10 shows afternoon peak period "demand" (vehicles per hour) on the American Legion Bridge Inner Loop from the MWCOG model. Figure 11 shows afternoon peak period "throughput" (vehicles per hour) on the American Legion Inner Loop from the VISSIM model.

00022702


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 129

*Figure 10: DEIS "Demand" for American Legion Bridge Inner Loop in the Afternoon Peak Period*



Source: Graphed numbers from DEIS Appendix C.

*Figure 11: DEIS "Throughput" for American Legion Bridge Inner Loop in the Afternoon Peak Period*



Source: Graphed numbers from DEIS Appendix C.

Neither of the graphics represents reality. As discussed above, the 2040 no build alternative afternoon period volumes cannot increase significantly from existing volumes due to capacity constraints; therefore, the DEIS "demand" volumes are impossible. The graphic showing future no build throughput being much less than throughput today is implausible and the large dip in throughput is ridiculous. It would never happen and is just an artifact of VISSIM model limitations. The impossible over-capacity inputs cause VISSIM model errors. Congestion

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 130

can never get so bad that it will reduce traffic volumes by 50% on a road that is already very congested.

The DEIS framing of "demand" vs. "throughput" is fundamentally wrong. Demand is not a point; demand is a curve with more demand when the price is lower and less demand when the price is higher. For un-tolled roads, this "price" is primarily based on the value of travel time. The generalized price for toll roads includes both cost and time. As shown in this illustration from the Federal Highway administration, there is a market equilibrium balance between demand and price/supply (Figure 12).

*Figure 12: Market Equilibrium User Costs and Traffic Volumes (FHWA)[205]*



**Exhibit 4.** Equilibrium user costs and traffic volumes.
P = price. V = volume.

Source: Federal Highway Administration, 2017.

The narrative accompanying the figure reproduced above states:

When supply and demand are in balance, a market is said to be in *equilibrium*. This is often represented as the intersection of a supply curve and a demand curve, which determines the market-clearing price and quantity (see Exhibit 4). At this point, everyone who purchases the good is willing to (collectively) buy that amount at that price, and producers are willing to supply that quantity at that price. If either the supply or demand curves shift, the market price and quantity will also change.

For highway travel, demand is determined as described above. The "supply" curve, however, is essentially represented by the generalized cost curve. The intersection of these two curves determines how high traffic volumes will be and what the

---

[205] Federal Highway Administration. Economics: Pricing, Demand, and Economic Efficiency – A Primer. 2017. https://ops.fhwa.dot.gov/publications/fhwahop08041/cp_prim4_03.htm.

00022703

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 131

associated average highway-user costs will be at that volume level. When the level of demand is low relative to the capacity of the road, it will be uncongested, and prices will be relatively constant even as volumes increase (the "flat" part of the user cost curve in Exhibit 4). However, when demand levels are high and the road is congested, both user costs and traffic volumes will be higher, potentially rising sharply as demand continues to increase.

The dichotomy put forward in the DEIS of "demand" vs. "throughput" does not exist. There are only traffic volumes at the equilibrium point. The volume $V_0$ represents the point on the demand curve where the cost equals $P_0$. The "throughput" should equal this equilibrium traffic volume.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 132

Figure 13 shows a more realistic estimate of forecast traffic based on the experience of the Virginia Express Lanes. The 2040 no build traffic volumes would be very similar to existing traffic volumes because of capacity constraints. The 2040 build volumes (represented here as Alternative 9)[206] would be significantly higher—and particularly higher during the mid-point of the afternoon peak period in the 4-5 and 5-6 hours. This shift happened following the opening of the Virginia Express Lanes.

*Figure 13: Realistic American Legion Bridge Inner Loop in the Afternoon Peak Period Traffic Volumes*



Source: Created this graphic based on Virginia Express Lanes data.

---

[206] Alternative 9, according to the DEIS, is two priced managed lanes in each direction on I-495 and convert one existing HOV lane to a priced managed lane and add one priced managed lane in each direction on I-270.

00022704

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 133

## 2.    Foreseeable Impacts of Building I-495 and I-270 Managed Lanes

### a.    Managed Lanes Are Unlikely to Reduce Congestion on the General-Purpose Lanes

The small reductions in general-purpose lane volumes shown in Figures 5 and 6 have not improved general-purpose lane travel times. As shown in Figure 14, the Express Lanes operator, Transurban, reports reliably fast travel times in the southbound Express Lanes and large average time savings compared to the general-purpose lanes.

*Figure 14: Transurban Travel Time Data[207]*



Source: Transurban, 2019.

Figure 14 shows average general-purpose lane travel times of about 60 minutes. Assuming that this is for the entire 14-mile length, this represents a speed of about 15 mph. However, Figure 13 could represent a shorter distance because the average time shown for the Express Lanes of about 10 minutes is impossible for the entire 14-mile length (because it would require an average speed of 84 mph). If the segment underlying the data is shorter than the full 14 miles, the actual general-purpose lane speeds may have been even lower than 15 mph.

---

[207] Bell, Elisa, Transurban. 495 and 95 Express lanes: Customer choice regional benefit. Presented as part of the Transportation Research Board's Webinar on Ensuring Equity with Priced Managed Lanes in April 2019, http://onlinepubs.trb.org/onlinepubs/webinars/190429.pdf.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 134

Researchers at the University of Virginia found that in March 2018, average morning and peak hour travel times in the general-purpose lanes were typically 20-30 mph.[208] March 2018 was one of the better months in the Transurban data. However, the discrepancy between the two sets of data is unexplained. An estimate of 20 mph is used in the figure below.

---

[208] Babiceanu, Simona and Donna Chen. Empirical Evidence for Estimating the Value of Travel Time on Express Lanes: Northern Virginia Regional Case Study, 2018.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 135

The Virginia I-495 Express Lanes FEIS reported pre-construction "existing" speeds for the Outer Loop of 46 mph in the AM peak hour and 39 mph in the PM peak hour, i.e., twice the speeds reported for today by Transurban. This suggests that peak hour general-purpose lane speeds have declined significantly since opening the Express Lanes. As shown in Figure 15, current general-purpose lane speeds are generally much lower than was forecast in the FEIS.

*Figure 15: I-495 General-Purpose Speed – Historical, FEIS Forecast, and Estimated Actual[209]*



Source: Virginia Express Lanes 2006 FEIS and current data.

The DEIS general-purpose lane travel time forecasts are invalid because (as discussed above):

- The models overestimate no build traffic volumes; and

- The models fail to account for the shift to the peak hours that would follow managed lanes construction.

These two factors cause the models to overestimate general-purpose lane congestion in the no build alternative and underestimate general-purpose-lane congestion in the build alternative.

_____
[209] Virginia Department of Transportation (VDOT). Capital Beltway Study: Final Environmental Impact Statement and Section 4(f) Evaluation, Table 2-9, at 45, April 2006.
http://www.virginiadot.org/VDOT/Projects/Northern_Virginia/asset_upload_file77_72985.pdf.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 136

The Virginia experience suggests that constructing similar managed lanes in Maryland would do little or nothing to reduce congestion on the general-purpose lanes. In fact, as discussed in a subsequent section of this report, the entire premise of this project is that extreme congestion is needed to justify the extremely high tolls required to pay for the project.

b.    Managed Lanes Are Likely to Make Arterial Congestion Worse

The DEIS puts forward a simplistic and incorrect framing of diversion from arterial roadways to I-495/I-270. It pretends that traffic is magically subtracted from one class of roadway and added to the other. In fact, no trip begins and ends on a limited access roadway and a traffic shift from arterials to I-495/I-270 necessarily adds traffic to some arterials as it reduces traffic on others. Figure 16 shows a typical example from Google Maps comparing routes between Bethesda and Silver Spring.

*Figure 16: Google Maps Recommended Route from Bethesda to Silver Spring*



Source: Google Maps, 2020.

Google Maps recommends a route using I-495 over an arterial route even though the I-495 route is more than 50% longer in miles (8.2 miles vs. 5-4 miles) because it is 2 minutes faster (16 minutes vs. 18 minutes). The I-495 route reduces the traffic volume on Jones Bridge Road and East-West Highway, but it adds traffic to MD 355 and US 29. Whether this represents a net congestion benefit depends on the congestion levels on all these roads.

The DEIS assumes trips like this should be on I-495 and that the non-freeway route represents undesirable diversion. However, circuitous routing that adds vehicle miles traveled (VMT) and air pollution including greenhouse gas emissions is undesirable. Adding express toll lanes also is likely to make arterial congestion worse because it counteracts peak spreading and will increase peak hour arterial traffic in the areas around I-495 and I-270 interchanges. The increased peak hour traffic congestion in these areas is likely to outweigh the congestion benefits on other roads.

Here is real world example. As discussed above, the opening of the Express Lanes in Virginia in November 2012 caused the worst I-495 bottleneck. Several months later in June

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 137

2013, VDOT announced a plan to partially address these problems by opening a shoulder lane on the left side of the Inner Beltway to increase the effective width to five general-purpose lanes at the merge. The public relations handout developed at this time stated that there would be "no impact to nearby bridges and neighborhoods.[210]

This change was implemented in 2015. Residents of McLean have complained that this seemingly minor change has had a large impact on their community as it shifts the bottleneck farther north and adds significant congestion to Georgetown Pike and other intersecting local streets.[211] Figure 17 shows traffic congestion at one of the key intersections where McLean residents are concerned about I-495 congestion spreading to I-495.

*Figure 17: Georgetown Pike Westbound at I-495*



Source: Google Maps, 2020.

As a response to these complaints, in 2018 VDOT analyzed returning to the original configuration. It found that such a return would improve operations at the SR 193 intersection [contradicting their 2013 public relations handout]: "as a result of the merge area for the Express Lanes moving back to the Old Dominion Drive area, which meters the traffic and provides a more consistent flow to the mainline near Route 193."[212] However, it also found that the closure of the shoulder lane would increase delay on the I-495 Express Lanes. The change was not made

---

[210] *VDOT 495 North Traffic Congestion to Get Better With New VDOT Shoulder-Use Lane Project*, Express Lanes (June 28, 2013). https://www.expresslanes.com/uploads/1000/382-Shoulder_use_Lane_Project_121013.pdf.

[211] Brian Trompeter, *Residents Fume Over I-495 Shoulder Lane in McLean*, InsideNova (Jan. 16, 2018). https://www.insidenova.com/news/arlington/residents-fume-over-i-495-shoulder-lane-in-mclean/article_da2f87a2-f871-11e7-8a7b-a7b93e288cea.html.

[212] VDOT. I-495 Auxiliary Lane Study, May 9, 2018.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 138

because Express Lanes traffic was prioritized over MacLean traffic. Nevertheless, even with the use of the shoulder lane, this merge area remains the worst bottleneck on I-495.

The VDOT quote uses the word "meters." Traffic metering is an underappreciated congestion control measure. Peak period traffic bottlenecks are inevitable but can be used as a management tool by choosing the bottleneck locations, metering traffic there, and providing peak period protection to other roadways. Constructing managing lanes focuses more traffic in the peak hours and undermines peak spreading and traffic metering.

        c.    Managed Lanes Would Benefit Only the Few Able to Pay Large Tolls

The Virginia I-495 Express toll lanes only carry about 1/6 of the daily traffic volume on the sections with Express Lanes despite being 1/3 of roadway capacity (Figures 18 and 19). The other 5/6 of traffic is carried in the general-purpose lanes. This is an inefficient use of infrastructure.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 139

*Figure 18: 2019 Daily Virginia Outer Loop Average Daily Traffic Volumes*[213]



Source: Virginia Department of Transportation traffic count data, 2019.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 140

*Figure 19: 2019 Daily Virginia Inner Loop Average Daily Traffic Volumes*



Source: Virginia Department of Transportation traffic count data, 2019.

The DEIS forecasts managed lane usage for Alternative 9 ranging from 10% to 31% during the 7-8 a.m. peak hour and from 12% to 35% during the 4-5 p.m. peak hour (DEIS, Appendix C, Figures 5-19 – 5-22, p. 99-100). These numbers are consistent with the estimate of 1/6 of daily traffic for Virginia because the managed lanes will attract a larger share of traffic during the peak hour. Only about 1/6 of the Maryland I-495 and I-270 traffic will be carried by the managed lanes despite being 1/3 of roadway capacity.

One of the "big ideas" from the 2018 Capital Region Transportation Forum was that "There's a market for $40 toll lanes." As reported in an article on the event, Nicholas Donohue from the Virginia Department of Transportation explained that "paying a $40 toll won't be an everyday choice for most people."[214]

The DEIS stresses "choice"—but who are these 1/6 that can afford to choose the Express Lanes? Researchers at the University of Virginia studied Virginia Express Lanes tolls and time savings. They found:

---

[213] Commonwealth of Virginia Department of Transportation Average Daily Traffic Volumes with Vehicle Classification Data on Interstate, Arterial and Primary Route 2019, https://www.virginiadot.org/info/resources/Traffic_2019/AADT_PrimaryInterstate_2019.pdf

[214] Longendyke, Lindsey. Five Big Ideas from the Capital Region Transportation Forum, Greater Washington Board of Trade December 13, 2018. https://www.bot.org/five-big-ideas-from-the-capital-region-transportation-forum/

00022708

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 141

The I-495 Express Lanes appear to provide the most time savings around 8:45 a.m. Mondays, when the toll rate also rises to around $1.75 per mile, and Wednesday evenings around 5:30 p.m. when tolls rise to a similar level.[215]

Whether paying $1.75 per mile is worth it depends on both how much time is saved and an individual's time" expressed in $/hour. Figure 20 shows how high a value of time is needed to justify using the Express Lanes vs. the speed on the general-purpose lanes.

*Figure 20: Value of Time Needed to Justify Paying $1.75 Per Mile Toll (Toll Lanes at 60 mph)*



Source: I created this figure using basic mathematics.

The U.S. General Accountability Office recommends using half the median wage for a typical value of time. The median wage in Maryland is $22.10 per hour.[216] This corresponds to a value of time of $11.05 per hour which would not justify a $1.75 per mile toll until general-purpose speeds decline to 5 mph. Wages in the study area are higher than the Maryland average, so it is possible that the median income worker might be willing to pay up to the $21 per hour at a general-purpose lane speed of 10 mph. However, such a worker would not be able to buy in at this price because with this much congestion, higher-income travelers would outbid them and the dynamic price would rise above $1.75. In fact, the DEIS shows a preliminary toll estimate as high as $2.36 per mile on I-270.[217]

---

[215] Max Smith, *Are Tolls Worth it on Virginia's HOT Lanes?*, WTOPnews (July 24, 2018), https://wtop.com/dc-transit/2018/07/are-tolls-worth-it-on-virginias-hot-lanes/.

[216] Occupational Employment Statistics. May 2019 State Occupational Employment and Wage Estimates Maryland. Bureau of Labor Statistics. https://www.bls.gov/oes/current/oes_md.htm#00-0000.

[217] DEIS, App. C, at 883.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 142

    d.    <u>Taxpayers May Not Be Off the Hook for Managed Lane Costs</u>

This choice between extreme congestion and extremely high tolls is fundamental to making the managed lanes attractive to private operators. They need high peak hour tolls to pay off bonds. They need extreme congestion to justify high tolls. Most toll roads including the Virginia I-495 Express Lanes lose money in the early years and count on increasing congestion in the future to allow them to raise tolls to the point that the investment finally pays off. Figure 21 shows Transurban's I-495 losses by year since the project was opened.

*Figure 21: Transurban's I-495 Express Lanes Losses[218]*



Source: Created graph using information from Transurban financial reports.

The Virginia I-495 Express Lanes have never been profitable, and cumulative losses now exceed $400 million. The 2020 fiscal year ending June 30th includes Covid-19 impacts, but it doesn't appear the road was on its way to profitability even before this. If the Virginia I-495 Express Lanes are ever to break even, the worst toll rates are yet to come.

The I-95 Express Lanes (also managed by Transurban) were profitable pre-Covid-19, but were not in FY 2020. It appears that a radial commuting route like I-95 is a better market than a circumferential highway like I-495. It is likely that the private operators are hoping to duplicate the I-95 success by extending the I-495 Express Lanes into Maryland in order to emphasize a radial north-south I-270/I-495 commuter route Maryland into Virginia.

The DEIS promises a free lunch where the entire project is paid for by private funding. As shown in Figure 22, this is not what happened in Virginia. The Virginia I-495 Express Lanes were constructed at a cost of over $2 billion with private equity and private bonds providing less than half the total. The larger share (over $1 billion) came from a government Transportation Infrastructure Finance and Innovation (TIFIA loan) and $495 million from the Virginia Department of Transportation.

The VDOT $495 million contribution was, pre-Covid, supporting just 46,000 transactions per day for the VA I-495 Express Lanes.

Virginia did not plan to contribute to the Express Lanes but was pushed into it in order to make a deal that was acceptable to the private entities. Maryland likely will be in an even weaker

---

[218] Reporting Suite. Transurban. https://www.transurban.com/investor-centre/reporting-suite.

00022709

OP·LANES™
M A R Y L A N D    I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 143

bargaining position. This project will look riskier post-Covid, because it is not certain that prior travel patterns ever will return completely. The poor I-495 Express Lanes financial performance will cast doubt on the financial viability of the east-west I-495 sections in Maryland.

*Figure 22: Virginia I-495 Express Lanes Construction Cost[219]*



Source: Federal Highway Administration project profile.

When asked about the potential for high tolls, Terry Owens, a state spokesman for the project, said,

> ...the group's assertion that motorists "will" pay the amounts projected by COG is "inaccurate, misleading and suggests a lack of understanding" of the federal environmental review process. The final toll rates will be set by the Maryland Transportation Authority's board after public hearings.[220]

This contention that the private operators will assume all the risk for construction but allow a public board to hold down toll rates is frankly implausible. If Maryland goes ahead with this project, it can be expected that negotiations with private operators on a binding long-term contract will include discussions of:

---

[219] Federal Highway Administration. Project Profile: Capital Beltway High Occupancy Toll (HOT) Lanes (I-495). https://www.fhwa.dot.gov/ipd/project_profiles/va_capital_beltway.aspx

[220] Katherine Shaver, *Beltway, I-270 Toll Lanes Could Cost More Than $1.50 and $2 Per Mile, Study Says*, Washington Post (Oct. 16, 2020), https://www.washingtonpost.com/local/trafficandcommuting/beltway-i-270-toll-lanes-could-cost-more-than-2-per-mile-study-says/2020/10/15/3d3e7fa0-0f27-11eb-8a35-237ef1eb2ef7_story.html

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 144

- Maryland making financial contributions (in addition to the many millions already being spent on studies and that will be spent on a bidding process),

- Maryland committing to a minimum rate of return and/or specified high toll rates,

- Maryland assuming risk, and/or

- the private operators agreeing only to build a small section of the entire project which they see as most profitable, creating the type of bottleneck problem that has occurred in Virginia at the end of the managed lanes.

### 3.    Appendix A: Traffic Forecasts

Figure A1 shows DEIS daily traffic data and forecasts for I-495 and I-270. The DEIS forecasts significant traffic growth in the 2040 no build alternative, particularly in the north-south direction, and considerably higher growth in the build alternatives (Alternative 9, which appears to be preferred by MDOT).[221]

*Figure A1: Maryland DEIS Daily Traffic Data and Forecasts (Tables 3-1 and 3-2)*



Source: DEIS, 2020.

Figure A2 shows the traffic data and forecasts from the 1998 FEIS for the Virginia Express Lanes, along with 2019 actual Average Annual Weekday Traffic (AAWDT).

---

[221] Alternative 9, according to the DEIS, is two priced managed lanes in each direction on I-495 and convert one existing HOV lane to a priced managed lane and add one priced managed lane in each direction on I-270.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 145

Officials offered a similar forecast of significant growth in the 1998 FEIS for the Virginia Express Lanes (Figure A2), but total daily I-495 traffic has changed little in 21 years and is much lower today than what was forecast in the FEIS no build scenario. Presumably, the 1998 FEIS modeling forecast even higher traffic volume for the build alternative but those numbers are not reported in the FEIS and therefore are not shown in Figure A2.

*Figure A2: Virginia FEIS Daily Traffic Data and Forecasts (from FEIS Tables 3-1 and 3-2)*



Source: Virginia Express Lanes FEIS, 2006.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 146

**4.    Appendix B: DEIS Wrongly Claims that Over-Capacity Assignments Indicate Latent Demand**

Generated traffic is a critical concept that is explained by Litman in Box B1.

*Box B1. Excerpt from Generated Traffic and Induced Travel: Implications for Transport Planning*

Todd Litman, Victoria Transport Policy Institute, July 1, 2020 https://www.vtpi.org/gentraf.pdf

Traffic engineers often compare traffic to a fluid, assuming that a certain volume must flow through the road system, but it is more appropriate to compare urban traffic to a gas that expands to fill available space (Jacobsen 1997). Traffic congestion tends to maintain equilibrium: traffic volumes increase to the point that congestion delays discourage additional peak-period vehicle trips. Expanding congested roads attracts *latent demand*, trips from other routes, times and modes, and encourage longer and more frequent travel. This is called *generated traffic*, referring to additional peak-period vehicle traffic on a particular road. This consists in part of *induced travel*, which refers to absolute increases in vehicle miles travel (VMT) compared with what would otherwise occur (Hills 1996; Schneider 2018).

This is not to suggest that increasing road capacity provides no benefits, but generated traffic affects the nature of these benefits. It means that road capacity expansion benefits consist more of increased peak-period mobility and less of reduced traffic congestion. Accurate transport planning and project appraisal must consider these three impacts:

1. Generated traffic reduces the predicted congestion reduction benefits of road capacity expansion (a type of rebound effect).
2. Induced travel imposes costs, including downstream congestion, accidents, parking costs, pollution, and other environmental impacts.
3. The additional travel that is generated provides relatively modest user benefits, since it consists of marginal value trips (travel that consumers are most willing to forego).

Ignoring these factors distorts planning decisions...

Litman makes an important distinction between latent demand and induced travel, with generated traffic encompassing both.

- *Latent demand: Additional trips that would be made if travel conditions improved (less congested, higher design speeds, lower vehicle costs or tolls)*

- *Induced travel: An increase in total vehicle mileage due to roadway improvements that increase vehicle trip frequency and distance, but exclude travel shifted from other times and routes*

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 147

- *Generated traffic: Additional peak-period vehicle trips on a particular roadway that occur when capacity is increased. This may consist of shifts in travel time, route, mode, destination and frequency.[222]*

The MWCOG Model Assignments Are Not Intended to Include Any Latent Travel

The DEIS uses the phrase latent demand in the same way Litman does: "... latent demand refers to people who want to use I-495 or I-270 during the peak hours, but do not because of the congestion." (DEIS, Appendix C, p. 76). The DEIS then mistakenly assumes that over-capacity MWCOG model forecasts can be used to quantify latent demand. This assumption is not supported by MWCOG model documentation or by the professional travel demand modeling literature in general.

The DEIS used MWCOG Version 2.3.71. The MWCOG website includes travel demand model documentation on the versions 2.3.70, 2.3.75 and 2.3.78. including:

- The TPB Version 2.3 Travel Model, Build 70, also known as the Version 2.3.70 Travel Mode became the adopted travel model on October 18, 2017.

  o User's Guide for the COG/TPB Travel Demand Forecasting Model, Version 2.3.70 (Volume 1)

  o Highway and Transit Networks from the VDOT and MDOT Off-Cycle Amendment to the 2016 CLRP (TPB Version 2.3.70 Travel Model)

- The TPB Version 2.3 Travel Model, Build 75, also known as the Version 2.3.75 Travel Mode became the adopted travel model on October 17, 2018.

  o User's Guide for the COG/TPB Travel Demand Forecasting Model, Version 2.3.75: Volume 1 of 2: Main Report and Appendix A (Flowcharts)

  o User's Guide for the COG/TPB Travel Demand Forecasting Model, Version 2.3.75: Volume 2 of 2: Appendices B (Batch Files), C (Cube Voyager Scripts), and D (AEMS Fortran Control Files)

  o Highway and Transit Networks for the TPB Ver. 2.3.75 Travel Model and Air Quality Conformity Analysis of Visualize 2045 and the FY 2019-2024 TIP

- The user's guide and the highway and transit networks documentation for the current model, Ver.2.3.78, were released April 14, 2020.

---

[222] Litman, 2020, at 3.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 148

  o User's Guide for the COG/TPB Travel Demand Forecasting Model, Version 2.3.78. Metropolitan Washington Council of Governments, National Capital Region Transportation Planning Board, April 14, 2020.

  o Highway and Transit Networks used in the Air Quality Conformity Analysis of the 2020 Amendment to Visualize 2045 and the FY 2021-2024 TIP (Ver. 2.3.78 Travel Model). Metropolitan Washington Council of Governments, National Capital Region Transportation Planning Board, April 14, 2020.

- Validation reports:

  o Calibration Report for the TPB Travel Forecasting Model, Version 2.3, on the 3,722-Zone Area System. Final Report. Washington, D.C.: National Capital Region Transportation Planning Board, January 20, 2012.

  o In 2013, the Version 2.3 Travel Model was validated to year-2010 conditions. Updates to the model resulting from this validation work were part of Ver.2.3.52. The model validation effort was documented in the following memo: Milone, Ronald. Memorandum to Files. "2010 Validation of the Version 2.3 Travel Demand Model." Memorandum, June 30, 2013.

  o In 2019, TPB staff conducted a re-validation of Version 2.3.75 to year-2014 conditions. The work was documented in the following memo: Feng Xie to Dusan Vuksan and Mark Moran, "Year-2014 Validation of TPB's Version 2.3 Travel Demand Model." Memorandum, March 12, 2019.

It appears that the version 2.3.75 documentation and validation report are generally consistent with the version used in the DEIS (2.3.71).

None of the ten model documents on the MWCOG website make any reference to "latent", "induced" or "generated" demand, The MWCOG model's traffic volume outputs are intended to represent actual traffic volumes - either for the base year or for a forecast year. This is apparent in the latest validation report (2019). It compares traffic volumes assigned by the model to traffic counts – both for an entire day (Figure B1) and for each of the four model time periods (Figure 26). In each case, the target is an exact match.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 149

*Figure B1: MWCOG Model Daily Model Traffic Volumes vs. Counts[223]*
**Table A3-1. Estimated and Observed 2014 Daily VMT by Facility Type***

| Facility Type | Links w/ Counts | Observed ("O") | Estimated ("E") | Ratio (E/O) | Standard † | |
|---|---|---|---|---|---|---|
| | | | | | Acceptable | Preferable |
| Freeway | 517 | 29,419,832 | 31,618,131 | 1.07 | ±7% | ±6% |
| Major Arterial | 1,867 | 14,795,795 | 15,845,341 | 1.07 | ±15% | ±10% |
| Minor Arterial | 2,939 | 10,897,071 | 12,343,027 | 1.13 | ±15% | ±10% |
| Collector | 1,144 | 2,311,056 | 1,718,105 | 0.74 | ±25% | ±20% |
| Expressway | 224 | 5,063,294 | 4,826,940 | 0.95 | ±15% | ±10% |
| Ramp | 2 | 30,176 | 26,161 | 0.87 | N/A | N/A |
| **Total:** | **6,693** | **62,517,224** | **66,377,704** | **1.06** | **±5%** | **±2%** |

Source: MWCOG, 2019.

*Figure 26: MWCOG Model Daily Model Traffic Volumes vs. Counts[224]*
**Table A4. 2014 VMT Estimated to Observed Ratio (E/O) by Time Period and Facility Type***

| | Links w/ Counts | AM Peak | Mid-day | PM Peak | Night | Daily |
|---|---|---|---|---|---|---|
| Freeway | 125 | 1.12 | 1.40 | 0.93 | 1.12 | *1.13* |
| Major Arterial | 543 | 1.05 | 1.08 | 0.87 | 1.15 | *1.02* |
| Minor Arterial | 596 | 1.33 | 1.12 | 1.17 | 1.37 | *1.22* |
| Collector | 319 | 0.81 | 0.68 | 0.71 | 0.72 | *0.72* |
| Expressway | 93 | 0.91 | 1.07 | 0.82 | 0.98 | *0.94* |
| **Total:** | **1,676** | **1.09** | **1.20** | **0.92** | **1.12** | ***1.07*** |

Note: * Based on 1,676 directional links with hourly traffic counts ( none of them are ramps)

Source: MWCOG, 2019.

The model outputs summarized in the tables above include both overestimated and underestimated traffic volumes relative to counts. Some of the overestimated volumes are impossibly high because they exceed roadway capacity, but these errors are not an estimate of latent demand—they are just errors.

---

[223] Xie, Feng. "Year-2014 Validation of TPB's Version 2.3 Travel Demand Model," Memorandum, (March 12, 2019).

[224] Xie, Feng. "Year-2014 Validation of TPB's Version 2.3 Travel Demand Model," Memorandum, (March 12, 2019).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 150

**5. Appendix C: The Virginia Express Lanes Caused the Worst Bottleneck on I-495**

Peak hour traffic volumes increased sharply after the Express Lanes opened. Peak hour traffic numbers were extracted from VDOT traffic reports by multiplying Annual Average Daily Traffic (AADT) by the estimate of the portion traveling during the peak hour or design hour (K Factor).

The VDOT reports do not include AADT for the Express Lanes except for a 2019 value of 15,000 at the southern exit. This 15,000 per direction number is used as an estimate. The VDOT traffic reports include K factors for the Express Lanes at the southern end in both directions. In 2019, these K factors were 0.1756 for the Outer Loop and 0.2053 for the Inner Loop. As shown in Figure C1, these are over two times the average K factors for parallel general-purpose lane (GPL) segment. This is logical because there is much less incentive to use the Express Lanes during off-peak periods, even given lower toll rates.

*Figure C1: I-495 K Factors Showing Concentration of Express Lanes Traffic in Peak Hour[225]*



Source: Virginia Department of Transportation traffic count reports, 2019.

The K-factors in Figure C1 show that traffic on the general-purpose lanes is spread widely across the day. This is an efficient use of the roadway capacity. "Peak spreading" is an underappreciated congestion management strategy. In sharp contrast, a large proportion of traffic

---

[225] From VDOT traffic data report. General-purpose-lanes K Factor is average of segments parallel to Express Lanes.


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 151

on the Express Lanes is during the peak hours. This undermines the congestion relief that otherwise would result from peak spreading and causes unintended negative consequences.

Figures 5 and 6 earlier in this report (reinserted for convenience as Figures C2 and C3 show the estimated change in peak hour traffic volume[226] for the Outer and Inner Loop GPL before and after construction. The "Before" numbers are averages from 2005-2007. The "After" numbers are averages from 2013-2019. The period 2008-2012 is omitted due to the extended construction period.

*C2: Change in Outer Loop GPL Peak Hour Traffic in Virginia After Express Lanes Opening*




Source: Virginia Department of Transportation traffic count reports.

---

[226] Calculated as AADT x K Factor.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 152

*C3: Change in Inner Loop GPL Peak Hour Traffic in Virginia After Express Lanes Opening*




Source: Virginia Department of Transportation traffic count reports.

The I-495 Inner Loop often is severely congested for several miles both north and south of the Potomac River in the afternoon. Therefore, the American Legion Bridge is often considered a primary bottleneck in the system. However, a close examination of speed data shows that the worst bottleneck is the first mile north of the end of the Express Lanes north of the Dulles Toll Road. This case is presented fully in Appendix A of this report.

Figure C4 shows Inner Loop speeds for 15-minute intervals from 7 a.m. to 10 a.m. Speeds for 11 Inner Loop segments are shown – from the Route 123 interchange at the bottom/south to the Cabin John Parkway interchange at the top/north. The gray dashed line above the GW Parkway interchange line represents the state line. The northbound speeds at the Georgetown Pike interchange just north of the Express Lane merge are 20 mph or less for a 2-hour period, but the speeds at the American Legion Bridge (above the gray dashed line) never fall below 35 mph. The bridge is not the primary bottleneck in the morning peak period.

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 153

*Figure C4: Inner Loop Morning Peak Period Speed Data (INRIX)*[227]

Source: Virginia Department of Transportation, 2018.

Legend: Purple box peak hour for core study area; white box longer study period.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 154

The afternoon picture is murkier because queues behind bottlenecks spill back into upstream bottlenecks. Nevertheless, Figure C5 shows that the worst afternoon bottleneck in the system is also north of the Express Lanes merge. Compared to the American Legion Bridge, the Express Lanes merge area:

- becomes severely congested (red) about an hour earlier,

- is severely congested for about two hours longer, and

- has lower minimum speeds (8 mph vs 15 mph).

*Figure C5: Inner Loop Afternoon Peak Period Speed Data (INRIX*[228]



Source: Virginia Department of Transportation, 2018.

Legend: Purple box peak hour for core study area; white box longer study period.

---

[227] Extracted from VDOT, I-495 Express Lanes Northern Extension Environmental Assessment Scoping Framework Document (November 15, 2018), Figure 7, p. 22. The purple box highlights the peak hour and the white box is for the peak period.

[228] Extracted from VDOT, I-495 Express Lanes Northern Extension Environmental Assessment Scoping Framework Document (November 15, 2018), Figure 7, p. 22. The purple box highlights the peak hour and the white box is for the peak period.

00022715

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 155

Finally, Figure C6 shows Inner Loop peak hour traffic for the segment from Georgetown Pike (SR 193) to the George Washington Parkway (the first segment with VDOT data after the Express Lanes merge).

*Figure C6: I-495 Inner Loop from SR 193 to George Washington Parkway Peak Hour Traffic Volume (Vehicles) by Year[229]*



Source: Virginia Department of Transportation traffic count reports.
Note: 2008-2012 omitted because of construction during this period.

Figure C6 shows that there was adequate capacity for the pre-Express Lanes traffic volume on four general purpose lanes (less than 8000 vehicles per hour) but not enough for the post-Express Lanes traffic volume. After the Express Lanes opened, the peak hour volume immediately shot up to about 9200 vehicles per hour and has stayed constant at that level from 2013 through 2019. This constant value indicates that this is the maximum capacity for this roadway segment – even with the use of the shoulder lane. The extreme delay results from the queue that spills back behind this bottleneck – a bottleneck that was caused by the Express Lanes project and the worst bottleneck on I-495 in Virginia.

### L. Other Traffic Problems in the DEIS

#### 1. Increase in "Heavy Truck versus Car" Crashes and Fatalities

Well over 95% of severe to fatal traffic injuries occur to the occupants of passenger cars, vans, and SUVs, as compared to trucks. With the road widening and toll lanes added to the I-270 and the I-495 Beltway, there will be a great increase in such truck-versus-car collisions.

---

[229] Estimated from VDOT annual Daily Traffic Volume Estimates reports.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 156

These horrific crashes will occur when cars and trucks need to shift from or into toll lanes to get to exits, and also because heavy trucks and tractor trailers need much greater stopping distances than do cars. If the cars ahead need to suddenly slow or stop, the trucks following in their wakes may be unable to avoid the crash.

The DEIS includes <u>Appendix C - Traffic Analysis Technical Report</u>, which is merely a statistical review of historic crash data along I-270 and I-495 "to help identify potential safety impacts" of the Managed Lane Study. The analysis is sorely lacking in any inputs or insights about how to mitigate or prevent such crashes. In the five-year review period of 2012-2016 there were a total of 2,918 crashes along I-270. There was no breakdown of the types of injuries, nor their severity. Nor was there information about the mismatch of large trucks and tractor-trailers interacting with passenger vehicles (cars, minivans, SUVs).

Look at the multiple lane designs for two of the proposals for I-270. Design #9 has 7 lanes in each direction, and design #10 has 8 lanes in each direction. Imagine you're going about 60 mph and you're on a northbound toll lane, and suddenly realize you need to exit. But all the adjacent lanes are jammed with vehicles all moving between 45 and 60 mph. How confident are you in being able to make six lane changes through traffic to your right in a rainstorm on a dark night?

The DEIS also lacks a sufficient safety analysis and does not consider how potentially increased speeds in managed lanes will reduce safety, causing crash injuries to be more severe and even fatal at higher speeds. The rise in traffic fatalities during the COVID-19 epidemic demonstrates this phenomenon.

#### 2. Bottlenecks: Traffic Will Stall and Pollute as it Funnels Down

The proposed build-out of I-270 will expand the road in each direction from the present four lanes to seven or eight lanes, which must then funnel down to four lanes in Gaithersburg and then to two lanes north of Germantown up through Frederick. Those bottlenecks will cause immense backups on I-270 south of Germantown.

During the 5 years (or more) of the construction phase for the Project, the local traffic will have to be re-routed throughout the surrounding local streets. There will be construction barriers preventing local travel in certain areas, thus forcing circuitous re-routing that will greatly increase the time and distances for travel. Imagine trying to go from the Beltway northbound on I-270 to your home in Frederick when major portions of I-270 are missing or restricted to one or two lanes. Living in Montgomery County will be a traffic nightmare.

### M. The Agencies Failed to Take the Required "Hard Look" At Environmental Justice Issues

Executive Order 12,898 directs each federal agency to "make achieving environmental justice part of its mission." Executive Order 12,898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations, 59 Fed. Reg. 8,113 (Feb. 16, 1994) [hereinafter EO 12,898], § 1-101. Moreover, agencies are required to include an

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 157

environmental justice analysis in their NEPA review. *See Sierra Club v. Fed. Energy Reg. Comm'n*, 867 F.3d 1357, 1368 (D.C. Cir. 2017). The purpose of the environmental justice analysis is to determine whether the proposed federal action will have a "disproportionately adverse effect on minority and low-income populations." *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 541 (8th Cir. 2003).

As with all NEPA requirements, agencies must "take a 'hard look' at environmental justice issues," *Sierra Club*, 867 F.3d at 1368, and their analysis is measured against the "arbitrary and capricious" standard. *See Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004) (arbitrary and capricious standard applies to every section of an EIS). Thus, an agency's environmental justice analysis must be both thorough and "reasonable and adequately explained." *Id.*

The Agencies failed to discharge this duty. First, the DEIS uses a fundamentally flawed methodology to identify environmental justice populations. Second, far from investigating the Project's environmental impacts on environmental justice populations, the Agencies relied on conclusory statements and alleged regulatory compliance to evade any meaningful analysis. Third, the DEIS does not compare environmental justice impacts to impacts on the general population, a necessary step to identify any "*disproportionately* adverse effect on minority and low-income populations." *Mid States Coal. for Progress*, 345 F.3d at 541 (emphasis added). Finally, by failing to adequately consider the impacts of the project on environmental justice populations, FHWA prevented those populations from effectively participating in the NEPA process. *See* 40 C.F.R. § 1500.1(b) (2019).

### 1. The Agencies' Methodology for Identifying Environmental Justice Populations Is Fundamentally Flawed

NEPA requires that an EIS contain high-quality information and accurate analysis. *See* 40 C.F.R. § 1500.1(b) (2019). If the agency relied on an incomplete model or the relevant data is unavailable, the EIS must disclose this shortcoming. *See Lands Council v. Powell*, 395 F.3d 1019, 1031-32 (9th Cir. 2005) (citing 40 C.F.R. § 1505.22 (2005)) (Forest Service violated NEPA by relying on data that it knew had shortcomings but did not disclose those shortcomings until its decision was challenged).

Here, the Agencies relied on census block group data for its environmental justice analysis. *See* DEIS, App. E, at 70. As a threshold matter, census data is deficient because it excludes "pockets of minority or low-income communities, including those that may be experiencing disproportionately high and adverse effects." EPA, Final Guidance for Incorporating Environmental Justice Concerns in EPA's NEPA Compliance Analyses, 2.1.1 (1998). Further, as FHWA itself has found, census data fails to reveal the intricate communal networks that could exacerbate negative impacts on environmental justice populations. *See* FHWA, U.S. DOT, Environmental Justice Reference Guide 15 (2015) (FHWA Guidance). FHWA did not disclose these shortcomings in the DEIS.

To remedy these limitations, the Agencies' environmental justice analysis must incorporate supplemental demographic data. For instance, the environmental justice analysis

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 158

should include data from a full range of state and local health, environmental, and economic agencies. *See* CEQ, Exec. Office of the President, Environmental Justice Guidance Under the National Environmental Policy Act 14 (1997) (CEQ Guidance). Additionally, FHWA should conduct a door-to-door household survey of the study corridor to identify cultural practices and patterns of living that are relevant to the environmental justice analysis.[230]

### 2. The Agencies' Discussion of Environmental Justice Lacks Any Meaningful Analysis of Impacts to Environmental Justice Populations

The Agencies failed to adequately analyze and explain the impacts of its proposed actions on environmental justice populations. At a minimum, the analysis must be sufficient to demonstrate that the Agencies have "adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97-98 (1983).

Proper analysis is especially important in the environmental justice context. Over the past 40 years, research has connected localized air pollutants to adverse health outcomes including pulmonary and cardiovascular disease, neurological effects, and cancer. 83 Fed. Reg. 42,986 (Aug. 24, 2018). These effects are compounded in environmental justice populations due to their proximity to major interstates and highway systems. *Id.* Though the DEIS admits there are at least 111 environmental justice populations within the study area, DEIS, App. E, at 72, it fails to adequately identify or evaluate the adverse environmental effects on any of those communities, and is therefore arbitrary and capricious.

#### a. The Agencies Improperly Relied on Conclusory Statements to Sidestep Their Duty to Take a Hard Look at Impacts to Environmental Justice Populations

The DEIS makes several conclusory statements regarding potential environmental impacts, but these passing remarks are insufficient to discharge the Agencies' duty to take a hard look at environmental justice issues. *See Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014) (alteration in original) (quoting *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 154 (D.C. Cir. 1985)) ("[s]imple, conclusory statements of 'no impact' are not enough to fulfill an agency's duty under NEPA").

In its discussion of air quality impacts, the DEIS simply states that "construction-related effects of the project would be limited." DEIS, App. E, at 105. However, the analysis does not consider, or even *list*, the harmful effects of construction-related fugitive dust.[231] Similarly, the DEIS asserts that "impacts by relocation or partial property acquisition would be limited to the individuals immediately affected by the property acquisition." DEIS, App. E, at 107. The DEIS

---

[230] *Cf. Friends of Buckingham v. State Air Pollution Control Bd.*, No. 19-1152, (4th Cir. Jan. 7, 2020).

[231] *See supra* Section II.H.1, 10, 11, & 12.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 159

cites no data—neither quantitative nor qualitative—to support this conclusion. This is especially concerning in the environmental justice context, where "the intricate relationships that exist between community members or institutions" could exacerbate negative impacts that would be benign in other communities. FHWA Guidance at 15.

FHWA's conclusory statements regarding environmental justice impacts in the DEIS are plainly insufficient under NEPA. Instead, the agency must evaluate all relevant data and "articulate a satisfactory explanation" for the conclusions reached in the EIS. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto, Ins. Co.*, 463 U.S. 29, 43 (1983).

> b.  **The Agencies Cannot Rely on Regulatory Compliance to Obviate NEPA's Requirement to Consider Impacts on Environmental Justice Populations**

Even if the Agencies intend to follow all relevant regulations to construct the Project, regulatory compliance does not obviate the need to conduct a proper environmental justice analysis. Indeed, a compliant project may still result in "significant environmental damage." *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1123 (D.C. Cir. 1971). Consequently, whether a project will violate a regulation is a distinctly different inquiry from whether the project will have "disproportionately high and adverse" impacts on environmental justice populations.

In its short discussion on air quality impacts, the DEIS states that the project will follow "[s]tate and local regulations regarding dust control and other air quality emission reduction controls," DEIS, App. E, at 105, but provides no analysis of the actual impact of the dust or emissions. Similarly, instead of discussing the potential impacts that congestion pricing would have on environmental justice commuters, the DEIS simply notes that toll prices would be set "in accordance with [Maryland law]," which requires public notice. DEIS, App. E, at 108. Compliance with regulations or established processes is also relied upon to excuse the superficial discussions of impacts to water quality, visual aesthetics, mobility, and the local economy. *See* DEIS, App. E, at 105-07.

Meeting a regulatory standard cannot replace the "reasonably thorough discussion of the significant aspects of the probable environmental consequences" as required by NEPA. *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1519 (9th Cir. 1992). Otherwise, the consideration of environmental justice issues would be limited to projects that cannot lawfully obtain permits in the first place. This stance is illogical and at odds with principles of environmental justice codified in EO 12,898.

> 3.  **The Agencies Failed to Consider Whether the Project Will Disproportionately Affect Environmental Justice Populations**

NEPA requires an agency to consider whether a proposed project's impacts on environmental justice populations will be "*disproportionately* high and adverse." EO 12,898, § 1-101 (emphasis added). To that end, an environmental justice analysis must "compare the

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 160

demographics of an affected population with demographics of a more general character." *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 541 (8th Cir. 2003).

Here, the Agencies did not compare the impacts on any of the 111 identified environmental justice populations to a more general affected population. In fact, the only comparison in the environmental justice analysis is a small table comparing the project alternatives to one another. *See* DEIS, App. E, at 109, Table 4-7. The table simply lists seven alternatives and whether each alternative has the potential to adversely affect 13 environmental resources that may be present in environmental justice populations, without even stating what those effects might be, let alone comparing them to effects on the general population. *Id.*

An EIS must *compare* impacts on populations to determine whether the environmental justice impacts "appreciably exceed" impacts to the general population. CEQ Guidance at 26-27. Not only should the comparison be quantitative, but the distinct culture and structure of environmental justice communities means the comparison should include qualitative analysis as well. *See id.* at 14. Even with the limited and insufficient data provided at the census block level, disproportionality of impact would be expected given the general demographics of the populations living within the impacted counties.

> 4.  **The Agencies' Failure to Take a "Hard Look" at Environmental Justice Impacts Precluded Meaningful Participation by Environmental Justice Populations**

The NEPA process relies on public scrutiny. *See* 40 C.F.R. § 1500.1(b) (2019). Further, environmental justice principles prohibit agencies from excluding low-income and minority populations from participating in the NEPA process. EO 12,898, § 2-2. However, without taking a hard look at environmental justice impacts, a DEIS cannot foster the "informed public participation" that is central to NEPA. *State of Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).

An informed evaluation of the project's impacts on environmental justice populations, which was lacking here, is critical to "effective community participation." CEQ Guidance at 4. The Agencies' failure to adequately disclose the impacts of its action "preclude[d] meaningful evaluation of the effectiveness of the agency's proposed action." *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 227 (D.D.C. 2003).

Additionally, the Agencies did not conduct sufficient outreach to communities of color. During the scoping and commenting periods, outreach and informational materials, like interpretation messages, were largely made available in English only, and the multilingual factsheets that were provided are hard to find on the Project website. Communities of color should be afforded equal access to and participation in every level of decisions making on projects that will impact their communities, but this has not occurred with the Project. For example, the percentage of people who answered the public opinion survey conducted during the scoping period shows 18% fewer respondents came from Prince George's County (which is majority African-American and Latinx) than Montgomery County. DEIS, App. P, at 18 (Table 2-6) (showing 39% of respondents were from the project area from the I-495/I-95 Interchange to the I-495/US 50 Interchange and only 21% of commenters were from the I-495/US 50


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 161

Interchange to the Woodrow Wilson Bridge). The lack of outreach to these communities of color flies in the face of the Principles of Environmental Justice.[232]

Had the Agencies taken a legally sufficient hard look at the project's environmental justice impacts and conducted more outreach to these communities, low-income and minority populations would be better informed of the Beltway expansion's environmental effects on their communities and, consequently, would be able to offer meaningful comment. *See Center for Biological Diversity v. Gould*, 150 F. Supp. 3d 1170, 1182 (E.D. Cal. 2015) (agency's failure to include environmental information that it relied upon in its decision precluded plaintiffs from submitting more complete comments and thus violated NEPA). Instead, the DEIS gives environmental justice populations scant basis to "understand and consider meaningfully the factors involved." *Concerned Citizens on I-190 v. Sec'y of Transp.*, 641 F.2d 1, 5 (1st Cir. 1981). Accordingly, the Agencies must supplement the DEIS with a thorough discussion of environmental justice impacts that meets NEPA requirements, complete with information that would allow environmental justice populations to meaningfully participate in the NEPA process.

**N.    The DEIS Does Not Address Induced Demand**

Building this hugely expensive highway capacity increase project will not solve the congestion problem but will cause long-term growth in automobile traffic and greenhouse gas emissions. Current research confirms that building new highway capacity does not, in the long run, reduce highway congestion.[233] Rather, it stimulates an increase in Vehicle Miles Traveled to soak up the new capacity, resulting in new congestion, more VMT, and more greenhouse gas emissions.

---

[232] *See* People of Color Environmental Leadership Summit, *17 Principles of Environmental Justice*, https://www.ejnet.org/ej/principles.pdf.

[233] Ronald T. Milam et al., *Closing the Induced Vehicle Travel Gap Between Research and Practice*, Transportation Research Board: Journal of the Transportation Research Board, No. 2653, at 10-16 (2017); Handy, Susan and Marlon G. Boarnet, *Impact of Highway Capacity and Induced Travel on Passenger Vehicle Use and Greenhouse Gas Emissions: Policy Brief*, California Air Resources Board, (2014), https://www.researchgate.net/profile/Chris_Ganson/publication/315534829_Closing_the_Induced_Vehicle_Travel_Gap_Between_Research_and_Practice/links/59ee5a9ba6fdcc32187db6bd/Closing-the-Induced-Vehicle-Travel-Gap-Between-Research-and-Practice.pdf; Handy, Susan, *Increasing Highway Capacity Unlikely to Relieve Traffic Congestion*, Policy Brief, National Center for Sustainable Transportation, University of California, Davis, (Oct. 2015), https://ww2.arb.ca.gov/sites/default/files/2020-06/Impact_of_Highway_Capacity_and_Induced_Travel_on_Passenger_Vehicle_Use_and_Greenhouse_Gas_Emissions_Policy_Brief.pdf.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 162

Researchers have concluded that "[i]ncreased roadway capacity induces additional VMT in the short-run and even more VMT in the long-run."[234] Further, "increases in GHG emissions attributable to capacity expansion are substantial",[235] and the increase in VMT "offsets any reductions in GHG emissions that would result from improved traffic flow."[236]

A timely new paper by three experts in the field, titled "Induced Vehicle Travel in the Environmental Review Process" confirms and elaborates on these findings and suggests how they should be applied in the environmental review process.[237]

The pertinent findings of this new study are summarized below:

1.  "Roadway capacity expansion is frequently proposed as a solution to traffic congestion" due to "flawed logic... The logic is flawed because it does not account for the induced vehicle travel effect. Constructing new highway lanes generally increases the average speed of highway traffic and thereby reduces the effective cost of driving on the highway. That, in turn, induces more vehicle travel on the highway—more vehicle miles traveled."[238]

2.  Induced travel is often not fully accounted for in the planning and environmental review process. "As a result, agencies often *overestimate* the traffic congestion-reducing benefits of capacity expansion projects and *underestimate* the projects' environmental impacts, resulting in a potential overallocation of public money on road construction."[239] [emphasis in original].

3.  The authors detail the process of induced travel (a term they believe more accurately describes the phenomenon than "induced demand"):

     The reduction in the time cost of vehicle travel induces driving by inducing shifts in travel behavior that increase VMT on the road network and can ultimately return congestion to pre-expansion levels. Those behavioral responses can include shifts from non-auto travel modes to driving, shifts in destinations, and shifts in driving routes, as well as entirely new trips. These responses can cause increases

---

[234] Handy, 2015, 1.

[235] Handy, 2015, 1.

[236] Handy, 2014, 7.

[237] Volker, Jamey M. B., Amy E. Lee, and Susan Handy, *Induced Vehicle Travel in the Environmental Review Process*, Transportation Research Record: Journal of the Transportation Research Board, No. 2674, at 468-479 (June 15, 2020).

[238] Volker, 468.

[239] Volker, 468.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 163

in both personal and commercial driving. In the longer term, adding capacity to highways or other major roadways can lead to changes in residential and employment location decisions that increase travel distances and may eventually spur commercial or residential growth in the region. The latter effect, an increase in population and jobs, represents a shift in the demand curve, increasing VMT even further, and is sometimes referred to as "induced demand." Instead of the intended effect of steady-state VMT and congestion relief, the initially reduced congestion and resulting decrease in time cost of driving induce yet more driving. The increasing VMT then worsens congestion and can start the whole process over again in a vicious cycle.[240]

4. A range of studies suggests that VMT grows to consume new highway capacity in 5 to 10 years.[241]

5. Studies identify four broad components of induced VMT growth: (1) increased household VMT, (2) increased commercial truck VMT, (3) diversion of traffic from other routes, and (4) migration (population increase). The share of each of these will vary from situation to situation. All but (3), diversion, represent new VMT.[242]

6. "Current travel demand models do not fully account for induced travel." The models "may do an adequate job of accounting for changes in route and shifts in mode, but they underestimate increases in VMT attributable to increases in trip frequencies and lengths that capacity expansion will induce."[243]

7. The authors have created an "Induced Travel Calculator" instrument, which, however, has not yet been calibrated for cases outside California.[244]

8. The authors examined five highway expansion projects in California. They found that the environmental documents for these projects "differ widely in their discussion, analysis, and reporting of induced travel. The documents range from not mentioning induced travel by name nor by concept, to addressing induced travel in response to public comments, to citing the induced travel literature and explaining why it does not apply to this project."[245]

---

[240] Volker, 469.

[241] Volker, 469-470.

[242] Volker, 470.

[243] Volker, 470.

[244] Volker, 471.

[245] Volker, 473.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 164

9. One of the case studies presented by the authors is the addition of 10.2 lane miles to I-405 in Los Angeles. The purpose of the project, according to the EIS, was to "reduce existing and forecast traffic congestion." The subject of induced traffic was not raised in the DEIS, but was addressed in response to public comments. The response minimized the concern, stating that the widening served "latent demand," not "new demand." The authors conclude: "The discussion does not acknowledge that providing new capacity to serve this latent demand could generate additional vehicle travel, that is, induced VMT." The Induced Travel Calculator estimates that the I-405 project will produce an additional 87.8 million VMT per year![246]

10. The authors present three main conclusions to their review of case studies: First, the environmental documents "did not address induced travel in much detail except in response to comments." Second, responses to public comments on the subject "were inconsistent both within and across the documents, and they were inconsistent with the induced travel literature." Third, where estimates of induced travel *were* included in the environmental documents, they were much lower than the predictions of the Induced Travel Calculator, in some cases by orders of magnitude.[247]

11. The authors, not surprisingly, recommend further research in this area, "particularly given the confluence of the vast sums of funding that continue to flow toward roadway expansion projects and the urgency of reducing VMT as a way to combat climate change and alleviate many other environmental, economic, and social impacts of driving and highway infrastructure."[248]

The I-495/I-270 DEIS does have a discussion of induced travel ("latent and induced demand"), contained in the traffic technical report.[249] To classify this DEIS alongside the Volker et al. case studies, the DEIS contains some discussion of induced travel, but neither references the current literature on the subject, nor recognizes it as a significant factor.

Of the four factors contributing to induced travel cited by Volker et al. (item 5 above), the only one discussed in detail is diversion from other (in this case, arterial) routes. Mirroring the I-495 EIS, this is labeled "induced demand": "Latent demand represents diverted trips. The project will improve the system by serving more latent demand on the freeways instead of on arterials."[250]

---

[246] Volker, 474.

[247] Volker, 477.

[248] Volker, 478.

[249] DEIS, App. C, Traffic Analysis Technical Report.

[250] DEIS, App. C, at 144.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 165

The document does recognize other induced travel ("induced demand") as a factor, but concludes that it will have only a minor impact: "Induced demand represents new trips. While the project may generate some new trips, MWCOG modeling shows that the amount of induced demand caused directly by the project would be less than 1% of the total VMT in the region."[251]

Land use changes that could be a result of highway widening are explicitly not considered in the DEIS: "There is little room for increased land use along I-270 and I-495 as the areas (sic) is already built out, and the model already accounts for changes in land use in areas further from these facilities."[252]

It seems likely that this DEIS is a case of traffic modeling (here by the MWCOG traffic model) underestimating VMT differential between the build cases and the no-build cases (see Volker item 6 above).

We recommend that DEIS be tasked with using the Volker et al. Induced Travel Calculator to provide a more accurate picture of the induced travel that would be generated by the highway widening.

**O.  The DEIS Does Not Adequately Examine The American Legion Bridge Contingencies**

The DEIS fails to take a hard look at the environmental impacts of constructing the American Legion Bridge. The impacts from the Bridge reconstruction and widening go well beyond a traditional highway expansion.[253] The Bridge's reconstruction will significantly impact the traffic costs and benefits of the Project, including potential bottlenecks, as well as air emissions and hotspots.

The status, plans, and risks relating to the Bridge reconstruction remain unknown to the public. The "Bi-state Capital Beltway Accord" announced on November 12, 2019 by Governors Hogan and Northam merely represents an "agreement on principles," not a written agreement.[254] Shortlisted proposers were perplexed about the Capital Beltway Accord; MDOT and VDOT asked:

The RFQ mentions that MDOT and VDOT intend to enter into a bi-state, bipartisan accord regarding the coordination of the Project within Virginia. MDOT indicated

---

[251] *Id.*

[252] *Id.*

[253] *See, e.g.,* the extensive considerations and mitigations undertaken for the Woodrow Wilson Bridge. *Woodrow Wilson Bridge Improvement Study Supplemental Draft Environmental Impact Statement / 4(f) Evaluation,* FHWA and Virginia Department of Transportation (Jan. 1996), https://babel.hathitrust.org/cgi/pt?id=ien.35556030096788&view=1up&seq=1.

[254] I-495 & I-270 P3 Program Phase 1 Transaction Summary, at 6.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 166

this would be released during the RFP phase. Can MDOT and MDTA provide further visibility on timing and key terms of this agreement?

Will Shortlisted Proposers have an opportunity to comment on the agreement before it is executed?

Please also confirm that this agreement is only intended to cover the Section Work that will be delivered in Virginia.

What are the risks related to the Capital Beltway Accord anticipated by MDOT to be covered by the P3 agreements as mentioned in section 5.2 of the RFQ?[255]

The response from MDOT in this March 25, 2020 document was initially "PENDING," but was later changed to:

More information regarding the Capital Beltway Accord, the scope of the Section Work and the form of the Section P3 Agreement, which will identify risk allocations for the Section Developer, will be provided as part of the draft RFP documents to the Shortlisted Proposers.[256]

This important information does not appear to have been included in the DEIS. Given the importance of the American Legion Bridge, its potential to connect the two states by rail in addition to highway, and the fact that rail is not currently being considered, it is inappropriate to minimize the actual number of alternatives and importance of fully informed decision making in relation to the American Legion Bridge. The nature and impact of the Bi-state Accord and how it will constrain state decision-making should have been evaluated in the DEIS to give the public an opportunity to comment. Reserving space for rail on the American Legion Bridge should have been considered in the DEIS. At a minimum, all information that has been provided to shortlisted proposers should also have been included in the DEIS.

The DEIS also should include consideration of and reference to the proposed 495 Next project on the Virginia side of the American Legion Bridge as well as the Bi-state Capital Beltway Accord. Specifically, information and documents from both the VA 495 Next project and consultations between Maryland and Virginia regarding the Bi-state Capital Beltway Accord should be considered in the DEIS. The DEIS should describe whether the cumulative impact of the 495 Next traffic data has been incorporated into the traffic analysis as well as whether cumulative impacts to neighborhoods and the environment have been considered. The DEIS does not examine these issues, although these questions and concerns have been raised with MDOT and VDOT, and it remains unclear to what extent these issues have been considered by the

---

[255] Addendum No. 2 and 3, Phase 1 of the I-495 & I-270 Public-Private Partnership (P3) Program Request for Qualifications (RFQ), MDOT SHA, at 2, 6 (Mar. 25, 2020), https://emma.maryland.gov/page.aspx/en/fil/download_public/2BC5622F-E806-48F4-8115-1C3C88F983E3?file_context%255brfp%255d=23413/process_manage_extranet/23413.

[256] *Id.*


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 167

Agencies, if at all.[257] The Project's cumulative impacts should include the Potomac Heritage Trail, George Washington Parkway, and any other federal, state or local parklands and natural resources relating to the American Legion Bridge and 495 Next project in Virginia.

**P.    NEPA Procedural Problems**

**1.    The Agencies Violated NEPA by Initially Providing the Public with an Incomplete DEIS and then Adding Appendices Without Notifying the Public**

NEPA requires that FHWA "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures[,]" "[p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected[,]" and "[i]n all cases . . . mail notice to those who have requested it on an individual action." 40 C.F.R. § 1506.6 (2019). NEPA also required the Agencies to circulate the appendices together with the DEIS or make them readily available upon request. 40 C.F.R. § 1502.18 (2019); 40 C.F.R. § 1502.19 (2020). Specifically, the Agencies:

> must circulate the draft EIS for comment. The draft EIS must be made available to the public and transmitted to agencies for comment no later than the time the document is filed with the Environmental Protection Agency in accordance with 40 CFR 1506.9. The draft EIS must be transmitted to:
>
> (1) Public officials, interest groups, and members of the public known to have an interest in the proposed action or the draft EIS.

23 C.F.R. § 771.123(i).

The Agencies instructed the interested public to sign up for email updates about the DEIS. On Friday, July 10, the Agencies announced on the Project's website and emailed those who signed up for notifications that the DEIS, including supporting traffic, environmental, engineering and financial analyses, was available online at 495-270-P3.com/DEIS.

An untold number of people went to that website and downloaded the DEIS's PDF files to start their review, including reviewers within and members of the Organizations.[258] The public had every right to expect that the files on the website the Agencies directed them to contained the

---

[257] *See* Letter from VDOT and MDOT to Sierra Club re 495 Next, (Nov. 2, 2020); Letter from Sierra Club to VDOT and MDOt re 495 Next, (Sept. 30, 2020).

[258] The Organizations do not know how many people downloaded the wrong files on July 10 and 11, but the Agencies certainly do. The Organizations request that the Agencies disclose that number.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 168

DEIS and supporting information. The public had every right to start using their limited time to review and comment on the files on the website.

However, seven weeks later, on August 18, 2020, it was reported in the media that the files available on 495-270-P3.com/DEIS on July 10 and July 11 were incomplete and that at some point on July 11, MDOT SHA added a new appendix and modified another appendix, adding about 1,700 new pages.[259] The Agencies claimed that the new information was added on Saturday, July 11.[260] Disturbingly, despite having the ability to notify the public about the added files through emails, publication in the Federal Register, or other means, the Agencies kept this change secret. As a result, the Agencies left many people reviewing and working on comments based on the incomplete DEIS for over a month.

If that were not bad enough, the Agencies still did not inform the public of the new files even after some local reports indicated their existence, with the result that many people continue to review the incorrect DEIS. After discovering the unannounced and unexplained DEIS changes, on August 25, 2020, the Organizations wrote to the Agencies requesting that the Agencies:

1.   Announce to the public that the DEIS downloaded from the 495-270-P3.com/DEIS website on July 10 was incomplete;

2.   Provide an itemized list of changes made to the posted DEIS after July 10, and when these changes were made; and

3.   Extend the comment period to 90 days from the day of that announcement.

The Organizations explained that by law, the public is entitled to review the complete DEIS and the Agencies are required to circulate appendices or make them readily available upon request. The Organizations further explained that everyone who downloaded the files was unknowingly reviewing incomplete information. The Organizations also requested a count of how many people downloaded the incomplete documents on July 10. The Organizations explained that the 90 day comment period should not begin until the Agencies informed the public that they were reviewing incomplete information; otherwise, the comment period would be arbitrarily shortened

---

[259] Louis Peck, *UPDATED: State's I-495/I-270 Study Expanded Without Proper Notice, Regional Agency Complains*, Bethesda Magazine (Aug. 18, 2020), https://bethesdamagazine.com/bethesda-beat/transportation/states-i-495-i-270-study-expanded-without-proper-notice-regional-agency-complains/; Brude DePuyt, *Local Planners Fume Over Unreported Additions to Highway Document*, Maryland Matters (Aug. 18, 2020), https://www.marylandmatters.org/2020/08/18/local-planners-fume-over-unreported-additions-to-highway-document/.

[260] A "Wayback Machine" website captured from the morning of Saturday, July 11 shows the website still containing the incorrect DEIS. http://web.archive.org/web/20200711094558/https://495-270-p3.com/DEIS/.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 169

for those people or, even worse, leave some of the public commenting on incomplete information. Last, the Organizations requested that the Agencies add public hearings at least 15 days after providing notice to the public that the posted DEIS was incomplete.

On September 8, 2020, MDOT SHA responded by confirming that the DEIS and supporting appendices on the website were incomplete as of July 10 and that two new appendices were uploaded sometime on July 11 after the initial release. The response ignored the bulk of the Organizations' requests, but said:

Considering the clarification of the facts regarding publication and availability of the DEIS and Technical Reports on July 10, we will not be further extending the comment period on the grounds that the DEIS was not complete.

This response is insufficient and the Agencies' actions with respect to their error render the process unlawful. As explained in the Organizations' letter, an untold number of people were reviewing an incomplete DEIS from July 10 until August 18. An untold number of people still are reviewing an incomplete DEIS and will be submitting comments based on the incomplete DEIS. The Organizations have attempted to inform their reviewers and members of this problem and make sure they submit comments based on the complete DEIS. However, the Organizations cannot reach everyone, and it is not in any event their obligation to inform the public. There is no justifiable reason why on July 11, August 18, or even September 8, the Agencies did not send out a simple notification to the public explaining the error and informing them that they could download the corrected DEIS files. Until the Agencies do so, and provide additional time to comment, they cannot legally proceed with the NEPA process.

Moreover, sometime after August 26, a month and a half after releasing the DEIS, the Agencies changed the title of one of the appendices: "Appendix A & B: MD 200 Diversion Alternative Analysis Results Paper" was changed to "Appendix A & B: MD 200 Diversion Alternatives Analysis Results Paper and Alternative 9 Modified Preliminary Evaluation."[261] The Agencies again made this change without informing the public. The Organizations and the public have had to devote significant time within the comment period comparing documents to ensure they are reviewing the right ones, because the Agencies keep changing what is posted as the DEIS without providing notice to the public. The Organizations and the public still cannot be confident they are reviewing the current version of the DEIS.

The Organizations therefore reiterate their requests that the Agencies:

1. Announce to the public that the DEIS downloaded from the 495-270-P3.com/DEIS website on July 10 was incomplete;

2. Provide an itemized list of changes made to the posted DEIS after July 10, and state when these changes were made;

---

[261] See https://web.archive.org/web/20200828182138/https:/495-270-p3.com/deis/#DEIS.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 170

3. Extend the comment period to 90 days from the date of that announcement; and

4. Add public hearings at least 15 days after providing notice to the public that the posted DEIS was incomplete.

**2.    The Agencies Systematically Downplayed and Miscounted Public Comments Opposing the Project**

According to the DEIS, MDOT SHA received over 3,900 public comment submissions over the Project's three public comment periods. DEIS, at 7-2. Under the NEPA process, MDOT SHA was required to collect, report on, and respond to public comments. Instead of transparently documenting the number of comments that were opposed to part or all of the Project, MDOT SHA employed policies and practices that kept opposition comments from being accurately labeled and fully counted in reported data. The information presented below shows how MDOT SHA's downplayed opposition comments.

a.    MDOT SHA Undercounted Opposition Comments

MDOT SHA quantified and reported on the content of public comments by tabulating the theme labels it assigns to each comment. MDOT SHA established a policy to label a comment as being in opposition to the Project only if the submitter used exactly the right words. No comparable stipulation was made for pro-Project comments. MDOT SHA's stated that:

"Opposition to I-495 & I-270 Managed Lanes Study" was typically only selected [as a theme label] when a submitter stated it directly. Otherwise, opposition or critical sentiments toward the Study/proposed improvements may be interpreted through [such theme labels as] "Support for Alternate Transportation Improvements," "Effectiveness of Proposed Alternatives in Addressing Traffic," "Support for Transit," or "Support for Alternative 1/No-Build."

*Summary of Public and Stakeholder Engagement for the Recommended ARDS,* at 21.

A clear example of how this played out is the **unequal treatment of an opposition letter** signed by multiple grassroots groups and a **pro-Project letter** signed by multiple business groups.[262]

1. The opposition letter spoke of the "egregious failures" of Project alternatives. MDOT SHA gave the letter the following three theme labels, none of which indicate opposition of any kind:

---

[262] The first letter is from the Maryland Transit Opportunities Coalition (MTOC). *Summary of Public and Stakeholder Engagement for the Recommended ARDS,* at PDF page 419. The second letter is from regional businesses, *id.,* at PDF page 446. MDOT SHA's assigned labels for the MTOC letter can be seen on page 292 and for the business groups' letter on page 294 of the referenced document.

00022723

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 171

- "I-495 & I-270 Managed Lanes Study Process/NEPA"

- "Public-Private Partnership Program"

- "Support for Transit"

2. In contrast, the business groups' pro-Project letter—nearly identical in length to the opposition letter—received seven theme labels, five of which call out support, even though the letter writers used the word "support" only once:

- "Public-Private Partnership Program"

- "Regional Economy"

- "Support for General Price-Managed/Toll Lanes"

- "Support for High-Occupancy Vehicle Lanes"

- "Support for I-495 & I-270 Managed Lanes Study"

- "Support for Specific ARDS Build Alternative"

- "Support for Transit"

3. MDOT SHA interpreted multiple instances of support in the pro-Project letter.

4. But MDOT SHA failed to interpret any opposition in the letter that speaks of the Project's "egregious failures."

5. This disparity is significant because this process leads to inaccurate representation of comments that do not support the Project or P3 Program. In the case of these two letters, the theme label count is 0 instances of opposition and 5 instances of support.

The following is a representative example of the significant number of individual submissions assigned theme labels that nullified the writers' opposition to the Project:

6. "Terrible idea! You're going to adversely impact quality of life and potentially adversely impact property values for an entire community with no likely long-term benefit to the traffic conditions in Montgomery County. This looks like a fast-moving train by financially interested parties, with no concern for affected Montgomery homeowners. The Governor should care about these voters' concerns and rights!! Over the long haul, this will reduce the excellence of one of our school systems in the country because of impact on community." *ARDS Summary*, App. C. at 10.

7. MDOT SHA did not label this submission as opposing anything. The comment's three assigned theme labels effectively hide the writer's voice and intent:

- "Property/Community Impacts"

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 172

- "Effectiveness of Proposed Alts. in Addressing Traffic"

- "I-495 & I-270 Managed Lanes Study Process/NEPA"

b.    MDOT SHA Says Opposition Must Be "Interpreted" from the Theme Labels, but MDOT Makes That Impossible

MDOT SHA chose overly broad and opaque theme labels that did not effectively convey the points found in opposition submissions. MDOT SHA's themes worked to confuse, neutralize, and hide the content of public opposition comments. MDOT SHA even acknowledged this subterfuge, stating, "[c]omments under neutral themes (i.e., comment themes without 'support' or 'opposition') are not necessarily neutral in tone" *Summary of Public and Stakeholder Engagement for the Recommended ARDS*, at 21. In the DEIS process for a P3 Program as large, costly, long, consequential, and controversial as this one, there is no excuse for not having a menu of theme labels that reflect the Project and capture and convey the public's reaction to it. Anything less, including what we see here, violates the intent of the NEPA public comment process.

Additionally, the numbers, names, and definitions of MDOT SHA's theme labels varied significantly across the three comment periods, making it impossible to compare theme totals, or to "interpret" what the public said about the project in the aggregate.

- The first public comment period had 17 themes; the second comment period had 7; the third comment period had 38. DEIS, App. P, at 17, 32-33, 52-56.

- The names and definitions of the themes changed between comment periods:

  o The theme "Environmental" in the first comment period was defined as "Mentioned environmental aspects, such as wildlife and natural resources." *Id.*, at 16.

  o The theme "Environmental Considerations" in the second period covered natural resources and wildlife habitat, traffic noise levels, vehicle emissions, air quality, residential property, and overall quality of life. *Alternatives Public Workshops Summary*, at 16-17 (Jan. 2019). Including opposition comments about 'residential property' and 'overall quality of life' under Environmental Considerations in this context is the same as burying those comments.

  o The theme "General Environmental Impacts" in the third period meant general pollution and potential physical impacts to the environment. DEIS, App. P, at 53.

- The definitions of themes became increasingly opaque from one comment period to the next. In the first period, at least some of definitions included the word "concerns" indicating, for instance, that a comment labeled "Noise" was about "Specific noise concerns" DEIS, App. P, at 17. By the second and third periods, the word "concerns" disappeared, and all theme labels just indicated that the commenter made a statement,

**OP·LANES**
MARYLAND    I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 173

question, or suggestion about the theme. Most theme labels gave no indication of the writer's opinion or point of view.

For the second comment period, MDOT SHA did not provide a matrix showing each individual comment matched to its theme labels. We know the matching was done because there are cumulative totals in the summary table in the Alternative Public Workshops Summary, Appendix C, at PDF page 55. We also know because MDOT SHA speaks in vague terms about it: "A number of comment submissions stated preference for HOV lanes, opposition to HOV lanes or suggestion on how to most effectively implement HOV lanes in the Study, and questions about tolling." DEIS, App. P, at 32.

But for the second comment period, we cannot see individual comments matched to their MDOT SHA comment labels. This disadvantages opposition comments:

- o  The second comment period had the largest number of submissions: 2,282.

- o  The majority of comments were from Rockville and Silver Spring, <u>DEIS, App. P,</u> at 32, where levels of opposition to the Project were—and remain—high.

- o  That means we would expect that many of the comment submissions during this comment period would have been in opposition to the Project.

- o  Without the ability to see comments matched with their theme labels, the public cannot verify the accuracy of MDOT SHA's labeling and characterizations and no way to hold MDOT SHA responsible for mislabeling and miscounting.

- o  The voices of opposition comment submitters are lost.

    c.    <u>MDOT SHA's Decisions Regarding Which Comment Submissions to Include in Its Totals Led to Undercounting of Opposition Comments</u>

The following examples show how MDOT SHA's "gatekeeper" decisions disfavored opposition submissions. MDOT SHA counted two opposition petitions, with a total of 1,950 signatures, as only two comments in the official tally:

8.  In MDOT SHA's own words: "Petitions were received from Growing East County (with 1,323 signatures) and Sierra Club, Maryland Chapter (with 627 signatures). Each petition was counted as one comment submission." <u>Alternative Public Workshops Summary</u>, at 14.

9.  MDOT SHA did this, even though the submitter of the Growing East County petition wrote: "Attached are signatures and comments . . . in opposition to the proposed Beltway widening. Contact information for each of the petition signers can be provided if necessary for the public record." <u>Id.</u> at 97 (emphasis added).

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 174

In contrast, MDOT SHA appeared to count supportive submissions with identical content as discrete submissions. In MDOT SHA's own words: "Submissions with almost identical content in support of the Study accounted for 141 submissions containing the 'Support for I-495 & I-270 Managed Lanes Study' comment theme" <u>Summary of Public and Stakeholder Engagement for the Recommended ARDS</u>, at 21. Of the 157 comments listed in the ARDS final summary table, <u>id.</u> at 21-22, as being in support of the Managed Lanes Study, 141 seem to be, by MDOT's admission, cut-and-pastes of identical text. Contrast that with 1,950 opposition petition signers being counted as <u>only two.</u>

Comments received by telephone during the second comment period, as recorded in the <u>Alternative Public Workshops Summary</u> table (PDF page 55), show 115 calls received: 12 of the callers were counted as not supporting the Managed Lane Study. However, one of the 115 lines detailing those calls says, "8/8/2018: 26 calls captured - Opposed to project – destroy homes, community – Rockville" (PDF page 57). Those 26 opposition calls were counted as only one call.

    d.    <u>MDOT SHA's Treatment of Opposition Comments Makes Its Final Accounting Not Credible</u>

Given MDOT SHA's treatment of opposition comments, it should come as no surprise that the final comment period's Summary of Comments by Theme table, in quantifying the 3,873 comments found in 1,035 submissions, identified only 335 comments, or less than 10%, as opposing anything at all, <u>Summary of Public and Stakeholder Engagement for the Recommended ARDS</u>, at 21-22. Even with the addition of the 81 comments labeled "Support for Alternative 1-No Build," the total shown as opposing the project is under 11%. As the information presented here indicates, significant opposition to the Project is hidden. <u>Id.</u> This accounting is not credible and not acceptable.

MDOT SHA was required to fully and accurately report on public comments as part of the NEPA process. The evidence of biased policies, processes, and practices, and the resulting minimizing of public opposition to the Project shows MDOT SHA has not complied with this requirement. MDOT SHA must correct the record of all three public comment periods. We urge MDOT SHA to:

1.  create new menus of themes that enable the truthful and accurate capture of opposition comments;

2.  relabel all comment submissions using the new menus of themes; and

3.  compile individual comment/theme-label matrices and summary tables for all three comment periods and make them easily accessible by the public.

For the current DEIS public comment period, MDOT SHA must ensure that all opposition comments are fully, accurately, and publicly labeled and reported on.

00022725


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 175

### 3. The Agencies' Decision to Hold Public Hearings During a Time that Guaranteed Lower Public Participation

The inopportune timing of this Project's public hearings did not escape attention. That timing, combined with other actions taken by MDOT, bolsters the appearance of a desire to suppress public engagement and participation to mask the heavy opposition to the Project. Several op eds raised concerns with the timing of the public hearings. Two examples are provided below.

This one was published before the hearings:[263]

> Gov. Larry Hogan's proposed I-495/I-270 project will influence transportation and economic development in the Washington region for the next 50 years. Given the potential consequence of this project, it is inexplicable why the Maryland Department of Transportation is holding the bulk of its public hearings in August.
>
> If you have any familiarity with politics, you know that August is the Valley of Death for public participation – a time to sneak through the unwanted and unacceptable. While the August hearings will be online, the reality is that even more than ever they are totally inappropriate.
>
> Many citizens are desperately focused on their jobs, worried about food and even being evicted. School and children are an existential preoccupation. Does school open? Are my kids safe? What do I do for child care if they are at home? These are just some of the concerns.
>
> With an increasing COVID-19 infection rate in Maryland it is hardly the time that the public will be thinking about something that is not an immediate crisis.

This one was published after the hearings:[264]

> If the goal was to maximize public participation, the timing of the hearings couldn't have been worse, in the middle of a pandemic, an economic crisis, massive unemployment, a superheated presidential campaign, and unprecedented weather events. During the second and final in-person hearing on Sept. 10 in Rockville, the day I testified, the area was paralyzed by a torrential rainstorm and flash flooding.

---

[263] Arthur Katz, *Opinion: What's the Hurry on Governor's I-495, I-270 Project?* Maryland Matters (Aug. 1, 2020), https://www.marylandmatters.org/2020/08/01/opinion-whats-the-hurry-on-governors-i-495-i-270-project/.

[264] Gary Hodge, *The Fatally Flawed Scheme to Outsource Md.'s Highways to Toll-Road Profiteers*, Maryland Matters (Sept. 21, 2020), https://www.marylandmatters.org/2020/09/21/gary-hodge-the-fatally-flawed-scheme-to-outsource-md-s-highways-to-toll-road-profiteers/.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 176

### 4. The Agencies' Refusal to Provide Underlying Environmental Data, Files and Referenced Documents in the DEIS Hinders Meaningful Public Review and Violates NEPA

The CEQ regulations implementing NEPA require that the Agencies:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

. . .

(d) Solicit appropriate information from the public.

. . .

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

40 C.F.R. § 1506.6 (2019); *id.* § 1506.6 (2020). Moreover, NEPA requires that Agencies "insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements [and] shall identify any methodologies used." *Id.* § 1502.24 (2019); *id.* § 1502.23 (2020). "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b) (2019)

The CEQ regulations explain that:

> Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. **No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.**

00022726

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 177

*Id.* § 1502.21 (2019) (emphasis added); *id.* § 1501.12 (2020). The public's review and comment is important and the Agencies' decision-making must be informed by it. *Id.* §§ 1500.3(b), 1503.4(a), 1505.2(b) (2020).

"To fulfill NEPA's public disclosure requirements, the agency must provide to the public 'the underlying environmental data' from which the [agency] develops its opinions and arrives at its decisions." *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015); *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1099 (9th Cir. 2008) (NEPA requires agencies "to take a 'hard look' at how the choices before them affect the environment, and then to place their data and conclusions before the public'"). NEPA's EIS requirement "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). It would be arbitrary and capricious to take action without data needed to carefully consider whether a project would have a significant environmental impact and without providing data to the public during the EIS process to allow the opportunity to participate in the decisionmaking process. *Northern Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1085 (9th Cir. 2012).

Ultimately, FHWA, as the lead Agency, is responsible for the accuracy, scope, and content of environmental documents prepared by the Agency, MDOT SHA, or a contractor, and must independently evaluate the information. 40 C.F.R. § 1506.5 (2019); 23 C.F.R. § 771.09(c).

The DEIS references materials such as MDOT SHA's 2004/2005 Capital Beltway Study, MDOT SHA's 2017 Highway Construction Cost Estimating Manual, and unit costs from the March 2018 and July 2019 Common Item Guides, discussed in Section A above, but the Agencies did not make these documents reasonably available for public review within the time allowed for comment. Further, the DEIS reaches conclusions based on traffic modeling and data files that have not been made available for public review. The Organizations have tried to work with the Agencies to obtain the information, but the Agencies' refusals have further illustrated their disregard for their obligations. And FHWA cannot abdicate its responsibility for the NEPA process by claiming it does not have data that underlie the DEIS's conclusions; FHWA must independently verify those conclusions, which it cannot do without reviewing the underlying data. Moreover, FHWA is independently responsible for compliance with NEPA, and must obtain and publicly provide data underlying the DEIS's conclusions. The Agencies must make available to the public the materials referenced in the DEIS and the data the Agencies used to reach their conclusions, and provide the public with additional time to review and comment on the DEIS, with the benefit of this material.

     a.    <u>The Agencies Refused to Provide Copies of the MDOT SHA's 2004/2005 Capital Beltway Study Despite Their Reliance on it in the DEIS and the Organizations' Specific Request for it</u>

The MDOT SHA's 2004/2005 Capital Beltway Study is referenced in the DEIS in the following places:

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 178

Management strategies were evaluated in several prior studies for these corridors: Capital Beltway Study, I-270 Multi-modal Corridor Study, and the West Side Mobility Study. The management strategies previously evaluated in these prior studies include HOV, high-occupancy toll (HOT), or express toll lanes (ETLs).

DEIS, at 1-7.

Data from the 2006 MDOT SHA Draft Capital Beltway Study Natural Environmental Technical Report (NETR) and the 2017 MDOT SHA I-270 ICM Project provide vegetation cover type information that remains applicable within the Maryland portions of the corridor study boundary.

DEIS, at 4-98.

In 2003, the transit and highway portions of the Capital Beltway/Purple Line Study were separated into two independent studies, the Purple Line Project and the Capital Beltway Study (MDOT SHA et al., 2013), with the justification that both projects were needed to meet the demands of the corridor. . . .

The 2004 Capital Beltway Study focused on roadway improvements that would address congestion of the Beltway. MDOT SHA carried three alternatives forward into the Alternatives Retained for Detailed Study (ARDS): 1) No-build; 2) Build Alternative 2 – six general-purpose and four ETLs; and 3) Build Alternative 3 – eight general-purpose and two ETLs. In 2004, environmental technical reports were completed analyzing the potential impacts to these three alternatives, in anticipation of completing the NEPA process. However, due to changes in transportation priorities, the NEPA process of the Capital Beltway Study was not completed and a Draft Environmental Impact Statement was not published.

DEIS, App. A, at 6.

Alternatives development and evaluation for the I-495 & I-270 Managed Lanes Study was informed by . . . the Capital Beltway/Purple Line Study, . . . the 2004 Capital Beltway Study . . . . Each of these studies included, in part, proposed transportation solutions reflecting some of the operational and/or engineering alternatives that were considered in development of the Preliminary Range of Alternatives. In particular, the studies evaluated the implementation of managed lanes including ETLs, HOV lanes, HOT lanes and parallel transit facilities on I-495, I-270, and I-95. These studies considered the potential to provide additional capacity along I-495 and I-270 that would connect with other regional transportation facilities. The solutions retained in these studies are listed in their respective sections below.

DEIS, App. B, at 9.

00022727



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 179

The 2004 Capital Beltway Study focused on roadway improvements that would address congestion on the Beltway from the American Legion Bridge to the Woodrow Wilson Bridge. MDOT SHA carried three alternatives forward into the Alternatives Retained for Detailed Study (ARDS): 1) No Build; 2) Build Alternative 2 – six GP lanes and four ETLs; and 3) Build Alternative 3 – eight GP lanes and two ETLs. In 2005, preliminary environmental technical reports were prepared analyzing the potential impacts to these three alternatives, in anticipation of completing the NEPA process. However, due to changes in transportation priorities, the NEPA process for the Capital Beltway Study was not completed and a DEIS was not published. A brief description of the ARDS, excluding the No Build, is provided below.

3.4.1 Alternative 2 – 6&4 Build Alternative (6 General Purpose & 4 Express Toll Lanes includes TSM/Transportation Demand Management (TDM) Strategies)

This alternative would have provided one additional lane per direction that would have been tolled and would have converted one existing GP lane per direction to be tolled. Both lanes would have been concurrent flow and marked using pavement striping (no barrier separation from the GP lanes). The proposed typical section would have included six GP lanes and four ETLs (Figure 3-1).

TSM/TDM included measures to optimize the existing transportation system (TSM) and measures to affect the demand on the existing system (TDM). The strategies were improvements that would have increased safety and enhanced operation without any increase in lane capacity. The TDM strategies focused on system demand and techniques to change drivers' behavior. Typical solutions would have included modest interchange improvements, employer participating flexible work hour or telecommuting programs, and parking restrictions/fees.

3.4.2 Alternative 3 – 8&2 Build Alternative (8 General Purpose & 2 Express Toll Lanes includes TSM/TDM Strategies)

This alternative would have provided one additional concurrent flow (no barrier separation) lane per direction that would have been tolled. The typical section would have included eight GP lanes and two ETLs (Figure 3-2). A modified version of Alternative 3 has been included in this study as Alternative 5. More detail on Alternative 5 is provided in Section 4.2.

*Id.* at 10-12 (footnote omitted).

MDOT SHA, MDOT MTA, and VDOT have performed numerous studies to evaluate a myriad of transportation solutions on I-495 and I-270. Options from these previous studies and planning documents were incorporated into the list of Preliminary Range of Alternatives for this Study. In particular, MDOT SHA reviewed alternatives that had been assessed to some level of detail from the following studies: the 1998 Capital Beltway HOV Feasibility Study, 2002 Capital

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 180

Beltway/Purple Line Study, 2002 I-270/US 15 Multi-Modal Corridor Study, 2004 Capital Beltway Study, and the 2009 West Side Mobility Study.

*Id.* at 19.

Existing forest canopy conditions within the Maryland portion of the corridor study boundary were identified based on field investigations from MDOT SHA's 2006 Capital Beltway Study and 2017 I-270 ICM Program and GIS desktop review of Chesapeake Conservancy Conservation Innovation Center High Resolution Data of forest canopy.

*Id.* at 116.

The possibility and uncertainty of airborne or subsurface contaminant migration from an off-site location was assessed by evaluating potential sites of concern within a one-quarter mile buffer of each of the screened alternative LODs (the hazardous materials investigation area, see corridor overview map in Appendix B). For continuity and comparison with previous NEPA investigations along the I-495 corridor, the assessment of sites of concern uses a methodology comparable with the 2005 Initial Site Assessment for the Capital Beltway Study (MDOT SHA, 2005).

DEIS, App. K, at 10.

Each site of concern within the hazardous materials investigation area was evaluated and given a ranking based on a combination of the data review, site reconnaissance findings and distance from the LOD for each Alternative. Because Alternatives 8 and 9 have the same LOD, these Alternatives were evaluated as a single Alternative. Seven criteria were used to rank the sites of concerns based on the general ranking methodology used in the Draft December 2005 Initial Site Assessment Capital Beltway Study to allow for consistency and comparison between the investigations.

*Id.* at 11.

Data from the 2006 MDOT SHA Draft Capital Beltway Study Natural Environmental Technical Report (NETR) and the 2017 MDOT SHA I-270 ICM Project provide vegetation cover type information that remains applicable within the Maryland portions of the corridor study boundary.

Descriptions of land cover included below were adapted from the Draft Capital Beltway Study NETR (MDOT SHA, 2006) and the I-270 ICM Program field investigation. Although the Draft Capital Beltway Study NETR information was collected in 2006, the land cover are still generally the same based on windshield survey and aerial review; therefore, the data collected for this purpose remains valid.

00022728

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 181

DEIS, App. L, at 96.

Moreover, the DEIS lists the 2004/2005 Capital Beltway Study as a reference in Appendix K and Appendix L (without a link to or description of where to find the study). The Agencies clearly referenced, considered, and relied on this study to make decisions regarding the current DEIS, its scope, and its methodology.

The Organizations searched for this study in order to meaningfully review and provide comment on the DEIS, but they could not find it. Accordingly, on July 21, 2020, the Organizations sent the following email to the Agencies:

> In our review of the I-495 & I-270 Managed Lanes Study Draft Environmental Impact Statement, we noticed that the DEIS references and relies on data from an MDOT SHA Capital Beltway Study, but we could not find that study on the 495-270-p3.com website or linked in the references sections. *See* Draft Environmental Impact Statement, at 1-7, 4-98; Appendix L, at 96; *see also* Letter from Pete K. Rahn, MDOT Secretary, to Montgomery County Council Members, at 7 https://www.montgomerycountymd.gov/council/Resources/Files/agenda/col/2018/180911/20180911_3.pdf ("The framework for the plan was developed based on previous studies including the Capital Beltway Planning Study, . . . These previous studies contain valuable technical information and will provide insight as MDOT delivers transformative, innovative solutions.").
>
> We request that you provide that study and its accompanying data on 495-270-p3.com or by email. If it is already available online, please direct us to that location.

The Agencies' response did not comply with NEPA. First, on August 3, 2020, MDOT responded by treating the Organizations' email as a Maryland Public Information Act Request. MDOT stated that it was providing an incomplete preliminary draft copy of the Capital Beltway Study's Natural Environmental Technical Report, with redactions based on the deliberative process privilege and intra-agency memoranda privilege. MDOT stated that the document requested is a rough draft that was never finalized and that redacted sections of the National Environmental Technical Report contain "very preliminary interpretative analysis of yet defined alternatives for that project." MDOT also stated that: "The MDOT now considers this request closed." MDOT provided 8 PDFs from the Study's Natural Environmental Technical Report: 1) unredacted cover pages, 2) an unredacted table of contents, 3) an unredacted introduction chapter, 4) an unredacted chapter describing the affected environment, 5) a completely redacted chapter that analyzed the environmental consequences, 6) an unredacted reference list, 7) an appendix of wetland descriptions, and 8) another appendix of wetland descriptions.

The letter ignored the Organizations' request for the Capital Beltway Study itself, including the study's nine other technical reports,[265] rather than only the Natural Environmental

---

[265] The Capital Beltway Study also includes: Socioeconomic and Land Use Technical Report, Secondary and Cumulative Effects Analysis Technical Memorandum, Section 4 Evaluation, Air Quality Technical Report, Noise and Vibration Technical Report, Traffic Analysis Technical

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 182

Technical Report. That would be like providing Appendix L to the DEIS in response to a request for the DEIS. It also was misleading in that MDOT's response could be taken to mean that the one report/appendix was the entirety of the study. Moreover, the Environmental Consequences chapter of the Natural Environmental Technical Report that was provided was entirely redacted, making review impossible.

On August 27, 2020, Jitesh Parikh, from FHWA, followed up on MDOT's response by email stating:

> The purpose of the reference to the Capital Beltway Study was to indicate that traffic management solutions have been the subject of several previous studies, i.e. the Capital Beltway Study, I-270 Multi-modal Corridor Study, and the West Side Mobility Study (DEIS pg. 1-7) and to draw upon previous data collection efforts related to vegetation cover type information in the study area (DEIS pg. 4-98 and DEIS Appendix L pg. 96). Though the report was never finalized in its entirety, the information the DEIS referred to was accurate for the purpose it was referenced.
>
> We understand that MDOT SHA has provided you a redacted copy of the draft report containing information referenced in the DEIS. To reduce confusion over the purpose of the reference and to clarify conclusions were not being drawn from a draft report, the Final Environmental Impact Statement (FEIS) will remove references to the Draft Capital Beltway Study Report. All comments will be reviewed and considered in the FEIS.

This response is nonsense. First, the Capital Beltway Study is clearly referenced and relied upon for additional reasons beyond merely indicating it was previously studied. *See, e.g.,* DEIS, App. B, at 11 (explaining that a modified version of a Capital Beltway Study alternative was included in this study); DEIS, App. K, at 10, 11 (claiming to use the same or a comparable methodology for hazardous materials assessment to that in the Capital Beltway Study, but not providing the Capital Beltway Study for review). Moreover, MDOT has officially stated that the framework for this plan was developed based on the Capital Beltway Planning Study.[266]

---

Report, Assessment of Effects to Archaeological and Historical Properties, Phase 1 Archaeological Identification Survey for the I-495 Capital Beltway Mainline Project and Storm Water Management Ponds, and Preliminary Survey Assessment of Transportation Corridor Alignments (HAZMAT).

[266] Letter from Pete K. Rahn, Maryland Department of Transportation to Roger Berliner, Nancy Floreen, and Tom Hucker, Montgomery County Council, at 2 (Oct. 23, 2017), available at PDF page 7 of 2018-09-07-Managed Lanes Study Briefing with Letters Attached, https://www.montgomerycountymd.gov/council/Resources/Files/agenda/col/2018/180911/20180911_3.pdf.


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 183

Second, regardless of the Agencies' stated purpose for referencing the study in the DEIS, the Agencies must by law provide the public the opportunity to review the referenced study and comment on how it is used in the DEIS, as explained above.

Third, removing any reference in the final EIS to a document that was relied upon in the DEIS does not remove the Agencies' legal obligation to make the referenced document publicly available. Instead FHWA's action seems to be an attempt to conceal the Agencies' failure to comply with the law.

The Organizations tried again to obtain copies of the referenced materials, and sent the following email on September 8, 2020, to MDOT SHA and FHWA:

> Thank you for your response. To clarify, did MDOT SHA or FHWA consider any information from the full Capital Beltway Study in developing the DEIS beyond the unredacted information provided by MDOT SHA on August 3? That includes information considered in the references noted below and anywhere else in the DEIS (potential other places such as Appendix B, Appendix E, Appendix K). If so, we request those documents, unredacted, as soon as possible, in order to meaningfully analyze and comment on the DEIS.

On September 22, 2020, MDOT responded:

> The MDOT SHA did not consider any additional information beyond the records previously provided to you on August 3, 2020. Therefore, the MDOT SHA has no additional records responsive to your request and now considers this request closed.

This response beggars belief and is contradicted by former MDOT SHA Secretary of Transportation Pete Rahn's 2017 letter to Montgomery County Council Transportation, Infrastructure, Energy & Environment Committee, which stated, "[t]he framework for the plan was developed based on previous studies including the Capital Beltway Planning Study, West Side Mobility Study, I-270 Multi-Modal Corridor Study."[267] The Agencies clearly relied on information in the Capital Beltway Study when they made decisions impacting the DEIS, which will also impact a final EIS, or they would not have referenced it in all the instances noted above. Yet the Agencies refuse to provide the Capital Beltway Study to the public.

The information discussed and described in the DEIS from the Capital Beltway Study is not found in the unredacted parts of the provided Capital Beltway Study Natural Environmental Technical Report. The public therefore has no way to review, evaluate, or comment on those statements. To the extent MDOT SHA (or FHWA) truly did not consider any additional information beyond the unredacted sections of the Natural Environmental Technical Report, that omission would be arbitrary and capricious; there is no justification for the Agency to ignore the majority of a study that examined the exact same issues—whether and how to expand the Beltway—as the current DEIS is looking at.

---
[267] Id.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 184

Moreover, the Agencies' statement in the DEIS that "the NEPA process of the Capital Beltway Study was not completed and a Draft Environmental Impact Statement was not published," "due to changes in transportation priorities," is disingenuous. See DEIS, App. B, at 10. First, the Organizations request that the Agencies explain what this statement is based on and what the changes in transportation priorities were. If the only thing that was examined in the Capital Beltway Study was the limited unredacted portion of the Natural Environmental Technical Report, how would the Agencies know why the Capital Beltway Study's NEPA process was not completed? The Organizations further request all information the Agencies possess regarding the reasons that NEPA process was discontinued. The Agencies' refusal to provide the study and its supporting information prevents the public from meaningfully evaluating the Agencies' claim.

The NEPA process for the Capital Beltway Study apparently showed that widening the Beltway by two lanes per side was not feasible[268], and that determination may have been a reason why the NEPA process was not completed. The "analysis found that four additional lanes could fit on Maryland's portion of the Beltway if they were double-decked 80 feet in the air —

---
[268] Other MDOT SHA studies came to the same conclusion, finding that only one lane per side should be considered. The I-270 Multimodal Study of 2002 states: "Only one additional lane is being considered on I-270 between MD 121 and I-70 and this additional lane will be evaluated as an HOV lane in Alternates 3A/B." The West Side Mobility Study of 2009 says:

> However, the physical footprint for all of the alternatives was the same and it included widening for two lanes per direction in Virginia and widening for one lane per direction on the American Legion Bridge and in Maryland. The widening in Maryland was constrained by the right-of-way, proximity to sensitive environmental features, and proximity to adjacent residences.

MDOT SHA, West Side Mobility Study, at 21 (Nov. 2009), https://web.archive.org/web/20131102090131/http://capitalbeltway.mdprojects.com/pdfs/Final_WestSideMobilityStudyReport.pdf. As recently as 2015, former MDOT SHA Secretary Pete Rahn said:

> How do we address I-270, which is the most congested corridor in the state? How do you address an interstate that there is no room to expand? How do you deal with the Washington Beltway that can no longer be expanded and it needs to be reconstructed because we have mush underneath it and the system frankly has got to be taken right down to the dirt and brought back up?

Sean Slone, Transportation Policy Academy 2015 – DC – Maryland Secretary of Transportation Pete Rahn, The Council of State Governments (May 19, 2015), https://web.archive.org/web/20200906121216/https://knowledgecenter.csg.org/kc/content/transportation-policy-academy-2015-%E2%80%93-dc-%E2%80%93-maryland-secretary-transportation-pete-rahn.


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 185

an idea rejected as prohibitively expensive and impractical."[269] If that finding, even if preliminary, played any role in the NEPA process being stopped, the Agencies should not claim in this DEIS that the process was stopped for other reasons.

Removing references to the study, while consistent with MDOT SHA's lack of transparency throughout this process, only serves to hide the Agencies' rationale and preclude meaningful public review and comment. The Agencies must provide the entire Capital Beltway Study to the public and re-open public comment so the public can consider and comment on the DEIS with the same underlying information the Agencies' utilized.

>    b.    The Agencies Have Not Publicly Provided the Traffic Model or Spreadsheets Containing Traffic and Speed Data that the Agencies Relied on to Reach Their Conclusions

The DEIS relies on traffic and speed data and modeling as a backbone to conclusions throughout the document.[270] Unfortunately, the DEIS provides an incomplete accounting of this data and modeling, merely presenting some of the modeling results and data in table or figure form in the DEIS and appendices PDFs. It is common for agencies, including FHWA, to publicly release the underlying data and modeling files either with the DEIS or, at a minimum, upon request. But the Agencies refused to do either here, instead delaying and withholding the data and modeling files, preventing the public from meaningfully reviewing the DEIS's traffic-based conclusions.

On October 1, 2020, the Sierra Club Maryland Chapter sent a request to the Agencies for the following basic information:

1) MWCOG model loaded traffic assignment output files for each of the 4 modeled periods (AM peak, midday, PM-Peak and night) for the:

* base year, and

* future year for all alternatives shown in DEIS Table 2-3 (1, 5, 8, 9, 9M, 10, 13B and 13C)

2) The spreadsheets containing the traffic data in DEIS Appendix C Traffic Analysis Technical Report Figures 2-10, 2-11, 2-12, 2-13. 2-14 and 2-15.

---

[269] Katherine Shaver, *Hogan's Plan to Add Additional Toll Lanes Faces a Long, Tough Road Ahead*, Frederick News-Post (Oct. 22, 2017), https://www.fredericknewspost.com/news/politics_and_government/transportation/hogan-s-plan-to-add-additional-toll-lanes-faces-a/article_596a73a6-8b97-5124-b731-ff2a847bed37.html.

[270] *See, e.g.*, DEIS, at ES-13 to ES-14, 1-1 to 1-14, 2-3 to 2-31, 2-41 to 2-44, 2-48 to 2-50, Chapter 3, 4-58 to 4-63, 4-137 to 4-138.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 186

3) The spreadsheets containing the speed data in DEIS Appendix C Traffic Analysis Technical Report Figures 2-20, 2-21, 2-22, 2-23, 2-24 and 2-25.

These are simple files that the Organizations' traffic consultant has received from departments of transportation numerous times in the past regarding proposed highway projects. The request simply requires copying and pasting computer folders to a cloud-based folder and emailing the link. The Agencies or their consultants should have these files organized and easy to provide, based on their use to form the basis for conclusions in the DEIS. Hearing no response to this request, the Sierra Club Maryland Chapter followed up on October 9, 2020, requesting the information by October 13, in order to meet the upcoming comment deadline.

Despite the request for the underlying data and files not being a Maryland Public Information Act (PIA) request, but rather a request for files required to be publicly disclosed under NEPA, on October 11, MDOT responded that the request was forwarded to the MDOT PIA Manager. Then, on October 14, MDOT's PIA Manager sent a letter stating the traffic data spreadsheets for Figures 2-12 through 2-15 are available in the DEIS appendix PDF. For the rest of the request, MDOT's PIA Manager would not review or produce the underlying data and information until the Sierra Club Maryland Chapter paid **$6,294.51**. The PIA Manager said this is MDOT's estimated cost to prepare, search, and review the documents, without further explanation. Also on October 14, FHWA responded, but merely said MDOT SHA would respond to the inquiry.

On October 15, 2020, the Sierra Club Maryland Chapter reiterated the request for the files and explained that the Agencies' response was unlawfully withholding underlying environmental data in violation of NEPA:.

First, the underlying data requested is required to be disclosed publicly with the DEIS. 40 C.F.R. § 1500.1(b) (2019) ("NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA"); *id.* § 1502.21 (2019) (underlying data may be incorporated by reference only if "it is reasonably available for inspection by potentially interested persons within the time allowed for comment"); *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015) ("To fulfill NEPA's public disclosure requirements, the agency must provide to the public 'the underlying environmental data' from which the [agency] develops its opinions and arrives at its decisions."). MDOT and FHWA's failure to provide this data violates NEPA.

The Sierra Club Maryland Chapter explained that the request was not one under Maryland's PIA but a request for files required to be disclosed under NEPA. The Sierra Club Maryland Chapter further explained that the requested data and files was not publicly available in Appendix C of the DEIS. Figures and tables presented in the DEIS appendix to support the Agencies' conclusions that were created from data files and models do not provide 1) the complete data

00022731

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 187

used to create those figures and tables or 2) the underlying formula and calculations that went into those figures and tables.

The Sierra Club Maryland Chapter further explained that providing these files should not take more than two hours, let alone cost $6,294.51, and pointed out nine instances where this data had been provided promptly to their consultant without charge:

1.  Florida Department of Transportation District 1 – Collier County MPO RTP Update;

2.  Colorado Department of Transportation – I-70 East EIS;

3.  Berkeley Charleston Dorchester Council of Governments (South Carolina) – RTP Update and I-526 Extension;

4.  New York Department of Transportation – Hunts Point Interstate Access Improvement Project DEIS;

5.  Southern California Association of Governments – High Dessert Corridor DEIR;

6.  Arkansas Department of Transportation – I-30 Planning and Linkages Study;

7.  Utah Department of Transportation – West Davis Corridor DEIS;

8.  Texas Department of Transportation – RTP Update and South Mopac modeling;

9.  Charlottesville/Albemarle Metropolitan Planning Organization (Virginia) – Charlottesville Bypass.

It is unclear why the Agencies think this project is so different than all of those such that it warrants withholding the data files. The Sierra Club Maryland Chapter requested that the files be provided by October 19, 2020 and further requested an extension of the comment period to allow a reasonable opportunity to review and comment on the traffic analysis and its conclusions. The Sierra Club Maryland Chapter also followed up to FHWA explaining that, as the lead Agency, FHWA is responsible for compliance with NEPA and requested the files from FHWA.

Hearing no response, the Sierra Club Maryland Chapter followed up on October 20 with both Agencies.

Later that day, FHWA stated: "We do not have the data files that you are requesting in FHWA's record for the I-495 & I-270 Managed Lane Study. Our subject matter experts reviewed the traffic analysis and information included in the DEIS and appendices, and FHWA agreed with the analysis as presented."

This response is insufficient. First, FHWA is responsible for complying with NEPA's requirements, including publicly providing underlying environmental data that formed the DEIS's conclusions to enable meaningful public review. If FHWA truly does not have this data,

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 188

it has the responsibility to obtain it, which it easily could, and provide it. Second, FHWA is responsible for the accuracy, scope, and content of environmental documents prepared by the Agency, MDOT SHA, or a contractor, and must independently evaluate the information. This includes evaluating the data files that form the basis of conclusions made in the DEIS. Has FHWA truly not reviewed the underlying traffic data and modeling that underlie the DEIS? How can FHWA agree with the analysis without reviewing its underlying data and modeling?

The Sierra Club Maryland Chapter also followed up with MDOT on October 27, after hearing no response from that Agency. Finally, on November 2, a week before the comment deadline, MDOT responded claiming first that the State of Maryland simply disagrees that NEPA requires the production of these files and data, and that documents responsive to the request can be found in the DEIS's Appendix F. (Note that the requestor has looked and have not found the Microsoft Excel or modeling files requested in the appendix.) MDOT stated that "some of the records you seek include data contained in the work papers of outside MDOT consultants and/or the work product of outside entities." MDOT stated that it has revised its estimate such that the Sierra Club Maryland chapter must pay **$6,082.60** before the Agency will begin working on the request. It is not clear why this amount is different than MDOT's earlier estimate.

The Organizations request that the Agencies make the data used to support the traffic conclusions in the DEIS be made publicly available. Contrary to MDOT's claim, this is required by NEPA. Merely presenting the end result of some of that data as figures and tables is not sufficient; the public cannot meaningfully review the conclusions. MDOT's changing claims that providing this data would cost over $6,000 are not credible and run contrary to every other department of transportation providing the data promptly free of charge. What is different about this DEIS than others that prevents the transparent production of underlying traffic data? Finally, FHWA remains responsible for complying with NEPA and cannot skirt its responsibilities by claiming it does not have the files.

00022732

Comments of the Maryland and Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 189

  c.  The Format and Structure of the DEIS Hides Impact Information from Affected People and the Public

  There are many examples of how the DEIS is structured to hide impacts on community assets, below is just one of the most egregious. The Organizations scoured the DIES and 54 appendices and sub-appendices (some appendices over 1500 pages; plus 25 more appendices in the JPA Appendix R) to identify properties that would be impacted by the Project. In DEIS Appendix E, Table 3-10 shows that 75 community properties and places will be partial acquired to allow the project to be built, but their names are not listed. This includes five schools and 14 places of worship.

**Table 3-10: Summary of Impacted Community Facility Properties Within the CEA Analysis Area**

| Type of Community Facility Property* | Alternative 5 | Alternatives 8 and 9 | Alternative 10 | Alternative 13B | Alternative 13C |
|---|---|---|---|---|---|
| Schools (#) | 5 | 5 | 5 | 5 | 5 |
| Higher Education (#) | 1 | 1 | 1 | 1 | 1 |
| Places of Worship (#) | 12 | 14 | 14 | 14 | 14 |
| Hospitals (#) | 3 | 3 | 3 | 3 | 3 |
| Recreation Centers (#) | 4 | 4 | 4 | 4 | 4 |
| Publicly-Owned Parks (#) | 44 | 45 | 45 | 45 | 45 |
| Police Stations and Correctional Facilities (#) | 2 | 2 | 2 | 2 | 2 |
| Public Libraries, Post Offices, etc. (#) | 1 | 1 | 2 | 1 | 1 |
| **Total Community Facility Properties Impacted (#)** | **72** | **75** | **76** | **75** | **75** |

*All community facility property impacts are partial acquisitions. No community facilities would be relocated under any Screened Alternative.

DEIS, App. E, CEA EJ Tech Report, at 63.

  It is impossible to identify the names of these properties or other identifying information from the DEIS documents. When asked for the list of names of places corresponding to the Table, MDOT FHWA responded:

  Please note that information presented in Tables 3-10 of Appendix E, page 63 (item 2 of your email) is depicted in Appendix E, Chapter 5 & Appendix C (CEA Analysis Area Community Profiles and Effects) and, and the information presented in Table 3-11, Appendix E, page 66 (item 3 of your email) is depicted in Environmental Resource Mapping (DEIS Appendix D).[271]

  When the lead agency project managers should be going into the communities and bending over backwards to help them understand impacts and hear their mitigation requests, yet, many of these communities are unaware their community areas are in harm's way from this

---

[271] October 30, 2020 Email response from FHWA to Maryland Sierra Club regarding "Request for I-495/I-270 DEIS underlying data" sent on October 23, 2020.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 190

Project and that they are legally entitled to voice their concerns and defend their need for mitigation measures. And when groups want to help their community members understand what is happening and how their lives could be impacted, they have often been shut out with comments like this. This shows MDOT SHA's disregard for transparency and accountability. Everyone has a right to know what those significantly impacted places are, to know if their children attend those schools or their families use those community facilities. When a document is over 19,500 pages, it would show good faith to provide, when asked, this requested information in a clear and accessible way.

  So to identify more information regarding he properties listed in Tables 3-10 and 3-11 of Appendix E, the Agencies (the MDOT project manager was asked and copied on FHWA's response and made no further reply) asks the reader and our Organizations to hopscotch between Appendix C, D, and E and Chapter 5 (a combined 2,029 pages). However, even after doing this full review of these appendices, we were unable to identify this information. The complete information needed is not in those chapters, despite their assertions otherwise. Only bits and pieces are extractable from those chapters, but the complete information is simply not there.

  In the same email request, the following documents were requested:

  1) The underlying data and complete itemized budget that went into Table 8-1 (Appendix B, page 148), including the assumed "efficiencies" coefficient and detailed explanation of any and all assumptions used to lower the estimates.

  4) The DEIS provided estimated opening year (2025) average weekday toll rates per mile, varying from $0.68 per mile to $0.77 per mile. In order to calculate an average, the data necessarily contains maximum and minimum tolls. Please provide the underlying data for 13 time periods and underlying data for the average tolls given on DEIS page 2-43, including the maximum and minimum tolls.

  5) The AM peak per mile rates were given on page 883 of Appendix C. Please provide the equivalent table for the PM peak.

  6) Any cost-benefit or value-for-money analysis done for this project to establish the cost-savings of using the public-private partnership financing method in place of increasing bonding capacity and using a more traditional design-build approach.

  FHWA's response stated, "[w]e do not have the data files or analyses requested in your email for items 1, 4, 5 and 6 in FHWA's record for the I-495 & I-270 Managed Lane Study." It is concerning that the agency does not have and has not bothered to obtain this underlying data.

  d.  The Agencies Should Provide All Documents That Formed the Basis of the DEIS and Re-Open the Comment Period

  In addition to refusing to make referenced documents available, the Agencies have failed to provide requested documents that the Agencies considered and relied on in the DEIS and that they are required to provide pursuant to NEPA, the Freedom of Information Act (FOIA), and the



Maryland Public Information Act (PIA). On February 18, 2020, the Sierra Club Maryland Chapter and Rock Creek Conservancy requested records in the Agencies' possession, custody, or control that underlie important aspects of decisions the Agencies made in the DEIS as well as in the earlier steps of retaining and eliminating alternatives from detailed study:

1. Terminus Concerns/Logical Termini records, including communications with the U.S. Department of Transportation and the Virginia Department of Transportation, regarding the logical terminus of the I-495 & I-270 Managed Lanes Study concerning connecting I-495 managed lanes to the Woodrow Wilson Bridge.

2. Records of the Stormwater Management Report for the project, including existing and proposed stormwater management impacts to state and national park property from the project.

3. Records of the project's impacts to state and national parkland.

4. Records (including traffic, financial, avoidance, minimization, and other environmental analyses) related to the decision to select the project's Alternatives Retained for Detailed Study and to eliminate Alterative 5 and MD-200 diversion from further review. *See* Alternatives Retained for Detailed Study, https://495-270-p3.com/environmental/alternatives/alternatives-retained-for-detailed-study/.

5. Records of the project's impacts on greenhouse gas emissions, including, but not limited to, reports and analyses performed to provide the project's estimated greenhouse gas emissions impact in Maryland's 2019 Greenhouse Gas Reduction Act Draft Plan and all records supporting and relating to the following tweet:

https://twitter.com/MDOTNews/status/1132300556599537669.

NEPA requires that the Agencies:

> Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

40 C.F.R. § 1506.6(f) (2019).

The Sierra Club Maryland Chapter and Rock Creek Conservancy have made clear repeatedly that their requests seek information that underlie the DEIS, not draft versions of the DEIS. However, over the course of five months, the Agencies refused to turn over these records, in violation of their NEPA, FOIA, and PIA obligations, and hindering meaningful comment as a result. *See* 5 U.S.C. § 552(a)(3), (a)(4)(B), (b), & (c). (providing the public a right to obtain

access to federal agency records, except to the extent such records are protected from disclosure); Md. Code Ann., GP § 4-103 (providing public a right to access records that are in possession of state and local government agencies). FHWA is required to determine whether to comply with the request within 20 business days, which may be extended 10 business days in unusual circumstances, and upon determination, must make records promptly available. 5 U.S.C. § 552(a)(6)(A), (B)(i), (C)(i); 49 C.F.R. § 7.31(a)(2). MDOT is required to promptly grant or deny a request, not more than 30 days after receipt. Md. Code Ann., GP § 4-203(a). If MDOT denies inspective of a responsive record, it must provide "a brief description of the undisclosed record that will enable the applicant to assess the applicability of the legal authority for the denial." *Id.* § 4-203(c)(1)(i)(3) requires "a brief description of the undisclosed record that will enable the applicant to assess the applicability of the legal authority for the denial." If a record contains exempt and non-exempt material, MDOT must permit inspection of the non-exempt portion of a record, typically by redacting the exempt material. *See id.* § 4-203(c)(1)(ii). And if inspection is denied as not in the public interest under § 4-343, MDOT must provide "an explanation of why redacting information would not address the reasons for the denial." *Id.* § 4-203(c)(1)(i)(2)(B).

Four months after the February 18 request, and after repeated follow-up, on June 24 (by letter dated June 17), FHWA: 1) produced three unredacted documents, 2) produced 71 redacted documents, and 3) claimed that an additional 253 unspecified responsive records were withheld in full pursuant to FOIA exemptions 4, 5, and 6. The only unredacted documents produced were two letters sent by Sierra Club Maryland Chapter and Rock Creek Conservancy themselves to FHWA and a Stream Channel Assessment prepared by Maryland National Capital Parks and Planning Commission. Almost all documents with redactions were emails with only the sender, receiver, and subject left unredacted. FHWA's actions violate 40 C.F.R. § 1506.6(f) (2019); 5 U.S.C. § 552(a)(6)(A), (B)(i), (b)(5); 49 C.F.R. § 7.31(a)(2), and prevent Sierra Club Maryland Chapter and Rock Creek Conservancy, and the public, from meaningfully commenting on the DEIS.

MDOT-SHA's response to Sierra Club Maryland Chapter and Rock Creek Conservancy's requests show an even more flagrant violation of that Agency's NEPA and PIA obligations, and a general lack of transparency regarding the Project. At each point, the Sierra Club Maryland Chapter and Rock Creek Conservancy emphasized their willingness to work with MDOT to efficiently obtain the needed information, only to be met with changing reasoning, lies, and unlawful denials. The Agencies should not go forward with the NEPA process until MDOT-SHA publicly releases the documents that were sought, which formed the basis for decisions in the DEIS.

Initially, MDOT falsely denied having records responsive to two of the requests (communications between MDOT, the U.S. Department of Transportation, and the Virginia Department of Transportation with regard to the Project's logical termini and the requested Stormwater Management Report for the Project). The Agency also denied other requests broadly, without specification, claiming that the documents being sought were preliminary, pre-decisional, deliberative, and subject to a non-disclosure agreement with FHWA, and that the documents' release was not in the public interest. With respect to one request, regarding the publicly posted tweet about the Project's estimated greenhouse gas emissions, the Agency



**OP · LANES**
M A R Y L A N D   I-495 & I-270 Managed Lanes Study    **FINAL ENVIRONMENTAL IMPACT STATEMENT**

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 193

eventually agreed to produce responsive documents by April 30, 2020 at no charge, based on a narrowed scope of search.

The Agency's broad exemption claims are improper, particularly for information underlying decisions that already had been made. While pre-decisional deliberative materials may be protected, "[o]nce an agency's decision has been made, the records embodying the decision or policy, and all subsequent explanations and rationales, are available for public inspection." Maryland Public Information Act Manual, 3-30 (14th ed., October 2015). Moreover, "[t]he exception [for pre-decisional deliverable materials] is also meant to cover only the deliberative parts of agency memoranda or letters. Generally, it does not apply to records that are purely objective or factual or to scientific data." *Id.* Sierra Club Maryland Chapter and Rock Creek Conservancy explained that they were "seeking records that formed the basis of this already made decision. If MDOT-SHA is asserting that these decisions were made based on incomplete and non-final records, please tell us so." Letter from Sierra Club Maryland Chapter and Rock Creek Conservancy to MDOT, at 2 (March 16, 2020).

MDOT then informed the Sierra Club Maryland Chapter and Rock Creek Conservancy that it would not abide by its agreement to respond to one of the requests by April 30, 2020 because of the COVID-19 state of emergency declared on March 5, 2020 and the stay at home order released on March 31, 2020. MDOT-SHA requested the Sierra Club Maryland Chapter and Rock Creek Conservancy's "agreement to extend the 10-day period for providing a time and cost estimate, as well as the 30-day period for responding to your request, until 10 days after the date that the state of emergency is lifted." Letter from MDOT to Sierra Club Maryland Chapter and Rock Creek Conservancy, at 4 (Apr. 14, 2020). MDOT estimated that the response would involve potentially 150 emails and their attachments, which, according to the Agency, was overwhelming under remote working conditions. Sierra Club Maryland Chapter and Rock Creek Conservancy did not agree to this indefinite extension request, but the Agency nevertheless has not produced any documents responsive to the request. The state of emergency was recently renewed and it is still ongoing.[272] If MDOT cannot produce responsive documents regarding the Project and the DEIS because of the state of emergency, or review the 150 emails and their attachments, MDOT also should delay the DEIS process until the state of emergency is over.

With respect to the other requests for records underling the DEIS, MDOT stated generally that that all records are exempt as pre-decisional and deliberative, based on its claim that: "Draft documents are not automatically denied. Each is considered on a case-by-case basis." Letter from MDOT to Sierra Club Maryland Chapter and Rock Creek Conservancy, at 4 (Apr. 14, 2020). MDOT further stated "In reference to the Logical Termini paper, this paper falls

---
[272] Larry Hogan, Renewal of Declaration of State of Emergency and Existence of Catastrophic Health Emergency — COVID-19 (Oct. 6, 2020), https://htv-prod-media.s3.amazonaws.com/files/10-6-2020-1602005863.pdf. October 30, 2020 marked the 10th time Hogan renewed this declaration of emergency which was first made on March 5, 2020. Abigail Constantino, *Maryland Once Again Renews State of Emergency During Pandemic*, WTOPnews (Oct. 30, 2020), https://wtop.com/coronavirus/2020/10/maryland-coronavirus-update-october-30/.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 194

under the jurisdiction of the FHWA and they have reiterated that it is a confidential report and is not disclosable under FOIA or PIA." *Id.*

Sierra Club Maryland Chapter and Rock Creek Conservancy responded and explained that MDOT's response:

> again fails to satisfy MDOT-SHA's obligations under Maryland GP § 4-203(c)(1), which requires "a brief description of the undisclosed record that will enable the applicant to assess the applicability of the legal authority for the denial," and for denials pursuant to Maryland GP § 4-343, "an explanation of why redacting information would not address the reasons for the denial."

Letter from Sierra Club Maryland Chapter and Rock Creek Conservancy to MDOT, at 2 (Apr. 23, 2020).

Sierra Club Maryland Chapter and Rock Creek Conservancy repeatedly followed up with MDOT on their requests and were ignored. Finally, on June 23, 2020, MDOT responded, but instead of withholding documents based on the previously claimed exemptions or a finding that they did not possess responsive documents, MDOT refused to review and provide documents for three of the requests, including the one MDOT had previously agreed to produce by April 30 at no charge, until the Sierra Club Maryland Chapter and Rock Creek Conservancy paid **$302,835.12**. It appears, but is not clear, that MDOT withdrew its previously claimed exemptions. Sierra Club Maryland Chapter and Rock Creek Conservancy had requested a fee waiver because the information was in the public interest, but the letter ignored that request.

On July 7, 2020, Sierra Club Maryland Chapter and Rock Creek Conservancy requested that MDOT respond to their unaddressed requests regarding stormwater and parkland impacts and respond to the fee waiver request, which detailed how their requests were in the public interest and explained how such a waiver was justified. After getting no response, Sierra Club Maryland Chapter and Rock Creek Conservancy followed up on July 22, 2020.

On July 24, 2020, MDOT responded by pointing Sierra Club Maryland Chapter and Rock Creek Conservancy to the Project's website and saying: "Given the number of documents publicly and readily available at this time, we recommend that you review those records and file a new request for any additional records you may be seeking" and that "MDOT considers this request closed." Letter from MDOT to Sierra Club Maryland Chapter and Rock Creek Conservancy, at 2 (July 24, 2020). MDOT did not address the fee waiver request or other requests.

Because the response did not answer the Sierra Club Maryland Chapter and Rock Creek Conservancy's questions, on July 27, 2020, they followed up with the below email:

> Based on your July 24 letter and previous letters, we understand MDOT SHA has:
>
> 1) Denied the organizations' request for a fee waiver with respect to the requests numbered 1, 4, and 5 in the February 18 PIA request; and



Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 195

2) Concluded that all records in MDOT SHA's possession that are responsive to requests numbered 2 and 3, and that are not already publicly available, are exempt from disclosure under Maryland GP §§ 4-343 or 4-344.

If any part of this is incorrect, please let us know by Monday, August 3.

As of November 6, 2020, Sierra Club Maryland Chapter and Rock Creek Conservancy have not received a response.

Throughout the process, MDOT has misrepresented, obfuscated, and violated its obligations under the PIA and NEPA. MDOT's actions to hide documents relevant to the DEIS demonstrate a lack of transparency and intent to preclude meaningful public review on the Project. MDOT has admitted that it possesses documents that are responsive to the requests, which underlie the DEIS, and that are not publicly available. MDOT is not allowed to withhold responsive documents based on a claim that it has already provided some, or even many, related documents online. Nor can either Agency withhold a document that it relied on to decide the termini of the Project by claiming that the document is proprietary, confidential, or subject to a non-disclosure agreement; once the Agencies use the document in the DEIS process, they must make it publicly available under both NEPA and the PIA.

MDOT based decisions made prior to and within the DEIS on documents that it still will not publicly disclose. It is shocking that MDOT would demand that two non-profit organizations pay the Agency over $300,000 just for the Agency to evaluate releasing documents that underlie a project as significant as this one, particularly when the Agencies should have made these documents publicly available from the start. And it is shocking that MDOT would deny the request for a fee waiver without explanation. Provision of these documents, and compliance with NEPA, particularly with such a significant project, is certainly in the public interest.

This letter requests that the Agencies put a halt to the NEPA process until they provide the public with access to all relevant documents that underlie decisions made in the DEIS. Once that occurs, the Agencies must provide a new comment period. As it stands, by refusing to provide such documents, the DEIS only provides a selective presentation, and does not allow the public to meaningfully review or comment on the DEIS and its alternatives.

### III. Problems with the Section 4(f) and National Historic Preservation Act Analyses

#### A. The DEIS and Section 4(f) Analysis Fail to Adequately Address the Project's Effects on Historic and Cultural Resources

The Project has the potential to cause irreparable damage to historic and cultural resources in the pathway of the proposed interstate expansion plans. In addition to National Historic Landmarks, such as the Greenbelt Historic District and Washington Aqueduct, the continued integrity of numerous other historic and cultural resources, including parks, are threatened, too.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 196

In addition to numerous historic resources, should the Proposal move forward, the National Parks Conservation Association estimates that seven National Parks including Greenbelt Park, Chesapeake & Ohio Canal National Historical Park, Clara Barton Parkway, George Washington Memorial Parkway, Baltimore-Washington Parkway, Suitland Parkway, and Rock Creek Park would be harmed—amounting to approximately eighty-six acres of National Park land—along with dozens of local and regional parks amounting to approximately 725 acres.[273] The Agencies should note that Greenbelt Park, C & O Canal National Historical Park, George Washington Memorial Parkway, Clara Barton Memorial Parkway, Baltimore Washington Parkway, Suitland Parkway, and Rock Creek Park are each listed or eligible for listing in the National Register of Historic Places. However, the Agencies have concluded that adverse effects cannot be fully determined.[274]

Nevertheless, as these comments have already made clear, a federal agency may not proceed with a proposed action until it performs an environmental review that includes meaningful consideration of alternatives to the proposed action that would avoid harm or have a less harmful impact. In addition to the other environmental considerations already discussed, environmental review must include meaningful consideration of impacts to historic and cultural resources, too. An accurate DEIS is important because the Project is expected to adversely affect these properties and sites, along with other environmental impacts that these comments have discussed.

Notwithstanding the importance of these resources to the American public, the DEIS fails to adequately consider the Project's effects on historic and cultural resources for three reasons. First, the DEIS relies admittedly on incomplete information. Second, the DEIS fails to consider the effect of Section 110(f) of the National Historic Preservation Act and the heightened scrutiny it requires federal agencies to apply to resolve adverse effects on National Historic Landmarks, such as the Greenbelt Historic District and Washington Aqueduct. Third, in preparing the Section 4(f) analysis, the Agencies failed to consider alternatives that would have emerged if they had used all possible planning to avoid use of historic properties and parks, among other resources, by exploring feasible and prudent alternatives. For the reasons discussed below, the DEIS violates the letter and intent of federal historic preservation laws that the Agencies are required by Congress to follow. The Agencies must prepare a Supplemental EIS to correct these defects.

##### 1. The Agencies Failed to Take a "Hard Look" at the Project's Effects on Historic and Cultural Resources Because Information Related to These Resources is Not Complete

The DEIS is fundamentally flawed because it has failed to give adequate consideration not only to all historic and cultural resources that would be adversely affected, but also to Project alternatives that would avoid harm to those resources or have a less harmful impact, which

---

[273] National Parks Conservation Association, "Highway Expansions Threaten Our Parks," https://www.npca.org/advocacy/95-don-t-pave-mid-atlantic-parks.

[274] DEIS, App. G, Cultural Resources Technical Report 3.1.2, at 26-28.

00022736


Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 197

include the parks and parkways owned by the National Park Service. As with other effects on the human environment, NEPA requires that the Agencies take a "hard look" at the effects of the Project on historic and cultural resources should the Project receive all necessary approvals.[275]

Here, however, the Agencies have not gone far enough to evaluate the effects of the Project on those resources. No "hard look" has occurred as required by law because the NEPA analysis has too many unanswered questions about how historic and cultural resources will be affected.[276] Specific examples of ways the DEIS is deficient include, but are not limited to, the following:

- The Maryland Historical Trust, Maryland's State Historic Preservation Office or SHPO has stated that additional archaeological investigations are warranted.
- The DEIS's reliance on a smaller "Limits of Disturbance" radius, instead of a broader Area of Potential Effect that would consider all potential direct, indirect, and cumulative effects, impermissibly restricts consideration of the Project's true effects on historic and cultural resources and incorrectly limits effects considered to physical impacts only, even though adverse visual, audible, and atmospheric effects are also expected.
- The DEIS admits that its analysis is not only incomplete, but that it cannot assess all effects on historic and cultural resources because the Agencies do not know what they are.
- The DEIS admits that 329 resources within the Area of Potential Effect require additional documentation or evaluation for purposes of determining listing or eligibility for listing in the National Register of Historic Places.
- The DEIS fails to consider effects on cultural resources, such as Indian Spring, that are tied to American Indian tribes.
- The boundaries of the Montgomery County Poor Farm Cemetery and the Moses Hall Cemetery have not been delineated and the potential for an unknown number of grave sites being disturbed is acknowledged.[277]

---

[275] *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970) (courts must examine the methodology and substance of agency decisions to ensure that they have adequate factual support).

[276] The "hard look" doctrine could never be satisfied where information needed to analyze environmental effects is not complete. *See id.*

[277] DEIS, Ch. 4 Env'tl Commentaries C Historic Cemeteries, at 4-55; *see also* Katherine Shaver, *Maryland Beltway Expansion Might Require Moving Part of Historic African American Cemetery*, Washington Post (Oct. 17, 2020), https://www.washingtonpost.com/local/trafficandcommuting/maryland-beltway-expansion-might-require-moving-part-of-historical-african-american-cemetery/2020/10/17/ae4696ca-0da5-11eb-8a35-237ef1eb2ef7_story.html. The potential impacts to these sites are not sufficiently evaluated, nor is there discussion of how impacts may be avoided.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 198

- The DEIS fails to consider all direct, indirect, and cumulative effects of how the removal of trees and the Project's proximity will affect the integrity of Greenbelt Historic District, a National Historic Landmark.
- The DEIS fails to make clear the extent to which the Project might harm the Washington Aqueduct, a National Historic Landmark.
- By limiting its scope to physical harm only, the DEIS fails to consider all direct, indirect, and cumulative impacts on historic and cultural resources.

Taken together, these shortcomings demonstrate a fundamental failure of the DEIS, which was likely rushed due to efforts to comply with the "One Federal Decision" rule: it is not complete, and therefore prevents the Agencies from taking a hard look at the Projects' impacts.

In addition to these overall deficiencies, the DEIS impermissibly defers full consideration of historic properties listed in or eligible for listing in the National Register of Historic Places by relying on a boilerplate Programmatic Agreement that the Agencies will not execute until after selecting a Preferred Alternative. Although a Programmatic Agreement may be sufficient for compliance with Section 106 of the National Historic Preservation Act, delaying full assessment of historic properties until a Programmatic Agreement is executed ignores the Agencies' present duty to comply with NEPA, which requires a "hard look" at all of the environmental consequences that will flow from the Project if the Agencies grant the permits needed for the Project to proceed. It is also impossible to understand how the Agencies could ever select a Preferred Alternative for the Final EIS without having fully considered this information. For these reasons, relying on an unexecuted Programmatic Agreement as part of the Section 106 review process mandated by the National Historic Preservation Act precludes, rather than assists, the Agencies and the public from understanding how these effects might harm historic and cultural resources as required by NEPA.

2.    **The Agencies Have Failed to Comply With Section 110(f) of the National Historic Preservation Act**

Section 110(f) of the National Historic Preservation Act mandates that federal agencies have affirmative, substantive responsibilities to protect National Historic Landmarks to the "maximum extent possible."[278] Section 110(f) provides:

Prior to the approval of any Federal undertaking that may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall *to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark.* The head of the Federal Agency shall afford the Council a reasonable opportunity to comment with regard to the undertaking.[279]

---

[278] 54 U.S.C. § 306107. (emphasis added).

[279] *Id.* (emphasis added).

OP·LANES™
M A R Y L A N D    I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 199

Section 110(f) imposes a stringent substantive standard for any project that will adversely affect a National Historic Landmark. Congress authorized the National Historic Landmark program to recognize "properties of exceptional value to the nation as a whole rather than to a particular State or locality."[280] In contrast to properties listed in the National Register of Historic Places, which are nominated by state historic preservation officers and federal agencies,[281] the Secretary of the Interior designates National Historic Landmarks based on the Department's own research. Each property considered for National Historic Landmark designation must be approved and recommended by the National Park System Advisory Board.[282]

Section 110(f) was enacted in 1980 as part of a comprehensive set of amendments to the NHPA.[283] The amendments significantly expanded the statutory responsibilities of federal agencies to preserve and protect historic properties. The legislative history of Section 110(f) states explicitly that it "establishes a higher standard of care to be exercised by federal agencies" with respect to National Historic Landmarks, as compared to the standard imposed by Section 106 of the NHPA, which applies to all sites listed in, or eligible for, the National Register of Historic Places.[284] Section 106, part of the original 1966 NHPA, requires only that federal agencies "take into account" the effect of their undertakings on historic properties, and afford the Advisory Council on Historic Preservation an opportunity to comment in advance on any such proposed undertaking.[285] Section 110(f) requires more than that. "[Section 110(f)] does not supersede Section 106, but complements it by setting a higher standard for agency planning in relationship to [National Historic] landmarks before the agency brings the matter to the [Advisory] Council."[286]

The higher standard was described by the National Park Service (NPS) in The Secretary of the Interior's Standards and Guidelines for Federal Agency Historic Preservation Programs Pursuant to Section 110 of the National Historic Preservation Act of 1966 ("Section 110 Guidelines"), which state that "Section 110(f) of the NHPA requires that Federal agencies exercise a higher standard of care when considering undertakings that may directly and adversely affect NHLs [National Historic Landmarks]."[287] The Section 110(f) Guidelines further direct

---

[280] 36 C.F.R. § 65.2(a).

[281] Id. §§ 60.5-60.9.

[282] Id. § 65.5(d)-(e).

[283] See Pub. L. No. 96-515, 94 Stat. 2957, 2981 (1980).

[284] H.R. Rep. No. 96-1457, at 38 (1980), reprinted in 1980 U.S.C.C.A.N. 6378, 6401.

[285] 54 U.S.C. § 306108.

[286] H. Rep. No. 96-1457, at 38, reprinted in 1980 U.S.C.C.A.N. at 6401.

[287] 63 Fed. Reg. 20,495, 20,503 (Apr. 24, 1998).

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 200

agencies to "consider all prudent and feasible alternatives to avoid an effect on the NHL."[288] This language mirrors that of Section 4(f) of the Department of Transportation Act.[289] The explicit terms of the statutory language of Section 110(f), as well as its legislative history, provide clear guidance as to the statute's strict mandate—to set the strongest and highest standard possible for protection of the nation's historic landmarks.

Here, the Agencies did not comply with Section 110(f) of the NHPA. In a letter dated March 16, 2020, FHWA notified the Department of the Interior that two National Historic Landmarks—Greenbelt Historic District and the Washington Aqueduct—are within the Project's Area of Potential Effects. However, the letter inaccurately minimized the expected effects that the Project will have on the historic resources and, as such, is insufficient. The DEIS contains no further evidence of compliance with Section 110(f)'s substantive requirements. Therefore, the DEIS is deficient as a matter of law because the Agencies have not undertaken "all possible planning" to minimize harm to National Historic Landmarks.

A Supplemental EIS is needed because the DEIS fails to consider alternatives that have been developed using all possible planning to minimize harm as Section 110(f) requires. Therefore, the Agencies should not select a Preferred Alternative or issue the Final EIS until they have complied with their Section 110(f) responsibilities and the Secretary of the Interior is satisfied that the Project will either avoid harming National Historic Landmarks or that all possible planning has been undertaken to minimize harm. In addition, the Agencies have a duty to inform the public of new alternatives that Section 110(f) requires the Agencies to consider. A Supplemental DEIS will be required to ensure that this information is disclosed not only so that the public will understand effects on National Historic Landmarks, but also so that Agencies can make an informed decision about the least harmful alternative.

**B.    The Agencies' Section 4(f) Analysis Fails to Comply With the Letter and Intent of the Department of Transportation Act Because it Does Not Consider the Full Range of Ways That the Project Will Use—Directly, Indirectly, and Constructively—Historic Sites of Local, State, or National Significance, and Parks**

Section 4(f) of the Department of Transportation Act of 1966 is the most stringent federal historic preservation law ever enacted. Congress passed it to protect public parks, recreation areas, wildlife and waterfowl refuges, and any significant public or private historic sites.[290] Section 4(f) applies to all transportation projects that require funding or approval by the U.S. Department of Transportation. Although minor changes to Section 4(f) have occurred since it

---

[288] Id.

[289] 49 U.S.C. § 303.

[290] 49 U.S.C. § 303(c).

---

00022738

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 201

was established, federal courts have repeatedly validated the importance of this policy goal and need for compliance with Section 4(f)'s mandates.[291]

Section 4(f)'s mandate is substantive rather than procedural in nature. Protected sites cannot be "used" in transportation projects unless there is no feasible and prudent avoidance alternative and "all possible planning" is incorporated to minimize harm resulting from the use.[292] When deciding whether a protected site will be "used," courts construe the term broadly.[293]

Moreover, the Federal Highway Administration (FHWA) and Federal Transit Administration have adopted regulations to define "use" of Section 4(f)-protected sites. Under these regulations, a "use" of protected property occurs when: (1) land from a 4(f) property is permanently incorporated into a transportation project; or (2) there is a temporary occupancy of a 4(f) site that causes adverse impacts that are contrary to the statute's preservation purposes; or (3) when constructive use of the site occurs.[294]

Here, the Agencies have not complied with either the letter or spirit of Section 4(f). So far, the Agencies have identified a total of 111 Section 4(f) properties within the corridor study boundary including historic sites, parks, and recreation areas.

Of the 111 Section 4(f) properties, the Draft Evaluation notes that 68 would have a Section 4(f) use and 43 would be avoided. Of the 68 Section 4(f) properties that have a use, 36 would result in minor Section 4(f) use, 22 require an evaluation of avoidance alternatives and analysis of least overall harm, and four properties meet the exception criteria. Not all of these conclusions, however, are accurate.

First, as part their Section 4(f) review, and for the same reasons the Agencies have failed to take a hard look at historic and cultural resources, the Agencies have improperly deferred the full identification of historic resources and the full extent of their "use." As a result, the Draft Section 4(f) Evaluation is not complete. Second, the Agencies have ignored indirect and cumulative effects on historic resources, even though they would amount to a "constructive use"

[291] See id. at 404-05; Benton Franklin Riverfront Trailway & Bridge Comm. v. Lewis, 701 F.2d 784, 787-88 (9th Cir. 1983); Stop H-3 Ass'n v. Dole, 740 F.2d 1442, 1447 (9th Cir. 1984).

[292] 49 U.S.C. § 303(c); 23 C.F.R. § 774.3.

[293] Adler v. Lewis, 675 F.2d 1085, 1092 (9th Cir. 1982) ("Even off-site activities are governed by § 4(f) if they could create sufficiently serious impacts that would substantially impair the value of the site in terms of its prior significance and enjoyment."); Stop H-3 Ass'n v. Coleman, 533 F.2d 434, 445, 452-53 (9th Cir. 1976) (6-lane highway passing within 100-200 feet of a historic petroglyph rock would result in "constructive use").

[294] See 23 C.F.R. § 774.17.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 202

if the Project is approved. Therefore, the Agencies have failed to recognize or satisfy the stringent mandate of Section 4(f) to avoid and minimize harm.

For example, the Section 4(f) Evaluation does not make clear how the Agencies intend to address impacts on a historic African American cemetery, also raising environmental justice implications.[295] Other historic properties identified by the Maryland Historical Trust within the administrative record are incorporated herein by reference, as well as sites that require additional study for eligibility determinations.

In addition, the National Parks Conservation estimates that seven National Parks including Greenbelt, the Chesapeake & Ohio Canal, Clara Barton Parkway, George Washington Memorial Parkway, Baltimore-Washington Parkway, Suitland Parkway, and Rock Creek Park[296] would be harmed—amounting to approximately eighty-six acre of National Park land—along with dozens of local and regional parks amounting to approximately 725 acres.[297] However, the Section 4(f) Evaluation fails to address the full extent of the Project's use of these resources. Consequently, the Agency could not possibly consider all feasible and prudent alternatives that would avoid this harm.

The Agencies' decision to defer full consideration of historic properties and affected park acreage, along with the full extent of their use or constructive use, renders the Project legally vulnerable under Section 4(f) of the Department of Transportation Act.[298] For this reason, the Agencies should prepare a revised Section 4(f) Evaluation to address this deficiency.

[295] See Katherine Shaver, Maryland Beltway Expansion Might Require Moving Part of Historic African American Cemetery, Washington Post (Oct. 17, 2020), https://www.washingtonpost.com/local/trafficandcommuting/maryland-beltway-expansion-might-require-moving-part-of-historical-african-american-cemetery/2020/10/17/ae46696ca-0da5-11eb-8a35-237ef1eb2ef7_story.html.

[296] In addition, it is anticipated that Rock Creek Stream Valley Park Units 2 and 3, which are managed by Maryland-National Capital Parks and Planning Commission, will also experience adverse effects or "use." However, the Section 4(f) analysis does not appear to adequately consider these effects or alternatives to avoiding them.

[297] National Parks Conservation Association, Highway Expansions Threaten Our Parks, https://www.npca.org/advocacy/95-don-t-pave-mid-atlantic-parks. It is also expected that the following estimates are the minimum estimate of acreage that will likely be used by the Project: George Washington Memorial Parkway (12.2 acres); C & O Canal (15.4 acres); Clara Barton Parkway (1.8 acres); Baltimore Washington Parkway (69.3 acres); and Greenbelt Park (0.6 acres). The Agencies have refused to estimate the amount of acreage affected by Suitland Parkway, another flaw in the Section 4(f) Evaluation.

[298] See Corridor H Alternatives, Inc. v. Slater, 166 F.3d 368 (D.C. Cir. 1999).

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 203

### C.    The Agencies Cannot Reasonably Rely on a Non-Executed Programmatic Agreement to Satisfy NEPA, Section 110(f), or Section 4(f)

Relying on an unexecuted Programmatic Agreement for NEPA, Section 110(f), and Section 4(f) purposes is fundamentally flawed. Programmatic Agreements are a common legal tool used in the separate Section 106 process under the National Historic Preservation Act that are used to spell out the terms of formal, legally binding agreement between federal agencies and other parties.[299]

Programmatic Agreements are used when the effects of an undertaking are not fully known, as well as for implementing approaches that do not follow the normal Section 106 process, usually in the name of streamlining project approval. Here, however, the Agencies cannot reasonably rely on a Programmatic Agreement that is not yet fully drafted or executed to satisfy their Section 110(f), NEPA, or Section 4(f) responsibilities.

By contrast, full information is needed now to comply with those individual mandates that do not depend on the outcome of a Section 106 Programmatic Agreement. Without a complete understanding of the Project's full range of environmental effects, including harm to historic properties and parks, there is no way that the Agencies can reasonably select a preferred alternative as required by NEPA, use all possible planning to minimize harm to National Historic Landmarks as required by Section 110(f), or identify an alternative that avoids use of historic properties, parks, and recreation areas unless no other feasible and prudent alternative is available as required by Section 4(f).

The *Corridor H* case, like this one, involved a long, linear transportation project that was the subject of a Programmatic Agreement under Section 106 of the National Historic Preservation Act. The Programmatic Agreement there deferred the identification of historic properties to the future. Although a Programmatic Agreement may be adequate for purposes of compliance with Section 106, the court found it was not adequate to comply with Section 4(f). In *Corridor H*, the historic resources at stake were large rural historic landscapes and battlefields, which could not be avoided without going outside the alignment that had been studied for the project. As a result, the agency could not document that it had made a meaningful evaluation of whether the project would require the "use" of historic properties under Section 4(f), unless and until it had sufficient information on whether historic properties existed within the corridor.[300] Here, the Agencies cannot make a reasonable evaluation, either. Thus, the DEIS and Draft Section 4(f) Evaluation are insufficient.

---

[299] 36 C.F.R. § 800.14(b).

[300] In fact, a large rural historic district was later determined eligible for the National Register, which required a major reroute of the proposed highway. Likewise, in this case, it makes no sense for the Agencies to forge ahead based on incomplete information that could later require the Project's rerouting.

---

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 204

Deferring the full identification of historic properties may be acceptable where the nature and scope of the resources would allow them to be easily avoided, as in the case of archaeological sites that are only significant under National Register Criterion D. However, resources such as historic properties and parks require an entirely different approach, because they have in-place significance, and the project may not be able to avoid harm to these resources without selecting a different alternative. If a determination of National Register eligibility would influence the agency's selection of alternatives under Section 4(f) (and Section 106 and NEPA as well), then the identification of those historic properties, and the Project's potential effects on them, must be evaluated at a time when they can actually inform the selection of alternatives, rather than being deferred to a later date after alternatives have been foreclosed.

Therefore, we request that Agencies develop a mitigation measure that is not currently offered, but that will provide a timely way for indirect and cumulative effects to be monitored and meaningful consequences if the effects turn out to be significant.

For the reasons discussed above, it is impossible to comment meaningfully on the Agencies' plans concerning historic and cultural resources because important baseline questions have not been decided. Outstanding issues that need to be resolved include the complete identification of historic properties affected and how the Project will affect them. In addition, it is impossible to determine how the Project will affect two National Historic Landmarks, especially when the Agencies have failed to consider anything other than physical impacts or comply with the heightened review mandates required by Section 110(f) of the NHPA.

Moreover, the Agencies' Draft Section 4(f) Evaluation is likewise insufficient because it does not have full information needed to understand the complete range of direct, indirect, and cumulative effects of the Project and therefore cannot know how the Project will use historic properties and parks. For these reasons, among others, the Agencies should issue a Supplemental DEIS, as well as a revised Section 4(f) Evaluation, addressing these issues fully. A Supplemental DEIS is especially appropriate where, as here, the DEIS acknowledges that damage to cultural resources may be irreversible and irretrievable.[301] If the Agencies refuse to issue a Supplemental DEIS, their analysis in the DEIS will be wide open to legal challenge as arbitrary, capricious, and contrary to law.[302]

### IV.    Conclusion

The Project will harm the environment and human health and the Agencies should not move forward with the flawed and inadequate DEIS. We urge the Agencies to restart the NEPA process after reformulating the Purpose and Need Statement to appropriately identify a solution that will equitably increase mobility and connectivity and reduce congestion. Any proposed solution should utilize the best available science and data and incorporate meaningful feedback

---

[301] DEIS, Ch. 4 Environmental Commentaries, at 4-159.

[302] 5 U.S.C. § 706 (an executive agency's decision amounts to an abuse of discretion if arbitrary, capricious, or contrary to law).

OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020
Page 205

from the public and lessons learned from failed highway expansions and P3 projects in the past. We also urge the Agencies to consider alternatives that utilize transportation demand management and multimodal alternatives. The new NEPA process should be characterized by transparency and community outreach conducted in good faith to ensure that the public in general, and environmental justice communities specifically, are provided the information needed to fully vet the alternatives considered by the Agency. The new NEPA process must not predetermine the outcome prior to its beginning, as the current process has done. If the Agencies nevertheless decide to move forward with the predetermined Project, the Agencies must fix the fundamental flaws identified throughout this document and provide a Supplemental EIS with revised analyses and an opportunity to review and comment on the impacts the Agencies failed to evaluate in this DEIS. If the Agencies decide to move forward without providing the required Supplemental EIS, the Agencies should separate the FEIS and ROD in order to provide the public an opportunity to comment on the new information likely to be provided in any FEIS, including the selection of the preferred alternative.

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020

**Comment Attachments**

| Date | Title |
|------|-------|
| 1989 | Major Sources of Benzene Exposure |
| 1999-01-04 | Md.'s Lesson Widen the Roads, Drivers Will Come |
| 1999-09 | The Health Costs of Motor Vehicle Related Air Pollution |
| 2001-03 | Air Pollution and Exacerbation of Asthma in African American Children in Los Angeles |
| 2001-08 | The Burden of Air Pollution Impacts among Racial Minorities |
| 2002-11-04 | Letter Concerning Effects of Proposed Potomac River Crossings |
| 2002 | Capital Beltway Purple Line Study Initial Findings & Recommendations Draft |
| 2003-08 | South Coast Air Quality Management District Health Risk Assessment Guidance |
| 2004-05-06 | Capital Beltway Study Public Display Boards |
| 2004-05 | Highway Repair A New Silicosis Threat |
| 2004 | Air Pollution at Parking Lots of Vilnius |
| 2004 | Urban Air Pollution Input from Car Parking Places |
| 2006-01 | Capital Beltway Study-NETR Appendix B 3-3-05 |
| 2006-01 | Capital Beltway Study NETR Chapter 2_Redacted |
| 2006-01 | Capital Beltway Study NETR Chapter 3_Redacted |
| 2006-01 | Capital Beltway Study NETR Cover and Dividers |
| 2006-01 | Capital Beltway Study-NETR-Appendix A References |
| 2006-01 | Capital Beltway Study-NETR-Appendix C Wetland and Waterways Chart |
| 2006-01 | Capital Beltway Study-NETR-Ch1 121505 |
| 2006-01 | Capital Beltway Study-NETR-TOC 11306 |
| 2007-08 | Minnesota Department of Transportation – Air toxics template |
| 2007-10 | Increases in Greenhouse-Gas Emissions From Highway Widening Projects |
| 2008-04-15 | Effect Modification by Community Characteristics on the Short term Effects of Ozone Exposure and Mortality in 98 US Communities |
| 2009-03-12 | Near Road Air Quality Monitoring Factors Affecting Network Design and Interpretation of Data |
| 2009-11 | West Side Mobility Study |
| 2010-06-25 | Prediction and Analysis of Near Road Concentrations |

00022741



I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020

| | |
|---|---|
| 2010-07 | Energy Usage and Greenhouse Gas Emissions of Pavement Preservation Processes for Asphalt Concrete Pavements |
| 2011-01 | Maryland Nontidal Wetland Mitigation Guidance 2nd Ed. |
| 2012 | Travel Demand Forecasting Parameters and Techniques |
| 2013-02 | Integrated Science Assessment for Ozone and Related Photochemical Oxidants |
| 2013-12 | Countywide Transit Corridors Functional Master Plan |
| 2014-08-14 | Degradation in Urban Air Quality From Construction Activity and Increased Traffic |
| 2014-09-15 | Danger in the Air Health Concerns for Silica in Outdoor Air |
| 2014-09-30 | Impact of Highway Capacity and Induced Travel on Passenger Vehicle Use |
| 2014-11 | Ecological Restoration of Streams and Rivers Shifting Strategies and Shifting Goals |
| 2015-05-19 | Transportation Policy Academy 2015 - DC Maryland Secretary of Transportation Pete Rahn |
| 2015-05 | Final Draft Function Based Rapid Stream Assessment Methodology |
| 2015-08-14 | Monitoring Study of the Near Road PM2.5 Concentrations in Maryland |
| 2016-03 | Stormwater Management In Response To Climate Change Impacts |
| 2016-11 | MARC Brunswick Frederick Line Improvement Proposal |
| 2017-06 | Silicosis There is No Cure But it Can be Prevented! |
| 2017-09-21 | Maryland Gov. Larry Hogan Proposes Widening the Beltway and I-270 to Include 4 Toll Lanes |
| 2017-10-22 | Hogan's Plan to Add Additional Toll Lanes Faces a Long, Tough Road Ahead |
| 2017-11-16 | The Best Way to Improve Transportation in Our Region is |
| 2017-12-01 | Hogan's Proposed Beltway Widening Project Could Require Taxpayer Funding and Exorbitant Tolls |
| 2017-12 | An Assessment of Regional Initiatives for the National Capital Region, Technical Report |
| 2017 | Closing the Induced Vehicle Travel Gap Between Research and Practice |
| 2017 | Economics Pricing, Demand, and Economic Efficiency – A Primer |
| 2018-01-16 | Residents Fume Over I-495 Shoulder Lane in McLean |
| 2018-04-20 | MDE Performance Standards and Monitoring Protocol for Permittee |
| 2018-07 | Comprehensive Assessment of Climate Change Impacts in Maryland |
| 2018-07 | Sacramento Metropolitan Air Quality Management District Board-Adopted Methodology |

| | |
|---|---|
| 2018-08-01 | The Concentration-Response Between Long-Term PM2.5 Exposure and Mortality |
| 2018-09-04 | Despite Skepticism, Hogan Says No Homes Will be Razed for I-270 Widening |
| 2018-09-07 | Managed Lanes Study Briefing with Letters Attached |
| 2018-10-11 | MDOT Officials on Widening I-270 'We're Not Going to Take Your Home' |
| 2018-10-17 | MWCOG Comments on SAFE Vehicles Rule |
| 2018-10-26 | North Carolina Environmental Quality Comment on SAFE Vehicles Rule |
| 2018-12-19 | Rejected Maryland Toll-Road Contract Goes to Different Bidder |
| 2018-12 | Forecasting the Impossible The Status Quo of Estimating Traffic Flows |
| 2019-03-29 | Traffic Terrors After 13-Hour Shutdown, Lanes Reopen on Inner Loop at American Legion Bridge |
| 2019-04 | MDOT GGRA Draft Plan Appendix J |
| 2019-05-19 | Conditions Leading to Elevated PM2.5 at Near-Road Monitoring Sites |
| 2019-05-29 | Here's Everything You Need To Know About The Capital Beltway Expansion |
| 2019-06-05 | Board of Public Works Transcript |
| 2019-07-22 | Caltrain has an Ambitious Plan to Run BART-Like Service |
| 2019-07-25 | Metro Reasons More Trains Bring More Riders to the Red Line |
| 2019-09-10 | Letters from Industry Coalition re SAFE Vehicles Rule Impact on Transportation Projects |
| 2019-10-22 | Advice from the Independent Particulate Matter Review Panel |
| 2019-10-24 | A Transportation Q&A Rahn Talks I-270, Partnerships, Growth and More |
| 2019-11-09 | Air Pollution and Noncommunicable Diseases |
| 2019-11-27 | Short Term Exposure to Fine Particulate Matter and Hospital Admission Risks and Costs |
| 2019-12-03 | Is MARC's Newest Plan to Improve Service a Step Backwards |
| 2019-12-18 | Letter from Lee Currey to Community Water Systems |
| 2019-12 | Integrated Science Assessment for Particulate Matter |
| 2019-12 | MetroTunnel Environmental Management Framework |
| 2019 | Air Pollution and Noncommunicable Diseases |
| 2020-01-08 | Board of Public Works Meeting |
| 2020-01-15 | Reaction to Governor's Budget Proposal Upbeat So Far |
| 2020-01-22 | West Gate Tunnel Workers Laid Off After Delays Caused by PFAS Contamination |

00022742

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020

| | |
|---|---|
| 2020-01-29 | West Gate Tunnel Builders Seek to Terminate Contract Over Contaminated Soil |
| 2020-01-31 | Transurban Warned on PFAS Before West Gate Tunnel Contracts Signed |
| 2020-02-07 | Request for Qualifications |
| 2020-02-13 | Causal Effect of Impervious Cover on Annual Flood Magnitude |
| 2020-02-18 | MDOT PIA Request |
| 2020-02-18 | USDOT-FHWA FOIA Request |
| 2020-03-03 | MDOT PIA request response |
| 2020-03-12 | Memorandum to Prince George's County Council and Montgomery County Council |
| 2020-03-13 | Express Toll Lanes Could Raise Water Bills in Montgomery and Prince George's |
| 2020-03-16 | MDOT PIA Request Response Letter |
| 2020-03-16 | Water Bills In Maryland Could Nearly Triple Under Beltway And I-270 Expansion Plan |
| 2020-03-18 | FHWA letter re extension of time |
| 2020-03-25 | Addendum No. 2 and 3, Phase 1 of the I-495 & I-270 Public-Private Partnership |
| 2020-03-30 | Emails with MDOT re PIA request |
| 2020-04-10 | Long-Term Community Noise Exposure in Relation to Dementia |
| 2020-04-11 | Assessing Nitrogen Dioxide (NO2) Levels as a Contributing Factor to Coronavirus (COVID-19) Fatality |
| 2020-04-14 | Email with MDOT re PIA request |
| 2020-04-14 | MDOT Follow Up Response to PIA Request |
| 2020-04-15 | Association Between Short-Term Exposure to Air Pollution and COVID-19 Infection Evidence from China |
| 2020-04-23 | MDOT PIA Request Response Letter |
| 2020-04-24 | Fewer Than Half of Working Americans Will Have a Paycheck in May |
| 2020-05-06 | Email with MDOT re PIA request |
| 2020-05-14 | Letter from Montgomery County Council to Gregory Slater |
| 2020-05-15 | Expanding Paved Areas Has an Outsize Effect on Urban Flooding |
| 2020-05-19 | Emails with MDOT re PIA request |
| 2020-05-25 | Toll Road Association Federal Money is Route to Recovery |
| 2020-05-28 | Email with MDOT re PIA request |

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020

| | |
|---|---|
| 2020-06-01 | Emails with FHWA re FOIA request |
| 2020-06-09 | Transurban Asked to Rip Up West Gate Tunnel Contract, Court Documents Allege |
| 2020-06-15 | Emails with MDOT re PIA request |
| 2020-06-15 | Induced Vehicle Travel in the Environmental Review Process |
| 2020-06-23 | Emails with MDOT re PIA request |
| 2020-06-23 | MDOT SHA Response to PIA Request |
| 2020-06-24 | FHWA FOIA Response |
| 2020-07-01 | Generated Traffic and Induced Travel Implications for Transport Planning |
| 2020-07-02 | Influence of Roadway Emissions on Near-Road PM2.5 |
| 2020-07-04 | People Are Driving Less and Skipping the Toll Roads, Leaving Less Money for Local Projects |
| 2020-07-07 | MDOT-SHA PIA Request Response Letter |
| 2020-07-10 | FHWA and MDOT email re Release of DEIS |
| 2020-07-21 | Email to MDOT and FHWA re Missing Reference Capital Beltway Study |
| 2020-07-22 | Email with MDOT re PIA request |
| 2020-07-24 | MDOT SHA PIA Response |
| 2020-07-27 | Email with MDOT re PIA request |
| 2020-08-01 | Opinion What's the Hurry on Governor's I-495, I-270 Project |
| 2020-08-03 | MDOT SHA Response to Request for Missing References |
| 2020-08-04 | Traffic Speeds Continue Falling Across the Country, But Still Up vs Pre-COVID |
| 2020-08-12 | DC-Area Toll Revenue Plunges 90% Amid Coronavirus Pandemic |
| 2020-08-13 | The Need for a Tighter Particulate-Matter Air-Quality Standard |
| 2020-08-18 | Local Planners Fume Over Unreported Additions to Highway Document |
| 2020-08-18 | Report faults Maryland for failings in Bay pollution |
| 2020-08-18 | 270 Study Expanded Without Proper Notice, Regional Agency Complains |
| 2020-08-25 | State's I-495 I-Email re Request for Extension Missing Appendices |
| 2020-08-25 | MDOT Response to Requests re Changing Appendices |
| 2020-08-27 | Jitesh Parikh Email re Missing References |
| 2020-08-28 | State Adds 30 days to Comment Period for I-495 I-270 Environmental Impact Study |
| 2020-08 | Urgent Concern on Toxic Silica Dust as Public Health Hazard |

00022743

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020

| | |
|---|---|
| 2020-09-01 | As Hogan's Highway-Widening Plan Changes, $9 Billion Price Tag Does Not |
| 2020-09-08 | Email re Follow Up to MDOT and FHWA re Missing References |
| 2020-09-08 | Maryland Would Have to Divert Money from Other Projects if Purple Line Builders Quit |
| 2020-09-10 | Torrential Rain Triggers Widespread Flooding in D.C. Area, Inundating Roads, Stranding Motorists |
| 2020-09-11 | Hazardous Air Pollutant Exposure as a Contributing Factor to COVID-19 Mortality in the United States |
| 2020-09-15 | State Figuring Out Who Will Take Over Purple Line Project |
| 2020-09-16 | D.C.-Area Employers are Open to the Idea of More Permanent Teleworking |
| 2020-09-16 | Transportation Officials Anticipating 'Great Localization' After COVID-19 |
| 2020-09-21 | The Fatally Flawed Scheme to Outsource Md.'s Highways to Toll-Road Profiteers |
| 2020-09-22 | MDOT Letter re Missing Reference |
| 2020-09-23 | Purple Line Will be Delayed as MDOT Seeks Management Solution |
| 2020-09-24 | Project Website with Email Sign Up Notice 2 |
| 2020-09-24 | Project Website with Email Sign Up Notice |
| 2020-09-30 | Letter from Sierra Club to VDOT and MDOT re 495 NEXT |
| 2020-09 | Sacramento Metropolitan Air Quality Management District Mobile Sources Air Toxics Protocol |
| 2020-10-01 | Email re Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-06 | Hogan Extends State of Emergency |
| 2020-10-08 | Transportation's Moving Target Wave of Relocations Prompted by COVID-19 |
| 2020-10-08 | Urban Air Pollution May Enhance COVID-19 Case-Fatality and Mortality Rates in the United States |
| 2020-10-09 | Email re Follow up Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-11 | MDOT Email re Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-11 | National Association of Clean Air Agencies Comments on SAFE Vehicles Rule |
| 2020-10-12 | Editorial Commuting Habits Have Changed During COVID-19 |
| 2020-10-14 | FHWA Email re Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-14 | Report Shows 15 Military Bases in Maryland Contaminated With PFAS |
| 2020-10-15 | Email re Follow Up to FHWA Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-16 | Beltway, I-270 Toll Lanes Could Cost More Than $1.50 and $2 Per Mile |

Comments of the Maryland Sierra Club et al. on the Beltway Expansion Project DEIS and JPA
November 6, 2020

| | |
|---|---|
| 2020-10-17 | Maryland Beltway Expansion Might Require Moving Part of Historic African American Cemetery |
| 2020-10-19 | Carol S. Rubin Memo to M-NCPPC, Comments to DEIS and JPA |
| 2020-10-20 | Email re Follow Up to FHWA Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-20 | Email re Follow Up to MDOT Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-20 | FHWA Email re Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-20 | Long-Term Community Noise Exposure in Relation to Dementia, Cognition, and Cognitive Decline |
| 2020-10-26 | Regional and Global Contributions of Air Pollution to Risk of Death from COVID-19 |
| 2020-10-27 | Email re Follow Up to MDOT Request for I-495 & I-270 Traffic Data and Files |
| 2020-10-28 | An Assessment of the Health Burden of Ambient PM2.5 Concentrations in Virginia |
| 2020-10-28 | Labyrinth of Pipelines and Cables Could Face Major Disruption by Highway Plan |
| 2020-10-28 | Living in Noisy Neighborhoods May Raise Your Dementia Risk |
| 2020-10-28 | Pipes, Cables Could Face Major Disruption by Plan to Widen Beltway and I-270 |
| 2020-10-30 | FHWA Email re Request for Underlying Data |
| 2020-10 | Connecting People and Places Exploring New Measures of Travel Behavior |
| 2020-10 | COVID-19 Mortality and Contemporaneous Air Pollution |
| 2020-10 | Norm Marshall Resume |
| 2020-10 | Thrive Montgomery 2050, Public Hearing Draft Plan |
| 2020-11-02 | Letter from VDOT and MDOT to Sierra Club re 495 NEXT |
| 2020-11-02 | MDOT Letter Response re Underlying Traffic Data |
| 2020-11-04 | Air Pollution and COVID-19 Mortality in the United States |
| | A Transit Vision for the I-270 Corridor |
| | ACS Infrastructure Development, Response to Request for Information |
| | Corridor Cities Transitway |
| | Examples of Silica Dust-Producing Tasks, Highway Road Construction and Repair |
| | Greenhouse Gas Emissions Mitigation in Road Construction and Rehabilitation |
| | Highway Expansions Threaten Our Parks |
| | The Principles of Environmental Justice |

**MDOT SHA Response to the Sierra Club:**

**Introduction**

The introductory portion of the comment letter summarizes specific comments offered the in rest of the document and restates the organizations' opposition to the proposed action. Because all topics summarized in the introductory pages are covered separately below, as well as in responses to common themes raised by numerous other parties, this portion of the comment letter does not require a specific response.

**Comments on Cost of Project and Impacts on Public and Private Property**

The comments concerning estimated projects costs and potential impacts have been substantially updated as reflected in the Supplemental Draft Environmental Impact Statement (SDEIS). In particular, the estimated range of costs for the Preferred Alternative is between $3 and $3.5 billion, which is substantially smaller than the build alternatives outlined in the DEIS. Similarly, the range of project impacts has been reduced substantially, and no property relocations would be required. Comments concerning outdated cost estimates have been superseded by approval of an agreement by the Board of Public Works with Accelerated Maryland Partners, Inc. for Phase I South, including payments to cover upfront predevelopment costs. The comments state incorrectly that the project costs will require diversion of funds from other state infrastructure priorities. For more detail and responses to comments concerning the current financial structure of the Public-Private Partnership (P3) program, refer to FEIS Chapter 9, Section 9.3.5. For a response to comments about the most current summary of impacts to property and community facilities, refer to FEIS Chapter 5, Sections 5.3, 5.4 and 5.5 Chapter 9, Section 9.3.4.K.

**Comments on NEPA Analysis**

*Segmentation*

The introductory paragraphs of this comment cite to or summarize case law and portions of the Council on Environmental Quality (CEQ) regulations and require no specific response. The remainder of the comments address a proposed action on I-270 North of the I-370 interchange. A pre-NEPA Study for potential improvements on I-270 North is being conducted independent from the MLS for that action. FHWA has carefully considered the proposed action's operational independence, the hallmark for determining whether there is an inappropriate segmentation. As outlined in the DEIS, I-370 (just north) was chosen as the northern terminus to allow the I-270 northbound mainline improvements that are carried to I-370 to be merged and transitioned into the existing general purpose lanes and HOV lanes safely, minimizing congestion due to lane drops and merges. Additionally, I-370 links MD200 with I-270 and is a major traffic generator that carries over 100,000 vehicles per day under existing conditions (2016). The average annual daily traffic volume on I-270 north of I-370 and MD 117 is approximately 10 percent less than the volume south of I-370 in existing conditions, indicating that a significant portion of traffic on I-270 comes from and goes to I-370. Refer to DEIS, Chapter 1, Section 1.1.

The decision concerning the scope of analysis to be conducted under NEPA lies within the discretion of the lead agencies. Depending on the factual circumstances, a programmatic or a project-specific analysis could be conducted to fulfill NEPA's procedural requirements. In this case, proceeding with a project-level review for the MLS was entirely appropriate. The geographic scope of the MLS, while large, is distinctly defined. It includes 37 miles of I-495 and 11 miles of I-270. Consistent with CEQ NEPA regulations 40 CFR 1502.4(a) and 1508.25(a), as well as FHWA NEPA regulations at 23 CFR 771.111(f), the lead agencies have identified the MLS as an independent action that may proceed regardless of whether other actions of the Op Lanes Maryland Program are implemented. Furthermore, the identified scope of the MLS has been sufficiently defined to be advanced with a project-level NEPA document. Consistent with FHWA regulations, other proposed actions, such as potential improvements to I-270 from I-370 to I-70, have been determined to possess independent utility from the MLS and thus will require separate project-level NEPA documents.

The introductory paragraph of this comment cites to or summarizes case law and portions of the CEQ regulations and require no specific response. The remainder of the comment states incorrectly that MDOT SHA must prepare a programmatic EIS for the P3 Program. The Governor's articulation of a broad plan to address congestion and mobility across the state does not mandate preparation of a programmatic NEPA document. The lead agencies properly exercised its discretion in this case to advance a specific project in the order it believes best serves the public and to prepare an appropriate NEPA analysis for that project. Any future proposal for improvements to the remaining parts of I-495 within the study limits outside of Phase I South would advance separately and would be subject to appropriate additional environmental studies, analysis and collaboration with the public, stakeholders, and agencies.

*Purpose and Need and Alternatives Considered*

The introductory paragraphs of this comment cite to or summarize case law and portions of the CEQ regulations and require no specific response. The remainder of the comment is largely addressed in the following common responses provided in the FEIS along with the internal citations to other NEPA documents: for a response to comments on the agency's formulation of the Purpose and Need, refer to DEIS and SDEIS Chapter 1, DEIS Appendix A, FEIS Chapter 9, Section 9.3.1; for a response to comments about the consideration of alternatives, including the specific alternatives mentioned in the comments, refer to DEIS Chapters 2 and 3, DEIS Appendix B, FEIS Chapter 9, Sections 9.3.2 and 9.3.3.

The comments also refer to the pandemic's impact on travel patterns and whether the impacts of COVID-19 diminish the need for the proposed action. For an analysis of current travel trends and the potential impacts of the pandemic on study area congestion, refer to FEIS Chapter 4, Section 4.2.2 and 4.5, FEIS Appendix C and FEIS Chapter 9, Section 9.3.1.

The comments also refer to the potential for a replacement of the American Legion Bridge (ALB) to accommodate rail traffic. The SDEIS accurately states that design options for the ALB will be completed so as not to preclude a future transit line across the bridge. Refer to FEIS Chapter 9, Section 9.3.3.D.

The comments also claim that the lead agencies should have used environmental impacts as a differentiator between preliminary alternatives. The NEPA record demonstrates that environmental impacts were considered as an initial screening criterion as presented to agencies and the public. Analysis of environmental resources considered as part of the alternatives screening process can be found in DEIS Chapter 2, Section 2.2, DEIS Appendix B. The majority of Preliminary Alternatives were located along the existing I-495 and I-270 corridors, and while operationally different, have similar physical footprints. The exception were two rail transit alternatives as they would be on separate alignments adjacent to the existing interstates and, thus, would have a larger physical footprint.

Finally, the comment suggests a completely different project Purpose and Need and, in light of that altered Purpose and Need, asks that the agencies consider a different alternative. MDOT SHA and FHWA have discretion to establish a project Purpose and Need and in this case the Purpose and Need was vetted and approved through an inter-agency process. Refer to comment response, above. An agency is required to analyze a reasonable range of alternative that meet the stated Purpose and Need, and not alternatives that would satisfy some other project Purpose and Need preferred by other parties.

*Water Quality Impacts*

For a response to comments about impacts to water resources, refer to FEIS Chapter 9, Section 9.3.4.E.

For additional information about impacts to water resources, refer to FEIS, Chapter 5 and Appendix M.

For additional information about stormwater management, refer to DEIS Chapter 2, Section 2.2.7, SDEIS Chapter 2, Section 2.3.2 and FEIS Chapter 3, Section 3.1.6.

For additional information about the Compensatory SWM Mitigation Plan, refer to FEIS Appendix D.

**OP·LANES**™ MARYLAND  I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 62-2    Filed 10/30/23    Page 56 of 58

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

Stormwater Management requirements in Virginia will be met by the SWM facilities provided in the FEIS and as required per the applicable laws and regulations of Virginia and under the requirements set forth by VDOT and VDOT's MS4 permit. This project will not adversely impact MDOT SHA's MS4 permitting requirements. The MDOT SHA National Pollutant Discharge Elimination System (NPDES) database tracks all existing best management practices (BMP) and any impacts to existing BMPs from this project will be tabulated as a water quality (WQ) loss, which will be replaced by SWM facilities within the project area or within the compensatory SWM locations. Therefore, the existing level of treatment will remain unchanged. As Maryland requires 50% treatment of the reconstructed untreated impervious area, this project will result in additional water quality for existing untreated impervious area, adding to the MDOT SHA overall MS4 treatment provided.

*Decision Not to Require Permit for American Legion Bridge Construction*

A September 23, 2019, letter from the U.S. Coast Guard confirms that no bridge permit under Coast Guard Authorization Act of 1982 will be required. This letter has been included in the Final Natural Resources Technical Report, FEIS Appendix M, sub-appendix N. However, impacts due to pier and abutment placement within the Potomac River for the replacement bridge are included in the Joint Federal/State Application for the Alteration of Any Floodplain, Waterway, Tidal or Non-Tidal Wetland in Maryland to comply with Section 404 and 401 of the Clean Water Act. Refer to FEIS Appendix P.

*Impacts to Aquatic Species, Aquatic Habitat and Fisheries*

This portion of the comment letter refers to quantities of potential impacts to waterways from the DEIS and supporting documents that are no longer applicable. As documented in the SDEIS, waterway impacts have been substantially reduced, as are potential effects on aquatic resources. The comment states incorrectly that the analysis of aquatic impacts is reflected in one statement in a DEIS Appendix but ignores the comprehensive analysis of aquatic resources reflected in the remainder of the technical report. For additional information about impacts to aquatic species, refer to SDEIS Chapter 4, Sections 4.12 and 4.18, and FEIS Chapter 5, Section 5.18. Also refer to responses to Sierra Club SDEIS letter.

*Impacts to Rare, Threatened and Endangered Species and Habitat*

The introductory paragraphs to this portion of the letter cite to statutory and regulatory provisions concerning the analysis of a project potential impacts on rare, threatened, or endangered species and require no specific response. For additional information about impacts to wildlife, including bat species, refer to DEIS and SDEIS Chapter 4, Sections 4.17 and 4.19, SDEIS Appendix H, and FEIS Chapter 5, Section 5.19. For a response to comments about impacts to wildlife and wildlife habitat, refer to FEIS Chapter 9, Section 9.3.4.J. Also refer to responses to Sierra Club SDEIS letter.

*Hazardous Materials*

The NEPA analysis of potential impacts from hazardous materials was prepared in accordance with FHWA Technical Advisory T6640.8A, "Guidance for Preparing and Processing Environmental and Section 4(f) Documents." This guidance requires, in part, that an agency identify the location of known or potential waste sites and the relationship to alternatives under consideration. If a known or potential site could be impacted by an alternative, the agency should provide information about the site, potential impacts and public health concerns, and potential measures to eliminate or mitigate those impacts. The Final EIS should address issues raised by the public and agencies. For the MLS, the DEIS summarizes all the required information. Refer to DEIS Chapter 4, Section 4.10 and Appendix K. The SDEIS provided additional information, as well as the potential for hazardous materials concerns during construction of the Preferred Alternative. Refer to SDEIS Chapter 4, Section 4.10, SDEIS Appendix I. The SDEIS properly summarizes the recommended site investigations and protocols that will be conducted prior to acquisition of right-of-way and prior to construction. These processes are designed

to characterize surficial and subsurface soils and groundwater at site where it is anticipated to be encountered. Investigations will consider locations of previous releases of materials, if any, former/current/abandoned storage tanks, and inferred groundwater flow. Procedures to address testing and handling of any sites with hazardous waste or other contaminants are also described. Also refer to FEIS, Chapter 5, Section 5.10.

*Air Emissions*

The comment letter expresses concerns with the scope and content of the DEIS analysis of project air quality impacts, and summarizes studies related to certain constituent pollutants. The comments admit that the agency is not required to perform hot spot analyses for PM 10, PM 2.5 and NO2 but requests that additional air quality analyses are included in the NEPA process. While the lead agencies acknowledge the information presented in the comments, as described in detail in the EIS documents and supporting technical appendices, the agency appropriately followed relevant FHWA guidance concerning the assessment of criteria pollutants applicable to the study area based on federal Clean Air Act rules, and therefore fulfills NEPA obligations to analyze potential impacts of the range of reasonable build alternatives and no-build alternative. For additional information about air quality impacts, see DEIS Chapter 4, Section 4.8 and Appendix I and FEIS Chapter 5, Section 5.8 and Appendix K. For a response to comments about impacts to air quality, refer to FEIS Chapter 9, Section 9.3.4.F. Also refer to responses to Sierra Club SDEIS response letter.

The comments request additional air quality analysis be performed for all parking lots greater than 100 spaces adjacent to the proposed highway improvements. The lead agencies are not required to analyze air quality from existing facilities that are outside of scope of the study, outside of the study limits and not impacted by the proposed improvements or part of the proposed action. The lead agencies properly considered air quality impacts in the analysis of indirect and cumulative effects and concluded that, based on the regional air quality conformity analysis, the incremental impact of the proposed project on mobile source emissions, when added to past, present and reasonably foreseeable future actions, will not cause or contribute to a new violation, increase in the frequency or severity of any violation, or delay timely attainment of the National Ambient Air Quality Standards established by the Environmental Protection Agency. Refer to FEIS Chapter 5, Section 5.22.

While acknowledging that there is no requirement to do so, the comments request additional air quality analysis be performed for ground-level ozone and its precursor. The scope of the air quality analysis is appropriate because ozone emissions are addressed in the regional air quality conformity analysis which is described in the DEIS and SDEIS. As the study is included in the currently conforming long-range plan, Visualize 2045, the proposed action is demonstrated to not cause an exceedance of the NAAQS including ozone.

For a response to the air quality analysis including Mobile Source Air Toxics, refer to FEIS, Chapter 9, Section 9.3.4(F). Also refer to DEIS, Chapter 4, Section 4.8.1, DEIS Appendix I, and SDEIS, Chapter 4, Section 4.8.1.

For a response to CO Hot Spot analysis, refer to FEIS Chapter 9, Section 9.3.4.F. Also refer to DEIS, Chapter 4, Section 4.8.1 DEIS Appendix I and SDEIS, Chapter 4, Section 4.81.

The comments question the scope and content of the analysis of potential project Greenhouse Gas (GHG) emissions and those related to project construction. For additional information about climate change and greenhouse gases, refer to FEIS Chapter 5, Sections 5.8 and 5.23 and FEIS Appendix K. For a response to comments about climate change and greenhouse gases, refer to FEIS Chapter 9, Section 9.3.4.G. For additional information about construction impacts to air quality, refer to FEIS Chapter 5, Sections 5.8 and 5.23 and FEIS Appendix K. For a response to comments about construction impacts, refer to FEIS Chapter 9, Section 9.3.4.I.

The comments request additional air quality analysis related to the COVID-19 pandemic and cite to articles speculating about the potential nexus between air pollution and COVID-19 health impacts. Because of the uncertainty regarding the

future course of the pandemic, the lack of substantial information and absence of approved regulations, guidance and methodology for such an analysis, the lead agencies are not required to conduct this additional analysis.

As accurately noted in DEIS Appendix I, the project is included in the approved 2018 constrained long-range plan, Visualize 2045, and the corresponding air quality conformity analysis. Page 39 of the Visualize 2045 Plan describes the Traffic Relief Plan as constructing four managed lanes on I-495/I-95 and I-270 for their entire length. As properly noted in DEIS Appendix I, prior to the Record of Decision being signed, the selected alternative will be included in the TIP and Long Range Plan, and the accompanying Transportation Conformity Determination. The traffic forecast for the draft air quality analysis in the DEIS appropriately used 2016 as the base year, the anticipated opening year of 2025 and design year based on a 20-year planning horizon as 2040. The final air quality analysis updated the traffic forecast to use the design year of 2045. Refer to FEIS, Chapter 9, Section 9.3.4.F and FEIS Appendix K.

The draft air quality analysis completed for the DEIS alternatives used the US EPA approved model, MOVES2014 which did not include the updated fuel efficiency standards. While not mandatory, the lead agencies used the updated model, MOVES3 (3.0.1), as approved by EPA for the final air quality analysis in the FEIS. MOVES3 includes many updates to exhaust emission rates to better estimate the real-world emissions of new vehicle technologies. Compared to the previous MOVES2014 modeling tool, MOVES3 allows users to model the benefits from new regulations promulgated since MOVES2014 was released, incorporates the latest emissions data, and has improved functionality. Some of the major updates include new regulations such as the Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2 and the Safer Affordable Fuel Efficient (SAFE) Vehicles Rule. Refer to FEIS Chapter 5, Section 5.8 and FEIS Appendix K.

For information concerning the detailed summary of all potential EJ impacts, refer to DEIS and SDEIS Chapter 4, Section 4.21, DEIS Appendix E, FEIS Chapter 5, Sections 5.8 and 5.21, and FEIS Appendix F. For a response to comments about environmental justice and equity, refer to FEIS Chapter 9, Section 9.3.4.D.

The comments repeat concerns with the analysis of potential air impacts associated with project construction. For additional information about construction impacts to air quality, refer to FEIS Chapter 5, Sections 5.8 and 5.23 and FEIS Appendix K. For a response to comments about construction impacts, refer to FEIS Chapter 9, Section 9.3.4.I.

Regarding avoiding and mitigating fugitive dust during construction, the FEIS outlines measures that will be implemented during construction to help minimize construction related dust and emissions include the following:

- Implementing a *Diesel Emissions Reduction Program* that exceeds pertinent Federal and state regulations to minimize air pollution including MSAT emissions during construction
- Implementing a *Truck Staging Area Plan* for all construction vehicles waiting to load or unload material where emissions will have the least impact on sensitive areas and the public. These include but not limited to hospitals, schools, residences, motels, hotels, daycare facilities, elderly housing and convalescent facilities. All sources of emissions shall be located as far away as possible from fresh air intakes, air conditioners and windows.
- Implementing a *Greenhouse Gas Reduction Program* to reduce emissions during construction
- Implementing an *Anti-Idling Policy* to avoid unnecessary idling of construction equipment in order to reduce engine emissions and to provide air quality benefits to those who live and work in or adjacent to the construction sites.
- Implementing *dust control* mitigation measures during construction to limit the production of dust, when practicable

Refer to FEIS, Chapter 9, Section 9.3.4.F., FEIS Chapter 5, Section 5.8 and Appendix K.

For responses to comments on technical omissions in the air quality analysis, see below:

Accepted practice for selecting analysis years for an MSAT analysis is to estimate emissions for a base year, the expected first year of operation, and the project design year. In the DEIS MSAT and GHG analyses, emissions were estimated for 2016, 2025, and 2040. The quantitative MSAT and GHG analyses were updated for the preferred alternative and an updated design year of 2045 was used in those analyses.

For a response to induced demand in the traffic analysis, refer to FEIS Chapter 9, Section 9.3.4.B.

Per FHWA MSAT guidance, MDOT SHA developed an affected network to be used in the quantitative MSAT analysis for the project. This MSAT affected network was also used for the quantitative GHG analysis. The need for a project level "hot spot" conformity analysis is determined by the attainment status of the county the project is located in. A CO hot spot analysis was not required for this project as Montgomery, Prince Georges, and Fairfax counties are not in non attainment for the CO National Ambient Air Quality Standards (NAAQS). However, CO is highlighted in the FHWA 1987 guidance as a transportation pollutant to be summarized in an EIS. Therefore, the DEIS presented the results of the potential impacts for CO at worst-case intersections throughout the study corridors. The methodologies and assumptions applied for the CO analysis are consistent with FHWA and EPA guidance. The quantitative MSAT and GHG analyses were updated for the Preferred Alternative using the latest version of the EPA MOVES model (MOVES3 Version 3.0.1). This version of MOVES includes new regulations such as the Greenhouse Gas Emissions and Fuel Efficiency Standards for Medium- and Heavy-Duty Engines and Vehicles—Phase 2 and the Safer Affordable Fuel Efficient (SAFE) Vehicles Rule.

*Impacts to Forests*

The lead agencies appropriately evaluated potential impacts to forest resources, including forest canopy and vegetated habitat. The Preferred Alternative has dramatically reduced the quantity of potential tree (or forest) canopy loss compared to the data referenced in the comment. For a summary of terrestrial and forest impacts, refer to SDEIS, Chapter 4, Section 4.16, FEIS Chapter 5, Section 5.16 and FEIS Appendix M and N. Maryland Reforestation Law requires state-funded highway project applicants that impact one acre or more of forest to provide one-to-one mitigation according to a preference for on-site planting within the project corridor. Beyond on-site mitigation, the applicant may accomplish off-site planting on public lands within the affected county or watershed, purchase credits from approved forest mitigation banks within the affected county or watersheds and payment into the Maryland Reforestation Fund. The mitigation plan for forest impacts has been developed in close coordination with appropriate local, state, or federal agencies. Refer to FEIS M. For responses to comments about forest (tree) canopy impacts, refer to FEIS Chapter 9, Section 9.3.4.J.

*Noise*

The lead agencies have conducted and documented a comprehensive assessment of potential project noise impacts and the evaluation of proposed noise mitigation. For additional information about noise impacts, refer to DEIS and SDEIS Chapter 4, Section 4.9, DEIS Appendix J, SDEIS Appendix E, and FEIS Chapter 5, Section 5.9 and Appendix L. For a response to comments about noise impacts, refer to FEIS Chapter 9, Section 9.3.4.H.

*Alleged Flaws in Traffic Modeling*

For a response to comments about traffic modeling and analysis, refer to FEIS Chapter 9, Section 9.3.4.B. Also refer to responses to Sierra Club SDEIS letter.

For additional information about traffic modeling and analysis, refer to DEIS Chapter 3 and Appendix C and FEIS Chapter 4 and Appendix A.

*Other Traffic Comments*

For a response to comments about vehicle safety, refer to FEIS Chapter 9, Section 9.3.4.O.

For additional information about vehicle safety, including congestion-related crashes, refer to FEIS Appendix A.

### Environmental Justice Issues

This portion of the letter cites to or summarizes case law and portions of the CEQ regulations in several sections and requires no specific response. The remainder of the comments concern the scope and methodology used to analyze environmental justice (EJ) impacts generally, including reference to portions of the study area in Prince George's County that will no longer be impacted by the Preferred Alternative. For information concerning the detailed summary of all potential EJ impacts, including the agency's comprehensive program to encourage public participation of all identified minority and/or low-income communities in the study area, refer to DEIS and SDEIS Chapter 4, Section 4.21, DEIS Appendix E, FEIS Chapter 5, Sections 5.8 and 5.21, and FEIS Appendix F. For a response to comments about environmental justice and equity, refer to FEIS Chapter 9, Section 9.3.4.D. Also refer to responses to Sierra Clubs SDEIS letter.

### Induced Demand

The comment letter summarizes a 2020 Transportation Research Record article concerning considerations of induced demand in environmental reviews, including a proposed "calculator" that has not been calibrated for use outside of California. The lead agencies acknowledge the reference. The record contains a comprehensive assessment of the potential induced demand related to the proposed action. Refer to DEIS Appendix C. For a response to comments about induced demand, refer to FEIS Chapter 9, Section 9.3.4.B.

### American Legion Bridge Contingencies

The NEPA record reflects an extensive effort to consider impacts related to the replacement of the American Legion Bridge (ALB). Substantial interagency coordination was conducted to consider and then incorporate avoidance and minimization efforts related to bridge design in order to address all resources, including Section 106 and Section 4(f) properties, around the replacement bridge. Refer to SDEIS, Chapter 2, Section 2.3.4.C and FEIS Chapter 9, Section 9.3.4.C.

The lead agencies invited VDOT to be a cooperating agency in development of the EIS in consideration of the southern terminus that extends over the ALB into the Commonwealth of Virginia and ties into Virginia Department of Transportation (VDOT) facilities. Extensive coordination with VDOT has occurred and, while the MLS is independent of the 495 NEXT project, close coordination regarding engineering, traffic and environmental analyses has occurred over the last four years. Impacts to Virginia resources were considered in the scope of the Study and were included in the EIS documents. The 495 NEXT project was included in the MLS design year models for both No Build and Build Alternatives. MDOT SHA coordinated with VDOT regarding traffic analyses throughout the Study, including regular meetings and sharing of information related to traffic counts, forecasts, and simulation models used on our respective studies to ensure that the data was compatible. Close coordination with VDOT occurred during development of the Preferred Alternative to ensure compatibility with the 495 NEXT project.

### Alleged Procedural Problems

The introductory paragraph of this comment cites to or summarizes case law and portions of the CEQ regulations and require no specific response. The comments note a minor error in uploading DEIS appendices to the project website which was brought to the lead agencies attention and rectified in one day. All DEIS material was available to the public for the full duration of the comment period and beyond, with the lead agencies instituting extraordinary measures during the pandemic to ensure maximum public participation and doing so in a manner that was protective of public health. For additional information about public involvement throughout the NEPA process, refer to DEIS and SDEIS Chapter 7, DEIS Appendix P, FEIS Chapter 8 and Appendix R. For a response to comments about public involvement during the NEPA process, refer to FEIS Chapter 9, Section 9.3.7. The lead agencies conducted a comprehensive scoping process, including making preliminary NEPA documents, such as the summary of Alternatives Retained for Detailed Study, available for public review and informal comment. The letter states incorrectly that the lead agencies improperly summarized or "miscounted" the public input on these preliminary NEPA documents. The lead agencies reviewed all comments received and properly summarized the content of those comments during the preliminary scoping stages of the NEPA review in order to inform production of the DEIS. The lead agencies were aware of and considered all such comments, in opposition to or in support of the project, and properly noted the submission of petitions and other mass mailings or communications. Once the EIS documents were made available for formal comment periods, MDOT SHA reprinted and made available all comments on the DEIS and SDEIS and responded to all substantive comments in the FEIS. Support for or opposition to the project and/or the Preferred Alternative as stated in all public comment is accurately reflected in the NEPA record and available for review. MDOT SHA received and responded to each request for records in compliance with the Maryland Public Information Act (MPIA) as did FHWA in compliance with the Freedom of Information Act (FOIA); commenter has not filed any appeal under either MPIA or FOIA to the said responses.

### Section 4(f) and NHPA Analysis

#### Effects on Historic and Cultural Resources

The Preferred Alternative eliminated the majority of resources referenced in this comment. Remaining impacts have been minimized to the extent practicable at this stage of design and reasonable mitigation to address the adverse effect has been developed in consultation with interested parties. The remainder of the comments summarize general concerns with the analysis of potential project impacts on parkland, historical and cultural resources. For a response to concerns over the Section 106 process, refer to DEIS and SDEIS Appendix D, FEIS Chapter 9, Section 9.3.4.C, FEIS Appendices E and J. For additional information about historic architectural and archaeological resources, refer to SDEIS Chapter 2, Section 2.3, FEIS Chapter 5, Section 5.7, and FEIS Appendices E, I and J. For additional information about the Section 4(f) evaluation, refer to DEIS and SDEIS Chapter 5, DEIS Appendix F, FEIS Chapters 5, 6, and 7, and FEIS Appendix G.

#### Agency Did Not Follow Intent of DOT

The Study includes a comprehensive analysis of all potential Section 4(f) resources, including the potential for constructive uses of those resources. The quantity of potential Section 4(f) impacts noted in these comments was reduced substantially as a result of identification of the Preferred Alternative, based in part on extensive coordination with and input from agencies, stakeholders, including Officials with Jurisdiction (OWJ) for Section 4(f) properties. The Final Section 4(f) Evaluation reflects consideration of all potential uses of parkland or historical resources and a comprehensive package of mitigation measures, including improvements to park facilities and amenities, tree planting and invasive species control, water quality improvements, ecological restoration, among others. The record of coordination with OWJs and stakeholders is reflected in DEIS Chapter 5, SDEIS Chapter 5 and FEIS Chapter 6. Refer to the Final Section 4(f) Evaluation in FEIS Appendix G and FEIS Chapter 9, Section 9.3.4.C.

#### Cannot Rely on Non-Executed Programmatic Agreement

The comment incorrectly states that the lead agencies relied solely on the anticipated execution of a Programmatic Agreement to fulfill obligations to analyze project impacts on cultural and historic resources. The lead agencies conducted a comprehensive analysis of cultural and historic properties in coordination with the State Historic Preservation Officers, the Maryland Historical Trust, the Virginia Department of Historic Resources and other agency and community consulting parties. For a summary of the complete analysis of impacts to historical architectural, historic cemeteries, archaeological, and other historical resources, refer to FEIS, Chapter 5, Section 5.7, Chapter 9, Section 9.3.4.C. The executed Programmatic Agreement, which reflects all agreed to mitigation measures as a result of the Section 106 consultation process appears at FEIS, Appendix J.

### Conclusion

This portion of the letter summarizes all previous comments and does not require a separate response.