**T.2.B Supplemental Draft Environmental Impact Statement Community Organization Comments and Responses**

**AFSCME MARYLAND COUNCIL 3 – GRETA JACKSON**

| From: | Greta Jackson |
| To: | SHA OPLANESMLS |
| Subject: | Proposed I-495 Expansion |
| Date: | Friday, November 12, 2021 1:58:37 PM |
| Attachments: | SDEIS 495 Excansion.pdf |

Good afternoon, Director Folden:

On behalf of AFSCME Maryland Cn. 3 and its members, please find attached correspondence which pertains to the proposed expansion of I-495.

Please direct any questions/comments to Lance Kilpatrick at lkilpatrick@afscmemd.org or contact our office at the number below.

Best regards,

*Greta Jackson*

Office Manager

AFSCME Maryland Cn. 3

Ph: 410 547 1515

Fax: 410 837 5436

Cell: 410 949 4956

*This page is intentionally left blank.*

OP·LANES™
M A R Y L A N D   I-495 & I-270 Managed Lanes Study   Case 8:22-cv-02597-DKC   Document 62-3   Filed 10/30/23   Page 2 of 96

**FINAL ENVIRONMENTAL IMPACT STATEMENT**



AFSCME
3

190 West Ostend St., #100
Baltimore, MD 21230
Phone: 410.547.1515
Fax: 410.837.5436

**Patrick Moran**
President

**Cherrish Vick**
Secretary-Treasurer

**Executive Vice Presidents:**
**Mildred Womble**
Local 3655

**Patrick Okafor**
Local 1679

**Anissa Pierce-Sessoms**
Local 1081

**Regional Vice-Presidents:**
**Larry Chriscoe**
Central Region

**Charlotte Leach**
Central Region

**Geron Mackall**
Central Region

**Rolland Matthews Sr.**
Eastern Region

**Jody Curry**
Southern Region

**Frederick Oloweyo**
Southern Region

**Jeff Grabenstein**
Western Region

**Ginger Noble**
Western Region

**Unit Vice-Presidents:**
**Debra Latton**
DHS

**Danise Henderson**
DJS

**Rowoha Stevens**
DPSCS

**Saul Walker**
Higher Education

**Christine Duffy**
RDH

**Wynton Johnson**
MDOT

**Wonderful Page-Neidzon**
BVA

**Tierra Dara**
P&P

**Sean Sardonyko**
SLPE

**Trustees:**
**Jeff Finey**
Local 1072

**Pat Davis**
Local 3655

November 12, 2021

**VIA EMAIL AND FIRST-CLASS U.S. MAIL TO:**
Jeffrey T. Folden, P.E., DBIA, Director
I-495 & I-270 P3 Office
Maryland Department of Transportation, State Highway Administration
707 North Calvert Street
Mail Stop P-601, Baltimore, MD 21202

Dear Director, Folden:

On behalf of the 25,000 plus members of the American Federation of State, County and Municipal Employees (AFSCME) Council 3, I am submitting comments on the Supplemental Draft Environmental Impact Statement (SDEIS) on the Managed Lanes I-495 & I-270 Public-Private Partnership (P3) for the Preferred Alternative 9 - Phase 1 South. AFSCME Council 3 opposes the Preferred Alternative and supports the no-build option.

**#1**

Lack of Information on State Subsidies: One of the critical omissions of the SDEIS is the lack of an estimate on the amount of subsidies that the State would be required to pay Accelerate Maryland Partners over the 50-year term of the P3. The Draft Environmental Impact Statement showed that the State could be on the hook for up to $482 million in subsidies. While the reduction in the miles of toll lanes would reduce costs, it would also reduce toll revenues. The intersection of these two consequences of the change in the project is not assessed in the SDEIS. The risk of State subsidies should not be hidden from the public.

**#2**

For Most Drivers, the Private Lanes Would Not Reduce Travel Time: MDOT has claimed that privately-operated toll lanes would reduce congestion in the general lanes as well as the toll lanes. But MDOT's Travel Time Matrix in Attachment D of Appendix A of the SDEIS shows that drivers in the general lanes would not experience a reduction in their commutes compared to the no-build option. Drivers traveling from I-370 to the American Legion Bridge during the morning rush hour would save 2 ½ minutes on average. But the trip back home in the evening would be an average of 1 minute and 48 seconds longer. For the round trip, drivers in the general lanes would save only 42 seconds on average under the Preferred Alternative, compared with the no-build option. It is irresponsible to put the State and taxpayers at financial risk for 50 years for a project that would not meaningfully improve the daily commutes of most drivers.

Every AFSCME Maryland State and University contract guarantees a right to union representation.
An employee has the right to a union representative if requested by the employee.
800.492.1996

Find us: afscmemd.org
Like us: facebook.com/AFSCMEMD
Follow/Tweet us: @afscmemaryland

**Response to SDEIS Comment #1**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**Response to SDEIS Comment #2**
The intent of the project is to improve operations for all users, not just those "willing to pay the tolls". The results of the operational analysis indicate that congestion will be reduced in the general purpose lanes and delays will be reduced on the local roads in most areas because the HOT lanes serve traffic that otherwise would be using the general purpose lanes and local roads. Additionally, HOV 3+ and transit vehicles will also be able to use the managed lanes (and obtain the associated speed and travel time benefits) without paying a toll. Refer to Chapter 4 and FEIS, Appendix A for additional details on the results of the traffic analysis.

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study | Case 8:22-cv-02597-DKC    Document 62-3    Filed 10/30/23    Page 3 of 96

FINAL ENVIRONMENTAL IMPACT STATEMENT

**Response to SDEIS Comment #3**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

#2
Cont.

Moreover, it is inequitable to spend State funds on a transportation project that would only benefit those who can afford expensive tolls, which could reach more than $4.00 per mile in the first year.

#3

Failure to Conduct an Environmental Justice Analysis: Federal Highway Administration policy (Order 6640.23A) commits the agency to "identify and prevent discriminatory effects...to ensure that social impacts to communities and people are recognized early." This is consistent with the National Environmental Policy Act which requires that an Environmental Justice analysis be conducted to determine whether the harmful impacts of a project fall disproportionately on communities of color and low-income communities. The SDEIS, like the DEIS, fails to provide this analysis. Instead, MDOT defers this analysis until the Final Environmental Impact Statement (FEIS). Because there will be no opportunity for the public to comment on the FEIS, failure to include it in the SDEIS obstructs public comment and input, especially from the communities that may be at risk. The failure to conduct an Environmental Justice Analysis is a disqualifying omission.

These deficiencies in the SDEIS make clear that the toll lanes P3 should not move forward. In closing, we urge that the public comment period be extended to 120 days. The current comment period of 45 days is inadequate for public review of the SDEIS and the thousands of pages in accompanying technical reports.

Sincerely,

Patrick Moran

**AUDUBON NATURALIST SOCIETY – DENISSE GUITARRA (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Denisse Guitarra

**Agency/Organization/Jurisdiction, if applicable:** Audubon Naturalist Society

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

**#1** Good afternoon. My name is Denisse Guitarra, spelled D-E-N-I-S-S-E G-U-I-T-A-R-R-A. I am here as a Maryland conservation advocate representing the Audubon Naturalist Society, which is located in Chevy Chase, Maryland. For 124 years, the Audubon Naturalist Society has inspired people to enjoy, learn about, and protect nature. And as a *[inaudible]* that last year's DEIS No Build option still remains as the Preferred Alternative, as the SDEIS still lacks the complete studies on environmental justice, climate change, wildlife and waterway impacts, and fails to include, fails to include the transit alternatives. The managed lane highway expansion project pushes far beyond the climate constraints people and the environment are currently experiencing today. The United Nations IPPC report released earlier this year makes it clear, we have no time to get ourselves off of fossil fuels and save as much of our planet as possible. Maryland and Virginia need more equitable and transit climate-friendly solutions to solve our traffic congestion problems. We need excellent transit and not an inch more of car coating pavement.

**#2** ANS demands that MDOT SHA FHWA do not move forward with the project's Preferred Alternative option. The Preferred Alternative option will negatively impact peoples' lives and wellbeing. On Chapter 4 of the SDEIS it mentions that 501 properties would be impacted by the project and the majority of these being residential properties. Even more alarming, the SDEIS does not properly detail how communities, especially POC (people of color) communities will be impacted by the new bottlenecks created on I-270 beyond the intersection with I-370.

**#3** Equally disturbing, the SDEIS fails to include complete study of the cumulative impacts the project will have on people and the environment. Moreover, the Preferred Alternative listed on the SDEIS does not properly mitigate the negative impacts the expansion will have on people, on the environment, and dangerously underestimates the devastating impacts the project will have on people and environment. The SDEIS fails to consider the mitigation of one million square feet of floodplains, over 186,000 square feet of wetlands lacking these critical piece of information when climate change is already causing major flooding issues in the region is completely irresponsible. Furthermore, the SDEIS states that Montgomery and Prince George's county will fail to meet its Chesapeake Bay total maximum goals for the expansion and that 500 acres of forest, 26 acres of Parkland, and 41 rare threatened and endangered species are also in peril. ANS demands that MDOT-SHA acts responsibly and does not move forward with the Preferred Alternative today. Thank you.

**Response to SDEIS Comment #1**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional operational and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C. For a discussion of the basis for the Purpose and Need and for the Selection of the Preferred Alternative, please see related Common Theme Responses and the SDEIS and FEIS.

Transit alternatives were considered. Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

Refer to Chapter 9, Section 3.4.G for a response to climate change considerations.

Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

**Response to SDEIS Comment #2**

While MDOT SHA and FHWA recognize that congestion would be present during the afternoon peak period on I-270 southbound and the I-495 inner loop in the design year 2045 due to downstream bottlenecks outside of Phase 1 South, the Preferred Alternative would provide tangible operational benefits to the system including significantly increasing throughput across the American Legion Bridge and the southern section of I-270 while reducing congestion. Refer to SDEIS Chapter 3, Section 3.3 and FEIS Chapter 4, Section 4.3.

Refer to Chapter 9, Section 3.4.K for a response to impacts to properties and communities, including community facilities.

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to SDEIS Comment #3**

Refer to Chapter 9, Section 3.4.N for a response to indirect and cumulative effects.

The FEIS reflects further design refinements and details, including final mitigation and commitments of the Preferred Alternative, many of which directly responded to public comments. Refer to FEIS, Chapter 7 for a comprehensive list of mitigation and commitments.

**AUDUBON NATURALIST SOCIETY – DENISSE GUITARRA (EMAIL FROM NOVEMBER 10, 2021)**

*This page is intentionally left blank.*

**From:**       Denisse Guitarra <denisse.guitarra@anshome.org>
**Sent:**       Wednesday, November 10, 2021 10:13 AM
**To:**         SHA OPLANESMLS
**Subject:**    ANS SDEIS comments
**Attachments:** 2021_11_10_SDEIS_ANS_Testimony .pdf

Dear MDOT SHA and FHWA,

Please find attached Audubon Naturalist Society's I-495 & I-270 Managed Lanes Study SDEIS comments. If you have any further questions, please don't hesitate to contact us again.

Sincerely,
Denisse Guitarra

**Denisse Guitarra**
She/Ella
MD Conservation Advocate
Audubon Naturalist Society

 

*ANS has received a 4-star rating from Charity Navigator for the 3rd consecutive year indicating that we are accountable, transparent and adhere to financial best practices.*

*In an effort to help contain the spread of Covid-19, ANS's offices are closed to the public. Email is the best way to reach me. For information about our current status please visit anshome.org/covid-19-updates/*



**Audubon Naturalist Society**
Connecting people with nature in the DC Region

November 10, 2021

Jeffrey T. Folden, P.E., DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
707 North Calvert Street
Mail Stop P-601, Baltimore, MD 21202

**Audubon Naturalist Society's written testimony to Maryland Department of Transportation State Highway Administration (MDOT SHA) and Federal Highway Administration (FHWA) on the I-495/I-270 Managed Lanes Study Supplemental Draft Environmental Impact Statement.[1]**

**Denisse Guitarra**
Maryland Conservation Advocate, Audubon Naturalist Society (ANS)

Dear MDOT SHA and FHWA,

**#1**

For 124 years, Audubon Naturalist Society has inspired people to enjoy, learn about and protect nature. ANS demands that last year's DEIS "No Build" option still remains as the preferred alternative, as the SDEIS still lacks complete studies on environmental justice, climate change, wildlife, and waterways impact, and fails to include transit alternatives. The Managed Lanes highway expansion project pushes far beyond the climate constraints people and the environment are currently experiencing today. The United Nations IPCC report[2] released earlier this year makes it clear – we have no time left to get ourselves off of fossil fuels and save as much of our planet as possible. Maryland and Virginia need a more equitable, transit, and climate friendly solution to solve our traffic congestion problems. We need excellent transit and not an inch more of car-coddling pavement. ANS demands that MDOT SHA and FHWA do not move forward with the project's "Preferred Alternative" option.

**#2**

The preferred alternative would negatively impact people's lives and wellbeing. On Chapter 4 of the SDEIS it mentions that 501 properties would be impacted by the project, the majority of these being residential

---

[1] 495/I-270 Managed Lanes Study Supplemental Draft Environmental Impact Statement. Available from: https://oplanesmd.com/sdeis/
[2] IPCC, 2021: Summary for Policymakers. In: Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change [Masson-Delmotte, V., P. et al] Cambridge University Press. In Press. Available from: https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_AR6_WGI_SPM.pdf

Woodend Sanctuary | 8940 Jones Mill Road, Chevy Chase, Maryland 20815 | 301-652-9188
Rust Sanctuary | 802 Children Center Road, Leesburg, Virginia 20175 | 703-669-0000
anshome.org

---

**Response to SDEIS Comment #1**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C. For a discussion of the basis for the Purpose and Need and for the Selection of the Preferred Alternative, please see related Common Theme Responses and the SDEIS and FEIS.

Transit alternatives were considered. Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

Refer to Chapter 9, Section 3.4.G for a response to climate change considerations.

Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

**Response to SDEIS Comment #2**

While MDOT SHA and FHWA recognize that congestion would be present during the afternoon peak period on I-270 southbound and the I-495 inner loop in the design year 2045 due to downstream bottlenecks outside of Phase 1 South, the Preferred Alternative would provide tangible operational benefits to the system including significantly increasing throughput across the American Legion Bridge and the southern section of I-270 while reducing congestion. Refer to SDEIS Chapter 3, Section 3.3 and FEIS Chapter 4, Section 4.3.

Refer to Chapter 9, Section 3.4.K for a response to impacts to properties and communities, including community facilities.

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

00022754

**#2 Cont.**

properties.[3] Even more alarming, the SDEIS does not provide details on how communities, especially POC communities, would be impacted by the new bottlenecks on I-270 beyond its intersection with I-370. Equally disturbing, the SDEIS fails to include a complete study of the overall cumulative impacts the project will have on people. Under our four concurrent public health, climate, economic, and social crises, it does not make sense to add more air polluting lanes.

**#3**

Moreover, the prefer alternative listed in the SDEIS does not properly mitigate the negative impacts the highway expansion project will have on air, water, wildlife, and people. The SDEIS, like its predecessor the DEIS, fails to properly account for and provide any solutions and dangerously underestimates the devastating impacts the project will have on people and the environment. The SDEIS fails to consider the mitigation of 1,000,000 sq ft of floodplains and over 186,000 sq ft of wetlands.[4] Lacking these critical pieces of information, when climate change is already causing major flooding issues in the region, is completely irresponsible of MDOT SHA and FHWA. In terms of water quality, the SDEIS's preferred alternative will reduce Montgomery and Prince George's Counties capacity to reduce and meet its Chesapeake Bay Total Maximum Daily Load (TMDL) goals. Furthermore, the project will impact 500 acres of forests and 26 acres of Parkland.[5] In terms of rare, threatened, and endangered (RTE) species, 41 species are in peril due to the project.[6] The irreplaceable destruction the "Preferred Alternative" is expected to have on the environment is so extensive that no built infrastructure could ever replace the natural infrastructure this project would take down, placing Maryland and Virginia at a higher climate catastrophe risk for the next 50 years.

ANS and our partners recommend that MDOT SHA and FHWA do not approve the SDEIS's "Preferred alternative" due to its incomplete, faulty, and deceiving information and instead opt for the "no build alternative" option listed in the DEIS. On behalf of ANS and our 28,000 members and supporters, ANS respectfully requests that MDOT SHA and FHWA to act responsibly and not move forward with the SDEIS's Managed Lanes Preferred alternative today.

Sincerely,
Denisse Guitarra
MD Conservation Advocate
Audubon Naturalist Society

---

[3] 4 Environmental Resources, Consequences & Mitigation. Page 4-22. I-495 & I-270 MLS SDEIS. Available from: https://oplanesmd.com/wp-content/uploads/2021/09/SDEIS_04_Environmental.pdf
[4] 4 Environmental Resources, Consequences & Mitigation. Page 4-58. I-495 & I-270 MLS SDEIS. Available from: https://oplanesmd.com/wp-content/uploads/2021/09/SDEIS_04_Environmental.pdf
[5] 4 Environmental Resources, Consequences & Mitigation. Page 4-77. I-495 & I-270 MLS SDEIS. Available from: https://oplanesmd.com/wp-content/uploads/2021/09/SDEIS_04_Environmental.pdf
[6] 4 Environmental Resources, Consequences & Mitigation. Page 4-87. I-495 & I-270 MLS SDEIS. Available from: https://oplanesmd.com/wp-content/uploads/2021/09/SDEIS_04_Environmental.pdf

Woodend Sanctuary | 8940 Jones Mill Road, Chevy Chase, Maryland 20815 | 301-652-9188
Rust Sanctuary | 802 Childrens Center Road, Leesburg, Virginia 20175 | 703-669-0000

**anshome.org**

---

**Response to SDEIS Comment #3**

Refer to Chapter 9, Section 3.4.N for a response to indirect and cumulative effects.

The FEIS reflects further design refinements and details, including final mitigation and commitments of the Preferred Alternative, many of which directly responded to public comments. Refer to FEIS, Chapter 7 for a comprehensive list of mitigation and commitments.

00022755

**BALTIMORE WASHINGTON LABORERS' DISTRICT COUNCIL - VICTORIA LEONARD (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Victoria Leonard

**Agency/Organization/Jurisdiction, if applicable:** Baltimore Washington Laborers' District Council

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

#1

Thank you for the opportunity to testify. My name is Victoria Leonard. V-I-C-T-O-R-I-A Leonard, L-E-O-N-A-R-D. I live in Silver, Spring, Maryland. And my address is 9207 Mintwood Street. I'm also the political and legislative director for the Baltimore Washington Laborers' District Council. We are the local affiliate and represent more than 7,500 members across the DC Metro area.  Let you know strongly support this project and the Preferred Alternative. The Preferred Alternative will eliminate congestion at the American Legion Bridge, and it will improve conditions on I-270 during rush hour. The Preferred Alternative will increase speeds, improve reliability, and reduce travel times and delays. It'll also create thousands of good paying union jobs with benefits for Maryland residents. And without this project, there is really no practical way to replace the American Legion Bridge which needs a lot of repairs. And on a personal note, my job requires me to drive a lot and I have been stuck in beltway traffic, trying to cross the American Legion Bridge more times than I can count. This project will bring huge improvements to traffic conditions across our region, and it will bring much needed economic growth and opportunities for Maryland residents and businesses. This project will create jobs through design, construction, and maintenance for years to come. And this is exactly the type of infrastructure investment we need. Thank you so much.

**Response to SDEIS Comment #1**

Thank you for your comments supporting improvements. The purpose of the Managed Lanes Study is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the Study limits, and enhances existing and planned multimodal mobility and connectivity.

FHWA and MDOT SHA have considered all comments received on the proposed improvements in the context of the Purpose and Need for the project and have identified Alternative 9 – Phase 1 South as the Preferred Alternative.  This alternative would best accomplish the Purpose and Need of the proposed action while fulfilling FHWA's statutory mission and responsibilities, giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**BIKEAAA**

## BikeAAA

Please provide the most direct pedestrian/bicycle connection possible between a separated ped/bike lane on the bridge and nearby trails (including the C&O), bike lanes and sidewalks in order to facilitate walking and biking for both transportation and recreation. Street crossings and circuitous routes should be avoided to encourage as much ped/bike use as possible.

#1

**Response to SDEIS Comment #1**

Public comments supporting a direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath were received by MDOT SHA, FHWA and NPS during the SDEIS public comment period. To be responsive, a direct connection to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative LOD and impact analyses. The three shared use path options connecting to MacArthur Boulevard presented in the SDEIS are no longer under consideration in this FEIS. The direct connection to the Chesapeake and Ohio Canal towpath results in fewer NPS property and natural resource impacts. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the Study Area. The alignment of the proposed shared use path connection to the Chesapeake and Ohio Canal towpath is shown in FEIS Appendix E.

**CABIN JOHN CITIZENS ASSOCIATION - TINA ECK**

From: Tina Eck <tinaeck@yahoo.com>
Sent: Friday, November 12, 2021 9:09 AM
To: SHA OPLANESMLS
Cc: governor.mail@maryland.gov; pfranchot@comp.state.md.us; elizabeth.hughes@maryland.gov; rebeccaih.ballo@montgomeryplanning.org; susan.lee@senate.state.md.us; MCP-Chair@mncppc-mc.org; marc.elrich@montgomerycountymd.gov; councilmember.glass@montgomerycountymd.gov; councilmember.riemer@montgomerycountymd.gov
Subject: Concerns about the Impact of Widening of I-495

November 15, 2021

Jeffrey T. Folden, P.E., DBIA
Deputy Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21202

RE: I-495/I-270 Managed Lane Study Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation

Dear Mr. Folden:

Our community of some 750 homes is bounded by I-495 to the west and north, Cabin John Park and Parkway to the east, and the C&O Canal National Historical Park to the south. Our major access roads are Clara Barton Parkway, MacArthur Boulevard, and Seven Locks Road. We wish to convey our concerns regarding the impacts identified in the Supplemental Draft Environmental Impact Statement (SDEIS) for the I-495/I-270 Managed Lane Study.

The Cabin John community recognizes that the American Legion Bridge is not only past its lifespan but is also one of the worst choke points in the federal highway system. We are glad to see the state taking on its reconstruction. However, the Preferred Alternative will not address the traffic issues for those unable to afford the exorbitant rush-hour toll rates proposed for the toll lanes, i.e., most daily commuters, including many Cabin John residents.

While not yet at pre-pandemic levels, cut-through traffic is rapidly worsening on Cabin John roads. Prior to 2020, traveling the one-mile stretch of MacArthur Blvd. between Seven Locks Rd. and Wilson Rd. (over the one-lane bridge) routinely took 8-10 minutes during rush hour. Neither the DEIS nor the SDEIS address what local traffic will look like during the years-long construction. As for afterwards, the Preferred Alternative in no way indicates that it will address our overburdened roads, especially MacArthur Blvd, with its own bottleneck at the Union Arch Bridge.

Furthermore, the alternative calls for the MD 190/Cabin John Parkway interchange to be expanded to incorporate toll lane access. That will result in additional traffic on MD 190, as well as the local roads that Cabin John residents have to use to get to their jobs, go to schools, buy groceries, and perform all the other errands of daily living.

Our concerns go beyond traffic. We consider ourselves stewards of the natural environment around us and are concerned by the wide range of environmental impacts of the Preferred Alternative.

The access ramps for the MD 190/Cabin John Parkway interchange, most notably the flyover ramp above Seven Locks Rd, will take away valuable parkland, impinge on the historic Moses Hall and Cemetery site, create additional noise and pollution over a broad area, and, as a result, irreparably harm our community.

In addition to these comments, we wish to reinforce any concerns that the National Park Service and Maryland-National Capital Park and Planning Commission may raise regarding park impacts in their comment letters.

Below, we provide the traffic, park, and stormwater issues that we have identified as of greatest concern to our community that are not adequately addressed in the SDEIS. We also draw attention to the detrimental impacts to Morningstar Moses Cemetery, the Gibson Grove Church and the Evergreen neighborhood.

Traffic Impacts

**The long-term traffic impacts to our local community have been inconsistently and inadequately addressed in this process.**

As documented in the *Traffic Technical Report* of the Draft EIS (Appendix C, Figure 5-73), the Project would result in increases in traffic on local roads. Figure 5-73 indicates that the local roadways most relevant for our community, Clara Barton Parkway and River Road, would see greater than 10% increases in delays as a result of the Project. A similar figure, detailing these roadway-specific impacts is not included in the SDEIS. There is only a statement that delay would be generally reduced on arterials in Montgomery County (Appendix A, Pg. 6). Since the figure in the SDEIS applied to all two managed lanes approaches, CJCA assumes that those congestion impacts will be experienced as a result

**Response to SDEIS Comment #1**

Updated traffic analysis for the design year of 2045 indicates that the Preferred Alternative will provide operational benefits compared to the full No Build Alternative in six key metrics (system-wide delay, corridor travel time and speed, density and level of service, travel time index, vehicle throughput, and local network delay). Refer to FEIS, Appendix A. The Preferred Alternative would significantly increase throughput across the ALB and on the southern section of I-270 while reducing congestion. The net impact of the project will be an overall reduction in delay on the surrounding arterials, despite some localized increases in arterial traffic near the managed lane access interchanges. Specific areas, such as MD 190/Cabin John, were evaluated in more detail as part of the FEIS, and mitigation is proposed where needed to maintain acceptable operations per FHWA Interstate Access Point Approval guidelines. Refer to FEIS, Appendix B, for MDOT SHA's Application for Interstate Access Point Approval.

The traffic results showing delay increases on River Road and Clara Barton Parkway were preliminary and were based on draft designs. Now that the Preferred Alternative has been identified and the design has been updated, these results have been updated. The results indicate that the net impact of the Preferred Alternative will be an overall reduction in delay on the surrounding arterials, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges. The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of this FEIS, and mitigation was proposed where needed to maintain acceptable operations and safety per FHWA Interstate Access Point Approval guidelines. Refer to FEIS Appendix B.

**#1 Cont.**

of the Preferred Alternative. As noted in response to the DEIS, those impacts need to be specifically identified in the body of the EIS and mitigated. Failure to do so will result in serious unaddressed impacts for our community.

Our community's concerns about the traffic impacts associated with the Preferred Alternative are buttressed by the recent findings of the Rocky Mountain Institute. Their SHIFT Calculator for highway projects evaluates the induced demand created by highway expansion, with the resulting consequences for carbon emissions and environmental degradation. Based on the 60 lane-miles of additional road capacity generated by the project, their tool indicates that the 495/270 Managed Lanes would generate 339-508 million extra Vehicle Miles Traveled (VMT) in the region every year. This VMT bump would generate the same emissions as 41,500 additional passenger cars and would directly contribute between 1.6 and 3.2 million metric tons of CO₂e between now and 2050. These consequences fly in the face of necessary policy goals to reduce carbon emissions in the face of the threat faced by climate change.

In addition to the inconsistent and insufficient approach to local traffic impacts, the SDEIS portrays modeling results that do not appear to accurately reflect future travel demand. As case in point, we examined the projected traffic volumes associated with travel into Clara Barton Parkway southbound from I-495 in the SDEIS Traffic Technical Report (Appendix A). Clara Barton Parkway and Cabin John Parkway are two highly constrained roadways serving our community. On Clara Barton Parkway, southbound travelers in the PM peak have two options: they can continue to the Glen Echo exit, where all traffic must exit the Parkway, or they can get off at the Cabin John exit and take MacArthur Blvd over the Union ArchOne Lane Bridge. Both locations are unique, constrained road segments that do not meet modern standards and are unlikely to provide additional capacity without major changes. These changes, in turn, may not be compatible with their historic and park context of these roads. The Project analysis indicates that volumes onto Clara Barton and Cabin John Parkway would decrease with the introduction of the managed lanes, by 5-10% in aggregate.

This conclusion is incompatible with two facts. First, the overall level of induced demand that the lanes would generate, as indicated by the SHIFT Calculator results below, would indicate growth on key, valuable connections like Cabin John Parkway and Clara Barton Parkway, the most convenient means of accessing large portions of NW Washington. Second, while the managed lanes may make certain connections more convenient, they cannot overcome that alternatives to these roadways are slower, like River Road, or highly congested, like George Washington Memorial Parkway. Beyond a series of volume tables at the end of an appendix, the SDEIS does not adequately describe how traffic reductions would occur on these roadways.

Cabin John therefore reiterates our concern, as evidenced by Figure 5-73 in the DEIS, that traffic volumes will result in continued negative consequences for our commutes and our community. This congestion must be documented and mitigated.

**#2**

Construction Transportation Impacts

**Our community continues to need more information about construction impacts to understand and evaluate what disruption we may experience. SHA needs to provide greater assurance that they and the P3 developer will work to minimize construction period issues for adjacent communities.**

The Draft EIS indicated that during the construction period, the I-495 bridges over MacArthur Blvd and Seven Locks Rd, and the Persimmon Tree Lane bridge over I-495, would all need to be rebuilt. No information was provided about the construction period disruption associated, nor was information provided about impacts to the local roadways below. Similarly, no such information is provided about the Preferred Alternative in the SDEIS.

Overall, the construction impacts section in this EIS is woefully inadequately for the size and scope of this project, and for the level of public resources dedicated to this process. The EIS does not provide any meaningful detail about a) the duration of construction, b) the means and methods of construction, or c) commitments to minimize impacts. We understand that these details are being left to the P3 Developer and final design. However, the purpose of the NEPA process is to disclose impacts, of which the construction is a meaningful part, where our lives may be disrupted for four to five years. That merits more detailed, quantitative attention to the construction impacts and honest consideration of an appropriate level of mitigation.

So far, SHA's materials have shown no interest in providing that reasonable level of disclosure for the public and, as noted in our 2020 DEIS comments, likely requires further supplemental analysis before proceeding to an FEIS. This inadequate analysis comes despite the fact that the Board of Public Works recently approved an additional $45 million for the EIS and related design work. We would conclude that some of those resources should go toward a more robust construction analysis and we would note that our DEIS comments raise a few key issues such an analysis should address, including a) coordination of roadway closures and b) minimization of impacts from construction staging.

**#3**

Park Impacts

**We are concerned by the magnitude of impacts to the parks surrounding our community.**

Nestled between Montgomery County (M-NCPPC) and National Park Service (NPS) parklands, our community is paying close attention to the parkland impacts of this project. There are expected construction-period and permanent impacts to the C&O Canal, the Clara Barton Parkway, and Cabin John Park.

We begin with the NPS properties. NPS, as indicated in public comments made October 7 at the National Capital Planning Commission, is concerned about the 3.8 acres of permanent impact, the need for a construction roadway, impacts to trees, and impacts to rare, threatened, and endangered species of the C&O Canal. The construction roadway would service the replacement of the American Legion Bridge and would extend north of I-495. We are frequent users of the towpath and share NPS's concerns. This roadway would have impacts for the C&O Canal and for the user experience of the towpath during construction. While we acknowledge the need for replacement of the American Legion Bridge, we urge SHA to work closely with NPS to meaningfully reduce the level of impacts associated with construction and resulting disruption to park users.

We turn next to the M-NCPPC parkland. The expansion of I-495 in Cabin John Park would require existing parkland to implement. As SHA and FHWA are aware, the agencies have an obligation under Section 4(f) to work to avoid use of these resources. CJCA believes that SHA's efforts to-date have been insufficient. In fact, impacts to Cabin John Park units have increased from the DEIS, as noted in Table 6-1.

These impacts result from SHA's desire to meaningfully expand the size and scale of the MD 190/Cabin John Parkway interchange. Throughout this process, SHA has failed to consider more creative approaches to this interchange that could avoid historic and parkland resources, in part because it has sought to graft the managed lanes onto this existing circulation approach at this interchange. Cabin John Park

---

**Response to SDEIS Comment #2**

It is anticipated that construction will last approximately five to six years. Details related to precisely when and where construction related activities will occur will be determined in final design, however, the project will likely require night work to occur when activities could not be completed safely during the day. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. Impacts associated with construction that will be further evaluated for the Selected Alternative in final design include traffic congestion associated with construction maintenance of traffic, utility disruptions, construction vibration, erosion and sediment and control, and construction related noise.

The management of construction impacts is addressed in an agreement between MDOT SHA and the Developer. Pursuant to that agreement, coordination with the neighboring communities will continue through final design and construction. The agreement includes requirements to minimize impacts to surrounding communities and the traveling public, while completing construction as soon as possible. Work hours and duration of construction will be identified to minimize impacts to traffic in an effort to reduce construction related congestion and in consideration of noise and vibration impacts to adjacent communities. Construction methods and materials will comply with contract, state and federal regulation, and environmental permits and mitigation requirements. Careful attention will be taken to assure that material placement will occur when weather conforms to industry standards and regulation. In addition to required governmental inspections, the Developer is required by contract to provide independent environmental, quality, and safety oversight of its contractor's performance. Refer to Final Phase 1 P3 Agreement, https://oplanesmd.com/p3-information/phase-1-agreement/. Once the Developer has selected a Design-Build Contractor(s), the schedule and duration for Phase 1 South construction will be made available to the public.

Refer to Chapter 9, Section 3.4.I for a response to construction impacts.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**Response to SDEIS Comment #3**

In addition to the significant work to avoid all direct impact to the Morningstar Tabernacle No.88 Moses Hall and Cemetery property, the SDEIS and FEIS describe reduction of impacts to the other resources that you have noted. Significant avoidance and minimization efforts also focused around the American Legion Bridge and adjacent National Park Service (NPS) properties. MDOT SHA and FHWA met with the NPS on December 8, 2020, to discuss the limits of disturbance (LOD) in the vicinity of the ALB that was presented in the DEIS. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the Chesapeake and Ohio Canal National Historic Park and George Washington Memorial Parkway units of the NPS.*

The ALB Strike Team considered bridge construction approaches to determine if any of them could limit the LOD further. The ALB Strike Team conducted detailed investigation on a top-down segmental construction approach; a top-down cable stayed approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of additional information, MDOT SHA and the ALB Strike Team determined that access to the site at river level could be consolidated to the north side of the river along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of the Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the Chesapeake and Ohio Canal and a temporary haul road paralleling the Chesapeake and Ohio towpath. This effort resulted in a 7.8 acre reduction in impact to the George Washington Memorial Parkway and a 5.3 acre reduction at the Chesapeake & Ohio Canal National Historical Park. Refer to *SDEIS, Chapter 4, Section 4.12.4* for additional details on the ALB Strike Team's efforts.

OP·LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study   Case 8:22-cv-02597-DKC   Document 62-3   Filed 10/30/23   Page 12 of 96

FINAL ENVIRONMENTAL IMPACT STATEMENT

**#3 Cont.**

is a sensitive resource and a watershed. Our community has spent many hours working to improve it. Identifying "replacement parkland" (Pg. 5-21) likely elsewhere in the County is not an appropriate substitute for giving a harder look at how different approaches at MD 190 could avoid Section 4(f) uses.

We also find SHA's statement in the DEIS that avoidance is limited because of the north-south nature of the parks against the east-west direction of I-495 (DEIS, Pg. 5-12) to reflect insufficient design attention to how the proposed lanes could be better accommodated within existing SHA ROW. Therefore, we believe more work is to be done before FHWA makes its final Section 4(f) determinations.

**Stormwater Impacts**

**The stormwater mitigation approach in the DEIS is inadequate, relying far too heavily on off-site treatment strategies.**

In the SDEIS, SHA indicates a mix of stormwater management approaches to address the serious implications of adding so many new lane miles in our sensitive watersheds. These include both on-site mitigation, as well as off-site, compensatory mitigation. Our community's work to help restore the Cabin John Creek leads us to be concerned with the level of off-site mitigation.

There are 98.2 acres of new impervious surface added in the Cabin John Creek watershed. Appendix C, the *Compensatory Stormwater Mitigation Plan*, indicates that only 44% of stormwater mitigation activities would be conducted on-site (Pg. 6) in this current phase of work. Future phases only bump that on-site percentage up to 51% (Ibid.). For a once-in-a-generation project that crosses multiple sensitive streams, this approach is wholly inadequate and disproportionate to the level of impact. While 100% on-site treatment may not be achievable, the majority of treatment should be achieved on-site through green practices to reduce the risk of even further erosion of sensitive lands and degradation of our waterways due to additional impervious surface. We align ourselves with the Montgomery County Planning Board's draft DEIS comments, which call for at least 80% on-site treatment.

We appreciate SHA's commitment throughout the SDEIS to use best management practices for stormwater management. Still, the Final EIS must contain more detailed information regarding the Preferred Alternative approach to addressing stormwater in the areas around our community and should include a substantially larger proportion of mitigation occurring on-site. In doing so, we look forward to SHA making further commitments to the best management practices that can enhance and protect our watersheds in green ways. As stewards of our local watersheds, we look forward to the opportunity to coordinate with the P3 Developer on local stormwater improvements that can complement years of efforts to restore and enhance Cabin John Creek.

**#4**

**#5**

**Morningstar Moses Cemetery, Gibson Grove Church and the Evergreen Neighborhood**

All of these properties abut the beltway and are most directly impacted by the Preferred Alternative. They already suffer from existing runoff and erosion issues and neither the DEIS nor the SDEIS adequately details a strategy to mitigate stormwater impacts to these properties.

These properties and the nearby parkland would most directly suffer the visual impacts from the Preferred Alternative, especially the proposed direct access off-ramp from the eastbound managed lanes onto MD 190. A Visual Impact Assessment (VIA) has yet to be conducted. We are very concerned that the SHA is suggesting an "Abbreviated VIA" that would only focus on views from the Preferred Alternative. Cabin John is a residential community, with the families of the Evergreen neighborhood literally having the Beltway in their backyard. To suggest that the views from Seven Locks Rd. and Cypress Grove Lane should not be considered is to ignore the fact that this expansion is going through our community, where residents are walking, biking and driving these roads daily. A "Standard VIA" needs to be done. But even without a VIA, it is clear that the Final EIS should advance an alternative that does not include an eastbound flyover off-ramp onto MD 190.

The SDEIS indicates that 8.6 acres of property would be acquired in the Cabin John area (Pg. 4-6). Appendix D indicates that seven properties in the Evergreen neighborhood would see at least partial impacts based on where the LOD is currently indicated. We remain concerned with the lack of information regarding the nature of the potential property impacts. Along with this are concerns about tree canopy loss and the need for noise barriers sooner rather than later in the construction process as noise impacts are already severe for these properties and significant for a much larger swath of Cabin John, especially during the winter months when the trees do not provide a natural buffer.

Last, but not least, the Cabin John community is committed to preserving the Morningstar Moses Cemetery – a site that is not only of historical significance as the first known Moses organization and burial ground in Montgomery County, but also of significance to current Cabin John families who are descendants of Morningstar Moses 88 and have family buried in its cemetery.

We appreciate the significant work that the State Highway Administration has done to date, especially the ground penetrating radar (GPR) survey of a portion of the cemetery and the Beltway right-of-way. The findings of that work – dozens of likely graves in the current right-of-way and hundreds within the cemetery – were shocking. We are pleased that the SHA is recommending complete avoidance of the cemetery and the right-of-way.

However, we remain deeply concerned that there is no honest way to achieve complete avoidance without finishing the GPR work, both inside the cemetery and along the rest of the right-of-way that touches the Morningstar Moses Cemetery property.

Thank you for your consideration of these comments. Our community will remain involved through the EIS process, the Board of Public Works approvals, and regulatory steps taken by M-NCPPC and the National Capital Planning Commission. We look forward to seeing the steps that SHA takes to address the issues we have raised in our comments to the DEIS as well as the SDEIS.

_____

Christina Eck

---

Based on the current design and as presented in the FEIS, the Preferred Alternative would have an estimated permanent impact of 1.0 acres to the Chesapeake and Ohio Canal National Historical Park, and an estimated temporary impact of 9.1 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 1.1 acres to Clara Barton Parkway, and an estimated temporary impact of 0.7 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 5.7 acres to Cabin John Regional Park, and an estimated temporary impact of 0.6 acres during construction.

Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

**Response to SDEIS Comment #4**

Impacts to receiving waters, including Cabin John Creek, will be addressed through the Maryland permitting process, which this project will be required to follow. Maryland Stormwater Management Law is relatively strict with the goal of maintaining post development runoff as nearly as possible to pre-development runoff characteristics. Water quantity is required to be managed onsite to match existing conditions for the 10-year storm. Water quality is required to treat all new impervious area and 50% of reconstructed existing impervious area to match the runoff characteristics of woods in good condition. Refer to Chapter 9, Section 3.4.E for additional information on impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**Response to SDEIS Comment #5**

The Visual Impact Assessment (VIA) was completed on the Preferred Alternative and documented in the FEIS in Chapter 5, Section 5.6 and FEIS, Appendix H and includes renderings in the area of concern around Seven Locks Road and Cabin John Stream Valley Park, Unit 2. The VIA concluded that construction of the Preferred Alternative would not introduce new elements incompatible with the existing visual character or qualities along the study corridors or that experienced by neighbors. Vegetation removal will be mitigated based on state and local agency requirements and standards to maintain the visual quality of the key locations. It is expected that aesthetic and landscaping guidelines will detail materials, lighting, signage, and vegetation standards contextually compatible with the study corridor. Aesthetic and landscaping guidelines will vary along the study corridor to incorporate the aesthetic and context of the neighbor stakeholders and surrounding resources. By inviting neighbor stakeholders in the development of the aesthetic and context, MDOT SHA would ensure that the Preferred Alternative would be consistent with applicable laws, ordinances, regulations, policies, and standards. As a result, the contextual compatibility impact of the proposed action would be low.

The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes at Seven Locks Road. Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction. An acceleration lane will also be built along the outer loop for approximately 1000-feet east of Seven Locks Road. No ramps are proposed in this area. The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop. The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier. Flyover ramps are no longer proposed in this area and thus will not create a visual impact. A noise barrier in this area is anticipated to be located close to the existing right of way line. Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

*This page is left intentionally blank.*

Since the DEIS, the Preferred Alternative eliminates of flyover ramps at MD 190/River Road by adjusting the location of the HOT lane direct access ramps between I-495 and MD 190. All HOT lanes direct access ramps within this interchange are now proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of flyover ramps.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and managed lanes separate to allow space for highway ramps. The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities. The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps. This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

Through the Section 106 review, MDOT SHA has completed extensive historical and archaeological research that thoroughly documents the Morningstar Tabernacle No. 88 Moses Hall Cemetery and its significant features, allowing the Preferred Alternative to avoid all known impacts. MDOT SHA will continue to work with the community through the project's Programmatic Agreement on further studies and context-sensitive design of new facilities.

**CABIN JOHN CITIZENS ASSOCIATION – SUSAN SHIPP**

MDOT SHA acknowledges receipt of your DEIS Comment Letter sent on behalf of the Cabin John Citizens Association dated October 15, 2020 that was appended to this SDEIS Comment Letter.  Refer to Appendix T for a response to this DEIS Comment Letter.

| | |
|---|---|
| From: | SUSAN SHIPP <jsjshipp3@verizon.net> |
| Sent: | Sunday, November 28, 2021 5:36 PM |
| To: | SHA OPLANESMLS |
| Cc: | governor.mail@maryland.gov; pfranchot@comp.state.md.us; treasurer@treasurer.state.md.us; jeanette.mar@dot.gov; elizabeth.hughes@maryland.gov; marc.elrich@montgomerycountymd.gov; councilmember.albornoz@montgomerycountymd.gov; councilmember.friedson@montgomerycountymd.gov; councilmember.glass@montgomerycountymd.gov; councilmember.hucker@montgomerycountymd.gov; councilmember.jawando@montgomerycountymd.gov; councilmember.katz@montgomerycountymd.gov; councilmember.navarro@montgomerycountymd.gov; councilmember.rice@montgomerycountymd.gov; councilmember.riemer@montgomerycountymd.gov; susan.lee@senate.state.md.us; marc.korman@house.state.md.us; sara.love@house.state.md.us; ariana.kelly@house.state.md.us; MCP-Chair@mncppc-mc.org; rebecccah.ballo@montgomeryplanning.org; brian.crane@montgomeryplanning.org |
| Subject: | Cabin John Comment Letter on the SDEIS for the Beltway Expansion P3 Project |
| Attachments: | 2021_11_28 CJCA Comment Letter  to Supplemental DEIS_Final.pdf; 2020_10_15 Cabin John Comments on DEIS_Final.pdf |

Mr. Folden et al,

Attached please find the Nov. 28 comment letter from the Cabin John community on the Supplemental Draft Environmental Impact Statement and the Updated Draft Section 4(f) Evaluation for the I-495 and I-270 Managed Lane Study

I am also attaching a copy of our Oct. 15, 2020 comment letter on the initial Draft Environmental Impact Statement for your convenience.

We look forward to seeing how the final environmental impact statement addresses our very serious concerns.

Thank you,

Susan Shipp
President, Cabin John Citizens Association

00022762

## CABIN JOHN CITIZENS ASSOCIATION
P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*
Susan Shipp – President; Bob Walsh – Treasurer; Meredith Griggs – Secretary

November 28, 2021

Jeffrey T. Folden, P.E., DBIA
Deputy Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21202

**RE: I-495/I-270 Managed Lane Study Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation**

Dear Mr. Folden:

As president of the Cabin John Citizens Association, I am writing on behalf of the residents of Cabin John. Our community of some 750 homes is bounded by I-495 to the west and north, Cabin John Park and Parkway to the east, and the C&O Canal National Historical Park to the south. Our major access roads are Clara Barton Parkway, MacArthur Boulevard, and Seven Locks Road. We wish to convey our concerns regarding the impacts identified in the Supplemental Draft Environmental Impact Statement (SDEIS) for the I-495/I-270 Managed Lane Study.

**#1**

The Cabin John community recognizes that the American Legion Bridge is not only past its lifespan but is also one of the worst choke points in the federal highway system. We are glad to see the state taking on its reconstruction. However, the Preferred Alternative will not address the traffic issues for those unable to afford the exorbitant rush-hour toll rates proposed for the toll lanes, i.e., most daily commuters, including many Cabin John residents.

Congress has just passed a $1 trillion dollar infrastructure bill. Surely, there is now federal money for one of the worst choke points in our nation's highway system. By scraping the public-private partnership approach to rebuilding the American Legion Bridge, we could gain an expanded highway that can be used by all, not just those that can afford the toll.

Even more important, with federal funds we would be able to build a new American Legion Bridge that can structurally support a railway should that one day become the most logical way to manage commuter transportation issues between Fredrick, MD and Tysons Corner, VA. Federal and state officials recognized that need when the Woodrow Wilson Bridge was rebuilt in the 1990s and it should be a given with any American Legion Bridge reconstruction. It is not in the public interest for a public-private partnership to preclude building a bridge that can support a railway.

Cabin John roads already strain under the burden of commuter traffic. While not yet at pre-pandemic levels, cut-through traffic is rapidly worsening in our community. Prior to 2020, traveling the one-mile stretch of MacArthur Blvd. between Seven Locks Rd. and Wilson Rd. (over the historic Union Arch one-lane bridge) routinely took 8-10 minutes during rush hour. Neither the DEIS nor the SDEIS address what local traffic will look like during the years-long construction. As for afterwards, the Preferred Alternative in no way indicates that it will address our overburdened roads, especially MacArthur Blvd, with its Union Arch Bridge bottleneck.

1

---

**Response to SDEIS Comment #1**

MDOT remains focused on supporting the State's pandemic response and recovery, while delivering projects that support safety, mobility, and state of good repair for the critical infrastructure that composes the State's transportation system. With the new funding Maryland will receive from the Infrastructure Investment and Jobs Act (IIJA), MDOT is presented with new opportunities to advance projects across the entire State. As of January 2022, MDOT is awaiting federal rulemaking and a congressional appropriations authorization to access these new funds, which will provide approximately 20 percent more in federal highway dollars than the state currently has. During this time, MDOT is reviewing each county's priorities and needs, the Statewide infrastructure needs, as well as the current State revenues to better understand what improvements will be able to advance with the additional federal funds.

While this funding is a significant increase overall, it is only a 14% increase in the two traditional categories that a project like I-495 & I-270 Managed Lanes Study would be funded out of. This amount of funding would not be adequate to fund a project of this magnitude over the five years of the IIJA bill.

Updated traffic analysis for the design year of 2045 indicates that the Preferred Alternative will provide operational benefits compared to the full No Build Alternative in six key metrics (system-wide delay, corridor travel time and speed, density and level of service, travel time index, vehicle throughput, and local network delay). Refer to **FEIS, Appendix A**. The Preferred Alternative would significantly increase throughput across the ALB and on the southern section of I-270 while reducing congestion. The net impact of the project will be an overall reduction in delay on the surrounding arterials, despite some localized increases in arterial traffic near the managed lane access interchanges. Specific areas, such as MD 190/Cabin John, were evaluated in more detail as part of the FEIS, and mitigation is proposed where needed to maintain acceptable operations per FHWA Interstate Access Point Approval guidelines. Refer to FEIS, Appendix B, for MDOT SHA's Application for Interstate Access Point Approval.

The traffic results showing delay increases on River Road and Clara Barton Parkway were preliminary and were based on draft designs. Now that the Preferred Alternative has been identified and the design has been updated, these results have been updated. The results indicate that the net impact of the Preferred Alternative will be an overall reduction in delay on the surrounding arterials, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges. The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of this FEIS, and mitigation was proposed where needed to maintain acceptable operations and safety per FHWA Interstate Access Point Approval guidelines. Refer to FEIS Appendix B.

In consideration of the comments received, MDOT SHA commits to designing and constructing the ALB such that a future capital improvement project will have one or more feasible options to achieve the full design and implementation of a transit line across the ALB. These options will be enabled by designing the northbound and southbound structures to not preclude a possible future transit line including the addition of foundation and substructure elements.



See response to Comment #1 above.

#1
Cont.

## CABIN JOHN CITIZENS ASSOCIATION
### P.O. BOX 31, Cabin John MD 20818

*Organized 1919     Charter Member Montgomery County Civic Federation*
Susan Shipp – President; Bob Walsh – Treasurer; Meredith Griggs – Secretary

Furthermore, the alternative calls for the MD 190/Cabin John Parkway interchange to be expanded to incorporate toll lane access. That will result in additional traffic on MD 190, as well as the local roads that Cabin John residents have to use to get to their jobs, go to schools, buy groceries, and perform all the other errands of daily living.

Our concerns go beyond traffic. We consider ourselves stewards of the natural environment around us and are concerned by the wide range of environmental impacts of the Preferred Alternative.

The access ramps for the MD 190/Cabin John Parkway interchange, most notably the flyover ramp above Seven Locks Rd, will take away valuable parkland, impinge on the historic Moses Hall and Cemetery site, create additional noise and pollution over a broad area, and, as a result, irreparably harm our community.

In addition to these comments, we wish to reinforce any concerns that the National Park Service and Maryland-National Capital Park and Planning Commission may raise regarding park impacts in their comment letters.

Below, we provide the traffic, park, and stormwater issues that we have identified as of greatest concern to our community that are not adequately addressed in the SDEIS. We also draw attention to the detrimental impacts to Morningstar Moses Cemetery, the Gibson Grove Church and the Evergreen neighborhood.

### Traffic Impacts

**The long-term traffic impacts to our local community have been inconsistently and inadequately addressed in this process.**

As documented in the *Traffic Technical Report* of the Draft EIS (Appendix C, Figure 5-73), the Project would result in increases in traffic on local roads. Figure 5-73 indicates that the local roadways most relevant for our community, Clara Barton Parkway and River Road, would see greater than 10% increases in delays as a result of the Project. A similar figure, detailing these roadway-specific impacts is not included in the SDEIS. There is only a statement that delay would be generally reduced on arterials in Montgomery County (Appendix A, Pg. 6). Since the figure in the SDEIS applied to all two managed lanes approaches, CJCA assumes that those congestion impacts will be experienced as a result of the Preferred Alternative. As noted in response to the DEIS, those impacts need to be specifically identified in the body of the EIS and mitigated. Failure to do so will result in serious unaddressed impacts for our community.

Our community's concerns about the traffic impacts associated with the Preferred Alternative are buttressed by the recent findings of the Rocky Mountain Institute. Their SHIFT Calculator for highway projects evaluates the induced demand created by highway expansion, with the resulting consequences for carbon emissions and environmental degradation.[1] Based on the 60 lane-miles of additional road capacity generated by the project, their tool indicates that the 495/270 Managed Lanes would generate 339-508 million extra Vehicle Miles Traveled (VMT) in the region every year. This VMT bump would generate the same emissions as 41,500 additional passenger cars and would directly contribute between 1.5 and 3.2 million metric tons of $CO_2$e between now and 2050. These

---

[1] *See:* Rocky Mountain Institute. *SHIFT Calculator*, 2021. https://shift.rmi.org/

2

**#1**
**Cont.**

**CABIN JOHN CITIZENS ASSOCIATION**
P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*
Susan Shipp – President; Bob Walsh – Treasurer; Meredith Griggs – Secretary

consequences fly in the face of necessary policy goals to reduce carbon emissions in the face of the threat faced by climate change.

In addition to the inconsistent and insufficient approach to local traffic impacts, the SDEIS portrays modeling results that do not appear to accurately reflect future travel demand. As case in point, we examined the projected traffic volumes associated with travel onto Clara Barton Parkway southbound from I-495 in the SDEIS *Traffic Technical Report* (Appendix A). Clara Barton Parkway and Cabin John Parkway are two highly constrained roadways serving our community. On Clara Barton Parkway, southbound travelers in the PM peak have two options: they can continue to the Glen Echo exit, where all traffic must exit the Parkway, or they can get off at the Cabin John exit and take MacArthur Blvd over the Union Arch/One Lane Bridge. Both locations are unique, constrained road segments that do not meet modern standards and are unlikely to provide additional capacity without major changes. These changes, in turn, may not be compatible with their historic and park context of these roads. The Project analysis indicates that volumes onto Clara Barton and Cabin John Parkway would decrease with the introduction of the managed lanes, by 5-10% in aggregate.

This conclusion is incompatible with two facts. First, the overall level of induced demand that the lanes would generate, as indicated by the SHIFT Calculator results below, would indicate growth on key, valuable connections like Cabin John Parkway and Clara Barton Parkway, the most convenient means of accessing large portions of NW Washington. Second, while the managed lanes may make certain connections more convenient, they cannot overcome that alternatives to these roadways are slower, like River Road, or highly congested, like George Washington Memorial Parkway. Beyond a series of volume tables at the end of an appendix, the SDEIS does not adequately describe how traffic reductions would occur on these roadways.

Cabin John therefore reiterates our concern, as evidenced by Figure 5-73 in the DEIS, that traffic volumes will result in continued negative consequences for our commutes and our community. This congestion must be documented and mitigated.

<u>Construction Transportation Impacts</u>

**#2**

Our community continues to need more information about construction impacts to understand and evaluate what disruption we may experience. SHA needs to provide greater assurance that they and the P3 developer will work to minimize construction period issues for adjacent communities.

The Draft EIS indicated that during the construction period, the I-495 bridges over MacArthur Blvd and Seven Locks Rd, and the Persimmon Tree Lane bridge over I-495, would all need to be rebuilt. No information was provided about the construction period disruption associated, nor was information provided about impacts to the local roadways below. Similarly, no such information is provided about the Preferred Alternative in the SDEIS.

Overall, the construction impacts section in this EIS is woefully inadequately for the size and scope of this project, and for the level of public resources dedicated to this process. The EIS does not provide any meaningful detail about a) the duration of construction, b) the means and methods of construction, or c) commitments to minimize impacts. We understand that these details are being left to the P3 Developer and final design. However, the purpose of the NEPA process is to disclose impacts, of which the construction is a meaningful part, where our lives may be disrupted for four to

3

---

See response to Comment #1 above.

**Response to SDEIS Comment #2**

It is anticipated that construction will last approximately five to six years. Details related to precisely when and where construction related activities will occur will be determined in final design, however, the project will likely require night work to occur when activities could not be completed safely during the day. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. Impacts associated with construction that will be further evaluated for the Selected Alternative in final design include traffic congestion associated with construction maintenance of traffic, utility disruptions, construction vibration, erosion and sediment and control, and construction related noise.

The management of construction impacts is addressed in an agreement between MDOT SHA and the Developer. Pursuant to that agreement, coordination with the neighboring communities will continue through final design and construction. The agreement includes requirements to minimize impacts to surrounding communities and the traveling public, while completing construction as soon as possible. Work hours and duration of construction will be identified to minimize impacts to traffic in an effort to reduce construction related congestion and in consideration of noise and vibration impacts to adjacent communities. Construction methods and materials will comply with contract, state and federal regulation, and environmental permits and mitigation requirements. Careful attention will be taken to assure that material placement will occur when weather conforms to industry standards and regulation. In addition to required governmental inspections, the Developer is required by contract to provide independent environmental, quality, and safety oversight of its contractor's performance. Refer to Final Phase 1 P3 Agreement, https://oplanesmd.com/p3-information/phase-1-agreement/. Once the Developer has selected a Design-Build Contractor(s), the schedule and duration for Phase 1 South construction will be made available to the public.

Refer to Chapter 9, Section 3.4.I for a response to construction impacts.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**#2 Cont.**

**#3**

## CABIN JOHN CITIZENS ASSOCIATION
P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*
Susan Shipp – President; Bob Walsh – Treasurer; Meredith Griggs – Secretary

analysis before proceeding to an FEIS. This inadequate analysis comes despite the fact that the Board of Public Works recently approved an additional $45 million for the EIS and related design work. We would conclude that some of those resources should go toward a more robust construction analysis and we would note that our DEIS comments raise a few key issues such an analysis should address, including a) coordination of roadway closures and b) minimization of impacts from construction staging.

### Park Impacts

**We are concerned by the magnitude of impacts to the parks surrounding our community.**

Nestled between Montgomery County (M-NCPPC) and National Park Service (NPS) parklands, our community is paying close attention to the parkland impacts of this project. There are expected construction-period and permanent impacts to the C&O Canal, the Clara Barton Parkway, and Cabin John Park.

We begin with the NPS properties. NPS, as indicated in public comments made October 7 at the National Capital Planning Commission, is concerned about the 3.8 acres of permanent impact, the need for a construction roadway, impacts to trees, and impacts to rare, threatened, and endangered species at the C&O Canal. The construction roadway would service the replacement of the American Legion Bridge and would extend north of I-495. We are frequent users of the towpath and share NPS's concerns. This roadway would have impacts for the C&O Canal and for the user experience of the towpath during construction. While we acknowledge the need for replacement of the American Legion Bridge, we urge SHA to work closely with NPS to meaningfully reduce the level of impacts associated with construction and resulting disruption to park users.

We turn next to the M-NCPPC parkland. The expansion of I-495 in Cabin John Park would require existing parkland to implement. As SHA and FHWA are aware, the agencies have an obligation under Section 4(f) to work to avoid use of these resources. CJCA believes that SHA's efforts to-date have been insufficient. In fact, impacts to Cabin John Park units have increased from the DEIS, as noted in Table 5-1.

These impacts result from SHA's desire to meaningfully expand the size and scale of the MD 190/Cabin John Parkway interchange. Throughout this process, SHA has failed to consider more creative approaches to this interchange that could avoid historic and parkland resources, in part because it has sought to graft the managed lanes onto the existing circulation approach at this interchange. Cabin John Park is a sensitive resource and a watershed. Our community has spent many hours working to improve it. Identifying "replacement parkland" (Pg. 5-21) likely elsewhere in the County is not an appropriate substitute for giving a harder look at how different approaches at MD 190 could avoid Section 4(f) uses.

We also find SHA's statement in the DEIS that avoidance is limited because of the north-south nature of the parks against the east-west direction of I-495 (DEIS, Pg. 5-12) to reflect insufficient design attention to how the proposed lanes could be better accommodated within existing SHA ROW. Therefore, we believe more work is to be done before FHWA makes its final Section 4(f) determinations.

4

---

**Response to SDEIS Comment #3**

In addition to the significant work to avoid all direct impact to the Morningstar Tabernacle No.88 Moses Hall and Cemetery property, the SDEIS and FEIS describe reduction of impacts to the other resources that you have noted. Significant avoidance and minimization efforts also focused around the American Legion Bridge and adjacent National Park Service (NPS) properties. MDOT SHA and FHWA met with the NPS on December 8, 2020, to discuss the limits of disturbance (LOD) in the vicinity of the ALB that was presented in the DEIS. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the Chesapeake and Ohio Canal National Historic Park and George Washington Memorial Parkway units of the NPS.*

The ALB Strike Team considered bridge construction approaches to determine if any of them could limit the LOD further. The ALB Strike Team conducted detailed investigation on a top-down segmental construction approach; a top-down cable stayed approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of additional information, MDOT SHA and the ALB Strike Team determined that access to the site at river level could be consolidated to the north side of the river along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of the Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the Chesapeake and Ohio Canal and a temporary haul road paralleling the Chesapeake and Ohio Canal towpath. This effort resulted in a 7.8 acre reduction in impact to the George Washington Memorial Parkway and a 5.3 acre reduction at the Chesapeake & Ohio Canal National Historical Park. Refer to *SDEIS, Chapter 4, Section 4.12.4* for additional details on the ALB Strike Team's efforts.

Based on the current design and as presented in the FEIS, the Preferred Alternative would have an estimated permanent impact of 1.0 acres to the Chesapeake and Ohio Canal National Historical Park, and an estimated temporary impact of 9.1 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 1.1 acres to Clara Barton Parkway, and an estimated temporary impact of 0.7 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 5.7 acres to Cabin John Regional Park, and an estimated temporary impact of 0.6 acres during construction.

Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

OP · LANES ™ MARYLAND  I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 62-3    Filed 10/30/23    Page 19 of 96

FINAL ENVIRONMENTAL IMPACT STATEMENT

#3
Cont.

#4

#5

### CABIN JOHN CITIZENS ASSOCIATION
P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*
Susan Shipp – President; Bob Walsh – Treasurer; Meredith Griggs – Secretary

attention to how the proposed lanes could be better accommodated within existing SHA ROW. Therefore, we believe more work is to be done before FHWA makes its final Section 4(f) determinations.

#### Stormwater Impacts

**The stormwater mitigation approach in the DEIS is inadequate, relying far too heavily on off-site treatment strategies.**

In the SDEIS, SHA indicates a mix of stormwater management approaches to address the serious implications of adding so many new lane miles in our sensitive watersheds. These include both on-site mitigation, as well as off-site, compensatory mitigation. Our community's work to help restore the Cabin John Creek leads us to be concerned with the level of off-site mitigation.

There are 98.2 acres of new impervious surface added in the Cabin John Creek watershed. Appendix C, the *Compensatory Stormwater Mitigation Plan*, indicates that only 44% of stormwater mitigation activities would be completed on-site (Pg. 6) in this current phase of work. Future phases only bump that on-site percentage up to 51% (Ibid.). For a once-in-a-generation project that crosses multiple sensitive streams, this approach is wholly inadequate and disproportionate to the level of impact. While 100% on-site treatment may not be achievable, the majority of treatment should be achieved on-site through green practices to reduce the risk of even further erosion of sensitive lands and degradation of our waterways due to additional impervious surface. We align ourselves with the Montgomery County Planning Board's draft DEIS comments, which call for at least 80% on-site treatment.[2]

We appreciate SHA's commitment throughout the SDEIS to use best management practices for stormwater management. Still, the Final EIS must contain more detailed information regarding the Preferred Alternative approach to addressing stormwater in the areas around our community and should include a substantially larger proportion of mitigation occurring on-site. In doing so, we look forward to SHA making further commitments to the best management practices that can enhance and protect our watersheds in green ways. As stewards of our local watersheds, we look forward to the opportunity to coordinate with the P3 Developer on local stormwater improvements that can complement years of efforts to restore and enhance Cabin John Creek.

#### Morningstar Moses Cemetery, Gibson Grove Church and the Evergreen Neighborhood

All of these properties abut the Beltway and are most directly impacted by the Preferred Alternative. They already suffer from existing runoff and erosion issues and neither the DEIS nor the SDEIS adequately details a strategy to mitigate stormwater impacts to these properties.

These properties and the nearby parkland would most directly suffer the visual impacts from the Preferred Alternative, especially the proposed direct access off-ramp from the eastbound managed lanes onto MD 190. A Visual Impact Assessment (VIA) has yet to be conducted. We are very concerned that the SHA is suggesting an "Abbreviated VIA" that would only focus on views from the parkland. Cabin John is a residential community, with the families of the Evergreen neighborhood

[2] *See:* Montgomery County Planning Board. November 4, 2021 draft letter presented before the Board.
https://montgomeryplanningboard.org/wp-content/uploads/2021/10/Item10_Nov-2021_M-NCPPC-SDEIS-Comment-Letter-ARG.pdf

5

---

**Response to SDEIS Comment #4**
Impacts to receiving waters, including Cabin John Creek, will be addressed through the Maryland permitting process, which this project will be required to follow. Maryland Stormwater Management Law is relatively strict with the goal of maintaining post development runoff as nearly as possible to pre-development runoff characteristics. Water quantity is required to be managed onsite to match existing conditions for the 10-year storm. Water quality is required to treat all new impervious area and 50% of reconstructed existing impervious area to match the runoff characteristics of woods in good condition. Refer to Chapter 9, Section 3.4.E for additional information on impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**Response to SDEIS Comment #5**
The Visual Impact Assessment (VIA) was completed on the Preferred Alternative and documented in the FEIS in Chapter 5, Section 5.6 and FEIS, Appendix H and includes renderings in the area of concern around Seven Locks Road and Cabin John Stream Valley Park, Unit 2. The VIA concluded that construction of the Preferred Alternative would not introduce new elements incompatible with the existing visual character or qualities along the study corridors or that experienced by neighbors. Vegetation removal will be mitigated based on state and local agency requirements and standards to maintain the visual quality of the key locations. It is expected that aesthetic and landscaping guidelines will detail materials, lighting, signage, and vegetation standards contextually compatible with the study corridor. Aesthetic and landscaping guidelines will vary along the study corridor to incorporate the aesthetic and context of the neighbor stakeholders and surrounding resources. By inviting neighbor stakeholders in the development of the aesthetic and landscaping guidelines, MDOT SHA would ensure that the Preferred Alternative would be consistent with applicable laws, ordinances, regulations, policies, and standards. As a result, the contextual compatibility impact of the proposed action would be low.

The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes at Seven Locks Road. Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction. An acceleration lane will also be built along the outer loop for approximately 1000-feet past of Seven Locks Road. No ramps are proposed in this area. The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop. The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier. Flyover ramps are no longer proposed in this area and thus will not create a visual impact. A noise barrier in this area is anticipated to be located close to the existing right of way line. Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

Since the DEIS, the Preferred Alternative eliminates of flyover ramps at MD 190/River Road by adjusting the location of the HOT lane direct access ramps between I-495 and MD 190. All HOT lanes direct access ramps within this interchange are now proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of flyover ramps.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and managed lanes separate to allow space for highway ramps. The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities. The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps. This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

#5
Cont.

## CABIN JOHN CITIZENS ASSOCIATION
P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*
Susan Shipp – President; Bob Walsh – Treasurer; Meredith Griggs – Secretary

literally having the Beltway in their backyard. To suggest that the views from Seven Locks Rd. and Cypress Grove Lane should not be considered is to ignore the fact that this expansion is going through our community, where residents are walking, biking and driving these roads daily. A "Standard VIA" needs to be done. But even without a VIA, it is clear that the Final EIS should advance an alternative that does not include an eastbound flyover off-ramp onto MD 190.

The SDEIS indicates that 8.6 acres of property would be acquired in the Cabin John area (Pg. 4-6). Appendix D indicates that seven properties in the Evergreen neighborhood would see at least partial impacts based on where the LOD is currently indicated. We remain concerned with the lack of information regarding the nature of the potential property impacts. Along with this are concerns about tree canopy loss and the need for noise barriers sooner rather than later in the construction process as noise impacts are already severe for these properties and significant for a much larger swath of Cabin John, especially during the winter months when the trees do not provide a natural noise buffer.

Last, but not least, the Cabin John community is committed to preserving the Morningstar Moses Cemetery - a site that is not only of historical significance as the first known Moses organization and burial ground in Montgomery County, but is also very important to current Cabin John families who are descendants of Morningstar Moses 88 and have family buried in its cemetery.

We appreciate the significant work that the State Highway Administration has done to date, especially the ground penetrating radar (GPR) survey of a portion of the cemetery and the Beltway right-of-way. The findings of that work – dozens of likely graves in the current right-of-way and hundreds within the cemetery – were shocking. We are pleased that the SHA is recommending complete avoidance of the cemetery and the right-of-way.

However, we remain deeply concerned that there is no honest way to achieve complete avoidance without finishing the GPR work, both inside the cemetery and along the rest of the right-of-way that touches the Morningstar Moses Cemetery property.

Thank you for your consideration of these comments. Our community will remain involved through the EIS process, the Board of Public Works approvals, and regulatory steps taken by M-NCPPC and the National Capital Planning Commission. We look forward to seeing the steps that SHA takes to address the issues we have raised in our comments to the DEIS as well as the SDEIS.

Sincerely,

Susan Shipp
President, Cabin John Citizens Association

cc: Governor Lawrence J. Hogan
Comptroller Peter V.R. Franchot
Treasurer Nancy Kopp,
Senators Ben Cardin and Chris Van Hollen
Rep. Jamie Raskin
Jeanette Mar, FHWA Maryland Division
Montgomery County Executive Marc Elrich
Montgomery County Councilmembers Andrew Friedson, Gabe Albornoz, Evan Glass, Will Jawando, Sidney Katz, Nancy Navarro, Craig Rice and Hans Riemer
Maryland Senator Susan Lee and Delegates Ariana Kelly, Marc Korman, and Sara Love
The Montgomery County Planning Board

6

Through the Section 106 review, MDOT SHA has completed extensive historical and archaeological research that thoroughly documents the Morningstar Tabernacle No. 88 Moses Hall Cemetery and its significant features, allowing the Preferred Alternative to avoid all known impacts. MDOT SHA will continue to work with the community through the project's Programmatic Agreement on further studies and context-sensitive design of new facilities.

**CABIN JOHN CITIZENS ASSOCIATION – GWYNN STURDEVANT**

| | |
|---|---|
| **From:** | gwynn s <nzgwynn@gmail.com> |
| **Sent:** | Tuesday, November 23, 2021 6:39 AM |
| **To:** | SHA OPLANESMLS; marc.elrich@montgomerycountymd.gov; MCP-Chair@mncppc-mc.org; rebeccah.ballo@montgomeryplanning.org; SUSAN SHIPP; governor.mail@maryland.gov |
| **Subject:** | Comments on the Supplemental DEIS for the Beltway Expansion |
| **Attachments:** | 2021_11 DRAFT CJCA Comment letter to Supplemental DEIS.docx |

Hello,

Attached please find my concerns about the beltway expansion.

s. gwynn sturdevant, PhD

www.nzgwynn.com

*This page is intentionally left blank.*

**#1**

### CABIN JOHN CITIZENS ASSOCIATION
P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*
Susan Shipp – President; Bob Walsh – Treasurer; Meredith Griggs – Secretary

### DRAFT

November 15, 2021

Jeffrey T. Folden, P.E., DBIA
Deputy Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21202

RE: I-495/I-270 Managed Lane Study Supplemental Draft Environmental Impact Statement
and Updated Draft Section 4(f) Evaluation

Dear Mr. Folden:

    As president of the Cabin John Citizens Association, I am writing on behalf of the residents of Cabin John. Our community of some 750 homes is bounded by I-495 to the west and north, Cabin John Park and Parkway to the east, and the C&O Canal National Historical Park to the south. Our major access roads are Clara Barton Parkway, MacArthur Boulevard, and Seven Locks Road. We wish to convey our concerns regarding the impacts identified in the Supplemental Draft Environmental Impact Statement (SDEIS) for the I-495/I-270 Managed Lane Study.

    The Cabin John community recognizes that the American Legion Bridge is not only past its lifespan but is also one of the worst choke points in the federal highway system. We are glad to see the state taking on its reconstruction. However, the Preferred Alternative will not address the traffic issues for those unable to afford the exorbitant rush-hour toll rates proposed for the toll lanes, i.e., most daily commuters, including many Cabin John residents.

    While not yet at pre-pandemic levels, cut-through traffic is rapidly worsening on Cabin John roads. Prior to 2020, traveling the one-mile stretch of MacArthur Blvd. between Seven Locks Rd. and Wilson Rd. (over the one-lane bridge) routinely took 8-10 minutes during rush hour. Neither the DEIS nor the SDEIS address what local traffic will look like during the years-long construction. As for afterwards, the Preferred Alternative in no way indicates that it will address our overburdened roads, especially MacArthur Blvd, with its own bottleneck at the Union Arch Bridge.

    Furthermore, the alternative calls for the MD 190/Cabin John Parkway interchange to be expanded to incorporate toll lane access. That will result in additional traffic on MD 190, as well as the local roads that Cabin John residents have to use to get to their jobs, go to schools, buy groceries, and perform all the other errands of daily living.

    Our concerns go beyond traffic. We consider ourselves stewards of the natural environment around us and are concerned by the wide range of environmental impacts of the Preferred Alternative.

1

---

**Response to SDEIS Comment #1**

As your Association and a number of residents in your community have noted, the Lead Agencies agree that improvements to the American Legion Bridge are critical and are included in the Preferred Alternative.

Updated traffic analysis for the design year of 2045 indicates that the Preferred Alternative will provide operational benefits compared to the full No Build Alternative in six key metrics (system-wide delay, corridor travel time and speed, density and level of service, travel time index, vehicle throughput, and local network delay). Refer to **FEIS, Appendix A**. The Preferred Alternative would significantly increase throughput across the ALB and on the southern section of I-270 while reducing congestion. The net impact of the project will be an overall reduction in delay on the surrounding arterials, despite some localized increases in arterial traffic near the managed lane access interchanges. Specific areas, such as MD 190/Cabin John, were evaluated in more detail as part of the FEIS, and mitigation is proposed where needed to maintain acceptable operations per FHWA Interstate Access Point Approval guidelines. Refer to FEIS, Appendix B, for MDOT SHA's Application for Interstate Access Point Approval.

The traffic results showing delay increases on River Road and Clara Barton Parkway were preliminary and were based on draft designs. Now that the Preferred Alternative has been identified and the design has been updated, these results have been updated. The results indicate that the net impact of the Preferred Alternative will be an overall reduction in delay on the surrounding arterials, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges. The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of this FEIS, and mitigation was proposed where needed to maintain acceptable operations and safety per FHWA Interstate Access Point Approval guidelines. Refer to FEIS Appendix B.

Refer to Chapter 9, Section 3.4.F for a response to adverse impacts to air quality.

Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

**CABIN JOHN CITIZENS ASSOCIATION**
P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*
Susan Shipp – President; Bob Walsh – Treasurer; Meredith Griggs – Secretary

**#1 Cont**

The access ramps for the MD 190/Cabin John Parkway interchange, most notably the flyover ramp above Seven Locks Rd, will take away valuable parkland, impinge on the historic Moses Hall and Cemetery site, create additional noise and pollution over a broad area, and, as a result, irreparably harm our community.

In addition to these comments, we wish to reinforce any concerns that the National Park Service and Maryland-National Capital Park and Planning Commission may raise regarding park impacts in their comment letters.

Below, we provide the traffic, park, and stormwater issues that we have identified as of greatest concern to our community that are not adequately addressed in the SDEIS.  We also draw attention to the detrimental impacts to Morningstar Moses Cemetery, the Gibson Grove Church and the Evergreen neighborhood.

<u>Traffic Impacts</u>

**The long-term traffic impacts to our local community have been inconsistently and inadequately addressed in this process.**

As documented in the *Traffic Technical Report* of the Draft EIS (Appendix C, Figure 5-73), the Project would result in increases in traffic on local roads. Figure 5-73 indicates that the local roadways most relevant for our community, Clara Barton Parkway and River Road, would see greater than 10% increases in delays as a result of the Project. A similar figure, detailing these roadway-specific impacts is not included in the SDEIS. There is only a statement that delay would be generally reduced on arterials in Montgomery County (Appendix A, Pg. 6). Since the figure in the SDEIS applied to all two managed lanes approaches, CJCA assumes that those congestion impacts will be experienced as a result of the Preferred Alternative. As noted in response to the DEIS, those impacts need to be specifically identified in the body of the EIS and mitigated. Failure to do so will result in serious unaddressed impacts for our community.

Our community's concerns about the traffic impacts associated with the Preferred Alternative are buttressed by the recent findings of the Rocky Mountain Institute. Their SHIFT Calculator for highway projects evaluates the induced demand created by highway expansion, with the resulting consequences for carbon emissions and environmental degradation.[1] Based on the 60 lane-miles of additional road capacity generated by the project, their tool indicates that the 495/270 Managed Lanes would generate 339-508 million extra Vehicle Miles Traveled (VMT) in the region every year. This VMT bump would generate the same emissions as 41,500 additional passenger cars and would directly contribute between 1.5 and 3.2 million metric tons of $CO_2$e between now and 2050. These consequences fly in the face of necessary policy goals to reduce carbon emissions in the face of the threat faced by climate change.

In addition to the inconsistent and insufficient approach to local traffic impacts, the SDEIS portrays modeling results that do not appear to accurately reflect future travel demand. As case in point, we examined the projected traffic volumes associated with travel onto Clara Barton Parkway southbound from I-495 in the SDEIS *Traffic Technical Report* (Appendix A). Clara

[1] *See:* Rocky Mountain Institute. *SHIFT Calculator.* 2021. https://shift.rmi.org/

2

See Response to Comment #1 above.

**CABIN JOHN CITIZENS ASSOCIATION**
P.O. BOX 31, Cabin John MD 20818

*Organized 1919     Charter Member Montgomery County Civic Federation*
Susan Shipp – President; Bob Walsh – Treasurer; Meredith Griggs – Secretary

**#1**

Barton Parkway and Cabin John Parkway are two highly constrained roadways serving our community. On Clara Barton Parkway, southbound travelers in the PM peak have two options: they can continue to the Glen Echo exit, where all traffic must exit the Parkway, or they can get off at the Cabin John exit and take MacArthur Blvd over the Union Arch/One Lane Bridge. Both locations are unique, constrained road segments that do not meet modern standards and are unlikely to provide additional capacity without major changes. Those changes, in turn, may not be compatible with their historic and park context of these roads. The Project analysis indicates that volumes onto Clara Barton and Cabin John Parkway would decrease with the introduction of the managed lanes, by 5-10% in aggregate.

This conclusion is incompatible with two facts. First, the overall level of induced demand that the lanes would generate, as indicated by the SHIFT Calculator results below, would indicate growth on key, valuable connections like Cabin John Parkway and Clara Barton Parkway, the most convenient means of accessing large portions of NW Washington. Second, while the managed lanes may make certain connections more convenient, they cannot overcome that alternatives to these roadways are slower, like River Road, or highly congested, like George Washington Memorial Parkway. Beyond a series of volume tables at the end of an appendix, the SDEIS does not adequately describe how traffic reductions would occur on these roadways.

Cabin John therefore reiterates our concern, as evidenced by Figure 5-73 in the DEIS, that traffic volumes will result in continued negative consequences for our commutes and our community. This congestion must be documented and mitigated.

Construction Transportation Impacts

**#2**

**Our community continues to need more information about construction impacts to understand and evaluate what we may experience. SHA needs to provide greater assurance that they and the P3 developer will work to minimize construction period issues for adjacent communities.**

The Draft EIS indicated that during the construction period, the I-495 bridges over MacArthur Blvd and Seven Locks Rd, and the Persimmon Tree Lane bridge over I-495, would all need to be rebuilt. No information was provided about the construction period disruption associated, nor was information provided about impacts to the local roadways below. Similarly, no such information is provided about the Preferred Alternative in the SDEIS.

Overall, the construction impacts section in this EIS is woefully inadequate for the size and scope of this project, and for the level of public resources dedicated to this process. The EIS does not provide any meaningful detail about a) the duration of construction, b) the means and methods of construction, or c) commitments to minimize impacts. We understand that these details are being left to the P3 Developer and final design. However, the purpose of the NEPA process is to disclose impacts, of which the construction is a meaningful part, where our lives may be disrupted for four to five years. That merits more detailed, quantitative attention to the construction impacts and honest consideration of an appropriate level of mitigation.

So far, SHA's materials have shown no interest in providing that reasonable level of disclosure for the public and, as noted in our 2020 DEIS comments, likely requires further supplemental

3

**Response to SDEIS Comment #2**

The information provided in the DEIS and SDEIS, and this FEIS and their relevant Appendices, include a description of the temporary and permanent property and resource by resource impacts associated with construction of the improvements; a detailed list of anticipated construction access and storage areas. As promised, the Visual Impact Assessment (VIA) was completed on the Preferred Alternative. See below for additional information on the VIA.

Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. Impacts associated with construction that will be further evaluated for the Selected Alternative in final design include traffic congestion associated with construction maintenance of traffic, utility disruptions, construction vibration, erosion and sediment and control, and construction related noise.

The management of construction impacts is addressed in an agreement between MDOT SHA and the Developer. Pursuant to that agreement, coordination with the neighboring communities will continue through final design and construction. The agreement includes requirements to minimize impacts to surrounding communities and the traveling public, while completing construction as soon as possible. Work hours and duration of construction will be identified to minimize impacts to traffic in an effort to reduce construction related congestion and in consideration of noise and vibration impacts to adjacent communities. Construction methods and materials will comply with contract, state and federal regulation, and environmental permits and mitigation requirements. Careful attention will be taken to assure that material placement will occur when weather conforms to industry standards and regulation. In addition to required governmental inspections, the Developer is required by contract to provide independent environmental, quality, and safety oversight of its contractor's performance. Refer to Final Phase 1 P3 Agreement, https://oplanesmd.com/p3-information/phase-1-agreement/. Once the Developer has selected a Design-Build Contractor(s), the schedule and duration for Phase 1 South construction will be made available to the public.

Also, to support community, environmental, and sustainability goals, the Developer is requiring the development of a Sustainability Plan for the project to achieve, at minimum, a Gold Award rating as recognized by the EnvisionTM Sustainable Infrastructure Rating System of the Institute for Sustainable Infrastructure ("ISI") and target a Platinum Award in collaboration with the Section Developer. The Sustainability Plan will include actions related to the quality of life surrounding the infrastructure asset, stakeholder and community engagement, natural resource management, ecosystems and biodiversity health, climate resilience and carbon emissions.

Refer to Chapter 9, Section 3.4.I for a response to construction impacts.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**CABIN JOHN CITIZENS ASSOCIATION**
P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*
Susan Shipp – President; Bob Walsh – Treasurer; Meredith Griggs – Secretary

**#2 Cont**

analysis before proceeding to an FEIS. This inadequate analysis comes despite the fact that the Board of Public Works recently approved an additional $45 million for the EIS and related design work. We would conclude that some of those resources should go toward a more robust construction analysis and we would note that our DEIS comments raise a few key issues such an analysis should address, including a) coordination of roadway closures and b) minimization of impacts from construction staging.

**Park Impacts**

**We are concerned by the magnitude of impacts to the parks surrounding our community.**

**#3**

Nestled between Montgomery County (M-NCPPC) and National Park Service (NPS) parklands, our community is paying close attention to the parkland impacts of this project. There are expected construction-period and permanent impacts to the C&O Canal, the Clara Barton Parkway, and Cabin John Park.

We begin work with the NPS properties. NPS, as indicated in public comments made October 7 at the National Capital Planning Commission, is concerned about the 3.8 acres of permanent impact, the need for a construction roadway, impacts to trees, and impacts to rare, threatened, and endangered species at the C&O Canal. The construction roadway would service the replacement of the American Legion Bridge and would extend north of I-495. We are frequent users of the towpath and share NPS's concerns. This roadway would have impacts for the C&O Canal and for the user experience of the towpath during construction. While we acknowledge the need for replacement of the American Legion Bridge, we urge SHA to work closely with NPS to meaningfully reduce the level of impacts associated with construction and resulting disruption to park users.

We turn next to the M-NCPPC parkland. The expansion of I-495 in Cabin John Park would require existing parkland to implement. As SHA and FHWA are aware, the agencies have an obligation under Section 4(f) to work to avoid use of these resources. CJCA believes that SHA's efforts to-date have been insufficient. In fact, impacts to Cabin John Park units have increased from the DEIS, as noted in Table 5-1.

These impacts result from SHA's desire to meaningfully expand the size and scale of the MD 190/Cabin John Parkway interchange. Throughout this process, SHA has failed to consider more creative approaches to this interchange that could avoid historic and parkland resources, in part because it has sought to graft the managed lanes onto the existing circulation approach at this interchange. Cabin John Park is a sensitive resource and a watershed. Our community has spent many hours working to improve it. Identifying "replacement parkland" (Pg. 5-21) likely elsewhere in the County is not an appropriate substitute for giving a harder look at how different approaches at MD 190 could avoid Section 4(f) uses.

We also find SHA's statement in the DEIS that avoidance is limited because of the north-south nature of the parks against the east-west direction of I-495 (DEIS, Pg. 5-12) to reflect insufficient design attention to how the proposed lanes could be better accommodated within existing SHA ROW. Therefore, we believe more work is to be done before FHWA makes its final Section 4(f) determinations.

4

**Response to SDEIS Comment #3**

In addition to the significant work to avoid all direct impacts to the Morningstar Tabernacle No.88 Moses Hall and Cemetery property, the SDEIS and FEIS describe reduction of impacts to the other resources that you have noted. Significant avoidance and minimization efforts also focused around the American Legion Bridge and adjacent National Park Service (NPS) properties. MDOT SHA and FHWA met with the NPS on December 8, 2020, to discuss the limits of disturbance (LOD) in the vicinity of the ALB that was presented in the DEIS. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the Chesapeake and Ohio Canal National Historic Park and George Washington Memorial Parkway units of the NPS.*

The ALB Strike Team considered bridge construction approaches to determine if any of them could limit the LOD further. The ALB Strike Team conducted detailed investigation on a top-down segmental construction approach; a top-down cable stayed approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of additional information, MDOT SHA and the ALB Strike Team determined that access to the site at river level could be consolidated to the north side of the river along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of the Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the Chesapeake and Ohio Canal and a temporary haul road paralleling the Chesapeake and Ohio Canal towpath. This effort resulted in a 7.8 acre reduction in impact to the George Washington Memorial Parkway and a 5.3 acre reduction at the Chesapeake & Ohio Canal National Historical Park. Refer to *SDEIS, Chapter 4, Section 4.12.4* for additional details on the ALB Strike Team's efforts.

Based on the current design and as presented in the FEIS, the Preferred Alternative would have an estimated permanent impact of 1.0 acres to the Chesapeake and Ohio Canal National Historical Park, and an estimated temporary impact of 9.1 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 1.1 acres to Clara Barton Parkway, and an estimated temporary impact of 0.7 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 5.7 acres to Cabin John Regional Park, and an estimated temporary impact of 0.6 acres during construction.

Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

OP·LANES™ MARYLAND — I-495 & I-270 Managed Lanes Study | Case 8:22-cv-02597-DKC   Document 62-3   Filed 10/30/23   Page 26 of 96

FINAL ENVIRONMENTAL IMPACT STATEMENT

## CABIN JOHN CITIZENS ASSOCIATION
P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*
Susan Shipp – President; Bob Walsh – Treasurer; Meredith Griggs – Secretary

**#4**

Stormwater Impacts

**The stormwater mitigation approach in the DEIS is inadequate, relying far too heavily on off-site treatment strategies.**

In the SDEIS, SHA indicates a mix of stormwater management approaches to address the serious implications of adding so many new lane miles in our sensitive watersheds. These include both on-site mitigation, as well as off-site, compensatory mitigation. Our community's work to help restore the Cabin John Creek leads us to be concerned with the level of off-site mitigation.

There are 98.2 acres of new impervious surface added in the Cabin John Creek watershed. Appendix C, the *Compensatory Stormwater Mitigation Plan*, indicates that only 44% of stormwater mitigation activities would be completed on-site (Pg. 6) in this current phase of work. Future phases only bump that on-site percentage up to 51% (Ibid.). For a once-in-a-generation project that crosses multiple sensitive streams, this approach is wholly inadequate and disproportionate to the level of impact. While 100% on-site treatment may not be achievable, the majority of treatment should be achieved on-site through green practices to reduce the risk of even further erosion of sensitive lands and degradation of our waterways due to additional impervious surface. We align ourselves with the Montgomery County Planning Board's draft DEIS comments, which call for at least 80% on-site treatment.[2]

We appreciate SHA's commitment throughout the SDEIS to use best management practices for stormwater management. Still, the Final EIS must provide more detailed information regarding the Preferred Alternative approach to addressing stormwater in the areas around our community and should include a substantially larger proportion of mitigation occurring on-site. In doing so, we look forward to SHA making further commitments to the best management practices that can enhance and protect our watersheds in green ways. As stewards of our local watersheds, we look forward to the opportunity to coordinate with the P3 Developer on local stormwater improvements that can complement years of efforts to restore and enhance Cabin John Creek.

**#5**

Morningstar Moses Cemetery, Gibson Grove Church and the Evergreen Neighborhood

All of these properties abut the beltway and are most directly impacted by the Preferred Alternative. They already suffer from existing runoff and erosion issues and neither the DEIS nor the SDEIS adequately details a strategy to mitigate stormwater impacts to these properties.

These properties and the nearby parkland would most directly suffer the visual impacts from the Preferred Alternative, especially the proposed direct access off-ramp from the eastbound managed lanes onto MD 190. A Visual Impact Assessment (VIA) has yet to be conducted. We are very concerned that the SHA is suggesting an "Abbreviated VIA" that would only focus on views from the parkland. Cabin John is a residential community, with the families of

[2] *See:* Montgomery County Planning Board. November 4, 2021 draft letter presented before the Board. https://montgomeryplanningboard.org/wp-content/uploads/2021/10/Item10_Nov-2021_M-NCPPC-SDEIS-Comment-Letter-ARG.pdf

5

**Response to SDEIS Comment #4**
Impacts to receiving waters, including Cabin John Creek, will be addressed through the Maryland permitting process, which this project will be required to follow. Maryland Stormwater Management Law is relatively strict with the goal of maintaining post development runoff as nearly as possible to pre-development runoff characteristics. Water quantity is required to be managed onsite to match existing conditions for the 10-year storm. Water quality is required to treat all new impervious area and 50% of reconstructed existing impervious area to match the runoff characteristics of woods in good condition. Refer to FEIS Chapter 9, Section 3.4.E for additional information on impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**Response to SDEIS Comment #5**
The Visual Impact Assessment (VIA) was completed on the Preferred Alternative and documented in the FEIS in Chapter 5, Section 5.6 and FEIS, Appendix H and includes renderings in the area of concern around Seven Locks Road and Cabin John Stream Valley Park, Unit 2. The VIA concluded that construction of the Preferred Alternative would not introduce new elements incompatible with the existing visual character or qualities along the study corridors or that experienced by neighbors. Vegetation removal will be mitigated based on state and local agency requirements and standards to maintain the visual quality of the key locations. It is expected that aesthetic and landscaping guidelines will detail materials, lighting, signage, and vegetation standards contextually compatible with the study corridor. Aesthetic and landscaping guidelines will vary along the study corridor to incorporate the aesthetic and the context of the neighbor stakeholders and surrounding resources. By inviting neighbor stakeholders in the development of the aesthetic and landscaping guidelines, MDOT SHA would ensure that the Preferred Alternative would be consistent with applicable laws, ordinances, regulations, policies, and standards. As a result, the contextual compatibility impact of the proposed action would be low.

The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes at Seven Locks Road. Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction. An acceleration lane will also be built along the outer loop for approximately 1000-feet east of Seven Locks Road. No ramps are proposed in this area. The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop. The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier. Flyover ramps are no longer proposed in this area and thus will not create a visual impact. A noise barrier in this area is anticipated to be located close to the existing right of way line. Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

Since the DEIS, the Preferred Alternative eliminates of flyover ramps at MD 190/River Road by adjusting the location of the HOT lane direct access ramps between I-495 and MD 190. All HOT lanes direct access ramps within this interchange are now proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of flyover ramps.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and managed lanes separate to allow space for highway ramps. The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities. The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps. This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

#5
Cont

**CABIN JOHN CITIZENS ASSOCIATION**
P.O. BOX 31, Cabin John MD 20818

*Organized 1919    Charter Member Montgomery County Civic Federation*
Susan Shipp – President; Bob Walsh – Treasurer; Meredith Griggs – Secretary

Evergreen neighborhood literally having the Beltway in their backyard. To suggest that the views from Seven Locks Rd. and Cypress Grove Lane should not be considered is to ignore the fact that this expansion is going through our community, where residents are walking, biking and driving these roads daily. A "Standard VIA" needs to be done. But even without a VIA, it is clear that the Final EIS should advance an alternative that does not include an eastbound flyover off-ramp onto MD 190.

The SDEIS indicates that 8.6 acres of property would be acquired in the Cabin John area (Pg. 4-6). Appendix D indicates that seven properties in the Evergreen neighborhood would see at least partial impacts based on where the LOD is currently indicated. We remain concerned with the lack of information regarding the nature of the potential property impacts. Along with this are concerns about tree canopy loss and the need for noise barriers sooner rather than later in the construction process as noise impacts are already severe for these properties and significant for a much larger swath of Cabin John, especially during the winter months when the trees do not provide a natural buffer.

Last, but not least, the Cabin John community is committed to preserving the Morningstar Moses Cemetery - a site that is not only of historical significance as the first known Moses organization and burial ground in Montgomery County, but also of significance to current Cabin John families who are descendants of Morningstar Moses 88 and have family buried in its cemetery.

We appreciate the significant work that the State Highway Administration has done to date, especially the ground penetrating radar (GPR) survey of a portion of the cemetery and the Beltway right-of-way. The findings of that work – dozens of likely graves in the current right-of-way and hundreds within the cemetery – were shocking. We are pleased that the SHA is recommending complete avoidance of the cemetery and the right-of-way.

However, we remain deeply concerned that there is no honest way to achieve complete avoidance without finishing the GPR work, both inside the cemetery and along the rest of the right-of-way that touches the Morningstar Moses Cemetery property.

Thank you for your consideration of these comments. Our community will remain involved through the EIS process, the Board of Public Works approvals, and regulatory steps taken by M-NCPPC and the National Capital Planning Commission. We look forward to seeing the steps that SHA takes to address the issues we have raised in our comments to the DEIS as well as the SDEIS.

Sincerely,

Susan Shipp

President, Cabin John Citizens Association

6

Through the Section 106 review, MDOT SHA has completed extensive historical and archaeological research that thoroughly documents the Morningstar Tabernacle No. 88 Moses Hall Cemetery and its significant features, allowing the Preferred Alternative to avoid all known impacts. MDOT SHA will continue to work with the community through the project's Programmatic Agreement on further studies and context-sensitive design of new facilities. Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

**CANOE CRUISERS ASSOCIATION – DAVID COTTINGHAM**



November 29, 2021

Jeffrey T. Folden, P.E., DBIA
Director, I-495 & I-270 P3 Office Maryland Department of Transportation State Highway
Administration
707 North Calvert Street
Mail Stop P-601, Baltimore, MD 21202

Regarding:  Comments on Beltway expansion SDEIS

Dear Mr. Folden,

On behalf of the Canoe Cruisers Association (CCA), I want to comment on the Supplemental Draft
Environmental Impact Statement (SDEIS) on I-495 and I-270 Managed Lanes Study.  CCA focuses
its comments only on the proposal to rebuild the American Legion Bridge (ALB) and the impacts
construction and maintenance of the new, wider bridge will have on the Potomac River.  The
construction and maintenance of the new bridge pose significant adverse impacts to people who,
like me and many CCA members, regularly recreate on the Potomac River in canoes, kayaks, Stand-
up-Paddle boards (SUPs), and other vessels.

CCA is the Washington DC area's oldest and largest whitewater canoeing and kayaking organization.
CCA was founded in 1956.  CCA has more than 300 active members who regularly paddle many
rivers and streams in the Mid-Atlantic area.  The DC area has many more paddlers who are not
members of CCA.  For instance, almost 3,000 people are on the Potomac Paddlers Facebook group.

The ALB lies between good Potomac River paddling access points at Angler's Inn, (upstream
approximately 4 miles), Carderock (upstream approximately 1 mile) and Lock 10 (downstream
approximately 1 mile) on the C&O Canal National Historic Park.  CCA's annual downriver race
passes under the ALB.  CCA members have demonstrated that the section of the Potomac under
the larger bridge is a navigable waterway.  Others who have documented that this section of the
Potomac is navigable date back to Native Americans in the area and George Washington when he
was planning to build a canal upriver from Georgetown.

1

*This page is intentionally left blank.*

General Comments

While the SDEIS goes into extensive detail about the natural and human resources associated with the proposal in terms of the Affected Environment and Environmental Consequences, it barely mentions the Potomac River itself.

CCA is a paddling group. Our members use this stretch of the river frequently, especially in the spring, summer, and fall. In 2021, CCA organized 16 trips with more than 115 paddlers who went under the ALB. In addition to leisurely paddle trips, the CCA's Downriver Race goes beneath the ALB. In 2021, about 100 racers and safety volunteers paddled the Potomac from just below Great Falls under the ALB to Sycamore Island. Our members regularly see fishermen, hikers, birders, and others when we are paddling this stretch of the Potomac.

**#1** The SDEIS explanatory materials describe the project as a "full replacement of the American Legion Bridge with a new, wider bridge (not widening of the existing bridge)." We would find few details about what construction of a new, wider bridge would entail relative to the Potomac River. To accommodate future transit across the new bridge, the ALB will "allow for future superstructure modifications and additional foundation and future superstructure capacity...." What does this portend for the Potomac River? Will new superstructure supports be required? Will rocks and concrete be placed in the Potomac channel to allow access by construction equipment? Construction of a new wider bridge across the Potomac will inevitably adversely affect our recreational experiences with increased noise, restriction of the channel with barges, riprap, and heavy equipment, and intermittent potential closing of this section of the Potomac. We have recent first-hand experience with a similar interstate highway expansion at the I-95 bridge over the Rappahannock River near Fredericksburg, Virginia.

**#2** The Potomac River is nationally recognized as an important historic, scenic, and recreational waterway. The National Park Service (NPS) has designated the Potomac as a National resource – The Potomac Heritage National Scenic Trail and as part of the Captain John Smith Chesapeake Historic Trail. Both of these National Trails include the section over which the new bridge will span. NPS has identified the section of the Potomac as a "High Potential Route Segment" for the Captain John Smith Chesapeake NHT. The SDEIS does not assess impacts to the historic character of these NPS managed trails. We recommend that MD DOT expand its consultation with the MD state historic preservation office and NPS to include consideration of the adverse impact of the project to the Potomac River itself. CCA would like to be a consulting party to such reviews.

**#3** Maryland has designated the Potomac in Montgomery County this as a "scenic waterway" under the State's Scenic and Wild Rivers System. The State policy is to "preserve and protect the natural values of these rivers" including a requirement for State and local governments to "take whatever action is necessary to protect and enhance the qualities of a designated river.(emphasis added)"

CCA strongly believes that recreation on the State-designated Scenic river is a factor that should be protected and enhanced by other State agencies. As such, CCA urges the Maryland Department of Transportation (MD DOT) to work closely with the Potomac River Scenic River Advisory Board and the paddling public, as represented by CCA and its members, to assure that construction and maintenance of the new ALB will not adversely affect recreational users. MD DOT should also work closely with the local paddling community to mitigate potential adverse impacts of the new, wider bridge.

2

**Response to SDEIS Comment #1**

While the American Legion Bridge is proposed to be replaced, the width of the proposed replacement structure has been minimized to the extent practicable and one pier in the Potomac River has been eliminated to minimize disturbance associated with the structure. The pier arrangement on either side of the main channel will remain approximately the same as the current pier arrangement, while the in-water pier nearest the Maryland shoreline will be shifted out of the river. During construction, the project will use trestles instead of causeways to support construction in the Potomac River and ensure flow velocities will be maintained below 3 feet per second at commonly observed discharges.

During construction, it is anticipated that causeways, trestles and barges will be utilized to access the ALB corridor for demolition and construction. It is not anticipated that rocks will be placed across the Potomac due to it's depth and that off the banks, the contractor will utilize steel trestles supported on temporary pilings that will be removed at the completion of construction as well as barges to obtain access. During the heavy construction operations, it is anticipated that water users will have temporary disembarkment and reentry requirements to detour around the construction. These are anticipated to be intermittent during construction. Permanent riprap for scour protection is anticipated to be placed around the pier footings but not across the entire channel between piers.

Refer to Chapter 9, Section 3.4.I for a response to construction impacts.

**Response to SDEIS Comment #2**

Public comments supporting a direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath were received by MDOT SHA, FHWA and NPS during the SDEIS public comment period. To be responsive, a direct connection to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative LOD and impact analyses. The three shared use path options connecting to MacArthur Boulevard presented in the SDEIS are no longer under consideration in this FEIS. The direct connection to the Chesapeake and Ohio Canal towpath results in fewer NPS property and natural resource impacts. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the Study Area. The alignment of the proposed shared use path connection to the Chesapeake and Ohio Canal towpath is shown in FEIS Appendix E.

The Potomac River is a natural feature and not a district, site, structure, building, or object and not considered a historic property under Section 106 of NHPA. While the river was not evaluated under Section 106, it was considered as a drainage basin, watershed and for surface water quality in FEIS, Section 5.13. With regards to Section 106 Consultation, MDOT SHA has reached out directly to the CCA and request the organization to provide more specifics of their interest in historic properties.

**Response to SDEIS Comment #3**

The FEIS acknowledges in Section 5.13: The Preferred Alternative will affect the Potomac River in Montgomery County and its tributaries, which is designated as Scenic under the Maryland Scenic and Wild Rivers Program (MDNR, 2018a). Any aesthetic impacts to scenic streams would be mostly temporary, during construction activities. However, replacement of the American Legion Bridge could have a longer-term aesthetic effect on the Scenic designated rivers and will be designed to protect the scenic value of the resource. As noted in Section 5.13.2 of this document, MDNR will assist the MDOT SHA with coordination for Maryland Scenic Rivers.

**#4**

Specific Comments

Chapter 4 of the SDEIS presents extensive technical detail on potential impacts of the Preferred Alternative. For instance, Table 4-1 provides square footage and acreage of impact to waterways and wetlands during construction (temporary) and permanently. These data are for the entire I-495 and I-270 project area. CCA cannot find information only for the impacts of a new bridge separate from other waterways and wetlands. Accordingly, CCA does not have detailed data on the areal extent of actual recreational impact. The impact zone will be larger than the immediate area of construction as noise and visual impacts will extend beyond that area during and after construction.

Most important to CCA members is having a designated channel through the construction zone at all times and in different flow conditions. We understand that such a passage channel could change based on construction activity throughout the duration of the project and that passage could be prevented for short periods when potentially dangerous construction activities are occurring.

**#5**

Table 4-5 should be amended to add the Potomac River itself as a Public Park. While not technically a "park", the Potomac River is a significant public historic and recreational resource. It is not apparent in the SDEIS that MD DOT has consulted with Maryland DNR Scenic and Wild Rivers Advisory Council or the NPS Potomac Heritage National Scenic Trail or NPS Captain John Smith Chesapeake National Historic Trail regarding impacts to the Potomac River itself as a historic, scenic, and recreational resource. The list of National Parks in the SDEIS omits the two trails managed and/or coordinated by NPS. Section 4.4.4 indicates that "Mitigation for impacts to publicly-owned park properties is being coordinated with the Officials with Jurisdiction of the impacted park properties" (page 4-18). Yet it does not appear to include relevant managers or planners of the Potomac itself, namely the Trails managed by the NPS. MD DOT cannot let the historic, scenic, and recreational resources of the Potomac suffer because the river itself is not part of a "park". This would be a serious oversight. Public materials indicate that MD DOT has held 8 meetings with consulting parties in compliance with Section 106. Have adverse effects to the historic nature Potomac trails not come up in any of those meetings?

**#6**

Section 4.6.2 discusses Visual Impact Analysis. It lists several trails impacted by the NPS and Maryland National Capitol Park and Planning Commission. Yet, it omits discussion of the Potomac River. This is another example of how MD DOT and preparers of the SDEIS have let the Nationally and State recognized historic and recreational aspects of the Potomac River fall through the cracks. CCA considers this an unfortunate oversight due to the frequent use of the Potomac in this area for recreation. MD DOT should assure CCA members and the paddling public that it will avoid, minimize, and mitgate for adverse impacts caused by the project.

**#7**

Section 4.13 of the DEIS (June 2020) discusses the project relative to Watershed and Surface Water Quality. It states that

"Regulatory agencies and the NPS expressed interest in the impacts to 15 streams/rivers: Rock Creek, Paint Branch, Thomas Branch, a tributary to Southwest Branch, Northwest Branch, the Potomac River, Rock Run, Booze Creek, Cabin John Creek, Sligo Creek, Little Paint Branch, Indian Creek, Henson Creek, Muddy Branch, and Watts Branch." Page 4-91.

3

**Response to SDEIS Comment #4**
Refer to the response to Comment #1 above.

**Response to SDEIS Comment #5**
While the Potomac River has a recreational use, it is not a park as defined under Section 4(f) of the US Department of Transportation (USDOT) Act of 1966 as amended (49 USC. 303(c)). Construction of the new ALB should not prohibit the navigability of the main channel of the Potomac River and construction will be limited to the shorelines.

MDOT SHA has coordinated extensively with the park administrators of the NPS parks impacted by the Preferred Alternative. Public comments supporting a direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath were received by MDOT SHA, FHWA and NPS during the SDEIS public comment period. To be responsive, a direct connection to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative LOD and impact analyses. The three shared use path options connecting to MacArthur Boulevard presented in the SDEIS are no longer under consideration in this FEIS. The direct connection to the Chesapeake and Ohio Canal towpath results in fewer NPS property and natural resource impacts. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the Study Area. The alignment of the proposed shared use path connection to the Chesapeake and Ohio Canal towpath is shown in FEIS Appendix E.

**Response to SDEIS Comment #6**
Visual impacts from the River are accounted for in the VIA. Refer to response to #3 above.

**Response to SDEIS Comment #7**
As described in the FEIS, the Preferred Alternative in Virginia and Maryland falls within the Potomac River drainage basin. More specifically, the Preferred Alternative crosses the Middle Potomac-Catoctin (USGS HUC8 02070008) and Middle Potomac-Anacostia-Occaquan (USGS HUC8 02070010) watersheds. The USGS HUC8 watersheds are divided into smaller subwatersheds determined by USGS, Maryland, and Virginia. Within Virginia, the USGS HUC12 Nichols Run – Potomac River subwatershed includes two streams that cross the Preferred Alternative, Scotts Run and Dead Run. Within Maryland, MDNR 12-digit watersheds are third order stream drainage watersheds determined by USGS contours in a joint state and Federal effort. MDNR 12-digit watersheds with streams that cross the Preferred Alternative include Potomac River/Rock Run, (021402020845), Cabin John Creek (021402070841), Watts Branch (021402020846), and Muddy Branch (021402020848). Note that while the Preferred Alternative LOD crosses the Rock Creek watershed (021402060836), the stream of Rock Creek is not within the Preferred Alternative LOD and is not impacted by the build improvements included in the Preferred Alternative. Refer to **FEIS, Chapter 5. Section 5.13** and **FEIS, Appendix M** for additional details.

**#7 Cont**

"Impacts to all Scenic Rivers have been avoided and minimized to the maximum extent practicable during preliminary design. Coordination with MDNR and the Scenic and Wild River Advisory Board will continue throughout future project design phases. Typically, protection of tributaries to state-designated Scenic Rivers is achieved through minimization and mitigation measures that are already being applied to waterways within the corridor study boundary."
Page 4-92.

What about the Potomac River?

<u>Summary</u>

CCA members actively use the Potomac River under the ALB for paddling. The NPS and State of Maryland have recognized this section of the Potomac River as significant for its historical significance, scenery, and recreational opportunities. MD DOT has not accessed the adverse impacts of replacing the ALB to the Potomac itself nor to CCA members and the greater DC area paddling community. Furthermore, MD DOT has not described how it can and must avoid, minimize, and mitigate those adverse impacts.

**#8**

On behalf of CCA members and others in the local paddling community, we ask that during construction the construction company selected by MD DOT be required to:
- Provide reasonable channels for passage during normal water levels;
- Not use any materials that could become "strainers" such as mesh or fencing, that could entrap paddlers;
- Provide safe landing and portage routes around the construction zone; and
- Remove all introduced materials post construction, e.g., introduced aggregate, riprap, or concrete.

We encourage MD DOT to work with us to identify ways to avoid adverse impacts to the maximum extent practicable during construction by allowing paddlers to cross the construction zone with minimal interference. Should MD DOT agree, we would also welcome an opportunity to discuss ways mitigate adverse effects of the construction and maintenance of the new span by improving access to the river for the public, including paddlers, fishermen, and others.

I can be reached by email (chairman@CCA.org).

Sincerely,
/SIGNED/

David Cottingham
Chair, Canoe Cruisers Association

CC via email:
- Ms. Tina Cappetta, Superintendent, C&O Canal National Historic Park
- Ms. Anne O'Neill, Acting Superintendent, Potomac Heritage National Historic Trail
- Mr. Stephen Williams, Acting Superintendent, Captain John Smith Chesapeake National Historic Trail
- Mr. Peter May, Associate Area Director, National Park Service, National Capital Area Office

4

**Response to SDEIS Comment #8**
Refer to the response to Comment #1 above.

## CARDEROCK SPRINGS CITIZENS ASSOCIATION – JACK ORRICK (ORAL TESTIMONY)

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** John Orrick

**Agency/Organization/Jurisdiction, if applicable:** Carderock Springs Community Association

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

**#1**

Yes, my name is John Orrick, O-R-R-I-C-K. My address is 8212 Fenway Road, Bethesda, Maryland. I'm representing the Carderock Springs Citizens Association, which is the Association representing Carderock Springs and Carderock Springs South. As a community adjacent to the beltway, we are deeply concerned by the lack of visual impact analysis in the Supplemental Draft EIS. We believe that SHA has failed in both the Draft EIS, and now the Supplemental DEIS, to meaningfully analyze and disclose the visual impacts in the alternatives in any meaningful way, by failure, by failing to perform a Visual Impact Assessment or VIA. As a result, we believe that the document remains legally deficient, and SHA should not proceed to a Final EIS until the visual impacts have been adequately disclosed through an appropriately scoped VIA.

As it stands currently the scoping questionnaire in Appendix J is inaccurate on several key points resulting in a determination that an abbreviated VIA needs to be prepared in lieu of a standard VIA. We have commented on several occasions as to the visual impacts from the design of the Maryland 190 interchange and the larger project on our neighborhood. We believe that these visual impacts will have a detrimental impact on our neighborhood, and therefore, believe that a standard VIA needs to be prepared, which renders the actual dimensions of these flyover ramps rather than an, an abbreviated VIA, as they, as stated in the in the Draft EIS.

**#2**

We have other concerns about the flyover ramps which we've expressed, and they extend beyond the visual impacts. First, in the environmental resource mapping, Appendix D, there was no indication that noise barriers will be provided on the flyover ramps, and we believe this could be a significant additional noise impact on our community. Secondly, the ramp alignment would have impacts on private property and forest conservation easements, and we believe that these impacts should be avoided through deeper design refinement. Finally, we believe that the flyover ramp in general is out of character with a residential neighborhood in a forested setting. And we believe that the SHA should give serious consideration to mitigating these impacts through a redesign of the access to the managed lanes, either through at-grade access or through using other types of, of access, which would not resolve in these flyover ramps. We planned to deliver a more complete written statement in response to the Supplemental DEIS, but I wanted to emphasize our concern of the flyover ramp. Thank you very much.

### Response to SDEIS Comment #1

The Visual Impact Assessment (VIA) was completed on the Preferred Alternative and documented in the FEIS in Chapter 5, Section 5.6 and FEIS, Appendix H and includes renderings in the area of concern around Seven Locks Road and Cabin John Stream Valley Park, Unit 2. The VIA concluded that construction of the Preferred Alternative would not introduce new elements incompatible with the existing visual character or qualities along the study corridors or that experienced by neighbors. Vegetation removal will be mitigated based on state and local agency requirements and standards to maintain the visual quality of the key locations. It is expected that aesthetic and landscaping guidelines will detail materials, lighting, signage, and vegetation standards contextually compatible with the study corridor. Aesthetic and landscaping guidelines will vary along the study corridor to incorporate the aesthetic and context of the neighbor stakeholders and surrounding resources. By inviting neighbor stakeholders in the development of the aesthetic and landscaping guidelines, MDOT SHA would ensure that the Preferred Alternative would be consistent with applicable laws, ordinances, regulations, policies, and standards. As a result, the contextual compatibility impact of the proposed action would be low.

As noted in the response to Comment #2 below the Preferred Alternative does not include an elevated structure to implement the HOT managed lanes at Seven Locks Road.

### Response to SDEIS Comment #2

The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes. Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction. An acceleration lane will also be built along the outer loop for approximately 1000-feet east of Seven Locks Road. No ramps are proposed in this area. The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop. The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier. Flyover ramps are no longer proposed in this area and thus will not create a visual impact. A noise barrier in this area is anticipated to be located close to the existing right of way line. Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

Since the DEIS, the Preferred Alternative eliminates flyover ramps at MD 190/River Road by adjusting the location of the HOT lane direct access ramps between I-495 and MD 190. All HOT lanes direct access ramps within this interchange are now proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of flyover ramps.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and managed lanes separate to allow space for highway ramps. The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities. The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps. This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

**CARDEROCK SPRINGS CITIZENS ASSOCIATION – JACK ORRICK**

*This page is intentionally left blank.*

| | |
|---|---|
| **From:** | Orrick, Jack <Jack.Orrick@offitkurman.com> |
| **Sent:** | Friday, November 12, 2021 12:21 PM |
| **To:** | SHA OPLANESMLS |
| **Cc:** | governor.mail@maryland.gov; pfranchot@comp.state.md.us; Treasurer@treasurer.state.md.us; marc.elrich@montgomerycountymd.gov; councilmember.friedson@montgomerycountymd.gov; councilmember.albornoz@montgomerycountymd.gov; councilmember.glass@montgomerycountymd.gov; councilmember.jawando@montgomerycountymd.gov; Friedson's Office, Councilmember; councilmember.riemer@montgomerycountymd.gov; Councilmember.Hucker@montgomerycountymd.gov; susan.lee@senate.state.md.us; marc.korman@house.state.md.us; ariana.kelly@house.state.md.us; sara.love@house.state.md.us |
| **Subject:** | Comments of Carderock Springs Citizens Association to Supplemental Draft Environmental Impact Statement |
| **Attachments:** | CSCA Comment Letter-SDEIS 11 15 2021 revised 4858-8267-6739 v.1.pdf |

Dear Mr. Folden:

Attached please find comments of Carderock Springs Citizens Association (CSCA), a neighborhood association representing the Carderock Springs Historic District and Carderock Springs South, on the Supplemental Draft Environmental Impact Statement issued by the State Highway Administration on October 1, 2021.

Thank you for your consideration of our concerns.

Jack Orrick
CSCA Board President



Offit | Kurman®
Attorneys At Law

**Jack Orrick**
Principal
D  240.507.1785
Jack.Orrick@offitkurman.com

7501 Wisconsin Ave.
Suite 1000W
Bethesda, MD  20814
T  240.507.1700
F  240.507.1735
offitkurman.com

 View My Bio ››



in f 🐦 📷

**PRIVILEGED COMMUNICATION/PRIVACY NOTICE**
Information contained in this transmission is attorney-client privileged and confidential.  It is solely intended for use by the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified

that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and delete this communication.

*This page is intentionally left blank.*





**CARDEROCK SPRINGS**
National Register of Historic Places

November 12, 2021

Jeffrey T. Folden, P.E., DBIA
Deputy Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21202

**RE: I-495/I-270 Managed Lane Study Supplemental Draft Environmental Impact Statement**

Dear Mr. Folden:

I am President of the Carderock Springs Citizens Association (CSCA), a community organization that represents Carderock Springs and Carderock Springs South, which together include approximately 600 homes. Carderock Springs is designated as a National Historic District as a notable example of "situated modernism".

We have closely followed the I-495/I-270 Managed Lanes Study environmental process and have been pleased to participate as a Consulting Party in the Section 106 consultation process. This letter provides our comments regarding the Supplemental Draft Environmental Impact Statement (SDEIS) released by the SHA on October 1, 2021.

We believe that the SDEIS is legally deficient in a number of important areas, including the lack of a sufficient visual impact analysis based on the scoping questionnaire (Appendix J) and an inconsistent and misleading analysis of the noise impacts on the Carderock Springs community (Appendix E) as more particularly detailed below. Further, we disagree with the conclusion in the SDEIS that the project would have no adverse impact on Carderock Springs.

**#1**

<u>Visual Impact Assessment and Scope of this Supplemental Draft EIS</u>

As communities directly adjacent to I-495, we are deeply concerned by the lack of visual impact analysis in the SDEIS. The SDES Executive Summary states that a Visual Impacts Assessment will be conducted in the Final EIS (ES-5) and only a scoping questionnaire for assessing visual impacts is included in the SDEIS (Appendix J). This approach is inadequate and inconsistent with NEPA regulations. 40 CFR 1502.9 requires that Draft Environmental Impact Statements (DEIS) provide a consistent level of analysis as the Final and be sufficiently detailed to permit "meaningful analysis" of impacts. SHA has failed, in both the DEIS and now the SDEIS, to disclose and analyze the visual impacts of the alternatives in any meaningful way by failing to perform a Visual Impact Assessment (VIA). As a result, the document is legally deficient, and

**Response to SDEIS Comment #1**

The Visual Impact Assessment (VIA) was completed on the Preferred Alternative and documented views of the proposed improvements in the FEIS in Chapter 5, Section 5.6 and FEIS, Appendix H. The total VIA scoping questionnaire score for the Study is 20 so based on this score a Standard VIA was prepared, which what is typically be used for EA or EIS projects that are anticipated as having substantial adverse or beneficial visual impacts. In the Standard VIA document, report the findings of the establishment, inventory, analysis, and mitigation phases of the VIA process.

The VIA specifically includes renderings in the area of concern around Seven Locks Road and Cabin John Stream Valley Park, Unit 2. The VIA concluded that construction of the Preferred Alternative would not introduce new elements incompatible with the existing visual character or qualities along the study corridors or that experienced by neighbors. Vegetation removal will be experienced and will be mitigated based on state and local agency requirements and standards to maintain the visual quality of the key locations. It is expected that aesthetic and landscaping guidelines will detail materials, lighting, signage, and vegetation standards contextually compatible with the study corridor. Aesthetic and landscaping guidelines will vary along the study corridor to incorporate the aesthetic and context of the neighbor stakeholders and surrounding resources. By inviting neighbor stakeholders in the development of the aesthetic and landscaping guidelines, MDOT SHA would ensure that the Preferred Alternative would be consistent with applicable laws, ordinances, regulations, policies, and standards. As a result, the contextual compatibility impact of the proposed action would be low.

As noted in the response to Comment #2 below the Preferred Alternative does not include an flyovers or elevated structures to implement the HOT managed lanes at Seven Locks Road or at MD 190.

See response to Comment #1 above.



CARDEROCK SPRINGS
National Register of Historic Places

**#1 Cont.**

SHA should not proceed to a Final EIS until visual impacts have been adequately disclosed through an appropriately scoped VIA.

As it stands currently, the scoping questionnaire (Appendix J) is inaccurate on several key points, resulting in a determination to insufficiently assess the potential impacts when a VIA is finally conducted. On Environmental Compatibility Question 3, SHA indicates that "Public comments received to date, including those received during the public comment period for the DEIS, did not express local concern for visual impacts" (Pg. 2). CSCA notes that we have raised concerns about visual impacts, including the removal of trees and vegetation along the right-of- way and from the design of the MD 190/Cabin John Parkway fly-over ramps and the larger project in our October 5, 2020 comments on the Draft EIS, our April 12, 2021 comments on the draft Programmatic Agreement and our October 8, 2021 comments on the Section 106 materials. Additionally, the Preferred Alternative substantially modifies the infrastructure element most likely to have visual impacts on our community, the flyover ramps from the managed lanes for the MD 190/Cabin John Parkway interchange, increasing our level of concern about visual impacts. With this statement, we believe that the answer to Environmental Compatibility Question 3 should be upgraded to "High Concern." Since SHA made similar representations in response to Viewer Sensitivity Question 1, there the potential for the project to be controversial within the community should also be updated to "High Potential." We assure you that Project elements are causing controversy in our community and that visual impacts are at the heart of our community's concerns.

With these appropriate modifications to the scoping questionnaire, the scoring on the questionnaire would increase to at least 21 instead of the score of 19 indicated in Appendix J to the SDEIS. As a result, a Standard VIA, versus an Abbreviated VIA, would be required and should be pursued and shared with our community prior to the release of the Final EIS.

When conducting the Standard VIA, SHA needs to amend its envisioned scope for the focus of the analysis. The SDEIS states, "This VIA focuses on the views from recreational/parks neighbors at five key park locations based on agency and public comments received to date" (Pg. 4-26). Later, the SDEIS states that there will be "renderings at the key park locations" with no mention of other developed renderings (Pg. 4-27). The proposed flyover ramps for the MD 190/Cabin John Parkway interchange have the potential to create meaningful changes to the visual context of the highway adjacent to our community. These ramps should be rendered with the opportunity for CSCA to review and provide comment before the Final EIS. Only with this information can we adequately assess and understand the potential visual impacts to our community. Given that SHA has concurred with performing such renderings for park stakeholders who made the request, it would be consistent and appropriate for SHA to do the same for our interests, particularly given the historic nature of our community.

**Carderock Springs Citizens' Association**
P.O. Box 237, Cabin John, MD 20818-0237
www.carderocksprings.net

2

#2



**CARDEROCK SPRINGS**
National Register of Historic Places

**MD 190/Cabin John Parkway Interchange Design**

The Preferred Alternative identified in the SDEIS includes a flyover ramp from the eastbound managed lanes to the southern edge of the highway right-of-way to provide access to the MD 190 interchange and a flyover ramp leading from the MD 190 interchange to the westbound managed lanes on the northern edge of the right-of-way. As indicated by our comments above regarding the lack of an appropriate VIA, we have a number of concerns regarding these flyover ramps. Those that extend beyond visual impacts are described below.

First, the Environmental Resource Mapping (Appendix D) does not clearly indicate whether noise barriers would be provided on the ramps. There is an apparent gap in the noise barriers that are proposed (Maps 7 & 8). As shown, Carderock Springs and Carderock Spring South residents would be exposed to traffic noise from these ramps with no adequate protection. Any ramp should include appropriate noise barriers to address this concern, consistent with the broader approach to noise barriers in this section of I-495.

Second, the ramp alignments would have impacts on private property and forest conservation easements. We believe that these impacts should be avoided through deeper design refinement to the potential location of the ramps. A more gradual curve from the managed lanes to the at-grade portion of the ramps would both improve safe operations of the ramps and move the ramps away from private property, forest areas, and our community more broadly.

Third, we maintain that these flyover ramps are out of character with a residential neighborhood in a forested setting. As a result, SHA should give removal of these ramps in favor of other alternatives a "hard look" that it is required to do under NEPA jurisprudence and that it has failed to do so far. The SDEIS says that a direct access interchange approach was chosen at MD 190 because of "high traffic demand" (Pg. 2-7). We recommend that SHA consider the following alterations or modifications to the direct access approach in this location to more meaningfully avoid impacts to our community:

- Provide at-grade access from the managed lanes between the Clara Barton Parkway and MD 190 to the general-purpose lanes, allowing as much as one-mile for users to merge over to the exit lane and on to the managed lanes. Such an approach is consistent with at-grade interchanges present on the Virginia side of I-495.
- Shift the direct access ramp east of Seven Locks Road using the widened median area, while avoiding impacts to the Gibson Grove or Moses Hall sites.
- Provide direct access to the MD 190 overpass itself. If combined with direct access in the westbound direction, this approach could reduce the technical complexity of the proposed managed lane on-ramp from MD 190. As proposed (Map 9) by SHA, the on-ramp would require large median structures over the general purpose and managed lanes. A different approach may simplify the structures required, delivering cost and risk savings to SHA and a less disrupted environment to our community.

*Carderock Springs Citizens' Association*
P.O. Box 237, Cabin John, MD 20818-0237
www.carderocksprings.net

3

---

**Response to SDEIS Comment #2**

The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes. Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction. An acceleration lane will also be built along the outer loop for approximately 1000-feet east of Seven Locks Road. No ramps are proposed in this area. The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop. The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier. Flyover ramps are no longer proposed in this area and thus will not create a visual impact. A noise barrier in this area is anticipated to be located close to the existing right of way line. Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

Since the DEIS, the Preferred Alternative eliminates flyover ramps at MD 190/River Road by adjusting the location of the HOT lane direct access ramps between I-495 and MD 190. All HOT lanes direct access ramps within this interchange are now proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of flyover ramps.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and managed lanes separate to allow space for highway ramps. The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities. The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps. This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.



**#2 Cont.**

These alternative approaches should be more deeply explored to identify opportunities for impact avoidance in the Final EIS.

In any eventuality, we would request that SHA make the P3 Developer available to coordinate with our community regarding the design and aesthetics of this exit so that potential impacts to our community can be mitigated through a collaborative design process.

**Noise Analysis in SDEIS**

**#3**

There appear to be a number of discrepancies and inconsistencies in the analysis of the noise impacts on Carderock Springs that collectively appear to (a) understate the current and proposed noise levels and (b) overstate the cost of installing effective noise barriers for our community. We therefore believe that the height of the proposed noise barriers should be increased to a height recommended for similarly situated communities along the Beltway between River Road and the I-270 spur (e.g., 29 – 32 feet).

*1. Combination of Disparate Noise Sensitive Areas to measure noise reduction impacts.*

As indicated on Appendix E to the SDEIS (Noise Analysis Technical Report Addendum), Noise sensitive area, NSA 1-03, which includes the Carderock Springs Elementary School and the homes located on Stone Trail Drive and a portion of Hamilton Spring Road, for which there are currently no existing noise barriers, was bundled together with NSA 2-01 to the east, a large portion of which has existing noise barriers.[1] The SDEIS indicates that both NSAs will share a common proposed barrier design, 495 MD-3. This practice appears to have been used widely across the noise study on other areas as well, obviously to cut some costs; however, per Executive Summary's Section ES.2 *Land Uses and Methodology*, the areas within NSAs for single barrier design should be similar in nature and "share a common noise environment".

The issue with bundling NSA 1-03 and NSA 2-01 into a single barrier design is that these two NSAs, unlike other bundled NSAs in the study, have quite different noise environments as evidenced by the noise levels registered at the critical measured receptors. NSA 1-03 has a total of five measured critical sensitive receptors that registered above 75dB(A) (two receptors above 80dB(A)), whereas NSA 2-01 to the east has no critical measured receptors above 75dB(A). Therefore, it appears the resulting proposed barrier design, 495 MD-03, provides a single, averaged out barrier design solution for the two NSAs with dissimilar noise environments (i.e.: same barrier height, same wall area per benefited residence for both NSAs). This results in the barrier underperforming for NSA 1-03 where the higher noise mitigation is really needed. We strongly believe that noise sensitive areas, NSA 1-03 and NSA 1-02, should be separated for the for the purpose of analyzing and modeling the two NSAs individually to produce two separate

---

[1] (Both NSAs are in the Carderock Spring neighborhood although NSA 2-01 also incorporates the Thornley Court neighborhood that had been assessed by the State to pay for the erection of the existing noise barriers).

**Response to SDEIS Comment #3**

1. Combination of NSAs for barrier analysis

It is common practice to analyze barrier systems to benefit multiple NSAs. Barrier systems often protect a variety of land uses with different noise environments. Although the barrier system is evaluated for feasibility and reasonableness criteria as a whole, the top of barrier elevation and heights of each panel are optimized to benefit the noise levels at each specific receptor location, following the MDOT SHA barrier design goals (outlined in the MDOT SHA Highway Noise Abatement Planning and Engineering Guidelines). Because of the varied topography of the Carderock Springs Community, the preliminary location of the noise barrier in some areas is at the top of the slope to reduce the highway noise levels efficiently and effectively. In these cases, taking advantage of the higher existing ground allows the noise barrier to achieve a top of barrier elevation to effectively reduce the noise levels and meet design goals with less panel height than a noise barrier alignment at lower ground elevation.

Table 4-7 of the Noise Analysis Technical Report (FEIS Appendix L) shows the predicted noise barrier reduction for each receptor analyzed (receptor locations are shown on pages 3 and 4 of the noise mapping). As shown in Table 4-7, the three first row receptors in NSA 1-3 have high predicted sound levels ranging from 75 to 81 dB(A), but have predicted noise reductions ranging from 11 to 18 dB(A), which exceeds the MDOT SHA goal of 7 to 10 dB(A). As comparison, the five first row receptors in NSA 2-01 have lower predicted sound levels ranging from 66 to 70 dB(A), but the predicted reductions are also lower, ranging from 6 to 10 dB(A).

Because this project is in the NEPA phase, detailed engineering plans, including soil borings and field surveyed topography, are not yet available. This level of detail is obtained during the final design phase of a project. The design, appearance and final alignment of the sound barriers will also be finalized during final design. The project must receive NEPA approval before final design is initiated, per 23 CFR 771.113(a).

#3 Cont.

CARDEROCK SPRINGS
National Register of Historic Places

proposed barriers designs: e.g., 495 MD-3A and 495 MD-3B, each with its corresponding wall length and height.

The SDEIS states on Page 41 of Appendix E (Paragraph D Barrier System 495 MD-3 (NSAs 1-03 and 2-01)), that the proposed barrier design 495 MD-3 will have a variable height from 24 to 32 feet; however, we have determined through back calculation (given the barrier length, average height and total barrier wall area) that the 32 foot barrier stretch would be only 211 feet long, and there is no indication in the SDEIS as to where this 32 foot high wall portion will be located along the barrier. It seems evident that 211 linear feet of 32-foot-high wall barrier would be insufficient to produce an adequate/effective increase in noise mitigation for the targeted small area since this length would barely cover the property frontage of at most two residences. We believe that the SDEIS needs to be amended to increase the height of proposed barrier design 495 MD-3 along the entire segment, and if there are to be variable heights within the segment, to clarify where the higher section of barrier is located along the 495 MD-3, what is the length of it, and what is intended to be shielded with the higher wall section.

2. *Inconsistent application of cost-effectiveness analysis among NSAs.*

We compared the measurement of cost used in the SDEIS for other communities located along the Beltway between River Road and the I-270 spur to those used for Carderock Springs and noticed striking discrepancies in the methodologies which resulted in the overstatement of cost-effectiveness for the portion of the noise barriers for Carderock in relation to that of these communities.

For example, in the case for proposed barrier design 495 MD-7 for NSA 1-38 (Fox Hill Senior Living Condominiums - 5-Story buildings), the impacted residences density factor had great influence on wall design/height. Even though none of the modeled critical noise receptors in this NSA registered higher than the 75dB(A) absolute noise level criterium (therefore the barrier design was subject to a lower cost-effectiveness threshold of 1700 SF per benefited residence), the MD-7 barrier design resulted in a 32-foot-high wall with a low cost-effectiveness parameter of 1132 SF-p-r. The fact that NSA 1-38 was analyzed and modeled individually (no bundling with either NSA 1-05 to the south or NSA 4-01 to the north) contributed greatly to the 495 MD-7 resulting proposed barrier design for this 5-story senior living condominium community. In fact, the proposed barrier design has ample spare room on the cost-effectiveness criterium for a 40-foot-high wall barrier design without reaching the threshold of 1,700 SF per residence.

The proposed barrier design 495 MD-6 for NSA 2-02, which includes the widely spread and large single-family residences in the Arrowood neighborhood and a portion of the Burning Tree Country Club at the back of the NSA, a condition similar to Carderock Springs, was analyzed and modeled individually (i.e., no bundling with dissimilar noise environment NSAs or schools as was done for NSA 1-03 and NSA 2-01). A significant number of first line critical measured receptors in this NSA registered above 75dB(A) and a few above 80dB(A). The great majority of impacted residences are evenly laid out in close proximity to the first line critical measured

Carderock Springs Citizens' Association
P.O. Box 237, Cabin John, MD 20818-0237
www.carderocksprings.net

5

**Response to SDEIS Comment #3, continued**

2. Cost Effectiveness Determination

The cost effectiveness criteria were applied uniformly and consistently throughout the project area. Barrier dimensions are dependent on the topography of the area as well as the density and location of noise sensitive receptors. A multi-family dwelling, such as a condominium complex, has a high density of discrete noise sensitive residences in a small geographic area. A community of single family homes may have the same number of residences, but they are spread out over a larger area and may have varied topography. Residences in the same community may have very different noise environments, depending on the location. For this reason, the approach to designing noise abatement may vary within a project area; however, the feasibility and reasonableness criteria used to evaluate the noise abatement is consistent. NSA 1-38 was added to the study area for the SDEIS. In response to comments received on the SDEIS, MDOT SHA re-evaluated Burning Tree Country Club and is proposing a barrier system (identified in the FEIS as Barrier 495 MD-6/6A/7) that protects NSAs 1-38, 4-01 and 2-02.

The square foot per residence (sfpr) value is used only in determining whether the barrier meets the cost effectiveness criterion and is reasonable to construct; it is influenced by the density of residences as much as by the size of the barrier. The noise barrier design will be further refined during the final design process as the barrier panel heights are optimized, resulting in potential changes to the sfpr value. Having a sfpr value below the threshold allows the design-builder the flexibility to increase panel heights if necessary (for example, by locating the barrier closer to the roadway rather than upslope to avoid tree impacts). If the sfpr is very close to the threshold, there is not much flexibility allowed for shifting the alignment to avoid other resources. Also note that the sfpr is not calculated for replacement sound barriers because MDOT SHA has committed to replacing all impacted sound barriers regardless of whether they are cost effective.

**#3**
**Cont.**



CARDEROCK SPRINGS
National Register of Historic Places

receptors where the noise is; therefore, the areas within the NSA close to the right of way are quite homogeneous, similar in nature and "share a common noise environment," which contributed positively to the 495 MD-6 proposed barrier design, thus resulting in a variable wall height of 32 to 36 feet and a considerable wall length of over 4,400 feet.

For proposed barrier 495 MD-6 the SDEIS analysis appears to have allowed the barrier cost effectiveness parameter (i.e., 2,474 square feet per residence) to increase closer to the cut off threshold (2,700 square feet per residence), than was the case with Carderock Spring's proposed barrier design 495 MD-3, whose cost effectiveness parameter remained at the lower end of the acceptable range (i.e., 2,026 square feet per residence).  Using a comparable cost effectiveness parameter for Carderock Spring's proposed barrier wall design, 495 MD-3, would have permitted a wall height of 30 feet, which would result in the cost effectiveness parameter increasing to 2,488 square feet per residence, which is comparable to the proposed 495 MD-6 barrier design's cost effectiveness parameter of 2,474 square feet per residence.

    *3.  Error in assigning only one residence equivalent to Carderock Springs Elementary School*

Per Table 4-8 on Page 42 of Appendix E to the SDEIS, the analysis clearly shows how the entire Carderock Springs Elementary School (CSES) area was modeled as less than one equivalent residence (i.e., 0.99 ER, see line M1-3-1 in Table 4-8). Reviewing the NSA 1-03 map, there was only one critical measured receptor placed within school property (M1), which registered 78dB(A). The issue is that when the length of the property frontage of CSES (approximately 850 linear feet) is treated as benefitting a single residence, the overall cost effectiveness for proposed barrier 495 MD-3 is reduced greatly and the resulting cost effective measure grossly understates the benefit of providing noise abatement to the over 350 students and 50 teachers, administrative staff and support staff who attend that facility on a daily basis, not to mention the many other community residents who use the ball fields on the school property.  Accordingly, counting the school as a single residence in NSA 1-03 greatly understates the overall cost effectiveness of noise barrier 495 MD-3 and correspondingly results in a lower overall height for the noise barrier that can be constructed across the entire NSA.

We believe that there is no question that CSES deserves an appropriate barrier design to shield the students and staff against emissions pollution and noise. Since the school has a critical measured location receptor that registered above 75dB(A) and given the sensitiveness of the issue here where elementary school kids are exposed to noise and pollutants and would benefit greatly from the shielding, the school should have been modeled separately and as a special case NSA with higher noise reduction design goals than the minimum 7dB(A) as allowed by the MDOT SHA Highway Noise Policy.  Given that the model assigns less than one equivalent residence (0.99ER) to the entire school area, the school alone would flunk the cost-effectiveness threshold criterion of 2,700 square feet of barrier per benefited residence since the resulting school sound barrier would be approximately 850 linear ft or 20,400 square feet of wall at 24 feet of height; this is 7.5 times more wall area than allowed by the cost feasibility criterion.

Carderock Springs Citizens' Association
P.O. Box 237, Cabin John, MD 20818-0237

www.carderocksprings.net

6

---

**Response to SDEIS Comment #3, continued**

3.  Equivalent Residence Determination

The Equivalent Residence (ER) value of 0.99 for Carderock Springs Elementary School was determined in accordance with the MDOT SHA Highway Noise Abatement Planning and Engineering Guidelines – Appendix D Equivalent Residences for Outdoor Noise Sensitive Uses.  Per Appendix D, the ER was determined by multiplying the Linear Frontage ER by the relevant use-time percentage (UTP).   The Linear Frontage ER is based upon the linear frontage of the use area along the subject roadway, approximately 500 feet for Carderock Springs Elementary School, using the metric of one equivalent residence for every 125 linear feet of frontage resulting in a Linear Frontage ER of four.  The UTP equation calculates the use-time percentage based on the number of months-per-year, days-per-week, and/or hours-per-day the use operates.  The outdoor fields were estimated to be used 5 days out of the 7 days in a week, for 10 hours out of the 24 hours in a day, and for 10 months out of the 12 months in the year, which yields a use-time percentage of 0.248. The Linear Frontage ER of four multiplied by the UTP of 0.248 equals 0.99 ER.

The 0.99 ER for Carderock Springs Elementary School was only used for evaluating the cost effectiveness reasonableness criterion, which was met for Barrier System 495 MD-3.  As shown in Table 4-8, Barrier System 495 MD-3 is predicted to provide a 2045 Barrier noise reduction of 15 dB(A) at receptor M1-3-1, which represents outdoor noise sensitive uses at Carderock Springs Elementary School.  This predicted noise reduction of 15 dB(A) exceeds the design goal of 7-10 dB(A).  As noted in the comment, an individual noise barrier to benefit Carderock Springs Elementary School is not likely to meet the feasibility and reasonableness criteria.  However, as shown in the Noise Analysis Technical Report Addendum (SDEIS Appendix E), Barrier System 495 MD-3 meets all of the feasibility and reasonableness criteria and is predicted to provide noise reduction exceeding the design goals at Carderock Springs Elementary School.

00022788

OP·LANES
M A R Y L A N D | I-495 & I-270 Managed Lanes Study     Case 8:22-cv-02597-DKC     Document 62-3     Filed 10/30/23     Page 41 of 96

FINAL ENVIRONMENTAL IMPACT STATEMENT

**#4**



**CARDEROCK SPRINGS**
National Register of Historic Places

### Impacts on Limits of Disturbance

It is noted in the SDEIS that "the Preferred Alternative would result in permanent and temporary impacts of less than 0.1 acre of the Carderock Springs Historic District". (page 4-35). Carderock Springs Elementary School, a community facility, would have a temporary impact of 0.1 acres and a permanent impact of 0.2 acres (Table 4.4 on p. 4-9). These represent an increase from the "no impact" reported in the DEIS. Furthermore, it is stated that the LOD adjoining Carderock Springs Historic District will impact approximately 3.2 square feet of the rear yard at 7610 Hamilton Spring Road, a contributing resource within the district. Based on our review of Map 7 in Appendix D of the SDEIS, which contains the Environmental Resource Mapping, it appears that this impact occurs at 7608 Hamilton Spring Road, not at the adjacent property at 7610 Hamilton Spring Road. This should be verified and amended as appropriate and as needed in the Final EIS. This LOD impact is in part due to the shifting of the centerline of I-495 noted above in combination with the construction of the new noise barrier walls and the 10-foot offset of the LOD behind the proposed walls. While we consider the noise barrier walls to be an important part of this project if the Preferred Alternative moves forward, we still consider this physical effect to have adverse effect on the Carderock Springs Historic District and specifically on the property at 7608 Hamilton Spring Road.

Given the foregoing, and the comments that we had previously delivered on the DEIS and Section 106 materials regarding the loss of tree canopy and increased exposure to air pollution for the residents of the community and the children and staff of the Carderock Springs Elementary School, we therefore disagree with the findings in the SDEIS that there will be no adverse impact on the Carderock Springs Historic District.

We hope that you will consider these comments as you work through the SDEIS and prepare for the issuance of the Final DEIS. We expect to continue to be actively involved in the NEPA process and, if the project advances, the design and construction of the improvements.

Sincerely,

*Jack Orrick*

Jack Orrick
CSCA President

CC:    Governor Lawrence J. Hogan
       Comptroller Peter V.R. Franchot
       Treasurer Nancy Kopp
       County Executive Marc Elrich
       Councilmembers Andrew Friedson, Tom Hucker, Gabe Albornoz, Evan Glass, Will
       Jawando, and Hans Riemer
       Senator Susan Lee and Delegates Ariana Kelly, Marc Korman, and Sara Love

Carderock Springs Citizens' Association
P.O. Box 237, Cabin John, MD 20818-0237                                        7
www.carderocksprings.net

---

**Response to SDEIS Comment #4**

The Preferred Alternative would result in 0.2 acres of impacts at Carderock Springs Elementary School. The impacted property is adjacent to I-495 and Persimmon Tree Road and would not affect any facilities at the school. The impacts are needed for construction of the roadway improvements on I-495, reconstruction of the bridge over Persimmon Tree Road and construction of the noise barrier.

MDOT SHA employed a conservative approach to defining the LOD for all the DEIS Build Alternatives and Preferred Alternative. The LOD represent the proposed boundary within which all construction, mainline widening, managed lane access, intersection improvements, construction access, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, stream stabilization, and related activities to the proposed roadway and interchange improvements. Property impacts associated with the LOD were broken into permanent (long-term) and temporary (short-term) areas. This conservative approach to defining the LOD fairly captured the full scope of potential impacts. Moreover, the methodology used to assess impacts to a number of key resources appropriately considered a broader geographic area than the LOD immediately surrounding the anticipated construction and related activity boundaries. When the project advances to final design, it is anticipated that the design will closely adhere to the LOD defined in the FEIS, as the LOD was established to include a reasonable area to construct the Preferred Alternative. For complete graphic descriptions of the Preferred Alternative LOD across the entire span of study limits, Refer to the FEIS, Appendix E- Environmental Resource Mapping. The Preferred Alternative limits of disturbance results in sliver impacts to properties along I-495 on Thornley Court within the Carderock Springs community. Sliver impacts are proposed for elements such as roadside grading, retaining wall and bridge construction, on-site drainage and stormwater management, and noise barrier replacement/construction. These partial property acquisitions are considered ones that do not cause a residential relocation and have been assumed where a principle building of a residence is located more than 20 feet from the Preferred Alternative limits of disturbance.

Project activities within the Carderock Springs Historic District are unchanged since the publication of the DEIS, but design advancement and further analysis of the limits of disturbance have resulted in a finding of no adverse effect for the property. The Preferred Alternative would result in impacts of less than 0.1 acre of the historic district, including permanent and temporary impacts. MDOT SHA has identified impacts, measuring 3.2 square feet, to the rear yard of 7610 Hamilton Spring Road, not 7608 Hamilton Spring Road. Additionally, 7608 Hamilton Spring Road does not contribute to the Carderock Springs Historic District because it is outside the period of significance. MDOT SHA completed a separate determination of NRHP eligibility for 7608 Hamilton Spring Road (Greenfield House, M:29-59-1) and found 7608 Hamilton Spring Road not eligible for the NRHP.

These actions will not disturb the original topography and natural vegetation within the district itself, and the proposed noise wall will further screen the district from visual and audible effects already present along I-495. No diminishment of location, design, materials, association, and workmanship will occur, and setting and feeling will remain consistent with the existing highway facility. The Maryland Historical Trust (the Maryland SHPO) concurred with the no adverse effect determination in October 2021.

**CITIZENS AGAINST BELTWAY EXPANSION (CABE)—SHOSHANNA ALLAIRE**

Shoshanna Allaire

Selected Findings and Deficiencies
in the Supplemental Draft Environmental Impact Statement (SDEIS)
for the I-495/I-270 Toll Lanes

#1

**Toll Lanes Would Not Improve Daily Commutes**
The Maryland Department of Transportation (MDOT) uses projections for the year 2045 as a benchmark to demonstrate the impact of toll lanes on travel times. Appendix A of the SDEIS shows travel times in 2045 if the lanes are built compared to not building the lanes. If the toll lanes are built, MDOT projects that only 2 minutes and 36 seconds will be saved during the morning rush hour by drivers who travel in the general (non-tolled) lanes on I-270 from where it intersects with I-370, down to the American Legion Bridge. However, when drivers return home during the evening rush hour, their travel time will increase by 10 minutes and 6 seconds on the same stretch of road heading from the American Legion Bridge to I-370. So, after enduring 5 years of construction delays, drivers who use the general lanes will be rewarded with a 7 minute and 30 second increase in their daily commute, round trip. Building the toll lanes will cause substantial harm to our communities while failing to help the majority of drivers who would use the general lanes.

#2

**Taxpayer Subsidies**
Last year's Draft Environmental Impact Statement (DEIS) provided the range of public subsidies that would be needed to fund the various alternative for private toll lanes. The SDEIS does not include an estimate of the subsidies that may be necessary under the alternative MDOT selected (the Preferred Alternative). The extent to which the State will be subsidizing this project is of immense concern to Maryland taxpayers, who could be on the financial hook for 50 years. The estimate of subsidies should have been included in the SDEIS and its omission suggests that MDOT is not willing to share it with the public.

#3

**Utility Relocations**
The SDEIS fails to describe the utility relocations that will be required to make way for the toll lanes. Nor does it address who will bear the cost of moving water, sewer, cable, gas, electric and other utility lines.

#4

**Pollution and Global Warming**
Inadequate Stormwater Treatment: The addition of lanes will drastically increase stormwater runoff, increasing water pollution and flash flood risk for local communities. MDOT plans to treat only 45% of the stormwater runoff onsite. These highways already contribute substantially to the degradation of water quality in nearby waterways. By failing to treat most of the stormwater onsite, the toll lanes would further degrade local streams, creeks and the Potomac River.

#5

Air Pollution and Global Warming Analyses Not Included: The SDEIS does not include an analysis of greenhouse emissions and the impact they would have on global warming. There is also no analysis of other pollutants such as particulate matter or ozone. All of these analyses are deferred until later. Omitting these analyses from the SDEIS denies the public the opportunity to understand the risks while there is still time to influence the project.

#6

**Harm to Parks and Other Greenspaces**
The toll lanes would impact 15 parks, including three national parks. Over 1,200 trees will be removed from national parks alone. The other parks impacted include five owned by the Maryland-National Capital Park and Planning Commission, five parks owned by the City of

---

**Response to SDEIS Comment #1**
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**Response to SDEIS Comment #2**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program or Board of Public Works and Project Costs.

**Response to SDEIS Comment #3**
Refer to Chapter 9, Section 3.4.M for a response to impacts to utilities and associated cost of repairs.

**Response to SDEIS Comment #4**
Refer to Chapter 9, Section 3.4.E for a response to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**Response to SDEIS Comment #5**
Refer to Chapter 9, Section 3.4.F for a response to adverse impacts to air quality.

**Response to SDEIS Comment #6**
Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

00022790

**#6 Cont.**

Rockville and two parks owned by the City of Gaithersburg. A total of 36.1 acres of parkland would be negatively impacted. There would be a total loss of 500 acres of forest canopy from parkland and other greenspaces, including from strips of greenspace that provide a buffer between the highways and neighborhoods next to the highways. These communities will be harmed by increased noise, air and water pollution and the increased risk of flooding.

**#7**

Environmental Justice

Environmental Justice Analysis Not Included. Similar to the DEIS, the SDEIS fails to provide an Environmental Justice analysis comparing whether the negative impacts of the project would be borne disproportionately by low-income communities or communities of color. For example, there is no discussion of whether Environmental Justice communities would be more likely to experience an increase in polluted air and its harmful impacts on health. Instead, the SDEIS defers this analysis to the Final Environmental Impact Statement. This cheats the public out of the opportunity to know and react to the Environmental Justice impacts while there is still time to influence the project.

Impact on Morningstar Tabernacle No. 88 Moses Hall and Cemetery and Gibson Grove A.M.E.

**#8**

Zion Church: The boundaries of permanent or temporary construction activity along the highways will not be finalized until after the environmental review process is completed. If the boundaries or limits of disturbance are expanded at this location, it puts the Cemetery at great risk of graves being disturbed by the project. While MDOT has shifted the proposed highway to avoid impact on the Cemetery, the shift also increases the impact on the Gibson Grove A.M.E. Zion Church.

Failure to Study Alternatives to Toll Lanes

**#9**

The SDEIS fails to consider alternatives to private toll lanes to address traffic congestion. Rail transit was not studied nor were operational improvements and policies to encourage more telework According to a 2017 report by the regional Transportation Planning Board (TPB), traffic demand management strategies, including a substantial increase in telework, would be the most effective mechanism to reduce traffic delays. Based on their research during the COVID pandemic, the Maryland Transportation Institute testified at a General Assembly hearing in August 2020 that "just a 5% reduction in travel demand could lead to 32%-58% reduction in traffic congestion on major freeways." The federal government has already announced that it will implement permanent policies to increase telework by the federal workforce. The State could build on this with policies to encourage private employers to implement more telework in the I-495/I-270 corridor. However, the SDEIS does not assess whether the change in federal telework policy, along with changes in state policy, could reduce congestion on the two highways.

Prepared by Citizens Against Beltway Expansion, November 2021

**Response to SDEIS Comment #7**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to SDEIS Comment #8**
Based on the current historic boundary, the Preferred Alternative will avoid direct impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Additionally, no atmospheric, audible, or visual effects to the property have been identified from the Preferred Alternative. No diminishment of location, design, setting, materials, workmanship, feeling or association has been found in these areas. The project will be governed by a programmatic agreement, including a treatment plan that specifies the methods, limits and consultation procedures for further investigation of areas with the potential for additional burials outside of the current historic boundary, no specific determination of effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery will be made at this time, and will be made following completion of the additional investigations specified in the programmatic agreement and treatment plan (Refer to **FEIS, Appendix J**).

**Response to SDEIS Comment #9**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

**CITIZENS AGAINST BELTWAY EXPANSION (CABE) – BARBARA COUFAL (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Barbara Coufal

**Agency/Organization/Jurisdiction, if applicable:** Citizens Against Beltway Expansion

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

Hello, my name is Barbara Coufal. That's B-A-R-B-A-R C-A-C-O-U-F-A-L. My address is 10112 Parkwood Drive, Bethesda 20814. I'm speaking on behalf of Citizens Against Beltway Expansion. First, let me state that the 45 days to review thousands of pages is wholly insufficient to meet the federal goal of informing and engaging the public. The comment period must be extended to 120 days.

**#1**

The Supplemental Draft Environmental Impact Statement fails to consider alternatives to toll lanes. To address traffic congestion, rail transit was not studied nor were policies to encourage more telework or operational improvements. According to a 2017 report by the Regional Transportation Planning Board traffic demand management strategies, including a substantial increase in telework would be the most effective approach to reducing traffic delays. Based on their research during the COVID pandemic, the Maryland Transportation Institute testified at a general assembly hearing in August 2020 that only a five percent traffic reduction led to a reduction in congestion of 32 to 58 percent. The federal government has already announced that it will implement permanent policies to increase telework by the federal workforce. The State could build on this by developing policies to encourage private employers to implement more telework in the I-495/I-270 corridor. However, the SDEIS does not assess how the change in federal telework policy, along with changes in state policy could reduce congestion on the two highways. Given the experience during the pandemic, this should be studied as an alternative to adding toll lanes and that plan to monitor traffic between now and the completion of the FEIS is not adequate.

**#2**

On page ES-9 the SDEIS states that the American Legion Bridge "is nearly 60 years old and would need to be replaced sometime over the next decade." This contradicts MDOT Secretary Greg Slater, who told the Maryland Transportation Authority on February 25, 2021, that the bridge was structurally sound, but that the deck of the bridge, not the entire bridge, the deck of the bridge needed to be replaced within the next 10 years. He made similar comments about the need to replace the deck at a Joint House and Senate Hearing on June 29. Why does the SDEIS contradict Secretary Slater? The DEIS provided the range of public subsidies that would be necessary to fund the toll lanes. The SDEIS does not include an estimate of the subsidies that may be needed for the Preferred Alternative. The extent to which the state will be subsidizing this project is of immense concern to Maryland taxpayers. Why doesn't the SDEIS include the subsidy estimate? Thank you.

**Response to SDEIS Comment #1**
The Study did consider transit and teleworking options. Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study. Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and teleworking.

**Response to SDEIS Comment #2**
Based on our biennial bridge inspection findings and experience on similar heavily-traveled steel superstructure bridges, MDOT SHA estimates that the current lifespan of the superstructure and substructure of the existing ALB are 10-15 years before they would deteriorate to poor condition needing replacement.

This assumes that additional repairs and preservation activities are not undertaken during that time. Even with repairs and preservation activities, such as a deck replacement, cleaning, painting, and steel repairs to the superstructure, and concrete repairs to the substructure units, this 59-year-old bridge would require considerable capital investment to maintain it in a state of good repair. In determining the need to replace a structure, we consider the cost to maintain and rehabilitate all three elements (deck, superstructure and substructure), the functional needs of the bridge, and the disruption to traffic during construction.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program or Board of Public Works and Project Costs.

00022792

**CITIZENS AGAINST BELTWAY EXPANSION (CABE) – BARBARA COUFAL**

| | |
|---|---|
| From: | bcoufal10@aol.com |
| Sent: | Tuesday, November 30, 2021 10:38 AM |
| To: | SHA OPLANESMLS |
| Cc: | bcoufal10@aol.com; 495cabe@gmail.com |
| Subject: | SDEIS Comments |
| Attachments: | SDEIS - CABE Written Comments.docx |

Below and attached, please find comments on the Supplemental Draft Environmental Impact Statement for the I-495/I-270 Phase I South P3, submitted by Citizens Against Beltway Expansion.

November 30, 2021

Mr. Jeffrey T. Folden, P.E., DBIA
Director, I-495/I-270 P3 Office
Maryland Dept. of Transportation State Highway Administration
707 North Calvert St.
Baltimore, MD 21202

On behalf of the Citizens Against Beltway Expansion (CABE), I am submitting written comments on the Supplemental Draft Environmental Impact Statement for the I-495/I-270 Phase I South P3. This letter expands on the comments CABE submitted at the November 1 virtual hearings. CABE supports the no-build option and is opposed to the Preferred Alternative toll lanes.

**#1**

**The SDEIS Does Not Study Reasonable Alternatives as Required by NEPA**

The National Environmental Policy Act (NEPA) requires that the Maryland Department of Transportation and the Federal Highway Administration study reasonable alternatives that would avoid or reduce harmful impacts of the Preferred Alternative. The Agencies failed to study reasonable alternatives, although they acknowledge in Appendix B that other measures would effectively address congestion. In the following statement from page 146, the Agencies specify that flexible work schedules and ridesharing, including express bus service, would be effective alternatives to toll lanes.

*"As may be seen from the compiled data, speed increases have been of a greater magnitude that the magnitude of traffic volumes. While traffic volumes regionally recently have been about 20% below pre-pandemic levels, peak period speed data remain near free-flow. Traffic flow theory and longstanding empirical data have established that when demand exceeds capacity and traffic operations are in unstable or saturated conditions, a small reduction in demand results in a disproportionate improvement in speeds. As such, strategies to marginally reduce single occupant vehicle (SOV) demand during peak demand via flexible work schedules, pricing or ridesharing (including express bus service) are effective ways to address peak period congestion, conserve energy and reduce emissions."*

While not specified on page 146, other traffic demand strategies have been studied and found to be effective by local policy experts. In a 2017 report, the regional Transportation Planning Board found that traffic demand management, including significant telework, would be more effective at reducing congestion than adding express toll lanes to local highways, including I-495 and I-270 (see page 11). In August 2020, the Maryland Transportation Institute testified that a 5 percent increase in

**Response to SDEIS Comment #1**

Other alternatives were considered; refer to Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

A TSM/TDM alternative was considered as part of the Study and included additional system and demand management measures applicable to I-495 and I-270, *in addition* to the ICM project. Benefits of these types of solutions optimize the existing system, but do not support long-term traffic growth. In order to assess the performance of the TSM/TDM alternative, MDOT SHA analyzed traffic modeling from the I-270 ICM project in the context of the modeling performed on the No Build Alternative for this Study. Relatively minor short-term benefits from these measures were forecast for portions of I-270 and I-495, however, those benefits would not be sustained for the long-term. Refer to **DEIS, Appendix B.** Even though this alternative would not satisfy the Purpose and Need as a standalone strategy, many TSM/TDM elements are included in the Preferred Alternative, including:

- Adaptive ramp metering along I-270 that is being installed as part of the I-270 ICM project.

- Needed changes at interchange ramp terminals and intersecting roadways to optimize lane configurations and traffic signal timing to provide adequate traffic flow along the crossroads.

- Enhancements to acceleration and deceleration lanes which can improve traffic operations along the mainline in locations where current design does not meet design guidelines.

Finally, the congestion pricing model to be employed as part of the proposed managed lanes is itself an effective travel demand management solution.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and teleworking.

#1
Cont

telework would reduce congestion by 32 to 58 percent. Even MDOT predicts that its Innovative Congestion Management program, including restriping to add lanes at certain locations, ramp entrance and exit adjustments and ramp meters on I-270, will improve driving time by as much as 30 minutes between Frederick and I-495.

In June 2021, the Office of Management and Budget, the Office of Personnel Management (OPM) and the General Services Administration issued a memo regarding post-pandemic work policies. The memo encourages federal agencies to adopt more telework on a permanent basis. On page 13, the memo states, "As agencies consider what their post-reentry policies should be, OPM encourages them to consider telework as part of the overall strategic workforce planning that provides new flexibilities to agencies competing for top talent with other sectors across the country." The SDEIS does not assess how the change in federal telework policy will impact traffic congestion in the future. Nor does the SDEIS assess policies that provide private employers incentives to implement telework or flexible work schedules.

The plan by the Maryland Department of Transportation to monitor traffic between now and the completion of the Final Environmental Impact Statement is not adequate. Traffic demand management strategies, including flexible work schedules, express buses, telework, ramp meters and lane and ramp adjustments are reasonable alternatives that would have less harmful impacts than the Preferred Alternative. An examination of these alternatives should have been included in the SDEIS, in order to fulfill the requirements of NEPA.

**Failure to Provide Estimate of Taxpayer Subsidies**

#2

The Draft Environmental Impact Statement (DEIS) issued in 2020 provided the range of public subsidies that would be necessary to fund the original toll lane alternatives. The SDEIS does not include an estimate of the subsidies that may be needed for the Preferred Alternative, which was not included in the DEIS and for which there was no estimate of subsidies. Moreover, the push to adopt more telework by the federal government, the region's largest employer, could significantly reduce traffic congestion on I-495 and I-270 in the future. It is important to understand how the increase in telework will impact the financing of the project. If traffic congestion and toll revenues are less than expected, taxpayers may be forced to provide substantial subsidies to the tollway developer. While Accelerate Maryland Partners may have stated that the project is financially viable, this does not protect Maryland taxpayers from financial risk. The amount of state subsidies is of immense concern to taxpayers and an estimate should have been included in the SDEIS.

**Failure to Conduct an Environmental Justice Analysis**

#3

The Agencies are required by NEPA to look at whether the harmful impacts of an infrastructure project fall disproportionately on low-income communities or communities of color. This analysis is not provided in the SDEIS, nor was it included in the DEIS. Instead, the Agencies plan to address this requirement in the Final Environmental Impact Statement (FEIS). Delaying the environmental justice analysis until the FEIS is issued cheats the public out of the opportunity to understand and respond to the impacts while there is still time to influence the project.

**The SDEIS Reveals that the Toll Lanes Would Not Reduce Congestion**

#4

Attachment D of Appendix A shows travel times if the Preferred Alternative toll lanes are built compared to not building the lanes, in the benchmark year of 2045. If the toll lanes are built, MDOT projects that 2 minutes and 36 seconds would be saved during the morning rush hour by drivers who travel in the general (non-tolled) lanes on I-270 from the start of the toll lanes at I-370, to the George

**Response to SDEIS Comment #2**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**Response to SDEIS Comment #3**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to SDEIS Comment #4**
Updated traffic analysis for the design year of 2045 indicates that the Preferred Alternative will provide operational benefits compared to the full No Build Alternative in six key metrics (system-wide delay, corridor travel time and speed, density and level of service, travel time index, vehicle throughput, and local network delay). Refer to **FEIS, Appendix A**. The Preferred Alternative would significantly increase throughput across the ALB and on the southern section of I-270 while reducing congestion.

#5

Washington Memorial Parkway exit, just beyond the American Legion Bridge. However, when drivers return home during the evening rush hour, their travel time would increase by 10 minutes and 6 seconds. Peak period drivers completing a roundtrip would experience an increase of 7 minutes and 30 seconds in their daily commute. The SDEIS shows that the Preferred Alternative would fail to ease congestion for the majority of drivers, who would be using the general lanes, while causing substantial harm to the environment, the climate and our communities.

**The SDEIS Misrepresents Condition of the American Legion Bridge**

Page ES-9 of the SDEIS states that the American Legion Bridge "is nearly 60 years old and would need to be replaced sometime over the next decade regardless of this study." This alarming assessment of the condition of the bridge contradicts repeated public statements made over the last several months by MDOT Secretary Greg Slater on the longer structural life of the bridge.

On February 25, 2021, Sec. Slater told the board of the Maryland Transportation Authority that the bridge was "structurally sound" but that the deck of the bridge needed to be replaced within the next 10 years. He went on to explain that if the deck were not replaced, then the entire bridge would need to be replaced within 15 years. Sec. Slater made similar comments about the need to replace the deck of the bridge, but not the entire bridge, at a joint hearing of House and Senate committees on June 29, 2021. Most recently, during a November 10, 2021 presentation to state legislators and local government officials from Montgomery County on MDOT's Consolidated Transportation Program, Sec. Slater was asked about a recent news report on the condition of the bridge. Sec. Slater stated that the bridge is "not unsafe" and went on to say that it has "a lot of structural life left." (Sec. Slater's February 25 comments can be viewed here at 1:10:50. Slater's June 29 comments can be viewed here at 2:27:25. Slater's November 10 comments can be viewed here at 3:19:10.)

The Agencies' statement about the condition of the bridge not only contradicts the Maryland Secretary of Transportation, but creates a false sense of urgency over the need to rebuild or replace the American Legion Bridge. One of the main purposes of the environmental review process under NEPA is to convey important information to the public. The fulfillment of this NEPA purpose can only be achieved if the Agencies are committed to conducting the review with integrity and providing accurate information.

Given the inadequacies and omissions of the SDEIS, it should be withdrawn and the Agencies should complete the missing analyses. However, the time tables provided in Appendix A make clear that the project would not address traffic congestion and should not move forward.

Sincerely,
Barbara Coufal, Co-Chair
Citizens Against Beltway Expansion
10112 Parkwood Dr.
Bethesda, MD 20814

**Response to SDEIS Comment #5**

Based on our biennial bridge inspection findings and experience on similar heavily-traveled steel superstructure bridges, MDOT SHA estimates that the current lifespan of the superstructure and substructure of the existing ALB are 10-15 years before they would deteriorate to poor condition needing replacement.

This assumes that additional repairs and preservation activities are not undertaken during that time. Even with repairs and preservation activities, such as a deck replacement, cleaning, painting, and steel repairs to the superstructure, and concrete repairs to the substructure units, this 59-year-old bridge would require considerable capital investment to maintain it in a state of good repair. In determining the need to replace a structure, we consider the cost to maintain and rehabilitate all three elements (deck, superstructure and substructure), the functional needs of the bridge, and the disruption to traffic during construction.

00022795

**COALITION FOR SMARTER GROWTH – JANE LYONS**

| | |
|---|---|
| **From:** | Jane Lyons <jane@smartergrowth.net> |
| **Sent:** | Tuesday, November 30, 2021 5:00 PM |
| **To:** | SHA OPLANESMLS |
| **Subject:** | CSG Comments on 495/270 Toll Lanes |
| **Attachments:** | 2021.11.29 CSG SDEIS Comments on I-495 I-270 -Managed Lanes Study - Final.pdf |

Good afternoon,

Please see attached.

Thank you,
Jane

--
Jane Lyons (she/her) | Maryland Advocacy Manager
Coalition for Smarter Growth
P.O. Box 73282, 2000 14th St NW
Washington, DC 20009
(410) 474-0741 | jane@smartergrowth.net
*Your gift helps keep CSG's advocacy going! Donate today!*

*This page is intentionally left blank.*

Submitted via email to oplanesMLS@mdot.maryland.gov

November 30, 2021

Jeffrey T. Folden, P.E., DBIA
Direction, I-495 & I-270 P3 Office
Maryland Department of Transportation
State Highway Administration
707 North Calvert Street
Mail Stop P-601, Baltimore, MD 21202

Re: Coalition for Smarter Growth's Comments on the I-495 and I-270 Managed Lanes
Study Supplemental Draft Environmental Impact Statement an Updated Draft Section 4(f)
Evaluation

The Coalition for Smarter Growth submits the following comments in response to the Notice of
Availability of the I–495 & I-270 Managed Lanes Study Supplemental Draft Environmental
Impact Statement (SDEIS) and Updated Draft Section 4(f) Evaluation. We have also signed onto
and endorse the comments submitted by the Maryland Chapter of the Sierra Club and separate
comments by the Maryland Transit Opportunities Coalition.

**#1** The SDEIS and Section 4(f) evaluation are insufficient and do not fully consider the impacts of
the proposed expansion, a massive alteration to our landscape that comes at an extremely high
cost to neighborhoods, community health, the natural environment, and taxpayers. At the same
time, there was no meaningful consideration of viable alternatives to constructing new toll lanes.
Therefore, we request that the U.S. Department of Transportation Federal Highway
Administration and the Maryland Department of Transportation State Highway Administration
(together, henceforth referred to as "the Agencies") stop and restart this process to fully address
all gaps in the current SDEIS and fulfill the requirements of the National Environmental Policy
Act (NEPA) and Section 4(f).

**#2** The main points of our comments that we submitted November 2020 regarding the original Draft
Environmental Impact Statement still stand and were not adequately addressed by the SDEIS:
the purpose and need is narrow, biased, and does not screen alternatives accurately; the traffic
modeling assumptions are deeply flawed; transit, land use, and comprehensive alternative
solutions were not taken into consideration; environmental and community impacts are
significant and the analysis is inadequate; taxpayer dollars will be used ineffectually and
irresponsibly; and the equity analyses are incomplete.

**#3** **Failure to achieve purpose and need:** The purpose and need is inappropriately narrow and
crafted to favor the selection of a pre-determine private high-occupancy toll option. Even so, the
traffic modeling information included in the SDEIS confirms that the Project will not achieve its
stated purpose and need, and the proposed segmentation will only create new bottlenecks that do
not lead to an overall reduction in traffic congestion. In fact, Table 3-8 shows negligible
improvement for 2045 travel times in the general-purpose lanes, and worse travel times for the I-

1

## Response to SDEIS Comment #1

The I-495 & I-270 Managed Lanes Study fulfills the requirement to review potential impacts and allowed the agency decision-makers and the public to understand the various advantages and disadvantages of a range of reasonable alternatives. As required by the CEQ NEPA regulations, the DEIS and SDEIS summarize the reasonably foreseeable social, cultural, and natural environmental effects of the alternatives retained for detailed study to a comparable level of detail. This analysis directly contributed to MDOT SHA's evaluation of these alternatives and to recommendations for a full suite of potential measures to avoid and minimize impacts, as well as comprehensive mitigation proposals where impacts could not be avoided.

## Response to SDEIS Comment #2

MDOT SHA acknowledges receipt of the Coalition for Smarter Growth's DEIS Comment Letter dated October 16, 2020. Refer to Appendix T, for a response to this DEIS Comment Letter.

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.
Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis and impacts.
Refer to Chapter 9, Section 3.5 for a response to the P3 Program or Board of Public Works and Project Costs.

## Response to SDEIS Comment #3

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

Updated traffic analysis for the design year of 2045 indicates that the Preferred Alternative will provide operational benefits compared to the full No Build Alternative in six key metrics (system-wide delay, corridor travel time and speed, density and level of service, travel time index, vehicle throughput, and local network delay). Refer to **FEIS, Appendix A**. The Preferred Alternative would significantly increase throughput across the ALB and on the southern section of I-270 while reducing congestion.

**#3 Cont**

495 Outer Loop from I-270 to I-95, the I-495 Inner Loop from Virginia 193 to I-270, and the I-495 Inner Loop from I-95 to MD-5.

Further data in the SDEIS states that drivers traveling south down I-270 in general purpose lanes would only save 2 minutes and 36 seconds during morning rush hour, and that the evening return trip north would increase by 10 minutes and 6 seconds. If the Project will not bring significant improvement to the general-purpose lanes, then the benefits of the Project will only be enjoyed by those who can afford the cost of daily tolls.

**#4**

**Traffic modeling flaws:** The traffic modeling is deeply flawed as discussed in the Sierra Club comments which include the analysis of transportation modeler Norm Marshall, of Smart Mobility, Inc. Beyond his analysis it is also the case that the project fails to adequately assess the benefits accrued from both increased telework due to the ongoing COVID-19 pandemic, including the federal government's new policy to support long-term telework options, and the $132 million I-270 Innovative Congestion Management project.

**#5**

**Failure to analyze a comprehensive land use, transit, demand management and equity-oriented alternative:** The study isolated transit alternatives in such a way that they were designed to fail. Transit works when fully integrated with a land use solution. Therefore, we repeatedly pressed for a comprehensive transit, land use, and system/demand management solution. At the core of this solution is building out transit-oriented centers on the east side of the DC region – particularly in Prince George's County. This majority Black community has 15 underdeveloped Metro stations and its residents have some of the longest average commutes in the nation due to lack of jobs on the east side of the region. Maryland's investment in transit-oriented development in Prince George's would bring jobs closer to residents, reducing demand on the Beltway and balancing out the east-west flows on the north side of the Beltway.

In contrast, the tolling approach to the Beltway will mean a large percentage of Black residents will have the choice of paying very high tolls for long commutes or sitting in the continued general-purpose lane traffic upon which the private toll operator depends to generate their profits from the toll lanes. In addition, segmenting the project may even add to the inequity because it places all of the transportation investment on the wealthy, western side of the Maryland suburbs. Previous expansion of I-270 in the late 1980s was confirmed in a 1999 Washington Post story and subsequent study by the Metropolitan Washington Council of Government's Transportation Planning Board to have shifted jobs and investment away from D.C. and Prince George's County to the wealthier, whiter western Montgomery County.

Failure to study this comprehensive and more equitable transit-oriented development alternative is a fatal flaw in the SDEIS.

**#6**

**Shared-use path:** We echo the concerns of the Washington Area Bicyclists Association about the exclusion of Option 1, for a shared-use path connection along the American Legion Bridge, which would connect to both MacArthur Boulevard and the C&O Canal Towpath, in the SDEIS. We believe there are feasible solutions to the National Park Service's concerns about maintenance costs and environmental damage during construction, and we oppose the rejection of this option on grounds that it will increase use. The intention of a shared-use path connection

2

---

See response to #3 above

**Response to SDEIS Comment #4**

Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**Response to SDEIS Comment #5**

The Study's Purpose and Need allowed for a robust analysis of a full range of alternatives that included evaluation of non-tolled, general purpose lanes, tolled managed lanes, transit only, and a combination of highway and transit improvements. Initially a range of 15 preliminary alternatives were identified and analyzed based on previous studies and planning documents, input from the public and federal, state and local agencies during the scoping process. Additional alternatives were identified and analyzed in direct response to public and agency comments for a total of eighteen different alternatives.

Non-highway alternatives were considered during the alternatives screening process. These included heavy rail and light rail parallel to the existing alignments (the Purple Line Light Rail was already proceeding), fixed guideway or Bus Rapid Transit along a new alignment parallel to the existing highway alignments and dedicated managed bus lanes on I-495 and I-270. *See DEIS Appendix B* at pgs. 19-27. As with all the alternatives under the Preliminary Range of Alternatives, these non-highway options were evaluated using the various project needs, a review of available data, similar proposals that had been made over time, as well as a qualitative assessment of each alternative's potential to reduce congestion on I-495 and I-270. For all the major areas of concern, the standalone transit options failed to address the Study's Purpose and Need and had major engineering and operational challenges associated with them. Based upon the analysis conducted and presented and input from agencies and public, FHWA and MDOT determined they would not adequately address long-term traffic growth, address trip reliability, roadway choices, and none of them accommodated homeland security and freight movement needs. For these reasons, those preliminary standalone transit alternatives were dropped from further consideration.

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity.

Refer to Chapter 9, Section 9.3.2 and 9.3.3 for a response regarding Alternative Screening and Alternatives Retained for Detailed Study

**Response to SDEIS Comment #6**

Public comments supporting a direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath were received by MDOT SHA, FHWA and NPS during the SDEIS public comment period. To be responsive, a direct connection to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative LOD and impact analyses. The three shared use path options connecting to MacArthur Boulevard presented in the SDEIS are no longer under consideration in this FEIS. The direct connection to the Chesapeake and Ohio Canal towpath results in fewer NPS property and natural resource impacts. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the Study Area. The alignment of the proposed shared use path connection to the Chesapeake and Ohio Canal towpath is shown in FEIS Appendix E.

See responses to Comment #6 above.

**#6 Cont**

is to encourage active, low-carbon commuting and recreation, and eliminating an option that would further those goals the best is antithetical to public goals. Without a direct connection to the C&O Canal Towpath, the next nearest access point would be two miles away.

**Conclusion:** Even with the inadequate analysis provided, the Project cannot be justified due to its associated environmental, community, and public health impacts. The Agencies should select the No Build alternative and then restart the process with the full proper analyses, including a comprehensive land use, transit, and system/demand management solution that will increase accessibility, reduce travel times, VMT, reduce environmental impacts, and offer a more equitable and sustainable transportation solution.

3

**DONTWIDEN270.ORG – JANET GALLANT (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Janet Gallant

**Agency/Organization/Jurisdiction, if applicable:** DontWiden 270.org

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

#1

I'm Janet Gallant. I live at 664 Adalia Drive in Rockville, Maryland 20850. I'm a coordinator of DontWiden 270.org, MDOT's SDEIS reads like an odd game of wits. MDOT hides the facts and the public hunts through 8,000 pages, trying to find them. Where are the detailed financials? Where is the climate change analysis? Not there. Ever since the governor mandated toll lanes, MDOT's role has been to look like it's proving what's unprovable, that the toll lanes benefit everyone and cost taxpayers nothing. MDOT does not represent the public in this toll lane public-private partnership. In effect MDOT has become a kind of de facto promoter of the P3 private partner. And that partner, Transurban, is solely focused on maximizing revenue and creating a setup for even more toll lane business. This SDEIS is the latest results, incomplete data, claims with no substance, promises that the good info will come later.

#2

What's missing is the simple truth about the impacts of the toll lanes on everyday lives for the next 50 years. That's exactly the information that federal environmental review process is supposed to provide. Here's one example of the kind of hole in the plan that the SDEIS should have but didn't address. The P3 calls for a new toll lane interchange on Wootton Parkway in Rockville, the DEIS and SDEIS touted as a project benefit because "the direct access ramps would provide access to the nearby Twin Brook Metro station". Now the Twin Brook station is 2.9 miles from that proposed interchange. The supposedly P3 benefit is entirely dependent on vehicles navigating those 2.9 miles on congested Rockville streets. It's dependent on the City of Rockville accommodating the extra traffic, maintaining the roads, planning for collateral congestion, and mitigating harm to homes, schools, and businesses. But the SDEIS has nothing substantive about the project's profound impacts on secondary roads. There are similar gaps and holes all through the SDEIS even for the most consequential issues – traffic forecasting, environmental justice, air quality, water quality, and on and on. The public never had a place at the P3 MDOT Transurban table. We do have a key role in the federal environmental review process. The public's written comments will document, at length, the overwhelming deficiencies, and flaws in the project and the SDEIS. The only equitable outcome is a do over. Thank you.

**Response to SDEIS Comment #1**

Refer to Chapter 9, Section 3.5 for a response to the P3 Program or Board of Public Works and Project Costs.

Refer to Chapter 9, Section 3.4.G for a response to climate change considerations.

**Response to SDEIS Comment #2**

As stated in the SDEIS and FEIS, direct and indirect connections from the proposed HOT managed lanes to existing transit stations and planned Transit Oriented Development as shown in Figure 3 3 at the Shady Grove Metro (I-370), Twinbrook Metro (Wootton Parkway), and Westfield Montgomery Mall Transit Center (Westlake Terrace). The improved access to Twinbrook Metro Station is an example of an indirect connection. Improved access via the managed lanes at Wooten Parkway would provide a driver a new way to access the station via Wooten Parkway.

Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis and impacts.

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

Refer to Chapter 9, Section 3.4.F for a response to adverse impacts to air quality.

Refer to Chapter 9, Section 3.4.E for a response to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**DONTWIDEN270.ORG – SALLY STOLZ**

| | |
|---|---|
| **From:** | Sally Stolz <sallystolz@aol.com> |
| **Sent:** | Tuesday, November 30, 2021 11:11 PM |
| **To:** | SHA OPLANESMLS |
| **Subject:** | SDEIS Comments from Dontwiden270.org by Sally Stolz |
| **Attachments:** | Dontwiden270.org SDEIS comments.pdf |

There are a total of 4 attachments which I will send separately

*This page intentionally left blank.*

Comments on Supplemental Draft Environmental Impact Statement (SDEIS) for
proposed 270/495 toll road, Phase I South
submitted by Sally Stolz, 5 Lochness Ct., Rockville, MD  20850
on behalf of Dontwidwen270.org

I'm writing on behalf of Dontwidwen270.org, a grassroots organization of thousands of
concerned residents advocating for fair and effective multi-modal transportation,
supported by evidence it will actually work.

**#1**

We support the no-build option and oppose the I-495-I-270 toll-lane project.

The proposed lower I-270 expansion plan, as described in the SDEIS, cannot achieve
its purported objectives. In addition, it will create irrevocable harm to Maryland
taxpayers, I-270 commuters, citizens living within several miles of the proposed project
area, and the environment.

**#2**

We stand by the comments we submitted on the DEIS in 2020, which enumerated many
fundamental flaws inherent in the proposed plan. This year we will focus on only two:
1. The underlying assumptions about the need for the project are inaccurate, and
2. A key element of the project would violate federal law.

**#3**

**Plan Assumptions Are Inaccurate**

The proposed project seeks to address supposed current and anticipated future traffic
congestion. Future congestion projections are built from the state of congestion in 2017,
but the huge increase in teleworking is here to stay and a new baseline year is needed.
As the accompanying graphic evidence indicates, congestion on lower 270 is not a
problem in the present. Additional factors establish that projected future congestion will
not justify the project as proposed.

The exhibit below, three representative Google maps of the proposed I-270 project area
with color-coded traffic congestion indicators: green = non-congested, red = very
congested, tells the story. Google map overlay images have been taken both morning
and evening every weekday from July, 2021 through the present (see additional
representative examples in the accompanying attachments) tell the same story.
Significant congestion southbound on lower I-270 in the morning, and northbound in the
evening, with rare exceptions, occurs only when there is a significant weather event,
vehicular accident, or roadwork.

**Response to SDEIS Comment #1**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment.
The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives.  For the Study, the No
Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation
initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan
Washington Council of Governments in October 2018.  Refer to DEIS, Chapter 2, Section 2.3.  Based on a comprehensive review of
regional demographics and traffic data, the No Build Alternative does not address any of the significant operational issues under
existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives.
Refer to DEIS, Chapter 3 and DEIS Appendix C. For a discussion of the basis for the Purpose and Need refer to **Section 9.3.1** and for
the Selection of the Preferred Alternative refer to **Section 9.3.3.C.**

**Response to SDEIS Comment #2**

MDOT SHA acknowledges receipt of the DEIS Comment Letter from Sally Stoltz on behalf of the Dontwiden270.org dated October
16, 2020. Refer to Appendix T for a response to this DEIS Comment Letter.

**Response to SDEIS Comment #3**

MDOT SHA has been monitoring traffic conditions throughout the pandemic. Permanent count stations on the Capital Beltway (I-
95 and I-495) and I-270 provide data that can and was used to compare counts. This information is provided FEIS. As an example,
data from October 31 to November 13, 2021 was compared to November 3 to November 16, 2019, excluding the Veterans Day
holiday. At the permanent count stations along the Capital Beltway, evening rush time volumes are close to or match pre-pandemic
volumes. At these same count stations, the morning rush and mid-day volumes still appear to be trailing pre-pandemic volumes by
5-15%. Volumes on permanent counts stations on I-270 appear to have rebounded to be slightly higher than pre-pandemic volumes
(5-10%) for the evening rush, while morning peak period and mid-day volumes appear to be similar to pre-pandemic volume levels.
In addition, real-time speed data obtained from the Regional Integrated Transportation Information System (RITIS) shows that along
with the rebound in peak period volumes, I-270 and I-495 are also experiencing a corresponding increase in congestion, similar to
pre-pandemic levels. Average vehicle speeds this Fall were below 20 mph during the PM peak on the I-495 Inner Loop between the
American Legion Bridge and MD 190, same as in 2019. Average vehicle speeds on northbound I-270 between Watkins Mill Blvd and
MD 118 are now below 40 mph during the PM peak period, which is slightly better than the 35 mph average speeds experienced in
this section pre-pandemic.  This is despite I-270 serving higher volumes in 2021 compared to 2019, as the speed increase may be
attributed to improvement projects along I-270 northbound, including the Watkins Mill Interchange, which opened in 2020.  Along
southbound I-270, average vehicle speeds remain higher than pre-pandemic levels by approximately 5-10 mph, despite serving
higher peak period volumes in 2021 compared to 2019. This can be attributed to the implementation of ramp metering in
September 2021.  Even so, some congestion remains along southbound I-270 during the AM peak period, with average vehicle
speeds of approximately 30 mph in November 2021. These results are provided in the **FEIS, Appendix C.**

Additionally, MDOT SHA has been monitoring and evaluating the effects of potential long-term behavioral changes related to travel
that have come from COVID-19. This includes changes in work from home, virtual learning, discretionary travel, and visitor travel.
MDOT SHA evaluated LOW, MID, and HIGH scenarios of reductions in travel. The HIGH scenario was developed to represent a level
of activity consistent with the period during the pandemic in late 2020/early 2021 that saw increases in activity because of loosening
restrictions but prior to the rollout of vaccines with still high levels of work from home and remote learning. This scenario is seen
as unlikely in the long term. The LOW and MID scenarios are more likely outcomes that will include some level of work from home
continuing into the future for higher-income industries, a low level of remote learning and potential long-term declines in visitor
and air passenger related travel. The resulting decrease in vehicle miles traveled (VMT) between the LOW, MID and HIGH scenarios
was 5%, 10% and 15% respectively across the entire model region. The results indicate that the VMT under the LOW and MID
scenarios is expected to exceed 2019 levels between 2030 and 2035. Additionally, even in the highly unlikely HIGH scenario, 2045
No Build VMT is projected to exceed 2019 VMT, when there was significant congestion. Overall, the results confirm that the capacity
improvements proposed under the Preferred Alternative would be needed and effective even if future demand changes from the
pre-pandemic forecasts due to potential long-term impacts associated with the pandemic (e.g., teleworking, e-commerce, transit
use) that are not formally accounted for in the current regional forecasting models. These results are provided in the **FEIS, Appendix
A.**

00022802


#3
Cont





#3
Cont



This page is intentionally left blank.

#3 Cont

One cause of these favorable traffic conditions has been long-term shifts in work patterns, with more employed Maryland citizens working from home – a change prompted by, but not ending with, the Covid-19 pandemic. This relatively recent development was not anticipated when the I-270/I-495 expansion plan was conceived, although in many studies flexible work hours and teleworking have been cited as effective tools in reducing traffic congestion.

**Innovative Congestion Management Project**

However, another significant factor in the lack of congestion today that will endure well into the future is the traffic capacity-enhancing impact of the 80% complete Maryland Department of Transportation's I-270 Innovative Congestion Management Project (ICM). As a reminder, this recently implemented initiative has:
1. Extended merge lanes between entrance ramps to create three "local lanes" instead of two,
2. Restructured the west I-270 spur for additional lanes within existing pavement, and
3. Added a lane in the northbound shoulder, creating 7 lanes: 6 Express Lanes and 1 HOV-2 lane, which is an Express Lane 21 hours per day on workdays and 24 hours a day on weekends and holidays. I must stress that the HOV-2 lanes on I-270 are Express Lanes over 91% of the time, and HOV-2 less than 9% of the time.

The ICM has resulted in between six and eight lanes in each direction of I-270 between I-370 and the split north of I-495 (see image below). The added capacity does not appear to have been taken into consideration when the proposed toll-financed project was conceived with only 5 non-tolled lanes on each side, and only 2 non-tolled lanes on the western spur which now has at least 3 express lanes.

In addition, on page 3-4 of the Executive Summary of the SDEIS it states that its traffic modeling uses 2017 data and assumes the I-270 ICM to be in place by 2045. But the ICM will be finished in 2022. With that completed and the huge shift to teleworking, a new base year should be determined.

#4

**Response to SDEIS Comment #4**

The I-270 Innovative Congestion Management (ICM) project is designed to address existing issues and short-term needs, unlike the Managed Lanes Study, which includes addressing long-term traffic growth as part of the Purpose and Need. The type of improvements in the ICM project are known as Transportation System Management/ Transportation Demand Management (TSM/TDM).

A TSM/TDM alternative was considered as part of the Study included additional system and demand management measures applicable to I-495 and I-270, *in addition* to the ICM project. In order to assess the performance of the TSM/TDM alternative, MDOT SHA analyzed traffic modeling from the I-270 ICM project in the context of the modeling performed on the No Build Alternative for this Study. Relatively minor short-term benefits from these measures were forecast for portions of I-270 and I-495, however, those benefits would not be sustained for the long-term. Refer to **DEIS, Appendix B**. Even though this alternative would not satisfy the Purpose and Need as a standalone strategy, many TSM/TDM elements are included in the Preferred Alternative, including:

- Adaptive ramp metering along I-270 that is being installed as part of the I-270 ICM project.

- Needed changes at interchange ramp terminals and intersecting roadways to optimize lane configurations and traffic signal timing to provide adequate traffic flow along the crossroads.

- Enhancements to acceleration and deceleration lanes which can improve traffic operations along the mainline in locations where current design does not meet design guidelines.

Finally, the congestion pricing model to be employed as part of the proposed managed lanes is itself an effective travel demand management solution.

The improvements included as part of the I-270 ICM project discussed above were all incorporated into the future year no-build traffic models. While the 2017 traffic models did not include the I-270 ICM improvements, that is because they were not built and in place at that time. In addition, an interim year analysis for 2027 conditions, which will include traffic modeling and analysis results, will be provided within the FHWA-required Interstate Access Point Approval. Refer to **FEIS, Appendix B**, for MDOT SHA's Application for Interstate Access Point Approval.

00022805



I-495 & I-270 Managed Lanes Study

#4
Cont



Page 20 of the "Design-Build Proposal and Analysis" document accessible via link from the "documents" section of the ICMP web page, contains the following prediction regarding the ICMP's impact until 2040:

*A review of the localized congestion patterns anticipated in 2040 (included in **Appendix F**) also shows that where congestion is anticipated in 2040 after the implementation of the CGI program are located in areas that are not targeted by the program. **Southbound, generally speaking, the bottlenecks approaching I-370 and within the express-local lanes section would remain alleviated through 2040.** However, two*

*This page is intentionally left blank.*

**#4 Cont**

*key bottleneck points, MD 80/MD 109 in Frederick County and the I-270 West Spur, would return to 2015 pre-improvement levels. Similarly, in the northbound direction, congestion in the local lanes from Montrose Road to I-370, as well as the West Spur north of I-495, would remain alleviated; however, the bottlenecks at MD 124 and 121 would re-emerge by 2040. By implementing our program of improvements, the capacity constraints that control the entire system in 2040 would shift from being between Father Hurley Boulevard and the West Spur, including the express-local lanes section, to two separate locations: north of MD 121 (the current four lane section), and along I-495 approaching and across the American Legion Bridge. This latter location currently experiences substantial congestion.*

The bottom line: **The only remaining problem areas until 2040 are those that will not be addressed by Phase I South of the proposed I-270 expansion as described in the SDEIS.**

**Alternative Strategies Discounted**

Curiously, the SDEIS even acknowledges the current lack of congestion, and its long-term implications, but fails to take those implications into account in the fundamental strategy behind the expansion plan. Appendix B on page 146 of the SDEIS notes the following:

**#5**

*"As may be seen from the compiled data… traffic volumes regionally recently have been about 20% below pre-pandemic levels, [but] peak period speed data remain near free-flow."*

The reason is explained as follows:  *"A small reduction in demand results in a disproportionate improvement in speeds. As such, strategies to marginally reduce single occupant vehicle (SOV) demand during peak demand via flexible work schedules, pricing or ridesharing (including express bus service) are effective ways to address peak period congestion, conserve energy and reduce emissions."*

Rather than fully incorporate those mechanisms into the core of the proposed project, the State has instead focused on the far more costly (and ultimately self-defeating) privatized toll lane strategy.

**Federal Prohibition of Reduction of Free Lanes**

**#6**

Under the federal law (23 U.S.C. § 129 (a) (1) (G) ) changes to an Interstate highway that entails participation by the Federal government, as the proposed I-495/I-270 project would, there can be no net reduction of unrestricted free lanes when the project is complete.

A Congressional Research Service report titled "Tolling U.S. Highways and Bridges" summarizes that U.S. Code provision this way: *"The toll-free lane count on existing Interstate System surface routes must be maintained."*

---

**Response to SDEIS Comment #5**

See response to Comment #3 above.

**Response to SDEIS Comment #6**

FHWA has participated as the lead Federal Agency on this NEPA Study.  Under the Preferred Alternative there is not a reduction or "loss" of the number of free or general purpose lanes on either I-495 or I-270. On I-495, the Preferred Alternative consists of adding two new, HOT managed lanes in each direction from the George Washington Memorial Parkway to west of MD 187 with four general purpose (free travel) lanes remaining in the build condition.

On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction from I-495 to north of I-370 and on the I-270 east and west spurs with five general purpose (free travel) lanes remaining in the build condition.

Thank you for taking our analysis into consideration.

*This page is intentionally left blank.*

**DONTWIDEN270.ORG – SALLY STOLZ**

| | |
|---|---|
| **From:** | Sally Stolz <sallystolz@aol.com> |
| **Sent:** | Tuesday, November 30, 2021 11:12 PM |
| **To:** | SHA OPLANESMLS |
| **Subject:** | Sally Stolz Attachment 1 DontWiden270.org Comments 2021 |
| **Attachments:** | Sally Stolz Attachment 14 Dontwiden270.org SDEIS comments 2021.pdf |

This is one of 4 attachments

*This page is intentionally left blank.*

**#1**

DW270 Comments
Attachment 1/4

I-270 Innovative Congestion Management Program

"In 2016, Governor Hogan provided $100 million in new funding for the I-270 Innovative Congestion Management Project to improve travel times throughout the 34.4 mile I-270 corridor"  April 19, 1017 Press Release

The following images are taken from the Innovative Congestion Management website. Scroll down to "Documents" and click on "I-270 Overview" to see this visual. Note the large circle at the bottom left, which shows three Local Lanes and five Express Lanes, bringing the total to eight existing lanes.



**Response to SDEIS Comment #1**

The I-270 Innovative Congestion Management (ICM) project is designed to address existing issues and short-term needs, unlike the Managed Lanes Study, which includes addressing long-term traffic growth as part of the Purpose and Need. The type of improvements in the ICM project are known as Transportation System Management/ Transportation Demand Management (TSM/TDM). We concur that the ICM project has been effective at reducing congestion on the lower portion of I-270 and this segment of I-270 south of I-370 currently operates well. However, HOT lanes are needed in this segment to address long-term needs and to provide system connectivity between the existing and proposed HOT lanes on I-495 in Maryland and Virginia and the ICC. The HOT lanes will not replace the ICM improvements, but rather will supplement them. Elements of the ICM improvements will be maintained following construction of the Preferred Alternative, including ramp metering, the additional auxiliary lane added in both directions along the I-270 west spur and I-270 mainline up to Montrose Road, auxiliary lanes between MD 189 (Falls Road) and MD 28 interchanges, and all improvements north of I-370. Elements that will not be maintained involve changes to the access and auxiliary lanes associated with the existing C-D road, which will be removed as part of the Preferred Alternative.

A TSM/TDM alternative was considered as part of the Study included additional system and demand management measures applicable to I-495 and I-270, *in addition* to the ICM project. In order to assess the performance of the TSM/TDM alternative, MDOT SHA analyzed traffic modeling from the I-270 ICM project in the context of the modeling performed on the No Build Alternative for this Study. Relatively minor short-term benefits from these measures were forecast for portions of I-270 and I-495, however, those benefits would not be sustained for the long-term.  Refer to **DEIS, Appendix B**.  Even though this alternative would not satisfy the Purpose and Need as a standalone strategy, many TSM/TDM elements are included in the Preferred Alternative, including:

- Adaptive ramp metering along I-270 that is being installed as part of the I-270 ICM project.

- Needed changes at interchange ramp terminals and intersecting roadways to optimize lane configurations and traffic signal timing to provide adequate traffic flow along the crossroads.

- Enhancements to acceleration and deceleration lanes which can improve traffic operations along the mainline in locations where current design does not meet design guidelines.

Finally, the congestion pricing model to be employed as part of the proposed managed lanes is itself an effective travel demand management solution.

**#1 Cont**

See response to Comment #1 above. The remaining pages are additional attachments included in the Comment.

Scroll down to "Documents" and click on "Design Build Proposal and Analysis. The first chart is from page one. The second image, taken using an iPhone, contrasts existing conditions (in 2016) with post-ICM conditions. When viewed on a computer, only the "Existing Conditions" show! The "Program of Improvements" could not be seen on my computer.

**The CGI Team's Improvements will:**
- Reduce SB peak travel time by 30 minutes; reduce delay 43%; increase speeds 23%
- Reduce NB peak delay 8%
- Increase SB vehicle throughout 3% during the AM and NB 1% during the PM
- Improve trip reliability by 9%
- Combined benefit/cost ratio is nearly 20:1



#1

**MDOT Secretary Greg Slater publicly acknowledges the success of the ICM**

Upon noting that many Rockville residents are reporting an absence of congestion on lower I-270 at all times including during rush hours, Rockville Mayor Bridget Donnell Newton asked MDOT Secretary Greg Slater at the annual MDOT "Road Show" in Montgomery County on Nov. 10, 2021, whether the ICM, which has cost over $132 million so far, has been successful. Secretary Slater confirmed emphatically that it "absolutely" has been successful. It is only 80% complete, so by the end of 2022 even more improvements will be seen.

This project was state-funded and did not expand the footprint of I-270, although many miles of new lanes were added to eliminate bottlenecks and improve flow through. If the toll road were to be built on I-270, these welcome and highly effective improvements would be lost. The free-flowing traffic would also be lost. The $132 million invested in these successful improvements (so far) would also be lost. Drivers on I-270 would be subjected to the nightmare of five or more years of construction, and when it was over, the choice of the congested and less safe free lanes or an unaffordable toll.

Attachment 2/4
SDEIS 2021 Comments by Sally Stolz for Dontwiden270.org

REPRESENTATIVE SCREENSHOTS OF GOOGLE MAP WITH TRAFFIC OVERLAYS

While the ICM won't be fully finished until the end of 2022, it has already significantly improved travel times on I-270, as can be seen in the Google Map screenshots below.

Its efficacy is aided by a reduction in single occupancy vehicles (SOV's) due to teleworking. But that reduction was partly offset by an increase in SOVs due to people switching from transit to cars because of COVID fears. While the latter switch will be temporary, the increase in teleworking will continue. An Aug. 3, 2021 article in BusinessInsider.com gives results of a recent poll of 1000 American adults. 65% of respondents said they would take a 5% reduction in pay to be allowed to continue teleworking full time and one in seven said they would give up 25% of their salaries to be able to work from home forever. This reality makes the 2017 baseline used by MDOT in both the DEIS and SDEIS obsolete.

Following are several recently taken screenshots using the Google Map App with the traffic overlay. These represent over 1,000 photographs taken during the morning and evening workday rush hours from July 22, 2021 to Nov. 30, 2021.

Green = no traffic delays
Orange = medium traffic
Red = traffic delays
Dark Red = even slower traffic speed or stationary vehicles

**Morning Rush Hour**


Entire Region


Entire Length of I-270


Lower I-270

00022812





Entire Region          Entire Length of I-270          Lower I-270

We have consistently noted that while congestion is moderate or severe around the metropolitan region, it rarely exists at all on Lower I-270.

Attachment 3/4
SDEIS 2021 Comments by Sally Stolz for Dontwiden270.org

REPRESENTATIVE SCREENSHOTS OF GOOGLE MAP WITH TRAFFIC OVERLAYS

**Evening Rush Hour**




Entire Region          Entire Length of I-270          Lower I-270



Entire Region        Entire Length of I-270        Lower I-270

We have consistently noted that while congestion is moderate or severe around the metropolitan region, it rarely exists at all on Lower I-270.

Due to file size limitations, I am not including more photos. Below are links to photo files of the screenshots of the Lower I-270 photos taken from July 22 - Oct. 7. When scrolling through them, day after day, you will see the same thing: Lower I-270 is free of congestion during both morning and afternoon rush hours unless a thunderstorm was overhead, in which case I also took a screen shot of the weather radar, or there was an accident, in which case I also took a screenshot of the Google accident icon.

Here's a link to "270 traffic morning rush hour July 22 - Oct. 1" in my Dropbox:
https://www.dropbox.com/sh/cfbsym5x9m7km6m/
AABWq8cg0zeFdqTtrLkL3l3_a?dl=0

Here's a link to "270 traffic afternoon rush hour July 22 - Oct. 7, 2021" in my Dropbox:
https://www.dropbox.com/sh/5kqxo77ptkjgwsj/
AAD38DTbdzvZTp5X2ElpdiMza?dl=0

00022814


Attachment 4/4
SDEIS 2021 Comments by Sally Stolz for Dontwiden270.org

### Patently Illegal

We are all now well aware of the legal requirement, as related in the body of these comments, that if an Interstate Highway is converted to a toll Road, all the existing lanes must remain free. And ever since Gov. Hogan and MDOT announced this plan, they have stated that all free lanes would remain free. But that is a lie. Does the right hand not know what the left hand is doing? How could MDOT be unaware of it's own I-270 Innovative Congestion management Program, which was begun in 2017 and will be completed in late 2022? Despite implementing the program very successfully, they have been nearly silent about it, presumably because they don't want the public to know that the part of I-270 where they want to build the toll road now has 8 lanes in places, 7 lanes in most other places, and possibly 6 lanes in a few places. And the I-270 spurs have an additional lane.

Here from the I-270 Overview Diagram from the IS-270 Innovative Congestion Management Contract, is the bottom circle, showing places where there are now 3 local lanes and 5 express lanes, bringing the total to 8 existing and totally free lanes. Please see the bottom left bubble.



On the next page are Google satellite photos showing places where we now have 8 or 7 lanes



Latest in Rockville




Latest in North Bethesda







**DONTWIDEN270.ORG – SALLY STOLZ (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Sally Stolz

**Agency/Organization/Jurisdiction, if applicable:** DontWiden270.Org

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

My name is Sally Stolz. That is spelled S-A-L-L-Y S-T-O-L-Z. I live at 5 Lochness Court, Rockville, Maryland 20850. And I am a co-coordinator of DontWiden270.org. We oppose this project for many reasons. Today, I will only speak about one. Last summer, MDOT representative, Rich Parsons, assured me that congestion on I-270 had almost erased the pre-pandemic levels. That did not square with my own experience or observations using Google maps with the traffic overlay. I focused on lower 270, between I-370 and Democracy Boulevard, where the proposed toll road would be placed. I found that the traffic there during rush hours was almost always traveling at or above the speed limit.

#1

On July 22nd, I began documenting what I had been observing by taking about nine screen capture images on my iPhone each morning, and nine each afternoon/evening to capture the morning and evening rush hour speed, where the toll road would be built. Today, I have well over 1,000 of these images and will continue to take them. Each one shows the date and time it was taken. They showed me, beyond a shadow of a doubt, that speeds on the lower stretch of I-270 have not returned to pre-pandemic levels. They are almost always at or above the speed limit. When the Google traffic map shows slow-downs, there is almost always an accident or a thunderstorm overhead.

#2

So, I'm investigating why the speeds have not slowed down, even close to pre- pandemic levels. I found that the innovative congestion management program, which MDOT embarked on in 2017, was almost finished and had made a huge difference. Part of that plan was the ramp metering, but another part was converting a shoulder to add a lane and extending merge lanes to alleviate bottlenecks and actually create, in some places, eight lanes on each side of lower 270 as shown on MDOT's own detailed graphic for that program. The bottom line is that lower I-270 is a different animal from upper I-270, where it funnels down to two lanes going up to Frederick. Ironically, lower I-270 where this toll road would be built is much less congestion than where Transurban already operates toll roads in Virginia. Lower I-270 will be much worse off if the toll road is built there. The five years of construction would immediately slow people's commutes and increase accidents and deaths. And when it's finished, there will only be five general lanes. The total road would actually reduce capacity, but as the innovative congestion management diagram shows, there are currently eight general lanes in much of lower I-270. Reducing the number of general lanes will definitely create congestion, which is not there now. Travel times will be longer and that's own figures in the SDEIS indicate that commuting in the general lanes will be faster with No Build option, and that be faster with the No Build option on I-270, it makes no sense to proceed. My written comments will include documentation to support the statements I have made today. Thank you.

**Response to SDEIS Comment #1**

MDOT has closely monitored changes in traffic patterns throughout the pandemic, and as of early 2022, daily traffic volumes have already recovered back to over 90 percent of pre-COVID levels.  Although there is still uncertainty surrounding traffic projections resulting from the COVID-19 pandemic, transportation experts have analyzed pandemic traffic conditions and future traffic demand inputs and note that traffic volumes have continued to recover since the rollout of the vaccines in early 2021. Traffic volumes are anticipated to return to pre-COVID levels before the time the HOT lanes are operational. Given the ultimate 2045 design year, the HOT lanes will be required to accommodate long-term traffic.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic and FEIS, Chapter 4, Section 4.5 for additional details.

**Response to SDEIS Comment #2**

MDOT SHA has been monitoring traffic conditions throughout the pandemic. Permanent count stations on the Capital Beltway (I-95 and I-495) and I-270 provide data that can and was used to compare counts. This information will be provided within the FEIS. As an example, data from October 31 to November 13, 2021 was compared to November 3 to November 16, 2019, excluding the Veterans Day holiday. At the permanent count stations along the Capital Beltway, evening rush time volumes are close to or match pre-pandemic volumes. At these same count stations, the morning rush and mid-day volumes still appear to be trailing pre-pandemic volumes by 5-15%. Volumes on permanent counts stations on I-270 appear to have rebounded to be slightly higher than pre-pandemic volumes (5-10%) for the evening rush, while morning peak period and mid-day volumes appear to be similar to pre-pandemic volume levels. In addition, real-time speed data obtained from the Regional Integrated Transportation Information System (RITIS) shows that along with the rebound in peak period volumes, I-270 and I-495 are also experiencing a corresponding increase in congestion, similar to pre-pandemic levels. Average vehicle speeds this Fall were below 20 mph during the PM peak on the I-495 Inner Loop between the American Legion Bridge and MD 190, same as in 2019. Average vehicle speeds on northbound I-270 between Watkins Mill Blvd and MD 118 are now below 40 mph during the PM peak period, which is slightly better than the 35 mph average speeds experienced in this section pre-pandemic.  This is despite I-270 serving higher volumes in 2021 compared to 2019, as the speed increase may be attributed to improvement projects along I-270 northbound, including the Watkins Mill Interchange, which opened in 2020.  Along southbound I-270, average vehicle speeds remain higher than pre-pandemic levels by approximately 5-10 mph, despite serving higher peak period volumes in 2021 compared to 2019. This can be attributed to the implementation of ramp metering in September 2021.  Even so, some congestion remains along southbound I-270 during the AM peak period, with average vehicle speeds of approximately 30 mph in November 2021. These results are provided in the **FEIS, Appendix C.**

Additionally, MDOT SHA has been monitoring and evaluating the effects of potential long-term behavioral changes related to travel that have come from COVID-19. This includes changes in work from home, virtual learning, discretionary travel, and visitor travel. MDOT SHA evaluated LOW, MID, and HIGH scenarios of reductions in travel. The HIGH scenario was developed to represent a level of activity consistent with the period during the pandemic in late 2020/early 2021 that saw increases in activity because of loosening restrictions but prior to the rollout of vaccines with still high levels of work from home and remote learning. This scenario is seen as unlikely in the long term. The LOW and MID scenarios are more likely outcomes that will include some level of work from home continuing into the future for higher-income industries, a low level of remote learning and potential long-term declines in visitor and air passenger related travel. The resulting decrease in vehicle miles traveled (VMT) between the LOW, MID and HIGH scenarios was 5%, 10% and 15% respectively across the entire model region. The results indicate that the VMT under the LOW and MID scenarios is expected to exceed 2019 levels between 2030 and 2035. Additionally, even in the highly unlikely HIGH scenario, 2045 No Build VMT is projected to exceed 2019 VMT, when there was significant congestion. Overall, the results confirm that the capacity improvements proposed under the Preferred Alternative would be needed and effective even if future demand changes from the pre-pandemic forecasts due to potential long-term impacts associated with the pandemic (e.g., teleworking, e-commerce, transit use) that are not formally accounted for in the current regional forecasting models. These results are provided in the **FEIS, Appendix A.**

*This page is intentionally left blank.*

Potential roadway or transit improvements on I-270 from north of I-370 to I-70 were not included as part of this Study, as alternatives for that segment will be developed as part of a separate NEPA process (https://495-270-p3.com/i270-environmental/).

**ENVIRONMENTAL JUSTICE OF THE CEDAR LANE UNITARIAN UNIVERSALIST CHURCH – NANCI WILKINSON**

| | |
|---|---|
| **From:** | nanci wilkinson <nanciwilkinson@gmail.com> |
| **Sent:** | Sunday, November 7, 2021 9:15 AM |
| **To:** | SHA OPLANESMLS |
| **Subject:** | No Build Alternative I-270 and I-495 Supplemental Draft Environmental Impact Statement (SDEIS) |
| **Attachments:** | EJM  Nov Test 2021 Beltway expanesion.docx |

Dear Mr. Folden:

Please find attached the testimony of the Environmental Justice Ministry of the Cedar Lane Unitarian Universalist Church in Bethesda, Maryland.

Thank you.

Nanci Wilkinson
Environmental Justice Ministry Team
Cedar Lane Unitarian Universalist Church
9601 Cedar Lane
Bethesda MD 20814

*This page is intentionally left blank.*

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 62-3    Filed 10/30/23    Page 72 of 96

FINAL ENVIRONMENTAL IMPACT STATEMENT

To: Jeffrey T. Folden, Director I-270 and I-495 P3 Office of
       MD DOT State Highway Administration
Position: **No Build Alternative** Supplemental Draft Environmental Impact Statement (SDEIS)
Date: November 7, 2021
Environmental Justice Ministry
Cedar Lane Unitarian Universalist Church
Bethesda MD 20814

Cedar Lane is a religious community that holds respect for the interdependent web of all existence of man and nature. The natural habitats, the air we breathe, the water we drink, the community fabric we hold dear are all massively affected by this project. The SDEIS fails to satisfy the **stated purpose** for the Environmental Impact Statement **to improve traffic and stated needs to protect the environment.** Cedar Lane's green team, the Environmental Justice Ministry, supports the **No Build Alternative** for the SDEIS for the following reasons:

**#1**
1. *Impact on Parks and Greenspace:* The toll lanes would impact 15 parks, including three national parks. Over 1,200 trees on National Park Service land would be removed for the toll lanes. The other parks impacted include five parks owned by the Maryland-National Capital Park and Planning Commission; five parks owned by the City of Rockville and two parks owned by the City of Gaithersburg. A total of 36.1 acres of parkland would be harmed. There would be a loss of 48.8 acres of forest canopy on parkland and other greenspaces, including greenspaces that currently provide a buffer between the highways and nearby neighborhoods.

**#2**
2. *Impact on Homes and Businesses:* While no homes or businesses would be wholly taken, land would be taken from a total of 501 properties, including 389 homes and 112 businesses and other nonresidential properties. Below we show the number of properties impacted, by jurisdiction.

**#3**
3. *Impact on Community Facilities:* Land from a number of schools, churches and other community facilities would be taken by the toll lanes, including 1.8 acres from Julius West Middle School, 1.0 acres from the Rockville Senior Center and 3.7 acres from the Montgomery County Detention Center

**#4**
4. *Impact on Morningstar Tabernacle No. 88 Moses Hall and Cemetery and Gibson Grove MDOT plans to shift the center of the proposed highway in an effort to avoid impact on the Morningstar Cemetery. But the shift just transfers the impact to the Gibson Grove AME Zion Church, which is already separated from the Cemetery by the existing Beltway lanes. Further, the SDEIS does not show that MDOT has considered alternatives that would avoid impacting the Cemetery and the Church altogether.*

**#5**
5. *The principle of  induced demand or the "iron law of congestion" which warns adding lanes won't cure snarled traffic; the additional car space inevitably invites more trips, until gridlock is as bad as ever. More roads inevitably bring more traffic. Countless studies of jurisdictions throughout the United States have found adding more highways does not solve congestion.*

**#6**
6. *The proposed project conflicts with other Unitarian Universalist principles that affirm and promote justice, equity and compassion* in human relations and the inherent worth and dignity

**Response to SDEIS Comment #1**
Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

**Response to SDEIS Comment #2**
Refer to Chapter 9, Section 3.4.K for a response to impacts to properties and communities, including community facilities.

**Response to SDEIS Comment #3**
Refer to Chapter 9, Section 3.4.K for a response to impacts to properties and communities, including community facilities.

**Response to SDEIS Comment #4**
Through the Section 106 review, MDOT SHA has completed extensive historical and archaeological research that thoroughly documents the property and its significant features, allowing the Preferred Alternative to avoid all known impacts. MDOT SHA will continue to work with the community through the project's Programmatic Agreement on further studies and context-sensitive design of new facilities.

Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

**Response to SDEIS Comment #5**
MDOT understands the phenomenon of induced demand, and it is a consideration on all of our large roadway projects. In this case, MDOT is recommending adding capacity via managed lanes (HOT lanes) instead of widening with additional general purpose lanes. Managed lanes do a better job at regulating demand, including induced demand, due to dynamic pricing.

Our study shows that there could be some induced demand as a result of this project, but the impact will be small (less than 1% increase in vehicle miles traveled (VMT) in the region) and those effects are fully accounted for in the regional traffic models COG and TPB use. Even with these effects, the proposed managed lanes would reduce regional congestion delays and significantly improve travel times along both freeway corridors and on local roads throughout the region.

Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**Response to SDEIS Comment #6**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

Refer to Chapter 9, Section 3.4.F for a response to adverse impacts to air quality.

#6 Cont

of every person. The marginalized communities living near the project widening areas who are massively impacted by the air pollution and adverse effects from the current auto carbon/methane emissions they breathe are greatly overlooked in this SDEIS. The choices for lower incomes and frequently BIPOC communities to have transportation to work are very few and may result in more job loss and greater inequities a result of this project.

#7

**7.The lack of any consideration of county, state or international climate plans** including the conflict of the SDEIS with the Maryland Greenhouse Gas Reduction Act which mandates a reduction of GHG by 40 % by 2030.

#8

**8.The total lack of research into better transportation alternatives from the beginning such as increased mass transit, rapid rail, and rapid bus lanes. The SDEIS new preferred alternative provides no basis for determining whether it satisfies the project's Purpose and Need mentioned above.**

Thank you for this opportunity to endorse the **No Build Alternative** to SDEIS.

Nanci Wilkinson
Environmental Justice Ministry
Cedar Lane Unitarian Universalist Church
9601 Cedar Lane
Bethesda MD 220814

**Response to SDEIS Comment #7**
Refer to Chapter 9, Section 3.4.G for a response to climate change considerations.

**Response to SDEIS Comment #8**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

OP · LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 62-3    Filed 10/30/23    Page 74 of 96

FINAL ENVIRONMENTAL IMPACT STATEMENT

**FALLS RIDGE HOMEOWNER'S ASSOCIATION – LEON FEUERSTEIN**

I-495 and I-270 Managed Lanes Study
Oral Testimony Received After SDEIS Virtual Public Hearing

**Name:** Leon Feuerstein

**Agency/Organization/Jurisdiction, if applicable:** Falls Ridge Homeowner's Association

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Voicemail (11/9/2021)

**Transcription:**

#1

Hi, my name is Leon Feuerstein and I represent the Falls Ridge Homeowner's Association. And I am calling to discuss the sound barrier, which ends at Falls Road on the southbound lanes. Currently the sound barrier ending at Falls Road at the southbound lanes and not continuing through the detention center leaves open the noise to permeate through our neighborhood. Currently, we hear a significant amount of traffic and during construction, we actually hear it so much noise that we can hear it through our house. It affects our homeowner's value, and we as an Association request that the noise barrier continue from Falls Road through to Montrose Road. The racing of cars has been so significant that our homeowners are not able to spend time outside in the evening and things like camping and, you know, sleeping outside in a tent are not possible because of the significant noise permeation. There is no berm by the detention center and therefore the noise permeates through our neighborhoods. So, both during construction and post-construction, the noise will be untenable. So as a Homeowner's Association, we appreciate your consideration of a noise barrier from Falls Road through Montrose Road on the southbound lanes for the new 270 project. Thank you.

**Response to SDEIS Comment #1**

MDOT SHA re-evaluated the Falls Ridge Community for noise impacts and abatement as part of the SDEIS and FEIS studies. Although we did identify noise impacts in your community, we found that a sound barrier does not meet MDOT SHA's criteria for reasonableness, and therefore is not recommended for further consideration as part of this project. MDOT SHA's noise impacts and abatement analysis was conducted in compliance with the agency's Highway Noise Abatement Planning and Engineering Guidelines (2020), which are in turn, based on FHWA regulations at 23 C.F.R. Part 772, "Procedures for Abatement of Highway Traffic Noise and Construction Noise. The federal regulations require MDOT SHA to assess whether abatement is "feasible and reasonable" based on a series of practical engineering and performance measures. In order to meet the acoustic feasibility and reasonableness criteria established in the MDOT SHA Noise Guidelines, a 40 foot tall sound barrier was evaluated (note that 40 feet is the maximum height of a sound barrier in the State of Maryland). The sound barrier would provide sufficient noise level reduction; however it does not meet the cost effectiveness threshold.

MDOT SHA measures "cost effectiveness" using a quantity of barrier per benefited residence rather than a cost of barrier per benefited residence. Abatement is cost effective only if the square footage of abatement is lower than the allotted cap. The SF per benefited residence is 3,746, which is more than the 1,700 SF-p-r threshold for this barrier system.

Although highway construction is a short-term phenomenon, MDOT SHA recognizes that it can cause significant noise impacts. The extent and severity of the noise impact depends upon the phase of construction. Mitigation measures for construction noise will be considered during the final design phase of the project and can include the provision of temporary noise barriers or construction of permanent noise barriers first where possible.

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study | Case 8:22-cv-02597-DKC    Document 62-3    Filed 10/30/23    Page 75 of 96

FINAL ENVIRONMENTAL IMPACT STATEMENT

### FOX CHAPEL CIVIC ASSOCIATION – ANDY STIEF

| | |
|---|---|
| From: | Fox Chapel Civic Assoc. Germantown Maryland |
| To: | SHA OPLANESMLS |
| Subject: | Comment on the SDEIS Documents |
| Date: | Friday, November 12, 2021 3:58:45 PM |

**I-495 & I-270 Managed Lanes Study SDEIS**

#1

We the Fox Chapel Civic Association of Germantown MD would like to submit our full approval for going ahead with Phase 1 South/Alt 9. Our Civic Association covers 46 houses and almost 200 residents on Plummer Dr, Plummer Ct and Staten Ct in Germantown. All of our Homeowners are often stuck in the terrible traffic on I-270 and I-495 and welcome any relief to that congestion.

#2

We also would like to see I-270 from I-370 up to Frederick/ I-70 receive fast tracked support for the building of that section. That north section is worse than the I-270 south of I-370 section and needs immediate attention. Extending the 3 lanes in both directions north of Hyattstown to Frederick/I-70 is greatly needed.

Thank you,
Andy Stief - Treasurer
Fox Chapel Civic Association



FOXCHAPELCIVICASSOCIATIONS@GMAIL.COM

*Please let us know what F.C.C.A. notifications you wish to Receive! (All - Social - Safety - News)*

**Response to SDEIS Comment #1**

MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**Response to SDEIS Comment #2**

Thank you for your comment on the I-270 Pre NEPA study. The northern section of I-270 from I-370 to I-70 is part of a separate, independent planning study under the I-495 and I-270 Public-Private Partnership (P3) Program. We recognize that improvements are needed in the northern section of I-270 with or without the improvements being considered under this project, however, MDOT SHA has prioritized improvements that will address the major regional congestion at the American Legion Bridge.

00022823



**FRIENDS OF MOSES HALL**

MDOT SHA acknowledges receipt of the Friends of Moses Hall DEIS Comment Letter dated October 16, 2020 that was appended to this SDEIS Comment Letter. Refer to Appendix T for a response to this DEIS Comment Letter.

**From:** Moses Morningstar 88 <morningstarmosescj@gmail.com>
**Sent:** Monday, November 29, 2021 9:30 AM
**To:** SHA OPLANESMLS
**Cc:** governor.mail@maryland.gov; pfranchot@comp.state.md.us; treasurer@treasurer.state.md.us; KParzen@savingplaces.org; elizabeth.hughes@maryland.gov; julie.langan@dhr.virginia.gov; Steve Archer; Julie Schablitsky; Richard Ervin; Jeanette Mar, FHWA; Beth Cole, MHT; Tim Tamburrino, MHT; Marc Holma, Virginia DHR; John Simkins, FHWA Virginia Division; rebeccah.ballo@montgomeryplanning.org; debra.borden@mncppc.org; brian.crane@montgomeryplanning.org; jsjshipp3@verizon.net; jack.orrick@offitkurman.com; Eddie Bankhead; ebankjs@verizon.net; Lee, Susan Senator; Korman, Marc Delegate; Love, Sara Delegate; Kelly, Ariana Delegate; MCP-Chair@mncppc-mc.org; marc.elrich@montgomerycountymd.gov; councilmember.Albornoz@montgomerycountymd.gov; councilmember.friedson@montgomerycountymd.gov; councilmember.glass@montgomerycountymd.gov; Hucker's Office, Councilmember; councilmember.Jawando@montgomerycountymd.gov; councilmember.katz@montgomerycountymd.gov; councilmember.Navarro@montgomerycountymd.gov; councilmember.rice@montgomerycountymd.gov; councilmember.Riemer@montgomerycountymd.gov
**Subject:** Comments of Friends of Moses Hall to SDEIS and Updated Draft Section 4(f) Evaluation
**Attachments:** Friends Moses Hall DEIS Letter 10.16.20 FINAL.pdf; FMH SDEIS Comment Letter - FINAL.pdf

Dear Mr. Folden,

Friends of Moses Hall submits our attached comments and concerns regarding the Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation for the I-495 and I-270 Managed Lanes Study.

The Morningstar Tabernacle No. 88 Moses Hall and Cemetery is eligible for listing on the National Register of Historic Places and is a historic African American cultural site and burial ground (MIHP No. M: 35-212). The site was also designated one of *America's 11 Most Endangered Historic Places* for 2021 by the National Trust for Historic Preservation. We represent descendants of the families who used the hall and are buried here and concerned neighbors who want to see this asset protected and preserved. We are a Consulting Party for the purposes of the Section 106 process.

For your convenience, we have also attached our comments to the DEIS dated October 16, 2020.

Sincerely,
**Friends of Moses Hall**
**The Board of Trustees of**
**Morningstar Tabernacle Number 88, Incorporated**
friendsofmoseshall.org




**Friends of Moses Hall**
**7550 Seven Locks Road**
**Cabin John, MD 20818**
morningstarmosescj@gmail.com
**www.friendsofmoseshall.org**

November 29, 2021

*By Email to:* oplanesMLS@mdot.maryland.gov
Jeffrey T. Folden, P.E., DBIA
Deputy Director, I-495 & I-270 P3 Office
**Maryland Department of Transportation State Highway Administration**
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21202

**RE: I-495/I-270 Managed Lane Study Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation**

Dear Mr. Folden:

We are writing on behalf of the Friends of Moses Hall (FMH), an organization of descendants and supporters of the historic lodge and cemetery located off of Seven Locks Road in Cabin John, Montgomery County, adjacent to I-495. We have been active as Consulting Parties in the Section 106 process, as Morningstar Tabernacle 88 Moses Cemetery and Hall is a historic site deemed eligible for the National Register of Historic Places. Our comments below focus on the cultural resources impacts, environmental justice impacts, and the updated Draft Section 4(f) evaluation, and serve to reinforce the comments and concerns we expressed regarding the ground penetrating radar (GPR) survey report on October 8, 2021.

**Physical Impacts to Morningstar Moses Cemetery and Hall (Moses Hall)**

The cultural resources section of the SDEIS indicates that the Moses Hall site is considered to be "adversely affected pending further consultation regarding options for future investigations and other issues raised regarding indirect and cumulative effects" (4-34). FMH concurs with this conclusion regarding the current state of affairs. However, FMH disagrees with the preceding conclusion, namely that the minimization efforts have avoided burial features (Ibid.). As documented in our response to the GPR survey results, more needs to be done to confirm whether or not the cemetery has been physically avoided. We summarize briefly below our key points from the October 8 letter:

FMH SDEIS Comments                 11.29.2021                        Page   1

**#1** (margin label)

---

**Response to SDEIS Comment #1**

Based on the current historic boundary, the Preferred Alternative will avoid direct impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Additionally, no atmospheric, audible, or visual effects to the property have been identified from the Preferred Alternative. No diminishment of location, design, setting, materials, workmanship, feeling or association has been found in these areas. The project will be governed by a programmatic agreement, including a treatment plan that specifies the methods, limits and consultation procedures for further investigation of areas with the potential for additional burials outside of the current historic boundary, no specific determination of effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery will be made at this time, and will be made following completion of the additional investigations specified in the programmatic agreement and treatment plan (Refer to **FEIS, Appendix J**).

MDOT SHA will continue to work with the community through the project's Programmatic Agreement on further studies and context-sensitive design of new facilities.

Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

**#1 Cont**

- The GPR work appears to be incomplete and should be expanded to the north, west, and east;
- There should be a greater buffer created between the northernmost identified burial and the Project's Limit of Disturbance (LOD); and
- More information is needed about highway construction methods to determine whether physical avoidance will take place or not.

We urge SHA to address these issues of physical avoidance promptly, as it will be necessary to conduct further GPR analysis before further advancing either the NEPA or Section 106 process.

**Cumulative Impacts to Moses Hall**

**#2**

As the SDEIS notes (4-34), there is a real need to address the cumulative negative impacts that Moses Hall has experienced over the decades. As the research conducted by Dr. Alexandra Jones and highlighted by the Montgomery County Planning Board in its draft comments on the SDEIS makes clear, the initial construction of I-495 divided important black community institutions and contributed to the decline of the local Cabin John black enclave.[1] The widening of I-495 in the 1990s also proceeded without consideration of the impacts to Moses Hall. SHA's staff, in comments to *The Washington Post*, acknowledged that SHA "own[s] the fault of the Maryland Roads Commission impacting this community 60 years ago… 'It's our responsibility now to repair that damage and come in and do the right thing.' "[2]

FMH appreciates this recognition of past damages from SHA and concurs that SHA bears such an obligation. We believe that this obligation goes beyond the construction of a sidewalk between Gibson Grove Church (now First Agape AMEZ Church) and Moses Hall, a necessary but insufficient step toward repairing the social and physical damage of the past. FMH has not seen substantive commitments from SHA in the Section 106, NEPA, or 4(f) process commensurate with SHA's statement to *The Washington Post*. The full nature of the impacts on the property needs to be better understood (as discussed above) and a true commitment to restorative justice needs to be articulated in SHA's environmental analysis and mitigations.

**Environmental Justice Analysis**

**#3**

As a community that has suffered due to past failures to adequately consider the environmental justice consequences of transportation activities, FMH is centrally concerned with how this NEPA document treats EJ communities. Unfortunately, we conclude that SHA has still failed to comply with its legal obligations under NEPA and Executive Order 12898. EO 12898 requires agencies to evaluate whether there are disproportionately high or adverse impacts to EJ communities. 40 CFR 1502.9 requires agencies to adequately disclose impacts in the DEIS. In the SDEIS, SHA states that "the determination of disproportionately high and adverse impacts to EJ populations will be made on the Preferred Alternative and will be disclosed in the FEIS" (Pg.

[1] See: https://montgomeryplanningboard.org/wp-content/uploads/2021/10/Item10_Nov-2021_M-NCPPC-SDEIS-Comment-Letter-ARG.pdf
[2] Shaver, Katherine. "African American gravesites detected near the Capital Beltway will be spared in road-widening plans." *The Washington Post* September 9, 2021.
https://www.washingtonpost.com/transportation/2021/09/09/maryland-beltway-moses-morningstar-cemetery/

FMH SDEIS Comments     11.29.2021       Page   2

---

**Response to SDEIS Comment #2**

The Preferred Alternative includes the following elements and commitments related to the First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall Cemetery:

- Direct and indirect impacts to historically African American Gibson Grove Community significantly minimized
- Gibson Grove Church is avoided with impacts minimized to 0.1 acre of temporary easement needed for drainage
- All direct and indirect impacts to Moses Hall Cemetery completely avoided
- Noise barrier with context sensitive treatment at the Moses Hall Cemetery
- Gifting land owned by MDOT SHA with potential graves back to Trustees of Moses Hall Cemetery
- Completing drainage improvements on Gibson Grove property and clearing space for their proposed parking lot
- Upgrading parking lot on the east side Seven Locks Road and making the sidewalk and path improvements to connect to the existing parking lot.
- Constructing a new sidewalk along the west side of Seven Lock Road under I-495 to reestablish the historic connection between Gibson Grove Church and the Moses Hall Cemetery.

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to SDEIS Comment #3**

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**#3 Cont**

4-104). 40 CFR 1502.16 also requires that all alternatives under consideration be treated equally, which this approach does not do.

Because EJ analysis turns on this disproportionate impact analysis, SHA has still not conducted an EJ analysis for the Project, in direct contravention of regulatory requirements. It has not adequately grappled with the consequences on current and historic minority populations. As a result, the SDEIS remains deficient on this issue, and our serious concerns regarding the need to address current and historic EJ consequences remain unaddressed.

**#4**

**Section 4(f) Analysis**

It is premature for SHA to make a use or constructive use determination under Section 4(f) due to the lack of information provided on key issues relevant for such a determination. As noted in this and our October 8 communication, the incomplete GPR results raise real questions as to whether the highway widening may affect existing burial sites. While the updated Draft Section 4(f) evaluation states that "GPR-indicated features" are avoided (5-53), we have noted that GPR did not continue up to the existing highway line (*See Attachment A*). Understanding that space is one important piece for confirming whether there would be a 4(f) use on the site.

Determining a constructive use also depends upon outstanding or currently unavailable information. 23 CFR 774.15(e)(4) requires consideration of the potential construction impacts on 4(f) properties, particularly vibration impacts. The SDEIS remains vague regarding construction means and methods and impacts. In particular, the SDEIS offers scant discussion of potential vibration impacts. Alongside noise, construction vibration may impair the use of the cemetery as a site for remembrance and contemplation. FMH has not been provided sufficient information on construction to understand whether a constructive use may occur. SHA also concludes that visual changes "would not substantially impair the aesthetic features or attributes of Morningstar Moses Cemetery that contribute to the value of the property" (5-53). This conclusion is premature. A Visual Impact Assessment (VIA) has yet to be conducted, which means consideration of visual or aesthetic impacts to the cemetery that may result in a constructive use cannot yet be determined. The forthcoming VIA should consider visual impacts because, when confronted with the possibility of additional yet-undiscovered burials, the visual relationship of the highway to this sensitive site could change substantially.

Friends of Moses Hall appreciates the consideration that SHA has paid to our site, as noted through the frequent documentation of the ongoing coordination and site investigation in the NEPA and Section 4(f) documentation. We look forward to continued coordination as SHA works to address the meaningful limitations of the analysis done to-date and seeks to affirmatively and substantively address the wrongs of the past.

Sincerely,

**FRIENDS OF MOSES HALL**
**The Board of Trustees of**
**Morningstar Tabernacle Number 88, Incorporated**

**Diane E. Baxter**
President, Morningstar Tabernacle Number 88, Incorporated
Descendant

FMH SDEIS Comments          11.29.2021                    Page   3

See response to Comment #3 above.

**Response to SDEIS Comment #4**
The Final Section 4(f) Evaluation concluded there would be no constructive use as a result of improvements proposed under the Preferred Alternative. Refer to **FEIS, Appendix G** for additional details.

**Dr. Charles W. Harris**
Vice President, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Eileen McGuckian**
Secretary, Morningstar Tabernacle Number 88, Incorporated
Historian and President, Montgomery Preservation

**Montgomery Crawford**
Treasurer, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Alexandra Jones, PhD, RPA**
Trustee, Morningstar Tabernacle Number 88, Incorporated
Executive Director and Founder, Archaeology in the Community

**Austin E. White**
Trustee, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Charlotte Troup Leighton**
Trustee and Chair, Friends of Moses Hall Committee, Morningstar Tabernacle Number 88,
Incorporated
Vice President of Advocacy, Cabin John Citizens Association

**L. Paige Whitley**
Chair, Research Committee, Morningstar Tabernacle Number 88, Incorporated
Independent Researcher

**Sondra Raspberry**
Descendant

**Shannon S. Steward**
Descendant

**Christopher Waynes**
Descendant

**Austin White II**
Descendant

**Nathan White II**
Descendant

**Pandora White**
Descendant

FMH SDEIS Comments          11.29.2021                    Page   4

00022828

*This page is intentionally left blank.*

cc:    Governor Lawrence J. Hogan – governor.mail@maryland.gov
Comptroller Peter V. R. Franchot – pfranchot@comp.state.md.us
Treasurer Nancy Kopp – treasurer@treasurer.state.md.us
Kendra Parzen, National Trust for Historic Preservation - KParzen@savingplaces.org
Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
Julie Langan, Virginia DHR - julie.langan@dhr.virginia.gov
Steve Archer, MDOT SHA – sarcher@mdot.maryland.gov
Julie Schablitsky, MDOT SHA – jschablitsky@mdot.maryland.gov
Richard Ervin, MDOT SHA – rervin@mdot.maryland.gov
Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
John Simkins, FHWA Virginia Division - john.simkins@dot.gov
Rebeccah Ballo, Montgomery County Planning Department – rebeccah.ballo@montgomeryplanning.org
Debra Borden, M-NCPPC - debra.borden@mncppc.org
Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
Eddie Bankhead, First Agape AME Zion Church - esbj@pobox.com
Rev. Edgar Bankhead, First Agape AME Zion Church - ebsnkj@verizon.net
Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
Sara Love, Maryland State Delegate – sara.love@house.state.md.us
Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Carol Rubin, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Gerald Cichy, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
Gabe Albornoz, Montgomery County Councilmember - councilmember.albornoz@montgomerycountymd.gov
Andrew Friedson, Montgomery County Councilmember - councilmember.friedson@montgomerycountymd.gov
Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

FMH SDEIS Comments                11.29.2021                        Page   5

00022829

**ATTACHMENT A**

## Morningstar Tabernacle 88 Hall and Cemetery



key
- Possible Burials (approximate)
- GPR Study Area (approximate)
- Hall Foundation
- Morningstar Property

0    100    200    400 Feet

N

NOTE: The approximate burials polygon reflects the combined
findings of geophysical survey (GPR) and earlier surface inspection
from archaeological reports.

Courtesy: Montgomery Planning

FMH SDEIS Comments          11.29.2021                    Page   6

*This page is intentionally left blank.*

OP·LANES™ MARYLAND  | I-495 & I-270 Managed Lanes Study  | Case 8:22-cv-02597-DKC   Document 62-3   Filed 10/30/23   Page 83 of 96

FINAL ENVIRONMENTAL IMPACT STATEMENT

**FRIENDS OF SLIGO CREEK – KIT GAGE**

| | |
|---|---|
| **From:** | KIT GAGE <kgage@verizon.net> |
| **Sent:** | Thursday, November 4, 2021 8:11 PM |
| **To:** | SHA OPLANESMLS |
| **Subject:** | Friends of Sligo Creek testimony on SDEIS of MDOT on Beltway expansion |
| **Attachments:** | FOSC testimony SDEIS MDOT Beltway 211104.docx |

Attached is our testimony.
Kit Gage
Advocacy Director
Friends of Sligo Creek

*This page is intentionally left blank.*



Jeffrey T. Folden, P.E., DBIA
Director, I-495 & I-270 P3 Office Maryland Department of Transportation State Highway Administration
707 North Calvert Street
Mail Stop P-601, Baltimore, MD 21202

**1**   Friends of Sligo Creek has reviewed the Supplemental Draft Environmental Impact Statement (SDEIS) prepared by the Maryland Department of Transportation (MDOT) for the I-495/I-270 toll lanes project, and we write to renew our opposition to this proposal. We support the "no-build" option and categorically oppose any toll lanes. We also write to express our disappointment at the failure of the SDEIS to address basic environmental impacts or seriously consider viable alternatives. This has deepened our ongoing concern that the process for advancing this proposal has been rushed and inadequate, and that plans to expand the project east along the Beltway and over the Sligo Creek watershed are likely to be revived and proceed in a similar fashion.

**2**   The SDEIS reinforces both that the project will cause significant environmental harm, and that it will not effectively address the problem it is supposed to solve. The tables in Appendix A of the SDEIS illustrate that improvements to traffic congestion in most segments are projected to be negligible, and in some segments it is estimated that commute times will actually increase. Overall, the SDEIS estimates a reduction in traffic delays of just 3 or 4 minutes per commute, a barely noticeable amount of time, and a **3** poor return on a massive investment of tax dollars with potentially profound negative impacts on the surrounding communities and natural environment.

The SDEIS fails to consider many basic environmental issues, but those it does address are gravely concerning to Friends of Sligo Creek. For example, according to details in Appendix C, it is estimated that only about half of stormwater runoff can or will be managed onsite. A lack of clarity on how all stormwater will be treated is unacceptable. In addition, the toll lanes will impact 15 parks, and a total of over 36 acres of parkland will be affected, with a potential loss of 500 acres of forest canopy. Over 1,200 **4** trees would be removed in 3 national parks.

These environmental impacts are bad, especially for a proposal with so little projected benefit, but what is omitted or left unaddressed by the SDEIS is equally troubling. The analysis of many essential environmental impacts has been left for a proposed future Final Environmental Impact Statement (FEIS). Thus, the SDEIS fails to provide a final Environmental Justice analysis, and it includes only a rudimentary analysis of greenhouse gas emissions and other pollutants likely to result from increased car traffic. Also deferred to the proposed FEIS is analysis of the impact of the project on wetlands and floodplains. These

**Response to SDEIS Comment #1**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to SDEIS Comment #2**
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

**Response to SDEIS Comment #3**
The project will be required to obtain a SWM and Erosion & Sediment permit.  In order to obtain these permits, the project will be required to control stormwater runoff for the 10-year storm to match existing conditions, provide water quality treatment for all new impervious area and 50% of reconstructed existing impervious area to match the runoff characteristics of woods in good condition and manage the 2-year storm during construction so that sediment is not released to local waterways.    Variances can be requested for minimal increases in stormwater runoff, however, detailed hydrologic calculations will be required to show that the minimal increases will not result in downstream flooding or erosion.  Given the strict permitting requirements, impacts to downstream water quality from stormwater runoff are not expected. Refer to Chapter 9, Section 3.4.E for additional information related to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**Response to SDEIS Comment #4**
Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

00022832

**OP·LANES** ™  MARYLAND   I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 62-3    Filed 10/30/23    Page 85 of 96

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

**Response to SDEIS Comment #5**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and teleworking.

#5

are basic environmental impacts that should have been included, and their absence, or postponement, does not inspire confidence that MDOT is taking environmental concerns seriously enough.

An analysis comparing the impact of the proposed toll lane project with potential alternatives is also absent. For example, during the last year and a half, as a result of the COVID pandemic, it has become clear that policies encouraging telework can significantly reduce traffic. An assessment of the potential environmental impact of increased telework as compared to the construction of toll lanes would have been instructive, though it is welcome that this kind of analysis is according to the SDEIS "ongoing", as presented in Appendix B.

Because many environmental impact analyses have been deferred, this SDEIS is incomplete at best. We encourage MDOT to ramp up its ongoing analysis of alternatives to highway construction like telework. Nonetheless, the analysis that the SDEIS does provide, detailing the impact on trees, parks, and stormwater, and the negligible benefits the proposal is projected to produce, have intensified our opposition to the construction of toll lanes.

It is clear to Friends of Sligo Creek that there are ways to reduce traffic congestion that will have a much less harmful impact on our environment, including our creeks and streams, than building toll lanes and increasing the number of cars on our highways. Friends of Sligo Creek emphatically supports the "no-build" option, and opposes any construction of toll lanes.

Friends of Sligo Creek, or FOSC, is a nonprofit community organization dedicated to protecting, improving, and appreciating the ecological health of Sligo Creek Park and its surrounding watershed.

Sincerely,

Kit Gage
Advocacy Director
Friends of Sligo Creek
advocacy@fosc.org
PO Box 11572
Takoma Park MD 20913
www.friendsofsligocreek.org

00022833

**FRIENDS OF CABIN JOHN CREEK – SANDRA LADEN**

| | |
|---|---|
| **From:** | Sandy Laden <shevaetta@gmail.com> |
| **Sent:** | Tuesday, November 30, 2021 9:28 PM |
| **To:** | SHA OPLANESMLS |
| **Cc:** | County.Council@montgomerycountymd.gov; MCP-Chair@mncppc-mc.org; contact@anshome.org |
| **Subject:** | FOCJC Comment submission 495/279 Managed Lanes SDEIS |
| **Attachments:** | 270~495 SDEIS Comments.pdf; Comments on SDEIS from FOCJC.pdf |

Dear Mr. Folden,

I am attaching comments for submission to the official record for the I270/I495 Manage Lanes Study SDEIS on behalf of Friends of Cabin John Creek, Montgomery County Maryland.

Sincerely,

Sandra Laden
Vice President
Friends of Cabin John Creek, Inc

*This page is intentionally left blank.*

**#1**

## Friends of the Cabin John Creek
P.O. Box 267, Cabin John, MD 20818

Incorporated 2013

Burr Gray - President      Scott Hoffman - Treasurer
Sandy Laden - Vice President      Jon Putnam - Secretary

Comments on the Supplemental Draft Environmental Impact Statement (SDEIS)
for the I-495/270 Highway Expansion Study

November 30, 2021

Jeffrey T. Folden, P.E., DBIA
Deputy Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21202

Dear Mr. Folden,

Friends of Cabin John Creek (FoCJC) is a 501(c)3 organization consisting of local residents and volunteers dedicated to the restoration, preservation, and stewardship of the Cabin John Creek Watershed (CJCW). We submitted comments November 4, 2020 on the Draft Environmental Impact Statement (DEIS) for the I-495 & I-270 Managed Lanes Study. Contained below are our comments and concerns regarding the Supplemental Draft Environmental Impact Statement (SDEIS), which focuses on impacts of the Preferred Alternative listed in the DEIS.

**The Cabin John Creek & Watershed are the most impacted** - The SDEIS (see Chapter 4) confirms that Cabin John Creek and its watershed will be the most impacted of the various waterways studied.

- Cabin John Creek will be the most affected waterway, with 31,429 linear feet (or 495,512 square feet) of waterway impacts. (p. 4-66).

- The Preferred Alternative would add the most impervious surface to the CJCW, with 98.2 acres (over 4 million sq ft) added. (See p. 4-70 and 71.) According to Montgomery County's 2012 Cabin John Creek Implementation Plan, there were 3,402 acres of impervious cover in the CJ Creek watershed at that time. The additional impervious surface will add another 3% to that amount. We noted in our previous comments, but it bears worth repeating: the opportunity to address not only any new pavement but also the existing I-495 and I-270 pavement regarding stormwater runoff is unique and should be seized upon and not be wasted.

---

MDOT SHA acknowledges receipt of the Friends of Cabin John Creek DEIS Comment Letter dated November 4, 2020 that was appended to this SDEIS Comment Letter. Refer to Appendix T, for a response to this DEIS Comment Letter.

**Response to SDEIS Comment #1**

The existing stream degradation within the Cabin John Creek Watershed is reported in the Natural Resources Technical Report Section 2.4.2 (FEIS, Appendix M), including issues from channelization and poor water quality. These support the statement that the streams within the watershed are already in need of restoration. FEIS Appendix M, Final Natural Resources Technical Report, Section 2.3.3, reflects the Preferred Alternative impacts to the Cabin John Creek Watershed as 31,556 linear feet of waterway impact and 1.36 acres of wetland impact. As noted in the FEIS, Chapter 7, mitigation is proposed at Site RFP-2: Stream restoration (6,074 functional feet) and wetland creation/restoration (4.61 acres of credit) along Cabin Branch east and west of Montgomery Village Avenue at Montgomery Village Golf Club.

The SWM analysis completed for the FEIS indicates that over 95 percent of the water quality requirements can be met onsite.

The FEIS reflects further design refinements and details, including final mitigation and commitments of the Preferred Alternative, many of which directly responded to public comments. Refer to **FEIS, Chapter 7** for a comprehensive list of mitigation and commitments. Also refer to Chapter 9, Section 3.4.E for a response to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes at Seven Locks Road. Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction. An acceleration lane will also be built along the outer loop for approximately 1000-feet east of Seven Locks Road. No ramps are proposed in this area. The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop. The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier. Flyover ramps are no longer proposed in this area and thus will not create a visual impact. A noise barrier in this area is anticipated to be located close to the existing right of way line. Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and managed lanes separate to allow space for highway ramps. The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190. Third-level flyover bridges above the existing beltway grades will be avoided by providing median ramps from the price managed lanes to MD 190 which connect into the center of the MD 190 bridge over I-495. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities. The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps. This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

The FEIS reflects further design refinements and details, including final mitigation and commitments of the Preferred Alternative, many of which directly responded to public comments. Refer to **FEIS, Chapter 7** for a comprehensive list of mitigation and commitments.

**#1 Cont**

- The Preferred Alternative talks about the need to connect the inner I-495 lanes with various exits, including in particular the connection with MD-190 (a.k.a. River Road). One of the connection scenarios in the Preferred Alternative is a "flyover" lane, that would exist suspended in the air with supporting columns embedded in and around the Cabin John Creek and parkland. This is truly a nightmare scenario with all sorts of adverse impacts to nearby residences and users of the County trail along the Cabin John Creek, including visual impacts and noise impacts that will be leveraged due to the elevated nature of the project. This location is an area that is residential in nature; the community prides itself on the beautiful creek and works hard to preserve and improve the creek.

Thus we are concerned about the impacts of the I-495/I-270 project on the health and beauty of both the watershed and the creek. We request that the SDEIS accurately reflect those impacts.

**COMMENTS**

**Comment #1: Include Environmental Enhancements in the Final EIS.** We are encouraged by MDOT SHA's commitment to "environmental enhancements that would provide meaningful benefits to adjacent resources" mentioned in Chapter 2, Section 4, including attributes and functions that may be compromised by the highway project. Such enhancements would include " … water quality improvements, stream restoration, and removal of invasive species on county parkland."

We are also applauded for MDOT SHA's additional commitments to avoid and minimize environmental and parkland impacts. MDOT SHA states that it will address "water quality concerns on parkland focused on stabilizing streams, creating natural surface channels, and re-vegetating areas to improve water quality and reduce flooding and pollutant loads." The agency states that it is committed to improvements such as "stream bank and bed stabilization and removal of concrete lined channels in identified priority areas such as Cabin John Stream Valley Park."

We applaud these commitments and request that they be described in detail in the Final Environmental Impact Statement as enhancements that will happen. If not in the final EIS, then they need to be described in the related mitigation document that follows.

**#2**

**Comment #2: Treat stormwater locally on-site.** We agree with the Maryland-National Capital Park and Planning Commission's (M-NCPPC) draft comments on the SDEIS (November 4, 2021) that this project should plan to treat stormwater on-site as much as possible − "a minimum of 80% of water quality treatment requirements should be handled on-site" − in order to protect Cabin John Creek and the organisms it sustains, and prevent harmful downstream impacts to the Potomac River and Chesapeake Bay.

**#3**

**Comment #3 - Keep mitigation sites within the same creek watershed** - none of the listed mitigation sites for impacted wetlands and streams are within our watershed. See Chapter 4 pages 59-63, especially Table 4-28, which shows three up-county proposed

2

**Response to SDEIS Comment #2**

This project will be required to meet Maryland SWM permitting requirements, which includes managing SWM runoff for the 10-year to match existing conditions and providing water quality treatment for all new impervious area and 50% of reconstructed existing impervious area. As noted, a sizeable portion of pre-existing untreated surface, estimated to be approximately 72 acres, will now be treated resulting in improved downstream conditions. In addition, a more detailed SWM analysis was completed for the FEIS based on standard MDE approved hydrology and hydraulic procedures. Based on this more detailed preliminary SWM concept developed for the FEIS, the anticipated offsite requirements for the Preferred Alternative have been significantly reduced from 114 acres to 2.5 acres, representing approximately 95 percent of environmental site design requirements being met onsite. Refer to FEIS Chapter 3, Section 3.1.6.

**Response to SDEIS Comment #3**

All of the proposed wetlands and waterways mitigation sites are located in the Middle Potomac-Catoctin watershed. Refer to Chapter 5, Section 5.12.4 and the Final Compensatory Wetlands and Waterways Mitigation Plan (CMP) (**FEIS, Appendix O**) for details on the wetlands and waters mitigation. **FEIS, Chapter 7** also provides a comprehensive list of the mitigation and commitments.

#3
Cont

mitigation sites. We support M-NCPPC's request that the project do off-site stormwater mitigation within 1,500 feet of the project's Limit of Disturbance. This will help mitigate the impact of the current highways and further help the creek. There is discussion about conducting mitigation in an area elsewhere in the watershed but quite remote from I-495 and I-270. (p. 2-11 "compensatory SWM ESD could not be met onsite.") Taking this "distant mitigation" approach is not going to help the creek, and thus it will be very unpopular with the local populace living in and around the impacted area.

#4

**Comment #4: Plan for a greater volume of stormwater.** The SDEIS needs to anticipate stormwater management (SWM) facilities for storms that drop more rain than in the past. The Washington, D.C. area is receiving more precipitation per year and more large precipitation events than in the past. In the D.C. area seven of the last 10 years have had above-normal precipitation, per data from the National Weather Service. This includes a record 66.28 inches in 2018. In addition, we have storm events dropping more than one inch of precipitation about 10 days per year, on average, over the last seven years, according to data from the United States Geological Survey. Due to climate change, these trends are expected to continue and likely increase.

In Chapter 2, when discussing SWM quantity requirements, the SDEIS says, "Each SWM facility is expected to meet a minimum of 1-inch treatment credit." These facilities should be designed to be able to handle the 2-, 3- and 4-inch rainstorms we are experiencing more often now due to climate change. In fact, United States Geological Survey precipitation gauge data since 2014 shows our area now has an average of two 2-inch or greater precipitation events each year, with some years having four such events. The SDEIS needs to contain information on how often the SWM facilities will be adequate during a given storm event and given year and how often the facilities will fail because the storms drop a higher volume of rain in a short amount of time. The state of MD recently passed a law requiring the state to use more up-to-date rainfall data when issuing permits. That law, which became effective June 1, 2021 requires MDE to report on the most recent precipitation data available, investigate flooding events since 2000, and update Maryland's stormwater quantity management standards for flood control. The SDEIS should not live in the past, working with outdated data and old scenarios, but instead should anticipate the impact of greater rainfall density and the resulting impacts to creeks if that stormwater is not ameliorated.

#5

**Comment #5: Prioritizing avoiding impacts to Forest Conservation Act easements.** Chapter 4 notes the project would impact Forest Conservation Act easements, including state and county owned easements, encompassing a total of 14.7 acres. Of these, 2.1 acres are in the Cabin John Stream Valley Park in the City of Rockville, and another 0.6 acres in M-NCPPC parkland. These easements were created to protect forested areas, in part because forests and trees do an excellent job of soaking up stormwater. The SDEIS needs to work harder to find a way to avoid, or greatly minimize, impacts to Forest Conservation Act easements. This land was set aside specifically to protect forests and it should be left that way.

3

## Response to SDEIS Comment #4

In Maryland, SWM facilities are typically designed to treat a minimum of 1 inch of rainfall because the first inch "flushes" pollutants off of adjacent roads and other impervious area; therefore the first inch of rainfall typically contains the majority of the pollutants. SWM facilities can be designed up to a maximum of the 1-year storm, defined as 2.6 inches of treatment, however, additional water quality credit cannot be received for treatment beyond 2.6 inches of rainfall.

This project will base stormwater runoff estimates on NOAA Atlas 14 historical rainfall averages, which is the most recent statewide precipitation data and includes record data through December 2000. Use of NOAA Atlas 14 rainfall data is standard practice for MDOT SHA projects. At this time, Maryland does not require increased intensity or amount of rainfall to account for future climate change.

MDE is considering updating Maryland regulations, including increasing the 1-year storm to 3 inches. If MDE regulations are updated, the project will be required to meet the updated regulations.

The project will be required to obtain a SWM and Erosion & Sediment permit. In order to obtain these permits, the project will be required to control stormwater runoff for the 10-year storm to match existing conditions, provide water quality treatment for all new impervious area and 50% of reconstructed existing impervious area to match the runoff characteristics of woods in good condition and manage the 2-year storm during construction so that sediment is not released to local waterways. Variances can be requested for minimal increases in stormwater runoff, however, detailed hydrologic calculations will be required to show that the minimal increases will not result in downstream flooding or erosion. Given the strict permitting requirements, impacts to downstream water quality from stormwater runoff are not expected. Refer to Chapter 9, Section 3.4.E for additional information related to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

## Response to SDEIS Comment #5

Unavoidable impacts to forested canopy or tree canopy areas from construction of the Preferred Alternative in Maryland will be regulated by MDNR under Maryland Reforestation Law. Forest impacts must be replaced on an acre-for-acre or one-to-one basis on public lands, within two years or three growing seasons of project completion (MD Natural Resources Code Ann. §5-103). Refer to Chapter 5, Section 5.16.4 for additional details on the forest mitigation plan.

**#6**

**Comment #6: Reduce the amount of parkland impacts.** Much of Cabin John Creek and its tributaries flow through parkland. The Cabin John Creek mainstem goes through parkland for most of its 10-mile length, from Rockville to the creek's confluence with the Potomac River. The creek's health depends in large part on the parkland, its forests and wetlands. We repeat the comment made early that the SDEIS needs to work harder at analyzing how to mitigate environmental impacts locally when at all possible.  As such, we urge SHA and FHWA to reduce the parkland impacts of this project. We understand the agencies have an obligation under so-called Section 4(f) to work to avoid parkland impacts and so the SDEIS needs to make a stronger effort to do so. The proposed changes to the MD-190/Cabin John Parkway interchange are one area where parkland impacts probably can and certainly should be reduced.

**#7**

**Comment #7 - 100% of stormwater from all re-constructed areas should be treated/managed** - the SDEIS states that all stormwater from new impervious surfaces and 50% of stormwater from reconstructed impervious surfaces will be treated.  Again, the opportunity to address stormwater runoff from not only any new pavement but also from the existing I-495 and I-270 pavement, regardless whether it is characterized as "reconstructed",  is unique and should be seen as an opportunity to address past failures. The SDEIS should examine the options/opportunities for addressing all of the stormwater coming off current as well as future wider versions of I-495 and I-270.

**Comment #8 - Incorporating of the FoCJC November 4, 2020 Comments** - to the extent relevant and applicable, we repeat the FoCJC comments submitted on November 4, 2020 regarding the draft EIS.

Thank you for considering our comments and concerns.

Sincerely,

*Sandra Laden*

Sandra Laden
Vice President
Friends of Cabin John Creek, Inc.

cc:

Montgomery County Council: County.Council@MontgomeryCountyMD.gov
County Executive Marc Elrich:  https://www.montgomerycountymd.gov/exec/Contactcex.aspx
MCP Planning Board Chair Casey Anderson: MCP-Chair@mncppc-mc.org
Audubon Naturalist Society: contact@anshome.org

4

**Response to SDEIS Comment #6**
Significant avoidance and minimization efforts also focused around the American Legion Bridge and adjacent National Park Service (NPS) properties. MDOT SHA and FHWA met with the NPS on December 8, 2020, to discuss the limits of disturbance (LOD) in the vicinity of the ALB that was presented in the DEIS. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the Chesapeake and Ohio Canal National Historic Park and George Washington Memorial Parkway units of the NPS.*

The ALB Strike Team considered bridge construction approaches to determine if any of them could limit the LOD further. The ALB Strike Team conducted detailed investigation on a top-down segmental construction approach; a top-down cable stayed approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of additional information, MDOT SHA and the ALB Strike Team determined that access to the site at river level could be consolidated to the north side of the river along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of the Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the Chesapeake and Ohio Canal and a temporary haul road paralleling the Chesapeake and Ohio Canal towpath. This effort resulted in a 7.8 acre reduction in impact to the George Washington Memorial Parkway and a 5.3 acre reduction at the Chesapeake & Ohio Canal National Historical Park.  Refer to *SDEIS, Chapter 4, Section 4.12.4* for additional details on the ALB Strike Team's efforts.

Based on the current design and as presented in the FEIS, the Preferred Alternative would have an estimated permanent impact of 1.0 acres to the Chesapeake and Ohio Canal National Historical Park, and an estimated temporary impact of 9.1 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 1.1 acres to Clara Barton Parkway, and an estimated temporary impact of 0.7 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 5.7 acres to Cabin John Regional Park, and an estimated temporary impact of 0.6 acres during construction.

Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

**Response to SDEIS Comment #7**
See response to Comment #2 above.

**Response to SDEIS Comment #8**
MDOT SHA acknowledges receipt of the Friends of Cabin John Creek DEIS Comment Letter dated November 4, 2020 that was appended to this SDEIS Comment Letter.  Refer to Appendix T, for a response to this DEIS Comment Letter.

**GAITHERSBURG-GERMANTOWN CHAMBER OF COMMERCE, INC. – MARILYN BALCOMBE**

| | |
|---|---|
| **From:** | Marilyn Balcombe <MBalcombe@GGChamber.org> |
| **Sent:** | Friday, October 29, 2021 2:49 PM |
| **To:** | SHA OPLANESMLS |
| **Subject:** | I-270 SDEIS Comments |
| **Attachments:** | I-270 - Supplemental Draft Environmental Impact Statement (SDEIS) public comment .doc |

Please accept the attached testimony on the SDEIS.



Marilyn Balcombe
President and CEO



910 Clopper Road, Suite 205N
Gaithersburg, MD 20878
301-840-1400 x15
mbalcombe@ggchamber.org

*This page is intentionally left blank.*



## Gaithersburg-Germantown Chamber of Commerce, Inc.

910 Clopper Road, Suite 205N, Gaithersburg, Maryland 20878 (301) 840-1400, Fax (301) 963-3918

**The Maryland Department of Transportation State Highway Administration (MDOT SHA) and Federal Highway Administration (FHWA)**
**I-495 & I-270 Managed Lanes Study Supplemental Draft Environmental Impact Statement (SDEIS)**
**Public Hearing - November 1, 2021**

**#1**

The Gaithersburg-Germantown Chamber of Commerce supports the Preferred Alternative that was included in the I-495 and I-270 Managed Lanes Study Supplemental Draft Environmental Impact Statement.

Increased capacity of I-270 has been a top priority for businesses in Montgomery County for a very long time. We cannot really address the significant traffic burden without a comprehensive investment in real solutions on I-270. The I-495 and I-270 Managed Lanes project is the first real opportunity to address the significant congestion along the Corridor.

The Preferred Alternative significantly improves peak-hour speed in most sections, during BOTH peak periods, It significantly reduces congestion, increases speeds, and improves reliability of expected travel times.

Other improvements include
- An increase in vehicle throughput at the American Legion Bridge which continues to be one of the region's most severe choke points.
- A reduction in the number of failing roadway segments.
- And a reduction of vehicle hours of delay on Montgomery County arterials.

As our name implies, my organization represents businesses along the I-270 Corridor north of Rockville up to the Frederick County line. As we have stated in the past, a comprehensive traffic solution on I-270 requires the completion of Phase I from the American Legion Bridge all the way to I-70 in Frederick. We accept that Phase I South stops at I-370 in Gaithersburg, knowing that MDOT SHA will continue to advance the activities association with the pre-National Environment Policy Act (pre-NEPA) requirements for Phase I North.

We believe in an "all of the above" approach to increased capacity and fully support free transit bus service on the managed lanes. Providing free access for buses on the toll lanes will make transit much more attractive to commuters.

**#2**

As important as transit is on I-270 itself, additional transit in the I-270 corridor is also critical. We strongly encourage the State to advance the long-awaited Corridor Cities Transitway, as well as increased capacity on the MARC rail system.

The businesses and residents in the I-270 Corridor need relief. We believe this project provides that relief.

Thank you.

---

**Response to SDEIS Comment #1**

Thank you for your comments supporting improvements. The purpose of the Managed Lanes Study is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the Study limits, and enhances existing and planned multimodal mobility and connectivity.

FHWA and MDOT SHA have considered all comments received on the proposed improvements in the context of the Purpose and Need for the project and have identified Alternative 9 – Phase 1 South as the Preferred Alternative. This alternative would best accomplish the Purpose and Need of the proposed action while fulfilling FHWA's statutory mission and responsibilities, giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

The Preferred Alternative includes multiple elements to enhance transit mobility and multimodal connectivity in furtherance of the established Purpose and Need and in response to public and agency comments supporting such elements. Refer to **FEIS Chapter 3, Section 3.1.4** and **Section 3.2.1**. These transit elements will serve to address the multi-modal mobility and connectivity need in the Purpose and Need and include:

- Allowing bus transit usage of the HOT managed lanes toll free to provide an increase in speed of travel, assurance of a reliable trip, and connection to local bus service/systems on arterials that directly connect to urban and suburban activity centers;

- Accommodating direct and indirect connections from the HOT managed lanes to existing transit stations and planned Transit Oriented Development at the Shady Grove Metro, Twinbrook Metro, Rockville Metro, and Westfield Montgomery Mall Transit Center; and

MDOT SHA has also committed to certain regional transit improvements to enhance existing and planned transit and support new opportunities for regional transit service including increasing the number of new bus bays at WMATA Shady Grove Metrorail Station and increasing parking at the Westfield Montgomery Mall Transit Center. Additional transit opportunities have been identified through the approved P3 Agreement.

**Response to SDEIS Comment #2**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

**GAITHERSBURG-GERMANTOWN CHAMBER OF COMMERCE, INC. – MARILYN BALCOMBE (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Marilyn Balcombe

**Agency/Organization/Jurisdiction, if applicable:** Gaithersburg-Germantown Chamber of Commerce

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

#1

Hi, my name is Marilyn Balcombe. M-A-R-I-L-Y-N B-A-L-C-O-M-B-E. I'm representing the Gaithersburg Germantown Chamber of Commerce. My address is 910 Clopper Road, Gaithersburg, Maryland. The Gaithersburg Chamber of Commerce supports the Preferred Alternative that was included in the Draft Environmental Impact Statement. Increase capacity of I-270 has been a top priority for businesses and Montgomery County for a very long time. We cannot really address the significant traffic burden without a comprehensive investment in real solutions on I-270. The I-495 and I-270 Managed Lanes projects is the first real opportunity to address the significant congestion along the corridor. The Preferred Alternative significantly improves peak hour speed in most sections during both peak periods. It significantly reduces congestion, increases speed, and improves reliability of expected travel times. Other improvements include an increased in vehicle through throughput at the American Legion Bridge, which continues to be one of the region's most severe choke points. A reduction in the number of failing roads, roadway segments, and a reduction of vehicle hours of delay on Montgomery County arterials. As our name implies my organization represents businesses along the I-270 corridor north of Rockville, up to the Frederick County line. As we've stated in the past a comprehensive traffic solution on I-270 requires the completion of Phase 1 from the American Legion Bridge all the way to I-70 and Frederick. We accept that Phase 1 South stopped at I-370 in Gaithersburg, knowing that MDOT SHA will continue to advance the activities associated with pre-need for requirements for Phase 1 North. We believe in an all-in all of the above approach to increase capacity and fully support free transit bus service on managed lanes. Providing free access for buses on the toll lanes will make transit much more attractive to commuters. The businesses and residents of the I-270 corridor need relief. We believe this project provides that relief. Thank you.

**Response to SDEIS Comment #1**

Thank you for your comments supporting improvements. The purpose of the Managed Lanes Study is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the Study limits, and enhances existing and planned multimodal mobility and connectivity.

FHWA and MDOT SHA have considered all comments received on the proposed improvements in the context of the Purpose and Need for the project and have identified Alternative 9 – Phase 1 South as the Preferred Alternative. This alternative would best accomplish the Purpose and Need of the proposed action while fulfilling FHWA's statutory mission and responsibilities, giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**GREATER FARMLAND CIVIC ASSOCIATION – EDWARD RICH**

| | |
|---|---|
| **From:** | Edward Rich <ejrich56@yahoo.com> |
| **Sent:** | Tuesday, November 30, 2021 4:16 PM |
| **To:** | SHA OPLANESMLS |
| **Cc:** | GFCABoard |
| **Subject:** | Comments of the Greater Farmland Civic Association on the Supplemental Draft Environmental Impact Statement for I-270 Managed Lane Project |
| **Attachments:** | GFCA Comments on the P3 Managed Lanes Project SEIS 11-29-2021.docx |

Attached for your consideration and the record are the comments of the Greater Farmland Civic Association concerning the SDEIS for the 270 Managed Lane Project. The GFCA represents the 981 households and over 3000 residents that would be directly affected by this project. These comments were officially adopted by the Association's Board for filing with the Maryland Department of Transportation.

Please feel free to contact me if you wish to further discuss our comments or have any questions or concerns.

Ed Rich
President
Greater Farmland Civic Association
http://www.greaterfarmland.org
(301) 237-1681
facebook.com/greaterfarmland

*This page is intentionally left blank.*

COMMENTS ON THE SDEIS FOR THE I-270 & I-495 MANAGED LANE PROJECT

SUBMITTED BY ED RICH, PRESIDENT

GREATER FARMLAND CIVIC ASSOCIATION

November 29, 2021

These comments on the Supplemental Draft Environmental Impact Statement (SDEIS) are submitted on behalf of the Greater Farmland Civic Association, representing a community of 981 homes that directly borders I-270 from Tuckerman Lane to Montrose Road. We submitted an extensive commentary on the Draft Environmental Impact Statement (DEIS) for the Managed Lane Project (MLP) in 2020, and upon our review of the SDEIS, we find our key concerns have not been addressed. We concur with the cogent comments of the Citizen's Against Beltway Expansion, the Sierra Club, Maryland Advocates for Sustainable Transportation, the Maryland Climate Coalition and the Coalition for Smart Growth. Like theirs, our analysis of the SDEIS and other project documentation shows that the MLP will not improve travel times and speeds, but will expose Marylanders to unacceptable financial risk and environmental degradation. The information provided in the SDEIS only confirms our conclusion: the MLP is wrong for Marylanders and for the region.

Our neighborhood is one of many that would be negatively impacted by this project. Our careful attention to the process and particulars of this study, however, has taken us far beyond any NIMBY objections to the MLP. Here are but a few of the key failings of the project and the inadequacies of the SDEIS that concern us:

**The SDEIS/DEIS gives only a fragmentary and preliminary analysis of the project.**

Many of the questions we have about the project continue to go unanswered. The purpose of an Environmental Impact Statement is to detail the environmental impacts, the reasonable alternatives, and the proposed mitigation measures and minimizations of these impacts. The multitude of pages, however, do not explain either the reasonable alternatives to the MLP or the impacts. The SDEIS continually states that specific analyses—of Green House Gas (GHG) emissions, of updated traffic, and of the environmental impacts of phase 2 of the MLP, for example—have been delayed. Maryland should not be committing to a P3 agreement before all the facts and risks are known.

**The P3 "money" comes at too high a price for Maryland.**

Unlike the DEIS, the SDEIS does not include an estimate of the subsidies that may be necessary. How much of our money has already been spent on all of these preliminary studies? Who will bear the costs of moving water, sewer, cable, gas, electric and other utility lines? Marylanders

#1

#2

**Response to SDEIS Comment #1**

MDOT SHA acknowledges receipt of the Greater Farmland Civic Association DEIS Comment Letter dated November 4, 2020 that was appended to this SDEIS Comment Letter. Refer to Appendix T for a response to this DEIS Comment Letter.

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C. For a discussion of the basis for the Purpose and Need refer to **Section 9.3.1** and for the Selection of the Preferred Alternative refer to **Section 9.3.3.C.**

**Response to SDEIS Comment #2**

Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

During predevelopment work for Phase 1, the selected Developer is working collaboratively with MDOT SHA and our utility partners to further identify, avoid and reduce any impacts to utilities and, where necessary, develop plans to relocate utilities in the most efficient and accommodating manner as possible. To the extent applicable, the selected Developer is required to adhere to the utility provider's regulations, design standards, and specifications and coordinate any design and construction with the utility provider.

Potential cost of utility relocation has consistently been factored into the overall estimates developed for the project. The reduced footprint of proposed improvements associated with the Preferred Alternative as compared to the Build Alternatives discussed in the DEIS, together with ongoing coordination to identify, avoid and minimize conflicts with existing infrastructure to the maximum extent practicable have lowered the cost estimates significantly. It is too early in the predevelopment process to determine the exact scope and cost of any utility relocations that may still be required, but it now appears that these costs will be significantly lower than WSSC's original estimates. The cost estimate for the Preferred Alternative includes the cost of utility relocation based on planning level information and can be found in the Final Environmental Impact Statement.

See reponse to Comment #2

**Response to SDEIS Comment #3**
MDOT remains focused on supporting the State's pandemic response and recovery, while delivering projects that support safety, mobility, and state of good repair for the critical infrastructure that composes the State's transportation system. With the new funding Maryland will receive from the Infrastructure Investment and Jobs Act (IIJA), MDOT is presented with new opportunities to advance projects across the entire State. As of January 2022, MDOT is awaiting federal rulemaking and a congressional appropriations authorization to access these new funds, which will provide approximately 20 percent more in federal highway dollars than the state currently has. During this time, MDOT is reviewing each county's priorities and needs, the Statewide infrastructure needs, as well as the current State revenues to better understand what improvements will be able to advance with the additional federal funds.

While this funding is a significant increase overall, it is only a 14% increase in the two traditional categories that a project like I-495 & I-270 Managed Lanes Study would be funded out of. This amount of funding would not be adequate to fund a project of this magnitude over the five years of the IIJA bill.

**Response to SDEIS Comment #4**
Updated traffic analysis for the design year of 2045 indicates that the Preferred Alternative will provide operational benefits compared to the full No Build Alternative in six key metrics (system-wide delay, corridor travel time and speed, density and level of service, travel time index, vehicle throughput, and local network delay). Refer to FEIS, Appendix A. The Preferred Alternative would significantly increase throughput across the ALB and on the southern section of I-270 while reducing congestion. The net impact of the project will be an overall reduction in delay on the surrounding arterials, despite some localized increases in arterial traffic near the managed lane access interchanges. Specific areas, such as MD 190/Cabin John, were evaluated in more detail as part of the FEIS, and mitigation is proposed where needed to maintain acceptable operations per FHWA Interstate Access Point Approval guidelines. Refer to FEIS, Appendix B, for MDOT SHA's Application for Interstate Access Point Approval.

---

**#2 Cont**

deserve to know the full extent of what we will have to pay for. Moreover, as the Maryland Treasurer, Nancy Kopp, pointed out, publicly issued bond financing for capital projects is significantly less expensive in the long run than the private financing proposed here. One need only look at the Purple Line fiasco to figure that out. MDOT continues refusing to release its value for money analysis for the Project, so we don't really know how this project stacks up against public bond financing.

The P3 agreement, moreover, binds Maryland residents to certain terms of construction as well as to a 50-year period of toll lane operation. Both the terms and the term period are unacceptable. The SDEIS continually defers to "guidelines" the developer will create with respect to noise walls, landscaping, and road design. The developer's goal is to cut costs and maximize profit, not to do what is best for our residents.

**#3** **The Infrastructure and Jobs Act offers an unexplored alternative to the MLP.**

The passage of the historic infrastructure bill offers Maryland a way to make improvements such as the American Legion Bridge replacement that the SDEIS has not accounted for. Seeking public funds will allow us to make highway and transit improvements and respond to changing needs and technology—without taking on unspecified subsidies and other financial risks.

**#4** **The MLP's improved speeds occur at the expense of increased congestion in the General Public lanes.**

The SDEIS demonstrates that the MLP will not, in fact, significantly improve travel speeds. The Maryland Department of Transportation projects that drivers who travel in the general (non-tolled) lanes from the American Legion Bridge to I-370 will save 2 minutes and 36 seconds during the morning rush hour. However, when drivers return home during the evening rush hour, their travel time will _increase_ by 10 minutes and 6 seconds on the same stretch of road. Moreover, the SDEIS states that afternoon "severe congestion" will occur along I-270 north of Phase 1 until future improvements are made to I-270—for which there is no project. Given that the MLP is converting existing High Occupancy Vehicle (HOV)-2 lanes available for free 23 hours a day to toll lanes, thereby reducing the number of lanes available to the general public and making the toll lanes free only for HOV-3 non-electric vehicles, it is hard to believe that any of the detailed travel times are realistic.

Moreover, the traffic projections were done pre-COVID-19 and do not take into account the rise in telecommuting (people working from home) and the likely permanent change to the way people work.