OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 62-4    Filed 10/30/23    Page 1 of 100

FINAL ENVIRONMENTAL IMPACT STATEMENT

**The MLs will benefit affluent commuters to the detriment of the disadvantaged.** #5

That toll rates have been set before the project has actually broken ground just confirms that profit is the chief consideration of the project framers. The toll charge for driving 15 miles, as Montgomery County Chief Executive Marc Elrich announced in his November 18th letter to county residents, could peak at $56 with an EZ Pass to $84 without one. The Virginia toll lanes are built to carry a third of rush hour traffic, but in fact carry less than a sixth. It is clear that these toll lanes are indeed "Lexus" lanes. Simply renaming the managed lanes as "opportunity lanes" does not disguise the fact that these lanes are for affluent drivers with the means to pay these tolls.

With a goal to milk the cash cow of these affluent drivers to pay the developer, the State is willing to relegate the economically disadvantaged drivers to GP lanes that are more overcrowded due to the project's preemption of rail, the state's lack of commitment to developing an effective BRT, and to the loss of use of the current HOV lanes during non-rush hour times.

**The project/study goal is focused on Managed Lanes only, and Transit and Multi-modal add-on options are insufficient.** #6

Because of the narrow focus on the toll lanes, the DEIS/SDEIS set up a circular argument to justify toll lanes as the only way traffic congestion can be eased. We concur with the statement of Citizens Against Beltway Expansion, November 2021: "The SDEIS fails to consider alternatives to private toll lanes to address traffic congestion. Rail transit was not studied, nor were operational improvements and policies to encourage more telework."

The SDEIS states that the preferred Alternative 9 will "reduce reliance on single occupancy vehicles and [permit] buses, carpool, vanpool, and personal vehicles with 3 or more people" to use the toll lanes free of charge. The SDEIS promises multi-modal options, links to existing transit hubs and services, and "an estimated $300 million for transit services in Montgomery County over the operating term of phase 1 south." These assertions are not compelling upon closer examination. How much money yearly are we talking about? How many transit projects can you build for, at most, $6 million of funding per year? Currently, there is no clear plan, funding, or time frame to develop an effective BRT between points in Maryland and Fairfax County. The "multi-modal" options mentioned are predominantly recreational—how many people will be walking or biking to work across the bridge? Vanpools and carpools comprise a small segment of commuter modes of travel, and nothing provided by the State and its agencies details any specific or programmatic assistance to develop these modes. Simply stipulating that carpools and buses will have access to the lanes does not constitute "transit."

**Response to SDEIS Comment #5**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.
Refer to Chapter 9, Section 3.6.B for a response to toll rate ranges and toll rate setting process.

**Response to SDEIS Comment #6**
Other alternatives including stand-alone rail transit alternatives were considered; refer to Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

The Preferred Alternative includes multiple elements to enhance transit mobility and multimodal connectivity in furtherance of the established Purpose and Need and in response to public and agency comments supporting such elements. Refer to **FEIS Chapter 3, Section 3.1.4 and Section 3.2.1**. These transit elements will serve to address the multi-modal mobility and connectivity need in the Purpose and Need and include:

- Allowing bus transit usage of the HOT managed lanes toll free to provide an increase in speed of travel, assurance of a reliable trip, and connection to local bus service/systems on arterials that directly connect to urban and suburban activity centers;

- Accommodating direct and indirect connections from the HOT managed lanes to existing transit stations and planned Transit Oriented Development at the Shady Grove Metro, Twinbrook Metro, Rockville Metro, and Westfield Montgomery Mall Transit Center; and

MDOT SHA has also committed to certain regional transit improvements to enhance existing and planned transit and support new opportunities for regional transit service including increasing the number of new bus bays at WMATA Shady Grove Metrorail Station and increasing parking at the Westfield Montgomery Mall Transit Center. Additional transit opportunities have been identified through the approved P3 Agreement.

In response to input received from the City of Rockville, the Montgomery County Department of Transportation, and stakeholder organizations, the Preferred Alternative will accommodate pedestrian/bicycle facilities throughout the study area, including improvements currently noted in Rockville and Montgomery County master plans and are assumed under the Preferred Alternative base design. These include:

- New sidepath (west side) and new sidewalk (east side) on Persimmon Tree Road over I-495;

- New bike lanes (both directions) and new sidepaths (both sides) on MD 190 over I-495;

- New bike lanes (both directions), new sidewalk (south side), and new sidepath (north side) on MD 191 over I-495;

- Reconstructed sidewalk (south side) and sidepath (north side) on Democracy Boulevard over I-270 west spur;

- New two-way separated bike lanes (south side), and reconstructed sidewalks (both sides) on Westlake Terrace over I-270 west spur;

- New Breezeway (south side) and reconstructed sidewalk (north side) on Montrose Road over I-270;

**#6 Cont**

The glaring omission in the SDEIS and the Managed Lane Study is rail. Rail is the most effective of all transit options in reducing impacts of transportation on climate change. At the very least, the contract with Transurban must ensure that the bridge and 270 are constructed to allow for the later addition of rail and that Marylanders are not prevented from adding rail by a contractual non-compete clause like that in Transurban's contract with Virginia. We cannot have a 50-year contract that prevents necessary steps to reduce the impact of climate change.

**The project's negative environmental impacts are largely unstudied.**

**#7**

The expansion project will cause direct harm to the environment. Over 1,200 trees would be removed from national parkland alone. A total of 36.1 acres of parkland would be negatively impacted. There would be a total loss of 500 acres of forest canopy from parkland and other greenspaces, including strips that provide buffers between the highways and neighborhoods next to the highways. In addition, the expanded highway surface will drastically increase storm water runoff, increasing water pollution and flash flood risk for local communities. MDOT plans to treat only 45% of the storm water runoff onsite, which would lead to further degradation of local streams, creeks and the Potomac River. Omitting these analyses from the SDEIS denies the public the opportunity to understand the risks while there is still time to influence the project.

Most significantly, the Managed Lanes are designed to allow more vehicles on the road—according to the SDEIS, more than 3000 vehicles. The Maryland Draft Plan to Achieve Climate Goals indicates that transportation accounted for 40% of Maryland's gross GHG emissions in 2017. An accelerating climate change, as well as Maryland's own ambitious goal for reducing GHG emissions, necessitates a plan that fundamentally reduces the number of vehicles on the road. The SDEIS, however, does not adequately contextualize the project in terms of Maryland's climate goal and does not include an analysis of GHG emissions and the impact they would have on global warming. There is also no analysis of other pollutants such as particulate matter or ozone. All of these analyses are deferred until later.

**Failure to Study Alternatives to Toll Lanes**

**#8**

The DEIS remains flawed, as it did not consider alternatives to building new lanes, such as the reduction or stabilization of traffic on 270 through (1) widening use of telework during the COVID-19 Pandemic, (2) workforce desire to permanently telework full or part time, (3) staggered work hours, (4) improvements to rail service (Metro, MARC, Monorail or rail service on the 270 Corridor) and (5) Smart-Growth opportunities at and around Metro Stations.

According to a 2017 report by the regional Transportation Planning Board, traffic demand management strategies, including a substantial increase in telework, would be the most effective mechanism to reduce traffic delays. Based on their research during the COVID pandemic, the Maryland Transportation Institute testified at a General Assembly hearing in

---

- Reconstructed sidewalk (south side) and shared use path (north side) on Wootton Parkway over I-270;

- New bike lanes (both directions) and new sidewalks (both sides) on MD 189 over I-270;

- New bike lanes/bikeable shoulders (both directions), reconstructed shared use path (south side), and new sidewalk (north side) on MD 28 over I-270;

- New bike lanes (both directions), reconstructed shared use path (Millennium Trail, south side), and new sidewalk (north side) on Gude Drive over I-270; and

- New Breezeway (south side) and new sidepath (north side) on Shady Grove Road over I-270.

Additionally, the Preferred Alternative includes pedestrian and bicycle enhancements and new connections that are beyond the base design approach but are accounted for in the Preferred Alternative limits of disturbance. Refer to FEIS Chapter 3, Section 3.2.2. These include:

- Construct a new pedestrian/bicycle shared use path across the ALB to connect facilities in Maryland and Virginia;

- Widen the existing variable-width sidepath along the east side of Seven Locks Road under I-495 (Cabin John Trail); and

- Construct a new sidewalk along the west side of Seven Locks Road under I-495 to reestablish the historic connection between Gibson Grove Church and Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

**Response to SDEIS Comment #7**

Refer to Chapter 9, Section 3.4.J for a response to impacts to greenspace and/or wildlife habitat.

Refer to Chapter 9, Section 3.4.E for a response to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

Refer to Chapter 9, Section 3.4.G for a response to climate change considerations.

**Response to SDEIS Comment #8**

Refer to Chapter 9, Section 3.3.C for a response to Analysis of Alternatives Retained for Detailed Study.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

See response to Comment #8 above.

**Response to SDEIS Comment #9**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and teleworking.

#8
Cont

August 2020 that "just a 5% reduction in travel demand could lead to 32%-58% reduction in traffic congestion on major freeways." The federal government has already announced that it will implement permanent policies to increase telework by the federal workforce. The State could build on this with policies to encourage private employers to implement more telework in the I-495/I-270 corridor. However, the SDEIS does not assess whether the change in federal telework policy, along with changes in state policy, could reduce congestion on the two highways.

#9

**The ML project does not address the real cause of the traffic congestion.**

The fundamental problem with this project is that it does not address the real cause of the traffic congestion along I 270 and on to the bridge. The "rush hours" are caused by workers who live in Maryland and commute to their jobs in Virginia. Marylanders need to be able to work in Maryland, or at least telework while the State and counties try to make Maryland more attractive for employers. Maryland can earn far more revenue from Marylanders working (and buying lunch and running errands) in Maryland than from the revenue of tolls in excess of the toll operator's guaranteed minimum. A 50-year contract to keep affluent Maryland commuters speeding to their good jobs in Virginia will not bring those jobs to Maryland.

\*\*\*\*

**GREATER WASHINGTON BOARD OF TRADE – DANIEL FLORES**

| | |
|---|---|
| **From:** | Daniel S. Flores <danielflores@bot.org> |
| **Sent:** | Monday, November 1, 2021 5:20 PM |
| **To:** | SHA OPLANESMLS |
| **Cc:** | Daniel S. Flores |
| **Subject:** | Board of Trade Testimony |
| **Attachments:** | BOT Testimony SDEIS.doc |

Thank you for the opportunity to testify in support of this very important project. Let me know if you have questions.

Daniel

Daniel Flores
Vice President
Regional Government Relations
Greater Washington Board of Trade
800 Connecticut Ave. NW
Suite 1001
Washington, D.C. 20006
202-857-5963 office
danielflores@bot.org

*This page is intentionally left blank.*

00022848

**Response to SDEIS Comment #1**

MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.



GREATER WASHINGTON
Board of Trade

**Statement of Daniel Flores**
**Vice President, Government Relations**
**Greater Washington Board of Trade**
**800 Connecticut Ave. NW Washington, DC 20006**
**Supplemental Draft Environmental Impact Statement**

**November 1st 2021**

**Also a former Montgomery County resident for close to 40 years until a few years ago that had to move after enduring daily soul crushing traffic on I-270 & I-495.**

Alleviating traffic congestion in Greater Washington is one of the Board of Trade's top priorities. On the infrastructure side, we support the construction of new roads, bridges, transit, bike and pedestrian facilities, and the funds needed to secure and maintain these improvements. Examples of Board of Trade priorities have included the Intercounty Connector, the Purple Line, a regional system of HOT lanes complimenting those now in Virginia, and more. Nowhere in our region is new infrastructure investment needed more than on the American Legion Bridge and I-270.

#1

We strongly support the Preferred Alternative, "Alternative 9 – Phase 1 South," identified in the I-495 & I-270 Managed Lanes Study Supplemental Draft Environmental Impact Statement (SDEIS) and encourage the Maryland Department of Transportation (MDOT) and the Federal Highway Administration to move forward without further delay on this critical project.

Several specific elements in Alternative 9-Phase 1 South are worth noting in particular that make this project a multi-modal win for our entire region:

**HOT Lanes to Maximize Person-Throughput** – Allowing carpools and vanpools with 3 or more passengers to travel free helps reduce reliance on single-occupancy vehicles and maximizes the efficient use of the new lanes, moving more people, not just more cars. We support the selection of HOT lanes for this Alternative.

**Major Commitments to Transit** – MDOT has committed an estimated $360 million in new funding for transit services just in the first section of this project and will also allow transit vehicles to use the new HOT lanes free of charge. This is not only consistent with the region's adopted long-range plan, Visualize 2045, it can revolutionize transit access

Your comments of support are noted.

at the regional level by adding faster, more reliable commuter bus transit service. Imagine traveling from Frederick to Bethesda, or from Germantown to Tysons Corner, or from Rockville to downtown DC, on a fast, efficient rapid-bus network that could always move at close to free-flow speeds, and most importantly, that we can afford to implement now.

**Real Traffic Relief** – Chapter 3 of the SDEIS details the transportation and traffic impacts of the Preferred Alternative, and that analysis shows significant improvement in most sections compared to the No-build Alternative. Average delay is reduced 18% to 32%; Peak travel speeds improve dramatically in most sections, including on I-270 and both the Beltway Inner Loop and Outer Loop during the morning peak period, and on the Inner Loop in the afternoon peak. Not all segments improve as much, but that is likely the result of cueing effects from areas not included for construction in this Alternative. Most importantly, the Preferred Alternative effectively eliminates the region's single worst traffic bottleneck – The American Legion Bridge – a daily dose of misery for the more than 200,000 travelers stuck on it every day. This Alternative allows Maryland and Virginia to implement the historic regional "Beltway Accord" agreed to between the Governors of Virginia and Maryland. This is urgently needed as traffic on the American Legion Bridge has already returned to and exceeded pre-COVID levels in recent months.

The traffic modeling analysis in Chapter 3 uses the Metropolitan Washington Council of Governments' official traffic model. Opponents have recently claimed, without any basis, that because this model shows improvements even in areas far from the proposed new lanes, there must be some kind of unspecified "problem" with the model. This is not likely. This is the same traffic model that all regional agencies use for major transportation projects, it is continually updated and validated and is considered a state-of-the-art tool, so there is no basis for this claim. A more likely explanation is that the American Legion Bridge is such a severe bottleneck that congestion there is forcing many travelers to use much longer, more convoluted routes, even going around the other side of the Beltway, to avoid it. Addressing the congestion on the bridge and eliminating that chokepoint should be expected to have regionwide impacts, drawing traffic off slower and longer alternative routes, even in the District and Prince George's County. MDOT may wish to address this in more detail in the Final Environmental Impact Statement but in our long years of experience on this issue, the region's traffic model is valid.

**Reduced Environmental and Community Impacts** – The Preferred Alternative now closely resembles earlier proposals from the Montgomery County Council and County Executive, completely avoiding any impacts to communities along the topside of the Capitol Beltway, and drastically reduces impacts to parks, wetlands, and culturally sensitive areas. The Morningstar Cemetery, for example, is now completely avoided, and

there are now zero homes and zero businesses that will have to be relocated. The reduced impacts outlined in Chapter 4 of the SDEIS demonstrate that the process has worked and MDOT has listened to the concerns local officials and residents raised.

**Bike and Pedestrian Improvements** – A significant element of this Alternative addresses a glaring gap in our region's pedestrian and bike network by adding a new multi-use trail connection across the American Legion Bridge. We feel it is important to seamlessly connect the extensive trail networks on either side of the Potomac River to provide more options for non-auto travel, to promote fitness and boost tourism in the region. One specific item of concern is that the connection points with the C&O Canal and McArthur Boulevard on the Maryland side needs to be as direct and easily accessible as possible. We feel that two of the options identified, Options 2 and 3 (on page 2-25 of the SDEIS), would provide an acceptable design approach. Option 4, on the other hand, would be more expensive and would create a much longer, higher, more convoluted "switch-back" ramp design. This design could create real barriers to those with disabilities and would not offer the kind of positive user experience that would be inviting to bikers or pedestrians. Option 4 should be dropped from further consideration.

**We Cannot Afford Any More Delay** – Adding managed lanes to I-495 and I-270 has now been under study in Maryland for over 30 years, including three previous Environmental Impact Statement studies on both corridors. There is no excuse for any further delay. That will only add cost for a badly needed set of improvements for which there is no practical alternative. There is no other way to improve conditions at the American Legion Bridge, and no other viable way to finance replacement of this aging facility without the toll funding this project provides. Recent calls to delay the project further by extending the comment period should be ignored. There has already been plenty of opportunity for the public to review and comment on this project. This is the type of needless delay tactic we have seen all too often from opponents of other major projects, including the Purple Line, which only succeeded in driving up taxpayer costs, putting needed projects at risk, and delaying investments we know we need to make. This Alternative will fix it and the time to act is now.

Our region urgently needs both the traffic relief, and the economic boost this project will provide, adding tens of thousands of good union-wage jobs, and providing hundreds of contracting opportunities for local, small, minority-owned and other DBE companies and their employees. The equity benefits of the project are undeniable – the existing lanes will continue to provide a free and less congested travel option, carpools and transit vehicles also travel free, and low-income families stand to gain the most from the improved access to jobs and affordable housing this project provides.

Your comments of support are noted.

Your comments of support are noted.

In conclusion, we believe, ultimately, that the region's entire Interstate Highway System needs to be upgraded and modernized, with new managed lanes and express-bus transit service on the entire network. However, the reduced footprint of this proposal provides important benefits of its own, avoids impacts to sensitive areas, and is entirely consistent with our longstanding regional transportation plans. We support this Alternative and feel it meets all elements of the project's stated purpose and need and is vital to the region's economic vitality and quality-of-life for millions of area residents and business owners. We respectfully urge its approval.

Thank you for the opportunity to testify.

**GREATER WASHINGTON BOARD OF TRADE – DANIEL FLORES (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Daniel Flores

**Agency/Organization/Jurisdiction, if applicable:** Greater Washington Board of Trade

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

My name is Daniel Flores with the Greater Washington Board of Trade. That is D-A-N-I-E-L F-L-O-R-E-S. I am at 800 Connecticut Avenue, Northwest Washington, DC, also a former Montgomery County resident for close to 40 years until a few years ago that I had to move after enduring daily soul crushing traffic on I-270 and I-495. Alleviating traffic congestion in greater Washington is one of the Board of Trades' top priorities. On the infrastructure side, we support the construction of new roads, bridges, transit, bike, and pedestrian facilities, and the funds needed to secure and maintain these improvements. Nowhere in our region is new infrastructure investment needed more than on the American Legion Bridge and I-270.

We strongly support the Preferred Alternative 9 - Phase 1 South identified in the I-495/I-270 Managed Lane Study, Supplemental Draft Environmental Impact Statement and encourage MDOT and SHA to move forward without further delay on this critical project. Several specific elements in Alternative 9 - Phase 1 South are worth noting in particular. What makes this project a multimodal win for our entire region? HOT lanes to maximize person throughput, major commitment to transit, real traffic relief, reduce environmental and community impacts, bike and pedestrian improvements. We cannot afford any more delays. Let me underline that.  Adding managed lanes so I-495 and I-270 have now been under study in Maryland for over 30 years, including three previous Environmental Impact Statement studies on both corridors. There is no excuse for any further delay that will only add cost for a badly needed set of improvements for which there is no practical, practical, or tentative. There is no other way to improve conditions at the American Legion Bridge and no other viable way to finance replacement off this aging facility without the toll funding this project provides. Our region urgently needs both the traffic relief and the economic boost this project will provide.

Adding tens of thousands of good union wage jobs and providing hundreds of contracting opportunities for local small minority owned and other DBE companies and their employees. The equity benefits of the project are undeniable. The existing lanes will continue to provide a free and less congested travel options, carpools and transit vehicles also travel free and low-income families stand to gain the most from improved access to jobs and affordable housing this project provides. In conclusion, we believe ultimately that the region and entire interstate highway system needs to be upgraded and modernized with new managed lanes and express bus transit service on the entire network. Thank you for the opportunity to testify today.

**Response to SDEIS Comment #1**

MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

#1

**HISPANIC CHAMBER OF COMMERCE, MONTGOMERY CO. – CARMEN LARSEN (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Carmen Larsen

**Agency/Organization/Jurisdiction, if applicable:** Hispanic Chamber of Commerce, Montgomery County

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

My name is Carmen Larsen. C-A-R-M-E-N Larsen, L-A-R-S-E-N. I live at 500 [inaudible] Road, Chevy Chase, Maryland. I'm representing the President of the Hispanic Chamber of Commerce in Montgomery County, which is at 10400 Connecticut Avenue, Kensington, Maryland. And I represent the Community Minority Community that is entrepreneurial and have small businesses. I'm also on the executive board of the County Economic Development Corporation. So I wanted to say that I've lived in Montgomery County since the last 3 years, and I've seen the development and all that, but Montgomery County.

#1

First of all, I just want to say that we, we are in full support of this project. We want to move forward with, with the Preferred Alternative for Phase 1, which is the Alternative 9 of Phase 1 South. And we have reviewed, believe it or not, the Draft Environmental Impact Statement and the Supplemental Draft Environmental Impact Statement. Montgomery County is prosperous because it has, it needs the balance of all sorts of all parts of the county. In our, in our membership, as the Hispanic Chamber of Commerce, we represent people of different trades and not everybody has the access to hybrid or the option of hybrid workplace. We have a lot of construction workers and, and restaurant owners and store owners, and a lot of independent workers that constantly drive through I-270 and are stuck on I-270 or stuck on the American Legion Bridge. Montgomery County needs to have better infrastructure. I need to have better transportation to and from Virginia. And I've been down I-270 and in other places, but for right now, I think we're happy with Alternative 9, at least to move forward.

This project has been 30 years in the work. We've had a lot of hearings, a lot of impact studies, and I understand we all want to appreciate the environment and Montgomery County, but we cannot afford that environment if we don't have jobs. If we don't have people who want to come into Montgomery County and provide those jobs. This project will provide valuable jobs for our membership or for our community for color. It will provide opportunities and it will, and it will encourage people who can bring jobs into the County that also fund some of the natural resources projects to come in and choose Montgomery County instead of our, some of our other neighbors, you know, so we really, really support this. And we hope that you will consider that communities of color are going to be greatly benefited by this project but thank you very much for inviting us to speak. And usually, I speak from the heart so probably not as eloquent, but that's what this project needs to move forward. We waited so long. It's very costly to keep dragging it out and we want to get started. Thank you.

**Response to SDEIS Comment #1**

MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

There will be significant economic benefit to the State of Maryland and the National Capital Region with the Preferred Alternative, Alternative 9 – Phase 1 South. The improvements will provide for faster and more reliable movement of goods and services and improved access to employment centers and housing. The delivery of these improvements will lead to more jobs. The preliminary, estimated capital cost for the Preferred Alternative is greater than $3 Billion and will support thousands of jobs per year during construction. Additionally, the Preferred Alternative will result in savings to the Transportation Trust Fund by providing hundreds of millions in infrastructure investment for state of good repair to the existing roads and bridges that needs to be completed, allowing public funds to be used for other necessary transit and highway improvements. This project will boost Maryland's competitiveness in the region and improve quality of life.

**LOCUST HILL CITIZENS ASSOCIATION – RICHARD LEVINE**

**From:** Levine, Richard <rlevine@constantinecannon.com>
**Sent:** Friday, November 12, 2021 1:30:40 PM (UTC+00:00) Monrovia, Reykjavik
**To:** SHA OPLANESMLS <oplanesMLS@mdot.maryland.gov>
**Subject:** Locust Hill Citizens Assoc. SDEIS comments

Attached, please find the statement of the Locust Hill Citizens Association commenting on the Phase 1 South DEIS.

The statement addresses the inappropriate extension of the Phase 1 South project boundary limits to include portions of the Beltway around to MD 187 and the I-270 east spur south of the east spur-west spur split.

Richard Levine
Locust Hill Citizens Association
9402 Locust Hill Road
Bethesda, MD  20814

Responses provided in the following page to your detailed comments.

00022855

**OP·LANES**
MARYLAND   I-495 & I-270 Managed Lanes Study   Case 8:22-cv-02597-DKC    Document 62-4    Filed 10/30/23    Page 12 of 100

FINAL ENVIRONMENTAL IMPACT STATEMENT

**SUBMITTED STATEMENT OF RICHARD LEVINE**
9402 Locust Hill Road, Bethesda, MD 20814

**ON BEHALF OF THE LOCUST HILL CITIZENS ASSOCIATION**

**ON THE I-495 & I-270 SUPPLEMENTAL DRAFT ENVIRONMENTAL IMPACT STATEMENT**

**NOVEMBER 12, 2021**

My name is Richard Levine and I am chair of the Locust Hill Citizens Association Traffic Committee. Locust Hill is a single-family community bounded on the north and east by the arc of Rock Creek Stream Valley Unit ("SVU") 3 and the Beltway within it, from the MD-355/I-495/I-270 interchange around to the Cedar Lane overpass.

The purpose of this statement is to address one issue of importance to our community: by incorporating Alternative 9, the current project limits of Phase 1 South *prejudge the number of lanes to be added on the I-270 east spur and the Beltway segment between the spurs by including: (1) reconstruction of the Beltway east of the I-270 west spur through the Old Georgetown Road (MD-187) intersection; and (2) reconstruction of the complex I-270 east spur Rockledge Drive/MD-187 interchange.* The solution is simple: end the project boundaries immediately east of the I-495/I-270 west spur interchange and immediately south of the I-270 east & west spur split. This simple project limit shift will both permit a full evaluation of the number of lanes on the inter-spur Beltway segment and the I-270 east spur in conjunction with updated traffic analysis for any future Phase 2, as well as reduce the cost of Phase 1 South.

More specifically, Locust Hill's September 10, 2020, submitted statement on the Draft EIS argued against the addition of two lanes on both the I-270 east spur and on the Beltway segment between the spurs because that would result in the need for a lengthy eastbound 2 lane + 2 lane = 2 lane merge area, causing unnecessary roadway width expansion adjacent to our community that would be eliminated by having only one additional lane on those two segments, for an easier 1 + 1 = 2 merge area. The 2 + 2 = 2 configuration would also create a merge bottleneck, an outcome that we believe should be avoided. We noted alternative 9M did not expand the number of lanes on the I-270 east spur at all, and constructing only a one-lane expansion on the rest of the Beltway from the I-270 west spur to I-95. However, we argued that a 9M-type alternative should not be rejected even if it is only a good choice from the I-270 west spur around to, e.g., MD 355 or Connecticut Avenue, with a 2-lane expansion needed east of that. For example, Appendix A to the EIS Traffic Analysis Technical Report shows that future Beltway pm volumes are significantly less between the Spurs than eastward.

In sum, while not endorsing any form of Beltway expansion, Locust Hill urgently requests that the Phase 1 South project boundaries be scaled back to eliminate any reconstruction of the inter-spur Beltway and the I-270 east spur and thus not build these *toll lanes to nowhere.* The number of lanes to be added, if any, should be determined only as part of traffic analyses of future Phases and should not be prejudged by building two additional managed lanes in each direction on those segments based on the current extended eastward and southward boundaries.

**Response to SDEIS Comment #1**
Your suggestions are appreciated. Based on additional design work by the Developer since the SDEIS, the limits Preferred Alternative are along I-495 from the George Washington Memorial Parkway to west of MD 187 and along I-270 from I-495 to north of I-370 and on the I-270 east and west spurs.

In addition, the specific areas, including the MD 187 interchange along I-495 and the Rockledge interchange along I-270 east spur, are evaluated in more detail as part of the FEIS, and mitigation is proposed where needed to maintain acceptable operations per FHWA Interstate Access Point Approval guidelines. Refer to **FEIS, Appendix B**, for MDOT SHA's Application for Interstate Access Point Approval.

**Response to SDEIS Comment #2**
MDOT SHA acknowledges receipt of the DEIS Comment Letter from the Locust Hill Citizens Association dated September 10, 2020 that was appended to this SDEIS Comment Letter. Refer to Appendix T for a response to this DEIS Comment Letter.

On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction from I-495 to north of I-370 and on the I-270 east and west spurs. The improvement limits along I-270 have not changed from those presented in the SDEIS. Along I-270, the existing collector-distributor (C-D) lane separation from Montrose Road to I-370 would be removed as part of the proposed improvements. The managed lanes would be separated from the general purpose (GP) lanes using flexible delineators placed within a buffer.

**MARYLAND BLACK CHAMBER OF COMMERCE – KENNETH WHITE (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Kenneth White

**Agency/Organization/Jurisdiction, if applicable:** Maryland Black Chamber of Commerce

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

Hello, my name is Kenneth White. K-E-N-N-E-T-H W-H-I-T-E. I'm the Board Chairman of the Maryland Black Chamber of Commerce, which is headquartered at 15800 Crabbs Branch Way, Suite 324 in Rockville, Maryland. The Chamber supports this project and the Preferred Alternative. This project will eliminate the congestion we experience daily at the American Legion Bridge and improve conditions on I-270. The Preferred Alternative will increase speeds and reduce travel times and delays along I-495 and I-270. This is the solution we've been waiting for. Addressing this long overdue need for a P3 will remove one of the region's most congested bottlenecks at no expense to the Maryland taxpayers. The American Legion Bridge I-270 to I-70 Traffic Plan, Relief Plan, will bring the needed improvements to traffic conditions, and it will bring needed economic growth and opportunities to Maryland citizens and businesses. This project will create jobs through design construct, construction and operational opportunities for years to come.

There's a Memorandum of Understanding with Accelerate Maryland. The Maryland Black Chamber of Commerce will work to ensure these opportunities are available, are Maryland black-owned businesses. This project creates thousands of jobs for black workers and DBE contractors and training opportunities that can support families and provide a marketable trade and rewarding careers. Accelerate Maryland Partners and the Maryland Black Chamber of Commerce will work together to identify, engage, and market projects, project subcontracting opportunities to MBEs and DBE firms. Together, we'll develop training certification programs for MBEs/DBEs, designed to meet the subcontracting needs and their requirements. In closing, the Chamber supports this project and the Preferred Alternative. I look forward to a positive economic impact it will have on Maryland black-owned businesses. Thank you for your time.

#1

**Response to SDEIS Comment #1**

MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

There will be significant economic benefit to the State of Maryland and the National Capital Region with the Preferred Alternative, Alternative 9 – Phase 1 South. The improvements will provide for faster and more reliable movement of goods and services and improved access to employment centers and housing. The delivery of these improvements will lead to more jobs. The preliminary, estimated capital cost for the Preferred Alternative is greater than $3 Billion and will support thousands of jobs per year during construction. Additionally, the Preferred Alternative will result in savings to the Transportation Trust Fund by providing hundreds of millions in infrastructure investment for state of good repair to the existing roads and bridges that needs to be completed, allowing public funds to be used for other necessary transit and highway improvements. This project will boost Maryland's competitiveness in the region and improve quality of life.

00022857

**MARYLAND COALITION FOR RESPONSIBLE TRANSIT – VICTORIA REYNOLDS (NOVEMBER 5, 2021)**

*This page is intentionally left blank.*

**From:** MCRT Action <mcrtaction@gmail.com>
**Sent:** Friday, November 5, 2021 11:53 AM
**To:** Secretary MDOT <SecretaryMDOT@mdot.maryland.gov>; LConti@mdot.gov; SHA OPLANESMLS <oplanesMLS@mdot.maryland.gov>; ExecSecretariat.FHWA@dot.gov
**Subject:** Request for Extension to the Public Comment Period for I-495 and I-270 Managed Lanes Study

Please see attached.

Thank you for your attention to this matter.

--
Maryland Coalition for Responsible Transit
mcrt-action.org

*Maryland Coalition for Responsible Transit (MCRT) evaluates transit projects for social equity, environmental justice, economic viability, and community accessibility.*

00022858

1



MARYLAND
COALITION FOR
RESPONSIBLE
TRANSIT

November 4, 2021

MDOT and MDOT SHA: secretary@mdot.maryland.gov; LConti@mdot.maryland.gov; oplanesMLS@mdot.maryland.gov
Federal Highway Administration (FHWA): ExecSecretariat.FHWA@dot.gov
U.S. and Maryland elected officials

Re: Extension to the Public Comment Period for the Supplemental DEIS is Necessary

The Maryland Coalition for Responsible Transit (MCRT) is writing regarding the public review of the I-495 and I-270 Managed Lanes Study Supplemental Draft Environmental Impact Statement (SDEIS) that was released on October 1. We request the Maryland Department of Transportation (MDOT) State Highway Administration (SHA) and Federal Highway Administration (FHWA) grant an extension of the current public review and comment period from 45 days (ends - November 15) to 180 days. Via this letter we are asking elected representatives, to support this request and ask the MDOT SHA and FHWA to grant an extension.

The SDEIS consists of 8,000 pages. A thoughtful review of the complex SDEIS for scope, cost, the myriad of consequences and responses to the questions posed in the DEIS is an enormous undertaking. This is particularly true when considering the agency, environmental and political negotiations that have taken place during the time in which the SDEIS was being developed, both behind the scenes with state and agency officials and with active public scrutiny. What is being proposed in the SDEIS itself needs to be addressed in the context of these intricate machinations that have been unfolding. In addition, the difficulties presented to the public review process by the COVID-19/Delta epidemic persist, limiting the ability for face-to-face Q&A opportunities. Virtual public hearing sessions will take place only on November 1, which is unduly truncated and wholly inadequate for a project of this extent.

It is only fair and logical that the MDOT SHA/FHWA extend the public comment period to 180 days to ensure genuine public access, broad awareness of the process, and clarification of current questions and missing data, as well as to promote and encourage serious public engagement with the controversial issues raised by this project.

The MCRT is a nonprofit organization formed in 2020. MCRT's mission is to evaluate transit projects for social equity, environmental protection, environmental justice, economic viability, and community accessibility. See MCRT's Facebook page www.facebook.com/MCRTaction and our website at www.mcrt-action.org. Contact the MCRT at mcrtaction@gmail.com.

**Response to SDEIS Comment #1**

The SDEIS published on October 1, 2021 was prepared to consider new information relative to the Preferred Alternative, Alternative 9 - Phase 1 South. Building off the analysis in the existing DEIS, the SDEIS disclosed new information relevant to the Preferred Alternative while referencing the DEIS for information that remained valid. The SDEIS also described the background and context in which the Preferred Alternative, Alternative 9 - Phase 1 South was identified. The SDEIS was available for the public to review and comment on the Preferred Alternative during a 45-day comment period, which was later extended an addition 15 days, until November 15, 2021.

Refer to Chapter 9, Section 3.7 for a response to comments related to public involvement and engagement.

Thank you for your attention to this request. We look forward to your response about this serious community and counties-wide Maryland matter.

Sincerely,

Victoria L. Reynolds
MCRT Vice Presisdent

*This page is intentionally left blank.*

**MARYLAND COALITION FOR RESPONSIBLE TRANSIT – DAN WOOMER**

| | |
|---|---|
| **From:** | Dan Woomer <woomer.dan@gmail.com> |
| **Sent:** | Sunday, November 14, 2021 6:43 PM |
| **To:** | SHA OPLANESMLS; Secretary MDOT; Leonora Conti; ExecSecretariat.FHWA@dot.gov |
| **Cc:** | Vicki Reynolds; Patricia Jackman; Kyle Hart; Suzzane Suzzie Karole & Olivieri, Douglas R Schuyler; Susan Rose McCutchen |
| **Subject:** | MCRT - I-495 & I-270 Managed Lanes Study SDEIS Comments - Support the No build Option |
| **Attachments:** | 20211114 - MCRT Comments on Managed Lanes SDEIS.pdf |

Good evening,
The Maryland Coalition for Responsible Transit has prepared and is submitting comments on the I-495 & I-270 Managed Lanes Study Supplemental Draft Environmental Impact Statement - see attached.
We join with the Maryland Sierra Club, and others, in opposition to the proposed project, and encourage the selection of the No build Option.

Respectfully,
Daniel E. Woomer
President
Maryland Coalition for Responsible Transit

*This page intentionally left blank.*

00022861



November 14, 2021

To: oplanesMLS@mdot.maryland.gov
MDOT and MDOT SHA: secretary@mdot.maryland.gov & LConti@mdot.maryland.gov
Federal Highway Administration (FHWA): ExecSecretariat.FHWA@dot.gov

**Re: Comments on the I-495 & I-270 Managed Lanes Study SDEIS; Support the No build Option**

#1    The Maryland Coalition for Responsible Transit (MCRT) is submitting comments on the Supplemental Draft Environmental Impact Statement (SDEIS) for the I-495 and I-270 Managed Lanes Study. We oppose the proposed toll lanes and only support the No Build Option. This public-private partnership transportation project is ill-conceived and poorly planned. It should not proceed. We concur with the detailed comments on the SDEIS prepared by the Maryland Sierra Club.

#2    The MCRT would first point out that toll roads are not an incentive; rather, an aggressive move and inequitable to travelers. Second, we are concerned about the course of proposals and approvals that has taken place. It is a history of political maneuvering and questionable lobbying diversions.

There are several key issues about which the MCRT is concerned:

#3    *Fundamental flaws*: Inherent flaws of omissions and undeveloped or underdeveloped plans cannot be fixed. They must be addressed directly and vetted with the public and the communities affected by the toll lanes construction.

#4    *Equity*: It creates another "have and have-not" situation for residents who need reasonably priced access to jobs, schools, and businesses and other locations that are part of their daily lives. We need multi-modal transportation.

#5    *Foreign economic foothold*: Australian Transurban does not have an interest in what the people need; rather, its incentive is to make a profit and establish a footprint in Maryland by creating a significant economic operational role in the state. It would effectively create a foothold for a foreign actor in our state taking an economic piece of the pie.

#6    *Diversity in Maryland*: According to the recent Census, Maryland is in the top four states in the United States in diversity. This quality extends to the needed modes of transportation. Communities of color rely heavily on transit, yet many will not be able to afford the tolls.

1

---

**Response to SDEIS Comment #1**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to SDEIS Comment #2**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program and Project Cost.

**Response to SDEIS Comment #3**
Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

**Response to SDEIS Comment #4**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to SDEIS Comment #5**
See response to #2

**Response to SDEIS Comment #6**
See response to #4

#7

*More vehicles on the road*: Toll roads encourage more vehicular traffic, which also leads to more pollution, which further leads to negative effects in communities of color located along the path of the toll lanes, not to mention the effect on local roads, particularly in these communities whose infrastructure issues are often last on the list for attention.

#8

*Environmental justice issues*: As explicated by the federal government, the needs of communities must be determined at the beginning of the process. This has not occurred and it is apparent at this juncture that environmental justice is not a concern of the developers or the state government. As you will know, communities of color and low-income communities are especially challenged with these kinds of transportation projects.

#9

*Big trucks*: These vehicles will use the free lanes to avoid the high cost of the toll lanes, which will make those lanes less safe. These lanes will face increased wear and tear. Repairing them will cost more. The net effect will be the creation of two transportation systems.

#10

*Shifting bottlenecks*: The Managed Lanes project should be viewed as a single project rather than be broken up. Phase I will worsen travel through the northern part of Maryland. One wonders whether the strategy is to create this very situation, with a goal of "pushing" this future transit project as a remedy for a problem purposely created.

*Local road impact analysis*: This analysis has not been undertaken. It is indicated that this will be done afterward and, in fact, will not be comprehensive. This is a serious flaw and unacceptable.

#11

*Non-vehicular traffic*: There is no commitment to addressing or assisting with plans for non-vehicular traffic. Alternate transportation modes are increasingly being addressed in Maryland, as are livable, walkable communities. This must be taken into consideration.

#12

*Environmental impact*: This is not addressed, a significant flaw. Stormwater mitigation, runoff from adding extensive impermeable surfaces, tree removal, wildlife, and more are not discussed. We are in a particularly rich environmental area of importance to residents and visitors—locally, statewide, nationally, and internationally—both for research and recreation, and this issue must be taken seriously.

#13

*Historical impact*: This impact is not discussed. We are in a particularly rich historical area of importance locally, statewide, nationally, and internationally, and this issue must be taken seriously.

#14

*Changing travel priorities*: The jury is still out on how the pandemic has affected work and travel patterns. To make major transportation decisions at this juncture is premature. While there has been an uptick in traffic, many are still working remotely or have even quit their jobs and started to work out of their homes or in other careers.

#15

*Climate change*: As stated previously, this plan will encourage more vehicular traffic. Maryland must proactively reduce greenhouse gas emissions and strategically designing mass transit systems that reduce vehicle use is critical.

2

**Response to SDEIS Comment #7**
Refer to Chapter 9, Section 3.6.B for a response to toll rate ranges and toll rate setting process.

**Response to SDEIS Comment #8**
See response to #4

**Response to SDEIS Comment #9**
The Preferred Alternative includes the resurfacing and rehabilitation of the general purpose lanes as well as construction of the managed lanes.

**Response to SDEIS Comment #10**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.
Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

While MDOT SHA and FHWA recognize that congestion would be present during the afternoon peak period on I-270 southbound and the I-495 inner loop in the design year 2045 due to downstream bottlenecks outside of Phase 1 South, the Preferred Alternative would provide tangible operational benefits to the system including significantly increasing throughput across the ALB and the southern section of I-270 while reducing congestion. Refer to SDEIS Chapter 3, Section 3.3 and FEIS Chapter 4, Section 4.3.

The traffic analysis results on Local Network and Arterials Adjacent to the Study Corridors indicate that the net impact of the Preferred Alternative will be an overall reduction in delay on the surrounding arterials, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges. The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of this FEIS, and mitigation was proposed where needed to maintain acceptable operations and safety per FHWA Interstate Access Point Approval guidelines. In addition, based on follow-up meetings between MDOT SHA and Rockville, additional improvements were considered and incorporated where feasible, including modifications to the right-turning movement from the I-270 off-ramp onto eastbound MD 189, and additional turn lanes at Wootton Pkwy at Seven Locks Rd, Gude Drive at Research Blvd, and MD 189 at Great Falls Road. All these enhancements will help manage and/or improve the function of the local roadway network.

**Response to SDEIS Comment #11**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

**Response to SDEIS Comment #12**
Refer to Chapter 9, Section 3.4.E for a response to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**Response to SDEIS Comment #13**
Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

**Response to SDEIS Comment #14**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

**Response to SDEIS Comment #15**
Chapter 9, Section 3.4.G for a response to climate change considerations.

The MCRT is a nonprofit organization formed in 2020. Its mission is to evaluate transit projects for social equity, environmental protection, environmental justice, economic viability, and community accessibility. See MCRT's Facebook page www.facebook.com/MCRTaction and our website at www.mcrt-action.org. Contact the MCRT at mcrtaction@gmail.com.

The MCRT opposes toll lanes and only supports the No Build Option for this project. Additionally, we find a 45-day comment period for the SDEIS to be woefully inadequate and a sad testimony to your insidious work on this project. We look forward to your response about this serious matter that affects communities and counties across the state of Maryland.

Sincerely,

Daniel E. Woomer
President

Victoria Reynolds
Vice President

**Contact Information**

Daniel E. Woomer
President
Maryland Coalition for Responsible Transit
6242 Woodland Road
Linthicum Heights, Maryland 21090
Email : woomer.dan@gmail.com
Phone : 410-684-2945

Ms. Victoria Reynolds
Vice President
Maryland Coalition for Responsible Transit
6715 Terra Alta Drive
Lanham, Maryland 20706
Email: reynoldsdev@yahoo.com
Phone: 301-651-8110

CC:    Steny Hoyer
       Chris Van Hollen
       Ben Cardin

3

*This page is intentionally left blank.*

**MARYLAND HISPANIC CHAMBER OF COMMERCE – CJ SANTOS (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** CJ Santos

**Agency/Organization/Jurisdiction, if applicable:** MD Hispanic Chamber of Commerce

**Virtual Public Hearing Date:** 11/2/2021

**Type/Session:** Testimony

**Transcription:**

Good evening, I'm CJ Santos. C-J S-A-N-T-O-S. Speaking on behalf of the Maryland Hispanic Chamber of Commerce located at 11 West Mount Vernon Place, Suite 304, Baltimore, Maryland, 21202. Thank you for your time this evening. And the Chamber would like to inform the hearing that we strongly support this project and the Preferred Alternative, Alternative 9 – Phase 1 South. The Supplemental Draft Environmental Impact Statement reflects that the Preferred Alternative will dramatically reduce congestion at the American Legion Bridge and improve conditions on I-270 during both rush hours – an important benefit for our members and all residents of the national capital region and Maryland. The Preferred Alternative will also allow Maryland to move forward with a $3.5 billion investment that will replace and upgrade our aging infrastructure, putting thousands of Maryland residents, including minority workers, back to work and provide valuable contracting opportunities for hundreds of small, minority-owned and other disadvantaged business enterprises in Maryland and around our region. The drive growth that this project will bring to our region will provide a much needed boost to our regional economy. The traffic relief it will bring, and the new transit options it will create for faster and more reliable transit trips will help keep Maryland competitive as a place to attract and retain employers, and valuable knowledgeable workers and other employers that the State needs. Current congestion on the American Legion Bridge and I-270 is a major disincentive to economic growth in the state of Maryland and there is no other practical solutions that, that addresses these choke points. This truly is a multimodal solution to our region's biggest transportation problems – congestion on American Legion Bridge, by not *[inaudible]*, the alternative fits in seamlessly with Virginia's I-495 express lanes project, which has already been successful in reducing traffic delays for toll lane users and non-toll lane users. For all of these reasons, respectfully *[inaudible]* approval of the Preferred Alternative. Thank you so much for your time.

**Response to SDEIS Comment #1**

MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

There will be significant economic benefit to the State of Maryland and the National Capital Region with the Preferred Alternative, Alternative 9 – Phase 1 South. The improvements will provide for faster and more reliable movement of goods and services and improved access to employment centers and housing. The delivery of these improvements will lead to more jobs. The preliminary, estimated capital cost for the Preferred Alternative is greater than $3 Billion and will support thousands of jobs per year during construction. Additionally, the Preferred Alternative will result in savings to the Transportation Trust Fund by providing hundreds of millions in infrastructure investment for state of good repair to the existing roads and bridges that needs to be completed, allowing public funds to be used for other necessary transit and highway improvements. This project will boost Maryland's competitiveness in the region and improve quality of life.

#1

**MARYLAND TRANSIT OPPORTUNITIES COALITION – BENJAMIN ROSS**

*This page is intentionally left blank.*

| | |
|---|---|
| **From:** | Ben Ross <ben@imbenross.com> |
| **Sent:** | Tuesday, November 30, 2021 7:26 AM |
| **To:** | SHA OPLANESMLS |
| **Subject:** | Comment on SDEIS |
| **Attachments:** | SDEIScomment.pdf |

Dear Mr. Folden,

Attached are comments in response to the I-495 and I-270 Managed Lanes Study Supplemental Draft Environmental Impact Statement.

These comments are submitted by the following organizations (mailing addresses are listed in the comments):

Action Committee for Transit
Baltimore Transit Equity Coalition
Central Maryland Transportation Alliance
Citizens Against Beltway Expansion
Coalition for Smarter Growth
Coalition for Transit Alternatives to Mid-County Highway Extended
Don't Widen 270
Maryland Rail Passengers Association
Maryland Transit Opportunities Coalition
Trains Not Tolls
Wyngate Citizens Association

Sincerely,

Benjamin Ross
Chair
Maryland Transit Opportunities Coalition

00022866

### Comments on Supplemental Draft Environmental Impact Statement

### I-495 & I-270 Managed Lanes Study

The Supplemental Draft Environmental Impact Statement repeats and exacerbates the fatal flaws in the DEIS, many of which we pointed out in comments on the DEIS and earlier study documents.

The fundamental defect of the SDEIS is that the Preferred Alternative does not fulfill the ostensible purpose of the project, to relieve congestion. To obscure this reality, the SDEIS envelops the Purpose and Need Statement in a fog of doubletalk. It relies on a failed traffic model whose predictions lack all credibility. And it omits entirely some of the most important considerations in choosing between alternatives, such as fairness to disadvantaged populations and financial feasibility.

**Purpose and Need**

The SDEIS states on page 1-2 that "The Purpose of the Study is to develop a travel demand management solution(s) that addresses congestion..."

We are never told what "address" means, because it is an Alice-in-Wonderland word. As Humpty-Dumpty told Alice, "When I use a word… it means just what I choose it to mean – neither more nor less." Shifting definitions at will, MDOT rules alternatives in or out by arbitrarily asserting that they do or do not "address congestion."

Thus the project website, on a page cited[1] by MDOT as the authoritative explanation of the reason for eliminating transit alternatives, states that "transit alone would not address the existing and long-term traffic growth in the study corridors."

Yet elsewhere we are told just the opposite. The Purpose and Need Statement itself, on DEIS page 1-7, tells us that the Purple Line – a "transit alone" project that will not even include parking – "addresses" growing traffic demand and congestion:

---

[1] https://oplanesmd.com/environmental/alternatives/screened-alternatives/, cited in L.B. Choplin, letter to B. Ross, July 9, 2019, responding to our comments on the recommended alternatives retained for detailed study (attached). Similar language appears on page 2-13 of the DEIS.

I

**#1**

**Response to SDEIS Comment #1**

The congestion and other transportation issues facing this region are so immense that multiple transportation initiatives are necessary to address or have a notable effect on reducing the negative impacts of transportation problems or fulfilling a transportation need. The Purple Line, which was selected after a review of transit alternatives in the region, will address or have a notable effect on addressing the need to provide faster, more direct, and more reliable east-west transit service connecting major activity centers in the corridor including Bethesda, Silver Spring, Takoma/Langley Park, College Park/University of Maryland, and New Carrollton. It will provide better connections to existing Metrorail and MARC commuter rail services and improve mobility and connectivity to the communities in the corridor located between existing rail lines. When evaluating the need for the Study the projected benefits to the 495/270 Study area were included. As set forth in the Study, Purpose and Need, the Managed Lanes Study was a critical adjunct to the regional plan.

Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis, and impacts.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need.

**#1 Cont**

Options to address the growing traffic demand and congestion in the region have been the subject of many prior studies…. While some of those strategies are being implemented, for example… Purple Line…

This linguistic sleight of hand is necessary because transit alternatives "address" congestion in the same way as the Preferred Alternative. Express toll lanes do not relieve congestion – indeed, they need congestion to be financially viable. Table 3-8 of the SDEIS states that the Preferred Alternative will make traffic worse on the existing lanes of the I-495 inner loop during the afternoon rush hour – the most congested section of the alternative's area.[2]

At most, toll lanes will remove some cars from the untolled lanes and enable a limited subset of travelers to bypass the congestion. Transit does the same. It takes some cars off highways, and it enables some but not all travelers to bypass congested roadway lanes. If this is a reason to eliminate transit alternatives from consideration, the Preferred Alternative must also be eliminated.

**"No Action" vs. "No Build"**

The Recommended Alternative for I-495 east of I-270 is described with another Alice-in-Wonderland phrase: "No Action." Here, the meaning shifts so that MDOT can have its cake and eat it too. When the state agency wants to wave aside the environmental and legal obstacles to building in park land, raised repeatedly by M-NCPPC, "No Action" means "No Build."

**#2**

But where it is more convenient, "No Action" means "Build Later." The map on the home page of the project website labels the remainder of the Beltway as "Future Phases." The SDEIS states on page 2-3 that "improvements on the remainder of the interstate system may still be needed… and would be subject to additional environmental studies…"

The SDEIS violates NEPA due to improper segmentation. The SDEIS has segmented the project into a first segment represented by the preferred alternative and then future

---

[2] Table 3-8 is based on an invalid traffic model, as discussed below. But the use of a double standard for transit and toll lanes is improper, regardless of the validity of the data to which the standard is applied.

2

**Response to SDEIS Comment #2**

As described in the SDEIS and FEIS, the Preferred Alternative will build a new American Legion Bridge and delivering two high-occupancy toll (HOT) managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to west of MD 187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from east of MD 187 to I-270. This Preferred Alternative was identified after coordination with resource agencies, the public and stakeholders to respond directly to feedback received on the DEIS, and to align the NEPA approval with the P3 Program planned project phased delivery and permitting approach.

The Study evaluated the full length of the Study Area. While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately and would be subject to additional environmental studies and analysis and collaboration with the public, stakeholders and agencies.

No Action is not the same as a No Build Alternative. NEPA's CEQ regulations, 40 CFR 1500-1508, require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multimodal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS, Appendix C. For a discussion of the basis for the Purpose and Need refer to Section 9.3.1 and for the Selection of the Preferred Alternative refer to Section 9.3.3.C.

**#2 Cont**

segments to be studied in future environmental studies. The SDEIS fails to show the first segment has independent utility according to 23 CFR 771.111(f)(2). Second, the SDEIS fails to show that Old Georgetown Rd. is a logical terminus for the first segment according to 23 CFR 771.111(f). Such segmentation has been ruled by the courts as illegal.

The SDEIS does not even assert that the first segment has independent utility or that Old Georgetown Rd. is a logical terminus for the first segment. The opposite is true, because the traffic bottleneck at the Wisconsin Avenue merge, which is beyond the terminus, will cause traffic to back up past the terminus. The SDEIS predicts that this will create extreme congestion – an increase in the pm peak Travel Time Index within the project limits from 6.6 to 6.9. As the SDEIS concedes on page 3-15:

> Congestion would be present during the pm peak period... on the inner loop in the design year of 2045 due to downstream bottlenecks outside of the Preferred Alternative Limits.

**Lack of financial analysis**

**#3**

Financial viability is another criterion used to justify exclusion of transit alternatives from detailed analysis in the DEIS.[3] The analysis in the DEIS was woefully inadequate (see our comments on that document), but there was at least an analysis. The SDEIS does not even offer a pretense of a financial analysis.

Moreover, the analysis in the DEIS has been rendered inapplicable by subsequent events. According to MDOT's February 18 press release, Transurban, the project developer chosen in February, proposed "a higher rate of return on its equity investment" than other bidders. Under Transurban's contract, this high rate of return will be used to determine financial viability. Financial viability for all alternatives must be re-analyzed with this high rate of return factored in.

---

[3]The attached July 9, 2019 Choplin letter states that "each alternative retained for detailed study will be consistently and objectively evaluated to determine if the alternative can generate sufficient revenue to assure the financing, construction, operation, and maintenance of the improvements."

3

**Response to SDEIS Comment #3**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program or Board of Public Works and Project Costs.

00022869

**#4**

### Erroneous traffic model

The output of the SDEIS's traffic model is contrary to common sense, logic, and traffic forecasting done by MDOT itself before the sudden policy reversal that produced the new Preferred Alternative.

A key location where the SDEIS traffic model fails spectacularly is the merge at Wisconsin Avenue where the I-270 east spur meets the Capital Beltway. Feeding in three more lanes of traffic without adding capacity at the merge point, will obviously worsen congestion there. Yet the SDEIS predicts that 400 *fewer* eastbound vehicles will pass through the merge during the evening rush hour if the toll lanes are built than if they aren't. Even larger reductions in traffic volumes are predicted farther east on I-495. More detail about the model failure is presented in the attached October 18 letter to FHWA Acting Administrator Pollack and in comments being submitted by others.

Because none of the output of a model with such severe and pervasive errors can be trusted, it is not a credible basis for federal decision-making. As a result, the SDEIS provides no basis for determining whether the Preferred Alternative satisfies the project's Purpose and Need, what the air pollution and noise impacts will be, and whether it will disproportionately harm Environmental Justice populations.

### Environmental justice

**#5**

In an affluent corridor through Bethesda, Potomac, and Rockville, the Preferred Alternative would move cars faster, at least for those who can afford the tolls. But the Preferred Alternative would exacerbate traffic bottlenecks at the toll lane termini, and environmental justice populations are concentrated beyond these bottlenecks. Residents of these areas driving into the project corridor to access jobs in Tysons, Bethesda, and Rockville would face additional delay at the bottlenecks that would offset, and often exceed, their travel time savings within the corridor.

For all anyone knows now, the project could increase overall traffic delay for drivers who belong to environmental justice populations. An equity analysis of traffic time savings, based on a valid traffic model, is needed.

Moreover, traffic speed will not be the only difference between tolled and untolled lanes; the untolled lanes will also be less safe and less well maintained. On I-495 in Virginia,

4

---

### Response to SDEIS Comment #4

The traffic analysis in the Supplemental Draft Environmental Impact Statement (SDEIS) followed accepted professional practices including using the latest Metropolitan Washington Council of Governments (MWCOG) Travel Demand Model, which has been thoroughly reviewed and validated, and traffic simulation models using VISSIM, which is the state of practice for traffic flow simulation. The results were thoroughly reviewed by experts for the Maryland Department of Transportation State Highway Administration and the Federal Highway Administration.

Anytime significant regional transportation improvements are made, such as to the American Legion Bridge and I-270, traffic in the region will redistribute in some locations. That is reflected in in the traffic forecasting from the MWCOG model and traffic analysis results from the VISSIM model.

It is logical that the volumes for the movements at MD 355 in question reduce slightly as a result of the improvements. For the ramp to MD 355 southbound in the AM peak period , it is logical that some vehicles would avoid this ramp and stay on I-495 and access DC from the west under the Build condition. For the section of the Inner Loop east of MD 355 in the PM peak period, it is logical that some vehicles would use the ICC instead under the Build condition. Also, the volume differences between Build and No Build are very small – less than 100 vehicles over four hours in the AM peak period example and only approximately 1% different in the PM peak period  example. So, even if the trend was incorrect (which it is not), this is certainly not a "blatant error" or something that would have any impact on the overall results.

The two largest origin-destination pairs for the Capital Beltway in Maryland are between the I-95/I-495 interchange and both the American Legion Bridge and Woodrow Wilson Bridge. This is due to the significant I-95 "through" traffic that has to use the Capital Beltway as there is no direct I-95 connection through Washington DC. Northbound traffic in Virginia in the I-95 corridor can use either the Woodrow Wilson Bridge or American Legion Bridge corridors to travel into Maryland and reach I-95. A continuous HOT lane system from I-95 in Virginia to and up I-270 to I-370 will provide for capacity in the American Legion Bridge corridor reducing northbound traffic on the eastern side of the Capital Beltway. This reduction of traffic on the eastern side of I-495 also allows traffic destined for points north like Baltimore to potentially use US 50 eastbound to MD 3 and/or I-97 to go north instead of continuing on the Capital Beltway and using the MD 295 or I-95 corridors (see below map). While the distance is longer, less congestion on US 50 and I-97 results in reduced travel time today during the PM peak period on many days. This travel pattern is used today and will only be used more in the future without significant improvements to accommodate north-south travel between the Washington DC and Baltimore regions.

While Phase 1 South is only 15-miles, it has significant regional transportation benefits even where improvements are not occurring. Refer to Chapter 9, Section 3.4.B for a response to traffic modeling and analysis.

FHWA responded directly to the October 18 letter included as an attachment to this comment.

### Response to SDEIS Comment #5

The intent of the project is to improve operations for all users, not just those "willing to pay the tolls". The results of the operational analysis indicate that congestion will be reduced in the general purpose lanes and delays will be reduced on the local roads in most areas because the HOT lanes serve traffic that otherwise would be using the general purpose lanes and local roads. Additionally, HOV 3+ and transit vehicles will also be able to use the managed lanes (and obtain the associated speed and travel time benefits) without paying a toll.

Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

Refer to Chapter 9, Section 3.4.O for a response to impacts to safety considerations.

00022870

**#5 Cont**

36% of regular toll lane users are motivated by safety.[4]

The project will make the untolled lanes less safe in numerous ways:

- The untolled lanes will not have a left shoulder. Currently, all portions of the roadway have right and left shoulders.
- High tolls for trucks in Maryland and the exclusion of heavy trucks from the Virginia toll lanes will put almost all heavy truck traffic in the untolled lanes in Maryland.
- Average vehicle age will be greater in the untolled lanes, resulting in more frequent mechanical failures. Mechanical failures at high speed endanger drivers of other vehicles.
- The toll lanes will be maintained to a higher standard.

The NEPA process cannot leave environmental equity as an afterthought to be cleaned up in an FEIS. These issues should have been thoroughly addressed in the SDEIS, but they were ignored. As a result, local governments and the public lacked proper opportunities for input.

Submitted by:

Maryland Transit Opportunities Coalition
5 Lochness Court
Rockville, MD 20850

Action Committee for Transit
P.O. Box 7074
Silver Spring, MD 20907

Baltimore Transit Equity Coalition
P.O. Box 23141
Baltimore, MD 21203

Central Maryland Transportation Alliance
11 E Mt Royal Ave, 2nd Floor
Baltimore, MD 21202

---

[4] Maryland Dept. of Transportation, I-495 and I-270 Express Lanes Stated Preference Survey, August 9, 2019, p. 43.

5

*This page is intentionally left blank.*

Citizens Against Beltway Expansion
219 Indian Spring Drive
Silver Spring, Maryland 20901

Coalition for Smarter Growth
P.O. Box 73282
Washington, DC 20056

Coalition for Transit Alternatives to Mid-County Highway Extended
11425 Neelsville Church Road
Germantown, MD 20876

Don't Widen 270
P.O. Box 10461
Rockville, Maryland 20849

Maryland Rail Passengers Association
7 Renmark Court
Gaithersburg, MD 20878

Trains Not Tolls
7005 Runny Court
Frederick, MD 21701

Wyngate Citizens Association
5607 Oakmont Ave,
Bethesda, MD 20817

6

*This page is intentionally left blank.*



MARYLAND DEPARTMENT
OF TRANSPORTATION

STATE HIGHWAY
ADMINISTRATION

Larry Hogan
Governor
Boyd K. Rutherford
Lt. Governor
Pete K. Rahn
Secretary
Gregory Slater
Administrator

July 9, 2019

Mr. Ben Ross
Chair
Maryland Transit Opportunities Coalition
8725 Warm Waves Way
Columbia MD 21045

Dear Mr. Ross:

Thank you for your comments on the recommended alternatives retained for detailed study for the I-495 and I-270 Managed Lanes Study. We have reviewed your comments and are providing our response.

Multiple studies over the last decade have shown that the National Capital Region is one of the most congested in the nation, and Marylanders face the second highest commuting times in the country. Today, on average, travelers experience seven hours of congestion daily on I-270. The duration is even worse on I-495 with travelers experiencing ten hours of congestion daily. With the projected population growth in the National Capital Region, Marylanders will continue to see those numbers increase. Improvements to I-495 and I-270, coupled with investment in transit, are necessary to move not only people, but goods and services through the National Capital Region.

Your comment that alternatives retained for detailed study are insufficient under the National Environmental Policy Act (NEPA) because of the lack of a standalone mass transit alternative is incorrect. The Federal Highway Administration guidance you cite notes that mass transit should be considered when determining reasonable alternatives. The Maryland Department of Transportation State Highway Administration (MDOT SHA) identified multiple standalone mass transit options as part of the preliminary range of alternatives. Those alternatives were analyzed and determined to not be reasonable in meeting the purpose and need of the I-495 and I-270 Managed Lanes Study. Discussion on why the standalone transit alternatives were determined to not be reasonable in meeting the purpose and need of this study is on our program website at www.495-270-P3.com under Environmental>Alternatives>Screened Alternatives. As required under NEPA, the Draft Environmental Impact Statement (DEIS) will briefly discuss alternatives that were under consideration but eliminated from detailed study and will devote substantial treatment to each reasonable alternative studied in detail.

While standalone mass transit is not part of the alternatives retained for detailed study, inclusion of enhancing existing and planned multimodal mobility and connectivity is an important facet of the study's purpose. Transit elements meeting this purpose will be incorporated into the study regardless of alternative.

707 North Calvert St., Baltimore, MD 21202 | 410.637.3320 | 1.833.858.5960 | Maryland Relay TTY 800.735.2258 | roads.maryland.gov

---

Mr. Ben Ross
Page Two

Your other comment that "MDOT admits that all six 'build' ARDS are not self-supporting and will require a taxpayer guarantee of the P3 concessionaire's loans" is also incorrect. First, it is important to note that the NEPA process is separate and distinct from the Public-Private Partnership (P3) process. To address the NEPA study's established goal of financial viability, each alternative retained for detailed study will be consistently and objectively evaluated to determine if the alternative can generate sufficient revenue to assure the financing, construction, operation, and maintenance of the improvements. As far as the terms you noted from the Pre-Solicitation Report supplement, those are typical terms and conditions included in most contracts. These terms absolutely do not reflect that one or any of the recommended alternatives retained for detailed study would not be self-supporting. These terms represent that in the extremely unlikely event that MDOT were to terminate the agreement, the Developer would be compensated for the value of work already delivered (less the value of any deficiencies in that work), e.g. construction of a new American Legion Bridge, prior to MDOT deciding to terminate the P3 agreement.

Thank you again for your comments. If you have any questions, please do not hesitate to contact me or Jeffrey T. Folden, P.E., DBIA, Deputy Director, I-495 & I-270 P3 Office at 410-637-3321 or jfolden1@mdot.maryland.gov.

Sincerely,

Lisa B Ch

Lisa B. Choplin
Director, I-495 & I-270 P3 Office

cc:    Ms. Caryn J. G. Brookman, Environmental Manager, I-495 & I-270 P3 Office,
       MDOT SHA
       Jeffrey T. Folden, P.E., DBIA, Deputy Director, I-495 & I-270 P3 Office, MDOT SHA
       Mr. Gregory Slater, Administrator, MDOT SHA

00022873

  

October 18, 2021

Stephanie Pollack
Acting Administrator
Federal Highway Administration
1200 New Jersey Ave. SW
Washington, DC 20590

Subject: I-495 & I-270 Managed Lanes Study

Dear Administrator Pollack:

On October 1, FHWA and the Maryland Dept. of Transportation issued a Supplemental Draft Environmental Impact Statement for the I-495 & I-270 Managed Lanes Study. The subject of the SDEIS is a new alternative, not addressed in the DEIS, which adds toll lanes from the George Washington Bridge in Virginia to I-370 in Maryland. MDOT has selected this as the Preferred Alternative, leaving the choice of alternative for the remainder of I-495 undetermined.

The SDEIS contains no valid information on how the Preferred Alternative will affect vehicle movement because its traffic model is invalid. The output of the SDEIS's traffic model is contrary to common sense, logic, and traffic forecasting done by MDOT itself before Maryland suddenly reversed its policy. As a result, the SDEIS provides no basis for determining whether the Preferred Alternative satisfies the project's Purpose and Need, what the air pollution and noise impacts will be, and whether it will disproportionately harm Environmental Justice populations.

We therefore request that you withdraw the SDEIS and instruct MDOT to identify the causes of the traffic model's failure, develop a valid model, and reissue the SDEIS with an explanation of the reasons for the previous failure and a thorough validation of the new model.

A key location where the SDEIS traffic model fails spectacularly is the merge at Wisconsin Avenue where the I-270 east spur meets the Capital Beltway. This is already one of the most congested parts of the Beltway. It is obvious that feeding in three more lanes of traffic (two from the Beltway and one from I-270), without adding capacity at the merge point, will worsen congestion there. This is a crucial difference between the new Preferred Alternative and the build alternatives studied in the DEIS, which all increase capacity at that merge point.

---

Ms. Stephanie Pollack, October 18, 2021                                    Page 2

MDOT said just that on November 7, 2019. At that time, the Maryland agency was resisting demands for the DEIS to study an "ICC diversion" alternative that would add toll lanes to I-270 and the American Legion Bridge but not widen the Beltway at the Wisconsin Avenue merge. MDOT told the National Capital Planning Commission that this would create a "New Bottleneck" at the merge point. The slide on the right is from MDOT's presentation to NCPC.



But then there was a sudden policy reversal. In May of this year, MDOT announced its new Preferred Alternative – with the Beltway no longer widened at the merge. The "New Bottleneck" then vanished.

According to the SDEIS, in the evening rush hour from 3:00 to 7:00, when congestion is at its worst, 400 *fewer* eastbound vehicles will pass through the merge if the toll lanes are built than if they aren't. To the east on the Inner Loop, between Georgia Avenue and I-95, the model predicts even larger drops in traffic volume. This leads the model to conclude that Inner-Loop traffic in Montgomery County will get worse where the highway is widened and get better where it is not.[1] These model outputs are contrary to common sense.

The SDEIS model also predicts that the Preferred Alternative will reduce evening rush-hour traffic volumes by up to 4% on the northbound Beltway south of US 50 in Prince George's County, nearly eliminating congestion there. A 4% reduction in traffic is also predicted for US 50 toward Annapolis. There is surely something deeply wrong with a model that shows traffic jams vanishing in Prince George's County when a highway is widened on



Detail from SDEIS, Appendix A, page 127

---

[1] Table 4 of Appendix A states that the Travel Time Index worsens from 6.6 to 6.9 in the untolled lanes west of I-270 but improves from 4.8 to 3.0 between I-270 and I-95.

Ms. Stephanie Pollack, October 18, 2021                                     Page 3

the other side of Washington.[2]

These are not the only inexplicable model forecasts. A widespread decline in traffic headed out of Washington toward the northeast during the evening rush hour is predicted if the Preferred Alternative is built, compared to no-build. The model predicts fewer vehicles headed outbound from every Beltway interchange from US 29 to US 50, except for a small increase on I-95. The traffic forecast for the College Park-Greenbelt area is especially dubious – 15.9% fewer cars on Kenilworth Avenue, 12.8% on Route 1, and 9.9% on the Baltimore-Washington Parkway.

Added capacity due to construction of the toll lanes on I-270 cannot be the cause of the reduction in outbound evening traffic between US 29 and US 50 predicted by the model. While I-270 and the ICC are an alternative route that will draw some traffic away from US 29 and I-95, they are not a reasonable alternative for people driving toward Annapolis. Moreover, the predicted increase in traffic exiting northbound I-270 onto I-370 toward the ICC, 1515 vehicles, is much smaller than the 5095-vehicle decline that is predicted for outbound traffic in the US29-to-US50 sector.

| Highway | No. of Vehicles | Percentage Change |
|---|---|---|
| US 29 | −340 | −2.9% |
| MD 193 | −190 | −2.6% |
| MD 650 | −395 | −3.8% |
| I-95 | +530 | 1.6% |
| US 1 | −950 | −12.8% |
| MD 201 | −1,690 | −15.9% |
| MD 295 | −1,395 | −9.9% |
| MD 450 | −35 | −0.3% |
| US 50 | −1,230 | −4.1% |

Model-predicted change in outbound rush hour traffic

When a model exhibits such severe and pervasive errors, none of its output can be trusted. Such a model is not a credible basis for federal decision-making. It must be corrected.

The necessary first step in fixing the model is to identify the root cause of its failure. One possible explanation to consider is a discrepancy in the input data, erroneously telling the model that fewer home-to-work trips originate in the Greenbelt-Laurel-Bowie area in the Preferred Alternative than in the No-Build alternative. That would explain the otherwise mysterious predictions that the Preferred Alternative will reduce evening rush-hour traffic volumes traveling toward that area from all directions – northbound on the Outer Loop in Prince George's County, eastbound on the Inner Loop in eastern Montgomery County, and outbound from D.C. (inside and outside the Beltway) throughout northern Prince George's County.

Comparison of alternatives, the fundamental purpose of an Environmental Impact Statement, is impossible when the traffic model lacks all credibility. Moreover, the public cannot intelligently comment on key aspects of the environmental analysis – among them whether the Preferred Alternative satisfies the Purpose and Need, air and noise pollution, and whether the project will

---

[2] The SDEIS, on page 3-10, absurdly explains the model output showing less congestion on the Beltway Outer Loop in Prince George's County as a consequence of cars no longer backing up from I-270 in Bethesda.

Ms. Stephanie Pollack, October 18, 2021                                     Page 4

help or harm Environmental Justice populations. We therefore request that you withdraw the Supplemental Draft Environmental Impact Statement and reissue it with a corrected and thoroughly validated traffic model.

Sincerely,

Benjamin Ross, Chair[3]
Maryland Transit Opportunities Coalition

Barbara Coufal, Co-Chair
Citizens Against Beltway Expansion

Janet Gallant and Sally Stolz, Coordinators
DontWiden270.org

cc:     Senator Ben Cardin
        Senator Chris Van Hollen
        Rep. Jamie Raskin
        Rep. Anthony Brown
        Elizabeth Hewlett, Chair, M-NCPPC
        Casey Anderson, Chair, Montgomery County Planning Board

---

[3] Please direct any technical questions or correspondence to Dr. Ross at ███████████ or ███████████

**MARYLAND TRANSPORTATION BUILDERS AND MATERIALS ASSOCIATION – MICHAEL SAKATA (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Michael Sakata

**Agency/Organization/Jurisdiction, if applicable:** MD Transportation Builders and Materials Association

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

Thank you. I'm Michael Sakata M-I-C-H-A-E-L S-A-K-T-A representing Maryland Transportation Builders and Materials Association, located at 2408 Peppermill Drive, Glen Burnie, Maryland. We represent the transit and construction industry companies and their 30,000 employees. We strongly support this project and the Preferred Alternative. We support the Preferred Alternative for many reasons. The SDEIS shows it will eliminate congestion at the American Legion Bridge and improve conditions on I-270 during both rush hours. The Preferred Alternative will reduce travel times and delays among most of I-495/I-270 and surrounding roads. On page 3 to 15 of the SDEIS, the findings of the traffic analysis are clearly presented as there have been some misreporting on this, on this point, and on some media accounts. It says right there, the Preferred Alternative would significantly increase throughput across the American Legion bridge on southern sections of I-270 while reducing congestion. It would also increase speeds, improve reliability, and reduce travel times and delays on the majority of I-495/I-270 in the surrounding roadway network compared to a No-Build alternative. It will put hundreds of Marylanders' companies to work including small and disadvantaged businesses. This project will need, will bring the economic growth and opportunities for Maryland citizens and businesses to compete in this regional area. We know firsthand how transformative this project will be, will be and how it will improve by personal commute in our regional area.

Finally, the inflated toll rates that opponents are citing from I-66 are pure fiction. In Maryland, the average toll rate is projected to be just about $3.95 per trip. We support the Preferred Alternative and urge Maryland to move forward without any further delay so this project can be delivered in close coordination with Virginia's I-495 NEXT Program, which will start construction just next year. It's time for Maryland to get moving again. Thank you for your time.

**Response to SDEIS Comment #1**

MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

#1

**NATIONAL PARKS CONSERVATION ASSOCIATION – KYLE HART**



**I-495 & I-270 Managed Lanes Study | Supplemental DEIS Comments**
Jeffrey T. Folden, P.E., DBIA| Maryland Department of Transportation
707 North Calvert Street| Baltimore, MD 21202
November 30, 2021

Dear Mr. Foden:
I am commenting today on behalf of the National Parks Conservation Association (NPCA). The National Parks Conservation Association is the only national membership-based organization dedicated to advocacy on behalf of our country's national parks. NPCA's mission is to protect and enhance America's National Park System for present and future generations, a mission we have upheld since NPCA was created by the very first National Park Service Director Stephen Mather in 1919. These comments represent approximately 32,000 members and supporters in Maryland, 5,000 in Washington DC, 43,514 in Virginia, and over 1.6 million members and supporters nationwide. NPCA remains concerned with the proposed impacts to National Park Service property and the environment generally by this project, and we firmly support the no-build alternative.

#1

NPCA submits these comments in addition to the comments that were submitted verbally during the public hearing on November 1, 2021 by Kyle Hart, as well as in conjunction with the comments submitted by the Maryland Sierra Club, of which NPCA is an official signatory. Also, these comments continue to build on the comments NPCA, and our coalition submitted on the Draft Environmental Impact Statement for this project on November 9, 2020.

As highlighted in the SDEIS, the chosen preferred alternative, Alternative 9, Phase 1- South, would directly, negatively impact 17 acres of National Park Service (NPS) property at three distinct NPS sites- the George Washington Memorial Parkway, the Chesapeake and Ohio Canal National Historical Park, and the Clara Barton Parkway. These impacts would be extensive and unmitigable.

According to Table 4-9, this proposal would destroy 1,212 trees on National Park Service property. The majority (850) of these trees would be removed from the Chesapeake and Ohio Canal, particularly at or around Plummers Island. This area consists mainly of old-growth, deciduous forests, with trees upwards of 100 years old or older. These are not temporary impacts, as forests of this type and age cannot simply be replaced with tree plantings and forest offsets. This level of impact to existing old-growth forests is unacceptable. Further, as identified in the SDEIS, the proposed Limit of Disturbance for the project includes 41 rare, threatened, and endangered plant and invertebrate species identified by NPS in site surveys. These are plants and habitat types that cannot continue to be lost and degraded.

#2

Plummers Island, along the Chesapeake and Ohio Canal, would bear the brunt of the negative impacts from the proposed alternative. The island has been studied for decades by the Washington Biologists Field Club (WBFC) and is often referred to as the "the most thoroughly studied island in North America." The research done on the island is extensive and it's impacts on the scientific community cannot be

**Response to SDEIS Comment #1**
MDOT SHA acknowledges receipt of the DEIS Comment Letter from the National Parks Conservation Association dated November 9, 2020 that was appended to this SDEIS Comment Letter. Refer to Appendix T for a response to this DEIS Comment Letter.

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018. Refer to DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. Refer to DEIS, Chapter 3 and DEIS Appendix C. For a discussion of the basis for the Purpose and Need and for the Selection of the Preferred Alternative, please see related Common Theme Responses and the SDEIS and FEIS. Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained

Based on the current design and as presented in the FEIS, the Preferred Alternative would have an estimated permanent impact of 1.0 acres to the Chesapeake and Ohio Canal National Historical Park, and an estimated temporary impact of 9.1 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 1.1 acres to Clara Barton Parkway, and an estimated temporary impact of 0.7 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 5.7 acres to Cabin John Regional Park, and an estimated temporary impact of 0.6 acres during construction.

Impacts to Plummers Island could not be avoided completely, but impacts have been reduced by 1.7 acres. In the DEIS, the Build Alternatives had 1.9 acres of impacts to Plummers Island. Under the Preferred Alternative, the impacts have been reduced to approximately 0.28 acres of impact at Plummers Island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. Impacts to Plummers Island would be required for the ALB substructure, including permanent use for three, discrete, approximately 10-foot diameter pier foundations and temporary, construction activities. Temporary construction activities may include efforts such as excavation, access for demolition of existing bridge foundation and piers, and slope protection. Access to the existing and proposed piers is required for these activities.

No wetlands, as delineated per Section 404 or the National Park Service, will be impacted on Plummers Island by the Preferred Alternative. The impact to the island was determined based on the Ordinary High Water (OHW) Mark. Area within the OHW mark is considered waterway by the US Army Corps of Engineers and permitted as such. Area landward of the OHW mark is considered part of the island. All construction impacts would be contained within the Limits of Disturbance included in the Final Environmental Impact Statement.

We appreciate the ecological importance of Plummers Island and the greater Potomac Gorge, which include rare habitats and rare, threatened, and endangered (RTE) organisms. We recognize the long-term biological studies conducted on and around the island have contributed to the understanding of these important habitats and the wildlife they support and that impacts would not only affect these diverse habitats and wildlife, but would affect a place that is important to many people for recreation. MDOT SHA has limited impact to Plummers Island and the Potomac Gorge to the greatest extent practicable, while maintaining constructability of the project. MDOT SHA conducted a four-season RTE plant survey in 2020 to identify the RTE plant species located within the project area. MDOT SHA is coordinating closely with NPS to develop an ecosystem restoration plan to limit impacts as much as possible and mitigate for impacts that cannot be avoided and will continue to coordinate with the Washington Biologists Field Club to ensure your concerns are heard and responded to.

Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

00022877

OP LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 62-4    Filed 10/30/23    Page 34 of 100

FINAL ENVIRONMENTAL IMPACT STATEMENT

**#2 Cont**

overstated. The proposed project would impact both ongoing studies being performed by WBFC members and their ability to execute future scientific studies in the area.

**#3**

On page ES-13 of the SDEIS, the document states "the Preferred Alternative, with build improvements only within the limits of Phase 1 South, avoids over 100 acres of parkland..." Indeed, the new Preferred Alternative reduces impacts to NPS property by 87 acres. However, by MDOT's own admission on http://oplanesmd.com, the portion of I-495 east of the current proposed preferred alternative is referred to as "future phases." Thus, the assertion in the SDEIS that the impacts to parkland have been avoided is simply untrue. These extensive negative impacts to parks have been pushed to a later date, not avoided. Using this as a justification for the new Preferred Alternative is not truthful.

**#4**

NPCA also has concerns with the proposed project's negative impacts to water quality. According to Table 4-33, the Preferred Alternative would add 158 acres of impervious surfaces to five 12-digit watersheds in Maryland and a sixth watershed in Virginia. This increase in impervious surface would lead to a dramatic increase in polluted stormwater runoff harming downstream resources all the way to the Chesapeake Bay. Several national park units lie downstream of the proposed project, including but not limited to Piscataway Park, Fort Washington Park, Oxon Cove Park, East and West Potomac Park, and much of the George Washington Memorial Parkway, and the Chesapeake and Ohio Canal National Historical Park. These parks would see diminished water quality due to the increase in polluted runoff created by this proposed project. The project would also destroy 4.3 acres of wetlands, thus reducing the numerous benefits that wetlands provide to water quality such as reducing flash flooding and filtering stormwater.

**#5**

NPCA also takes concern with the SDEIS's lack of full analysis on stormwater impacts and mitigation. On page ES-5, the document differs the "Final Wetland and Floodplain Statement of Findings identifying final mitigation impacts to wetlands and floodplain on National Park Service Property" until the Final EIS. This analysis must be completed ahead of time to allow the public and NPS ample time to review and comment on these impacts and mitigation strategies. Beyond NPS property impacts, the SDEIS is wholly inadequate in its analysis of stormwater impacts and mitigation strategies. As the DC metropolitan region continues to grow, more must be done to protect local water quality and the health of the Chesapeake Bay watershed. This proposed project takes us in the wrong direction regarding stormwater runoff, pollution, and water quality in the region.

**#6**

Another great concern to NPCA is the project's impacts on climate change and increased greenhouse gas emissions. Climate change and its impacts are the greatest threat to America's National Parks, and urgent action must be taken at all levels of government to reduce climate pollution and slow the planet's warming. Despite continued claims by MDOT, this project will not reduce greenhouse gas emissions. On page 4-44 of the document, the SDEIS acknowledges that "all build alternatives are projected to slightly increase annual tailpipe GHG emissions by an average of 1.4 percent compared to the no-build alternative in 2040." Given the urgency of addressing climate change, this proposed increase in greenhouse gas emissions alone should disqualify this project from moving forward.

Beyond the direct and stated impacts to climate change, the SDEIS reveals a general lack of analysis on climate impacts of this project. The SDEIS lacks any substantial analysis of climate implications from a multiple-year construction project reliant on diesel-run, heavy machinery. Moreover, the SDEIS lacks any true analysis that other, non-expansion alternatives would have on greenhouse gas emissions. The reliance solely on build alternatives, similar to the reliance in the DEIS, invalidates the SDEIS emissions

**Response to SDEIS Comment #2**

Despite the extensive avoidance and minimization efforts to NPS properties around the ALB including Plummers Island, impacts to Plummers Island could not be avoided completely, but impacts have been reduced by 1.7 acres. In the DEIS, the Build Alternatives had 1.9 acres of impacts to Plummers Island. Under the Preferred Alternative, approximately 0.28 acres of impact at Plummers Island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. Impacts to Plummers Island would be required for the ALB substructure, including permanent use for three, discrete, approximately 10-foot diameter pier foundations and temporary, construction activities. Temporary construction activities may include efforts such as excavation, access for demolition of existing bridge foundation and piers, and slope protection. Access to the existing and proposed piers is required for these activities.

**Response to SDEIS Comment #3**

Significant avoidance and minimization efforts also focused around the American Legion Bridge and adjacent National Park Service (NPS) properties. MDOT SHA and FHWA met with the NPS on December 8, 2020, to discuss the limits of disturbance (LOD) in the vicinity of the ALB that was presented in the DEIS. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the Chesapeake and Ohio Canal National Historic Park and George Washington Memorial Parkway units of the NPS.*

The ALB Strike Team considered bridge construction approaches to determine if any of them could limit the LOD further. The ALB Strike Team conducted detailed investigation on a top-down segmental construction approach; a top-down cable stayed approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of additional information, MDOT SHA and the ALB Strike Team determined that access to the site at river level could be consolidated to the north side of the river along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of the Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the Chesapeake and Ohio Canal and a temporary haul road paralleling the Chesapeake and Ohio Canal towpath. This effort resulted in a 7.8 acre reduction in impact to the George Washington Memorial Parkway and a 5.3 acre reduction at the Chesapeake & Ohio Canal National Historical Park.  Refer to *SDEIS, Chapter 4, Section 4.12.4* for additional details on the ALB Strike Team's efforts.

Based on the current design and as presented in the FEIS, the Preferred Alternative would have an estimated permanent impact of 1.0 acres to the Chesapeake and Ohio Canal National Historical Park, and an estimated temporary impact of 9.1 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 1.1 acres to Clara Barton Parkway, and an estimated temporary impact of 0.7 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 5.7 acres to Cabin John Regional Park, and an estimated temporary impact of 0.6 acres during construction.

Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

**Response to SDEIS Comment #4**

Refer to Chapter 9, Section 3.4.E for a response to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

00022878

#7

analysis. A proper DEIS/SDEIS would examine numerous alternatives, including transit, traffic management, and more.

The SDEIS continues the trend of the DEIS's inadequate examination of alternatives to this project. The Purpose and Need Statement continues to rely on an ill-defined "financial viability" element, setting up a pre-determined outcome of a Public-Private Partnership project reliant on highway expansion with toll lanes financed by a private corporation. Relying on this aspect of the Purpose and Need intentionally excludes alternatives that could achieve the same objectives of addressing congestion and improving trip reliability on I-495 and I-270 without toll lanes and extensive highway expansion.

The state and MDOT continue to focus on a "one size fits all" approach to traffic congestion in the region. Instead, MDOT should examine a multifaceted approach to meeting aspects of the Purpose and Need Statement. For instance, according to a study by the Maryland Transportation Institute (MTI), "a 5% reduction in travel demand could lead to 32%-58% reduction in traffic congestion on major freeways" and "a 15% reduction in traffic volume observed in July 2020 was able to eliminate almost all traffic bottlenecks in the region." MTI shows that the work-from-home policies that went into place during the COVID-19 pandemic reduced traffic congestion almost entirely on I-495 and I-270. Incentivizing continued work from home, at simply a 5% rate in the region, could have dramatic positive impacts on regional traffic congestion. Increase that rate to 15% and traffic congestion would nearly disappear.

Other potential alternatives include examining Active Traffic Management (ATM) and expanding transit. Examples of ATM defined by the Federal Highway Administration include adaptive ramp metering, dynamic junction control, dynamic lane reversal, dynamic speed limits and more (https://ops.fhwa.dot.gov/atdm/approaches/atm.htm). Combined, these solutions could work to reduce traffic congestion at the same rate, or a higher rate, than the Preferred Alternative with nearly none of the negative impacts on the environment. Expanded transit could include rapid bus services, expanding metro farther into Maryland, and more. Collectively, ATM and expanded transit could work to reduce the region's congestion problems without highway expansion.

MDOT has had a preordained conclusion on this project since its inception many years ago. The state has been laser-focused on adding four toll lanes to I-495 and I-270 through a Public Private Partnership as the only possible solution to the region's traffic congestion. However, this project would be devastating to national and local parks, local water quality, regional air quality, and climate change. MDOT has failed its NEPA obligations to examine true alternatives that would be less damaging to the environment while achieving the biggest goals of the Purpose and Need Statement. NPCA once again calls on MDOT to go back to the drawing board and present the public with a better solution to regional traffic that doesn't pave parks, forests, and wetlands.

Sincerely,

Kyle W. Hart
Field Representative, Mid-Atlantic Region
National Parks Conservation Association
777 6th St., N.W., #700
Washington, DC 20001
khart@npca.org |202-400-1193

**Response to SDEIS Comment #5**

The project will be required to obtain a SWM and Erosion & Sediment permit. In order to obtain these permits, the project will be required to control stormwater runoff for the 10-year storm to match existing conditions, provide water quality treatment for all new impervious area and 50% of reconstructed existing impervious area to match the runoff characteristics of woods in good condition and manage the 2-year storm during construction so that sediment is not released to local waterways. Variances can be requested for minimal increases in stormwater runoff, however, detailed hydrologic calculations will be required to show that the minimal increases will not result in downstream flooding or erosion. Given the strict permitting requirements, impacts to downstream water quality from stormwater runoff are not expected. Refer to Chapter 9, Section 3.4.E for additional information related to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**Response to SDEIS Comment #6**

Refer to Chapter 9, Section 3.4.G for a response to climate change and greenhouse gas considerations.

**Response to SDEIS Comment #7**

Refer to Chapter 9, Section 3.2.A for a response on Screening of Preliminary Alternatives Process.

Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and teleworking.

**NATIONAL PARKS CONSERVATION ASSOCIATION – KYLE HART (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Kyle Hart

**Agency/Organization/Jurisdiction, if applicable:** National Parks Conservation Association

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

Hi, my name is Kyle Hart. K-Y-L-E H-A-R-T. And today I'm commenting on behalf of the National Parks Conservation Association, also known as NPCA. Thank you for the opportunity to comment today. The National Parks Conservation Association is the only membership organization dedicated to advocacy on behalf of our country's national park system for present and future generations. A mission we have upheld since we were created by the first national park service director, Stephen Mather in 1919.

**#1**

Today, I am here representing approximately 32,000 members and supporters in the state of Maryland and over 1.6 million members and supporters nationwide. NPCA remains concerned with the proposed impacts to National Park Service property by this unnecessary and poorly planned project, and we continue to support the No Build alternative. The SDEIS highlights extensive impacts [on] the National Park Service property from this proposed plan. As currently proposed this project would have negative impacts on 17 acres of National Park Service property at three and distinct NPS sites. For instance, over 1200 trees would need to be clear cut to make way for construction impacts, construction equipment and permanent new highway features, particularly at Plumbers Island and George Washington Memorial Parkway. This is an unacceptable level of impact. Should this project have been proposed at say Sequoia National Park and the plan was to clear cut 1200 old growth forest trees to make way for a highway, you would get laughed out of town. So because some, for some reason, this park is less well-known and in an urbanized area, somehow MDOT thinks this is an acceptable level of impact.

**#2**

NPCA is also concerned with how the SDEIS attempts to justify the current Preferred Alternative by claiming a reduction in National Park Service property. The original proposal would have impacted approximately 100 acres of National Park Service property. MDOT is very open about the fact that the remainder of I-495 will develop, will be developed in "future phases of this project". To call these impacts as removed, is simply disingenuous and really kind of a lie. These impacts to Greenbelt Park, the Baltimore Washington Parkway, Suitland Parkway, haven't been eliminated. They've rather just been pushed to a later, to a later date. NPCA retains, as it has since our comments on the Draft Environmental Impact Statement, that this project is entirely unnecessary, too environmentally damaging, and it should not move forward. Instead of attempting to ram through this highway expansion, MDOT should focus on incentivizing telework, expanding transit, and looking at other traffic management solutions. We support the No Build alternative. Thank you for your time.

**Response to SDEIS Comment #1**

Significant avoidance and minimization efforts also focused around the American Legion Bridge and adjacent National Park Service (NPS) properties. MDOT SHA and FHWA met with NPS on December 8, 2020, to discuss the limits of disturbance (LOD) in the vicinity of the ALB that was presented in the DEIS. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the Chesapeake and Ohio Canal National Historic Park and George Washington Memorial Parkway units of the NPS.*

The ALB Strike Team considered bridge construction approaches to determine if any of them could limit the LOD further. The ALB Strike Team conducted detailed investigation on a top-down segmental construction approach; a top-down cable stayed approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of additional information, MDOT SHA and the ALB Strike Team determined that access to the site at river level could be consolidated to the north side of the river along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of the Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the Chesapeake and Ohio Canal and a temporary haul road paralleling the Chesapeake and Ohio Canal towpath. This effort resulted in a 7.8 acre reduction in impact to the George Washington Memorial Parkway and a 5.3 acre reduction at the Chesapeake & Ohio Canal National Historical Park. Refer to *SDEIS, Chapter 4, Section 4.12.4* for additional details on the ALB Strike Team's efforts.

Based on the current design and as presented in the FEIS, the Preferred Alternative would have an estimated permanent impact of 1.0 acres to the Chesapeake and Ohio Canal National Historical Park, and an estimated temporary impact of 9.1 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 1.1 acres to Clara Barton Parkway, and an estimated temporary impact of 0.7 acres during construction.

The Preferred Alternative would have an estimated permanent impact of 5.7 acres to Cabin John Regional Park, and an estimated temporary impact of 0.6 acres during construction.

Impacts to Plummers Island could not be avoided completely, but impacts have been reduced by 1.7 acres. In the DEIS, the Build Alternatives had 1.9 acres of impacts to Plummers Island. Under the Preferred Alternative, the impacts have been reduced to approximately 0.28 acres of impact at Plummers Island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. Impacts to Plummers Island would be required for the ALB substructure, including permanent use for three, discrete, approximately 10-foot diameter pier foundations and temporary, construction activities. Temporary construction activities may include efforts such as excavation, access for demolition of existing bridge foundation and piers, and slope protection. Access to the existing and proposed piers is required for these activities.

No wetlands, as delineated per Section 404 or the National Park Service, will be impacted on Plummers Island by the Preferred Alternative. The impact to the island was determined based on the Ordinary High Water (OHW) Mark. Area within the OHW mark is considered waterway by the US Army Corps of Engineers and permitted as such. Area landward of the OHW mark is considered part of the island. All construction impacts would be contained within the Limits of Disturbance included in the Final Environmental Impact Statement.

We appreciate the ecological importance of Plummers Island and the greater Potomac Gorge, which include rare habitats and rare, threatened, and endangered (RTE) organisms. We recognize the long-term biological studies conducted on and around the island have contributed to the understanding of these important habitats and the wildlife they support and that impacts would not only affect these diverse habitats and wildlife, but would affect a place that is important to many people for recreation. MDOT SHA has limited impact to Plummers Island and the Potomac Gorge to the greatest extent practicable, while maintaining constructability of the project. MDOT SHA conducted a four-season RTE plant survey in 2020 to identify the RTE

*This page is intentionally left blank.*

plant species located within the project area. MDOT SHA is coordinating closely with NPS to develop an ecosystem restoration plan to limit impacts as much as possible and mitigate for impacts that cannot be avoided and will continue to coordinate with the Washington Biologists Field Club to ensure your concerns are heard and responded to.

Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

Refer to Chapter 9, Section 3.4.J for a response to impacts to greenspace and/or wildlife habitat.

**Response to SDEIS Comment #2**
As described in the SDEIS and FEIS, the Preferred Alternative focuses solely on building a new American Legion Bridge and delivering two high-occupancy toll (HOT) managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to west of MD 187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from east of MD 187 to I-270. This Preferred Alternative was identified after coordination with resource agencies, the public and stakeholders to respond directly to feedback received on the DEIS, and to align the NEPA approval with the P3 Program planned project phased delivery and permitting approach.

While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately and would be subject to additional environmental studies and analysis and collaboration with the public, stakeholders and agencies.

**NATIONAL TRUST FOR HISTORIC PRESERVATION – CHRIS CODY**

| | |
|---|---|
| **From:** | Christopher Cody <CCody@savingplaces.org> |
| **Sent:** | Tuesday, November 30, 2021 7:32 PM |
| **To:** | SHA OPLANESMLS; Parikh, Jitesh (FHWA) |
| **Subject:** | National Trust Comments Re: I-495/I-270 Managed Lane Study Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation |
| **Attachments:** | National Trust comments on SDEIS-4f Eval. for I-495 and I-270 Nov 30 2021.docx |

Mr. Folden and Mr. Parikh,

The National Trust for Historic Preservation hereby submits the attached comments concerning the I-495/I-270 Managed Lane Study Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation.

Thank you,

Chris Cody

*This page is intentionally left blank.*

00022882



**National Trust for Historic Preservation**
Save the past. Enrich the future.

November 30, 2021

Jeffrey T. Folden, P.E., DBIA
Deputy Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State Highway Administration
707 North Calvert Street
Baltimore, MD 21202
MLS-NEPA-P3@mdot.maryland.gov

Mr. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
jitesh.parikh@dot.gov

**RE:    I-495/I-270 Managed Lane Study Supplemental Draft Environmental
        Impact Statement and Updated Draft Section 4(f) Evaluation**

Dear Mr. Folden,

The National Trust for Historic Preservation has reviewed the I-495/I-270 Managed Lane
Study Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f)
Evaluation (SDEIS). In addition to our interest in this undertaking as a consulting party
under Section 106 of the National Historic Preservation Act, the National Trust recently
named Morningstar Moses Tabernacle No. 88 to its 2021 list of America's 11 Most
Endangered Historic Places. Over its 34-year history, this annual list has shed light on
important examples of our nation's heritage that are at risk of destruction or irreparable
damage. The 2021 list includes a diverse mix of historic places nationwide that celebrate the
interconnection of American culture and acknowledge it as a multicultural fabric that, when
understood together, helps tell the full American story. The inclusion of Morningstar Moses
Tabernacle No. 88 on this list reflects the significant interest the National Trust has in its
preservation. To further that objective, we offer the following comments on the SDEIS:

_Additional Ground Penetrating Radar (GPR) Survey is Required_

In our letter on October 8th, 2021 addressed to Steve Archer, we strongly encouraged the
Maryland Department of Transportation (MDOT) to "undertake additional non-invasive
investigation in areas of the property and adjacent ROW that were not included in the
previous GPR survey, in case additional potential graves may be found in those areas". We
further cautioned that, "[w]ithout additional study, our understanding of the footprint of
the historic cemetery is incomplete, and direct adverse impacts to burial sites remains a

The Watergate Office Building   2600 Virginia Avenue NW   Suite 1100   Washington, DC 20037
E law@savingplaces.org   P 202.588.6035   F 202.588.6272   www.savingplaces.org

**Response to SDEIS Comment #1**
MDOT SHA recognizes there is some potential for human remains associated with historic properties to be present adjacent to Morningstar Tabernacle No. 88 Moses Hall and Cemetery which is not currently accessible for the types of thorough archaeological investigation necessary to definitively identify interments. This includes non-SHA neighboring properties. MDOT SHA has determined that areas for further GPR survey are not accessible or practicable at this time and further investigations as needed will be identified under the PA. MDOT SHA will work with the developer to minimize LOD to the maximum extent practicable adjacent to the Cemetery property. The Treatment Plan will include proposed investigations to identify and evaluate potential graves or human remains in specified sensitive areas to the maximum extent practicable to ensure avoidance or treatment prior to final design and construction.

#1

**#2**

serious risk". The requested additional investigations have not been conducted as of the issuance of the SDEIS, and there is no mention in the SDEIS of any intent to conduct such additional surveys.

We again strongly recommend that MDOT expand the survey area to the north, west, and east of the already-surveyed site, including within the existing right-of-way. We further recommend the inclusion of a more substantial buffer between the northernmost identified burial and the project's Limit of Disturbance. These recommendations are crucial to minimizing the risk of causing adverse impacts to burials.

The Section 4(f) Evaluation Fails to Demonstrate that No "Use" Will Occur of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

Until this additional survey work is performed, we believe it is premature to make a constructive use determination under Section 4(f), and therefore we disagree with the conclusion in the SDEIS that "no constructive use would occur." SDEIS at 5-53. The scope of the adverse impacts that this project will cause has not yet been sufficiently explored. Further, additional information is required concerning the specific means and methods of construction for this project so that all likely impacts may be reasonably understood. We also disagree with the assumption in the SDEIS that there will be no *direct* use of the historic Morningstar Tabernacle No. 88 Moses Hall and Cemetery. The SDEIS states:

> [I]mpacts to the Morningstar Cemetery boundary were reduced from 0.3 acres (13,068 square feet) reported in the DEIS for Alternative 9 to approximately 14 square feet of temporary area needed for construction access to build a noise barrier adjacent to the property. This design refinement also resulted in *complete avoidance of ground disturbance within the cemetery boundary.* In July 2021, additional investigation was conducted to detect and map both potential marked and unmarked graves within and adjacent to the cemetery boundary. *Complete avoidance of the Morningstar Cemetery property has been achieved* based on further design refinements in response to the results of this investigation."

SDEIS at 5-3 (emphasis added). We appreciate and commend the highway agencies for the substantial efforts that have been made to reduce the adverse effects to this historic property. However, we do not agree that "complete avoidance" has been achieved.

First, this rationale appears to assume that the historic property stops at the boundary of the existing right-of-way. That assumption needs to be reevaluated based on additional research and GPR.

Second, this finding in the SDEIS assumes that the direct "temporary" use of an additional 14 square feet outside the existing right-of-way does not constitute a direct "use" of the property. The Federal Highway Administration's own Section 4(f) regulations require a more detailed showing, which has not been made here:

---

See response to Comment #1 above.

**Response to SDEIS Comment #2**

Through the Section 106 review, MDOT SHA has completed extensive historical and archaeological research that thoroughly documents the property and its significant features, allowing the Preferred Alternative to avoid all known impacts. The boundary of the historic property was updated in December 2021 to include the area of possible burial features identified by the May 2021 GPR survey within MDOT SHA right-of-way. The proposed design will entirely avoid the historic property boundary as updated and will not affect the property's character-defining features, which are confined within the historic boundary. The project will not impact any markers, any known or suspected burials, and will avoid all impacts to the archaeological foundation of Moses Hall. The proposed noise barrier will further screen the property from visual and audible effects already present along I-495. MDOT SHA will continue to work with the community through the project's Programmatic Agreement on further studies and context-sensitive design of new facilities.

Refer to Chapter 9, Section 3.4.C for a response to analyses of parklands and historic resources.

OP·LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study   Case 8:22-cv-02597-DKC   Document 62-4   Filed 10/30/23   Page 41 of 100

FINAL ENVIRONMENTAL IMPACT STATEMENT

#3

(d) Temporary occupancies of land that are so minimal as to not constitute a use within the meaning of Section 4(f). The following conditions must be satisfied:

(1) Duration must be temporary, *i.e.*, less than the time needed for construction of the project, and there should be no change in ownership of the land;

(2) Scope of the work must be minor, *i.e.*, both the nature and the magnitude of the changes to the Section 4(f) property are minimal;

(3) There are no anticipated permanent adverse physical impacts, nor will there be interference with the protected activities, features, or attributes of the property, on either a temporary or permanent basis;

(4) The land being used must be fully restored, *i.e.*, the property must be returned to a condition which is at least as good as that which existed prior to the project; and

(5) There must be documented agreement of the official(s) with jurisdiction over the Section 4(f) resource [i.e., SHPO] regarding the above conditions.

23 C.F.R. § 774.13(d). The SDEIS and Section 4(f) evaluation fail to demonstrate that these five conditions are satisfied. Accordingly, the record does not support a finding that the admitted temporary use of land within the historic property would not constitute a direct "use" under Section 4(f).

Furthermore, since the "adverse effect" on the Morningstar Tabernacle property has been acknowledged (and appropriately so) for purposes of Section 106, the potential "use" of the historic property cannot qualify as "de minimis." 23 U.S.C. § 138(b)(2).

<u>Cumulative Impacts and Environmental Justice Concerns</u>

We appreciate the acknowledgement in the SDEIS of the need to address the cumulative adverse impact suffered by Moses Hall as a result of the proposed project. SDEIS at 4-105 *et seq.* While cumulative impact analysis is often focused on evaluating reasonably foreseeable *future* indirect impacts, in the case of the Morningstar Tabernacle Moses Hall and Cemetery, the most important part of the cumulative impact analysis will be the *past* impacts – the damage and destruction directly and indirectly inflicted on this historic property, as well as on the Gibson Grove AME Zion Church and the wider Black community of Cabin John, by the earlier highway construction. It will be important to ensure that robust mitigation is developed commensurate with the magnitude of these adverse cumulative impacts. In our view, the Section 106 consultation will be the best forum for developing an effective mitigation plan based on input from the consulting parties, especially since Section 106 itself requires consideration of cumulative impacts. 36 C.F.R. § 800.5(a)(1). We look forward to discussing specific proposals to mitigate these adverse impacts.

**Response to SDEIS Comment #3**

The Preferred Alternative includes the following elements and commitments related to the First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall Cemetery:

- Direct and indirect impacts to historically African American Gibson Grove Community significantly minimized

- Gibson Grove Church is avoided with impacts minimized to 0.1 acre of temporary easement needed for drainage

- All direct and indirect impacts to Moses Hall Cemetery completely avoided

- Noise barrier with context sensitive treatment at the Moses Hall Cemetery

- Gifting land owned by MDOT SHA with potential graves back to Trustees of Moses Hall Cemetery

- Completing drainage improvements on Gibson Grove property and clearing space for their proposed parking lot

- Upgrading parking lot on the east side Seven Locks Road and making the sidewalk and path improvements to connect to the existing parking lot.

- Constructing a new sidewalk along the west side of Seven Lock Road under I-495 to reestablish the historic connection between Gibson Grove Church and the Moses Hall Cemetery.



**#3 Cont**

We also support the concerns raised by other consulting parties regarding the environmental justice reviews of this project. Essentially, much of this analysis is being deferred to the Final EIS, SDEIS at 4-104, which unfortunately minimizes the opportunity for public input. It is the National Trust's hope that the environmental justice review will fully explore and address those concerns and use this project as an opportunity to correct past injustices.

Additional Historic Resources Protected by Section 4(f)

**#4**

The lengthy comments submitted by the Maryland Chapter of the Sierra Club, et al., identify a number of additional historic resources that have not been adequately addressed in the draft Section 4(f) Evaluation. These include, but are not limited to: Plummers Island, the Gibson Grove A.M.E. Zion Church, Cedar Lane Unitarian Universalist Church, and Native American Site(s) within the C&O Canal Historical Park. We agree with the detailed concerns and objections to the Section 4(f) Evaluation articulated by the Maryland Chapter of the Sierra Club, and we urge the highway agencies to prepare a revised draft of the Section 4(f) Evaluation before proceeding further, in order to address the substantial flaws identified in the current draft of the Evaluation.

Thank you for considering these comments, and we appreciate the ability to continue our participation in the Section 106 consultation process, as many of these key issues are being further evaluated and resolved.

Sincerely,

*Elizabeth Merritt*

Elizabeth S. Merritt
Deputy General Counsel

*Chris Cody*

Christopher Cody
Associate General Counsel

See response #3 above.

**Response to SDEIS Comment #4**
Per NEPA and Section 4(f) practice the Final Section 4(f) Evaluation is included in this FEIS.

Refer to Chapter 9, Section 9.3.4C regarding Section 4(f) Analysis

00022886

**NORTHERN VIRGINIA TRANSPORTATION ALLIANCE – JASON STANFORD**

1

**From:** Jason Stanford <jason@nvta.org>
**Sent:** Friday, October 22, 2021 11:07 AM
**To:** SHA OPLANESP3 <oplanesmd@mdot.maryland.gov>; jeanette.mar@dot.gov
**Cc:** Gregory Slater <GSlater@mdot.maryland.gov>
**Subject:** DC Area Community Leaders Oppose Extending the SDEIS 45-Day Public Comment Period

Dear Mr. Folden and Ms. Mar:

Please see the attached letter from more than 60 DC area organizations representing the vast majority of employer, workers, and commuters in our region, which urges MDOT and the Federal Highway Administration to not extend the public comment period for the Supplemental Draft Environmental Impact Statement beyond the currently scheduled 45 days. Our community has waited long enough for traffic relief. Now is the time to move forward.

Please let me know if you have any questions or require any additional information.

Thank you for your time and consideration of this important matter.

Sincerely,

Jason Stanford



Jason Stanford
President
P.O. Box 6149
McLean, VA 22106-6149
Office: 703-883-1830
Mobile: 650-200-6375
www.NVTA.org

**Response to SDEIS Comment #1**
The SDEIS published on October 1, 2021 was prepared to consider new information relative to the Preferred Alternative, Alternative 9 - Phase 1 South. Building off the analysis in the existing DEIS, the SDEIS disclosed new information relevant to the Preferred Alternative while referencing the DEIS for information that remained valid. The SDEIS also described the background and context in which the Preferred Alternative, Alternative 9 - Phase 1 South was identified. The SDEIS was available for the public to review and comment on the Preferred Alternative during a 45-day comment period, which was later extended an addition 15 days, until November 15, 2021 . Refer to Chapter 9, Section 3.7 for a response to comments related to public involvement and engagement.

00022887

**#1**

October 22, 2021

Jeffrey Folden
Project Director
I-495 and I-270 P-3 Project Office
Maryland Department of Transportation State Highway Administration
707 North Calvert Street, Mail Stop P-601
Baltimore MD 21202
495-270-P3@sha.state.md.us

Jeanette Mar
Environmental Program Manager
Federal Highway Administration, Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore MD 21201
jeanette.mar@dot.gov

Dear Mr. Folden and Ms. Mar:

As representatives of the vast majority of the Washington, D.C. area's employers, workers, and commuters, we are writing to urge you to not extend the Supplemental Draft Environmental Impact Statement (SDEIS) public comment period beyond the current forty-five days.

Our community has waited long enough for traffic relief. Any further delay for this major regional transportation improvement is unacceptable to residents who are stuck in soul-crushing traffic day-in and day-out on the American Legion Bridge and I-270, and risks serious schedule delays that could potentially derail the entire project.

The American Legion Bridge is in desperate need of repair and improvement. Just a few weeks ago, it was widely reported that pieces of the bridge were crumbling and in need of repair. This project will not only ensure the safety of people traveling throughout our region today, but also expand the capacity of the bridge to accommodate future economic growth and travel demand that we know is coming.

In addition, there has already been extensive public comment on the impacts of this project over the last 3+ years of this NEPA process. Indeed, in the fall of 2020, MDOT nearly tripled the public comment period for this project resulting in thousands of comments received over 120 days. All told, there have already been over 275 days of formal public comment period in this NEPA study, plus many other informal opportunities to review and comment on the findings.

In addition to all these opportunities for public comment on the current study, this is not the first time we have been through all of this. There have already been at least three previous NEPA studies already conducted in these corridors in a NEPA study process that, combined, has now extended over roughly 30-years. There is no plausible need for any further delay.

Now that a preferred alternative has been selected – two high occupancy toll (HOT) Lanes in each direction, allowing for more transit, bike, and pedestrian travel in this corridor – this SDEIS presents a less impactful version of what the public has already seen and commented on before in the Draft Environmental Impact Statement. There are no new impacts in the SDEIS that would justify any extension beyond the already planned 45-day period.

The details put forward in the SDEIS are by no means a new or unexpected outcome. In fact, the SDEIS now reflects many of the public comments received on the DEIS and closely resembles the proposal put forward by Montgomery County elected officials in July of 2019. That's because this SDEIS is the direct result of active public engagement over

---

**Response to SDEIS Comment #1**

MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

The SDEIS published on October 1, 2021 was prepared to consider new information relative to the Preferred Alternative, Alternative 9 - Phase 1 South. Building off the analysis in the existing DEIS, the SDEIS disclosed new information relevant to the Preferred Alternative while referencing the DEIS for information that remained valid. The SDEIS also described the background and context in which the Preferred Alternative, Alternative 9 - Phase 1 South was identified. The SDEIS was available for the public to review and comment on the Preferred Alternative during a 45-day comment period, which was later extended an addition 15 days, until November 15, 2021.

Refer to Chapter 9, Section 3.7 for a response to comments related to public involvement and engagement.

00022888

the last three years from the community, public and elected officials. The public has been consulted, has weighed in with comments, and has been heard.

Finally, further delaying this project will result in millions of dollars in higher costs and more uncertainty that could jeopardize many of the community benefits that we have all worked so hard to ensure are included in this project. If we want improvements to the American Legion Bridge and I-270 to be truly multimodal and provide extensive community benefits beyond just the substantial traffic relief and new travel opportunities, it is important to avoid unnecessary delays and costly increases while we are still in the early planning stages. The current proposal includes more than $360 million in transit improvements, and tens of millions more in community, bike and pedestrian grants, all of which will likely have to be scaled back or eliminated to cover the cost of more delay. This is an unacceptable risk.

For these reasons and more, we urge you to keep the forty-five-day public comment period on the SDEIS in place so that we can stay on track to build this monumental improvement to our region's transportation infrastructure. Time is money and enough time has already been wasted.

Thank you for your time and consideration of this important matter.

Sincerely,

   

   

   

   

  

Thank you for your comments of support.
































*This page is intentionally left blank.*


*This page is intentionally left blank.*

   

  

  

CC:    The Hon. Greg Slater, Maryland Secretary of Transportation

**NORTHERN VIRGINIA TRANSPORTATION ALLIANCE – JASON STANFORD**

| | |
|---|---|
| **From:** | Jason Stanford <jason@nvta.org> |
| **Sent:** | Tuesday, November 30, 2021 8:08 PM |
| **To:** | SHA OPLANESMLS |
| **Subject:** | Support for I-495 & I-270 SDEIS |
| **Attachments:** | NVTA SDEIS Comment.pdf |

To Whom It May Concern:

Please find attached the Northern Virginia Transportation Alliance's comments on the I-495 & I-270 Supplemental Draft Environmental Impact Statement. Please move forward with this game-changing regional project as quickly as possible.

Thank you,

Jason



Jason Stanford
President
P.O. Box 6149
McLean, VA 22106-6149
Office: 703-883-1830
Mobile: 650-200-6375
www.NVTA.org

*This page is intentionally left blank.*



November 30, 2021

Jeffrey T. Folden, P.E., DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation
State Highway Administration
707 North Calvert Street
Mail Stop P-601, Baltimore, MD 21202

RE: I-495 & I-270 Supplemental Draft Environmental Impact Statement

Dear Mr. Folden:

On behalf of the Northern Virginia Transportation Alliance (NVTA) and its members, I wish to submit the following comments on the Managed Lanes Study Supplemental Draft Environmental Impact Statement (SDEIS).

1. NVTA supports the Preferred Alternative, Alternative 9 – Phase 1 South, and we believe this alternative meets all the key elements identified in the Purpose and Need statement for this project, and is responsive to many of the comments received from Maryland officials to the Draft Environmental Impact Statement (DEIS).
2. The new Preferred Alternative now requires zero residential and zero commercial property relocations, sharply reduced from earlier build alternatives.
3. While property and environmental impacts have been sharply reduced in this Preferred Alternative when compared to the build alternatives in the DEIS, we are encouraged to see that significant time savings, reduced delay, and improved peak-period speeds are still achieved even given the project's more constrained footprint. We believe this shows the SDEIS has resulted in a project that can move forward now and that will relieve congestion in some of the National Capital Region's worst traffic bottlenecks, notably the American Legion Bridge.
4. NVTA supports the selection of an alternative that includes High-Occupancy-Toll (HOT) Lanes as this provides consistency with existing facilities in the region and can form a coherent regional network, allowing Maryland to benefit for increased use of carpools and vanpools as we have seen in Virginia. Since the opening of similar HOT Lanes on I-495, Virginia has seen a 550% increase in carpool usage, meaning reduced reliance on single-occupancy vehicles can be expected in Maryland as well.
5. NVTA supports the significant new investment in bike and pedestrian access now included in the Preferred Alternative. In particular, the new mixed-use trail connecting the Maryland and Virginia sides of the Potomac River across the American Legion Bridge. We believe this is a vital new link in the region's hiking and biking trail networks, and feel that a direct connection to the C&O Canal would further enhance this

**#1**

**Response to SDEIS Comment #1**
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

00022893

*This page is intentionally left blank.*

**#1 Cont**

important aspect of the project. The current designs shown in the SDEIS would all require a more circuitous and less desirable connection here.

6. The public and agency coordination described in Chapter 7 is truly impressive and illustrates the unprecedented access the public and local agencies have had throughout this process. This may be one of the most transparent efforts to engage the public on a "mega-project" like this and the thousands of public comments received to date indicate those efforts have been successful.

7. One of the public comments we are concerned about and wish to correct for the record, is the unsupported claim that the traffic models used in the SDEIS are somehow not accurate. We strongly disagree with this contention, as the SDEIS relies on commonly used and highly accurate traffic models developed and maintained by the Metropolitan Washington Council of Governments and used for all other major projects in the region. We have seen ample evidence that these traffic models are accurate, are routinely calibrated using industry accepted methods, and fully account for any induced demand effects, while still showing significant improvement in regional travel times and system-wide delay. Just because one disagrees with some of the findings, that is not a valid basis to question the accuracy of the traffic models.

8. The traffic analysis clearly shows that the Preferred Alternative improves throughput, reduces delay by up to 12% during the AM peak and by 32% in the PM peak, when compared to the No Build Alternative. It also improves vehicle throughput at the American Legion Bridge by 25-30%, eliminating one of the region's most severe choke points for most parts of the day. The number of failing roadway segments will be reduced by 12% in the AM peak and 42% in the PM peak, a 29% overall reduction in the percentage of lane-miles operating at Level "F" service. This is tremendous improvement for a single project to demonstrate.

9. Vehicle hours of delay on all Montgomery County arterials are reduced by 4.8% daily, and system-wide, traffic on local arterials is reduced by 3.5%. This includes improvements to Prince George's County's local network, despite no physical roadway improvements in the county. This reflects the true region-wide benefits the project will deliver.

10. Peak period travel speeds on both the Inner Loop and the Outer Loops of I-495 improve significantly during the AM peak period, and on the Inner Loop during the PM peak period. The fact that certain bottlenecks will remain on the Inner Loop in the PM peak simply shows that more will need to be done beyond the scope of this project to address other regional bottlenecks, as indicated in the region's adopted long-range plan (Visualize 2045).

11. The traffic analysis on I-270 also indicates some improvement but is incomplete in one respect. Namely, the travel speeds listed in Table 3-5 on page 3-9 of the SDEIS for the No Build Alternative only include traffic using the existing express lanes, not the existing local lanes on I-270, which move at a significantly slower speed. Not including these trips presents incomplete data that has the practical effect of overstating the peak-period travel speeds in the No Build Alternative when compared to the Preferred Alternative. We suggest this analysis be adjusted in the Final Environmental Impact Statement to reflect all traffic in the No Build Alternative.

*This page is intentionally left blank.*

#1
Cont

12. The Preferred Alternative provides important equity benefits for the region, by providing faster, more reliable access between area job centers and lower-income communities, by creating tens of thousands of new jobs, and by maintaining and improving access and travel conditions on the notoriously congested American Legion Bridge and I-270 even for those who chose to pay nothing. We note in the SDEIS that most people using the existing general-purpose lanes will experience reduced congestion and more reliable travel times in these existing lanes, which remain free for anyone. We also note that those riding in vehicles with three or more passengers and those using transit can also choose to use the new HOT lanes at no charge.

In summary, NVTA strongly supports this project and the Preferred Alternative presented in the SDEIS.

Sincerely,

Jason Stanford
President

**NORTHERN VIRGINIA TRANSPORTATION ALLIANCE – JASON STANFORD (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Jason Stanford

**Agency/Organization/Jurisdiction, if applicable:** Northern Virginia Transportation Alliance

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

Hi, this is Jason Stanford. Can you hear me? Great. J-A-S-O-N S-T-A-N-F-O-R-D. And it's, my address is 8260 Greensboro Drive, McLean, Virginia 22102. And I'm the President of the Northern Virginia Transportation Alliance. For more than 30 years the Alliance has been the visionary leader for regional transportation solutions in the DC area that improve our quality of life and promote economic prosperity. Thank you for the opportunity to comment today on the Supplemental Draft Environmental Impact Statement. The SDEIS is clearly the product of extensive public engagement and collaboration by the Maryland Department of Transportation on this project over the last three years.

#1

Three years ago, concerns were raised about the number of homes and businesses that might be impacted as a result of this project. Now, no homes will be demolished, and no properties will need to be fully taken. Three years ago there was a concern about the community benefits of the project beyond the congestion relief and delay reduction for hundreds of thousands of people who traveled this corridor everyday. Now, MDOT has selected an alternative that allows HOV-3 and transit vehicles to use the lanes for free, creating an opportunity for congestion-free regional express bus service on the I-270 corridor and across the American Legion Bridge.

Furthermore, MDOT has incurred $360 million for transit improvements, money provisions, [inaudible] and community development grants, regional bike and pedestrian improvements, connecting Virginia and Maryland, a 26 percent commitment to hire minority-owned firms and the creation of thousands of good paying jobs for Maryland workers. And finally, three years ago, there was a concern about the environmental impacts of the project, including parkland along the top side of the beltway. Montgomery County even offered an alternative that included managed lanes from the American Legion Bridge to I-370 as a bypass for the beltway. Now, MDOT's proposal does exactly that. And even more, MDOT has incorporated improvements to stormwater management and mitigated key impacts to cultural centers and environmental sites, including the Moses Hall cemetery and Plummers Island. And it does it while still achieving an 18 percent reduction in system-wide delays during the morning rush hour and 32 percent during the evening rush hour, when compared to the No Build. At the same time vehicle throughput at the American Legion Bridge increases by 25 to 30 percent, eliminating one of the region's most severe choke points for most parts of the day.

On behalf of the Alliance and more than 60 regional partners, including businesses, citizens, the community organizations from every corner of the DC area, I'd like to applaud MDOT for listening and working to reach a consensus. While no compromise is ever perfect, the SDEIS is a bold vision for the future of our region and a testament to MDOT's willingness to hear public feedback over the last three years and incorporate it into the project. Thank you all for your hard work and I urge you to now move forward as quickly as possible. With our region expected to gain one million new jobs and 1.3 million new people by 2045, this project is essential to keeping our community moving. Thank you.

**Response to SDEIS Comment #1**
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**ROCK CREEK CONSERVANCY – JEANNE BRAHA (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Jeanne Braha

**Agency/Organization/Jurisdiction, if applicable:** Rock Creek Conservancy

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

#1

Hi, I am Jeanne Braha. That's J-E-A-N-N-E B-R-A-H-A. Executive Director of Rock Creek Conservancy, which is based at 7200 Wisconsin Avenue, Suite 500 in Bethesda, Maryland. The Conservancy is cautiously optimistic that the State has published a Supplemental DEIS. This suggests a willingness to learn as you go and adaptively manage the process for this project, which will be essential as this continues. We're also pleased that most of the potential areas within the Rock Creek watershed had been removed from the State's plans at this time. However, a small portion of the Rock Creek watershed is contained in the project and would be deforested, and it is likely that the storm water pollution that will result from that as well as the runoff would be added to the Rock Creek watershed as a result of phase one. This is concerning given the relatively vague plan for mitigation outlined in the SDEIS. The health of the Rock Creek watershed is not protected as mitigation is not near the impact, the site of impact, and we've all seen this year that stormwater can have deadly consequences. We should be working hard to reduce overall stormwater runoff rather than meeting basic requirements for not as much with future projects. Just because you can meet the basic requirements doesn't mean you should stop there. In addition, we remain concerned that any future plans as managed lanes in the Rock Creek watershed must be done with the utmost of care. We look forward to seeing a full environmental assessment or even EIS before any thought is given to extending the project past Phase 1. We would expect that these studies would use new data that reflects both traffic patterns that may change as we reach a new normal vis-a-vis the pandemic and after the purple line opens. Such a study should also include detailed studies and specific recommendations for stormwater management that are proximate to areas of impact and a *[inaudible]*, applying different alternatives to different segments of the project. Thank you for the opportunity to testify this afternoon.

**Response to SDEIS Comment #1**
Approximately, 0.8 acres of additional impervious surface would be added to the Rock Creek watershed by the Preferred Alternative. The FEIS, Chapter 3, Section 3.1.6 provides more detail on the stormwater approach, which includes Environmental Site Design (ESD) to the maximum extent practicable (MEP). The result of ESD to the MEP is that onsite stormwater management has been maximized to ensure that chemical and sediment pollution do not negatively affect streams within or downstream of the project area. Areas within the LOD will be replanted to the greatest extent practicable, a requirement of Maryland Reforestation Law. Erosion and sediment control requirements will be met to prevent sediment discharges during construction.

**ROCK CREEK CONSERVANCY – JEANNE BRAHA**

| | |
|---|---|
| **From:** | Jeanne Braha <jbraha@rockcreekconservancy.org> |
| **Sent:** | Monday, November 15, 2021 12:02 PM |
| **To:** | SHA OPLANESMLS |
| **Cc:** | John Boland |
| **Subject:** | Rock Creek Conservancy comments on 495/270 Managed Lanes SDEIS |
| **Attachments:** | 2021 11 RCC SDEIS comments.pdf |

Please find attached comments from Rock Creek Conservancy regarding the Supplemental Draft Environmental Impact Statement for the 495/270 Managed Lanes Study.

Please acknowledge receipt of this email adn your ability to access the attached comments; it was not possible to see if the comments went through via the online form.

Thanks,
Jeanne

--
**Jeanne Braha**
**Executive Director**
**Rock Creek Conservancy**
7200 Wisconsin Avenue, Suite 500, Bethesda, MD 20814
jbraha@rockcreekconservancy.org
301-579-3105

Friend us on **Facebook**
Follow us on **Twitter**
Follow us on **Instagram**

*This page is intentionally left blank.*

00022898

**Response to SDEIS Comment #1**
The FEIS reflects further design refinements and details, including final mitigation and commitments of the Preferred Alternative, many of which directly responded to public comments. Refer to **FEIS, Chapter 7** for a comprehensive list of mitigation and commitments.

#1

**ROCK CREEK**
CONSERVANCY

*Rock Creek Conservancy exists to restore Rock Creek and its parklands as a natural oasis for all people to appreciate and protect.*

Rock Creek Conservancy
Comments on Managed Lane Study Supplemental Draft Environmental Impact Statement
November, 2021

Rock Creek Conservancy (the Conservancy) submits these comments on the I-495 and I-270 Managed Lanes Study Supplemental Draft Environmental Impact Statement (SDEIS). While appreciating the significantly reduced impacts of Phase I on Rock Creek's parks and watershed relative to the entirety of the project, we continue to emphasize the need for stronger commitments to stormwater management and environmental protection practices. We also ask the state to make specific commitments to rigorous environmental study before any Phase II work.

Rock Creek Conservancy is a non-profit organization based in Bethesda, Maryland, that restores Rock Creek and its parklands for all people to appreciate and protect, and annually engages nearly 4,000 volunteers in people-powered restoration.

First, the Conservancy is pleased to see that the new Recommended Preferred Alternative -- Alternative 9 - Phase 1 South -- will, for the moment, avoid impacts on 52 acres of the Rock Creek watershed that had been in direct proximity to proposed construction.

Previously, Alternative 9, which was selected as the Recommended Preferred Alternative in January of 2021, proposed to expand I-495 through the Rock Creek watershed with addition of two new high-occupancy toll lanes. The Conservancy submitted comments in opposition to the selection of Alternative 9 and the approaches used to evaluate impacts on environmental resources, emphasizing the need for further analysis of runoff and downstream impacts in the Rock Creek watershed. Under Alternative 9, significant areas of the Rock Creek watershed and Rock Creek stream valley parks would have been at risk to dangerous levels of erosion, sedimentation, and pollution from construction and loss of parkland.

The new Recommended Preferred Alternative avoids construction in much of the Rock Creek watershed during the first phase of the project. We appreciate the constructive dialogue surrounding the Draft Environmental Impact Statement published in July of 2020, and the resulting changes in this SDEIS that avoid, in part, and significantly reduce the impacts to public property, parkland, and natural resources. That being said, there are still significant environmental concerns for Rock Creek with Phase 1 of the Managed Lanes Study project. Most saliently, 2.6 acres (112,088 sq. ft.) of impervious surface will be added to the Rock Creek watershed under Alternative 9 - Phase I South (shown in Table 4-33) via additions to the I-270 east spur (Maps 19-22) and the portion of I-495 that is east of the I-270 west spur (Maps 13-16).

In Section 4.13.2 of the SDEIS, the impacts on Rock Creek are discussed as follows:

Note that while the Preferred Alternative LOD crosses the Rock Creek watershed, the stream of Rock Creek is not within the Preferred Alternative LOD and is not impacted by the build improvements included in the Preferred Alternative.

While the changes to the location of construction with regard to Rock Creek itself are an improvement over the previous                                                                                    Preferred

7200 Wisconsin Avenue, Suite 500 | Bethesda, MD 20814
(301) 579-3105 | info@rockcreekconservancy.org
rockcreekconservancy.org | #LoveRockCreek

00022899

**OP·LANES**
MARYLAND    I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 62-4    Filed 10/30/23    Page 56 of 100

FINAL ENVIRONMENTAL IMPACT STATEMENT

**#2**

Alternative, all risks associated with the proposed construction are not eliminated or mitigated. All water that falls within a watershed eventually flows to the receiving body of water for that watershed; even if pollutants are not washed from a roadway directly into Rock Creek, they still pose a significant risk to the health of the stream. Some of the most common roadway pollutants, such as salt, are conveyed very easily by runoff into streams. Rock Creek is already heavily impacted by salt due to its proximity to residential and commercial roadways, and regularly experiences toxic levels of salt that can result in eutrophication and fish kills. Increasing the area of roadways in the Rock Creek watershed increases the amount of salt needed to treat them in wintertime, and poses an environmental risk to Rock Creek.

**#3**

Additionally, as noted in Section 4.13.3, the loss of forest coverage in the Rock Creek watershed will further exacerbate the ability for runoff to be mitigated. Mature forests are an indispensable tool in reducing the effects of impervious surface runoff. Vegetation slows the flow of stormwater two-fold: first as it is raining and again as it travels overland to the receiving body of water. Vegetation also acts as a natural filtration system by removing pollutants from water absorbed through the roots. Root systems also help to prevent erosion and decrease sedimentation in streams. By removing 2.6 acres of forest cover in the Rock Creek watershed and replacing them with impervious surface, the Managed Lanes Study project takes away one of the most effective tools we have to fight further degradation of Rock Creek. We ask that the Montgomery County Environmental Site Design requirements for managing stormwater runoff be strictly adhered to, with proper mitigation planning and plans for reforestation or stormwater management elsewhere in the Rock Creek watershed if on-site conditions do not allow for direct installation of Best Management Practices. The final mitigation plan for Phase I must include at least 2.6 acres of afforestation in the Rock Creek watershed (not the middle Potomac watershed, as is used as a standard throughout the SDEIS), as close to the area of impact as is possible. In addition, green infrastructure BMPs (such as bioretention areas using native plants) must be installed along the spurs and culverts to offset the increase in impervious surface area. If immediately onsite opportunities are not deemed practicable, mitigation funds should be provided to a trusted technical expert to identify and manage stormwater management downshed (between the project and creek) of the new impervious areas. If onsite mitigation for 100% of the impact is not possible, Rock Creek Conservancy would be happy to meet with MDOT and other parties to identify and develop projects to manage stormwater with funding from this project.

**4**

As previously stated, the Conservancy welcomes the improved stormwater management proposals incorporated in the SDEIS. The SDEIS lists a number of strategies for implementing these practices, including but not limited to, mitigation for overland hydrology-borne pollutants provided by wet ponds and bioswales, reforestation on public lands on a one-to-one basis, sediment and erosion control measures, and aquatic biota monitoring. The addition of these metrics is helpful in the understanding that the project will implement these strategies wherever possible. However, the specifics of how and where these management strategies are executed will determine how the known environmental harms from this project will impact the surrounding ecosystems. In that sense, the SDEIS is lacking in specific information on which BMPs will be employed to address stormwater issues from increased impervious surface runoff. There is also a lack of mitigation strategies for preventing flooding related to stormwater. Section 4.15.4 mentions a more detailed hydrologic study that would be prepared during the final design phase, and we must ask that this study examines existing stormwater conveyance and discharge infrastructure, how the increases in impervious surface area would affect that infrastructure, and includes additional flooding mitigation strategies related to stormwater.

While the SDEIS is a                                                         productive step

7200 Wisconsin Avenue, Suite 500 | Bethesda, MD 20614
(301) 579-3105 | info@rockcreekconservancy.org
rockcreekconservancy.org | #LoveRockCreek

---

**Response to SDEIS Comment #2**

The project is required to provide stormwater treatment for all new impervious area, which includes approximately 0.8 acres in the Rock Creek watershed. Given the strict stormwater permitting requirements, impacts to downstream water quality from stormwater runoff are not expected.

**Response to SDEIS Comment #3**

MDOT SHA recognizes the value of vegetation for reducing the velocity of water flow, as a filtration system and for sediment control. MDOT SHA will replant all temporarily impacted areas to the greatest extent practicable and coordinate with the Maryland Forest Service to determine acceptable offsite mitigation opportunities. Maryland Reforestation Law requires state-funded highway projects with over an acre of forest impacts to avoid and minimize forest impacts to the extent practicable and to mitigate all unavoidable forest impacts through first planting on-site where practicable, then planting the remainder of the requirement off-site on public lands within the affected county and/or watershed. If planting is not feasible, there is the option to purchase credits from forest mitigation banks in the affected county/watershed, or to pay into the state Reforestation Fund. All forest impacts will be replaced on an acre-for-acre or one-to-one basis on public lands, within two years or three growing seasons of project completion (MDNR, 1997) or mitigated through banks or reforestation fund payment, as determined through coordination with the Maryland Forest Service. Environmental Site Design (ESD) will be implemented to the maximum extent practicable to treat new impervious area in accordance with MDE's stormwater regulations. ESD approaches include bioretention along with other environmentally sensitive approaches to stormwater treatment.

**Response to SDEIS Comment #4**

The project will be required to obtain a SWM and Erosion & Sediment permit. In order to obtain these permits, the project will be required to perform analysis based upon the final design and will be required to control stormwater runoff for the 10-year storm to match existing conditions, provide water quality treatment for all new impervious area and 50% of reconstructed existing impervious area to match the runoff characteristics of woods in good condition and manage the 2-year storm during construction so that sediment is not released to local waterways. Variances can be requested for minimal increases in stormwater runoff, however, detailed hydrologic calculations will be required to show that the minimal increases will not result in downstream flooding or erosion. Given the strict permitting requirements, impacts to downstream water quality from stormwater runoff are not expected. Refer to Chapter 9, Section 3.4.E for additional information related to impact analysis and mitigation of water resources, including wetlands, waterways, and stormwater management.

**OP·LANES**
M A R Y L A N D

I-495 & I-270 Managed Lanes Study

FINAL ENVIRONMENTAL IMPACT STATEMENT

**Response to SDEIS Comment #5**
MDOT SHA has committed that any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

#4
Cont.

#5

towards transparency, there are still areas where improvement can be sought. Any future phases should be assessed with a complete environmental impact statement that draws on updated data for stormwater and traffic studies.

In the Environmental Impact Statements for future phases, we will expect to see more thorough and specific discussion of mitigation strategies for stormwater management, including more detailed stormwater evaluation and traffic studies. The aforementioned lack of specificity on how stormwater management strategies will be employed will hopefully be addressed in future statements. These evaluations should also be conducted not just for the construction proposal that is eventually selected in each future phase, but also during the evaluation process for each potential Alternative as a means to understand holistic environmental impacts and execute comparative analysis with a greater level of detail.

Preserving the health of Rock Creek, its parks, and its watershed is of utmost concern for the Conservancy and residents in Montgomery County whose quality of life depends upon the natural, historic, and recreational resources afforded by the parklands and the natural infrastructure of these special places. This SDEIS is a necessary, but insufficient, step towards protecting our region's quality of life and environmental health.

7200 Wisconsin Avenue, Suite 500 |Bethesda, MD 20814
(301) 579-3105 | info@rockcreekconservancy.org
rockcreekconservancy.org | #LoveRockCreek

**SAFE SILVER SPRING – TONY HAUSNER**

| | |
|---|---|
| **From:** | Tony Hausner <thausner@gmail.com> |
| **Sent:** | Wednesday, November 10, 2021 5:49 PM |
| **To:** | SHA OPLANESMLS |
| **Subject:** | Comments on SDEIS for I270 Project |
| **Attachments:** | Testimony on SDEIS.docx |

Please see attached

--
Tony Hausner
Founder, Safe Silver Spring
safesilverspring.org
Past Chair,
AAII Chapter Leaders Executive Committee
aaii.com
Cell: 301-641-0497

*This page is intentionally left blank.*



Testimony on SDEIS for 495/270 Project To the Board of Public Works 11/03/21

Tony Hausner, Indian Spring Neighborhood

I am Tony Hausner. I live at 203 Brewster Ave, Silver Spring, MD. I live in the Indian Spring neighborhood which is immediately adjacent to the Beltway just south of it, between Colesville Road and University Blvd. We have 800 homes.

**#1**
I support the no-build option and oppose MDOT's toll lanes proposal. This applies to both I270 and I495.

I support transit solutions to the traffic issues raised by this SDEIS.

**#2**
While the 495 beltway is not specifically discussed in this SDEIS, the SDEIS clearly indicates that widening of 495and adding toll lanes around the entire portion of the Maryland Beltway is in a subsequent phase. The widening of the beltway will result in the following impacts to our neighborhood.

- Impacting a number of homes that are currently right next to the Beltway. They will at least lose a significant portion of their backyards.
- A park and playground in the middle of our neighborhood would be significantly reduced as well as a county recreation center which is in the middle of the park and which our neighborhood makes great use of.

I have the following comments on transportation issues

**#3**
The SDEIS study does not include all the way to Frederick in this first phase which is an essential part of the plan.

**#4**
- The SDEIS mentions the Corridor Cities transitway, the Randolph Road BRT, and the North Bethesda Transit Way. However, the SDEIS does not take into account whether or not these projects will or will not be completed. If these projects were completed it would significantly reduce the need for widening 270 and 495. Further, MDOT nor other agencies have not made any commitment to these Projects.

**#5**
- The M-NCPPC recommended that the State examine using the ICC as an alternative to widening the Beltway. The SDEIS dismisses this alternative without providing any analysis. We are very skeptical that this study has been adequately performed.

**#6**
- The SDEIS does not take into account the impact that COVID-19 has had on traffic. There have been significant reductions in traffic due to teleworking and much of these changes are likely to persist after COVID19 ends. Studies by KPMG and the Maryland Transportation Institute project a 5-10% long term decrease in traffic due to teleworking.

**#7**
- The SDEIS does not examine the use of reversible lanes on 270. This is more effective than adding toll lanes.

**Response to SDEIS Comment #1**
Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to SDEIS Comment #2**
Thank you for your comment concerning impacts to the entire portion of the Maryland Beltway. As described in the Supplemental DEIS, based upon your letter it appears that the facilities and resources referenced are located outside the Preferred Alternative limits of build improvements and impacts have now been completely avoided. See Figure 1-1 in the Supplemental DEIS on page 1-2. Any future proposal for improvements to the remaining parts of I-495 within the study limits, outside of Phase 1 South, would advance separately and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agencies.

**Response to SDEIS Comment #3**
Thank you for your comment on the I-270 Pre NEPA study. The northern section of I-270 from I-370 to I-70 is part of a separate, independent planning study under the I-495 and I-270 Public-Private Partnership (P3) Program. We recognize that improvements are needed in the northern section of I-270 with or without the improvements being considered under this project, however, MDOT SHA has prioritized improvements that will address the major regional congestion at the American Legion Bridge.

**Response to SDEIS Comment #4**
The Study uses the MWCOG model, which includes all existing and approved planned transportation projects in the Washington, D.C., Metropolitan region. The traffic analysis for the 2045 design year assumed completion of several background projects, both highway and transit projects, were included. The impacts of these background projects were assumed as part of the baseline conditions for the design year 2045 No Build Alternative and the 2045 Preferred Alternative. The background transit projects include: Purple Line Light Rail, Corridor Cities Transitway (CCT), US 29 Bus Rapid Transit (BRT), Randolph Road BRT and North Bethesda Transitway. Refer to FEIS, Chapter 3, Section 4.1.3.

**Response to SDEIS Comment #5**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

**Response to SDEIS Comment #6**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need and effects of the Pandemic.

**Response to SDEIS Comment #7**
Refer to Chapter 9, Section 3.3.B for a response to Analysis of Alternatives Retained for Detailed Study.


#8

- The SDEIS does not adequately address the high tolls from the American Legion Bridge. To the ICC, it likely will be as high as $50. All the way to Frederick, it will $100.

#9

- The SDEIS does not adequately take into account the destructive aspects of adding entrance ramps onto the toll lanes.

#10

Please note the latest UN report on climate change.that indicates that temperatures will increase. The question is how much of an increase will occur. A highway approach is the worst way to address this increase.

There are also many changes to P3 legislation that are needed as recommended by "In the Public Interest."

Thank you

http://rebrand.ly/270495SDEISth

**Response to SDEIS Comment #8**
Refer to Chapter 9, Section 3.6.B for a response to toll rate ranges and toll rate setting process.

**Response to SDEIS Comment #9**
MDOT SHA employed a conservative approach to defining the Limits of Disturbance (LOD) for all the DEIS Build Alternatives and Preferred Alternative. The LOD represent the proposed boundary within which all construction, mainline widening, managed lane access, intersection improvements, construction access, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, stream stabilization, and related activities to the proposed roadway and interchange improvements. For additional details refer to Chapter 9, Section 3.4.A for a response to Limits of Disturbance.

**Response to SDEIS Comment #10**
Refer to Chapter 9, Section 3.4.G for a response to climate change considerations.

**SEVEN LOCKS CIVIC ASSOCIATION, INC**

Seven Locks Civic Association, Inc

The SDEIS does not address the additional traffic that will be added to Seven Locks Road from River Road to Montrose Road due to the reduction of one lane during the 21 hours that HOV was not in effect on weekdays and for 24 hours per day on weekends. The tolls should not be in effect when the speed of the proposed HOT Lanes is less than 15 miles per hour due to accidents in the HOT lanes or bad weather, this will cause more traffic to be diverted onto Seven Locks Road. Currently Seven Locks Road is beyond its capacity for many hours in the morning and afternoons when there is congestion on I-270, and I-495.

#1

**Response to SDEIS Comment #1**

The traffic results showing delay increases on River Road and Clara Barton Parkway were preliminary and were based on draft designs. Now that the Preferred Alternative has been identified and the design has been updated, these results have been updated. The results indicate that the net impact of the Preferred Alternative will be an overall reduction in delay on the surrounding arterials, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges. The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of this FEIS, and mitigation was proposed where needed to maintain acceptable operations and safety per FHWA Interstate Access Point Approval guidelines. Refer to **FEIS Appendix B**.

**SIERRA CLUB MARYLAND CHAPTER ET AL.**

Refer to page CO-735 for the full Sierra Club SDEIS comment letter and page CO-826 for the comment response.

November 30, 2021

Mr. Jeff Folden, I-495 & I-270 P3 Program Deputy Director
I-495 & I-270 P3 Office
707 North Calvert Street, Mail Stop P-60
Baltimore Maryland, 21202
MLS-NEPA-P3@mdot.maryland.gov

Mr. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
jitesh.parikh@dot.gov

**Re: Comments on I-495 & I-270 Managed Lane Study Supplemental Draft Environmental Impact
Statement and Updated Draft Section 4(f) Evaluation**

On July 10, 2020, the Federal Highway Administration and the Maryland Department of
Transportation State Highway Administration (the "Agencies") issued a draft environmental impact
statement ("DEIS") for the I-495 and I-270 Expansion Project ("Project"). The Agencies then created and
selected a new alternative, Alternative 9 Phase 1 South, as the preferred alternative for the Project.
Subsequently, on October 1, 2021, the Agencies issued a supplemental draft environmental impact
statement ("SDEIS") to consider the preferred alternative's environmental impacts.

The undersigned Organizations and City oppose the preferred alternative put forth in the SDEIS
and support the no build alternative. The SDEIS (including its appendices) presents incomplete and
inadequate analyses of environmental impacts and fails to achieve the fundamental objectives of the
National Environmental Policy Act ("NEPA"). Even the inadequate information presented shows that the
Project will harm Maryland citizens and their environment and cannot be justified.

The comments provided below refer specifically to the SDEIS, and do not repeat the comments on
the DEIS that were provided to the Agencies on November 9, 2020, by the Maryland Chapter of the Sierra
Club and other organizations. Unfortunately, the SDEIS disregards all the technical and procedural issues
raised in the November 9 comments and does not present any information that would alter any of those
comments or cause any to be removed from consideration. The comments on the DEIS therefore remain
valid, and both they and the comments below on the SDEIS must be satisfactorily addressed.

These comments identify the Organizations' key concerns regarding the SDEIS, including but not
limited to the following, and discuss them in detail in the body of this document:

- The SDEIS fails to disclose the preferred alternative's cost breakdown in any meaningful way.
  The SDEIS fails to disclose the significant financial costs the preferred alternative would impose
  on the state and its citizens, including a direct subsidy to a private developer, costs of relocation
  of utilities, decreases in property values, shortfall payments, and other significant financial risks
  associated with the Public Private Partnership ("P3") Program. Those risks are recognized by
  Maryland Department of Transportation ("MDOT") in signed contracts with the developer but not
  disclosed to the public in the SDEIS. Evaluating the entire Project's costs in the NEPA process is
  particularly important given that MDOT and Maryland's governor misled the public regarding the
  Project's costs.

i

**SUBURBAN MARYLAND TRANSPORTATION ALLIANCE (SMTA) – SAMUEL RAKER (ORAL TESTIMONY)**

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Samuel Raker

**Agency/Organization/Jurisdiction, if applicable:** Suburban MD Transportation Alliance (retired)

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

Hello. My name is Sam Raker, S-A-M-U-E-L R-A-K-E-R. My address is 7908 Robeson Road in Bethesda. I represent SMTA Suburban Maryland Transit Transportation Alliance. Although I'm retired and inactive because of age, I am a resident right near Seven Locks in River Road and at the beltway River Road in the beltway, I have been there for 57 years from before the beltway opened. I have seen a lot. I was a co-chair of TPR2 transportation policy report to run by the Park and Planning Commission in Montgomery County for two years in 2002 to 2000, 2000 to 2002, which studied every possible alternative for the future of transportation in this area. After that, 2006, I was an assistant to the Secretary of Transportation for the ICC and the Purple Line. During those four years that the projects were studied and the ICC that got funded and under construction. I have seen a lot. I support fully the Preferred Alternative and not the transit option. We have. I've seen all the reports and studies, and I believe it is clear and convincing that transit should not be an option because it's very limited in what it can provide for ridership and it has the limitation of fixed destinations, which do not always work. I urge that you proceed with the Preferred Alternative, the preferred option of widening, a new bridge of wider with the transit transfer or the public transportation lanes, but not fixed, not fixed rail and or dedicated rails or lanes for transit. Thank you for your time and I appreciate the opportunity to speak to you. Bye.

#1

**Response to SDEIS Comment #1**
MDOT SHA and FHWA appreciate your comment on the proposed action. As a result of the NEPA process, including consideration of all public, stakeholder and agency comments concerning the project, MDOT SHA and FHWA have identified Alternative 9 Phase 1 South as the Preferred Alternative giving consideration to economic, environmental, technical, and other factors as detailed in the SDEIS and FEIS.

**THE EVERGREEN COMMUNITY**

*This page is intentionally left blank.*

| | |
|---|---|
| **From:** | Charlotte Troup Leighton <troupleighton@gmail.com> |
| **Sent:** | Tuesday, November 30, 2021 8:42 AM |
| **To:** | SHA OPLANESMLS |
| **Cc:** | governor.mail@maryland.gov; pfranchot@comp.state.md.us; treasurer@treasurer.state.md.us; Lee, Susan Senator; Korman, Marc Delegate; Love, Sara Delegate; Kelly, Ariana Delegate; MCP-Chair@mncppc-mc.org; marc.elrich@montgomerycountymd.gov; councilmember.Albornoz@montgomerycountymd.gov; Friedson's Office, Councilmember; councilmember.glass@montgomerycountymd.gov; Hucker's Office, Councilmember; councilmember.Jawando@montgomerycountymd.gov; councilmember.katz@montgomerycountymd.gov; councilmember.Navarro@montgomerycountymd.gov; councilmember.rice@montgomerycountymd.gov; councilmember.Riemer@montgomerycountymd.gov; SUSAN SHIPP; Orrick, Jack; Petra Jacobs; Vashti Van Wyke |
| **Subject:** | Comments of the Evergreen Community to SDEIS and Updated Draft Section 4(f) Evaluation |
| **Attachments:** | Evergreen SDEIS Comments - 11.29.21 - FINAL.pdf |

Dear Mr. Folden,

The Evergreen community in Cabin John, Montgomery County, Maryland submits our attached comments and concerns regarding the Supplemental Draft Environmental Impact Statement (SDEIS) for the I-495 and I-270 Managed Lanes Study.

As adjacent neighbors to I-495, we have been closely engaged in the I-495 and I-270 Managed Lanes Study environmental process. We are writing as both an affected community and as neighbors to, and supporters of, the historic Morningstar Tabernacle No. 88 Moses Hall and Cemetery.

Please note our support for the comments to the SDEIS submitted by **Cabin John Citizens Association (CJCA)**, **Carderock Springs Citizens Association (CSCA)**, and **Friends of Moses Hall**.

Sincerely,
**The Evergreen Community**
7900-8041 Cypress Grove Lane
Cabin John, Montgomery County, Maryland

00022908



**The Evergreen Community**
7900-8041 Cypress Grove Lane
Cabin John, Montgomery County, MD 20818
troupleighton@gmail.com

November 29, 2021

By Email to:
Jeffrey T. Folden, P.E., DBIA
Deputy Director, I-495 & I-270 P3 Office
**Maryland Department of Transportation State Highway Administration**
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21202
Email to: oplanesMLS@mdot.maryland.gov

RE: I-495/I-270 Managed Lane Study Supplemental Draft Environmental Impact Statement

Dear Mr. Folden:

We are writing on behalf of the Evergreen community, a collection of 27 homes along Cypress Grove Lane in Cabin John, Maryland. As adjacent neighbors to I-495, we have been closely engaged in the I-495/I-270 Managed Lanes Study environmental process. We wish to provide comments on the Supplemental Draft Environmental Impact Statement (SDEIS) through this letter. We are writing as both an affected community and as neighbors to, and supporters of, the Morningstar Tabernacle Number 88 Cemetery and Hall.

We have several procedural and substantive concerns with the material presented in the SDEIS regarding the Preferred Alternative.

1) **The scope of the SDEIS is insufficient to address the defects with the DEIS, particularly the failure to complete environmental justice or visual analyses.**
2) **The Preferred Alternative's Limit of Disturbance (LOD) indicates substantial incursions into property owned by members of our community. The SDEIS provides insufficient documentation of the use of that property.**
3) **Our community has existing runoff and erosion issues from I-495. The SDEIS does not provide sufficiently detailed information regarding the strategy to manage the existing and future stormwater generated by the impervious service of the highway. The Final EIS must provide additional detail and strong commitments to manage these impacts.**

Page 1 of 19

Thank you for your comments.  The 6 major issues listed on pages 1 and 2 of your comment letter are addressed on the subsequent pages associated with each detailed discussion in your letter.

4) Issues related to local road congestion and construction period impacts have not been sufficiently addressed.
5) We share the concerns of our neighbors that the required noise walls be adequately sized to provide sufficient protection for adjacent communities.
6) The Final EIS should substantively address impacts that the project generally and the MD 190 off-ramp and exit specifically would have on our community related to safety, potential tree canopy loss, and congestion at Seven Locks Road and MD 190.

Please find a more detailed discussion of these issues below.

**#1**

### Scope of the SDEIS – Environmental Justice

As next-door neighbors and partners of the Morningstar Tabernacle No. 88 Cemetery and Hall, we are additionally concerned about the insufficient analysis of environmental justice issues in the DEIS or SDEIS. As Executive Order 12898 makes clear, agencies are required, as part of an environmental justice analysis, to evaluate whether there are disproportionately high or adverse impacts to EJ communities. As mentioned above, 40 CFR 1502.9 requires agencies to adequately disclose impacts in the DEIS. In the SDEIS, SHA states that "the determination of disproportionately high and adverse impacts to EJ populations will be made on the Preferred Alternative and will be disclosed in the FEIS" (Pg. 4-104). SHA's continued failure to actually assess environmental justice impacts by not completing the requisite analysis means that this SDEIS has failed to cure a meaningful legal deficiency in the DEIS. As a result, SHA must perform additional supplemental analysis on Environmental Justice impacts before proceeding to a Final EIS.

**#2**

### Scope of the SDEIS – Visual Impacts

As we wrote in our October 16, 2020 response to the Draft EIS (courtesy copy as Attachment 1), the failure to perform a Visual Impact Assessment (VIA) means that the visual impacts of the Project have not been adequately documented. 40 CFR 1502.9 requires that the Draft EIS adequately disclose the impacts associated with the Project. Additionally, 40 CFR 1502.14(b), as further articulated by the *Forty Questions*, requires that all Alternatives be treated substantially similarly. SHA's indication in the SDEIS that the Visual Impact Assessment for the Preferred Alternative can be conducted in the Final EIS (ES-5) is inconsistent with the regulations.

What has been provided in the SDEIS instead, a scoping questionnaire (Appendix J), is insufficient and incorrect in a number of locations. The scoping questionnaire is appropriate as an explanation of the methodology taken on a prospective VIA. However, that is the purpose of a Methodology Report. The SDEIS should be disclosing the visual impacts themselves. Repeatedly in the scoping questionnaire, SHA indicates that DEIS comments, beyond those from park agencies, did not raise specific visual impact concerns. This statement is materially false. For the benefit of SHA, we provide a relevant portion of our community's DEIS comment letter.

   *Visual and Property Impacts of MD 190 Off-Ramp*
   *The proposed direct access off-ramp from the eastbound managed lanes onto MD 190 is a major source of concern for our community.*

Page 2 of 19

---

**Response to SDEIS Comment #1**
Refer to Chapter 9, Section 3.4.D for a response to Environmental Justice and equity concerns.

**Response to SDEIS Comment #2**
The Visual Impact Assessment (VIA) was completed on the Preferred Alternative and documented in the FEIS in Chapter 5, Section 5.6 and FEIS, Appendix H and includes renderings in the area of concern around Seven Locks Road and Cabin John Stream Valley Park, Unit 2. The VIA concluded that construction of the Preferred Alternative would not introduce new elements incompatible with the existing visual character or qualities along the study corridors or that experienced by neighbors. Vegetation removal will be mitigated based on state and local agency requirements and standards to maintain the visual quality of the key locations. It is expected that aesthetic and landscaping guidelines will detail materials, lighting, signage, and vegetation standards contextually compatible with the study corridor. Aesthetic and landscaping guidelines will vary along the study corridor to incorporate the aesthetic and context of the neighbor stakeholders and surrounding resources. By inviting neighbor stakeholders in the development of the aesthetic and landscaping guidelines, MDOT SHA would ensure that the Preferred Alternative would be consistent with applicable laws, ordinances, regulations, policies, and standards. As a result, the contextual compatibility impact of the proposed action would be low.

The Preferred Alternative does not include an elevated structure to implement the HOT managed lanes at Seven Locks Road. Between Persimmon Tree Road and Seven Locks Road, the Preferred Alternative includes four general purpose lanes and two high-occupancy toll managed lanes in each direction. An acceleration lane will also be built along the outer loop for approximately 1000-feet east of Seven Locks Road. No ramps are proposed in this area. The proposed typical section serves to minimize the roadway footprint between the Carderock Springs Historic District and Gibson Grove Church along the outer loop and the Morningstar Tabernacle No. 88 Moses Hall & Cemetery along the inner loop. The centerline of I-495 will be relocated such that it gradually shifts away from the Cemetery as it moves north from Persimmon Tree Road; at the Cemetery the proposed median barrier between inner loop and outer loop traffic will be approximately 25 feet further from the Cemetery than the existing median barrier. Flyover ramps are no longer proposed in this area and thus will not create a visual impact. A noise barrier in this area is anticipated to be located close to the existing right of way line. Vegetation will need to be removed within the Limit of Disturbance to facilitate this construction.

Since the DEIS, the Preferred Alternative eliminates of flyover ramps at MD 190/River Road by adjusting the location of the HOT lane direct access ramps. All HOT lanes direct access ramps within this interchange are now proposed to connect at a new intersection on the MD 190 bridge over I-495 without the use of flyover ramps.

Between Seven Locks Road and MD 190/River Road, the general purpose lanes and managed lanes separate to allow space for highway ramps. The existing Cabin John Parkway bridges will be replaced with new north-facing ramps to I-495 general purpose lanes, and I-495 managed lanes, and MD 190. New ramps connecting to Cabin John Parkway will be provided below existing I-495 grades, avoiding additional visual impacts to adjacent communities. The existing loop ramps at the MD 190 interchange will be replaced by diamond ramps. This configuration typically allows ramps to be located further from adjacent houses than the SDEIS ramp configuration.

#2 Cont

*The Final EIS should advance an alternative that does not include an eastbound flyover off-ramp onto MD 190.*

*As indicated in the Environmental Resources Mapping (Appendix D), the ramp would create new property impacts for residents in our community and the adjacent Moses Hall site that would not be present should at-grade slip ramps be used instead. Additionally, a new elevated off-ramp would have an adverse impact on the views from our community and potentially privacy issues as well. The viewshed analysis conducted for the Draft EIS is insufficient, fails to take the "hard look" required under Marsh, Methow Valley, and other relevant case law, and therefore fails to comply with the NEPA regulations. The analysis broadly concludes that "Where new direct access at-grade auxiliary lanes or ramps would be constructed, visual impacts would be readily apparent, but would not contribute to a change in the character of the existing viewsheds" (DEIS Pg. 4-34). However, the analysis also notes that a Visual Impact Assessment (VIA) has yet to be conducted. In the absence of such a VIA, we believe that visual impacts have not been adequately documented. 40 CFR 1502.9 requires that the Draft EIS adequately disclose the impacts associated with the Project. Additionally, 40 CFR 1502.14(b), as further articulated by the Forty Questions, requires that all Alternatives be treated substantially similarly. SHA suggests, instead, that a VIA "in accordance with FHWA's guidance" will only be performed once "design advances on a Preferred Alternative" (DEIS Pg. 4-34).*

Correcting the project record on this issue is important because it affects the level of VIA that SHA is proposing to perform and the scope of that VIA. SHA indicates that they plan to perform an "Abbreviated VIA" and will only focus on views from parklands. The consideration of our community's comments should result in an updated questionnaire scoring that would require instead a "Standard VIA." We note that there are two places (Environmental Compatibility Q3 and Viewer Sensitivity Q1) where SHA erred in stating that stakeholders like ourselves had not raised visual impact concerns. In both of those places, that statement is the basis of awarding two points on the scoring criteria ("Moderate Potential"/ "Moderate Concern"). In correcting the misrepresentation, SHA should then increase the scores to three points ("High Potential"/ "High Concern") and thereby exceed the point threshold for a "Standard VIA."

Additionally, as a stakeholder interested in visual impacts, we request that renderings be provided of the off-ramp that clarify the visual impacts of the modified MD 190 off-ramp location.

#3

**Limit of Disturbance and Property Impacts**

For this SDEIS, we repeat our concern expressed in our DEIS comments regarding the potential property impacts on our neighborhood. As shown in the *Environmental Resources Mapping* (Appendix D), our community along Cypress Grove Lane would experience substantial property incursions under the current planning assumptions of the evaluated Alternatives. The limits of

**Response to SDEIS Comment #3**

The Preferred Alternative does not result in any full acquisitions or residential or business displacements; therefore, no homes would be taken due to the proposed roadway widening.

Sliver impacts to properties along I-495 within the Evergreen community are proposed for elements such as roadside grading, on-site drainage and stormwater management, and noise barrier replacement/construction. These partial property acquisitions are considered ones that do not cause a residential relocation and have been assumed where a principle building of a residence or community facility is located more than 20 feet from the Preferred Alternative limits of disturbance.

As the design is advanced on the Preferred Alternative there may be further reductions in impacts. An important benefit to conducting a P3 process with pre-development work concurrent with the NEPA process is to increase efficiency by receiving input by the Developer on design and ancillary elements of the project such as stormwater management. This collaborative effort ensures that the design and associated limits of disturbance (LOD) are appropriate and feasible ahead of final design. While additional LOD changes may occur during final design, including additional avoidance and minimization, the risk of substantial changes in the LOD or substantial increase in environmental impacts is significantly lowered by the early involvement of the Developer.

disturbance (LOD) indicate construction and/or permanent impacts to multiple properties in our community, often quite close to existing homes.

The available information in the SDEIS provides scant information about the nature or purpose of these impacts. However, based on the presence of a proposed stormwater facility immediately west of our community (Appendix D, Map 7), we interpret these impacts as most likely related to that facility.

We reiterate that in the Final EIS, SHA must take steps to avoid and/or minimize any impacts to private property in our community consistent with NEPA regulations.

In the meantime, we continue to request additional information regarding the nature of potential property impacts. The SDEIS indicates that 8.6 acres of property would be acquired in the Cabin John area (Pg. 4-6). Appendix D indicates that seven properties in our community would see at least partial impacts based on where the LOD is currently indicated.

### Stormwater and Runoff

In the Final EIS, SHA must take more substantive steps to address existing and future stormwater and runoff than are presented in the SDEIS.

As noted in our comments on the DEIS, the properties within the Evergreen subdivision along Cypress Grove Lane are downstream of the I-495 roadway and experience substantial runoff and stormwater flows today. These existing flows create substantial damage to our properties on a regular basis. The water creates erosion across our backyards that results in long gullies where dirt, rocks, and sticks accumulate. As shown in **Attachment 2** to this letter, these conditions are not only unsightly, but also result in real degradation to property condition and value.

Greater amounts of runoff will result from widening I-495 as a result of the increase in impervious **area**. As we indicated in our comments on the DEIS, the Final EIS should provide additional detail to confirm the stormwater management (SWM) approach for the section of I-495 adjacent to Evergreen and to ensure that the SWM approach **improves upon the existing, inadequate SWM mitigation framework**, rather than cause further detrimental impact to our community.

We are particularly concerned about the relative amount of off-site treatment of SWM proposed in the SDEIS, with 114 acres addressed off-site versus 92 acres on-site (Appendix C, Pg. 5). We believe that to adequately address future and present SWM issues in the vicinity of Evergreen, as much mitigation as possible should be provided on-site in this location, while respecting our community's property rights. In addition to greater detail in the Final EIS regarding the approach, we request that the P3 Developer be made available to our community so that we can substantively engage on the resolution of SWM and drainage issues.

### Construction Impacts

In the DEIS, the *Environmental Resource Mapping* (DEIS, Appendix D) indicated that the existing I-495 bridge over Seven Locks Road would need to be replaced to construct the Alternatives. The SDEIS Appendix D provides less information regarding the construction impacts. More

Page 4 of 19

**#3**

**#4**

**#5**

---

**Response to SDEIS Comment #4**

Since there is a documented drainage complaint at the Moses Cemetery the current draft SWM concept presented in the FEIS diverts all the impervious area from I-495 away from the cemetery property to the north side of the highway where it is treated in a SWM facility. As a result, the houses between I-495 and Cypress Grove Lane will see a significant reduction in surface runoff.

The majority of the SWM runoff along Cypress Grove Lane will be diverted, however, some runoff will still be directed to the existing 21"RCP located behind 8021 Cypress Grove Lane and the existing swale located between Osage Lane and Cypress Grove Lane. This project will be required to control stormwater runoff for the 10-year storm to match existing conditions prior to leaving MDOT SHA ROW; therefore the runoff at both locations will not be increased and given that the surface runoff is being directed elsewhere, the total runoff will be significantly reduced.

**Response to SDEIS Comment #5**

Impacts during construction are a key consideration for the overall project. As the design is finalized, constructability reviews will be completed and a Transportation Management Plan will be developed to assess operations during construction and lay out a set of strategies that will be implemented to manage work zone impacts.

It is anticipated that construction will last approximately five to six years. Details related to precisely when and where construction related activities will occur will be determined in final design, however, the project will likely require night work to occur when activities could not be completed safely during the day. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. Impacts associated with construction that will be further evaluated for the Selected Alternative in final design include traffic congestion associated with construction maintenance of traffic, utility disruptions, construction vibration, erosion and sediment control, and construction related noise.

The management of construction impacts is addressed in an agreement between MDOT SHA and the Developer. Pursuant to that agreement, coordination with the neighboring communities will continue through final design and construction. The agreement includes requirements to minimize impacts to surrounding communities and the traveling public, while completing construction as soon as possible. Work hours and duration of construction will be identified to minimize impacts to traffic in an effort to reduce construction related congestion and in consideration of noise and vibration impacts to adjacent communities. Construction methods and materials will comply with contract, state and federal regulation, and environmental permits and mitigation requirements. Careful attention will be taken to assure that material placement will occur when weather conforms to industry standards and regulation. In addition to required governmental inspections, the Developer is required by contract to provide independent environmental, quality, and safety oversight of its contractor's performance. Refer to Final Phase 1 P3 Agreement, https://oplanesmd.com/p3-information/phase-1-agreement/. Once the Developer has selected a Design-Build Contractor(s), the schedule and duration for Phase 1 South construction will be made available to the public.

For additional information refer to Chapter 9, Section 3.4.I for a response to construction impacts.

**#5 Cont**

broadly, the SDEIS provides extremely limited construction information. There is no information about the nature of construction disruptions to Seven Locks Road, the duration of that disruption, and how construction impacts will be mitigated. Additionally, there is limited information in the SDEIS regarding construction staging for the construction of the main line of I-495. In total, the information presented remains inadequate for our community to fully understand the nature of impact that we will experience as highway-adjacent residents.

The SDEIS indicates that, "Details related to when construction related activities will occur will be determined in final design" (Pg. 4-111). While it is reasonable that additional design would help to clarify the construction approach, the Final EIS must provide a deeper level of information about construction approaches as they are understood today.

**Long-Term Traffic Impacts**

**#6**

The long-term consequences of the Project on the roadway network are inadequately evaluated in the SDEIS and inconsistent with information presented in the DEIS.

In the DEIS, the *Traffic Analysis Technical Report* (Appendix C) showed impacts to local arterials that serve as major access routes for Evergreen (Figure 5-73). The figure indicated that MD 190 and Clara Barton Parkway would see a greater than 10% increase in delay due to the Project. These two routes represent the major regional routes serving our community. These impacts were not documented in the Draft EIS, nor proposed to be mitigated.

In the SDEIS, the *Traffic Evaluation Memorandum* (Appendix A) omits a similar figure, instead making a general statement that traffic would be reduced by 3.5% on the entire local roadway network (Pg. 6). Given that a similar traffic reduction was projected for the local roadway system in the DEIS, we infer that the same sort of local traffic negative impacts for MD 190 and Clara Barton Parkway disclosed in the DEIS would be experienced by Evergreen should the Preferred Alternative be implemented. SHA's failure to consistently report this impact and to offer resulting mitigations is inconsistent with the NEPA regulations and must be addressed in the Final EIS.

**Sizing of Noise Barriers**

**#7**

As adjacent property owners, we are glad to see commitments in the SDEIS to noise barriers along I-495. Since noise will be an enduring, long-term impact to our community, we wish to be certain that the noise barriers are sized sufficiently to minimize the deleterious effect of noise on our quality of life and property values. Accordingly, we wish to reinforce the comments of our neighbors at the Carderock Springs Citizens Association requesting that SHA review their noise analysis to ensure that the noise barrier proposed to be implemented in our neighborhood offers adequate protection from the noise impacts caused by the Preferred Alternative.[1]

---

[1] See Carderock Springs Citizens Association. SDEIS Comment Letter. November 12, 2021.

Page 5 of 19

**Response to SDEIS Comment #6**

The traffic results showing delay increases on River Road and Clara Barton Parkway were preliminary and were based on draft designs. Now that the Preferred Alternative has been identified and the design has been updated, these results have been updated. The results indicate that the net impact of the Preferred Alternative will be an overall reduction in delay on the surrounding arterials, including a 4.8 percent reduction in daily delay on the arterials in Montgomery County, despite some localized increases in arterial traffic near the managed lane access interchanges. The portions of the local road network with an anticipated increase in volumes were evaluated in more detail as part of this FEIS, and mitigation was proposed where needed to maintain acceptable operations and safety per FHWA Interstate Access Point Approval guidelines. Refer to **FEIS, Appendix B**.

**Response to SDEIS Comment #7**

As part of this project, the existing sound barrier that crosses Seven Locks Road along the outer loop of I-495 will be replaced and extended along the outer loop of I-495 to Persimmon Tree Road. A new barrier is proposed along the inner loop of I-495 from just south of Cabin John Parkway to Persimmon Tree Road. The new barriers will be constructed as close to the roadway as possible to minimize or avoid property impacts. As described in the Supplemental DEIS (SDEIS) and the supporting Noise Analysis Technical Report Addendum the noise analysis is based on the current preferred alternative design and MDOT SHA's Highway Noise Abatement Planning and Engineering Guidelines ("Noise Guidelines"), which detail implementation guidance, critical background information, rationale, and other comprehensive criteria associated with a highway noise study. The noise policy and guidelines are based upon the provisions contained in Title 23 of the Code of Federal Regulations Part 772 (23 CFR 772), Procedures for Abatement of Highway Traffic Noise and Construction Noise and the Federal Highway Administration (FHWA) report FHWA-HEP-10-025, Highway Traffic Noise: Analysis and Abatement Guidance and subsequent revisions.

The DEIS, SDEIS and FEIS all include the "Statement of Likelihood" that is required by FHWA regulation 23 CFR 772.13(g)(3):

"A statement of likelihood shall be included in the environmental document since feasibility and reasonableness determinations may change due to changes in project design after approval of the environmental document. The statement of likelihood shall include the preliminary location and physical description of noise abatement measures determined feasible and reasonable in the preliminary analysis. The statement of likelihood shall also indicate that final recommendations on the construction of an abatement measure(s) is determined during the completion of the project's final design and the public involvement processes."

Because we are in the NEPA phase of this project, we do not yet have detailed engineering plans, including soil borings and field surveyed topography. This level of detail is obtained during the final design phase of a project. The design, appearance and final alignment of the sound barriers will also be finalized during final design. The project must receive NEPA approval before final design is initiated, per 23 CFR 771.113(a). MDOT SHA is sensitive to the visual impact of a sound barrier when it is located directly adjacent to a residence. Sound barriers are most effective when placed directly adjacent to either the noise source (the highway) or the receiver (the residence). Ideally sound barriers are placed close to the highway, but in some cases, they must be located close to a residence in order to maximize the effectiveness. Sound barriers have a height limitation of 40 feet, and any structure over 24 feet requires a significantly larger foundation (which leads to more ground disturbance and environmental impacts). MDOT SHA will make every effort to keep the sound barriers as close to the highway as possible, but because of the varied topography of the Carderock Springs Community, it may be necessary to locate the walls at the top of the slope in order for them to effectively reduce the highway noise levels.

At this time there is no sound barrier proposed along the flyover ramps at River Road, however this area will continue to be evaluated during final design. The noise levels that were shown in the DEIS, as well as the 66 dBA contour line, were developed assuming the existing sound barrier was not there. This was done in order to get a baseline worst case future noise level for design of the replacement sound barrier. As shown in the above referenced mapping and described in the SDEIS, the receptors along Seven Locks Road north of I-495 are not impacted by noise under future build conditions.

#8

**Impacts to Address Further in the Final EIS and Beyond**

As design advances, our community requests detailed coordination with SHA and the P3 Developer on key implementation issues for the Project. Where possible, these issues should be substantively addressed in the Final EIS. These issues include:

· Minimizing tree canopy loss, particularly of specimen trees, for the construction of the roadway, noise barrier, and other project features. As neighbors, we would appreciate the opportunity to walk the site with an arborist to understand, and hopefully help reduce, the number of trees taken down to implement the project.
· Design of the MD 190 off-ramp to improve traffic safety operations, in light of increased levels of traffic crashes on I-495 during the pandemic.
· Prompt construction of the noise barriers during the Project. The SDEIS indicates that replacement noise barriers would need to be complete within 60 days and that noise barriers need to be constructed continuously once started (4-111). These are positive commitments. We also request that the noise barriers adjacent to our, and others', communities be built early in the construction process to reduce construction noise and long-term impacts. We would appreciate coordination with the P3 Developer on the specific design and placement of the adjacent noise barriers, as well.

Sincerely,
**EVERGREEN COMMUNITY RESIDENTS**

Charlotte Troup Leighton and Russell Leighton (8005 Cypress Grove Lane)
Frank L. Wright III and Marcy Harrison (8014 Cypress Grove Lane)
Andrew Strasfogel and Elizabeth L. Jackson (7913 Cypress Grove Lane)
WeiWei and Fenhua He-Han (7910 Cypress Grove Lane)
Manny and Elizabeth Andrade (7909 Cypress Grove Lane)
Matt and Min Shih (7900 Cypress Grove Lane)
Cindy and Leslie Miller (7905 Cypress Grove Lane)
Gladys Vaughn (7921 Cypress Grove Lane)
Ellen and Steve Futterman (8000 Cypress Grove Lane)
Kara Cunzeman and Marc Bosch (8009 Cypress Grove Lane)
Michael and Gail Marcus (8026 Cypress Grove Lane)
Gregory and Sheila Duncan-Peters (8037 Cypress Grove Lane)
Sheryl Israel-Bloch and Peter Bloch (7920 Cypress Grove Lane)
Khalid and Ruham Usmani (8013 Cypress Grove Lane)
Donald and Sedene Dunac (8021 Cypress Grove Lane)
Assiatu and Richard Crossman (8025 Cypress Grove Lane)
Santiago and Beatriz Bonetti (8001 Cypress Grove Lane)
Edwin Paxson and Olga Syrodoeva (8041 Cypress Grove Lane)

*Also Provided:*
**Attachment 1:** Evergreen DEIS Comment Letter dated 10/16/2020
**Attachment 2:** Drainage and Stormwater Damage

**Response to SDEIS Comment #8**

The FEIS reflects further design refinements and details, including final mitigation and commitments of the Preferred Alternative, many of which directly responded to public comments. Refer to **FEIS, Chapter 7** for a comprehensive list of mitigation and commitments.

MDOT SHA acknowledges receipt of the Evergreen DEIS Comment Letter dated October 16, 2020 and Drainage and Stormwater Damage Attachments that was appended to this SDEIS Comment Letter. Refer to Appendix T for a response to this DEIS Comment Letter.

cc:   Governor Lawrence J. Hogan
      Comptroller Peter V.R. Franchot
      Treasurer Nancy Kopp
      Montgomery County Executive Marc Elrich
      Montgomery County Councilmembers Andrew Friedson, Gabe Albornoz, Evan Glass, Will
      Jawando, and Hans Riemer
      Maryland Senator Susan Lee and Delegates Ariana Kelly, Marc Korman, and Sara Love

*This page is intentionally left blank.*

Page 7 of 19

**WASHINGTON AREA BICYCLIST ASSOCIATION – STEPHANIE PIPERNO (NOVEMBER 10, 2021)**

| | |
|---|---|
| From: | Stephanie Piperno <stephanie.piperno@waba.org> |
| Sent: | Wednesday, November 10, 2021 10:33 AM |
| To: | SHA OPLANESMLS |
| Subject: | Shared-Use Path Alternatives |

Good morning,

I recently spoke with Richard Parsons regarding the shared-use path alternatives, and he mentioned that I should put my questions in writing to you.

- What is the % grade for each of the shared-use path alternatives?
- What is the proposed trail/shared-use path width for each alternative?
- Is there a plan for a sound wall along the bridge portion of the trail?
- Does the trail alignment connect to the proposed trail that is included in VA's 495 Next project?

Thank you!

Sincerely,
Steph

--

**Stephanie Piperno| Trails Coalition Manager**

**Washington Area Bicyclist Association**
2599 Ontario Rd. NW, Washington, DC 20009

Cell: 202-964-5266 Extension 13

Email: stephanie.piperno@waba.org

Website: https://www.capitaltrailscoalition.org/

Twitter: @TrailsCoalition

**Response to SDEIS Comment #1**

Public comments supporting a direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath were received by MDOT SHA, FHWA and NPS during the SDEIS public comment period. To be responsive, a direct connection to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative LOD and impact analyses. The three shared use path options connecting to MacArthur Boulevard presented in the SDEIS are no longer under consideration in this FEIS. The direct connection to the Chesapeake and Ohio Canal towpath results in fewer NPS property and natural resource impacts. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the Study Area. The alignment of the proposed shared use path connection to the Chesapeake and Ohio Canal towpath is shown in FEIS Appendix E.

1

**WASHINGTON AREA BICYCLIST ASSOCIATION – STEPHANIE PIPERNO (NOVEMBER 19, 2021)**

*This page is intentionally left blank.*

| | |
|---|---|
| **From:** | Stephanie Piperno <stephanie.piperno@waba.org> |
| **Sent:** | Friday, November 19, 2021 3:40 PM |
| **To:** | SHA OPLANESMLS |
| **Subject:** | I-495 & I-270 P3 Comments |
| **Attachments:** | WABA Comments_I-495270.pdf |

Good afternoon Mr. Folden,

Please find WABA's comments regarding the I-495 & I-270 attached.

Sincerely,
Steph

--

**Stephanie Piperno| Trails Coalition Manager**

**Washington Area Bicyclist Association**
2599 Ontario Rd. NW, Washington, DC 20009

Cell: 202-964-5266 Extension 13

Email: stephanie.piperno@waba.org

Website: https://www.capitaltrailscoalition.org/

Twitter: @TrailsCoalition

00022917



**WABA**
WASHINGTON AREA
BICYCLIST ASSOCIATION

November 19, 2021

Re: I-495 & I-270 Managed Lanes SDEIS

Dear Mr. Jeffrey Folden,

**#1**

On behalf of the Washington Area Bicyclist Association (WABA) and our nearly 7,000 members across the Metropolitan Washington Region, we are writing in **support of Alternative 1, the No Build Alternative.** We do not feel like the true conditions of the bridge have been provided for this project, we do not feel like the true conditions of the bridge have been truthfully portrayed (as the SDEIS contradicts MDOT Secretary Greg Slater's previous comments that only the deck of the bridge needs to be replaced in the next 10 years), and we do not support this project moving forward as a P3.

WABA would like the American Legion Bridge (ALB) deck to be repaired using public funds or dollars from the recently passed Infrastructure Bill-- which will provide the state of Maryland with $409 million for bridge replacement and repairs.

**#2**

When just the ALB is repaired, a shared-use path should be included in the project scope. A shared-use path across the ALB will enhance pedestrian and bicycle connectivity between Maryland and Virginia. This connection will encourage active transportation, help reduce C02 emissions, and increase and enhance recreational opportunities for VA and MD residents.

The shared-use path should connect to both Macarthur Blvd and the C&O Canal Towpath. Without the connection to the Canal Towpath, pedestrians and bicyclists must go 2 miles East along the MacArthur Boulevard Bike Path to access the nearest connection down to the Towpath. The direct connection to the Towpath is important because the Towpath is one of the few areas that provides a separate walking and bicycling path completely separate from cars. Although MacArthur Blvd has a shared-use path, it is next to a very busy road and is not a pleasant experience for walkers, runners, rollers, or bikers.

The proposed shared-use path will also close a significant gap in the regional trail network (as defined by the Capital Trails Network), and serve as an important piece of

2599 Ontario Road NW | Washington, DC 20009 | **waba.org** | (202) 518-0524

---

**Response to SDEIS Comment #1**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment. The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives. For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multimodal transportation initiatives and projects included in the "Visualize2045" plan adopted by the Metropolitan Washington Council of Governments (2018). See DEIS, Chapter 2, Section 2.3. Based on a comprehensive review of regional demographics and traffic data, the No-Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives. See DEIS, Chapter 3 and DEIS Appendix C. For a discussion of the basis for the Purpose and Need and for the Selection of the Preferred Alternative, please see related Common Theme Responses and the SDEIS and FEIS.

Based on our biennial bridge inspection findings and experience on similar heavily-traveled steel superstructure bridges, we estimate that the current lifespan of the superstructure and substructure are 10-15 years before they would deteriorate to poor condition needing replacement. This assumes that additional repairs and preservation activities are not undertaken during that time. Even with repairs and preservation activities, such as a deck replacement, cleaning, painting, and steel repairs to the superstructure, and concrete repairs to the substructure units, this 59-year-old bridge would require considerable capital investment to maintain it in a state of good repair. In determining the need to replace a structure, we consider the cost to maintain and rehabilitate all three elements (deck, superstructure and substructure), the functional needs of the bridge, and the disruption to traffic during construction. Refer to Chapter 9, Section 9.3.5 for a response on the P3 Program and Project Costs.

**Response to SDEIS Comment #2**

Public comments supporting a direct connection of the shared use path from the ALB to the Chesapeake and Ohio Canal towpath were received by MDOT SHA, FHWA and NPS during the SDEIS public comment period. To be responsive, a direct connection to the Chesapeake and Ohio Canal towpath has been incorporated into the preliminary design and is accounted for in the Preferred Alternative LOD and impact analyses. The three shared use path options connecting to MacArthur Boulevard presented in the SDEIS are no longer under consideration in this FEIS. The direct connection to the Chesapeake and Ohio Canal towpath results in fewer NPS property and natural resource impacts. MDOT SHA and the Developer will continue to coordinate with NPS to review the condition of the existing connection between the Chesapeake and Ohio Canal towpath and the MacArthur Boulevard sidepath outside of the Study Area. The alignment of the proposed shared use path connection to the Chesapeake and Ohio Canal towpath is shown in FEIS Appendix E.

00022918

**#2 Cont**

the Potomac Heritage National Scenic Trail. Absent a direct connection from the ALB to the C&O Towpath, the closest bridge crossing over the Potomac River for cyclists and pedestrians is over 5.5 miles away at the Chain Bridge. Additionally, the proposed shared-use path will connect with the 2.9 mile shared-use path being built as a part of the I-495 Next project being managed by VDOT.

**#3**

In order to make the shared-use path the best experience possible for all users, the path should meet AASHTO standards and be at least 12-feet wide (similar to that of the Woodrow Wilson Bridge) and include a river viewing platform. We would like there to be a sound wall separating the vehicle lanes from the shared-use path. Portions of the shared-use path along the Woodrow Wilson Bridge are protected by a transparent durisol noise barrier, which drastically improve the experience for pedestrians and bicyclists (as seen in this video). Finally, the running slope of the trail should meet ADA Accessibility standards. By including these features, the trail can become a destination in itself, rather than just a way from A to B.

Finally, popular sites along the C&O Canal Towpath, like Carder Rock and Great Falls are highly trafficked and are only accessible to VA residents by car. The National Park Service is concerned with overcrowded parking lots and illegal parking to access the Towpath, but the shared-use path connection to the Towpath could actually relieve parking congestion as the popular destinations would be newly accessible by walking, rolling, and biking!

We urge you to pursue the no build alternative and re-evaluate this project for a more climate-friendly, multi-modal approach.

Thank you for the opportunity to comment.

Sincerely,

*Stephanie Piperno*
Stephanie Piperno
Trails Coalition Manager
Washington Area Bicyclist Association

**Response to SDEIS Comment #3**
A shared-use path is generally considered a transportation feature, and not a noise sensitive land use. It would not be eligible for noise abatement under 23 CFR 772.

00022919

## WASHINGTON BIOLOGISTS' FIELD CLUB – ROBERT SORENG (ORAL TESTIMONY)

I-495 and I-270 Managed Lanes Study
SDEIS Virtual Public Hearing: Oral Testimony

**Name:** Robert Soreng

**Agency/Organization/Jurisdiction, if applicable:** Washington Biologists' Field Club

**Virtual Public Hearing Date:** 11/1/2021

**Type/Session:** Testimony

**Transcription:**

My name is Robert Soreng. That's S as in snow, O-R-E-N-G. I live at 5506 Uppingham Street. That's U-P-P-I-N-G-H-A-M, Chevy Chase, Maryland 20815. I am representing the Washington Biologists Field Club on Plummers Island, http://wbfc.science. The Washington Biologists' Field Club has studied the long-term trends on the biodiversity of Plummers Island for 120 years. When the plans for the original American Legion Bridge were developed in 1959, the Club sold the adjacent mainland tract of land up to the C&O Canal to the federal government and gave Plummers Island to the federal government in exchange for protecting the island from construction of the bridge and giving the Club rights in perpetuity to maintain the island as a wild, natural area on which to continue the Club's long-term research.

#1   The island then became part of the new C&O Canal National Historical Park. As part of the Section 106 Process, the WBFC and Plummers Island was determined to be eligible for the National Register of Historical Places and Maryland Historical Trust properties. Now, the I-495 stakeholders, Transurban and MDOT-SHA Alternative 9, plans to take part of Plumber's Island, place a pier on the island, destroy important research plots, rare plant species and habitat, and overshadow the island by as much as 30 feet with a noisy new bridge lanes. Under the Section 106 Evaluation published in September, MDOT cartographers redrew the islands boundaries in Map 3 in a misleading and deceitful way.

#2   First, they trimmed all the riparian areas, the wetland margins out of the island, out of Plummers Island and assigned those to the C&O Canal National Historical Park. Then, they subtracted the rare Potomac River Gorge, Riverside outcrop baron plant community on the southwest corner of the island and simply assigned that to the Potomac River, effectively Waters of the United States. This tricky Section 106 mapping allowed MDOT to publicly state that only 0.2 acres of Plummers Island are within the limits of disturbance. In the early 1900's, WBFC purchased the island for their research station and meeting place and we've studied the entire island, including the riparian margins for 120 years. The plan must truly fully include the island's riparian wetlands in the NEPA, Section 4(f), and Section 106 processes.

#3   On October 1, we asked Mr. Archer of MDOT to set up a meeting with representatives of the National Park Service and Federal Highway Administration, Maryland Historical Trust, Section 106 leaders, and MDOT to address further and mitigate our comment, concerns. However, no date has been set. WBFC members are adamant that the riparian margins of Plummers Island must be included in the protective property and be given full consideration under NEPA and Section 4(f) and Section 106. The SDEIS plan violates the conditions of our agreement with the federal government and the plan disturbance seriously impacts our long-term research goals and the quality of this historic property. WBFC is a stakeholder too. Thank you for this opportunity to comment.

**Response to SDEIS Comment #1**

Despite the extensive avoidance and minimization efforts to NPS properties around the ALB including Plummers Island, impacts to Plummers Island could not be avoided completely, but impacts have been reduced by approximately 1.6 acres. In the DEIS, the Build Alternatives had 1.9 acres of impacts to Plummers Island. Under the Preferred Alternative, the impacts have been reduced to approximately 0.28 acres of impact to Plummers Island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. Impacts to Plummers Island would be required for the ALB substructure, including permanent use for three, discrete, approximately 10-foot diameter pier foundations and temporary, construction activities. Temporary construction activities may include efforts such as excavation, access for demolition of existing bridge foundation and piers, and slope protection. Access to the existing and proposed piers is required for these activities.

No wetlands, as delineated per Section 404 or the National Park Service, will be impacted on Plummers Island by the Preferred Alternative. The impact to the island was determined based on the Ordinary High Water (OHW) Mark. Area within the OHW mark is considered waterway by the US Army Corps of Engineers and permitted as such. Area landward of the OHW mark is considered part of the island. All construction impacts would be contained within the Limits of Disturbance included in the Final Environmental Impact Statement.

We appreciate the ecological importance of Plummers Island and the greater Potomac Gorge, which include rare habitats and rare, threatened, and endangered (RTE) organisms. We recognize the long-term biological studies conducted on and around the island have contributed to the understanding of these important habitats and the wildlife they support and that impacts would not only affect these diverse habitats and wildlife, but would affect a place that is important to many people for recreation. MDOT SHA has limited impact to Plummers Island and the Potomac Gorge to the greatest extent practicable, while maintaining constructability of the project. MDOT SHA conducted a four-season RTE plant survey in 2020 to identify the RTE plant species located within the project area. MDOT SHA is coordinating closely with NPS to develop an ecosystem restoration plan to limit impacts as much as possible and mitigate for impacts that cannot be avoided and will continue to coordinate with the Washington Biologists Field Club to ensure your concerns are heard and responded to.

**Response to SDEIS Comment #2**

The historic property boundary for the Washington Biologists' Field Club was established using the tax parcel boundary, as is standard for MDOT SHA Section 106 survey efforts. In preparing the National Register of Historic Places determination of eligibility documentation, MDOT SHA did not find character-defining features of the historic property that justified a different boundary.

**Response to SDEIS Comment #3**

MDOT SHA held a meeting with the Washington Biologists' Field Club and NPS on November 29, 2021 to discuss Section 106 mitigation of the Washington Biologists' Field Club on Plummers Island historic property.

00022920

OP·LANES™
MARYLAND

I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

**WASHINGTON BIOLOGISTS' FIELD CLUB – ROBERT SORENG**

*This page is intentionally left blank.*

| | |
|---|---|
| **From:** | Robert Soreng <sorengrj@gmail.com> |
| **Sent:** | Tuesday, November 30, 2021 8:41 PM |
| **To:** | SHA OPLANESMLS |
| **Subject:** | SDEIS Comments from WBFC |
| **Attachments:** | WBFC SDEIS comments 30 Nov 2021 1.5.pdf |

Please accept the attached SDEIS comments from WBFC

Respectfully,
Rob Soreng
--
WBFC President

https://wbfc.science/

WBFC SDEIS Comments 30 November 2021

WBFC SDEIS Comments 30 November 2021

Mr. Jeff Folden, I-495 & I-270
P3 Program Deputy Director I-495 & I-270 P3 Office
707 North Calvert Street,
Mail Stop P-60 Baltimore, Maryland, 21202
MLS-NEPA-P3@mdot.maryland.gov

Mr. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza,
Suite 1520 Baltimore, Maryland 21201
jitesh.parikh@dot.gov

**This Authorized Testimony on the I-495 and I-270 P3 Program SDEIS is submitted on behalf of the hundreds of past and present members of the Washington Biologists' Field Club (WBFC).** November 30 2021.

Our website is https://WBFC.science

Dear MDOT Officials:

Thank you for the opportunity to comment on this important issue. WBFC is a Section 106 Consulting Party, and "WBFC on Plummers Island" was determined by MDOT's Section 106, Cultural Resources Team analyses to be eligible for nomination to the National Register of Historical Places. The main contributing features for eligibility were the history of the WBFC and historic research record of 120 years of documenting the ecosystems and biodiversity of Plummers Island. Plummers Island is widely known as "**The most thoroughly studied island in North America.**" We have identified the following flaws in the SDEIS as relates to Plummers Island:

**#1**

- Plummers Island needs to be considered as a whole including its riparian wetlands. Any affects on the Island wetlands and waterways needs to be considered as 4(f) issues in the NEPA process. The SDEIS does not adequately address this, and the Section 106 process considered only the dryland property.

**#2**

- Destruction and disturbance of Chesapeake & Ohio National Historical Park (CONHP) lands and riparian and pond wetlands, including "ca. 0.2" acres (SDEIS calculation) of the 12.2 acre Plummers Island, Montgomery Co., Maryland, is underestimated in the SDEIS and unacceptable. Moreover, we don't believe construction impacts can or will be contained within the SDEIS Limits of Disturbance (LOD) (see map, Appendix 8). The positioning of the

1

**Response to SDEIS Comment #1**

The historic property boundary for the Washington Biologists' Field Club was established using the tax parcel boundary, as is standard for MDOT SHA Section 106 survey efforts. In preparing the National Register of Historic Places determination of eligibility documentation, MDOT SHA did not find character-defining features of the historic property that justified a different boundary.

**Response to SDEIS Comment #2**

Despite the extensive avoidance and minimization efforts to NPS properties around the ALB including Plummers Island, impacts to Plummers Island could not be avoided completely, but impacts have been reduced by approximately 1.6 acres. In the DEIS, the Build Alternatives had 1.9 acres of impacts to Plummers Island. Under the Preferred Alternative, the impacts have been reduced to approximately 0.28 acres of impact at Plummers Island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. Impacts to Plummers Island would be required for the ALB substructure, including permanent use for three, discrete, approximately 10-foot diameter pier foundations and temporary, construction activities. Temporary construction activities may include efforts such as excavation, access for demolition of existing bridge foundation and piers, and slope protection. Access to the existing and proposed piers is required for these activities.

No wetlands, as delineated per Section 404 or the National Park Service, will be impacted on Plummers Island by the Preferred Alternative. The impact to the island was determined based on the Ordinary High Water (OHW) Mark. Area within the OHW mark is considered waterway by the US Army Corps of Engineers and permitted as such. Area landward of the OHW mark is considered part of the island. All construction impacts would be contained within the Limits of Disturbance included in the Final Environmental Impact Statement.

We appreciate the ecological importance of Plummers Island and the greater Potomac Gorge, which include rare habitats and rare, threatened, and endangered (RTE) organisms. We recognize the long-term biological studies conducted on and around the island have contributed to the understanding of these important habitats and the wildlife they support and that impacts would not only affect these diverse habitats and wildlife, but would also affect a place that is important to many people for recreation. MDOT SHA has limited impact to Plummers Island and the Potomac Gorge to the greatest extent practicable, while maintaining constructability of the project. MDOT SHA conducted a four-season RTE plant survey in 2020 to identify the RTE plant species located within the project area. MDOT SHA is coordinating closely with NPS to develop an ecosystem restoration plan to limit impacts as much as possible and mitigate for impacts that cannot be avoided and will continue to coordinate with the Washington Biologists Field Club to ensure your concerns are heard and responded to.

00022922

WBFC SDEIS Comments 30 November 2021

**#2Cont**

LOD on Plummers Island is obscured on the SDIES maps relative to the rocky ridge line protecting the Island from flooding. We can't identify exactly where the critical LOD line runs. Compare maps in Appendices 6, 7 and 8.

- Lack of understanding the impacts of the proposed construction to the value of the extensive of contributions and commitments by WBFC to a 120 year long-term record of historical and ongoing biological research on ecosystems and biodiversity of Plummers Island is evident. Impacts to the many rare plants, animals, habitats, and long-term research plots on the Island have not been adequately considered. This severely impairs the integrity of Plummers Island and our long-term research.

**#3**

- The destruction of the upper end of the misnamed "Rock Run Culvert" (proposed new name Plummers Channel), placement of caissons on the Island, and reshaping of the rocky outcrops flanking the channel on the west end of the Island, for expanding the American Legion Bridge under Alternative 9, seriously affects the Island.

**#4**

- The SDEIS lacks full consideration of flooding impacts of pier, caisson, and trestle emplacements, particularly those that will inevitably result from frequent logjams in the channel.

**#5**

- The SDEIS lacks a plans for diverting and treating ALB runoff including road salts, oil, antifreeze, and further toxic by-products from these, or from spills resulting from accidents. (Currently these drain onto NPS land and into the Channel from the lowest point on the ALB.) The SDEIS lacks plans for mud, dust, and debris resulting from construction and demolition of the current ALB, which will fill the channel and drift and fall over and impact the land environment of Plummers Island.

**#6**

- The SDEIS lacks plans for noise reduction from the expanded bridge overhanging Plummers Island and its expanded traffic. The noise is a serious threat to animal communications.

**#7**

- The SDEIS lacks alternatives to placing the proposed bike and pedestrian lane to overhang Plummers Island.

**#8**

- The SDEIS lacks consideration of the impact of the Covid-19 epidemic on present and future transportation loads and patterns (many folks are teleworking, attending virtual meetings and appointments, and shopping online). With peak traffic flows down due to changed behavior patterns resulting from Covid-19, toll lanes will be unlikely to provide revenue streams of sufficient reward to P3 contractors, likely leaving taxpayers on the hook for billions of dollars.

**#9**

- The SDEIS lacks smart-growth forward-thinking on Climate Change (only more cars, more low occupancy vehicle traffic) remains a problem in the SDEIS. MDOT has declined to study,

2

**Response to SDEIS Comment #3**
The oxbow of the Potomac River around Plummers Island would not be impacted by the Preferred Alternative. Bridge piers will not be placed in the oxbow and the bridge will span the oxbow to limit disruption to the waterway. The rocky outcrops flanking the channel will not be significantly reshaped, however bridge pier supports will need to be located on the rocky outcrop. The bridge pier support is anticipated to be a drilled shaft, which would limit the impact to the existing land form.

**Response to SDEIS Comment #4**
Full hydrologic and hydraulic analysis will be completed in final design to ensure that the implications of bridge construction on potential flooding are fully considered for both the oxbow of the Potomac River around Plummers Island and the Potomac River itself.

**Response to SDEIS Comment #5**
Water quality treatment for the ALB is not feasible since NPS has indicated that they will not accept any SWM on their land and all the land surrounding the ALB is owned by NPS. Some alternative practices exist that may be feasible to provide some level of pretreatment of the bridge or approaches that may be incorporated into the drainage design. These practices are not approved to provide water quality credit in Maryland and may prove to be infeasible given the various site constraints during final design. However, MDOT SHA will consider use of these alternative practices on or around the ALB area within MDOT SHA ROW.

**Response to SDEIS Comment #6**
While there have been many published studies discussing the effect of noise on wildlife, there is not an approved methodology for defining noise impacts to wildlife and evaluating the effectiveness of abatement. The analysis of noise impacts and abatement for this project was completed in compliance with FHWA regulations (23 CFR 772), which are written to protect the human environment. Humans as a species are perceptible to a specific range of sound frequencies; the noise levels used in our analysis are weighted to reflect this.

**Response to SDEIS Comment #7**
The shared use path is part of the new ALB. The shared use path is supported by both state Governor's and has a large amount of support from the public.

**Response to SDEIS Comment #8**
Refer to Chapter 9, Section 3.1 for a response on Purpose and Need, effects of the Pandemic, and impacts of teleworking/remote working.

**Response to SDEIS Comment #9**
Refer to Chapter 9, Section 3.4.G for a response to climate change considerations.

**#9 Cont**

WBFC SDEIS Comments 30 November 2021

delayed, or hidden from state official's requests, recalculations of projected traffic reductions due to Covid-19 impacts on commuters and P3 revenues.

**#10**

- The SDEIS lacks consideration Build options with well-connected mass transportation options (trains, light rail, monorail, etc.), including on the American Legion Bridge. The P3 selected Alternative 9 is the worst option in this regard.

**#11**

- Massive construction costs, with near certain cost overruns will be passed on to taxpayers. Regarding Washington Suburban Sanitary Commission (WSSC) expenditures, estimated to be $2 billion, it is obvious ratepayers and taxpayers will be responsible for this cost.

**#12**

- Toll lanes within Maryland could cost as much as $50 in peak traffic hours, *just to get to or return from Virginia toll lanes*, on I-495-270, which would provide little if any benefit to the average local commuter. These rates are expected to go up yearly with inflation, and compensation to the P3s as they deem it needed.

**#13**

- P3 revenues will mostly go to overseas and out-of-state conglomerates, with limited contributions to needed infrastructure returned to Maryland (if MD gets anything). With the new 2021 Federal infrastructure bill signed into law, the alternative of paying for the project without using P3 partners should be fully considered. P3 control of the project represents unacceptable legal power in corporate hands to curtail future mass-transit developments on the beltway and connecting highways.

**#14**

- Massive traffic congestion and delays are inevitable during the construction period lasting 5-10 years, after which the traffic flow is projected to be just as congested 10 years later-on due to the encouragement of more cars to be on the road, also known as induced demand.

**#15**

- Because the SDEIS's engineering analyses for Alternative 9 are still incomplete, it is impossible for the concerned Agencies, Consulting Parties, and the public to fully comment on, the full scope of the proposed project's impacts at this time. We respectfully request that MDOT prepare a revised SDEIS to provide all of us the ability to meaningfully review and comment on the impacts before a final EIS is produced.

**#16**

**Alternative placements and designs of the American Legion Bridge (ALB) were summarily rejected by MDOT and P3 stakeholders in favor of Alternative 9.**

- By MDOTs own analysis (stated as recently as this year by Secretary Slater) the ALB is structurally sound and only required redecking in 10 to 20 years.

- According to the unredacted copy of the MDOT 2005 plan for expanding I-495, only one extra lane in either direction was needed to relieve traffic congestion. And even that plan was

3

---

See response to Comment #9 above.

**Response to SDEIS Comment #10**
Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

**Response to SDEIS Comment #11**
Refer to Chapter 9, Section 3.4.M for a response to impacts to utilities and associated cost of repairs.

Refer to Chapter 9, Section 3.5 for a response to the P3 Program or Board of Public Works and Project Costs.

**Response to SDEIS Comment #12**
Refer to Chapter 9, Section 3.6.A for a response on opposition to managed lanes or tolling public roads.

Refer to Chapter 9, Section 3.6.B for a response to toll rate ranges and toll rate setting process.

**Response to SDEIS Comment #13**
Refer to Chapter 9, Section 3.5 for a response to the P3 Program or Board of Public Works and Project Costs.

**Response to SDEIS Comment #14**
Refer to Chapter 9, Section 3.4.I for a response to construction impacts.

**Response to SDEIS Comment #15**
Refer to Chapter 9, Section 3.4 for a response on the NEPA approach, analysis and impacts.

**Response to SDEIS Comment #16**
Based on our biennial bridge inspection findings and experience on similar heavily-traveled steel superstructure bridges, MDOT SHA estimates that the current lifespan of the superstructure and substructure of the existing ALB are 10-15 years before they would deteriorate to poor condition needing replacement.

This assumes that additional repairs and preservation activities are not undertaken during that time. Even with repairs and preservation activities, such as a deck replacement, cleaning, painting, and steel repairs to the superstructure, and concrete repairs to the substructure units, this 59-year-old bridge would require considerable capital investment to maintain it in a state of good repair. In determining the need to replace a structure, we consider the cost to maintain and rehabilitate all three elements (deck, superstructure and substructure), the functional needs of the bridge, and the disruption to traffic during construction.

WBFC SDEIS Comments 30 November 2021

dropped due to concerns over environmental damage and proximity to parks, neighborhoods, cemeteries, and facilities.

**#17**
- The full accounting for reasoning for acceptance of Alternative 9 has not been presented to the public. It is evident that P3 stakeholders and Governor Hogan decided on this outcome before the DEIS was published in 2020, for their own convenience, revenue stream desires, lowest construction costs, and political posturing, thus, overruling all environmental concerns, destruction of properties, actual transportation needs (then projected, or subsequently needing adjustment for Covid-19 impacts), and any of the dozen other alternatives proposed in the DEIS.

**#18**
- Much more information has come to MDOT on the impacts to Plummers Island since that backroom decision for Alternative 9 was made and the DEIS was published. WBFC presented formal public written and virtual comments to MDOT on the DEIS (Appendix 9) and Section 106 documents (Appendices 2 to 7), documenting the Club's long history and extensive research on Plummers Island ecosystems and biodiversity, and threats to the Island. WBFC has held three meetings with MDOT-SHA in the winter and fall of 2021 to voice our concerns about impacts to Plummers Island ecosystems, biological diversity, and our long-term research program. Although some modifications resulted, WBFC still has major concerns (Appendices 1 to 8).

**#19**
- To avoid, minimize or reduce impacts to the Chesapeake and Ohio Canal National Historical Park and Plummers Island MDOT could have chosen to only redeck the ALB, or to build a narrow double decker bridge or a suspension bridge instead of expanding the current bridge over Plummers Island on the east side and a newly discovered archaeological site on the west side.

- We respectfully ask that agencies consider other options to the ALB portion of this project to avoid impacts to Plummers Island and the surrounding National Historical Park area.

WBFC continues to support the NO Build Option.


Robert Soreng, WBFC President

Carla?

Lowell?


**Appendices**

4

**Response to SDEIS Comment #17**
Refer to Chapter 3 and Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

**Response to SDEIS Comment #18**
MDOT SHA acknowledges receipt of the WBFC DEIS Comment Letter dated November 6, 2020 that was appended to this SDEIS Comment Letter. Refer to Appendix T for a response to this DEIS Comment Letter.

**Response to SDEIS Comment #19**
During the NEPA Study, options for rehabilitating or replacing the ALB were considered including double decking the existing bridge or constructing a new double decker bridge.

Construction of a second deck over the existing structure is infeasible. The existing bridge piers cannot accommodate the load from a second deck. A new second deck structure would have to include structure elements that would completely span across the existing bridge width and new large piers and foundations that would support the new structure. These new piers would include substantial impact in the Potomac River and both shorelines, including on Plummer's Island, outside of the existing bridge footprint. MDOT must maintain traffic on the existing American Legion Bridge, and this would not be possible if a new deck were to be constructed over the existing bridge.

A new double-deck bridge replacing the existing bridge would have to be built off alignment since the structural design for such a bridge would have to be constructed completely separate from any demolition of the existing bridge. Either an upstream or downstream alignment would have considerable impacts along the Potomac River, both shorelines to accommodate the new alignment, and impacts to the George Washington Memorial Parkway and Clara Barton Parkway interchanges. In addition, a double-deck bridge would require substantial area on each shoreline to accommodate bifurcating the two directions of I-495 and ramping one direction to be above the other. Similar impacts and challenges would be associated with other major bridge designs, such as a suspension or cable-stayed bridge.

As noted in the SDEIS, Section 4.4 and in the FEIS, Section 5.4, the ALB Strike Team considered a "west shift" of the LOD to entirely avoid impacts to Plummers Island and determined that a conventional construction approach with a west shift was also a viable option. However, MDOT SHA compared the NPS land impacts and those of the natural and cultural resources surrounding the ALB and determined that the on-center alignment would impact the least amount of total NPS Land; would not require re-configuration of the Clara Barton Parkway interchange; and would not require residential displacement, as the west shift alignment would. For these reasons, the on-center alignment with the reduced LOD required by the Base Option or Cast-In-Place Segmental bridge types was incorporated into the Preferred Alternative LOD.

OP·LANES
MARYLAND · I-495 & I-270 Managed Lanes Study | Case 8:22-cv-02597-DKC    Document 62-4    Filed 10/30/23    Page 82 of 100

FINAL ENVIRONMENTAL IMPACT STATEMENT

WBFC SDEIS Comments 30 November 2021

Appendix 1. Threats to Plummers Island, March 2021. https://wbfc.science/wp-content/uploads/2021/02/Threats-to-Plummers-Island-4.6.pdf

**#20**

WBFC comments on ALB construction and expansion impacts to Plummers Island Threats to Plummers Island from American Legion Bridge construction and expansion 1) Damage to waterways: a) Potomac River shore: mud flats and sandbars are wetland features in the MDOT recalibrated (post the DEIS comments) Zone of Destruction. b) we don't know what the new and reconstructed bridge piers will do to flow along the river or channel, particularly if the point of rocks and Rock of Gibraltar (at the upper tip of the Island) are destroyed or significantly altered. Sand bars and mud flat habitats could be substantially reduced for plants and animals that depend on these. c) the Island Channel (AKA "Rock Run Culvert"). The head of the channel down to the dog leg would not see daylight for years of construction. After which this part of the Channel would be overshadowed by the 2 added lanes on the Island side of the Bridge. What are the consequences to waterways there and downstream? d) with the Channel covered by planking for the construction platform, high and mid-level floods will be redirected over those onto the Island flood plain, potentially adversely affecting much of that flood plain. e) if sub-point d happens, all research plots in the flood plain could be substantially altered, (including vegetation plots 1, 3, 9, 10, 11, 12, and habitats for plants and animals) f) the "frog water" pools at the head of the island noted in the DEIS and circumscribed in subsequent documents are highly vulnerable to disturbance (vegetation plot 3 is in this zone). g) Zone of potential effects/disturbance uncertain, but estimated by DEIS to be 2/5 of the Island. What is the MDOT plan for protecting this zone? h) Amphibians are in global and local decline due to pollution, diseases, ozone, and habitat destruction. Eleven species of amphibians are known from Plummers Island (Manville 1968 and https://collections.nmnh.si.edu/search/herps/): Acris crepitans, northern cricket frog; Hyla versicolor, eastern gray treefrog; Lithobates clamitans, green tree frog; Lithobates palustris, pickerel frog; Lithobates sylvaticus, wood frog; Pseudacris crucifer, spring peeper; Pseudacris feriarum, upland chorus frog; Ambystoma maculatum, spotted salamander; Eurycea longicauda longicauda, long-tailed salamander; Hemidactylium scutatum, four-toed salamander; Notophthalmus viridescens, eastern

**#21**

newt; Pseudotriton ruber, northern red salamander. 2) Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of the Island within the Zone of Destruction: a) Hibiscus laevis (mud flats just below and above point of rocks) b) Solidago racemosa (point of rocks, below Rock of Gibraltar) c) Hypericum prolificum (point of rocks, below Rock of Gibraltar) d) Paspalum fluitans (mud flats just below and above point of rocks) WBFC comments on ALB construction and expansion impacts to Plummers Island e) other native plants rare on the island occurring only on west end in Zone of Destruction: e.g., Sedum ternatum. (on Rock of Gibraltar) f) Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus Herbaceous Vegetation (USNVC: CEGL006483). Non-tidal mudflats. Global/State Ranks: G3/SNR (Simmons et al. 2016) g) Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (Hypericum prolificum, Eubotrys racemosa) / Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia Herbaceous Vegetation (USNVC: CEGL006491). Global/State

**#22**
**#23**

Ranks: G2/S1. 3) Destruction of WBFC research plots: a) Vegetation research plots from 1997 and 2013-2015 will be destroyed (plots 4, 5, on the sandbar at the head of the Island will be totally destroyed [see also 1) e)], A historic National Park Service vegetation plot on the Potomac River sandbar could be destroyed. 4) Destruction of past collection sites: a) many plants and animals were vouchered or recorded from the west end of the Island, some are only known on the Island from these. 5) Habitat destruction and disturbance lead to more invasive

**#24**

organisms: a) the west end of the Island is covered in a tangle of oriental bittersweet (first vouchered in 1982), and shrubs of amur honeysuckle (first vouchered in 1997), among many other invasive plants recorded there. Invasive species establishment and expansion will be sorely exacerbated by disturbance involved the

5

---

**Response to SDEIS Comment #20**

While there will be shading to the head of the oxbow of the Potomac River around Plummers Island from construction, trestles will be constructed over the channel so that the flow will not be affected. The trestles will be constructed so as not to increase flood flow onto the Potomac River floodplain. However, this floodplain functions to dissipate floodwaters from this large river on a regular basis, and alteration of the floodplain is part of the river's flood cycle. Detailed hydrology and hydraulics analysis will be completed for this oxbow channel and for the Potomac River prior to construction to ensure that the pier design does not negatively impact flow. MDOT SHA has limited impact to Plummers Island to the greatest extent practicable. The vernal pool, "frog water," on Plummers Island has been avoided and will not be affected by the Preferred Alternative. Protective silt fencing would be placed prior to construction to ensure that impacts do not extend beyond the LOD.

**Response to SDEIS Comment #21**

MDOT SHA conducted a four-season RTE plant survey in 2020 to identify the RTE plant species located within the LOD. MDOT SHA is coordinating closely with NPS to develop an ecosystem restoration plan to limit impacts as much as possible and mitigate for impacts that cannot be avoided. One component of the ecosystem restoration plan includes collection of seeds from seed-dispersed rare plant species prior to construction and propagation in a plant nursery followed by replanting post-construction. Similarly, threatened individual plant species that cannot be propagated by seed will be collected, propagated, and replanted.

**Response to SDEIS Comment #22**

MDOT SHA has limited impact to Plummers Island to the greatest extent practicable to limit impacts to the important long-term research plots located there. Unfortunately, there are a couple of research plots that would be affected by construction and shading of the replacement bridge and could not be avoided. MDOT SHA would like to work with WBFC to ensure that the disturbance results in the least impact to long-term studies.

**Response to SDEIS Comment #23**

MDOT SHA has limited impact to Plummers Island to the greatest extent practicable to limit impacts to past research plots and collection sites. There is no alternative to replacing the American Legion Bridge and unfortunately it passes through an important ecological area.

**Response to SDEIS Comment #24**

Invasive species do often establish in disturbed areas. The ecosystem restoration plan developed to mitigate for impacts will include a plan to control invasive species and will replant disturbed areas with native plant species to limit the opportunity for non-native colonization.

OP·LANES
MARYLAND
I-495 & I-270 Managed Lanes Study | Case 8:22-cv-02597-DKC     Document 62-4     Filed 10/30/23     Page 83 of 100

FINAL ENVIRONMENTAL IMPACT STATEMENT

**#25**

WBFC SDEIS Comments 30 November 2021

construction process. 6) Potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction blow out. Construction timbers potentially could rip out acres of trees and other vegetation in the island flood plain. Note 1: 51 out of the 100 recorded historic Potomac River floods (over 9.4 ft at Little Falls Gauge, NOAA data) were recorded since the first bridge was built in 1962, 33 since the midsection of the bridge was filled in 1992, 1996 included two of the top 7 floods, and 2018 included 4 historic floods. In 2019 the island flood plain was inundated on and off for much of winter and spring. Note 2: Mather Gorge (Cohn 2004) is much narrower at the ALB and Plummers Island than at Little Falls Gauge, so the highwater marks listed below substantially underestimate the peak flows at the bridge and head of Island. rank height ft date 5 19.29 ft 1/21/1996 7 17.84 ft 9/8/1996 31 12.82 ft 3/15/2010 36 12.38 ft 6/5/2018 37 12.35 ft 3/6/1993 46 11.7 ft 5/18/2014 47 11.68 ft 4/18/2011 50 11.56 ft 12/17/2018 54 11.44 ft 9/21/2003 58 11.3 ft 5/20/2011 61 11.17 ft 1/27/2010 65 11.11 ft 9/29/2018 66 10.88 ft 3/12/2011 67 10.87 ft 12/12/2003 68 10.85 ft 9/11/2018 70 10.79 ft 3/22/1998 77 10.55 ft 4/18/1993 WBFC comments on ALB construction and expansion impacts to Plummers Island 81 10.43 ft 1/10/1998 10.37 ft 3/30/1994 86 10.33 ft 10/31/2012 87 10.28 ft 3/30/2005 90 10.16 ft 3/25/1993 92 10.13 ft 1/29/1993 95 10.09 ft 11/29/1993 96 10.06 ft 5/13/2008 97 9.97 ft 9/23/2003 98 9.78 ft 9/9/2011 99 9.67 ft 5/6/2009 100 9.43 ft 4/17/2007 7) Sound from bridge construction and closer proximity of traffic in 2 new bridge lanes after they open on the bridge: a) The noise factor cannot be ignored by humans or wildlife. Already the sound of traffic is disturbing to human conversation at our meeting

**#26**

place the WBFC Cabin grounds. 8) Salt and oil runoff impacts on biota from the bridge: a) This depends on where the outflow is drained from the bridge drainage scuppers b) The unintended consequences of that volume of road salts on freshwater ecosystems can be severe. A colleague is working on this very subject on area

**#27**

highways, and the impacts he found were surprisingly devastating. One of the worst impacts was mobilizing (and making bioavailable) toxic metals in waterways. 10) Violation of long-term continuity of 120 years of research

**#28**

(Perry 2007; Shetler et al. 2006): a) lichen study on Plummers Island validated essentiality of long-term research contributing to National and global removal of Lead from gasoline: A drop from 70 species to 20 species due to sensitivity to Lead pollution on the island (Lawrey & Hale 1979). b) the decline of forest breeding birds on Plummers Island is related to the Bridge (Johnston & Winings 1987). c) Insects, like other organisms, are experiencing major declines globally (Borenstein 2018; Hallman et al. 2017; Jarvis 2018; Vogel 2017). Giant silk moths (Saturniidae) include Imperial, Cercropia, Luna, Polyphemus, Royal Walnut, Rosy maple etc. In New England, most of these are state endangered species because they have been hammered by an introduced biocontrol agent -- a non-native tachinid fly, Compsilura concinna, which was introduced to try and control gypsy moths in Massachusetts. That fly has wreaked havoc in New England because it is a generalist and the Saturniids have been heavily impacted. This pest has arrived in DC and vicinity but impacts here are not yet known (John Lil pers. comm. 2020). Thanks to the long history of research on insects of Plummers Island (more than 3000 species documented there; Brown & Bahr 2008a,b), the island is a key place to further document this aspect of "insect apocalypse" (Jarvis 2018) assuming the island remains intact. Erwin (1981) and Brown (2001) have documented long-term trends in beetles and moths, respectively, with shifts in species composition related mainly to vegetation succession. The ALB project puts WBFC Plummers Island research on trends in biodiversity in jeopardy. WBFC comments on ALB construction and expansion impacts to Plummers Island d) bellwether issues of plagues, invasions and expansion of exotic species are expected to be exacerbated due to disturbance from construction -- some examples of timing of introductions spread, and manifestations of infestations of plants animals, and diseases from around the region are recorded from Plummers Island (plant records from Shetler et al. 2006, WBFC Invasive Biota Committee reports 2015-2020), and https://collections.nmnh.si.edu/search/botany/) i) arrival and expansion of garlic mustard (1915), now rampant ii) arrival and expansion of tree of heaven (or hell) (1933), now 50+ trees iii) arrival and expansion of Japanese honeysuckle (1949), now dominant iv) arrival and expansion of Japanese stilt grass (1979), now locally dominant v) arrival and expansion of oriental bittersweet (1982), now all over and covering trees vi) arrival and expansion

6

**Response to SDEIS Comment #25**

MDOT SHA recognizes the dynamic flood regime of the Potomac River and understands the concerns associated with large storms during construction. To minimize this risk, trestles and temporary construction platforms will be built to withstand the 100-year storm to ensure that construction materials do not blow out during storm events. Full hydrologic and hydraulic analysis will be completed in final design to ensure that the implications of bridge construction on potential flooding are fully considered for both the oxbow of the Potomac River around Plummers Island and the Potomac River itself.

**Response to SDEIS Comment #26**

In earlier coordination, NPS requested that no noise barriers be constructed within NPS-managed land due to Section 4(f) concerns.

**Response to SDEIS Comment #27**

Water quality treatment for the ALB is not feasible since NPS has indicated that they will not accept any SWM on their land and all the land surrounding the ALB is owned by NPS. Some alternative practices exist that may be feasible to provide some level of pretreatment of the bridge or approaches that may be incorporated into the drainage design. These practices are not approved to provide water quality credit in Maryland and may prove to be infeasible given the various site constraints during final design. However, MDOT SHA will consider use of these alternative practices on or around the ALB area within MDOT SHA ROW.

**Response to SDEIS Comment #28**

We understand that the long-term biological studies conducted on and around Plummers Island have contributed and continue to contribute to the understanding of a myriad of plant and animal species, trends in biodiversity, and effects of climate change, as well as many other important research contributions. MDOT SHA has limited impact to Plummers Island and the Potomac Gorge to the greatest extent practicable, while maintaining constructability of the project. The American Legion Bridge requires replacement, and it is unfortunate that it crosses important ecological areas that support long-term research. MDOT SHA is coordinating closely with NPS to develop an ecosystem restoration plan to limit impacts as much as possible and mitigate for impacts that cannot be avoided.

**OP · LANES**
MARYLAND
I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

#28 Cont

WBFC SDEIS Comments 30 November 2021

of amur honeysuckle (1997), now dominant on west end vii) arrival and expansion of winter creeper (1997), now patchily established but potentially widespread viii) arrival and expansion of ivy (ca 2015), now patchily established but potentially widespread ix) Emerald Ash Borer (EAB) arrival and expansion in 2015 and death of almost all ash trees (2016), mass die off of ash trees, a major shift in forest climax community (Simmons et al. 2016) x) fig buttercup arrival and expansion and expansion (3 plants 2017, 50 plants in 2019, 160 plants 2020), expanding exponentially xi) arrival and expansion of European and Asian earthworms, which rapidly consume forest detritus and restructure soils, upending soil ecological processes and networks of indigenous species adapted to them, favoring colonization and replacement by invasive species, https://en.wikipedia.org/wiki/Invasive_earthworms_of_North_America xii) arrival and expansion of Asian clams (Corbicula fluminea), shells now abundant in sandy soils across the island (arrived in Ohio River Valley ca 1959, established in the Potomac River by 1982) xiii) Chestnut blight, was discovered in the USA in New York in 1904, arrived in Maryland by 1906, Chestnuts were historically on Plummers Island adjacent mainland, last documented in 1934, but considered extinct there by 1935. This once dominant species of the eastern deciduous forest was mostly wiped out within 50 years. xiv) Beech blight. Popkin (2019) documents a deadly beech disease is spreading in the northeast USA. There is a mature beech forest on the mainland side of Plummers Island, near Lock 12. We will be watching for the blight here, unless the forest is cut down for the Bridge construction. WBFC comments on ALB construction and expansion impacts to Plummers Island c) Following climate change impacts to the ecosystems on Plummers Island will be conflated with issues involved with disturbance from bridge construction and emplacements. References Borenstein, S. 2018. 'Windshield test' highlights big drop in flying bugs. The Washington Post -HEALTH & SCIENCE (2018-09-25). Brown, J. W. 2001. Species turnover in the Leafrollers (Lepidoptera: Tortricicae) of Plummers Island, Maryland: Assessing a century of inventory data. Proceedings of the Etnomolgical Society of Washington 103(3): 673-685. https://www.biodiversitylibrary.org/bibliography/2510 Brown, J. W., & S. M. Bahr II. 2008a. The Insect (Insecta) Fauna of Plummers Island, Maryland: Brief Collecting History and Status of the Inventory. Bulletin of the Biological Society of Washington 15: 54-64. http://dx.doi.org/10.2988/0097-0298{2008}15[54:TIIFOP]2.0.CO;2 Brown, J. W., & S. M. Bahr II. 2008b. Appendix List of the Invertebrates of Plummers Island, Maryland. Bulletin of the Biological Society of Washington 15: 192-226 http://dx.doi.org/10.2988/0097-0298{2008}15[192:ALOTIO]2.0.CO;2 Brown, J. W., Epstein, M., Vann, K., Watkins, R., Bahr, S. M., Kolski, E. 2008. An overview of the Lepidoptera (Insecta) of Plummers Island, Maryland. Bulletin of the Biological Society of Washington 15: 65–74. Cohn, J.P. 2004. The Wildest Urban River: Potomac River Gorge. BioScience, Volume 54(1): 8–14, https://doi.org/10.1641/0006-3568{2004}054[0008:TWURPR]2.0.CO;2 Erwin, T. L. 1981. Natural History of Plummers Island, Maryland. XXVI. The ground beetles of a temprate forest site (Coleoptera: Carabidae): an analysis of fauna in relation to size, habitat selection, vagility, seasonality, and extinction. Bulletin of the Biological Society of Washington 5: 105-224. Hallmann, C. A., Sorg, M., Jongejans, E., Siepel, H., Hofland, N., Schwan, H., et al. 2017. More than 75 percent decline over 27 years in total flying insect biomass in protected areas. PLoS ONE 12 (10): e0185809. https://doi.org/10.1371/journal. pone.0185809 Jarvis, B. 2018. The insect apocalypse is here: What does it mean for the rest of life on Earth? The New York Times Magazine, 27 November 2018, pp. 41–48. Johnston, W. H. & D.L. Winings. 1987. Natural History of Plummers Island, Maryland XXVII. The decline of forest breeding birds on Plummers Island, Maryland, and vicinity, by David W. Johnston and Daniel L. Winings. Proceedings of the Biological Society of Washington 100:762- 768. (December 31, 1987). Lawrey, J. D., M. E. Hale Jr. 1979. Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution. Science Vol. 204, Issue 4391, pp. 423-424 https://dx.doi.org/10.1126/science.204.4391.423 Manville, R. H. 1968. Natural History of Plummers Island, Maryland XX. Annotated list of the vertebrates, by Richard H. Manville, except birds by Alexander Wetmore and Manville. Special Publication, Washington Biologists' Field Club, pp. 1-44. (January 1968.) WBFC comments on ALB construction and expansion impacts to Plummers Island Perry, M. C. (ed.) 2007. THE WASHINGTON BIOLOGISTS' FIELD CLUB: ITS MEMBERS AND ITS HISTORY (1900-2006). The

7

*This page is intentionally left blank.*

WBFC SDEIS Comments 30 November 2021

Washington Biologists' Field Club, printed by The Maple Press Company, York Pennsylvania. Pdf available under the About dropdown as WBFC Book at https://WBFC.science/wp-content/uploads/2019/09/wbfc_booksm.pdf Popkin, G. 2019. A mysterious disease is striking American beech trees. Science Nov 14 2019 https://dx.doi.org/10.1126/science.aba2201 Shetler, S. G., S. S. Orli, E. F. Wells & M. Beyersdorfer. 2006 CHECKLIST OF THE VASCULAR PLANTS OF PLUMMERS ISLAND, MARYLAND. Bulletin of the Biological Society of Washington, 14(1): 1-57 https://wbfc.science/wp-content/uploads/2020/07/Checklist_Vasc_Plants_Plummers.pdf Simmons, R.H, Fleming A.H., Soreng R.J. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Appendix 6, pdf. available at https://WBFC.science/wpcontent/uploads/2019/09/plummer_island_nc_map_v1.3.pdf Simmons R.H., Soreng R.J., Barrows E.M., Emmons L.H. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County. Maryland. Report prepared for the National Parks Conservation Association, July 2020. Appendix 5, pdf. available at https://WBFC.science Vogel, G. 2017. 'Where have all the insects gone' Science 2 May 2017, Vol. 356, Issue 6338, pp. 576-579 https://science.sciencemag.org/content/356/6338/576.full

Appendix 2. Section 106 comments, 8 October 2021.

1 Washington Biologists' Field Club October 8, 2021 Dear Mr. Archer, We are writing you on behalf of the Washington Biologists' Field Club with regard to Plummers Island1 and its associated channel and wetlands in response to the MDOT-SHA Section 106 letter of September 8, 2021 and including the email message from Mr. Archer entitled "1-495 and I-270 MLS Section 106 Materials, Comments Requested by October 8" and associated linked documents and attachments. We frame our comments within the historical context of impacts to the long-term value of scientific research on Plummers Island and the biodiversity we have discovered there, and the quality of experience of the island, which are implicitly protected by recommendations for historical preservation of the place for future generations. We remain highly concerned about the proposed I-495/I-270 and American Legion Bridge toll lane widening project and the significant, probable threats from bridge construction, operation, and maintenance to Plummers Island and its historic character, including its biota, and the century of intensive research activities that have taken place on the island. Since last writing and in line with our requests from April 2021, the Washington Biologists' Field Club (WBFC) has been added as a Section 106 consulting party, been recognized as a site of historic significance with National Register of Historic Places (NRHP) eligibility independent of the C & O Canal National Historical Park. Some of the project's adverse effects on the WBFC have also been recognized. These steps are important but do not go nearly far enough to protect Plummers Island, which the Federal Government agreed in 1959 to protect in perpetuity as a site for long-term scientific research so long as the WBFC still exists as an incorporated entity. In order to ensure that the proposed project's impacts on Plummers Island receive adequate attention and consideration, we have several concerns and requests which will be detailed in the remainder of this comment letter. As a reminder, Plummers Island is a small federally-owned island immediately downriver of the American Legion Bridge with unique historical, biological, and research value. Plummers Island is NRHP eligible "under Criterion A for its association with contributions to science and conservation as the site of long-term scientific studies conducted by the club and as the meeting place for the club's collective membership of influential and accomplished scientists." The long-term, ongoing research value of Plummers Island is part of its NRHP eligibility. The I-495/I-270 project, which aims to nearly double the size of the American Legion Bridge, would have many adverse effects to the island's historic features and significance as a research site including: 1 Montgomery County, Maryland, Potomac River, adjacent to the American Legion Bridge 2 1. Damage to waterways 2. Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of the island within the Zone of Destruction 3. Destruction of WBFC research plots 4. Destruction of past collection sites 5. Habitat destruction

8

**Response to SDEIS Comment #29**

MDOT SHA has been consulting with the Washington Biologists Field Club and Maryland Historical Trust through the Section 106 process. MDOT SHA found the WBFC on Plummers Island to be eligible for the National Register of Historic Places, has found an adverse effect to the property, and is identifying mitigation through the Programmatic Agreement.

MSOT SHA responded to your Section 106 comments through the Section 106 process and development of the draft Programmatic Agreement which was shared with representatives of the WBFC on January 4th as a consulting party.

See previous pages for responses to other comments outside the Section 106 process that were raised.

#29

WBFC SDEIS Comments 30 November 2021

**#29 Cont**

and disturbance lead to more invasive organisms 6. Potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction blow out 7. Sound from bridge construction and closer proximity of traffic in 2 new bridge lanes after they open on the bridge 8. Impacts on biota from salt, oil and other toxic runoff from the new bridge 9. Violation of long-term continuity of 120 years of research. Plummers Island must be fully protected from the MDOT plan to expand the American Legion Bridge. The taking of Plummers Island lands by this project as well as the destructive proximity impacts are a violation of the agreement with the Federal Government signed in 1959 to protect the Island in perpetuity so long as the WBFC still existed as an incorporated entity. The damage proposed for the Island violates the very principal upon which the Federal Government signed the agreement with WBFC, that the value of the property was the historic nature of the long-term research on the biodiversity of the Island, which at that time exceeded 58 years with long-term goals. Now that research has extended to 120 years. Yet, it appears that the most damaging project alternative has been selected and the necessary mitigations we discussed earlier in the year were ignored.2 Plummers Island, far from being protected, will have most of the new bridge overhang, casting its rare, endangered, and threatened biota in shadow and increasing impacts of noise, runoff, and more. There is clearly a disconnect that the very process affirming that major historical and scientific research significance of the island. The plan seems to ignore the results of its own process, and the revised plan egregiously violates the historic and research integrity of the very property it is responsible for protecting. 1) Regarding the NRHP eligibility, we have the following requests: • The NRHP determination narrative should better contextualize Plummers Island in its unique location as highlighted below. Plummers Island is located within the Potomac Gorge, which itself has unique and important features. This publication offers a suitable kind of description: "The 9,700-acre (3925.5 ha) Potomac Gorge project area (see map on inside front cover) is the 15-mile (21.4 km) river corridor from Great Falls to the Key Bridge, including parts of Maryland, Virginia, and the District of Columbia. It is in the midst of a major metropolitan region inhabited by over 4.5 million people (see Cohen, 2005). The Potomac Gorge is widely recognized as one of the most biologically rich areas in the eastern United States, with more than 400 known occurrences of 200 state or globally rare plant 2 See Appendix B for more on our interactions with the MDOT Strike Team. (M: 12-46-2): 3 and animal species, and ten globally rare plant communities. The Gorge's unusual concentration of species diversity and rarity is the direct result of its unique hydrology, geology, and geomorphology. This wild and free-flowing section of the Potomac River is one of the most intact eastern Fall Zone river systems with an abundance of parkland not subject to the environmental pressures of residential or commercial development." • The NRHP determination narrative should recognize that the research sites within the WBFC are important contributing features. Specifically, Plummers Island has had national and international significance and species not only rare but new to science continue to be found and studied there, as recently as 2014 (Stálvecz et al, 2014). It is worth recalling that the 1959 agreement between WBFC and the Federal Government states: • The said Plummers Island has become among systematic biologists one of the world's most famous collecting spots and type localities, and • The discoveries have indicated the probability of new knowledge in the field of biology and natural history, and • The fame of this island is world-wide and many scientific organizations are interested in its preservation as a source of discovery, and • The Washington Biologists' Field Club, Inc. and the United States Government desire to preserve this natural wild area as a sanctuary and scientific research preserve. • Correct inaccurate and misleading use of language related to Rock Run. The Dovetail CRG report on the Maryland Historical Trust Determination of Eligibility Form continues the unprofessional practice of calling the channel separating Plummers Island from the mainland "Rock Run Culvert" (p. 1). This is an inaccurate and misleading name, mentioned in the DEIS, as the channel is neither a culvert nor is it any part of Rock Run (a nearby drainage with an outlet into the Potomac River about 1,000 ft. downstream from Plummers Island, and with its own real culvert passing under the C&O towpath just below Lock 11). The channel is a historical natural side stream of the Potomac River that prehistorically was more of a major river channel. When WBFC members reported this inaccurate name to the

9

See response above for SDEIS Comment #29.

WBFC SDEIS Comments 30 November 2021

**#29 Cont**

USGS and Board of Geographical Names, they fully agreed, and the name was removed from their listings (on or before 23 April 2021).The channel head has been displaced downstream about 40 feet (Soreng's estimate from a detailed 1950s topographical survey map and other observations), by ALB pier emplacements of 1960 and early 1990s, but the rest of the channel remains in its historical position from about 15 to 30 feet below the current channel head. 2) We request that the understanding of the historic boundaries of Plummers Island be updated in all documentation pertaining to the project in light of the NRHP eligibility designation. It is incorrect to say, "the majority of the historic features of the WBFC are outside the LOD." The entire island is NRHP eligible. Impacts to the 4 Western part of the island would be highly significant. The entire island is being used for research. Its associated channel and wetlands are, too. Encroaching on and over the island and placing piers on it is a direct adverse impact to one of the WBFC's most important and salient historic features: the long-term and ongoing use of the Island for research on the biodiversity of the Island. 3) We request that those involved with this project make greater efforts to understand and recognize the scale and irreversibility of the adverse impacts the proposed plan would have and prioritize avoidance and mitigation of impacts. Appendix C contains some examples of impacts to promote better understanding. Additional impact concerns are detailed in Appendices D and E. It is WBFC's view that Plummers Island was not part (or sufficiently part of) of the American Legion Bridge alignment decision making, and WBFC was not weighted properly in making this decision. At that time, no one was even talking about Plummers Island as it had barely been mentioned in the DEIS and had not been recognized as a significant historic site at that time. Avoiding Plummers Island is possible, it has just not been prioritized in MDOT's process. See SDEIS, at pp. 4-14- and 4-15. The adverse impacts to Plummers Island affect the research value of the island. That is to say, the adverse impacts impact the qualities and attributes of the site that make it historically significant. By destroying the value of the island for research of rare plant, insect, and other life forms, the project would be destroying decades of research. A complete and accurate identification of the project's effects on these sites and attributes is needed. 4) More must be done to mitigate impacts. Moving the piers is not adequate mitigation. Documentation sent as part of the Section 106 process on September 8, 2021 shows some of the adverse impacts to Plummers Island and yet they are still underestimated. Moving the piers, as proposed by MDOT (below) is not sufficient mitigation to address the full spectrum of mitigation. Additional minimum mitigations measures that are needed are listed in Appendix F, including shifting the ALB's 4 new lanes to the upstream side, rather than dividing those between the up and downstream sides. "The LOD adjoining Plummers Island along the American Legion Bridge will impact approximately 0.2 acre of the WBFC. This area is required for the bridge substructure, including permanent pier placement and construction activities. Construction activities within the LOD at the WBFC may include excavation; demolition of the existing bridge foundation and piers; installation of proposed foundations, piers, or abutments; and slope protection. Access to the existing and proposed piers is required for these activities. Impacts were minimized by strategically locating the new piers near the existing piers such that a single access method could be used for demolition of the existing and construction of the proposed structures. However, some impact is unavoidable based on construction requirements and the structural requirements for pier locations. 5 Although the majority of the historic features of the WBFC are outside the LOD, the proposed construction activities at the western edge of Plummers Island will alter the natural landscape of the island, a character-defining feature of the WBFC, resulting in diminishment of the property's integrity of setting. MDOT State Highway Administration has determined the project will adversely affect the WBFC." (Sept 8, 2021 letter to Elizabeth Hughes and Julie Langan from Steve Archer for Julie M. Schablitsky, pages 7-8) 5) We have major concerns about damage from construction to the channel that separates Plummers Island from the mainland. More information needs to be provided to us about impacts to the channel as soon as possible. Some of the measures discussed for this sensitive area would exacerbate adverse effects. We noted that on maps the LOD is marked on the land of the Island, while the channel itself is not identified as part of the WBFC are even with the area of potential effects. This channel is integral to the sustainability of the adjoining Plummers Island wetlands

10

See response above for SDEIS Comment #29.

00022931

OP·LANES
MARYLAND

I-495 & I-270 Managed Lanes Study

**FINAL ENVIRONMENTAL IMPACT STATEMENT**

WBFC SDEIS Comments 30 November 2021

#29
Cont

and floodplain. The channel and the Island's wetlands are Waters of the U.S. (WOTUS), thus requiring rigorous, protective oversight by the U.S. Army Corps of Engineers, Baltimore District. Yet, there is no discussion in the current plan of what MDOT plans to do with the channel, or with the wetlands along the Island's western perimeter. WBFC - and the National Park Service - consider the Island's emergent wetland perimeter to be part of the biodiverse whole, and since 1901 we have studied the biota of the wetlands and channel as an extension of the land above the official property waterline. The MDOT Strike team indicated the original DEIS plan to fill in the "culvert" (channel) with spall for a construction platform has been modified. Now as we understand it MDOT intends to put planking of heavy timbers across the channel for a construction platform. This will have a serious adverse effect on the channel. With all the planned land-clearing and earth moving, and burning for construction ramps and the building of two new lanes on the downstream side of the ALB, there is no way MDOT can effectively protect the channel from excess accumulation of mud, rock, and other debris. This will adversely impact the water quality and wildlife of the channel and perimeter emergent wetlands of the Island in the short and long run. We have commented several times to MDOT that during the construction phase the elevated vulnerability of the Island and channel to damage from catastrophic flooding should be enhanced in construction plans. We have had no assurances on this front that adequate precautions will be taken to avoid damage in this time period. Catastrophic flooding could destroy much of the long-term, ongoing research value of Plummers Island, a part of the Island's NRHP eligibility. Further explanation of these concerns can be found in Appendix C. 6) WBFC has had and continues to have a significant and primary responsibility to maintain this island as a long-term research site high in biodiversity with minimal disturbance. It must be protected. Under the Section 106 process, requests can be 6 made for mitigation measures. There is a direct use of the island for purposes of Section 4(f) and a significant adverse effect under Section 106. Avoidance and mitigation measures cannot be deferred until later, after the Final Environmental Impact Statement, after the Record of Decision, or after predevelopment. That is already too late. We require assurances at an administrative level that Plummers Island will be avoided and that the needed mitigation measures will be put in place after all avoidance options are exhausted. Our mission is to protect the biodiversity of Plummers Island including its perimeter wetlands, our long-term research efforts, and the quality of the place as a whole for future generations. We need your attention, your understanding of the Island's value and sensitive ecology, and your support in this effort. Respectfully, Robert Soreng, President Carla Dove, Vice President Lowell Adams, Secretary On behalf of the 88 members of the Washington Biologists' Field Club 7 Appendix A: Documentation of Experience with Strike Team Two of the staff that have communicated with us have been professional and communicative with WBFC and led us to believe they have our best interests at heart. A MDOT-Strike Team asked WBFC to join them in a virtual video discussion in January of 2021. That hour long discussion considered our concerns documented by us as "Threats to Plummers Island" (see https://wbfc.science/plummers-island-threatened/) and discussed alternatives to the DEIS plans that might mitigate some damage to Plummers Island. The initial minutes of that meeting produced by the Strike Team provided a cursory account that basically said the meeting had taken place. We protested those minutes, and a fuller account was submitted by the Strike Team, but to our knowledge our further suggestions for modifications to the minutes were not added. In the following week after the MDOT Strike Team meeting of January of 2021, WBFC was invited to join the Section 106 process as a consulting party. We did not recognize that invite until March of that year because the initial offer made by MDOT was sent through a clogged email box of a secondary contact rather than through the WBFC leader of the discussions, and once unearthed was then misunderstood. While we were heartened to be acknowledged as a consulting party, once delay caused us serious consternation that could have been avoided. However, most of the deliberations and communications of the section 106 process have been in meetings between Agencies that we were not privy to attend or review. At our request, the Section 106 process has led to Plummers Island being recommended as a special historical place within the C & O Canal National Historical Park. We appreciate that MDOT hired a competent research company to study WBFC on Plummers Island and to file the Maryland

11

See response above for SDEIS Comment #29.

00022932



#29
Cont

WBFC SDEIS Comments 30 November 2021

Historical Trust Determination of Eligibility Form (DOE). That Form and report were submitted to MDOT in June of 2021, and the Section 106 supervisory team accepted that company's report (whether modified or not we do not know). The final report was sent to WBFC on 8 September 2021 and to the Maryland Historical Trust State Historic Trust Officer. The MDOT-SHA, Cultural Resources Team Leader, Mr. Archer, has answered multiple of our email questions in a prompt, professional and friendly manner, clarifying various aspects of the process and results. We believe that report represents a fair and unbiased, but brief, assessment of the history of the WBFC and some its most prominent members. The report notes that WBFC contributions to science are many and details a few, but does not go into depth. To investigate the deeper impacts of the WBFC, its membership on society, and its science on biodiversity of the Potomac Gorge, on local and national scales DoveTail would have to access the full WBFC archives, and do further research stemming from those files. The DoveTail report notes WBFC archives were accessed in June of 2021. While it is true that most scientific publications and many photographs have been digitized, and many are available on-line, we note that the actual archives are stored in the Department of Botany, at the Smithsonian Institution, and could not have been accessed at that time due to Covid-19, nor could they have been accessed without knowledge or permission of the WBFC Archivist. Our Archivist has indicated that there are many more documents and photographs in the Archives that have not been digitized. 8 MDOT "Strike Team" representatives misled us in the meeting of January 2021, when they said they could potentially limit construction access under the ALB to from the upstream side (west side). This is confusing as on p. 5 paragraph 2 (MLS_106_Sept_8_Letter_sig) they write that that construction access will only be from the west side, while the map of 1 September and other communications suggest that the access will be from the "north side," which is both upstream and downstream through National Park land (i.e., nothing changed there). All this is disingenuous as in the building of the two east side lanes under Alternative 9, there is no way for them to not work on the east side of the bridge. The proposed solution of building the extra lanes only on the upstream side and other options presented to avoid damage to Plummers Island were rejected by the "stakeholders." We request the evidence that these options were seriously considered and the full accounting of the reasons for their rejection. The public, their representatives, consulting parties, agencies, and contractors are all stakeholders. And all stakeholders are equal but some stakeholders are more equal than others, it appears. The Supplemental Draft Environmental Impact Statement (pp. 4-14- and 4-15) gives the description of the decision-making about the bridge construction, but it still doesn't explain how and to what extent Plummers Island was actually considered as a unique NRHP-eligible historical and important scientific research site within a national historical park. In fact, WBFC was the prior owner of the NPS land on the downstream side of the ALB, now MDOT plans to turn that into a huge ramp to build the downstream lanes, if not to access the underside of the bridge and then to build it up and pave it over for new lanes. MDOT, in the same January meeting, also said they could cantilever the bridge piers such that no piers would need to be placed on the island. That is not evident in the current MDOT plan. Moreover, they still plan to place a pier on the island. The DEIS LOD on Plummers Island was crudely drawn, just a line across the head of the Island, with an additional 250-foot APE, extending to about 2/5ths of the Island. MDOT-SHA had Plummers Island LOD and APE zones surveyed in detail in the spring and summer of 2020 without consulting WBFC. Moreover, the survey team callously hacked down seven of the old age fringe trees on the island. The DEIS did not mention WBFC or consider the worth of 120 years of accounting and long-term research on the biota of Plummers Island by WBFC. Post the DEIS publication and comments period which ended in November of 2020, MDOT representatives keep saying in public comments, documents, and email messages to WBFC, that they had reduced the LOD on the Island significantly. Yet all they seem to have done in the current document (MLS_106_Sept_8_Att_1A_APE_Corridor_R, map 3) is draw a more precise but still-ragged LOD line of delineation. Map 3 also fails to capture lands in the NW corner of Plummers Island in Eligible / Listed, or Eligible – Pending SHPO Concurrence), and also fails in the same way to include the river front of Carderock section of the C & O National Historical Park upstream from the ALB. At one point this summer MDOT even publicized a

12

See response above for SDEIS Comment #29.

#29 Cont

WBFC SDEIS Comments 30 November 2021

map with no LOD line on the Island. We do not have faith that the LOD as currently mapped is more than a hollow public relations scheme to ward off complaints, or that it will even be adhered to if construction proceeds. 9 Appendix B: Views on the Project From our (WBFC's) perspective, MDOT's selection of Alternative 9: Phase I South is the among the worst of the DEIS alternatives for it ignores and exacerbates climate change, puts the future of transit in the region in the reigns of a foreign conglomerate with a vested interest in opposing mass-transit options. Recent findings, detailed in WTOP, the Washington Post, and other media outlets, confirm what critics have been saying: that the whole freeway system is so backed up that adding capacity to a segment of I-495 is unlikely to result in long-term improvement to traffic flow. This undesirable alternative also has the most damaging impact on the Plummers Island scientific and historical site of the DEIS alternatives proposed. From our perspective, the whole project was predicated on a need to rebuild the bridge in 10-15 years, when in fact the bridge is structurally sound and only requires redecking in 10 to 15 years. From our perspective, reversing climate change requires doing things differently to reduce $CO_2$ output from personal vehicles, by adding mass transit alternatives and increasing people's reliance on telework, not to expand the current commuting status quo indefinitely. From our perspective, adding 4 toll lanes to the ALB, is adding Luxury Lanes to keep those with deep pockets moving faster, while everyone else sits in congestion. And, as noted above, current studies using MWCOG traffic models confirm what critics have been saying: that the whole freeway system is so backed up that adding capacity to a segment of I-495 is unlikely to result in long-term improvement to traffic flow. From our perspective, none of this achieves the goals of traffic improvement in the longrun. Recently published future congestion predictions tell us that within a decade after the project is completed (and noting there would be 10 years of miserable traffic during the construction project), in many places along the route and in the evening rush congestion would be no better that it is today. So, you get a 10-year window of viability of the project to reduce traffic ... and lots of damage to historical properties and more $CO_2$. There absolutely needs to be smarter thinking of how people and goods are moved. The project has been falsely pushed as something that must be urgently approved and driven by a private company as part of a public-private partnership, because it is too costly to be done using state funds. Therefore, it is argued, it must be designed to be extensive enough to be lucrative for the private sector. Yet, this very day, Maryland is sitting on a $5 billion dollar surplus of funds that could be used for transportation system improvements. The Daily Record reports on this in these articles: Maryland's flush finances have some officials pushing for more borrowing (Oct 4, 2021) and Hogan takes combative stance over use of state's revenue windfall (Oct 7, 2021). 10 Appendix C: Impact Concerns On project maps, the limits of disturbance (LOD) is marked on the land of the Island, while the channel itself is not considered as integral to the sustainability of the adjoining Plummers Island wetlands and floodplain. The channel and the Island's wetlands are Waters of the U.S. (WOTUS), thus requiring rigorous, protective oversight by the U.S. Army Corps of Engineers, Baltimore District. Yet, there is no discussion in the current plan of what MDOT plans to do with the channel, or with the wetlands along the Island's western perimeter. WBFC - and the National Park Service - consider the Island's emergent wetland perimeter to be part of the biodiverse whole, and since 1901 we have studied the biota of the wetlands and channel as an extension of the land above the official property waterline. The MDOT Strike team indicated the original DEIS plan to fill in the "culvert" (channel) with spall for a construction platform has been modified. Now as we understand it MDOT intends to put planking of heavy timbers across the channel for a construction platform. Where is NEPA in this? With all the planned land-clearing and earth moving, and burming for construction ramps and the building of two new lanes on the downstream side of the ALB, there is no way MDOT can effectively protect the channel from excess accumulation of mud, rock, and other debris. This will adversely impact the water quality and wildlife of the channel and perimeter emergent wetlands of the Island in the short and long run. We have commented several times to MDOT that during the construction phase the elevated vulnerability of the Island and channel to damage from catastrophic flooding should be enhanced in construction plans. We have had no assurances on this front that adequate precautions will be taken to avoid damage in this time period. Due to

13

See response above for SDEIS Comment #29.

#29

WBFC SDEIS Comments 30 November 2021

Climate Change, the NOAA Atlas 14 used in preparation of the DEIS, is well out-of-date for frequency and intensity of massive floods. So-called hundred-year floods in Atlas 14 Volume 2, Revision 3 (2006) are now 5-10-year events, and two such events occurred in the last 12 years. Moreover, the DEIS planned their construction activities around flood levels recorded at Little Falls Gauging station 3 miles downstream from the ALB and in a wide section of the Potomac River. The flood levels at the ALB, situated in the narrows of Mather Gorge, are 7 feet higher than posted at Little Falls (Soreng observation, January 2021, photo documented). From our perspective what they need to do in the construction period, is build a flood protection wall on upstream side of the ALB that will withstand extreme floods. If this is not done all the heavy timber planking used to cover the channel for a construction platform could blow out in a high flood, and then wash across the Island along with other construction mud and debris, with catastrophic consequences. Additionally, the LOD boundaries exclude the rocks at the head of the island situated in the Potomac River, which are connected to the Island except in flood stages and which harbor the highly rare Natural Community: Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (Hypericum prolificum, Eubotrys racemosus) / Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia Herbaceous Vegetation (USNVC: CEGL006491). 11 Global/State Ranks: G2/S1. (Simmons et al., 2016, 2020). These rocks bear the only significant and sustainable population of this community on Plummers Island. These rocks also protect and produce the rare Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus Herbaceous Vegetation (USNVC: CEGL006483). Non-tidal mudflats. Global/State Ranks: G3/SNR. These communities occur downstream along the perimeter of Plummers Island and along the channel, and again are of small actual area on the Island such that any loss is a big loss to Plummers Island biodiversity. MDOT representatives indicated that they considered our suggestion that the addition of 4 new lanes to the ALB could be made to the upstream side, rather than dividing those between the up and downstream sides. However, nothing changed their Alternative 9: Phase 1 South plan for two toll lanes on each side (in fact the bridge will have three lane widths added per direction!). These three additional lane widths on the downstream side would overshadow the Island by at least 20 ft. On top of this, MDOT's engineers ungraciously amended the Alternative 9 plans by placing a bike and foot traffic lane (requested by various consulting parties and DEIS comments) to the downstream side to further overshadow the Island. Much of what we have discussed above relates to construction effects. However, there are myriad negative future effects to be concerned about. Several rare plant species exist on the head of the Island adjacent to emergent perimeter wetlands. Their habitats will be utterly destroyed by the extended ALB lane overhang and emplacement of a pier on the island. This unnecessary "taking" of public lands and rare species cannot be mitigated with surveys, plant rescues/relocations, or other such measures. It will simply be forever lost. Moreover, there is no comparable occurrence of these rare species and habitats on the northwest side of the ALB. The noise in Plummers Island from the ALB, already injurious and distracting, will be exacerbated by the displacement of heavy vehicle traffic to the outermost lanes overhanging the Island, causing persistent and significant injury to the communications of native animals, human communications, and seriously impacting the quality of experience of the natural wild lands. We have discussed sound barriers and decking surfacing to reduce noise with MDOT representatives. However, we see nothing in the current document to address this. WBFC has not found any MDOT plans to alter drainage to the channel or Plummers Island from the ALB in stormwater management (SWM) plans (Attachment 4 MLS Compensatory Stormwater Management Sites, September 2021). The low point on the ALB is just above the dogleg in the channel, and bridge scuppers drain the toxic runoff from there into the channel, further impacting and endangering the biota of the emergent wetlands and aquatic species. WBFC noted this problem in our DEIS comments and our Threats to Plummers Island document sent to MDOT and other organizations and agencies in early 2021. 12 Appendix D: Endangered, Threatened, and Rare Species on Plummers Island The species on Plummers Island, including endangered, threatened, and rare species, have been studied since 1901. They are part of the island's historic and ongoing research value. Current awareness of and attention to their protection

14

See response above for SDEIS Comment #29.

#29
Cont

WBFC SDEIS Comments 30 November 2021

in the state's DEIS process has been inadequate. Plummers Island has numerous state endangered, threatened, and rare species. Plummers Island has three extant endangered plants that have been considered endangered in Maryland for many years and were mentioned as endangered in the H495/I-270 Managed Lanes DEIS, Appendix R of Appendix L, page 1. These state endangered plants are: 1. Coville's Phacelia (Phacelia covellei) 2. Horse-tail Paspalum (Paspalum fluitans) 3. Pale Dock (Rumex altissimus) Curiously in March 2021, Maryland DNR downgraded two of those species (Coville's Phacelia and Horse-tail Paspalum) from endangered to threatened although their status, if anything, is more imperiled by the planned widening of the ALB. On what basis could these species have been downgraded? The WBFC cannot agree with this change without compelling evidence. The above list of three state RTE plant species is not complete or exhaustive (see Simmons et al. 2020); there are additional Maryland RTE plants on the island, such as Smooth Rose Mallow (Hibiscus laevis) which is a rare plant of concern; Pink Valerian (Valeriana pauciflora) which is endangered; Leatherwood (Dirca palustris) which is threatened; and Sticky Goldenrod (Solidago racemosa) which is threatened and part of a rare natural community. There are also several grass and sedge species including Flat-spiked Sedge (Carex planispicata) and Open-flower Panic Grass (Dichanthelium laxiflorum). Other rare species include Ostrich Fern (Matteuccia struthiopteris) and Smooth Wild-petunia (Ruellia strepens). RTE animals that live on or utilize the island include Eastern Small-footed Myotis (state endangered) and Northern Long Eared Bat (state threatened/US threatened). We can provide recent inventories of species on Plummers Island upon request. The Endangered Species Act protects both federally listed endangered species and those species deemed endangered, threatened, or in need of conservation within the state, based on habitat and conservation factors. At the state level, threatened and endangered species are regulated under the Maryland Non-game and Endangered Species Act (Annotated Code of Maryland 10-2A-01). Excerpts from a December 2020 Washington Post article by Katherine Shaver tell more of the story: 13 Tucked below the American Legion Bridge on the Maryland side of the Potomac River ... Plummers Island, ... "the most thoroughly studied island in North America." For nearly 120 years, the 12-acre patch of rock and woods has been home to the Washington Biologists' Field Club. Its 85 botanists, entomologists, ornithologists and other scientists have spent decades scrutinizing the island's thousands of species of plants, insects and wildlife. Robert Soreng, the club's vice president and a botanist at the Smithsonian National Museum of Natural History, said Plummers Island provides a critical research site because of its remarkable biodiversity and protected status under the National Park Service. Studying the same wilderness since 1901, he said, has revealed how nature responds to human development, climate change, invasive species and other changes. "This is incredibly valuable for studying long-term trends," Soreng said. "We know more about what's there than in any other place." But Soreng and other scientists say the island's research value is in danger of being lost to a new, wider American Legion Bridge. Under a plan by Maryland Gov. Larry Hogan (R) to relieve traffic congestion on the Capital Beltway, an expanded bridge between Virginia and Maryland could require piers on the island's western edge. Trees would also have to be cut in that area to build a road for construction vehicles to access the bridge site over four to five years. Plummers Island is in the Potomac Gorge, between Great Falls and Georgetown. The gorge is home to hundreds of rare species, including the highest concentration of rare plants in Maryland, according to the National Park Service. Moreover, the biologists say, its protection from development has provided a rare chance to do fieldwork nine miles from downtown Washington. "When you think about the Washington area, there aren't many places that haven't been disturbed by humans," said Matthew Perry, a club member and emeritus scientist with the Patuxent Wildlife Research Center in Laurel. Soreng said more than 400 scientific papers have emerged from Plummers Island research. The most well-known study showed that many of the island's lichen species had died off and others had soaked up significantly more lead after the bridge was built, because of emissions from leaded gasoline used at the time. ... Club members have included legendary ornithologist Roger Tory Peterson; Gifford Pinchot, the first chief of the U.S. Forest Service; and Frederick Coville, who helped establish the National Arboretum. "There's an extraordinary concentration of world-class biologists," said Bruce Stein, a club member and chief scientist for

15

See response above for SDEIS Comment #29.

00022936



#29
Cont

WBFC SDEIS Comments 30 November 2021

the National Wildlife Federation. "Everything that's in there," Soreng said, "someone is recording." Ralph Eckerlin, the club's president and a Northern Virginia Community College biology professor, said he worries about the birds, crickets, katydids and other species that rely on calling out to one another. Pamela Goddard, a Mid-Atlantic specialist for the National Parks Conservation Association, said Plummers Island must be spared as a precious urban green space. "The promise for national parks is that they'll be protected," Goddard said. "They're not here as land to be developed for a highway." 14 APPENDIX E: April 2021 WBFC Comments on American Legion Bridge Construction and Expansion Impacts to Plummers Island Threats to Plummers Island from American Legion Bridge Construction and Expansion (Submitted to the MDOT-SHA Strike Team, February 28, 2021 for the March 1 joint meeting with WBFC) 1. Damage to waterways: a. Potomac River shore: mud flats and sandbars are wetland features in the MDOT recalibrated (post the DEIS comments) Zone of Destruction. b. We don't know what the new and reconstructed bridge piers will do to flow along the river or channel, particularly if the point of rocks and Rock of Gibraltar (at the upper tip of the island) are destroyed or significantly altered. c. Sand bars and mud flat habitats could be substantially reduced for plants and animals that depend on these. c. The Island Channel (AKA "Rock Run Culvert"). The head of the channel down to the dog leg would not see daylight for years of construction. After which this part of the channel would be overshadowed by the 2 added lanes on the island side of the bridge. What are the consequences to waterways there and downstream? d. With the Channel covered by planking for the construction platform, high and mid-level floods will be redirected over those onto the island flood plain, potentially adversely affecting much of that flood plain. e. If sub-point d happens, all research plots in the flood plain could be substantially altered, (including vegetation plots 1, 3, 9, 10, 11, 12, and habitats for plants and animals) f. The "frog water" pools at the head of the island noted in the DEIS and circumscribed in subsequent documents are highly vulnerable to disturbance (vegetation plot 3 is in this zone). g. Zone of potential effects/disturbance uncertain, but estimated by DEIS to be 2/5 of the island. What is the MDOT plan for protecting this zone? h. Amphibians are in global and local decline due to pollution, diseases, ozone, and habitat destruction. Eleven species of amphibians are known from Plummers Island (Manville 1968 and https://collections.nmnh.si.edu/search/herps/): Acris crepitans, northern cricket frog; Hyla versicolor, eastern gray treefrog; Lithobates clamitans, green tree frog; Lithobates palustris, pickerel frog; Lithobates sylvaticus, wood frog; Pseudacris crucifer, spring peeper; Pseudacris feriarum, upland chorus frog; Ambystoma maculatum, spotted salamander; Eurycea longicauda longicauda, long-tailed salamander; Hemidactylium scutatum, four-toed salamander; Notophthalmus viridescens viridescens, eastern newt; Pseudotriton ruber, northern red salamander. 2. Destruction of rare plants (Simmons et al. 2020) and rare plant communities (Simmons et al. 2016) from the far west end of Plummers Island within the Zone of Destruction: 15 a. Hibiscus laevis (mud flats just below and above point of rocks) b. Solidago racemosa (point of rocks, below Rock of Gibraltar) c. Hypericum prolificum (point of rocks, below Rock of Gibraltar) d. Paspalum fluitans (mud flats just below and above point of rocks) e. other native plants rare on the island occurring only on west end in Zone of Destruction: e.g., Sedum ternatum. (on Rock of Gibraltar) f. Piedmont / Central Appalachian Sand Bar / River Shore (Low Herbs Type): Eragrostis hypnoides - Lindernia dubia - Ludwigia palustris - Cyperus squarrosus Herbaceous Vegetation (USNVC: CEGL006483). Non-tidal mudflats. Global/State Ranks: G3/SNR (Simmons et al. 2016) g. Potomac Gorge Riverside Outcrop Barren (Potomac Gorge Type): (Hypericum prolificum, Eubotrys racemosa) / Schizachyrium scoparium - Solidago racemosa - Ionactis linariifolia Herbaceous Vegetation (USNVC: CEGL006491). Global/State Ranks: G2/S1. 3. Destruction of WBFC research plots: a. Vegetation research plots from 1997 and 2013-2015 will be destroyed (plots 4, 5, on the sandbar at the head of the island will be totally destroyed [see also sub-point 1e]), A historic National Park Service vegetation plot on the Potomac River sandbar could be destroyed. 4. Destruction of past collection sites: a. many plants and animals were vouchered or recorded from the west end of the island, some are only known on the island from there. 5. Habitat destruction and disturbance lead to more invasive organisms: a. the west end of the island is covered in a tangle of oriental bittersweet (first recorded from the island in 1982), and shrubs of amur honeysuckle (first recorded

16

See response above for SDEIS Comment #29.

00022937

**WBFC SDEIS Comments 30 November 2021**

#29
Cont

from the island in 1997), among many other invasive plants recorded there. Invasive species establishment and expansion will be sorely exacerbated by disturbance involved the construction process. 6. Potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction blow out. Construction timbers potentially could rip out acres of trees and other vegetation in the island flood plain. Note 1: 51 out of the 100 recorded historic Potomac River floods (over 9.4 ft at Little Falls Gauge, NOAA data) were recorded since the first bridge was built in 1962, 33 since the midsection of the bridge was filled in 1992, 1996 included 2 of the top 7 floods, and 2018 included 4 historic floods. In 2019 the island flood plain was inundated on and off for much of winter and spring. Note 2: Mather Gorge (Cohn 2004) is much narrower at the American Legion Bridge and Plummers Island than at Little Falls Gauge, so the high-water marks listed below substantially underestimate the peak flows at the 16 bridge and head of island by as much as 7 ft (verified at the bridge side of the channel bend, March 25, 2021). rank height ft date 47 11.68 ft 4/18/2011 5 19.29 ft 1/21/1996 50 11.56 ft 12/17/2018 7 17.84 ft 9/8/1996 54 11.44 ft 9/21/2003 31 12.82 ft 3/15/2010 58 11.3 ft 5/20/2011 36 12.38 ft 6/5/2018 61 11.17 ft 1/27/2010 37 12.35 ft 3/6/1993 65 11.01 ft 9/29/2018 46 11.7 ft 5/18/2014 66 10.88 ft 3/12/2011 67 10.87 ft 12/12/2003 90 10.16 ft 3/25/1993 68 10.85 ft 9/11/2018 92 10.13 ft 1/29/1993 70 10.79 ft 3/22/1998 95 10.09 ft 11/29/1993 77 10.55 ft 4/18/1993 96 10.04 ft 5/13/2008 81 10.43 ft 1/10/1998 97 9.97 ft 9/23/2003 82 10.37 ft 3/30/1994 98 9.78 ft 9/9/2011 86 10.33 ft 10/31/2012 99 9.67 ft 5/6/2009 87 10.28 ft 3/30/2005 100 9.43 ft 4/17/2007 7. Sound from bridge construction and closer proximity of traffic in 2 new bridge lanes after they open on the bridge: a. The noise factor cannot be ignored by humans or wildlife. Already the sound of traffic is disturbing to human conversation at our meeting place the WBFC Cabin grounds. 8. Salt and oil runoff impacts on biota from the bridge: a. This depends on where the outflow is drained from the bridge drainage scuppers (particularly at the bridge's low-point) b. The unintended consequences of that volume of road salts on freshwater ecosystems can be severe. A colleague is working on this very subject on area highways, and the impacts he found were surprisingly devastating. One of the worst impacts was mobilizing (and making bioavailable) toxic metals in waterways. 9. Violation of long-term continuity of 120 years of research (Perry 2007; Shetler et al. 2006): a. Lichen study on Plummers Island validated essentiality of long-term research contributing to national and global removal of Lead from gasoline: A drop from 70 species to 20 species due to sensitivity to Lead pollution on the island (Lawrey & Hale 1979). b. The decline of forest breeding birds on Plummers Island is related to the American Legion Bridge (Johnston & Winings 1987). 17 c. Insects, like other organisms, are experiencing major declines globally (Borenstein 2018; Hallman et al. 2017; Jarvis 2018; Vogel 2017). Giant silk moths (Saturniidae) include Imperial, Cecropia, Luna, Polyphemus, Royal Walnut, Rosy maple etc. In New England, most of these are state endangered species because they have been hammered by an introduced biocontrol agent -- a non-native tachinid fly, Compsilura concinna, which was introduced to try and control gypsy moths in Massachusetts. That fly has wreaked havoc in New England because it is a generalist and the Saturniids have been heavily impacted. This pest has arrived in DC and vicinity but impacts here are not yet known (John Lil pers. comm. 2020). Thanks to the long history of research on insects of Plummers Island (more than 3000 species documented there; Brown & Bahr 2008a,b), the island is a key place to further document this aspect of "insect apocalypse" (Jarvis 2018) assuming the island remains intact. Erwin (1981) and Brown (2001) have documented long-term trends in beetles and moths, respectively, with shifts in species composition related mainly to vegetation succession. The AL Bridge project puts WBFC Plummers Island research on trends in biodiversity in jeopardy. d. Bellwether issues of plagues, invasions and expansion of exotic species are expected to be exacerbated due to disturbance from construction – some examples of timing of introductions spread, and manifestations of infestations of plants animals, and diseases from around the region are recorded from Plummers Island (plant records from Shetler et al. 2006, WBFC Invasive Biota Committee reports 2015- 2020), and https://collections.nmnh.si.edu/search/botany/) i. arrival and expansion of garlic mustard (1915), now rampant ii. arrival and expansion of tree of heaven (or hell) (1933), now 50+ trees iii. arrival and expansion of Japanese honeysuckle (1949), now dominant iv. arrival and

17

See response above for SDEIS Comment #29.

OP LANES™ MARYLAND | I-495 & I-270 Managed Lanes Study    Case 8:22-cv-02597-DKC    Document 62-4    Filed 10/30/23    Page 95 of 100

FINAL ENVIRONMENTAL IMPACT STATEMENT

**#29**

WBFC SDEIS Comments 30 November 2021

expansion of Japanese stilt grass (1979), now locally dominant v. arrival and expansion of oriental bittersweet (1982), now all over and covering trees vi. arrival and expansion of amur honeysuckle (1997), now dominant on west end vii. arrival and expansion of winter creeper (1997), now patchily established but potentially widespread. viii. arrival and expansion of ivy (ca 2015), now patchily established but potentially widespread ix. Emerald Ash Borer (EAB) arrival and expansion in 2015 and death of ash trees (2016), mass die off of ash trees, a major shift in forest climax community (Simmons et al. 2016) x. fig buttercup arrival and expansion and expansion (3 plants 2017, 50 plants in 2019, 160 plants 2020), expanding exponentially 18 xi. arrival and expansion of European and Asian earthworms, which rapidly consume forest detritus and restructure soils, upending soil ecological processes and networks of indigenous species adapted to them, favoring colonization and replacement by invasive species, https://en.wikipedia.org/wiki/Invasive_earthworms_of_North_Amer ica xii. arrival and expansion of Asian clams (Corbicula fluminea), shells now abundant in sandy soils across the island (arrived in Ohio River Valley ca 1959, established in the Potomac River by 1982) xiii. Chestnut blight, was discovered in the USA in New York in 1904, arrived in Maryland by 1906, Chestnuts were historically on Plummers Island adjacent mainland, last documented in 1934, but considered extinct there by 1935. This once dominant species of the eastern deciduous forest was mostly wiped out within 50 years. xiv. Beech blight is coming. Popkin (2019) documents a deadly beech disease is spreading in the northeast USA. There is a mature beech forest on the mainland side of Plummers Island, near Lock 12. We will be watching for the blight here, unless the forest is cut down for the bridge construction. e. Research following climate change impacts to the ecosystems and organisms on Plummers Island will be conflated with issues involved with disturbance from bridge construction and emplacements. References Borenstein, S. 2018. 'Windshield test' highlights big drop in flying bugs. The Washington Post -HEALTH & SCIENCE (2018-09-25). Brown, J. W. 2001. Species turnover in the Leafrollers (Lepidoptera: Tortricicae) of Plummers Island, Maryland: Assessing a century of inventory data. Proceedings of the Entomological Society of Washington 103(3): 673-685. https://www.biodiversitylibrary.org/bibliography/2510 Brown, J. W., & S. M. Bahr II. 2008a. The Insect (Insecta) Fauna of Plummers Island, Maryland: Brief Collecting History and Status of the Inventory. Bulletin of the Biological Society of Washington 15: 54-64. http://dx.doi.org/10.2988/0097- 0298(2008)15[54:TIIFOP]2.0.CO;2 Brown, J. W., & S. M. Bahr II. 2008b. Appendix List of the Invertebrates of Plummers Island, Maryland. Bulletin of the Biological Society of Washington 15: 192-226 http://dx.doi.org/10.2988/0097- 0298(2008)15[192:ALOTIO]2.0.CO;2 Brown, J. W., Epstein, M., Vann, K., Watkins, R., Bahr, S. M., Kolski, E. 2008. An overview of the Lepidoptera (Insecta) of Plummers Island, Maryland. Bulletin of the Biological Society of Washington 15: 65–74. Cohn, J.P. 2004. The Wildest Urban River: Potomac River Gorge. BioScience, Volume 54(1): 8–14, https://doi.org/10.1641/0006- 3568(2004)054[0008:TWURPR]2.0.CO;2 19 Erwin, T. L. 1981. Natural History of Plummers Island, Maryland. XXVI. The ground beetles of a temperate forest site (Coleoptera: Carabidae): an analysis of fauna in relation to size, habitat selection, vagility, seasonality, and extinction. Bulletin of the Biological Society of Washington 5: 105-224. Hallmann, C. A., Sorg, M., Jongejans, E., Siepel, H., Hofland, N., Schwan, H., et al. 2017. More than 75 percent decline over 27 years in total flying insect biomass in protected areas. PLoS ONE 12 (10): e0185809. https://doi.org/10.1371/journal. pone.0185809 Jarvis, B. 2018. The insect apocalypse is here: What does it mean for the rest of life on Earth? The New York Times Magazine, 27 November 2018, pp. 41–48. Johnston, W. H. & D.L. Winings. 1987. Natural History of Plummers Island, Maryland XXVII. The decline of forest breeding birds on Plummers Island, Maryland, and vicinity, by David W. Johnston and Daniel L. Winings. Proceedings of the Biological Society of Washington 100:762- 768. (December 31, 1987). Lawrey, J. D., M. E. Hale Jr. 1979. Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution. Science Vol. 204, Issue 4391, pp. 423-424 https://dx.doi.org/10.1126/science.204.4391.423 Manville, R. H. 1968. Natural History of Plummers Island, Maryland XX. Annotated list of the vertebrates, by Richard H. Manville, except birds by Alexander Wetmore and Manville. Special Publication, Washington Biologists' Field Club, pp. 1- 44. (January 1968.) Perry, M. C. (ed.) 2007. THE WASHINGTON BIOLOGISTS' FIELD CLUB: ITS MEMBERS AND ITS

18

See response above for SDEIS Comment #29.

00022939


#29

WBFC SDEIS Comments 30 November 2021

HISTORY (1900-2006). The Washington Biologists' Field Club, printed by The Maple Press Company, York Pennsylvania. Pdf available under the About dropdown as WBFC Book at https://WBFC.science/wpcontent/uploads/2019/09/wbfc_booksm.pdf Popkin, G. 2019. A mysterious disease is striking American beech trees. Science Nov 14 2019 https://dx.doi.org/10.1126/science.aba2201 Shetler, S. G., S. S. Orli, E. F. Wells & M. Beyersdorfer. 2006 CHECKLIST OF THE VASCULAR PLANTS OF PLUMMERS ISLAND, MARYLAND. Bulletin of the Biological Society of Washington, 14(1): 1-57 https://wbfc.science/wpcontent/uploads/2020/07/Checklist_Vasc_Plants_Plummers.pdf Simmons, R.H, Fleming A.H., Soreng R.J. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Appendix 6, pdf. available at https://wbfc.science/wpcontent/uploads/2019/09/plummer_island_nc_map_v1.3.pdf Simmons R.H., Soreng R.J., Barrows E.M., Emmons L.H. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County. Maryland. Report prepared for the National Parks Conservation Association, July 2020. Appendix 5, pdf. available at https://WBFC.science Vogel, G. 2017. Where have all the insects gone! Science 2 May 2017, Vol. 356, Issue 6338, pp. 576-579 https://science.sciencemag.org/content/356/6338/576.full 20 Appendix F: Minimum Avoidance and Mitigation Measures Needed Below are the minimum avoidance measures, design considerations, and mitigations to avoid or reduce impacts that should be made to avoid, minimize, and mitigate adverse effects to Plummers Island and the ongoing research there. These provisions should have been considered from the beginning of the MDOT-SHA project development and in the DEIS. This content comes from WBFC's April 9, 2021 Section 106 comments. No bridge alternatives were discussed in the Draft Environmental Impact Statement (DEIS), which is a major omission, and should have been presented there so that the public could have the same information to comment on. We would have certainly made DEIS comments on the bridge alternatives if any relevant information on bridge alternatives had been discussed in the DEIS. That information was lacking and clearly should have been included in the DEIS. A Supplemental DEIS has now been issued (October 1, 2021), and still no bridge alternatives are clearly delineated. Clearly there needs to be a specific focus on design changes that will reduce and avoid impacts to Plummers Island. The first obvious choice for reducing and avoiding impacts is the "no build" option. Second is the upriver bridge alternative, which should have been evaluated in the DEIS and certainly must be now before the project is advanced. Although WBFC is opposed to the American Legion Bridge (ALB) expansion, particularly with toll lanes and lack of mass transit in the design (vans and buses from a few points are not an acceptable replacement for dedicated mass transit), the following types of mitigations are necessary and non-negotiable. To protect Plummers Island and its significant historic features and attributes, the minimum mitigations follow: • Plan for major (not minor) flooding during the construction period. • Avoid obstructing natural water flow into the Plummers Island channel. • Build all the new lanes for the ALB on the upriver side of the bridge. • Build the access to and the construction platforms themselves only on the upriver side of the bridge and under the bridge. • In any case, add sound barriers to the downstream side of the bridge. • Use lane surfacing that is as quiet as possible. • Place the outflow from bridge scuppers somewhere the runoff will not enter into Plummers Island waters. • Avoid fugitive dust blowing onto the island by use of dust minimization measures including spraying. • A waste and hazardous material disposal plan must ensure off-site disposal so as not to flow to or near Plummers Island. • Provide prior notification informing WBFC of work schedules so notice can be given to researchers. • Piping of road runoff (that contains oil and salt) is a major issue; currently the main scupper drainage flows into the channel separating the island from the mainland; future drainage should avoid the wetlands including the channel. 21 • For the duration of construction, any construction infrastructure should be designed to withstand major floods (over 14 feet) not minor (10-12 feet) floods; there have been 3 moderate (12-14 feet) and 2 major floods (17-19 feet) in the past 25 years. However, even minor floods recorded at Little Falls produce major flooding in the Plummers Island channel adjacent to the bridge (see Appendix D, point 6). • Monitor during construction to ensure that construction work is not impacting the island and no construction

19

See response above for SDEIS Comment #29.

00022940

**#29 Cont**

WBFC SDEIS Comments 30 November 2021

workers or project personnel visit the island unless oriented and approved by the Washington Biologists' Field Club. These requirements should be included in bidding document and contractor's work plan as part of the environmental specifications that will be followed. • Chance find or inadvertent discovery procedures should be followed and incorporated into bidding documents and contracts. Please provide a copy for our review to ensure they meet the requirements for protection of Plummers Island.

Appendix 3.  WBFC's concerns expressed to MDOT meeting and position on the ALB, 30 November 2021.

Read, November 29 in our joint Teams meeting (flooding concerns added November 30 after review of MDOT maps in our Teams meeting), 2021

**#30**

This is WBFCs position on I-495-295 American Legion Bridge expansion in regard to Plummers Island:

Avoidance of Plummers Island is essential. We discussed avoidances with MDOT strike team in early 2021.  Some minimizations were made, however, Mitigation and Minimization are not solutions to our concerns.

MDOT needs another highway and American Legion Bridge plan. WBFC supports the No Build option. We urge NPS to support the No Build Option. This MDOT carry-on-as-usual plan, as well being a threat to our 120-year long-term research project, does not account for climate change impacts or major changes in commuter patterns due to covid and teleworking.  There are smarter ways to deal with traffic.  This project is not supported by rigorous data and is wasteful, with minimal improvements in commuting time only after 5 to 10 year construction disruptions. And luxury-lane Tolling by the P3 is an insult to the local public, filling coffers overseas and with minimal funds funneling back to needed infrastructure at home.  Expanding the American Legion Bridge laterally by 4 new lanes is the most environmentally damaging of MDOT's alternatives to Plummers Island.

20

---

See response above for SDEIS Comment #29.

**Response to SDEIS Comment #30**

NEPA's CEQ regulations require every environmental impact statement to include a No Build Alternative for detailed assessment.  The No Build Alternative serves as a baseline alternative for comparison to all proposed action alternatives.  For the Study, the No Build Alternative does not include any improvements to I-495 and I-270 but does reflect all other multi-modal transportation initiatives and projects included in the regional Constrained Long Range Plan, "Visualize2045", adopted by the Metropolitan Washington Council of Governments in October 2018.  Refer to DEIS, Chapter 2, Section 2.3.  Based on a comprehensive review of regional demographics and traffic data, the No Build Alternative would not address any of the significant operational issues under existing conditions and fails to accommodate any of the congestion relief metrics established for evaluating all Build Alternatives.  Refer to DEIS, Chapter 3 and DEIS Appendix C. For a discussion of the basis for the Purpose and Need and for the Selection of the Preferred Alternative, please see related Common Theme Responses and the SDEIS and FEIS.

Transit alternatives were considered. Refer to Chapter 9, Section 3.2.B for a response to Alternatives Not Retained for Detailed Study.

Refer to Chapter 9, Section 3.6.A for a response on opposition to managed lanes or tolling public roads.

Refer to Chapter 9, Section 3.3.A for a response to Analysis of Alternatives Retained for Detailed Study.

00022941

OP·LANES™ MARYLAND · I-495 & I-270 Managed Lanes Study · Case 8:22-cv-02597-DKC    Document 62-4    Filed 10/30/23    Page 98 of 100

FINAL ENVIRONMENTAL IMPACT STATEMENT

**#31**

WBFC SDEIS Comments 30 November 2021

These are our concerns:

Beyond Section 106 and NHPA this is a 4F issue for Plummers Island. Plummers Island needs to be protected as a whole, including its riparian and wetland margins.

The impacts that will result from current the MDOT SDEIS proposal will seriously affect all our ongoing long-term research. WBFC's core mission is treating the Island as a site for long-term monitoring of the ecosystem and biodiversity changes. Disturbance resets our 120-year record back to zero by terminating the ecosystem processes. Tree cutting, stream and land habitat disturbance will also inevitably lead to further uncontrolled proliferation of invasive species.

**#32**

Flooding: The proposed positioning of the caisson pilings in the channel is alarming. WBFC has noted three massive log jams in the last eight years in the channel: at the northwest dog-leg, and at the rock ledge crossing at the toe of the island. These jams dam the flow and back up flood waters flushing these over the low terraces of the island. The inevitable log jams forming at the caissons will predictably result in a massive river eddy that will swell above the river's tide and force a flow around the river end of the rock ridge at the west end of the island and through the ancient river side-channel directly behind the rock ridge. This flow will wash out plots 4 & 5, and 3 for sure, and possibly plot 1 (one recent flood season stripped the top soil from the island up to the 66 ft contour, leaving only sandy bottom lands). Trees are falling at alarming rates along the Potomac Gorge lowlands due to dead ash trees from emerald-ash-borer, oak die off from fungus, hemlocks dying from woolly algid infestations, and beech blight (heading this way from the northeast), stresses from higher temperatures and more frequent droughts, leading to more huge logs being ferried down river by more frequent massive floods resulting from climate change. The placement of the caissons forms a perfect sieve for catching logs which are often over 30 ft long, but even shorter ones stick and pile up. What will happen with the trestles in addition to the caissons?

**#33**

In addition, we are still trying to get a clear understanding of the topographic position of the line of the LOD. The rocky ridge at the west end of the head of the island (centered at the dent in the LOD line) is a distinctive island feature that seems to be within the LOD. Reduction/distruction of that ridge will seriously impact future flooding of the island. This ridge keeps the channel from overflowing the island at most flood stages. Unfortunately, the MDOT maps occlude/obscure these topographic features.

**#34**

Rare, Threatened and Endangered Plants and Animals: There are rare plant and animal species, and rare plant communities documented on the island including its riparian margins, both within the LOD and APE. MDOT has seen WBFC and NPS reports of these. These should be fully protected.

**#35**

Toxic Runoff: The lowest point on the ALB and nearby I-495 lanes drains into our channel and the river. Toxic runoff from the bridge needs to be treated before dumping onto the land and then into the channel and Potomac River. Salts, oil, and antifreeze which release toxic metals can no longer be dumped on NPS land and our waters. If there is a major accidental spill on this ALB drainage that waste will end up directly in the channel and river.

21

---

**Response to SDEIS Comment #31**

Despite the extensive avoidance and minimization efforts to NPS properties around the ALB including Plummers Island, impacts to Plummers Island could not be avoided completely, but impacts have been reduced by approximately 1.6 acres. In the DEIS, the Build Alternatives had 1.9 acres of impacts to Plummers Island. Under the Preferred Alternative, approximately 0.28 acres of impact at Plummers Island would be impacted, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact. Impacts to Plummers Island would be required for the ALB substructure, including permanent use for three, discrete, approximately 10-foot diameter pier foundations and temporary, construction activities. Temporary construction activities may include efforts such as excavation, access for demolition of existing bridge foundation and piers, and slope protection. Access to the existing and proposed piers is required for these activities.

**Response to SDEIS Comment #32**

See response to Comment #4 above.

**Response to SDEIS Comment #33**

The historic property boundary for the Washington Biologists' Field Club was established using the tax parcel boundary, as is standard for MDOT SHA Section 106 survey efforts. In preparing the National Register of Historic Places determination of eligibility documentation, MDOT SHA did not find character-defining features of the historic property that justified a different boundary.

**Response to SDEIS Comment #34**

See response to Comment #22 above.

**Response to SDEIS Comment #35**

Water quality treatment for the ALB is not feasible since NPS has indicated that they will not accept any SWM on their land and all the land surrounding the ALB is owned by NPS. Some alternative practices exist that may be feasible to provide some level of pretreatment of the bridge or approaches that may be incorporated into the drainage design. These practices are not approved to provide water quality credit in Maryland and may prove to be infeasible given the various site constraints during final design. However, MDOT SHA will consider use of these alternative practices on or around the ALB area within MDOT SHA ROW.

WBFC SDEIS Comments 30 November 2021



7B. Explanation of Geological map of Plummers Island, 2015.

WBFC SDEIS Comments 30 November 2021

Appendix 8.  SDEIS map of the Alternative 9 emplacement of the American Legion Bridge. Old bridge buttresses and piers and bridge - pink, new bridge buttresses, piers and caissons - blue, new lanes - orange, yellow line LOD.

24

25

WBFC SDEIS Comments 30 November 2021



Appendix 9. Link to WBFC DEIS comments, November 2020. https://wbfc.science/wp-content/uploads/2021/03/WBFC-written-Testimony-on-I-495-270-DEIS-Nov-6-2020.pdf

26

*This page is intentionally left blank.*

00022944