

**MARYLAND DEPARTMENT OF TRANSPORTATION**

**STATE HIGHWAY ADMINISTRATION**

U.S. Department of Transportation
**Federal Highway Administration**

# I-495 & I-270 MANAGED LANES STUDY

## Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation

### October 2021







00027631

# I-495 & I-270 MANAGED LANES STUDY

**Montgomery and Prince George's Counties, Maryland & Fairfax County, Virginia**

## SUPPLEMENTAL DRAFT ENVIRONMENTAL IMPACT STATEMENT
and
## UPDATED DRAFT SECTION 4(f) EVALUATION

Submitted Pursuant to:
42 U.S.C. §4332(2)(C) and 49 U.S.C. §303

By:
U.S. DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION
and
MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

In Cooperation with:
U.S. Army Corp of Engineers, National Park Service,
U.S. Environmental Protection Agency, National Capital Planning Commission,
Maryland Department of the Environment,
Virginia Department of Transportation, and Maryland-National Capital Park and Planning Commission

9/23/2021
_____
Date of Approval

Tim Smith, P.E., Administrator
Maryland Department of Transportation
State Highway Administration

9/23/2021
_____
Date of Approval

Gregory Murrill, Division Administrator
Federal Highway Administration

The following persons may be contacted for additional information concerning this document:

Mr. Jeffrey T. Folden, P.E., DBIA
Maryland Department of Transportation,
State Highway Administration, I-495 & I-270 P3 Office
707 North Calvert Street, Mail Stop P-601
Baltimore, MD 21202
410-637-3320

Mr. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
410-962-4440

This Supplemental Draft Environmental Impact Statement (SDEIS) has been prepared, in accordance with 23 CFR 771.130, to consider new information relative to the Preferred Alternative, Alternative 9 – Phase 1 South. Building off the analysis in the existing Draft Environmental Impact Statement (DEIS), the SDEIS is limited in scope to focus on new information available and analyses completed since the July 10, 2020 DEIS publication while referencing the DEIS for information that remains valid. The Preferred Alternative focuses on constructing two high-occupancy toll (HOT) managed lanes in each direction on I-495 from the GWMP in Virginia to east of MD 187 on I-495, including the American Legion Bridge, and on I-270 from I-495 to north of I-370 and on the I-270 east spur from east of MD 187 to I-270. No action or no improvements are proposed east of the I-270 East Spur as part of the Preferred Alternative. This SDEIS presents a description of the Preferred Alternative, 2045 No Build and Preferred Alternative traffic analyses, the permanent and temporary impacts associated with the Preferred Alternative, including avoidance and minimization efforts as well as details related to the current efforts on conceptual mitigation for unavoidable impacts. Comments on the SDEIS are due 11:59 PM on November 15, 2021 and should be sent to Jeff Folden at the above address or submitted using the online comment form at oplanesmd.com/SDEIS. FHWA does not intend to issue a combined FEIS/ROD.



# Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation

## October 2021



U.S. Department
of Transportation

**Federal Highway Administration**



MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00027633

Supplemental Draft Environmental Impact Statement

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ...................................................................................................ES-1

**1     PURPOSE AND NEED** ...........................................................................................1-1
   1.1   Background and Context............................................................................................1-1
   1.2   Study Purpose and Need...........................................................................................1-2

**2     ALTERNATIVES** ...................................................................................................2-1
   2.1   Overview of Alternatives Development Process .......................................................2-1
   2.2   Preferred Alternative ...............................................................................................2-4
   2.3   Elements of the Preferred Alternative......................................................................2-6
       2.3.1   Interchanges and HOT Managed Lanes Access.............................................2-6
       2.3.2   Stormwater Management Considerations ...................................................2-10
       2.3.3   Cross Culverts.............................................................................................2-13
       2.3.4   Construction and Short-term Effects ..........................................................2-14
       2.3.5   Limit of Disturbance...................................................................................2-17
       2.3.6   Tolling.........................................................................................................2-18
       2.3.7   Transit-Related Elements............................................................................2-21
       2.3.8   Pedestrian and Bicycle Facility Considerations...........................................2-23
   2.4   Transportation Commitments and Enhancements...................................................2-27
   2.5   Phase 1 Solicitation Process and P3 Agreement.....................................................2-28
       2.5.1   Selection of the Phase Developer ...............................................................2-29
       2.5.2   NEPA and the Progressive P3 Work Together .............................................2-29

**3     TRANSPORTATION AND TRAFFIC** ........................................................................3-1
   3.1   Introduction .............................................................................................................3-1
       3.1.1   Traffic Analysis Data Collection and Modeling Methodology........................3-1
       3.1.2   Traffic Analysis Area.....................................................................................3-2
       3.1.3   Traffic Modeling Assumptions ......................................................................3-2
       3.1.4   Impact of COVID-19 Pandemic on Traffic Demand and Forecasts .................3-5
   3.2   Existing Conditions...................................................................................................3-7
   3.3   Future Traffic Conditions and Alternatives Analysis ................................................3-7
       3.3.1   Speed...........................................................................................................3-8
       3.3.2   Delay ...........................................................................................................3-10
       3.3.3   Travel Time...................................................................................................3-11

00027634

3.3.4    Level of Service ...................................................................................................3-12

3.3.5    Throughput ........................................................................................................3-13

3.3.6    Local Network ....................................................................................................3-14

3.3.7    Summary ............................................................................................................3-15

3.4    Next Steps ....................................................................................................................3-16

**4    ENVIRONMENTAL RESOURCES, CONSEQUENCES & MITIGATION ...........................................4-1**

4.1    Land Use and Zoning....................................................................................................4-3

4.1.1    Introduction .......................................................................................................4-3

4.1.2    Affected Environment........................................................................................4-3

4.1.3    Environmental Consequences...........................................................................4-4

4.2    Demographics .............................................................................................................4-4

4.2.1    Introduction .......................................................................................................4-4

4.2.2    Affected Environment........................................................................................4-5

4.2.3    Environmental Consequences...........................................................................4-5

4.3    Communities & Community Facilities.........................................................................4-5

4.3.1    Introduction .......................................................................................................4-5

4.3.2    Affected Environment........................................................................................4-5

4.3.3    Environmental Consequences...........................................................................4-5

4.3.4    Mitigation...........................................................................................................4-9

4.4    Parks and Recreational Facilities................................................................................4-9

4.4.1    Introduction .......................................................................................................4-9

4.4.2    Affected Environment......................................................................................4-10

4.4.3    Environmental Consequences.........................................................................4-10

4.4.4    Mitigation.........................................................................................................4-18

4.5    Property Acquisitions and Relocations ....................................................................4-18

4.5.1    Introduction .....................................................................................................4-18

4.5.2    Affected Environment......................................................................................4-18

4.5.3    Environmental Consequences.........................................................................4-22

4.5.4    Mitigation.........................................................................................................4-22

4.6    Visual and Aesthetic Resources ...............................................................................4-24

4.6.1    Introduction .....................................................................................................4-24

4.6.2    Affected Environment......................................................................................4-25

4.6.3    Environmental Consequences.........................................................................4-27

00027635

4.6.4    Mitigation .................................................................................................................4-27

4.7    Historic Architectural and Archaeological Resources ....................................................4-28

4.7.1    Introduction .............................................................................................................4-28

4.7.2    Affected Environment ..............................................................................................4-30

4.7.3    Environmental Consequences ...................................................................................4-33

4.7.4    Mitigation .................................................................................................................4-40

4.8    Air Quality ...................................................................................................................4-41

4.8.1    Introduction .............................................................................................................4-41

4.8.2    Affected Environment ..............................................................................................4-42

4.8.3    Environmental Consequences ...................................................................................4-42

4.8.4    Mitigation .................................................................................................................4-44

4.9    Noise .........................................................................................................................4-45

4.9.1    Introduction .............................................................................................................4-45

4.9.2    Affected Environment ..............................................................................................4-46

4.9.3    Environmental Consequences ...................................................................................4-46

4.9.4    Mitigation .................................................................................................................4-47

4.9.5    Statement of Likelihood ...........................................................................................4-48

4.10    Hazardous Materials ...................................................................................................4-51

4.10.1    Introduction .............................................................................................................4-51

4.10.2    Affected Environment ..............................................................................................4-51

4.10.3    Environmental Consequences ...................................................................................4-51

4.10.4    Mitigation .................................................................................................................4-53

4.11    Topography, Geology, and Soils ...................................................................................4-53

4.11.1    Introduction .............................................................................................................4-53

4.11.2    Affected Environment ..............................................................................................4-54

4.11.3    Environmental Consequences ...................................................................................4-54

4.11.4    Mitigation .................................................................................................................4-55

4.12    Waters of the US and Waters of the State, Including Wetlands ......................................4-55

4.12.1    Introduction .............................................................................................................4-55

4.12.2    Affected Environment ..............................................................................................4-57

4.12.3    Environmental Consequences ...................................................................................4-57

4.12.4    Mitigation .................................................................................................................4-58

4.13    Watersheds and Surface Water Quality ......................................................................4-63

00027636

4.13.1    Introduction ............................................................................................................4-63

4.13.2    Affected Environment.............................................................................................4-64

4.13.3    Environmental Consequences.................................................................................4-65

4.13.4    Mitigation...............................................................................................................4-71

4.14    Groundwater Hydrology .......................................................................................................4-73

4.14.1    Introduction ...........................................................................................................4-73

4.14.2    Affected Environment.............................................................................................4-73

4.14.3    Environmental Consequences.................................................................................4-73

4.14.4    Mitigation...............................................................................................................4-73

4.15    Floodplains ...........................................................................................................................4-74

4.15.1    Introduction ...........................................................................................................4-74

4.15.2    Affected Environment.............................................................................................4-74

4.15.3    Environmental Consequences.................................................................................4-75

4.15.4    Mitigation...............................................................................................................4-75

4.16    Vegetation and Terrestrial Habitat ......................................................................................4-76

4.16.1    Introduction ...........................................................................................................4-76

4.16.2    Affected Environment.............................................................................................4-76

4.16.3    Environmental Consequences.................................................................................4-77

4.16.4    Mitigation...............................................................................................................4-78

4.17    Terrestrial Wildlife ...............................................................................................................4-80

4.17.1    Introduction ...........................................................................................................4-80

4.17.2    Affected Environment.............................................................................................4-80

4.17.3    Environmental Consequences.................................................................................4-80

4.17.4    Mitigation...............................................................................................................4-81

4.18    Aquatic Biota........................................................................................................................4-81

4.18.1    Introduction ...........................................................................................................4-81

4.18.2    Affected Environment.............................................................................................4-82

4.18.3    Environmental Consequences.................................................................................4-83

4.18.4    Mitigation...............................................................................................................4-84

4.19    Rare, Threatened, and Endangered Species .........................................................................4-85

4.19.1    Introduction ...........................................................................................................4-85

4.19.2    Affected Environment.............................................................................................4-85

4.19.3    Environmental Consequences.................................................................................4-89

00027637

4.19.4    Mitigation.................................................................................................4-92

4.20    Unique and Sensitive Areas .................................................................................4-92

4.20.1    Introduction ...........................................................................................4-92

4.20.2    Affected Environment.............................................................................4-92

4.20.3    Environmental Consequences.................................................................4-93

4.20.4    Mitigation..............................................................................................4-93

4.21    Environmental Justice (EJ) and Title VI Compliance .................................................4-93

4.21.1    Introduction ...........................................................................................4-93

4.21.2    Affected Environment.............................................................................4-94

4.21.3    Environmental Consequences...............................................................4-102

4.21.4    Mitigation............................................................................................4-105

4.22    Indirect and Cumulative Effects.........................................................................4-105

4.22.1    Introduction .........................................................................................4-105

4.22.2    Affected Environment...........................................................................4-106

4.22.3    Environmental Consequences...............................................................4-107

4.23    Consequences of Construction ..........................................................................4-109

4.23.1    Visual and Aesthetic Resources ...........................................................4-109

4.23.2    Hazardous Materials ...........................................................................4-110

4.23.3    Air Quality ..........................................................................................4-110

4.23.4    Noise ..................................................................................................4-111

4.24    Commitment of Resources ................................................................................4-111

4.24.1    Irreversible and Irretrievable Commitment of Resources ...........................4-111

4.24.2    Short-Term Effects/Long-Term Effects ..................................................4-112

5    UPDATED DRAFT SECTION 4(F) EVALUATION .......................................................5-1

5.1    Introduction ......................................................................................................5-1

5.1.1    Purpose and Background ..........................................................................5-1

5.1.2    Description of Preferred Alternative..........................................................5-2

5.1.3    Changes Since the Draft Section 4(f) Evaluation and DEIS ..............................5-3

5.2    Inventory and Use of Section 4(f) Properties............................................................5-4

5.2.1    Overview .................................................................................................5-5

5.2.2    George Washington Memorial Parkway......................................................5-10

5.2.3    Chesapeake and Ohio Canal National Historical Park....................................5-12

5.2.4    Clara Barton Parkway............................................................................5-15

00027638


5.2.5    Carderock Springs Historic District......................................................................5-17

5.2.6    Gibson Grove AME Zion Church..........................................................................5-19

5.2.7    Cabin John Stream Valley Park Unit 2..................................................................5-19

5.2.8    Burning Tree Club..............................................................................................5-23

5.2.9    Academy Woods ................................................................................................5-25

5.2.10   Cabin John Regional Park...................................................................................5-25

5.2.11   Tilden Woods Stream Valley Park .......................................................................5-28

5.2.12   Old Farm Neighborhood Conservation Area........................................................5-30

5.2.13   Cabin John Stream Valley Park Unit 6 .................................................................5-31

5.2.14   Cabin John Stream Valley Park (Rockville) ..........................................................5-33

5.2.15   Bullards Park and Rose Hill Stream Valley Park ...................................................5-35

5.2.16   Rockmead Park..................................................................................................5-37

5.2.17   Woottons Mill Park ...........................................................................................5-37

5.2.18   Woodley Gardens...............................................................................................5-39

5.2.19   Rockville Senior Center and Park ........................................................................5-41

5.2.20   Ward Building....................................................................................................5-45

5.2.21   Malcolm King Park .............................................................................................5-45

5.2.22   Morris Park.......................................................................................................5-46

5.3    Avoidance Alternatives and Analysis ...........................................................................5-48

5.4    All Possible Planning ..................................................................................................5-51

5.4.1    Summary of All Possible Planning Presented in DEIS...........................................5-51

5.4.2    Preferred Alternative ........................................................................................5-51

5.4.3    American Legion Bridge (ALB)............................................................................5-52

5.4.4    Morningstar Tabernacle No. 88 Moses Hall and Cemetery...................................5-52

5.4.5    Mitigation.........................................................................................................5-53

5.5    Least Overall Harm.....................................................................................................5-54

5.5.1    Draft Section 4(f) Least Overall Harm Evaluation ...............................................5-55

5.5.2    Updated Least Overall Harm Analysis.................................................................5-55

5.6    Coordination ..............................................................................................................5-60

5.7    Conclusion..................................................................................................................5-61

6    ONE FEDERAL DECISION ......................................................................................................6-1

7    PUBLIC INVOLVEMENT AND AGENCY COORDINATION .........................................................7-1

7.1    Introduction ................................................................................................................7-1

00027639

7.2    Public Involvement.......................................................................................7-1

7.2.1    DEIS Notice of Availability and Comment Period.............................................7-1

7.2.2    Public Outreach with Environmental Justice (EJ) Populations............................7-4

7.2.3    Other Community Meetings and Stakeholder Outreach Events ........................7-6

7.2.4    SDEIS Comment Period and Public Hearing.......................................................7-9

7.3    Agency and Stakeholder Coordination ......................................................7-9

7.3.1    Natural Resource Agency Coordination...........................................................7-14

7.3.2    Section 106 Consultation ...............................................................................7-16

7.3.3    Section 4(f) Agency Coordination ...................................................................7-18

7.4    Incorporation of Public and Agency Input into the Study.........................7-19

**8    LIST OF PREPARERS .......................................................................................8-1**

**9    DISTRIBUTION LIST.........................................................................................9-1**

9.1    Federal Agencies .........................................................................................9-1

9.2    Federally Recognized Tribes ........................................................................9-1

9.3    State of Maryland Agencies .........................................................................9-1

9.4    Commonwealth of Virginia Agencies...........................................................9-2

9.5    State Recognized and Other Tribal Groups...................................................9-2

9.6    County and Local Agencies ..........................................................................9-2

9.7    SDEIS Availability.........................................................................................9-2

**10    REFERENCES .............................................................................................10-1**

## LIST OF TABLES

Table 2-1: Interchange Improvements and HOT Managed Lane Access Locations under the Preferred Alternative[1] ..............................................................................................................2-7

Table 2-2: Stormwater Management for the Preferred Alternative ......................................2-11

Table 2-3: Compensatory SWM Phase 1 South Potential.......................................................2-13

Table 2-4: Compensatory SWM Potential Phase 1 South Environmental Impacts .................2-13

Table 2-5: Summary and Comparison of Shared Use Path Options ......................................2-25

Table 3-1: Existing Average Daily Traffic (ADT).....................................................................3-7

Table 3-2: Existing and No Build Average Daily Traffic (ADT) .................................................3-7

Table 3-3: 2045 Average Daily Traffic (ADT) .........................................................................3-8

Table 3-4: 2045 Average Speed ............................................................................................3-8

Table 3-5: 2045 Corridor Travel Speed (mph) Results from VISSIM Model.............................3-9

Table 3-6: 2045 System-Wide Delay ...................................................................................3-10

Table 3-7: 2045 Travel Time Index (TTI)...............................................................................3-11

Table 3-8: 2045 Travel Time Index (TTI) Results for General Purpose Lanes from VISSIM Model .........3-12

Table 3-9: 2045 Percent of Lane-Miles Operating at LOS F ..................................................3-12


Table 3-10: 2045 Vehicle Throughput.............................................................................................3-13
Table 3-11: 2045 Vehicle Throughput Results from VISSIM Model.........................................3-13
Table 3-12: 2045 Effect on the Local Network.............................................................................3-14
Table 3-13: 2045 Local Network Results from MWCOG Model .................................................3-15
Table 4-1: Summary of Quantifiable Impacts for the Preferred Alternative ..............................4-3
Table 4-2: Conversion of Land Use Within the Preferred Alternative LOD (Acres) ...................4-4
Table 4-3: Property Impacts in Analysis Area Communities.......................................................4-6
Table 4-4: Property Impacts to Community Facilities from the Preferred Alternative .............................4-9
Table 4-5: Potential Public Park Impacts (Acres).......................................................................4-10
Table 4-6: Summary of NPS Wetland and Floodplain Impacts on NPS Properties...................4-12
Table 4-7: NPS Historic Properties with Adverse Effect............................................................4-13
Table 4-8: RTE Plant Species Surveyed within the Potomac River Gorge Portion...................4-13
Table 4-9: Survey Trees on NPS Properties and Impacts from the Preferred Alternative.......................4-15
Table 4-10: Summary of Impacts from the Preferred Alternative to Parks Acquired .............................4-17
Table 4-11: M-NCPPC Parkland and Resource Impacts (Acres)................................................4-19
Table 4-12: City of Rockville Parkland and Resource Impacts (Acres)......................................4-20
Table 4-13: City of Gaithersburg Parkland and Resource Impacts (Acres)..............................4-21
Table 4-14: Summary of Right-of-Way Acquisitions and Impacts from the Preferred Alternative .........4-22
Table 4-15: Property Impacts by Geographic Area .....................................................................4-23
Table 4-16: Historic Architectural Properties within the APE for the Preferred Alternative...................4-31
Table 4-17: Eligible Archaeological Resources within the APE of the Preferred Alternative .................4-32
Table 4-18: Historic Architectural Properties with Known Adverse Effect...............................4-34
Table 4-19: Historic Properties with Revised Effect Determinations Subsequent to the DEIS................4-36
Table 4-20: Archaeological Resources with a Known Adverse Effect........................................4-38
Table 4-21: Summary of Noise Sensitive Area (NSA) Impacts and ..........................................4-48
Table 4-22: Sites of Potential Concern Summary ......................................................................4-52
Table 4-23: Impact to Soils by Type in Acres ............................................................................4-54
Table 4-24: Impacts to Steep Slopes and Highly Erodible Soils in Acres..................................4-55
Table 4-25: Summary of Impacts to USACE/MDE Wetlands and Waterways ..........................4-58
Table 4-26: Summary of Delineated NPS Wetland Features and Impacts on NPS Properties within the
Preferred Alternative LOD ..........................................................................................................4-59
Table 4-27: Maryland Wetland and Stream Mitigation Requirements ..................................4-61
Table 4-28: Proposed Mitigation Sites.......................................................................................4-61
Table 4-29: Summary of Impacts to Waterways by Classification within USGS HUC8 Watersheds........4-65
Table 4-30: Summary of Impacts to Wetlands and Waterways by Classification within MD 8-Digit
Watersheds.................................................................................................................................4-66
Table 4-31: Impacts to Wetland Buffers by Classification within MD 8-Digit Watersheds .....................4-66
Table 4-32: Summary of Impacts to Wetlands and Waterways by Classification ...................4-67
Table 4-33: Additional Impervious Surfaces by MDNR 12-Digit Watershed ..........................4-71
Table 4-34: Additional Impervious Surface by 8-Digit Watershed ..........................................4-71
Table 4-35: Waterways and Associated Floodplains within the Preferred Alternative LOD ...................4-74
Table 4-36: Impacts to FEMA 100-Year Floodplain in Acres....................................................4-75
Table 4-37: Impacts to Forests in Acres.....................................................................................4-77
Table 4-38: NPS Tree Survey Results and Impacts on NPS Properties.....................................4-77

00027641

Table 4-39: Impacts to Potential FIDS Habitat Within the Preferred Alternative in Acres......................4-81
Table 4-40: Summary of Watershed Quality Index Narrative Score Results ...........................................4-83
Table 4-41: SSPRA Impact Acreage within the Preferred Alternative ....................................................4-86
Table 4-42: RTE Plant Species Surveyed within the Potomac River Gorge Portion................................4-87
Table 4-43: Impacts to Unique and Sensitive Areas (acres)..................................................................4-93
Table 4-44: Environmental Justice Working Group Meetings ...............................................................4-101
Table 4-45: Comparison of Effects to EJ Block Groups Compared to Non-EJ Block Groups.................4-102
Table 5-1: Summary of Section 4(f) Property Use .................................................................................5-6
Table 5-2: Avoided Section 4(f) Use by the Preferred Alternative .........................................................5-9
Table 5-3: Avoidance Alternatives .......................................................................................................5-49
Table 5-4: Least Overall Harm Analysis................................................................................................5-56
Table 7-1: DEIS Viewing Locations ......................................................................................................7-2
Table 7-2: Environmental Justice Working Group Meetings ..................................................................7-6
Table 7-3: Stakeholder and Community Meetings ................................................................................7-7
Table 7-4:  Agency & Stakeholder Coordination Meetings Post-DEIS Publication ..................................7-10
Table 7-5: IAWG Meetings Post-DEIS Publication..................................................................................7-13
Table 7-6: City of Rockville and City of Gaithersburg Meetings Post-DEIS Publication ..........................7-14
Table 7-7: Natural Resource Related Meetings .....................................................................................7-14
Table 7-8: Section 106 Consultation Meetings Post-DEIS Publication....................................................7-17

## LIST OF FIGURES

Figure 1-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative..................................1-2
Figure 2-1: Alternatives Screening Process...........................................................................................2-2
Figure 2-2: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative..................................2-4
Figure 2-3: Alternative 9 – Phase 1 South Typical Sections (HOT Managed Lanes Shown in Yellow).......2-5
Figure 2-4: Proposed HOT Managed Lanes Access Locations................................................................2-9
Figure 2-5: Shared Use Path Option 2 Alignment (Shown in White)......................................................2-26
Figure 2-6: Shared Use Path Option 3 Alignment (Shown in White)......................................................2-26
Figure 2-7: Shared Use Path Option 4 Alignment (Shown in White)......................................................2-27
Figure 3-1: Limits of VISSIM Model Network and Interchange Locations Included along I-495 and I-270..2-3
Figure 3-2: Daily Traffic Volume Changes on I-495 and I-270 During COVID-19 Pandemic vs. 2019 ........3-6
Figure 4-1: Analysis Area Communities ...............................................................................................4-7
Figure 4-2: Phase 1 South Wetland and Stream Mitigation Sites...........................................................4-62
Figure 4-3: Environmental Justice Populations Adjacent to the Preferred Alternative LOD.....................4-96
Figure 4-4: Maryland EJSCREEN EJScore for Census Tracts in the Analysis Area....................................4-99
Figure 5-1: I-495 & I-270 Managed Lanes Study Corridors –  Preferred Alternative................................5-2
Figure 5-2: George Washington Memorial Parkway...............................................................................5-11
Figure 5-3: Chesapeake and Ohio C&O Canal NHP and Clara Barton Parkway .......................................5-14
Figure 5-4: Carderock Springs Historic District ....................................................................................5-18
Figure 5-5: Gibson Grove AME Zion Church .........................................................................................5-20
Figure 5-6: Cabin John SVP Unit 2.......................................................................................................5-22
Figure 5-7: Burning Tree Club .............................................................................................................5-24
Figure 5-8: Academy Woods ...............................................................................................................5-26

00027642

Figure 5-9: Cabin John Regional Park..................................................................................................5-27
Figure 5-10: Tilden Woods SVP and Old Farm NCA ...........................................................................5-29
Figure 5-11: Cabin John Stream Valley Park, Unit 6...........................................................................5-32
Figure 5-12: Cabin John Stream Valley Park (Rockville)....................................................................5-34
Figure 5-13: Bullards Park and Rose Hill Stream Valley Park.............................................................5-36
Figure 5-14: Rockmead Park ..............................................................................................................5-38
Figure 5-15: Woottons Mill Park.........................................................................................................5-40
Figure 5-16: Woodley Gardens ...........................................................................................................5-42
Figure 5-17: Rockville Senior Center and Park and Ward Building ....................................................5-44
Figure 5-18: Malcolm King Park and Morris Park ..............................................................................5-47

## LIST OF APPENDICES

| | |
|---|---|
| APPENDIX A | Traffic Evaluation Memorandum: Alternative 9 – Phase 1 South |
| APPENDIX B | COVID-19 Travel Analysis and Monitoring Plan |
| APPENDIX C | Compensatory Stormwater Mitigation Plan (July 12, 2021) |
| APPENDIX D | Environmental Resource Mapping |
| APPENDIX E | Noise Analysis Technical Report Addendum (July 2021) |
| APPENDIX F | Natural Resources Impact Tables: Alternative 9 – Phase 1 South |
| APPENDIX G | Wetland and Floodplain Statement of Findings July 2021 |
| APPENDIX H | Rare, Threatened and Endangered Species and Plant Survey Reports |
| APPENDIX I | Limited Phase 1 Environmental Site Assessment Phase 1 South |
| APPENDIX J | Visual Impact Assessment Questionnaire |
| APPENDIX K | EJSCREEN Data & Mapping Supporting the Environmental Justice Analysis |

## ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| 495 NEXT | Virginia Department of Transportation I-495 Express Lanes Northern Extension |
| AC | Acres |
| ACHP | Advisory Council on Historic Preservation |
| ADT | Annual Daily Traffic |
| ALB | American Legion Bridge |
| AMR | Avoidance, Minimization, and Impacts Report |
| APE | Area of Potential Effects |
| ARDS | Alternatives Retained for Detailed Study |
| AST | Aboveground Storage Tank |
| BMP | Best Management Practice |
| BRT | Bus Rapid Transit |
| C&O | Chesapeake and Ohio |
| CAVs | Connected and Automated Vehicles |
| CCA | Capper-Cramton Act |
| CEA | Community Effects Assessment |

00027643

Supplemental Draft Environmental Impact Statement



| | |
|---|---|
| CFR | Code of Federal Regulations |
| $CH_4$ | Methane |
| CLRP | Constrained Long-Range Plan |
| CMP | Compensatory Mitigation Plan |
| CNE | Common Noise Environment |
| CO | Carbon Monoxide |
| $CO_2$ | Carbon Dioxide |
| COMAR | Code of Maryland Regulations |
| $C_{pv}$ | Channel Protection Volume |
| CWA | Clean Water Act |
| dB | Decibel |
| dBA | A-weighted Decibel |
| DBH | Diameter at Breast Height |
| DEIS | Draft Environmental Impact Statement |
| DHR | Department of Historical Resources |
| DOT | Department of Transportation |
| DPW&T | Department of Public Works & Transportation |
| E&S | Erosion and Sediment Control |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EJ | Environmental Justice |
| EO | Executive Order |
| EPA | Environmental Protection Agency |
| ESA | Environmental Site Assessment |
| ESD | Environmental Site Design |
| ETC | Electronic Toll Collection |
| ETL | Express Toll Lane |
| FEIS | Final Environmental Impact Statement |
| FEMA | Federal Emergency Management Agency |
| FHWA | Federal Highway Administration |
| FIDS | Forest Interior Dwelling Bird Species |
| FTA | Federal Transit Administration |
| GHG | Greenhouse Gases |
| GI | Green Infrastructure |
| GIA | Green Infrastructure Assessment |
| GIS | Geographic Information System |
| GP | General Purpose |
| GWMP | George Washington Memorial Parkway |
| H&H | Hydrologic and Hydraulic |
| HB | House Bill |
| HOA | Homeowners' Association |

00027644



Supplemental Draft Environmental Impact Statement

| | |
|---|---|
| HOT | High-occupancy Toll |
| HOV | High-occupancy Vehicle |
| HUC | Hydrologic Unit Code |
| HUD | Housing and Urban Development |
| IAPA | Interstate Access Point Approval |
| IAT | Impervious Area Treatment |
| IAWG | Interagency Working Group |
| IB | Indiana Bat |
| IBI | Indices of Biological Integrity |
| ICC | Intercounty Connector |
| ICE | Indirect and Cumulative Effects |
| ICM | Innovative Congestion Management |
| JD | Jurisdictional Determination |
| JPA | Joint Permit Application |
| KLC | Keyes, Lethbridge, and Condon |
| LF | Linear Feet |
| LOD | Limits of Disturbance |
| LOS | Level of Service |
| LRP/VCP | Land Restoration Program/Voluntary Cleanup Program |
| LUST | Leaking Underground Storage Tank |
| MARC | Maryland Area Regional Commuter |
| MCCC | Maryland Commission on Climate Change |
| MCDOT | Montgomery County Department of Transportation |
| MDE | Maryland Department of the Environment |
| MDNR | Maryland Department of Natural Resources |
| MDOT SHA | Maryland Department of Transportation State Highway Administration |
| MDP | Maryland Department of Planning |
| MDTA | Maryland Transportation Authority |
| MERLIN | Maryland's Environmental Resources and Land Information Network |
| MHT | Maryland Historical Trust |
| MIHP | Maryland Inventory of Historic Properties |
| M-NCPPC | Maryland-National Capital Park and Planning Commission |
| MPO | Metropolitan Planning Organization |
| MPH | Miles per Hour |
| MSATs | Mobile Source Air Toxics |
| MSFCMA | Magnuson-Stevens Fishery Conservation and Management Act |
| MTA | Maryland Transit Administration |
| MWCOG | Metropolitan Washington Council of Governments |
| MWG | Mitigation Working Group |
| $N_2O$ | Nitrous Oxide |
| NAAQS | National Air Quality Standards |

00027645

| NAC | Noise Abatement Criteria |
| NB | Northbound |
| NCPC | National Capital Planning Commission |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |
| NIST | National Institute of Standards and Technology |
| NLEB | Northern Long-eared Bat |
| NMFS | National Marine Fisheries Service |
| $NO_2$ | Nitrogen Dioxide |
| NOAA | National Oceanic and Atmospheric Administration |
| NPS | National Park Service |
| NRCS | Natural Resources Conservation Service |
| NRHP | National Register of Historic Places |
| NPDES | National Pollutant Discharge Elimination System |
| NSA | Noise-sensitive Area |
| $O_3$ | Ozone |
| OFD | One Federal Decision |
| OWJ | Officials with Jurisdiction |
| P3 | Public-Private Partnership |
| PA | Programmatic Agreement |
| Pb | Lead |
| PCB | Polychlorinated Biphenyl |
| PCT | Piscataway Conoy Tribe of Maryland |
| PEM | Palustrine Emergent |
| PFO | Palustrine Forested |
| PM | Particulate Matter |
| PPE | Personal Protective Equipment |
| PSI | Preliminary Site Investigations |
| PSS | Palustrine Scrub-shrub |
| PTI | Planning Time Index |
| $Q_p$ | Quantity Management |
| RBP | Rapid Bioassessment Protocol |
| RFP | Request for Proposals |
| ROD | Record of Decision |
| RTE | Rare, Threatened, and Endangered |
| SB | Southbound |
| SDEIS | Supplemental Draft Environmental Impact Statement |
| SF | Square Feet |
| SFB | Small-footed Bat |
| SGCN | Species of Greatest Conservation Need |
| $SO_2$ | Sulfur Dioxide |

00027646

| SOF | Statement of Findings |
| SPA | Special Protection Area |
| SSPRA | Sensitive Species Project Review Areas |
| SVP | Stream Valley Park |
| SWAP | State Wildlife Action Plan |
| SWM | Stormwater Management |
| TDM | Transportation Demand Management |
| TEA | Targeted Ecological Area |
| TMDL | Total Maximum Daily Loads |
| TNM | Traffic Noise Model |
| TSM | Transportation System Management |
| TTI | Travel Time Index |
| USACE | United States Army Corps of Engineers |
| USC | United States Code |
| USDA | United States Department of Agriculture |
| USDOI | United States Department of the Interior |
| USDOT | United States Department of Transportation |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |
| USPS | United States Postal Service |
| UST | Underground Storage Tank |
| VAC | Virginia Administrative Code |
| VDCR | Virginia Department of Conservation and Recreation |
| VDEQ | Virginia Department of Environmental Quality |
| VDGIF | Virginia Department of Game and Inland Fisheries |
| VDHR | Virginia Department of Historic Resources |
| VDOT | Virginia Department of Transportation |
| VMT | Vehicle Miles Traveled |
| WBFC | Washington Biologists' Field Club |
| WHS | Wildlife and Heritage Service |
| WMATA | Washington Metropolitan Area Transit Authority |
| WQ$_v$ | Water Quality Volume |
| WQC | Water Quality Certification |
| WSSC | Washington Suburban Sanitary Commission |
| WUS | Waters of the United States |

00027647

# EXECUTIVE SUMMARY

## Overview

### What is the Purpose of the Supplemental Draft Environmental Impact Statement?

An Environmental Impact Statement (EIS) may be supplemented at any time, in accordance with 23 CFR 771.130, when the Federal Highway Administration (FHWA) determines that changes to the proposed action or new information relevant to environmental concerns or impacts from the proposed action were not evaluated in the Draft EIS (DEIS). This Supplemental Draft Environmental Impact Statement (SDEIS) has been prepared to consider new information relative to the Preferred Alternative, Alternative 9 - Phase 1 South. Building off the analysis in the existing DEIS, the SDEIS discloses new information relevant to the Preferred Alternative focusing on new information while referencing the DEIS for information that remains valid. The SDEIS also describes the background and context in which the Preferred Alternative, Alternative 9 - Phase 1 South was identified. The SDEIS will be available for the public to review and comment on the Preferred Alternative during a 45-day comment period. Following the comment period of the SDEIS, FHWA and the Maryland Department of Transportation State Highway Administration (MDOT SHA) will consider comments received and will respond to substantive comments on the DEIS and SDEIS in the Final Environmental Impact Statement (FEIS).

### What is the Focus of the SDEIS?

The SDEIS focuses on new information related to the Preferred Alternative for the I-495 & I-270 Managed Lanes Study (Study). The Study is considering alternatives that address roadway congestion within the specific Study scope which remains unchanged from the DEIS: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including replacement of the American Legion Bridge over the Potomac River, to west of MD 5 and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs, in Montgomery and Prince George's Counties, Maryland. The Preferred Alternative, Alternative 9 - Phase 1 South (shown in **dark blue** in **ES-Figure 1**), includes build improvements within the limits of Phase 1 South only. There is no action or no improvements included at this time on I-495 east of the I-270 east spur to MD 5 (shown in **light blue** in **ES-Figure 1**). While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the scope of the Study, improvements on the remainder of the interstate system may still be needed in the future and would advance separately, subject to additional environmental studies, analysis and collaboration with the public, stakeholders and local agencies.

00027648

### ES-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative



## What Is the Study's Purpose and Need?

The Purpose and Need Statement remains the same as presented in the **DEIS, Chapter 1** and in the full Purpose and Need Statement in **DEIS, Appendix A.** However, the purpose and needs are restated below for ease to the reader.

The Study's purpose is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the Study limits, and enhances existing and planned multimodal mobility and connectivity.

The needs for the Study are:

- Accommodate Existing Traffic and Long-Term Traffic Growth
- Enhance Trip Reliability
- Provide Additional Roadway Travel Choices
- Accommodate Homeland Security
- Improve Movement of Goods and Services

Two goals for the Study were also identified in addition to the purpose and needs: (1) the use of alternative funding approaches for financial viability and (2) environmental responsibility. Refer to **Chapter 1** and **DEIS, Appendix A** for additional information on the Study's Purpose and Need.

## Does the Purpose and Need remain valid with the Preferred Alternative?

Identifying Alternative 9 - Phase 1 South as the Preferred Alternative does not alter the Study's Purpose and Need. The overall need for improvements in the study area remains valid, regardless of the build alternatives evaluated and any potential change to the limits of construction for a preferred alternative. The stated project needs, to accommodate existing and long-term traffic growth, to enhance trip reliability, and to provide additional roadway choices, are still necessary to address transportation

00027649



challenges in the study area. In addition, MDOT SHA continues to consider potential changes in traffic and mobility trends as a result of the pandemic, as described in **Chapter 3** of this SDEIS, and will report on those findings in the FEIS.

## Will Comments on the DEIS be Addressed?

All substantive comments received on DEIS and SDEIS will be reviewed and responded to in the FEIS.

Over the last year, MDOT SHA and FHWA have considered the nearly 3,000 comments received on the DEIS and have worked with our partner agencies and stakeholders to address many of the common comments received through the following efforts:

- Aligning the Preferred Alternative and permitting process with the phased delivery approach focusing on addressing the severe congestion at the American Legion Bridge as priority.
- Avoiding and significantly reducing property, community, historic, natural resources and parkland impacts.
- Avoiding all residential and business displacements.
- Avoiding impacts to Morningstar Tabernacle No. 88 Moses Hall and Cemetery.
- Identifying on-site and off-site stormwater management to meet regulatory requirements.
- Monitoring and analyzing traffic impacts associated with the COVID-19 Pandemic to understand any impacts to the Study.
- Committing to priority bicycle, pedestrian, and transit improvements to increase multi-modal options for travel within the study corridors.
- Including toll-free travel under the Preferred Alternative for High Occupancy Vehicles (HOV) with three (3) or more user, transit buses, carpool/vanpool and motorcyclists to reduce the reliance on single occupancy vehicles and provide equitable travel options.

This effort was possible through the extensive agency and stakeholder coordination that occurred since publication of the DEIS in July 2020 including:

- Establishing Economic, Transit and Environmental Justice Working Groups

- Holding over 60 individual stakeholder Meetings with municipalities, non-governmental organizations, elected officials and communities.

- Holding over 80 resource and regulatory agency meetings to discuss DEIS comments, avoidance, minimization, and mitigation opportunities; and

- Holding over 60 field and office meetings with regulatory agencies to discuss natural resource impacts, stormwater management, culvert augmentation and permitting.

Refer to SDEIS **Chapters 4** and **5** for more detail on avoidance, minimization and mitigation efforts and **SDEIS, Chapter 7** for more detail on public and agency coordination.

## How Has the COVID-19 Pandemic Impacted the Study?

The COVID-19 global pandemic had a profound impact on the daily routines of people across the world, affecting the way residents and commuters in the National Capital Region work, travel, and spend their free time. These changes have altered traffic demand, transit use, and traffic volumes on all roadways in

00027650

Maryland, the District of Columbia, and Virginia, including I-495 and I-270. MDOT SHA has been closely monitoring the changes in traffic patterns throughout the pandemic. Refer to **SDEIS, Appendix B** for the COVID-19 Travel Analysis and Monitoring Plan. This plan includes a sensitivity analysis that will confirm the need for the project and verify that the Preferred Alternative would provide benefits if future demand is less than projected. Results will be included in the FEIS.

The traffic data shows a severe drop in traffic volumes in April 2020 after stay-at-home orders were issued across Maryland, with daily traffic volumes on I-270 and I-495 reducing by more than 50 percent compared to April 2019. With the rollout of vaccines in early 2021, the corresponding drop in COVID-19 cases, and the gradual reopening of schools and businesses, traffic volumes have continued to recover and are back to over 90 percent of normal as of August 2021. Transit use has been slower to recover, with usage of the Maryland Department of Transportation Maryland Transit Administration (MDOT MTA) services still down approximately 50 percent compared to pre-pandemic levels as of August 2021 per data presented on MDOT's coronavirus tracking website.

The COVID-19 Travel Analysis and Monitoring Plan will continue to evaluate transportation trends and confirm that the capacity improvements proposed under the Preferred Alternative would be needed and effective if future demand changes substantially from the pre-pandemic forecasts. MDOT SHA must ensure that transportation improvements are being developed to meet our State's needs not only for today, but for the next 25-plus years. Because long-term travel trends are far from settled and because the most recent data suggests traffic is rebounding close to pre-pandemic levels, the SDEIS forecasts continue to apply models that were developed and calibrated prior to 2020 for use in evaluating projected 2045 conditions in this document. However, MDOT SHA will continue to review new data as it becomes available. The sensitivity analysis evaluating several "what if" scenarios related to future traffic demand due to potential long-term changes to teleworking, e-commerce, and transit use as part of the *COVID-19 Travel Analysis and Monitoring Plan* (**SDEIS, Appendix B**) is ongoing.

Refer to **Chapter 3, Section 3.1.4 and SDEIS, Appendix B** for additional detail on the impact of the COVID-19 pandemic on the Study. Results will be presented in the FEIS.

## Supplemental Draft Environmental Impact Statement

### What is Included in the Supplemental Draft Environmental Impact Statement vs. the Final Environmental Impact Statement?

This SDEIS has been prepared to present new information relative to the Preferred Alternative, Alternative 9 – Phase 1 South. FHWA and MDOT SHA have identified Alternative 9 Phase 1 South as the Preferred Alternative.

This SDEIS supplements the existing DEIS that was published on July 10, 2020. The SDEIS is limited to focus on new information while referencing the DEIS for information that remains valid. The detailed documentation of existing conditions, methodologies, assessments of effects of the DEIS Build Alternatives, and conceptual mitigation, when applicable, are included in the Study technical reports appended to the DEIS (**Appendices A through S**) and are available through the Program website (https://495-270-p3.com/deis/#DEIS).

The SDEIS presents a description of the Preferred Alternative, as well as the associated traffic analysis along with the permanent and temporary impacts associated with the Preferred Alternative. With the advancement of the Preferred Alternative, coordination with the resource agencies on avoidance, minimization, and conceptual mitigation has continued. The SDEIS describes the current efforts from the

July 2020 DEIS publication through summer 2021 on the avoidance, minimization, and conceptual mitigation. Final mitigation and commitments will be included with the Record of Decision (ROD).

The SDEIS is available so that interested citizens, elected officials, government agencies, businesses, and other stakeholders can review and comment on the Preferred Alternative over a 45-day comment period and during a virtual public hearing on November 1, 2021 (refer to oplanesmd.com/SDEIS for the latest details on the virtual public hearing).

After circulation of the SDEIS and review and consideration of comments received, a FEIS will be developed.  The FEIS will focus on any additional analysis and refinements of the data, as well as responding to substantive comments received on the DEIS and SDEIS. Additional analyses or final analyses that will be presented in the FEIS include:

- Final Visual Impacts Assessment for the Preferred Alternative, including renderings and final mitigation

- Final Air Quality Analysis for the Preferred Alternative including CO, MSATs, Greenhouse Gas Emissions and construction related air quality impacts.

- Final Section 4(f) Evaluation with the final Least Overall Harm Analysis.

- Final Environmental Justice Analysis including consideration of mitigation, comparison of adverse effects from the Preferred Alternative within EJ populations to adverse effects within a non EJ population reference community and final conclusion of whether disproportionately high and adverse effects would occur.

- Final Mitigation Package including all final measures to mitigate unavoidable impacts for all resources identified through coordination with jurisdictional agencies.

- Final Wetland and Floodplain Statement of Findings identifying final mitigation for impacts to wetlands and floodplain on National Park Service property.

- Final Application Joint Federal/State Application and supporting documentation for the Alteration of Any Floodplain, Waterway, Tidal or Nontidal Wetlands.

## What is the Format of the SDEIS?

The format of the SDEIS follows the same format as the July 10, 2020 DEIS and contains ten chapters.

- **Chapter 1** presents the Study's Purpose and Need, which is unchanged from the DEIS, but repeated for ease of the reader. This chapter is supported by the *Purpose and Need Statement* (**DEIS, Appendix A,** https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_AppA_PN_web.pdf).
- **Chapter 2** presents a description of the Preferred Alternative. It also describes other common elements of the Preferred Alternative such as, limits of disturbance (LOD),[1] managed lanes access, stormwater management, culverts, construction and short-term effects, transit elements, pedestrian and bicycle considerations, and tolling.
- **Chapter 3** presents results from the traffic operational analyses conducted for the 2045 No Build Alternative and Preferred Alternative. It also discusses how the effects of the pandemic are being

---

[1] The limits of disturbance are the proposed boundary within which all construction, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, and related activities would occur.

00027652

considered in the traffic analysis, as well as the effects to local roadway networks. This chapter is supported by *Traffic Evaluation Memorandum – Alternative 9: Phase 1 South* in **SDEIS, Appendix A.**

- **Chapter 4** presents the permanent and temporary impacts associated with the Preferred Alternative. It also provides an update on the measures to avoid, minimize, and mitigate potential environmental effects, where applicable. Final mitigation will be included in the FEIS.

- **Chapter 5** presents the Updated Draft Section 4(f) Evaluation, which updates the potential Section 4(f) uses and mitigation associated with the Preferred Alternative to significant public parks, recreational areas, and historic properties in compliance with Section 4(f) of the US Department of Transportation (USDOT) Act of 1966. This chapter is a supplement to the *Draft Section 4(f) Evaluation* (**DEIS, Appendix F,** https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_AppF_Draft-Section-4f-Eval_web.pdf).

- **Chapter 6** acknowledges that on January 20, 2021, *Executive Order 13807: Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects,* was revoked in the *Executive Order 13990: Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis.*

- **Chapter 7** presents a summary of the public outreach and agency coordination for the Study that has occurred, since publication of the DEIS in July 2020 through summer 2021.

- **Chapter 8** presents the List of Preparers of the SDEIS.

- **Chapter 9** presents the Distribution List of agencies, organizations, and persons to whom the SDEIS was made available for review and comment as well as information on public availability of the SDEIS.

- **Chapter 10** presents the references for the SDEIS.

The SDEIS focuses on new information related to the Preferred Alternative. The complete SDEIS and supporting appendices can be found on the Program website: oplanesmd.com/SDEIS. Existing information from the July 2020 DEIS that has not changed will not be repeated in the SDEIS, but the DEIS and supporting technical analyses are available for review and reference on the Program website: https://495-270-p3.com/deis/.

## What are the Ways to Comment on the SDEIS?

FHWA and MDOT SHA invite interested elected officials, state and local governments, other Federal agencies, Native American tribal governments, organizations, and members of the public to provide comments on the SDEIS. The SDEIS for the Study and technical reports can be viewed and downloaded from the project website at: oplanesmd.com/SDEIS.

The public comment period opens on October 1, 2021 and will continue until November 15, 2021. *Written and oral comments will be given equal consideration*. MDOT SHA and FHWA will review all comments, and consider and respond to all substantive comments received or postmarked by that date in the preparation of the FEIS. Comments received or postmarked after that date will be reviewed and considered to the extent practicable. A virtual public hearing will be held on November 1, 2021. Refer to oplanesmd.com/SDEIS for the latest information on the public hearing details.

00027653

Comments on the SDEIS may be made by:

- Oral testimony at the virtual Public Hearing, on November 1, 2021
- SDEIS comment form at oplanesmd.com/SDEIS
- Email to MLS-NEPA-P3@mdot.maryland.gov
- Letters to Jeff Folden, I-495 & I-270 P3 Program Deputy Director, I-495 & I-270 P3 Office, 707 North Calvert Street, Mail Stop P-601, Baltimore MD 21202
- Call-in a comment at 855-432-1483 and leave a voicemail that is limited to three minutes

## Alternatives

### What is the Preferred Alternative?

In January 2021, Alternative 9 was announced as the MDOT SHA Recommended Preferred Alternative based on results of traffic, engineering, financial, and environmental analyses, as well as public comment. After several months of further coordinating with and listening to agencies and stakeholders regarding Alternative 9 as the Recommended Preferred Alternative, MDOT SHA decided to align the Study to be consistent with the previously determined phased delivery and permitting approach which focused on Phase 1 South only. As a result, FHWA and MDOT SHA identified a new Recommended Preferred Alternative: Alternative 9 – Phase 1 South. Alternative 9 – Phase 1 South includes the same improvements proposed as part of Alternative 9 but limited to the Phase 1 South limits only (**Figure ES-1**). This Preferred Alternative was identified after coordination with resource agencies, the public and stakeholders to respond directly to feedback received on the DEIS, and to align the NEPA approval with the P3 Program's planned project phased delivery and permitting approach. FHWA and Cooperating Agencies[2] concurred on Alternative 9 - Phase 1 South as the Preferred Alternative in June 2021.

The Preferred Alternative includes a two-lane, High Occupancy Toll (HOT) managed lanes network on I-495 and I-270 within the limits of Phase 1 South only (**Figure ES-2**). On I-495, the Preferred Alternative consists of adding two, new HOT managed lanes in each direction from the George Washington Memorial Parkway to east of MD 187. On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5. Along I-270, the existing collector-distributor (C-D) lanes from Montrose Road to I-370 would be removed as part of the proposed improvements. The managed lanes would be separated from the general purpose lanes using pylons placed within a four-foot wide buffer. Transit buses and HOV 3+ vehicles would be permitted to use the managed lanes toll-free.

---

[2] NCPC and M-NCPPC did not concur on the Preferred Alternative.

00027654



### Figure ES-1: Alternative 9 – Phase 1 South Typical Sections (HOT Managed Lanes Shown in Yellow)

I-495 from the George Washington Memorial Parkway to east of MD 187



I-495: American Legion Bridge (Looking north towards Maryland)

Exit and entrance lanes provide access to the High-Occupancy Toll Lanes from the George Washington Memorial Parkway

High-Occupancy Toll Lanes with free transit and carpools of three or more

Possible location for shared-use path on ALB

I-495 east of MD 187 to west of MD 5 - NO ACTION AT THIS TIME



I-270 from I-495 to I-370



## What Transit Components Are Included in the Preferred Alternative?

While standalone transit alternatives were found to not meet the Study's Purpose and Need, the Preferred Alternative includes transit elements consistent with the project purpose of enhancing existing and planned multimodal mobility and connectivity. (Refer to **Chapter 2, Section 2.3.7** for additional details on the transit-related elements of the Preferred Alternative.) In furtherance of this key consideration and to address public and agency comments received to-date, MDOT SHA has identified opportunities to enhance transit mobility and connectivity within the Preferred Alternative. These include the following elements:

- Allowing bus transit usage of the HOT managed lanes toll free to provide an increase in speed of travel, assurance of a reliable trip, and connection to local bus service/systems on arterials that directly connect to urban and suburban activity and economic centers.

- Accommodating direct and indirect connections from the proposed HOT managed lanes to existing transit stations and planned Transit Oriented Development at the Shady Grove Metro (I-370), Twinbrook Metro (Wootton Parkway), Montgomery Mall Transit Center (Westlake Terrace), and Medical Center Metro (MD 187).

- Regional transit improvements to enhance existing and planned transit and support new opportunities for regional transit service have been committed to as part of the Preferred Alternative and include:

00027655

- o   Construction of new bus bays at WMATA Shady Grove Metrorail Station
- o   Increased parking capacity at the Westfield Montgomery Mall Park and Ride

Transit elements were also considered by the Transit Work Group and the joint I-495/American Legion Bridge Transit/Transportation Demand Management (TDM) study by the Virginia Department of Trail and Public Transit and the Maryland Department of Transportation Maryland Transit Administration. Both of these initiatives resulted in reports.

The *Transit Service Coordination Report* completed in coordination with the Transit Work Group was made available to the public in June 2020 on the P3 Program website (https://495-270-p3.com/transit-benefits/) and it is being used to inform affected counties and transit providers about the significant transit opportunities offered by managed lanes such as strategies to maximize the benefits of reliability and speed; provide a basis for the evaluation and prioritization of future capital and operating needs in the service area; and initiate discussions about ways to incorporate regional transit services into the P3 Program.

The *I-495/ALB Transit/TDM Final Report and Plan* was completed in March 2021 and was posted online. (http://www.drpt.virginia.gov/media/3375/i495_alb_transittdm_study_finalreport_030521_combined.pdf) It identified a series of potential investment packages to provide new mobility choices to service bi-state travel. Each package outlined a combination of transit service elements, technology enhancements, Commuter Assistance Programs, and parking needs. The investment packages offered options to move more people across the American Legion Bridge (ALB) in fewer vehicles.

## What Additional Transit Commitments Have Been Made through the P3 Agreement?

On August 11, 2021, in accordance with Maryland law, MDOT and MDTA presented to and received approval from the Board of Public Works to award the Phase 1 P3 Agreement to the Selected Proposer for the predevelopment work related to Phase 1 South of the P3 Program.  As part of its proposal, the Phase Developer has committed to provide an estimated $300 million for transit services in Montgomery County over the operating term of Phase 1 South.

To further support transit services, MDOT has committed, upon financial close of the Section P3 Agreement for Phase 1 South, to fund not less than $60 million for design and permitting of high priority transit investments in Montgomery County, such as Phase I of the Corridor Cities Transitway, Bus Rapid Transit in the MD 355 Corridor, or other high priority projects and to construct and equip the Metropolitan Grove Bus Operations and Maintenance Facility.

## Is the Replacement of the American Legion Bridge Part of the Managed Lanes Study?

Yes, the Preferred Alternative includes the full replacement of the American Legion Bridge (ALB) with a new, wider bridge (not widening of the existing bridge) to accommodate the two HOT lanes in each direction. The existing bridge is nearly 60 years old and would need to be replaced sometime over the next decade regardless of this Study. The new bridge would be constructed in phases to maintain the same number of existing lanes at all times during construction. The new bridge will be replaced in the same existing location.

The reconstructed ALB will include a shared use path to provide bicycle and pedestrian connection between Virginia and Maryland. Refer to **SDEIS, Chapter 2, Section 2.3.8** for the shared use path options under consideration.

00027656



### Does the Preferred Alternative Address Stormwater Management?

Yes, a preliminary, conceptual level stormwater management (SWM) analysis was completed for the Preferred Alternative and used to assist with the determination of the LOD. (Refer to **Chapter 2, Section 2.3.2** of this document for additional details.) In accordance with the Maryland Stormwater Management Act of 2007, MDOT SHA will ensure SWM water quantity and quality requirements, and treatment will be provided and will improve current conditions, as required under the SWM Act.

For the Preferred Alternative, the water quantity management requirement will be met within each drainage segment, except one: the ALB drainage segment. Based on typical practice, a quantity waiver could be granted for the ALB due to the direct discharge to the Potomac River, a major waterway.

For water quality requirements, the Preferred Alternative will meet the environmental site design (ESD) requirements to the maximum extent practicable (MEP) on-site. However, due to the amount of impervious area requiring treatment and existing site constraints, the full amount of required water quality could not be provided in all drainage segments. For those drainage segments where water quality could not be met on-site, the deficit will be met using compensatory stormwater management within the same watershed as defined by the MDOT SHA *Sediment and Stormwater Guidelines and Procedures* (SSGP), Section 5.5. Based on the results of an off-site compensatory stormwater management analysis, numerous potential water quality sites were identified to meet and exceed the full impervious area treatment (IAT) required for the Preferred Alternative. (Refer to **Chapter 2, Section 2.3.2** and **SDEIS, Appendix C** for additional details on the compensatory stormwater management.)

### What Happens to the Improvements That Were Studied for I-495, East of the I-270 East Spur to MD 5?

While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately, and would be subject to additional environmental studies, analysis and collaboration with the public, stakeholders and local agencies.

## Tolling

### Why Do the New Lanes Need to Be Tolled and Why Does the State Need a Developer to Build Them?

The State of Maryland does not have the funds to construct improvements of this magnitude with an estimated cost of approximately $3 to $3.5 billion as the estimated cost of the Phase 1 South improvements. Additionally, even with the tolls to pay back loans, the State does not have enough bonding capacity to take out loans to pay for the improvements. Therefore, the State has selected a Phase Developer through a competitive process and has entered into a Phase P3 agreement whereby the Developer will design, build, finance, operate, and maintain the managed lanes for a period of time using the toll revenue. MDOT SHA would continue to own all of the lanes on I-495 and I-270 and ensure the highway meets their intended transportation function.

### How Will the Toll Rates Be Set?

The toll-rate range setting process is led by the MDTA. They are the only State entity with the authority to set, revise, and fix toll rates in accordance with Transportation Article §4-312 of the Annotated Code of Maryland and COMAR Title 11 Department of Transportation, Subtitle 07 MDTA, Chapter 05 Public Notice of Toll Schedule Revisions (11.07.05). The MDTA is responsible for setting the toll rate ranges and conducting toll collection operations for the Phase 1 South limits.

00027657

The toll rate range setting process is centered around a proposal by the MDTA staff to establish minimum toll rates, maximum toll rates, soft rate caps within the minimum and maximum toll rate ranges, a process for annual toll escalation, and toll discounts for certain types of vehicles.

The process for conducting the public hearings and recording comments from the public is specified in Transportation Article, §4-312, Annotated Code of Maryland. The initial proposal was presented to the MDTA Board on May 20, 2021. Per the process, the Board voted to take the toll proposal to public hearings and a public comment period, thereby ensuring the public is engaged in the toll rate range setting process and complying with State law by providing opportunities for public review and comment.

Public hearings were held on July 12 and 14, 2021 and all public hearing materials, including information and studies used in the analysis to justify the toll rate range proposal, were posted on the MDTA's website and remain available for the public to view at https://mdta.maryland.gov/ALB270TollSetting. The comment period lasted from May 20 through August 12, 2021. At the August 26, 2021 MDTA Board Meeting, the MDTA staff presented a summary and analysis of any public comments received at the public hearings. In addition, they responded to questions from the Board members. A summary of the public comments received and the analysis of the comments is available on the MDTA webpage at mdta.maryland.gov/ALB270TollSetting/PublicParticipation.

After consideration of the public comments, at the September 30, 2021, MDTA Board Meeting, the MDTA staff presented the final toll rate range proposal. This final toll rate range will be the recommended action for the Board and is available on the MDTA webpage at mdta.maryland.gov/ALB270TollSetting.

## What Could the Toll Rates Be?

Rather than solely focusing on revenue, the Preferred Alternative will be designed to maintain speeds of 45 mph or greater in the HOT lanes. The goal of the HOT lanes is to maintain free-flowing traffic and to use pricing factors to influence traffic flow. As such, the toll rate range will be set to ensure the HOT lanes operate to established operational metrics, which applies the economic principles of supply and demand to influence the utilization of the HOT lanes. The Phase 1 Section Developer will be responsible for setting toll rates within the established toll rate ranges, if approved at the end of the toll rate range setting process.

The proposed toll rate ranges for Preferred Alternative - Phase 1 South limits are available on the MDTA website at http://mdta.maryland.gov/ALB270TollSetting/TollRateRangeSettingProcessandProposal. The toll rate ranges will consist of minimum toll rates, soft toll rate caps, and maximum toll rates for the HOT lanes. The rates will also include annual escalation factors to ensure the toll rate ranges are adequate to cover the full term of the P3 Program agreements (anticipated to be 50 years). Toll rates will be set dynamically, meaning they could change up to every five minutes based on traffic volumes or speed in the HOT lanes to provide customers who choose to use the HOT lanes and pay a toll, a faster and more reliable trip. The actual toll rates will change based on real-time traffic within each tolling segment.

# Transportation and Traffic
## What Traffic Analysis Was Updated for the SDEIS?

The traffic analysis was updated from a design year of 2040 to a design year of 2045 for the No Build and Preferred Alternatives using traffic volume projections from an updated version of the MWCOG regional forecasting model, Version 2.3.75. The DEIS used an earlier version of the MWCOG model, Version 2.3.71, which was the latest available model version when the Study was initiated and only projected traffic demand out to the year 2040.

00027658



For future traffic conditions, the Preferred Alternative was evaluated and compared to the No Build condition using the updated 2045 forecasts for several key operational metrics, including: speed, delay, travel time, level of service, throughput, and the effect on the local network. These metrics are the same metrics used in the DEIS to evaluate and compare the alternatives. Refer to **Chapter 3** of this SDEIS and **SDEIS, Appendix A** for additional details.

**SDEIS, Chapter 3** also discusses how MDOT SHA is considering the effects of the COVID-19 pandemic on traffic demand and forecasts. Refer to **Chapter 3, Section 3.1.4** and **SDEIS, Appendix B** for additional details.

## What Are the Results of the Traffic Operational Analyses?

The design year 2045 traffic operational evaluation results for the No Build Alternative and the Preferred Alternative are summarized below and presented in **Chapter 3** of this SDEIS and **SDEIS, Appendix A**.

The **No Build Alternative** would not address any of the significant operational issues experienced under existing conditions. It would not be able to accommodate long-term traffic growth, resulting in slow travel speeds, significant delays, long travel times, and an unreliable network. Compared to the 2040 No Build results presented in the DEIS, the 2045 No Build results show higher delays and travel times on I-495 and I-270 due to additional projected traffic growth between 2040 and 2045. This traffic growth is anticipated despite additional transit projects included in the 2045 forecast that help to slightly reduce projected delays on the surrounding local roadway network.

The **Preferred Alternative** is projected to provide tangible operational benefits to the system even though it includes no action or no improvements for a large portion of the study area to avoid and minimize impacts. This alternative would significantly increase throughput across the American Legion Bridge and on the southern section of I-270 while reducing congestion. It would also increase speeds, improve reliability, and reduce travel times and delays along the majority of I-495, I-270, and the surrounding roadway network compared to the No Build Alternative. Although the Preferred Alternative provides less improvement to traffic operations when compared to the Build Alternatives, that included the full 48-mile study limits evaluated in the DEIS (such as Alternatives 9 and 10), it was chosen based in part on feedback from the public and stakeholders who indicated a strong preference for eliminating property and environmental impacts on the top and east side of I-495. Congestion would be present during the PM peak period on I-270 northbound and the I-495 inner loop in the design year of 2045 due to downstream bottlenecks outside of the Preferred Alternative limits.

The FEIS and Interstate Access Point Approval (IAPA), which is an FHWA approval to ensure safety, operations, and engineering acceptability on the interstate system, will include a more detailed assessment of the future mainline and localized operational impacts of the Preferred Alternative. Opportunities to further address safety and operations will be evaluated on the Selected Alternative after the conclusion of NEPA and during final design.

Overall, the Preferred Alternative provides tangible operational benefits that would be significantly better than the No Build.

# Environmental Resources, Consequences and Mitigation
## What Are the Effects of the Preferred Alternative on the Environmental Resources?

The environmental consequences presented in **Chapter 4** are described for the Preferred Alternative. Since the DEIS, design has advanced on the Preferred Alternative. The permanent or long-term and

00027659

temporary or short-term, construction-related effects are quantified and presented in this SDEIS. The summary of environmental effects of the Preferred Alternative are presented in **Table ES-1.**

### Table ES-1: Summary of Quantifiable Impacts from the Preferred Alternative

| Resource | Permanent[1] | Temporary[1] | Total[1] |
|---|---|---|---|
| Total Potential Impacts to park properties (acres) | 21.0 | 15.1 | **36.1** |
| Total Right-of-way Required[2] (acres) | 97.2 | 18.7 | **115.9** |
| Number of Properties Directly Affected (count) | - | - | **501** |
| Number of Residential Relocations (count) | - | - | **0** |
| Number of Business Relocations (count) | - | - | **0** |
| Number of Historic Properties with Adverse Effect[3] (count) | - | - | **11** |
| Noise Sensitive Areas Impacted (count) | - | - | **49** |
| Hazardous Materials Sites of Concern (count) | - | - | **255** |
| Wetlands of Special State Concern (acres) | 0 | 0 | **0** |
| Wetlands[4] (acres) | 3.7 | 0.6 | **4.3** |
| Wetland 25-foot buffer[4] (acres) | 6.5 | 0.6 | **7.1** |
| Waterways[4] (square feet) | 673,757 | 343,945 | **1,017,702** |
| Waterways[4] (linear feet) | 43,852 | 2,701 | **46,553** |
| Tier II Catchments (acres) | 0 | 0 | **0** |
| 100-Year Floodplain (acres) | 33.7 | 15.1 | **48.8** |
| Forest canopy (acres) | 479.6 | 20.3[5] | **500.1** |
| Rare, Threatened and Endangered Species Habitat (acres) | 33.4 | 23.0 | **56.4** |
| Sensitive Species Project Review Area (acres) | 24.5 | 20.0 | **44.5** |
| Unique and Sensitive Areas (acres) | 139.2 | 29.4 | **168.5** |

Notes: The impacts in this table are for the mainline improvements for the Preferred Alternative. Any impacts associated with the compensatory stormwater management are preliminary and discussed in SDEIS, Appendix C.

[1] All values are rounded to the tenths place

[2] The right-of-way is based on State records research and filled in with county right-of-way, as necessary.

[3] Refer to Chapter 4, Section 4.7 for additional details on the effects to historic properties.

[4] Refer to **Table 4-25, Section 4.12** for additional details on the impacts to wetlands and waterways.

[5] Temporary forest canopy impacts are cleared forest in areas that will not be permanently acquired or altered by roadway construction. Replanting will occur in these areas. Impacts will be avoided and minimized, and replanting will be maximized within the corridor as determined in final design.

*Blue Text = Adjusted to match Table 4-1, Page 4-3 (11/10/21)*

What Avoidance and Minimization Opportunities Have Been Considered for Effects to Environmental Resources?

Since the publication of the DEIS, avoidance and minimization opportunities to historic properties, parklands, wetlands, wetland buffers, waterways, forests, and the Federal Emergency Management Agency's 100-year floodplain have advanced through extensive coordination with the regulatory and resource agencies. The Preferred Alternative, with build improvements only within the limits of Phase 1 South, avoids over 100 acres of parkland and hundreds of wetland and stream features. The impacts associated with the Preferred Alternative were avoided and minimized to the greatest extent practicable in all areas at this preliminary stage of the Study, and avoidance and minimization techniques were specifically refined in some areas of sensitive or recreationally valuable resources, such as the NPS park properties around the American Legion Bridge. Refer to **Chapters 2, 4 and 5** of this document for additional details. The effort to avoid, minimize, and mitigate impacts will continue through ongoing and future coordination with the applicable regulatory and resource agencies.  The final avoidance, minimization and mitigation will be documented in the FEIS.

00027660



### What Minimization Efforts Have Been Incorporated into the Preferred Alternative LOD at the Morningstar Tabernacle No. 88 Moses Hall and Cemetery Property?

In response to public, agency and stakeholder comments following the DEIS publication, MDOT SHA refined the LOD at the Morningstar Tabernacle No. 88 Moses Hall and Cemetery property. In late winter 2021, impacts to Morningstar Cemetery were reduced from 0.3 acres (13,068 square feet) reported in the DEIS for Alternative 9 to approximately 14 square feet of temporary area needed for the construction of a noise barrier adjacent to the property. This effort also avoided all ground disturbance within the cemetery boundary. The reduction was in response to public and agency comments and resulted from design modifications, including changes to the Cabin John Parkway interchange ramp configuration, to minimize impacts to the cemetery property. In summer 2021, additional investigation was conducted to detect and map both potential marked and unmarked graves within and adjacent to the Morningstar Cemetery boundary. Further design refinements were made in response to the results of this investigation and complete avoidance of the Morningstar Cemetery property has now been achieved.

### What Minimization Efforts Have Been Incorporated into the Preferred Alternative LOD at the Park Properties and Associated Resources Around the American Legion Bridge?

The most significant avoidance and minimization efforts since the Draft Section 4(f) Evaluation and DEIS focused around the ALB. MDOT SHA and FHWA met with the NPS on December 8, 2020, to discuss the LOD in the vicinity of the ALB that was presented in the DEIS. The NPS requested that MDOT SHA re-assess the LOD in the vicinity of the ALB to limit impacts to NPS land and its natural resources. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the C&O Canal National Historic Park and George Washington Memorial Parkway units of the NPS.*

The ALB Strike Team considered bridge construction approaches to determine if any of them could limit the LOD further. The ALB Strike Team conducted detailed investigation on a top-down segmental construction approach; a top-down cable stayed approach; and a slide-in place bridge construction approach. In addition, after field analysis and review of readily available information, MDOT SHA and the ALB Strike Team determined that access to the site at river level could be consolidated to the north side of the river along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of the Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the C&O Canal and a temporary haul road paralleling the C&O Canal towpath. This effort resulted in a 7.8 acre reduction in impact to the George Washington Memorial Parkway and a 5.3 acre reduction at the Chesapeake & Ohio Canal National Historical Park.  Refer to **Chapter 4, Section 4.12.4** for additional details on the ALB Strike Team's efforts.

### What Mitigation Is Being Considered for Unavoidable Environmental Effects?

The advancement of conceptual mitigation for unavoidable effects to environmental resources from the Preferred Alternative has occurred since the DEIS. The proposed conceptual mitigation is discussed by applicable resource in **Chapter 4** and further detailed in the *Conceptual Mitigation Plan* (**DEIS, Appendix Q**) for the following resources: wetlands; forests; rare, threatened, and endangered species; parkland; cultural resources; noise; air; properties; hazardous materials; topography, geology, soils; groundwater; environmental justice; visual aesthetic; aquatic biota; and unique and sensitive areas. Further mitigation

00027661



measures will be identified and refined as the Study progresses and in consideration of public, stakeholder, and agency comment on this SDEIS. The final mitigation will be documented in the FEIS.

## What Is the Updated Draft Section 4(f) Evaluation?

Section 4(f) of the USDOT Act of 1966, as amended (49 U.S.C. 303(c)) stipulates that the USDOT, including the FHWA, cannot approve the use of land from a publicly-owned park, recreation area, wildlife or waterfowl refuge, or public or private historic site unless the following conditions apply:

- FHWA determines that there is no feasible and prudent avoidance alternative to the use of land from the property, and the action includes all possible planning to minimize harm to the property resulting from such use (23 CFR §774.3(a)(1) and (2)); or
- FHWA determines that the use of the Section 4(f) properties, including any measures to minimize harm committed to by the applicant, will have a *de minimis* impact on the property (23 CFR §774.3(b)).

Since the publication of the Draft Section 4(f) Evaluation and DEIS in July 2020, the Preferred Alternative has been identified as Alternative 9 – Phase 1 South, which includes the same build improvements proposed as part of Alternative 9 in the DEIS and Draft Section 4(f) Evaluation but limited to the Phase 1 South limits only. No action or no improvements would occur within the study limits outside of Phase 1 South. This decision on the Preferred Alternative considered further coordination with and listening to agencies and stakeholders, including the Officials with Jurisdiction (OWJs) for Section 4(f) properties. The Preferred Alternative is responsive to comments received requesting avoidance of Section 4(f) resources and aligns the Study to be consistent with the previously determined phased delivery and permitting approach.

**Chapter 5** of this SDEIS includes the Updated Draft Section 4(f) Evaluation to provide information on the Preferred Alternative. The information included in this Updated Draft Section 4(f) Evaluation will inform FHWA's consideration of the use of Section 4(f) property by the Preferred Alternative. This chapter of the SDEIS provides updated, supplemental information for the Draft Section 4(f) Evaluation, which was included as **DEIS, Appendix F**. This supplemental information does not replace the Draft Section 4(f) Evaluation; it only provides additional analysis. The Section 4(f) Evaluation and this supplement follows established USDOT regulations at 23 CFR 774, FHWA's 2012 Section 4(f) Policy Paper, and 23 U.S.C. 138 and 39 U.S.C. 303.

## What Are the Section 4(f) Impacts?

A "use" of (or impact to) Section 4(f) property occurs:

(i)    When land is **permanently incorporated** into a transportation facility;
(ii)   When there is a **temporary occupancy** of land that is adverse in terms of the statute's preservation purpose as determined by the criteria in 23 CFR §774.13(d); or
(iii)  When there is a **constructive use** of a Section 4(f) property as determined by the criteria in 23 CFR §774.15.

The Preferred Alternative would avoid the use of 38 Section 4(f) properties totaling approximately 105 acres relative to the DEIS Build Alternatives. The Preferred Alternative would require use a total of 39.1 acres of 21 Section 4(f) properties (including temporary and permanent), compared to a total of 146.8 acres for the DEIS Build Alternative 9.

00027662

Refer to **SDEIS, Chapter 5, Section 5.2** and **DEIS, Appendix F** for additional details. Conceptual mitigation for Section 4(f) impacts has been identified, but coordination with the OWJs for the Section 4(f) properties is still ongoing. The Final Section 4(f) Evaluation will reflect ongoing coordination with OWJs to coordinate impacts and mitigation, and *de minimis* coordination with the OWJs. The Final Section 4(f) Evaluation will also include finalization of the analysis to demonstrate all possible planning to minimize harm, and finalization of the Least Overall Harm Analysis, and final mitigation commitments.

## What Are the Next Steps for the Study?

This SDEIS has been approved by FHWA and MDOT SHA and distributed to Federal, state, and local agencies, as well as organizations and other interested parties and is available for public review. There will be a virtual public hearing held during a 45-day review period for the SDEIS; the comment deadline is November 15, 2021. During this 45-day review period, the SDEIS is available in public locations throughout the study corridors and on the Program website oplanesmd.com/SDEIS Comments on the SDEIS are considered equally regardless of whether received orally or in writing and may be made by:

- Oral testimony at the virtual public hearing on November 1, 2021
- SDEIS comment form at oplanesmd.com/SDEIS
- Email to MLS-NEPA-P3@mdot.maryland .gov
- Letters to Jeff Folden, I-495 & I-270 P3 Program Deputy Director, I-495 & I-270 P3 Office, 707 North Calvert Street, Mail Stop P-601, Baltimore MD 21202
- Call-in a comment at 855-432-1483 and leave a voicemail that is limited to three minutes

Following the 45-day review period, the MDOT SHA and FHWA will review all comments and respond to all substantive comments received or postmarked by the end of the comment period in the preparation of the FEIS. Comments received or postmarked after that date will be reviewed and considered to the extent practicable. In addition to the disposition of all substantive comments received on the DEIS and SDEIS, the FEIS will summarize additional and updated information not refined or quantified in the SDEIS, and mitigation measures. The ROD will document the commitments to be carried forth during final design and construction.

# Public-Private Partnership (P3) Program

## What Is a P3?

A Public-Private Partnership (P3) is an alternative model for delivery of a capital project. A P3 is a partnership between the public or governmental sector with private entities. The P3 seeks to harness private sector expertise, innovation, and funding in order to deliver public infrastructure for the benefit of the public owner and users of the infrastructure. P3s seek to successfully leverage the respective strengths of the public and private sectors to deliver large, complex infrastructure projects in a cost effective and timely fashion. Functions under a P3 agreement may include designing, building, financing, operating, and maintaining a transportation facility. The following definitions of limits are provided to assist in understanding the NEPA and Phase 1 Solicitation process.

- Phase 1: I-495 from south of the ALB to I-270 and I-270 from I-495 to I-70. These are also the limits of the Phase 1 P3 Agreement.
- Phase 1 South: I-495 from south of the ALB to I-270 and I-270 from I-495 to I-370. These are also the limits of the NEPA Preferred Alternative.
- Phase 1 North: I-270 from I-370 to I-70.

00027663



## What is the Status of the Phase 1 Solicitation Process and P3 Agreement?

The Maryland BPW originally approved the P3 designation for the P3 Program in June 2019 and provided a supplemental approval in January 2020. These approvals allowed MDOT SHA to use Progressive P3 process to design and construct Phase 1 of the P3 Program, by seeking a Phase Developer for Phase 1. This progressive approach allowed the solicitation process to proceed without final commitment during the NEPA process.

As part of the Progressive P3 solicitation, MDOT followed a Request for Proposal (RFP) process seeking interested phase developers in February 2020. MDOT and MDTA, with participation from local jurisdictions, developed a shortlist of four highly qualified Proposers in July 2020. Three of the four shortlisted firms submitted proposals to enter into the Phased P3 Agreement for Phase 1 to assist in the pre-development work, deliver Phase 1 including I-495 from the ALB to I-270, and along I-270 from I-495 to I-70. In February 2021, MDOT SHA identified the Selected Proposer that could best deliver the project in a manner most advantageous to the State.

On August 11, 2021, in accordance with Maryland law, MDOT and MDTA presented to and received approval from the Board of Public Works to award the Phase 1 P3 Agreement to the Selected Proposer, a jointly owned company created for the project, called Accelerate Maryland Partners, Inc. (AMP). They will be completing the predevelopment work related to Phase 1 of the P3 Program.

In accordance with the terms and conditions of the Phase 1 P3 Agreement, MDOT and AMP will further advance predevelopment work on the first section, which includes from the vicinity of the George Washington Memorial Parkway across the American Legion Bridge to I-270 and on I-270 up to I-370, ("Phase 1 South"). The Preferred Alternative in this SDEIS is aligned with the Phase 1 South limits, which is the first section planned for delivery under the Project. As part of its proposal, the Phase Developer has committed to provide an estimated $300 million for transit services in Montgomery County over the operating term of Phase 1 South. To further support transit services, MDOT has committed, upon financial close of the Section P3 Agreement for Phase 1 South, to fund not less than $60 million for design and permitting of high priority transit investments in Montgomery County, such as Phase I of the Corridor Cities Transitway, Bus Rapid Transit in the MD 355 Corridor, or other high priority projects and to construct and equip the Metropolitan Grove Bus Operations and Maintenance Facility.

AMP, as the Phase Developer, is working collaboratively with MDOT, MDTA, and the stakeholders on pre-development work including advancing the preliminary design and due-diligence activities to further minimize impacts. After completion of the predevelopment work with respect to Phase 1 South and, the FEIS, MDOT would seek final approval from the BPW to move forward with the Section P3 Agreement under which a subsidiary of the Phase Developer (called the "Section Developer") will be responsible for the final design, construction, financing, operations, and maintenance of a particular section for an estimated term of 50 years.

00027664

# 1  PURPOSE AND NEED

The Study Purpose and Need has not changed.  Refer to the Draft Environmental Impact Statement (DEIS), Chapter 1 and DEIS, Appendix A.  These materials can be viewed through the following links on the Program website:

DEIS, Chapter 1: https://495-270-p3.com/wp-content/uploads/2020/11/2020-06-02_DEIS_01_Purpose_and_Need.pdf

DEIS, Appendix A: https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_AppA_PN_web.pdf

This SDEIS Chapter includes the following updates:

- Identification of the Preferred Alternative, Alternative 9 – Phase 1 South, which is comprised of two, new high-occupancy toll (HOT) managed lanes in each direction on I-495 from George Washington Memorial Parkway (GWMP) to I-270 and then on I-270 from I-495 to I-370 as well as along I-495 and the I-270 east spur to MD 187. No action or improvements on I-495 from the I-270 east spur to west of MD 5.

## 1.1  Background and Context

The Federal Highway Administration (FHWA), as the Lead Federal Agency, and the Maryland Department of Transportation State Highway Administration (MDOT SHA), as the Local Project Sponsor, have prepared a Supplemental Draft Environmental Impact Statement (SDEIS) under the National Environmental Policy Act (NEPA) for the I-495 & I-270 Managed Lanes Study (Study).  The I-495 & I-270 Managed Lanes Study (Study) is the first environmental study under the broader I-495 & I-270 Public-Private Partnership (P3) Program.

In January 2021, Alternative 9 was announced as the MDOT SHA's Recommended Preferred Alternative based on results of traffic, engineering, financial, and environmental analyses, as well as public comment. After several months of further coordinating with and listening to agencies and stakeholders regarding Alternative 9 as the Recommended Preferred Alternative, MDOT SHA decided to align the Study to be consistent with the previously determined phased delivery and permitting approach which focused on Phase 1 South only. As a result, FHWA and MDOT SHA identified a new Recommended Preferred Alternative: Alternative 9 – Phase 1 South. Alternative 9 – Phase 1 South includes the same improvements proposed as part of Alternative 9 but limited to the Phase 1 South limits only.

The Preferred Alternative focuses solely on building a new American Legion Bridge and delivering two high-occupancy toll (HOT) managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to east of MD 187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from east of MD 187 to I-270. Refer to **Figure 1-1**. This Preferred Alternative was identified after coordination with resource agencies, the public and stakeholders to respond directly to feedback received on the DEIS, and to align the NEPA approval with the P3 Program planned project phased delivery and permitting approach.

00027665

The 48-mile Study limits remain unchanged: I-495 from south of the GWMP in Fairfax County, Virginia, to west of MD 5 and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs in Montgomery and Prince George's Counties, Maryland. The Preferred Alternative, Alternative 9 - Phase 1 South (shown in **dark blue** in **Figure 1-1**), includes build improvements within the limits of Phase 1 South only totaling approximately 15 miles of proposed improvements. There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5 (shown in light blue in **Figure 1-1**). While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately and would be subject to additional environmental studies and analysis and collaboration with the public, stakeholders and agencies.

**Figure 1-1: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative**



## 1.2 Study Purpose and Need

The Purpose and Need Statement remains the same as presented in the **DEIS, Chapter 1** and in the full Purpose and Need Statement in **DEIS, Appendix A**. However, the purpose and needs are restated below for ease to the reader.

The purpose of the Study is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the study limits and enhances existing and planned multimodal mobility and connectivity.

The needs for the Study are:

- Accommodate Existing Traffic and Long-Term Traffic Growth
- Enhance Trip Reliability
- Provide Additional Roadway Travel Choices

00027666

- Improve Movement of Goods and Services
- Accommodate Homeland Security.

Two goals for the Study were identified in addition to the needs: (1) the use of alternative funding approaches for financial viability and (2) environmental responsibility.

00027667

# 2   ALTERNATIVES

The analysis of the Build Alternatives was documented in the **Draft Environmental Impact Statement (DEIS), Chapter 2** and **DEIS, Appendix B** and can be viewed through the following links on the Program website:

DEIS, Chapter 2: https://495-270-p3.com/wp-content/uploads/2020/11/2020-06-02_DEIS_02_Alternatives_Development.pdf

DEIS, Appendix B: https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_AppB_Alts_web.pdf

This SDEIS Chapter documents the following updates:
- Identification of the Preferred Alternative, which is Alternative 9 – Phase 1 South with two new, high-occupancy toll (HOT) managed lanes on I-495 in each direction from the George Washington Memorial Parkway to east of MD 187 and conversion of the one existing high-occupancy vehicle lane in each direction on I-270 to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east and west spurs. There is no action or no improvements on I-495 east of the I-270 east spur.
- The on-site and off-site (compensatory) stormwater management considerations
- Review of existing culverts and potential culvert augmentation requirements
- Advanced constructability review of the Preferred Alternative
- Revisions to the Limit of Disturbance (LOD) for the Preferred Alternative
- Maryland Transportation Authority (MDTA) Toll Rate Setting Process and Proposal
- Transit considerations and connections with the Preferred Alternative
- Pedestrian and bicycle facilities included with the Preferred Alternative
- Public-Private Partnership (P3) solicitation and Phase 1 Developer Agreement

## 2.1   Overview of Alternatives Development Process

The alternatives development and screening process for the I-495 & I-270 Managed Lanes Study (Study) followed five steps to narrow the Preliminary Range of Alternatives under consideration to the Preferred Alternative (**Figure 2-1**). The results and documentation of the first four steps were presented in the Study's Draft Environmental Impact Statement (DEIS) with the last step, identification of the Preferred Alternative, being documented in this Supplemental DEIS (SDEIS).

The DEIS evaluated the No Build Alternative (Alternative 1) and six Build Alternatives (Alternatives 8, 9, 9M, 10, 13B and 13C). The following list briefly describes those alternatives:

- Alternative 1: No Build – Though this alternative does not meet the Study's Purpose and Need, consistent with National Environmental Policy Act (NEPA) requirements, the scenario assuming no construction of a Build Alternative was carried forward for further evaluation to serve as a base case for comparing the other alternatives
- Alternative 8: Two Express Toll Lane (ETL) Managed Lanes Network on I-495 and one ETL and retain one High-Occupancy Vehicle (HOV) Lane Network on I-270

00027668


- Alternative 9: Two High-Occupancy Toll (HOT) Managed Lanes Network
- Alternative 9M: Two HOT Managed Lanes Network on the west and east side of I-495 and on I-270; one HOT Managed Lane Network on top side of I-495 between I-270 and I-95
- Alternative 10: Two ETL Managed Lanes Network on I-495 and I-270 and retain one HOV Lane Network on I-270 only
- Alternative 13B: Two HOT Managed Lanes Network on I-495 and two Reversible HOT Managed Lanes Network on I-270
- Alternative 13C: Two ETL Managed Lanes Network on I-495 and two Reversible ETL Managed Lanes Network on I-270 and retain one HOV Lane Network on I-270 only

Refer to **DEIS Chapter 2,** and **DEIS Appendix B, Alternatives Technical Report** for additional information.

### Figure 2-1: Alternatives Screening Process

The DEIS considered how well each alternative met the Study's Purpose and Need using the following criteria:

- Engineering considerations:
  - Accommodates existing traffic and long-term traffic growth
  - Improves trip reliability
  - Provides additional roadway travel choice
  - Provides ease of use for travelers
- Accommodates homeland security
- Improves the movement of goods and services
- Enhances multimodal mobility and connectivity
- Financial viability
- Environmental considerations

00027669

The Council on Environmental Quality (CEQ) guidance describes an "agency's preferred alternative" as one that the agency believes would fulfill its statutory mission and responsibilities, giving consideration to economic, environmental, technical, and other factors.[1] During the current NEPA process, and especially based on input from cooperating agencies and the general public following publication of the DEIS, the Federal Highway Administration (FHWA) and the Maryland Department of Transportation State Highway Administration (MDOT SHA) considered many common themes reflected in the comments.

In January 2021, Alternative 9 was announced as the MDOT SHA Recommended Preferred Alternative based on results of traffic, engineering, financial, and environmental analyses, as well as public comment. Commenters specifically highlighted the need to address improvements to the American Legion Bridge (ALB), a major regional traffic bottleneck, as soon as possible; to minimize property displacement and public parkland impacts; to coordinate with planned managed lane projects in Northern Virginia to provide a seamless regional managed lanes system; and to increase multi-modal transportation options in the Study Area.

After several months of further coordinating with and listening to agencies and stakeholders and reviewing public comments, MDOT SHA decided to align the Recommended Preferred Alternative to be consistent with the previously determined phased delivery and permitting approach, which focuses on Phase 1 South. As a result, FHWA and MDOT SHA identified a new Preferred Alternative: Alternative 9 – Phase 1 South. Alternative 9 – Phase 1 South includes the same improvements proposed as part of Alternative 9 but is limited to the Phase 1 South limits only. The limits of Phase 1 South are along I-495 from the George Washington Memorial Parkway to east of MD 187 and along I-270 from I-495 to north of I-370 and on the I-270 east and west spurs as shown in **dark blue** in **Figure 2-2**. The improvements include two new HOT managed lanes in each direction along I-495 and I-270 within the Phase 1 South limits.  There is no action, or no improvements included at this time on I-495 east of the I-270 east spur to MD 5 (shown in **light blue** in **Figure 2-2**). While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately and would be subject to additional environmental studies and analysis and collaboration with the public, stakeholders and agencies.

The overall Study limits remain unchanged: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including the ALB over the Potomac River, to west of MD 5 in Prince George's County, Maryland and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs in Montgomery County, Maryland. While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the Study limits, improvements on the remainder of the interstate system may still be needed in the future. Any such improvements would advance separately, and would be subject to additional environmental studies, analysis and collaboration with the public, stakeholders and local agencies.

The FHWA and MDOT SHA's selection of the Preferred Alternative is based on currently available information and consideration of comments received on the DEIS. The majority of the key concerns and comments raised by the agencies and public through review of the DEIS were common among the Build

---

[1] Council on Environmental Quality, Memorandum to Agencies: Forty Most Frequently Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Federal Register 18026 (March 23, 1981), as amended (1986); Question 4a

00027670



Supplemental Draft Environmental Impact Statement

Alternatives retained including, but not limited to, stormwater management, direct access, transit elements, noise, property impacts, and proposed relocations. Identifying a Preferred Alternative allows the lead agencies to continue the coordination, design, and analysis effort on a single alternative. The efforts to further address comments, avoid and minimize impacts, and determine mitigation for unavoidable impacts will continue through the development of the Final Environmental Impact Statement (FEIS).

**Figure 2-2: I-495 & I-270 Managed Lanes Study Corridors – Preferred Alternative**



## 2.2  Preferred Alternative

Alternative 9 - Phase 1 South has been identified as the Preferred Alternative and includes a two-lane, HOT managed lanes network on I-495 and I-270 (**Figure 2-3**). On I-495, the Preferred Alternative consists of adding two new, HOT managed lanes in each direction from the George Washington Memorial Parkway to east of MD 187. On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction from I-495 to north of I-370 and on the I-270 east and west spurs. There is no action (i.e., no improvements) included at this time on I-495 east of the I-270 east spur. Along I-270, the existing collector-distributor (C-D) lane separation from Montrose Road to I-370 would be removed as part of the proposed improvements. The managed lanes would be separated from the general purpose (GP) lanes using flexible delineators placed within a buffer. Transit buses and HOV 3+ vehicles would be allowed free passage in the managed lanes.

The preliminary, estimated capital cost for the Preferred Alternative ranges between $3.0 and $3.5 Billion. This estimate includes costs for construction, property acquisition, and environmental mitigation.

00027671

**Figure 2-3: Alternative 9 – Phase 1 South Typical Sections (HOT Managed Lanes Shown in Yellow)**







Alternative 9 – Phase 1 South was identified as the Preferred Alternative in response to public and agency comments received on the DEIS. The Preferred Alternative would:

- Further align with the phased delivery and permitting approach.
- Focus improvements on Phase 1 South, including the American Legion Bridge, the biggest traffic chokepoint in the region. Replacement of the bridge is part of a bi-state effort to improve mobility and would provide a seamless regional system of managed lanes by connecting to Virginia over the American Legion Bridge.
- Expedite replacement of the American Legion Bridge with a private funding source.
- Provide options for travel by keeping all existing general purpose lanes free.
- Reduce reliance on single occupancy vehicles and permitting buses, carpool, vanpool, and personal vehicles with three or more people to travel faster and more reliably in the new HOT lanes free of charge any time of the day.
- Avoid all residential and commercial displacements.

00027672


- Minimize impacts by over 50% to National Parks near the American Legion Bridge (George Washington Memorial Parkway and Chesapeake & Ohio Canal National Historical Park) and completely avoid three other National Parks: Baltimore Washington Parkway, Greenbelt Park, and Suitland Parkway.
- Avoid approximately 22 acres of Maryland-National Capital Park and Planning Commission parkland including Rock Creek, Sligo Creek, and Northwest Branch Stream Valley Parks.
- Permit continued collaboration with the public and agency partners to work through issues raised outside of Phase 1 South through separate, future environmental studies.

As described in greater detail in **SDEIS, Chapter 3**, the Preferred Alternative is projected to provide meaningful operational benefits to the regional system even though it includes no action for a large portion of the study area in an effort to avoid and minimize impacts. The Preferred Alternative would significantly increase throughput across the American Legion Bridge and on the southern section of I-270 while reducing congestion. It would also increase speeds, improve reliability, and reduce travel times and delays along I-495, I-270, and the surrounding roadway network compared to the No Build Alternative, albeit to a lesser degree than the Build Alternatives presented in the DEIS that provided managed lanes throughout the full study area limits. Projected daily traffic volumes served would increase with development of the Preferred Alternative when compared to the No Build Alternative because the freeways would be able to accommodate latent demand that would otherwise use the local roadway network to avoid congestion. Congestion would be present during the PM peak period on I-270 northbound and the I-495 inner loop in the design year of 2045 due to downstream bottlenecks outside of the Preferred Alternative limits, but overall operations would be significantly better than the No Build.

## 2.3  Elements of the Preferred Alternative

Updated design elements of the Preferred Alternative presented in this SDEIS include Interchanges and HOT Managed Lanes Access (**Section 2.3.1**); Stormwater Management Considerations (**Section 2.3.2**); Cross Culverts (**Section 2.3.3**); Construction and Short-term Effects (**Section 2.3.4**); Limit of Disturbance (**Section 2.3.5**); Tolling (**Section 2.3.6**); Transit-Related Elements (**Section 2.3.7**); and Pedestrian and Bicycle Considerations (**Section 2.3.8**). These elements contributed to refinement of the Preferred Alternative and associated impacts. Specifically, modifications to the Preferred Alternative since the DEIS included roadway design adjustments, revisions to noise barrier locations based on further analysis, consideration of additional needs at culvert augmentation sites, and continued application of avoidance and minimization efforts at sensitive resources.

### 2.3.1  Interchanges and HOT Managed Lanes Access

The HOT managed lane access locations within the Phase 1 South limits, except for the exchange ramps, did not change from those identified in the DEIS for the Build Alternatives. This section indicates which access points and interchange improvements are and are not included in the Preferred Alternative.

There are 34 existing interchanges within the Study limits, and 14 existing interchanges within the limits of Phase 1 South of the Preferred Alternative. All 14 interchanges would be modified as needed to accommodate the mainline widening of I-495 and I-270. The HOT managed lanes traveling in the same direction as the GP lanes would be separated from the GP lanes by a buffer and flexible delineators as shown in the typical sections (**Figure 2-3**). Access to and from the HOT lanes would be provided via direct

00027673


access ramps at select existing interchanges; direct access ramps at two new interchanges; exchange ramps between Virginia and Maryland where ingress to the managed lanes from the GP lanes or egress from the managed lanes to the GP lanes would be provided; and at the end points of the Preferred Alternative.

The preliminary direct access locations were identified using the following considerations:

- Providing system-to-system connections between major interstates and freeways (e.g., I-495/I-270 west spur, I-270/I-370)
- Providing access at interchanges with high traffic demand (e.g., MD 190)
- Providing access throughout the Study Area for reasonable access to the managed lanes (e.g., Gude Drive, Wootton Parkway)
- Providing access in consideration of land use and at major transit facilities (e.g., Westlake Terrace at Montgomery Mall Transit Center)
- Potential community, property, and environmental impacts resulting from providing access.

In total, access to and from the HOT managed lanes is proposed at nine locations (five existing interchanges, two new interchanges, and two exchange ramp locations), as well as at the end of the HOT lanes along eastbound I-495 east of MD 187, along the northbound I-270 east spur south of MD 187, and along southbound I-270 north of I-370. The interchanges that will be modified to accommodate the widened mainline and managed lane access locations are listed in **Table 2-1** and shown in **Figure 2-4**. **Table 2-1** also includes a list of the I-495 interchange locations within the Study Limits and outside of Phase 1 South limits that will not be improved for the Preferred Alternative.

**Table 2-1: Interchange Improvements and HOT Managed Lane Access Locations under the Preferred Alternative[1]**

| Location | Modification |
|---|---|
| Interface with Virginia I-495 HOT Lanes south of the ALB (see location 'E' on **Figure 2-4**) | • Exchange ramp from Maryland HOT managed lanes to Virginia GP lanes (outer loop only) |
| I-495/George Washington Memorial Parkway Interchange (see location 'F' on **Figure 2-4**) | • HOT lanes direct access to managed lanes in Maryland<br>• Adjusted interchange ramps to accommodate widened mainline |
| I-495/Clara Barton Parkway Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| Interface with Virginia I-495 HOT Lanes north of Clara Barton Parkway (see location 'G' on **Figure 2-4**) | • Exchange ramp from Virginia GP lanes to Maryland HOT managed lanes (inner loop only) |
| I-495/MD 190/Cabin John Parkway Interchange (see location 'H' on **Figure 2-4**) | • HOT lanes direct access interchange<br>• Adjusted interchange ramps to accommodate widened mainline |
| I-495/I-270 west spur Interchange (see location 'I' on **Figure 2-4**) | • HOT lanes direct access interchange<br>• Reconstructed interchange to accommodate HOT lanes |
| I-495/MD 187 Interchange | • Potential adjustment of interchange ramps to accommodate widened mainline |
| I-495/I-270 east spur/MD 355 Interchange | • No proposed interchange improvements |
| I-495/MD 185 Interchange | • No proposed interchange improvements |
| I-495/MD 97 Interchange | • No proposed interchange improvements |

00027674


| Location | Modification |
|---|---|
| I-495/US 29 Interchange | • No proposed interchange improvements |
| I-495/MD 193 Interchange | • No proposed interchange improvements |
| I-495/MD 650 Interchange | • No proposed interchange improvements |
| I-495/ I-95 Interchange | • No proposed interchange improvements |
| I-495/US 1 Interchange | • No proposed interchange improvements |
| I-495/Greenbelt Metro Interchange | • No proposed interchange improvements |
| I-495/MD 201 Interchange | • No proposed interchange improvements |
| I-495/Baltimore-Washington Parkway Interchange | • No proposed interchange improvements |
| I-495/MD 450 Interchange | • No proposed interchange improvements |
| I-495/US 50 Interchange | • No proposed interchange improvements |
| I-495/MD 202 Interchange | • No proposed interchange improvements |
| I-495/Arena Drive Interchange | • No proposed interchange improvements |
| I-495/MD 214 Interchange | • No proposed interchange improvements |
| I-495/Ritchie Marlboro Interchange | • No proposed interchange improvements |
| I-495/MD 4 Interchange | • No proposed interchange improvements |
| I-495/MD 337/Suitland Road Interchange | • No proposed interchange improvements |
| I-495/MD 5 Interchange | • No proposed interchange improvements |
| I-270 west spur/Democracy Boulevard Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| I-270 west spur/Westlake Terrace Interchange (see location 'D' on **Figure 2-4**) | • Repurposed existing HOV only ramps to/from north to HOT lanes direct access ramps<br>• Added HOT lanes direct access ramps to/from south |
| I-270 Y-Split Interchange | • Reconstructed interchange to accommodate HOT lanes |
| I-270/Montrose Road Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| I-270/Wootton Parkway Interchange *(new interchange)* (see location 'C' on **Figure 2-4**) | • New interchange for HOT lanes direct access only |
| I-270/MD 189 Interchange | • Reconfigured interchange ramps to accommodate widened mainline |
| I-270/MD 28 Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| I-270/Gude Drive Interchange *(new interchange)* (see location 'B' on **Figure 2-4**) | • New interchange for HOT lanes direct access only |
| I-270/Shady Grove Road Interchange | • Adjusted interchange ramps to accommodate widened mainline |
| I-270/I-370 Interchange (see location 'A' on **Figure 2-4**) | • HOT lanes direct access interchange (to/from south only)<br>• Adjusted interchange ramps to accommodate widened mainline |
| I-270 east spur/MD 187/Rockledge Drive Interchange | • Adjusted interchange ramps to accommodate widened mainline |

Note: The rows shaded in blue indicate HOT managed lanes access locations.
[1]The proposed managed lanes access points may change based on public and agencies' comments on the SDEIS and as more detailed analyses are completed, and the Interstate Access Point Approval request is reviewed by FHWA.

00027675

Supplemental Draft Environmental Impact Statement



Figure 2-4: Proposed HOT Managed Lanes Access Locations

**Proposed Managed Lanes Access Locations**

- Ⓐ I-270 at I-370 (access to Shady Grove Metro)
- Ⓑ I-270 at Gude Drive
- Ⓒ I-270 at Wootton Parkway (access to Twinbrook Metro)
- Ⓓ I-270 at Westlake Terrace (access to Montgomery Mall Transit Center)
- Ⓔ I-495 south of the American Legion Bridge (Outer Loop only)
- Ⓕ I-495 at George Washington Parkway
- Ⓖ I-495 north of Clara Barton Parkway (Inner Loop only)
- Ⓗ I-495 at MD 190/Cabin John Parkway
- Ⓘ I-495 at I-270 West Spur

**Legend**

- 🟣 Direct Access Locations
- 🟠 Exchange Ramps Allowing Traffic to Move Between GP and HOT Lanes
- ⭐ Managed Lane Access to Transit Station
- ▬ Phase 1 South Limits
- ▬ MLS Limits Outside of Phase 1 South

**I-495 & I-270 Managed Lanes Study**

**Proposed Managed Lanes Access Locations**

MDOT MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

The proposed managed lanes access points are based on preliminary traffic and revenue analyses and may change as more detailed analyses are completed.

00027676



## 2.3.2   Stormwater Management Considerations

### A.   Introduction

A planning-level, conceptual identification of stormwater management (SWM) needs was considered throughout the Study Area when establishing the limit of disturbance (LOD) for the Preferred Alternative. The Maryland *Stormwater Management Act of 2007* emphasizes environmental site design (ESD)[2] and consideration of SWM early in the planning stage of a project to better balance transportation needs, right-of-way considerations, and requirements of the Act, which include both water quality (i.e., ESD) and water quantity management. Water quality management treats the first flush of rainfall to remove pollutants and improve downstream conditions. Water quantity management stores and slowly releases water to reduce downstream flooding.

Modifications to conceptual stormwater management for the SDEIS included: reevaluation of stormwater needs and locations for roadway updates based on traffic operations and noise barrier locations; continued avoidance and minimization; and coordination with key agency stakeholders.  For example, continued coordination with National Park Service (NPS) led to the removal of all SWM facilities outside of the transportation footprint on NPS owned property. The methodology for stormwater evaluation remained the same as presented in the **DEIS, Chapter 2** and is restated below in **Section 2.3.2.B** for ease to the reader.

The land adjacent to the study corridors is heavily developed with numerous natural, cultural, and socioeconomic resources. The existing roadways are a mix of open section (i.e., no curb or concrete barrier) and closed section (i.e., curb or retaining wall) with superelevated cross slopes through horizontal curves. The density of development adjacent to the study corridors, combined with numerous environmental sensitive areas, complicated the efforts of finding enough suitable SWM site locations. However, as the design continues to progress, MDOT SHA will ensure SWM water quality requirements and treatment will be provided to the maximum extent practicable (MEP) at on-site locations, as required under the SWM Act.

### B.   Methodology and Assumptions

The 2000 Maryland Stormwater Design Manual (Rev. May 2009) requires all projects to provide Water Quality Volume (WQv), Channel Protection Volume (Cpv), Recharge Volume (Rev), and Overbank Protection Volume or Quantity management (Qp). In addition, the Preferred Alternative will need to meet the county requirements within their jurisdiction limits. Montgomery County requires a Qp of 10-year management and Qp of 100-year management if downstream flooding problems exist. Coordination with the county will continue through final design. All new impervious area and a minimum of 50 percent of reconstructed impervious area will require treatment. Reconstructed impervious area is defined as existing impervious area that is removed, exposing bare earth, before being repaved or repurposed. To calculate both the total new and reconstructed impervious area, water quality shading was performed for the preliminary roadway engineering for all new and existing pavement within the limits of the Preferred Alternative. Existing study points (where water leaves the State right-of-way) were identified in each

---

[2] Title 4, Subtitle 201.1(B) of the Stormwater Management Act of 2007 defines ESD as "…using small-scale stormwater management practices, nonstructural techniques, and better site planning to mimic natural hydrologic runoff characteristics and minimize the impact of land development on water resources." Under this definition, ESD includes optimizing conservation of natural features (e.g., drainage patterns, soil, vegetation); minimizing impervious surfaces (e.g., pavement, concrete channels, roofs); slowing down runoff to maintain discharge timing and to increase infiltration and evapotranspiration; or using other nonstructural practices or innovative technologies approved by the Maryland Department of Environment (MDE).

00027677



section and field investigated to determine existing conditions. SWM requirements or impervious area requiring treatment were determined for the Preferred Alternative and preliminary SWM facility locations were identified. An evaluation of potential water quality loss was also conducted.

For this analysis, the redeveloped impervious area was quantified by assuming all shoulders and one to two of the existing lanes would need to be reconstructed. Based on the preliminary engineering, there are locations where existing pavement removal could result in a reduced SWM requirement. To be conservative, pavement removal was only included in the water quality shading when an existing interchange was reconfigured, resulting in ramp removal, or the pavement removal width was greater than ten (10) feet. During detailed design, further pavement removal opportunities may be realized.

## C. Assumed Stormwater Management Provided for the Preferred Alternative

Six types of SWM facilities were identified in the analysis for this Study: quantity ponds, quality ponds, water quality outfalls, swales, quantity vaults, and water quality vaults. The proposed, preliminary large surface SWM features are shown on the *Environmental Resource Mapping* (**SDEIS, Appendix D**).

The quantity requirements for the Preferred Alternative must be met for each drainage section. The quantity management requirement is met in each drainage segment, except one: the ALB drainage segment. Based on typical practice, a quantity waiver could be granted for the ALB due to the direct discharge to the Potomac River, a major waterway. The ESD requirements must be maximized; however, any deficit within a given drainage segment could be met utilizing compensatory SWM within the same watershed as defined by the MDOT SHA *Sediment and Stormwater Guidelines and Procedures (SSGP), Section 5.5.*, Compensatory SWM is anticipated to be provided through a variety of means including, but not limited to, new SWM facilities to provide water quality treatment for untreated existing impervious surfaces, stream restoration, outfall stabilization, existing SWM facility retrofits, pavement removal, or generation of water quality credits as provided in applicable sections of the SSGP. **Table 2-2** summarizes the required quantity, provided quantity, required ESD and provided ESD for the Preferred Alternative, and the resulting compensatory SWM mitigation requirement.

### Table 2-2: Stormwater Management for the Preferred Alternative

| Required Quantity surface area (ac) | Provided Quantity surface area (ac) | Required ESD surface area (ac) | Provided ESD surface area (ac) | Impervious Area Requiring Offsite Treatment (ac) |
|---|---|---|---|---|
| 28 | 26 | 85 | 40 | 114 |

Due to the large amount of impervious area requiring treatment for the Preferred Alternative and existing site constraints, ESD could not be met onsite for the Preferred Alternative. Consequently, compensatory SWM treatment may be required to offset the ESD deficit, as shown in **Table 2-2**. It is important to consider that the methodology used to determine the conceptual SWM requirements for the Study was based on surface area requirements and was developed to support overall costs and determine right-of-way needs. Detailed stormwater management design, to be performed during final design, and/or use of innovative technologies may reduce the compensatory stormwater management requirements. As noted above, water quantity requirements were met on site in every drainage segment except one: the ALB drainage segment.

00027678



## D. Compensatory Stormwater Management Plan Considerations

Due to the heavily urbanized areas and numerous resources along the study corridors that limit the amount of SWM water quality that can be practically provided on-site, alternate means for providing SWM were evaluated. MDOT SHA performed an extensive planning level study to identify compensatory, or off-site, SWM opportunities to ensure the SWM water quality requirements of the Preferred Alternative could be met. The results of this evaluation, presented in this SDEIS, were not included in the DEIS because the study was completed after the DEIS publication.

Potential SWM sites were identified to meet the compensatory SWM needs for the Preferred Alternative. The methodologies, assumptions, and evaluations documented below were used for this compensatory SWM analysis to support and inform the Joint Permit Application (JPA), the SDEIS, and ultimately the FEIS and Record of Decision (ROD). The compensatory treatment identified generally exceeds the requirement; however, the intent was to provide an excess of compensatory SWM sites to evaluate in detail during final design. Although it is anticipated that sites may be dropped from consideration when final design deems them infeasible and through coordination with Maryland Department of the Environment (MDE) and MDOT SHA permitting authorities, there would still be an adequate amount of treatment potential to meet the study area needs.

All findings of the compensatory SWM efforts are documented in the Compensatory Stormwater Mitigation Plan (**SDEIS, Appendix C**) and will be included in the JPA and FEIS, and ROD. This section summarizes the compensatory SWM requirements and potential water quality credit only.

### a. Methodology and Assumptions

According to the Code of Maryland Regulations (COMAR), "the management of stormwater runoff is necessary to reduce stream channel erosion, pollution, siltation and sedimentation, and local flooding..." The quantification of the SWM required, water quality, and water quantity for a project is determined by the amount of existing impervious area and proposed impervious area located within the study area or LOD. While the MDE and MDOT SHA Water Quality Banking Agreement indicates SWM water quantity requirements must be met on-site for any given project, the SWM water quality requirements, while desirable to be met on-site, can be met elsewhere within the same MDE 6-digit watershed when on-site treatment is not practicable.

For the compensatory SWM analysis, LODs were identified for three types of sites: (1) SWM facilities, (2) stream restoration sites, and (3) pavement removal sites. In general, SWM facility sites were selected to maximize impervious area draining to the site and are primarily within the MDOT SHA right-of-way, while minimizing impacts to private properties and historic and environmental resources (trees, wetlands, waterways, 100-year floodplains, etc.). Each SWM facility is expected to meet a minimum of 1-inch treatment credit, which will provide full impervious area treatment (IAT) credit for MDOT SHA impervious area. For all non-MDOT SHA impervious areas draining to a site, or for pavement removal, half of the impervious area treated or removed is the resultant IAT credit. Unlike the SWM facility and pavement removal locations, the stream restoration sites are generally located outside of MDOT SHA right-of-way and will have impacts to private properties and environmental resources; however, impacts to wetlands and waterways at these sites are generally considered self-mitigating. Self-mitigating sites are sites where the potential design would improve the function of the environmental resources and would not require

00027679



impacts to be mitigated. The credit potential of one-acre IAT credit per 100 linear foot stream restored is a conservative estimate used for the efforts and additional credit may be realized during final design.

To ensure full compliance with NEPA requirements, impacts to forests, wetlands, waterways, floodplains, and properties were determined using desktop evaluations of compensatory SWM sites by the following disciplines: water resources, cultural resources, forestry, hazardous materials, maintenance of traffic, wetlands and waterways, right-of-way, parks/Section 4(f), structures, utilities, and constructability. All desktop evaluations were completed using the best data available at the time and were utilized to inform the LOD for each site. In addition to the desktop evaluations performed, field assessments were performed by the water resources, forestry, wetlands, and stream disciplines to inform the environmental resource delineations and determine SWM feasibility. Refer to **SDEIS, Appendix C** for additional details on the methodology.

### b. Compensatory Stormwater Management Requirements and Potential

The current Compensatory Stormwater Management Plan will provide the opportunity for up to 298 acres of IAT for the Preferred Alternative, through use of SWM facilities, stream restoration, and pavement removal (**Table 2-3**). As stated above, the compensatory IAT potential exceeds the requirement; however, the intent of the plan is to provide an excess of compensatory SWM sites to evaluate in more detail during final design.

#### Table 2-3: Compensatory SWM Phase 1 South Potential

| MDE 6-Digit Watershed | Target Compensatory SWM IART Requirement (AC) | Compensatory SWM IAT Potential (AC) |
|---|---|---|
| Washington Metropolitan (No. 021402) | 114 | 298 |

Further avoidance and minimization of impacts to resources that would be caused by work associated with the compensatory SWM sites will be investigated during final design. In addition, the use of alternate sites which could have fewer or no impacts is encouraged. Final impacts should not exceed those presented in the JPA and the Compensatory Stormwater Management Plan, listed below in **Table 2-4**. While it may be possible that alternate compensatory SWM sites identified during final design could result in an increase in impacts, the full approval and permitting process, including any necessary evaluations for the anticipated environmental and other permitting approvals, would be required.

#### Table 2-4: Compensatory SWM Potential Phase 1 South Environmental Impacts

| Potential LOD Area (acre) | Potential Property Impact (acre) | Wetland Impact (AC/SF) | | | Wetland Buffer Impact (AC/SF) | Waterway Impact (LF/SF) | | FEMA 100-Year Floodplain Impact (AC/SF) | Forest Impact (AC/SF) | Specimen Tree Impact (Count/DBH) |
|---|---|---|---|---|---|---|---|---|---|---|
| | | PFO | PSS | PEM | | Perennial | Intermittent | | | |
| 234.9 | 37.5 | 4.1 / 176,854 | 0.02 / 871 | 0.6 / 27,007 | 7.7 / 335,232 | 20,994 / 226,250 | 4,666 / 24,126 | 46.5 / 2,023,362 | 76.4 / 3,329,321 | 38 / 1,410 |

### 2.3.3 Cross Culverts

The approach for identifying cross culverts and cross culvert augmentation remains the same as presented in the **DEIS, Chapter 2** and is included below for ease of review by the reader. All major cross culverts, defined as culverts 36 inches in diameter or greater with a drainage area greater than 25 acres, were

00027680

identified and analyzed to determine if they would need additional capacity in the proposed conditions. Major culverts were identified by desktop analysis using the MDOT SHA large and small structure database; LiDAR topographic data with one-foot contours; the MDOT SHA National Pollutant Discharge Elimination System (NPDES) database; and field observations.

If an existing culvert crossing needed additional capacity in the proposed conditions, then an auxiliary culvert was proposed to meet the need. It was assumed that the auxiliary culverts could be installed using trenchless technologies (installing the culvert underground without disturbing the existing road) so as not to disrupt traffic traveling on the existing road. Existing culverts were also proposed to be extended so the new outfall structure could be tied to the proposed grading limits for the Preferred Alternative.

After the need for the culvert augmentation was identified, further investigations including site visits and additional hydrologic and hydraulic computations, were conducted to set the LOD at each location. For all proposed culvert augmentation sites in the Preferred Alternative, site visits were conducted to assess the existing site condition, as well as the potential LOD requirements as they relate to the existing condition and the proposed crossing modification. Several agencies, including FHWA, United States Army Corps of Engineers (USACE) and MDE Nontidal Wetlands and Waterways, attended specific site visits to provide general feedback on the LOD requirements related to culvert augmentation.

To prepare for the site visit, a desktop review of each location was conducted, and the following data was compiled into an assessment form: existing and proposed culvert geometry, drainage area parameters, and an estimate of the potential capacity increase via augmentation. Additional site-specific information, such as upstream and downstream channel conditions including any bank erosion, channel head cutting, or other instability; notation of any unusual site circumstances including potentially impacted built infrastructure; and a photo documentation log, were added to the assessment form during the field investigations. Based on the field findings, LODs were proposed for each augmentation site, and they are included in the Preferred Alternative LOD.

Detailed hydrologic and hydraulic analysis will be completed during final design to confirm that augmentation is required. The detailed design will utilize additional data, including roadway and stream topographic survey, to analyze each culvert crossing location more thoroughly and will assess the hydraulic impacts associated with augmentation to confirm that the proposed design will meet the regulatory requirements. During final design, it is possible that culvert augmentation will not be needed at some previously identified locations or will be needed at other additional locations.

### 2.3.4   Construction and Short-term Effects

Construction of the Preferred Alternative will be conducted in a heavily developed area constrained by existing residential and commercial development and environmental resources. Continued, detailed analysis was completed since publication of the DEIS to further assess constructability requirements relative to the existing constraints and to identify additional appropriate adjustments to the LOD and cost estimate. Incorporation of the results of this constructability analysis allows for a more complete picture of the potential impacts. An overview of the analysis was provided in **DEIS, Chapter 2** and is repeated below, with an update on the ALB and Thomas Branch constructability evaluations that occurred following the publication of the DEIS.

00027681



## A. Constructability Considerations

The constructability analysis was based on assumptions and conceptual ideas about construction phasing, methodology, and the general sequence of how the work may proceed. These include:

- Construction sequencing to construct the improvements in a manner that limits the total number of phases and accommodates reasonable and feasible construction methods.

- Maintenance of traffic to maintain the existing number of mainline travel lanes during peak periods, maintain traffic on crossroads, and maintain existing interchange ramp movements. Temporary off-peak lane closures were assumed.

- Construction access and staging to ensure that the LOD allows for storage of construction equipment and materials and construction access to/from the site.

- The ability of regional construction suppliers and contractors to meet the scheduled demand for resources given the scope of this project and the many other large concurrent projects proposed within the region.

## B. Elements Included in the Constructability Analysis

The constructability analysis included potential approaches to complete the proposed work, including:

- Mainline widening to accommodate the HOT lanes.

- Interchange reconstruction to accommodate mainline widening and direct access for the HOT lanes, including new or reconstructed bridges and ramp structures within the existing interchange areas.

- Mainline bridges and overpass reconstruction to accommodate the widened mainline.

- Construction in challenging locations such as the ALB and the bridges over the Chesapeake and Ohio (C&O) Canal and Clara Barton Parkway (see section C. below) and widening adjacent to Thomas Branch. The constructability analysis included coordination with the regulatory agencies at the properties or resources under their jurisdiction including the National Park Service (NPS), Maryland-National Capital Park and Planning Commission (M-NCPPC), USACE, MDE, and Maryland Department of Natural Resources (DNR).

- Minimization of impacts to community, residential and commercial properties, and regulated resources such as cemeteries, parks, historic and archeological resources, and at wetlands and streams, to the greatest extent practicable.

- Drainage outfall stabilization and cross culvert reconstruction to accommodate roadway drainage, including MD Code 378[3] compliance.

- Avoidance and minimization of utility impacts where feasible and accommodation of utility relocations where impacts may be unavoidable.

- Retaining wall construction in cut and fill sections to minimize impacts.

- Construction, extension, or replacement of noise barriers.

The Preferred Alternative LOD also accounts for land needed for construction. The assumed areas for construction staging, materials storage, and access needs at specific locations are identified on the

---

[3] Plans must be submitted to the local Soil Conservation District for approval and prepared in accordance with MD 378: USDA Natural Resources Conservative Service Maryland Pond Code 378, January 2000.

00027682


*Environmental Resource Mapping* (**SDEIS, Appendix D**). The quantified property impacts presented in this SDEIS (**Chapter 4, Section 4.5**) are separated by permanent (or long-term) effects and temporary (or short-term) effects. Short-term, construction related work includes construction staging, material and equipment storage, construction easements, and other areas needed to support the construction, but are not part of the long-term improvements.

### C.  American Legion Bridge Strike Team

The Preferred Alternative includes the full replacement of the ALB on I-495 spanning the Potomac River with a new, wider bridge on the existing centerline. The existing bridge is nearly 60 years old and would need to be replaced regardless of the outcome of this Study. The new bridge would also need to be constructed to maintain the existing number of travel lanes at all times.

Comments on the Build Alternatives presented in the DEIS reflected a common support for advancing replacement of the ALB. With its location over the Potomac River and adjacent to several federally-owned parks, MDOT SHA created a separate group (the ALB Strike Team) whose mission was to investigate alternative bridge designs and construction techniques that could be employed to reduce, minimize, and avoid impacts to water and parkland resources in and around the ALB. The results of the effort are reflected in the Preferred Alternative and are the result of coordination with key agency and public stakeholders, including NPS, M-NCPPC, USACE, MDE, and Maryland DNR.

The National Park Service properties that border the Potomac River at the ALB include the George Washington Memorial Parkway, the Chesapeake and Ohio Canal National Historic Park (including the C&O Canal Towpath and Plummer's Island), and Clara Barton Parkway. In addition to these sensitive properties, there are also many construction challenges associated with replacement of the ALB, such as access constraints.

A number of bridge types and construction methods (both standard and innovative) were evaluated during the Strike Team's analysis. A westward/upstream shift of the bridge alignment and additional phases of construction were also evaluated for the different bridge options. These options were presented to the stakeholders and a conventional structure was recommended that remained on the existing bridge centerline. Impacts to Plummer's Island were significantly reduced compared to those presented for the Build Alternatives in the DEIS by strategically locating the proposed piers for the replacement bridge and eliminating construction access from the island. In addition to a reduction of total impacts at the bridge construction site, the Strike Team effort resulted in a reduction of the number of construction access locations from all four quadrants, as noted in the DEIS, to the northwest quadrant only, due to its grade and proximity to a nearby roadway. This change substantially minimized impacts to the surrounding land. Refer to **Chapter 4, Section 4.4.3** for additional information on the minimization efforts around the ALB.

### D.  Thomas Branch Investigation

Thomas Branch runs parallel to I-495 and the I-270 west spur from the interchange of Democracy Boulevard and the I-270 west spur to the interchange of MD 190 (River Road) and I-495, for approximately three miles. The proposed roadway improvements along I-495 and I-270 would impact Thomas Branch for nearly the entire length where it runs parallel to and crosses under these roadways. An analysis of the impacts and minimization efforts along Thomas Branch were performed for the Build Alternatives for the DEIS. Further review efforts continued after publication of the DEIS and for this SDEIS to ensure that

00027683


multiple scenarios were considered to limit impacts to the resource while determining the LOD for the Preferred Alternative.

Because the LOD along Thomas Branch is constrained to minimize impacts to adjacent residential properties, a multi-disciplinary group was formed to identify a potential construction scenario for Thomas Branch based on the hydrologic and hydraulic conditions of the proposed improvement area. The group evaluated the major construction challenges and risks, as well as costs associated with those risks; this analysis informed the LOD required for construction of the Preferred Alternative. The group identified segments of Thomas Branch that would need to be enclosed and locations of retaining walls along the proposed roadway widening that would allow the stream to remain at grade. Major construction issues include the presence of bedrock slightly below the surface, maintenance of traffic, maintenance of stream flow, and utility constraints. Adjustments to the LOD recommended by this multi-disciplinary group were incorporated for the Preferred Alternative. Refinements to the proposed construction methods and minimization techniques to limit impacts to Thomas Branch will continue through final design.

### 2.3.5  Limit of Disturbance

A limit of disturbance (LOD) was established for the Preferred Alternative. The LOD is the proposed boundary within which all mainline construction-related activities would occur. The LOD for the Preferred Alternative was determined from the proposed roadway typical section, interchange configuration, and roadside design elements and is shown on the *Environmental Resource Mapping* (**SDEIS, Appendix D**). Property impacts associated with the LOD were broken into permanent (or long-term) and temporary (or short-term) areas. Examples of temporary impacts where a temporary construction easement would be acquired include the use of property for construction staging and/or storage that is not needed for the project after construction. The LOD

> **What changes were made to the Limit of Disturbance since the DEIS?**
> Modifications to the LOD for the Preferred Alternative included:
> - Roadway design adjustments based on traffic operations;
> - Revisions to noise barrier locations based on further analysis;
> - Inclusion of LOD needs at culvert augmentation sites through detailed evaluation; and
> - Continued application of avoidance and minimization efforts at sensitive resources

for the Preferred Alternative assumed the potential area of disturbance for the following elements:

- Profile adjustments and roadway shifts due to mainline widening
- Inclusion of pedestrian and bicycle facilities for roads that cross over I-495 and I-270
- Direct access ramps and exchange ramps for access to the HOT managed lanes
- Interchange ramp relocation, reconfiguration, and tie-ins due to mainline widening
- On-site drainage and stormwater management, including swales, ponds, and large facilities along the roadside and within interchanges
- Relocation of existing streams, where determined to be feasible
- Culvert extensions, auxiliary pipes, and outfall stabilization areas
- Noise barrier replacement/construction
- Reconstruction of I-495 and I-270 mainline and interchange ramp bridges over water and roadways

00027684



- Full replacement of the ALB
- Utility relocations
- Avoidance and impact minimization of adjacent land uses such as: streams, wetlands, historic properties, parks, and private properties
- Construction access, staging, materials storage, grading, clearing, and erosion and sediment control

For the compensatory or off-site stormwater management sites, an LOD for each potential site was developed. Refer to **SDEIS, Appendix C** for details.

### 2.3.6  Tolling

The Preferred Alternative will include tolling of the HOT lanes. The toll rates and the toll rate ranges are determined through a multi-step process that is codified in Maryland law, which provides for public input through public hearings and official public testimony. This process was outlined in the DEIS and has advanced since the DEIS was published. The toll rate ranges are in the process of being finalized now, with an anticipated completion in Fall 2021, following the Notice of Availability for this SDEIS. This section provides a more detailed explanation of the toll rate setting process and the current status of the effort.

The toll-rate setting process is led by the Maryland Transportation Authority (MDTA). They are the only State entity with the authority to set, revise, and fix toll rates in accordance with Transportation Article §4-312 of the Annotated Code of Maryland and COMAR Title 11 Department of Transportation, Subtitle 07 MDTA, Chapter 05 Public Notice of Toll Schedule Revisions (11.07.05). The MDTA is responsible for setting the toll rate ranges and conducting toll collection operations for the Phase 1 South limits.

The MDTA toll rate proposal includes minimum toll and maximum toll rate ranges, soft rate caps, a process for annual toll escalation, and toll discounts for certain types of vehicles. The minimum and maximum toll rates are the lowest and highest toll rate per mile that would be charged in any tolling segment. The soft rate cap is the toll rate per mile that can only be exceeded when certain thresholds are met.  More detailed explanations are provided below in **Section 2.3.6.C**.

Maryland law requires the establishment of toll rate ranges for variably priced facilities, including those utilizing dynamic pricing, such as the Preferred Alternative. The toll rate range proposal will be limited to only Phase 1 South. Any action to set, revise and fix tolls outside of Phase 1 South limits would require a separate toll setting process in accordance with State law.

00027685



MDTA has spent the past two years conducting due diligence activities on the toll rate range proposal which included traffic and revenue studies, post-model processing, and feedback from potential developers. The toll rate ranges proposed by MDTA are available on their website at http://mdta.maryland.gov/ALB270TollSetting/TollRateRangeSettingProcessandProposal. The following sections provide more detail on the toll rate setting process, variably and dynamically priced facilities, and the current MDTA toll proposal.

## A. Toll Rate Setting Process

The toll rate range setting process is centered on a proposal by the MDTA staff to establish minimum toll rates, maximum toll rates, soft rate caps within the minimum and maximum toll rate ranges, a process for annual toll escalation, and toll discounts for certain types of vehicles.

The process for conducting the public hearings and recording comments from the public is specified in Transportation Article, §4-312, Annotated Code of Maryland. The initial proposal was presented to the MDTA Board on May 20, 2021. Per the process, the Board voted to take the toll proposal to public hearings and a public comment period, thereby ensuring the public is engaged in the toll rate range setting process and complying with State law by providing opportunities for public review and comment.

The comment period lasted from May 20 through August 12, 2021. Two public hearings were held:

- **Monday, July 12, 2021**: in-person hearing at the Hilton Washington D.C./Rockville Hotel & Executive Meeting Center in Rockville, 2 to 4 PM and 6 to 8 PM
- **Wednesday, July 14, 2021**: virtual hearing, 2 to 4 PM and 6 to 8 PM

All public hearing materials, including information and studies used in the analysis to justify the toll rate range proposal, were posted on the MDTA's website and remain available for the public to view at mdta.maryland.gov/ALB270TollSetting/PublicParticipation. The material presented included the background and justification for the toll rate ranges (minimum and maximum per-mile rates), soft rate caps within the ranges, and discounts, as well as the process required for completing the hearings.

The process for approving and finalizing the proposed toll rate ranges is also specified in Transportation Article, §4-312, Annotated Code of Maryland. At the August 26, 2021 MDTA Board Meeting, the MDTA staff presented a summary and analysis of comments received at the public hearings. In addition, they responded to questions from the Board members. A summary of the public comments received, and the analysis of the comments is available on the MDTA webpage at mdta.maryland.gov/ALB270TollSetting/PublicParticipation.

After consideration of the public comments, at the September 30, 2021 MDTA Board Meeting, the MDTA staff will present the final toll rate range proposal. This final toll rate range will be the recommended action for the Board and is available on the MDTA webpage at mdta.maryland.gov/ALB270TollSetting.

The MDTA is accepting written comments on the recommended action/final toll rate range proposal into October. At a fall MDTA Board Meeting, the MDTA staff are expected to present a summary and analysis of any public comments received during this second public comment period at an open meeting. The comment summary and analysis will be posted to the MDTA webpage at mdta.maryland.gov/ALB270TollSetting. During this meeting, the MDTA Board will vote on the final toll

00027686


rate range recommendation. Before the Board votes, the public will be provided a third opportunity to comment on the final toll rate range recommendation live during the MDTA Board Meeting.

## B. Variably Priced and Dynamically Priced Facility

The Preferred Alternative will be a variably priced facility that utilizes dynamic pricing. A variably priced toll facility requires the establishment of toll rate ranges (minimum and maximum) for each vehicle classification and payment method. The MDTA Board is also responsible for establishing an annual escalation process and discount programs (including free passage) for certain types of vehicles.

Dynamic pricing is a method of calculating the toll where the pricing mileage rate varies within the approved toll rate range in real time. A dynamic facility uses operational metrics to adjust the toll in real time. Toll rates adjust to maintain free-flowing traffic by using pricing factors to influence the traffic flow— when lanes become more congested, the toll increases, and when the lanes become less congested, the toll decreases. Tolls will be collected electronically at highway speeds, using overhead gantries, with no toll plazas or toll booths (cashless tolling). Similar to the Virginia Express Lanes, MD 200, and the I-95 Express Toll Lanes north of Baltimore, current toll rates for common destinations will be displayed on electronic roadway signs allowing drivers to know their toll prior to entering the HOT lanes.

## C. MDTA Toll Rate Range Proposal

The Preferred Alternative will be designed to maintain speeds of 45 mph or greater in the HOT lanes. The goal of the HOT lanes is to maintain free-flowing traffic and to use pricing factors to influence traffic flow. As such, the toll rate range will be set to ensure the HOT lanes operate to established operational metrics, which applies the economic principles of supply and demand to influence the utilization of the HOT lanes. The Phase 1 Section Developer will be responsible for setting toll rates within the established toll rate ranges, if approved at the end of the toll rate range setting process. The Developer will not only be responsible to ensure the free-flowing traffic goals but will also have to cover design, maintenance, finance and operations costs from the generated toll revenue. The toll rate range proposal will only be used if a ROD is signed by FHWA at the end of this study.

The proposed toll rate ranges for Phase 1 South will consist of minimum toll rates, soft toll rate caps, and maximum toll rates for the HOT lanes. The rates will also include annual escalation factors to ensure the toll rate ranges are adequate to cover the full term of the P3 Program agreements (anticipated to be 50 years). Toll rates will be set dynamically, meaning they could change up to every five minutes based on traffic volumes or speed in the HOT lanes to provide customers who choose to use the HOT lanes and pay a toll, a faster and more reliable trip. The actual toll rates will change based on real-time traffic within each tolling segment.

The toll rate ranges will only apply to the HOT lanes; the existing free general-purpose lanes will not be tolled. In addition, the proposal will include discounts for qualifying vehicles—including HOV 3+ (including carpools and vanpools), buses and motorcycles. MDTA recognizes that designated HOV compliant vehicles are required to be toll-free under the Federal regulation Section 166; however, MDTA is using the term 'discount' to refer to all vehicles that would have a toll rate that is lower than the standard toll rate.

00027687



### a. Minimum Toll Rate

The minimum toll rate is the lowest toll rate per mile that will be charged at any tolling segment for the HOT lanes or the lowest total toll a customer will pay regardless of how far they travel. The minimum toll rate is intended to cover toll capture, processing and collection costs.

### b. Soft Rate Caps

The soft rate cap is the toll rate amount that can only be exceeded when at least one of the following thresholds are met within a given tolling segment during the preceding five-minute period: the average traffic volume exceeds 1,600 passenger car equivalent vehicles per hour per lane or the average speed in a tolling segment is below 50 mph. The soft rate cap will always be lower than the maximum toll rate and can be exceeded only temporarily to provide customers who choose to pay a toll, a faster and more reliable trip. The toll rate will continue to decrease once throughput and speed performance targets are achieved until it is at or below the soft rate cap.

MDTA is proposing the soft rate cap as a protection for customers. The purpose of the soft rate cap is to constrain the toll rate charged to customers when throughput and speed performance targets are achieved. This provides customers protection from price gouging when traffic conditions do not justify higher rates. Although not standard practice in the tolling industry, the MDTA is choosing to be one of only two states in the United States to set a soft rate cap to constrain the toll rate as a protective measure for customers.

### c. Maximum Toll Rate

The maximum toll rate is the highest per-mile toll rate that may be charged within any tolling segment for the HOT lanes. The actual per-mile rate paid by customers is responsive to real-time traffic. The maximum rates cannot be exceeded under any circumstance. The maximum rate will only be realized under conditions where the soft rate cap is exceeded, which would be during times of deteriorating performance. In extremely rare circumstances, when traffic demand is very high and customers are experiencing decreased speeds in a given tolling segment, the toll rate may reach the maximum toll rate. The toll rate is determined on a segment-by-segment basis. The maximum toll rate is required for the most congested tolling segments and likely would not come into effect for many segments.

### d. Escalation

The minimum and maximum toll rate ranges, and the soft rate cap within them, will be adjusted annually according to pre-determined escalation factor equations. The adjustments are necessary to ensure the toll rates will (1) keep up with the growing traffic demand for the HOT lanes, (2) account for annual inflation, and (3) achieve the goal of providing a faster and more reliable trip for customers who choose to pay the toll over the life of project. For the toll rates to effectively manage demand and ensure reliability for users of the HOT lanes into the future, the maximum per mile rates, soft rate caps, and unregistered video surcharge rates will escalate over time to account for inflation, population employment, and income growth. The minimum per mile toll rate ranges and the minimum trip tolls are both subject to escalation for inflation only.

## 2.3.7   Transit-Related Elements

A description of the transit-related elements considered for the Build Alternatives and the State Board of Public Works (BPW) consideration of regional transit service improvements in the P3 agreements was

00027688


included in **DEIS, Chapter 2**. The same transit-related elements apply for the Preferred Alternative within the area of the build improvements. This section has been updated to describe additional transit considerations since publication of the DEIS and connections specifically related to the Preferred Alternative.

## A. Enhanced Transit Mobility and Connectivity

A key element of this Study's Purpose and Need includes enhancing existing and planned multimodal mobility and connectivity. In furtherance of this key consideration and to address public and agency comments on the DEIS, MDOT SHA has identified opportunities to enhance transit mobility and connectivity within the Preferred Alternative including the following elements:

- Free bus transit usage of the HOT managed lanes to provide an increase in speed of travel, assurance of a reliable trip, and connection to local bus service/systems on arterials that directly connect to activity and economic centers.

- Direct and indirect connections from the proposed HOT managed lanes to existing transit stations and planned Transit Oriented Development as shown in **Figure 2-4** at the Shady Grove Metro (I-370), Twinbrook Metro (Wootton Parkway), Westfield Montgomery Mall Transit Center (Westlake Terrace), and Medical Center Metro (MD 187).

- Regional transit improvements to enhance existing and planned transit and support new opportunities for regional transit service including:
    - Construction of new bus bays at WMATA Shady Grove Metrorail Station
    - Increased parking capacity at the Westfield Montgomery Mall Park and Ride

### a. BPW and Regional Transit Services

On August 11, 2021, in accordance with Maryland law, MDOT and MDTA presented to and received approval from the Board of Public Works to award the Phase 1 P3 Agreement to the Selected Proposer for the predevelopment work related to Phase 1 South of the P3 Program. As part of its proposal, the Phase Developer has committed to provide an estimated $300 million for transit services in Montgomery County over the operating term of Phase 1 South.

> **Transit Riders Will Benefit from the Managed Lanes**
> - Enhances transit mobility and connectivity to existing and planned transit facilities.
> - Improved highway system will provide less-congested and more reliable routes for bus service.
> - Provides opportunities for planned or modified bus service to connect to underserved suburban to suburban transit markets.
> - Provides opportunities for new express bus service in National Capital Region, such as between Bethesda and Tysons.

To further support transit services, MDOT has committed, upon financial close of the Section P3 Agreement for Phase 1 South, to fund not less than $60 million for design and permitting of high priority transit investments in Montgomery County, such as Phase I of the Corridor Cities Transitway, Bus Rapid Transit in the MD 355 Corridor, or other high priority projects and to construct and equip the Metropolitan Grove Bus Operations and Maintenance Facility.

00027689



### b. Transit Work Group, Transit Service Coordination Report, and I-495/American Legion Bridge Transit and TDM Plan

As described in the DEIS, the MDOT Secretary convened the I-495 & I-270 Managed Lanes Transit Work Group in May 2019 to seek input on existing transit services and help identify feasible opportunities for transit to use the managed lanes. The transit and planning representatives who are both directly and indirectly affected by the P3 Program include Montgomery, Prince George's, Frederick, Howard, Anne Arundel, and Charles Counties, as well as MDOT MTA commuter bus and Maryland Rail Commuter (MARC) and WMATA, MDOT Secretary's Office of Planning and Capital Programming, MDOT SHA, FHWA, Federal Transit Administration and the Metropolitan Washington Council of Governments.

The *Transit Service Coordination Report* was made available to the public in June 2020 and was the result of coordination between MDOT, local governments, and the transit providers through the I-495 & I-270 Managed Lanes Transit Work Group. The purpose of the report was to inform the development of the I-495 & I-270 P3 Program and assist the affected counties and transit providers in prioritizing capital and operating investments. Ongoing collaboration with the affected jurisdictions continues to establish priorities, identify and develop specific regional transit service improvements to be considered as part of the memorandum of understandings, and determine appropriate long-term funding strategies.

The I-495/American Legion Bridge Transit/Transportation Demand Management (TDM) Study was initiated to identify a range of current and future potential multimodal solutions that could be implemented to reduce congestion, improve trip reliability and regional connections, and enhance existing and planned multimodal mobility and connectivity for travel between Maryland and Virginia across the ALB. The study was a joint effort between the MDOT Maryland Transit Administration and the Virginia Department of Rail and Public Transportation. The potential construction of managed lanes in both states represents an opportunity to implement new transit service options that take advantage of the infrastructure and provide riders with congestion-free service.

The *I-495/ALB Transit/TDM Final Report and Plan*[4] was completed in March 2021 and identified a series of potential investment packages to provide new mobility choices to service bi-state travel. Each package outlined a combination of transit service elements, technology enhancements, Commuter Assistance Programs, and parking needs. The investment packages offered options to move more people across the ALB in fewer vehicles. The suggested next steps recommended in the Final Report included advancement of transit service before or during construction of the managed lanes, consideration of a bus-on-shoulder approach based on the sequence and duration of construction of the managed lanes, working with local entities and transit providers to facilitate first-last mile connections, and determining local service modifications. Additional next steps were related to commuter assistance programs and technology enhancements, and parking and facility needs. Consideration of these potential investment packages and regional transit improvements will continue through development of the FEIS, ROD and P3 agreements.

Further, the ALB will be designed and constructed such that a future capital improvement project will have one or more feasible options to achieve the full design and implementation of a transit line across the ALB. These options will be enabled by designing the northbound and southbound structures to not

---

[4] http://www.drpt.virginia.gov/media/3375/i495_alb_transittdm_study_finalreport_030521_combined.pdf

00027690



preclude future superstructure modifications and additional foundation and substructure capacity capable of supporting a new transit line.

### 2.3.8    Pedestrian and Bicycle Facility Considerations

A preliminary determination of existing pedestrian and bicycle facilities that would need to be replaced as part of the Build Alternatives was considered in the **DEIS, Chapter 2**. The updates since the DEIS consist of additional consideration of the proposed master plan facilities, refinement of the design approach applied for the Preferred Alternative in consultation with the key agency stakeholders, and development of options for a proposed shared use path connection across the ALB, between Maryland and Virginia.

Many pedestrian and bicycle facilities exist along crossroads or as separate facilities that cross over or under I-495 and I-270. The different facility types considered as part of this Study are described in guidance from the jurisdictions with ownership of these existing facilities within Phase 1 South including the MDOT SHA *Bicycle Policy & Design Guidelines* (January 2015), Montgomery County Planning Department's *Bicycle Facility Design Toolkit* (May 2018), and City of Rockville's *Bikeway Master Plan* (April 2017) and are defined below:

- Bikeway – General term denoting any trail, path, part of a highway, surfaced or smooth shoulder or any other travel way specifically signed, marked, or otherwise designated for bicycle travel. Bikeways include bike lanes, shared lanes, shared-use paths, and trails.

- Bike lane – Any portion of a roadway or shoulder which includes pavement markings and signage for the preferential or exclusive use of bicyclists. Separated bike lanes, or cycle tracks, are exclusive bikeways that are physically separated from both traffic and the sidewalk. They operate one-way or two-way.

- Shared lane – A roadway lane which is open to both bicycle and motor vehicle travel, without assigned space for each.

- Sidepath – Also known as a shared-use path, a paved or unpaved bikeway outside the motor vehicle traveled way providing two-way travel for pedestrians and bicycles within the highway right-of-way. A sidepath is physically separated from motorized vehicular traffic by an open space, curb, curb and gutter, or barrier.

- Off-street trail: A shared-use path providing two-way travel for pedestrians and bicycles located outside of the highway right-of-way.

Through coordination with the local agencies having jurisdiction over and/or maintenance responsibility for these facilities, existing pedestrian and bicycle facilities impacted by the Preferred Alternative would be replaced in kind or upgraded to meet the master plan recommended facilities. Provision of these upgraded facilities would be subject to maintenance agreements between MDOT SHA and the local jurisdictions in compliance with Maryland law.

The preliminary design approach for facilities along crossroads where the crossroad bridge would be reconstructed is to replace, upgrade, or provide new pedestrian/bicycle facilities consistent with the master plan, where adjacent connections on either side of the bridge currently exist. Where the I-495 and I-270 mainline or ramps cross over a roadway or pedestrian/bicycle facility and the bridge would be replaced, the mainline and ramp bridges would be lengthened to accommodate the footprint for the master plan facility under the structure. Identification of the proposed master plan facilities was conducted in coordination with M-NCPPC, the Montgomery County Department of Transportation

00027691

(MCDOT) and the City of Rockville and will be refined during final design. Additional new facilities or upgrades included in the Preferred Alternative were designed at a planning level in accordance with MDOT SHA, Montgomery County, or City of Rockville design requirements, as referenced above.

MDOT and the Virginia Department of Transportation have agreed to reconstruct the ALB with a new pedestrian and bicycle shared use path to provide multi-modal connectivity across the Potomac River, likely anticipated to be located along the east side of the ALB. The path would connect to the planned Fairfax County trail system and the Montgomery County master plan trail system at MacArthur Boulevard. An existing connection from the MacArthur Boulevard sidepath to the C&O Canal towpath exists just outside of the Study Area, supporting regional connectivity.

Since the DEIS, four options were developed for a proposed shared use path connection between the ALB and MacArthur Boulevard in Maryland. These options have been presented to agency stakeholders for input including NPS, MCDOT, M-NCPPC, and USACE. Through this coordination, Option 1 was eliminated from further consideration. A description of the remaining three options is summarized in the bullets below and graphical depictions of the path locations are shown in white in **Figure 2-5** through **Figure 2-7**. The shared use path options are included in the LOD for the Preferred Alternative and, therefore, any associated impacts are included in the overall impact totals.

- Option 2 (**Figure 2-5**) would provide the shortest path between the ALB and MacArthur Boulevard, traversing approximately 1,600 feet. From the ALB to north of eastbound Clara Barton Parkway, the path would be adjacent to and barrier-separated from I-495, thus presenting a single bridge structure over the towpath, Canal, and Parkway and limiting the visual effect of the path. North of the eastbound Clara Barton Parkway, the alignment of Option 2 would rise to cross over the northbound I-495 to eastbound Clara Barton Parkway ramp on a bridge and over Clara Barton Parkway westbound, connecting to the sidepath along MacArthur Boulevard. This alignment would allow for a natural buffer between the trail and I-495 ramps at the Clara Barton Parkway interchange, enhancing the user experience and reducing the visual effect of the trail from the Parkway.

- Option 3 (**Figure 2-6**) is similar to Option 2 and is approximately 1,770 feet long between the ALB and MacArthur Boulevard. From the ALB to north of the eastbound Clara Barton Parkway, Option 3 would be adjacent to and barrier-separated from I-495, thus presenting a single bridge structure over the towpath, Canal, and Eastbound Parkway and limiting the visual effect of the path. North of eastbound Clara Barton Parkway, the alignment would rise to cross over the northbound I-495 to eastbound Clara Barton Parkway ramp and over Clara Barton Parkway westbound on a bridge, connecting to the sidepath along MacArthur Boulevard. This option would keep the path alignment close to, but above, the existing loop ramp and would connect to MacArthur Boulevard further west than Option 2. The alignment would not provide a vegetative buffer between the trail and I-495 ramps.

- Option 4 (**Figure 2-7**) would provide an alignment approximately 2,050 feet long between the ALB and MacArthur Boulevard, which would remain parallel to I-495 while raising the elevation of the path to cross over the roadway ramps to and from the I-495 inner loop to Clara Barton Parkway. To meet vertical grade requirements of the Americans with Disabilities Act, Option 4 would include a switchback ramp north of the ALB to facilitate the grade change required to cross over the I-495 ramp to Clara Barton Parkway. This option would be on a continuous structure above I-

00027692


495, from the switchback ramp to MacArthur Boulevard. The trail would horizontally consolidate impacts with I-495 but would be more visible for a greater distance along the C&O Canal towpath and Clara Barton Parkway due to the height. It would also need to include additional safety measures due to the height and length of the structure.

These options for the shared use path connection between the ALB and MacArthur Boulevard will continue to be evaluated and coordinated with the agency stakeholders. The preferred alignment for the path will be identified in the FEIS. A summary of the key aspects of each shared use path option is provided in **Table 2-5**.

### Table 2-5: Summary and Comparison of Shared Use Path Options

| Alignment Option | Length between ALB and MacArthur Blvd | Overall Change in Elevation | Percent of Alignment in Tunnel | Percent of Alignment Higher than 25' above Existing Ground |
|---|---|---|---|---|
| Option 2 | 1,600' | 29' | 0% | 34% |
| Option 3 | 1,770' | 33' | 0% | 42% |
| Option 4 | 2,050' | 51' | 0% | 78% |

### Figure 2-5: Shared Use Path Option 2 Alignment (Shown in White)



00027693


**Figure 2-6: Shared Use Path Option 3 Alignment (Shown in White)**



**Figure 2-7: Shared Use Path Option 4 Alignment (Shown in White)**



00027694



## 2.4  Transportation Commitments and Enhancements

Mitigation for unavoidable impacts is continuing to be evaluated and is being identified in close coordination with the partner resource and regulatory agencies. Final mitigation will be identified in the FEIS. Beyond mitigation for unavoidable impacts, MDOT SHA is committing to certain elements that have been identified as priorities through extensive coordination with local, state, and federal agency partners and in consideration of public comments received on the DEIS. These commitments and enhancements will serve to support new options for travel, reduce reliance on single occupancy vehicles, support new opportunities for regional transit service, and provide meaningful benefits to adjacent resources to improve values and functions that may be compromised. While extensive coordination efforts were performed to consider and address key concerns, the ultimate list of commitments will be finalized by MDOT SHA in the ROD. The current list of proposed commitments and enhancements include the following:

1. Commitment to *priority bicycle and pedestrian connections to remove barriers and provide connectivity* for bicyclists and pedestrians consistent with connections identified in the Montgomery County and City of Rockville master plans and priorities, including but not limited to:
   - Constructing a new pedestrian/bicycle shared use path across the ALB to connect facilities in Maryland and Virginia
   - Lengthening the I-270 bridge over Tuckerman Lane to accommodate future pedestrian/bicycle facilities along Tuckerman Lane
   - Constructing new sidepaths across MD 190 over I-495
   - Widening the existing variable-width sidepath along Seven Locks Road under I-495 (Cabin John Trail)
   - Constructing a new sidewalk along the west side of Seven Locks Road under I-495 to connect First Agape AME Zion Church (Gibson Grove Church) and Morningstar Tabernacle No. 88 Moses Hall and Cemetery

2. Commitment to certain *regional transit improvements* to enhance existing and planned transit and support new opportunities for regional transit service, as outlined in **Section 2.3.7** Transit Related Elements and below:
   - Construct new bus bays at WMATA Shady Grove Metrorail Station
   - Increase parking capacity at Westfield Montgomery Mall Transit Center

3. Commit to *environmental enhancements* that would provide meaningful benefits to adjacent resources to improve the values, services, attributes, and functions which may be compromised including water quality improvements, stream restoration, and removal of invasive species on county parkland.
   - Commit to continue working collaboratively with partner agencies to further avoid and minimize community, cultural, environmental, and parkland impacts, and finalize mitigation based on identified priorities that would, at a minimum, bring no net loss to impacted resources with a goal of net benefit.

00027695



- Commit to addressing water quality concerns on parkland focused on stabilizing streams, creating natural surface channels, and revegetating areas to improve water quality and reduce flooding and pollutant loads.
- Committed improvements include stream bank and bed stabilization and removal of concrete lined channels in identified priority areas such as Cabin John Stream Valley Park.

## 2.5  Phase 1 Solicitation Process and P3 Agreement

The Preferred Alternative is aligned with Phase 1 South Solicitation, which is the first section planned to be delivered under the I-495 & I-270 P3 Program. This Preferred Alternative does not suggest that improvements will not be needed on sections of I-495 that are recommended for no action at this time, including the top side and east side of I-495. However, under the Preferred Alternative, consideration of improvements to the remaining parts of I-495 would be required to advance separately, subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and agency partners. Additional improvements would proceed through subsequent P3 solicitation(s) or a public project delivery model, such as Design-Build. The following definitions of limits are provided to assist in understanding the NEPA and Phase 1 Solicitation process.

- Phase 1:  I-495 from south of the ALB to I-270 and I-270 from I-495 to I-70. These are also the limits of the Phase 1 P3 Agreement.
- Phase 1 South: I-495 from south of the ALB to I-270 and I-270 from I-495 to I-370. These are also the limits of the NEPA Preferred Alternative.
- Phase 1 North: I-270 from I-370 to I-70.

### 2.5.1   Selection of the Phase Developer

The BPW originally approved the P3 designation for the P3 Program in June 2019 and provided a supplemental approval in January 2020. These approvals allowed MDOT SHA to use a Progressive P3 process to design and construct Phase 1 of the P3 Program, by seeking a phase developer for Phase 1. This progressive approach allowed the solicitation process to proceed without final commitment during the NEPA process.

As part of the progressive P3 solicitation, MDOT followed a two-step Request for Proposal (RFP) process, which began with MDOT seeking interested phase developers through a Request for Qualifications issued in February 2020. Statements of Qualifications were submitted and evaluated by MDOT and MDTA with participation from local jurisdictions and resulted in a shortlist of four highly qualified Proposers in July 2020.

The Proposers were then invited to submit proposals to enter into the Phase P3 Agreement for Phase 1 to assist in the predevelopment work and financial commitments for delivering Phase 1. The RFP outlined how each Proposer should present their plan to advance MDOT's goals of delivery certainty, minimizing impacts, maximizing value to the State, providing community benefits, congestion relief, and financial elements such as cost of performing predevelopment work and willingness to offer an upfront payment for the right to develop and deliver Phase 1 including I-495 from the ALB to I-270, and along I-270 from I-495 to I-70.  Transparency, fairness, and competition were prioritized to ultimately identify the Proposer (the Selected Proposer) that could best deliver the project in a manner most advantageous to the State.

00027606

With the initiation of the solicitation process in February 2020, Proposers had nearly a year to develop their proposals.

Three of the four shortlisted firms submitted proposals to enter into the Phase P3 Agreement for Phase 1 to assist in the pre-development work. In February 2021, MDOT SHA identified the Selected Proposer that could best deliver the project in a manner most advantageous to the State.

On August 11, 2021, in accordance with Maryland law, MDOT and MDTA presented to and received approval from the Board of Public Works to award the Phase 1 P3 Agreement to the Selected Proposer, a jointly owned company created for the project, called Accelerate Maryland Partners, Inc. (AMP). Initially, they will be completing the predevelopment work related to Phase 1 South of the P3 Program; however, there is also an option in the Phase 1 Agreement for AMP to proceed with predevelopment work for Phase 1 North after the necessary NEPA approvals have been issued.

### 2.5.2   NEPA and the Progressive P3 Work Together

As noted above, Phase 1 South will be delivered using a Progressive P3 approach, which is designed to minimize risks to the State, provide more-efficient pricing, better schedule certainty, and support a phased delivery approach of the Preferred Alternative identified in this SDEIS.

As the first step to this two-step Progressive P3, AMP, the Phase Developer, has entered into the Phase P3 Agreement and is working collaboratively with MDOT, MDTA, and the stakeholders on predevelopment work for Phase 1 South. This upfront effort is focusing on advancing the preliminary design and due-diligence activities by involving all stakeholders – including Montgomery and Frederick Counties, municipalities, property owners, utilities, and citizens. During the predevelopment work, the focus will be on further avoiding and minimizing impacts to environmental resources, communities, properties, utilities, and other features.

After completion of the predevelopment work with respect to Phase 1 South and the FEIS and ROD, MDOT would seek final approval from the BPW to move forward with the Section P3 Agreement under which a subsidiary of the Phase Developer (called the "Section Developer") will be responsible for the final design, construction, financing, operations and maintenance of such section for an estimated term of 50 years.

00027697

# 3  TRANSPORTATION AND TRAFFIC

The traffic analysis of the Build Alternatives was documented in the Draft Environmental Impact Statement (DEIS), **Chapter 3** and **DEIS, Appendix C**.  It can be viewed through the following links on the project website:

https://495-270-p3.com/wp-content/uploads/2020/11/2020-06-02_DEIS_03_Traffic.pdf

https://495-270-p3.com/wp-content/uploads/2020/07/APP-C_MLS_Traffic-Tech-Report-Appendices.pdf

What is new in this Supplemental DEIS (SDEIS) Chapter:

- Traffic analysis results for the No Build Alternative with an updated design year 2045
- Traffic analysis results for the Preferred Alternative: Alternative 9 - Phase 1 South with design year 2045
- Discussion regarding the impact of COVID-19 on traffic demand and forecasts and the State's ongoing monitoring plan

## 3.1  Introduction

As noted in **Chapter 1**, any proposed action resulting from the Managed Lanes Study (Study) must accommodate existing congestion on I-495 and I-270 and long-term traffic growth.  An understanding of current and projected traffic demands on the transportation network along the study corridors and the surrounding area is essential to properly evaluate how each of the Build Alternatives would address these traffic challenges. The DEIS and its appendices presented results from the traffic operational analyses conducted for the 2040 No Build Alternative and eight (8) Build Alternatives (Alternative 5, Alternative 8, Alternative 9, Alternative 9M, Alternative 10, Alternative 13B, Alternative 13C, and the MD 200 Diversion Alternative).  This chapter presents the results from the traffic operational analyses conducted for the 2045 No Build condition and the Preferred Alternative: Alternative 9 - Phase 1 South.  For additional details, refer to the *Traffic Evaluation Memorandum: Alternative 9 - Phase 1 South* in **SDEIS, Appendix A**.

### 3.1.1  Traffic Analysis Data Collection and Modeling Methodology

Baseline conditions for year 2017 and elements of the Study's Purpose and Need are unchanged from the DEIS. The DEIS assumed a design year of 2040. In this SDEIS, detailed traffic operational analyses were performed for the No Build Alternative and the Preferred Alternative for the updated design year of 2045. Refer to Paragraph 1 below and **Section 3.1.3** for additional details regarding why the design year was updated, as planned. Analysis was also completed for this SDEIS to evaluate the Preferred Alternative's ability to meet the Study's Purpose and Need based on year 2045 conditions. Similar to the DEIS, the evaluation methodology included a three-step process:

1. First, a regional forecasting model was developed for the No Build Alternative and Preferred Alternative using the Metropolitan Washington Council of Governments Travel Demand Model (MWCOG model), which is the model typically used by MDOT SHA and other transportation agencies to evaluate projects in the Washington, DC metro area.  For the SDEIS, MDOT SHA used an updated version of the MWCOG model, Version 2.3.75, which was released in Fall 2018. The DEIS used an earlier version of the MWCOG model, Version 2.3.71. There are three primary differences between the model versions. First, land use data was

00027698

updated as part of MWCOG's regularly updated population, household, and employment cooperative forecasts from Round 9.0 to Round 9.1. Second, the transportation network was updated with new projects per the latest Constrained Long-Range Plan (CLRP), approved in 2018. Finally, forecasts were performed at five-year intervals out to the year 2045, which allowed MDOT SHA to extend the design year to 2045 for analysis in the SDEIS.

2. Next, the outputs from the MWCOG model were used to develop traffic volume projections for the design year of 2045 for each roadway segment and ramp movement within the study limits during the peak periods for the No Build Alternative and Preferred Alternative.

3. Finally, traffic simulation models were developed for the 2045 No Build Alternative and 2045 Preferred Alternative using VISSIM software to determine the projected operational performance in several key metrics during the AM peak period (6AM to 10AM) and the PM peak period (3PM to 7PM). The metrics were selected to evaluate the effectiveness of each of the Build Alternatives to efficiently move people through the region and to provide benefits to the transportation system. These same metrics used to evaluate in this SDEIS were the same used to evaluated for the other Build Alternatives in the DEIS: speed, delay, travel time, level of service, throughput, and local network impacts.

### 3.1.2  Traffic Analysis Area

The traffic analysis area for the DEIS extended beyond the Study limits to capture upstream and downstream effects. Evaluation of the Preferred Alternative in the SDEIS used the same limits for the VISSIM simulation models as in the DEIS, as shown in **Figure 3-1** and listed below:

- I-495 from VA 193 in Virginia across the American Legion Bridge (ALB) and through the state of Maryland to the Woodrow Wilson Bridge

- I-270 from the I-70 ramp merges to I-495, including the East and West Spurs

Additionally, the updated version of the MWCOG model used to develop 2045 volume projections for this SDEIS covered the same area as the previous version for the DEIS: the entire National Capital Region of surrounding roadways in 22 jurisdictions, including Montgomery County, Prince George's County, and Frederick County in Maryland, as well as Arlington County and Fairfax County in Virginia, and the District of Columbia.

### 3.1.3  Traffic Modeling Assumptions

The DEIS used a 2040 design year to evaluate the Build Alternatives. MDOT SHA assumed the design year 2040 for all traffic analysis in the DEIS because at the time the Study began, that was the latest approved regional forecasting model from MWCOG. The 2040 forecasts were used to compare alternatives and determine which alternatives would be expected to provide the best operational benefit to meet the Study's Purpose and Need. A new version of the MWCOG model was approved and released in October 2018 that projected traffic demand out to the year 2045. The DEIS included a sensitivity analysis comparing the 2040 forecasts to the 2045 forecasts (refer to **Appendix J** of the **DEIS, Appendix C**, *Traffic Technical Report*) and a commitment to include updated 2045 operational analyses for the Preferred Alternative to evaluate how that Alternative would meet the Purpose and Need based on the latest MWCOG model. Therefore, this SDEIS assumes a design year 2045 for the No Build Alternative and Preferred Alternative.

00027699

**Figure 3-1: Limits of VISSIM Model Network and Interchange Locations Included along I-495 and I-270**



00027700

The analysis for the design year assumed completion of several background projects included in the region's CLRP. The impacts of these background projects were assumed as part of the baseline conditions for the design year 2045 No Build Alternative and for 2045 Preferred Alternative. The following roadway projects of regional significance within the Study limits were not in the baseline model, but were assumed to be in place in the year 2040 in the DEIS and are also assumed to be in place in the year 2045 for the purposes of this Study:

- I-270 Innovative Congestion Management (ICM) Improvements
- Virginia Department of Transportation I-495 Express Lanes Northern Extension (495 NEXT)
- I-270 at Watkins Mill Road Interchange (open to traffic in June 2020)
- Greenbelt Metro Station Access Improvements

Additionally, the benefits of the following proposed transit projects on the traffic demands for the roadway network within the study corridors were accounted for in the 2040 modeling and also included in the 2045 modeling:

- Purple Line Light Rail
- Corridor Cities Transitway (CCT)
- US 29 Bus Rapid Transit (BRT)
- Randolph Road BRT
- North Bethesda Transitway

The updated 2045 MWCOG model also includes the following additional transit projects that are part of Montgomery County's Rapid Transit System that were not included in the 2040 model:

- MD 355 BRT
- Veirs Mill Road BRT
- New Hampshire Avenue BRT

Potential roadway or transit improvements on I-270 from north of I-370 to I-70 were not included as part of this Study, as alternatives for that segment will be developed as part of a separate NEPA process (https://495-270-p3.com/i270-environmental/).

Each of the Build Alternatives studied as part of the traffic analysis for the DEIS and SDEIS included managed lanes. The managed lanes were assumed to be buffer-separated with a physical delineation from the adjacent general purpose (GP) lanes, with access provided via direct connections at key locations. The direct access locations have evolved throughout the Study based on input from the stakeholders and design modifications to avoid or minimize impacts to sensitive resources, while still meeting the Purpose and Need.

The operational analysis results presented in this SDEIS assume direct access would be provided at the following locations, consistent with the latest design for the Preferred Alternative.

- Three (3) Interchanges on I-495:
  o George Washington Memorial Parkway
  o Cabin John Parkway / MD 190
  o I-270 west spur
- A Set of Exchange Ramps, including one (1) slip ramp per direction:

00027701

- o Outer loop exchange ramp from Maryland high-occupancy toll (HOT) managed lanes to Virginia GP lanes south of the ALB
- o Inner loop exchange ramp from Virginia GP lanes to Maryland HOT managed lanes north of Clara Barton Parkway
- Five (5) Interchanges on I-270:
  - o I-495 and I-270 Y-split on the west spur
  - o Westlake Terrace
  - o Wooton Parkway
  - o Gude Drive
  - o I-370 (to/from the south)

Assumptions related to tolling and considerations for connected and automated vehicles (CAVs) are unchanged from the DEIS and can be found in **DEIS, Chapter 3** at the following link: (https://495-270-p3.com/wp-content/uploads/2020/11/2020-06-02_DEIS_03_Traffic.pdf)

### 3.1.4  Impact of COVID-19 Pandemic on Traffic Demand and Forecasts

The COVID-19 global pandemic clearly impacted the daily routines of people across the world, affecting the way Maryland residents and regional commuters work, travel, and spend their free time. In the short-term, these changes have altered travel demand, transit use, and traffic volumes on all roadways in Maryland, including I-495 and I-270. As part of its ongoing mission, and in response to public comments on the DEIS, MDOT SHA has been closely monitoring the changes in traffic patterns throughout the pandemic. **Figure 3-2** shows how traffic volumes within the study corridors have fluctuated during the pandemic compared to pre-pandemic levels. The data shows a severe drop in traffic volumes in April 2020 after stay-at-home orders were issued across Maryland, with daily traffic volumes on I-270 and I-495 reducing by more than 50 percent compared to April 2019. After the stay-at-home order was replaced with a "safer at home" advisory in May 2020, traffic volumes gradually increased throughout the summer, stabilizing at approximately 15 percent less than typical conditions during fall 2020. As cases began to surge in November/December 2020, traffic volumes dipped again through the winter. With the rollout of vaccines in early 2021, the corresponding drop in COVID-19 cases, and the gradual reopening of schools and businesses, daily traffic volumes have continued to recover. Volumes were back to over 90 percent of normal as of August 2021 compared to expected 2021 levels considering two years of growth since 2019.  MDOT SHA will continue to monitor volumes into fall 2021 and winter 2021-2022.

Statewide, weekly traffic volumes were only down seven (7) percent for the week of August 16, 2021 compared to the same week in 2019, per MDOT's coronavirus tracking website, linked below. Volumes during the afternoon peak hour have recovered closer to pre-pandemic levels compared to morning hours and daily volumes, with some permanent count stations on I-270 and I-495 recording higher volumes between 5PM and 6PM in May 2021 than May 2019. Transit use has been slower to recover, with usage of Maryland Transit Administration (MTA) services still down approximately 50 percent compared to pre-pandemic levels as of August 2021 per data presented on MDOT's coronavirus tracking website: (https://www.mdot.maryland.gov/tso/Pages/Index.aspx?PageId=141)

There is uncertainty surrounding forecasts for post-pandemic traffic levels and transit use and there is no definitive model to predict how or if changes to mobility patterns during the pandemic will affect long-term traffic projections. To adapt to the ongoing and potential long-term travel impacts associated with the pandemic, MDOT SHA developed a *COVID-19 Travel Analysis and Monitoring Plan* for the Study. A copy of the latest version of the plan is included in **SDEIS, Appendix B**. The plan includes three components:

00027702

- **Monitoring**: tracking changes in roadway and transit demand during the pandemic, including daily and hourly volume data, i.e., how does travel change in response to the number of cases, vaccine distribution, unemployment rates, school closings, and policy changes;
- **Research:** reviewing historical data and surveys/projections from the Transportation Research Board and the National Capital Region Transportation Planning Board;
- **Sensitivity Analyses**: evaluating "what if" scenarios, including potential changes in teleworking, eCommerce, and transit use on projected 2045 travel demand and operations.

**Figure 3-2: Daily Traffic Volume Changes on I-495 and I-270 During COVID-19 Pandemic vs. 2019**



This plan will continue to evaluate transportation trends and confirm that the capacity improvements proposed under the Preferred Alternative would be needed and effective if future demand changes substantially from the pre-pandemic forecasts. MDOT SHA must ensure that transportation improvements are being developed to meet our State's needs not only for today, but for the next 25-plus years. Historically, vehicular travel has increased as the economy recovered following economic events and societal changes, such as the 2008 Great Recession. As noted above, traffic volumes within the Study area continue to increase as businesses and schools reopen with more openings expected by fall 2021. Because long-term travel trends are far from settled and because the most recent data suggests traffic is rebounding close to pre-pandemic levels, the SDEIS forecasts continue to apply models that were developed and calibrated prior to 2020 for use in evaluating projected 2045 conditions in this document. However, MDOT SHA will continue to review new data as it becomes available. The sensitivity analysis evaluating several "what if" scenarios related to future traffic demand due to potential long-term changes to teleworking, e-commerce, and transit use as part of the *COVID-19 Travel Analysis and Monitoring Plan* (**SDEIS, Appendix B**) is ongoing. Results will be presented in the Final Environmental Impact Statement (FEIS).

00027703

## 3.2   Existing Conditions

The Study limits are the same as the DEIS and include many of the most heavily traveled, most congested, and most unreliable roadway segments in Maryland[1]. According to the *2019 Maryland State Highway Mobility Report*, the top four highest volume roadway sections in Maryland based on average daily traffic (ADT) are contained within the study limits. These locations include I-270 from the I-270 Split to MD 117, I-495 from the I-270 east spur to I-95, I-495 from the Virginia State Line to the I-270 west spur, and I-495 from MD 4 to I-95. **Table 3-1** shows the existing (year 2017) ADT for each segment within the study area, which reflects total traffic in both directions. Regional travel impacts of the COVID-19 pandemic were discussed above in Section 3.1.4.

**Table 3-1: Existing Average Daily Traffic (ADT)**

| Corridor | Segment | Existing Volumes (2017) |
|---|---|---|
| I-270 (both directions) | I-370 to MD 28 | 226,000 |
| | MD 28 to I-270 Spur | 259,000 |
| I-495 (both directions) | at American Legion Bridge | 243,000 |
| | MD 190 to I-270 Spur | 253,000 |
| | Between I-270 Spurs | 119,000 |
| | MD 355 to I-95 | 235,000 |
| | I-95 to US 50 | 230,000 |
| | US 50 to MD 214 | 235,000 |
| | MD 214 to MD 4 | 221,000 |
| | MD 4 to MD 5 | 198,000 |

## 3.3   Future Traffic Conditions and Alternatives Analysis

Traffic volumes throughout the study corridors are projected to continue to grow over the next 20 to 25 years due to expected increases in population and employment in the Washington, DC metropolitan region. **Table 3-2** shows the projected design year 2040 ADT for each segment along I-495 and I-270 within the study limits under the No Build condition that were presented in the DEIS, as well as the updated design year 2045 ADT values prepared for the SDEIS. Despite many segments already operating at or near capacity, daily traffic volumes on I-270 and I-495 are projected to continue to increase between now and the design year 2045 under the No Build condition.

**Table 3-2: Existing and No Build Average Daily Traffic (ADT)**

| Corridor | Segment | Existing (2017) | No Build (2040) | No Build (2045) |
|---|---|---|---|---|
| I-270 | I-370 to MD 28 | 226,000 | 265,000 | 274,000 |
| | MD 28 to I-270 Spur | 259,000 | 299,000 | 308,000 |
| I-495 | at American Legion Bridge | 243,000 | 277,000 | 285,000 |
| | MD 190 to I-270 Spur | 253,000 | 282,000 | 289,000 |
| | Between I-270 Spurs | 119,000 | 127,000 | 129,000 |
| | MD 355 to I-95 | 235,000 | 252,000 | 256,000 |
| | I-95 to US 50 | 230,000 | 245,000 | 248,000 |
| | US 50 to MD 214 | 235,000 | 252,000 | 256,000 |

---

[1] Segments as defined by *2019 Maryland State Highway Mobility Report*

00027704



| Corridor | Segment | Existing (2017) | No Build (2040) | No Build (2045) |
|---|---|---|---|---|
| | MD 214 to MD 4 | 221,000 | 244,000 | 249,000 |
| | MD 4 to MD 5 | 198,000 | 218,000 | 223,000 |

For future traffic conditions, the Preferred Alternative was evaluated and compared to the No Build condition using updated 2045 forecasts for several key operational metrics, including speed, delay, travel time, level of service, throughput, and the effect on the local network. These metrics are the same metrics used in the DEIS to evaluate and compare the alternatives. The results were obtained from the MWCOG model and the VISSIM traffic simulation models and are summarized in the following sections. For additional details, refer to **SDEIS, Appendix A,** *Traffic Evaluation Memorandum: Alternative 9 - Phase 1 South.*

**Table 3-3** shows the projected design year 2045 ADT for each segment along I-495 and I-270 within the study limits for the No Build and Preferred Alternative. Locations that add capacity to I-270 and I-495 under the Preferred Alternative would be projected to see an increase in daily traffic volumes served compared to the No Build Alternative because the freeways would be able to accommodate latent demand that would otherwise use the local roadway network to avoid congestion.

**Table 3-3: 2045 Average Daily Traffic (ADT)**

| Corridor | Segment | No Build (2045) | Preferred Alternative (2045) |
|---|---|---|---|
| I-270 | I-370 to MD 28 | 274,000 | 277,000 |
| | MD 28 to I-270 Spur | 308,000 | 311,000 |
| I-495 | at American Legion Bridge | 285,000 | 309,000 |
| | MD 190 to I-270 Spur | 289,000 | 317,000 |
| | Between I-270 Spurs | 129,000 | 135,000 |
| | MD 355 to I-95 | 256,000 | 267,000 |
| | I-95 to US 50 | 248,000 | 250,000 |
| | US 50 to MD 214 | 256,000 | 258,000 |
| | MD 214 to MD 4 | 249,000 | 251,000 |
| | MD 4 to MD 5 | 223,000 | 224,000 |

### 3.3.1  Speed

The metric of average speed was calculated from the traffic simulation model output. Speed data was compiled for all links in the system. Similar to the DEIS, the speed data is summarized in two tables shown below. **Table 3-4** shows the average speed for the Preferred Alternative in the GP lanes for the entire study limits of I-495 and I-270 compared to the No Build Alternative during the peak periods in the design year of 2045 to determine if benefits would be achieved in the GP lanes. The results are shown for the entire study limits to be consistent with the results presented in the DEIS, even though the Build improvements for the Preferred Alternative are only proposed in the Phase 1 South limits.

**Table 3-4: 2045 Average Speed**

| Alternative | Average Speed[1] (GP Lanes) |
|---|---|
| No Build | 24 mph |
| Preferred Alternative | 29 mph |

Note: [1] Reflects weighted average speed on I-270 and I-495 during peak hours

00027705

The results indicated that the additional capacity proposed under the Preferred Alternative would improve average speed in the GP lanes by five (5) miles per hour (mph) on average throughout the study area during the peak periods compared to the No Build condition.

Detailed corridor travel speed results by peak hour and direction for the GP lanes and the managed lanes are provided in **Table 3-5**. During the 2045 AM peak, speeds in the I-495 GP lanes are projected to improve under the Preferred Alternative compared to No Build and all HOT lanes are projected to maintain speeds of at least 50 mph. On the I-495 outer loop, average speeds in the GP lanes are projected to improve from 33 mph to 52 mph between the I-270 west spur and the George Washington Memorial Parkway and improve slightly (from 26 mph to 27 mph) in the no action area between MD 5 and the I-270 West Spur. On the I-495 inner loop, average speeds in the GP lanes are projected to improve from 36 mph to 45 mph between the George Washington Memorial Parkway and the I-270 west spur and remain unchanged (at 31 mph) in the no action area between MD 5 and the I-270 west spur. On I-270 southbound, average speeds in the GP lanes are projected to improve from 46 mph to 50 mph between I-370 and I-495. On I-270 northbound, speeds are free flow during the AM peak period under both the No Build and the Preferred Alternative. The results show a slight decrease in average speed along I-270 northbound under the Preferred Alternative compared to No Build (from 63 mph to 61 mph) because the No Build data reflects speeds in the Express Lanes and therefore does not account for vehicles in the Local Lanes that are typically moving slower than vehicles in the Express Lanes while entering and exiting the facility.

**Table 3-5: 2045 Corridor Travel Speed (mph) Results from VISSIM Model**

| Peak Period | Corridor | Travel Lanes | Alternative | |
|---|---|---|---|---|
| | | | No Build | Preferred |
| AM Peak | I-495 Outer Loop from MD 5 to I-270 West Spur[1] | GP Lanes | 26 | 27 |
| | | HOT Lanes | - | - |
| | I-495 Outer Loop from I-270 West Spur to George Washington Memorial Parkway | GP Lanes | 33 | 52 |
| | | HOT Lanes | - | 56 |
| | I-495 Inner Loop from George Washington Memorial Parkway to I-270 West Spur | GP Lanes | 36 | 45 |
| | | HOT Lanes | - | 51 |
| | I-495 Inner Loop from I-270 West Spur to MD 5[1] | GP Lanes | 31 | 31 |
| | | HOT Lanes | - | - |
| | I-270 Northbound from I-495 to I-370 | GP Lanes | 63[2] | 61 |
| | | HOT Lanes | - | 63 |
| | I-270 Southbound from I-370 to I-495 | GP Lanes | 46[2] | 50 |
| | | HOT Lanes | - | 58 |
| PM Peak | I-495 Outer Loop from MD 5 to I-270 West Spur[1] | GP Lanes | 25 | 48 |
| | | HOT Lanes | - | - |
| | I-495 Outer Loop from I-270 West Spur to George Washington Memorial Parkway | GP Lanes | 37 | 52 |
| | | HOT Lanes | - | 59 |
| | I-495 Inner Loop from George Washington Memorial Parkway to I-270 West Spur | GP Lanes | 7 | 7 |
| | | HOT Lanes | - | 23 |
| | I-495 Inner Loop from I-270 West Spur to MD 5[1] | GP Lanes | 23 | 27 |
| | | HOT Lanes | - | - |
| | I-270 Northbound from I-495 to I-370 | GP Lanes | 29[2] | 28 |
| | | HOT Lanes | - | 37 |
| | I-270 Southbound from I-370 to I-495 | GP Lanes | 60[2] | 56 |
| | | HOT Lanes | - | 56 |

Notes: [1] Shaded rows reflect locations with no action proposed under the Preferred Alternative. [2] No Build results along I-270 are shown for the Express Lanes. Under No Build conditions, vehicles enter and exit I-270 via a separated Local Lanes system, which will be eliminated under the Build alternatives to reduce the roadway footprint and minimize impacts.

00027706

During the 2045 PM peak, the Preferred Alternative is projected to improve speeds significantly along the I-495 outer loop for both the GP lanes and the HOT lanes. On the I-495 outer loop, average speeds in the GP lanes are projected to improve from 37 mph to 52 mph between the I-270 west spur and the George Washington Memorial Parkway and also improve significantly (from 25 mph to 48 mph) in the no action area between MD 5 and the I-270 west spur due to the Preferred Alternative relieving the downstream bottleneck. The HOT lanes on the I-495 outer loop are projected to operate at free flow conditions (59 mph) during the PM peak. However, speeds along the I-495 inner loop and I-270 northbound are limited by downstream congestion outside the limits of Phase 1 South during the PM peak under the Preferred Alternative. On the I-495 inner loop, average speeds in the GP lanes are projected to remain unchanged (7 mph) between the George Washington Memorial Parkway and the I-270 west spur under the Preferred Alternative during the 2045 PM peak hour compared to the No Build Alternative because of severe congestion on the top side of I-495 in the proposed no action area. Average speeds in the HOT lanes would be better (23 mph) but would not be expected to achieve the desired 45 mph in 2045 without additional improvements along I-495 east of the I-270 west spur.

On I-270 northbound, average speeds in the GP lanes would be similar for the Preferred Alternative compared to the No Build Alternative in the 2045 PM peak without additional improvements on I-270 north of I-370 (speeds would reduce slightly from 29 mph to 28 mph) because of severe congestion where I-270 reduces to two lanes north of the Phase 1 South limits. Average speeds in the HOT lanes would be better (37 mph) but would not be expected to achieve the desired 45 mph without additional improvements along I-270 north of I-370 by 2045. As noted earlier in **Section 3.1.3**, potential improvements in this section of I-270 are being evaluated under a separate pre-NEPA study. On I-270 southbound, speeds in the GP lanes and HOT lanes are free flow during the PM peak period under both the No Build and the Preferred Alternative. The results show a slight decrease in average speed along I-270 southbound under the Preferred Alternative compared to No Build (from 60 mph to 56 mph) because the No Build data reflects speeds in the Express Lanes and therefore does not account for vehicles in the Local Lanes that are typically moving slower than vehicles in the Express Lanes while entering and exiting the facility. Additional details are provided in the *Traffic Evaluation Memorandum: Alternative 9 - Phase 1 South* (**SDEIS, Appendix A**).

### 3.3.2  Delay

System-wide delay was calculated to determine the average amount of time each vehicle in the traffic simulation model was delayed while trying to reach its destination. Delay can be caused by slow travel due to congestion or vehicles yielding the right-of-way at stop-controlled or signalized intersections. **Table 3-6** shows the projected average delay per vehicle in the entire network under the No Build Alternative and the Preferred Alternative during the 2045 AM peak period and the 2045 PM peak period.

Table 3-6: 2045 System-Wide Delay

| Alternative | Average Delay (min/vehicle) | | Percent Improvement vs. No Build | |
|---|---|---|---|---|
| | AM Peak | PM Peak | AM Peak | PM Peak |
| No Build | 12.9 | 13.6 | N/A | N/A |
| Preferred Alternative | 10.6 | 9.2 | 18% | 32% |

00027707

The results indicated that the Preferred Alternative would be projected to reduce system-wide delay by 18 percent during the AM peak period and by 32 percent during the PM peak period compared to 2045 No Build conditions. These results reflect all vehicles in the model, including those traveling on I-495 and I-270 for the entire length of the study area (including the no action areas) and those traveling through and within the cross-street interchanges.

### 3.3.3 Travel Time

Travel time index (TTI) was calculated for each segment of I-495 and I-270 based on the outputs from the traffic simulation model. TTI quantifies the average travel time and congestion levels during the peak periods and is defined as the ratio of the average (50th percentile) travel time during a particular hour to the travel time during free-flow or uncongested conditions. TTI also serves as a proxy for the Planning Time Index (PTI), which is used to estimate reliability, because there is a strong correlation between PTI and TTI. Roadways with a lower TTI have some reserve capacity to absorb the disruption caused by non-recurring congestion (and generally have a lower PTI), while roadways with high TTI values are more likely to be impacted by minor incidents (and generally have a higher PTI). **Table 3-7** shows the weighted average TTI values for the entire study area (including the no action areas) in the GP lanes for the Preferred Alternative and the No Build Alternative in the design year 2045.

#### Table 3-7: 2045 Travel Time Index (TTI)

| Alternative | Weighted Average TTI[1] (GP Lanes) |
|---|---|
| No Build | 2.36 |
| Preferred Alternative | 2.01 |

Note: [1] Reflects weighted average TTI on I-270 and I-495 during peak hours

MDOT SHA defines "congestion" as any roadway segment with a TTI value greater than 1.15, while "severe congestion" is reached when TTI values exceed 2.0. Under the 2045 No Build Alternative, the weighted average TTI along I-270 and I-495 during the peak hours is 2.36, which reflects severe congestion. The results indicated that the GP lanes under the Preferred Alternative would improve compared to No Build but would remain in the severe congestion category in the design year of 2045. TTI values broken down by segment are provided in **Table 3-8** and have been color coded based on MDOT SHA's definition of uncongested conditions, moderate congestion, heavy congestion, and severe congestion.

The results indicated that the Preferred Alternative would be projected to improve five segments from congested levels under the No Build Alternative (TTI over 1.15) to uncongested (TTI under 1.15) and improve two segments from severe congestion (TTI over 2.0) to heavy congestion (TTI under 2.0). However, the I-495 inner loop from I-270 to I-95 would be projected to degrade during the 2045 AM peak hour from moderate congestion (TTI of 1.3) to severe congestion (TTI over 2.0) due to congestion on the top side of I-495 in the proposed no action area. Additionally, the segment of the I-495 inner loop from Virginia 193 to I-270 would also degrade slightly during the 2045 PM peak hour due to residual effects of congestion in the proposed no action area on the top side of I-495. Additional details are provided in the *Traffic Evaluation Memorandum: Alternative 9 - Phase 1 South* (**SDEIS**, **Appendix A**).

00027708



### Table 3-8: 2045 Travel Time Index (TTI) Results for General Purpose Lanes from VISSIM Model

| Peak Period | Corridor | Alternative | |
|---|---|---|---|
| | | No Build | Preferred |
| AM Peak | I-495 Inner Loop from Virginia 193 to I-270 | 1.7 | 1.0 |
| | I-495 Outer Loop from I-270 to Virginia 193 | 1.3 | 1.1 |
| | I-495 Inner Loop from I-270 to I-95 | 1.3 | 2.7 |
| | I-495 Outer Loop from I-95 to I-270 | 2.9 | 2.6 |
| | I-495 Inner Loop from I-95 to MD 5 | 2.5 | 1.9 |
| | I-495 Outer Loop from MD 5 to I-95 | 2.5 | 2.5 |
| | I-270 Northbound from I-495 to I-370 | 1.0 | 1.0 |
| | I-270 Southbound from I-370 to I-495 | 1.2 | 1.1 |
| PM Peak | I-495 Inner Loop from Virginia 193 to I-270 | 6.6 | 6.9 |
| | I-495 Outer Loop from I-270 to Virginia 193 | 1.6 | 1.1 |
| | I-495 Inner Loop from I-270 to I-95 | 4.8 | 3.0 |
| | I-495 Outer Loop from I-95 to I-270 | 3.5 | 1.1 |
| | I-495 Inner Loop from I-95 to MD 5 | 1.5 | 1.8 |
| | I-495 Outer Loop from MD 5 to I-95 | 2.4 | 1.5 |
| | I-270 Northbound from I-495 to I-370 | 1.9 | 1.9 |
| | I-270 Southbound from I-370 to I-495 | 1.0 | 1.0 |

Notes: [1] MDOT SHA defines various levels of congestion based on TTI: Uncongested (green) – TTI ≤ 1.15; Moderate Congestion (yellow) – 1.15 < TTI ≤ 1.3; Heavy Congestion (orange) – 1.3 < TTI < 2.0; Severe Congestion (red) – TTI ≥ 2. [2] This table summarizes TTI in the GP lanes. All HOT/Express Toll Lanes would have TTI values in the uncongested range (TTI less than 1.15).

### 3.3.4   Level of Service

Level of Service (LOS) is a letter grade assigned to a section of roadway that measures the quality of traffic flow, ranging from LOS A to LOS F. LOS A represents optimal, free-flow conditions, while LOS F represents failing conditions where demand exceeds capacity. For freeway segments, the *Highway Capacity Manual* assigns LOS grades based on density. Urban freeway segments reach failing (LOS F) conditions when the density exceeds 45 passenger cars per mile per lane. The percentage of lane-miles projected to operate at LOS F during the peak periods in the design year of 2045 was calculated from the traffic simulation model output for the Preferred Alternative and the No Build Alternative. The results include the entire study areas (including the no action areas) and are shown in **Table 3-9**.

### Table 3-9: 2045 Percent of Lane-Miles Operating at LOS F

| Alternative | Percent of Lane-Miles Operating at LOS F | | |
|---|---|---|---|
| | AM Peak | PM Peak | Average |
| No Build | 33% | 50% | 41% |
| Preferred Alternative | 29% | 29% | 29% |

The results indicated that the Preferred Alternative would be effective at reducing the number of failing segments within the study corridors. However, it is projected that 29 percent of the lane miles would continue to operate at LOS F in the design year of 2045 under the Preferred Alternative, primarily in areas along I-495 east of the I-270 east spur that would have no action.

00027709



### 3.3.5  Throughput

The metric of vehicle throughput was calculated from the traffic simulation model output to quantify how efficiently goods, services, and people could be moved through the study corridors under each alternative. Throughput represents the number of vehicles that pass by a given point in the roadway network in a set amount of time. Four key locations were chosen for evaluating throughput during the peak periods: I-495 crossing the American Legion Bridge, I-495 west of I-95, I-495 at MD 5, and I-270 at Montrose Road. These locations cover the four main segments of the study area, separated by major freeway junctions (I-495 at I-95 and I-495 at I-270) and are considered representative of the entire study area. **Table 3-10** summarizes the average vehicle-throughput at the four key locations for the No Build Alternative and the Preferred Alternative in terms of vehicles per hour. The values include traffic traveling in both directions and account for vehicles traveling in both the GP lanes and the managed lanes. For consistency, the same four key locations used in the DEIS are reported in this SDEIS even though the Preferred Alternative includes no action in two of the four locations. Under No Build conditions, the number of vehicles (and people) that can travel through the system during the peak period is constrained by congestion. The Preferred Alternative would result in increased throughput compared to the No Build Alternative. This translates into increased efficiency of the roadway network in getting people, goods, and services to their destinations. Additional benefits of increased throughput on the highway include reduced peak spreading (i.e., less congestion in the off-peak hours) and reduced burden on the surrounding roadway network.

#### Table 3-10: 2045 Vehicle Throughput

| Alternative | Average Vehicle Throughput at Four Key Locations[1] (veh/hr) |
|---|---|
| No Build | 15,600 |
| Preferred Alternative | 17,600 |

Note: [1] Evaluation locations include I-495 at American Legion Bridge, I-495 west of I-95, I-495 at MD 5, I-270 at Montrose Road

**Table 3-11** provides additional detail by showing the vehicle throughput results generated from the VISSIM outputs at each key location. Results are reported in terms of vehicles per hour and percent increase in vehicle-throughput for the Preferred Alternative compared to the No Build Alternative, rounded to the nearest five (5) percent. As expected, the most significant increases under the Preferred Alternative occur at the locations where HOT lanes are proposed (I-495 at the American Legion Bridge and I-270 at Montrose Road). For additional information, refer to the *Traffic Evaluation Memorandum: Alternative 9 - Phase 1 South* (**SDEIS, Appendix A**).

#### Table 3-11: 2045 Vehicle Throughput Results from VISSIM Model

| Metric | Peak Period | Location | Alternative | |
|---|---|---|---|---|
| | | | No Build | Preferred |
| Vehicle-Throughput (veh/hr) | AM Peak | I-495 at American Legion Bridge | 17,869 | 22,930 |
| | | I-495 west of I-95 | 15,393 | 14,523 |
| | | I-495 at MD 5 | 10,661 | 12,197 |
| | | I-270 at Montrose Rd | 17,765 | 20,774 |

00027710



| Metric | Peak Period | Location | Alternative | |
|---|---|---|---|---|
| | | | No Build | Preferred |
| | PM Peak | I-495 at American Legion Bridge | 15,999 | 19,635 |
| | | I-495 west of I-95 | 14,896 | 15,965 |
| | | I-495 at MD 5 | 14,591 | 14,086 |
| | | I-270 at Montrose Rd | 17,403 | 20,563 |
| Percent Change in Vehicle-Throughput vs. 2045 No Build | AM Peak | I-495 at American Legion Bridge | N/A | 30% |
| | | I-495 west of I-95 | N/A | < 0% |
| | | I-495 at MD 5 | N/A | 15% |
| | | I-270 at Montrose Rd | N/A | 15% |
| | PM Peak | I-495 at American Legion Bridge | N/A | 25% |
| | | I-495 west of I-95 | N/A | 5% |
| | | I-495 at MD 5 | N/A | < 0% |
| | | I-270 at Montrose Rd | N/A | 20% |

### 3.3.6   Local Network

While the focus of the Study is to provide benefits to travelers using I-495 and I-270, the proposed action would also have impacts on the surrounding local roadway network[2]. This impact was quantified by using the results of the MWCOG regional model output for the No Build Alternative and the Preferred Alternative to calculate the total vehicle hours of delay on all arterials in Montgomery County, Maryland, Prince George's County, Maryland, and the District of Columbia. Other regions in Maryland and Virginia showed negligible changes in local delay as a result of the project. **Table 3-12** shows the relative change in total delay on the local network for the Preferred Alternative compared to the No Build Alternative. The results indicated that the Preferred Alternative would be projected to result in a net reduction in daily delay on the surrounding arterials of 3.5 percent by drawing traffic off the local network, despite some localized increases in arterial traffic near the managed lane access interchanges.

**Table 3-12: 2045 Effect on the Local Network**

| Alternative | Percent Reduction Local Network Delay vs. No Build[1] |
|---|---|
| No Build | N/A |
| Preferred Alternative | 3.5% |

Note: [1] Based on total daily vehicle-hours of delay from 2045 MWCOG model for arterials in Montgomery County, Prince George's County, and the District of Columbia

---

[2] For the purposes of this Study, the local roadway network includes minor and principal arterials, but not roadways that are classified as expressways, freeways, or interstate.

00027711



**Table 3-13** provides additional detail by showing the total vehicle hours of delay and percent reduction compared to the 2045 No Build Alternative for arterials in Montgomery County, Prince George's County, and the District of Columbia individually. Montgomery County would be projected to experience the largest local network savings under the Preferred Alternative as a result of the proposed physical roadway widening along portions of I-495 and I-270 in Montgomery County to provide HOT lanes under this Alternative. Prince George's County and the District of Columbia would also expect to experience some benefits to the local network despite no physical roadway improvements within these jurisdictions under the Preferred Alternative.

**Table 3-13: 2045 Local Network Results from MWCOG Model**

| Metric | Alternative | |
|---|---|---|
| | No Build | Preferred |
| Daily Delay (vehicle-hours) for All Arterials in Montgomery County | 242,408 | 230,882 |
| *Percent Reduction vs. No Build (Montgomery County)* | *N/A* | *4.8%* |
| Daily Delay (vehicle-hours) for All Arterials in Prince George's County | 160,143 | 157,832 |
| *Percent Reduction vs. No Build (Prince George's County)* | *N/A* | *1.4%* |
| Daily Delay (vehicle-hours) for All Arterials in District of Columbia (DC) | 176,612 | 169,859 |
| *Percent Reduction vs. No Build (District of Columbia)* | *N/A* | *3.8%* |
| Total Daily Delay (vehicle-hours) for All Arterials in Montgomery County, Prince George's County, and the District of Columbia (DC) | 579,163 | 558,573 |
| **Percent Reduction vs. No Build (Total)** | **N/A** | **3.5%** |

### 3.3.7 Summary

The following summarizes the results of the design year 2045 traffic operational evaluation for the No Build Alternative and the Preferred Alternative presented in this chapter of the SDEIS.

1.  The **No Build Alternative** would not address any of the significant operational issues experienced under existing conditions, and it would not be able to accommodate long-term traffic growth, resulting in slow travel speeds, significant delays, long travel times, and an unreliable network. Compared to the 2040 No Build results presented in the DEIS, the 2045 No Build results show higher delays and travel times on I-495 and I-270 due to additional projected traffic growth between 2040 and 2045. This traffic growth is anticipated despite additional transit projects included in the 2045 forecast that help to slightly reduce projected delays on the surrounding local roadway network.

2.  The **Preferred Alternative** is projected to provide meaningful operational benefits to the system even though it includes no action or no improvements for a large portion of the study area to avoid and minimize impacts. This alternative would significantly increase throughput across the American Legion Bridge and on the southern section of I-270 while reducing congestion. It would also increase speeds, improve reliability, and reduce travel times and delays along the majority of I-495, I-270, and the surrounding roadway network compared to the No Build Alternative. Although the Preferred Alternative provides less improvement to traffic operations when compared to the Build Alternatives that included the full 48-mile study limits evaluated in the DEIS

00027712



(such as Alternatives 9 and 10), it was chosen based in part on feedback from the public and stakeholders who indicated a strong preference for eliminating property and environmental impacts on the top and east side of I-495. Congestion would be present during the PM peak period on I-270 northbound and the I-495 inner loop in the design year of 2045 due to downstream bottlenecks outside of the Preferred Alternative limits.

## 3.4   Next Steps

As the Study progresses, traffic models for the Preferred Alternative will continue to be refined and updated to reflect ongoing design enhancements resulting from stakeholder coordination. In addition, MDOT SHA will continue to monitor traffic trends and changes in travel behavior related to the COVID-19 pandemic and will complete a sensitivity analysis of potential long-term impacts to the forecasts per the *COVID-19 Travel Analysis and Monitoring Plan* (**SDEIS, Appendix B**). These updated traffic results will be documented in the FEIS.

MDOT SHA will also continue to work with FHWA to evaluate operations and safety at the project termini and at all interchanges within the limits of the proposed build improvements as part of the Interstate Access Point Approval (IAPA) process. This requires an evaluation of the operations and safety of each interchange including the nearby intersections by analyzing any localized increase in demand on cross streets near the interchange. The IAPA will evaluate potential ways to mitigate increases in traffic volumes to ensure safe and efficient operations on these roads. Potential mitigation strategies include signal timing adjustments, adding or extending turn lanes, changing lane assignments, pedestrian and bicycle improvements, modification to intersections such as new traffic signals, and TDM strategies such as dynamic signage to encourage traffic to use I-270 and MD 200 when practical to avoid congested segments in the no action areas. These mitigation strategies will continue to be refined as the IAPA is completed and will be included in the FEIS. Any mitigation proposed will avoid environmental impacts along I-495 outside of the Phase 1 South limits. The IAPA will be included as an appendix to the FEIS.

00027713



# 4  ENVIRONMENTAL RESOURCES, CONSEQUENCES & MITIGATION

This chapter presents an overview of the socio-economic, cultural, natural, and other environmental resources along the study corridors, the anticipated permanent and temporary effects to those resources from the Preferred Alternative, and a preliminary assessment of measures to avoid, minimize, and mitigate unavoidable effects to those resources. This chapter follows the same format as the Draft Environmental Impact Statement (DEIS), Chapter 4 and is supported by the 19 DEIS Technical Reports which can be viewed through the following links on the program website:

DEIS, Chapter 4: https://495-270-p3.com/wp-content/uploads/2020/11/2020-06-02_DEIS_04_Environmental.pdf

The supporting DEIS, Technical Reports are available on the Program website: https://495-270-p3.com/deis/#DEIS

This Supplemental DEIS (SDEIS) Chapter includes the following updates:

- Updates on applicable resources related to the Preferred Alternative, Alternative 9 - Phase 1 South limits from George Washington Memorial Parkway to east of MD 187 and then on I-270 from I-495 to I-370 including the I-270 east spur from east MD 187 to I-270.
- The proposed effects, both permanent and temporary, from the Preferred Alternative.
- Updated agency coordination that has occurred since the DEIS related to further avoidance, minimization and mitigation of resources.

This SDEIS does not include final mitigation for the permanent and temporary impacts presented in chapter; it presents conceptual mitigation to the same level of detail as the DEIS. The final mitigation for unavoidable impacts is still being coordinated with the applicable resource and regulatory agencies and will be included in the FEIS.

This chapter provides an updated summary of existing resources, anticipated effects, and mitigation related to the Preferred Alternative. The results and analysis documented in the DEIS and the Study technical reports appended to the DEIS remain valid. Additional technical analyses and supporting documentation have been appended to support the SDEIS. All supporting documentation is cross-referenced throughout this chapter and available through the program website (https://495-270-p3.com/deis/).

Since the DEIS was published in July 2020, design has advanced (refer to **SDEIS, Chapter 2** for details). Permanent or long-term effects and temporary or short-term construction-related effects of the Preferred Alternative have been quantified. A summary of the permanent and temporary effects associated with the Preferred Alternative are shown in **Table 4-1**. The anticipated construction effects are discussed qualitatively throughout this chapter, in **Section 4.23** and in **Chapter 2, Section 2.3.4**.

00027714

Additional opportunities to avoid, minimize, and mitigate effects will be considered and the commitments will be documented in the Final Environmental Impact Statement (FEIS). All substantive comments received on the DEIS and SDEIS will be responded to in the FEIS.

Common terms used throughout this chapter are defined below.

- *Study corridors*, as defined in the Study scope, includes I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including the American Legion Bridge (ALB) crossing over the Potomac River, to west of MD 5 in Prince George's County, Maryland; and I-270 from I-495 to I-370 in Montgomery County, including the east and west I-270 spurs north of I-495.

- *Phase 1 South Limits* were defined as the limits of the build improvements associated with the Preferred Alternative, Alternative 9 – Phase 1 South and includes two, new high-occupancy toll (HOT) managed lanes in each direction on I-495 from George Washington Memorial Parkway to east of MD 187 and then on I-270 from I-495 to I-370 including the I-270 east spur from east MD 187 to I-270.

- *Corridor study boundary* was defined as 48 miles long and approximately 300 feet on either side of the centerline of I-495 and I-270. The corridor study boundary was used to define the data collection area for gathering information on existing environmental conditions. The corridor study boundary was used in the environmental resource investigations for Natural Resources, summarized in **Sections 4.11** through **4.20** of this chapter, and parks and Section 4(f) Resources summarized in **Section 4.4** and **Chapter 5** of this document.

- *Limits of Disturbance (LOD)* were established for the Preferred Alternative and includes two, new HOT managed lanes in each direction on I-495 from George Washington Memorial Parkway to east of MD 187 and then on I-270 from I-495 to I-370 including the I-270 east spur from east MD 187 to I-270. The LOD is the proposed boundary within which all mainline construction, construction access, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, and related activities would occur (refer to **Chapter 2, Section 2.3.5**).

- *Permanent impacts* are defined as those impacts which result in long term or permanent change to the use of the land due to the Preferred Alternative. An acquisition of property in fee, a perpetual right of way easement or any other perpetual easement is considered as a permanent impact.

- *Temporary impacts* are those impacts that are short-term and related to the construction of the Preferred Alternative. Short-term, construction related work includes construction staging, material and equipment storage, construction easements, and other areas needed to support the construction, but not part of the long-term improvements. An acquisition of a short-term easement for construction related work is defined as a temporary impact.

00027715

### Table 4-1: Summary of Quantifiable Impacts for the Preferred Alternative

| Resource | Permanent[1] | Temporary[1] | Total[1] | Section Reference in Chapter 4 |
|---|---|---|---|---|
| Total Potential Impacts to Park Properties (acres) | 21.0 | 15.1 | 36.1 | Section 4.4 |
| Total Right-of-Way Required[2] (acres) | 97.2 | 18.7 | 115.9 | Section 4.5 |
| Number of Properties Directly Affected (count) | - | - | 501 | Section 4.5 |
| Number of Residential Relocations (count) | - | - | 0 | Section 4.5 |
| Number of Business Relocations (count) | - | - | 0 | Section 4.5 |
| Number of Historic Properties with Adverse Effect[3] | - | - | 11 | Section 4.7 |
| Noise Sensitive Areas Impacted (count) | - | - | 49 | Section 4.9 |
| Hazardous Materials Sites of Concern (count) | - | - | 255 | Section 4.10 |
| Wetlands of Special State Concern | 0 | 0 | 0 | Section 4.12 |
| Wetlands[4] (acres) | 3.7 | 0.6 | 4.3 | Section 4.12 |
| Wetland 25-foot Buffer[4] (acres) | 6.5 | 0.6 | 7.1 | Section 4.12 |
| Waterways[4] (square feet) | 673,757 | 343,945 | 1,017,702 | Section 4.12 |
| Waterways[4] (linear feet) | 43,852 | 2,701 | 46,553 | Section 4.12 |
| Tier II Catchments (acres) | 0 | 0 | 0 | Section 4.13 |
| 100-Year Floodplain (acres) | 33.7 | 15.1 | 48.8 | Section 4.15 |
| Forest Canopy (acres) | 479.6 | 20.3[5] | 500.1 | Section 4.16 |
| Rare, Threatened and Endangered Species Habitat (acres) | 33.4 | 23.0 | 56.4 | Section 4.19 |
| Sensitive Species Project Review Area (acres) | 24.5 | 20.0 | 44.5 | Section 4.19 |
| Unique and Sensitive Areas (acres) | 139.2 | 29.4 | 168.5 | Section 4.20 |

Notes: The impacts in this table are for the mainline improvements for the Preferred Alternative. Any impacts associated with the compensatory stormwater management are preliminary and discussed in **SDEIS, Appendix C.**

[1] All values are rounded to the tenths place.

[2] The right-of-way is based on State records research and supplemented with county right-of-way, as necessary.

[3] Refer to Chapter 4, Section 4.7 for additional details on the effects to historic properties.

[4] Refer to Table 4-25, Section 4.12 for additional details on the impacts to wetlands and waterways.

[5] Temporary forest canopy impacts are cleared forest in areas that will not be permanently acquired or altered by roadway construction. Replanting will occur in these areas. Impacts will be avoided and minimized, and replanting will be maximized within the corridor as determined in final design.

## 4.1   Land Use and Zoning

### 4.1.1   Introduction

Local governments adopt plans and identify land use patterns and development goals in long-term comprehensive plans that are implemented through zoning codes. Zoning codes regulate the type and density of development that occurs within delineated land area. For details of the land use, zoning, and development patterns reviewed for the Study, as well as applicable federal and state regulations and methodology, refer to the **DEIS, Appendix E, Section 3.1** *Community Effects Assessment and Environmental Justice Analysis Technical Report* (https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_AppE_CEA-EJ-Tech-Report_web.pdf ).

### 4.1.2   Affected Environment

As documented in the DEIS, the existing land use conditions were identified through review of zoning designations because these data are consistently updated by municipalities. (Refer to **DEIS, Chapter 4, Section 4.1** and **DEIS, Appendix E, Section 3.1**) Other information, such as the land use data provided by the Maryland Department of Planning, is valuable, but not as current (most recent reports date from

00027716


2010). For land use in Virginia, Fairfax County maintains current land use data (Fairfax, 2021). All of this existing land use data was compared to the LOD of the Preferred Alternative for the SDEIS.

### 4.1.3 Environmental Consequences

The Preferred Alternative would result in the conversion of existing land uses to right-of-way for transportation use across each of the seven land use types, including the alteration of transportation right-of-way from non-highway facilities (e.g., railway, county roadway right-of-way, etc.) outside of the existing I-495 and I-270 highway footprint (**Table 4-2**).

#### Table 4-2: Conversion of Land Use Within the Preferred Alternative LOD (Acres)

| Land Use | Perm[1] | Temp[1] | Total[1] |
|---|---|---|---|
| Transportation[2] | 11.9 | 1.6 | **13.5** |
| Residential | 46.6 | 10.4 | **57.0** |
| Planned Unit/ Planned Community | 11.7 | 0.2 | **11.9** |
| Park/Open Space | 19.0 | 15.3 | **34.2** |
| Mixed-Use | 18.8 | 3.5 | **22.3** |
| Industrial | 2.6 | 0.0 | **2.6** |
| Commercial/ Employment | 3.1 | 0.1 | **3.2** |
| **TOTAL CHANGE IN LAND USE[3] (ACRES)** | **113.6** | **31.2** | **144.8** |

Notes: [1] All values are rounded to the tenths place.

[2] Transportation Land Use totals refer to transportation right-of-way outside of the existing I-495 & I-270 highway footprint, such as railway facilities, county right-of-way, and vegetated buffer zones.

[3] Total change in land use acreage differs from property acreage requirements in **Section 4.5** due to differences in GIS base layer boundaries. Property acreage requirements are calculated by applying the LOD over precise parcel/property line boundaries, while land use conversion acreage is calculated by applying the LOD over generalized land use/zoning boundaries.

Since the Preferred Alternative does not include any improvements east of MD 187, all residential and business displacements that were previously associated with the DEIS Build Alternatives have been avoided. The land use conversions under the Preferred Alternative would primarily consist of partial property acquisitions, which are mostly strips of land from undeveloped areas or areas of landscaping and trees along the existing I-495 and I-270 transportation corridors. (Refer to **Section 4.5** for additional details on the property acquisitions associated with the Preferred Alternative.) The proposed expansion of the existing interstates under the Preferred Alternative would not be expected to result in a substantial land use change to the surrounding urbanized area within the Preferred Alternative LOD. The extent, pace, and location of development beyond the Preferred Alternative LOD would be influenced and controlled by the respective county land development policies and plans. The proposed improvements would accommodate future planned growth beyond the Preferred Alternative LOD; however, future growth is not dependent on these improvements. I-495 and I-270 would remain access-controlled under the Preferred Alternative LOD.

### 4.2 Demographics

#### 4.2.1 Introduction

This Study evaluates potential changes to the demographics of the region. The population and demographic data from the US Census, 2015-2019 American Community Survey Five-Year Estimates was used in the DEIS and Community Effect Assessment. For details on the demographic data reviewed for the Study, as well as applicable federal and state regulations and methodology, refer to the **DEIS, Chapter 4,**

00027717


**Section 4.2** and **DEIS, Appendix E, Section 3.2** *Community Effects Assessment and Environmental Justice Analysis Technical Report* (https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_AppE_CEA-EJ-Tech-Report_web.pdf ).

### 4.2.2   Affected Environment

The demographic data was presented in the **DEIS, Chapter 4, Section 4.2** and in **DEIS Appendix E, Section 3.2.1**. A review of the demographic data from the 2019 American Community Survey for 2015- 2019 will be reviewed and presented in the FEIS.

### 4.2.3   Environmental Consequences

The Preferred Alternative does not result in any full acquisitions or residential or business displacements. By providing additional roadway capacity through managed lanes, the Preferred Alternative, would accommodate increased traffic and congestion attributed to the projected regional growth between 2010 and 2045. The maintained function of I-495 and I-270, access to travel choices, and enhanced trip reliability would maintain the area's desirability for future economic activity, and therefore, the Preferred Alternative would have a negligible impact to population growth or general demographics within the region. Those minimal demographic changes would be consistent with approved master plans and population growth projections associated with those plans.

## 4.3   Communities & Community Facilities

### 4.3.1   Introduction

For the DEIS, Census block groups were matched with the municipality or Census Designated Place in which they were primarily located to define the Analysis Area Communities. Similarly, for the SDEIS, impacts are being assessed based on the Analysis Area Communities that are located within or adjacent to the Preferred Alternative LOD. For details on the demographic data reviewed for the Study, as well as applicable federal and state regulations and methodology, refer to the **DEIS, Chapter 2, Section 4.3** and **DEIS, Appendix E, Section 3.2** *Community Effects Assessment and Environmental Justice Analysis Technical Report* (https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_AppE_CEA-EJ-Tech-Report_web.pdf). A review of the demographic data from the 2015-2019 American Community Survey for 2015- 2019 will be reviewed and presented in the FEIS.

### 4.3.2   Affected Environment

Of the 36 Analysis Area Communities identified in the DEIS, seven (7) communities are located within or adjacent to the limits of the proposed build improvements in the Preferred Alternative LOD: Gaithersburg, Rockville, Bethesda, North Bethesda, Cabin John, and Potomac in Montgomery County, Maryland; and McLean in Fairfax County, Virginia. These Analysis Area Communities are shown in **Figure 4-1.**

### 4.3.3   Environmental Consequences

The Preferred Alternative requires property acquisition to accommodate the following Study elements: managed lanes, shoulders, traffic barrier, direct access at-grade auxiliary lanes or ramps, cut and fill slopes, stormwater management (SWM) facilities, retaining walls, and noise barriers along the existing highway corridor. Construction of the Preferred Alternative would also require relocation of signage, guardrails, communications towers, and light poles due to the widening of the roadway. Similarly, where noise barriers already exist, they would be replaced; additional noise barriers may be constructed as

00027718



described in **Section 4.9.3**. Impacts from the construction activities and operation of the Preferred Alternative on communities and community facilities are described below.

## A. Communities

There are no residential or business relocations or displacements with the Preferred Alternative. As shown in **Table 4-3**, partial property impacts under the Preferred Alternative are dispersed throughout the seven Analysis Area Communities within the Preferred Alternative LOD.

### Table 4-3: Property Impacts in Analysis Area Communities

| Analysis Area Community | Number of Impacted Parcels[1] | Property Impacts (Acres) | | |
|---|---|---|---|---|
| | | Permanent[2] | Temporary[2] | Total[2] |
| Gaithersburg | 18 | 4.7 | 0.0 | 4.7 |
| Rockville | 114 | 40.1 | 3.8 | 44.0 |
| North Bethesda | 143 | 16.6 | 2.2 | 18.8 |
| Bethesda | 101 | 7.6 | 1.9 | 9.5 |
| Cabin John | 28 | 6.6 | 2.0 | 8.6 |
| Potomac | 82 | 20.4 | 4.8 | 25.2 |
| McLean | 16 | 1.3 | 3.8 | 5.0 |

Notes: [1] One impacted parcel falls in both the Cabin John and Potomac Analysis Area Communities and is counted twice for the purpose of this table; it is only counted once in the calculation of the total number of impacted parcels.
[2]All values are rounded to the tenths place.

Of the total 115.9 acres of property required under the Preferred Alternative (refer to **Table 4-3** for details), the Rockville Analysis Area Community would experience the largest proportion (38.0 percent) of the property impacts, and the Potomac Analysis Area Community would experience the second-largest proportion (21.7 percent) of the property impacts; at 4.1 percent, the Gaithersburg Analysis Area Community would experience the smallest proportion of property impacts.

Property acquisitions under the Preferred Alternative would occur to properties adjacent to the existing I-495 and I-270 roadway alignments, acquiring strips of land from undeveloped areas or areas of trees and landscaping directly adjacent to I-495 or I-270. Permanent acquisitions may also be required for the off-site stormwater management. (Offsite stormwater management locations are preliminary at this point in the Study and will be identified by the developers in coordination with property owners during final design; refer to **SDEIS, Appendix C** for additional details on the compensatory stormwater management.)

Divisions or isolation of properties, persons, or groups would not occur due to the generally parallel nature of the Preferred Alternative LOD along I-495 and I-270 and the fact that no properties would be displaced. As such, the existing sense of community cohesion of communities along the study corridors would not be impacted. The Preferred Alternative also would not eliminate access or provide new access to properties, nor would it impede access between residences, community facilities, and businesses as no properties are accessed directly from I-495 or I-270.

00027719

## Figure 4-1: Analysis Area Communities



00027720


Properties immediately adjacent to the improved highway may experience an increase in noise impacts as travel lanes are moved closer to the properties; however, the increased noise experienced by properties set back from the highway would be negligible. Noise abatement will occur within all seven (7) Analysis Area Communities. For specific noise barrier locations, refer to the *Environmental Resource Mapping* (**SDEIS, Appendix D**). Details on noise impacts and proposed abatement along the study corridors is provided in **Section 4.9.4.**

Construction would require the removal of vegetation to varying degrees from strips of land adjacent to the study corridors within the Preferred Alternative LOD. As a result of the vegetation removal, the wider interstates, added direct access, at-grade auxiliary lanes or ramps, retaining walls, and noise barriers would become more visible and prominent. The views from adjacent properties, including residential properties, commercial enterprises, parkland/ open space properties, and a number of community resources would experience an impact; however, impacts would generally be consistent with existing views of the study corridors as the surrounding area is adjacent to the existing interstate facilities and are visually consistent with the existing highway setting.

Additionally, the Preferred Alternative would require modifications at existing interchanges to accommodate the mainline widening, direct access, at-grade auxiliary lanes, or ramps. This would require the reconstruction of structures spanning the study corridor to lengthen or raise the elevation of these structures. In general, construction would introduce some new elements, such as direct access ramps, but they would generally be compatible with the existing visual character or qualities along the study corridor as the Preferred Alternative is expanding existing interstates.

The Preferred Alternative is projected to relieve traffic congestion and improve trip reliability which would result in more predictable travel and increased response times for emergency services and travel times to other community facilities, especially during peak travel periods. The Preferred Alternative would also reduce traffic on local roads by three and half (3.5) percent, which would lead to better access to facilities and improved emergency response times along local roadways.

Residents and employees who live, work, and utilize services immediately adjacent to the study corridors may experience changes in current quality of life due to visual and aesthetic impacts, partial property acquisition, and temporary construction activities. Additionally, community residents could experience a benefit to quality of life due to reduced congestion along the study corridors and improved trip reliability and travel choices to destination points within the region.

### B. Community Facilities

A summary of the community facilities where partial property impacts would occur is shown in **Table 4-4**. Public parks and historic properties identified in the Section 4(f) Evaluation are not included in this assessment of community facilities. Details on park impacts can be found in **Section 4.4** and **Chapter 5** of this SDEIS. Details on historic cemeteries is found in **Section 4.7.**

As previously stated, property acquisitions under the Preferred Alternative would primarily occur to properties adjacent to the existing I-495 and I-270 roadway alignments, acquiring strips of land from undeveloped areas or areas of trees and landscaping directly adjacent to I-495 or I-270. There are no residential, business, community facility relocations or displacements associated with the Preferred Alternative.

00027721


**Table 4-4: Property Impacts to Community Facilities from the Preferred Alternative**

| Community Facility | Property Impacts (Acres) | | |
|---|---|---|---|
| | Permanent[1] | Temporary[1] | Total[1] |
| St. Jane de Chantal School | < 0.1 | 0.0 | < 0.1 |
| Saint Marks United Presbyterian Church | < 0.1 | 0.0 | < 0.1 |
| Carderock Springs Elementary School | 0.2 | 0.1 | 0.2 |
| Gibson Grove Church | 0.1 | 0.0 | 0.1 |
| First Baptist Church | 0.4 | 0.0 | 0.4 |
| First Christ Church of Scientist | < 0.1 | < 0.1 | 0.1 |
| Montgomery County Detention Center | 3.7 | 0.1 | 3.7 |
| Rockville Christian Church | 0.5 | 0.0 | 0.5 |
| Rockville Senior Center | 1.0 | 0.0 | 1.0 |
| Shady Grove Medical Center, Kaiser Permanente | 0.5 | 0.0 | 0.5 |
| Sterling Care Rockville Nursing | 0.9 | 0.0 | 0.9 |
| West (Julius) Middle School | 1.8 | 0.0 | 1.8 |

Note: [1] All values are rounded to the tenths place.

Refer to **Section 4.4.3** for a discussion on potential public park impacts.

The Preferred Alternative would not eliminate existing access or provide new access to impacted community facility properties, as none of these properties are currently accessed directly from I-495 or I-270.[1] No permanent impacts to the operation of community facilities would occur. MDOT SHA will continue to coordinate with the neighboring communities through design and construction.

### 4.3.4   Mitigation

The design of all highway elements would follow aesthetic and landscaping guidelines and would be visually consistent with the existing highway setting. The aesthetic and landscaping guidelines would be developed by the P3 Developer in consultation with local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state, and federal agencies. Further detail on mitigation efforts for impacts to communities and community facilities are provided in **Section 4.5**: Property Acquisitions and Relocations, **Section 4.6**: Visual and Aesthetic Resources, and **Section 4.9**: Noise.

## 4.4   Parks and Recreational Facilities

### 4.4.1   Introduction

Publicly-owned parks and recreation facilities within the LOD of the Preferred Alternative were reviewed in support of the SDEIS and the Updated Draft Section 4(f) Evaluation, **Chapter 5** of this document. Detailed information regarding individual, publicly-owned parks and potential impacts are addressed in the *Draft Section 4(f) Evaluation* (**DEIS, Appendix F**) https://495-270-p3.com/wp-content/uploads/2020/07/DEIS_AppF_Draft-Section-4f-Eval_web.pdf and **Chapter 5** of this SDEIS.

---

[1] This discussion of impacts to community facilities excludes impacts public parks and public parks with historic properties, which are described in **Section 4.4.3**.

00027722



Supplemental Draft Environmental Impact Statement

### 4.4.2  Affected Environment

The Preferred Alternative would avoid the use of 37 Section 4(f) properties that were previously reported as Section 4(f) uses in the DEIS and Draft Section 4(f) Evaluation, totaling approximately 105 acres of park property avoided. The Preferred Alternative would impact 15 park properties.  The impacts are described in **Section 4.4.3** and in greater detail in **Chapter 5** of this document.

### 4.4.3  Environmental Consequences

### A.  Park Impacts for Preferred Alternative

The Preferred Alternative would impact park/ open space land and recreational facilities. Based on the current LOD, the permanent and temporary right-of-way needed from park/ open space properties for the Preferred Alternative is shown in **Table 4-5**.  The impacts to publicly-owned parks would be partial property acquisitions along adjacent interstates for roadway widening, stormwater management, augmentation of culverts, construction of retaining walls, grading, construction or reconstruction of noise barriers, and landscaping. Removal of trees and landscaping that buffer the park from the study corridors would occur but will be minimized to the greatest extent possible. The detailed analysis and potential impacts to individual publicly-owned parks is represented in **Chapter 5, Table 5-1** and described in **Section 5.2** of this SDEIS.

#### Table 4-5: Potential Public Park Impacts (Acres)

| Public Park/ Open Space/ Rec. Facility | Park Owner/ Operator | Park Size[1] (Acres) | Permanent[2] | Temporary[2] | Total[2] |
|---|---|---|---|---|---|
| Chesapeake and Ohio Canal National Historical Park[3] | NPS | ~19,575 | 1.0 | 9.1 | 10.1 |
| Clara Barton Parkway[3] | NPS | 96.2 | 1.6 | 0.9 | 2.5 |
| George Washington Memorial Parkway | NPS | 7,146 | 0.7 | 3.7 | 4.4 |
| Malcolm King Park | City of Gaithersburg | 78.5 | 1.3 | 0 | 1.3 |
| Morris Park | City of Gaithersburg | 30.7 | 1.1 | 0 | 1.1 |
| Bullards Park and Rose Hill Stream Valley Park | City of Rockville | 16.8 | 3.3 | 0 | 3.3 |
| Cabin John Stream Valley Park (Rockville) | City of Rockville | 33.1 | 2.1 | 0 | 2.1 |
| Rockmead Park | City of Rockville | 27.4 | 0.2 | 0.1 | 0.3 |
| Woottons Mill Park | City of Rockville | 95.3 | 0.7 | 0 | 0.7 |
| Rockville Senior Center Park | City of Rockville | 12.2 | 1.0 | 0 | 1.0 |
| Cabin John Regional Park | M-NCPPC Montgomery Co. | 514.0 | 5.7 | 0.6 | 6.3 |
| Cabin John Stream Valley Park, Unit 2 | M-NCPPC Montgomery Co. | 105.0 | 0.8 | 0.6 | 1.4 |
| Old Farm Neighborhood Conservation Area | M-NCPPC Montgomery Co. | 0.8 | 0.1 | 0 | 0.1 |
| Tilden Woods Stream Valley Park | M-NCPPC Montgomery Co. | 67.4 | 0.6 | 0.1 | 0.7 |

00027723


| Public Park/ Open Space/ Rec. Facility | Park Owner/ Operator | Park Size[1] (Acres) | Permanent[2] | Temporary[2] | Total[2] |
|---|---|---|---|---|---|
| Cabin John Stream Valley Park, Unit 6 | M-NCPPC Montgomery Co. | 19.8 | 0.8 | 0 | **0.8** |
| **Total Potential Impacts to Park Properties (acres)** | | - | **21.0** | **15.1** | **36.1** |

Notes: [1] The size of Section 4(f) properties is sourced from data or documentation provided by the Officials with Jurisdiction. [2] All values are rounded to the tenths place.

[3] Section 4(f) impacts to C&O Canal NHP and Clara Barton Parkway as currently noted in **Chapter 5** exclude the area that currently has an existing transportation use. The area within NPS property defined as transportation use includes existing I-495 at-grade roadway sections to the toe of slope, Clara Barton Parkway Interchange ramp sections to the toe of slope, existing pier locations for the structure over the C&O Canal and eastbound Clara Barton Parkway, and existing pier locations for the American Legion Bridge. The LOD accounts for structures over NPS land; however these aerial crossings would not require a permanent acquisition of land.

## B. Resource Impacts by Park Owner/Operator

The following section presents the impacts by agency with jurisdiction over park properties with the Preferred Alternative LOD.

### a. National Park Service (NPS)

As part of the inter-agency coordination process, the NPS requested that resource impacts occurring on NPS properties be specifically quantified. The following text summarizes the potential, specific impacts to resources on NPS properties.   Further details on these impacts are available in **Section 4.12, 4.15 4.16** and **Chapter 5** of the SDEIS. A summary of coordination with NPS is included in **Chapters 5 and 7** of this document.

Based on property information provided by NPS, MDOT SHA has now evaluated impacts to the C&O Canal NHP using a single boundary applicable to both the historic property and public park, rather than two separate boundaries as reported in the DEIS. This change to use a single boundary was made at the request of NPS. Impacts to the C&O Canal NHP and Clara Barton Parkway in the DEIS and Draft Section 4(f) Evaluation were based on readily available property information which included permits for operation and maintenance of the existing highway, including an area surrounding the highway, bridges, and ramps. While the intent to formally transfer property from NPS to MDOT SHA was noted in historical documents, neither NPS nor MDOT SHA recovered official documentation formalizing the transfer. Therefore, this SDEIS has altered the area delineated as within transportation use. MDOT SHA, FHWA, and NPS have agreed that Section 4(f) impacts to C&O Canal NHP and Clara Barton Parkway could exclude the area that currently has an existing transportation use.  The area within NPS property defined as transportation use includes existing I-495 at-grade roadway sections to the toe of slope, Clara Barton Parkway Interchange ramp sections to the toe of slope, existing pier locations for the structure over the C&O Canal NHP and eastbound Clara Barton Parkway, and existing pier locations for the ALB. The Preferred Alternative LOD accounts for structures over NPS land; however these aerial crossings would not require a permanent acquisition of land.

Wetlands on NPS property are subject to NPS Director's Order #77-1: *Wetland Protection*.  NPS requires avoidance, minimization, and compensation for unavoidable adverse impacts to wetlands via restoration of degraded wetlands on NPS property at a minimum of a 1:1 restoration/replacement ratio that can be adjusted upward to ensure functional replacement. NPS requires that a Wetland and Floodplain Statement of Findings (SOF) be prepared in accordance with the procedural manual during the National Environmental Policy Act (NEPA) process documenting compliance with DO #77-1 for proposed actions

00027724


that would result in adverse impacts to wetlands (**Table 4-6**). The draft SOF has been developed for the Preferred Alternative, refer to **SDEIS, Appendix G**. The SDEIS and the draft SOF have been advertised for public comment and have a concurrent 45-day comment period. The final SOF will be attached to the FEIS.

### Table 4-6: Summary of NPS Wetland and Floodplain Impacts on NPS Properties from the Preferred Alternative

| Park Unit and Resource (unit) | Permanent | Temporary | Total |
|---|---|---|---|
| **George Washington Memorial Parkway[1]** | | | |
| Riverine wetlands (sq feet) | 862 | 0 | **862** |
| Riverine wetlands (linear feet) | 69 | 0 | **69** |
| Palustrine wetlands (acres) | 0 | 0 | **0** |
| FEMA 100-year floodplain (sq. ft/acres) | 1,098/0.03 | 2,603.1/0.06 | **3,701/0.09** |
| **C&O Canal National Historical Park** | | | |
| Riverine wetlands (sq feet) | 14 | 7,105 | 7,179 |
| Riverine wetlands (linear feet) | 11 | 1,099 | 1,110 |
| Palustrine wetlands (acres) | 0.05 | 0.59 | 0.64 |
| FEMA 100-year floodplain (sq. ft/acres) | 35,541/0.82 | 290,892/6.68 | **326,433/7.49** |
| **Clara Barton Parkway** | | | |
| Riverine wetlands (sq feet) | 203 | 48 | 251 |
| Riverine wetlands (linear feet) | 45 | 17 | 62 |
| Palustrine wetlands (acres) | 0.01 | 0.01 | 0.02 |
| FEMA 100-year floodplain (sq. ft/acres) | 0/0 | 0/0 | **0/0** |

Note: The impacts indicated in this table are only those occurring on NPS property as defined in the NPS DO #77-1: Wetland Protection and Procedural Manual #77-1: Wetland Protection.

Work within floodplains on NPS lands must adhere to NPS DO #77-2: Floodplain Management, unless exempted, which calls for the avoidance of long- and short-term environmental effects associated with the occupancy and modification of floodplains. The floodplain impacts by NPS park are presented in **Table 4-6**. The Floodplain Statement of Findings has been prepared and combined with the Wetland Statement of Findings in SOF in the **SDEIS, Appendix G**.

The three NPS parks within the Preferred Alternative - Phase 1 South limits are also historic properties listed on or eligible for listing on the National Register of Historic Places. In a letter dated March 12, 2020, the Maryland Historical Trust (MHT) concurred with the eligibility and effects determination for the Study as well as the need for further Phase I and II archaeological investigation in the specified areas. **Table 4-7** summarizes the NPS historic properties that would incur an adverse effect from the Preferred Alternative. (Refer to **Section 4.7.3** and **Tables 4-18 and 4-19** for specific details on the adverse effects to historic park properties). Due to the complexity of the Study and current state of design, MDOT SHA and FHWA will conclude the Section 106 of the National Historic Preservation Act (NHPA) process through execution of a Programmatic Agreement (PA). MDOT SHA and FHWA will continue to work with NPS to resolve the adverse effects through development of appropriate mitigation measures that will be captured in the PA.

00027725



Supplemental Draft Environmental Impact Statement

**Table 4-7: NPS Historic Properties with Adverse Effect**

| MIHP#/DHR# | Name | Period of Significance | NRHP Criteria[1] |
|---|---|---|---|
| M: 12-46 | Chesapeake and Ohio Canal National Historical Park | 1828-1924 | A, C, D |
| M: 35-61 and 029-0228 (Virginia) | George Washington Memorial Parkway/ Clara Barton Memorial Parkway | 1930-1966 | B, C |
| 18MO749 | C&O Canal Site 1 | Early Woodland | D |
| 18MO751 | C&O Canal Site 3 | 1828-1924 | D |
| (N/A) | Dead Run Ridges Archaeological District | Late Archaic- Woodland | D |
| 44FX0374 (Virginia) | N/A | Late Archaic- Late Woodland | D |
| 44FX0379 (Virginia) | N/A | Late Archaic- Early Woodland | D |
| 44FX0389 (Virginia) | N/A | Late Archaic- Late Woodland | D |

Note: [1] The NRHP Criteria are:
A.  Associated with events that have made a significant contribution to the broad patterns of our history; or
B.  Associated with the lives of persons significant in our past; or
C.  Embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or
D.  Have yielded or may be likely to yield, information important in prehistory or history.

NPS has identified state and globally rare plants and invertebrates from NPS property within the Potomac Gorge on both sides of the Potomac River through numerous distributional surveys over the past ten to twenty years. Some of these areas lie adjacent to the corridor study boundary. **Table 4-8** includes the list of these state-listed rare plant and invertebrate species from the NPS Potomac Gorge park surveys and their state and global protected species ranking. (Refer to **Section 4.19** for additional details.) The RTE species that would be impacted by the Preferred Alternative are highlighted in green in **Table 4-8**.

**Table 4-8: RTE Plant Species Surveyed within the Potomac River Gorge Portion of the Preferred Alternative LOD**

| Scientific Name | Common Name | Status |
|---|---|---|
| **Maryland and Virginia** | | |
| *Arabis patens* | Spreading Rockcress | S3G3/S1G3 |
| *Carex careyana* | Carey's Sedge | S1G4G5 Endangered/ S3G4G5 |
| *Erigenia bulbosa* | Harbinger-of- Spring | S3G5/S3G5 |
| *Erythronium albidum* | Small White Fawn-Lily | S2G5 Threatened/ S2G5 |
| *Maianthemum stellatum* | Starry False Solomon's-Seal | S2G5 Endangered/ S2G5 |
| *Phacelia covillei* | Buttercup Scorpion-Weed | S2G3 Threatened/ S1 |
| *Ripariosida hermaphrodita* | Virginia Fanpetals | S1G3 Endangered/ S1G3 |
| *Solidago racemosa* | Rand's Goldenrod | S1G3 Threatened/ S1G3? |
| *Valeriana pauciflora* | Large-flower Valerian | S1G4 Endangered/ S1G4 |

00027726

Supplemental Draft Environmental Impact Statement



| Scientific Name | Common Name | Status |
|---|---|---|
| **Maryland Only** | | |
| *Astragalus canadensis* | Canadian Milk-Vetch | S1G5 Endangered |
| *Baptisia australis* | Blue Wild Indigo | S2G5 Threatened |
| *Bromus latiglumis* | Early-leaf Brome | S1G5 Endangered |
| *Carex hitchcockiana* | Hitchcock's Sedge | S1G5 Endangered |
| *Clematis viorna* | Vasevine | S3G5 |
| *Corallorhiza wisteriana* | Spring Coralroot | S1G5 Endangered |
| *Coreopsis tripteris* | Tall Tickseed | S1G5 Endangered |
| *Cubelium concolor* | Green-Violet | S3G5 |
| *Cuscuta polygonorum* | Smartweed Dodder | S1G5 Endangered/ S1G5 |
| *Galactia volubilis* | Downy Milk-Pea | S5G3 |
| *Gentiana villosa* | Striped Gentian | S1G4 Endangered |
| *Geum aleppicum* | Yellow Avens | S1G5 Endangered/ SHG5 |
| *Helianthus occidentalis* | Few-leaf Sunflower | S1G5 Threatened/ S1G5T5 |
| *Hibiscus laevis* | Halberd-leaf Rose-Mallow | S3G5 |
| *Homalosorus pycnocarpos* | Glade Fern | S2G5 Threatened |
| *Iresine rhizomatosa* | Juda's-Bush | S1 G5 Endangered |
| *Lipocarpha micrantha* | Small-flower Halfchaff Sedge | S1G5 Endangered/ S2G5 |
| *Matelea obliqua* | Climbing Milkweed | S1S2G4? Endangered |
| *Mecardonia acuminata* | Axil-Flower | S2G5 Endangered |
| *Monarda clinopodia* | White Bergamot | S3S4G5 |
| *Paspalum fluitans* | Horse-tail Paspalum | S2G5 Threatened |
| *Phaseolus polystachios* | Thicket Bean | S3G5 |
| *Polygala polygama* | Racemed Milkwort | S1G5 Threatened |
| *Potamogeton foliosus* | Leafy Pondweed | S2G5 |
| *Pycnanthemum verticillatum* | Whorled Mountain-Mint | S2G5 Threatened |
| *Rumex altissumus* | Tall Dock | S1G5 Endangered |
| *Sagittaria rigida* | Sessile-fruit Arrowhead | S1G5 Endangered/ S1G5 |
| *Salix interior* | Sandbar Willow | S1G5 Endangered/ S1G5TNR |
| *Silene nivea* | Snowy Catchfly | S1G4? Endangered/ S1G4? |
| *Triphora trianthophoros* | Threebirds | S1G4? Endangered/ S1G3G4T3T4 |
| **Virginia Only** | | |
| *Borodinia dentata* | Short's Rockcress | S3G5/S1G5 |
| *Senecio suaveolens* | False Indian-Plantain | S1G4 Endangered/ S2G4 |

Source: Townsend 2019, MDNR 2021, Weakley 2012, Brown and Brown 1984
1State Rank: S1=Critically Imperiled/Highly State Rare; S2=Imperiled/State Rare; S3=Vulnerable/Watchlist; T=Subspecies/Variety Ranked Differently than Species
Global Rank: G3=Vulnerable; G4=Apparently Secure; G5=Secure; ?=Inexact Numeric Rank; NR=Not Ranked

00027727

Since the DEIS was published, a tree inventory was conducted on NPS property within the corridor study boundary. Following the guidance in the *Forest Inventory and Analysis National Core Field Guide. Volume I: Field Data Collection Procedures for Phase 2 Plots. Version 9.0, October 2019*, an inventory of all trees and standing dead trees ≥ 5 inches diameter at breast height (DBH) (4.5 feet, DBH) was completed within the survey limits, including the identification of all significant trees (trees ≥ 24 inches DBH < 30 inches) and specimen trees (> 30 inches DBH or 75% of the size of the state champion).  The results are summarized in **Table 4-9**. Refer to **Section 4.16** for additional details on the NPS tree survey.

**Table 4-9: Survey Trees on NPS Properties and Impacts from the Preferred Alternative**

| NPS Property | Number of Live Individual Trees Surveyed | Live Tree Impacts[1] (#/DBH) | Number of Standing Dead Trees Surveyed | Standing Dead Tree Impacts[1] (#/DBH) | Total inches of DBH |
|---|---|---|---|---|---|
| George Washington Memorial Parkway | 2,175 | 82/1,108 | 154 | 9/113 | 31,900 |
| C&O Canal NHP | 1,544 | 815/10,148 | 244 | 115/1,339 | 19,345 |
| Clara Barton Parkway | 756 | 315/3,999 | 114 | 51/669 | 10,098 |
| **Totals** | **4,475** | **1,212/15,255** | **512** | **175/2,121** | **61,343** |

Notes: [1] Impacts to trees are only considered permanent totals; there are no temporary impacts.

Since the publication of the DEIS, considerable avoidance and minimization has been undertaken to the NPS properties around the American Legion Bridge (ALB).  MDOT SHA and FHWA met with the NPS on December 8, 2020 to discuss the LOD in the vicinity of the ALB that was presented for the Build Alternatives in the DEIS. The NPS requested that MDOT SHA re-assess the LOD in the vicinity of the ALB to limit impacts to NPS land and its natural and cultural resources. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the C&O Canal National Historic Park (C&O Canal NHP) and George Washington Memorial Parkway units of the NPS.*

The ALB Strike Team conducted an intensive investigation in January 2021 to explore alternative design solutions, project phasing solutions, site access solutions, and the potential use of specialty construction techniques to limit the LOD. The ALB Strike Team presented its results to the NPS on February 8, 2021.

MDOT SHA established the Base LOD as the "Base Option," which includes a conventionally constructed bridge structure built in two phases on the existing bridge centerline with the assumption of temporary construction access over the Potomac River via trestles and causeways. This Base Option included minor LOD reductions from the DEIS LOD to minimize impacts to Plummers Island. The Base Option also started with construction access in all four quadrants and was minimized to remove the construction access in the southwest, southeast, and northeast quadrants, which significantly reduced impacts to NPS property.

The ALB Strike Team first reviewed the avoidance and minimization options developed by MDOT SHA to date, and agreed that these options were not practicable, with the exception of the top-down construction option, which was investigated in further detail. The ALB Strike Team then reviewed the viability of the Base Option and confirmed that this on-center alignment with a conventional construction approach was a viable option. The ALB Strike Team also considered a "west shift" of the LOD to entirely

00027728


avoid impacts to Plummers Island and determined that a conventional construction approach with a west shift was also a viable option.

The ALB Strike Team then considered other bridge construction approaches to determine if any of them could limit the LOD further than the Base Option could. The Strike Team conducted detailed investigation on a top-down segmental construction approach; a top-down cable stayed approach; and a slide-in place bridge construction approach.

After field analysis and known information review, MDOT SHA and the ALB Strike Team determined that access to the site at river level could be consolidated to the north side of the river along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of the Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the C&O Canal and a temporary access road paralleling the C&O Canal towpath.

MDOT SHA determined the LOD options for the ALB based on the results of the ALB Strike Team investigations. The bridge construction types with the smallest LOD footprint were the Base Option and the Cast-In-Place Segmental Option, both with a similar LOD requirement. Both construction types could be built with an on-center alignment or a west-shift alignment. MDOT SHA compared the NPS land impacts and those of the natural and cultural resources surrounding the ALB and determined that the on-center alignment would impact the least amount of total NPS Land; would not require re-configuration of the Clara Barton Parkway interchange; and would not require residential displacement, as the west shift alignment would. For these reasons, the on-center alignment with the reduced LOD required by the Base Option or Cast-In-Place Segmental bridge types was incorporated into the Preferred Alternative LOD.

Despite the minimization efforts, impacts to Plummers Island could not be avoided completely, but impacts have been reduced by 1.7 acres. In the DEIS, the Build Alternatives had 1.9 acres of impacts to Plummers Island. Under the Preferred Alternative, approximately 0.2 acres of impact at Plummers Island would be required for the ALB substructure, including permanent pier placement and construction activities. Construction activities may include efforts such as excavation, demolition of existing bridge foundation and piers, installation of proposed foundations, piers, abutments and slope protection. Access to the existing and proposed piers is required for these activities. Impacts were minimized by strategically locating the piers, specifically the new piers in close proximity to the existing piers such that a single access method could be used for demolition of the existing and construction of the proposed structures. However, some impact is unavoidable based on construction requirements and the structural requirements for pier locations.

**b. National Capital Planning Commission (NCPC)**

The Capper-Cramton Act (CCA) of 1930 (46 Stat. 482), as amended, states that lands purchased with funds appropriated under the CCA for the park, parkway, and playground system in Maryland shall be developed and administered by Maryland-National Capital Park and Planning Commission (M-NCPPC) in accordance with plans approved by the National Capital Park and Planning Commission (predecessor of NCPC). NCPC also has responsibility under NEPA and is participating as a Cooperating agency to fulfill their NEPA responsibility for CCA-related stream valley parks. A summary of coordination with NCPC is included in **Chapters 5 and 7** of this document. MDOT SHA and FHWA will continue to coordinate with NCPC on their

00027729

authority over Capper-Cramton properties. **Table 4-10** includes a summary of impacts from the Preferred Alternative to parks acquired with Capper-Crampton Funding.

**Table 4-10: Summary of Impacts from the Preferred Alternative to Parks Acquired with Capper-Cramton Funding (Acres)**

| Park Property Acquired with Capper-Cramton Funding | Permanent | Temporary | Total |
|---|---|---|---|
| George Washington Memorial Parkway | 0.7 | 3.7 | **4.4** |
| Clara Barton Parkway | 1.6 | 0.9 | **2.5** |
| Cabin John Stream Valley Park, Unit 2[1] | 0.8 | 0.6 | **1.4** |
| Cabin John Regional Park[1] | 5.7 | 0.6 | **6.3** |

Note: [1]Additional research is necessary to determine whether these specific parks were acquired with Capper-Cramton Act funding. If research reveals they were not funded through Capper-Cramton Act, the change will be reflected in the FEIS.

The Preferred Alternative avoids many significant park resources including Capper-Cramton funded parkland at: Rock Creek Stream Valley Park, Locust Hill Neighborhood Park, Sligo Creek Parkway, and Northwest Branch Stream Valley Park. In addition, MDOT SHA has worked extensively with NPS and M-NCPPC on minimization measures to reduce environmental impacts, including significantly reduced impacts to Capper-Cramton funded parkland around the American Legion Bridge by more than 50 percent from the DEIS. MDOT SHA and FHWA will continue to coordinate with NCPC and M-NCPPC on additional minimization measures and appropriate mitigation measures for the remaining unavoidable impacts.

**c.   Maryland-National Capital Park and Planning Commission Parkland and Resource Impacts**

Coordination is on-going with M-NCPPC on potential impacts and ways to avoid, minimize and mitigate for impacts to parkland and environmental resources within those parks.  A summary of coordination with M-NCPPC is included in **Chapters 5 and 7** of this document. The Preferred Alternative avoids over 20 acres of M-NCPPC park property previously impacted under the DEIS Build Alternatives, including avoiding impacts to Rock Creek, Northwest Branch, Sligo Creek, Southwest Branch, and Henson Creek Stream Valley Parks.  The Preferred Alternative parkland and resource impact totals on M-NCPPC park properties is summarized in **Table 4-11**. Refer to **Chapter 5, Section 2** for additional details on impacts to these parks. The FEIS and Final Section 4(f) Evaluation will include final park impact numbers accounting for greater avoidance and minimization, along with commitments for park mitigation.

**d.   City of Rockville Parkland and Resource Impacts**

Coordination is on-going with the City of Rockville on potential impacts and ways to avoid, minimize and mitigate for impacts to parkland and environmental resources within those parks.  A summary of coordination with the City of Rockville is included in **Chapters 5 and 7** of this document. The Preferred Alternative parkland and resource impact totals on Rockville park properties is summarized in **Table 4-12**. Refer to **Chapter 5, Section 2** for additional details on impacts to these parks. The FEIS and Final Section 4(f) Evaluation will include final park impact numbers accounting for greater avoidance and minimization, along with commitments for park mitigation.

00027730