#### Table 4-29: Additional Impervious Surfaces by Watershed

| Watershed Name | MDNR 12-Digit Watershed | Alt 5[1] | | Alts 8 & 9[2] | | ALT 10 | | ALT 13B | | ALT 13C | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | AC | SF | AC | SF | AC | SF | AC | SF | AC | SF |
| Potomac River/Rock Run | 021402020845 | 9.1 | 396,479 | 13.8 | 599,986 | 13.8 | 599,986 | 13.8 | 599,986 | 13.8 | 599,986 |
| Cabin John Creek | 021402070841 | 64.1 | 2,791,915 | 90.4 | 3,937,384 | 111.7 | 4,865,280 | 80.6 | 3,510,516 | 96.4 | 4,199,977 |
| Rock Creek | 021402060836 | 43.7 | 1,904,069 | 56.5 | 2,460,759 | 62.9 | 2,739,693 | 54.5 | 2,375,644 | 58.4 | 2,542,005 |
| Sligo Creek | 021402050821 | 17.7 | 770,111 | 24.5 | 1,066,885 | 24.5 | 1,066,885 | 24.5 | 1,066,885 | 24.5 | 1,066,885 |
| Northwest Branch | 021402050818 | 16.6 | 722,856 | 23.7 | 1,030,664 | 23.7 | 1,030,664 | 23.7 | 1,030,664 | 23.7 | 1,030,664 |
| Paint Branch | 021402050826 | 24.7 | 1,077,300 | 29.2 | 1,270,058 | 29.2 | 1,270,058 | 29.2 | 1,270,058 | 29.2 | 1,270,058 |
| Little Paint Branch | 021402050825 | 8.4 | 364,474 | 10.1 | 439,088 | 10.1 | 439,088 | 10.1 | 439,088 | 10.1 | 439,088 |
| Northeast Branch | 021402050822 | 64.8 | 2,823,465 | 86.3 | 3,758,473 | 86.3 | 3,758,473 | 86.3 | 3,758,473 | 86.3 | 3,758,473 |
| Upper Beaverdam Creek | 021402050816 | 45.7 | 1,992,463 | 51.0 | 2,219,977 | 51.0 | 2,219,977 | 51.0 | 2,219,977 | 51.0 | 2,219,977 |
| Upper Southwest Branch | 021311030924 | 22.2 | 967,846 | 33.1 | 1,443,606 | 33.1 | 1,443,606 | 33.1 | 1,443,606 | 33.1 | 1,443,606 |
| Lower Southwest Branch | 021311030922 | 15.0 | 653,087 | 18.4 | 800,512 | 18.4 | 800,512 | 18.4 | 800,512 | 18.4 | 800,512 |
| Upper Henson Creek | 021402010797 | 35.3 | 1,539,708 | 47.0 | 2,045,481 | 47.0 | 2,045,481 | 47.0 | 2,045,481 | 47.0 | 2,045,481 |
| Muddy Branch | 021402020848 | 13.4 | 582,659 | 14.5 | 632,307 | 19.1 | 830,422 | 14.9 | 650,486 | 18.3 | 796,919 |
| Watts Branch | 021402020846 | 1.1 | 47,398 | 2.9 | 127,328 | 7.6 | 331,873 | 2.4 | 102,407 | 5.4 | 233,242 |
| Bald Hill Branch | 021311030928 | 0.9 | 38,634 | 1.0 | 42,208 | 1.0 | 42,208 | 1.0 | 42,208 | 1.0 | 42,208 |
| Beaverdam Creek | 021402050823 | 0.0 | 2,007 | 0.0 | 2,007 | 0.0 | 2,007 | 0.0 | 2,007 | 0.0 | 2,007 |
| Nichols Run - Potomac River (Virginia)[3] | N/A | 12.9 | 562,791 | 14.5 | 631,590 | 14.5 | 631,590 | 14.5 | 631,590 | 14.5 | 631,590 |

Notes: [1] MDOT SHA and FHWA determined Alternative 5 is not a reasonable alternative, but it is included in the DEIS for comparison purposes only.

[2] Alternatives 8 and 9 have the same limits of disturbance footprint and therefore have the same impacts.

[3] Part of the additional impervious surface area is in the Potomac River HUC8 Watershed in Virginia and is not associated with an MDNR 12-digit Watershed.

00035945

## 4.18.4 Mitigation

MDOT SHA will continue to coordinate with regulatory agencies and resource managers to identify sensitive aquatic resources and determine further potential avoidance and minimization as design is refined. Agency recommendations would be evaluated based on engineering and cost effectiveness and would be implemented wherever possible. Avoidance and minimization efforts to date have included alignment shifts, reductions to roadside ditch widths to minimize the overall width of improvements, bridging waterways when feasible, and addition of retaining walls where practicable.

Bridges and depressed culverts would be used wherever possible to maintain natural stream substrate in areas where new or replaced culverts are necessary. However, opportunities for using depressed culverts may be limited because most existing culverts would be extended or augmented rather than replaced. Channel morphology would be evaluated, and culvert extensions designed to maintain aquatic life passage by avoiding downstream scour and channel degradation. Preliminary designs do not include culvert replacements, but do include augmentations resulting from installing new pipes adjacent to existing culverts to provide additional area for flow.

All in-stream work would comply with the stream closure period for the designated use class of the stream, including that for culvert extensions, and any potential waiver requests would require agency approval(s). In-stream work is prohibited in Use I streams from March 1 through June 15, Use III streams from October 1 through April 30, and Use IV streams from March 1 through May 31, to protect aquatic species. In addition, in areas where yellow perch have been documented (Bald Hill Branch and Western Branch of the Patuxent River), no in-stream work is permitted in Use I waters from February 15 through June 15.

In particularly sensitive areas, other impact minimization activities may be considered and could include: more specialized stormwater management options; redundant erosion and sediment control measures; monitoring of aquatic biota above and below sensitive stream crossings before and after construction to quantify any inadvertent impacts that occur at the crossing; fish relocation from dewatered work areas during construction to reduce fish mortality; and use of a qualified environmental monitor on-site to enhance erosion and sediment control compliance. Through the use of erosion and sediment control measures, stormwater management, and other BMPs, MDOT SHA will minimize impacts from any additional impervious area from the proposed project to the greatest extent practicable to avoid further declines in the quality of aquatic habitat and communities.

## 4.19 Rare, Threatened, and Endangered Species

### 4.19.1 Introduction and Methodology

#### A. Regulatory Context

Section 7 of the Endangered Species Act (ESA) of 1973 (16 U.S.C. § 1531-1544) requires all Federal agencies to use their authorities to conserve endangered and threatened species in consultation with the USFWS and/or National Oceanic and Atmospheric Administration (NOAA) National Marine Fisheries Service (NMFS). Section 7(a)(2) (16 U.S.C. § 1536) establishes substantive requirements for Federal agencies to ensure, in consultation with the USFWS, any action authorized, funded, or carried out is not likely to jeopardize the continued existence of any endangered or threatened species or destroy or adversely modify designated critical habitat.

00035946

The Section 7 implementing regulations (50 CFR Part 402) specify how Federal agencies must fulfill their Section 7(a)(2) consultation requirements. Section 9 of the ESA (16 U.S.C. § 1538) prohibits any action that causes a "take" of species listed as endangered or threatened. "Take" is further defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt any of these. The USFWS administers the ESA for all terrestrial and nontidal freshwater species, while the NMFS administers the ESA for marine and anadromous species or critical habitat. While there are no tidal areas within the corridor study boundary, NMFS also regulates effects to other trust resources, such as anadrous fish species, estuaries, and EFH. The Fish and Wildlife Coordination Act (FWCA) requires consultation with the NMFS to address impacts to fish and aquatic resources under their jurisdiction. The Magnuson-Stevens Fishery Conservation and Management Act (MSFCMA) requires consultation with NMFS to address effects to fish and EFH identified under the MSFCMA. These resources are discussed in **Section 4.18**.

Although the bald eagle (*Haliaeetus leucocephalus*) is no longer a listed species under the ESA, it is still protected under the Bald and Golden Eagle Protection Act (16 U.S.C. § 668-668c). The Bald and Golden Eagle Protection Act prohibits the take, possession, sale, purchase, barter, transport, export, or import of any bald or golden eagle (alive or dead), including any part (such as feathers), nest, or egg without a valid permit issued by the Secretary of the Interior (50 CFR 22.3). MDOT SHA's position is that the MLS is not an activity that deliberately intends to kill or take migratory birds. MDOT SHA coordinated with USFWS to determine whether any bald eagle nests occur within the corridor study boundary.

The Maryland Nongame Endangered Species Conservation Act (Md. Code Ann., Nat. Res., § 10¬2A¬01 through 09) regulates activities that impact plants and wildlife, including their habitats, listed on the Maryland Threatened and Endangered Species list. Protections under the Act are for species listed as Endangered, Threatened, or In Need of Conservation (animals only). Endangered species are those whose continued existence in Maryland is in jeopardy. Threatened species are those that are likely, in the foreseeable future, to become endangered in Maryland. Species with a status of In Need of Conservation are animals whose populations are limited or declining in Maryland such that the species may become threatened in the foreseeable future if current trends or conditions persist. Any Federal, state, local, or private constructing agency is required to cooperate and consult with MDNR regarding: the presence of listed species within a project area, field verification of habitat and/or populations of listed species, and avoidance and minimization efforts, as appropriate.

The Virginia Department of Agriculture and Consumer Services (VDACS), Virginia Department of Game and Inland Fisheries (VDGIF), and VDCR cooperate in the protection of Virginia's state and Federally listed threatened and endangered species. Threatened and endangered wildlife species are protected under the Virginia Endangered Species Act of 1972 (Chapter 5 Wildlife and Fish Laws; Va. Code Ann., § 29.1¬563 through 570). Virginia's threatened and endangered plant and insect species are protected under the Endangered Plant and Insect Species Act of 1979 (Chapter 10 Endangered Plant and Insect Species of the Virginia Code; Va. Code Ann., § 3.2¬1000 through 1011). In addition, a cooperative agreement with the USFWS, signed in 1976, recognizes VDGIF as the designated state agency with regulatory and management authority over Federally-listed animal species and provides for Federal/state cooperation regarding the protection and management of those species. VDACS holds authority to enforce regulations pertaining to plants and insects. However, as per a memorandum of agreement between VDCR and VDACS, VDCR represents VDACS in comments regarding potential impacts to state-listed threatened and endangered plant and insect species.

00035947



## B. Methodology

The Information for Planning and Consultation (IPaC) tool was used to assess the potential presence of Federally-listed species under the jurisdiction of the USFWS. This online resource allows an assessment of potential listed species within an estimated action area. The IPaC official species list for both the Virginia and Chesapeake Bay Ecological Services field offices of the USFWS were originally accessed on July 11, 2018. Follow-up IPaC coordination occurred on October 24, 2019. The NMFS was contacted by email on July 16, 2018 regarding the potential presence of EFH or Federally-listed tidal aquatic threatened or endangered species. NOAA Fisheries indicated via email dated July 27, 2018 that no EFH resources exist within the study area. Response letters, online reviews, and other correspondence from the state and Federal agencies responsible for rare, threatened, and endangered (RTE) species are included in *Appendix N* of the *Natural Resources Technical Report* (**Appendix L**).

The results of the USFWS Virginia field office official species list in 2018 indicated the potential presence of the northern long-eared bat (*Myotis septentrionalis*) and the yellow lance (*Elliptio lanceolata*), both federally-listed threatened species. However, the yellow lance is presumed extirpated within the study area, as explained by USFWS in the 2018 Final Rule[46] and the *Species Status Assessment Report for the Yellow Lance (Elliptio lanceolata)* (USFWS, 2018[47]). No federally-listed species were noted in the 2018 USFWS Chesapeake Bay field office official species list. However, in early 2019 during coordination meetings with MDOT SHA, USFWS voiced concerns about potential impacts from the Study in Maryland and Virginia to the northern long-eared bat (NLEB) and Indiana bat (*Myotis sodalis*) (IB), a federally-listed endangered species due to positive detections of these species through field research conducted by researchers from Virginia Polytechnic Institute and State University (Virginia Tech) in areas surrounding the study corridor boundary in their 2017, 2018, and 2019 spring/summer surveys. As a result of new information, the USFWS met with MDOT SHA and FHWA on March 25, 2019 to further discuss Study coordination efforts regarding the NLEB and IB. The IPaC reviews for the Virginia and Chesapeake Bay field offices were rerun on October 24, 2019. Both field offices listed only the NLEB as potentially occurring within the corridor study boundary.

On July 18, 2019, the USFWS submitted a letter to the MDOT SHA providing comments on the IPaC Section 7 coordination for the two Federally listed bat species. Two potential ESA consultation pathways can be used when transportation projects may affect the NLEB or IB. These include 1) the Programmatic Biological Opinion (BO) for Transportation Projects in the Range of the Indiana Bat and Northern Long-eared Bat, currently dated February 2018 due to revisions, and 2) the Programmatic Biological Opinion on Final 4(d) Rule for the Northern Long-eared Bat and Activities Excepted from Take Prohibitions, dated January 5, 2016. Either of these two Biological Opinions could be used to help facilitate ESA Section 7(a)(2) compliance for transportation projects.

According to the July 18, 2019 USFWS letter to MDOT SHA, the Study would not qualify under the Programmatic BO for Transportation Projects referenced above because the Study proposes to clear more than 20 acres of suitable habitat within any given five-mile section of roadway. The Study would qualify under the Programmatic BO on the Final 4(d) Rule for the NLEB even though forest clearing may affect NLEB. However, the following conservation measures in the Final 4(d) Rule must be followed: Incidental

---

[46] USFWS, 2018a. Threatened Species Status for the Yellow Lance; Final Rule. 83. Fed. Reg. 14189. (May 3, 2018).
[47] US Fish and Wildlife Service (USFWS). 2018b. Species Status Assessment Report for the Yellow Lance (*Elliptio lanceolata*). Species Status Assessment Reports. Version 1.3. January, 2018. Raleigh Ecological Services Field Office.

00035948

take resulting from tree removal is prohibited if it: (1) occurs within a 0.25 mile (0.4 kilometer) radius of known NLEB hibernacula; or (2) cuts or destroys known occupied maternity roost trees, or any other trees within a 150-foot (45-meter) radius from the known maternity tree during the pup season (June 1 through July 31). Based on the data collected by researchers at Virginia Tech over the previous three summers, the USFWS recommended that MDOT SHA conduct surveys to determine if IB are utilizing summer habitat within the corridor study boundary. These studies, which include visual bridge surveys and emergence bridge surveys, would qualify as "conservation measures" under Section 7(a)(I) of the ESA for the NLEB and are recommended for the IB to let the USFWS know if conservation measures need to be implemented to avoid adverse effects to the IB.

A follow-up meeting between the MDOT SHA, FHWA, and USFWS was held on July 26, 2019 to further discuss potential bat survey activities and to finalize an acceptable survey approach. To apply "conservation measures" under Section 7(a)(I) of the ESA for the NLEB, MDOT SHA proposed acoustic presence/absence surveys within the corridor study boundary and informational mist netting and radio tracking in areas with positive acoustic identification of rare, threatened and endangered bat species during the survey window from May 15 through August 15, 2020. The USFWS concurred with the survey approach on March 11, 2020.  USFWS subsequently asked that mist netting and radio telemetry surveys be removed from the study plan due to concerns of transmission of COVID-19 to bats (refer to *Appendix N* of the *Natural Resources Technical Report* (**Appendix L**) for copies of the agency correspondence). The results of the acoustic and 2020 bridge surveys will be presented in the FEIS. Results of the 2020 bridge survey are discussed in **Section 4.19.2A**.  Refer to the *Natural Resources Technical Report* (**Appendix L, Section 2.10**) for the complete summary of USFWS coordination related to these species.

The Maryland Trilogy Application was completed to determine the potential for the presence of Maryland state-listed terrestrial or aquatic RTE species within the corridor study boundary. This online application solicits state-listed RTE species review from the MDNR Wildlife and Heritage Service (WHS) and MDNR Environmental Review Program (ERP). In addition, mapped MDNR Sensitive Species Project Review Areas (SSPRA) were reviewed in Maryland to determine areas supporting or providing habitat buffers for RTE species within the corridor study boundary. SSPRAs are mapped to include both sensitive species habitat and a buffer to allow potential activities anywhere within or near the SSPRA to be flagged for more detailed review by MDNR to determine if a sensitive species could potentially be affected.

MDOT SHA requested information from USFWS about potential bald eagle nest locations in proximity to the corridor study boundary as well as potential protection measures for the peregrine falcons nesting on the American Legion Bridge during the proposed replacement of the bridge.  USFWS replied to this request via email on May 13, 2020 (included in *Appendix N* of the *Natural Resources Technical Report* (**Appendix L** )), and a summary of this response is included in **Section 4.19.2**.

For Virginia state-listed RTE species, the VDCR was contacted for information on the potential presence of RTE plant and insect species within the corridor study boundary. Response letters, online reviews, and other correspondence from the state and Federal agencies responsible for rare, threatened, and endangered (RTE) species are included in *Appendix N* of the *Natural Resources Technical Report* (**Appendix L**).

00035949

## 4.19.2 Affected Environment

### A. Northern Long-eared Bat and Indiana Bat

The NLEB and IB, both Federally-listed bat species, are found throughout the eastern and north-central US, hibernating in mines and caves during winter and spending the summer in wooded areas (USFWS, 2016; USFWS, 2018c). NLEB is typically a short-distance migrant, with the distance from winter hibernacula in caves and mines to summer roosts being typically less than 50 miles (USFWS, 2016), while IB are known to migrate hundreds of miles from their hibernacula (USFWS 2007). No winter hibernacula exist within the corridor study boundary for either species, but summer roosting and maternity habitat can include any patch of typically upland forest or loose clusters of trees that have individual live or dead trees with loose bark, crevices, cavities, or hollows. The NLEB will also use barns and sheds in areas where suitable roost trees do not occur (USFWS, 2016). Upland forest habitat that could serve as summer roost habitat for NLEB or IB occurs throughout the corridor study boundary in Virginia and Maryland.

Due to timing of the Study and the short survey period, MDOT SHA was not able to conduct acoustic or mist netting surveys in 2019. However, based on agreement between USFWS and MDOT SHA, bat surveys of bridges, both visual and emergence, adjacent to suitable forest habitat were able to be conducted prior to the August 15, 2019 survey deadline. Between August 5 and 12, 2019, 14 bridge structures and associated ramp bridges within the corridor study boundary were assessed for the presence of roosting bats or their suitability to support roosting bats. While suitable bat roosting habitat features were present on most bridges, most did not combine all necessary habitat variables. Bat guano was found beneath the American Legion Bridge on the Maryland side of the Potomac River, the McArthur Boulevard/Clara Barton Parkway Westbound bridge, and the bridge over Seven Locks Road. Based on the results of the visual assessment, there was no evidence of use of the bridges by the NLEB or IB. However, five big brown bats, not state or Federally- listed, were found day-roosting singly within gaps between pier caps of the bridge over the McArthur Boulevard/Clara Barton Parkway Westbound bridge. All five roosting bats were in locations with a vertical clearance of at least 10 feet with forested habitat adjacent to the bridge. All had small amounts of guano on the ground beneath them suggesting that these were not extensively used roosts. Bat emergence surveys were conducted at the American Legion Bridge on August 12, 2019 and at the Northwest Branch Bridge on August 13, 2019. Small and larger bats were observed flying beneath or near each bridge, but no bats were definitively confirmed exiting the bridge structures.

Based on suitable conditions for bridge roosting reported in the literature and evidence of roosting bats from MDOT SHA's visual survey, corridor study boundary bridges that support or could support roosting bats include the American Legion Bridge, Clara Barton Parkway Eastbound bridge (not surveyed due to construction, but with conditions similar to the McArthur Boulevard/Clara Barton Parkway Westbound bridge), McArthur Boulevard/Clara Barton Parkway Westbound bridge, Seven Locks Road bridge, and Northwest Branch bridge. Details of the bridge visual and bridge emergence surveys can be found within the *Bridge Survey Report for the Northern Long-eared Bat (Myotis septentrionalis) and Indiana Bat (Myotis sodalis)* in *Appendix P* of the *Natural Resources Technical Report* (**Appendix L**). MDOT SHA will perform acoustic surveys during the survey window from May 15 through August 15, 2020 to determine whether listed bat species are present within the Build Alternative LODs as well as some additional bridge surveys

00035950



for those bridges not able to be surveyed in the 2019 season. The results of the bat acoustic surveys will be presented in the FEIS.

## B. Fisheries

A response was received on August 9, 2018 from NMFS, included in *Appendix N* of the *Natural Resources Technical Report* (**Appendix L**), stating the corridor study boundary lies outside the limits of potential direct or indirect effects to Federally-listed or proposed threatened or endangered species under the jurisdiction of NMFS. Therefore, further consultation with NMFS under Section 7 of the ESA is not needed unless the study changes substantially or new information becomes available.

## C. Sensitive Species Project Review Areas

MDNR has mapped five SSPRAs that intersect with the corridor study boundary. As mentioned previously, these mapped areas include both sensitive species habitat and a buffer to allow potential activities within the SSPRA to be flagged for more detailed review by MDNR to determine if a sensitive species could potentially be affected. Presence of an SSPRA within the corridor study boundary or LOD does not necessarily mean an impact would occur. **Table 4-30** displays the total acreage of SSPRA impacted by Build Alternative.

### Table 4-30: SSPRA Acreage Impacted by Build Alternative

|  | Alt 5[1] | Alts 8&9 | Alt 9M | Alt 10 | Alt 13B | Alt 13C |
|---|---|---|---|---|---|---|
| Total SSPRA in Acres | 151.7 | 155.0 | 153.7 | 155.0 | 155.0 | 155.0 |

Note: [1] MDOT SHA and FHWA determined Alternative 5 is not a reasonable alternative, but it is included in the DEIS for comparison purposes only. [2] Alternatives 8 and 9 have the same limits of disturbance footprint and therefore have the same impacts.

## D. Maryland Species of Concern

MDNR indicated that the state-listed RTE species shown in **Table 4-31**, located within riparian areas of the Potomac River in the western portion of the corridor study boundary, were those of greatest concern. Known occurrences of RTE species identified by MDNR (two species of dragonflies, six species of plants, three species of fish, and one crustacean) are described in the *Natural Resources Technical Report* (**Appendix L, Section 2.10**).

### Table 4-31: RTE Plant Species in Riparian Areas of the Potomac River Within the Corridor Study Boundary, as indicated by MDNR

| Scientific Name | Common Name | Status |
|---|---|---|
| Rumex latissimus | Tall dock | Endangered |
| Paspalum fluitans | Horse-tail paspalum | Endangered |
| Matelea obliqua | Climbing milkweed | Endangered |
| Baptisia australis | Blue wild indigo | Threatened |
| Coreopsis tripteris | Tall tickseed | Endangered |
| Phacelia covellei | Buttercup scorpionweed | Endangered |

All of the Maryland-listed species are known to occur on scour bars of the Potomac River or within the adjacent floodplain, and MDNR recommended habitat surveys of the area where the Potomac River

00035951

crosses the corridor study boundary to determine whether suitable habitat exists for the listed species. MDOT SHA conducted state-listed RTE plant habitat assessments within the corridor study boundary within forested habitat on terraces and slopes immediately above the Potomac River floodplain, the forested Potomac River floodplain itself, and the rocky shoreline of the Potomac River on June 25 and July 10, 2019 to determine the presence of suitable habitat for six state-listed plant species. A targeted species survey was also completed for four of the six species. Marginally-suitable habitat for the climbing milkweed and the buttercup scorpionweed was found within upland terrace forest in two locations within the corridor study boundary, one just south of the C&O Canal Towpath and the other just west of the American Legion Bridge. Neither of these species were observed during the field survey. Marginally-suitable habitat was also found for tall dock, tall coreopsis, wild blue indigo, and horse-tail paspalum within bedrock scour bar/riverside outcrop barrens habitat, though the scour areas appear to be too frequently disturbed and the outcrop barrens devoid of sufficient soil to support these plants. None of these four species were found during the survey. Field survey methodologies are described within the *Natural Resources Technical Report* (**Appendix L, Section 2.10**).

Much of the forested upland terrace areas within the proposed LODs had dense invasive species cover within the understory, vine, and groundcover layers. Dominant species included bush honeysuckle (*Lonicera* spp.), Asian bittersweet (*Celastrus orbiculatus*), Japanese stilt grass (*Microstegium vimineum*), and ground ivy (*Glechoma hederacea*). The scour bar areas occurred beneath the American Legion Bridge and intermittently downstream to the extent of the corridor study boundary. Areas beneath the bridge appeared to be frequently flooded and may not have been able to support herbaceous vegetation growth, as much of the area was bare mud. Riverside outcrop barrens occurred on boulders at the edge of the river, but these areas had very little soil. Vegetation present in this area included sapling American sycamore (*Platanus occidentalis*) and sticky goldenrod (*Solidago racemosa*). None of the targeted RTE plant species were found during the surveys. One of the targeted species, buttercup scorpionweed (*Phacelia covellei*), is an early spring blooming herbaceous plant that would not have been present at the time of the surveys. Follow up surveys for this and the other targeted species identified by the state and Federal resource agencies are being conducted between spring and late summer 2020.

### E. Virginia Species of Concern

Correspondence with VDCR indicated that the corridor study boundary overlaps the Potomac Gorge Conservation Site. According to VDCR, conservation sites are tools for representing key areas of the landscape that warrant further review for possible conservation action because of the natural heritage resources and habitat they support. Conservation sites are like SSPRAs tracked by the MDNR in Maryland and discussed above. The Potomac Gorge Conservation Site has been given a biodiversity significance rank of B1, which represents a site of outstanding significance. The list of the natural heritage resources known to occur within the Potomac Gorge Conservation site includes several state-listed rare plant and invertebrate fauna. While not protected under state or Federal laws, these species are tracked by the state because they are vulnerable to becoming state threatened or endangered. Additionally, the NPS has identified state and globally rare plants and invertebrates from national park property within the Potomac Gorge on both sides of the Potomac River through numerous distributional surveys over the past ten to twenty years. Some of these areas lie adjacent to the corridor study boundary. **Table 4-32** includes a list provided by the NPS of these state-listed rare plant and invertebrate species documented by VDCR or the NPS.



00035952

The above referenced NPS Potomac Gorge park surveys also noted numerous Virginia state first records for various species of beetles, moths, caddisflies, and land snails and slugs. VDCR also indicated the potential presence of other Stygobromus amphipod species within the corridor study boundary. VDCR and NPS have recommended conducting plant surveys to document whether any of the listed species are presently located within the corridor study boundary. Coordination with VDCR and NPS will continue and targeted plant species surveys within the corridor study boundary are planned for 2020 and the results will be presented in the FEIS.

**Table 4-32: Virginia and Maryland State Listed Species From the Potomac Gorge Known or Potentially Occurring[3] (VDCR/NPS/MDNR) Within the Corridor Study Boundary**

| Scientific Name | Common Name | Organism | Global Rank[2] | State Rank/Status[3] |
|---|---|---|---|---|
| Stygobromus phreaticu | Northern Virginia Well Amphipod | Amphipod | G1 | S1 |
| Stygobromus pizzinii[1] | Pizzini's Amphipod | Amphipod | G3G4 | S1S2 |
| Fontigens bottimer | Appalachian Springsnail | Snail | G2 | S1S2 |
| Hydropsyche brunneipenni | Caddisfly | Caddisfly | G3G4 | S1S3 |
| Cordulegaster erronea | Tiger Spiketail | Dragonfly | G4 | S3 |
| Gomphus fraternus | Midland Clubtail | Dragonfly | G5 | S2 |
| Acronicta radcliffei | Radcliffe's Dagger Moth | Moth | G5 | S2S4 |
| Acronicta spinigera | Nondescript Dagger Moth | Moth | G4 | S1S3 |
| Sphinx frankii | Frank's Sphinx | Moth | G4G5 | S2S3 |
| Arabis patens | Spreading Rock Cress | Vascular Plant | G3 | S1 |
| Baptisia australis | Blue Wild Indigo | Vascular Plant | G5T5 | S2 |
| Boechera dentata | Short's Rock Cress | Vascular Plant | G5 | S1 |
| Cirsium altissimum[1] | Tall Thistle | Vascular Plant | G5 | S1 |
| Clematis viorna | Vase-vine Leatherflower | Vascular Plant | G3 | S3 |
| Coreopsis tripteris | Tall Tickseed | Vascular Plant | G5T5 | S1 |
| Cuscuta polygonorum[1] | Smartweed Dodder | Vascular Plant | G5 | S1 |
| Echinocystis lobata[1] | Wild Cucumber | Vascular Plant | G5 | SH |
| Erigenia bulbosa | Harbinger-of-Spring | Vascular Plant | G5 | S1 |
| Eryngium yuccifolium var. yuccifolium[1] | Northern Rattlesnake-Master | Vascular Plant | G5T5 | S2 |
| Galactia volubilis | Downy Milkpea | Vascular Plant | G5 | S3 |
| Helianthus occidentalis | McDowell's Sunflower | Vascular Plant | G5 | S1/T |
| Hibiscus laevis | Halberd-leaf Rosemallow | Vascular Plant | G5 | S3 |
| Hybanthus concolor | Green Violet | Vascular Plant | G5 | S3 |
| Lipocarpha micrantha | Small-flower Halfchaff Sedge | Vascular Plant | G5 | S2 |
| Maianthemum stellatum | Starry Solomon's-Plume | Vascular Plant | G5 | S2 |
| Monarda clinopodia | Basil Beebalm | Vascular Plant | G5 | S3S4 |
| Orthilia secunda[1] | One-sided Shinleaf | Vascular Plant | G5 | SH |
| Phacelia covillei | Covilli's Phacelia | Vascular Plant | G3 | S1 |
| Phaseolus polystachios | Wild Kidney Bean | Vascular Plant | G5 | S3 |
| Polygala polygama | Racemed Milkwort | Vascular Plant | G5 | S1/T |
| Sida hermaphrodita | Virginia Sida | Vascular Plant | G3 | S1 |
| Silene nivea | Snowy Campion | Vascular Plant | G4* | S1 |

[1] Historically occurred within the Potomac Gorge Conservation Site crossed by the project. [2] G1 = Highly Globally Rare, G2 = Globally Rare, G3 = Very Rare and Local or Range Restricted, G4 = Apparently Secure Globally, G5 = Demonstrably Secure Globally, GNR = Not Yet Ranked, * = Species has not yet been Ranked or additional information is needed [3] Rank: S1 = Highly State Rare, S2 = State Rare, S3 = Watch List, S4 = Apparently Secure; Status: E = Endangered, T = Threatened; *Sources: VDCR July 31, 2019 letter, Steury et al. 2007, NPS Coordination*

00035953



### 4.19.3 Environmental Consequences

The No Build Alternative would not result in any study-related construction and would therefore not directly impact RTE species.

The USFWS IPaC indicates that the NLEB may occur within the corridor study boundary. Additionally, the NPS and VDCR have identified rare, state-listed plant and invertebrate species that occur on NPS lands within the Potomac River Gorge. Potential impacts to RTE habitat would be the same for all Build Alternatives along I-495, except for Alternative 9M. Surveys were initiated in spring 2020 for NLEB, IB and identified rare state-listed plant and invertebrate species and will continue to the end of the surveying season in late summer 2020. Coordination also continues with the USFWS, VDGIF, VDCR, and NPS to determine whether any potential effects could occur to any of these species from any of the Build Alternatives. The survey results and effects will be documented in the FEIS.

Within the Maryland portion of the corridor study boundary, the NLEB and IB may occur within suitable forested habitat. Neither species was confirmed within the corridor study boundary during visual bridge and emergence surveys in 2019. However, temporary day roosting by big brown bats on the bridge over McArthur Boulevard/Clara Barton Parkway Westbound and evidence of guano beneath the American Legion Bridge and bridge over Seven Locks Road, suggest that bats do occasionally roost on suitable I-495 bridges. None of the I-495 bridges appeared to serve as maternity roosting habitat, but were likely used as temporary day or night roosting sites. Therefore, potential impacts to bridge roosting bats would be minimal and would likely cause a shift to other suitable roosting sites near the bridges rather than resulting in an impact to the bats.  The ALB and many other bridges within the study corridors will need to be replaced in all Build Alternatives, so any impacts to potential roosting bats on these bridges would occur regardless of which Build Alternative is selected. To determine potential impacts to suitable forested habitat for the NLEB and IB, further studies will be undertaken within the corridor study boundary during the 2020 active season (May 15 through August 15). Acoustic surveys are proposed to be conducted to better determine the potential presence of these Federally-listed bat species within the corridor study boundary. Mist net and radio telemetry surveys were proposed within the corridor study boundary for the 2020 survey season, however the USFWS has asked that mist netting not be conducted due to concerns of transmission of COVID-19 to bats, included in *Appendix N* of the *Natural Resources Technical Report* (**Appendix L**).

The MDNR identified several state-listed threatened or endangered plant species that may occur within scour bars or the adjacent floodplain of the Potomac River. A habitat assessment and targeted species survey was completed on Federal lands within the C&O Canal National Historical Park in late June and early July 2019 to determine whether suitable habitat for the state listed plant species exists. Marginally suitable habitat was found for climbing milkweed (*Matelea obliqua*) and buttercup scorpionweed within less disturbed understory of upland terrace forest habitat and on scour bar/riverside outcrop barren habitat along the Potomac River for the remaining species. The targeted species survey did not identify any of the listed species, though follow-up surveys for the buttercup scorpionweed were conducted during the suitable flowering period for this species in the spring of 2020. Based on the results of the targeted RTE species survey conducted in 2019, the Build Alternatives for the Study would not be anticipated to impact five of the six DNR WHS-listed plant species of concern within the Potomac River corridor. However, further surveys will be conducted in this area and within the Potomac Gorge in Virginia in the spring and summer of 2020 to determine whether buttercup scorpionweed and other state listed

00035954

or rare plants occur within the corridor study boundary. These surveys are currently ongoing and, if found, an evaluation will be made of the potential impacts of the Study on these species and will be documented in the FEIS.

### 4.19.4 Mitigation

Acoustic surveys for federally-listed bats are proposed during spring and summer 2020 to determine the presence/probable absence of these species within the LODs of the Build Alternatives. MDOT SHA will continue to coordinate with USFWS regarding federally listed bat species before, during, and after the bat surveys are completed. USFWS confirmed in a meeting with MDOT SHA on April 30, 2020, that if high frequency calls from NLEB and/or IB are identified within the LODs of the Build Alternatives, each positive acoustic detection location will receive a 3-mile buffer for NLEB and a 5-mile buffer for IB, within which there will be a tree clearing time-of-year restriction from May 1 to July 31. Additional bridge surveys for bats will also be conducted in the 2020 survey season. If either the NLEB or IB are found roosting on bridges within the corridor study boundary, minimization efforts could include a time of year restriction on the start of construction on these bridges. This would ensure that bats would not be present when the construction work begins. Most species of bats, and particularly NLEB and IB, would be expected to be absent from the corridor study boundary from mid to late October through March. Bats returning to the area the following season would likely seek other suitable roosting sites to avoid an active work zone on the bridge. In the unlikely event of a construction delay or stoppage lasting longer than two months, bridges under construction would be re-surveyed for bat utilization prior to resuming construction. All bridges where guano was found occur in areas with large stands of suitable forest habitat for bats that could be and are likely used for roosting. USFWS indicated in the April 30, 2020 meeting that full compliance with the time-of-year restrictions would conclude informal Section 7 consultation.

For state-listed plant species, additional surveys have been initiated and will continue through summer of 2020 for the buttercup scorpionweed and other rare and listed species to determine whether project-related impacts could occur to these species if present. Coordination with the regulatory agencies is ongoing and will continue regarding Federally- or state-listed RTE species. If more detailed surveys or later coordination indicate that effects could occur, those effects will be minimized and mitigated to the extent practicable and in accordance with state and Federal regulations.

## 4.20 Unique and Sensitive Areas
### 4.20.1 Introduction and Methodology

Unique and Sensitive Areas are ecological resources designated by state and local municipalities that do not fall within the regulations of other environmental resources such as waterways or forests. Maryland's 2001 GreenPrint Program was established to protect Maryland's most-ecologically-valuable natural lands and watersheds, which were designated as Targeted Ecological Areas (TEAs). TEAs were created based on rankings of Green Infrastructure (GI); RTE species; aquatic habitat and biota; water quality; coastal ecosystem; and climate change adaptation. GI areas were identified by the Maryland Greenways Commission and MDNR's Green Infrastructure Assessment (GIA), which considered land cover, wetlands, sensitive species, roads, streams, terrestrial and aquatic conditions, floodplains, soils, and developmental pressure to identify a network of "hubs" and "corridors" containing the most-ecologically-critical undeveloped lands remaining in Maryland. Montgomery County has designated certain watersheds as Special Protection Areas (SPAs) due to the presence of high-quality water resources and related natural features that could be jeopardized by development activities without additional water quality protection

00035955



measures. Environmental Overlay Zones were established within the limits of SPAs to impose additional land use regulations and impervious surface limits on the underlying areas (Montgomery Planning, 2012[48]; Blackwell, 1989[49]).

A review of MDNR, Maryland iMap, and the Montgomery County Atlas (MCAtlas) was conducted to identify the locations of TEAs, GI hubs and corridors, SPAs, and Environmental Overlay Zones within the corridor study boundary.

The VDCR Natural Heritage (DNH) Program conserves Virginia's natural resources through programs such as biological inventories, natural community inventory and classification, and the creation of Natural Area Preserves throughout the state. VDCR-DNH also identifies Conservation Sites, which represent key areas of the landscape worthy of protection and stewardship action, because of the natural heritage resources and habitat they support.

Additional information including the locations of identified unique and sensitive areas, can be found in the *Natural Resources Technical Report* (**Appendix L, Section 2.11**).

### 4.20.2 Affected Environment

### A. Targeted Ecological Areas and Green Infrastructure

Ten GI corridors and eight GI hubs overlap with the corridor study boundary, as shown in *Appendix Q of the Natural Resources Technical Report* (**Appendix L**). In addition, TEAs overlap with the corridor study boundary between Cabin John Creek and the Potomac River in Montgomery County, a small area along Little Paint Branch, and along Bald Hill Branch east of the I-495/US 50 interchange in Prince George's County.

### B. Special Protection Area (SPA) and Environmental Overlay Zones

There are no SPAs or Environmental Overlay Zones within the corridor study boundary, but the Piney Branch SPA is located approximately 4,000 feet southwest of the I-270/Shady Grove Road interchange.

### C. Natural Area Preserves and Conservation Sites

There are no VDCR-DNH Natural Area Preserves within the corridor study boundary or within Fairfax County, Virginia. There are two VDCR Conservation Sites within a five-mile radius of the corridor study boundary.

### 4.20.3 Environmental Consequences

The No Build Alternative would not result in any study-related construction and would therefore not directly impact GI hubs and corridors, TEAs, or SPAs.

Impacts associated with the Build Alternatives are summarized in **Table 4-33**. All of the Build Alternatives would impact 77.1 acres of TEAs. The GI hubs would be impacted from between to 43.8 acres under Alternative 13B and 46.2 acres with Alternative 10. GI corridors would be impacted by all Build Alternatives as well, with the lowest impact of 280.4 acres for Alternative 9M and the highest impact of

---

[48] Montgomery Planning. 2012. Special Protection Areas (SPA). Available at:
http://www.montgomeryplanning.org/environment/spa/index.shtm [Accessed 7 September 2018].
[49] Blackwell, Robert J. 1989. *Overlay Zoning, Performance Standards, and Environmental Protection After Nollan*. 16 B.C. Envtl. Aff. L. Rev. 615. Available at: http://lawdigitalcommons.bc.edu/ealr/vol16/iss3/6 [Accessed 7 September 2018].

00035956

287.5 acres for Alternative 10. There would be no impacts to SPAs or VDCR Natural Area Preserves and Conservation Sites resulting from the Build Alternatives.

**Table 4-33: Impacts to Unique and Sensitive Areas (acres)**

| Resource | Alt 5[1] | Alts 8 & 9[2] | Alt 9M | Alt 10 | Alt 13B | Alte 13C |
|---|---|---|---|---|---|---|
| Targeted Ecological Areas | 74.7 | 77.1 | 77.1 | 77.1 | 77.1 | 77.1 |
| Green Infrastructure Hubs | 41.8 | 45.0 | 44.3 | 46.2 | 43.8 | 44.4 |
| Green Infrastructure Corridors | 278.8 | 286.1 | 280.4 | 287.5 | 285.8 | 287.1 |
| Special Protection Areas | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL Unique and Sensitive Area Types** | **395.3** | **408.2** | **401.8** | **410.8** | **406.7** | **408.6** |

Notes: [1] MDOT SHA and FHWA determined Alternative 5 is not a reasonable alternative, but it is included in the DEIS for comparison purposes only. [2]: Alternatives 8 and 9 have the same limits of disturbance footprint and therefore have the same impacts.

Each of the Build Alternatives would increase the man-made footprint within the TEAs and GI areas, but the GI hubs and corridors would remain intact. However, road widening would create larger gaps in GI corridors, further fragmenting the GI network. New manmade structures and roadways impact contiguous forest blocks and wetland complexes in TEAs and GI areas, which are often habitats for FIDS, and contain biologically important rivers, streams, and other natural resources.

### 4.20.4 Mitigation

Avoidance and minimization efforts to reduce impacts to GI and TEAs will involve a two-tiered approach. The first tier is occurring during the planning stage where effort is being made to avoid wetlands and waterways, floodplains, and large forested areas to the greatest extent practicable. Many GI, TEA, and wildlife corridors overlap with wetlands, waterways, and park land. The second tier of avoidance and minimization will occur during final design, with advancement of the design and further refinements to the LOD to further reduce impacts.

## 4.21 Environmental Justice and Title VI Compliance

### 4.21.1 Introduction and Regulatory Context

All federal agencies must comply with Title VI of the 1964 Civil Rights Act and Executive Order 12898: Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (EJ Order). Under Title VI and related statutes, each federal agency is required to ensure that no person is excluded from participation in, denied the benefit of, or subjected to discrimination under any program or activity receiving federal financial assistance on the basis of race, color, national origin,[50] age, sex, disability, or religion. Executive Order 12898 states that "...each Federal agency shall make achieving Environmental Justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations."

Executive Order 12898 directs Federal agencies to identify and address the disproportionately high and adverse human health or environmental effects of their actions on minority and low-income populations, to the greatest extent practicable and permitted by law. A disproportionately high and adverse effect on

---

[50] Including individuals with Limited English Proficiency.

00035957

minority and low-income populations is defined by the FHWA Order 6640.23A: *FHWA Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* (2012), as an impact that:

- Would be predominately borne by a minority and/or low-income population, or
- Will be suffered by the minority population and/or low-income population and is appreciably more severe or greater in magnitude than the adverse effect that will be suffered by the nonminority population and/or non-low-income population.

The Executive Order is intended to promote nondiscrimination in Federal programs that affect human health and the environment, as well as provide minority and low-income communities access to public information and public participation.

The strategies developed under Executive Order 12898 and subsequent Environmental Justice (EJ) FHWA guidance set forth the appropriate and necessary steps to identify and address disproportionately high and adverse effects of federal transportation projects on the health or environment of minority and low-income populations to the greatest extent practicable and permitted by law. The guidance also addresses an important aspect of EJ: providing meaningful opportunities for public involvement by members of minority populations and low-income populations during the planning and development of programs, policies, and activities (including the identification of potential effects, alternatives, and mitigation measures). The following policies and guidance documents provide assistance for addressing minority and low-income communities.

- US Department of Transportation (USDOT) Order 5610.2(a) Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (2012 revision);
- FHWA Order 6640.23A, FHWA Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (2012); and
- FHWA memorandum Guidance on Environmental Justice and NEPA (2011).

Executive Order 12898 does not define the terms *minority* or *low-income*, but the terms have been defined in the USDOT and FHWA Orders on EJ. FHWA Order 6640.23A provides the following definitions, which have been used in this analysis:

- *Minority Individual* – A person who identifies as:
    1) Black: a person having origins in any of the black racial groups of Africa;
    2) Hispanic or Latino: a person of Mexican, Puerto Rican, Cuban, Central or South American, or other Spanish culture or origin, regardless of race;
    3) Asian American: a person having origins in any of the original peoples of the Far East, Southeast Asia or the Indian subcontinent;
    4) American Indian and Alaskan Native: a person having origins in any of the original people of North America, South America (including Central America), and who maintains cultural identification through tribal affiliation or community recognition; or
    5) Native Hawaiian and Other Pacific Islander: a person having origins in any of the original peoples of Hawaii, Guam, Samoa or other Pacific Islands.

- *Low-Income Individual* – A person whose household income is at or below the US Department of Health and Human Services (HHS) poverty guidelines.

00035958



## 4.21.2 Environmental Justice Analysis Methodology

As stated previously, the strategies developed under Executive Order 12898, USDOT Order 5610.2(a), FHWA Order 6640.23A, and FHWA memorandum *Guidance on Environmental Justice and NEPA* (2011) set forth the appropriate and necessary steps to identify and address disproportionately high and adverse effects of Federal transportation projects on minority and low-income populations. Based on these strategies, the following steps are documented in this Environmental Justice Analysis in support of the DEIS:

1) The identification of minority race and ethnicity populations and low-income populations (EJ populations) along the study corridors (**Section 4.21.2A and 4.21.2B**);

2) The review of demographic data to determine the existing environmental and community conditions of the EJ populations (**Section 4.21.3**);

3) The documentation of public outreach as planned, conducted and refined throughout the study duration in consideration of the demographic and community data to ensure meaningful involvement in EJ populations (**Section 4.21.4**); and

4) The identification of beneficial and adverse effects to EJ populations under the No Build and Build Alternatives (**Section 4.21.5**).

The following steps will be documented in the FEIS:

5) The consideration of mitigation and enhancement measures if unavoidable adverse effects are expected to occur under the Preferred Alternative.

6) A comparison of adverse effects from the Preferred Alternative within EJ populations to adverse effects within a non-EJ population reference community;

7) A determination of whether disproportionately high and adverse effects would occur under the Preferred Alternative to EJ populations; and

8) A final conclusion of whether disproportionately high and adverse effects would occur, based on unmitigated adverse effects and whether public feedback has been addressed.

## A.  Identification of Minority Race and Ethnicity Populations

MDOT SHA, in coordination with FHWA, identified the methodology for the EJ Analysis for the Study. Using this methodology, the following definition applies to this Study:

- *Minority Populations* - Any readily identifiable groups of minority persons who live in geographic proximity, and if circumstances warrant, geographically dispersed/transient persons (such as migrant workers or Native Americans) who would be similarly affected by a proposed FHWA program, policy or activity (refer to USDOT Order 5610.2(a) and FHWA Order 6640.23A).

Per the Council on Environmental Quality (CEQ) Environmental Guidance Under NEPA (1997), a minority population is present when: (A) the minority race/ethnicity population of the affected area exceeds 50 percent or (B) the minority population percentage of the affected area is meaningfully greater than the

00035959



minority population percentage in the general population or other appropriate unit of geographic analysis.

For the purposes of this EJ Analysis, the appropriate unit of geographic analysis utilized was the block group, with boundaries defined by the US Census Bureau in 2010.[51] Collectively, 199 block groups are within the EJ Analysis Area surrounding the I-495 and I-270 study corridors[52] (**Figure 4-15**). Based on data collected from the American Community Survey (ACS) Five-Year Estimates (2012-2016), the minority population percentage within the EJ Analysis Area was 63 percent. Of the 199 block groups within the EJ Analysis Area, 107 had minority populations equal to or above 50 percent while 108 had minority populations equal to or above 48 percent. For the EJ Analysis, a block group was considered an EJ population where the percent of minority race and/or ethnicity persons was equal to or greater than 50 percent of the total block group population, consistent with the CEQ guidance.

## B.  Identification of Low-Income Populations

As stated previously, MDOT SHA, in coordination with FHWA, identified the methodology for the EJ Analysis for the Study. Using the methodology, the following definition applies to this Study:

- *Low-Income Population* – Any readily identifiable group of low-income persons who live in geographic proximity, and, if circumstances warrant, geographically dispersed/transient persons (such as migrant workers or Native Americans) who would be similarly affected by a proposed USDOT program, policy, or activity (refer to USDOT Order 5610.2 and FHWA Order 6640.23A).

The ACS Five-Year Estimates (2012-2016) were also used to collect the median household income and average household size data for each of the 199 EJ Analysis Area block groups. The average household size within the block groups was three persons. The HHS Poverty Guidelines provide a threshold median household income for low-income household identification by size of household. Using the HHS 2016 Poverty Guidelines income threshold for a three-person household, an EJ Analysis Area block group would have a median income of $20,160 or less to be considered a low-income population. However, no EJ Analysis Area block groups had a median household income at or below $20,160. Under the HHS 2016 Poverty Guidelines methodology, no low-income populations would be in the EJ Analysis Area.

Additional guidance provided in the EJ Federal Interagency Working Group (IWG) report, *Promising Practices for EJ Methodologies in NEPA Reviews* (2016) was used to evaluate low-income populations for the EJ Analysis Area. Guidelines for identifying low-income populations explain that it may be appropriate for agencies to select a threshold for identifying low-income populations that exceed the poverty level as defined by the HHS Poverty Guidelines (IWG EJ 2016). While HHS Poverty Guidelines are calculated based on a national average, the EJ Analysis Area is in a high-income area compared to the rest of the 48 contiguous states.  Because the cost of living in the EJ Analysis Area was determined to be greater than the national average and comparison with the HHS 2016 Poverty Guidelines did not yield any low-income populations, a more conservative methodology for determining low-income populations was adopted

---

[51] Block groups were selected as the appropriate unit of geographic analysis for this EJ Analysis because they provide demographic detail for small selections of the study corridor population and because they were also determined to be the appropriate unit of geographic analysis for the demographic data collection in the *Community Effects Assessment and Environmental Justice Analysis Technical Report* (Appendix E, Section 2.1).

[52] Block group delineation for the EJ Analysis Area is the same as the delineation for the *Community Effects Assessment and Environmental Justice Analysis Technical Report* (Appendix E, Section 2.1).

00035960

using the Department of Housing and Urban Development (HUD) 2016 Income Limits Survey. The HUD Income Limits Survey calculates the threshold for a low-income family/household designation at the Metropolitan Fair Market Rent (FMR)/Income Limits Area-level. The calculations are based on the number of persons in a family.

The HUD 2016 FMR/Income Limits, shown in **Table 4-34**, provided a more appropriate comparison for determining local low-income populations in the EJ Analysis Area. HUD defines *low-income* as a family earning 80 percent or less of an area's median family income. The EJ Analysis Area is in the Washington-Arlington-Alexandria, DC-VA-MD FMR Area. As previously stated, the average household size within the EJ Analysis Area block groups was three persons. Therefore, for this EJ Analysis, a block group was considered an EJ population if its median household income was at or below $63,150, the HUD 2016 Low-Income Limit for a family of three in the Washington-Arlington-Alexandria, DC-VA-MD FMR Area.

**Table 4-34: HUD 2016 Low-Income Limit for the Washington-Arlington-Alexandria, DC-VA-MD FMR Area**

| Persons in Family/Household | Guideline |
|---|---|
| 1 | $49,150 |
| 2 | $56,150 |
| 3 | $63,150 |
| 4 | $70,150 |
| 5 | $75,800 |
| 6 | $81,400 |
| 7 | $87,000 |
| 8 | $92,600 |

*Source: Department of Housing and Urban Development, FY 2016 Income Limits Survey* (www.huduser.gov/portal/datasets/il/il2016/2016summary.odn)

### 4.21.3 Existing Conditions of Environmental Justice Populations

The existing conditions of minority race and ethnicity populations and low-income populations are identified for each EJ Analysis Area block group. Of the total 199 EJ Analysis Area block groups along the study corridors, 111 are considered EJ populations. Note that EJ Analysis Area block groups are sometimes described as belonging to an *EJ Analysis Area Community* for the purpose of local context[53]. The 199 EJ Analysis Area block groups have been sorted into 36 EJ Analysis Area Communities using the same methodology as done for *CEA Analysis Area Communities* in the *Community Effects Assessment and Environmental Justice Analysis Technical Report* (**Appendix E, Chapters 2 and 3**).

### A. Existing Minority Race and Ethnicity Populations

As described in **Section 4.21.2A**, a block group was identified as minority population if 50 percent or more of the block group population identified as a minority.

---

[53] The terms "CEA Analysis Area Community" and "EJ Analysis Area Community" are interchangeable. For instance, the Silver Spring EJ Analysis Area Community has the same block groups and boundaries as the Silver Spring CEA Analysis Area Community. As such, the profile for the Silver Spring CEA Area Community serves as the profile for the Silver Spring EJ Analysis Area Community. Refer to the Community Effects Assessment and Environmental Justice Analysis Technical Report (Appendix E, Section 2.1) for delineation details.

00035961



The percent minority population within the EJ Analysis Area (63 percent) exceeds that of the state of Maryland (48 percent) by 15 percent. In the Montgomery County portion of the EJ Analysis Area, 45 percent of the population identifies as of minority race and/or ethnicity, which is less than that of Montgomery County as a whole (54 percent). In the Prince George's County portion of the EJ Analysis Area, 86 percent of the population identifies as of minority race and/or ethnicity, which is equal to that of Prince George's County. In the Fairfax County portion of the EJ Analysis Area, 28 percent of the population identifies as of minority race and/or ethnicity, which is nearly half that of Fairfax County as a whole.

Within the EJ Analysis Area as a whole, the population composition is highly diverse (refer to *Race and Ethnicity Characteristics* in **Section 4.2.2**). Of the 199 EJ Analysis Area block groups, 107 had minority populations equal to or above 50 percent. Minority populations were present to varying degrees in all EJ Analysis Area Communities except for the McLean; Cabin John; North Bethesda; Bethesda; South Kensington; Chevy Chase; and Joint Base Andrews EJ Analysis Area Communities. Within Montgomery County, 31 of the 112 EJ Analysis Area block groups (nearly 28 percent) were identified as minority populations; 76 of the 82 EJ Analysis Area block groups (nearly 93 percent) in Prince George's County were identified as minority populations.

Minority populations were present to varying degrees in all EJ Analysis Area Communities except for the McLean; Cabin John; North Bethesda; Bethesda; South Kensington; Chevy Chase; and Joint Base Andrews EJ Analysis Area Communities. Within Montgomery County, 31 of the 112 EJ Analysis Area block groups (nearly 28 percent) were identified as minority populations; 76 of the 82 EJ Analysis Area block groups (nearly 93 percent) in Prince George's County were identified as minority populations. The minority populations are shown in blue in **Figure 4-15**.

Race and ethnicity data for each EJ Analysis Area block group is provided in the *Community Effects Assessment and Environmental Justice Analysis Technical Report* (**Appendix E, Section 4.3.1** and **Table 4-2**).

## B. Existing Low-Income Populations

As described in **Section 4.21.2B**, a block group was identified as low-income population if its median household income was at or below $63,150. EJ Analysis Area block groups that qualified as low-income populations are highlighted in yellow in **Figure 4-15**. (Refer to **Appendix E, Table 4-3** for details on the EJ Analysis Area household/low-income characteristics and EJ populations.) Of the 199 EJ Analysis Area block groups, 30 had a median household income below $63,150. The highest density of low-income populations was in the Landover and Landover Hills EJ Analysis Area Communities, where all the block groups had median household income below $63,150. Slightly less than half of the Greenbelt EJ Analysis Area Community block groups (seven of the 16) had a median household income below $63,150. The remaining low-income populations were individual block groups located in the Potomac, Silver Spring, Beltsville, College Park, New Carrollton, Lanham, Summerfield, Forestville, Joint Base Andrews, Camp Springs, Gaithersburg, and Temple Hills EJ Analysis Area Communities. Household income data for each EJ Analysis Area block group is provided in the *Community Effects Assessment and Environmental Justice Analysis Technical Report* (**Appendix E, Section 4.3.2**).

00035962

**Figure 4-15: EJ Populations in the EJ Analysis Area**



00035963



## C. Supplemental Community Data

Supplemental data reviewed to further identify EJ populations is summarized below, including: households' English-speaking status, the locations of low-income subsidized housing, the distribution of Food Stamps/Supplemental Nutrition Assistance Program (SNAP) benefits, the proportion of students receiving free and reduced-price lunch programs, and Equity Emphasis Areas[54].

### a.  Limited English-Speaking Households

Executive Order 13166 *Improving Access to Services for Persons with Limited English Proficiency* (2000) requires Federal agencies to examine the services they provide, identify any need for services to those with limited English proficiency (LEP), and develop and implement a system to provide those services so LEP persons can have meaningful access to them.  A person who does not speak English as their primary language and who has a limited ability to read, speak, write or understand English may be LEP.  In accordance with MDOT SHA's *Title VI Program Implementation Plan* (2015), "MDOT SHA will provide translation services to individuals that have limited ability to read, write, speak or understand English. SHA will seek to communicate with LEP populations and provide LEP individuals meaningful access to SHA programs and activities." Interpretation services were available by request at each Public Workshop and outreach event and will be available for the Public Hearings and any subsequent public outreach effort. Spanish and American Sign Language (ASL) interpreters have been requested and utilized at several Public Workshops and will be available for the Public Hearings.

ACS Five-Year Estimates (2012-2016) data on limited English-Speaking households was evaluated to identify potential LEP populations within the EJ Analysis Area where specific LEP supporting outreach would be targeted.  The ACS allows respondents to identify one's household as English-speaking only, Spanish-speaking, other Indo-European language-speaking, Asian and Pacific Island language-speaking, or other language-speaking. Respondents who identify as part of a non- English-speaking only household further classify as either a "limited English-speaking household" or, "not a limited English-speaking household."

Using ACS Five-Year Estimates (2012-2016) data, LEP populations were identified in nearly every block group within the EJ Analysis Area.  Half of the EJ Analysis Area block groups had a population of limited English-speaking households that is three percent (rounded down from 3.03 percent) or less, and half of EJ Analysis Area block groups have a population of limited English-speaking households greater than three percent (rounded down from 3.03 percent).

### b.  Free and Reduced-Price Lunch Programs

The Virginia Department of Education (VDOE 2016) and Maryland State Department of Education (MSDE 2017) provide annual data on public school student enrollment in the free and reduced-price lunch program.  Among the public schools in the EJ Analysis Area, an average of 45 percent of students use free and reduced-price lunch programs per school. Within the EJ Analysis Area, 36 schools (all located in the Maryland portion of the EJ Analysis Area) have a student population that receives free or reduced-price

---

[54] The National Capital Region Transportation Planning Board (TPB) *Methodology for Equity Emphasis Areas,* referenced tract-level Census data to identify communities that have significant concentrations of low-income and/ or minority populations. Data from the American Community Survey for each of the following four population groups is used: Low-Income, African American, Asian, and Hispanic or Latino.

00035964



lunches, which is greater than the 45 percent, the EJ Analysis Area average. All of the schools with an above-average population of students receiving a free and reduced-price lunch are in block groups already identified as minority or low-income populations. A list of the 36 public schools with an average of 45 percent or more students using free and reduced-price lunch programs is provided in the *Community Effects Assessment and Environmental Justice Analysis Technical Report* (**Appendix E, Chapter 4, Section 3.3**).

#### c. Places of Worship[55]

Additionally, to support and facilitate outreach efforts places of worship located within EJ Analysis Area Communities that contain minority or low-income populations were identified. A list of the 108 places of worship is provided in the *Community Effects Assessment and Environmental Justice Analysis Technical Report* (**Appendix E, Section 4.3.3**).

#### d. Low-Income Subsidized Housing Complexes

The HUD Multifamily Assistance & Section 8 Database, Montgomery County Housing Opportunities Commission, Prince George's County Housing Authority, and Fairfax County Redevelopment and Housing Authority were consulted to locate housing complexes with subsidized units within the EJ Analysis Area. Housing complexes are identified in their respective Community Profile[56] in *Appendix C of* the *Community Effects Assessment and Environmental Justice Analysis Technical Report* (**Appendix E**). In the EJ Analysis Area, a total of 32 housing complexes rent units at affordable, below-market rates for qualifying households. A list of the housing complexes is provided in the *Community Effects Assessment and Environmental Justice Analysis Technical Report* (**Appendix E, Section 4.3.3**).

Four of the 32 subsidized housing complexes (Timberlawn Crescent, Victory Forest Senior Apartments, St. Luke's Homes, Inc., and Pooks Hill Tower and Court Apartments) are located outside of minority or low-income populations; in the North Bethesda, Bethesda, and Forest Glen EJ Analysis Area Communities. The remaining 28 housing complexes with subsidized units are in minority or low-income populations within the EJ Analysis Area.

#### e. Food Stamps/SNAP Benefits

American Community Survey Five-Year Estimates (2012-2016) were used to collect data on households utilizing Food Stamps/SNAP benefits. The average percent of households receiving Food Stamps/SNAP benefits for the Maryland EJ Analysis Area block groups is seven percent. Of the 199 EJ Analysis Area block groups, 74 block groups have a proportion of households that receive Food Stamps/SNAP benefits above the seven percent EJ Analysis Area average. Seventy-one (71) of these block groups were identified as minority or low-income populations. The three block groups that were not identified as minority or low-income populations are located within EJ Analysis Area Communities that contain multiple minority or low-income populations.

---

[55] Geographic Information Systems (GIS) data sourced from Maryland iMap (data.imap.maryland.gov/datasets/maryland-land-use-land-cover-land-use-land-cover-2010); Prince George's County Open Data Portal (gisdata.pgplanning.org/metadata/); Montgomery County Planning Department Open Data Portal (Montgomery County Planning Department. Open Data Portal). Corresponding mailing addresses gathered using Google Search.

[56] The Community Profiles provide information for each CEA Analysis Area Community in *Appendix C* of the *Community Effects Assessment and Environmental Justice Analysis Technical Report* (Appendix E).

00035965



Draft Environmental Impact Statement

### f. Equity Emphasis Areas

The National Capital Region Transportation Planning Board (TPB) identified Equity Emphasis Areas as census tracts with higher than average concentrations of minority, low-income populations, or both. The TPB methodology used census tract data, which encompassed a larger geographic area than the census block groups referenced to identify minority or low-income populations. As a result, there are a few areas where TPB identified an entire census tract as an Equity Emphasis Area; however, individual census block groups within the EJ Analysis Area did not contain higher than average concentrations of minority populations or low-income populations. Similarly, there were census tracts that TPB did not identified as Equity Emphasis Areas; however, block groups within the EJ Analysis Area were identified as minority or low-income populations for this analysis.

### g. MDOT SHA Voluntary Demographic Survey

It is MDOT SHA policy to offer a demographic survey to voluntarily complete for attendees of MDOT SHA public meetings. Attendees at the April 11, 23, 24, 2019 and November 13 and 21, 2019 Public Workshops completed the survey and provided the demographic information shown in **Table 4-35**. Note that, due to the voluntary nature of the survey and the small sample size, the results of the survey may not accurately represent the demographics of all the Public Workshop attendees.

**Table 4-35: Voluntary Demographic Survey Results**

| Demographic Information* | Number of Attendees |
|---|---|
| **Race** | |
| Asian | 1 |
| Black or African American | 3 |
| Hispanic or Latino | 3 |
| White | 48 |
| **Sex** | |
| Female | 21 |
| Male | 23 |
| Not Answered | 12 |
| **Age Bracket** | |
| 65+ | 24 |
| 41-65 | 27 |
| 18-40 | 4 |
| Not Answered | |
| **Disability with Reasonable Accommodation** | |
| N/A | 37 |
| Not Answered | 10 |
| Yes | 3 |
| Conditional Yes | 1 |
| No | 7 |
| **Other Language Spoken** | |
| ASL | 2 |
| Not Answered | 24 |

00035966

| Demographic Information[*] | Number of Attendees |
|---|---|
| No | 14 |
| Spanish | 1 |
| French | 1 |
| Lithuanian | 1 |
| N/A | 2 |

Note: Categories listed here reflect categories checked by the attendees and do not necessarily include all survey question options. Associated comments, where provided on the surveys, are not included here.

The review of the above additional data confirmed that minority and low-income populations previously identified correspond with the locations of limited English-Speaking households, low-income subsidized housing, households receiving Food Stamps/SNAP benefits, and students receiving free and reduced-price lunches. Further, block groups identified as minority and low-income populations are located within census tracts that were identified as Equity Emphasis Areas.

### D. Summary of the Existing Conditions of Environmental Justice Populations

Based on the methodology described in **Section 4.21.2**, there are a total of 111 block groups identified as EJ populations within the EJ Analysis Area. The 111 EJ Analysis Area block groups ("EJ populations") are shown above in **Figure 4-15** and listed in the *Community Effects Assessment and Environmental Justice Analysis Technical Report* (**Appendix E, Sections 4.3.1 and 4.3.2**).

### 4.21.4 Public Outreach with Environmental Justice Populations

Providing full and fair access to meaningful involvement by low-income and minority populations in project planning and development is an important aspect of EJ. Meaningful involvement means the Lead Agencies invite participation from populations typically underrepresented, throughout all the project stages. It is important to engage and advise EJ populations of the project development steps and consider their feedback. Residents are an important source for local history, special sites, and unusual traffic, pedestrian or employment patterns relevant to the project. This information is used in the design and evaluation of alternatives, to avoid negative impacts to valued sites, and to support the development of safe, practical, and attractive transportation options that are responsive to the EJ population's needs. Due to the highly diverse demographics composing the population adjacent to and using the study corridors, much of the corridor-wide public involvement efforts conducted for the Study were aimed at reaching this socioeconomically diverse audience. This section summarizes the public involvement efforts conducted in EJ populations, as well as additional efforts to notify traditionally underserved populations. Additional detail on the public involvement efforts presented here is provided in the *Public Involvement and Agency Coordination Technical Report* (**Appendix P**).

#### A. Study Corridor-Wide Public Involvement Efforts

Beginning with the initiation of the Study in March 2018, public involvement efforts have included comprehensive outreach through Public Open Houses/Workshops, Community Association meetings, stakeholder meetings, community pop-up events, updates via website and email, and solicitation of public comments. Outreach events were held or attended in EJ Analysis Area Communities that contain one or more EJ populations, in locations adjacent to EJ populations, or at events generally serving EJ populations in the EJ Analysis Area. These public involvement efforts are shown in **Table 4-36**.

00035967

Draft Environmental Impact Statement

**Table 4-36: Public Involvement Efforts in or near EJ Populations**

| EJ Analysis Area Community[1]/ General EJ Population | Date | Outreach Type | Event/ Organization/ Location | Number of Attendees |
|---|---|---|---|---|
| Summerfield, Lake Arbor, Glenarden, and Landover EJ Analysis Area Communities | April 23, 2018 | Community Association Meeting during Scoping | Greater 202 Coalition St. Margaret's Catholic Church 410 Addison Road South, Capitol Heights, MD 20743 | Approx. 50 |
| General EJ Population throughout EJ Analysis Area | August 5, 2018 | Pop-Up Informational Booth | 9th Annual Salvadoran American Festival/7th Annual Latino Health Fair Montgomery College Rockville Campus, Rockville, MD 20850 | 120 |
| General EJ Population throughout EJ Analysis Area | August 7, 2018 | Pop-Up Informational Booth | National Night Out Against Crime Heurich Park 2800 Nicholson Street Hyattsville, MD 20782 | 105 |
| Greenbelt EJ Analysis Area Community | April 24, 2018 | Public Scoping Open House | Eleanor Roosevelt High School 7601 Hanover Parkway, Greenbelt, MD 20770 | 56 |
| | July 17, 2018 | Preliminary Alternatives Public Workshop | | 130 |
| | April 23, 2019 | ARDS Public Workshop | | 99 |
| College Park EJ Analysis Area Community | January 30, 2019 | Stakeholder Meeting | Four Cities Meeting (College Park, Berwyn Heights, Greenbelt, New Carrollton) | - |
| Gaithersburg EJ Analysis Area Community | April 8, 2019 | Legislative/Elected Officials Briefing | Gaithersburg Mayor and Council City Hall, 31 S Summit Ave Gaithersburg, MD 20877 | 6 |
| Landover and Summerfield EJ Analysis Area Communities | April 11, 2019 | ARDS Public Workshop | Prince George's Sports & Learning Complex 8001 Sheriff Rd Landover, MD 20785 | 48 |
| Silver Spring EJ Analysis Area Community | April 24, 2019 | ARDS Public Workshop | Eastern Middle School 300 University Blvd E Silver Spring, MD 20901 | 377 |
| Marlow Heights, Camp Springs, and Forestville EJ Analysis Area Communities | April 27, 2019 | ARDS Public Workshop | Suitland Community Center 5600 Regency Ln, Forestville, MD 20747 | 23 |
| Marlow Heights and Temple Hills EJ Analysis Area Communities | May 14, 2019 | ARDS Public Workshop | Oxon Hill High School 6701 Leyte Drive Oxon Hill, MD 20745 | 26 |

00035968

Draft Environmental Impact Statement



| EJ Analysis Area Community[1]/ General EJ Population | Date | Outreach Type | Event/ Organization/ Location | Number of Attendees |
|---|---|---|---|---|
| Glenarden EJ Analysis Area Community | May 23, 2019 | Legislative/Elected Officials Briefing | City of Glenarden Councilmembers | 18 |
| College Park EJ Analysis Area Community | June 4, 2019 | Stakeholder Meeting | Four Cities Meeting (College Park, Berwyn Heights, Greenbelt, New Carrollton) | - |
| College Park EJ Analysis Area Community | June 13, 2019 | Community Association Meeting | North College Park Citizens' Association | 53 |
| General EJ Population throughout EJ Analysis Area | June 13, 2019 | Stakeholder Meeting | Montgomery County Hispanic Chamber 12276 Rockville Pike, Rockville, MD 20852 | 2 |
| Glenarden EJ Analysis Area Community | June 17, 2019 | Residents' Meeting | City of Glenarden Residents | 80 |
| Gaithersburg EJ Analysis Area Community | June 30, 2019 | Pop-Up Informational Booth | SummerFest 506 South Frederick Ave., Gaithersburg, MD 20877 | 200 |
| Lake Arbor EJ Analysis Area Community | July 13, 2019 | Pop-Up Informational Booth | Lake Arbor Community Center 10100 Lark Arbor Way, Mitchellville, MD 20721 | 300 |
| Gaithersburg and Rockville EJ Analysis Area Communities | July 26, 2019 | Legislative/Elected Officials Briefing | Del. Kumar Barve, District 17 Montgomery County 150 Gibbs St, Rockville, MD 20850 | 1 |
| Forestville EJ Analysis Area Community | July 31, 2019 | Large Landowner Meeting | Calvary Lutheran Evangelical Church 9545 Georgia Ave Silver Spring, MD 20910 | 9 |
| General EJ Population throughout EJ Analysis Area | August 15, 2019 | Stakeholder Meeting | Hispanic Chamber of Commerce Montgomery County 11001 Veirs Mill Rd, Silver Spring, MD 20902 | 25 |
| Gaithersburg EJ Analysis Area Community/ General EJ Population throughout EJ Analysis Area | August 9-17, 2019 | Pop-Up Informational Booth | Montgomery County Agricultural Fair 501 Perry Pkwy., Gaithersburg, MD 20877 | 286 |
| Forestville EJ Analysis Area Community | September 6, 2019 | Large Landowner Meeting | Jabbok Ministries 7819 Parston Dr Forestville, MD 20747 | 6 |
| General EJ Population throughout EJ Analysis Area | September 5-8, 2019 | Pop-Up Informational Booth | Prince George's County Fair 14900 Pennsylvania Avenue, Upper Marlboro, MD 20772 | 134 |
| Rockville EJ Analysis Area Community | October 3, 2019 | Large Landowner Meeting | First Baptist Church 55 Adclare Rd Rockville, MD 20850 | 10 |
| Gaithersburg and Rockville EJ Analysis Area Communities | October 10, 2019 | Legislative/Elected Officials Briefing | Del. Julie Palakovich-Carr, District 17 Montgomery County | 1 |

00035969



| EJ Analysis Area Community[1]/ General EJ Population | Date | Outreach Type | Event/ Organization/ Location | Number of Attendees |
|---|---|---|---|---|
| | | | 225 N Washington St, Rockville, MD 20850 | |
| General EJ Population throughout EJ Analysis Area | October 17, 2019 | Stakeholder Meeting | Maryland Hispanic Chamber of Commerce 11 W Mt Vernon Pl, Baltimore, MD 21201 | 35 |
| New Carrollton EJ Analysis Area Community | November 9, 2019 | Community Association Meeting | 295 Coalition Meeting New Carrollton Library, 7414 Riverdale Rd., New Carrollton, MD 20784 | 30 |
| General EJ Population throughout EJ Analysis Area | November 14, 2019 | Stakeholder Meeting | Maryland Black Chamber of Commerce 8630 Fenton Street, Plaza 5, Silver Spring, MD 20910 | 2 |
| General EJ Population throughout EJ Analysis Area | December 4, 2019 | Legislative/Elected Officials Briefing | Montgomery County Minority Legislative Breakfast Event 5151 Pooks Hill Rd, Bethesda, MD 20814 | 300 |
| Gaithersburg and Rockville EJ Analysis Area Communities | December 10, 2019 | Legislative/Elected Officials Briefing | Sen. Cheryl Kagan, District 17 Montgomery County 225 N Washington St, Rockville, MD 20850 | 1 |
| General EJ Population throughout EJ Analysis Area | February 26, 2020 | Stakeholder Meeting | Asian American Chamber of Commerce 1801 Rockville Pike, Rockville, MD 20852 | 25 |
| General EJ Population throughout EJ Analysis Area | March 4, 2020 | Stakeholder Meeting | Maryland Black Chamber of Commerce 8630 Fenton Street, Plaza 5, Silver Spring, MD 20910 | 2 |
| Gaithersburg and Rockville EJ Analysis Area Communities | April 6, 2020 | Legislative/Elected Officials Briefing | Montgomery County District 17 Legislative Town Hall (Conference Call) | 75 |

Note: [1] Identifies the community containing EJ populations in which the event either occurs directly, is adjacent to, or is outside of but in whose community EJ populations are served.

Public outreach events were accessible by public transit, such as the Suitland Metro Station near the Suitland Community Center and the Greenbelt Road/Frankfort Drive bus station near Eleanor Roosevelt High School. All Public Open House/Workshop venues were accessible by Americans with Disabilities Act (ADA) standards; each Public Open House/Workshop and several pop-up events featured an American Sign Language interpreter. As shown in **Table 4-36**, pop-up informational booths were staffed at the Annual Salvadoran American Festival/7th Annual Latino Health Fair at Montgomery College (August 5, 2018), and the National Night Out Against Crime at Hyattsville's Heurich Park (August 7, 2018 and August 6, 2019). A Spanish interpreter was available at the Annual Salvadoran American Festival/7th Annual Latino Health Fair, and Spanish and English outreach materials were provided at both events.

00035970



Advertisement campaigns for Public Open Houses/Workshops included a variety of outreach methods. Digital outreach included P3 Program website announcements, e-mail blasts, social media posts, downloadable newsletters, and digital newspapers. Print outreach included local/regional newspaper advertisements, newspaper inserts, postcards, and mailed newsletters. Advertisements were featured in print and online newspapers whose local/regional readership includes EJ populations in the EJ Analysis Area as well as those whose primary audiences are of minority races/ethnicities and are considered traditionally underserved (Tiempo Latino, Washington Hispanic, Prince George's Sentinel, Afro.com, and DCBlack.com). Additionally, a newspaper insert was distributed in the Washington Post's Local Living Section to over 690,000 regional subscribers and non-subscribers, also including EJ populations. Radio outreach for the Alternatives Retained for Detailed Study (ARDS) Public Workshops included "traffic sponsorships" on 14 regional radio stations whose local/regional audiences also broadly encompass EJ populations in the EJ Analysis Area.

Multi-lingual meeting materials for the Public Open Houses/Workshops were provided by request; requests were made for Amharic, Spanish, and Chinese language materials. Each Public Open House/Workshop and several pop-up events featured a Spanish-language interpreter. Newspaper inserts and postcards stated that Amharic, Vietnamese, Spanish, and Chinese language materials could be requested in each respective language. Spanish-language "Stay Connected" cards were distributed at engagement events, and Spanish-language meeting materials, including display boards and Public Workshop handouts, were made available on the P3 Program website. The website also features Google Translate capabilities.

Additional detail on the public involvement efforts presented here is provided in the *Public Involvement and Agency Coordination Technical Report* **(Appendix P)**.

### B. Coordinated Local Outreach and Demonstrated Engagement of Traditionally Underrepresented Populations

Based on initial low attendance at Prince George's County events and receipt of fewer public comments compared to Montgomery County, MDOT SHA reached out to the M-NCPPC Prince George's County Planning Department to enhance local engagement during the ARDS Public Workshop outreach campaign. Coordinated local outreach efforts included, but were not limited to:

- M-NCPPC Prince George's County Planning Department distribution of the Public Workshops' announcement flyer via Office of Municipalities' community outreach database for display at 45 County community centers (March 14, 2019);
- M-NCPPC Prince George's County Planning Department distribution of the Public Workshops' announcement flyer via WMATA Office of Communications for their community update posting (March 29, 2019);
- M-NCPPC Prince George's County Planning Department forwarding of study e-mail blasts to their Community Association database and Office of Planning database (e-mail blasts distributed on March 7, April 10, May 8, June 10, 2019);
- Prince George's County Department of Public Works and Transportation distribution of Public Workshops' announcement flyer through email blast; and
- Distribution of Public Workshops' announcement flyer to several large places of worship along the study corridor (on and after March 14, 2019), including First Baptist Church of Glenarden, the

00035971



Collective Empowerment Group (an umbrella group for more than 300 churches in the County), Prince George's County Liaison for Faith Connections/Relationship Building, People's Community Baptist Church, Sanctuary at Kingdom Square, and the Transforming Neighborhoods Initiative.[57]

While study awareness, meeting attendance, and the volume of comments received was consistently strong in Montgomery County; additional outreach was conducted that included distribution of the Public Workshops' announcement flyer through the Montgomery County Department of Transportation email blasts.

To enhance engagement of the Study's identified EJ populations and other underserved populations, and consistent with recommendations in NCHRP Report 710, *Practical Approaches for Involving Traditionally Underserved Populations in Transportation Decisionmaking*, demographic data was used to identify locations for targeted mailing outreach. These locations included EJ Analysis Area schools with above-average participation in the Free and Reduced-price Meals Program;[58] places of worship[59] in EJ Analysis Area Communities containing EJ populations; and all affordable-housing complexes[60] in the EJ Analysis Area.

In early April 2019, an introductory cover letter asking recipients to display an enclosed Public Workshops' announcement flyer wherever community information is displayed was mailed to the 174 affordable-housing complexes, schools, and places of worship listed in the *Community Effects Assessment and Environmental Justice Analysis Technical Report*, **Appendix E, Section 4.2**. English and Spanish versions of the flyer were included with the cover letter.

### C.  Public Comments with Socioeconomic Themes

Public input on the I-495 and I-270 Managed Lanes Study has been solicited continually since the initiation of the Study in March 2018. Over 3,900 comments have been received via postal mail, e-mail, the website comment form, hard copy comment forms at Public Workshops, and oral testimony. Comments specifically from EJ populations cannot be identified as commenters do not submit race/ethnicity or income status with their submissions. However, the following socioeconomic-related statements, questions, or suggestions raised by some commenters may be broadly considered as relevant to Environmental Justice principles: concerns that toll pricing could have a negative impact on low-income users; concerns about the potential financial impact of tolls on households, particularly lower/middle-income; general commentary on toll affordability and wealth; the socioeconomic status of I-495 and I-270

---

[57] The Transforming Neighborhoods Initiative was an effort by Prince George's County to provide additional services and resources to six underserved communities within the County.

[58] The MDOT SHA Office of Equal Opportunity collects public feedback surveys to ensure compliance with Title VI of the Civil Rights Act of 1964. Maryland State Department of Education (*Free and Reduced-Price Meal Statistics for School Year 2017-2018*. http://marylandpublicschools.org/programs/pages/school-community-nutrition/freereducedpricemealstatistics.aspx).

[59] Geographic Information Systems (GIS) data sourced from Maryland iMap (data.imap.maryland.gov/datasets/maryland-land-use-land-cover-land-use-land-cover-2010); Prince George's County Open Data Portal (gisdata.pgplanning.org/metadata/); Montgomery County Planning Department Open Data Portal (Montgomery County Planning Department. Open Data Portal). Corresponding mailing addresses gathered using Google Search.

[60] Sourced from Housing and Urban Development Multifamily Assistance & Section 8 Database, Montgomery County Housing Opportunities Commission, Prince George's County Housing Authority, and Fairfax County Redevelopment and Housing Authority websites. Corresponding mailing addresses gathered using Google Search.

00035972



highway corridor users; and support for mass transit transportation improvements either in combination with the proposed Build Alternatives or instead of the proposed Build Alternatives.

Additional detail on the comment themes discussed here is provided in the *Scoping Report, Summary of July 2018 Alternatives Public Workshops, and Summary of Public and Stakeholder Engagement for the Recommended ARDS*, available for download on the Study website (https://495-270-p3.com/your-participation/past-public-outreach/). An overview of other comment themes received during the Study is provided in the *Public Involvement and Agency Coordination Technical Report* **(Appendix P)**.

### 4.21.5 Identification of Beneficial and Adverse Effects to Environmental Justice Populations

Both beneficial and adverse effects to the existing conditions of EJ populations are considered in this EJ Analysis. Effects described in this section include physical impacts to and relocations of existing private property, including community facility property, as well as physical impacts to transportation right-of-way. Per FHWA EJ Order 6640.23A, consideration is also given to effects on the following environmental characteristics: human health and safety; air quality; noise/vibration; water quality; hazardous materials; natural resources; visual landscape and aesthetic values; economy and employment; access and mobility; community cohesion/isolation and quality of life; and tolling considerations.

### A. No Build Alternative

The No Build Alternative would not result in any study-related construction and therefore no right-of-way or property acquisitions are required; no direct impacts would occur in EJ populations. Increased traffic congestion under the No Build Alternative would contribute to increased overflow congestion on the local road network. As a result, the No Build Alternative would result in increased response times for emergency services and increased travel times to community facilities, especially during peak travel periods.

Existing congestion on I-495 and I-270 occur for periods of ten to seven hours per day, respectively. Re-occurring congestion results in vehicles idling for extended periods which can increase emissions and impact air quality. The No Build Alternative would not address the existing congestion experienced along the study corridors.

### B. The Build Alternatives

The Build Alternatives would, to varying degrees, provide improvements as outlined by the Study Purpose and Need. The impacts of the Build Alternatives to EJ populations are presented in this section. As shown in **Table 4-37**, the Build Alternatives would convert between 163.3 and 313.3 acres of right-of-way from properties in EJ populations adjacent to the existing I-495 and I-270 roadway alignments. The conversion of land would be mostly sliver takes along existing interstate systems.

#### Table 4-37: Right-of-Way Requirements in EJ Populations

| Build Alternative | Right-of-Way Required (acres) |
|---|---|
| Alternative 5[1] | 163.3 |
| Alternatives 8 and 9[2] | 182.9 |
| Alternative 9M | 313.3 |
| Alternative 10 | 185.0 |
| Alternative 13B | 182.0 |
| Alternative 13C | 184.0 |

00035973



Notes: ¹MDOT SHA and FHWA determined Alternative 5 is not a reasonable alternative, but it is included in the DEIS for comparison purposes only. ² Alternatives 8 and 9 have the same limits of disturbance footprint and therefore have the same impacts.

Each of the Build Alternatives would result in the relocation of four businesses, one of which is located in the Glenarden EJ Analysis Area Community, an EJ population. Alternative 9M would result in 25 residential relocations, seven of which are located in the Silver Spring EJ Analysis Area Community, an EJ population. Alternatives 8, 9, 10, 13B and 13C would result in 34 residential relocations, eight of which are also located in the Silver Spring EJ Analysis Area Community. Impacted properties under the Build Alternatives are shown on the *Environmental Resource Mapping* (**Appendix D**). None of the 32 housing complexes in the EJ Analysis Area with subsidized units would experience relocation.

Community facility properties within EJ populations would be impacted by partial property acquisition (generally, sliver impacts along property lines), including (depending on the Build Alternative): 11 to 12 places of worship, three schools, one higher education facility, one to two postal facilities, one police station, two recreation centers, and 15 to 16 parks. No community facilities would be relocated. However, impacts at one recreational facility located adjacent to I-495 in the Silver Spring EJ Analysis Area Community would include the outdoor and indoor pools; further information on impacts to this facility is provided in the *Community Effects Assessment and Environmental Justice Analysis Technical Report*, **Appendix E**, **Section 3.5.2**.

Additionally, preliminary archeological research has identified two potentially historic cemeteries whose sites are located within the Build Alternatives' LOD and may be cultural significant: the Moses Hall Cemetery (Cabin John EJ Analysis Area Community) and the Montgomery County Poor Farm Cemetery (Rockville EJ Analysis Area Community). Further archaeological investigations will be included in development of the Programmatic Agreement; additional information is provided in the *Volume 4* of the *Cultural Resources Technical Report*, (**Appendix G**). MDOT SHA will work to avoid and minimize impacts. MDOT SHA will continue to coordinate with affected communities and the Friends of Moses Hall, which includes some descendant families of those buried in the cemetery, on treatment of human remains should avoidance not be possible.

Other environmental characteristics within EJ populations would experience effects from the Build Alternatives. The nature of most of these characteristics makes it difficult to precisely quantify effects at the block group-level. The effects within EJ populations are described qualitatively for each environmental characteristic below.

### a. Human Health and Safety

When traffic speeds and flow are optimized, less idling occurs; thereby reducing excessive emissions. As the No Build Alternative would not address traffic speed and flow, excessive emissions would not be expected to be reduced under the No Build Alternative. The Build Alternatives would address congestion on two of the most heavily traveled highways in the region. Implementation of any of these would, to varying degrees, reduce emissions through the corridor, as documented in the *Air Quality Technical Report* (**Appendix I**). The Build Alternatives would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and Federal regulation. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour

00035974



network. Existing pedestrian and bicycle facilities impacted by the Build Alternatives would be replaced in-kind, at a minimum, regardless of the alternative and would be coordinated with the counties and local jurisdictions. Additional capacity on I-495 and I-270 would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. Further, by providing additional travel choices, the Build Alternatives are expected to reduce congestion on the mainline and local roadways networks, allowing for more reliable travel times for all users, including emergency responders, as documented in the *Alternatives Technical Report* (**Appendix B**). In summary, the Build Alternatives would result in a reduction in emissions and congestion while improving emergency response access, increasing travel choice, and providing reliable travel times; resulting in a benefit to human health and safety throughout the study corridors. Human health and safety impacts and benefits would be borne throughout the study corridors in both EJ populations and non-EJ populations.

**b. Air Quality**

As stated above, when traffic speeds and flow are optimized, less idling occurs; thereby reducing excessive emissions. As the No Build Alternative would not address traffic speed and flow, excessive emissions would not expect to be reduced under the No Build Alternative.

As documented in the *Air Quality Technical Report* (**Appendix I**), the Build Alternatives are not predicted to cause or exacerbate a violation of the NAAQS or measurably increase regional emission burdens or MSATs levels. The Build Alternatives would address congestion on two of the most heavily traveled highways in the region. As a result, the Build Alternatives are not predicted to increase emission burdens compared to the No Build Alternative in 2040, aside from a slight increase in GHG emissions; nor cause or contribute to a violation of the NAAQS, no long-term or regional air quality impacts are anticipated, and no mitigation measures are warranted.

As the project's construction is not anticipated to last more than five years in any single location, construction-related effects of the project would be limited to short-term increased fugitive dust and mobile-source emissions during construction. State and local regulations regarding dust control and other air quality emission reduction controls would be followed.

**c. Noise**

The *Noise Analysis Technical Report* (**Appendix J**) found that Build Alternatives would increase traffic noise in communities adjacent to the proposed limits of disturbance throughout the corridor. Where noise barriers already exist, they would be replaced, as needed. In accordance with Federal regulation (23 CFR 772) and the MDOT SHA *Highway Noise Policy*, approved by FHWA, noise abatement is being investigated at all noise sensitive areas (NSAs) where the traffic noise levels would approach or exceed the FHWA noise abatement criteria (NAC) for the defined land use category. The study area was divided into 133 noise sensitive areas in accordance with the MDOT SHA and FHWA noise policies and guidance. Geographically, 92 of the noise sensitive areas (NSAs) are located along I-495, 37 are located along I-270, and four are located along I-95 and MD 295 adjacent to the respective interchanges with I-495.  The NSAs are comprised of areas that have different land use activity categories which have been combined into a single NSA.  Federal regulation (23 CFR 772) and the MDOT SHA *Highway Noise Policy* require that noise abatement be investigated at all NSAs where the Build traffic noise levels approach or exceed the FHWA

00035975

Noise Abatement Criteria (NAC) for the defined land use category.   Where noise abatement was warranted for consideration, it was examined to determine if the abatement is feasible and reasonable.

The following is a summary of the proposed feasible and reasonable noise barrier systems under the Build Alternatives and their NSA locations relative to EJ populations:

- Of the seven NSAs where the existing noise barrier would remain in place as currently constructed, five are located in EJ populations;
- Of the 42 NSAs where the existing noise barrier would be displaced by construction and replaced by a reconstructed barrier, 24 are located in EJ populations;
- Of the 19 NSAs where the existing noise barrier would be reconstructed and extended, eight are located in EJ populations;
- Of the 23 NSAs where there is currently not an existing noise barrier and a new barrier would be constructed, 10 are located in EJ populations;

Noise barrier systems are considered not feasible and reasonable[61] based on the MDOT SHA Highway Noise Policy in 17 NSAs, 9 of which are located in EJ populations.

Refer to the *Noise Analysis Technical Report* (**Appendix J**) for the locations of the proposed noise barriers.

**d.   Water Quality**

As documented in the *Natural Resources Technical Report* (**Appendix L**), the Build Alternatives would result in additional impervious surface to accommodate additional lanes throughout the study corridors. Public drinking water within the EJ Analysis Area is supplied through the Occoquan Reservoir, Potomac River, and Patuxent River. Potential impacts to water quality, including public drinking water sources, would be mitigated via stormwater management measures in accordance with appropriate Federal and state stormwater management regulations. The impacts and benefits from stormwater management would be borne throughout the study corridors in both EJ populations and non-EJ populations.

**e.   Hazardous Materials**

Construction of any of the Build Alternatives would require disturbance of existing soil conditions, including identified hazardous materials sites of concern as documented in the *Hazardous Materials Technical Report* (**Appendix K**). Prior to acquisition of right-of-way and construction, Preliminary Site Investigations (PSIs) would be conducted to further investigate properties within the final limits of disturbance and vicinity that have a high potential for mobilization of hazardous materials as a result of construction activities.

**f.   Natural Resources**

As documented in the *Natural Resources Technical Report* (**Appendix L**), the Build Alternatives would impact: soils, wetlands and waters, floodplains, vegetation and terrestrial habitats, and wildlife. Efforts to mitigate for these impacts would include development and implementation of an Erosion and Sediment

---

[61] Feasible and reasonable criteria are determined in accordance with MDOT SHA policy. The assessment of noise abatement feasibility, in general, focuses on whether it is physically possible to build an abatement measure (i.e., noise barrier) that achieves a  minimally acceptable level of noise abatement reasonableness, in general, focuses on whether it is practical to build an abatement measure. Barrier reasonable ness considers three primary factors: viewpoints, design goal, and cost effectiveness.

00035976



Control Plan, water resource mitigation, and the replacement of impacted trees and habitat to the extent possible with priority replacement on-site near the impacted area.

**g.  Visual Landscape and Aesthetic Values**

The Build Alternatives would result in changes to viewsheds or visual impacts within the EJ Analysis Area. The construction of managed lanes, shoulders, traffic barrier, cut and fill slopes, stormwater management facilities, retaining walls, and noise walls along the existing highway corridor would not introduce new elements incompatible with the existing visual character or qualities along the study corridors. However, where managed lanes access ramps be constructed, new interchange ramps and structures may be introduced that could impact the viewsheds of adjacent properties and communities. The locations or design of these elements have not been finalized.  The design of all highway elements would follow aesthetic and landscaping guidelines that will be developed in consultation with the design team, local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state and Federal agencies.

**h.  Economy and Employment**

Except where right-of-way acquisitions would result in business property relocation, the Build Alternatives would not impact access to area businesses or employers.  Within EJ populations, one business, a warehouse/office property in the Glenarden EJ Analysis Area Community, is anticipated to require relocation.  Similar services exist and facilities and properties are available for the relocation of these services if business owners choose to relocate.  There would be no overall impact to the distribution of worker occupation, or major employers within EJ populations or non-EJ populations within the EJ Analysis Area.

Proposed improvements would help address increasing congestion, thereby maintaining mobility throughout the region, including areas with EJ populations.

Additionally, through Opportunity MDOT Program the agency will provide resources for job seekers as well as small, minority-, women- and veteran-owned businesses and disadvantaged businesses to access training, advisory services and advanced industry resources to prepare for potential opportunities to work with MDOT and the I-495 & I-270 P3 Program.

**i.  Access and Mobility**

The No Build Alternative would not provide reduced congestion, enhanced trip reliability, or travel choices to destination points within the region, thereby reducing access and mobility conditions along the study corridors.

For each of the Build Alternatives, traffic, access, and mobility would be maintained during construction in compliance with MDOT SHA Work Zone Safety and Mobility requirements. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network.  Existing pedestrian and bicycle facilities impacted by the Build Alternatives would be replaced in-kind, at a minimum, regardless of the alternative and would be coordinate with the counties and local jurisdictions.  The Build Alternatives would not eliminate access, nor would they impede access between residences and community facilities and business.  However, an

00035977



incremental enhancement to access may occur due to reduced congestion on local routes. Additionally, bus transit systems could utilize I-495 and I-270 managed lanes implemented under the Build Alternatives.

**j.    Community Cohesion/Isolation and Quality of Life**

Under the Build Alternatives, changes to community cohesion would occur from the loss of 25 or 34 residences and four businesses. This would include the loss of seven or eight residences in two EJ populations in the Silver Spring EJ Analysis Area Community and the loss of one business in an EJ population within the Glenarden EJ Analysis Area Community. Additionally, partial property acquisition for right-of-way would occur throughout the study corridors. Generally, these would include acquiring strips of land from undeveloped areas or areas of trees from properties adjacent to I-495 or I-270, resulting in a reduction of the overall property size. However, impacts by relocation or partial property acquisition would be limited to the individuals immediately affected by the property acquisition and would occur in areas bordering the existing highway rights-of-way due to the generally parallel nature of the limits of disturbance of the Build Alternatives along the study corridors.

Changes to land use and development would be limited to those properties affected by property acquisition. Residents and employees who live, work, and utilize services immediately adjacent to the study corridors may experience changes in current quality of life due to property acquisition and temporarily during construction activities. However, community residents would experience a benefit to quality of life due to reduced congestion along the study corridors and enhanced trip reliability and travel choices to destination points within the region.

**k.    Tolling Considerations**

The FHWA's, *Impacts of Congestion Pricing on Low-Income Populations* (FHWA 2017), explains that the impacts of congestion pricing on low-income populations vary widely by context and type of project (i.e., full facility tolling or partial facility tolling). In the tolled managed-lanes scenario, new travel choice becomes available for all users and additional network capacity is provided. According to FHWA, well planned congestion pricing schemes:

- "Increase transportation options for all commuters, including low-income commuters, to achieve relatively congestion-free travel on specific occasions.
- Demonstrate wide acceptance and usage of priced-managed facilities by low-income commuters.
- Demonstrate that low-income commuters, many of whom are transit riders, particularly benefit from reduced congestion and transit investments made from pricing revenues (FHWA 2017)."

Consistent with FHWA guidance, while the travel speed and trip reliability benefits offered by the tolled lanes could be a less feasible choice for EJ populations due to cost burden, under any of the managed lane alternatives, all existing GP lanes would remain toll-free and would undergo some travel time improvements. Traffic analysis conducted in support of the Study indicates that travel times would improve and congestion would decrease along GP lanes under each of the Build Alternatives. MDOT currently provides the following in managed lanes throughout the state:

- Free transponders for all customers
- Prepaid cash/check payment options at MDTA walk-in centers, including four MVA's and six MDTA facilities

00035978

- Allowing multiple payment methods, including credit card, cash, check or money order
- Funding alternative modes of transportation through commuter programs such as Commuter Choice Maryland, Guaranteed Ride Home, and Maryland Rideshare
- Providing more than 100 park-n-ride locations throughout the state
- Minimum prepaid balances sized to reduce the chance of users violating account minimums

All electronic tolling (AET) methods would be enlisted to collect tolls for the managed lanes under each of the Build Alternatives. Tolls would be set using dynamic pricing, based on a tolling algorithm that would correlate the traffic volumes and demands with the toll rate. The toll rate caps, or upper and lower thresholds for tolls, would be set through a public process by the Maryland Transportation Authority in accordance with COMAR 11.07.05. Additionally, COMAR 11.07.05. requires public notice of toll schedule revisions. The advantage of using dynamic pricing is that it enables the managed lanes to maintain a 45-MPH speed at all times and would reduce congestion in the GP lanes, which results in benefits for all users of the roadway facilities. GP lanes would remain free for users under all Build Alternatives. In addition, under Build Alternatives 9, 9M, and 13B all HOV +3 users would be able to travel toll-free.

## C. The Potential for Adverse Effects to Environmental Justice Populations

As described above, both beneficial and adverse effects to EJ populations would occur from the Build Alternatives. The potential for adverse effects to EJ populations is summarized in **Table 4-38**.

**Table 4-38: Potential for Adverse Effects to Environmental Resources within EJ Populations**

| No Build | Alt. 5[1] | Alts. 8 & 9[2] | Alt. 9M | Alt. 10 | Alt. 13B | Alt. 13C |
|---|---|---|---|---|---|---|
| **Right-of-Way Requirements and Property Relocations within EJ Populations** | | | | | | |
| No | Yes (163.3 acres) (8 relocations) | Yes (182.9 acres) (9 relocations) | Yes (313.3 acres) (29 relocations) | Yes (185.0 acres) (9 relocations) | Yes (182.0 acres) (9 relocations) | Yes (184.0 acres) (9 relocations) |
| **Impacted Community Facility Properties[3] within EJ Populations** | | | | | | |
| No | Yes (19 properties) | Yes (20 properties) | Yes (20 properties) | Yes (21 properties) | Yes (20 properties) | Yes (20 properties) |
| **Human Health and Safety** | | | | | | |
| Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Air Quality** | | | | | | |
| Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Noise** | | | | | | |
| No | Yes | Yes | Yes | Yes | Yes | Yes |
| **Water Quality** | | | | | | |
| No | Yes | Yes | Yes | Yes | Yes | Yes |
| **Hazardous Materials** | | | | | | |
| No | Yes | Yes | Yes | Yes | Yes | Yes |
| **Natural Resources** | | | | | | |
| No | Yes | Yes | Yes | Yes | Yes | Yes |
| **Visual and Aesthetic Resources** | | | | | | |
| No | Yes | Yes | Yes | Yes | Yes | Yes |
| **Economy and Employment** | | | | | | |
| TBD | No | No | No | No | No | No |

| Access and Mobility | | | | | | |
|---|---|---|---|---|---|---|
| Yes | No | No | No | No | No | No |
| Community Cohesion/ Isolation and Quality of Life | | | | | | |
| No | No | No | No | No | No | No |
| Tolling Considerations | | | | | | |
| No | Yes | Yes | Yes | Yes | Yes | Yes |

Notes: The potential for adverse effects to environmental resources in EJ populations, as documented in the DEIS and in other Technical Reports are described in the *Community Effects Assessment and Environmental Justice Analysis Technical Report*; Appendix E, Chapter 5 identifies the direct impacts as well as effects to environmental characteristics for the CEA Analysis Area Communities, including those containing EJ populations.

[1] MDOT SHA and FHWA determined Alternative 5 is not a reasonable alternative, but it is included in the DEIS for comparison purposes only. [2]Alternatives 8 and 9 have the same limits of disturbance footprint and therefore have the same impacts. [3]Community facility properties within EJ populations would be impacted by partial property acquisition (generally, sliver impacts along property lines). No community facilities would be relocated.

The determination of disproportionately high and adverse impacts to EJ populations will be made on the Preferred Alternative and will be disclosed in the FEIS. Measures to mitigate any disproportionately high and adverse impacts will be determined in consideration of the specific impacts to EJ populations and will be done with input from the potentially affected minority of low-income populations.  Strategies for mitigating potential adverse effects to EJ populations may consist of, but are not limited to:

- Free bus transit usage of managed lanes for faster and more reliable trip
- Direct access to existing and proposed transit stations and transit-oriented development areas within the EJ Analysis Area
- Direct access supporting transit connections in Equity Emphasis Areas
- No toll for eligible High Occupancy Vehicles (Alts 9 and 13B)
- Making cross highway pedestrian and bicycle enhancements and connections

As enumerated in **Section 4.21.2**, the next steps for the EJ Analysis, to be documented in the FEIS, include the following:

- The consideration of mitigation and enhancement measures if unavoidable adverse effects are expected to occur under the Preferred Alternative
- A comparison of adverse effects from the Preferred Alternative within EJ populations to adverse effects within a non-EJ population reference community
- A determination of whether disproportionately high and adverse effects would occur under the Preferred Alternative to EJ populations
- A final conclusion of whether disproportionately high and adverse effects would occur, based on unmitigated adverse effects and whether public feedback has been addressed.

00035980


## 4.22 Indirect and Cumulative Effects
### 4.22.1 Introduction and Methodology

This indirect and cumulative effects (ICE) assessment was conducted in accordance with MDOT SHA's current ICE guidelines (MDOT SHA, 2012) and in accordance with NEPA and its implementing regulations. The ICE analysis considers the effects discussed in this chapter on general population trends, employment trends, and general growth trends based on master plans, reports, census and geographic data, historic maps, and aerial imagery. It considers planning and forecasting documents concerning past, present,

> **Indirect effects** are caused by the action and are later in time or farther removed in distance but are still reasonably-foreseeable (40 CFR § 1508.8(b)).
>
> **Cumulative effects** are defined as impacts on the environment that result from the incremental impact of the action when added to past, present, and reasonably-foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such actions (40 CFR § 1508.7).

and future economic development; the history and origins of the proposed action and previous studies; and data reflected in previously completed NEPA documents for understanding of the potential for indirect and cumulative effects in the region.

The ICE Analysis methodology includes the following four general steps:

- Step 1: Collect data and identify resources
- Step 2: Define the ICE Analysis Boundary
- Step 3: Define the ICE time frame
- Step 4: Define the analysis approach and methodology

**Step 1:** This ICE analysis considers the resources, listed below, that could potentially experience direct or indirect impacts by the Build Alternatives:

- Socioeconomic Resources (communities, residences, businesses, parks and recreation);
- Cultural Resources (historic structures/districts and archeological sites);
- Natural Resources (surface water, wetlands, floodplains, forest, wildlife /wildlife habitat, and sensitive species); and
- Air Quality

**Step 2:** Representative sub-boundaries were identified and reviewed, for example Area of Traffic Influence, Planning Areas, and watersheds. The geographic boundary used for the ICE analysis was developed by synthesizing sub-boundaries to create a single ICE Analysis Area boundary (**Figure 4-16**) to capture the full geographic area where potential indirect and/or cumulative effects would be reasonably-foreseeable. The representative sub-boundary components can be found in the *Indirect and Cumulative Effects Technical Report* **(Appendix O, Section 2.2.2)**.

**Step 3:** The temporal boundaries, or time frame, of the ICE analysis includes setting a past and future time frame. In general, the temporal boundary is identified based on factors including data availability, relevant historical events or trends, data availability and the design year for improvements being evaluated in the EIS.

00035981

A period of 70 years, from 1970 to 2040, is the ICE time frame (or temporal boundary). The first section of I-495 was opened in 1961, and the highway was completed in 1964. The first year for which decennial census data was available after the completion of I-495 was 1970. In addition, 1970 generally coincides with the opening of I-95 between Baltimore and Washington, DC. Washington National Pike was built from 1953 to 1960 and became known as I-270 in 1975.

The future time frame of 2040 was determined based on the Study's design year, as well as the availability of data. Population and employment projections are available through 2040 from MWCOG, allowing a more accurate depiction of future conditions within the ICE Analysis Area.

**Step 4:** The ICE analysis requires an understanding of past, current and potential future conditions in the ICE analysis area in order to assess the potential for impacts associated with the range of study alternatives. Consideration of past effects included research and review of published literature, census information, and historic aerial imagery. Geographic information systems (GIS) mapping was obtained or created for the ICE Analysis Area and used to assess trends from the past to the present time frame. Resources identified within the ICE boundary are considered in light of past and present socioeconomic, cultural, and natural environmental conditions and trends. Future conditions are analyzed to compare build and no build scenarios and the resulting potential indirect and cumulative effects.

00035982

Figure 4-16: Overall ICE Analysis Area Boundary



00035983



The methodologies identified in the MDOT SHA ICE guidance were applied, including trends analysis and overlays.

- Trends analysis involves qualitative discussion of impacts to a resource over time. Past and current effects can allow for an informed projection of likely future effects.
- Overlays of present and future land use maps over the existing environmental resources allow for quantitative or qualitative description of the impacts to those resources.

Based on these methods, the ICE Analysis is designed to identify impacts to resources from other actions (past, present, and future) including indirect impacts—if any—due to each Build Alternative. Then, the potential incremental effects of the Build Alternatives are evaluated in light of the past, present, and future impacts identified. **Table 4-39** provides a brief summary of the resources, data, data sources, and analysis methodology used for identifying potential indirect and cumulative effects.

**Table 4-39: ICE Analysis Data Sources and Methodology**

| Resource | Data | Data Sources | Analysis Methodology |
|---|---|---|---|
| **Socioeconomic Resources** | | | |
| Communities (facilities, services, cohesion), residences, businesses, parks and recreation | Aerial photos, land use maps, census data, county comprehensive plans | M-NCPPC, MDP, Maryland iMap GIS, MWCOG, US Census Bureau, Montgomery County, Prince George's County, Fairfax County, Alexandria, City of Fairfax | Overlay mapping and aerial photos, analyze trends in population and housing and availability of services, examine county comprehensive plans |
| **Cultural Resources** | | | |
| Historic structures/districts and archeological sites | Historic maps and photos, land use maps, historical site records | M-NCPPC, MHT, VDHR, National Register | Overlays of land use surrounding historical sites; trend analysis |
| **Natural Resources** | | | |
| Surface Water / Floodplains | Stream mapping, aerial imagery, land use data, watershed boundaries, floodplain mapping | M-NCPPC, MDNR, MDE, VDEQ, FEMA | Overlays of land use and historical imagery, trends analysis |
| Wetlands and Aquatic Habitat | Wetlands mapping, land use and historical imagery | M-NCPPC, MDNR, VDNR, NWI | Overlays of land use and historical imagery, trends analysis |
| Forests | Land use mapping and historical imagery | M-NCPPC, MDP, VDNR | Overlays of land use and historical imagery, trends analysis |
| **Other** | | | |
| Air Quality | CLRP | NCRTPB | Regional conformity discussion |

00035984



### 4.22.2 Affected Environment

### A. Past and Present Land Use

Substantial population growth and land development has occurred in the ICE Analysis Area during the analysis time frame. Most ICE Analysis Area jurisdictions have seen substantial population growth since 1970 and are projected to have an increase in population by 2040. Most populations in the ICE Analysis Area are estimated to rise at a somewhat more modest pace compared to the prior decades, as the land uses become older and available land becomes scarcer.

MWCOG member jurisdictions include the ICE Analysis Area jurisdictions of Montgomery, Prince George's and Fairfax Counties, as well as Frederick, Charles, Arlington, Loudoun and Prince William Counties, the District of Columbia, and the many independent cities and municipalities within the region. According to the MWCOG 2016 Amended CLRP (NCRTPB, 2016), approximately 57 major roadway construction projects and 15 major transit projects are proposed in the ICE Analysis Area. According to MWCOG's Round 9.1 Cooperative Forecast, the Metropolitan Washington Region will add more than 633,000 households between 2015 and 2040, for a total of 2.6 million households. More than half of the expected household growth in the ICE Analysis Area will occur in Fairfax County, the District of Columbia, and Montgomery County. Commercial development in the MWCOG region declined by seven percent in 2017 compared to 2016 (MWCOG, 2018d). Seven of the ten largest development projects in the MWCOG region, by square footage, are located within the ICE Analysis Area.

The majority of the study corridor is located within the Potomac River drainage basin, with the eastern-most portion of the study corridor, between approximately US 50 and MD 4, falling within the Patuxent River drainage basin. The full ICE Analysis Area contains approximately 40,900 acres of wetlands according to NWI mapping and approximately 6,700 acres of FEMA's 100-year floodplains. A total of 407 nontidal wetlands and 1,061 stream segments were delineated within the corridor study boundary. More detailed descriptions of wetland resources and impacts are included in the *Natural Resources Technical Report* (**Appendix L**).

The Chesapeake Bay Land Cover GIS dataset was used to identify land cover in the full ICE Analysis Area (670,000 acres total). Forest and shrub land cover accounts for approximately 51 percent (341,700 acres) of the ICE Analysis Area, with herbaceous and impervious land cover at 25 percent (168,300 acres) and 20 percent (137,600 acres), respectively. The remaining categories account for three percent (19,400 acres) water cover and less than one percent (3,200 acres) of barren land.

Existing land use in the ICE Analysis Area includes a mix of developed residential, commercial, and institutional land uses, along with open spaces, forested areas, and relatively small areas of farmland. For the Maryland portion of the ICE Analysis Area, Land Use/Land Cover (LULC) is available for 1973, 2002, and 2010 data years from the MDP. The data suggests an overall pattern of agricultural and forest land converted into residential use between 1973 and 2010. Institutional and industrial uses rose modestly in this time frame, and other land use categories were generally stable. Land use in the Maryland portion of the ICE Analysis Area is predominantly suburban, mid to low-density residential use, with more dense areas closer to Washington, DC and becoming less intense further from the city core. Commercial, industrial, and institutional uses are generally clustered around major transportation corridors, especially interstate highways. Green spaces are generally stream valley corridors and larger parks dispersed throughout the area.

The land use data for the District of Columbia from 2005, as presented in the District of Columbia Comprehensive Plan notes the expansive city core of about four-square miles centered around the open spaces of the Federal city. The core is surrounded by an inner ring of moderate- to high-density residential and mixed-use neighborhoods. Beyond the inner ring is an outer ring of less dense development, characterized largely by single-family housing and garden apartments. However, as noted in the Comprehensive Plan, the District was almost fully developed by 1960.

The Virginia portion of the ICE Analysis Area is generally characterized by mature suburban residential land uses, with commercial and other uses focused in hubs along major transportation corridors. The land uses are denser in the areas closer to Washington, DC, becoming more suburban further away from the urban core. The Virginia portion of the ICE Analysis Area has seen a major growth in office buildings since 1970, particularly in areas close to highways, Metrorail stations, and near Washington, DC.  Residential land use accounts for 50 percent of the land use in the Fairfax County portion of the ICE Analysis Area.

### A. Future Land Use

The availability and level of detail for future land use varies depending on the planning jurisdiction. Background information on future land use is summarized below based on available plans and data by jurisdiction. County and local master plans focus on protecting existing open space and residential communities by directing future development to designated areas. There are no planned developments in the ICE Analysis Area that are dependent upon the completion of the Build Alternatives. For additional information refer to the *Indirect and Cumulative Effects Technical Report* (**Appendix O, Chapter 3, Section 3.1**).

- Montgomery County, Maryland: A review of the various land use plans in Montgomery County, indicates that the comprehensive planning documents aim to protect existing suburban residential areas along I-495, and maintain them in their current form. New growth is to be primarily focused into hubs around existing mass transit, and in more-densely-urbanized areas closer to Washington, DC.

- Prince George's County, Maryland: Future land use changes are outlined in the Growth Policy Map, included in the Prince George's Approved General Plan (M-NCPPC, 2014). The Regional Transit Districts, Employment Areas, and Local Centers are primarily focused along and inside I-495, particularly near highways and Metro lines. Most of the area between I-495 and US 301 is designated as Established Communities with pockets of Future Water and Sewer Service Areas scattered throughout. The Rural and Agricultural Areas are primarily east of US 301, along with several large areas near the northern and southern boundaries of the County. This overall distribution indicates that new growth will be focused primarily around major transit hubs and highways, along with infill development in existing residential communities.

- Frederick County, Maryland: The 2010 comprehensive plan policy is to direct future land use growth in the vicinity of existing population centers and highway infrastructure, particularly near Frederick and along I-270 in the ICE Analysis Area.

- Fairfax County, Virginia: The 2017 county plan also calls for the creation of community-focused, mixed-use centers with a compatible mix of housing, commercial, institutional/public services, and recreation uses. These are encouraged within the established urban centers such as Tysons

00035986


Corner, primarily located along major highways in the County, and focused mostly closer to Arlington and Washington, DC.

- Arlington County, Virginia: The 2016 comprehensive plan calls for retention of the predominant residential character of the County, and limitation of intense development to defined areas (Arlington County, 2016). In particular, it calls for concentrating high-density development within the Rosslyn-Ballston and Jefferson Davis Metrorail Transit Corridors.

- District of Columbia: The District of Columbia comprehensive plan notes that the City has been largely built-out since the 1960s, but demand for land for housing and jobs has continued to fuel land use change (DC Office of Planning, 2010). The plan notes that two areas are emerging as major hubs of central city growth in DC. The first includes land in the triangle bounded by New York Avenue, Massachusetts Avenue NW, and the CSX railroad, along with adjacent lands around the New York Avenue Metro station. The second includes the South Capitol corridor and Near Southeast.

### B. Population, Housing and Employment Growth

Most ICE Analysis Area jurisdictions have seen substantial population growth since 1970. Montgomery County's population nearly doubled between 1970 and 2016; and Prince George's County grew by over 35 percent. Frederick County, the least populous of the three Maryland counties, nearly tripled with a growth of 187 percent. Fairfax County, the most populous of the ICE Analysis Area counties in Virginia, grew nearly 150 percent during that time. Arlington County grew by approximately 30 percent.

All of the ICE Analysis Area jurisdictions are projected to increase in population by 2040. Most are estimated to rise at a somewhat more modest pace compared to the prior decades, as the land uses become more mature and available land becomes scarcer. Washington, DC is estimated to continue rising in population, regaining the population lost since 1970 and exceeding it by 2030. **Figure 4-17** shows the estimated growth by Traffic Analysis Zone (TAZ) between 2015 and 2040. Areas with the greatest population growth (shown in darker shades) are generally clustered around I-270 and I-495, in Washington, DC, and along other major roadway corridors such as I-95 and I-66.

Much of the housing growth occurred as farmland in the jurisdictions surrounding Washington, DC were converted to suburban residential uses. The growth in housing has gradually tapered off as developable land has been depleted in these areas; new housing growth primarily comes from infill, densification, and redevelopment of existing land uses.

Employment growth projections were obtained from MWCOG Round 9.1 Cooperative Forecasts and shows that employment is projected to grow between 2015 and 2040 for all jurisdictions in the ICE Analysis Area. Washington, DC is the greatest concentration of employment in the ICE Analysis Area, followed by Fairfax County and Montgomery County.

**Figure 4-18** shows the total estimated change in employment by TAZ for the ICE Analysis Area between 2015 and 2040, with greater employment growth forecast for darker shaded areas. The forecasts predict growth clustered in central Washington, DC as well as other urban centers primarily located along major transportation infrastructure corridors such as I-495, I-270, I-95 and I-66. Similar to population growth, several growth areas are located along I-495 and I-270.

00035987





Figure 4-17: Projected Population Growth 2015 – 2040 by TAZ

00035988

## Figure 4-18: Projected Employment Growth 2015 -2040 by TAZ



*Source: MWCOG Round 9.1 Cooperative Forecasting*

00035989



Draft Environmental Impact Statement

MWCOG member jurisdictions include all the ICE Analysis Area jurisdictions and more. According to MWCOG's Round 9.1 Cooperative Forecast, the Metropolitan Washington Region will add more than 633,000 households between 2015 and 2040, for a total of 2.6 million households. Fairfax County, the District of Columbia, and Montgomery County would have more than half of the expected household growth in the ICE Analysis Area. Commercial development in the MWCOG region declined by seven percent in 2017 compared to 2016 (MWCOG, 2018d). Seven of the ten largest development projects in the MWCOG region, by square footage, are located within the ICE Analysis Area. None of the future projects identified are known to be dependent upon the I-495 & I-270 Managed Lanes Study. Refer to the *Indirect and Cumulative Effects Technical Report* (**Appendix O**) for additional details.

### 4.22.3 Environmental Consequences

#### A. Indirect Effects

**Indirect effects** are caused by the action and are later in time or farther removed in distance but are still reasonably-foreseeable. Indirect effects may include growth-inducing effects and other effects related to induced changes in the patterns of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems (40 CFR § 1508.8).

The indirect effects of worsening traffic congestion under the No Build Alternative could include loss of economic productivity, changes in community cohesion resulting from reduced access and delays, effects on the desirability of communities, and potential changes to individual decisions about where to live and work. While no resources are anticipated to be directly impacted by a No Build Alternative, the No Build Alternative does include currently planned and programmed infrastructure projects that may affect the ICE Analysis Area. Moreover, under the No Build Alternative, motor vehicle volumes are forecasted to increase over time and with them are anticipated increases in travel times and delays related to growing traffic congestion. Worsening traffic congestion could have potential negative effects on motor vehicle-reliant activities, such as; emergency response services, supply chain/commercial trucking and deliveries, school bus schedules, and workforce commuters.

The indirect effects of the Build Alternatives in the ICE Analysis Area are summarized in **Table 4-40.**

#### Table 4-40: Indirect Effects in the ICE Analysis Area

| Resource | Indirect Effects of the Build Alternatives |
|---|---|
| *Socioeconomic Resources* (communities, residences, businesses, parks and recreation) | Roadway improvements, such as those proposed under the Build Alternatives, can be an attraction to commercial or real estate development. The possibility of induced growth in this ICE analysis area would be lessened by the long-term presence of the existing highway, as well as the mature land uses and developments that have occurred in the ICE Analysis Area. As a result, the likelihood of induced commercial or residential development is reduced substantially by the built-out environment that has been in existence for many years. Moreover, much of the undeveloped land within the ICE Analysis Area is designated by comprehensive plans for preservation. |
| | The Build Alternatives could change travel patterns by providing increased capacity along existing facilities. More rural, less-developed portions of the ICE Analysis Area and other locations where undeveloped land exists would be most likely to experience pressure for new development from improved access along the I-270 and I-495 corridors. Noise impacts could occur to communities from greater traffic volumes on connecting roadways. Indirect impacts would be minimized by adherence to existing master plans and zoning regulations pertaining to new development. |

00035990

| Resource | | Indirect Effects of the Build Alternatives |
|---|---|---|
| *Cultural Resources* (historic structures /districts and archeological sites) | | Potential indirect effects could occur to historic properties resulting from increased population growth and development in the APE. However, these areas are subject to many greater economic and demographic pressures producing increased population and development that are not caused by the Study. Development of new land uses or more intensive land uses could lead to destruction or altering the integrity of historically important characteristics of archeological and architectural historic properties. |
| *Natural Resources* | Surface Water | Indirect impacts of the Build Alternatives would result from effects related to changes in facility-related run-off quality and quantity associated with the conversion of land from rural to urban and suburban uses as well as changes in drainage patterns and imperviousness. Indirect downstream impacts to surface water would be minimized through the development and application of approved erosion and sediment control plans and stormwater-related best management practices (BMPs). In addition, coordination with state and local agencies overseeing water resources in the ICE Analysis Area will continue throughout the study to determine appropriate mitigation for impacts |
| | Wetlands | Indirect impacts to wetlands and waterways from the Build Alternatives could result from roadway runoff, sedimentation, and changes to hydrology. All indirect impacts would lead to a decrease in available wetland and waterway habitat within the ICE Analysis Area and ultimately a decrease in plant and animal species inhabiting these areas. Any wetlands impacts associated with proposed public or private development would require permitting by the USACE and state regulatory agencies, as well as review and approval by county governments to ensure consistency with environmental protection guidelines. |
| | Floodplains | Floodplain encroachment could alter the hydrology of the floodplain, which could indirectly result in more severe flooding in terms of flood height, duration, and erosion. Indirect impacts from the Build Alternatives would be limited as they are confined to widening in existing corridors and impacts to floodplains would be minimized through adherence to existing regulatory requirements. |
| | Forest | Indirect impacts to forests from any of the Build Alternatives could result from roadway runoff, sedimentation, and the introduction of non-native plant species within disturbed areas. Increased demand for land development resulting from greater access provided by the Build Alternatives could result in pressure for conversion of forest land to residential or commercial use. |
| | Wildlife and Wildlife Habitat | The potential negative indirect effects to terrestrial and aquatic wildlife and wildlife habitat would be limited as the Build Alternatives would improve existing roadways in highly urbanized areas which are already highly fragmented and affected by the existing transportation facilities |
| | Sensitive Species | Loss of protected species' habitat and fragmentation of such habitat related to an increased demand for land use changes could indirectly affect protected and other wildlife species. |
| *Air Quality* | | No substantial indirect effects to air quality are anticipated from the Build Alternatives and would not cause or contribute to any violation of NAAQS. The quantitative assessments conducted for the project-specific CO and MSATs impacts were considered analyses of indirect effects because they address air quality impacts attributable to the project that occur at a later time in the future. Those assessments demonstrate that in the future: (1) air quality impacts from CO would not cause or contribute to violations of the CO NAAQS; (2) MSATs emissions from the affected network would be significantly lower than they are today; and (3) the mobile source emissions budgets established for the region for purposes of meeting the ozone NAAQS would not be exceeded. |

## B.  Cumulative Effects

**Cumulative effects** are defined as impacts on the environment that result from the incremental impact of the action when added to past, present, and reasonably-foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such actions (40 CFR § 1508.7).

00035991

Past actions that have impacted resources include the numerous infrastructure and land development activities that occurred in the ICE Analysis Area throughout the ICE time frame. As described in the *Indirect and Cumulative Effects Technical Report* (**Appendix O**, **Section 3.1.2)** jurisdictions in the ICE Analysis Area have experienced substantial growth of population, housing, and employment since 1970. For example, Montgomery County's population nearly doubled between 1970 and 2016; and Prince George's County grew by over 35 percent according to US Census 2016 five-year estimates. This growth and development in the ICE Analysis Area has entailed continuous expansion and intensification of urban and suburban land uses into previously rural landscapes. Similarly, the network of transportation infrastructure has been continually expanded to accommodate the transportation needs of the growing regional economy and population.

Present and future actions impacting resources include noise, land development, and infrastructure improvements required to accommodate existing and future populations and economic activity. MWCOG estimates show ICE Analysis Area jurisdictions growing in population and employment through 2040. Demand from existing populations and economic activity has created substantial traffic congestion in the region, and many currently planned projects are intended to accommodate this existing demand. Future projects, as described in the *Indirect and Cumulative Effects Technical Report* (**Appendix O, Section 3.1.3**) will continue to expand infrastructure capacity to meet the needs of the growing population.

The past, present and future actions have had both beneficial and adverse impacts. Past and present growth and development have improved local economies and led to provision of community facilities, transportation infrastructure, and recreational resources benefiting residences and businesses. Construction and expansion of transportation facilities has facilitated economic growth by providing access to employment and community facilities and allowing for more efficient movement of goods and services.

Increased population and employment in the ICE Analysis Area is expected to increase traffic volumes and create eventual need for more transportation improvement projects. The proposed action is one of many reasonably-foreseeable future transportation projects designed to address both existing volumes, as well as anticipated growth. The Build Alternatives alone would provide improved access, mobility, and traffic conditions. Combined with the other projects identified in the *Indirect and Cumulative Effects Technical Report* (**Appendix O**, **Section 3.1.3B**) it is anticipated that there would be a greater overall benefit to local communities. The proposed action, along with other future transportation projects would cause noise impacts, with potential cumulative effects on communities in the vicinity of improved and new roadways.

The No Build Alternative, considered in the context of growth and development occurring throughout the ICE Analysis Area, would result in potentially negative socioeconomic impacts from increasing traffic congestion. The effects of worsening traffic congestion could include loss of economic productivity, changes in community cohesion resulting from reduced access and delays, effects on the desirability of communities, and potential changes to individual decisions about where to live and work.

The cumulative effects of the Build Alternatives in the ICE Analysis Area are summarized in **Table 4-41.**

## Table 4-41: Cumulative Effects in the ICE Analysis Area

| Resource | Cumulative Effects of the Build Alternatives |
|---|---|
| *Socioeconomic Resources* (communities, residences, businesses, parks and recreation) | • The continual expansion of transportation facilities in the region, while providing benefits of increased access and mobility, also has detrimental effects on communities adjacent to these facilities, including potential loss of community cohesion.<br>• The Build Alternatives would add to the impacts from other past, present and future projects to parklands in communities adjacent to the I-495 and I-270 corridors, often in well-developed areas where replacement parkland could not be easily located. |
| *Cultural Resources* (historic structures /districts and archeological sites) | • Past actions in the ICE Analysis Area have already resulted in destruction or degradation of resources, including demolition for new construction or changes in land use context surrounding cultural resource areas, where proximal replacement of resources may not be possible.<br>• Present and future actions, including transportation projects and land development activity, would likely continue to impact cultural resources in similar ways. |
| *Natural Resources* — Surface Water | • Cumulative impacts to water quality could occur from stream loss and the incremental increase of impervious surfaces that may increase runoff from past, present, and future development projects.<br>• These would be minimized through the use of BMPs during construction and use of SWM facilities.<br>• The incremental effect would be minimized by the required permitting process, which would identify avoidance, minimization, and mitigation as needed to offset wetland losses. |
| *Natural Resources* — Wetlands | • Past land use development and transportation projects have had impacts on wetlands, particularly those that occurred prior to the passage of state and Federal laws that regulate wetland impacts.<br>• The incremental effect would be minimized by the required permitting process, which would identify avoidance, minimization, and mitigation as needed to offset wetland losses. |
| *Natural Resources* — Floodplains | • The incremental impact of the Build Alternatives to floodplains, considered in light of past, present and future impacts, is expected to be relatively minimal due to existing regulatory controls and regulations. |
| *Natural Resources* — Forest | • While future development and transportation projects would be regulated in a manner that minimizes forest impacts, the past losses of forest in the ICE Analysis Area have been extensive. The incremental effect of the Build Alternatives on forested land in the ICE analysis area would be potentially substantial.<br>• The required 1:1 mitigation would help offset the incremental effect of this impact; however, it may not be possible to find suitable replacement land within close proximity of the build corridors. Additionally, this may result in replacement of mature forest areas with new, smaller trees. |
| *Natural Resources* — Wildlife and Wildlife Habitat | • Overall, the cumulative effects of past transportation and development projects have been adverse to wildlife and wildlife habitat, but present and future impacts would be reduced by applicable Federal, state, and local laws and regulations requiring potential adverse effects to be avoided, minimized, or mitigated.<br>• The Build Alternatives would contribute to the incremental effect on wildlife habitat in the ICE Analysis Area in light of other past, present and future projects. |
| *Natural Resources* — Sensitive Species | • The overall impacts of past actions in the ICE Analysis Area have had adverse effects on sensitive species due to the conversion of wildlife habitat to urbanized land.<br>• Present and future development could potentially impact protected species, though such effects would likely be minimized by adherence to Federal and state laws and regulations for protected species. |

00035993



| Resource | Cumulative Effects of the Build Alternatives |
|---|---|
| *Air Quality* | • The Study is currently included in the NCRTPB FY 2019 – 2024 TIP [TIP ID 6432 and Agency ID AW0731 (planning activities)] and the NCRTPB Visualize 2045 Long-Range Plan (CEID 1182; CEID 3281; and Appendix B, page 56). This project (adding two managed lanes in each direction) is included in the Air Quality Conformity Analysis that accompanies the Visualize 2045 Plan. This analysis demonstrates that the incremental impact of the proposed project on mobile source emissions, when added to the emissions from other past, present, and reasonably-foreseeable future actions, is in conformance with the TIP and will not cause or contribute to a new violation, increase the frequency or severity of any violation, or delay timely attainment of the NAAQS established by EPA. Therefore, the cumulative impacts of the project to air quality are not expected to be significant. Prior to the ROD being signed, the selected alternative will be included in the TIP and Long-Range Plan along with a transportation conformity determination. (See Appendix I– Air Quality Technical Report for more information.) |

## 4.23 Consequences of Construction

The LODs of the Build Alternatives account for areas needed for construction. The assumed areas for construction staging and materials storage are identified on the *Environmental Resource Mapping* (**Appendix D**). The quantified impacts presented in this DEIS are assumed to be permanent or long-term effects. As design is advanced on the Preferred Alternative, the long-term effects will be refined and short-term, construction-related effects of the Preferred Alternative will be quantified and documented in the FEIS. Impacts associated with construction that will be further evaluated for the Preferred Alternative include, traffic congestion associated with construction maintenance of traffic, impacts to business and residential access, utility disruptions, vibrations, sediment erosion and stormwater management, and construction related noise and visual impacts, among others.

Due to the magnitude of the Study, MDOT SHA would need to construct any Build Alternative in phases. Phase 1 of the P3 Program would include that portion of the MLS along I-495 from the vicinity of the George Washington Memorial Parkway in Virginia, across and including the ALB, to its interchange with I-270 at the West Spur, and I-270 from its interchange with I-495 to its interchange with I-370. A Phase 1 P3 Agreement would also include I-270 up to I-70 which would be advanced through a separate, independent NEPA study.

It is anticipated that construction of any phase will last approximately four to five years. Details related to when construction related activities will occur will be determined in final design; however, the project will likely require night work to occur when activities could not be completed safely during the day. Advanced notice of construction related activities would be provided and all reasonable efforts to minimize impacts to residential communities would be undertaken. MDOT SHA will continue to coordinate with the neighboring communities through design and construction, should a Build Alternative be selected.

### 4.23.1 Visual and Aesthetic Resources

Construction would require the removal of vegetation to varying degrees throughout the study corridors. As a result of the vegetation removal, the wider interstates, added ramps, retaining walls, and noise barriers would become more visible and prominent from both the dynamic and static views. The static views from adjacent properties, including residential properties, commercial enterprises, parkland/ open space properties, and a number of community resources would experience an impact; however, impacts would generally be consistent with existing views of the study corridors as the surrounding area is adjacent to the existing interstate facilities and the surrounding area is urban in nature. Temporary visual

impacts from both dynamic and static views will occur from the addition of construction equipment including cranes, heavy vehicles, trucks, borrow material and equipment stockpiling, safety signage, temporary barriers, etc.

## 4.23.2 Hazardous Materials

Prior to construction, the Preliminary Site Investigations (PSIs) would be conducted based on the proposed construction schedule and phases of design in order to identified sites with contamination that may require mitigation prior to construction. The PSIs will include subsurface sampling for those properties where additional soil and/or groundwater analysis (beyond the information documented in detailed regulatory records) is needed.  The Developer would be required to use best management practices to minimize the release of any hazardous materials during construction.

## 4.23.3 Air Quality

The construction duration of the project is not anticipated to exceed five years in any single location; thus, most emissions associated with construction are considered short-term or temporary in nature. The primary air quality concerns during construction would be a potential short-term localized increase in the concentration of fugitive dust (including airborne $PM_{2.5}$ and $PM_{10}$), as well as mobile source emissions, including pollutants such as CO. To minimize the amount of emissions generated, efforts would be made during construction to limit traffic disruptions, especially during peak travel hours. A quantitative analysis of the construction-related GHG emissions for the Preferred Alternative will be conducted using FHWA's Infrastructure Carbon Estimator tool. The results of that analysis will be included in the FEIS.

Mobile source emissions include pollutants such as CO. Since CO emissions from motor vehicles generally increase with decreasing vehicle speed, disruption of traffic during construction (such as temporary reduction of roadway capacity and increased queue lengths) could result in short-term elevated concentrations of CO. To minimize the amount of emissions generated, efforts would be made during construction to limit traffic disruptions, especially during peak travel hours.

Construction and subsequent maintenance of the project would also generate GHG emissions. Preparation of the roadway corridor (e.g., earth-moving activities) involves a considerable amount of energy consumption and resulting GHG emissions; manufacture of the materials used in construction and fuel used by construction equipment also contribute to GHG emissions; and on-road vehicle delay during construction would also increase fuel use, resulting in GHG emissions.  A quantitative analysis of the construction related GHG emissions for the Preferred Alternative will be conducted using FHWA's Infrastructure Carbon Estimator tool.  The results of that analysis will be included in the FEIS.

During construction the contractor may use the following dust control measures, to minimize and mitigate, to the greatest extent practicable, impacts to air quality:

- Minimize land disturbance;
- Cover trucks when hauling soil, stone, and debris (MDE Law);
- Use water trucks to minimize dust;
- Use dust suppressants if environmentally acceptable;
- Stabilize or cover stockpiles;
- Construct stabilized construction entrances per construction standard specifications;
- Regularly sweep all paved areas including public roads;

00035995



- Stabilize onsite haul roads using stone; and
- Temporarily stabilize disturbed areas per MDE erosion and sediment standards.

### 4.23.4 Noise

Noise would be generated from the construction of the highway improvements and the noise barriers. The Developer would be responsible for developing a construction work sequence that minimizes the duration of time without a noise barrier in place.

## 4.24 Commitment of Resources

### 4.24.1 Irreversible and Irretrievable Commitment of Resources

Implementation of any of the Build Alternatives in this DEIS would require the commitment of a range of natural, physical, human, and fiscal resources. Under the implementing regulations for NEPA, any expenditure of these resources that would be considered irreversible or irretrievable is required to be included in the discussion of potential environmental impacts of the alternatives (40 CFR §1502.16). The term irreversible refers to the loss of future options; it applies primarily to the impacts or use of nonrenewable resources, such as cultural resources, or to those factors, such as soil productivity, that are renewable only over long periods of time. The term irretrievable applies to the loss of production (via land use) or use of natural resources. The production lost is irretrievable, but the action is not irreversible. Therefore, an irreversible or irretrievable commitment of resources results in a permanent loss of a resources for future uses (or alternative purposes) as they cannot be replaced or recovered.

Under the No Build Alternative there would be no study-related construction. The No Build Alternative would result in the irreversible loss of financial resources for maintaining the existing infrastructure in the study corridors.

The construction of any of the Build Alternatives would result in the commitment of natural, physical, and financial resources that would be irreversible and irretrievable. The irreversible dedication of land to transportation use for the construction of any of the Build Alternatives would render the land unusable for any other use. The range in impacts of land converted to transportation use under the Build Alternatives varies by the specific alternative and would range from 362.4 to 388.5 acres (refer to **Section 4.1.3, Table 4-2**). Land used in the construction and operation of the proposed facility (right-of-way) is considered an irreversible commitment during the time period that the land is used for a transportation facility. However, if a greater need arises for use of the land or if the transportation facility is no longer needed, the land can be converted to another use. At present, it is not anticipated such a conversion would be necessary or desirable.

As part of this permanent land alteration, approximately 1,477 to 1,515 acres of forest canopy (refer to **Section 4.16.3, Table 4-25**), 16.1 to 16.5 acres of wetlands, and 155,229 to 156,984 linear feet of streams (refer to **Section 4.12.3, Table 4-20**) have the potential to be affected, depending on the Build Alternative. While forest, stream and wetland mitigation could account for some of these losses, these individual distinct ecosystems could be irreversibly impacted.

Significant amounts of fossil fuels, electricity, labor, and highway construction materials would be irretrievably expended for the construction of any of the Build Alternatives. Anticipated construction materials would include aggregates, asphalt, cement, gravel, and sand. Concrete and steel would be required for bridges and other structures such as retaining walls and noise walls. Fuel, electricity, and

00035996

labor required to manufacture, transport, and install these materials would be irretrievably lost. As of the time of this document these construction materials are not in short supply and their use would not have an adverse effect upon the continued availability of these resources. The resources used to construct any of the Build Alternatives would be similar; however, Alternative 9M may require slightly less resources due to the narrower LODs of these Build Alternatives.  No long-term construction-related resources are anticipated with any of the Build Alternatives.

Since the managed lanes would generate toll revenue, the costs would be recouped over time. Projects that include a future revenue source such as tolls may be constructed with no direct state and Federal funding upfront. The I-495 & I-270 P3 Program has a goal to implement the improvements at no net cost to the State. However, if a state subsidy is required, it would typically be paid to the Developer at the beginning of the contract, whereas if positive excess cashflows are anticipated, they could be paid to the State at the beginning of the contract and/or as revenue sharing payments to the State during the operation of the facility.

The commitment of these resources is based on the concept that residents in the immediate area, state, and region would benefit from the improved quality of the transportation system. These benefits would consist of reduced congestion, enhanced trip reliability, additional roadway choices, and improved movement of goods and services, as described in **Chapters 1 and 2**, which are expected to outweigh the commitment of the irreversible and irretrievable resources.

### 4.24.2 Short-Term Effects/Long-Term Effects

Short-term impacts to resources in relation to long-term productivity have been evaluated in accordance with (42 U.S.C. 4332(C)(iv)) and guidelines published by CEQ on implementing NEPA (40 CFR 1502.16). This analysis qualitatively discusses the relationship between short-term impacts to and use of resources, and the long-term benefits and productivity of the environment. For this analysis, short-term refers to the estimated three-to-five-year period of construction, the time when the largest number of temporary environmental effects is most likely to occur. Long-term refers to the more than 100-year life span estimated for the proposed improvements. This section discusses whether the short-term uses of environmental resources by the proposed improvements would affect (either positively or negatively) the long-term productivity of the environment.

### A.  Short-Term Impacts

Construction of any Build Alternative would result in short-term impacts, as described in **Chapter 2**, **Section 2.7.3.**

An increase in employment and job opportunities for future permitting and design, construction workers, suppliers, and inspectors would result during construction of a Build Alternative. In addition, short-term employment, use of materials to construct the improvements, and purchases of goods and services generated by construction could create a short-term improvement in the local economy that would diminish once the construction is completed. Workers who live in the region may fill these new positions or it is possible that people may move to the area as a result of the job opportunities created by the project. The concentration of workers within the area would stimulate the local economy by increasing business at area commercial and retail establishments. Increased sales tax would be derived from the commercial sales and from the sales of materials required for construction.

00035997



During construction, detours may be required rerouting travelers to other area roadways. Some travelers may choose to take alternate routes to avoid construction areas and further delays. The use of alternate routes may increase fossil fuel usage and could result in loss of business for commercial establishments thereby lowering sales tax revenues. Rerouting may lead to increased congestion and delays on the detour routes.

Expanding roadway alignments, materials storage areas, and movement of construction vehicles may result in the removal of existing vegetation. A temporary increases in air quality and noise impacts are expected. Water resources would also be needed for construction activities including mixing aggregate materials, road wetting, and landscaping.

Construction activity resulting from the project would impact different sectors of the region's economy. Specifically, the total jobs generated under each Build Alternative scenario would add value to the gross regional product.

## B. Long-Term Impacts

The long-term impacts and benefits of the implementation of the Build Alternatives would remain for the duration of the facility's life. The increased capacity and reduced traffic congestion would result in more efficient use of fossil fuels.

Reduced congestion, enhanced trip reliability, and additional roadway choices would result in quicker trips and commutes for drivers. Improved movement of goods and services would benefit the local and regional economy. Generally, logistics costs decrease as trucks and commercial vehicles travel in less congested conditions, spending less time en route, thus improving supply chain fluidity for regional industries dependent on truck traffic.

Improving congestion and reducing the amount and duration of idle traffic would result in decreased air pollution, (refer to **Section 4.8** for more detail). Together, these effects would result in an enhanced overall environment for the many communities in Maryland along I-495, I-270, and the greater National Capital area.

The implementation of any of the Build Alternatives would require permanent conversion of property to transportation uses. Real estate taxes paid of those properties would be eliminated. These long-term loses may be offset by areas adjacent to the improvements that experience induced growth.

00035998

00035999



# 5   DRAFT SECTION 4(f) EVALUATION

## 5.1   Introduction

Section 4(f) of the US Department of Transportation (USDOT) Act of 1966 as amended (49 U.S.C. 303(c)) (Section 4(f)) is a Federal law that protects significant publicly-owned parks, recreation areas, wildlife and/or waterfowl refuges, or any significant public or private historic sites. Section 4(f) applies to all transportation projects that require funding or other approvals by the USDOT.  As a USDOT agency, FHWA must comply with Section 4(f) and its implementing regulations at 23 CFR 774. The *Draft Section 4(f) Evaluation* (**Appendix F**) in this Draft Environmental Impact Statement (DEIS) follows established USDOT regulations at 23 CFR 774, FHWA's *2012 Section 4(f) Policy Paper*, and 23 U.S.C. 138 and 39 U.S.C. 303.

Regulations at 23 CFR 774.17 define a Section 4(f) property as "publicly-owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, state, or local significance, or land of an historic site of national, state, or local significance." 23 CFR 774.17 further defines "Historic site" to include any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places (NRHP).

Section 4(f) stipulates that the USDOT, including the FHWA, cannot approve a transportation project that uses Section 4(f) property, unless FHWA determines that:

- There is no feasible and prudent avoidance alternative to the use of land from the property, and the action includes all possible planning to minimize harm to the property resulting from such use (23 CFR 774.3(a)(1) and (2)); or

- The use of the Section 4(f) properties, including any measures to minimize harm (such as avoidance, minimization, mitigation, or enhancements measures) committed to by the applicant, will have a *de minimis* impact on the property (23 CFR 774.3(b)).

The *Draft Section 4(f) Evaluation* found in **Appendix F** and summarized below describes Section 4(f) properties identified within the corridor study boundary; discusses potential impacts or use of the properties; evaluates potential feasible and prudent avoidance alternatives; analyzes least overall harm alternatives; and through a discussion of all possible planning, presents measures to minimize harm and mitigate for impacts to and the use of Section 4(f) properties.

## 5.2   Use of Section 4(f) Properties

Pursuant to 23 CFR 774.17, a "use" of Section 4(f) property occurs:

- (i)   When land is **permanently incorporated** into a transportation facility;
- (ii)   When there is a **temporary occupancy** of land that is adverse in terms of the statute's preservation purpose as determined by the criteria in 23 CFR 774.13(d); that is, when one of the following criteria for temporary occupancy are not met:
  - The duration of the occupancy must be less than the time needed for the construction of the project, and no change of ownership occurs;
  - Both the nature and magnitude of the changes to the Section 4(f) land are minimal;

00036000



- o No permanent adverse physical changes, nor interference with activities or purposes of the resources on a temporary or permanent basis, are anticipated;
- o The land must be returned to a condition that is at least as good as existed prior to the project; and
- o There is documented agreement with the appropriate Federal, State, or local officials having jurisdiction over the land that the above conditions have been met.
- (iii) When there is a **constructive use** of a Section 4(f) property.
  - o As defined in 23 CFR 774.15, a constructive use occurs when the transportation project does not incorporate land from a Section 4(f) property, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired. The degree of impact and impairment must be determined in consultation with the Officials with Jurisdiction in accordance with 23 CFR 774.15(d)(3).
  - o Refer to **Appendix F**, **Section 1.2.2 A**. for a preliminary analysis of constructive use.

### 5.2.1   Exceptions to Section 4(f) Use

FHWA has identified various exceptions to the requirement of Section 4(f) approval. Exceptions to Section 4(f) use are found in 23 CFR 774.11 and 774.13 and are discussed in the *Draft Section 4(f) Evaluation* (**Appendix F, Section 1.2.6**). Ten Section 4(f) properties listed in **Table 5-3**, including six archaeological sites, would experience an impact from the Study and meet the exception to Section 4(f) use criteria. Additional information on the impacts to these properties and why they qualify as exceptions to Section 4(f) is located in **Appendix F, Section 2**.

### 5.2.2   De Minimis Impact

An impact to a significant public park, recreation area, or wildlife and waterfowl refuge may be determined to be *de minimis* if the use of the Section 4(f) property, including incorporation of any measure(s) to minimize harm (such as any avoidance, minimization, mitigation, or enhancement measures), will not adversely affect the activities, features, or attributes that qualify the resource for protection under Section 4(f) (23 CFR 774.3(b), 23 CFR 774.5(b), and 23 CFR 774.17).

For historic sites, a *de minimis* impact means that FHWA has received written concurrence from the pertinent State Historic Preservation Officer (SHPO) or Tribal Historic Preservation Officer (THP), and from the Advisory Council on Historic Preservation (ACHP) if participating, a finding of "no adverse effect" or "no historic properties affected" in accordance with 36 CFR Part 800. FHWA is required to inform these officials of its intent to make a *de minimis* impact determination based on their concurrence in the finding (36 CFR 774.5(b)(1)(ii). On March 12, 2020, Maryland Historical Trust (MHT) concurred with MDOT SHA's determination of effects on historic properties. MHT also provided written acknowledgement of FHWA's intent to make *de minimis* impact determinations.

A *de minimis* impact determination does not require analysis to determine if avoidance alternatives are feasible and prudent, but consideration of avoidance, minimization, mitigation or enhancement measures should occur. Upon fulfilling the requirements set forth in 23 CFR 774.5(b), FHWA intends to make Section 4(f) *de minimis* impact findings for the 36 properties listed in **Table 5-2**. A full description and analysis of

00036001



the 36 Section 4(f) properties that would experience a *de minimis* impact is found in **Appendix F, Sections 2.1, 2.2, and 2.4**.

## 5.3    Proposed Action

For purposes of the *Draft Section 4(f) Evaluation*, the **Proposed Action** includes the six Build Alternatives retained for detailed study in the DEIS: Alternatives 8, 9, 9M, 10, 13B, and 13C. These alternatives, as described in **Chapter 2, Section 2.6**, include managed lanes that differ in the manner in which the proposed travel lanes would be designated and configured. The limits of disturbance (LOD) are the same on I-495 for each of the Build Alternatives, except for Alternative 9M between I-270 West Spur and the I-95 Interchange. Therefore, the Section 4(f) use will be the same for each of these Build Alternatives on I-495, except along the top side of I-495 under Alternative 9M. The difference in Section 4(f) use for resources along I-495 is described in the evaluation, when applicable. The LODs for the Build Alternatives differ slightly on I-270 due to the existing High Occupancy Vehicle (HOV) system. The differences in Section 4(f) use for resources along I-270 is described in the evaluation, where applicable.

## 5.4    Officials with Jurisdiction

In the case of public parks, recreation areas, and wildlife and waterfowl refuges, the Officials with Jurisdiction are the officials of the agency or agencies that own or administer the property in question and who are empowered to represent the agency on matters related to the property. There are eight Officials with Jurisdiction over parkland in the study corridor: National Park Service (NPS); Maryland-National Capital Park and Planning (M-NCPPC), Montgomery Parks; Maryland-National Capital Park and Planning, Prince George's County; Montgomery County Public Schools Board of Education; City of Gaithersburg; City of Greenbelt; City of New Carrollton; and City of Rockville. The Officials with Jurisdiction over historic sites are the MHT in Maryland and the Virginia Department of Historic Resources (VDHR) in Virginia. The ACHP is also  an official with jurisdiction over historic sites when they are involved in Section 106 consultation. NPS is the official with jurisdiction over National Historic Landmarks (NHL).

Some public parks, recreation areas, and wildlife and waterfowl refuges are also historic properties that are either listed in or eligible for listing in the NRHP. In other cases, historic sites are located within the property boundaries of public parks, recreation areas, and wildlife and waterfowl refuges. When either of those situations exists, there will be more than one Official with Jurisdiction. **Appendix F**, **Section 1.2.1** provides more information on the Officials with Jurisdiction including roles and responsibilities.

## 5.5    Section 4(f) Properties

MDOT SHA established a corridor study boundary that extends 300 feet to either side of the existing right-of-way along I-495 and I-270. Within the corridor study boundary, 111 Section 4(f) properties were inventoried consisting of national parks, county and local parks, parkways, stream valley units of larger park facilities, local neighborhood parks, and historic sites that are listed in or eligible for listing in, the NRHP (refer to **Figures 5-1** through **5-3**).

Of the 111 Section 4(f) properties identified in the corridor study boundary, 43 would be avoided (**Table 5-1**) 68 would experience an impact as a result of the Proposed Action. Those impacted Section 4(f) properties that do not qualify as exceptions to a Section 4(f) use are listed in **Table 5-2**. Of these 68 properties, 22 would experience a use that warrants an Individual Section 4(f) Evaluation. FHWA intends to apply *de minimis* impact findings at 36 properties because many of the anticipated uses of Section 4(f)

00036002

properties consist of minor impacts along the edge of the properties in question adjacent to the existing transportation facility. Such impacts would not affect characteristics that contribute to the significance of historic sites or recreational amenities and features of those properties. The impacts to the ten Section 4(f) properties listed in **Table 5-3** meet the criteria of exceptions to a Section 4(f) use. Descriptions of the Section 4(f) properties that would experience an impact from the Proposed Action are provided in the *Draft Section 4(f) Evaluation* (**Appendix F, Section 2.1, page 28**).

During final design, certain uses of Section 4(f) property may be determined to be temporary in nature, as related solely to the construction phase of the proposed action. Currently there is not enough information to make such a determination. For purposes of the *Draft Section 4(f) Evaluation*, all impacts to Section 4(f) property are assumed to be permanently incorporated into the transportation facility.

00036003

Draft Environmental Impact Statement



Figure 5-1: Inventory of Section 4(f) Property in the Corridor Study Boundary (Map 1 of 3)



### Section 4(f) Property

1. Scott's Run Nature Preserve
2. George Washington Memorial Parkway
3. Chesapeake and Ohio Canal National Historical Park
4. Clara Barton Parkway
5. Washington Aqueduct
6. Naval Surface Warfare Center Carderock Division Historic District
7. Congressional Country Club
8. Carderock Springs South
9. Carderock Springs Historic District
10. Morningstar Tabernacle No. 88 Moses Hall and Cemetery
11. Gibson Grove A.M.E. Church
12. Cabin John SVP, Unit 2
13. Booze Creek SVP
14. Cabin John SVP, Unit 3
15. Burning Tree Club
16. Bethesda Trolley Trail
17. Fleming Local Park
18. Grosvenor Estate (Wild Acres)
19. Federation of American Societies for Experimental Biology
20. Rock Creek SVP, Unit 3
21. Locust Hill Neighborhood Park
22. Locust Hill Estates
23. Elmhirst Parkway NCA
24. Cedar Lane Unitarian Universalist Church
25. North Chevy Chase Local Park
26. In the Woods
27. Rock Creek SVP, Unit 2
28. Washington D.C. Temple
29. National Park Seminary Historic District / Forest Glen
30. Capitol View Park Historic District
31. Metropolitan Branch, B&O Railroad
32. Forest Glen Historic District
33. Forest Glen Neighborhood Park
34. Calvary Evangelical Lutheran Church
35. Forest Grove Neighborhood Park
36. Sligo Creek Parkway
37. Greater Washington Boys and Girls Club
38. Argyle Local Park
39. Margaret Schweinhaut Senior Center
40. South Four Corners Neighborhood Park
41. Polychrome Historic District
42. Montgomery Blair High School Athletic Fields
43. Blair Local Park
44. Hastings NCA
45. Indian Spring Club Estates and Indian Spring Country Club
46. Indian Springs Terrace Local Park
47. Northwest Branch SVP, Unit 3
48. Brookview Local Park
49. Washington Coca-Cola Bottling Plant (Silver Spring)

**Legend**

Limit of Proposed Action
See Map 2 or 3
Historic Property
Park Property

**Inventory of Section 4(f) Property in the Corridor Study Boundary**

0   1   2 Miles

Map 1 of 3

00036004

Draft Environmental Impact Statement



Figure 5-2: Inventory of Section 4(f) Property in the Corridor Study Boundary (Map 2 of 3)



### Section 4(f) Property

50. Knollwood Park
51. Buck Lodge Park
52. Edgefield Drive Park
53. Paint Branch SVP, Unit 3
54. Cherry Hill Road Park
55. Beltsville Agricultural Research Center (BARC)
56. Sunnyside Park
57. Hollywood Park
58. B & O Railroad, Washington Branch
59. SHA District 3 Headquarters Building
60. Greenbelt Historic District
61. Buddy Attick Lake Park
62. Indian Springs Park
63. Greenbelt Park
64. Baltimore Washington Parkway
65. McDonald Field
66. Spellman Overpass
67. Good Luck Estates Park
68. Youth Memorial Sports Park
69. Robert Frost Park
70. Dresden Green Park
71. Beckett Field
72. B & P Railroad, Washington City Branch
73. New Carrollton Metro Station
74. Whitfield Chapel Park
75. Capitol Car Distributors
76. Carsondale
77. Carsondale Park
78. Street Railway Service Building
79. Glenarden Historic District
80. Henry P. Johnson Park
81. Southwest Branch SVP
82. Heritage Glen Park
83. Little Washington
84. Percy Benson Sansbury Property
85. Suitland Parkway
86. Douglas E. Patterson Park
87. Morningside Historic District
88. Andrews Manor Park
89. Manchester Estates Park
90. Henson Creek SVP

**Legend**

Limit of Proposed Action
See Map 1
Historic Property
Park Property

**Inventory of Section 4(f) Property in the Corridor Study Boundary**

0    1    2 Miles

Map 2 of 3

00036005

Draft Environmental Impact Statement



**Figure 5-3: Inventory of Section 4(f) Property in the Corridor Study Boundary (Map 3 of 3)**



### Section 4(f) Property

91. Academy Woods
92. Stratton Local Park
93. Grosvenor Park
94. Cabin John Regional Park
95. Tilden Woods SVP
96. Old Farm NCA
97. Cabin John SVP, Unit 6
98. Cabin John SVP (Rockville)
99. Millennium Garden Park
100. Julius West Middle School Athletic Fields
101. Bullards Park and Rose Hill SVP
102. Rockmead Park
103. Woottons Mill Park
104. Woodley Gardens Park
105. Woodley Gardens
106. Fallsgrove SVP
107. Rockville Senior Center Park
108. Ward Building
109. Malcolm King Park
110. Morris Park
111. National Institute of Standards and Technology (NIST) Headquarters

**Legend**

Limit of Proposed Action
See Map 1
Historic Property
Park Property

**Inventory of Section 4(f) Property in the Corridor Study Boundary**

0     1     2 Miles

Map 3 of 3

00036007



**Table 5-1: Inventory of Section 4(f) Properties that** Would Not Experience a Use

| Map ID | Section 4(f) Property | Size (Acres) | Official with Jurisdiction | Type of Section 4(f) Property |
|---|---|---|---|---|
| 1 | Scott's Run Nature Preserve | 336.0 | Fairfax County | Public Park |
| 5 | Washington Aqueduct | 163.0 | MHT, NPS | Historic Site (NHL) |
| 6 | Naval Surface Warfare Center Carderock Division Historic District | 30.3 | MHT | Historic Site |
| 7 | Congressional Country Club | 31.8 | MHT | Historic Site |
| 8 | Carderock Springs South | 18.6 | MHT | Historic Site |
| 9 | Carderock Springs Historic District | 146.0 | MHT | Historic Site |
| 11 | Gibson Grove A.M.E. Church | 0.4 | MHT | Historic Site |
| 13 | Booze Creek SVP | 24.1 | M-NCPPC | Public Park |
| 14 | Cabin John SVP, Unit 3 | 50.0 | M-NCPPC | Public Park |
| 19 | Federation of American Societies for Experimental Biology | 11.4 | MHT | Historic Site |
| 22 | Locust Hill Estates | 47.0 | MHT | Historic Site |
| 23 | Elmhirst Parkway Neighborhood Conservation Area (NCA) | 7.6 | M-NCPPC | Public Park |
| 24 | Cedar Lane Unitarian Universalist Church | 6.3 | MHT | Historic Site |
| 25 | North Chevy Chase Local Park | 30.9 | M-NCPPC | Public Park |
| 26 | In the Woods | 1.9 | MHT | Historic Site |
| 28 | Washington DC Temple | 31.7 | MHT | Historic Site |
| 30 | Capitol View Park Historic District | 124.0 | MHT | Historic Site |
| 35 | Forest Grove Neighborhood Park | 7.0 | M-NCPPC | Public Park |
| 38 | Argyle Local Park | 8.8 | M-NCPPC | Public Park |
| 39 | Margaret Schweinhaut Senior Center | 8.9 | M-NCPPC | Public Park |
| 41 | Polychrome Historic District | 1.1 | MHT | Historic Site |
| 44 | Hastings Neighborhood Conservation Area (NCA) | 0.4 | M-NCPPC, MHT | Public Park |
| 48 | Brookview Local Park | 12.4 | M-NCPPC | Public Park |
| 49 | Washington Coca-Cola Bottling Plant (Silver Spring) | 4.6 | MHT | Historic Site |
| 50 | Knollwood Park | 12.4 | M-NCPPC | Public Park |
| 51 | Buck Lodge Park | 40.0 | M-NCPPC | Public Park |
| 52 | Edgefield Drive Park | 7.2 | M-NCPPC | Public Park |
| 53 | Paint Branch SVP, Unit 3 | 51.9 | M-NCPPC | Public Park |
| 56 | Sunnyside Park | 8.7 | M-NCPPC | Public Park |
| 59 | SHA District 3 Headquarters Building | 7.5 | MHT | Historic Site |
| 67 | Good Luck Estates Park | 6.6 | M-NCPPC | Public Park |
| 68 | Youth Memorial Sports Park | 3.9 | City of New Carrollton | Public Park |
| 69 | Robert Frost Park | 5.9 | M-NCPPC | Public Park |
| 70 | Dresden Green Park | 2.1 | M-NCPPC | Public Park |
| 73 | New Carrollton Metro Station | 71.7 | MHT | Historic Site |
| 74 | Whitfield Chapel Park | 26.2 | M-NCPPC | Public Park |
| 75 | Capitol Car Distributors | 38.7 | MHT | Historic Site |
| 77 | Carsondale Park | 2.9 | M-NCPPC | Public Park |
| 78 | Street Railway Service Building | 0.4 | MHT | Historic Site |
| 83 | Little Washington | 63.0 | MHT | Historic Site |
| 84 | Percy Benson Sansbury Property | 0.8 | MHT | Historic Site |
| 87 | Morningside Historic District | 191.0 | MHT | Historic Site |
| 92 | Stratton Local Park | 11.0 | M-NCPPC | Public Park |
| 93 | Grosvenor Park | 57.4 | MHT | Public Park |

00036008



Draft Environmental Impact Statement

| Map ID | Section 4(f) Property | Size (Acres) | Official with Jurisdiction | Type of Section 4(f) Property |
|---|---|---|---|---|
| 100 | Julius West Middle School Athletic Fields | 22.0 | Montgomery Board of Ed. | Public Park |
| 104 | Woodley Gardens Park | 37.5 | City of Rockville, MHT | Public Park |
| 106 | Fallsgrove SVP | 50.2 | City of Rockville | Public Park |
| 111 | National Institute of Standards and Technology (NIST) Headquarters | 578.0 | MHT | Historic Site |

Notes: [1]All units are in acres unless otherwise noted. [2]The size of Section 4(f) properties is sourced from data or documentation provided by the Officials with Jurisdiction.[3]The Section 4(f) properties in **Table 5-1** are sorted from west to east along I-495 and from south to north along I-270.

**Table 5-2: Inventory of Section 4(f) Properties with Use**

| Map ID | Section 4(f) Property | Size (Acres) | Potential Impacts from Proposed Action (Acres) | Officials with Jurisdiction | Type of Section 4(f) Property | Type of Section 4(f) Approval |
|---|---|---|---|---|---|---|
| 2 | George Washington Memorial Parkway | 7,146.0 | 12.2 | ACHP, NPS, VDHR | Public Park, Historic Site | Individual Evaluation |
| 3 | Chesapeake and Ohio Canal National Historical Park | ~19,575 | 15.4 | ACHP, NPS, MHT | Public Park, Historic Site | Individual Evaluation |
| 4 | Clara Barton Parkway | 96.2 | 1.8 | ACHP, NPS, MHT | Public Park, Historic Site | Individual Evaluation |
| 10 | Morningstar Tabernacle No. 88 Moses Hall and Cemetery | 1.5 | 0.3 | ACHP, MHT | Historic Site | Individual Evaluation |
| 12 | Cabin John SVP, Unit 2 | 105.0 | 1.1 | M-NCPPC | Public Park | de minimis |
| 15 | Burning Tree Club | 221.0 | 0.8 | MHT | Historic Site | de minimis |
| 17 | Fleming Local Park | 24.0 | 0.1 | M-NCPPC, MHT | Public Park, Historic Site | de minimis |
| 18 | Grosvenor Estate (Wild Acres) | 34.7 | 0.1 0.2 (Alt 10) | MHT | Historic Site | de minimis |
| 20 | Rock Creek SVP, Unit 3 | 326.6 | 3.3 2.5 (Alt 9M) | M-NCPPC, MHT, ACHP | Public Park, Historic Site | Individual Evaluation |
| 21 | Locust Hill Neighborhood Park | 5.0 | 0.3 0.2 (Alt 9M) | M-NCPPC | Public Park | de minimis |
| 27 | Rock Creek SVP, Unit 2 | 277.0 | 0.4 0.2 (Alt 9M) | M-NCPPC, ACHP, MHT | Public Park, Historic Site | Individual Evaluation |
| 29 | National Park Seminary Historic District/ Forest Glen | 23.0 | 1.2 | ACHP, MHT | Historic Site | Individual Evaluation |
| 31 | Metropolitan Branch, B&O Railroad | 405.7 | 8.8 | ACHP, MHT | Historic Site | Individual Evaluation |
| 32 | Forest Glen Historic District | 10.3 | 0.2 0.1 (Alt 9M) | MHT | Historic Site | de minimis |
| 33 | Forest Glen Neighborhood Park | 3.7 | 0.3 0.2 (Alt 9M) | M-NCPPC | Public Park | de minimis |
| 34 | Calvary Evangelical Lutheran Church | 1.8 | < 0.1 | MHT | Historic Site | de minimis |

00036009



| Map ID | Section 4(f) Property | Size (Acres) | Potential Impacts from Proposed Action (Acres) | Officials with Jurisdiction | Type of Section 4(f) Property | Type of Section 4(f) Approval |
|---|---|---|---|---|---|---|
| 36 | Sligo Creek Parkway | 543.0 | 4.1<br>3.3 (Alt 9M) | M-NCPPC, ACHP, MHT | Public Park, Historic Site | Individual Evaluation |
| 40 | South Four Corners Neighborhood Park | 3.6 | 0.1<br>< 0.1 (Alt 9M) | M-NCPPC | Public Park | de minimis |
| 42 | Montgomery Blair High School Athletic Fields | 30.0 | 1.4<br>1.1 (Alt 9M) | M-NCPPC; Montgomery County Public Schools Board of Education | Public Park | de minimis |
| 43 | Blair Local Park | 10.2 | 0.4<br>0.3 (Alt 9M) | M-NCPPC | Public Park | de minimis |
| 45 | Indian Spring Club Estates and Indian Spring Country Club | 51.0 | 1.2<br>1.1 (Alt 9M) | ACHP, MHT | Historic Site | Individual Evaluation |
| 46 | Indian Springs Terrace Local Park | 30.0 | 1.4<br>1.2 (Alt 9M) | M-NCPPC | Public Park | Individual Evaluation |
| 47 | Northwest Branch SVP, Unit 3 | 144.0 | 3.2 | M-NCPPC | Public Park | Individual Evaluation |
| 54 | Cherry Hill Road Park | 43.1 | 1.8 | M-NCPPC | Public Park | Individual Evaluation |
| 55 | Beltsville Agricultural Research Center (BARC) | 6,852 | 0.5 | MHT | Historic Site | de minimis |
| 57 | Hollywood Park | 22.3 | <0.1 | M-NCPPC | Public Park | de minimis |
| 60 | Greenbelt Historic District | 789.0 | 0.3 | NPS, MHT | Historic Site (NHL) | de minimis |
| 61 | Buddy Attick Lake Park | 85.3 | 0.1 | City of Greenbelt, NPS, MHT | Public Park, Historic Site (NHL) | de minimis |
| 62 | Indian Springs Park | 3.0 | 0.1 | City of Greenbelt, NPS, MHT | Public Park, Historic Site (NHL) | de minimis |
| 63 | Greenbelt Park | 1,100 | 0.6 | ACHP, MHT, NPS | Public Park, Historic Site | Individual Evaluation |
| 64 | Baltimore Washington Parkway | ~1,400 | 69.3 | ACHP, MHT, NPS | Public Park, Historic Site | Individual Evaluation |
| 65 | McDonald Field | 2.1 | <0.1 | City of Greenbelt | Public Park | de minimis |
| 71 | Beckett Field | 7.0 | 0.2 | City of New Carrollton | Public Park | de minimis |
| 76 | Carsondale | 35.1 | 0.1 | ACHP, MHT | Historic Site | Individual Evaluation |
| 79 | Glenarden Historic District | 306.0 | 0.8 | ACHP, MHT | Historic Site | Individual Evaluation |
| 80 | Henry P. Johnson Park | 7.1 | <0.1 | M-NCPPC, ACHP, MHT, | Public Park | Individual Evaluation |
| 81 | Southwest Branch SVP | 264.0 | 0.3 | M-NCPPC | Public Park | de minimis |
| 82 | Heritage Glen Park | 38.2 | 0.5 | M-NCPPC | Public Park | de minimis |

00036010



Draft Environmental Impact Statement

| Map ID | Section 4(f) Property | Size (Acres) | Potential Impacts from Proposed Action (Acres) | Officials with Jurisdiction | Type of Section 4(f) Property | Type of Section 4(f) Approval |
|---|---|---|---|---|---|---|
| 85 | Suitland Parkway | 419.0 | 0.3 | ACHP, MHT, NPS | Public Park, Historic Site | Individual Evaluation |
| 86 | Douglas E. Patterson Park | 26.2 | 0.7 | M-NCPPC | Public Park | *de minimis* |
| 88 | Andrews Manor Park | 4.1 | 2.6 | M-NCPPC | Public Park | Individual Evaluation |
| 89 | Manchester Estates Park | 4.6 | 0.5 | M-NCPPC | Public Park | *de minimis* |
| 90 | Henson Creek SVP | 1103.0 | 0.1 | M-NCPPC | Public Park | *de minimis* |
| 91 | Academy Woods | 6.4 | 0.2 | MHT | Historic Site | *de minimis* |
| 94 | Cabin John Regional Park | 514.0 | 5.7<br>7.2 (Alt 10)<br>4.5 (Alt 13B)<br>5.2 (Alt 13C) | M-NCPPC | Public Park | Individual Evaluation |
| 95 | Tilden Woods SVP | 67.4 | 0.2 | M-NCPPC | Public Park | *de minimis* |
| 96 | Old Farm Neighborhood Conservation Area | 0.8 | 0.1 | M-NCPPC | Public Park | *de minimis* |
| 97 | Cabin John SVP, Unit 6 | 19.8 | 0.4<br>0.3 (Alt 10) | M-NCPPC | Public Park | *de minimis* |
| 98 | Cabin John SVP (Rockville) | 33.1 | 2.1 | City of Rockville | Public Park | Individual Evaluation |
| 99 | Millennium Garden Park | 1.3 | 0.2 | City of Rockville | Public Park | *de minimis* |
| 101 | Bullards Park and Rose Hill SVP | 16.8 | 0.3 | City of Rockville | Public Park | *de minimis* |
| 102 | Rockmead Park | 27.4 | 0.2<br>0.3 (Alt 10) | City of Rockville | Public Park | *de minimis* |
| 103 | Woottons Mill Park | 95.3 | 0.2 | City of Rockville | Public Park | *de minimis* |
| 105 | Woodley Gardens | 200.0 | 0.7<br>1.1 (Alt 10)<br>1.0 (Al 13C0 | MHT | Historic Site | *de minimis* |
| 107 | Rockville Senior Center Park | 12.2 | 0.7<br>0.9 (Alt 10)<br>0.8 (Alt 13C) | City of Rockville, MHT | Public Park, Historic Site | *de minimis* |
| 108 | Ward Building | 4.8 | 0.1<br><0.1(Alt 13B) | MHT | Historic Site | *de minimis* |
| 109 | Malcolm King Park | 78.5 | 0.1 | City of Gaithersburg | Public Park | *de minimis* |
| 110 | Morris Park | 30.7 | 0.1 | City of Gaithersburg | Public Park | *de minimis* |
| **Total Potential Impacts of Section 4(f) Properties by Build Alternative** | | | **144.7 (Alt 9M)<br>145.5 (Alt 13B)<br>146.7 (Alt 13C)<br>146.8 (Alts 8 & 9)<br>149.0 (Alt 10)** | | | |

Notes: [1]The size of Section 4(f) properties is sourced from data or documentation provided by the Officials with Jurisdiction. [2]Section 4(f) properties in **Table 5-2** are sorted from west to east along I-495 and from south to north along I-270. [3]The size of the Baltimore-Washington Parkway in **Table 5-2** is only the area within the historic boundary, which ends at the Anne Arundel County border.  The full size of the Baltimore-Washington Parkway is larger.

00036011

**Table 5-3: Inventory of Properties that Qualify as Section 4(f) Exemptions**

| Map ID | Section 4(f) Property | Size (Acres) | Potential Impacts from Proposed Action (Acres) | Officials with Jurisdiction | Type of Section 4(f) Property | Exception Criteria |
|--------|----------------------|--------------|-----------------------------------------------|------------------------------|-------------------------------|---------------------|
| 16 | Bethesda Trolley Trail | 4 miles | 0.2 | Montgomery County Department of Transportation | Public Park/Trail | 23 CFR 774.13(f)(3) |
| 58 | Baltimore & Ohio Railroad, Washington Branch | 146.4 | 0.6 | MHT | Historic Site | 23 CFR 774.13(a)(3) |
| 66 | Spellman Overpass | 1.0 | <0.1 | City of Greenbelt | Public Park | 23 CFR 774.13(f)(3) |
| 72 | Baltimore & Potomac Railroad, Washington City Branch | 284.4 | 1.0 | MHT | Historic Site | 23 CFR 774.13(a)(3) |
| N/A | Site 18MO749 | N/A | N/A | MHT, NPS | Historic Site | 23 CFR 774.13(b) |
| N/A | Site 18MO751 | N/A | N/A | MHT, NPS | Historic Site | 23 CFR 774.13(b) |
| N/A | Site 44FX0374 | N/A | N/A | VDHR, NPS | Historic Site | 23 CFR 774.13(b) |
| N/A | Site 44FX0379 | N/A | N/A | VDHR, NPS | Historic Site | 23 CFR 774.13(b) |
| N/A | Site 44FX0381 | N/A | N/A | VDHR, NPS | Historic Site | 23 CFR 774.13(b) |
| N/A | Site 44FX0389 | N/A | N/A | VDHR, NPS | Historic Site | 23 CFR 774.13(b) |

Note: To protect location information, archaeological sites are not inventoried on Section 4(f) mapping.

## 5.6   Avoidance Alternatives and Analysis

A *feasible and prudent avoidance alternative* is one that avoids using any Section 4(f) property and does not cause other severe problems of a magnitude that substantially outweigh the importance of protecting the Section 4(f) property (23 CFR 774.17). In assessing the importance of protecting Section 4(f) properties, it is appropriate to consider the relative value of the resource to the preservation purpose of the statute. The preservation purpose of Section 4(f) is described in 49 U.S.C. § 303(a), which states: "It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites."

The presence of linear, mostly north-south oriented, Section 4(f) properties such as Cabin John Stream Valley Park, Rock Creek Stream Valley Park, Sligo Creek Stream Valley Park, Northwest Branch Stream Valley Park, Southwest Stream Valley Park, Henson Creek Stream Valley Park, George Washington Memorial Parkway, Clara Barton Parkway, Baltimore Washington Parkway, Sligo Creek Parkway, and Suitland Parkway, in contrast to the largely east-west oriented interstate corridors, limits the potential for feasible and prudent avoidance alternatives to exist in this corridor. Each of these park properties extends perpendicular to the alignment of I-495 or I-270. Additionally, the area in the vicinity of the study limits is a densely populated, urban area with large residential communities, business complexes, large

00036012


governmental institutions, numerous community facilities, and hundreds of sensitive cultural and natural resources. Since I-495 and I-270 are existing interstate systems that serve local and regional traffic and connect to major arterials in each county, addressing the need on a system level is critical to achieving the overall purpose of the Study.

Six alternatives that would completely avoid the use of any Section 4(f) properties have been developed and are discussed below. They are evaluated in accordance with the definition of a *feasible* and *prudent* avoidance alternative found in 23 CFR 774.17.

- **Alternative 1: No Build Alternative** would include routine maintenance and safety improvements, but there would be no changes to the existing lane configuration on I-495 and I-270. There would be no operational improvements or increased capacity along I-495 and I-270; existing and future traffic volumes would not be accommodated at this location. The No Build Alternative would not meet Purpose and Need and would cause other severe problems that substantially outweigh the importance of protecting Section 4(f) properties.  I-495 and I-270 are the two most heavily traveled freeways in the National Capital Region, each with an Average Annual Daily Traffic volume of up to 260,000 vehicles per day in 2018.  On both of these interstate systems, congestion within the study area lasts between 7 and 10 hours per day resulting in the second highest congestion in the United States. In 2040, under the no build condition, the average daily traffic is estimated to increase by 7-17%, depending on the roadway segment along the 48-mile study corridor. Alternative 1 would not accommodate existing and long-term traffic growth, enhance trip reliability, or improve the movement of goods and services. Alternative 1 would not provide the much-needed capacity improvements to serve both existing and future traffic growth on these interstate systems.

- **Increased Bus Transit** would include expansion of the existing bus transit services within the limits of the study  on both I-270 and I-495 and the additional surrounding roadway network.  This could be in the form of an increase in bus service on existing I-495 and I-270 within the study limits, or consideration of dedicated facilities such as bus rapid transit systems on existing infrastructure. To avoid impacting Section 4(f) property, the Increased Bus Transit Alternative would not include any capacity improvements to I-495 and I-270 within the limits of the study and therefore the bus transit would be subject to the same existing delays on both interstate corridors that are expected to worsen in the future.

  A 2017 study by the National Capital Region TPB, Long-Range Plan Task Force, titled, *An Assessment of Regional Initiatives for the National Capital Region - Draft Technical Report on Phase II of the TPB Long-Range Plan Task Force[1],* studied a series of regional transportation initiatives compared to the baseline of the Financially Constrained Long Range Plan (CLRP). This study showed that an extensive, regionwide network of BRT and transitway facilities would result in a one percent reduction in average travel times for transit, HOV and single-occupancy vehicle commute trips relative to the 2040 CLRP scenario.  Daily vehicle hours of delay would be reduced by two percent, and transit commute mode share would increase four percent.  Daily VMT and daily VMT per capita would be reduced by less than one percent.  Share of passenger miles on reliable modes would increase by six percent.

---

[1] https://www.mwcog.org/documents/2017/12/20/long-range-plan-task-force-reports-projects-regional-transportation-priorities-plan-scenario-planning-tpb/

00036013



The Increased Bus Transit Alternative would not meet the Purpose and Need and would cause other severe problems that outweigh the importance of protecting Section 4(f) properties. Given the modest improvements to travel times and vehicle hours of delay expected from an extensive regionwide network of BRT and transitways, dedicated BRT facilities along only I-495 and I-270 would not achieve the Study's Purpose and Need as it would not address existing and long-term traffic growth, would not enhance trip reliability along I-495 or I-270, and would not accommodate Homeland Security. Under this alternative, fares would be collected, but additional analysis would be needed to determine financial feasibility based on ridership and operations and maintenance costs. In addition, improvement in the movement of goods and services would be limited to commuter benefits and not the movement of freight or services that require vehicular movement (i.e., mechanical, electrical, etc. services). Additional discussion of the Increased Transit Alternative can be found in **Appendix F**, **Section 3.1.2**.

- **Transportation Systems Management (TSM)/Transportation Demand Management (TDM) Alternative** would improve the operation and coordination of transportation services and facilities through strategies such as ramp metering, modifications to turn lanes, reconfiguring interchanges, changing driver behavior to provide the most efficient and effective use of existing transportation services and facilities. TSM/TDM strategies would only be implemented where no impacts to Section 4(f) properties would occur. Some TSM/TDM strategies have been incorporated into the Proposed Action, such as ramp metering and signal timing optimization. Other TSM/TDM measures have been determined infeasible because they would result in additional impacts to Section 4(f) properties or would not meet the Purpose and Need.

  TSM/TDM Alternatives, by their nature, do not include the addition of roadway capacity, and could not address the large-scale challenges with existing capacity along the existing interstate systems. Therefore, because of the limited scope of these types of improvements, TSM/TDM improvements alone would not address the existing or future capacity needs. The TSM/TDM Alternative is therefore not prudent because it would be unreasonable to proceed with the alternative in light of the stated Purpose and Need and it would result in unacceptable operational problems.

  Because the actions that would be included as part of TSM/TDM solutions would only address a small fraction of congestion challenges and only do so in the short-term, the TSM/TDM Alternative would not accommodate existing and future long-term traffic, nor would these measures enhance trip reliability. In addition, TSM/TDM Alternative does not directly provide an additional travel choice, accommodate Homeland Security, improve the movement of goods and services, nor enhance multimodal connectivity; and it does not provide a revenue source. Additional discussion of the TSM/TDM Alternative can be found in **Chapter 2, Section 2.5.2 and Appendix F, Section 3.1.3**.

- **Section 4(f) Avoidance Alternative 1** would construct four, new managed lanes off-alignment between George Washington Memorial Parkway and MD 4. The managed lanes would be constructed in Montgomery and Prince George's Counties, outside the alignment of existing I-495 between the American Legion Bridge and the MD 202 interchange. The alignment of Section 4(f) Avoidance Alternative 1 would cross from outside to inside the existing I-495 at the MD 202 interchange and continue south until rejoining existing I-495 at the limit of the study area between

00036014

the interchanges with MD 4 and MD 5.  To avoid the use of any Section 4(f) property on I-270, four managed lanes would be constructed off alignment to the west of existing I-270.  The alignment of Section 4(f) Avoidance Alternative 1 would rejoin existing I-270 at the MD 200 interchange, the limit of the study area.

The proposed improvements would avoid impacts to all Section 4(f) properties inventoried in the corridor study boundary, including by bridging over long linear Section 4(f) properties such as stream valley parks. This alternative would construct a new roadway on new alignment that would require a LOD 200 feet wide by 50 miles long at an estimated construction cost of $25 billion. By comparison, the estimated range of costs for the Proposed Action is between $8.7 billion and $10 billion. This area has not been subject to a detailed, technical inventory of Section 4(f) properties or other environmental resources. However, desktop review of the alignment indicates it would likely result in significant impacts to neighborhoods causing many relocations and impacts to natural resources. After reasonable mitigation, it would still cause severe social, economic and environmental impacts. Avoidance Alternative 1 would cause severe problems that outweigh the importance of protecting Section 4(f) properties.  A map and additional discussion of Section 4(f) Avoidance Alternative 1 can be found in **Appendix F, Section 3.1.4.**

- **Section 4(f) Avoidance Alternative 2** would construct four, new managed lanes off-alignment between George Washington Memorial Parkway and MD 4.  The managed lanes would be constructed in Montgomery and Prince George's Counties, inside the alignment of existing I-495 through nearly full the limits of the study: from the Potomac River crossing and between interchanges with MD 4 and MD 5.  To avoid the use of any Section 4(f) property on I-270, four managed lanes would also be constructed off-alignment to the east of existing I-270.  The alignment of Section 4(f) Avoidance Alternative 2 would rejoin existing I-270 at the MD 200 interchange, the limit of the study area.

  This alternative is similar to Avoidance Alternative 1 in that all Section 4(f) properties in the corridor study boundary would be avoided, but it would build a new highway on new alignment, having similar severe impacts to socioeconomic and natural resources. Constructing a new roadway on new alignment would require a LOD 200 feet wide along a distance of approximately 40 miles at an estimated construction cost of $20 billion. By comparison, the estimated range of costs for the Proposed Action is between $8.7 billion and $10 billion.  This area has not been subject to a detailed, technical inventory of Section 4(f) properties or other environmental resources. However, desktop review of the alignment plainly indicates it would likely result in significant impacts to neighborhoods causing many relocations and impacts to natural resources. After reasonable mitigation, it would still cause severe social, economic and environmental impacts. Avoidance Alternative 2 would cause severe problems that outweigh the importance of protecting Section 4(f) properties. A map and additional discussion of Section 4(f) Avoidance Alternative 2 can be found in **Appendix F, Section 3.1.5.**

- **Section 4(f) Avoidance Alternative 3** would construct four, new managed lanes as proposed in the Proposed Action but incorporate alignment shifts or bridges to avoid impacts to Section 4(f) properties at 15 different locations to avoid impacts to all Section 4(f) properties inventoried within the corridor study boundary.  The estimated cumulative cost of the location specific alignment shifts would be $18 billion. By comparison, the estimated range of costs for the Proposed Action is between $8.7 billion and $10 billion.  The avoidance alignment shifts would

00036015



involve construction on new location adjacent to I-495 and I-270 disrupting communities from relocations and resulting in significant additional impacts to natural resources. After reasonable mitigation, it would still cause severe social, economic and environmental impacts. Avoidance Alternative 3 would cause operational challenges to access and egress between the managed and general purpose lanes. Avoidance Alternative 3 would cause other severe problems that outweigh the importance of protecting Section 4(f) properties. Additional discussion of Section 4(f) Avoidance Alternative 1 can be found in **Appendix F, Section 3.1.6, Page 157**.

The orientation of multiple linear parks perpendicular to the study alignments presents significant challenges to complete avoidance of all Section 4(f) properties. The analysis summarized above and presented in greater detail in **Appendix F** was not able to identify an alternative that totally avoids the use of any Section 4(f) property while addressing the Purpose and Need and without causing other severe problems of a magnitude that substantially outweighs the importance of protecting Section 4(f) properties. The final determination of whether there is no feasible and prudent avoidance alternative to the use of land from Section 4(f) properties will be presented in the Final Section 4(f) Evaluation. Refer to **Appendix F, Section 3** for a detailed discussion of these avoidance alternatives.

## 5.7  All Possible Planning to Minimize Harm

FHWA may not approve the use of Section 4(f) property unless there is no feasible and prudent avoidance alternative and the action includes all possible planning to minimize harm to the property resulting from such use. "All possible planning," as defined in 23 CFR 774.17, includes all reasonable measures to minimize harm or mitigate for adverse impacts and effects. Measures to avoid and minimize harm have been incorporated into the Proposed Action, as discussed in **Chapter 2, Section 2.7.4** of this DEIS. These measures include but are not limited to:

- Minimization of visual impacts (i.e. removing flyover ramps, consolidating and reducing fixed and dynamic signing along historic parkways)
- Reducing the typical section width by varying type of stormwater control (i.e. undergrounding stormwater management facilities, removing or limiting stormwater management facilities in parks)
- Widening toward the existing median wherever possible
- Alignment shifts
- Use of retaining walls to avoid or minimize property impacts due to additional grading or filling.
- Landscaping
- Minimizing vegetation disturbance
- Mitigation

MDOT SHA has engaged in extensive coordination with the majority of the Officials with Jurisdiction over Section 4(f) properties through existing regulatory processes (such as Section 106 consultation), regularly scheduled coordination meetings, and meetings requested by stakeholders. Additional coordination took place via written letter, over the phone, and via electronic communication. This coordination resulted in minimizing harm to Section 4(f) properties through a variety of means, such as: eliminating or relocating stormwater management facilities; shifting the centerline of the transportation facility; developing alternative interchange configurations; relocating slip ramps; refining construction access locations; and limiting the number, type, and configuration of signage. The results of coordination and descriptions of

00036016



the minimization efforts resulting from such coordination are discussed in detail throughout **Appendix F, Section 2**.

Minimization of harm may entail both alternative design modifications that reduce the amount of Section 4(f) property used, such as those described in the preceding paragraphs, and mitigation measures that compensate for residual impacts. For Section 4(f) uses that cannot be avoided or further minimized, mitigation would be considered. The level of mitigation considered would be commensurate with the severity of the impact on the Section 4(f) property. Final mitigation and minimization measures would be determined through continued consultation with the officials having jurisdiction over each Section 4(f) property and presented in the Final Section 4(f) Evaluation. MDOT SHA and FHWA have committed to providing meaningful benefit to impacted Section 4(f) properties by improving the values, services, attributes and functions that may be compromised. The goal of mitigation is net benefit to the property impacted. To date, preliminary mitigation discussions with many of the Officials with Jurisdiction have included replacement land, completing additional cultural and natural resource surveys, reconfiguring recreational facilities, relocating recreational facilities out of environmentally compromised areas (i.e. floodplains), restoring streams, and funding of cultural and park related buildings and amenities.

Potential mitigation measures for the Section 4(f) use of historic sites would be identified within a Section 106 Programmatic Agreement that would be developed with FHWA, MDOT SHA, ACHP, NPS, MHT, VDHR, and the Section 106 consulting parties (refer to **Appendix H** for the Draft Section 106 Programmatic Agreement). Mitigation measures will be developed on a case by case basis. By signature, agencies will assure that the mitigation measures would be completed.

All minimization and mitigation measures will be documented in the Final Section 4(f) Evaluation.

Pursuant to 23 CFR 774.17, a determination of Section 4(f) *de minimis* impacts inherently includes the requirement for all possible planning to minimize harm because impacts have already been reduced to a *de minimis* level.

## 5.8   Least Overall Harm

If the avoidance analysis concludes there is no feasible and prudent avoidance alternative, then FHWA may approve, from among the remaining alternatives that use Section 4(f) property, only the alternative that causes the least overall harm in light of the statute's preservation purpose. This analysis is required when multiple alternatives that use Section 4(f) property remain under consideration.

The least overall harm to Section 4(f) property is determined by balancing the following factors set forth in 23 CFR 774.3(c)(1)):

  (i) The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);
  (ii) The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;
  (iii) The relative significance of each Section 4(f) property;
  (iv) The views of the official(s) with jurisdiction over each Section 4(f) property;
  (v) The degree to which each alternative meets the purpose and need for the project;

00036017

(vi) After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

(vii) Substantial differences in costs among the alternatives.

By balancing the seven factors, four of which concern the degree of harm to Section 4(f) properties, FHWA will be able to consider all relevant concerns to determine which alternative would cause the least overall harm in light of the statute's preservation purpose.  For the *Draft Section 4(f) Evaluation*, location specific alignment shifts were developed that would avoid one or more of the 22 Section 4(f) properties that would experience a non-*de minimis*. The location specific alignment shifts primarily follow the alignment of the Proposed Action, but incorporate alignment shifts or design changes that locally avoid specific Section 4(f) properties.  In general when compared to the Proposed Action, these location specific alignment shifts would result in additional use of other Section 4(f) properties, cause a severe magnitude of adverse impacts to resources not protected by Section 4(f), and/or result in additional construction, maintenance, or operational costs of extraordinary magnitude. The alignment shift alternatives are described and evaluated in **Appendix F**, **Section 5.1, Page 166.**

The Least Overall Harm section also evaluates two additional alternatives that would potentially reduce impacts to Section 4(f) properties: Alternative 5 and the MD 200 Diversion Alternative. Analysis shows that  these two alternatives would result in less impact to Section 4(f) property; however, they would not meet the Purpose and Need of the Study.

The final section of the Least Overall Harm analysis evaluates the Proposed Action.  This analysis balances the seven factors to determine which alternative would cause the least overall harm in light of the preservation purpose of Section 4(f).  Refer to **Appendix F**, **Section 5** for the detailed discussion of the least overall harm analysis.

## 5.9   Coordination

Many of the Officials with Jurisdiction have been active Cooperating or Participating Agencies in the development of the DEIS and through consultation in the Section 106 process. Coordination with the Officials with Jurisdiction have included letters, calls, emails, in-person meetings, and other written correspondence throughout the Study.  Consultation and coordination with these agencies is ongoing and will continue with the review of the *Draft Section 4(f) Evaluation*. For detailed information on the coordination to-date (refer to **Appendix F, Section 6**).

The public has an opportunity to review and comment on the *Draft Section 4(f) Evaluation* concurrently with the DEIS. For parks, recreation areas, or wildlife and waterfowl refuges, the Officials with Jurisdiction over Section 4(f) property must be informed of the intent to make a *de minimis* impact determination, after which an opportunity for public review and comment must be provided. For historic sites, FHWA and MDOT SHA will consult with the parties participating in the Section 106 process, but is not required to provide additional public notice or provide additional opportunity for review and comment of *de minimis* impact findings.  Comments from the public related to the Draft Section 4(f) analysis will be addressed in the Final Section 4(f) Evaluation.

00036018

Draft Environmental Impact Statement 

Table 5-4 summarizes the coordination with Officials with Jurisdiction and other regulatory agencies to date. FHWA will complete coordination prior to making Section 4(f) approvals under 23 CFR 774.3. **Appendix F**, **Section 6** details coordination completed with Officials with Jurisdiction to date.

**Table 5-4: Section 4(f) Officials with Jurisdiction Coordination Summary**

| Officials With Jurisdiction | Subject | Discussion Topic | Upcoming Coordination |
|---|---|---|---|
| Advisory Council on Historic Preservation | Participating Agency | FHWA notified ACHP about the study. ACHP replied to FHWA they are participating in Section 106 consultation | Determination of eligibility and finding of effect review, PA execution, Draft Section 4(f) Evaluation review of historic properties |
| City of Gaithersburg | Briefing Mayor and City Council, Scoping, Property Access, Consulting Party | Project status, Scoping comments, property access, cultural resources study overview and schedule | Draft Section 4(f) Evaluation review of City properties |
| City of Greenbelt | Purpose and Need, Alternatives, Impacts; Impacts to Historic Properties | Section 106 Consulting Party acceptance, Project status briefing, comments on preliminary list of adversely and potentially adversely affected historic properties, PA Development | Draft Section 4(f) Evaluation review of City properties |
| City of New Carrollton | Purpose and Need, Alternatives, Impacts | Project status briefing | Draft Section 4(f) Evaluation review of City properties |
| City of Rockville | Section 106 Consulting Party; Impacts to Parks and Historic Properties | Section 106 Consulting Party acceptance, Project status briefing | Section 106 review; Draft Section 4(f) Evaluation review of City properties |
| DOI/HUD | | | Draft Section 4(f) Evaluation review |
| Maryland Historical Trust | Participating Agency, Section 106 approach, APE Concurrence, Gap Analysis, Inventory, NRHP Eligibility, Historic Property Effect Determination | Participating agency, concurrence with Section 106 initiation letter, cultural resources information gap concurrence, revised APE concurrence, NRHP eligibility review and comment; Concurrence on Section 106 effects on historic properties | Coordination on Draft Programmatic Agreement; Review of Draft Section 4(f) Evaluation |
| MNCPPC-Montgomery County | Cooperating Agency, Property Access, Impacts, Avoidance, Minimization Mitigation | Cooperating Agency and Section 106 Consulting Party invitation and acceptance, impacts to park properties, avoidance, minimization, mitigation | Draft Section 4(f) Evaluation review Montgomery County M-NCPPC parks |
| MNCPPC- Prince George's County | Cooperating Agency, Property Access, | Cooperating Agency and Section 106 Consulting Party | Draft Section 4(f) Evaluation review |

00036019

| Officials With Jurisdiction | Subject | Discussion Topic | Upcoming Coordination |
|---|---|---|---|
| | Impacts, Avoidance, Minimization, Mitigation | invitation and acceptance, impacts to park properties, avoidance, minimization, mitigation | Prince George's County M-NCPPC parks |
| NPS | Cooperating Agency, Property Access, Cultural Resources, Parks, Impacts, Avoidance, Minimization, Mitigation | Cooperating Agency and Section 106 Consulting Party invitation and acceptance, property access, cultural resources inventory permitting, determinations of NRHP eligibility for NPS properties, impact avoidance, minimization and mitigation | Section 106 consultation for NPS properties, Draft Section 4(f) Evaluation of NPS properties |
| USDA | Participating Agency, Section 106 Consultation, Property Impacts, Minimization, Mitigation | Participating Agency and Section 106 Consulting Party invitation and acceptance, BARC property impacts, minimization, mitigation | Preliminary finding of effect, Section 106 consultation, Draft Section 4(f) Evaluation review |
| Virginia Department of Historic Resources | Participating Agency, Section 106 Approach, APE Definition Concurrence, Archaeological Scope; Concurrence and comments on MDOT SHA eligibility determinations | Participating Agency invitation and acceptance, Section 106 initiation, APE definition and revised APE concurrence, archaeological scope of investigations in Virginia; Concurrence and comments on MDOT SHA eligibility determinations | Preliminary finding of effect and Draft Section 4(f) historic properties review |

## 5.10 Mitigation

To determine meaningful mitigation for impacts to parkland resources, MDOT SHA has engaged in ongoing discussions with Officials with Jurisdiction and received substantive input from them concerning potential mitigation measures. Pursuant to those discussions and a review of best practices to address parkland impacts, possible mitigation measures may include:

- Replacement with lands of at least comparable value, and of reasonably equivalent usefulness and location
- Replacement of facilities impacted by the project, including sidewalks, paths, benches, lights, trees, fields, courts, stormwater facilities, parking lots, trails, swales, buildings, and other facilities
- Relocation of recreational facilities outside of environmentally compromised areas (i.e. floodplains)
- Restoration and landscaping of disturbed areas
- Incorporation of design features and habitat features where necessary
- Payment of fair market value for the land
- Rehabilitation of deteriorating facilities and assets on nearby parkland

00036020

- Relocation of impacted facilities and assets to allow for use similar to that which existed pre-impact
- Design and construction of new facilities
- Non-native invasive species management
- Environmental enhancements with the goals of habitat and/or water quality improvements
- Any additional measures recommended during consultation with the official with jurisdiction that are relevant to and commensurate with the impacts.

00036021

Draft Environmental Impact Statement



# 6  ONE FEDERAL DECISION

## 6.1  Background

*Executive Order 13807: Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects[1]* requires Federal agencies to process environmental reviews and authorization decisions for major infrastructure projects as "One Federal Decision (OFD)." The Executive Order 13807 (EO) sets a goal of reducing the average time to complete environmental reviews under the National Environmental Policy Act (NEPA) and authorization decisions for major infrastructure projects within an agency average two years from the publication of the Notice of Intent (NOI). The EO also directs that, except under certain circumstances,[2] the Federal lead agency and all Cooperating and Participating agencies shall "record any individual agency decision in one Record of Decision (ROD)" and prepare a single Environmental Impact Statement (EIS). Provided the EIS includes adequate detail to inform the agency decisions, the EO requires obtaining permits and approvals within 90 days of the issuance of the ROD[3]. The EO also requires major infrastructure projects to be managed under a single permitting timetable covering environmental review and authorizations.

## 6.2  Agency Roles

In accordance with 40 CFR 1501.6 and 23 U.S.C. § 139(d)(5), agencies with jurisdiction by law should be invited to serve as Cooperating Agencies for an EIS.  Other agencies with special interest or expertise with respect to any environmental impact involved in the proposed project or project alternative may also be invited.

The Federal Highway Administration (FHWA) is the lead Federal agency for the Study. The Cooperating Agencies for this Study include those Federal and state agencies that would ultimately be responsible for Federal authorization decisions. In addition, other key Federal, state, regional, and local agencies with regulatory or management jurisdiction over sensitive resources were invited to act as Cooperating Agencies. There are eight Cooperating Agencies (four Federal, three state, and one regional), 18 Participating Agencies (ten Federal, six state, and two county), and seven Notified Agencies (three Federal, one state, and three regional) for the Study. An overview of the Federal, state, and regional Cooperating Agencies is provided below. Refer to **Chapter 7, Table 7-1** and the *Public Involvement and Agency Coordination Technical Report* (**Appendix P**), for a complete listing of the Lead, Cooperating, Participating, and Notified Agencies for the Study.

The following are the Federal Cooperating Agencies with authorization decision responsibilities, and thus are subject to the OFD requirement for this Study:

---

[1] Exec. Order No. 13807, 82 Fed. Reg. 40463 (August 15, 2017), https://www.whitehouse .gov/presidential-actions/presidential-executive-order-establishing-discipline-accountability-environmental-review-permitting-process-infrastructure/

[2] The EO provides that a single ROD shall be issued, "unless the project sponsor requests that agencies issue separate NEPA documents, the NEPA obligations of a cooperating or participating agency have already been satisfied, or the lead Federal agency determines that a single ROD would not best promote completion of the project's environmental review and authorization process."

[3] The lead Federal Agency may extend the 90-day deadline if it determines Federal law prohibits the agency from issuing its approval within 90 days or an extension would better promote completion of the project's environmental review and authorization process or the project sponsors requests a different timeline.  Exec. Order No. 13807, 82 Fed. Reg. 40463 (August 15, 2017). https://www.whitehouse.gov/wp-content/uploads/2018/04/MOU-One-Federal-Decision-m-18-13-Part-2-1.pdf

00036022

- US Army Corps of Engineers (USACE) Baltimore District
- US Environmental Protection Agency (EPA)
- National Park Service (NPS)
- National Capital Planning Commission (NCPC)[4]

The state Cooperating Agencies for the Study are:

- Maryland Department of Environment (MDE)
- Maryland Department of Natural Resources (MDNR)
- Virginia Department of Transportation (VDOT)

The one regional Cooperating Agency is Maryland-National Capital Park and Planning Commission (M-NCPPC) covering both Montgomery and Prince George's Counties.

## 6.3 Concurrence Points

The 2018 *Memorandum of Understanding Implementing One Federal Decision Under Executive Order 13807*[5] issued by the Office of Management and Budget (OMB) and the Council on Environmental Quality (CEQ) provides a framework for implementation of EO 13807. The Memorandum of Understanding (MOU) identifies three concurrence points in the environmental review process where the lead Federal agency must request the concurrence of Cooperating Agencies with authorization decision responsibilities:

- Purpose and Need (generally prior to the issuance of the notice of intent for an infrastructure project);
- Alternatives to be carried forward for evaluation (prior to detailed analysis in the Draft EIS); and
- Identified preferred alternative (prior to identification in the Draft EIS or the Final EIS).

A Coordination Plan[6] was developed during the scoping phase of the Study, which served as a schedule of concurrence points for the Purpose and Need, Alternatives Retained for Detailed Study (ARDS), and the Preferred Alternative. Coordination with the Cooperating Agencies on the concurrence points for the Study occurred at Interagency Working Group (IAWG) Meetings and other resource specific coordination meetings.

Written concurrence was received[7] on the Purpose and Need on May 16, 2018, on the ARDS on June 5, 2019, and on the Revised ARDS on October 16, 2019. Concurrence on the Preferred Alternative will occur during the development of the Final EIS.

---

[4] NCPC is not subject to the One Federal Decision Memorandum of Understanding (MOU) but has agreed to the "spirit" of the Executive Order 13807 through coordination with FHWA.
[5] Memorandum of Understanding Implementing One Federal Decision Under Executive Order 13807, https://www.whitehouse.gov/wp-content/uploads/2018/04/MOU-One-Federal-Decision-m-18-13-Part-2-1.pdf
[6] Pursuant to 23 U.S.C. 139(g)
[7] NCPC concurred on the Purpose and Need only; M-NCPPC did not concur on Purpose and Need or ARDS, including revised ARDS

00036023



## 6.4    Federal Cooperating Agencies Authorization

### 6.4.1    Ongoing Coordination with National Park Service (NPS)

The NPS authorization decision relates to consideration of a Special Use Permit for the temporary use of land under its administration for construction staging and execution of a highway deed easement by FHWA, pursuant to the authority of 23 U.S.C. 107(d) for the proposed permanent use of a portion of that land for the project.

Assuming selection of a Build Alternative, the NPS action would be taken in response to FHWA's request for land for highway purposes from the following NPS park properties: George Washington Memorial Parkway, Chesapeake and Ohio Canal National Historical Park, Clara Barton Parkway, Baltimore-Washington Parkway, Greenbelt Park, and Suitland Parkway and their accompanying administered properties, as expressed in statute, regulation, and policies.

After conclusion of the NEPA process and NPS agrees to the use of the impacted lanes, FHWA would officially request land for highway purposes via execution of a highway deed easement. NPS authorization or consent of the request would be required to advance the transfer of land for permanent incorporation into transportation use. The execution of a highway deed easement would be done in compliance with 23 U.S.C. 107(d) which authorizes the FHWA to arrange with Federal agencies to provide rights-of-way to state DOT's whenever such rights-of-way are required for the Interstate System and NPS Director's Order (DO) #87D: Non-NPS Roads, which sets forth NPS operational policies and procedures for responding to requests for use of national parks for non-NPS highway projects partially or fully funded under Title 23 of the United States Code. The project would also require NPS to issue a Special Use Permit for the temporary use of land under its administration for construction staging.

### A.    Specific Impacts to NPS Properties

In coordination with NPS and to assist NPS' decision making, impacts occurring on NPS properties have been called out specifically, and the impacts to NPS resources are quantified. All quantified impacts presented below and in Chapter 4 of the DEIS (and in referenced technical reports) are assumed to be permanent or long-term effects. As design is advanced on a Preferred Alternative, the long-term effects will be refined and short-term, construction-related effects will be quantified and documented in the FEIS and Final Section 4(f) Evaluation.   The following text summarizes the potential, specific impacts to resources on NPS properties.   Further details on these impacts are available in Chapter 4 and the referenced technical reports.

The potential impacts from the Build Alternatives to the six NPS park and historic properties are identical as shown in **Table 6-1**. Additional details on these potential impacts are included in **Chapter 5** of this DEIS and the *Draft Section 4(f) Evaluation* (**Appendix F**).

00036024



**Table 6-1: Potential Impacts to NPS Properties**

| NPS Property | Total Size (Acres) | Potential Impacts from the Alternatives 8, 9, 9M, 10, 13B, 13C (Acres) |
|---|---|---|
| George Washington Memorial Parkway | 7,146 | 12.2 |
| Chesapeake and Ohio Canal National Historical Park | 19,575 | 15.4 |
| Clara Barton Parkway | 96.2 | 1.8 |
| Baltimore-Washington Parkway[1] | ~1,400 | 69.3 |
| Greenbelt Park | 1,176 | 0.6 |
| Suitland Parkway | 419 | 0.3 |

Note: [1]The size of the Baltimore-Washington Parkway in Table 5-2 is only the area within the historic boundary, which ends at the Anne Arundel County border.  The full size of the Baltimore Washington Parkway is larger.

NPS wetlands subject to NPS DO #77-1: Wetland Protection include: three palustrine emergent (PEM), nine palustrine forested (PFO), one palustrine scrub-shrub (PSS), four riverine lower perennial, two riverine upper perennial, and 22 riverine intermittent wetlands. The impacts to wetland features on NPS properties is summarized in **Table 6-2**. (Refer to **Table 4-21** and *Appendix I of the Natural Resources Technical Report* (**Appendix K**) for details on specific wetland impacts on NPS properties.) NPS requires avoidance, minimization, and compensation for unavoidable adverse impacts to wetlands via restoration of degraded wetlands on NPS property at a minimum of a 1:1 restoration/replacement ratio that can be adjusted upward to ensure functional replacement. NPS requires that a Wetland Statement of Findings (WSOF) be prepared in accordance with the procedural manual during NEPA documenting compliance with DO #77-1 for proposed actions that would result in adverse impacts to wetlands. The draft WSOF will be developed once a Preferred Alternative has been identified and temporary and permanent impacts have been determined. The FEIS and the draft WSOF will be advertised for public comment and will have a concurrent 30-day comment period. The final, signed WSOF will be attached to the ROD.

Work within floodplains on NPS lands must adhere to NPS DO #77-2: Floodplain Management, unless exempted, which calls for the avoidance of long- and short-term environmental effects associated with the occupancy and modification of floodplains. The Floodplain Statement of Findings will be prepared and may be combined with the WSOF in the FEIS.

**Table 6-2: Summary of NPS Wetland Impacts on NPS Properties within the Corridor Study Boundary**

| NPS Property | Potential Impacts to NPS Wetlands from the Alternatives 8, 9, 9M, 10, 13B, 13C (Acres) |
|---|---|
| George Washington Memorial Parkway | 0.09 |
| Chesapeake and Ohio Canal National Historical Park | 1.37 |
| Clara Barton Parkway | 0.02 |
| Baltimore-Washington Parkway | 0.39 |
| Greenbelt Park | 0.13 |
| Suitland Parkway | 0.29 |
| **TOTAL NPS WETLAND IMPACTS ON NPS PROPERTIES** | 2.29 |

Note: The impacts indicated in this table are only those occurring on NPS property as defined in the NPS DO #77-1: Wetland Protection and Procedural Manual #77-1: Wetland Protection.

00036025



In a letter dated March 12, 2020, the Maryland Historical Trust (MHT) concurred with the eligibility and effects determination for the Study as well as the need for further Phase I and II archaeological investigation in the specified areas to which access was denied. **Table 6-3** summarizes the NPS historic properties that would incur an adverse effect from the Build Alternatives (refer to **Tables 4-11 and 4-12** and **Appendix G** for specific details on the adverse effects to historic properties). Due to the complexity of the Study and current state of design, MDOT SHA and FHWA will conclude the Section 106 process through execution of a Programmatic Agreement (PA). MDOT SHA and FHWA will work with NPS to resolve the adverse effect through development of appropriate mitigation measures that will be captured in the PA.

**Table 6-3: NPS Historic Properties with Adverse Effect**

| MIHP#/DHR# | Name | Period of Significance | NRHP Criteria[2] |
|---|---|---|---|
| PG:69-26 | Baltimore-Washington Parkway | 1942-1954 | A, C |
| M: 12-46 | Chesapeake and Ohio Canal National Historical Park | 1828-1924 | A, C, D |
| M: 35-61 and 029-0228 (Virginia) | George Washington Memorial Parkway/Clara Barton Memorial Parkway | 1930-1966 | B, C |
| PG:67-69 | Greenbelt Park | Unspecified | A, C, D |
| 18MO749 | C&O Canal Site 1 | Early Woodland | D |
| 18MO751 | C&O Canal Site 3 | 1828-1924 | D |
| (N/A) | Dead Run Ridges Archaeological District[1] | Late Archaic-Woodland | D |

Note: [1] On February 14, 2020, Virginia DHR did not concur with characterizing the resources as an archaeological district and recommended four sites as individually eligible for listing on the NRHP.
[2]The NRHP Criteria are:
   A.  2 - The characteristics of an historic property qualifying it for inclusion in or eligibility for the NRHP (36 CFR Part 800.16[i]), include A: Associated with events that have made a significant contribution to the broad patterns of our history; or
   B.  Associated with the lives of persons significant in our past; or
   C.  Embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or
   D.  Have yielded or may be likely to yield, information important in prehistory or history.

NPS has identified state and globally rare plants and invertebrates from NPS property within the Potomac Gorge on both sides of the Potomac River through numerous distributional surveys over the past ten to twenty years. Some of these areas lie adjacent to the corridor study boundary. **Table 6-4** includes the list of these state-listed rare plant and invertebrate species from the NPS Potomac Gorge park surveys.

00036026


**Table 6-4: Virginia and Maryland State Listed Species From the Potomac Gorge Known or Potentially Occurring[3] (VDCR/NPS/MDNR) Within the Corridor Study Boundary**

| Scientific Name | Common Name | Organism | Global Rank[2] | State Rank/Status[3] |
|---|---|---|---|---|
| *Stygobromus phreaticu* | Northern Virginia Well Amphipod | Amphipod | G1 | S1 |
| *Stygobromus pizzinii[1]* | Pizzini's Amphipod | Amphipod | G3G4 | S1S2 |
| *Fontigens bottimer* | Appalachian Springsnail | Snail | G2 | S1S2 |
| *Hydropsyche brunneipenni* | Caddisfly | Caddisfly | G3G4 | S1S3 |
| *Cordulegaster erronea* | Tiger Spiketail | Dragonfly | G4 | S3 |
| *Gomphus fraternus* | Midland Clubtail | Dragonfly | G5 | S2 |
| *Acronicta radcliffei* | Radcliffe's Dagger Moth | Moth | G5 | S2S4 |
| *Acronicta spinigera* | Nondescript Dagger Moth | Moth | G4 | S1S3 |
| *Sphinx frankii* | Frank's Sphinx | Moth | G4G5 | S2S3 |
| *Arabis patens* | Spreading Rock Cress | Vascular Plant | G3 | S1 |
| *Baptisia australis* | Blue Wild Indigo | Vascular Plant | G5T5 | S2 |
| *Boechera dentata* | Short's Rock Cress | Vascular Plant | G5 | S1 |
| *Cirsium altissimum[1]* | Tall Thistle | Vascular Plant | G5 | S1 |
| *Clematis viorna* | Vase-vine Leatherflower | Vascular Plant | G3 | S3 |
| *Coreopsis tripteris* | Tall Tickseed | Vascular Plant | G5T5 | S1 |
| *Cuscuta polygonorum[1]* | Smartweed Dodder | Vascular Plant | G5 | S1 |
| *Echinocystis lobata[1]* | Wild Cucumber | Vascular Plant | G5 | SH |
| *Erigenia bulbosa* | Harbinger-of-Spring | Vascular Plant | G5 | S1 |
| *Eryngium yuccifolium* var. *yuccifolium[1]* | Northern Rattlesnake-Master | Vascular Plant | G5T5 | S2 |
| *Galactia volubilis* | Downy Milkpea | Vascular Plant | G5 | S3 |
| *Helianthus occidentalis* | McDowell's Sunflower | Vascular Plant | G5 | S1/T |
| *Hibiscus laevis* | Halberd-leaf Rosemallow | Vascular Plant | G5 | S3 |
| *Hybanthus concolor* | Green Violet | Vascular Plant | G5 | S3 |
| *Lipocarpha micrantha* | Small-flower Halfchaff Sedge | Vascular Plant | G5 | S2 |
| *Maianthemum stellatum* | Starry Solomon's-Plume | Vascular Plant | G5 | S2 |
| *Monarda clinopodia* | Basil Beebalm | Vascular Plant | G5 | S3S4 |
| *Orthilia secunda[1]* | One-sided Shinleaf | Vascular Plant | G5 | SH |
| *Phacelia covillei* | Covilli's Phacelia | Vascular Plant | G3 | S1 |
| *Phaseolus polystachios* | Wild Kidney Bean | Vascular Plant | G5 | S3 |
| *Polygala polygama* | Racemed Milkwort | Vascular Plant | G5 | S1/T |
| *Sida hermaphrodita* | Virginia Sida | Vascular Plant | G3 | S1 |
| *Silene nivea* | Snowy Campion | Vascular Plant | G4* | S1 |

Notes: [1]Historically occurred within the Potomac Gorge Conservation Site crossed by the corridor study boundary.
[2]G1 = Highly Globally Rare, G2 = Globally Rare, G3 = Very Rare and Local or Range Restricted, G4 = Apparently Secure Globally, G5 = Demonstrably Secure Globally, GNR = Not Yet Ranked, G* = Species has not yet been Ranked or additional analysis is needed
[3]Rank: S1 = Highly State Rare, S2 = State Rare, S3 = Watch List, S4 = Apparently Secure; Status: E = Endangered, T = Threatened
Sources: VDCR July 31, 2019 letter, Steury et al. 2007, NPS Coordination

Coordination with NPS will continue and targeted plant species surveys within the corridor study boundary are occurring or are planned between Spring and Fall 2020. The result of these surveys will be presented in the FEIS. Additional information on state listed rare plant and invertebrate species documented by NPS is included in the *Natural Resources Technical Report* (**Appendix L, Section 2.10**).

00036027

Using the 2013/2014 GIS forest cover data from the Chesapeake Conservancy Conservation Innovation Center's High Resolution Land Cover Data for tree canopy cover[8] and the Virginia Department of Forestry (VDOF) 2005 Virginia Forest Cover dataset (VDOF, 2014), the potential impacts to tree canopy cover on NPS properties were calculated and summarized in **Table 6-5**. As the Study progresses and once a Preferred Alternative is identified, a detailed tree survey on NPS properties will be conducted.

**Table 6-5: Tree Canopy Cover Impacts on NPS Properties in Acres**

| NPS Property | Potential Impacts from the Alternatives 8, 9, 9M, 10, 13B, 13C (Acres) |
|---|---|
| George Washington Memorial Parkway | 9.3 |
| Chesapeake and Ohio Canal National Historical Park | 16.6 |
| Clara Barton Parkway | 1.2 |
| Baltimore-Washington Parkway | 47.0 |
| Greenbelt Park | 0.8 |
| Suitland Parkway | 1.3 |
| TREE CANOPY COVER TOTAL[1] IMPACTS ALL NPS PROPERTIES (ACRES) | 76.2 |

Note: [1] The total reflects tree canopy cover areas by individual property within the LODs.

## B. Ongoing Coordination with NPS Regarding Avoidance and Minimization Measures to NPS Properties

MDOT SHA and FHWA recognize the importance of the NPS properties that would be impacted by the Build Alternatives. Since initiation of the study, NPS has actively participated as a Cooperating agency in the NEPA process and as a consulting party in the Section 106 consultation. MDOT SHA and FHWA have met with NPS staff on a regular basis and this coordination will continue through project development, design and construction stages of the project. One of the challenges with this consultation has been in locating and interpreting the various formal and informal agreements for the use of the NPS properties for transportation use, some of which are over 50 years old. The following discussions summarize the avoidance and minimization efforts made to-date by MDOT SHA and FHWA regarding NPS properties. The effort to avoid, minimize and mitigate unavoidable impacts will continue through ongoing and future coordination with NPS staff.

### a. American Legion Bridge Area: George Washington Memorial Parkway, C&O Canal, and Clara Barton Parkway

As part of the *Draft Section 4(f) Evaluation*, MDOT SHA and FHWA developed and presented several options for avoiding the George Washington Memorial Parkway (GWMP), Chesapeake and Ohio (C&O) Canal, and Clara Barton Parkway while replacing the American Legion Bridge. These avoidance options included a suspension bridge and a tunnel and are fully described in the *Draft Section 4(f) Evaluation*, (**Appendix F, Section 5.1.2**).

In response to NPS comments seeking no direct access to GWMP from the managed lanes, MDOT SHA completed a traffic analysis to determine traffic implications of no direct access on I-495 and GWMP.

---

[8] https://chesapeakeconservancy.org/conservation-innovation-center-2/high-resolution-data/land-cover-data-project/

00036028



Results showed that direct access was needed to meet the Study's purpose and need. NPS asked for additional information and MDOT SHA provided a supplemental analysis of options including providing slip ramps on the American Legion Bridge and GWMP for outbound direct access only. MDOT SHA also developed five additional interchange options at GWMP to avoid or minimize visual and physical impacts to GWMP. The option of nested ramps as opposed to flyover ramps was chosen to minimize visual impacts to the historic parkway and is included in the current design (**Appendix D, Map Sheet 1**).

Replacement of the American Legion Bridge will be required under any of the Build Alternatives. In order to minimize the potential construction impacts, MDOT SHA minimized areas of impact along C&O Canal by working with NPS to determine suitable locations for construction areas and temporary access roads on both the east and west sides of the bridge.  Construction areas were adjusted to avoid a sensitive historic lock east of I-495. Additionally, MDOT SHA committed to using barges in the Potomac River for construction to further minimize impacts at GWMP and C&O Canal.

Other minimizations options were also considered and discussed with NPS such as a double deck bridge, top-down construction and reduced typical sections and pier locations (**Appendix F, Section 2.1.2.C**).

In response to NPS comments, all stormwater management surface facilities were removed from NPS property except for scuppers on the American Legion Bridge, which are needed due to the profile change from the Clara Barton Parkway to the Potomac River. MDOT SHA explained that a much longer bridge would be needed to avoid the use of scuppers but committed to planning the locations of the scuppers to minimize impact to NPS property.

These minimization efforts have resulted in a reduction of impacts at GWMP from 17.6 acres in June 2019 to 12.2 acres in December 2019.  Most of the current LOD is due to area needed on a temporary basis for construction of the American Legion Bridge.

**b.  Greenbelt Park, Baltimore-Washington Parkway, and Suitland Parkway**

As part of the Draft Section 4(f) Evaluation, MDOT SHA and FHWA developed and presented several options for avoiding Greenbelt Park, Baltimore-Washington (BW) Parkway, and Suitland Parkway.

To address NPS comments about having no direct access to BW Parkway, a traffic analysis was completed to determine traffic implications of no direct access on I-495 and BW Parkway. Results showed that direct access was needed to meet the Study's Purpose and Need. Six options for direct access were developed and presented to NPS to further reduce physical and visual impacts to Greenbelt Park and BW Parkway. In addition to further reduce visual impacts to BW Parkway and Greenbelt Park, two proposed flyover ramps were removed from the current interchange design (**Appendix D, Map Sheet 80**).

Minimization of physical impacts at Greenbelt Park was achieved by placing a retaining wall along the relocated ramp at BW Parkway and removing stormwater management facilities from this NPS property. These minimization efforts have resulted in a reduction of impacts to Greenbelt Park from 2.0 acres in June 2019 to 0.6 acre in December 2019, and at BW Parkway (Parkland) from 69.9 acres in June 2019 to 69.3 acres in December 2019.

00036029

### 6.4.2   Ongoing Coordination with US Army Corps of Engineers (USACE) Regarding Avoidance and Minimization to Jurisdictional Features

The proposed transportation upgrades to the I-495 and I-270 corridors being evaluated in the Study will result in discharges of dredged/fill material into Waters of the US, including jurisdictional wetlands and structures built in/over navigable waters. Therefore, the project will require USACE authorization under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act. Concurrent with the NEPA Process, MDOT SHA has prepared a Joint Federal/State Permit Application and supporting documentation for the Alteration of Any Floodplain, Waterway, Tidal or Non-Tidal Wetland within the LODs of the Build Alternatives of the Study.  This application was prepared pursuant to the requirements of the Code of Maryland Regulations, Sections 26.17 and 26.23, and Section 404 of the Clean Water Act and supported by the DEIS. The *Joint Permit Application* (JPA) is included in **Appendix R**.

The JPA is further supported by the *Avoidance, Minimization and Mitigation Report* (AMR) (**Appendix M**) and the *Draft Compensatory Mitigation Plan* (**Appendix N**). The AMR describes the process of avoiding and minimizing impacts to wetlands, their buffers, waterways, and the Federal Emergency Management Agency (FEMA) 100-year floodplain to the greatest extent practicable and presents justifications for impacts that were unavoidable.  The *Draft Compensatory Mitigation Plan* presents the approach to compensatory mitigation for the unavoidable impacts from the Build Alternatives and includes Phase I Mitigation Design Plans for permittee-responsible mitigation. Phase II Mitigation Design Plans will be developed for approved sites and included in the Final Compensatory Mitigation Plan (Final CMP).

Section 14 of the Rivers and Harbors Act of 1899, as amended and codified in 33 US Code (USC) 408 (Section 408) regulates alteration of USACE civil work's projects, such as dams, levees, or flood channels. The Section 408 review process typically includes review of engineering, environmental, legal, and safety issues associated with the requested alteration(s). USACE Engineering Circular No. 1165-2-220 issued on September 10, 2018 provides procedural guidance for processing Section 408 requests.  MDOT SHA coordinated with USACE to determine applicability of Section 408 to the proposed Study. USACE identified one Section 408 resource within the corridor study boundary, the Washington Aqueduct, located adjacent to Clara Barton Parkway near the Potomac River. This feature would not be impacted by any of the Build Alternatives.

### 6.4.3   Ongoing Coordination with US Environmental Protection Agency (EPA)

Under Section 309 of the Clean Air Act, the EPA is charged with reviewing EISs of all Federal agencies and to comment on the adequacy of the analysis, and identification and recommendation of appropriate measures to avoid and mitigate significant environmental impacts of the proposed action.[9] The EPA also serves as the repository (EIS database) for EISs prepared by Federal agencies and provides notice of its availability in the Federal Register.  The EPA also has veto power over the Section 404 permits issued by the USACE. It is anticipated that EPA will provide comments on the EIS in fulfillment of their statutory duty under the Clean Air Act and coordinate with the lead Federal Agency and state proponents consistent with that authority.

### 6.4.4   Ongoing Coordination with National Capital Planning Commission (NCPC)

The Capper-Cramton Act (CCA) of 1930 (46 Stat. 482), as amended, states that lands purchased with funds appropriated under the CCA for the park, parkway, and playground system in Maryland shall be developed

---

[9] https://www.epa.gov/nepa

and administered by M-NCPPC in accordance with plans approved by the National Capital Park and Planning Commission (predecessor of NCPC). NCPC also has responsibility under NEPA and is participating as a Cooperating agency to fulfill their NEPA responsibility for CCA-related stream valley parks and in the spirit of EO 13807 as NCPC was not a signatory of the MOU. MDOT SHA and FHWA will continue to coordinate with NCPC on their authority over Capper-Cramton properties.

MDOT SHA and FHWA have been actively coordinating with staff from NCPC throughout the Study to date including two informational presentations to the full Commission on July 11, 2019 and November 7, 2019. Concerns raised by the NCPC Commission focused on the need for additional efforts to analyze alternatives that would limit or avoid Capper-Cramton funded park impacts. MDOT SHA studied the MD 200 Diversion Alternative, which would avoid impacts to sensitive environmental resources on the topside of I-495, including significant Capper-Cramton funded parkland. The results of the analysis demonstrated that the MD 200 Diversion Alternative performed the worst of all the Build Alternatives under consideration in the majority of traffic metrics, and therefore was not carried forward as an Alternative Retained for Detailed Study. Refer to **Chapter 2, Section 2.5.3** and **Appendix B** for additional details.

However, consideration of an alternative which minimizes Capper-Cramton parkland on the topside of I-495 is under review in this DEIS. MDOT SHA has incorporated Alternative 9 Modified (9M) as a Build Alternative in the DEIS which provides a one-lane, managed lane system along the top side of I-495 between I-270 West Spur and I-95. Alternative 9M includes a two-lane, managed lane system within the portion of the study area outside of the I-495 topside limits mentioned above. An analysis to the same level as the Screened Alternatives has been done for Alternative 9 Modified and is included in the DEIS for public review and comment. Refer to **Chapter 2, Section 2.6.4** and **Appendix B** for additional details.

MDOT SHA has worked extensively with NCPC and M-NCPPC on minimization measures to reduce environmental impacts, including significantly reduced impacts to sensitive resources including Capper-Cramton funded parkland. A summary of the minimization of impacts to park properties acquired with Capper-Cramton funding is included in **Table 6-6**. For example, Rock Creek and Rock Creek Stream Valley Park experienced the most significant reduction in impact including a 74 percent reduction in park impacts, 45 percent reduction in wetland impacts and an 88 percent reduction in stream impacts. This reduction in impacts was coordinated with both NCPC and M-NCPPC and presented to the full NCPC and M-NCPPC Commissions in November 2019.

00036031



**Table 6-6: Summary of Minimization of Impacts to Parks Acquired
with Capper-Cramton Funding Implemented Between June 2019 and May 2020**

| Park Property Acquired with Capper-Cramton Funding | June 2019 Impacts in acres | May 2020 Impacts in acres | Change in Impacts in acres |
|---|---|---|---|
| George Washington Memorial Parkway | 17.6 | 12.5 | - 5.1 |
| Chesapeake and Ohio Canal National Historical Park | 15.1 | 15.4 | + 0.3 |
| Clara Barton Parkway | 1.8 | 1.8 | No Change |
| Cabin John Stream Valley Park, Unit 2 | 0.1 | < 0.1 | Negligible |
| Rock Creek Stream Valley Park, Unit 3 | 4.9<br>4.6 (Alt 9M) | 3.3<br>2.5 (Alt 9M) | - 1.6<br>- 2.1 (Alt 9M) |
| Rock Creek Stream Valley Park, Unit 2 | 9.6<br>9.5 (Alt 9M) | 0.4<br>0.2 (Alt 9M) | - 9.2<br>- 9.3 (Alt 9M) |
| Locust Hill Neighborhood Park (previously part of Rock Creek Park) | 0.3<br>0.3 (Alt 9M) | 0.3<br>0.2 (Alt 9M) | No Change<br>- 0.1 |
| Sligo Creek Parkway | 5.0<br>4.1 (Alt 9M) | 4.1<br>3.3 (Alt 9M) | - 0.9<br>- 0.8 (Alt 9M) |
| Northwest Branch Stream Valley Park, Unit 3 | 3.2 | 3.0 | - 0.2 |
| Cabin John Regional Park | 5.4 (Alt 8, 9, 9M)<br>6.9 (Alt 10)<br>5.2 (Alt 13B)<br>6.7 (Alt 13C) | 5.7 (Alts 8,9, 9M)<br>7.2 (Alt 10)<br>4.5 (Alt 13B)<br>5.2 (Alt 13C) | + 0.3 (Alts 8, 9, 9M)<br>+ 0.3 (Alt 10)<br>- 0.7 (Alt 13B)<br>- 1.5 (Alt 13C) |

MDOT SHA and FHWA will continue to coordinate with NCPC and M-NCPPC on additional minimization measures and appropriate mitigation measures for the remaining unavoidable impacts.

## 6.5   Permits, Approvals and Authorizations Required

In addition to NEPA compliance, several permits, approvals and authorizations are being coordinated concurrently preparation of this EIS.  Federal agency authorizations would be obtained within 90 days of issuance of a Record of Decision consistent with Section 5 of EO 13807 or would be obtained prior to construction of any improvements. **Table 6-7** summarizes the Federal, state, and local permits, authorizations and approvals that will likely be required based on the current Study design assumptions and associated impacts.

00036032



### Table 6-7: Likely Permits and Approvals

| | Permit/ Approval | Responsible/Permitting Agency |
|---|---|---|
| **Concurrent with NEPA or within 90 days from the Record of Decision** | National Environmental Policy Act (NEPA) Approval – Record of Decision[1] | Federal Highway Administration |
| | Section 4(f) Approval | Federal Highway Administration |
| | Endangered Species Act Consultation | US Fish and Wildlife Service / NOAA-NMFS |
| | Section 106 Programmatic Agreement | Federal Highway Administration |
| | Clean Water Act Section 404 and Section 10 | US Army Corps of Engineers |
| | Maryland/Virginia State Waters (Section 401) | US Army Corps of Engineers / Maryland Department of Environment / Virginia Department of Environmental Quality |
| | Maryland Nontidal Wetlands and Waterways Permit | Maryland Department of Environment |
| | Virginia Wetland Protection Permit | Virginia Department of Environmental Quality |
| **Prior to Construction** | Special Use Permit - Construction in VA and MD | National Park Service |
| | Capper-Cramton Park Permits | National Capital Planning Commission |
| | Park Construction Permit - M-NCPPC | Maryland National Capital Park and Planning Commission |
| | Maryland Reforestation Law Approval | Maryland Department of Natural Resources |
| | State and County Forest Conservation Easement Revision Approvals | Maryland Department of Natural Resources / Maryland National Capital Park and Planning Commission |
| | General Permit for Stormwater Associated with Construction Activity - MD | US Environmental Protection Agency / Maryland Department of the Environment |
| | General Permit for Stormwater Associated with Construction Activity - VA | US Environmental Protection Agency / Virginia Department of Environmental Quality |
| | Stormwater Management/Erosion and Sediment Control | Maryland Department of Transportation - State Highway Administration Plan Review Division / Maryland Department of the Environment |
| | Stormwater Management/Erosion and Sediment Control | US Environmental Protection Agency / Maryland Department of the Environment / Virginia Department of Environmental Quality |
| | Clean Water Act Section 402 (MS4) | Maryland Department of the Environment |
| | Water Appropriation and Use Permit | Maryland Department of the Environment |

Note: [1]The lead agency is responsible for preparing and publishing a single ROD for all Federal agencies with authorization responsibility for the project to support any necessary authorization decisions. The ROD will incorporate the decisions of each such agency, unless an exception to a single ROD is met as set forth in Section XIII or where Federal law provides for the lead agency to issue a combined FEIS/ROD. Memorandum of Understanding Implementing One Federal Decision Under Executive Order 13807, https://www.whitehouse.gov/wp-content/uploads/2018/04/MOU-One-Federal-Decision-m-18-13-Part-2-1.pdf

00036033



# 7   PUBLIC INVOLVEMENT AND AGENCY COORDINATION

## 7.1   Introduction

A comprehensive public involvement and agency coordination program has been conducted throughout the I-495 and I-270 Managed Lanes Study (Study). This chapter summarizes that program, including regulatory agency consultation, conducted during the NEPA process from the initial scoping in March 2018 to the publication of this Draft Environmental Impact Statement (DEIS). Public and agency engagement will continue during the remainder of the Study and will include, but is not limited to, the solicitation of comments on this document; avoidance, minimization, and mitigation measures; and permitting decisions. Additional detail on the public involvement efforts, outreach materials, summaries from the public meetings, and agency coordination, summarized in the subsequent sections, is provided throughout the *Public Involvement and Agency Coordination Technical Report* (**Appendix P**).

## 7.2   Public Involvement

### 7.2.1   Public Workshops and Comment Periods

The Study's public involvement efforts began immediately after the publication of the Notice of Intent (NOI) in the *Federal Register* on March 16, 2018 to announce the initiation of the Study. Following the NOI, public involvement efforts were organized by subsequent engagement stages: Scoping, Preliminary Alternatives, and Alternatives Retained for Detailed Study (ARDS). Following publication of this DEIS, a full range of public engagement activities will be conducted during the remainder of the Study, leading to the publication of a Record of Decision (ROD). These outreach stages correspond to three Study milestones and associated Public Workshops: Scoping, Preliminary Alternatives and Alternatives Retained for Detailed Study (ARDS).

Since publication of the NOI, 16 Public Workshops with over 2,100 attendees have been held along the study corridors in Montgomery and Prince George's Counties. Specifically, four (two in each County) Scoping Public Workshops were held between April 17, 2018 and April 24, 2018; four (two in each County) Preliminary Alternatives Public Workshops were held between July 17, 2018 and July 25, 2018; and eight (four in each County) ARDS Public Workshops were held between April 11, 2019 and May 16, 2019. A wide range of approaches were employed to notify travelers, commuters, residents, and workers along the study corridors about the 16 Public Workshops. These included:

- Newsletters, postcards, and announcements mailed and emailed to the Study mailing list, including the public, community organizations, and other stakeholders
- Notifications via the I-495 & I-270 P3 Program website (https://495-270-p3.com/),
- MDOT SHA press releases
- Local and regional newspaper advertisements and flyers
- Geographically-targeted digital banner advertisements and social media promotion
- Local and regional radio station advertisements
- Emails to Federal, state, and local elected officials in Montgomery, Prince George's, and Frederick Counties

00036034



At the Public Workshops, attendees were able to assess Study information and to ask questions and to provide agency officials comments through multiple methods:

- Review display boards and a handout
- View and listen to a presentation with opportunities for Q&A
- Interact with technical staff at small working group tables, interactive online mapping stations; tables of roll maps, and at the display boards
- Comment on the Study via hard copy comment cards, an online comment form, an online contact form, e-mail, mail, and court reporter

Spanish and American Sign Language interpreters were available to assist attendees, as needed. The display boards (in English and in Spanish), narrated presentations/videos of the display boards, and handouts were uploaded to the program website concurrently with the Public Workshops (https://495-270-p3.com/your-participation/upcoming-events/). Materials from these Public Workshops are still available on the Program website.

Comment periods were assigned for each series of Public Workshop. Specifically, the public could submit comments related to the Scoping Public Workshops from March 16, 2018 to May 1, 2018, the Preliminary Alternatives Public Workshops from July 17, 2018 to August 27, 2018, and the Alternatives Retained for Detailed Study (ARDS) Public Workshops from April 11, 2019 to June 14, 2019. Over 3,900 comment submissions were received during the Study comment periods and were organized into relevant comment themes and summarized respectively in the *Scoping Report*, the *Summary of July 2018 Alternatives Public Workshops*, and the *Summary of Public and Stakeholder Engagement for the Recommended ARDS* posted to the program website (https://495-270-p3.com /environmental/resources/). Comments received outside of the formal comment periods are continuously encouraged, accepted, reviewed, and recorded for the study record.

Some common themes emerged in the comments received at the Public Workshops:

- Acknowledgement of problems associated with congestion;
- Environmental considerations, such as natural resources, wildlife habitat, traffic noise levels and sound barriers, air quality, and quality of life;
- Support for transit;
- Bicycle and pedestrian interest, infrastructure, and safety;
- Questions or concerns about tolling;
- Support for additional HOV lanes;
- Concerns about utilizing private industry for public transportation improvements; and
- Public outreach and notification methodology.

## 7.2.2    Public Outreach with Environmental Justice Populations

An Environmental Justice (EJ) population is a population concentration of minority race and ethnicity individuals and/or low-income households that meets federal definitions. Through the EJ Analysis in the **Chapter 4, Section 21,** EJ populations have been identified along the study corridor and are shown in **Figure 7-1**.

00036035

**Figure 7-1: EJ Populations along the Study Corridors**



00036036

Providing full and fair access to meaningful involvement by low-income and minority populations in project planning and development is an important aspect of EJ. Meaningful involvement means the Lead Agencies invite participation from populations typically underrepresented, throughout all the project stages. Due to the highly diverse demographics composing the population adjacent to and using the study corridors, much of the corridor-wide public involvement efforts conducted for the Study were aimed at reaching this socioeconomically diverse audience.

Over 30 outreach events held between March 2018 and December 2019 were held or attended in communities that contain one or more EJ populations, in locations adjacent to EJ populations, or at events generally serving EJ populations along the study corridors. Refer to **Table 4-25** in **Chapter 4, Section 21.4** for a list of these outreach events and additional information on how public involvement efforts aimed to provide full and fair access to meaningful involvement by EJ populations in the Study process.

Based on initial low attendance at Prince George's County events and receipt of fewer public comments compared to Montgomery County, MDOT SHA reached out to the M-NCPPC Prince George's County Planning Department to enhance local engagement during the ARDS Public Workshop outreach campaign. Coordinated local outreach efforts with M-NCPPC Prince George's County Planning Department included, but were not limited to: distribution of the Public Workshops' announcement flyer via Office of Municipalities' community outreach database for display at 45 County community centers; distribution of the Public Workshops' announcement flyer via WMATA Office of Communications for their community update posting; and forwarding of study e-mail blasts to the Community Association database and Office of Planning database. Additional local outreach included distribution of Public Workshops' announcement flyer through Prince George's County Department of Public Works and Transportation e-mail blast; and distribution of Public Workshops' announcement flyer to several large places of worship along the study corridor, including First Baptist Church of Glenarden, the Collective Empowerment Group (an umbrella group for more than 300 churches in the County), Prince George's County Liaison for Faith Connections/Relationship Building, People's Community Baptist Church, Sanctuary at Kingdom Square, and the Transforming Neighborhoods Initiative.[1]

While study awareness, meeting attendance, and the volume of comments received was consistently strong in Montgomery County; additional outreach was conducted that included distribution of the Public Workshops' announcement flyer through the Montgomery County Department of Transportation email blasts.

To further enhance engagement of the Study's identified EJ populations and other underserved populations, and consistent with recommendations in NCHRP Report 710, *Practical Approaches for Involving Traditionally Underserved Populations in Transportation Decisionmaking*, demographic data was used to identify locations for targeted mailing outreach. These locations included EJ Analysis Area schools

---

[1] The Transforming Neighborhoods Initiative was an effort by Prince George's County to provide additional services and resources to six underserved communities within the County.

00036037



with above-average participation in the Free and Reduced-price Meals Program;[2] places of worship[3] in EJ Analysis Area Communities containing EJ populations; and all affordable-housing complexes[4] in the EJ Analysis Area. In early April 2019, an introductory cover letter asking recipients to display an enclosed Public Workshops' announcement flyer wherever community information is displayed was mailed to the 174 affordable-housing complexes, schools, and places of worship listed in the *Community Effects Assessment and Environmental Justice Analysis Technical Report* (**Appendix E, Section 4.2**). English and Spanish versions of the flyer were included with the cover letter.

### 7.2.3   Small-Scale Meetings and Outreach Events

The geographic scope of the study corridors has resulted in a wide variety of stakeholder interests across the region. Therefore, in addition to the Public Workshops, the I-495 & I-270 P3 Program Director, Deputy Director, and technical experts conducted meetings or conference calls with at least 114 community associations, elected officials and legislators, stakeholder organizations, and large, potentially-impacted landowners to present detailed Study information and hold question-and-answer sessions. To provide Study information and capture feedback on community interests and concerns, MDOT SHA staffed 14 several "pop-up" informational booths in Montgomery, Prince George's, and Frederick Counties. The pop-up/informational booth captured attention with project-branded tablecloth, and branded giveaways. The table contained informational boards, and project media which detailed the project scope and timelines. Refer to *the Public Involvement and Agency Coordination Technical Report* (**Appendix P, Sections 3.4 and 7.1**) for additional information on these meetings.

### 7.2.4   Public Hearings

MDOT SHA will continue to solicit public and agency feedback through a variety of methods as the Study is advanced. The public is invited to stay connected to the Study via the Program website (https://495-270-p3.com/), e-mail (MLS-NEPA-P3@mdot.maryland.gov), toll-free telephone (833-858-5960), and through signing up for the Study mailing list via the Study website.

After the release of the DEIS, Public Hearings will be held to obtain input and comments from the public on the results presented in this DEIS. All comments received during the associated comment period  will be reviewed and considered, and all substantive comments will be formally responded to in the Final Environmental Impact Statement (FEIS).

---

[2] The MDOT SHA Office of Equal Opportunity collects public feedback surveys to ensure compliance with Title VI of the Civil Rights Act of 1964. Maryland State Department of Education (*Free and Reduced-Price Meal Statistics for School Year 2017-2018.* http://marylandpublicschools.org/programs/pages/school-community-nutrition/freereducedpricemealstatistics.aspx).

[3] Geographic Information Systems (GIS) data sourced from Maryland iMap (data.imap.maryland.gov/datasets/maryland-land-use-land-cover-land-use-land-cover-2010); Prince George's County Open Data Portal (gisdata.pgplanning.org/metadata/); Montgomery County Planning Department Open Data Portal (Montgomery County Planning Department. Open Data Portal). Corresponding mailing addresses gathered using Google Search.

[4] Sourced from Housing and Urban Development Multifamily Assistance & Section 8 Database, Montgomery County Housing Opportunities Commission, Prince George's County Housing Authority, and Fairfax County Redevelopment and Housing Authority websites. Corresponding mailing addresses gathered using Google Search.

00036038

MDOT SHA will perform extensive outreach to notify the public of the upcoming Public Hearings, including the location of the DEIS and Joint Permit Application[5] for public review. MDOT SHA's advertising approach to notify the public includes the following (note: due to COVID-19, these advertising approaches are subject to change):

- Press Release;
- Elected Official E-mail Blast;
- Program-wide E-mail Blast;
- Single-page flyer via US Mail;
- Newspaper Print Ads via:
  - *The Washington Post* Print Ad (Daily),
  - *Frederick News-Post* (Daily),
  - *Laurel Leader* (Thursday),
  - *Howard County Times* (Thursday),
  - *El Tiempo Latino* (Friday),
  - *Washington Hispanic* (Friday),
  - *Sun Gazette Fairfax* (Thursday),
  - *Fairfax County Times* (Friday),
  - *Prince George's Post* (Thursday),
  - *The Enquirer-Gazette* (Thursday);
- Single-page flyer in *The Washington Post* (Thursday);
- Radio Ads via (iHeart and TTWN);
- Pop-up Events at Transit Centers;
- Online Digital Ads with geographic and demographic programmatic targeting:
  - Washingtonpost.com,
  - WTOP.com,
  - DCBlack.com,
  - Afro.com,
  - Eltiempo.com,
  - Faifaxtimes.com;
- Facebook and Instagram;
- Media promotions (interviews, media kits, word-of-mouth, etc.);
- MDOT SHA News Release and Social Media Channels (Facebook, Twitter, etc.); and
- P3 Program Website (495-270-p3.com).

## 7.3  Agency Coordination

The FHWA and MDOT SHA actively engaged the Federal, state, regional, and local agencies, as well as the adjacent counties, Metropolitan Planning Organizations (MPO), and other stakeholders throughout the Study process, simultaneously with other public involvement efforts. At the initiation of the Study, an Agency Coordination Plan was developed. The plan facilitated the structured coordination with federal, state and local agencies to ensure participation in the Study, including the development of the Purpose

---

[5] State and federal permits are required for unavoidable impacts to wetlands, wetland buffers, waterways, and the FEMA 100-year floodplain from the I-495 & I-270 Managed Lanes Study. The federal permit decision for these impacts is required to be made within 90 days of the NEPA Record of Decision, per Executive Order 13807-One Federal Decision. The United States Army Corps of Engineers (USACE) and the Maryland Department of the Environment (MDE) are soliciting comments from the public; Federal, State, and local agencies; Native American Tribes; and other interested parties on the impacts as part of the permitting process.

00036039



and Need and the range of alternatives, as well as identification of environmental issues. This section categorizes agency coordination into three broad and concurrent efforts: Scoping engagement, Interagency Working Group (IAWG) meetings, and on-going regulatory and resource agency consultation. Additional detail on agency coordination is provided throughout the *Public Involvement and Agency Coordination Technical Report* (**Appendix P**).

### 7.3.1   Scoping Outreach

During the Scoping process, potential Cooperating, Participating, and Notified Agencies at the Federal, state, local, and regional levels were initially identified by FHWA and MDOT SHA, in accordance with 40 CFR 1501.6 and 23 U.S.C. § 139. The list of two Lead (Federal Agency and Local Project Sponsor), eight Cooperating, 18 Participating, and seven Notified agencies is provided in **Table 7-1**.

By e-mail, dated February 21, 2018, FHWA and MDOT SHA invited potential Cooperating and Participating Agencies to attend the kickoff Interagency Working Group (IAWG) meeting on March 14, 2018, initiating the Agency Scoping period and inviting input regarding IAWG coordination and the proposed schedule. Throughout the Study process as new information was received and the status of several agencies was revised, these changes were reflected in updates to the Agency Coordination Plan. Refer to *Public Involvement and Agency Coordination Technical Report* (**Appendix P, Chapter 2**) for additional information.

### 7.3.2   Interagency Working Group Meetings

IAWG Meetings were convened monthly, or as needed, by MDOT SHA and FHWA, and attended by the Cooperating and Participating Agencies and other notified agencies. IAWG Meetings focused on sharing and discussing information and seeking feedback from attendees on the Study approach and results of major study findings at key milestones. Key information discussed and shared at the IAWG meetings included Study process and schedule, methodologies and results from traffic analyses, review of existing environmental resources, development of alternatives, potential environmental and property impacts, permitting schedule, and avoidance, minimization and mitigation strategies. Throughout the Study, all Cooperating and Participating Agencies were encouraged to provide both data and comments to help support analyses and decision-making. Cooperating Agencies were requested to provide concurrence at certain milestones, as outlined in the Agency Coordination Plan, including Purpose and Need and Alternatives Retained for Detailed Study. A total of 12 IAWG meetings have been held since the Study initiation in March 2018. During development of this DEIS, monthly Study updates were emailed to the IAWG participants to keep the agencies up-to-date on the Study's progress. **Table 7-2** provides a summary of the IAWG meetings held to date for the Study.  Additional details on the IAWG meetings are provided throughout the *Public Involvement and Agency Coordination Technical Report* (**Appendix P**).

00036040



Draft Environmental Impact Statement

## Table 7-1: Lead, Cooperating, Participating, and Notified Agencies for the Study

| Role | Federal Agencies | Maryland / State Agencies | Local Agencies and Regional Stakeholders |
|---|---|---|---|
| **Lead Agency -** As codified in 23 U.S.C. Section 139, manages the coordination process; prepares EIS; provides opportunity for public & participating/ cooperating agency involvement. Defined as the Department of Transportation (DOT) and, if applicable, any State or local governmental entity serving as a joint lead agency | • FHWA – Maryland Division | • MDOT SHA | |
| **Local Project Sponsor -** a State or local governmental entity receiving funds under 23 U.S.C. Section 139 for the project shall serve as a joint lead agency with the Department for purposes of preparing any environmental document under NEPA | | • MDOT SHA | |
| **Cooperating Agencies** | • US Army Corps of Engineers (USACE), Baltimore District<br>• US Environmental Protection Agency (EPA)<br>• National Park Service (NPS)<br>• National Capital Planning Commission (NCPC) | • MD Department of Environment (MDE)<br>• Maryland Department of Natural Resources (MDNR)<br>• Virginia DOT (VDOT) | • Maryland-National Capital Park and Planning Commission (M-NCPPC) |
| **Participating Agencies** | • Federal Transit Administration (FTA)<br>• US Fish and Wildlife Service (USFWS)<br>• Federal Railroad Administration (FRA - Amtrak)<br>• National Oceanic and Atmospheric Administration (NOAA)- National Marine Fisheries Service (NMFS) | • Maryland Historical Trust (MHT)<br>• Maryland Department of Planning (MDP)<br>• MDOT Maryland Transit Administration (MTA)<br>• MDOT Maryland Transportation Authority (MDTA)<br>• Virginia Department of Historic Resources (VDHR) | • Prince George's County Department of Public Works and Transportation (DPW&T)<br>• Montgomery County Department of Transportation |

00036041



Draft Environmental Impact Statement

| Role | Federal Agencies | Maryland / State Agencies | Local Agencies and Regional Stakeholders |
|---|---|---|---|
| | • US Department of Defense – Joint Base Andrews (JBA)<br>• US Postal Service (USPS)<br>• Natural Resources Conservation Service (NRCS)<br>• US Navy<br>• US Department of Agriculture Beltsville Agricultural Resources Center (USDA BARC)<br>• US Coast Guard (USCG) | • Virginia Department of Conservation and Recreation (VDCR) | |
| **Notified Agencies** | • National Institute of Standards and Technology (NIST)<br>• Federal Emergency Management Agency (FEMA)<br>• Advisory Council on Historic Preservation (ACHP) | • Maryland Commission on Indian Affairs | • Frederick County<br>• MWCOG TPB<br>• WMATA |

00036042



## Table 7-2: Summary of Interagency Working Group (IAWG) Meetings

| Meeting | Date/Timeframe | Public or Agencies Involved | Key Topic(s) |
|---|---|---|---|
| IAWG #1 | March 14, 2018 | Lead, Cooperating, Participating Agencies and other Federal, state agencies and MPO | Introduce study to agencies, including limits, IAWG framework, summary of preliminarily-identified needs. |
| IAWG #2 | April 12, 2018 | Lead, Cooperating, Participating Agencies and other Federal, state agencies and MPO | Present preliminary purpose and need, Agency Coordination Plan and Schedule, public scoping materials, and discuss status of Cooperating and Participating Agency Letter responses. **Cooperating and Participating Agency invitation acceptance due 4/23-4/26.** |
| IAWG #3 | May 16, 2018 | Lead, Cooperating, Participating Agencies and other Federal, state agencies and MPO | Summarize scoping meetings and comments; present environmental inventory; present full range of preliminary alternatives. **Concurrence on Agency Coordination Plan and Purpose and Need.** Agency and public scoping period closes. |
| IAWG #4 | July 11, 2018 | Lead, Cooperating, Participating Agencies and other Federal, state agencies and MPO | Present preliminary range of alternatives and screening criteria; present materials for July Preliminary Alternatives Public Workshops; present agency and public comments on Purpose and Need received post concurrence |
| IAWG #5 | September 28, 2018 | Lead, Cooperating, Participating Agencies and other Federal, state agencies and MPO | Agency Field Review/Tour of I-495 & I-270 within the study area and significant environmental resources. |
| IAWG #6 | October 10, 2018 | Lead, Cooperating, Participating Agencies and other Federal, state agencies and MPO | Present Issue Resolution Process, Executive Order 13807, summary of public comments from July Preliminary Alternatives Public Workshops; revisit IAWG Framework including purpose and protocol; discuss Issue Resolution Process; present list of permits/approvals for the Permitting Timetable. |
| IAWG #7 | February 13, 2019 | Lead, Cooperating, Participating Agencies and other Federal, state agencies and MPO | Present recommended Screened Alternatives |
| IAWG #8 | March 13, 2019 | Lead, Cooperating, Participating Agencies and other Federal, state agencies and MPO | Discuss agency comments on recommended Screened Alternatives; present public outreach approach for April and May Alternatives Retained for Detailed Study Public Workshops |
| IAWG #9 | April 10, 2019 | Lead, Cooperating, Participating Agencies and other Federal, state agencies and MPO | Present recommended Alternatives Retained for Detailed Study |
| IAWG #10 | May 8, 2019 | Lead, Cooperating, Participating Agencies and other Federal, state agencies and MPO | Discuss comments on recommended ARDS; present public comment themes received to-date. |
| IAWG #11 | June 12, 2019 | Lead, Cooperating, Participating Agencies and other Federal, state agencies and MPO | **Request verbal and written agency concurrence on ARDS;** present additional public comment themes received to-date (ARDS public comment period April 11th through June 14th) |
| IAWG #12 | October 16, 2019 | Lead, Cooperating, Participating Agencies and other Federal, state agencies and MPO | Discuss dropping of Alternative 5; present methodology and results of MD 200 Diversion Alternative analysis. |

00036043

### 7.3.3   Regulatory and Resource Agency Consultation

Concurrent with the efforts described previously, consultation with regulatory and resource agencies with jurisdiction and/or special expertise over environmental resources potentially affected by the Study was conducted to discuss resource-based issues and to obtain their input on existing resources, potential impacts, avoidance, minimization and mitigation strategies. Resource-specific agency consultation is an ongoing effort that will continue through the FEIS and Record of Decision to the extent appropriate through development and will focus on impact avoidance and minimization strategies and mitigation opportunities for unavoidable impacts. Details on consultation and related correspondence are provided in the respective resource-specific technical reports appended to this DEIS and referenced below.

### A.   Natural Resource Agency Coordination

As documented in the *Natural Resources Technical Report* (**Appendix L**), permitting programs required agency consultation for a number of natural resource review processes, including:

- Jurisdictional Determination (JD);
- Permitting strategy;
- Avoidance, minimization, and mitigation;
- Wetland delineation; and
- Rare, Threatened, and Endangered (RTE) Species coordination.

Between April 2018 and May 2020, MDOT SHA has held 56 natural resources-related agency consultation office and field meetings with:

- FHWA
- US Army Corps of Engineers
- US Department of Agriculture- Beltsville Agricultural Research Center
- US Environmental Protection Agency
- National Park Service
- US Fish and Wildlife Service
- National Capital Planning Commission

- US Navy
- Maryland Department of Natural Resources
- Maryland Department of the Environment
- Maryland-National Capital Park and Planning Commission

### B.   Section 106 Agency Coordination

*Volume 1* of the *Cultural Resources Technical Report* (**Appendix G**) documents agency consultation conducted in accordance with Section 106 of the National Historic Preservation Act (NHPA) of 1966 that considers the effects of the proposed action on historic properties. FHWA notified the Advisory Council on Historic Preservation (ACHP) of the Study on March 26, 2018, and the Section 106 process was initiated on April 12, 2018 with a letter to the MHT, the Virginia DHR, and other consulting parties. MDOT SHA met with MHT on April 18, 2018 to discuss the project, the APE, and the proposed Section 106 consultation process. Additional parties, including tribal, Federal, state, and local governments, were invited in 2018 and 2019 to participate as Section 106 consulting parties. Consulting parties have received and continue to receive Study cultural resources documents for review and comment. FHWA and MDOT SHA held three consulting parties' meetings, on May 3, 2018, November 13, 2018, and June 17, 2019. A fourth consulting

00036044

parties meeting is anticipated in the summer of 2020. Note that Section 106 public involvement is being fulfilled through the same processes used for general public involvement and NEPA compliance. Refer to **Appendix G** for additional information on the Section 106 Coordination.

## C. Section 4(f) Agency Coordination

Section 4(f) of the US Department of Transportation Act of 1966 mandates that use of a publicly-owned park, recreation area, wildlife/waterfowl refuge, or historic site for a transportation project cannot be approved unless certain conditions are applied. Section 4(f) regulations require the *Draft Section 4(f) Evaluation* be made available for coordination and comment to officials with jurisdiction over the Section 4(f) resource and to the USDA and the Department of Housing and Urban Development (HUD) (23 C.F.R. §774.5). Between March 2018 and May 2020, MDOT SHA has conducted conference calls, meetings, and field reviews with or sent letters to the following agencies with jurisdiction over parkland along the study corridors: NPS, M-NCPPC- Montgomery County, M-NCPPC- Prince George's County, National Capital Planning Commission, City of Rockville, City of Gaithersburg, City of Greenbelt, City of New Carrollton, and Montgomery County Department of Education. FHWA and MDOT SHA have also held meetings and coordinated with the agencies with jurisdiction over historic sites, including NPS, the ACHP, MHT, and the Virginia DHR. Coordination with USDA and HUD is ongoing; the USDA is a participating agency under NEPA and MDOT SHA has notified HUD via letter of the Draft Section 4(f) Evaluation for the MLS. Details on ongoing official with jurisdiction consultation under Section 4(f) are provided in *of the Draft Section 4(f) Evaluation* (**Appendix F, Section 6**).

## 7.4  Incorporation of Public and Agency Input into the Study

In response to comments received through the public and agency engagement processes conducted up to this point, MDOT SHA and FHWA enhanced the Study and included many additional elements  for review in this DEIS:

**Purpose and Need:**

- Amended to include *enhance existing and planned multimodal mobility and connectivity* in the purpose statement;

- MDOT SHA committed to working in good faith with its regulatory agency partners to plan worthwhile mitigation based on identified priorities that would, at a minimum, bring no net loss to impacted resources with a goal of net benefit.

**Alternatives:**

- Retained alternatives that support high occupancy vehicle travel (Alternatives 8, 10, and 13C); retained alternatives that support no toll for eligible high occupancy vehicles (Alternatives 9M, 9, and 13B).

- Allowed free bus usage of all Build Alternatives.

- Developed a Transit Work Group to further explore opportunities for new or expanded transit service on managed lanes.

00036045



- Included additional direct access that would support direct and indirect access to transit stations and transit-oriented development; added direct access in Equity Emphasis Areas; modified direct access to support priority development and facilities including the University of Maryland (UMD) Capital Region Medical Center/downtown Largo redevelopment in Prince George's County and the new Federal Drug Administration (FDA) center in Montgomery County.

- Committed to constructing a shared-use path on the south side of a new American Legion Bridge to support pedestrian and bicycle connectivity, regardless of the build alternative.

- Analyzed two new alternatives to the same level as the Screened Alternatives to identify opportunities to avoid or minimize sensitive environmental resources and property relocations (MD 200 Diversion Alternative and Alternative 9 Modified). Refer to **Chapter 2, Section 2.5.3** and *Alternatives Technical Report* (**Appendix B**).

**Environmental and Property Impacts**

- Incorporated a closed roadway section with retaining walls where feasible to avoid and minimize environmental and property impacts.

- Included underground stormwater management vaults to avoid and minimize environmental and property impacts.

- Removed the existing Collector-Distributor system on I-270 to largely stay within the existing roadway footprint on I-270 to avoid and minimize environmental and property impacts.

- Reconfigured direct access ramps and designed signage at the George Washington Memorial Parkway and the Baltimore Washington Parkway to reduce visual intrusions to these important historic parkways.

- Removed or relocated stormwater management facilities from sensitive resources including parks, where feasible.

- Shifted I-495 and added retaining walls to eliminate the need to relocation Rock Creek thus significantly reducing park, stream, and wetland impacts.

00036046

00036047

# 8   LIST OF PREPARERS

This Draft EIS was prepared by FHWA and MDOT SHA with assistance from technical professionals.  Key preparers of this document are included below.

| Name | Education Highest Degree Achieved | Study Role/ Responsibility |
|------|-----------------------------------|----------------------------|
| **FEDERAL HIGHWAY ADMINISTRATION** | | |
| Jitesh Parikh | MS Civil Engineering | Environment & Project Delivery Team Leader |
| Jeanette Mar | MS Environmental Studies | Environmental Program Manager |
| Keilyn Perez | BS Civil Engineering | Area Engineer |
| Megan Cogburn, AICP | MS City and Regional Planning | Environmental Protection Specialist |
| **MARYLAND DEPARTMENT OF TRANSPORTATION STATE HIGHWAY ADMINISTRATION** | | |
| Lisa Choplin, DBIA | BS Civil Engineering | Director, I-495 & I-270 P3 Program |
| Jeffrey Folden, PE, DBIA | BS Civil Engineering | Deputy Director, I-495 & I-270 P3 Program |
| Carole Delion, PE | MS Civil Engineering | Traffic Analysis Advisor |
| Steve Archer | MA Anthropology | Cultural Resources Advisor |
| **BLACKWATER ENVIRONMENTAL GROUP** | | |
| Caryn J.G. Brookman | MS Environmental Science & Policy | Environmental Program Manager |
| Chrissy Brandt | MS Environmental Science & Policy | Air Quality |
| Catherine Robbins | MS Environmental Science & Policy | Noise |
| Stacy Talmadge | BS Environmental Analysis & Planning | NEPA |
| Bob Maimone | MA Historic Preservation | Section 4(f) |
| **RK&K** | | |
| Karen Kahl, PE, PTOE | MS Civil Engineering | Project Manager/ Concept Design |
| Erron Ramsey, AICP | BA Environmental Studies | Environmental Technical Manager/ NEPA |
| Jeffrey Roberta, PE | BS Civil Engineering | Concept Development Manager |
| Eric Almquist, AICP, PWS, CE | MS Forest Ecology | NEPA Advisor/ Section 4(f) Analysis |
| Maggie Berman, CEP | BA Environmental Studies | NEPA |
| Ted Chadeayne | MS Geology & Environmental Engineering | Hazardous Materials |
| Danielle Hankins | BS Civil Engineering | Stormwater Management |
| Kevin Hughes | BS Engineering Science | Noise |

00036048



Draft Environmental Impact Statement

| Name | Education Highest Degree Achieved | Study Role/ Responsibility |
|------|----------------------------------|----------------------------|
| Nick Krause | MS Climate Science & Solutions | Air Quality |
| Tyler Lane | MS Engineering & Environmental Science | Hazardous Materials |
| Susan Miller, RPA | MA Anthropology | NEPA |
| Michelle Moir | BS Biology | NEPA |
| Alexis Morris, CEP | BS Environmental Science | NEPA/ Community Effects Analysis |
| Liz O'Keefe | BS Environmental Science & Technology | NEPA/ GIS |
| Justin Reel | BS Biology | Natural Resource/ Mitigation |
| Brittany Rolf | Master of Community Planning | NEPA/Public Involvement |
| Jon Schmidt | MS Urban Affairs & Public Policy | Section 4(f) |
| Jason Shellenhamer | MA Historical Archeology | Section 106 |
| Dori Shivers | MS Civil Engineering | Stormwater Management |
| Madeline Sigrist | BS Environmental Science | Natural Resources |
| Matt Snare, PE, PTOE | MS Civil Engineering | Traffic |
| Ryan Snyder, AICP | Master of Community Planning | NEPA |
| Christine Sutkowski, PE | MA Civil Engineering | Concept Design Team |
| Christine Taniguchi | MS Historic Preservation | Section 106 |
| Kimberly Troiani | BS Computer Science | Public Involvement |
| **WSP** | | |
| Eric Beightel | Master of Public Policy | Environmental Program Manager |
| Pam McNicholas | MS Environmental Science and Policy | Natural Resources & Mitigation |
| Steve Plano | MA Geography and Environmental Planning | NEPA Advisor |
| Bridey Gallagher | BS Environmental Science and Studies | NEPA |
| **ATCS** | | |
| Scott Shifflett | Master of Environmental Management | Deputy Environmental Manager |
| Jack Cramer | BS Geo-Environmental Studies | Air and Noise |
| Josh Wilson | BS Geo-Environmental Studies | Air and Noise |
| **APPLIED ARCHAEOLOGY & HISTORY ASSOCIATES, INC.** | | |
| Brett Arnold | MS Anthropology | Section 106 |
| Jason Tyler | MA Landscape Archaeology | Section 106 |
| **ASC GROUP, INC.** | | |
| Hylton Hobday | MS Environmental Science | Community Effects |
| Michael Stafford | PhD Civil Engineering | Noise |
| Yvonne Werzinsky | BA Biology & Environmental Science | Community Effects |

00036049

| Name | Education Highest Degree Achieved | Study Role/ Responsibility |
|------|-----------------------------------|----------------------------|
| **CEM** | | |
| Kevin DeMartino | BS Environmental Health Science | Hazardous Materials |
| Steven Wicker | BS Geology | Hazardous Materials |
| **COASTAL RESOURCES, INC.** | | |
| Jeffery Gring | MS Natural Resources & Environmental Science | Natural Resources |
| Sarah Williamson | BA English | Natural Resources |
| **DCI ENGINEERING** | | |
| Don Feng | MS Civil Engineering | Stormwater Management |
| Jakish Hirachan | MS Civil Engineering | Stormwater Management |
| Will McLennan | BS Civil Engineering | Concept Development |
| **DOVETAIL CULTURAL RESOURCES GROUP** | | |
| Kerri Barile | PhD Anthropology & Architectural History | Section 106 |
| Varna Boyd | MA Anthropology | Section 106 |
| Heather Staton | Master of Historic Preservation | Section 106 |
| **HMMH** | | |
| Christopher Menge | BS Physics | Noise |
| Scott Noel | BA Geography and Environmental Planning | Noise |
| Phil DeVita | MS Environmental Studies | Air Quality |
| **REMLINE** | | |
| Anthony Brown | MS Human Resource Development | Public Involvement |
| Kieran O'Connell | BS Marketing | Public Involvement |
| **RJM ENGINEERING** | | |
| Jim Yang | PhD Transportation Engineering | Traffic |
| Sean McCarthy | BS Civil Engineering | Stormwater Management |
| Lisa Yang | MS Civil Engineering | Stormwater Management |
| **ROSSI TRANSPORTATION GROUP** | | |
| Lindsay Ewell, EIT | BCE Civil Engineering | Traffic |
| Brian Lapinsky, PE | BS Civil Engineering | Concept Development |
| **STRAUGHAN ENVIRONMENTAL, INC.** | | |
| Lauren McMahon | BS Environmental Science | Noise |
| Tracy Seymour | BS Civil Engineering | Noise |
| **WILSON T. BALLARD COMPANY** | | |
| Dale Topper | AA Engineering | Concept Development |
| **WRA** | | |
| Melanie Ernest | BS Civil Engineering | Traffic |

00036050

00036051

# 9   DISTRIBUTION LIST

## 9.1   Federal Agencies

Advisory Council on Historic Preservation
Department of Defense, Joint Base Andrews
Federal Emergency Management Agency Region III
Federal Highway Administration
Federal Railroad Administration
Federal Transit Administration, Region 3
General Services Administration
National Capital Planning Commission
National Institute of Standards & Technology, Office of Facilities and Property Management
National Marine Fisheries Service, Greater Atlantic Regional Office
National Oceanic Atmospheric Administration
National Park Service, National Capital Regional Office
Naval Support Activity Bethesda
US Army Corps of Engineers, Baltimore District
US Coast Guard
US Department of Agriculture
US Department of Housing and Urban Development
US Department of the Interior, Office of Environmental Policy & Compliance
US Environmental Protection Agency, Region 3
US Postal Service, Westlake Carrier Annex Post Office/Capital Heights Post Office
US Fish and Wildlife Service, Chesapeake Bay Field Office

## 9.2   Federally Recognized Tribes

Absentee-Shawnee Tribe of Oklahoma
Delaware Nation
Delaware Tribe of Indians
Chickahominy Indian Tribe
Chickahominy Indians Eastern Division
Eastern Shawnee Tribe of Oklahoma
Monacan Indian Nation
Nansemond Indian Tribe
Oneida Indian Nation
Onondaga Nation
Pamunkey Indian Tribe
Rappahannock Tribe, Inc.
Saint Regis Mohawk Tribe
Seneca-Cayuga Nation
Shawnee Tribe
Tuscarora Nation
Upper Mattaponi Indian Tribe

## 9.3   State of Maryland Agencies

Maryland Department of Business and Economic Development

00036052



Maryland Department of the Environment, Wetlands and Waterways Program
Maryland Department of Natural Resources
Maryland Department of Planning Clearinghouse
Maryland Department of Transportation, Maryland Transit Administration
Maryland Department of Transportation, Maryland Transportation Authority
Maryland Department of Transportation, Office of Planning & Capital Programming
Maryland Historical Trust

## 9.4  Commonwealth of Virginia Agencies

Virginia Department of Conservation and Recreation
Virginia Department of Environmental Quality, Office of Environmental Impact Review
Virginia Department of Forestry
Virginia Department of Game and Inland Fisheries
Virginia Department of Health
Virginia Department of Historic Resources
Virginia Department of Transportation, Northern Virginia District
Virginia Marine Resources Commission

## 9.5  State Recognized and Other Tribal Groups

Piscataway Conoy Tribe of Maryland (PCT)
PCT - Cedarville Band of Piscataway
PCT - Choptico Band of Piscataway
Piscataway Conoy Confederacy and Subtribes of Maryland
Piscataway Indian Nation

## 9.6  County and Local Agencies

City of College Park
City of Gaithersburg
City of Greenbelt
City of New Carrollton
City of Rockville
Maryland-National Capital Park and Planning Commission, Montgomery County Department of Parks
Maryland-National Capital Park and Planning Commission, Montgomery County Planning Board
Maryland-National Capital Park and Planning Commission, Montgomery County Planning Department
Maryland-National Capital Park and Planning Commission, Prince George's County Parks and Recreation
Maryland-National Capital Park and Planning Commission, Prince George's County Planning Board
Maryland-National Capital Park and Planning Commission, Prince George's County Planning Department
Maryland-National Capital Park Police, Montgomery County
Maryland-National Capital Park Police, Prince George's County
Metropolitan Washington Council of Governments, Department of Environmental Programs
Montgomery County, Department of Transportation
Montgomery County Executive's Office
Prince George's County Department of Public Works and Transportation
Prince George's County Executive's Office
Washington Metropolitan Area Transit Authority

00036053

Draft Environmental Impact Statement

## 9.7 DEIS Availability

The DEIS and technical reports can be viewed and downloaded from the project website at: https://495-270-p3.com/DEIS/.  Hard copies of the DEIS are available for review at public locations. Visit the project website to find where hard copies of the DEIS are available due to the uncertainties related to COVID-19.

00036054

00036055

# 10 REFERENCES

7 Code of Federal Regulations (CFR) § 658.2. *Farmland Protection Policy Act*.

23 Code of Federal Regulations (CFR) § 772. *Procedures for Abatement of Highway Traffic Noise and Construction Noise.*

23 Code of Federal Regulations (CFR) § 774.3(a, b, c). *Section 4(f) Approvals*.

23 Code of Federal Regulations (CFR) § 774.5(b). *Coordination*.

23 Code of Federal Regulations (CFR) § 774.11. *Applicability*.

23 Code of Federal Regulations (CFR) § 774.13(a, d, f). *Exceptions*.

23 Code of Federal Regulations (CFR) § 774.15. *Constructive Use Determinations*.

23 Code of Federal Regulations (CFR) § 774. 17. *Definitions*.

33 Code of Federal Regulations (CFR) § 328.3.*Definition of Waters of the United States*.

33 Code of Federal Regulations (CFR) § 408.14. *Rivers and Harbors Act*.

36 Code of Federal Regulations (CFR) § 800.2[c][5]. *Participants in the Section 106 process; Consulting parties; Additional consulting parties*.

36 Code of Federal Regulations (CFR) § 800.3[f]. *Initiation of the Section 106 Process; Identify other consulting parties*.

36 Code of Federal Regulations (CFR) § 800.5(a)(1). *Assessment of Adverse Effects; Apply criterial of adverse effect; Criteria of adverse effect*.

36 Code of Federal Regulations (CFR) § 800 [6][1]iii. *Resolution of Adverse Effects*.

36 Code of Federal Regulations (CFR) § 800.8. *Coordination with the National Environmental Policy Act*.

36 Code of Federal Regulations (CFR) § 800.14[b]. *Federal Agency Program Alternatives; Programmatic Agreements*.

36 Code of Federal Regulations (CFR) § 800.16[l][1]. *Protection of Historic Properties; Program Alternatives; Definitions; Historic Property*.

00036056



Draft Environmental Impact Statement

40 Code of Federal Regulations (CFR) § 230.3. *Guidelines for Specification of Disposal Sites for Dredged or Fill Material; Definitions*.

40 Code of Federal Regulations (CFR) § 1502.16. *Environmental Consequences*.

40 Code of Federal Regulations (CFR) § 1508.7. *Cumulative Impact*.

40 Code of Federal Regulations (CFR) § 1508.8. *Effects*.

49 Code of Federal Regulations (CFR) § 24. Uniform Relocation Assistance and Real Property Acquisition for Federal and Federally-Assisted Programs.

9 Code of Virginia (VAC) 25-210. *Virginia Water Protection Permit Program Regulation*.

33 United States Code (U.S.C.) 403. *Navigation and Navigable Waters. Chapter 9 Protection of Navigable Waters and of Harbor and River Improvements.*
https://www.govinfo.gov/content/pkg/USCODE-2011-title33/html/USCODE-2011-title33.htm

33 United States Code (U.S.C.) 1344. *Navigation and Navigable Waters. Chapter 26 Water Pollution Prevention and Control, Subchapter IV Permits and Licenses.*
https://www.govinfo.gov/content/pkg/USCODE-2011-title33/html/USCODE-2011-title33.htm

42 United States Code (U.S.C.) 61. *Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970* (as amended, 1987).

42 United States Code (U.S.C.) 300h-7. *State Programs to Establish Wellhead Protection Areas*.

42 United States Code (U.S.C.) 300j-13. *Source Water Quality Assessment*.

42 United States Code (U.S.C.) 4332(c)(iv). *Cooperation of Agencies; Reports; Availability of Information; Recommendations; International and National Coordination of Efforts*.

54 United States Code (U.S.C.) 306108. *Effect of Undertaking on Historic Property*.

ASTM. (2013). *ASTM E1527-13, Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process.* West Conshohocken, PA: American Society for Testing and Materials.

Blackwell, Robert J. 1989. *Overlay Zoning, Performance Standards, and Environmental Protection After Nollan*. 16 B.C. Envtl. Aff. L. Rev. 615. Available at:
http://lawdigitalcommons.bc.edu/ealr/vol16/iss3/6 [Accessed 7 September 2018].

City of Gaithersburg Geographic Information System (GIS) web map.
https://maps.gaithersburgmd.gov/gallery/

00036057

City of Gaithersburg Master Plan. 2009. https://www.gaithersburgmd.gov/services/planning-services/city-master-plan

City of Rockville GIS Open Data. http://data-rockvillemd.opendata.arcgis.com/

Code of Maryland Regulations (COMAR). Chapter 11.07.05. *Public Notice of Toll Schedule Revisions.*

Code of Maryland Regulations (COMAR). 26.17. 01 *Erosion and Sediment Control; Definitions.*

Code of Maryland Regulations (COMAR). 26.17.04.02. *Construction on Nontidal Waters and Floodplains; Definitions.*

Code of Maryland Regulations (COMAR). 26.23.01. *Nontidal Wetlands; General.*

Code of Maryland Regulations (COMAR). 26.23.01.01. *Nontidal Wetlands; General; Definitions.*

Code of Maryland Regulations (COMAR). 26.23.01.04. *Nontidal Wetlands; General; Expanded Buffer.*

Code of Maryland Regulations (COMAR). 26.23.06. *Nontidal Wetlands of Special State Concern.*

Council on Environmental Quality, *Memorandum to Agencies: Forty Most Frequently Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Federal Register 18026 (March 23, 1981), as amended (1986); Question 4a

Cowardin, L.M., V. Carter, F.C. Golet, E.T. LaRoe. 1979. *Classification of Wetlands and Deepwater Habitats of the United States*. U.S. Department of the Interior, Fish and Wildlife Service, Washington D.C. https://www.fws.gov/wetlands/Documents/Classification-of-Wetlands-and-Deepwater-Habitats-of-the-United-States.pdf

Cunningham, Heather R. and N. H. Nazdrowicz. 2018. *The Maryland Amphibian and Reptile Atlas*. Baltimore, MD: The Johns Hopkins University Press. 283 pages.

District of Columbia Office of Planning. 2010. *The Comprehensive Plan for the National Capital.* https://planning.dc.gov/page/comprehensive-plan

Executive Order 5650.2. 1979. *Floodplain Management and Protection*. https://www.fhwa.dot.gov/engineering/hydraulics/policymemo/order56502.pdf

Executive Order 11988. 1977. *Floodplain Management*. https://www.fema.gov/executive-order-11988-floodplain-management

Executive Order 12898. 1994. *Federal Actions to Address Environmental Justice in Minority and Low-Income Populations.*

00036058

Executive Order 13807. 2017. *Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects.*

Fairfax County Open Geospatial Data. https://www.fairfaxcounty.gov/maps/open-geospatial-data

Fairfax County. 2017. *Fairfax County Comprehensive Plan.* https://www.fairfaxcounty.gov/planning-development/fairfax-county-comprehensive-plan

Fairfax County, 2018. Understanding Erosion and Sediment Controls. https://www.fairfaxcounty.gov/soil-water-conservation/erosion-sediment-controls-construction-site

Fairfax Water. 2018. Annual Water Quality Report. https://www.fairfaxwater.org/sites/default/files/newsletters/ccr_2018.pdf

Federal Emergency Management Administration (FEMA). 2018*. Floodplain Management Requirements, Unit 1: Floods and Floodplain Management*. Available at: https://www.fema.gov/pdf/floodplain/nfip_sg_unit_1.pdf [Accessed August 23, 2018].

Federal Highway Administration (FHWA). 2008*. Wildlife-Vehicle Collision Reduction Study: Report to Congress.* August 2008. FHWA-HRT-08-034

Federal Highway Administration (FHWA). 2011. *Guidance on Environmental Justice and NEPA Memorandum.* https://www.environment.fhwa.dot.gov/env_topics/ej/guidance_ejustice-nepa.aspx

Federal Highway Administration (FHWA). 2012. Executive Order 6640.23A. *FHWA Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*.

Federal Highway Administration (FHWA). 2012. *Section 4(f) Policy Paper*. https://www.environment.fhwa.dot.gov/legislation/section4f/4fpolicy.aspx

Federal Highway Administration (FHWA). 2016. *Updated Interim Guidance on Mobile Source Air Toxic Analysis in NEPA Documents.* https://www.fhwa.dot.gov/environment/air_quality/air_toxics/policy_and_guidance/msat/

Federal Highway Administration (FHWA). 23 CFR 771.123(e) Draft Environmental Impact Statements.

Federal Highway Administration (FHWA). One Federal Decision Fact Sheet https://www.transportation.gov/sites/dot.gov/files/docs/policy-initiatives/320411/ofd-fact-sheet.pdf

https://495-270-p3.com/

https://495-270-p3.com/your-participation/upcoming-events/

https://495-270-p3.com/environmental/resources/

00036059

https://495-270-p3.com/i270-environmental/

Federal Register. 1978. Volume 43. Issue 21. Chapter 657.5. 1978. *Identification of Important Farmlands.*

Federal Register. 1994. Volume 59. Issue 133. July 13, 1994. *Changes in hydric soils of the United States.* Available at: https://www.govinfo.gov/app/details/FR-1994-07-13/94-16835

Griffin and McGwin. 2013. *Emergency Medical Service Providers' Experiences with Traffic Congestion.* ncbi.nlm.nih.gov/pubmed/22883716.

Jones, Claudia, J. McCann, and S. McConville. 2000. *A Guide to the Conservation of Forest Interior Dwelling Birds in the Critical Area.* Chesapeake Bay Critical Area Commission, 58 pp.

Maryland Department of the Environment. May 2009. Maryland Stormwater Design Manual. https://mde.maryland.gov/programs/water/StormwaterManagementProgram/Pages/stormwater_de sign.aspx

Maryland Department of the Environment. 2015. *Maryland Groundwater Well Database.* Maryland Department of the Environment. Received via request 1 November 2016.

Maryland Department of Labor, Licensing, & Regulation (MDL). 2018. *Commuting Patterns: Montgomery Workforce Region.* dllr.maryland.gov/lmi/wiacommuting/.

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2012. *Indirect and Cumulative Effects Analysis Guidelines.* https://www.roads.maryland.gov/OPPEN/SHA%20ICE%20Guidelines.pdf

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2018. *2018 Maryland State Highway Mobility Report* www.roads.maryland.gov/OPPEN/2018%20Mobility%20Report.pdf

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2018. *I-495 & I-270 Managed Lanes Study Purpose and Need Statement.* (Appendix A)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-495 & I-270 Managed Lanes Study Air Quality Technical Report.* (Appendix I)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-495 & I-270 Managed Lanes Study Alternatives Technical Report.* (Appendix B)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-495 & I-270 Managed Lanes Study Avoidance, Minimization, & Impacts Report.* (Appendix M)

00036060



Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-495 & I-270 Managed Lanes Study Community Effects Assessment and Environmental Justice Analysis Technical Report.* (Appendix E)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-495 & I-270 Managed Lanes Study Draft Compensatory Mitigation Plan.* (Appendix N)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-495 & I-270 Managed Lanes Study Conceptual Mitigation Plan* (Appendix Q)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-495 & I-270 Managed Lanes Study Cultural Resources Technical Report, Volumes 1 through 6.* (Appendix G)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-495 & I-270 Managed Lanes Study Draft Section 4(f) Evaluation.* (Appendix F)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. I-495 & I-270 Managed Lanes Study *Draft Section 106 Programmatic Agreement* (Appendix H)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-496 & I-270 Managed Lanes Study Environmental Resource Mapping* (Appendix D)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-495 & I-270 Managed Lanes Study Hazardous Materials Technical Report.* (Appendix K)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-495 & I-270 Managed Lanes Study Indirect and Cumulative Effects Technical Report.* (Appendix O)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-495 & I-270 Managed Lanes Study Natural Resources Technical Report.* (Appendix L)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-495 & I-270 Managed Lanes Study Noise Analysis Technical Report.* (Appendix J)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-495 & I-270 Managed Lanes Study Public Involvement and Agency Coordination Technical Report.* (Appendix P)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *I-495 & I-270 Managed Lanes Study Traffic Analysis Technical Report.* (Appendix C)

Maryland Department of Transportation State Highway Administration (MDOT SHA). 2020. *Highway Noise Abatement Planning and Engineering Guidelines.*

00036061



Draft Environmental Impact Statement

Metropolitan Washington Council of Governments (MWCOG). 2017. National Capital Region TPB, Long-Range Plan Task Force, titled, *An Assessment of Regional Initiatives for the National Capital Region - Draft Technical Report on Phase II of the TPB Long-Range Plan Task Force* https://www.mwcog.org/documents/2017/12/20/long-range-plan-task-force-reports-projects-regional-transportation-priorities-plan-scenario-planning-tpb/

Metropolitan Washington Council of Governments (MWCOG). 2018. *FY 2019-2024 Transportation Improvement Program*. https://www.mwcog.org/transportation/plans/transportation-improvement-program/

Metropolitan Washington Council of Governments, *Visualize2045* Plan, National Capital Region Transportation Planning Board, October 17, 2018. http://mwcog.maps.arcgis.com/apps/Cascade/index.html?appid=debc2550777b4cc2bae2364c7712a151

Metropolitan Washington Council of Governments (MWCOG). 2018d. *Commercial construction slows in Metropolitan Washington, COG reports.* https://www.mwcog.org/newsroom/2018/04/02/commercial-construction-slows-in-metropolitan-washington-cog-reports/

Montgomery County/MNCPPC MCATLAS. http://www.mcatlas.org/viewer/

Montgomery County Planning. 2004. *Capital Beltway HOV Lane Project and Interchange at the Intersection of Randolph Road and Veris Mill Road*. http://www.montgomeryplanning.org/transportation/highways/documents/MPOH-Amendment-2004.pdf

Montgomery County Planning. 2008. *Guiding the Future of the MD 355/I-270 Corridor.* https://www.montgomeryplanning.org/community/md355/documents/md355report_01282008.pdf

Montgomery County Planning. 2012. Special Protection Areas (SPA). Available at: http://www.montgomeryplanning.org/environment/spa/index.shtm [Accessed 7 September 2018].

Montgomery County Planning. 2018. *Highways and Transitways Master Plan*. https://montgomeryplanning.org/planning/transportation/highway-planning/master-plan-of-highways-and-transitways/

National Capital Regional Transportation Planning Board (NCRTPB). 2016 Amendment. Financially Constrained Long-Range Transportation Plan for the National Capital Region. http://www1.mwcog.org/clrp/resources/2016/2016AmendmentReport.pdf

National Capital Region Transportation Planning Board (TPB). 2016c. *National Capital Region Freight Plan*. mwcog.org/documents/2010/07/28/national-capital-region-freight-plan-freight/.

00036062


National Capital Region Transportation Planning Board (TPB). 2016d. *Congestion Management Process Technical Report*. mwcog.org/documents/2016/09/09/congestion-management-process-technical-report/.

National Cooperative Highway Research Program (NCHRP). 2012. Report 710, *Practical Approaches for Involving Traditionally Underserved Populations in Transportation Decision-making*.

Prince George's County Open Data Portal. http://gisdata.pgplanning.org/metadata/

Prince George's County Planning. 1994. *Bladensburg-New Carrollton and Vicinity Technical Bulletin*. http://mncppcapps.org/planning/publications/BookDetail.cfm?item_id=16&Category_id=1

Prince George's County Planning. 2000. *The Heights and Vicinity Master Plan and Sector Master Plan*. http://mncppcapps.org/planning/publications/BookDetail.cfm?item_id=30&Category_id=1

Stormwater Management Act of 2007. Title 4, Subtitle 201.1(B).

Transportation Research Board. *Highway Capacity Manual*. Sixth Edition.

Trombulak, S.C. and C.A. Frissell. 2001. Review of Ecological Effects of Roads on Terrestrial and Aquatic Communities. Conservation Biology. 14(1):18-30.

US Army Corps of Engineers (USACE). 1987. *Wetlands Delineation Manual*, Y-87-I (Environmental Laboratory).

US Army Corps of Engineers (USACE). 1999. *The Highway Methodology Workbook Supplement – Wetland Functions and Values; A Descriptive Approach.*

US Army Corps of Engineers (USACE). 2010. *Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Coastal Plain Region.*

US Army Corps of Engineers (USACE). 2012. *Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Coastal Plain Region.*

US Army Corps of Engineers (USACE). 2012. *Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Eastern Mountains and Piedmont Region*, Version 2.0.

US Department of Transportation (USDOT), Federal Highway Administration (FHWA). 2008. Wildlife-Vehicle Collision Reduction Study: Report to Congress. August 2008. FHWA-HRT-08-034.

US Department of Transportation (USDOT), Federal Highway Administration (FHWA). 2010. *Highway Evacuations in Selected Metropolitan Areas: Assessment of Impediments*. ops.fhwa.dot.gov/eto_tim_pse/reports/ 2010_cong_evac_study/fhwahop10059.pdf.

00036063


US Department of Transportation, Federal Highway Administration, United States Department of Transportation, Federal Transit Administration, Maryland Transit Administration, and Maryland State Highway Administration (US Department of Transportation et al.). 2009. *I-270/US 15 Multimodal Corridor Study Alternatives Analysis/Environmental Assessment*. i270multimodalstudy.com/environmental-studies/aaea.html.

US Department of Transportation (US DOT). 2012. Executive Order 5610.2(a). *Actions to Address Environmental Justice in Minority Populations and Low-Income Populations.* https://www.transportation.gov/transportation-policy/environmental-justice/department-transportation-order-56102a

US Environmental Protection Agency (EPA). Executive Order 12898. 1994. *Federal Actions to Address Environmental Justice in Minority and Low-Income Populations.*

US Environmental Protection Agency (EPA). MOVES2014b and CAL3QHC. https://www.epa.gov/moves/latest-version-motor-vehicle-emission-simulator-moves#SIP

US Fish and Wildlife Service (USFWS). 2007. Indiana Bat (Myotis sodalis) Draft Recovery Plan: First Revision. U.S. Fish and Wildlife Service, Fort Snelling, MN. 258 pp.

US Fish and Wildlife Service (USFWS). 2016. *Revised Programmatic Biological Opinion for Transportation Projects in the Range of the Indiana Bat and Northern Long-Eared Bat.* USFWS, Bloomington, Minnesota.

US Fish and Wildlife Service (USFWS). 2018c. Programmatic Biological Opinion for Transportation Projects in the Range of the Indiana Bat and Northern Long-eared Bat. U.S. Fish and Wildlife Service Midwest Regional Office, Bloomington, MN. 157pp

US Fish and Wildlife Service (USFWS). 2018a. Threatened Species Status for the Yellow Lance; Final Rule. 83. Fed. Reg. 14189.  (May 3, 2018).

US Fish and Wildlife Service (USFWS). 2018b. Species Status Assessment Report for the Yellow Lance (Elliptio lanceolata). Species Status Assessment Reports. Version 1.3. January, 2018. Raleigh Ecological Services Field Office.

US Geological Survey. 2017. National Water Information System.

Virginia Department of Environmental Quality (VDEQ). 1992. Virginia Erosion and Sediment Control Handbook.https://www.deq.virginia.gov/Programs/Water/StormwaterManagement/Publications/ESC Handbook.aspx

Virginia Department of Environmental Quality (VDEQ). 2005. *Wellhead Protection Program*.

00036064



Draft Environmental Impact Statement

Virginia Department of Environmental Quality (VDEQ). 2018. Virginia Water Protection Compliance Program. https://www.deq.virginia.gov/Programs/Water/WetlandsStreams/Compliance.aspx

Virginia Department of Environmental Quality (VDEQ). 2014. Virginia Erosion and Sediment Control Law: Virginia Erosion and Sediment Control    Regulations and Certification Regulations. https://www.deq.virginia.gov/Portals/0/DEQ/Water/StormwaterManagement/Erosion_Sediment_Control_Handbook/ESC_Handbook_Law_Regulations.pdf.

Virginia Department of Transportation (VDOT). 2017. *Drainage Manual*. Available at: http://www.virginiadot.org/business/locdes/hydra-drainage-manual.asp

Virginia Department of Forestry (VDOF). 2014. Virginia Forest Cover dataset.

Virginia Department of Health (VDH). 1999. *Virginia's Source Water Assessment Program*.

Virginia Department of Health (VDH). 2019. Private Well Program. http://www.vdh.virginia.gov/environmental-health/onsite-sewage-water-services-updated/private-well-program/ [Accessed 26 April 2019].

Washington Area Bus Transformation Project. https://bustransformationproject.com/resources/public-survey-results/

Water Management Administration (WMA). 2013. *Groundwater Protection Program: Annual Report* to *the Maryland General Assembly*. Maryland Department of the Environment. Available at: www.mde.state.md.us/programs/Water/.../SJR25-JR5_1985%282013%29.pdf [Accessed 9 Aug 2018].

White House, *Executive Order 13807: Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects.* https://www.whitehouse.gov/presidential-actions/presidential-executive-order-establishing-discipline-accountability-environmental-review-permitting-process-infrastructure/

https://www.whitehouse.gov/wp-content/uploads/2018/04/MOU-One-Federal-Decision-m-18-13-Part-2-1.pdf

00036065