

| EJ Analysis Area Community*/ General EJ Population | Date | Outreach Type | Event/ Organization/ Location | Number of Attendees |
|---|---|---|---|---|
| General EJ Population throughout EJ Analysis Area | August 7, 2018 | Pop-Up Informational Booth | National Night Out Against Crime<br><br>Heurich Park<br>2800 Nicholson Street<br>Hyattsville, MD 20782 | 105 |
| Greenbelt EJ Analysis Area Community | April 24, 2018 | Public Scoping Open House | Eleanor Roosevelt High School<br><br>7601 Hanover Parkway, Greenbelt, MD 20770 | 56 |
| | July 17, 2018 | Preliminary Alternatives Public Workshop | | 130 |
| | April 23, 2019 | ARDS Public Workshop | | 99 |
| College Park EJ Analysis Area Community | January 30, 2019 | Stakeholder Meeting | Four Cities Meeting (College Park, Berwyn Heights, Rockville, New Carrollton) | - |
| Gaithersburg EJ Analysis Area Community | April 8, 2019 | Legislative/Elected Officials Briefing | Gaithersburg Mayor and Council<br><br>City Hall, 31 S Summit Ave Gaithersburg, MD 20877 | 6 |
| Landover and Summerfield EJ Analysis Area Communities | April 11, 2019 | ARDS Public Workshop | Prince George's Sports & Learning Complex<br><br>8001 Sheriff Rd Landover, MD 20785 | 48 |
| Silver Spring EJ Analysis Area Community | April 24, 2019 | ARDS Public Workshop | Eastern Middle School<br><br>300 University Blvd E Silver Spring, MD 20901 | 377 |
| Marlow Heights, Camp Springs, and Forestville EJ Analysis Area Communities | April 27, 2019 | ARDS Public Workshop | Suitland Community Center<br><br>5600 Regency Ln, Forestville, MD 20747 | 23 |
| Marlow Heights and Temple Hills EJ Analysis Area Communities | May 14, 2019 | ARDS Public Workshop | Oxon Hill High School<br><br>6701 Leyte Drive Oxon Hill, MD 20745 | 26 |
| Glenarden EJ Analysis Area Community | May 23, 2019 | Legislative/Elected Officials Briefing | City of Glenarden Councilmembers | 18 |

00038433

COMMUNITY EFFECTS ASSESSMENT AND ENVIRONMENTAL JUSTICE ANALYSIS



| EJ Analysis Area Community*/ General EJ Population | Date | Outreach Type | Event/ Organization/ Location | Number of Attendees |
|---|---|---|---|---|
| College Park EJ Analysis Area Community | June 4, 2019 | Stakeholder Meeting | Four Cities Meeting (College Park, Berwyn Heights, Rockville, New Carrollton) | - |
| College Park EJ Analysis Area Community | June 13, 2019 | Community Association Meeting | North College Park Citizens' Association | 53 |
| General EJ Population throughout EJ Analysis Area | June 13, 2019 | Stakeholder Meeting | Montgomery County Hispanic Chamber<br><br>12276 Rockville Pike, Rockville, MD 20852 | 2 |
| Glenarden EJ Analysis Area Community | June 17, 2019 | Residents' Meeting | City of Glenarden Residents | 80 |
| Gaithersburg EJ Analysis Area Community | June 30, 2019 | Pop-Up Informational Booth | SummerFest<br><br>506 South Frederick Ave., Gaithersburg, MD 20877 | 200 |
| Lake Arbor EJ Analysis Area Community | July 13, 2019 | Pop-Up Informational Booth | Lake Arbor Jazz Festival<br><br>10100 Lark Arbor Way, Mitchellville, MD 20721 | 300 |
| Gaithersburg and Rockville EJ Analysis Area Communities | July 26, 2019 | Legislative/Elected Officials Briefing | Del. Kumar Barve, District 17 Montgomery County<br><br>150 Gibbs St, Rockville, MD 20850 | 1 |
| Forestville EJ Analysis Area Community | July 31, 2019 | Large Landowner Meeting | Calvary Lutheran Evangelical Church<br><br>9545 Georgia Ave Silver Spring, MD 20910 | 9 |
| General EJ Population throughout EJ Analysis Area | August 6, 2019 | Pop-Up Informational Booth | National Night Out Against Crime<br><br>Heurich Park 2800 Nicholson Street Hyattsville, MD 20782 | - |
| General EJ Population throughout EJ Analysis Area | August 15, 2019 | Stakeholder Meeting | Hispanic Chamber of Commerce Montgomery County | 25 |

00038434

COMMUNITY EFFECTS ASSESSMENT AND ENVIRONMENTAL JUSTICE ANALYSIS



| EJ Analysis Area Community*/ General EJ Population | Date | Outreach Type | Event/ Organization/ Location | Number of Attendees |
|---|---|---|---|---|
| | | | 11001 Veirs Mill Rd, Silver Spring, MD 20902 | |
| Gaithersburg EJ Analysis Area Community/ General EJ Population throughout EJ Analysis Area | August 9-17, 2019 | Pop-Up Informational Booth | Montgomery County Agricultural Fair<br><br>501 Perry Pkwy., Gaithersburg, MD 20877 | 286 |
| Forestville EJ Analysis Area Community | September 6, 2019 | Large Landowner Meeting | Jabbok Ministries<br><br>7819 Parston Dr Forestville, MD 20747 | 6 |
| General EJ Population throughout EJ Analysis Area | September 5-8, 2019 | Pop-Up Informational Booth | Prince George's County Fair<br><br>14900 Pennsylvania Avenue, Upper Marlboro, MD 20772 | 134 |
| Rockville EJ Analysis Area Community | October 3, 2019 | Large Landowner Meeting | First Baptist Church<br><br>55 Adclare Rd Rockville, MD 20850 | 10 |
| Gaithersburg and Rockville EJ Analysis Area Communities | October 10, 2019 | Legislative/Elected Officials Briefing | Del. Julie Palakovich-Carr, District 17 Montgomery County<br><br>225 N Washington St, Rockville, MD 20850 | 1 |
| General EJ Population throughout EJ Analysis Area | October 17, 2019 | Stakeholder Meeting | Maryland Hispanic Chamber of Commerce<br><br>11 W Mt Vernon Pl, Baltimore, MD 21201 | 35 |
| Gaithersburg and Rockville EJ Analysis Area Communities | October 23, 2019 | Legislative/Elected Officials Briefing | Sen. Cheryl Kagan, District 17 Montgomery County<br><br>225 N Washington St, Rockville, MD 20850 | 1 |
| New Carrollton EJ Analysis Area Community | November 9, 2019 | Community Association Meeting | 295 Coalition Meeting<br><br>New Carrollton Library, 7414 Riverdale Rd., New Carrollton, MD 20784 | 30 |

00038435

| EJ Analysis Area Community*/ General EJ Population | Date | Outreach Type | Event/ Organization/ Location | Number of Attendees |
|---|---|---|---|---|
| General EJ Population throughout EJ Analysis Area | November 14, 2019 | Stakeholder Meeting | Maryland Black Chamber of Commerce<br><br>8630 Fenton Street, Plaza 5, Silver Spring, MD 20910 | 2 |
| General EJ Population throughout EJ Analysis Area | December 4, 2019 | Legislative/Elected Officials Briefing | Montgomery County Minority Legislative Breakfast Event<br><br>5151 Pooks Hill Rd, Bethesda, MD 20814 | 300 |
| Gaithersburg and Rockville EJ Analysis Area Communities | December 10, 2019 | Legislative/Elected Officials Briefing | Sen. Cheryl Kagan, District 17 Montgomery County<br><br>225 N Washington St, Rockville, MD 20850 | 1 |
| Gaithersburg and Rockville EJ Analysis Area Communities | December 10, 2019 | Legislative/Elected Officials Briefing | Sen. Cheryl Kagan, District 17 Montgomery County<br><br>225 N Washington St, Rockville, MD 20850 | 35 |
| General EJ Population throughout EJ Analysis Area | February 26, 2020 | Stakeholder Meeting | Asian American Chamber of Commerce<br><br>1801 Rockville Pike, Rockville, MD 20852 | 25 |
| General EJ Population throughout EJ Analysis Area | March 4, 2020 | Stakeholder Meeting | Maryland Black Chamber of Commerce<br><br>8630 Fenton Street, Plaza 5, Silver Spring, MD 20910 | 2 |
| Gaithersburg and Rockville EJ Analysis Area Communities | April 6, 2020 | Legislative/Elected Officials Briefing | Montgomery County District 17 Legislative Town Hall (Conference Call) | 75 |

*Identifies the community containing EJ populations in which the event either occurs directly, is adjacent to, or is outside of but in whose community EJ populations are served.

Public outreach events were accessible by public transit, such as the Suitland Metro Station near the Suitland Community Center and the Greenbelt Road/Frankfort Drive bus station near Eleanor Roosevelt High School. All Public Open House/Workshop venues were accessible by Americans with Disabilities Act (ADA) standards; each Public Open House/Workshop and several pop-up events featured an American Sign Language interpreter. As shown in **Table 4-5**Error! Reference source not found., pop-up informational

00038436



booths were staffed at the Annual Salvadoran American Festival/7[th] Annual Latino Health Fair at Montgomery College (August 5, 2018), and the National Night Out Against Crime at Hyattsville's Heurich Park (August 7, 2018 and August 6, 2019). A Spanish interpreter was available at the Annual Salvadoran American Festival/7[th] Annual Latino Health Fair, and Spanish and English outreach materials were provided at both events.

Advertisement campaigns for Public Open Houses/Workshops included a variety of outreach methods. Digital outreach included P3 Program website announcements, e-mail blasts, social media posts, downloadable newsletters, and digital newspapers. Print outreach included local/regional newspaper advertisements, newspaper inserts, postcards, and mailed newsletters. Advertisements were featured in print and online newspapers whose local/regional readership includes EJ populations in the EJ Analysis Area as well as those whose primary audiences are of minority races/ethnicities and are considered traditionally underserved (*Tiempo Latino, Washington Hispanic, Prince George's Sentinel, Afro.com,* and *DCBlack.com*). Additionally, a newspaper insert was distributed in the *Washington Post's* Local Living Section to over 690,000 regional subscribers and non-subscribers, also including EJ populations. Radio outreach for the Alternatives Retained for Detailed Study (ARDS) Public Workshops included "traffic sponsorships" on 14 regional radio stations whose local/regional audiences also broadly encompass EJ populations in the EJ Analysis Area.

Multi-lingual meeting materials for the Public Open Houses/Workshops were provided by request; requests were made for Amharic, Spanish, and Chinese language materials. Each Public Open House/Workshop and several pop-up events featured a Spanish-language interpreter. Newspaper inserts and postcards stated that Amharic, Vietnamese, Spanish, and Chinese language materials could be requested in each respective language. Spanish-language "Stay Connected" cards were distributed at engagement events, and Spanish-language meeting materials, including display boards and Public Workshop handouts were made available on the P3 Program website. The website also features Google Translate capabilities.

Additional detail on the public involvement efforts presented here is provided in the ***Public Involvement and Agency Coordination Technical Report*** (DEIS Appendix P).

### 4.4.2    Coordinated Local Outreach and Demonstrated Engagement of Traditionally Underrepresented Populations

Based on initial low attendance at Prince George's County events and receipt of fewer public comments compared to Montgomery County, MDOT SHA reached out to the M-NCPPC Prince George's County Planning Department to enhance local engagement during the ARDS Public Workshop outreach campaign. Coordinated local outreach efforts included, but were not limited to:

- M-NCPPC Prince George's County Planning Department distribution of the Public Workshops' announcement flyer via Office of Municipalities' community outreach database for display at 45 County community centers (March 14, 2019);

- M-NCPPC Prince George's County Planning Department distribution of the Public Workshops' announcement flyer via WMATA Office of Communications for their community update posting (March 29, 2019);

00038437



- M-NCPPC Prince George's County Planning Department forwarding of study e-mail blasts to their Community Association database and Office of Planning database (e-mail blasts distributed on March 7, April 10, May 8, June 10, 2019);

- Prince George's County Department of Public Works and Transportation distribution of Public Workshops' announcement flyer through email blast; and

- Distribution of Public Workshops' announcement flyer to several large places of worship along the study corridor (on and after March 14, 2019), including First Baptist Church of Glenarden, the Collective Empowerment Group (an umbrella group for more than 300 churches in the County), Prince George's County Liaison for Faith Connections/Relationship Building, People's Community Baptist Church, Sanctuary at Kingdom Square, and the Transforming Neighborhoods Initiative.[23]

While study awareness, meeting attendance, and the volume of comments received was consistently strong in Montgomery County; additional outreach was conducted that included distribution of the Public Workshops' announcement flyer through the Montgomery County Department of Transportation email blasts.

To enhance engagement of the Study's identified EJ populations and other underserved populations, and consistent with recommendations in NCHRP Report 710, *Practical Approaches for Involving Traditionally Underserved Populations in Transportation Decisionmaking*, demographic data was used to identify locations for targeted mailing outreach. These locations included EJ Analysis Area schools with above-average participation in the Free and Reduced-price Meals Program;[24] places of worship[25] in EJ Analysis Area Communities containing EJ populations; and all affordable-housing complexes[26] in the EJ Analysis Area.

In early April 2019, an introductory cover letter asking recipients to display an enclosed Public Workshops' announcement flyer wherever community information is displayed was mailed to the following affordable-housing complexes, schools, and places of worship. English and Spanish versions of the flyer were included with the cover letter.

## A.    Affordable Housing Complexes

- Burnt Mills Crossing
- Chelsea Towers
- Council House

- St. Luke's Homes, Inc.
- The Crossings at Washingtonian Center
- The Willows

---

[23] The Transforming Neighborhoods Initiative was an effort by Prince George's County to provide additional services and resources to six underserved communities within the County.

[24] The MDOT SHA Office of Equal Opportunity collects public feedback surveys to ensure compliance with Title VI of the Civil Rights Act of 1964. Maryland State Department of Education (*Free and Reduced-Price Meal Statistics for School Year 2017-2018.* http://marylandpublicschools.org/programs/pages/school-community-nutrition/freereducedpricemealstatistics.aspx).

[25] Geographic Information Systems (GIS) data sourced from Maryland iMap (data.imap.maryland.gov/datasets/maryland-land-use-land-cover-land-use-land-cover-2010); Prince George's County Open Data Portal (gisdata.pgplanning.org/metadata/); Montgomery County Planning Department Open Data Portal (Montgomery County Planning Department. Open Data Portal). Corresponding mailing addresses gathered using Google Search.

[26] Sourced from Housing and Urban Development Multifamily Assistance & Section 8 Database, Montgomery County Housing Opportunities Commission, Prince George's County Housing Authority, and Fairfax County Redevelopment and Housing Authority websites. Corresponding mailing addresses gathered using Google Search.

00038438

COMMUNITY EFFECTS ASSESSMENT AND ENVIRONMENTAL JUSTICE ANALYSIS



- Diamond Square
- Friendly Gardens Apartments
- Green Ridge House Apartments
- Guide Nashville Homes
- Guide Trexler House
- Lakeview House Apartments
- Londonderry Towers
- Magruder's Discovery Apartments
- Montgomery Club VI
- Montgomery Housing, Inc.
- Paddington Square Apartments
- Pooks Hill Tower & Court
- Second Step II

- Thomas Street Housing
- Timberlawn Crescent
- Trinity Terrace
- University Gardens
- University Gardens II
- Vesta 2000
- Vesta Enteka
- Vesta Housing, Inc.
- Vesta Riverdale
- Vesta Thirteen
- Victory Forest
- Victory Oaks at Saint Camillus
- VOA Lanham

## B. Schools

- Annapolis Road Academy Alternative High
- Ardmore Elementary School
- Arrowhead Elementary School
- Barnaby Manor Elementary School
- Buck Lodge Middle School
- Carrollton Elementary School
- Cherokee Lane Elementary School
- Cresthaven Elementary School
- Eastern Middle School
- The Foundation School
- Frances Fuchs Early Childhood Center
- Francis Scott Key Middle School
- Glenarden Woods Elementary School
- Greenbelt Middle School
- H. Winship Wheatley Early Childhood Cente
- High Point High School
- Hollywood Elementary School
- James E. Duckworth Regional School

- James McHenry Elementary School
- JoAnn Leleck Elementary School at Broad Acres
- Longfields Elementary School
- Margaret Brent Regional Center
- North Forestville Elementary School
- Oak View Elementary School
- Pine Crest Elementary School
- Princeton Elementary School
- Robert Frost Elementary School
- Roscoe R. Nix Elementary School
- Rosemont Elementary School
- Saint Francis International School
- Samuel Chase Elementary School
- Springhill Lake Elementary School
- Thomas Johnson Middle School
- Turning Point Academy

## C. Places of Worship

- Adelphi Presbyterian Church
- Ascension Lutheran Church
- Berwyn Baptist Church
- Beth Sholom Congregation and Talmud Torah Synagogue
- Bethel Baptist Church
- Bonner Wardell Church
- Burnt Mills Seventh Day Adventist Church
- Calvary Apostolic Church

- Iglesia Pentecostes Sinai
- Jehovah's Witness Kingdom Hall
- Kingdom Hall of Jehovah's Witnesses
- Knox Orthodox Presbyterian Church
- Lanham Church of God
- Lanham United Methodist Church
- Latvian Lutheran Church
- Lighthouse Ministries International
- Lutheran Church of the Abiding Presence

00038439



- Calvary Lutheran Church
- Chinese Bible Church
- Christ Apostolic Church (Lanham)
- Christ Apostolic Church (Silver Spring)
- Christ Congregational Church
- Christ Destiny International Church
- Christadelphian Chapel
- Chua Quan Am Pho Chieu Ni Vien
- Church of God of Silver Spring
- Church of Our Saviour
- City of David Tabernacle
- College Park Church of The Nazarene
- College Park United Methodist Church
- College Park Wesleyan Church
- Congressional Heights Baptist Church
- Covenant of Faith Church
- Crossover Christian Church
- DC Center of Self Realization Fellowship
- Deliverance Tabernacle Church
- Eglise Baptiste du Calvaire
- Emmanuel Lutheran Church
- Episcopal Church of the Ascension
- Epworth United Methodist Church
- Faith Ministries
- First Assembly of God Church
- First Baptist Church of Glenarden
- First Baptist Church of Rockville
- Gaithersburg Mennonite Church
- Gaithersburg Presbyterian Church
- Geneva United Presbyterian Church
- Good Shepherd Lutheran Church
- Good Shepherd United Methodist Church
- Good Tidings Tabernacle
- Grace Church
- Grace Presbyterian Church
- Greek Orthodox Church of Saint George
- Greenbelt Baptist Church
- Greenbelt Community Church
- Healing Temple Church of the Nazarene
- Heart of God Baptist Church
- Hermon Church
- Hillandale Baptist Church
- Holy Apostle Orthodox Church
- Holy Cross Lutheran Church
- Holy Family Seminary Church

- Lutheran Church of the Cross
- Memorial United Methodist Church
- Mishkan Torah Synagogue
- Montgomery Hills Baptist Church
- Mount Calvary Baptist Church
- Mowatt Memorial United Methodist Church
- Murugan Temple of North America
- New Beginnings Church of God of Prophecy
- New Carrollton Bible Church
- New Creations Christian Church
- Our Lady Queen of Poland Church
- Point of Grace Community Church
- Prince George's Muslim Association
- Reaching the Nations Ministries International
- Rock Salvation Ministries
- Rockville Christian Church
- Rockville Church of Christ
- Rockville Presbyterian Church
- Rockville Seventh Day Adventist Church
- Saint Andrew Lutheran Church
- Saint Christopher's Episcopal Church
- Saint Cosmas of Aitolia Orthodox Church
- Saint Hugh Catholic Church
- Saint James Episcopal Church
- Saint John the Evangelist Church
- Saint John's Episcopal Church
- Saint Luke's Church
- Saint Martin's Catholic Church
- Saint Matthias Catholic Church
- Saint Raphael's Catholic Church
- Silver Spring Christian Church of Christ
- Silver Spring United Presbyterian Church
- Silver Spring Zendo Meditation
- Sligo Baptist Church
- Southeast Hebrew Congregation
- The Hindu Temple of Metropolitan Washington
- Trinity Assembly of God
- Tumaini Baptist Church
- Unitarian of Rockville Church
- Unitarian Universalist Church of Silver Spring
- Washington, DC Temple of the Church

00038440

**COMMUNITY EFFECTS ASSESSMENT AND ENVIRONMENTAL JUSTICE ANALYSIS**



- Holy Redeemer Metropolitan Community Church
- Horeb Haitian Adventist Church
- Iglesia de Dios Septimo Dia

of Jesus Christ of Latter-day Saints

### 4.4.3    Public Comments with Socioeconomic Themes

Public input on the I-495 and I-270 Managed Lanes Study has been solicited continually since the initiation of the Study in March 2018. Over 3,900 comments have been received via postal mail, e-mail, the website comment form, hard copy comment forms at Public Workshops, and oral testimony. Comments specifically from EJ populations cannot be identified as commenters do not submit race/ethnicity or income status with their submissions. However, the following socioeconomic-related statements, questions, or suggestions raised by some commenters may be broadly considered as relevant to Environmental Justice principles: concerns that toll pricing could have a negative impact on low-income users; concerns about the potential financial impact of tolls on households, particularly lower/middle-income; general commentary on toll affordability and wealth; the socioeconomic status of I-495 and I-270 highway corridor users; and support for mass transit transportation improvements either in combination with the proposed Screened Alternatives or instead of the proposed Screened Alternatives.

Additional detail on the comment themes discussed here is provided in the **Scoping Report**, **Summary of July 2018 Alternatives Public Workshops**, and **Summary of Public and Stakeholder Engagement for the Recommended ARDS**, available for download on the Study website (https://495-270-p3.com/your-participation/past-public-outreach/). An overview of other comment themes received during the Study is provided in the **Public Involvement and Agency Coordination Technical Report (DEIS Appendix P)**.

## 4.5    Identification of Beneficial and Adverse Effects to Environmental Justice Populations

Both beneficial and adverse effects to the existing conditions of EJ populations are considered in this EJ Analysis. Effects described in this section include physical impacts to and relocations of existing private property, including community facility property, as well as physical impacts to transportation right-of-way. Per FHWA EJ Order 6640.23A, consideration is also given to effects on the following environmental characteristics: human health and safety; air quality; noise/vibration; water quality; hazardous materials; natural resources; visual landscape and aesthetic values; economy and employment; access and mobility; community cohesion/isolation and quality of life; and tolling considerations.

### 4.5.1    No Build Alternative

The No Build Alternative would not result in any study-related construction and therefore no land use conversions or property acquisitions are required; no direct impacts would occur in EJ populations. Increased traffic congestion under the No Build Alternative would contribute to increased overflow congestion on the local road network. As a result, the No Build Alternative would result in increased response times for emergency services and increased travel times to community facilities, especially during peak travel periods.

Existing congestion on I-495 and I-270 occur for periods of ten to seven hours per day, respectively. Re-occurring congestion results in vehicles idling for extended periods which can increase emissions and

00038441



impact air quality. The No Build Alternative would not address the existing congestion experienced along the study corridors.

## 4.5.2    The Screened Alternatives

The Screened Alternatives[27] would, to varying degrees, provide improvements as outlined by the Study Purpose and Need. The impacts of the Screened Alternatives to EJ populations are presented in this section.

As shown in **Table 4-6**, the Screened Alternatives would convert between 163.3 and 185.0 acres of right-of-way from properties in EJ populations adjacent to the existing I-495 and I-270 roadway alignments. The conversion of land would be mostly sliver takes along existing interstate systems.

**Table 4-6: Right-of-Way Requirements in EJ Populations**

| Screened Alternative | Right-of-Way Required (acres) |
|---|---|
| Alternative 5 | 163.3 |
| Alternatives 8 and 9 | 182.9 |
| Alternative 10 | 185.0 |
| Alternative 13B | 182.0 |
| Alternative 13C | 184.0 |

Each of the Screened Alternatives would result in the relocation of four businesses, one of which is located in the Glenarden EJ Analysis Area Community, an EJ population. Alternative 5 would result in 25 residential relocations, seven of which are located in the Silver Spring EJ Analysis Area Community, an EJ population. Alternatives 8, 9, 10, 13B and 13C would result in 34 residential relocations, eight of which are also located in the Silver Spring EJ Analysis Area Community. Impacted properties under the Screened Alternatives are shown on the ***Environmental Resource Mapping* (DEIS Appendix D)**. None of the 32 housing complexes in the EJ Analysis Area with subsidized units would experience relocation.

Community facility properties within EJ populations would be impacted by partial property acquisition (generally, sliver impacts along property lines), including (depending on the Screened Alternative): 11 to 12 places of worship, three schools, one higher education facility, one to two postal facilities, one police station, two recreation centers, and 15 to 16 parks. No community facilities would be relocated. However, impacts at one recreational facility located adjacent to I-495 in the Silver Spring EJ Analysis Area Community would include the outdoor and indoor pools; further information on impacts to this facility is provided in **Chapter 3, Section 5.2**. Additionally, preliminary archeological research has identified two potentially historic cemeteries whose sites are located within the Screened Alternatives' LOD and may be cultural significant: the Moses Hall Cemetery (Cabin John EJ Analysis Area Community) and the Montgomery County Poor Farm Cemetery (Rockville EJ Analysis Area Community). Further archaeological

---

[27] This Technical Report, an appendix to the DEIS, documents the analysis of Alternatives 1, 5, 8 and 9, 10, 13B, 13C. The DEIS summarizes the analysis of these Alternatives, plus Alternative 9M. See the *Consideration of Alternative 9M* discussion on **pg. 6** for detail on Alternative 9M. No additional EJ Analysis Area block groups would be included or excluded as a result of Alternative 9M. The difference in environmental impacts is documented in Chapter 4 of the DEIS. The determination of disproportionately high and adverse impacts to EJ populations will be made on the Preferred Alternative and will be disclosed in the FEIS.

00038442

**COMMUNITY EFFECTS ASSESSMENT AND ENVIRONMENTAL JUSTICE ANALYSIS**



investigations will be included in development of the Programmatic Agreement; additional information is provided in the *Volume 4 of the Cultural Resources Technical Report*, (**DEIS Appendix G**). MDOT SHA will work to avoid and minimize impacts. MDOT SHA will continue to coordinate with affected communities and the Friends of Moses Hall, which includes some descendant families of those buried in the cemetery, on treatment of human remains should avoidance not be possible.

Other environmental characteristics within EJ populations would experience effects from the Screened Alternatives. The nature of most of these characteristics makes it difficult to precisely quantify effects at the block group-level. The effects within EJ populations are described qualitatively for each environmental characteristic below.

## A.    Human Health and Safety

When traffic speeds and flow are optimized, less idling occurs; thereby reducing excessive emissions. As the No Build Alternative would not address traffic speed and flow, excessive emissions would not be expected to be reduced under the No Build Alternative. The Screened Alternatives would address congestion on two of the most heavily traveled highways in the region. Implementation of any of these would, to varying degrees, reduce emissions through the corridor, as documented in the *Air Quality Technical Report* (**DEIS Appendix I**). The Screened Alternatives would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulation. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Existing pedestrian and bicycle facilities impacted by the Screened Alternatives would be replaced in-kind, at a minimum, regardless of the alternative and would be coordinated with the counties and local jurisdictions. Additional capacity on I-495 and I-270 would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. Further, by providing additional travel choices, the Screened Alternatives are expected to reduce congestion on the mainline and local roadways networks, allowing for more reliable travel times for all users, including emergency responders, as documented in the *Alternatives Technical Report* (**DEIS Appendix B**). In summary, the Screened Alternatives would result in a reduction in emissions and congestion while improving emergency response access, increasing travel choice, and providing reliable travel times; resulting in a benefit to human health and safety throughout the study corridors. Human health and safety impacts and benefits would be borne throughout the study corridors in both EJ populations and non-EJ populations.

## B.    Air Quality

As stated above, when traffic speeds and flow are optimized, less idling occurs; thereby reducing excessive emissions. As the No Build Alternative would not address traffic speed and flow, excessive emissions would not expect to be reduced under the No Build Alternative.

As documented in the *Air Quality Technical Report* (**DEIS Appendix I**), the Screened Alternatives are not predicted to cause or exacerbate a violation of the NAAQS or measurably increase regional emission burdens or MSAT levels. The Screened Alternatives would address congestion on two of the most heavily traveled highways in the region. As a result, the Screened Alternatives are not predicted to increase emission burdens compared to the No Build Alternative in 2040, aside from a slight increase in GHG

00038443

emissions; nor cause or contribute to a violation of the NAAQS. No long-term or regional air quality impacts are anticipated, and no mitigation measures are warranted.

As the project's construction is not anticipated to last more than five years in any single location, construction-related effects of the project would be limited to short-term increased fugitive dust and mobile-source emissions during construction. State and local regulations regarding dust control and other air quality emission reduction controls would be followed.

## C.   Noise

The *Noise Technical Report* **(DEIS Appendix J)** found that Screened Alternatives would increase traffic noise in communities adjacent to the proposed limits of disturbance throughout the corridor. Where noise barriers already exist, they would be replaced, as needed. In accordance with Federal regulation (23 CFR 772) and the MDOT SHA *Highway Noise Policy, approved by FHWA*, noise abatement is being investigated at all noise sensitive areas (NSAs) where the traffic noise levels would approach or exceed the FHWA noise abatement criteria (NAC) for the defined land use category. The study area was divided into 133 noise sensitive areas in accordance with the MDOT SHA and FHWA noise policies and guidance. Geographically, 92 of the noise sensitive areas (NSAs) are located along I-495, 37 are located along I-270, and four are located along I-95 and MD 295 adjacent to the respective interchanges with I-495.  The NSAs are comprised of areas that have different land use activity categories which have been combined into a single NSA.   Federal regulation (23 CFR 772) and the MDOT SHA *Highway Noise Policy* require that noise abatement be investigated at all NSAs where the Build traffic noise levels approach or exceed the FHWA Noise Abatement Criteria (NAC) for the defined land use category.   Where noise abatement was warranted for consideration, it was examined to determine if the abatement is feasible and reasonable.

The following is a summary of the proposed feasible and reasonable noise barrier systems under the Screened Alternatives and their NSA locations relative to EJ populations:

- Of seven NSAs where the existing noise barrier would remain in place as currently constructed, five are located in EJ populations;

- Of 42 NSAs where the existing noise barrier would be displaced by construction and replaced by a reconstructed barrier, 24 are located in EJ populations;

- Of 19 NSAs where the existing noise barrier would be reconstructed and extended, eight are located in EJ populations;

- Of 23 NSAs where there is currently not an existing noise barrier and a new barrier would be constructed, 10 are located in EJ populations;

Noise barrier systems are considered not feasible and reasonable[28] based on the MDOT SHA Highway Noise Policy in 17 NSAs, 9 of which are located in EJ populations.

---

[28] Feasible and reasonable criteria are determined in accordance with MDOT SHA policy. The assessment of noise abatement feasibility, in general, focuses on whether it is physically possible to build an abatement measure (i.e. noise barrier) that achieves a minimally acceptable level of noise reduction.  Barrier feasibility considers three primary factors: acoustics, safety & access, and site constraints. The assessment of noise abatement reasonableness, in general, focuses on whether it is practical to build an abatement measure.  Barrier reasonableness considers three primary factors: viewpoints, design goal, and cost effectiveness.

00038444



Refer to the *Noise Technical Report* **(DEIS Appendix J)** for the locations of the proposed noise barriers.

**D.    Water Quality**

The Screened Alternatives would result in additional impervious surface to accommodate additional lanes throughout the study corridors. Public drinking water within the EJ Analysis Area is supplied through the Occoquan Reservoir, Potomac River, and Patuxent River (**Chapter 3, Section 5.1**). Potential impacts to water quality, including public drinking water sources, would be mitigated via stormwater management measures in accordance with appropriate Federal and state stormwater management regulations.

**E.    Hazardous Materials**

Construction of any of the Screened Alternatives would require disturbance of existing soil conditions, including identified hazardous materials sites of concern as documented in the *Hazardous Materials Technical Report* **(DEIS Appendix K)**. Prior to acquisition of right-of-way and construction, Preliminary Site Investigations (PSIs) would be conducted to further investigate properties within the final limits of disturbance and vicinity that have a high potential for mobilization of hazardous materials as a result of construction activities.

**F.    Natural Resources**

As documented in the *Natural Resources Technical Report* **(DEIS Appendix L)**, the Screened Alternatives would impact: soils, wetlands and waters, floodplains, vegetation and terrestrial habitats, and wildlife. Efforts to mitigate for these impacts would include development and implementation of an Erosion and Sediment Control Plan, water resource mitigation, and the replacement of impacted trees and habitat to the extent possible with priority replacement on-site near the impacted area.

**G.    Visual Landscape and Aesthetic Values**

The Screened Alternatives would result in changes to viewsheds or visual impacts within the EJ Analysis Area.  The construction of managed lanes, shoulders, traffic barrier, cut and fill slopes, stormwater management facilities, retaining walls, and noise walls along the existing highway corridor would not introduce new elements incompatible with the existing visual character or qualities along the study corridors. However, where managed lanes access ramps would be constructed, new interchange ramps and structures may be introduced that could impact the viewsheds of adjacent properties and communities. The locations or design of these elements have not been finalized. The design of all highway elements would follow aesthetic and landscaping guidelines that will be developed in consultation with the design team, local jurisdictions, private interest groups (private developers or companies), local community or business associations, as well as local, state and federal agencies.

**H.    Economy and Employment**

Except where right-of-way acquisitions would result in business property relocation, the Screened Alternatives would not impact access to area businesses or employers.  Within EJ populations, one business, a warehouse/office property in the Glenarden EJ Analysis Area Community, is anticipated to require relocation.  Similar services exist and facilities and properties are available for the relocation of these services if business owners choose to relocate.  There would be no overall impact to the distribution of worker occupation, or major employers within EJ populations or non-EJ populations within the EJ Analysis Area.

00038445



Proposed improvements would help address increasing congestion, thereby maintaining mobility throughout the region, including areas with EJ populations.

Additionally, through Opportunity MDOT Program the agency will provide resources for job seekers as well as small, minority-, women- and veteran-owned businesses and disadvantaged businesses to access training, advisory services and advanced industry resources to prepare for potential opportunities to work with MDOT and the I-495 & I-270 P3 Program.

## I.   Access and Mobility

The No Build Alternative would not provide reduced congestion, enhanced trip reliability, or travel choices to destination points within the region, thereby reducing access and mobility conditions along the study corridors.

For each of the Screened Alternatives, traffic, access, and mobility would be maintained during construction in compliance with MDOT SHA Work Zone Safety and Mobility requirements.  Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network.  Existing pedestrian and bicycle facilities impacted by the Screened Alternatives would be replaced in-kind, at a minimum, regardless of the alternative and would be coordinate with the counties and local jurisdictions.  The Screened Alternatives would not eliminate access, nor would they impede access between residences and community facilities and business.  However, an incremental enhancement to access may occur due to reduced congestion on local routes. Additionally, bus transit systems could utilize I-495 and I-270 managed lanes implemented under the Screened Alternatives.

## J.   Community Cohesion/Isolation and Quality of Life

Under the Screened Alternatives, changes to community cohesion would occur from the loss of 25 or 34 residences and four businesses.  This would include the loss of seven or eight residences in two EJ populations in the Silver Spring EJ Analysis Area Community and the loss of one business in an EJ population within the Glenarden EJ Analysis Area Community.  Additionally, partial property acquisition for right-of-way would occur throughout the study corridors.  Generally, these would include acquiring strips of land from undeveloped areas or areas of trees from properties adjacent to I-495 or I-270, resulting in a reduction of the overall property size.  However, impacts by relocation or partial property acquisition would be limited to the individuals immediately affected by the property acquisition and would occur in areas bordering the existing highway rights-of-way. Divisions or isolation of properties, persons, or groups would not occur due to the generally parallel nature of the limits of disturbance of the Screened Alternatives along the study corridors.

Changes to land use and development would be limited to those properties affected by property acquisition.  Residents and employees who live, work, and utilize services immediately adjacent to the study corridors may experience changes in current quality of life due to property acquisition and temporarily during construction activities.  However, community residents would experience a benefit to quality of life due to reduced congestion along the study corridors and enhanced trip reliability and travel choices to destination points within the region.

00038446



### K.    Tolling Considerations

The FHWA's *Impacts of Congestion Pricing on Low-Income Populations* (FHWA 2017), explains that the impacts of congestion pricing on low-income populations vary widely by context and type of project (i.e., full facility tolling or partial facility tolling).  In the tolled managed-lanes scenario, new travel choice becomes available for all users and additional network capacity is provided.  According to FHWA, well planned congestion pricing schemes:

- "Increase transportation options for all commuters, including low-income commuters, to achieve relatively congestion-free travel on specific occasions.
- Demonstrate wide acceptance and usage of priced-managed facilities by low-income commuters.
- Demonstrate that low-income commuters, many of whom are transit riders, particularly benefit from reduced congestion and transit investments made from pricing revenues (FHWA 2017)"

Consistent with FHWA guidance, while the travel speed and trip reliability benefits offered by the tolled lanes could be a less feasible choice for EJ populations due to cost burden, under any of the managed lane alternatives, all existing GP lanes would remain toll-free and would undergo some travel time improvements.  Traffic analysis conducted in support of the I-495 & I-270 MLS indicates that travel times would improve and congestion would decrease along GP lanes under each of the Screened Alternatives. MDOT currently provides the following in managed lanes throughout the state:

- Free transponders for all customers;
- Prepaid cash/check payment options at MDTA walk-in centers, including four MVA's and six MDTA facilities;
- Allowing multiple payment methods, including credit card, cash, check or money order;
- Funding alternative modes of transportation through commuter programs such as Commuter Choice Maryland, Guaranteed Ride Home, and Maryland Rideshare;
- Providing more than 100 park-n-ride locations throughout the state; and
- Minimum prepaid balances sized to reduce the chance of users violating account minimums.

All electronic tolling (AET) methods would be enlisted to collect tolls for the managed lanes under each of the Screened Alternatives.  Tolls would be set using dynamic pricing, based on a tolling algorithm that would correlate the traffic volumes and demands with the toll rate.  The toll rate caps, or upper and lower thresholds for tolls, would be set through a public process by the Maryland Transportation Authority in accordance with COMAR 11.07.05.  Additionally, COMAR 11.07.05. requires public notice of toll schedule revisions.  The advantage of using dynamic pricing is that it enables the managed lanes to maintain a 45-MPH speed at all times and would reduce congestion in the GP lanes, which results in benefits for all users of the roadway facilities. GP lanes would remain free for users under all Screened Alternatives.

### 4.5.3    The Potential for Adverse Effects to Environmental Justice Populations

As described above, both beneficial and adverse effects to EJ populations would occur from the Screened Alternatives. The potential for adverse effects to EJ populations is summarized in **Table 4-7**.

00038447

COMMUNITY EFFECTS ASSESSMENT AND ENVIRONMENTAL JUSTICE ANALYSIS



### Table 4-7: Potential for Adverse Effects to Environmental Resources within EJ Populations

| No-Build | Alt. 5 | Alts. 8 & 9 | Alt. 10 | Alt. 13B | Alt. 13C |
|---|---|---|---|---|---|
| **Land Use Acquisition and Property Relocations within EJ Populations** | | | | | |
| No | Yes (186.7 acres) (8 relocations) | Yes (209.4 acres) (9 relocations) | Yes (211.7 acres) (9 relocations) | Yes (137.7 acres) (9 relocations) | Yes (210.5 acres) (9 relocations) |
| **Impacted Community Facility Properties* within EJ Populations** | | | | | |
| No | Yes (19 properties) | Yes (20 properties) | Yes (21 properties) | Yes (20 properties) | Yes (20 properties) |
| **Human Health and Safety** | | | | | |
| Yes | Yes | Yes | Yes | Yes | Yes |
| **Air Quality** | | | | | |
| Yes | Yes | Yes | Yes | Yes | Yes |
| **Noise** | | | | | |
| No | Yes | Yes | Yes | Yes | Yes |
| **Water Quality** | | | | | |
| No | Yes | Yes | Yes | Yes | Yes |
| **Hazardous Materials** | | | | | |
| No | Yes | Yes | Yes | Yes | Yes |
| **Natural Resources** | | | | | |
| No | Yes | Yes | Yes | Yes | Yes |
| **Visual and Aesthetic Resources** | | | | | |
| No | Yes | Yes | Yes | Yes | Yes |
| **Economy and Employment** | | | | | |
| TBD | No | No | No | No | No |
| **Access and Mobility** | | | | | |
| Yes | No | No | No | No | No |
| **Community Cohesion/ Isolation and Quality of Life** | | | | | |
| No | No | No | No | No | No |
| **Tolling Considerations** | | | | | |
| No | Yes | Yes | Yes | Yes | Yes |

*Note: The potential for adverse effects to environmental resources in EJ populations, as documented in the DEIS and in other Technical Reports (**DEIS Appendices**) are described in **Chapter 4, Sections 5.1** and **5.2**. **Chapter 5/Appendix C** identifies the direct impacts as well as effects to environmental characteristics for the CEA Analysis Area Communities[29], including those containing EJ populations.*

*\*Community facility properties within EJ populations would be impacted by partial property acquisition (generally, sliver impacts along property lines). No community facilities would be relocated.*

---

[29] For the purposes of the Community Profiles in Chapter 5, the terms "EJ Analysis Area Community" and "CEA Analysis Area Community" are interchangeable. For instance, the Silver Spring EJ Analysis Area Community has the same block groups and boundaries as the Silver Spring CEA Analysis Area Community.

00038448



The determination of disproportionately high and adverse impacts to EJ populations will be made on the Preferred Alternative and will be disclosed in the FEIS. Measures to mitigate any disproportionately high and adverse impacts will be determined in consideration of the specific impacts to EJ populations and will be done with input from the potentially affected minority of low-income populations. Strategies for mitigating potential adverse effects to EJ populations may consist of, but are not limited to:

- Vehicles with three or more occupants (HOV-3+) may use the managed lanes at no cost;

- Free bus transit usage of managed lanes for faster and more reliable trip;

- Direct access to existing and proposed transit stations and transit-oriented development areas within the EJ Analysis Area;

- Direct access supporting transit connections in Equity Emphasis Areas;

- Free or reduced tolls for High Occupancy Vehicles (Alts 9 and 13B); and

- Making cross highway pedestrian and bicycle enhancements and connections.

As enumerated in **Section 4.4.2**, the next steps for the EJ Analysis, to be documented in the FEIS, include the following:

- The consideration of mitigation and enhancement measures if unavoidable adverse effects are expected to occur under the Preferred Alternative;

- A comparison of adverse effects from the Preferred Alternative within EJ populations to adverse effects within a non-EJ population reference community;

- A determination of whether disproportionately high and adverse effects would occur under the Preferred Alternative to EJ populations; and

- A final conclusion of whether disproportionately high and adverse effects would occur, based on unmitigated adverse effects and whether public feedback has been addressed.

00038449

COMMUNITY EFFECTS ASSESSMENT AND ENVIRONMENTAL JUSTICE ANALYSIS

5

## 5   COMMUNITY PROFILES AND EFFECTS

To enhance public accessibility to the Community Effects Assessment data and Environmental Justice Analysis data, a community profile for each of the of the 36 CEA Analysis Area Communities was prepared (**Appendix C**).[30]  Each community profile includes: **Map 1**, which depicts the community, as defined in this technical report; the limits of the CEA Analysis Area; any overlaying city, town, municipal or Census Designated Place (CDP) boundaries; and the CEA Analysis Area block groups within the subject community. Each community profile outlines the unique characteristics of community, including its physical and geographic location and character; economic and socio-history, present conditions, master plans, and future development; and travel patterns.  Further the community profile identifies and maps (**Map 2**) community facilities within the CEA Analysis Area for that community and summarizes demographic data for the population of the community.  Minority race/ethnicity populations and low-income populations are also identified, consistent with the methodology described in **Chapter 4, Section 1.**  The community profiles also include qualitative descriptions of community aesthetics and community character.

Potential impacts from the alternatives to each community are also described including: the number of potential property relocations, the number and type of community facilities impacted, and changes to land use for each of the CEA Analysis Area Communities.  As described in **Chapter 3, Section 6**, a partial acquisition would be needed when the limits of disturbance[31] encroach onto a portion of the property but is more than 20 feet from a principal building.  Residential structures, businesses, and community facilities have been identified as relocations where the proposed limits of disturbance for the Screened Alternatives are within 20 feet or less from a principal building on a property.

---

[30] As described previously, the terms "CEA Analysis Area Community" and "EJ Analysis Area Community" are interchangeable. For instance, the Silver Spring EJ Analysis Area Community has the same block groups and boundaries as the Silver Spring CEA Analysis Area Community. As such, the profile for the Silver Spring CEA Analysis Area Community serves as the profile for the Silver Spring EJ Analysis Area Community. See **Chapter 2, Section 1** for delineation detail.

[31] Generally defined as the proposed boundary within which all construction, materials storage, grading, landscaping and related activities would occur.

00038450



Qualitative impacts, including potential changes to community aesthetics and character, as well as development patterns are also highlighted for each CEA Analysis Area Community.  Impacts are presented in this manner to communicate how the alternatives may impact specific communities, while the preceding Chapter identifies impacts throughout the entire CEA Analysis Area. A summary of the acreage of property acquisitions and noise abatement detailed in the Community Profiles is provided in **Table 3-9**.

00038451

**COMMUNITY EFFECTS ASSESSMENT AND ENVIRONMENTAL JUSTICE ANALYSIS**

# 6

## 6    REFERENCES

Fairfax County

2017. *Demographic Reports*. Accessed at:
fairfaxcounty.gov/demographics/sites/demographics/files/assets/demographicreports/fullrpt.pdf

2018. Agricultural & Forestal Map. Accessed at:
fairfaxcountygis.maps.arcgis.com/apps/webappviewer/index.html?id=8703c68608b64c2890ddfed032f20d25.

2018. Fairfax County Land Use Data. Accessed at: data-fairfaxcountygis.opendata.arcgis.com/datasets/existing-land-use-generalized

2018. Fairfax County Open Geospatial Data. Accessed at: fairfaxcounty.gov/maps/open-geospatial-data.

2018. Fairfax County Zoning Administration Division. *The Fairfax County Zoning Ordinance*. Accessed at: fairfaxcounty.gov/planning-zoning/zoning-ordinance.

2020. Fairfax County Department of Housing and Community Development. *Affordable Dwelling Unit Rental Program*. Accessed at:
https://www.fairfaxcounty.gov/housing/sites/housing/files/assets/documents/adu/adu021720.pdf

2020. Fairfax County Department of Housing and Community Development. *Workforce Dwelling Unit Rental Program*. Accessed at:
https://www.fairfaxcounty.gov/housing/sites/housing/files/assets/documents/wdu/wdubrochure021720.pdf.

Federal Highway Administration (FHWA)

2017. Impacts of Congestion Pricing on Low-Income Populations: Efforts to Measure and Response to Income-Equity Concerns. Accessed at: ops.fhwa.dot.gov/publications/fhwahop17019/index.htm.

00038452



City of Gaithersburg

> 2018. City of Gaithersburg GIS web map – Zoning. Accessed at: maps.gaithersburgmd.gov/gallery/.

> 2018. *City Master Plan.* Accessed at: gaithersburgmd.gov/services/planning-services/city-master-plan.

City of Rockville

> 2019. *Rockville 2040: Comprehensive Plan Update* (Public Hearing Draft). Accessed at: rockvillemd.gov/203/Rockville-2040-Comprehensive-Plan-Update

> 2018. City of Rockville GIS Open Data – Zoning. Accessed at: data-rockvillemd.opendata.arcgis.com/.

Maryland iMap (iMap)

> 2010. *Maryland Land Use Land Cover – 2010*. Accessed at: data.imap.maryland.gov/datasets/maryland-land-use-land-cover-land-use-land-cover-2010.

Maryland Department of Commerce (MDC)

> 2015. *Major Employers in Montgomery County, Maryland.* Accessed at: commerce.maryland.gov/Documents/ResearchDocument/MajorEmployersInMontgomeryCounty.pdf

> 2015. *Major Employers in Prince George's County, Maryland*. Accessed at: commerce.maryland.gov/Documents/ResearchDocument/MajorEmployersInPrinceGeorgesCounty.pdf

Maryland Department of Planning (MDP)

> 2019. *Planning Legislation.* Accessed at: planning.maryland.gov/pages/OurWork/plan-legislation.aspx

The Maryland-National Capital Park and Planning Commission (M-NCPPC)

> 2015. Montgomery County Planning Department. *Rustic Roads,* Montgomery County Rustic Roads Advisory Committee 2015. Accessed at: montgomeryplanning.org/planning/transportation/highway-planning/rustic-roads/.

> 2018. Montgomery County Planning Department. *Planning.* Includes access to Community Plans, Planning Subregion, and County Plans. Accessed at: montgomeryplanning.org/planning/.

> 2018. Montgomery County Planning Department. *Development Activity Information Center*. Accessed at: montgomeryplanning.org/development/.

> 2018. Montgomery County Planning Department. Open Data Portal. *MNCPPC MCATLAS.* Accessed at: mcatlas.org/viewer/.

00038453



2018. Prince George's County Planning Department. *Planning.* Includes access to Community Plans, Planning Subregion, and County Plans. Accessed at: mncppc.org/168/Planning.

2018. Prince George's County Planning Department. Prince George's County Open Data Portal. Accessed at: gisdata.pgplanning.org/metadata/.

2018. Prince George's County Code of Ordinances. Accessed at: https://library.municode.com/md/prince_george's_county/codes/code_of_ordinances?nodeId=PTII TI17PULOLAPRGECOMA_SUBTITLE_27ZO_PT2GE_DIV3ZOZOMA_S27-109CLZO.

2018. Prince George's County Planning Department. *Development Activity Monitoring System*. Accessed at: mncppcapps.org/planning/DAMSWEB/Reports/DAMSWebA.pdf

2019. Montgomery County Planning Department. *Pipeline of Approved Development*. Accessed at: montgomeryplanning.org/tools/research/development-pipeline/

The Maryland State Department of Education (MSDE)

2018. *Free and Reduced-Price Meal Statistics for School Year 2017-2018*. Accessed at: marylandpublicschools.org/programs/pages/school-community-nutrition/freereducedpricemealstatistics.aspx

Metropolitan Washington Council of Governments

2018. *Equity Emphasis Areas for TPB's Enhanced Environmental Justice Analysis*. Updated June 20, 2018. Accessed at: mwcog.org/transportation/planning-areas/fairness-and-accessibility/environmental-justice/equity-emphasis-areas/

Montgomery County Housing Opportunities Commission

2019. *Section 236*. Accessed at: https://www.hocmc.org/extra/153-section-236.html.

2019. *Section 8/MOD Rehab*. Accessed at: https://www.hocmc.org/extra/155-section-8-mod-rehab.html.

2019. *Privately Owned Developments Financed by HOC*. Accessed at: https://www.hocmc.org/extra/154-privately-owned-developments-financed-by-hoc.html.

National Cooperative Highway Research Program (NCHRP)

2018. *NCHRP Research Report 860. Assessing the Environmental Justice Effects of Toll Implementation or Rate Changes*. Accessed at: www.trb.org/Main/Blurbs/177062.aspx.

2012. *NCHRP Report 710. Practical Approaches for Involving Traditionally Underserved Populations in Transportation Decisionmaking*. Accessed at: http://www.trb.org/Publications/Blurbs/166872.aspx

00038454



Prince George's County Housing Authority

    2020. *Public Housing*. Accessed at https://www.princegeorgescountymd.gov/1117/Public-Housing.

Rotenstein, David S. (Rotenstein)

    2010. *Mapping Montgomery County's Jewish Courtyards: The Eruvim (updated)*. October 20, 2010. Accessed at: blog.historian4hire.net/2010/10/20/mapping-moco-eruvim/

US Census Bureau (Census)

    2010. *2010 Census Urban Area Reference Maps.* Accessed at: census.gov/geo/maps/dc10map/UAUC_RefMap/ua/ua92242_washington_dc--va--md/.

    2018. *Industry and Occupation.* Accessed at: census.gov/topics/employment/industry-occupation/about/faq.html#par_textimage_1746965162

    2018. *Longitudinal Employer-Household Dynamics.* Accessed at: lehd.ces.census.gov/data/.

US Department of Housing and Urban Development (HUD)

    2018. *Multifamily Assistance & Section 8 Contracts Database.* (Current as of 06/29/2018) Accessed at: hud.gov/program_offices/housing/mfh/exp/mfhdiscl

Virginia Department of Education (VDOE)

    2018. *National School Lunch Program Free and Reduced Price Eligibility Reports by School for 2017-2018.* Accessed at: doe.virginia.gov/support/nutrition/statistics/index.shtml.

00038455



# APPENDIX A:
# CEA Analysis Area
# Detailed Mapping

00038456

00038457



Maryland

Map Page 2
Hillandale
Four Corners
Kemp Mill
Forest Glen
South Kensington
Gaithersburg
Rockville
North
Bethesda
Potomac
Bethesda
Cabin John
McLean
Virginia

Beltsville
College Park
Adelphi
Silver Spring
Greenbelt
Seabrook
Lanham
Mitchellville
Springdale
New Carrollton
Landover Hills
Landover
Glenarden
Lake Arbor
Largo
Summerfield
Westphalia
Forestville
Morningside
Camp Springs
Andrews AFB
Marlow Heights
Temple Hills

Chevy Chase

Washington D.C.

Map Page 7
Map Page 4
Map Page 8

Legend

Corridor Study Boundary
State Boundary
County Boundary

Census Block Groups
Map Page

Overview Map

1 in = 12,500 feet

0    6,250    12,500
Feet

Community Effects
Assessment Analysis Area

495 270 MANAGED LANES STUDY

00038458



Community Effects
Assessment Analysis Area

Map 1 of 4

1 in = 5,000 feet

0   2,500   5,000
Feet

**Legend**
Corridor Study Boundary
State Boundary
County Boundary
Census Block Groups
Map Page

00038459



Montgomery County

7007-06-1
7007-24-1    7007-17-1
7007-17-3
7007-17-2    7007-17-4
7008-15-1    7007-18-2    7007-18-1
7008-29-1    7008-18-4    7012-11-3
7008-17-2    7008-17-1
7008-16-2    7010-04-2
7008-17-3    7010-07-2    7010-04-4
7010-05-2
7010-07-1    7010-05-1    7010-01-2
7010-06-1    7010-06-2    7010-01-3
7010-02-1    7010-01-3
7010-02-2
7012-10-1    7010-02-5
7012-06-1    7012-05-2
Gaithersburg    7012-06-2    7012-05-1    7012-05-4
7012-05-3
7060-12-1    7060-12-3    7045-01-1
7045-01-4
7060-12-2    7045-01-2    7045-02-1
Potomac    7045-02-2
7060-13-2

Rockville
North
Bethesda
South
Kensington
Four Corners
Forest Glen
Kemp
Mill
7031-00-4
7039-01-1    7031-00-5
7030-00-2
7039-01-2    7029-00-2
7039-01-3
7040-00-3    7040-00-2
7040-00-4    7029-00-1
7023-00-2    7029-00-4
7028-00-1    7028-00-3
7041-00-2    7027-00-4
7041-00-1
7041-00-5    7051-00-1
7012-13-2
7012-13-1    7012-13-3    7043-00-2
7012-13-4    7043-00-4
7012-13-2    7012-14-1
7012-13-2    7012-14-2    7050-00-1
7012-14-3    7051-00-2
7044-03-2    Silver
7044-01-1    Spring
7044-03-3    7044-01-3
7044-04-1    7044-01-4
7045-03-1    7044-03-2    Chevy
7050-00-4    Chase
7060-03-2
Bethesda

Legend
Corridor Study Boundary    Census Block Groups
State Boundary    Map Page
County Boundary

Map 2 of 4
1 in = 5,000 feet
0    2,500    5,000
Feet

Community Effects
Assessment Analysis Area

495 270 MANAGED LANES STUDY

00038460



Prince George's County

Montgomery County

Greenbelt

Seabrook

Springdale

Lanham

Mitchellville Glenarden

Beltsville

Lake Arbor

Hillandale

College Park

Adelphi

Silver Spring

Four Corners

New Carrollton

Landover Hills

Glenarden

Landover

Summerfield

**Legend**

— Corridor Study Boundary
— State Boundary
— County Boundary
— Census Block Groups
▪▪▪ Map Page

Map 3 of 4

1 in = 5,000 feet

0   2,500   5,000
Feet

**Community Effects Assessment Analysis Area**

495 270 MANAGED LANES STUDY

00038461



Prince George's County

Andrews AFB

Westphalia

Temple Hills

8011.04-1

8011.04-3

8007.01-2

8022.01-2

8019.04-1

8019.04-2

8017.01-2

8013.01-2

8019.06-1

8017.01-1

8021.04-1

8019.05-1

8013.01-1

8017.01-2

8022.03-2

8021.04-2

8019.06-2

8019.05-2

8017.02-1

8022.01-1

Largo

8035.12-3

8021.03-2

8019.07-1

8017.08-1

8035.12-1

8022.04-4

8022.03-3

Camp Springs

Marlow Heights

8035.13-2

Map Page 3

Forestville

Morningside

Lake Arbor

8035.18-1

8035.19-3

Summerfield

Washington D.C.

Glenarden

8035.25-1

Mitchellville

| Legend | | Map 4 of 4 | Community Effects Assessment Analysis Area | |
|---|---|---|---|---|
| ⬛ Corridor Study Boundary | 🟨 Census Block Groups | 1 in = 5,000 feet | | |
| ⬜ State Boundary | ⬛ Map Page | 0   2,500   5,000 Feet | | |
| 🟧 County Boundary | | | | |

00038462

00038463



COMMUNITY EFFECTS ASSESSMENT AND ENVIRONMENTAL JUSTICE ANALYSIS TECHNICAL REPORT

# APPENDIX B:
# MDOT SHA Relocation
# Assistance Program Summary

00038464

Revised: February 10, 2016
State Highway Administration - Office of Real Estate

## SUMMARY OF THE RELOCATION ASSISTANCE PROGRAM OF THE MARYLAND STATE HIGHWAY ADMINISTRATION

All State Highway Administration projects utilizing Federal funds must comply with the provisions of the Uniform Relocation and Real Property Acquisition Policies Act of 1970 (42 USC 4601) as amended by Title IV of the Surface Transportation and Uniform Relocation Assistance Act of 1987 (Public Law 100-17), Public Law 105-117 in 1997, MAP 21, and Title 49 CFR Part 24 in 2005.  State-funded projects must comply with Sections 12-112 and Subtitle 2, Sections 12-201 to 12-212, of the Real Property Article of the Annotated Code of Maryland.

The State Highway Administration's Office of Real Estate administers the Relocation Assistance Program for the Maryland Department of Transportation.

The aforementioned Federal and State laws require that the State Highway Administration provide relocation assistance payments and advisory services to eligible persons who are displaced by a public project.  There are two categories of residential occupants:  90-day owner-occupants and tenants and less than 90 day or short-term owner-occupants.  Non-residential occupants may be businesses, farms or non-profit organizations.

A displaced person that has owned and occupied a subject dwelling for at least 180 days prior to the initiation of negotiations for the property may receive a replacement housing payment of up to $45,000.  The replacement housing payment is composed of three parts: a purchase price differential; an increased mortgage interest differential; and reimbursement for incidental settlement expenses.

The purchase price differential is the difference between the value paid by the State Highway Administration for the existing dwelling and the cost to the displaced owner of a comparable replacement dwelling, as determined by the State's replacement housing study.

The increased mortgage interest differential is a payment made to the owner at the time of settlement on the replacement dwelling to negate the effects of less favorable financing in the new situation.  The payment is calculated by use of the "buy-down" mortgage method.

Reimbursable incidental expenses are necessary and reasonable incidental costs that are incurred by the displaced person in purchasing a replacement dwelling, excluding pre-paid expenses such as real estate taxes and insurance.  The maximum reimbursable amount for these incidental expenses is based upon the cost of the comparable selected in the replacement housing study.

A displaced person who has leased and occupied a subject dwelling for at least 90 days prior to the initiation of negotiations for the property may receive a replacement rental housing payment of up to $10,500.  The replacement rental housing payment is the difference between

00038465

the monthly cost of housing for the subject dwelling, plus utilities, and the monthly cost of housing for a comparable replacement rental unit, plus utilities, over a period of 42 months. Owner-occupants of 90 or less days prior to the initiation of negotiations for the subject dwelling are eligible for the same replacement rental housing payments as tenants.

As an alternative to renting, a displaced tenant-occupant may elect to apply the rental replacement housing eligibility amount toward the down payment needed to purchase a replacement dwelling.

The comparable properties used in calculating any replacement housing payment eligibility must comply with all local standards for decent, safe and sanitary (DS&S) housing and be within the financial means of the displaced person.

If affordable, comparable DS&S replacement housing cannot be provided within the statutory maximums of $45,000 for 90-day owner-occupants or $10,500 for 90-day tenants or short-term owners, the maximums may be exceeded on a case-by-case basis. This may only be done after the completion and approval of a detailed study that documents the housing problem, explores the available replacement options and selects the most feasible and cost-effective alternative for implementation.

In addition, eligible displaced residential occupants may be reimbursed for the expense of moving personal property up to a maximum distance of fifty (50) miles, using either an actual cost or fixed schedule method.

Actual cost moves are based upon the lower of at least two commercial moving estimates and must be documented with receipted bills or invoices. Other incidental moving expenses, such as utility reconnection charges, may also be paid in the same manner.

As an alternative method, the fixed schedule move offers a lump sum, all-inclusive payment based upon the number of rooms to be moved. Other incidental costs are not separately reimbursable with this method.

Non-residential displaced persons such as businesses, farms or non-profit organizations may also receive reimbursement for the expense of relocating and re-establishing operations at a replacement site on either an actual cost or fixed payment basis.

Under the actual cost method, a non-residential displaced person may receive reimbursement for necessary and reasonable expenses for moving its personal property, the loss of tangible personal property that is not moved, the cost of searching for a replacement site and a re-establishment allowance of up to $60,000.

The actual reasonable moving expenses may be paid for a move by a commercial mover or for a self-move. Payments for the actual reasonable expenses are limited to a 50-mile radius unless the State determines a longer distance is necessary. The expenses claimed for actual cost moves must be supported by firm bids and receipted bills. An inventory of the items to be moved must be prepared in all cases. In self-moves, the State will negotiate an amount for

2

payment, usually lower than the lowest acceptable bid.  The allowable expenses of a self-move may include amounts paid for equipment hired, the cost of using the business vehicles or equipment, wages paid to persons who participate in the move, the cost of actual supervision of the move, replacement insurance for the personal property moved, costs of licenses or permits required and other related expenses.

In addition to the actual moving expenses mentioned above, the displaced business is entitled to receive a payment for the actual direct losses of tangible personal property that the business is entitled to relocate but elects not to move.  These payments may only be made after an effort by the owner to sell the personal property involved.  The costs of the sale are also reimbursable moving expenses.

If the business elects not to move or to discontinue the use of an item, the payment shall consist of the lesser of:  the fair market value of the item for continued use at the displacement site, less the proceeds from its sale; or the estimated cost of moving the item.

If an item of personal property which is used as part of a business or farm operation is not moved and is promptly replaced with a substitute item that performs a comparable function at the replacement site, payment shall be the lesser of:  the cost of the substitute item, including installation costs at the replacement site, minus any proceeds from the sale or trade-in of the replaced item; or the estimated cost of moving and reinstalling the replaced item.

In addition to the moving payments described above, a business may be eligible for a payment up to $60,000 for the actual reasonable and necessary expenses of re-establishing at the replacement site.  Generally, re-establishment expenses include certain repairs and improvements to the replacement site, increased operating costs, exterior signing, advertising the replacement location, and other fees paid to re-establish.  Receipted bills and other evidence of these expenses are required for payment.  The total maximum re-establishment payment eligibility is $60,000.

In lieu of all moving payments described above, a business may elect to receive a fixed payment equal to the average annual net earnings of the business.  This payment shall not be less than $1,000 nor more than $60,000.  In order to be entitled to this payment, the State must determine that the business cannot be relocated without a substantial loss of its existing patronage; the business is not part of a commercial enterprise having more than three other establishments in the same or similar business that are not being acquired; and the business contributes materially to the income of a displaced owner during the two taxable years prior to the year of the displacement.  A business operated at the displacement site solely for the purpose of renting to others is not eligible.  Considerations in the State's determination of loss of existing patronage are the type of business conducted by the displaced business and the nature of the clientele.  The relative importance of the present and proposed locations to the displaced business and the availability of suitable replacement sites are also factors.

In order to determine the amount of the "in lieu of" moving expense payment, the average annual net earnings of the business is to be one-half of the net earnings before taxes during the two taxable years immediately preceding the taxable year in which the business is relocated.  If the two taxable years are not representative, the State may use another two-year

3

00038467

period that would be more representative. Average annual net earnings include any compensation paid by the business to the owner, owner's spouse, or dependents during the period. Should a business be in operation less than two years, the owner of the business may still be eligible to receive the "in lieu of" payment. In all cases, the owner of the business must provide information to support its net earnings, such as income tax returns, or certified financial statements, for the tax years in question.

Displaced farms and non-profit organizations are also eligible for actual reasonable moving costs up to 50 miles, actual direct losses of tangible personal property, search costs up to $2,500 and re-establishment expenses up to $60,000 or a fixed payment "in lieu of" actual moving expenses of $1,000 to $60,000. The State may determine that a displaced farm may be paid a minimum of $1,000 to a maximum of $60,000 based upon the net income of the farm, provided that the farm has been relocated or the partial acquisition caused a substantial change in the nature of the farm. In some cases, payments "in lieu of" actual moving costs may be made to farm operations that are affected by a partial acquisition. A non-profit organization is eligible to receive a fixed payment or an "in lieu of" actual moving cost payment, in the amount of $1,000 to $60,000 based on gross annual revenues less administrative expenses.

A more detailed explanation of the benefits and payments available to displaced persons, businesses, farms and non-profit organizations is available in the brochure entitled, "Relocation Assistance – Your Rights and Benefits," that will be distributed at the public hearing for this project and be given to all displaced persons.

Federal and State laws require that the State Highway Administration shall not proceed with any phase of a project which will cause the relocation of any persons, or proceed with any construction project, until it has furnished satisfactory assurances that the above payments will be provided, and that all displaced persons will be satisfactorily relocated to comparable decent, safe and sanitary housing within their financial means, or that such housing is in place and has been made available to the displaced persons.

In addition, the requirements of Public Law 105-117 provides that a person who is an alien and is not lawfully present in the United States shall not be eligible for relocation payments or other assistance under the Uniform Act. It also directed all State displacing agencies that utilize Federal funds in their projects to implement procedures for compliance with this law in order to safeguard that funding. To this end, displaced persons will be asked to certify to their citizenship or alien status prior to receiving payments or other benefits under the Relocation Assistance Program.

4

00038468

**US Code**
*(Unofficial compilation from the Legal Information Institute)*

**TITLE 42 - THE PUBLIC HEALTH AND WELFARE**

**CHAPTER 61—UNIFORM RELOCATION ASSISTANCE AND REAL PROPERTY
ACQUISITION POLICIES FOR FEDERAL AND FEDERALLY ASSISTED PROGRAMS**

*Please Note: This compilation of the US Code, current as of Jan. 4, 2012 , has been prepared by
the Legal Information Institute using data from the U.S. House of Representatives, Office of the Law
Revision Counsel. It is not an official U.S. government publication. For more details please see:
http://www.law.cornell.edu/uscode/uscprint.html.*

*Notes on this document: The content in this document is taken directly from the US Code, with the following
exceptions: page headers and footers, page numbering, and all formatting are artifacts of this presentation.
Divider lines have been inserted between sections. The notes are set off by a vertical line and a larger left
margin. The table of contents immediately following this title page is machine-generated from the headings
in this portion of the Code. Commonly available fonts are used.*

*The Legal Information Institute promotes worldwide, free public access to law via the Internet. Founded
in 1992, the LII created the first legal information website. It continues to be a pre-eminent "law-not-com"
publisher of legal information and an important outreach activity of the Cornell Law School.*

00038469

**TITLE 42 - THE PUBLIC HEALTH AND WELFARE**    1

**CHAPTER 61 - UNIFORM RELOCATION ASSISTANCE AND REAL PROPERTY ACQUISITION POLICIES FOR FEDERAL AND FEDERALLY ASSISTED PROGRAMS**    5

**SUBCHAPTER I - GENERAL PROVISIONS**    6
§ 4601. Definitions    6
§ 4602. Effect upon property acquisition    9
§ 4603. Additional appropriations for moving costs, relocation benefits and other expenses incurred in acquisition of lands for National Park System; waiver of benefits    10
§ 4604. Certification    10
§ 4605. Displaced persons not eligible for assistance    11

**SUBCHAPTER II - UNIFORM RELOCATION ASSISTANCE**    13
§ 4621. Declaration of findings and policy    13
§ 4622. Moving and related expenses    14
§ 4623. Replacement housing for homeowner; mortgage insurance    16
§ 4624. Replacement housing for tenants and certain others    17
§ 4625. Relocation planning, assistance coordination, and advisory services    18
§ 4626. Housing replacement by Federal agency as last resort    20
§ 4627. State required to furnish real property incident to Federal assistance (local cooperation)    20
§ 4628. State acting as agent for Federal program    21
§ 4629. Public works programs and projects of District of Columbia government and Washington Metropolitan Area Transit Authority    21
§ 4630. Requirements for relocation payments and assistance of federally assisted program; assurances of availability of housing    22
§ 4631. Federal share of costs    22
§ 4632. Administration; relocation assistance in programs receiving Federal financial assistance    23
§ 4633. Duties of lead agency    24
§ 4634. Repealed. Pub. L. 100–17, title IV, § 415, Apr. 2, 1987, 100 Stat. 255    26
§ 4635. Planning and other preliminary expenses for additional housing    26
§ 4636. Payments not to be considered as income for revenue purposes or for eligibility for assistance under Social Security Act or other Federal law    27
§ 4637. Repealed. Pub. L. 100–17, title IV, § 415, Apr. 2, 1987, 101 Stat. 255    27
§ 4638. Transfers of surplus property    27

**SUBCHAPTER III - UNIFORM REAL PROPERTY ACQUISITION POLICY**    29
§ 4651. Uniform policy on real property acquisition practices    29
§ 4652. Buildings, structures, and improvements    30
§ 4653. Expenses incidental to transfer of title to United States    31
§ 4654. Litigation expenses    31
§ 4655. Requirements for uniform land acquisition policies; payments of expenses incidental to transfer of real property to State; payment of litigation expenses in certain cases    32

00038470

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

# TITLE 42—THE PUBLIC HEALTH AND WELFARE

Chap.  ...Sec.
1.  The Public Health Service [Mostly Repealed or Omitted, See Chapter 6A]  ...1
1A.  The Public Health Service; Supplemental Provisions [Transferred or Omitted]  ...71
2.  Sanitation and Quarantine  ...81
3.  Leprosy [Repealed]  ...121
3A.  Cancer [Repealed]  ...137
4.  Viruses, Serums, Toxins, Antitoxins, etc. [Repealed]  ...141
5.  Maternity and Infancy Welfare and Hygiene [Repealed]  ...161
6.  The Children's Bureau  ...191
6A.  Public Health Service  ...201
7.  Social Security  ...301
7A.  Temporary Unemployment Compensation Program [Omitted]  ...1400
8.  Low-Income Housing  ...1401
8A.  Slum Clearance, Urban Renewal, and Farm Housing  ...1441
8B.  Public Works or Facilities [Omitted]  ...1491
8C.  Open-Space Land [Omitted or Repealed]  ...1500
9.  Housing of Persons Engaged in National Defense  ...1501
10.  Federal Security Agency [Transferred or Omitted]  ...1601
11.  Compensation for Disability or Death to Persons Employed at Military, Air, and Naval Bases Outside United States  ...1651
12.  Compensation for Injury, Death, or Detention of Employees of Contractors with United States Outside United States  ...1701
13.  School Lunch Programs  ...1751
13A.  Child Nutrition  ...1771
14.  Development and Control of Atomic Energy [Transferred to Chapter 23]  ...1801
15.  Disaster Relief [Repealed]  ...1851
15A.  Reciprocal Fire Protection Agreements  ...1856
15B.  Air Pollution Control [Transferred or Repealed]  ...1857
16.  National Science Foundation  ...1861
16A.  Grants for Support of Scientific Research [Repealed]  ...1891
16B.  Contracts for Scientific and Technological Research  ...1900
17.  Federal Employment Service [Transferred]  ...1901
18.  Youth Medals  ...1921
19.  Saline and Salt Waters [Repealed, Omitted, or Transferred]  ...1951
19A.  Water Resources Research Program [Repealed]  ...1961
19B.  Water Resources Planning  ...1962
20.  Elective Franchise  ...1971
20A.  Civil Rights Commission  ...1975
21.  Civil Rights  ...1981
21A.  Privacy Protection  ...2000aa
21B.  Religious Freedom Restoration  ...2000bb
21C.  Protection of Religious Exercise in Land Use and by Institutionalized Persons  ...2000cc
21D.  Detainee Treatment  ...2000dd
21E.  Privacy and Civil Liberties Protection and Oversight  ...2000ee
21F.  Prohibiting Employment Discrimination on the Basis of Genetic Information  ...2000ff
22.  Indian Hospitals and Health Facilities  ...2001
23.  Development and Control of Atomic Energy  ...2011
24.  Disposal of Atomic Energy Communities  ...2301
25.  Federal Flood Insurance  ...2401
26.  National Space Program [Repealed, Omitted, or Transferred]  ...2451
26A.  National Space Grant College and Fellowship Program [Repealed or Transferred]  ...2486
26B.  Biomedical Research in Space [Repealed or Transferred]  ...2487
27.  Loan Service of Captioned Films and Educational Media for Handicapped  ...2491
28.  Area Redevelopment Program [Omitted or Repealed]  ...2501
29.  Juvenile Delinquency and Youth Offenses Control [Omitted]  ...2541
30.  Manpower Development and Training Program [Repealed]  ...2571
31.  Public Works Acceleration Program  ...2641
32.  Third Party Liability for Hospital and Medical Care  ...2651
33.  Community Mental Health Centers [Omitted, Transferred, or Repealed]  ...2661
34.  Economic Opportunity Program  ...2701

00038471

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

35.  Programs for Older Americans  ...3001
35A.  Community Service Employment for Older Americans [Repealed]  ...3061
36.  Compensation of Condemnees in Development Programs [Repealed]  ...3071
37.  Community Facilities and Advance Land Acquisition  ...3101
38.  Public Works and Economic Development  ...3121
39.  Solid Waste Disposal [Omitted or Repealed, See Chapter 82]  ...3251
40.  Soil Information Assistance for Community Planning and Resource Development  ...3271
41.  Demonstration Cities and Metropolitan Development Program  ...3301
42.  Narcotic Addict Rehabilitation  ...3401
43.  Department of Health and Human Services  ...3501
44.  Department of Housing and Urban Development  ...3531
45.  Fair Housing  ...3601
46.  Justice System Improvement  ...3701
47.  Juvenile Delinquency Prevention and Control [Omitted or Repealed]  ...3801
48.  Guarantees for Financing New Community Land Development [Repealed or Omitted]  ...3901
49.  National Housing Partnerships  ...3931
50.  National Flood Insurance  ...4001
51.  Design and Construction of Public Buildings To Accommodate Physically Handicapped  ...4151
52.  Intergovernmental Cooperation [Repealed, See Chapter 65 of Title 31]  ...4201
52A.  Joint Funding Simplification [Repealed]  ...4251
53.  Advisory Commission on Intergovernmental Relations  ...4271
54.  Cabinet Committee on Opportunities for Spanish-Speaking People [Omitted]  ...4301
55.  National Environmental Policy  ...4321
56.  Environmental Quality Improvement  ...4371
57.  Environmental Pollution Study  ...4391
58.  Disaster Relief [Repealed or Transferred]  ...4401
59.  National Urban Policy and New Community Development  ...4501
60.  Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Program  ...4541
61.  Uniform Relocation Assistance and Real Property Acquisition Policies for Federal and Federally Assisted
Programs  ...4601
62.  Intergovernmental Personnel Program  ...4701
63.  Lead-Based Paint Poisoning Prevention  ...4801
63A.  Residential Lead-Based Paint Hazard Reduction  ...4851
64.  Public Service Employment Programs [Omitted]  ...4871
65.  Noise Control  ...4901
66.  Domestic Volunteer Services  ...4950
67.  Child Abuse Prevention and Treatment and Adoption Reform  ...5101
68.  Disaster Relief  ...5121
69.  Community Development  ...5301
70.  Manufactured Home Construction and Safety Standards  ...5401
71.  Solar Energy  ...5501
72.  Juvenile Justice and Delinquency Prevention  ...5601
73.  Development of Energy Sources  ...5801
74.  Nonnuclear Energy Research and Development  ...5901
75.  Programs for Individuals With Developmental Disabilities [Repealed]  ...6000
76.  Age Discrimination in Federally Assisted Programs  ...6101
77.  Energy Conservation  ...6201
78.  National Petroleum Reserve in Alaska  ...6501
79.  Science and Technology Policy, Organization and Priorities  ...6601
80.  Public Works Employment  ...6701
81.  Energy Conservation and Resource Renewal  ...6801
82.  Solid Waste Disposal  ...6901
83.  Energy Extension Service  ...7001
84.  Department of Energy  ...7101
85.  Air Pollution Prevention and Control  ...7401
86.  Earthquake Hazards Reduction  ...7701
87.  Water Research and Development [Repealed or Transferred]  ...7801
88.  Uranium Mill Tailings Radiation Control  ...7901
89.  Congregate Housing Services  ...8001
90.  Neighborhood and City Reinvestment, Self-Help and Revitalization  ...8101
91.  National Energy Conservation Policy  ...8201
92.  Powerplant and Industrial Fuel Use  ...8301

00038472

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

93.  Emergency Energy Conservation  ...8501
94.  Low-Income Energy Assistance  ...8601
95.  United States Synthetic Fuels Corporation [Omitted]  ...8701
96.  Biomass Energy and Alcohol Fuels  ...8801
97.  Acid Precipitation Program and Carbon Dioxide Study  ...8901
98.  Ocean Thermal Energy Conversion Research and Development  ...9001
99.  Ocean Thermal Energy Conversion  ...9101
100.  Wind Energy Systems  ...9201
101.  Magnetic Fusion Energy Engineering  ...9301
102.  Mental Health Systems  ...9401
103.  Comprehensive Environmental Response, Compensation, and Liability  ...9601
104.  Nuclear Safety Research, Development, and Demonstration  ...9701
105.  Community Services Programs  ...9801
106.  Community Services Block Grant Program  ...9901
107.  Consumer-Patient Radiation Health and Safety  ...10001
108.  Nuclear Waste Policy  ...10101
109.  Water Resources Research  ...10301
109A.  Membrane Processes Research  ...10341
109B.  Secure Water  ...10361
110.  Family Violence Prevention and Services  ...10401
111.  Emergency Federal Law Enforcement Assistance  ...10501
112.  Victim Compensation and Assistance  ...10601
113.  State Justice Institute  ...10701
114.  Protection and Advocacy for Individuals With Mental Illness  ...10801
115.  Child Development Associate Scholarship Assistance Program  ...10901
116.  Emergency Planning and Community Right-To-Know  ...11001
117.  Encouraging Good Faith Professional Review Activities  ...11101
118.  Alzheimer's Disease and Related Dementias Research  ...11201
119.  Homeless Assistance  ...11301
120.  Enterprise Zone Development  ...11501
121.  International Child Abduction Remedies  ...11601
122.  Native Hawaiian Health Care  ...11701
123.  Drug Abuse Education and Prevention  ...11801
124.  Public Housing Drug Elimination  ...11901
125.  Renewable Energy and Energy Efficiency Technology Competitiveness  ...12001
126.  Equal Opportunity for Individuals With Disabilities  ...12101
127.  Coordinated Services for Children, Youth, and Families  ...12301
128.  Hydrogen Research, Development, and Demonstration Program  ...12401
129.  National and Community Service  ...12501
130.  National Affordable Housing  ...12701
131.  Housing Opportunities for Persons With AIDS  ...12901
132.  Victims of Child Abuse  ...13001
133.  Pollution Prevention  ...13101
134.  Energy Policy  ...13201
135.  Residency and Service Requirements in Federally Assisted Housing  ...13601
136.  Violent Crime Control and Law Enforcement  ...13701
137.  Management of Rechargeable Batteries and Batteries Containing Mercury  ...14301
138.  Assisted Suicide Funding Restriction  ...14401
139.  Volunteer Protection  ...14501
140.  Criminal Justice Identification, Information, and Communication  ...14601
140A.  Jennifer's Law  ...14661
141.  Commercial Space Opportunities and Transportation Services [Repealed or Transferred]  ...14701
142.  Poison Control Center Enhancement and Awareness [Repealed]  ...14801
143.  Intercountry Adoptions  ...14901
144.  Developmental Disabilities Assistance and Bill of Rights  ...15001
145.  Public Safety Officer Medal of Valor and Tributes  ...15201
145A.  Law Enforcement Congressional Badge of Bravery  ...15231
146.  Election Administration Improvement  ...15301
147.  Prison Rape Elimination  ...15601
148.  Windstorm Impact Reduction  ...15701
149.  National Energy Policy and Programs  ...15801
150.  National Aeronautics and Space Programs, 2005 [Repealed, Omitted, or Transferred]  ...16601

00038473

*TITLE 42 - CHAPTER 61 UNIFORM RELOCATION*
*ASSISTANCE AND REAL PROPERTY ACQUISITION POLIC...*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

151. Child Protection and Safety  ...16901
152. Energy Independence and Security  ...17001
153. Community Safety Through Recidivism Prevention  ...17501
154. Combating Child Exploitation  ...17601
155. Aeronautics and Space Activities [Repealed, Omitted, or Transferred]  ...17701
156. Health Information Technology  ...17901
157. Quality, Affordable Health Care for All Americans  ...18001
158. Support for Pregnant and Parenting Teens and Women  ...18201
159. Space Exploration, Technology, and Science  ...18301

00038474

Case 8:22-cv-02597-DKC   Document 65-2   Filed 10/30/23   Page 43 of 94
*TITLE 42 - CHAPTER 61 - SUBCHAPTER I GENERAL PROVISIONS*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

# CHAPTER 61—UNIFORM RELOCATION ASSISTANCE AND REAL PROPERTY ACQUISITION POLICIES FOR FEDERAL AND FEDERALLY ASSISTED PROGRAMS

SUBCHAPTER I—GENERAL PROVISIONS
Sec.
4601.  Definitions.
4602.  Effect upon property acquisition.
4603.  Additional appropriations for moving costs, relocation benefits and other expenses incurred in acquisition of lands for National Park System; waiver of benefits.
4604.  Certification.
4605.  Displaced persons not eligible for assistance.

SUBCHAPTER II—UNIFORM RELOCATION ASSISTANCE
4621.  Declaration of findings and policy.
4622.  Moving and related expenses.
4623.  Replacement housing for homeowner; mortgage insurance.
4624.  Replacement housing for tenants and certain others.
4625.  Relocation planning, assistance coordination, and advisory services.
4626.  Housing replacement by Federal agency as last resort.
4627.  State required to furnish real property incident to Federal assistance (local cooperation).
4628.  State acting as agent for Federal program.
4629.  Public works programs and projects of District of Columbia government and Washington Metropolitan Area Transit Authority.
4630.  Requirements for relocation payments and assistance of federally assisted program; assurances of availability of housing.
4631.  Federal share of costs.
4632.  Administration; relocation assistance in programs receiving Federal financial assistance.
4633.  Duties of lead agency.
4634.  Repealed.
4635.  Planning and other preliminary expenses for additional housing.
4636.  Payments not to be considered as income for revenue purposes or for eligibility for assistance under Social Security Act or other Federal law.
4637.  Repealed.
4638.  Transfers of surplus property.

SUBCHAPTER III—UNIFORM REAL PROPERTY ACQUISITION POLICY
4651.  Uniform policy on real property acquisition practices.
4652.  Buildings, structures, and improvements.
4653.  Expenses incidental to transfer of title to United States.
4654.  Litigation expenses.
4655.  Requirements for uniform land acquisition policies; payments of expenses incidental to transfer of real property to State; payment of litigation expenses in certain cases.

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

## SUBCHAPTER I—GENERAL PROVISIONS

....................................

### § 4601. Definitions

As used in this chapter—

**(1)** The term "Federal agency" means any department, agency, or instrumentality in the executive branch of the Government, any wholly owned Government corporation, the Architect of the Capitol, the Federal Reserve banks and branches thereof, and any person who has the authority to acquire property by eminent domain under Federal law.

**(2)** The term "State" means any of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, the Trust Territory of the Pacific Islands, and any political subdivision thereof.

**(3)** The term "State agency" means any department, agency, or instrumentality of a State or of a political subdivision of a State, any department, agency, or instrumentality of 2 or more States or of 2 or more political subdivisions of a State or States, and any person who has the authority to acquire property by eminent domain under State law.

**(4)** The term "Federal financial assistance" means a grant, loan, or contribution provided by the United States, except any Federal guarantee or insurance, any interest reduction payment to an individual in connection with the purchase and occupancy of a residence by that individual, and any annual payment or capital loan to the District of Columbia.

**(5)** The term "person" means any individual, partnership, corporation, or association.

**(6)** **(A)** The term "displaced person" means, except as provided in subparagraph (B)—

    **(i)** any person who moves from real property, or moves his personal property from real property—

        **(I)** as a direct result of a written notice of intent to acquire or the acquisition of such real property in whole or in part for a program or project undertaken by a Federal agency or with Federal financial assistance; or

        **(II)** on which such person is a residential tenant or conducts a small business, a farm operation, or a business defined in paragraph (7)(D), as a direct result of rehabilitation, demolition, or such other displacing activity as the lead agency may prescribe, under a program or project undertaken by a Federal agency or with Federal financial assistance in any case in which the head of the displacing agency determines that such displacement is permanent; and

    **(ii)** solely for the purposes of sections 4622 (a) and (b) and 4625 of this title, any person who moves from real property, or moves his personal property from real property—

        **(I)** as a direct result of a written notice of intent to acquire or the acquisition of other real property, in whole or in part, on which such person conducts a business or farm operation, for a program or project undertaken by a Federal agency or with Federal financial assistance; or

        **(II)** as a direct result of rehabilitation, demolition, or such other displacing activity as the lead agency may prescribe, of other real property on which such person conducts a business or a farm operation, under a program or project undertaken by a Federal agency or with Federal financial assistance where the head of the displacing agency determines that such displacement is permanent.

  **(B)** The term "displaced person" does not include—

    **(i)** a person who has been determined, according to criteria established by the head of the lead agency, to be either in unlawful occupancy of the displacement dwelling or to have occupied such dwelling for the purpose of obtaining assistance under this chapter;

00038476

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

(ii) in any case in which the displacing agency acquires property for a program or project, any person (other than a person who was an occupant of such property at the time it was acquired) who occupies such property on a rental basis for a short term or a period subject to termination when the property is needed for the program or project.

(7) The term "business" means any lawful activity, excepting a farm operation, conducted primarily—

**(A)** for the purchase, sale, lease and rental of personal and real property, and for the manufacture, processing, or marketing of products, commodities, or any other personal property;

**(B)** for the sale of services to the public;

**(C)** by a nonprofit organization; or

**(D)** solely for the purposes of section 4622 of this title, for assisting in the purchase, sale, resale, manufacture, processing, or marketing of products, commodities, personal property, or services by the erection and maintenance of an outdoor advertising display or displays, whether or not such display or displays are located on the premises on which any of the above activities are conducted.

**(8)** The term "farm operation" means any activity conducted solely or primarily for the production of one or more agricultural products or commodities, including timber, for sale or home use, and customarily producing such products or commodities in sufficient quantity to be capable of contributing materially to the operator's support.

**(9)** The term "mortgage" means such classes of liens as are commonly given to secure advances on, or the unpaid purchase price of, real property, under the laws of the State in which the real property is located, together with the credit instruments, if any, secured thereby.

**(10)** The term "comparable replacement dwelling" means any dwelling that is

**(A)** decent, safe, and sanitary;

**(B)** adequate in size to accommodate the occupants;

**(C)** within the financial means of the displaced person;

**(D)** functionally equivalent;

**(E)** in an area not subject to unreasonable adverse environmental conditions; and

**(F)** in a location generally not less desirable than the location of the displaced person's dwelling with respect to public utilities, facilities, services, and the displaced person's place of employment.

**(11)** The term "displacing agency" means any Federal agency carrying out a program or project, and any State, State agency, or person carrying out a program or project with Federal financial assistance, which causes a person to be a displaced person.

**(12)** The term "lead agency" means the Department of Transportation.

**(13)** The term "appraisal" means a written statement independently and impartially prepared by a qualified appraiser setting forth an opinion of defined value of an adequately described property as of a specific date, supported by the presentation and analysis of relevant market information.

(Pub. L. 91–646, title I, § 101, Jan. 2, 1971, 84 Stat. 1894; Pub. L. 100–17, title IV, § 402, Apr. 2, 1987, 101 Stat. 246.)

### References in Text

This chapter, referred to in introductory provision and par. (6)(B)(i), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out below and Tables.

### Amendments

1987—Par. (1). Pub. L. 100–17, § 402(a), amended par. (1) generally. Prior to amendment, par. (1) read as follows: "The term 'Federal agency' means any department, agency, or instrumentality in the executive branch of the

00038477

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

Government (except the National Capital Housing Authority), any wholly owned Government corporation (except the District of Columbia Redevelopment Land Agency), and the Architect of the Capitol, the Federal Reserve banks and branches thereof."

Par. (3). Pub. L. 100–17, § 402(b), amended par. (3) generally. Prior to amendment, par. (3) read as follows: "The term 'State agency' means the National Capital Housing Authority, the District of Columbia Redevelopment Land Agency, and any department, agency, or instrumentality of a State or of a political subdivision of a State, or any department, agency, or instrumentality of two or more States or of two or more political subdivisions of a State or States."

Par. (4). Pub. L. 100–17, § 402(c), inserted ",  any interest reduction payment to an individual in connection with the purchase and occupancy of a residence by that individual," after "insurance".

Par. (6). Pub. L. 100–17, § 402(d), amended par. (6) generally. Prior to amendment, par. (6) read as follows: "The term 'displaced person' means any person who, on or after January 2, 1971, moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance; and solely for the purposes of sections 4622 (a) and (b) and 4625 of this title, as a result of the acquisition of or as the result of the written order of the acquiring agency to vacate other real property, on which such person conducts a business or farm operation, for such program or project."

Par. (7)(D). Pub. L. 100–17, § 402(f), substituted "section 4622" for "section 4622 (a)".

Pars. (10) to (13). Pub. L. 100–17, § 402(e), added pars. (10) to (13).

## Effective Date of 1987 Amendment

Section 418 of title IV of Pub. L. 100–17 provided that: "The amendment made by section 412 of this title [amending section 4633 of this title] (to the extent such amendment prescribes authority to develop, publish, and issue regulations) shall take effect on the date of the enactment of this title [Apr. 2, 1987]. This title and the amendments made by this title [enacting section 4604 of this title, amending this section and sections 4621 to 4626, 4630, 4631, 4633, 4636, 4638, 4651, and 4655 of this title, repealing sections 4634 and 4637 of this title, and enacting provisions set out as a note under this section] (other than the amendment made by section 412 to such extent) shall take effect on the effective date provided in such regulations but not later than 2 years after such date of enactment."

## Effective Date

Section 221 of Pub. L. 91–646 provided that:

"(a) Except as provided in subsections (b) and (c) of this section, this Act and the amendments made by this Act [see Short Title note below] shall take effect on the date of its enactment [Jan. 2, 1971].

"(b) Until July 1, 1972, sections 210 and 305 [sections 4630 and 4655 of this title] shall be applicable to a State only to the extent that such State is able under its laws to comply with such sections. After July 1, 1972, such sections [sections 4630 and 4655 of this title] shall be completely applicable to all States.

"(c) The repeals made by paragraphs (4) [repealing section 1606(b) of former Title 49, Transportation], (5) [repealing section 1465 of this title], (6) [repealing section 1415 (7)(b)(iii) and (8) second sentence of this title], (8) [repealing section 3074 of this title], (9) [repealing section 3307 (b), (c) of this title], (10) [repealing chapter 5 (sections 501–511) of Title 23, Highways], (11) [repealing provisions set out as notes under sections 501 and 510 of Title 23], and (12) of section 220 (a) of this title and section 306 of title III [repealing sections 3071 to 3073 of this title, section 141 of Title 23, and section 596 of Title 33, Navigation and Navigable Waters] shall not apply to any State so long as sections 210 and 305 [sections 4630 and 4655 of this title] are not applicable in such State."

## Short Title of 1987 Amendment

Section 401 of title IV of Pub. L. 100–17 provided that: "This title [enacting section 4604 of this title, amending this section and sections 4621 to 4626, 4630, 4631, 4633, 4636, 4638, 4651, and 4655 of this title, repealing sections 4634 and 4637 of this title, and enacting provisions set out as a note under this section] may be cited as the 'Uniform Relocation Act Amendments of 1987'."

## Short Title

Section 1 of Pub. L. 91–646 provided that: "That this Act [enacting this chapter, amending sections 1415, 2473, and 3307 of this title and section 1606 of former Title 49, Transportation, repealing sections 1465 and 3071 to 3074 of this title, section 2680 of Title 10, Armed Forces, sections 141 and 501 to 512 of Title 23, Highways, section 596 of Title 33, Navigation and Navigable Waters, sections 1231 to 1234 of Title 43, Public Lands, and enacting provisions set out as notes under this section and sections 4621 and 4651 of this title, and repealing provisions set out as notes under

00038478

*TITLE 42 - Section 4602 - Effect upon property acquisition*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

sections 501 and 510 of Title 23] may be cited as the 'Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970'."

## Termination of Trust Territory of the Pacific Islands

For termination of Trust Territory of the Pacific Islands, see note set out preceding section 1681 of Title 48, Territories and Insular Possessions.

## Willing Sellers Considered Displaced Persons

Pub. L. 111–8, div. E, title I, Mar. 11, 2009, 123 Stat. 710, provided that: "For fiscal year 2009 and hereafter, a willing seller from whom the Service acquires title to real property may be considered a 'displaced person' for purposes of the Uniform Relocation Assistance and Real Property Acquisition Policy Act [probably means the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. 4601 et seq.] and its implementing regulations, whether or not the Service has the authority to acquire such property by eminent domain."

## Treatment of Real Property Buyout Programs

Pub. L. 103–181, § 4, Dec. 3, 1993, 107 Stat. 2055, provided that:

"(a) Inapplicability of URA.—The purchase of any real property under a qualified buyout program shall not constitute the making of Federal financial assistance available to pay all or part of the cost of a program or project resulting in the acquisition of real property or any owner of real property being a displaced person (within the meaning of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 [42 U.S.C. 4601 et seq.]).

"(b) Definition of 'Qualified Buyout Program'.—For purposes of this section, the term 'qualified buyout program' means any program that—

"(1) provides for the purchase of only property damaged by the major, widespread flooding in the Midwest during 1993;

"(2) provides for such purchase solely as a result of such flooding;

"(3) provides for such acquisition without the use of the power of eminent domain and notification to the seller that acquisition is without the use of such power;

"(4) is carried out by or through a State or unit of general local government; and

"(5) is being assisted with amounts made available for—

"(A) disaster relief by the Federal Emergency Management Agency; or

"(B) other Federal financial assistance programs."

[For transfer of all functions, personnel, assets, components, authorities, grant programs, and liabilities of the Federal Emergency Management Agency, including the functions of the Under Secretary for Federal Emergency Management relating thereto, to the Federal Emergency Management Agency, see section 315 (a)(1) of Title 6, Domestic Security.]

[For transfer of functions, personnel, assets, and liabilities of the Federal Emergency Management Agency, including the functions of the Director of the Federal Emergency Management Agency relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see former section 313 (1) and sections 551 (d), 552 (d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.]

......................................

# § 4602. Effect upon property acquisition

(a)  The provisions of section 4651 of this title create no rights or liabilities and shall not affect the validity of any property acquisitions by purchase or condemnation.

(b)  Nothing in this chapter shall be construed as creating in any condemnation proceedings brought under the power of eminent domain, any element of value or of damage not in existence immediately prior to January 2, 1971.

(Pub. L. 91–646, title I, § 102, Jan. 2, 1971, 84 Stat. 1895.)

00038479

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

### References in Text

This chapter, referred to in subsec. (b), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

.....................................

## § 4603. Additional appropriations for moving costs, relocation benefits and other expenses incurred in acquisition of lands for National Park System; waiver of benefits

**(a)**  In all instances where authorizations of appropriations for the acquisition of lands for the National Park System enacted prior to January 9, 1971, do not include provisions therefor, there are authorized to be appropriated such additional sums as may be necessary to provide for moving costs, relocation benefits, and other expenses incurred pursuant to the applicable provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (Public Law 91–646; 84 Stat. 1894). There are also authorized to be appropriated not to exceed $8,400,000 in addition to those authorized in Public Law 92–272 (86 Stat. 120) to provide for such moving costs, relocation benefits, and other related expenses in connection with the acquisition of lands authorized by Public Law 92–272.

**(b)**  Whenever an owner of property elects to retain a right of use and occupancy pursuant to any statute authorizing the acquisition of property for purposes of a unit of the National Park System, such owner shall be deemed to have waived any benefits under sections 4623, 4624, 4625, and 4626 of this title, and for the purposes of those sections such owner shall not be considered a displaced person as defined in section 4601 (6) of this title.

(Pub. L. 93–477, title IV, § 405, Oct. 26, 1974, 88 Stat. 1448.)

### References in Text

The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, referred to in subsec. (a), is Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

Public Law 92–272, referred to in subsec. (a), is Pub. L. 92–272, Apr. 11, 1972, 86 Stat. 120, which to the extent classified to the Code, amended sections 284b, 428m, 459f–10, 460m–1, 460m–7 and 460t–4 of Title 16, Conservation, and amended a provision set out as a note under section 450ll of Title 16. For complete classification of this Act to the Code, see Tables.

### Codification

Section was not enacted as part of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 which comprises this chapter.

.....................................

## § 4604. Certification

**(a)  Acceptance of State agency certification**

Notwithstanding sections 4630 and 4655 of this title, the head of a Federal agency may discharge any of his responsibilities under this chapter by accepting a certification by a State agency that it will carry out such responsibility, if the head of the lead agency determines that such responsibility will be carried out in accordance with State laws which will accomplish the purpose and effect of this chapter.

**(b)  Promulgation of regulations; notice and comment; consultation with local governments**

**(1)**  The head of the lead agency shall issue regulations to carry out this section.

**(2)**  Repealed. Pub. L. 104–66, title I, § 1121(f), Dec. 21, 1995, 109 Stat. 724.

**(3)**  Before making a determination regarding any State law under subsection (a) of this section, the head of the lead agency shall provide interested parties with an opportunity for public review

00038480

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

and comment. In particular, the head of the lead agency shall consult with interested local general purpose governments within the State on the effects of such State law on the ability of local governments to carry out their responsibilities under this chapter.

**(c)  Effect of noncompliance with certification or with applicable law**

> **(1)**  The head of a Federal agency may withhold his approval of any Federal financial assistance to or contract or cooperative agreement with any displacing agency found by the Federal agency to have failed to comply with the laws described in subsection (a) of this section.

> **(2)**  After consultation with the head of the lead agency, the head of a Federal agency may rescind his acceptance of any certification under this section, in whole or in part, if the State agency fails to comply with such certification or with State law.

(Pub. L. 91–646, title I, § 103, as added Pub. L. 100–17, title IV, § 403, Apr. 2, 1987, 101 Stat. 248; amended Pub. L. 104–66, title I, § 1121(f), Dec. 21, 1995, 109 Stat. 724.)

### References in Text

This chapter, referred to in subsecs. (a) and (b)(3), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

### Amendments

1995—Subsec. (b)(2). Pub. L. 104–66 struck out par. (2) which read as follows: "The head of the lead agency shall, in coordination with other Federal agencies, monitor from time to time, and report biennially to the Congress on, State agency implementation of this section. A State agency shall make available any information required for such purpose."

### Effective Date

Section effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as an Effective Date of 1987 Amendment note under section 4601 of this title.

.....................................

## § 4605. Displaced persons not eligible for assistance

**(a)  In general**

Except as provided in subsection (c) of this section, a displaced person shall not be eligible to receive relocation payments or any other assistance under this chapter if the displaced person is an alien not lawfully present in the United States.

**(b)  Determinations of eligibility**

> **(1)  Promulgation of regulations**

> Not later than 1 year after November 21, 1997, after providing notice and an opportunity for public comment, the head of the lead agency shall promulgate regulations to carry out subsection (a) of this section.

> **(2)  Contents of regulations**

> Regulations promulgated under paragraph (1) shall—

> > **(A)**  prescribe the processes, procedures, and information that a displacing agency must use in determining whether a displaced person is an alien not lawfully present in the United States;

> > **(B)**  prohibit a displacing agency from discriminating against any displaced person;

> > **(C)**  ensure that each eligibility determination is fair and based on reliable information; and

> > **(D)**  prescribe standards for a displacing agency to apply in making determinations relating to exceptional and extremely unusual hardship under subsection (c) of this section.

00038481

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

**(c)  Exceptional and extremely unusual hardship**

If a displacing agency determines by clear and convincing evidence that a determination of the ineligibility of a displaced person under subsection (a) of this section would result in exceptional and extremely unusual hardship to an individual who is the displaced person's spouse, parent, or child and who is a citizen of the United States or an alien lawfully admitted for permanent residence in the United States, the displacing agency shall provide relocation payments and other assistance to the displaced person under this chapter if the displaced person would be eligible for the assistance but for subsection (a) of this section.

**(d)  Limitation on statutory construction**

Nothing in this section affects any right available to a displaced person under any other provision of Federal or State law.

(Pub. L. 91–646, title I, § 104, as added Pub. L. 105–117, § 1, Nov. 21, 1997, 111 Stat. 2384.)

### References in Text

This chapter, referred to in subsecs. (a) and (c), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

00038482

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscprint.html).*

## SUBCHAPTER II—UNIFORM RELOCATION ASSISTANCE

.....................................

### § 4621. Declaration of findings and policy

**(a) Findings**

The Congress finds and declares that—

**(1)** displacement as a direct result of programs or projects undertaken by a Federal agency or with Federal financial assistance is caused by a number of activities, including rehabilitation, demolition, code enforcement, and acquisition;

**(2)** relocation assistance policies must provide for fair, uniform, and equitable treatment of all affected persons;

**(3)** the displacement of businesses often results in their closure;

**(4)** minimizing the adverse impact of displacement is essential to maintaining the economic and social well-being of communities; and

**(5)** implementation of this chapter has resulted in burdensome, inefficient, and inconsistent compliance requirements and procedures which will be improved by establishing a lead agency and allowing for State certification and implementation.

**(b) Policy**

This subchapter establishes a uniform policy for the fair and equitable treatment of persons displaced as a direct result of programs or projects undertaken by a Federal agency or with Federal financial assistance. The primary purpose of this subchapter is to ensure that such persons shall not suffer disproportionate injuries as a result of programs and projects designed for the benefit of the public as a whole and to minimize the hardship of displacement on such persons.

**(c) Congressional intent**

It is the intent of Congress that—

**(1)** Federal agencies shall carry out this subchapter in a manner which minimizes waste, fraud, and mismanagement and reduces unnecessary administrative costs borne by States and State agencies in providing relocation assistance;

**(2)** uniform procedures for the administration of relocation assistance shall, to the maximum extent feasible, assure that the unique circumstances of any displaced person are taken into account and that persons in essentially similar circumstances are accorded equal treatment under this chapter;

**(3)** the improvement of housing conditions of economically disadvantaged persons under this subchapter shall be undertaken, to the maximum extent feasible, in coordination with existing Federal, State, and local governmental programs for accomplishing such goals; and

**(4)** the policies and procedures of this chapter will be administered in a manner which is consistent with fair housing requirements and which assures all persons their rights under title VIII of the Act of April 11, 1968 (Public Law 90–284), commonly known as the Civil Rights Act of 1968 [42 U.S.C. 3601 et seq.], and title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.].

(Pub. L. 91–646, title II, § 201, Jan. 2, 1971, 84 Stat. 1895; Pub. L. 100–17, title IV, § 404, Apr. 2, 1987, 101 Stat. 248.)

### References in Text

This chapter, referred to in subsecs. (a)(5) and (c)(2), (4), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

00038483

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

This subchapter, referred to in subsecs. (b) and (c)(1), (3), was in the original "this title", meaning title II of Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1895, which is classified principally to this subchapter. For complete classification of title II to the Code, see Tables.

Title VIII of the Act of April 11, 1968 (Public Law 90–284), commonly known as the Civil Rights Act of 1968, referred to in subsec. (c)(4), is title VIII of Pub. L. 90–284, Apr. 11, 1968, 82 Stat. 81, known as the Fair Housing Act, which is classified principally to subchapter I (§ 3601 et seq.) of chapter 45 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 3601 of this title and Tables.

The Civil Rights Act of 1964, referred to in subsec. (c)(4), is Pub. L. 88–352, July 2, 1964, 78 Stat. 241. Title VI of the Civil Rights Act of 1964 is classified generally to subchapter V (§ 2000d et seq.) of chapter 21 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 2000a of this title and Tables.

## Amendments

1987—Pub. L. 100–17 substituted "Declaration of findings and policy" for "Declaration of policy" in section catchline and amended text generally. Prior to amendment, text read as follows: "The purpose of this subchapter is to establish a uniform policy for the fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs in order that such persons shall not suffer disproportionate injuries as a result of programs designed for the benefit of the public as a whole."

## Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

## Savings Provision

Section 220(b) of Pub. L. 91–646 provided that: "Any rights or liabilities now existing under prior Acts or portions thereof shall not be affected by the repeal of such prior Acts or portions thereof under subsection (a) of this section [repealing sections 1415 (7)(b)(iii), (8) second sentence, 1465, 2473(b)(14), 3074, and 3307(b), (c) of this title, section 2680 of Title 10, Armed Forces, sections 501 to 512 of Title 23, Highways, sections 1231 to 1234 of Title 43, Public Lands, and section 1606(b) of former Title 49, Transportation, and provisions set out as notes under sections 501 and 511 of Title 23]."

.....................................

## § 4622. Moving and related expenses

### (a)   General provision

Whenever a program or project to be undertaken by a displacing agency will result in the displacement of any person, the head of the displacing agency shall provide for the payment to the displaced person of—

> **(1)**   actual reasonable expenses in moving himself, his family, business, farm operation, or other personal property;

> **(2)**   actual direct losses of tangible personal property as a result of moving or discontinuing a business or farm operation, but not to exceed an amount equal to the reasonable expenses that would have been required to relocate such property, as determined by the head of the agency;

> **(3)**   actual reasonable expenses in searching for a replacement business or farm; and

> **(4)**   actual reasonable expenses necessary to reestablish a displaced farm, nonprofit organization, or small business at its new site, but not to exceed $10,000.

### (b)   Displacement from dwelling; election of payments: expense and dislocation allowance

Any displaced person eligible for payments under subsection (a) of this section who is displaced from a dwelling and who elects to accept the payments authorized by this subsection in lieu of the payments authorized by subsection (a) of this section may receive an expense and dislocation allowance, which shall be determined according to a schedule established by the head of the lead agency.

### (c)   Displacement from business or farm operation; election of payments; minimum and maximum amounts; eligibility

00038484

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

Any displaced person eligible for payments under subsection (a) of this section who is displaced from the person's place of business or farm operation and who is eligible under criteria established by the head of the lead agency may elect to accept the payment authorized by this subsection in lieu of the payment authorized by subsection (a) of this section. Such payment shall consist of a fixed payment in an amount to be determined according to criteria established by the head of the lead agency, except that such payment shall not be less than $1,000 nor more than $20,000. A person whose sole business at the displacement dwelling is the rental of such property to others shall not qualify for a payment under this subsection.

**(d)  Certain utility relocation expenses**

    **(1)**  Except as otherwise provided by Federal law—

        **(A)**  if a program or project

            **(i)**  which is undertaken by a displacing agency, and

            **(ii)**  the purpose of which is not to relocate or reconstruct any utility facility, results in the relocation of a utility facility;

        **(B)**  if the owner of the utility facility which is being relocated under such program or project has entered into, with the State or local government on whose property, easement, or right-of-way such facility is located, a franchise or similar agreement with respect to the use of such property, easement, or right-of-way; and

        **(C)**  if the relocation of such facility results in such owner incurring an extraordinary cost in connection with such relocation;

the displacing agency may, in accordance with such regulations as the head of the lead agency may issue, provide to such owner a relocation payment which may not exceed the amount of such extraordinary cost (less any increase in the value of the new utility facility above the value of the old utility facility and less any salvage value derived from the old utility facility).

    **(2)**  For purposes of this subsection, the term—

        **(A)**  "extraordinary cost in connection with a relocation" means any cost incurred by the owner of a utility facility in connection with relocation of such facility which is determined by the head of the displacing agency, under such regulations as the head of the lead agency shall issue—

            **(i)**  to be a non-routine relocation expense;

            **(ii)**  to be a cost such owner ordinarily does not include in its annual budget as an expense of operation; and

            **(iii)**  to meet such other requirements as the lead agency may prescribe in such regulations; and

        **(B)**  "utility facility" means—

            **(i)**  any electric, gas, water, steam power, or materials transmission or distribution system;

            **(ii)**  any transportation system;

            **(iii)**  any communications system (including cable television); and

            **(iv)**  any fixtures, equipment, or other property associated with the operation, maintenance, or repair of any such system;

located on property which is owned by a State or local government or over which a State or local government has an easement or right-of-way. A utility facility may be publicly, privately, or cooperatively owned.

(Pub. L. 91–646, title II, § 202, Jan. 2, 1971, 84 Stat. 1895; Pub. L. 100–17, title IV, § 405, Apr. 2, 1987, 101 Stat. 249.)

00038485

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

## Amendments

1987—Subsec. (a). Pub. L. 100–17, § 405(a)(1), inserted introductory provisions and struck out former introductory provisions which read as follows: "Whenever the acquisition of real property for a program or project undertaken by a Federal agency in any State will result in the displacement of any person on or after January 2, 1971, the head of such agency shall make a payment to any displaced person, upon proper application as approved by such agency head, for—".

Subsec. (a)(4). Pub. L. 100–17, § 405(a)(2)–(4), added par. (4).

Subsec. (b). Pub. L. 100–17, § 405(b), substituted "an expense and dislocation allowance, which shall be determined according to a schedule established by the head of the lead agency" for "a moving expense allowance, determined according to a schedule established by the head of the Federal agency, not to exceed $300; and a dislocation allowance of $200".

Subsec. (c). Pub. L. 100–17, § 405(c), amended subsec. (c) generally. Prior to amendment, subsec. (c) read as follows: "Any displaced person eligible for payments under subsection (a) of this section who is displaced from his place of business or from his farm operation and who elects to accept the payment authorized by this subsection in lieu of the payment authorized by subsection (a) of this section, may receive a fixed payment in an amount equal to the average annual net earnings of the business or farm operation, except that such payment shall be not less than $2,500 nor more than $10,000. In the case of a business no payment shall be made under this subsection unless the head of the Federal agency is satisfied that the business (1) cannot be relocated without a substantial loss of its existing patronage, and (2) is not a part of a commercial enterprise having at least one other establishment not being acquired by the United States, which is engaged in the same or similar business. For purposes of this subsection, the term 'average annual net earnings' means one-half of any net earnings of the business or farm operation, before Federal, State, and local income taxes, during the two taxable years immediately preceding the taxable year in which such business or farm operation moves from the real property acquired for such project, or during such other period as the head of such agency determines to be more equitable for establishing such earnings, and includes any compensation paid by the business or farm operation to the owner, his spouse, or his dependents during such period."

Subsec. (d). Pub. L. 100–17, § 405(d), added subsec. (d).

## Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

..................................

## § 4623. Replacement housing for homeowner; mortgage insurance

(a) (1) In addition to payments otherwise authorized by this subchapter, the head of the displacing agency shall make an additional payment not in excess of $22,500 to any displaced person who is displaced from a dwelling actually owned and occupied by such displaced person for not less than one hundred and eighty days prior to the initiation of negotiations for the acquisition of the property. Such additional payment shall include the following elements:

(A) The amount, if any, which when added to the acquisition cost of the dwelling acquired by the displacing agency, equals the reasonable cost of a comparable replacement dwelling.

(B) The amount, if any, which will compensate such displaced person for any increased interest costs and other debt service costs which such person is required to pay for financing the acquisition of any such comparable replacement dwelling. Such amount shall be paid only if the dwelling acquired by the displacing agency was encumbered by a bona fide mortgage which was a valid lien on such dwelling for not less than 180 days immediately prior to the initiation of negotiations for the acquisition of such dwelling.

(C) Reasonable expenses incurred by such displaced person for evidence of title, recording fees, and other closing costs incident to the purchase of the replacement dwelling, but not including prepaid expenses.

(2) The additional payment authorized by this section shall be made only to a displaced person who purchases and occupies a decent, safe, and sanitary replacement dwelling within 1 year after

00038486

the date on which such person receives final payment from the displacing agency for the acquired dwelling or the date on which the displacing agency's obligation under section 4625 (c)(3) of this title is met, whichever is later, except that the displacing agency may extend such period for good cause. If such period is extended, the payment under this section shall be based on the costs of relocating the person to a comparable replacement dwelling within 1 year of such date.

**(b)**  The head of any Federal agency may, upon application by a mortgagee, insure any mortgage (including advances during construction) on a comparable replacement dwelling executed by a displaced person assisted under this section, which mortgage is eligible for insurance under any Federal law administered by such agency notwithstanding any requirements under such law relating to age, physical condition, or other personal characteristics of eligible mortgagors, and may make commitments for the insurance of such mortgage prior to the date of execution of the mortgage.

(Pub. L. 91–646, title II, § 203, Jan. 2, 1971, 84 Stat. 1896; Pub. L. 100–17, title IV, § 406, Apr. 2, 1987, 101 Stat. 251.)

## Amendments

1987—Subsec. (a)(1). Pub. L. 100–17, § 406(1)–(3), substituted "displacing agency" for "Federal agency" and "$22,500" for "$15,000" in introductory provisions, and in subpar. (A) "acquired by the displacing agency, equals the reasonable cost of a comparable replacement dwelling" for "acquired by the Federal agency, equals the reasonable cost of a comparable replacement dwelling which is a decent, safe, and sanitary dwelling adequate to accommodate such displaced person, reasonably accessible to public services and places of employment and available on the private market. All determinations required to carry out this subparagraph shall be made in accordance with standards established by the head of the Federal agency making the additional payment".

Subsec. (a)(1)(B). Pub. L. 100–17, § 406(4), added subpar. (B) and struck out former subpar. (B) which read as follows: "The amount, if any, which will compensate such displaced person for any increased interest costs which such person is required to pay for financing the acquisition of any such comparable replacement dwelling. Such amount shall be paid only if the dwelling acquired by the Federal agency was encumbered by a bona fide mortgage which was a valid lien on such dwelling for not less than one hundred and eighty days prior to the initiation of negotiations for the acquisition of such dwelling. Such amount shall be equal to the excess in the aggregate interest and other debt service costs of that amount of the principal of the mortgage on the replacement dwelling which is equal to the unpaid balance of the mortgage on the acquired dwelling, over the remainder term of the mortgage on the acquired dwelling, reduced to discounted present value. The discount rate shall be the prevailing interest rate paid on savings deposits by commercial banks in the general area in which the replacement dwelling is located."

Subsec. (a)(2). Pub. L. 100–17, § 406(5), added par. (2) and struck out former par. (2) which read as follows: "The additional payment authorized by this subsection shall be made only to such a displaced person who purchases and occupies a replacement dwelling which is decent, safe, and sanitary not later than the end of the one year period beginning on the date on which he receives from the Federal agency final payment of all costs of the acquired dwelling, or on the date on which he moves from the acquired dwelling, whichever is the later date."

## Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

...................................

## § 4624. Replacement housing for tenants and certain others

**(a)**  In addition to amounts otherwise authorized by this subchapter, the head of a displacing agency shall make a payment to or for any displaced person displaced from any dwelling not eligible to receive a payment under section 4623 of this title which dwelling was actually and lawfully occupied by such displaced person for not less than 90 days immediately prior to

**(1)**  the initiation of negotiations for acquisition of such dwelling, or

**(2)**  in any case in which displacement is not a direct result of acquisition, such other event as the head of the lead agency shall prescribe. Such payment shall consist of the amount necessary to enable such person to lease or rent for a period not to exceed 42 months, a comparable replacement

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

dwelling, but not to exceed $5,250. At the discretion of the head of the displacing agency, a payment under this subsection may be made in periodic installments. Computation of a payment under this subsection to a low-income displaced person for a comparable replacement dwelling shall take into account such person's income.

**(b)** Any person eligible for a payment under subsection (a) of this section may elect to apply such payment to a down payment on, and other incidental expenses pursuant to, the purchase of a decent, safe, and sanitary replacement dwelling. Any such person may, at the discretion of the head of the displacing agency, be eligible under this subsection for the maximum payment allowed under subsection (a) of this section, except that, in the case of a displaced homeowner who has owned and occupied the displacement dwelling for at least 90 days but not more than 180 days immediately prior to the initiation of negotiations for the acquisition of such dwelling, such payment shall not exceed the payment such person would otherwise have received under section 4623 (a) of this title had the person owned and occupied the displacement dwelling 180 days immediately prior to the initiation of such negotiations.

(Pub. L. 91–646, title II, § 204, Jan. 2, 1971, 84 Stat. 1897; Pub. L. 100–17, title IV, § 407, Apr. 2, 1987, 101 Stat. 251.)

### Amendments

1987—Pub. L. 100–17 amended section generally, revising and restating as subsecs. (a) and (b) provisions formerly contained in introductory provisions and in pars. (1) and (2).

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

......................................

## § 4625. Relocation planning, assistance coordination, and advisory services

**(a) Planning of programs or projects undertaken by Federal agencies or with Federal financial assistance**

Programs or projects undertaken by a Federal agency or with Federal financial assistance shall be planned in a manner that

**(1)** recognizes, at an early stage in the planning of such programs or projects and before the commencement of any actions which will cause displacements, the problems associated with the displacement of individuals, families, businesses, and farm operations, and

**(2)** provides for the resolution of such problems in order to minimize adverse impacts on displaced persons and to expedite program or project advancement and completion.

**(b) Availability of advisory services**

The head of any displacing agency shall ensure that the relocation assistance advisory services described in subsection (c) of this section are made available to all persons displaced by such agency. If such agency head determines that any person occupying property immediately adjacent to the property where the displacing activity occurs is caused substantial economic injury as a result thereof, the agency head may make available to such person such advisory services.

**(c) Measures, facilities, or services; description**

Each relocation assistance advisory program required by subsection (b) of this section shall include such measures, facilities, or services as may be necessary or appropriate in order to—

**(1)** determine, and make timely recommendations on, the needs and preferences, if any, of displaced persons for relocation assistance;

00038488

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

**(2)** provide current and continuing information on the availability, sales prices, and rental charges of comparable replacement dwellings for displaced homeowners and tenants and suitable locations for businesses and farm operations;

**(3)** assure that a person shall not be required to move from a dwelling unless the person has had a reasonable opportunity to relocate to a comparable replacement dwelling, except in the case of—

**(A)** a major disaster as defined in section 5122 (2) of this title;

**(B)** a national emergency declared by the President; or

**(C)** any other emergency which requires the person to move immediately from the dwelling because continued occupancy of such dwelling by such person constitutes a substantial danger to the health or safety of such person;

**(4)** assist a person displaced from a business or farm operation in obtaining and becoming established in a suitable replacement location;

**(5)** supply

**(A)** information concerning other Federal and State programs which may be of assistance to displaced persons, and

**(B)** technical assistance to such persons in applying for assistance under such programs; and

**(6)** provide other advisory services to displaced persons in order to minimize hardships to such persons in adjusting to relocation.

**(d) Coordination of relocation activities with other Federal, State, or local governmental actions**

The head of a displacing agency shall coordinate the relocation activities performed by such agency with other Federal, State, or local governmental actions in the community which could affect the efficient and effective delivery of relocation assistance and related services.

**(e) Selection of implementation procedures**

Whenever two or more Federal agencies provide financial assistance to a displacing agency other than a Federal agency, to implement functionally or geographically related activities which will result in the displacement of a person, the heads of such Federal agencies may agree that the procedures of one of such agencies shall be utilized to implement this subchapter with respect to such activities. If such agreement cannot be reached, then the head of the lead agency shall designate one of such agencies as the agency whose procedures shall be utilized to implement this subchapter with respect to such activities. Such related activities shall constitute a single program or project for purposes of this chapter.

**(f) Tenants occupying property acquired for programs or projects; eligibility for advisory services**

Notwithstanding section 4601 (1) of this title, in any case in which a displacing agency acquires property for a program or project, any person who occupies such property on a rental basis for a short term or a period subject to termination when the property is needed for the program or project shall be eligible for advisory services to the extent determined by the displacing agency.

(Pub. L. 91–646, title II, § 205, Jan. 2, 1971, 84 Stat. 1897; Pub. L. 100–17, title IV, § 408, Apr. 2, 1987, 101 Stat. 252.)

### References in Text

This chapter, referred to in subsec. (e), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

00038489

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

### Amendments

1987—Pub. L. 100–17, substituted "Relocation planning, assistance coordination, and advisory services" for "Relocation assistance advisory services" in catchline and amended text generally, revising and restating as subsecs. (a) to (f) provisions formerly contained in subsecs. (a) to (d).

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

...................................

## § 4626. Housing replacement by Federal agency as last resort

**(a)**  If a program or project undertaken by a Federal agency or with Federal financial assistance cannot proceed on a timely basis because comparable replacement dwellings are not available, and the head of the displacing agency determines that such dwellings cannot otherwise be made available, the head of the displacing agency may take such action as is necessary or appropriate to provide such dwellings by use of funds authorized for such project. The head of the displacing agency may use this section to exceed the maximum amounts which may be paid under sections 4623 and 4624 of this title on a case-by-case basis for good cause as determined in accordance with such regulations as the head of the lead agency shall issue.

**(b)**  No person shall be required to move from his dwelling on account of any program or project undertaken by a Federal agency or with Federal financial assistance, unless the head of the displacing agency is satisfied that comparable replacement housing is available to such person.

(Pub. L. 91–646, title II, § 206, Jan. 2, 1971, 84 Stat. 1898; Pub. L. 100–17, title IV, § 409, Apr. 2, 1987, 101 Stat. 253.)

### Amendments

1987—Subsec. (a). Pub. L. 100–17 amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: "If a Federal project cannot proceed to actual construction because comparable replacement sale or rental housing is not available, and the head of the Federal agency determines that such housing cannot otherwise be made available he may take such action as is necessary or appropriate to provide such housing by use of funds authorized for such project."

Subsec. (b). Pub. L. 100–17 amended subsec. (b) generally. Prior to amendment, subsec. (b) read as follows: "No person shall be required to move from his dwelling on or after January 2, 1971, on account of any Federal project, unless the Federal agency head is satisfied that replacement housing, in accordance with section 4625 (c)(3) of this title, is available to such person."

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

...................................

## § 4627. State required to furnish real property incident to Federal assistance (local cooperation)

Whenever real property is acquired by a State agency and furnished as a required contribution incident to a Federal program or project, the Federal agency having authority over the program or project may not accept such property unless such State agency has made all payments and provided all assistance and assurances, as are required of a State agency by sections 4630 and 4655 of this title. Such State agency shall pay the cost of such requirements in the same manner and to the same extent as the real property acquired for such project, except that in the case of any real property

---

00038490

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

acquisition or displacement occurring prior to July 1, 1972, such Federal agency shall pay 100 per centum of the first $25,000 of the cost of providing such payments and assistance.

(Pub. L. 91–646, title II, § 207, Jan. 2, 1971, 84 Stat. 1898.)

......................................

## § 4628. State acting as agent for Federal program

Whenever real property is acquired by a State agency at the request of a Federal agency for a Federal program or project, such acquisition shall, for the purposes of this chapter, be deemed an acquisition by the Federal agency having authority over such program or project.

(Pub. L. 91–646, title II, § 208, Jan. 2, 1971, 84 Stat. 1899.)

### References in Text

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

......................................

## § 4629. Public works programs and projects of District of Columbia government and Washington Metropolitan Area Transit Authority

Whenever real property is acquired by the government of the District of Columbia or the Washington Metropolitan Area Transit Authority for a program or project which is not subject to sections 4630 and 4631 of this title, and such acquisition will result in the displacement of any person on or after January 2, 1971, the Mayor of the District of Columbia or the Washington Metropolitan Area Transit Authority, as the case may be, shall make all relocation payments and provide all assistance required of a Federal agency by this chapter. Whenever real property is acquired for such a program or project on or after such effective date, such Mayor or Authority, as the case may be, shall make all payments and meet all requirements prescribed for a Federal agency by subchapter III of this chapter.

(Pub. L. 91–646, title II, § 209, Jan. 2, 1971, 84 Stat. 1899; Pub. L. 93–198, title IV, § 421, Dec. 24, 1973, 87 Stat. 789.)

### References in Text

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

Subchapter III of this chapter, referred to in text, was in the original "title III of this Act", meaning title III of Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1904, which enacted subchapter III of this chapter, repealed sections 3071 to 3073 of this title, section 141 of Title 23, Highways, and section 596 of Title 33, Navigation and Navigable Waters, and enacted provisions set out as a note under section 4651 of this title. For complete classification of title III to the Code, see Tables.

### Transfer of Functions

"Mayor" substituted for "Commissioner" pursuant to section 421 of Pub. L. 93–198. Office of Commissioner of District of Columbia, as established by Reorg. Plan No. 3 of 1967, abolished as of noon Jan. 2, 1975, by Pub. L. 93–198, title VII, § 711, Dec. 24, 1973, 87 Stat. 818, and replaced by Office of Mayor of District of Columbia by section 421 of Pub. L. 93–198.

00038491

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

......................................

## § 4630. Requirements for relocation payments and assistance of federally assisted program; assurances of availability of housing

Notwithstanding any other law, the head of a Federal agency shall not approve any grant to, or contract or agreement with, a displacing agency (other than a Federal agency), under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the displacement of any person on or after January 2, 1971, unless he receives satisfactory assurances from such displacing agency that—

(1) fair and reasonable relocation payments and assistance shall be provided to or for displaced persons, as are required to be provided by a Federal agency under sections 4622, 4623, and 4624 of this title;

(2) relocation assistance programs offering the services described in section 4625 of this title shall be provided to such displaced persons;

(3) within a reasonable period of time prior to displacement, comparable replacement dwellings will be available to displaced persons in accordance with section 4625 (c)(3) of this title.

(Pub. L. 91–646, title II, § 210, Jan. 2, 1971, 84 Stat. 1899; Pub. L. 100–17, title IV, § 410, Apr. 2, 1987, 101 Stat. 254.)

### Amendments

1987—Pub. L. 100–17 in introductory provisions substituted "displacing agency (other than a Federal agency)" for "State agency" and "assurances from such displacing agency" for "assurances from such State agency", and in par. (3) substituted "comparable replacement dwellings" for "decent, safe, and sanitary replacement dwellings".

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

### Effective Date

Section as completely applicable to all States after July 1, 1972, but until such date applicable to a State to extent the State is able under its laws to comply with this section, see section 221(b) of Pub. L. 91–646, set out as a note under section 4601 of this title.

......................................

## § 4631. Federal share of costs

### (a) Cost to displacing agency; eligibility

The cost to a displacing agency of providing payments and assistance under this subchapter and subchapter III of this chapter shall be included as part of the cost of a program or project undertaken by a Federal agency or with Federal financial assistance. A displacing agency, other than a Federal agency, shall be eligible for Federal financial assistance with respect to such payments and assistance in the same manner and to the same extent as other program or project costs.

### (b) Comparable payments under other laws

No payment or assistance under this subchapter or subchapter III of this chapter shall be required to be made to any person or included as a program or project cost under this section, if such person receives a payment required by Federal, State, or local law which is determined by the head of the Federal agency to have substantially the same purpose and effect as such payment under this section.

### (c) Agreements prior to January 2, 1971; advancements

00038492

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

Any grant to, or contract or agreement with, a State agency executed before January 2, 1971, under which Federal financial assistance is available to pay all or part of the cost of any program or project which will result in the displacement of any person on or after January 2, 1971, shall be amended to include the cost of providing payments and services under sections 4630 and 4655 of this title. If the head of a Federal agency determines that it is necessary for the expeditious completion of a program or project he may advance to the State agency the Federal share of the cost of any payments or assistance by such State agency pursuant to sections 4626, 4630, 4635, and 4655 of this title.

(Pub. L. 91–646, title II, § 211, Jan. 2, 1971, 84 Stat. 1900; Pub. L. 100–17, title IV, § 411, Apr. 2, 1987, 101 Stat. 254.)

### References in Text

Subchapter III of this chapter, referred to in subsecs. (a) and (b), was in the original "title III of this Act", meaning title III of Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1904, which is classified principally to subchapter III of this chapter. For complete classification of title III to the Code, see Tables.

### Amendments

1987—Subsec. (a). Pub. L. 100–17, § 411(a), amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: "The cost to a State agency of providing payments and assistance pursuant to sections 4626, 4630, 4635, and 4655 of this title, shall be included as part of the cost of a program or project for which Federal financial assistance is available to such State agency, and such State agency shall be eligible for Federal financial assistance with respect to such payments and assistance in the same manner and to the same extent as other program or project costs, except that, notwithstanding any other law in the case where the Federal financial assistance is by grant or contribution the Federal agency shall pay the full amount of the first $25,000 of the cost to a State agency of providing payments and assistance for a displaced person under sections 4626, 4630, 4635, and 4655 of this title, on account of any acquisition or displacement occurring prior to July 1, 1972, and in any case where such Federal financial assistance is by loan, the Federal agency shall loan such State agency the full amount of the first $25,000 of such cost."

Subsec. (b). Pub. L. 100–17, § 411(b), amended subsec. (b) generally. Prior to amendment, subsec. (b) read as follows: "No payment or assistance under section 4630 or 4655 of this title shall be required or included as a program or project cost under this section, if the displaced person receives a payment required by the State law of eminent domain which is determined by such Federal agency head to have substantially the same purpose and effect as such payment under this section, and to be part of the cost of the program or project for which Federal financial assistance is available."

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

....................................

## § 4632. Administration; relocation assistance in programs receiving Federal financial assistance

In order to prevent unnecessary expenses and duplications of functions, and to promote uniform and effective administration of relocation assistance programs for displaced persons under sections 4626, 4630, and 4635 of this title, a State agency may enter into contracts with any individual, firm, association, or corporation for services in connection with such programs, or may carry out its functions under this subchapter through any Federal or State governmental agency or instrumentality having an established organization for conducting relocation assistance programs. Such State agency shall, in carrying out the relocation assistance activities described in section 4626 of this title, whenever practicable, utilize the services of State or local housing agencies, or other agencies having experience in the administration or conduct of similar housing assistance activities.

(Pub. L. 91–646, title II, § 212, Jan. 2, 1971, 84 Stat. 1900.)

00038493

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

.....................................

## § 4633. Duties of lead agency

### (a)  General provisions

The head of the lead agency shall—

   **(1)**  develop, publish, and issue, with the active participation of the Secretary of Housing and Urban Development and the heads of other Federal agencies responsible for funding relocation and acquisition actions, and in coordination with State and local governments, such regulations as may be necessary to carry out this chapter;

   **(2)**  provide, in consultation with the Attorney General (acting through the Commissioner of the Immigration and Naturalization Service), through training and technical assistance activities for displacing agencies, information developed with the Attorney General (acting through the Commissioner) on proper implementation of section 4605 of this title;

   **(3)**  ensure that displacing agencies implement section 4605 of this title fairly and without discrimination in accordance with section 4605 (b)(2)(B) of this title;

   **(4)**  ensure that relocation assistance activities under this chapter are coordinated with low-income housing assistance programs or projects by a Federal agency or a State or State agency with Federal financial assistance;

   **(5)**  monitor, in coordination with other Federal agencies, the implementation and enforcement of this chapter and report to the Congress, as appropriate, on any major issues or problems with respect to any policy or other provision of this chapter; and

   **(6)**  perform such other duties as may be necessary to carry out this chapter.

### (b)  Regulations and procedures

The head of the lead agency is authorized to issue such regulations and establish such procedures as he may determine to be necessary to assure—

   **(1)**  that the payments and assistance authorized by this chapter shall be administered in a manner which is fair and reasonable and as uniform as practicable;

   **(2)**  that a displaced person who makes proper application for a payment authorized for such person by this subchapter shall be paid promptly after a move or, in hardship cases, be paid in advance; and

   **(3)**  that any aggrieved person may have his application reviewed by the head of the Federal agency having authority over the applicable program or project or, in the case of a program or project receiving Federal financial assistance, by the State agency having authority over such program or project or the Federal agency having authority over such program or project if there is no such State agency.

### (c)  Applicability to Tennessee Valley Authority and Rural Electrification Administration

The regulations and procedures issued pursuant to this section shall apply to the Tennessee Valley Authority and the Rural Electrification Administration only with respect to relocation assistance under this subchapter and subchapter I of this chapter.

(Pub. L. 91–646, title II, § 213, Jan. 2, 1971, 84 Stat. 1900; Pub. L. 100–17, title IV, § 412, Apr. 2, 1987, 101 Stat. 254; Pub. L. 102–240, title I, § 1055, Dec. 18, 1991, 105 Stat. 2002; Pub. L. 105–117, § 2, Nov. 21, 1997, 111 Stat. 2385.)

### References in Text

This chapter, referred to in subsecs. (a)(1), (4) to (6) and (b)(1), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

00038494

me

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

## Amendments

1997—Subsec. (a)(2) to (6). Pub. L. 105–117 added pars. (2) and (3) and redesignated former pars. (2) to (4) as (4) to (6), respectively.

1991—Subsec. (c). Pub. L. 102–240 inserted "and the Rural Electrification Administration" after "Tennessee Valley Authority".

1987—Pub. L. 100–17 in amending section generally, substituted "Duties of lead agency" for "Regulations and procedures" in section catchline.

Subsec. (a). Pub. L. 100–17 amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: "In order to promote uniform and effective administration of relocation assistance and land acquisition of State or local housing agencies, or other agencies having programs or projects by Federal agencies or programs or projects by State agencies receiving Federal financial assistance, the heads of Federal agencies shall consult together on the establishment of regulations and procedures for the implementation of such programs."

Subsec. (b). Pub. L. 100–17 amended subsec. (b) generally. Prior to amendment, subsec. (b) read as follows: "The head of each Federal agency is authorized to establish such regulations and procedures as he may determine to be necessary to assure—

"(1) that the payments and assistance authorized by this chapter shall be administered in a manner which is fair and reasonable, and as uniform as practicable;

"(2) that a displaced person who makes proper application for a payment authorized for such person by this subchapter shall be paid promptly after a move or, in hardship cases, be paid in advance; and

"(3) that any person aggrieved by a determination as to eligibility for a payment authorized by this chapter, or the amount of a payment, may have his application reviewed by the head of the Federal agency having authority over the applicable program or project, or in the case of a program or project receiving Federal financial assistance, by the head of the State agency."

Subsec. (c). Pub. L. 100–17 amended subsec. (c) generally. Prior to amendment, subsec. (c) read as follows: "The head of each Federal agency may prescribe such other regulations and procedures, consistent with the provisions of this chapter, as he deems necessary or appropriate to carry out this chapter."

## Effective Date of 1991 Amendment

Amendment by Pub. L. 102–240 effective Dec. 18, 1991, and applicable to funds authorized to be appropriated or made available after Sept. 30, 1991, and, with certain exceptions, not applicable to funds appropriated or made available on or before Sept. 30, 1991, see section 1100 of Pub. L. 102–240, set out as a note under section 104 of Title 23, Highways.

## Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective Apr. 2, 1987, to the extent such amendment prescribes authority to develop, publish, and issue regulations, and otherwise to take effect on effective date provided in such regulations but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

## Abolition of Immigration and Naturalization Service and Transfer of Functions

For abolition of Immigration and Naturalization Service, transfer of functions, and treatment of related references, see note set out under section 1551 of Title 8, Aliens and Nationality.

## Improvement of Administration and Implementation of This Chapter

Memorandum of the President dated February 27, 1985, 50 F.R. 8953, provided:

The purpose of this Memorandum is to improve administration and implementation of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 [42 U.S.C. 4601 et seq.].

Specifically, I hereby direct the following actions:

1. The Presidential Memorandum of September 6, 1973 on this subject is superseded.

2. As with other Administration management improvement initiatives, a lead agency, the Department of Transportation (DOT), is designated to coordinate and monitor implementation of the Act, and consult periodically with State and local governments and other organizations and interest groups affected by administration of the Act.

3. DOT, jointly with the Department of Housing and Urban Development, shall interact with the principal executive departments and agencies affected by the Act in developing Administration policy.

00038495

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

4. Within 90 days of the date of this Memorandum, all affected executive departments and agencies shall propose common regulations under the Act. Within one year of the date of this Memorandum, such departments and agencies shall issue common regulations under the Act. Such regulations shall be consistent with the model policy promulgated by DOT, in consultation and coordination with other affected agencies, and published in final form in the Federal Register simultaneously with this Memorandum.

5. DOT shall report annually to the President's Council on Management Improvement, through the Office of Management and Budget, on implementation of the Act.

......................................

## § 4634. Repealed. Pub. L. 100–17, title IV, § 415, Apr. 2, 1987, 100 Stat. 255

Section, Pub. L. 91–646, title II, § 214, Jan. 2, 1971, 84 Stat. 1901, required head of each Federal agency to submit an annual report to the President respecting programs and policies established or authorized by this chapter, and the President to submit such reports to Congress.

### Effective Date of Repeal

Repeal effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as an Effective Date of 1987 Amendment note under section 4601 of this title.

......................................

## § 4635. Planning and other preliminary expenses for additional housing

In order to encourage and facilitate the construction or rehabilitation of housing to meet the needs of displaced persons who are displaced from dwellings because of any Federal or Federal financially assisted project, the head of the Federal agency administering such project is authorized to make loans as a part of the cost of any such project, or to approve loans as a part of the cost of any such project receiving Federal financial assistance, to nonprofit, limited dividend, or cooperative organizations or to public bodies, for necessary and reasonable expenses, prior to construction, for planning and obtaining federally insured mortgage financing for the rehabilitation or construction of housing for such displaced persons. Notwithstanding the preceding sentence, or any other law, such loans shall be available for not to exceed 80 per centum of the reasonable costs expected to be incurred in planning, and in obtaining financing for, such housing, prior to the availability of such financing, including, but not limited to, preliminary surveys and analyses of market needs, preliminary site engineering, preliminary architectural fees, site acquisition, application and mortgage commitment fees, and construction loan fees and discounts. Loans to an organization established for profit shall bear interest at a market rate established by the head of such Federal agency. All other loans shall be without interest. Such Federal agency head shall require repayment of loans made under this section, under such terms and conditions as he may require, upon completion of the project or sooner, and except in the case of a loan to an organization established for profit, may cancel any part or all of a loan if he determines that a permanent loan to finance the rehabilitation or the construction of such housing cannot be obtained in an amount adequate for repayment of such loan. Upon repayment of any such loan, the Federal share of the sum repaid shall be credited to the account from which such loan was made, unless the Secretary of the Treasury determines that such account is no longer in existence, in which case such sum shall be returned to the Treasury and credited to miscellaneous receipts.

(Pub. L. 91–646, title II, § 215, Jan. 2, 1971, 84 Stat. 1901.)

00038496

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

.....................................

## § 4636. Payments not to be considered as income for revenue purposes or for eligibility for assistance under Social Security Act or other Federal law

No payment received under this subchapter shall be considered as income for the purposes of title 26; or for the purposes of determining the eligibility or the extent of eligibility of any person for assistance under the Social Security Act [42 U.S.C. 301 et seq.] or any other Federal law (except for any Federal law providing low-income housing assistance).

(Pub. L. 91–646, title II, § 216, Jan. 2, 1971, 84 Stat. 1902; Pub. L. 99–514, § 2, Oct. 22, 1986, 100 Stat. 2095; Pub. L. 100–17, title IV, § 413, Apr. 2, 1987, 101 Stat. 255.)

### References in Text

The Social Security Act, referred to in text, is act Aug. 14, 1935, ch. 531, 49 Stat. 620, as amended, which is classified generally to chapter 7 (§ 301 et seq.) of this title. For complete classification of this Act to the Code, see section 1305 of this title and Tables.

### Amendments

1987—Pub. L. 100–17 inserted "(except for any Federal law providing low-income housing assistance)" before period at end.

1986—Pub. L. 99–514 substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954", which for purposes of codification was translated as "title 26" thus requiring no change in text.

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

.....................................

## § 4637. Repealed. Pub. L. 100–17, title IV, § 415, Apr. 2, 1987, 101 Stat. 255

Section, Pub. L. 91–646, title II, § 217, Jan. 2, 1971, 84 Stat. 1902, related to displacement by code enforcement, rehabilitation, and demolition programs receiving Federal assistance.

### Effective Date of Repeal

Repeal effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as an Effective Date of 1987 Amendment note under section 4601 of this title.

.....................................

## § 4638. Transfers of surplus property

The Administrator of General Services is authorized to transfer to a State agency for the purpose of providing replacement housing required by this subchapter, any real property surplus to the needs of the United States within the meaning of chapters 1 to 11 of title 40 and division C (except sections 3302, 3307 (e), 3501 (b), 3509, 3906, 4710, and 4711) of subtitle I of title 41. Such transfer shall be subject to such terms and conditions as the Administrator determines necessary to protect the interests of the United States and may be made without monetary consideration, except that such State agency shall pay to the United States all net amounts received by such agency from any sale, lease, or other disposition of such property for such housing.

(Pub. L. 91–646, title II, § 218, Jan. 2, 1971, 84 Stat. 1902; Pub. L. 100–17, title IV, § 414, Apr. 2, 1987, 101 Stat. 255.)

00038497

*TITLE 42 - CHAPTER 61 - SUBCHAPTER III*
*UNIFORM REAL PROPERTY ACQUISITION POLICY*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

## Codification

In text, "chapters 1 to 11 of title 40 and division C (except sections 3302, 3307 (e), 3501 (b), 3509, 3906, 4710, and 4711) of subtitle I of title 41" substituted for "the Federal Property and Administrative Services Act of 1949, as amended" on authority of Pub. L. 107–217, § 5(c), Aug. 21, 2002, 116 Stat. 1303, which Act enacted Title 40, Public Buildings, Property, and Works, and Pub. L. 111–350, § 6(c), Jan. 4, 2011, 124 Stat. 3854, which Act enacted Title 41, Public Contracts.

## Amendments

1987—Pub. L. 100–17 inserted "net" after "all".

## Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

00038498

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

## SUBCHAPTER III—UNIFORM REAL PROPERTY ACQUISITION POLICY

.....................................

### § 4651. Uniform policy on real property acquisition practices

In order to encourage and expedite the acquisition of real property by agreements with owners, to avoid litigation and relieve congestion in the courts, to assure consistent treatment for owners in the many Federal programs, and to promote public confidence in Federal land acquisition practices, heads of Federal agencies shall, to the greatest extent practicable, be guided by the following policies:

**(1)** The head of a Federal agency shall make every reasonable effort to acquire expeditiously real property by negotiation.

**(2)** Real property shall be appraised before the initiation of negotiations, and the owner or his designated representative shall be given an opportunity to accompany the appraiser during his inspection of the property, except that the head of the lead agency may prescribe a procedure to waive the appraisal in cases involving the acquisition by sale or donation of property with a low fair market value.

**(3)** Before the initiation of negotiations for real property, the head of the Federal agency concerned shall establish an amount which he believes to be just compensation therefor and shall make a prompt offer to acquire the property for the full amount so established. In no event shall such amount be less than the agency's approved appraisal of the fair market value of such property. Any decrease or increase in the fair market value of real property prior to the date of valuation caused by the public improvement for which such property is acquired, or by the likelihood that the property would be acquired for such improvement, other than that due to physical deterioration within the reasonable control of the owner, will be disregarded in determining the compensation for the property. The head of the Federal agency concerned shall provide the owner of real property to be acquired with a written statement of, and summary of the basis for, the amount he established as just compensation. Where appropriate the just compensation for the real property acquired and for damages to remaining real property shall be separately stated.

**(4)** No owner shall be required to surrender possession of real property before the head of the Federal agency concerned pays the agreed purchase price, or deposits with the court in accordance with section 3114 (a) to (d) of title 40, for the benefit of the owner, an amount not less than the agency's approved appraisal of the fair market value of such property, or the amount of the award of compensation in the condemnation proceeding for such property.

**(5)** The construction or development of a public improvement shall be so scheduled that, to the greatest extent practicable, no person lawfully occupying real property shall be required to move from a dwelling (assuming a replacement dwelling as required by subchapter II of this chapter will be available), or to move his business or farm operation, without at least ninety days' written notice from the head of the Federal agency concerned, of the date by which such move is required.

**(6)** If the head of a Federal agency permits an owner or tenant to occupy the real property acquired on a rental basis for a short term or for a period subject to termination by the Government on short notice, the amount of rent required shall not exceed the fair rental value of the property to a short-term occupier.

**(7)** In no event shall the head of a Federal agency either advance the time of condemnation, or defer negotiations or condemnation and the deposit of funds in court for the use of the owner, or take any other action coercive in nature, in order to compel an agreement on the price to be paid for the property.

**(8)** If any interest in real property is to be acquired by exercise of the power of eminent domain, the head of the Federal agency concerned shall institute formal condemnation proceedings. No Federal agency head shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property.

00038499

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(9)**  If the acquisition of only a portion of a property would leave the owner with an uneconomic remnant, the head of the Federal agency concerned shall offer to acquire that remnant. For the purposes of this chapter, an uneconomic remnant is a parcel of real property in which the owner is left with an interest after the partial acquisition of the owner's property and which the head of the Federal agency concerned has determined has little or no value or utility to the owner.

**(10)**  A person whose real property is being acquired in accordance with this subchapter may, after the person has been fully informed of his right to receive just compensation for such property, donate such property, and part thereof, any interest therein, or any compensation paid therefor to a Federal agency, as such person shall determine.

(Pub. L. 91–646, title III, § 301, Jan. 2, 1971, 84 Stat. 1904; Pub. L. 100–17, title IV, § 416, Apr. 2, 1987, 101 Stat. 255.)

### References in Text

Subchapter II of this chapter, referred to in par. (5), was in the original "title II of this Act", meaning title II of Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1895, which is classified principally to subchapter II of this chapter. For complete classification of title II to the Code, see Short Title note set out under section 4601 of this title and Tables.

This chapter, referred to in par. (9), was in the original "this Act", meaning Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1894, known as the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 4601 of this title and Tables.

This subchapter, referred to in par. (10), was in the original "this title", meaning title III of Pub. L. 91–646, Jan. 2, 1971, 84 Stat. 1904, which is classified principally to this subchapter. For complete classification of title III to the Code, see Tables.

### Codification

In par. (4), "section 3114 (a) to (d) of title 40" substituted for "section 1 of the Act of February 26, 1931 (46 Stat. 1421; 40 U.S.C. 258a)" on authority of Pub. L. 107–217, § 5(c), Aug. 21, 2002, 116 Stat. 1303, the first section of which enacted Title 40, Public Buildings, Property, and Works.

### Amendments

1987—Par. (2). Pub. L. 100–17, § 416(a), inserted provision respecting the waiver of appraisal in cases involving the acquisition of property with a low fair market value.

Par. (9). Pub. L. 100–17, § 416(b), amended par. (9) generally. Prior to amendment, par. (9) read as follows: "If the acquisition of only part of a property would leave its owner with an uneconomic remnant, the head of the Federal agency concerned shall offer to acquire the entire property."

Par. (10). Pub. L. 100–17, § 416(c), added par. (10).

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

### Savings Provision

Section 306 of Pub. L. 91–646 provided in part that: "Any rights or liabilities now existing under prior Acts or portions thereof shall not be affected by the repeal of such prior Act or portions thereof under this section [repealing sections 3071 to 3073 of this title, section 141 of Title 23, Highways, and section 596 of Title 33, Navigation and Navigable Waters]."

..........................................

## § 4652. Buildings, structures, and improvements

**(a)**  Notwithstanding any other provision of law, if the head of a Federal agency acquires any interest in real property in any State, he shall acquire at least an equal interest in all buildings, structures, or

00038500

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

other improvements located upon the real property so acquired and which he requires to be removed from such real property or which he determines will be adversely affected by the use to which such real property will be put.

**(b)** **(1)** For the purpose of determining the just compensation to be paid for any building, structure, or other improvement required to be acquired by subsection (a) of this section, such building, structure, or other improvement shall be deemed to be a part of the real property to be acquired notwithstanding the right or obligation of a tenant, as against the owner of any other interest in the real property, to remove such building, structure, or improvement at the expiration of his term, and the fair market value which such building, structure, or improvement contributes to the fair market value of the real property to be acquired, or the fair market value of such building, structure, or improvement for removal from the real property, whichever is the greater, shall be paid to the tenant therefor.

**(2)** Payment under this subsection shall not result in duplication of any payments otherwise authorized by law. No such payment shall be made unless the owner of the land involved disclaims all interest in the improvements of the tenant. In consideration for any such payment, the tenant shall assign, transfer, and release to the United States all his right, title, and interest in and to such improvements. Nothing in this subsection shall be construed to deprive the tenant of any rights to reject payment under this subsection and to obtain payment for such property interests in accordance with applicable law, other than this subsection.

(Pub. L. 91–646, title III, § 302, Jan. 2, 1971, 84 Stat. 1905.)

......................................

## § 4653. Expenses incidental to transfer of title to United States

The head of a Federal agency, as soon as practicable after the date of payment of the purchase price or the date of deposit in court of funds to satisfy the award of compensation in a condemnation proceeding to acquire real property, whichever is the earlier, shall reimburse the owner, to the extent the head of such agency deems fair and reasonable, for expenses he necessarily incurred for—

**(1)** recording fees, transfer taxes, and similar expenses incidental to conveying such real property to the United States;

**(2)** penalty costs for prepayment of any preexisting recorded mortgage entered into in good faith encumbering such real property; and

**(3)** the pro rata portion of real property taxes paid which are allocable to a period subsequent to the date of vesting title in the United States, or the effective date of possession of such real property by the United States, whichever is the earlier.

(Pub. L. 91–646, title III, § 303, Jan. 2, 1971, 84 Stat. 1906.)

......................................

## § 4654. Litigation expenses

### (a) Judgment for owner or abandonment of proceedings

The Federal court having jurisdiction of a proceeding instituted by a Federal agency to acquire real property by condemnation shall award the owner of any right, or title to, or interest in, such real property such sum as will in the opinion of the court reimburse such owner for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of the condemnation proceedings, if—

**(1)** the final judgment is that the Federal agency cannot acquire the real property by condemnation; or

**(2)** the proceeding is abandoned by the United States.

00038501

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(b)  Payment**

Any award made pursuant to subsection (a) of this section shall be paid by the head of the Federal agency for whose benefit the condemnation proceedings was instituted.

**(c)  Claims against United States**

The court rendering a judgment for the plaintiff in a proceeding brought under section 1346 (a)(2) or 1491 of title 28, awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.

(Pub. L. 91–646, title III, § 304, Jan. 2, 1971, 84 Stat. 1906.)

......................................

## § 4655. Requirements for uniform land acquisition policies; payments of expenses incidental to transfer of real property to State; payment of litigation expenses in certain cases

**(a)**  Notwithstanding any other law, the head of a Federal agency shall not approve any program or project or any grant to, or contract or agreement with, an acquiring agency under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the acquisition of real property on and after January 2, 1971, unless he receives satisfactory assurances from such acquiring agency that—

**(1)**  in acquiring real property it will be guided, to the greatest extent practicable under State law, by the land acquisition policies in section 4651 of this title and the provisions of section 4652 of this title, and

**(2)**  property owners will be paid or reimbursed for necessary expenses as specified in sections 4653 and 4654 of this title.

**(b)**  For purposes of this section, the term "acquiring agency" means—

**(1)**  a State agency (as defined in section 4601 (3) of this title) which has the authority to acquire property by eminent domain under State law, and

**(2)**  a State agency or person which does not have such authority, to the extent provided by the head of the lead agency by regulation.

(Pub. L. 91–646, title III, § 305, Jan. 2, 1971, 84 Stat. 1906; Pub. L. 100–17, title IV, § 417, Apr. 2, 1987, 101 Stat. 256.)

### Amendments

1987—Pub. L. 100–17 designated existing provisions as subsec. (a), substituted "an acquiring agency" for "a State agency" and "such acquiring agency" for "such State agency", and added subsec. (b).

### Effective Date of 1987 Amendment

Amendment by Pub. L. 100–17 effective on effective date provided in regulations promulgated under section 4633 of this title (as amended by section 412 of Pub. L. 100–17), but not later than 2 years after Apr. 2, 1987, see section 418 of Pub. L. 100–17, set out as a note under section 4601 of this title.

00038502



# APPENDIX C:
## CEA Analysis Area
### Community Profiles & Effects

| CEA Analysis Area Community | Page | CEA Analysis Area Community | Page |
|---|---|---|---|
| McLean | pgs. 1 - 2 | Landover Hills | pgs. 37 - 38 |
| Potomac | pgs. 3 - 4 | Lanham | pgs. 39 - 40 |
| Cabin John | pgs. 5 - 6 | Springdale | pgs. 41 - 42 |
| Bethesda | pgs. 7 - 8 | Glenarden | pgs. 43 - 44 |
| North Bethesda | pgs. 9 - 10 | Mitchellville | pgs. 45 - 46 |
| South Kensington | pgs. 11 - 12 | Summerfield | pgs. 47 - 48 |
| Chevy Chase | pgs. 13 - 14 | Landover | pgs. 49 - 50 |
| Forest Glen | pgs. 15 - 16 | Lake Arbor | pgs. 51 - 52 |
| Silver Spring | pgs. 17 - 18 | Largo | pgs. 53 - 54 |
| Kemp Mill | pgs. 19 - 20 | Forestville | pgs. 55 - 56 |
| Four Corners | pgs. 21 - 22 | Westphalia | pgs. 57 - 58 |
| Hillandale | pgs. 23 - 24 | Morningside | pgs. 59 - 60 |
| Adelphi | pgs. 25 - 26 | Joint Base Andrews | pgs. 61 - 62 |
| Beltsville | pgs. 27 - 28 | Camp Springs | pgs. 63 - 64 |
| College Park | pgs. 29 - 30 | Marlow Heights | pgs. 65 - 66 |
| Greenbelt | pgs. 31 - 32 | Temple Hills | pgs. 67 - 68 |
| Seabrook | pgs. 33 - 34 | Gaithersburg | pgs. 69 - 70 |
| New Carrollton | pgs. 35 - 36 | Rockville | pgs. 71 - 72 |

00038503

# McLean CEA Analysis Area Community



**Location**: The McLean CEA Analysis Area Community includes five Census block groups and covers 4,891 acres, overlapping the northern border of the McLean Census-Designated Place along I-495 in Fairfax County, Virginia (**Map 1**). The CEA Analysis Area Community is bordered roughly by: the Potomac River to the north; Chain Bridge and Chain Bridge Road to the east; Georgetown Pike and Old Dominion Drive (Route 738) to the south; and Georgetown Pike (Route 193) and Difficult Run to the west. This is the southwestern-most community in the CEA Analysis Area and the only community located outside of Maryland.

**Planning & Development**: Planning is guided by the *Fairfax County Comprehensive Plan* (2017) and the *Fairfax County Transportation Plan* (Amended September 2, 2015). Development patterns in the CEA Analysis Area Community include low-density, single-family houses and ample greenspace and parklands.

**Community Facilities**: Located within the CEA Analysis Area Community are: 4 schools (Churchill Road Elementary School, Cooper Middle School, Langley High School, The Madeira School); 5 places of worship (Friends Meeting Church, Holy Trinity Church, Immanuel Presbyterian Church, McLean Presbyterian Church, Saint Luke's Catholic Church); and 12 parks/parkways (Turkey Run Park, George Washington Memorial Parkway, Langley Oaks Park, Churchill Road Park, Cooper Intermediate School Site, Great Falls National Park, Bull Neck Stream Valley Park, Tollbrook Ridge Park, Scott's Run Nature Preserve, Dead Run Stream Valley Park, Islands of the Potomac Wildlife Management Area, New Hope Island Conservation Park) (**Map 2**). No affordable housing developments were identified in this community.

**Environmental Justice populations:** No EJ populations are identified in the McLean CEA Analysis Area Community. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in *Chapter 4*.







| Total Population | 5,653 |
|---|---|
| *as percent of CEA Analysis Area* | 2% |
| Median Age | 51 |
| Households with One + Persons with a Disability | 290 |
| Range of Median Household Income (Block Groups) | $197,083–$250,000+ |
| Low-Income Populations Identified? | No |
| Population Driving Car/Truck/Van to Work | 1,915 |



*Sources: ACS 5-Year Estimates (2012-2016); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Prince George's County Open Data Portal; Fairfax County Open Geospatial Data*



# McLean CEA Analysis Area Community Impacts

| Alternative | Potential Relocations | Potential Community Facilities Impacted (#) | Existing Land Use Conversion to Study-Related Transportation Right-of-Way (ROW) |
|---|---|---|---|
| Alternative 1 (No Build) | None | None | None |
| Alternative 5 | None | Partial right-of-way acquisition from: 1 Park | **Park/Open Space**: 12.0 acres **Transportation**: 2.2 acres **Total Land Required**: 14.2 acres |
| Alternatives 8 and 9 | None | Partial right-of-way acquisition from: 1 Park | **Park/Open Space**: 12.2 acres **Transportation**: 2.3 acres **Total Land Required**: 14.5 acres |
| Alternative 10 | None | Partial right-of-way acquisition from: 1 Park | **Park/Open Space**: 12.2 acres **Transportation**: 2.3 acres **Total Land Required**: 14.5 acres |
| Alternative 13B | None | Partial right-of-way acquisition from: 1 Park | **Park/Open Space**: 12.2 acres **Transportation**: 2.3 acres **Total Land Required**: 14.5 acres |
| Alternative 13C | None | Partial right-of-way acquisition from: 1 Park | **Park/Open Space**: 12.2 acres **Transportation**: 2.3 acres **Total Land Required**: 14.5 acres |

## Summary of Impacts from the Screened Alternatives

The Build Alternatives would require no relocations. They would require partial acquisition from multiple properties, including one park property. Impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities at the I-495 interchange with the George Washington Memorial Parkway. Generally, the Build Alternatives would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495. Acquisition of a few larger areas were also assumed for the accommodation of stormwater management facilities.

The Build Alternatives would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway networks would be mitigated by the inclusion of signage and the implementation of a temporary detour network. Emergency services would experience an incremental reduction in response times due to reduced congestion on I-495 that is anticipated under the Build Alternatives. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The Build Alternatives would not eliminate access or provide new access to properties, nor would they impede access between residences and community facilities and business, as no properties are accessed directly from I-495. However, an incremental enhancement to access may occur due to reduced congestion on the study corridors.

Changes to land use and development would be limited to those properties directly affected by acquisition. It is anticipated that the Build Alternatives would have negligible impact on the overall population or demographic patterns within the CEA Analysis Area. Further, Build Alternatives would not change the sense of cohesion or interactions between persons or groups within the community as no relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors; however, the increased noise experienced by properties set back from the highway would be negligible. Noise abatement for noise sensitive land use/activity areas in McLean is being evaluated in coordination with the Virginia Department of Transportation (VDOT) and in compliance with the VDOT Highway Traffic Noise Impact Analysis Guidance Manual. The results of this evaluation will be included in the Final Environmental Impact Statement. Additional noise abatement information, including mapping, is available in the Noise Technical Report (DEIS, Appendix J).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Build Alternatives would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in Chapter 3, Section 5.2.

# Potomac CEA Analysis Area Community

**Location**: The Potomac CEA Analysis Area Community includes 11 Census block groups and covers 8,972 acres, overlapping the western portion of the Potomac Census-Designated Place in a crescent shape along the I-270 split and I-495 (**Map 1**). The CEA Analysis Area Community extends roughly from the I-270 and Montrose Road interchange south along the west spur of I-270 to its intersection with I-495 and along I-495 to the Potomac River. The community then extends west along the Potomac River to Bealls Island.

**Planning & Development**: Planning within this analysis area community is guided by the *Potomac Subregion Master Plan* (2002). Development patterns are primarily rural suburban, with tree-lined residential developments of single-family houses as well as pockets of forested lands and parks located along local and arterial roadways.

**Community Facilities**: Within the CEA Analysis Area Community are 9 schools (Beverly Farms Elementary School, Carderock Springs Elementary School, Seven Locks Elementary School, St. James' Children's School, The Harbor School, Mater Dei School, Geneva Day School, Chabad Hebrew School of Potomac, Feynman School); 9 places of worship (Beth Sholom Congregational and Talmud Torah Synagogue, Congressional Heights Baptist Church, Emmanuel Lutheran Church, Geneva United Presbyterian Church, Gibson Grove Church, Greek Orthodox Church of Saint George, Hermon Church, Mount Glory Church, Saint James Episcopal Church); 1 cemetery; 1 eruv; 14 parks/parkways (Cabin John Stream Valley Park Units 2, 3, 4, and 5, Cabin John Regional Park, Scott's Run Nature Preserve, Beverly Farms Local Park, Washington Suburban Sanitary Commission Avenel Site, Charred Oak Neighborhood Conservation Area, Avenel Local Park, Rock Run Stream Valley Park, Chesapeake and Ohio Canal National Historical Park, Clara Barton Parkway, Islands of the Potomac Wildlife Management Area); 2 fire/rescue stations (Cabin John Park Volunteer Fire Department Stations 10 and 30); and 2 post offices (**Map 2**). Additionally, 3 affordable housing developments (Chelsea Towers, Magruder's Discovery, Lakeview House) were identified in this community.

**Environmental Justice populations**: Three of the 11 Potomac CEA Analysis Area Community block groups (7060.12-1, 7060.12-2, and 7060.12-3) are identified as EJ populations. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 4**.



**Potomac Map 1**

LEGEND
— Municipality/Census Designated Place
▢ Census Block Groups
— Corridor Study Boundary



**Potomac Map 2**

LEGEND
— Corridor Study Boundary
▢ CEA Analysis Area Community
◯ Park Property
☆ K thru 12 Education
▢ Place of Worship
△ Cemetery
● Fire Station
▲ Post Office



**Race & Ethnicity**

- 13%
- 2%
- 14%
- 4%
- 67%

■ Asian Alone
■ Black or African American Alone
■ White Alone
■ Some Other Race Alone & Two or More Races
■ Hispanic or Latino of Any Race



**Land Use**    ■ Acres

| Land Use | Acres |
| --- | --- |
| Commercial/Employment | 71 |
| Industrial | 0 |
| Mixed-Use | 65 |
| Park/Open Space | 2,403 |
| Planned Unit/Planned Community | 0 |
| Residential | 5,687 |
| Transportation | 746 |



**Housing Characteristics**    ■ Owned  ■ Rented

| | Single-Family, Detached | Single-Family, Attached | 2&3-4 Units in Structure | 5-9 & 10-19 Units in Structure | 20-49 & 50+ Units in Structure | Mobile Home, Boat, RV, Van, Etc. |
| --- | --- | --- | --- | --- | --- | --- |
| Owned | 3,259 | 769 | 0 | 39 | 578 | 0 |
| Rented | 192 | 167 | 55 | 154 | 565 | 0 |

| Total Population | 15,653 |
| --- | --- |
| *as percent of CEA Analysis Area* | 5% |
| Median Age | 46.1 |
| Households with One + Persons with a Disability | 906 |
| Range of Median Household Income (Block Groups) | $33,977-$239,000 |
| Low-Income Populations Identified? | Yes |
| Population Driving Car/Truck/Van to Work | 5,786 |

*Sources: ACS 5-Year Estimates (2012-2016); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Prince George's County Open Data Portal; Fairfax County Open Geospatial Data*

MANAGED LANES STUDY · 495 · 270

# Potomac CEA Analysis Area Community Impacts

| Alternative | Potential Relocations (#) | Potential Community Facilities Impacted (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) |
|---|---|---|---|
| Alternative 1 (No Build) | None | None | None |
| Alternative 5 | None | Partial right-of-way acquisition from: 1 School 3 Parks | **Commercial/Employment**: 0.2 acre **Mixed-Use**: 0.2 acre **Park/Open Space**: 8.6 acres **Residential**: 13.9 acres **Transportation**: 2.8 acres **Total Land Required**: 25.7 acres |
| Alternatives 8 and 9 | None | Partial right-of-way acquisition from: 1 School 1 Place of Worship 3 Parks | **Commercial/Employment**: 0.2 acre **Mixed-Use**: 0.2 acre **Park/Open Space**: 10.1 acres **Residential**: 15.4 acres **Transportation**: 3.0 acres **Total Land Required**: 28.9 acres |
| Alternative 10 | None | Partial right-of-way acquisition from: 1 School 1 Place of Worship 3 Parks | **Commercial/Employment**: 0.4 acre **Mixed-Use**: 0.2 acre **Park/Open Space**: 11.7 acres **Residential**: 16.1 acres **Transportation**: 3.2 acres **Total Land Required**: 31.6 acres |
| Alternative 13B | None | Partial right-of-way acquisition from: 1 School 1 Place of Worship 3 Parks | **Commercial/Employment**: 0.2 acre **Mixed-Use**: 0.2 acre **Park/Open Space**: 8.9 acres **Residential**: 15.3 acres **Transportation**: 2.9 acres **Total Land Required**: 27.5 acres |
| Alternative 13C | None | Partial right-of-way acquisition from: 1 School 1 Place of Worship 3 Parks | **Commercial/Employment**: 0.2 acre **Mixed-Use**: 0.2 acre **Park/Open Space**: 9.7 acres **Residential**: 16.0 acres **Transportation**: 3.0 acres **Total Land Required**: 29.1 acres |

## Summary of Impacts from the Screened Alternatives

The Build Alternatives would require no relocations. They would require partial acquisition from multiple properties, including: one school, one place of worship, and three park properties. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Generally, the Build Alternatives would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495 or I-270. Acquisition of a few larger areas were also assumed for the accommodation of stormwater management facilities.

Coordination with the local Orthodox Jewish community would be requiring prior to construction to identify potential impacts to eruvim and ensure impacts to these facilities would be minimized or mitigated.

The Build Alternatives would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental reduction in response times due reduced congestion on study corridors that is anticipated under the Build Alternatives. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The proposed Build Alternatives would not eliminate access or provide new access to properties, nor would they impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on study corridors.

Changes to land use and development would be incremental and limited to those properties directly affected by property acquisition. It is anticipated that the Build Alternatives would have negligible impact on the overall population or demographic patterns within the CEA Analysis Area. Further, Build Alternatives would not change the sense of cohesion or interactions between persons or groups within the community as no relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors; however, the increased noise experienced by properties set back from the highway would be negligible. Based on current analysis, this community contains four noise sensitive land use/activity areas (NSAs) where existing noise barriers would be reconstructed and extended; and two NSAs where there are no existing noise barriers, but new barriers would be constructed. Additional noise abatement information, including mapping, is available in the Noise Technical Report (DEIS, Appendix J).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Build Alternatives would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in Chapter 3, Section 5.2.

Information on the potential beneficial and adverse effects to EJ populations is provided in the EJ Analysis in Chapter 4. Effects to the following resources within EJ populations are considered: human health and safety, air quality, noise, water quality, hazardous materials sites, natural resources, visual landscape and aesthetic values, economy and employment, access and mobility, community cohesion/isolation and quality of life, and tolling.

# Cabin John CEA Analysis Area Community



**Location**: The Cabin John CEA Analysis Area Community includes two Census block groups and covers 1,886 acres, overlapping with much of the Cabin John Census-Designated Place (**Map 1**). This CEA Analysis Area Community is bordered roughly by: I-495 to the west and north; Cabin John Parkway to the north; MacArthur Boulevard to the east; and the Potomac River to the south.

**Planning & Development**: Planning and development within this CEA Analysis Area Community is guided by the *Langley Park-College Park-Greenbelt and Vicinity Master Plan and Sectional Map Amendment* (1989/1990). Development patterns generally include single-family houses as well as pockets of forested lands and parks located along local and arterial roadways.

**Community Facilities**: Located within the Cabin John CEA Analysis Area Community are 1 school (Brookmont Children's Program); 2 places of worship (Cabin John United Methodist Church, Saint George Coptic Orthodox Church); 14 parks/parkways and recreation centers (Clara Barton Parkway Clara Barton Recreation Center, Cabin John Local Park, Cabin John Stream Valley Park Units 1 and 2, Carderock Springs Neighborhood Conservation Area, Seven Locks Local Park, Chesapeake and Ohio Canal National Historical Park, Princeton Avenue Park, Capital Crescent Trail Special Park, Brookmont Neighborhood Park, Cedar Island Conservation Park, New Hope Island Conservation Park, Little Falls Stream Valley Park Unit 1); 1 fire/rescue station (Morningside Volunteer Fire Department Station 27); 2 post offices; and the potentially historic site of Moses Hall Cemetery.  No affordable housing developments were identified in this community. (**Map 2**).

**Environmental Justice populations:**  No EJ populations are identified in the Cabin John CEA Analysis Area Community. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 4**.



Cabin John Map 1

LEGEND
- Municipality/Census Designated Place
- Census Block Groups
- Corridor Study Boundary



Race & Ethnicity
- Asian Alone
- Black or African American Alone
- White Alone
- Some Other Race Alone & Two or More Races
- Hispanic or Latino of Any Race
- Native Hawaiian or Other Pacific Islander Alone

4%  1%
6%
1%
8%
80%

### Land Use

| Land Use | Acres |
|---|---|
| Commercial/Employment | 0 |
| Industrial | 0 |
| Mixed-Use | 4 |
| Park/Open Space | 586 |
| Planned Unit/Planned Community | 0 |
| Residential | 1,142 |
| Transportation | 153 |

### Housing Characteristics

■ Owned  ■ Rented

| | Single-Family, Detached | Single-Family, Attached | 2& 3-4 Units in Structure | 5-9 & 10-19 Units in Structure | 20-49 & 50+ Units in Structure | Mobile Home, Boat, RV, Van, Etc. |
|---|---|---|---|---|---|---|
| Owned | 906 | 111 | 0 | 0 | 25 | 0 |
| Rented | 36 | 0 | 1 | 113 | 32 | 0 |

| | |
|---|---|
| Total Population | 3,062 |
| *as percent of CEA Analysis Area* | 1% |
| Median Age | 43.5 |
| Households with One + Persons with a Disability | 242 |
| Range of Median Household Income (Block Groups) | $152,540-$163,029 |
| Low-Income Populations Identified? | No |
| Population Driving Car/Truck/Van to Work | 1,198 |



Cabin John Map 2

LEGEND
- Corridor Study Boundary
- CEA Analysis Area Community
- ☆ K thru 12 Education
- ☐ Place of Worship
- Park Property
- ● Recreation Center
- ▲ Post Office

*Sources: ACS 5-Year Estimates (2012-2016); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Prince George's County Open Data Portal; Fairfax County Open Geospatial Data*

MANAGED LANES STUDY
495 270

00038508

# Cabin John CEA Analysis Area Community Impacts

| Alternative | Potential Relocations (#) | Potential Community Facilities Impacted (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) | **Summary of Impacts from the Screened Alternatives** |
|---|---|---|---|---|
| **Alternative 1 (No Build)** | None | None | None | The Build Alternatives would require no relocations. They would require partial acquisition from multiple properties, including three park properties. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Generally, the Build Alternatives would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495. Acquisition of a few larger areas were also assumed for the accommodation of stormwater management facilities. |
| **Alternative 5** | None | Partial right-of-way acquisition from: 3 Parks | **Park/Open Space**: 4.7 acres **Residential**: 9.2 acres **Transportation**: 0.5 acre **Total Land Required**: 14.4 acres | The Build Alternatives would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental reduction in response times due reduced congestion on study corridors that is anticipated under the Build Alternatives. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The proposed Build Alternatives would not eliminate access or provide new access to properties, nor would they impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on study corridors. |
| **Alternatives 8 and 9** | None | Partial right-of-way acquisition from: 3 Parks | **Park/Open Space**: 5.0 acres **Residential**: 10.2 acres **Transportation**: 0.5 acre **Total Land Required**: 15.7 acres | Changes to land use and development would be incremental and limited to those properties directly affected by property acquisition. It is anticipated that the Build Alternatives would have negligible impact on the overall population or demographic patterns within the CEA Analysis Area. Further, Build Alternatives would not change the sense of cohesion or interactions between persons or groups within the community as no relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway. |
| **Alternative 10** | None | Partial right-of-way acquisition from: 3 Parks | **Park/Open Space**: 5.0 acres **Residential**: 10.2 acres **Transportation**: 0.5 acre **Total Land Required**: 15.7 acres | Properties immediately adjacent to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors; however, the increased noise experienced by properties set back from the highway would be negligible. Based on current analysis, this community contains three noise sensitive land use/activity areas where there are no existing noise barriers, but new barriers would be constructed. Additional noise abatement information, including mapping, is available in the Noise Technical Report (DEIS, Appendix J). |
| **Alternative 13B** | None | Partial right-of-way acquisition from: 3 Parks | **Park/Open Space**: 5.0 acres **Residential**: 10.2 acres **Transportation**: 0.5 acre **Total Land Required**: 15.7 acres | Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Build Alternatives would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in Chapter 3, Section 5.2.

Further archaeological investigation of the potentially historic Moses Hall Cemetery, whose site may be culturally significant, will be included in development of a Programmatic Agreement; additional information is provided in the *Volume 4 of the Cultural Resources Technical Report*, (DEIS Appendix G). MDOT SHA will work to avoid and minimize impacts. MDOT SHA will continue to coordinate with affected communities and the Friends of Moses Hall, which includes some descendant families of those buried in the cemetery, on treatment of human remains should avoidance not be possible. |
| **Alternative 13C** | None | Partial right-of-way acquisition from: 3 Parks | **Park/Open Space**: 5.0 acres **Residential**: 10.2 acres **Transportation**: 0.5 acre **Total Land Required**: 15.7 acres | |

00038509

# Bethesda CEA Analysis Area Community

**Location:** The Bethesda CEA Analysis Area Community includes 12 Census block groups and covers 3,421 acres, overlapping portions of the Bethesda Census-Designated Place along I-495 (**Map 1**). The CEA Analysis Area Community is bordered roughly by: I-495 to the north and west; encompassing Walter Reed National Military Medical Center to the east; Chestnut Street, McKinley Street, and Greentree Road to Burning Tree Road, and Wilson Lane (Route 188) to Cabin John Parkway to the south.

**Planning & Development:** Planning and development within this CEA Analysis Area Community is guided by the *Comprehensive Amendment to the Bethesda/Chevy Chase Master Plan* (1990). Development patterns and density generally include single-family houses as well as pockets of forested lands and parks located along local and arterial roadways such as Old Georgetown Road and Rockville Pike (MD 355). Additionally, the National Institutes of Health (NIH) (over 300 acres) and Walter Reed National Military Medical Center (more than 240 acres) occupy more than 540 acres of the CEA Analysis Area Community.

**Community Facilities:** Within the CEA Analysis Area Community are 15 schools and higher education institutions (Burning Tree Elementary School, Wyngate Elementary School, North Bethesda Middle School, Holton-Arms School, St. Jane de Chantal School, Bethesda Country Day School, Rochambeau: the French International School and Lycee Rochambeau, Stone Ridge School of the Sacred Heart, The Primary Day School, The Woods Academy, Apple Montessori School, Saint Bartholomew School, University of Maryland University College at Walter Reed National Military Medical Center, Uniformed Services University of Health Sciences); 6 places of worship (Concord Church, Saint Bartholemew Church, Saint Jane DeChantel Church, Saint Mark Orthodox Church, Temple Hills Church, Ursuline Academy Convent); 1 cemetery; 17 parks and recreation centers (Booze Creek Stream Valley Park, Locust Hill Neighborhood Park, Elmhirst Parkway Neighborhood Conservation Area, Daley Lane Park, Burning Tree Park, Maplewood-Alta Vista Park, Wyngate Woods Neighborhood Park, North Chevy Chase Park, Cabin John Stream Valley Park Unit 1, Bradley Hills Neighborhood Conservation Area, Concord Park, Rock Creek Stream Valley Park Units 2 and 3, Fernwood Park, McCrillis Gardens Park, Ayrlawn Park, Our Lady of Bethesda Retreat Center); 1 fire/rescue station (Bethesda Fire Department Station 20); and 1 hospital/urgent care facility (Walter Reed National Military Medical Center) (**Map 2**). No affordable housing developments were identified in this community.

**Environmental Justice populations:** No EJ populations are identified in the Bethesda CEA Analysis Area Community. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 4**.





Bethesda Map 1

LEGEND
- Municipality/Census Designated Place
- Census Block Groups
- Corridor Study Boundary



Bethesda Map 2

LEGEND
- Corridor Study Boundary
- CEA Analysis Area Community
- K thru 12 Education
- Higher Education
- Place of Worship
- Cemetery
- Hospital
- Park Property
- Recreation Center
- Fire Station
- Post Office



Race & Ethnicity
- Asian Alone 12%
- Black or African American Alone 4%
- White Alone 73%
- Some Other Race Alone & Two or More Races < 1%
- Hispanic or Latino of Any Race 8%
- Native Hawaiian or Other Pacific Islander Alone 3%



Land Use (Acres)
- Commercial/Employment 0
- Industrial 0
- Mixed-Use 18
- Park/Open Space 194
- Planned Unit/Planned Community 0
- Residential 2,619
- Transportation 589



Housing Characteristics (Owned / Rented)
- Single-Family, Detached: 4,123 / 533
- Single-Family, Attached: 213 / 145
- 2 & 3-4 Units in Structure: 9 / 46
- 5-9 & 10-19 Units in Structure: 0 / 216
- 20-49 & 50+ Units in Structure: 1,015 / 462
- Mobile Home, Boat, RV, Van, Etc.: 17 / 0

| | |
|---|---|
| Total Population | 17,904 |
| *as percent of CEA Analysis Area* | 6% |
| Median Age | 45.2 |
| Households with One + Persons with a Disability | 1,332 |
| Range of Median Household Income (Block Groups) | $77,721-$250,000+ |
| Low-Income Populations Identified? | No |
| Population Driving Car/Truck/Van to Work | 5,859 |

*Sources: ACS 5-Year Estimates (2012-2016); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Prince George's County Open Data Portal; Fairfax County Open Geospatial Data*

MANAGED LANES STUDY 495 270

# Bethesda CEA Analysis Area Community Impacts

| Alternative | Potential Relocations (#) | Potential Community Facilities Impacted (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) |
|---|---|---|---|
| Alternative 1 (No Build) | None | None | None |
| Alternative 5 | None | Partial right-of-way acquisition from: 1 Hospital 1 Park | **Mixed-Use:** 0.7 acre **Park/Open Space:** 1.4 acres **Residential:** 9.3 acres **Transportation:** 1.6 acres **Total Land Required:** 13.0 acres |
| Alternatives 8 and 9 | None | Partial right-of-way acquisition from: 1 Hospital 1 Park | **Mixed-Use:** 0.7 acre **Park/Open Space:** 2.3 acres **Residential:** 12.9 acres **Transportation:** 1.8 acres **Total Land Required:** 17.7 acres |
| Alternative 10 | None | Partial right-of-way acquisition from: 1 Hospital 1 Park | **Mixed-Use:** 0.7 acre **Park/Open Space:** 2.3 acres **Residential:** 12.9 acres **Transportation:** 1.8 acres **Total Land Required:** 17.7 acres |
| Alternative 13B | None | Partial right-of-way acquisition from: 1 Hospital 1 Park | **Mixed-Use:** 0.7 acre **Park/Open Space:** 2.3 acres **Residential:** 12.9 acres **Transportation:** 1.8 acres **Total Land Required:** 17.7 acres |
| Alternative 13C | None | Partial right-of-way acquisition from: 1 Hospital 1 Park | **Mixed-Use:** 0.7 acre **Park/Open Space:** 2.3 acres **Residential:** 12.9 acres **Transportation:** 1.8 acres **Total Land Required:** 17.7 acres |

## Summary of Impacts from the Screened Alternatives

The Build Alternatives would require no relocations. The Build Alternatives would require partial acquisition from multiple properties, including one hospital and one park property. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Generally, the Build Alternatives would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495. Acquisition of a few larger areas were also assumed for the accommodation of stormwater management facilities.

The Build Alternatives would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental reduction in response times due reduced congestion on study corridors that is anticipated under the Build Alternatives. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The proposed Build Alternatives would not eliminate access or provide new access to properties, nor would they impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on study corridors.

Changes to land use and development would be incremental and limited to those properties directly affected by property acquisition. Although the Build Alternatives would result in the relocation of two residences, it is anticipated that the Build Alternatives would have negligible impact on the overall population or demographic patterns within the CEA Analysis Area. Further, Build Alternatives would not change the sense of cohesion or interactions between persons or groups within the community as no relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors; however, the increased noise experienced by properties set back from the highway would be negligible. Based on current analysis, this community contains four noise sensitive land use/activity areas (NSAs) where existing noise barriers would be displaced by construction and replaced by reconstructed barriers; four NSAs where existing noise barriers would be reconstructed and extended; and five NSAs where there are no existing noise barriers, but new barriers would be constructed. Additional noise abatement information, including mapping, is available in the Noise Technical Report (DEIS, Appendix J).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, noise walls and other structures may be introduced; however, the Build Alternatives would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in Chapter 3, Section 5.2.

00038511

# North Bethesda CEA Analysis Area Community



**Location**: The North Bethesda CEA Analysis Area Community includes 19 Census block groups and covers 3,640 acres, overlapping the North Bethesda Census-Designated Place along the I-270 split (**Map 1**). The CEA Analysis Area Community is bordered roughly by: Montrose Road, Executive Boulevard, Edson Lane, and Strathmore Avenue to the north; Rock Creek Park to the east; I-495, through the I-270 split to the south; and I-270 to the west.

**Planning & Development**: Planning within this analysis area community is guided by the *Grosvenor-Strathmore Minor Area Master Plan* (2017), the *Rock Spring Master Plan* (2017), and the *White Flint 2 Sector Plan* (2017). Development patterns and density include tree-lined single- and multi-family residential developments, pockets of forested lands and parks, and light industrial uses located along local and arterial roadways.

**Community Facilities**: Within the CEA Analysis Area Community are 17 schools (Grosvenor Center, Tilden Center School, Tilden Middle School, Ashburton Elementary School, Farmland Elementary School, Garrett Park Elementary School, Luxmanor Elementary School, Walter Johnson High School, The Manor Montessori School, Executive Child Development Center, Green Acres School, Georgetown Preparatory School, Academy of the Holy Cross, Alef Bet Montessori, Faith Methodist Church Preschool, Holy Cross School, Lone Oak/Fernwood Montessori School); 10 places of worship (Bethesda United Church of Christ, Faith United Methodist Church, Holy Cross Catholic Church, Magen David Sephardic Congregation, Mount Zion Church, North Bethesda United Methodist Church, Saint Luke's Episcopal Church, Saint Mark's United Presbyterian Church, Trinity Lutheran Church, Wildwood Baptist Church); 1 eruv; 1 cemetery; 11 parks (Cabin John Stream Valley Park Unit 6, Tilden Woods Stream Valley Park, Tilden Woods Park, Old Farm Neighborhood Conservation Area, Stratton Park, Fleming Park, Farmland Drive Park, Garrett Park Estates Park, Luxmanor Park, Josiah Henson Park, Timberlawn Park, Rock Creek Stream Valley Park Unit 3); 1 fire/rescue station (Bethesda Fire Department Station 26); and 1 library (Davis Community Library) (**Map 2**). No affordable housing developments were identified in this community.

**Environmental Justice populations**: No EJ populations are identified in the North Bethesda CEA Analysis Area Community. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 4**.



**North Bethesda Map 1**

LEGEND
- Municipality/Census Designated Place
- Census Block Groups
- Corridor Study Boundary



## Race & Ethnicity

- American Indian and Alaska Native Alone < 1%
- Asian Alone 12%
- Black or African American Alone 8%
- White Alone 67%
- Some Other Race Alone & Two or More Races 4%
- Hispanic or Latino of Any Race 9%



## Land Use
(Acres)

| Category | Acres |
|---|---|
| Commercial/Employment | 71 |
| Industrial | 0 |
| Mixed-Use | 282 |
| Park/Open Space | 256 |
| Planned Unit/Planned Community | 140 |
| Residential | 2,064 |
| Transportation | 827 |

| | |
|---|---|
| **Total Population** | **27,318** |
| *as percent of CEA Analysis Area* | 9% |
| Median Age | 42 |
| Households with One + Persons with a Disability | 1,579 |
| Range of Median Household Income (Block Groups) | $81,471-$239,167 |
| Low-Income Populations Identified? | No |
| Population Driving Car/Truck/Van to Work | 10,053 |



## Housing Characteristics
(Owned / Rented)

| | Owned | Rented |
|---|---|---|
| Single-Family, Detached | 3,714 | 519 |
| Single-Family, Attached | 1,268 | 382 |
| 2& 3-4 Units in Structure | 81 | 203 |
| 5-9 & 10-19 Units in Structure | 877 | 784 |
| 20-49 & 50+ Units in Structure | 880 | 2,756 |
| Mobile Home, Boat, RV, Van, Etc. | 0 | 0 |

Sources: ACS 5-Year Estimates (2012-2016); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Prince George's County Open Data Portal; Fairfax County Open Geospatial Data



**North Bethesda Map 2**

LEGEND
- Corridor Study Boundary
- CEA Analysis Area Community
- Place of Worship
- Cemetery
- Park Property
- Recreation Center
- Fire Station
- Library
- K thru 12 Education

**495 270 MANAGED LANES STUDY**

# North Bethesda CEA Analysis Area Community Impacts

| Alternative | Potential Relocations (#) | Potential Community Facilities Impacted (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) |
|---|---|---|---|
| Alternative 1 (No Build) | None | None | None |
| Alternative 5 | None | Partial right-of-way acquisition from: 4 Parks | **Commercial/Employment**: 1.9 acres **Mixed-Use**: 1.9 acres **Park/Open Space**: 1.8 acres **Residential**: 23.7 acres **Transportation**: 3.8 acres **Total Land Required**: 33.1 acres |
| Alternatives 8 and 9 | None | Partial right-of-way acquisition from: 4 Parks | **Commercial/Employment**: 2.0 acres **Mixed-Use**: 2.1 acres **Park/Open Space**: 1.9 acres **Residential**: 26.4 acres **Transportation**: 4.3 acres **Total Land Required**: 36.7 acres |
| Alternative 10 | None | Partial right-of-way acquisition from: 4 Parks | **Commercial/Employment**: 2.2 acres **Mixed-Use**: 2.4 acres **Park/Open Space**: 1.9 acres **Residential**: 31.1 acres **Transportation**: 4.7 acres **Total Land Required**: 42.3 acres |
| Alternative 13B | None | Partial right-of-way acquisition from: 4 Parks | **Commercial/Employment**: 1.9 acres **Mixed-Use**: 1.8 acres **Park/Open Space**: 1.8 acres **Residential**: 25.5 acres **Transportation**: 3.7 acres **Total Land Required**: 34.7 acres |
| Alternative 13C | None | Partial right-of-way acquisition from: 4 Parks | **Commercial/Employment**: 2.0 acres **Mixed-Use**: 2.1 acres **Park/Open Space**: 1.9 acres **Residential**: 28.0 acres **Transportation**: 4.0 acres **Total Land Required**: 38.0 acres |

## Summary of Impacts from the Screened Alternatives

The Build Alternatives would require no relocations. They would require partial acquisition from multiple properties, including four park properties. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Generally, the Build Alternatives would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495 or I-270. Acquisition of a few larger areas were also assumed for the accommodation of stormwater management facilities.

Coordination with the local Orthodox Jewish community would be requiring prior to construction to identify potential impacts to eruvim and ensure impacts to these facilities would be minimized or mitigated.

The Build Alternatives would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental reduction in response times due reduced congestion on study corridors that is anticipated under the Build Alternatives. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The proposed Build Alternatives would not eliminate access or provide new access to properties, nor would they impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on study corridors.

Changes to land use and development would be incremental and limited to those properties directly affected by property acquisition. It is anticipated that the Build Alternatives would have negligible impact on the overall population or demographic patterns within the CEA Analysis Area. Further, Build Alternatives would not change the sense of cohesion or interactions between persons or groups within the community as no relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors; however, the increased noise experienced by properties set back from the highway would be negligible. Based on current analysis, this community contains three noise sensitive land use/activity areas (NSAs) where existing noise barriers would be displaced by construction and replaced by reconstructed barriers; three NSAs where existing noise barriers would be reconstructed and extended; four NSAs where there are no existing noise barriers, but new barriers would be constructed; and one NSA that does not meet the feasible and reasonable criteria for noise abatement. Additional noise abatement information, including mapping, is available in the Noise Technical Report (DEIS, Appendix J).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Build Alternatives would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in Chapter 3, Section 5.2.

00038513

# South Kensington CEA Analysis Area Community



**Location**: The South Kensington CEA Analysis Area Community includes five Census block groups and covers 1,078 acres, overlapping most of the South Kensington Census-Designated Place immediately east of the I-270 split and I-495 (**Map 1**). The crescent-shaped CEA Analysis Area Community is bordered roughly by: Plyers Mill Road to the north; Grant and Capitol View Avenue to the east; I-495 to the south; and Rock Creek Park to the west.

**Planning & Development**: Planning within this analysis area community is guided by the *Town of Kensington and Vicinity Sector Plan Update* (2012), the *Kensington-Wheaton Communities Master Plan* (1989), and the *Capital View & Vicinity Sector Plan* (1982). The South Kensington CEA Analysis Area Community development patterns and density are typical of an older suburb, with shopping centers and light industrial uses clustered around arterial roadways and tree-lined residential developments of single-family houses and pockets of forested lands and parks located along local and arterial roadways.

**Community Facilities**: Located within the CEA Analysis Area Community are: 4 schools (Kensington Parkwood Elementary School, Oneness-Family High School of Washington, Grace Episcopal Day School, Holy Redeemer Catholic School); 3 places of worship (Cedar Lane Unitarian Universalist Church, Holy Redeemer Church, Washington Mormon Temple); and 5 parks (Kensington Parkway Stream Valley Park, Capitol View-Homewood Park, Rock Creek Hills Park, Rock Creek Stream Valley Park Units 2 and 3) (**Map 2**). No affordable housing developments were identified in this community.

**Environmental Justice populations**: No EJ populations are identified in the South Kensington CEA Analysis Area Community. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 4**.









| Total Population | 5,732 |
|---|---|
| *as percent of CEA Analysis Area* | 2% |
| Median Age | 45 |
| Households with One + Persons with a Disability | 392 |
| Range of Median Household Income (Block Groups) | $135,156-$184,118 |
| Low-Income Populations Identified? | No |
| Population Driving Car/Truck/Van to Work | 2,114 |

*Sources: ACS 5-Year Estimates (2012-2016); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Prince George's County Open Data Portal; Fairfax County Open Geospatial Data*

# South Kensington CEA Analysis Area Community Impacts

| Alternative | Potential Relocations (#) | Potential Community Facilities Impacted (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) |
|---|---|---|---|
| Alternative 1 (No Build) | None | None | None |
| Alternative 5 | 1 business relocation | Partial right-of-way acquisition from: 2 Parks | **Commercial/Employment**: 2.0 acres<br>**Park/Open Space**: 0.1 acre<br>**Transportation**: 2.6 acres<br>**Total Land Required**: 4.7 acres |
| Alternatives 8 and 9 | 1 business relocation | Partial right-of-way acquisition from: 2 Parks | **Commercial/Employment**: 2.0 acres<br>**Park/Open Space**: 0.2 acre<br>**Transportation**: 2.6 acres<br>**Total Land Required**: 4.8 acres |
| Alternative 10 | 1 business relocation | Partial right-of-way acquisition from: 2 Parks | **Commercial/Employment**: 2.0 acres<br>**Park/Open Space**: 0.2 acre<br>**Transportation**: 2.6 acres<br>**Total Land Required**: 4.8 acres |
| Alternative 13B | 1 business relocation | Partial right-of-way acquisition from: 2 Parks | **Commercial/Employment**: 2.0 acres<br>**Park/Open Space**: 0.2 acre<br>**Transportation**: 2.6 acres<br>**Total Land Required**: 4.8 acres |
| Alternative 13C | 1 business relocation | Partial right-of-way acquisition from: 2 Parks | **Commercial/Employment**: 2.0 acres<br>**Park/Open Space**: 0.2 acre<br>**Transportation**: 2.6 acres<br>**Total Land Required**: 4.8 acres |

## Summary of Impacts from the Screened Alternatives

Each of the Build Alternatives would result in the relocation of one medical office property. Sufficient similar medical services exist within the community, further there is office space for the relocation of this service if required. Additionally, the Build Alternatives would require partial acquisition from multiple properties, including two park properties. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Except where relocations would occur, the Build Alternatives would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495. Acquisition of a few larger areas were also assumed for the accommodation of stormwater management facilities.

The Build Alternatives would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental reduction in response times due reduced congestion on study corridors that is anticipated under the Build Alternatives. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The proposed Build Alternatives would not eliminate access or provide new access to properties, nor would they impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on study corridors.

Changes to land use and development would be incremental and limited to those properties directly affected by property acquisition. It is anticipated that the Build Alternatives would have negligible impact on the overall population or demographic patterns within the CEA Analysis Area. The Build Alternatives may result in a minor change to the sense of cohesion or interactions between persons or groups within the community as one business relocation would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors; however, the increased noise experienced by properties set back from the highway would be negligible. Based on current analysis, this community contains three noise sensitive land use/activity areas (NSAs) where there are no existing noise barriers, but new barriers would be constructed. Additional noise abatement information, including mapping, is available in the Noise Technical Report (DEIS, Appendix J).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Build Alternatives would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in Chapter 3, Section 5.2.

00038515

# Chevy Chase CEA Analysis Area Community



**Chevy Chase Map 1**

**Location**: The Chevy Chase CEA Analysis Area Community includes three Census block groups and covers 1,067 acres, overlapping with portions of the Chevy Chase Census-Designated Place along I-495 (**Map 1**). The CEA Analysis Area Community is bordered roughly by: I-495 to the north; Rock Creek Park to the east; East West Highway (MD 410) to the south; and the east boundary of Walter Reed National Military Medical Center and encompassing Columbia Country Club to the west. Connecticut Avenue (MD 185) bisects the community.

**Planning & Development**: Existing conditions and development goals for the Chevy Chase CEA Analysis Area Community are identified within the *Chevy Chase Lake Sector Plan* (2013), and the *Comprehensive Amendment to the Bethesda/Chevy Chase Master Plan* (1990). This analysis area community is home to approximately 5,200 people who live primarily in single-family detached homes. Development patterns and density are typical of an older suburb, with residential areas of tree-lined local roadways largely separated from shopping centers and light industrial uses along larger arterial roadways such as Connecticut Avenue.

**Community Facilities**: Located within the CEA Analysis Area Community are: 1 school (North Chevy Chase Elementary School); 1 place of worship (North Chevy Chase Christian Church); 2 eruvim; 6 parks (Rock Creek Stream Valley Park Units 2 and 3, North Chevy Chase Park, Jones Mill Road Neighborhood Park, Lynnbrook Park, East -West Highway Neighborhood Conservation Area); 1 fire/rescue station (Chevy Chase Fire Department Station 7); and 1 library (Chevy Chase Branch Library) (**Map 2**). No affordable housing developments were identified in this community.

**Environmental Justice populations:** No EJ populations are identified in the Chevy Chase CEA Analysis Area Community. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 4**.

**LEGEND**
- Municipality/Census Designated Place
- Census Block Groups
- Corridor Study Boundary



**Chevy Chase Map 2**

**LEGEND**
- Corridor Study Boundary
- CEA Analysis Area Community
- ☆ K thru 12 Education
- Place of Worship
- Park Property
- Fire Station
- Library



**Race & Ethnicity**

- 7%
- < 1%
- 3%
- 6%
- 8%
- 76%

- American Indian and Alaska Native Alone
- Asian Alone
- Black or African American Alone
- White Alone
- Some Other Race Alone & Two or More Races
- Hispanic or Latino of Any Race



**Land Use** ■ Acres

| Land Use | Acres |
|---|---|
| Commercial/Employment | 0 |
| Industrial | 40 |
| Mixed-Use | 25 |
| Park/Open Space | 157 |
| Planned Unit/Planned Community | 0 |
| Residential | 637 |
| Transportation | 208 |



**Housing Characteristics** ■ Owned ■ Rented

| | Single-Family, Detached | Single-Family, Attached | 2& 3-4 Units in Structure | 5-9 & 10-19 Units in Structure | 20-49 & 50+ Units in Structure | Mobile Home, Boat, RV, Van, Etc. |
|---|---|---|---|---|---|---|
| Owned | 1,159 | 81 | 10 | 0 | 239 | 0 |
| Rented | 80 | 79 | 111 | 58 | 354 | 0 |

| | |
|---|---|
| **Total Population** | **5,236** |
| *as percent of CEA Analysis Area* | 2% |
| Median Age | 52 |
| Households with One + Persons with a Disability | 568 |
| Range of Median Household Income (Block Groups) | $102,875-$191,652 |
| Low-Income Populations Identified? | No |
| Population Driving Car/Truck/Van to Work | 1,745 |

*Sources: ACS 5-Year Estimates (2012-2016); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Prince George's County Open Data Portal; Fairfax County Open Geospatial Data*

**MANAGED LANES STUDY** 495 270

# Chevy Chase CEA Analysis Area Community Impacts

| Alternative | Potential Relocations (#) | Potential Community Facilities Impacted (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) | Summary of Impacts from the Screened Alternatives |
|---|---|---|---|---|
| Alternative 1 (No Build) | None | None | None | The Build Alternatives would require no relocations. They would require partial acquisition from multiple properties, including the one park property. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Generally, the Build Alternatives would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495. Acquisition of a few larger areas were also assumed for the accommodation of stormwater management facilities.<br><br>Coordination with the local Orthodox Jewish community would be requiring prior to construction to identify potential impacts to eruvim and ensure impacts to these facilities would be minimized or mitigated. |
| Alternative 5 | None | Partial right-of-way acquisition from: 1 Park | **Park/Open Space**: 0.2 acre **Transportation**: 0.1 acre **Total Land Required**: 0.3 acre | The Build Alternatives would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental reduction in response times due reduced congestion on study corridors that is anticipated under the Build Alternatives. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The proposed Build Alternatives would not eliminate access or provide new access to properties, nor would they impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on study corridors. |
| Alternatives 8 and 9 | None | Partial right-of-way acquisition from: 1 Park | **Park/Open Space**: 0.2 acre **Transportation**: 0.1 acre **Total Land Required**: 0.3 acre | Changes to land use and development would be incremental and limited to those properties directly affected by property acquisition. It is anticipated that the Build Alternatives would have negligible impact on the overall population or demographic patterns within the CEA Analysis Area. Further, Build Alternatives would not change the sense of cohesion or interactions between persons or groups within the community as no relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway. |
| Alternative 10 | None | Partial right-of-way acquisition from: 1 Park | **Park/Open Space**: 0.2 acre **Transportation**: 0.1 acre **Total Land Required**: 0.3 acre | Properties immediately adjacent to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors; however, the increased noise experienced by properties set back from the highway would be negligible. Based on current analysis, this community contains one noise sensitive land use/activity area (NSA) where the existing noise barriers would remain in place as currently constructed; one NSA where there are no existing noise barriers, but new barriers would be constructed; two NSAs where the existing noise barrier would be displaced by construction and replaced by a reconstructed barrier; and one NSA that does not meet the feasible and reasonable criteria for noise abatement. Additional noise abatement information, including mapping, is available in the Noise Technical Report (DEIS, Appendix J). |
| Alternative 13B | None | Partial right-of-way acquisition from: 1 Park | **Park/Open Space**: 0.2 acre **Transportation**: 0.1 acre **Total Land Required**: 0.3 acre | Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Build Alternatives would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in Chapter 3, Section 5.2. |
| Alternative 13C | None | Partial right-of-way acquisition from: 1 Park | **Park/Open Space**: 0.2 acre **Transportation**: 0.1 acre **Total Land Required**: 0.3 acre | |

00038517

# Forest Glen CEA Analysis Area Community



**Location**: The Forest Glen CEA Analysis Area Community includes five Census block groups and covers 743 acres, overlapping the Forest Glen Census-Designated Place along I-495 (**Map 1**). The CEA Analysis Area Community is bordered roughly by: Plyers Mill Road, Dexter Avenue, and Dennis Avenue to the north; the Sligo Creek Park and Parkways to the east; I-495 to the south; and Grant Avenue and Capitol View Avenue (Route 192) to the west. The community is bisected by Georgia Avenue (MD 97).

**Planning & Development**: Planning and development within this analysis area community is guided by the *Capital View & Vicinity Sector Plan* (1982). The CEA Analysis Area Community development patterns and density are typical of an older suburb, with shopping centers and light industrial uses clustered around arterial roadways such as Georgia Avenue. Tree-lined residential developments of single-family houses and large apartment buildings as well as pockets of forested lands and parks are located along local and arterial roadways.

**Community Facilities**: Located within the CEA Analysis Area Community are: 3 schools (Oakland Terrace Elementary School, Flora M. Singer Elementary School, Saint John the Evangelist School); 5 places of worship (Montgomery Hills Baptist Church, Our Lady Queen of Poland Church, Saint Andrew Lutheran Church, Saint John the Evangelist Church, Sligo Baptist Church); 1 eruv; 1 cemetery; 8 parks (Forest Glen Neighborhood Park, Forest Grove Neighborhood Park, Sligo Creek Stream Valley Park Units 3 and 4, McKenney Hills Neighborhood Park, Capitol View-Homewood Park, General Getty Neighborhood Park, Capitol View Park Open Space); and 1 hospital/urgent care facility (Holy Cross Hospital) (**Map 2**). No affordable housing developments were identified in this community.

**Environmental Justice populations:** Two of the 5 Forest Glen CEA Analysis Area Community block groups (7039.01 – 1 and 7040.00-3) are identified as EJ populations. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 4**.





Race & Ethnicity

- American Indian and Alaska Native Alone
- Asian Alone
- Black or African American Alone
- White Alone
- Some Other Race Alone & Two or More Races
- Hispanic or Latino of Any Race



Land Use ■ Acres

| Land Use | Acres |
|---|---|
| Commercial/Employment | 1 |
| Industrial | 0 |
| Mixed-Use | 1 |
| Park/Open Space | 84 |
| Planned Unit/Planned Community | 0 |
| Residential | 496 |
| Transportation | 161 |



Housing Characteristics  ■ Owned  ■ Rented

| | Single-Family, Detached | Single-Family, Attached | 2 & 3-4 Units in Structure | 5-9 & 10-19 Units in Structure | 20-49 & 50+ Units in Structure | Mobile Home, Boat, RV, Van, Etc. |
|---|---|---|---|---|---|---|
| Owned | 1,369 | 237 | 0 | 113 | 89 | 0 |
| Rented | 133 | 137 | 174 | 311 | 295 | 0 |

| Total Population | 7,736 |
|---|---|
| *as percent of CEA Analysis Area* | 2% |
| Median Age | 40.6 |
| Households with One + Persons with a Disability | 585 |
| Range of Median Household Income (Block Groups) | $79,808-$167,792 |
| Low-Income Populations Identified? | No |
| Population Driving Car/Truck/Van to Work | 2,422 |

*Sources: ACS 5-Year Estimates (2012-2016); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Prince George's County Open Data Portal; Fairfax County Open Geospatial Data*

MANAGED LANES STUDY 495 270

May 2020

00038518

# Forest Glen CEA Analysis Area Community Impacts

| Alternative | Potential Relocations (#) | Potential Community Facilities Impacted (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) |
|---|---|---|---|
| Alternative 1 (No Build) | None | None | None |
| Alternative 5 | 15 residential relocations | Partial right-of-way acquisition from:<br>1 Place of Worship<br>1 Hospital<br>1 Park | **Park/Open Space**: 0.2 acre<br>**Residential**: 3.3 acres<br>**Transportation**: 2.2 acres<br>**Total Land Required**: 5.7 acres |
| Alternatives 8 and 9 | 20 residential relocations | Partial right-of-way acquisition from:<br>1 Place of Worship<br>1 Hospital<br>1 Park | **Park/Open Space**: 0.3 acre<br>**Residential**: 4.2 acres<br>**Transportation**: 2.3 acres<br>**Total Land Required**: 6.8 acres |
| Alternative 10 | 20 residential relocations | Partial right-of-way acquisition from:<br>1 Place of Worship<br>1 Hospital<br>1 Park | **Park/Open Space**: 0.3 acre<br>**Residential**: 4.2 acres<br>**Transportation**: 2.3 acres<br>**Total Land Required**: 6.8 acres |
| Alternative 13B | 20 residential relocations | Partial right-of-way acquisition from:<br>1 Place of Worship<br>1 Hospital<br>1 Park | **Park/Open Space**: 0.3 acre<br>**Residential**: 4.2 acres<br>**Transportation**: 2.3 acres<br>**Total Land Required**: 6.8 acres |
| Alternative 13C | 20 residential relocations | Partial right-of-way acquisition from:<br>1 Place of Worship<br>1 Hospital<br>1 Park | **Park/Open Space**: 0.3 acre<br>**Residential**: 4.2 acres<br>**Transportation**: 2.3 acres<br>**Total Land Required**: 6.8 acres |

## Summary of Impacts from the Screened Alternatives

Each of the Build Alternatives would require between 15 and 20 residential relocations. Each of these residences are located very close to the existing roadway. Roadway widening along I-495 and the reconfiguration of the interchange at MD 97 to accommodate the proposed widening would push the roadway even closer to these residences. Sufficient housing exists to accommodate relocation within or near the community. The Build Alternatives would also require partial acquisition from multiple properties, including: one place of worship, one hospital, and one park property. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Except where relocations would occur, the Build Alternatives would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495. Acquisition of a few larger areas were also assumed for the accommodation of stormwater management facilities.

Coordination with the local Orthodox Jewish community would be requiring prior to construction to identify potential impacts to eruvim and ensure impacts to these facilities would be minimized or mitigated.

The Build Alternatives would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental reduction in response times due reduced congestion on study corridors that is anticipated under the Build Alternatives. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The proposed Build Alternatives would not eliminate access or provide new access to properties, nor would they impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on study corridors.

Changes to land use and development would be incremental and limited to those properties directly affected by property acquisition. The relocation of 20 residences would result in impacts to the population level; ranging from minor (at the CEA Analysis Area Community level) to substantial (at the smaller, neighborhood level where the relocations would occur). However, no impact to the employment, age, sex, disability, and race/ethnicity patterns of the community would occur. Through coordination with the impacted neighborhoods and area stakeholders, the study team would work to ensure that the Build Alternatives would not change the sense of cohesion or interactions between persons or groups within the community. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors; however, the increased noise experienced by properties set back from the highway would be negligible. Based on current analysis, this community contains three noise sensitive land use/activity areas (NSAs) where existing noise barriers would be displaced by construction and replaced by reconstructed barriers. Additional noise abatement information, including mapping, is available in the Noise Technical Report (DEIS, Appendix J).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Build Alternatives would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in Chapter 3, Section 5.2.

Information on the potential beneficial and adverse effects to EJ populations is provided in the EJ Analysis in Chapter 4. Effects to the following resources within EJ populations are considered: human health and safety, air quality, noise, water quality, hazardous materials sites, natural resources, visual landscape and aesthetic values, economy and employment, access and mobility, community cohesion/isolation and quality of life, and tolling.

00038519

# Silver Spring CEA Analysis Area Community



**Location:** The Silver Spring CEA Analysis Area Community includes 15 Census block groups over 2,375 acres, overlapping the northern portion of the Silver Spring Census-Designated Place along I-495 (**Map 1**). The community extends along the I-495 inner loop in the north from Rock Creek Park to the Prince George's and Montgomery County line. The southern boundary roughly follows Northwest Branch Stream Valley Park to Piney Branch Road (MD 320), Franklin Avenue to Colesville Road/Columbia Pike (US 29), Georgia Avenue (MD 97) toward Hanover Street, Lyttonsville Road to Grubb Road, then extends west to Rock Spring Park.

**Planning & Development:** Planning within this analysis area community is guided by the *East Silver Spring Master Plan* (2000), *North & West Silver Spring Master Plan* (2000), and *Silver Spring CBD Sector Plan* (2000). Portions of the analysis area community are also guided by the *Greater Lyttonsville Sector Plan* (2017) and *Long Branch Sector Plan* (2013). The Community development patterns include single-family and multi-unit homes located along tree-lined local roadways in gridded and curvilinear patterns. Shopping centers and light industrial uses are clustered around arterial roadways such as Georgia Avenue.

**Community Facilities:** Located within the CEA Analysis Area Community are: 11 schools (JoAnn Leleck Elementary School at Broad Acres, Montgomery Knolls Elementary, Oak View Elementary School, Roscoe Nix Elementary School, Woodlin Elementary School, Eastern Middle School, Acorn Hill Waldorf Kindergarten & Nursery School, The Auburn School, Torah School of Greater Washington, Mount Jezreel Baptist Church Christian Academy, Yeshiva of Greater Washington Girls Campus); 13 places of worship (Bonner Wardell Church, Calvary Lutheran Church, Christ Apostolic Church, Christ Congregational Church, Church of God of Silver Spring, Good Shepherd United Methodist Church, Grace Church, Knox Orthodox Presbyterian Church, Memorial United Methodist Church, Saint Luke's Church, Silver Spring Christian Church of Christ, Silver Spring United Presbyterian Church, Silver Spring Zendo, Temple Israel); 2 eruvim; 1 cemetery; 17 parks (Indian Springs Terrace Park, Brookview Park, Hastings Neighborhood Conservation Area, Rosemary Hills-Lyttonsville Park, Broadacres Park, Northwest Branch Stream Valley Park Unit 3, Parkside Headquarters, Sligo Creek Stream Valley Park Unit 3, Rock Creek Stream Valley Park Unit 1, Birch Drive Neighborhood Conservation Area, Montgomery Hills Neighborhood Park, Upper Long Branch Neighborhood Park, Long Branch Stream Valley Park Unit 2, Long Branch-Wayne Park, Long Branch Park, Meadowbrook Maintenance Annex); 3 recreation centers (Long Branch Community Recreation Center, Silver Spring YMCA, Sligo Golf Course); and 1 fire/rescue station (Silver Spring Volunteer Fire Department Station 19) (**Map 2**). Also identified were, 6 affordable housing developments (Victory Oaks at St. Camillus, Second Step II, University Gardens, University Gardens II, Friendly Gardens, Paddington Square).

**Environmental Justice populations:** Ten of the 15 Silver Spring CEA Analysis Area Community block groups (7016.01-1, 7016.02-1, 7016.02-3, 7016.02-4, 7021.01-2, 7021.01-3, 7022.00-1, 7027.00-4, 7028.00-4, and 7029.00-2) are identified as EJ populations. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Ch. 4**.



**Silver Spring Map 1**

LEGEND
- Municipality/Census Designated Place
- Census Block Groups
- Corridor Study Boundary



**Silver Spring Map 2**

LEGEND
- Corridor Study Boundary
- CEA Analysis Area Community
- K thru 12 Education
- Place of Worship
- Cemetery
- Park Property
- Recreation Center
- Fire Station
- Post Office



**Race & Ethnicity**

- < 1%
- 11%
- 30%
- 22%
- 3%
- 34%

Legend:
- American Indian and Alaska Native Alone
- Asian Alone
- Black or African American Alone
- White Alone
- Some Other Race Alone & Two or More Races
- Hispanic or Latino of Any Race

| | |
|---|---|
| **Total Population** | **22,040** |
| *as percent of CEA Analysis Area* | 7% |
| Median Age | 40.1 |
| Households with One + Persons with a Disability | 1,182 |
| Range of Median Household Income (Block Groups) | $43,438-$224,453 |
| Low-Income Populations Identified? | Yes |
| Population Driving Car/Truck/Van to Work | 8,300 |



**Land Use**
■ Acres

- Commercial/Employment: 0
- Industrial: 80
- Mixed-Use: 61
- Park/Open Space: 442
- Planned Unit/Planned Community: 30
- Residential: 1,250
- Transportation: 512



**Housing Characteristics**
■ Owned ■ Rented

- Single-Family, Detached: 3,907 / 545
- Single-Family, Attached: 292 / 98
- 2& 3-4 Units in Structure: 0 / 82
- 5-9 & 10-19 Units in Structure: 11 / 756
- 20-49 & 50+ Units in Structure: 36 / 1,167
- Mobile Home, Boat, RV, Van, Etc.: 19 / 0

*Sources: ACS 5-Year Estimates (2012-2016); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Prince George's County Open Data Portal; Fairfax County Open Geospatial Data*

00038520

# Silver Spring CEA Analysis Area Community Impacts

| Alternative | Potential Relocations (#) | Potential Community Facilities Impacted (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) |
|---|---|---|---|
| **Alternative 1 (No Build)** | None | None | None |
| **Alternative 5** | 10 residential relocations | Partial right-of-way acquisition from:<br>2 Schools<br>1 Recreation Center<br>3 Parks | **Commercial/Employment:** 0.1 acre<br>**Industrial:** 0.2 acre<br>**Park/Open Space**: 5.9 acres<br>**Planned Unit/Community**: 0.6 acre<br>**Residential:** 6.6 acres<br>**Transportation**: 7.2 acres<br>**Total Land Required:** 20.6 acres |
| **Alternatives 8 and 9** | 14 residential relocations | Partial right-of-way acquisition from:<br>2 Schools<br>1 Recreation Center<br>3 Parks | **Commercial/Employment:** 0.1 acre<br>**Industrial:** 0.2 acre<br>**Park/Open Space**: 6.5 acres<br>**Planned Unit/Community**: 0.7 acre<br>**Residential:** 8.6 acres<br>**Transportation**: 7.8 acres<br>**Total Land Required:** 23.9 acres |
| **Alternative 10** | 14 residential relocations | Partial right-of-way acquisition from:<br>2 Schools<br>1 Recreation Center<br>3 Parks | **Commercial/Employment:** 0.1 acre<br>**Industrial:** 0.2 acre<br>**Park/Open Space**: 6.5 acres<br>**Planned Unit/Community**: 0.7 acre<br>**Residential:** 8.6 acres<br>**Transportation**: 7.8 acres<br>**Total Land Required:** 23.9 acres |
| **Alternative 13B** | 14 residential relocations | Partial right-of-way acquisition from:<br>2 Schools<br>1 Recreation Center<br>3 Parks | **Commercial/Employment:** 0.1 acre<br>**Industrial:** 0.2 acre<br>**Park/Open Space**: 6.5 acres<br>**Planned Unit/Community**: 0.7 acre<br>**Residential:** 8.6 acres<br>**Transportation**: 7.8 acres<br>**Total Land Required:** 23.9 acres |
| **Alternative 13C** | 14 residential relocations | Partial right-of-way acquisition from:<br>2 Schools<br>1 Recreation Center<br>3 Parks | **Commercial/Employment:** 0.1 acre<br>**Industrial:** 0.2 acre<br>**Park/Open Space**: 6.5 acres<br>**Planned Unit/Community**: 0.7 acre<br>**Residential:** 8.6 acres<br>**Transportation**: 7.8 acres<br>**Total Land Required:** 23.9 acres |

## Summary of Impacts from the Screened Alternatives

Each of the Build Alternatives would require 10 to 14 residential relocations. Each of these residences are located very close to the existing roadway. Widening along I-495 and the reconfiguration of the interchanges at MD 97 and US 29 to accommodate the proposed widening would push the roadway even closer to these residences. Sufficient housing exists to accommodate relocation within or near the community. The Build Alternatives would also require partial acquisition from multiple properties, including: two schools and three park properties. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Except where relocations would occur, the Build Alternatives would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495. Acquisition of a few larger areas were also assumed for the accommodation of stormwater management facilities.

Coordination with the local Orthodox Jewish community would be required prior to construction to identify potential impacts to eruvim and ensure impacts to these facilities would be minimized or mitigated.

The Build Alternatives would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental reduction in response times due reduced congestion on study corridors that is anticipated under the Build Alternatives. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The proposed Build Alternatives would not eliminate access or provide new access to properties, nor would they impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on study corridors.

Changes to land use and development would be incremental and limited to those properties directly affected by property acquisition. The relocation of 10 to 14 residences would result in impacts to the population level; ranging from minor (at the CEA Analysis Area Community level) to substantial (at the smaller, neighborhood level where the relocations would occur). However, no impact to the employment, age, sex, disability, and race/ethnicity patterns of the community would occur. Through coordination with the impacted neighborhoods and area stakeholders, the study team would work to ensure that the Build Alternatives would not change the sense of cohesion or interactions between persons or groups within the community. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors; however, the increased noise experienced by properties set back from the highway would be negligible. Based on current analysis, this community contains eight noise sensitive land use/activity areas (NSAs) where existing noise barriers would be displaced by construction and replaced by reconstructed barriers; and two NSAs where existing noise barriers would be reconstructed and extended. Additional noise abatement information, including mapping, is available in the Noise Technical Report (DEIS, Appendix J).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Build Alternatives would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in Chapter 3, Section 5.2.

Information on the potential beneficial and adverse effects to EJ populations is provided in the EJ Analysis in Chapter 4. Effects to the following resources within EJ populations are considered: human health and safety, air quality, noise, water quality, hazardous materials sites, natural resources, visual landscape and aesthetic values, economy and employment, access and mobility, community cohesion/isolation and quality of life, and tolling.

# Kemp Mill CEA Analysis Area Community



**Location:** The Kemp Mill CEA Analysis Area Community includes 1 Census block group and covers 127 acres, overlapping the southernmost portion of the Kemp Mill Census-Designated Place (**Map 1**). The CEA Analysis Area Community is bordered roughly by: Dennis Avenue to the north; Renfrew Road to the east; I-495 to the south; and Sligo Creek Park and Parkway to the west.

**Planning & Development:** Planning within this analysis area community is guided by the *Kemp Mill Master Plan* (2001). Development patterns and density are typical of a suburb, with shopping centers and light industrial uses clustered around arterial roadways such as Martin Luther King, Jr. Highway or mixed-use development such as the Woodmore Towne Centre. Tree-lined residential developments consisting primarily of single-family houses as well as pockets of forested lands and parks are located along local and arterial roadways.

**Community Facilities:** Located within the CEA Analysis Area Community are: 1 school (The Siena School); 1 place of worship (Marvin Memorial United Methodist Church); 1 eruvim; 6 parks and recreation centers (Argyle Park, South Four Corners Neighborhood Park, Forest Grove Neighborhood Park, Sligo Creek Stream Valley Park, Units 3 and 4, Margaret Schweinhaut Senior Center) (**Map 2**). No affordable housing developments were identified in this community.

**Environmental Justice populations:** No EJ populations are identified in the Kemp Mill CEA Analysis Area Community. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 4**.



**Kemp Mill Map 1**

LEGEND
- Municipality/Census Designated Place
- Census Block Groups
- Corridor Study Boundary



### Race & Ethnicity

- Asian Alone — 4%
- Black or African American Alone — 16%
- White Alone — 46%
- Some Other Race Alone & Two or More Races — 10%
- Hispanic or Latino of Any Race — 24%



### Land Use

■ Acres

| Land Use | Acres |
|---|---|
| Commercial/Employment | 0 |
| Industrial | 0 |
| Mixed-Use | 0 |
| Park/Open Space | 41 |
| Planned Unit/Planned Community | 0 |
| Residential | 62 |
| Transportation | 24 |

| | |
|---|---|
| **Total Population** | **1,164** |
| *as percent of CEA Analysis Area* | <1% |
| Median Age | 38.5 |
| Households with One + Persons with a Disability | 89 |
| Range of Median Household Income (Block Groups) | $124,712-$124,712 |
| Low-Income Populations Identified? | No |
| Population Driving Car/Truck/Van to Work | 444 |



### Housing Characteristics

■ Owned   ■ Rented

| | Owned | Rented |
|---|---|---|
| Single-Family, Detached | 351 | 12 |
| Single-Family, Attached | 0 | 0 |
| 2& 3-4 Units in Structure | 0 | 0 |
| 5-9 & 10-19 Units in Structure | 0 | 0 |
| 20-49 & 50+ Units in Structure | 0 | 0 |
| Mobile Home, Boat, RV, Van, Etc. | 0 | 0 |

*Sources: ACS 5-Year Estimates (2012-2016); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Prince George's County Open Data Portal; Fairfax County Open Geospatial Data*

**Kemp Mill Map 2**



LEGEND
- Corridor Study Boundary
- CEA Analysis Area Community
- ☆ K thru 12 Education
- Park Property
- ● Recreation Center

MANAGED LANES STUDY 495 270

00038522

# Kemp Mill CEA Analysis Area Community Impacts

| Alternative | Potential Relocations (#) | Potential Community Facilities Impacted (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) |
|---|---|---|---|
| Alternative 1 (No Build) | None | None | None |
| Alternative 5 | None | Partial right-of-way acquisition from: 2 Parks | **Park/Open Space**: 0.6 acre<br>**Total Land Required**: 0.6 acre |
| Alternatives 8 and 9 | None | Partial right-of-way acquisition from: 2 Parks | **Park/Open Space**: 1.0 acre<br>**Total Land Required**: 1.0 acre |
| Alternative 10 | None | Partial right-of-way acquisition from: 2 Parks | **Park/Open Space**: 1.0 acre<br>**Total Land Required**: 1.0 acre |
| Alternative 13B | None | Partial right-of-way acquisition from: 2 Parks | **Park/Open Space**: 1.0 acre<br>**Total Land Required**: 1.0 acre |
| Alternative 13C | None | Partial right-of-way acquisition from: 2 Parks | **Park/Open Space**: 1.0 acre<br>**Total Land Required**: 1.0 acre |

**Summary of Impacts from the Screened Alternatives**

The Build Alternatives would require no relocations. They would require partial acquisition from multiple properties, including two park properties. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Generally, the Build Alternatives would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495. Acquisition of a few larger areas were also assumed for the accommodation of stormwater management facilities.

The Build Alternatives would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental reduction in response times due reduced congestion on study corridors that is anticipated under the Build Alternatives. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The proposed Build Alternatives would not eliminate access or provide new access to properties, nor would they impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on study corridors.

Changes to land use and development would be incremental and limited to those properties directly affected by property acquisition. It is anticipated that the Build Alternatives would have negligible impact on the overall population or demographic patterns within the CEA Analysis Area. Further, Build Alternatives would not change the sense of cohesion or interactions between persons or groups within the community as no relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors; however, the increased noise experienced by properties set back from the highway would be negligible. Based on current analysis, this community contains one noise sensitive land use/activity area (NSA) where existing noise barriers would be displaced by construction and replaced by reconstructed barriers. Additional noise abatement information, including mapping, is available in the Noise Technical Report (DEIS, Appendix J).

Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Build Alternatives would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in Chapter 3, Section 5.2.

00038523

# Four Corners CEA Analysis Area Community



**Four Corners Map 1**

**Location**: The Four Corners CEA Analysis Area Community includes six Census block groups and covers 765 acres, overlapping primarily with the Four Corners Census-Designated Place along I-495 (**Map 1**). The CEA Analysis Area Community is bordered roughly by: Dennis Avenue and Colesville Road to the north; the Northwest Branch Stream Valley Park to the east; I-495 to the south; and Dallas Avenue and Sligo Creek Parkway to the west. The community is bisected by University Boulevard (MD 193).

**Planning & Development**: Planning within this analysis area community is guided by the *Four Corners Master Plan* (1996) and the *Eastern Montgomery County Master Plan Areas (Four Corners, White Oak, Cloverly, Fairland) Environmental Resources* (1996). Development patterns are typical of an older suburb with shopping centers and light industrial uses clustered around arterial roadways such as University Boulevard. Tree-lined residential developments of single-family houses as well as pockets of forested lands and parks are located along local and arterial roadways.

**Community Facilities**: Within the CEA Analysis Area Community are 3 schools (Pine Crest Elementary School, Montgomery Blair High School, Saint Bernadette's School); 3 places of worship (Holy Family Seminary Church, Church of Jesus Christ of Latter-day Saints, Saint Bernadette's Catholic Church); 1 eruv; 5 parks (Blair Park, Northwest Branch Stream Valley Park Unit 3, Burnt Mills East Park, Pinecrest Park, North Four Corners Park); 1 fire/rescue station (Silver Spring Fire Department Station 16); and 1 post office (**Map 2**). No affordable housing developments were identified in this community.

**Environmental Justice populations**: One of the 6 Four Corners CEA Analysis Area Community block groups (7031.00-4) is identified as an EJ population. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 4**.

**LEGEND**
- Municipality/Census Designated Place
- Census Block Groups
- Corridor Study Boundary



**Four Corners Map 2**

**LEGEND**
- Corridor Study Boundary
- CEA Analysis Area Community
- K thru 12 Education
- Place of Worship
- Park Property
- Fire Station
- Post Office



**Race & Ethnicity**

- < 1% — American Indian and Alaska Native Alone
- Asian Alone
- Black or African American Alone
- White Alone
- Some Other Race Alone & Two or More Races
- Hispanic or Latino of Any Race

13%, 3%, 5%, 8%, 71%



**Land Use**
Acres

| Land Use | Acres |
|---|---|
| Commercial/Employment | 1 |
| Industrial | 0 |
| Mixed-Use | 12 |
| Park/Open Space | 92 |
| Planned Unit/Planned Community | 0 |
| Residential | 454 |
| Transportation | 206 |



**Housing Characteristics**
Owned / Rented

| | Single-Family, Detached | Single-Family, Attached | 2& 3-4 Units in Structure | 5-9 & 10-19 Units in Structure | 20-49 & 50+ Units in Structure | Mobile Home, Boat, RV, Van, Etc. |
|---|---|---|---|---|---|---|
| Owned | 1,858 | 12 | 0 | 15 | 0 | 10 |
| Rented | 150 | 0 | 16 | 0 | 122 | 0 |

| Total Population | 6,329 |
|---|---|
| *as percent of CEA Analysis Area* | 2% |
| Median Age | 39 |
| Households with One + Persons with a Disability | 397 |
| Range of Median Household Income (Block Groups) | $112,000-$178,802 |
| Low-Income Populations Identified? | No |
| Population Driving Car/Truck/Van to Work | 2,628 |

*Sources: ACS 5-Year Estimates (2012-2016); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Prince George's County Open Data Portal; Fairfax County Open Geospatial Data*

**MANAGED LANES STUDY** 495 270

# Four Corners CEA Analysis Area Community Impacts

| Alternative | Potential Relocations (#) | Potential Community Facilities Impacted (#) | Existing Land Use Conversion to Study Related Transportation Right-of-Way (ROW) | Summary of Impacts from the Screened Alternatives |
|---|---|---|---|---|
| Alternative 1 (No Build) | None | None | None | The Build Alternatives would require two relocations, one of these is a warehouse/office property the other is a small business property. The properties proposed to be displaced are located very close to the existing roadway. Widening along I-495 and the reconfiguration of the interchange at US 29 to accommodate the proposed widening would push the roadway even closer to these properties. Sufficient similar services exist within the community, further there is office space for the relocation of services if required. The Build Alternatives would require partial acquisition from multiple properties, including one school and one park property. The assumed impacts would accommodate mainline widening, new direct access ramps, and stormwater management facilities. Except where relocations would occur, the Build Alternatives would require acquisition of strips of land from undeveloped areas or areas of trees from properties adjacent to I-495. Acquisition of a few larger areas were also assumed for the accommodation of stormwater management facilities. |
| Alternative 5 | 2 business relocations | Partial right-of-way acquisition from: 1 School 1 Park | **Mixed-Use:** 0.5 acre **Park/Open Space:** 0.7 acre **Residential:** 2.1 acres **Transportation:** 0.3 acre **Total Land Required:** 3.6 acres | Coordination with the local Orthodox Jewish community would be required prior to construction to identify potential impacts to eruvim and ensure impacts to these facilities would be minimized or mitigated.

The Build Alternatives would maintain the existing separation between highway operations and local traffic, bicyclists, and pedestrians through access limits and physical barriers in accordance with state and federal regulations. Where direct access ramps would be constructed, alterations to traffic patterns and roadway/sidewalk networks would be mitigated by the inclusion of signage, high-visibility crosswalk markings, pedestrian countdown signals, and the implementation of a temporary detour network. Emergency services would experience an incremental reduction in response times due reduced congestion on study corridors that is anticipated under the Build Alternatives. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur. The proposed Build Alternatives would not eliminate access or provide new access to properties, nor would they impede access between residences and community facilities and business, as no properties are accessed directly from I-495 or I-270. However, an incremental enhancement to access may occur due to reduced congestion on study corridors. |
| Alternatives 8 and 9 | 2 business relocations | Partial right-of-way acquisition from: 1 School 1 Park | **Mixed-Use:** 0.5 acre **Park/Open Space:** 0.8 acre **Residential:** 2.8 acres **Transportation:** 0.3 acre **Total Land Required:** 4.4 acres | |
| Alternative 10 | 2 business relocations | Partial right-of-way acquisition from: 1 School 1 Park | **Mixed-Use:** 0.5 acre **Park/Open Space:** 0.8 acre **Residential:** 2.8 acres **Transportation:** 0.3 acre **Total Land Required:** 4.4 acres | Changes to land use and development would be incremental and limited to those properties directly affected by property acquisition. It is anticipated that the Build Alternatives would have negligible impact on the overall population or demographic patterns within the CEA Analysis Area. The Build Alternatives may result in a minor change to the sense of cohesion or interactions between persons or groups within the community as two business relocations would occur. Isolation of properties, persons, or groups would not occur due to the parallel nature of the proposed improvements along the existing highway.

Properties immediately adjacent to the improved highway may experience an increase in noise impacts as noise generators (travel lanes) are moved closer to receptors; however, the increased noise experienced by properties set back from the highway would be negligible. Based on current analysis, this community contains four noise sensitive land use/activity areas (NSAs) where existing noise barriers would be displaced by construction and replaced by reconstructed barriers. Additional noise abatement information, including mapping, is available in the Noise Technical Report (DEIS, Appendix J). |
| Alternative 13B | 2 business relocations | Partial right-of-way acquisition from: 1 School 1 Park | **Mixed-Use:** 0.5 acre **Park/Open Space:** 0.8 acre **Residential:** 2.8 acres **Transportation:** 0.3 acre **Total Land Required:** 4.4 acres | Properties immediately adjacent to the improved highway may experience a change in viewshed where the roadway features including direct managed lanes access ramps, new interchange ramps, and other structures may be introduced; however, the Build Alternatives would not result in changes to viewsheds or visual impacts incompatible with the existing visual character or qualities of the larger community. Additional information on visual impacts is provided in Chapter 3, Section 5.2. |
| Alternative 13C | 2 business relocations | Partial right-of-way acquisition from: 1 School 1 Park | **Mixed-Use:** 0.5 acre **Park/Open Space:** 0.8 acre **Residential:** 2.8 acres **Transportation:** 0.3 acre **Total Land Required:** 4.4 acres | Information on the potential beneficial and adverse effects to EJ populations is provided in the EJ Analysis in Chapter 4. Effects to the following resources within EJ populations are considered: human health and safety, air quality, noise, water quality, hazardous materials sites, natural resources, visual landscape and aesthetic values, economy and employment, access and mobility, community cohesion/isolation and quality of life, and tolling. |

00038525

# Hillandale CEA Analysis Area Community



**Location**: The Hillandale CEA Analysis Area Community includes three Census block groups and covers 1,471 acres, overlapping primarily with the Hillandale Census-Designated Place along I-495 (**Map 1**). The CEA Analysis Area Community is bordered roughly by: the US Food and Drug Administration's White Flint Campus to the north; the interchange of I-95 with I-495 to the east; I-495 to the south; and Northwest Branch Stream Valley Park to the west. The community is bisected by New Hampshire Avenue and spans both Montgomery County and Prince George's County.

**Planning & Development**: Planning within this analysis area community is guided by the *Eastern Montgomery County Master Plan Areas- Four Corners, White Oak, Cloverly, Fairland Environmental Resources* (1996) and the *White Oak Science Gateway Master Plan* (2014). Development patterns are typical of an older suburb with shopping centers and light industrial uses clustered around arterial roadways such as New Hampshire Avenue. Tree-lined residential developments of single-family houses and large apartment buildings as well as pockets of forested lands and parks are located along local and arterial roadways.

**Community Facilities**: Located within the CEA Analysis Area Community are: 3 schools (Cresthaven Elementary School, Francis Scott Key Middle School, Paint Branch Montessori School); 8 places of worship (Burnt Mills Seventh Day Adventist Church, Church of Our Saviour, Eglise Baptiste du Calvaire, Hillandale Baptist Church, Sitka Church, Southeast Hebrew Congregation, The Hindu Temple of Metropolitan Washington, Unitarian Universalist Church of Silver Spring); 1 cemetery; 7 parks (Knollwood Park, Edgefield Drive Park, Burnt Mills East Park, Hillandale Park, Northwest Branch Stream Valley Park Unit 3, Paint Branch Stream Valley Park Unit 3, Powder Mill Park); 1 fire/rescue station (Hillandale Volunteer Fire Department Station 12) (**Map 2**). Also identified was 1 affordable housing development (Burnt Mills Crossing).

**Environmental Justice populations**: Two of the 3 Hillandale CEA Analysis Area Community block groups (7015.05-3 and 8073.04-1) are identified as EJ populations. The EJ Analysis, including EJ principles and the methodology for identifying EJ populations, is provided in **Chapter 4**.





## Race & Ethnicity

- < 1% — American Indian and Alaska Native Alone
- 10% — Asian Alone
- 25% — Black or African American Alone
- 37% — White Alone
- 4% — Some Other Race Alone & Two or More Races
- 24% — Hispanic or Latino of Any Race



## Land Use

■ Acres

| Land Use | Acres |
|---|---|
| Commercial/Employment | 1 |
| Industrial | 0 |
| Mixed-Use | 95 |
| Park/Open Space | 198 |
| Planned Unit/Planned Community | 0 |
| Residential | 872 |
| Transportation | 304 |

| | |
|---|---|
| **Total Population** | **6,509** |
| *as percent of CEA Analysis Area* | 2% |
| Median Age | 42.8 |
| Households with One + Persons with a Disability | 523 |
| Range of Median Household Income (Block Groups) | $82,989-$115,588 |
| Low-Income Populations Identified? | No |
| Population Driving Car/Truck/Van to Work | 2,390 |



## Housing Characteristics

■ Owned ■ Rented

| | Owned | Rented |
|---|---|---|
| Single-Family, Detached | 1,640 | 188 |
| Single-Family, Attached | 9 | 23 |
| 2& 3-4 Units in Structure | 0 | 0 |
| 5-9 & 10-19 Units in Structure | 0 | 51 |
| 20-49 & 50+ Units in Structure | 0 | 172 |
| Mobile Home, Boat, RV, Van, Etc. | 0 | 0 |

*Sources: ACS 5-Year Estimates (2012-2016); City of Gaithersburg GIS; City of Rockville GIS Open Data; Montgomery County/M-NCPPC MCATLAS; Prince George's County Open Data Portal; Fairfax County Open Geospatial Data*

00038526