

# APPENDIX F
# DRAFT SECTION 4(f) EVALUATION

## May 2020







00038576

00038577

## TABLE OF CONTENTS

1    INTRODUCTION ...................................................................................................................1

    1.1    Overview ....................................................................................................................1

    1.2    Regulatory Context ....................................................................................................3

    1.3    Study Purpose and Need............................................................................................14

    1.4    Proposed Action.........................................................................................................15

    1.5    Common Elements of the Build Alternatives.............................................................17

2    INVENTORY AND USE OF SECTION 4(F) PROPERTY .....................................................18

    2.1    Section 4(f) Property along I-495 ...............................................................................28

    2.2    Section 4(f) Property along I-270 ...............................................................................118

    2.3    Impacted Properties that Qualify as Exceptions to Section 4(f) ...............................143

    2.4    Summary of Section 4(f) Property with Potential *De Minimis* Impacts ...................147

    2.5    Archaeological Properties ..........................................................................................148

3    AVOIDANCE ANALYSIS .....................................................................................................149

    3.1    Avoidance Alternatives .............................................................................................149

    3.2    Avoidance Analysis Summary ...................................................................................156

4    ALL POSSIBLE PLANNING..................................................................................................158

    4.1    Methodology and Assumptions for Establishing Limits of Disturbance ...................159

    4.2    Considerations for Adjacent Land Use and Minimization of the LOD ......................159

    4.3    Mitigation...................................................................................................................162

5    LEAST OVERALL HARM.....................................................................................................165

    5.1    Location Specific Options...........................................................................................165

    5.2    Other Minimization Alternatives Considered ...........................................................254

    5.3    Proposed Action.........................................................................................................259

    5.4    Results of Least Overall Harm Analysis .....................................................................269

6    COORDINATION..................................................................................................................275

    6.1    Department of Interior ..............................................................................................275

    6.2    Officials with Jurisdiction over Public Parks..............................................................275

    6.3    Officials with Jurisdiction of Historic Sites ...............................................................278

    6.4    Coordination with Other Agencies.............................................................................279

    6.5    Public..........................................................................................................................279

7    CONCLUSION ......................................................................................................................280

00038578

APPENDIX A ............................................................................................................................... 281
APPENDIX B ............................................................................................................................... 294

## LIST OF TABLES

Table 1-1: Section 4(f) Properties in the Corridor Study Boundary Acquired.............................................. 12
Table 1-2: Parks in the Corridor Study Boundary Improved or Acquired with funds from LWCF .............. 12
Table 2-1: Inventory of Section 4(f) Properties with Use or de minimis impact......................................... 23
Table 2-2: Impacts to Properties that Qualify as Exceptions to Section 4(f) ............................................. 26
Table 2-3: Inventory of Section 4(f) Properties where there is no Use or Impact...................................... 26
Table 2-4: Section 4(f) Use of Contributing Properties in Carsondale....................................................... 97
Table 2-5: Section 4(f) Use of Contributing Properties in the Glenarden Historic District......................... 99
Table 2-6: Properties with Impacts Subject to an Exception to Section 4(f) ............................................ 143
Table 2-7: Summary of Section 4(f) Properties with Potential De Minimis Impact Finding .................... 147
Table 5-1: Section 4(f) Properties Avoided by Option LS-1...................................................................... 167
Table 5-2: Section 4(f) Properties Avoided by Option LS-2...................................................................... 173
Table 5-3: Section 4(f) Properties Avoided by Option LS-3...................................................................... 174
Table 5-4: Properties Experiencing an Increase in Section 4(f) Use by Option LS-3................................. 174
Table 5-5: Properties Avoided by Option LS-4......................................................................................... 183
Table 5-6: Properties Experiencing an Increase in Section 4(f) Use by Option LS-4................................. 184
Table 5-7: Properties Avoided by Option LS-5......................................................................................... 190
Table 5-8: Properties Experiencing an Increase in Section 4(f) Use by Option LS-5................................. 190
Table 5-9: Properties Avoided by Option LS-6......................................................................................... 194
Table 5-10: Properties Experiencing an Increase in Section 4(f) Use by Option LS-6............................... 195
Table 5-11: Section 4(f) Properties Avoided by LS-7................................................................................ 201
Table 5-12: Properties Experiencing an Increase in Section 4(f) Use by Option LS-7............................... 202
Table 5-13: Section 4(f) Properties Avoided by LS-10.............................................................................. 215
Table 5-14: Properties Experiencing an Increase in Section 4(f) Use by Option LS-10............................. 216
Table 5-15: Properties Avoided by Option LS-12..................................................................................... 226
Table 5-16: Properties Avoided by Option LS-15..................................................................................... 238
Table 5-17: Property Avoided by Option LS-16........................................................................................ 247
Table 5-18: Properties Experiencing an Increase in Section 4(f) Use by Option LS-16............................. 247
Table 5-19: Difference in Use of Section 4(f) Properties among the Proposed Action and Alternative 5 254
Table 5-20: Section 4(f) Properties Avoided by MD 200 Diversion Alternative........................................ 258
Table 5-21: Total Potential Impacts to Section 4(f) properties by Build Alternative................................ 259
Table 5-22: Summary of the Least Overall Harm Analysis of Alternatives ............................................... 271
Table A-1: Relevant Correspondence with Agencies and Officials with Jurisdiction over Section 4(f) Properties............................................................................................................................................... 282

## LIST OF FIGURES

Figure 1-1: Limits of Managed Lanes Study ................................................................................................ 2
Figure 2-1: Section 4(f) Property Overview (Map 1 of 3)............................................................................ 20
Figure 2-2: Section 4(f) Property Overview (Map 2 of 3)............................................................................ 21

00038579

Figure 2-3: Section 4(f) Property Overview (Map 3 of 3)............................................................................. 22
Figure 2-4: Section 4(f) Property (Map 1 of 35)......................................................................................... 35
Figure 2-5: Section 4(f) Property (Map 2 of 35)......................................................................................... 36
Figure 2-6: Section 4(f) Property (Map 3 of 35)......................................................................................... 42
Figure 2-7: Section 4(f) Property (Map 4 of 35)......................................................................................... 43
Figure 2-8: Section 4(f) Property (Map 5 of 35)......................................................................................... 44
Figure 2-9: Section 4(f) Property (Map 6 of 35)......................................................................................... 50
Figure 2-10: Section 4(f) Property (Map 7 of 35)....................................................................................... 51
Figure 2-11: Section 4(f) Property (Map 8 of 35)....................................................................................... 60
Figure 2-12: Section 4(f) Property (Map 9 of 35)....................................................................................... 61
Figure 2-13: Section 4(f) Property (Map 10 of 35)..................................................................................... 62
Figure 2-14: Section 4(f) Property (Map 11 of 35)..................................................................................... 70
Figure 2-15: Section 4(f) Property (Map 12 of 35)..................................................................................... 73
Figure 2-16: Section 4(f) Property (Map 13 of 35)..................................................................................... 79
Figure 2-17: Section 4(f) Property (Map 14 of 35)..................................................................................... 80
Figure 2-18: Section 4(f) Property (Map 15 of 35)..................................................................................... 81
Figure 2-19: Section 4(f) Property (Map 16 of 35)..................................................................................... 82
Figure 2-20: Section 4(f) Property (Map 17 of 35)..................................................................................... 83
Figure 2-21: Section 4(f) Property (Map 18 of 35)..................................................................................... 84
Figure 2-22: Section 4(f) Property (Map 19 of 35)..................................................................................... 85
Figure 2-23: Section 4(f) Property (Map 20 of 35)................................................................................... 102
Figure 2-24: Section 4(f) Property (Map 21 of 35)................................................................................... 103
Figure 2-25: Section 4(f) Property (Map 22 of 35)................................................................................... 104
Figure 2-26: Section 4(f) Property (Map 23 of 35)................................................................................... 113
Figure 2-27: Section 4(f) Property (Map 24 of 35)................................................................................... 114
Figure 2-28: Section 4(f) Property (Map 25 of 35)................................................................................... 115
Figure 2-29: Section 4(f) Property (Map 26 of 35)................................................................................... 116
Figure 2-30: Section 4(f) Property (Map 27 of 35)................................................................................... 117
Figure 2-31: Section 4(f) Property (Map 28 of 35)................................................................................... 119
Figure 2-32: Section 4(f) Property (Map 29 of 35)................................................................................... 125
Figure 2-33: Section 4(f) Property (Map 30 of 35)................................................................................... 126
Figure 2-34: Section 4(f) Property (Map 31 of 35)................................................................................... 128
Figure 2-35 Section 4(f) Property (Map 32 of 35).................................................................................... 132
Figure 2-36: Section 4(f) Property (Map 33 of 35)................................................................................... 133
Figure 2-37: Section 4(f) Property (Map 34 of 35)................................................................................... 141
Figure 2-38: Section 4(f) Property (Map 35 of 35)................................................................................... 142
Figure 3-1: Alternative 1 Typical Sections............................................................................................... 150
Figure 3-2: Alignment of Section 4(f) Avoidance Alternatives 1, 2, and 3 ............................................... 155
Figure 4-1: Open Section with Full Stormwater Management ................................................................. 160
Figure 4-2: Open Section with Reduced Stormwater Management.......................................................... 161
Figure 4-3: Open Section with No Stormwater Management ................................................................... 161
Figure 4-4: Closed Section with Concrete Barrier.................................................................................... 162
Figure 4-5: Closed Section with Retaining Wall ...................................................................................... 162
Figure 5-1: Overview Map of Location Specific Options LS-1 and LS-2 .................................................... 168

00038580

Figure 5-2: Detail of Location Specific Options LS-1 and LS-2 (Map 1 of 3)...........................................169
Figure 5-3: Detail of Location Specific Options LS-1 and LS-2 (Map 2 of 3)...........................................170
Figure 5-4: Detail of Location Specific Options LS-1 and LS-2 (Map 3 of 3)...........................................171
Figure 5-5: Overview Map of Location Specific Option LS-3....................................................................176
Figure 5-6: Detail of Location Specific Option LS-3 (Map 1 of 6) .............................................................177
Figure 5-7: Detail of Location Specific Option LS-3 (Map 2 of 6) .............................................................178
Figure 5-8: Detail of Location Specific Option LS-3 (Map 3 of 6) .............................................................179
Figure 5-9: Detail of Location Specific Option LS-3 (Map 4 of 6) .............................................................180
Figure 5-10: Detail of Location Specific Option LS-3 (Map 5 of 6) ...........................................................181
Figure 5-11: Detail of Location Specific Option LS-3 (Map 6 of 6) ...........................................................182
Figure 5-12: Overview Map of Location Specific Option LS-4..................................................................185
Figure 5-13: Detail of Location Specific Option LS-4 (Map 1 of 4) ...........................................................186
Figure 5-14: Detail of Location Specific Option LS-4 (Map 2 of 4) ...........................................................187
Figure 5-15: Detail of Location Specific Option LS-4 (Map 3 of 4) ...........................................................188
Figure 5-16: Detail of Location Specific Option LS-4 (Map 4 of 4) ...........................................................189
Figure 5-17: Overview Map of Location Specific Option LS-5..................................................................192
Figure 5-18: Detail of Location Specific Option LS-5................................................................................193
Figure 5-19: Overview Map of Location Specific Option LS-6..................................................................196
Figure 5-20: Detail of Location Specific Option LS-6 (Map 1 of 4) ...........................................................197
Figure 5-21: Detail of Location Specific Option LS-6 (Map 2 of 4) ...........................................................198
Figure 5-22: Detail of Location Specific Option LS-6 (Map 3 of 4) ...........................................................199
Figure 5-23: Detail of Location Specific Option LS-6 (Map 4 of 4) ...........................................................200
Figure 5-24: Overview Map of Location Specific Option LS-7..................................................................203
Figure 5-25: Detail of Location Specific Option LS-7 (Map 1 of 2) ...........................................................204
Figure 5-26: Detail of Location Specific Option LS-7 (Map 2 of 2) ...........................................................205
Figure 5-27: Overview Map of Location Specific Option LS-8..................................................................208
Figure 5-28: Detail of Location Specific Option LS-8 (Map 1 of 2) ...........................................................209
Figure 5-29: Detail of Location Specific Option LS-8 (Map 2 of 2) ...........................................................210
Figure 5-30: Overview Map of Location Specific Option LS-9..................................................................212
Figure 5-31: Detail of Location Specific Option LS-9 (Map 1 of 2) ...........................................................213
Figure 5-32: Detail of Location Specific Option LS-9 (Map 2 of 2) ...........................................................214
Figure 5-33: Overview Map of Location Specific Option LS-10................................................................217
Figure 5-34: Detail of Location Specific Option LS-10 (Map 1 of 4) .........................................................218
Figure 5-35: Detail of Location Specific Option LS-10 (Map 2 of 4) .........................................................219
Figure 5-36: Detail of Location Specific Option LS-10 (Map 3 of 4) .........................................................220
Figure 5-37: Detail of Location Specific Option LS-10 (Map 4 of 4) .........................................................221
Figure 5-38: Overview Map of Location Specific Option LS-11................................................................223
Figure 5-39: Detail of Location Specific Option LS-11 (Map 1 of 2) .........................................................224
Figure 5-40: Detail of Location Specific Option LS-11 (Map 2 of 2) .........................................................225
Figure 5-41: Overview Map of Location Specific Option LS-12................................................................227
Figure 5-42: Detail of Location Specific Option LS-12 (Map 1 of 3) .........................................................228
Figure 5-43: Detail of Location Specific Option LS-12 (Map 2 of 3) .........................................................229
Figure 5-44: Detail of Location Specific Option LS-12 (Map 3 of 3) .........................................................230
Figure 5-45: Overview Map of Location Specific Option LS-13................................................................232

00038581

Figure 5-46: Detail of Location Specific Option LS-13 ................................................................ 233
Figure 5-47: Overview Map of Location Specific Option LS-14 ................................................... 235
Figure 5-48: Detail of Location Specific Option LS-14 (Map 1 of 2) .......................................... 236
Figure 5-49: Detail of Location Specific Option LS-14 (Map 2 of 2) .......................................... 237
Figure 5-50: Overview Map of Location Specific Option LS-15 ................................................... 240
Figure 5-51: Detail of Location Specific Option LS-15 (Map 1 of 6) .......................................... 241
Figure 5-52: Detail of Location Specific Option LS-15 (Map 2 of 6) .......................................... 242
Figure 5-53: Detail of Location Specific Option LS-15 (Map 3 of 6) .......................................... 243
Figure 5-54: Detail of Location Specific Option LS-15 (Map 4 of 6) .......................................... 244
Figure 5-55: Detail of Location Specific Option LS-15 (Map 5 of 6) .......................................... 245
Figure 5-56: Detail of Location Specific Option LS-15 (Map 6 of 6) .......................................... 246
Figure 5-57: Overview Map of Location Specific Options LS-16 and LS-17 ............................... 249
Figure 5-58: Detail of Location Specific Option LS-16 (Map 1 of 4) .......................................... 250
Figure 5-59: Detail of Location Specific Option LS-16 (Map 2 of 4) .......................................... 251
Figure 5-60: Detail of Location Specific Option LS-16 (Map 3 of 4) .......................................... 252
Figure 5-61: Detail of Location Specific Option LS-16 (Map 4 of 4) and Location Specific Option LS-17 . 253
Figure 5-62: Alternative 5 Typical Sections ............................................................................... 255
Figure 5-63: MD 200 Diversion Alternative ............................................................................... 257
Figure 5-64: Alternative 8 Typical Sections ............................................................................... 261
Figure 5-65: Alternative 9 Typical Sections ............................................................................... 262
Figure 5-66: Alternative 10 Typical Sections ............................................................................. 266
Figure 5-67: Alternative 13B Typical Sections ........................................................................... 267
Figure 5-68: Alternative 13C Typical Section ............................................................................. 269

## ABBREVIATIONS AND ACRONYMS

| | |
|---|---|
| ACHP | Advisory Council on Historic Preservation |
| BRT | Bus Rapid Transit |
| CEQ | Council on Environmental Quality |
| CFR | Code of Federal Regulations |
| CLRP | Constrained Long-Range Plan |
| DEIS | Draft Environmental Impact Statement |
| DOI | Department of the Interior |
| EIS | Environmental Impact Statement |
| ESD | Environmental Site Design |
| ETL | Express Toll Lane |
| FAST | Fixing America's Surface Transportation Act |
| FHWA | Federal Highway Administration |
| GP | General Purpose |
| HOT | High-Occupancy Toll |

00038582



| | |
|---|---|
| HOV | High-Occupancy Vehicle |
| HUD | Housing and Urban Development |
| ICC | Intercounty Connector |
| ICM | Innovative Congestion Management |
| LOD | Limits of Disturbance |
| LWCF | Land Water Conservation Fund |
| MDE | Maryland Department of the Environment |
| MDNR | Maryland Department of Natural Resources |
| MDOT SHA | Maryland Department of Transportation State Highway Administration |
| MDTA | Maryland Transportation Authority |
| MHT | Maryland Historical Trust |
| M-NCPPC | Maryland-National Capital Park and Planning Commission |
| NCA | Neighborhood Conservation Area |
| NCPC | National Capital Planning Commission |
| NEPA | National Environmental Policy Act |
| NHP | National Historic Preservation |
| NHPA | National Historic Preservation Act |
| NPS | National Park Service |
| NRHP | National Register of Historic Places |
| OWJ | Official(s) with Jurisdiction |
| PA | Programmatic Agreement |
| POS | Program Open Space |
| SHPO | State Historic Preservation Office(r) |
| SVP | Stream Valley Park |
| THPO | Tribal Historic Preservation Office(r) |
| TPB | Transportation Planning Board |
| U.S.C. | United States Code |
| USDA | United States Department of Agriculture |
| USDOT | United States Department of Transportation |
| VDHR | Virginia Department of Historic Resources |
| VDOT | Virginia Department of Transportation |
| VMT | Vehicle Miles Traveled |

00038583

1

# 1   INTRODUCTION

## 1.1   Overview

The Federal Highway Administration (FHWA), as the Lead Federal Agency, and the Maryland Department of Transportation State Highway Administration (MDOT SHA), as the Local Project Sponsor, are preparing an Environmental Impact Statement (EIS) in accordance with the National Environmental Policy Act (NEPA) for the I-495 & I-270 Managed Lanes Study (Study). The Study is evaluating potential transportation improvements to portions of the I-495 and I-270 corridors in Montgomery and Prince George's County, Maryland, and Fairfax County, Virginia. Specifically, the Study extends along I-495 from south of the American Legion Bridge in Fairfax County, Virginia, to west of MD 5 in Prince George's County, Maryland; and along I-270 from I-495 to north of I-370 in Montgomery County, Maryland, including the east and west I-270 spurs north of I-495 (**Figure 1-1**).

The EIS is being prepared in accordance with FHWA and Council on Environmental Quality (CEQ) regulations at 40 CFR 1500-1508 implementing NEPA and provisions of the Fixing America's Surface Transportation (FAST) Act of 2015 (Pub. L. No. 114-94). The content of the EIS also conforms to CEQ guidelines, which provide direction regarding implementation of the procedural provisions of NEPA, and the FHWA's *Guidance for Preparing and Processing Environmental and Section 4(f) Documents* (Technical Advisory T6640.8A, October 1987).

MDOT SHA established a Corridor Study Boundary for the Study that extends 300 feet to either side of the existing right-of-way along I-495 and I-270. This Draft Section 4(f) Evaluation describes Section 4(f) lands identified within the Corridor Study Boundary and potential use of the lands. Section 4(f) of the US Department of Transportation Act of 1966 as amended (49 U.S.C. Section 303) stipulates that the US Department of Transportation (USDOT), including FHWA, cannot approve the use of land from a significant publicly-owned public park, recreation area, wildlife or waterfowl refuge, or significant public or private historic site unless certain conditions apply, as described in **Section 1.2 Regulatory Context**.

The following sections in the **Introduction** present the regulatory context of Section 4(f), the Purpose and Need for the Study, and the alternatives evaluated in the EIS.

00038584



### Figure 1-1: Limits of Managed Lanes Study



00038585



## 1.2    Regulatory Context

Section 4(f) of the US Department of Transportation Act of 1966 as amended (49 U.S.C. 303(c) and 23 U.S.C. 138) is a Federal Law that protects properties defined in 23 CFR 774.17 as "publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, state, or local significance, or land of an historic site of national, state, or local significance." Section 4(f) applies to all transportation projects that require funding or other approvals by the USDOT. As a USDOT agency, FHWA must comply with Section 4(f) and its implementing regulations at 23 CFR 774.

Regulations at 23 CFR 774.11(c) state Section 4(f) applies to a park, recreation area, or wildlife and waterfowl refuge determined to be significant. For properties where no determination exists, "the Section 4(f) property will be presumed to be significant." 23 CFR 774.17 further defines "Historic site" to include any prehistoric or historic district, site, building, structure, or object included in, or eligible for inclusion in, the National Register of Historic Places (NRHP). The criteria for defining a site as eligible for inclusion in the National Register is further detailed in **Section 1.2.8 (C)**.

FHWA cannot approve a transportation project that uses any Section 4(f) property, unless:

- FHWA determines that there is no feasible and prudent avoidance alternative to the use of land from the property, and the action includes all possible planning to minimize harm to the property resulting from such use (23 CFR 774.3(a)); or

- FHWA determines that the use of Section 4(f) property, including any measures to minimize harm (such as avoidance, minimization, mitigation, or enhancements measures) committed to by the applicant, will have a *de minimis* impact on the property (23 CFR 774.3(b)).

### 1.2.1    Roles and Responsibilities of Participants

### A.    Federal Highway Administration (FHWA)

The authority to administer Section 4(f) and make Section 4(f) approvals resides with the Secretary of the USDOT. The Secretary of Transportation has delegated the authority for administering Section 4(f) to the FHWA Administrator in 49 CFR 1.48. Authority has been re-delegated to FHWA Division Administrators by *FHWA Order M1100.1A*, Chapter 5, Section 17e and Chapter 6, Section 7d. Any approval of the use of Section 4(f) property, other than a use with a *de minimis* impact or a use processed with an existing programmatic Section 4(f) evaluation is subject to legal sufficiency review by the Office of Chief Counsel.

### B.    State Historic Preservation Officer (SHPO)

The regulations define the entities and individuals who are considered the officials with jurisdiction (OWJ) for various types of property in 23 CFR 774.17. In the case of historic sites, the official with jurisdiction is the SHPO. The Maryland SHPO is the Maryland Historical Trust (MHT). The Virginia SHPO is the Virginia Department of Historic Resources.

### C.    Advisory Council on Historic Preservation (ACHP)

When the Advisory Council on Historic Preservation (ACHP) is involved in consultation concerning a property under Section 106 of the National Historic Preservation Act (NHPA), the ACHP is also the official with jurisdiction over that resource for the purposes of Section 4(f). FHWA notified ACHP on March 26,

00038586

2018 of the Managed Lanes Study. ACHP chose to participate in Section 106 consultation in a letter dated May 22, 2018.

Per 36 CFR 800.5(b), an agency official "in consultation with the SHPO/THPO" may propose a finding of no adverse effect when the undertakings do not meet the criteria of an adverse effect. Under Section 106, the ACHP is only involved in reviewing a SHPO decision if there is disagreement with a Section 106 finding (36 CFR 800.5(c)(2)(ii) and 800.5(c)(3)). For these reasons, the ACHP will only be informed of FHWA's intent to apply *de minimis* on properties where there is no disagreement. Because there is a Section 106 finding of no adverse effect, the ACHP has no role in acknowledging FHWA's intent to apply *de minimis*. As a result, for this Study the ACHP will only act as the official with jurisdiction over historic properties that would experience an impact greater than *de minimis*.

## D.    National Park Service (NPS)

Under Section 4(f) regulations at 23 CFR 774.5(a), DOT must coordinate with the Department of Interior (DOI) prior to making Section 4(f) approvals under 23 CFR 774.3(a). NPS usually serves as DOI's lead bureau for preparing comments on projects that may affect units of the National Park System, other public park and recreation resources, historic and archaeological properties, and unique natural areas. When a Section 4(f) property is a National Historic Landmark (NHL), the designated official with jurisdiction over the resource for the purposes of Section 4(f) is the NPS. There were two NHLs inventoried within the Corridor Study Boundary: Washington Aqueduct and Greenbelt Historic District.

## E.    Officials with Jurisdiction over Parks

In the case of public parks, recreation areas, and wildlife and waterfowl refuges, the OWJ are the officials of the agency or agencies that own or administer the property in question and who are empowered to represent the agency on matters related to the property. There are no wildlife and waterfowl refuges within the Corridor Study Boundary. There are eight OWJ over parkland inventories in the Corridor Study Boundary: NPS; Maryland-National Capital Park and Planning (M-NCPPC), Montgomery County; M-NCPPC, Prince George's County; Montgomery County Public Schools Board of Education; City of Gaithersburg; City of Greenbelt; City of New Carrollton; and City of Rockville.

Some public parks, recreation areas, and wildlife and waterfowl refuges are also historic properties included in, or eligible for inclusion in the NRHP. In other cases, historic sites are located within the property boundaries of public parks, recreation areas, and wildlife and waterfowl refuges. When either of those situations exists and a project alternative proposes use of land from the historic site, there will be more than one official with jurisdiction.

## F.    Coordination with Officials with Jurisdiction

The regulations require coordination with the official(s) with jurisdiction for the following situations prior to Section 4(f) approval (recognizing that additional coordination may be required under other statues or regulations):

- Prior to making approvals (23 CFR 774.3(a))
- Determining least overall harm (23 CFR 774.3(c))
- Applying Section 4(f) to properties that are subject to Federal encumbrances (23 CFR 774.5(d))

00038587

- Applying Section 4(f) to archaeological sites discovered during construction (23 CFR 774.9(e))
- Determining if a property is significant (23 CFR 774.11(c))
- Determining application to multiple-use properties (23 CFR 774.11(d))
- Determining applicability of Section 4(f) to historic sites (23 CFR 774.11(e))
- Determining constructive use (23 CFR 774.15(d))
- Determining if proximity impacts will be mitigated to equivalent or better condition (23 CFR 774.15(f)(6)), and
- Evaluating the reasonableness of measures to minimize harm (23 CFR 774.3(a)(2) and 774.17).

The regulations require a finding that the official(s) with jurisdiction have been consulted and "have not objected" in the following situations:

- When applying the exception for maintenance, preservation, rehabilitation, operation, modernization, reconstruction, or replacement of historic transportation facilities (23 CFR 774.13(a)(3)), and
- When applying the exception for archaeological sites of minimal value for preservation in place (23 CFR 774.13(b)(2)).

The regulations require written concurrence of the official(s) with jurisdiction in the following situations:

- Finding there are no adverse effects prior to making *de minimis* impact findings (23 CFR 774.5(b));
- Applying the exception for temporary occupancies (23 CFR 774.13(d)), and
- Applying the exception for transportation enhancement activities and mitigation activities (23 CFR 774.13(g)).

### 1.2.2 Definition of Section 4(f) Use

Pursuant to 23 CFR 774.17, a "use" of Section 4(f) property occurs:

- When land is **permanently incorporated** into a transportation facility;
- When there is a **temporary occupancy** of land that is adverse in terms of the statute's preservation purpose as defined in 23 CFR 774.13(d); that is, when one of the following criteria for temporary occupancy are not met:
  - The duration of the occupancy must be less than the time needed for the construction of the project, and no change of ownership occurs;
  - Both the nature and magnitude of the changes to the Section 4(f) land are minimal;
  - No permanent adverse physical changes, nor interference with activities or purposes of the resources on a temporary or permanent basis, are anticipated;
  - The land must be returned to a condition that is at least as good as existed prior to the project; and
  - There is documented agreement with the appropriate Federal, State, or local officials having jurisdiction over the land that the above conditions have been met.

00038588

- When there is a ***constructive use*** of a Section 4(f) property. As defined in 23 CFR 774.15, a constructive use occurs when the transportation project does not incorporate land from a Section 4(f) property, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired. The degree of impact and impairment must be determined in consultation with the OWJ in accordance with 23 CFR 774.15(d)(3).

## A.  **Constructive Use Analysis**

The purpose of constructive use analysis is to evaluate whether the proposed action, while not directly incorporating land from a Section 4(f) property(ies), has proximity impacts that would substantially impair the use or value of the resource(s). These analyses evaluate how the Proposed Action effects neighboring or nearby Section 4(f) properties and determines if impacts from the proposal would result in substantial impairment of the activities, features or attributes that qualify the resource for protection under Section 4(f). Constructive use analysis considers noise and visual intrusions, restrictions of access and vibrations.

Properties included in this constructive use analysis include public parks and recreation areas within or in close proximity to the Corridor Study Boundary, from which there will be no property taken. Section 106 of the National Historic Preservation Act of 1966 (36 CFR 800.5) identifies historic properties not encroached upon but possibly adversely effected (36 CFR 800.5), as having the potential for constructive use and would be additionally considered as Section 4(f) properties. MDOT SHA has not identified any properties in the latter category. In a concurrence letter dated March 12, 2020, MHT did not disagree with any of MDOT SHA's effect determinations.

Noise intrusions are considered constructive uses when there is substantial impairment to Section 4(f) property that derives some of its value and use from a generally accepted quiet setting. No constructive use would occur where the projected noise is mitigated to a level below that of the standards set by FHWA noise abatement criteria. Further, no constructive use would be considered when the projected noise increase is "barely perceivable" even when greater than FHWA noise abatement criteria. Barely perceivable is defined as a projected noise level increase of 3 dBA or less over existing no-build scenario noise levels. No constructive Section 4(f) uses are expected for noise intrusions as mitigation of noise impacts above the FHWA noise abatement criteria is being considered under the Proposed Action.

Visual intrusions are considered constructive use only if the property possesses significant aesthetic or visual qualities. Constructive use occurs only where there is substantial impairment of aesthetic features or attributes of the resource where such features or attributes are important contributing elements to the value of the resource. Per 23 CFR 774.15(e)(2), constructive use also occurs where the location of a transportation facility "substantially detracts from the setting of a Section 4(f) property which derives its value in substantial part from setting." Generally for Section 4(f) qualifying historic sites, as described in 36 CFR 60.4, properties listed or eligible for the NRHP under Criterion A would have to have a diminishment of the physical features that make up the character or appearance for which they are associated with in history. For a property eligible under NRHP Criterion C, the emphasis for determining substantial diminishment involves a degrading or loss of integrity of design or material, with lesser emphasis on changes to the integrity of location, setting, feeling and association.

00038589



Current engineering plans take mitigating measures for all Section 4(f) properties, providing retaining walls and noise barriers. Design of such walls in proximity to Section 4(f) properties will consider the features and attributes that quality for the resource for protection and will be done in coordination with the relevant OWJ.

Restriction of access as constructive use is considered in the Section 4(f) process where access restrictions would create a substantial diminishment of the utility of a public park, recreation area or significant historic site. The Proposed Action provides direct access to two Section 4(f) properties: the Baltimore Washington Parkway and George Washington Memorial Parkway. Because access to Baltimore Washington Parkway and George Washington Memorial Parkway would not be restricted by the Proposed Action, constructive use in this manner is not applicable. No other permanent restriction of access would occur as a result of the Proposed Action. Temporary restriction of access to trails may occur during construction, would be coordinated with the OWJ and would not be considered a substantial diminishment of the use of the resource.

Vibration as constructive use involves vibration impacts from the operation of a project which substantially impairs the use of Section 4(f) properties. In the case of parks and recreation areas, substantial impairment from constructive vibration use would be the distraction from the primary activities of the property. With concern for historic properties, the literature review section of NCHRP 25-25/Task 72 *Current Practices to Address Construction Vibration and Potential Effects to Historic Buildings Adjacent to Transportation Projects* (September 2012) cites ample studies and provides a volume of evidence indicating operational highway traffic vibrations are below criteria for architectural or structural damage to nearby buildings. MDOT SHA is committed to monitor construction vibration at locations along the limits of the study adjacent to sensitive sites. It is expected that advance planning and monitoring during construction can effectively limit vibration to levels that will not cause any structural or architectural damage to resources protected by Section 4(f).

While constructive use is not anticipated, a final determination will be made in the Final Section 4(f) Evaluation.

### 1.2.3   Feasible and Prudent Avoidance Alternative

A feasible and prudent avoidance alternative avoids using any Section 4(f) property and does not cause other severe problems of a magnitude that substantially outweighs the importance of protecting the Section 4(f) property (23 CFR 774.17). In assessing the importance of protecting the Section 4(f) property, it is appropriate to consider the relative value of the resource to the preservation purpose of the statute. The preservation purpose of Section 4(f) is described in 49 U.S.C. 303(a), which states: "It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites."

An alternative is not *feasible* if it cannot be built as a matter of sound engineering judgment.

An alternative is not *pruden*t if:

- It compromises the project to a degree that it is unreasonable to proceed with the project in light of its stated purpose and need;

00038590

- It results in unacceptable safety or operational problems;
- It causes severe social, economic, or environmental impacts even after reasonable mitigation; severe disruption to established communities; severe disproportionate impacts to minority or low income populations; or severe impacts to environmental resources protected under other Federal statutes;
- It results in additional construction, maintenance, or operational costs of an extraordinary magnitude;
- It causes other unique problems or unusual factors; or
- It involves multiple factors above that while individually minor, cumulatively cause unique problems, or impacts of extraordinary magnitude.

### 1.2.4  All Possible Planning

All possible planning means that all reasonable measures identified in the Section 4(f) Evaluation to minimize harm or mitigate for adverse impacts and effects must be included in the project (23 CFR 774.17).

For public parks, recreation areas and wildlife and waterfowl refuges, the measures may include (but are not limited to): design modifications; replacement of land or facilities of comparable value and function; or monetary compensation to enhance the remaining property or to mitigate the adverse impacts of the project in other ways.

For historic sites, the measures normally serve to preserve the historic activities, features, or attributes of the site as agreed by FHWA and the official(s) with jurisdiction over the Section 4(f) resource in accordance with the consultation process under 36 CFR 800.

In evaluating the reasonableness of measures to minimize harm, FHWA would consider the preservation purpose of the statute and:

- The views of the official(s) with jurisdiction over the Section 4(f) property;
- Whether the cost of the measures is a reasonable public expenditure in light of the adverse impacts of the project on the Section 4(f) property and the benefits of the measure to the property; and
- Any impacts or benefits of the measures to communities or environmental resources outside of the Section 4(f) property.

### 1.2.5  Least Overall Harm

Pursuant to 23 CFR 774.3(c)(1), if the avoidance analysis determines that there is no feasible and prudent avoidance alternative, then FHWA may only approve the alternative that causes the least overall harm. **Section 5** of this document provides a review and analysis of the alternatives that use one or more Section 4(f) property(ies). The analysis includes alternatives that would eliminate or reduce the use of individual Section 4(f) property(ies). The seven factors balanced and analyzed to identify the alternative with the least overall harm are listed in **Section 5**.

00038591



### 1.2.6 Exceptions to Section 4(f)

FHWA has identified various exceptions to the requirement for Section 4(f) approval. The following exceptions are applicable to this evaluation (23 CFR 774.13):

- The use of historic transportation facilities in certain circumstances:
  - o  Common post-1945 concrete or steel bridges and culverts that are exempt from individual review under 54 U.S.C. 306108;
  - o  Improvement of railroad or rail transit lines that are in use or were historically used for the transportation of goods or passengers, including but not limited to, maintenance, preservation, rehabilitation, operation, operation, modernization, reconstruction, and replacement of railroad or rail transit line elements, except for: stations, bridges or tunnels on rail lines that have been abandoned, or historic sites unrelated to railroad or transit lines; and
  - o  Maintenance, preservation, rehabilitation, operation, modernization, reconstruction, or replacement of historic transportation facilities, if the administration concludes, as a result of the consultation under 36 CFR 800.6, that: (i) such work would not adversely affect the historic qualities of the facility that caused it to be on or eligible for the National Register, or this work achieves compliance with Section 106 through a program alternative under 36 CFR 800.14; and (II) the OWJ over the Section 4(f) resource have not objected to the Administration conclusion that the proposed work does not adversely affect the historic qualities of the facility that caused it to be on or eligible for the National Register, or the Administration concludes this work achieves compliance with 54 U.S.C. 306108 (Section 106) through a program alternative under 36 CFR 800.14.

- Archaeological sites that are on or eligible for the National Register when:
  1. The Administration concludes that the archeological resource is important chiefly because of what can be learned by data recovery and has minimal value for preservation in place. This exception applies both to situations where data recovery is undertaken and where the Administration decides, with agreement of the official(s) with jurisdiction, not to recover the resource; and

  2. The official(s) with jurisdiction over the Section 4(f) resource have been consulted and have not objected to the Administration finding in paragraph (b)(1) of this section (above).

- Designations of park and recreation lands, wildlife and waterfowl refuges, and historic sites that are made, or determinations of significance that are changed, late in the development of a proposed action. With the exception of the treatment of archeological resources in § 774.9(e), the Administration may permit a project to proceed without consideration under Section 4(f) if the property interest in the Section 4(f) land was acquired for transportation purposes prior to the designation or change in the determination of significance and if an adequate effort was made to identify properties protected by Section 4(f) prior to acquisition. However, if it is reasonably

00038592

foreseeable that a property would qualify as eligible for the National Register prior to the start of construction, then the property should be treated as a historic site for the purposes of this section.

- Temporary occupancies of land that are so minimal as to not constitute a use within the meaning of Section 4(f). The following conditions must be satisfied:

  1. Duration must be temporary, i.e. less than the time needed for construction of the project, and there should be no change in ownership of the land;

  2. Scope of the work must be minor, i.e., both the nature and the magnitude of the changes to the Section 4(f) property are minimal;

  3. There are no anticipated permanent adverse physical impacts, nor will there be interference with the protected activities, features, or attributes of the property, on either a temporary or permanent basis;

  4. The land being used must be fully restored, i.e. the property must be returned to a condition which is at least as good as that which existed prior to the project; and

  5. There must be documented agreement of the official(s) with jurisdiction over the Section 4(f) resource regarding the above conditions.

- Certain trails, paths, bikeways, and sidewalks, in the following circumstances:

  1. Trail-related projects funded under the Recreational Trails Program, 23 U.S.C. 206(h)(2);

  2. National Historic Trails and the Continental Divide National Scenic Trail designated under the National Trails System Act, 16 U.S.C. 1241-1251, with the exception of those trail segments that are historic sites as defined in 774.17

  3. Trails, paths, bikeways, and sidewalks that occupy a transportation facility right-of-way without limitation to any specific location within that right-of-way, so long as the continuity of the trail, path, bikeway, or sidewalk is maintained (23 CFR 774.13(f)(3)); and

  4. Trails, paths, bikeways, and sidewalks that are part of the local transportation system and which function primarily for transportation. (23 CFR 774.13(f)(4))

## 1.2.7   *De minimis* Impacts

An impact to a significant public park, recreation area, or wildlife and waterfowl refuge may be determined to be *de minimis* if the transportation use of the Section 4(f) property, including incorporation of any measure(s) to minimize harm (such as any avoidance, minimization, mitigation, or enhancement measures), does not adversely affect the activities, features, or attributes that qualify the resource for protection under Section 4(f) (23 CFR 774.17). For historic sites, a *de minimis* impact means that FHWA has determined (in accordance with 36 CFR 800) that either no historic property is affected by the project or that the project will have "no adverse effect" on the historic property. A *de minimis* impact

00038593



determination does not require analysis to determine if avoidance alternatives are feasible and prudent, but consideration of avoidance, minimization, mitigation or enhancement measures should occur.

Following 23 CFR 774.5(b), the public should be afforded an opportunity to review and comment on the effects of the Proposed Action on the protected activities, features, or attributes of the Section 4(f) parks, recreation areas or wildlife and waterfowl refuges. Opportunity for public review applies to historic sites as well. This is accomplished during the Section 106 process. Documentation of consulting party involvement is required (23 CFR 774.5(b) and 774.7(b)). Moreover, the official(s) with jurisdiction over the property, after being informed of the public comments and FHWA's intent to make the *de minimis* impact finding, must concur in writing that the project will not adversely affect the activities, features, or attributes that qualify the property for protection under Section 4(f).

### 1.2.8   Other Relevant Authority

### A.   Capper-Cramton Act of 1930

The Capper-Cramton Act of May 29, 1930 (46 Stat. § 482), as amended, is a federal statute enacted for the acquisition, establishment, and development of the George Washington Memorial Parkway and for the acquisition of lands in the District of Columbia, Maryland and Virginia for a comprehensive park, parkway, and playground system in and around the National Capital Region. The Capper-Cramton Act empowered the National Capital Planning Commission (NCPC) to acquire lands in Maryland and Virginia for the George Washington Memorial Parkway, owned by the federal government and operated by NPS. Property records provided by NPS indicate portions of Chesapeake and Ohio Canal National Historical Park and Clara Barton Parkway known as Tracts 114-006, 114-009, 119-034, 119-040, 119-043, 119-044, 120-001, 120-003, 120-008 were acquired by funds from the Capper-Cramton Act. All impacts to of Chesapeake and Ohio Canal National Historical Park and Clara Barton Parkway are within the above referenced tracts.

For those lands acquired for the park, parkway, and playground system, the Capper-Cramton Act states that land titles purchased with Capper-Cramton Act funds for the park, parkway, and playground system shall vest with the States of Maryland or Virginia and shall be developed and administered in accordance with plans approved by the NCPC. The M-NCPPC administers more than 2,200 acres of Maryland Stream Valley Parks in Montgomery and Prince George's Counties. Many of these lands were purchased with funds from the Capper-Cramton Act.

The Capper-Cramton Act is discussed in this Section 4(f) Evaluation because impacts to some park properties under the jurisdiction of M-NCPPC require additional coordination and approval under the Capper-Cramton Act. There are no implementing regulations or mitigation requirements associated with the Capper-Cramton Act. However, M-NCPPC is the designated applicant to NCPC for any proposed changes to parks funded by the Capper-Cramton Act. Inventoried parks that are known to have used funds from the Capper-Cramton Act are listed in **Table 1-1**.

00038594

**Table 1-1: Section 4(f) Properties in the Corridor Study Boundary Acquired with Capper-Cramton Act Funds**

| | |
|---|---|
| George Washington Memorial Parkway | Rock Creek Stream Valley Park, Unit 2 |
| Chesapeake and Ohio Canal National Historical Park | Locust Hill Neighborhood Park (previously part of Rock Creek Park) |
| Clara Barton Parkway | Sligo Creek Parkway |
| Cabin John Stream Valley Park, Unit 2 | Northwest Branch Stream Valley Park, Unit 3 |
| Rock Creek Stream Valley Park, Unit 3 | Cabin John Regional Park |

## B.    Section 6(f) of the Land and Water Conservation Fund Act

Section 6(f) of the Land and Water Conservation Fund Act of 1965 (LWCF) comprised a federal program of assistance to federal, state, and local governments for the acquisition of land and water for the benefit of all Americans. The LWCF is administered by the Department of Interior's NPS, which retains oversight of development projects that would cause impacts to or permanent conversion of recreational property acquired with LWCF monies. The implementing regulations at 36 CFR 59 apply solely to the "Program of Assistance to States." Section 36 CFR 59.1 discusses the post-completion responsibilities that "apply to each area of facility for which LWCF assistance is obtained, regardless of the extent of participation of the program in the assisted area or facility and consistent with the contractual agreement between NPS and the State. Responsibility for compliance and enforcement of these provisions rests with the State for both State and locally sponsored projects."

Section 6(f) is discussed concurrently with Section 4(f) because recreational properties could have been acquired or improved with funds from the LWCF. While mitigation opportunities are more flexible under Section 4(f) and may or may not include replacement land, Section 6(f) directs NPS to assure replacement lands are of equal value, location and usefulness (NPS, 2019). Therefore, Section 6(f) requirements may influence the Section 4(f) mitigation for this project. In Maryland, the Director of Land Acquisition and Planning of the Maryland Department of Natural Resources (MDNR) administers the program. In Virginia, the Director of the Department of Conservation and Recreation administers the program.

MDOT SHA has not identified any State or locally sponsored projects which received LWCF assistance from the "Program of Assistance to States" that would experience an impact from the Managed Lanes Study. NPS has informed MDOT SHA that the two properties identified in **Table 1-2**: received LWCF assistance from the federal side of the program. These properties are not subject to the specific requirements set forth in Section 6(f) and its implementing regulations are 36 CFR 59.

**Table 1-2: Parks in the Corridor Study Boundary Improved or Acquired with funds from LWCF**

| | |
|---|---|
| Chesapeake and Ohio Canal National Historical Park | Baltimore Washington Parkway |

00038595

## C.    Section 106 of the National Historic Preservation Act

Section 106 of the NHPA as amended and its implementing regulations at 36 CFR 800 are intended to preserve historical and archaeological sites in the United States. Regulations require that each federal agency take into account the effects of their undertakings on historic properties and to provide the Advisory Council on Historic Preservation (ACHP) with a reasonable opportunity to comment. Section 106 requires that federal agencies consult with the SHPO, Tribal Historic Preservation Officer (THPO), and Native Hawaiian Organizations, among other parties. The regulations at 36 CFR 800 define an undertaking, and specify how to identify historic properties, assess potential effects on historic properties, and resolve adverse effects. An historic property is any historic district, site, building, structure or object that is listed in or determined eligible for inclusion in the NRHP. Under Section 106, each federal agency must consider public views and concerns about historic preservation issues when making final project decisions. Refer to Appendix G of the Draft Environmental Impact Statement (DEIS) for the Cultural Resources Technical Report which includes details on how the Study is complying with Section 106 regulations.

Section 4(f) stipulates that in order for a historic site to be granted protection, it must be considered significant (i.e., eligible for or listed in the NRHP).[1] Archaeological sites only qualify for Section 4(f) protection if they are significant *and* warrant preservation in place. Judgments about a site's importance and preservation value are made by the FHWA after consultation with the SHPO and/or THPO, Federally recognized Indian Tribe as appropriate, and the ACHP if participating in the project.

In the event an archaeological site which warrants preservation in place is discovered during construction, the Section 4(f) process may be expedited, and any required evaluation of feasible and prudent avoidance alternatives will consider the level of investment already made. The review process, including the consultation with other agencies, will be shortened as appropriate.

## D.    Section 110(e) of the National Historic Preservation Act

Section 110 of the NHPA as amended establishes the broad preservation responsibilities of Federal agencies to ensure that historic preservation is fully integrated into the ongoing programs of all Federal agencies. Section 110(f) of the NHPA and its implementing regulations at 36 CFR 800.10 require that Federal agencies exercise a higher standard of care when considering undertakings that may directly and adversely affect National Historic Landmarks (NHLs). Prior to the approval of any Federal undertaking that may directly or adversely affect any NHL, the head of the agency shall undertake such planning and actions as may be necessary to minimize harm to such landmark, and to provide the ACHP with a reasonable opportunity to comment.

---

[1] *National Register Criteria for Evaluation:* The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association, and:

A.  That are associated with events that have made a significant contribution to the broad patterns of our history; or

B.  That are associated with the lives of persons significant in our past; or

C.  That embody the distinctive characteristics of type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or

D.  That have yielded or may be likely to yield, information important in prehistory or history.

00038300



The regulations at 36 CFR 800 also specify the participation of the ACHP in the resolution of adverse effects on NHLs, the invitation of the Secretary to participate in the consultation where there may be an adverse effect, and the ACHP's reporting of the outcome.

## E.    Maryland Program Open Space

Program Open Space (POS) was established under MDNR in 1969. The POS is split into a statewide program that purchases fee simple land for establishing state parks, forest, and wildlife and fisheries management areas and a local program that provides financial and technical assistance to subdivisions for the planning, acquisition, and/or development of recreation land and open space areas. Potential impacts to land or easements purchased with POS funds requires coordination with MDNR. The conversion of POS property to transportation use would require replacement of that property with land of equal or greater value; this requirement may influence 4(f) mitigation provided for these resources. Further, the conversion of state-funded parks and open space must demonstrate a net positive benefit to the public; demonstrating that the site or the jurisdiction's open space resources will significantly benefit from the proposed conversion. This process will be coordinated with OWJ over relevant park property and documented in Appendix B.

## 1.3    Study Purpose and Need

I-495 and I-270 in Maryland are the two most heavily traveled freeways in the National Capital Region, each with an Average Annual Daily Traffic volume of approximately 260,000 vehicles per day in 2016 (MDOT SHA, 2017). I-495 is the only circumferential route that provides interregional connections to many radial routes, such as I-270, US 29 (Colesville Road), I-95, the Baltimore Washington Parkway, US 50 (John Hanson Highway), and MD 5 (Branch Avenue). I-270 is the only freeway link between I-495 and the fast-growing northwest suburbs in northern Montgomery County and the suburban area in Frederick County. In addition to heavy commuter traffic demand, I-495 is merged with I-95 in Maryland for 25 miles around the east side of Washington, DC, providing connectivity along the East Coast.

The purpose of the Study is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the Study limits and enhances existing and planned multimodal mobility and connectivity. The Study will address the following needs:

- **Accommodate Existing Traffic and Long-Term Traffic Growth** - High travel demand from commuter, business, and recreational trips results in severe congestion from 7 to 10 hours per day on the Study corridors, which is expected to deteriorate further by the planning horizon year of 2040. Additional capacity is needed to address existing and future travel demand and congestion, reduce travel times, and allow travelers to use the facilities efficiently.

- **Enhance Trip Reliability -** Congestion on I-495 and I-270 results in unpredictable travel times. Travelers and freight commodities place a high value on reaching their destinations in a timely and safe manner, and in recent years, the Study corridors have become so unreliable that uncertain travel times are experienced daily. More dependable travel times are needed to ensure trip reliability.

- **Provide Additional Roadway Travel Choices -** Travelers on I-495 and I-270 do not have enough options for efficient travel during extensive periods of congestion. Additional roadway

00038597



management options are needed to improve travel choices, while retaining the general-purpose lanes.

- **Accommodate Homeland Security** - The National Capital Region is considered the main hub of government, military, and community installations related to homeland security. These agencies and installations rely on quick, unobstructed roadway access during a homeland security threat. Additional capacity would assist in accommodating a population evacuation and improving emergency response access should an event related to homeland security occur.

- **Improve Movement of Goods and Services** - I-495 and I-270 are major regional transportation networks that support the movement of passenger and freight travel within the National Capital Region. Existing congestion along both corridors increases the cost of doing business due to longer travel times and unreliable trips. The effects of this congestion on the movement of goods and services is a detriment to the health of the local, regional, and national economy. Efficient and reliable highway movement is necessary to accommodate passenger and freight travel, moving goods and services through the region.

Additional capacity and improvements to enhance reliability must be financially viable. MDOT's traditional funding sources would be unable to effectively finance, construct, operate, and maintain improvements of this magnitude. Revenue sources that provide adequate funding, such as pricing options, are needed to achieve congestion relief and address existing high travel demand.

Given the highly constrained area surrounding the interstates in the Study corridors, MDOT SHA recognizes the need to plan and design this project in an environmentally responsible manner. MDOT SHA will strive to avoid and minimize community, natural, cultural, and other environmental impacts, and mitigate for any unavoidable impacts at an equal or greater value. MDOT SHA will work with our federal, state, and local resource agency partners in a streamlined, collaborative, and cooperative way to meet all regulatory requirements to ensure the protection of significant environmental resources. Any Build Alternatives will adequately offset unavoidable impacts while prioritizing and coordinating comprehensive mitigation measures near the Corridor Study Boundary which are meaningful for the environment and to the community.

## 1.4    Proposed Action

For the purposes of this Section 4(f) Evaluation, the Proposed Action includes six Build Alternatives that are being retained for detailed study in the **Chapter 2, Section 2.6** of the DEIS**.** These alternatives include managed lanes that differ in the manner in which the proposed travel lanes would be designated and configured. The limits of disturbance (LOD) are the same on I-495 for each of the Build Alternatives described below, except for Alternative 9M between I-270 West Spur and the I-95 Interchange. Therefore, the Section 4(f) use will be the same for each of these alternatives on I-495, except along the topside of I-495 under Alternative 9M, as presented in **Section 2** of this document. The LODs for the Build Alternatives differ slightly on I-270 due to the existing High Occupancy Vehicle (HOV) system. The differences in Section 4(f) use for resources along I-270 is described in **Section 2**, when applicable. The six Build Alternatives are described in detail in **Chapter 2**, **Section 2.6** of the DEIS and are summarized below.

00038598

### 1.4.1   Alternative 8: 2 ETL Managed Lanes on I-495 and 1 ETL and 1 HOV Managed Lane on I-270

This alternative consists of adding two managed Express Toll Lanes (ETL) in each direction on I-495, retaining one existing High-Occupancy Vehicle (HOV) lane in each direction on I-270, and adding one ETL managed lane in each direction on I-270. Buses would be permitted to use the managed lanes.

### 1.4.2   Alternative 9: 2 HOT Managed Lanes

This alternative consists of adding two managed High-Occupancy Toll (HOT) lanes in each direction on I-495, converting the one existing HOV lane in each direction to a HOT managed lane on I-270, and adding one HOT managed lane in each direction on I-270, resulting in a two-lane, managed lanes network on both highways. Buses would be permitted to use the managed lanes.

### 1.4.3   Alternative 9 Modified

MDOT SHA and FHWA evaluated an additional alternative identified as Alternative 9 Modified (Alternative 9M) in response to public and agency comments. Alternative 9M consists of a blend of Alternative 5 and Alternative 9, to determine if the reduction of lanes and associated LOD on the top side of I-495 would sufficiently meet the Purpose and Need to justify a reduction of traffic benefits. Alternative 5 consists of adding one HOT lane on I-495 and converting the existing HOV lane on I-270 to a HOT lane. This alternative was not considered reasonable to carry forward as a Build Alternative in the DEIS. Please refer to **Section 2.5.2** of the DEIS for more detail on Alternative 5. Alternative 9M has the same LOD as Alternative 9 along I-495 from south of the George Washington Memorial Parkway in Virginia to the I-270 West Spur and from the I-95 interchange to west of MD 5 as well as along I-270 from I-495 to I-370. Alternative 9M has the same LOD as Alternative 5 along I-495 from I-270 West Spur to the I-95 interchange. Alternative 9M includes the same build elements as the other Build Alternatives including direct access locations and interchange improvements.

### 1.4.4   Alternative 10: 2 ETL Managed Lanes and 1 HOV Managed Lane on I-270

This alternative consists of adding two ETL managed lanes in each direction on I-495, retaining one existing HOV lane per direction on I-270, and adding two ETL managed lanes in each direction on I-270. Buses would be permitted to use the managed lanes.

### 1.4.5   Alternative 13B: 2 HOT Managed Lanes on I-495 and 2 Reversible HOT Managed Lanes on I-270

Alternative 13B would provide a two-lane, HOT managed lanes network on I-495 similar to Alternative 9. This alternative would also convert the existing HOV lanes on I-270 to two HOT managed reversible lanes while maintaining the existing General Purpose (GP) lanes. Buses would be permitted to use the managed lanes.

### 1.4.6   Alternative 13C: 2 ETL Managed Lanes on I-495 and Reversible ETL Managed Lanes Plus 1 HOV Managed Lane on I-270

Alternative 13C would provide a two-lane, ETL managed lanes network on I-495 similar to Alternatives 8 and 10. This alternative considers retaining the existing HOV lanes in both directions and adding two ETL managed, reversible lanes on I-270. Buses would be permitted to use the managed lanes.

00038599



## 1.5   Common Elements of the Build Alternatives

Alternatives 8, 9, 9M, 10, 13B, and 13C each propose widening of existing I-495 and I-270 within the Study limits. These managed lanes alternatives differ in the manner in which the proposed travel lanes would be designated and configured. Alternatives 8, 9, 10, 13B and 13C include adding two lanes on I-495 as either HOT or ETL; therefore, the LOD are the same on I-495. Impacts to Section 4(f) properties along I-495 will be the same for each of these alternatives. The LOD for Alternative 9M varies from the other Build Alternatives on I-495 between I-270 West Spur and the I-95 interchange as a one lane HOT system is proposed in the section. The Build Alternatives differ on I-270 due to the existing HOV system. Alternatives 8, 9, 9M, and 13B would have similar LODs on I-270 because of the addition of one lane or the conversion of the existing HOV lane combined with the addition of one lane. Alternative 13C would have a slightly wider footprint on I-270 than Alternatives 8, 9, and 13B due to the addition two reversible ETL and retaining the existing HOV managed lanes. However, this alternative would have a slightly narrower footprint than Alternative 10 due to its configuration of reversible lanes in the median of I-270. Therefore, Alternative 10 would have the widest footprint on I-270 compared to the other alternatives and the highest amount of impact to Section 4(f) resources.

Elements common to all the alternatives under the Proposed Action include:

- Direct access at certain interchanges

- Removal and replacement of the American Legion Bridge

- Removal and replacement of structures on I-495 and I-270

- Replacement in -kind of existing bicycle and pedestrian facilities along roadways

- A new trail along the American Legion Bridge

- Installation of retaining walls

- Removal, replacement or construction of noise barriers

- Installation of stormwater management facilities

For the purposes of this Section 4(f) Evaluation, the Proposed Action represents all six Build Alternatives described above. Impacts to Section 4(f) properties will be differentiated by alternative, when applicable, in **Section 2**.

00038600

00038601

2

## 2    INVENTORY AND USE OF SECTION 4(F) PROPERTY

MDOT SHA established a Corridor Study Boundary for the Study that extends 300 feet to either side of the existing right-of-way along I-495 and I-270. Within the Corridor Study Boundary, 111 Section 4(f) properties were inventoried consisting of national parks, county and local parks, parkways, stream valley units of larger park facilities, local neighborhood parks, and historic sites that are eligible for, or listed in, the NRHP.

Of the 111 Section 4(f) properties identified in the Corridor Study Boundary, 68 would experience an impact as a result of the Proposed Action (**Table 2-1**). Of these 68 properties, 22 warrant an Individual Section 4(f) Evaluation. As many of the impacts to Section 4(f) properties consist of minor impacts along the edge of the existing transportation facility that would not affect characteristics that contribute to the significance of historic sites or recreational amenities and features, FHWA intends to apply *de minimis* impact findings at 36 properties. Impacts to the remaining ten Section 4(f) properties, including six archaeological sites, listed in **Table 2-2** are identified as exceptions to a Section 4(f) use. To protect location information, archaeological sites are not inventoried on Section 4(f) mapping. The 43 Section 4(f) properties listed in **Table 2-3** are within the Corridor Study Boundary and would not experience an impact from the Proposed Action.

During final design, certain uses of Section 4(f) property may be determined to be temporary in nature. Currently there is not enough information to make such a determination. For the purposes of this Draft Section 4(f) Evaluation, all impacts to Section 4(f) property are assumed to be permanently incorporated into the transportation facility.

The greatest area of impacts to Section 4(f) properties from the proposed action is 149.0 acres. Nearly 47% of this total, or 69.3 acres, is derived from impacts to the Baltimore Washington Parkway, a public park and historic transportation facility. The impacted portions of Baltimore Washington Parkway are in an existing transportation use. Impacts from the proposed action would consist of grading, tree removal, and landscape plantings; widening the parkway at I-495 to accommodate direct access ramps to and from the managed lanes; reconfiguring the interchange with Southway and Greenbelt Road; replacing the bridge carrying Greenbelt Road over Baltimore Washington Parkway; constructing and maintaining stormwater management facilities; updating and installing signage; and providing access for construction equipment and materials. Through coordination with the OWJ, MDOT SHA will strive to make the proposed impacts compatible with the design, setting, and character of the existing Baltimore Washington Parkway.

00038602



The vast majority of impacts to Section 4(f) properties are composed of sliver property impacts to areas that currently abut the existing transportation facility without affecting the features and attributes that qualify the properties for Section 4(f) protection. Moreover, the constrained built-environment surrounding I-495 and I-270 consisting of a large amount of commercial and residential development in close proximity to the limits of the Study means that there are only minimal differences between each alternative in the number, type, and area of Section 4(f) properties impacted. MDOT SHA has worked diligently to implement reasonable measures to avoid and minimize the impacts to Section 4(f) property as part of the Proposed Action.

Each description identifies the type of Section 4(f) property, the OWJ over the property, and the attributes that qualify the property for Section 4(f) protection. The type, location, and area of the impacts to each Section 4(f) property are described in detail. Where the potential use is anticipated to be minor, the applicability of Section 4(f) *de minimis* use criteria is also presented. Efforts to minimize impacts to each Section 4(f) property are also presented.

Impacts to Section 4(f) properties are differentiated by alternative, when applicable. All Build Alternatives would impact the same number of Section 4(f) properties. With regard to impacts to historic properties, there is no difference in the Section 106 findings across the range of the Build Alternatives considered.

**Figure 2-1, Figure 2-2, and Figure 2-3** provide an overview of the LOD for the Proposed Action and identify the distribution of Section 4(f) properties throughout the Study limits. In this evaluation, Section 4(f) properties are sorted from west to east along I-495, then south to north along I-270.

00038603



Figure 2-1: Section 4(f) Property Overview (Map 1 of 3)



### Section 4(f) Property

1. Scott's Run Nature Preserve
2. George Washington Memorial Parkway
3. Chesapeake and Ohio Canal National Historical Park
4. Clara Barton Parkway
5. Washington Aqueduct
6. Naval Surface Warfare Center Carderock Division Historic District
7. Congressional Country Club
8. Carderock Springs South
9. Carderock Springs Historic District
10. Morningstar Tabernacle No. 88 Moses Hall and Cemetery
11. Gibson Grove A.M.E. Church
12. Cabin John SVP, Unit 2
13. Booze Creek SVP
14. Cabin John SVP, Unit 3
15. Burning Tree Club
16. Bethesda Trolley Trail
17. Fleming Local Park
18. Grosvenor Estate (Wild Acres)
19. Federation of American Societies for Experimental Biology
20. Rock Creek SVP, Unit 3
21. Locust Hill Neighborhood Park
22. Locust Hill Estates
23. Elmhirst Parkway NCA
24. Cedar Lane Unitarian Universalist Church
25. North Chevy Chase Local Park
26. In the Woods
27. Rock Creek SVP, Unit 2
28. Washington D.C. Temple
29. National Park Seminary Historic District / Forest Glen
30. Capitol View Park Historic District
31. Metropolitan Branch, B&O Railroad
32. Forest Glen Historic District
33. Forest Glen Neighborhood Park
34. Calvary Evangelical Lutheran Church
35. Forest Grove Neighborhood Park
36. Sligo Creek Parkway
37. Greater Washington Boys and Girls Club
38. Argyle Local Park
39. Margaret Schweinhaut Senior Center
40. South Four Corners Neighborhood Park
41. Polychrome Historic District
42. Montgomery Blair High School Athletic Fields
43. Blair Local Park
44. Hastings NCA
45. Indian Spring Club Estates and Indian Spring Country Club
46. Indian Springs Terrace Local Park
47. Northwest Branch SVP, Unit 3
48. Brookview Local Park
49. Washington Coca-Cola Bottling Plant (Silver Spring)

**Legend**

☐ Limit of Proposed Action
▨ See Figure 2-2 or 2-3
▨ Historic Property
▨ Park Property

**Inventory of Section 4(f) Property in the Corridor Study Boundary**

0     1     2 Miles

Map 1 of 3



Figure 2-2: Section 4(f) Property Overview (Map 2 of 3)



### Section 4(f) Property

50. Knollwood Park
51. Buck Lodge Park
52. Edgefield Drive Park
53. Paint Branch SVP, Unit 3
54. Cherry Hill Road Park
55. Beltsville Agricultural Research Center (BARC)
56. Sunnyside Park
57. Hollywood Park
58. B & O Railroad, Washington Branch
59. SHA District 3 Headquarters Building
60. Greenbelt Historic District
61. Buddy Attick Lake Park
62. Indian Springs Park
63. Greenbelt Park
64. Baltimore Washington Parkway
65. McDonald Field
66. Spellman Overpass
67. Good Luck Estates Park
68. Youth Memorial Sports Park
69. Robert Frost Park
70. Dresden Green Park
71. Beckett Field
72. B & P Railroad, Washington City Branch
73. New Carrollton Metro Station
74. Whitfield Chapel Park
75. Capitol Car Distributors
76. Carsondale
77. Carsondale Park
78. Street Railway Service Building
79. Glenarden Historic District
80. Henry P. Johnson Park
81. Southwest Branch SVP
82. Heritage Glen Park
83. Little Washington
84. Percy Benson Sansbury Property
85. Suitland Parkway
86. Douglas E. Patterson Park
87. Morningside Historic District
88. Andrews Manor Park
89. Manchester Estates Park
90. Henson Creek SVP

Legend

Limit of Proposed Action    See Figure 2-1
Historic Property
Park Property

**Inventory of Section 4(f) Property in the Corridor Study Boundary**

0    1    2
Miles

Map 2 of 3

00038605

DRAFT SECTION 4(f) EVALUATION



Figure 2-3: Section 4(f) Property Overview (Map 3 of 3)



### Section 4(f) Property

91. Academy Woods
92. Stratton Local Park
93. Grosvenor Park
94. Cabin John Regional Park
95. Tilden Woods SVP
96. Old Farm NCA
97. Cabin John SVP, Unit 6
98. Cabin John SVP (Rockville)
99. Millennium Garden Park
100. Julius West Middle School Athletic Fields
101. Bullards Park and Rose Hill SVP
102. Rockmead Park
103. Woottons Mill Park
104. Woodley Gardens Park
105. Woodley Gardens
106. Fallsgrove SVP
107. Rockville Senior Center Park
108. Ward Building
109. Malcolm King Park
110. Morris Park
111. National Institute of Standards and Technology (NIST) Headquarters

**Legend**
— Limit of Proposed Action
/// Historic Property
▨ See Figure 2-1
▧ Park Property

**Inventory of Section 4(f) Property in the Corridor Study Boundary**

0    1    2 Miles

Map 3 of 3

00038606

00038607

DRAFT SECTION 4(f) EVALUATION



#### Table 2-1: Inventory of Section 4(f) Properties with Use or *de minimis* impact

| Map ID | Section 4(f) Property | Size (Acres) | Potential Impacts from Proposed Action (Acres) | Officials with Jurisdiction | Type of Section 4(f) Property | Type of Section 4(f) Approval |
|---|---|---|---|---|---|---|
| 2 | George Washington Memorial Parkway | 7,146.0 | 12.2 | ACHP, NPS, VDHR | Public Park, Historic Site | Individual Evaluation |
| 3 | Chesapeake and Ohio Canal National Historical Park | ~19,575 | 15.4 | ACHP, NPS, MHT | Public Park, Historic Site | Individual Evaluation |
| 4 | Clara Barton Parkway | 96.2 | 1.8 | ACHP, NPS, MHT | Public Park, Historic Site | Individual Evaluation |
| 10 | Morningstar Tabernacle No. 88 Moses Hall and Cemetery | 1.5 | 0.3 | ACHP, MHT | Historic Site | Individual Evaluation |
| 12 | Cabin John SVP, Unit 2 | 105.0 | 1.1 | M-NCPPC | Public Park | *de minimis* |
| 15 | Burning Tree Club | 221.0 | 0.8 | MHT | Historic Site | *de minimis* |
| 17 | Fleming Local Park | 24.0 | 0.1 | M-NCPPC, MHT | Public Park, Historic Site | *de minimis* |
| 18 | Grosvenor Estate (Wild Acres) | 34.7 | 0.1 0.2 (Alt 10) | MHT | Historic Site | *de minimis* |
| 20 | Rock Creek SVP, Unit 3 | 326.6 | 3.3 2.5 (Alt 9M) | M-NCPPC, MHT, ACHP | Public Park, Historic Site | Individual Evaluation |
| 21 | Locust Hill Neighborhood Park | 5.0 | 0.3 0.2 (Alt 9M) | M-NCPPC | Public Park | *de minimis* |
| 27 | Rock Creek SVP, Unit 2 | 277.0 | 0.4 0.2 (Alt 9M) | M-NCPPC, ACHP, MHT | Public Park, Historic Site | Individual Evaluation |
| 29 | National Park Seminary Historic District/ Forest Glen | 23.0 | 1.2 | ACHP, MHT | Historic Site | Individual Evaluation |
| 31 | Metropolitan Branch, B&O Railroad | 405.7 | 8.8 | ACHP, MHT | Historic Site | Individual Evaluation |
| 32 | Forest Glen Historic District | 10.3 | 0.2 0.1 (Alt 9M) | MHT | Historic Site | *de minimis* |
| 33 | Forest Glen Neighborhood Park | 3.7 | 0.3 0.2 (Alt 9M) | M-NCPPC | Public Park | *de minimis* |
| 34 | Calvary Evangelical Lutheran Church | 1.8 | < 0.1 | MHT | Historic Site | *de minimis* |
| 36 | Sligo Creek Parkway | 543.0 | 4.1 3.3 (Alt 9M) | Montgomery County, M-NCPPC, ACHP, MHT | Public Park, Historic Site | Individual Evaluation |
| 40 | South Four Corners Neighborhood Park | 3.6 | 0.1 < 0.1 (Alt 9M) | M-NCPPC | Public Park | *de minimis* |
| 42 | Montgomery Blair High School Athletic Fields | 30.0 | 1.4 1.1 (Alt 9M) | M-NCPPC; Montgomery County Public Schools Board of Education | Public Park | *de minimis* |
| 43 | Blair Local Park | 10.2 | 0.4 0.3 (Alt 9M) | M-NCPPC | Public Park | *de minimis* |
| 45 | Indian Spring Club Estates and Indian Spring Country Club | 51.0 | 1.2 1.1 (Alt 9M) | ACHP, MHT | Historic Site | Individual Evaluation |

00038608



| Map ID | Section 4(f) Property | Size (Acres) | Potential Impacts from Proposed Action (Acres) | Officials with Jurisdiction | Type of Section 4(f) Property | Type of Section 4(f) Approval |
|---|---|---|---|---|---|---|
| 46 | Indian Springs Terrace Local Park | 30.0 | 1.4<br>1.2 (Alt 9M) | M-NCPPC | Public Park | Individual Evaluation |
| 47 | Northwest Branch SVP, Unit 3 | 144.0 | 3.2 | M-NCPPC | Public Park | Individual Evaluation |
| 54 | Cherry Hill Road Park | 43.1 | 1.8 | M-NCPPC | Public Park | Individual Evaluation |
| 55 | Beltsville Agricultural Research Center (BARC) | 6,852.0 | 0.5 | MHT | Historic Site | *de minimis* |
| 57 | Hollywood Park | 22.3 | <0.1 | M-NCPPC | Public Park | *de minimis* |
| 60 | Greenbelt Historic District | 789.0 | 0.3 | NPS, MHT | Historic Site (NHL) | *de minimis* |
| 61 | Buddy Attick Lake Park | 85.3 | 0.1 | City of Greenbelt, NPS, MHT | Public Park, Historic Site (NHL) | *de minimis* |
| 62 | Indian Springs Park | 3.0 | 0.1 | City of Greenbelt, NPS, MHT | Public Park, Historic Site (NHL) | *de minimis* |
| 63 | Greenbelt Park | 1100.0 | 0.6 | ACHP, MHT, NPS | Public Park, Historic Site | Individual Evaluation |
| 64 | Baltimore Washington Parkway | ~1400 | 69.3 | ACHP, MHT, NPS | Public Park, Historic Site | Individual Evaluation |
| 65 | McDonald Field | 2.1 | <0.1 | City of Greenbelt | Public Park | *de minimis* |
| 71 | Beckett Field | 7.0 | 0.2 | City of New Carrollton | Public Park | *de minimis* |
| 76 | Carsondale | 35.1 | 0.1 | ACHP, MHT | Historic Site | Individual Evaluation |
| 79 | Glenarden Historic District | 306.0 | 0.8 | ACHP, MHT | Historic Site | Individual Evaluation |
| 80 | Henry P. Johnson Park | 7.1 | <0.1 | M-NCPPC, ACHP, MHT, | Public Park | Individual Evaluation |
| 81 | Southwest Branch SVP | 264.0 | 0.3 | M-NCPPC | Public Park | *de minimis* |
| 82 | Heritage Glen Park | 38.2 | 0.5 | M-NCPPC | Public Park | *de minimis* |
| 85 | Suitland Parkway | 418.9 | 0.3 | ACHP, MHT, NPS | Public Park, Historic Site | Individual Evaluation |
| 86 | Douglas E. Patterson Park | 26.2 | 0.7 | M-NCPPC | Public Park | *de minimis* |
| 88 | Andrews Manor Park | 4.1 | 2.6 | M-NCPPC | Public Park | Individual Evaluation |
| 89 | Manchester Estates Park | 4.6 | 0.5 | M-NCPPC | Public Park | *de minimis* |
| 90 | Henson Creek SVP | 1103.0 | 0.1 | M-NCPPC | Public Park | *de minimis* |
| 91 | Academy Woods | 6.4 | 0.2 | MHT | Historic Site | *de minimis* |
| 94 | Cabin John Regional Park | 514.0 | 5.7 (Alts 8&9)<br>7.2 (Alt 10)<br>4.5 (Alt 13B)<br>5.2 (Alt 13C) | M-NCPPC | Public Park | Individual Evaluation |
| 95 | Tilden Woods SVP | 67.4 | 0.2 | M-NCPPC | Public Park | *de minimis* |

00038609

| Map ID | Section 4(f) Property | Size (Acres) | Potential Impacts from Proposed Action (Acres) | Officials with Jurisdiction | Type of Section 4(f) Property | Type of Section 4(f) Approval |
|---|---|---|---|---|---|---|
| 96 | Old Farm Neighborhood Conservation Area | 0.8 | 0.1 | M-NCPPC | Public Park | *de minimis* |
| 97 | Cabin John SVP, Unit 6 | 19.8 | 0.4 0.3 (Alt 13B) | Montgomery County, M-NCPPC | Public Park | *de minimis* |
| 98 | Cabin John SVP (Rockville) | 33.1 | 2.1 | City of Rockville | Public Park | Individual Evaluation |
| 99 | Millennium Garden Park | 1.3 | 0.2 | City of Rockville | Public Park | *de minimis* |
| 101 | Bullards Park and Rose Hill SVP | 16.8 | 0.3 | City of Rockville | Public Park | *de minimis* |
| 102 | Rockmead Park | 27.4 | 0.2 0.3 (Alt 10) | City of Rockville | Public Park | *de minimis* |
| 103 | Woottons Mill Park | 95.3 | 0.2 | City of Rockville | Public Park | *de minimis* |
| 105 | Woodley Gardens | 200.0 | 0.7 1.1 (Alt 10) 1.0 (Alt 13C) | MHT | Historic Site | *de minimis* |
| 107 | Rockville Senior Center Park | 12.2 | 0.7 0.9 (Alt 10) 0.8 (Alt 13C) | City of Rockville, MHT | Public Park, Historic Site | *de minimis* |
| 108 | Ward Building | 4.8 | 0.1 < 0.1 (Alt 13B | MHT | Historic Site | *de minimis* |
| 109 | Malcolm King Park | 78.5 | 0.1 | City of Gaithersburg | Public Park | *de minimis* |
| 110 | Morris Park | 30.7 | 0.1 | City of Gaithersburg | Public Park | *de minimis* |
| **Total Potential Impacts of Section 4(f) Properties by Build Alternative** | | | **144.7 (Alt 9M) 145.5 (Alt 13B) 146.7 (Alt 13C) 146.8 (Alts 8 & 9) 149.0 (Alt 10)** | | | |

Notes:
1. *The size of Section 4(f) properties is sourced from data or documentation provided by the Officials with Jurisdiction.*
2. *Section 4(f) properties in Table 2-1 are sorted from west to east along I-495 and from south to north along I-270.*
3. *The size of the Baltimore-Washington Parkway in Table 2-1 is only the area within the historic boundary, which ends at the Anne Arundel County border. The full size of the Baltimore Washington Parkway is larger.*

00038610

### Table 2-2: Impacts to Properties that Qualify as Exceptions to Section 4(f)

| Map ID | Section 4(f) Property | Size (Acres) | Potential Impacts from Proposed Action (Acres) | Officials with Jurisdiction | Type of Section 4(f) Property | Exception Criteria |
|--------|---------------------|--------------|-----------------------------------------------|----------------------------|------------------------------|--------------------|
| 16 | Bethesda Trolley Trail | 4 miles | 0.2 | Montgomery County Department of Transportation | Public Park/Trail | 23 CFR 774.13(f)(3) |
| 58 | Baltimore & Ohio Railroad, Washington Branch | 146.4 | 0.6 | MHT | Historic Site | 23 CFR 774.13(a)(3) |
| 66 | Spellman Overpass | 1.0 | <0.1 | City of Greenbelt | Public Park | 23 CFR 774.13(f)(3) |
| 72 | Baltimore & Potomac Railroad, Washington City Branch | 284.4 | 1.0 | MHT | Historic Site | 23 CFR 774.13(a)(3) |
| N/A | Site 18MO749 | N/A | N/A | MHT, NPS | Historic Site | 23 CFR 774.13(b) |
| N/A | Site 18MO751 | N/A | N/A | MHT, NPS | Historic Site | 23 CFR 774.13(b) |
| N/A | Site 44FX0374 | N/A | N/A | VDHR, NPS | Historic Site | 23 CFR 774.13(b) |
| N/A | Site 44FX0379 | N/A | N/A | VDHR, NPS | Historic Site | 23 CFR 774.13(b) |
| N/A | Site 44FX0381 | N/A | N/A | VDHR, NPS | Historic Site | 23 CFR 774.13(b) |
| N/A | Site 44FX0389 | N/A | N/A | VDHR, NPS | Historic Site | 23 CFR 774.13(b) |

1. To protect location information, archaeological sites are not inventoried on Section 4(f) mapping.

### Table 2-3: Inventory of Section 4(f) Properties where there is no Use or Impact

| Map ID | Section 4(f) Property | Size (Acres) | Official with Jurisdiction | Type of Section 4(f) Property |
|--------|---------------------|--------------|----------------------------|------------------------------|
| 1 | Scott's Run Nature Preserve | 336.0 | Fairfax County | Park |
| 5 | Washington Aqueduct | 163.0 | MHT, NPS | Historic Site (NHL) |
| 6 | Naval Surface Warfare Center Carderock Division Historic District | 30.3 | MHT | Historic Site |
| 7 | Congressional Country Club | 31.8 | MHT | Historic Site |
| 8 | Carderock Springs South | 18.6 | MHT | Historic Site |
| 9 | Carderock Springs Historic District | 146.0 | MHT | Historic Site |
| 11 | Gibson Grove A.M.E. Church | 0.4 | MHT | Historic Site |
| 13 | Booze Creek SVP | 24.1 | M-NCPPC | Public Park |
| 14 | Cabin John SVP, Unit 3 | 50.0 | M-NCPPC | Public Park |
| 19 | Federation of American Societies for Experimental Biology | 11.4 | MHT | Historic Site |
| 22 | Locust Hill Estates | 47.0 | MHT | Historic Site |
| 23 | Elmhirst Parkway Neighborhood Conservation Area (NCA) | 7.6 | M-NCPPC | Public Park |
| 24 | Cedar Lane Unitarian Universalist Church | 6.3 | MHT | Historic Site |
| 25 | North Chevy Chase Local Park | 30.9 | M-NCPPC | Public Park |
| 26 | In the Woods | 1.9 | MHT | Historic Site |

00038611

| Map ID | Section 4(f) Property | Size (Acres) | Official with Jurisdiction | Type of Section 4(f) Property |
|--------|---------------------|--------------|---------------------------|------------------------------|
| 28 | Washington, DC Temple | 31.7 | MHT | Historic Site |
| 30 | Capitol View Park Historic District | 124.0 | ACHP, MHT | Historic Site |
| 35 | Forest Grove Neighborhood Park | 7.0 | M-NCPPC | Public Park |
| 37 | Greater Washington Boys and Girls Club | 1.2 | MHT | Historic Site |
| 38 | Argyle Local Park | 8.8 | M-NCPPC | Public Park |
| 39 | Margaret Schweinhaut Senior Center | 8.9 | M-NCPPC | Public Park |
| 41 | Polychrome Historic District | 1.1 | MHT | Historic Site |
| 44 | Hastings Neighborhood Conservation Area (NCA) | 0.4 | M-NCPPC, MHT | Public Park |
| 48 | Brookview Local Park | 12.4 | M-NCPPC | Public Park |
| 49 | Washington Coca-Cola Bottling Plant (Silver Spring) | 4.6 | MHT | Historic Site |
| 50 | Knollwood Park | 12.4 | M-NCPPC | Public Park |
| 51 | Buck Lodge Park | 40.0 | M-NCPPC | Public Park |
| 52 | Edgefield Drive Park | 7.2 | M-NCPPC | Public Park |
| 53 | Paint Branch SVP, Unit 3 | 51.9 | M-NCPPC | Public Park |
| 56 | Sunnyside Park | 8.7 | M-NCPPC | Public Park |
| 59 | SHA District 3 Headquarters Building | 7.5 | MHT | Historic Site |
| 67 | Good Luck Estates Park | 6.6 | M-NCPPC | Public Park |
| 68 | Youth Memorial Sports Park | 3.9 | City of New Carrollton | Public Park |
| 69 | Robert Frost Park | 5.9 | M-NCPPC | Public Park |
| 70 | Dresden Green Park | 2.1 | M-NCPPC | Public Park |
| 73 | New Carrollton Metro Station | 71.7 | MHT | Historic Site |
| 74 | Whitfield Chapel Park | 26.2 | M-NCPPC | Public Park |
| 75 | Capitol Car Distributors | 38.7 | MHT | Historic Site |
| 77 | Carsondale Park | 2.9 | M-NCPPC | Public Park |
| 78 | Street Railway Service Building | 0.4 | MHT | Historic Site |
| 83 | Little Washington | 63.0 | MHT | Historic Site |
| 84 | Percy Benson Sansbury Property | 0.8 | MHT | Historic Site |
| 87 | Morningside Historic District | 191.0 | MHT | Historic Site |
| 92 | Stratton Local Park | 11.0 | M-NCPPC | Public Park |
| 93 | Grosvenor Park | 57.4 | M-NCPPC | Public Park |
| 100 | Julius West Middle School Athletic Fields | 22.0 | Montgomery Board of Ed. | Montgomery |
| 104 | Woodley Gardens Park | 37.5 | City of Rockville, MHT | Public Park |
| 106 | Fallsgrove SVP | 50.2 | City of Rockville | Public Park |
| 111 | National Institute of Standards and Technology (NIST) Headquarters | 578.0 | MHT | Historic Site |

00038612

## 2.1    Section 4(f) Property along I-495

### 2.1.1    George Washington Memorial Parkway

**Type of Section 4(f) Property:** Historic Site and Public Park

**Officials with Jurisdiction:** ACHP, NPS, VDHR

**Type of Section 4(f) Approval:** Individual Evaluation

### A.    Description of Section 4(f) Property

George Washington Memorial Parkway (**Figure 2-4**) is a publicly-owned park and NRHP-listed historic district that extends along the Potomac River from I-495 to Mount Vernon in Virginia. The George Washington Memorial Parkway is administered by the NPS. The George Washington Memorial Parkway is a scenic roadway honoring the nation's first president that protects and preserves cultural and natural resources along the Potomac River below Great Falls to Mount Vernon. It is also a historic district listed in the NRHP for its association with twentieth-century parkway design, engineering, landscape architecture, park planning and conservation, commemoration, and its association with George Washington. Features within George Washington Memorial Parkway include the Potomac Heritage National Scenic Trail and Turkey Run Park conservation area. The park boundary of George Washington Memorial Parkway extends 38.3 miles and comprises approximately 7,300 acres, including all administrative units and features.

In 1989, the George Washington Memorial Parkway running along the Maryland side of the Potomac River was renamed Clara Barton Parkway. A principal part of the legislated purpose of the George Washington Memorial Parkway, which includes the Clara Barton Parkway, is to protect the vistas and views along both sides of the Potomac River. The Parkway was the first comprehensively designed modern motorway built by the federal government based on the idea of a landscaped, park-like roadway corridor that protected riverfront lands and today includes an extension north to the Capital Beltway, as well as Spout Run Parkway and Clara Barton Parkway. Because Clara Barton Parkway is divided from George Washington Memorial Parkway by the Potomac River and possesses a separate historic boundary, it is described as a separate Section 4(f) property in **Section 2.1.3** of this document.

The National Trails System designated Potomac Heritage National Scenic Trail as a recreational trail and feature of George Washington Memorial Parkway and the C&O Canal National Historic Park. The Potomac Heritage National Scenic Trail is a network of existing and planned trails spanning 710 miles between the mouth of the Potomac River and the Alleghany Highlands. Within the Study Corridor, the Potomac Heritage Trail passes beneath the American Legion Bridge on the Virginia side of the Potomac River.

Another feature of George Washington Memorial Parkway, the Turkey Run Park recreation and forest preservation area encompasses approximately 700 acres on the Virginia side of the Potomac River, east of I-495. The area contains a unique combination of flora and fauna, as well as riverbanks, flood terraces, upland forest, and streams. The area also provides visitor amenities such as picnic tables, restrooms, water fountains, and trails.

George Washington Memorial Parkway is also an historic district that was listed in the NRHP on June 2, 1995. It is historically significant under Criterion B for its association with the life of George Washington and Criterion C for its embodiment of the distinctive characteristics of a parkway. The boundary of the

00038613

historic district encompasses the full length and breadth of the parkway in Virginia and Washington, DC The boundary is congruent with the original right-of-way determined by the Bureau of Public Roads (predecessor of FHWA) and maintained by the NPS in Virginia, and Washington, DC Attributes that contribute to the significance of the parkway include bridges, culverts, landscape architectural elements, and natural topographic features. The interchange with I-495 does not contribute to the significance of the parkway.

Portions of George Washington Memorial Parkway were funded in part by the Capper-Cramton Act of 1930. However, as George Washington Memorial Parkway is currently under federal jurisdiction, NCPC's role is advisory.

B.    **Potential Section 4(f) Use**

The Proposed Action would result in a Section 4(f) use of 12.2 acres of George Washington Memorial Parkway to accommodate access for construction vehicles and materials to build the new American Legion Bridge and remove the existing structure; the construction, operation, and future maintenance of new direct access ramps to the managed lanes on I-495; and the installation, operation, and future maintenance of electrical conduit and signage to inform the traveling public of toll rates and operation of the facility (**Figure 2-4**). The area of Section 4(f) use is concentrated at two locations: in the quadrant southeast of the American Legion Bridge and along a small strip of land north of the westbound lanes of George Washington Memorial Parkway from west of the bridges at Dead Run to where the parkway approaches the existing interchange with I-495. Temporary lane closures during construction are also possible.

The large area within George Washington Memorial Parkway southeast of the American Legion Bridge is needed to construct a temporary switchback road that will be used to maneuver construction vehicles and materials up and down the steep grade along the bank of the Potomac River. To erect the new bridge, construction cranes will be placed in each of the four quadrants adjacent to the existing crossing. Construction barges in the river will reduce the need for additional impacts on land. Access to the construction area within George Washington Memorial Parkway will be from a temporary access road built within existing VDOT right-of-way.

The proposed Section 4(f) use would result in changes to the recreational characteristics of George Washington Memorial Parkway through the alteration of designed landscape features, including the removal of trees, and placement of toll signage. The proposed direct access ramps would largely be within existing disturbed VDOT right-of-way. Tree removal would be concentrated in the area along the Potomac River where the temporary switchback road would be constructed. Tree removal along the parkway itself would be minimal. The landscape of George Washington Memorial Parkway, including trees, is a defining recreational characteristic of the Parkway. The removal of trees would largely be necessary to accommodate access for construction vehicles and materials to erect the new American Legion Bridge and remove the existing bridge. The installation of dynamic and static signage would involve minimal impact to the significant designed landscape along the historic transportation facility.

Where it passes beneath the American Legion Bridge, access to the Potomac National Heritage Scenic Trail would be restricted for the duration of construction. The temporary closure of the trail would be for the safety of trail users as construction equipment would be operating in the area. Although subject to

00038614

change, a preliminary estimate of the duration of construction at this location is between four and five years. At the conclusion of this time period, the trail will be restored and reopened to the public.

There would be no use of Turkey Run Park under the Proposed Action.

Section 106 consultation has resulted in a finding of adverse effect. Mitigation for the use of George Washington Memorial Parkway would be consistent with stipulations identified in the Section 106 Programmatic Agreement and be coordinated with the NPS, VDHR and Section 106 consulting parties.

The impacts to George Washington Memorial Parkway require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.2**).

## C.    Applied Minimization

In addition to the general minimization efforts described in Section 4, MDOT SHA has been able to further reduce impacts to George Washington Memorial Parkway. No stormwater facilities would be placed within the boundaries George Washington Memorial Parkway. In response to NPS concerns about proposed direct access to the managed lanes from George Washington Memorial Parkway, MDOT SHA completed a traffic analysis to determine impacts on I-495 and the NPS parkway. Results showed that direct access was needed to meet the Study's Purpose and Need. At NPS's request, MDOT SHA provided a supplemental analysis of options including providing slip ramps on the American Legion Bridge and George Washington Memorial Parkway for outbound access only. Further, MDOT SHA developed five different interchange options to minimize visual impacts to George Washington Memorial Parkway. The interchange option of nested ramps was chosen with the result of substantially reducing potentially significant visual impacts to the George Washington Memorial Parkway by removing flyover ramps proposed in previous iterations of the interchange design. Extensive coordination with VDOT and NPS has also resulted in developing a plan that would limit the number, variety, design, and location of signs within George Washington Memorial Parkway. To reduce impacts to Section 4(f) properties on the shores of the Potomac River, MDOT SHA also proposes the use of barges to facilitate removal of the existing bridge and construction of the new bridge.

As a result of these minimization efforts and on-going coordination with the OWJ, MDOT SHA has been able to reduce impacts to George Washington Memorial Parkway from 17.6 acres on June 5, 2019 to the 12.5 acres in this Draft Section 4(f) Evaluation. The effort to minimize and mitigate impacts will continue through ongoing and future coordination with NPS staff.

### 2.1.2   Chesapeake and Ohio Canal National Historic Park

**Type of Section 4(f) Property:** Historic Site and Public Park

**Officials with Jurisdiction:** ACHP, MHT, NPS

**Type of Section 4(f) Approval:** Individual Evaluation

## A.    Description of Section 4(f) Property

The Chesapeake and Ohio Canal National Historic Park (C&O Canal NHP, **Figure 2-5**) is an NRHP-listed historic district and publicly-owned park and recreation area encompassing 19,575 acres. The C&O Canal NHP stretches along the Potomac River from Rock Creek at Georgetown in Washington, DC, to

00038615



Cumberland, Maryland, for 184.5 miles. Construction on the C&O Canal began in 1828 and concluded in 1850. It served as a major transportation corridor operating as a conduit for coal, lumber, and agricultural products to propel western development and satisfy demands from eastern US markets until 1924. The C&O Canal became a unit of the NPS as a national monument in 1961 and then established as a national historical park in 1971. The purpose of the C&O Canal NHP is to preserve and interpret the 19th century transportation canal and its associated scenic, natural, and cultural resources; and to provide opportunities for education and appropriate outdoor recreation. The C&O Canal NHP is listed on the NRHP and contains more than 1,300 historic structures, including one of the largest collections of 19th century canal features and buildings in the national park system. The C&O Canal NHP is administered by NPS. Property records provided by NPS indicate the portions of C&O Canal NHP that would experience an impact from the Study were acquired in part by funds from the Capper-Cramton Act of 1930. However, according to NCPC, as the C&O Canal NHP is under federal management NCPC's role is advisory.

The C&O Canal was listed in the NRHP on October 15, 1966, prior to becoming a national historical park. A supplementary listing under the name "Chesapeake and Ohio Canal National Historical Park" was added to the NRHP on February 3, 2015. The C&O Canal NHP is listed in the NRHP under Criteria A, C, and D. In addition to 455 contributing resources previously listed in the NRHP, the supplemental listing added 796 contributing resources comprising 106 buildings, 175 sites, 483 structures, and 32 objects. The supplemental listing contains the extensive list of contributing resources throughout the historic district, summarized here elements of the physical infrastructure such as the canal, canal towpath, bridges, canal locks, lock houses, and archaeological resources.

## B.    Potential Section 4(f) Use

A letter permit issued to MDOT SHA by the NPS on March 7, 1961 grants permission for the "operation and maintenance of a highway," for much of the I-495 mainline and the interchange with Clara Barton Parkway, including the C&O Canal (**Appendix B**). Therefore, the permit area is not Section 4(f) parkland as it is already in a transportation use. However, because the park is also a significant historic site, any impact from the Proposed Action within the NPS permit area would still qualify as a Section 4(f) use. Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 15.4 acres of the C&O Canal *historic site*. Historic boundaries are not defined, necessarily, by legal property boundaries and can encompass areas within transportation use without impacting its historical significance or protection under Section 4(f). Under the terms of the NPS letter permit, portions of the *public park* are in an existing transportation use. Therefore, the total Section 4(f) *public park* use is reduced to 7.8 acres due to the area in existing transportation use under the NPS letter permit.

The impacts to C&O Canal accommodate access for construction vehicles and materials to build the new American Legion Bridge and remove the existing structure; the construction and maintenance of the realigned ramp from I-495 northbound to Clara Barton Parkway; the construction of a trail connection between a multi-use path on the east side of the new American Legion Bridge and the C&O Canal towpath; the realignment of Rock Run; and the construction and maintenance of linear stormwater management features beneath the shoulders of I-495 mainline, south of the towpath (**Figure 2-5**). The latter features are within an area currently in a transportation use.

00038616

The area of Section 4(f) use is concentrated along the northbound and southbound lanes of the existing I-495 alignment and to the south of the C&O Canal towpath both west and east of the highway. In order to move construction vehicles and materials to and from the base of the American Legion Bridge, temporary bridge crossings would be built across the canal and towpath. The locations of these crossings as well as the access points on Clara Barton Parkway have been coordinated with NPS. Two bridges and access roads are necessary to provide safe movement of construction equipment to, from and around the construction site. Having two construction roads will also shorten the duration of construction. The temporary access roads and temporary bridges would require the removal of trees, grading land, and placing surface treatment to support the movement of heavy equipment. These activities would require the temporary closure of the canal towpath for the construction and removal of the grade separated crossings. These temporary crossings would be in place during construction of the new American Legion Bridge, which is anticipated to last between four and five years. At the conclusion of construction, the towpath will be restored.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have an adverse effect on C&O Canal. Mitigation for the use of C&O Canal would be consistent with stipulations identified in the Section 106 Programmatic Agreement and be coordinated with the NPS, MHT and Section 106 consulting parties. The impacts to C&O Canal require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.1** and **Section 5.1.2**).

## C.    Applied Minimization

In addition to the minimization efforts described in Section 4, MDOT SHA has been able to further reduce impacts to C&O Canal. MDOT SHA evaluated multiple preliminary alignments for replacing the American Legion Bridge including total avoidance options and minimization options such as constructing a double-decker bridge and utilizing top-down construction methods. Owing to the age of the existing bridge, replacement is warranted. Any solution involving augmenting travel lanes on the existing structure would be temporary and require MDOT SHA to impact NPS lands twice – first for widening and then again for replacement Upon coordination with NPS, MDOT SHA determined the on-alignment replacement of the bridge would result in fewer permanent impacts to C&O Canal. In order to minimize impacts to C&O Canal, MDOT SHA will use construction barges in the Potomac River. Construction cranes will be placed at the four quadrants of the existing bridge and multiple temporary access roads will be constructed in order to minimize impacts to Section 4(f) property. MDOT SHA has coordinated with NPS on the number and location of these temporary access roadways. MDOT SHA has also adjusted the proposed LOD to avoid impacts to historic archaeological deposits east of I-495.

As a result of these minimization efforts and on-going coordination with the OWJ, impacts to C&O NHP have changed from 15.1 acres on June 5, 2019 to the 15.4 acres in this Draft Section 4(f) Evaluation. This increase is owing to changes to the LOD related to requests from NPS to shift impacts and providing additional area construct the bridge. The effort to minimize and mitigate impacts will continue through ongoing and future coordination with NPS staff.

00038617



### 2.1.3   Clara Barton Parkway

**Type of Section 4(f) Property:** Historic Site and Public Park

**Officials with Jurisdiction:** ACHP, MHT, NPS

**Type of Section 4(f) Approval:** Individual Evaluation

### A.   Description of Section 4(f) Property

The Clara Barton Parkway (**Figure 2-5**) is an administrative unit of George Washington Memorial Parkway in Maryland. Clara Barton Parkway extends 6.6 miles along the northern shore of the Potomac River between the Naval Surface Warfare Center at Carderock and the Washington, DC border with Maryland. The historic boundary in Maryland comprises 96.2 acres. This information is sourced from the NRHP nomination prepared by NPS employee Jere L. Krakow in November 1993. The historic boundary was then mapped on MHT Medusa. Clara Barton Parkway is under the jurisdiction of NPS and was designed for recreational driving, to link sites that commemorate important episodes in American history, and to preserve habitat for local wildlife.

The Clara Barton Parkway is also an historic site and was listed in the NRHP on June 2, 1995. It is historically significant under Criterion B for its association with the life of George Washington and Clara Barton, persons significant in our past, and Criterion C for its embodiment of the distinctive characteristics of a parkway. The historic boundary encompasses the full length and breadth of the parkway – 5.5 miles in Maryland. Though Clara Barton Parkway has a separate historic boundary in Maryland, it is part of the larger George Washington Memorial Parkway Historic District. The boundary is coterminous with the original right-of-way determined by the Bureau of Public Roads (a predecessor to FHWA) and maintained by the NPS. Elements that contribute to the significance of the parkway include eight bridges that carry the roadway and two pedestrian bridges that span the parkway, the stone clad culverts, and 0.44 miles of barrier walls and miscellaneous structures. The I-495 bridges and interchange complex do not contribute to the historical significance of the parkway.

Property records provided by NPS indicate the portions of Clara Barton Parkway that would experience an impact from the Study were acquired in part by funds from the Capper-Cramton Act of 1930. According to NCPC, as Clara Barton Parkway is under federal management, NCPC's role is advisory.

A letter permit issued to MDOT SHA by the NPS on March 7, 1961 authorizes the "operation and maintenance of a highway," for much of I-495 mainline and the interchange with Clara Barton Parkway at this location (**Appendix B**). As such, the subject permit area is not Section 4(f) parkland. However, because the parkway is an historic site impacts from the Proposed Action within the permit area may still qualify as a Section 4(f) use.

### B.   Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 1.8 acres of the Clara Barton Parkway. The NPS letter permit reduces the use of Section 4(f) parkland to 0.1 acres. The parkland impacts are entirely within the impacts to the historic site.

The impacts to Clara Barton Parkway consist of construction vehicle and material access beneath the grade-separated crossing with I-495 to accommodate the bridge replacement; the construction of a

00038618



temporary access road to transport vehicles and materials to the American Legion Bridge construction site; and the construction, maintenance, and operation of a linear stormwater management feature that extends from the area currently maintained by MDOT SHA in a transportation use to an area within Clara Barton Parkway (**Figure 2-5**). The relocation of the I-495 interchange ramps is also required. However, this work is within the area permitted by NPS to MDOT SHA and takes place at or within the existing I-495 interchange, which does not contribute to the significance of the historical site.

The area of Section 4(f) use is concentrated in three locations: extending approximately 1,000 linear feet along the north side of Clara Barton Parkway east of the I-495 bridge; and two construction vehicle access locations to the American Legion Bridge. The linear impact north of Clara Barton Parkway would consist of tree removal, grading, and the installation of a stormwater management facility.

Both construction vehicle access locations are south of the parkway. One is approximately 1,000 feet west of the I-495 bridge. The other is approximately 450 feet east of the bridge. These locations were coordinated with NPS. Having two construction access locations will shorten the duration of construction and provide safe movement of equipment and materials to and from the construction site. Impacts associated with the construction vehicle access consist of tree removal, land grading, and placing surface treatment to support the movement of equipment and materials. Construction access would be required for the duration of construction of the new American Legion Bridge which is anticipated to last between four and five years.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have an adverse effect on the Clara Barton Parkway. Mitigation for the use of Clara Barton Parkway would be consistent with stipulations identified in the Section 106 Programmatic Agreement and be coordinated with the NPS, MHT and Section 106 consulting parties. The impacts to Clara Barton Parkway require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.1** and **Section 5.1.2**).

### C.    Applied Minimization

In addition to the minimization efforts described in Section 4, MDOT SHA has been able to further reduce impacts to Clara Barton Parkway. Upon direction from NPS, MDOT SHA worked to eliminate the placement of stormwater management facilities on NPS lands, including Clara Barton Parkway. However, the existing drainage pattern and topography of the landscape along I-495 through Clara Barton Parkway and C&O Canal NHP present significant challenges. The low point on NPS lands is near where Rock Run drains into the Potomac River. Removing all stormwater from NPS property would require a much longer bridge that would also result in significant additional use of Section 4(f) property at C&O Canal NHP and Clara Barton Parkway. Much of the stormwater can be treated in facilities within the NPS permit area granted to MDOT SHA. Additional stormwater would be treated in vaults beneath the shoulders of the widened I-495. However, a linear stormwater feature would be required along the north side of Clara Barton Parkway. Scuppers would also be placed to drain stormwater from the surface of the bridge. MDOT SHA will plan their location to avoid drainage onto NPS property as much as possible.

- As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Clara Barton Parkway have remained unchanged since June 5, 2019. The effort to minimize and mitigate impacts will continue through ongoing and future coordination with NPS staff.

00038619



Figure 2-4: Section 4(f) Property (Map 1 of 35)



00038620

00038621



Figure 2-5: Section 4(f) Property (Map 2 of 35)



00038622



### 2.1.4 Moses Hall Cemetery (Pending)

**Type of Section 4(f) Property:** Historic Site

**Officials with Jurisdiction:** ACHP, MHT

**Type of Section 4(f) Approval:** Individual Evaluation

### A.    Description of Section 4(f) Property

More formally known as the Morningstar Tabernacle No. 88 Moses Hall and Cemetery, Moses Hall Cemetery is an African American cemetery situated south of I-495, bounded to the east by Seven Locks Road and to the south by the Evergreen residential neighborhood (**Figure 2-6**). The boundary of the 1.5 acre historic site comprises three separate tax parcels. At the time of publication, identification of Moses Hall Cemetery as a Section 4(f) historic site was pending a formal NRHP eligibility determination and concurrence from MHT. The property was identified as potentially significant by consulting parties participating in Section 106 consultation for the Study. At the request of M-NCPPC and community groups, MDOT SHA has conducted additional research and coordinated with community groups, including descendent family members of those buried in the Moses Hall Cemetery.

As a result of this work and the developing understanding of the historical significance of Moses Hall Cemetery, MDOT SHA has chosen to identify the property as a Section 4(f) historic site prior to receiving concurrence from MHT. Moses Hall Cemetery appears to be significant under Criterion A for its association with the African American community in Cabin John in the late nineteenth century. The significant, above-ground elements of Moses Hall Cemetery may be the foundation of Moses Hall and the gravestones marking known burials.

The Morningstar Tabernacle No. 88 Moses Cemetery is typical of what has been termed an "upland South cemetery," generally characterized by an unplanned design, frugal grave markers, and small size. The remains of Moses Hall are also present, consisting of a partial fieldstone and concrete block foundation, rectangular in plan, approximately 15 feet wide by 30 feet long. Morningstar Tabernacle No. 88 was a local chapter of a fraternal organization created after the Civil War to provide financial support and security to African Americans. Such organizations were common in the late nineteenth century, when segregation and discrimination excluded African Americans from traditional means of wealth-building. Morningstar Tabernacle No. 88, formed in the 1880s to serve the African American community in Cabin John, established a meeting hall and adjoining cemetery (the Moses Hall and Cemetery) along Seven Locks Road. Here, the community could gather to discuss business, attend social events, care for the sick, and find a community-based resting place for the deceased.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.3 acre of Moses Hall Cemetery. The actions that would result in the use of Moses Hall Cemetery would be to widen I-495 to accommodate the managed lanes system and direct access interchange at Cabin John Parkway. The area of Section 4(f) use extends approximately 600 linear feet along the northern edge of Moses Hall Cemetery where the property is bound by existing MDOT SHA right-of-way. Activities in the area of Section 4(f) use would consist of clear cutting, grading, roadway widening, landscape plantings, and access for construction equipment. Due to the sensitive nature of both marked and unmarked human remains, this 4(f) property

00038623

will be a priority to further evaluate through both engineering design and historic research (archival and oral history), including potential non-intrusive and intrusive archaeological fieldwork to avoid and minimize the 0.3 acres of impact as currently designed. All work related to this property will comply with the Maryland State Burial Law (State of Maryland Criminal Code Section 10-402).

## C.    Applied Minimization

At the time of publication, MHT has not yet concurred on the NRHP eligibility of Moses Hall Cemetery or Section 106 effects from the Managed Lanes Study. In advance of an eligibility determination and an adverse effect determination, MDOT SHA will develop a Location Specific Avoidance Option to avoid impacts to Moses Hall Cemetery. The Section 106 PA will document how adverse effects will be addressed, mitigation commitments, and procedures for both marked and unmarked Human Remains in compliance with state and federal regulations. The Section 4(f) use of Moses Hall Cemetery will be evaluated in the Final Section 4(f) Evaluation.

### 2.1.5   Cabin John Stream Valley Park, Unit 2 (M-NCPPC)

**Type of Section 4(f) Property:** Public Park

**Officials with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

## A.    Description of Section 4(f) Property

Cabin John Stream Valley Park, Unit 2 (**Figure 2-6** and **Figure 2-7**) is one of six units that comprise M-NCPPC Montgomery County Cabin John Stream Valley Park, a publicly-owned park and recreation area. Cabin John Stream Valley Park, Unit 2 extends north-south across I-495 from south of River Road to along Cabin John Parkway, where it abuts Unit 1 of the park. The entirety of Cabin John Stream Valley Park encompasses 520 acres across six units; of which Unit 2 comprises approximately 105.0 acres. Cabin John Stream Valley Park features portions of the natural-surface Cabin John Trail that runs north-south and connects the stream valley park's Potomac Area to Cabin John Parkway. The park also features undeveloped wooded area that provides a protective buffer along Cabin John Creek. This park is under jurisdiction of M-NCPPC, Montgomery County. Tax Parcels 10-00428584, 10-0085717, and 10-00857428 within Unit 2 were acquired in 1962 using funding from the Capper-Cramton Act of 1930.

## B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 1.1 acres of Cabin John Stream Valley Park, Unit 2 to accommodate widening I-495, realigning the interchange with Cabin John Parkway, and providing northbound managed lane access to River Road (**Figure 2-6**). Unit 2 of the park is divided by I-495, where it passes over Seven Locks Road and Cabin John Parkway. South of I-495, Cabin John Stream Valley Park, Unit 2 would experience an impact from highway widening and constructability access owing to the replacement of the bridges across Seven Locks Road and Cabin John Parkway.

Additional impacts to the park are anticipated in the southwest quadrant of interchange of I-495 with River Road. Impacts less than 0.1 acre are from improvements to and augmentation of a drainage pipe and culvert, both of which are existing features. The proposed work consists of a work area for a construction pit where an augmentation pipe would be installed.

00038624

FHWA intends to make a *de minimis* impact determination for Unit 2 of Cabin John Stream Valley Park if M-NCPPC, Montgomery County concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

## C.    Applied Minimization

To minimize the Section 4(f) use of Cabin John Stream Valley Park Unit 2, the proposed typical section of I-495 was reduced along this property by utilizing a closed section with a retaining wall along I-495. This process is more fully described in **Section 4.2.** No surface stormwater management facilities would be constructed adjacent to the park. Stormwater quantity treatment would be provided in underground vaults beneath the shoulder. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Cabin John Stream Valley Park, Unit 2 have changed from 1.0 acre on June 5, 2019 to 1.1 acre in this Draft Section 4(f) Evaluation. This change is owing to a extending a culvert outfall along MD 190 for stabilization. The effort to minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

### 2.1.6    Burning Tree Club

**Type of Section 4(f) Property:** Historic Site

**Officials with Jurisdiction:** MHT

**Type of Section 4(f) Approval**: *De Minimis* Impact

## A.    Description of Section 4(f) Property

Burning Tree Club (**Figure 2-7**) is a privately-owned, historic golf course in the northeast quadrant of the interchange of I-495 and River Road. The 221-acre club includes a Tudor Revival clubhouse and 18-hole golf course built in 1922 and 1923. Burning Tree Club is eligible for the NRHP under Criteria A and C. Burning Tree Club is significant under Criterion A as an exclusive, male-only social institution devoted to the pastime of golf, and an example of the type of recreational organization that flourished during the 1920s. Burning Tree Club is also eligible under Criterion C as a good example of a 1920s private golf club. The significant physical characteristics of the golf course are the Tudor-Revival clubhouse and the setting of the latter within the designed landscape.

## B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.8 acre of Burning Tree Club to accommodate widening I-495; the augmentation of an existing culvert carrying Thomas Branch beneath I-495; and the realignment of Thomas Branch along the east side of I-495 (**Figure 2-7**). The area of Section 4(f) use is concentrated along a narrow strip of land that extends approximately 1200 linear feet along the western edge of Burning Tree Club where it is bound by existing MDOT SHA right-of-way. Activities in the area of Section 4(f) use would consist of tree removal, grading, constructing a stable stream bed, and landscape plantings. Noise modeling at eleven different locations on the golf course indicate an increase in noise,

00038625



but not to a degree that meets the feasible and reasonable criteria for noise mitigation. More information about noise mitigation can be found in the *Noise Analysis Technical Report* attached to the DEIS as **Appendix J**. No noise barrier is proposed along the property. The proposed impacts would not affect game play or the layout of the golf course. No elements greater than 50 years of age or that contribute to the significance of the historic Burning Tree Club would experience an impact.

On March 12, 2020 MHT concurred that the Managed Lanes Study would have no adverse effect on Burning Tree Club. MHT additionally provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding. As such, the impact to Burning Tree Club under the Proposed Action would constitute a minor use. FHWA intends to make a *de minimis* impact determination for Burning Tree Club.

### C.    Applied Minimization

Consistent with the minimization efforts described in Section 4, MDOT SHA has been able to reduce impacts to Burning Tree Club by eliminating stormwater management facilities from within the historic boundary of the property. A retaining wall would be constructed at the edge of pavement along the historic property.

As a result of these minimization efforts and on-going coordination with the OWJ, impacts to Burning Tree have changed from 0.6 acres on June 5, 2019 to the 0.8 acres in this Draft Section 4(f) Evaluation. This increase is owing to changes to the LOD at the I-495 interchange with River Road. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with MHT.

### 2.1.7    Fleming Local Park

**Type of Section 4(f) Property:** Historic Site and Public Park

**Officials with Jurisdiction:** MHT, M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Fleming Local Park (**Figure 2-8**) is a publicly-owned park and recreation area at 9929 Fleming Avenue in Bethesda. It is adjacent to the I-495 outer loop between MD 187 and the East Spur of I-270. This 24-acre park features two softball fields, two tennis courts, two basketball courts, a playground, and picnic shelter. This park is under the jurisdiction of M-NCPPC, Montgomery County and was acquired in 1967 with POS funds.

The eastern portion of Fleming Local Park additionally contributes to the significance of the Grosvenor Estate, determined eligible for the NRHP on September 11, 2000. Grosvenor Estate is significant under Criterion A as a representative example of a twentieth century suburban estate. It is further significant under Criterion C as an example of Tudor Revival architecture. Significant elements of the property include the architectural detailing of the house, the garage, the location and design of the driveway, and sweeping rear lawn. The design of the main drive and rear lawn have been compromised by suburban infill development within the last 10 years.

As an historic property, Fleming Local Park is under the jurisdiction of MHT. The Section 4(f) use of Grosvenor Estate is discussed in **Section 2.1.8**.

00038626



## B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.1 acre of Fleming Local Park to relocate the overpass carrying the Bethesda Trolley Trail across I-495 and provide construction access at two locations to augment existing stormwater pipes beneath I-495 and the I-270 east spur. These actions would involve tree removal, grading, and maneuvering of construction vehicles and materials. The area of Section 4(f) use is divided into three locations: a triangular area at the southwestern corner of the park; a small rectangular area approximately 850 feet west of the I-495/I-270 east spur split; and a small rectangular area in the southeast corner of the park along the I-270 east spur, approximately 75 feet north of the split (**Figure 2-8**). The former impact is approximately 0.1 acre and is outside the historic boundary of Grosvenor Estate. No recreational facilities would experience an impact from the proposed use of Section 4(f) *park* property. The latter impacts are within the historic boundary and total less than 0.1 acre. The proposed impacts would not affect elements greater than 50 years of age or that contribute to the significance of Grosvenor Estate.

FHWA intends to make a *de minimis* impact determination for Fleming Local Park if MHT and M-NCPPC concur that the proposed action, after measures to mitigate harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments. On March 12, 2020 MHT concurred that the Managed Lanes Study would have no adverse effect on Grosvenor Estate, including the portions of Fleming Local Park within the historic boundary. MHT additionally provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding. For *de minimis* impacts to parks, the public must also be given the opportunity to comment beyond that in the Section 106 process.

## C.    Applied Minimization

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Fleming Local Park by eliminating linear stormwater management facilities along the edge of the park boundary. The narrowest typical section has been applied where improvements to I-495 are proposed along Fleming Local Park. This entails constructing a closed section with a retaining wall along the edge of pavement on I-495. No surface stormwater management facilities would be constructed adjacent to the park and historic site.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Fleming Local Park have remained unchanged since June 5, 2019. The effort to minimize and mitigate impacts will continue through ongoing and future coordination with MHT and M-NCPPC staff.

00038627

**Figure 2-6: Section 4(f) Property (Map 3 of 35)**



00038628

**Figure 2-7: Section 4(f) Property (Map 4 of 35)**



00038629

**Figure 2-8: Section 4(f) Property (Map 5 of 35)**



00038630



### 2.1.8   Grosvenor Estate (Wild Acres)

**Type of Section 4(f) Property:** Historic Site

**Officials with Jurisdiction:** MHT

**Type of Section 4(f) Approval**: *De Minimis* Impact

### A.    Description of Section 4(f) Property

Grosvenor Estate (Wild Acres, **Figure 2-8**) is an NRHP-eligible historic site at 10100 Laureate Way in Bethesda. It is immediately west of the I-270 east spur, north of the I-495 split. The historic boundary encompasses 34.7 acres and includes all land remaining from its association with Gilbert Grosvenor and the property's period of significance from 1928-1966. The historic boundary includes the eastern portion of Fleming Local Park, the Section 4(f) use of which is described in **Section 2.1.7**. Grosvenor Estate was determined eligible for the NRHP on September 11, 2000. It is significant under Criterion A as a representative example of a twentieth century suburban estate. Grosvenor Estate is also significant under Criterion C, as an excellent example of Tudor Revival architecture. Significant elements of the property include the architectural detailing of the house, the garage, location and design of the driveway, and sweeping rear lawn. The design of the main drive and the rear lawn have been compromised by suburban infill development within the last 10 years.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a use of 0.1 acre of Section 4(f) use of Grosvenor Estate, except for Alternative 10 which would result in 0.2 acre, to accommodate mainline widening along I-270; and provide constructability access to augment an existing stormwater pipe beneath I-270 (**Figure 2-8**). These actions would involve tree removal, grading, and maneuvering of construction vehicles and materials. The area of Section 4(f) use is at two locations: a small rectangular area in the southeast corner of the historic boundary along the I-270 east spur, approximately 75 feet north of the split and a narrow linear area that extends approximately 600 feet along I-270 at the northeast corner of the historic boundary. The area of Grosvenor Estate and Fleming Local Park that would experience a Section 4(f) use contains no standing structures greater than 50 years of age or elements that contribute to the significance of the historic site.

On March 12, 2020 MHT concurred that the Managed Lanes Study would have no adverse effect on Grosvenor Estate, including the portions of Fleming Local Park within the historic boundary. MHT additionally provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding. Because Fleming Local Park is also a public park, there is the additional requirement for M-NCPPC Montgomery County to concur that the Proposed Action, after measures to mitigate and minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection. For *de minimis* impacts to parks, the public must also be given the opportunity to comment. FHWA intends to make a finding of *de minimis* impact to Fleming Local Park.

### C.    Applied Minimization

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Grosvenor Estate by eliminating linear stormwater management facilities along the southern edge of the historic boundary. A retaining wall would be constructed at the edge of pavement in that location.

00038631



As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Grosvenor Estate have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with MHT.

### 2.1.9   Rock Creek Stream Valley Park, Unit 3

**Type of Section 4(f) Property:** Historic Site and Public Park

**Officials with Jurisdiction:** MHT and M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** Individual Evaluation

### A.     Description of Section 4(f) Property

Rock Creek Stream Valley Park Unit 3 (**Figure 2-8**, **Figure 2-9** and **Figure 2-10**) is 1 of 15 units that comprise Montgomery County's Rock Creek Stream Valley Park, a publicly-owned park and recreation area. Rock Creek Stream Valley Park, Unit 3 follows the course of Rock Creek from the MARC railroad tracks in Kensington southwest to the I-495/I-270 split and then southeast along the northside of I-495 to Cedar Lane. Rock Creek Stream Valley Park encompasses approximately 3,960 acres; of which Unit 3 comprises 326.6 acres. Rock Creek Stream Valley Park features portions of the Rock Creek Trail that runs north-south and connects the portion of Rock Creek Regional Park north of Rockville to Washington, DC. The stream valley park provides a riparian buffer for the environmentally sensitive Rock Creek. Recreational amenities within the park include bicycling, picnic areas, playgrounds, and hiking trails. The Rock Creek Stream Valley Park was established using funds from the Capper-Cramton Act of 1930. The portions of Unit 3 through which I-495 runs were acquired in 1939 and 1942.

Rock Creek Stream Valley Park Unit 3 is also an historic site eligible for the NRHP under Criterion A for the significant association with early twentieth century environmental protection and regional planning efforts in Metropolitan Washington. As an historic site in Maryland, the official with jurisdiction is MHT. The period of significance for the park units extends from 1931 to 1970, marking the beginning of the construction of Beach Drive and the year in which the park was substantially completed. Elements that contribute to the significance of Rock Creek Stream Valley Park Unit 3 consists of the of the bridges within the park that cross Rock Creek and retain integrity; the natural landscape that remains intact and continues to be preserved per the park's original intention; Beach Drive, which adheres to the 1954 design by the Olmsted Brothers company; and the Rock Creek Hiker-Biker Trail, an original component of the park plan that is generally consistent with routes established in 1929 and 1954 park plans.

The Maryland Inventory of Historic Properties form specifically references the impact of I-495 on Rock Creek Park. "Construction of the beltway did impact some sections of the park, but the road was designed to limit disturbance as much as possible by placing the roadway at the edges of the park boundary. Thus, most of the natural and recreational areas of the park were retained and continue to contribute to the significance of the park."[2] The Capital Beltway does not contribute to the significance of Rock Creek Stream Valley Park Unit 3.

---

[2] Diehlman, Nicole. "Rock Creek Park Stream Valley Park Units 2 and 3." Maryland Inventory of Historic Properties M: 36-87 (Crownsville, MD: Maryland Historic Trust, 1996), 15.

00038632



### B.    Potential Section 4(f) Use

The portion of I-495 through Rock Creek Stream Valley Park is owned by M-NCPPC. The agency granted a perpetual easement (L 3199, F 506 in land records of Montgomery County) to MDOT SHA on March 24, 1964 for "all and every highway purpose." A variety of conditions were attached to the transfer of land, including an agreement between M-NCPPC and MDOT SHA that the Capital Beltway through the easement area shall have a maximum of six lanes, existing area roadways shall not be relocated, and any additional widening of I-495 shall be constructed in the median. During the late 1980s, MDOT SHA widened I-495 toward the median resulting in the current configuration of four lanes in each direction. Copies of these easements are in Appendix B. Any impact from the Proposed Action within this easement area would not qualify as a Section 4(f) use as it is currently in a transportation use. Potential Section 4(f) Use

The Proposed Action would result in the Section 4(f) use of 3.3 acres (2.5 acres under Alternative 9M) of Rock Creek Stream Valley Park, Unit 3. The actions that would result in the use of Rock Creek Stream Valley Park, Unit 3 would be to realign the off-ramp from the I-495 outer loop to northbound MD 355 and to repair and improve, or replace existing storm drain outfalls and stream conveyance pipes (**Figure 2-8, Figure 2-9,** and **Figure 2-10**).

MDOT SHA has identified the need for a small, linear stormwater management facility east of the ramp from the outer loop of I-495 to northbound MD 355. This facility would require ground disturbance and the removal of trees from within this area of Unit 3 of Rock Creek Stream Valley Park. The repair and improvement, replacement, or augmentation of existing storm drain and stream conveyance pipes that traverse I-495 would require impacts to small, rectangular areas of Section 4(f) property. Impacts associated with repairing the existing outfalls would be considered an overall benefit to the currently degraded outfall system in the park. Actions in these areas will include the removal of vegetation and ground disturbance. No recreational facilities would experience an impact from the proposed use of Section 4(f) property.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have an adverse effect on Rock Creek Stream Valley Park, Unit 3. Any mitigation for the Section 4(f) use of the historic site would be consistent with stipulations identified in the Section 106 Programmatic Agreement and be coordinated with the NPS, MHT and Section 106 consulting parties. The impacts to Rock Creek Stream Valley Park, Unit 3 require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.3**).

### C.    Applied Minimization

In addition to the minimization efforts described in Section 4, MDOT SHA has been able to further reduce impacts to Rock Creek Stream Valley Park, Unit 3. On June 12, 2019 MDOT SHA held a field review meeting at Rock Creek Park with representatives of the U.S. Army Corps of Engineers (USACE), Maryland Department of the Environment (MDE), Maryland Department of Natural Resources (MDNR) and M-NCPPC. The purpose of the meeting was to review an area along the mainstem of Rock Creek where stream realignment was under consideration as part of the Proposed Action. The agencies requested that MDOT SHA identify options that would avoid relocating Rock Creek.

A follow up meeting with the agencies was held at the MDOT SHA P3 office on August 8, 2019. MDOT SHA presented three design options for the proposed widening within Rock Creek Stream Valley Park, Unit 3.

00038633



MDOT SHA recommended implementing into the preliminary design the option that would result in the least impact to a variety of environmental features within Unit 3 of the stream valley park. The option selected for incorporation into the preliminary design involves shifting the alignment of the widened I-495 through Rock Creek Park west of Cedar Lane. Rather than widening about the centerline, the highway will be widened to the inner loop side of the existing roadway. This alignment shift will avoid any permanent realignment of Rock Creek and allow the existing riparian buffer between Rock Creek and I-495 to remain in place. No linear stormwater management facilities will be placed along this segment of I-495. Subterranean stormwater vaults will be placed beneath the variable width 10-12' shoulders. This design would require the replacement of the bridge carrying I-495 over Cedar Lane. However, the bridge replacement would be conducted within existing MDOT SHA right-of-way.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Rock Creek Stream Valley Park, Unit 3 have been reduced from 4.9 acres (4.6 acres under Alternative 9M) on June 5, 2019 to 3.3 acres (2.5 acres under Alternative 9M) in this Draft Section 4(f) Evaluation. The effort to minimize and mitigate impacts will continue through ongoing and future coordination with MHT and M-NCPPC staff.

### 2.1.10  Locust Hill Neighborhood Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.      Description of Section 4(f) Property

Locust Hill Neighborhood Park (**Figure 2-9**) is a publicly-owned park and recreation area at 9621 Bellevue Drive in Bethesda. It is adjacent to the I-495 inner loop, nestled within two sections of the Locust Hill Estates residential neighborhood. The five-acre park features walking trails and an undeveloped wooded area. The park was originally acquired in 1939 as part of Rock Creek Park using funds from the Capper-Cramton Act. This park is under the jurisdiction of M-NCPPC Montgomery County.

### B.      Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.3 acre (0.2 acre under Alternative 9M) of Locust Hill Neighborhood Park to accommodate widening along I-495; improvements and augmentation to an existing culvert beneath I-495; and providing access for construction vehicles and materials. The area of Section 4(f) use is concentrated at three locations: a narrow area that extends approximately 150 feet at the western end of the park adjacent to the I-495 inner loop; a narrow area that extends approximately 100 feet at the eastern end of the park adjacent to the I-495 inner loop; and a small area at the center of the park and adjacent to the inner loop (**Figure 2-9**). Activities in the area of Section 4(f) use would consist of tree removal, grading, improvements to the existing stormwater culvert and access for construction vehicles and materials. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

00038634



FHWA intends to make a *de minimis* impact determination for Locust Hill Neighborhood Park if M-NCPPC, Montgomery County concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

## C.    Applied Minimization

The narrowest typical section has been applied where improvements to I-495 are proposed along Locust Hill Neighborhood Park. This entails constructing a closed section with a retaining wall along the edge of pavement on I-495. No surface stormwater management facilities would be constructed adjacent to the park. Stormwater quantity treatment would be provided in underground vaults beneath the shoulder. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Locust Hill Neighborhood Park have been reduced from 0.3 acre under Alternative 9M on June 5, 2019 to 0.2 acres under Alternative 9M in this Draft Section 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

00038635



**Figure 2-9: Section 4(f) Property (Map 6 of 35)**



Figure 2-10: Section 4(f) Property (Map 7 of 35)



00038637



### 2.1.11 Rock Creek Stream Valley Park, Unit 2

**Type of Section 4(f) Property:** Historic Site and Public Park

**Officials with Jurisdiction:** MHT and M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** Individual Evaluation

### A.    Description of Section 4(f) Property

Rock Creek Stream Valley Park, Unit 2 (**Figure 2-10**, **Figure 2-11**, **Figure 2-12**, and **Figure 2-13**) is 1 of 15 that comprise Montgomery County's Rock Creek Stream Valley Park, a publicly-owned park and recreation area. Rock Creek Stream Valley Park, Unit 2 extends from Piney Branch Road to East West Highway (MD 410). Rock Creek Stream Valley Park encompasses 3,960 acres; of which Unit 2 comprises approximately 277 acres. Rock Creek Stream Valley Park features portions of the Rock Creek Trail that runs north-south and connects the portion of Rock Creek Regional Park north of Rockville to Washington, DC. The stream valley park additionally provides a riparian buffer for the environmentally sensitive Rock Creek. Recreational amenities within the park include bicycling, picnic areas, playgrounds, and hiking trails. The park was acquired using funds from the Capper-Cramton Act of 1930. The area where I-495 passes through Unit 2 of the park were acquired in 1933 and 1934.

Rock Creek Stream Valley Park Unit 2 is also an historic site eligible for the NRHP under Criterion A for the significant association with early twentieth century environmental protection and regional planning efforts in Metropolitan Washington. As an historic site in Maryland, the official with jurisdiction is MHT. The period of significance for the park units extends from 1931 to 1970, marking the beginning of the construction of Beach Drive and the year in which the park was substantially completed. Elements that contribute to the significance of Rock Creek Stream Valley Park Unit 2 consists of the bridges within the park that cross Rock Creek and retain integrity; the natural landscape that remains intact and continues to be preserved per the park's original intention; Beach Drive and Jones Mill Road, which adhere to the 1954 design by the Olmsted Brothers; and the Rock Creek Hiker-Biker Trail, an original component of the park plan that is generally consistent with routes established in 1929 and 1954 park plans.

The Maryland Inventory of Historic Properties form specifically references the impact of I-495 on Rock Creek Park. "Construction of the beltway did impact some sections of the park, but the road was designed to limit disturbance as much as possible by placing the roadway at the edges of the park boundary. Thus, most of the natural and recreational areas of the park were retained and continue to contribute to the significance of the park."[3] The Capital Beltway does not contribute to the significance of Rock Creek Stream Valley Park Unit 2.

The portion of I-495 through Rock Creek Stream Valley Park is owned by M-NCPPC. The agency granted a perpetual easement (L 3199, F 506 in land records of Montgomery County) to MDOT SHA on March 24, 1964 for "all and every highway purpose." A variety of conditions were attached to the transfer of land, including an agreement between M-NCPPC and MDOT SHA that the Capital Beltway through the easement area shall have a maximum of six lanes, existing area roadways shall not be relocated, and any additional widening of I-495 shall be constructed in the median. During the late 1980s, MDOT SHA

---

[3] Diehlman, Nicole. "Rock Creek Park Stream Valley Park Units 2 and 3." Maryland Inventory of Historic Properties M: 36-87 (Crownsville, MD: Maryland Historic Trust, 1996), 15.

00038638



widened I-495 toward the median resulting in the current configuration of four lanes in each direction. Copies of these easements are in **Appendix B**. Any impact from the Proposed Action within this easement area would not qualify as a Section 4(f) use as it is currently in a transportation use.

### B.     Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.4 acre (0.2 acre under Alternative 9M) of Rock Creek Stream Valley Park, Unit 2 to accommodate widening I-495 and adding a direct access interchange at MD 185 (**Figure 2-10, Figure 2-11**, **Figure 2-12**, and **Figure 2-13**). This would result in the permanent incorporation of portions of Rock Creek Stream Valley Park, Unit 2 into the transportation facility. The area of Section 4(f) use is concentrated along the I-495 outer loop, southwest of Jones Mill Road. The portion of the park that would experience a Section 4(f) use consists of the wooded area between the Rock Creek stream bank and I-495. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. Access to the Rock Creek Trail, which runs along the north side of I-495 through the corridor, would be maintained during construction with limited interruption.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have an adverse effect on Rock Creek Stream Valley Park, Unit 2. Any mitigation for the Section 4(f) use of the historic site would be consistent with stipulations identified in the Section 106 Programmatic Agreement and be coordinated with the NPS, MHT and Section 106 consulting parties. The impacts to Rock Creek Stream Valley Park, Unit 2 require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.4**).

### C.     Applied Minimization

In addition to the minimization efforts described in Section 4, MDOT SHA has been able to further reduce impacts to Rock Creek Stream Valley Park, Unit 2. On June 12, 2019 MDOT SHA held a field review meeting at Rock Creek Park with representatives of the USACE, MDE, MDNR and M-NCPPC. The purpose of the meeting was to review an area along the mainstem of Rock Creek where stream realignment was under consideration as part of the Proposed Action. The agencies asked MDOT SHA to identify options that would avoid relocating Rock Creek.

A follow up meeting with the agencies was held August 8, 2019. MDOT SHA presented three design options at the location within Unit 2 of Rock Creek Park. MDOT SHA recommended incorporating into the preliminary design the option that would result in the least impact to a variety of environmental features within Unit 2 of the stream valley park, including Rock Creek, wetlands, and forest resources.

The option incorporated into the preliminary design involves reducing the off-ramp capacity from the I-495 outer loop to MD 185 from two lanes to one. A proposed slip ramp allowing traffic to merge from the managed lanes to GP lanes was removed from the preliminary design. These changes sufficiently narrowed the LOD to reduce the Section 4(f) use of Rock Creek Stream Valley Park, Unit 2 while avoiding impacts to Rock Creek and associated wetlands. A retaining wall needed to support the highway would be constructed from the existing roadway. This option may require the replacement of the I-495 bridge over Jones Mill Road and Rock Creek. Access to the Rock Creek Trail, which passes beneath this bridge, would be maintained through the duration of construction, with limited interruptions. No linear stormwater management facilities will be placed along the segment of I-495 that passes through Unit 2 of the stream valley park. Subsurface stormwater vaults would be placed beneath the variable width 10-12' shoulders.

00038639



In order to improve existing drainage and culvert outfalls, the LOD would still extend into Rock Creek Park at two locations along this segment.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Rock Creek Stream Valley Park, Unit 2 have been reduced from 9.6 acres (9.5 acres under Alternative 9M) on June 5, 2019 to 0.4 acre (0.2 acre under Alternative 9M) in this Draft Section 4(f) Evaluation. The effort to minimize and mitigate impacts will continue through ongoing and future coordination with MHT and M-NCPPC.

### 2.1.12 National Park Seminary Historic District/ Forest Glen

**Type of Section 4(f) Property:** Historic Site

**Officials with Jurisdiction:** ACHP, MHT

**Type of Section 4(f) Approval:** Individual Evaluation

### A.    Description of Section 4(f) Property

The National Park Seminary Historic District/ Forest Glen (**Figure 2-13)** on Linden Lane in Forest Glen encompasses a wide variety of eclectic and fanciful historic buildings and structures as well as wooded and variable terrain within the 23-acre boundary. Situated between the Connecticut Avenue and Georgia Avenue interchanges on I-495, the Forest Glenn Inn was originally built in 1890. In 1894, it reopened as a finishing school for girls with contributing buildings erected between 1894 and 1915. The district is composed of eclectic houses built in different architectural styles ranging from Japanese Pagoda to Spanish Mission. The National Park Seminary Historic District was listed in the NRHP on September 14, 1972 for its significance as a twentieth century architectural folly and its landscape architecture as well as for its association with education. Although the property is named "National Park Historic District" it is technically a historic property because the boundary is confined to one property containing multiple buildings. Elements that contribute to the significance of the historic site include the 22 standing structures, surrounding wooded landscape, stone retaining walls, statuary, numerous walkways, and rustic footbridges.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 1.2 acres of National Park Seminary Historic District/ Forest Glen to accommodate the replacement and realignment of two bridges across I-495: Linden Lane and the CSX railroad (**Figure 2-13**). The realignments and bridge replacements would result in the permanent incorporation of portions of National Park Seminary Historic District/ Forest Glen into the transportation facility. The area of Section 4(f) use is concentrated at two locations: the northwestern and northeastern corners of the historic site boundary. The bridge carrying Linden Lane would be constructed directly east of the existing alignment. Its length would be extended to accommodate the added width of the managed lanes on I-495. The Y-split of Linden Lane and Newcastle Avenue would also shift slightly into the boundary of the historic site. The realignment would result in the removal of trees and grading, as well as the construction and maintenance of the relocated Linden Lane and bridge over I-495 at the northwestern corner of the historic site.

00038640

The CSX railroad and bridge would be realigned to the west of the existing alignment. This decision was made because an alignment to the east of the existing bridge would result in residential relocations and impacts within the Capitol View Park Historic District. The realignment of the CSX railroad over I-495 to the west would result in the removal of trees and grading, as well as the construction and maintenance of the relocated CSX railroad and bridge at the northeastern corner of the historic site.

The landscape of National Park Seminary Historic District/Forest Glen is a defining characteristic of the historic site. On March 12, 2020, MHT concurred that the Managed Lanes Study would have an adverse effect on National Park Seminary Historic District/Forest Glen. Any mitigation for the Section 4(f) use of the historic site would be consistent with stipulations identified in the Section 106 Programmatic Agreement and be coordinated with the NPS, MHT and Section 106 consulting parties. The impacts to National Park Seminary Historic District/Forest Glen require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.4** and Section **5.1.5**).

### C.    **Applied Minimization**

In addition to the minimization efforts described in Section 4, MDOT SHA has been able to further reduce impacts to National Park Seminary Historic District/Forest Glen. MDOT SHA was able to locate the realigned CSX railroad as close as possible to the existing alignment in order to reduce the Section 4(f) use of National Park Seminary Historic District/Forest Glen. A retaining wall needed to support I-495 would be constructed from the shoulder of I-495, eliminating the need for construction access from within the historic site. No linear stormwater management facilities would be placed along the I-495 inner loop. Subsurface stormwater vaults would be placed beneath the variable width 10-12' shoulders. In order to improve an existing outfall of an unnamed tributary to Forest Glen Creek and culvert outfall, the LOD would still extend into the historic boundary directly west of the realigned CSX railroad.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to National Park Seminary/ Forest Glen have been reduced from 1.3 acres on June 5, 2019 to 1.2 acres in this Draft Section 4(f) Evaluation. The effort to minimize and mitigate impacts will continue through ongoing and future coordination with MHT.

### 2.1.13 Metropolitan Branch, Baltimore and Ohio Railroad

**Type of Section 4(f) Property:** Historic Site

**Officials with Jurisdiction:** ACHP, MHT

**Type of Section 4(f) Approval**: Individual Evaluation

### A.    **Description of Section 4(f) Property**

The Metropolitan Branch, Baltimore and Ohio Railroad (**Figure 2-13**) was determined eligible for the NRHP under Criteria A and C on September 11, 2000. This Section 4(f) historic site is a linear rail line that extends from Union Station in Washington, DC through Montgomery County to Point-of-Rocks in Frederick County. The boundary of the historic site consists of 405.7 acres. The railroad is significant under Criterion A for its association with the transportation industry as well as the agricultural and residential development of Montgomery County. It is also significant under Criterion C for its extant station buildings and engineering structures.

00038641

Small Structure 15046X0 is a small, masonry arched culvert situated north of I-495 and east of Capitol View Avenue (MD 192). It contributes to the significance of the Metropolitan Branch, Baltimore and Ohio Railroad. The small structure carries the modern CSX railroad (historical name: the Metropolitan Branch, Baltimore and Ohio Railroad) across a branch of Rock Creek. The culvert has been altered with a concrete culvert beneath MD 192. The small structure is significant under Criteria A and C.

## B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 8.8 acres of Metropolitan Branch, Baltimore and Ohio Railroad, including 0.3 acre of Small Structure 15046X0. This Section 4(f) use would accommodate realigning the railroad crossing to the west and replacing the existing bridge across I-495. The area of Section 4(f) use consists of approximately 3,500 linear feet of railroad, which extends approximately 1,800 feet south of I-495 and 1700 feet north (**Figure 2-13**). Activities in the area of Section 4(f) use consist of providing construction access for vehicles and materials, removing the existing rail and track bed, and constructing a new alignment. The railroad would be realigned in a manner that allows continued operation during construction of both I-495 and the active CSX railroad. The portion of the historic site that would experience an impact consists of the rails, rail prism, and the bridge across I-495. The outfall of the Small Structure 15046X0 is within the LOD of the Study. However, MDOT SHA is committed to avoiding any physical impact to the historic small structure.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have an adverse effect on Metropolitan Branch, Baltimore and Ohio Railroad. Mitigation for the Section 4(f) use of Metropolitan Branch, Baltimore and Ohio Railroad historic site would be consistent with stipulations identified in the Section 106 Programmatic Agreement and be coordinated with the NPS, MHT and Section 106 consulting parties. The impacts to Metropolitan Branch, Baltimore and Ohio Railroad require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis **Section 5.1.4**.

Section 106 consultation with MHT is ongoing. MDOT SHA has identified new information indicating the segment of Metropolitan Branch, Baltimore and Ohio Railroad within the project area is modified and does not contribute to the significance of the historic property. MDOT SHA will submit a revised effect determination of no adverse effect on Metropolitan Branch, Baltimore and Ohio Railroad. Should MHT concur that the portion of Metropolitan Branch, Baltimore and Ohio Railroad within the project area is non-contributing there would be no Section 4(f) use of the property. The results of ongoing coordination and consultation will be documented in the Final Section 4(f) Evaluation.

## C.    Applied Minimization

Owing to the nature of the railroad as a transportation facility and Section 4(f) property, the minimization efforts described in Section 4 do not readily apply at this location. However, MDOT SHA has been able to further reduce impacts to the Metropolitan Branch, Baltimore and Ohio Railroad. While it was not possible to avoid a Section 4(f) use of National Park Seminary Historic District/Forest Glen, Metropolitan Branch, Baltimore and Ohio Railroad, or Capitol View Park Historic District, the realigned CSX railroad was located as close as possible to the existing alignment in order to reduce the Section 4(f) use of National Park Seminary Historic District/Forest Glen. This would benefit Metropolitan Branch, Baltimore and Ohio Railroad by avoiding the removal of Small Structure 15046X0.

00038642



As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Metropolitan Branch, Baltimore and Ohio Railroad have changed only slightly since June 5, 2019, increasing less than 0.1 acre. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with MHT staff.

### 2.1.14 Forest Glen Historic District

**Type of Section 4(f) Property:** Historic Site

**Officials with Jurisdiction:** MHT

**Type of Section 4(f) Approval**: *De Minimis* Impact

### A.   Description of Section 4(f) Property

The Forest Glen Historic District (**Figure 2-13**) is an NRHP-eligible historic district situated north of I-495 between the Connecticut Avenue and Georgia Avenue interchanges. The boundary of the historic district encompasses 9.3 acres containing a variety of residential architectural styles common during the second half of the nineteenth century. On April 17, 2001 the Forest Glen Historic District was determined eligible for the NRHP under Criteria A and C. Under Criterion A, the district is eligible as an excellent example of early suburban development that resulted from the construction of the Metropolitan Branch of the Baltimore & Ohio Railroad in the 1873. It is a representative early residential community illustrating the history of suburban growth in Montgomery County. Under Criterion C, the district is eligible for its collection of exemplary residential architecture. Elements that contribute to the significance of the historic site are the outstanding examples of Queen Anne, Stick-style, and Gothic Revival architecture and the setting which consists of curvilinear streets, mature trees, and landscape elements greater than fifty years of age.

### B.   Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.2 acre (0.1 acre under Alt 9M) of the Forest Glen Historic District to accommodate widening I-495, removing the existing noise barrier, and erecting a new noise barrier (**Figure 2-13**). The area of Section 4(f) use is concentrated along the southern edge of two properties that contribute to the significance of the historic district: 2418 and 2420 Forest Glen Road. Activities in this area would consist of tree removal, grading, paving, removing the existing noise wall and constructing a new noise wall. The elements of these properties that contribute to the significance of the historic district are the residential dwellings and topographical and landscape features associated with the development of the subdivision. Aerial photographs indicate the area within the historic district that would experience an impact consists of trees planted after the construction of the existing noise wall circa 1982. No standing structures greater than fifty years of age or landscape elements that contribute to the significance of the historic district would experience an impact.

Section 106 consultation has resulted in a finding of no adverse effect. As such, the impact to Forest Glen Historic District under the Proposed Action would constitute a minor use. FHWA intends to issue a finding of *de minimis* impact Forest Glen Historic District.

00038643



### C.    Applied Minimization

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Forest Glen Historic District by eliminating linear stormwater management facilities along the southern edge of the historic boundary. A retaining wall would be constructed at the edge of pavement in that location.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Forest Glen Historic District have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with MHT staff.

## 2.1.15 Forest Glen Neighborhood Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval**: *De Minimis* Impact

### A.    Description of Section 4(f) Property

Forest Glen Neighborhood Park (**Figure 2-13)** is a publicly-owned park and recreation area at 2323 Coleridge Drive in Silver Spring. It is adjacent to the I-495 outer loop and east of MD 192. This 3.7-acre park features two basketball courts, a playground area and a small parking lot. The park is under the jurisdiction of M-NCPPC Montgomery County and was acquired in 1969.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.3 acre (0.2 acre under Alternative 9M) of Forest Glen Neighborhood to accommodate widening on I-495, providing access for construction vehicles and materials; and removing and replacing the existing noise wall (**Figure 2-13**). The area of Section 4(f) use is a narrow linear area across the southern end of the park. This area is planted with trees. A basketball court in close proximity to the existing noise barrier would not experience a permanent impact. Activities within the area of Section 4(f) use would consist of tree removal, grading, removing the existing noise barrier and constructing a replacement; and access for construction equipment and materials. No recreational facilities would experience an impact from the proposed use of Section 4(f) property.

FHWA intends to make a *de minimis* impact determination for Forest Glen Neighborhood Park if M-NCPPC, Montgomery County concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

### C.    Applied Minimization

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Forest Glen Neighborhood Park by eliminating linear stormwater management facilities along the edge of the park boundary. The narrowest typical section has been applied where improvements to I-495 are proposed along the park. This entails constructing a closed section with a retaining wall along the edge of pavement on I-495. At the conclusion of construction and subject to additional coordination with M-NCPPC, new trees would be planted on the park side of the noise barrier. No surface stormwater management facilities would be constructed adjacent to the park.

00038644



As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Forest Glen Neighborhood Park have increased from 0.2 acre under Alternative 9M on June 5, 2019 to 0.3 acres under Alternative 9M in this Draft Section 4(f) Evaluation. The effort to minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

00038645

Figure 2-11: Section 4(f) Property (Map 8 of 35)



00038646



**Figure 2-12: Section 4(f) Property (Map 9 of 35)**



00038647



**Figure 2-13: Section 4(f) Property (Map 10 of 35)**



00038648

### 2.1.16 Calvary Evangelical Lutheran Church

**Type of Section 4(f) Property:** Historic Site

**Officials with Jurisdiction:** MHT

**Type of Section 4(f) Approval**: *De Minimis* Impact

#### A.    Description of Section 4(f) Property

The Calvary Lutheran Evangelical Church (**Figure 2-14**) at 9545 Georgia Avenue in Silver Spring, Maryland was determined eligible for the NRHP under Criterion C on June 7, 2013. It is an excellent example of ecclesiastical architecture from the middle of the twentieth century. The property is near the southeast quadrant of the I-495 Exit 31B where northbound Georgia Avenue enters the I-495 inner loop. The historic site is a complex of five attached buildings erected over the course of three building campaigns extending from 1948 until 1962. Elements that contribute to the significance of the historic site are the physical buildings, built in a variety of styles that range from Gothic Revival to Modern. The landscaping, driveways and parking areas do not contribute to the historic significance of this property.

#### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of less than 0.1 acre of the Calvary Evangelical Lutheran Church property to accommodate realigning the onramp from northbound Georgia Ave to the I-495 inner loop (**Figure 2-14**). The area of Section 4(f) use is concentrated along a narrow frontage strip and sidewalk that extends approximately 150 feet along northbound Georgia Ave. Activities in the area of Section 4(f) use would consist of clearing, grading, paving, and access for construction vehicles and materials. The ramp would be relocated approximately 30 feet to the south to accommodate widening on I-495 and a new interchange configuration. No standing structures or features that contribute to the historical significance of the Calvary Evangelical Lutheran Church property would experience a use.

On March 12, 2020 MHT concurred that the Managed Lanes Study would have no adverse effect on Calvary Evangelical Lutheran Church. MHT additionally provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding. As such, the impact to the historic church property under the Proposed Action would constitute a minor use. FHWA intends to make a finding of *de minimis* impact to Calvary Evangelical Lutheran Church.

#### C.    Applied Minimization

Consistent with the minimization efforts described in Section 4 MDOT SHA was able to reduce impacts to Calvary Evangelical Lutheran Church by eliminating linear stormwater management facilities along the western edge of the historic boundary. Additionally, MDOT SHA worked to realign the ramp to the north of the property in such a manner to avoid impacts within the historic boundary.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Calvary Evangelical Lutheran Church have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with MHT staff.

00038649

### 2.1.17 Sligo Creek Parkway

**Type of Section 4(f) Property:** Historic Site and Public Park

**Officials with Jurisdiction:** ACHP, MHT, M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** Individual Evaluation

### A.    Description of Section 4(f) Property

Sligo Creek Parkway (**Figure 2-14)** is a NRHP-eligible historic district and publicly-owned park that extends between University Boulevard (MD 193) near Silver Spring to New Hampshire Avenue (MD 650) in Takoma Park. For the purposes of this evaluation, Sligo Creek Parkway consists of Sligo Golf Course and Units 3 and 4 of Sligo Creek Stream Valley Park. The parkway is composed of an approximately 300-foot right-of-way and extends approximately five miles. It comprises 543 acres and is the longest parkway under the jurisdiction of M-NCPPC, Montgomery County. Other important features include pedestrian trails, playgrounds, picnic areas, native and ornamental plantings, and Sligo Golf Course. The golf course is a nine-hole, public facility situated adjacent to the I-495 inner loop and occupying 71.9 acres. Although owned by M-NCPPC, Montgomery County, the golf course is operated through a lease agreement with the Montgomery County Revenue Authority, a private management company.

Sligo Creek Stream Valley Park, Unit 3 is one of the six units that comprise Montgomery County's Sligo Creek Stream Valley Park, a publicly-owned park, to protect the environmentally sensitive Sligo Creek stream valley. Unit 3 of Sligo Creek Stream Valley Park extends between the I-495 inner loop and Colesville Road (US 29). The entirety of Sligo Creek Stream Valley Park encompasses approximately 530 acres of which unit 3 comprises approximately 73.5 acres. Park amenities include open space, playgrounds, and ballfields. The Sligo Creek Trail is an element within Sligo Creek Stream Valley Park. This hard surface trail is eight feet wide and extends 10.2 miles north to south and passes beneath I-495 adjacent to Sligo Creek Parkway. It is the most heavily used facility in the stream valley park. Features of the trail include restrooms, drinking fountains, and accessible parking.

The park is under the jurisdiction of M-NCPPC and was acquired over time beginning in 1930 using funding from the Capper-Cramton Act of 1930.

The portion of I-495 through Sligo Creek Stream Valley Park is owned by M-NCPPC Montgomery County. The agency granted a perpetual easement (L 2696, F 11 in land records of Montgomery County) to MDOT SHA on November 25, 1959 "in perpetuity for highway purposes over all lands...".[4] A copy of this easement is enclosed in the **Appendix B**. MDOT SHA possesses additional slope easements beyond the perpetual easement that provide for drainage and allow for the construction of new drainage structures and highway widening.

Sligo Creek Parkway was determined eligible for the NRHP on October 12, 2000 and again on June 22, 2005 under Criterion A for its association with trends associated with social history, recreation, transportation, and conservation during the first half of the twentieth century. Sligo Creek Parkway is also significant under Criterion C as a good example of its type and period of construction. Elements of the Parkway that contribute to its historic significance consist of the undivided two-lane road, metal foot

---

[4] Liber 2696, Folio 11. Land Records of Montgomery County. www.mdlandrec.net. Accessed Multiple Times.

00038650

bridges, stone bridges, stone retaining walls, reinforced timber guardrails, and stream valley views. As an historic site, Sligo Creek Parkway is under jurisdiction of MHT.

The portion of the parkway that would experience a use as a result of the Proposed Action was acquired in 1934 using funding from the Capper-Cramton Act. Sligo Golf Course was acquired in 1946.

## B.   Potential Section 4(f) Use

The Proposed Action would result in the Section 4(f) use of 4.1 acres (3.3 acres under Alternative 9M) of the Sligo Creek Parkway *historic site* to accommodate widening along I-495; augmenting an existing culvert beneath I-495 and the construction and maintenance of a stormwater management facility (**Figure 2-14**). Owing to the presence of the transportation easement, portions of the *public park* are in an existing transportation use. The easement reduces the use of Section 4(f) parkland to 3.2 acres (2.3 acres under Alternative 9M). The area of Section 4(f) use is concentrated at three locations: a narrow area extending approximately 1,400 linear feet along the I-495 outer loop; a narrow area extending approximately 2,300 feet along the I-495 inner loop; and an oblong shape at the northeast corner of the golf course. Activities in the area of Section 4(f) consist of tree removal; grading; bridge replacement; movement of construction vehicles and materials; and the construction and operation of a stormwater management facility. The area of impact along the I-495 inner loop would require the relocation of two tee boxes parallel to their current distance from the hole in order to maintain play at the golf course. The stormwater management facility on the Sligo Golf Course is necessary at this location owing to limited available space for the treatment of stormwater along this portion of I-495. The proposed facility is located in the northeast corner of the golf course, in an out-of-bounds location that will not affect game play of the recreational function of the golf course.

A proposed construction staging area on the north side of the outer loop and northwest of Sligo Creek Trail is within MDOT SHA's existing easement, outside the historic boundary, and would not result in a Section 4(f) use. Access to Sligo Creek Trail would be temporarily restricted during the bridge replacement at that location and would be coordinated with M-NCPPC Montgomery County.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have an adverse effect on Sligo Creek Parkway. Any mitigation for the Section 4(f) use of the historic site would be consistent with stipulations identified in the Section 106 Programmatic Agreement in consultation with MHT and consulting parties. The impacts to Sligo Creek Parkway require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.6**).

## C.   Applied Minimization

In addition to the minimization efforts described in Section 4, MDOT SHA has been able to further reduce impacts to Sligo Creek Parkway. No linear stormwater management facilities will be placed along the roadside. A retaining wall would be constructed at the edge of pavement along Sligo Creek Parkway. In an effort to avoid the potential relocation of the Margaret Schweinhaut Senior Center, the centerline and proposed widening of I-495 has been slightly shifted to the south. This shift results in impacts to Sligo Golf Course that would involve relocating two tee boxes. While the shift under Alternative 9M would result in less Section 4(f) use than the other alternatives, it is likely the tee boxes will still need to be relocated. However, this alteration would only temporarily affect game play and not the recreational function of the golf course.

00038651

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Sligo Creek Parkway *historic site* have changed from 5.0 acres (4.1 acres under Alternative 9M) on June 5, 2019 to 4.1 acres (3.3 acres under Alternative 9M) in this Draft Section 4(f) Evaluation. This decrease is owing to removing stormwater management facilities and constructing a retaining wall at the edge of the pavement. The effort to minimize and mitigate impacts will continue through ongoing and future coordination with ACHP, MHT, and M-NCPPC staff.

### 2.1.18 South Four Corners Neighborhood Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.   Description of Section 4(f) Property

South Four Corners Neighborhood Park (**Figure 2-14)** is a publicly-owned park and recreation area at 900 Forest Glen Road in Silver Spring. This 2.0-acre park features a playground, park benches, and open space. The park is the easternmost recreational facility in a string of parks that include Sligo Creek Parkway, Argyle Local Park, and Margaret Schweinhaut Senior Center. The park was acquired in 1946 and is under the jurisdiction of M-NCPPC.

### B.   Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.1 acre (< 0.1 acre under Alternative 9M) from South Four Corners Neighborhood Park to accommodate widening along I-495; replacing the existing noise wall; and augmenting an existing stormwater culvert beneath I-495 resulting in the permanent incorporation of portions of South Four Corners Neighborhood Park into the transportation facility (**Figure 2-14**). The area of Section 4(f) use consists of a rectangular area at the existing culvert outlet in the southwest corner of the park and a narrow strip that extends approximately 300 feet along the southern edge of the park. Activities within this area consist of tree removal, grading, removing the existing noise barrier and constructing a replacement, and access for construction vehicles and materials. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The proposed impacts would not adversely affect the activities, features, or attributes that qualify the park for protection under Section 4(f).

FHWA intends to make a *de minimis* impact determination for Forest Glen Neighborhood Park if M-NCPPC, Montgomery County concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

### C.   Applied Minimization

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to South Four Corners Neighborhood Park by eliminating linear stormwater management facilities along the edge of the park boundary. The narrowest typical section has been applied where improvements to I-495 are proposed along the park. This entails constructing a closed section with a retaining wall along the edge of

00038652



pavement on I-495. No surface stormwater management facilities would be constructed adjacent to the park.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to South Four Corners Neighborhood Park have remain unchanged since June 5. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

### 2.1.19 Montgomery Blair High School Athletic Fields

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** Montgomery County Public Schools, M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Montgomery Blair High School Athletic Fields (**Figure 2-15**) are a publicly-owned recreation area at 51 University Boulevard in Silver Spring. The fields primarily serve as recreation for the high school student body but are also open for use by the public. The 30-acre recreation facility features two combination football and soccer fields, multiple tennis and basketball courts, a baseball/softball field, fitness trail, and playground. The recreation area is under jurisdiction of the Montgomery County Public Schools and opened in 1998. A lease agreement with M-NCPPC, Montgomery County signed October 8, 2019 outlines the use and maintenance of Montgomery Blair High School Athletic Fields between the two agencies. As a result of this agreement, M-NCPPC is also an official with jurisdiction for the park.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 1.4 acres (1.1 acres under Alternative 9M) of Montgomery Blair High School Athletic Fields to accommodate widening along I-495; realignment of the offramp from the I-495 outer loop to US 29; replacing the existing noise barrier; constructing a new noise barrier; and providing access for construction vehicles and equipment (**Figure 2-15**). The area of Section 4(f) use is concentrated at two locations: a narrow strip along the southern edge of the recreation area, where it borders the I-495 outer loop; and a narrow area northwest of the high school track along US 29. Activities in the area of Section 4(f) use consist of tree removal; grading; paving; removing the existing noise wall; constructing a new noise wall; and access for construction vehicles and materials. The portion of the athletic fields that would experience a use is vegetated open space that provides a visual buffer between Montgomery Blair High School Athletic Fields and I-495. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The proposed impacts would not adversely affect the activities, features, or attributes that qualify the park for protection under Section 4(f).

The impact to the property under the Proposed Action would constitute a minor use. FHWA intends to make a *de minimis* impact determination for Montgomery Blair High School Athletic Fields if the Montgomery County Public Schools Board of Education and M-NCPPC concur that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and, if public comments do not identify new issues.

00038653

## C.    Applied Minimization

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Montgomery Blair High School Athletic Fields by eliminating linear stormwater management facilities along the edge of the park boundary. The narrowest typical section has been applied where improvements to I-495 are proposed along the recreation area. This entails constructing a closed section with a retaining wall along the edge of pavement on I-495. No surface stormwater management facilities would be constructed adjacent to the park.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Montgomery Blair High School Athletic Fields have changed from 1.1 acres under Alternative 9M on June 5, 2019 to the 1.2 acres in this Draft Section 4(f) Evaluation. This increase is owing to changes in the LOD at the interchange of I-495 and US 29. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with Montgomery County Public Schools and M-NCPPC staff.

### 2.1.20  Blair Local Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Blair Local Park (**Figure 2-15**), also known as Montgomery Blair Ball fields, is a publicly-owned park and recreation area associated with and adjoining Montgomery Blair High School at 51 University Boulevard in Silver Spring, north of I-495. The 10.2-acre park features a baseball field, softball field, and football field and provides recreational opportunities for students at the high school as well as the public. Parking is available onsite. The park is under jurisdiction of M-NCPPC Montgomery County and was acquired in 1994 with POS funds.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.4 acre (0.3 acre under Alternative 9M) of Blair Local Park to accommodate widening along I-495; replacing the existing noise barrier; constructing a new noise barrier; and providing access for construction vehicles and equipment (**Figure 2-15**). The area of Section 4(f) use is concentrated along a narrow strip planted with trees along the southern edge of the park, where it borders the I-495 outer loop. Activities in the area of Section 4(f) use consist of tree removal; grading; paving; removing the existing noise wall; constructing a new noise wall; and access for construction vehicles and materials. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. No activities, features or attributes that qualify the park for protection under Section 4(f) would experience an impact or adverse effect.

The impact to the property under the Proposed Action would constitute a minor use. FHWA intends to make a *de minimis* impact determination for Blair Local Park if M-NCPPC Montgomery County concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection.

00038654



## C.    Applied Minimization

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Blair Local Park by eliminating linear stormwater management facilities along the edge of the park boundary. The narrowest typical section has been applied where improvements to I-495 are proposed along the recreation area. This entails constructing a closed section with a retaining wall along the edge of pavement on I-495. No surface stormwater management facilities would be constructed in or adjacent to the park.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Blair Local Park have changed from 0.2 acres under Alternative 9M on June 5, 2019 to 0.3 acre under Alternative 9M) in this Draft Section 4(f) Evaluation. The difference in impacts from Alternative 9M is related to changes in the location and design of the stormwater management facilities situated southeast of the park. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

### 2.1.21  Indian Spring Club Estates and Indian Spring Country Club

**Type of Section 4(f) Property:** Historic Site

**Officials with Jurisdiction:** ACHP, MHT

**Type of Section 4(f) Approval:** Individual Evaluation

### A.    Description of Section 4(f) Property

The Indian Spring Club Estates and Indian Spring Country Club (**Figure 2-15**) is an NRHP-eligible historic district situated south of I-495 between Colesville Road and Indian Spring Terrace Local Park. The boundary of the historic district encompasses approximately 51 acres and maintains a significant association with suburban community planning and development by Jewish developers in the Silver Spring area. Under Criterion C, the district is eligible for its collection of exemplary pre-World War II middle class residential architecture. Elements that contribute to the significance of the historic site are the outstanding examples of residential architecture featuring Tudor Revival and Colonial Revival details as well as the Hastings Conservation Area public park.

### B.    Potential Section 4(f) Use

The Proposed Action would result in the Section 4(f) use of 1.2 acres (1.1 acres under Alternative 9M) of Indian Spring Club Estates and Indian Spring Country Club to accommodate widening I-495; relocating the on-ramp from northbound US 29 to the I-495 inner loop; and access for construction vehicles and materials (**Figure 2-15**). The area of Section 4(f) use extends approximately 750 feet along the south side of the existing ramp and I-495. Activities in the area of Section 4(f) use would consist of tree removal, grading, and realigning the ramp from northbound US 29 to the I-495 inner loop. Under the Proposed Action, the Section 4(f) use would impact one property that contributes to the significance of the historic district: Silver Spring YMCA at 9800 Hastings Drive. The impact would involve relocating the indoor and outdoor swimming pools.

00038655



Figure 2-14: Section 4(f) Property (Map 11 of 35)



00038657



On March 12, 2020, MHT concurred that the Managed Lanes Study would have an adverse effect on Indian Spring Club Estates and Indian Spring Country Club. Any mitigation for the Section 4(f) use of the historic site would be consistent with stipulations identified in the Section 106 Programmatic Agreement and be coordinated with the NPS, MHT and Section 106 consulting parties. The impacts to Indian Spring Club Estates and Indian Spring Country Club require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.7**).

## C.    Applied Mitigation

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Indian Spring Club Estates and Indian Spring Country Club by eliminating linear stormwater management facilities along the edge of the park boundary. The narrowest typical section has been applied where improvements to I-495 are proposed along the park. This entails constructing a closed section with a retaining wall along the edge of pavement on I-495.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Indian Spring Club Estates and Indian Spring Country Club have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with ACHP and MHT staff.

### 2.1.22 Indian Springs Terrace Local Park

**Type of Section 4(f) Property:** Public Park

**Officials with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** Individual Evaluation

## A.    Description of Section 4(f) Property

This 11-acre publicly-owned park and recreation area at 9717 Lawndale Drive in Silver Spring features a playground, activity building, soccer field, basketball court, baseball/softball field, and tennis court. The park is under the jurisdiction of M-NCPPC and was acquired in 1971.

## B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 1.4 acres (1.2 acres under Alternative 9M) of Indian Spring Terrace Local Park (**Figure 2-15**) to accommodate widening along I-495; replacing the existing noise barrier; constructing a new noise barrier; augmenting an existing storm drain outfall; constructing, operating, and maintaining a stormwater management facility; and providing access for construction vehicles and equipment. The area of Section 4(f) use is concentrated at two locations: a narrow strip planted with trees that extends approximately 1,300 feet along the northern edge of the park, where it borders the I-495 inner loop and a one acre, irregularly shaped area near the beginning of the ramp from the inner loop to southbound University Boulevard. Activities within the area of Section 4(f) use would consist of tree removal, grading, a work area for a construction pit where the augmentation pipe would be installed; construction, operation and future maintenance of a stormwater management facility; and access for construction vehicles and materials. The stormwater management facility is required at this location owing to the limited available space for the treatment of stormwater on this portion of I-495.

00038658



There is potential for the relocation of the noise barrier to directly impact a basketball court on park property. Coordination with M-NCPPC, Montgomery County is ongoing. Portions of the park would be permanently incorporated into the transportation facility. The impacts to Indian Springs Terrace Local Park require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.7**).

C.    **Applied Minimization**

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Indian Springs Terrace Local Park by eliminating linear stormwater management facilities along the edge of the park boundary. The narrowest typical section has been applied where improvements to I-495 are proposed along the park. This entails constructing a closed section with a retaining wall along the edge of pavement on I-495.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Indian Springs Terrace Local Park have been reduced from 2.3 acres (2.1 acres under Alternative 9M) to 1.4 acres (1.2 acres under Alternative 9M) in this Draft Section 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

00038659



## Figure 2-15: Section 4(f) Property (Map 12 of 35)



00038660



### 2.1.23 Northwest Branch Stream Valley Park, Unit 3

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** Individual Evaluation

### A.    Description of Section 4(f) Property

Northwest Branch Stream Valley Park Unit 3 (**Figure 2-16**) is one of seven units that comprise Northwest Branch Stream Valley Park, a publicly-owned park and recreation area. Northwest Branch Stream Valley Park Unit 3 extends along the Northwest Branch Anacostia River between Columbia Pike (US 29) and New Hampshire Avenue (MD 650), encompassing 144 acres of the total 327-acre Northwest Branch Stream Valley Park. A feature of Northwest Branch Stream Valley Park is the natural surface Rachel Carson Greenway Trail, which comprises a portion of the larger Northwest Branch Trail. The trail system runs north-south, extending from Randolph Road to the Montgomery/Prince George's County border. The park is an undeveloped wooded area that serves as a protective buffer along the Northwest Branch of the Anacostia River. The park was acquired in 1953 using funding from the Capper-Cramton Act of 1930 and is under the jurisdiction of M-NCPPC Montgomery County. Additional lands have been acquired using POS funds.

The two parallel bridges on I-495 are situated approximately 100 feet above the Northwest Branch Stream Valley Park. The area directly beneath the western half of the bridges is owned by MDOT SHA. The area beneath the eastern portion of the bridges is in an easement granted to MDOT SHA by M-NCPPC. The latter agency granted a perpetual easement (Liber 3098, Folios 574-578 in land records of Montgomery County) to MDOT SHA on May 15, 1963 for "normal highway purposes." A copy of this easement is in **Appendix B**. Any impacts from the Proposed Action within these areas would not qualify as an impact to Section 4(f) property. As this area is already in a transportation use, Section 4(f) would not apply (23 CFR 774.11 and 23 CFR 774.17).

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 3.2 acres of Northwest Branch Stream Valley Park, Unit 3 to accommodate replacing the bridge across Northwest Branch Anacostia River; augmenting two existing storm drains; and providing access for construction vehicles and equipment (**Figure 2-16**). There is no difference in the size of impacts among the Build Alternatives owing to the large area needed to construct the new bridge and remove the existing structure. The area of Section 4(f) use is concentrated in two areas: two small rectangular areas in the northwest quadrant of the bridge crossing at the location of existing storm drain outfalls, north of the I-495 outer loop; and a large rectangular area south of the inner loop. Activities in the former areas consist of tree removal; grading; improvements to and augmentation of two extant storm drains; and access for construction vehicles and equipment. The outfalls at these locations would be modified to meet current design standards. Activities in the latter area consist of tree removal; grading; construction staging; and access for construction vehicles and equipment. It should be noted that replacement of the current bridges across Northwest Branch Anacostia River would be needed in the near future as the existing bridges reach the end of their 60+ year life span.

00038661



The bridges across Northwest Branch Stream Valley Park would be replaced in a manner that allows the passage of vehicle traffic through the duration of construction. In order to remove the existing bridges, they will be demolished in pieces and dropped by crane onto trucks which will transport pieces for removal along the existing highway. Access for construction vehicles would be via a temporary switchback road approximately 50 feet in width. Access to the highway, however, would be from a temporary construction road built within the existing MDOT SHA right-of-way. For safety and efficiency, constructability requires a temporary access road from the I-495 inner loop to the site through the western portion of the park. A temporary crossing of Northwest Branch is required. A second temporary road to exit the construction site would be built to the east. Vehicles returning to the I-495 inner loop would do so from within the existing highway right-of-way. For the safety of trail users, the portion of the Northwest Branch Trail beneath I-495 would be closed through the duration of construction. At the conclusion of construction, affected locations within the park would be restored and reopened. Many of these actions are described as temporary in nature, because no transfer of ownership is anticipated. However, MDOT SHA recognizes that temporary occupancies of parkland can result in permanent impacts. For the purposes of this Draft Section 4(f) Evaluation, all impacts are considered permanent.

Coordination with M-NCPPC, Montgomery County is ongoing. The impacts to Unit 3 of Northwest Branch Stream Valley Park require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.8**).

### C.    **Applied Minimization**

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Unit 3 of Northwest Branch Stream Valley Park by eliminating linear stormwater management facilities along the edge of the park boundary where they would result in impacts. The narrowest typical section has been applied where improvements to I-495 are proposed. This entails constructing a closed section with a retaining wall along the edge of pavement on I-495.

Additionally, MDOT SHA explored several possibilities for replacing the I-495 bridges across Unit 3 of Northwest Branch Stream Valley Park. Consideration was given to placing construction cranes in each of the four quadrants of the bridges, but this was determined to be more impactful to parkland and high quality wetlands north of the bridges. Another possibility examined was placing two cranes at the western or eastern ends of the bridges. However, this arrangement would not provide enough room to turn equipment around due to the size of the construction vehicles. This would create a constrained area for construction, which would present a safety issue.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Northwest Branch Stream Valley Park have changed from 3.0 acres on June 5, 2019 to 3.2 acres in this Draft Section 4(f) Evaluation. The increase in Section 4(f) use is related to enlarging the work areas needed to augment existing storm drains. The locations of these changes have been coordinated with M-NCPPC. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

00038662



### 2.1.24 Cherry Hill Road Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Prince George's County

**Type of Section 4(f) Approval:** Individual Evaluation

### A.    Description of Section 4(f) Property

Cherry Hill Road Park (**Figure 2-18** and **Figure 2-19**) is a publicly-owned park and recreation area at 9201 and 9301 Cherry Hill Road in College Park. Cherry Hill Road Park is adjacent to the I-495 inner loop, west of the Baltimore Avenue (US 1) interchange. Amenities in the 42.1-acre park include two tennis courts, community garden plots, two picnic areas, a natural surface trail and a pavilion. This park is under the jurisdiction of M-NCPPC, Prince George's County and was acquired from the United States Government in 1980. The quitclaim deed transferring ownership of the property to M-NCPPC contains a variety of stipulations limiting the activities that can take place on the park property. Stipulation 7 reverts a 100-foot wide strip along the north side of the park to the federal government in the event MDOT SHA determines it is necessary to widen I-495. Coordination with M-NCPPC is ongoing.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 1.8 acres of Cherry Hill Road Park to accommodate widening along I-495; constructing, operating, maintaining stormwater management facilities; augmenting the existing culvert conveying Little Paint Branch beneath I-495; and providing access for construction vehicles and materials (**Figure 2-18** and **Figure 2-19**). The area of Section 4(f) use is concentrated at four different locations: a narrow area planted with trees along the east side of Cherry Hill Road, at the western end of the park; two rectangular areas currently planted with trees along I-495 that comprise approximately one acre, north of the community garden; a narrow linear area planted with trees along the northern end of the park where it bounds the I-495 inner loop; and a small rectangular area at the existing culvert for Little Paint Branch.

Activities in the area of Section 4(f) use consist of grading; tree removal; constructing, operating, and maintaining stormwater management facilities; improvements to the existing culvert for Little Paint Branch; and access for construction vehicles and materials. While no recreational activities would be disrupted, the Proposed Action would affect natural areas of the park by causing substantial tree loss. The stormwater management facilities are required at this location owing to the limited available space for the treatment of stormwater on this portion of I-495. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. Even so, the impacts would result in the permanent incorporation of portions of Cherry Hill Road Park into the transportation facility. Coordination with M-NCPPC, Prince George's County is ongoing. The impacts to Cherry Hill Road Park require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.9**).

### C.    Applied Minimization

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Cherry Hill Road Park by eliminating linear stormwater management facilities along the edge of the park boundary. The narrowest typical section has been applied where improvements to I-495 are proposed. This entails constructing a closed section and retaining wall along the edge of pavement on I-495.

00038663



Stormwater quantity treatment would be provided in underground vaults beneath the shoulder. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

In an additional effort to further reduce impacts to Cherry Hill Road Park, asymmetrical roadway widening toward the I-495 outer loop was studied and included in the proposed engineering design. The end result limits the area of widening along the inner loop and associated impacts to the park. The greatest impact of this minimization is at the northeastern corner of the park, adjacent to the US 1 interchange.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Cherry Hill Road Park have changed from 2.0 acres on June 5, 2019 to the 1.8 acres in this Draft Section 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

### 2.1.25 Beltsville Agricultural Research Center (BARC)

**Type of Section 4(f) Property:** Historic Site

**Officials with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

The Beltsville Agricultural Research Center (BARC, **Figure 2-17** through **Figure 2-20**) is an NRHP-eligible historic district, situated north of I-495 between the I-95 and US 1 interchanges. BARC was determined eligible for the NRHP on October 16, 1998. Owned by the United States Department of Agriculture (USDA), the facility was established in Beltsville in 1910 and significantly expanded in the 1930s and 1940s. The historic boundary of the property encompasses 6,582 acres. BARC is significant under Criterion A for the history and development of the agricultural research facility and its association with New Deal policies and programs, including the Civilian Conservation Corps. BARC is also eligible under Criterion C for the architectural merits of its collection of research clusters and for the design contributions of landscape architect A.D. Taylor. Elements that contribute to the significance of the historic site include cultivated fields and hundreds of buildings and structures such as barns, greenhouses, laboratories, dwellings and office buildings.

This portion of I-495 is constructed on land owned by the federal government and administered by the USDA. The quarter mile east of the ramp from the I-95 park and ride lot to the I-495 outer loop and half mile east of the Cherry Hill Road overpass are on easements granted by the USDA to MDOT SHA on October 4, 1971 (L 4053, F 130 of the Land Records of Prince George's County) in response to an Act of Congress approved October 15, 1966. A copy of this easement is in **Appendix B**. Any impact from the Proposed Action within this easement area would not qualify as a Section 4(f) impact, as the land is already in a transportation use (23 CFR 774.11 and 23 CFR 774.17). Coordination with the USDA would include the preparation of a new easement that would document any additional use required as part of the Proposed Action and clarify both MDOT SHA's permitted use and property ownership.

00038664



### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.5 acre of BARC to accommodate access for construction vehicles and materials at the I-95 interchange; the augmentation of existing culverts beneath I-495; and the removal and replacement of the Cherry Hill Road bridge across I-495 (**Figure 2-17**, **Figure 2-18**, **Figure 2-19**, and **Figure 2-20**). The area of Section 4(f) use is concentrated at three locations: a rectilinear area east of the existing ramp from the I-95 park-and-ride to the I-495 outer loop; the northeast quadrant of the bridge carrying Cherry Hill Road over I-495; and a small rectangular area north of the I-495 outer loop approximately 2,000 feet west of the interchange with US 1. Activities in the area of Section 4(f) use would consist of tree removal, grading, and access for construction vehicles and materials. No standing structures or agricultural activities that contribute to the significance of BARC would experience an impact.

On March 12, 2020 MHT concurred that the Managed Lanes Study would have no adverse effect on BARC within the historic boundary. MHT additionally provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding. As such, the impact to BARC under the Proposed Action would constitute a minor use. FHWA intends to make a finding of *de minimis* impact to BARC.

### C.    Applied Minimization

Consistent with the minimization efforts described in Section 4 MDOT SHA was able to reduce impacts to BARC by eliminating above-ground stormwater management facilities along the I-495 where they would result in impacts to the historic district.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to BARC have remained been reduced from 2.5 acres on June 5, 2019 to the 0.5 acre in this Draft Section 4(f) Evaluation The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with MHT staff.

00038665

DRAFT SECTION 4(f) EVALUATION



Figure 2-16: Section 4(f) Property (Map 13 of 35)



DRAFT SECTION 4(f) EVALUATION



Figure 2-17: Section 4(f) Property (Map 14 of 35)



00038667



Figure 2-18: Section 4(f) Property (Map 15 of 35)



DRAFT SECTION 4(f) EVALUATION



Figure 2-19: Section 4(f) Property (Map 16 of 35)



00038669

Figure 2-20: Section 4(f) Property (Map 17 of 35)



00038670



### Figure 2-21: Section 4(f) Property (Map 18 of 35)



00038671



**Figure 2-22: Section 4(f) Property (Map 19 of 35)**

Legend
- Limits of Proposed Action
- Historic Site
- Park Property
- Impacted Contributing Properties in Historic District
- Property Permitted to MDOT-SHA

**Section 4(f) Property**

Map 19 of 35

1 in = 0.2 miles

0    0.1    0.2 Miles

00038672

00038673



### 2.1.26 Hollywood Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Prince George's County

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Hollywood Park (**Figure 2-20**) is a publicly-owned park and recreation area at 9699 53rd Avenue in College Park, Maryland. The park is composed of several tax parcels adjacent to the Washington Metropolitan Area Transit Authority's Greenbelt Metro Station. This 22.3-acre neighborhood park features full and half basketball courts, two tennis courts, two softball fields, a picnic shelter and playground. This park is under the jurisdiction of M-NCPPC, Prince George's County and was acquired in 1957 and expanded in 1958 and 1976 using POS funds.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of less than 0.1 acre of Hollywood Park to accommodate the realignment of the entrance to the Greenbelt Metro Station and provide access to construction vehicles and materials (**Figure 2-20**). The area of Section 4(f) use is a small, rectangular are at the northeastern corner of the park, just east of the MARC railroad right-of-way. Portions of the area may already be in a transportation use beneath the current alignment of the ramp from the I-495 inner loop to the Greenbelt Metro Station (23 CFR 774.11 and 23 CFR 774.17). Activities within the area of Section 4(f) use would consist of removing the existing roadway and bridge; and access for construction vehicles and materials. The proposed realignment would move the ramp further away from Hollywood Park. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

The impact to the property under the Proposed Action would constitute a minor use. FHWA intends to make a *de minimis* impact determination for Hollywood Park if M-NCPPC, Prince George's County concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection.

### C.    Applied Minimization

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Hollywood Park by eliminating linear stormwater management facilities where they would result in impacts to the park.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Hollywood Park have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

00038674



### 2.1.27 Greenbelt Historic District

**Type of Section 4(f) Property:** Historic Site

**Officials with Jurisdiction:** MHT, NPS

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Greenbelt Historic District (**Figure 2-21** and **Figure 2-22**) is an NRHP-listed historic district and a National Historic Landmark situated northwest of I-495 interchange with the Baltimore Washington Parkway. This historic district consists of the City of Greenbelt inclusive of Buddy Attick Lake Park, and three discontinuous parcels to the west of the historic district proper that are separated by the surrounding road network: Greenbelt Junior High School, Greenbelt City Cemetery, and Indian Springs Park. The historic district encompasses 789.1 acres. Greenbelt Historic District was listed in the NRHP on November 25, 1980 as one of three planned "green" communities founded by the federal government under the New Deal. The historic district was additionally registered as a National Historic Landmark on February 18, 1997. As an historic site and National Historic Landmark, Greenbelt Historic District is under the jurisdiction of MHT and NPS. The town is historically significant for its association with the academic attempt to use planning and architecture to solve the social and economic problems confronting the nation during the Great Depression. Elements that contribute to the significance of the historic site include the residential apartment units, condominiums, row houses, and detached houses set within the landscaped "green belt."

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.3 acre of the Greenbelt Historic District to accommodate augmenting existing drainage outfalls; realigning the interchange of Baltimore Washington Parkway with Southway and Greenbelt Road; and construction, operation, and future maintenance of stormwater management facilities (**Figure 2-21** and **Figure 2-22**). There are two areas of Section 4(f) use: a rectangular area adjacent to the inner loop and outer loop at the southeastern end of the interchange with Kenilworth Ave; and two small areas north and east of the exit from MD 295 south to Southway. Activities in the areas of Section 4(f) use would consist of tree removal, grading, installation of a stormwater augmentation pipe, and access for construction vehicles and materials. The use would require the acquisition of right-of-way from three properties that contribute to the significance of the historic district: Indian Springs Park, Buddy Attick Lake Park, and the residential apartments at 7-9-11 Southway. The impact to Indian Springs Park and Buddy Attick Lake Park consists of a trenching pit related to the installation of the stormwater augmentation pipe beneath I-495. The impacts to 7-9-11 Southway are related to the large-scale reconfiguration of the I-495 interchange with the Baltimore Washington Parkway. Providing direct access at the interchange requires the addition and realignment of ramps throughout the larger interchange. These alterations include replacing the bridge carrying Greenbelt Road over Baltimore Washington Parkway to accommodate the ramp from southbound MD 295 to the I-495 outer loop. This latter alteration requires a minor realignment of the partial interchange between the Baltimore Washington Parkway and Southway/Greenbelt Road. The areas of the contributing properties that would experience an impact contains no standing structures greater than fifty years of age or landscape elements that contribute to the significance of the historic district.

00038675



On March 12, 2020 MHT concurred that the Managed Lanes Study would have no adverse effect on Greenbelt Historic District, including Buddy Attick Lake Park and Indian Springs Park, which are within the boundary of and contribute to the significance of the historic district. MHT additionally provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding. FHWA intends to issue a finding of *de minimis* impact to Greenbelt Historic District if the City of Greenbelt Department of Recreation and Parks concurs the Proposed Action, after measures to mitigate and minimize harm are employed, would not adversely affect the activities, features, or attributes that make Indian Springs Park and Buddy Attick Lake Park eligible for Section 4(f) protection. For instances of *de minimis* impacts to parks, the public must also be given the opportunity to comment.

## C.    Applied Minimization

Consistent with the minimization efforts described in Section 4, MDOT SHA was able to reduce impacts to Greenbelt Historic District by eliminating linear stormwater management facilities along the edge of the historic boundary. No surface stormwater management facilities would be constructed adjacent to the historic site. Stormwater quantity treatment would be provided in underground vaults beneath the shoulder. A retaining wall would be constructed at the edge of pavement. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Greenbelt Historic District have been reduced from 0.5 acre on June 5, 2019 to 0.3 acre in this Draft Section 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with MHT and NPS staff.

### 2.1.28 Buddy Attick Lake Park

**Type of Section 4(f) Property:** Public Park and Historic Site

**Officials with Jurisdiction:** City of Greenbelt Dept. of Recreation and Parks, MHT, NPS

**Type of Section 4(f) Approval:** *De Minimis* Impact

## A.    Description of Section 4(f) Property

Buddy Attick Lake Park (**Figure 2-21** and **Figure 2-22**) is a publicly-owned park and recreation area at 555 Crescent Road in Greenbelt. The park also contributes to the significance of the Greenbelt Historic District. This 85.3-acre park is in the northeast quadrant of the I-495 and Kenilworth Avenue interchange. Park amenities include a walking track, hiking and biking trail, basketball courts, a playground, as well as picnic areas with shelters, tables, and grills. Canoeing, kayaking, and licensed fishing are permitted. As a public park and recreation area, the park is under jurisdiction of the City of Greenbelt Department of Recreation and Parks. Originally constructed in 1935 as Greenbelt Lake Park by the federal government, the park predates the construction of the residential portions of Greenbelt. Ownership of the park was transferred to the City of Greenbelt in 1953. Originally 62 acres in size, the park was enlarged in 1970 and again in 1987. In correspondence dated May 1, 2020, the City of Greenbelt confirmed Buddy Attick Lake Park is a significant park property for the purposes of Section 4(f).

00038676

Elements of Buddy Attick Lake Park – originally known as Greenbelt Lake – that contribute to the significance of the historic district include the lake, the lake shore, and the recreational activities that take place there. MHT is the official with jurisdiction over historic properties in Maryland. The historic district was additionally registered as a National Historic Landmark on February 18, 1997. As a National Historic Landmark, Buddy Attick Lake Park is under the jurisdiction of MHT and NPS. The Section 4(f) use of Greenbelt Historic District is discussed in **Section 2.1.27**.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.1 acre of Buddy Attick Lake Park to accommodate widening of I-495, utility relocation, and augmentation of existing storm drain outfall locations(**Figure 2-21** and **Figure 2-22**). The portion of the park that would experience a Section 4(f) use is vegetated open space that provides a buffer between I-495 and the recreational areas of Buddy Attick Lake Park. The impact to the property under the Proposed Action would constitute a minor use of the recreational facility. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f). Similarly, no elements greater than fifty years of age or that contribute to the significance of the historic district would experience a use.

On March 12, 2020 MHT concurred that the Managed Lanes Study would have no adverse effect on Greenbelt Historic District, including Buddy Attick Lake Park and Indian Springs Park, which are within the boundary of and contribute to the significance of the historic district. MHT additionally provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding. FHWA intends to make a *de minimis* impact determination for Buddy Attick Lake Park if the City of Greenbelt Department of Recreation and Parks concurs that the Proposed Action, after measures to mitigate and minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and if public comments do not identify new issues.

### C.    Applied Minimization

MDOT SHA was able to reduce impacts to Buddy Attick Lake Park by eliminating linear stormwater management facilities along the edge of the park and historic boundary. A retaining wall would be constructed at the edge of pavement, where possible.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Buddy Attick Lake Park have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with City of Greenbelt Department of Recreation and Parks, MHT, and NPS staff.

### 2.1.29  Indian Springs Park (City of Greenbelt)

**Type of Section 4(f) Property:** Public Park and Historic Site

**Officials with Jurisdiction:** City of Greenbelt Dept. of Recreation and Parks, MHT, NPS

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Indian Springs Park (**Figure 2-21** and **Figure 2-22**) is a publicly-owned recreation area situated northeast of the office building at 7855 Walker Drive. The 3-acre public park abuts the onramp from Kenilworth

00038677



Avenue (MD 201) to the I-495 inner loop. The park features a picnic table and an unpaved path that leads to a springhead set into a hillside surrounded by trees. The springhead is set within a masonry wall that features three voids that collect and distribute the water source. Originally part of Greenbelt Lake (now Buddy Attick Lake Park), the Indian Springs Park parcel was separated by the construction of I-495. The park can only be accessed via foot from the privately-owned parking area associated with the office property at 7855 Walker Drive. The park is under the jurisdiction of the City of Greenbelt. In correspondence dated May 1, 2020, the City of Greenbelt confirmed Indian Springs Park is a significant park property for the purposes of Section 4(f).

Indian Springs Park additionally contains the Walker Family Cemetery, outside the limits of the Study, and contributes to the significance of the Greenbelt Historic District, which was listed in the NRHP on November 25, 1980. The historic district was additionally registered as a National Historic Landmark on February 18, 1997. As a National Historic Landmark, Indian Springs Park is under the jurisdiction of MHT and NPS. The Section 4(f) use of Greenbelt Historic District is discussed in **Section 2.1.27**.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.1 acre of Indian Springs Park to accommodate the realignment of the onramp from northbound Kenilworth Avenue to the I-495 inner loop at the MD 193 interchange (**Figure 2-21** and **Figure 2-22**). The area of the park and historic site that would experience a Section 4(f) use is concentrated along the ramp from northbound Kenilworth Ave to the I-495 inner loop. The activities within the area of 4(f) use include augmenting an existing drainage pipe and access for construction vehicles and equipment. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

On March 12, 2020 MHT concurred that the Managed Lanes Study would have no adverse effect on Greenbelt Historic District, including Buddy Attick Lake Park and Indian Springs Park, which are within the boundary of and contribute to the significance of the historic district. MHT additionally provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding. FHWA intends to make a *de minimis* impact determination for Indian Springs Park if the City of Greenbelt Department of Recreation and Parks concurs that the Proposed Action, after measures to mitigate and minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and, if public comments do not identify new issues.

### C.    Applied Minimization

MDOT SHA was able to reduce impacts to Indian Springs Park by eliminating linear stormwater management facilities along the edge of the park and historic boundary. A retaining wall would be constructed at the edge of pavement where possible.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Indian Springs Park have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with City of Greenbelt Department of Recreation and Parks, MHT, and NPS staff.

00038678



### 2.1.30 Greenbelt Park

**Type of Section 4(f) Property:** Public Park and Historic Site

**Officials with Jurisdiction:** ACHP, MHT, NPS

**Type of Section 4(f) Approval:** Individual Evaluation

### A.    Description of Section 4(f) Property

Greenbelt Park (**Figure 2-22**), is a publicly-owned park and recreation area that abuts the inner loop of I-495 in Greenbelt. The park is situated between Kenilworth Avenue (MD 201) and Good Luck Road with a street address of 6565 Greenbelt Road. The 1,174-acre park is under the jurisdiction of NPS. Greenbelt Park was established by Congress on August 3, 1950, through Public Law 81-643 in association with the creation of the Baltimore-Washington Parkway, which traverses the park.

The park features a 174-site campground, 9 miles of trails, and three picnic areas. In some ways, Greenbelt Park is a "backyard" national park unit, as many locals come to camp, hike, picnic, and run. Greenbelt also attracts visitors from across the country and around the world who are drawn by the recreational opportunities, natural beauty, and the campground that is open all year. The land that is now Greenbelt Park was originally intended to be a future extension of the town of Greenbelt, but was eventually preserved as a park for the community and region. In the 1930s, the town of Greenbelt, Maryland, became the first government-sponsored, planned community in the United States. Built on "garden city" principles, which emphasized self-contained, complete communities with ample green space, it was part of a larger plan for several such communities as part of President Roosevelt's New Deal.

The NPS submitted written correspondence to MHT indicating it considers Greenbelt Park potentially significant under Criteria A, C, and D. According to NPS Greenbelt Park is locally significant under Criterion A for its association with the Mission 66 program and for fulfilling the National Capital Region's goal of providing a variety of recreational opportunities for Washington, DC's urban population. NPS considers Greenbelt Park potentially significant under Criterion C as an example of the landscape design characteristics of the Mission 66 program. It is the only park in the region where the landscape, roads, campsites, comfort stations, and buildings were constructed during the NPS Mission 66 program. Elements that contribute to the significance of Greenbelt Park consist of the design, location, and materials of the ranger station, recreational buildings and facilities, and the location and design of the roads and trails including the use of retaining walls to reduce the height and extent of cut-and-fill slopes and the use of vegetation to blend ditches and shoulders into the adjacent landscape. MHT has not commented on the NPS eligibility determination.

The I-495 interchange with the Baltimore Washington Parkway, including portions of Greenbelt Park, is on land owned by the federal government and administered by NPS. MDOT SHA right-of-way plats reference a July 23, 1956 Act of Congress and an NPS letter permit issued October 4, 1962. Although the Act of Congress has not been located, a copy of the plats and NPS Land Record No. 593 dated May 13, 1968 identifying the extent of MDOT SHA's permitted use is in **Appendix B**. A note on a drawing included in the NPS file indicates the "Area Occupied By Capital Beltway is Under Permit to State of Maryland."[5] As

---

[5] Baltimore-Washington Parkway Reservation No. 688. National Park Service National Capital Region Land Record No. 593. May 13, 1968. Files of National Park Service.

00038679



this area is already in a transportation use, Section 4(f) would not apply (23 CFR 774.11 and 23 CFR 774.17). Future coordination with NPS would include the preparation of a highway deed easement that documents any additional use required as part of the Proposed Action and clarifies both property ownership and MDOT SHA's permitted use.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.6 acre of Greenbelt Park. The historic boundary of Greenbelt Park is both smaller than and excludes some discontinuous parcels identified by NPS as part of the park. The difference in the boundaries reduces the Section 4(f) use of Greenbelt Park as an historic site to 0.3 acre. The Section 4(f) use would accommodate widening along I-495; the realignment of the ramp from eastbound Greenbelt Road to southbound Baltimore Washington Parkway; augmentation and repair of an existing storm drain outfall; and access for construction vehicles and materials (**Figure 2-22**). The area of Section 4(f) use is at three locations: a narrow strip approximately 1,600 feet in length along the southern side of the ramp from eastbound Greenbelt Road to the southbound Baltimore Washington Parkway; and two small rectangular areas south of the ramp from northbound Baltimore Washington Parkway to the I-495 inner loop. Activities in the areas of Section 4(f) use would consist of tree removal, grading, installation of augmentation pipes, construction of a retaining wall, and access for construction equipment and materials. A portion of the Perimeter Trail may need to be relocated near the ramps from Greenbelt Road to the southbound Baltimore Washington Parkway. The Proposed Action would adversely affect the activities, features, or attributes of the public park and recreation area.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have an adverse effect on Greenbelt Park. Significant for its recreational history, the park would experience some diminishment of setting due to the visibility and proximity of an enlarged interchange at the Baltimore Washington Parkway. Any mitigation for the Section 4(f) use of the historic site would be consistent with stipulations identified in the Section 106 Programmatic Agreement in consultation with NPS, MHT and Section 106 consulting parties. The impacts to Greenbelt Park require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.10**).

### C.    Applied Minimization

Consistent with the minimization efforts described in **Section 4**, MDOT SHA was able to reduce impacts to Greenbelt Park by eliminating above-ground stormwater management facilities along I-495 where they would result in impacts to the park and historic site. After coordination with NPS, MDOT SHA eliminated two flyover ramps from the proposed design in the southwest quadrant and developed a number of different LOD at the I-495 interchange with Baltimore Washington Parkway that would accommodate different interchange configurations. These interchange options would result in similar physical impacts to Greenbelt Park, but have different visual impacts that could potentially reduce adverse visual impacts identified under Section 106. Coordination with NPS is ongoing. NPS will provide MDOT SHA with input on the design of the interchange. Additionally, MDOT SHA will work with NPS on the number, location, and type of signage on NPS property.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Greenbelt Park have changed from 0.7 acre on June 5, 2019 to the 0.6 acre in this Draft Section 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with ACHP, MHT, and NPS staff.

00038680



### 2.1.31 Baltimore Washington Parkway

**Type of Section 4(f) Property:** Public Park and Historic Site

**Officials with Jurisdiction:** ACHP, MHT, NPS

**Type of Section 4(f) Approval:** Individual Evaluation

### A. Description of Section 4(f) Property

Opened in 1954, the Baltimore Washington Parkway (**Figure 2-22**) is a 29-mile scenic highway that connects Baltimore, Maryland with Washington, DC. The federally-owned and NPS-administered portion of the parkway extends from Washington, DC to MD 175 in Anne Arundel County. As a park facility, the Baltimore Washington Parkway is under jurisdiction of NPS. The Baltimore Washington Parkway encompasses 1,353 acres. Within an irregular right-of-way ranging from 400 to 800 feet wide, the terrain is generally forested with gentle hills and modest vistas. Portions of the Baltimore Washington Parkway were acquired with funds from the federal side of the LWCF.

The Baltimore Washington Parkway was listed in the NRHP on May 9, 1991 and achieves state and local significance in the areas of transportation and landscape architecture. It is associated with urban development of the National Capital as the federal center; is a late period example of this type of roadway; and is the only fully-developed parkway of its kind in Maryland. Features that contribute to the historical significance of the Baltimore Washington Parkway include culverts, bridges, landscape-architectural elements, as well as natural topographical features. The existing I-495 interchange with the Baltimore Washington Parkway was constructed in 1962 and does not contribute to the historical significance of the parkway. As an historic property, the Baltimore Washington Parkway is under jurisdiction of MHT.

The existing I-495 interchange with the Baltimore Washington Parkway is on land administered by NPS with a letter permit for the use of MDOT SHA. MDOT SHA right-of-way plats reference a July 23, 1956 Act of Congress and an NPS Permit issued October 4, 1962. Although the Act of Congress has not been located, a copy of the plats and NPS Land Record No. 593 dated May 13, 1968 identifying the extent of MDOT SHA's permitted use is in the **Appendix B**. A note on a drawing included in the NPS file indicates the "Area Occupied By Capital Beltway is Under Permit to State of Maryland."

### B. Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 69.3 acres of the Baltimore Washington Parkway historic site. Under the terms of the NPS letter permit, portions of the parkway are in an existing transportation use (23 CFR 774.11 and 23 CFR 774.17) maintained by MDOT SHA. Although this has no effect on the historical significance, the permit reduces the Section 4(f) park use of Baltimore Washington Parkway to 62.1 acres. The Section 4(f) use would accommodate reconfiguring the existing interchange of I-495 and Baltimore Washington Parkway; constructing direct access ramps to and from the managed lanes and the Baltimore Washington Parkway; replacing the existing bridges carrying the Parkway over I-495; constructing, operating, and maintaining stormwater management facilities; constructing a noise wall; and providing access for construction vehicles and materials. The area of Section 4(f) use is concentrated in two areas: a linear area along the Baltimore Washington Parkway that extends approximately 3,800 feet of the interchange with I-495; and a linear area along Baltimore Washington Parkway that extends approximately 3,000 feet south of the interchange with I-495. Activities in the areas

00038681



of Section 4(f) use would consist of grading, tree removal, and landscape plantings; realigning the existing parkway to accommodate direct access ramps to and from the managed lanes; realigning the interchange with Southway and Greenbelt Road; replacing the bridge carrying Greenbelt Road over Baltimore Washington Parkway; constructing, operating, and maintaining stormwater management facilities; updating and installing signage; and access for construction equipment and materials. The Proposed Action would adversely affect the activities, features, or attributes of the historic site, public park and recreation area.

The existing bridges carrying the Baltimore Washington Parkway over I-495 and Baltimore Washington Parkway Interchange with I-495 would also be replaced and reconfigured, respectively. However, these actions will be within the existing interchange which does not contribute to the historic significance of the Parkway and is within the existing area permitted by NPS for highway use. These actions would not result in a Section 4(f) use of the Baltimore Washington Parkway.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have an adverse effect on Baltimore Washington Parkway.. Any mitigation for the Section 4(f) use of the historic site would be consistent with stipulations identified in the Section 106 Programmatic Agreement and in consultation with NPS, MHT and Section 106 consulting parties. The impacts to Baltimore Washington Parkway require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.10**).

C.    **Applied Minimization**

Minimization of physical impacts at Greenbelt Park was achieved by placing a retaining wall along the relocated ramp from the I-495 inner loop to southbound Baltimore Washington Parkway. In response to NPS comments about not providing direct access to the parkway, MDOT SHA completed a traffic analysis to determine traffic impacts on I-495 and the Baltimore Washington Parkway without direct access. Results showed that direct access was needed to meet the Study's Purpose and Need. NPS requested additional traffic analyses and safety information, which MDOT SHA provided. After determining direct access was needed, MDOT SHA further evaluated options to minimize impacts to the parkway. After coordination with NPS, MDOT SHA eliminated two flyover ramps in the southwest quadrant from the proposed design and developed six different direct access options at the I-495 and Baltimore Washington Parkway interchange. This coordination effort took place to minimize visual and property impacts. These interchange options would result in similar physical impacts to Greenbelt Park, but have different visual impacts that could potentially reduce adverse visual impacts identified under Section 106. In addition, MDOT SHA has developed renderings of two interchange options potentially suitable to NPS while accommodating direct access in support of the Study's Purpose and Need. Coordination with NPS is ongoing and NPS will provide MDOT SHA with input on the design of the interchange. MDOT SHA will also continue coordinating with NPS on the number, location, design, and type of fixed and dynamic signage on NPS property along the parkway.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Baltimore Washington Parkway have changed from 69.9 acres on June 5, 2019 to the 69.3 acres in this Draft Section 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with ACHP, MHT, and NPS staff.

00038682



### 2.1.32 McDonald Field

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Greenbelt Dept. of Recreation and Parks

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

McDonald Field (**Figure 2-22**) is a publicly-owned recreation area at 13 Southway Court in Greenbelt. The 2.1-acre park abuts the right-of-way along southbound MD 295. Park amenities include a baseball/softball field, bleachers, and parking areas. Acquired in 1951, the park is under the jurisdiction of the City of Greenbelt. In correspondence dated May 1, 2020, the City of Greenbelt confirmed McDonald Field is a significant park property for the purposes of Section 4(f).

McDonald Field is a recreation feature within the Greenbelt Historic District, which was listed in the NRHP on November 25, 1980 and additionally listed as a National Historic Landmark on February 18, 1997. However, McDonald Field does not contribute to the significance of the historic district or the National Historic Landmark as it was constructed outside the period of significance identified in the nominations of both the historic district (1935-1941) and the National Historic Landmark (1935-1946). MHT concurred on August 12, 2019 that McDonald Field is not eligible for the NRHP and does not contribute to the Greenbelt Historic District. The Section 4(f) use of Greenbelt Historic District is discussed in **2.1.27**.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of less than 0.1 acre of McDonald Field to accommodate the realignment of the southbound off ramp at the Baltimore Washington Parkway interchange with Southway. The area of Section 4(f) use is a narrow triangular area that extends approximately 100 feet along the southwestern end of the park, where it borders the ramp from southbound Baltimore Washington Parkway to Southway. Activities within the area of Section 4(f) use would consist of tree removal, grading, and providing access for construction vehicles and materials. No areas of recreational activity would experience an impact from the Proposed Action. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

FHWA would issue a finding of *de minimis* impact if the City of Greenbelt Department of Recreation and Parks concurs that the Proposed Action, after measures to mitigate and minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments

### C.    Applied Minimization

The narrowest typical section has been applied where improvements to I-495 are proposed along McDonald Field. This entails constructing a closed section with a retaining wall along the edge of pavement on I-495. No surface stormwater management facilities would be constructed adjacent to the park. Stormwater quantity treatment would be provided in underground vaults beneath the shoulder. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

00038683



As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to McDonald Field have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with City of Greenbelt Department of Recreation and Parks.

### 2.1.33 Beckett Field

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of New Carrollton

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Beckett Field is a publicly-owned park at 8511 Legation Road in New Carrollton, Prince George's County. The 3.8-acre park abuts the Annapolis Road (MD 450) offramp from southbound I-495. Park amenities include two baseball/softball fields, multi-purpose fields, a basketball court, batting cages, a playground, a picnic area and the Hanko Community Center. The park is under the jurisdiction of the New Carrollton Department of Public Works – Parks and Recreation and was acquired in 1961. The park was enlarged in 1975.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.2 acre of Beckett Field to accommodate a constructing, operating, and maintaining a stormwater management facility on the tax parcel that adjoins to the south. The area of Section 4(f) use would consist of a small rectangular area at the southeastern corner of the park, near the alignment of the ramp from the I-495 inner loop to MD 450 (**Figure 2-23**). Activities in the area include tree removal, grading, and access for construction equipment and materials. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

FHWA intends to make a *de minimis* impact determination for Beckett Field if the New Carrollton Department of Public Works – Parks and Recreation, concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

### C.    Applied Minimization

The narrowest typical section has been applied where improvements to I-495 are proposed along Beckett Field. This entails constructing a closed section with a retaining wall along the edge of pavement on I-495. No surface stormwater management facilities would be constructed adjacent to the park. Stormwater quantity treatment would be provided in underground vaults beneath the shoulder. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Beckett Field have changed from 0.3 acre on June 5, 2019 to the 0.2 acre in this Draft Section

00038684



4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with the City of New Carrollton staff.

### 2.1.34 Carsondale

**Type of Section 4(f) Property:** Historic Site

**Officials with Jurisdiction:** ACHP, MHT

**Type of Section 4(f) Approval:** Individual Evaluation

### A.    Description of Section 4(f) Property

Carsondale (**Figure 2-24**) is the first planned residential community in Prince George's County that was designed for and advertised to African American veterans and their families. Carsondale serves an important purpose in making housing available to African Americans in Prince George's County. The historic site comprises 35.1 acres east of I-495 and northwest of Martin Luther King Jr. Highway. Carsondale is an historic district eligible for the NRHP under Criterion A for its important role as an African American residential neighborhood. As Carsondale is eligible under Criterion A, planned buildings and developments that still serve their intended historical functions are considered contributing.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.1 acre from Carsondale to accommodate widening along US 50 associated with realigning the interchange of US 50 and I-495 that would require replacing the bridge carrying Whitfield Chapel Road over US 50 (**Figure 2-24**). There are two areas of Section 4(f) use: a narrow linear area that extends approximately 550 feet where the northern edge of the historic district meets US 50; and a narrow strip that extends 150 along the east side of Whitfield Chapel Road. Activities in the area of Section 4(f) use would consist of tree removal, grading, construction of a retaining wall, and access for construction vehicles and materials. The Proposed Action would result in a use of the nine properties listed in **Table 2-4** that contribute to the significance of Carsondale. The portions of the historic district that would experience a Section 4(f) use consist of strips of front yards along Whitfield Chapel Road where the roadway height would be adjusted to meet the elevation of the new bridge across US 50. Backyards of houses on Wallace Street would be impacted by widening on US 50 at the direct access interchange. There are no physical impacts to contributing dwellings, but the LOD encompass minor portions of front or rear yards, including some secondary structures, of nine dwellings that contribute to the district's significance.

#### Table 2-4: Section 4(f) Use of Contributing Properties in Carsondale

| 4909 Whitfield Chapel Rd | 9010 Wallace Road | 9104 Wallace Road |
|---|---|---|
| 4907 Whitfield Chapel Rd | 9016 Wallace Road | 9112 Wallace Road |
| 9004 Wallace Road | 9018 Wallace Road | 9114 Wallace Road |

On March 12, 2020, MHT concurred that based on current design information, Section 106 effects on Carsondale cannot be fully determined. MDOT SHA will submit a Section 106 effect determination informing MHT there is now enough information to determine the Study would result in an adverse effect to Carsondale.  The multiple minor impacts to contributing resources will result in a cumulative diminishment of the property's integrity of setting and design. The results of this consultation will be

00038685



documented in the Final Section 4(f) Evaluation. Section 106 consultation with MHT and ACHP is ongoing. At the time of publication, it is assumed that the Proposed Action would result in an adverse effect. Impacts to Carsondale require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.11**).

C.    **Applied Minimization**

Consistent with the minimization efforts described in Section 4, MDOT SHA was able to reduce impacts to Carsondale by modifying the roadside section and eliminating stormwater management facilities along US 50. A retaining wall would be constructed at the edge of pavement along the boundary of the historic district, resulting in the narrower LOD and the associated reduction in impacts to properties that contribute to the significance of the historic district.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Carsondale have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with ACHP and MHT.

### 2.1.35 Glenarden Historic District

**Type of Section 4(f) Property:** Historic Site

**Officials with Jurisdiction:** ACHP, MHT

**Type of Section 4(f) Approval:** Individual Evaluation

A.    **Description of Section 4(f) Property**

The Glenarden Historic District (**Figure 2-25**) was specifically marketed as an African American community in association with completion of the new Washington, Baltimore & Annapolis Electric Railroad in the 1910s. By the 1960s and 1970s, its older housing stock was subject to extensive urban renewal that removed its older core to construct affordable and subsidized semi-detached and attached housing, as well as for improvements to roads, sidewalks, and drainage. The historic site comprises 306 acres at either side of I-495 in the City of Glenarden. The Glenarden Historic District is eligible for the NRHP under Criterion A for its important role as a middle-class African American community in the DC suburbs and the unique use of urban renewal funds for a suburban municipality. As Glenarden is eligible under Criterion A, planned buildings and developments that still serve their planned historical functions, such as the modified community center, are considered contributing. Street patterns, roads, sidewalks, lighting and landscaping vary in construction date, location, size and materials and do not contribute to the significance of the historic site.

B.    **Potential Section 4(f) Use**

The Proposed Action would result in a Section 4(f) use of 0.8 acre from the Glenarden Historic District to accommodate widening of I-495; replacing the Glenarden Parkway overpass; constructing, operating, and maintaining stormwater management facilities; and access for construction vehicles and materials (**Figure 2-25**). The area of Section 4(f) use consists of the following:

- An area on a vacant lot at the northern end of the historic district east of the I-495 outer loop;
- A narrow linear area that extends 1,600 feet along the eastern edge of the I-495 outer loop;

00038686



- A narrow linear area that extends approximately 3,800 feet along the western edge of the I-495 inner loop;

- Narrow linear areas that extend approximately 1,000 feet along the north and south sides of Glenarden Parkway;

- A narrow linear area that extends approximately 400 feet along the east and west sides of 7th Street and

- A narrow area that extends approximately 100 feet along the west side of the I-495 inner loop.

Activities in the areas of Section 4(f) use consist of grading; tree removal; paving; removing and replacing an existing noise wall along I-495; constructing, operating, and maintaining stormwater management facilities; raising the height of the local roads to match the elevation of the new bridge carrying Glenarden Parkway across I-495; and access for construction vehicles and materials. A stormwater management facility would be constructed on a vacant lot within the historic district that does not contribute to the significance of the historic district. The stormwater management facility is required at this location owing to the limited available space for the treatment of stormwater on this portion of I-495.

The Proposed Action would result in impacts to the 25 properties listed in **Table 2-5** that contribute to the significance of the Glenarden Historic District. The portions of the historic site that would experience a Section 4(f) use consists of strips of front and back yards of properties within the Glenarden Historic District. Secondary outbuildings erected within existing MDOT SHA right-of-way which may date from the period of significance and could potentially be demolished.

**Table 2-5: Section 4(f) Use of Contributing Properties in the Glenarden Historic District**

| 8901 Glenarden Parkway | 1418 7th Street | 1506 7th Street | 1526 7th Street |
|---|---|---|---|
| 8903 Glenarden Parkway | 1420 7th Street | 1508 7th Street | 1438 8th Street |
| 8932 Glenarden Parkway | 1431 7th Street | 1516 7th Street | 8616 Reichter Street |
| 9001 Glenarden Parkway | 1433 7th Street | 1520 7th Street | 8620 Reichter Street |
| 1501 4th Street | 1436 7th Street | 1522 7th Street | 8706 Reichter Street |
| 1504 5th Street | 1504 7th Street | 1524 7th Street | 8708 Reichter Street |
| Henry P. Johnson Park | | | |

On March 12, 2020, MHT concurred that the Managed Lanes Study would have an adverse effect on Glenarden Historic District, including Henry P. Johnson Park which is a contributing property.. Any mitigation for the Section 4(f) use of the historic district would be consistent with stipulations identified in the Section 106 Programmatic Agreement and in consultation with NPS, MHT and Section 106 consulting parties. The impacts to Glenarden Historic District require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.12**).

C.    **Applied Minimization**

Consistent with the minimization efforts described in Section 4, MDOT SHA was able to reduce impacts to Glenarden Historic District by modifying the roadside section along I-495 where it would result in additional impacts to the park and historic district. Linear stormwater management facilities behind the edge of shoulder were eliminated in several areas along the Historic District boundary, resulting in

00038687



narrowed LOD and fewer impacts to the Historic District and in select locations, construction of a retaining wall at the edge of pavement is proposed to further minimize the LOD.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Glenarden Historic District have changed from 1.1 acres on June 5, 2019 to the 0.8 acre in this Draft Section 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with ACHP and MHT staff.

### 2.1.36 Henry P. Johnson Park

**Type of Section 4(f) Property:** Public Park and Historic Site

**Official with Jurisdiction:** M-NCPPC Prince George's County, ACHP, MHT

**Type of Section 4(f) Approval:** Individual Evaluation

### A.    Description of Section 4(f) Property

Henry P. Johnson Park (**Figure 2-25**) is a publicly-owned park, and recreation area located at 8710 Reicher Street in Landover. The park is situated between Brightseat Road and the southbound lanes of I-495. This 7.1-acre park features full and half basketball courts, two tennis courts, a multi-purpose field, picnic area with grills, and hard surface trail. This park is under the jurisdiction of M-NCPPC and was acquired in 1969 and 1970 using POS funds.

Henry P. Johnson Park additionally contributes to the significance of the Glenarden Historic District, eligible for the NRHP under Criterion A for its important role as a middle-class African American community in the DC suburbs and the unique use of urban renewal funds for a suburban municipality. As Glenarden is eligible under Criterion A, planned buildings and developments that still serve their planned historical functions, such as the modified community center, are considered contributing. Street patterns, roads, sidewalks, lighting and landscaping vary in construction date, location, size and materials and do not contribute to the significance of the historic site.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of less than 0.1 acre of Henry P. Johnson Park to accommodate widening of I-495 (**Figure 2-25**) and provide access for construction vehicles and materials. The area of Section 4(f) use is a narrow linear area 100 feet in length at the southwestern corner of the park where it adjoins the I-495 inner loop. Activities within the area of Section 4(f) use consist of grading; tree removal; and access for construction vehicles and materials. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. Henry P. Johnson is both a public park and one of the 25 contributing properties in Glenarden Historic District that would experience an impact from the Representative Proposed Action.

On March 12, 2020, MHT concurred that the Managed Lanes Study would have an adverse effect on Glenarden Historic District, including Henry P. Johnson Park which is a contributing property.. Any mitigation for the Section 4(f) use of the historic site and public park would be consistent with stipulations identified in the Section 106 Programmatic Agreement and be coordinated with the NPS, MHT and Section 106 consulting parties. The impacts to Henry P. Johnson Park require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.12**).

00038688



## C. **Applied Minimization**

Consistent with the minimization efforts described in Section 4, MDOT SHA was able to reduce impacts to Henry P. Johnson Park by reducing the roadside section along I-495, where it would result in additional impacts to the park and historic district.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Henry P. Johnson Park have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC, ACHP, and MHT staff.

00038689

Figure 2-23: Section 4(f) Property (Map 20 of 35)





**Figure 2-24: Section 4(f) Property (Map 21 of 35)**



00038691



**Figure 2-25: Section 4(f) Property (Map 22 of 35)**



00038692



### 2.1.37  Southwest Branch Stream Valley Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Prince George's County

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Southwest Branch Stream Valley Park (**Figure 2-26**) is a publicly-owned park and recreation area in Upper Marlboro along the Southwest Branch of the Patuxent River between Harry S. Truman Drive and I-495. This 263-acre park is an undeveloped wooded area that provides a protective buffer for the Southwest Branch of the Patuxent River. This park is under the jurisdiction of M-NCPPC, Prince George's County and was originally acquired in 1977 with additional parcels acquired in 1978, 1980, 1982, 1988, 1989, 1990, and 1998 using funding POS funds.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.3 acre of Southwest Branch Stream Valley Park to accommodate improvements and augmentation to an existing culvert beneath I-495; and providing access for construction vehicles and materials (**Figure 2-26**). The area of Section 4(f) use is concentrated at two locations: a narrow, sparsely wooded linear area that extends approximately 600 feet along the ramp from the outer loop to eastbound MD 214 (Central Avenue); and a small rectangular area at an existing storm drain outfall at the western edge of the park, approximately 350 feet south of the previous impact. Activities in the area of Section 4(f) use would consist of tree removal, grading, improvements to and augmentation of an existing storm drain and culvert; and access for construction vehicles and materials. The Section 4(f) use constitutes a minor impact. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

FHWA intends to make a *de minimis* impact determination for Southwest Branch Stream Valley Park if M-NCPPC, Prince George's County concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

### C.    Applied Minimization

The narrowest typical section has been applied where improvements to I-495 are proposed along Southwest Branch Stream Valley Park. This entails constructing a closed section with a retaining wall along the edge of pavement on I-495. No surface stormwater management facilities would be constructed adjacent to the park. Stormwater quantity treatment would be provided in underground vaults beneath the shoulder. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Southwest Branch Stream Valley Park have changed from 0.4 acre on June 5, 2019 to the 0.3

00038693



acre in this Draft Section 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

### 2.1.38 Heritage Glen Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Prince George's County

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Heritage Glen Park (**Figure 2-27**), also known as Greenwood Manor Park and McCarthy Park, is a publicly-owned park and recreation area at 1309 Southern Springs Lane in Upper Marlboro. The park abuts the northbound onramp from Ritchie Marlboro Road to I-495. Amenities within the 38.2-acre community park consist of an undeveloped wooded area, a small playground, and a picnic area. This park is under the jurisdiction of M-NCPPC and was acquired in 1985 using POS funds.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.5 acre of Heritage Glen Park to accommodate improvements and augmentation to two existing storm drain outfalls beneath the on-ramp from Ritchie Marlboro Road to the I-495 outer loop; and providing access for construction vehicles and materials (**Figure 2-27**). The area of Section 4(f) use is concentrated at two rectangular areas planted with trees at the northern end of the ramp. Activities within the area would consist of tree removal, grading, a work area for a construction pit where the augmentation pipes would be installed; and access for construction vehicles and materials. The Section 4(f) use constitutes a minor impact. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

FHWA intends to make a *de minimis* impact determination for Heritage Glen Park if M-NCPPC, Prince George's County concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

### C.    Applied Minimization

The narrowest typical section has been applied where improvements to I-495 are proposed along Heritage Glen Park. This entails constructing a closed section with a retaining wall along the edge of pavement on I-495. No surface stormwater management facilities would be constructed adjacent to the park. Stormwater quantity treatment would be provided in underground vaults beneath the shoulder. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Heritage Glen Park have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

00038694



**DRAFT SECTION 4(f) EVALUATION**

### 2.1.39 Suitland Parkway

**Type of Section 4(f) Property:** Public Park and Historic Site

**Officials with Jurisdiction:** ACHP, MHT, NPS

**Type of Section 4(f) Approval:** Individual Evaluation

### A.    Description of Section 4(f) Property

Suitland Parkway (**Figure 2-28**) is a NRHP-listed historic district and a publicly-owned park and recreation area. The Parkway consists of 9.18 miles of roadway, of which 6.38 miles and approximately 418.9 acres are in Maryland. Suitland Parkway was conceived in 1937 and constructed in 1944 as an entryway to Washington, DC As a recreation facility, the parkway is under the jurisdiction of NPS. Suitland Parkway is on land owned by the federal government and administered by NPS.

The Parkway was listed in the NRHP on June 2, 1995 under Criteria A and C as one of several parkways leading to the National Capital. Under Criterion A, the Parkway is significant for being a vital component of the regional transportation system that contributes to the historic symbolism and design of the Nation's Capital. Under Criterion C the parkway is significant for its distinctive architectural and landscape design characteristics in support of Criterion A. The bridges carrying I-495 across Suitland Parkway do not contribute to the historic significance of the parkway. According to the historic site's NRHP nomination, Suitland Parkway was not designed as a recreational parkway, rather a parkway with elements to convey a scenic driving experience. Like many of the later parkways built in the National Capital Region, at the time of its nomination it was significant under Criterion Consideration G, for having achieved significance within the last fifty years, thus exemplifying extraordinary significance. As an historic site, Suitland Parkway is under the jurisdiction of MHT.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.3 acre of Suitland Parkway to accommodate widening I-495 at the bridges over Suitland Parkway, erosion and sediment control, adding an auxiliary pipe to augment the culvert conveying Henson Creek beneath I-495, and providing access for construction vehicles and materials. Small stormwater management facilities would be placed in vaults beneath the shoulders within the area currently permitted by NPS to MDOT SHA for transportation use, as shown on **Figure 2-28**, under Special Use Permit No. NCR NACE 6000 1903. The NPS permit, **enclosed in Appendix B**, expires 3/8/2024 and would need to be amended to accommodate the newly proposed activities on NPS property. The stormwater management facilities are required to address a deficit in stormwater quantity treatment in this portion of the Proposed Action. The area of Section 4(f) use is concentrated in small, irregularly shaped areas at the northwest and northeast quadrants of where I-495 passes over Suitland Parkway. Activities in the area of Section 4(f) use would consist of grading, tree removal, landscape plantings, erosion and sediment control, constructing an auxiliary pipe to augment the existing culvert conveying Henson Creek beneath I-495, and access for construction vehicles and materials. The Proposed Action would not adversely affect the activities, features, or attributes of the public park. The impact to the property under the Proposed Action would constitute a minor use of the public park.

No standing structures or features that contribute to the historic significance of Suitland Parkway would experience an impact from the Proposed Action. The existing bridges carrying I-495 over Suitland Parkway

00038695



are currently being replaced by MDOT SHA. The bridges currently under construction will be wider in order to accommodate the Proposed Action, but minor impacts are still anticipated. As transfer of property out of federal control may take place – a criterion of an adverse effect under Section 106 36 CFR 800.5(a)(2)(vii) – in the absence of enforceable restrictions to ensure preservation.

On March 12, 2020, MHT concurred that based on current design information, Section 106 effects cannot be fully determined. Further consultation is required to consider and address effects. It is assumed that the Proposed Action would result in an adverse effect. Suitland Parkway warrants an avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.13**). If ongoing coordination with NPS concludes that the proposed actions within the boundaries of Suitland Parkway can be accomplished via a special use permit that would not require the transfer of property ownership, or other legally enforceable conditions can be identified that avoid diminishment and ensure long-term preservation of any contributing features to the historic property, MDOT SHA would coordinate a Section 106 finding of no adverse effect to MHT and NPS and request signatures acknowledging a finding of *de minimis* impact. The results of ongoing coordination and Section 106 consultation will be documented in the Final Section 4(f).

### C.    Applied Minimization

Consistent with the minimization efforts described in Section 4, MDOT SHA was able to reduce impacts to Suitland Parkway by eliminating above-ground stormwater management facilities along the I-495 where they would result in impacts to the park and historic site.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Suitland Parkway have changed from 3.6 acres on June 5, 2019 to the 0.3 acres in this Draft Section 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with ACHP, MHT, and NPS staff.

### 2.1.40 Douglas E. Patterson Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Prince George's County

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Douglas E. Patterson Park (**Figure 2-28**) is a publicly-owned park and recreation area located at 7001 Marianne Drive in Suitland. This park is situated north of the I-495 inner loop and south of Benjamin Foulois Creative and Performing Arts School. This 26.2-acre park features two tennis courts, a lighted basketball court, two lighted half basketball courts, a baseball field, and a multipurpose ball field. Other amenities include a picnic area, comfort station, and playground. This park is under the jurisdiction of M-NCPPC and was acquired in 1963 using POS funds.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.7 acres of Douglas E. Patterson Park to accommodate the construction, operation, and future maintenance of a stormwater management facility; and providing access for construction vehicles and materials (**Figure 2-28**). The impacted area is shaped

00038696



like a trapezoid and consists of a stand of trees at the southwestern corner of the park, adjacent to the I-495 inner loop. Activities within the area of Section 4(f) use would consist of tree removal; grading; construction, operation and future maintenance of a stormwater management facility; and access for construction vehicles and materials. The stormwater management facility is required at this location owing to the limited available space for the treatment of stormwater on this portion of I-495. This Section 4(f) use would result in the permanent incorporation of portions of Douglas E. Patterson Park into the transportation facility. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

FHWA intends to make a *de minimis* impact determination for Douglas E. Patterson Park if M-NCPPC, Prince George's County concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

## C.    Applied Minimization
The narrowest typical section has been applied where improvements to I-495 are proposed along Douglas E. Patterson Park. This entails constructing a closed section with a retaining wall along the edge of pavement on I-495. No surface stormwater management facilities would be constructed adjacent to the park. Stormwater quantity treatment would be provided in underground vaults beneath the shoulder. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements. Coordination with M-NCPPC has resulted in changing the shape of the stormwater management facility proposed on the park property.  At M-NCPPC's request, the western edge of the facility has been moved further from the Morningside neighborhood.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Douglas E. Patterson Park have changed from 1.1 acres on June 5, 2019 to the 0.7 acre in this Draft Section 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

### 2.1.41 Andrews Manor Park
**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Prince George's County

**Type of Section 4(f) Approval:** Individual Evaluation

## A.    Description of Section 4(f) Property
Andrews Manor Park (**Figure 2-29**) is a publicly-owned park and recreation area adjacent to the I-495 outer loop on Gunston Lane in Suitland. This 4.1-acre park consists of an undeveloped wooded area. This park is under the jurisdiction of M-NCPPC, Prince George's County and was acquired in 1972. During coordination, M-NCPPC indicated there are currently no plans to develop the park.

00038697



### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 2.6 acres of Andrews Manor Park to accommodate the construction, operation, and future maintenance of a new stormwater management facility and provide access for construction vehicles and materials (**Figure 2-29**). The area of Section 4(f) use is a large irregularly shaped area along the northern portion of the park, where it borders the southern edge of the outer loop of I-495. Activities within the area of Section 4(f) use would consist of tree removal; grading; construction and maintenance of a stormwater management facility; and access or construction vehicles and materials. The stormwater management facility is required at this location owing to the limited available space for the treatment of stormwater on this portion of I-495.

Coordination with M-NCPPC, Prince George's County is ongoing. The impacts to Andrews Manor Park require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.14**).

### C.    Applied Minimization

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Andrews Manor Park by eliminating linear stormwater management facilities along the edge of the park boundary. The narrowest typical section has been applied where improvements to I-495 are proposed. This entails constructing a closed section and retaining wall along the edge of pavement on I-495. Stormwater quantity treatment would be provided in underground vaults beneath the shoulder. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Andrews Manor Park have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

### 2.1.42 Manchester Estates Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Prince George's County

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Manchester Estates Park (**Figure 2-29**) is a publicly-owned park and recreation area adjacent to the I-495 outer loop on Gunston Lane in Suitland. This 6.0-acre park consists of an undeveloped wooded area. Under the jurisdiction of M-NCPPC, the park was acquired in 1968 and expanded in 1974. During coordination, M-NCPPC indicated there are currently no plans to develop the park.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.5 acre of Manchester Estates Park to accommodate widening I-495; constructing a direct access interchange between the managed lanes and MD 4; and providing access for construction vehicles and materials (**Figure 2-29**). The Section 4(f) use is concentrated at two locations: a triangular area at the northwest corner of the park, south of the existing ramp from northbound MD 5 to the I-495 outer loop; and a narrow linear area along the northern edge

00038698

of the park where it borders the I-495 outer loop. Activities in the area of Section 4(f) use would consist of tree removal, grading, ramp construction; paving; and access for construction vehicles and materials. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

The impact to the property under the Proposed Action would constitute a minor use. FHWA intends to make a *de minimis* impact determination for Manchester Estates Park if M-NCPPC, Prince George's County concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection.

## C.    Applied Minimization

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Manchester Estates Park by eliminating linear stormwater management facilities along the edge of the park boundary. The narrowest typical section has been applied where improvements to I-495 are proposed. This entails constructing a closed section and retaining wall along the edge of pavement on I-495. Stormwater quantity treatment would be provided in underground vaults beneath the shoulder. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Manchester Estates Park have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

### 2.1.43 Henson Creek Stream Valley Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Prince George's County

**Type of Section 4(f) Approval:** *De Minimis* Impact

## A.    Description of Section 4(f) Property

Henson Creek Stream Valley Park (**Figure 2-30**) is a publicly-owned public park and recreation area accessed via Henson Drive in Temple Hills. Henson Creek Stream Valley Park is a linear resource buffering Henson Creek from the Potomac River in Fort Washington to Suitland Parkway in Suitland. The 1,103-acre park is primarily an undeveloped wooded area that provides a protective buffer for Henson Creek. Park amenities include the hard surface Henson Creek Trail that extends 5.7 miles through the southern portion of the park. Although the trail does not traverse the Capital Beltway, an extension north to Suitland Parkway is planned. This park is under the jurisdiction of M-NCPPC and was acquired in pieces beginning in 1967 using funding POS funds.

## B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.1 acre of Henson Creek Stream Valley Park to accommodate augmenting the existing culvert that conveys Henson Creek beneath I-495; and providing access to construction vehicles and materials **Figure 2-30**. The Section 4(f) use is concentrated at a narrow,

00038699



linear area at the southeast corner of the park where it adjoins the inner loop of I-495. Both the culvert and Henson Creek are outside the park at this location. The activities within the area of Section 4(f) use would consist of grading and access for construction equipment and materials. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not disrupt the programmed extension of the Henson Creek Trail nor would it adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

The impact to the property under the Proposed Action would constitute a minor use. FHWA intends to make a *de minimis* impact determination for Henson Creek Stream Valley Park if M-NCPPC, Prince George's County concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection.

## C.    Applied Minimization

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Henson Creek Stream Valley Park by eliminating linear stormwater management facilities along the edge of the park boundary. The narrowest typical section has been applied where improvements to I-495 are proposed. This entails constructing a closed section and retaining wall along the edge of pavement on I-495. Stormwater quantity treatment would be provided in underground vaults beneath the shoulder. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Henson Creek Stream Valley Park have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

00038700

## Figure 2-26: Section 4(f) Property (Map 23 of 35)



00038701



**Figure 2-27: Section 4(f) Property (Map 24 of 35)**



00038703



**Figure 2-28: Section 4(f) Property (Map 25 of 35)**

Legend

— Limits of Proposed Action
▨ Historic Site
▨ Park Property

⋯ Grade Separation
▨ Property Permitted to MDOT-SHA

**Section 4(f) Property**

Map 25 of 35

1 in = 0.1 miles

0    0.05    0.1
Miles

00038704

00038705



## Figure 2-29: Section 4(f) Property (Map 26 of 35)

00038706



**Figure 2-30: Section 4(f) Property (Map 27 of 35)**



00038707



## 2.2    Section 4(f) Property along I-270

### 2.2.1    Academy Woods

**Type of Section 4(f) Property:** Historic Site

**Official with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Academy Woods (**Figure 2-31**) is a Section 4(f) historic site comprised of a small neighborhood on 6.5 acres northeast of the I-495 and I-270 Spur interchange in Bethesda. The historic district is eligible for the NRHP under Criterion C as representative of a type, period, and method of construction. The 1967 to 1974 planned residential development of 13 single-family homes consists of atypical Contemporary and Postmodern houses extending along Grubby Thicket Way. Other character defining features of the subdivision include the cul-de-sac layout, lot orientation, and original streetlights.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.2 acre to accommodate the construction, operation and future maintenance of a stormwater management facility (**Figure 2-31**). The area of Section 4(f) use is a trapezoidal area planted with trees at the southwestern corner of the historic district. Activities within the area of 4(f) use consist of tree removal; grading; construction, operation, and future maintenance of a stormwater management facility; and access for construction vehicles and equipment. The stormwater management facility would extend from the existing MDOT SHA right-of-way onto what is currently private property. The stormwater management facility is required at this location owing to the limited available space for the treatment of stormwater on this portion of I-270. Right-of-way would be acquired from the rear yard of one property that contributes to the significance of the historic site: 7224 Grubby Thicket Way. No standing structures greater than fifty years of age or elements that contribute to the significance of Academy Woods would experience a Section 4(f) use.

On March 12, 2020 MHT concurred that the Managed Lanes Study would have no adverse effect on Academy Woods. MHT additionally provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding. As such, the impact to Academy Woods Historic District under the Proposed Action would constitute a minor use. FHWA intends to issue a finding of *de minimis* impact to Academy Woods.

### C.    Applied Minimization

In addition to the minimization efforts described in Section 4, MDOT SHA has been able to reduce impacts to Academy Woods Historic District. Earlier designs for the stormwater management facility included impacts to 7225 and 7221 Grubby Thicket Way. After refinements to the design, these properties would no longer experience a Section 4(f) use. As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Academy Woods have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

00038708