**Figure 2-31: Section 4(f) Property (Map 28 of 35)**



00038709

### 2.2.2  Cabin John Regional Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** Individual Evaluation

### A.  **Description of Section 4(f) Property**

Cabin John Regional Park (**Figure 2-32** and **Figure 2-33**) is a publicly-owned park and recreation area situated between Democracy Boulevard and southbound I-270. The 513.8-acre park contains a playground, dog park, picnic shelters, a miniature train, grills, horseshoe pits, and restrooms. The park has more than four miles of natural surface trails and two miles of hard surface trails. Athletic facilities include an indoor ice rink, baseball field, five softball fields, a volleyball court, and indoor tennis center. The Locust Grove Nature Center and Robert C. McDonnell Campground are also within the park. This park is under the jurisdiction of M-NCPPC Montgomery County and was acquired in 1960 using funding from the Capper-Cramton Act of 1930.

### B.  **Potential Section 4(f) Use**

The Build Alternatives would result in a use of 5.7 acres of Cabin John Regional Park, except for 7.2 acres under Alternative 10, 4.5 acres under Alternative 13B, and 5.2 acres under Alternative 13C to accommodate widening along I-270; augmenting two existing storm drains and one culvert; the construction and maintenance of new stormwater management features; and providing access for construction vehicles and materials (**Figure 2-32** and **Figure 2-33**). The area of Section 4(f) use extends approximately 6,000 feet along the length of the park, where it borders southbound I-270. Much of the impacted area is along a narrow strip planted with trees along the edge of the roadway. There are four areas where the area of Section 4(f) use extends further into the park.

- A half-acre area planted with trees at the southeast corner of the park, where Tuckerman Lane passes beneath I-270;

- Two small rectangular areas at existing storm drains along southbound I-270 at the eastern edge of the park and across the highway from Old Farm Neighborhood Conservation Area;

- An irregularly shaped, two-acre area at the eastern edge of the park along southbound I-270 and east of Gainsborough Road; and

- A 0.3 acre area on the west side of I-270, at the existing culvert conveying Cabin John Creek beneath I-270.

Activities in the area of Section 4(f) use would consist of tree removal, grading, a work area for a construction pipe to install augmentation pipes at the existing storm drains; a work area to improve the existing culvert beneath I-270 for Cabin John Creek; construction and maintenance of new stormwater management facilities; and access for construction vehicles and materials. The stormwater management facility is required at this location owing to the limited available space for the treatment of stormwater on this portion of I-270. Owing to the differences in elevation between the highway and park, a detailed constructability review identified that an offset of 14 feet is required behind the retaining wall along the

00038710

edge of pavement. This is in contrast to an offset of 10 feet used elsewhere on the project. Activities in this area may include erosion and sediment control, equipment maneuvering, and construction easements.

There is the potential for permanent impacts to the connecting trail between the Highway Loop Trail and Kidney Bean Loop Trail. Coordination with M-NCPPC Montgomery County is ongoing. Portions of Cabin John Regional Park would be permanently incorporated into the transportation facility. The impacts to Cabin John Regional Park require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.15** and **Section 5.1.16**).

## C.    **Applied Minimization**

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Cabin John Regional Park by eliminating linear stormwater management facilities along the edge of the park boundary. The narrowest typical section has been applied where improvements to I-270 are proposed along the park. This entails constructing a closed section with a retaining wall along the edge of pavement on I-270.

A high quality wetland was identified at the location of the proposed stormwater management facility, in an effort to eliminate impacts to the environmentally sensitive area, the feature was reduced in size and redesigned. Owing to the presence of Tilden Woods Stream Valley Park, Old Farm Neighborhood Conservation Area, Unit 6 of Cabin John Regional Park, and a residential neighborhood, shifting the centerline of the widening to the east was not an option.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Cabin John Regional Park from the Proposed Action have changed from 6.9 acres (under Alternative 10), 6.7 acres (under Alternative 13C), 5.4 acres (under Alternatives 8 and 9), and 5.2 acres (under Alternative 13B) on June 5, 2019 to 7.2 acres (under Alternative 10), 5.2 acres (under Alternative 13C), 5.7 acres (under Alternative 8 and 9), and 4.5 acres (under Alternative 13B) in this Draft Section 4(f) Evaluation. The reason for the inconsistent increase across the alternatives is the need for additional space to maneuver equipment while constructing a retaining wall along the edge of the roadway as part of the widest alternatives. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

### 2.2.3   **Tilden Woods Stream Valley Park**

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

## A.    **Description of Section 4(f) Property**

Tilden Woods Stream Valley Park (**Figure 2-32**) is a publicly-owned park, and recreation area, accessed via Sulky Lane in Bethesda. Tilden Woods Stream Valley Park extends along the banks of Old Farm Creek from Montrose Road to I-270. This 67.4-acre park consists of an undeveloped wooded area that provides a protective buffer along Old Farm Creek. This park is under the jurisdiction of M-NCPPC and was acquired in pieces beginning in 1961 using POS funds.

00038711

## B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.2 acre of Tilden Woods Stream Valley Park to accommodate a constructability area related to widening I-270; replacing the bridge that carries I-270 over Tuckerman Lane; augmenting the existing culvert conveying Old Farm Creek beneath I-270; and providing access for construction vehicles and materials (**Figure 2-32**). The area of Section 4(f) use is concentrated in the shape of an L at the southwestern corner of the park where I-270 northbound passes over Tuckerman Lane. The area is planted sparsely with trees, having been disturbed by recently completed underground utility work. Activities within the area of Section 4(f) use would consist of tree removal; grading; a work area for a construction pit where an augmentation pipe would be installed; and access for construction vehicles and materials. The geometry of Tuckerman Lane would need to be altered to accommodate the new vertical height beneath the wider bridge on I-270. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

FHWA intends to make a *de minimis* impact determination for Tilden Woods Stream Valley Park if M-NCPPC Montgomery County concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

## C.    Applied Minimization

Consistent with the minimization efforts described in Section 4, MDOT SHA has been able to reduce impacts to Tilden Woods Stream Valley Park by eliminating stormwater management facilities from within the boundary of the public park. A retaining wall would be constructed at the edge of pavement along the park. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Tilden Woods Stream Valley Park have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

### 2.2.4   Old Farm Neighborhood Conservation Area

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

## A.    Description of Section 4(f) Property

Old Farm Neighborhood Conservation Area (**Figure 2-32**) is a publicly-owned park and recreation area at 7030 Tilden Lane in Rockville. The park is bounded to the west by I-270. The 0.8-acre park is composed of an undeveloped wooded area. The park was acquired in 1962 and is under the jurisdiction of M-NCPPC.

00038712

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.1 acre of Old Farm Neighborhood Conservation Area to construct, operate, and maintain a stormwater management facility on land adjacent to the park; and provide access for construction vehicles and materials (**Figure 2-32**). The area of Section 4(f) use is a small rectangular area planted with trees at the southern end of the park, directly east of the residential dwelling at 7024 Tilden Lane. Activities in the impacted area would consist of tree removal; grading; construction and maintenance of the stormwater management facility; and access for construction vehicles and materials. The stormwater management facility is required at this location owing to the limited available space for the treatment of stormwater on this portion of I-270. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

FHWA intends to make a *de minimis* impact determination for Locust Hill Neighborhood Park if M-NCPPC, Montgomery County concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

### C.    Applied Minimization

The narrowest typical section has been applied where improvements to I-270 are proposed along Old Farm Neighborhood Conservation Area. This entails constructing a closed section with a retaining wall along the edge of pavement on I-270. No linear surface stormwater management facilities would be constructed along I-270. Stormwater quantity treatment would be provided in underground vaults beneath the shoulder. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Old Farm Neighborhood Conservation Area have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

### 2.2.5   Cabin John Stream Valley Park, Unit 6 (M-NCPPC)

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** M-NCPPC Montgomery County

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Cabin John Stream Valley Park, Unit 6 (Figure 2-33:) is one of six units that comprise M-NCPPC Montgomery County's Cabin John Stream Valley Park, a publicly-owned park and recreation area. Cabin John Stream Valley Park, Unit 6 is the northernmost portion of the stream valley park and is situated east of I-270 bounded by Old Stage Road to the south and the I-270 offramp to Montrose Road to the north. The entirety of Cabin John Stream Valley Park encompasses 118 acres; of which Unit 6 comprises 19.8

00038713

acres. Cabin John Stream Valley Park features portions of the natural surface Cabin John Trail that runs north-south and connects the stream valley park's Potomac area to Cabin John Parkway as well as an undeveloped wooded area that provides a protective buffer along Cabin John Creek. The park is under the jurisdiction of M-NCPPC Montgomery County and Unit 6 was acquired in 1967.

## B.     Potential Section 4(f) Use

The Build Alternatives would result in a use of 0.4 acre of Cabin John Stream Valley Park, Unit 6, except for 0.3 acre under Alternative 13B, to accommodate realigning the ramp from I-270 north to Montrose Road; augmenting the existing culvert that conveys Cabin John Creek beneath I-270; and providing access for construction vehicles and materials (**Figure 2-33**:). The area of Section 4(f) use is a semi-circular area concentrated at the western edge of the park around the existing culvert conveying Cabin John Creek beneath I-270. There would be no impact to Cabin John Trail. Activities in the area of Section 4(f) use would consist of tree removal; grading; a work area for the improvements to the existing culvert; and access for construction vehicles and materials. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. This Section 4(f) use would result in the permanent incorporation of portions of Unit 6 of Cabin John Stream Valley Park into the transportation facility. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

FHWA intends to make a *de minimis* impact determination for Cabin John Stream Valley Park, Unit 6 if M-NCPPC, Montgomery County concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

## C.     Applied Minimization

Consistent with the minimization efforts described in Section 4, MDOT SHA has been able to reduce impacts to Cabin John Stream Valley Park, Unit 6 by eliminating linear stormwater management facilities from within the boundary of the property. A retaining wall would be constructed at the edge of pavement along the public park. A 10-foot offset from the rear of the retaining wall is provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Cabin John Stream Valley Park, Unit 6 have changed from 0.5 acre (0.6 acre under Alternative 13B) on June 5, 2019 to the 0.4 acre (0.3 acre under Alternative 13B) in this Draft Section 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with M-NCPPC staff.

00038714

## Figure 2-32: Section 4(f) Property (Map 29 of 35)



00038715



**Figure 2-33: Section 4(f) Property (Map 30 of 35)**



## 2.2.6   Cabin John Stream Valley Park (Rockville)

**Type of Section 4(f) Property**: Public Park

**Official with Jurisdiction:** City of Rockville Department of Recreation and Parks

**Type of Section 4(f) Approval:** Individual Evaluation

### A.      Description of Section 4(f) Property

Cabin John Stream Valley Park is a publicly-owned park and recreation area east of Tower Oaks Boulevard and south of Preserve Parkway in Rockville. The 4.5-acre park provides a wooded buffer along a portion of the environmentally sensitive Cabin John Creek. The park is under jurisdiction of City of Rockville Department of Recreation and Parks and was acquired in 2001 and 2002. There are currently no recreational features within the park.

### B.      Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 2.1 acres of Cabin John Stream Valley Park to construct, operate, and maintain a stormwater management facility; and provide access for construction vehicles and materials (**Figure 2-34**). The area of Section 4(f) use comprises a rectangular area planted with trees at the southern portion of the park, southeast of the intersection of Tower Oaks Boulevard and Preserve Parkway. Activities in the impacted area would consist of tree removal; grading; construction and maintenance of the stormwater management facility; and access for construction vehicles and materials. The stormwater management facility is required at this location owing to the limited available space for the treatment of stormwater on this portion of I-270. At a coordination meeting on February 10, 2020, officials with the City of Rockville identified the proposed stormwater management facility as an existing dry pond.

Portions of Cabin John Stream Valley Park would be permanently incorporated into the transportation facility. The impacts to Cabin John Stream Valley Park require avoidance alternatives evaluation (**Section 3.1**) and least overall harm analysis (**Section 5.1.16**).

### C.      Applied Minimization

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Cabin John Stream Valley Park by eliminating linear stormwater management facilities along the edge of northbound I-270. Linear features through this area would have caused the realignment of Tower Oaks Boulevard resulting in additional impacts to the park. The narrowest typical section has been applied where improvements to I-270 are proposed. This entails constructing a closed section with a retaining wall along the edge of pavement on I-270.

As a result of these minimization efforts and on-going coordination with the officials with jurisdiction, the impacts to Cabin John Stream Valley Park have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with City of Rockville staff.

00038717



## Figure 2-34: Section 4(f) Property (Map 31 of 35)





### 2.2.7    Millennium Garden Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Rockville Department of Recreation and Parks

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Millennium Garden Park is a publicly-owned park and recreation area at the southwest corner of the intersection of MD 189 and Potomac Valley Road in Rockville. Features of the 1.25 acre park consist of paved paths, an unpaved trail, and benches. The park is under the jurisdiction of the City of Rockville Department of Recreation and Parks.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.2 acre of Millennium Garden Park to accommodate the realignment of the interchange of MD 189 and I-270 (**Figure 2-35**). The area of Section 4(f) use is a narrow area that extends approximately 350 feet along the northwestern boundary of the park at MD 189. The paved trail on the park should remain accessible for the duration of construction activities at this location. The existing noise barrier along the ramp from I-270 north to MD 189 may need to be relocated. This could result in construction activities on the park property. Activities within the area of Section 4(f) use would consist of grading; erosion and sediment control; equipment maneuvering; and construction easements. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

FHWA intends to make a *de minimis* impact determination for Millennium Garden Park if City of Rockville Department of Recreation and Parks concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

### C.    Applied Minimization

Consistent with the minimization described in Section 4, MDOT SHA was able to reduce impacts to Millennium Garden Park by eliminating linear stormwater management facilities along the edge of the offramp from I-270 north

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Millennium Garden Park have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with City of Rockville staff.

00038719

### 2.2.8    Bullards Park and Rose Hill Stream Valley Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Rockville Department of Recreation and Parks

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Bullards Park and Rose Hill Stream Valley Park is a publicly-owned park and recreation area abutting the northbound lanes of I-270 in Rockville. The 4.7-acre park is divided into two sections. The stream valley park comprises the central and southern portions of the park while the northern portion contains basketball courts, hard and natural surface trails, a playground, and picnic area. The park is under jurisdiction of the City of Rockville Department of Recreation and Parks and was acquired in 1991.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.3 acre of Bullards Park and Rose Hill Stream Valley Park to accommodate improvements to the existing culvert conveying a tributary to Watts Branch beneath I-270; and activities related to the construction of a stormwater management facility on a parcel south of the park. The area of Section 4(f) use is concentrated at two locations: a semicircular area at the existing culvert adjacent to I-270 and a narrow linear area at the southwestern corner of the park (**Figure 2-35**). Activities within the area of Section 4(f) use would consist of grading; tree removal; improvements to the existing culvert; and access for construction vehicles and materials. The paved paths and active recreational facilities within the park would not be impacted. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

FHWA would issue a finding of *de minimis* impact if City of Rockville Department of Recreation and Parks concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments

### C. Applied Minimization

Consistent with the minimization efforts described in Section 4, MDOT SHA has been able to reduce impacts to Bullards Park and Rose Hill Stream Valley Park by eliminating linear stormwater management facilities from along the edge of I-270. A retaining wall would be constructed at the edge of pavement with a 10-foot offset from the rear of the retaining wall provided for various constructability activities that may include erosion and sediment control, equipment maneuvering, and construction easements.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Bullards Park and Rose Hill Stream Valley Park have changed from 0.6 acre on June 5, 2019 to the 0.3 acre in this Draft Section 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with City of Rockville staff.

00038720

### 2.2.9   Rockmead Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Rockville Department of Recreation and Parks

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.   Description of Section 4(f) Property

Rockmead Park is a publicly-owned park and recreational facility at 1800 Greenplace Terrace in Rockville. This 25.3-acre park abuts the southbound lanes of I-270. Park amenities include open space, benches, natural and hard surface paths, and playground equipment. The sidewalks along Watts Branch Parkway are part of the transportation facility and not within the boundaries of the park. Further, the City of Rockville identifies the park as an urban wildlife sanctuary and forest preserve. The park is under jurisdiction of City of Rockville Department of Recreation and Parks and was initially acquired in 1967 with additions in 1968, 1970, and 1976.

### B.   Potential Section 4(f) Use

The Build Alternatives would result in a use of 0.2 acre of Rockmead Park, except for 0.3 acre under Alternative 10, to accommodate improvements to two existing culverts that convey waterways beneath I-270 and providing access for construction vehicles and materials (**Figure 2-35**). The area of Section 4(f) use is concentrated at two small rectangular areas at the existing culvert locations. Activities within the area of Section 4(f) use would consist of tree removal; grading; a work area for the improvements to the existing culverts; and access for construction vehicles and materials. Any impacts to the noise barrier along the edge of I-270 southbound would not result in a Section 4(f) use of Rockmead Park. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

FHWA intends to make a *de minimis* impact determination for Rockmead Park if City of Rockville Department of Recreation and Parks concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments

### C.   Applied Minimization

Consistent with the minimization efforts described in Section 4, MDOT SHA has been able to reduce impacts to Rockmead Park by eliminating surface stormwater management facilities from along I-270 where it extends along the boundary of the park.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Rockmead Park have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with City of Rockville staff.

00038721



## Figure 2-35 Section 4(f) Property (Map 32 of 35)



**Figure 2-36: Section 4(f) Property (Map 33 of 35)**

00038723

### 2.2.10 Woottons Mill Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Rockville Department of Recreation and Parks

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.     Description of Section 4(f) Property

Woottons Mill Park is a publicly-owned park and recreation area on Hurley Road in Rockville. Woottons Mill Park extends along a portion of Watts Branch from the southwest quadrant of the I-270 and MD 28 interchange to the intersection of Scott Drive and Wootton Parkway. Amenities within this 106.5-acre park include basketball and tennis courts, benches and picnic tables, natural surface and hard surface paths, playground equipment, and garden plots. A portion of the park is designated as an urban wildlife sanctuary and forest preserve. The park is under jurisdiction of City of Rockville Department of Recreation and Parks and was initially acquired in 1966 with later additions in 1967, 1970, 1972, 1990 and 1996.

### B.     Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.2 acre of Woottons Mill Park to accommodate improvements to two existing storm drain outfalls beneath the ramp from eastbound MD 28 to southbound I-270. The area of Section 4(f) use is concentrated at two small rectangular areas at the existing outfall locations (**Figure 2-36**). Activities within the area of Section 4(f) use would consist of tree removal; grading; a work area for the improvements to the existing culverts; and access for construction vehicles and materials. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Section 4(f) use would constitute a minor use. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

FHWA intends to make a *de minimis* impact determination for Woottons Mill Park if the City of Rockville Department of Recreation and Parks concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments

### C.     Applied Minimization

Consistent with the minimization efforts described in Section 4, MDOT SHA has been able to reduce impacts to Woottons Mill Park by eliminating surface stormwater management facilities from along the ramp from MD 28 to southbound I-270.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Woottons Mill Park have increased from 0.1 acre on June 5, 2019 to 0.2 acre in this Draft Section 4(f) Evaluation. The increase in the Section 4(f) use is owing to an increased work area related to augmenting two existing storm drains beneath the onramp from eastbound MD 28 to southbound I-270. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with City of Rockville staff.

00038724



### 2.2.11 Woodley Gardens

**Type of Section 4(f) Property:** Historic Site

**Official with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A.    Description of Section 4(f) Property

Woodley Gardens is a planned residential development containing Colonial Revival-style, single- and multi-family dwellings constructed between 1960 and 1970 in Rockville, Maryland. The approximately 200-acre development is east of I-270 and south of the Gude Drive overpass. Woodley Gardens is an important, early example of mixed housing types in a planned residential development and is therefore eligible for the NRHP under criterion A as a historic district. Woodley Gardens is also significant as a historic district under Criterion C as an excellent, intact example of a planned residential development with a period of significance ranging from 1960 to 1970. Overall, 517 dwellings are within the planned subdivision. Significant elements of the historic property include the dwellings, shopping center, swim club, Woodley Gardens Park, and the Rockville Senior Center and Park. The latter is inventoried in **Section 2.2.12** as a public park that would potentially experience a Section 4(f) use.

### B.    Potential Section 4(f) Use

The Build Alternatives would result in a use 0.7 acre of Woodley Gardens under Alternatives 8, 9, 9M, and 13B, 1.1 acres under Alternative 10, and 1.0 acre under Alternative 13C to accommodate the construction, operation, and future maintenance of a stormwater management facility and provide access for construction vehicles and materials (**Figure 2-36** and **Figure 2-37**). The area of Section 4(f) use is concentrated at the northwestern corner of the historic district, which is the southeastern quadrant of where the bridge carrying Gude Drive passes over I-270. Activities within the area of Section 4(f) use consist of grading; tree removal; construction of a stormwater management facility; and access for construction vehicles and materials. The stormwater management facility is required at this location owing to the limited available space for the treatment of stormwater on this portion of I-270. A second area of impact within the historic district is at the western edge of the Woodley Gardens Shopping Center at 1101 Nelson Street. No elements greater than fifty years of age or contribute to the significance of the historic district. The impact would be related to access for construction vehicles and materials. Two properties that contribute to the significance of Woodley Gardens would experience a Section 4(f) use: Rockville Senior Center Park and Woodley Gardens Park. A walking path on the park property would be relocated as part of the Proposed Action. At a coordination meeting with the City of Rockville on February 14, city officials identified a potential conflict with a gas line at this location. MDOT SHA reviewed utility plans and determined the conflict would not affect the potential placement of the stormwater management facility. While the walking path is a recreational element on the park property, it was constructed after the period of significance and does not contribute to the historic district.

On March 12, 2020 MHT concurred that the Managed Lanes Study would have no adverse effect on Woodley Gardens, including Rockville Senior Center. MHT additionally provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding. The impact to Woodley Gardens under the Build Alternatives would constitute a minor use. FHWA intends to make a finding of *de minimis* impact to Woodley Gardens.

00038725



## C.    Applied Minimization

Consistent with the minimization efforts described in Section 4 MDOT SHA was able to reduce impacts to Woodley Gardens by eliminating above-ground linear stormwater management facilities along the I-270 where they would result in impacts to the historic district.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Woodley Gardens have changed from 0.7 acre (0.9 acre under Alternative 10 and 0.8 acre under Alternative 13C) on June 5, 2019 to 0.7 acre (1.1 acres under Alternative 10 and 1.0 acre under Alternative 13C) in this Draft Section 4(f) Evaluation. The reason for the increase in the use of Section 4(f) property is an adjustment to the boundary of the historic district to correctly include Woodley Gardens Shopping Center. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with MHT.

### 2.2.12  Rockville Senior Center and Park

**Type of Section 4(f) Property:** Public Park and Historic Site

**Officials with Jurisdiction:** City of Rockville Department of Recreation and Parks, MHT

**Type of Section 4(f) Approval:** *De Minimis* Impact

## A.    Description of Section 4(f) Property

Rockville Senior Center and Park (**Figure 2-37**) is a publicly-owned park and recreational facility at 1150 Carnation Drive in Rockville. This 12.1-acre park is immediately south of West Gude Drive and abuts the northbound lanes of I-270. Park amenities consist of benches, picnic tables, walking paths, a nature trail, community garden, outdoor fitness equipment, art, bocce ball court, and playground equipment. The senior center building features additional recreational facilities including fitness rooms, a woodworking studio and meeting space. Originally constructed in 1972 as the Woodley Gardens Elementary School, in 1994 Montgomery County conveyed the property to the City of Rockville for use as a recreational facility. As a recreational facility, the park is under jurisdiction of City of Rockville Department of Recreation and Parks.

The Rockville Senior Center and Park additionally contributes to the significance of Woodley Gardens, eligible for the NRHP under Criteria A and C as an early example of a developed residential-focused, mixed use community in Rockville. Significant elements of the historic property include the dwellings, shopping center, swim club, Woodley Gardens Park, and the Rockville Senior Center.

## B.    Potential Section 4(f) Use

The Proposed Action would result in a use of 0.7 acre of Rockville Senior Center and Park, except for 0.9 acre under Alternative 10 and 0.8 acre under Alternative 13C, to accommodate the construction, operation, and future maintenance of a stormwater management facility and provide access for construction vehicles and materials. The area of Section 4(f) use is concentrated at the northwestern corner of Rockville Senior Center and Park, which is the southeastern quadrant of where the bridge carrying Gude Drive passes over I-270. Activities within the area of Section 4(f) use consist of grading; tree removal; construction of a stormwater management facility; and access for construction vehicles and materials. The stormwater management facility is required at this location owing to the limited available

00038726

space for the treatment of stormwater on this portion of I-270. Rockville Senior Center Park is both a park and the only contributing property within the historic district that would experience a Section 4(f) use. A walking path on the property would be relocated. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

On March 12, 2020 MHT concurred that the Managed Lanes Study would have no adverse effect on Woodley Gardens, including Rockville Senior Center. MHT additionally provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding. FHWA intends to make a finding of *de minimis* impact to Rockville Senior Center and Park if the City of Rockville Department of Recreation and Parks concurs that the Proposed Action, after measures to mitigate and minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

### C. Applied Minimization

Consistent with the minimization efforts described in Section 4 MDOT SHA was able to reduce impacts to Rockville Senior Center and Park by eliminating above-ground linear stormwater management facilities along the I-270 where they would result in additional impacts to the park and historic district.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Rockville Senior Center and Park have increased slightly under Alternative 10 from 0.8 acre on June 5, 2019 to 0.9 acre in this Draft 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with City of Rockville staff.

## 2.2.13 Ward Building

**Type of Section 4(f) Property:** Historic Site

**Official with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** *De Minimis* Impact

### A. Description of Section 4(f) Property

The Ward Building (**Figure 2-37**) is a Brutalist-style suburban corporate office constructed in 1978 at 1300 Piccard Drive, Rockville, Maryland. The property is 4.76 acres laying just east of I-270 and north of the Gude Drive overpass. The building is surrounded by small lawns and planting beds, featuring asphalt parking lots on all four sides. Two asphalt driveways connect the parking lot to Piccard Drive, with concrete sidewalks linking the building's entrances to the parking lots. Small landscaped concrete plazas separate exterior stair features at the northeast and southwest entrances, part of original construction. The Ward Building is eligible under Criterion C for its high artistic value as an example of Brutalist-style architecture. Its original exterior stairway/plaza features and signing contribute to its historic significance.

### B. Potential Section 4(f) Use

The Proposed Action would result in a use of 0.1 acre of the Ward Building, except for less than 0.1 acre under Alternative 13B, to accommodate widening of I-270 and provide access for construction vehicles and materials. The area of Section 4(f) use is concentrated at two rectangular areas where the irregularly shaped tax parcel extends towards the right-of-way at the southern and western corners of the property. These areas feature a manicured grass lawn and ornamental tree plantings. Activities within the area of

Section 4(f) use would include tree removal, grading, and access for construction vehicles and materials. No elements greater than 50 years of age or that contribute to the significance of the Ward Building are anticipated to experience a Section 4(f) use.

On March 12, 2020 MHT concurred that the Managed Lanes Study would have no adverse effect on the Ward Building. MHT additionally provided written acknowledgement of FHWA's intent to make a *de minimis* impact finding. As such, the impact to the Ward Building under the Proposed Action would constitute a minor use. FHWA intends to make a finding of *de minimis* impact to Ward Building.

## C.    Applied Minimization

Consistent with the minimization efforts described in Section 4 MDOT SHA was able to reduce impacts to Ward Building by eliminating above-ground linear stormwater management facilities along the I-270 where they would result in additional impacts to the park and historic district.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Ward Building have been reduced from 0.2 acre on June 5, 2019 to the 0.1 acre (< 0.1 acre under Alternative 13B) in this Draft Section 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with MHT staff.

### 2.2.14 Malcolm King Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Gaithersburg Department of Parks, Recreation and Culture

**Type of Section 4(f) Approval:** *De Minimis* Impact

## A.    Description of Section 4(f) Property

Malcolm King Park (**Figure 2-38**) is a publicly-owned park and recreation area at 1200 West Side Drive in Gaithersburg. The 72.9-acre park abuts the interchange of southbound I-270 and westbound I-370. Park amenities include a basketball court, picnic area, playground, tot lot, two miles of hiking trails, and two tennis courts. The majority of the park's acreage is wooded and serves as an environmental buffer for Muddy Branch. The park is under jurisdiction of the City of Gaithersburg Department of Parks, Recreation and Culture and was initially acquired in 1966 with additions in 1967, 1969, and 1999.

## B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of less than 0.1 acre of Malcolm King Park to accommodate a constructability area related to widening I-270; augmenting the existing culvert conveying Muddy Branch beneath I-270; providing access for construction vehicles and materials. The Section 4(f) use would take place within a rectangular area at the northeast corner of the park planted with trees. Activities within the area of Section 4(f) use would consist of grading; tree removal; a work area to improve the culvert beneath I-270; and access for construction vehicles and materials. The paved path that connects the residential neighborhood with Malcom King Park may be relocated, but access to the path and park would be maintained for the duration of construction. No recreational facilities would experience an impact from the proposed use of Section 4(f) property. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

00038728

The impact to the property under the Proposed Action would constitute a minor use. FHWA would issue a finding of *de minimis* impact if the City of Gaithersburg Department of Parks, Recreation and Culture, concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

## C.    Applied Minimization

Consistent with the minimization efforts described in Section 4 MDOT SHA was able to reduce impacts to Malcolm King Park by eliminating above-ground linear stormwater management facilities along the I-270 where they would result in additional impacts to the park. Consultation with the City of Gaithersburg has been initiated.

As a result of these minimization efforts and on-going coordination with the official with jurisdiction, impacts to Malcolm King Park have been reduced from 0.1 acre on June 5, 2019 to less than 0.1 acre in this Draft Section 4(f) Evaluation. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with City of Gaithersburg staff.

### 2.2.15 Morris Park

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Gaithersburg Department of Parks, Recreation and Culture

**Type of Section 4(f) Approval:** *De Minimis* Impact

## A.    Description of Section 4(f) Property

Morris Park (**Figure 2-38**) is a publicly-owned park and recreation area on Summit Hall Road in Gaithersburg. The 37.2-acre park abuts the interchange of northbound I-270 and westbound I-370. Park amenities include two baseball fields, three tennis courts, a basketball court, soccer field, picnic pavilion, picnic area with grill, playground, and tot lot. Wooded areas of the park provide an environmental buffer along Muddy Branch creek. The park is under jurisdiction of the City of Gaithersburg Department of Parks, Recreation and Culture and was initially acquired in 1967 with additional acquisitions in 1968 and 1971.

## B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.1 acre of Morris Park to accommodate a constructability area related to widening I-270; augmenting the existing culvert conveying Muddy Branch beneath I-270; providing access for construction vehicles and materials. The Section 4(f) use would take place within a rectangular area at the northwest corner of the park sparsely planted with trees. Activities within the area of Section 4(f) use would consist of grading; tree removal; a work area to improve the culvert beneath I-270; and access for construction vehicles and materials. No recreational features on the park would experience an impact. The Proposed Action would not adversely affect the activities, features, or attributes that qualify this park for protection under Section 4(f).

The impact to the property under the Proposed Action would constitute a minor use. FHWA would issue a finding of *de minimis* impact if the City of Gaithersburg Department of Parks, Recreation and Culture, concurs that the Proposed Action, after measures to minimize harm are employed, would not adversely

00038729



affect the activities, features, or attributes that make the property eligible for Section 4(f) protection; and in consideration of public comments.

## C.    Applied Minimization

Consistent with the minimization efforts described in Section 4 MDOT SHA was able to reduce impacts to Morris Park by eliminating above-ground linear stormwater management facilities along the I-270 where they would result in additional impacts to the park. Consultation with the City of Gaithersburg has been initiated.

As a result of these minimization efforts and on-going coordination with the OWJ, the impacts to Morris Park have remained unchanged since June 5, 2019. The effort to avoid, minimize and mitigate impacts will continue through ongoing and future coordination with City of Gaithersburg staff.

00038730

## Figure 2-37: Section 4(f) Property (Map 34 of 35)



00038731

**Figure 2-38: Section 4(f) Property (Map 35 of 35)**



00038732



## 2.3    Impacted Properties that Qualify as Exceptions to Section 4(f)

Based on the review of Section 4(f) properties, the Proposed Action would result in impacts to ten properties that would qualify under one or more of the exceptions to Section 4(f) listed at 23 CFR 774.13. Properties that would experience an impact that qualifies as an exception to Section 4(f) are presented in **Table 2-6**:.

**Table 2-6: Properties with Impacts Subject to an Exception to Section 4(f)**

| Section 4(f) Property | Type of Section 4(f) Exception |
|---|---|
| Bethesda Trolley Trail | 23 CFR 774.13(f)(3) and (4) |
| Baltimore & Potomac Railroad, Washington City Branch | 23 CFR 774.13(a)(3) |
| Spellman Overpass | 23 CFR 774.13(f)(3) and (4) |
| Baltimore & Ohio Railroad, Washington Branch | 23 CFR 774.13(a)(3) |
| Archeological Site 18MO749 | 23 CFR 774.13(b) |
| Archeological Site 18MO751 | 23 CFR 774.13(b) |
| Archeological Site 44FX0374 | 23 CFR 774.13(b) |
| Archeological Site 44FX0379 | 23 CFR 774.13(b) |
| Archeological Site 44FX0381 | 23 CFR 774.13(b) |
| Archeological Site 44FX0389 | 23 CFR 774.13(b) |

### 2.3.1    Bethesda Trolley Trail

**Type of Section 4(f) Property:** Public Park

**Officials with Jurisdiction:** Montgomery County Department of Transportation

**Type of Section 4(f) Approval**: Exception under 774.13(f)(3)

### A.    Description of Section 4(f) Property

The Bethesda Trolley Trail, also known as the North Bethesda Trail, is a publicly-owned, recreation facility that follows the alignment of an abandoned trolley line between Rockville and Bethesda. The shared use path is a paved, off-road, recreational and commuter trail that passes over both I-495 and I-270 near Fleming Avenue. The overpasses were completed in 2004 and 2005.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 0.2 acre of Bethesda Trolley Trail (**Figure 2-8**). The Section 4(f) use would accommodate widening of I-495 and I-270 that would impact the abutments of the bridges carrying the trail over the highways. Because of this use, MDOT SHA would relocate the

00038733

bridges carrying the Bethesda Trolley Trail over I-495 and I-270, temporarily closing the trail at these two locations. This action qualifies as an exception to the requirements for Section 4(f) approval under 23 CFR § 774.13 (f)(3) and (4), "Certain trails, paths, bikeways, and sidewalks…that occupy a transportation facility right-of-way without limitation to any specific location within that right-of-way, so long as the continuity of the trail, path, bikeway, or sidewalk is maintained; and…that are part of the local transportation system and which function primarily for transportation."

### 2.3.2  Baltimore & Ohio Railroad, Washington Branch

**Type of Section 4(f) Property:** Historic Site

**Officials with Jurisdiction:** ACHP, MHT

**Type of Section 4(f) Approval:** Exception under 774.13(a)(3)

### A.  Description of Section 4(f) Property

The Baltimore &Ohio Railroad, Washington Branch was determined eligible for the NRHP under Criteria A and C on February 22, 2019. This Section 4(f) historic site is a linear rail line that extends 13.8 miles from the border of Prince George's and Anne Arundel Counties into Washington, DC (**Figure 2-20**). The boundary encompasses 146.4 acres. The railroad is significant under Criterion A for its association with improvements in nineteenth century communications technology. In 1844, the first intercity telegraph line connected Baltimore and Washington, DC using the railroad right-of-way. It is also significant under Criterion C for its extant engineering structures and design as the work of a master railroad engineer Benjamin Latrobe II.

### B.  Potential Section 4(f) Use

The Proposed Action would result in an impact of 0.6 acre to accommodate widening the bridge carrying I-495 across the railroad. Section 106 consultation has resulted in a finding of no adverse effect to the historic site. Because the Baltimore and Potomac Railroad, Washington City Branch is an extant transportation facility that would not be adversely affected by the Proposed Action, in accordance with 774.13(a)(3) Section 4(f) approval is not required. Therefore, there is no Section 4(f) use of the Baltimore & Ohio Railroad, Washington Branch, which meets the criteria of a Section 4(f) exception described in **Section 1.2.6**.

### 2.3.3  Spellman Overpass

**Type of Section 4(f) Property:** Public Park

**Official with Jurisdiction:** City of Greenbelt Dept. of Recreation and Parks

**Type of Section 4(f) Approval:** Exception under 774.13(f)(3) and (4)

### A.  Description of Section 4(f) Property

Spellman Overpass is a publicly-owned recreation facility that carries a paved path over the Baltimore Washington Parkway. The shared use path is an off-road, recreational trail that connects the residential area of Greenbelt with Eleanor Roosevelt High School. The overpass and trail were constructed during the 1980s. The trail is under the jurisdiction of the City of Greenbelt Department of Recreation and Parks.

00038734



### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of < 0.1 acre of Spellman Overpass Trail (**Figure 2-22**). The impacts at this location would accommodate widening of Baltimore Washington Parkway; construction of a noise wall; construction, operation and maintenance of a linear stormwater management facility; and providing access for construction vehicles and materials. These impacts would occur at grade in a location where the trail is above these activities. The proposed stormwater management facility would not affect the functioning of the trail. The area of impacts is along the northbound lanes of the Baltimore Washington Parkway and the planted area immediately to the east. Bridge replacement is not anticipated at this time and access to Spellman Overpass would be maintained through the duration of construction at this location. This action would qualify as an exception to the requirements for Section 4(f) approval under 23 CFR § 774.13 (f)(3) and (4), "Certain trails, paths, bikeways, and sidewalks...that occupy a transportation facility right-of-way without limitation to any specific location within that right-of-way, so long as the continuity of the trail, path, bikeway, or sidewalk is maintained; and...that are part of the local transportation system and which function primarily for transportation."

## 2.3.4    Baltimore & Potomac Railroad, Washington City Branch

**Type of Section 4(f) Property:** Historic Site

**Officials with Jurisdiction:** MHT

**Type of Section 4(f) Approval:** Exception under 774.13(a)(3)

### A.    Description of Section 4(f) Property

The Baltimore & Potomac Railroad, Washington City Branch was determined eligible for the NRHP under Criteria A and C on February 22, 2019. This Section 4(f) historic site is a linear rail line that extends 13 miles from the border of Prince George's and Anne Arundel Counties to the border of Prince George's County and Washington, DC (**Figure 2-23**). The boundary encompasses 284.4 acres. The railroad is significant under Criterion A for breaking the monopoly on rail travel between the northeastern states and Washington, DC that had been held between 1835 and 1872. It is further significant under Criterion A for the experimental use of electrification and high speed rail service. The railroad is also significant under Criterion C for retaining integrity from its period of significance, including elements from pre-electrification and post-electrification periods. It is an excellent example of railroad engineering. Elements that contribute to the significance of the railroad consist of the catenary poles, signal bridges, and Bowie and Landover substations.

### B.    Potential Section 4(f) Use

The Proposed Action would result in a Section 4(f) use of 1.0 acre to accommodate widening the bridge carrying I-495 across the railroad (**Figure 2-23**). Section 106 consultation has resulted in a finding of no adverse effect. Because the Baltimore & Potomac Railroad, Washington City Branch is a transportation facility that would not be adversely affected by the Proposed Action, in accordance with 774.13(a)(3) Section 4(f) approval is not required. Therefore, there is no Section 4(f) use of the Baltimore & Potomac Railroad, Washington City Branch, which meets the criteria of a Section 4(f) exception described in **Section 1.2.6**.

00038735



### 2.3.5  Site 18MO749

Site 18MO749 is an Early Woodland site located within the Chesapeake and Ohio Canal National Historical Park approximately 200 ft (60 m) north of the river and approximately 350 ft (107m) west of I-495. It encompasses an area of 0.77 acres and contained an assemblage of precontact artifacts including quartz flakes, Early Woodland pottery and tools. Given the artifact density, buried context, and the frequency, type, and context of the material recovered, Site 18MO749 has the ability to answer significant questions about prehistoric settlement patterns in the region. Site 18MO749 retains a high degree of stratigraphic integrity and has the potential to provide meaningful new data on precontact lifeways in the area. Site 18MO749 is recommended eligible for the NHRP under Criterion D and does not warrant preservation in places as it is important due to what can be learned through data recovery

An archaeological resource is not protected by Section 4(f) if FHWA determines, after consultation with MHT and the ACHP (if participating), that the archaeological resource is important chiefly because of what can be learned by data recovery and has minimal value for preservation in place (23 CFR 774.13(b)(1)). On March 12, 2020 MHT concurred with MDOT SHA's determination that Site 18MO749 is eligible for the NRHP under Criterion D. Therefore, Site 18MO749 is not addressed further in this evaluation.

### 2.3.6  Site 18MO751

Site 18MO751 is a nineteenth- and twentieth-century domestic scatter associated with the Lock 12 Lockhouse within the Chesapeake and Ohio Canal National Historical Park. The site is located east and adjacent to the I-495 embankment and south of the Chesapeake and Ohio Canal prism. A dry-laid stone foundation was recorded within the site, measuring approximately 30 ft (9 m) by 20 ft (6 m). The artifact assemblage ranges in date from the second quarter of the nineteenth century into the twentieth century, likely beginning ca. 1820. Based on the nature of the material recovered, its proximity to what would have been the primary residence for a canal lockkeeper, Site 18MO751 is associated with the daily occupation of the canal lockhouse. Site 18MO751 has the potential to provide significant information about the occupation and use of Lock 12 and its associated lockhouse. The investigations indicate that the site contains intact archaeological contexts and features related to the operation of the canal and the domestic lives of lockkeepers. On March 12, 2020 MHT concurred that Site 18MO751 is eligible for the NHRP under Criterion D. Therefore, Site 18MO751 is not addressed further in this evaluation. If impacts cannot be avoided, further archaeological investigations will be included in the treatment plan that is being developed as part of the Section 106 Programmatic Agreement.

### 2.3.7  Sites 44FX0374, 44FX0379, 44FX0381, and 44FX0389

Six sites within the George Washington Memorial Parkway (44FX0373, 44FX0374, 44FX0379, 44FX0381, 44FX0389, and 44FX3160) appear to represent a related set of activities over roughly contemporaneous periods and occur within a distinct landscape setting. The investigations indicate that these sites can provide important information about precontact occupations and use of the landscape. MDOT SHA considered these sites to be part of an archaeological district, determined eligible for the NRHP as a "significant concentration, linkage, or continuity of sites, … united historically by … physical development" (US DOI 1991:5). However, VDHR did not concur with MDOT SHA's recommendation of the sites as an individual archaeological district. As a result, Sites 44FX0373 and44FX3160 have been determined not individually eligible for the NRHP. Sites 44FX0374 and 44FX0379, 44FX0381, and 44FX0389 are recommended as individually eligible for the NRHP under Criterion D; and have minimal value for warrant

00038736



preservation in place and qualify as exceptions to Section 4(f) as defined in 23 CFR 774.13(b). NPS, VDHR, and MDOT SHA are continuing Section 106 consultation regarding the eligibility of the archaeology district at the time of publication. The outcome of consultation will be documented as part of Section 106 consultation as well as in the Final Section 4(f) Evaluation. If impacts cannot be avoided, further archaeological investigations will be included in the treatment plan that is being developed as part of the Section 106 Programmatic Agreement.

## 2.4   Summary of Section 4(f) Property with Potential *De Minimis* Impacts

Based on the review of Section 4(f) properties in **Section 2.1** and **2.2**, the Proposed Action would result in a minor Section 4(f) use of the 36 properties listed in **Table 2-7**. FHWA intends to make Section 4(f) *de minimis* impact findings for these properties. Pursuant to 23 CFR 774.3 (b), FHWA in cooperation with MDOT SHA, will notify the OWJ of this intent and request written concurrence that the Proposed Action would not adversely affect the activities, features, or attributes that qualify the property for protection under Section 4(f). In a letter dated March 12, 2020, MHT acknowledged FHWA's intent to make a *de minimis* finding for the minor use of nine historic Section 4(f) resources as noted in **Table 2-7** below. MHT acknowledgment FHWA's intent to make a *de minimis* finding for Grosvenor Estate applies to Fleming Local Park, a portion of which is included within the boundary of the former. Similarly, MHT's acknowledgement of FHWA's intent to make a *de minimis* finding for Greenbelt Historic District extends to Indian Springs Park and Buddy Attick Lake Park, which contribute to the historic district.

**Table 2-7: Summary of Section 4(f) Properties with Potential D*e Minimis* Impact Finding**

| Section 4(f) Property | Officials with Jurisdiction for Section 4(f) |
|---|---|
| Cabin John Stream Valley Park, Unit 2 | M-NCPPC, Montgomery County |
| Burning Tree | MHT |
| Fleming Local Park | M-NCPPC, Montgomery County and MHT |
| Grosvenor Estate | MHT |
| Locust Hill Neighborhood Park | M-NCPPC, Montgomery County |
| Forest Glen Historic District | MHT |
| Forest Glen Neighborhood Park | M-NCPPC, Montgomery County |
| Calvary Evangelical Lutheran Church | MHT |
| South Four Corners Neighborhood Park | M-NCPPC, Montgomery County |
| Montgomery Blair High School Athletic Fields | Montgomery County Public Schools; M-NCPPC |
| Blair Local Park | M-NCPPC, Montgomery County |
| Hollywood Park | M-NCPPC, Prince George's County |
| Greenbelt Historic District | MHT, NPS |
| Buddy Attick Lake Park | City of Greenbelt, MHT, NPS |
| Indian Springs Park | City of Greenbelt, NPS, MHT |
| McDonald Field | City of Greenbelt |
| Beckett Field | New Carrollton Department of Public Works |
| Southwest Branch Stream Valley Park | M-NCPPC, Prince George's County |
| Heritage Glen Park | M-NCPPC, Prince George's County |
| Douglas E. Patterson Park | M-NCPPC, Prince George's County |
| Manchester Estates Park | M-NCPPC, Prince George's County |
| Henson Creek Stream Valley Park | M-NCPPC, Prince George's County |

00038737



| Section 4(f) Property | Officials with Jurisdiction for Section 4(f) |
| --- | --- |
| Academy Woods Historic District | MHT |
| Tilden Woods Stream Valley Park | M-NCPPC, Montgomery County |
| Old Farm Neighborhood Conservation Area | M-NCPPC, Montgomery County |
| Cabin John Stream Valley Park, Unit 6 | M-NCPPC, Montgomery County |
| Millennium Garden Park | City of Rockville Department of Recreation and Parks |
| Bullards Park and Rose Hill Stream Valley Park | City of Rockville Department of Recreation and Parks |
| Rockmead Park | City of Rockville Department of Recreation and Parks |
| Woottons Mill Park | City of Rockville Department of Recreation and Parks |
| Woodley Gardens Historic District | MHT |
| Rockville Senior Center Park | City of Rockville Dept. of Recreation and Parks, MHT |
| Ward Building | MHT |
| Malcolm King Park | Gaithersburg Dept. of Parks, Recreation and Culture |
| Morris Park | Gaithersburg Dept. of Parks, Recreation and Culture |

## 2.5    Archaeological Properties

Under Section 106 of the National Historic Preservation Act of 1966, a series of archaeological identification and evaluation investigations are underway as part of the Study. To date, three archaeological resources located within the LOD for the Proposed Action have been recommended eligible for the NRHP. Sites 18MO749 and 18MO751 within the Chesapeake and Ohio Canal National Historical Park were recommended eligible under Criterion D. MHT concurred on this determination on March 12, 2020. A proposed Dead Run Ridges Archaeological District within George Washington Memorial Park was also recommended eligible under Criterion D. On February 14, 2020, VDHR did not concur with characterizing the archaeological resources as an archaeological district. VDHR recommended Sites 44FX0374, 44FX0379, 44FX0381, and 44FX0389 as individually eligible for the NRHP. As the sites are recommended as individually eligible for the NRHP under Criterion D; and have minimal value for warrant preservation in place they qualify as exceptions to Section 4(f) as defined in 23 CFR 774.13(b) and described in **Section 2.3.17**. NPS, VDHR, and MDOT SHA are continuing Section 106 consultation regarding the eligibility of the archaeology district at the time of publication. The outcome of consultation will be documented as part of Section 106 consultation as well as in the Final Section 4(f) Evaluation.

The Montgomery County Poor Farm Cemetery is within the LOD of the Proposed Action. This property will be subject to additional delineation, evaluation and treatment under the Section 106 Programmatic Agreement and consultation with the consulting parties and any identified descendants. MDOT SHA will work to minimize impacts and coordinate with affected communities on treatment where human remains may exist regardless of NRHP eligibility. Upon further investigations, if this cemetery is found to also meet the eligibility criteria for the NRHP, MDOT SHA will make an eligibility determination and conduct additional Section 106 review, evaluation, and treatment as part of the Programmatic Agreement (PA).

No additional NRHP-eligible archaeological resources have yet been identified within the LOD for the Proposed Action but additional studies of previously unsurveyed properties are currently underway. However, Phase IA archaeological assessments and completed studies in the vicinity of the locations that have not previously been surveyed suggest there is a minimal likelihood that any archaeological resources will be identified that warrant preservation in place.

00038738

# 3

# 3 AVOIDANCE ANALYSIS

## 3.1 Avoidance Alternatives

A *feasible and prudent avoidance alternative* is one that avoids using any Section 4(f) property and does not cause other severe problems of a magnitude that substantially outweigh the importance of protecting the Section 4(f) property (23 CFR 774.17). In assessing the importance of protecting Section 4(f) properties, it is appropriate to consider the relative value of the resource to the preservation purpose of the statute. The preservation purpose of Section 4(f) is described in 49 U.S.C. § 303(a), which states: "It is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites."

An alternative is not *feasible* if it cannot be built as a matter of sound engineering judgement.

An alternative is not *prudent* if:

- It compromises the project to a degree that is unreasonable to proceed with the project in light of its stated Purpose and Need;
- It results in unacceptable safety or operational problems;
- It causes severe social, economic, or environmental impacts even after reasonable mitigation; severe disruption to established communities; severe disproportionate impacts to minority or low income populations; or severe impacts to environmental resources protected under other Federal statutes;
- It results in additional construction, maintenance, or operational costs of an extraordinary magnitude;
- It causes other unique problems or unusual factors; or
- It involves multiple factors above that while individually minor, cumulatively cause unique problems; or impacts of extraordinary magnitude.

The presence of linear, mostly north-south oriented, Section 4(f) properties such as Cabin John Stream Valley Park, Rock Creek Stream Valley Park, Sligo Creek Stream Valley Park, Northwest Branch Stream Valley Park, Southwest Stream Valley Park, Henson Creek Stream Valley Park, George Washington Memorial Parkway, Clara Barton Parkway, Baltimore Washington Parkway, Sligo Creek Parkway, and

00038739



Suitland Parkway, in contrast to the largely east-west oriented interstate corridors, limits the potential for feasible and prudent avoidance alternatives to exist in this corridor, which makes avoidance of all Section 4(f) properties difficult. Each of these park properties extends perpendicular or parallel to the alignment of I-495 or I-270. Additionally, the Corridor Study Boundary is characterized as a densely populated, urban area with large residential communities, business complexes, large governmental institutions, numerous community facilities, and hundreds of sensitive cultural and natural resources. Since I-495 and I-270 are existing interstate systems that serve local and regional traffic and connect to major arterials in each county, addressing the need on a system level is critical to achieving the overall purpose of the Study.

Six alternatives that would completely avoid the use of Section 4(f) properties have been developed and are discussed below. They are evaluated in accordance with the definition of a *feasible* and *prudent* avoidance alternative found in 23 CFR 774.17.

### 3.1.1   Alternative 1: No Build Alternative

Alternative 1 would avoid all Section 4(f) property impacts. Under this alternative routine maintenance and safety improvements would occur but there would be no changes to the existing lane configuration on I-495 and I-270 (**Figure 3-1**:). There would be no operational improvements or increased capacity along I-495 and I-270; existing and future traffic volumes would not be accommodated at this location.

Alternative 1 would avoid impacts to Section 4(f) properties, but would be unreasonable to proceed with in light of the Study's stated Purpose and Need. Alternative 1 causes other severe problems of a magnitude that substantially outweigh the importance of protecting Section 4(f) properties. It would not accommodate existing and long-term traffic growth, enhance trip reliability, or improve the movement of goods and services. I-495 and I-270 are the two most heavily traveled freeways in the National Capital Region, each with an Average Annual Daily Traffic volume of up to 260,000 vehicles per day in 2018. On both of these interstate systems, congestion within the Study limits lasts between 7 and 10 hours per day resulting in the second highest congestion in the United States. Alternative 1 would not provide the much-needed capacity improvements to serve both existing and future traffic growth on these interstate systems.

**Figure 3-1: Alternative 1 Typical Sections**

00038740



### 3.1.2   Increased Bus Transit

This alternative would include expansion of existing bus transit services within the limits of the Study on both I-270 and I-495 and the additional surrounding roadway network. This could be in the form of an increase in bus service on existing I-495 and I-270 within the limits of the Study, or consideration of dedicated facilities such as bus rapid transit systems on existing infrastructure. A Bus Transit Alternative would be limited to roadway striping. No additional capital or capacity improvements to I-495 and I-270 would occur.

A 2017 study by the National Capital Region Transportation Planning Board (TPB), Long-Range Plan Task Force, titled, *An Assessment of Regional Initiatives for the National Capital Region - Draft Technical Report on Phase II of the TPB Long-Range Plan Task Force,*[6] studied a series of regional transportation initiatives compared to the baseline of the Financially Constrained Long-Range Plan (CLRP). One of the initiatives studied was a regionwide system of bus rapid transit (BRT) and transitway networks (known as *Initiative 4: Regionwide Bus Rapid Transit and Transitways*). This included new BRT facilities in Montgomery County, Prince George's County, Northern Virginia, DC, and a transitway from Branch Avenue to Waldorf. These lines are in addition to those already in the CLRP.

This study showed that an extensive, regionwide network of BRT and transitway facilities would result in a one percent reduction in average travel times for transit, HOV and single-occupancy vehicle commute trips relative to the 2040 CLRP scenario. Daily vehicle hours of delay would be reduced by two percent, and transit commute mode share would increase four percent. Daily vehicle miles traveled (VMT) and daily VMT per capita would be reduced by less than one percent. Share of passenger miles on reliable modes would increase by six percent.

As a result of these issues, the bus transit alternative would be unreasonable to proceed with the alternative in light of the stated Purpose and Need. This avoidance alternative causes other severe problems of a magnitude that substantially outweigh the importance of protecting the Section 4(f) properties.

Given the modest improvements to travel times and vehicle hours of delay expected from an extensive regionwide network of BRT and transitways, dedicated BRT facilities along only I-495 and I-270 would not achieve the Study's Purpose and Need as it would not address existing and long-term traffic growth, would not enhance trip reliability along I-495 or I-270, and would not accommodate Homeland Security. Under this alternative, fares would be collected, but additional analysis would be needed to determine financial feasibility based on ridership and operations and maintenance costs. In addition, improvement in the movement of goods and services would be limited to commuter benefits and not the movement of freight or services that require vehicular movement (i.e., mechanical, electrical, etc. services).

### 3.1.3   Transportation System Management/Transportation Demand Management

Transportation System Management (TSM)/Transportation Demand Management (TDM) strategies are improvements to existing facilities that improve the operation and coordination of transportation services and facilities. The TSM options could include interchange reconfigurations, modifications to turn lanes

---

[6]https://www.mwcog.org/documents/2017/12/20/long-range-plan-task-force-reports-projects-regional-transportation-priorities-plan-scenario-planning-tpb/

00038741

and acceleration/deceleration lanes, ramp metering, peak period shoulder use, enhancements to parallel roadway networks, enhanced traveler information, etc. TDM strategies focus on system demand and ways to change drivers' behavior aimed at providing the most efficient and effective use of existing transportation services and facilities. Options include rideshare and telecommuting promotion, park-and-ride lots, flexible work hours, carpool subsidies, and transit subsidies; all of which are most effective on a regional basis and commonly implemented through employers. TSM/TDM strategies would only be implemented where they do not create impacts to Section 4(f) properties.

The TSM/TDM Alternative would involve extending the Innovative Congestion Management (ICM) improvements currently under construction along I-270 onto I-495. The ICM improvements are anticipated to provide traffic operational benefits in I-270. However, they are expressly designed to be short term solutions. For example, in the AM peak, as virtually all of the relevant congestion measures indicate, the I-270 network with the ICM improvements performs better than under the existing (2015) conditions. Overall, detailed modeling of the I-270 ICM improvements also indicated that as traffic continues to increase, the traffic operations are expected to return to existing levels of congestion by 2040. Based on the 2040 modeling from the ICM Improvement Study and VISSIM modeling on the No Build Alternative for this Study, I-270 would accommodate upwards of 19 percent more vehicles in the northern section and 7 percent more vehicles around I-495 during the peak hour. Similar results would be expected on I-495 if these types of improvements were implemented. The benefit would be recognized in the short-term but could not be sustained for the long-term.

The TSM/TDM Alternative would consist of adaptive ramp metering to optimize the traffic operations where no managed lanes would be provided. This system would be intended to regulate the flow of traffic onto the mainline based on real-time mainline operations to prevent congestion associated with the heavy ramp merging volumes. The system would be designed to limit impacts to arterials by increasing the flow rate onto the freeway when the queues increase on the entrance ramps to prevent or limit queuing back onto the arterials.

Another improvement would be signal timing optimization to best accommodate the anticipated traffic patterns resulting from implementation of this alternative. This strategy reduces vehicle wait times at intersections within the limits of the Study without requiring physical widening or impacts by adjusting the length of green lights to match demand.

Other potential TSM/TDM improvements were deemed infeasible for the following reasons:

- **Hard shoulder running** is not considered feasible because the width of existing median shoulders is less than 12 feet for a significant portion of the limits of the Study, preventing its use as a peak period lane. The outside shoulder was also not considered acceptable as a shoulder through lane because it would require widening to provide additional auxiliary lanes for the interchanges within the limits of the Study. This widening would result in impacts to Section 4(f) properties.

- **Interchange reconfigurations** to improve traffic operations were not considered feasible because the modifications would require new/widened ramps, arterial modifications, and auxiliary lane widening. At many locations, these improvements would result in impacts to Section 4(f) properties.

00038742



TSM/TDM alternatives, by their nature, do not include the addition of roadway capacity, and could not address the large-scale challenges with existing capacity along the existing interstate systems. Therefore, because of the limited scope of these types of improvements, TSM/TDM improvements alone would not address the existing or future capacity needs. The TSM/TDM alternative is therefore not prudent because it would be unreasonable to proceed with the alternative in light of the stated Purpose and Need and it would result in unacceptable operational problems.

Because the actions that would be included as part of TSM/TDM solutions would only address a small fraction of congestion challenges and only do so in the short-term, Alternative 2 would not accommodate existing and future long-term traffic, nor would these measures enhance trip reliability. In addition, Alternative 2 does not directly provide an additional travel choice, accommodate Homeland Security, improve the movement of goods and services, nor enhance multimodal connectivity; and it does not provide a revenue source. Based on these factors, the TSM/TDM alternative is not a feasible and prudent alternative.

### 3.1.4   Section 4(f) Avoidance Alternative 1

Section 4(f) Avoidance Alternative 1 would construct four new managed lanes off-alignment between George Washington Memorial Parkway and MD 4 **(Figure 3-2)**. The managed lanes would be constructed in Montgomery and Prince George's counties, outside the alignment of existing I-495 between the American Legion Bridge and the MD 202 interchange. The alignment of Section 4(f) Avoidance Alternative 1 would cross from outside to inside the existing I-495 at the MD 202 interchange and continue south until rejoining existing I-495 at the limit of the Study between the interchanges with MD 4 and MD 5.

To avoid the use of any Section 4(f) property on I-270, four managed lanes would be constructed off alignment to the west of existing I-270. The alignment of Section 4(f) Avoidance Alternative 1 would rejoin existing I-270 at the MD 200 interchange, the limit of the Study.

The proposed improvements would avoid impacts to all Section 4(f) properties inventoried in the Corridor Study Boundary. Section 4(f) Avoidance Alternative 1 would avoid the following inventoried Section 4(f) properties through bridging: Chesapeake and Ohio Canal National Historical Park, Clara Barton Parkway, Cabin John Stream Valley Park, Rock Creek Stream Valley Park, Sligo Creek Stream Valley Park, Northwest Branch Stream Valley Park, Southwest Branch Stream Valley Park, and Suitland Parkway.

The new off alignment managed lanes system would operate in addition to the I-495 GP lanes, providing additional traffic capacity for system users. It would, therefore, meet the Purpose and Need by alleviating some of the congestion on I-495 and I-270. It would also meet Purpose and Need by accounting for future growth, accommodating homeland security, and improving the movement of goods and services.

However, constructing new roadway on new alignment would require a new limit of disturbance approximately 200 feet wide along a distance of approximately 50 miles at an estimated construction cost of $25 billion. The new alignment would be disruptive to established suburban communities, land use patterns, and local road systems. Section 4(f) Avoidance Alternative 1 would result in significant additional impacts to wetlands, waterways, endangered species habitat, and forest resources. Section 4(f) Avoidance Alternative 1 would result in significant impacts to residences, businesses, and institutions through a large swatch of densely populated areas in Montgomery and Prince George's counties. The alignment of the

00038743



avoidance alternative would necessitate relocating thousands of properties when compared to the Proposed Action. As a result Section 4(f) Avoidance Alternative 1 would have severe impacts on established communities.

Although Section 4(f) Avoidance Alternative 1 would avoid impacts to all Section 4(f) properties identified in the Corridor Study Boundary it would result in additional construction, maintenance, and operational costs of an extraordinary magnitude. After reasonable mitigation, it would still cause severe social, economic, and environmental impacts; severe disruption to established communities; and severe impacts to environmental resources protected under other Federal statutes. Section 4(f) Avoidance Alternative 1 causes other severe problems of a magnitude that substantially outweighs the importance of protecting Section 4(f) properties.

### 3.1.5   Section 4(f) Avoidance Alternative 2

Section 4(f) Avoidance Alternative 2 would construct four new managed lanes off-alignment between George Washington Memorial Parkway and MD 4 (**Figure 3-2**). The managed lanes would be constructed in Montgomery and Prince George's counties, inside the alignment of existing I-495 through nearly full the limits of the Study: from the Potomac River crossing and between interchanges with MD 4 and MD 5.

To avoid the use of any Section 4(f) property on I-270, four managed lanes would also be constructed off-alignment to the east of existing I-270. The alignment of Section 4(f) Avoidance Alternative 1 would rejoin existing I-270 at the MD 200 interchange, the limit of the Study.

The proposed improvements would avoid impacts to all Section 4(f) properties inventoried in the Corridor Study Boundary. Section 4(f) Avoidance Alternative 2 would avoid the following inventoried Section 4(f) properties through bridging: George Washington Memorial Parkway, Chesapeake and Ohio Canal National Historical Park, Clara Barton Parkway, Cabin John Stream Valley Park, Rock Creek Stream Valley Park, Sligo Creek Stream Valley Park, Northwest Branch Stream Valley Park, Southwest Branch Stream Valley Park, and Suitland Parkway.

The new off alignment managed lanes system would operate in addition to the I-495 GP lanes and provide additional traffic capacity for system users. It would, therefore, meet the Purpose and Need by alleviating some of the congestion on I-495 and I-270. It would also meet Purpose and Need by accounting for future growth, accommodating homeland security, and improving the movement of goods and services.

However, as with Section 4(f) Avoidance Alternative 1, constructing new roadway on new alignment would require a limit of disturbance 200 feet wide along a distance of approximately 40 miles at an estimated construction cost of $20 billion. The new alignment would be disruptive to established suburban and urban communities, land use patterns, and local road systems. Section 4(f) Avoidance Alternative 2 would result in significant additional impacts to wetlands, waterways, endangered species habitat, and forest resources. The proposed alignment would result in significant impacts to residences, businesses, and institutions through a large swath of densely populated areas in Montgomery and Prince George's counties. Thousands of additional properties would be relocated when compared to the Proposed Action. As a result Section 4(f) Avoidance Alternative 2 would have severe impacts on established communities.

00038744

00038745



Figure 3-2: Alignment of Section 4(f) Avoidance Alternatives 1, 2, and 3



00038747

Although Section 4(f) Avoidance Alternative 2 would avoid impacts to the Section 4(f) properties identified in the Corridor Study Boundary it would result in additional construction, maintenance, and operational costs of an extraordinary magnitude. After reasonable mitigation, it would still cause severe social, economic, and environmental impacts; severe disruption to established communities; and severe impacts to environmental resources protected under other Federal statutes. Section 4(f) Avoidance Alternative 2 causes other severe problems of a magnitude that substantially outweighs the importance of protecting Section 4(f) properties.

### 3.1.6   Section 4(f) Avoidance Alternative 3

Section 4(f) Avoidance Alternative 3 would construct four managed lanes as proposed in the Proposed Action. However, where impacts to Section 4(f) properties would occur, the location specific options described in **Section 5.1** would be incorporated into the alignment of Section 4(f) Avoidance Alternative 3 (**Figure 3-2**). For the purposes of Section 4(f) Avoidance Alternative 3, it is assumed that *de minimis* impact findings throughout the Managed Lanes Study would be eliminated through minimization and by applying innovative design solutions.

Section 4(f) Avoidance Alternative 3 would incorporate alignment shifts, tunnels, and bridges to avoid impacts to Section 4(f) properties at 15 different locations throughout the Managed Lanes Study to avoid impacts to all Section 4(f) properties inventoried within the Corridor Study Boundary. The estimated cumulative cost of the location specific options is $9 billion greater than the Proposed Action. In a manner similar to Section 4(f) Avoidance Alternatives 1 and 2, the alignment shifts would be disruptive to established suburban and urban communities, land use patterns, and local road systems. Shifting the alignment of the managed lanes system throughout the corridor would also present operational challenges related to providing access and egress between the managed lanes and GP lanes. Section 4(f) Avoidance Alternative 3 would result in significant additional impacts to wetlands, waterways, endangered species habitat, and forest resources. The proposed alignment would result in significant impacts to residences, businesses, and institutions through a large swath of densely populated areas along I-495 through Montgomery County and Prince George's County and I-270 in Montgomery County. Hundreds of additional properties would be relocated when compared to the Proposed Action. As a result Section 4(f) Avoidance Alternative 3 would have severe impacts on established communities.

Although Section 4(f) Avoidance Alternative 3 would avoid impacts to the Section 4(f) properties identified in the Corridor Study Boundary it would result in additional construction, maintenance, and operational costs of an extraordinary magnitude. After reasonable mitigation, it would still cause severe social, economic, and environmental impacts; severe disruption to established communities; and severe impacts to environmental resources protected under other Federal statutes. Section 4(f) Avoidance Alternative 2 causes other severe problems of a magnitude that substantially outweighs the importance of protecting Section 4(f) properties.

## 3.2   Avoidance Analysis Summary

As discussed in Section 3.1, the orientation of multiple linear parks perpendicular to the Study alignments makes avoidance of all Section 4(f) properties difficult. The analysis described in this section was not able to identify an alternative that totally avoids the use of any Section 4(f) property while addressing the Purpose and Need and without causing other severe problems of a magnitude that substantially outweighs the importance of protecting Section 4(f) properties. In addition to trying to devise avoidance

00038748



alternatives that completely avoid the use of Section 4(f) property, MDOT SHA also looked at avoiding each Section 4(f) property that experiences a use under the Proposed Action through the development of Location Specific Options. Those options, consisting of alignment shifts, tunnels, and bridges designed to avoid impacts to specific Section 4(f) properties, are presented in **Section 5.1, page 165.** The final determination of whether there is no feasible and prudent avoidance alternative to the use of land from Section 4(f) properties will be presented in the Final Section 4(f) evaluation. Therefore, the Section 4(f) evaluation continues with a least overall harm analysis.

00038749

# 4

# 4    ALL POSSIBLE PLANNING

Section 4(f) states FHWA may not approve the use of Section 4(f) property unless there is no feasible and prudent avoidance alternative and the action includes all possible planning to minimize harm to the property resulting from such use. "All possible planning," as defined in 23 CFR 774.17, includes all reasonable measures to minimize harm or mitigate for adverse impacts and effects. The cost of mitigation should be a reasonable public expenditure in light of the severity of the impact on Section 4(f) property, in accordance with 23 CFR 771.105(e).

Avoidance analysis has already occurred in the context of searching for alternatives that completely avoid all Section 4(f) properties. For the Draft Section 4(f) Evaluation, all possible planning to minimize harm has been specifically applied to Proposed Action (**Section 5.3**) as well as all of the other Least Overall Harm Alternatives analyzed in **Sections 5.1** and **5.2**. These minimization actions are documented in this section. However, the final determination of whether or not all possible planning has occurred with respect to historic properties awaits completion of the Section 106 process.

Pursuant to Section 106, MDOT SHA is in the process of drafting a PA to resolve adverse effects to historic properties. In general, mitigation measures agreed upon as part of the Section 106 process satisfy the all possible planning to minimize harm requirement for historic sites under Section 4(f).

With regard to public parks, all possible planning will involve the minimization activities described herein as well as mitigation coordinated with the OWJ over public parks and recreation areas. All possible planning to minimize harm will additionally involve an agreement document that outlines the process to continue coordination with the OWJ over Section 4(f) properties through the design phase of the project. Members of the public are also afforded an opportunity to provide comments. Mitigation measures involving the public parks and recreation areas may involve a replacement of land and/or facilities of comparable value and function, or monetary compensation to enhance the remaining land.

The measures outlined in this Draft 4(f) Evaluation, therefore, are preliminary but appropriate and suitable for informing the preparation of the PA and future coordination with the OWJs over public parks. The final determination of whether or not all possible planning has occurred is reserved for the Final Section 4(f) Evaluation, after considering comments on the Draft Section 4(f) Evaluation.

00038750

## 4.1    Methodology and Assumptions for Establishing Limits of Disturbance

The Limits of Disturbance (LOD) are the proposed boundary within which all construction, access, material storage, grading, clearing, landscaping, and related activities would occur. The design for on-site stormwater management, including ponds and large facilities along the roadside and within interchanges, was developed to a concept level of detail and is included within the LOD. Existing streams that would be impacted by roadside grading have been relocated where possible.

Improvements needed to accomplish profile adjustments and roadway shifts for roads that cross over I-495 and I-270, due to mainline widening, were designed at a preliminary level. The LOD incorporates the modifications along these crossroads. It was assumed that any required noise barriers along I-495 and I-270 would be located within the LOD. A 30-foot offset to the proposed LOD was established beyond the edge of I-495 and I-270 mainline bridges over water and roadways to accommodate the reconstruction.

MDOT SHA conducted a preliminary assessment of potential impacts and identified the necessary major utility relocations. Locations of known utilities were assessed to determine the potential likelihood for requiring relocation. Where relocations were deemed most likely MDOT SHA established a variable offset, between 10 and 50 feet, beyond the typical cut and fill lines associated with the LOD.

In general, the proposed LOD was compared to existing right-of-way and adjusted according to the presence of a few conditions. Where the distance between the cut and fill lines and the existing right-of-way was greater than 10 feet, the LOD was set at the existing right-of-way line. Adjacent land use, such as the presence of Section 4(f) properties, environmentally sensitive natural resources, military installations, educational institutions, and residential neighborhoods, was considered in the development of the LOD as described in the following sections.

## 4.2    Considerations for Adjacent Land Use and Minimization of the LOD

During the development of the engineering layouts and LOD for the Proposed Action a process was used to limit or avoid impacts to sensitive environmental features. This includes the application of five progressively narrower roadside typical sections to first avoid and then minimize impacts to Section 4(f) properties. The roadside typical sections were applied to the Proposed Action in an iterative manner, from widest to narrowest to the greatest extent necessary to comply with regulatory requirements, as well as to accommodate existing roadside conditions and land use constraints.

The five typical sections consist of:

1.   An open section with a full-width bioswale for stormwater management;

2.   An open section with a reduced-width bioswale for stormwater management;

3.   An open section with no surface stormwater management;

4.   A closed section with concrete barrier; and

5.   A closed section with retaining wall.

00038751



All roadside design values meet MDOT SHA and American Association of State Highway and Transportation Officials design standards. Existing roadways were widened into the median wherever possible to in an effort to first avoid and then minimize impacts to Section 4(f) properties.

The costs and layouts of the Build Alternatives assume application of the various steps of the roadside typical sections. These engineering modifications were applied to demonstrate possible planning to minimize harm to Section 4(f) property. Unless limited by other constraints (driven by factors such as topography, the presence of non-contributing properties within an historic district, or specific stormwater management needs, as discussed in **Section 2**), when adjacent to Section 4(f) properties the LOD was set based on the 10-foot offset from the cut and fill lines or was set at the resource boundary if the distance between the cut/fill line and the resource boundary was greater than 10 feet.

In addition to the standard minimization process, MDOT SHA considered all reasonable measures to minimize impacts to Section 4(f) properties. MDOT SHA engaged in extensive coordination with the majority of the OWJ over Section 4(f) properties through existing regulatory processes (such as Section 106 consultation), regularly scheduled coordination meetings, and meetings requested by stakeholders. Additional coordination took place via written letter, over the phone, and via electronic communication. This coordination resulted in minimizing harm to Section 4(f) properties through a variety of means, such as: eliminating or relocating stormwater management facilities; shifting the centerline of the transportation facility; developing alternative interchange configurations; relocating slip ramps; refining construction access locations; and limiting the number, type, and configuration of signage. The results of coordination and descriptions of the minimization efforts resulting from such coordination are discussed in detail in **Section 2**.

### 4.2.1   Step 1: Open Section with Full Stormwater Management

The widest roadside typical section with surface stormwater management shown in **Figure 4-1** is an open section without curb and gutter that allows stormwater sheet flow off the road into a drainage ditch. The typical section would include W-beam guardrail at the edge of pavement; an eight-foot wide flat bottom Environmental Site Design (ESD) swale with 3:1 side slopes; a V-ditch with 2:1 side slopes that ties to the existing ground; and a 10-foot offset to the LOD to accommodate erosion and sediment control, noise barrier construction, and construction easements. This typical section is used as the starting typical section since it would provide the greatest flexibility for roadside grading and linear stormwater management.

<div align="center">

**Figure 4-1: Open Section with Full Stormwater Management**

</div>



00038752

### 4.2.2  Step 2: Open Section with Reduced Stormwater Management

A second roadside typical section with surface stormwater management shown in **Figure 4-2** is an open section that would include W-beam guardrail at the edge of pavement; a 2-foot wide flat bottom ESD swale, the minimum allowable by MDE with 3-to-1 side slopes; a V-ditch with 2-to-1 side slopes that ties to existing ground; and a 10-foot offset to the LOD to accommodate erosion and sediment control, noise barrier construction, and construction easements. This would maintain linear stormwater management, but at a reduced water storage capacity compared to Step 1.

**Figure 4-2: Open Section with Reduced Stormwater Management**



### 4.2.3  Step 3: Open Section with No Stormwater Management

This roadside typical section is an open section shown in **Figure 4-3** with no surface stormwater management facilities and would include W-beam guardrail at the edge of pavement; a 2:1 slope to tie to existing ground; and a 10-foot offset to the LOD to accommodate erosion and sediment control, noise barrier construction, and construction easements. This section would maintain an open section for drainage conveyance without linear stormwater management. Stormwater quantity management and treatment would be provided via ponds and underground vaults.

**Figure 4-3: Open Section with No Stormwater Management**



### 4.2.4  Step 4: Closed Section with Concrete Barrier

This closed roadside typical section as shown in **Figure 4-4** would include a single-face concrete barrier at the edge of pavement with no linear surface stormwater management facilities; a 2:1 slope behind the barrier to tie to existing ground; and a 10-foot offset to the LOD to accommodate erosion and sediment control, noise barrier construction, and construction easements. The paved outside shoulder would be 12 feet wide to provide a 2-foot offset to the barrier. Stormwater quantity management and treatment would be provided via ponds and underground vaults.

00038753

**Figure 4-4: Closed Section with Concrete Barrier**



### 4.2.5   Step 5: Closed Section with Retaining Wall

This closed roadside typical section as shown in **Figure 4-5** would include a retaining wall at the edge of pavement and no surface stormwater management facilities; and a 10-foot offset from the back of the wall to the LOD to accommodate erosion and sediment control, noise barrier construction, and construction easements. The paved outside shoulder would be 12 feet wide to provide a 2-foot offset to the retaining wall. Stormwater quantity management and treatment would be provided via ponds and underground vaults. This would be the narrowest typical section.

**Figure 4-5: Closed Section with Retaining Wall**

### 4.3   Mitigation

Minimizing harm to Section 4(f) property can include mitigation through specific actions to compensate for impacts, not just measures to reduce impacts. For Section 4(f) uses that cannot be avoided or further minimized, mitigation would be considered. The level of mitigation considered would be commensurate with the severity of the impact on the Section 4(f) property. Final mitigation would be determined through continued consultation with the officials having jurisdiction over each Section 4(f) property and presented in the Final Section 4(f) Evaluation. MDOT SHA and FHWA have committed to providing meaningful benefit to impacted Section 4(f) properties by improving the values, services, attributes and functions that may be compromised. The goal of mitigation is net benefit to the property impacted. To-date, preliminary mitigation discussions with many of the OWJ have included replacement land, completing additional cultural and natural resource surveys, reconfiguring recreational facilities, relocating recreational facilities

00038754



out of environmentally compromised areas (i.e. floodplains), restoring streams, and funding of cultural and park related buildings and amenities.

In a letter dated March 12, 2020, the MHT concurred that the undertaking would have an adverse effect to historic properties pursuant to 36 CFR Part 800. The Regulations for Protection of Historic Properties, 36 CFR Part 800, define an undertaking as having an adverse effect on a historic property when "the integrity of the property's location, design, setting, materials, workmanship, feeling, or association" are diminished. Adverse effects include the "introduction of visual, audible, or atmospheric elements that are out of character with the property or alter its setting." Potential mitigation measures for the Section 4(f) use of historic sites would be identified within a Programmatic Agreement that would be developed with FHWA, MDOT SHA, ACHP, NPS, MHT, VDHR, and the Section 106 consulting parties. Mitigation measures will be developed on a case by case basis. By signature, agencies will assure that the mitigation measures would be completed.

Discussions with OWJ over parkland resources are ongoing to determine meaningful mitigation for impacts to these resources. Possible mitigation measures may include:

- Replacement with lands of at least comparable value, and of reasonably equivalent usefulness and location.
- Replacement of facilities impacted by the project, including sidewalks, paths, benches, lights, trees, fields, courts, stormwater facilities, parking lots, trails, swales, buildings, and other facilities.
- Relocation of recreational facilities outside of environmentally compromised areas (i.e. floodplains);
- Restoration and landscaping of disturbed areas.
- Incorporation of design features and habitat features where necessary.
- Payment of fair market value for the land.
- Rehabilitation of deteriorating facilities and assets on nearby parkland.
- Relocation of impacted facilities and assets to allow for use similar to that which existed pre-impact.
- Design and construction of new facilities.
- Non-native invasive species management.
- Environmental enhancements with the goals of habitat and/or water quality improvements.

Any additional measures recommended during consultation with the official with jurisdiction that are relevant to and commensurate with the impacts.

All minimization and mitigation measures will be documented in the Final Section 4(f) Evaluation.

Pursuant to 23 CFR 774.17, a determination of Section 4(f) *de minimis* impacts inherently includes the requirement for all possible planning to minimize harm because impacts have already been reduced to a *de minimis* level. Therefore, additional planning to minimize harm is not required for those properties where a *de minimis* impact finding is made.

00038755



Section 6(f) and Maryland POS are federal and state programs, respectively, that have specific mitigation requirements. Mitigation opportunities are more flexible under Section 4(f) and may or may not include replacement lands. Section 6(f) directs NPS to assure that replacement lands are of equal value, location, and usefulness as impacted lands.

The Maryland POS Law provides that land under a state grant from POS may not be acquired or developed without written approval from the Secretary of the Department of Natural Resources, Secretary of the Department of Budget and Management, and the Secretary of the Department of Planning. Any conversion of land use may be approved only after the land has been replaced with land of equivalent area and of equal recreation or open space value. Further, replacement lands must be equal or greater to the appraised monetary value of the land to be converted.

00038756

5

# 5    LEAST OVERALL HARM

Pursuant to 23 CFR 774.3(c)(1), if the avoidance analysis determines that there is no feasible and prudent avoidance alternative, then only the alternative that causes the least overall harm may be approved. Since the discussion in Section 3 demonstrates there is no feasible and prudent avoidance alternative, all remaining alternatives are evaluated to determine which would cause the least overall harm. Therefore, this section provides a review of the multiple remaining alternatives that use one or more Section 4(f) properties, including alternatives that would eliminate or reduce the use of individual Section 4(f) properties.

23 CFR 774.3(c)(1) identifies seven factors for identifying the alternative with the least overall harm.

- **Factor 1:** The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property);

- **Factor 2:** The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection;

- **Factor 3:** The relative significance of each Section 4(f) property; and

- **Factor 4:** The views of the OWJ over each Section 4(f) property.

- **Factor 5:** The degree to which each alternative meets the Purpose and Need for the project;

- **Factor 6:** After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and

- **Factor 7:** Substantial differences in costs among the alternatives.

## 5.1    Location Specific Options

The following discussion describes location specific alternatives that would avoid the use of individual Section 4(f) properties and evaluates those alternatives using the seven factors of least overall harm. Each option would be integrated into the Proposed Action in a manner that would avoid the Section 4(f) property(ies) identified in the sections below. The options consist of alignment shifts, tunnels, or bridges that were developed to avoid those Section 4(f) properties for which the Section 4(f) use is not anticipated to be *de minimis*. In general, these location specific options would result in additional use of other Section 4(f) properties, adverse impacts of a severe magnitude to resources not subject to Section 4(f) protection, or a substantial increase in cost. Because the location specific options modify relatively short portions of

00038757

the end-to-end Proposed Action, each would meet the Purpose and Need of the Study to some degree. However, those location specific options that more substantially deviate from the existing alignments of I-495 and I-270 and result in a lengthier travel routes would be less effective in addressing the project needs.

### 5.1.1 Location Specific Option 1 (LS-1)

**Section 4(f) Properties Avoided: C&O Canal NHP and Clara Barton Parkway**

#### A. Description

The Proposed Action would replace the existing American Legion Bridge on alignment. The newly constructed bridge would be wide enough to accommodate managed lanes and result in a Section 4(f) use of George Washington Memorial Parkway (**Section 2.1.1**), C&O Canal NHP (**Section 2.1.2**), and Clara Barton Parkway (**Section 2.1.3**). The conceptual design of the bridge that would be constructed as part of the Proposed Action would require the placement of piers within the boundary of George Washington Memorial Parkway in Virginia as well as the construction of temporary access roads within the boundaries of Clara Barton Parkway and C&O Canal NHP in Maryland and George Washington Memorial Parkway in Virginia.

Option LS-1 would construct a new suspension bridge east of the existing American Legion Bridge to avoid the Section 4(f) use of C&O Canal NHP and Clara Barton Parkway (**Figure 5-1** through **Figure 5-4**). The new bridge would carry both GP and managed lanes and feature a clear span of 3,250 feet, a length which could only be met by a suspension bridge. In order to anchor the towers and cables that support the design, the bridge span would extend 800 feet beyond the towers at either side of the crossing. The design of the suspension bridge would require placing the western tower within the Turkey Run area of George Washington Memorial Parkway and thus would not avoid a use of that Section 4(f) property. Option LS-1 would eliminate all interchanges between I-495 and George Washington Memorial Parkway and Clara Barton Parkway.

#### B. Analysis

In consideration of Least Overall Harm Factor 5, applying Option LS-1 would compromise the ability of the Study to meet the Purpose and Need by adding significant risk to financial viability through removing direct access to the managed lanes at George Washington Memorial Parkway. Additionally, in consideration of Least Overall Harm Factor 7, Option LS-1 would cost approximately $900 million, or $600 million more than the Proposed Action along this portion of the project. Even though it avoids the Section 4(f) use of C&O Canal NHP and Clara Barton Parkway, owing to the substantial difference in cost and compromised ability to meet the Purpose and Need, Option LS-1 would result in more harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, because it avoids the use of two NPS Section 4(f) properties and significantly reduces the use of George Washington Memorial Parkway (as listed in **Table 5-1**), there would be greater ability to mitigate adverse impacts caused by Option LS-1 when compared to the Proposed Action. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-1 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

00038758

#### Table 5-1: Section 4(f) Properties Avoided by Option LS-1

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| George Washington Memorial Parkway[1] | 11.5 |
| C&O Canal NHP | 15.4 |
| Clara Barton Parkway | 1.8 |
| **Total Section 4(f) Property Avoided** | **28.7** |

*1. Option LS-1 would not totally avoid the use of George Washington Memorial Parkway*

The three Section 4(f) properties situated along the bridge option qualify for Section 4(f) protection as both public recreational facilities and historic sites. These properties are George Washington Memorial Parkway, Clara Barton Parkway, and Chesapeake and Ohio Canal NHP. In consideration of Least Overall Harm Factor 3, the properties are of substantially equal significance. While the Proposed Action would result in a Section 4(f) use of each of these properties, Option LS-1 would only result in the use of George Washington Memorial Parkway.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation.

Option LS-1 would span the Potomac River and result in fewer impacts to streams and wetlands. However because the proposed suspension bridge would be erected off alignment, Option LS-1 would result in greater impacts to forest resources in Maryland and Virginia. Under Option LS-1, removing the existing American Legion Bridge and portion of I-495 would provide opportunities to mitigate for impacts to trees. Neither the Proposed Action nor Option LS-1 would result in relocations. In consideration of Least Overall Harm Factor 6, Option LS-1 and the Proposed Action would result in substantially equal harm to resources not protected by Section 4(f).

00038759

DRAFT SECTION 4(f) EVALUATION



**Figure 5-1: Overview Map of Location Specific Options LS-1 and LS-2**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.



**Figure 5-2: Detail of Location Specific Options LS-1 and LS-2 (Map 1 of 3)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**
- Option LS-1
- Option LS-2

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Suspension Bridge
- Tunnel

Map 1.1.1

**Location Specific Options Map**

0  150  300 Feet

00038761



**Figure 5-3: Detail of Location Specific Options LS-1 and LS-2 (Map 2 of 3)**



00038762

**DRAFT SECTION 4(f) EVALUATION**



**Figure 5-4: Detail of Location Specific Options LS-1 and LS-2 (Map 3 of 3)**



00038763



### 5.1.2   Location Specific Option 2 (LS-2)

**Section 4(f) Properties Avoided: George Washington Memorial Parkway, C&O Canal NHP, and Clara Barton Parkway**

#### A.    Description

The Proposed Action would replace the existing American Legion Bridge on alignment with widening and result in the Section 4(f) use of George Washington Memorial Parkway (**Section 2.1.1**), C&O Canal NHP (**Section 2.1.2**), and Clara Barton Parkway (**Section 2.1.3**). The conceptual design of the bridge that would be constructed as part of the Proposed Action would require the placement of piers within the boundary of George Washington Memorial Parkway in Virginia as well as the construction of temporary access roads within the boundaries of Clara Barton Parkway and C&O Canal NHP in Maryland and George Washington Memorial Parkway in Virginia.

Option LS-2 would construct a tunnel to carry both the GP lanes and managed lanes beneath the Potomac River close to the alignment of the existing American Legion Bridge (**Figure 5-1** through **Figure 5-4**). In order to reach the required depth of 80 to 120 feet to safely tunnel beneath the Potomac River and avoid the use of Section 4(f) property, the tunnel would need to be approximately 11,000 feet long. Tunnel portal locations would be approximately 2,000 feet south of the George Washington Memorial Parkway in Virginia, and 2,200 feet north of MacArthur Boulevard in Maryland. Direct access to the George Washington Parkway and Clara Barton Parkway from I-495 would be eliminated.

#### B.    Analysis

In consideration of Least Overall Harm Factor 5, implementing Option LS-2 would compromise the ability of the Study to meet the Purpose and Need by adding significant risk to financial viability through removing direct access, especially at George Washington Memorial Parkway. Additionally, in consideration of Least Overall Harm Factor 7, Option LS-2 would cost in approximately $1.3 billion or $1 billion more than the Proposed Action along this portion of the project. Even though it avoids impacts to C&O Canal NHP, Clara Barton Parkway, and George Washington Memorial Parkway, owing to the substantial difference in cost and compromised ability to meet the Purpose and Need, Option LS-2 would result in more harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action Option LS-2 would have a greater ability to mitigate for the use of Section 4(f) property owing to avoiding the use of the three NPS Section 4(f) properties listed in **Table 5-2**. In support of this assessment, Option LS-2 would create additional opportunities for mitigation through the removal of the existing I-495. Implementing Option LS-2 would have the beneficial effect of eliminating the visual and physical intrusion of the American Legion Bridge and I-495 on George Washington Memorial Parkway, C&O Canal NHP, and Clara Barton Parkway. In consideration of Least Overall Harm Factor 2, when compared to the Proposed Action Option LS-2 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) property for protection.

The three Section 4(f) properties along the tunnel option qualify for Section 4(f) protection as both public recreational facilities and historic sites. These properties are George Washington Memorial Parkway, C&O Canal NHP, and Clara Barton Parkway. In Consideration of Least Overall Harm Factor 3, the properties are

00038764

of substantially equal significance. The Proposed Action would result in significant impacts to each of these three Section 4(f) properties. Option LS-2 would not impact any of the three.

**Table 5-2: Section 4(f) Properties Avoided by Option LS-2**

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| George Washington Memorial Parkway | 12.2 |
| C&O Canal NHP | 15.4 |
| Clara Barton Parkway | 1.8 |
| **Total Section 4(f) Property Avoided** | **29.4** |

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation.

Option LS-2 would construct a tunnel to convey both the managed lanes and GP lanes beneath the Potomac River near the alignment of the existing American Legion Bridge. When compared to the Proposed Action, Option LS-2 would result in fewer impacts to streams, wetlands, and forest resources. Option LS-2 would result in some impacts to forest resources at the locations of the tunnel portals. The full area of forest impacts would depend on the method of construction, but any impacts are expected to be less than the Proposed Action. Additionally, five residential relocations would be necessary at the location of the tunnel portal in Maryland, when compared to the Build Alternatives, which would require none at this location. In consideration of Least Overall Harm Factor 6, when compared to the Proposed Action Option LS-2 would result in less harm to Section 4(f) properties and resources not protected by Section 4(f).

### 5.1.3    Location Specific Option 3 (LS-3)

**Section 4(f) Properties Avoided: Unit 3 of Rock Creek Stream Valley Park, Bethesda Trolley Trail, and Locust Hill Neighborhood Park**

#### A.    Description

The Proposed Action would widen I-495 on alignment through Rock Creek Stream Valley Park, Unit 3, as described in **Section 2.1.9** and expand the highway beyond the existing MDOT SHA easement.

Option LS-3 would relocate the GP and managed lanes on I-495 approximately 0.5 mile to the south to avoid impacts to Unit 3 of Rock Creek Stream Valley Park (**Figure 5-5** through **Figure 5-11**). The drastic alignment shift to the south is needed to avoid impacts while maintaining the existing movements on I-495 at I-270, MD 187, MD 355, and MD 185, as well as accommodate proposed direct access to the managed lanes system. In designing the alignment shift option, additional consideration was given to avoiding significant elements of the Section 4(f) properties on the south side of I-495. To achieve avoidance of Unit 3 of Rock Creek Stream Valley Park while also minimizing to the extent possible impacts to other Section 4(f) properties, a shift of 0.5 mile is necessary.

00038765



B.    **Analysis**

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action Option LS-3 would result in 10.4 acres of additional impacts to Section 4(f) properties. Despite eliminating the use of the Section 4(f) properties listed in **Table 5-3**, total use of Section 4(f) properties would increase owing to the use of the properties listed in **Table 5-4** This would result in less ability to mitigate adverse impacts to Section 4(f) properties. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-3 would result in greater remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection. Implementing Option LS-3 would result in demolishing the historic Grosvenor Estate and eliminating North Chevy Chase Local Park.

In consideration of Least Overall Harm Factor 6, Option LS-3 would cause severe impacts to community resources, potentially resulting in the relocation of 325 properties. Option LS-3 would also impact the roadway infrastructure of several existing communities, potentially cutting off access to these areas. In consideration of Least Overall Harm Factor 7, Option LS-3 would cost an estimated $2.8 billion or $1.7 billion more than the Proposed Action along this portion of the project. Owing to the increase in the use of Section 4(f) property, severe impacts to community resources, and substantial difference in cost, Option LS-3 would result in more harm than the Proposed Action.

**Table 5-3: Section 4(f) Properties Avoided by Option LS-3**

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| Rock Creek Stream Valley Park, Unit 3 | 3.3 |
| Locust Hill Neighborhood Park | 0.3 |
| Bethesda Trolley Trail | 0.2 |
| **Total Section 4(f) Property Avoided** | **3.8** |

**Table 5-4: Properties Experiencing an Increase in Section 4(f) Use by Option LS-3**

| Section 4(f) Property | Increase in Impact (in Acres) |
|---|---|
| Rock Creek Stream Valley Park, Unit 2 | 0.2 |
| North Chevy Chase Local Park | 5.8 |
| Fleming Local Park | 2.0 |
| Grosvenor Estate | 4.0 |
| Elmhirst Parkway Neighborhood Conservation Area | 2.0 |
| In the Woods | 0.2 |
| **Total Increase in Use of Section 4(f) Property** | **14.2** |

00038766

In consideration of Least Overall Harm Factor 3, Unit 3 of Rock Creek Stream Valley Park is a large, heavily used, multi-function, recreational facility that provides opportunities to a wide segment of densely populated lower Montgomery County where no comparable facilities exist. The park is also historically significant for its association with early twentieth century environmental protection and regional planning efforts in Metropolitan Washington. As historic sites of statewide significance and parts of a large park that offers diverse recreational opportunities to a regional population, Units 2 and 3 of Rock Creek Stream Valley Park are the most significant Section 4(f) property along this portion of the Study.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation.

In consideration of Least Overall Harm Factor 5, Option LS-3 would maintain the same typical section as the Proposed Action and meet the Purpose and Need of the Study to a degree comparable to the Proposed Action.

00038767

DRAFT SECTION 4(f) EVALUATION



**Figure 5-5: Overview Map of Location Specific Option LS-3**



00038768

DRAFT SECTION 4(f) EVALUATION



**Figure 5-6: Detail of Location Specific Option LS-3 (Map 1 of 6)**



00038769

DRAFT SECTION 4(f) EVALUATION



**Figure 5-7: Detail of Location Specific Option LS-3 (Map 2 of 6)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**

Option LS-3

**Legend**

Centerline of Proposed Action

Map Match Line

Historic Property

Park Property

**Location Specific Options Map**

Map 2.1.2

0   150   300 Feet

00038770



**Figure 5-8: Detail of Location Specific Option LS-3 (Map 3 of 6)**



00038771



Figure 5-9: Detail of Location Specific Option LS-3 (Map 4 of 6)



DRAFT SECTION 4(f) EVALUATION



**Figure 5-10: Detail of Location Specific Option LS-3 (Map 5 of 6)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**
- Option LS-3

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Property in MDOT-SHA Easement

**Location Specific Options Map**

Map 2.1.5

0   150   300 Feet

00038773



**Figure 5-11: Detail of Location Specific Option LS-3 (Map 6 of 6)**



00038775



### 5.1.4   Location Specific Option 4 (LS-4)

**Section 4(f) Properties Avoided: Unit 2 of Rock Creek Stream Valley Park, National Park Seminary Historic District/Forest Glen, and Metropolitan Branch, B&O Railroad**

#### A.   Description

The Proposed Action would widen I-495 on existing alignment through Unit 2 of Rock Creek Stream Valley Park, as described in **Section 2.1.11** and expand the highway beyond the existing MDOT SHA easement. Option LS-4 would relocate mainline I-495 approximately 0.5 miles to the north to avoid a Section 4(f) use of Rock Creek Stream Valley Park, Unit 2 (**Figure 5-12** through **Figure 5-16**). LS-4 would avoid the Section 4(f) use of Rock Creek Stream Valley Park, Unit 2; National Park Seminary Historic District/Forest Glen; and Metropolitan Branch, B&O Railroad. Option LS-4 would avoid a Section 4(f) use of Metropolitan Branch, B&O Railroad through a grade separation. However, the alignment of Option LS-4 would bisect Rock Creek Stream Valley Park, Unit 3, and result in the increased Section 4(f) use of Forest Glen Historic District, Forest Glen Neighborhood Park, and the Washington DC Temple.

#### B.   Analysis

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action Option LS-4 would result in 11 acres of additional impacts to Section 4(f) properties. Despite eliminating the use of the Section 4(f) properties listed in in **Table 5-5**, total use of Section 4(f) properties would increase owing to the use of the properties listed in **Table 5-6**. This would result in less ability to mitigate adverse impacts to Section 4(f) properties. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-4 would result in greater remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 6, Option LS-4 would cause severe impacts to community resources, potentially resulting in the relocation of 257 properties. By comparison, the Proposed Action would not result in any relocations along this portion. In consideration of Least Overall Harm Factor 7, Option LS-4 would cost an estimated $1.4 billion or $700 million more than the Proposed Action on this portion of the project. Owing to the increase in the use of Section 4(f) property, severe impacts to community resources and substantial difference in cost, Option LS-4 would result in more harm than the Proposed Action.

#### Table 5-5: Properties Avoided by Option LS-4

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| Rock Creek Stream Valley Park, Unit 2 | 0.4 |
| National Park Seminary Historic District | 1.2 |
| Metropolitan Branch, B&O Railroad | 8.8 |
| **Total Section 4(f) Property Avoided** | **10.4** |

00038776

Table 5-6: Properties Experiencing an Increase in Section 4(f) Use by Option LS-4

| Section 4(f) Property | Increase in Section 4(f) Use (in Acres) |
|---|---|
| Rock Creek Stream Valley Park, Unit 3 | 14.3 |
| Forest Glen Historic District | 2.8 |
| Forest Glen Neighborhood Park | 1.2 |
| Washington, DC Temple | 3.0 |
| **Total Increase in Use of Section 4(f) Property** | **21.3** |

In consideration of Least Overall Harm Factor 3, Unit 2 of Rock Creek Stream Valley Park is a large, heavily used, multi-function recreational facility that provides opportunities to a wide segment of densely populated lower Montgomery County where no comparable facilities exist. The park is also historically significant for its association with early twentieth century environmental protection and regional planning efforts in Metropolitan Washington. As historic sites of statewide significance and parts of a large park that offers diverse recreational opportunities to a regional population, Units 2 and 3 of Rock Creek Stream Valley Park are the most significant Section 4(f) property along this portion of the Study.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-4 would maintain the same typical section as the Proposed Action and meet the Purpose and Need of the Study to a degree comparable to the Proposed Action.

00038777



**Figure 5-12: Overview Map of Location Specific Option LS-4**



00038778



**Figure 5-13: Detail of Location Specific Option LS-4 (Map 1 of 4)**



00038779

DRAFT SECTION 4(f) EVALUATION



**Figure 5-14: Detail of Location Specific Option LS-4 (Map 2 of 4)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

00038780



**Figure 5-15: Detail of Location Specific Option LS-4 (Map 3 of 4)**



00038781



**Figure 5-16: Detail of Location Specific Option LS-4 (Map 4 of 4)**



00038783

### 5.1.5   Location Specific Option 5 (LS-5)

**Section 4(f) Property Avoided: National Park Seminary Historic District/Forest Glen**

#### A.   Description

The Proposed Action would widen I-495 on existing alignment at this location. The widening would require replacing the bridges carrying the historic Metropolitan Branch, B&O Railroad and Linden Lane across I-495. The replacement and relocation of these bridges would impact National Park Seminary Historic District/Forest Glen as described in **Section 2.1.12**. Option LS-5 would relocate the replacement bridge carrying Metropolitan Branch, B&O Railroad further to the east to avoid impacts to National Park Seminary Historic District/Forest Glen (**Figure 5-17** and **Figure 5-18**).

#### B.   Analysis

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action Option LS-5 would result in 3.8 acres of additional impacts to Section 4(f) properties. Despite eliminating the Section 4(f) use of National Park Seminary Historic District/Forest Glen (**Table 5-7**), total use of Section 4(f) properties would increase owing to the use of the properties listed in **Table 5-8.** This would result in less ability to mitigate adverse impacts to Section 4(f) properties. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-5 would result in greater remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 6, Option LS-5 would cause severe impacts to community resources, potentially resulting in the relocation of 16 properties, including the demolition of contributing properties within Capitol View Park Historic District. In consideration of Least Overall Harm Factor 7, Option LS-5 would cost approximately $182 million, which is $27 million more than the Proposed Action along this portion of the project. Owing to the increase in the use of Section 4(f) property, severe impacts to community resources, and substantial difference in cost, Option LS-5 would result in more harm than the Proposed Action.

**Table 5-7: Properties Avoided by Option LS-5**

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| National Park Seminary Historic District | 1.3 |
| **Total Section 4(f) Property Avoided** | **1.3** |

**Table 5-8: Properties Experiencing an Increase in Section 4(f) Use by Option LS-5**

| Section 4(f) Property | Increase in Section 4(f) Use (in Acres) |
|---|---|
| Rock Creek Stream Valley Park, Unit 2 | 0.1 |
| Capitol View Park Historic District | 5.0 |
| **Total Increase in Use of Section 4(f) Property** | **5.1** |

In consideration of Least Overall Harm Factor 3, Unit 2 of Rock Creek Stream Valley Park is a large, heavily used, multi-function, recreational facility that provides opportunities to a wide segment of densely

00038784

populated lower Montgomery County where no comparable facilities exist. The park is also historically significant for its association with early twentieth century environmental protection and regional planning efforts in Metropolitan Washington. As an historic site of statewide significance and part of a large park that offers diverse recreational opportunities to a regional population, Unit 2 of Rock Creek Stream Valley Park is the most significant Section 4(f) property along this portion of the Study. In consideration of relative significance, National Park Seminary Historic District is an historically significant architectural folly comprising a unique location, setting, feeling, and collection of architecture. While National Park Seminary is a unique and significant historic site, it does not provide the recreational opportunities of Rock Creek Park. Comparatively, a small impact to Rock Creek Park under Option LS-5 would not result in a Section 4(f) use of significant features or attributes that characterize the property as an historic site or would negatively affect the qualities of the park that qualify the property for Section 4(f) protection. Capital View Park Historic District is a pre-World War II residential subdivision. When compared to Rock Creek Park and National Park Seminary Historic District, pre-World War II subdivisions are a relatively well represented Section 4(f) property type. However, Option LS-5 would result in significant impacts to Capitol View Park Historic District and would result in the demolition of multiple residential dwellings that contribute to the significance of the district.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation.

In consideration of Least Overall Harm Factor 5, Option LS-5 would maintain the same typical section as the Proposed Action and meet the Purpose and Need of the Study to a degree comparable to the Proposed Action.

00038785



**Figure 5-17: Overview Map of Location Specific Option LS-5**



00038786



**Figure 5-18: Detail of Location Specific Option LS-5**



00038787

### 5.1.6    Location Specific Option 6 (LS-6)

**Section 4(f) Properties Avoided: Sligo Creek Parkway, South Four Corners Neighborhood Park, Blair Local Park, Montgomery Blair High School Athletic Fields**

### A.    Description

The Proposed Action would widen I-495 on existing alignment at this location. The widening would impact Sligo Creek Parkway, as described in **Section 2.1.17.** Option LS-6 would relocate I-495 approximately 0.7 miles to the south to avoid a Section 4(f) use of Sligo Creek Parkway (**Figure 5-19** through **Figure 5-23**). Avoidance would be achieved by bridging over the narrowest portion of Sligo Creek Parkway. Option LS-6 would maintain the same typical section as the Proposed Action while eliminating the Section 4(f) use of National Park Seminary Historic District/Forest Glen.

### B.    Analysis

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action Option LS-6 would result in 12 acres of additional impacts to Section 4(f) properties. Despite eliminating the use of the Section 4(f) properties listed in **Table 5-9**, total use of Section 4(f) properties would increase owing to the use of the properties listed in **Table 5-10**. This would result in less ability to mitigate adverse impacts to Section 4(f) properties. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-6 would result in greater remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection. While avoiding impacts to four Section 4(f) properties, the additional impacts to Indian Spring Club Estates and Indian Spring Country Club would be considerable and result in the demolition of dozens of contributing residential dwellings. By comparison, the impacts to Sligo Creek Stream Valley Park from the Proposed Action are to landscaping features that can be more readily mitigated.

In comparison to the Proposed Action and in consideration of Least Overall Harm factor 6, Option LS-6 would cause severe impacts to community resources, potentially resulting in the relocation of 547 properties. Implementing Option LS-6 would also impact the established land use patterns, and roadway infrastructure in multiple communities, potentially cutting off access to these areas. In consideration of Least Overall Harm factor 7, Option LS-6 would cost approximately $2 billion, which is $1.2 billion more than the Proposed Action along this portion of the project. In comparison to the Proposed Action, Option LS-6 would not be a reasonable public expenditure. Owing to the increase in the use of Section 4(f) property, severe impacts to community resources, and substantial difference in cost, Option LS-6 would result in more harm than the Proposed Action.

#### Table 5-9: Properties Avoided by Option LS-6

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| Sligo Creek Parkway | 4.1 |
| South Four Corners Park | 0.1 |
| Blair Local Park | 0.4 |
| Montgomery Blair Senior High School Athletic Fields | 1.4 |
| **Total Acreage of Section 4(f) Properties Avoided** | **6.0** |

00038788



**Table 5-10: Properties Experiencing an Increase in Section 4(f) Use by Option LS-6**

| Section 4(f) Property | Increase in Section 4(f) Use (in Acres) |
|---|---|
| Indian Spring Club Estates and Indian Spring Country Club | 18.0 |
| **Total Increase in Use of Section 4(f) Property** | **18.0** |

In consideration of Least Overall Harm Factor 3, Sligo Creek Stream Valley Park is a heavily used recreational facility in the lower portion of Montgomery County. It is also historically significant for its association with social history, recreation, transportation, and conservation during the first half of the twentieth century. Owing to its location, heavy use and historical significance, Sligo Creek Stream Valley Park is the most significant Section 4(f) property along this portion of the Study. Montgomery Blair High School Athletic Fields and Blair Local Park provide a diversity of recreational opportunities to the broader community and are also significant Section 4(f) properties.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation.

In consideration of Least Overall Harm Factor 5, Option LS-6 would maintain the same typical section as the Proposed Action and although longer in distance, would meet the Purpose and Need of the Study to a degree comparable to the Proposed Action.

00038789



**Figure 5-19: Overview Map of Location Specific Option LS-6**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

DRAFT SECTION 4(f) EVALUATION



**Figure 5-20: Detail of Location Specific Option LS-6 (Map 1 of 4)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

DRAFT SECTION 4(f) EVALUATION



**Figure 5-21: Detail of Location Specific Option LS-6 (Map 2 of 4)**



00038792

DRAFT SECTION 4(f) EVALUATION



**Figure 5-22: Detail of Location Specific Option LS-6 (Map 3 of 4)**



DRAFT SECTION 4(f) EVALUATION



**Figure 5-23: Detail of Location Specific Option LS-6 (Map 4 of 4)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**
- Option LS-6
- Option LS-7
- Option LS-8

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Bridge

**Location Specific Options Map**

Map 3.1.4

0    150    300 Feet

00038795



### 5.1.7    Location Specific Option 7 (LS-7)

**Section 4(f) Properties Avoided: Indian Spring Club Estates and Indian Spring Country Club and Indian Springs Terrace Local Park.**

### A.    Description

The Proposed Action would widen I-495 on existing alignment at this location. The proposed improvements would result in impacts to Indian Spring Club Estates and Indian Spring Country Club (**Section 2.1.21**) and Indian Springs Terrace Local Park (**Section 2.1.22**). Option LS-7 would relocate I-495 approximately 65 feet to the north while maintaining the same typical section as the Proposed Action (**Figure 5-24** through **Figure 5-26**). Option LS-7 would eliminate impacts to two Section 4(f) properties: Indian Spring Club Estates and Indian Spring Country Club and Indian Springs Terrace Local Park.

### B.    Analysis

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action Option LS-7 would result in 0.9 acre of additional impacts to Section 4(f) properties. Despite eliminating the Section 4(f) use of the properties listed in **Table 5-11**, total use of Section 4(f) properties would increase owing to the use of the properties listed in **Table 5-12**. This would result in less ability to mitigate adverse impacts to Section 4(f) properties. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-7 would result in greater remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 6, Option LS-7 would cause severe impacts to community resources, potentially eliminating the Montgomery Blair High School Athletic Fields and a significant portion of the recreational facilities in Blair Local Park. The impacts to these parks would require the complete and challenging redesign of the athletic fields in order to provide adequate playing fields to support sports for both the broader community and high school students. The large area of impact to these athletic fields under Option LS-7 would require reconfiguring the site plan to convert the existing parking lot into athletic fields and realigning the exit and entry to the school to construct a new parking garage. In consideration of Least Overall Harm Factor 7, Option LS-7 would cost approximately $410 million, which is $250 million more than the Proposed Action along this portion of the project. Owing to the increase in the use of Section 4(f) property, severe impacts to community resources, and substantial difference in cost, Option LS-7 would result in more harm than the Proposed Action.

**Table 5-11: Section 4(f) Properties Avoided by LS-7**

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| Indian Spring Club Estates and Indian Spring Country Club Historic District | 1.2 |
| Indian Spring Terrace Local Park | 1.4 |
| **Total Section 4(f) Property Avoided** | **2.6** |

00038796

Table 5-12: Properties Experiencing an Increase in Section 4(f) Use by Option LS-7

| Section 4(f) Property | Increase in Section 4(f) Use (in Acres) |
|---|---|
| Montgomery Blair High School Athletic Fields | 1.7 |
| Blair Local Park | 1.8 |
| **Total Increase in Use of Section 4(f) Property** | **3.5** |

In consideration of Least Overall Harm Factor 3, Montgomery Blair High School Athletic Fields and Blair Local Park provide a diversity of recreational opportunities in densely populated lower Montgomery County. For this reason, these parks are the most significant Section 4(f) properties along this portion of the project. Indian Spring Club Estates and Indian Spring Country Club is historically significant as an example of pre-World War II middle class residential architecture. Significant examples of this type of suburban residential historic districts from this time period and that retain integrity are rare. For this reason, the historic district is more significant as a Section 4(f) property than Indian Springs Terrace Local Park.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation.

In consideration of Least Overall Harm Factor 5, Option LS-7 would maintain the same typical section as the Proposed Action and meet the Purpose and Need of the Study to a degree comparable to the Proposed Action.

00038797

DRAFT SECTION 4(f) EVALUATION



Figure 5-24: Overview Map of Location Specific Option LS-7



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.



Figure 5-25: Detail of Location Specific Option LS-7 (Map 1 of 2)



00038799

DRAFT SECTION 4(f) EVALUATION



**Figure 5-26: Detail of Location Specific Option LS-7 (Map 2 of 2)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**
- Option LS-6
- Option LS-7
- Option LS-8

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line
- Bridge

**Location Specific Options Map**

Map 3.2.2

0   150   300 Feet

00038801

### 5.1.8   Location Specific Option 8 (LS-8)

**Section 4(f) Property Avoided: Unit 3 of Northwest Branch Stream Valley Park**

### A.   Description

The Proposed Action would replace the bridge carrying I-495 across Unit 3 of Northwest Branch Stream Valley Park. The proposed improvements would result in impacts to the park, as described in **Section 2.1.23**. Option LS-8 would involve constructing a longer bridge across Northwest Branch Stream Valley Park in order to avoid impacts to the Section 4(f) property (**Figure 5-27** through **Figure 5-29**). The bridge would be constructed on the existing alignment. Staging and stockpiling would take place offsite, outside the park boundary.

The greatest challenge would be maintaining operation of the existing highway while building the bridge from the surface of the roadway in a manner that does not result in permanent impacts to Northwest Branch Stream Valley Park. This would be accomplished through a lengthy and complicated maintenance of traffic plan that would shift traffic on I-495 to one bridge while construction takes place on the newly proposed span. This would result in significant congestion over a lengthy period of time. Under Option LS-8, to avoid a Section 4(f) use of the park, the existing bridges would be stabilized and remain in place.

### B.   Analysis

In consideration of Least Overall Harm Factor 7, implementing Option LS-8 would cost $270 million, which is $200 million more than the Proposed Action along this portion of the project. Stabilizing rather than removing the existing bridges would incur additional maintenance costs over time. Despite avoiding the Section 4(f) use of Northwest Branch Stream Valley Park, owing to the substantial difference in cost, Option LS-8 would result in greater harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, as it avoids the use of Northwest Branch Stream Valley Park when compared to the Proposed Action Option LS-8 would have greater ability to mitigate adverse impacts to Section 4(f) property. In consideration of Least Overall Harm Factor 2, Option LS-8 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) property for protection. In consideration of Least Overall Harm Factor 3, Option LS-8 would avoid the use of Northwest Branch Stream Valley Park. There are no other Section 4(f) properties in the vicinity.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-8 would meet the Purpose and Need to a degree that is comparable to the Proposed Action.

In consideration of Least Overall Harm Factor 6, by constructing the replacement bridge from the surface of the highway, Option LS-8 would avoid impacts to Northwest Branch and the associated flood plain and wetland systems, forest resources, as well as the flora and fauna within Northwest Branch Stream Valley Park. Construction would also be staged offsite. Impacts to Northwest Branch Stream Valley Park from the Proposed Action are largely related to constructability – both building the new structure and removing the current bridges. By comparison, implementing Option LS-8 would largely avoid ecological impacts

00038802

within Northwest Branch Stream Valley Park. Neither the Proposed Action nor Option LS-8 would result in any relocations along this portion of the project.

00038803



**Figure 5-27: Overview Map of Location Specific Option LS-8**



00038804



**Figure 5-28: Detail of Location Specific Option LS-8 (Map 1 of 2)**



00038805



**Figure 5-29: Detail of Location Specific Option LS-8 (Map 2 of 2)**



00038806

00038807



### 5.1.9   Location Specific Option 9 (LS-9)

**Section 4(f) Property Avoided: Cherry Hill Road Park**

#### A.   Description

The Proposed Action would widen I-495 on existing alignment at this location and result in a Section 4(f) use of 1.8 acres from Cherry Hill Park, as described in **Section 2.1.24**. Option LS-9 would avoid impacts to Cherry Hill Road Park by relocating I-495 approximately 85 feet to the north while maintaining the same typical section as the Proposed Action and eliminating stormwater management facilities on park property (**Figure 5-30** through **Figure 5-32**).

#### B.   Analysis

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action Option LS-9 would result in 6.1 acres of additional impacts to BARC. The impacts to BARC would include an agricultural field that contributes to the historical significance of the Section 4(f) property. These impacts could be mitigated through documentation or reconfiguring the field, but historically significant activities would still be severely impacted. This would result in less ability to mitigate adverse impacts to Section 4(f) properties. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-9 would result in greater remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection. In consideration of Least Overall Harm factor 7, Option LS-9 would cost approximately $350 million or $88 million more than the Proposed Action along this portion of the project. Owing to the increase in the use of Section 4(f) property and substantial difference in cost, Option LS-9 would result in more harm than the Proposed Action.

BARC is historically significant for its association with the history and development of agricultural research and the New Deal. It is also historically significant for being associated with the landscape architecture of A.D. Taylor. As a unique historic site and in consideration of Least Overall Harm Factor 3, it possesses greater significance as a Section 4(f) property than Cherry Hill Road Park.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation.

In consideration of Least Overall Harm Factor 5, Option LS-9 would maintain the same typical section as the Proposed Action and although longer in distance, would meet the Purpose and Need of the Study to a degree comparable to the Proposed Action. In consideration of Least Overall Harm Factor 6, impacts to resources not protected by Section 4(f) would be comparable to the Proposed Action.

00038808

00038809

DRAFT SECTION 4(f) EVALUATION



**Figure 5-30: Overview Map of Location Specific Option LS-9**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

00038810



**Figure 5-31: Detail of Location Specific Option LS-9 (Map 1 of 2)**



00038811



**Figure 5-32: Detail of Location Specific Option LS-9 (Map 2 of 2)**



00038813



### 5.1.10 Location Specific Option 10 (LS-10)

**Section 4(f) Properties Avoided: Greenbelt Park, Baltimore Washington Parkway, and McDonald Field.**

#### A.    Description

The Proposed Action would widen I-495 on alignment, replace the existing bridges over the Baltimore Washington Parkway and construct a new direct access interchange that would accommodate both the GP and managed lanes. These improvements would result in impacts to Greenbelt Park (**Section 2.1.30**) and Baltimore Washington Parkway (**Section 2.1.31**). Option LS-10 would retain the existing interchange configuration for the GP lanes. The managed lanes would be constructed on a new, parallel tunnel south of existing I-495 (**Figure 5-33** through **Figure 5-37**). Option LS-10 would eliminate direct access to Baltimore Washington Parkway from the managed lanes. The alignment of the managed lanes would diverge south from I-495 east of Kenilworth Avenue and continue southeast, tunneling underneath Greenbelt Park and Baltimore Washington Parkway. The second tunnel portal would be placed east of Greenbelt Park and intersect with mainline I-495 east of Good Luck Road.

#### B.    Analysis

In consideration of Least Overall Harm Factor 7, Option LS-10 would cost $1.6 billion, which is approximately $500 million more than the Proposed Action along this portion of the project. . The method for constructing the tunnel (bore versus open trench) has not been determined as part of this analysis, and complex construction risks would be high, thus costs could be higher. In consideration of Least Overall Harm Factor 5, implementing Option LS-10 would compromise the ability of the Study to meet the Purpose and Need by adding significant risk to financial viability through removing direct access to the managed lanes at Baltimore Washington Parkway Even though it avoids the Section 4(f) use of the three Section 4(f) properties listed in **Table 5-13**, owing to the substantial difference in cost and compromised ability to meet the Purpose and Need, Option LS-10 would result in more harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, because it avoids the use of three Section 4(f) properties – despite the increased use of the Section 4(f) properties listed in **Table 5-14** – when compared to the Proposed Action Option LS-10 would result in greater ability to mitigate adverse impacts to Section 4(f) property. In consideration of Least Overall Harm Factor 2, Option LS-10 would also result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

**Table 5-13: Section 4(f) Properties Avoided by LS-10**

| Section 4(f) Property | Avoidance of Section 4(f) Property (in Acres) |
|---|---|
| Greenbelt Park | 0.6 |
| Baltimore Washington Parkway | 69.3 |
| McDonald Field | < 0.1 |
| **Total Section 4(f) Property Avoided** | **69.9** |

00038814

**Table 5-14: Properties Experiencing an Increase in Section 4(f) Use by Option LS-10**

| Section 4(f) Property | Increase in Section 4(f) Use (in Acres) |
|---|---|
| Buddy Attick Lake Park (part of Greenbelt Historic District) | 0.3 |
| Indian Springs Park (part of Greenbelt Historic District) | 1.1 |
| Good Luck Estates Park | 4.2 |
| Youth Sports Memorial Park | < 0.1 |
| Robert Frost Park | 1.0 |
| **Total Increase in Use of Section 4(f) Property** | **6.7** |

In consideration of Least Overall Harm Factor 3, both Baltimore Washington Parkway and Greenbelt Park are NPS properties that qualify for Section 4(f) protection as public parks and historic sites. Baltimore Washington Parkway is a significant public parkway with gentle hills and modest vistas significant for its landscape architecture and design. Greenbelt Park features a campground, trails, and picnic areas. The park is historically significant for its association with the NPS Mission 66 program and providing recreational opportunities in suburban Washington, DC. These two properties are the most significant Section 4(f) properties along this portion of the project.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. In consideration of Least Overall Factor 6, impacts to resources not protected by Section 4(f) would be comparable to the Proposed Action.

00038815



**DRAFT SECTION 4(f) EVALUATION**

**Figure 5-33: Overview Map of Location Specific Option LS-10**



00038816

DRAFT SECTION 4(f) EVALUATION



Figure 5-34: Detail of Location Specific Option LS-10 (Map 1 of 4)



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

DRAFT SECTION 4(f) EVALUATION



**Figure 5-35: Detail of Location Specific Option LS-10 (Map 2 of 4)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

| Location Specific Options | Legend | | |
|---|---|---|---|
| Option LS-10 | Centerline of Proposed Action | Map Match Line | |
| Historic Property | Property Permitted to MDOT-SHA | | |
| Park Property | Tunnel | | |

**Location Specific Options Map**

Map 5.1.2

0   150   300 Feet

00038818

DRAFT SECTION 4(f) EVALUATION



Figure 5-36: Detail of Location Specific Option LS-10 (Map 3 of 4)





**Figure 5-37: Detail of Location Specific Option LS-10 (Map 4 of 4)**



00038821



### 5.1.11 Location Specific Option 11 (LS-11)

**Section 4(f) Property Avoided: Carsondale**

#### A.    Description

The Proposed Action would widen I-495 on existing alignment at this location. The improvements would involve reconfiguring the interchange with US 50. In order to accommodate the new interchange, the Proposed Action would result in impacts of 0.1 acre to Carsondale, as described in **Section 2.1.34**. On March 12, 2020 MHT concurred that no effect determination could be made and additional consultation is required. Under 23 CFR 774.17, Section 4(f) requires a Section 106 finding of no adverse effect or no historic properties affected to apply a *de minimis* impact. This analysis assumes Carsondale would be adversely affected. Based on these assumptions, the evaluation of avoidance alternatives is required.

Option LS-11 would relocate US 50 approximately 18 feet to the north of its existing alignment east of the interchange with I-495 (**Figure 5-38** through **Figure 5-40**). Option LS-11 would hold the existing southern edge of pavement along US 50 eastbound, where the highway borders the northern boundary of Carsondale. Option LS-11 additionally requires realigning both the GP and managed lane ramps connecting I-495 and US 50.

#### B.    Analysis

In consideration of Least Overall Harm Factor 6, Option LS-11 would result in two residential relocations in the middle of a subdivision, resulting in negative impacts to community cohesion. The Proposed Action would not require any relocations along this portion of the project. Owing to the impacts to community resources, Option LS-11 would result in more harm than the Proposed Action.

Under the Proposed Action, impacts to Carsondale would involve demolishing a detached garage and potentially filling-in a backyard pool from two contributing properties. Even with the adverse impacts to two contributing properties, the larger historic district would retain its historical significance. Option LS-11 would avoid the use of 0.1 acre of Carsondale. In consideration of Least Overall Harm Factor 1, Option LS-11 has a greater ability to mitigate for adverse impacts. However, because mitigation would significantly reduce the harm to Carsondale caused by the Proposed Action, in consideration of Least Overall Harm Factor 2, the Proposed Action and Option LS-11 would both result in minimal remaining harm.

In consideration of Least Overall Harm Factor 3, Option LS-11 would avoid the use of Carsondale and the use of additional Section 4(f) properties in the vicinity would not change. In consideration of Least Overall Harm Factor 4, OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-11 would maintain the same typical section as the Proposed Action and meet the Purpose and Need of the Study to a degree comparable to the Proposed Action. In consideration of Least Overall Harm factor 7, Option LS-11 would cost approximately $216 million, which is $1 million less than the Proposed Action.

00038822

00038823



Figure 5-38: Overview Map of Location Specific Option LS-11



00038824

**DRAFT SECTION 4(f) EVALUATION**



Figure 5-39: Detail of Location Specific Option LS-11 (Map 1 of 2)





**Figure 5-40: Detail of Location Specific Option LS-11 (Map 2 of 2)**



00038826

00038827



### 5.1.12 Location Specific Option 12 (LS-12)

**Section 4(f) Properties Avoided: Glenarden Historic District and Henry P. Johnson Park**

#### A.    Description

The Proposed Action would widen I-495 on alignment in the vicinity of Glenarden Historic District and Henry P. Johnson Park resulting in the Section 4(f) use of both properties (**Sections 2.1.35** and **2.1.36**). Option LS-12 would relocate I-495 approximately a half mile to the east to avoid impacts to Section 4(f) properties (**Figure 5-41** through **Figure 5-44**). A shift this far from the existing alignment is due to the size of Glenarden Historic District, which is situated on either side of I-495. Option LS-12 would result in impacts to one Section 4(f) property outside the Corridor Study Boundary: Ardmore Neighborhood Park.

#### B.    Analysis

In consideration of Least Overall Harm Factor 6, Option LS-12 would cause severe impacts to community resources, potentially resulting in the relocation of 166 properties, including Ardmore Elementary School. By comparison, the Proposed Action may cause one residential displacement along this portion of the project. In consideration of Least Overall Harm factor 7, Option LS-12 would cost approximately $1 billion, which is $400 million more than the Proposed Action along this portion of the project.

Option LS-12 would eliminate the 0.8 acre use of the two Section 4(f) properties listed in **Table 5-15** and result in 0.8 acres of impact to Ardmore Neighborhood Park. Under the Proposed Action, impacts to Glenarden Historic District would consist of demolishing outbuildings and grading the landscaped areas. Option LS-12 would result in impacts to basketball courts, a playground, and access to Ardmore Neighborhood Park. In consideration of Least Overall Harm Factor 1, Option LS-12 has a greater ability to mitigate for adverse impacts. However, because mitigation would significantly reduce the harm to Glenarden Historic District caused by the Proposed Action and given the nature of the potential impacts to Ardmore Neighborhood Park by Option LS-12, in consideration of Least Overall Harm Factor 2, Option LS-12 would cause more severe remaining harm than the Proposed Action.

**Table 5-15: Properties Avoided by Option LS-12**

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| Glenarden Historic District | 0.8 |
| Henry P. Johnson Park | <0.1 |
| **Total Section 4(f) Properties Avoided** | **0.8** |

In consideration of Least Overall Harm Factor 3, Glenarden Historic District is significant as a middle-class African American community in the DC suburbs. This property type is underrepresented on the NRHP. For this reason, Glenarden Historic District is the most significant Section 4(f) property along this portion of the project.

In consideration of Least Overall Harm Factor 4, OWJ have not provided views regarding least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-12 would maintain the same typical section as the Proposed Action. However, owing to the length of the Option LS-12 and substantial difference in cost, it would meet the Purpose and Need of the Study to a slightly lesser degree than the Proposed Action.

00038828

00038829



**Figure 5-41: Overview Map of Location Specific Option LS-12**



00038830

DRAFT SECTION 4(f) EVALUATION



**Figure 5-42: Detail of Location Specific Option LS-12 (Map 1 of 3)**



00038831



Figure 5-43: Detail of Location Specific Option LS-12 (Map 2 of 3)



00038832



Figure 5-44: Detail of Location Specific Option LS-12 (Map 3 of 3)





### 5.1.13  Location Specific Option 13 (LS-13)

**Section 4(f) Property Avoided: Suitland Parkway**

A.  **Description**

The Proposed Action would widen I-495 on existing alignment at this location. The improvements would involve replacing or widening the bridges that carry I-495 over Suitland Parkway and result in impacts of 0.3 acre to Suitland Parkway. This impact that may require transfer of lands out of federal ownership, as described in **Section 2.1.39**. Under 36 CFR 800.5(a)(2)(vii), the transfer of land out of federal ownership is identified as a Section 106 adverse effect. Not enough information is known about the design of the Proposed Action for MDOT SHA to determine a Section 106 effect finding for Suitland Parkway. On March 12, 2020 MHT concurred that no effect determination could be made and additional consultation is required. Under 23 CFR 774.17, Section 4(f) requires a Section 106 finding of no adverse effect or no historic properties affected to apply a *de minimis* impact. This analysis assumes Suitland Parkway would be adversely affected. Based on these assumptions, the evaluation of avoidance alternatives is required.

Option LS-13 would involve spanning Suitland Parkway to avoid a Section 4(f) use (**Figure 5-45** and **Figure** 5-46. Any structure that would span Suitland Parkway would need to be precast segmental or cast-in-place, post-tensioned and balanced cantilever. The main span of the structure would be approximately 575 feet in length over Suitland Parkway with 200-foot approach spans at either side for a total length of approximately 975 feet. The width of the structure would be approximately 100 feet with approximately 20-feet between the inner loop and outer loop structures.

B.  **Analysis**

In consideration of Least Overall Harm factor 7, implementing Option LS-13 would cost approximately $244 million, which is $125 million more than the Proposed Action along this portion of the project. In consideration of Least Overall Harm Factor 6, when compared to the Proposed Action, Option LS-13 would result in additional impacts to 0.6 acre of additional forest resources and 0.1 acre of wetlands. Despite avoiding the Section 4(f) use of Suitland Parkway, owing to the substantial difference in cost and additional impacts to resources not protected by Section 4(f), Option LS-13 would result in greater harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, because it avoids the use of Suitland Parkway when compared to the Proposed Action Option LS-13 would have greater ability to mitigate adverse impacts to Section 4(f) property. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-13 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) property for protection. In consideration of Least Overall Harm Factor 3, Option LS-13 would avoid the use of Suitland Parkway. There are no additional Section 4(f) properties in the vicinity.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-13 would meet the Purpose and Need to a degree that is comparable to the Proposed Action.

00038834

00038835